# EXHIBIT 4
## (ECF Nos. 68-59 through 68-68)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    x
                                                    :
NEXTERA ENERGY GLOBAL HOLDINGS              :
B.V. and NEXTERA ENERGY SPAIN               :
HOLDINGS B.V.,                              :
                                                    :
                          Petitioners,      :
                                                    :    Civil Action No. 19-cv-01618-TSC
             v.                             :
                                                    :
KINGDOM OF SPAIN                            :
                                                    :
                          Respondent        :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    x
```

## DECLARATION OF CESAR RIVIERE

Pursuant to 28 U.S.C. § 1746, I, CESAR RIVIERE, declare as follows:

1.      I am an attorney admitted to practice law in New York, and admitted *pro hac vice* in this Court. I am an associate at Skadden, Arps, Slate, Meagher & Flom, LLP, and I represent Petitioners NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. (collectively "NextEra") in this action.

2.      I respectfully submit this Declaration in support of Petitioners' Memorandum in Opposition to Respondent's Motion to Dismiss and in Support of Petitioners' Cross-Motion for Summary Judgment, and to place before the Court the following Exhibits attached hereto.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of the certified copy of the Decision on Annulment rendered on March 18, 2022 in ICSID Case No. ARB/14/11, entitled

*NextEra Energy Global Holdings B.V. & NextEra Energy Spain Holdings B.V. v. Kingdom of Spain.*

4.      Attached hereto as **Exhibit 2** is a true and correct copy of "Introducing ICSID," a publication of the International Center for Settlement of Investment Dispute, dated September 2021.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of the Kingdom of Spain's Submission in Support of the Continuation of the Stay of Enforcement of the Award, dated January 16, 2020 and submitted in the annulment proceedings in ICSID Case No. ARB/14/11, entitled *NextEra Energy Global Holdings B.V. & NextEra Energy Spain Holdings B.V. v. Kingdom of Spain.*

6.      Attached hereto as **Exhibit 4** is a true and correct copy of "Chapter 6: Nonarbitrability and International Arbitration Agreement" in Gary Born, International Commercial Arbitration (3rd ed. 2021) (Kluwer).

7.      Attached hereto as **Exhibit 5** is a true and correct copy of the Optional Protocol concerning the Compulsory Settlement of Disputes Done at Vienna on 24 April 1963, entered into force on 19 March 1967, 596 U.N. Treaty Series 487.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of Frédéric Simon, *EU asserts 'right to regulate' as part of energy charter treaty reform,* EURACTIV, July 19, 2019.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of Ana Mercedes López-Rodríguez, *The Sun Behind the Clouds? Enforcement of Renewable Energy Awards in the EU,* 8 TRANSNATIONAL ENV. L. 2 (2019).

10.     Attached hereto as **Exhibit 8** is a true and correct copy of the International Court of Justice's Summary of Judgement, Advisory Opinions and Order regarding Case Concerning the

2

Vienna Convention on Consular Relations (*Paraguay v. United States*), Provisional Measures, Order (ICJ April 9, 1998).

11.     Attached hereto as **Exhibit 9** is a true and correct copy of Procedural Order No. 1 issued by the arbitral tribunal on May 21, 2015 in ICSID Case No. ARB/14/11, entitled *NextEra Energy Global Holdings B.V. & NextEra Energy Spain Holdings B.V. v. Kingdom of Spain*.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed this 9th day of June 2022,
in New York, New York.


_____
Cesar Riviere

# EXHIBIT 1

**ICSID**

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

### NEXTERA ENERGY GLOBAL HOLDINGS B.V. AND NEXTERA ENERGY SPAIN HOLDINGS B.V.

**V.**

### KINGDOM OF SPAIN

### (ICSID CASE NO. ARB/14/11)

### ANNULMENT PROCEEDING

I hereby certify that the attached document is a true copy of the English version of the *ad hoc* Committee's Decision on Annulment dated 18 March 2022.

Martina Polasek
Acting Secretary-General

Washington, D.C., 18 March 2022

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

NextEra Energy Global Holdings B.V. and
NextEra Energy Spain Holdings B.V.

v.

Kingdom of Spain

**ICSID Case No. ARB/14/11**
**Annulment Proceeding**

---

# DECISION ON ANNULMENT

---

**Members of the *ad hoc* Committee**
Prof. Joongi Kim, President of the *ad hoc* Committee
Prof. Lawrence Boo, Member of the *ad hoc* Committee
Mr. Humberto Sáenz-Marinero, Member of the *ad hoc* Committee

**Secretary of the *ad hoc* Committee**
Ms. Natalí Sequeira

*Date of dispatch to the Parties:* 18 March 2022

**REPRESENTATION OF THE PARTIES**

*Representing NextEra Energy Global Holdings*
*B.V. and NextEra Energy Spain Holdings B.V.:*

*Representing the Kingdom of Spain:*

Ms. Karyl Nairn
Mr. David Herlihy
Mr. George Zimmerman
Ms. Teresa Queirós
Ms. Sophia Lekakis
Mr. Olivier Peeters
Ms. Carla Alves
Skadden, Arps, Slate, Meagher & Flom (UK) LLP
40 Bank Street
Canary Wharf
London, E14 5DS
United Kingdom

Ms. María del Socorro Garrido Moreno
Ms. Gabriela Cerdeiras Megías
Ms. Lorena Fatás Pérez
Ms. Ana Fernández-Daza Álvarez
Mr. Rafael Gil Nievas
Ms. Lourdes Martínez de Victoria Gómez
Ms. Amparo Monterrey Sánchez
Ms. Elena Oñoro Sainz
Mr. Francisco Javier Peñalver Hernández
Abogacía General del Estado
Departamento de Arbitrajes Internacionales
c/ Marqués de la Ensenada, 14-16, 2ª planta
28004, Madrid
Spain

i

TABLE OF CONTENTS

I.     INTRODUCTION AND PARTIES ............................................................ 1

II.    PROCEDURAL HISTORY .................................................................... 2

III.   REQUEST FOR RELIEF ..................................................................... 9

IV.    APPLICABLE LEGAL STANDARDS FOR ANNULMENT ...................................... 13

       A.    Manifest Excess of Powers (Art. 52(1)(b) of the ICSID Convention) ................. 15

             a.    Spain's Position ........................................................ 16

             b.    The NextEra Entities' Position ........................................ 17

             c.    The Committee's Analysis ............................................. 18

       B.    Serious Departure from a Fundamental Rule of Procedure (Art. 52(1)(d) of the
             ICSID Convention) ................................................................. 23

             a.    Spain's Position ........................................................ 24

             b.    The NextEra Entities' Position ........................................ 25

             c.    The Committee's Analysis ............................................. 27

       C.    Award's Failure to State Reasons (Art. 52(1)(e) of the ICSID Convention)........ 30

             a.    Spain's Position ........................................................ 31

             b.    The NextEra Entities' Position ........................................ 33

             c.    The Committee's Analysis ............................................. 36

V.     GROUNDS FOR ANNULMENT ............................................................. 39

       A.    Tribunal's Decision Concerning its Jurisdiction *ratione personae* ................. 39

       (1)   Manifest Excess of Powers and Failure to State Reasons to Exercise Jurisdiction:
             The NextEra Entities' Nationality and Status as Investor (Art. 52(1)(b) and
             Art. 52(1)(e)) (Annulment Grounds (a) and (b)) ................................. 39

             a.    Spain's Position ........................................................ 39

ii

       b.    The NextEra Entities' Position ................................................................... 41

       c.    The Committee's Analysis ........................................................................ 43

B.      Tribunal's Decision concerning its Jurisdiction *ratione materiae* ...................... 46

   (1)   Manifest Excess of Powers to Exercise Jurisdiction and Failure to State Reasons: Whether a Protected Investment and Direct Relationship Existed between the Parties (Art. 52(1)(b) and Art. 52(1)(e))(Annulment Grounds (a) and (b)).......... 46

       a.    Spain's Position ....................................................................................... 46

       b.    The NextEra Entities' Position ................................................................ 48

       c.    The Committee's Analysis ........................................................................ 49

C.      Tribunal's Decision concerning its Jurisdiction *ratione voluntatis* ..................... 52

   (1)   Manifest Excess of Powers to Exercise Jurisdiction and Failure to State Reasons: Denial of Benefits under Art. 17 of the ECT. (Art. 52(1)(b) and (e)) (Annulment Grounds (c) and (d)).............................................................................................. 52

       a.    Spain's Position ....................................................................................... 52

       b.    The NextEra Entities' Position ................................................................ 53

       c.    The Committee's Analysis ........................................................................ 54

D.      Spain's Allegations as to Manifest Excess of Powers .......................................... 57

   (1)   Manifest Excess of Powers by Upholding Jurisdiction despite Spain's Installed Capacity and "*Unclean Hands*" Objection (Art. 52(1)(b) (Annulment Ground (e)) 57

       a.    Spain's Position ....................................................................................... 57

       b.    The NextEra Entities' Position ................................................................ 58

       c.    The Committee's Analysis ........................................................................ 59

(2) Manifest Excess of Powers by Hearing a Dispute between an Investor of an EU Member State and an EU Member State – "*Intra-EU Objection*" (Art. 52(1)(b)) (Annulment Ground (g)) ...................................................................................... 63

    a.   Spain's Position ...................................................................................... 63

    b.   The NextEra Entities' Position ............................................................... 65

    c.   The Committee's Analysis ....................................................................... 66

(3) Manifest Excess of Powers by not Applying the Applicable International Rules, the ECT and EU Law to the Merits of the Case (Art. 52(1)(b)) (Annulment Ground (i)) 68

    a.   Spain's Position ...................................................................................... 68

    b.   The NextEra Entities' Position ............................................................... 69

    c.   The Committee's Analysis ....................................................................... 70

(4) Manifest Excess of Powers Regarding the Tribunal's Assessment of Legitimate Expectation Regarding the State Aid (Art. 52(1)(b)) (Annulment Ground (k)) ... 72

    a.   Spain's Position ...................................................................................... 72

    b.   The NextEra Entities' Position ............................................................... 74

    c.   The Committee's Analysis ....................................................................... 74

(5) Manifest Excess of Powers Regarding the Tribunal's Granting of Damages (Art. 52(1)(b)) (Annulment Ground (p)) ......................................................................... 76

    a.   Spain's Position ...................................................................................... 76

    b.   The NextEra Entities' Position ............................................................... 77

    c.   The Committee's Analysis ....................................................................... 77

E.   Spain's Allegations as to Failures to State Reasons ............................................. 80

(1) Failure to State Reasons Regarding the Installed Capacity Objection– "*Unclean Hands Objection*" (Art. 52(1)(e)) (Annulment Ground (f)).................................. 80

      a.    Spain's Position ................................................................... 80

      b.    The NextEra Entities' Position ............................................ 82

      c.    The Committee's Analysis ................................................... 83

(2)  Failure to State Reasons in Hearing a Dispute between an Investor of an EU Member State and an EU Member State – "*Intra-EU Objection*" (Art. 52(1)(b)) (Annulment Ground (h)) ................................................................... 86

      a.    Spain's Position ................................................................... 86

      b.    The NextEra Entities' Position ............................................ 87

      c.    The Committee's Analysis ................................................... 88

(3)  Failure to State Reasons for not Applying Applicable International Rules, the ECT and EU law (Art. 52(1)(e)) (Annulment Ground (j)) ........................................... 89

      a.    Spain's Position ................................................................... 89

      b.    The NextEra Entities' Position ............................................ 90

      c.    The Committee's Analysis ................................................... 91

(4)  Failure to State Reasons for its Conclusion on the Breach of Legitimate Expectations (Art. 52(1)(e)) (Annulment Ground (l)) ........................................ 95

      a.    Spain's Position ................................................................... 95

      b.    The NextEra Entities' Position ............................................ 97

      c.    The Committee's Analysis ................................................... 97

(5)  Failure to State Reasons Regarding the Date of Investment (Art. 52(1)(e)) (Annulment Ground (m)) ................................................................... 101

      a.    Spain's Position ................................................................. 101

      b.    The NextEra Entities' Position .......................................... 102

      c.    The Committee's Analysis ................................................. 103

(6)   Failure to State Reasons for its Conclusion on Liability (Art. 52(1)(e)) (Annulment Ground (n)) ................................................................................................ 104

     a.   Spain's Position ................................................................................ 104

     b.   The NextEra Entities' Position ....................................................... 105

     c.   The Committee's Analysis ............................................................... 106

(7)   Failure to State Reasons Regarding the Quantification of Damages (Art. 52(1)(e)) (Annulment Ground (o)) ................................................................. 107

     a.   Spain's Position ................................................................................ 107

     b.   The NextEra Entities' Position ....................................................... 108

     c.   The Committee's Analysis ............................................................... 109

(8)   Failure to State Reasons in Relation to the Evidentiary Activity and the Assessment of Evidence (Art. 52(1)(e)) (Annulment Ground (s)) ..................... 111

     a.   Spain's Position ................................................................................ 111

     b.   The NextEra Entities' Position ....................................................... 112

     c.   The Committee's Analysis ............................................................... 112

(9)   Failure to State Reasons when Admitting an Alleged Erroneous Translation (Art. 52(1)(e)) (Annulment Ground (v)) ......................................... 114

     a.   Spain's Position ................................................................................ 114

     b.   The NextEra Entities' Position ....................................................... 114

     c.   The Committee's Analysis ............................................................... 115

F.    Spain's Allegations as to Violations of Fundamental Rules of Procedure ......... 117

(1)   Serious Departure from a Fundamental Rule of Procedure Regarding Late Submissions (Art. 52(1)(d)) (Annulment Ground (q)) ...................................... 117

     a.   Spain's Position ................................................................................ 117

     b.   The NextEra Entities' Position ....................................................... 118

        c.     The Committee's Analysis ........................................................................ 120

(2)   Serious Departure from a Fundamental Rule of Procedure in Relation to the Evidentiary Activity and Assessment of Evidence (Art. 52(1)(d) (Annulment Ground (r)) ...................................................................................................... 120

        a.     Spain's Position ........................................................................................ 120

        b.     The NextEra Entities' Position ............................................................... 122

        c.     The Committee's Analysis ........................................................................ 123

(3)   Serious Departure from a Fundamental Rule of Procedure by Breaching the Principle of Congruence and Infringing the Right of Defense (Art. 52(1)(d)) (Annulment Ground (t)) ............................................................................................ 127

        a.     Spain's Position ........................................................................................ 127

        b.     The NextEra Entities' Position ............................................................... 128

        c.     The Committee's Analysis ........................................................................ 128

(4)   Serious Departure from a Fundamental Rule of Procedure by Admitting an Alleged Erroneous Translation (Art. 52(1)(d)) (Annulment Ground (u)) ........................ 131

        a.     Spain's Position ........................................................................................ 131

        b.     The NextEra Entities' Position ............................................................... 131

        c.     The Committee's Analysis ........................................................................ 132

G.     Waiver ..................................................................................................................... 133

(1)   Waiver of the Grounds for Annulment (ICSID Arbitration Rule 27) ................. 133

        a.     The NextEra Entities' Position ............................................................... 133

        b.     Spain's Position ........................................................................................ 135

        c.     The Committee's Analysis ........................................................................ 135

H.     Residual Discretion ............................................................................................... 136

(1) Residual Discretion of *ad hoc* Committees (Art. 52(3) of the ICSID Convention) 136

    a.   The NextEra Entities' Position ................................................................... 136

    b.   Spain's Position ......................................................................................... 137

    c.   The Committee's Analysis ........................................................................ 137

VI.    COSTS ............................................................................................................. 138

    A.   Spain's Cost Submissions ................................................................................ 138

    B.   The NextEra Entities' Cost Submissions ........................................................ 140

    C.   The Committee's Decision on Costs ................................................................ 143

VII.   DECISION ........................................................................................................ 147

TABLE OF SELECTED ABBREVIATIONS

| | |
|---|---|
| Application | Application for Annulment filed by the Kingdom of Spain on 26 September 2019 |
| Award | Award issued on 31 May 2019 |
| C-[#] | The NextEra Entities' Exhibit |
| CL-[#] | The NextEra Entities' Legal Authority |
| Committee | *ad hoc* Committee composed of Prof. Joongi Kim (President); Prof. Lawrence Boo; and Mr. Humberto Sáenz-Marinero, constituted on 16 December 2019 |
| Counter-Memorial | The NextEra Entities' Counter-Memorial on Annulment dated 9 July 2020 |
| Decision | The Tribunal's Decision on Jurisdiction, Liability and Quantum dated 12 March 2019 |
| ECT | Energy Charter Treaty |
| Hearing | Hearing on Annulment held on 19 & 21 December 2020 |
| ICSID Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| ICSID Convention | Convention on the Settlement of Investment Disputes between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| Memorial | Spain's Memorial on Annulment dated 16 April 2020 |
| R-[#] | Spain's Exhibit |
| Rejoinder | The NextEra Entities' Rejoinder on Annulment dated 19 November 2020 |

| RL-[#] | Spain's Legal Authority |
|---|---|
| Tr. Day [#] [Speaker(s)], [page:line] | Revised Transcript of the Hearing |
| Tribunal | Arbitral tribunal composed of Prof. Donald M. McRae (President); The Honorable Yves Fortier, P.C., C.C., O.Q., Q.C., and Prof. Laurence Boisson de Chazournes, constituted on 23 January 2015 |

## I.    INTRODUCTION AND PARTIES

1.    This annulment proceeding concerns an application for annulment (the "**Application**") of the award rendered on 31 May 2019 in the arbitration proceeding between NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. and the Kingdom of Spain (ICSID Case No. ARB/14/11) (the "**Award**") rendered by a Tribunal composed of Professor Donald M. McRae (President), the Honourable Yves Fortier, P.C., C.C., O.Q., Q.C., and Professor Laurence Boisson de Chazournes (the "**Tribunal**").

2.    The respondents on annulment are NextEra Energy Global Holdings B.V. ("**NextEra Global**"), and NextEra Energy Spain Holdings B.V. ("**NextEra Spain**"), both limited liability companies incorporated under the laws of the Netherlands (*besloten vennootschap met beperkte aansprakelijkheid*), (collectively, "**NextEra Entities**" or the "**Claimants**").[1]

3.    The applicant on annulment is the Kingdom of Spain ("**Spain**" or the "**Applicant**").

4.    The NextEra Entities and Spain are collectively referred to as the "**Parties**". The Parties' representatives and their addresses are listed above on page (i).

5.    The Award decided on a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Energy Charter Treaty (the "**ECT**"), which entered into force on 16 April 1998 for the Netherlands and Spain, and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**").

6.    The dispute in the original proceeding related to regulatory measures implemented by Spain modifying the economic regime for renewable energy investments in Spain.

7.    In the Decision on Jurisdiction, Liability and Quantum dated 12 March 2019 (the "**Decision**"), issued 80 days before the Award, the Tribunal found Spain liable for breach of the fair and equitable treatment standard in Art. 10(1) of the ECT.[2] The Tribunal

---

[1] While the Applicant uses the "*Florida Power & Light, Inc*", "*FPL*" and "*NextEra*" interchangeably in its submissions, for purposes of this decision, the Committee uses "*NextEra Entities*" or "*Claimants*" unless otherwise relevant.

[2] Decision on Jurisdiction, Liability and Quantum, 12 March 2019 ("Decision"), RL-132, ¶ 682.

stipulated that the Decision constituted an "*integral part of this Award and it is hereby incorporated as Annex A*".[3] The Tribunal found that "*on the basis of the assurances given to them by the Spanish authorities, in the broader context of the specific terms of Regulatory Framework I, registration in the Pre-assignment Registry and the Ministerial Resolutions of 28 December 2010, Claimants had a legitimate expectation that the regulatory regime in RD 661/2007 would not be changed in a way that would undermine the security and viability of their investment*".[4] The Tribunal further held that, the "*denial of legitimate expectations is based on the failure to provide that certainty and security by changing fundamentally the regime under which remuneration was to be calculated*".[5] The Tribunal did not rule on the other liability claims.[6]

8.   In its Award, the Tribunal reaffirmed the Decision and ordered Spain to pay the NextEra Entities damages assessed at EUR 290.6 million, together with pre-Award and post-Award interest and costs.[7]

9.   Spain applied for the annulment of the Award on the basis of Art. 52(1) of the ICSID Convention, identifying three grounds for annulment: (i) the Tribunal manifestly exceeded its powers (ICSID Convention, Art. 52(1)(b)); (ii) there was a serious departure from a fundamental rule of procedure (ICSID Convention, Art. 52(1)(d)); and (iii) the Award failed to state the reasons on which it was based (ICSID Convention, Art. 52(1)(e)).[8]

## II.   PROCEDURAL HISTORY

10.  On 26 September 2019, Spain submitted its Application on annulment of the Award. In the Application, Spain also requested (i) a provisional stay of enforcement of the Award in accordance with Art. 52(5) of the ICSID Convention and ICSID Arbitration Rule 54(2), which provide that the Secretary-General shall grant an automatic provisional stay until the

---

[3] Award, 31 May 2019 ("Award"), RL-130, ¶ 5.

[4] Decision, RL-132, ¶ 596.

[5] Decision, RL-132, ¶ 600.

[6] Decision, RL-132, ¶ 602.

[7] Award, RL-130, ¶ 37.

[8] Application for Annulment of the Award, 26 September 2019 ("Application"), ¶ 17.

*ad hoc* committee rules on such request; and (ii) the continuation of the stay of enforcement until the decision in this annulment proceeding is rendered by the *ad hoc* committee.

11.    On 2 October 2019, pursuant to ICSID Arbitration Rule 50(2), the acting Secretary-General of ICSID registered the Application. On the same date, in accordance with ICSID Arbitration Rule 54(2), the acting Secretary-General informed the Parties that the enforcement of the Award had been provisionally stayed.

12.    By letter dated 16 December 2019, in accordance with ICSID Arbitration Rules 6 and 53, the Parties were notified that an *ad hoc* committee composed of Professor Joongi Kim, a national of the Republic of Korea, Professor Lawrence Boo, a national of Singapore, and Mr. Humberto Sáenz-Marinero, a national of El Salvador, had been constituted following its members' appointment by the Chairman of the Administrative Council ("the **Committee**"). On the same date, the Parties were notified that Ms. Natalí Sequeira, Team Leader – Legal Counsel, ICSID, would serve as Secretary of the Committee.

13.    On 16 January 2020, Spain filed a request to continue the stay of enforcement of the Award.

14.    On 26 January 2020, the NextEra Entities filed an opposition to Spain's request to continue the stay of enforcement of the Award.

15.    On 30 January 2020, Spain filed a reply on the request to continue the stay of enforcement of the Award.

16.    On 5 February 2020, the NextEra Entities filed a rejoinder on the request to continue the stay of enforcement of the Award.

17.    In accordance with ICSID Arbitration Rules 53 and 13(1), the Committee held a First Session with the Parties on 11 February 2020 by teleconference. On the same date before the First Session, the Committee held a hearing in which the Parties' representatives explained their arguments in favor of and against the continuance of the stay of

enforcement. They further discussed and agreed to the applicable rules for the annulment proceeding.

18.     On 17 February 2020, the NextEra Entities submitted a letter that sought to clarify whether they could execute an undertaking to protect against attachment of any funds by third parties and to offer proof as to the corporate relationship between NextEra Global, NextEra Energy Canada Holdings B.V., and the nine wind farm projects in Canada identified in their opposition to Spain's request to continue the stay of enforcement of the Award.

19.     On 24 February 2020, the European Commission ("**EC**") submitted an application for leave to intervene as a non-disputing party pursuant to ICSID Arbitration Rule 37(2). The Centre transmitted the application to the Parties and the members of the Committee on 25 February 2020.

20.     On 27 February 2020, the Committee invited the Parties to submit any observations on EC's application.

21.     Following the first session, on 4 March 2020, the Committee issued Procedural Order No. 1 ("**PO1**") recording the agreement of the Parties on procedural matters and the Committee's decision on disputed issues. PO1 provided, *inter alia*, that the procedural languages would be English and Spanish, and that the place of proceeding would be Washington, D.C. PO1 also set out the agreed procedural calendar for the proceeding.

22.     On 6 March 2020, Spain submitted its comments to the EC's application, requesting that the Committee grant the request for intervention as a non-disputing party.

23.     On the same date, the NextEra Entities filed their comments to EC's application, requesting that the Committee reject the application.

24.     On 13 March 2020, Spain filed a request for leave to submit three types of new expert evidence into the annulment proceeding.

25.     On 15 March 2020, the Committee invited the NextEra Entities to respond to Spain's request.

26.     On 18 March 2020, the NextEra Entities filed observations on Spain's request, requesting the Committee to deny it in its entirety.

27.     On 2 April 2020, the Committee issued its Decision on the Request to Admit New Evidence, allowing Spain to submit "*one expert report or declaration by a university professor that addresses the relevant rules and principles of European Union* [("**EU**")] *Law for purposes of Art. 52(1)(b) and (e) of the ICSID Convention under the terms stipulated in Section 15.3 of Procedural Order No. 1*", and denying Spain's other requests to submit additional expert evidence.[9]

28.     On 3 April 2020, the Committee issued its Decision on the EC's Application to Intervene as a Non-Disputing Party, granting EC permission to present a written submission, "*addressing why the Arbitral Tribunal lacked jurisdiction based upon the conflict of EU Law and the ECT*".[10] The Committee denied the EC's "*participation in the ruling of the stay of enforcement*" and deferred its decision on whether to allow the EC to participate in the hearing.[11]

29.     On 6 April 2020, the Committee issued its Decision on the Stay of Enforcement of the Award, extending the stay of enforcement of the Award "*on a provisional basis*".[12]

30.     On 16 April 2020, Spain filed a Memorial on Annulment.

31.     On 23 April 2020, the EC filed a written submission pursuant to ICSID Arbitration Rule 37(2).

32.     On 25 May 2020, the NextEra Entities filed their observations on the EC's written submission.

---

[9] Decision on the Request to Admit New Evidence, 2 April 2020, ¶ 19.

[10] Decision on the European Commission's Application to Intervene as a Non-Disputing Party, 3 April 2020, ¶ 51(a).

[11] Decision on the European Commission's Application to Intervene as a Non-Disputing Party, 3 April 2020, ¶¶ 51(b), (e).

[12] Decision on the Stay of Enforcement of the Award, 6 April 2020, ¶ 102.

33.    On 28 May 2020, pursuant to ICSID Arbitration Rule 54(3), the Committee issued a Decision Terminating the Stay of Enforcement of the Award as of the date of the notification.

34.    On 9 July 2020, the NextEra Entities filed a Counter-Memorial on Annulment.

35.    On 17 September 2020, Spain filed a Reply on Annulment.

36.    On 19 November 2020, the NextEra Entities filed a Rejoinder on Annulment.

37.    On 15 December 2020, Spain filed a request for leave to submit a communication the *Abogacía del Estado* received from the Public Prosecutor's Office and Art. 262 of the Criminal Procedural Law as new evidence into the annulment proceeding.

38.    On the same date, the Committee invited the NextEra Entities to submit any comments on Spain's request.

39.    On 16 December 2020, the NextEra Entities filed comments on Spain's request, requesting the Committee to deny it in its entirety.

40.    On 17 December 2020, the Committee issued its Decision on the Request to Admit New Evidence, rejecting Spain's request to introduce new evidence into the record.

41.    On 17 December 2020, the Committee issued Procedural Order No. 2 concerning the organization of the hearing.

42.    On 19 and 21 December 2020, the Committee held a hearing by video conference (the "**Hearing**"). The following persons were present at the Hearing[13]:

   *Committee*:

   Joongi Kim                              President of the Committee
   Lawrence Boo                            Member of the Committee
   Humberto Sáenz-Marinero                 Member of the Committee

---

[13] Both Parties presented expert reports but neither side sought to cross-examine the other side's experts.

**ICSID Secretariat:**

Natalí Sequeira                              Secretary of the Committee


**Representing the NextEra Entities:**

Karyl Nairn                                  Skadden, Arps, Slate, Meagher & Flom
                                             (UK) LLP
David Herlihy                                Skadden, Arps, Slate, Meagher & Flom
                                             (UK) LLP
Sophia Lekakis                               Skadden, Arps, Slate, Meagher & Flom
                                             (UK) LLP
Olivier Peeters                              Skadden, Arps, Slate, Meagher & Flom
                                             (UK) LLP
Carla Alves                                  Skadden, Arps, Slate, Meagher & Flom
                                             (UK) LLP
Aaron Shorr                                  Skadden, Arps, Slate, Meagher & Flom
                                             (UK) LLP


Michiel van Schijndel                        Director, NextEra Energy Global
                                             Holdings BV and NextEra Energy Spain
                                             Holdings BV
Susanne ten Berge                            Director, NextEra Energy Global
                                             Holdings BV and NextEra Energy Spain
                                             Holdings BV
Mitchell S. Ross                             General Counsel, NextEra Energy
                                             Resources, LLC

**For the Kingdom of Spain:**

Rafael Gil Nievas                            *Abogacía General del Estado*
Elena Oñoro Sainz                            *Abogacía General del Estado*
Socorro Garrido Moreno                       *Abogacía General del Estado*
Lourdes Martínez de Victoria Gómez           *Abogacía General del Estado*
Gabriela Cerdeiras Megias                    *Abogacía General del Estado*
Ana Fernández-Daza Alvarez                   *Abogacía General del Estado*
Lorena Fatás Pérez                           *Abogacía General del Estado*
José Manuel Gutiérrez Delgado                *Abogacía General del Estado*
Juan Quesada Navarro                         *Abogacía General del Estado*
Gloria de la Guardia Limeres                 *Abogacía General del Estado*

7

**Court Reporters:**

| | |
|---|---|
| Trevor McGowan | Caerus Reporting Ltd<br>[English Court Reporter] |
| Dante Rinaldi | DR – Esteno<br>[Spanish Court Reporter] |
| Marta Rinaldi | DR – Esteno<br>[Spanish Court Reporter] |
| Rodolfo Rinaldi | DR – Esteno<br>[Spanish Court Reporter] |
| Regina Spector | DR – Esteno<br>[Spanish Court Reporter] |
| Eliana Da Silva | DR – Esteno<br>[Spanish Court Reporter] |

**Interpreters:**

| | |
|---|---|
| Jesus Getan Bornn | Interpretation Services |
| Anna Sophia Chapman | Interpretation Services |
| Amalia Thaler de Klemm | Interpretation Services |

43. The Parties filed their submissions on costs on 25 February 2021.

44. On 10 September 2021, Spain filed a request to introduce into the record the Court of Justice of the European Union (**"CJEU"**) Judgment dated 2 September 2021 issued in the Case C-741/19, *Republic of Moldova v. Komstroy*, which was rendered in a request for a preliminary ruling made by the Paris Court of Appeal to the CJEU concerning the interpretation of certain provisions of the Energy Charter Treaty and the concept of "*investment*" under the same.

45. Following the Committee's invitation, on 14 September 2021, the NextEra Entities submitted their response to Spain's application opposing the introduction of the CJEU Judgment into the record.

46. On 17 September 2021, the Committee granted Spain's request to submit the CJEU Judgment as a new legal authority. The Committee further granted leave for the Parties to submit their observations on the CJEU Judgment, together with "*an elaboration of how the Judgment is related to the nature and purpose of the annulment proceeding given the annulment committee's mandate under the ICSID Convention*". On 24 September 2021,

8

Spain submitted its comments on the new legal authority introduced per the Committee's decision.

47.   On 1 October 2021, the NextEra Entities presented their observations on the newly introduced legal authority.

48.   The proceeding was closed on 1 December 2021.

49.   On 3 December 2021, Spain filed a request to reopen the proceeding to introduce two new documents into the record.

50.   On 4 December 2021, the Committee invited the NextEra Entities to submit their comments on Spain's request.

51.   The NextEra Entities filed their observations on 7 December 2021.

52.   On 21 December 2021, the Committee issued its Decision on Spain's Request on Reopening the Proceeding rejecting Spain's request.

53.   Pursuant to ICSID Arbitration Rules 28(2) and 53, on 21 December 2021, the Committee invited the Parties to submit their final statements on costs. On 7 January 2022, the Claimants submitted their updated statement on costs. After receiving an extension, the Applicant submitted its updated statement on costs on 25 January 2022.

## III.   REQUEST FOR RELIEF

54.   Spain requests the Committee to:

(i) annul the Award in its entirety or, alternatively, annul it in part on the basis of the following grounds and arguments:

(a) in accordance with Art. 52(1)(b) of the ICSID Convention, the Tribunal manifestly exceeded its powers for any or all of the following reasons: (i) the NextEra Entities did not have investor status; (ii) the NextEra Entities did not make

an investment; or (iii) there was no direct relationship between the investor and Spain;

(b) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons why the Tribunal considered that the NextEra Entities had an investment and were investors;

(c) in accordance with Art. 52(1)(b) of the ICSID Convention, the Tribunal manifestly exceeded its powers when Spain availed itself of the power provided for in Art. 17 of the ECT and the Tribunal rejected it by inventing requirements for the exercise of that power not provided for in the ECT;

(d) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons why it did not accept the denial of benefits ground provided for in Art. 17 of the ECT and imposed requirements for such refusal not set out in Art. 17;

(e) under Art. 52(1)(b) of the ICSID Convention, the Tribunal manifestly exceeded its powers by conferring international protection on those who did not turn to the Tribunal with clean hands and being against *jus cogens* and the principle that international arbitration cannot shelter or protect fraudulent actions;

(f) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons why it considered that the Tribunal had jurisdiction to hear an arbitration initiated by the NextEra Entities in order to obtain protection for investments made without clean hands;

(g) under Art. 52(1)(b) of the ICSID Convention, the Tribunal manifestly exceeded its powers when it heard a dispute between an alleged investor of an EU Member State and an EU Member State;

(h) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons why it considered that the Tribunal had jurisdiction to hear a dispute between an alleged investor of an EU Member State and an EU Member State;

(i) under Art. 52(1)(b) of the ICSID Convention, the Tribunal manifestly exceeded its powers by dispensing with the application of applicable international rules, including the ECT itself and totally dismissing the application of all EU law;

(j) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons why it disregarded the application of applicable international standards, including the ECT itself and why it totally disregarded the application of all EU law;

(k) under Art. 52(1)(b) of the ICSID Convention, the Tribunal manifestly exceeded its powers by making a manifestly incorrect application of applicable law to be taken into account in assessing legitimate expectations;

(l) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons for how there may be legitimate expectations of petrification of subsidies contrary to EU law and other applicable legislation;

(m) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons in determining which date should be taken into account as the date of the investment and, without deciding on the date of the investment, resolving on the alleged legitimate expectations;

(n) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons with regard to liability;

(o) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons with regard to damages;

(p) under Art. 52(1)(b) of the ICSID Convention, the Tribunal manifestly exceeded its powers by granting damages contrary to its own conclusions on quantum;

(q) under Art. 52(1)(d)  of the ICSID Convention, there was a serious departure from a fundamental rule of procedure to the extent that the Tribunal allowed the NextEra Entities to submit documents, expert reports, memorials and witness

11

statements outside the deadlines set by the Tribunal, breaking the balance of the Parties in the process;[14]

(r) under Art. 52(1)(d) of the ICSID Convention, there was a serious departure from a fundamental rule of procedure to the extent that the Tribunal committed multiple procedural breaches in relation to the evidentiary activity and the assessment of evidence developed in the Arbitration;

(s) under Art. 52(1)(e) of the ICSID Convention, the Award repeatedly failed to state the reasons in relation to the evidentiary activity and the assessment of evidence developed in the Arbitration;

(t) under Art. 52(1)(d) of the ICSID Convention, there was a serious departure from a fundamental rule of procedure insofar as the Tribunal, in breach of the principle of congruence, infringed the right of defence of the Spain by condemning on grounds different from those expressed by the NextEra Entities in their memorials;[15]

(u) under Art. 52(1)(d) of the ICSID Convention, there was a serious departure from a fundamental rule of procedure to the extent that the Tribunal relied on a false document to make its decision; and

(v) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons in so far as Spain denounced and demonstrated the falsehood of a key document in the proceedings and the Tribunal completely failed to resolve or even comment on this point.

(ii) reject all requests made by the NextEra Entities;

(iii) order the NextEra Entities to pay all the costs of the proceedings, including the fees and expenses of the Spain's legal service, together with interest at an appropriate rate; and

---

[14] Spain withdrew its application based on this ground at the hearing, *see* Revised Tr. Day 2 (Gil Nievas), 6:16–7:1.

[15] Memorial of Reply on Annulment, 17 September 2020 ("Reply"), ¶ 391; the Applicant also uses the expression "*writing of Claim*" in its Memorial. Memorial on Annulment, 16 April 2020 ("Memorial"), ¶ 457(t).

(iv) annul the Award if the facts described by Spain constitute a ground for annulment according to Art. 52(1) of the ICSID Convention, other than those grounds alleged by Spain.[16]

55.    The NextEra Entities request the Committee issue a final decision:

(i) declaring that Spain has not established any ground for annulling the Award, in whole or in part; or

(ii) in the alternative, declaring that any ground for potential annulment established by Spain shall not result in annulment of the Award, exercising the Committee's discretion under Art. 52(3) of the ICSID Convention;

(iii) denying Spain's Application;

(iv) ordering Spain to bear the entire costs of this annulment proceeding, including the fees and expenses of the Members of the Committee and all associated costs including the ICSID fees and translators' fees; and

(v) ordering Spain to reimburse the NextEra Entities for their full legal costs and expenses incurred in the defence of these annulment proceedings (including expert fees), together with interest to run from the date of the Committee's Decision on Annulment until the date of payment by Spain, at the same rate of interest ordered by the Tribunal in its Award.[17]

## IV.    APPLICABLE LEGAL STANDARDS FOR ANNULMENT

56.    As an initial matter, the Committee extends its appreciation to the Parties and their representatives for their consummate professionalism and extensive written and oral submissions. The Committee has carefully considered all of the Parties' arguments even if

---

[16] Memorial, ¶¶ 457–459; Reply, ¶¶ 674–676.

[17] Claimants' Counter-Memorial on Annulment, 9 July 2020 ("Counter-Memorial"), ¶ 468; Claimants' Rejoinder on Annulment, 19 November 2020 ("Rejoinder"), ¶ 454(c).

not referred to expressly, or not set out in full in this Decision and they are subsumed in the Tribunal's analysis.

57. The Committee first provides its analysis on the applicable legal standards for annulment. The Committee observes that the ICSID Convention and the ICSID Arbitration Rules provide the legal standards that apply in an annulment proceeding and are the source of the Committee's mandate.

58. Art. 52(1) of the ICSID Convention provides that a party may seek annulment on one or more of the following grounds:

(a) that the Tribunal was not properly constituted;

(b) that the Tribunal has manifestly exceeded its powers;

(c) that there was corruption on the part of a member of the Tribunal;

(d) that there has been a serious departure from a fundamental rule of procedure; or

(e) that the award has failed to state the reasons on which it is based.

59. The Committee confirms that the five grounds under Art. 52(1) are the exclusive grounds for annulment.

60. Art. 52(3) of the ICSID Convention adds that an *ad hoc* committee "*shall have the authority to annul the award or any part thereof on any of the grounds set forth in paragraph (1)*".[18]

61. Art. 53(1) of the ICSID Convention confirms that an annulment should not amount to an appeal by providing that an "*award shall be binding on the parties and shall not be subject to any appeal*". A fundamental goal of the ICSID system is to assure the finality of an ICSID arbitration award.[19]

---

[18] Art. 52(3) is reviewed in Section V.H, *infra*.

[19] Updated Background Paper on Annulment for the Administrative Council of ICSID, prepared by the ICSID Secretariat, May 5, 2016 ("Updated Background Paper"), p. 31, ¶ 71.

62.     As an initial matter, the Committee observes that the Vienna Convention on the Law of Treaties ("**Vienna Convention**")[20] as such is not applicable to the ICSID Convention, which predates it. Nevertheless, its provisions on treaty interpretation are widely regarded as declaratory of customary international law. Both Parties extensively cite the Vienna Convention in their memorials and the Netherlands and Spain are both contracting parties to the Vienna Convention. The Committee considers it appropriate to be guided by the General Rule of Interpretation in Art. 31 of the Vienna Convention such that interpretation of relevant provisions of the ICSID Convention should be conducted "*in good faith and in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose*".[21]

63.     The Parties have referred to prior *ad hoc* committee decisions for the various criteria to be considered when deciding an annulment. The Committee confirms that prior decisions of other *ad hoc* committees are non-binding, and notes, as prior *ad hoc* committees have, that no *jurisprudence constante* can be discerned regarding annulment. The Committee concludes that, subject to the specific facts of the relevant case, due consideration should be given to earlier cases where these are indicative of a certain line of jurisprudential consistency. The Committee's decision ultimately remains one based on its own opinion given the particular circumstances of the case at hand.

## A.     MANIFEST EXCESS OF POWERS (ART. 52(1)(b) OF THE ICSID CONVENTION)

64.     Art. 52(1)(b) of the ICSID Convention provides that a committee may annul an award if "*the Tribunal has manifestly exceeded its powers*".

---

[20] RL-23/CL-7; Memorial, ¶¶ 94, 106, 107, 111, 143; Reply, ¶¶ 71, 122, 144, 210, 217, 547; Counter Memorial, ¶¶ 147, 160, 238; Rejoinder, ¶¶ 113, 174.
[21] RL-23, Art. 31(1).

### a.    Spain's Position

65.    As Spain points out, regarding Art. 52(1)(b), committees have "*on some occasions, made a very uniform and undisputed interpretation of the standard"* but *"on other occasions there are certain nuances among the arbitral precedents*".[22]

66.    Spain indicates that in Spanish, the Dictionary of the Royal Spanish Academy of the Spanish Language cited by Spain provides that the first meaning of "*manifiesta*" is "*descubierta*" or "*discovered*". [23] In English, the Oxford dictionary provides that "*manifest*" means "*easy to see or understand*".[24] In French, the Larousse dictionary cited by Spain provides that "*manifeste*" means "*dont la nature, la réalité, l'authenticité s'imposent avec évidence*" or "*whose nature, reality or authenticity are evident*".[25] Spain suggests that manifest should be interpreted to mean that "*if an overshoot of powers is discovered*" or "*becomes evident*".[26]

67.    Spain cites the ICSID Background Paper on Annulment and the History of the ICSID Convention to assert that a manifest excess of powers may exist, *inter alia*, when a tribunal does not "*apply the appropriate law (including ius cogens) or when the Tribunal exceeds its jurisdiction or has no jurisdiction or the Tribunal decides on matters not raised by the Parties*".[27] Spain considers mistaken or wrong application of the law could be annullable. Spain relies on *Soufraki v. The United Arab Emirates* and *Occidental Petroleum v. Ecuador* and other *ad hoc* committees' observations for the view that "[i]*n exceptional*

---

[22] Reply, ¶ 49.

[23] https://dle.rae.es/manifiesto?m=form, Reply, ¶ 73, fn 47.

[24] https://www.oxfordlearnersdictionaries.com/definition/english/manifest_2; Reply, ¶ 74, fn 48.

[25] https://www.larousse.fr/dictionnaires/francais/manifeste/49162?q=manifeste#49069; Reply, ¶ 75, fn 49.

[26] Reply, ¶¶ 73 & 74.

[27] Memorial, ¶ 57, citing the Updated Background Paper on Annulment, RL-134, ¶ 87 and History of the ICSID Convention: documents concerning the origin and the formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of other States, volumes II-1 and II-2 (ICSID 2006) ("History of ICSID Convention"), RL-192, p. 851.

*circumstances…a <u>gross or egregious error of law</u> could be construed to amount to a failure to apply the proper law*" and could be grounds for annulment.[28] (emphasis added).

68.  Spain also cites *Pey Casado v. Chile I,* which concluded that a manifest excess of power could exist "*as long as it is sufficiently clear and serious*" even though a Tribunal engaged in "*extensive argumentation and analysis*".[29]

### b.  The NextEra Entities' Position

69.  The NextEra Entities assert that Art. 52(1)(b) sets a demanding threshold. The Claimants submit that a "*manifest*" excess of jurisdiction must be "*obvious, i.e., not discerned through elaborate arguments by each side*".[30] The NextEra Entities note that in Spanish, the Dictionary of the Royal Spanish Academy of the Spanish Language cited by Spain provides that "*manifiesta*" has the meaning of not only "*descubierta*" or "*discovered*" but also "*patente*" or "*patent*", or "*clara*" or "*clear*".[31] In French, the NextEra Entities cite the French Academy's Dictionary that provides the meaning of "*manifeste*" as "*dont l'existence, la réalité est évidente, incontestable; flagrant, patent*" or "*whose existence [and] reality is evident, incontestable; flagrant, patent*".[32]

70.  The Claimants point out that an *ad hoc* committee is not empowered to verify whether a tribunal's jurisdictional analysis was "*correct*", but only whether it was "*tenable*". Where other ICSID tribunals have reached the same jurisdictional finding, where "*reasonable minds*" disagree as to jurisdiction, or where there can be more than one possible interpretation of a dispute provision, for instance, the "*manifest*" requirement cannot be fulfilled.[33]

---

[28] Memorial, ¶¶ 58 & 59; Reply, ¶¶ 62 & 66; *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment, 2 November 2015 ("*Occidental Petroleum v. Ecuador*"), RL-179, ¶ 56 .
[29] Memorial, ¶ 58; Reply, ¶ 66.
[30] Counter-Memorial, ¶ 87.
[31] Rejoinder, ¶ 53.
[32] Rejoinder, ¶ 54.
[33] Counter-Memorial, ¶ 87.

71.     The NextEra Entities argue that an error related to the applicable law does not amount to a
        manifest excess of powers.[34] They assert only a failure to choose the proper law applicable
        to the merits would be annullable. They also cite *Occidental Petroleum v. Ecuador* for the
        view that even then "*annulment…is only permitted if the tribunal totally disregarded
        applicable law or grounded its award on a law other than the applicable law*".[35] They
        stress that the few committees that annulled based on a failure to apply the applicable law
        have been "*widely criticised as unfortunate examples of committees straying past their
        limited mandate*".[36]

### c.      *The Committee's Analysis*

72.     The Committee observes that for annulment to occur under Art. 52(1)(b) a tribunal must
        have "*exceeded its powers*" in a "*manifest*" manner.  An application under Art. 52(1)(b)
        must therefore demonstrate both an "*excess of powers*" and that such excess was
        "*manifest*".[37]

73.     The Committee notes that a key consideration under Art. 52(1)(b) is what constitutes a
        "*manifest*" excess of powers. The Spanish version of the ICSID Convention uses the term
        "*manifiestamente*" and the French version, the term "*manifeste*". All three terms are
        equally authoritative and appear to derive from the same word.

74.     In Spanish, the *Diccionario de la Lengua Española de la Real Academia Española*
        (Dictionary of the of the Spanish Language of the Royal Spanish Academy) cited by both
        Parties provides that "*manifiestamente*" means "*de una manera manifiesta*".[38] In turn,
        "*manifiesta*" means not only "*descubierta*" ("*discovered*"), but also "*patente*" ("*patent*"),
        or "*clara*" ("*clear*").[39] In French, the Larousse dictionary cited by Spain provides that

---

[34] Counter-Memorial, ¶ 91.

[35] *Occidental Petroleum v. Ecuador*, RL-179, ¶ 309.

[36] Counter-Memorial, ¶ 94.

[37] The *prima facie* approach has been adopted by some committees where "*a summary examination is undertaken in
order to ascertain if any alleged excess of powers was so egregious as to be manifest*", *AES Summit Generation
Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Decision on Annulment, 29
June 2012, RL-071, ¶ 32.

[38] See https://dle.rae.es/manifiestamente?m=form.

[39] See https://dle.rae.es/manifiesto?m=form; Memorial, ¶ 73, fn 47.

"*manifeste*" means "*dont la nature, la réalité, l'authenticité s'imposent avec évidence*" or "*whose nature, reality or authenticity are evident*".[40] Whereas the French Academy's Dictionary, as cited by the NextEra Entities, provides the meaning of "*manifeste*" as "*dont l'existence, la réalité est évidente, incontestable; flagrant, patent*" or "*whose existence* [and] *reality is evident, incontestable; flagrant, patent*". In English, the Oxford dictionary cited by both Parties provides that "*manifest*" means "*easy to see or understand*".[41] The NextEra Entities also referred to the dictionary meaning "*clearly apparent, obvious*" as cited by the *Dugan v. Turkmenistan* committee.[42]

75. The Committee finds that the ordinary meaning as described in the dictionary of "*manifest*", "*manifiesta*" and "*manifeste*" is virtually identical in all three languages and the meaning of "*patent*", "*clear*", "*evident*", "*clearly apparent*", "*obvious*", "*flagrant*" are practically interchangeable. Spain's suggestion that "*manifest*" should be interpreted to mean "*become evident*" or "*is discovered*" as though "*manifest*" means one must engage in some additional process to "*become evident*" or "*be discovered*" are not persuasive and deviate from the plain meaning of the term as described in the various dictionaries.

76. The Committee concludes that based on the ordinary meaning of the term "*manifest*", the excess of power must reach the level of being "*patent*", "*clear*", "*evident*" and "*easy to see or understand*". The Committee decides that its analysis should focus on the "*ease with which* [the excess of power] *is perceived*" such that it must be "*discerned with little effort and without deeper analysis*".[43] Thus, instead of the "*gravity*" or "*seriousness*" of the excess of powers, the focus should be on "*the cognitive process that makes it apparent*".[44]

77. Numerous other *ad hoc* committees have broadly reached the same conclusion regarding the meaning of the term "*manifest*". *Soufraki v. The United Arab Emirates* proclaimed that

---

[40] Reply, ¶ 75, fn 49.

[41] Reply, ¶ 74, fn 48; see also https://www.oxfordlearnersdictionaries.com/definition/english/manifest_2.

[42] Rejoinder, ¶ 51, citing *Adem Dogan v. Turkmenistan*, ICSID Case No. ARB/09/9, Decision on Annulment, 15 January 2016, CL-306, ¶ 103, fn 181. (The American Heritage Dictionary of English Language, 5th ed. (2015) defines "*manifest*" as "*clearly apparent to the sight or understanding; obvious*" (available at https://www.ahdictionary.com/word/search.html?q=manifest)).

[43] C.H. Schreuer, *et al.*, *The ICSID Convention: A Commentary* (Cambridge University Press, 2nd ed., excerpts) ("Schreuer"), RL-210/RL-257/CL-279, Art. 52, ¶ 135; Updated Background Paper, RL-134, ¶ 83.

[44] Schreuer, RL-210, Art. 52, ¶ 135.

"'*manifest*' *is a strong and emphatic term referring to <u>obviousness</u>*" and should be "*textually obvious and substantively serious*".[45] (emphasis added). *CDC v. Seychelles* described that "*the excess must be <u>plain on its face</u>*" (emphasis added) and *Rumeli v. Kazakhstan* similarly held it must be "*evident on the face of the award*".[46] The *Wena Hotels v. Egypt* committee stated "*manifest*" must be "<u>*self-evident* rather than the product of *elaborate interpretation one way or the other*</u>".[47] (emphasis added).

78.    Hence, the term "*manifest*" establishes a high threshold that an applicant must meet.

79.    The ordinary meaning of "*manifest*" must be interpreted in its context, and in light of the object and purpose of the ICSID Convention. Art. 52 establishes the exclusive grounds for annulment and Art. 53 stipulates the finality and binding nature of an award. The drafting history also confirms that "*manifest*" was added to address concerns that "*annulment posed a risk of frustrating awards and therefore the annulment provision should be made more restrictive*".[48]

80.    The Committee agrees with past *ad hoc* committees that if any apparent excess in the exercise of the tribunal's powers is "*susceptible of argument 'one way or the other*'"[49] (*CDC v. Seychelles*), or if "*reasonable minds differ as to whether or not the tribunal issued a correct decision*" (*Standard Chartered v. Tanzania Electric*), then the manifest requirement would not be satisfied.[50] Put it differently, as *TECO v. Guatemala* explained,

---

[45] *Hussein Nuaman Soufraki v. The United Arab Emirates*, ICSID Case No. ARB/02/07, Decision of the *ad hoc* Committee on the Application for Annulment, 5 June 2007 ("*Soufraki v. The United Arab Emirates*"), RL-107, ¶¶ 39, 40.

[46] *CDC Group plc v. Republic of the Seychelles*, ICSID Case No. ARB/02/14, Decision of the *ad hoc* Committee on the Application for Annulment of the Republic of Seychelles, 29 June 2005 ("*CDC v. Seychelles*"), RL-208, ¶ 41; *Rumeli, Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Decision of the *ad hoc* Committee on Annulment, 25 March 2010 ("*Rumeli v. Kazakhstan*"), CL-241, ¶ 96.

[47] *Wena Hotels Ltd. v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, 5 February 2002, 41 Int'l Legal Materials 934 (2002) ("*Wena Hotels v. Egypt*"), RL-140, at ¶ 25.

[48] Updated Background Paper, RL-134, ¶ 14.

[49] *CDC v. Seychelles*, RL-208, ¶ 41.

[50] *Standard Chartered Bank (Hong Kong) Limited v. Tanzania Electric Supply Company Limited (TANESCO)*, ICSID Case No. ARB/10/20, Decision on the Application for Annulment, 22 August 2018 ("*Standard Chartered v. Tanzania Electric*"), CL-244, ¶ 183. See also *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Decision on the Application for Annulment of the Argentine Republic, 1 September 2009 ("*Azurix v. Argentina*"), RL-176, ¶¶ 68 & 69.

"*an annulment committee is not empowered to verify whether a tribunal's jurisdictional analysis or a tribunal's application of the law was correct, but only whether it was tenable as a matter of law*".[51] The Committee agrees that its role is not to determine whether a tribunal's analysis was correct, but only whether it was "*tenable*". If its decision was tenable, a tribunal could not have committed an excess of powers that is "*patent*", "*clear*", "*evident*" or "*easy to see or understand*".

81.     A manifest excess of powers based on a tribunal's treaty interpretation will be generally difficult to establish. The Committee agrees with the *Lucchetti v. Peru* committee that treaty interpretation by its nature is "*not an exact science, and it is frequently the case that there is more than one possible interpretation of a disputed provision*".[52] If other ICSID committees reached a similar finding or interpretation on the same issue, this will demonstrate that an issue was "*susceptible of argument 'one way or the other'*". One interpretation of a treaty among many possible ones will not qualify as a manifest excess of powers. As *Alapli v. Turkey* held, "[t]*he Applicant would need to prove that its interpretation is a monolithic and firmly settled principle of law that is 'not subject to debate'*".[53]

82.     The ICSID Annulment Background Paper confirms that the focus of the excess of powers provision pertains to a tribunal's powers to decide on its jurisdiction and to the applicable law.[54] It will include, for example, the failure to exercise jurisdiction or a failure to apply the law agreed to by the parties.[55] As found by the committee in *Impregilo v. Argentina*, "[f]*ailure to apply the law is part of the concept of manifest excess of powers and for the reasons set out above, should be self-evident, clear, obvious, flagrant and substantially*

---

[51] *TECO Guatemala Holdings LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment, 5 April 2016 ("*TECO v. Guatemala*"), RL-207, ¶ 78.

[52] *Industria Nacional de Alimentos, S.A. (previously Empresas Lucchetti, S.A.) and Indalsa Perú, S.A. (previously Lucchetti Perú, S.A.) v. The Republic of Peru*, ICSID Case No. ARB/03/4, Decision on Annulment, 5 September 2007, CL-274, ¶ 112.

[53] *Alapli Elektrik B.C. v. Republic of Turkey*, ICSID Case No. ARB/08/13, Decision on Annulment, 10 July 2014 ("*Alapli v. Turkey*"), CL-273, ¶ 82.

[54] Updated Background Paper, RL-134, ¶ 81.

[55] Schreuer, RL-210, Art. 52, ¶¶ 167–171; 191–270.

*serious*".[56]  The Committee also agrees with Schreuer that annulment for non-application of the applicable law would be possible where a tribunal has failed to apply the proper law *in toto*.[57]

83.     The Parties hold different positions on whether an error in the application of the law or a misapplication of the law qualifies as a manifest excess of powers. Both Parties cite *Occidental Petroleum v. Ecuador* in support of their respective positions. Spain believes a gross and egregious error may be annullable grounds whereas the NextEra Entities disagree. The Committee observes that the "*fine line between failure to apply the proper law and erroneous application of the law*" is difficult to discern.[58] An alleged misapplication could easily overstep the line to become an appeal instead of an annulment. The drafting history of the ICSID Convention confirms that an "*erroneous application of the law could not amount to an annullable error, even if it is manifest*".[59] The drafting Legal Committee of the ICSID Convention confirmed that even a "*manifestly incorrect application of the law*" was not a ground for annulment.[60] The Committee finds that unlike a non-application or disregarding of the law, a mere misapplication or incorrect application of the law would not meet the high threshold of a manifest excess of powers.[61]

84.     The Committee finds that for a misapplication of the law to become annullable it would require meeting an "*extraordinarily high standard*".[62] The Committee agrees with the *Alapli v. Turkey* committee that it would require a "*'gross and egregious' misapplication*

---

[56] *Impregilo S.p.A. v. Argentine Republic*, ICSID Case No. ARB/07/17, Decision of the *ad hoc* Committee on the Application for Annulment, 24 January 2014 ("*Impregilo v. Argentina*"), RL-205, ¶ 132. *See also Helnan International Hotels A/S v. Arab Republic of Egypt*, ICSID Case No. ARB/05/19, Decision of the *ad hoc* Committee, 14 June 2010, RL-191, ¶ 41; *Víctor Pey Casado and Foundation "Presidente Allende" v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Application for Annulment of the Republic of Chile, 18 December 2012 ("*Pey Casado v. Chile I*"), RL-182, ¶ 66.

[57] Schreuer, CL-279, Art. 52, ¶ 226.

[58] Updated Background Paper, RL-134, ¶ 93.

[59] Updated Background Paper, RL-134, ¶ 90. *See also Maritime International Nominees Establishment (MINE) v. Government of Guinea,* ICSID Case No. ARB/84/4, Decision on the Application by Guinea for Partial Annulment of the Arbitral Award, 14 December 1989, ICSID Review 96 ("*MINE v. Guinea*"), RL-178, at ¶¶ 5.08–5.09.

[60] Updated Background Paper, RL-134, ¶ 72.

[61] History of ICSID Convention, RL-192, Vol II, Part 1, p. 518; Schreuer, RL-210, ¶ 195.

[62] *Alapli v. Turkey*, CL-273, ¶ 82.

*of law*" reaching the level of "*non-application of the proper law*".[63] An applicant would have to show that the tribunal's legal analysis was "*so untenable or implausible that the error is evident on the face of the award*".[64]   As *Occidental Petroleum v. Ecuador* similarly provided, "[o]*nly exceptionally gross or egregious errors of law, acknowledged as such by any reasonable person, could be construed to amount to a failure to apply the proper law, and could give rise to the possibility of annulment*".[65] Furthermore, as suggested by *Soufraki v. The United Arab Emirates,* the "*gross and consequential misinterpretation or misapplication of the proper law*" must be such that "*no reasonable person ('bon père de famille') could accept*" it.[66] The Committee concludes that a misapplication of the law could only be annullable if it was so "*gross and egregious*" that "*no reasonable person could accept it*" and amounted to a non-application of the law.

85.    Overall, as long as a tribunal's decision and its reasoning reflected in the Award is tenable, it would not be a "*patent*", "*clear*", "*evident*", "*obvious*", "*flagrant*" or "*easy to see or understand*" excess of powers, and a tribunal could not have manifestly exceeded its powers to justify annulment of an award.[67]

## B.    SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE (ART. 52(1)(d) OF THE ICSID CONVENTION)

86.    Art. 52(1)(d) of the ICSID Convention provides that a committee may annul an award if "*there has been a serious departure from a fundamental rule of procedure*".

---

[63] *Alapli v. Turkey*, CL-273, ¶ 82.

[64] *Alapli v. Turkey*, CL-273, ¶ 82. *Soufraki v. The United Arab Emirates* similarly provided that "[m]*isinterpretation or misapplication of the proper law may, in particular cases, be so gross or egregious as substantially to amount to failure to apply the proper law*", *Soufraki v. The United Arab Emirates*, RL-107, ¶ 86.

[65] *Occidental Petroleum v. Ecuador*, RL-179, ¶ 309.

[66] *Soufraki v. The United Arab Emirates*, RL-107, ¶ 86.

[67] *Helnan International Hotels A/S v. Arab Republic of Egypt, ICSID Case No. ARB/05/19*, Decision of the ad hoc Committee, 14 June 2010, RL-191, ¶ 55, also citing *Klöckner Industrie-Anlagen GmbH and others v. United Republic of Cameroon and Société Camerounaise des Engrais S.A.*, ICSID Case No. ARB/81/2, Decision on the Application for Annulment Submitted by Klöckner Against the Arbitral Award, 3 May 1985 ("*Klöckner v. Cameroon*"), RL-194, ¶ 52. See also *Rumeli v. Kazakhstan*, CL-241, ¶ 96, also citing *Klöckner v. Cameroon*, ¶ 115.

##### a.    Spain's Position

87.    According to Spain, a departure is serious if a party is "*deprived of the protection afforded by the relevant procedural rule*".[68] A procedural rule is fundamental if it refers to the "*essential impartiality that must govern all proceedings and is included within the minimum standards of 'due process' required by international law*".[69] Spain focuses its claim on the right to be heard, equality of arms, treatment of evidence, and the rules on the burden of proof.[70]

88.    Spain contends the right to be heard can be violated when a party cannot submit "*all the arguments and all the evidence it* [deems] *relevant*",[71] "*does not have the opportunity to respond adequately to the arguments and evidence submitted by the other party*",[72] or a request for the submission of documents is unjustifiably refused.[73]

89.    Spain agrees with *Fraport v. Philippines* that "[i]*t is* [not an] *answer to a failure to accord such a right that both parties were equally disadvantaged*".[74] Spain also claims that the infringement of a simple procedural rule such as admitting a document as evidence or accepting false evidence can constitute a "*serious*" offence.[75] Spain cites *Teco v. Guatemala* for the position that a "*serious breach of a fundamental rule of procedure cannot be justified in light of a tribunal's discretion*".[76]

---

[68] Memorial, ¶ 373.

[69] Memorial, ¶ 373.

[70] Reply, ¶¶ 367–370.

[71] Memorial, ¶ 377, quoting *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Decision on Annulment, 30 December 2015 ("*Tulip v. Turkey*"), RL-181, ¶ 80.

[72] Memorial, ¶ 378.

[73] Memorial, ¶ 382.

[74] Reply, ¶ 373, citing *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, Decision on the Application for Annulment of Fraport AG Frankfurt Airport Services Worldwide, 23 December 2010, RL-177, ¶ 202.

[75] Reply, ¶ 376.

[76] Reply, ¶ 381, quoting *Teco v. Guatemala*, RL-207, ¶ 196.

90.     In terms of the equality of arms, Spain argues that the Tribunal refused Spain's right to present the evidence it considered necessary for the defense of its case and on an equal footing with the other party.[77]

91.     As to the effect of a departure on the outcome, in its Memorial, Spain states that an applicant has "*no obligation to prove that the result of the Arbitration would have been different…but only the seriousness of the breach*".[78] At the Hearing, Spain repeated this position.[79] In its Reply, however, Spain recalibrates its position and states that an applicant would have to show "*the clear possibility that…there would have been a difference in some relevant aspect of the dispute*".[80] (emphasis added). Spain then cites with approval *Teco v. Guatemala*'s position, and similarly *Tulip v. Turkey*'s, that it would be enough to show "*whether the tribunal's compliance with a rule of procedure could potentially have affected the award*".[81] (emphasis added).

### b.      The NextEra Entities' Position

92.     The NextEra Entities claim that "*Spain has waived the majority of its procedural complaints, if not all of them, pursuant to ICSID Arbitration Rule 27*".[82]

93.     The NextEra Entities argue that the legal threshold to establish a serious violation of a fundamental rule of procedure is far higher than what Spain asserts. They claim that "[o]*nly rules of natural justice, which concern the essential fairness of the proceedings, can be considered fundamental*".[83] They cite the Background Paper's summary that "*it excludes the Tribunal's failure to observe ordinary arbitration rules*".[84]

---

[77] Reply, ¶ 370.

[78] Memorial, ¶ 387, citing *Pey Casado v. Chile I*, RL-182, ¶ 78.

[79] Tr. Day 1 (Gil Nievas), 43:21-44:2.

[80] Reply, ¶ 378.

[81] Reply, ¶ 379, quoting *Teco v. Guatemala*, RL-207, ¶ 85. *See also* Memorial, ¶ 399, citing *Tulip v. Turkey*, RL-181, ¶ 78.

[82] Counter-Memorial, ¶ 363.

[83] Counter-Memorial, ¶ 374.

[84] Counter-Memorial, ¶ 375, quoting the Updated Background Paper, RL-134, ¶ 98.

94.     They contend that an application must (1) identify a fundamental rule of procedure; (b) show that the Tribunal departed from that fundamental rule; and (c) demonstrate that the departure was serious.[85]

95.     They contend that Spain confuses the meaning of the right to be heard with how the Tribunal decided on its arguments after hearing them.[86] The Claimants claim that *Fraport v. Philippines*, *Amco v. Indonesia II*, *Pey Casado v. Chile I* and *Teco v. Guatemala*, the four examples of annulment on this ground, had "*readily distinguishable*" violations of procedure.[87]

96.     They cite *Churchill Mining v. Indonesia* to stress that "*the right to be heard is commonly considered as not absolute, but rather subject to possible limitations, provided that they are reasonable and proportional to the aim to be achieved*".[88] They also argue that Spain denies effect to the adjective "*serious*".[89]

97.     The NextEra Entities argue that for a departure to be "*serious*" it must have either "*caused the tribunal to reach a <u>result substantially different</u> from what it would have awarded had such a rule been observed*"(*Wena Hotels v. Egypt*) or "*a <u>material effect</u> on the outcome of the award*".[90] (emphasis in original). They also cite the *MINE v. Guinea* standard that the term "*serious*" "*establishes both quantitative and qualitative criteria: the departure must be substantial and be such as to deprive a party of the benefit or protection which the rule was intended to provide*".[91] They disagree with Spain's view that a "*potential impact*" would suffice and submit that an actual impact is necessary.

---

[85] Counter-Memorial, ¶ 371.

[86] Counter-Memorial, ¶ 364.

[87] Rejoinder, ¶ 81.

[88] Rejoinder, ¶ 80(b), quoting *Churchill Mining PLC and Planet Mining Pty Ltd v. Republic of Indonesia*, ICSID Case No. ARB/12/14 and 12/40, Decision on Annulment, 18 March 2019 ("*Churchill Mining v. Indonesia*"), CL-287, ¶ 178.

[89] Counter-Memorial, ¶ 378.

[90] Rejoinder, ¶ 82, quoting *Wena Hotels v. Egypt*, RL-140, at ¶ 58.

[91] Counter Memorial, ¶ 379.

### c.     The Committee's Analysis

98.    Art. 52(1)(d) provides for annulment if "*there has been a serious departure from a fundamental rule of procedure*". To meet this ground, an applicant must establish that a "*rule of procedure*" that was "*fundamental*" existed, and that a "*departure from*" it, occurred in a "*serious*" manner. The Committee observes that the ICSID Convention does not stipulate what rules of procedure are "*fundamental*", what is a "*departure*", and what constitutes a "*serious*" departure. The Committee finds that the meaning of "*fundamental*", "*departure*", and "*serious*" should be interpreted in accordance with their ordinary meaning, in their context, and in light of the object and purpose of the ICSID Convention.

99.    In terms of what constitutes a "*fundamental*" rule of procedure, the Committee agrees with the conclusions reached by *Fraport v. Philippines* that it should be "*restricted to the principles of natural justice, including the principles that both parties must be heard and that there must be adequate opportunity for rebuttal*".[92] Only rules of natural justice or rules concerned with the "*essential fairness of the proceeding*"[93] (*CDC v. Seychelles*) or "*essential to the integrity and fairness of the arbitral process*"[94] (*Occidental Petroleum v. Ecuador*), for example, would qualify. As *Wena Hotels v. Egypt* provided, a fundamental rule of procedure refers to a "*set of minimal standards of procedure to be respected as a matter of international law*".[95] The ICSID Convention's drafting history also provides that this ground concerns principles of due process that are necessary to ensure a full and fair hearing "*but that it excludes the Tribunal's failure to observe ordinary arbitration rules*".[96]

---

[92] *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, Decision on the Application for Annulment of Fraport AG Frankfurt Airport Services Worldwide, 23 December 2010, RL-177, ¶ 186. *See also MINE v. Guinea,* RL-178, at ¶ 5.06.

[93] *CDC v. Seychelles,* RL-208, ¶ 49. *See also Teco v. Guatemala,* RL-207, ¶ 86; *Total S.A. v. Argentine Republic*, ICSID Case No ARB/04/1, Decision on Annulment, 1 February 2016, RL-211, ¶ 313.

[94] *Occidental Petroleum v. Ecuador*, RL-179, ¶ 62.

[95] Memorial, ¶¶ 374–5; Updated Background Paper, RL-134, ¶ 98; *Wena v. Egypt*, RL-140, at ¶ 57; *Iberdrola Energía, S.A. v. Republic of Guatemala*, ICSID Case No. ARB/09/5, Decision on the Remedy for Annulment of the Award Submitted by Iberdrola Energía, S.A., 13 January 2015, RL-180, ¶ 105; *Total S.A. v. Argentine Republic*, ICSID Case No ARB/04/1, Decision on Annulment, 1 February 2016, RL-211, ¶ 51; CL-302, *Orascom TMT Investments S.à r.l. v. People's Democratic Republic of Algeria*, ICSID Case No. ARB/12/35, Decision on Annulment, 17 September 2020, ¶ 140.

[96] Updated Background Paper, RL-134, ¶ 98.

100.    The Committee notes that Spain contends that the fundamental rules of procedure in dispute consist of the right to be heard, equality of arms, and the rules on the burden of proof.[97] The Claimants do not challenge that these are fundamental rules of procedure but stress that "[o]*nly rules of natural justice, which concern the essential fairness of the proceedings, can be considered fundamental*".[98]

101.    Most of Spain's claims under this ground focus on the right to be heard. Spain takes a broader view of the scope of the right to be heard and argues for the view taken by *Tulip v. Turkey* that a party should be able to submit "*all the arguments and all the evidence it* [deems] *relevant*".[99] The Claimants assert the view of *Churchill Mining v. Indonesia* that the "*the right to be heard is commonly considered as not absolute, but rather subject to possible limitations, provided that they are reasonable and proportional to the aim to be achieved*".[100]

102.    The Committee finds that Art. 52(1)(b) only applies to a "*serious departure*" of a fundamental rule of procedure that is essential to the fairness and integrity of the proceeding. Given that only a serious departure of the right to be heard would qualify, the Committee concludes that the right should be limited by a standard of reasonableness. The Committee agrees with *Churchill Mining v. Indonesia* that the right to be heard could be subject to "*reasonable and proportional*" limitations provided that the fairness and integrity of the proceeding were maintained.

103.    Furthermore, the Committee finds that in accordance with its ordinary meaning, in its context, and in light of the object and purpose of the ICSID Convention, a serious departure from a fundamental rule of procedure would not be meaningful unless it is interpreted to have a material impact on the outcome. Committees have diverged on how seriously affected an applicant must be. Some committees believe an applicant must demonstrate

---

[97] Memorial, ¶¶ 374–5. Spain mentions other rules of procedure such as the absence or abuse of deliberation by the arbitrators; the violation of the rules of legal standing only in passing, *see* Memorial, ¶ 385.

[98] Counter-Memorial, ¶ 374.

[99] Memorial, ¶ 377, quoting *Tulip v. Turkey*, RL-181, ¶ 80.

[100] Counter-Memorial, ¶ 377, quoting *Churchill Mining v. Indonesia*, CL-287, ¶ 178.

that the final decision of the tribunal would have been different but for the breach, whereas others consider a potential impact would suffice.[101]

104.    The NextEra Entities adopt the former view. They argue that, for a departure to be "*serious*", it must have either "*caused the tribunal to reach a result substantially different from what it would have awarded had the rule been observed*" or "*a material effect on the outcome of the award*".[102] They cite *Wena Hotels v. Egypt* for the view that "*the violation of such a rule must have caused the Tribunal to reach a result substantially different from what it would have awarded had such a rule been observed*".[103] They also cite *MINE v. Guinea* that held that the term "*serious*" "*establishes both quantitative and qualitative criteria: the departure must be substantial and be such as to deprive a party of the benefit or protection which the rule was intended to provide*".[104]

105.    Other committees such as *Pey Casado v. Chile I* and *Tulip v. Turkey* have adopted Spain's position in its Reply, and focused on whether the final decision could have been different but for the breach.[105] *Pey Casado v. Chile I*, for example, held that "*a distinct possibility (a 'chance') that it may have made a difference on a critical issue*" would be sufficient. *Tulip v. Turkey* held that "*the potential of causing the tribunal to render an award substantially different from what it actually decided*" was all that needed to be shown.[106] Notably, some committees have gone further and followed Spain's original position in its Memorial that a breach alone was sufficient for an award to be annulled. This view suggests that the effect on the outcome need not be shown as long as the breach was serious enough. The Committee concurs with the Claimants that Spain's reference in its Memorial to *Tulip*

---

[101] *Wena Hotels v. Egypt*, RL-140, at ¶ 58; *CDC v. Seychelles*, RL-208, ¶ 49; *Azurix v. Argentina*, RL-176, ¶ 234; *Enron Creditors Recovery Corp. Ponderosa Assets, L.P. v. The Argentine Republic*, Decision on the Application for Annulment of the Argentine Republic, ICSID Case No. ARB/01/3, 30 July 2010 ("*Enron v. Argentina*"), RL-197, ¶ 71; *Impregilo v. Argentina*, RL-205, ¶ 164; *Total S.A. v. Argentine Republic*, ICSID Case No ARB/04/01, Decision on Annulment, 1 February 2016, RL-211, ¶ 308; *Occidental Petroleum v. Ecuador*, RL-179, ¶ 62; *OI European Group B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/25, Decision on the Application for Annulment of the Bolivarian Republic of Venezuela, 6 December 2018, CL-240, ¶ 248.

[102] Rejoinder, ¶ 82.

[103] *Wena Hotels v. Egypt*, RL-140, at ¶ 58.

[104] *MINE v. Guinea*, RL-178, at ¶ 5.05.

[105] *Pey Casado v. Chile I*, RL-182, ¶ 78, 269; *CEAC Holdings Limited v. Montenegro*, ICSID Case No. ARB/14/8, Decision on Annulment, 1 May 2018 ("*CEAC v. Montenegro*"), CL-284, ¶ 93; *Tulip v. Turkey*, RL-181, ¶ 78.

[106] *Pey Casado v. Chile I*, RL-182, ¶ 77; *Tulip v. Turkey*, RL-181, ¶ 78.

> *v. Turkey* and *Pey Casado v. Chile I* as support for this view is inapposite but does find *Churchill Mining v. Indonesia* serves as an example for this view.[107]

106.   The Committee agrees with Spain's position in its Reply and the committees that have held that it is sufficient to demonstrate that the departure had the potential of causing a material impact on the outcome of the award. Requiring an applicant to establish that a departure would have had a material impact on the outcome would constitute an unreasonable burden. A committee does not have to go so far as to determine whether the award would have been substantially different. At the same time, having an applicant only establish a breach of the standard without any potential impact would undermine the purpose of the annulment proceeding.

107.   Finally, in terms of ICSID Arbitration Rule 27, the Committee notes that the Parties agree that, for an applicant to be entitled to seek annulment based on a serious departure of a fundamental rule of procedure, the applicant must object in a timely manner at the time the procedural violation occurred.[108] Failure to make a timely objection would preclude annulment based on these grounds.[109]

## C.   AWARD'S FAILURE TO STATE REASONS (ART. 52(1)(e) OF THE ICSID CONVENTION)

108.   Art. 52(1)(e) provides that an award may be annulled if it "*fail*[s] *to state the reasons on which it is based*". This provision should be considered within the context of Art. 48(3) which requires that "*the award shall deal with every question submitted to the Tribunal, and shall state the reasons upon which it is based*".

---

[107] *Churchill Mining v. Indonesia*, CL-287, ¶ 180.

[108] Reply, ¶¶18(a), 18(b); Rejoinder, ¶ 84.

[109] *Joseph C. Lemire v. Ukraine,* ICSID Case No. ARB/06/18, Decision on Ukraine's Application for Annulment of the Award, 8 July 2013, CL-275, ¶ 272.

Case 1:19-cv-01618-TSC    Document 86-50    Filed 05/09/22    Page 48 of 352

### a.    Spain's Position

109.    Spain submits that committees have "*uniformly established*" that Arts. 48(3) and 52(1)(e) require "*at least, that the award allow the reader to 'follow how the tribunal proceeded from Point A. to Point B*'".[110]

110.    Spain cites *TECO v. Guatemala* for support that an award should be annulled if a tribunal "*ignored the existence in the record of evidence which at least appeared to be relevant to its analysis*".[111]

111.    Spain recites examples of what would qualify as a failure to state reasons. First, Spain submits that "*a failure to deal with 'every question submitted to the Tribunal'*" would qualify.[112] (emphasis added). Spain contends that an award must "*address all issues submitted to the Tribunal by the parties and state the reasons on which it is based (Article 48) so that, if those reasons are not stated, the award must be annulled under Article 52(1)(e)*"[113] (emphasis added). At the same time, Spain acknowledges that "*all arguments and evidences may not be addressed in an Award*".[114] It agrees with *MINE v. Guinea* that "*the lack of response to each of the arguments presented by the parties was not constitutive of the cause of annulment*".[115] Yet, Spain submits that when a tribunal "*fails to rule on relevant issues raised by the parties*" this constitutes a failure to state reasons.[116]

112.    Second, in terms of the "*adequacy of the reasons*", Spain submits the reasons must be "*comprehensive and consistent*",[117] "*sufficiently relevant*" (*Klöckner v. Cameroon*)[118], or

---

[110] Application, ¶ 79; Memorial, ¶ 179, quoting *MINE v. Guinea*, RL-178, at ¶ 5.09, and other committees; Reply, ¶ 494.

[111] Memorial, ¶ 188, quoting *Teco v. Guatemala*, RL-207, ¶ 138.

[112] Reply, ¶ 484, quoting *Klöckner v. Cameroon*, RL-194, ¶ 115.

[113] Reply, ¶ 127.

[114] Reply, ¶ 115.

[115] Reply, ¶ 495, citing *MINE v. Guinea,* RL-178, at ¶¶ 5.08, 5.09.

[116] Reply, ¶ 509, citing *Pey Casado v. Chile I*, RL-182, but the actual text is "*pivotal or outcome-determinative point*", *see* ¶ 86.

[117] Memorial, ¶ 180.

[118] Reply, ¶ 485, quoting *Klöckner v. Cameroon*, RL-194, ¶ 120.

"*sufficiently pertinent*" (*Amco v. Indonesia I*).[119] An award must "*detail the reasoning which enabled the Tribunal to reach that particular conclusion*".[120] Spain explains that an award would fail to state reasons if the reasons are "*insufficient or inadequate*" (*Soufraki v. The United Arab Emirates*)[121] or "*so inadequate that the coherence of the reasoning is seriously affected*" (*Mitchell v. The Democratic Republic of Congo*)[122].

113.    Third, the reasons must not be "*frivolous*" or "*contradictory*".[123] Spain submits that reasoning that is "*inconsistent or contradictory*"[124] or "*seriously contradictory*" (*Mitchell v. The Democratic Republic of Congo*)[125] would be annullable. It cites *MINE v. Guinea* and *Amco v. Indonesia I* as examples of annulment because the tribunal "*contradicted itself*".[126]

114.    Finally, Spain argues that if a tribunal "*does not treat a specific question referred to it*" or "*fails to cover certain relevant proof or evidence*" for its determination it would justify annulment.[127]

115.    Spain stresses the finding in *Klöckner v. Cameroon* that "*it is not for the Committee to imagine what might or should have been the arbitrators' reasons, any more than it should substitute 'correct' reasons for possibly 'incorrect' reasons, or deal 'ex post facto' with questions submitted to the Tribunal which the Award left unanswered*".[128]

116.    Spain also cites *MINE v. Guinea* regarding the "*relevance*" of the questions that did not have reasons and suggests that it was necessary that the answer to those questions "*might*

---

[119] Reply, ¶ 490, quoting *Amco Asia Corporation, et al. v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision of the *ad hoc* Committee on the Application for Annulment, 16 May 1986, 1 ICSID Reports 509, RL-196, at ¶ 43.

[120] Reply, ¶ 509, citing *MINE v. Guinea*, RL-178, and *Teco v. Guatemala*, RL-207.

[121] Memorial, ¶ 182, quoting *Soufraki v. The United Arab Emirates*, RL-107, ¶¶ 122–123.

[122] Reply, ¶ 509, citing *Mr. Patrick Mitchell v. The Democratic Republic of Congo*, ICSID Case No. ARB/99/7, Decision on the Application for Annulment of the Award, 1 November 2006 ("*Mitchell v. The Democratic Republic of Congo")*, RL-206, ¶ 21.

[123] Memorial, ¶ 183.

[124] Memorial, ¶ 183.

[125] Reply, ¶ 497, citing *Mitchell v. The Democratic Republic of Congo*, RL-206, ¶ 21.

[126] Memorial, ¶¶ 183–184.

[127] Memorial, ¶ 187, quoting, Updated Background Paper, RL-134, ¶ 104. The actual wording is "*failure to address a particular question submitted to it*" and "*failure to address certain evidence relevant to the determination of damages*".

[128] Reply, ¶ 488.

32

*have affected the Tribunal's conclusion*".[129] At the same time, Spain cites *Pey Casado v. Chile I* which suggests that reasons must be provided for "*a pivotal or outcome-determinative point*".[130]

### b.    The NextEra Entities' Position

117.    As provided in response to Annulment Ground (e) in Section V.D(1), *infra,* the Claimants submit that under ICSID Arbitration Rule 27 the Applicant waived its objections on these grounds.[131] The NextEra Entities argue that Spain has waived its right to seek annulment because it became aware of the issue when it received the Tribunal's Decision but failed to object within the 80 days since the Award was rendered. Spain's waiver is compounded because it did not request a supplementary decision on, or rectification of, the Award.[132]

118.    The NextEra Entities emphasize the high threshold that must be met for annulment for failure to state reasons.[133] First, Art. 52(1)(e) only requires a tribunal to address the questions that are "*essential*" or "*necessary*" to its award.[134] A tribunal does not have to deal with every question or argument submitted to it.[135] The Claimants criticize the Applicant's failure to address the difference between Art. 48(3) and Art. 52(1)(e) and how "*failure to deal with every question submitted to a Tribunal*" is not a basis for annulment.[136] Citing *MINE v. Guinea*, the Claimants argue that the sole exception is where the question is so "*essential*" the failure to deal with it would "*render[ ] the award 'unintelligible'*".[137] The Claimants claim that Spain misquoted *Sempra v. Argentina* for the view that

---

[129] Reply, ¶ 495, quoting *MINE v. Guinea,* RL-178, at ¶ 6.99.

[130] Reply, ¶ 502, quoting *Pey Casado v. Chile I*, RL-182, ¶ 86.

[131] Counter-Memorial, ¶ 79.

[132] Counter-Memorial, ¶ 174.

[133] Rejoinder, ¶ 61.

[134] Counter-Memorial, ¶¶ 175–176, quoting *Ioan Micula and Ors. v. Romania,* ICSID Case No. ARB/05/20, Decision on Annulment, 26 February 2016*,* CL-188, ¶ 139, and *Joseph C. Lemire v. Ukraine,* ICSID Case No. ARB/06/18, Decision on Ukraine's Application for Annulment of the Award, 8 July 2013, CL-275, ¶ 279 (citing *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, ICSID Review 90 ("*Vivendi v. Argentina I*"), CL-276.

[135] Counter-Memorial, ¶¶ 182–185.

[136] Rejoinder, ¶¶ 70–71.

[137] Counter-Memorial, ¶ 189, citing *MINE v. Guinea,* RL-178, at ¶ 5.13.

"*comprehensive*" reasoning is needed because the actual wording is that awards should be "*reasonably comprehensible and consistent*".[138]

119.  Along similar lines, the Claimants submit a tribunal is not required to address every piece of evidence. Citing *Tza Yap Shum v. Peru,* they argue that a tribunal does not have to "*explain* […] *itself in respect of each piece of evidence adduced by either party which is not outcome determinative*".[139] The Claimants submit that "*even for issues that are outcome-determinative*", a tribunal does not have to "*traverse every single argument or piece of evidence*".[140]

120.  Second, Art. 52(1)(e) does not permit a review of the merits of a tribunal's decision. As provided by *Tidewater v. Venezuela,* a committee "*must not re-argue the merits of the case*".[141]

121.  Third, Art. 52(1)(e) does not involve an inquiry into the sufficiency or adequacy of a tribunal's reasons but only the existence of reasons.[142] The Claimants submit that "[a]*nnulment committees have widely rejected the claim that Art. 52(1)(e) allows an inquiry into the adequacy or sufficiency of a tribunal's reasons*".[143] The Claimants disagree with Spain and claim Spain mis-cites *Mitchell v. The Democratic Republic of Congo*, which endorsed the *MINE v. Guinea* test when it stated "*the adequacy of the reasoning is not an appropriate standard of review*".[144]

122.  Fourth, tribunals are given considerable discretion as to how they provide their reasons, both expressly and implicitly, and they may do so succinctly.[145] As summarized by the

---

[138] Counter-Memorial, ¶ 181(a); *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, Decision on the Argentine Republic's Request for Annulment of the Award, 29 June 2010", RL-133, ¶ 167.

[139] Counter-Memorial, ¶ 192, quoting *Mr. Tza Yap Shum v. Republic of Peru*, ICSID Case No. ARB/07/6, Decision on Annulment, 12 February 2015, RL-195, ¶ 110 (emphasis added by the Claimants); and citing with approval *Teco v. Guatemala,* RL-207, ¶ 125.

[140] Rejoinder, ¶ 77.

[141] Counter-Memorial, ¶ 194, quoting *Tidewater Investment SRL and Tidewater Caribe, C.A. v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/10/5, Decision on Annulment, 27 December 2016, RL-141, ¶ 171.

[142] Counter-Memorial, ¶¶ 196–201.

[143] Rejoinder, ¶ 67.

[144] Rejoinder, ¶ 67, quoting *Mitchell v. The Democratic Republic of Congo*, RL-206, ¶ 21.

[145] Counter-Memorial, ¶¶ 203–206, quoting *Wena Hotels v. Egypt*, RL-140, at ¶ 81.

*Wena Hotels v. Egypt* committee: "[t]*he Tribunal's reasons may be implicit in the considerations and conclusions contained in the award, provided they can be reasonably be inferred from the terms used in the decision*".[146] They also point out that a committee may "*explain or clarify*" a tribunal's reasons.[147] Contrary to Spain's assertions, the NextEra Entities argue that Spain's own authorities provide that tribunals: (i) can state their reasons without reference to the underlying factual or legal bases of such reasons; and (ii) are not required to document reasons with elaborate citations to decisions and exhibits.[148] The Claimants highlight that tribunals are given even greater discretion as to their statement of reasons on quantum.

123.    Fifth, Art. 52(1)(e) sets a high threshold for proving contradictory reasons and awards are presumed not to contain them.[149] They cite *Daimler v. Argentina* for the position that a committee should, "*to the extent possible and considering each case, prefer an interpretation which confirms an award's consistency as opposed to its alleged inner contradictions*".[150] They also cite *Standard Chartered v. Tanzania Electric* for the view that contradictory reasons must "*completely cancel each other out, leaving the Award with a total absence of reasons*".[151]

124.    The Claimants also invoke *Gambrinus v. Venezuela* to point out that a "*Tribunal cannot be faulted in not addressing* [an issue] *when it was not raised specifically as an issue or argued in extensor [sic] by the Applicant before the Tribunal*".[152] The Claimants raise this point due to the "*extensive new merits and jurisdictional arguments contained in Spain's Reply on Annulment and the Reply Report of Professor Gosalbo*".[153]

---

[146] Counter-Memorial, ¶ 207.

[147] Counter-Memorial, ¶ 208.

[148] Counter-Memorial, ¶ 209.

[149] Counter-Memorial, ¶¶ 212–215.

[150] Counter-Memorial, ¶ 212, quoting *Daimler Financial Services A.G. v. Republic of Argentina*, ICSID Case No. ARB/05/1, Decision on Annulment, 7 January 2015 ("*Daimler v. Argentina)*, CL-283, ¶ 78.

[151] Counter-Memorial, ¶ 213, quoting *Standard Chartered v. Tanzania Electric*, CL-244, ¶ 611.

[152] Rejoinder, ¶ 79, quoting *Gambrinus, Corp. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/31, Decision on Annulment, 3 October 2017, CL-307, ¶ 199.

[153] Rejoinder, ¶ 79.

35

125.    Finally, the Claimants challenge Spain's assertion that a tribunal's summation of the parties' arguments cannot be considered to be part of the tribunal's reasoning. The Claimants assert that awards should be read as a whole.[154] As support, they invoke *Continental v. Argentina* for the position that "*in determining whether the reasons given for a conclusion on a particular question are sufficient, it is necessary not to look in isolation at the particular paragraphs of the award dealing specifically with that question. Those paragraphs must always be read together with the award as a whole*".[155]

### c.    The Committee's Analysis

126.    Art. 52(1)(e) provides for annulment if an award fails to state the reasons on which it is based. Unlike other grounds, Art. 52(1)(e) does not include any limiting terms such as "*manifest*", "*serious*", or "*fundamental*". The Committee agrees with the Claimants that Art. 52(1)(e) should be interpreted within the context of Art. 48(3). While Art. 48(3) requires that a tribunal should answer "*every question submitted*", a failure to do so was specifically not included as a basis for annulment in Art. 52(1)(e).[156] A tribunal's failure to address all questions submitted to it by the parties is not in itself a basis for annulment. As Schreuer explains, "[t]*he duty to state reasons refers only to a minimum requirement. It does not call for tribunals to strain every sinew in an attempt to convince the losing party that the decision was the right one*".[157]

127.    Both Parties cite *MINE v. Guinea* to support their positions on Art. 52(1)(e) with Spain calling it "*one of the most followed interpretations*" and the NextEra Entities, one that has

---

[154] Counter-Memorial, ¶ 205.

[155] Counter-Memorial, ¶ 205, quoting *Continental Casualty Company v. The Argentine Republic*, ICSID Case No. ARB/03/9, Decision on the Application of the Partial Annulment of Continental Casualty Company and the Application for Partial Annulment of the Argentine Republic, 16 September 2011, CL-282, ¶ 261; Rejoinder, fn 668, citing *Continental Casualty v. Argentina* and referring to cases that they cite with approval: *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Decision on Annulment, 29 June 2012, RL-071, ¶ 157; *Churchill Mining v. Indonesia*, CL-287, ¶ 257; *Enron v. Argentina*, RL-197, ¶¶ 269, 326; and suggesting to *see also Duke Energy International Peru Investments No. 1, Ltd. v. Republic of Peru*, ICSID Case No. ARB/03/28, Decision of the *ad hoc* Committee, 1 March 2011, RL-204, ¶ 180; *Rumeli v. Kazakhstan*, CL-241, ¶ 11; *Azurix v. Argentina*, RL-176, ¶ 244.

[156] Schreuer, RL-257, ¶¶ 308–309, citing *MINE v. Guinea,* RL-178, at ¶ 5.13. *See also MINE v. Guinea,* RL-178, at ¶ 5.08; Rejoinder, ¶¶ 70–71.

[157] Schreuer, RL-257, Art. 52, ¶ 342.

been "*largely settled*".[158] The Parties agree that under Art. 52(1)(e) an award must allow a reader to "*follow how the tribunal proceeded from Point A. to Point B., and eventually to its conclusion, even if it made an error of fact or law. This minimum requirement is in particular not satisfied by either contradictory or frivolous reasons*".[159] *MINE v. Guinea*'s pronouncement on the meaning of Art. 52(1)(e) is well-established, although the Parties differ in its application.

128.  One issue concerns whether the correctness, persuasiveness, or adequacy of an award's reasoning should be considered. The Committee notes the admonishment by Schreuer that Art. 52(1)(e) "*is most likely to blend into an examination of the award's substantive correctness and hence to cross the border between annulment and appeal*".[160] The Committee confirms that its mandate requires it must not engage in an appeal but only assess whether to annul within the limits prescribed under Art. 52(1). The Committee finds that it must not engage in an assessment of the "*correctness*" of the Tribunal's reasoning or whether it was "*appropriate or convincing*". The Committee agrees with *Vivendi v. Argentina I* that "[p]*rovided that the reasons given by a tribunal can be followed and relate to the issues that were before the tribunal, their correctness is beside the point in terms of Article 52(1)(e)*".[161] Along similar lines, the Committee agrees with the analysis of *CEAC v. Montenegro* that a committee is "*not empowered to reconsider whether the Tribunal's reasons were appropriate or convincing*".

129.  Echoing *MINE v. Guinea*, *CEAC v. Montenegro* summarizes that "[t]*he test is simply whether the Tribunal was guilty of a failure to state its reasons in such a way that there is a lack of expressed rationale or that the reasoning cannot be followed*".[162] The failure to state reasons must leave the decision on a particular point essentially lacking in any expressed rationale or the reasoning could not be followed. Second, that point must itself

---

[158] Reply, ¶ 494; Counter-Memorial, ¶ 198.

[159] *MINE v. Guinea,* RL-178, at ¶ 5.09; Reply, ¶¶ 494, 512; Counter-Memorial, ¶ 229.

[160] Schreuer, RL-257, Art. 52, ¶ 344.

[161] *Vivendi v. Argentina I*, CL-276, at ¶ 64, as cited in *Soufraki v. The United Arab Emirates*, RL-107, ¶ 124.

[162] *CEAC v. Montenegro*, CL-284, ¶ 139.

be necessary to the tribunal's decision. As long as there is some rationale, the focus of the analysis is whether the reasoning could be "*followed*".

130.    In terms of adequacy of the reasoning, the Committee does not agree with Spain's assertion that "*the mere expression in the Decision or the Award of an opinion is not an expression of reasoning if it does not detail the reasoning which enabled the Tribunal to reach that particular conclusion*" and "*the mere expression of reasons is not sufficient to validate the Award…if they are not adequate*".[163] Art. 52(1)(e) does not require a committee to determine if a tribunal "*detail*[ed] *the reasoning which enabled* [it] *to reach* [a] *particular conclusion*". Instead, as found above, the Committee finds that it must not venture into whether a tribunal "*detailed*" its reasoning and whether it was "*adequate…to reach* [a] *particular conclusion*". Should a committee assess the adequacy or completeness of the reasoning it should only do so to determine if the reasoning could be "*followed*".

131.    Both Parties agree that "*contradictory*" or "*frivolous*" reasons may, in certain circumstances, give rise to a potential ground for annulment.[164] The Committee agrees with both Parties that contradictory reasons exist when they cancel each other out.[165] The Committee concurs with *Vivendi v. Argentina I,* that a committee should be "*careful not to discern contradiction when what is actually expressed in a tribunal's reasons could more truly be said to be but a reflection of such conflicting considerations*".[166] The Committee notes that the Applicant has not explicitly raised "*frivolous*" reasons as a basis for annulment.

132.    Both Parties cite the view from *Wena Hotels v. Egypt* that reasons must be "*reasonably inferred from the terms used in the decision*".[167] The Committee agrees with the decisions that follow *Wena Hotels v. Egypt,* such as *Azurix v. Argentina*, *CMS v. Argentina*, and

---

[163] Reply, ¶ 509.

[164] Memorial, ¶ 183; Rejoinder, ¶ 68.

[165] Reply, ¶ 484; Counter-Memorial, ¶ 213; *Tidewater Investment SRL and Tidewater Caribe, C.A. v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/10/5, Decision on Annulment, 27 December 2016, RL-141, ¶ 170.

[166] *Vivendi v. Argentina I*, CL-276, at ¶ 65.

[167] Reply, ¶ 499, quoting *CMS Gas Transmission Company v. Argentine Republic*, Decision of the *ad hoc* Committee on the Application for Annulment of the Argentine Republic, ICSID Case No. ARB/01/8, 25 September 2007, RL-075, ¶ 97; *CMS v. Argentina* quotes this from *Wena Hotels v. Egypt*, RL-140, at ¶ 81.

*Enron v. Argentina* that reasons may be "*implicit*" but at the same time "*provided they can be reasonably inferred from the terms used in the decision*".[168] The Committee concurs with the view of *Vivendi v. Argentina I* that "*reasons may be stated succinctly or at length, and different legal traditions differ in their modes of expressing reasons. Tribunals must be allowed a degree of discretion as to the way in which they express their reasoning*".[169] A tribunal should be granted a measure of discretion when providing its reasons such that the reasoning may be implicit as long as it can be "*reasonably inferred*".

## V.    GROUNDS FOR ANNULMENT

### A.    TRIBUNAL'S DECISION CONCERNING ITS JURISDICTION *RATIONE PERSONAE*

#### (1)    Manifest Excess of Powers and Failure to State Reasons to Exercise Jurisdiction: The NextEra Entities' Nationality and Status as Investor (Art. 52(1)(b) and Art. 52(1)(e)) (Annulment Grounds (a) and (b))

##### a.    *Spain's Position*

133.    Spain submits that the Tribunal committed a manifest excess of powers by upholding jurisdiction *ratione personae* given the Claimants' nationality and lack of status as an "*Investor*" under the ECT.

134.    Spain starts by explaining the following:

> The ECT does not give further criteria as to what is to be understood as the '*enterprise' making the investment in accordance with Article 1(7). The determination of the ECT is to refer to the law of the contracting party. It was clearly explained in the Arbitration that an 'enterprise' could only be considered as such for the purposes of the ECT if under the law applicable to that entity it is qualified as 'enterprise'.*[170]

---

[168] *Wena Hotels v. Egypt*, RL-140, at ¶ 81. Cited with approval in *Azurix v. Argentina*, RL-176, ¶ 54; *Enron v. Argentina,* RL-197, ¶ 75.

[169] *Vivendi v. Argentina I*, CL-276, at ¶ 64, as cited in *Soufraki v. The United Arab Emirates*, RL-107, ¶ 124.

[170] Memorial, ¶ 89.

135.   Spain claims that the Tribunal erred in its analysis in connection with the existence of an "*Investor*" under the ECT because it merely resorted to case law, which is not a source of international law, and did not look at the factual circumstances.[171] Under the ECT, to analyze whether a company can be qualified as an "*Investor*", it was necessary to analyze the law of the State concerned. Spain recalls that the ECT refers to the legislation of the State concerned to determine the existence or inexistence of an enterprise that can qualify as an "*Investor*" under the treaty.[172] The Tribunal did not conduct such an analysis of Dutch or EU legislation. According to Spain, based on the ECT and following the criteria for interpretation stated in the Vienna Convention, the NextEra Entities did not qualify under Dutch law as an enterprise or another legally constituted organization for the purpose of the ECT.[173]

136.   Spain rebuts the NextEra Entities' point that the Tribunal interpreted Art. 1(7) consistently with dozens of other ECT tribunals by arguing that: (i) ECT awards "*are not a source of international law*"; (ii) "*it is perfectly feasible that many tribunals have been mistaken on the same point before*"; and (iii) "*previous decisions are not comparable to the case. The case here is different, since the Tribunal does not apply the ECT directly*".[174]

137.   On similar grounds, Spain adds that the Award failed to state reasons in finding jurisdiction *ratione personae* based on the nationality of the NextEra Entities and their status as investors under the ECT.[175] Spain claims it provided evidence of Florida Power and Light's ("**FPL**") control and direction of the Claimants and the implications of this under the applicable Dutch and EU legislation. Yet, the Tribunal ruled on the matter without giving any reasons other than relying on arguments from other awards. It disregarded the evidence and did not justify why the evidence submitted by the Parties led to its judgment.[176]

---

[171] Memorial, ¶ 92.
[172] Memorial, ¶ 94.
[173] Memorial, ¶ 94.
[174] Reply, ¶ 102.
[175] Reply, ¶ 137.
[176] Reply, ¶¶ 129–130.

138.   According to Spain, the Tribunal dismissed the claims under Art. 1(7) of the ECT without analyzing the applicable Dutch or EU law and without analyzing a "*single piece of evidence*".[177] The Tribunal "*totally and absolutely dispense*[d] *with any explanation of why it understands that there is an investor*" under the ECT.[178]

139.   Spain submits the Award is "*obviously contradictory, when it mentions the CVDT* [Vienna Convention] *but does not apply the ordinary meaning of the ECT and consequently applies the law applicable in the Netherlands*".[179] Alternatively, the Award should be annulled for "*failure to apply EU law to a company formally incorporated in the EU to determine its nationality and therefore to apply the appropriate law*".[180]

###   *b.*   *The NextEra Entities' Position*

140.   The NextEra Entities start by claiming that Spain waived its argument on this ground because after it reviewed the Decision, it knew, or should have known, of its objection that the Tribunal had failed to deal with all of Spain's arguments about the existence of an investment. Spain did not promptly object, and it also failed to apply to the Tribunal to rectify or supplement this aspect of its Decision under Art. 49(2) of the ICSID Convention.[181] They cite Schreuer to contend that jurisdictional objections must be raised as soon as they are known and if these are not raised, they are deemed to be waived.[182]

141.   The NextEra Entities refer to their Observations on the EC's Amicus Brief of 23 April 2020, where they explained that:

> ...*(a) a 'manifest' excess of jurisdiction must be obvious, i.e., not discerned through elaborate arguments by each side; (b) an annulment committee is not empowered to verify whether a tribunal's jurisdictional analysis was correct, but only whether it was tenable; (c) where multiple other ICSID tribunals have reached the same jurisdictional finding, an alleged excess of powers cannot*

---

[177] Reply, ¶ 131.
[178] Reply, ¶ 126.
[179] Reply, ¶ 136.
[180] Reply, ¶ 137.
[181] Counter-Memorial, ¶ 98.
[182] Counter-Memorial, ¶ 104.

41

> *be manifest; and (d) where 'reasonable minds' disagree as to jurisdiction, the 'manifest' requirement is not fulfilled.*[183]

142.  The NextEra Entities contend that it is not a function of an *ad hoc* committee in an annulment proceeding to substitute its own view of the law and its own appreciation of the facts for those of the tribunal.[184]

143.  The NextEra Entities explain as follows:

> *...the ECT contains broad definitions of 'Investor' (based on a place of incorporation test)....Unsurprisingly, the Tribunal found that the Claimants satisfied [the] definition [ ] because they were companies incorporated in the Netherlands, which held direct and indirect equity interests in NEE España (the Spanish holding company that, in turn, owned the Spanish project companies).*[185]

144.  The Claimants claim that dozens of ECT tribunals have interpreted Art. 1(7) of the ECT in accordance with its ordinary meaning with the result that it covers holding companies incorporated in a relevant State just as the Tribunal did. Where many other tribunals have adopted the same interpretation, any alleged excess of powers cannot be manifest.[186]

145.  The NextEra Entities conclude that there was no manifest excess of powers as the Tribunal's interpretation was plainly tenable because it applied the express language of the ECT to undisputed facts such as NextEra Entities' place of incorporation.[187]

146.  Similarly, they claim that there was no failure to state reasons because reasoning was provided and it could be followed. The Decision identified the relevant treaty text in Art. 1(7) of the ECT and applied it to the fact that the Claimants were incorporated in the Netherlands and the Claimants owned the shareholding in NEE España.[188] The Tribunal was not required to address all of the Spain's arguments, particularly irrelevant ones, and was entitled to state its reasons succinctly. The Tribunal explained why it rejected

---

[183] Counter-Memorial, ¶ 87; NextEra Entities' Observations on the EC's Amicus Brief, 25 May 2020, Section III.

[184] Counter-Memorial, ¶ 89; *Venezuela Holdings B.V. and others v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Decision on Annulment, 9 March 2017, RL-198, ¶ 114.

[185] Counter-Memorial, ¶ 100.

[186] Counter-Memorial, ¶ 101.

[187] Counter-Memorial, ¶ 113.

[188] Decision, RL-132, ¶¶ 204, 207–212.

42

interpreting Art. 1(7) on the basis of EU and Dutch law and instead why it interpreted it based on the Vienna Convention.[189]

147.   The Claimants contend the Decision's reasoning was not contradictory. Spain's sole basis for claiming a contradiction in paragraph 205 of the Decision was that since there was no "*Investment*" there was no "*Investor*". The Claimants argue the reasoning within the paragraph "*fit* [s] *logically together*".[190] Each aspect of the Tribunal's reasoning was plain and could be followed by any reasonable reader of the Decision from "*Point A. to Point B.*".[191]

### c.   The Committee's Analysis

148.   The Committee must determine whether the Tribunal's interpretation and application of Art. 1(7) of the ECT to uphold jurisdiction *ratione personae* constitute a manifest excess of powers and whether the Award fails to state the reasons on which it is based.

149.   First, the Committee examines the Tribunal's exercise of its powers to determine whether it had jurisdiction *ratione personae*. The Tribunal noted that the ECT was a treaty and should be interpreted based on the Vienna Convention and its terms should be given their ordinary meaning in their context, and in light of the object and purpose of the treaty. The Tribunal first quoted the definition of "*Investor*" under Art. 1(7)(a)(ii) that provided "*a company or other organisation organised in accordance with the law applicable within that Contracting Party*".

150.   The Tribunal found that the NextEra Entities qualified as a "*company or other organisation*" under Art. 1(7). The Committee finds that the Tribunal's application of the plain wording of Art. 1(7)(a)(ii) that "*a company or other organisation*" would include holding companies and indirect equity interests was not untenable or implausible as a matter of law.

---

[189] Decision, RL-132, ¶ 211; Rejoinder, ¶ 99.

[190] Rejoinder, ¶ 103 (refers to "*paragraphs 247 and 248*" of the Decision but apparently meant to refer to the two sentences in paragraph 205 of the Decision that are referenced with footnote numbers 247 and 248).

[191] Counter-Memorial, ¶ 113(b).

151.    The Tribunal proceeded to declare that it was "*not disputed that Claimants, NextEra Global and NextEra Spain are incorporated in accordance with the law of the Netherlands*".[192] The Tribunal found that the NextEra Entities satisfied the second component of the definition of "*Investor*" under the ECT. The Tribunal based this decision on the fact that the Claimants were incorporated in the Netherlands and owned the subsidiary NEE España, the Spanish holding company that owned the Spanish project companies. The incorporation and ownership are not contested.[193] The Committee finds that the Tribunal analyzed the status of the Claimants under Dutch law and does not agree with Spain that the Tribunal "*dispensed with*" an analysis of the applicable law. The Tribunal identified the conditions for *ratione personae* by establishing that the dispute involved a Contracting State and a national of another Contracting State. The Committee therefore finds that the Tribunal's interpretation and application of Art. 1(7) to the Claimants were tenable and plausible as a matter of law and could not be considered a manifest excess of powers. The Tribunal's decision does not fall under the realm of being a "*'gross and egregious' misapplication of law*" that a "*reasonable person could not accept*" and does not reach the level of being a "*non-application of the proper law*".[194]

152.    The Committee observes that, as noted by the Tribunal itself, other tribunals applying the ECT have reached the same conclusions on jurisdiction *ratione personae* as the Tribunal in interpreting Art. 1(7).[195] As noted by the NextEra Entities, a "*dozens of ECT tribunals*" have interpreted Art. 1(7) in accordance with its ordinary meaning and held that they include "*holding companies incorporated in a relevant State, and indirect equity interests*".[196] Spain has not challenged this fact or cited any decisions disputing this argument.[197] While the decisions of other tribunals are not binding, they do shed light on whether a view is tenable. At a minimum, the fact that other tribunals have arrived at the

---

[192] Decision, RL-132, ¶ 208.

[193] Spain's Memorial on Preliminary Objections with Request for Bifurcation, 9 September 2015, C-307, ¶¶ 114–118; Spain's Reply on Preliminary Objections, 14 October 2016, R-470, ¶¶ 17, 55.

[194] See also *Alapli v. Turkey*, CL-273, ¶ 82.

[195] Decision, RL-132, ¶¶ 209–210.

[196] Counter-Memorial, ¶ 101, citing Decision, RL-132, ¶¶ 199, 200, 204–212 and fn 242.

[197] Spain only contends that (i) ECT awards "*are not a source of international law*"; (ii) "*it is perfectly feasible that many tribunals have been mistaken on the same point before*"; and (iii) "*previous decisions are not comparable to the case. The case here is different, since the Tribunal does not apply the ECT directly*", Reply, ¶ 102.

same conclusion supports the position that the Tribunal's findings were not only "*susceptible of argument 'one way or the other'*" but also "*tenable as a matter of law*". This also confirms that the Tribunal's decision on jurisdiction *ratione personae* and the applicable law could not constitute an excess of powers that was "*plain*", "*clear*", "*obvious*", "*flagrant*", "*evident*" or "*easily understood or recognized by the mind*".

153.   Second, on a similar basis, the Committee finds that Spain has not demonstrated that the Award failed to state reasons based on the NextEra Entities' nationality and jurisdiction *ratione personae*.  The Tribunal considered Spain's argument that pure holding companies did not comply with  Art. 1(7) and that it had to be interpreted on the basis of a particular meaning under EU or Netherlands law. [198] The Tribunal then applied the rules of interpretation according to Art. 31(1) of the Vienna Convention to find that the "*Claimants are companies that are organized under the law of the Netherlands*" and were thus "*investors*" under Art. 1(7). The Committee concludes that the Tribunal's decision on the Claimant's status as investors under Art. 1(7) of the ECT did not lack a rationale and that its reasoning could be followed. The Award did not fail to state reasons concerning its finding that the Claimants qualified as investors.

154.   The Committee concludes that the Tribunal interpreted and applied Art. 1(7) of the ECT based on its plain meaning to find jurisdiction *ratione personae.* This was not untenable or implausible and overall the reasons could be followed. Therefore, the Tribunal did not manifestly exceed its powers and the Award did not fail to provide reasons.

---

[198] Decision, RL-132, ¶¶ 209–211.

45

**B.**     **TRIBUNAL'S DECISION CONCERNING ITS JURISDICTION *RATIONE MATERIAE***

**(1)**     **Manifest Excess of Powers to Exercise Jurisdiction and Failure to State Reasons: Whether a Protected Investment and Direct Relationship Existed between the Parties (Art. 52(1)(b) and Art. 52(1)(e))(Annulment Grounds (a) and (b))**

*a.     Spain's Position*

155.    Spain considers that the Tribunal manifestly exceeded its powers as it lacked jurisdiction to hear the present case, because there was neither an investment nor a direct relationship between the NextEra Entities and the events that gave rise to the alleged legitimate expectation.

156.    Relying on *Isolux v. Spain*, Spain states that according to the ECT an investment requires the existence of three elements: (i) contribution of funds; (ii) receipt of benefits; and (iii) assumption of risk.[199] The text of Art. 1(6) of the ECT should be read to require a "*real and effective economic investment, in an objective sense*".[200]

157.    Spain argues that the NextEra Entities did not contribute any funds as all economic obligations and risks were assumed by the American company FPL[201].

158.    Referring to the NextEra Entities, Spain explains that "[t]*hese Claimants acted as a mere conduit through which funds flow from the United States to Spain, without providing any economic value*".[202]

159.    As provided with respect to Art. 1(7), Spain rebuts the NextEra Entities' point that the Tribunal interpreted Art. 1(6) consistently with dozens of other ECT tribunals by providing that: (i) ECT awards "*are not a source of international law*"; (ii) "*it is perfectly feasible that many tribunals have been mistaken on the same point before*"; and (iii) "*previous*

---

[199] Memorial, ¶ 82. *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, Case No. SCC V2013/153, Award, 12 July 2016, RL-121, ¶¶ 683–685.
[200] Memorial, ¶ 78.
[201] Memorial, ¶ 88.
[202] Memorial, ¶ 88.

*decisions are not comparable to the case. The case here is different, since the Tribunal does not apply the ECT directly*".[203]

160.    Spain claims on similar grounds that the Award failed to state reasons for finding jurisdiction *ratione materiae* based on the NextEra Entities' investment. According to Spain, the Award did not provide reasons as to why the NextEra Entities' investment qualified as a protected investment and "*totally and absolutely dispenses with any explanation of why it understands that there is an investment*".[204] Spain argues that the Tribunal did not address its argument that since the Claimants are not "*Investors*" within the meaning of Article 1(7) of the ECT, then they cannot have an "*Investment*" within the meaning of Article 1 (6) of the ECT.

161.    Spain contends the Tribunal ruled on the matter without giving any reasons, and simply relied on arguments from other awards. It disregarded the evidence and did not justify why the evidence submitted by the Parties led to its judgment.[205] Spain also submits that the Award is "*obviously contradictory, when it mentions the CVDT* [Vienna Convention] *but does not apply the ordinary meaning of the ECT and consequently applies the law applicable in the Netherlands*".[206]

162.    Spain then invokes Art. 25 of the ICSID Convention and Art 26 (1) of the ECT. Spain asserts that there was no direct relationship between the NextEra Entities and Spain that could justify any legitimate expectation. The letters that the Claimants rely upon for their claim of damages were addressed to an American entity.[207] Spain concludes by saying that "*there is not a dispute directly arising from expectations that the Kingdom of Spain would have generated in the Claimants. And the direct relationship required by the treaties is therefore non-existent*".[208]

---

[203] Reply, ¶ 102.
[204] Reply, ¶ 126.
[205] Reply, ¶¶ 129–130.
[206] Reply, ¶ 136.
[207] Memorial, ¶ 96.
[208] Memorial, ¶ 96.

163.    Finally, Spain claims the Award wrongly concludes that it waived its objections under Art. 1(6). Spain submits that the Tribunal no longer dealt with Spain's claims as to why there was no investment under the *Salini* test just because it determined that Spain recognized that the Claimants owned the investment.[209] Spain also denies that the *Salini* arguments were raised for the first time and argues that the entire rationale was raised in the underlying arbitration.[210]

### b.    *The NextEra Entities' Position*

164.    The NextEra Entities again contend that Spain's argument regarding the existence of an investment has been waived because Spain did not promptly object and also failed to apply to the Tribunal to rectify or supplement this aspect of the Decision under Art. 49(2) of the ICSID Convention.[211] They cite Schreuer to contend that jurisdictional objections must be raised as soon as they are known and if these are not raised, they are deemed to be waived.[212]

165.    The NextEra Entities explain that Spain cannot relitigate the existence of an investment by introducing new arguments not raised in the arbitration, such as the *Salini* test.[213] They explain that doing so would breach the well-established principle that an annulment proceeding is not an appeal or a "*challenge to the correctness*" and is not a forum to expand a party's original arguments.[214] According to the Claimants, other than claiming that without an "*Investor*" under Art. 1(7) there could be no "*investment*", Spain pursued no other arguments concerning the requirements of Art. 1(6).[215]

166.    The Tribunal found that the Claimants satisfied the definition of investment because the companies incorporated in the Netherlands held direct and indirect equity interests in NEE España, the Spanish holding company that owned the Spanish project companies. The ECT

---

[209] Memorial, ¶¶ 86–88.
[210] Reply, ¶ 109.
[211] Counter-Memorial, ¶ 98.
[212] Counter-Memorial, ¶ 104.
[213] Counter-Memorial, ¶ 103.
[214] Counter-Memorial, ¶¶ 103–104.
[215] Counter-Memorial, ¶ 107.

contains broad definitions of "*Investment*" that expressly extend to investments held both directly and indirectly.

167.    The Claimants cite that dozens of ECT tribunals have interpreted Art. 1(6) in accordance with its ordinary meaning with the result that they cover holding companies and indirect equity interests just as the Tribunal did. Where many other tribunals have adopted the same interpretation, any alleged excess of powers cannot be manifest.[216]

168.    In addition, the NextEra Entities contend that Spain's argument regarding the need for a direct relationship between the investor and the State confuses the requirements under Art. 1(6) of the ECT and Art. 25(1) of the ICSID Convention. First, they claim that Spain never raised this argument in the arbitration. Second, they claim that Art. 25(1) does not require a direct relationship between the parties for the purposes of legitimate expectations but only a direct relationship between the investment and the dispute.[217]

169.    The Tribunal did not fail to state reasons because each aspect of the Tribunal's reasoning is plain and can be followed by any reasonable reader of the Decision from Point A to Point B.

### c.      *The Committee's Analysis*

170.    Art. 1(6)(b) of the ECT provides that an "*Investment*" means "*every kind of asset, owned or controlled directly or indirectly by an Investor*" and includes "*a company or business enterprise*". The Committee examines the Tribunal's exercise of its powers to determine it had jurisdiction *ratione materiae* based on Art. 1(6) and whether the Award fails to state the reasons on which it is based.

171.    First, the Tribunal addressed Spain's argument that an investor had to own and control the assets on which the investment was based and found that Spain conceded that the Claimant's owned the Spanish companies. The Tribunal then considered Spain's next argument that since the Claimants were not "'*Investors' within the meaning of Art. 1(7)*"

---

[216] Counter-Memorial, ¶ 101.
[217] Counter-Memorial, ¶ 116; Rejoinder, ¶ 98.

they consequently could not have an "*'Investment' within the meaning of Art. 1(6)*".[218] The Tribunal concluded that since the Claimants were determined to be "*Investors*" under Art. 1(7), Spain's related argument under Art. 1(6) failed. The Committee finds that the Tribunal's reasoning concerning whether an investment existed pursuant to Art. 1(6) was based on the dismissal of Spain's argument concerning Art. 1(7). In the view of the Committee, the Tribunal considered that once Spain's argument based on Art. 1(7) was dismissed, Spain's basis to challenge the existence of an investment under Art. 1(6) was undermined. The Committee notes that this constituted Spain's core objection concerning Art. 1(6).

172. As for the *Salini* test, Spain does not dispute that it did not specifically cite the *Salini v. Morocco* case in the underlying arbitration. At the same time, the Claimants recognize that Spain did raise an argument based on the principles outlined in the *Salini* test through the *Isolux v. Spain* case.[219] Nevertheless, the Committee concludes that whether the *Salini* test should have been applied calls for an assessment of the correctness of the decision and need not be considered in an application under Art. 52(1)(b) or (e).

173. The Committee finds that the Tribunal interpreted and applied the plain wording of Art. 1(6)(b) to find a legal dispute arising directly out of an investment based on the NextEra Entities ownership. This conclusion was tenable and cannot be considered a manifest excess of powers. Whether Art. 1(6)(b) requires an investment to be a "*real and effective economic investment, in an objective sense*" or a "*direct*" relationship concerns the correct interpretation and relates to an alleged misapplication of the law beyond the subject of review under Art. 52(1)(b). The Tribunal's decision does not fall under the realm of being a "*'gross and egregious' misapplication of law*" to reach the level of being a "*non-application of the proper law*".[220]

174. Again, the Committee observes that, as noted by the Tribunal itself, other tribunals applying the ECT have reached the same conclusions on jurisdiction *ratione materiae* as

---

[218] Decision, ¶ 205.
[219] Counter-Memorial, fn 119.
[220] *Alapli v. Turkey*, CL-273, ¶ 82.

the Tribunal in interpreting Art. 1(6).[221] As noted by the NextEra Entities, "*dozens of ECT tribunals*" have interpreted the wording of Art. 1(6) in accordance with its ordinary meaning and held that it includes "*holding companies incorporated in a relevant State, and indirect equity interests*".[222] Spain has not challenged this fact or cited any decisions disputing this argument.[223] The decisions of other tribunals are not binding but do shed light on whether a view is tenable. At a minimum, the fact that other tribunals have made such a decision supports the position that the Tribunal's findings were not only "*susceptible of argument 'one way or the other'*" but also "*tenable as a matter of law*". This also confirms that the Tribunal's decision on jurisdiction *ratione materiae* and the applicable law could not be deemed an excess of powers that was "*plain*", "*clear*", "*obvious*", "*flagrant*", "*evident*" or "*easily understood or recognized by the mind*".

175. On a similar basis, the Committee also finds that Spain has not demonstrated that the Tribunal failed to state reasons when finding it had jurisdiction *ratione materiae* based on the existence of a protected investment under the ECT. The Tribunal first addressed Spain's argument regarding whether an investor must own and control the assets on which the investment was based. The Tribunal found that Spain conceded that the Claimants owned the Spanish companies. According to the Tribunal, Spain argued that since the Claimants were not investors under Art. 1(7) they consequently could not have an investment under Art. 1(6).[224] The Tribunal concluded that since the Claimants were determined to be investors under Art. 1(7), Spain's related argument under Art. 1(6) failed. The Committee notes that this was the core of Spain's argument concerning Art. 1(6). A tribunal's reasons may be stated "*succinctly*" and adequacy and comprehensibility are not the test under Art. 52(1)(e). The Award did not lack a rationale in finding that the Claimant's investment met Art. 1(6) of the ECT.

---

[221] Decision, RL-132, ¶¶ 209–210.

[222] Counter-Memorial, ¶ 101, citing Decision, RL-132, ¶¶ 199, 200, 204–212 and fn 242.

[223] Spain only contends that (i) ECT awards "*are not a source of international law*"; (ii) "*it is perfectly feasible that many tribunals have been mistaken on the same point before*"; and (iii) "*previous decisions are not comparable to the case. The case here is different, since the Tribunal does not apply the ECT directly*". Reply, ¶ 102.

[224] Decision, RL-132, ¶ 205.

176. The Committee finds the Tribunal's reasoning concerning whether an investment existed under Art. 1(6) of the ECT focused on rebutting Spain's argument based on Art. 1(7). In the view of the Committee, the Tribunal considered that once Spain's argument based on Art. 1(7) was dismissed, Spain's basis to challenge the existence of an investment under Art. 1(6) was undermined.

177. The Committee also agrees with the Claimants that the Applicant confuses the requirements under Art. 1(6) of the ECT and Art. 25(1) of the ICSID Convention. The plain wording of the Art. 25(1) provides that it does not require a direct relationship between the parties for the purposes of legitimate expectations but only a direct relationship between the investment and the dispute.

178. The Committee concludes that the Applicant has not established that the Tribunal manifestly exceed its powers or that the Award failed to state the reasons when it determined it had jurisdiction *ratione materiae* based on Art. 1(6) of the ECT.

### C. TRIBUNAL'S DECISION CONCERNING ITS JURISDICTION *RATIONE VOLUNTATIS*

**(1)    Manifest Excess of Powers to Exercise Jurisdiction and Failure to State Reasons: Denial of Benefits under Art. 17 of the ECT. (Art. 52(1)(b) and (e)) (Annulment Grounds (c) and (d))**

*a.    Spain's Position*

179. Referring to the denial of benefit clause of Art. 17 of the ECT, Spain contends that the Tribunal exceeded its powers when rejecting Spain's decision to deny benefits to the NextEra Entities based on a non-existent time requirement.[225] The Tribunal's interpretation created a new requirement not provided for in Art. 17, and violated the criteria for interpretation of the Vienna Convention. Spain's right of defense was infringed contrary to general principles of law when it was deprived of the denial of benefits clause under Art. 17.

---

[225] Application, ¶¶ 35–42; Memorial, ¶ 104.

180.   Spain contends that the Tribunal "*violated a general principle of international law and violated the right of defense of the accused of an international wrong and gave an interpretation of Article 17 favourable to the accuser and not to the accused*".[226]

181.   In furtherance of its argument, Spain states that Art. 17 "*does not set time limits on the exercise of this right and may not be freely created by arbitral* [t]*ribunals without support in the ECT or in the interpretation thereof under the Vienna Convention*".[227]

182.   The Tribunal exceeded its power by relying on decisions of "*international courts*", which are not a source of international law according to Article 38 of the Statute of the International Court of Justice ("**ICJ**"). Spain argues that the Tribunal created international law by relying upon "*decisions of international courts*" to create new requirements under Art. 17.

183.   Referring to the "*denial of benefit*" clause of Art. 17 of the ECT, Spain also contends that the Award fails to state the reasons "*why it* [did] *not accept the denial of benefits provided for in Article 17 of the ECT and impose*[d] *requirements for such refusal not set out in Article 17 of the ECT*".[228]

### b.    The NextEra Entities' Position

184.   The NextEra Entities argue that Spain waived its right to object to the Award on this ground because six months passed since the Tribunal issued its Decision.[229]

185.   In addition, the Claimants explain that "*numerous ECT tribunals had found that a State cannot deny the benefits of the ECT after the investment had been made. Acknowledging the two authorities submitted by Spain (*Ulysseas *and* Guaracachi - *neither of which was decided under the ECT), the Tribunal noted the 'controversy' surrounding this question*

---

[226] Reply, ¶ 149.
[227] Memorial, ¶ 107.
[228] Memorial, ¶ 457.d).
[229] Counter-Memorial, ¶ 122.

*and stated that '*recent cases have suggested that the right must be exercised no later than the time the benefits are claimed'".[230]

186.   The NextEra Entities assert that the Tribunal held that Spain's government knew that it was dealing with an American corporation but that the investment was going to be operated through a Dutch company and it provided assurances to the NextEra Entities without any suggestions that it would invoke Art. 17(1) of the ECT.[231]

187.   The NextEra Entities highlight that even after they communicated to Spain their willingness to enforce their rights under the ECT through arbitration, Spain did not invoke Art. 17(1) of the ECT.[232]

188.   The NextEra Entities recall that the Tribunal held that Spain's "*conduct can only be viewed as acquiescence in Claimants' assertion of ECT rights precluding Respondent from later seeking to assert a right to deny benefits when it filed its Memorial on Jurisdiction on 9 September 2015*".[233]

189.   The NextEra Entities conclude that the Tribunal's reasoning was plainly tenable and its decision did not manifestly exceed its powers in rejecting Spain's Art. 17 defense.[234] To them, Spain impermissibly raises an issue regarding the correctness of the interpretation of the ECT. They also argue that the Award did not fail to state reasons because it provided reasoning that could be followed.

### c.   *The Committee's Analysis*

190.   Art. 17 of the ECT provides that "[e]*ach Contracting Party reserves the right to deny the advantages of this Part to: (1) a legal entity if citizens or nationals of a third state own or control such entity and if that entity has no substantial business activities in the Area of the Contracting Party in which it is organised*". The Committee examines whether the

---

[230] Counter-Memorial, ¶ 128; Decision, RL-132, ¶ 263.

[231] Counter-Memorial, ¶ 129; Decision, RL-132, ¶ 264.

[232] Counter-Memorial, ¶ 129; Decision, RL-132, ¶¶ 266, 269.

[233] Counter-Memorial, ¶ 129; Decision, RL-132, ¶ 269.

[234] Counter-Memorial, ¶ 130.

Tribunal manifestly exceeded its powers to determine it had jurisdiction *ratione voluntatis* despite Spain's objection under Art. 17 and whether the Award stated the reasons on which it is based.

191.    First, the Committee notes that the Tribunal rejected Spain's denial of benefits defense under Art. 17 of the ECT. The Tribunal considered the objection was three years too late such that Spain had acquiesced to the Claimants' assertion of rights under the ECT.[235] The Tribunal reached its decision based upon the submissions of both Parties and its assessment of the evidence. It focused on the timeline of Spain's knowledge that the Claimants were controlled by citizens or nationals of a third State and when it could have potentially asserted an objection under the ECT. The Committee notes that the Tribunal then cites *Khan Resources v. Mongolia* concerning what would constitute a "*good faith interpretation*" of Art. 17. The Tribunal concluded that if a State could deny an investor's benefits under the Art. 17 of ECT after luring an investor into an investment, this would not be a "*good faith exercise of its rights*".[236]

192.    The Committee finds that the Tribunal's interpretation and application of Art. 17 of the ECT and rejection of Spain's denial of benefits defense based on the general concept of good faith were tenable as a matter of law. The Committee does not agree that the Tribunal created international law, imposed a new requirement, or violated a general principle of international law or Spain's right of defense. The Tribunal did not exceed its powers in reaching this decision, let alone in a manifest manner. The Tribunal's interpretation of Art. 17 could also not be considered a non-application of the law or a misapplication of the law.

193.    The Committee observes that various ICSID tribunals applying the ECT reached the same conclusions as the Tribunal in rejecting a denial of benefits defense after an investment was made.[237] While other tribunal decisions are not binding, the fact that so many other tribunals made the same decision supports the position that the Tribunal's decision was not

---

[235] Decision, RL-132, ¶¶ 268–269.
[236] Decision, RL-132, ¶¶ 267–268.
[237] Decision, fn 307.

only "*susceptible of argument 'one way or the other*'" but also "*tenable as a matter of law*".[238] This further confirms that the Tribunal's decision to reject Spain's denial of benefits defense was not a manifest excess of powers.

194.     Next, the Committee finds that the Tribunal did not fail to state reasons concerning the Applicant's objections under Art. 17. The Tribunal first dealt with the question whether the Claimants were owned and controlled by the citizens or nationals of a third State and concluded that the first criterion under Art. 17(1) was met because the "*ultimate principal entity*" that controlled them was an "*American company*".[239] Second, the Tribunal considered whether the Claimants had substantial business activities in the Netherlands but concluded it was unnecessary to determine based on the subsequent denial of benefits decision.[240] Third, the Tribunal reviewed when Spain became aware that the investment was made through a Dutch company controlled by an American corporation and whether the Applicant exercised a denial of benefits under Art. 17(1) in a timely fashion.[241] The Committee finds that the Tribunal did explain why it did not accept Spain's denial of benefits objection under Art. 17 and no grounds for annulment exist under Art. 52(1)(e).

195.     Thus, in view of the above, the Committee concludes that the Tribunal did not manifestly exceed its powers and did not fail to state reasons when it determined it had jurisdiction *ratione voluntatis*.

---

[238] *CDC v. Seychelles*, RL-0208, ¶ 41; *CEAC v. Montenegro*, CL-284, ¶ 87; *SGS v. Paraguay*, CL-228, ¶ 113; *Daimler v. Argentina*, CL-283, ¶ 187; *TECO v. Guatemala*, RL-0207, ¶ 78.

[239] Decision, ¶¶ 249–252.

[240] Decision, ¶¶ 253–261.

[241] Decision, ¶¶ 262–270.

**D.    SPAIN'S ALLEGATIONS AS TO MANIFEST EXCESS OF POWERS**

**(1)    Manifest Excess of Powers by Upholding Jurisdiction despite Spain's Installed Capacity and "*Unclean Hands*" Objection (Art. 52(1)(b) (Annulment Ground (e))**

*a.    Spain's Position*

196.   Spain argues that the NextEra Entities "*consciously made misrepresentations*" in connection with the installed capacity of its investment to benefit from a system of subsidies to which they would not have been entitled having "*acted in bad faith, fraudulently or unlawfully*".[242]

197.   In support of its position, Spain recalls what the tribunal held in *Plama Consortium Limited v. Bulgaria*:

> *…The Tribunal is of the view that granting the ECT's protections to Claimant's investment would be contrary to the principle* nemo auditur propriam turpitudinem allegans *invoked above. It would also be contrary to the basic notion of international–public policy - that a contract obtained by wrongful means (fraudulent misrepresentation) should not be enforced by a tribunal…*[243]

198.   Spain explains that the NextEra Entities "*lied*" by saying that the installed capacity of the project was lower than 50 MW when, according to Spain, it was above 50 MW.[244] According to Spain, "*Article 27 of the 1997 Electricity Sector Act required as an essential condition that, in order to qualify for the system of Article 36 of the RD 661/2007, the installations had an 'installed power* [which] *does not exceed 50 MW*".[245] Spain submits that since the plants had an installed capacity of more than 50 MW, they could not benefit from the privileged system of subsidies.

---

[242] Memorial, ¶¶ 113, 120.

[243] Memorial, ¶ 124, referring to "RL-008" but citing *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶¶ 143, 144 and 146. Publicly available at: https://www.italaw.com/cases/857.

[244] Memorial, ¶ 122.

[245] Memorial, ¶ 121.

199.   Spain submits that NextEra Entities' misrepresentation constituted the crime of subsidy fraud and the crime of falsehood in public documents under Spanish law.[246]

200.   The Tribunal committed a manifest excess of powers by upholding jurisdiction and conferring international protection on the Claimants when they were not entitled to it due to their unclean hands. The Tribunal should have found a lack of jurisdiction or inadmissibility of the NextEra Entities' claim.[247] Spain submits that the Tribunal's decision is against *ius cogens,* "*essential principles of international law*", and the principle that international arbitration cannot shelter or protect fraudulent actions.[248]

201.   In this regard, Spain contends that it raised a jurisdictional objection in the underlying arbitration "*because legitimate expectations cannot be protected in those who access benefits with fraud and falsehood*".[249] Spain claims that the Tribunal committed a manifest excess of its power by "*omitting any pronouncement on the matter*" and deciding on the merits of the case when it should have "*declared itself incompetent*" or "*dismiss*[ed] *the substance of the claim*" due to the "*unlawful investment*".[250] Spain also contends that the Committee must annul the Award because the Tribunal did not have jurisdiction or because "*it is contrary to the essential principles of international law and to the* ius cogens *that protection is granted to those who go to a Tribunal without clean hands*".[251]

### b.   The NextEra Entities' Position

202.   The NextEra Entities highlight that:

> ...it is not an option for a party first to await the outcome of the proceedings on the merits without making an objection to jurisdiction and then, if the award turns out to be unfavourable, to

---

[246] Reply, ¶ 166.

[247] Reply, ¶ 173.

[248] Memorial, ¶ 457.(e); Reply, ¶¶ 173, 175.

[249] Memorial, ¶ 37.

[250] Memorial, ¶ 126.

[251] Memorial, ¶ 127.

> *request annulment on the ground of an excess of powers because the tribunal acted outside of its competence…*[252]

203. According to the NextEra Entities, Spain is precluded from raising any argument in connection with the installed capacity based on two reasons: (i) Spain cannot invoke the installed capacity objection or unclean hands allegation as a jurisdictional issue because Spain never raised that issue as a jurisdictional objection in the arbitration; and (ii) ICSID Arbitration Rule 27 is applicable to the annulment and therefore the argument has been waived because it was not promptly raised after the Decision.[253] Spain also did not seek a supplemental decision under Art. 49 of the ICSID Convention.

204. The NextEra Entities also argue that the Tribunal ultimately did not need to decide upon the installed capacity issue because it was a matter only relevant for its primary claim. They added that in any event the Tribunal did decide upon the matter implicitly. A tribunal does not "*manifestly*" exceed its powers by finding it does not need to resolve a particular question.[254]

205. The NextEra Entities also argue that the Committee is not able to make findings of fact as that is "*beyond its remit*".[255]

206. In this regard, it requests the Committee dismiss Spain's grounds of annulment regarding the installed capacity issue.[256]

### c.    *The Committee's Analysis*

207. The Committee examines whether the Tribunal committed a manifest excess of powers because it upheld jurisdiction or admitted the Claimants' claims despite their unclean hands concerning the installed capacity issue. Spain contends that upholding jurisdiction or admitting their claims would be contrary to the "*essential principles of international law*

---

[252] Counter-Memorial, ¶ 76, quoting Schreuer, CL-279, Art. 52, ¶ 174.

[253] Counter-Memorial, ¶ 134.

[254] Counter-Memorial, ¶ 135.

[255] Counter-Memorial, ¶ 136.

[256] Counter-Memorial, ¶ 139.

*and* ius cogens".[257] According to Spain, the Tribunal should have "*declared itself incompetent to deal with an unlawful investment or, alternatively, dismiss the substance of the claim*".[258] The Committee considers that the Applicant has raised this annulment ground as a jurisdictional objection and a matter of inadmissibility.

208.    The Committee focuses its attention on how this argument was presented in the underlying arbitration. In the underlying arbitration, Spain did not plead the installed capacity issue ("**Installed Capacity Objection**") as a jurisdictional objection. As the Claimants point out, the Applicant specifically stated that it was "*not defending the investment violation by the Claimants as a grounds* [sic] *affecting the Tribunal's jurisdiction*" in the underlying arbitration.[259] Spain reaffirmed this fact in its 27 February 2017 post-hearing letter to the Tribunal.[260] The Applicant only raised installed capacity as a merits and quantum issue in the underlying arbitration and specifically did not as a jurisdictional objection.[261] Spain instead raised five, specific jurisdictional objections in the underlying arbitration that were based on (1) *ratione materiae* and *ratione personae*, (2) *ratione voluntatis*, (3) *ratione personae*, (4) Art. 10(1) of the ECT, and (5) Art. 10(7) of the ECT, none of which were related to the Installed Capacity Objection.[262] Spain's two key pleadings on jurisdiction, its Memorial on Preliminary Objections with Request for Bifurcation dated 9 September 2015 and Reply on Preliminary Objections dated 14 October 2016, did not raise installed capacity as the basis for a jurisdictional objection.[263]

209.    The Committee further finds that Spain did not frame the installed capacity issue as an issue involving unclean hands, illegality, fraud, misrepresentation or bad faith on the part

---

[257] Memorial, ¶ 127; Reply, ¶ 173.

[258] Counter-Memorial, ¶ 126.

[259] Spain's Rejoinder on the Merits, 20 October 2016, R-471, ¶ 982.

[260] Letters from Spain to the Tribunal, 27 February and 7 March 2017, R-476, fn 1.

[261] Spain's Rejoinder on the Merits, 20 October 2016, R-471, ¶ 982.

[262] Decision, Section V (Jurisdiction), ¶¶ 187–384. Spain did initially raise an objection related to the cooling-off period that it subsequently withdrew, *see* Spain's Reply on Preliminary Objections, 14 October 2016, R-470, fn 1.

[263] Spain's Memorial on Preliminary Objections with Request for Bifurcation, 9 September 2015, R-496/C-307; Spain's Reply on Preliminary Objections, 14 October 2016, R-470; Spain's Counter-Memorial on the Merits and Rejoinder on Merits confirm that these two pleadings were the basis for its jurisdictional objections. Spain's Counter-Memorial on the Merits, 4 March 2016, R-491, ¶ 901(a); Spain's Rejoinder on the Merits, 20 October 2016, R-471, ¶ 1240.(a).

of the Claimants (collectively "**Unclean Hands Argument**") in the underlying arbitration. The Committee notes that Spain's related claims based on a violation of *ius cogens*, "*essential principles of international law*", and Spanish criminal law, were also not raised before the annulment proceeding. The Committee considers the Unclean Hands Argument as a subsidiary argument of the Installed Capacity Objection. The key memorials Spain submitted such as its Memorial on Preliminary Objections with Request for Bifurcation dated 9 September 2015, Reply on Preliminary Objections dated 14 October 2016, Counter-Memorial on the Merits dated 4 March 2016, or its Rejoinder on the Merits of 20 October 2016 contain nothing regarding the Unclean Hands Argument.[264] At most, in its Rejoinder on the Merits, Spain raised the issue that the real installed capacity was "*concealed*".[265] Subsequently, during the arbitration hearing, Spain alleged that it had been "*deluded*" and that the nameplate contained "*false information*".[266] Further, in two post-hearing letters Spain submitted that information was "*hidden*" or "*concealed*".[267] Spain did not formally advance the Unclean Hands Argument in the underlying arbitration and introduced it for the first time in its Application.[268]

210.   The Committee concludes that Spain therefore raised both the Installed Capacity Objection and the Unclean Hands Argument as jurisdictional objections at the annulment stage for the first time. The Committee assesses the consequences of the Applicant raising these jurisdictional objections for the first time at the annulment stage. ICSID Arbitration Rule 41(1) stipulates that "[a]*ny objection that the dispute or any ancillary claim is not*

---

[264] Spain's Memorial on Preliminary Objections with Request for Bifurcation, 9 September 2015, R-496/C-307; Spain's Reply on Preliminary Objections, 14 October 2016, R-470; Spain's Counter-Memorial on the Merits, 4 March 2016, R-491; Spain's Rejoinder on the Merits, 20 October 2016, R-471.

[265] "*Claimants have concealed the real installed power on their technical data plate and they have demonstrated the Respondent from verifying the real installed power technically*", Spain's Rejoinder on the Merits, 20 October 2016, R-471, ¶ 997 (emphasis added).

[266] Arbitration Hearing, Day 2, 12 December 2016, C-316, 338:15–6 ("*And we have been deluded by the Claimants*"), 338:19–20 ("*On the plate of the generator there is information that is false information…*")(emphasis added).

[267] Letter from Spain to the Tribunal, 27 February, R-476 ("*the Respondent did not introduce a new fact or argument that could affect the damages calculation issue; it just provided a numeric example of the reasons or interest that led the Claimant to equip the Termosol Plants with an installed capacity over the authorised threshold (50 MW) and hide it from the Respondent*".), p. 7 (emphasis added); Letter from Spain to the Tribunal, 7 March 2017, R-476 ("Termosol Plants have been hidden to the Respondent their real installed capacity", "*the estoppel argument cannot be applied in this case, because the Claimants concealed the actual installed capacity of the Termosol Plants*".), p. 12 (emphasis added).

[268] Application, Title of 3.3 and ¶ 96.

*within the jurisdiction of the Centre or, for other reasons, is not within the competence of the Tribunal shall be made <u>as early as possible</u>*". (emphasis added). ICSID Arbitration Rule 41(1) adds that where the facts concerning the objection are known, the party must file its objection before its counter-memorial. Spain itself confirmed that parties must raise jurisdictional objections no later than their counter-memorial where they know of the facts underlying the objection.[269] Spain has not denied that it was aware of the installed capacity issue before it filed its Counter-Memorial on the Merits.

211.    ICSID Arbitration Rule 41(1) does not stipulate the consequences of failing to raise a jurisdictional objection "*as early as possible*" or before the counter-memorial. The Claimants argue that taken together with ICSID Arbitration Rule 27 the consequences should be a waiver of the objection. They contend that Spain was aware of the issue and, under ICSID Arbitration Rule 27, had to "*state promptly its objection*".[270] They claim that by not "*promptly*" complaining, Spain waived its right to object under ICSID Arbitration Rule 27.

212.    The implications of failing to comply with ICSID Arbitration Rule 41(1) and whether it should automatically lead to a waiver under ICSID Arbitration Rule 27 are not specified under the ICSID Arbitration Rules. In any event, the Committee finds that the Installed Capacity Objection and Unclean Hands Argument were never raised before the Tribunal as a jurisdictional objection. Spain raised five specific jurisdictional objections before the Tribunal but none of them concerned installed capacity or unclean hands.

213.    The Tribunal rejected all five jurisdictional objections and upheld jurisdiction. The Tribunal could not have committed a manifest excess of powers because it did not consider a jurisdictional objection that was never advanced before it. A jurisdictional argument that was never advanced before a tribunal cannot be brought before an *ad hoc* committee *de novo* and serve as a basis for annulment. Spain has not claimed that the facts behind the Installed Capacity Objection and Unclean Hands Argument were unknown and recently discovered. Therefore, in the words of Schreuer, "*it would appear unacceptable to let a*

---

[269] Spain's Reply on Preliminary Objections, 14 October 2016, R-470, ¶ 137.
[270] Counter-Memorial, ¶¶ 29, 76; Rejoinder, ¶¶ 34–39.

*party that has knowingly failed to challenge a serious irregularity before the tribunal later attack the award in annulment proceedings*".[271] Along the same lines, the Committee finds it is unnecessary to consider Spain's *ius cogens*, "*essential principles of international law*", and Spanish criminal law arguments since they are dependent upon the Unclean Hands Argument and were never advanced in the underlying arbitration either.

214. In addition to the jurisdictional objection, Spain also claims the Tribunal committed a manifest excess of powers because the NextEra Entities' claims should have been inadmissible based on the Installed Capacity Objection and the Unclean Hands Argument. The Committee notes that admissibility is not a concept mentioned or used in the ICSID Convention. As a general matter, the Committee observes that, if admissibility is considered, it should be viewed as a narrower concept than jurisdiction, and a tribunal should be granted substantial discretion in its assessment of what is admissible in a particular circumstance. The Committee ultimately finds that admissibility need not be considered since it was never raised before the Tribunal.

215. The Committee concludes that Spain's claim that the Tribunal committed a manifest excess of powers based on Spain's Unclean Hands Argument and Install Capacity Objection must be denied because they were not advanced as a jurisdictional objection or admissibility challenge in the underlying arbitration and cannot be raised for the first time on annulment.

**(2)     Manifest Excess of Powers by Hearing a Dispute between an Investor of an EU Member State and an EU Member State – "*Intra-EU Objection*" (Art. 52(1)(b)) (Annulment Ground (g))**

*a.     Spain's Position*

216. Spain argues that "*there is no possibility of investment arbitration between a company of an EU Member State and a Member State*".[272] Spain refers to Professor Gosalbo's two expert reports and provides that "[a]*ll the reasons stated by Professor Gosalbo are assumed*

---

[271] Schreuer, CL-279, Art. 52, ¶ 60.
[272] Memorial, ¶ 128.

*by the Kingdom of Spain*".[273]  Professor Gosalbo opined that (1) the ECT does not apply to intra-EU disputes; (2) the Treaty on the Functioning of the EU ("**TFEU**") provides that international agreements such as the ECT cannot be contradictory to EU law since the latter has primacy; and (3) the CJEU has exclusive jurisdiction over EU law issues.[274]

217.    According to Spain, EU Member States decided that EU legislation should apply to intra-community affairs and intra-EU disputes, while international conventions remain in force for relations with third countries.[275]

218.    Referring to the *Achmea* decision, Spain remarks that the CJEU found that:

> *Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept...*[276]

219.    Spain claims that Art. 26 of the ECT does not apply within the EU for disputes between Member States. It further holds that the Tribunal did not carry out an analysis of all the rules of interpretation provided in Art. 31 of the Vienna Convention, but merely indicated that there was no disconnection clause and on that basis stated its conclusion.[277]

220.    Spain argues that the CJEU judgment in *Moldova v. Komstroy* decides for the first time that arbitration of intra-EU investment disputes under the ECT is not allowed and not compatible with EU law, EU treaties, and the autonomy principle. Spain adds that the

---

[273] Memorial, ¶ 129; Reply, ¶ 193.

[274] Gosalbo Expert Report, 13 April 2020, ¶¶ 21–26, 46–47; 65–71; Gosalbo Second Expert Report, 8 September 2020, ¶¶ 2–27.

[275] Memorial, ¶ 133.

[276] Memorial, ¶ 138; *The Slovak Republic v. Achmea B.V.*, Judgment of the Court, CJEU Case No. C-284/16, 6 March 2018, RL-135, ¶ 60.

[277] Memorial, ¶ 143.

decision is binding upon the Netherlands and Spain, and Dutch investors cannot have any rights different than the rights and legal framework that is applicable to the Netherlands.[278]

221.    Spain concludes by saying that admitting jurisdiction for investment arbitration within the EU for disputes between Member States constitutes a manifest excess of jurisdiction.[279]

### b.    The NextEra Entities' Position

222.    The NextEra Entities submit that there can hardly be a manifest excess of jurisdiction by the Tribunal where all other ECT tribunals to date have unanimously upheld their jurisdiction over intra-EU disputes.[280] The Tribunal's conclusion on jurisdiction was instead plainly tenable.[281]

223.    Additionally, the NextEra Entities consider that this is an attempt from Spain to re-argue the correctness of the case that is beyond the bounds of Art. 52 of the ICSID Convention.[282]

224.    Finally, the NextEra Entities refer to Professor Piet Eeckhout's expert opinion:

> *...In particular, Professor Eeckhout explains that: (i) the ECT applies on an intra-EU basis; (ii) there is in fact no conflict between the ECT and EU law; and (iii) even if such a conflict existed, it would have to be resolved in favour of the ECT and international law, not EU law, based on the express terms of Art. 16 of the ECT.*[283]

225.    According to the Claimants, the "*elaborate arguments*" that Spain, Professor Gosalbo and the EC through "*more than one hundred pages of complex (and highly disputed) legal argument*" illustrate that the Tribunal's decision was not an excess of powers "*evident on its face*".[284] The Claimants argue that the Applicant attempts to "*re-argue jurisdiction* de novo*" through its arguments based on Art. 38 of the ICJ Statute.[285]

---

[278] Spain's Final Comments on the *Komstroy* CJEU Decision, 24 September 2021, ¶ 49.

[279] Memorial, ¶ 152.

[280] Counter-Memorial, ¶ 141; NextEra Entities' Observations on the EC's Amicus Brief, 25 May 2020, ¶ 27.

[281] Rejoinder, ¶ 153(a).

[282] Counter-Memorial, ¶ 147.

[283] Counter-Memorial, ¶ 149; Eeckhout Expert Opinion, 9 July 2020, ¶¶ 7–24, 25–79, 80–96.

[284] Rejoinder, ¶ 153(b).

[285] Rejoinder, ¶ 174; Counter-Memorial, fn 179.

226. As for the *Moldova v. Komstroy* CJEU judgment, the Claimants submit that it was rendered years after the Tribunal's award. This precludes it from being a basis for annulment. Spain's attempt to rely on it contradict the settled law that *ad hoc* committees assess a tribunal's decision based on the record before it at the time of its award, not on subsequent materials.[286]

227. For these reasons, according to the NextEra Entities, Spain failed to establish that the Tribunal manifestly exceeded its powers by upholding jurisdiction over an intra-EU claim.[287]

### c.    The Committee's Analysis

228. The Committee examines whether the Tribunal committed a manifest excess of powers by hearing a dispute between an investor from an EU Member State and another Member State.

229. The Committee finds that the Tribunal's decision was based on a straightforward analysis of the ECT, the Vienna Convention, and the applicable rules and principles of international law, which, as agreed by the Parties, together constituted the applicable substantive law.[288] The Tribunal first reviewed the decisions of previous tribunals that upheld jurisdiction under Art. 26 of the ECT, the *Achmea* judgment, and the observations of the EC.[289] The Tribunal then considered whether the ECT applied to relations between EU Member States or whether it excluded jurisdiction over intra-EU disputes.[290] The Tribunal decided that absent a "*disconnection clause and a revision of the ECT*" the EU's consenting to the ECT did not supersede each EU Member State's individual consent to the ECT.[291]

---

[286] NextEra Entities' Observations on the Court of Justice of the European Union Judgment in Case C-741/19 *Republic of Moldova v. Komstroy*, 1 October 2021, ¶ 3.
[287] Counter-Memorial, ¶ 150.
[288] Decision, ¶¶ 385 and 388.
[289] Decision, ¶ 333.
[290] Decision, ¶¶ 339–344.
[291] Decision, ¶ 342.

230.    The Tribunal next considered whether the overlap that might exist between the ECT and EU law affected Spain's offer to arbitrate.[292] The Tribunal concluded that even if there was an overlap, its jurisdiction "*must be answered in light of Article 26 of the ECT*" and not EU law.[293] The Tribunal also decided that intra-EU obligations were not superseded by subsequent treaties because the treaties did not relate to the same subject matter.[294] The Tribunal concluded that it could not hold that "*Spain's consent to submit ECT disputes to arbitration excluded intra-EU investment disputes*" and that "*primacy of EU Law exclude*[d] *jurisdiction of the present Tribunal established under the ECT*".[295]

231.    The Committee finds that the Tribunal did not exceed its powers by upholding jurisdiction to hear the case under Art. 26 of the ECT despite Spain's intra-EU objection. The Tribunal's decision was tenable as a matter of law and it could not be deemed a gross or egregious misapplication of the law that a reasonable person could not accept such that it would amount to a non-application of the law. In terms of application of Art. 38 of the ICJ Statute, the Committee agrees that this argument was raised *de novo* during the annulment proceedings and need not be considered since it was not brought before the Tribunal. Spain did not demonstrate that it made any reference to Art. 38 of the ICJ Statute in the underlying arbitration.

232.    The Committee also notes that, as the Claimants submit, 32 ICSID tribunals applying the ECT have rejected the alleged primacy of EU law over intra-EU disputes between an investor of the EU and another EU Member State under the ECT.[296] As Spain contends, the Committee agrees that it is not bound by these decisions and arguably they may not even be correct. Yet, the Committee finds that the fact that so many other tribunals reached the same conclusion on the same issue as the Tribunal confirms that the Tribunal's interpretation of the ECT was tenable as a matter of law. In contrast, Spain did not submit any ICSID decisions upholding its intra-EU argument. This reaffirms that the Tribunal's

---

[292] Decision, ¶ 345.

[293] Decision, ¶ 351.

[294] Decision, ¶ 352.

[295] Decision, ¶ 357.

[296] Rejoinder, fn 237.

decision to uphold its jurisdiction for the intra-EU dispute under the ECT and reject Spain's argument based on the primacy of EU law over intra-EU disputes cannot be considered as being an excess of powers, let alone a plain, clear, obvious, flagrant or evident one.

233. The Committee finds that the CJEU judgment *Moldova v. Komstroy* was rendered more than two years after the Tribunal's Award. Art. 52(1)(b) is limited to assessing a tribunal's decision based on the record and law at the time it was rendered. This precludes the Committee from considering the CJEU judgment and it cannot serve as a basis for annulment.

234. The Committee concludes that the Tribunal did not manifestly exceed its powers in finding jurisdiction to hear the intra-EU dispute and instead had a tenable basis to do.

**(3)    Manifest Excess of Powers by not Applying the Applicable International Rules, the ECT and EU Law to the Merits of the Case (Art. 52(1)(b)) (Annulment Ground (i))**

*a.    Spain's Position*

235. According to Spain, the Tribunal manifestly exceeded its powers by going beyond its jurisdiction and totally omitting the application of applicable international rules and applicable international law, the ECT, and EU law.[297]

236. In furtherance of this argument, Spain states that the Tribunal exceeded its powers when deciding that the applicable law was the "*ECT and any rules of international law relevant to its interpretation and application*" and did not recognize the "*autonomy and primacy*" of EU law.[298]

---

[297] Memorial, ¶ 154.
[298] Memorial, ¶¶ 159 and 161; Reply, ¶¶ 262, 279–282.

237. Relying on *Soufraki v. The United Arab Emirates*[299] and *Sempra v. Argentina*,[300] Spain highlights that:

> *… Committees have concluded that there is also an excess of powers, where the Tribunal fails in determining the applicable law or when it manifestly fails in interpreting the law applicable to the dispute…*[301]

238. Spain argues that under Art. 26(6) of the ECT, the Tribunal should have applied the "*applicable rules and principles of international law*" but instead limited the application of the rules and principles of international law to only what may be "*relevant to the application and the interpretation*" of the ECT.[302]

### b. The NextEra Entities' Position

239. Based on *Lemire v. Ukraine*, the NextEra Entities argue that Spain should have raised its objection that the Tribunal failed to apply the applicable law promptly after receipt of the Decision.[303]

240. The NextEra Entities also add that the Tribunal's interpretation of the applicable law clause contained in Art. 26(6) of the ECT was consistent with the interpretation reached by numerous other ECT tribunals.[304]

241. In addition, the NextEra Entities highlight that:

> *…Consistent with that finding, the Tribunal then proceeded to decide the dispute in accordance with Art. 10(1) of the ECT and applicable rules of international law relevant to the interpretation and application of the ECT, such as the rules of interpretation set out in the VCLT.*[305]

---

[299] Memorial, ¶ 167; *Soufraki v. The United Arab Emirates*, RL-107, ¶¶ 41–45.

[300] Memorial, ¶ 167; *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, Decision on the Argentine Republic's Request for Annulment of the Award, 29 June 2010, RL-133, ¶¶ 164–165.

[301] Memorial, ¶ 167.

[302] Memorial, ¶ 160.

[303] Counter-Memorial, ¶ 153.

[304] Counter-Memorial, ¶ 154.

[305] Counter-Memorial, ¶ 160.

242. All in all, the NextEra Entities conclude that the Tribunal's decision to not apply EU law, including EU State aid rules, as a substantive law, is not a manifest excess of power but the natural consequence of the Tribunal's finding as to the applicable law.[306]

### c.   The Committee's Analysis

243. The Committee examines whether the Tribunal committed a manifest excess of powers concerning the applicable law and rules. Art. 26(6) of the ECT provides that "[a] *tribunal...shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law*".[307]

244. Spain's claims that the Tribunal dispensed with the application of (1) "*applicable international rules*" and "*applicable international law*", (2) the ECT, and (3) all EU law.[308] The Committee considers Spain's argument as being that the Tribunal committed a manifest excess of powers by improperly interpreting and applying Art. 26(6) of the ECT and by not determining and applying the applicable law and rules, which included the ECT and all EU law. As provided in Section V.A(1)c, *supra*, Spain's claim of a manifest excess of powers is, all the more difficult because it primarily seeks to challenge the interpretation of a treaty provision. A party seeking annulment on this basis must "*prove that its interpretation is a monolithic and firmly settled principle of law that is 'not subject to debate*'".[309]

245. The Committee finds that the Tribunal held that it was common ground between the Parties that the substantive law included the ECT, the Vienna Convention, and the "*applicable rules and principles of international law*".[310] They also agreed that Spanish law was "*relevant*", although they disagreed as to how much weight should be given to Spanish law and EU law.[311] The Tribunal interpreted the meaning of Art. 26(6) of the ECT and

---

[306] Counter-Memorial, ¶ 161.

[307] ECT, CL-001, Art. 26(6).

[308] Memorial, ¶ 457 ("*dispensing with the application of applicable international rules*").(i); Reply, ¶ 323 ("*dispensed with the application of the applicable international law*").

[309] *Alapli v. Turkey*, CL-273, ¶ 82.

[310] Decision, ¶¶ 385 and 388.

[311] Decision, ¶¶ 385–389.

determined the applicable law and rules when it held that "*the applicable law is the ECT and any rules of international law relevant to its interpretation and application*".[312] The Tribunal added that it would "*refer to provisions of Spanish law and EU law if appropriate*".[313] The Committee finds that the Tribunal's interpretation is based on the general agreement between the Parties on the substantive law and the express text of Art. 26(6). The Committee finds that the Tribunal decided that it only needed to determine the meaning of "*applicable rules and principles of international law*" under Art. 26(6) and the relevance and weight to be given to Spanish and EU law.

246.   The Committee notes that the Tribunal then proceeded to apply the applicable law and rules. Contrary to Spain's assertion, the Committee finds that the Tribunal did not "*dispense*[] *with the application of applicable international rules*" and "*applicable international law*".[314] The Tribunal instead rejected Spain's preferred application of the "*applicable law and rules*" concerning the weight to be given to EU law.

247.   As provided in Section V.D(2), *supra,* the Tribunal chose to reject Spain's intra-EU objection based on EU law. The Tribunal accordingly rejected Spain's claim concerning the "*applicable rules and the principles of international law*" under Art. 26(6) of the ECT and the weight to be given to EU law. As found above, the Committee considers that the Tribunal's interpretation and application of the ECT were tenable as a matter of law. Even if this application was a misapplication, it could not be considered a non-application of law. A tenable decision to not apply a certain law is not a failure to apply the law annullable under Art. 52(1)(b).

248.   The Committee notes again that various ICSID tribunals applying the ECT reached the same conclusion as the Tribunal's regarding the interpretation of Art 26(6) of the ECT and the limited application of EU Law. The Committee agrees with Spain that it is not bound to follow these other tribunals' decisions and there are tribunals that have decided

---

[312] Decision, ¶ 390.
[313] Decision, ¶ 390.
[314] Memorial, ¶ 457(i); Reply, ¶ 323.

differently.[315] Yet, the fact that so many other tribunals reached the same decision regarding the same matter reinforces that the Tribunal's interpretation was at a minimum tenable as a matter of law. This reaffirms that the Tribunal's decision to determine the applicable law based on the ECT and the weight to be given to EU Law could not be deemed an excess of powers, let alone one that was plain, clear, obvious, flagrant or evident.

249.    In terms of application of Art. 38 of the ICJ Statute, as provided in Section V.D(2)c, *supra*, the Committee repeats that this argument was raised *de novo* during the annulment proceedings and need not be considered since it was not raised before the Tribunal.

250.    The Committee finds that the Applicant has not established a manifest excess of powers under Art. 52(1)(b) based upon the interpretation and application of the applicable law under Art. 26(6) of the ECT.

### (4)    Manifest Excess of Powers Regarding the Tribunal's Assessment of Legitimate Expectation Regarding the State Aid (Art. 52(1)(b)) (Annulment Ground (k))

#### a.    Spain's Position

251.    Spain argues that the Tribunal misapplied and dispensed with EU law and the decision of the EC, both applicable laws, to assess legitimate expectations.

252.    In their submissions, both Spain and the EC, the latter as *amicus curiae*, stressed that the State aid schemes for renewable energies should have been notified to the EC and they were not in the present case.[316]

---

[315] *Electrabel S.A. v. Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, RL-091, ¶ 4.195; *Belenergia S.A. v. Italian Republic*, ICSID Case No. ARB/15/40, Award, 6 August 2019, CL-246, ¶ 292; *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain,* ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019, RL-165, ¶ 591(a).

[316] Memorial, ¶ 172.

253.   Therefore, Spain explains that under the EU law on State aid "*it could not be understood that there was any legitimate expectation that the subsidy would remain unchanged*".[317] Based on *Electrabel v. Hungary*, Spain argues that:

> *...interpretation must be made in accordance with EU law and that it cannot be held that Article 10 of the ECT has been infringed to the extent that there is another rule of international law (recognised by Article 1 (3) of the ECT itself) that prevents legitimate expectations from being considered.*[318]

254.   Spain concludes by saying that:

> *In the event that it was understood that the Arbitral Tribunal applied European Union law (*quod non*), it would have made a blatantly erroneous application by completely disregarding the value of the Commission's Decision applicable to the case and by declaring that there were legitimate expectations contrary to what this European Commission's Decision states.*[319]

255.   According to Spain, the Tribunal should have also applied the State aid regime as part of Spanish (*i.e.*, national) law.[320] The Claimants could not have had any expectation to something that was "*illegal*" or "*not authorised by law*".[321] Spain also adopts "*all the reasons stated by*" Professor Gosalbo who argued that "*there is a likelihood of frustration of enforcement of intra-EU ECT awards dealing with State Aid*".[322]

256.   The Tribunal failed to apply EU State aid law and committed a "*blatantly erroneous application*" of the applicable law.[323] The Tribunal manifestly exceeded its powers through "*a manifestly incorrect application of applicable law to be taken into account in assessing legitimate expectations*".[324]

---

[317] Memorial, ¶ 173.

[318] Memorial, ¶ 173*; Electrabel S.A. v. Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, RL-091.

[319] Memorial, ¶ 176.

[320] Memorial, ¶ 174.

[321] Reply, ¶¶ 349, 354. The Committee addressed this argument in terms of a jurisdictional objection in Section V.D(1), *supra*.

[322] Gosalbo Expert Report, ¶ 137; Memorial, ¶ 170.

[323] Memorial, ¶ 176.

[324] Memorial, ¶ 457(k).

### b.    The NextEra Entities' Position

257.    As an initial matter, the NextEra Entities claim that if the Committee denies Spain's Annulment Ground (i), *supra,* Spain's Annulment Ground (k) necessarily fails by extension.[325]

258.    The NextEra Entities contend that Spain offers no substantive analysis as to why a EC decision is a "*rule and principle of international law*" that is applicable in deciding whether Spain breached the ECT.[326]

259.    The NextEra Entities explain that:

> [n]*umerous ECT tribunals have declined to follow* Electrabel*'s reasoning on the law applicable to merits of an ECT claim, illustrating that there can be no manifest excess of powers where an ECT tribunal elects not to subordinate Art. 10(1) of the ECT to EU law, or to EU State aid law in particular.*[327]

260.    The NextEra Entities highlight that the Tribunal was entitled to interpret the applicable law clause in the Art. 26(6) in the way it did. The Tribunal's application of Art. 10 of the ECT, exclusive of EU law, as the governing standard for determining legitimate expectations could not serve as a basis for annulment.[328] This interpretation was tenable as a matter of law.

261.    The NextEra Entities also conclude by saying that Spain's request to this Committee concerns an alleged erroneous application of the law and is an attempt to re-argue the merits of the case, both of which lie beyond the scope of Art. 52(1)(b) of the ICSID Convention.

### c.    The Committee's Analysis

262.    The Committee examines whether the Tribunal's assessment of legitimate expectation that was based on its decision not to apply EU State aid law was a manifest excess of powers.

---

[325] Rejoinder, ¶ 233(a).

[326] Counter-Memorial, ¶ 162.

[327] Counter-Memorial, ¶ 163.

[328] Counter-Memorial, ¶ 165.

263. The Committee agrees with the Claimants that this ground cannot be sustained based on the same reasons as Annulment Ground (i). Spain itself concedes that this ground is "*subsidiary*" to the previous ground on EU law.[329] If the Tribunal did not commit a manifest excess of powers when it found that the law applicable to the merits was the ECT and applicable rules and principles of international law, and EU law where appropriate, then it could not have committed a manifest excess of powers when it found legitimate expectations under Art. 10 of the ECT without applying EU State aid law. This premise establishes that the Tribunal's decision could not be deemed an excess of powers, let alone one that was plain, clear, obvious, flagrant or evident.

264. For completeness, the Committee does not find that the Tribunal committed a "*blatantly erroneous application*", that the Tribunal should have applied the EU State aid regime as part of Spanish (*i.e.*, national) law,[330] or that the Claimants could not have had any expectation to something that was "*illegal*" or "*not authorised by law*" that breaches the EU State aid law. The Committee finds that Applicant's claims are at most assertions that the Tribunal incorrectly applied the applicable law. The Committee observes that the Tribunal decided that since EU law was not applicable to determining the alleged breach of fair and equitable treatment, then EU State aid law should not be applied to determine the Claimants' legitimate expectations. As noted in Section V.D(1), *supra,* the Committee notes that the installed capacity issue was not framed in terms of illegality in the underlying arbitration. The Tribunal's decision does not reach the bar established by *Alapli v. Turkey* that the "*legal analysis was so untenable or implausible that the error* [wa]*s evident on the face of the award*".[331] The Tribunal's decision could not be considered a gross or egregious misapplication of the law that a reasonable person could not accept and amount to a failure to apply the law.

265. The Committee confirms that other ICSID tribunals applying the ECT such as *AES v. Hungary* reached the same conclusions as the Tribunal and found legitimate expectations

---

[329] Memorial, ¶ 169.
[330] Memorial, ¶ 174.
[331] *Alapli v. Turkey*, CL-273, ¶ 82.

based on Art. 10(1) of the ECT without applying EU law.[332] For the Committee's purposes, whether *AES v. Hungary* or *Electrabel v. Hungary* were correct does not matter. What matters is that some tribunals reached the same decision on legitimate expectations as the Tribunal. This confirms that the Tribunal's decision was at least tenable as a matter of law.

266.    The Committee also agrees with the Claimants that Art. 52(1)(b) does not permit annulment based on the potential for enforcement and Professor Gosalbo's report in this regard may be disregarded.

267.    The Committee concludes that the Tribunal did not commit a manifest excess of powers based on its assessment of legitimate expectation under Spain's State aid regime.

### (5)    Manifest Excess of Powers Regarding the Tribunal's Granting of Damages (Art. 52(1)(b)) (Annulment Ground (p))

#### a.    *Spain's Position*

268.    Spain asserts that the Decision is inconsistent with the Tribunal's finding on liability because, among other things, the Tribunal intended to provide the Claimants with a return fixed at the weighted average cost of capital ("**WACC**") established as of the valuation date of June 2016 plus 200 basis points ("**bps**") but did not do so.[333] Spain submits that the Decision provides that the Claimants were entitled to a return equal to WACC plus 200 bps at the valuation date, and did not distinguish "*between periods or different expectations at an earlier stage*".[334] According to Spain, the Decision on quantum is inconsistent with this.

269.    While primarily focused on the failure to state reasons grounds, Spain also submits "*where appropriate*"[335] that the Tribunal committed a manifest excess of powers due to the following: (1) for the capitalization of historical damages, a risk-free rate should have been

---

[332] *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, CL-084, ¶ 7.6.4.

[333] Memorial, ¶ 335; Reply, ¶¶ 621–623, 633.

[334] Memorial, ¶ 331.

[335] Reply, ¶ 665.

used instead of the cost of equity; (2) for the primary claim of the actual scenario, the benchmark for the regulatory rate of return was not set even though it was disputed by the experts of the Parties; (3) for the premium added to the WACC reference, although disputed by the experts, the use of 200 bps was not "*specifically justified*"[336]; and (4) for the effective tax conversion rate, although disputed by the experts, Compass Lexecon's assumption of using a nominal tax rate was accepted without mentioning and explaining the reasons for rejecting Accuracy's arguments.[337]

### b.   The NextEra Entities' Position

270.   The NextEra Entities claim that the Tribunal's approach to quantum was straightforward and consistent since it adopted the alternative but-for damages model put forward by Compass Lexecon in its entirety with one adjustment in the form of a reduction of 100 bps to the allowed rate of return.

271.   The Claimants submit that Spain's argument is a "*complete rewriting of the Decision*" because there was no "*contradiction*" and that Spain is trying to appeal the Tribunal's findings on quantum as being "*incorrect*".[338]

272.   Under settled law, annulment is not a forum for challenging the correctness of an award and would not qualify as a manifest excess of powers.

### c.   The Committee's Analysis

273.   The Committee examines whether the Tribunal committed a manifest excess of power when it awarded damages as Spain claims. As a general matter, the Committee agrees with the consensus that exists among committees that tribunals have a wide margin of appreciation when determining damages. As provided in *Occidental Petroleum v. Ecuador*, "[a]*nnulment of quantum decisions face an additional hurdle:* ad hoc *committees have consistently held that tribunals have a wide margin of discretion with respect to the*

---

[336] Memorial, ¶ 364.
[337] Memorial, ¶ 368.
[338] Rejoinder, ¶ 356; Reply, ¶ 622.

*calculation of damages*".[339] By its nature, a tribunal must engage in a fact intensive inquiry and must make a discretionary judgment to assess what it deems appropriate for damages. An annulment application based on damages must meet a higher bar.

274.   The Committee notes that for the first regulatory period from 2014 to 2019, the Tribunal used a WACC prevailing as of 30 June 2014 that was equal to 6.0% (on a post-tax basis), then added a 200-bps premium and converted it to a pre-tax basis resulting in a reasonable rate of return of 11.4%. For the subsequent regulatory period from 2020 onwards, the Tribunal used a WACC that reflected the date of valuation 30 June 2016, then again added a 200-bps premium and converted it to a pre-tax basis resulting in a reasonable rate of return of 9.2%.

275.   First, Spain claims that the Tribunal included the Claimants' damages experts' "*incorrect quantification*" of the capitalization of historical damages that should have included a risk-free rate instead of the cost of equity used.[340] The Committee considers that even if Spain's contention is accepted and the quantification of the Claimants' damages experts was incorrect, it would not constitute an excess of powers since it was tenable.

276.   Second, Spain argues that the experts did not agree on the benchmark for reasonable return used in the Actual Scenario and the Tribunal "*overlooked*" this and did not "*substantiate*[] *its decision*" for choosing the rate proposed by the Claimants' experts.[341] The Committee finds that a difference of opinion among experts only supports the view that tenable arguments existed on both sides. The Tribunal's decision to choose one benchmark over the other was tenable and not an excess of powers.

277.   Third, Spain asserts that the Tribunal added 200 bps to the WACC reference instead of 300 bps. The Committee finds that the Tribunal considered three factors in making this decision: (1) "*there is no consistent practice of fixing the premium at 300bps in European jurisdictions that provide for a premium when calculating a return on investment in*

---

[339] *Occidental Petroleum v. Ecuador*, RL-179, ¶ 412. See also *Duke Energy International Peru Investments No. 1, Ltd. v. Republic of Peru*, ICSID Case No. ARB/03/28, Decision of the ad hoc Committee, 1 March 2011, RL-204, ¶ 256; *Wena Hotels v. Egypt*, RL-140, at ¶ 91; *Impregilo v. Argentina*, RL-205, ¶ 160.

[340] Memorial, ¶ 343.

[341] Memorial, ¶ 348.

78

*regulated sectors*"; *(2)* "*the desire to encourage entrants into the Spanish solar energy system*"; and (3) "*the view expressed by CNE* [the Comisión Nacional de Energía] *that a premium over WACC was a reasonable expectation of return*".[342] What matters is not whether it would have been more "*appropriate*" to have granted a premium between "*0 and 100 basis points*"[343]; what matters is whether the decision was tenable. The Committee finds the decision was tenable based on these factors.

278.   Fourth, Spain submits that the Tribunal used a nominal tax rate over an effective tax conversion rate that was disputed among the experts and the Tribunal "*simply accepted*" the Claimants' expert's position. The Committee again holds that the key issue is whether the Tribunal decision on the nominal tax rate was a tenable one. The Tribunal explained that it "*took account of the fact that the statement of Compass Lexecon that the use of the nominal rate* [was] *'accepted regulatory practice' was not contradicted by Respondent and noted the difficulty of calculating an 'effective rate' for each year*".[344] The Committee concludes that the Tribunal's decision to adopt an "*accepted regulatory practice*" instead of the position of Spain's experts in light of the difficulty of calculating an "*effective rate*" for each year was a tenable one.[345] The Committee again confirms that a difference of opinion among experts only supports the view that tenable arguments existed on both sides. The Tribunal's decision to prefer one expert's methodology and choose a nominal tax rate over an effective tax conversion rate cannot constitute a manifest excess of powers.

279.   The Committee's role under a claim under Art. 52(1)(b) is not to assess the correctness of the Tribunal's decision or whether it had "*inconsistencies*" but only whether it was tenable as a matter of law and not a "*plain*", "*clear*", "*obvious*", "*flagrant*", or "*evident*" excess of powers. Paragraph 678 of the Decision provides that the "*Claimants are entitled to damages based on a return on the capitalized value of their assets as of 30 June 2016 on the basis of the WAAC of the Termosol Plants plus a premium of 200bps*". Spain claims that the Tribunal intended to provide the Claimants with a return based on a fixed WACC

---

[342] Decision, ¶¶ 664–665.

[343] Memorial, ¶ 364.

[344] Decision, ¶ 667; Memorial, ¶ 369.

[345] Decision, ¶ 667.

established as of the valuation date of June 2016 plus 200 bps for the entire period, including the first regulatory period, but that the Award provided otherwise. The Claimants contend that the Tribunal's reference to 30 June 2016 "*corresponds to the date of valuation for the capitalised value of the Claimants' assets, and not the date on which to establish the rate of return for the first regulatory period*".[346] (emphasis in original). The Committee finds that the Decision might be ambiguous whether the same WACC plus a 200-bps premium was meant to apply for the entire period, including the first regulatory period. Theoretically, both Parties' interpretations are tenable. The Committee's mandate is not to determine which view is more tenable. All in all, the Tribunal's decision on quantum in the Award cannot be considered a manifest excess of powers.

E.    **SPAIN'S ALLEGATIONS AS TO FAILURES TO STATE REASONS**

(1)    **Failure to State Reasons Regarding the Installed Capacity Objection–"*Unclean Hands Objection*" (Art. 52(1)(e)) (Annulment Ground (f))**

a.    ***Spain's Position***

280.    Spain argues that the Award fails to state the reasons why it has "*jurisdiction to hear an arbitration initiated by Claimants in order to obtain protection for investments made without clean hands*".[347] Spain submits that "*the falsehoods committed by FPL in the investment, which prevent it from going to the Tribunal to claim and, in any case, would determine inadmissibility on the grounds as legitimate expectations cannot cover an investor fraud*".[348] (emphasis added). A violation of the clean-hands doctrine leads to the Tribunal's "*lack of jurisdiction*" or that the "*claim should* [have been] *dismissed*", because international arbitration cannot protect fraud or those without clean hands.[349] Spain submits that "*it is clear that the legality of the investment, in so far as it determines the material scope of the Tribunal's own jurisdiction, or where appropriate, the admissibility*

---

[346] Rejoinder, ¶ 357.

[347] Memorial, ¶ 457(f).

[348] Memorial, ¶ 177.

[349] Memorial, ¶ 304.

*of the Claim, are aspects of what should have been pronounced by the Award*".[350] (emphasis added).

281.   As noted in Section V.D(1)a, paragraph 198, *supra,* Spain explains that the NextEra Entities "*lied*" by saying that the installed capacity of the project was lower than 50 MW when, according to Spain, it was above 50 MW.[351] According to Spain, "*Article 27 of the 1997 Electricity Sector Act required as an essential condition that, in order to qualify for the system of Article 36 of the RD 661/2007, the installations had an 'installed power* [which] *does not exceed 50 MW*'".[352] Since the plants had an installed capacity of more than 50 MW, they could not benefit from the privileged system of subsidies.

282.   Spain also submits that the Tribunal did not apply or interpret international *jus cogens,* "*which prevents those who seek to benefit from falsehoods and frauds from being granted international protection*".[353] The Award does not give any reasoning on this "*transcendental issue that centered the debate on the Arbitration*".[354] The Tribunal failed to state reasons on the "*fraudulent access…to subsidies to which* [the Claimants were] *not entitled due to* [their] *false statements on installed power*".[355]

283.   Spain contends that it raised a jurisdictional objection in the underlying arbitration "*because legitimate expectations cannot be protected in those who access benefits with fraud and falsehood*".[356] On the first day of the Hearing, Spain stated that not only that the fraud "*should not be admitted*", but it also provided "*on the basis of such a false declaration, one cannot have legitimate expectations*".[357] (emphasis added). On the second day of the Hearing, Spain expanded upon the Tribunal's failure to state reasons on how the

---

[350] Memorial, ¶ 306.
[351] Memorial, ¶ 122.
[352] Memorial, ¶ 121.
[353] Reply, ¶ 188.
[354] Reply, ¶ 188.
[355] Reply, ¶ 611.
[356] Memorial, ¶ 37.
[357] Tr. Day 1 (Gil Nievas), 56:19–22; Spain's Opening Presentation, Slide 84.

Claimants could have a legitimate expectation in light of the unclean hands issue surrounding the installed capacity.[358]

284.   Spain claims that tribunals may not be required to state their reasoning in full extent but a "*minimum pronouncement is required on the essential issues raised by the parties*" such as the "*legality of the investment*".[359] According to Spain, the Tribunal acknowledged that both Parties made arguments regarding the installed capacity of the project, but the Award failed to make any pronouncement, even brief, on these matters and did not refer to the evidence presented.[360]

### b.   The NextEra Entities' Position

285.   The NextEra Entities argue that most of the arguments under this ground overlap with Annulment Ground (e) in Section V.D(1), *supra*.

286.   The Claimants argue that Spain has waived its right to seek annulment because it became aware of the issue when it received the Tribunal's Decision but failed to object within the 80 days since the Award was rendered.  This cannot be allowed. As cited above in response to Annulment Ground (e), in Section V.D(1), *supra,* the Claimants submit that under Art. 27 the Applicant waived its objections on these grounds.[361]

287.   The NextEra Entities stress that Spain raised the unclean hands, illegality, fraud, and misrepresentation arguments as a jurisdictional objection for the first time in the annulment proceedings. They claim that Spain did not raise a jurisdictional objection in the underlying arbitration arising from fraud and falsehood. The Claimants argue that an objection based on admissibility cannot be sustained even more so.[362]

288.   The Claimants submit that even if, *quod non*, the Applicant's objections were permissible, they are not sustainable because no unclean hands, falsehood, fraud, or misrepresentation

---

[358] Tr. Day 2 (Gil Nievas), 36:15–40:25; Spain's Closing Presentation, Slides 81–96.
[359] Memorial, ¶ 306.
[360] Memorial, ¶ 316.
[361] Counter-Memorial, ¶ 79.
[362] Counter-Memorial, ¶¶ 75–79; Rejoinder, ¶¶ 128–33, fn 206.

existed. The Claimants argue that they were transparent about the installed capacity.[363] They state Spain is asserting a novel interpretation of the installed capacity of a power plant not supported by Spanish law or industry practice, and the qualification of the Termosol Plants under the Special Regime was confirmed by various administrative organs of the Spanish State in full knowledge of the actual capacity of the Termosol Plants.[364] The NextEra Entities claim they presented evidence to this effect not challenged by Spain.[365]

289.    The NextEra Entities contend that given the Tribunal's findings on liability and legitimate expectations based on the Claimants' alternative claim, it did not have to decide upon the installed capacity issue. Since the Tribunal found that the Claimants were not entitled to damages based on RD 661/2007, but on a corrected version of Regulatory Framework III, it was unnecessary to decide the installed capacity objection.[366]

290.    The Claimants finally argue that the Tribunal implicitly provided reasons concerning the installed capacity issue. Based on the *Wena Hotels v. Egypt* case, the NextEra Entities explain that a tribunal's reasons "*may be implicit in the considerations and conclusions contained in the award, provided they can be reasonably inferred from the terms used in the decision*".[367]

### c.    The Committee's Analysis

291.    The Committee examines whether the Award failed to state reasons regarding "*a potential fraud on the installed MW that would determine that the Claimants didn't come with clean hands to the ICSID and that they were out of legal scope they benefited from*".[368] (emphasis added). The Applicant claims that the Claimants made a "*misrepresentation*" or "*possible misrepresentation*" on the installed capacity to be "*entitled to*" or "*benefit*" from the special subsidies.[369] Spain's Memorial states that the clean hands doctrine means the Tribunal

---

[363] Counter-Memorial, ¶ 315; fn 167; Rejoinder, ¶¶ 136–137.

[364] Tr. Day 2 (Herlihy), 98:19–99:7.

[365] Counter-Memorial, ¶¶ 311–315. *Wena Hotels v. Egypt*, RL-140, at ¶ 81.

[366] Counter-Memorial, ¶¶ 306–309.

[367] Counter-Memorial, ¶ 207, quoting *Wena Hotels v. Egypt*, RL-140, at ¶ 81.

[368] Application, Title 3.3.

[369] Application, ¶¶ 96, 98.

should be "*declared without jurisdiction, or simply that the claim should be dismissed*".[370] Spain added that the "*legality of the investment, insofar as it determines the material scope of the Tribunal's own <u>jurisdiction</u> or, where appropriate, the <u>admissibility</u> of the Claim, are aspects of what should have been pronounced by the Award*".[371] (emphasis added).

292.    As determined in Section V.D(1), *supra,* in the underlying arbitration, the Installed Capacity Objection was raised as a merits issue and the Unclean Hands Argument was not advanced at all. Both issues were advanced as jurisdictional issues for the first time on annulment. In addition to the jurisdictional objection, Spain claims that the Tribunal failed to state reasons because the NextEra Entities' claims should have been inadmissible based on the Installed Capacity Objection and the Unclean Hands Argument. Yet, based on its conclusions above in Section V.D(1), *supra,* the Committee similarly finds that admissibility need not be considered since it was never raised before the Tribunal.

293.    The Committee focuses its analysis on whether the Tribunal failed to state reasons concerning the Installed Capacity Objection issue. The Committee holds the Unclean Hands Argument need not be considered because it was not raised as a merits issue in the underlying arbitration. The Committee first examines whether it was relevant or necessary for the Tribunal to state reasons concerning the Installed Capacity Objection in terms of its merits. The Tribunal rejected the primary claim based on RD 661/2007 and instead chose to adopt the alternative claim. While the installed capacity issue was relevant for the primary claim, whether it was, for the alternative claim is the question.

294.    Spain argues that the installed capacity was a threshold issue that could not be divorced from Regulatory Framework III even if the claim was not based upon Art. 36 of RD 661/2007. Spain emphasizes that the Decision summarizes that "*Respondent points out that Article 27 of the 1997 Electricity Law required as an 'essential condition' that in order to qualify for the regime in Article 36 of RD 661/2007 the installations had an 'installed*

---

[370] Memorial, ¶ 304.

[371] Memorial, ¶ 306. The Memorial similarly provided "*the falsehoods committed by FPL in the investment, which prevent it from going to the Tribunal to claim and, in any case, would determine inadmissibility on the grounds as legitimate expectations cannot cover an investor fraud*". Memorial, ¶ 177 (emphasis added).

capacity [ ... ] no greater than 50MW'".[372] The Claimants, in contrast, cite *RREEF v. Spain* as an example where a tribunal found it was not necessary to decide the installed capacity issue because its decision was not based on the special regime under RD 661/2007.[373]  The *RREEF v. Spain* tribunal explained:

> *concerning more specifically* [the] *Arenales* [CSP plant]*, the question debated between the Parties as to its installed capacity has no consequence in the Tribunal's reasoning since the compensation awarded to the Claimants is based on an assessment of the reasonableness of the actual return, not on that resulting from the special regime under RD 661/2007 which was limited to plants of an installed capacity of 50 MW and below.*[374]

295.    The Committee does not find that the installed capacity issue was an "*essential condition*" under the alternative claim. The Tribunal ultimately based its finding on legitimate expectations not on a specific law but on the broad assurances of the Spanish authorities that legal security would be guaranteed and the economic regime would not be significantly changed. The Tribunal concluded that based on those assurances the "*Claimants had a legitimate expectation that the regime would not be changed in a way that would undermine the security that Claimants had in respect of the economic regime set out in RD 661/2007*".[375] (emphasis added).

296.     Tribunals may be succinct in their reasoning and do not have to address all issues. What matters is whether a matter was "*relevant or necessary*". As *TECO v. Guatemala* explains:

> [i]*nsufficiency of reasons is not a ground for annulment where a tribunal did not explain why it rejected arguments, evidence or authorities that were not relevant or necessary for its analysis…. Similarly, 'inadequate' reasons may justify annulment only if they*

---

[372] Decision, ¶ 506.

[373] Counter-Memorial, ¶ 305, citing *RREEF Infrastructure (G.P) Limited and RREEF Pan-European Infrastructure Two Lux S.á.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, CL-261.

[374] *RREEF Infrastructure (G.P) Limited and RREEF Pan-European Infrastructure Two Lux S.á.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, CL-261, ¶ 522.

[375] Decision, ¶ 591.

> *cannot logically explain the decision they are purportedly supporting.*[376]

297. Spain has not convinced the Committee that it was "*relevant or necessary*" for the Tribunal to address the installed capacity issue given that it rejected the primary claim. The Tribunal did not explicitly deal with the installed capacity although it was extensively explored by the Parties in the underlying arbitration. The Committee finds this can be logically explained because it was not "*relevant or necessary*" to consider it in the alternative claim.

298. The Committee concludes that Spain's claim that the Award failed to state reasons concerning the Installed Capacity Objection should be denied because it was not necessary or relevant for the Tribunal's decision. Furthermore, as determined in Section V.D(1), *supra,* Spain's claim that the Award failed to state reasons concerning the Unclean Hands Argument and Installed Capacity Objection cannot be sustained as a jurisdictional objection or admissibility challenge because they were not advanced in the underlying arbitration and cannot be raised for the first time on annulment.

**(2)   Failure to State Reasons in Hearing a Dispute between an Investor of an EU Member State and an EU Member State – "*Intra-EU Objection*" (Art. 52(1)(b)) (Annulment Ground (h))**

*a.  Spain's Position*

299. Spain refers to Professor Gosalbo's report and argues that:

> *...there is no possibility of investment arbitration between a company of an EU Member State and a Member State.*[377]

300. According to Spain, Member States of the EU decided that EU legislation should apply to intra-community affairs and intra-EU disputes, while international conventions remain in force for relations with third countries.[378]

---

[376] *TECO v. Guatemala*, RL-207, ¶¶ 249–250.

[377] Memorial, ¶ 128.

[378] Memorial, ¶ 133.

301.   Referring to the *Achmea* decision, Spain remarks that the CJEU found that:

> *Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept...*[379]

302.   Spain claims that the Tribunal did not explain how Art. 26 of the ECT applies within the EU. It further holds that the Tribunal did not carry out an analysis of all the rules of interpretation provided in Art. 31 of the Vienna Convention, but merely indicated that there was no disconnection clause and on that basis stated its conclusion.[380]

303.   Spain concludes that the Tribunal failed to state its reasons for admitting jurisdiction for an investment arbitration within the EU.

### b.   The NextEra Entities' Position

304.   The NextEra Entities submit that the Tribunal did provide reasons for upholding its jurisdiction over intra-EU disputes.[381]

305.   To rebut Spain's argument, the NextEra Entities explain that the Tribunal found that EU law did not apply for the purpose of jurisdiction. Instead, the jurisdictional question was to be determined under the ECT (Art. 26) and the ICSID Convention (Art. 25).[382]

306.   The NextEra Entities conclude by saying:

> *On any analysis, the Tribunal therefore stated reasons for its decision that the ECT and the ICSID Convention – rather than EU law – provided the basis for determining its jurisdiction.*[383]

---

[379] Memorial, ¶ 138; *The Slovak Republic v. Achmea B.V.*, Judgment of the Court, CJEU Case No. C-284/16, 6 March 2018, RL-135, ¶ 60.

[380] Memorial, ¶ 143.

[381] Counter-Memorial, ¶ 141; NextEra Entities' Observations on the EC's Amicus Brief, 25 May 2020, ¶ 27.

[382] Counter-Memorial, ¶ 221.

[383] Counter-Memorial, ¶ 223.

307.    The Claimants cite Professor Piet Eeckhout's expert opinion:

> ...In particular, Professor Eeckhout explains that: (i) the ECT applies on an intra-EU basis; (ii) there is in fact no conflict between the ECT and EU law; and (iii) even if such a conflict existed, it would have to be resolved in favour of the ECT and international law, not EU law, based on the express terms of Art. 16 of the ECT.[384]

308.    According to the NextEra Entities, Spain did not establish that the Tribunal failed to state reasons for upholding jurisdiction over an intra-EU claim.[385]

### c.    The Committee's Analysis

309.    The Committee examines whether the Award failed to state reasons to uphold jurisdiction to hear the dispute between an investor of an EU Member State and another EU Member State under the ECT. The Committee finds that much of the reasoning in this section overlaps with the analysis concerning Annulment Ground (g) in Section V.D(2), *supra*, and that the Award stated its reasons in finding jurisdiction to hear the intra-EU dispute.

310.    As provided in Section V.D(2), *supra*, the Tribunal first reviewed the earlier decisions from other tribunals that upheld jurisdiction under Art. 26 of the ECT, the *Achmea* judgment, and the observations of the EC.[386] The Tribunal then considered whether the ECT applied to relations *inter se* of EU Member States and whether the ECT intended to carve out and exclude jurisdiction over intra-EU disputes.[387] The Tribunal analyzed Arts. 1(3) and 10 of the ECT and noted in the absence of a "*disconnection clause and a revision of the ECT*" it could not conclude that EU's consenting to the ECT would supersede the consent given by the EU Member States individually to the ECT.[388] The Tribunal cited the reasoning of *Blusun v. Italy* to support its views and held it could not infer a carve-out to exclude intra-EU disputes as Spain argued.

---

[384] Counter-Memorial, ¶ 149; Expert Opinion of Professor Piet Eeckhout, 9 July 2020, ¶¶ 7–24, 25–79, 80–96.

[385] Counter-Memorial, ¶ 150.

[386] Decision, ¶ 333.

[387] Decision, ¶¶ 339–344.

[388] Decision, ¶ 342.

311.    The Tribunal next reviewed whether the subsequent overlap that may exist between the ECT and EU law regarding investment operations rendered Spain's offer to arbitrate invalid.[389] The Tribunal noted that it was not empowered to determine whether a dispute under the ECT falls under the TFEU and instead held that the ECT was "*the instrument governing the present Tribunal's jurisdiction*".[390] The Tribunal rejected Spain's arguments that any intra-EU obligations were superseded by subsequent treaties because it found the treaties did not relate to the same subject matter under Art. 30 of the Vienna Convention.[391] As support, the Tribunal also cited *Electrabel v. Hungary* that "*the ECT's genesis generates a presumption that no contradiction exists between the ECT and EU law*".[392] The Tribunal concluded that it could not hold that "*Spain's consent to submit ECT disputes to arbitration excluded intra-EU investment disputes*" and that "*primacy of EU Law exclude*[d] *jurisdiction of the present Tribunal established under the ECT*".[393] The Tribunal therefore rejected Spain's argument based on the primacy of EU law over intra-EU disputes between an investor and EU.

312.    The Committee finds that the Award provided reasoning that can be followed in upholding jurisdiction over an intra-EU dispute under the ECT. The Committee holds that the Tribunal provided reasoning for rejecting Spain's intra-EU objection and that the Award did not fail to state its reasons concerning intra-EU disputes. The Committee denies Spain's Application based on this ground.

### (3)    Failure to State Reasons for not Applying Applicable International Rules, the ECT and EU law (Art. 52(1)(e)) (Annulment Ground (j))

#### a.    *Spain's Position*

313.    Spain explains that Art. 52(1)(e) of the ICSID Convention states that an award must be annulled if it fails to indicate the reasons on which it is based. Additionally, Spain holds

---

[389] Decision, ¶¶ 345–356.
[390] Decision, ¶ 350.
[391] Decision, ¶ 352.
[392] Decision, ¶ 355; *Electrabel S.A. v. Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, RL-091, ¶ 4.134.
[393] Decision, ¶ 357.

that pursuant to Art. 48(3) of the ICSID Convention, the Tribunal must deal with all matters referred to it and state the reasons on which it bases its conclusions.[394]

314.   Citing the *Amco v. Indonesia I* case, Spain points out the following:

> *...supporting reasons must be more than a matter of nomenclature and must constitute an appropriate foundation for the conclusions reached through such reasons. Stated a little differently, there must be a reasonable connection between the bases invoked by a tribunal and the conclusions reached by it.*[395]

315.   Spain argues that the Tribunal rejected the application of EU law by denying it the character of international law without giving any justification.[396]

316.   In addition, Spain explains that according to Art. 26(6) of the ECT, arbitral tribunals must apply the ECT and the applicable rules of international law which, according to Spain, lead to the application of Art. 38 of the ICJ Statute.[397]

317.   Spain claims that:

> *...the Award, without justification or motivation, modifies the International Law and invents a new rule of* 'international law' *by pointing out that the rules of International Law apply only to the extent relevant to (the) interpretation and application (of the ECT).*[398]

### b.   The NextEra Entities' Position

318.   The NextEra Entities again argue that Spain waived its claims under this ground based on ICSID Arbitration Rule 27. Spain did not raise its objection promptly after receiving the Tribunal's Decision and prior to the Award.

---

[394] Memorial, ¶ 178.

[395] Memorial, ¶ 179; *Amco Asia Corporation, et al. v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision of the *ad hoc* Committee on the Application for Annulment, 16 May 1986, 16 May 1986, 1 ICSID Reports 509, RL-196, ¶ 43.

[396] Memorial, ¶ 191.

[397] Memorial, ¶ 194.

[398] Memorial, ¶ 194.

319.    Referring to the *Micula v. Romania* case, the NextEra Entities argue that the committee in that case explained the threshold for establishing a failure to state reason by saying that:

> The standard for annulment under Art. 52(1)(e) of the ICSID Convention is, therefore, high. It does not permit an ad hoc committee to second-guess the reasoning of the tribunal. It imposes on the applicant the burden of proving that the reasoning of the tribunal on a point that is essential for the outcome of the case was either absent, unintelligible, contradictory or frivolous. To succeed, the Applicant must discharge this burden.[399]

320.    In addition, they cite the *Daimler v. Argentina* case where it was held that:

> ...in reviewing the apparent contradictions, the ad hoc committee should, to the extent possible and considering each case, prefer an interpretation which confirms an award's consistency as opposed to its alleged inner contradictions.[400]

321.    The NextEra Entities further argue that any objective reader would be able to follow the Tribunal's reasons. The Tribunal's decision is reasoned because it recounts the Parties' arguments and it is based on the express text of Art. 26(6) ECT, to which the Tribunal had referred in the immediately preceding paragraphs.[401]

322.    They claim that the Tribunal not only referred to the treaty text, but went further and interpreted it. They point out that the Decision found that the reference to "*applicable rules and principles of international law*" in Art. 26(6) meant "*any rules of international law relevant to* [the ECT's] *interpretation and application*" (emphasis added by the Claimants) rather than "*international law*" at large or EU law.[402]

### c.    The Committee's Analysis

323.    The Committee examines whether Spain demonstrated that the Award failed to provide reasons concerning the applicable law and rules. Art. 26(6) of the ECT provides that "*A*

---

[399] Counter-Memorial, ¶ 175 (emphasis omitted); *Ioan Micula and Ors. v. Romania,* ICSID Case No. ARB/05/20, Decision on Annulment, 26 February 2016, CL-188, ¶ 139.

[400] Counter-Memorial, ¶ 212; *Daimler v. Argentina*, CL-283, ¶ 78.

[401] Counter-Memorial, ¶ 234.

[402] Counter-Memorial, ¶ 235.

*tribunal...shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law*".[403] The Tribunal first summarized that the Parties were largely in agreement that the applicable substantive law pursuant to Art. 26(6) of the ECT was (i) the ECT substantive provisions; (ii) the Vienna Convention; and (iii) "*applicable rules and principles of international law*".[404] The Tribunal then explained that the Parties differed in their view on the relevance and weight of Spanish law and EU law.[405]

324.    The Tribunal explained in its "Analysis" that "*the applicable law is the ECT and any rules of international law relevant to its interpretation and application*". The Tribunal added that it will "*refer to provisions of Spanish law and EU law if appropriate*".[406] The Tribunal concluded that "[t]*heir particular weight and relevance will be assessed in this decision in the context of the issues in respect of which they have been raised*".[407]

325.    The Committee finds that the reasoning of the Award is based on the general agreement between the Parties on the substantive law and the express text of Art. 26(6) of ECT. The Committee finds the Tribunal provided reasons when determining the meaning of "*applicable rules and principles of international law*" under Art. 26(6) and the relevance and weight to be given to Spanish and EU law. The Tribunal explained that "*applicable rules and principles of international law*" in Art. 26(6) meant "*any rules of international law relevant to* [the ECT's] *interpretation and application*"[408]. The Tribunal therefore distinguished between "*rules of international law relevant to its* [i.e. the ECT's] *interpretation and application*" and "*Spanish law and EU law*". While the applicable law was the "*ECT and rules of international law relevant to its interpretation and application*", the Tribunal would separately "*refer*" to Spanish and EU law "*if appropriate*". The Tribunal explained that how much "*weight*" *and* "*relevance*" Spanish and EU law would

---

[403] ECT, Art. 26(6), CL-001.

[404] Decision, ¶¶ 385, 388.

[405] Decision, ¶¶ 386–387; ¶¶ 389–390; the Tribunal also noted that the Claimants contended that the applicable procedural law was the procedural provisions of the ECT and the ICSID Arbitration Rules, Decision, ¶ 385.

[406] Decision, ¶ 390.

[407] Decision, ¶ 390.

[408] Decision, ¶ 390.

be given would depend upon the "*context of the issues in respect of which they have been raised*".[409]

326.   The Committee agrees with the Claimants' view that the Tribunal did not consider EU law to be among the "*rules of international law relevant to* [the] *interpretation and application*" of the ECT.[410] The Tribunal (i) dealt with each body of law in separate sentences; (ii) placed EU law in the same category as Spanish law; (iii) found that EU law could be "*referred to*" and "*applied*" or not "*if appropriate*"; and (iv) provided that "*weight*" and "*relevance*" given to EU law would depend upon the "*context of the issues in respect of which they have been raised*". Spain itself admits that the Tribunal "*devotes a single paragraph to the analysis of the applicable law*".[411]

327.   The Tribunal then separately referred to EU law to determine its potential application in relation to intra-EU disputes under the ECT. In terms of EU law, the Tribunal explained when addressing Spain's intra-EU objection that "*it is not the task of this Tribunal to determine whether the scope of this dispute concerns the application of the TFEU, but rather whether such dispute concerns the application of substantive provisions of the ECT*".[412] As explained in Section V.E(2)c, *supra,* the Tribunal then held that the ECT applies and EU law does not have primacy in an intra-EU dispute. The Committee finds that the Tribunal's analysis on the applicable law provides reasons that could be followed and grounds for annulment under Art. 52(1)(e) were not met.

328.   Spain also challenges how the Tribunal interprets the ECT and its application of international law and suggests that the Tribunal did not provide "*justification or reasoning*" or "*sufficient grounds*".[413] The Committee is not persuaded. As Spain concedes, the Tribunal "*devotes paragraphs 332 to 357 to try to justify the existence of jurisdiction to know the intra-EU disputes*".[414] The Committee concludes that these issues therefore were

---

[409] Decision, ¶ 390.
[410] Counter-Memorial, ¶ 236.
[411] Memorial, ¶ 192.
[412] Decision, ¶ 349.
[413] Memorial, ¶¶ 194–195.
[414] Memorial, ¶ 190.

covered in these paragraphs. The Tribunal did provide "*justification or reasoning*" and "*sufficient grounds*" when it analyzed (1) whether the ECT applied to relations *inter se* of EU Member States; (2) whether the ECT Contracting Parties intended to carve out and exclude jurisdiction over intra-EU disputes; and (3) whether any subsequent overlap between the ECT and EU law regarding investment operations rendered Spain's offer to arbitrate invalid.

329.   Spain next cites the Tribunal's failure to address the EU rules on State aid or the EC's decision.[415] The Committee finds that the Tribunal's decision to reject the primacy of EU law resulted in an umbrella that subsumed these issues, rendered them moot, and made it unnecessary to "*give reasons*" or "*even mention*" them.[416]

330.   Spain's assertion that the reasoning of the Award contained "*flaws and clumsiness*"[417] focuses on the adequacy and correctness of the Tribunal's decision. These factors do not constitute a basis for annulment under Art. 52(1)(e) as long as the reasoning could be followed and was not contradictory or frivolous.

331.   As provided in paragraph 126, *supra*, while Art. 48(3) of the ICSID Convention requires an award to "*deal with every question submitted to the Tribunal*" this does not serve as a ground for annulment.[418] Art. 52(1)(e) provides for annulment only when a failure to state reasons exists. The test for the Committee is whether the reasoning could be followed. The Tribunal did not have to address all of Spain's assertions regarding the applicable international law and rules.

332.   The Committee observes that Spain finds fault with the Tribunal's justification and the adequacy of such justification. Yet, the correctness and adequacy of the Tribunal's justification do not qualify as annulment grounds under Art. 52(1)(e). The Committee concludes that the Tribunal stated its reasons for determining the applicable law and how

---

[415] Memorial, ¶¶ 196–197.

[416] Memorial, ¶ 197.

[417] Memorial, ¶ 190.

[418] Updated Background Paper, RL-134, ¶ 103.

EU law should apply. The reasoning could be followed and was not contradictory or frivolous.

### (4) Failure to State Reasons for its Conclusion on the Breach of Legitimate Expectations (Art. 52(1)(e)) (Annulment Ground (l))

#### a. Spain's Position

333. According to Spain, the NextEra Entities' legitimate expectation claim was based on five bases, four of which were dismissed by the Tribunal.[419] Spain asserts the Tribunal did not explain how the Claimants could have had legitimate expectations of the petrification of subsidies contrary to EU law and other applicable legislation.

334. Spain argues that "*the* [Tribunal's] *decision jumps from one conclusion to another without being able to follow how one arrives at one*", "*its paragraphs jump from one point to another without reasoning*", and "*in each conclusion*" Spain can "*find aspects that are either unsubstantiated or frankly contradictory*".[420] Spain blames the Tribunal's reasoning for its "*absences and serious inconsistencies*".[421]

335. Spain points out that the Tribunal found that "*legitimate expectations can exist in the absence of actual formal commitment*".[422] Spain claims that this conclusion was in complete disconnection with the Tribunal's findings[423] and that the Tribunal did not explain its reasoning to arrive to such conclusion.[424]

---

[419] Memorial, ¶¶ 223–235.
[420] Reply, ¶¶ 552, 554.
[421] Reply, ¶ 556.
[422] Memorial, ¶ 239; Decision, ¶ 592.
[423] Memorial, ¶ 242.
[424] Memorial, ¶ 246.

336.    Citing *Continental v. Argentina*,[425] *Charanne v. Spain*,[426] *Isolux v. Spain*,[427] *Stadtwerke v. Spain*,[428] and *PV Investors v. Spain*,[429] Spain argues that the Award is contradictory because absent "*specific formal immutability commitments*" there cannot be legitimate expectations of immutability.[430]

337.    Spain reinforces its argument by saying that:

> *...such Tribunal affirmation, that in the absence of a formal commitment to immutability in the regulatory framework or by the Spanish authorities, may nevertheless raise legitimate expectations, is not supported by sufficient and non-contradictory reasons offered by the Court. And this affirmation is the substance on which the declaration of liability against Spain hinges, so that it must be annulled.*[431]

338.    Spain concludes by saying that:

> *...the lack of expression of reasons is notable and the Decision does not allow to follow the reasoning from Point A to B and now C: the State retains the regulatory power to accommodate the regulation to the economic situation for reasons of general interest (Point A), a State for those same reasons cannot change the regulation unexpectedly, altering essential characteristics of the regulation (Point B), Spain has altered essential characteristics of its regulation and that this also leads to point C that Spain has consequently infringed the ECT.*[432]

---

[425] Memorial, ¶ 248; *Continental Casualty Company v. Argentine Republic*, ICSID Case No. ARB/03/9, Award, 5 September 2008, RL-209, ¶ 261.

[426] Memorial, ¶ 248; *Charanne v. The Kingdom of Spain*, SCC Case No. 062/2012, Final Award, 21 January 2016, RL-088, ¶¶ 493, 150, 545 and 546.

[427] Memorial, ¶ 248; *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, Case No. SCC V2013/153, Award, 12 July 2016, RL-121, ¶¶ 764–765.

[428] Memorial, ¶ 248; *Stadtwerke München GMBH, RWE Innogy GMBH, and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019, RL-167, ¶¶ 259 et seq.

[429] Memorial, ¶ 248; *The PV Investors v. The Kingdom of Spain*. UNCITRAL, PCA Case No. 2012-14, Final Award, 28 February 2020, RL-188, ¶¶ 587 *et seq*.

[430] Memorial, ¶ 248.

[431] Memorial, ¶ 250.

[432] Memorial, ¶ 300.

### b.    The NextEra Entities' Position

339.    On this point, the NextEra Entities explain that the Tribunal analyzed each of the sources on which the NextEra Entities based their legitimate expectation claim.

340.    The NextEra Entities also highlight that the Tribunal went on to explain why it was not convinced that any of these arguments, viewed in isolation, were sufficient for the expectation that the NextEra Entities would be guaranteed the terms of Regulatory Framework I.[433]

341.    Nevertheless, it went on to say that the Tribunal found that these elements:

> did 'provide context for [the] claim' *that the final component identified by the Claimants – i.e., the specific statements and representations made to NextEra by Spanish officials – created protected legitimate expectations.*[434]

342.    According to the NextEra Entities, the Tribunal thereby reasoned that the NextEra Entities could not have had the expectation that the regime would remain frozen and could not be changed. However, based on the assurances given by Spanish authorities, they had a legitimate expectation that the regime would not be changed in a way that would undermine the security and viability of their investment.[435]

343.    The NextEra Entities conclude by denying any contradiction in the Tribunal's reasoning and highlighting that the Tribunal found the regime was fundamentally and radically changed, violating the NextEra Entities' legitimate expectations.[436]

### c.    The Committee's Analysis

344.    The Committee finds that the test under Art. 52(1)(e) is not whether a tribunal's decision "*jumps from one point to another without reasoning*" but whether it can be "*followed*" overall. A tribunal's decision can "*jump from one point to another without reasoning*" as

---

[433] Counter-Memorial, ¶¶ 269–270.

[434] Counter-Memorial, ¶ 271.

[435] Counter-Memorial, ¶¶ 272–274.

[436] Counter-Memorial, ¶¶ 280–290.

long as the reader can follow how the tribunal's reasoning proceeded from point to point. The Committee also confirms that tribunals have discretion to decide on a legal standard for legitimate expectations.

345. The Committee is not convinced by Spain's contentions concerning the lack of reasoning. First, the Committee does not find that the decision "*jumps*" from one point to the next without reasoning in a manner that cannot be followed. The Committee finds that Spain's claim of a lack of reasoning pertaining to legitimate expectations concerns more the adequacy and correctness of the reasoning. A reasonable reader can understand that the Tribunal reached a finding on legitimate expectations based on the assurances and representations that Spanish authorities made guaranteeing the security of the regulatory framework that went beyond the immutability of legislation. In this regard, the Committee finds that Tribunal met its "*minimum requirement*" to state reasons.[437]

346. The Tribunal does not have to "*strain every sinew*" as Spain's detailed analysis of the Award would suggest.[438] A committee's mandate does not include assessing "*the quality or persuasiveness of reasons*" and a committee may be "*dissatisfied with the adequacy of reasons, but provided they meet the conditions set out in* MINE" the grounds under Art. 52(1)(e) will not be met.[439]

347. The Committee disagrees with Spain that the lack of "*reasonable and sufficient explanations*",[440] lack of "*understandable*"[441] reasoning, "*flaws in the findings*",[442] failure to "*develop* [an] *idea in order to clear...doubts*",[443] and "*ambiguities*"[444] would qualify for an application under Art. 52(1)(e). These factors would call upon the Committee to consider the merits in the manner of an appeal, which is beyond its mandate.

---

[437] See Schreuer, CL-279, Art. 52, ¶ 342.
[438] Schreuer, CL-279, Art. 52, ¶ 342.
[439] Schreuer, RL-210, Art. 52, ¶ 388.
[440] Memorial, ¶ 253.
[441] Memorial, ¶ 271.
[442] Memorial, ¶ 264.
[443] Memorial, ¶ 267.
[444] Memorial, ¶ 278.

348.    The Committee holds that "*serious inconsistencies*" could constitute grounds under Art. 52(1)(e) but only if they reached the level of being "*contradictions*" that led to an absence of reasons.[445] An assessment of whether such inconsistencies existed could only be conducted to determine if they amounted to contradictory reasons that cancelled each other. An inquiry beyond that would fall prey to the slippery slope of an impermissible inquiry into the adequacy and correctness of the reasoning.

349.    The *ad hoc* committee's mandate under Art. 52(1)(e) does not include a reassessment of the Tribunal's analysis of the evidence and the weight and significance it placed on the evidence. The *ad hoc* Committee's mandate does not include how the Tribunal determined (1) whether the statements that the Spanish authorities made amounted to guarantees of security; (2) whether the Claimants conducted due diligence; (3) how other tribunals treated the regulatory changes; (4) how to treat the jurisprudence of the Spanish Supreme Court; and (5) whether the assurances were made to a legal entity different from the Claimants. The fact that the letters were characterized as being "*from a Spanish minister*" instead of a "*Secretario de Estado*" is similarly at most a "*mistake*" and an error of fact.[446]

350.    The Committee does not find any contradictions or "*antinomy*"[447] to sustain a basis for an application under Art. 52(1)(e). The Committee notes that Spain also based its Application under Art. 52(1)(e) on the existence of frivolous reasons but does not fully elaborate this basis.[448]

351.    Spain's claims are more a dissatisfaction with the adequacy, correctness, and quality of the reasons, which, however fair the criticisms might be, would not form the basis for the "*lack of reasons*" ground.

352.    The Committee agrees with the Claimants that the Tribunal rejected the Claimant's primary claim and did not find legitimate expectations based on the petrification of the subsidies.

---

[445] Memorial, ¶ 247 ("*contradictio in terminis*"); Reply, ¶ 556 ("*serious inconsistencies*"); ¶¶ 559, 588 ("*contradictions*"), ¶ 560 ("*inconsistencies*"), ¶ 561 ("*inconsistencies and inadequacies*").
[446] Memorial, ¶ 262.
[447] Memorial, ¶¶ 254, 257.
[448] Reply, ¶ 509.

The Tribunal stated that it was "*not convinced that in the circumstances of the present case the mere fact of Regulatory Framework 1 was a sufficient basis for the expectation that Claimants would be guaranteed the terms of Regulatory Framework I. The Framework was based on legislation and legislation can be changed*".[449] The Tribunal held that the Claimants could not have any legitimate expectations concerning the petrification of subsidies solely based on the immutability of legislation itself. Under these circumstances, contrary to Spain's assertions, the Tribunal did not have to determine whether "*there may be a legitimate expectation that the legal framework would not be amended*" even though the "*the legal framework* [did] *not have any immutability clause*".[450] The Committee finds that the Tribunal's rejection of the primary claim does not contradict finding legitimate expectation based on the separate assurances of the Spanish authorities concerning the regulatory framework.[451]

353.    The Committee finds that the Tribunal did provide reasoning on this point. The Tribunal explained that the various statements and assurances by the Spanish authorities might not have been "*actual formal commitments*" but considered that the "*question* [wa]*s whether what was said could reasonably give rise to expectations about the future conduct of the government*".[452] The Tribunal elaborated that the specific assurances of a Spanish minister could "*reasonably be taken as statements that the Spanish government had no intention of making significant changes to the investment regime…and that this could be relied on by an investor*".[453] Spain claims that the Decision does not "*clearly identify the content*" of the Claimants' legitimate expectations and does not "*analyse each of the disputed measures under the prism of the FET standard*".[454] The Committee finds that the Tribunal stated its reasoning that specific assurances could lead to legitimate expectations even though they were not formal commitments. The Tribunal provided reasons when finding that legitimate

---

[449] Decision, ¶ 584.

[450] Reply, ¶ 564.

[451] Reply, ¶ 586.

[452] Decision, ¶¶ 592–593.

[453] Decision, ¶ 593.

[454] Memorial, ¶ 276.

expectations could exist, particularly in the "*absence of actual formal commitment*". The Committee does not agree with Spain that "*this assertion is not reasoned*".[455]

354.   Spain also claims that this assertion "*remains unjustified*", but this would not be a basis for annulment under Art. 52(1)(e).[456] For instance, whether other tribunal's "*stated the opposite*" and reached contrary conclusions goes to the correctness of the reasoning not the lack of it.[457] The Committee finds that Spain is ultimately challenging the correctness of the Tribunal's reasoning, which cannot be the basis for an application under Art. 52(1)(e).

355.   The Committee concludes that, given the reasoning that the Tribunal provided, the Applicant's assertion of failure to state reasons based on Art. 52(1)(e) cannot be sustained.

### (5)   Failure to State Reasons Regarding the Date of Investment (Art. 52(1)(e)) (Annulment Ground (m))

#### a.   Spain's Position

356.   Spain claims that the Tribunal failed to decide the date on which the purported investment was made, which was a matter disputed by the Parties during the proceedings.

357.   Spain considers that the investment date is a key issue for a "*motivated analysis*" of the Claimants' expectation.[458] Spain states as follows:

> The Kingdom of Spain considered that FPL had made its alleged investment in April 2011. However, the Claimants stated that the investment was made in December 2010.[459]

---

[455] Reply, ¶ 564.

[456] Reply, ¶ 565; Memorial, ¶¶ 245–248.

[457] Reply, ¶ 565.

[458] Memorial, ¶ 205.

[459] Memorial, ¶ 206.

358.   Spain alleges that the failure of the Tribunal to rule upon this "*fundamental issue in dispute*"[460] constituted a violation to Art. 48 of the ICSID Convention and constituted grounds for annulment of the Award under Art. 52(1)(e) of the ICSID Convention.[461]

359.   Spain asserts that while the Award reflects the Parties' positions it does not state who is right and why. Spain contends that the date of the investment was relevant for liability or quantum because it acts as the date from which an investor's legitimate expectations may be assessed.[462]

### b.   The NextEra Entities' Position

360.   The NextEra Entities deny that the Tribunal failed to determine when the NextEra Entities' investment was made. However, even if this were a valid argument, it holds that Spain waived this claim long ago in accordance with ICSID Arbitration Rule 27 as it was not promptly raised after receiving the Decision and prior to the Award.[463] The NextEra Entities explain that Spain never raised this alleged lack of decision until it filed for annulment of the Award, which cannot be considered to be a "*prompt*" objection on Spain's part as provided under ICSID Arbitration Rule 27.[464]

361.   The NextEra Entities argue that Spain's arguments are a challenge to the correctness of the Decision and its appreciation of the evidence, rather than a failure to state reasons or to decide when the investment took place.[465]

362.   In any case, they contend that the Award was not silent on the date of the investment because it expressly recorded the Parties' respective positions on the issue and included express findings of fact that referred to the investment.[466]

---

[460] Reply, ¶ 533.
[461] Memorial, ¶¶ 210–211.
[462] Reply, ¶¶ 533–534.
[463] Counter-Memorial, ¶ 225.
[464] Counter-Memorial, ¶ 226.
[465] Counter-Memorial, ¶ 249.
[466] Counter-Memorial, ¶ 244.

363.    The NextEra Entities add that the date of the investment was not relevant for liability or quantum as the Tribunal found that the NextEra Entities could not have expected the regime to remain unchanged, but nevertheless could expect that there would be no radical changes made to the economic regime.[467]

###    c.    *The Committee's Analysis*

364.    The Committee examines whether Spain has established that the Tribunal failed to state reasons concerning the date of the investment.

365.    The Tribunal did make findings of fact as to how and when the Claimants' investment was made and was not silent on the issue of the investment date.[468] At the same time, the Committee agrees with Spain that the Tribunal did not make a determination about the exact investment date that was disputed between the Parties. The passages in the Decision that the Claimants cite as examples where the Tribunal provided reasons consist of only summaries of the Parties' respective positions.[469]

366.    Nevertheless, the Committee ultimately determines that whether the investment date was December 2010, as the Claimants argued, or April 2011, as the Applicant argued, does not affect the finding on legitimate expectations in this case. The Committee notes that neither investment date would have affected the Tribunal's finding on legitimate expectations. Both dates were related to the Claimants' primary claim that was dismissed, but not the alternative claim that the Tribunal adopted.

367.    Under these circumstances, the Committee does not consider that it was "*relevant or necessary*" to rule on this issue. Even if the Tribunal failed to state reasons on the investment date, it would not qualify as a ground for annulment because it was not relevant or necessary. As *TECO v. Guatemala* explains:

>    [i]*nsufficiency of reasons is not a ground for annulment where a tribunal did not explain why it rejected arguments, evidence or authorities that were not relevant or necessary for its*

---

[467] Counter-Memorial, ¶¶ 251–253.

[468] Decision, ¶¶ 168–178.

[469] Counter-Memorial, ¶¶ 244–249, citing Decision, RL-132, ¶¶ 168–178, 413, 424, 431, 435, 468, 499, 500.

> *analysis...Similarly, insufficiency of reasons does not warrant annulment if the tribunal did not address every argument, piece of evidence or authority in the record...Similarly, 'inadequate' reasons may justify annulment only if they cannot logically explain the decision they are purportedly supporting.*[470]

368. The Committee concludes that the Applicant's claims based on the investment date cannot be sustained under Art. 52(1)(e).

### (6)    Failure to State Reasons for its Conclusion on Liability (Art. 52(1)(e)) (Annulment Ground (n))

#### a.    *Spain's Position*

369. Spain claims the following:

> *...the NextEra Tribunal has not sufficiently reasoned: (1) neither Article 10(1) ECT nor the interpretation that should be given to it in accordance with the Vienna Convention; (2) the alleged breaches by the Kingdom of Spain of the applicable standards and regulations...*[471]

370. Spain argues that the Tribunal failed to examine the standards contained in Art. 10(1) of the ECT which, according to the NextEra Entities, were violated.[472] In particular, Spain considers that there is a lack of reasons on the Tribunal's decision not to carry out an analysis of the alleged breached of Art. 10 of the ECT after finding the "*alleged breach of legitimate expectations as an integral part of the Fair and Equitable Treatment*".[473]

371. Spain claims that the Tribunal did not conduct any analysis on the "*concept of legitimate expectations, its application by arbitral jurisprudence, its configuration, content, and scope*".[474] The Tribunal only cited one prior investment treaty award when discussing legitimate expectations.

---

[470] *TECO v. Guatemala*, RL-207, ¶¶ 249–250.

[471] Memorial, ¶ 214.

[472] Memorial, ¶ 215.

[473] Memorial, ¶ 216.

[474] Memorial, ¶ 220.

372.  As a result, according to Spain, it is not possible to verify whether such reasoning was correct or not and whether it was "*well applied in relation to the facts*" of the case, preventing Spain from rebutting what the Tribunal considered when deciding on Spain's liability.[475]

### b.     The NextEra Entities' Position

373.  The NextEra Entities start by saying that:

> *Annulment is not a forum for correcting an allegedly* 'flawed application of Article 10(1) of the ECT'. *Nor is annulment concerned with whether the reasoning in an award is* 'valid'. *Even less so can an annulment committee determine what should have been* 'the content of [the NextEra Entities'] legitimate expectations' *(which is a fact-driven inquiry) or second-guess the Tribunal's* 'assessment of the disputed measures'.[476]

374.  The NextEra Entities recall that Spain has waived these arguments by virtue of ICSID Arbitration Rule 27, because they arose from a claim that the Tribunal failed to state reasons when issuing the Decision. Spain should therefore have raised its objections promptly upon receipt of the Decision and before the Award.[477]

375.  The NextEra Entities explain that the Tribunal summarized the Parties' views on the legal standard contained in Art. 10(1) of the ECT, including legitimate expectations. Under the heading "*The Standard in Article 10(1) of the ECT*", the Tribunal explained its views on the scope of that article. The NextEra Entities further hold that Tribunal's analysis clearly allows a reader to follow its reasoning.[478]

376.  The NextEra Entities conclude that Spain is trying to expand the scope of the annulment proceeding to re-argue the case and has not established that the Award failed to state reasons when finding liability.[479]

---

[475] Memorial, ¶ 221.
[476] Counter-Memorial, ¶ 256.
[477] Counter-Memorial, ¶ 264.
[478] Counter-Memorial, ¶¶ 265–266.
[479] Counter-Memorial, ¶ 267.

c.      *The Committee's Analysis*

377.    The Committee examines whether Spain met the grounds for annulment based on the Award's failure to state reasons concerning Spain's liability under the ECT.

378.    The Committee notes that the Tribunal first sought to analyze and interpret Art. 10(1) of the ECT in accordance with Arts. 31 and 32 of the Vienna Convention by "*look*[ing] *at the words used in Article 10 in their context and in light of the object and purpose of the treaty as a whole*".[480] The Tribunal found that based on the words of Art. 10(1) it was a "*broad-ranging provision*".[481] It then determined that "*the protection of legitimate expectations* [wa]*s an essential element of the provision of fair and equitable treatment*" under Art. 10[482] and that it served as the legal basis for Spain's liability.[483] The Tribunal explained that the source and content of the Claimants' legitimate expectations were the assurances given by the Spanish authorities. The other factors such as the terms of the Regulatory Framework I, the registration of the Termosol Plants in the Pre-Assignment Registry and in the Administrative Registry for Production Facilities under the Special Regime (RAIPRE), and the Ministerial Resolutions of 28 December 2010 provided "*context*".[484] The Tribunal then described how Spain breached those expectations through the "*substantial*" changes to the economic regime under Regulatory Framework III.[485]

379.    The Committee can clearly follow the Award's reasoning from "*Point A. to Point B.*" on how the Tribunal reached its decision on legitimate expectations based on Art. 10(1).[486] The Committee finds that the Tribunal did interpret Art. 10 in accordance with Arts. 31 and 32 of the Vienna Convention to determine the scope and content of legitimate expectations as part of the fair and equitable treatment standard.[487]

---

[480] Decision, ¶ 580.
[481] Decision, ¶ 581.
[482] Decision, ¶ 582.
[483] Decision, ¶¶ 581–582.
[484] Decision, ¶¶ 583–587.
[485] Decision, ¶ 597.
[486] *MINE v. Guinea*, RL-178, at ¶ 5.09.
[487] Reply, ¶¶ 544, 547.

380. The Tribunal provided reasons that could be followed. Tribunals are not required to address every argument that the parties raise and the adequacy and correctness of reasons do not serve as a basis for annulment. Overall, the Committee concludes that Tribunal did not fail to provide reasons when finding Spain liable for a breach of legitimate expectation under Art. 10(1) of the ECT.

### (7) Failure to State Reasons Regarding the Quantification of Damages (Art. 52(1)(e)) (Annulment Ground (o))

#### a. Spain's Position

381. In connection with this point, Spain argues that:

> ...the reasons for the annulment of the Award in relation to quantum are as follows:
>
> a.- There is a clear inconsistency between the principles of the decision on quantum and the amount of damages awarded; and
>
> b.- There is a lack reasoning in the Award related to several issues that have significant impact on quantum: the capitalisation of historical damages, the 200 bps premium above the WACC granted, and the effective tax conversion rate.[488]

382. Spain further recalls that the NextEra Entities' experts on quantum departed from the instructions given by the Tribunal when calculating damages for the period that went from 2014–2019.[489]

383. Spain concludes that the Tribunal did not adopt Compass Lexecon's approach and that Compass Lexecon's quantification is inconsistent with the quantum principles set forth in the Decision. This includes the capitalization of historical losses until the valuation date of 30 June 2016, the regulatory rate of return in the actual scenario, the magnitude of the 200

---

[488] Memorial, ¶ 324; Reply, ¶ 628.
[489] Memorial, ¶¶ 330–331.

bps premium of the WACC, and the tax rate to convert the reasonable rate of return into a pre-tax return.[490] Therefore, the Award should be annulled.

384.    Spain adds that it did not confirm that it agreed with Compass Lexecon's approach or that it had no criticism with the Decision and Award when it did not claim anything when questioned by the Tribunal. Spain only confirmed that Compass Lexecon's calculation was "*mathematically*" correct.[491]

### b.    *The NextEra Entities' Position*

385.    The NextEra Entities recall the scope of annulment proceedings and that Spain is trying to re-argue the case.[492] The Claimants reiterate their general waiver argument and claim that Spain has failed to address this.

386.    They first contend that the Award did not have any "*inconsistencies*" with the decision on liability and the approach to quantum, as Spain claims.

387.    They also explain that the Tribunal provided ample reasons for its determination of damages and that the approach to quantum was entirely consistent with the Tribunal's findings on liability by using an "*alternative but-for scenario*".[493] The Tribunal covered the capitalization of historical losses, the regulatory return in the actual scenario, the magnitude of the 200-bps premium above the WACC, and the nominal tax rate.

388.    The NextEra Entities recall that the Tribunal instructed them to re-calculate their damages claim following the principles that the Tribunal set forth in its Decision. As a result, the NextEra Entities submitted their calculations, amounting to EUR 290.6 million (excluding interest) as of 30 June 2016, to which Spain replied it had "*no observations on the mathematical calculations of the Claimants' recalculation of their damages claim*".[494]

---

[490] Reply, ¶ 634.

[491] Reply, ¶ 632.

[492] Counter-Memorial, ¶ 325.

[493] Counter-Memorial, ¶ 326.

[494] Counter-Memorial, ¶ 333, citing Award ¶¶ 10, 15, 17.

Spain was allowed to comment on the Claimants' re-calculated damages but it did not disagree or raise any concerns with the rate used.

### c.    The Committee's Analysis

389.    The Committee examines whether the Tribunal failed to state reasons concerning damages. As an initial matter, the Committee reiterates that it agrees with the general consensus that exists among committees that tribunals have a wide margin of appreciation to assess the parties' positions on damages and determine a reasonable approximation of damages.[495]

390.    Spain initially argues that the Award has inconsistencies between the quantum decision and the damages awarded concerning the WACC and the 200-bps premium granted in the but-for scenario. Spain reiterates its argument regarding the appropriate investment date to be used for the WACC that was made under Annulment Ground (m) in Section V.E(5)a, *supra*. As provided in Section V.E(5)c, *supra,* the Committee does not find a clear inconsistency that could be considered a contradiction or lack of reasoning concerning damages.

391.    Spain  claims that the Award failed to state reasons concerning the capitalization of historical damages, the benchmark of reasonable return used in the Actual Scenario, the 200-bps premium added to the WACC reference, and the effective tax conversion rate. First, Spain claims that the Tribunal included the Claimants' damages experts' "*incorrect quantification*" of the capitalization of historical damages that should have included a risk-free rate instead of the cost of equity used.[496] The Committee considers that even if the quantification was, as Spain argues, incorrect it would not constitute an annullable error.

392.    Second, Spain argues that the experts did not agree on the benchmark for reasonable return used in the Actual Scenario and the Tribunal "*overlooked*" this and did not "*substantiate*[] *its decision*" for choosing the rate proposed by the Claimants' experts.[497] The Committee

---

[495] Section V.D(5)(c), *supra*, citing *Occidental Petroleum v. Ecuador,* RL-0179, ¶ 412; *Duke Energy International Peru Investments No. 1, Ltd. v. Republic of Peru*, ICSID Case No. ARB/03/28, Decision of the *ad hoc* Committee, 1 March 2011, RL-204, ¶ 256; *Wena Hotels v. Egypt*, RL-140, at ¶ 91; *Impregilo v. Argentina*, RL-205, ¶ 160.

[496] Memorial, ¶ 343.

[497] Memorial, ¶ 348.

finds that the Tribunal chose the benchmark that Compass Lexecon proposed and stated its reasons for doing so. It explained that it chose the model because it was "*based on a calculation of the value of the assets and a reasonable return on that value*" and was "*an appropriate method for valuation of loss in this case*".[498]

393.    Third, Spain asserts that the Tribunal failed to state the reasons why it chose to add a 200-bps premium to the WACC reference. As described in paragraph 277 in Section V.D(5)c, *supra*, the Committee finds that the Tribunal provided reasons in choosing a premium of 200 bps instead of 300 bps.[499] Spain's argument that the Tribunal did not "*specifically justif*[y] *its decision to adopt the 200 basis points*" is not convincing.[500] Spain's suggestion that it would have been more "*appropriate*" to have granted a premium between 0 and 100 bps is not a ground for annulment.[501]

394.    Fourth, Spain submits that the Tribunal failed to state reasons concerning the use of a nominal tax rate over an effective tax conversion rate that was disputed among the experts. Spain also claims that the Tribunal "*simply accepted*" the Claimants' experts' position.[502] The Committee does not agree with Spain that not mentioning its expert's view and not providing the reason for rejecting those views would necessarily qualify as grounds for annulment. The key factor is whether the Tribunal provided reasons for its decision on the nominal tax rate. Furthermore, the Committee finds that the Tribunal did consider Spain's expert's view and did provide reasons for rejecting it. The Tribunal provided reasons for its decision by stating that it "*took account of the fact that the statement of Compass Lexecon that the use of the nominal rate is 'accepted regulatory practice' was not contradicted by Respondent and noted the difficulty of calculating an 'effective rate' for each year*".[503] The Tribunal provided reasoning when it explained that it adopted an "*accepted regulatory practice*".[504] The Tribunal considered the view of Spain's experts in

---

[498] Decision, ¶¶ 648, 650.

[499] Decision, ¶¶ 664–665.

[500] Memorial, ¶ 364.

[501] Memorial, ¶ 364.

[502] Memorial, ¶ 369.

[503] Memorial, ¶ 369; Decision, ¶ 667.

[504] Decision, ¶ 667.

that they chose not to dispute that the use of the nominal rate was an "*accepted regulatory practice*" and also explained that a reason for rejecting the Spanish experts' view was the difficulty of calculating an effective rate for each year.

395.    The Committee concludes that the Tribunal did not fail to state reasons concerning the quantification damages, as Spain claims.

### (8)    Failure to State Reasons in Relation to the Evidentiary Activity and the Assessment of Evidence (Art. 52(1)(e)) (Annulment Ground (s))

### *a.    Spain's Position*

396.    Spain asserts a failure to state reasons based on its claim under Annulment Ground (r) in Section V.F(2), *infra*. Spain argues that pursuant to Art. 52(1)(e) of the ICSID Convention, the Award must be annulled for its failure to state reasons pertaining to the evidentiary activity and the assessment of evidence, including regarding the burden of proof, both in terms of its incorporation and in terms of its assessment.

397.    Spain submits that the Award relies on reasons "*not properly explained*",[505] that its "*argument[s] [are] not understood*",[506] that it "*does not analyse*",[507] that it reveals a "*blatant absence of any reference to the evidentiary activity carried out in the oral hearing*",[508] that it "*does not make any assessment of such evidence*",[509] and that it "*lack[s]…valid reasons*".[510] The Award "*without any reasons, place*[d] *on Spain the negative consequences of (allegedly) not carrying out evidential work on a question*" that was the Claimants' burden to prove.[511] The Applicant submits that the Tribunal kept "*an absolute silence in relation to a whole array of evidences*", including "*many internal*

---

[505] Memorial, ¶ 417.
[506] Memorial, ¶ 418.
[507] Memorial, ¶ 426.
[508] Memorial, ¶ 427.
[509] Memorial, ¶ 434.C.
[510] Memorial, ¶ 439.
[511] Reply, ¶ 430.

*documents*" of the Claimants, "[t]*he normative evolution of the regulatory framework prior to the alleged investment*", and the "*numerous Rulings by the of* [sic] *Supreme Court*".[512]

### b.    The NextEra Entities' Position

398.   The Claimants deny the Applicant's assertions and submit that the Tribunal did state reasons in this regard. The Claimants dealt with this ground together with Annulment Ground (r).

399.   Regarding Spain's burden of proof argument, the Claimants submit that it was "*plainly not a reversal of the burden of proof*".[513] The Tribunal's decision was based on Spain's election not to both adduce any witness testimony from its own officials who provided the alleged assurances and cross-examine the Claimants' witnesses.[514] This was "*a classic instance of a tribunal evaluating the evidence and (in this case) finding that it was unrebutted*".[515] The Claimants submit that this was an "*entirely reasonable finding*".[516]

400.   The Claimants point out that the Tribunal "*stated the reasons on which its decision was based*" and "*was not required to explain why it did not refer to any particular witness statement or factual exhibit in its analysis of liability*".[517]

### c.    The Committee's Analysis

401.   The Committee examines whether the Applicant established that the Tribunal failed to state reasons in relation to the evidentiary activity and the assessment of evidence pursuant to Art. 52(1)(e) of the ICSID Convention.

402.   Spain presented its claims based on these grounds together with its claim under Annulment Ground (r) in Section V.F(2), *infra*. The NextEra Entities largely rebutted both grounds

---

[512] Reply, ¶¶ 445–446.
[513] Rejoinder, ¶ 390.
[514] Counter-Memorial, ¶ 430; Rejoinder, ¶ 390.
[515] Counter-Memorial, ¶ 430.
[516] Rejoinder, ¶ 391.
[517] Rejoinder, ¶ 396; Counter-Memorial, ¶¶ 191–193.

together.[518] The Committee concludes that considerable overlap exists in its analysis under the present ground and Annulment Ground (r).

403. As an initial matter, the Committee agrees with the Claimants that Art. 52(1)(e) does not require a tribunal to state why it has not referred to any individual piece of written or oral fact evidence. The Tribunal was not required to provide reasons as to why it did not refer to all of the evidentiary activity carried out at the Hearing such as Mr. Montoya's evidence. As provided in *Enron v. Argentina*, "*a tribunal is not required to comment on all arguments of the parties in relation to each of the questions that it decides*".[519] The Committee similarly agrees with *Rumeli v. Kazakhstan* that "[t]*he Committee is neither empowered nor competent to conduct a re-evaluation of the significance of the factual evidence weighed by the Tribunal*".[520] The evaluation of the significance of factual evidence is a realm for the Tribunal.

404. Hence, the Committee agrees that an award cannot be annulled because it did not state reasons concerning all of the evidentiary activity and assessment of evidence. The Committee finds that the Applicant has not established that the Award could not be "*followed*", or was "*contradictory*", "*frivolous*" or rendered "*unintelligible*" due to the Tribunal's failure to address certain evidentiary activity or to assess particular evidence.[521]

405. The Committee finds that the Award did state the reasons on which it was based concerning the evidentiary activity and assessment of evidence and therefore the Committee dismisses Spain's argument that this constituted an annullable ground under Art. 52(1)(e).

---

[518] Rejoinder, ¶ 408.
[519] *Enron v. Argentina*, RL-197, ¶ 221.
[520] *Rumeli v. Kazakhstan*, CL-241, ¶ 104.
[521] *MINE v. Guinea,* RL-178, at ¶ 5.13.

113

**(9)** **Failure to State Reasons when Admitting an Alleged Erroneous Translation (Art. 52(1)(e)) (Annulment Ground (v))**

*a.* *Spain's Position*

406. Spain claims that pursuant to Art. 52(1)(e) of the ICSID Convention, the Award must be annulled given the Tribunal was "*silent on the claim and evidence made by the Kingdom of Spain at this point*" concerning false and fraudulent translation of Exhibit C-006.[522]

407. Spain's claim focuses on how the words "*se realizaron*" in the sentence "*las inversiones en marcha, garantizando por tanto las perspectivas bajo las que se realizaron dichas inversiones*" were translated. (emphasis added). For the translation of the tense of the verb "*se realizaron*", as "*are to be made*" instead of "*were made*", Spain submits that the Claimants' "*misrepresentation* [was] *very serious and seems clearly intended*".[523] Spain argues that the "*clear error*" in translation was "*identical to that of falsehood and fraud*".[524] The translation made a huge difference and was a bad faith attempt to gain protection for future investments.

408. Spain claims that "*the Award is based on the document whose translation (in front of interpreters) is discussed as the basis for the given Award*".[525] Despite this, the Tribunal "*completely disregarded any consideration of this matter and used in its deliberation*" and "*did not even rule on this matter*" and failed to state reasons accordingly.[526]

*b.* *The NextEra Entities' Position*

409. The NextEra Entities assert that Spain has waived the right to challenge the translation of Exhibit C-006 under ICSID Arbitration Rule 27 as it was part of the record of the proceeding from the very outset of the case when it was filed with the Claimants' Request for Arbitration. Spain even devoted a specific section of its Counter-Memorial on the

---

[522] Memorial, ¶ 2(k).

[523] Memorial, ¶¶ 451–452; Tr. Day 2 (Gil Nievas), 133:19–21; During the hearing, Spain withdrew its challenge related to the translation of the term "*perspectivas*". Tr. Day 2 (Gil Nievas), 133:11–19.

[524] Memorial, ¶¶ 443–444.

[525] Memorial, ¶ 454.

[526] Memorial, ¶¶ 453, 456; Reply, ¶ 477.

Merits to the exhibit that never questioned the accuracy of the English translation. Spain only raised an objection to the translation for the first time during its oral closing.[527]

410. The Claimants submit that a debate on the translation would not have had any impact on the proceedings.[528] According to the Claimants, the Applicant's revised translation would still serve as evidence of the Claimants' legitimate expectations. The Claimants add that the Tribunal placed no particular emphasis on the phrases the Applicant claimed were incorrect.[529]

411. Furthermore, the Claimants contend that the translation of the Spanish verb "*realizaron*" as "*are to be made*" was entirely legitimate in the context of the sentence in which it appears. They also point out that Spain never filed its own translation or requested a certified translation as provided under Procedural Order No. 1 of the underlying arbitration ("PO1-A") in the case of a dispute in the translation.[530]

### c. The Committee's Analysis

412. The Committee examines whether the Tribunal failed to state reasons by not ruling on the translation issue concerning Exhibit C-006.

413. The Committee takes note that Spain did not object to the translation even though it was used in an exhibit that was part of the Claimants' Request for Arbitration in May 2014.[531] Spain did not challenge the translation until its closing argument on the last day of the underlying arbitration in December 2016 when it stated it should have been the "*perspective – not the forecast but the perspective – under which said investments were made*".[532] In response to the Claimants' objection that the Applicant belatedly raised the translation issue, the Applicant replied thereafter that "[t]*he last point I wanted to talk about*

---

[527] Counter-Memorial, ¶ 446; Rejoinder, ¶ 439.

[528] Rejoinder, fn 692.

[529] Rejoinder, ¶ 444.

[530] Counter-Memorial, ¶ 449; Rejoinder, fn 692.

[531] Letter from Pedro L. Marín Uribe, Secretary of State for Energy, to Mitchell Davidson, President of NextEra Energy Resources, 3 September 2009, C-006.

[532] Arbitration Hearing, Day 7, 19 December 2016, R-474/C-313, 1494:6–15.

*was the translation of the English word 'forecast' into Spanish. We don't have anything to add to that. I apologise. I certainly don't want to reopen the debate, Mr President*".[533] Spain never even requested a certified translation through the procedure established for disputed translations under PO1-A. Spain apparently did not raise the translation issue in any of its written post-hearing submissions, including its 27 February 2017 Post-Hearing Submission or its 8 March 2017 Post-Hearing Reply. Even after receiving the Tribunal's Decision, which stated the Tribunal's reliance upon the exhibit, Spain still did not raise any issues regarding the translation.

414.    Under these circumstances, the Committee agrees with the Claimants that the Applicant waived its right to challenge this procedural matter as provided under ICSID Arbitration Rule 27 by not "*promptly*" objecting to it. Spain was aware of the document from the onset of the arbitration. Spain's awareness of the document is confirmed because it even raised its own arguments based on the document. It never challenged the translation under the procedures stipulated under PO1-A. It raised the translation issue over two and a half years after the document in question was submitted. This can hardly be considered as "*promptly*" objecting as required under ICSID Arbitration Rule 27. Furthermore, after raising the issue for the first time, it appeared to withdraw its concern about the translation overall when responding to Claimants' objection by stating, "[w]*e don't have anything to add to that* [the translation of 'forecast']. *I apologise. I certainly don't want to reopen the debate*".[534] It did not mention any issue with the tense used in the translation and did not make any reservations when withdrawing its concerns.[535] Thereafter, the Applicant never raised the translation issue even after receiving the Decision that relied upon the exhibit.

415.    The Committee holds that disputes concerning a translation of a document, particularly one that existed from the beginning of a proceeding, are a procedural matter concerning a "*rule*[]...*applicable to the proceeding*" under ICSID Arbitration Rule 27. The Applicant

---

[533] Arbitration Hearing, Day 7, 19 December 2016, R-474/C-313, 1541:10–14.

[534] Arbitration Hearing, Day 7, 19 December 2016, R-474/C-313, 1541:10–14.

[535] As noted previously, during the hearing, Spain withdrew its challenge related to the translation of the term "*perspectivas*". Tr. Day 2 (Gil Nievas), 133:11–19.

waived any basis to present its Application on the translation issue because it "*fail*[ed] *to state promptly its objection*" pursuant to ICSID Arbitration Rule 27.

416.    Irrespective of the waiver under ICSID Arbitration Rule 27, the Committee also finds that it was not necessary for the Tribunal to state any reasons concerning the translation issue because the Applicant appeared to withdraw the issue overall at the hearing without reservation and did not present it before the Tribunal thereafter. The Tribunal reasonably considered the issue was withdrawn.

417.    Hence, the Applicant waived its rights to bring a claim on this basis and the Tribunal did not fail to state reasons when using the translation by not ruling on this matter.

### F.    SPAIN'S ALLEGATIONS AS TO VIOLATIONS OF FUNDAMENTAL RULES OF PROCEDURE

#### (1)    Serious Departure from a Fundamental Rule of Procedure Regarding Late Submissions (Art. 52(1)(d)) (Annulment Ground (q))

##### a.    *Spain's Position*

418.    Spain claims that pursuant to Art. 52(1)(d) of the ICSID Convention, an award must be annulled if there is a serious deviation from a fundamental procedural rule. Spain explains that:

> *A departure is serious if a party is deprived of the protection afforded by the relevant procedural rule. A procedural rule is fundamental if it refers to the essential impartiality that must govern all proceedings and is included within the minimum standards of 'due process' required by international law.*[536]

419.    Spain further explains that:

> *...if a Tribunal quotes a lack of evidence as the basis for its decision, and it has previously refused requests to submit documents to constitute said evidence, there could be a serious departure from rules of procedure.*[537]

---

[536] Memorial, ¶ 373; Updated Background Paper, RL-134, ¶ 98.

[537] Memorial, ¶ 383.

420.   Spain further recalls the *Iberdrola v. Guatemala* case where the following was decided,

> *This Committee understands that a fundamental rule of procedure is one that establishes a minimum procedural standard that must be respected in accordance with international law, as defined in* Wena Hotels v. Egypt*. In general, the following hypotheses have been recognized as a violation of fundamental rules: (i) the lack of impartiality and unequal treatment of the parties, (ii) the violation of the right to be heard, (iii) the absence or abuse of deliberation by the arbitrators; (iv) the violation of the rules of proof and (v) the violation of the rules of legal standing.*[538]

421.   Spain explains that the Tribunal accepted the NextEra Entities' reply on the merits despite being filed late and in violation of PO1-A. According to Spain, the Tribunal explained that the late submission would not have any consequences in terms of admission but could have consequences in terms of costs.[539]

422.   In addition, Spain argues that this violation was obvious and decisive for the result because:

> *...there is no doubt that we speak of violations that affect the pretension, the amount claimed and the reports and witnesses on which the claim and the amount are based.*[540]

### b.   The NextEra Entities' Position

423.   The NextEra Entities explain that Art. 52(1)(d) provides that parties may request annulment of an award on the ground "*that there has been a serious departure from a fundamental rule of procedure*".[541]

424.   Referring to the *MINE v. Guinea* case "[t]*he text of Article 52(1)(d) makes clear that not every departure from a rule of procedure justifies annulment; it requires that the departure*

---

[538] Memorial, ¶ 385; *Iberdrola Energía, S.A. v. Republic of Guatemala*, ICSID Case No. ARB/09/5, Decision on the Remedy for Annulment of the Award Submitted by Iberdrola Energía, S.A., 13 January 2015, RL-180, ¶ 105.

[539] Memorial, ¶ 392.

[540] Memorial, ¶ 398.

[541] Counter-Memorial, ¶ 367.

be a _serious_ one and that the rule of procedure be _fundamental_ in order to constitute a ground for annulment"[542] (emphasis in original).

425.    Furthermore, the NextEra Entities highlight that the committee in _MINE v. Guinea_ held that the term "_serious_" "_establishes both quantitative and qualitative criteria: the departure must be substantial and be such as to deprive a party of the benefit or protection which the rule was intended to provide_".[543]

426.    Moreover, the _Wena Hotels v. Egypt_ committee elaborated on this standard by saying that:

> [i]_n order to be a 'serious' departure from a fundamental rule of procedure, the violation of such a rule must have caused the Tribunal to reach a result substantially different from what it would have awarded had such a rule been observed._[544]

427.    Therefore, the NextEra Entities argue that:

> _If a breach of a fundamental rule has no material impact, even if it deprived a party of the benefit it was intended to provide, then it can hardly be considered to be so serious as to require the exceptional remedy of annulment._[545]

428.    In connection with Spain's argument, the NextEra Entities explain that the Tribunal admitted its Reply on the Merits 55 minutes after the relevant deadline and also permitted the NextEra Entities to file a supplemental quantum report nine days later, but these examples do not meet the threshold of a serious violation of fundamental rule of procedure.[546]

429.    The NextEra Entities also argue that in any case Spain has waived this argument as it did not raise it until it filed its Application.[547]

---

[542] Counter-Memorial, ¶ 367; _MINE v. Guinea_, RL-178, at ¶ 4.06.

[543] Counter-Memorial, ¶ 379; _MINE v. Guinea,_ RL-178, at ¶ 5.05.

[544] _Wena Hotels v. Egypt_, RL-140, at ¶ 58.

[545] Counter-Memorial, ¶ 381.

[546] Counter-Memorial, ¶ 386.

[547] Counter-Memorial, ¶ 387.

430.    Finally, the NextEra Entities refer to the Tribunal's decision dated 17 August 2016 where, after the hearing, it held that failing to meet deadlines can be considered in the determination of costs but does not affect the admissibility of documents filed.[548]

### c.    The Committee's Analysis

431.    The Committee confirms that Spain withdrew its Application based on this ground at the Hearing.[549] The Committee therefore holds that this ground need not be considered.

### (2)    Serious Departure from a Fundamental Rule of Procedure in Relation to the Evidentiary Activity and Assessment of Evidence (Art. 52(1)(d) (Annulment Ground (r))

### a.    Spain's Position

432.    Spain asserts that the Tribunal committed a series of breaches in relation to "*evidential activity and the assessment of evidence*". Such violations breached the rules of evidence (and in particular the rules on the burden of proof), the right to be heard, and the right to equality of arms.[550]

433.    Spain claims this ground for annulment based on the Claimants' concealment of essential documents, the Tribunal's practice in the hearing, and the Tribunal's other lack of assessment of the evidence submitted. In terms of Claimant's concealment of essential documents, Spain argues that the Tribunal's denial of access and use of documents relevant to Spain's defense and its refusal to order the submission of documents violated Spain's right to be heard.[551] Spain argues that on several occasions, the Tribunal pointed out the relevance of the NextEra Entities' due diligence reports concerning the regulatory framework under which they made their investment.[552] The NextEra Entities opposed the production of the due diligence reports alleging attorney-client privilege or attorney work

---

[548] Counter-Memorial, ¶ 388.

[549] Tr. Day 2 (Gil Nievas), 6:16–7:1.

[550] Memorial, ¶¶ 404–441; Reply, ¶ 384.

[551] Memorial, ¶¶ 411–412, 419–420.

[552] Memorial, ¶ 409.

product. The Tribunal "*ignore*[d] *the lack of evidence*" and denied the production of the documents holding that the request was "*too broad*".[553] Spain claims that the Tribunal ignored "*the lack of evidence derived from failure to provide legal reports*" and ignored Pöyry's report provided by the NextEra Entities, which was "*incompatible with any legitimate expectation of the immutability of the system*".[554] By ignoring the lack of evidence, it violated the rules on the burden of proof.[555]

434. In terms of the Tribunal's practice in the hearing, Spain submits that the Tribunal violated the rules of the burden of proof, by not complying with the principle of *onus probandi incumbit actori* and extracting negative inferences from the lack of questions by Spain concerning two witnesses.[556] The Tribunal unlawfully reversed the burden of proof. Spain claims that the Tribunal did not examine and assess the content of the statements made by the witnesses or experts and did not "*refer*[ ] *to the evidentiary activity carried out at the hearing*", particularly Mr. Carlos Montoya's testimony, in violation of the right to be heard.[557]

435. In terms of the Tribunal's other lack of assessment of the evidence, Spain explains that on numerous occasions the Tribunal did not consider documentary evidence that negated any legitimate expectation, such as: (i) the possibility of rule change was expressly reflected in various agreements signed by the Claimants and the Claimants' own internal documents and emails; (ii) the existence, prior to the investments, of multiple modifications to the legal framework showing that the Claimants knew that the legal framework was not petrified; (iii) the Pöyry report, submitted by the NextEra Entities, highlighted those modifications, and showing the NextEra Entities were aware of them; and (iii) the Supreme Court's judgment, which was also provided, where it was decided that no one could claim to have a right to the immutability of tariffs.[558]

---

[553] Memorial, ¶¶ 419, 410.

[554] Memorial, ¶ 419.

[555] Memorial, ¶¶ 419–420.

[556] Reply, ¶¶ 424–425.

[557] Memorial, ¶ 427; Reply, ¶¶ 435–436.

[558] Memorial, ¶ 434.

436. This series of breaches infringed Spain's right of defense in the form of the right to be heard. The violations, both individually and as a whole, are of the necessary magnitude to have had a clear impact on the Award and warrant annulment.

### b.    The NextEra Entities' Position

437. The NextEra Entities recall the high threshold contained in Art. 52(1)(d) and argue that Spain did not meet it.

438. In particular, the NextEra Entities explain that the Tribunal was entitled to exercise its discretion by not ordering the disclosure of documents and that privilege is widely recognized as a ground to refuse disclosure of documents. In addition, the NextEra Entities allege they provided adequate and substantial evidence regarding their due diligence.[559]

439. Relying on *Azurix v. Argentina*, the NextEra Entities highlight that the committee decided the following:

> *...a party cannot, simply by requesting the tribunal to call upon the other party to produce documents which are said to be relevant to a particular allegation, mandate the tribunal either to require the production of those documents or to accept the truth of the allegation in default of production...Regardless of whether or not the tribunal decides to call upon a party to produce documents, it will decide all of the issues on the basis of the evidence before it. However, the fact that the tribunal decides to exercise its discretion one way rather than the other cannot in itself be annullable error. To establish an annullable error, it is not sufficient to show that the tribunal rejected repeated requests for the production of evidence that the requesting party considered crucial to its case. Rather, it is necessary to establish that, in all circumstances there has been a serious departure from a fundamental rule of procedure.*[560]

440. Regarding Spain's burden of proof argument, the Claimants submit that it was "*plainly not a reversal of the burden of proof*".[561] The Tribunal's decision was based on Spain's election not to adduce any witness testimony from its own officials who provided the

---

[559] Counter-Memorial, ¶ 400.
[560] Counter-Memorial, ¶ 406; *Azurix v. Argentina*, RL-176, ¶ 219.
[561] Rejoinder, ¶ 390.

alleged assurances or cross-examine the Claimants' witnesses. This was "*a classic instance of a tribunal evaluating the evidence and (in this case) finding that it was unrebutted*".[562] The Claimants submit that this was an "*entirely reasonable finding*".[563]

441.    The Claimants submit that the lack of congruence cannot serve as a basis for annulment *per se*.[564] Spain has not provided a single authority to support this alleged principle.

442.    As for Mr. Montoya's evidence, the Claimants submit that it is "*not the role of an annulment committee to decide which parts of the oral or written evidence a tribunal should give emphasis to in its award*".[565] They further explain that this evidence was irrelevant to the claim of legitimate expectations.

443.    The NextEra Entities conclude that this argument does not show a case of serious departure from a fundamental rule of procedure and argue that Spain is trying to expand the scope of annulment.[566]

### c.    The Committee's Analysis

444.    The Committee examines whether the Tribunal's decision pertaining to the Claimants' alleged concealment of essential documents, the Tribunal's practice at the hearing, the Tribunal's alleged lack of assessment of the evidence submitted, or the Tribunal's decision regarding the alternative but-for scenario amounted to a serious departure of fundamental rules of procedure.

445.    ICSID Arbitration Rule 34(1) stipulates that that "*the Tribunal shall be the judge of the admissibility of any evidence adduced and of its probative value*". The Committee observes that a tribunal has considerable discretion in formulating its opinions about the relevance and evaluation of the elements of evidence presented by the parties. It would require exceptional circumstances for a tribunal's opinions about the relevance and evaluation of

---

[562] Counter-Memorial, ¶ 430.
[563] Rejoinder, ¶ 391.
[564] Counter-Memorial, ¶¶ 435–437.
[565] Rejoinder, ¶ 398; Counter-Memorial, ¶ 424.
[566] Counter-Memorial, ¶ 407.

the elements of evidence to amount to a serious departure of fundamental rules of procedure.

446. Other committees such as *Wena Hotels v. Egypt* have similarly declared that "[i]*rrespective whether the matter is one of substance or procedure, it is in the Tribunal's discretion to make its opinion about the relevance and evaluation of the elements of proof presented by each Party*".[567] *Tulip v. Turkey* is also consistent with the Committee's views when it stated that "*an applicant's dissatisfaction with the way a tribunal has exercised its discretion in evaluating evidence cannot be a basis for a finding that there has been unequal treatment*".[568]

447. The Committee first finds that a tribunal is entitled to a measure of discretion in its decision on whether to order the disclosure of documents. The Committee notes that Spain has not offered any case where a decision on document disclosure has served as the basis for annulment by constituting a serious departure of a fundamental rule of procedure.

448. Although explained within the context of Art. 43(a) of the ICSID Convention, the Committee finds the *Azurix v. Argentina* committee's views persuasive where it stated that: "[t]*he extent to which the tribunal does call upon one party to produce documents at the request of another party will always be a matter for the tribunal to determine in its discretion*".[569] As further found in *Azurix v. Argentina*,

> [t]*o establish an annullable error, it is not sufficient to show that the tribunal rejected repeated requests for the production of evidence that the requesting party considered crucial to its case. Rather, it is necessary to establish that, in all of the circumstances there has been a serious departure from a fundamental rule of procedure.*[570]

449. The Committee considers that the Tribunal's treatment and assessment of the evidence concerning the Claimants' alleged due diligence and privilege attached to certain documents was within its discretion. The Tribunal had the "*discretion to make its opinion*

---

[567] *Wena Hotels v. Egypt*, RL-140, at ¶ 65.

[568] *Tulip v. Turkey*, RL-181 ¶ 85.

[569] *Azurix v. Argentina*, RL-176, ¶ 217.

[570] *Azurix v. Argentina*, RL-176, ¶ 219.

*about the relevance and evaluation of the elements of proof*" concerning the assessment of the due diligence and privilege.[571]

450.  Furthermore, the Committee does not find that Spain has established that, had the documents Spain requested been produced, it could have led to a "*substantially different*" Award or it could have had a "*material impact on the outcome*" on the Award.

451.  The Committee also finds that the Tribunal's alleged lack of reference to the evidentiary record does not constitute annullable grounds. The Committee finds that even if the Tribunal chose not to refer to the evidentiary record, particularly regarding specific testimony such as Mr. Carlos Montoya's, this would be within the realm of its discretion in weighing the evidence. Again, the Tribunal had the "*discretion to make its opinion about the relevance and evaluation of the elements of proof*" that was presented during the hearing.[572] Spain's attempts to distinguish the present case from *Tulip v. Turkey* are not convincing given that, as a general matter, whether a tribunal mentions any witnesses is within its discretion. The Tribunal did mention the testimony of two of the Claimants' witnesses. The Tribunal's choice not to mention Spain's only witness could not be deemed as a failure of its "*duty to respect the right to be heard of both parties in an equitable manner*".[573] Just because one witness was not mentioned does not mean that the witness' testimony was not considered or that the right to be heard was violated.

452.  The Committee similarly does not find Spain's arguments persuasive concerning the burden of proof and the Tribunal's practices concerning the hearing. The Committee considers that weighing the evidence and effect of a party's failure to cross-examine a witness is broadly within the province of a tribunal's discretion. Spain cites Section 18.2 of PO1-A and the IBA Rules for the proposition that "*a decision not to call a witness cannot per se imply the assumption of correctness of his or her statement*".[574] Section 18.2 provides that "[i]*f the appearance and/or examination of a witness has not been requested, none of the parties shall be deemed to have (i) admitted any facts or opinions stated in the*

---

[571] *Wena Hotels v. Egypt*, RL-140, at ¶ 65.
[572] *Wena Hotels v. Egypt*, RL-140, at ¶ 65.
[573] Reply, ¶ 444.
[574] Reply, ¶ 429.

125

*witness statement or (ii) agreed to the correctness of the content of the witness statement".*[575] The Committee does not find this means that the Tribunal cannot take this into consideration when weighing the evidence. It only means that a party will not be deemed to have "*admitted any facts or opinions*" or "*agreed to the correctness*". The Tribunal is free to assess the weight of a witness' testimony when it is not challenged. The Tribunal's consideration of the witness statements presented by the Claimants containing various alleged statements made by the Spanish government officials and the consequences of Spain's choice not to challenge the witnesses were matters within the Tribunal's discretion.

453.    The Tribunal's alleged lack of assessment of the other evidence submitted appears based on a lack of reference to the evidence and is similarly unpersuasive. The Tribunal's assessment of the various documentary evidence that Spain contends might have negated any legitimate expectation was within its permissible discretion. The Tribunal had the "*discretion to make its opinion about the relevance and evaluation of the elements of proof*" concerning the assessment of the various forms of evidence.[576] The Tribunal was not required to reference the "*whole array of evidence*[]" and not doing so did not mean they did not "*examine…key elements*".[577] The Tribunal had the "*discretion to make its opinion about the relevance and evaluation of the elements of proof*" and could choose not to mention evidence. A lack of reference to evidence does not necessarily mean a lack of its assessment.

454.    The Committee finds that Spain briefed the relevant issues through both written and oral submissions and was given the opportunity to be heard. All in all, the Committee concludes that the Tribunal's decision pertaining to the Claimants' alleged concealment of essential documents, the Tribunal's practice at the hearing, the Tribunal's lack of reference to the evidence submitted, or the Tribunal's consideration of the alternative but-for scenario did not constitute a serious departure of fundamental rules of procedure under Art. 52(1)(d).

---

[575] Arbitration Procedural Order No. 1, 21 May 2015, R-468, Section 18.2.

[576] *Wena Hotels v. Egypt*, RL-140, at ¶ 65.

[577] Reply, ¶¶ 445, 446.

(3)     **Serious Departure from a Fundamental Rule of Procedure by Breaching the Principle of Congruence and Infringing the Right of Defense (Art. 52(1)(d)) (Annulment Ground (t))**

a.      *Spain's Position*

455.    Spain asserts a lack of congruence between the Claimants' claims and the considerations the Tribunal made to find liability. In terms of the Tribunal's lack of congruence between the Claimants' claims and the Tribunal's considerations to find liability, Spain submits that the Tribunal found liability based on reasons not set forth by the Claimants and, as a result, it could not defend itself properly.[578]

456.    Spain submits that the Tribunal went beyond the facts that were "*prefigured*" and "*on which the debate between the parties* [was] *established*", and ruled on the "*alleged factual grounds which clearly deviate*[d] *from those which were the subject of the debate*".[579] To Spain, the Tribunal introduced "ex novo" and "*invent*[ed] *an alternative theory different from the one put forward*" that Spain had no opportunity to defend against.[580] The Tribunal invented an alternative theory that was not based on the principle of reasonable returns as argued by the Parties.

457.    Spain also submits that the Tribunal's "*lack of congruence*" infringed its rights to be heard. According to Spain, if "*the Tribunal goes beyond the facts which are prefigured by the Claim, and on which the debate between the parties has been established, and rules on alleged factual grounds which clearly deviate from those which were the subject of the debate, the right of the party to be heard is violated*".[581]  Spain cites *TECO v. Guatemala* and *Caratube v. Kazakhstan* as support for this principle.[582]

---

[578] Memorial, ¶ 440.

[579] Reply, ¶ 397.

[580] Reply, ¶¶ 412, 421.

[581] Reply, ¶ 397.

[582] Reply, ¶¶ 400–401.

### b.    The NextEra Entities' Position

458.    The Claimants argue that there was no lack of congruence as Spain claims.

459.    The Claimants submit that they briefed both the primary claim and alternative case with respect to liability and quantum from the outset. For its primary claim, they anticipated Spain's position that the Claimants did not have a legitimate expectation to receive the tariffs and premiums applicable under Regulatory Framework I.

460.    They also made the alternative claim that they had a legitimate expectation to earn a "*reasonable return*" on their investment.[583] The Claimants' quantum expert Compass Lexecon used Regulatory Framework III for the primary claim and an adjusted Regulatory Framework III for the alternative but-for claim.

461.    The Claimants also submit that "*Spain* [has] *not provided a single authority for the 'principle of congruence'*".[584]

### c.    The Committee's Analysis

462.    The Committee examines Spain's claim that the Tribunal committed a serious departure from a fundamental rule of procedure under Art. 52(1)(b) by breaching the principle of congruence and infringing the right of defense.

463.    At the outset, the Committee agrees with the Claimants' point that the Applicant has not provided any specific authority for the "*principle of congruence*" that it pleads. The definition of the principle and its boundaries remain unclear. To the extent it may exist, the Committee concludes that it falls within the principle of a right to be heard and will analyze Spain's application accordingly.

464.    The Committee agrees that, as found in *TECO v. Guatemala*, a breach of Art. 52(1)(d) could arise "*when a tribunal effectively surprises the parties with an issue that neither party has invoked, argued or reasonably could have anticipated during the proceedings.*

---

[583] Counter-Memorial, ¶ 438.
[584] Counter-Memorial, ¶ 435.

*In such a scenario, a reasonable question to ask is whether the parties' right to be heard has been <u>seriously affected</u>".*[585] (emphasis added). As provided under *TECO v. Guatemala*, two issues to consider are whether a party was "*effectively surprised*" and whether a party's rights were "*seriously affected*". Other cases cited by the Parties such as *Fraport v. Philippines* and *Pey Casado v. Chile I*, also confirm that a key element is whether a party was afforded an opportunity to address the relevant matter.[586] The present case differs from *TECO v. Guatemala*, where a central legal concept ("*unjust enrichment*") which served as the basis for the tribunal's decision was never raised before the parties.

465.    Furthermore, the Committee agrees with the *Caratube v. Kazakhstan* committee that provided:

> *Tribunals do not violate the parties' right to be heard if they ground their decision on legal reasoning not specifically advanced by the parties, provided that the tribunal's arguments can be <u>fitted within the legal framework argued during the procedure and therefore concern aspects on which the parties could reasonably be expected to comment</u>, if they wished their views to be taken into account by the tribunal"..*[587] (emphasis added).

466.    The Committee does not find Spain could have been "*effectively surprised*" and instead finds the Tribunal's arguments "*fitted within the legal framework argued during the procedure and therefore concern*[ed] *aspects on which the parties could reasonably be expected to comment*".[588] The Committee finds that the Claimants' primary claim and alternative case with respect to liability and quantum "*fit*[ ] *within the legal framework*

---

[585] *TECO v. Guatemala*, RL-207, ¶ 184.

[586] *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, Decision on the Application for Annulment of Fraport AG Frankfurt Airport Services Worldwide, 23 December 2010, RL-177, ¶ 202; *Pey Casado v. Chile I*, RL-182, ¶ 262.

[587] *Caratube International Oil Company LLP v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Decision on the Annulment Application of Caratube International Oil Company LLP, 21 February 2014 ("*Caratube v. Kazakhstan")*, RL-174, ¶ 94.

[588] *Caratube v. Kazakhstan*, RL-174, ¶ 94.

*argued during the procedure*". The central tenets of the alternative claim fit within the same general legal framework of the primary claim.[589]

467.   Contrary to Spain's claims, the Committee considers that the Tribunal's finding of a legitimate expectation through the Claimants' alternative claim did not constitute an annullable ground under Art. 52(1)(d). The Tribunal found that the Claimants had a legitimate expectation that Spain would honor its commitments in terms of regulatory certainty, stability, and viability. The Committee does not find that the Tribunal "*invented*" an alternative theory, and "*effectively surprised*" and denied Spain the opportunity to defend itself. The Tribunal's decision was within the framework and arguments presented by the Parties concerning legitimate expectations and a right to a reasonable return on actual sunk costs and actual cost of capital plus a margin. Spain was not denied a right to be heard. After the Claimants raised the alternative theory, the Spain had the full opportunity to respond and responded to the allegations that formed the basis of the alternative case.[590]

468.   The Committee concludes that the Tribunal decided the case on liability within the framework presented by the Parties. The Tribunal therefore did not infringe Spain's right to be heard and there was no serious departure from a fundamental rule of procedure under Art. 52(1)(d).

---

[589] NextEra Entities' Memorial on the Merits, 22 May 2015, R-488, Parts II and V.5; NextEra Entities' Reply on the Merits, 10 August 2016, R-492, Parts III and IV; NextEra Entities' Skeleton Argument, 9 December 2016, C-333, ¶¶ 41–45; 57–61; NextEra Entities' Opening Presentation in Arbitration Hearing, C-332, Slides 3, 7, 23–27, 31–33, 37, 39–41.

[590] Spain's Counter-Memorial on the Merits, R-491, 4 March 2016, ¶¶ 240–316 (regarding the principle of reasonable return), ¶¶ 374–598 (regarding the legal regime applicable), ¶¶ 643–719 and ¶¶ 720–731 (regarding the FET standard); ¶¶ 678 *et seq*, 335–359, Part F; Spain's Rejoinder on the Merits, 20 October 2016, R-471, ¶¶ 190–344 (regarding the principle of reasonable return), 356–535 (regarding the legal regime applicable), ¶¶ 1041–1112 (regarding the FET standard).

**(4)** **Serious Departure from a Fundamental Rule of Procedure by Admitting an Alleged Erroneous Translation (Art. 52(1)(d)) (Annulment Ground (u))**

*a.* *Spain's Position*

469.    Spain's raises the same issues concerning the translation of Exhibit C-006 as Annulment Ground (v) in Section V.E(9), *supra,* but based on Art. 52(1)(d) of ICSID Convention.

470.    Spain claims the following:

> *As can be seen from the Award, the Tribunal bases the hypothetical legitimate expectations on two simple letters from the* Secretaría de Estado de Energía *to the American company FLP (not to the instrumental masks of the Claimants). The fact is that the translation of one of these letters is blatantly erroneous, tending to change the meaning of it and benefit the position of the Claimants. The Kingdom of Spain considers that the result is identical to that of falsehood and fraud.*[591]

471.    Spain explains that because the Award was based on a false document, it can be assumed that the result of the arbitration could have been different.[592]

472.    A serious departure of a fundamental rule of procedure occurred because the Award relied upon a false and fraudulent translation.

*b.* *The NextEra Entities' Position*

473.    The NextEra Entities reiterate that Spain's ground on annulment that relies upon the allegedly incorrect translation has been waived under ICSID Arbitration Rule 27.[593]

474.    In any event, the NextEra Entities argue the following:

> *Spain's revised translation would still be evidence of the Claimants' legitimate expectations: Spain does not challenge the fact in this letter that Secretary Marín informs Mitch Davidson of NextEra 'that*

---

[591] Memorial, ¶ 444.

[592] Memorial, ¶ 446.

[593] Counter-Memorial, ¶ 451.

> *the absolute vocation of said legislation is to preserve the legal*
> *security of all investments currently underway'.*[594]

475. The NextEra Entities conclude by saying that even using Spain's preferred translation, the overall meaning of the letter would not be materially changed.[595] They also argue that the translation was not incorrect.[596]

476. The Claimants contend that a serious departure of a fundamental rule of procedure did not occur due to the translation of the Exhibit C-006.[597]

### c.    The Committee's Analysis

477. The Committee examines whether the Tribunal committed a serious departure from a fundamental rule of procedure concerning the translation issue for Exhibit C-006.

478. This ground overlaps with the Annulment Ground (v) in Section V.E(9), *supra*. The Committee reiterates that Spain did not to object to the translation even though it was used as an exhibit that was part of the Claimants' Request for Arbitration in May 2014.  Spain did not challenge the translation until its closing argument on the last day of the underlying arbitration hearing in December 2016. In response to the Claimants' objection that the Applicant belatedly raised the translation issue, the Applicant replied shortly thereafter that "[t]*he last point I wanted to talk about was the translation of the English word 'forecast' into Spanish. We don't have anything to add to that. I apologise. I certainly don't want to reopen the debate, Mr President*".[598] Spain never even requested a certified translation through the procedure established for disputed translations under PO1-A. Spain apparently did not raise the translation issue in any of its written post-hearing submissions, including its 27 February 2017 Post-Hearing Submission or its 8 March 2017 Post-Hearing Reply. Even after receiving the Tribunal's Decision, which stated the Tribunal's reliance upon the exhibit, Spain did not raise any issues regarding the translation.

---

[594] Counter-Memorial, ¶ 454 (emphasis omitted).

[595] Counter-Memorial, ¶ 456.

[596] Counter-Memorial, ¶ 445.

[597] Counter-Memorial, ¶ 452.

[598] Arbitration Hearing, Day 7, 19 December 2016, R-474/C-313, 1541:10–14.

479. Under these circumstances, the Committee agrees with the Claimants that the Applicant waived its right to challenge this procedural matter as provided under ICSID Arbitration Rule 27 by not promptly objecting to it. Spain was aware of the document from the onset of the arbitration. Spain's awareness of the document is confirmed because it even raised its own arguments based on the document. It never challenged the translation under the procedures provided for in PO1-A. It raised the translation issue over two and a half years after the document in question was submitted. This cannot be considered as "*promptly*" objecting under ICSID Arbitration Rule 27. Furthermore, after raising the issue for the first time, it appeared to withdraw its concern about the translation as a general matter by stating, "[w]*e don't have anything to add to that* [the translation of 'forecast']. *I apologise. I certainly don't want to reopen the debate*".[599] It did not mention any issue with the tense used in the translation and it did not make any reservations when withdrawing its concerns. Thereafter, the Applicant never raised the issue even after receiving the Decision that relied upon the exhibit.

480. The Committee holds that the dispute concerning a translation of a document, particularly one that existed from the beginning of a proceeding, was a procedural matter concerning a "*rule*[ ]...*applicable to the proceeding*" under ICSID Arbitration Rule 27. The Applicant waived any basis to present its Application based on the translation issue because it "*fail*[ed] *to state promptly its objection*" pursuant to ICSID Arbitration Rule 27.

481. Hence, Spain waived its rights to bring a claim on this basis and the Tribunal's use of the translation did not constitute a serious departure of a fundamental rules of procedure.

## G.    WAIVER

### (1)    Waiver of the Grounds for Annulment (ICSID Arbitration Rule 27)

#### a.    *The NextEra Entities' Position*

482. According to ICSID Arbitration Rule 27, the NextEra Entities contend that:

---

[599] Arbitration Hearing, Day 7, 19 December 2016, R-474/C-313, 1541:10–14.

> *A party which knows or should have known that a provision of the Administrative and Financial Regulations, of these Rules, of any other rules or agreement applicable to the proceeding, or of an order of the Tribunal has not been complied with and which fails to state promptly its objections thereto, shall be deemed—subject to Article 45 of the Convention—to have waived its right to object.*[600]

483. The NextEra Entities continue by asserting that ICSID *ad hoc* committees have concurred on two basic principles: (i) ICSID Arbitration Rule 27 applies to annulment proceedings; and (ii) the rule prevents a party from raising as ground for annulment something that it failed to object promptly before the tribunal if it had an opportunity to do so.[601]

484. The NextEra Entities rely on *Lemire v. Ukraine* where the committee held that Ukraine's right to claim the annulment of the decision on jurisdiction and liability were waived in light of ICSID Arbitration Rule 27.

485. The *Lemire v. Ukraine* committee explained that:

> *the waiver provided by Arbitration Rule 27 applies to the case at hand on the basis that Respondent knew or should have known about such violations since the moment the Decision on Jurisdiction and Liability was issued on January 14, 2010. Consequently, Respondent should have objected to such violations and should have reserved its rights to claim these objections in a subsequent annulment proceeding. There was no reason for Respondent to remain silent and wait until the Award was issued to object to the terms and content of the first decision. Respondent's silence amounts to a waiver of its rights to object to the Decision on Jurisdiction and Liability at the present stage.*[602]

486. Among other things, "*Spain chose not to raise its current complaints with the Tribunal throughout the period of almost three months (80 days, to be more precise) between the Decision and the final Award*".[603]

---

[600] Counter-Memorial, ¶ 31.

[601] Counter-Memorial, ¶ 35.

[602] Counter-Memorial, ¶¶ 39–40; *Joseph C. Lemire v. Ukraine,* ICSID Case No. ARB/06/18, Decision on Ukraine's Application for Annulment of the Award, 8 July 2013, CL-275, ¶¶ 201–203.

[603] Counter-Memorial, ¶ 48.

487.   As a result, the NextEra Entities argue that because Spain failed to act promptly it waived most of the grounds on which it now seeks to annul the Award.

### b.   Spain's Position

488.   Spain claims that the NextEra Entities are trying to apply ICSID Arbitration Rule 27 not only to procedural grounds for annulment but also to other grounds such as a manifest excess of powers and failure to state reasons. In this regard, Spain states that such interpretation is contrary to the wording and purpose of the provision and must be rejected.[604]

489.   Spain explains that ICSID Arbitration Rule 27 is applicable to those cases in which there was an opportunity, during the proceedings, to use the mechanisms provided for purging them.[605]

490.   Spain also cites *Pey Casado v. Chile I* for the view that "*'waiver' can only be triggered if the applicant knew that the tribunal by its conduct had not complied with the rule and thus had a reasonable opportunity to raise its objection. If the objecting party acquired actual or constructive knowledge of a rule violation only after the award has become available, it cannot be considered as having waived its right to object*".[606]

491.   According to Spain, due to the nature of the mistakes in the Award, the annulment proceeding was the only available procedural mechanism.[607]

### c.   The Committee's Analysis

492.   In light of its rulings above, the Committee exercises its procedural economy and decides it is not necessary to render a separate decision on this issue.

---

[604] Reply, ¶¶ 21–22 and 33.

[605] Reply, ¶ 23.

[606] Reply, ¶ 19 citing *Pey Casado v. Chile I*, RL-182, ¶ 82.

[607] Reply, ¶¶ 23–24.

135

## H.   RESIDUAL DISCRETION

### (1)   Residual Discretion of *ad hoc* Committees (Art. 52(3) of the ICSID Convention)

#### a.   *The NextEra Entities' Position*

493.   The NextEra Entities hold that Art. 52(3) of the ICSID Convention entrusts an *ad hoc* committee with the authority and not the obligation to annul an award. In this regard, they highlight that:

> *This is borne out by the plain wording of Art. 52(3), which provides that a committee* 'shall have the authority to annul the award'. *It does not say* 'shall annul the award'.[608]

494.   The NextEra Entities say:

> *For the reasons explained in this Counter-Memorial, Spain has failed to establish any of the Art. 52(1) grounds of annulment. However, if the Committee considers that Spain has established a possible ground for annulment, NextEra respectfully requests the Committee exercise its discretion to deny Spain's Annulment Application and uphold the Award in full.*[609]

495.   Finally, the NextEra Entities point out that regarding this discretion the Committee should follow the factors mentioned in *CEAC v. Montenegro*. In exercising its discretion, the Committee should consider as follows:

> [the] *gravity of the relevant issue and its impact on the Award; the impact on each party that annulment would produce; the length of the proceeding, which began in 2014; the costs for both sides of a resubmitted dispute; the undisputed commitments that Spain provided to NextEra in this case; and the importance of the finality of the Award in the ICSID system.*[610]

---

[608] Rejoinder, ¶ 449.

[609] Counter-Memorial, ¶ 465.

[610] Counter-Memorial, ¶¶ 466–467; *CEAC v. Montenegro*, CL-284, ¶ 84.

136

### b. Spain's Position

496.    Spain argues that:

> The ICSID Convention does not provide that ad hoc annulment
> committees have 'discretion' to refuse to annul an award once it is
> determined that there are grounds for annulment. Nor does the
> drafting history of the ICSID Convention support that position.[611]

497.    Spain relies on *Klöckner v. Cameroon*, *Pey Casado v. Chile I*, and *Eiser v. Spain,* where committees held that if there are grounds for annulment, then the award should be annulled without the committee having any discretion.[612]

### c. The Committee's Analysis

498.    The Committee finds that Art. 52(3) of the ICSID Convention must be interpreted based upon the ordinary meaning as provided under the Vienna Convention. The plain wording of Art. 52(3) provides that a committee "*shall have the authority to annul the award*". It does not say "*shall annul the award*". This suggests that a committee has "*the authority*" to determine whether or not to annul an award based upon its discretion. The discretion of committees is well-established. As the *Pey Casado v. Chile II* committee found in 2020, "*the Committee agrees with the position of the* CEAC *committee, which is itself in line with well-established case law, that committees should not automatically declare an award annulled if one of the grounds for annulment is present*".[613] As described by Professor Schreuer, committees no longer adopt the "*hair trigger*" standard of automatically annulling awards.[614]

---

[611] Reply, ¶ 667.

[612] Reply, ¶¶ 669–672; *Klöckner v. Cameroon*, RL-194, ¶ 179; *Pey Casado v. Chile I*, RL-182, ¶ 80; *Eiser Infrastructure Limited and Energía Solar Luxembourg S.À R.I. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Decision on the Kingdom of Spain's Application for Annulment, 11 June 2020, RL-255, ¶ 254.

[613] *Víctor Pey Casado and Foundation President Allende v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on Annulment, 8 January 2020 ("*Pey Casado v. Chile II*"), CL-239, ¶ 210. See also *MINE v. Guinea*, RL-178, at ¶ 4.09.

[614] Christoph Schreuer, "Three Generations of ICSID Annulment Procedures", in *Annulment of ICSID Awards* by Emmanuel Gaillard and Yas Banifatemi, 2004, CL-294, p. 19.

499.    The Committee agrees that the discretion should be subject to reasonable limits and that various factors should be taken into consideration when exercising this discretion. As listed in *Pey Casado v. Chile II*, factors to be considered include "*the gravity of the circumstances which constitute the ground for annulment*", and, "*whether they had – or could have had – a material effect upon the outcome of the case*".[615] *CEAC v. Montenegro* also cites (1) "*the importance of the finality of the award*" and (2) "*the overall question of fairness to both Parties*".[616]

500.    In light of its rulings above that Spain has not established any grounds for annulment, the Committee decides it is not necessary to render a separate decision on this issue.

## VI.    COSTS

### A.    SPAIN'S COST SUBMISSIONS

501.    In its submission on costs, the Applicant requests that the Claimants be ordered to pay the total costs of the arbitration proceeding and the legal fees and expenses incurred by the Applicant, amounting to EUR 2,014,749.04[617], broken down as follows:

| ICSID Fees and Advance Payments | EUR 497,742.25[618] |
|---|---|
| Legal Fees | EUR 1,527,890.00 |
| Expert Reports | EUR 71,125.00 |
| Translations | EUR 5,858.46 |

---

[615] *Pey Casado v. Chile II*, CL-239, ¶ 210.

[616] *CEAC v. Montenegro*, CL-284, ¶ 84.

[617] Spain filed a Submission on Costs on 25 February 2021 ("**Spain's 2021 Submission on Costs**") for a total amount of EUR 2,836,038, which was updated by the Statement of Costs of 25 January 2022 ("**Spain's 2022 Statement of Costs**") a total amount of EUR 2,014,749.04.

[618] According to paragraph 4 of Spain's 2022 Statement of Costs, this total amount results from deducting EUR 97,405.20 (USD 110,790.62) (identified as a "*reimbursement by ICSID*") from Spain's advance payments of EUR 572,275.79 (USD 650,000). The Committee observes, however, ICSID has not made any reimbursements out of the advance payments concerning the annulment proceeding.

| Printing Services | EUR 1,386.37 |
| Courier Services | EUR 729.16 |
| Other Expenses | EUR 17.80 |
| Total | EUR 2,104,749.04 |

(Currency: EUR)

502.    Spain acknowledges that, pursuant to Article 52(4) of the ICSID Convention and Arbitration Rule 53, Article 61(2) of the ICSID Convention and Rule 47(1)(j) apply *mutatis mutandis* to annulment proceedings. Article 61(2) grants the Committee a "*degree of discretion*" to allocate the costs of the proceeding.[619]

503.    Spain "*understands that the Committee should be guided by the principle that 'costs follow the event' if there are no indications that a different approach should be called for*".[620]

504.    Spain further argues that it was "*compelled to go through these annulment proceedings*".[621] It asserts that the Tribunal lacked jurisdiction to hear the dispute and that the Claimants should be responsible for the costs Spain incurred as they decided to initiate the dispute. Furthermore, according to Spain, the Claimants should bear the costs since they "*filed a conscious false translation that led the Tribunal to an erroneous holding*", and they "*got access to a privileged subsidies framework due to a false statement that made them go to the Arbitration with no clean hands*".[622]

505.    Spain contends that if the Committee annuls the Award, the Claimants should pay for the legal, arbitration, and annulments costs of Spain.[623] Spain adds that even if the Committee does not annul the Award in its entirety it should be entitled to recover its costs.[624]

---

[619] Spain's 2021 Submission on Costs, ¶ 5.
[620] Spain's 2021 Submission on Costs, ¶ 6.
[621] Spain's 2021 Submission on Costs, ¶ 7.
[622] Spain's 2021 Submission on Costs, ¶ 7.
[623] Spain's 2021 Submission on Costs, ¶ 10.
[624] Spain's 2021 Submission on Costs, ¶ 8.

506.   Spain notes that its costs are "*reasonable in light of the complexity and duration of the case*".[625]

507.   Spain further requests that the Claimants should pay "*post-award interest on the foregoing sums, at a compound rate of interest to be determined by the Committee until the date of full satisfaction of the Committee's decision*".[626]

508.   Finally, Spain reserves its right to submit "*additional arguments in accordance with the ICSID Rules and the instructions of the ad hoc Committee for the purpose of responding to the allegations made by the Respondent on Annulment*".[627]

## B.     THE NEXTERA ENTITIES' COST SUBMISSIONS

509.   In its submissions on costs, the Claimants submit that the Applicant should bear all the costs, fees, and expenses of these annulment proceedings and reimburse the Claimants' attorneys' fees, expert fees, and other disbursements for a total amount of USD 3,529,855.95, broken down as follows:

| | |
|---|---|
| Skadden Professional Fees | USD 3,382,592.83[628] |
| Translations | USD 47, 918.13 |
| Trial graphics consultant fees | USD 61,182.00 |
| Expert fees of Prof. Eeckhout | USD 35,253.69 |
| Miscellaneous (copying, courier, legal technology, outside legal research) | USD 2,909.30 |
| Total | USD 3,529,855.95 |

---

[625] Spain's 2021 Submission on Costs, ¶ 11.

[626] Spain's 2021 Submission on Costs, ¶ 24.

[627] Spain's 2021 Submission on Costs, ¶ 25.

[628] This corresponds to the total amount of fees reflected in the Claimants' Submission on Costs of 25 February 2021, ¶ 31 (i.e. USD 3,285,437.15) and the Claimants' Statement of Costs of 7 January 2022, p. 2 (i.e. USD 97,155.68).

_____

(Currency: USD)

510.   In addition, the Claimants request interests for the fees and disbursements (specified in the previous paragraph), from the date of the Committee's Decision on Annulment until the date of payment at the same interest rate specified in the Award. [629]

511.   The Claimants also argue that Article 61(2) of the ICSID Convention extends to ICSID *ad hoc* committees. They cite that "*both sides have claimed that costs should be awarded to them as the prevailing party*". [630] They note that "[p]*rior annulment committees have attached importance to any such common position. Article 61(2) also expressly recognises the deference that should be given to any party agreement on costs*". [631] They advocate the 'cost follows the event' approach should be followed as it is "*well-settled in ICSID arbitration*". [632]

512.   While a party has a right to seek annulment, such right should not be "*consequence-free*". [633] They assert that "[t]*he applicant for annulment is the only party that stands to gain from filing an annulment application. If the applicant prevails, it reaps a substantial benefit by annulling the award. If the applicant loses, the respondent on annulment gains nothing new*". [634]

513.   They argue that the cost-follows-event principle is "*especially relevant here, where Spain raised 22 claims for annulment (which may be a record number in ICSID arbitration)*". [635] They emphasize that "*Spain should bear the cost consequences that flow from its 'kitchen sink'*" approach. [636] They add that even if Spain were to prevail on any one of its 22 claims, the principle should still warrant awarding them almost all of their costs because they

---

[629] Claimants' Submission on Costs, ¶ 38.i and ii.

[630] Claimants' Submission on Costs, ¶ 3, citing Spain's Reply on Annulment, ¶ 674(d), and NextEra's Rejoinder on Annulment, ¶ 454(c)(iv) and (v) (each seeking full cost recovery).

[631] Claimants' Submission on Costs, ¶ 7.

[632] Claimants' Submission on Costs, ¶ 11.

[633] Claimants' Submission on Costs, ¶ 9.

[634] Claimants' Submission on Costs, ¶ 9.

[635] Claimants' Submission on Costs, ¶ 10.

[636] Claimants' Submission on Costs, ¶ 21.

would have prevailed on the other 21 claims.[637] In addition to the number of claims, the Claimants argue that the following factors increased costs: (1) Spain's re-litigation of issues beyond the limits of annulment review, including a considerable number of new arguments and authorities; (2) the Parties' diverging views on waiver; (3) Spain's arguments based on alleged omission; and (4) Spain's lengthy use of expert evidence.[638]

514.  The Claimants assert that it should be able to claim costs for the numerous procedural applications that Spain lost. This includes Spain's request for a stay of enforcement, two requests for new expert evidence, invocation of criminal law, and application for expert testimony. The Claimants also claimed supplemental costs incurred for responding to Spain's application to introduce the *Moldova v. Komstroy* judgment into the record, commenting on that judgment after its admission into the record, and responding to Spain's application to reopen these proceedings.[639]

515.  They also cite various "*recent committees*" have awarded attorney's fees as part of the "*recent trend in ICSID annulment proceedings towards a 'cost follows the event approach*'".[640] They argue that the "*allocation of attorneys' fees supplements the well-accepted principle that the costs of the annulment proceeding itself (such as the fees of the committee members) should be borne by the unsuccessful applicant, 'unless there are exceptional circumstances which warrant an alternative allocation*'".[641]

516.  The Claimants assert that their costs are reasonable and commensurate with the number of claims that Spain raised in this annulment proceeding. They add that their costs are "*consistent with the costs incurred by both Spain and the investor in the* Eiser *annulment*

---

[637] Claimants' Submission on Costs, ¶ 18.

[638] Claimants' Submission on Costs, ¶ 22.

[639] Claimants' letter of 7 January 2022, pp. 1–2.

[640] Claimants' Submission on Costs, ¶ 14, citing, Bl*usun S.A., Jean-Pierre Lecorcier & Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Decision on Annulment, 13 April 2020, RL-318; *OI European Group B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/25, Decision on Annulment, 6 December 2018, CL-240; *Alapli v. Turkey*, CL-273; *Adem Dogan v. Turkmenistan*, ICSID Case No. ARB/09/9, Decision on Annulment, 15 January 2016, CL-306; *Togo Electricité y GDF-Suez Energie Services v. Republic of Togo*, ICSID Case No. ARB/06/07, Decision on Annulment, 6 September 2011, CL-324; and *Compagnie d'Exploitation du Chemin de Fer Transgabonais v. Republic of Gabon*, ICSID Case No. ARB/04/5, Decision on Annulment, 11 de mayo de 2010, CL-325; ¶ 30 (on recent trends).

[641] Claimants' Submission on Costs, ¶ 15, citing *CEAC v. Montenegro*, ¶ 151.

proceeding (*which is the closest comparator because it is the only other Spanish ECT award that has reached a decision on annulment thus far*)".[642] They cite that *Eiser v. Spain* involved far fewer claims but that Eiser claimed approximately USD 2.9 million in attorney's fees and approximately USD 235,000 in disbursements, which amounted to 2% of the *Eiser v. Spain* award's value. They highlight that their legal costs is commensurate with the value of the Award and amounts to 1% of the sums owed.[643]

517.    They cite that they anticipate that Spain's legal costs will be lower because its State Attorney's Office is handling the case and many of its arguments have been raised in other ECT cases, which allows it to spread its costs.[644] In contrast, the Claimant's counsel is not acting for any other investors against Spain, which does not allow it to similarly spread costs.[645]

## C.    THE COMMITTEE'S DECISION ON COSTS

518.    Art. 61(2) of the ICSID Convention provides:

> *In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*

519.    ICSID Arbitration Rule 47(1)(j) provides that an award shall contain "*any decision of the Tribunal regarding the cost of the proceeding*".

520.    Art. 61(2) of the ICSID Convention and Arbitration Rule 47(1)(j) (applied by virtue of Article 52(4) of the ICSID Convention and Arbitration Rule 53) give an *ad hoc* committee discretion to allocate the costs of the proceeding, including attorneys' fees and other costs, between the Parties as it deems appropriate. The Committee notes that Regulation 14(3)(e)

---

[642] Claimants' Submission on Costs, ¶¶ 5, 34–35, 37.
[643] Claimants' Submission on Costs, ¶¶ 34–36.
[644] Claimants' Submission on Costs, ¶ 32.
[645] Claimants' Submission on Costs, ¶ 33.

of the ICSID Administrative and Financial Regulations also recognizes the committee's discretion to allocate the costs of annulment proceedings.

521.    In exercise of its discretion, the Committee considers that the "*costs should follow the event*" principle should apply. An important factor for the Committee to follow this principle is that both Parties agree with its application. Both Parties claim recovery of their costs based on their position prevailing in the case. The Committee further notes the recent practice of committees following this principle.[646] The Committee agrees with *CEAC v Montenegro* that the costs should be borne by the unsuccessful applicant unless there are "*exceptional circumstances which warrant an alternative allocation*".[647]

522.    In view that the Application did not succeed Spain should therefore bear the entire costs of the proceeding, including the fees and expenses of the Members of the Committee. The Committee sees no exceptional circumstances that would warrant a different allocation of costs.

523.    The costs of the proceeding, including the fees and expenses of the Committee, ICSID's administrative fees and direct expenses, amount to (in USD):

| | |
|---|---|
| Committee Members' fees and expenses | |
| Joongi Kim (President) | USD 197,279.40 |
| Lawrence Boo | USD 56,038.04 |
| Humberto Sáenz Marinero | USD 156,000.00 |
| ICSID's administrative fees | USD 126,000.00 |
| Direct expenses | USD 47,157.05 |
| **Total** | **USD 528,474.49** |

---

[646] Background Paper, ¶ 65.

[647] Claimants' Submission on Costs, ¶ 15, citing *CEAC v. Montenegro*, ¶ 151.

144

524.    The above costs have been paid out of the advances made by the Applicant pursuant to Administrative and Financial Regulation 14(3)(e).[648]

525.    In terms of legal fees and other expenses, the Committee finds that the same principle should apply and the costs should be borne by the unsuccessful Applicant. In applying the principle, the Committee takes into consideration the relative success of the Parties' submissions, the particular circumstances of the case, reasonableness of fees and expenses claimed, and the conduct of the Parties.

526.    The Committee first notes that Spain's Application was denied in its entirety.

527.    In terms of the circumstances of the case, Spain raised 22 claims in its Application, all of which were denied in their entirety. Similarly, it did not prevail in most of the procedural applications made during the course of the proceedings, including the request for stay of enforcement, several applications to submit new evidence, and an application to reopen the proceedings. The Committee does not find any exceptional circumstances that would warrant a different allocation.

528.    Given the complexity of the case and the issues argued, the Claimants' attorneys' fees and other expenses such as translations, experts' fees, and miscellaneous fees seem reasonable. The Committee, however, observes that the "*Trial graphics consultant fee*" substantially surpasses even the expert's fees of Prof. Eeckhout and finds it excessive.

529.    The Committee extends its appreciation to both Parties for having conducted themselves in a professional and cooperative manner and considers that neither can be faulted for causing any unwarranted delays. The Committee does not find that either Party committed any misconduct during the annulment proceedings.

530.    Accordingly, taking these factors into consideration, the Committee orders the Applicant to cover USD 3,500,000 of the Claimants' legal fees and other expenses (out of the total amount of USD 3,529,855.95 claimed).

---

[648] The remaining balance will be reimbursed to the Applicant.

531.     The Committee finds that, in the normal course of business, interest should accrue for sums due until payment is made. The Committee notes that Spain requests post-Decision interest at a compound rate to be determined by the Committee. The Respondent requests the same interest rate specified in the Award (i.e. 0.234% compounded monthly).[649] Both Parties requested post-Decision compound interest.

532.     The Committee considers appropriate to apply the same interest rate granted in the Award. Accordingly, Spain shall pay interests on the amount determined in this Decision, at the rate of 0.234% compounded monthly, starting 30 days after the date of the Decision until the date of payment.

*(intentionally left blank)*

---

[649] Award, ¶¶ 18, 37.

## VII.   DECISION

533.   For the reasons set forth above, the Committee unanimously decides that:

(1)   the Application for Annulment of the Award rendered on 31 May 2019 submitted by Spain is dismissed in its entirety;

(2)   the Applicant shall bear all the costs of the proceedings, including the fees and expenses of the Members of the Committee, ICSID's administrative fees, and direct expenses, in the amount of USD 528,474.49; and

(3) the Applicant shall, within 30 days of the dispatch of the Decision on Annulment, pay to the Claimants the sum of USD 3,500,000 in respect of the Claimants' legal fees and expenses, and interests on this amount at the rate of 0.234% compounded monthly, starting 30 days after the date of the Decision until the date of payment.

_____
Mr. Humberto Sáenz-Marinero
Member of the *ad hoc* Committee
Date: 12 March 2022

_____
Prof. Lawrence Boo
Member of the *ad hoc* Committee
Date:

_____
Prof. Joongi Kim
President of the *ad hoc* Committee
Date:

148

_____                    _____
Mr. Humberto Sáenz-Marinero                      Prof. Lawrence Boo
Member of the *ad hoc* Committee            Member of the *ad hoc* Committee
Date:                                       Date: 14 March 2022



_____
Prof. Joongi Kim
President of the *ad hoc* Committee
Date:

_____
Mr. Humberto Sáenz-Marinero
Member of the *ad hoc* Committee
Date:

_____
Prof. Lawrence Boo
Member of the *ad hoc* Committee
Date:

_____
Prof. Joongi Kim
President of the *ad hoc* Committee
Date: 16 March 2022

EXHIBIT 2

# Introducing **ICSID**



## International Centre for Settlement of Investment Disputes



**The global leader in international investment dispute settlement**







**ICSID** | **International Centre for Settlement of Investment Disputes** WORLD BANK GROUP



This map was produced by the Cartography Unit of the World Bank Group. The boundaries, colors, denominations and any other information shown on this map do not imply, on the part of the World Bank Group, any judgment on the legal status of any territory, or any endorsement or acceptance of such boundaries.

# Our Global Membership



IBRD 39525
SEPTEMBER 2021



**ICSID facilitates foreign investment by providing an impartial system for dispute settlement.**

## Introducing ICSID

One of the more remarkable economic trends in recent decades has been the expansion of international investment. This benefits countries by providing access to external financing, technology and expertise. But it also means that there are more opportunities for tensions to arise amongst investors and States.

The International Centre for Settlement of Investment Disputes (ICSID) provides an independent forum to conciliate and arbitrate these disputes. ICSID was established under the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the ICSID Convention)—a treaty that entered force in 1966, and which today has been signed and ratified by 156 States.

Today, ICSID is as relevant as ever—with a membership and caseload that is larger than at any other point in its history.

## Q: **What is investor-State dispute settlement?**

A: Investor-State dispute settlement (ISDS) is—as the term implies—a system of conflict resolution between foreign investors and the State that hosts the investment.

Both the foreign investor and the host State must consent to ISDS before a proceeding may commence. Usually, the consent of the State is contained in international investment agreements between States. These agreements can be bilateral (between two countries), or multilateral (between more than two countries). There are currently more than 3,300 international agreements providing for ISDS.

Consent to ISDS can also be found in the domestic investment laws of some States and in contracts between a foreign investor and a State, or a State-affiliated agency.

## Q: **How does ICSID facilitate dispute settlement?**

A: ICSID provides the institutional facility and procedural rules for independent conciliation commissions and arbitral tribunals constituted in each case.

The ISDS provisions in international agreements usually allow the investor to select the applicable rules. ICSID has two sets of rules that govern most proceedings under its auspices: the ICSID Convention, Regulations and Rules; and the ICSID Additional Facility Rules. However, ICSID also administers investment cases under other rules, such as the rules of the United Nations Commission on International Trade Law (UNCITRAL).

# ICSID and the World Bank Group

## World Bank Group
### Five institutions

| ICSID | IBRD | IDA | IFC | MIGA |
|-------|------|-----|-----|------|
| The International Centre for Settlement of Investment Disputes facilitates foreign investment by providing a multilaterally-agreed system for dispute settlement. | The International Bank for Reconstruction and Development lends to governments of middle-income and creditworthy low-income countries. | The International Development Association provides interest-free loans – called credits – and grants to governments of the poorest countries. | The International Finance Corporation helps developing countries achieve sustainable growth by financing investment, mobilizing capital in international financial markets, and providing advisory services to businesses and governments. | The Multilateral Investment Guarantee Agency promotes foreign direct investment into developing countries by offering political risk insurance (guarantees) to investors and lenders. |

## ICSID Organizational Structure
### Two components, two separate functions

| ADMINISTRATIVE COUNCIL | SECRETARIAT |
|------------------------|-------------|
| ▪ One representative of each Member State, and one vote per State<br>▪ Adopts ICSID arbitration, conciliation and fact-finding rules<br>▪ Adopts annual budget and approves annual report<br>▪ Elects Secretary-General and Deputy Secretaries-General<br>▪ Each State designates persons to a list of arbitrators and conciliators | ▪ Led by Secretary-General<br>▪ Provides technical and administrative support to proceedings<br>▪ Offers training and technical assistance to governments and the public<br>▪ Contributes to the development of investment law through publishing and outreach |

## Q: How is ICSID structured?

A: ICSID has an Administrative Council and a Secretariat. Each ICSID Member State has one seat, and one vote, on the Administrative Council. The Administrative Council plays no role in the administration of individual cases. Rather, its mandate is to address organizational matters related to ICSID's institutional framework.

The ICSID Secretariat consists of about 70 professionals who administer arbitration and conciliation cases and support other ICSID activities. It is led by the Secretary-General, who is the legal representative of ICSID, the registrar of ICSID proceedings, and the principal officer of the Centre.

ICSID is one of the five organizations that make up the World Bank Group. However, ICSID cases are separate and independent from the work of the World Bank.

## Q: Who decides ICSID arbitrations?

A: International jurists from all over the world decide ICSID cases. In most instances, the tribunals consist of three arbitrators: one appointed by the investor, another appointed by the State, and the third, presiding arbitrator appointed by agreement of both parties. When a party fails to make an appointment or when the parties do not agree on a tribunal president, ICSID may be asked to make the missing appointments.

ICSID maintains a list of individuals who may be named as arbitrators and conciliators in ICSID proceedings, known as the ICSID Panel of Arbitrators and Panel of Conciliators. Each ICSID Member State may designate four persons to each Panel. The ICSID Panels provide a source from which the parties to ICSID cases may select conciliators and arbitrators, but parties to a dispute may select any person they wish.

Notably, proceedings are detached from domestic procedures under the ICSID Convention. This means that local courts do not intervene in the ICSID process. Awards are final and binding, and may not be set aside by the courts of any Member State.

## Q: Why do States and investors choose ICSID?

A: ICSID is the only institution designed with the special characteristics of international investment disputes in mind, and its rules are drafted to balance the interests of investors and States. Moreover, dispute settlement at ICSID is efficient and cost-effective, and therefore accessible to a broad range of investors, including many small and medium-sized enterprises.

The ICSID Secretariat also provides extensive administrative and legal support. ICSID maintains panels of experienced conciliators and arbitrators, and offers state-of-the art facilities around the world.

Arbitration under the ICSID Convention entails a strong enforcement mechanism. An award by an ICSID tribunal is binding on all parties to the proceeding, and all Member States must recognize and enforce the award.

Also, ICSID provides registers for all cases, up-to-date listings of procedural steps, and links to awards and other case materials. Parties have the option of public hearings, and ICSID facilitates the participation of non-disputing parties. These features enhance accountability and public confidence in the process.

## Q: What are the steps in an ICSID arbitration?

**A:** The first step is submitting a request for arbitration to the Secretary-General of ICSID, outlining the facts and legal issues to be addressed. Once requested, the case will be registered unless the dispute is manifestly outside the jurisdiction of ICSID.

Next, an arbitral tribunal is constituted, and a first session is held to deal with preliminary questions of procedure. From there, the proceeding usually comprises two distinct phases: a written procedure followed by in-person hearings. After the parties present their case, the tribunal deliberates and renders its award. Parties may agree to hold an ICSID proceeding in any location. Where suitable, hearings and sessions are conducted by telephone or video conference to reduce the cost and increase the efficiency of proceedings.

## Q: What are some trends at ICSID?

**A:** The ICSID caseload has increased in the last twenty years. This reflects the substantial growth in cross-border investment and the increased number of international investment agreements offering ISDS. ICSID has administered over 650 investment cases to date.

ICSID cases involve a full range of economic sectors. Traditionally, the extractives sector—i.e. oil, gas and mining—as well as the energy sectors have accounted for the largest share. Disputes related to finance, transport, and construction are also prominent. Up-to-date caseload statistics, covering a broad range of trends, are available on the ICSID website.

States from all regions of the world have been involved in ICSID arbitration and conciliation. Originally, disputes involved mainly investors from developing States which invested in developing countries. However, that trend is changing as countries develop and their investors venture overseas.

# **Where can I learn more?**

ICSID's website offers a wealth of information in the Centre's three official languages: English, French and Spanish.

Visit us at
https://icsid.worldbank.org/en
https://icsid.worldbank.org/fr
https://icsid.worldbank.org/sp



# EXHIBIT 3



ABOGACÍA GENERAL DEL ESTADO-
DIRECCIÓN DEL SERVICIO JURÍDICO DEL
ESTADO

SUBDIRECCIÓN GENERAL DE LOS SERVICIOS
CONTENCIOSOS

# TO THE SECRETARY-GENERAL OF THE INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

in relation to

## ICSID ARBITRATION CASE No. ARB/14/11

### THE KINGDOM OF SPAIN
### Applicant

- and -

### NEXTERA ENERGY GLOBAL HOLDINGS. B.V. and
### NEXTERA ENERGY SPAIN HOLDINGS. B.V.
### Respondents

---

## SUBMISSION OF THE KINGDOM OF SPAIN IN SUPPORT OF THE CONTINUATION OF THE STAY OF ENFORCEMENT OF THE AWARD

---

**Submited on behalf of the Kingdom of Spain by:**

State Attorney's Office

C/ Marqués de la Ensenada, 14-16

28004 Madrid

Spain

**16 January 2020**

# CONTENTS

I.  INTRODUCTION                                                      3

II.  CONTINUATION OF THE STAY SHOULD BE GRANTED                       4

(1)  The Annulment Application has been made in good faith           5

(2)  Harm to the Kingdom of Spain if stay is not continued           5

(3)  Continuing the stay would not harm NextEra                      6

(3.1)  Payment of interests granted by the Award ............................................... 6

(3.2)  Spain will abide by its international obligations........................................ 7

III.  CONCLUSION                                                      8

## I.    INTRODUCTION

1. Pursuant to Rule 54 of the ICSID Arbitration Rules and in accordance with the timetable agreed by the Paries, the Kingdom of Spain hereby files this submission in support of the continuation of the provisional stay of enforcement of the Award[1] rendered in the Case NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. (hereinafter "**NextEra**") and the Kingdom of Spain (ICSID case No. ARB/14/11) on 31 May 2019 (hereinafter, the "**Award**").[1]

2. On September 26, 2019 the Kingdom of Spain submitted its Application for Annulment of the Award (hereinafter, the "**Annulment Application**"). In the Annulment Application, the Kingdom of Spain requested (i) a provisional stay of enforcement of the Award in accordance with Article 52(5) of the ICSID Convention and Rule 54(2) of the ICSID Arbitration Rules, which provide that the Secretary-General shall grant an automatic provisional stay until the *ad hoc* Committee rules on such request, and (ii) the continuation of the stay of enforcement until the decision in this annulment proceeding is rendered by the *ad hoc* Committee (hereinafter, the "**Committee**").[2]

3. On October 2 2019, the Secretary-General registered the Annulment Application and granted the provisional stay of the Award in accordance with Article 52(5) of the ICSID Convention. The Committee was constituted on December 16 2019 and this annulment proceeding was deemed to have commenced as of that date. Further to the request for the stay of enforcement of the Award set forth in the Annulment Application, the Kingdom of Spain files this submission in support of continuation of the stay.

4. As discussed below, it is the prevailing practice for ICSID *ad hoc* annulment committees to stay enforcement of an award during the pendency of the annulment proceeding. Absent exceptional circumstances that require a departure from this standard practice, such stays have been considered the norm. Thus, unless faced with an obviously frivolous annulment application or other improper purposes, which are not present here, a stay of enforcement should be granted.[3]

5. In this case, continuation of the stay of enforcement is clearly justified. The Kingdom of Spain has filed its Annulment Application in good faith, in accordance with Article 52(1) of the ICSID Convention, while raising serious grounds (including an issue related with a lack of clean hands on the Respondent in the annulment) that it believes require the annulment of the Award, including manifest excess of powers, failure to state reasons and serious departure from a fundamental rule of procedure. As discussed below, the grounds for annulment raised by the Kigdom of Spain go to the very core of the validity of the Award and the integrity of the arbitral proceeding. Continuation of the stay of enforcement is compelling in this case, in which there are clear and serious grounds for annulment of an Award that is deeply flawed.

6. Indeed, under these circumstances, premature enforcement of the Award before the Annulment Application is decided would be particularly inappropriate and unfair. Such enforcement would prejudice the Kingdom of Spain, which, if successful in the annulment proceedings, would then be faced with the prospect of trying to recover amounts improperly obtained by NextEra. On the

---

[1] Award rendered on 31 May 2019 in the ICSID Case No. ARB/14/11 between NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. the Kingdom of Spain. **Annex-001**.
[2] Annulment Application, ¶¶ 106 and 107.
[3] See *infra*, ¶¶ 7-10.

contrary, there would be no prejudice to NextEra as a result of continuing the stay, since any delay in payment of the Award could be fully compensated by the payment of interest from the date of the Award.

## II.   CONTINUATION OF THE STAY SHOULD BE GRANTED

7.   Pursuant to Article 52(5) of the ICSID Convention, the Committee may continue the stay of enforcement of the Award *"if it considers that the circumstances so require",* as also reflected in Rule 54(2) of the ICSID Arbitration Rules. The prevailing ICSID practice of granting stays of enforcement was recognized by the *ad hoc* committee in *Occidental v. Ecuador*, which stated:

> *"The prevailing practice in prior annulment cases has been to grant the stay of enforcement. Although this practice does not create a presumption for continuation, and a committee is entitled to deviate from it, 'if it considers that the circumstances so require', the Committee finds that in this case there is no reason to deviate from the standard practice."[4]*

8.   The *ad hoc* committee in the *Victor Pey Casado* case spoke in similar terms, stating that:

> *"absent unusual circumstances, the granting of a stay of enforcement pending the outcome of the annulment proceedings has now become almost automatic."[5]*

9.   *Ad hoc* annulment committees have found that a request for continuation of a stay should be granted unless it is obvious that the application is *"without any basis under the Convention"* and is *"dilatory"* in nature. As stated by the *ad hoc* committee in *MTD v. Chile*:

> *"The Committee agrees with earlier decisions to the effect that, unless there is some indication that the annulment application is brought without any basis under the Convention, i.e., that it is dilatory, it is not for the Committee to assess as a preliminary matter whether or not it is likely to succeed. In requesting annulment, an applicant avails itself of a right given by the Convention. There is no indication here that Chile is acting in a merely dilatory manner. Thus the Committee does not need to form any view as to the likelihood of success of the application for annulment in the present case."[6]*

---

[4] *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. The Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision on the Stay of Enforcement of the Award dated 30 September 2013, ¶ 50. **Annex-029**.

[5] *Víctor Pey Casado and Fondation "Presidente Allende" v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Republic of Chile's Application for a Stay of Enforcement of the Award dated 5 May 2010, ¶ 25. **Annex-030**. See also *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Decision on the Argentine Republic's Request for a Continued Stay of Enforcement of the Award dated December 28, 2007, ¶ 22 (*"Although the Committee accepts that there may be very exceptional circumstances where a stay ought not be ordered, that is not the situation here."*). **Annex-031**.

[6] *Víctor Pey Casado and Fondation "Presidente Allende" v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Republic of Chile's Application for a Stay of Enforcement of the Award dated 5 May 2010, ¶ 25. **Annex-030**. See also *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Decision on the Argentine Republic's Request for a Continued Stay of Enforcement of the Award dated 28 December 2007, ¶ 22 (*"Although the Committee accepts that there may be very exceptional circumstances where a stay ought not be ordered, that is not the situation here."*). **Annex-031**.

10. As expounded below, there are no circumstances present in this case that would warrant a departure from this standard practice. The Kingdom of Spain's Annulment Application has been made in good faith and there would be no harm caused to NextEra as a result of the stay.

**(1)      The Annulment Application has been made in good faith**

11. It is clear that the Annulment Application in this case is based on serious grounds, was made in good faith, and is not dilatory.

12. First, as discussed in the Annulment Application, in the Award the Tribunal went beyond its jurisdiction by failing to apply the proper law with regard to the intra-EU objection and wrongly interpreting Article 26 of the Energy Charter Treaty (hereinafter, "**ECT**"). Furthermore, the Tribunal ignored the applition of the Article 17 of the ECT and the fact, that there was no investor in accordance with the applicable law. The Tribunal also failed to apply the proper law by completely disregarding European Union Law when assessing the facts and merits of the case. Finally, the wrongful application of the proper law by the Tribunal determined that the Award infringed the most basic principles contained in the European Commission's State Aid Decision on the Spanish renewable energy support scheme.[7]

13. In addition, the Award incurred in serious departures from fundamental rules of procedure and thus prevented the Kingdom of Spain ofhaving a fair trial. The Tribunal authorized the Clamiants to breach the basic rules of procedural order, Nº 1; the Kingdom of Spain denounced and demonstrated the wrong translation of a key document essential for the Award but the Tribunal consciously used the wrong translation; there were key documents in power of Claimants that were concealed by them and the Tribunal was willful blindness on that concealment; the Tribunal flipped the burden of proof and set the principle that the documents NextEra voluntarily concealed were favorable to them; and finally, the hearing discussion and the transcriots were completely irrelevant for the Tribunal as it decided (likely what it had already in mind before the hearing) as if the hearing, transcripts and post hearing submission had never happened.[8]

14. Lastly, the Award failed to state the reasons on which it is based by providing contradictory findings in relation to stabilization commitments and the application of European Union Law; not specifyed the date of the investment what is essential for any valuation; omitted voluntarily to decide on a potential fraud allegation that would determine that NextEra didn't come to the ICSID with clean hands; committeed gross errors in the damages claculations.[9]

**(2)      Harm to the Kingdom of Spain if stay is not continued**

15. Moreover, a key factor that may be considered by an *ad hoc* committee when deciding on a request for the continuation of the stay of enforcement is the harm that the continuation or not of the stay could imply for each party. Certainly, in the present case, as will be expounded below, not continuing the stay would prejudice the position of the Kingdom of Spain while continuing the stay would not harm NextEra in any way.

---

[7] Annulment Application, ¶¶ 17-57.
[8] *Ibid.*, ¶¶ 58-77.
[9] *Ibid.*, ¶¶ 78-105.

5

16. In the event that the stay was not continued, the Kingdom of Spain would face the risk of non-recoupment of the amounts unduly paid. The Kingdom of Spain could not be able to recover funds from NextEra if the Award is paid before the final decision on this annulment proceeding is rendered and later said decision annulles the Award (as it will likely happen).

17. If NextEra enforced the Award and executed its payment during the pendency of this annulment proceeding and the Award was afterwards annulled, the Kingdom of Spain would be put in the difficult position of having to recover the amount prematurely and inappropriately paid to the Respondent, aggravated by the circumstance of NextEra's "investment" been channeled trough a long chain of instrumental companies with no actual assets.[10]

18. In any case, even in the hipothetical event that the amount could ultimately be recouped, the process for the recouperation would indeed imply resources and efforts by the Kingdom of Spain, who would need to start further legal proceedings for said recouperation. The Applicant should not be driven to having to face such additional burden, particularly considering that those additional resources and efforts are financed with taxpayers´money, when that additional and unnecesary burden could have been avoided by the mere maintenance of the stay until this annulment proceeding is concluded.

**(3)      Continuing the stay would not harm NextEra**

19. As noted above, in deciding requests to continue a stay of enforcement, *ad hoc* committees may also consider whether continuation of the stay would have adverse economic consequences on the award creditor.[11]

20. In the present case, contrary to the consequences for the Applicant already mentioned,  NextEra would not be harmed in any way if the Committee decides to continue the provisional stay of enforcement of the Award, as explained below.

**(3.1)      Payment of interests granted by the Award**

21. In the hypothetical event that the Annulment Application was denied, the delay in payment of the Award would be remedied by the payment of interest. Thus, the deferral in payment of the Award during the pendency of the annulment proceeding would not prejudice NextEra at all. This factor has been recognized by other *ad hoc* committees, such as in *Azurix v. Argentina*, where the committee stated:

> *"Other than by being put to the effort and expense of defending an annulment request and by the receipt of funds being delayed (assuming the annulment application to be unsuccessful), the*

---

[10] NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V.  and the Kingdom of Spain.  in the ICSID case No. ARB/14/11. Award rendered on 31 May 2019, ¶¶ 188-212

[11] *Quiborax S.A. and Non-Metallic Minerals S.A. v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/2, Decision on the Application to Terminate the Provisional Stay of Enforcement of the Award dated 21 February 2017, ¶ 62 ("*A determination of which Party is more or less harmed by the continuation of the provisional stay of enforcement requires a comparison of how continuing or lifting the stay would affect the interests of each Party. Such a comparison is customarily made by annulment committees.*") (Unnofical translation.) **Annex-032**.

6

> *Committee does not accept that Azurix suffers any prejudice of a kind warranting the provision of security. The provision for interest compensates for the delay."[12]*

22. Under the terms of the Award, interest will accrue on the amount of the Award to the date of payment compounded monthly.[13] Thus, during the entire period that this annulment proceeding is pending, interest will be accruing.

## (3.2)   Spain will abide by its international obligations

23. In deciding whether to continue a stay of enforcement, committees may consider the risk of non-compliance with the award if it is not annulled.[14] Even when such a risk exists, committees have found that it is not conclusive, and stays of enforcement have been granted even in such circumstances.[15]

24. Spain is the fifth-largest economy in the European Union,[16] and it is ranked 13th among all countries in the world in terms of GDP.[17] As such, there is no danger that the Kingdom of Spain would not have the financial resources to pay the Award in this case, if and when the time comes that such payment may be appropriate, after this annulment proceeding is concluded.

25. There is also no history of non-compliance. The Kingdom of Spain takes its international commitments seriously, and it intends to honor them. That includes its obligation under Article 53 of the ICSID Convention to abide by and comply with the terms of the Award in this case.

---

[12] *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Decision on the Argentine Republic's Request for a Continued Stay of Enforcement of the Award dated 28 December 2007, ¶ 40 **Annex-031**. See also *MTD Equity Sdn Bhd. and MTD Chile S.A. v. The Republic of Chile*, ICSID Case No. ARB/01/7, Decision on the Respondent's Request for a Continued Stay of Execution dated 1 June 2005, ¶ 36 (Delay in payment "*which is … incidental to the Convention system of annulment ... can be remedied by the payment of interest in the event that the annulment application is unsuccessful*.") **Annex-033** and *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Decision on the Argentine Republic's Request for a Continued Stay of Enforcement of the Award dated 1 September 2006, ¶ 50 ("*Argentina had demonstrated that CMS will not be prejudiced by the grant of a stay, other that in respect of the delay which is, however, incidental to the Convention system of annulment and which can be remedied by the payment of interest in the event that the annulment application is unsuccessful. As a consequence, the Committee has decided to grant such a stay without requesting Argentina to provide a bank guarantee*"). **Annex-034**.
[13] NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. and the Kingdom of Spain. in the ICSID case No. ARB/14/11. Award rendered on 31 May 2019 and Decision on Jurisdiction, Liabllity and Quantum Principles 12 March 2019, ¶¶ 682. **Annex-001**.
[14] *Enron Corporation and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3, Decision on the Argentine Republic's Request for a Continued Stay of Enforcement of the Award dated 7 October 2008, ¶ 49. **Annex-035**.
[15] *Enron Corporation and Ponderosa Assets, L.P. v. The Argentine Republic*, ICSID Case No. ARB/01/3, Decision on the Claimants' Second Request to Lift Provisional Stay of Enforcement of the Award dated 20 May 2009, ¶¶ 29, 46 (continuing the stay of enforcement unconditionally in light of all the circumstances, even though there was "*a high risk of non-compliance by Argentina with its obligations under Article 53 of the ICSID Convention if the Award is not annulled*") **Annex-036**; *Continental Casualty Company v. The Argentine Republic*, ICSID Case No. ARB/03/9, Decision on Argentina's Application for a Stay of Enforcement of the Award dated 23October 2009, ¶¶ 12-16 (granting an unconditional stay, in light of the circumstances, even though there was "*no prospect that Argentina will comply with its obligation under Article 53 of the ICSID Convention*"). **Annex-037**.
[16] Eurostat, *Share of Member States in EU GDP*, April 10, 2017, available at: http://ec.europa.eu/eurostat/web/products-eurostat-news/-/DDN-20170410-1.
[17] World Bank, Gross domestic product ranking table for 2016, available at: https://data.worldbank.org/data-catalog/GDP-ranking-table.

26. Finally, the Kingdom of Spain submits that no guarantee should be required as a condition for continuing the stay of enforcement. *Ad hoc* committees have recognized that this would place the award creditor in a better position than it would have been if an annulment proceeding had not been even commenced, and that it requires a high burden of proving that the award creditor would suffer prejudice if the stay were continued.[18]

## III.   CONCLUSION

27. In view of the aforementioned, the Kingdom of Spain respectfully submits that the stay of enforcement of the Award should be continued and maintained in effect until the decision on the Annulment Application is rendered by the Committee in this proceeding.

Respectfully submitted on behalf of the Applicant,

---

[18] *Víctor Pey Casado and Fondation "Presidente Allende" v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Republic of Chile's Application for a Stay of Enforcement of the Award dated 5 May 2010, ¶ 29 ("*The Claimants bear the burden of proving that security should be ordered and that, if it is not ordered, they will suffer a prejudice.*"), **Annex-030**; *Quiborax S.A. and Non-Metallic Minerals S.A. v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/2, Decision on the Application to Terminate the Provisional Stay of Enforcement of the Award dated 21 February 2017, ¶ 43 ("*[I]t is the Claimants' duty to prove the necessity of granting a guarantee if the Committee decides to continue the stay.*"); **Annex-032**; *Enron Corporation and Ponderosa Assets, L.P. v. The Argentine Republic*, ICSID Case No. ARB/01/3, Decision on the Claimants' Second Request to Lift Provisional Stay of Enforcement of the Award dated 20 May 2009, ¶ 45 ("*Another consideration is that a condition of security will often place the award creditor in a better position than it would have been in if annulment proceedings had not been brought, since the award creditor would not otherwise have had the benefit of such security.*") **Annex-036**.

# EXHIBIT 4



Document information

## Publication

○ International
Commercial Arbitration
(Third Edition)

## Bibliographic
reference

'Chapter 6: Nonarbitrability
and International Arbitration
Agreements', in Gary B. Born
, International Commercial
Arbitration (Third Edition),
3rd edition (© Kluwer Law
International; Kluwer Law
International 2021) pp. 1027 -
1138

## *Chapter 6: Nonarbitrability and International Arbitration Agreements*

(1)

This Chapter addresses "nonarbitrability" as a basis for challenging the enforceability of an international arbitration agreement. The "nonarbitrability" doctrine applies to categories of
P 1028
disputes or subject matters which are deemed by national law to be incapable of resolution by arbitration, even if the parties have otherwise validly agreed to arbitrate such matters. This Chapter first considers the treatment of the nonarbitrability doctrine in international arbitration conventions, including distinctions between the nonarbitrability doctrine and rules of contractual validity, illegality and public policy. Second, the Chapter considers the treatment of the nonarbitrability doctrine under national law, including the historical evolution and application of the doctrine in leading jurisdictions. The Chapter then considers the application of the nonarbitrability doctrine in a variety of specific contexts, including antitrust, securities regulation, corruption, intellectual property, bankruptcy or insolvency, consumer, employment, corporate disputes and other settings. Finally, the Chapter considers various choice-of-law, procedural and related issues arising from application of the nonarbitrability doctrine.

## §6.01 INTRODUCTION

Arbitration legislation or judicial decisions in many states provide that particular categories of disputes or subject matters are not capable of settlement by arbitration, or "nonarbitrable." In some jurisdictions, this defense is referred to as "objective arbitrability," or "arbitrability *ratione materiae*," (2) while, in other jurisdictions, it is termed the "nonarbitrability" doctrine. (3) Both
P 1029
international arbitration conventions (including the New York Convention) and national laws provide that agreements to arbitrate such "nonarbitrable" matters need not be given effect, even if they are otherwise valid, (4) and that arbitral awards concerning such matters also need not be recognized. (5)

The nonarbitrability doctrine has deep roots and a reasonably well-defined character, both historically and in different contemporary national legal systems. In one commentator's words:

> "All jurisdictions put limits on what can be submitted to arbitration. Customary law in Homeric Greece as in modern Papua Guinea would allow a dispute arising from a killing to be settled by arbitration; but … not sacrilege in Greece, nor adultery in parts of Papua New Guinea … or in Rome." (6)

The New York Convention and other international arbitration conventions recognize, and permit Contracting States to apply, nonarbitrability exceptions of this nature as an exceptional escape mechanism. Although the better view is that the Convention imposes international limits on Contracting States' applications of the nonarbitrability doctrine (as discussed elsewhere), (7) the types of claims that are nonarbitrable differ from nation to nation. Among other things, typical examples of nonarbitrable subjects in different jurisdictions include selected categories of disputes involving criminal matters; domestic relations and succession; bankruptcy; trade sanctions; certain competition claims; consumer claims; labor or employment grievances; and certain intellectual property matters. (8) Over the past several decades, the scope of the non-arbitrability doctrine has materially diminished in most developed jurisdictions.

As these examples suggest, the types of disputes which are nonarbitrable nonetheless almost always arise from a common set of considerations. The nonarbitrability doctrine rests on the notion that some matters so pervasively involve either "public" rights and concerns, or interests of third parties, that agreements to resolve such disputes by "private" arbitration should not be given effect. This rationale was summarized, in evocative terms, by one U.S. appellate court:

> "A claim under the antitrust laws is not merely a private matter. … Anti-trust violations can affect hundreds of thousands – perhaps millions – of people and inflict staggering economic damage. … We do not believe Congress intended such claims to be resolved elsewhere than in the courts." (9)

The court explained that the relevant statute, the Sherman Act, "is designed to promote the national

interest in a competitive economy" and equated a private litigant asserting antitrust claims under the provisions of the Act with an agent of the government, reasoning "thus, the plaintiff asserting his rights under the Act has been likened to a private attorney-general who protects the public's interest." [10] Other explanations of the rationale for the non-arbitrability doctrine are similar. [11]

P 1030

As discussed elsewhere, the nonarbitrability doctrine contemplates a peculiar, and limited, type of unenforceability of valid arbitration agreements. When an arbitration agreement is invalid for lack of consent, noncompliance with form requirements, duress, or mistake, then the agreement is invalid: the agreement is not binding or enforceable upon the parties in any circumstances. In contrast, as discussed in greater detail below, the nonarbitrability doctrine provides that an otherwise valid arbitration agreement, which can be enforced as applied to some disputes, may not be given effect as applied to other (typically limited) categories of "disputes" or "subject matters." [12] The focus of analysis under the nonarbitrability doctrine is on the character and status of particular disputes or claims, not on the terms of the parties' arbitration agreement.

# §6.02 NONARBITRABILITY IN INTERNATIONAL ARBITRATION CONVENTIONS

The nonarbitrability doctrine has long been acknowledged, and given effect, in international arbitration conventions. The doctrine's role in leading international arbitration treaties has been broadly consistent, with textual differences providing guidance in interpreting contemporary instruments.

## [A] Geneva Protocol and Geneva Convention

Article 1 of the Geneva Protocol provided for the recognition of international arbitration agreements concerning "commercial matters or … any other matter *capable of settlement by arbitration*." [13] Similarly, the Geneva Convention provided for recognition of arbitral awards where "the subject matter of the award is capable of settlement by arbitration under the law of the country in which the award is sought to be relied upon." [14] These formulations were also employed, with some variations, in most subsequent international arbitration treaties. [15]

## [B] New York Convention: Articles II(1) and V(2)(a)

Drawing on the Geneva Protocol, Article II(1) of the New York Convention provides that an international arbitration agreement shall be recognized if it "*concern[s] a subject matter capable of settlement by arbitration*." [16] Similarly, Article V(2)(a) of the Convention provides that an award need not be recognized or enforced if "*[t]he subject matter of the difference is not capable of settlement by arbitration under the law*" of the country where recognition is sought. [17] Consistent with the character of the nonarbitrability doctrine as an exceptional escape mechanism, Article V(2)(a) permits nonrecognition of an award only where a "difference" is not "capable of settlement by arbitration" under the law of the recognition forum. Together, Articles II(1)

P 1031

and V(2)(a) permit the assertion of "nonarbitrability" defenses to the recognition and enforcement of otherwise valid and binding international arbitration agreements and awards under the Convention.

The drafting history of Article V(2)(a) provides limited guidance in interpreting that provision and its reference to disputes "not capable of settlement by arbitration." The initial drafts of what became Article V(2)(a) referred to the "subject matter of the award," paralleling the Geneva Convention, which used the same formula. [18] That provision was subsequently revised to refer in the final version of Article V(2)(a) to "[t]he subject matter of the difference." These changes do not appear to have a material impact on the meaning of the Convention. [19]

Potentially more significant than this aspect of the Convention's drafting history was the Convention's departure from the Geneva Protocol's treatment of all "commercial matters" as arbitrable, with the possibility of certain additional categories of non-commercial disputes also being regarded as arbitrable. [20] This is different from the approach apparently taken by the text of the New York Convention, which is that any matter – including both "commercial" and other types of subject matters – may be categorized as "nonarbitrable," depending on national law. [21] As discussed below, there is a persuasive argument that the New York Convention's nonarbitrability provisions should be interpreted in light of the Geneva Protocol's terms and the Convention's general objective of enhancing the recognition and enforcement of international arbitration agreements and awards (beyond that provided by the Geneva Protocol and Geneva Convention). [22]

## [C] European and Inter-American Conventions

Other international arbitration conventions contain nonarbitrability provisions that are almost identical to those in the New York Convention. Article VI(2) of the European Convention provides:

"The courts may also refuse recognition of the arbitration agreement if under the law of their country *the dispute is not capable of settlement by arbitration*." [23] Consistent with the character of the nonarbitrability doctrine as an exceptional escape mechanism, Article VI(2) provides only a limited recognition of the doctrine, in those courts where "under the law of *their country*," the dispute is nonarbitrable.

In contrast, Article 5(2)(a) of the Inter-American Convention does not refer to nonarbitrability in the context of arbitration agreements and provides only for the nonrecognition of arbitral awards where "the subject of the dispute *cannot be settled by arbitration* under the
P 1032
law of that State." [24] As with other international arbitration conventions, Article 5(2)(a) treats the nonarbitrability doctrine as an exceptional escape device, allowing a Contracting State to rely on its domestic public policy to deny recognition of an award that it would otherwise be internationally-obliged to recognize. In contrast, the Inter-American Convention does not expressly provide for the unenforceability of arbitration agreements as applied to disputes that are not capable of settlement by arbitration; on the contrary, Article 1 provides broadly that "an agreement in which the parties undertake to submit to arbitral decision any differences that may arise or have arisen between them with respect to a commercial transaction is valid," [25] without reference to any "nonarbitrability" exception. [26]

## [D] "Subject Matter Is Not Capable of Settlement by Arbitration"

It is not entirely clear what the Geneva Protocol, New York Convention and European Convention mean when they refer to a subject matter or dispute "not capable of settlement by arbitration." As a factual and logistical matter, it would be possible to settle almost any dispute by arbitration: different cultures have arbitrated all manner of disputes, including criminal, family, inheritance, intellectual property and other matters. There might be situations where indispensable evidence was physically unavailable, preventing any meaningful decision, or where none of the parties could participate in arbitral proceedings. Even these (very) unusual circumstances would not, however, fall comfortably within the exception in Article V(2)(a) of the New York Convention for subjects "not capable of settlement by arbitration" and would instead more readily be covered by Article II(3)'s exception for arbitration agreements that are "incapable of being performed." [27]

Instead, Article V(2)(a)'s exception for subjects that are "not capable of settlement by arbitration" has almost uniformly been applied where there is a legal (as distinguished from a factual or practical) impediment to resolution of a dispute by arbitration. That is, most authorities hold that a matter is "not capable of settlement by arbitration" where national law forbids or restricts the arbitrability of particular claims or disputes. [28] This is also consistent with the Geneva Protocol, which provided for the recognition of arbitration agreements concerning "commercial matters or … any other matter capable of settlement by arbitration" [29] – a formula
P 1033
fairly clearly directed at legal "incapability," particularly given historic national law rules regarding the arbitrability of commercial and non-commercial matters. [30]

## [E] Distinction Between Nonarbitrability and Substantive Invalidity of Arbitration Agreement

A rule of nonarbitrability under the New York Convention (and parallel national arbitration legislation) is distinguishable in important ways from a rule of substantive invalidity of an arbitration agreement. [31] There are a number of key differences between the two types of rules.

First, the two types of rules arise from different types of legal sources. Issues of substantive validity are defined by generally-applicable contract law principles (*i.e.*, unconscionability, fraud, frustration, mistake), while issues of nonarbitrability are defined by legislation directed specifically at application of the arbitration agreement to particular types of disputes or subject matters (*i.e.*, certain categories of consumer, bankruptcy, or criminal legislation) without regard to the terms of the parties' agreement. [32] Rules of substantive validity are derived from (and, under the New York Convention, *must* be derived from [33] ) generally-applicable principles of contract formation and validity, while rules of nonarbitrability are based on specific statutory enactments directed at agreements to arbitrate which, exceptionally, need not be generally-applicable rules of contract law.

Second, a decision that a particular dispute is nonarbitrable is fundamentally different in character from a decision that an agreement to arbitrate is invalid. Application of a rule of contractual invalidity generally results in the arbitration agreement being held invalid, including as applied to all categories of disputes: an unconscionable or forged arbitration agreement is invalid no matter what issues a party seeks to arbitrate. In contrast, a rule of nonarbitrability generally results in a valid agreement to arbitrate being unenforceable as it is applied to a particular dispute or category of disputes: an agreement to arbitrate franchise disputes can be valid, but claims for termination of the franchise contract falling within that arbitration agreement can nonetheless be nonarbitrable. [34]

Finally, the same distinction that applies to rules of substantive validity and nonarbitrability must also

be drawn between rules regarding capacity to enter into an arbitration agreement and nonarbitrability. In some jurisdictions, national law invalidates all (or some categories of) arbitration agreements concluded by certain categories of persons. Examples include minors, bankrupt parties, consumers and employees. [35] These types of legislative provisions

P 1034

are properly regarded as capacity limitations or rules of contractual invalidity, invalidating the arbitration agreement entirely, rather than prohibitions against the arbitration of particular categories of disputes.

## [F] Distinction Between Nonarbitrability and Illegality of Arbitration Agreement

The nonarbitrability doctrine is also closely related to, but distinguishable from, the illegality of the arbitration agreement. As discussed above, there are limited circumstances in which an agreement to arbitrate will be illegal and unenforceable. [36] In many instances, legislation forbidding the enforcement of arbitration agreements will properly be categorized as an application of the nonarbitrability principle: the legislation will forbid arbitration of a particular category of disputes (*i.e.*, franchise, domestic relations, or insolvency matters). [37] These cases do not in fact involve "illegality" of the arbitration agreement, but rather rules that render the arbitration agreement unenforceable as applied to particular claims (that is, those categories of claims that are "not capable of settlement by arbitration").

In contrast, true examples of "illegal" arbitration agreements are very rare and will involve cases where the parties seek to use arbitration as a means to accomplish an illegal purpose (*i.e.*, money laundering) or where arbitration agreements are subject to generally-applicable legal prohibitions (*i.e.*, trade sanctions). In these instances, national criminal legislation will be applied to a particular arbitration agreement and the results that it seeks to produce in specific circumstances. The agreement to arbitrate will be "illegal" and can be denied enforcement. [38]

## [G] Distinction Between Nonarbitrability and Mandatory Law or Public Policy

The nonarbitrability doctrine under the New York Convention is also closely related to – but distinguishable from – principles of mandatory law and public policy. [39] As discussed

P 1035

elsewhere, most developed legal systems treat a limited set of legal rules, based on fundamental public policies, as mandatory: despite general acceptance of party autonomy, parties are ordinarily not permitted to derogate by agreement from the content of these rules, or their underlying public policies, whether with regard to their choice of substantive law, [40] their choice of the procedural law of the arbitration, [41] or their choice of arbitral procedures. [42]

In certain respects, the doctrine of public policy (or mandatory law) parallels the nonarbitrability doctrine: despite the parties' general autonomy to agree to arbitrate their disputes, their agreements to arbitrate may be unenforceable in some jurisdictions as applied to certain, limited categories of issues. Thus, the nonarbitrability doctrine rests on legal rules that, much like the public policy doctrine's invalidation of private agreements, preclude recognition of an arbitration agreement or award, notwithstanding an otherwise valid agreement and arbitral proceeding. In both instances, the nonarbitrability doctrine rests on the premise that there are unacceptable conflicts between the award or arbitration agreement and basic public policies and legal norms of a particular state, which that state is permitted, exceptionally, to invoke as an escape mechanism to justify nonrecognition of an otherwise valid award or agreement. As noted elsewhere, classic examples include certain issues arising in criminal, domestic relations, bankruptcy, real property and governmental sanctions matters. [43]

Nonetheless, the concepts of nonarbitrability and public policy or mandatory law are distinguishable in vitally-important respects. In particular, although public policies or mandatory laws require that particular substantive rules be applied, they do not necessarily preclude the arbitrability of those mandatory law claims; indeed, as discussed below, in the vast majority of cases, mandatory law and public policy claims and defenses are arbitrable. [44]

As discussed below, the arbitrability of particular types of claims, including mandatory law claims, is ordinarily a question of legislative intent (and conflict of laws). [45] If a legislature does not preclude arbitration of a mandatory law provision, by treating it as nonarbitrable, then agreements to arbitrate such matters will almost always be valid and enforceable. That is, merely because a dispute involves matters of mandatory law or public policy does not necessarily mean that the dispute is nonarbitrable – and in practice mandatory law claims are frequently both arbitrable and arbitrated. [46] An early decision of the Paris Cour d'Appel explained this reasoning clearly, concluding that:

P 1036

"the impact of public policy on the arbitrability of a dispute does not cause

arbitrators to be prohibited from applying mandatory rules, but only from hearing cases which, because of their subject-matter, can only be heard by courts." [47]

Similarly, a Canadian decision held:

"there are rules of public order that can be applied in arbitrations as easily and as appropriately as they are by courts. … The fact that these regulations are of public order does not deprive the arbitrators of their jurisdiction to hear the disputes or require that they be heard by the ordinary courts." [48]

Virtually all other national court decisions are to the same effect, and have resulted in decisions holding that a wide range of mandatory law claims or defenses are arbitrable, including antitrust, securities, fraud, trade sanctions, insolvency, corruption and the like. [49]

P 1037

The foregoing conclusions are reflected in the provisions of Article V of the New York Convention. Apart from other grounds for nonrecognition of arbitral awards, Article V(2) of the Convention sets forth two exceptional bases for nonrecognition – the public policy of the enforcement forum (in Article V(2)(b)) and the nonarbitrability rules of the enforcement forum (in Article V(2)(a)). [50] Thus, Article V(2)(a) of the Convention provides for the nonrecognition of awards dealing with nonarbitrable matters (*i.e.*, matters "not capable of settlement by arbitration"), [51] while Article V(2)(b) provides that awards need not be recognized if doing so "would be contrary to the public policy" of the state where recognition is sought. [52] The separate treatment of issues of public policy and nonarbitrability within Article V(2)'s "escape" provisions, rather than under the general provisions of Article V(1), both reflects and confirms their common, and exceptional, character.

At the same time, however, Article V(2) treats public policy and nonarbitrability in separate subsections. This reflects the fact that public policy objections to an award are also distinct and separate from the nonarbitrability doctrine. That is consistent with applications of the two principles: the public policy doctrine provides that certain results reached by arbitral awards contradict public policy and cannot be recognized, while the nonarbitrability doctrine provides that the arbitral process itself cannot be used to produce a binding decision in cases related to a particular subject matter (regardless what its results are). [53]

Relatedly, although Article II of the New York Convention contains a nonarbitrability exception (in Article II(1)), Article II does not contain any "public policy" exception (paralleling that in Article V(2)(b)). As discussed elsewhere, a number of national courts have relied on the text of Article II in concluding that public policy does not provide a basis for challenging the validity or enforceability of arbitration agreements. [54] Rather, public policy is held to provide a defense only to the recognition of arbitral awards, not arbitration agreements.

## [H] No Interlocutory Judicial Decision on Mandatory Law

As discussed elsewhere, national court decisions over the past several decades have held that a wide range of mandatory law claims are arbitrable, with courts referring the parties to arbitration while reserving the possibility of a judicial "second look" in annulment, recognition, or other proceedings. [55] Among other things, antitrust or competition law claims, securities law claims, corruption defenses, fraud claims, insolvency disputes and a wide range of other mandatory law issues have been referred to arbitration under Article II of the Convention. [56]

P 1038

In doing so, most courts have held that, if it is unclear whether the arbitral tribunal will actually apply mandatory national law, then the proper course is not to assume that the tribunal will refuse to consider the mandatory law claims, in a manner that violates those mandatory laws or public policies. Instead, the proper course in these circumstances is to stay litigation and allow the arbitration to proceed. [57] The U.S. Supreme Court adopted precisely this approach to the mandatory provisions of the U.S. antitrust laws in its classic decision in *Mitsubishi Motors*. There, notwithstanding the fact that the case involved an agreement to arbitrate in Japan and a Swiss choice-of-law provision, the Supreme Court proceeded on the assumption that the arbitral tribunal would apply the mandatory provisions of the U.S. antitrust laws. [58]

The Supreme Court adopted a similar approach in an analogous context (involving the U.S. Carriage of Goods by Sea Act ("COGSA")), reasoning that "mere speculation that the foreign arbitrators *might* apply Japanese law which … *might* reduce respondents' legal obligations, does not in and of itself" render a COGSA claim nonarbitrable. [59] The Court adopted a very similar view, in a related context involving a domestic Racketeer-Influenced and Corrupt Organizations ("RICO") Act claim:

"since we do not know how the arbitrator will construe the remedial limitations,

the questions whether they render the parties' agreements unenforceable and whether it is for courts or arbitrators to decide enforceability in the first instance are unusually abstract[, requiring submission of the matter to arbitration]." [60]

Other U.S. decisions, [61] as well as decisions by courts in other jurisdictions, [62] have reached similar conclusions.

P 1039

Under this analysis, the proper role of courts is not to attempt to predict what the arbitral tribunal will or will not do with regard to mandatory law claims (like antitrust or securities claims). Instead, national courts should permit the arbitration to proceed and then consider any resulting award in recognition, annulment, or other proceedings. This is consistent with the approach, outlined above, generally taken by courts towards claims that arbitration agreements are "illegal" or contrary to "public policy"; under that approach, courts will permit the arbitral proceeding to go forward and reserve judicial review until the award has been made, when courts can consider whether the arbitrators' decision violates applicable mandatory or criminal law or public policies. [63] In one court's words, the mere possibility that

"'the foreign arbitrators might apply [foreign] law which, depending on the proper construction of [the federal statute in issue], might reduce respondents' legal obligations,' does not provide an adequate basis upon which to declare the relevant arbitration agreement unenforceable." [64]

There are some contrary judicial decisions, which instead refuse to enforce arbitration agreements, at least when coupled with foreign choice-of-law provisions that arguably exclude applicable mandatory statutory protections. [65] For example, a frequently-cited Belgian decision held a dispute involving a mandatory Belgian statutory protection for Belgian distributors nonarbitrable absent sufficient affirmative evidence that the arbitral tribunal would apply Belgian law:

"The Belgian judge, in order to decide the validity of the arbitration agreement, must set the law chosen by the parties aside and apply immediately the law of 27 July 1961, according to which the dispute is not capable of arbitration if proof/evidence is given that arbitrators are obliged to apply not Belgian law but a foreign law." [66]

Decisions of this nature are exceptions to the general (and correct) approach adopted by national courts, which is to defer to the arbitral process, rather than assuming that the arbitrators' award will violate applicable mandatory laws or public policies. [67] Indeed, the better view is
P 1040
that Article II of the New York Convention requires such an approach, as one aspect of Contracting States' obligations to refer parties to arbitration. [68]

## [I] International Limits on Nonarbitrability Doctrine

As discussed above, Articles II(1) and V(2)(a) of the New York Convention contemplate that Contracting States may exceptionally apply their own law to refuse enforcement of an otherwise valid and binding arbitration agreement or award on nonarbitrability grounds. That is a form of "escape valve" which is available without regard to the generally-applicable choice-of-law rule set forth in Article V(1)(a) of the Convention for arbitration agreements. [69]

Importantly, as again discussed elsewhere, the Convention should also be interpreted to subject application of the nonarbitrability doctrine by Contracting States to international limitations. In particular, consistent with the nonarbitrability doctrine's status as an exceptional dispensation from the Convention's basic structure, choice-of-law regime and purposes, Contracting States should be permitted to adopt nonarbitrability exceptions only when narrowly-tailored to achieve specifically-defined, articulated public policies which are not inconsistent with state practice under the Convention. [70] Consistent with these limits, and as discussed below, courts in most Contracting States have applied the nonarbitrability exception only rarely in international settings.

## [J] "Conditional Nonarbitrability"

Although there is no reference to the concept in the New York Convention (or other international arbitration treaties) or any national arbitration statutes, a few authorities have referred to concepts of "conditional arbitrability." In particular, the *Restatement of the U.S. Law of International Commercial and Investor-State Arbitration* asserts that some matters may be "conditionally nonarbitrable." This suggestion is difficult to reconcile with existing authority, in the United States and elsewhere; similarly, the rationale for the proposal contradicts important principles prescribed

by the New York Convention.

The *Restatement* provides that:

> "Under U.S. law, arbitrability restrictions only exceptionally affect international commercial … arbitration. When limitations are instituted, they are not ordinarily categorical and unqualified. Rather, the prevailing U.S. legislative practice is to make arbitrability depend on prescribed conditions being fulfilled; typical conditions are that consent to arbitrate be given after dispute has arisen or that the agreement to arbitrate take a particular form." [71]

The *Restatement* also asserts that:

> "It is useful to consider arbitration restrictions as falling into one of two broad and analytically distinct categories. First, some matters may be made categorically, or *per se*, nonarbitrable. … By contrast, a matter may be made non-arbitrable only if certain
> P 1041
> conditions are not satisfied; the *Restatement* refers to this second category of restriction as 'conditional arbitrability.'" [72]

The *Restatement* identifies issues relating to the "time or form" of the arbitration agreement as examples of so-called conditional arbitrability – as in cases involving post-dispute arbitration agreements or separately signed arbitration agreements. [73] The *Restatement* apparently envisages particular categories of disputes that would be arbitrable if they were the subject of a conspicuous or separately signed arbitration agreement, but not if they were the subject of an agreement not satisfying these form requirements.

The *Restatement's* analysis of so-called "conditional arbitrability" is unsupported by U.S. (or other) authority; it is also ill-considered and contrary to the Convention's text and structure. Moreover, the *Restatement's* analysis illustrates why it is essential to distinguish carefully in applying the New York Convention and national arbitration legislation between issues of substantive validity and nonarbitrability (as both types of instruments do). [74]

As noted above, neither the New York Convention nor any developed national arbitration statute (including the FAA) refers to the concept of "conditional arbitrability"; likewise, no reported national court decision refers to or applies the concept. That is in large part because nothing in Article II or V of the Convention permits Contracting States to "conditionally" treat categories of disputes as arbitrable and because the application of such a concept would materially undermine the Convention's purposes and uniform international rules.

The concept of "conditional arbitrability" would enable Contracting States to treat particular (and potentially broad) categories of disputes as "not capable of settlement by arbitration," but then to reverse that treatment if requirements or conditions prescribed by national law were satisfied. [75] This would effectively circumvent the Convention's uniform international substantive and choice-of-law rules regarding the formal and substantive validity of international arbitration agreements and "re-nationalize" international dispute resolution, both results being contrary to the Convention's basic objectives. As the U.S. Supreme Court has observed, in rejecting comparable reasoning, "[t]he utility of the [New York] Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own." [76]

More fundamentally, the *Restatement's* analysis confuses issues of non-arbitrability and issues of substantive and formal validity of arbitration agreements. Thus, the *Restatement's* examples of "conditional nonarbitrability" raise issues of substantive and formal validity – specifically, the "timing and form" of arbitration agreements – and not issues of nonarbitrability. These issues of "timing and form" do not concern the nonarbitrability of particular "subject matters" or "differences," as required by the Convention (in Articles II(3) and V(2)(a)) and the Model Law (in Articles 34(2)(b)(i) and 36(1)(b)(i)); rather, these issues involve classic
P 1042
requirements for the formal and substantive validity of the arbitration agreement itself. It is precisely for that reason that these requirements must be governed by the Convention's uniform form requirements and choice-of-law rules, which are applicable to issues of validity, and cannot properly be recharacterized as issues of nonarbitrability.

This conclusion is underscored by the *Restatement's* explanation of its analysis. Surprisingly, the *Restatement* seeks to justify its treatment of "conditional arbitrability" on the basis that it would assertedly permit application of the recognition or enforcement forum's local law to issues of validity

of the arbitration clause:

> "In treating questions of arbitrability under this Section, the Restatement excludes for purposes of choice-of-law analysis the characterization of them as questions of capacity, formal validity, or other categories that might lead unpredictably to application of foreign law." [77]

The *Restatement*'s observation that its treatment of questions of non-arbitrability is intended to "exclude characterization" of particular matters as issues of validity, because doing so "might lead unpredictably to the application of foreign law" is frank, but flatly contrary to the Convention's uniform choice-of-law regime. That choice-of-law regime is central to the Convention's efficacy [78] and cannot properly be circumvented by recharacterizing issues of substantive or formal validity as issues of nonarbitrability. Doing so would undermine one of the Convention's central accomplishments, [79] as well as the Convention's overall efficacy. Virtually no state has adopted the notion of "conditional arbitrability" and there is no justification for U.S. courts, historically at the forefront of implementing the Convention, to follow such a course.

# §6.03 NONARBITRABILITY IN NATIONAL ARBITRATION LEGISLATION

National arbitration legislation and judicial decisions have long provided that there are limits, albeit relatively modest, rarely-invoked ones, on the subject matters and disputes that may be subject to an enforceable agreement to arbitrate. As discussed below, these limits differ from state to state, although they all arise from a common set of concerns regarding the use of arbitration to resolve "public" disputes entailing the exercise of uniquely governmental authority.

The nonarbitrability limits that exist under national law have evolved materially over time, with historic skepticism about the arbitral process' ability to resolve particular categories of disputes eroding substantially in recent decades. This erosion has progressed to the point that most developed jurisdictions now impose only very few and limited restrictions on the subjects that may be arbitrated. As discussed below, that is particularly true in international (as distinguished from domestic) matters, where national courts have generally required clear statements of legislative intention before concluding that a particular subject matter is nonarbitrable.

## [A] Nonarbitrability: International Versus Domestic

Preliminarily, it is essential in considering nonarbitrability issues to distinguish between matters which are nonarbitrable in a domestic context and those which are nonarbitrable in an international context. In many jurisdictions, the categories of disputes that are nonarbitrable
P 1043
are materially broader in domestic than in international matters. [80] As the U.S. Supreme Court reasoned, in one early decision adopting a narrow view of nonarbitrability under the New York Convention, it is "necessary for national courts to subordinate domestic notions of arbitrability to the international policy favoring commercial arbitration." [81]

Under this analysis, the fact that a particular matter is nonarbitrable in a domestic setting under a particular national law does not necessarily mean that it will also be nonarbitrable in an international setting; rather, local nonarbitrability rules are often interpreted as applicable only in domestic matters. The rationale for this conclusion has been that, in international cases, national conceptions of public policy and mandatory law should be moderated, in light of the more tenuous domestic interest, the existence of competing public policies of other states and the shared international policy of encouraging the resolution of international commercial disputes through arbitration. Consistent with this, and as discussed below, U.S., [82] French, [83] Swiss, [84] Swedish, [85] and other national courts, [86] as well as a substantial body of commentary, [87] have distinguished between the treatment of nonarbitrability in international and domestic contexts.

In general, the question whether a particular international dispute is or is not arbitrable will be a question of national law, with the international character of the dispute affecting the interpretation and application of local law. [88] Nonetheless, as discussed elsewhere, there are instances in which the New York Convention limits the extent to which Contracting States may treat particular subjects as nonarbitrable. [89]

## [B]
P 1044
## Nonarbitrability: Clear Statement of Legislative Intent

In general, national courts have required a clear and express statement of legislative intention before concluding that a subject is nonarbitrable in an international setting. In the words of the U.S.

Supreme Court, in one representative decision, "[w]e must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history" [90] and claims will be treated as arbitrable unless Congress "expressly directed" a contrary result. [91] The Court has also refused to imply (or "deduce") nonarbitrability from a statutory scheme and has required the party resisting arbitration to prove that Congress intended "to preclude a waiver of judicial remedies." [92]

Likewise, the Canadian Supreme Court has held that, "[i]f Parliament had intended to exclude arbitration in copyright matters, it would have clearly done so." [93] Citing this conclusion, a well-reasoned dissenting opinion, in another Canadian decision, reasoned similarly that:

> "It is now settled that if a legislature intends to exclude arbitration as a vehicle for resolving a particular category of legal disputes, it must do so explicitly. Arbitration in and of itself is no longer considered contrary to public order, and courts ought not to read in the exclusion of arbitration if the legislature has not clearly provided that it is to be excluded." [94]

This general approach has been followed in other jurisdictions, [95] and is reflected in the UNCITRAL Model Law (which contemplates that non-arbitrability exceptions will take the

P 1045

form of legislative enactments). [96] These approaches reflect the policies of restraint adopted by national courts under Article V(2)(a) and the Convention's international limits on the nonarbitrability exception. Among other things, legislative provisions requiring that particular classes of claims or disputes be resolved in specified courts or by prescribed procedures do not render those claims or disputes nonarbitrable. [97]

It is important that this approach to statutory interpretation – requiring a clear, unequivocal statement of non-arbitrability – be applied robustly in cases involving international arbitration agreements under the New York Convention. Failure to do so will inevitably result in courts and legislatures in different states variously declaring different subject matters and categories of disputes nonarbitrable. As the U.S. Supreme Court rightly observed, in one landmark decision:

> "The utility of the [New York] Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own." [98]

This is particularly true because, if non-arbitrability exceptions undermine the ability of commercial parties to resolve all of their disputes in a single, centralized proceeding, those parties will become less willing to use the arbitral process, thereby ultimately undermining and frustrating the Convention's purposes.

## [C] National Arbitration Legislation

National arbitration legislation adopts a variety of different approaches to the subject of nonarbitrability. Nonetheless, as detailed below, the unifying theme of these legislative instruments is the treatment of nonarbitrability as an exception, which is rarely invoked and narrowly applied, based upon a clear statement of legislative intention, with particular reserve being exercised by courts in international cases.

### [1] UNCITRAL Model Law: No Definition of Arbitrability

The UNCITRAL Model Law does not contain provisions prescribing any particular category of disputes as nonarbitrable. [99] That reflects in part the recognition that, as a matter of principle, almost any dispute is capable of resolution by arbitration, [100] and in part, the recognition that there is not yet any uniform or model international principle that would clearly designate particular disputes as nonarbitrable. [101] Instead, paralleling Article V(2) of the New York Convention, the Model Law exceptionally leaves to individual legislatures in particular jurisdictions the articulation of nonarbitrability provisions (subject to international limits imposed by the New York Convention). [102]

P 1046

Thus, Article 1(5) of the Model Law provides that "this Law shall not affect any other law of this State by virtue of which certain disputes may not be submitted to arbitration." [103] In effect, the Model Law recognizes the possibility for states to characterize, as a matter of national law, specified categories of "disputes" as nonarbitrable outside the four corners of their international arbitration statute. As discussed below, this is the approach that a number of states adopt, imposing exclusions from the general scope of their arbitration legislation either on the basis of other statutes or judicial decisions interpreting such statutes. [104]

### [2] Swiss and German Arbitration Legislation: Broad Definitions of Arbitrability

Many civil law systems impose some sort of statutory restriction on the subject-matter of valid international arbitration agreements. As discussed below, recent legislation tends to define arbitrable subjects very broadly, while earlier statutory limitations tend to be somewhat more restrictive in their definitions of arbitrable matters. [105] In both instances, however, most provisions are drafted in broad terms, that leave much to case-by-case judicial interpretation.

Thus, Article 177(1) of the Swiss Law on Private International Law provides that "any dispute involving an economic interest can be the subject-matter of an arbitration." [106] The term used in Article 177(1) – "property" or "economic interest" (*"vermögensrechtlicher Anspruch"*) – is not given a statutory definition, but was intended to be interpreted liberally. [107] As noted above, Article 177 provides for a more liberal conception of arbitrability in international matters than that which applies in domestic matters. [108] Swiss courts have interpreted
P 1047
Article 177(1) broadly, to permit arbitration of "any claims that have pecuniary value" for the parties. [109]

Similarly, the 1998 German version of the UNCITRAL Model Law adopts the Swiss approach and provides that any claim for an economic interest (*"vermögensrechtlicher Anspruch"*) is arbitrable in arbitrations seated in Germany, absent contrary statutory provisions. [110] As with the Swiss approach, this formulation is intended to be interpreted expansively (and to limit the scope of the nonarbitrability doctrine in Germany). [111]

A variation of this approach is to provide for the arbitrability of any matter subject to the parties' "free disposition." [112] That leaves for judicial resolution the question of what parties are free to "dispose" of, but the legislative intention is again to narrowly limit the scope of the nonarbitrability doctrine.

It is difficult to see how these provisions do not, at least read literally, and not qualified by other legislation, effectively render all commercial, and virtually all non-criminal, disputes arbitrable: even issues such as divorce and marital status or a declaration of bankruptcy involve pecuniary value. Nevertheless, it is very unlikely that disputes regarding marital status, a bankrupt's status, or similar subjects would be deemed arbitrable under existing law, [113] even in international matters. [114] Equally, as discussed below, some civil law jurisdictions retain
P 1048
nonarbitrability rules in specific contexts involving consumers, employees, securities purchasers, or distributors (often in response to local political considerations) which clearly involve pecuniary value. [115] Despite these exceptions, statutory provisions affirmatively permitting arbitration of all "pecuniary matters" or all matters subject to the parties' "disposition" underscore the intended narrow limits on any application of the nonarbitrability doctrine.

### [3] France: Evolution of Nonarbitrability Doctrine

In France, existing statutory restrictions on the arbitrability of disputes date to the 19th century and, read literally, would impose significant limitations on the arbitrability of disputes concerning public policy matters. With regard to domestic arbitration, Article 2059 of the French Civil Code provides that "all persons may submit to arbitration those rights which they are free to dispose of," while Article 2060(1) provides that "[o]ne may not enter into arbitration agreements in matters of status and capacity of the persons, in those relating to divorce and judicial separation or to disputes concerning public bodies and institutions and more generally in all matters in which public policy is concerned." [116]

Read literally, the language of this latter provision is problematic, most obviously because "all areas which concern public policy" is an undefined, potentially expansive field, while the mere fact that an issue "concerns" public policy (however that term is defined) extends this category even more widely and unpredictably. [117] Competition, securities law and intellectual property, as well as disputes involving state entities and regulated industries, all "concern" public policy in various ways – as, for that matter, do most claims in tort/delict. Nonetheless, the suggestion that all such matters are nonarbitrable does not accord with either the New York Convention or French judicial decisions over the past several decades. [118]

Consistent with this, French judicial decisions progressively dispensed with the nonarbitrability provisions of Articles 2059 and 2060 in international matters (in the context of what one commentator correctly termed a "progressive elaboration of a specific liberal regime of international arbitration, as opposed to domestic arbitration" [119] ). In 1961, the Orléans Cour d'Appel held that a claim for breach of contract, where the defense relied on a legislative trade embargo, was nonarbitrable, on the grounds that "this dispute concerns public policy, and the arbitration agreement is void [sic] whenever the resolution of the arbitration entails interpreting and applying a rule of public policy." [120] This approach adopted a broad view of the nonarbitrability doctrine, apparently treating any dispute requiring interpretation and
P 1049
application of "public policy" standards as nonarbitrable – which could readily include most or all antitrust, securities law, trade controls, intellectual property and similar matters.

Over time, French courts rejected the foregoing view. [121] The Paris Cour d'Appel held, only a few years later, that:

> "although it is forbidden to enter into arbitration agreements concerning disputes implicating public policy, that rule does not mean that every case which in some respect depends on regulations based on public policy will be held nonarbitrable on those grounds." [122]

Subsequently, French courts concluded that Articles 2059 and 2060 of the Civil Code do not apply to international arbitration agreements. [123] Thereafter, in 1991, the Paris Cour d'Appel held that, in the international context, claims of illegality and violations of public policy could be arbitrated, including where they involved the validity of the parties' contract. The court reasoned:

> "[I]n international arbitration, an arbitrator … is entitled to apply the principles and rules of public policy and to grant redress in the event that those principles and rules have been disregarded. … [A]s a result, except in cases where the nonarbitrability is a consequence of the subject-matter – in that it implicates international public policy and absolutely excludes the jurisdiction of the arbitrators because the arbitration agreement is void – an international arbitrator, whose functions include ensuring that international public policy is complied with, is entitled to sanction conduct which is contrary to the good faith required in relations between partners in international trade." [124]

The same analysis was applied by the Paris Cour d'Appel in 1993, which upheld the validity of an international arbitration agreement as applied to civil claims arising under EU competition law:

> "if the character of the economic policy of Community competition law rules prohibits arbitrators from granting injunctions or levying fines, they may nonetheless assess the civil consequences of conduct held to be illegal with respect to public order rules that can be directly applied to the parties' relations." [125]

P 1050

In subsequent decisions, French courts have repeatedly upheld the arbitrability of competition law (and other public law) claims in emphatic terms. [126]

The result of the past five decades' judicial developments in France has been a substantial retrenchment of nonarbitrability limits in the international context. [127] Notwithstanding potentially expansive (and archaic) nonarbitrability provisions of the Civil Code, and almost equally expansive historic judicial interpretations of those provisions, French courts have progressively narrowed the scope of nonarbitrable matters. The end result is that they have apparently categorized matters as nonarbitrable only where mandatory statutory text expressly requires this result.

More recently, the Conseil d'Etat, the highest administrative body in France, has suggested that, when reviewing arbitral awards, it would determine as a threshold matter whether the subject-matter of the dispute is susceptible of being resolved through arbitration. Among other things, the Conseil d'Etat held that it could annul an arbitral award "if it verifies that the dispute is nonarbitrable." [128] The Conseil d'Etat's ruling does not alter the course of the last several decades of French international arbitration law: it merely confirms judicial authority over interpretation and application of the nonarbitrability doctrine, without implying any expansion of that doctrine or departure from prior French authority.

*[4]* U.S. Federal Arbitration Act: Evolution of Nonarbitrability Doctrine

Developments in the United States over the past several decades have been very similar to those in France, albeit with their own accent. The text of the FAA does not address the subject of arbitrability, either directly or by implication. [129] Both historically and today, questions whether or not a particular dispute is arbitrable under U.S. law turn almost entirely on judicial interpretation of other statutes (*e.g.*, antitrust, securities or bankruptcy legislation), most of which do not expressly address issues of arbitrability.

Until the 1980s, federal law in the United States treated a substantial number of claims as nonarbitrable. The U.S. Supreme Court's first modern treatment of the nonarbitrability doctrine was *Wilko v. Swan.* [130] There, an investor brought a damages action in a federal district court against his brokers for alleged misrepresentations under the federal securities laws. The Supreme Court rejected the defendants' application to stay the action, based upon an arbitration clause, reasoning that Congress "has enacted the Securities Act to protect the rights

P 1051

of investors and has forbidden a waiver of any of those rights, by means of a specific statutory anti-waiver provision." [131] The Court concluded that:

> "Recognizing the advantages that prior agreements for arbitration may provide for the solution of commercial controversies, we decide that the intention of Congress concerning the sale of securities is better carried out by holding invalid such an agreement for arbitration of issues arising under the Act." [132]

Relying on *Wilko*, U.S. lower courts fashioned a variety of applications of the nonarbitrability doctrine during the 1960s and 1970s, predominantly in domestic cases, designed to protect perceived U.S. public values or legislative objectives. Claims touching on patent rights were deemed to involve the public interest, and thus to be inappropriate for arbitration. [133] Likewise, courts concluded that a wide variety of other federal statutory claims, including federal antitrust, [134] Racketeer-Influenced and Corrupt Organizations ("RICO") Act, [135] bankruptcy, [136] Carriage of Goods by Sea Act ("COGSA") [137] and race discrimination [138] claims, were "too important" to be left to "private" arbitration.

In many of these cases, the U.S. courts emphasized the "public" rights at issue and the perceived inability of the arbitral process satisfactorily to resolve disputes concerning such rights. [139] In one particularly expansive formulation of the approach of U.S. courts to the subject of nonarbitrability, "although arbitration is well suited to resolving contractual disputes

P 1052

… it cannot provide an adequate substitute for a judicial proceeding in protecting the federal statutory and constitutional rights." [140]

Although many of these decisions occurred in the domestic context, U.S. courts generally applied the same nonarbitrability principles to international arbitration agreements. [141] In one lower court's words:

> "[T]o permit arbitration by an international tribunal of a Sherman Act claim would be particularly inappropriate considering the public interest in private enforcement of the antitrust laws. These factors, uncertainty as to the scope of the arbitration clause and utilization of a foreign tribunal, were not present in [other case law]." [142]

During the 1970s and 1980s, however, U.S. courts moved decisively to limit the nonarbitrability doctrine in a wide range of areas, beginning with international arbitration agreements, but subsequently extending to the domestic context (as also occurred at roughly the same time in France [143] ). Thus, in *Scherk v. Alberto-Culver Co.*, decided in 1974, the U.S. Supreme Court distinguished *Wilko* and held that claims under the federal securities laws were arbitrable, provided they arose from an "international" transaction. [144] Thereafter, in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, the Court held that federal antitrust claims were also arbitrable, again provided that they arose from an "international" transaction. [145]

In both cases, the Court stressed the importance of the United States' (and other Contracting States') commitment to the New York Convention:

> "A parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate [the Convention's] purposes, but would invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages." [146]

P 1053

Likewise, the Court in *Mitsubishi Motors* emphasized "the utility of forum-selection clauses in international transactions." [147] It also stressed that "adaptability and access to expertise are hallmarks of arbitration," [148] and that "there is no reason to assume at the outset of the dispute that international arbitration will not provide an adequate mechanism" [149] to enforce the U.S. antitrust laws. Using language that has subsequently been repeatedly cited by other national courts, the Court reasoned:

> "The utility of the [New York] Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own." [150]

As a consequence, the Court declared that "it will be necessary for national courts to subordinate

domestic notions of arbitrability to the international policy favoring commercial arbitration." [151]

Given these considerations, the Supreme Court's *Mitsubishi Motors* opinion formulated a demanding standard for holding a statutory claim nonarbitrable: "We must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history." [152] The Court also said that claims will be deemed arbitrable unless Congress "expressly directed" a contrary result. [153] (This general approach of restraint and confidence in the international arbitral process has also found favor outside the United States, [154] as well as in better-reasoned academic commentary. [155] )

Subsequently, the U.S. Supreme Court overruled *Wilko v. Swan*, holding that claims – either domestic or international – under both RICO legislation and the Securities Exchange Act are arbitrable. [156] In another decision, after remarking that "[i]t is by now clear that statutory claims may be the subject of an arbitration agreement," [157] the Court held that claims under the Age Discrimination in Employment Act are arbitrable. [158] More recently, the Supreme
P 1054
Court held that federal employment legislation did not require treating employment claims as nonarbitrable, declaring that "we have made clear that even a statute's express provision for collective legal action does not necessarily mean that it precludes 'individual attempts at conciliation' through arbitration." [159] Similarly, with little debate, lower U.S. courts have extended *Mitsubishi* beyond international matters and permitted the arbitration of antitrust claims in purely domestic matters. [160]

There have been occasional U.S. statutory enactments, adopting nonarbitrability rules for particularly categories of disputes, but these are typically both narrowly-limited and domestically-focused. Examples include disputes under certain "motor vehicle franchise contracts," limited types of claims by employees of specified public companies, and disputes concerning certain consumer lending agreements. [161] The narrow scope of these provisions is consistent with the Supreme Court's insistence on clear legislative direction regarding issues of nonarbitrability: where Congress has prescribed nonarbitrability, it has done so specifically and narrowly.

In sum, as in France, the past five decades have witnessed a substantial evolution of the nonarbitrability doctrine in the United States. In contrast to a relatively expansive, judicially-created nonarbitrability doctrine in the early 1970s, most categories of statutory (and other) claims are now treated as arbitrable by U.S. courts, and a claim will only be deemed nonarbitrable under the FAA's statutory regime where federal legislation expressly requires this result. [162] This is particularly true in international contexts, but also increasingly applicable in domestic settings.

### [5] English Arbitration Act

The English Arbitration Act, 1996, is entirely silent concerning the subject of nonarbitrability. Although few reported cases have addressed the issue, English courts have generally had little sympathy for attempted nonarbitrability arguments: in one decision, the court affirmed the arbitrability of competition law claims in unhesitating, almost dismissive, terms. [163] The
P 1055
English Court of Appeal has also rejected arguments that minority shareholder claims under the Companies Act are nonarbitrable. [164]

More generally, English courts recently held that a dispute that could be characterized in several ways, including in ways that would render the dispute nonarbitrable, should nonetheless be treated as arbitrable. The Court reasoned that "in each case the essential dispute is the same, regardless of the label. This is a dispute which arbitrators can determine." [165]

English courts have only rarely held matters nonarbitrable. [166] In one unusual case, a first instance judge held that a "constitutional claim to invalidate" a Jordanian statute based on its purported incompatibility with the Jordanian constitution was nonarbitrable. [167] Apart from such (unusual) circumstances, English courts have construed the nonarbitrability doctrine very narrowly.

### [6] Other Jurisdictions

Legislation in other developed jurisdictions adopts approaches which are broadly comparable to France, the United States and England in their treatment of the topic of nonarbitrability, with only a few exceptions. Similarly, decisions in other developed jurisdictions are broadly comparable in their treatment of nonarbitrability issues. [168]

In Canada, for example, a decision of the Québec Court of Appeal held
P 1056
that claims under the Canadian Copyright Act were nonarbitrable, relying on a grant of jurisdiction over copyright claims to the Canadian federal courts and the public policies reflected in the Copyright Act. [169] On appeal, however, the Canadian Supreme Court reversed, holding in emphatic terms that claims under the Copyright Act were arbitrable, and declaring: "If Parliament had intended to exclude arbitration in copyright matters, it would have clearly done so." [170] Similarly, an Ontario court recently held that tort claims were arbitrable, cautioning that courts should

be "wary of cases in which a party to an arbitration agreement seeks to avoid it by pleading a common law tort." [(171)]

Courts in Singapore have taken a similar approach. Holding that minority shareholder oppression claims are arbitrable, the Singapore Court of Appeals reasoned that:

> "There is certainly nothing in the text of [the Companies Act] to suggest an express or implied preclusion of arbitration. Nor does the legislative history and statutory purpose of the provision suggest that a dispute over minority oppression or unfair prejudice is of a nature which makes it contrary to public policy for the dispute to be adjudicated by an arbitral tribunal." [(172)]

Likewise, a Swedish court reasoned that, under the Swedish Arbitration Act:

> "[A]n arbitration award is invalid if it includes an assessment of an issue that, according to Swedish law, may not be settled by arbitrators (nonarbitrable). The fact that there are mandatory provisions in a certain area, however, does not automatically imply that disputes in this area are nonarbitrable. As regards international disputes relating to foreign legislation, it should be determined from case to case whether the applicable foreign law is of such a nature that a settlement of the case in a Swedish court would not be accepted. When it comes to an economic-political regulation in a foreign state, there is often no reason to have the mandatory rules affect settlement possibilities in Sweden and therefore arbitrability according to Swedish law. This opinion is in line with a tendency internationally to accept that an international dispute may be resolved by arbitration proceedings even if a similar national dispute would fall outside the arbitration area." [(173)]

Some national arbitration legislation similarly limits the scope of nonarbitrability defenses, particularly in international cases. In New Zealand's enactment of the UNCITRAL Model Law, nonarbitrability is statutorily-prescribed in more limited terms than those in the Model Law:

> P 1057
> "Any dispute which the parties have agreed to submit to arbitration under an arbitration agreement may be determined by arbitration unless the arbitration agreement is contrary to public policy or, under any other law, such a dispute is not capable of determination by arbitration." [(174)]

Likewise, Article 806 of the Italian Code of Civil Procedure provides that:

> "The parties may have disputes which have arisen between them decided by arbitrators provided the subject matter does not concern rights which may not be disposed of, except in case of express prohibition by law. Disputes provided for in Article 409 [certain labor disputes] may be decided by arbitrators only if so provided by law or by collective labor contracts or agreements." [(175)]

Other national arbitration legislation in developed jurisdictions is similar to these statutory approaches. [(176)] These narrow statutory definitions of the nonarbitrability doctrine reflect contemporary confidence in the arbitral process and are again consistent with the New York Convention's requirement that nonarbitrability exceptions rest on clear legislative direction.

Arbitral tribunals have reached similar conclusions. In one well-publicized international arbitration, a state-owned Indonesian party argued that Indonesian law provided for the nonarbitrability of claims of termination of a contract, absent an express and specific waiver of recourse to national courts. [(177)] Not surprisingly, the argument was rejected out of hand by the arbitral tribunal as "extraordinarily perverse." [(178)]

P 1058
Despite the overwhelming weight of authority, particularly in recent years, there are occasional decisions holding particular matters nonarbitrable. One Australian decision held a claim that contractual licensing arrangements between two parties were "unfair," in breach of §106 of the then Australian Trade Practices Act, 1986, was not capable of settlement by arbitration. [(179)] The Australian decision (by an administrative appellate tribunal) reasoned that:

> "[T]he subject matter of the proceedings under [the Industrial Relations Act] concerns the fairness of the licensing agreement having regard to its alleged representations and the provisions dealing with the termination of the agreement. We are satisfied that this is not a matter 'that is … capable of settlement by arbitration.' … An 'unfair contract' is defined firstly as a contract which is 'unfair, harsh or unconscionable,' but also includes contracts which are 'against the public interest' or which provides remuneration less than that available to an employee or which are designed to avoid an industrial instrument[, which are not capable of application by arbitral tribunals]." [180]

This reasoning is an anomaly, reminiscent of some 19th century decisions, denying the parties' autonomy to resolve their disputes by arbitration, and contrary to both modern conceptions of arbitrability and the obligations imposed by Article II of the New York Convention. [181] In contrast, more recent Australian decisions have held that Trade Practices Act claims were to be referred to international arbitration. [182]

A similarly misconceived conclusion was reached by a Pakistani decision, holding that all claims of fraud are nonarbitrable. [183] Again, that decision is contrary to Pakistan's commitments under the New York Convention, which requires the recognition and enforcement of international arbitration agreements as applied to differences "whether contractual or not." [184] That formulation, and the policies it reflects, make clear the Convention's requirement that the nonarbitrability doctrine be applied as an exception, based on and tailored to advance specific and articulated local public policies. [185]

Finally, an anomalous English High Court decision apparently suggested (without serious analysis) that claims under mandatory provisions of EU law are nonarbitrable. [186] That
P 1059
decision has attracted well-reasoned criticism and is clearly out-of-step with the weight of both European and English authority; it is unlikely that the decision will survive more considered review by English trial and appellate courts. [187] The decision nonetheless reflects the apparently enduring allure of the nonarbitrability doctrine, and generalized notions of public policy, even in developed jurisdictions which have otherwise generally confined the doctrine to narrow settings.

# §6.04 APPLICATIONS OF NONARBITRABILITY DOCTRINE

There is a substantial body of national case law and international arbitral authority addressing claims of nonarbitrability in different contexts. As already outlined, judicial and legislative decisions over the past several decades have progressively narrowed the scope of the nonarbitrability doctrine and the subjects which are considered to be nonarbitrable. [188] This reflects growing experience of national courts with, and confidence in, the international arbitral process, which is increasingly regarded as capable of settling virtually every type of transnational commercial or civil dispute; it also reflects the continuing commitment of national courts, in almost all jurisdictions, to effective and robust application of the New York Convention in international commercial settings.

As discussed above, in many cases, both national arbitration legislation and national regulatory statutes do not expressly address the subject of nonarbitrability – particularly in international matters. [189] U.S. and EU antitrust/competition laws are leading examples, where neither statutory instrument makes any reference to arbitration. [190] In these circumstances, national courts must resolve issues of nonarbitrability by reference to implied legislative intent and the competing policies of the New York Convention (and national arbitration legislation) and a particular regulatory regime. [191]

In doing so, courts in different jurisdictions have typically focused on the text of the relevant national legislation, as well as on a common core of recurrent factors. These factors include the "public values" or "public interests" at issue, [192] the extent to which arbitral procedures (as distinguished from judicial or administrative procedures) are suited to resolution of the dispute, [193] whether such disputes involve unacceptable, systemic disparities of bargaining
P 1060
power between the parties, [194] the effect of a decision on third party rights, [195] the ability of an arbitral tribunal to grant legislatively-mandated relief [196] and (most generally) legislative intent. [197] In the words of one representative expression of these views:

> "Arbitral procedures, while well suited to the resolution of contractual disputes, make arbitration a comparatively inappropriate forum for the final resolution of rights created by Title VII. This conclusion rests first on the special role of the arbitrator, whose task is to effectuate the intent of the parties rather than the

requirements of enacted legislation. … Other facts may [also] render arbitral processes comparatively inferior to judicial processes in the protection of Title VII rights. Among these is the fact that the specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land. … Moreover, the factfinding process in arbitration usually is not equivalent to judicial factfinding. The record of the arbitration proceedings is not as complete; the usual rules of evidence do not apply; and rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath, are often severely limited or unavailable. … Indeed, it is the informality of arbitral procedure that enables it to function as an efficient, inexpensive, and expeditious means for dispute resolution. This same characteristic, however, makes arbitration a less appropriate forum for final resolution of Title VII issues than the federal courts." [(198)]

P 1061

The premise of most contemporary nonarbitrability analysis, however, is that arbitral tribunals have the competence to consider and satisfactorily decide disputes involving "public law" claims reflecting important national and international public policies. [(199)] Moreover, national courts have held with increasing clarity and conviction that "nonarbitrability" is an exception to Article II of the New York Convention, which should be interpreted very narrowly – with particular care being taken to prevent tendencies towards local parochialism from undermining the Convention's purposes. Again, the U.S. Supreme Court captured these perspectives well when it reasoned in *Mitsubishi*:

> "There is no reason to assume at the outset of the dispute that international arbitration will not provide an adequate mechanism. … The utility of the Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own. … [W]e decline to subvert the spirit of the United States' accession to the Convention by recognizing subject matter exceptions where Congress has not expressly directed the courts to do so." [(200)]

This analysis is best considered as reflecting a mandatory obligation, arising from the structure and purposes of the Convention (*i.e.*, "utility of the Convention" and "spirit of the United States' accession"), rather than a purely voluntary decision. As discussed above, that obligation requires Contracting States to treat nonarbitrability as an exceptional defense, requiring a specific and clearly-articulated justification in mandatory local public policy. [(201)] Consistent with this view, most recent national judicial decisions have been unwilling to hold matters nonarbitrable in international cases absent clear and specific legislative direction. As detailed below, this legislative direction is not present in the vast majority of settings.

## [A] Antitrust and Competition Claims

The development of the nonarbitrability doctrine in the context of competition law claims is a paradigm for the doctrine's broader application. During the early decades after such legislation was enacted, U.S. [(202)] and European [(203)] courts consistently held that antitrust claims were nonarbitrable, as did (less clearly) arbitral tribunals. [(204)] One U.S. court explained the nonarbitrability of antitrust claims as follows:

P 1062

"The reasoning is fourfold: (1) governance of the realm of antitrust law, so vital to the successful functioning of a free economy, is delegated by statute to both government and private parties, the latter being given special incentive to supplement efforts of the former, the work of both being equally the grist of judicial decisions; (2) the strong possibility that contracts which generate antitrust disputes may be contracts of adhesion militates against automatic forum determination by contract; (3) antitrust issues are – an understatement – 'prone to be complicated, and the evidence extensive and diverse,' and, we may add, the economic data subject to rigorous analysis dictated by a growing and increasingly sophisticated jurisprudence, with the subject correspondingly ill-adapted to strengths of the arbitral process, *i.e.*, expedition, minimal requirements of written rationale, simplicity, resort to basic concepts of common sense and simple equity; and (4) the notion, suggestive of the proposition that

issues of war and peace are too important to be vested in the generals, that decisions as to antitrust regulation of business are too important to be lodged in arbitrators chosen from the business community – particularly those from a foreign community that has had no experience with or exposure to our law and values." [205]

This general approach prevailed for nearly half a century, following the enactment of the FAA, in the United States, and for several decades following the enactment of modern competition laws in Europe. In the mid-1980s, however, judicial and legislative attitudes began to shift. This occurred in parallel in a number of developed jurisdictions, including the United States, the European Union, France and elsewhere.

## [1] U.S. Antitrust Law

As discussed above, in *Mitsubishi Motors*, the U.S. Supreme Court held that, in international matters, federal antitrust claims could be validly subjected to an arbitration agreement. [206] Refusing to follow a uniform body of U.S. lower court authority holding antitrust claims nonarbitrable in the domestic context, [207] the Supreme Court held that, absent clear legislative direction, it would not conclude that statutory antitrust claims were nonarbitrable in the international context. [208] In the wake of *Mitsubishi*, U.S. courts have repeatedly held antitrust claims arbitrable in both international and domestic cases. [209]

P 1063
As discussed below, the *Mitsubishi* Court nonetheless acknowledged the public importance of antitrust claims. It made clear that U.S. courts would take a "second look" at an arbitral tribunal's decision applying the antitrust laws at the stage of award annulment and/or recognition, concluding that: "Having permitted the arbitration to go forward, the national courts of the United States will have the opportunity at the award enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed." [210] The content of this "second look" doctrine is discussed in detail below. [211]

Relatedly, U.S. regulatory authorities have recently displayed willingness to resort to arbitration to resolve antitrust disputes with private parties. In 2019, for example, after filing suit in a U.S. court seeking to block an acquisition on antitrust grounds, the Department of Justice agreed to submit the dispute (about application of the antitrust laws) to arbitration. [212]

P 1064
Of course, arbitrators may not exercise uniquely governmental or administrative functions, either under the U.S. antitrust laws or otherwise. An arbitral tribunal may not purport to approve (or disapprove) a merger, grant antitrust immunity from governmental prosecution or civil suits, or conduct a criminal investigation. These are matters reserved to governmental regulatory authorities (*e.g.*, the U.S. Department of Justice's Antitrust Division), and cannot be the subject of arbitral authority.

## [2] EU Competition Law

In parallel with developments in the United States, a series of judicial decisions in Europe during the past three decades held that EU competition claims are arbitrable (subject to subsequent judicial review). Early judicial decisions and arbitral awards raised questions regarding the arbitrability of EU competition claims. [213] As in the United States, however, attitudes shifted substantially in the late 20th century.

In *Eco Swiss China Time Ltd v. Benetton Int'l NV*, [214] the European Court of Justice ("ECJ") made clear in dicta that an arbitration agreement could validly be given effect with respect to EU competition claims (subject to judicial review of any resulting award). [215] More explicitly,
P 1065
national court decisions in France, Switzerland, Germany, Italy, Sweden, Spain and England have repeatedly held that EU and Member State competition law claims may validly and enforceably be the subject of an international arbitration agreement. [216] In the words of a leading decision of the Swiss Federal Tribunal:

> "The Swiss judge or arbitrator who has to decide on the validity of a contractual agreement concerning markets in the European Union examines this issue in the light of Art. 81 Rome Treaty [Art. 85 of the former Rome Treaty]. He must do so notwithstanding the fact that the parties agreed on the application of Swiss law to their contractual relationship." [217]

Similarly, the Madrid Court of Appeals held that:

> "We cannot see any reason … that precludes us from concluding that the

subjective rights of individuals that arise from Community competition law are susceptible to being waived (and thus of being subject to an arbitration agreement). … The application

P 1066

of public policy provisions to this case does not constitute a circumstance that renders the issue nonarbitrable." [(218)]

The arbitrability of competition law claims has also been confirmed by the 2014 EU Damages Directive. Recital 48 of that Directive provides that:

"[I]nfringers and injured parties should be encouraged to agree on compensating for the harm caused by a competition law infringement through consensual dispute resolution mechanisms, such as out-of-court settlements (including those where a judge can declare a settlement binding), arbitration, mediation or conciliation. Such consensual dispute resolution should cover as many injured parties and infringers as legally possible. The provisions in this Directive on consensual dispute resolution are therefore meant to facilitate the use of such mechanisms and increase their effectiveness." [(219)]

At the same time, however, both the ECJ and Member States' courts have emphasized that arbitral awards deciding EU competition law claims will be subject to subsequent judicial review, [(220)] analogous to that under *Mitsubishi*'s "second look" doctrine in the United States. [(221)]

Despite the foregoing developments, the ECJ recently adopted an anomalous and ill-considered approach towards interpretation of a choice-of-court provision in a case concerning application of the jurisdiction clause to claims arising from an alleged cartel:

"[T]he referring court must … regard a clause which abstractly refers to all disputes arising from contractual relationships as not extending to a dispute relating to the tortious liability that one party allegedly incurred as a result of the other's participation in an unlawful cartel. Given that the undertaking which suffered the loss could not reasonably foresee such litigation at the time that it agreed to the jurisdiction clause and that that undertaking had no knowledge of the unlawful cartel at that time, such litigation cannot be regarded as stemming from a contractual relationship. Such a clause would not therefore have validly derogated from the referring court's jurisdiction." [(222)]

The ECJ's analysis does not conclude that claims for damages arising from a cartel are nonarbitrable. Instead, the court implausibly construed a broad forum selection clause narrowly – contrary to the consistent approach of courts in European (and other) jurisdictions. [(223)]

An appellate court in the Netherlands has extended the ECJ's reasoning to arbitration agreements, holding that a claim for damages under EU competition law, arising from an alleged cartel, did not fall within the parties' arbitration agreement. [(224)] The appellate court held that:

P 1067

"[T]he wording of the present dispute resolution clause is clear in that it does not relate to disputes concerning liability for breach of the competition law. Instead, it refers in general (abstract) terms to disputes that may arise in contractual relationships …The [competition] dispute cannot therefore be considered to have its origin in the contractual relationship." [(225)]

Surprisingly, the analysis of the ECJ and the Dutch court made no reference to the text of the parties' choice-of-court and arbitration clauses, nor to the parties' evident commercial objective (of centralizing disputes arising from their relationship in a single forum). The Dutch decision also ignored the pro-arbitration canon of construction which, as discussed elsewhere, is mandated by the New York Convention and almost uniformly applied to international arbitration agreements. [(226)] The better approach is that of the U.S. Supreme Court, which held in *Mitsubishi Motors* that an international arbitration agreement should be interpreted expansively to encompass antitrust claims. [(227)]

### [3] Other National Competition Laws

Likewise, decisions outside the United States and the EU have largely rejected arguments that particular competition law claims are nonarbitrable, including in Australia, New Zealand and

Canada. [228] As one court reasoned with respect to Australia's competition law:

> "[T]here is no reason in principle why the parties to a commercial contract cannot agree to submit to arbitration disputes which have arisen between them in relation to their rights and obligations under the Trade Practices Act. Indeed, it is consistent with the modern policy of encouragement of various forms of alternative dispute resolution, including arbitration, mediation and conciliation, that courts should facilitate, rather than impede, agreements for the private resolution of all forms of dispute, including disputes involving claims under statutes such as the Trade Practices Act." [229]

P 1068

In contrast, there are very few reported contemporary decisions holding competition claims nonarbitrable. One unusual exception was a recent decision from the Chinese Supreme People's Court that held that domestic competition law disputes were nonarbitrable, [230] following an earlier Chinese lower court decision that had held Chinese competition law claims nonarbitrable. [231] The Chinese courts cited the public law character of competition claims and the governmental interests associated with such claims. The decision of the Chinese Supreme Court does not address, and is out of step with, the overwhelming majority of contemporary international authorities addressing the arbitrability of competition law claims.

### [4] Arbitral Awards

Consistent with developments in national courts, arbitral tribunals have uniformly affirmed their power to entertain and decide competition law disputes. [232] Indeed, there appears to be no reported instance in the past four decades where an arbitral tribunal has held that an antitrust or competition law claim is nonarbitrable.

### [5] "Second Look" Doctrine and Judicial Review of Arbitral Awards

At the same time they have recognized the arbitrability of antitrust/competition law claims, national courts have emphasized that arbitral awards dealing with antitrust or competition law issues will be subject to subsequent judicial review. As noted above, in *Mitsubishi Motors*, the U.S. Supreme Court adopted a so-called "second look" doctrine, reasoning that "[h]aving permitted the arbitration to go forward, the national courts of the United States will have the opportunity at the award enforcement stage to ensure that the legitimate interest in the enforcement of the antitrust laws has been addressed." [233]

Similarly, in *Eco Swiss*, the ECJ made clear that Article 81 of the EU Treaty is a matter of public policy and that:

> "a national court to which application is made for annulment of an arbitration award must grant that application if it considers that the award in question is in fact contrary to Article 81 EC (ex. Art 85) where its domestic rules of procedure require it to grant an application for annulment founded on failure to observe national rules of public policy." [234]

In this context, the ECJ held that "the ordinary courts may have to examine those questions [of Community law], in particular during review of the arbitration award, which may be more
P 1069
or less extensive depending on the circumstances." [235] Decisions by EU Member State courts similarly confirm the availability of judicial review of arbitral awards addressing competition law claims. [236]

In both the United States and EU, national courts thus retain the opportunity to take a so-called "second look" at the application of the competition laws by the arbitrators. [237] As discussed below, the nature and extent of this subsequent judicial review is unsettled: in particular, it is unclear to what extent national courts can (or must) reexamine the substantive merits of the arbitrator's decisions on competition law matters.

Thus, U.S. courts have interpreted the "second look" doctrine narrowly, not to authorize extensive judicial review of arbitral tribunals' dispositions of antitrust issues. In one illustrative example, an appellate court held that "*Mitsubishi* did not contemplate that, once arbitration was over, the federal courts would throw the result in the waste basket and litigate the antitrust issues anew. That would just be another way of saying that antitrust matters are not arbitrable." [238] The application of the second look doctrine is discussed in detail below. [239]

A comparable approach has been adopted by the Swiss Federal Tribunal, which has held that review of an award made in Switzerland in an annulment proceeding will not consider the correctness of the arbitrators' application of mandatory law (at least where EC competition law is

concerned). In the Federal Tribunal's words:

> "There can be no doubt any longer: the provisions of any competition law whatsoever are not part of the essential and largely recognized values, which, according to the conception prevailing in Switzerland, should form the basis of every legal system. Therefore, the violation of such a provision does not trigger the application of SLPIL, Art. 190(2)(e) [providing for annulment of awards made in Switzerland]." [240]

P 1070

It is unclear, however, whether Swiss courts would adopt the same approach to awards made in Switzerland applying mandatory provisions of the applicable law chosen by the parties or of Swiss mandatory law (as distinguished from EC or EU law). [241]

*[6] Advance Waivers of Antitrust and/or Competition Law Claims*

Some national courts have also indicated that they may not give effect to dispute resolution arrangements that produce advance waivers of statutory antitrust and competition law protections. In *Mitsubishi Motors*, the U.S. Supreme Court reasoned in a footnote that:

> "in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." [242]

The Court's apparent rationale was that parties could validly agree to submit their antitrust claims to international arbitration, but not to entirely waive those claims in advance. As discussed below, most subsequent U.S. decisions have concluded that this qualification concerning advance waivers of statutory rights is relatively narrow and does not sanction expansive application of notions of nonarbitrability or public policy. [243]

Recently, for example, the Supreme Court held that the U.S. antitrust laws do not invalidate waivers of rights to assert antitrust claims in a class arbitration: "[t]he antitrust laws do not 'evinc[e] an intention to preclude a waiver' of class-action procedure." [244] The Court also rejected the argument that a waiver of rights to assert claims in a class arbitration was invalid because it imposed financial obstacles that allegedly made the pursuit of antitrust claims untenable. [245] The Court recognized that, in some circumstances, an arbitration agreement might effectively preclude assertion of federal statutory rights and indicated, in those circumstances, that the agreement would be unenforceable. [246] But the Court confined such cases narrowly to contractual restrictions on the "right to pursue" claims, such as prohibitions against asserting such claims or "perhaps" impracticable filing or administrative fees. [247] The Court refused to

P 1071

extend this analysis to waivers of class actions rights that made it unattractive or uneconomical as a practical matter to pursue a claim. [248]

*[a] No Interlocutory Judicial Decision on Application of Antitrust Laws by Arbitral Tribunal*

Most U.S. courts have held that, if it is unclear whether the arbitral tribunal will actually apply U.S. antitrust (or other mandatory U.S.) laws, then the appropriate course is to stay U.S. litigation and allow the arbitration to proceed, rather than assuming that the arbitrators will not consider antitrust claims. [249] As noted above, *Mitsubishi Motors* involved an agreement to arbitrate in Japan and a Swiss choice-of-law provision, which arguably excluded application of U.S. antitrust claims by the arbitral tribunal. Nonetheless, the Supreme Court proceeded on the assumption that the tribunal would give appropriate effect to mandatory U.S. antitrust law. [250]

Applying this analysis, U.S. lower courts have generally refused to entertain claims that an arbitral tribunal (including a foreign-seated tribunal) will violate U.S. public policy or mandatory law by refusing to apply U.S. statutory protections. [251] There are some contrary U.S. lower court authorities, but these are exceptions to the general (and correct) rule adopted by U.S. courts. [252] Other national courts have reached conclusions similar to those of most U.S. courts. [253]

*[b] Effect of Waiver of U.S. Statutory Rights*

Despite language in *Mitsubishi* condemning advance waivers of U.S. statutory rights, U.S. courts have also generally upheld agreements to arbitrate notwithstanding choice-of-law provisions that concededly provide for the application of a foreign substantive law, including to the exclusion of U.S. antitrust or other statutory protections. In these cases, it is not uncertain, but instead conceded (or entirely clear), that a foreign arbitral tribunal will not apply U.S.

P 1072

statutory protections, and U.S. courts have considered whether, nonetheless, to give effect to the

agreement to arbitrate and choice-of-law provision.

In these circumstances, U.S. courts have frequently given effect to arbitration agreements, even when combined with conceded waivers of U.S. statutory protections, but have generally done so only after considering the content of the foreign law chosen by the parties' choice-of-law agreement and concluding that it is broadly similar to U.S. law. That is best illustrated by a series of U.S. lower court decisions upholding the enforceability of arbitration and foreign choice-of-law agreements that had the conceded effect of excluding more favorable U.S. federal securities law protections. [254] In enforcing contractual dispute resolution provisions that had the effect of excluding otherwise applicable U.S. federal law, the U.S. courts emphasized that the selected foreign law provided comparable substantive protections to those of U.S. law. [255]

The same analysis has been adopted in other statutory contexts, with a number of U.S. courts holding that waivers or exclusions of U.S. statutory rights would be upheld, provided that the parties' chosen law provided broadly similar protections to those available under U.S. law. [256] Lower court authority, although limited, suggests that the same result would apply to U.S. federal antitrust claims. [257]

*[c] Effect of Waiver or Loss of Statutory Damage Claims*

It is unclear how U.S. courts will treat arbitration agreements or awards involving claims for statutory damages in excess of compensatory damages (*e.g.*, treble damages under the U.S.
P 1073
antitrust or RICO legislation). In *Shearson/American Express Inc. v. McMahon*, [258] the U.S. Supreme Court rejected the argument that RICO claims were nonarbitrable because of the availability of treble damages in a civil RICO action. It was not clear, however, whether the Court concluded that treble damage claims could be pursued in arbitration or that they could not be; the Court held only that the availability of compensatory damages in arbitration sufficed to permit enforcement of the arbitration agreement.

In subsequent decisions, the Supreme Court has made clear, however, that the decision whether or not to award treble damages (or similar sorts of relief) is in the first instance for the arbitrators, subject to later judicial review in an annulment or recognition action. [259] As noted above, under this analysis, U.S. courts are not to deny effect to arbitration agreements based upon the possibility that arbitrators may not apply mandatory U.S. statutory protections or award treble (or other) damages required by mandatory U.S. law. [260] Moreover, lower U.S. courts have suggested that the unavailability of the same remedies in arbitral proceedings as may be available in U.S. litigation, does not prevent recognition of an award. [261]

* * * * *

The result of the foregoing developments in most developed jurisdictions has generally been to confine the nonarbitrability doctrine, in the context of antitrust or competition law claims, to those matters as to which regulatory bodies are plainly assigned exclusive jurisdiction (*e.g.*, granting exemptions from antitrust laws, approving mergers or other transactions). As to the civil law consequences of competition law violations between individual parties, it is now almost universally recognized that such matters may validly be submitted to international arbitration. National courts also generally hold that subsequent judicial review of awards dealing with public policy and mandatory law claims is necessary, but the extent and nature of this review is generally limited. [262]

# [B] Securities Claims

Securities issuances and transactions are highly-regulated in most developed jurisdictions and frequently include provisions forbidding or limiting waivers of applicable judicial or
P 1074
administrative remedies. [263] As a consequence, disputes involving securities laws and regulations have not infrequently raised nonarbitrability issues.

## [1] U.S. Securities Law

The most extensive decisions concerning the arbitrability of securities law claims are in the United States, where the case law mirrors developments in the antitrust/competition fields. As discussed above, the U.S. Supreme Court's 1953 decision in *Wilko v. Swan* held that statutory claims for securities law violations were nonarbitrable:

> "When the security buyer, prior to any violation of the Securities Act, waives his right to sue in court, he gives up more than would a participant in other business transactions. The security buyer has a wider choice of courts and venue. He thus surrenders one of the advantages the Act gives him." [264]

The *Wilko* Court also criticized the procedures available in an arbitration of securities law claims, declaring, in terms reminiscent of language used by some 19th century judicial critics of arbitration,

that the arbitral tribunal would receive no "judicial instructions on the law," that their "award may be made without explanation of their reasons and without a complete record of their proceedings," and that judicial "power to vacate an award is limited." [(265)]

Despite this, only two decades later, the U.S. Supreme Court held in *Scherk v. Alberto-Culver Co.* that a statutory federal securities law claim was arbitrable, at least in an international arbitration subject to the New York Convention. The Court reasoned that, while a domestic securities buyer might be waiving procedural advantages in agreeing to arbitrate, "in the context of an international contract, … these advantages become chimerical since … an opposing party may by speedy resort to a foreign court block or hinder access to the American court of the purchaser's choice." [(266)] As discussed above, the Court also stressed the significance of the New York Convention and the damage that expansive applications of the nonarbitrability doctrine by national courts would cause to the Convention's objectives. [(267)]

Paralleling developments in the antitrust field, [(268)] *Scherk* was followed by subsequent U.S. Supreme Court decisions overruling *Wilko v. Swan*, even in the purely domestic context. Thus, the Court declared in *Rodriguez de Quijas v. Shearson/American Express Inc.* that *Wilko* had reflected "the old judicial hostility to arbitration" which could no longer be accepted. [(269)] U.S.
P 1075
courts have similarly held that so-called "RICO" claims, in both international and domestic settings, are arbitrable. [(270)]

### [2] Advance Waivers of U.S. Securities Claims

As noted above, U.S. courts have held in many contexts that the determination whether or not an arbitration agreement and choice-of-law provision operate to violate U.S. public policy is to be made *after* an arbitral award is rendered. [(271)] U.S. courts decline to hold particular claims or disputes nonarbitrable based upon the possibility that the arbitrators will not apply U.S. statutory protections, or will not apply adequate foreign protections, in future arbitral proceedings. Rather, they generally hold that the arbitration should proceed and that a decision regarding possible violations of U.S. public policy or mandatory law protections be made subsequently, after an award has been made, in an enforcement or annulment proceeding. [(272)]

Despite this general approach, U.S. courts have considered a series of cases in which U.S. securities purchasers agreed to arbitration seated in England, subject exclusively to English law (which was interpreted to exclude statutory U.S. securities law protections). The result of these choice-of-law provisions was to substitute less expansive English common law fraud principles for more expansive statutory U.S. protections. U.S. decisions considering these arrangements almost unanimously concluded that the combination of arbitration/choice-of-law provisions did not render the dispute nonarbitrable or otherwise violate U.S. public policy. [(273)]

P 1076
Central to most of these courts' analyses, however, was a conclusion that the foreign law selected by the parties to govern their dispute would provide "available remedies and potential damages recoveries [sufficient] to deter deception of American investors." [(274)] Where foreign law fails to provide such remedies (with respect to transactions otherwise subject to the U.S. federal securities laws), [(275)] some U.S. courts have suggested that they would decline to give effect to an arbitration/choice-of-law clause which excludes the application of U.S. statutory provisions. [(276)] The weight of authority holds, however, that the appropriate course is to permit the arbitrators to decide the parties' dispute (including interpreting any applicable choice-of-law clause and mandatory national laws) and reserve issues of public policy until award annulment and recognition. [(277)]

### [3] Other National Securities Laws

Under German law, arbitration agreements in securities transactions involving merchants, including securities professionals and state entities are valid and the underlying securities law claims are arbitrable. [(278)] Historically, a series of German judicial decisions held that securities disputes involving non-merchants were arbitrable provided that the arbitral seat was in Germany and that German law was applicable; in contrast, agreements to arbitrate under foreign law in a foreign arbitral seat were apparently unenforceable on the grounds that mandatory German securities laws could be disregarded without the possibility of subsequent German judicial review. [(279)]

In 2002, German securities legislation was amended to provide that arbitration agreements involving consumers are valid only if concluded after the dispute has arisen. [(280)] The new German legislation was designed to end discrimination against foreign tribunals. It has, however, correctly been criticized on the grounds that the different treatment of existing and future disputes is incompatible with Article II(1) of the New York Convention. [(281)]

P 1077
The German Bundesgerichtshof has nonetheless upheld the German securities legislation, reasoning that its restrictions should be characterized as matters of capacity (to agree validly to arbitrate) and that Articles II and V(1)(a) permit application of the personal law of a party to questions of capacity. [(282)] Accordingly, the Bundesgerichtshof held that an agreement by a German

consumer to arbitrate future securities disputes outside Germany, although presumptively governed by the law of the arbitral seat, can be invalidated under German law, on the theory that German law governs the capacity of a German consumer to conclude an arbitration agreement.

The Bundesgerichtshof's decision is deeply flawed and contrary to the New York Convention. As discussed above, it is impossible to characterize prohibitions against the arbitration of particular categories of future disputes as "capacity" limitations; such prohibitions are, instead, properly regarded as rules of substantive validity of arbitration agreements (or, less clearly, nonarbitrability rules).

The characterization of rules invalidating agreements to arbitrate future securities disputes as issues of "capacity" purportedly permits German courts to deny recognition of agreements to arbitrate under local (German) law. The German rule does not do so, however, on the basis of a generally-applicable rule of capacity (that affects the capacity of securities purchasers generally to conclude contractual relations); rather, the German rule is directed specifically at the validity of one particular type of agreement (*i.e.*, certain types of arbitration agreements). Treating such a rule as an issue of "capacity," as the German legislation does, plainly circumvents Article V(1)(a)'s uniform choice-of-law regime for the law governing arbitration agreements, contrary to the text and obvious purpose of the Convention. [283]

Moreover, as discussed above, Article II(1) of the Convention does not permit Contracting States to differentiate between existing and future disputes, whether in nonarbitrability rules or otherwise. [284] The German legislation improperly does precisely this, again in violation of Germany's commitments under the Convention.

## [C] Corruption and Bribery [285]

Disputes involving claims of corruption, bribery, or similar illegality have long raised issues of arbitrability. In the same fashion as antitrust and securities claims, however, the scope of

P 1078

the nonarbitrability doctrine as applied to corruption claims has progressively narrowed in the past several decades. Apart from the adjudication of criminal and administrative liability, and the imposition of associated sanctions, civil claims and defenses of corruption, bribery and related wrongdoing are now capable of settlement by arbitration under virtually all legal systems.

As discussed above, early judicial decisions frequently concluded that challenges to the legality of the parties' underlying contract also implicated the associated arbitration clause, requiring judicial resolution of the dispute. [286] Similarly, arbitral tribunals historically evidenced considerable reluctance to resolve matters involving claims of corruption or bribery.

An early arbitral award by a well-known Swedish arbitrator (Gunnar Lagergren) apparently declined jurisdiction over a claim for commissions owed to an agent who had been retained to bribe Latin American government officials. Lagergren relied on "general principles denying arbitrators the power to entertain disputes of this nature," rather than a specific national law, reasoning:

> "It cannot be contested that there exists a general principle of law recognized by civilized nations that contracts which seriously violate *bonos mores* or international public policy are invalid or at least unenforceable and that they cannot be sanctioned by courts or arbitrators." [287]

Accordingly, Lagergren held that "parties who ally themselves in an enterprise of the present nature must realize that they have forfeited any right to ask for assistance of the machinery of justice (national courts or arbitral tribunals) in settling their disputes," [288] and concluded "jurisdiction must be declined in this case." [289]

More recent awards and national court decisions have correctly rejected Lagergren's analysis as overbroad, and instead confirmed the competence of arbitrators to resolve claims of illegality, including bribery and corruption. Accordingly, arbitral tribunals have frequently considered disputes where one party claims that the parties' underlying contract was tainted by, or invalid because of, illegality, or that it is not obligated to perform an illegal contract. [290] Rather than dismissing such disputes on jurisdictional or nonarbitrability grounds, tribunals have ordinarily entertained illegality/corruption claims and made awards on the merits, either upholding those claims or rejecting them. [291]

P 1079

National courts have also generally made clear that arbitral tribunals may consider and resolve claims of corruption, bribery and related illegality. [292] A decision of the English Court of Appeal held that this was a logical corollary of the separability presumption. The court reasoned that "if arbitrators can decide that a contract is void for initial illegality, there is no reason why they should not decide whether a contract has been procured by bribery." [293] In another case, the Court of Appeal was even more categorical, holding that:

> "in the ordinary way an arbitrator has jurisdiction to find facts which constitute a criminal offence (fraud being an all too common example) or that in an appropriate case an arbitrator also has jurisdiction to find that a criminal offence has been committed ... it is necessary to distinguish between a finding of criminal conduct and a conviction which provides the basis for a penal sanction." [294]

Similarly, the Swiss Federal Tribunal has held that an arbitral tribunal is empowered to examine, as a preliminary question, whether criminal acts were committed that affected the main contract. [295]

One exception to this approach is a Pakistani Supreme Court judgment, which apparently concluded that claims of fraud could not be arbitrated. [296] That decision will hopefully not survive Pakistan's ratification of the New York Convention, and clearly contradicts the Convention's requirements that applications of the nonarbitrability doctrine be narrowly-tailored to achieve specific and non-idiosyncratic local public policies. [297] On any view, a prohibition against the arbitrability of fraud or tort claims must be considered inconsistent with state practice under the Convention (where virtually all Contracting States permit arbitration of such claims) and with the Convention's structural requirements that the nonarbitrability doctrine be applied with restraint, as an exception to the Convention's policies. [298]
P 1080

## [D] Intellectual Property Claims [299]

Patent, copyright and trademark claims have also raised questions of nonarbitrability, because of the state's substantial involvement in granting and regulating such intellectual property rights. As with competition, securities and corruption claims, [300] the past several decades have witnessed a progressive retrenchment of historic nonarbitrability principles in the intellectual property field. This is graphically illustrated by the establishment of the institutional arbitration mechanism of the World Intellectual Property Organization ("WIPO"), specifically for the arbitration of intellectual property claims. [301]

The most delicate arbitrability issues in this context arise with claims concerning the validity of patents, copyrights, or trademarks, aspects of which are deemed nonarbitrable in many jurisdictions. In Europe, EU law provides that disputes directly concerning the validity or existence of registered intellectual property rights are nonarbitrable, instead being subject to the exclusive jurisdiction of specified national courts. [302] Aside from this core area of nonarbitrability, disputes involving patent and other intellectual property claims are generally arbitrable in the EU. [303] Swiss law is similar in permitting a broad range of intellectual property claims to
P 1081
be arbitrated. [304] Other civil law jurisdictions are generally similar. [305]

In the United States, the historic rule was that patent disputes were nonarbitrable. [306] In 1983, however, federal legislation was enacted which reversed this position and provided that patent disputes (including issues of validity, infringement and ownership) are arbitrable. [307] Outside the patent context, U.S. lower courts have also held that copyright disputes (including issues of validity, infringement and ownership) [308] and trademark issues [309] are arbitrable.

Similarly, in a landmark 2003 ruling, the Supreme Court of Canada overturned a Québec Court of Appeal decision and held that intellectual property matters, including particularly copyright issues, are arbitrable. [310] The court correctly held that the lower court's contrary ruling was "inconsistent with the trend in case law and legislation, which has been, for several decades, to accept and even encourage the use of civil and commercial arbitration, particularly in modern western legal systems, both common law and civil law." [311] The court concluded:
P 1082
"If Parliament had intended to exclude arbitration in copyright matters, it would have clearly done so." [312]

Legislative developments have also expanded the arbitrability of intellectual property claims. In 2018, Hong Kong amended its arbitration legislation to provide expressly that intellectual property claims are arbitrable. [313] The legislation also provides that certain arbitral awards that deal with intellectual property rights may not be challenged on public policy grounds. [314]

There are very few exceptions to these international developments. One contrary decision was by the Indian Supreme Court, which recently held that certain disputes involving patents, trademarks and copyrights are nonarbitrable. [315] The court's decision, which arose in a domestic setting, was based on local precedents and did not address the weight of authority in other jurisdictions. [316] Moreover, the decision's meaning is uncertain, resting on a distinction between allegations of fraud (which are arbitrable) and serious fraud (which are assertedly nonarbitrable). [317]

Arbitral tribunals have reached similar results in deciding the scope of the nonarbitrability doctrine

as applied to intellectual property disputes. Most tribunals have had little difficulty concluding that they have the competence to resolve disputes about the performance of contracts concerning intellectual property rights (*e.g.*, patent, copyright and trademark licenses). [318] On the other hand, arbitrators have occasionally shown reluctance to resolve disputes involving the validity or existence of intellectual property rights. [319]

Nonetheless, in principle, there is no reason that issues of patent, copyright and trademark validity cannot be resolved by arbitration – but only insofar as the parties to the arbitration are concerned. An arbitral tribunal obviously cannot effect registrations of intellectual property

P 1083

rights or invalidate a patent generally, thereby affecting the rights or obligations of the public or third parties. There is no reason, however, that an arbitral tribunal cannot apply rules of intellectual property law in other contexts to decide claims between the contracting parties that a particular intellectual property right is invalid or does not exist, as well as whether such rights have been infringed. Indeed, determining the validity or invalidity, and legal effects, of intellectual property rights as between the parties to the arbitration is fundamental to the tribunal's mandate of resolving their dispute in accordance with applicable law and cannot properly be disregarded or omitted.

## [E] Trade Sanctions, Embargoes and Controls

It is also sometimes argued that disputes implicating national or international trade sanctions, embargoes, or export controls are nonarbitrable. Some early national court decisions contained broad language suggesting that any dispute requiring consideration of trade regulations was nonarbitrable. [320] As in other fields, however, most contemporary national courts and arbitral tribunals have rejected this view and concluded that arbitrators may consider the consequences of trade regulations and embargoes for the parties' contracts. [321] Of course, even under this view, arbitral tribunals may not purport to impose administrative or criminal sanctions associated with trade embargoes or regulations.

A striking example of the decline of the nonarbitrability doctrine in this field involves claims under U.S. law requesting U.S. governmental regulatory investigation of allegedly unfair trade practices. [322] Although the investigation is conducted by an administrative agency (rather

P 1084

than a private party), with the power to impose administrative sanctions, the statute allows investigations to be suspended pursuant to an agreement to arbitrate between the parties. [323]

## [F] Bankruptcy and Insolvency [324]

Parties to international arbitration agreements sometimes become subject to some form of bankruptcy or insolvency, either in their home jurisdiction or elsewhere. [325] In most jurisdictions, only national courts (often specialized courts) have the authority to commence, administer and wind-up bankruptcy proceedings, including proceedings that liquidate a bankrupt company, reschedule its liabilities, operate it under some form of receivership or administration, or distribute pro rata payments to designated creditors and owners. Disputes concerning these "core" bankruptcy functions are almost universally considered nonarbitrable, whether in domestic or international arbitrations, under the laws of developed jurisdictions. [326]

P 1085

It is much more controversial, however, whether and when disputes merely involving a bankrupt entity as a party, or raising questions of bankruptcy law (*e.g.*, the continued effect of a contract), may be resolved in arbitration. Different national legislative regimes and judicial decisions have reached different conclusions about these types of disputes. In many such cases, the desirability of a centralized forum for resolving all disputes involving the bankrupt entity is weighed against that entity's preexisting commitment to resolve disputes with a contractual counter-party by international arbitration, with different legal systems adopting different resolutions of these competing interests. Again, however, the weight of authority, particularly in recent years, supports narrow nonarbitrability rules in this context.

### *[1]* National Legislation Imposing Absolute Prohibition Against Arbitration by Insolvent Entities

In some jurisdictions, the bankruptcy of a party is treated as an issue of the continued validity and efficacy of the bankrupt entity's arbitration agreement, while in other jurisdictions it is treated as a matter of nonarbitrability. As noted above, in a few states (*e.g.*, Latvia), [327] local law purportedly invalidates all arbitration agreements to which a bankrupt entity is party. [328] These national law rules can be characterized as either rules of substantive validity, having the effect of invalidating a previously-valid arbitration agreement, or as rules of capacity, assertedly having the effect of withdrawing the insolvent entity's capacity. [329]

Other national bankruptcy legislation adopts a somewhat different approach. Under Dutch law, any monetary claim against the bankrupt must mandatorily be resolved in special bankruptcy proceedings, rather than arbitration, apparently reflecting a rule of nonarbitrability. [330] Similarly, in

Italy, all monetary claims against an insolvent company must be brought exclusively in a specialized bankruptcy court. [331] Slightly differently, in Portugal, the effects of arbitration agreements to which an insolvent entity is party, and which may affect the validity

P 1086

of that party's estate, are suspended during the bankruptcy proceedings. [332] A few other jurisdictions also appear to impose automatic stays of arbitral proceedings, or similar suspensions, involving a party that has entered insolvency. [333]

### *[2]* National Legislation Imposing No Prohibitions Against Arbitration by Insolvent Entities

In other jurisdictions, the bankruptcy or insolvency of a party does not affect its obligations under preexisting arbitration agreements, which remain binding on the company and any bankruptcy trustee or administrator. That is the case in Switzerland, at least with regard to international arbitration agreements. [334] Likewise, aside from "core" bankruptcy issues, contractual disputes involving a bankrupt company remain subject to arbitration, pursuant to the bankrupt's preexisting arbitration agreements, in France [335] and Germany. [336]

P 1087

Even where an insolvent party's arbitration agreement remains valid following commencement of bankruptcy proceedings, and even if disputes involving the insolvent entity are arbitrable, it is sometimes argued that, any arbitral proceedings should be stayed as a discretionary matter. [337] In some jurisdictions, public policy is relied upon as a basis for requiring a mandatory stay of arbitration against the insolvent/bankrupt party. [338] Other jurisdictions leave decisions whether to stay arbitral proceedings to the arbitral tribunal's discretion. [339]

### *[3]* National Legislation Providing Case-by-Case Rules Regarding Arbitration by Insolvent Entities

In a number of jurisdictions, courts adopt what is best described as a case-by-case approach, considering the circumstances of particular insolvent parties and the arbitration agreements and proceedings to which they are party. That is true, for example, in Spain, where Spanish insolvency legislation provides that arbitration agreements may be suspended during the pendency of the insolvency on the order of the bankruptcy court. [340] Similarly, in England, the trustee for the bankrupt entity's affairs is granted the power to disclaim the bankrupt's contracts; alternatively, a bankruptcy tribunal is granted discretion to require that otherwise

P 1088

arbitrable disputes be decided in the context of judicial bankruptcy proceedings. [341] Similarly, an English court has held that, in some instances, arbitration legislation "trumps" insolvency rules, and that liquidators therefore must arbitrate disputes which the bankrupt party had agreed to resolve by arbitration. [342]

Likewise, in Singapore, the Court of Appeal recently held that if arbitration of a dispute would "affect the substantive rights of other creditors," or arise from "the operation of the statutory provisions of the insolvency regime *per se*," then the dispute would be nonarbitrable; conversely, the dispute would be arbitrable when it does not. [343] Citing a prior edition of this Treatise, the court also observed that, with respect to disputes resolved pursuant to pre-insolvency agreement to arbitrate, there would generally be no reason not to give effect to the parties' agreement:

> "[I]n instances where the agreement is only to resolve the prior private *inter se* disputes between the company and another party there will usually be no good reason not to observe the terms of the arbitration agreement. … [A]llowing a creditor to arbitrate his claim against an insolvent company in such circumstances does not undermine the insolvency regime's underlying policy aims." [344]

The clearest example of a jurisdiction requiring case-by-case analysis of particular bankruptcy and arbitration proceedings, in order to determine whether to give effect to the arbitration agreement, is the United States. Under U.S. law, companies seeking bankruptcy protection generally remain bound by their preexisting international arbitration agreements, the filing of bankruptcy proceedings does not, in and of itself, invalidate the bankruptcy applicant's existing contracts (including their arbitration agreements). [345]

P 1089

Nonetheless, although the bankruptcy applicant's arbitration agreements remain binding, the "automatic stay" provision of U.S. federal bankruptcy law suspends all legal proceedings against the putatively bankrupt company, subject to court order which can permit particular proceedings to continue. [346] In deciding whether to permit particular proceedings to go forward, U.S. courts generally require debtors to perform their pre-existing arbitration agreements, [347] particularly as to claims that do not involve "core" bankruptcy matters. [348] That is

P 1090

especially true with respect to international arbitration agreements. One frequently-cited U.S. lower court decision explained this approach, ordering an insolvent party to honor its international arbitration agreement because:

> "In weighing the strong public policy favoring international arbitration with any countervailing potential harm to bankruptcy policy upon the present facts, the Court finds the scales weighed in favor of arbitration. … [N]o major bankruptcy issues will be implicated in valuing contract damages and the international arbitration panel requires no special expertise to accomplish their task. While international arbitration will require a temporary and limited incursion into the Bankruptcy Court's exclusive jurisdictional bailiwick, no bankruptcy policies will suffer adverse impact. Conversely, the very image of the United States in the international business community stands to be tarnished. It is important and necessary for the United States to hold its domiciliaries to their bargains and not allow them to escape their commercial obligations by ducking into statutory safe harbors." [349]

Nevertheless, there are exceptions, where U.S. courts have refused to compel arbitration on the grounds that the dispute at issue concerns a "core" bankruptcy matter promised on the provisions of the Bankruptcy Code and arbitral proceedings against the debtor would conflict with the purposes of the Bankruptcy Code. [350] In an influential decision, *In re United States Lines, Inc.*, [351] the Second Circuit attempted to prescribe generally-applicable rules for the treatment of arbitration agreements involving an insolvent company. In so doing, the court articulated a pro-arbitration standard in determining whether the automatic stay should be lifted in order to allow an arbitration involving the debtor to proceed. Among other things, the *United States Lines* court held that "the [FAA] as interpreted by the Supreme Court dictates that an arbitration clause should be enforced unless doing so would seriously jeopardize the objectives of the [Bankruptcy] Code." [352] The court also held:

> P 1091
> "even a determination that a proceeding is core will not automatically give the bankruptcy court discretion to stay arbitration … not all core bankruptcy proceedings are premised on provisions to the Code that 'inherently conflict' with the Federal Arbitration Act; nor would arbitration of such proceedings necessarily jeopardize the objectives of the Bankruptcy Code." [353]

Consistent with this approach, a number of U.S. lower courts have conducted case-by-case analyses as to whether the circumstances of particular bankruptcy proceedings, and particular arbitrations, justified overriding the parties' agreement to arbitrate; even in so-called "core bankruptcy" proceedings, a case-by-case assessment of the needs of the bankruptcy process is required to overcome an otherwise valid arbitration agreement. [354]

Lower courts have also held that a particular showing of need is required to overcome an international, as distinguished from a domestic, arbitration agreement. In the words of one court, "[w]ith respect to international agreements, the Court has less discretion to deny motions to arbitrate than it does with respect to domestic agreements." [355] U.S. courts have also
P 1092
upheld the validity of international arbitration agreements notwithstanding pending foreign bankruptcy proceedings. [356]

Under U.S. bankruptcy law, the bankruptcy trustee or debtor-in-possession may assume or reject any executory contracts – that is, contracts with substantial obligations remaining unperformed on both sides – that it has with creditors. [357] There is scant authority as to whether a debtor or trustee remains bound by a pre-existing arbitration clause when the trustee rejects the executory contract containing that arbitration clause. Some lower courts have held that the arbitration agreement survives rejection of the underlying contract, [358] basing their decision on long-standing principles that rejection of an executory contract "does not alter the substantive rights of the parties." [359] With respect to a nonexecutory contract, meaning one that is fully performed at least on one side, the trustee does not have a choice to reject the contract and remains bound to the debtor's pre-petition obligations, including any arbitration agreement contained within the nonexecutory contract. [360]

### [4] Effect of Foreign Insolvency Legislation on Arbitrations Seated Abroad

International arbitral proceedings occasionally present the question whether rules in an insolvent party's home jurisdiction, providing for the invalidity of arbitration agreements or nonarbitrability of claims of an insolvent entity, should be given effect in other jurisdictions. For example, if a Polish (or Portuguese) company agrees to arbitrate in Switzerland (or England) then Polish (or Portuguese)

bankruptcy legislation will likely be invoked in Swiss (or English) arbitral proceedings and, potentially, in annulment or similar Swiss (or English) judicial proceedings. Although different courts have reached different results, both national courts and arbitral tribunals have generally been reluctant to give automatic effect to foreign bankruptcy legislation that forbids arbitration by an insolvent party.

A representative approach was that of the English Court of Appeal in an arbitration, seated in England, involving an insolvent Polish entity which argued that, under Polish law, it lacked
P 1093
the capacity to continue to arbitrate. [361] (As noted above, prior Polish bankruptcy legislation provides that "[a]n arbitration agreement concluded by the bankrupt shall lose its force from the date of the declaration of bankruptcy and pending proceedings shall be subject to discontinuance." [362] ). The English court upheld the arbitral tribunal's refusal to discontinue arbitral proceedings against the insolvent Polish entity; the English court reasoned that the Polish legislation addressed issues of capacity and that the applicable EU Insolvency Regulation provided for application of English, not Polish, law to the capacity of a party to English-seated arbitral proceedings. [363] The English court concluded that, under English law, the Polish company retained its capacity to arbitrate, notwithstanding Polish legislation allegedly withdrawing that capacity. [364]

In contrast, the Swiss Federal Tribunal reached (largely) the opposite result, in an arbitration seated in Switzerland involving the same insolvent Polish entity, which again argued that it no longer possessed the capacity to participate in arbitral proceedings. [365] The Federal Tribunal reasoned, based on the expert evidence submitted to it, that the Polish insolvency legislation should be characterized as a matter of capacity, to which (under Article V(1)(a) of the Convention and Swiss law) the insolvent company's personal law was applicable. [366] Upholding the arbitral tribunal's similar conclusion, the Federal Tribunal held that, in the case of a Polish company, its personal law was Polish law, which denied it capacity to participate in arbitral proceedings. [367]

The decision of the Swiss Federal Tribunal attracted a measure of criticism, [368] reflected by the observation by a Swiss practitioner that "[t]he Swiss Federal Supreme Court got it wrong, wrong, wrong, and wrong a fourth time." [369] In a subsequent decision, involving ap
P 1094
plication of Portugal's insolvency legislation (providing for effects arguably similar to that of Poland's legislation), the Swiss Federal Tribunal emphasized that its previous interpretation of the Polish bankruptcy law was narrowly limited, [370] and refused to characterize Portuguese law as withdrawing Portuguese companies' capacity to participate in arbitral proceedings. [371] According to the Federal Tribunal:

> "When the foreign entity is a legal person according to its status at the place of incorporation, it is also capable of standing as a party in an international arbitration seated in Switzerland. Possible limitations of the legal status as a person or a legal entity that are specific to the arbitral proceedings and leave the legal personality of the foreign entity untouched, are fundamentally irrelevant from the point of view of the capacity to be a party to an arbitration seated in Switzerland. … [I]f Art. 87 p-IL [the relevant provision of the Portuguese Insolvency Law] prevented an insolvent Portuguese entity from appearing as a party in a Portuguese arbitration, this would have no influence on its capacity to be a party in an international arbitration seated in Switzerland. It is decisive in this respect that Portuguese law affords the Appellant a legal personality through which it may be allocated rights and obligations." [372]

The Federal Tribunal instead applied Swiss law (as the law of the arbitral seat) to the substantive validity of the arbitration agreement, upholding the agreement's validity and requiring the insolvent Portuguese party to honor its agreement to arbitrate in Switzerland. [373] This subsequent holding of the Swiss Federal Tribunal, like that of the English Court of Appeal, reflects the general reluctance of national courts to give automatic effect to foreign bankruptcy legislation purporting to invalidate international arbitration agreements. [374]

### [5] Arbitral Awards

In practice, most international arbitral tribunals have proceeded with arbitrations notwithstanding the pendency of bankruptcy proceedings involving one of the parties in that party's home jurisdiction. [375] Tribunals have usually rejected arguments, based on national insolvency
P 1095
law, that the arbitration agreement became invalid or that the arbitration could not proceed, [376] often requiring at a minimum clear and convincing evidence that a foreign law applicable to a party prohibits its continuing participation in bankruptcy proceedings and that this law should be recognized. [377]

Tribunals have also generally been reluctant to stay arbitral proceedings based on a pending insolvency involving one of the parties:

> "Even in circumstances in which the suspension seems mandatory, if the other party – with full awareness of the relevant particulars – requests to proceed with the arbitration, the arbitrator should refuse to suspend the proceedings, for no one knows best what suits the party's interests than the party itself." [378]

Arbitral awards are almost uniformly consistent with this view. [379]

*[6]*
P 1096
Future Directions: Insolvency and Nonarbitrability

The correct analysis of the effects of the bankruptcy of a party on an international arbitration agreement, and application of the nonarbitrability doctrine in these circumstances, is complex. The insolvency of parties in these circumstances presents both choice-of-law and nonarbitrability issues.

Where the law governing the bankruptcy of a party to an international arbitration agreement provides for the invalidity of the bankrupt's arbitration agreements, a choice-of-law analysis is necessary. In general, only where the law governing the bankruptcy also governs the arbitration agreement, and provides for its invalidity, or (arguably) the incapacity of the bankrupt party, will the agreement potentially be invalid. That is, where a bankruptcy law does not govern either the substantive validity of the arbitration agreement or the capacity of the insolvent entity, then there is no basis for applying that law to suspend or terminate the arbitral proceedings or invalidate the arbitration agreement.

The better view is also that the effects of bankruptcy or insolvency legislation should generally not be characterized as issues of capacity, governed by the personal law of a party (typically, the law of the insolvent party's home jurisdiction). As discussed above, the scope of the concept of "capacity" for purposes of the New York Convention should not be governed by national law, but rather by a uniform international definition of the concept; [380] under that international definition, the consequences of insolvency should not be regarded as affecting the "capacity" of a party, but rather should be characterized as an issue concerning the substantive validity of that party's contractual rights and obligations.

This conclusion avoids the undesirable possibility that every Contracting State would be free, through application of local insolvency legislation (and otherwise [381] ), to invalidate the international arbitration agreements of local parties – which would materially undercut the purposes of the Convention and frustrate parties' legitimate commercial expectations. This analysis is consistent with that of the Swiss Federal Tribunal, discussed above, holding that Portuguese bankruptcy legislation which putatively "prevented an insolvent Portuguese entity from appearing as a party in a Portuguese arbitration … would have no influence on its capacity to be a party in an international arbitration seated in Switzerland." [382]

Even where a foreign bankruptcy law governs an arbitration agreement, the applicable bankruptcy law would be required to be consistent with the New York Convention's prohibitions against discriminatory national legislation. In particular, a law singling out only arbitration agreements (or, worse, only international arbitration agreements), but not other contracts, for invalidity or similar consequences in bankruptcy would contradict these prohibitions and be precluded by Article II of the Convention. [383] The better view is that the Convention requires, consistent with the prevailing practice of most states, a reasoned, case-by-case analysis of the needs of a particular insolvency proceeding and the impact of enforcement of an international arbitration agreement on those proceedings, before the agreement to arbitrate may be denied effect. [384] Moreover, again consistent with the weight of better-reasoned national court
P 1097
authority, there should be a strong presumption in cases involving international arbitration agreements that such agreements will be given effect. [385]

Exceptionally, a state might, consistent with the nonarbitrability exception in Articles II(1) and V(2)(a) of the Convention, treat some or all of the disputes involving a bankrupt party as nonarbitrable and deny effect to the arbitration agreement or arbitral award in its own courts. This would not, however, require other states to give effect to such results, although they may exceptionally do so for reasons of their own public policy. [386] This result is consistent with the approach of most arbitral tribunals, which continue arbitral proceedings, notwithstanding foreign bankruptcy laws, leaving open the possibility of nonrecognition of the arbitral award in the state whose bankruptcy legislation and proceedings are at issue. [387]

# [G] Employment and Labor Disputes [388]

There is substantial diversity among states in their treatment of agreements to arbitrate employment

and labor disputes. Some states regard arbitration as unsuitable for labor or employment-related disputes, and hold agreements to arbitrate such disputes unenforceable, while other states consider that arbitration is superior to judicial and other forms of dispute resolution for labor disputes and both enforce and therefore encourage agreements to arbitrate in employment settings.

*[1]* Jurisdictions Treating Labor Disputes as Nonarbitrable

Historically, many national legal systems treated various sorts of labor or employment-related claims as nonarbitrable. Despite the evolution of the nonarbitrability doctrine in other contexts, that remains the case in many European jurisdictions, including Belgium, [389] Italy, [390]
P 1098
England [391] and France. [392] Similar legislation exists in other jurisdictions. [393]

Moreover, despite the general approach of French courts to the allocation of jurisdictional competence, it appears to be settled law that it is for French courts, not arbitral tribunals, initially to determine whether or not a dispute involves a nonarbitrable employment matter. In the words of a recent Cour de cassation decision, "the competence-competence principle, pursuant to which it is for the arbitrator to decide by priority on his own jurisdiction, does not apply in employment matters." [394]

*[2]*
P 1099
Jurisdictions Treating Labor Disputes as Arbitrable

In contrast, a very different approach is taken in the United States and a few other jurisdictions. In these jurisdictions, arbitration of labor or employer-employee disputes is often not merely permitted but sometimes affirmatively encouraged.

In general, U.S. federal law and policy has long encouraged arbitration of many domestic labor disputes, [395] regarding labor arbitration as a specialized mode of dispute resolution that is superior in many respects to that of litigation, while imposing only narrow nonarbitrability limits on some forms of employer-employee disputes. [396] Thus, §1 of the U.S. FAA excludes from the Act's coverage agreements arising from a limited range of employment relations – involving "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." [397] Consistent with its text, this exclusion has been held to apply only to employees engaged in transportation (and not other) industries. [398]

Thus, the U.S. Supreme Court has repeatedly upheld the validity and enforceability of arbitration agreements in the domestic employment context, declaring that "mere inequality in bargaining power … is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context." [399] Likewise, the Supreme Court recently held that employees did not have a statutory right to assert claims in a class action when they had entered into individual arbitration agreements with their employers. [400]

Consistent with this, U.S. courts have also routinely held that a wide variety of domestic employment-related claims are arbitrable. This includes claims under the Employee Retirement Income Security Act, [401] the Age Discrimination in Employment
P 1100
Act, [402] the Fair Labor Standards Act, [403] the National Labor Relations Act, [404] legislation protecting seamen, [405] employment discrimination claims under Title VII [406] and employment discrimination or wage claims under state law. [407]

As discussed above, several U.S. lower courts have held that §1's exclusion for transportation workers applies only to domestic U.S. transportation workers and not to employment
P 1101
relations in international transportation. [408] Relying on the analysis of the New York Convention in *Mitsubishi Motors* and *Scherk*, these decisions have held that the U.S. ratification of the Convention contemplated abandoning domestic rules of nonarbitrability in the international context. [409] Thus, holding that an arbitration agreement in a foreign seaman's contract was enforceable under the Convention, a U.S. appellate court reasoned:

> "[T]he language of the Convention, the ratifying language, and the [provisions of the FAA] implementing the Convention do not recognize an exception for seamen employment contracts. On the contrary, they recognize that the only limitation on the type of legal relationship falling under the Convention is that it must be considered 'commercial,' and we conclude that an employment contract is 'commercial.'" [410]

Some U.S. lower courts have imposed procedural limits on domestic arbitration agreements that employees are required to accept as part of an employment relationship. [411] Even under this approach, where employment contracts are negotiated, procedural matters are generally left to the

parties' agreement (subject to general unconscionability and procedural regularity safeguards). [412] Moreover, subsequent Supreme Court decisions reaffirmed the autonomy of parties to an arbitration agreement to agree on procedural matters, [413] significantly restricting the possibility of procedural limits on the arbitration of federal statutory claims. [414]

P 1102
In 2012, the National Labor Relations Board ("NLRB") (an administrative agency responsible for administering various U.S. labor laws) issued a ruling forbidding the inclusion of class action waivers in arbitration agreements contained in employment contracts. [415] The NLRB reasoned that the class action waivers unfairly restricted statutory rights granted to employees by U.S. federal labor laws. The NLRB's decision was overturned, however, in subsequent litigation, which underscored the limited nature of the nonarbitrability doctrine in the United States: on appeal, the U.S. Supreme Court held that the NLRB's decision exceeded its statutory authority, reasoning that "the absence of any specific statutory discussion of arbitration or class actions is an important and telling clue that Congress has not displaced the Arbitration Act." [416]

In part because of asserted concerns about the fairness of employment (and consumer) arbitration, legislative proposals have been made in the U.S. Congress to amend the FAA to treat some or all types of consumer (and employment) disputes as nonarbitrable. As discussed above, proposals have been made to preclude mandatory agreements to arbitrate future consumer disputes. The most recent of these efforts was titled the so-called "Arbitration Fairness Act of 2018." [417]

Among other things, these legislative proposals would amend the FAA to provide that "no predispute arbitration agreement shall be valid or enforceable if it requires arbitration of an employment dispute, consumer dispute, antitrust dispute, or civil rights dispute." [418] It is uncertain whether these proposals will ever be adopted, even in the purely domestic context, in the United States; [419] if they were, however, these proposals would reverse the historic treatment of domestic labor and employment disputes in the United States and would generally make agreements to arbitrate such disputes unenforceable.

P 1103
A few other jurisdictions also permit arbitration of at least some types of labor disputes. That includes Germany, [420] the Netherlands, [421] Switzerland [422] and Hong Kong. [423]

# [H] Consumer Claims [424]

As with employment disputes, different national legal systems take significantly different approaches towards the arbitration of "consumer" disputes. "Consumer" disputes are defined generally as disputes between a consumer (or a non-merchant) and a merchant or commercial party, sometimes with a limited amount in controversy. [425]

P 1104
In broad outline, U.S. law currently recognizes the validity of agreements to arbitrate between consumers and businesses and permits the arbitration of both existing and future consumer disputes, subject to restrictions based on principles of unconscionability and due notice. In contrast, other jurisdictions adopt a wide variety of different approaches to agreements to arbitrate future consumer disputes. In some jurisdictions, statutory provisions invalidate all such agreements, at least in domestic cases, while other jurisdictions impose a variety of restrictions on consumer arbitration agreements.

The restrictions imposed in some states on the arbitration of consumer disputes appear to be better categorized as rules of substantive validity than nonarbitrability rules. As discussed below, legislation in some states appears to invalidate specified categories of arbitration agreements (*e.g.*, arbitration agreements between consumers and merchants), rather than to provide for the unenforceability of arbitration agreements as applied to particular categories of claims, disputes, or subject matters. As such, these statutory provisions are better regarded as prescribing rules of substantive validity than nonarbitrability.

## [1] U.S. Federal Arbitration Act

In the United States, the FAA clearly extends to agreements between consumers and merchants; there is nothing in §§2, 3 or 4 of the FAA that excludes consumer transactions or agreements from the general scope of the rule that arbitration agreements are presumptively enforceable. Consistent with that statutory text, the U.S. Supreme Court has repeatedly and unambiguously upheld both the validity of such agreements and the arbitrability of consumer claims. [426]

In an illustrative example, the Supreme Court took the unusual step of summarily reversing a decision of a state supreme court which held, as a "matter of public policy" in West Virginia, that predispute arbitration agreements in nursing home contracts were unenforceable
P 1105
as applied to claims of personal injury or wrongful death. [427] The U.S. Supreme Court declared that "[t]he [FAA's] text includes no exception for personal-injury or wrongful-death claims," [428] and emphatically reiterated its prior holdings, that the FAA precludes state law rules purporting to hold

particular categories of disputes, including consumer disputes, nonarbitrable. [429]

Despite this, a few U.S. lower courts have criticized, and sought to limit, the arbitrability of consumer disputes. According to one especially sweeping critique:

> "The reality that the average consumer frequently loses his/her constitutional rights and rights of access to the court when he/she buys a car, household appliance, insurance policy, receives medical attention or gets a job rises as a putrid odor which is overwhelming to the body politic." [430]

Academic commentary is also frequently critical of rules giving effect to predispute arbitration agreements in the context of consumer and employee claims. [431] Among other things, some commentators have observed that even the most conspicuous forms of arbitration clause will seldom actually be considered, much less understood and negotiated, by consumers:

> "To the extent that one does not understand the terms of the agreement, requiring the same to be printed in bold letters is like yelling at a deaf man." [432]

Similarly, academic commentary has been critical of consumer contracts that include arbitration agreements, particularly when coupled with class-action waivers: "[t]he providers [have] won the power to impose a mandatory, no-opt-out system in their own private 'courts' designed to preclude aggregate litigation." [433]

Despite this criticism, the U.S. Supreme Court has upheld the validity of class action waivers, including in consumer (and employment) contexts. Most recently, for example, the Court
P 1106
held that the FAA preempted the application of state law to invalidate a class action waiver on unconscionability grounds. [434]

Some U.S. lower courts have invoked the unconscionability doctrine or related principles to impose heightened standards of notice [435] or procedural fairness [436] on the terms of arbitration agreements in consumer contracts. These decisions do not challenge the basic arbitrability of consumer disputes, but seek to protect presumptively less sophisticated parties against perceived overreaching or systemic bias. This has been particularly true in disputes involving federal statutory claims (almost exclusively in purely domestic settings). [437] Applying this analysis, U.S. courts require an arbitration agreement to be both substantively and procedurally unconscionable in order to find them void, but sometimes employ a "sliding scale" approach such that "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." [438]

P 1107
Some U.S. states have also sought to exclude certain types of consumer contracts from state laws that otherwise favor arbitration. For example, Texas, Massachusetts, Montana and Georgia prohibit arbitration for consumer contracts which involve consideration less than a certain dollar amount [439] or particular types of contracts. [440] These types of state law provisions are very likely preempted by the FAA in both domestic and international settings in the United States. [441]

As discussed above, in part because of asserted concerns about the fairness of consumer arbitration, legislative proposals have periodically been made in the U.S. Congress to amend the FAA to treat some or all types of consumer (and employment) disputes as nonarbitrable. Although these proposals have been uniformly unsuccessful, legislation rendering claims by consumers nonarbitrable has been adopted in specific (and narrowly defined) areas, including certain financial services for consumers [442] and warranty protections for specific consumer products. [443]

In addition, as noted above, more general proposals have also periodically been made to preclude or restrict the use of so-called "mandatory" agreements to arbitrate future consumer disputes, including the "Arbitration Fairness Act of 2018." [444] Among other things, these proposals would amend the FAA to provide that "no predispute arbitration agreement shall be valid or enforceable if it requires arbitration of … [a] consumer dispute." [445] Previous legislative proposals of this character have failed and it is uncertain whether such proposals will be adopted in the future, even in the purely domestic context. [446]

Those legislative proposals have also prompted U.S. arbitral institutions to review their institutional rules and policies with the aim of ensuring fair procedures in consumer (and employment) disputes. As discussed below, the AAA is a leading example of these developments.

P 1108
Initially, the AAA issued a Consumer Due Process Protocol, which set out procedural guidelines for fair and efficient consumer arbitration. [447] Subsequently, the AAA issued a set of Consumer Arbitration Rules, [448] which implement the objectives set out in the Protocol. [449] Among other

things, the AAA's Rules and Protocol provide for conducting proceedings at a reasonable cost, in reasonably convenient locations, within a reasonable time and without delay, taking into account the right of each party to be represented by a person of their choosing. In contrast, other arbitral institutions have not adopted comparable protocols and, in some cases, their procedures and awards in consumer arbitrations have encountered considerable judicial and other skepticism. [(450)]

U.S. legislative and regulatory proposals for nonarbitrability or invalidity rules in the context of consumer arbitration agreements have generally recognized the limitations imposed by the New York Convention. Thus, most legislative proposals for an "Arbitration Fairness Act" have excluded international arbitration agreements, subject to the New York and Inter-American Conventions, from the legislation's coverage. [(451)] If they were adopted, as previously proposed and without limitations with respect to international arbitration agreements, these proposals would place the United States in violation of its obligations under the New York Convention. [(452)]

Similarly, the U.S. Federal Reserve Board excluded international arbitration agreements (subject to chapters 2 and 3 of the FAA) from the scope of federal regulations of arbitration agreements in retail foreign exchange transactions. [(453)] The federal regulations forbid binding predispute arbitration agreements in specified foreign exchange transactions with consumers, but, at the (well-considered) urging of the U.S. Department of State, the regulation expressly excluded arbitration agreements subject to the New York and Inter-American Conventions. [(454)]
P 1109

### [2] EU Consumer Regulations

In Europe, statutory protections either forbid or regulate the use of arbitration clauses covering future disputes in consumer contracts. [(455)] Under the EU's Unfair Terms in Consumer Contracts Directive, the provisions of standard form consumer contracts are subject to statutory fairness requirements. [(456)] Among other things, the Directive provides that a provision is *prima facie* unfair, and therefore invalid, if it "requir[es] the consumer to take disputes exclusively to arbitration not covered by legal provision." [(457)]

The critical phrase – arbitration "not covered by legal provision" – is not defined in the Directive. The apparent intention of the phrase is to permit arbitration of some consumer disputes, but to invalidate other categories of consumer arbitration agreements (*i.e.*, those "not covered by legal provision"). The most obvious meaning of that formula would be to invalidate arbitration agreements that imposed waivers of legal protections or required arbitration *ex aequo et bono*. Despite this, various EU Member States have implemented the Directive by adopting legislation that deems arbitration clauses in standard form contracts unfair (and therefore invalid) if they require binding arbitration of future disputes involving claims for less than specified sums (*e.g.*, approximately $10,000). [(458)]

The European Court of Justice has held that the Unfair Terms in Consumer Contracts Directive prescribes binding EU public policy and that national courts must ensure that the Directive's purposes are achieved. [(459)] A Member State court may (and apparently must) address the fairness of a consumer contract term even if the consumer does not raise the issue. [(460)] Moreover, if the Directive renders an arbitration agreement contained in a consumer contract
P 1110
unenforceable, the arbitral tribunal may (and apparently must) hold the agreement unenforceable, even if the consumer does not raise the issue. [(461)]

In the words of the ECJ:

> "[T]he result sought by Article 6 of the Directive which … requires the Member States to ensure that consumers are not bound by unfair terms, could not be achieved if the court seized of an action for annulment of an arbitration award was unable to determine whether that award was void solely because the consumer did not plead the invalidity of the arbitration agreement in the course of the arbitration proceedings. … [T]he Directive must be interpreted as meaning that a national court seized of an action for annulment of an arbitration award must determine whether the arbitration agreement is void and annul that award where that agreement contains an unfair term, even though the consumer has not pleaded that invalidity in the course of the arbitration proceedings, but only in that of the action for annulment." [(462)]

The ECJ has also held that Member State courts, when deciding whether to enforce an arbitral award, are "obliged to assess of [their] own motion whether that [arbitration] clause is unfair in the light of Article 6 of [the Directive]." [(463)]

On a Member State level, different jurisdictions have adopted a variety of different approaches towards consumer arbitration agreements. French law historically imposed relatively strict statutory prohibitions on domestic arbitration clauses between persons involved in commercial activities

(*commerçants*) and individuals who are not involved in these activities (so-called "*acte (contrat) mixte*," or "mixed agreements"). [464] These domestic prohibitions on arbitration do not apply in the context of international-consumer contracts. [465]

Similarly, Swedish law provides for the nonarbitrability of consumer arbitration agreements as to defined categories of future disputes. Notably, the Swedish legislation provides that its terms do not apply where they would be contrary to Sweden's international obligations (in particular, the New York Convention). [466] This exception produces results similar to French (and U.S.) limitations of many nonarbitrability rules to domestic transactions.

P 1111

German [467] and Austrian [468] law contain specialized rules regarding the arbitration of future consumer disputes, recognizing the validity of such provisions apparently as to both future and existing disputes only if they are recorded in a separate arbitration agreement signed by the consumer (as is the case in some U.S. state legislation [469] ). Other European jurisdictions have similar types of statutory provisions. [470]

A different approach is adopted under English law. There, the Arbitration Act, amended in part in 2015 by the Consumer Rights Act, provides that an arbitration agreement in a consumer context may be "unfair where modest amount" is sought. [471] This is consistent with previous case law, which had concluded that consumer arbitration agreements (whether they relate to present or future disputes) are invalid if they are either below a specified monetary sum (roughly $5,000) or if they are "unfair." [472] This unfairness standard in turn requires inquiry into the substantive fairness of a provision's terms and the drafting history of the provisions. [473]

### [3] Other Jurisdictions

Other jurisdictions also adopt a variety of different approaches to the arbitration of consumer claims. In New Zealand, an arbitration agreement will be enforceable against a consumer only

P 1112

if "the consumer, by separate written agreement, certifies that, having read and understood the arbitration agreement, the consumer agrees to be bound by it" and the arbitration agreement discloses that he or she is waiving various protections. [474] As with German and Austrian law, this approach parallels that of various U.S. states (likely preempted by the FAA [475] ), which require specific evidence of informed consent to arbitration provisions on the part of consumers and a separate arbitration agreement. [476]

In broadly similar fashion, Québec adopted amendments to its Consumer Protection Act, providing flatly that "[a]ny stipulation that obliges the consumer to refer a dispute to arbitration ... is prohibited." [477] British Columbia legislation adopts a comparable approach to domestic agreements to arbitrate future consumer disputes, [478] which has been upheld by Canadian courts. [479] In the words of the Canadian Supreme Court, §172 of the British Columbia Business Practices and Consumer Protection Act offers "remedies different in scope and quality from those available from an arbitrator and constitutes a legislative override of the parties' freedom to choose arbitration." [480] That decision drew a well-reasoned dissent, which concluded:

> "Access to justice in Canada no longer means access just to the public court system. Historically, judges were reluctant to relinquish their grasp on dispute resolution, and they even viewed alternative dispute resolution as antithetical to the parties' interests. This era is gone. It is the role of the legislature, not the courts, to limit access to alternative dispute resolution mechanisms. Unlike several other provinces, British Columbia has not limited the resolution of consumer disputes to a single procedural regime. On the contrary, it has left room for arbitration and allowed arbitrators to exercise broad remedial powers, subject to the agreement of parties to a dispute. Given the current structure of consumer protection legislation in British Columbia, submitting a consumer's dispute with their mobile phone service provider to arbitration is entirely consistent with the important public purposes of protecting consumers, vindicating their rights and promoting access to justice." [481]

P 1113

Ontario courts have reached similar conclusions to those of the Canadian Supreme Court, holding arbitration agreements in consumer contracts invalid. [482]

In a recent decision, the Canadian Supreme Court also held that the restrictions on consumer arbitration agreements imposed by consumer protection legislation did not extend to contracts between merchants, even if they sued jointly with consumers:

> "The business customers, however, do not qualify as 'consumers' under the

*Consumer Protection Act,* and as such they cannot invoke the protections that consumers enjoy. … If non-consumers bound by a valid arbitration agreement could do an end run around the … *Arbitration Act* simply by joining their claim with that of a consumer. … [T]his provision would become a vehicle for 'piggybacking' non-consumer claims onto consumer claims. Indeed, if such an interpretation were accepted, a class action proceeding brought on behalf of millions of non-consumers who are each bound by an arbitration agreement would, if certified, be permitted to proceed in court *in its entirety* so long as a single consumer joined the class." [(483)]

In yet another variation, Japan's Arbitration Law provides that consumer arbitration agreements are valid, but that, "for the time being," consumers may cancel their agreements to arbitrate future disputes with businesses prior to the first oral hearing of the arbitral tribunal (or if the consumer is the claimant). [(484)] Similarly, for a time, Alberta also attempted a novel approach (allowing for binding pre-dispute consumer arbitration agreements, provided that the terms of the agreements had been approved by a consumer protection authority). [(485)]

Finally, the Indian Supreme Court recently held that consumer disputes are nonarbitrable, even when it is the consumer who initiates the claim. [(486)] It is difficult to reconcile this decision with either the purposes of most consumer protection regimes or the exceptional character of the non-arbitrability doctrine.

### *[4]* Future Directions: Arbitrability of Consumer Disputes

The arbitration of consumer disputes raises special concerns, both because of the presumptively substantial disparity of sophistication and bargaining power of the parties during contract formation and the procedural challenges of implementing the cost-effective resolution of disputes involving modest financial stakes. These concerns are partially reflected in the various invalidity and nonarbitrability rules in Europe, and elsewhere, as well as in legislative proposals in the United States. [(487)] The differing nature of these concerns are not, however, always clearly addressed or implemented in legislative and judicial responses.

First, a number of national law statutory provisions regarding consumer arbitration are not properly characterized as nonarbitrability rules. Rather, statutes such as the Québec legislation and EU Directive are rules of contractual validity, that purport to invalidate all of certain defined categories of arbitration agreements (rather than to forbid their enforcement as to
P 1114
certain categories of disputes). Thus, various legislative provisions (or proposals) invalidate either all pre-dispute consumer arbitration agreements or specified consumer arbitration agreements not satisfying heightened form requirements (*e.g.*, a separate or notarized agreement). These types of provisions are properly categorized as rules of substantive validity, not rules of nonarbitrability.

There are reasons to doubt both the wisdom of these national rules of contractual invalidity and, in international settings, their compatibility with Article II of the New York Convention. In particular, there is a compelling argument that the blanket invalidation of all pre-dispute consumer arbitration agreements (as in Québec) is, again in international settings, contrary to both Article II's requirements of neutrality for rules of contractual validity, [(488)] and the
P 1115
Convention's uniform choice-of-law rules. [(489)] Indeed, as discussed above, precisely these concerns have resulted in exceptions to U.S., French, Swedish and other legislation for consumer transactions containing international arbitration agreements. [(490)]

The invalidity rule prescribed by EU, Quebec and other similar national legislative instruments applies regardless of the terms of a consumer arbitration agreement (including where it is entirely even-handed or even pro-consumer) and regardless of the extent of negotiation or inequality of bargaining power (including where an arbitration agreement is specifically negotiated or where a "consumer" in fact has equal or greater bargaining power and sophistication than a merchant). [(491)] It is doubtful that a blanket rule of invalidity of agreements to arbitrate of this sort comports with the Convention's requirement that agreements to arbitrate be subject to the same rules of validity as other categories of contracts: it is obvious that consumers are, as a general matter, able to conclude binding sale and purchase, financial and other contracts and it is difficult to see why, subject to unconscionability defenses, consumers ought not also be able to conclude valid arbitration agreements.

There are less blunt, more nuanced means of addressing concerns about unequal bargaining power or sophistication than blanket invalidity rules. For example, English legislation (adopting a case-by-case inquiry into the fairness of particular agreements over a specified monetary value), German and Austrian legislation (permitting consumer arbitration agreements in separate instruments), and former Alberta legislation (previously permitting regulatory-approved consumer arbitration agreements), adopt approaches to contractual invalidity which are less susceptible to

challenge under the New York Convention. These legislative solutions are by no means perfect, but provide more constructive and proportionate mechanisms for addressing concerns about consumer protection and unequal bargaining power than blanket prohibitions on all pre-dispute consumer arbitration agreements.

Statutory provisions invalidating consumer arbitration agreements are also potentially inconsistent with the Convention's uniform choice-of-law rules (in Articles II and V(1)(a) of the Convention). [492] Most consumer arbitration agreements are purely domestic (and not subject to the Convention). Where a consumer arbitration agreement is international, however, the Convention's uniform choice-of-law rules would apply and, where national law rules invalidating such arbitration agreements purported to override the Convention's rules, a Contracting State would likely violate its obligations under the Convention.

Second, a separate, but related, set of concerns about consumer arbitration agreements involves the process by which consumer disputes are arbitrated. In particular, restrictions on the arbitrability of consumer disputes often arise from concerns that such disputes cannot, as a financial matter, realistically be arbitrated effectively or fairly by consumers (owing to costs of filing fees, location of the arbitral seat, etc.) or that businesses will enjoy systemic advantages over consumers (*e.g.*, because they are repeat players). These are legitimate concerns and can provide valid grounds for either nonarbitrability rules or due process requirements for fair arbitral procedures. Such nonarbitrability and contractual validity rules would need to be tailored towards the objective of safeguarding the ability of consumers to pursue their claims in an effective and affordable manner, but in principle would be permitted by the Convention. [493]

It is important to note that litigation of consumer disputes in national courts raises serious procedural challenges, particularly in international transactions (where issues of jurisdiction, language and enforcement may make small claims uneconomic to pursue). [494] In many instances, "preserving" recourse to national courts may therefore offer little of real benefit to consumers, while inhibiting the development of mechanisms that would provide better alternatives. Of course, it makes little sense to forbid parties from agreeing to arbitrate if the alternatives which they are required to pursue suffer from the same (or worse) defects.

A more constructive approach would be to develop neutral, efficient arbitral procedures capable of resolving consumer and similar disputes in a fairer, more cost-effective manner than currently available in national courts. [495] Indeed, some skeptics of the arbitral process as applied to consumers have recognized this possibility. [496] A goal of developing means of arbitration for consumer disputes, which address concerns about the fairness of the arbitral process, is suggested by Alberta's previous consumer protection legislation, which permitted regulatory-approved consumer arbitration agreements, and by Japan's arbitration legislation, which does not invalidate consumer arbitration agreements outright, but rather permits, "for the time being," consumers to cancel consumer arbitration agreements. [497]

P 1116
Consistent with this, some arbitral institutions have adopted specialized rules tailored to encourage cost-effective resolution of smaller disputes, which are well-suited for consumer and employment disputes, including (as noted above) the AAA's Consumer Arbitration Rules and due process protocols. [498] This includes rules regarding class action arbitrations, which offer possible avenues for relief which may be unavailable to consumers under many national legal systems. [499] It also includes protocols for handling consumer and employment claims in a fair manner. [500]

Empirical studies of these sorts of neutral procedural regimes, and accompanying protections, suggest that they are effective in providing efficient and fair mechanisms for resolving consumer disputes. [501] The procedural protections that these regimes prescribe are a critical step towards overcoming mistrust of the arbitral process in this context. [502]

A related set of proposals involve online dispute resolution, aimed at providing an efficient mechanism for resolving low monetary value disputes involving consumers. A UNCITRAL working group is exploring mechanisms for providing online dispute resolution for consumer disputes and has proposed a set of "technical notes" on online dispute resolution. [503] This initiative has the merit of addressing directly the fundamental problem of most consumer disputes, namely the difficulty of providing a cost-effective means of fairly resolving a dispute with low monetary value (and, often, a commercially unsophisticated party).

## [l] Natural Resources

Some developing nations historically viewed international arbitration with considerable reserve and occasional hostility. [504] Among other things, international arbitration was seen as dominated by Western or capital-exporting interests and arbitrators, supposedly inadequately-sensitive to the policies and needs of developing countries, and unacceptably expensive for
P 1117
non-Western entities. [505] In particular, these voices have urged that disputes involving significant sovereign interests (like natural resource development projects) be deemed nonarbitrable. [506]

Courts and legislatures in most developed countries have consistently rejected claims that disputes involving issues of sovereignty or natural resources are inherently nonarbitrable. [507] In the United States, the Foreign Sovereign Immunities Act contains detailed provisions concerning the enforcement of arbitration agreements and awards against foreign states, including in matters involving natural resources. [508] Further, federal legislation was enacted in 1988 [509] to ensure that the act of state doctrine was not applied to prevent enforcement of arbitral awards against foreign states in U.S. courts. [510]

Legislation and judicial decisions in other developed jurisdictions are similar. For example, the European Convention on State Immunity [511] and national legislation in most European jurisdictions, [512] provides for the recognition and enforcement of international arbitration agreements and arbitral awards against foreign states, again in matters involving natural resources. Similar legislation has been enacted in other developed states. [513] In recent years, many developing states have also rejected historic notions of nonarbitrability in the context of con
P 1118
cession agreements and natural resources projects, both through widespread acceptance of bilateral and multilateral investment treaties [514] and enactment of national legislation. [515]

## [J] Carriage of Goods by Sea

The carriage of goods by sea is regulated by a framework of international treaties and national legislation, generally designed to ensure that shippers are provided with adequate remedies in specified forums against shipping enterprises. [516] This regulatory framework has resulted in claims that arbitration agreements, customarily included in ocean shipping contracts, are unenforceable on nonarbitrability or related public policy grounds.

In *Vimar Seguros y Reaseguros, SA v. MV Sky Reefer*, the U.S. Supreme Court rejected lower court authority holding that claims under the U.S. Carriage of Goods by Sea Act ("COGSA") were nonarbitrable. [517] The Court held that "COGSA does not forbid selection of [a] foreign [arbitral] forum," reasoning, much like the *Mitsubishi* Court in the antitrust context, [518] that arbitration is merely a procedural mechanism which does not compromise COGSA's substantive statutory protections. [519] The *Vimar* Court also concluded that it was improper for U.S. courts to speculate about the substantive decisions that arbitral tribunals might reach, including as to whether or not they would apply mandatory U.S. COGSA protections: "mere speculation that the foreign arbitrators *might* apply Japanese law which, depending on the proper construction of [the U.S. Carriage of Goods by Sea Act], *might* reduce respondents' legal obligations, does not in and of itself" render a COGSA claim nonarbitrable. [520]

Consistent with this, U.S. lower courts have virtually always upheld agreements to arbitrate COGSA claims, including in circumstances where a combination of a foreign choice-of-law clause and arbitration agreement appeared likely to exclude the application of statutory COGSA protections. [521] There are contrary results under the so-called Carmack Amendment,
P 1119
with a few lower courts holding that the Amendment mandatorily requires disputes to be resolved in statutorily-specified U.S. judicial districts. [522]

There is limited authority from other jurisdictions. Some national courts have suggested less receptive views towards the enforceability of forum selection agreements as applied to claims by shippers against ocean shippers, but these decisions do not appear to apply to arbitration agreements. [523] A few other decisions have, however, refused to enforce arbitral awards on the grounds that COGSA claims are nonarbitrable. [524] These decisions are ill-considered and inconsistent with the New York Convention's objectives.

## [K] Corporate Governance [525]

Arbitration of corporate governance disputes between shareholders or between a company and its officers, directors, or shareholders is sometimes claimed to involve nonarbitrable matters. In almost all jurisdictions, such claims have been rejected, save for unusual cases involving requests for relief that cannot be granted by arbitral tribunals (such as liquidation or winding up of a company, disqualification of a director, or, in some instances, invalidation of a shareholders resolution). [526]

The approach towards corporate governance disputes in the United States is representative. Historically, U.S. courts viewed agreements to arbitrate corporate disputes with disfavor, holding them unenforceable on various grounds (including that they did not really involve disputes, that they were non-justiciable, or that they interfered with statutorily-mandated
P 1120
corporate governance rules). [527] More recently, U.S. courts abandoned that hostility, first with closely-held corporations [528] and later more widely, with U.S. courts now holding broadly that disputes regarding corporate matters are arbitrable under the FAA. As one court put it, "[t]he FAA does not carve out disputes relating to the internal affairs of corporations as an exception to the

general enforceability of arbitration agreements." [(529)]

German courts followed a similar pattern. Historically, there was disagreement regarding the arbitrability of the validity of shareholder resolutions, which was eventually resolved in favor of arbitrability, provided that all shareholders in the company were party to the arbitration. [(530)] Other types of disputes among shareholders to a German company are in principle
P 1121
arbitrable. [(531)] Given these developments, the leading German arbitral institution (DIS) adopted specialized arbitration rules governing corporate disputes in 2009, updated in 2018. [(532)]

Decisions in other jurisdictions also treat most corporate and company law disputes as arbitrable, including in England, [(533)] Austria, [(534)] Switzerland, [(535)] Canada, [(536)] Singapore, [(537)] Hong Kong [(538)] and elsewhere. [(539)] In a few jurisdictions, legislation provides for the validity and enforceability of agreements to arbitrate contained in corporate constitutive instruments (*e.g.*,
P 1122
articles of association). [(540)] More generally, UNCITRAL is engaged in efforts to clarify and confirm the arbitrability of intra-corporate disputes. [(541)]

Despite this general principle, some jurisdictions appear to disfavor agreements to arbitrate in the constitutive instruments of public companies (with large numbers of public shareholders). As discussed below, for example, in the United States, the Securities and Exchange Commission has an informal policy of discouraging the registration of securities whose documentation includes mandatory arbitration provisions. [(542)] Despite that, there are a number of U.S.-registered securities, virtually all by non-U.S. companies, that include mandatory arbitration agreements. [(543)] It is unusual, but not unheard of, in other jurisdictions, for corporate charters of publicly-traded companies to contain arbitration agreements. [(544)]

## [L] Trust Disputes

The arbitrability of disputes arising from trusts paralleled that of corporate law disputes. Historically, trust disputes were frequently treated as nonarbitrable. [(545)] More recently, however, courts in a number of jurisdictions, however, have upheld the arbitrability of trust disputes in a variety of contexts. [(546)] In a few jurisdictions, legislation provides specifically for the arbitration of trust disputes. [(547)]
P 1123

## [M] Distributorship and Commercial Agent Claims

Legislation in some jurisdictions provides statutory protections for distributors or commercial agents, typically by requiring payment of specified amounts in the event of termination of their distributorship, agency, or franchise. In some cases, these statutory regimes are accompanied by provisions requiring that all claims under such legislation be resolved under local law, in local courts. The compatibility of these statutory provisions with the New York Convention is subject to serious doubts.

In the United States, some state laws purport to invalidate agreements to arbitrate in distributorship agreements [(548)] and franchise agreements. [(549)] These legislative provisions are almost always preempted, even in purely domestic settings, by the FAA. [(550)] In contrast, U.S. federal law renders certain disputes involving motor vehicle franchises nonarbitrable. [(551)]

In Europe, a few jurisdictions have adopted restrictions on the validity of arbitration agreements as applied to certain categories of distribution agreements. A leading example of such legislation is Belgium's Law of 27 July 1961, granting legal protections to exclusive sales distributors, based in Belgium, against unilateral termination of their franchise. [(552)]

An early Belgian judicial decision appeared to interpret the Law of 27 July 1961 as permitting arbitration of distributorship termination claims, provided that the arbitral tribunal would apply Belgian law. [(553)] Similarly, the Belgian Cour de Cassation apparently concluded that the Law rendered claims by Belgian distributors against foreign principals nonarbitrable absent evidence that the arbitral tribunal would apply Belgian law. [(554)] The court reasoned that the New York Convention permitted it to apply Belgian law, as the law of the forum, to issues of nonarbitrability, [(555)] and concluded:

> "Articles 4 and 6 of the Law of 27 July 1961, intending to give to the distributor a legal protection, are mandatory rules applicable whatever the law chosen by the parties if the distribution agreement in dispute produces its effects in Belgium. As a consequence of these provisions, a dispute related to the termination of an exclusive distribution agreement producing effects on the whole or on a part of the Belgian territory is not capable of arbitration when the parties agreed on arbitration before the end of
> P 1124

their agreement and when the arbitration agreement aims to or produces the effect of applying a foreign law. … The Belgian judge, in order to decide the validity of the arbitration agreement, must set the law chosen by the parties aside and apply immediately the law of 27 July 1961, according to which the dispute is not capable of arbitration if proof/evidence is given that arbitrators are obliged to apply not Belgian law but a foreign law." [556]

These decisions are retrograde and contrary to the Convention. The Belgian Cour de Cassation's refusal to permit the arbitration to proceed, and its speculation that the arbitrators would not apply mandatory Belgian law, are out-of-step with the Convention and other national court authority. In particular, the Belgian approach contradicts that of courts in other jurisdictions in the context of competition, securities and other mandatory national laws, [557] as well as the Convention's requirement to enforce valid agreements to arbitrate (with resulting awards being subject to nonrecognition). [558]

Other authorities have refused to give effect to the provisions of Law of 27 July 1961. An arbitral tribunal that considered the effect of the Belgian legislation held that it was ineffective to invalidate an arbitration agreement in a sales distribution agreement (covering Belgium, Luxembourg and Zaire), where the place of arbitration was Germany. [559] The tribunal reasoned that the parties had chosen Italian law to govern their disputes, and their arbitration agreement, and that, under Italian law, the arbitration clause was valid. [560]

That conclusion is well-considered, if imprecisely phrased. As discussed above, the nonarbitrability doctrine is an exceptional escape device, which permits courts of Contracting States to deny enforcement of otherwise valid arbitration agreements, based on local law. [561] Importantly, these decisions are not interpretations of the Convention's uniform international rules nor decisions about the validity of the arbitration, but are instead simply exceptional refusals to enforce an otherwise valid arbitration agreement. [562] These refusals are escape devices which Contracting States are permitted to adopt by Article II(1) and V(2)(a), but which neither other Contracting States nor arbitral tribunals are permitted, much less required, to adopt. Thus, while Articles II(1) and V(2)(a) may exceptionally permit Belgian courts to rely on the Law of 27 July 1961 in some circumstances, arbitral tribunals seated outside Belgium, and courts in other Contracting States, are not required, or permitted, to adopt the same view.

P 1125
A German appellate decision considered comparable issues under §89b of the German Commercial Code, which guarantees statutory protections to certain commercial agents. Like the Belgian Cour de Cassation, the German court held that the combined effect of a foreign choice-of-law clause (selecting California law) and foreign arbitration agreement (specifying a California seat) rendered the arbitration agreement unenforceable, because it might compromise or nullify the protections afforded by §89b. [563] Again, that is an ill-considered and parochial decision, which violates Germany's obligations under the New York Convention: by preempting the arbitral process, and denying enforcement of an otherwise valid arbitration agreement based on speculation about the arbitral process, the German court disregarded the mandatory requirements of Article II(3) and the weight of well-reasoned authority in other Contracting States. [564]

More recently, the Austrian Oberster Gerichtshof reached similar conclusions. It held that an arbitration agreement in a distribution contract was not enforceable because the arbitral tribunal, in a partial award, had indicated that New York law was applicable and because that law did not provide a mandatory right of indemnification for the agent. [565] Like the German decision discussed above, this holding is contrary to the Convention and the weight of authority in other Contracting States.

## [N] Fraud Claims

The overwhelming weight of authority holds that claims of fraud, fraudulent inducement, intentional misrepresentation and the like are capable of settlement by arbitration. [566] These decisions are consistent with Article II(1) of the New York Convention, providing for recognition of agreements to arbitrate disputes "whether contractual or not" – a formulation that is most readily directed towards, and certainly encompasses, disputes involving claims of fraud. [567]

P 1126
There are only a few contrary decisions, which are inconsistent with both the Convention and the conclusions of most national courts. For example, as noted above, Pakistani decisions have held that all claims of fraud are nonarbitrable. [568] Again, that decision is contrary to Pakistan's commitments under Article II of the Convention: as detailed above, national law rules holding that all fraud claims are nonarbitrable are contrary to the Convention's requirement that the nonarbitrability doctrine be applied as an exception, based on and tailored to advance specific and articulated local public policies. [569] That is particularly true where the national law rule applies to commercial

disputes, between commercial parties, and where the almost unanimous weight of state practice is to treat fraud claims as arbitrable.

Indian courts have adopted a comparable, albeit less expansive, treatment of fraud claims, at least in a domestic context. The Indian Supreme Court has held that at least some claims of "serious fraud," in a domestic setting, are nonarbitrable, [570] while claims of "ordinary" fraud are arbitrable. The Indian approach, although undesirable from a policy perspective and out-of-step with that of most national courts, is arguably consistent with the Convention's treatment of the nonarbitrability doctrine. [571]

## [O] Miscellaneous Other Claims

National courts and arbitral tribunals have also occasionally considered the arbitrability of a wide range of other claims that can only be briefly catalogued. Courts and arbitral tribunals have generally upheld the arbitrability of claims involving product liability claims, [572] insurance
P 1127
regulatory disputes, [573] construction liens, [574] import regulations, [575] whistleblower protections, [576] real property issues, [577] relations between lawyers and clients, [578] succession disputes, [579] tax disputes, [580] and miscellaneous other subjects. [581] On the other hand, as noted above, a few categories of claims have been held nonarbitrable, including certain franchise disputes, [582] issues concerning some categories of publicly-registered titles and security interests, [583] some
P 1128
constitutional issues, [584] issues of family law and succession, [585] claims under international conventions regarding the carriage of goods by road, [586] retail lease disputes [587] and issues concerning the status of states under international law. [588]

## [P] State Law Claims in United States

Many of the U.S. Supreme Court's nonarbitrability decisions, including those in *Scherk*, *Mitsubishi*, *Vimar* and *PacifiCare*, concerned arguments that claims under particular U.S. *federal* statutes were nonarbitrable. [589] U.S. state statutes and judicial decisions also sometimes purport to render certain types of claims nonarbitrable. That is true, for example, under various U.S. state laws with respect to tort claims, [590] real estate claims, [591] insurance claims, [592] labor
P 1129
disputes [593] and consumer claims. [594]

The U.S. Supreme Court has summarily rejected arguments under both the domestic FAA and the New York Convention that state law may properly preclude arbitration of particular categories of claims. In a 1984 decision, *Southland Corp. v. Keating*, [595] the Court considered a California state statute that invalidated certain arbitration agreements relating to franchise investments. The California Supreme Court had held that, notwithstanding the parties' agreement to arbitrate, the state statute rendered the agreement unenforceable. [596] The U.S. Supreme Court rejected that view, holding that "Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements." [597] The Court left open the possibility of asserting "general contract defenses such as fraud to avoid enforcement of an arbitration agreement." [598]

Not long thereafter, in *Perry v. Thomas*, [599] the Supreme Court again rejected a claim that state employment law rendered a claim nonarbitrable. The Court held that the FAA preempted a California statute requiring judicial resolution of claims for "wages." Emphasizing the "unmistakable conflict" between the two legislative regimes, the Court concluded that "under the Supremacy Clause, the state statute must give way." [600]

Similarly, in *Allied-Bruce Terminix Co. v. Dobson*, the Supreme Court again held that the FAA preempts state laws purporting to render particular claims or disputes nonarbitrable (in this case, all agreements to arbitrate future disputes). [601] That conclusion has been repeatedly cited in subsequent Supreme Court decisions, which emphatically affirmed that the FAA preempted state law nonarbitrability rules. [602] Lower U.S. court decisions have held that a wide range of other state legislative efforts to foreclose or limit arbitration of particular categories of claims are preempted by the FAA. [603]

P 1130
In another decision, the Supreme Court took the relatively unusual step of summarily reversing a decision of a state supreme court (the Supreme Court of Appeals of West Virginia) which held, as a "matter of public policy" in West Virginia, that predispute arbitration agreements were unenforceable as applied to claims concerning personal injury or wrongful death in West Virginia. [604] The Supreme Court held

> "The West Virginia court's interpretation of the FAA was both incorrect and inconsistent with clear instruction in the precedents of this Court. The FAA provides that a 'written provision in … a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of

such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' The statute's text includes no exception for personal-injury or wrongful-death claims. It 'requires courts to enforce the bargain of the parties to arbitrate.'" [605]

The Court concluded by holding that "[t]hat rule resolves these cases": "West Virginia's prohibition against predispute agreements to arbitrate personal-injury or wrongful-death claims against nursing homes is a categorical rule prohibiting arbitration of a particular type of claim, and that rule is contrary to the terms and coverage of the FAA." [606]

More recently, the Supreme Court reversed a decision that had refused to enforce class action waivers in contracts containing arbitration clauses on grounds of unconscionability under state law. The Court held that state unconscionability rules had been applied in a manner that singled out arbitration clauses for discriminatory treatment (compared with other types
P 1131
of contracts) and were therefore preempted. [607] The Court's decision reflects both the U.S. federal policy in favor of arbitration and the perennial attraction of nonarbitrability and antiarbitration positions, notwithstanding clear and emphatic national policies to the contrary.

# §6.05 CHOICE OF LAW GOVERNING NONARBITRABILITY

The nonarbitrability doctrine raises potentially complex choice-of-law questions in determining what law(s) apply to determine whether a claim or dispute is nonarbitrable. These issues arise under both the New York Convention (in particular, Article V(2)(a)) and national arbitration legislation. Related to these choice-of-law issues is the question whether the New York Convention places international limits on the ability of Contracting States to apply nonarbitrability exceptions to disputes under international arbitration agreements. The choice-of-law issues under the nonarbitrability doctrine and related questions of the Convention's international limits are discussed in detail above. [608]

# §6.06 SUA SPONTE CONSIDERATION OF NONARBITRABILITY ISSUES BY ARBITRAL TRIBUNAL

A few authorities have raised the question whether arbitral tribunals may (or must) independently raise issues of nonarbitrability and public policy, even if the parties have not done so. For example, as discussed above, in one classic arbitration, Judge Lagergren *sua sponte* raised the question of corruption, which had not been identified or relied upon by the parties, reasoning:

"[B]oth parties affirmed the binding effect of their contractual undertakings and my competence to consider and decide their case in accordance with the terms of reference. However, in the presence of a contract in dispute of the nature set out hereafter, condemned by public policy, decency and morality, I cannot in the interest of the administration of justice avoid examining the question of jurisdiction on my own motion." [609]

A few other awards are to the same effect, affirming the arbitral tribunal's right (and responsibility) to raise issues of nonarbitrability or illegality *ex officio*. [610]

P 1132
Notwithstanding the importance of party autonomy in international arbitration, and the tribunal's mandate to resolve those disputes which are submitted to it (but not others), [611] these decisions are correct. The arbitral tribunal's adjudicative mandate is to resolve the disputes that are submitted to it in accordance with applicable law – including applicable mandatory law [612] – and to render an award on such matters that is binding and enforceable.

Where the parties' contract raises issues of illegality, violations of public policy or mandatory law, or performance of administrative functions, then the tribunal's mandate must necessarily include consideration of those issues insofar as they would affect its decision or the enforceability of its award. For an obvious example, the parties' request that the tribunal decide whether to grant a patent or declare a party bankrupt should not prevent the tribunal from considering *sua sponte* whether or not such claims are arbitrable; equally, if granting one party's substantive claims (or defenses) would violate applicable mandatory criminal, competition, intellectual property, or other laws, then the tribunal both can and must consider those mandatory law issues on its own motion.
[613] Of course, as discussed elsewhere, it is an essential element of the arbitrators' mandate and

the parties' procedural rights that any *sua sponte* consideration of nonarbitrability or similar issues by a tribunal be accompanied by notice to the parties and an opportunity to be heard on the issue. [614]

# §6.07 JUDICIAL "SUPERVISION" OF ARBITRAL CONSIDERATION OF PUBLIC LAW CLAIMS

Application of the nonarbitrability doctrine can give rise to procedural issues concerning the relationship between arbitral proceedings and national court litigation. Under most contemporary arbitration statutes, national courts are generally forbidden from intervening in or considering interlocutory challenges to ongoing arbitrations, save in the most exceptional circumstances. [615] Nevertheless, some lower U.S. courts have ordered the parties to submit U.S. statutory claims to arbitration and to furnish periodic reports on the progress of the arbitration. [616] Such "judicial supervision" has occurred even with respect to arbitrations seated outside the United States. [617]

This sort of judicial supervision of an ongoing arbitration is generally contrary to Article II of the Convention. As discussed below, Article II(3) requires Contracting States to "refer the parties to arbitration," and does not admit ongoing judicial supervision of the arbitral
P 1133
proceedings. [618] The same rule of judicial non-interference is set forth in the UNCITRAL Model Law (in Article 5) [619] and other national arbitration laws. [620] Where a claim is capable of settlement by arbitration, the proper role of national courts is to refer the parties to arbitration; if the arbitrators misconduct themselves, or render an award that violates the concerned state's public policy, Article V permits that state's courts to deny recognition (or to annul an award made locally) – but the Convention does not allow for interlocutory judicial supervision of ongoing arbitral proceedings.

Consistent with this analysis, U.S. courts have more recently rejected requests that they decline to order or delay ordering arbitration until it is clear that the arbitral tribunal will hear claims that are allegedly nonarbitrable under the law of the arbitral seat. As discussed above, they have instead held that doubts about the arbitral process should be resolved in favor of arbitration, with any objections being reserved for consideration in challenges to the tribunal's award. [621] The same rationale precludes judicial supervision of the consideration of public law claims in the arbitral proceedings.

# §6.08 FUTURE DIRECTIONS: NONARBITRABILITY DOCTRINE

The past four decades have witnessed a substantial evolution and maturation of the nonarbitrability doctrine. During the 1950s and 1960s, judicial decisions in a number of states adopted expansive interpretations of national regulatory regimes that rendered important categories of commercial disputes entirely or partially nonarbitrable. [622] This departed from the historic autonomy of business enterprises to resolve their commercial business disputes through the arbitral process, as reflected in the Geneva Protocol's provisions for the arbitrability of all "commercial" disputes and in state practice. [623] The expansive application of judicially-created "nonarbitrability" rules also contradicted the objectives of the New York Convention and most national arbitration legislation. [624]

More recently, national legislatures and courts in most jurisdictions have adopted more restrained views of the nonarbitrability doctrine, abandoning mistrust of the arbitral process and reaffirming the vital role of party autonomy, particularly in international commercial matters. [625] This evolution has been reflected in U.S., European, Asian, Latin American and other
P 1134
national court decisions [626] and in legislative enactments [627] from all parts of the world. There have been a few exceptions to this trend (*e.g.*, the Chinese Supreme People's Court's treatment of Chinese competition law claims), but these have been isolated and typically in purely domestic settings.

Some commentators have criticized the evolution, and substantial diminution, of the nonarbitrability doctrine over the past three decades. They have urged that "'a-legality' informs the arbitral decisional law of the United States Supreme Court and the French courts alike," and warned that "[l]aw will be generated within the confines of a fully privatized system that is unaccountable to any public organization or process." [628]

That criticism is misconceived, on multiple grounds, in the international context. It ignores the fact that the demise of the nonarbitrability doctrine has occurred exclusively in the field of private rights of action, almost always in commercial disputes between business entities: [629] it is hardly surprising, nor proper ground for objection, that national courts and legislatures have been prepared to give effect to agreements between sophisticated business parties for the resolution of

commercial disputes regarding these types of rights by arbitration. On the contrary, this is precisely consistent with historic respect, and contemporary need, for party autonomy in commercial matters. [630] It is also consistent with how commercial disputes were historically treated (as evidenced by the Geneva Protocol's provisions regarding "commercial" disputes [631]). More generally, the limited role of the nonarbitrability doctrine reflects contemporary respect for private autonomy and freedom of association, basic human rights recognized widely in both national and international instruments. [632]

P 1135
The foregoing criticisms also rest fundamentally on the (incorrect) perception that international arbitral procedures are suspect or defective means to resolve public law claims. [633] This premise is not sustainable, and contradicts the policies underlying both the New York Convention and modern arbitration legislation, judicial decisions in almost all developed jurisdictions and the experience of several decades of contemporary international arbitration practice. [634]

In fact, as compared with virtually all national courts as forums for international litigation, international arbitration offers significant benefits for private parties (including efficiency, neutrality and the enhanced enforceability of any final decision). [635] Practical experience with international arbitral tribunals and procedures, dealing with complex factual and legal issues since the 1970s, leaves no serious doubt as to the competence of these tribunals to deal with such issues no less competently and fairly than national courts; indeed, arbitral tribunals typically offer benefits of enhanced neutrality, technical or legal expertise and commercial or regulatory experience. And, even if one ignored these benefits, enforcement of national court decisions applying local mandatory laws is seldom practicable: "in the context of an international contract … these advantages become chimerical since … an opposing party may by speedy resort to a foreign court block or hinder access to the American court of the purchaser's choice." [636] Given these considerations, there is no legitimate reason to distrust the arbitral process in cases involving commercial disputes between business entities, and on the contrary, substantial reason to facilitate and give effect to arbitration as a dispute resolution mechanism.

Moreover, even outside the context of commercial parties (*e.g.*, in settings involving consumers and employees), international arbitration has the potential to provide benefits of cost, speed and enforceability that are not readily replicated in most national courts. Moreover, many consumer and employment disputes involve commercial issues, which are squarely within the traditional areas of competence and expertise of arbitral tribunals. Insofar as concerns about one-sided or unfair arbitral procedures are concerned, these are readily addressed by application of principles of unconscionability, duress and guarantees of equal treatment and procedural fairness in the arbitral proceedings. The reality is that, in many instances, arbitration of consumer and employment disputes provide more efficient, fair and beneficial results for consumers and employees than traditional litigation processes. [637]

Criticisms of the contemporary disavowal of the nonarbitrability doctrine also omit consideration of the continuing role of national courts in reviewing arbitral awards (including the "second look" doctrine adopted in both U.S. and EU decisions [638]), which provides a material restraint on arbitral decision-making. At the same time, these critiques neglect the broad (and expanding) role of regulatory enforcement authorities and regulatory standards in contemporary international commercial affairs, which provide effective and appropriate mechanisms for safeguarding public interests. [639]

P 1136
Developments over the past decade also raise fundamental questions about the proper scope of the nonarbitrability doctrine, as distinguished from the public policy doctrine. As discussed elsewhere, there are now more than 3,000 bilateral and multilateral investment treaties in force, pursuant to which most states have undertaken to arbitrate a vast range of disputes with foreign investors, often affecting public interests and third party rights in profound ways. [640] At the same time, national laws and institutional arbitration rules have provided for the arbitration of class action claims, [641] small claims by consumers and employees, [642] human rights claims, [643] tax claims, [644] claims involving financial institutions and instruments, [645] intellectual property claims, [646] environmental claims, [647] sport disputes [648] and other "new" [649] categories of disputes. [650]

The question raised by the extension of arbitration to investor-state, tax, intellectual property, human rights and similar disputes is what the continuing role of the nonarbitrability doctrine should be. In principle, the notion that a dispute is not "capable of settlement by arbitration" should be applied exceptionally, with great restraint and as a last resort, particularly in commercial settings: [651] as the use of the arbitral process in diverse fields demonstrates, the arbitral process is entirely "capable" of resolving a wide range of international disputes. Indeed, the flexibility of the arbitral process can often make it *more* capable than many national litigation regimes for resolving particular categories of international disputes.

There are important categories of cases in which the nonarbitrability doctrine is appropriate. These include, for example, requests that an arbitral tribunal declare a company bankrupt, impose a

criminal sentence, approve a merger, or issue similar administrative acts. These decisions necessarily dictate the rights and obligations of third parties and involve the exercise of prosecutorial or administrative discretion which must reside in democratically-accountable decision-makers and regulatory authorities. Matters of this nature are not ordinarily "capable of settlement" by arbitration, which is a consensual process between specified parties.

Beyond such matters, however, the nonarbitrability doctrine should only rarely be applied in international matters, and virtually never in commercial settings. The experience of the past decades, in multiple contexts and jurisdictions, is that arbitration provides a neutral, workable and fair dispute resolution mechanism for almost all types of disputes. Inadequacies in the arbitral process can, in most instances, be addressed through the application of traditional
P 1137
contract law principles (*e.g.*, unconscionability, duress), through application of public policy doctrines in the context of recognition and enforcement of awards, or through well-tailored legislative or regulatory efforts aimed at improving the arbitral process (as with Alberta's previous legislative framework for regulatory approval of predispute consumer arbitration agreements [652] ). What neither the New York Convention nor the objectives of contemporary national arbitration legislation contemplate is the wholesale nonarbitrability of important categories of international disputes or the application of idiosyncratic rules designed to favor local parties at the expense of foreign entities.

When the nonarbitrability doctrine is applied, it must be within the limits imposed by Article II(3) and Article V(2)(a) of the New York Convention. The nonarbitrability doctrine is an exception, contrary to the uniform choice-of-law regime established by Article V(1)(a) and contrary to the Convention's objectives, which should be applied with restraint, in a narrowly-tailored and non-idiosyncratic fashion, [653] and generally not on an interlocutory basis (*e.g.*, prior to a final arbitral award). [654] Moreover, consistent with an appropriate choice-of-law analysis, national courts should not apply foreign nonarbitrability rules (save in unusual cases), and should instead give effect to Article V(1) (a)'s choice-of-law regime. [655] Even if a state is permitted by the Convention to adopt local nonarbitrability rules as an escape device, other Contracting States generally should not (and may not) give such rules effect. [656]
P 1137

References

1)

For commentary, *see* H. Arfazadeh, *Ordre Public et Arbitrage International à l'Épreuve de la Mondialisation* 79-109 (2d ed. 2006); Arfazadeh, *Arbitrability Under the New York Convention: The Lex Fori Revisited*, 17 Arb. Int'l 73 (2001); Baker & Stabile, *Arbitration of Antitrust Claims: Opportunities and Hazards for Corporate Counsel*, 48 Bus. L. 395 (1993); Baron & Liniger, *A Second Look at Arbitrability: Approaches to Arbitration in the United States, Switzerland and Germany*, 19 Arb. Int'l 27 (2003); Bedell, Harrison & Grant, *Arbitrability: Current Developments in the Interpretation and Enforceability of Arbitration Agreements*, 13 J. Cont. L. 1 (1987); Beechey, *Arbitrability of Anti-Trust/Competition Law Issues: Common Law*, 12 Arb. Int'l 179 (1996); Blessing, *Arbitrability of Intellectual Property Disputes*, 12 Arb. Int'l 191 (1996); Böckstiegel, *Public Policy and Arbitrability*, in P. Sanders (ed.), *Comparative Arbitration Practice and Public Policy in Arbitration* 177 (1987); Borris, *Arbitrability of Corporate Law Disputes in Germany*, 2012 Int'l Arb. L. Rev. 161; Brekoulakis, *Arbitrability and Conflict of Jurisdictions: The (Diminishing) Relevance of Lex Fori and Lex Loci Arbitri*, in F. Ferrari & S. Kröll (eds.), *Conflict of Laws in International Arbitration* (2019); Brekoulakis, *On Arbitrability: Persisting Misconceptions and New Areas of Concern*, Queen Mary, University of London, 2009 School of Law Legal Studies Research Paper No. 20/2009 (2009); Buzbee, *When Arbitrable Claims Are Mixed with Nonarbitrable Ones: What's A Court to Do?*, 39 S. Tex. L. Rev. 663 (1998); Caivano, *Arbitrabilidad y Orden Público*, 12 Foro Jurídico 22 (2013); Calavros, *The Application of Substantive Mandatory Rules in International Commercial Arbitration from the Perspective of An EU UNCITRAL Model Law Jurisdiction*, 34 Arb. Int'l 219 (2018); Carbonneau, *Liberal Rules of Arbitrability and the Autonomy of Labor Arbitration in the United States*, in L. Mistelis & S. Brekoulakis (eds.), *Arbitrability: International & Comparative Perspectives* 143 (2009); Carbonneau, *Shattering the Barrier of Inarbitrability*, 22 Am. Rev. Int'l Arb. 573 (2011); Carbonneau, *The Exuberant Pathway to Quixotic Internationalism: Assessing the Folly of* Mitsubishi, 19 Vand. J. Transnat'l L. 265 (1986); Carbonneau & Janson, *Cartesian Logic and Frontier Politics: French and American Concepts of Arbitrability*, 2 Tul. J. Int'l & Comp. L. 193 (1994); Cheng, *New Tools for An Old Quest: A Commentary on Kleinheisterkamp, The Impact of Internationally Mandatory Laws on the Enforceability of Arbitration Agreements*, 3 World Arb. & Med. Rev. 121 (2009); de Oliviera, *Arbitrability Under the New Brazilian Arbitration Act: A Real Change*, 33 Arb. Int'l 295 (2017); de Oliviera & Miranda, *International Public Policy and Recognition and Enforcement of Foreign Arbitral Awards in Brazil*, 30 J. Int'l Arb. 49 (2013); Dharmananda, *Arbitrability: International and Comparative Perspectives*, 5 Asian Int'l Arb. J. 223 (2009); Drličková, *Arbitrability and Public Interest in International Commercial Arbitration*, 17 Int'l & Comp. L. Rev. 55 (2017); V. Fernandez Andrade, *Arbitrabilidad de los Actos Administrativos Contractuales* (2018); French, *Arbitration*

*and Public Policy: 2016 Goff Lecture,* 24 Asia Pac. L. Rev. 1 (2016); Ghodoosi, *Arbitrating Public Policy: Why the Buck Should Not Stop at National Courts,* 20 Lewis & Clark L. Rev. 237 (2016); Gruner, *Accounting for the Public Interest in International Arbitration: The Need for Procedural and Structural Reform,* 41 Colum. J. Transnat'l L. 923 (2003); Hanotiau, *L'Arbitrabilité,* 296 Recueil des Cours 29 (2002); Hanotiau, *The Law Applicable to Arbitrability,* in A. van den Berg (ed.), *Improving the Efficiency of Arbitration Agreements and Awards: 40 Years of Application of the New York Convention* 146 (1999); Hanotiau, *What Law Governs the Issue of Arbitrability?,* 12 Arb. Int'l 391 (1996); Hanotiau & Caprasse, *Arbitrability, Due Process, and Public Policy Under Article V of the New York Convention,* 25 J. Int'l Arb. 721 (2008); Kerr, *Arbitrability of Securities Claims in Common Law Nations,* 12 Arb. Int'l 171 (1996); Kirry, *Arbitrability: Current Trends in Europe,* 12 Arb. Int'l 373 (1996); Klein, *Arbitrability of Company Law Disputes,* 2007 Austrian Arb. Y.B. 29; Kleinheisterkamp, *Overriding Mandatory Laws in International Arbitration,* 67 Int'l Comp. L.Q. 903 (2018); Kleinheisterkamp, *The Impact of Internationally Mandatory Laws on the Enforceability of Arbitration Agreements,* 3 World Arb. & Med. Rev. 91 (2009); Korzun, *Arbitrating Antitrust Claims: From Suspicion to Trust,* 48 N.Y.U. J. Int'l L. & Pol'y 867 (2016); Kozubovska, *Trends in Arbitrability,* 1 IALS Stud. L. Rev. 1, 22 (2014); Kurt, *Comment: An Unstoppable Mandate and An Immovable Policy: The Arbitration Act and the Bankruptcy Code Collide,* 43 UCLA L. Rev. 999 (1996); Landi & Rogers, *Arbitration of Antitrust Claims in the United States and Europe,* 13-14 Concorrenza e Mercato 455 (2005-06); Lowenfeld, *The* Mitsubishi *Case: Another View,* 2 Arb. Int'l 178 (1986); Mante, *Arbitrability and Public Policy: An African Perspective,* 33 Arb. Int'l 275 (2016); McLaughlin, *Arbitrability: Current Trends in the United States,* 12 Arb. Int'l 113 (1996); Mourre, *Arbitration and Criminal Law. Reflections on the Duties of the Arbitrator,* 22 Arb. Int'l 95 (2006); Mourre, *Arbitrability of Antitrust Law From the European and US Perspectives,* in G. Blanke & P. Landolt (eds.), *EU and US Antitrust Arbitration: A Handbook for Practitioners* 3 (2011); Park, *Arbitrability and Tax,* in L. Mistelis & S. Brekoulakis (eds.), *Arbitrability: International & Comparative Perspectives* 179 (2009); 2010 OECD Arbitration and Competition; Park, *Private Adjudicators and the Public Interest: The Expanding Scope of International Arbitration,* 12 Brooklyn J. Int'l L. 629 (1986); Poser, *Arbitrability of International Securities Disputes,* 12 Brook. J. Int'l L. 675 (1986); Quinke, *Objective Arbitrability: Article V(2)(a),* in R. Wolff (ed.), *New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Commentary* 380 *et seq.* (2012); Rau, *The Arbitrator &* "*Mandatory Rules of Law,*" 18 Am. Rev. Int'l Arb. 51 (2007); Segan, *Arbitration Clauses and Competition Law,* 9 J. Euro. Comp. L. & Prac. 423 (2018); Smit, *Mandatory Law in Arbitration,* 18 Am. Rev. Int'l Arb. 155 (2008); Smit, Mitsubishi: *It Is Not What It Seems to Be,* 4(3) J. Int'l Arb. 7 (1987); Sterk, *Enforceability of Agreements to Arbitrate: An Examination of the Public Policy Defense,* 2 Cardozo L. Rev. 481 (1981); van Otterloo, *Arbitrability of Corporate Disputes: A Cross-Jurisdictional Analysis* (unpublished paper 2013); Vincent, *Oh, What A Tangled Web We Weave: The Implications of Conflicting Domestic Policy on Arbitrability and Award Enforcement,* 38 Hastings L.J. 141 (2015); Wai, *Transnational Private Law and Private Ordering in A Contested Global Society,* 46 Harv. Int'l L.J. 471 (2005); Westbrook, *The Coming Encounter: International Arbitration and Bankruptcy,* 67 Minn. L. Rev. 595 (1983); Youssef, *The Death of Inarbitrability,* in L. Mistelis & S. Brekoulakis (eds.), *Arbitrability: International and Comparative Perspectives* 47 (2009).

2)

*See, e.g.,* B. Berger & F. Kellerhals, *International and Domestic Arbitration in Switzerland* ¶389 (3d ed. 2015); E. Gaillard & J. Savage (eds.), *Fouchard Gaillard Goldman on International Commercial Arbitration* ¶¶5-59 *et seq.* (1999); J. Lew, L. Mistelis & S. Kröll, *Comparative International Commercial Arbitration* ¶¶9-35 *et seq.* (2003).

3)

U.S. courts have also occasionally used the term "arbitrable" more broadly to include any question whether or not a particular dispute should be arbitrated. For example, some U.S. courts have treated questions about the scope of the arbitration clause, compliance with predispute conditions to commencing arbitration and the arbitral tribunal's jurisdiction (including the application of the competence-competence principle) as issues of "arbitrability." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943 (U.S. S.Ct. 1995); §7.03[E][2]. *See also Henry Schein, Inc. v. Archer & White Sales, Inc.,* 139 S.Ct. 524 (U.S. S.Ct. 2019) ("When a dispute arises, the parties sometimes may disagree not only about the merits of the dispute but also about the threshold arbitrability question. … Under the [Federal Arbitration] Act and this Court's cases, the question of who decides arbitrability is itself a question of contract. The Act allows parties to agree by contract that an arbitrator, rather than a court, will resolve the threshold arbitrability questions as well as underlying merits disputes."). This terminology is imprecise, even in the U.S. context, and should be avoided in international settings.

4)

*See* §§6.02-6.03.

5)

*See id.*

6)

D. Roebuck & B. de Fumichon, *Roman Arbitration* 104-05 (2004). *See also* D. Roebuck, *Mediation and Arbitration in the Middle Ages: England 1154-58* (2013) (various crimes, including murder, subject to arbitration).

7)

*See* §4.05_[A][2]; §6.02[I].

8)

*See* §§6.04 *et seq.*

9)

*Am. Safety Equip. Corp. v. J.P. Maguire & Co.*, 391 F.2d 821, 826-27 (2d Cir. 1968).

10)

*Id.* at 826.

11)

*See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 646-50 (U.S. S.Ct. 1985) (Stevens, J., dissenting); *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 744 (U.S. S.Ct. 1981); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 58 (U.S. S.Ct. 1974); §6.03_[C] [4]; §6.04.

12)

*See* §6.02[D]. This is consistent with the text of the New York Convention and most national arbitration legislation. New York Convention, Arts. II(1), V(2)(a) ("*subject matter of the difference* is not capable of settlement by arbitration") (emphasis added); European Convention, Art. VI(2) ("*dispute* is not capable of settlement by arbitration") (emphasis added); UNCITRAL Model Law, Art. 1(5) ("certain *disputes* may not be submitted to arbitration") (emphasis added).

13)

Geneva Protocol, Art. 1(1) (emphasis added).

14)

Geneva Convention, Art. 1(b).

15)

§§1.01[C][1]-[2]; §5.01[B][1].

16)

New York Convention, Art. II(1).

17)

*Id.* at Art. V(2)(a).

18)

*Report of the Committee on the Enforcement of International Arbitral Awards,* U.N. Doc. E/AC.42/4/Rev. 1, 2 (1955) (Article IV(a)).

19)

Also during the negotiations, the French delegation proposed omitting Article V(2)(a) entirely, on the basis that it might be used to apply purely domestic rules to international awards. *Consideration of the Draft Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, U.N. Doc. E/Conf.26/SR.11, 7 (1958) (French delegate). That proposal was, however, not accepted by the New York Conference. *See also* Arfazadeh, *Arbitrability Under the New York Convention: The Lex Fori Revisited*, 17 Arb. Int'l 73 (2001); Paulsson, *Arbitrability, Still Through A Glass Darkly,* in ICC, *Arbitration in the Next Decade* 95 (1999) ("In the international context it is not easy to determine what rule of arbitrability should be applied … the New York Convention, for all its merit in other ways, leaves something to be desired in the way it treats this issue").

20)

As noted above, the Geneva Protocol applied to all international arbitration agreements concerning "commercial matters or … any *other* matter capable of settlement by arbitration." Geneva Protocol, Art. 1(1) (emphasis added). The apparent meaning of Article 1(1) was to treat all "commercial matters" as arbitrable, while contemplating that other "non-commercial matters" might be either arbitrable or non-arbitrable."

21)

*See* §6.02[B].

22)

*See* §1.04_[A][1]; §2.01[A][1][a]; §25.02[B].

23)

European Convention, Art. VI(2) (emphasis added).

24)

Inter-American Convention, Art. 5(2) (emphasis added).

25)

*Id.* at Art. 1.

26)

The Inter-American Convention has not yet been frequently applied, but the effect of its text is to require recognition of arbitration agreements even if they may concern matters that cannot be resolved by arbitration, while permitting states subsequently to refuse recognition of resulting awards on this ground. This is a sensible result, consistent with the approach taken by courts in developed nations towards many other issues relating to the validity of arbitration agreements. *See* §26.05[C][10]. On the other hand, there is at least a credible argument that a nonarbitrability exception could be implied into Article 1.

27)

*See* §5.06[B][1][e].

28)

*See* Arfazadeh, *Arbitrability Under the New York Convention: The Lex Fori Revisited*, 17 Arb. Int'l 73 (2001); Böckstiegel, *Public Policy and Arbitrability*, in P. Sanders (ed.), *Comparative Arbitration Practice and Public Policy in Arbitration* 177 (1987); Hanotiau, *L'Arbitrabilité*, 296 Recueil des Cours 29 (2002); Hanotiau & Caprasse, *Arbitrability, Due Process, and Public Policy Under Article V of the New York Convention*, 25 J. Int'l Arb. 721 (2008); Mourre, *Arbitration and Criminal Law. Reflections on the Duties of the Arbitrator*, 22 Arb. Int'l 95 (2006); Schramm, Geisinger & Pinsolle, in H. Kronke *et al.* (eds.), *Recognition and Enforcement of Foreign Arbitral Awards: A Global Commentary on the New York Convention* Art. II, 68 (2010) ("a subject matter is arbitrable when there is no mandatory jurisdiction of a national court").

29)

Geneva Protocol, Art. 1.

30)

*See* §1.01[C][1].

31)

*See* §5.06; Arfazadeh, *Arbitrability Under the New York Convention: The Lex Fori Revisited*, 17 Arb. Int'l 73, 79-80 (2001) ("clear distinction that arbitration laws draw between arbitrability, on the one hand, and the validity of the arbitration clause, on the other hand"); Quinke, *Objective Arbitrability: Article V(2)(a)*, in R. Wolff (ed.), *New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Commentary* 382-83 (2012).

32)

Hanotiau, *The Law Applicable to Arbitrability,* 26 Sing. Acad. L.J. 874 (2014) ("there seems to be a general agreement to the effect that the subjective arbitrability of international disputes to which a State, a public collectivity or entity or a public body is a party, is, notwithstanding the contents of the domestic law of the State or entity concerned, a principle of public policy of the law of international arbitration").

33)

*See* §5.06[B][1][a].

34)

Similarly, an arbitration agreement in a joint venture agreement may generally be valid, including as applied to contract, tort and some competition claims, but may be unenforceable as applied to certain nonarbitrable disputes under competition or intellectual property legislation (*e.g.*, where regulatory actions are required). *See* §§6.04[A] & [D].

35)

*See* §5.03[B].

36)

*See* §5.06[D][11].

37)

*See* §6.04.

38)

*See* §5.06[D][11].

39)

As discussed below, there is a close relationship between principles of mandatory law and public policy. *See* §19.04[B]. A mandatory law is typically a statutory (or constitutional) directive, reflecting fundamental public policies, that dictates particular rules and results, regardless of the parties' agreement. *See* §19.04[B][1]. A public policy is the legislative or other policy that underlies such mandatory laws, or that finds independent recognition in judicial decisions (particularly in common law systems). *See* §19.04[B][1]. *See also* Caivano, *Arbitrabilidad y Orden Público,* 12 Foro Jurídico 22 (2013); Calavros, *The Application of Substantive Mandatory Rules in International Commercial Arbitration from the Perspective of An EU UNCITRAL Model Law Jurisdiction,* 34 Arb. Int'l 219 (2018); Cheng, *New Tools for An Old Quest: A Commentary on Kleinheisterkamp, The Impact of Internationally Mandatory Laws on the Enforceability of Arbitration Agreements,* 3 World Arb. & Med. Rev. 121 (2009); de Oliviera & Miranda, *International Public Policy and Recognition and Enforcement of Foreign Arbitral Awards in Brazil,* 30 J. Int'l Arb. 49 (2013); Drličková, *Arbitrability and Public Interest in International Commercial Arbitration,* 17 Int'l & Comp. L. Rev. 55 (2017); French, *Arbitration and Public Policy: 2016 Goff Lecture,* 24 Asia Pac. L. Rev. 1 (2016); Ghodoosi, *Arbitrating Public Policy: Why the Buck Should Not Stop at National Courts,* 20 Lewis & Clark L. Rev. 237 (2016); Kleinheisterkamp, *The Impact of Internationally Mandatory Laws on the Enforceability of Arbitration Agreements,* 3 World Arb. & Med. Rev. 91 (2009); Kleinheisterkamp, *Overriding Mandatory Laws in International Arbitration,* 67 Int'l Comp. L.Q. 903 (2018); Kramer, *EU Overriding Mandatory Law and the Applicable Law on the Substance in International Commercial Arbitration,* in F. Ferrari (ed.)*, The Impact of EU Law on International Commercial Arbitration* 285 (2017) ("the importance of international commercial arbitration as a dispute resolution method … gives these tribunals a responsibility to at least consider EU overriding mandatory law of a fundamental nature"); Mante, *Arbitrability and Public Policy: An African Perspective,* 33 Arb. Int'l 275 (2016); Rau, *Comment: Mandatory Law and the Enforceability of Arbitration Agreements,* 3 World Arb. & Med. Rev. 133 (2009).

40)

*See* §19.04[B][4].

41)

*See* §11.05[B][2][b].

42)

*See* §15.04.

43)

*See* §5.06._[D][10]; §6.04; §26.05[C][9][h].

44)

*See* §5.06[D][12].

45)

*See* §6.03[B]. In practice, legislatures not infrequently couple rules of mandatory law with nonarbitrability rules, typically in an effort to ensure the enforcement of such rules. *See* §6.03[C].

46)

For example, competition or securities law claims involve matters of public policy and/or mandatory law, but will generally be arbitrable. *See* §§6.04[A]-[B]; *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626-27 (U.S. S.Ct. 1985); *Judgment of 20 March 2008, Jacquetin v. SA Intercaves,* 2008 Rev. Arb. 341 (Paris Cour d'Appel); *Judgment of 19 May 1993, Labinal v. Mors et Westland Aerospace,* 1993 Rev. Arb. 645 (Paris Cour d'Appel); *Judgment of 23 June 1992,* DFT 118 II 353 (Swiss Fed. Trib.) (Iraq sanctions were mandatory laws for arbitrators to apply); *Judgment of 18 October 2003,* Case No. AAP M 1988/2013 (Madrid Audiencia Provincial); *Final Award in Chamber of National and International Arbitration of Milan of 23 September 1997,* XXIII Y.B. Comm. Arb. 93 (1998).

*Judgment of 16 February 1989, Almira Films v. Pierrel*, 1989 Rev. Arb. 711, 714-15 (Paris Cour d'Appel). *See also Mitsubishi Motors*, 473 U.S. 614; *Judgment of 20 March 2008, Jacquetin v. SA Intercaves*, 2008 Rev. Arb. 341 (Paris Cour d'Appel); *Judgment of 12 September 2002, Macron v. Cartonnages de Pamfou*, 2002 Rev. Arb. 173 (Paris Cour d'Appel); *Judgment of 20 September 1995, Matra Hachette v. Reteitalia*, 1996 Rev. Arb. 87, 90-91 (Paris Cour d'Appel); *Judgment of 7 December 1994, V 2000 v. Project XL 220 ITD*, 1996 Rev. Arb. 245, 249 (Paris Cour d'Appel); *Judgment of 14 October 1993, Aplix v. Velcro*, 1994 Rev. Arb. 164, 167 (Paris Cour d'Appel) ("arbitrability of a dispute is not excluded solely because public policy rules are applicable to this dispute; in international arbitration, an arbitrator decides on its own jurisdiction with regard to arbitrability of the dispute, taking into account the rules of international public order, has the power to apply these rules and principles and order sanctions for violation of these rules, subject to subsequent control by the annulment judge"); *Judgment of 19 May 1993, Labinal v. Mors et Westland Aerospace*, 1993 Rev. Arb. 645 (Paris Cour d'Appel); *Judgment of 29 March 1991, Ganz v. Nationale des Chemins de Fer Tunisiens*, 1991 Rev. Arb. 478, 480 (Paris Cour d'Appel) ("in international arbitration, an arbitrator … is entitled to apply rules of [international] public policy and to grant redress in the event that those rules have been disregarded …"); *Judgment of 15 November 2005, Arkhangelskoe Geologodobychnoe Predpriyatie v. Archangel Diamond Corp.*, Case No. T-2277-04 (Svea Ct. App. 2005) ("The fact that there are mandatory provisions in a certain area, however, does not automatically imply that disputes in this area are nonarbitrable"); *Judgment of 5 July 2006, Terra Armata Srl v. Tensacciai SpA*, 25 ASA Bull. 618, 623-24 (Milan Corte di Appello) (2007); *Judgment of 13 September 2002*, 2004 Rev. Arb. 105 (Milan Corte di Appello); Mourre, *Arbitrability of Antitrust LawFrom the European and US Perspectives*, in G. Blanke & P. Landolt (eds.), *EU and US Antitrust Arbitration: A Handbook for Practitioners* 3, 11 (2011) ("There is nowadays … a general consensus that arbitrators have the power to apply mandatory rules, either principally or incidentally, and to draw the civil consequences of a violation of said rules, under the control of the judge who will be called upon to assess the award's validity and/or enforceability").

Some national arbitration statutes expressly recognize this. *See, e.g.*, Québec Civil Code, Art. 2639(2) ("An arbitration agreement may not be opposed on the ground that the rules applicable to settlement of the dispute are in the nature of rules of public order").

*Judgment of 9 November 1990, Condominiums Mont Saint-Sauveur Inc. v. Constrs. Serge Sauvé Ltée*, [1990] RJQ 2783, 2789 (Québec Cour d'Appel).

*See, e.g., Mitsubishi Motors*, 473 U.S. at 626-27; *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 515-16 (U.S. S.Ct. 1974); *London S.S. Owners' Mutual Ins. Ass'n Ltd v. Spain* [2015] EWCA Civ 333, ¶78 (English Ct. App.); *Judgment of 20 March 2008, Jacquetin v. SA Intercaves*, 2008 Rev. Arb. 341, 341 (Paris Cour d'Appel) ("arbitrators decide on their jurisdiction in relation to arbitrability with regard to international public policy and have authority to apply principles and rules arising from the latter, as well as to sanction their eventual violation; arbitrability is not excluded solely because public policy regulation is applicable to the legal relationship subject of the dispute"); *Judgment of 19 May 1993, Labinal v. Mors et Westland Aerospace*, 1993 Rev. Arb. 645, 645 (Paris Cour d'Appel) ("arbitrability of a dispute is not excluded solely because public policy regulation is applicable to the legal relationship subject of the dispute; in international arbitration, arbitrators decide on their jurisdiction in relation to arbitrability of the dispute with regard to international public policy, and have authority to apply principles and rules arising from the latter, as well as to sanction their eventual violation, subject to control by the annulment judge"); *Judgment of 19 July 2004*, II ZR 65/03 (German Bundesgerichtshof) (arbitrability does not depend on whether award might violate mandatory rules of law); *Tomolugen Holding Ltd v. Silica Investors Ltd*, [2015] SGCA 57, ¶84 (Singapore Ct. App.); *Judgment of 23 December 2004, Can Taulina SL v. Totalfinalelf España*, Case No. AAP M 11350/2004 (Madrid Audiencia Provincial) (application of mandatory rules of EU competition law does not render dispute nonarbitrable; arbitrators are bound to apply those rules). *See also* Vincent, *Oh, What A Tangled Web We Weave: The Implications of Conflicting Domestic Policy on Arbitrability and Award Enforcement*, 38 Hastings L.J. 141 (2015).

New York Convention, Art. V(2); §§26.05[C][9]-[10].

New York Convention, Art. V(2)(a); §26.05[C][10].

New York Convention, Art. V(2)(b); §26.05[C][9]. *See also* Kleinheisterkamp, *Overriding Mandatory Laws in International Arbitration*, 67 Int'l Comp. L.Q. 903 (2018).

*See* §§25.04[G]-[H]. *See also* Quinke, *Objective Arbitrability: Article V(2)(a)*, in R. Wolff (ed.), *New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Commentary* 386-88 (2012).

54)

See §5.06_[D][12]; §6.08.

55)

See §§6.04[A][1] & [5].

56)

See §§6.04[A]-[C] & [F].

57)

See, e.g., Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 723 n.4 (9th Cir. 1999); George Fischer Foundry Sys., Inc. v. Adolph H. Hottinger Maschinenbau GmbH, 55 F.3d 1206, 1210 (6th Cir. 1995) (rejecting (on ripeness grounds) argument that rules governing Zurich arbitration proceeding would be prospective waiver of statutory rights to treble damages "because it is not clear what law the Zurich tribunal will apply"). See also Life of Am. Ins. Co. v. Aetna Life Ins. Co., 744 F.2d 409 (5th Cir. 1984).

58)

See §6.04[A][1].

59)

Vimar Seguros y Reaseguros, SA v. MV Sky Reefer, 515 U.S. 528, 541 (U.S. S.Ct. 1995) (emphasis in original).

60)

PacifiCare Health Sys., Inc. v. Book, 538 U.S. 401, 407 (U.S. S.Ct. 2003).

61)

See, e.g., Dillon v. BMO Harris Bank, NA, 856 F.3d 330, 334 (4th Cir. 2017) ("When there is uncertainty whether the foreign choice of law would preclude otherwise applicable federal substantive statutory remedies, the arbitrator should determine in the first instance whether the choice of law provision would deprive a party of those remedies. … In such a case, the prospective waiver issue would not become ripe for final determination until the federal court is asked to enforce the arbitrator's decision."); Escobar v. Celebration Cruise Operator, Inc., 805 F.3d 1279, 1289 (11th Cir. 2015) ("any claim that an arbitration agreement prospectively waived a party's right to pursue U.S. statutory remedies must be brought at the award-enforcement stage, not at the arbitration-enforcement stage"); Aggarao v. MOL Ship Mgt Co., 675 F.3d 355, 373 (4th Cir. 2012) ("Aggarao is not entitled to interpose his public policy defense, on the basis of the prospective waiver, doctrine until the second stage of the arbitration-related court proceedings – the award-enforcement stage"); Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 723 n.4 (9th Cir. 1999) ("[I]t is possible that the Swiss Tribunal might apply U.S. antitrust law to the dispute. … Moreover, even if Swiss law is applied to the dispute, there has been no showing that it will not provide Simula with sufficient protection."); Suzlon Structure, Ltd v. Pulk, 2010 WL 3540951 (S.D. Tex.) (staying litigation of RICO claims notwithstanding fact that parties' choice of (English) law might preclude assertion of RICO claims in foreign-seated arbitration).

62)

See, e.g., Judgment of 2 June 2004, 2005 Rev. Arb. 674, 677 (Paris Cour d'Appel); Casaceli v. Natuzzi SpA, [2012] FCA 691, ¶¶31-33 (Australian Fed. Ct.) (rejecting argument that arbitral tribunal seated in Italy would not apply mandatory Australian law, citing expert evidence that: "an arbitral tribunal sitting in Italy and deciding under the Rules of the Milan Arbitration Chamber a dispute involving the market of a third country would consider the applicability of the mandatory rule of that country, even if the law governing the merits of the dispute chosen by the parties were a different law. … First, as a matter of policy, it is recognized that arbitration should not be perceived as a means to avoid or circumvent the application of such mandatory rules. Secondly, arbitrators must consider the enforceability of their awards in countries where the parties wish [to seek enforcement].").

63)

See §5.06[D][12].

64)

Dziennik v. Sealift, Inc., 2010 WL 1191993, at *7 (E.D.N.Y.) (quoting Vimar Seguros y Reaseguros, 515 U.S. at 541).

65)

See, e.g., Lindo v. NCL (Bahamas), Ltd, 652 F.3d 1257, 1292 (11th Cir. 2011) (Barkett, J., dissenting) ("null and void" standard in Article II provides a public policy defense at the arbitration agreement enforcement stage); Judgment of 17 May 2006, 7 U 1781/06, 1556 (Oberlandesgericht München) (combined effect of foreign choice-of-law clause (selecting California law) and foreign arbitration agreement (specifying California seat) rendered arbitration agreement unenforceable, because it might compromise or nullify protections afforded by §89b of German Commercial Code); Judgment of 16 November 2006, Case No. C.02.0445.F, 9 (Belgian Cour de Cassation); Judgment of 22 December 1988, Gutbrod Werke GmbH v. Usinorp de Saint-Hubert, 1988 Journal des Tribunaux 458 (Belgian Cour de Cassation) ("an arbitration clause could only be valid if it specified that the arbitrators are obligated to apply Belgian law [and] that, if that is not the case, the clause could not stand"). See also Kleinheisterkamp, The Impact of Internationally Mandatory Laws on the Enforceability of Arbitration Agreements, 3 World Arb. & Med. Rev. 91, 99-103 (2009); §5.06[C][13][d].

66)

Judgment of 16 November 2006, Case No. C.02.0445.F, 9 (Belgian Cour de Cassation).

67)

Compare Quinke, Objective Arbitrability: Article V(2)(a), in R. Wolff (ed.), New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Commentary 386-88 (2012) (national court may refuse to recognize arbitration agreement where there is "reasonable certainty," but not "reasonable threat," that arbitral tribunal will not apply mandatory law).

68)

See §4.05[C][4].

69)

See §4.05_[A][1]; §6.02[B]. As discussed above, Article V(1)(a)'s conflicts rules are generally-applicable rules with universal application. See §4.04[A][1][b]; §4.04[B][2][b].

70)

See §4.05[A][2].

71)

Restatement of the U.S. Law of International Commercial and Investor-State Arbitration §2.16 comment b (2019).

72)

Id.

73)

Id. at comment a ("The arbitrability limitations that Congress has chosen to impose have ordinarily been of the conditional type, and the conditions established often involve timing or form of consent. For example, arbitrability may depend on post-dispute consent having been given or a pre-dispute agreement to arbitrate having been conspicuous or separately signed, or a 'cooling off' period having elapsed.").

74)

See §5.06; §6.02.

75)

Thus, under the Restatement's concept of conditional arbitrability, a Contracting State could treat all tort claims, all fraud claims, or all shareholder disputes as conditionally nonarbitrable, while also providing that such claims or disputes could be arbitrated if the parties' arbitration agreement satisfied elevated form requirements (e.g., large font, separate and signed instrument) or unusual substantive requirements (e.g., local arbitral seat or local arbitral institution, heightened standard of proof), in each case imposed by local law.

76)

Mitsubishi Motors, 473 U.S. 639.

77)

Restatement of the U.S. Law of International Commercial and Investor-State Arbitration §2.16 comment c (2019).

78)

See §1.04_[A][1]; §4.04[A][1][b].

79)

See §1.04_[A][1]; §4.04[A][1][b].

80)

See §6.03[C][2] (Switzerland); §6.03[C][3] (France); §6.03[C][4] (United States).

81)

Mitsubishi Motors, 473 U.S. at 639.

82)

*See* §6.03_[C][4]; *Mitsubishi Motors,* 473 U.S. 614; *Scherk,* 417 U.S. at 515-16; *Cvoro v. Carnival Corp.,* 2019 WL 5257962 (11th Cir.); *Galilea, LLC v. AGCS Marine Ins. Co.,* 879 F.3d 1052, 1060 (9th Cir. 2018); *Suazo v. NCL (Bahamas), Ltd,* 822 F.3d 543, 547 (11th Cir. 2016); *Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London,* 587 F.3d 714, 730-32 (5th Cir. 2009); *Antillean Marine Shipping Corp. v. Through Transp. Mut. Ins., Ltd,* 2002 U.S. Dist. LEXIS 26363, at *7-8 (S.D. Fla.) (rejecting nonarbitrability objection under McCarran-Ferguson Act, which "does not apply to international insurance contracts made under the Convention"); *Assuranceforeningen Skulld (Gjensidig) v. Apollo Ship Chandlers, Inc.,* 847 So.2d 991, 993 (Fla. Dist. Ct. App. 2003) (rejecting nonarbitrability objection under McCarran-Ferguson Act "because the parties' dispute involves foreign commerce").

83)

*See* §6.03_[C][3]; *Judgment of 29 March 1991, Ganz v. Nationale des Chemins de Fers Tunisiens,* 1991 Rev. Arb. 478 (Paris Cour d'Appel); *Judgment of 20 June 1969, Impex v. Malteria Adriatica,* 1969 Rev. Arb. 95 (Paris Cour d'Appel).

84)

*See* §6.03_[C][2]; *Judgment of 23 June 1992,* DFT 118 II 353 (Swiss Fed. Trib.).

85)

*Judgment of 22 February 2019,* Case Nos. T 8538-17 & T 12033-17 (Svea Ct. App.) (underlying dispute was arbitrable and ECJ's *Achmea* decision, regarding validity of intra-EU BITs, did not render award incompatible with Swedish public policy). *See also Judgment of 15 November 2005,* Case No. T-2277-04, 7 (Svea Ct. App.) ("a tendency internationally to accept that an international dispute may be resolved by arbitration proceedings even if a similar national dispute would fall outside the arbitration area").

86)

*See* §§6.03[C][5]-[6].

87)

*See* E. Gaillard & J. Savage (eds.), *Fouchard Gaillard Goldman on International Commercial Arbitration* ¶575 (1999); Mourre & Radicati di Brozolo, *Towards Finality of Arbitral Awards: Two Steps Forward and One Step Back,* 23 J. Int'l Arb. 171 (2006); J.-F. Poudret & S. Besson, *Comparative Law of International Arbitration* ¶¶326, 342, 348 (2d ed. 2007); A. van den Berg, *The New York Arbitration Convention of 1958* 153 (1981) ("the field of nonarbitrable matters in international cases may … be smaller than that in domestic ones").

88)

*See* §§6.03[A] & [C].

89)

*See* §4.05[A][2]. *See Judgment of 15 November 2005,* Case No. T-2277-04, 7 (Svea Ct. App.).

90)

*Epic Sys. Corp. v. Lewis,* 138 S.Ct. 1612, 1627 (U.S. S.Ct. 2018) ("In many cases over the years, this Court has heard and rejected efforts to conjure conflicts between the [FAA] and other federal statutes. … Throughout, we have made clear that even a statute's express provision for collective legal actions does not necessarily mean that it precludes 'individual attempts at conciliation' through arbitration. … And we've stressed that the absence of any specific statutory discussion of arbitration or class actions is an important and telling clue that Congress has not displaced the Arbitration Act.") (quoting *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 32 (U.S. S.Ct. 1991)). *Compare id.* at 1628 (Ginsburg, J., dissenting) ("Even assuming the FAA and the NLRA were inharmonious, the NLRA should control. Enacted later in time, the NLRA should qualify as 'an implied repeal' of the FAA, to the extent of any genuine conflict.").

91)

*Mitsubishi Motors,* 479 U.S. at 639-40 n.21. *See also Shearson/Am. Express, Inc. v. McMahon,* 482 U.S. 220, 226-27 (U.S. S.Ct. 1987).

92)

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 483 (U.S. S.Ct. 1989). *See also CompuCredit Corp. v. Greenwood,* 565 U.S. 95 (U.S. S.Ct. 2012) (rejecting claim that Credit Repair Organization Act rendered CROA claims nonarbitrable: "Had Congress meant to prohibit these very common [arbitration] provisions in the CROA, it would have done so in a manner less obtuse than what respondents suggest. When it has restricted the use of arbitration in other contexts, it has done so with a clarity that far exceeds the claimed indications in the CROA.").

93)

*Editions Chouette Inc. v. Desputeaux,* 2003 SCC 17, ¶46 (Canadian S.Ct.).

94)

*Seidel v. TELUS Commc'ns Inc.,* 2011 SCC 15, ¶103 (Canadian S.Ct.) (Lebel, J., dissenting). *See also Rinehart v. Welker,* [2012] NSWCA 95, 96 (N.S.W. Ct. App.) (discussing arbitrability of disputes under trust deed: "only in extremely limited circumstances that a disputes which the parties have agreed to refer to arbitration will [be] held to be non-arbitrable").

95)

*See* authorities cited §6.03_[C][4]; §6.03_[C][5]; *Larsen Oil & Gas Pte Ltd v. Petroprod Ltd*, [2011] SGCA 21 (Singapore Ct. App.) ("we accept that there is ordinarily a presumption of arbitrability where the words of an arbitration clause are wide enough to embrace a dispute, unless it is shown that parliament intended to preclude the use of arbitration for the particular type of dispute in question (as evidenced by the statute's text or legislative history), or that there is an inherent conflict between arbitration and the public policy considerations involved in that particular type of dispute"); *Rinehart v. Welker*, [2012] NSWCA 95, ¶167 (N.S.W. Ct. App.) ("it is only in extremely limited circumstances that a dispute which the parties have agreed to refer to arbitration will be held to be nonarbitrable").

96)

UNCITRAL Model Law, Art. 1(5).

97)

*See, e.g., BWV Invs. Ltd v. Saskferco Prods. Inc.*, [1994] CanLII 4557 (Saskatchewan Ct. App.); *Union Charm Dev. Ltd v. B&B Constr. Co.*, [2001] HKCFI 779 (H.K. Ct. First Inst.).

98)

*Mitsubishi Motors*, 473 U.S. 639.

99)

*See* UNCITRAL Model Law, Art. 1(5). *See also* Bantekas & Ortolani, *Definition and Form of Arbitration Agreement*, in I. Bantekas *et al.* (eds.), *UNCITRAL Model Law on International Commercial Arbitration: A Commentary* 127 (2020); Sanders, *UNCITRAL's Model Law on International Commercial Conciliation*, 23 Arb. Int'l 105 (2007).

100)

*See* §6.02[D].

101)

*See* §4.05[A][2].

102)

*See id.*

103)

UNCITRAL Model Law, Art. 1(5). *See* Bantekas & Ortolani, *Definition and Form of Arbitration Agreement*, in I. Bantekas *et al.* (eds.), *UNCITRAL Model Law on International Commercial Arbitration: A Commentary* 127 (2020); H. Holtzmann & J. Neuhaus, *A Guide to the UNCITRAL Model Law on International Commercial Arbitration: Legislative History and Commentary* 26 (1989).

104)

*See* §6.03[C][1].

105)

*See* §§6.03[C][2] *et seq*.

106)

Swiss Law on Private International Law, Art. 177(1). *See, e.g., Judgment of 15 March 1993*, DFT 119 II 271, 275 (Swiss Fed. Trib.); *Judgment of 23 June 1992*, DFT 118 II 353 (Swiss Fed. Trib.) (Article 177(1) of SLPIL reflects legislative intention to permit easier access to international arbitration); B. Berger & F. Kellerhals, *International and Domestic Arbitration in Switzerland* ¶¶207 *et seq*. (3d ed. 2015); Kaufmann-Kohler & Lévy, *Insolvency and International Arbitration*, in H. Peter, N. Jeandin & J. Kilborn (eds.), *The Challenges of Insolvency Law Reform in the 21st Century* 257 (2006); Oetiker, in M. Müller-Chen & C. Widmer Lüchinger (eds.), *Zürcher Kommentar zum IPRG* Art. 177, ¶¶18 *et seq*. (3d ed. 2018).

107)

Swiss Expert Committee, *Final Report on the Draft Bill for the Private International Law Act*, SSIR 13, 46-47 (1979); Swiss Federal Council (Bundesrat), *Report of 10 November 1982 Regarding the Private International Law Act*, Bundesblatt 301 (1983).Article 177(1) applies to any international arbitration seated in Switzerland and subject to the Swiss Law on Private International Law. *Judgment of 23 June 1992*, DFT 118 II 353 (Swiss Fed. Trib.); Briner, in S. Berti *et al.* (eds.), *International Arbitration in Switzerland* Art. 177, ¶11 (2000) ("Arbitrability is therefore governed by the *lex arbitri* without any consideration for the possibly stricter rules of the *lex causae* or of the national law of the parties").

108)

*Compare* Swiss Code of Civil Procedure, Art. 354 (in domestic matters: "Any claim over which the parties may freely dispose may be the object of an arbitration agreement"). *See Judgment of 23 June 1992*, DFT 118 II 353, 356 (Swiss Fed. Trib.) ("Art. 177 PIL does not subordinate the arbitrability of a dispute to the fact that the parties can freely dispose of the related right, so that it is erroneous to equate the '*nature patrimoniale*' [*i.e.*, pecuniary value], in the sense of this provision, to the freedom to dispose mentioned in Art. 5 CIA. … These are two distinct criteria. The legislator voluntarily left aside the second of the two, which would presuppose a conflict-of-laws solution since, in international matters, the definition of the nature of legal relationships submitted to arbitration requires examination of the material law applicable to them.").

109)

See Judgment of 30 June 2014, DFT 5A_22/2013, ¶2.4.1 (Swiss Fed. Trib.); *Judgment of 23 June 1992*, DFT 118 II 353, 356 (Swiss Fed. Trib.) (Article 177(1) "covers all claims which have an either active or passive financial value for the parties or, in other words, all rights which, at least as far as one of [the parties] is concerned, can be appreciated in money"). *See also* Baron & Liniger, *A Second Look at Arbitrability: Approaches to Arbitration in the United States, Switzerland and Germany*, 19 Arb. Int'l 27 (2003); D. Dardel, *Trust in Arbitration: Schweizerische Schiedsgerichtsbarkeit in Trustrechtlichen Angelegenheiten* ¶693 (2009); Fluor, *Die Entsendung des Arbeitnehmers in die Schweiz und nach China*, 85 Schriften zum Schweizerischen Arbeitsrecht 88, 113 (2019); Schwander, in R. Zäch (ed.), *KG Kommentar* Arts. 12-15, ¶34 (2018).

110)

See German ZPO, §1030 I(1) ("Any claim involving an economic interest (*vermögensrechtlicher Anspruch)* can be the subject of an arbitration agreement. An arbitration agreement not involving an economic interest shall have legal effect to the extent that the parties are entitled to include a settlement on the issue."). Section 1030 applies to arbitrations seated in Germany. *See Judgment of 7 July 2014*, 2014 SchiedsVZ 262 (Oberlandesgericht München).

111)

See K.-P. Berger, *The New German Arbitration Law in International Perspective* 7 (2000) ("notion of arbitrability implemented in both acts is extremely liberal"); Bundestags-Drucksache No. 13/5274 of 12 July 1996, reprinted in K.-P. Berger, *The New German Arbitration Law* 140, 179 (1998). A number of German statutory provisions that previously excluded certain categories of disputes from arbitration have been repealed.

112)

French Code of Civil Procedure, Art. 2059; Spanish Arbitration Act, Art. 2(1). *See also* Austrian ZPO, §582 ("[A]ny claim involving an economic interest that lies within the jurisdiction of the courts of law can be the subject of an arbitration agreement. An arbitration agreement on claims which do not involve an economic interest shall be legally effective insofar as the parties are capable of concluding a settlement on the issue in dispute.").

113)

For decisions involving arbitration of divorce matters, *see, e.g., Cohoon v. Cohoon*, 784 N.E.2d 904 (Ind. 2003); *Kelm v. Kelm*, 749 N.E.2d 299 (Ohio 2001); *Faherty v. Faherty*, 477 A.2d 1257 (N.J. 1984); *In re Marriage of Barker*, 251 P.3d 591 (Colo. App. 2010); *Kirshenbaum v. Kirshenbaum*, 929 P.2d 1204 (Wash. Ct. App. 1997); *Dick v. Dick,* 534 N.W.2d 185 (Mich. Ct. App. 1995); *Judgment of 3 December 1986*, 1987 NJW 651 (German Bundesgerichtshof); *Judgment of 8 February 1995*, 1996 NJW-RR 500 (Landgericht Giessen).

114)

Huber, *Schiedsvereinbarungen im Scheidungsrecht*, 2004 SchiedsVZ 280, 281. The concept of allowing disputes in connection with divorce to be resolved by arbitration has thoughtful proponents in a number of jurisdictions. *See, e.g.*, B. Berger & F. Kellerhals, *International and Domestic Arbitration in Switzerland* ¶222 (3d ed. 2015); McGuane, *Model Marital Arbitration Act: A Proposal*, 14 J. Am. Acad. Matrimonial Law 393, 396 (1997); Oetiker, in M. Müller-Chen & C. Widmer Lüchinger (eds.), *Zürcher Kommentar zum IPRG* Art. 177, ¶142 (3d ed. 2018); Schlissel, *A Proposal for Final and Binding Arbitration of Initial Custody Determinations*, 26 Fam. L.Q. 71, 73, 76-79 (1992); Wagner, *Schiedsgerichtsbarkeit in Scheidungssachen*, in *Festschrift Schlosser* 1025, 1035-48 (2005).

115)

See §6.04[B][3] (securities disputes under German law); §6.04[H][2] (consumer disputes under EU law); §6.04[M] (distributorship claims in Belgium and Germany).

116)

French Civil Code, Arts. 2059, 2060(1). These provisions are essentially preserved from the 1806 Code of Civil Procedure. E. Gaillard & J. Savage (eds.), *Fouchard Gaillard Goldman on International Commercial Arbitration* ¶560 (1999).

117)

J.-P. Gridel, *Notions Fondamentales de Droit et Droit Français, Introduction, Méthodologie, Synthèses* 7-8 (1992); Level, *L'Arbitrabilité*, 1992 Rev. Arb. 213, 219.

118)

See §4.05_[A][2]; §6.03[C][3].

119)

Mourre, *Arbitrability of Antitrust Law from the European and US Perspectives*, in G. Blanke & P. Landolt (eds.), *EU and US Antitrust Arbitration: A Handbook for Practitioners* 3, 7-8 (2011).

120)

Judgment of 15 May 1961, *Jean Tardits et Cie v. Jydsk Andels Foderstof Forretning*, 89 J.D.I. (Clunet) 140, 148 (Orléans Cour d'Appel) (1962). The court held that claims for breach of contract raised issues "that could only be resolved by interpreting and applying rules of French economic public policy, which governed the performance of the contract," which were nonarbitrable.

121)

For a disapproving U.S. account of the erosion of the French nonarbitrability doctrine, *see* Carbonneau & Janson, *Cartesian Logic and Frontier Politics: French and American Concepts of Arbitrability*, 2 Tul. J. Int'l & Comp. L. 193, 194 (1994).

122)

*Judgment of 21 February 1964, Meulemans et Cie v. Robert*, 92 J.D.I. (Clunet) 113, 116 (Paris Cour d'Appel) (1965). The court held that a claim for damages, where an export license had not been obtained, was arbitrable, provided that it did not concern the legality of the underlying transaction. *See also Judgment of 11 October 1954*, 1982 Dalloz 388 (French Cour de Cassation) (tort claims may be arbitrable); *Judgment of 28 November 1950, Tissot v. Neff*, 1950 Bull. Civ. No. 316, 154 (French Cour de Cassation); *Judgment of 11 December 1981, Bureau de Recherches Géologiques et Minières v. Patino Int'l NV*, 1982 Rev. Arb. 311 (Paris Cour d'Appel) (tort claims arbitrable).

123)

*See Judgment of 20 June 1969, Impex v. Malteria Adriatica*, 1969 Rev. Arb. 95 (Paris Cour d'Appel).

124)

*Judgment of 29 March 1991, Ganz v. Nationale des Chemins de Fers Tunisiens*, 1991 Rev. Arb. 478, ¶¶13-14 (Paris Cour d'Appel). Applying this analysis, the court concluded that "the allegation of fraud or spoliation [was] not in itself such as to exclude the jurisdiction of the arbitral tribunal." *Id.* at 480.

125)

*Judgment of 14 October 1993, Aplix v. Velcro*, 1994 Rev. Arb. 164 (Paris Cour d'Appel) (arbitrators may apply EC competition law provisions and, where appropriate, award relief for wrongful conduct). *See also Judgment of 19 May 1993, Labinal v. Mors et Westland Aerospace*, 1993 Rev. Arb. 645, 650 (Paris Cour d'Appel).

126)

*See, e.g., Judgment of 4 June 2008, SNF v. Cytec*, 2008 Rev. Arb. 473 (French Cour de Cassation Civ. 1); *Judgment of 20 March 2008, Jacquetin v. SA Intercaves*, 2008 Rev. Arb. 341, 341 (Paris Cour d'Appel) ("arbitrators decide on their jurisdiction in relation to arbitrability with regard to international public policy and have authority to apply principles and rules arising from the latter, as well as to sanction their eventual violation; arbitrability is not excluded solely because public policy regulation is applicable to the legal relationship subject of the dispute"); *Judgment of 23 March 2006, SNF v. Cytec*, 2007 Rev. Arb. 100 (Paris Cour d'Appel); *Judgment of 18 November 2004, SA Thalès Air Défense v. GIE Euromissile*, 2004 Rev. Arb. 986 (Paris Cour d'Appel) (2005); *Judgment of 12 September 2002, Macron v. Cartonnages de Pamfou*, 2003 Rev. Arb. 173 (Paris Cour d'Appel).

127)

For good discussions, *see* E. Gaillard & J. Savage (eds.), *Fouchard Gaillard Goldman on International Commercial Arbitration* ¶¶560, 567 (1999); Mourre, *Arbitrability of Antitrust Law from the European and US Perspectives*, in G. Blanke & P. Landolt (eds.), *EU and US Antitrust Arbitration: A Handbook for Practitioners* 3, 6-8 (2011).

128)

*Judgment of 9 November 2016,* Decision No. 388806 (French Conseil d'Etat).

129)

The only exception to this is 9 U.S.C. §15, which provides that the U.S. Act of State doctrine does not permit non-enforcement of arbitration agreements or awards. U.S. FAA, 9 U.S.C. §15.

130)

*See Wilko v. Swan*, 346 U.S. 427 (U.S. S.Ct. 1953).

131)

The Court relied principally on the text of U.S. securities legislation, which provides: "Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void." 15 U.S.C. §77n.

132)

*Wilko*, 346 U.S. at 438.

133)

*See, e.g., Hanes Corp. v. Millard*, 531 F.2d 585 (D.C. Cir. 1976); *Tire & Rubber Co. v. Jefferson Chem. Co.*, 182 U.S.P.Q. 70 (2d Cir. 1974); *Zip Mfg Co. v. Pep Mfg Co.*, 44 F.2d 184, 186 (D. Del. 1930); *Diematic Mfg Corp. v. Packaging Indus. Inc.*, 381 F.Supp. 1057 (S.D.N.Y. 1974). In 1982 and 1984, U.S. legislation rendering most categories of patent disputes arbitrable was enacted. 35 U.S.C. §294. *See* §6.04[D].

134)

*See, e.g., Martin v. Yasuda,* 829 F.3d 1118, 1125 (9th Cir. 2016); *Lake Commc'ns, Inc. v. ICC Corp.,* 738 F.2d 1473 (9th Cir. 1984); *Univ. Life Ins. Co. v. Unimarc Ltd,* 699 F.2d 846 (7th Cir. 1983); *Cobb v. Lewis,* 488 F.2d 41 (5th Cir. 1974); *Helfenbein v. Int'l Indus., Inc.,* 438 F.2d 1068 (8th Cir. 1971); *Am. Safety Equip. v. J.P. Maguire,* 391 F.2d 821 (2d Cir. 1968). *Compare* §6.04[A][1].

135)

*SA Mineracao da Trindade-Samitri (Brazil) v. Utah Int'l Inc.,* 576 F.Supp. 566 (S.D.N.Y. 1984). §6.04[C].

136)

*See, e.g., Crawford v. Halsey,* 124 U.S. 648 (U.S. S.Ct. 1888); *Zimmerman v. Cont'l Airlines, Inc.,* 712 F.2d 55, 59-60 (3d Cir. 1983) ("[B]ecause of the importance of bankruptcy proceedings in general, and the need for the expeditious resolution of bankruptcy matters in particular, we hold that the intentions of Congress will be better realized if the Bankruptcy Reform Act is read to impliedly modify the [Federal] Arbitration Act. Thus, while a bankruptcy court would have the power to stay proceedings pending arbitration, the use of this power is left to the sound discretion of the bankruptcy court."); *Allegaert v. Perot,* 548 F.2d 432 (2d Cir. 1977) (bankruptcy claims nonarbitrable where trustee asserts claims for the benefit of the estate's creditors, who would not be bound by arbitration agreement, rather than on behalf of the bankrupt); *Fallick v. Kehr,* 369 F.2d 899, 904-06 (2d Cir. 1966). *Compare* §6.04[F][3].

137)

*See, e.g., State Est. for Agric. Prod. Trading v. MV Wesermunde,* 838 F.2d 1576 (11th Cir. 1988) (declining to enforce foreign arbitration clause, reasoning that such enforcement would violate COGSA). *See* §6.04[J].

138)

*Alexander v. Gardner-Denver Co.,* 415 U.S. 36 (U.S. S.Ct. 1974) ("collective bargaining agreement could not waive covered workers' rights to a judicial forum for causes of action created by Congress").

139)

*See* §6.04_[A][1]; §6.04_[F][3]; *Alexander,* 415 U.S. at 57 ("[O]ther facts may still render arbitral processes comparatively inferior to judicial processes in the protection of Title VII rights. Among these is the fact that the specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land."). *Compare* §6.04[K].

140)

*McDonald v. City of W. Branch,* 466 U.S. 284, 290 (U.S. S.Ct. 1984). For an early, somewhat excited, argument in favor of a broad nonarbitrability doctrine, *see* Kronstein, *Business Arbitration: Instrument of Private Government,* 54 Yale L.J. 36 (1944).

141)

*See, e.g., State Est. for Agric. Prod. Trading v. MV Wesermunde,* 838 F.2d 1576 (11th Cir. 1988) (declining to enforce international arbitration agreement to COGSA claims); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 723 F.2d 155 (1st Cir. 1983), *aff'd,* 473 U.S. 614 (U.S. S.Ct. 1985); *NV Maatschappij Voor Industriele Waarden v. A.O. Smith Corp.,* 532 F.2d 874 (2d Cir. 1976).

142)

*Nationale Pour La Recherche v. Gen. Tire & Rubber Co.,* 430 F.Supp. 1332, 1332 (S.D.N.Y. 1977).

143)

*See* §6.03[C][3].

144)

*See Scherk,* 417 U.S. at 515-16.

145)

*See Mitsubishi Motors,* 473 U.S. 614. For some of the considerable commentary on *Mitsubishi, see* Allison, *Arbitration of Private Antitrust Claims in International Trade: A Study in the Subordination of National Interests to the Demands of A World Market,* 18 N.Y.U. Int'l L. & Pol. 361 (1986); Carbonneau, *The Exuberant Pathway to Quixotic Internationalism: Assessing the Folly of* Mitsubishi, 19 Vand. J. Transnat'l L. 265 (1986); Cloud, Mitsubishi *and the Arbitrability of Antitrust Claims: Did the Supreme Court Throw the Baby out with the Bathwater?,* 18 L. & Pol'y Int'l Bus. 341 (1986); Fox, Mitsubishi v. Soler *and Its Impact on International Commercial Arbitration,* 19 J. World Trade L. 579 (1985); Lipner, *International Antitrust Laws: To Arbitrate or Not to Arbitrate,* 19 Geo. Wash. J. Int'l L. & Econ. 395 (1985); McLendon, *Subject-Matter Arbitrability in International Cases:* Mitsubishi Motors *Closes the Circle,* 11 N.C.J. Int'l L. & Com. Reg. 81 (1986); Posner, *Arbitration and the Harmonization of International Commercial Law: A Defense of* Mitsubishi, 39 Va. J. Int'l L. 647 (1999); Radicati di Brozolo, *Antitrust: A Paradigm of the Relations Between Arbitration and Mandatory Rules: A Fresh Look at the "Second Look,"* 2004 Int'l Arb. L. Rev. 23; Rau, *The Arbitrator & "Mandatory Rules of Law,"* 18 Am. Rev. Int'l Arb. 51 (2007); Smit, *Mandatory Law in Arbitration,* 18 Am. Rev. Int'l Arb. 155 (2008); Smit, Mitsubishi: *It Is Not What It Seems to Be,* 4(3) J. Int'l Arb. 7 (1987).

146)

*Scherk*, 417 U.S. at 517-18.

147)

*Mitsubishi Motors*, 473 U.S. at 629.

148)

*Id.* at 633.

149)

*Id.* at 636. The Court reasoned that "the tribunal … should be bound to decide [the parties'] dispute in accord with the national law giving rise to the claim." *Id.* at 636-37.

150)

*Id.* at 639 n.21.

151)

*Id.* at 639.

152)

*Id.* at 628.

153)

*Id.* at 639-40 n.21. *See also Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 226-27 (U.S. S.Ct. 1987).

154)

*See* authorities cited §6.03_[C][3]; §6.03_[C][5]; Carbonneau & Janson, *Cartesian Logic and Frontier Politics: French and American Concepts of Arbitrability*, 2 Tul. J. Int'l & Comp. L. 193, 194 (1994) ("study of arbitrability in United States law is also occurring in France and other European civil law jurisdictions"); Radicati di Brozolo, *Antitrust: A Paradigm of the Relations Between Arbitration and Mandatory Rules: A Fresh Look at the "Second Look*,*"* 2004 Int'l Arb. L. Rev. 23.

155)

*See* E. Gaillard & J. Savage (eds.), *Fouchard Gaillard Goldman on International Commercial Arbitration* ¶575 (1999); Mourre & Radicati di Brozolo, *Towards Finality of Arbitral Awards: Two Steps Forward and One Step Back*, 23 J. Int'l Arb. 171 (2006); J.-F. Poudret & S. Besson, *Comparative Law of International Arbitration* ¶¶326, 342, 348 (2d ed. 2007).

156)

*See, e.g., Shearson/Am. Express, Inc.*, 482 U.S. 220; *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (U.S. S.Ct. 1989) (overruling *Wilko v. Swan*, 346 U.S. 427 (U.S. S.Ct. 1953)).

157)

*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (U.S. S.Ct. 1991).

158)

*Id.* at 26. *See also 14 Penn Plaza LLC v. Pyett,* 556 U.S. 247, 258-60, 274 (U.S. S.Ct. 2009) ("a collective-bargaining agreement that clearly and unmistakably requires union members to arbitrate [ADEA] claims is enforceable as a matter of federal law").

159)

*Epic Sys. Corp. v. Lewis,* 138 S.Ct. 1612, 1627 (U.S. S.Ct. 2018) (quoting *Gilmer*, 500 U.S. at 32). *See also Lambert v. Tesla, Inc.,* 923 F.3d 1246 (9th Cir. 2019) ("no conflict between Title VII and arbitration, [because] 'the view that compulsory arbitration weakens Title VII conflicts with the Supreme Court's stated position that arbitration affects only the choice of forum, not substantive rights'") (quoting *Gilmer*, 500 U.S. at 26).

160)

*See* §6.04_[A][1]; *Lindo v. NCL (Bahamas), Ltd*, 652 F.3d 1257, 1266 (11th Cir. 2011); *Kowalski v. Chicago Tribune Co.*, 854 F.2d 168 (7th Cir. 1988) (antitrust claim arbitrable in domestic context).

161)

*See, e.g.,* 15 U.S.C. §1226(a)(2) ("motor vehicle franchise contract" disputes nonarbitrable except where post-dispute agreement to arbitrate exists); Dodd-Frank Wall Street Reform and Consumer Protection Act, §748 ("No predispute arbitration agreement shall be valid or enforceable, if the agreement requires arbitration of a dispute arising under this section"), §921(a) (adding similar provisions to §15(o) to Securities Exchange Act of 1934 and §205(f) to Investment Advisers Act of 1940), §922(c) (adding similar provision to 18 U.S.C. §1514A(e), applicable to whistle-blower claims of employees of publicly registered companies and nationally recognized statistical rating organizations), §1057(d) (prohibiting predispute arbitration agreements that affect employee protection rights of person employed by entity subject to CFPB regulation), §1414 (amending §129C of Truth in Lending Act to prohibit predispute arbitration agreements with respect to residential mortgage loans and home equity loans).

162)

For a somewhat exaggerated assessment, *see* Rau, *The Culture of American Arbitration and the Lessons of ADR*, 40 Tex. Int'l L.J. 449, 452 (2005) ("I think … the category of 'inarbitrable' disputes is now a null set"). *See also* Shore, *The United States' Perspective on "Arbitrability,"* in L. Mistelis & S. Brekoulakis (eds.), *Arbitrability: International & Comparative Perspectives* 69 (2009).

*See ET Plus SA v. Jean-Paul Welter* [2005] EWHC 2115, ¶51 (Comm) (English High Ct.) ("no realistic doubt that such competition or antitrust claims are arbitrable"). *See also Microsoft Mobile OY (Ltd) v. Sony Euro. Ltd* [2017] EWHC 374 (Ch) (English High Ct.) (cartel damages claims arbitrable).

*Fulham Football Club (1987) Ltd v. Richards* [2011] EWCA Civ 855, ¶78 (English Ct. App.) ("nothing in the scheme of these provisions which … ma[de] the resolution of the underlying dispute inherently unsuitable for determination by arbitration on grounds of public policy"). *See also Re Vocam Euro. Ltd* [1998] BCC 396 (Ch) (English High Ct.) (summarily rejecting arguments that disputes concerning minority shareholder rights under §459 of English Companies Act, 1985, are nonarbitrable).

*Nori Holding Ltd v. PJSC "Bank Otkritie Fin. Corp."* [2018] EWHC 1343, ¶63 (Comm) (English High Ct.). *See also London S.S. Owners' Mutual Ins. Ass'n Ltd v. Spain* [2015] EWCA Civ 333, ¶78 (English Ct. App.).

*London S.S. Owners' Mutual Ins. Ass'n Ltd v. Spain* [2015] EWCA Civ 333, ¶78 (English Ct. App.); *Aqaba Container Terminal (Pvt) Co. v. Soletanche Bachy France sas* [2019] EWHC 471, ¶36 (Comm) (English High Ct.); *Accentuate Ltd v. Asigra Inc.* [2009] EWHC 2655, ¶89 (Comm) (English High Ct.).

*Aqaba Container Terminal (Pvt) Co. v. Soletanche Bachy France sas* [2019] EWHC 471, ¶36. *See also Accentuate Ltd* [2009] EWHC 2655, ¶89 ("arbitration clause would be 'null and void' and 'inoperative' within the meaning of Article 9(4) of the Arbitration Act, in so far as it purported to require the submission to arbitration of 'questions pertaining to' mandatory provisions of EU law").

*See, e.g.*, *Judgment of 19 April 2012*, 6 Ob 42/12p (Austrian Oberster Gerichtshof) (arbitrability of claim regarding resolution of limited liability company's annual general meeting not affected by need for factual findings regarding third party); *Judgment of 5 October 1994, Van Hopplynus v. Coherent Inc.*, XXII Y.B. Comm. Arb. 637 (Brussels Tribunal de Commerce) (1997) (upholding arbitrability of disputes concerning termination of distributorship despite mandatory character of Belgian Law on Termination of Exclusive Distributorships); *Lightsource Tech. Australia Pty Ltd v. Pointsec Mobile Tech. AB*, [2011] ACTSC 59 (Australian Cap. Terr. Sup. Ct.) (statutory claims arbitrable in principle); *Judgment of 22 October 1976, SA Tradax Exp. v. Spa Carapelli*, III Y.B. Comm. Arb. 279 (Florence Corte di Appello) (1978) (tort claims may be arbitrable, even if facts could also provide grounds for criminal liability).

*Despeteaux v. Editions Chouette (1987) Inc.*, [2001] JQ No. 1510 (Québec Ct. App.), *rev'd*, [2003] 1 SCR 178 (Canadian S.Ct.). The Court of Appeal also cited Article 2639 of the Québec Civil Code, which provides: "[A] dispute regarding status and legal capacity of natural person, family matters or other questions involving public policy [cannot be submitted to arbitration]. However, the arbitration agreement should not be barred from application because the applicable rules to decide on the dispute have a public policy character." Québec Civil Code, Art. 2639. *See also Booz Allen & Hamilton Inc. v. SBI Home Fin. Ltd*, Civil Appeal No. 5440/2002, ¶22 (Indian S.Ct. 2011) (*in personam* rights are arbitrable but rights *in rem* are not).

*Editions Chouette Inc. v. Despeteaux*, 2003 SCC 17, ¶46 (Canadian S.Ct.). *See also Seidel v. TELUS Commc'ns Inc.*, 2011 SCC 15 (Canadian S.Ct.) (Lebel, J., dissenting) ("It is now settled that if a legislature intends to exclude arbitration as a vehicle for resolving a particular category of legal disputes, it must do so explicitly. Arbitration in and of itself is no longer considered contrary to public order, and courts ought not to read in the exclusion of arbitration if the legislature has not clearly provided that it is to be excluded.").

*Haas v. Gunasekaram*, [2016] ONCA 744, ¶35 (Ontario Ct. App.).

*Tomolugen Holding Ltd v. Silica Investors Ltd*, [2015] SGCA 57, ¶84 (Singapore Ct. App.) (citing G. Born, *International Commercial Arbitration* 945 (2d ed. 2014)).

*Judgment of 15 November 2005, Arkhangelskoe Geologodobychnoe Predpriyatie v. Archangel Diamond Corp.*, Case No. T-2277-04, 7 (Svea Ct. App. 2005). *See also Judgment of 23 November 2012*, Case No. T 4982-11, ¶16 (Swedish S.Ct.) ("According to the parties' agreement, Swedish law governs the loan agreement. The dispute related to the liability to make the payment as such, and is thus amenable to out-of-court settlement. When the arbitral award was rendered, there was no Swedish peremptory currency legislation. … The foreign currency regulations – former or current – referenced in the case, are not of such nature as to affect the parties' rights to settle out-of-court in Sweden.").

174)

New Zealand Arbitration Act, Art. 10(1).

175)

Italian Code of Civil Procedure, Art. 806. Italian courts have interpreted the exceptions in Article 806 of the Italian Code of Civil Procedure narrowly. *See* M. Rubino-Sammartano, *International Arbitration Law* 104 (1990). *See also Final Award in Chamber of National and International Arbitration of Milan of 23 September 1997*, XXIII Y.B. Comm. Arb. 93 (1998) (issues involving mandatory provisions of Italian law are arbitrable).

176)

*See, e.g.*, Norwegian Arbitration Act, §9 ("Disputes concerning legal relations in respect of which the parties have an unrestricted right of disposition may be determined by arbitration"); Chinese Arbitration Law, Art. 3 (permitting arbitration of "[c]ontractual disputes and other disputes over rights and interests in property" and making exception only for "(1) marital, adoption, guardianship, support and succession disputes; (2) administrative disputes that laws require to be handled by administrative authorities"); Japanese Arbitration Law, Art. 13(1) (arbitration agreement valid "when its subject matter is a civil dispute that is capable of being settled by the parties"); Malaysian Arbitration Act, §4 ("Any dispute which the parties have agreed to submit to arbitration under an arbitration agreement may be determined by arbitration unless the arbitration agreement is contrary to public policy. … The fact that any written law confers jurisdiction in respect of any matter on any court of law but does not refer to the determination of that matter by arbitration shall not, by itself, indicate that a dispute about that matter is not capable of determination by arbitration."); South African Arbitration Act, §2 (making exception only for "(a) any matrimonial cause or any matter incidental to any such cause; or (b) any matter relating to status"); Argentine Arbitration Act, Art. 6 (commercial matters are arbitrable: "[A]ny legal relation, contractual or extracontractual, governed by private law or preponderantly by private law under Argentinian law, will be considered commercial. This interpretation will be broad and, in case of doubt, it should be held that the relation is commercial."); Brazilian Arbitration Law, Art. 1 ("Those who are capable of entering into contracts may make use of arbitration to resolve conflicts regarding freely transferable property rights. (1) Direct and indirect public administration may use arbitration to resolve conflicts regarding transferable public property rights."); Latvian Civil Procedure Law, Art. 487(1) ("a dispute, the adjudication of which may infringe the legal rights or interests of a person that is not a party to the arbitration agreement [is not arbitrable]"); Uruguayan Arbitration Law, Art. 1(7) ("The term 'commercial' must be interpreted broadly so that it covers the issues that arise in all commercial relations, contractual or otherwise").

177)

*Himpurna Cal. Energy Ltd v. PT (Persero) Perusahaan Listruik Negara, Final Award in Ad Hoc Case of 4 May 1999*, XXV Y.B. Comm. Arb. 13, 30-31 (2000).

178)

*Id. See also Final Award in Chamber of National and International Arbitration of Milan of 18 March 1999*, XXV Y.B. Comm. Arb. 382 (2000) (upholding arbitrability of extracontractual claims).

179)

*Metrocall Inc. v. Elec. Tracking Sys. Pty Ltd*, [2000] NSW IR Comm. 136 (N.S.W. Indus. Relations Comm'n).

180)

*Id.* at ¶54.

181)

As discussed below, the New York Convention is best understood as imposing limits on a Contracting State's ability to declare subjects nonarbitrable, requiring that the nonarbitrability doctrine be applied as an exception, based on specific and articulated local public policies. *See* §4.05_[A][2]; §25.04_[G]; §26.05[C][10]. A decision reserving to national courts or administrative agencies determinations whether a particular contract was "unfair" contradicts these limitations, by establishing an overbroad rule of nonarbitrability, rather than an exception grounded in specific public policies. That result is particularly true given the long-standing and unquestioned competence of arbitral tribunals to apply doctrines such as unconscionability or changed circumstances in contractual settings.

182)

*See, e.g., Comandate Mardoine Corp. v. Pan Australia Shipping Pty Ltd*, [2006] FCAFC 192 (Australian Fed. Ct.); *Transfield v. PacifiCare Hydro Ltd*, [2006] VSC 175 (Victoria Sup. Ct.).

183)

*Hub Power Co. v. Pakistan WAPDA*, 16 Arb. Int'l 439 (Pakistan S.Ct. 2000) (2000). *See* §6.04[N]. *See also Oyugi v. Law Soc'y of Kenya*, Civil Case No. 482/2004 (Nairobi High Ct. 2005) (tort claims nonarbitrable under Kenyan law).

184)

New York Convention, Art. II(1); §6.04[N].

185)

*See* §4.05[A][2].

186)

See *Accentuate Ltd v. Asigra Inc.* [2009] EWHC 2655, ¶89 (Comm) (English High Ct.) (suggesting that "arbitration clause would be 'null and void' and 'inoperative' within the meaning of Article 9(4) of the Arbitration Act, in so far as it purported to require the submission to arbitration of 'questions pertaining to' mandatory provisions of EU law"). The English court misunderstood both the character of the nonarbitrability doctrine (treating it as an issue of substantive validity under Article II(3), rather than nonarbitrability under Article II(1)) and the scope of the doctrine (treating it as extending to any issue of mandatory law).A similar approach was followed in relation to forum selection clauses. *See Fern Computer Consultancy Ltd v. Intergraph Cadworx & Analysis Solutions Inc.* [2014] EWHC 2908, ¶127 (Ch) (English High Ct.) ("That primacy [of EU law], in my view, justifies the court in determining that it is the proper place to determine the dispute and in declining to give effect to the jurisdiction clause in this context, where it is not clear that the alternative court would give effect to the Regulation at all").

187)

See Global Legal Group, *International Comparative Legal Guide to International Arbitration 2012* 253 (9th ed. 2012); Weiniger & Byrne, *Mandatory Rules, Arbitrability and the English Court Gets It Wrong*, 2010 Paris J. Int'l Arb. 201.

188)

See §6.03[C].

189)

See *id.*

190)

See §§6.04[A][1]-[2].

191)

*Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1627 (U.S. S.Ct. 2018).

192)

*See, e.g., Wilko*, 346 U.S. at 435 n.18 ("We … proceed to the question decided below, namely, whether the 1933 Act evidences a public policy which forbids referring the controversy to arbitration"); *Judgment of 18 July 1987*, XVII Y.B. Comm. Arb. 534 (Bologna Tribunale) (1992). *See also* Kronstein, *Business Arbitration: Instrument of Private Government*, 54 Yale L.J. 36 (1944).

193)

*See, e.g., Wilko*, 346 U.S. at 438 ("Congress has afforded participants in transactions subject to its legislative power an opportunity generally to secure prompt, economical and adequate solution of controversies through arbitration *if the parties are willing to accept less certainty of legally correct adjustment*. … Recognizing the advantages that prior agreements for arbitration may provide for the solution of commercial controversies, we decide that the intention of Congress concerning the sale of securities is better carried out by holding invalid such an agreement for arbitration of issues arising under the Act.") (emphasis added); *Mitsubishi Motors*, 473 U.S. at 640 (Stevens, J., dissenting); *Alexander*, 415 U.S. at 58.

194)

*See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 723 F.2d 155, 162 (1st Cir. 1983) ("strong possibility that contracts which generate antitrust disputes may be contracts of adhesion"), *aff'd*, 473 U.S. 614, 646-50 (U.S. S.Ct. 1985).

195)

*See, e.g., Zimmerman v. Cont'l Airlines, Inc.*, 712 F.2d 55, 59-60 (3d Cir. 1983) ("because of the importance of bankruptcy proceedings in general, and the need for the expeditious resolution of bankruptcy matters in particular, we hold that the intentions of Congress will be better realized if the Bankruptcy Reform Act is read to impliedly modify the [FAA]"); *Benton v. Singleton*, 40 S.E. 811 (Ga. 1902) ("While the law favors the submission to arbitration of disputes arising between individuals over private matters as to which they alone are concerned, the submission to arbitrators of questions in which the public at large is interested, is not only discountenanced but positively forbidden").

196)

*See, e.g., Alexander*, 415 U.S. at 53 ("The arbitrator, however, has no general authority to invoke public laws that conflict with the bargain between the parties"); *Harrington v. Brown*, 1865 WL 4687, at *1 (Mass.) ("arbitrators to whom a matter in dispute and also all accounts outstanding between parties have been submitted have no authority to award concerning the costs of a criminal prosecution instituted by one of the parties against the other, and growing out of the matter in dispute"; since this was a matter in which the Commonwealth was concerned, "it would be against public policy to permit these parties to settle the question of liability as a private question between them"); *Wyatt v. Benson*, 23 Barb. 327 (N.Y. Sup. 1857) ("A religious corporation, not having the power to sell its real estate without the consent of the supreme court, cannot submit the question of sale to any other tribunal").

197)

*See Mitsubishi Motors*, 473 U.S. at 627.

198)

*Alexander*, 415 U.S. at 58. *But see Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 233 (U.S. S.Ct. 1987) ("the mistrust of arbitration that formed the basis for the *Wilko* opinion in 1953 is difficult to square with the assessment of arbitration that has prevailed since that time"). *See also Epic Sys.*, 138 S.Ct. at 1627.

199)

*See* §19.04[B][3] for a discussion of arbitrators' power to consider and decide claims based on mandatory laws and public policy. *See also* §19.04[B][4].

200)

*Mitsubishi Motors*, 473 U.S. at 636, 639 n.21.

201)

The grounds for these international obligations are discussed above. *See* §4.05_[A][1]; §6.02[B].

202)

*See, e.g., Lake Commc'ns, Inc. v. ICC Corp.*, 738 F.2d 1473 (9th Cir. 1984); *Univ. Life Ins. Co. v. Unimarc Ltd*, 699 F.2d 846 (7th Cir. 1983); *Cobb v. Lewis*, 488 F.2d 41 (5th Cir. 1974); *Helfenbein v. Int'l Indus., Inc.*, 438 F.2d 1068 (8th Cir. 1971); *Am. Safety Equip. Corp. v. J.P. Maguire & Co.*, 391 F.2d 821 (2d Cir. 1968). *See also Baxter Int'l, Inc. v. Abbott Labs.*, 315 F.3d 829, 835 (7th Cir. 2003) (Cudahy, J., dissenting) ("For some considerable time not long in the past, … antitrust disputes were not arbitrable").

203)

*See, e.g., Judgment of 18 July 1987*, XVII Y.B. Comm. Arb. 534 (Bologna Tribunale) (1992) ("the nullity of the [arbitration] clause concerns the clause's conflict with imperative provisions [of EC competition law] and cannot, therefore … be capable of settlement by arbitration").

204)

*See, e.g., Award in ICC Case No. 1397*, in J.-J. Arnaldez, Y. Derains & D. Hascher (eds.), *Collection of ICC Arbitral Awards 1974-1985* 179, 181 (1990) (although considering EU competition law claims to evaluate challenge to validity of contract, tribunal reasoned: "a dispute relating essentially to the validity or nullity of a contract under Article 85 of the Treaty of Rome would be beyond the jurisdiction of an arbitrator and no arbitration agreement could substitute a private judge for a public judge to resolve a dispute concerning public policy *in se* and *per se*"). *Compare Final Award in ICC Case No. 7673*, 6(1) ICC Ct. Bull. 57 (1995); *Final Award in ICC Case No. 7097*, in ICC, *International Commercial Arbitration in Europe* 38 (1993); *Award in ICC Case No. 4604*, 112 J.D.I. (Clunet) 973 (1985); *Award in ICC Case No. 2811*, 106 J.D.I. (Clunet) 984 (1979).

205)

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 723 F.2d 155 (1st Cir. 1983), *aff'd*, 473 U.S. 614, 646-50 (U.S. S.Ct. 1985).

206)

*See Mitsubishi Motors*, 473 U.S. at 626-27. The Court explained that "concerns of international comity, respect for the capacities of foreign and international tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, even assuming that a contrary result would be forthcoming in a domestic context." *Id.* at 629. *See* §6.04[A].

207)

*See Mitsubishi Motors*, 473 U.S. at 628-29, 655-56 (Stevens, J., dissenting) (citing lower court decisions); §6.03[C][4].

208)

*See Mitsubishi Motors*, 473 U.S. at 627-28. The Court's decision provoked a vigorous dissent by Justice Stevens. Among other things, Justice Stevens reasoned:"The Court's repeated incantation of the high ideals of 'international arbitration' creates the impression that this case involves the fate of an institution designed to implement a formula for world peace. But just as it is improper to subordinate the public interest in enforcement of antitrust policy to the private interest in resolving commercial disputes, so is it equally unwise to allow a vision of world unity to distort the importance of the selection of the proper forum for resolving this dispute. … In my opinion, the elected representatives of the American people would not have us dispatch an American citizen to a foreign land in search of an uncertain remedy for the violation of a public right that is protected by the Sherman Act. This is especially so when there has been no genuine bargaining over the terms of the submission, and the arbitration remedy provided has not even the most elementary guarantees of fair process. Consideration of a fully developed record by a jury, instructed in the law by a federal judge, and subject to appellate review, is a surer guide to the competitive character of a commercial practice than the practically unreviewable judgment of a private arbitrator." *Id.* at 665-66 (Stevens, J., dissenting).

209)

*See, e.g., Henry Schein, Inc. v. Archer & White Sales, Inc.,* 139 S.Ct. 524 (U.S. S.Ct. 2019); *In re Cox Enter. Inc. Set-Top Cable Television Box Antitrust Litg.,* 835 F.3d 1195, 1201 (10th Cir. 2016) (federal antitrust claims arbitrable); *Lindo v. NCL (Bahamas), Ltd,* 652 F.3d 1257, 1266 (11th Cir. 2011) (international antitrust claim arbitrable); *TradeComet.com LLC v. Google, Inc.,* 435 F.App'x 31 (2d Cir. 2011); *JLM Indus. v. Stolt-Nielsen SA,* 387 F.3d 163, 181 (2d Cir. 2004) (international antitrust claim arbitrable notwithstanding its asserted complexity); *Seacoast Motors of Salisbury, Inc. v. DaimlerChrysler Motors Corp.,* 271 F.3d 6, 11 (1st Cir. 2001) (domestic antitrust claims arbitrable); *Kotam Elecs., Inc. v. JBL Consumer Prods., Inc.,* 93 F.3d 724, 728 (11th Cir. 1996); *George Fischer Foundry Sys., Inc. v. Adolph H. Hottinger Maschinenbau GmbH,* 55 F.3d 1206, 1210 (6th Cir. 1995) (international antitrust claim arbitrable "even if there is a chance that United States antitrust statutory rights will not be fully recognized"); *Sanjuan v. Am. Bd of Psychiatry & Neurology,* 40 F.3d 247, 250 (7th Cir. 1994) ("Producers may agree to arbitrate their antitrust disputes – certainly so for international transactions … and likely so for domestic transactions"); *Nghiem v. NEC Elecs. Inc.,* 25 F.3d 1437, 1441-42 (9th Cir. 1994) (domestic antitrust claims arbitrable); *Swensen's Ice Cream Co. v. Corsair Corp.,* 942 F.2d 1307, 1310 (8th Cir. 1991) (suggesting, without deciding, that domestic as well as international antitrust claims are arbitrable); *In re Auto. Parts Antitrust Litg.,* 2017 WL 3579753, at *2, 6 (E.D. Mich. 2017) (federal antitrust claims arbitrable); *Spinelli v. Nat'l Football League,* 96 F.Supp.3d 81, 103 (S.D.N.Y. 2015) (federal antitrust conspiracy claims arbitrable); *Animal Science Prods., Inc. v. China Minmetals, Corp.,* 34 F.Supp.3d 465, 518 (D.N.J. 2014); *In re A2P SMS Antitrust Litg.,* 972 F.Supp.2d 465 (S.D.N.Y. 2013) (federal antitrust claims arbitrable); *In re Titanium Dioxide Antitrust Litg.,* 962 F.Supp.2d 840, 846 (D. Md. 2013); *HCI Techs., Inc. v. Avaya, Inc.,* 446 F.Supp.2d 518, 525 (D. Va. 2006) (suggesting that domestic, as well as international, antitrust claims are arbitrable); *In re Currency Conversion Fee Antitrust Litg.,* 265 F.Supp.2d 385, 410 (S.D.N.Y. 2003); *Automated Tech. Machs., Inc. v. Diebold,* 2002 U.S. Dist. LEXIS 9146 (D. La.); *Acquaire v. Canada Dry Bottling,* 906 F.Supp. 819, 837 (E.D.N.Y. 1995); *Hough v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 757 F.Supp. 283, 286 (S.D.N.Y. 1991), *aff'd,* 946 F.2d 883 (2d Cir. 1991); *Cindy's Candle Co. v. WNS Inc.,* 714 F.Supp. 973 (N.D. Ill. 1989); *In re Hops Antitrust Litg.,* 655 F.Supp. 169 (E.D. Mo. 1987) (requiring arbitration of antitrust claims against foreign defendants); *Genna v. Lady Foot Int'l, Inc.,* 1986 WL 1236 (E.D. Pa.) (domestic antitrust claim arbitrable); *Standard Petroleum Co. v. Faugno Acquisition LLC,* 191 A.3d 147 (Conn. Super. Ct. 2018). *See also* Korzun, *Arbitrating Antitrust Claims: From Suspicion to Trust,* 48 N.Y.U. J. Int'l L. & Pol'y 867 (2016).

210)

*Mitsubishi Motors,* 473 U.S. at 638.

211)

*See* §6.04[A][5].

212)

*See* U.S. Department of Justice, *Press Release* (4 Sept. 2019) ("The Department of Justice filed a civil antitrust lawsuit today seeking to block Novelis Inc.'s proposed acquisition of Aleris Corporation in order to preserve competition in the North American market for rolled aluminum sheet for automotive applications … The Antitrust Division's lawsuit alleges that the transaction would combine two of only four North American producers of aluminum auto body sheet … The Antitrust Division has agreed with defendants to refer the matter to binding arbitration should certain conditions be triggered. The arbitration would resolve the issue of product market definition. … This would mark the first time the Antitrust Division is using this arbitration authority to resolve a matter."); U.S. Department of Justice, *Press Release* (9 Mar. 2020) ("The Department of Justice prevailed in a first-of-a-kind arbitration, which will resolve a civil antitrust lawsuit challenging Novelis's proposed merger with Aleris Corporation. As a result, Novelis must divest Aleris's entire aluminum auto body sheet operations in North America, which will fully preserve competition in this important industry.").

213)

*See, e.g., Judgment of 28 April 1992,* XVIII Y.B. Comm. Arb. 143, 144 (Swiss Fed. Trib.) (1993); *Judgment of 18 July 1987,* XVII Y.B. Comm. Arb. 534 (Bologna Tribunale) (1992). *See also* Bensaude, *Defining the Limits of Scrutiny of Awards Based on Alleged Violations of European Competition Law,* 22 J. Int'l Arb. 239 (2005); Dalhuisen, *The Arbitrability of Competition Issues,* 11 Arb. Int'l 151 (1995); de Groot, *The Impact of the* Benetton *Decision on International Commercial Arbitration,* 20 J. Int'l Arb. 365 (2003); Dempegiotis, *EC Competition Law and International Arbitration in Light of EC Regulation 1/2003,* 25 J. Int'l Arb. 365 (2008); Dhunèr, *EC Competition Law and National Arbitration Procedure,* 2000:1 Stockholm Arb. Rev. 24; Komninos, *Arbitration and EU Competition Law,* in J. Basedow, S. Francq & L. Idot (eds.), *International Antitrust Litigation: Conflict of Laws and Coordination* 191, 192 (2012); Landi & Rogers, *Arbitration of Antitrust Claims in the United States and Europe,* 13-14 Concorrenza e Mercato 455 (2005-06); Landolt, *Arbitration and Antitrust: An Overview of EU and National Case Law,* in N. Charbit *et al.* (eds.), *Competition Case Law Digest: A Synthesis of EU and National Leading Cases* 232 (2012); Liebscher, *Arbitration and EC Competition Law: The New Competition Regulation: Back to Square One?,* 2003 Int'l Arb. L. Rev. 84; Liebscher, *European Public Policy After* Eco Swiss, 10 Am. Rev. Int'l Arb. 81 (1999); 2010 OECD Arbitration and Competition; Radicati di Brozolo, *Arbitration and Competition Law: The Position of the Courts and of Arbitrators,* 27 Arb. Int'l 1 (2011).

214)

*Eco Swiss China Time Ltd v. Benetton Int'l NV,* Case No. C-126/97, [1999] ECR I-3055 (E.C.J.). One commentator has concluded that "*Eco Swiss* extends *Mitsubishi,* which held that claims arising out of competition laws *may* be arbitrated, by holding that they *must* be arbitrated and if they are not, any award is subject to challenge, presumably not only in an action to annul under domestic law but also in an action under the New York Convention." von Mehren, *The* Eco-Swiss *Case and International Arbitration,* 19 Arb. Int'l 465 (2003) (emphasis in original). *See also* Blanke, *Defining the Limits of Scrutiny of Awards Based on Alleged Violations of European Competition Law,* 23 J. Int'l Arb. 249 (2006); Zekos, Eco Swiss China Time Ltd v. Benetton International NV*: Courts' Involvement in Arbitration,* 17(2) J. Int'l Arb. 91 (2000).

215)

*See also Genentech Inc. v. Hoechst GmbH,* [2016] Case No. C-567/14 (E.C.J.) (refusing to set aside arbitral award based on purported violations of EU competition law; EU Advocate General opined that the "task of arbitrators in international commercial arbitration is to interpret and apply the contract binding the parties correctly. In the performance of this task, arbitrators may naturally find it necessary to apply EU law, if it forms part of the law applicable to the contract (*lex contractus*) or the law applicable to the arbitration (*lex arbitri*). However, the responsibility for reviewing compliance with European public policy rules lies with the courts of the Member States and not with arbitrators, whether in the context of an action for annulment or proceedings for recognition and enforcement.").

216)

*See, e.g., Attheraces Ltd v. British Horseracing Bd* [2007] EWCA Civ 38, ¶7 (English Ct. App.) ("The nature of these difficult questions suggests that the problems of gaining access to essential facilities and of legal curbs on excessive and discriminatory pricing might, when negotiations between the parties fail, be solved more satisfactorily by arbitration or by a specialist body equipped with appropriate expertise and flexible powers. The adversarial procedures of an ordinary private law action, the limited scope of expertise in the ordinary courts and the restricted scope of legal remedies available are not best suited to helping the parties out of a deadlocked negotiating position or to achieving a business-like result reflecting both their respective interests and the public interest."); *Microsoft Mobile OY (Ltd) v. Sony Euro. Ltd* [2017] EWHC 374 (Ch) (English High Ct.); *ET Plus SA v. Jean-Paul Welter* [2005] EWHC 2115, ¶51 (Comm) (English High Ct.) ("There is no realistic doubt that such 'competition' or 'anti-trust' claims are arbitrable; the issue is whether they come within the scope of the arbitration clause, as a matter of its true construction"); *Judgment of 4 June 2008, SNF v. Cytec,* 2008 Rev. Arb. 473 (French Cour de Cassation Civ. 1) (confirming award where arbitrators applied EU competition law); *Judgment of 18 November 2004, SA Thalès Air Défense v. GIE Euromissile,* 2004 Rev. Arb. 986 (Paris Cour d'Appel); *Judgment of 14 October 1993, Aplix v. Velcro,* 1994 Rev. Arb. 164 (Paris Cour d'Appel); *Judgment of 19 May 1993, Labinal v. Mors et Westland Aerospace,* 1993 Rev. Arb. 645, 650 (Paris Cour d'Appel) (competition disputes arbitrable in international matters); *Judgment of 13 November 1998,* XXV Y.B. Comm. Arb. 511 (Swiss Fed. Trib.) (2000); *Judgment of 28 April 1992,* XVIII Y.B. Comm. Arb. 143 (Swiss Fed. Trib.) (1993) (EU competition law claim arbitrable); *Judgment of 21 December 1991, SpA Coveme v. Compagnie Française des Isolants,* XVIII Y.B. Comm. Arb. 422 (Bologna Corte di Appello) (1993) (EU competition claims arbitrable); Swedish Arbitration Act, §1(3) ("arbitrators may rule on the civil law effects of competition law as between the parties"). *See also* B. Berger & F. Kellerhals, *International and Domestic Arbitration in Switzerland* ¶¶227 *et seq.* (3d ed. 2015); Carron, *L'Arbitre Suisse Face au Droit de la Concurrence: Une Partition sans Accord ni (Position) Dominante,* in L. Hammoud, C. von Wunschheim & M.N. Zen-Ruffinen (eds.), *Concerto Arbitral en Trois Mouvements pour Pierre Tercier: Témoignange d'Une Jeunesse Sous Influence Tercierienne* 35 (2013); Kühn, *Arbitrability of Anti-Trust Disputes in the Federal Republic of Germany,* 3 Arb. Int'l 230 (1987); Landi & Rogers, *Arbitration of Antitrust Claims in the United States and Europe,* 13-14 Concorrenza e Mercato 455 (2005-06); Mourre, *Arbitrability of Antitrust Law From the European and US Perspectives,* in G. Blanke & P. Landolt (eds.), *EU and US Antitrust Arbitration: A Handbook for Practitioners* 3, 35-42 (2011); von Segesser & Schramm, *Swiss International Arbitration Act,* in L. Mistelis (ed.), *Concise International Arbitration* 911, 915 (2d ed. 2015) ("arbitral tribunal must decide upon the (in)validity of the contract under antitrust law, regardless of the state authorities' exclusive competence …").

217)

*Judgment of 8 March 2006,* DFT 132 III 389, 398 (Swiss Fed. Trib.).

218)

*Judgment of 18 October 2003,* Case No. AAP M 1988/2013 (Madrid Audiencia Provincial).

219)

EU Directive 2014/104/EU.

220)

*See* §6.04_[A][5]; *Eco Swiss China Time Ltd v. Benetton Int'l NV,* Case No. C-126/97, [1999] ECR I-3055 (E.C.J.); *Judgment of 4 June 2008, SNF v. Cytec,* 2008 Rev. Arb. 473 (French Cour de Cassation Civ. 1); *Judgment of 23 March 2006, SNF v. Cytec,* 2007 Rev. Arb. 100 (Paris Cour d'Appel); Landi & Rogers, *Arbitration of Antitrust Claims in the United States and Europe,* 13-14 Concorrenza e Mercato 455 (2005-06).

221)

*See* §6.04[A] (especially §6.04[A][5]). *See also* Segan, *Arbitration Clauses and Competition Law,* 9 J. Euro. Comp. L. & Prac. 423 (2018).

222)

*CDC v. Akzo Nobel*, [2015] Case No. C-352/13, ¶¶69-70 (E.C.J.).

223)

*See* §§6.03[C][2]-[3].

224)

*Judgment of 21 July 2015*, Case No. ECLI:NL:GHAMS:2015:3006 (Amsterdam Ct. App.). *See also* Goldsmith, *Arbitrating Antitrust Follow-on Damages Claims: A European Perspective (Part 1),* Kluwer Arb. Blog (22 Sept. 2015) ("[T]he Amsterdam Court of Appeals extended the CJEU's reasoning to the interpretation of agreements to arbitrate, upholding a 2014 decision of the Amsterdam District Court, which had refused to dismiss cartel damages follow-on claims, despite the fact that such claims were based on contracts containing broadly worded agreements to arbitrate. According to the Amsterdam Court of Appeals, there was no reason to depart from the CJEU's interpretive approach to jurisdiction clauses when confronted with the same question in relation to arbitration agreements."); Nazzini, *Are Claims for Tortious Damages for Breach of the Antitrust Rules Arbitrable in the European Union? Some Reflections on the CDC Case in the Court of Justice,* 1 Italian Antitrust Rev. 70 (2016).

225)

*Judgment of July 2015*, Case No. ECLI:NL:GHAMS:2015:3006, ¶2.14 (Amsterdam Ct. App).

226)

*See* §9.02[D][1].

227)

*Mitsubishi Motors*, 473 U.S. at 638.

228)

*See, e.g.*, *Murphy v. Amway Canada Corp.*, [2014] 3 FCR 478 (Canadian Fed. Ct. App.); *Recyclers of Australia Pty Ltd v. Hettinga Equip. Inc.*, (2000) 175 ALR 725 (Australian Fed. Ct.); *Hi-Fert Pty Ltd v. Kiukiang Maritime Carriers Inc.*, 12(7) Mealey's Int'l Arb. Rep. C-1 (Australian Fed. Ct. 1997) (1997) (rejecting argument that claims under Australian Trade Practices Act are nonarbitrable); *Stericorp. Ltd v. Stericycle Inc.*, XXXI Y.B. Comm. Arb. 549, 556 (Victoria Sup. Ct. 2005) (2006) (disputes under Australian Trade Practices Act are arbitrable); *IBM Australia Ltd v. Nat'l Dist. Serv. Ltd*, (1991) 22 NSWLR 466 (N.S.W. Sup. Ct.) (Australian antitrust claim arbitrable); *N.Z. v. Mobil Oil N.Z. Ltd*, XIII Y.B. Comm. Arb. 638, 651-54 (Wellington High Ct. 1987) (1988) (New Zealand competition law claims arbitrable); Beechey, *Arbitrability of Anti-Trust/Competition Law Issues: Common Law*, 12 Arb. Int'l 179 (1996).

229)

*Francis Travel Mktg Pty Ltd v. Virgin Atl. Airways Ltd*, [1996] 131 FLR 422, 428 (N.S.W. Ct. App.). *See also Comandate Marine Corp. v. Pan Australia Shipping Pty Ltd*, [2006] FCAFC 192, ¶240 (Australian Fed. Ct.) ("There is nothing inimical to Australian public policy or to the terms of the Trade Practices Act in commercial parties agreeing to commercial arbitration. … There is no relevant Australian statutory provision … that might affect its operation. … The Trade Practices Act is not being undermined; rather, another law of the Parliament [*i.e.*, the Australian International Arbitration Act] is in operation.").

230)

*Judgment of 21 August 2019, Shell China Co. Ltd v. Huili Hohhot Co., Ltd*, [2019] Zhi Min Xia Zhong No. 47 (Chinese S.Ct.).

231)

*Judgment of 29 August 2016*, [2015] Su Zhi Min Xia Zhong Zi No. 00072 (Jiangsu Higher People's Ct.).

232)

*See, e.g.*, *Final Award in ICC Case No. 8423*, XXVI Y.B. Comm. Arb. 153 (2001) (considering but rejecting argument that non-competition clause violated EC competition law); *Final Award in ICC Case No. 7673*, 6(1) ICC Ct. Bull. 57 (1995); *Partial Award in ICC Case No. 7146*, XXVI Y.B. Comm. Arb. 119 (2001) (considering but rejecting claims that agreements violated EC competition law); *Final Award in ICC Case No. 7097*, in ICC, *International Commercial Arbitration in Europe* 38 (1993); *Award in ICC Case No. 4604*, 112 J.D.I. (Clunet) 973 (1985); *Award in CAS Case No. 98/200 of 20 August 1999*, XXV Y.B. Comm. Arb. 393 (2000) (considering and partially granting claims based on EU competition laws); *Final Award in Chamber of National and International Arbitration of Milan of 23 September 1997*, XXIII Y.B. Comm. Arb. 93 (1998) (issues involving mandatory provisions of Italian law are arbitrable).

233)

*Mitsubishi Motors*, 473 U.S. at 638.

234)

*Eco Swiss China Time Ltd v. Benetton Int'l NV*, Case No. C-126/97, [1999] ECR I-3055, ¶3 (E.C.J.).

235)

*Id.* at ¶32.

236)

*See, e.g.*, *Judgment of 4 June 2008, SNF v. Cytec*, XXXIII Y.B. Comm. Arb. 489, 493 (French Cour de Cassation Civ. 1) (in case involving award applying EU competition law to supply agreement, lower court's decision was "within the limits of its powers, that is, without reviewing the merits of the arbitral award – [the court] reviewed the awards in light of the application of the community rules on competition, [and] correctly held that their recognition and enforcement were not contrary to international public policy"); *Judgment of 18 November 2004, SA Thalès Air Défense v. GIE Euromissile*, 2004 Rev. Arb. 986 (Paris Cour d'Appel) (issues of EC competition law are arbitrable but subject to review by national courts applying national and EU law); *Judgment of 24 March 2005, Mktg Displays Int'l Inc. v. VR Van Raalte Reclame BV*, XXXI Y.B. Comm. Arb. 808, 820 (Hague Gerechtshof) (2006) (refusing to recognize award made in United States, under Michigan law, because it supposedly violated EU competition laws). *See also* Bensaude, Thalès Air Defence BV v. GIE Euromissile: *Defining the Limits of Scrutiny of Awards Based on Alleged Violations of European Competition Law*, 22 J. Int'l Arb. 239 (2005).

237)

*See* Radicati di Brozolo, *Antitrust: A Paradigm of the Relations Between Arbitration and Mandatory Rules: A Fresh Look at the "Second Look,"* 2004 Int'l Arb. L. Rev. 23. From a procedural perspective, it is not clear that particular courts will necessarily have an opportunity to take a "second look" at an arbitrator's antitrust decision. For example, awards made outside the United States, but dealing with the U.S. antitrust laws, ordinarily will be subject to review in an annulment action only where they were made, and not in United States courts. *See* §22.04. The prevailing party may seek enforcement of the award outside the United States, and not in U.S. courts. Ultimately, the sole opportunity for a second look might be in a renewed antitrust action in U.S. courts, where the prevailing party in the arbitration would be obliged to raise the award as preclusive.

238)

*Baxter Int'l, Inc. v. Abbott Labs.*, 315 F.3d 829, 830 (7th Cir. 2003).

239)

*See* §26.05[C][10][g].

240)

*Judgment of 8 March 2006*, DFT 132 III 389, 398 (Swiss Fed. Trib.). *See also Judgment of 1 February 2002*, 20 ASA Bull. 337, 348 (Swiss Fed. Trib.) (2002); *Judgment of 13 November 1998*, XXV Y.B. Comm. Arb. 511, 513 (Swiss Fed. Trib.) (2000); Oetiker, in M. Müller-Chen & C. Widmer Lüchinger (eds.), *Zürcher Kommentar zum IPRG* Art. 177, 41 (3d ed. 2018) ("In BGE 132 III 389, the [Swiss Federal Tribunal] finally ruled that competition law provisions were not part of the international public order"); N. Shelkoplyas, *The Application of EC Law in Arbitration Proceedings* 313-15 (2003) ("It is submitted that non-application or incorrect application of EC competition law cannot by itself be contrary to public policy because, if it were, there should be a corresponding positive obligation on arbitrators to enforce certain laws, which there is not"); P. Tercier, L. Bieri & B. Carron, *Les Contrats Spéciaux* 270 (2016).

241)

*Judgment of 19 April 1994*, DFT 120 II 155, 167 (Swiss Fed. Trib.) ("the arbitral tribunal is required, in all cases, to respect the public policy of the domestic law that it is obliged to apply").

242)

*Mitsubishi Motors*, 473 U.S. at 637 n.19.

243)

*See* §6.04[A][6][b].

244)

*Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (U.S. S.Ct. 2013) (quoting *Mitsubishi Motors*, 473 U.S. at 628). *See also In re A2P SMS Antitrust Litg.*, 972 F.Supp.2d 465 (S.D.N.Y. 2013) (federal antitrust claims arbitrable).

245)

*Am. Express*, 570 U.S. at 236 ("The class-action waiver merely limits arbitration to the two contracting parties. It no more eliminates those parties' right to pursue their statutory remedy than did federal law before its adoption of the class action for legal relief in 1938. Or, to put it differently, the individual suit that was considered adequate to assure 'effective vindication' of a federal right before adoption of class-action procedures did not suddenly become 'ineffective vindication' upon their adoption.").

246)

*Id.* at 235 (*Mitsubishi Motors* "expressed a willingness to invalidate, on 'public policy' grounds, arbitration agreements that 'operat[e] … as a prospective waiver of a party's *right to pursue* statutory remedies'") (emphasis in original).

247)

*Id.* ("[T]he exception finds its origin in the desire to prevent 'prospective waiver of a party's *right to pursue* statutory remedies.' That would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights. And it would perhaps cover filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable.") (emphasis in original).

248)

*Id.* at 236 ("the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy") (emphasis in original).

249)

*See, e.g., Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 723 n.4 (9th Cir. 1999); *George Fischer Foundry Sys., Inc. v. Adolph H. Hottinger Maschinenbau GmbH*, 55 F.3d 1206, 1210 (6th Cir. 1995) (rejecting (on ripeness grounds) argument that rules governing Zurich arbitration would serve as prospective waiver of statutory rights to treble damages "because it is not clear what law the Zurich tribunal will apply"); *Rappaport v. Fed. Sav. Bank*, 341 F.Supp.3d 1039, 1043 (D. Ariz. 2018); *Loewen v. Lyft, Inc.*, 129 F.Supp.3d 945, 965 (N.D. Cal. 2015). *See also Life of Am. Ins. Co. v. Aetna Life Ins. Co.*, 744 F.2d 409 (5th Cir. 1984).

250)

*See* §6.02[H].

251)

*See, e.g., Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 723 n.4 (9th Cir. 1999) ("[I]t is possible that the Swiss Tribunal might apply U.S. antitrust law to the dispute. ... Moreover, even if Swiss law is applied to the dispute, there has been no showing that it will not provide Simula with sufficient protection."); *Suzlon Structure, Ltd v. Pulk*, 2010 WL 3540951 (S.D. Tex.) (staying litigation of RICO claims notwithstanding fact that parties' choice of (English) law might preclude assertion of RICO claims in foreign-seated arbitration); *Dziennik v. Sealift, Inc.*, 2010 WL 1191993, at *7 (E.D.N.Y.).

252)

*See, e.g., Lindo v. NCL (Bahamas), Ltd*, 652 F.3d 1257, 1292 (11th Cir. 2011) (Barkett, J., dissenting) ("null and void" standard in Article II provides a public policy defense at the arbitration agreement enforcement stage); §6.02[G].

253)

*See, e.g., Casaceli v. Natuzzi SpA*, [2012] FCA 691, ¶¶31-33 (Australian Fed. Ct.) (rejecting argument that arbitral tribunal seated in Italy would not apply mandatory Australian law).

254)

*See, e.g., MBC Fin. Servs. Ltd v. Boston Merchant Fin., Ltd*, 704 F.App'x 14, 18 (2d Cir. 2017); *Richards v. Lloyd's of London*, 135 F.3d 1289, 1295 (9th Cir. 1998); *Haynsworth v. The Corp.*, 121 F.3d 956, 969 (5th Cir. 1997); *Allen v. Lloyd's of London*, 94 F.3d 923, 929 (4th Cir. 1996); *Bonny v. Soc'y of Lloyd's*, 3 F.3d 156, 162 (7th Cir. 1993); *Roby v. Corp. of Lloyd's*, 996 F.2d 1353 (2d Cir. 1993); *Ortho-Clinical Diagnostics v. Mazuma Capital Corp.*, 2019 WL 108298, at *5 (W.D.N.Y.); *Lazare Kaplan Int'l Inc. v. KBC Bank NV*, 337 F.Supp.3d 274, 292 (S.D.N.Y. 2018).

255)

*See* §6.04[B][2]. *See also* Stein, Thomas v. Carnival Corporation: *Has the Eleventh Circuit Set International Arbitration off Course?*, 27 J. Int'l Arb. 529, 535 (2010) (suggesting that *Mitsubishi* would invalidate choice-of-law/choice-of-forum clause only "if there were evidence that the law and seat of arbitration were chosen specifically to prevent pursuing U.S. statutory claims"); *Escobar v. Celebration Cruise Operator, Inc.*, 805 F.3d 1279 (11th Cir. 2015).

256)

*See, e.g., Hiotakis v. Celebrity Cruises Inc.*, 2011 WL 2148978, at *7 (S.D. Fla.) (plaintiff's "failure to make any showing regarding Greek law, including the recognition or foreign statutory causes of action such as the Wage Act and the remedies available to seamen seeking overtime wages, and the opportunity for review of arbitral awards, preclude this Court from making the finding that the public policy affirmative defense voids the arbitration provisions"); *Williams v. Royal Caribbean Cruises, Ltd*, 2011 WL 1467179, at *2 (S.D. Fla.) ("An arbitration clause is null and void as a matter of public policy where it deprives the plaintiff of a U.S. statutory right"; compelling arbitration of plaintiff's Jones Act claims in St. Vincent or the Bahamas, after invalidating Norwegian choice-of-law provision and requiring application of U.S. law); *Shaw v. Carnival Cruise Lines*, 2011 WL 2160617 (S.D. Fla.) (compelling arbitration in Panama, after severing Bahamian choice-of-law clause with respect to plaintiff's Jones Act claims and requiring application of U.S. law); *Suzlon Infrastructure, Ltd v. Pulk*, 2010 WL 3540951 (S.D. Tex.); *Cardoso v. Carnival Corp.*, 2010 WL 996528, at *4 (S.D. Fla.) ("the appropriate remedy is to sever the Panamanian choice-of-law provision" from the agreement to arbitrate); *Mosqueda v. Offshore Specialty Fabricators, Inc.*, 2010 WL 1416786, at *2 (S.D. Tex.) ("A party seeking to avoid an international arbitration clause on public policy grounds must meet a 'heavy burden of proof'") (quoting *Lim v. Offshore Specialty Fabricators, Inc.*, 404 F.3d 898, 905 (5th Cir. 2005)).

257)

*See, e.g., Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 723 n.4 (9th Cir. 1999) ("even if Swiss law is applied to the dispute, there has been no showing that it will not provide Simula with sufficient protection"); *Rappaport v. Fed. Sav. Bank*, 341 F.Supp.3d 1039, 1043 (D. Ariz. 2018); *Loewen v. Lyft, Inc.*, 129 F.Supp.3d 945, 965 (N.D. Cal. 2015).

258)

*See Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 240-41 (U.S. S.Ct. 1987).

259)

*See, e.g., PacifiCare*, 538 U.S. 401; *Vimar Seguros*, 515 U.S. 528; *Larry's United Super, Inc. v. Werries*, 253 F.3d 1083, 1086 (8th Cir. 2001) ("[whether waiver of punitive damages] violates the public policy underlying RICO's treble damages provision is a matter for the arbitrators in the first instance").

260)

*See, e.g., Life of Am. Ins. Co. v. Aetna Life Ins. Co.*, 744 F.2d 409, 412 (5th Cir. 1984) (declining to decide in action to compel arbitration whether treble damages were awardable under state law: "Until arbitration establishes that Life of America is entitled to damages but must be denied treble damages, its asserted rights under Texas law have not been impaired"); §6.04[A][6][a]. *Compare PPG Indus., Inc. v. Pilkington plc*, 825 F.Supp. 1465 (D. Ariz. 1993) ("the Court directs that any damages determination, or arbitral award, made by the arbitrators shall be determined according to U.S. antitrust law irrespective of any conflict that may exist between those laws and the laws of England").

261)

*See* §4.05_[C][4]; *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 723 (9th Cir. 1999) ("remedies in a foreign forum need not be identical"); *Hopkinton Drug, Inc. v. CaremarkPCS LLC*, 77 F.Supp.3d 237, 247 (D. Mass. 2015) (some contractual restrictions on statutory remedies are valid). *See also Shipman Agency, Inc. v. TheBlaze Inc.*, 315 F.Supp.3d 967 (S.D. Tex. 2018) (contractual remedies limitations are valid, but court would sever unconscionable remedies limitation from arbitration clause); *Whitney v. Alltel Commc'ns, Inc.*, 173 S.W.3d 300, 309 (Mo. Ct. App. 2005) (contractual limitations on remedies coupled with class-action waiver unconscionable).

262)

*See also* §26.05[C][9][i].

263)

*See* U.S. Securities Act of 1933, 15 U.S.C. §77n; German Securities Exchange Act, §28, replaced by German Securities Trading Act, §37h; German Securities Exchange Act, §§53, 61. *See* Kerr, *Arbitrability of Securities Claims in Common LawNations*, 12 Arb. Int'l 171 (1996); Poser, *Arbitrability of International Securities Disputes*, 12 Brook. J. Int'l L. 675 (1986); van Houtte, *Arbitration Involving Securities Transactions*, 12 Arb. Int'l 405 (1996).

264)

*Wilko*, 346 U.S. at 435. *See* §6.03[C][4].

265)

*Id.* at 436. *See* §6.03[C][4]. *See also* Graziano & Trisotto, *Keeping Investors out of Court: The Looming Threat of Mandatory Arbitration*, Harv. L. Sch. Forum on Corp. Gov. (18 Feb. 2019) ("Mandatory arbitration provisions have the potential to undermine investors' ability to prosecute securities claims in court and hold companies accountable for their misconduct. Under the Federal Rules of Civil Procedure, investors can institute a class action to hold companies liable for their violations of securities laws in federal court. But, if limited to arbitration and subjected to class action waivers, individual investors may not be able to afford to pursue their claims unless they have very large losses."); Scott & Silverman, *Stockholder Adoption of Mandatory Individual Arbitration for Stockholder Disputes*, 36 Harv. J. L. & Pub. Pol'y 1187, 1194 (2013).

266)

*Scherk*, 417 U.S. at 518.

267)

*See id.* at 516-17; §6.03[C][4].

268)

*See* §6.04_[A]; *Scherk*, 417 U.S. 506.

269)

*See Rodriguez de Quijas v. Shearson/Am. Express Inc.*, 490 U.S. 477, 484 (U.S. S.Ct. 1989).

270)

*See PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 404 (U.S. S.Ct. 2003) ("there is nothing in the text of the RICO statute that even arguably evinces congressional intent to exclude civil RICO claims from the dictates of the Arbitration Act"). *See also Torres v. Simpatico, Inc.,* 781 F.3d 963, 970 (8th Cir. 2015) (RICO claims arbitrable even if arbitration agreement excludes treble damages); *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 9 (1st Cir. 2014) (RICO claims arbitrable); *Tech. in P'ship, Inc. v. Rudin*, 894 F.Supp.2d 274, 278 (2d Cir. 2013); *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 174 (2d Cir. 2004); *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840 (2d Cir. 1987); *Spinelli v. Nat'l Football League*, 96 F.Supp.3d 81, 103 (S.D.N.Y. 2015) (antitrust conspiracy claims arbitrable); *Vento v. Crithfield*, 2012 WL 3758432, at *4 (D.V.I.) ("Courts have held that the civil claims brought under the [RICO] Act … are arbitrable").

271)

*See* §6.04_[A][5]; *PacifiCare*, 538 U.S. 401.

272)

*See PacifiCare*, 538 U.S. 401; *Vimar Seguros*, 515 U.S. at 541 ("mere speculation that the foreign arbitrators *might* apply Japanese law which, depending on the proper construction of COGSA, *might* reduce respondents' legal obligations, does not in and of itself" render a COGSA claim nonarbitrable) (emphasis in original); *Escobar v. Celebration Cruise Operator, Inc.*, 805 F.3d 1279, 1285 (11th Cir. 2015); *Aggarao v. MOL Ship Mgt Co.,* 675 F.3d 355, 373 (4th Cir. 2012) ("Aggarao is not entitled to interpose his public policy defense, on the basis of the prospective waiver, doctrine until the second stage of the arbitration-related court proceedings – the award-enforcement stage").

273)

*See, e.g., Richards v. Lloyd's of London*, 135 F.3d 1289, 1295 (9th Cir. 1998) (en banc); *Haynsworth v. The Corp.*, 121 F.3d 956, 969 (5th Cir. 1997); *Allen v. Lloyd's of London*, 94 F.3d 923, 929 (4th Cir. 1996); *Bonny v. Soc'y of Lloyd's*, 3 F.3d 156, 162 (7th Cir. 1993); *Roby v. Corp. of Lloyd's*, 996 F.2d 1353 (2d Cir. 1993). *See also S.K.I. Beer Corp. v. Baltika Brewery*, 612 F.3d 705, 712 (2d Cir. 2010) (speculation as to application of U.S. law by foreign court did not justify non-enforcement of forum selection clause); *Ortho-Clinical Diagnostics v. Mazuma Capital, Corp.*, 2019 WL 1082987, at *5 (W.D.N.Y.); *Lazare Kaplan Int'l Inc. v. KBC Bank NV*, 337 F.Supp.3d 274, 292 (S.D.N.Y. 2018); *Int'l Chartering Serv. Inc. v. Eagle Bulk Shipping Inc.*, 138 F.Supp.3d 629, 638 (S.D.N.Y. 2015); *BMR & Assocs. LLP v. SFW Capital Partners, LLC*, 92 F.Supp.3d 128, 138 (S.D.N.Y. 2015).Some U.S. commentary has been critical of the *Lloyd's* decisions, arguing that they undermine the protections of the U.S. securities laws and ignore the "anti-waiver" provisions of those laws. Eck, *Turning Back the Clock: A Judicial Return to Caveat Emptor for U.S. Investors in Foreign Markets*, 19 N.C. J. Int'l & Com. Reg. 313 (1994); McConnaughay, *The Risks and Virtues of Lawlessness: A "Second Look" at International Commercial Arbitration*, 93 N.W. U. L. Rev. 453 (1999).

274)

*Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1365 (2d Cir. 1993). *See also Allen v. Lloyd's of London*, 94 F.3d 923, 929 (4th Cir. 1996); *Bonny v. Soc'y of Lloyd's*, 3 F.3d 156, 162 (7th Cir. 1993).

275)

Like most other mandatory national laws, the U.S. federal securities laws apply only to conduct falling within their jurisdictional scope (*i.e.*, having sufficient connections to the United States). *See* G. Born & P. Rutledge, *International Civil Litigation in United States Courts* 694-705 (6th ed. 2018).

276)

*See, e.g., Cardoso v. Carnival Corp.*, 2010 WL 996528, at *3 (S.D. Fla.) (Panamanian choice-of-law clause was, in tandem with Philippines arbitration clause, unenforceable as applied to Jones Act claims: "foreign choice-of-law and arbitration clauses can – if enforced in tandem – constitute a prospective waiver of statutory rights in violation of public policy"; ordering: "Paragraph 8 [*i.e.,* the parties' choice of law clause] is hereby STRICKEN from Plaintiff's Seafarer's Agreement and shall be treated by the parties as null and void").

277)

*See* §6.02[G].

278)

*See Judgment of 26 February 1991*, XI ZR 349/89 (German Bundesgerichtshof) (recognizing Dutch award against German company on liability under futures contract); Zimmer, in E. Schwark & D. Zimmer (ed.), *Kapitalmarktrechtskommentar* §37h WpHG nn.1 *et seq.* (5th ed. 2020).

279)

*See Judgment of 6 June 1991*, 1991 NJW 2215 (German Bundesgerichtshof). This is only true to the extent that German securities law applies to protect the consumer in question. *See, e.g., Judgment of 21 September 1993*, 1993 NJW-RR 1519 (German Bundesgerichtshof) (German national residing in Italy not protected by German securities law and therefore arbitration agreement with national providing for arbitration in New York under New York law held valid).

280)

*See* German Securities Trading Act, §37h. *See Judgment of 9 March 2010*, 2010 RIW 391 (German Bundesgerichtshof) (denying enforcement of arbitration clause in consumer contract); *Judgment of 16 June 2008*, I-9 U 17/08 (Oberlandesgericht Düsseldorf) (same).

281)

*See* Lehmann, *Wertpapierhandel als Schiedsfreie Zone? Zur Wirksamkeit von Schiedsvereinbarungen nach §37h WpHG*, 2003 SchiedsVZ 219.

282)

*See Judgment of 8 June 2010*, 2011 SchiedsVZ 46 (German Bundesgerichtshof) (German Securities Trading Act, §37h is limitation on capacity and New York Convention allows application of party's personal law to issues of capacity).

283)

*See* §4.07_[A]; §5.03[B].

284)

*See* §6.04[B][3]. *See also* Lehmann, *Wertpapierhandel als Schiedsfreie Zone? Zur Wirksamkeit von Schiedsvereinbarungen nach §37h WpHG*, 2003 SchiedsVZ 219.

285)

For commentary, *see* Gaillard, *La Corruption Saisie par les Arbitres du Commerce International,* 3 Rev. Arb. 818 (2017); Kosheri & Leboulanger, *L'Arbitrage Face à la Corruption et aux Trafics d'Influence,* 1984 Rev. Arb. 3; Kreindler, *Aspects of Illegality in the Formation and Performance of Contracts*, in A. van den Berg (ed.), *International Commercial Arbitration: Important Contemporary Questions* 209 (2003); R. Kreindler, *Competence-Competence in the Face of Illegality in Contracts and Arbitration Agreements* 342 (2013); Lalive, *Ordre Public Transnational (ou Réellement International) et Arbitrage International*, 1986 Rev. Arb. 329, 336-41; Mourre, *Arbitration and Criminal Law: Jurisdiction, Arbitrability and Duties of the Arbitral Tribunal*, in L. Mistelis & S. Brekoulakis (eds.), *Arbitrability: International & Comparative Perspectives* 207 (2009); Mourre, *Arbitration and Criminal Law: Reflections on the Duties of the Arbitrator*, 22 Arb. Int'l 95, 98 (2006); Rosell & Prager, *Illicit Commissions and International Arbitration: The Question of Proof*, 15 Arb. Int'l 329 (1999); Wetter, *Issues of Corruption Before International Arbitral Tribunals: The Authentic Text and True Meaning of Judge Gunnar Lagergren's 1963 Award in ICC Case No. 1110*, 10 Arb. Int'l 277 (1994).

286)

*See* §3.02; *Heyman v. Darwins Ltd* [1942] AC 356 (House of Lords). As also discussed above, these decisions have been overtaken by the separability doctrine. *See* §3.02[B][3].

287)

*Award in ICC Case No. 1110*, 10 Arb. Int'l 282, 293 (1994).

288)

*Id. See also* Wetter, *Issues of Corruption Before International Arbitral Tribunals: The Authentic Text and True Meaning of Judge Gunnar Lagergren's 1963 Award in ICC Case No. 1110*, 10 Arb. Int'l 277 (1994).

289)

*Award in ICC Case No. 1110*, 10 Arb. Int'l 282, 293 (1994). To avoid any misunderstanding, the arbitrator also declared "[i]n concluding that I have no jurisdiction, guidance has been sought from general principles denying arbitrators jurisdiction to entertain disputes of this nature rather than from any national rules on arbitrability." *Id.* Some commentators have suggested that Lagergren might have rejected the claimant's request for relief on substantive, rather than jurisdictional, grounds (noting Lagergren's references that the claims were non-justiciable). Mourre, *Arbitration and Criminal Law: Reflections on the Duties of the Arbitrator*, 22 Arb. Int'l 95, 98 (2006). This would have been the more appropriate result, but is very difficult to reconcile with much of the language of the award.

290)

*See, e.g.*, *Partial Award on Jurisdiction and Admissibility in ICC Case No. 6474*, XXV Y.B. Comm. Arb. 279 (2000) (dispute involving claims of corruption and illegality is arbitrable (applying Swiss law)); *Partial Award in ICC Case No. 6286*, XIX Y.B. Comm. Arb. 141 (1994); *Interim Award in ICC Case No. 4145*, XII Y.B. Comm. Arb. 97 (1987) (rejecting claim of illegality as unsubstantiated).

291)

*See* Gaillard, *La Corruption Saisie par les Arbitres du Commerce International,* 3 Rev. Arb. 818 (2017) ("there is perfect unanimity today between arbitral and court case-law that an arbitrator who finds that the contract covers corrupt activities should not declare the issue nonarbitrable and decline jurisdiction, but rather uphold jurisdiction and determine the nullity or non-effectiveness of the contract because it breaches international public order"); R. Kreindler, *Competence-Competence in the Face of Illegality in Contracts and Arbitration Agreements* 342 (2013); Schwartz, *The Domain of Arbitration and Issues of Arbitrability: The Viewfrom the ICC*, in *Tenth Joint ICC/AAA/ICSID Colloquium on International Arbitration* 4 n.6 (1998).

292)

*See, e.g.*, *JLM Indus. v. Stolt-Nielsen SA*, 387 F.3d 163, 175 (2d Cir. 2004); *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 854 (2d Cir. 1987); *Altshul Stern & Co. v. Mitsui Bussan Kaisha*, 385 F.2d 158, 159 (2d Cir. 1967); *Philippines v. Westinghouse Elec. Corp.*, 821 F.Supp. 292, 298 (D.N.J. 1993); *Fiona Trust & Holding Corp. v. Privalov* [2007] UKHL 40 (House of Lords); *Westacre Inv. v. Jugoimport-SPDR Holding Co. Ltd* [1992] 2 Lloyd's Rep. 65 (1999) (English Ct. App.); *Judgment of 2 September 1993, Nat'l Power Corp. v. Westinghouse*, DFT 119 II 380, 384 (Swiss Fed. Trib.); *Judgment of 22 October 1976*, III Y.B. Comm. Arb. 279, 280 (Florence Corte di Appello) (1978); *Sarawak Shell v. PPES Oil & Gas*, (1998) Arb. & Disp. Resol. L.J. 356 (Kuala Lumpur Ct. App.); *Judgment of 6 June 2018*, Case No. A.I. No. 49 (Asunción Tribunal de Apelación). *See also* §6.02[G].U.S. courts have consistently held that private damages claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), which frequently involve claims of corruption and comparable alleged wrongdoing, are arbitrable. *See Kerr-McGee Refining Corp. v. MT Triumph*, 924 F.2d 467 (2d Cir. 1991); Kühn, *RICO Claims in International Arbitration and Their Recognition in Germany*, 11(2) J. Int'l Arb. 37 (1994); §6.02[G].

293)

*Fiona Trust & Holding Corp. v. Privalov* [2007] EWCA Civ 20, ¶29 (English Ct. App.), *aff'd*, [2007] UKHL 40 (House of Lords).

294)

*London S.S. Owners' Mutual Ins. Ass'n Ltd v. Spain* [2015] EWCA Civ 333, ¶78 (English Ct. App.).

295)

*Judgment of 19 February 2007*, DFT 133 III 139, 142 (Swiss Fed. Trib.).

296)

*Hub Power Co. v. Pakistan WAPDA*, 16 Arb. Int'l 439 (Pakistan S.Ct. 2000) (2000).

297)

*See* §4.05_[A][2]; §6.02[H].

298)

That is particularly true in light of Article II(1)'s requirement that international arbitration agreements be recognized as to differences whether "contractual or not," which plainly contemplates recognition of arbitration agreements as applied to non-contractual fraud claims. *See* §2.02[A].

299)

For commentary, *see* Blessing, *Arbitrability of Intellectual Property Disputes*, 12 Arb. Int'l 191 (1996); Caron, *The World of Intellectual Property and the Decision to Arbitrate*, 19 Arb. Int'l 441 (2003); Caron, *Le Contentieux Arbitral du Droit d'Auteur,* 2014 Rev. Arb. 331; Certilman & Lutzker, *Arbitrability of Intellectual Property Disputes,* in T. Halket (ed.), *Arbitration of International Intellectual Property Disputes* 55 (2012); T. Cook & A. Garcia, *International Intellectual Property Arbitration* 49 (2010); Derains, *L'Expérience de la Cour d'Arbitrage de la Chambre de Commerce Internationale en Matière de Propriété Industrielle*, 1977 Rev. Arb. 40; Dessemontet, *Arbitration of Intellectual Property Rights and Licensing Contracts,* in E. Gaillard & D. di Pietro (eds.), *Enforcement of Arbitration Agreements and International Arbitral Awards: The New York Convention 1958 in Practice* 555 (2008); Fortunet, *Arbitrability of Intellectual Property Disputes in France,* 26 Arb. Int'l 281 (2010); ICC, *Extracts from ICC Awards on Intellectual Property Rights: Part I*, 4(2) ICC Ct. Bull. 70 (1993); Lew, *Intellectual Property Disputes and Arbitration, Final Report of the Commission on International Arbitration*, 9(1) ICC Ct. Bull. 37 (1998); Mantakou, *Arbitrability and Intellectual Property Disputes*, in L. Mistelis & S. Brekoulakis (eds.), *Arbitrability: International & Comparative Perspectives* 263 (2009); Plant, *Binding Arbitration of U.S. Patents,* 10(3) J. Int'l Arb. 79 (1993); Racine, *Arbitrage et Contentieux de l'Exploitation Contractuelle des Droits de Propriété Industrielle*, 2014 Rev. Arb. 287; Rivoire, *L'Arbitrabilité du Droit d'Auteur: Le Cas du Droit Français,* 4 McGill J. Disp. Resol. 43 (2017-18); Simms, *Arbitrability of Intellectual Property Disputes in Germany*, 15 Arb. Int'l 193 (1999); Vicente, *Arbitrability of Intellectual Property Disputes: A Comparative Survey,* 31 Arb. Int'l 163 (2015).

300)

*See* §§6.04[A]-[C].

301)

*See* §1.04[C][6]. *See also* Vicente, *Arbitrability of Intellectual Property Disputes: A Comparative Survey*, 31 Arb. Int'l 163 (2015).

302)

*See* EC Regulation 44/2001, Art. 22(4); EC Regulation 1215/2012, Art. 24(4). *See also* T. Cook & A. Garcia, *International Intellectual Property Arbitration* 65 (2010); Derains, *L'Expérience de la Cour d'Arbitrage de la Chambre de Commerce Internationale en Matière de Propriété Industrielle*, 1977 Rev. Arb. 40, 45; Simms, *Arbitrability of Intellectual Property Disputes in Germany*, 15 Arb. Int'l 193 (1999); Voit, in H.-J. Musielak (ed.), *Kommentar zur Zivilprozessordnung* §1030, ¶3 (9th ed. 2012).

303)

*See Interim Award in ICC Case No. 6097*, 4(2) ICC Ct. Bull. 76 (1993) (tribunal seated in Geneva declares German patent null and void, but emphasizes that award was only binding on parties and could not serve as basis for revocation of patent and had no *erga omnes* effect); *Judgment of 28 February 2008, Hidravlika DOO v. SA Diebolt*, 2008 Rev. Arb. 167 (Paris Cour d'Appel) (disputes regarding exploitation of patents, relating to interpretation or execution of patent license, are arbitrable); *Judgment of 24 March 1994, Deko v. Dingler*, 1994 Rev. Arb. 515 (Paris Cour d'Appel) (upholding award concerning patent and license rights). *See also* Fortunet, *Arbitrability of Intellectual Property Disputes in France*, 26 Arb. Int'l 292 (2010); Papenberg, *The Arbitrability of Intellectual Property Disputes in Germany*, in WIPO & AAA, *Worldwide Forum on the Arbitration of Intellectual Property Disputes* 81 (1994).

304)

*See, e.g., Judgment of 19 May 2003*, DFT 4C.40/2003 (Swiss Fed. Trib.) (claim for assignment of patent and naming inventor); *Judgment of 7 October 1933*, DFT 59 I 177 (Swiss Fed. Trib.) (claim for recognition of patent claims). *See also* B. Berger & F. Kellerhals, *International and Domestic Arbitration in Switzerland* ¶¶225 *et seq.* (3d ed. 2015); Blessing, *Arbitrability of Intellectual Property Disputes*, 12 Arb. Int'l 191 (1996) (patent and trademark validity issues arbitrable under Swiss law); Wenger, in S. Berti *et al.* (eds.), *International Arbitration in Switzerland* Art. 177, ¶15 (2000).

305)

*See, e.g., Judgment of 21 June 2017*, XLIV Y.B. Comm. Arb. 182 (Brazilian Superior Tribunal de Justiça) (2019) (rejecting Article V(2)(a) defense that film exploitation and distribution rights were non-arbitrable under law of recognition forum).

306)

*See Lear, Inc. v. Adkins*, 395 U.S. 653, 677 (U.S. S.Ct. 1969) ("The national policy expressed in the patent laws, favoring free competition and narrowly limiting monopoly, cannot be frustrated by private agreements among individuals, with or without the approval of the state").

307)

35 U.S.C. §294 authorizes arbitration of disputes as to validity and infringement of a U.S. patent pursuant to a written agreement between the parties. In addition, 35 U.S.C. §135(d) provides statutory authorization for arbitration of "any aspect" of a U.S. patent interference contest. For U.S. decisions, *see In re Med. Eng'g Corp.*, 1992 WL 217763 (Fed. Cir.) (patent infringement dispute arbitrable); *Rhone-Poulenc Specialities Chiniques v. SCM Corp.*, 769 F.2d 1569 (Fed. Cir. 1985) (patent infringement claim arbitrable); *Apple Inc. v. BYD Co. Ltd*, 2016 WL 1212638 (N.D. Cal.) (dispute concerning "non-assert" provisions arbitrable). *See also* Plant, *Binding Arbitration of U.S. Patents*, 10(3) J. Int'l Arb. 79 (1993).

308)

*See, e.g., Cortés-Ramos v. Sony Corp. of Am.*, 889 F.3d 24, 25 (1st Cir. 2018) (Copyright Act claims arbitrable); *McMahan Sec. Co. v. Forum Capital Mkts*, 35 F.3d 82 (2d Cir. 1994) (complex copyright issues arbitrable); *Folkways Music Publ'rs, Inc. v. Weiss*, 989 F.2d 108 (2d Cir. 1993) (copyright ownership arbitrable); *Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191 (7th Cir. 1987) (copyright validity arbitrable); *Kamakazi Music Corp. v. Robbins Music Corp.*, 684 F.2d 228 (2d Cir. 1982); *Pegasus Int'l Inc. v. Champagne*, 2012 WL 5616095 (W.D. La.) (compelling arbitration of copyright infringement claim); *1mage Software, Inc. v. Reynolds & Reynolds Co.*, 273 F.Supp.2d 1168, 1172 (D. Colo. 2003); *Danisco AS v. Novo Nordisk A*S, 2003 U.S. Dist. LEXIS 1842 (S.D.N.Y.) (staying action for patent infringement on basis of arbitration agreement); *LDS Inc. v. Metro Canada Logistics*, 28 F.Supp.2d 1297 (D. Kan. 1998) (copyright infringement claims arbitrable); *Molecular Analytical Sys. v. Ciphergen Biosystems, Inc.*, 186 Cal.App.4th 696, 716 (Cal. Ct. App. 2010).

309)

*See, e.g., Cara's Notions, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566, 571-72 (4th Cir. 1998); *Necchi Sewing Mach. Sales Corp. v. Necchi SpA*, 369 F.2d 579 (2d Cir. 1966) (trademark dispute arbitrable); *Alexander Binzel Corp. v. Nu-Tecsys Corp.*, 1992 WL 26932 (N.D. Ill.) (same); *Givenchy SA v. William Stuart Indus. (Far E.) Ltd*, 1986 WL 3358 (S.D.N.Y.); *Saucy Susan Prod., Inc. v. Allied Old English*, 200 F.Supp. 724 (S.D.N.Y. 1961). *See also Aerojet-Gen. Corp. v. Mach. Tool Works, Oerlikon-Buehrle, Ltd*, 895 F.2d 736 (Fed. Cir. 1990) (trade secrets dispute arbitrable), *overruled on other grounds*, *Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826 (U.S. S.Ct. 2002).

310)

*Editions Chouette Inc. v. Desputeaux*, 2003 SCC 17 (Canadian S.Ct.). *See also* Boivin & Mariani, *Highest Court Rules in Favour of Broad Interpretation of Arbitrability*, 20 J. Int'l Arb. 507 (2003).

311)

*Editions Chouette Inc.*, 2003 SCC 17, ¶38.

312)

*Id.* at ¶46.

313)

Hong Kong Arbitration Ordinance, §103.D(1) ("An IPR dispute is capable of settlement by arbitration as between the parties to the IPR dispute").

314)

*Id.* at §103.G(2) ("it is not contrary to public policy of Hong Kong to enforce an award only because the award is in respect of a matter that relates to an IPR dispute").

315)

*Ayyasamy v. Paramasivam*, Civil Appeal Nos. 8245 & 8246 of 2016, ¶5 (Indian S.Ct.).

316)

Several recent Indian lower court decisions have held that disputes relating to intellectual property rights are nonarbitrable. *See, e.g., Eros Int'l Media Ltd v. Telemax Links India Pvt Ltd,* Suit No. 331/2013, ¶14 (Bombay High Ct. 2016) ("the rights to a trade mark and in connection therewith are matters *in rem* and by their very nature are not amenable to private forum chosen by the parties").

317)

*Ayyasamy v. Paramasivam*, Civil Appeal Nos. 8245 & 8246 of 2016, ¶51 (Indian S.Ct.) ("It, thus, follows that those cases where there are serious allegations of fraud, they are to be treated as non-arbitrable and it is only the civil court which should decide such matters. However, where there are allegations of fraud simplicitor and such allegations are merely alleged, we are of the opinion it may not be necessary to nullify the effect of the arbitration agreement between the parties as such issues can be determined by the Arbitral Tribunal.").

318)

See, e.g., *Partial Award in ICC Case No. 6709*, in J.-J. Arnaldez, Y. Derains & D. Hascher (eds.), *Collection of ICC Arbitral Awards 1991-1995* 435, 437 (1997) ("[French law] gives the national courts exclusive jurisdiction over disputes involving public policy, *i.e.*, the issuance, cancellation or validity of patents; yet it is nevertheless clear that disputes relating to the exploitation of a patent remain beyond doubt arbitrable"); *Award in ICC Case No. 4491*, 112 J.D.I. (Clunet) 966 (1985); *Award in ICC Case No. 2048*, discussed in Derains, *L'Expérience de la Cour d'Arbitrage de la Chambre de Commerce Internationale en Matière de Propriété Industrielle*, 1977 Rev. Arb. 40, 45; *IBM Corp. v. Fujitsu Ltd, Award in AAA Case No. 13T-117-0636-85 of 15 September 1987*, 4(4) J. Int'l Arb. 153 (1987).

319)

See, e.g., *Interim Award in ICC Case No. 6097*, 4(2) ICC Ct. Bull. 76 (1993) (award regarding patent invalidity described by arbitral tribunal as having no *erga omnes* effects); *Award in ICC Case No. 1912*, discussed in Derains, *L'Expérience de la Cour d'Arbitrage de la Chambre de Commerce Internationale en Matière de Propriété Industrielle*, 1977 Rev. Arb. 40, 46.

320)

*Judgment of 15 May 1961, Jean Tardits et Cie v. Jydsk Andels Foderstof Forretning*, 89 J.D.I. (Clunet) 140 (Orléans Cour d'Appel) (1962). As discussed above, the court held that claims for breach of contract raised issues "that could only be resolved by interpreting and applying rules of French economic public policy, which governed the performance of the contract," which were nonarbitrable. *See* §6.03[C][3].

321)

*See* §§6.03[C][3]-[4]; *Ministry of Def. & Support for Iran v. Cubic Def. Sys. Inc.*, 665 F.3d 1091, 1098 (9th Cir. 2011); *Belship Navigation Inc. v. Sealift, Inc.*, 1995 WL 447656 (S.D.N.Y.); *Judgment of 21 February 1964, Meulemans et Cie v. Robert*, 92 J.D.I. (Clunet) 113 (Paris Cour d'Appel) (1965); *Judgment of 13 November 1998*, XXV Y.B. Comm. Arb. 511 (Swiss Fed. Trib.) (2000); *Judgment of 23 June 1992*, DFT 118 II 353 (Swiss Fed. Trib.); *Partial Award in ICC Case No. 6719*, 121 J.D.I. (Clunet) 1071, 1074 (1994) ("The mere fact that the nature of the dispute may lead the arbitrator to apply various rules of law implicating public policy does not mean that the dispute becomes nonarbitrable as a result. The arbitrator must comply with the rules of international public policy, but he need not decline jurisdiction."); *Judgment of 24 November 2015*, XLI Y.B. Comm. Arb. 50 (Italian Corte di Cassazione) (2016). *See also* M. Azeredo da Silveira, *Trade Sanctions and International Sales: An Inquiry into International Arbitration and Commercial Litigation* 353 (2014); Moitry, *L'Arbitre International et l'Obligation de Boycottage Imposée par un Etat*, 118 J.D.I. (Clunet) 349 (1991). *Compare Judgment of 7 May 1994, Fincantieri-Cantieri Navali Italiani SpA v. Ministry of Defence, Armement & Supply Directorate of Irak*, XXI Y.B. Comm. Arb. 594 (Genoa Corte di Appello) (1996) (holding dispute regarding arms supply agreement nonarbitrable because of UN and EU regulations forbidding delivery of arms to Iraq); *Judgment of 15 June 2006, Legal Dep't of Ministry of Justice of Irak v. Fincantieri Cantieri Navali Italiani,* 2007 Rev. Arb. 87, 89-90 (Paris Cour d'Appel) (refusing to recognize decision of Genoa Corte di Appello: "[a court] decision which concludes, after review on the merits, that arbitration clauses contained in contracts between the Iraqi government and the companies … are unenforceable because of embargo regulations enacted by the UN Resolution 661 of 1990, has been rendered by an incompetent court, and such decision cannot be recognized in France").

322)

*See* 19 U.S.C. §1337. Section 1337 authorizes the International Trade Commission to conduct an administrative investigation into alleged unfair trade practices and impose regulatory sanctions. *See also Interdigital Commc'ns LLC v. Int'l Trade Comm'n*, 718 F.3d 1336, 1344 (Fed. Cir. 2013) ("When Congress amended the jurisdictional statute that broadly provides the Court of Appeals with exclusive jurisdiction to hear appeals of any 'final determinations … relating to unfair practices in import trade …' to permit the International Trade Commission (ITC) to terminate an investigation on the basis of 'an agreement between the private parties to the investigation, including an agreement to present the matter for arbitration,' it was envisioning a situation where the parties indisputably agreed to arbitrate, not a situation where there is a serious disagreement as to whether the dispute is subject to arbitration. Tariff Act of 1930, §337(c).").

323)

*See* 19 U.S.C. §1337(c). *See also* Brand, *International Trade Law and the Arbitration of Administrative Law Matters: Farrel Corp. v. U.S. International Trade Commission*, 31 Colum. J. Transnat'l L. 181 (1993).

324)

For commentary, *see* Baizeau, *Arbitration and Insolvency: Issues of Applicable Law*, in C. Müller & A. Rigozzi (eds.), *New Developments in International Commercial Arbitration* 97-120 (2009); Kaufmann-Kohler & Lévy, *Insolvency and International Arbitration*, in H. Peter, N. Jeandin & J. Kilborn (eds.), *The Challenges of Insolvency Law Reform in the 21st Century* 257 (2006); Kaufmann-Kohler, Lévy & Sacco, *The Survival of the Arbitration Agreement and Arbitration Proceeding in Cases of Cross Border Insolvency: An Analysis from the Swiss Perspective*, 2010 Paris J. Int'l Arb. 371, 383; Kröll, *Arbitration and Insolvency: Selected Conflict of Laws Problems*, in F. Ferrari & S. Kröll (eds.), *Conflict of Laws in International Commercial Arbitration* 211 (2d ed. 2019); Kurt, *Comment: An Unstoppable Mandate and An Immovable Policy: The Arbitration Act and the Bankruptcy Code Collide*, 43 UCLA L. Rev. 999 (1996); Landolt, *Switzerland: Supreme Court Should Recalibrate Its Review Following Bankruptcy Case Decision*, Global Arb. Rev. (23 Oct. 2009); V. Lazic, *Insolvency Proceedings and Commercial Arbitration* (1998); Liebscher, *Insolvency and Arbitrability*, in L. Mistelis & S. Brekoulakis (eds.), *Arbitrability: International & Comparative Perspectives* 165 (2009); Mantilla-Serrano, *International Arbitration and Insolvency Proceedings*, 11 Arb. Int'l 51 (1995); Marković, *Impact of EU Insolvency Regulations on Process of Resolving Disputes Before International Commercial Arbitration*, in T. Petrašević & D. Duić (eds.), *Procedural Aspects of EU* 127, 142 (2017); Moyano, *Impecuniosity and Validity of Arbitration Agreements* 34 J. Int'l Arb. 631 (2017); Naegeli, *The Impact of Bankruptcy on A Pending Arbitral Proceeding: Comments on A Recent Decision of the Swiss Federal Supreme Court*, 14(2) Arb. News 57 (2009); Penadés Fons, *International Arbitration and Vis Attractiva Concursus*, in J. Schmidt, C. Esplugues Mota & R. Arenas Garcia (eds.), *EU Law After the Financial Crisis* 237 (2016); Penadés Fons, *El Arbitraje Internacional en el Reglamento Europeo de Insolvencia*, 32 Anuario de Derecho Concursal 265 (2014); Rosell & Prager, *International Arbitration and Bankruptcy: United States, France and the ICC*, 18 J. Int'l Arb. 417 (2001); Soo, *Impact of Insolvency on Hong Kong Arbitration*, 3 Int'l L. Rev. 103 (2000); Vidal, *Arbitration and Insolvency Proceedings: Comments on ICC Awards and Other Recent Decisions*, 20(1) ICC Ct. Bull. 51 (2009); Wagner, *When International Insolvency Law Meets International Arbitration*, 3 Disp. Resol. Int'l 56 (2009); Westbrook, *The Coming Encounter: International Arbitration and Bankruptcy*, 67 Minn. L. Rev. 595 (1983).

325)

*See* Mantilla-Serrano, *International Arbitration and Insolvency Proceedings*, 11 Arb. Int'l 51 (1995) (roughly 5% of awards and proceedings studied at ICC during selected periods involved issues relating to some form of insolvency).

326)

*See* Kaufmann-Kohler & Lévy, *Insolvency and International Arbitration*, in H. Peter, N. Jeandin & J. Kilborn (eds.), *The Challenges of Insolvency Law Reform in the 21st Century* 257, 262-63 (2006); Mantilla-Serrano, *International Arbitration and Insolvency Proceedings*, 11 Arb. Int'l 51, 65 (1995) (quoting from unpublished award: "only those issues that have a direct connection with the insolvency proceedings, that is the issues that arise out of the application of rules particular to those proceedings" are nonarbitrable); A. Samuel, *Jurisdictional Problems in International Commercial Arbitration* 143 (1989) ("an arbitrator cannot officially declare someone bankrupt").

327)

Prior versions of the Polish Bankruptcy Law invalidated (or suspended) arbitration agreements of bankrupt companies. Polish Bankruptcy Law, Art. 142 ("An arbitration agreement concluded by the bankrupt shall lose its force from the date of the declaration of bankruptcy and pending proceedings shall be subject to discontinuance"). That legislation has been repealed and the current Polish Bankruptcy and Restructuring Act provides that arbitration agreements remain valid after bankruptcy proceedings are commenced against a party. Polish Bankruptcy and Restructuring Act, 2015, Art. 147 (arbitration agreement of debtor remains binding after bankruptcy proceedings are commenced).

328)

Latvian Civil Procedure Law, Art. 487(8) (disputes "regarding the rights and obligations of persons that have been declared insolvent before the making of the award by the arbitral tribunal" are not arbitrable); Polish Bankruptcy Law, Art. 142). *See also Judgment of 31 May 2009,* 28 ASA Bull. 104 (Swiss Fed. Trib.) (2010).

329)

*See* §5.06[D][10].

330)

*See* Netherlands Bankruptcy Act, Art. 122; Lazic, *Arbitration and Insolvency Proceedings: Claims of Ordinary Bankruptcy Creditors*, 3.3 E.J.C.L., 1., 4.3.2.2.1 (1999) ("the wording of Art. 122 [of Netherlands Bankruptcy Act] seems to imply that an arbitration agreement concluded prior to the bankruptcy may not be successfully invoked by or against the trustee (or another party contesting the claim)").

331)

*See, e.g., Award in ICC Case No. 12421,* 20 ICC Ct. Bull. 88 (2009) (pursuant to Article 52 of Italian Bankruptcy Law all monetary claims against insolvent company must be brought exclusively in Bankruptcy Court). For claims that do not seek a declaration that the insolvent party owes a debt, the arbitration clause remains valid. *See, e.g., Judgment of 13 February 1991, Adda Officine Elettromeccaniche e Meccaniche v. Alsthom Atlantique SA,* XXI Y.B. Comm. Arb. 580, ¶6 (Lodi Tribunale) (1996). In addition, the Italian Bankruptcy Law provides that the trustee may terminate any contract of the bankrupt party that has not been fully performed; if he does so, arbitral proceedings which are already pending cannot be continued. Italian Bankruptcy Law, Art. 83bis.

332)

*See* Portuguese Bankruptcy Law, Art. 87 ("Without prejudice to provisions contained in applicable international treaties, the efficacy of arbitral agreements relating to disputes that may potentially affect the value of the insolvency estate and to which the insolvent is party shall be suspended"). As discussed below, such legislation will not necessarily be given effect in foreign-seated arbitrations (or judicial proceedings in a foreign arbitral seat). *See Judgment of 16 October 2012,* 31 ASA Bull. 354 (Swiss Fed. Trib.) (2013) (Article 87 of Portuguese Law on Insolvency did not withdraw capacity of insolvent entity to be party to Swiss-seated arbitration).

333)

*See, e.g.,* French Bankruptcy Law, Art. 47 (all proceedings, including arbitration, stayed by commencement of French bankruptcy proceeding); Austrian Insolvency Act, §7 (arbitral proceedings stayed by commencement of insolvency proceedings).

334)

*See, e.g., Judgment of 16 October 2012,* 31 ASA Bull. 354 (Swiss Fed. Trib.) (2013) (where law of place of incorporation of company does not deprive it of legal capacity in insolvency proceedings, company may participate in arbitral proceedings seated in Switzerland; restrictions (other than those relating to company's capacity) that law of its place of incorporation may impose on such arbitral proceedings are irrelevant); *Judgment of 8 December 2009,* DFT 136 III 107 (Swiss Fed. Trib.); *Judgment of 9 April 1991,* DFT 117 II 94 (Swiss Fed. Trib.) (dicta); *Judgment of 9 July 1986,* 5 ASA Bull. 203 (Valais Kantonsgericht) (1987); *Judgment of 8 October 1981,* 1(3) ASA Bull. 27 (Jura Tribunal) (1983). *Contra Judgment of 26 October 1907,* DFT 33 II 648, 653 *et seq.* (Swiss Fed. Trib.) (arbitration clause nullified by declaration of bankruptcy).

335)

*See, e.g., Judgment of 6 May 2009, Jean X. v. Int'l Co. for Commercial Exchanges,* XXXV Y.B. Comm. Arb. 353 (2010) (French Cour de Cassation Civ. 1) (legal proceedings against insolvent party should be stayed until claimant has filed its claim with liquidator; thereafter, proceedings should be limited to validation and quantification of claim); *Judgment of 5 February 1991, Almira Films v. Pierrel,* 1991 Rev. Arb. 625 (French Cour de Cassation Civ. 1), Note, Idot ("The principles of the halting of individual claims by creditors, of the exclusion of the debtor and of the interpretation of actions in the case of bankruptcy are a matter of both internal and international public policy"); *Judgment of 8 March 1988, Thinet v. Labrely,* 1989 Rev. Arb. 473 (French Cour de Cassation Civ. 1); *Judgment of 12 January 1993, République de Côte d'Ivorie v. Norbert Beyrard,* 1994 Rev. Arb. 685 (Paris Cour d'Appel) (ICC arbitral tribunal seated in Paris may proceed with arbitration notwithstanding bankruptcy of party in home jurisdiction). *See also* Rosell & Prager, *International Arbitration and Bankruptcy: United States, France and the ICC,* 18 J. Int'l Arb. 417, 422 (2001) ("It is widely recognized under French jurisprudence and doctrine that principles of comity and equality of creditors require that all proceedings, including arbitrations, be stayed by virtue of the commencement of a French bankruptcy proceeding. However, pursuant to Article 48 of the French Bankruptcy Law, proceedings are only stayed until a creditor has filed a declaration of its claim. Thereafter, the proceedings may continue, and, in practice, proceedings, including international arbitrations, can often be resumed quite quickly. However, the object of the arbitration is generally considered to be transformed. Article 48 of the French Bankruptcy Law provides, in pertinent part, that the continuation of the proceedings leads 'only to the validation of debts and the quantifying of their amount. … Therefore, although the arbitral tribunal may still decide the case, it is generally considered that the purpose of the arbitral award in these circumstances should be solely to liquidate the amount of the claim, rather than order its payment.").

336)

*See, e.g., Judgment of 20 November 2003*, 2004 ZInsO 88 (German Bundesgerichtshof) ("It is generally accepted that the insolvency trustee is bound by an arbitration agreement concluded by the debtor [prior to the commencement of insolvency proceedings]"); *Judgment of 28 February 1957*, 24 BGHZ 15, 18 (German Bundesgerichtshof) ("The trustee in bankruptcy is bound … by an arbitration agreement concluded by the common debtor"); *Judgment of 9 July 1932*, RGZ 137, 109, 111 (German Reichsgericht) ("The legal validity [of an arbitration agreement] is not destroyed by the commencement of insolvency proceedings, it rather is extended to the trustee in bankruptcy. The Insolvency Act assumes that the trustee in bankruptcy is generally bound by the legal situation as it exists when the [insolvency] proceedings are commenced."); *Judgment of 25 September 1998*, 11 Sch 01/98 (Oberlandesgericht Dresden). *See also* Hanefeld, *Germany*, in F.-B. Weigand & A. Baumann (eds.), *Practitioner's Handbook on International Commercial Arbitration* 9.9 (3d ed. 2019) ("The German courts have constantly ruled that an arbitration agreement extends to … [the] trustee and remains unaffected by the insolvency of one party."); K.-H. Schwab & G. Walter, *Schiedsgerichtsbarkeit* ¶16-49 (7th ed. 2005) ("[The arbitration proceedings] are not affected by insolvency").Under German law, if a party becomes unable to fund its share of the arbitration, it is entitled to terminate the arbitration agreement; however, its counter-party has the right (but not the duty), before termination may be effected, to pay all the costs of the arbitration. *Judgment of 12 November 1987*, 1988 NJW 1215 (German Bundesgerichtshof).

337)

Mantilla-Serrano, *International Arbitration and Insolvency Proceedings*, 11 Arb. Int'l 51, 56-58 (1995) (describing various cases of mutually-agreed consent to stay arbitration pending insolvency proceedings).

338)

This appears to be the case in France. *See Judgment of 2 June 2004, Gaussin v. Alstom Power Turbo-machines*, 2004 Rev. Arb. 593 (French Cour de Cassation Com.) ("the public policy principle of stay of individual proceedings by creditors precludes referral of creditor's claims to arbitral tribunal where such claims arose prior to judgment initiating insolvency proceedings); *Judgment of 4 February 1992, Saret v. SBBM*, 1992 Rev. Arb. 663 (French Cour de Cassation Com.); *Judgment of 5 February 1991, Almira Films v. Pierrel*, 1991 Rev. Arb. 625 (French Cour de Cassation Civ. 1) ("the principles of stay of individual proceedings by creditors, of dispossession of the debtor, and of interruption of the case in the event of bankruptcy are matters of both domestic and international public policy: they apply even where the arbitration, while being held in France, is not subject to French law"); *Judgment of 7 April 2011*, 2011 Rev. Arb. 747 (Paris Cour d'Appel).

339)

*See Judgment of 29 December 1967*, DFT 93 III 84, 89 (Swiss Fed. Trib.), discussed in Kaufmann-Kohler & Lévy, *Insolvency and International Arbitration*, in H. Peter, N. Jeandin & J. Kilborn (eds.), *The Challenges of Insolvency Law Reform in the 21st Century* 257, 270 (2006).

340)

*See* Spanish Insolvency Act, Art. 52(1) ("The commencement of an insolvency proceeding, by its own, does not affect the mediation agreements or arbitration agreements entered into by the insolvent. When a court understands that such agreements could undermine the insolvency proceeding, they can order the suspension of their effects without prejudice of the established international treaties.").

341)

*See* English Insolvency Act, 1986, §349A(3) (trustee may affirm arbitration agreement; failing affirmance, bankruptcy court has discretion to decide whether to refer matter to arbitration under agreement); *Salford Estates (No. 2) Ltd v. Altomart Ltd* [2014] EWCA Civ 1575, ¶41 (English Ct. App.) ("Exercise of the discretion [to compel arbitration] otherwise than consistently with the policy underlying the 1996 Act would inevitably encourage parties to an arbitration agreement – as a standard tactic – to by-pass the arbitration agreement and the 1996 Act by presenting a winding up petition. The way would be left open to one party, through the draconian threat of liquidation, to apply pressure on the alleged debtor to pay up immediately or face the burden, often at short notice on an application to restrain presentation … of a winding up petition, of satisfying the Companies Court that a debt is bona fide disputed on substantial grounds. That would be entirely contrary to the parties' agreement as to the proper forum for the resolution of such an issue and to the legislative policy of the 1996 Act."). *See also* Burn & Grubb, *Insolvency and Arbitration in English Law*, 2005 Int'l Arb. L. Rev. 124, 126-27 (discussing procedure).

342)

*Philpott v. Lycee Francais Charles De Gaulle School* [2015] EWHC 1065 (Ch) (English High Ct.).

343)

*Larsen Oil & Gas Pte Ltd v. Petroprod Ltd,* [2011] SGCA 21, ¶¶46, 50 (Singapore Ct. App.) ("[T]he insolvency regime's objective of facilitating claims by a company's creditors against the company and its pre-insolvency management overrides the freedom of the company's pre-insolvency management to choose the forum where such disputes are to be heard. The courts should treat disputes arising from the operation of the statutory provisions of the insolvency regime *per se* as nonarbitrable even if the parties expressly included them within the scope of the arbitration agreement."). *See also Lasmos Ltd v. S.W. PacifiCare Bauxite (HK) Ltd,* [2018] HKCFI 426 (H.K. Ct. First Inst.) (winding-up petition issued on insolvency grounds should generally be dismissed when there is arbitration agreement in contract giving rise to claimed debt).

344)

*Larsen Oil & Gas Pte Ltd v. Petroprod Ltd,* [2011] SGCA 21, ¶¶18, 51 (Singapore Ct. App.) (citing G. Born, *International Commercial Arbitration* 1083 (2009)).

345)

*See In re Anderson* 884 F.3d. 382, 387 (2d Cir. 2018); *In re Tribune Co. Fraudulent Conveyance Litg.,* 818 F.3d 98, 116 (2d Cir. 2016); *In re Robert Plan Co.* 777 F.3d 594, 596 (2d Cir. 2015); *In re Eber* 687 F.3d 1123, 1130 n.6 (9th Cir. 2012); *Whiting-Turner Contracting Co. v. Elec. Mach. Enters., Inc.,* 479 F.3d 791, 796 (11th Cir. 2007) ("In general, bankruptcy courts do not have the discretion to decline to enforce an arbitration agreement relating to a non-core proceeding. … However, even if a proceeding is determined to be a core proceeding, the bankruptcy court must still analyze whether enforcing a valid arbitration agreement would inherently conflict with the underlying purposes of the bankruptcy code."); *MBNA Am. Bank, NA v. Hill,* 436 F.3d 104 (2d Cir. 2006) (reversing bankruptcy court and remanding with directions to stay proceedings in favor of arbitration of core claim).

346)

11 U.S.C. §362(a).

347)

*See, e.g., In re Anderson,* 884 F.3d 382, 387 (2d Cir. 2018); *In re Tribune Co. Fraudulent Conveyance Litg.,* 818 F.3d 98, 116 (2d Cir. 2016); *In re Robert Plan Co.,* 777 F.3d 594, 596 (2d Cir. 2015); *In re Eber,* 687 F.3d 1123, 1130 n.6 (9th Cir. 2012); *Whiting-Turner Contracting Co. v. Elec. Mach. Enters., Inc.,* 479 F.3d 791, 796 (11th Cir. 2007) ("In general, bankruptcy courts do not have the discretion to decline to enforce an arbitration agreement relating to a non-core proceeding. … However, even if a proceeding is determined to be a core proceeding, the bankruptcy court must still analyze whether enforcing a valid arbitration agreement would inherently conflict with the underlying purposes of the bankruptcy code."). *See also MBNA Am. Bank, NA v. Hill,* 436 F.3d 104 (2d Cir. 2006) (reversing bankruptcy court and remanding with directions to stay proceedings in favor of arbitration of core claim); *In re Mor-Ben Ins. Mkts Corp.,* 73 B.R. 644 (9th Cir. B.A.P. 1987); *In re Morgan,* 28 B.R. 3 (9th Cir. 1983); *Hart Ski Mfg Co. v. Maschinenfabrik Hennecke,* 711 F.2d 845 (8th Cir. 1983); *Fotochrome, Inc. v. Copal Co.,* 517 F.2d 512 (2d Cir. 1975); *In re Salander-O'Reilly Galleries, LLC,* 475 B.R. 9, 26 (S.D.N.Y. 2012); *In re SW BACH & Co.,* 425 B.R. 78, 90-92 (Bankr. S.D.N.Y. 2010); *Cibro Petroleum Prods., Inc. v. City of Albany,* 270 B.R. 108, 126 (S.D.N.Y. 2001) (reversing bankruptcy court's denial of motion to compel arbitration of core matter because arbitration of dispute "would not jeopardize an underlying purpose of the Bankruptcy Code"). *Compare Vesta Fire Ins. Corp. v. NewCap Reins. Corp.,* 2000 U.S. Dist. LEXIS 1257 (S.D.N.Y.) (staying arbitration of claims against bankrupt); *Bigelow v. Green Tree Fin. Serv. Corp.,* 2000 WL 33596476 (E.D. Cal.) (compelling arbitration as court perceived no adverse effects on purposes of Bankruptcy Code from compelling arbitration); *In re Beckemeyer,* 206 B.R. 466 (Bankr. W.D. Tenn. 1997) (staying adversary proceeding before Bankruptcy Court, based on parties' arbitration agreement, after concluding that debtor would suffer little prejudice from being required to participate); *In re R.M. Cordova Int'l, Inc.,* 77 B.R. 441 (Bankr. D.N.J. 1987) (same).

348)

See, e.g., In re Eber, 687 F.3d 1123, 1130 n.6 (9th Cir. 2012) ("generally, bankruptcy judges do not have discretion to refuse to compel arbitration of non-core matters because they are generally only tangentially related to a bankruptcy case"); MBNA Am. Bank, NA v. Hill, 436 F.3d 104, 108 (2d Cir. 2006) (in resolving conflicts between Bankruptcy Code and FAA, "courts distinguish between claims over which bankruptcy judges have discretion to refuse arbitration and those that they must send directly to arbitration. Bankruptcy courts generally do not have discretion to refuse to compel arbitration of 'non-core' bankruptcy matters, or matters that are simply 'related to' bankruptcy cases"); Crysen/Montenay Energy Co. v. Shell Oil Co., 226 F.3d 160, 166 (2d Cir. 2000) ("The unmistakable implication is that bankruptcy courts generally do not have discretion to decline to stay non-core proceedings in favor of arbitration, and they certainly have authority to grant such a stay") (emphasis in original); Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 885 F.2d 1149 (3d Cir. 1989); In re MF Global Holdings Ltd, 571 B.R. 80, 95 (Bankr. S.D.N.Y. 2017) ("if a claim is 'non-core,' the court generally lacks discretion and must refer the claim to arbitration"); In re Residential Capital LLC, 563 B.R. 756, 766 (Bankr. S.D.N.Y. 2016); In re Harrelson, 537 B.R. 16, 23, 27 (M.D. Ala. 2015); In re Salander-O'Reilly Galleries, LLC, 475 B.R. 9, 26 (S.D.N.Y. 2012) ("As to non-core proceedings, bankruptcy courts usually do not have the discretion to refuse to compel arbitration, as 'the strong national policy favoring the enforcement of arbitration agreements,' generally trumps 'the lesser interest of bankruptcy courts in adjudicating non-core proceedings that could otherwise be arbitrated'") (quoting Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 226 (U.S. S.Ct. 1987) and Crysen/Montenay Energy Co., 226 F.3d at 166); In re Barney's Inc., 206 B.R. 336 (S.D.N.Y. 1997); In re U.S. Lines, Inc., 199 B.R. 465 (S.D.N.Y. 1996); In re Spectrum Info. Tech., Inc., 183 B.R. 360 (Bankr. E.D.N.Y. 1995); In re Hupp Indus., Inc., 157 B.R. 360, 362 (N.D. Ohio 1993) ("submission of … noncore matters to arbitration presents no conflict with the Bankruptcy Code").

349)

Societe Nationale Algerienne Pour La Recherche v. Distrigas Corp., 80 B.R. 606, 614 (D. Mass. 1987).

350)

See, e.g., In re Gandy, 299 F.3d 489, 498-99 (5th Cir. 2002) (where dispute "intimately implicates a central purpose of the Bankruptcy Code" and claims "appear to represent very nearly the entirety of Debtor's bankruptcy estate," dividing case such that some claims be sent to arbitration "would be of disservice to the parties and defeat the purposes of the Bankruptcy Code"); Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgt Corp., 118 F.3d 1056, 1069 (5th Cir. 1997) ("where the cause of action at issue is not derivative of the pre-petition legal or equitable rights possessed by the debtor but rather is derived entirely from the federal rights conferred by the Bankruptcy Code, a bankruptcy court retains significant discretion to assess whether arbitration would be consistent with the purpose of the Code, including the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders"); In re SW BACH & Co., 425 B.R. 78, 90-92 (Bankr. S.D.N.Y. 2010) (distinguishing between core claims which were "procedural" – "garden variety pre-petition contract disputes dubbed core because of how the dispute arises or gets resolved" – and "substantive" – claims that are "not based on the parties' pre-petition relationship, and involve rights created under the Bankruptcy Code" are core for substantive reasons, and are usually nonarbitrable); Braniff Airways, Inc. v. United Air Lines, Inc., 33 B.R. 33 (Bankr. N.D. Tex. 1983); Coar v. Brown, 29 B.R. 806 (Bankr. N.D. Ill. 1983).

351)

In re U.S. Lines, Inc., 197 F.3d 631 (2d Cir. 1999).

352)

Id. at 640. See also Harwood, Bankruptcy Arbitration and the Unwilling Debtor, 48 Disp. Resol. J. 28 (1993); Kurt, Comment: An Unstoppable Mandate and An Immovable Policy: The Arbitration Act and the Bankruptcy Code Collide, 43 UCLA L. Rev. 999 (1996); Rosell & Prager, International Arbitration and Bankruptcy: United States, France and the ICC, 18 J. Int'l Arb. 417 (2001); Ware, ADR Meets Bankruptcy: Cross-Purposes or Cross-Pollination? Bankruptcy Law's Treatment of Creditors' Jury-Trial and Arbitration Rights, 17 Am. Bankr. Inst. L. Rev. 479 (2009).

353)

See In re U.S. Lines, Inc., 197 F.3d at 640 (quoting Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgt Corp., 118 F.3d 1056, 1067 (5th Cir. 1997)).

354)

*See, e.g., In re Anderson,* 884 F.3d 382, 387 (2d Cir. 2018) ("If the bankruptcy court determines that arbitration would create a 'severe conflict' with the purposes of the Bankruptcy Code, it has discretion to conclude that 'Congress intended to override the Arbitration Act's general policy favoring the enforcement of arbitration agreements'") (quoting *MBNA Am. Bank, NA v. Hill,* 436 F.3d 104, 108 (2d Cir. 2006)); *In re Tribune Co. Fraudulent Conveyance Litg.,* 818 F.3d 98, 116 (2d Cir. 2016); *In re Robert Plan Co.,* 777 F.3d 594, 596 (2d Cir. 2015); *MBNA Am. Bank, NA v. Hill,* 436 F.3d 104, 108 (2d Cir. 2006) (court may deny motion to compel arbitration only when there is a "severe conflict" between FAA and Bankruptcy Code); *Winton v. Trans Union LLC,* 2019 WL 1932342, at *4 (E.D. Pa.) ("A bankruptcy discharge extinguishes only 'the personal liability of the debtor.' ... While personal liability for the underlying debt is discharged, a bankruptcy discharge does not render a valid arbitration agreement unenforceable."); *Crooks v. Wells Fargo, NA,* 312 F.Supp.3d 932, 938 (S.D. Cal. 2018); *Sidney v. Verizon Commc'ns,* 2018 WL 1459461 (E.D.N.Y.) (same); *McMahan v. Byrider Sales of Ind. S., LLC,* 2017 WL 4077013, at *4 (W.D. Ky.); *AmeriCorp, Inc. v. Hamm,* 2012 WL 1392927, at *3-4 (M.D. Ala.) ("the party opposing arbitration ... [must] meet its burden of showing that arbitration of the core proceeding inherently conflicts with the Bankruptcy Code"); *In re Garrido Jimenez,* 455 B.R. 51, 71 (D.P.R. 2011) ("where a conflict exists between the Bankruptcy Code and the FAA, a bankruptcy court retains discretion to decide whether and when to compel arbitration if the at-issue proceeding is core"); *In re Rarities Group, Inc.,* 434 B.R. 1 (D. Mass. 2010) ("For both core and non-core claims, then, a bankruptcy court must still analyze whether enforcing a valid arbitration agreement would inherently conflict with the underlying purposes of the Bankruptcy Code"); *In re Bethlehem Steel Corp.,* 390 B.R. 784, 794 (Bankr. S.D.N.Y. 2008) (preferential transfer claims brought under 11 U.S.C. §547 are clearly "core proceedings": "In core proceedings, a further determination is needed to show that arbitrating the dispute would severely conflict with relevant provisions of the Bankruptcy Code. 'If a severe conflict is found, then the court can properly conclude that, with respect to the particular Code provision involved, Congress intended to override the Arbitration Act's general policy favoring enforcement of arbitration agreements.'") (quoting *MBNA Am. Bank,* 436 F.3d at 108).

355)

*In re Bethlehem Steel Corp.,* 390 B.R. 784, 794 (Bankr. S.D.N.Y. 2008). *See also In re JSC BTA Bank,* 434 B.R. 334, 340 (Bankr. S.D.N.Y. 2010) (denying debtor's motion to stay foreign arbitral proceedings having no connection to the United States; "[Chapter 15] stays actions against a foreign debtor within the United States and applies in other countries only to the extent that such actions affect property of the debtor that is 'within the territorial jurisdiction of the United States.' ... The automatic stay does not afford broad anti-suit injunctive relief to the debtor entity outside the territorial jurisdiction of the United States upon entry of an order of recognition in a chapter 15 case. ... [A] broadly expansive interpretation ... would improperly centralize global control of dispute resolution within an ancillary case in the United States that is meant to support, not supplant, a main proceeding in a foreign jurisdiction."); *In re Nu-Kote Holding, Inc.,* 257 B.R. 855, 863 (Bankr. M.D. Tenn. 2001) (considering whether arbitration provision was "international" as factor in compelling arbitration).

356)

*See, e.g., Ingenieria, Maquinaria y Equipos de Colombia SA v. ATTS, Inc.,* 2017 WL 6316632 (D.N.J.) (pending bankruptcy proceedings in Colombia did not render dispute nonarbitrable or invalidate arbitration agreement).

357)

*See* 11 U.S.C. §365(a). Rejection of an executory contract by a bankruptcy trustee gives rise to potential breach of contract claims. *See Stewart Foods, Inc. v. Broecker,* 64 F.3d 141, 144 (4th Cir. 1995) ("The rejection of an executory contract constitutes a breach of the contract, and a party's damages resulting from that rejection are treated as a pre-petition claim and receive the priority provided to general unsecured creditors"). *See also* 11 U.S.C. §365(g)(1).

358)

*See, e.g., In re Fleming Cos.,* 2007 WL 788921, at *3 (D. Del.) (arbitration clause in contract rejected by trustee survives rejection); *Societe Nationale Algerienne Pour La Recherche v. Distrigas Corp.,* 80 B.R. 606, 609 (D. Mass. 1987) (where rejection of executory contract is itself a breach of that contract, arbitration clause may be considered "separable" and survives rejection of contract in which it appears).

359)

*Megafoods Stores, Inc. v. Flagstaff Realty Assocs.,* 60 F.3d 1031, 1034 (3d Cir. 1995). *Accord Cinicola v. Scharffenberger,* 248 F.3d 110, 119 n.8 (3d Cir. 2001).

360)

*See Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153-55 (3d Cir. 1989) (trustee is bound by arbitration clause contained in nonexecutory contract when standing in shoes of debtor; claims which derive not from any claims debtor would have had but rather from powers established by Bankruptcy Code are not subject to arbitration); *In re Paragon Offshore plc,* 588 B.R. 735, 748 (Bankr. D. Del. 2018); *Janvey v. Alguire*, 2014 U.S. Dist. LEXIS 193394, at *109 (N.D. Tex.); *Cohen v. Ernst & Young LLP*, 372 B.R. 530, 540 (Bankr. S.D. Ga. 2007) ("as the party asserting these causes of action derived from the Debtors, the Trustee stands in the shoes of the Debtors and is subject to the same defenses that could have been asserted against the Debtors had they brought the causes of action, including exposure to the arbitration clauses").

361)

*Elektrim SA v. Vivendi Universal SA* [2009] EWCA Civ 677 (English Ct. App.).

362)

Polish Bankruptcy Law, Arts. 142, 147. *See* §5.06[C][11].

363)

*See Elektrim SA* [2009] EWCA Civ 677.

364)

*See Id. See also Nori Holding Ltd v. PJSC "Bank Otkritie Fin. Corp."* [2018] EWHC 1343, ¶63 (Comm) (English High Ct.).

365)

*See Judgment of 31 March 2009, Vivendi SA v. Deutsche Telekom AG*, 28 ASA Bull. 104 (Swiss Fed. Trib.) (2010) (confirming award holding that bankruptcy of Polish company deprived company of capacity to arbitrate, under Article 142 of Polish Bankruptcy Law, and that Polish law of capacity applied in arbitration seated in Switzerland). *See also* Landolt, *Switzerland: Supreme Court Should Recalibrate Its Review Following Bankruptcy Case Decision*, Global Arb. Rev. (23 Oct. 2009); Naegeli, *The Impact of Bankruptcy on A Pending Arbitral Proceeding: Comments on A Recent Decision of the Swiss Federal Supreme Court*, 14(2) Arb. News 57, 58 (2009).

366)

*Judgment of 31 March 2009, Vivendi SA v. Deutsche Telekom AG*, 28 ASA Bull. 104, 108 (Swiss Fed. Trib.) (2010). In contrast to the English decision, cited above, the EU Insolvency Regulation was not applicable in the Swiss proceedings, leaving the choice of law governing capacity to Swiss law, which was held to provide for application of the personal law of the Polish company (Polish law). *Id.*

367)

In contrast to the English Court of Appeal, the arbitral tribunal refused to interpret the EU Insolvency Regulation to require application of the law of the arbitral seat to issues of capacity. *See Award in ICC Case No. 12421,* 20(1) ICC Ct. Bull. 88, 89 (2009) ("We also have misgivings about the meaning and effect of Article 15 of the Insolvency Regulation. In the first place, it is not clear that an arbitration is a 'lawsuit pending': the phrase might only refer to court proceedings which are pending"). In any event, as noted above, the Swiss arbitral tribunal and Swiss Federal Tribunal concluded that the EU Insolvency Regulation was inapplicable in a Swiss-seated arbitration.

368)

*See* Kaufmann-Kohler, Lévy & Sacco, *The Survival of the Arbitration Agreement and Arbitration Proceeding in Cases of Cross Border Insolvency: An Analysis from the Swiss Perspective*, 2010 Paris J. Int'l Arb. 371, 383 (disagreeing with Swiss Federal Tribunal's characterization of Polish Bankruptcy Law as addressing "subjective capacity" and instead concluding that it "points to issues of substantive validity of the arbitration agreement and the conduct of the arbitration proceedings").

369)

Karrer, *Views on the Decision by the Swiss Supreme Court of March 31, 2009, Vivendi. v. Deutsche Telekom*, 28 ASA Bull. 111, 111 (2010).

370)

*Judgment of 16 October 2012*, 31 ASA Bull. 354, 362-63 (Swiss Fed. Trib.) (2013) ("The *Vivendi* judgment must rather be seen in the specific context of Polish law and the legal writing developed thereunder, as expressed in the legal opinions of Polish law professors. It may neither be generalized nor extend the observations made there as to Polish law to other legal orders."). *See also* Naegeli, *The Capacity of A Bankrupt Party to Be or Remain A Party to International Arbitral Proceedings: A Landmark Decision of the Swiss Federal Supreme Court*, 31 ASA Bull. 372, 380 (2013).

371)

*Judgment of 16 October 2012*, 31 ASA Bull. 354, 366 (Swiss Fed. Trib.) (2013). *See also* Naegeli, *The Capacity of A Bankrupt Party to Be or Remain A Party to International Arbitral Proceedings: A Landmark Decision of the Swiss Federal Supreme Court*, 31 ASA Bull. 372, 379 (2013).

372)

*Judgment of 16 October 2012*, 31 ASA Bull. 354, 366 (Swiss Fed. Trib.) (2013).

373)

*Id.* (Article 37 of Portuguese Law on Insolvency did not withdraw capacity of insolvent entity to be party to Swiss-seated arbitration). The Swiss Federal Tribunal's subsequent decision did not address many of the choice-of-law arguments raised in its decision involving Poland's insolvency legislation which had characterized that legislation as involving issues of capacity. *See* §6.04[F][4].

374)

*See also Judgment of 20 March 2015,* Case No. T 8043-13 (Svea Ct. App).

375)

The ICC (and most other arbitral institutions) will continue to administer arbitrations that are conducted against allegedly insolvent parties, notwithstanding arguments that insolvency terminates or discharges the arbitration agreement. *See* Fry, *Extracts from ICC Arbitral Awards: Arbitration and Insolvency Proceedings*, 20(1) ICC Ct. Bull. 71 (2009); Mantilla-Serrano, *International Arbitration and Insolvency Proceedings*, 11 Arb. Int'l 51, 53-54 (1995); Vidal, *Arbitration and Insolvency Proceedings: Comments on ICC Awards and Other Recent Decisions*, 20(1) ICC Ct. Bull. 51 (2009).

376)

*See, e.g., Interim Award in ICC Case No. 7337,* XXIV Y.B. Comm. Arb. 149, 154 (1999) ("[T]he bankruptcy estate is bound by the agreement to arbitrate in the exclusive distributorship contract. … Consequently, he has jurisdiction to try claimant's claims against [the bankruptcy estate], although any award on the merits in favour of claimant would be binding on the bankruptcy estate only as the basis for claimant's dividend as a creditor in the bankruptcy."); *Award in ICC Case No. 6192,* excerpted in Mantilla-Serrano, *International Arbitration and Insolvency Proceedings*, 11 Arb. Int'l 51, 65 (1995) (rejecting argument that trustee for bankrupt company could not assert claim in arbitration); *Award in ICC Case No. 5877,* excerpted in *id.* at 67 (rejecting argument that claimant could not pursue arbitration against insolvent company, and could instead proceed only against its insolvency trustees); *Award in ICC Case No. 4415,* 111 J.D.I. (Clunet) 952 (1984) (tribunal proceeding with arbitration notwithstanding respondent being declared bankrupt and stricken from company register in home jurisdiction); *Award in ICC Case No. 2139,* 102 J.D.I. (Clunet) 929 (1975) (same).

377)

*See, e.g., Award in ICC Case No. 7563,* 121 J.D.I. (Clunet) 1054 (1994) (international public policy would preclude enforcement of award against insolvent party for duration of bankruptcy proceedings); *Award in ICC Case No. 7205,* 122 J.D.I. (Clunet) 1031 (1995); *Partial Award in ICC Case No. 6697,* 1992 Rev. Arb. 135, 141 ("[T]he fact that one of the parties is subject to bankruptcy proceedings is not in itself sufficient to render a dispute nonarbitrable *per se.* … The only disputes which are excluded are those which have a direct link with the bankruptcy proceedings, namely those disputes arising from the application of rules specific to those proceedings."); *Award in ICC Case No. 6057,* 120 J.D.I. (Clunet) 1016 (1993) (bankruptcy proceedings in France do not affect pending arbitral proceedings in Syria; tribunal relied on Syrian law, as applicable law, which does not recognize French bankruptcy proceedings). *Compare Award in ICC Case No. 9163,* 2003 Rev. Arb. 227, 230 ("[T]he insolvency law of the country where the insolvency proceedings take place has all the characteristics of a mandatory rule of law to which the arbitral tribunal must have regard, by reason of this law's 'close links' with the dispute and the 'legitimate interests' that it purports to safeguard. The place of the arbitration and the laws applicable to the merit or the arbitral procedure matter little.").

378)

Mantilla-Serrano, *International Arbitration and Insolvency Proceedings*, 11 Arb. Int'l 51, 57 (1995). The same author rejects the applicability of *lis pendens* principles in arbitral proceedings. *Id.* at 61. *See also* §27.03.

379)

*See, e.g., Award in ICC Case No. 11876,* 20 ICC Ct. Bull. 85 (2009) ("In light of the above mentioned French doctrine and case law, we consider that the commencement of liquidation proceedings in relation to the Respondent [a French company] cannot deprive us, the Arbitral Tribunal [seated in England], of jurisdiction"); *Interim Award in ICC Case No. 7337,* XXIV Y.B. Comm. Arb. 149, 153 (1999) (with regard to bankrupt Swedish company: "Although an arbitration may be pursued against the debtor, the bankruptcy estate is the proper law to all post-bankruptcy legal proceedings as it has assumed, by universal succession, all rights and obligations of the debtor"); *Award in ICC Case No. 6057,* 120 J.D.I. (Clunet) 1016 (1993) (regardless of French law, arbitral tribunal, sitting in Damascus and applying Syrian law, "considers that its mission … is not to be affected by a Court's decision rendered subsequently in France which, without more, is not intended to produce effects" outside France), quoted in Mantilla-Serrano, *International Arbitration and Insolvency Proceedings*, 11 Arb. Int'l 51, 58 (1995); *Award in ICC Case No. 4415,* 111 J.D.I. (Clunet) 952 (1984); *Award in ICC Case No. 2139,* 102 J.D.I. (Clunet) 929 (1975); *Award in ICC Case No. 1350,* 102 J.D.I. (Clunet) 931 (1975); *Award in SCAI Case No. 25 of 25 January 2016,* 34 ASA Bull. 394 (2016); *Award in CAM Case of 21 September 2016,* summarized in *A Contribution by the ITA Board of Reporters.*

380)

See §5.03[B].

381)

The German Bundesgerichtshof's conclusion that German securities legislation invalidating agreements to arbitrate future securities disputes concerned matters of "capacity" is an example of such (wrongful) application of the Convention. See §6.04[B][3].

382)

Judgment of 16 October 2012, 31 ASA Bull. 354, 366 (Swiss Fed. Trib.) (2013). See §6.04[F][4].

383)

See §4.05[C][5].

384)

See §6.04[F][3].

385)

See §6.04[F][3].

386)

For a more detailed discussion of this choice-of-law analysis, see §4.05[B].

387)

See §6.02[G].

388)

For commentary, see Aubert, L'Arbitrage en Droit du Travail, 18 ASA Bull. 2 (2000); Bingham, Emerging Due Process Concerns in Employment Arbitration: A Look at Actual Cases, 47 Lab. L.J. 113 (1996); Bingham, Employment Arbitration: The Repeat Player Effect, 1 Empl. Rts. & Employ. Pol'y J. 189 (1997); Carbonneau, Liberal Rules of Arbitrability and the Autonomy of Labor Arbitration in the United States, in L. Mistelis & S. Brekoulakis (eds.), Arbitrability: International & Comparative Perspectives 143 (2009); Castellane, Arbitration in Employment Relationships in France, 26 J. Int'l Arb. 293 (2009); Cole, Incentives and Arbitration: The Case Against Enforcement of Executory Arbitration Agreements Between Employers and Employees, 64 U.M.K.C.L. Rev. 449 (1996); Courtois-Champenois, L'Arbitrage des Litiges en Droit du Travail: À la Redécouverte d'Une Institution Française en Disgrâce, 2003 Rev. Arb. 349; Craver, The Use of Non-Judicial Procedures to Resolve Employment Discrimination Claims, 11 Kan. J.L. & Pub. Pol'y 141 (2001); Estreicher, Predispute Agreements to Arbitrate Statutory Employment Claims, 72 N.Y.U. L. Rev. 1352 (1997); Johnson & Wildhaber, Arbitrating Labor Disputes in Switzerland, 27 J. Int'l Arb. 631 (2010); Kirry, Arbitrability: Current Trends in Europe, 12 Arb. Int'l 373 (1996); Nickson, Closing U.S. Court to Foreign Seamen: The Judicial Excision of the FAA Seamen's Arbitration Exemption from the New York Convention Act, 41 Tex. Int'l L.J. 103 (2006); Rogers, The Arrival of the "Have-Nots" in International Arbitration, 8 Nev. L.J. 341 (2007); Sternlight, Is the U.S. out on A Limb? Comparing the U.S. Approach to Mandatory Consumer and Employment Arbitration to That of the Rest of the World, 56 U. Miami L. Rev. 831 (2002); St. Antoine, Mandatory Arbitration of Employee Discrimination Claims: Unmitigated Evil or Blessing in Disguise?, 15 T.M. Cooley L. Rev. 1 (1998).

389)

See Belgian Judicial Code, Art. 1676(5).

390)

See Italian Code of Civil Procedure, Art. 806; Judgment of 30 April 1980, V Y.B. Comm. Arb. 342 (Genoa Pretore) (1980); F. Emanuele & M. Molfa, Selected Issues in International Arbitration: The Italian Perspective 86 (2014) ("The disputes envisaged in Article 409 [of the Code of Civil Procedure] [employment disputes] may be submitted to arbitration only to the extent that is allowed by statute or by individual or collective contracts of employment").

391)

See U.K. Employment Rights Act, 1996, §203(1)(b); Clyde & Co. LLP v. van Winkelhof [2011] EWHC 668 (Comm) (English High Ct.) (claims under Employment Rights Act, 1996 are nonarbitrable).

392)

French courts have consistently held employment disputes nonarbitrable on the basis of Article L1411-4 of the French Employment Code. Article L1411-4 provides that "*Conseil des prud'hommes* [*i.e.,* court specialized in employment disputes] has exclusive jurisdiction, regardless of the amount claimed, to rule on the disputes arising out of the performance or termination of employment contracts; any agreement to the contrary is without effect." *See, e.g., Judgment of 30 November 2011, Conseil v. Serant*, 2012 Rev. Arb. 433 (French Cour de Cassation Soc.); *Judgment of 28 June 2005, Taiphoon Ltd v. Bobinet*, 2005 Rev. Arb. 799 (French Cour de Cassation Soc.) (dispute involving international employment contract is nonarbitrable, regardless of law applicable to employment contract); *Judgment of 9 October 2001, SA Kis France v. Lopez-Alberdi*, 2002 Rev. Arb. 347 (French Cour de Cassation Soc.) (same); *Judgment of 16 February 1999, Chateau Tour Saint Christophe v. Asthorn,* and *Judgment of 4 May 1999, Picquet v. Sacinter*, 1999 Rev. Arb. 290 (French Cour de Cassation Soc.) (disputes involving international employment agreement are nonarbitrable; arbitration agreement is not null and void, but cannot be enforced against employee); *Judgment of 12 February 1985*, 1986 Rev. Arb. 47 (French Cour de Cassation Soc.); *Judgment of 10 January 2012, Serant v. Deloitte Conseil*, 2012 Rev. Arb. 337 (Paris Cour d'Appel). *See also* Boucaron-Nardetto, *La Réforme de l'Article 2061 du Code Civil Français*, 10 Arbitraje: Revista de Arbitraje Comercial y de Inversiones 109, 124 (2017); Clay, *La Réforme des Articles du Code Civil sur l'Arbitrage en France*, 35 ASA Bull. 40, 48 (2017); Jarrosson & Racine, *Les Dispositions Relatives à l'Arbitrage dans la Loi de Modernisation de la Justice du XXie Siècle*, 2017 Rev. Arb. 1007, 1021.One lower court decision held that an arbitration clause in an international labor contract is valid and enforceable. *See Judgment of 13 September 1993*, XX Y.B. Comm. Arb. 656 (Grenoble Cour d'Appel) (1995) ("arbitration agreement included in an international individual employment agreement is valid").

393)

*See, e.g.*, Chinese Arbitration Law, Art. 77 (providing for arbitration of labor disputes to be separately regulated outside ambit of Chinese Arbitration Law); Japanese Arbitration Law, Supplementary Provisions, Art. 4 ("for the time being," agreements to arbitrate certain "individual labor-related disputes" shall be "null and void"); Libyan Code of Civil Procedure, Art. 740; *Kingfisher Airlines Ltd v. Captain Prithvi Malhotra,* Writ Petition No. 2585/2012, ¶11 (Bombay High Ct. 2012) (labor disputes nonarbitrable: "'Adjudication of certain categories of proceedings are reserved by the legislature exclusively for public fora as a matter of public policy. Certain other categories of cases, though not expressly reserved for adjudication by public fora … may by necessary implication stand exclude from the purview of private fora. Consequently, where the cause/dispute is inarbitrable, the Court where a suit is pending, will refuse to refer the parties to arbitration, under §8 of the Act, even if the parties might have agreed upon arbitration as the forum for settlement of such disputes.'") (quoting *Booz Allen & Hamilton Inc. v. SBI Home Fin. Ltd*, Civil Appeal No. 5440/2002, ¶22 (Indian S.Ct. 2011)); *Judgment of 18 March 2010, Xerox Comercio e Indústria LTDA v. Guimaraes Neto*, Case No. TST-RR-79500-61.2006.5.05.0028 (Trabalho Tribunal Superior) (although collective labor disputes are arbitrable, individual labor disputes (involving claims for rescission of a labor contract) are nonarbitrable). *See also Korat v. Innoviti,* Writ Petition No. 34537/2015 (Karnataka High Ct. 2017); Sitaram, *Arbitration of Labor Disputes in India: Towards A Public Policy Theory of Arbitrability*, Kluwer Arb. Blog (26 Nov. 2017).

394)

*Judgment of 30 November 2011, Deloitte Conseil v. Serant,* 2012 Rev. Arb. 333, 337 (French Cour de Cassation Soc.).

395)

*See United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593 (U.S. S.Ct. 1960); T. Bornstein, A. Gosline & M. Greenbaum, *Labor and Employment Arbitration* §1.04 (2007); Corrada, *The Arbitral Imperative in Labor and Employment Law,* 47 Cath. U. L. Rev. 919 (1998); Nolan & Abrams, *American Labor Arbitration: The Early Years*, 35 Fla. L. Rev. 373 (1983); Nolan & Abrams, *American Labor Arbitration: The Maturing Years*, 35 Fla. L. Rev. 557 (1983).

396)

*See* T. Bornstein, A. Gosline & M. Greenbaum, *Labor and Employment Arbitration* §§1.01, 45.01 (2007); Carbonneau, *Liberal Rules of Arbitrability and the Autonomy of Labor Arbitration in the United States,* in L. Mistelis & S. Brekoulakis (eds.), *Arbitrability: International & Comparative Perspectives* 143 (2009); Corrada, *The Arbitral Imperative in Labor and Employment Law,* 47 Cath. U. L. Rev. 919 (1998); Malin & Ladenson, *Privatizing Justice: A Jurisprudential Perspective on Labor and Employment Arbitration from the* Steelworkers *Trilogy to* Gilmer, 44 Hastings L.J. 1187 (1993).

397)

U.S. FAA, 9 U.S.C. §1.

398)

See *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 107 (U.S. S.Ct. 2001) ("As for the residual exclusion of 'any other class of workers engaged in foreign or interstate commerce,' it would be rational for Congress to ensure that workers in general would be covered by the FAA, while reserving for itself more specific legislation for transportation workers"). It is unclear what scope of commerce Congress envisaged in 1925, and in particular whether §1 excluded only a limited class of specialized transportation workers or, instead, most employees engaged in what was considered at the time to be the full reach of interstate commerce (*e.g.*, transportation).

399)

*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (U.S. S.Ct. 1991).

400)

*Epic Sys. Corp. v. Lewis,* 138 S.Ct. 1612, 1627 (U.S. S.Ct. 2018).

401)

See, e.g., *Dorman v. Charles Schwab Corp.,* 780 F.App'x 510, 513 (9th Cir. 2019); *Prime Healthcare Serv.-Landmark LLC v. United Nurses & Allied Prof'ls, Local 5067,* 848 F.3d 41, 48 (1st Cir. 2017) (ERISA claims arbitrable); *Woods v. Tex. Aggregates, LLC,* 459 F.3d 600, 603-04 (5th Cir. 2006) (ERISA claims arbitrable); *Caley v. Gulfstream Aerospace Corp.,* 428 F.3d 1359, 1367 (11th Cir. 2005); *Chappel v. Lab. Corp. of Am.,* 232 F.3d 719, 726 (9th Cir. 2000) (ERISA claims arbitrable); *Kramer v. Smith Barney,* 80 F.3d 1080 (5th Cir. 1996) (same); *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 7 F.3d 1110, 1117 (3d Cir. 1993) ("duty to enforce arbitration agreements is not diminished when a party bound by an agreement raises a claim founded upon statutory rights [such as ERISA]"); *Bird v. Shearson Lehman/Am. Express, Inc.,* 926 F.2d 116 (2d Cir. 1991); *Peruvian Connection, Ltd v. Christian,* 977 F.Supp. 1107, 1113-14 (D. Kan. 1997) ("Having conceded that an arbitrator is competent to decide sophisticated breach of fiduciary duty claims under ERISA, [defendant] cannot be heard to assert this case is somehow beyond the competence of an arbitrator"); *Bevere v. Oppenheimer,* 862 F.Supp. 1243 (D.N.J. 1994); *Fox v. Merrill Lynch & Co.,* 453 F.Supp. 561 (S.D.N.Y. 1978).

402)

See, e.g., *14 Penn Plaza LLC v. Pyett,* 556 U.S. 247, 258-60, 274 (U.S. S.Ct. 2009) ("a collective-bargaining agreement that clearly and unmistakably requires union members to arbitrate [ADEA] claims is enforceable as a matter of federal law"); *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20 (U.S. S.Ct. 1991); *Patterson v. Tenet Healthcare, Inc.,* 113 F.3d 832, 837 (8th Cir. 1997) ("Title VII claims, like ADEA claims, are subject to individual consensual agreements to arbitrate").

403)

See, e.g., *Walthour v. Chipio Windshield Repair, LLC,* 745 F.3d 1326, 1334 (11th Cir. 2014) (arbitration agreement containing FLSA class action waiver is valid); *Sutherland v. Ernst & Young LLP,* 726 F.3d 290, 296 (2d Cir. 2013); *Owen v. Bristol Care, Inc.,* 702 F.3d 1050, 1052 (8th Cir. 2013) ("the FLSA contains no 'contrary congressional command' as required to override the FAA"); *Albertson's, Inc. v. United Food & Commercial Workers Union,* 157 F.3d 758, 762 (9th Cir. 1998) ("under the FAA the employee's individual agreement to arbitrate all disputes was enforceable with respect to disputes over claims covered by the FLSA"); *Kuehner v. Dickinson & Co.,* 84 F.3d 316, 319-20 (9th Cir. 1996); *Bell v. S.E. Pa. Transp. Auth.,* 2012 WL 4479272, at *6 (E.D. Pa.) ("FLSA claim required arbitration when the plaintiff alleged certain activities were considered work under the FLSA") *rev'd on other grounds,* 733 F.3d 490, 495 (3d Cir. 2013); *DeLock v. Securitas Sec. Servs. USA, Inc.,* 883 F.Supp.2d 784, 788 (E.D. Ark. 2012) ("Nothing in the FLSA's text or legislative history indicates that Congress excepted those claims from the FAA's mandate" to enforce arbitration agreements according to their terms); *D'Antuono v. Serv. Road Corp.,* 789 F.Supp.2d 308, 319 (D. Conn. 2011).

404)

*Epic Sys.,* 138 S.Ct. at 1627.

405)

See *Estibeiro v. Carnival Corp.,* 2012 WL 4718978, at *5 (S.D. Fla.) ("Plaintiff maintains that a 2008 amendment to the Jones Act, which deleted the statute's venue provision, renders the Bermuda forum selection clause unlawful and contrary to public policy and, as such, … Jones Act claim is inarbitrable. This argument has been expressly rejected by the Eleventh Circuit."); *Lazarus v. Princess Cruise Lines, Ltd,* 2011 WL 6070294, at *2 (S.D. Fla.).

406)

See, e.g., Lambert v. Tesla, Inc., 923 F.3d 1246, 1248 (9th Cir. 2019); Ashbey v. Archstone Prop. Mgt, 785 F.3d 1320, 1323 (9th Cir. 2015); Anthony v. Affiliated Computer Serv. Inc., 621 F.App'x 49, 51 (2d Cir. 2015); Jock v. Sterling Jewelers, Inc., 646 F.3d 113 (2d Cir. 2011) (Title VII claims arbitrable); Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1364 (11th Cir. 2005) (same); EEOC v. Luce, Forward, Hamilton & Scripps, 345 F.3d 742, 744 (9th Cir. 2003) (same); Patterson v. Tenet Healthcare, Inc., 113 F.3d 832, 837 (8th Cir. 1997) ("Title VII claims, like ADEA claims, are subject to individual consensual agreements to arbitrate"); Alford v. Dean Witter Reynolds, Inc., 939 F.2d 229 (5th Cir. 1991) (Title VII claims arbitrable); Bright-Asante v. Saks & Co. Inc., 242 F.Supp.3d 229, 241 (S.D.N.Y. 2017); Hagan v. Katz Commc'n Inc., 200 F.Supp.3d 435, 442 (S.D.N.Y. 2016); DeGroff v. Mascotech Forming Techs. – Fort Waynes, Inc., 179 F.Supp.2d 896, 907 (N.D. Ind. 2001) ("Agreements that require arbitration of statutory claims, including discrimination and retaliation claims under Title VII, are generally enforceable under the FAA"); Johnson v. Hubbard Broadcasting, Inc., 940 F.Supp. 1447 (D. Minn. 1996) (same); Cherry v. Wertheim Schroder, 868 F.Supp. 830 (D.S.C. 1994) (same).

407)

See, e.g., Perry v. Thomas, 482 U.S. 483 (U.S. S.Ct. 1987) (claim for wages under state law, forbidding arbitration of such claims, arbitrable under FAA); Patterson v. Tenet Healthcare, Inc., 1996 WL 33674550 (W.D. Mo.) (employee's claims under Title VII and Missouri Human Rights Act subject to arbitration); Fletcher v. Kidder, Peabody & Co., 601 N.Y.S.2d 686 (N.Y. 1993) (state employment discrimination claims held arbitrable); Rembert v. Ryan's Family Steak Houses, Inc., 596 N.W.2d 208, 230 (Mich. App. 1999) (state statutory employment discrimination claims held arbitrable so long as arbitral process is fair and employee waives no substantive statutory rights or remedies).

408)

See §2.03[B][2][b]; §6.04 _[G][2]; Thomas v. Carnival Corp., 573 F.3d 1113, 1117 (11th Cir. 2009); Rogers v. Royal Caribbean Cruise Line, 547 F.3d 1148, 1155-59 (9th Cir. 2008); Bautista v. Star Cruises, 396 F.3d 1289, 1300 (11th Cir. 2005); Francisco v. Stolt Achievement MT, 293 F.3d 270, 274-75 (5th Cir. 2002).

409)

See Bautista, 396 F.3d at 1300; Francisco, 293 F.3d at 274-75.

410)

Francisco, 293 F.3d at 274. See also Lobo v. Celebrity Cruises, Inc., 488 F.3d 891, 894 (11th Cir. 2007) (dismissing claim brought under Seamen's Wage Act and enforcing arbitration agreement contained in employment agreement because Congress' intent when implementing New York Convention was to promote "uniform enforcement of arbitration agreements, despite the potential presence of parochial policies present in other parts of the U.S. Code … to nullify the arbitration provision here would hinder the purpose of the Convention and subvert congressional intent"). The "commercial" requirement under the Convention is discussed above. See §§2.03[B][1]-[2]).

411)

See, e.g., Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1 (1st Cir. 1999) (employer did not provide employee with rules explaining what disputes were subject to arbitration); Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465 (D.C. Cir. 1997) (arbitration agreement, required as condition of employment, cannot validly require former employee to pay any portion of arbitrators' fees); Prudential v. Lai, 42 F.3d 1299 (9th Cir. 1994) (in deciding whether arbitration clause waived claims for civil action over sexual harassment and discrimination, notice of waiver required); Clinton v. Oppenheimer & Co. Inc., 214 F.Supp.2d 476, 458 (S.D.N.Y. 2011); Bennet v. Dillard's Inc., 849 F.Supp.2d 616, 619 (E.D. Va. 2011); Geiger v. Ryan's Family Steak Houses, Inc., 134 F.Supp.2d 985, 998 (S.D. Ind. 2001) (employment arbitration agreement consisting of three separate documents, one of which was not given to employee; not sufficient to apprise employee of rights and obligations regarding arbitration); Prevot v. Phillips Petroleum Co., 133 F.Supp.2d 937, 940-41 (S.D. Tex. 2001) (English-language arbitration agreements unconscionable where they were not translated for non-English-speaking employees and employees were pressured into signing them); Hoffman v. Kamhi, Inc., 927 F.Supp. 640 (S.D.N.Y. 1996) (in deciding whether arbitration clause encompassed employee's statutory claims, court required that clause put employee on notice of waiver of such claims).

412)

See, e.g., Semcken v. Genesis Med. Interventional, Inc., 2004 WL 2203561 (N.D. Cal.) (arbitration clause in negotiated, executed employment agreement fully enforceable); §15.02.

413)

See Penn Plaza LLC v. Pyett, 556 U.S. 247, 258 (U.S. S.Ct. 2009); Green Tree Fin. Corp. v. Randolph, 531 U.S. 79, 92 (U.S. S.Ct. 2000) ("where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs").

414)

*See Campbell v. Gen. Dynamics Gov't Sys. Corp.,* 407 F.3d 546, 552 (1st Cir. 2005); *Caley v. Gulfstream Aerospace Corp.,* 428 F.3d 1359, 1375 (11th Cir. 2005); *Gold v. Deutsche AG,* 365 F.3d 144, 147 (2d Cir. 2004); *Brown v. Wheat First Sec.,* 257 F.3d 821, 826 (D.C. Cir. 2001) ("[The Supreme Court] framed the question as whether dispute resolution under the FAA was consistent with the federal right-creating statute in question. … For a common law claim under District of Columbia law, any such inconsistency would be resolved in favor of the only federal law involved, the FAA."); *Andresen v. IntePros Fed. Inc.,* 240 F.Supp.3d 143, 152 (D.D.C. 2017); *Ellerbee v. GameStop, Inc.,* 604 F.Supp.2d 349, 354 (D. Mass. 2009).

415)

*In re D.R. Horton, Inc.,* 357 NLRB No. 184 (N.L.R.B. 2012) (agreement waiving employee's right to bring class action "unlawfully restricts employees' §7 right [under National Labor Relations Act] to engage in concerted action for mutual aid or protection, notwithstanding the [FAA], which generally makes employment-related arbitration agreements judicially enforceable").

416)

*Epic Sys. Corp. v. Lewis,* 138 S.Ct. 1612, 1627 (U.S. S.Ct. 2018). *See also Owen v. Bristol Care, Inc.,* 702 F.3d 1050 (8th Cir. 2013) ("given the absence of any 'contrary congressional command' from the FLSA that a right to engage in class actions overrides the mandate of the FAA in favor of arbitration, we reject Owen's invitation to follow the NLRB's rationale in *D.R. Horton* and join our fellow circuits that have held that arbitration agreements containing class waivers are enforceable in claims brought under the FLSA"); *D.R. Horton, Inc. v. NLRB,* 737 F.3d 344 (5th Cir. 2013) ("Caselaw under the FAA points us in a different direction than the course taken by the Board. As an initial matter, arbitration has been deemed not to deny a party any statutory right. … The use of class actions procedures, though, is not a substantive right. … The issue here is narrow: do the rights of collective action embodied in this labor statute make it distinguishable from cases which hold that arbitration must be individual arbitration? … We have explained the general reasoning that indicates the answer is 'no.'").

417)

Arbitration Fairness Act of 2018, S. 2591, 115th Cong. (2017-18).

418)

*Id.* at §402(a).

419)

*See* §1.04[B][1][e][viii]; §3.03[A][2][b][iii].

420)

*See* German Labor Court Act, §101 (providing, as a statutory exception to arbitrability pursuant to German ZPO, §1030(3), for detailed system for arbitration regarding collective wage agreements); Hanefeld, *Germany,* in F.-B. Weigand & A. Baumann (eds.), *Practitioner's Handbook on International Commercial Arbitration* 475, ¶9.38 (3d ed. 2019).Other employment disputes are nonarbitrable under German law. *See* Trittmann & Hanefeld, *§1030: Arbitrability,* in K.-H. Böckstiegel, S. Kröll & P. Nacimiento (eds.), *Arbitration in Germany: The Model Lawin Practice* 93 (2d ed. 2014).

421)

*See* Meijer & Lazic, *Netherlands,* in F.-B. Weigand & A. Baumann (eds.), *Practitioner's Handbook on International Commercial Arbitration* ¶11.13 (3d ed. 2019).

422)

*Judgment of 18 April 2018,* DFT 4A_7/2018 (Swiss Fed. Trib.) (domestic employment disputes cannot be submitted to arbitration if dispute concerns mandatory claims (*e.g.,* claims regarding employee's termination, overtime, or reference letters) under Swiss law). *See also* Bohnet, *Arbitrabilité des Conflits de Travail: Le Tribunal Federal Renforce sa Ligne – Commentaire de l'Arret du Tribunal Federal 4A-&/2018,* Newsletter DroitDuTravaila.ch (June 2018); D. Girsberger & N. Voser, *International Arbitration: Comparative and Swiss Perspectives* 119 (3d ed. 2016) ("Disputes relating to employment agreements normally involve an economic interest in the sense of Art. 177(1) SPILA and are considered arbitrable. … [H]owever, the question arises as to whether arbitrability may be affected by mandatory provisions outside of Chapter 12 SPILA. This issue is of considerable importance in domestic arbitration. The Swiss Supreme Court held that an arbitration agreement cannot be enforced against an employee who invokes claims which cannot be waived according to the applicable Swiss employment legislation."); Johnson & Wildhaber, *Arbitrating Labor Disputes in Switzerland,* 27 J. Int'l Arb. 631 (2010); Karrer & Straub, *Switzerland,* in F.-B. Weigand & A. Baumann (eds.), *Practitioner's Handbook on International Commercial Arbitration* ¶14.33 (3d ed. 2019); D. Mavromati & M. Reeb, *The Code of the Court of Arbitration for Sport: Commentary, Cases and Materials* 46 (2015) ("the arbitrability is given not only for commercial disputes arising out of a contract of employment between a club and a player but also for disciplinary cases (like anti-doping rule violations) due to their potential economic consequences").

423)

*See, e.g., Paquito Lima Buton v. RainbowJoy Shipping Ltd Inc.,* [2008] HKCFA 30 (H.K. Ct. Fin. App.).

424)

For commentary, *see* Alderman, *Consumer Arbitration: The Destruction of the Common Law,* 2 J. Am. Arb. 1 (2003); Alqudah, *Enforceability of Arbitration Clauses in Online Business-to-Consumer Contracts,* 28 J. Int'l Arb. 67 (2011); Bates, *A Consumer's Dream or Pandora's Box: Is Arbitration A Viable Option for Cross-Border Consumer Disputes?,* 27 Ford. Int'l L.J. 823 (2003); Drahozal & Friel, *Consumer Arbitration in the European Union and the United States,* 28 N.C. J. Int'l L. & Comm. Reg. 357 (2002); Drahozal & Zyontz, *Private Regulation of Consumer Arbitration,* 79 Tenn. L. Rev. 289 (2012); Rogers, *The Arrival of the "Have-Nots" in International Arbitration,* 8 Nev. L.J. 341 (2007); Saumnier, *Consumer Arbitration in the Evolving Canadian Landscape,* 113 Penn St. L. Rev. 1203 (2009); Schwartz, *Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in An Age of Compelled Arbitration,* 1997 Wisc. L. Rev. 33; Sternlight, *Panacea or Corporate Tool?: Debunking the Supreme Court's Preference for Binding Arbitration,* 74 Wash. U. L.Q. 637 (1996); Stipanowich, *The Arbitration Fairness Index: Using A Public Rating System to Skirt the Legal Logjam and Promote Fairer and More Effective Arbitration of Employment and Consumer Disputes,* 60 U. Kan. L. Rev. 985 (2012); Ware, *Arbitration and Unconscionability After Doctor's Associates, Inc. v. Casarotto,* 31 Wake Forest L. Rev. 1001 (1996).

425)

*See, e.g.,* Bates, *A Consumer's Dream or Pandora's Box: Is Arbitration A Viable Option for Cross-Border Consumer Disputes?,* 27 Ford. Int'l L.J. 823 (2003); Drahozal & Friel, *Consumer Arbitration in the European Union and the United States,* 28 N.C. J. Int'l L. & Comm. Reg. 357 (2002); Horton, *Arbitration About Arbitration,* 70 Stan. L. Rev. 363 (2018); Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure,* 88 N.Y.U. L. Rev. 286, 323 (2013); Resnik, *Diffusing Disputes: The Public in the Private of Arbitration, the Private in Courts, and the Erasure of Rights,* 124 Yale L.J. 2804, 2900–10 (2015); Resnik, *Fairness in Numbers: A Comment on AT&T v. Concepcion, Wal–Mart v. Dukes, and Turner v. Rogers,* 125 Harv. L. Rev. 78 (2011); Rogers, *The Arrival of the "Have-Nots" in International Arbitration,* 8 Nev. L.J. 341 (2007); Stanley, *Sixth Time's the Charm: Rethinking the Arbitration Fairness Act to Achieve Practical Reform,* 10 Arb. L. Rev. 199 (2018); Szalai, *A New Legal Framework for Employee and Consumer Arbitration Agreements,* 19 Cardozo J. Conflict Resol. 653 (2017); Ware, *Arbitration and Unconscionability After Doctor's Associates, Inc. v. Casarotto,* 31 Wake Forest L. Rev. 1001 (1996).

426)

*See DirecTV Inc. v. Imburgia,* 136 S.Ct. 463 (U.S. S.Ct. 2015) (upholding agreement to arbitrate consumer claims); *Green Tree Fin. Corp. v. Randolph,* 531 U.S. 79 (U.S. S.Ct. 2000) (mobile home financing agreement); *Allied-Bruce Terminix Co. v. Dobson,* 513 U.S. 265 (U.S. S.Ct. 1995) (consumer contract for pest control); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477 (U.S. S.Ct. 1989) (brokerage agreement); *Walton v. Rose Mobile Homes, LLC,* 298 F.3d 470, 477 (5th Cir. 2002) (Magnuson-Moss Warranty Act claims arbitrable: "consumers can still vindicate their rights under warranties in an arbitral forum"); *In re Marcia L. Pate,* 198 B.R. 841 (Bankr. S.D. Ga. 1996) (FAA preempts Georgia state statutory bar against arbitration clauses in consumer transactions); *Borowiec v. Gateway 2000, Inc.,* 808 N.E.2d 957, 967 (Ill. 2004) (Magnuson-Moss Warranty Act does not indicate "congressional intent to bar arbitration of written warranty claims"); *In re Am. Homestar of Lancaster, Inc.,* 50 S.W.3d 480 (Tex. 2001) (same). *Compare DirecTV Inc. v. Imburgia,* 575 U.S. at 9111 (Ginsburg, J., dissenting) ("Today's decision steps beyond *Conception* and *Italian Colors.* There, as here, the Court misread the FAA to deprive consumers of effective relief against powerful economic entities that write no-class-action arbitration clauses in their form contracts. … These decisions have predictably resulted in the deprivation of consumers' rights to seek redress for losses, and, turning the coin, they have insulated powerful economic interests from liability for violations of consumer-protection laws.").Most U.S. state laws also give effect to arbitration clauses in consumer contracts. Cole, *Uniform Arbitration: "One Size Fits All" Does Not Fit,* 16 Ohio St. J. Disp. Resol. 759, 787 (2001).

427)

*Marmet Health Care, Inc. v. Brown,* 565 U.S. 530 (U.S. S.Ct. 2012). *See also Smith v. Lindemann,* 710 F.App'x 101 (3d Cir. 2017) (state-law rule precluding inclusion of arbitration agreements in attorney-client contracts is preempted by FAA).

428)

*Marmet Health Care,* 565 U.S. at 532.

429)

*Id.* at 532-33 ("West Virginia's prohibition against predispute agreements to arbitrate personal-injury or wrongful-death claims against nursing homes is a categorical rule prohibiting arbitration of a particular type of claim, and that rule is contrary to the terms and coverage of the FAA").

430)

*In re Knepp,* 229 B.R. 821, 827 (N.D. Ala. 1999). The same court *sua sponte* raised the validity of the arbitration clause in question and held it unconscionable. *Id.*

431)

See Carrington, *Regulating Dispute Resolution Provisions in Adhesion Contracts*, 35 Harv. J. Legis. 225 (1998); Carrington & Haagen, *Contract and Jurisdiction*, 1996 Sup. Ct. Rev. 331; Resnik, *Diffusing Disputes: The Public in the Private of Arbitration, the Private in Courts, and the Erasure of Rights, 124 Yale L.J. 2804, 2900–10 (2015)*; Resnik, *Fairness in Numbers: A Comment on AT&T v. Concepcion, Wal-Mart v. Dukes, and Turner v. Rogers, 125 Harv. L. Rev. 78, 133 (2011)*; Schwartz, *Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in An Age of Compelled Arbitration*, 1997 Wisc. L. Rev. 33; Sternlight, *Panacea or Corporate Tool?: Debunking the Supreme Court's Preference for Binding Arbitration*, 74 Wash. U. L.Q. 637 (1996). *See also* Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure, 88 N.Y.U. L. Rev. 286, 323 (2013)* ("powerful economic entities can impose no-class-action-arbitration clauses on people with little or no bargaining position – through adhesion contracts involving securities accounts, credit cards, mobile phones, car rentals, and many other social amenities and necessities").

432)

Baum, *Medical Malpractice Arbitration: A Patient's Perspective*, 61 Wash. U. L.Q. 123, 148 n.198 (1983).

433)

Barnes, *How Mandatory Arbitration Agreements and Class Action Waivers Undermine Consumer Rights and Why We Need Congress to Act*, 9 Harv. L. & Pol'y Rev. 329 (2015); Resnik, *Fairness in Numbers: A Comment on AT&T v. Concepcion, Wal-Mart v. Dukes, and Turner v. Rogers, 125 Harv. L. Rev. 78, 133 (2011)*.

434)

*DirecTV Inc. v. Imburgia,* 136 S.Ct. 463, 476 (U.S. S.Ct. 2015). *See also* Blumenthal, *Circumventing* Concepcion: *Conceptualizing Innovative Strategies to Ensure the Enforcement of Consumer Protection Laws in the Age of the Inviolable Class Action Waiver,* 103 Cal. L. Rev. 700 (2015); Downing, *An Important Time for the Future of Class Action Waivers and the Power Struggle Between Businesses and Consumers,* 81 Mo. L. Rev. 1151 (2016).

435)

*See Metro. Regʹl Info. Sys. Inc. v. Am. Home Realty Network Inc.,* 722 F.3d 591, 602 (4th Cir. 2013); *Schnabel v. Trilegiant Corp.,* 697 F.3d 110, 123 (2d Cir. 2012); *Campbell v. Gen. Dynamics Govʹt Sys. Corp.,* 407 F.3d 546, 558-59 (1st Cir. 2005) (email notification of new arbitration requirement failed to put employee on notice that there was a new, unilateral contract which required arbitration of disputes, where no reply to the email was required and typical personnel decisions were communicated in paper); *Specht v. Netscape Commcʹns Corp.,* 306 F.3d 17 (2d Cir. 2002) (where reasonable person would not have had notice of existence of license terms containing arbitration clause because terms were not immediately visible upon acceptance of offer, arbitration clause not part of contract); *Bekele v. Lyft, Inc.,* 199 F.Supp.3d 284, 294 (D. Mass. 2016); *Cabi v. Boston Childrenʹs Hosp.,* 161 F.Supp.3d 136, 161 (D. Mass. 2016); *Payne v. WBY, Inc.,* 141 F.Supp.3d 1344, 1349 (N.D. Ga. 2015); *Hudyka v. Sunoco, Inc.,* 474 F.Supp.2d 712, 717-19 (E.D. Pa. 2007) (email notification to employee of new arbitration requirement gave insufficient notice where terms of arbitration agreement were not clearly set forth in email, employer could not prove that employee received email notification, and employee did not receive arbitration program booklet containing definite terms); *Klocek v. Gateway 2000, Inc.,* 104 F.Supp.2d 1332 (D. Kan. 2000); *Reedy v. Cincinnati Bengals, Inc.,* 758 N.E.2d 678 (Ohio Ct. App. 2001) (subsequent document containing arbitration agreement did not constitute part of contract between parties and dispute was therefore nonarbitrable); *Brower v. Gateway 2000, Inc.,* 246 A.D.2d 246, 254 (N.Y. App. Div. 1998) (ICC clause in domestic U.S. contract unconscionable).

436)

*See* §5.06[D][4].

437)

*See Green Tree Fin. Corp. v. Randolph,* 531 U.S. 79, 90 (U.S. S.Ct. 2000) (arbitration agreement may be invalid if it "preclude[s] litigant … from effectively vindicating her statutory rights in the arbitral forum" because of, *e.g.,* costs or waiver of non-waivable remedies); *Dale v. Comcast Corp.,* 498 F.3d 1216, 1223 (11th Cir. 2007) (class action waiver in arbitration agreement held unconscionable as it precluded state claims based on federal statute); *Kristian v. Comcast Corp.,* 446 F.3d 25 (1st Cir. 2006) (denial of class action arbitration of antitrust claims prevented plaintiffs from vindicating statutory rights; provision held invalid and was severed); *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 170 F.3d 1, 21 (1st Cir. 1999) ("Our conclusion that a union waiver of employee rights to a federal judicial forum for employment discrimination claims must be clear and unmistakable means that, absent a clear waiver, it is not 'appropriate' … to find an agreement to arbitrate").

438)

*Poublon v. C.H. Robinson Co.,* 846 F.3d 1251, 1260-54 (9th Cir. 2017). Some decisions hold that a contract may be procedurally unconscionable if it is a standard form contract whose terms the consumer has no opportunity to negotiate. *See Circuit City Stores, Inc. v. Adams,* 279 F.3d 889, 893 (9th Cir. 2002) ("The [arbitration agreement] is procedurally unconscionable because it is a contract of adhesion: a standard-form contract, drafted by the party with superior bargaining power, which relegates to the other party the option of either adhering to its terms without modification or rejecting the contract entirely"); *Harold Allen's Mobile Home Factory Outlet, Inc. v. Butler,* 825 So.2d 779 (Ala. 2002); Ware, *Arbitration and Unconscionability After* Doctor's Associates, Inc. v. Casarotto, 31 Wake Forest L. Rev. 1001 (1996).

439)

*See* Georgia Code Annotated 2017 §9-9-2(c)(5) ($25,000); Montana Code Annotated 2019, §27-5-114 ($5,000); Texas Civil Practice & Remedies Code Annotated §171.002(a)(2) ($50,000). In Texas, for a consumer contract over $50,000, an arbitration clause will only be enforced if signed by each party to the contract and signed by each party's attorney. Texas Civil Practice & Remedies Code Annotated §171.002(b)(2).

440)

*See* Massachusetts "Lemon Law," Massachusetts General Laws Ch. 90, §7N1/2 (providing for compulsory fast-track arbitration, at consumer's request, of consumer claims against automobile manufacturers, with arbitrators appointed by Secretary of Consumer Affairs; consumer may accept award or sue *de novo* in state court).

441)

*See* §1.04[B][I][e][viii]; *Allied-Bruce Terminix Co. v. Dobson,* 513 U.S. 265 (U.S. S.Ct. 1995); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477 (U.S. S.Ct. 1989) (brokerage agreement).

442)

*See* Dodd-Frank Wall Street Reform and Consumer Protection Act, §921 ("(o) Authority to Restrict Mandatory Predispute Arbitration – The Commission, by rule, may prohibit, or impose conditions or limitations on the use of, agreements that require customers or clients of any broker, dealer, or municipal securities dealer to arbitrate any future dispute between them arising under the Federal securities laws, the rules and regulations thereunder, or the rules of a self-regulatory organization if it finds that such prohibition, imposition of conditions, or limitations are in the public interest and for the protection of investors").

443)

*See* Magnuson-Moss Warranty Act, 15 U.S.C. §§2301-2312 (allowing warrantors to require that consumers attempt to resolve claims by alternative dispute resolution mechanisms, but providing that any decisions be non-binding and that consumer be permitted to assert claims in court if dissatisfied).

444)

Arbitration Fairness Act of 2018, S. 2591, 115th Cong. (2017-18). *See* §6.04[G][2].

445)

Arbitration Fairness Act of 2018, S. 2591, §402(a), 115th Cong. (2017-18).

446)

As discussed above, various of these legislative proposals have been limited to domestic matters, excluding international arbitration agreements subject to the New York and Inter-American Conventions. *See* §6.03[C][4].

447)

*See* 1998 AAA Consumer Due Process Protocol Statement of Principles. Judicial Arbitration and Mediation Services ("JAMS") has adopted a set of "Streamlined Arbitration Rules and Procedures," which apply upon agreement of the parties or if the claim is worth less than $250,000. *See* 2014 JAMS Streamlined Arbitration Rules and Procedures.

448)

2014 AAA Consumer Arbitration Rules.

449)

*Id.* at Introduction ("These Rules were drafted and designed to be consistent with the minimum due process principles of the *Consumer Due Process Protocol*").

450)

For example, the National Arbitration Forum ("NAF"), a provider of consumer debt collection arbitration administration services, did not adopt the AAA Protocols. The NAF was prosecuted by the Attorney General of the State of Minnesota and is no longer administering consumer arbitrations. *See* Salzwedel & Wells, *National Arbitration Forum Settlement with Minnesota Attorney General,* 1(4) State AG Tracker (2009).

451)

The Arbitration Fairness Act would not have amended FAA Chapter 2 of the FAA. *See* Arbitration Fairness Act of 2018, S. 2591, 115th Cong. (2017-18); Arbitration Fairness Act of 2017, H.R. 1374, 115th Cong. (2017-18); Arbitration Fairness Act of 2015, S. 1133, 114th Cong. (2015-16).

452)

*See* §1.04[B][1][e][iii]; §3.03[A][2][b][iii].

453)

*See* Board of Governors of the Federal Reserve System, Retail Foreign Exchange Transactions (Regulation NN), 78 Fed. Reg. 21027 (9 Apr. 2013).

454)

*See Id.* ("The Department of State has advised that transactions between the foreign branch or office of a banking institution and a U.S. customer could be cross-border transactions subject to the New York and Panama Conventions. These Conventions, implemented in the United States by chapters 2 and 3 of the Federal Arbitration Act (FAA), create treaty obligations to enforce international commercial arbitration agreements and to recognize and enforce international commercial arbitral awards. The Board is amending section 240.16 to provide that it will not apply to transactions covered by chapters 2 or 3 of the FAA.").

455)

*See* European Commission, *Recommendation on the Principles Applicable to the Bodies Responsible for Out-of-Court Settlement of Consumer Disputes (98/257/EC)*, 1998 O.J. (L 115) 31 ("access to courts is a fundamental right that knows no exceptions … whereas out of court procedures cannot be designed to replace court procedures; whereas therefore, use of the out of court alternative may not deprive consumers of their right to bring the matter before the courts unless they expressly agree to do so, in full awareness of the facts and only after the dispute has materialized"). *See also* European Commission, *Recommendation of 4 April 2001 on the Principles for Out-of-Court Bodies Involved in the Consensual Resolution of Consumer Disputes (C(2001) 1016),* 2001 O.J. (L 109) 56; C. Hodges, I. Benöhr & N. Creutzfeldt, *Consumer ADR in Europe* (2012); Piers, *Consumer Arbitration in the EU: A Forced Marriage with Incompatible Expectations,* 2 J. Int'l Disp. Sett. 209 (2011).The EU has also adopted legislation requiring mandatory mediation for disputes arising from consumer contracts and establishing online non-judicial dispute resolution proceedings for consumer claims. *See* EU Directive 2013/11/EU amending EC Regulation 2006/2004 and EC Directive 2009/22/EC and EU Regulation 524/2013, amending EC Regulation 2006/2004 and EC Directive 2009/22EC; Reich, *Party Autonomy and Consumer Arbitration in Conflict: A "Trojan Horse" in the Access to Justice in the E.U. ADR-Directive 2013/11*, 4 Penn St. J. L. & Int'l Aff. 292 (2015).

456)

*See* EU Directive 93/13/EEC.

457)

*See id.* at Annex 1(q) ("Requiring the consumer to take disputes exclusively to arbitration not covered by legal provision").

458)

*See* U.K. Office of Fair Trading, *Unfair Contract Terms Guidance* ¶¶5.29.2-6 (2017) ("a compulsory arbitration clause as defined is automatically unfair if it relates to claims of £5,000 or less"); German ZPO, §1031(5) ("Arbitration agreements to which a consumer is a party must be contained in a document which has been personally signed by the parties. No agreements other than those referring to the arbitral proceedings may be contained in such a document; this shall not apply in the case of a notarial certification."); Swedish Arbitration Act, §6 ("If a dispute between a business entity and a consumer concerns goods, services, or any other products supplied principally for private use, an arbitration agreement may not be invoked where such was entered into prior to the dispute").

459)

*See* Asturcom Telecomunicaciones SL v. Nogueira, Case No. C-40/08, [2009] ECR I-9579 (E.C.J.); *Mostaza Claro v. Centro Móvil Milenium SL*, Case No. C-168/05, [2006] ECR I-10421. (E.C.J.).

460)

*See* Asturcom Telecomunicaciones, [2009] ECR I-9579; *Mostaza Claro*, [2006] ECR I-10421.

461)

*See Mostaza Claro*, [2006] ECR I-10421 (arbitrators must terminate arbitral proceedings *ex officio* under E.U. Unfair Contract Terms Directive even if consumer appears in proceedings). This would apparently contemplate that challenges to the validity or enforceability of arbitration agreements would be submitted to the arbitrators in the first instance. *See also* Bermann, *Navigating EU Law and the Law of International Arbitration*, 28 Arb. Int'l 397, 416-17 (2012).

462)

*Mostaza Claro*, [2006] ECR I-10421.

463)

*Pohotovost' sro v. Korčkovská,* Case No. C-76/10, [2010] E.C.R. I-11557 (E.C.J.).

464)

These prohibitions do not apply to arbitration agreements entered into to resolve an existing dispute. *See Judgment of 25 February 2010, Guichard v. AGPM*, 2011 Rev. Arb. 139 (French Cour de Cassation Civ. 1).Further, French courts held that this prohibition did not apply where the individual not involved in commercial activities had waived the right to invoke it. *See Judgment of 21 November 2002, Gromelle v. Institut International des Techniques d'Organisation*, 2004 Rev. Arb. 287 (French Cour de Cassation Civ. 2) (participation in arbitration without reservation is waiver of right to invoke nullity of arbitration agreement in an *acte mixte*).

465)

*See, e.g., Judgment of 12 May 2010, El Assidi v. Nest*, 2010 Rev. Arb. 391 (French Cour de Cassation Civ. 1); *Judgment of 5 January 1999, Zanzi v. de Coninck*, 1999 Rev. Arb. 260 (French Cour de Cassation Civ. 1); *Judgment of 7 December 1994, V 2000 v. Project XJ 220 ITD*, 1996 Rev. Arb. 245 (Paris Cour d'Appel).

466)

*See* Swedish Arbitration Act, §6 ("If a dispute between a business entity and a consumer concerns goods, services, or any other products supplied principally for private use, an arbitration agreement may not be invoked where such was entered into prior to the dispute. … The first paragraph shall not apply where the dispute concerns an agreement between an insurer and a policy-holder concerning insurance based on a collective agreement or group agreement and handled by representatives of the group. Nor shall the first paragraph apply where Sweden's international obligations provide to the contrary.").

467)

*See* German ZPO, §1031(5) ("Arbitration agreements to which a consumer is a party must be contained in a document which has been personally signed by the parties. … No agreements other than those referring to the arbitral proceedings may be contained in such a document; this shall not apply in the case of a notarial certification."); Mäsch, *Schiedsvereinbarungen mit Verbrauchern*, in B. Bachmann *et al.* (eds.), *Grenzüberschreitungen: Beiträge zum Internationalen Verfahrensrecht und zur Schiedsgerichtsbarkeit – Festschrift für Peter Schlosser zum 70. Geburtstag* 529, 534-35, 539 (2005).

468)

*See* Austrian ZPO, §617 ("(2) Arbitration agreements to which a consumer is a party must be contained in a document signed personally by him. This document must not contain any agreements other than those relating to the arbitral proceedings. (3) In arbitration agreements between an entrepreneur and a consumer, the consumer shall, prior to concluding the arbitration agreement receive written legal advice on the relevant differences between arbitral and court proceedings."); Riegler, in S. Riegler *et al.* (eds.), *Arbitration Lawof Austria: Practice and Procedure* §617, ¶¶8-15, 23 (2007). *See also Judgment of 22 July 2009*, 3 Ob 144/09m (Austrian Oberster Gerichtshof) (although violations of consumer protection law might constitute a violation of Austrian public policy in some cases, conclusion of arbitration agreements with consumers are not public policy violations if they are negotiated separately).

469)

*See* §6.04[H][1].

470)

*See, e.g.*, Italian Civil Code, Arts. 1341-1342 (requiring separate signature on arbitration agreement); Slovenian Arbitration Law, Arts. 45(1)-(2) (requiring separate signature on arbitration agreement; agreement valid only if concluded with respect to dispute that has already arisen). *See also* Mauritius International Arbitration Act, Art. 8 (same).

471)

English Arbitration Act, 1996, §91.

472)

*Id.* at §§89-91; U.K. Unfair Terms in Contracts Regulations, Reg. 5, SI 1999 No. 2083. These sections are mandatory rules that apply "whatever the law applicable to the arbitration agreement." English Arbitration Act, 1996, §89(3).

473)

*See, e.g.*, Consumer Rights Act, Schedule 2 ("Consumer Contract Terms Which may be Regarded as Unfair": "A term which has the object or effect of excluding or hindering the consumer's rights to take legal action or exercise any other legal remedy"). *See also Director Gen. of Fair Trading v. First Commercial Bank plc* [2001] UKHL 52 (House of Lords) (unfairness resulting from lack of good faith in relation to predispute consumer arbitration clause can be either substantive or procedural); *Bryen & Langley Ltd v. Boston* [2005] EWCA Civ 973 (English Ct. App.) (determining whether consumer arbitration agreement is substantively unfair involves consideration of both fairness of arbitration provision itself and whether term was imposed on consumer); *Heifer Int'l Inc. v. Christiansen* [2007] EWHC 3015 (QB) (English High Ct.).

474)

New Zealand Arbitration Act, §11. Brazilian legislation is broadly similar. *See* Brazilian Arbitration Law, Art. 4(2) ("In adhesion contracts, the arbitration clause will only be valid if the adhering party initiates arbitral proceedings or if it expressly agrees to arbitration by means of an attached written document, or if it signs or initials the corresponding contractual clause, inserted in boldface type").

475)

*See* §6.04[H][1].

476)

*See id.*

477)

Québec Consumer Protection Act, §11(1) The Act permits post-dispute agreements to arbitrate consumer claims. *Id.*

478)

*See* British Columbia Business Practices and Consumer Protection Act, S.B.C. 2004, c. 2, §172.

479)

*See Seidel v. TELUS Commc'ns Inc.*, 2011 SCC 15 (Canadian S.Ct.) (actions under British Columbia Business Practices and Consumer Protection Act, S.B.C. 2004, c. 2 are nonarbitrable because "clear intention of the legislature is to supplement and multiply the efforts of the Director under the BPCPA to implement province-wide standards of fair consumer practices by enlisting the efforts of a whole host of self-appointed private enforcers"; "to the extent the arbitration clause purports to take away a right, benefit or protection conferred by the BPCPA, it will be invalid, and to that extent, [a consumer] will retain her individual cause of action under the BPCPA in the Supreme Court of British Columbia").

480)

*Seidel v. TELUS Commc'ns Inc.*, 2011 SCC 15, ¶40 (Canadian S.Ct.).

481)

*Id.* at ¶54 (Lebel, J., dissenting) ("We endorse the view that a clear statement of legislative intent is necessary for a court to conclude that a particular category of disputes cannot be submitted to arbitration. To hold otherwise would be to revert to the former judicial hostility towards arbitration, and to the pre-*Zodiak* view that there is a right to bring an action in the public court system that cannot be waived.").

482)

*See* Ontario Consumer Protection Act, S.O. 2002, c. 30, §§7, 8; *Griffin v. Dell Canada Inc.*, [2010] ONCA 29 (Ontario Ct. App.) (applying Ontario Consumer Protection Act to deny enforcement of arbitration clauses (which included class action waivers) in consumer contracts). *See also* Saumier, *Consumer Arbitration in the Evolving Canadian Landscape*, 113 Penn. St. L. Rev. 1203 (2009).

483)

*TELUS Commc'ns Inc. v. Wellman*, [2019] SCC 19, ¶98 (Canadian S.Ct.).

484)

*See* Japanese Arbitration Law, Supplementary Provisions, Art. 3. As discussed above, Japanese legislation adopts a similar approach to employee-employer arbitration agreements. *See* §6.04[H][4].

485)

*See* Alberta Fair Trading Act, §16.

486)

*MS Emaar MGF Land Ltd v. Singh*, Review Petition Nos. 2629 & 2630 of 2018 (Indian S.Ct.).

487)

*See* §6.04[H][1].

488)

*See* §5.06[B][1].

489)

*See* §4.02[A][1][b].

490)

*See* §§6.04[H][1]-[2]; U.S. Board of Governors of the Federal Reserve System, Retail Foreign Exchange Transactions (Regulation NN), 78 Fed. Reg. 21019 (9 Apr. 2013); Swedish Arbitration Act, §6 ("Nor shall the first paragraph apply where Sweden's international obligations provide to the contrary").

491)

It is clear that most national law rules providing for the invalidity of consumer arbitration agreements are addressed towards concerns about unequal bargaining power and sophistication of the parties during the contract formation process. That is the reason that these invalidity rules apply generally to predispute agreements to arbitrate, and not to post-dispute arbitration agreements.

492)

*See* §1.04_[E][7]; §2.04_[A]; §4.02[A][1][b].

493)

*See* §4.05 (especially §4.05[A][2]). A rule providing for the nonarbitrability of claims beneath a specified monetary threshold (as in the EU) is arguably a reasonably well-tailored mechanism for denying effect to arbitration agreements that would make it uneconomical for consumers to pursue their claims. As discussed below, however, a preferable approach would be to develop arbitral mechanisms that provide more efficient and effective ways of resolving consumer claims than national courts. Nonetheless, given the widespread existence of nonarbitrability rules in the context of consumer disputes, it is difficult to characterize such rules as idiosyncratic. *See* §6.04[H].

494)

*See* Dam, *Class Actions: Efficiency, Compensation, Deterrence and Conflict of Interests*, 4 J. Legal Studies 47 (1975); Matthews & Stewart, *Online Arbitration of Cross-Border: Business to Consumer Disputes*, 56 U. Miami L. Rev. 1111 (2002).

495)

*See* Rogers, *The Arrival of the "Have-Nots" in International Arbitration*, 8 Nev. L.J. 341 (2007); Ware, *Arbitration and Unconscionability After* Doctor's Associates, Inc. v. Casarotto, 31 Wake Forest L. Rev. 1001 (1996).

496)

Matthews & Stewart, *Online Arbitration of Cross-Border, Business to Consumer Disputes*, 56 U. Miami L. Rev. 1111, 1136 (2002) ("As the difficulty inherent in applying domestic laws to electronic commerce has become more apparent, many consumer groups have changed sides on the issue and are now in favor of establishing fair procedural standards for international arbitration") (citing Bureau of Consumer Protection, Federal Trade Commission, *Consumer Protection in the Global Electronic Marketplace: Looking Ahead* (2000)).

497)

*See* §6.04_[H][3]; Japanese Arbitration Law, Supplementary Provisions, Art. 3. In Spain, since 1993, consumers have been permitted to submit disputes with merchants at no cost to the Juntas Arbitrales de Consumo, a domestic arbitration institution whose role is to supervise consumer arbitrations. *See* Kirry, *Arbitrability: Current Trends in Europe*, 12 Arb. Int'l 373 (1996).

498)

For example, the AAA has enacted a separate set of procedures for consumer-related disputes between "individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers" and the product is for personal use. *See* 2014 AAA Consumer Arbitration Rules; 1998 AAA Consumer Due Process Protocol.

499)

*See* §10.08.

500)

*See, e.g.*, 2017 AAA Employment Arbitration Rules and Mediation Procedures; 2014 AAA Consumer Arbitration Rules; 1995 AAA Employment Due Process Protocol; 1997 National Academy of Arbitrators Guidelines on Arbitration of Statutory Claims Under Employer-Promulgated Systems.

501)

Drahozal & Zyontz, *Private Regulation of Consumer Arbitration*, 79 Tenn. L. Rev. 289 (2012) (concluding that AAA's enforcement of its Consumer Due Process Protocol is effective); Horton & Chandrasekher, *After the Revolution: An Empirical Study of Consumer Arbitration*, 104 Geo. L.J. 57 (2015); Sovern *et al*., *"Whimsy Little Contracts" with Unexpected Consequences: An Empirical Analysis of Consumer Understanding of Arbitration Agreements*, 75 Md. L. Rev. 4 (2015).

502)

2005 AAA Consumer-Related Disputes Supplementary Procedures; ICC, *Guidelines for Arbitrating Small Claims Under the ICC Rules of Arbitration*, 14(1) ICC Ct. Bull. 29 (2003).

503)

*Report of Working Group III (Online Dispute Resolution) on the Work of Its Thirty-Third Session*, U.N. Doc. A/CN.9/868 (2016). *See also* UNCITRAL, *Report of Working Group III (Online Dispute Resolution) on the Work of Its Twenty-Sixth Session*, U.N. Doc. A/CN.9/762, ¶15 (2012).

504)

*See* §1.04_[B][2]; §5.01[C][5]. This hostility was particularly pronounced in many communist and other totalitarian states. *See, e.g.*, Osakwe, *A Soviet Perspective on Foreign Sovereign Immunity: Law and Practice*, 23 Va. J. Int'l L. 13 (1982); People's Republic of China Ministry of Foreign Affairs, *Aide Mémoire of 2 February 1983*, 22 I.L.M. 81 (1983).

505)

*See* §1.04_[B][2]; Kassis, *The Questionable Validity of Arbitration and Awards Under the Rules of the International Chamber of Commerce*, 6(2) J. Int'l Arb. 79 (1989); Sornarajah, *The UNCITRAL Model Law: A Third World Viewpoint*, 6(4) J. Int'l Arb. 7 (1989).

506)

Sornarajah, *The UNCITRAL Model Law: A Third World Viewpoint*, 6(4) J. Int'l Arb. 7, 16 (1989).

507)

J. Dellapenna, *Suing Foreign Governments and Their Corporations* 241-43, 460-63 (2d ed. 2003); Fox, *States and the Undertaking to Arbitrate*, 37 Int'l & Comp. L.Q. 1, 4 (1988); Kessedjian, *Court Decisions on Enforcement of Arbitration Agreements and Awards*, 18 J. Int'l Arb. 1 (2001); Meyer-Fabre, *Enforcement of Arbitral Awards Against Sovereign States, A New Milestone: Signing ICC Arbitration Clause Entails Waiver of Immunity from Execution Held French Court of Cassation in* Creighton v. Qatar, 15(9) Mealey's Int'l Arb. Rep. 48 (2000); Moury, *L'Incidence de la Stipulation d'Une Clause Compromissoire sur l'Immunité d'Exécution de l'Etat Étranger*, 2001 Dalloz 2140.

508)

28 U.S.C. §§1605(a)(1), 1605(a)(6), 1610(c), 1610(d); J. Dellapenna, *Suing Foreign States and Their Corporations* 241-43, 460-63 (2d ed. 2003); Turck, *French and US Courts Define Limits of Sovereign Immunity in Execution and Enforcement of Arbitral Awards*, 17 Arb. Int'l 327 (2001).

509)

In the early 1980s, one lower U.S. court held that, even where the Foreign Sovereign Immunities Act permits enforcement, the Act of State Doctrine does not allow the enforcement of an arbitral award concerning claims of expropriation. In *Libyan Am. Oil Co. (LIAMCO) v. Socialist People's Libyan Arab Jamahirya*, 482 F.Supp. 1176 (D.D.C. 1980), *vacated mem.*, 684 F.2d 1032 (D.C. Cir. 1981), the district court denied enforcement of an arbitration award after concluding that the expropriation dispute between the parties underlying the award was within the scope of the act of state doctrine. The lower court decision in *LIAMCO* was plainly wrong. Following submissions from the U.S. Government, the opinion was vacated. *See* 684 F.2d 1032 (D.C. Cir. 1981). The FAA was nonetheless amended to ensure that the error was not repeated. U.S. FAA, 9 U.S.C. §15.

510)

*See* U.S. FAA, 9 U.S.C. §15 ("Enforcement of arbitral agreements, confirmation of arbitral awards, and execution upon judgments based on orders confirming such awards shall not be refused on the basis of the Act of State Doctrine").

511)

European Convention on State Immunity (1972), Arts. 12(1), 17(1); Blessing, *Sovereign Immunity and Transnational Arbitration*, 3 Arb. Int'l 28 (1987); Goh, *Court-Ordered Interim Relief Against States in Aid of Arbitration: Sovereign Immunity, Waiver and Comity*, 34 J. Int'l Arb. 679 (2017).

512)

*See, e.g.*, U.K. State Immunity, 1978, §9(1); French Code of Civil Procedure, Art. 1514; Bowett, *The State Immunity Act 1978*, 1978 Cambridge L.J. 37; Mann, *The State Immunity Act 1978*, 50 Brit. Y.B. Int'l L. 43 (1979); *Judgment of 6 June 2000, Creighton Ltd v. Qatar*, 2001 Rev. Arb. 114 (French Cour de Cassation Civ. 1). *See also* Turck, *French and US Courts Define Limits on Sovereign Immunity in Execution and Enforcement of Arbitral Awards*, 17 Arb. Int'l 327, 327-32 (2001).

513)

*See, e.g.*, Australian Foreign States Immunities Act, §17; Singapore State Immunity Act, §11; South African Foreign States Immunity Act, §10.

514)

*See* §1.04_[A][7]; C. Schreuer *et al.*, *The ICSID Convention: A Commentary* Art. 25, ¶71 (2d ed. 2009).

515)

*See* K.-H. Böckstiegel, *Acts of State and Arbitration* (1997); Idornigie, *The Principle of Arbitrability in Nigeria Revisited*, 21 J. Int'l Arb. 279 (2004); Kroeger, Kautz & Acikel, *Turkey Revisited: Developments in Energy Project Arbitration in the Context of Bilateral Investment Treaties and ICSID*, 14(9) Mealey's Int'l Arb. Rep. 32 (1999); Reddy & Nagaraj, *Arbitrability: The Indian Perspective*, 19 J. Int'l Arb. 117 (2002). *But see Judgment of 17 July 2001, Etat Libanais v. FTML*, 2001 Rev. Arb. 855 (Libyan Conseil d'État) (arbitration clause in administrative contract held invalid).

516)

*See* T. Schoenbaum, *Admiralty and Maritime Law* 837-50 (5th ed. 2011).

517)

*Vimar Seguros y Reaseguros, SA v. MV Sky Reefer*, 515 U.S. 528 (U.S. S.Ct. 1995).

518)

*See* §6.04[A][1].

519)

*See Vimar Seguros*, 515 U.S. at 536.

520)

*Id.* at 541.

521)

*See, e.g., Royal SMIT Transformers BV v. Onego Shipping & Chartering BV*, 898 F.3d 543, 549 (5th Cir. 2018); *Liberty Woods Int'l v. Motor Vessel Ocean Quartz*, 889 F.3d 127, 129 (3d Cir. 2018); *Escobar v. Celebration Cruise Operator, Inc.*, 805 F.3d 1279, 1289 (11th Cir. 2015) ("any claim that an arbitration agreement prospectively waived a party's right to pursue U.S. statutory remedies must be brought at the award-enforcement stage, not at the arbitration-enforcement stage"); *Ambraco, Inc. v. Bossclip BV*, 570 F.3d 233 (5th Cir. 2009) (rejecting claim that forum selection clause violated public policy because English courts would supposedly not apply COGSA, pursuant to parties' choice-of-law clause); *Mitsui & Co. v. Mira MV*, 111 F.3d 33, 36 (5th Cir. 1997) (extending *Vimar* to forum selection clauses); *Am. Home Assur. Co. v. MV Hanjin Marseilles*, 2004 U.S. Dist. LEXIS 9705, at *8-9 (S.D.N.Y.) (collecting U.S. cases showing that "[s]ince [*Vimar*], courts have consistently held that forum selection clauses (including foreign arbitration clauses) in bills of lading are valid under COGSA").

522)

*See Smallwood v. Allied Van Lines, Inc.*, 660 F.3d 1115 (9th Cir. 2011) (arbitration clauses are unenforceable under Carmack Amendment, which affords shippers right to sue in one of Amendment's enumerated judicial districts, unless he or she agrees to arbitrate elsewhere after dispute arises).

523)

*See Judgment of 30 May 1983*, 1983 NJW 2772 (German Bundesgerichtshof) (agreement on exclusive jurisdiction of foreign court in maritime freight agreement, pursuant to §662 of German Commercial Code, invalid if it relieves carrier of mandatory liability under Hague Rules).

524)

*Dampskibsselskabet Norden AS v. Beach Bldg & Civil Group Pty Ltd*, [2012] FCA 696 (Australian Fed. Ct.) (denying recognition of two awards on ground that arbitration clause was void under Carriage of Goods by Sea Act).

525)

For commentary, *see* Borris, *Arbitrability of Corporate LawDisputes in Germany*, 2012 Int'l Arb. L. Rev. 161; Caprasse, *Les Decisions Sociales*, 2013 Rev. Arb. 673; Caprasse, *Objective Arbitrability of Corporate Disputes: Belgium and France*, in C. Klaassen *et al*. (eds.), *Onderneming en ADR* 79 (2011); Cohen & Staff, *The Arbitration of Trust Disputes*, 7 J. Int'l Tr. & Corp. Plan. 203 (1999); Conaglen, *The Enforceability of Arbitration Clauses in Trusts*, 74 Cambridge L.J. 450 (2015); Gibirila, *La Validité de la Clause Compromissoire Soumettant a l'Arbitrage les Litiges nés de l'Évaluation des Parts Sociales de l'Associé Exclu,* 170 Journal des Sociétés 34 (2018); Herzfeld, *Prudent Anticipation? The Arbitration of Public Company Shareholder Disputes*, 24 Arb. Int'l 297 (2008); Kraft, *German Federal Court of Justice Refines the Criteria for the Admissibility of Arbitration Clauses*, 2010 Int'l Arb. L. Rev. 13; Meijer & Guzman, *The International Recognition of An Arbitration Clause in the Articles of Association of A Company,* in C. Klaassen *et al*. (eds.), *Onderneming en ADR* 117 (2011); Note, *Madrid Update: Corporate Battles: The Amendment of Dispute Resolution Clauses in Company Bylaws*, 23(2) Mealey's Int'l Arb. Rep. 21 (2008); Note, *Madrid Update: Arbitration Clause in Organization's By-Laws*, 23(5) Mealey's Int'l Arb. Rep. 26 (2008); Pilar Perales Viscasillas, *Arbitrability of (Intra-) Corporate Disputes*, in L. Mistelis & S. Brekoulakis (eds.), *Arbitrability: International & Comparative Perspectives* 273 (2009); Quinke, *Schiedsklauseln in SPE-Satzungen*, 2011 GmbHR R168; Ravanides, *Arbitration Clauses in Public Company Charters: An Expansion of the ADR Elysian Fields Or A Descent into Hades?*, 18 Am. Rev. Int'l Arb. 371 (2007); Shell, *Arbitration and Corporate Governance*, 67 N.C. L. Rev. 517 (1989).

526)

In 2015 the Russian International Commercial Arbitration Law was amended to, among other things, address the arbitrability of so-called "corporate disputes." The scope of arbitrability for corporate law disputes was expanded further through the 2018 Russian Federal Law on the Incorporation of Amendments to the Federal Law on Arbitration in the Russian Federation.

527)

*See, e.g., In re Burkin*, 1 N.Y.2d 570 (N.Y. 1956) (disputes over corporate management and control are "nonjusticiable"), *superseded by statute*, N.Y. Civ. Prac. L. & R. §§7501; *Long Park, Inc. v. Trenton-NewBrunswick Theatres Co.*, 297 N.Y. 174 (N.Y. 1948) (agreement to arbitrate corporate disputes unenforceable because it "sterilizes" corporate board), *superseded by statute*, N.Y. Bus. Corp. Law §620(b); *In re Fletcher*, 237 N.Y. 440 (N.Y. 1924) (agreement among shareholders in close corporation to determine transfer price of shares unenforceable because valuation is not "controversy" subject to arbitration), *superseded by statute*, Act of April 15, 1952, ch. 757, 1952 N.Y. Laws 1632. *See also* Shell, *Arbitration and Corporate Governance*, 67 N.C. L. Rev. 517 (1989).

528)

Shell, *Arbitration and Corporate Governance*, 67 N.C. L. Rev. 517, 525-26 (1989) ("Although arbitration of shareholder claims is a novelty for the public corporation, this dispute resolution system is well established in the context of another class of corporate entities, that of the privately held or 'close' corporation").

529)

*See Shy v. Navistar Int'l Corp.*, 781 F.3d 820, 827 (6th Cir. 2015) (disputes regarding company's corporate structure arbitrable); *PureWorks, Inc. v. Unique Software Solutions, Inc.*, 554 F.App'x 376, 380 (6th Cir. 2014); *In re Petrobras Sec. Litg.*, 116 F.Supp.3d 368, 387 (S.D.N.Y. 2015); *JSC Surgutneftegaz v. President & Fellows of Harvard College*, 2005 WL 1863676, at *4 (S.D.N.Y.); *Stewart v. Mitchell Madison Group, LLC*, 1999 U.S. Dist. LEXIS 3711 (S.D.N.Y.); *James & Jackson LLC v. Willie Gary LLC*, 906 A.2d 76 (Del. 2006); *In re Peter Herrero*, 562 N.Y.S.2d 665 (N.Y. App. Div. 1990) (corporate dissolution dispute arbitrable); *Banores v. Riviere*, 1999 Conn. Super. LEXIS 1985 (Conn. Super. Ct.) (statutory claims arbitrable in shareholder dispute); *Faustini v. Faustini Food Servs., Inc.*, 1996 Conn. Super. LEXIS 2949 (Conn. Super. Ct.) (corporate dissolution dispute arbitrable). *See also* Shell, *Arbitration and Corporate Governance*, 67 N.C. L. Rev. 517 (1989).Early U.S. decisions had generally held corporate governance disputes nonarbitrable on various grounds. *See, e.g., In re Burkin*, 136 N.E.2d 862 (N.Y. 1956) (dispute over removal of director nonarbitrable); *In re Ades*, 177 N.Y.S.2d 582, 584 (N.Y. Sup. 1958) (same); *In re Scuderi*, 39 N.Y.S.2d 422, 423 (N.Y. Sup. 1943) (validity of director's election nonarbitrable). *See also* Kessler, *Arbitration of Intra-Corporate Disputes Under New York Laws*, 19 Arb. J. 1 (1964).

530)

*Judgment of 6 April 2017,* 2017 SchiedsVZ 194 (German Bundesgerichtshof) (disputes concerning validity of shareholders' resolutions of partnerships are arbitrable, provided arbitral procedures require for participation of all shareholders and company and preclude contradictory awards); *Judgment of 6 April 2009*, 2009 NJW 1962 (German Bundesgerichtshof) (disputes concerning validity of shareholders' resolutions in limited liability companies are arbitrable, provided arbitral procedures provide for participation of all shareholders and company and preclude contradictory awards); *Judgment of 29 March 1996*, 1996 NJW 1753 (German Bundesgerichtshof) (suggesting that corporate disputes are arbitrable, provided arbitral procedures provide for participation of all shareholders and company and preclude contradictory awards). *See also Judgment of 6 April 2017*, I ZB 32/16, ¶22 (German Bundesgerichtshof) (although disputes regarding corporate law issues of partnerships (*Personengesellschaften*) are generally arbitrable, several provisions must be included in arbitration agreements to make disputes between company and its shareholders or between shareholders, arbitrable). *See also* Borris, *Arbitrability of Corporate Law Disputes in Germany*, 2012 Int'l Arb. L. Rev. 161 ("main source of debate in this area has been the issue of synchronising the mandatory *inter omnes* effect of the arbitral award with the right of all parties bound by the arbitral award to participate in the arbitral proceedings"); Borris, *Die Schiedsfähigkeit Gesellschaftsrechtlicher Streitigkeiten in der Aktiengesellschaft*, 2010 NZG 481; Borris, *Gesellschaftsrechtliche Streitigkeiten in der Schiedspraxis,* 2018 SchiedsVZ 242; Geimer, in R. Zöller (ed.), *Zivilprozessordnung* §1030, ¶9 (32d ed. 2018). *See also* Hertel & Covi, *Arbitrability of Shareholder Disputes in Germany*, Kluwer Arb. Blog (7 Feb. 2018).

531)

Geimer, in R. Zöller (ed.), *Zivilprozessordnung* §1030, ¶¶1, 8 *et seq.* (32d ed. 2018).

532)

2018 DIS Arbitration Rules, Annex 5 ("Supplementary Rules for Corporate Law Disputes"); 2009 DIS Supplementary Rules for Corporate Law Disputes. *See* Borris, *Die "Ergänzenden Regeln für Gesellschaftsrechtliche Streitigkeiten" der DIS*, 2009 SchiedsVZ 299; Wolff, *Die Ergänzenden Regeln für Gesellschaftsrechtliche Streitigkeiten der DIS: Bilanz der DIS-ERGeS 2009 und Vorstellung der DIS-ERGeS 2018*, 2018 SchiedsVZ 246.

533)

*See, e.g., Fulham Football Club (1987) Ltd v. Richards* [2011] EWCA Civ 855, ¶28 (English Ct. App.) (claim for "unfair prejudice" or breach of fiduciary duty by director arbitrable; "there is no express provision in either the [English Arbitration Act, 1996 or the English Companies Act, 2006] which excludes arbitration as a possible means of determining disputes of this kind"); *Re Vocam Euro. Ltd* [1998] BCC 396 (Ch) (English High Ct.).

534)

*See, e.g., Judgment of 21 December 2017*, 6 Ob 104/17p (Austrian Oberster Gerichtshof); *Judgment of 26 June 2014*, 6 Ob 84/14t (Austrian Oberster Gerichtshof); *Judgment of 10 July 2007*, 4 Ob 108/07v (Austrian Oberster Gerichtshof); *Judgment of 17 June 2003*, 5 Ob 112/03m (Austrian Oberster Gerichtshof); *Judgment of 10 December 1998*, 7 Ob 221/98w (Austrian Oberster Gerichtshof); *Judgment of 19 October 1989*, 7 Ob 681/89 (Austrian Oberster Gerichtshof).

535)

*See, e.g., Judgment of 8 December 2009*, DFT 136 III 107 (Swiss Fed. Trib.) (implicitly assuming arbitrability of derivative suits). *See also Award in ICC Case No. 16369*, in J.-J. Arnaldez, Y. Derains & D. Hascher (eds.), *Collection of ICC Arbitral Awards 2012-2015* 313 (2018).

536)

*See, e.g., Investissement Charlevoix Inc. v. Gestion Pierre Gingras Inc.*, [2010] QCCA 1229 (Québec Ct. App.); *1640895 Ontario, Inc. v. Harvey*, [2009] ONCA 76 (Ontario Ct. App.); *Acier Leroux Inc. v. Tremblay*, [2004] CanLII 28564 (Québec Ct. App.).

537)

*Tomolugen Holding Ltd v. Silica Investors Ltd,* [2015] SGCA 57, ¶84 (Singapore Ct. App.) (minority shareholder claims are arbitrable) (citing G. Born, *International Commercial Arbitration* 945 (2d ed. 2014)).

538)

*See Re Quiksilver Glorious Sun JV Ltd,* [2014] 4 HKLRD 759, ¶23 (H.K. Ct. First Inst.) ("In the present case the dispute between the parties concerns the basis upon which the joint venture is to end. … These issues can be determined by arbitration. If the arbitrators conclude that Quicksilver is correct an application can then be made to the Court for winding-up orders.").

539)

*See Judgment of 19 April 2012,* 6 Ob 42/12p (Austrian Oberster Gerichtshof) (claim regarding resolution of limited liability company's annual general meeting arbitrable); *L Capital Jones Ltd v. Maniach Pte Ltd,* [2017] SGCA 3, ¶32 (Singapore Ct. App.) (shareholder agreement "regulate[d] the relationship between [the Respondent] and the only other shareholder of [JtGGH] in their capacity as shareholders"; shareholder disputes arbitrable); *Tomolugen Holdings Ltd v. Silica Investors Ltd,* [2015] SGCA 57, ¶84 (Singapore Ct. App.) ("There is certainly nothing in the text of §216 to suggest an express or implied preclusion of arbitration. Nor does the legislative history and statutory purpose of the provision suggest that a dispute over minority oppression or unfair prejudice is of a nature which makes it contrary to public policy for the dispute to be adjudicated by an arbitral tribunal."). *Compare Judgment of 26 November 2010, Silver Lining Fin. v. Perstorp Waspik,* 2011 NJ 55 (Netherlands Hoge Raad) (claims involving validity of shareholder resolutions capable of settlement by arbitration); *Judgment of 21 January 2011,* Case No. T 2375-08 (Svea Ct. App.) (validity of decision to remove member of board of company (and related consultancy agreement) is arbitrable); Colombian Arbitration Act, Art. 1; Ukrainian Commercial Procedural Code, Art. 6(1) (corporate disputes nonarbitrable); Bernardini, *The Problem of Arbitrability in General*, in E. Gaillard & D. di Pietro (eds.), *Enforcement of Arbitration Agreements and International Arbitral Awards: The New York Convention in Practice* 503 (2008) (Italy). *See also Powell Duffryn plc v. Petereit,* Case No. C-0214.89, [1992] ECR I-1745 (E.C.J.) (jurisdiction clause in company's articles of association binding on shareholders); Shah, *Arbitrability of Minority Shareholder Disputes: Extending the Reach*, Thomson Reuters Arb. Blog (1 Mar. 2017); Shmatenko & Bevz, *The Arbitrability of Corporate Disputes in Ukraine*, 36 ASA Bull. 53 (2018).

540)

*See, e.g.,* Austrian ZPO, §581(2); Finnish Arbitration Law, §4.

541)

*Report on the Work of Its Thirty-Ninth Session, Supp. No. 17,* U.N. Doc. A/61/17, ¶183 (2006); UNCITRAL, *Report of Working Group II (Arbitration) on the Work of Its Forty-Fourth Session*, U.N. Doc. A/CN.9/592, ¶¶89-95 (2006). *See also* Russian Arbitrazh Procedure Code, Art. 225(1) (dividing corporate disputes into three categories based on arbitrability).

542)

*See* Ravanides, *Arbitration Clauses in Public Company Charters: An Expansion of the ADR Elysian Fields or A Descent into Hades?*, 18 Am. Rev. Int'l Arb. 371 (2007); Sockol, *A Natural Evolution: Compulsory Arbitration of Shareholder Derivative Suits in Publicly Traded Corporations,* 77 Tul. L. Rev. 1095, 1111 (2003); §10.07.

543)

Ravanides, *Arbitration Clauses in Public Company Charters: An Expansion of the ADR Elysian Fields or A Descent Into Hades?*, 18 Am. Rev. Int'l Arb. 371, 389-407 (2007).

544)

Some major corporations nonetheless include such provisions in their articles of association. *See, e.g., Royal Dutch Shell Articles of Association (adopted on 17 May 2005), as amended by written resolution on 18 July 2005*, Arts. 152-54, reprinted in Herzfeld, *Prudent Anticipation? The Arbitration of Public Company Shareholder Disputes*, 24 Arb. Int'l 297, 326-29 (2008).

545)

*See Meredith's Estate*, 266 N.W. 351 (Mich. 1936); *Schoneberger v. Oelze*, 96 P.3d 1078, 1082-83 (Ariz. Ct. App. 2004); *In re Jacobovitz' Will*, 295 N.Y.S.2d 527, 529 (Nassau County Surety Ct. 1968); *Shah v. Shah,* [2016] 8 SCC 788, ¶¶58-61 (Indian S.Ct.) (trust disputes nonarbitrable). *See also* Nueber & Puschmann, *Arbitration of Foundation and Trust Disputes in Liechtenstein and the United Kingdom: A Comparative Analysis,* 24(5) Trusts & Trustees 418 (2018); Strong, *Arbitration of International Trust Disputes: The Next Frontier for International Commercial Arbitration?,* in J. Kalicki & M. Abdel Raouf (eds.), *Evolution and Adaptation: The Future of International Arbitration* 971 (2019); Strong, *Arbitration of Trust Disputes: Two Bodies of LawCollide,* 45 Vand. J. Trans. L. 1157 (2012); Strong, *The European Succession Regulation and the Arbitration of Trust Disputes,* 103 Iowa L. Rev. 2205 (2018); S. Strong & T. Molloy (eds.), *Arbitration of Trust Disputes* (2016); von Segesser & Bell, *Arbitration of Trust Disputes,* 35 ASA Bull. 10 (2017).

546)

*See Laughton v. CGI Tech. & Solutions, Inc.,* 602 F.Supp.2d 262, 265 (D. Mass. 2009) (upholding arbitrability of trustee's claim); *Rachal v. Reitz*, 2013 WL 1859249 (Tex.) (upholding validity of arbitration clause in trust); *Rinehart v. Welker,* [2012] NSWCA 95 (N.S.W. Ct. App.). *See also* Spitko, *The Will as An Implied Unilateral Arbitration Contract,* 68 Fla. L. Rev. 49 (2016); Strong, *Arbitration of International Trust Disputes: The Next Frontier for International Commercial Arbitration?,* in J. Kalicki & M. Abdel Raouf (eds.), *Evolution and Adaptation: The Future of International Arbitration* 971 (2019); Strong, *Arbitration of Trust Disputes: Two Bodies of Law Collide,* 45 Vand. J. Trans. 1157 (2012); Strong, *Mandatory Arbitration of Internal Trust Disputes: Improving Arbitrability and Enforceability Through Proper Procedural Choices,* 28 Arb. Int'l 591 (2012).

547)

*See, e.g.,* New Zealand Trusts Bill, §138 ("A trustee may, with the agreement of each party to the matter, refer the matter to an ADR process").

548)

*See* Arkansas Code Annotated §16-108-201; Puerto Rico Dealers Act, 10 L.P.R.A. §278.

549)

*See* §6.03_[C][4]; California Corporations Code, §31512 (rendering void any provision which purported to bind a franchisee to waive compliance with any provision of Californian franchise law).

550)

The U.S. Supreme Court has held that these types of provisions conflict with §2 of the FAA and hence violate the Supremacy Clause. *See Southland Corp. v. Keating*, 465 U.S. 1 (U.S. S.Ct. 1984).

551)

*See* §6.03_[C][4]; U.S. Motor Vehicle Franchise Contract Arbitration Fairness Act, 15 U.S.C. §1226.

552)

*See* Belgian Law of 27 July 1961, as amended by Belgian Law of 13 April 1971 (titled "Law on the Unilateral Rescission of Exclusive Sales Concessions Concluded for an Unlimited Period of Time"), Art. 4 ("The aggrieved grantee, at the time of the termination of a concession of sale taking effect in whole or in part in the Belgian territory, can in any case bring an action against the grantor in Belgium, either before the judge of his own domicile, or before the judge of the domicile or the seat of the grantor. If the case is brought before a Belgian court, it will exclusively apply Belgian law."); §6.03[C][2].

553)

*Judgment of 18 June 1976, Audi NSU v. Adelin Petit SA*, 1979 Journal des Tribunaux 626 (Belgian Cour de Cassation).

554)

*See Judgment of 16 November 2006*, Case No. C.02.0445.F (Belgian Cour de Cassation) (dispute governed by Belgian law regarding distributors nonarbitrable).

555)

*See id.* at 9 (Belgian Cour de Cassation) ("A consistent interpretation of the New York Convention, in particular of Articles II and V(2)(a) requires determining whether the dispute is arbitrable under the *lex fori*, whenever the question is raised").

556)

*Judgment of 16 November 2006*, Case No. C.02.0445.F, 9 (Belgian Cour de Cassation). *See also Judgment of 22 December 1988, Gutbrod Werke GmbH v. Usinorp de Saint-Hubert et Saint Hubert Gardening*, 1988 Journal des Tribunaux 458 (Belgian Cour de Cassation) ("an arbitration clause could only be valid if it specified that the arbitrators are obligated to apply Belgian law [and] that, if that is not the case, the clause could not stand"); Kleinheisterkamp, *The Impact of Internationally Mandatory Laws on the Enforceability of Arbitration Agreements,* 3 World Arb. & Med. Rev. 91, 94-99 (2009).

557)

*See* §6.02[G].

558)

*See* §2.01[A][1][a].

559)

*See Final Award in ICC Case No. 6379*, XVII Y.B. Comm. Arb. 212 (1992).

560)

*See id.* at 215-16. *Compare* Keutgen & Dal, *National Report for Belgium (2007)*, in J. Paulsson (ed.), *International Handbook on Commercial Arbitration* 1, 9 (1984 & Update 2007) ("Arbitration is also possible regarding exclusive distributorship contracts. However, one must note that when a dispute concerns a unilateral termination of an exclusive distributorship contract of unspecified (indeterminate) duration in Belgium, the Law of 27 July 1961 allocates important indemnities to the concessionaire. For such disputes, one can have recourse to arbitration when the dispute arises and even when it has not yet arisen and one can also conclude an arbitration agreement but in such cases the arbitrator will have to apply Belgian law.").

561)

*See* §4.05[C][5].

562)

*See id.*

563)

*Judgment of 17 May 2006*, 2006 IHR 166, 167-68 (Oberlandesgericht München). *See also* Kleinheisterkamp, *The Impact of Internationally Mandatory Laws on the Enforceability of Arbitration Agreements*, 3 World Arb. & Med. Rev. 91, 99-103 (2009).

564)

*See* §1.04[A][1][c][i]. *See also* Quinke, *Schiedsvereinbarungen und Eingriffsnormen*, 2007 SchiedsVZ 246; Rau, *Comment: Mandatory Law and the Enforceability of Arbitration Agreements*, 3 World Arb. & Med. Rev. 133 (2009); Ruhl, *Extending* Ingmar *to Jurisdiction and Arbitration Clauses: The End of Party Autonomy in Contracts with Commercial Agents?*, 2007 Euro. Rev. Priv. L. 891. *See also Judgment of 21 June 2017*, XLIV Y.B. Comm. Arb. 463 (Brazilian Superior Tribunal de Justiça) (2019) (rejecting Article V(2)(a) defense that film exploitation and distribution rights were non-arbitrable under law of recognition forum).

565)

*Judgment of 1 March 2017,* 5 Ob 72/16y (Austrian Oberster Gerichtshof).

566)

*See, e.g.*, *London S.S. Owners' Mutual Ins. Ass'n Ltd v. Spain* [2015] EWCA Civ 333, ¶78 (English Ct. App.); *Westacre Inv. Inc. v. Jugoimport-SPDR Holding Co.* [1999] 3 All ER 864 (English Ct. App.) (award enforced despite alleged illegality of "consulting fee"); *Judgment of 8 July 2010, Doga v. HTC Sweden AB*, Case No. 09-67013 (French Cour de Cassation Civ. 1) (tort claims under mandatory French law held arbitrable)*; Agrawest v. BMA*, [2005] PESCTD 36 (Prince Edward Island S. Ct.). *See also Ayyasamy v. Paramasivam*, Civil Appeal Nos. 8245 & 8246 of 2016, ¶5 (Indian S.Ct.) (mere allegation of fraud does not render dispute nonarbitrable, but also holding: "When the case involves serious allegations of fraud, the dicta contained in the aforesaid judgments would be understandable. However, at the same time, mere allegation of fraud in the pleadings by one party against the other cannot be a ground to hold that the matter is incapable of settlement by arbitration and should be decided by the civil court. The allegations of fraud should be such that not only these allegations are serious that in normal course these may even constitute criminal offence, they are also complex in nature and the decision on these issues demand extensive evidence for which civil court should appear to be more appropriate forum than the Arbitral Tribunal.").

567)

New York Convention, Art. II(1). *See* §9.02[F][1].

568)

*See, e.g.*, *Hub Power Co. v. Pakistan WAPDA*, 16 Arb. Int'l 439 (Pakistan S.Ct. 2000) (2000); §6.03[C][6].

569)

*See* §4.05[C][5].

570)

*Radhakrishnan v. MS Maestro Eng'rs*, Civil Appeal No. 7019/2009, ¶6 (Indian S.Ct.) (apparently holding claims nonarbitrable because they involved complex allegations of fraud and serious misconduct, requiring that dispute "must be tried in court and the Arbitrator could not be competent to deal with such matters which involved an elaborate production of evidence to establish the claims relating to fraud and criminal misappropriation").

571)

It is unclear whether Indian courts would apply this nonarbitrability rule to disputes subject to international arbitration agreements. As discussed above, a number of courts have applied nonarbitrability exceptions more narrowly in international than in domestic settings. *See* §6.03[A].

572)

*See, e.g.*, Kreindler, *The Arbitration Clause: The Validity of An Arbitration Clause in Matters of Product Liability*, in M. Blessing (ed.), *The Arbitration Agreement: Its Multifold Critical Aspects* 123 (1994); Thornburg, *Contracting with Tortfeasors: Mandatory Arbitration Clauses and Personal Injury Claims*, 67 Law & Contemp. Prob. 253, 256-60 (2004) (discussing cases). *See also Leong v. Kaiser Found. Hosp.*, 788 P.2d 164, 169 (Haw. 1990) (enforcing clause in health care plan calling for binding arbitration of "[a]ny claims for damages for personal injury … arising out of the rendition of or failure to render services under this contract"); *Doyle v. Giuliucci*, 401 P.2d 1, 3 (Cal. 1965) ("The arbitration provision in such contracts [for medical care] is a reasonable restriction, for it does no more than specify a forum for the settlement of disputes").

573)

Compare *McDonnel Group LLC v. Great Lakes Ins. SE,* 923 F.3d 427, 431 (5th Cir. 2019) (relying on Convention to uphold arbitration agreement despite state insurance regulation invalidating agreement); *Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London,* 587 F.3d 714 (5th Cir. 2009) (same); *Bennett v. Liberty Nat'l Fire Ins. Co.,* 968 F.2d 969 (9th Cir. 1992); *Life of Am. Ins. Co. v. Aetna Life Ins. Co.,* 744 F.2d 409 (5th Cir. 1984); *Floyd v. Kelly Serv. Inc.,* 2019 WL 4452309 (N.D. Tex.); *First United Methodist Church of Corinth, Inc. v. Certain Underwriters at Lloyds,* 2019 WL 4197595 (N.D. Miss.); *Antillean Marine Shipping Corp. v. Through Transp. Mut. Ins., Ltd,* 2002 U.S. Dist. LEXIS 26363, at *7-8 (S.D. Fla.) (rejecting nonarbitrability objection under McCarran-Ferguson Act, which "does not apply to international insurance contracts made under the Convention"); *Philipps v. Lincoln Nat'l Health & Cas. Ins. Co.,* 774 F.Supp. 1297 (D. Colo. 1991); *Triton Lines, Inc. v. Steamship Mut. Underwriting Ass'n,* 707 F.Supp. 277 (S.D. Tex. 1989) (McCarran-Ferguson Act does not create exception to FAA permitting state nonarbitrability statute to render agreement to arbitrate unenforceable); *Assuranceforeningen Skulld (Gjensidig) v. Apollo Ship Chandlers, Inc.,* 847 So.2d 991, 993 (Fla. Dist. Ct. App. 2003) (rejecting nonarbitrability objections under McCarran-Ferguson Act "because the parties' dispute involves foreign commerce") *with ESAB Group Inc. v. Zurich Ins. plc,* 685 F.3d 376, 390 (FAA does not preempt anti-arbitration provisions under McCarran-Ferguson Act); *Stephens v. Am. Int'l Ins. Co.,* 66 F.3d 41, 45-46 (2d Cir. 1995); *Foresight Energy LLC v. Certain London Mkt Ins. Cos.,* 311 F.Supp.3d 1085, 1099 (E.D. Mo. 2018); *Washburn v. Corcoran,* 643 F.Supp. 554 (S.D.N.Y. 1986) (relying on McCarran-Ferguson Act and New York statute to hold claims by state insurance liquidators nonarbitrable); *Corcoran v. Ardra Ins. Co.,* 566 N.Y.S.2d 575 (N.Y. 1990) (New York Convention and FAA do not require arbitration of claims by state insurance liquidator).

574)

See, e.g., *BWV Invs. Ltd v. Saskferco Prods. Inc.,* [1994] CanLII 4557 (Saskatchewan Ct. App.); *Automatic Sys. Inc. v. Bracknell Corp.,* [1994] CanLII 1871 (Ontario Ct. App.).

575)

See *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Tech., Inc.,* 369 F.3d 645 (2d Cir. 2004) (compelling arbitration of claims for moral damages under Brazilian import/export regulations).

576)

See, e.g., *Orcutt v. Kettering Radiologists, Inc.,* 199 F.Supp.2d 746 (S.D. Ohio 2002) (False Claims Act whistle-blower claims arbitrable). *Contra Nguyen v. City of Cleveland,* 121 F.Supp.2d 643 (N.D. Ohio 2000) (False Claims Act claims nonarbitrable).

577)

See, e.g., *Judgment of 28 February 2008,* RG No. 05/10577 (Paris Cour d'Appel) (disputes over industrial property licenses are arbitrable); *Judgment of 15 November 2005,* Case No. T-2277-04 (Svea Ct. App.) (dispute over Russian real property rights arbitrable notwithstanding Russian Subsoil Law); *Judgment of 26 May 2011,* Russian Gazette No. 5498 (Russian Const. Ct.) (upholding arbitrability of real estate disputes (including disputes over transfers and security interests)). *Compare Judgment of 22 February 2008, Alloys Trading Ltd v. AvangardTorgRos LLC,* Case No. A56-44076/2007 (N.W. Fed. Arbitrazh Ct.) (disputes over real estate in Russia held nonarbitrable). *See also* Azzi, *Arbitrabilité et Validité du Titre en Droit Francais,* 2014 Rev. Arb. 319.

578)

See, e.g., *Jean Estate v. Wires Jolley LLP,* [2009] ONCA 339 (Ontario Ct. App.) (fact that Solicitor's Act grants Superior Court jurisdiction does not mean that disputes arising between solicitor and client cannot be submitted to arbitration); *Fung v. Henry Wai & Co.,* [2018] HKCFI 31 (H.K. Ct. First Inst.) (disputes over legal fees are arbitrable).

579)

See, e.g., *Judgment of 17 May 2017,* 2017 NJW 2112 (German Bundesgerichtshof); *Judgment of 16 March 2017,* 2017 NJW 2115 (German Bundesgerichtshof); *Judgment of 16 March 2017,* 2017 ZEV 416 (German Bundesgerichtshof). *See also* Karrer & Straub, *Switzerland,* in F.-B. Weigand & A. Baumann (eds.), *Practitioner's Handbook on International Commercial Arbitration* ¶14.33 (3d ed. 2019); Lazić & Meijer, *Netherlands,* in *id.* at ¶9.54.

580)

See, e.g., *Final Awards in ICC Case Nos. 6515 & 6516,* XXIV Y.B. Comm. Arb. 80, 84 (1999) (dispute over contractual allocation of Greek taxes did not implicate Greek sovereignty and was arbitrable); Park, *Income Tax Treaty Arbitration,* 10 George Mason L. Rev. 803 (2001). *Compare* Carbonneau & Sheldrick, *Tax Liability and Inarbitrability in International Commercial Arbitration,* 1 J. Transnat'l L. & Pol'y 23, 38 (1992); Chambon, *L'Arbitrabilité des Litiges a Tonalite Fiscal,* 2017 Revue Européene et Internationale de Droit Fiscal 351.

581)

*See, e.g., Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 723-24 (9th Cir. 1999) (Lanham Act); *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 133 (2d Cir. 1997) (Lanham Act); *Saari v. Smith Barney, Harris Upham & Co.*, 968 F.2d 877 (9th Cir. 1992) (Employee Polygraph Protection Act claim is arbitrable). *See also Judgment of 3 March 2015*, Case No. A41-60951/13 (Russian S.Ct.) (public procurement dispute nonarbitrable due to public interest).

582)

*See* 15 U.S.C. §1226(a)(2) ("motor vehicle franchise contract" disputes nonarbitrable except where post-dispute agreement to arbitrate exists); *Arch Reins. Ltd v. Akay Holdings Sdn Bhd,* [2019] 1 CLJ 305 (Malaysian Fed. Ct.) (disputes regarding statutory foreclosure proceedings under Malaysian National Land Code are nonarbitrable).

583)

*See, e.g., Judgment of 9 March 2006, N.K. Belavia v. O.J.S.C. Aviakompaniya Sibir*, Case No. 04-786/2006 (W. Siberian Dist. Fed. Arb. Ct.) (disputes over title to aircraft held nonarbitrable).

584)

*See, e.g., Aqaba Container Terminal (Pvt) Co. v. Soletanche Bachy France SAS* [2019] EWHC 471, ¶36 (Comm) (English High Ct.); *Union of India v. Tantia Constr. Pvt Ltd*, [2011] INSC 410, ¶27 (Indian S.Ct.) (at least some constitutional claims nonarbitrable in domestic dispute: "the constitutional powers vested in the High Court or the Supreme Court cannot be fettered by any alternative remedy available to the authorities").

585)

*See* French Civil Code, Art. 2060 (divorce and separation claims nonarbitrable); Quinke, *Objective Arbitrability: Article V(2)(a)*, in R. Wolff (ed.), *New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Commentary* 396 (2012) (divorce and child custody issues nonarbitrable in Germany; matrimonial claims arbitrable). *Compare A.I. v. M.T.* [2013] EWHC 100, ¶33 (Fam) (English High Ct.) (court granted parties' request to refer all issues (including those relating to financial settlement, status of parties' marriage and care and parenting of children) to arbitration by Jewish religious court (New York Beth Din): "it was an integral aspect of the process of arbitration that it took place under the auspices of the *Beth Din*. It was a profound belief held by both parties, and their respective extended families, that the marriage which had been solemnised in accordance with the tenets of their faith should be dissolved within those tenets"). *See also S v. S* [2014] 1 WLR 2299 (Fam) (English High Ct.) (claims for post-divorce ancillary relief are arbitrable).

586)

*AB Bofors-Uva CAV Ltd v. AB Skandia Transp.* [1982] 1 Lloyd's Rep. 410 (Comm) (English High Ct.) (refusing to recognize arbitration agreement that was contrary to Convention on Contracts for the International Carriage of Goods by Road; interpreting Convention as requiring "express provision that the tribunal shall apply the Convention," which arbitration agreement failed to do).

587)

*Subway Sys. Australia Pty Ltd v. Ireland*, [2013] VSC 550, ¶63 (Victoria Sup. Ct.) ("the effect of §94 of the [Retail Leases Act 2003] is to render a dispute to which §94 … applies, a matter which may not be the subject of arbitration in Victoria"); *Himangni Enters. v. Kamaljeet Singh Ahluwalia*, Civil Appeal No. 16850/2017 (Indian S.Ct.) (disputes relating to tenancy, eviction and rent are non-arbitrable). *But see Ambuja Neotia Holdings Pvt Ltd v. MS Planet M Retail Ltd*, AP No. 9/2015 (Calcutta High Ct.) (lease deed disputes are arbitrable and only those eviction or tenancy matters governed by special statute are non-arbitrable). *See also* Susan & Malhotra, *Arbitrability of Lease Deed Disputes in India: The Apex Court Answers*, Kluwer Arb. Blog (19 Feb. 2018).

588)

*See, e.g., Serbia v. Imagesat Int'l BV* [2009] EWHC 2853 (Comm) (English High Ct.) (question whether state is "successor" state is not nonarbitrable).

589)

*See* §6.03[C][4].

590)

*See* Arkansas Code Annotated §16-108-201(b)(2); Iowa Code Annotated §679A.1(2)(c); Kansas State Annotated §5-401(c) (recognized as preempted by FAA in *Skewes v. Shearson Lehman Bros.*, 829 P.2d 874, 874 (Kan. 1992)); S.C. Code Annotated §15-48-10(b)(4); Texas Civil Practice & Remedies Code Annotated §171.002(a)(3)(c) (recognized as preempted by FAA in *In re Nexion Health at Humble, Inc.*, 173 S.W.3d 67, 69 (Tex. 2005)).

591)

*See* Louisiana Revised State Annotated §22:868 ("A. No insurance contract delivered or issued for delivery in this state and covering subjects located, resident, or to be performed in this state … shall contain any condition, stipulation, or agreement: … (2) Depriving the courts of this state of the jurisdiction of action against the insurer. … Any such condition, stipulation, or agreement in violation of this Section shall be void, but such voiding shall not affect the validity of the other provisions of the contract."); Michigan Franchise Investment Law, Michigan Compiled Laws Annotated §600.5005; Montana Code Annotated 2019, §27-5-114(2)(b) (when consideration for real estate is less than $5000); Ohio Revised Code Annotated §2711.01(B)(1).

592)

*See* Arkansas Code Annotated §16-108-201(b)(2) (recognized as preempted by Federal Crop Insurance Act in *IGF Ins. Co. v. Hat Creek P'ship*, 76 S.W.3d 859, 866 (Ark. 2002)); Kansas State Annotated §5-401(c)(3).

593)

*See Perry v. Thomas*, 482 U.S. 483 (U.S. S.Ct. 1987); Iowa Code Annotated §679A.1(2)(b); Kansas State Annotated §5-401(c)(2) (recognized as preempted by FAA in *Lewis v. Circuit City Stores, Inc.*, 500 F.3d 1140, 1151-52 (10th Cir. 2007)).

594)

*See* §6.04_[H][1]; Cole, *Uniform Arbitration: "One Size Fits All" Does Not Fit*, 16 Ohio St. J. Disp. Resol. 759, 787 (2001); Spitko, *Federal Arbitration Act Preemption of State Public-Policy Based Employment Arbitration Doctrine: An Autopsy and An Argument for Federal Agency Oversight*, 20 Harv. Negot. L. Rev. 1 (2015).

595)

*See Southland Corp. v. Keating*, 465 U.S. 1 (U.S. S.Ct. 1984).

596)

*See Keating v. Super. Ct. of Alameda County*, 645 P.2d 1192, 1203-04 (Cal. 1982).

597)

*Southland*, 465 U.S. at 16.

598)

*Id.* at 16 n.11.

599)

*Perry*, 482 U.S. 483.

600)

*Id.* at 488.

601)

*Allied-Bruce Terminix Co. v. Dobson*, 513 U.S. 265, 269-71 (U.S. S.Ct. 1995) (preempting Alabama statute invalidating agreements to arbitrate future disputes). The state statute, Alabama Code §8-1-41, provided: "The following obligations cannot be specifically enforced: … (3) An agreement to submit a controversy to arbitration."

602)

*See, e.g., KPMG LLP v. Cocchi*, 565 U.S. 18, 22 (U.S. S.Ct. 2011) (FAA preempts state law rule denying enforcement of arbitration agreement where dispute involved non-arbitrable claims); *Preston v. Ferrer*, 552 U.S. 346 (U.S. S.Ct. 2008) (FAA preempts state law granting exclusive jurisdiction over particular claims to state administrative agency); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (U.S. S.Ct. 2006); *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (U.S. S.Ct. 1996) ("Courts may not, however, invalidate arbitration agreements under state laws applicable *only* to arbitration provisions") (emphasis in original); *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (U.S. S.Ct. 1995).

603)

See §4.02[A][2][d]; *Generational Equity LLC v. Schomaker,* 602 F.App'x 560, 562 (3d Cir. 2015) (Pennsylvania statute barring unregistered foreign business from utilizing state courts preempted by FAA); *THI of N.M. at Hobbs Ctr LLC v. Patton,* 741 F.3d 1162, 1165 (10th Cir. 2014) (FAA preempted New Mexico law of unconscionability of arbitration for contracts governed by FAA); *Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd's, London,* 587 F.3d 714, 723-25 (5th Cir. 2009); *Lewis v. Circuit City Stores, Inc.,* 500 F.3d 1140, 1151-52 (10th Cir. 2007) (FAA "preempts Kansas's statute rendering disputes between an employer and employee nonarbitrable"); *S+L+H SpA v. Miller-St. Nazianz, Inc.,* 988 F.2d 1518 (7th Cir. 1993) (Wisconsin Fair Dealership Law's prohibition on arbitration of certain disputes preempted); *David L. Threlkeld & Co. v. Metallgesellschaft Ltd (London),* 923 F.2d 245, 250 (2d Cir. 1991) ("state statutes such as the Vermont statute [requiring that any agreement to arbitrate be displayed prominently in the contract and signed by the parties] directly clash with the Convention and with the [FAA] because they effectively reincarnate the former judicial hostility towards arbitration"); *Saturn Distrib. Corp. v. Williams,* 905 F.2d 719 (4th Cir. 1989); *Sec. Indus. Ass'n v. Connolly,* 883 F.2d 1114 (1st Cir. 1989); *Perez v. Qwest Corp.,* 883 F.Supp.2d 1095, 1113 (D.N.M. 2012); *JSC Surgutneftegaz v. President & Fellows of Harvard College,* 2005 WL 1863676, at *4 (S.D.N.Y) ("To the extent that New York law would exempt matters going to the internal affairs of corporations from arbitration, it is preempted by the FAA"); *In re Marcia L. Pate,* 198 B.R. 841 (Bankr. S.D. Ga. 1996) (FAA preempts Georgia state statutory bar against arbitration clauses in consumer transactions); *In re Nexion Health at Humble, Inc.,* 173 S.W.3d 67, 69 (Tex. 2005) (FAA preempts provision of Texas statute rendering tort claims nonarbitrable if arbitration agreement not signed by counsel); *Skewes v. Shearson Lehman Bros.,* 829 P.2d 874, 874 (Kan. 1992) (FAA preempts Kansas' statute rendering tort claims nonarbitrable); *Dahiya v. Talmidge Int'l Ltd,* 931 So.2d 1163, 1173 (La. Ct. App. 2006) (New York Convention and FAA preempt state law making pre-dispute arbitration agreements in employment contracts unenforceable); *Wells Fargo Auto Fin., Inc. v. Wright,* 698 S.E.2d 17 (Ga. Ct. App. 2010) (FAA preempted state law purportedly invalidating arbitration agreement contained in vehicle purchase contract). *But see Sakkab v. Luxottica Retail N. Am. Inc.,* 803 F.3d 425, 427 (9th Cir. 2015) (FAA did not preempt California rule barring waiver of representative Private Attorneys General Act claims).

604)

*Marmet Health Care, Inc. v. Brown,* 565 U.S. 531 (U.S. S.Ct. 2012).

605)

*Id.* at 532-33 (quoting *Dean Witter Reynolds Inc. v. Byrd,* 470 U. S. 213, 217 (U.S. S.Ct. 1985)).

606)

*Id.* at 533.

607)

*Epic Sys. Corp. v. Lewis,* 138 S.Ct. 1612, 1627 (U.S. S.Ct. 2018) ("In many cases over the years, this Court has heard and rejected efforts to conjure conflicts between the FAA and other federal statutes. … Throughout, we have made clear that even a statute's express provision for collective legal actions does not necessarily mean that it precludes 'individual attempts at conciliation' through arbitration. … And we've stressed that the absence of any specific statutory discussion of arbitration or class actions is an important and telling clue that Congress has not displaced the Arbitration Act.") (quoting *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 32 (U.S. S.Ct. 1991)). *Compare id.* at 1678 (Ginsburg, J., dissenting) ("Even assuming the FAA and the NLRA were inharmonious, the NLRA should control. Enacted later in time, the NLRA should qualify as 'an implied repeal' of the FAA, to the extent of any genuine conflict").

608)

See §4.05.

609)

*Award in ICC Case No. 1110,* 10 Arb. Int'l 282, 291 (1994). *See also* §6.04[C].

610)

*See, e.g., Final Award in ICC Case No. 8423,* XXVI Y.B. Comm. Arb. 153, 154 (2001) ("The first issue for the Arbitral Tribunal is whether disputes concerning the application of community competition law are arbitrable. As community law pertains to international public policy, the Arbitral Tribunal must examine this issue *ex officio,* even if the parties do not raise an objection."); *Award in ICC Case No. 7539,* 123 J.D.I. (Clunet) 1030 (1996). *See also* Mourre, *Arbitration and Criminal Law. Reflections on the Duties of the Arbitrator,* 22 Arb. Int'l 95 (2006).

611)

See §26.05[C][4][c].

612)

See §19.04[B].

613)

National law in some jurisdictions may require an arbitrator to do more than raise nonarbitrability issues *sua sponte.* Ottenlenghi, *National Report for Israel (1984),* in J. Paulsson (ed.), *International Handbook of Commercial Arbitration* 1, 5 (1984) (arbitrator required to report suspected criminal activity to Attorney General). *See* §13.04[A][5].

614)

*See* §15.04[B][3].

615)

The principle of judicial non-interference in arbitral proceedings is discussed below. *See* §15.06.

616)

*See, e.g., Cole v. Burns Int'l Sec. Servs.,* 105 F.3d 1465, 1482 (D.C. Cir. 1997) (conditioning arbitrability of Title VII dispute on various "procedural safeguards" in arbitration proceedings, including "more than minimal discovery," punitive damages and employee's exemption from paying arbitrators' fees); *Rodriguez v. Sim,* 2009 WL 975457, at \*4 (N.D. Cal.) (compelling arbitration in "compliance with the [FAA] and the California Code of Civil Procedure, and the FAA's mandatory and permissive rights to discovery" with "the employer bear[ing] … any cost of the arbitration that the employee would not have incurred had the claim been filed in court").

617)

*See PPG Indus., Inc. v. Pilkington plc,* 825 F.Supp. 1465 (D. Ariz. 1993); *MEL v. Gotaas-Larsen Shipping Corp.,* 837 F.Supp. 1207 (S.D. Fla. 1993) (requiring reports every three months on progress of arbitration of federal securities law claims in London).

618)

*See* §§8.03[B]-[C]; §15.06.

619)

*See* §8.03_[A][2]; §8.03_[C]; UNCITRAL Model Law, Art. 5.

620)

*See* §8.03_[A][2]; §8.03[C].

621)

*See* §6.02_[G]; *Howard v. Anderson,* 36 F.Supp.2d 183, 187 (S.D.N.Y. 1999) ("[G]iven defendants' desire to arbitrate this case and reach a resolution that will be enforced by the Court, they should make every effort to ensure that Howard is afforded all of her statutory rights. However, if Howard is unable to vindicate her rights in the arbitral forum, she will have recourse to the Court.").

622)

*See* §6.03_[C]; §6.04.

623)

*See* §1.01_[B]; §1.01[C][1].

624)

*See* §1.04_[A][1]; 1.04[B][1].

625)

*See* §6.03[C]. *See also* Brekoulakis, *The Protection of the Public Interest in Public Private Arbitrations,* Kluwer Arb. Blog (8 May 2017) ("The last forty years has witnessed a remarkable growth in the rise of public-private contracts and related disputes. The growth owes to two concurrent developments. One the one hand, with the collapse of the non-arbitrability doctrine, the scope of arbitration has greatly expanded to include not only claims pertaining to the formation, interpretation and performance of commercial contracts, but crucially statutory claims that may have crucial social implications. Today, international arbitral tribunals routinely review disputes associated with public policy, including (in investment law) disputes arising out of the exercise of regulatory sovereignty of host states.").

626)

*See* §6.03_[C]; §6.04.

627)

*See* §6.03[C].

628)

Carbonneau & Janson, *Cartesian Logic and Frontier Politics: French and American Concepts of Arbitrability,* 2 Tul. J. Int'l & Comp. L. 193, 222 (1994). *See also* Abraham & Montgomery, *The Lawlessness of Arbitration,* 9 Conn. Ins. L.J. 355 (2003); Comrie-Thomson, *A Statement of Arbitral Jurisprudence: The Case for A National Law Obligation to Publish International Commercial Arbitral Awards,* 34(2) J. Int'l Arb. 275 (2017); McConnaughay, *The Risks and Virtues of Lawlessness: A "Second Look" at International Commercial Arbitration,* 93 N.W. U. L. Rev. 453 (1999); Park, *Private Adjudicators and the Public Interest: The Expanding Scope of International Arbitration,* 12 Brooklyn J. Int'l L. 629 (1986); Silberman, *International Arbitration: Comments from A Critic,* 13 Am. Rev. Int'l Arb. 9, 12, 18 (2002) ("Broader protection for mandatory laws in the context of international arbitration could give greater integrity in the process"; "Important legal issues – whether they fall within the public or private sphere – deserve public attention and debate. Arbitration of certain private disputes may be appropriate, but particular issues in the private sector have public resonance and should be left to the formal adjudication processes of courts that are entrusted with those responsibilities and accountability.").

629)

As discussed above (and in greater detail below), U.S., EU and other nonarbitrability decisions have all concerned private rights to enforce, *inter alia,* competition, securities, trade and other statutory rights, without affecting the authority of regulatory agencies to enforce the same statutory provisions. *See* §§6.04[A]-[B] & [E].

630)

Considered from an historical perspective, many of the statutory rights which are involved in disputes over nonarbitrability arise from modern legislation, such as competition, securities, intellectual property, consumer, civil rights, employment and similar statutory regimes. Suggestions that such rights were historically nonarbitrable, and have recently become arbitrable, are therefore confused. *See, e.g., Baxter Int'l, Inc. v. Abbott Labs.*, 315 F.3d 829 (7th Cir. 2003) (Cudahy, J., dissenting) ("For some considerable time not long in the past, the law of the land was that antitrust disputes were not arbitrable"). In fact, such rights were historically nonexistent and only recently became either litigable or arbitrable.

631)

*See* §1.01[C][1].

632)

Born, *Right to Arbitrate: Historical and Contemporary Perspectives,* 17 Asian Disp. Rev. 56 (2015).

633)

*See* §1.04[B][2].

634)

*See* §§6.03-6.04.

635)

*See* §1.02[B].

636)

*Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 518 (U.S. S.Ct. 1974).

637)

*See also* Drahozal & Zyontz, *Private Regulation of Consumer Arbitration*, 79 Tenn. L. Rev. 289 (2012).

638)

*See* §6.04[A][5].

639)

*See* Fox, *Antitrust and Regulatory Federalism: Races Up, Down, and Sideways*, 75 N.Y.U. L. Rev. 1781 (2000) (discussing increasing antitrust regulation globally); Prentice, *The Inevitability of A Strong SEC*, 91 Cornell L. Rev. 775, 778 (2006) ("It was reasonably clear before the Enron scandal, and is even clearer now, that substantial federal government regulation of securities transactions in the United States will continue"); Waller, *Prosecution by Regulation: The Changing Nature of Antitrust Enforcement*, 77 Or. L. Rev. 1383 (1998) (explaining increasingly regulatory nature of U.S. antitrust enforcement efforts). *See also Baxter Int'l, Inc. v. Abbott Labs.*, 315 F.3d 829, 832 (7th Cir. 2003) ("Treating Baxter as bound (*vis-à-vis* Abbott) by the tribunal's conclusion that the license (as construed to provide strong exclusivity) is lawful does not condemn the public to tolerate a monopoly. If the three-corner arrangement among Baxter, Maruishi and Abbott really does offend the Sherman Act, the United States, the FTC, or any purchaser of sevoflurane is free to sue and obtain relief.").

640)

*See* §§1.04[A][4]-[7].

641)

*See* §10.08.

642)

*See* §6.04_[G][2]; §6.04[H].

643)

*See* Alford, *Arbitrating Human Rights,* 83 Notre Dame L. Rev. 505 (2008).

644)

*See* §6.04_[O]; Chambon, *L'Arbitrabilité des Litiges a Tonalite Fiscal,* 2017 Revue Européene et Internationale de Droit Fiscal 351; Park, *Income Tax Treaty Arbitration*, 10 Geo. Mason L. Rev. 803 (2001).

645)

*See* §6.04[K].

646)

*See* §6.04[D].

647)

*See* 2002 PCA Optional Rules for Conciliation of Disputes Relating to the Environment and/or Natural Resources.

648)

*See* §1.04[C][6][o].

649)

Born, *A New Generation of International Adjudication*, 61 Duke L.J. 775 (2012).

650)

*See* §6.04[O] for discussion of the arbitrability of domestic relations disputes.

651)
As discussed above, such restraint is required by the New York Convention. *See* §4.05_[A][2];
§6.02[I].

652)
*See* §6.02_[G]; §6.04[H][3].

653)
*See* §4.05_[A][2]; §6.02[I].

654)
*See* §6.02[G].

655)
*See* §4.05[C][3].

656)
Equally, it is critical, in assessing asserted applications of the nonarbitrability doctrine, to ascertain
clearly whether or not such rules are intended to apply in international, as distinguished from
domestic, matters. As discussed above, a recurring feature of decisions over the past several
decades has been recognition that domestic nonarbitrability rules often do not apply to international
disputes. *See* §6.03[A].

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Kluwer Arbitration is made available for personal use only. All content is protected by copyright and other intellectual property laws. No part of this
service or the information contained herein may be reproduced or transmitted in any form or by any means, or used for advertising or promotional
purposes, general distribution, creating new collective works, or for resale, without prior written permission of the publisher.

If you would like to know more about this service, visit www.kluwerarbitration.com or contact our Sales staff at lrs-sales@wolterskluwer.com or call +31
(0)172 64 1562.

EXHIBIT 5

# Optional Protocol concerning the Compulsory Settlement of Disputes
**1963**

Done at Vienna on 24 April 1963. Entered into force on 19 March 1967.
United Nations, *Treaty Series*, vol. 596, p. 487



Copyright © United Nations

2005

**Optional Protocol concerning the Compulsory Settlement of Disputes**
**Done at Vienna on 24 April 1963**

*The States Parties to the present Protocol and to the Vienna Convention on Consular Relations*, hereinafter referred to as "the Convention", adopted by the United Nations Conference held at Vienna from 4 March to 22 April 1963,

*Expressing their wish* to resort in all matters concerning them in respect of any dispute arising out of the interpretation or application of the Convention to the compulsory jurisdiction of the International Court of Justice, unless some other form of settlement has been agreed upon by the parties within a reasonable period.

*Have agreed* as follows:

*Article I*

Disputes arising out of the interpretation or application of the Convention shall lie within the compulsory jurisdiction of the International Court of Justice and may accordingly be brought before the Court by an application made by any party to the dispute being a Party to the present Protocol.

*Article II*

The parties may agree, within a period of two months after one party has notified its opinion to the other that a dispute exists, to resort not to the International Court of Justice but to an arbitral tribunal. After the expiry of the said period, either party may bring the dispute before the Court by an application.

*Article III*

1. Within the same period of two months, the parties may agree to adopt a conciliation procedure before resorting to the International Court of Justice.

2. The conciliation commission shall make its recommendations within five months after its appointment. If its recommendations are not accepted by the parties to the dispute within two months after they have been delivered, either party may bring the dispute before the Court by an application.

*Article IV*

States Parties to the Convention, to the Optional Protocol concerning Acquisition of Nationality, and to the present Protocol may at any time declare that they will extend the provisions of the present Protocol to disputes arising out of the interpretation or application of the Optional Protocol concerning Acquisition of Nationality. Such declarations shall be notified to the Secretary-General of the United Nations.

*Article V*

The present Protocol shall be open for signature by all States which may become Parties to the Convention as follows: until 31 October 1963 at the Federal Ministry for Foreign Affairs of the Republic of Austria and, subsequently, until 31 March 1964, at the United Nations Headquarters in New York.

2

*Article VI*

The present Protocol is subject to ratification. The instruments of ratification shall be deposited with the Secretary-General of the United Nations.

*Article VII*

The present Protocol shall remain open for accession by all States which may become Parties to the Convention. The instruments of accession shall be deposited with the Secretary-General of the United Nations.

*Article VIII*

1. The present Protocol shall enter into force on the same day as the Convention or on the thirtieth day following the date of deposit of the second instrument of ratification or accession to the Protocol with the Secretary-General of the United Nations, whichever date is the later.

2. For each State ratifying or acceding to the present Protocol after its entry into force in accordance with paragraph 1 of this article, the Protocol shall enter into force on the thirtieth day after deposit by such State of its instrument of ratification or accession.

*Article IX*

The Secretary-General of the United Nations shall inform all States which may become Parties to the Convention:

(*a*)    of signatures to the present Protocol and of the deposit of instruments of ratification or accession, in accordance with articles V, VI and VII;

(*b*)    of declarations made in accordance with article IV of the present Protocol;

(*c*)    of the date on which the present Protocol will enter into force, in accordance with article VIII.

*Article X*

The original of the present Protocol, of which the Chinese, English, French, Russian and Spanish texts are equally authentic, shall be deposited with the Secretary-General of the United Nations, who shall send certified copies thereof to all States referred to in article V.

IN WITNESS WHEREOF the undersigned Plenipotentiaries, being duly authorized thereto by their respective Governments, have signed the present Protocol.

DONE at Vienna, this twenty-fourth day of April, one thousand nine hundred and sixty-three.

———————————

# EXHIBIT 6



Editions ▾   Newsletters   Events   Marketplace ▾   Future of Europe   f ☰ ⏷ ▶ 🔊 ◉   Login/Register   [Search box] [Search]

# *EURACTIV*

The Capitals     The Brief     Ukraine

Agrifood | Economy & Jobs | Energy & Environment | Global Europe | Health | Politics | Technology | Transport | **Brussels**

France's newly appointed health minister in favour of 'strengthening' Europe's health systems *powered by EURACTIV France*

[EURACTIV SPECIAL REPORT advertisement — With the support of PGE Polska Grupa Energetyczna]

Home / News / Energy & Environment / Energy / EU asserts 'right to regulate' as part of energy charter treaty reform

# EU asserts 'right to regulate' as part of energy charter treaty reform

By Frédéric Simon | EURACTIV.com                    📅 Jul 16, 2019 (updated: 📅 Jul 19, 2019)          Advertisement



The EU taxpayer is the main loser from the continuation of the Energy Charter Treaty which locks Europe into carbon and energy injustice at a high cost to taxpayers, argues Yamina Saheb. [Jonathan Cutrer / Flickr]

💬 Comments    🖨 Print    


EURACTIV SPECIAL REPORT — How the Ukraine war is reshaping the CAP — With the support of

**EU member states gave the European Commission a mandate on Monday (15 July) to revise the Energy Charter Treaty, saying the legally-binding charter must reinstate Europe's "right to regulate" in areas like climate change and workers' rights.**

The Council of the EU, representing the bloc's 28 member states, gave the European Commission its green light to begin negotiations on the revision of the Treaty.

"The modernised ECT should explicitly reaffirm the so-called 'right to regulate'" in areas such as health, safety, and the environment, the Council said, announcing the approval of EU negotiating directives to revise the charter.

In a statement, the Council insisted on "ensuring that climate change and clean energy transition goals are reflected in the modernised ECT." This, it added, includes "a clarification" that EU governments are entitled to enforce environmental and safety laws on foreign companies operating on their territory.

As part of the revision process, the EU also seeks to clarify that investment protection clauses in the ECT "cannot be interpreted as a commitment" that EU laws won't be changed in the future, "even if that may negatively affect the investor's expectations of profits".

Signed in 1991 after the collapse of the Soviet Union, the Energy Charter's initial objective was to provide legal protection for oil and gas companies investing in the former communist bloc.

However, the treaty is regarded as "outdated" by the European Commission, which proposed reforming the energy charter earlier this year, notably when it comes to investor protection clauses, climate change and the clean energy transition.

## EURACTIV Members

360° Foodservice
APPLiA - Home Appliance Europe
BSEF - The International Bromine Council
CEPI - The Confederation of European Paper Ind...
EBA - European Biogas Association
ECI - European Copper Institute
ENTSO-E - European network of transmission sys...
EURIMA - European Insulation Manufacturers' As...
EUROFER - The European Steel Association
European Aluminium
FEAD - European Waste Management Association
FIA - Fédération Internationale de l'Automobile
FIEC - European Construction Industry Federation
GIE - Gas Infrastructure Europe
IFRA - International Fragrance Association
IndustriAll Europe
Metal Packaging Europe
NGVA Europe - The Natural & bio Gas Vehicle As...
PETCORE Europe
Wind Europe

## Popular articles

After Ukraine, 'whole world' is a customer for Turkish drone, maker says  **1**

G7 leadership is critical to put the brakes on deforestation  **2**

Greece-Bulgaria gas interconnector operational from 1 July  **3**

Slovak customs snowed under by trains

Case 1:18-cv-01516-TSC Document 68-65 Filed 12/08/22 Page 301 of 352



## Leaked report reveals 'misfunctioning' of Energy Charter Treaty amid EU reform calls

A confidential internal report, obtained by EURACTIV, lists the multiple failings of the Energy Charter secretariat, at a time when the treaty is undergoing a major revision process and is being used by Russia's Nord Stream 2 pipeline in a first-time legal proceeding against the EU.

Lithuanians club together to buy drone for Ukraine **5**

After Nord Stream 2, time has come for Nord Stream 1 to go **6**

Russian gas halt looms large over Italian economy **7**

Zelenskyy loses patience with EU divisions over new Russia sanctions **8**

Slovaks rush to Hungary for cheap gas as 'petrol tourism' era ends **9**

Advancing Russian forces reach key highway out of Donbas cities **10**

In a statement, the European Commission welcomed the Council's mandate to reform the charter, including "stronger provisions" on climate change, clean energy, human rights and international labour standards.

"The world is evolving, and the energy/climate world is disrupting," Luxembourg wrote in an internal room document about the treaty's revision process, obtained by EURACTIV.

"Contracting parties have taken engagements in Paris towards climate objectives," Luxembourg said in the document, adding that the "ultimate goal" of the Paris Agreement is to achieve "a net-zero carbon world in 2050" and limit the rise in global temperatures to 1.5°C maximum.

"Luxembourg shares the view that these major evolutions need to be horizontally reflected in the revised Treaty," the document reads.

**Investor protection clause**

Discussions in Europe have focused mainly on trade aspects, in particular the Investment-State Dispute Settlement (ISDS) clause.

In the room document, the EU calls for a "fundamental reform" of the ISDS, including a stricter definition of investors in order to "prevent that mailbox companies bring disputes under the ECT" when they have no substantive business activities in their country of legal residence.

Activists see those guarantees as insufficient, however, saying the EU's arbitration system is "flawed" and won't be sufficient to safeguard the environment, public health or workers' rights against the interests of private companies.

"Investment protection under the EU's current system is a simple rebranding of the infamous ISDS arbitration scheme – a parallel justice system in which corporate investors file multi-million dollar lawsuits against governments before private tribunals," said Vicky Cann from the Corporate Europe Observatory (CEO), a campaign group.

"A reform of the Energy Charter Treaty that is based on the EU's investment court system will only ensure that the treaty remains a risk to public interest policy-making," she said in e-mailed comments to EURACTIV. "Reforms that tinker at the edges will not suffice to foster confidence in what remains a thoroughly skewed system."

> New research by Corporate Europe Observatory & the Transnational Institute – "One Treaty to rule them all: The Energy Charter Treaty and the power it gives corporations to halt the energy transition"
> https://t.co/VrUcf6saMN
>
> — Environmental Politics (@Env_Pol) June 20, 2018

**Ditch the treaty?**

Others are more radical, saying the EU should withdraw from the treaty instead of seeking to reform it.

"I don't see how the Treaty could be aligned with EU investment protection standard or the Paris Climate Agreement as any amendment to the Treaty requires unanimity vote," said an insider at the Energy Charter Secretariat who spoke to EURACTIV on condition of anonymity.

"It's insane to think that countries making their income from the export or the transit of fossil fuels would vote to terminate the protection of fossil fuels under the ECT," the insider said.

The source pointed to the Rockhopper case in Italy as a case in point. Under a "sunset" clause in the charter, energy companies can sue signatory countries even after they pull out from the Treaty.

Italy decided to withdraw from the Energy Charter Treaty as of 1 January 2016. But despite this, existing investments will remain protected until 2036 under the charter.

"I wonder how many ECT cases does the EU need to acknowledge that the only way forward is to withdraw from the Treaty," the insider said.

*[Edited by Zoran Radosavljevic]*

Advertisement



# EXHIBIT 7

*Transnational Environmental Law*, 8:2 (2019), pp. 279–302 © 2019 Cambridge University Press
doi:10.1017/S204710251900013X

# ARTICLE

# *The Sun Behind the Clouds? Enforcement of Renewable Energy Awards in the EU*

Ana Mercedes López-Rodríguez* ⓘ

First published online 7 June 2019

**Abstract**
A number of European Union (EU) countries have undertaken thorough reforms in the renewable energy sector over the past years. The regulatory changes have triggered a wave of claims from low-carbon investors asserting that the reforms have diminished or exhausted the economic viability of their investments. Unlike local investors, who typically take legal action before domestic courts, foreign investors have filed arbitration claims in accordance with the Energy Charter Treaty, notably against Spain, Italy, Bulgaria, and the Czech Republic, resulting in several awards of damages. However, recent developments in EU state aid law seem to restrict the ability of investors to obtain compensation. This article argues that such developments may undermine renewable energy policy, because arbitration enhances the regulatory stability and predictability which low-carbon investments require only if arbitral awards can be enforced effectively. The article examines the different scenarios that may arise out of the interplay between EU law and investment arbitration in the EU and concludes that the European Commission's arguable redrawing of the boundaries of state aid rules to encompass investment arbitration, combined with the EU's general quest to replace investment arbitration with alternative mechanisms of adjudication, may jeopardize climate change mitigation policies.

**Keywords:** Renewable energy, Energy Charter Treaty, State aid, Investor-state dispute settlement (ISDS), EU law, Climate change mitigation

## 1. INTRODUCTION

The 2018 Special Report of the Intergovernmental Panel on Climate Change (IPCC) finds that global net human-caused emissions of carbon dioxide ($CO_2$) would need to fall by about 45% from 2010 levels by 2030, reaching 'net zero' around 2050, to avoid irreversible changes to life on Planet Earth.[1] To the extent that other low-carbon alternatives are not proven on a sufficient scale or remain controversial, renewable

---

*   Law Department, Loyola University Andalusia (Spain).
    Email: amlopez@uloyola.es.
    The author wishes to thank the anonymous reviewers for their time and valuable suggestions. Any errors in the final version are, of course, solely those of the author.
[1]  Intergovernmental Panel on Climate Change (IPCC), 'Special Report on Global Warming of 1.5°C', 8 Oct. 2018, available at: http://www.ipcc.ch/report/sr15.

energy plays a pivotal role in decarbonizing the energy sector.[2] Foreign direct investment (FDI) can help to induce the transfer of knowledge and technology necessary for the production of renewable energy. However, given the high investment costs for producers, it takes governmental intervention to spur the development of renewable energy sources and to achieve full potential.[3] Subsidies, incentive tariffs and, in particular, feed-in tariffs have emerged as popular renewable energy support mechanisms.[4] Renewable energy investors regard regulatory instability, including uncertainty about the policies implemented to compensate for the risk-return imbalance, as a crucial risk in the development of projects.[5] Hence, any unexpected changes in the support mechanisms can affect the profitability of the investment.

A widespread strategy to manage investment risk caused by regulatory uncertainty is the adoption of investment treaties, backed up by arbitration. In this respect, the present article argues that the tension between European Union (EU) law and investment arbitration in Europe may produce an undesirable collateral effect in climate change mitigation policies. The EU has taken on the role of world leader in climate change mitigation policies, setting very ambitious targets for energy transition.[6] To reach those targets, huge amounts of capital are required.[7] However, if EU institutions undermine investor confidence in the renewable energy sector by impairing the enforcement of damages awards, these investments are unlikely to materialize.

The article starts with a section on investment treaties and investment arbitration (Section 2), followed by the background to renewable energy claims (Section 3). Section 4 examines the clash between EU law and investment arbitration, followed by an analysis of the enforcement of damages awards (Section 5). Section 6 discusses the interaction between the different regulatory frameworks at stake and the impact on climate change mitigation policies. Section 7 summarizes and concludes.

---

[2]  A. Behrens, 'The Role of Renewables in the Interaction between Climate Change Policy and Energy Security in Europe' (2010) 1(1) *Renewable Energy Law and Policy*, pp. 5–15.

[3]  According to the International Renewable Energy Agency (IRENA), however, the costs of renewable energy will drop to meet those of fossil fuels by 2020: IRENA, *Renewable Power Generation Costs in 2017* (IRENA, 2018), available at: https://www.irena.org/publications/2018/Jan/Renewable-power-generation-costs-in-2017.

[4]  T. Couture et al., *A Policymaker's Guide to Feed-in Tariff Policy Design*, Technical Report NREL/TP-6A2-44849 (National Renewable Energy Laboratory, US Department of Energy, 2010), available at: http://www.nrel.gov/docs/fy10osti/44849.pdf; A. Held et al., 'Feed-In Systems in Germany, Spain and Slovenia: A Comparison', Oct. 2007, available at: http://www.mresearch.com/pdfs/docket4185/NG11/doc44.pdf.

[5]  Institutional Investors Group on Climate Change (IIGCC), 'Achieving the Investment Plan for Europe's Million Ambition: 12 Fixes', 2015; Norges Bank Investment Management, *Renewable Energy Investments: Discussion Note* (Norges Bank Investment Management, 2015), available at: https://www.nbim.no/contentassets/d4dc0aaf69ba4f73b9112da6bef259c0/nbim_discussionnotes_4-15.pdf.

[6]  European Commission, 'Energy Roadmap 2050', COM(2011) 0885 final, 15 Dec. 2011, available at: https://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=COM:2011:0885:FIN:EN:PDF.

[7]  According to the International Energy Agency (IEA), to reach the overall 2050 targets, USD 1.6 trillion will need to be invested: IEA, 'Deep Energy Transformation Needed by 2050 to Limit Rise in Global Temperature', 20 Mar. 2017, available at: https://www.iea.org/newsroom/news/2017/march/deep-energy-transformation-needed-by-2050-to-limit-rise-in-global-temperature.html.

## 2. INVESTMENT TREATIES AND INVESTMENT ARBITRATION

As a result of the lengthy return on infrastructure development projects, renewable energy investors are particularly vulnerable to regulatory change over the lifetime of the investment.[8] To stimulate low-carbon investments, states must, therefore, provide regulatory stability, predictability and a guarantee of protection.[9] The promotion of renewable energy requires not only public support in terms of subsidies and incentives, but also adequate mechanisms to mitigate the risks of ex-post regulatory changes and interference from the state.[10]

To reduce uncertainty about policy changes in times of global connectivity and cross-border capital flows, governments can commit to international treaties. These agreements, either bilateral or multilateral investment treaties (BITs or MITs), typically include a set of principles and standards for the promotion and protection of foreign investment. The basic idea is to create a level playing field for investment and minimize non-commercial risks. In the past decades, international investment treaties have become particularly important for infrastructure assets, especially in the energy sector.[11] Indeed, they can help to reduce regulatory risk, which improves investor confidence and fosters international investment in renewable sources of energy.[12]

Investment treaties typically provide for international arbitration in the event of a dispute.[13] In fact, arbitration is the main dispute resolution mechanism in the energy sector.[14] The long-term nature of energy investments demands access to rapid and

---

[8]   C. Patrizia et al., 'Investment Disputes Involving the Renewable Energy Industry under the Energy Charter Treaty', in J.W. Rowley, D. Bishop & G. Kaiser (eds), *The Guide to Energy Arbitrations*, 2nd edn (Global Arbitration Review, 2017), blog available at: https://globalarbitrationreview.com/chapter/1142579/investment-disputes-involving-the-renewable-energy-industry-under-the-energy-charter-treaty.

[9]   A. Boute, 'A Comparative Analysis of the European and Russian Support Schemes for Renewable Energy: Return on European Experience for Russia' (2011) 4(2) *Journal of World Energy Law & Business*, pp. 157–80; European Commission, 'Energy 2020: A Strategy for Competitive, Sustainable and Secure Energy', COM(2010)639 final, 10 Nov. 2010, available at: https://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=COM:2010:0639:FIN:En:PDF.

[10]  G. Bellantuono, 'The Misguided Quest for Regulatory Stability in the Renewable Energy Sector' (2017) 10(4) *Journal of World Energy Law and Business*, pp. 274–92; N. Bankes, 'Decarbonising the Economy and International Investment Law' (2012) 30(4) *Journal of Energy & Natural Resources Law*, pp. 497–510, at 502; R. Sullivan & W. Blyth, 'Climate Change Policy Uncertainty and the Electricity Industry: Implications and Unintended Consequences', Briefing Paper, Chatham House, Aug. 2006, available at: https://www.chathamhouse.org/sites/default/files/public/Research/Energy,%20Environment%20and%20Development/bp0806climatechange.pdf; A. Boute, 'The Potential Contribution of International Investment Protection Law to Combat Climate Change' (2009) 27(3) *Journal of Energy & Natural Resources Law*, pp. 333–76, at 334–5.

[11]  World Economic Forum, 'Strategic Infrastructure Mitigation of Political & Regulatory Risk in Infrastructure Projects', Feb. 2015, available at: http://www3.weforum.org/docs/WEF_Risk_Mitigation_Report_2015.pdf.

[12]  B. Condon & T. Sinha, *The Role of Climate Change in Global Economic Governance* (Oxford University Press, 2013), p. 93.

[13]  J.W. Yackee, 'Controlling the International Investment Law Agency' (2012) 53(2) *Harvard International Law Journal*, pp. 392–445 (discussing investor protection under international investment law and noting that investors are increasingly bringing bilateral and multilateral international investment agreement disputes before international arbitral tribunals).

[14]  A.T. Martin, 'Dispute Resolution in the International Energy Sector: An Overview' (2011) 4(4) *Journal of World Energy Law and Business*, pp. 332–68, at 339.

*Transnational Environmental Law*, 8:2 (2019), pp. 279–302

efficient dispute resolution without damaging the long-term relationship between the parties, which court adjudication can hardly provide. Furthermore, arbitration protects foreign investors against possible judicial bias in the courts of the host state. Yet, a balance needs to be struck between investor protection and the right of the state to regulate. Indeed, the fear of having to face arbitration proceedings may 'chill' initiatives for regulatory change, which might affect the economic schemes that support investment in renewable energies.[15] The substantial financial risk involved may further constrain the ability of governments to adopt climate change measures.[16]

Investment arbitration provides the conceptual framework necessary to enhance the regulatory stability and predictability that is required for low-carbon investments.[17] If justice is done in a predictable, efficient and timely way, the risk of unfair, unexpected regulatory changes impacting on investors in renewable energy sources diminishes.[18] Of course, the same logic inevitably applies to investments in less clean sources of energy, as arbitral claims may be also filed against a host country's pivot towards a pro-renewables policy. However, higher construction costs make investments in renewables more risky, dependent on support schemes and, consequently, more vulnerable to regulatory change than investments in coal, natural gas, and nuclear power. The existence of a neutral and efficient dispute resolution mechanism is therefore crucial for maintaining the confidence of private investors in renewable energy's policies and commitments.

The importance of investment arbitration to de-risk green investments depends on the effective enforcement of investment awards, as a negative relation has been documented between refusals to comply with investment treaty obligations and FDI.[19] However, recent developments in EU law pose serious obstacles to the enforcement of investment awards. Specifically, Member State compensation to investors as a result of an investment tribunal award is considered to be illegal state aid.[20] Moreover, the

---

[15] K. Tienhaara, 'Regulatory Chill in a Warming World: The Threat to Climate Policy Posed by Investor-State Dispute Settlement' (2018) 7(2) *Transnational Environmental Law*, pp. 229–50; S.W. Schill, 'Do Investment Treaties Chill Unilateral State Regulation to Mitigate Climate Change?' (2007) 24(5) *Journal of International Arbitration*, pp. 469–77; B.W. Jenkins, 'The Next Generation of Chilling Uncertainty: Indirect Expropriation under CAFTA and Its Potential Impact on Environmental Protection' (2007) 12(2) *Ocean and Coastal Law Journal*, pp. 269–304.

[16] B.J. Condon, 'Climate Change and International Investment Agreements' (2015) 14(2) *Chinese Journal of International Law*, pp. 309–35; J. Werksman, K.A. Baumert & N.K. Dubash, 'Will International Investment Rules Obstruct Climate Protection Policies? An Examination of the Clean Development Mechanism' (2003) 3(1) *International Environmental Agreements: Politics, Law and Economics*, pp. 59–83.

[17] A. Boute, 'Combating Climate Change through Investment Arbitration' (2012) 35(3) *Fordham International Law Journal*, pp. 613–64, at 617; V. Vadi, 'Beyond Known Worlds: Climate Change Governance by Arbitral Tribunals? (2015) 48(5) *Vanderbilt Journal of Transnational Law*, pp. 1285–351.

[18] World Economic Forum, n. 11 above.

[19] T. Allee & C. Peinhardt, 'Contingent Credibility: The Impact of Investment Treaty Violations on Foreign Direct Investment' (2011) 65(3) *International Organization*, pp. 401–32; United Nations Conference on Trade and Development (UNCTAD), 'Pink Series Sequel: Investor-State Dispute Settlement', 24 July 2014, available at: http://investmentpolicyhub.unctad.org/Publications/Details/120.

[20] E.g., in European Commission Decision, 'State Aid SA.38517(2014/C) (ex 2014/NN): Romania – Implementation of Arbitral Award *Micula v Romania* of 11 December 2013', C(2014) 3192 final, 1 Oct. 2014, available at: http://ec.europa.eu/competition/state_aid/cases/254586/254586_1595781_31_11.pdf. For further detail, see Section 4 below.

compatibility of investment arbitration with the autonomy of the EU legal order is being called into question.[21] These challenges particularly affect the large number of arbitration claims decided or pending in the sector of renewable energy.

## 3. RENEWABLE ENERGY CLAIMS

In the mid-2000s, following a series of EU proposals setting ambitious greenhouse gas (GHG) reduction targets, many EU countries sought to attract investment in the renewable energy sector by enacting legislation which offered incentives such as feed-in tariffs for lengthy periods and without limitations on energy generation and distribution.[22] However, the advent of the global financial crisis in 2008 made such incentives unsustainable and states derogated from or amended the relevant legislation. These interventions affected the profitability of low-carbon investments undertaken under the prior legislative framework and originated a wave of claims against Member States.[23] With the exception of a few cases, the claims brought before domestic courts failed.[24] Foreign investors, in turn, filed for arbitration under BITs and on the basis of the Energy Charter Treaty (ECT),[25] which provides protection against unfair treatment and expropriation from signatory states.[26]

    Among the procedural remedies available to investors, Article 26(4) ECT allows the submission of disputes for resolution to the International Centre for Settlement of Investment Disputes (ICSID), to a sole arbitrator or ad hoc arbitration under the

---

[21]  Case C-284/16, *Slowakische Republik (Slovak Republic)* v. *Achmea*, Judgment of the Court (Grand Chamber), 6 Mar. 2018, ECLI:EU:C:2018:158. For further detail, see Section 4 below.

[22]  European Commisson, Commission Staff Working Document, 'European Commission Guidance for the Design of Renewables Support Schemes', SWD(2013) 439 final, 5 Nov. 2013, available at: https://ec.europa.eu/energy/sites/ener/files/documents/com_2013_public_intervention_swd04_en.pdf; European Commission, 'Renewable Energy: Progressing towards the 2020 Target', COM(2011) 31 final, 31 Jan. 2011, available at: https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52011DC0031&from=EN; J. Tirado & J. Bloom, 'Renewable Energy Reforms in Europe: Growing Threats to International Investors' (2014) *Lexology* online articles, available at: http://cdn2.winston.com/images/content/8/4/v2/84476/IA-RenewableEnergyReformEurope-6-9-2014.pdf.

[23]  Vadi, n. 17 above; F. Dias Simoes, 'When Green Incentives Go Pale: Investment Arbitration and Renewable Energy Policymaking' (2017) 45(2) *Denver Journal of International Law and Policy*, pp. 251–85; Patrizia et al., n. 8 above.

[24]  *Infinis Plc Infinis (Re-Gen) Ltd, R (on the application of)* v. *Gas & Electricity Markets Authority & Anor* [2011] EWHC 1873 (Admin) (10 Aug. 2011), confirmed by the Court of Appeal in *Ofgem (Gas & Electricity Markets Authority)* v. *Infinis* [2013] EWCA Civ 70, Court of Appeal, 13 Feb. 2013; *Breyer Group Plc & Ors* v. *Department of Energy and Climate Change* [2014] EWHC 2257 (QB) (9 July 2014), confirmed by the Court of Appeal in *Department for Energy and Climate Change* v. *Breyer Group Plc and Others* [2015] EWCA Civ 408, Court of Appeal, 28 Apr. 2015; Constitutional Court of Bulgaria, Resolution N13/31.07.2014. The cases brought to national courts in the Czech Republic, Italy, and Spain have been all unsuccessful: see M. Alessi, J.N. Ferrer & C. Egenhofer, 'Suspended in Legal Limbo: Protecting Investment in Renewable Energy in the EU', *CEPS Policy Insights*, No. 2018/03, 23 Jan. 18, available at: https://www.ceps.eu/publi cations/suspended-legal-limbo-protecting-investment-renewable-energy-eu.

[25]  The Hague (The Netherlands), 17 Dec. 1994, in force 16 Apr. 1998, available at: https://energycharter.org/process/energy-charter-treaty-1994.

[26]  E.g., ECT, Art. 10. See C.H. Schreuer, 'Selected Standards of Treatment Available under the Energy Charter Treaty', in G. Coop & C. Ribeiro (eds), *Investment Protection and the Energy Charter Treaty* (Juris Publishing, 2008), pp. 63–99.

Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL), or to the Arbitration Institute of the Chamber of Commerce of Stockholm (SCC). Most arbitral claims in renewables cases have been lodged with the ICSID, but there are also ad hoc claims conducted under the UNCITRAL Arbitration Rules, the Permanent Court of Arbitration (PCA), and the SCC.[27] Bulgaria, the Czech Republic, Italy, and Spain are involved in a considerable number of claims.[28] Spain alone is facing arbitration claims amounting to a total of €7,566 million.[29] In fact, because of the number of claims against Spain, Western Europe is the most litigated region before the ICSID.[30]

Although most renewable energy cases are still pending and this is a fast developing area, in the first quarter of 2019 some tribunals gave awards on claims brought against Spain, Italy, and the Czech Republic: *Charanne* (SCC, January 2016);[31] *Isolux* (SCC, July 2016);[32] *Blusun* (ICSID, December 2016);[33] *Eiser* (ICSID, May 2017);[34] *Wirtgen* (PCA, October 2017);[35] *NovEnergia* (SCC, February 2018),[36] *Masdar Solar* (ICSID, May 2018);[37] *Antaris* (PCA, May 2018),[38] *Antin* (ICSID, June 2018),[39] *Greentech* (SCC, November 2018),[40] *RREEF* (ICSID, December 2018),[41] and *NextEra* (ICSID,

---

[27] Y.S. Selivanova, 'Changes in Renewables Support Policy and Investment Protection under the Energy Charter Treaty: Analysis of Jurisprudence and Outlook for the Current Arbitration Cases' (2018) 33(2) *ICSID Review*, pp. 1–23.

[28] Out of a total of 41 claims, 30 are pending, according to the ICSID Database, available at: https://icsid.worldbank.org/en/Pages/cases/searchcases.aspx.

[29] 'El nuevo Gobierno "se come" su primer laudo contra España por los recortes renovables', *El Confidencial*, 18 June 2018, available at: https://www.elconfidencial.com/empresas/2018-06-18/laudo-antin-arbitraje-ciadi-renovables-primas-termosolar_1580658 (in Spanish).

[30] ICSID Database, n. 28 above.

[31] *Charanne and Construction Investments* v. *Spain*, SCC Case No. V 062/2012, IIC 758 (2016), available at: https://www.italaw.com/cases/2082.

[32] *Isolux Infrastructure Netherlands BV* v. *Kingdom of Spain*, Award, SCC Case No. V 2013/153, IIC 979 (2016), available at: https://www.italaw.com/cases/5893.

[33] *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein* v. *Italian Republic*, ICSID Case No. ARB/14/3, available at: https://www.italaw.com/cases/5739.

[34] *Eiser Infrastructure Ltd and Energía Solar Luxembourg S.à.r.l.* v. *Kingdom of Spain*, Award, ICSID Case No. ARB/13/36, IIC 950 (2017), available at: https://www.italaw.com/cases/5721.

[35] *Jürgen Wirtgen et al.* v. *Czech Republic*, Final Award, PCA Case No. 2014-03, 11 Oct. 2017, available at: https://www.italaw.com/cases/6428.

[36] *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR* v. *Kingdom of Spain*, Award SCC Case No. 063/2015 (2018), available at: https://www.italaw.com/cases/6613.

[37] *Masdar Solar & Wind Cooperatief U.A.* v. *Kingdom of Spain*, Award, ICSID Case No. ARB/14/1 (2018), available at: https://www.italaw.com/cases/6608.

[38] *Antaris Solar GmbH and Dr Michael Göde* v. *Czech Republic*, PCA Case No. 2014-01, available at: https://www.italaw.com/cases/2080.

[39] *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.* v. *Kingdom of Spain*, ICSID Case No. ARB/13/31, available at: https://www.italaw.com/cases/2319.

[40] *Greentech Energy System A/S, Foresight Luxembourg Solar 1 S.à.r.l., Foresight Luxembourg Solar 2 S.à.r.l., GWM Renewable Energy I S.P.A, GWM Renewable Energy II S.P.A* v. *Kingdom of Spain* (SCC Case No. 2015/50) – final award – Athena Investments AS Company Announcement No. 17-2018 – 14 Nov. 2018 (unpublished).

[41] *RREEF Infrastructure (GP) Ltd and RREEF Pan-European Infrastructure Two Lux S.à.r.l.* v. *Kingdom of Spain*, ICSID Case No. ARB/13/30, notice of the decision available at: https://www.italaw.com/cases/2317.

March 2019).[42] In these cases – and most likely in those still pending – the key issue on the merits involves the application of the concept of 'fair and equitable treatment' and its essential component of 'legitimate expectations' under Article 10(1) ECT.[43]

*Eiser*, *NovEnergia*, *Masdar Solar*, *Antin*, and *Greentech* were decided in favour of the investors,[44] with a total of €368 million in damages awarded.

## 4. THE CLASH BETWEEN INVESTMENT ARBITRATION AND EU LAW

Just when arbitral claims are being decided and investors in renewable energy are starting to see the sun behind the clouds, EU institutions have thrown a spanner in the works, preventing the enforcement of damages awards on the basis of EU law. In particular, EU competition rules have been deemed to prevail over conflicting investment awards if a petition to enforce is filed within the EU. To complicate matters further, the Court of Justice of the EU (CJEU) has recently ruled that arbitral decisions undermine the autonomy of the EU legal order. Post-2008 policy reversals to renewable energies support in the Member States had already compromised the reputation of the EU as an attractive place for investing in renewables. The prevailing state of legal uncertainty following these recent EU regulatory and judicial decisions threatens to aggravate the situation considerably.

### 4.1. *Arbitral Awards and State Aid*

In recent years, the European Commission has deployed state aid rules to make an unprecedented incursion into the realm of investment arbitration. According to the Commission, compensation given to investors by Member States as a result of an investment tribunal award is considered illegal state aid.[45] Within this context, in a Decision of 10 November 2017[46] the Commission announced that the Spanish legislative

---

[42] *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V.* v. *Kingdom of Spain*, ICSID Case No. ARB/14/11, notice of the decision is available at: https://icsid.worldbank.org/en/Pages/cases/casedetail.aspx?CaseNo=ARB/14/11.

[43] Selivanova, n. 27 above.

[44] C. Hendel, 'The Past, Present and Possible Future of the Spanish Renewable Energy Arbitration Saga' (2018) 31(1) *International Law Practicum*, pp. 96–101, available at: https://www.araozyrueda.com/en/publicaciones/the-past-present-and-possible-future-of-the-spanish-renewable-energy-arbitration-saga; D. Behn, 'Spain Wins First PV Solar Arbitration: A Word of Caution in Using this Case to Predict Outcome in the more than Three Dozen Cases to Come,' *Pluricourts*, University of Oslo blog, 27 Jan. 2016, available at: http://www.jus.uio.no/pluricourts/english/blog/daniel-friedrich-behn/2016-01-26-arbitration-spain.html; T. Restrepo, 'Modification of Renewable Energy Support Schemes under the Energy Charter Treaty: *Eiser* and *Charanne* in the Context of Climate Change' (2017) 8(1) *Goettingen Journal of International Law*, pp. 101–37.

[45] A. Bakos, 'The Relationship between EU State Aid Law and Obligations Arising under Investment Treaties', *EFILA Blog*, 3 Apr. 2018, available at: https://efilablog.org/2018/04/03/the-relationship-between-eu-state-aid-law-and-obligations-arising-under-investment-treaties; T. Kende, 'Arbitral Awards Classified as State Aid under European Union Law' (2015) 1 *ELTE Law Journal*, pp. 37–56, available at: http://eltelawjournal.hu/arbitral-awards-classified-state-aid-european-union-law.

[46] European Commission Decision, 'State Aid SA.40348 (2015/NN): Spain – Support for Electricity Generation from Renewable Energy Sources, Cogeneration and Waste', C(2017) 7384 final, 10 Nov. 2017, available at: http://ec.europa.eu/competition/state_aid/cases/258770/258770_1945237_333_2.pdf.

reforms that replaced and superseded the premium economic scheme for renewables from 2007 to 2008 did not constitute illegal state aid under EU law. However, any compensation which an arbitration tribunal were to grant to an investor on the basis that Spain modified the premium economic scheme by the notified scheme would constitute in and of itself state aid, which arbitration tribunals are not competent to authorize. The Commission warns arbitration tribunals, in consequence, that 'if they award compensation, such as in *Eiser* v. *Spain*,[47] or were to do so in the future, this compensation would be notifiable state aid pursuant to Article 108(3) TFEU [Treaty on the Functioning of the EU[48]] and be subject to the standstill obligation'.[49] In the absence of such notification, damages awarded amount to unlawful state aid and would be unenforceable.

This is not the only time the Commission has made inroads into the realm of investment arbitration. The clash between state aid rules and investor protection has been exposed in a number of cases,[50] attracting a great deal of attention in the case of *Micula*. In this widely reported case,[51] the Commission took the position that enforcement of an ICSID award was illegal. This award aimed to reinstate the status quo with regard to an EU decision declaring aid illegal and ordering such aid to be recovered. During the arbitral proceedings, the Commission, acting as *amicus curiae*, alleged that the actual payment of damages for Romania's repeal of incentives under the BIT between Sweden and Romania would be economically equivalent to specific performance and undermine the functioning of the internal market. Then, when the final award was given in December 2013, the Commission ordered Romania to suspend any action leading to the execution or implementation of the award until it had reached a final decision on the compatibility of such payment with the internal market.[52] The Final Decision, of March 2015,[53] concluded that enforcement of the ICSID award amounted

---

[47] *Eiser* v. *Spain*, n. 34 above.

[48] Lisbon (Portugal), 13 Dec. 2007, in force 1 Dec. 2009 [2012] OJ C 326/47, available at: http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:C:2012:326:FULL:EN:PDF.

[49] *Eiser* v. *Spain*, n. 34 above, para 165.

[50] *Electrabel S.A.* v. *Republic of Hungary*, ICSID Case No. ARB 07/19, available at: https://www.italaw.com/cases/380; *AES Summit Generation Ltd and AES-Tisza Erőmű Kft* v. *Republic of Hungary*, ICSID Case No. ARB 07/22, available at: https://www.italaw.com/cases/193; and *EDF International* v. *Hungary*, PCA Case 2009-13.

[51] *Ioan Micula, Viorel Micula, S.C. European Food S.A, S.C. Starmill S.R.L. and S.C. Multipack S.R.L.* v. *Romania*, ICSID Case No. ARB/05/20, available at: http://www.italaw.com/cases/697; J. Chevry, 'Micula v. Romania' (2015) 14(3) *World Trade Review*, pp. 540–42; H. Wehland, 'The Enforcement of Intra-EU BIT Awards: *Micula v Romania* and Beyond' (2016) 17(6) *The Journal of World Investment & Trade*, pp. 942–63; E. Matei, 'SA.38517 – Commission Decision of 30 March 2015 on State Aid Granted by Romania to Micula' (2016) 15(1) *European State Aid Law Quarterly: EStAL*, pp. 134–41; K. Struckmann et al., 'Micula and Others v Romania – Annotation of [2017] EWHC 31 (Comm)' (2017) 16(2) *European State Aid Law Quarterly*, pp. 316–21.

[52] European Commission, Press Release, 'State Aid: Commission Orders Romania to Recover Incompatible State Aid Granted in Compensation for Abolished Investment Aid Scheme', 30 Mar. 2015, available at: http://www.europa.eu/rapid/press-release_IP-15-4725_en.htm.

[53] Commission Decision (EU) 2015/1470 of 30 Mar. 2015 on State Aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania – Arbitral Award Micula v Romania of 11 December 2013 (notified under document C(2015) 2112).

to state aid under Article 107 TFEU. It is currently under review before the General Court of the EU (GCEU).[54]

The Commission's equation between damages awards and state aid is debatable. Although both the CJEU and the GCEU have established that state aid rules cannot be circumvented by bringing a claim for breach of a benefit which an undertaking was entitled to have, in the absence of state aid approval,[55] awarding damages does not constitute state aid *per se*.[56] A number of reasons militate against classifying the payment of compensation following the enforcement of an arbitral award as state aid under Article 107 TFEU.

Firstly, the element of imputability is missing because the enforcement of a damages award is part of a judicial proceeding and not a *unilateral* and *autonomous* decision by a Member State,[57] as required by the CJEU in *Denkavit*[58] and later confirmed in *Deutsche Bahn*.[59] Although Member States have agreed to investment arbitration,[60] once a state has given up part of its sovereignty under an investment agreement, implementing an award is no longer a unilateral and autonomous decision and the payment of damages is not voluntary.

Secondly, the payment of damages is not selective. Arbitral awards benefit only a limited number of persons. However, at least in the case of ICSID awards, which have a status equivalent to final judgments, the obligation to enforce an award would be selective only if the Member State in question did not generally satisfy its judgment debts.[61] Hence, when judgment debts are satisfied generally, there is no difference in honouring payments stemming from ICSID awards from those arising out of other final judgments. In such a case, the state would be choosing to honour debts stemming from ICSID awards, while refusing to satisfy other judgment debts.

Thirdly, enforcement of damages awards would constitute state aid if it granted an economic advantage – namely, preferential treatment favouring certain undertakings. As held by the CJEU, state aid is 'fundamentally different in its legal nature from [compensation for] damage they [Member States] have caused to individuals'.[62] According to the

---

[54] Case T-694/15, *Micula* v. *Commission*.

[55] Case C-672/13, *OTP Bank Nyrt.* v. *Magyar Állam and Magyar Államkincstár*, Judgment of the Court (Sixth Chamber), 19 Mar. 2015, ECLI:EU:C:2015:185; Case T-15/14, *Simet SpA* v. *European Commission*, Judgment of the General Court (Eighth Chamber), 3 Mar. 2016, ECLI:EU:T:2016:124.

[56] Joint Cases 106 to 120/87, *Asteris AE and Others* v. *Hellenic Republic and European Economic Community*, Judgment of the Court (Fifth Chamber), 27 Sept. 1988, ECLI:EU:C:1988:457.

[57] C. Tietje & C. Wackenmagel, 'Outlawing Compliance? The Enforcement of Intra-EU Investment Awards and EU State Aid Law', *Policy Papers on Transnational Economic Law*, No. 41, June 2014, p. 7, available at: http://telc.jura.uni-halle.de/sites/default/files/PolicyPaper/PolicyPaper_No41.pdf; Bakos, n. 45 above.

[58] Case 61/79, *Amministrazione delle finanze dello Stato* v. *Denkavit italiana Srl*, Judgment of the Court, 27 Mar. 1980, ECLI:EU:C:1980:100.

[59] Case T-351/02, *Deutsche Bahn AG* v. *Commission*, Judgment of the Court of First Instance (First Chamber, extended composition), 5 Apr. 2006, ECLI:EU:T:2006:104.

[60] Kende, n. 45 above.

[61] K. Struckmann, G. Forwood & A. Kadri, 'Investor-State Arbitrations and EU State Aid Rules: Conflict or Co-existence? (2016) 15(2) *European State Aid Quarterly*, pp. 258–69, at 266.

[62] *Asteris*, n. 56 above, para. 23.

Commission, this fundamental difference applies only with reference to compensation under the rules of civil liability, and not to arbitral awards.[63] Yet, it is hard to see why damages awards aimed at compensating investors for the wrongful conduct of the defendant state should be any different from compensation under the rules of civil liability.[64]

Finally, the Commission condemns damages awards which could be said to covertly reinstate unlawful state aid.[65] This approach follows the opinion of Advocate General Ruiz-Jarabo Colomer in Joined Cases C-346/03 and C-529/03, emphasizing that damages cannot be regarded as equal to the sum of amounts to be repaid, since this would constitute an indirect grant of the aid found to be illegal and incompatible with the common market.[66] Indeed, in that case recipients of illegal and later withdrawn state aid would be repaid. However, at least in *Micula*, the arbitral tribunal expressly found that Romania's withdrawal of the incentives was reasonable.[67] Compensation was granted, but only on the basis that Romania had misrepresented its intention to withdraw the referred incentives.[68] The wrongful act was not the withdrawal but the manner of withdrawal. The equivalence between the amount of withdrawn incentives and the damages awarded for the wrongful conduct of the state was coincidental. Conceivably, the amount of damages could have been greater.[69]

Furthermore, the 2017 Commission Decision does not even concern the enforcement of awards of compensation for the removal of state aid declared incompatible with EU law. In fact, it refers to arbitral proceedings initiated following legislative reforms on solar energy subsidies, which the Commission has declared to be compatible with EU law, even though they had not been notified in accordance with the requirements of EU state aid law under Article 108(3) TFEU. In the Decision, the Commission recalls that any compensation granted to an investor in relation to the premium scheme 'would constitute in and of itself State aid' and that, in consequence, it is notifiable under Article 108(3) TFEU. However, this approach, which thwarts the hopes of renewable energy investors, is manifestly wrong. Indeed, it cannot be seriously argued that compensation itself would constitute state aid, given that arbitral awards are not rendered by organs of any state. Consequently, damages awards should be neither notifiable aid nor subject to a standstill obligation, as required by the Commission.

### 4.2. *Investor-State Dispute Settlement and the Autonomy of EU Law*

The relationship between state aid policies and investor protection is only one aspect of the much broader, complex, and complicated relationship between the EU legal order on one side, and international investment arbitration on the other.

---

[63] Ibid., para. 101.

[64] Struckmann, Forwood & Kadri, n. 61 above, p. 266.

[65] Tietje & Wackenmagel, n. 57 above, p. 7.

[66] Opinion of Mr Advocate General Ruiz-Jarabo Colomer in Joined Cases C-346/03 and C-529/03, *Giuseppe Atzeni and Others* (C-346/03), *Marco Scalas and Renato Lilliu* (C-529/03) v. *Regione autonoma della Sardegna*, delivered on 28 Apr. 2005, ECLI:EU:C:2005:256, para. 198.

[67] *Micula et al.* v. *Romania*, n. 51 above, para. 825.

[68] Ibid., para. 827.

[69] Struckmann, Forwood & Kadri, n. 61 above, p. 267.

On 6 March 2018, the CJEU delivered its landmark judgment in the *Achmea* case.[70] This case reviews the compatibility of an UNCITRAL award, rendered on the basis of Article 8 of the Netherlands-Slovakia BIT,[71] with EU law. The investor claimed damages following Slovakia's 2006 measures, which partly reversed the liberalization of the health insurance market. Slovakia objected to the jurisdiction of the arbitral tribunal, arguing that following Slovakia's accession to the EU, the Netherlands-Slovakia BIT had become incompatible with EU law. However, the objection was dismissed by the arbitral tribunal, which awarded €22.1 million in damages to the investor. Subsequently, Slovakia applied for annulment of the award in Germany, which annulment was later appealed against before the German Federal Court of Justice. The latter then referred various questions concerning the interpretation of Articles 18, 267 and 344 TFEU to the CJEU under the preliminary reference procedure provided in Article 267 TFEU.

Contrary to the opinion of the EU Advocate General,[72] the CJEU embraced the Commission's position and the views expressed by a majority of Member States, many of which were affected by arbitration claims. According to the CJEU, the BIT is contrary to Articles 344 and 267 TFEU[73] because investor-state arbitration, as referred to in Article 8 of the Netherlands-Slovakia BIT, affects the allocation of powers fixed by the EU Treaties and, consequently, the autonomy of the EU legal system. By referring to investment arbitration, the BIT prevents courts within the judicial system of the EU from deciding questions of EU law and from referring preliminary questions of EU law to the CJEU.[74] Hence, investor-state arbitration mechanisms in intra-EU BITs, such as the Netherlands-Slovakia BIT, are not in conformity with EU law.

It is arguable whether *Achmea* also applies to extra-EU arbitration.[75] Technically, the judgment has a limited reach and should apply only to BITs concluded between EU Member States. It should not include ICSID arbitration, which is delocalized, or multilateral treaties of which the EU itself is a signatory, such as the ECT. This is because the EU has agreed to resolve claims under the ECT by the arbitration mechanisms provided for in Article 26 ECT. By doing so, it has accepted submitting to institutions which apply international law rather than EU law as their primary source, and which have a different understanding of the principle of the primacy of EU law than that held by the CJEU. Furthermore, there is no basis in the 1969 Vienna

---

[70] C-284/16, *Slowakische Republik (Slovak Republic)* v. *Achmea*, Judgment of the Court (Grand Chamber), 6 Mar. 2018, ECLI:EU:C:2018:158.

[71] Agreement on Encouragement and Reciprocal Protection of Investments between the Kingdom of the Netherlands and the Czech and Slovak Federal Republic, 29 Apr. 1991, in force 1 Oct. 1992, available at: https://investmentpolicyhub.unctad.org/Download/TreatyFile/2080.

[72] Opinion of Advocate General Wathelet delivered on 19 Sept. 2017, ECLI:EU:C:2017:699.

[73] The Court did not answer the question regarding the compatibility of the BIT with Art. 18 TFEU.

[74] *Achmea*, n. 70 above, para. 50.

[75] P. Pinsolle & I. Michou, 'Arbitration: The Achmea v Slovakia Judgment of the CJEU, Is It Really the End of Intra-EU Investment Treaties?', 7 Mar. 2018, available at: https://www.quinnemanuel.com/the-firm/news-events/the-achmea-v-slovakia-judgment-of-the-cjeu-is-it-really-the-end-of-intra-eu-investment-treaties.

Convention on the Law of Treaties (VCLT)[76] to understand the ECT as including an implicit disconnection clause which would bar EU Member States from applying the ECT *inter se*, as Spain has argued.[77] Arbitral tribunals have rejected the incompatibility between investor-state dispute settlement (ISDS) mechanisms and EU law – for instance, in *NovEnergia*, and in *Masdar* v. *Spain*, where the tribunal held that:

> the Achmea judgment has no bearing upon the present case and … cannot be applied to multilateral treaties, such as the ECT, to which the EU itself is a party. … Had the CJEU seen it necessary to address the distinction … between the ISDS provisions of the ECT and the investment protection mechanisms to be found in bilateral investment treaties made between Member States [it would have done so].[78]

The doubts raised in *Achmea* have not been allayed in the recently issued Opinion 1/17 on the compatibility with EU law of the Investor Court System in the Comprehensive Economic and Trade Agreement (CETA)[79] between Canada and the EU. According to the CJEU, a distinction must be made between the ruling in *Achmea*, which refers to a bilateral agreement between Member States, and Opinion 1/17, which relates to an agreement between the EU and a non-Member State. Furthermore, *Achmea* concerns the compatibility with EU law of a tribunal which may be called upon to give rulings on the interpretation and application of EU law, whereas in CETA the investment tribunal may only consider the domestic law of a party, including EU law, as a matter of fact.[80] Meanwhile, in a Decision of July 2018[81] the Commission has declared that EU investors may not resort to arbitration tribunals established under Article 26 ECT. According to the Commission, given the principle of primacy, the application of Article 26 ECT intra-EU is incompatible with EU law. This is because, just like the clauses of intra-EU BITs, Article 26 ECT opens the possibility of submitting those disputes to a body which is not part of the judicial system of the EU. This extension of *Achmea* to the ECT by the Commission has caused a great deal of perplexity, as the Commission is not empowered to make any finding as to the validity or otherwise of Member States' international agreements.

Undoubtedly, the Commission's Decisions of November 2017 and July 2018 are a godsend for Member States facing damages claims for renewable energy support cuts. Indeed, it is no secret that the 2017 Decision was issued after Spain had called the

---

[76] Vienna (Austria), 23 May 1969, in force 27 Jan. 1980, available at: https://treaties.un.org/doc/Publication/UNTS/Volume%201155/volume-1155-I-18232-English.pdf.

[77] As highlighted by the arbitral tribunal in *NovEnergia* v. *Spain*, n. 36 above, para. 454.

[78] *Masdar Solar & Wind Cooperatief U.A.* v. *Spain*, n. 37 above, paras 678–82.

[79] Brussels (Belgium), 30 Oct. 2016, partially in force 21 Sept. 2017, [2017] OJ L 11, pp. 23–1079, available at: http://data.consilium.europa.eu/doc/document/ST-10973-2016-INIT/en/pdf.

[80] Opinion of the Court (Full Court) of 30 April 2019 on Case C-1/17, Request for an Opinion by the Kingdom of Belgium on the Compatibility with the Treaties of the Comprehensive Economic and Trade Agreement between Canada, of the one part, and the European Union and its Member States, of the other part, ECLI:EU:C:2019:341, paras 126 and 127; L. Ankersmit, 'Investment Court System in CETA to be Judged by the ECJ', *European Law Blog*, 31 Oct. 2016, available at: http://europeanlawblog.eu/2016/10/31/investment-court-system-in-ceta-to-be-judged-by-the-ecj.

[81] Communication from the Commission, 'Protection of Intra-EU Investment', COM(2018) 547 final, 19 July 2018, available at: https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52018DC0547&rid=8.

Commission in to help.[82] The 2018 Decision also came right after Spain had challenged the *NovEnergia* award, relying on *Achmea* and, on 16 May 2018, the Swedish Court of Appeals issued a Decision suspending the enforcement of the award in Sweden until further notice.[83] Furthermore, 22 Member States (including Belgium, Croatia, France, Germany, Italy, the Netherlands, Romania, Slovakia, Spain, and the United Kingdom (UK)) have recently signed a joint declaration proclaiming that arbitral tribunals have no jurisdiction to decide investor claims based on intra-EU bilateral investment treaties.[84] However, while being favourable to Member States and the achievement of other EU policies, these views on investment arbitration have created a legal limbo in which investors are experiencing a great deal of uncertainty regarding their legal rights. This situation may ultimately lead to a decrease in private investment in renewable energies in the EU.

## 5. THE ENFORCEMENT OF DAMAGES AWARDS

Investment arbitration has proved to be the most effective way for foreign investors to obtain compensation for the violation of their rights by host states, partly because the overwhelming majority of states honour their obligations and pay awards voluntarily (though there are several known cases of non-payment).[85] Securing an effective resolution of investment disputes is a key factor influencing the investment climate in any market.[86] Hence, a reputation for non-compliance with awards can have a serious impact on inward foreign investment.[87]

The recent developments in EU law may cause investors to face significant obstacles to the enforcement of damages awards in the Member States. The situation is not much different from that of a state that repeatedly refuses to fulfil its international obligations on the basis of domestic law. If investors in renewables cannot obtain effective relief for the harm suffered by unexpected policy changes, they might consider restructuring their investments through companies incorporated outside the EU, or even invest elsewhere.[88] The present legal context may in the end harm the reputation of the EU as an attractive place for investment in renewables and have a negative impact on climate

---

[82] Hendel, n. 44 above; J.C. Peña, 'Bruselas abre la puerta a que España evite el pago de 7.565M por el recorte a las renovables', *El Confidencial*, 26 Dec. 2017, available at: https://www.elconfidencial.com/economia/2017-12-26/arbitrajes-espana-renovables-bruselas-ayudas-de-estado_1498030 (in Spanish).

[83] Decision T 4658-18, 16 May 2018, available at: https://www.italaw.com/sites/default/files/case-documents/italaw9746.pdf (in Swedish).

[84] Declaration of the Member States of 15 Jan. 2019 on the Legal Consequences of the Achmea Judgment and on Investment Protection, available at: https://ec.europa.eu/info/sites/info/files/business_economy_euro/banking_and_finance/documents/190117-bilateral-investment-treaties_en.pdf.

[85] UNCTAD, n. 19 above.

[86] M.P. Ramaswamy, 'Enforcement of ICSID and Non-ICSID Arbitration Awards and the Enforcement Environment in BRICS' (2018) 15(2) *International Journal of Business, Economics and Law*, pp. 73–81.

[87] E. Reinstein, 'Finding a Happy Ending for Foreign Investors: The Enforcement of Arbitration Awards in the People's Republic of China' (2005) 16(1) *Indiana International and Comparative Law Review*, pp. 37–72. It remains unclear, though, whether commitment to ISDS actually results in greater FDI inflows: S. Jandhyala & R.J. Weiner, 'Institutions sans Frontières: International Agreements and Foreign Investment' (2014) 45(6) *Journal of International Business Studies*, pp. 649–69.

[88] R.G. Volterra & Á. Nistal, 'Enforcing Investment Treaty Awards', *Financier Worldwide*, July 2018, available at: https://www.financierworldwide.com/enforcing-investment-treaty-awards/#.W9GBeHszbIU.

change mitigation. Indeed, because a considerable capital flow and transfer of technology are necessary to reduce GHG emissions, experts have established a negative correlation between a difficult investment climate and climate change mitigation.[89]

To accurately assess the impact of the EU institutions' approach to investment arbitration on climate change mitigation, it is necessary to examine the limits to the enforcement of winning awards. For this purpose, a distinction must be made between non-ICSID awards on one side and ICSID awards on the other, as courts in the Member States take different views depending on the nature of the arbitration.[90] Furthermore, it is relevant to examine central principles of EU and international law that may ultimately have a bearing on the payment of compensation to successful claimants.

## 5.1. *The Legal Framework for Enforcement*

UNCITRAL and SCC awards are subject to the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York Convention).[91] Courts in the Member States may refuse to implement the awards on the basis of Article V(2) of the New York Convention, which concerns disputes not capable of settlement by arbitration or contrary to public policy. According to the CJEU, EU competition rules are part of EU public policy. Subject to the principle of equivalence, national courts are obliged to give them effect as they give effect to rules of domestic public policy.[92] It follows that Member State courts may not uphold renewable energy awards which the Commission considers to be illegal state aid by applying Article V(2)(b) of the New York Convention, which allows domestic courts to refuse recognition and enforcement if the award is contrary to the public policy of the state in which recognition and enforcement are sought.[93] Similarly, a broad interpretation of *Achmea* may lead courts in the EU to refuse enforcement based on the inability to arbitrate the dispute under Article V(2)(a) of the New York Convention.

---

[89] S. Fankhauser & L. Lavric, 'The Investment Climate for Climate Investment: Joint Implementation in Transition Countries', *European Bank for Reconstruction and Development*, Working Paper No. 77, Jan. 2003, available at: http://www.ebrd.com/downloads/research/economics/workingpapers/wp0077.pdf; Boute, n. 17 above.

[90] Hendel, n. 44 above.

[91] New York (USA), 10 June 1958, in force 7 June 1959, available at: http://www.uncitral.org/pdf/english/texts/arbitration/NY-conv/New-York-Convention-E.pdf.

[92] Case C-126/97, *Eco Swiss China Time Ltd* v. *Benetton Int'l NV*, Judgment of the Court, 1 June 1999, ECLI:EU:C:1999:269; confirmed in Case C-168/05, *Elisa María Mostaza Claro* v. *Centro Móvil Milenium*, Judgment of the Court (First Chamber), 26 Oct. 2006, ECLI:EU:C:2006:675; Case C-473/00, *Cofidis SA* v. *Jean-Louis Fredout*, Judgment of the Court (Fifth Chamber), 21 Nov. 2002, ECLI:EU:C:2002:705; Joined Cases C-240/98 to C-244/98, *Océano Grupo Editorial SA* v. *Rocío Murciano Quintero* (C-240/98) & *Salvat Editores SA* v. *José M. Sánchez Alcón Prades* (C-241/98), *Jost Luis Copano Badillo* (C-242/98), *Mohammed Berroane* (C-243/9), Judgment of the Court, 27 June 2000, ECLI:EU:C:2000:346. See S. Prechal & N. Shelkoplyas, 'National Procedures, Public Policy and EC Law: From Van Schijndel to Eco Swiss and Beyond' (2004) 12(5) *European Review of Private Law*, pp. 589–611; G. Berman, 'Navigating EU Law and the Law of International Arbitration' (2012) 28(3) *Arbitration International*, pp. 397–445, at 418.

[93] Berman, ibid.

ICSID awards, however, are not subject to the New York Convention. These awards are binding on all parties to the proceedings and each party must comply pursuant to the terms of the award (Article 53(1) of the Convention for the Settlement of Investment Disputes between States and Nationals of Other States (ICSID Convention)).[94] Furthermore, Article 54(1) of the ICSID Convention provides that if a party fails to comply with the award, the other party can seek to have the pecuniary obligations recognized and enforced in any ICSID member state court as though it were a final judgment of that state's court. This provision thus prevents national courts from refusing enforcement of pecuniary obligations based on domestic laws, inability to arbitrate, or public policy.[95]

No attempts have been made so far to enforce damages awards that are favourable to renewable energy investors in the EU. Should that happen, enforcement of non-ICSID awards could be refused on the basis of Article V(2) of the New York Convention. ICSID awards, on the contrary, are self-executing and are exempted from considerations of inability to arbitrate or public policy. However, EU courts would be most likely to prevent enforcement based on the primacy of EU law. In *Micula*, for instance, the UK High Court of Justice granted a stay of enforcement of the award until the GCEU has ruled on the claimants' annulment application, based on two major principles: the duty of sincere cooperation contained in Article 4(3) of the Treaty on European Union (TEU)[96] and the principle of legal certainty, which requires national courts to avoid the risk of conflicting decisions with EU institutions.[97] Its decision was confirmed recently by the Court of Appeal.[98] Similarly, a Belgian judge has unfrozen assets which had been seized in Belgium in support of ICSID enforcement proceedings against Romania, holding that the investors lacked a 'current' enforceable title because of the European Commission's findings that their ICSID award amounted to illegal state aid.[99]

It is likely that Member State courts will proceed as in *Micula* when asked to enforce renewable energy awards because they are bound by the principle of primacy of EU law. However, even if courts refuse to award compensation to investors, the arbitral awards are still binding and enforceable. From a legal viewpoint, a clash arises between two parallel jurisdictions: international law and EU law, which apparently are incompatible with each other.

---

[94] Washington DC (US), 18 Mar. 1965, in force 14 Oct. 1966, available at: http://icsidfiles.worldbank.org/icsid/ICSID/StaticFiles/basicdoc/partA.htm.

[95] B. Demirkol, 'Enforcement of International Commercial Arbitration Agreements and Awards in Investment Treaty Arbitration' (2015) 30(1) *ICSID Review – Foreign Investment Law Journal*, pp. 56–77; C.H. Schreuer et al., 'Article 54: Enforcement', in *The ICSID Convention: A Commentary*, 2nd edn (Cambridge University Press, 2009), p. 1115–50.

[96] Lisbon (Portugal), 13 Dec. 2007, in force 1 Dec. 2009, available at: http://eur-lex.europa.eu/legal-content/en/TXT/?uri=CELEX%3A12012M%2FTXT.

[97] *Micula & Ors v. Romania & Anor* [2017] EWHC 31 (Comm) (20 Jan. 2017), para. 64.

[98] *Micula & Ors v. Romania* [2018] EWCA Civ 1801 (27 July 2018).

[99] Decision of 25 Jan. 2016. The decision is currently on appeal before the Brussels Court of Appeal, available at: http://www.globalarbitrationreview.com/digital_assets/46aa46ba-9228-4118-a74f-1a452dcd4198/micula-belgium.pdf.

## 5.2. *The Primacy of EU Law*

Nothing in the EU Treaties determines the place of international law within the hierarchy of sources of EU law, or in relation to its particular effects.[100] Some public international lawyers consider EU law as simply regional international law, the status and effects of which are to be determined on the basis of international rules on the conflict of treaties and by the principles governing the internal law of international organizations.[101] However, the EU institutions and the CJEU, in particular, consider the EU as a subject of international law with its own, independent and autonomous legal order.[102]

Fair and equitable treatment is a central principle in international investment law and features in the vast majority of international investment treaties.[103] In this regard, the infringement of legitimate expectation is one of the most debated issues in international investment arbitration.[104] It was indeed brought up successfully in relation to the obligation to accord fair and equitable treatment under Article 10(1) ECT in *Eiser*, *NovEnergia*, *Masdar Solar*, and *Antin*.[105] It appears, however, that investors cannot rely on legitimate expectations created by EU Member States or any of their institutions, even though the protection of legitimate expectations is one of the general principles of EU law.[106] Based on existing cases, it seems that the Commission gives priority to the application of state aid rules, where the principle of legitimate expectation is rarely applied.[107] This approach ignores the obligation arising from the ECT to compensate for breach of legitimate expectation and the obligation arising from the ICSID Convention to abide by any arbitral award in the context of an investor-state dispute.

---

[100] P. Gragl, 'The Silence of the Treaties: General International Law and the European Union' (2015) 57 *German Yearbook of International Law*, pp. 375–409.

[101] I. Pernice, 'Multilevel Constitutionalism and the Treaty of Amsterdam: European Constitution-Making Revisited?' (1999) 36(4) *Common Market Law Review*, pp. 703–50, at 711; T. Schilling, 'The Autonomy of the Community Legal Order: An Analysis of Possible Foundations' (1996) 37(2) *Harvard International Law Journal*, pp. 389–409.

[102] Case 6-64, *Flaminio Costa* v. *ENEL*, Judgment of the Court, 15 July 1964, ECLI:EU:C:1964:66. B. Simma & D. Pulkowski, 'Of Planets and the Universe: Self-Contained Regimes in International Law' (2006) 17(3) *European Journal of International Law*, pp. 483–529. V. Moreno-Lax & P. Gragl, 'The Quest for a (Fully Fledged) Theoretical Framework: Co-Implication, Embeddedness, and Interdependency between Public International Law and EU Law' (2016) 35(1) *Yearbook of European Law*, pp. 455–70, at 457.

[103] L. Reed & S. Consedine, 'Fair and Equitable Treatment: Legitimate Expectations and Transparency', in M. Kinnear et al. (eds), *Building International Investment Law: The First 50 Years of ICSID* (Kluwer Law International, 2015), pp. 283–94. W.M. Reisman et al., 'Violation of Investor Rights under Investment Treaties', in D.R. Bishop, J.R. Crawford & W.M. Reisman (eds), *Foreign Investment Disputes: Cases, Materials and Commentary*, 2nd edn (Kluwer Law International, 2014), pp. 753–896; P. Dumberry, 'The Protection of Investors' Legitimate Expectations and the Fair and Equitable Treatment Standard under NAFTA Article 1105' (2014) 31(1) *Journal of International Arbitration*, pp. 47–74.

[104] Reed & Consedine, ibid.

[105] Selivanova, n. 27 above.

[106] Case C-369/09 P, *ISD Polska and Ors* v. *Commission*, Judgment of the Court (First Chamber), 24 Mar. 2011, ECLI:EU:C:2011:175, para. 122.

[107] A. Giraud, 'A Study of the Notion of Legitimate Expectations in State Aid Recovery Proceedings: "Abandon All Hope, Ye Who Enter Here"'? (2008) 45(5) *Common Market Law Review*, pp. 1399–431.

The supremacy of EU law over obligations arising from investment treaties, however, is effective only within the EU's self-contained regime. EU law has limited effects outside the EU judicial system, as is acknowledged by the Commission.[108] Clearly, in investment treaty arbitration the role of the tribunal is restricted to controlling that the host state has respected the legal standards laid down to protect foreign investors under international law, and not to monitor compliance with EU law. Moreover, courts outside the EU are not compelled to refuse to enforce awards that conflict with EU public policy. In *Micula*, for instance, when the claimants sought to have the award enforced in the United States (US), the Court of the Southern District of New York rejected Romania's argument that it could not pay the damages awarded because the European Commission had forbidden it from doing so. According to the Court, 'there can be no substantive review of an ICSID award in this court. ... To do otherwise would undermine the ICSID Convention's expansive spirit on which many American investors rely when they seek to confirm awards in the national courts of the Convention's other member states'.[109] Consequently, the application of EU rules on state aid was denied, considering that it would amount to a breach of international law obligations as determined by the ICSID tribunal. It is no surprise, then, that the claimants in *Eiser*, *Antin*, and *Masdar Solar* have filed for enforcement in US courts.[110]

### 5.3. Pacta sunt servanda

Despite the questionable merits of the Commission's stance on the lack of enforceability of damages awards, if EU law is treated as a subsystem of public international law, the primacy of one system over the other should be determined on the basis of general principles of public international law.[111] This logic implicitly resonates in Article 351 TFEU, which, in applying the principle of *pacta sunt servanda*,[112] provides that '[t]he rights

[108] European Commission, Decision of 10 Nov. 2017, n. 46 above, para. 161.

[109] *Micula et al.* v. *Government of Romania*, US District Court, Southern District of New York, No. 15 Misc. 107 (SDNY 5 Aug. 2015).

[110] Petition for Recognition and Enforcement of an Arbitration Award, filed 19 May 2017 by Eiser Infrastructure Ltd and Energia Solar Luxembourg S.à.r.l. against the Kingdom of Spain, US District Court for the Southern District of New York, available at: https://www.italaw.com/sites/default/files/case-documents/italaw9186.pdf; Petition for Recognition and Enforcement of an Arbitration Award, filed 27 July 2018 by Infrastructure Services Luxembourg S.à.r.l. and Energia Termosolar BV against the Kingdom of Spain, US District Court for the District of Columbia, available at: https://www.italaw.com/sites/default/files/case-documents/italaw9983.pdf; Petition for Enforcement of an Arbitration Award, filed 28 Sept. 2018 by Masdar Solar & Wind Cooperatief UA against the Kingdom of Spain. US District Court for the District of Columbia, available at: https://www.italaw.com/sites/default/files/case-documents/italaw9983.pdf.

[111] Struckmann, Forwood & Kadri, n. 61 above, p. 260. However, this is a highly controversial debate. Whereas public international lawyers consider EU law as mere regional international law, the status and effects of which are to be determined on the basis of international rules on conflict of treaties and by the principles governing the internal law of international organizations, EU institutions and the CJEU, in particular, consider the EU as a subject of international law with its own independent and autonomous legal order since Case 26-62, *NV Algemene Transport – en Expeditie Onderneming van Gend & Loos* v. *Netherlands Inland Revenue Administration*, Judgment of the Court, 5 Feb. 1963, ECLI:EU:C:1963:1, and Case 6-64, *Flaminio Costa v ENEL*, n. 102 above: Simma & Pulkowski, n. 102 above. See also Moreno-Lax & Gragl, n. 102 above, p. 457.

[112] Struckmann, Forwood & Kadri, ibid.; I.I. Lukashuk, 'The Principle *Pacta Sunt Servanda* and the Nature of Obligation under International Law' (1989) 83(3) *American Journal of International Law*, pp. 513–18;

and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties'. In consequence, also as a matter of EU law, obligations arising from international agreements concluded prior to EU membership have prevalence over any obligations arising under the EU Treaties, including Articles 107 and 108 TFEU on state aid.[113] That would be the case for obligations arising under the ICSID Convention for most EU Member States except for the six 'founding states' (Belgium, France, Germany, Italy, Luxembourg, and the Netherlands), Spain, which signed and ratified the ICSID Convention after its accession to the EU, and Poland, which is not party to the ICSID Convention.[114] The application of Article 351 TFEU is, indeed, a central issue in the pending GCEU proceedings brought by *Micula*,[115] and also in the decision of the England and Wales Court of Appeal in *Micula & Ors* v. *Romania*.[116]

The Commission insists that Article 351 TFEU does not apply to prior multilateral international agreements in cases involving intra-EU relations.[117] However, in most renewable energy cases this argument is not pertinent, since enforcement of winning awards also concerns extra-EU relations. For instance, non-EU states which are ICSID parties may also have an interest in an EU Member State's compliance with its obligations under Articles 53 and 54 of the ICSID Convention because if enforcement of renewable energy awards becomes impossible in the EU, the practical burden of enforcement would be passed onto the courts of non-EU Member States parties to the ICSID Convention.[118] Indeed, as already seen in *Eiser*, *Masdar Solar* and *Antin*, petitions to enforce the awards have been exclusively filed with US courts.[119]

The much awaited decision of the GCEU in *Micula* hopefully will shed some light on the application of Article 351 TFEU but, as it stands, enforcement of damages awards is likely to be restricted to courts outside the EU, where EU law does not prevail and no mechanisms are available for the EU eventually to recover sums that have been lawfully and successfully paid to foreign investors under international law.

---

J.W. Yackee, 'Pacta Sunt Servanda and State Promises to Foreign Investors before Bilateral Investment Treaties: Myth and Reality' (2009) 32(5) *Fordham International Law Journal*, pp. 1550–613.

[113] Struckmann, Forwood & Kadri, ibid.

[114] Database of ICSID Member States, available at: https://icsid.worldbank.org/en/Pages/about/Database-of-Member-States.aspx.

[115] *Micula* v. *Commission*, n. 54 above.

[116] *Micula & Ors* v. *Romania & Anor*, n. 97 above.

[117] As ruled by the Court of Justice in, e.g., Case T-69/89, *RTE* v. *Commission*, Judgment of the Court of First Instance (Second Chamber), 10 July 1991, ECLI:EU:T:1991:39.

[118] In the same sense, see Struckmann, Forwood & Kadri, n. 61 above, p. 262.

[119] See n. 110 above.

## 6. THE SYNERGY BETWEEN INVESTOR PROTECTION AND CLIMATE CHANGE MITIGATION POLICIES IN A CONTEXT OF EUROPEAN HOSTILITY TOWARDS ISDS

The promotion of energy from renewable sources is an essential part of EU energy policy.[120] Much has changed since the EU adopted its first package of climate and energy measures in 2008. The need for substantial and sustained reductions of GHGs is imperative and the EU is ready to take a global leadership in renewable energies.[121] On 30 November 2016, the Commission launched the Clean Energy Package,[122] which includes, inter alia, a recast of the Directive on the Promotion of Renewable Energy Sources (RES).[123] The recast seeks to advance towards compliance with the goals of the 2030 EU Climate and Energy Framework,[124] and sets a binding target of a 27% EU share of RES in final energy consumption by 2030. The Council and the European Parliament adopted their positions in December 2017 and January 2018, respectively.[125] On 14 June 2018, negotiators from the European Commission, the European Parliament and the Council of Ministers reached an agreement.[126] The final text was formally adopted by Parliament (13 November 2018) and the Council (4 December 2018).[127]

European institutions are aware that the EU will have to step up its efforts on research and innovation policy to support the 2030 EU climate goals. In this regard it is acknowledged that:

> [a] particular emphasis should be on accelerating cost reductions and market uptake of low-carbon technologies (renewables, energy efficiency, and low-carbon industrial processes across a range of sectors). This should focus on scaling up investments in large scale demonstrators, stimulating the demand for innovative technologies, and ensuring appropriate regulatory frameworks across the single market.[128]

---

[120] P. Prisecaru & P. Calanter, 'Governance of Renewable Energies in the EU' (2017) 5(2) *Global Economic Observer*, pp. 31–38.

[121] Communication from the Commission, 'A Clean Planet For All: A European Strategic Long-term Vision for a Prosperous, Modern, Competitive and Climate Neutral Economy', COM(2018) 773 final, 28 Nov. 2018, available at: https://ec.europa.eu/clima/sites/clima/files/docs/pages/com_2018_733_en.pdf.

[122] European Commission, 'Clean Energy for all Europeans', available at: https://ec.europa.eu/energy/en/topics/energy-strategy-and-energy-union/clean-energy-all-europeans.

[123] Proposal for a Directive of the European Parliament and of the Council on the Promotion of the Use of Energy from Renewable Sources (Recast), COM/2016/0767 final, 30 Nov. 2016, 2016/0382 (COD).

[124] Communication from the Commission, 'A Policy Framework for Climate and Energy in the Period from 2020 to 2030', COM/2014/015 final, 22 Jan. 2014, available at: https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52014DC0015&from=EN.

[125] European Parliament, Amendments adopted on the Proposal for a Directive on the Promotion of the Use of Energy from Renewable Sources (Recast), (COM/2016/0767 – C8-0500/2016 – 2016/0382(COD), 17 Jan. 2018, available at: http://www.europarl.europa.eu/sides/getDoc.do?pubRef=-//EP//TEXT%20TA%20P8-TA-2018-0009%200%20DOC%20XML%20V0//EN.

[126] Council of the EU, 'Analysis of the Final Compromise Text with a View to Agreement', 21 June 2018, available at: http://data.consilium.europa.eu/doc/document/ST-10308-2018-INIT/en/pdf.

[127] Directive (EU) 2018/2001 of 11 December 2018 on the Promotion of the Use of Energy from Renewable Sources [2018] OJ L 328/82.

[128] COM/2014/015 final, n. 124 above.

Not surprisingly, one of the guiding principles for RES-generated electricity set out in the recast RES Directive is the need to ensure that investors have sufficient predictability of the planned support for energy from renewable sources.[129] This was reinforced by the European Parliament in its position in plenary of January 2018,[130] and has been introduced in recital 29 of the recast RES Directive:

> Without prejudice to Articles 107 and 108 TFEU, policies supporting renewable energy should be predictable and stable and should avoid frequent or retroactive changes. Policy unpredictability and instability have a direct impact on capital financing costs, on the costs of project development and therefore on the overall cost of deploying renewable energy in the Union. Member States should prevent the revision of any support granted to renewable energy projects from having a negative impact on their economic viability.[131]

It is, therefore, clear that EU institutions acknowledge the synergy between setting the right conditions for investors and the promotion of renewables in the EU. Indeed, the relationship between legal certainty and renewable energy policies has long been established in the literature.[132] However, as shown in the preceding sections, other EU policies seem to interfere with this view.

The *Achmea* ruling and the Commission Decisions on state aid are just new bricks in the wall of hostility which the EU is building around investment arbitration. Originally, the EU supported the inclusion of ISDS in post-Lisbon Agreements, stating that '[i]nvestor-state [arbitration] is such an established feature of investment agreements that its absence would in fact discourage investors and make a host economy less attractive than others. For these reasons, future EU agreements including investment protection should include investor-state dispute settlement'.[133]

However, following fierce opposition to ISDS in certain Member States and sectors of European public opinion, the EU has now retracted its original support of ISDS and introduced a new approach based on the creation of a Permanent International Investment Tribunal to replace traditional ISDS mechanisms. CETA is the first trade agreement in which the new vision has been realized,[134] followed by the EU draft on the Transatlantic Trade and Investment Partnership between the EU and the US

---

[129] COM/2016/0767 final, n. 123 above, Art. 15(3).

[130] European Parliament, n. 125 above.

[131] Directive (EU) 2018/2001, n. 127 above.

[132] R. Dolzer & C. Schreuer, *Principles of International Investment Law* (Oxford University Press, 2008), pp. 145–49; Bellantuono, n. 10 above; D. Schiereck & J. Trillig, 'Regulatory Changes and the Volatility of Stock Returns: The German Solar Energy Sector' (2014) 8(2) *International Journal of Energy Sector Management*, pp. 160–77; N. Gatzert & T. Kosub, 'Determinants of Policy Risks of Renewable Energy Investments' (2017) 11(1) *International Journal of Energy Sector Management*, pp. 28–45; Dias Simões, n. 23 above, pp. 251–71.

[133] Communication from the Commission, 'Towards a Comprehensive European International Investment Policy', COM(2010) 343 final, 7 July 2010, p. 10, available at: http://ec.europa.eu/transparency/regdoc/rep/1/2010/EN/1-2010-343-EN-F1-1.Pdf.

[134] N. 79 above, Arts 8.27–29. See also Commission Concept Paper, 'Investment in TTIP and Beyond: The Path for Reform', p. 3, available at: http://trade.ec.europa.eu/doclib/docs/2015/may/tradoc_153408.PDF ('CETA is the first agreement to which the U.S. is not a party which contains a clear commitment to the possible creation of an appeal mechanism').

(TTIP),[135] the EU-Vietnam Trade Agreement,[136] the EU-Singapore trade and investment agreements,[137] and the new EU-Mexico Trade Agreement.[138] These developments put an end to the traditional approach to ISDS in the EU. In the long term, the idea is to replace bilateral arrangements with a Multilateral Investment Court (MIC) for the settlement of investment disputes. The initiative is part of the EU's new approach to investment dispute resolution, which moves away from the traditional arbitration framework towards a court system. In March 2018, the Council of the EU adopted and published the negotiating directives for the MIC.[139] More broadly, initial talks on the possible creation of an MIC started in late 2017 under the auspices of UNCITRAL, which has given its Working Group III a mandate to work on multilateral reform of investor-state dispute settlement.[140]

The creation of an MIC pursues the noble cause of responding to some of the legitimate public concerns raised in the context of traditional investor-to-state dispute settlement,[141] but its conformity with EU law is far from clear.[142] Indeed, in relation to the European Patent Court[143] and accession to the European Convention on Human Rights and Fundamental Freedoms (ECHR)[144] (Opinion 2/13),[145] the CJEU has

---

[135] European Union's Proposal for Investment Protection and Resolution of Investment Disputes, Transatlantic Trade and Investment Partnership (TTIP), 12 Nov. 2015, Arts 9–10, 12, available at: http://trade.ec.europa.eu/doclib/docs/2015/november/tradoc_153955.pdf. See also Commission Concept Paper, ibid. (remarking that the TTIP contains the first EU negotiating directives that explicitly mention an appellate mechanism).

[136] EU-Vietnam Trade and Investment Agreement, authentic text as of Aug. 2018, not yet binding under international law, available at: http://trade.ec.europa.eu/doclib/press/index.cfm?id=1437.

[137] Investment Protection Agreement between the European Union and its Member States, of the one part, and the Republic of Singapore, of the other part, Brussels (Belgium), 19 Oct. 2018, available at: http://trade.ec.europa.eu/doclib/press/index.cfm?id=961.

[138] New EU-Mexico Agreement, agreement in principle, Brussels (Belgium), 23 Apr. 2018, available at: http://trade.ec.europa.eu/doclib/press/index.cfm?id=1833.

[139] Council of the EU, 'Negotiating Directives for a Convention establishing a Multilateral Court for the Settlement of Investment Disputes', Document/ST-12981-2017-ADD-1-DCL-1, 20 Mar. 2018, available at: http://data.consilium.europa.eu/doc/document/ST-12981-2017-ADD-1-DCL-1/en/pdf.

[140] UNCITRAL, 'Possible Reform of Investor-State Dispute Settlement (ISDS)' (5 Sept. 2018), UN Doc. A/CN.9/WG.III/WP.149, available at: http://www.uncitral.org/uncitral/en/commission/working_groups/3Investor_State.html.

[141] S.D. Franck, 'The Legitimacy Crisis in Investment Treaty Arbitration: Privatizing Public International Law through Inconsistent Decisions" (2005) 73(4) Fordham Law Review, pp. 1521–625; G. van Harten, 'A Case for an International Investment Court', Society for International Economic Law, Online Proceedings, Working Paper No. 22/08, available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1153424; S.W. Schill, 'Crafting the International Economic Order: The Public Function of Investment Treaty Arbitration and Its Significance for the Role of the Arbitrator' (2010) 23(2) Leiden Journal of International Law, pp. 401–30, at 412.

[142] S. Schill, 'Editorial: Opinion 2/13: The End for Dispute Settlement in EU Trade and Investment Agreements?' (2015) 16(3) The Journal of World Investment & Trade, pp. 379–88; L. Woods, 'Fit for Purpose? The EU's Investment Court System', Kluwer Arbitration Blog, 23 Mar. 2016, available at: http://arbitrationblog.kluwerarbitration.com/2016/03/23/to-be-decided.

[143] Case C-1/09, Opinion delivered pursuant to Art. 218(11) TFEU, Opinion of the Court (Full Court), 8 Mar. 2011, ECLI:EU:C:2011:123.

[144] Rome (Italy), 4 Nov. 1950, in force 3 Sept. 1953, available at: http://www.echr.coe.int/pages/home.aspx?p=basictexts.

[145] Case C-2/13, Draft International Agreement: Accession of the European Union to the European Convention for the Protection of Human Rights and Fundamental Freedoms, Compatibility of the

persistently declared the incompatibility with EU law of any judicial body or international tribunal that jeopardizes the principles of autonomy and primacy of EU law and the exclusive competence of the CJEU in its interpretation and application. Presumably, the issue of the material compatibility of investment tribunals with EU law has now been defined for the future in the recently issued Opinion 1/17.[146] In line with the conclusions of Advocate General Bot, the CJEU has ruled that the Investment Court System established under CETA is compatible with EU law,[147] looking more favourably upon a permanent investment court than on the European Court of Human Rights (ECtHR) or other international courts and tribunals.

The recently adopted recast RES Directive clearly states that retroactive changes must be avoided and enables the European Commission to launch infringement proceedings against Member States which retroactively adopt significant policy reversals. However, this possibility will apply once the new Directive is transposed into national law by 30 June 2021 and, in consequence, will only cover future cases. Furthermore, infringement proceedings deal only with disputes between the European Commission and national governments regarding the implementation of EU law, and not with the protection of investors' rights. Accordingly, the recast RES Directive neither addresses specific violations of investors' rights nor contemplates the awarding of compensation for loss suffered. If the EU insists on replacing ISDS altogether, investors are left without a dispute settlement mechanism, with provisions on fairness, legitimate expectations, equitable treatment and expropriation (as enshrined in Articles 10 and 13 ECT).

Of course, one may reject the legitimacy and utility of direct international claims by foreign investors against states, regardless of whether they are heard by arbitral tribunals or an investment court. Indeed, it may be argued that in the field of renewable energy policies, which is subject to intense public debate, public policy issues should matter, and proceedings should permit much broader stakeholder participation, including by recognizing standing for actors other than investors and states. Various proposals to reform ISDS are on the table, but different major states favour different options, from minor reforms of ISDS to the creation of an investment court, or the rejection of international investment claims altogether.[148] For this reason, states and international institutions should not concentrate on just one reform approach, but instead develop multiple and flexible reform options.[149] The present article does not intend to discuss the pros and cons of replacing ISDS by more democratic mechanisms of

---

Draft Agreement with the EU and FEU Treaties, Opinion of the Court (Full Court), 18 Dec. 2014, ECLI: EU:C:2014:2454.

[146] Opinion C-1/17, n. 80 above. See further, G. Kübek, 'CETA's Investment Court System and the Autonomy of EU Law: Insights from the Hearing in Opinion 1/17', *VerfBlog*, 4 July 2018, available at: https://verfassungsblog.de/cetas-investment-court-system-and-the-autonomy-of-eu-law-insights-from-the-hearing-in-opinion-1-17.

[147] Opinion of Advocate General Bot, delivered 29 Jan. 2019, ECLI:EU:C:2019:72; Opinion of the Court (Full Court) of 30 April 2019 on Case C-1/17, n. 80 above.

[148] S. Puig & G. Shaffer, 'Imperfect Alternatives: Institutional Choice and the Reform of Investment Law' (2018) 112(3) *American Journal of International Law*, pp. 361–409.

[149] In the same sense, A. Roberts, 'Incremental, Systemic, and Paradigmatic Reform of Investor-State Arbitration' (2018) 112(3) *American Journal of International Law*, pp. 410–32.

dispute resolution but does draw attention to the synergy between arbitration and climate change mitigation policies. It is an undeniable fact that, to date, investors in the energy sector, including renewable energies, prefer arbitration and that the number of new investor-state dispute settlement claims remains high.[150] Accordingly, reforms are welcome but compliance with signed investment treaties that provide for arbitration is crucial for generating investor confidence and, therewith, stimulate the substantial investments that are necessary to achieve the EU's ambitious climate objectives.

## 7. CONCLUSIONS

Recent studies in policy coherence show that, even in an institutional context that is formally favourable to policy coordination, policy coherence may fail in highly politicized contexts.[151] This seems to be happening in the EU with regard to climate change, competition, and foreign investment policies. On the one side, European institutions wish to step up their efforts on research and innovation policy to support the 2030 EU climate goals. They are aware of the synergy between setting the right conditions for investors and the promotion of renewables in the EU. On the other side, the European Commission's untested extension of the boundaries of state aid law to the realm of investment arbitration may be turning the EU into a territory where the implementation of damages awards is problematic, while casting serious doubts on the neutrality of EU competition policy. The EU's position against investment arbitration reflects a desire to achieve the political goal of moving away from traditional ISDS mechanisms. Yet, given the legal and political uncertainties surrounding the creation of a permanent investment court, the growing attempts of the EU to torpedo ISDS might have the side effect of weakening the overall credibility of investment arbitration as a mechanism for investor protection and, thereby, diminish its potential as a tool to reinforce the credibility of climate change mitigation policies.

At first, following the series of EU proposals that openly promote the development of clean energy in Europe, legislation favoured investment in renewables. No government ever considered that renewables investment support might be incompatible with state aid law, thus the economic schemes were never notified to the Commission. Then, rapid legislative change in various Member States impacted upon investments in renewables in almost a punitive way. However, instead of strengthening the legal mechanisms that protect investors against such retroactive regulatory changes at the level of the Member States, the Commission's crusade against investment arbitration added more instability and unpredictability to the investment climate.

The current tension between EU law and investment arbitration damages the EU's reputation as an investor-friendly destination and may dissuade investment in renewable energy. To avoid this undesirable collateral effect on climate change mitigation, the EU

---

[150] UN Conference on Trade and Development, *World Investment Report 2018*, available at: https://unctad.org/en/PublicationChapters/wir2018ch3_en.pdf.

[151] I. Selianko & A. Lenschow, 'Energy Policy Coherence from an Intra-Institutional Perspective: Energy Security and Environmental Policy Coordination within the European Commission' (2015) 19(1) *European Integration online Papers*, pp. 1–29, available at: http://eiop.or.at/eiop/pdf/2015-002.pdf.

institutions should work towards greater policy coherence. The Commission, in particular, should review its policy on state aid rules and avoid untested extensions to the realm of arbitration. It should monitor the proper functioning of the internal market, while avoiding any unnecessary infliction of further damage on investor confidence.[152] Only then will the EU and its Member States have a fighting chance of meeting the 2030 renewables target.

---

[152] Similarly, Alessi, Ferrer & Egenhofer, n. 24 above.

EXHIBIT 8

Case 1:19-cv-01618-TSC Document 68-67 Filed 12/02/22 Page 2 of 352
Summaries of Judgments, Advisory Opinions and Orders of the International Court of Justice
Not an official document

# CASE CONCERNING THE VIENNA CONVENTION ON CONSULAR RELATIONS (PARAGUAY *v.* UNITED STATES OF AMERICA) (PROVISIONAL MEASURES)

## Order of 9 April 1998

In an order adopted unanimously in the case concerning the Vienna Convention on Consular Relations (Paraguay v. United States of America), the Court called on the United States to "take all measures at its disposal" to prevent the execution of Mr. Angel Francisco Breard, pending a final decision of the Court in the proceedings instituted by Paraguay. Mr. Breard was a Paraguayan national convicted of murder in Virginia (United States) whose execution was scheduled for 14 April 1998. In its Order, the Court also requested the United States to inform it of all the measures taken in implementation of it.

The Court was composed as follows: Vice-president Weeramantry, Acting President; President Schwebel; Judges Oda, Bedjaoui, Guillaume, Ranjeva, Herczegh, Shi, Fleischhauer, Koroma, Vereshchetin, Higgins, Parra-Aranguren, Kooijmans, Rezek; Registrar Valencia-Ospina.

\*

\* \*

The complete text of the operative paragraph of the Order reads as follows:

"41. For these reasons,

THE COURT

Unanimously,

*Indicates* the following provisional measures:

I. The United States should take all measures at its disposal to ensure that Angel Francisco Breard is not executed pending the final decision in these proceedings, and should inform the Court of all the measures which it has taken in implementation of this Order;

II. *Decides*, that, until the Court has given its final decision, it shall remain seized of the matters which form the subject matter of this Order."

\*

\* \*

President Schwebel and Judges Oda and Koroma appended declarations to the Order of the Court.

\*

\* \*

*History of the case and submissions*
(paras. 1-22)

The Court begins by recalling that on 3 April 1998 Paraguay instituted proceedings against the United States of America for "violations of the Vienna Convention on Consular Relations [of 24 April 1963]" (hereinafter the "Vienna Convention") allegedly committed by the United States. Paraguay bases the jurisdiction of the Court on Article 36, paragraph 1, of the Statute of the Court and on Article I of the Optional Protocol concerning the Compulsory Settlement of Disputes, which accompanies the Vienna Convention on Consular Relations ("the Optional Protocol").

In Paraguay's Application, it is stated that in 1992 the authorities of Virginia arrested a Paraguayan national, Mr. Angel Francisco Breard, who was charged, tried, convicted of culpable homicide and sentenced to death by a Virginia court in 1993, without having been informed of his rights under Article 36, subparagraph 1 (*b*), of the Vienna Convention; it is specified that among these rights are the right to request that the relevant consular office of the State of which he is national be advised of his arrest and detention, and the right to communicate with that office; it is further alleged that the authorities of the Commonwealth of Virginia also did not advise the Paraguayan consular officers of Mr. Breard's detention, and that those officers were only able to render assistance to him from 1996, when the Paraguayan Government learnt by its own means that Mr. Breard was imprisoned in the United States.

Paraguay states that federal courts denied Mr. Breard the right to invoke the Vienna Convention; that the Virginia court that sentenced Mr. Breard to the death penalty set an execution date of 14 April 1998; that Mr. Breard, having exhausted all means of legal recourse available to him as of right, petitioned the United States Supreme Court for a writ of *certiorari*, requesting it to exercise its discretionary power to review the decision given by the lower federal courts and to grant a stay of his execution pending that review; and that, while this request is still pending before the Supreme Court, it is however rare for that Court to accede to such requests. Paraguay stated, moreover, that, having brought proceedings itself before the federal courts of the United States without success, it also filed such a petition in the Supreme Court, which is also still pending; and that Paraguay furthermore engaged in diplomatic efforts with the Government of the United States and sought the good offices of the Department of State.

Paraguay maintains that by violating its obligations under Article 36, subparagraph 1 (*b*), of the Vienna Convention, the United States prevented Paraguay from exercising the consular functions provided for in Articles 5 and 36 of the Convention and specifically for ensuring the protection of its interests and of those of its nationals in the United States; that it was not able to contact Mr. Breard nor to offer him the necessary assistance, and that accordingly Mr. Breard "made a number of objectively unreasonable decisions during the criminal proceedings against him,

which were conducted without translation" and that he "did not comprehend the fundamental differences between the criminal justice systems of the United States and Paraguay"; Paraguay concludes from this that it is entitled to *restitutio in integrum*, that is to say "the re-establishment of the situation that existed before the United States failed to provide the notifications ... required by the Convention";

Paraguay requests the Court to adjudge and declare as follows:

"(1) that the United States, in arresting, detaining, trying, convicting, and sentencing Angel Francisco Breard, as described in the preceding statement of facts, violated its international legal obligations to Paraguay, in its own right and in the exercise of its right of diplomatic protection of its national, as provided by Articles 5 and 36 of the Vienna Convention;

(2) that Paraguay is therefore entitled to *restitutio in integrum*;

(3) that the United States is under an international legal obligation not to apply the doctrine of 'procedural default', or any other doctrine of its internal law, so as to preclude the exercise of the rights accorded under Article 36 of the Vienna Convention; and

(4) that the United States is under an international legal obligation to carry out in conformity with the foregoing international legal obligations any future detention of or criminal proceedings against Angel Francisco Breard or any other Paraguayan national in its territory, whether by a constituent, legislative, executive, judicial or other power, whether that power holds a superior or a subordinate position in the organization of the United States, and whether that power's functions are of an international or internal character;

and that, pursuant to the foregoing international legal obligations,

(1) any criminal liability imposed on Angel Francisco Breard in violation of international legal obligations is void, and should be recognized as void by the legal authorities of the United States;

(2) the United States should restore the *status quo ante*, that is, re-establish the situation that existed before the detention of, proceedings against, and conviction and sentencing of Paraguay's national in violation of the United States' international legal obligations took place; and

(3) the United States should provide Paraguay a guarantee of the non-repetition of the illegal acts."

On 3 April 1998 Paraguay also submitted an urgent request for the indication of provisional measures in order to protect its rights. It states in the following terms the grounds for its request and the possible consequences of its dismissal:

"Under the grave and exceptional circumstances of this case, and given the paramount interest of Paraguay in the life and liberty of its nationals, provisional measures are urgently needed to protect the life of Paraguay's national and the ability of this Court to order the relief to which Paraguay is entitled: restitution in kind. Without the provisional measures requested, the United States will execute Mr. Breard before this Court can consider the merits of Paraguay's claims, and Paraguay will be forever deprived of the opportunity to have the *status quo ante* restored in the event of a judgment in its favour."

Paraguay requests that, pending final judgment in this case, the Court indicate:

"(a) That the Government of the United States take the measures necessary to ensure that Mr. Breard not be executed pending the disposition of this case;

(b) That the Government of the United States report to the Court the actions it has taken in pursuance of subparagraph (a) immediately above and the results of those actions; and

(c) That the Government of the United States ensure that no action is taken that might prejudice the rights of the Republic of Paraguay with respect to any decision this Court may render on the merits of the case."

It asks the Court moreover to consider its request as a matter of the greatest urgency "in view of the extreme gravity and immediacy of the threat that the authorities ... will execute a Paraguayan citizen".

By identical letters dated 3 April 1998, the Vice-President of the Court addressed both Parties in the following terms:

"Exercising the functions of the presidency in terms of Articles 13 and 32 of the Rules of Court, and acting in conformity with Article 74, paragraph 4, of the said Rules, I hereby draw the attention of both Parties to the need to act in such a way as to enable any Order the Court will make on the request for provisional measures to have its appropriate effects."

At public hearings held on 7 April 1998, oral statements on the request for the indication of provisional measures were presented by both Parties.

*The Court's reasoning*
(paras. 23-41)

The Court begins by pointing out that on a request for the indication of provisional measures it need not, before deciding whether or not to indicate them, finally satisfy itself that it has jurisdiction on the merits of the case, but that it may not indicate them unless the provisions invoked by the Applicant appear, prima facie, to afford a basis on which the jurisdiction of the Court might be founded.

It notes that Article I of the Optional Protocol, which Paraguay invokes as the basis of jurisdiction of the Court in this case, is worded as follows:

"Disputes arising out of the interpretation or application of the Convention shall lie within the compulsory jurisdiction of the International Court of Justice and may accordingly be brought before the Court by an application made by any party to the dispute being a Party to the present Protocol";

and that both Paraguay and the United States are parties to the Vienna Convention and to the Optional Protocol, in each case without reservation.

The Court observes that Paraguay, in its Application and at the hearings, stated that the issues in dispute between itself and the United States concern Articles 5 and 36 of the Vienna Convention and fall within the compulsory jurisdiction of the Court under Article I of the Optional Protocol.

At the hearing the United States contended that Paraguay had not established that the Court had jurisdiction in these proceedings, even prima facie; it argued that there is no dispute between the Parties as to the interpretation of Article 36, subparagraph 1 (*b*), of the Vienna Convention nor is there a dispute as to its application, since the United States recognizes that the notification provided for was not carried out; the United States maintained that the objections raised by Paraguay to the proceedings brought against its national do not constitute a dispute concerning the interpretation or application of the Vienna Convention; and it added that there was no entitlement to *restitutio in integrum* under the terms of that Convention.

The Court finds that there exists a dispute as to whether the relief sought by Paraguay is a remedy available under the Vienna Convention, in particular in relation to Articles 5 and 36 thereof, which is a dispute arising out of the application of the Convention within the meaning of Article I of the Optional Protocol; and that prima facie it has jurisdiction under Article I of the aforesaid Optional Protocol to determine the dispute between Paraguay and the United States.

The Court then indicates that the purpose of the power to indicate provisional measures is to preserve the respective rights of the parties, pending a decision of the Court, and presupposes that irreparable prejudice shall not be caused to rights which are the subject of a dispute in judicial proceedings; that it follows that the Court must be concerned to preserve by such measures the rights which may subsequently be adjudged by the Court to belong either to the Applicant, or to the Respondent; and that such measures are only justified if there is urgency.

The Court then refers to the fact that the execution of Mr. Breard is ordered for 14 April 1998; and finds that such an execution would render it impossible for the Court to order the relief that Paraguay seeks and thus cause irreparable harm to the rights it claims.

In doing so the Court observes that the issues before it do not concern the entitlement of the federal states within the United States to resort to the death penalty for the most heinous crimes, and that, further, the function of the Court is to resolve international legal disputes between States, inter alia when they arise out of the interpretation or application of international conventions, and not to act as a court of criminal appeal.

In the light of the above considerations, the Court finds that the circumstances require it to indicate, as a matter of urgency, provisional measures as provided by Article 41 of its Statute.

## Declaration of President Schwebel

I have voted for the Order, but with disquiet. The sensitive issues it poses have been hastily, if ably, argued. The evidence introduced is bare. The Court's consideration of the issues of law and fact, in the circumstances imposed upon it, has been summary. The United States maintains that no State has ever before claimed as Paraguay now does that, because of lack of consular access under the Vienna Convention on Consular Relations, the results of a trial, conviction, and appeal should be voided. Not only has the United States apologized to Paraguay for the unintentional failure of notification to Paraguay's consul of the arrest and trial of the accused, but it has taken substantial steps to strengthen what appears to be a practice in the United States of variable compliance with the obligations imposed upon it by the Vienna Convention.

All this said, I have voted for the Order indicating provisional measures suggested pursuant to Article 41 of the Statute of the Court. Those measures ought to be taken to preserve the rights of Paraguay in a situation of incontestable urgency.

I have so voted essentially for these reasons. There is an admitted failure by the Commonwealth of Virginia to have afforded Paraguay timely consular access, that is to say, there is an admitted breach of treaty. An apology and Federal provision for avoidance of future such lapses does not assist the accused, who Paraguay alleges was or may have been prejudiced by lack of consular access, a question which is for the merits. It is of obvious importance to the maintenance and development of a rule of law among States that the obligations imposed by treaties be complied with and that, where they are not, reparation be required. The mutuality of interest of States in the effective observance of the obligations of the Vienna Convention on Consular Relations is the greater in the intermixed global community of today and tomorrow (and the citizens of no State have a higher interest in the observance of those obligations than the peripatetic citizens of the United States). In my view, these considerations outweigh the serious difficulties which this Order imposes on the authorities of the United States and Virginia.

## Declaration of Judge Oda

1. I voted in favour of the Court's Order with great hesitation as I believed and I still believe that the request for the indication of provisional measures of protection submitted by Paraguay to the Court should have been dismissed. However, in the limited time — one or two days — given to the Court to deal with this matter, I have found it impossible to develop my points sufficiently to persuade my colleagues to alter their position.

2. First of all, I would like to express some of my thoughts in connection with this request.

I can, on humanitarian grounds, understand the plight of Mr. Breard and recognize that owing to the fact that Paraguay filed this request on 3 April 1998, his fate now, albeit unreasonably, lies in the hands of the Court.

I would like to add, however, that, if Mr. Breard's rights as they relate to humanitarian issues are to be respected then, in parallel, the matter of the rights of victims of violent crime (a point which has often been overlooked) should be taken into consideration. It should also be noted that since his arrest, Mr. Breard has been treated fairly in all legal proceedings within the American judicial system governed by the rule of law.

The Court cannot act as a court of criminal appeal and cannot be petitioned for writs of *habeas corpus*. The Court does not have jurisdiction to decide matters relating to capital punishment and its execution, and should not intervene in such matters.

\* \*

3. As stated earlier, Paraguay's request was presented to the Court on 3 April 1998 in connection with and at the same time as its Application instituting proceedings against the United States for violations of the 1963 Vienna Convention on Consular Relations. Paraguay's Application was unilaterally submitted to the Court on the basis of the Optional Protocol. I very much doubt that, on the date of filing of the Application and the request, there was any "dispute[s] arising out of the interpretation or application of the [Vienna] Convention" (Optional Protocol, Article I).

If there was any dispute between Paraguay and the United States concerning the interpretation or application of the Vienna Convention, it could have been that the United States was presumed to have violated the Convention at the time of the arrest of Mr. Breard in 1992, as the United States did not inform the Paraguayan consul of that event.

This issue was raised by Paraguay when it became aware of Mr. Breard's situation. In 1996, negotiations took place between Paraguay and the United States concerning the consular function provided for under the Convention. In July 1997, the United States proceeded to remedy the violation by sending a letter to the Government of Paraguay apologizing for its failure to inform the consul of the events concerning Mr. Breard and giving an assurance that this failure would not be repeated in future. In my view, the United States was thus released from its responsibility for violation of the Vienna Convention.

From that time, the question of violation of the Vienna Convention, which may have led to a dispute concerning its application and interpretation, no longer existed. However, this question was raised once more on 3 April 1998, the date on which Paraguay's Application was filed.

4. What did Paraguay ask the Court to decide in its Application of 3 April 1998? Paraguay asked mainly for a decision relating to Mr. Breard's personal situation, namely, his pending execution by the competent authorities of the State of Virginia.

Paraguay requested *restitutio in integrum*. However, if consular contact had occurred at the time of Mr. Breard's arrest or detention, the judicial procedure in the United States domestic courts relating to his case would have been no different. This point was clarified in the course of the oral pleadings.

\* \*

5. I would like to turn to some general issues relating to provisional measures. First, as a general rule, provisional measures are granted in order to preserve *rights* exposed to imminent breach which is irreparable and these *rights* must be those to be considered at the merits stage of the case, and must constitute the subject matter of the Application or be directly related to it. In this case, however, there is no question of such *rights* (of States parties), as provided for by the Vienna Convention, being exposed to an imminent irreparable breach.

6. Secondly, in order that provisional measures may be granted by the Court, the Court has to have, at the very least, prima facie jurisdiction to deal with the issues concerning the *rights* of the States parties. However I believe that, as regards the present request for provisional measures, the Court does not even have prima facie jurisdiction to handle this matter.

7. Thirdly, if the request in the present case had not been granted, the Application itself would have become meaningless. If that had been the case, then I would have had no hesitation in pointing out that the request for provisional measures should not be used to ensure that the main Application continue. In addition the request for provisional measures should not be used by applicants for the purpose of obtaining interim judgments that would affirm their own rights and predetermine the main case.

8. I have thus explained why I formed the view that, given the fundamental nature of provisional measures, those measures should not have been indicated upon Paraguay's request.

I reiterate, however, that I voted in favour of the Order, for humanitarian reasons, and in view of the fact that, if the execution were to be carried out on 14 April 1998, whatever findings the Court might have reached might be without object.

### Declaration of Judge Koroma

My decision to vote in favour of the Order granting the interim measures of protection in this matter was reached only after careful consideration and in the light of the urgency and exceptional circumstances of this case. Torn as I was between the need to observe the requirements for granting provisional measures of protection under Article 41 of the Statute of the Court, thereby ensuring that whatever decision the Court might reach should not be devoid of object, and the need for the Court to comply with its jurisdiction to settle disputes between States which, in my view, includes respect for the sovereignty of a State in relation to its criminal justice system.

It was, therefore, both propitious and appropriate for the Court to bear in mind its mission which is to decide disputes between States, and not to act as a universal supreme court of criminal appeal. On the other hand, it is equally true that the Court's function is to decide disputes between States which are submitted to it in accordance with international

law, applying international conventions, etc. The Order, in my judgement, complies with these requirements.

Paraguay's Application, filed on 3 April 1998 instituting proceedings against the United States for purported violations of the 1963 Vienna Convention on Consular Relations, inter alia, requested the Court to grant provisional measures of protection under Article 41 of the Statute so as to protect its rights and the right of one of its nationals who had been convicted of a capital offence committed in the United States and sentenced to death.

The purpose of a request for provisional measures is to preserve as well as to safeguard the rights of the parties that are in dispute, especially when such rights or subject matter of the dispute could be irretrievably or irreparably destroyed thereby rendering the Court's decision ineffective or without object. It is in the light of such circumstances that the Court has found it necessary to indicate interim measures of protection with the aim of preserving the respective rights of either party to the dispute. But prior to this, the applicant State has the burden of indicating that prima facie, the Court has jurisdiction.

When the facts presented were considered by the Court in the light of the Vienna Convention on Consular Relations, in particular in relation to its Articles 5 and 36, and Article I of the Optional Protocol concerning the Compulsory Settlement of Disputes of 24 April 1963, the Court reached the correct conclusion that a dispute existed and that its jurisdiction had been established prima facie.

In my view, in granting this Order, the Court met the requirements set out in Article 41 of the Statute, whilst at the same time the Order preserves the respective rights of either Party — Paraguay and the United States. The Order called for the suspension of the sentence of execution of Mr. Breard on 14 April 1998, thereby preserving his right to life pending the final decision of the Court on this matter, and also recognized the United States' criminal sovereignty in matters such as charging, trying, convicting and sentencing suspects as appropriate, within the United States or its jurisdiction. I concur with this finding.

In reaching this decision, the Court has also acted with the necessary judicial prudence in considering a request for interim measures of protection, in that it should not deal with issues which are not immediately relevant for the protection of the respective rights of either party or which are for the merits. It also thus, once again confirmed its consistent jurisprudence that a provisional measure of protection should only be granted where it is indispensable and necessary for the preservation of the respective rights of either party and only with circumspection. It was in the light of the foregoing consideration, that I joined the Court in granting the request under Article 41 of the Statute.

---

# EXHIBIT 9

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

**NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V.**
**v.**
**Kingdom of Spain**

**(ICSID Case No. ARB/14/11)**

**PROCEDURAL ORDER No. 1**

Professor Donald M. McRae, C.C., President of the Tribunal
Mr. L. Yves Fortier, P.C., C.C., O.Q., Q.C., Arbitrator
Professor Laurence Boisson de Chazournes, Arbitrator

*Secretary of the Tribunal*
Ms. Luisa Fernanda Torres

*NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V.*
*v. Kingdom of Spain*
(ICSID Case No. ARB/14/11)
**Procedural Order No. 1**

# Contents

1.     Applicable Arbitration Rules .................................................................. 3
2.     Constitution of the Tribunal and Tribunal Members' Declarations................................ 3
3.     Fees and Expenses of Members of the Tribunal ............................................... 4
4.     Presence and Quorum .................................................................... 4
5.     Decisions and Procedural Rulings of the Tribunal .......................................... 4
6.     Power to Fix Time Limits ................................................................ 5
7.     Secretary of the Tribunal ................................................................ 5
8.     Representation of the Parties ............................................................. 6
9.     Apportionment of Costs and Advance Payments to ICSID........................................ 6
10.   Place of Proceeding...................................................................... 7
11.   Procedural Language(s), Translation and Interpretation ..................................... 7
12.   Routing of Communications ............................................................... 8
13.   Number of Copies and Method of Filing of Parties' Pleadings................................. 9
14.   Number and Sequence of Pleadings ........................................................ 11
15.   Production of Documents ................................................................ 11
16.   Submission of Documents ................................................................ 12
17.   Witness Statements and Expert Reports ................................................... 13
18.   Examination of Witnesses and Experts.................................................... 14
19.   Pre-Hearing Organizational Meetings ..................................................... 15
20.   Hearings ............................................................................... 16
21.   Records of Hearings and Sessions ........................................................ 16
22.   Post-Hearing Memorials and Statements of Costs........................................... 17
23.   Publication ........................................................................... 17
24.   Other Matters ......................................................................... 17

*NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V.*
*v. Kingdom of Spain*
(ICSID Case No. ARB/14/11)
**Procedural Order No. 1**

### Introduction

     The first session of the Arbitral Tribunal was held on May 15, 2015, at 8:30 a.m. at the seat of the Centre in Washington D.C.

     Participating in the conference were:

Members of the Tribunal:
Professor Donald M. McRae, C.C., President of the Tribunal
Mr. L. Yves Fortier, P.C., C.C., O.Q., Q.C., Arbitrator
Professor Laurence Boisson de Chazournes, Arbitrator

ICSID Secretariat:
Ms. Luisa Fernanda Torres, Secretary of the Tribunal

Attending on behalf of the Claimants:
| Ms. Karyl Nairn QC | Skadden, Arps, Slate, Meagher & Flom (UK) LLP |
| Mr. David Herlihy | Skadden, Arps, Slate, Meagher & Flom (UK) LLP |
| Ms. Sara Nadeau Séguin | Skadden, Arps, Slate, Meagher & Flom (UK) LLP |
| Mr. Charles Sieving | Claimants' party representative |
| Mr. Mitchell S. Ross | Claimants' party representative |
| Mr. Robert B. Sendler | Claimants' party representative |

Attending on behalf of the Respondent:
| Mr. Diego Santacruz | Abogacía General del Estado |
| Mr. Javier Torres | Abogacía General del Estado |
| Mr. Antolín Fernández | Abogacía General del Estado |

The Tribunal and the parties considered the following:

- The Draft Agenda circulated by the Secretary of the Tribunal on February 11, 2015 as amended by the parties on April 24, 2015.

- The Draft Procedural Order circulated by the Secretary of the Tribunal on February 11, 2015; and

- The parties' comments on the Draft Agenda and the Draft Procedural Order received on April 24, 2015, indicating the items on which they agreed and their respective positions regarding the items on which they did not agree.

The session was adjourned at 11:00 a.m.

An audio recording of the session was made and deposited in the archives of ICSID. The recording was subsequently distributed to the Members of the Tribunal and the parties.

Following the session, the Tribunal now issues the present order:

**<u>Order</u>**

Pursuant to ICSID Arbitration Rules 19 and 20, this first Procedural Order sets out the Procedural Rules that govern this arbitration. The timetable is attached as **Annex A**.

1.  <u>Applicable Arbitration Rules</u>
    *Convention Article 44*

    1.1.  These proceedings are conducted in accordance with the ICSID Arbitration Rules in force as of April 10, 2006.

2.  <u>Constitution of the Tribunal and Tribunal Members' Declarations</u>
    *Arbitration Rule 6*

    2.1.  The Tribunal was constituted on January 23, 2015 in accordance with the ICSID Convention and the ICSID Arbitration Rules. The parties confirmed that the Tribunal was properly constituted and that no party has any objection to the appointment of any Member of the Tribunal.

    2.2.  The Members of the Tribunal timely submitted their signed declarations in accordance with ICSID Arbitration Rule 6(2). Copies of these declarations were distributed to the parties by the ICSID Secretariat on January 23, 2015.

    2.3.  The contact details for the Members of the Tribunal are:

| | | |
|---|---|---|
| **Prof. Donald M. McRae, C.C.** | **The Honourable** | **Prof. Laurence Boisson de** |
| University of Ottawa | **L. Yves Fortier, PC, CC, OQ, QC** | **Chazournes** |
| Law School | Cabinet Yves Fortier | University of Geneva |
| 57 Louis Pasteur St., Room 340 | 1 Place Ville Marie, Suite 2822 | Faculty of Law |
| Ottawa, Ontario K1N 6N5 | Montréal, Québec H3B 4R4 | 40, boulevard du Pont-d'Arve |
| Canada | Canada | 1211 Geneva 4 |
| dmcrae@uottawa.ca | yves.fortier@yfortier.ca | Switzerland |
| Donald.Mcrae@uottawa.ca | | laurence.boissondechazournes |
| | | @unige.ch |

*NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V.*
*v. Kingdom of Spain*
(ICSID Case No. ARB/14/11)
**Procedural Order No. 1**

3.   Fees and Expenses of Members of the Tribunal
*Convention Article 60; Administrative and Financial Regulation 14; ICSID Schedule of Fees*

    3.1.   The fees and expenses of each Member of the Tribunal shall be determined and paid in accordance with the ICSID Schedule of Fees and the Memorandum on Fees and Expenses of ICSID Arbitrators in force at the time the fees and expenses are incurred.

    3.2.   Under the current Schedule of Fees, each Member of the Tribunal receives:

        3.2.1.   US$3,000 for each day of meetings or each eight hours of other work performed in connection with the proceedings or *pro rata*; and

        3.2.2.   subsistence allowances, reimbursement of travel, and other expenses pursuant to ICSID Administrative and Financial Regulation 14.

    3.3.   Each Member of the Tribunal shall submit his claims for fees and expenses to the ICSID Secretariat on a quarterly basis.

    3.4.   Non-refundable expenses incurred in connection with a hearing as a result of a postponement or cancellation of the hearing shall be reimbursed.[1]

4.   Presence and Quorum
*Arbitration Rules 14(2) and 20(1)(a)*

    4.1.   The presence of all Members of the Tribunal constitutes a quorum for its sittings, including by any appropriate means of communication.

5.   Decisions and Procedural Rulings of the Tribunal
*Convention Article 48(1); Arbitration Rules 16, 19 and 20*

    5.1.   Decisions of the Tribunal shall be taken by a majority of the Members of the Tribunal.

    5.2.   ICSID Arbitration Rule 16(2) applies to decisions taken by correspondence except that where the matter is urgent, the President may issue procedural decisions without consulting the other Members, subject to possible reconsideration of such decision by the full Tribunal.

---

[1] During the First Session, the Tribunal invited the parties to consider adding provisions for cancellation fees to be paid to the Members of the Tribunal in the event of cancellation of a hearing. The parties agreed to confer and revert to the Tribunal on this issue.

5.3.    The President is authorized to issue Procedural Orders and Procedural Decisions on behalf of the Tribunal.

5.4.    The Tribunal's rulings on procedural matters may be communicated to the parties by the Secretary of the Tribunal in the form of a letter or email.

6.    Power to Fix Time Limits
      *Arbitration Rule 26(1)*

6.1.    The President may fix and extend time limits for the completion of the various steps in the proceeding.

6.2.    In exercising this power, the President shall consult with the other Members of the Tribunal.  If the matter is urgent, the President may fix or extend time limits without consulting the other Members, subject to possible reconsideration of such decision by the full Tribunal.

7.    Secretary of the Tribunal
      *Administrative and Financial Regulation 25*

7.1.    The Secretary of the Tribunal is Ms. Luisa Fernanda Torres, Legal Counsel, ICSID, or such other person as ICSID may notify the Tribunal and the parties from time to time.

7.2.    To send copies of communications by email, mail, and courier/parcel deliveries to the ICSID Secretariat, the contact details are:

        Luisa Fernanda Torres
        ICSID
        MSN J2-200
        1818 H Street, N.W.
        Washington, D.C. 20433
        USA
        Tel.: + 1 (202) 473-5018
        Fax: + 1 (202) 522-2615
        Email: ltorresarias@worldbank.org

7.3.    For local messenger deliveries, the contact details are:

        Luisa Fernanda Torres
        701 18th Street, N.W. ("J Building")
        2nd Floor
        Washington, D.C. 20006

*NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V.*
*v. Kingdom of Spain*
(ICSID Case No. ARB/14/11)
**Procedural Order No. 1**

Tel.: + 1 (202) 473-5018

8.  Representation of the Parties
    *Arbitration Rule 18*

    8.1.  Each party shall be represented by its counsel (below) and may designate additional agents, counsel, or advocates by notifying the Tribunal and the Secretary of the Tribunal promptly of such designation.

| For Claimants | For Respondent |
|---|---|
| Ms. Karyl Nairn QC | Mr. Fernando Irurzun |
| Mr. David Kavanagh | Mr. José Luis Gómara |
| Mr. David Herlihy | Mr. Diego Santacruz |
| Ms. Sara Nadeau-Séguin | Ms. Mónica Moraleda |
| Skadden, Arps, Slate, Meagher & Flom (UK) LLP | Mr. Javier Torres |
| | Ms. Ana Rodríguez |
| 40 Bank Street | Abogacía General del Estado |
| London E14 5DS | Ministry of Justice of the Government of Spain |
| United Kingdom | Calle Ayala 5 |
| | 28001, Madrid |
| Emails: | Spain |
| karyl.nairn@skadden.com | Tel. + 00 34 91 390 4689 |
| david.kavanagh@skadden.com | Fax. + 00 34 91 390 4750 |
| david.herlihy@skadden.com | |
| sara.nadeau-seguin@skadden.com | Emails: |
| | aearbitraje@mjusticia.es |
| | FERNANDO.IRURZUN@mjusticia.es |
| | JOSE.GOMARA@mjusticia.es |
| | DIEGO.SANTACRUZ@mjusticia.es |
| | MONICA.MORALEDA@mjusticia.es |
| | JAVIER.TORRES@mjusticia.es |
| | ANA.RODRIGUEZE@mjusticia.es |

9.  Apportionment of Costs and Advance Payments to ICSID
    *Convention Article 61(2); Administrative and Financial Regulation 14; Arbitration Rule 28*

    9.1.  The parties shall defray the direct costs of the proceeding in equal parts, without prejudice to the final decision of the Tribunal as to the allocation of costs.

    9.2.  By letter of January 27, 2015 ICSID requested that each party pay US$ 100,000.00 to defray the initial costs of the proceeding. ICSID received Claimants' payment

of US$ 99,970 on February 26, 2015 and the Respondent's payment of US$ 99,935 on February 24, 2015.

9.3.    ICSID shall request further advances as needed. Such requests shall be accompanied by a detailed interim statement of account.

10.    <u>Place of Proceeding</u>
*Convention Articles 62 and 63; Administrative and Financial Regulation 26; Arbitration Rule 13(3)*

10.1.    Washington, D.C. shall be the place of the proceeding.

10.2.    The Tribunal may hold hearings at any other place that it considers appropriate if the parties so agree.

10.3.    The Tribunal may deliberate at any place it considers convenient.

11.    <u>Procedural Language(s), Translation and Interpretation</u>
*Administrative and Financial Regulation 30(3) and (4); Arbitration Rules 20(1)(b) and 22*

11.1.    English and Spanish are the procedural languages of the arbitration.

*For ICSID Secretariat*

11.2.    Routine, administrative, or procedural correspondence addressed to or sent by the ICSID Secretariat may be in either procedural language.

*For Parties' Pleadings*

11.3.    Any written requests and applications shall be submitted in one procedural language, provided that a translation of such document to the other procedural language is filed within five (5) business days thereafter.[2]

11.4.    Pleadings, expert opinions, witness statements, and any other accompanying documentation (excluding legal authorities) shall be submitted in one procedural language, provided that a translation of such document to the other procedural language is filed within fifteen (15) business days thereafter.

---

[2] The Tribunal takes note of the parties' common understanding expressed during the First Session that, in the event of urgent requests or applications, the translations into the other procedural language shall be provided in a shorter time frame to allow prompt resolution of the matter.

11.5.   If the document is lengthy and relevant only in part, it is sufficient to translate only relevant parts, provided that the Tribunal may require a fuller or a complete translation at the request of any party or on its own initiative.

11.6.   Translations need not be certified unless there is a dispute as to the translation provided and the party disputing the translation specifically requests a certified version.

11.7.   Documents exchanged between the parties under §15 below (Production of Documents) need not be translated and will be exchanged between the parties in the language in which they were originally produced.

*For Hearings*

11.8.   Simultaneous interpretation from one procedural language into the other procedural language shall be available during hearings.  The testimony of a witness called for examination during the hearing who prefers to give evidence other than in the English or Spanish languages shall be interpreted simultaneously into both procedural languages.

11.9.   The parties will notify the Tribunal, as soon as possible, and no later than at the pre-hearing organizational meeting (see §19 below), which witnesses or experts require interpretation.

11.10.  The costs of the interpreter(s) will be paid from the advance payments made by the parties, without prejudice to the decision of the Tribunal as to which party shall ultimately bear those costs.

*For Tribunal's Documents Except the Award*

11.11.  The Tribunal may initially make any order or decision in one procedural language, and subsequently issue that order or decision in the other procedural language. Both language versions shall be equally authentic.

*For Tribunal's Award*

11.12.  The Tribunal shall render the Award in English and Spanish simultaneously.  Both language versions shall be equally authentic.

12.   <u>Routing of Communications</u>
      *Administrative and Financial Regulation 24*

12.1.   The ICSID Secretariat shall be the channel of written communications between the

parties and the Tribunal.

12.2.  Each party's written communications shall be transmitted by email or other electronic means to the opposing party and to the Secretary of the Tribunal, who shall send them to the Tribunal.

12.3.  Electronic versions of communications ordered by the Tribunal to be filed simultaneously shall be transmitted to the Secretary of the Tribunal only, who shall send them to the opposing party and the Tribunal.

12.4.  The Secretary of the Tribunal shall not be copied on direct communications between the parties when such communications are not intended to be transmitted to the Tribunal.

13.  <u>Number of Copies and Method of Filing of Parties' Pleadings</u>
     *Administrative and Financial Regulation 30; Arbitration Rules 20(1)(d) and 23*

13.1.  By the relevant filing date, the parties shall submit by email to the Secretary of the Tribunal and the opposing party an electronic version (without exhibits) of the pleading, witness statements, expert reports and a list of exhibits.[3]  The parties shall upload the pleading with all the supporting documentation to the folder created by ICSID for this case in the World Bank's file sharing system by the following business day.

13.1.1.  The parties shall courier to the <u>Secretary of the Tribunal</u> within the following seven (7) business days:[4]

13.1.1.1.  one <u>unbound</u> hard copy in A4/Letter format[5] of the entire submission, including signed originals of the pleading, witness statements, and expert reports, together with exhibits (but not including legal authorities);

13.1.1.2.  one hard copy in A5 format of the entire submission including the pleading, the witness statements, expert reports, and exhibits (but not including legal authorities); and

13.1.1.3.  two USB drives with full copies of the entire submission, including the pleading, the witness statements, expert reports, exhibits, and legal authorities.

---

[3] Please note that the World Bank server does not accept emails larger than 25 MB.
[4] For the avoidance of doubt, Saturdays and Sundays shall not be considered business days.
[5] The A4/Letter format is required for ICSID's archiving.

13.1.2.  at the same time, courier to the <u>opposing party</u> at the address(es) indicated at §8.1 above

    13.1.2.1.  two hard copies in A4/Letter format of the entire submission including the pleading, the witness statements, expert reports, and exhibits (but not including legal authorities); and

    13.1.2.2.  two USB drives with a full copy of the entire submission, including the pleading, the witness statements, expert reports, exhibits, and legal authorities.

13.1.3.  at the same time, courier to <u>each Member of the Tribunal</u> at the addresses indicated at §2.3 above:

    13.1.3.1.  one hard copy of the entire submission including the pleading, the witness statements, expert reports, and exhibits (but not including legal authorities) in the following formats:  A4/Letter format (Prof. McRae and Prof. Boisson de Chazournes) and A5 format (Mr. Fortier); and

    13.1.3.2.  one USB drive with a full copy of the entire submission, including the pleading, the witness statements, expert reports, exhibits, and legal authorities.

13.2.  Legal authorities shall be submitted in electronic format only, unless a hard copy is specifically requested by the Tribunal.

13.3.  Electronic versions of pleadings, witness statements and expert reports shall be text searchable (i.e., OCR PDF or Word).

13.4.  Pleadings shall be accompanied by an index hyperlinked to the supporting documentation.

13.5.  The official date of receipt of a pleading or communication shall be the day on which the electronic version is sent to the Secretary of the Tribunal.

13.6.  A filing shall be deemed timely if sent by a party by midnight, Washington, D.C. time, on the relevant date.

14.    Number and Sequence of Pleadings
       *Arbitration Rules 20(1)(c), 20(1)(e), 29 and 31*

    14.1.    The proceedings shall consist of a written phase followed by an oral phase.

    14.2.    The sequence of pleadings and relevant dates are set out in **Annex A** hereto.

    14.3.    The parties will include with their Reply and Rejoinder only additional written testimony and documents or other evidence as is necessary to respond to or rebut the matters raised in the other party's immediately previous written pleading.

15.    Production of Documents
       *Convention Article 43(a); Arbitration Rules 24 and 33-36*

    15.1.    The Tribunal will consider the IBA Rules on the Taking of Evidence in International Arbitration 2010 ("**IBA Rules**") as guidelines with respect to any requests for document production.

    15.2.    The document production phase shall be managed through the process described below.

        15.2.1.    Each party may submit a Request to Produce Documents along the lines of Article 3 of the IBA Rules.

        15.2.2.    To the extent not objected to by the parties, each party shall produce the documents as requested by the other party.

        15.2.3.    A party may object to one or more requests in the other party's Request to Produce Documents on the basis of the objections set forth in Article 9(2) or a failure to satisfy any of the requirements in Article 3(3) of the IBA Rules.

        15.2.4.    In the event of an objection as mentioned in the preceding sub-section, the other party may reply to the objection.

        15.2.5.    The Tribunal shall decide on the objections.

        15.2.6.    The request, objection, reply, and decision shall be in the form of a so-called "Redfern Schedule" a template of which is provided as **Annex B**.

        15.2.7.    If and to the extent that the Tribunal rejects the objection, each party shall produce the documents to the other party.

15.3.   The documents produced in this phase shall be directly provided to the other party and not to the Members of the Tribunal or the Secretary of the Tribunal.  These documents shall not be considered as part of the record until one of the parties files them as documentary evidence in accordance with §16.

16.   Submission of Documents
*Convention Article 44; Administrative and Financial Regulation 30; Arbitration Rule 24*

16.1.   The Memorial and Counter-Memorial shall be accompanied by the documentary evidence relied upon by the parties, including exhibits and legal authorities.  Further documentary evidence relied upon by the parties may be submitted in rebuttal with the Reply and Rejoinder.

16.2.   The documents shall be submitted in the manner and form set forth in §13 above.

16.3.   Neither party shall be permitted to submit additional or responsive documents after the filing of its respective last written submission, save under exceptional circumstances at the discretion of the Tribunal upon a reasoned written request followed by observations from the other party.

16.3.1.   Should a party request leave to file additional or responsive documents, that party may not annex the documents that it seeks to file to its request.

16.3.2.   If the Tribunal grants such an application for submission of an additional or responsive document, the Tribunal shall ensure that the other party is afforded sufficient opportunity to make its observations concerning such a document.

16.4.   The Tribunal may call upon the parties to produce documents or other evidence in accordance with ICSID Arbitration Rule 34(2).

16.5.   The documents shall be submitted in the following form:

16.5.1.   Exhibits shall be numbered consecutively throughout these proceedings.

16.5.2.   The number of each Exhibit containing a document produced by Claimants shall be preceded by the letter "C-" for factual exhibits and "CL-" for legal exhibits containing authorities etc.  The number for each Exhibit containing a document produced by Respondent shall be preceded by the letter "R-" for factual exhibits and "RL-" for legal exhibits containing authorities etc.

16.5.3.  Each Exhibit shall have a divider with the Exhibit identification number on the tab.

16.5.4.  A party may produce several documents relating to the same subject matter within one Exhibit, numbering each page of such Exhibit separately and consecutively.

16.5.5.  Exhibits shall also be submitted in PDF format and start with the number "C-0001" and "R-0001," respectively.

16.5.6.  Copies of documentary evidence shall be assumed to be authentic unless specifically objected to by a party, in which case the Tribunal will determine whether authentication is necessary.

16.6.  The parties shall file all documents only once by attaching them to their pleadings. Documents so filed need not be resubmitted with witness statements even if referred to in such statements.

16.7.  Demonstrative exhibits (such as Power Point slides, charts, tabulations, etc.) may be used at any hearing, provided they contain no new evidence. Each party shall number its demonstrative exhibits consecutively, and indicate on each demonstrative exhibit the exhibit number of the document(s) from which it is derived. The party submitting such exhibits shall provide them in hard copy to the other party, the Members of the Tribunal, the Secretary of the Tribunal, the court reporter(s) and interpreter(s) at the hearing.

17.  **Witness Statements and Expert Reports**
     *Convention Article 43(a); Arbitration Rule 24*

17.1.  The Tribunal will consider the IBA Rules as guidelines with respect to witnesses of fact and expert witnesses.

17.2.  Witness statements and expert reports shall be filed together with the parties' pleadings.

17.3.  Documents on which the Party-Appointed Expert relies that have not already been submitted shall be provided with that Expert's report.

17.4.  The Tribunal shall not admit any testimony that has not been filed with the written submissions, unless the Tribunal determines that exceptional circumstances exist.

17.5.  Each witness statement and expert report shall be signed and dated by the witness or expert.

18.   <u>Examination of Witnesses and Experts</u>
      *Arbitration Rules 35 and 36*

18.1.   Additionally to Arbitration Rules 35 and 36, the Tribunal will consider the IBA Rules as guidelines with respect to the examination of witnesses and experts.

18.2.   Each witness whose witness statement has been submitted as aforesaid in §17 shall be available for examination at the Hearing, subject to the provisions of this Procedural Order. Each party is entitled to cross-examine witnesses at the Hearing by notification to the party which has submitted the witness statement and to the Arbitral Tribunal. If the appearance and/or examination of a witness has not been requested, none of the parties shall be deemed to have (i) admitted any facts or opinions stated in the witness statement or (ii) agreed to the correctness of the content of the witness statement. The Tribunal may adopt the conclusions it deems appropriate where no good reason has been given for the failure by a witness to appear or a lack of cooperation by a party to ensure the witness's appearance.

18.3.   The procedure for examining witnesses at the Hearing shall be the following:

   (a)   Before giving evidence, witnesses shall make the declaration set out in ICSID Arbitration Rule 35(2), and experts shall make the declaration set out in ICSID Arbitration Rule 35(3).

   (b)   The witness statement of each witness shall stand in lieu of the examination by the party producing the witness ("direct examination"), subject to paragraph (d) below.

   (c)   The examination shall be limited to matters that have arisen in the witness statements. If a party wishes that the examination covers other subject matters, that party shall provide an advance notification about the additional subject matter(s), explaining why the witness in question is competent to testify on the additional subject matter(s). Should the other party object, the Arbitral Tribunal shall decide whether an expansion of the scope of examination is permissible.

   (d)   Each witness giving oral evidence may first be briefly examined in direct examination. The maximum length of the direct examination of a fact witness shall be 10 minutes.

   (e)   Expert witnesses may give a summary presentation of the conclusions reached in their reports either by way of direct examination or a presentation. The maximum length of time for such direct examination or presentation shall

be agreed between the parties or determined by the Tribunal at its Pre-Hearing Organizational Meeting.

(f)   The direct examination shall be followed by the examination by the other side ("cross-examination"), and subsequently by the party producing the witness ("re-direct examination").

(g)   The re-direct examination shall be limited to matters that have arisen in cross-examination.

(h)   Re-cross examination may be permitted by the Tribunal only upon application of a party.  If the application is granted, the adverse party will be entitled to a re-re-direct examination limited to matters that have arisen in the re-cross examination.

(i)   The Tribunal shall have the right to interject questions during the examination and may ask questions after the re-examination.  Each side shall be afforded the opportunity to ask the witness follow-up questions limited to matters that have arisen during the examination by the Tribunal.

(j)   The Tribunal shall also at all times have complete control over the procedure in relation to a witness giving oral evidence, including the right to limit or deny on its own motion or at the request of a party, the right of a party to examine a witness in direct examination, cross-examination or re-direct if it appears to the Tribunal that such examination or evidence is unlikely to serve any further relevant purpose.

18.4.   The provisions of this §18 also apply to expert witnesses, with the addition that any expert witness report shall attach, or make reference to, if previously exhibited, all documents upon which the report relies.

18.5.   The parties will discuss any additional rules on the examination of witnesses and experts prior to the Pre-Hearing Organizational Meeting and will submit to the Tribunal any issue on which they do not reach an agreement by the date fixed by the Tribunal.

19.   Pre-Hearing Organizational Meetings
*Arbitration Rule 13*

19.1.   A pre-hearing organizational meeting shall be held at a date to be determined by the Tribunal after consultation with the parties, by telephone between the Tribunal, or its President, and the parties in order to resolve any outstanding procedural, administrative, and logistical matters in preparation for the hearing.

20.    Hearings
*Arbitration Rules 20(1)(e) and 32*

    20.1.    The oral procedure shall consist of a hearing for examination of witnesses and experts, if any, and for oral arguments.

    20.2.    The hearing shall be held at a place to be determined.

    20.3.    The hearing shall take place on the dates provided in **Annex A**.

    20.4.    The Members of the Tribunal shall reserve at least one day after the hearing to determine the next steps and to hold deliberations.

    20.5.    The principle of equal time shall be observed at the hearing, subject to any contrary decision by the Tribunal.

    20.6.    Hearings will be closed to the public.  Any petition for the presence of other persons besides the parties, their agents, counsel and advocates, witnesses and experts during their testimony, and officers of the Tribunal shall be decided by the Tribunal in application of Arbitration Rule 32(2).

    20.7.    The hearing shall, as the case may be, proceed as follows:

        (a) Opening Statement by Claimants;
        (b) Opening Statement by Respondent;
        (c) Examination of Claimants' fact witnesses;
        (d) Examination of Respondent's fact witnesses;
        (e) Examination of Claimants' expert witnesses;
        (f) Examination of Respondent's expert witnesses;
        (g) Closing Statement by Claimants;
        (h) Closing Statement by Respondent.

    This matter will be revisited in the event of a bifurcated proceeding.

21.    Records of Hearings and Sessions
*Arbitration Rules 13 and 20(1)(g)*

    21.1.    Sound recordings shall be made of all hearings and sessions.  The sound recordings shall be provided to the parties and the Members of the Tribunal.

    21.2.    Verbatim transcripts in the procedural languages shall be made of any hearing and session other than sessions on procedural issues.  Unless otherwise agreed by the parties or ordered by the Tribunal, the verbatim transcripts shall be available in real-

**Procedural Order No. 1**

time using LiveNote or similar software and electronic transcripts shall be provided to the parties and the Tribunal on a same-day basis.

21.3.   The parties shall agree on any corrections to the transcripts within 21 days of the later of the dates of the receipt of the sound recordings and transcripts.  The agreed corrections may be entered by the court reporter in the transcripts ("revised transcripts").  The Tribunal shall decide upon any disagreement between the parties and any correction adopted by the Tribunal shall be entered by the court reporter in the revised transcripts.

22.   <u>Post-Hearing Memorials and Statements of Costs</u>
      *Convention Article 44; Arbitration Rule 28(2)*

22.1.   The parties will discuss any rules on the post-hearing memorials and statements of costs prior to the Pre-Hearing Organizational Meeting and will submit to the Tribunal any issue on which they do not reach an agreement by the date fixed by the Tribunal.

23.   <u>Publication</u>
      *Convention Article 48(5), Administrative and Financial Regulation 22, Arbitration Rule 48(4)*

23.1.   The ICSID Secretariat shall not publish any ruling issued in the present proceeding without the consent of the parties, unless it has been previously published by any other source.

24.   <u>Other Matters</u>

24.1.   European Commission's Application for Leave to Intervene as a Non-Disputing Party (Arbitration Rule 37(2))

24.1.1.   The Parties shall file written observations on this application on the dates established in **Annex A**.

24.2.   Third Party Funding

24.2.1.   The Tribunal takes note that, at Respondent's counsel request, Claimants' counsel confirmed during the First Session that no third party funding arrangement is in place for this arbitration.

*NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V.*
*v. Kingdom of Spain*
(ICSID Case No. ARB/14/11)
**Procedural Order No. 1**

For and on behalf of the Tribunal,

Donald M. McRae
President of the Tribunal
Date: 21 May 2015