## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NEXTERA ENERGY GLOBAL HOLDINGS B.V. AND NEXTERA ENERGY SPAIN HOLDINGS B.V. ,

                Petitioners,

     v.

KINGDOM OF SPAIN,

                Respondent.

Civil Action No. 19-cv-01618-TSC

## MEMORANDUM OF LAW IN OPPOSITION TO PETITIONERS' RENEWED (AND SUPPLEMENTAL) MOTION FOR SUMMARY JUDGMENT

Eamon P. Joyce (D.C. Bar No. 483127)
Simon Navarro (admitted *pro hac vice*)
Tyler J. Domino (D.C. Bar No. 1619758)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-8555
Fax: (212) 839-5599
ejoyce@sidley.com
snavarro@sidley.com
tdomino@sidley.com

Carter G. Phillips (D.C. Bar No. 264176)
Peter A Bruland (D.C. Bar No. 1600717)
Cody M. Akins (D.C. Bar No. 90012255)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
cphillips@sidley.com
pbruland@sidley.com
cakins@sidley.com

*Attorneys for Respondent Kingdom of Spain*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

    A.    Spain's Renewable-Energy Subsidies and the Energy Charter Treaty .................. 3

    B.    European Union Law ............................................................................................ 5

        1.    The legal order of the European Union ...................................................... 5

        2.    EU law prohibits Member States from arbitrating with each other's nationals. ... 6

        3.    EU law prohibits Member States from providing "state aid." ................. 10

    C.    Arbitration Proceedings ..................................................................................... 11

    D.    U.S. Proceedings ............................................................................................... 13

STANDARD OF REVIEW ............................................................................................... 14

ARGUMENT ................................................................................................................... 15

I.    THE AWARD IS NOT ENTITLED TO FULL FAITH AND CREDIT BECAUSE THE ARBITRATORS LACKED JURISDICTION. ............................................................. 15

    A.    There Was No Agreement to Arbitrate Between Spain and Petitioners. ............. 16

        1.    It is the Court's role to determine whether the Arbitral Tribunal had jurisdiction based on a valid agreement to arbitrate. ................................ 16

        2.    EU law governs Spain's capacity to arbitrate. .......................................... 18

        3.    EU law barred any arbitration agreement here. ........................................ 19

        4.    General treaty interpretation principles yield the same result. ................. 21

    B.    The Arbitrators Exceeded Any Authority They Did Have by Awarding State Aid. ....................................................................................................... 22

II.    THE FOREIGN SOVEREIGN COMPULSION DOCTRINE BARS ENFORCEMENT OF THE AWARD ........................................................................................................ 24

III.    PETITIONERS INACCURATELY CHARACTERIZE THE INTEREST AWARD. ..... 25

CONCLUSION ................................................................................................................ 27

# TABLE OF AUTHORITIES

**Page(s)**

## U.S. Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................................................14

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*,
  138 S. Ct. 1865 (2018)......................................................................................18, 19

*Assocs., Inc. v. Alemayehu*,
  934 F.3d 245 (2d Cir. 2019)...................................................................................17

*Athridge v. Rivas*,
  141 F.3d 357 (D.C. Cir. 1998)...............................................................................15

*BG Grp., PLC v. Republic of Argentina*,
  572 U.S. 25 (2014)..................................................................................................21

*Blasket Renewable Invs., LLC v. Kingdom of Spain*,
  No. 23-cv-2701, 2024 WL 4298808 (D.D.C. Sept. 26, 2024)..........................24, 26

*Blinder, Robinson & Co. v. SEC*,
  837 F.2d 1099 (D.C. Cir. 1988).............................................................................16

*Caremark, LLC v. Chickasaw Nation*,
  43 F.4th 1021 (9th Cir. 2022)................................................................................17

*China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*,
  334 F.3d 274 (3d Cir. 2003)..............................................................................17, 18

*Danforth v. Minnesota*,
  552 U.S. 264 (2008)................................................................................................20

*Dist. No. 1 v. Liberty Mar. Corp.*,
  998 F.3d 449 (D.C. Cir. 2021)...............................................................................17

*Field Intel. Inc. v. Xylem Dewatering Sols. Inc.*,
  49 F.4th 351 (3d Cir. 2022) ...................................................................................17

*First Options of Chi., Inc. v. Kaplan*,
  514 U.S. 938 (1995)................................................................................................18

*FTC v. Compagnie de Saint-Gobain-Pont-à-Mousson*,
  636 F.2d 1300 (D.C. Cir. 1980).............................................................................24

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
    561 U.S. 287 (2010).........................................................................................17

*Hilton v. Guyot*,
    159 U.S. 113 (1895).........................................................................................24

*Holcomb v. Powell*,
    433 F.3d 889 (D.C. Cir. 2006) ........................................................................14

*Lamps Plus, Inc. v. Varela*,
    139 S. Ct. 1407 (2019)....................................................................................22

*Medellín v. Texas*,
    552 U.S. 491 (2008).........................................................................................21

*\*NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*,
    112 F.4th 1088 (D.C. Cir. 2024) ............................................................ *passim*

*Radtke v. Caschetta*,
    254 F. Supp. 3d 163 (D.D.C. 2017) ................................................................26

*Ratner v. Chem. Bank New York Tr. Co.*,
    329 F. Supp. 270 (S.D.N.Y. 1971) .................................................................26

*Ret. Sys. v. Olver*,
    589 F.3d 1292 (D.C. Cir. 2009) ......................................................................19

*In re Sealed Case*,
    825 F.2d 494 (D.C. Cir. 1987) ........................................................................24

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
    559 U.S. 662 (2010).........................................................................................22

*Taylor v. Fannie Mae*,
    839 F. Supp. 2d 259 (D.D.C. 2012) ................................................................23

*TECO Guatemala Holdings, LLC v. Republic of Guatemala*,
    414 F. Supp. 3d 94 (D.D.C. 2019) ..................................................................15

*Underwriters Nat'l Assur. Co. v. N. Carolina Life & Acc. & Health Ins. Guar. Ass'n*,
    455 U.S. 691 (1982).........................................................................................15

*Usoyan v. Republic of Turkey*,
    6 F.4th 31 (D.C. Cir. 2021)..............................................................................24

*Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela*,
    87 F.4th 510 (D.C. Cir. 2023) .........................................................................15

*In re Vivendi Universal, S.A. Secs. Litig.*,
  284 F.R.D. 144 (S.D.N.Y. 2012) ........................................................26

*W.C. & A.N. Miller Cos. v. United States*,
  173 F.R.D. 1 (D.D.C. 1997), *aff'd sub nom. Hicks v. United States*, 1999 WL
  414253 (D.C. Cir. May 17, 1999) ........................................................15

**European Authorities**

*Budějovický Budvar v. Rudolf Ammersin GmbH*,
  ECLI:EU:C:2009:521 ........................................................5, 19

*Comm'n v. Eur. Food SA*,
  ECLI:EU:C:2022:50 ........................................................8, 11, 20

*Comm'n v. Ireland*,
  ECLI:EU:C:2006:345 ........................................................6, 7, 19, 20

*Declaration on the Legal Consequences of the Judgment of the Court of Justice in*
  Komstroy *and Common Understanding on the Non-Applicability of Article 26*
  *of the Energy Charter Treaty as a Basis for Intra-EU Arbitration Proceedings*
  (Aug. 6, 2024) ........................................................9, 19, 22

*Declaration of the Representatives of the Governments of the Member States on*
  *the Legal Consequences of the Judgment of the Court of Justice in* Achmea
  *and on Investment Protection in the European Union* (Jan. 15, 2019) ......................8

*In re ECHR*,
  ECLI:EU:C:2014:2454 ........................................................5, 6

*Elcogás SA v. Administración del Estado*,
  ECLI:EU:C:2014:2314 ........................................................10

Eur. Comm'n, *Communication on the Protection of Intra-EU Investment* (July 7, 2018),
  https://bit.ly/2J7h7hd ........................................................7

Eur. Comm'n Decision 2015/1470 (Mar. 30, 2015) ........................................................25

Eur. Comm'n Decision 2017/7384 (Nov. 10, 2017) ........................................................11, 22, 25

*Kadi v. Council*,
  ECLI:EU:C:2008:461 ........................................................5

*Koninkrijk Spanje v. AES Solar Energy Coöperatief U.A.*,
  ECLI:NL:RBAMS:2025:732 ........................................................23

*Poland v. PL Holdings Sàrl*,
  ECLI:EU:C:2021:875 ........................................................6, 19, 20

*Republic of Moldova v. Komstroy LLC,
    ECLI:EU:C:2021:655 ................................................................................ passim

*Slovak Republic v. Achmea B.V.,
    ECLI:EU:C:2018:158 ................................................................................ passim

Slovak Republic v. Achmea B.V. (Achmea II),
    Case No. I ZB 2/15 (2018) (Ger.) .......................................................7, 20

**Statutes & Rules**

*22 U.S.C. § 1650a(a)............................................................1, 13, 15, 16

Consolidated Version of the Treaty on the Functioning of the EU (TFEU)........................ passim

*Energy Charter Treaty (ECT) ............................................................ passim

Fed. R. Civ. P. 56(a) ............................................................14

**Other Authorities**

Black's Law Dictionary (12th ed. 2024)........................................................26

Eur. Comm'n Brief in NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain,
    112 F.4th 1088 (D.C. Cir. 2024), 2023 WL 3863247............................................19

Mark P. Cussen, Interest Rates Explained: Nominal, Real, and Effective,
    Investopedia (updated Jan. 15, 2025), https://www.investopedia.com/articles/
    investing/082113/understanding-interest-rates-nominal-real-and-effective.asp ...................26

Restatement (Third) of Foreign Relations Law § 441 (1987)........................................24

Restatement (Fourth) of Foreign Relations Law § 442 (2018)....................................24

Restatement (Third) U.S. Law of Int'l Com. Arb. § 2.8............................................18

Spain's Financial Crisis Claims Another Victim: The Solar Power Industry,
    Guardian (Mar. 30, 2011), https://bit.ly/40XAGgE..................................................4

# INTRODUCTION

Spain did not—and cannot—agree to arbitrate disputes with nationals of the European Union ("EU").  EU law bars Spain and other Member States from doing so.  And because Spain cannot arbitrate intra-EU disputes, it never formed an agreement to arbitrate *this* intra-EU dispute. Petitioners do not dispute the facts of EU law.  But to avoid its application, Petitioners brought this enforcement action not in their home country of the Netherlands, but rather abroad in the United States—a forum that has no connection to the parties or their dispute.

After holding that jurisdiction exists under the Foreign Sovereign Immunities Act ("FSIA"), the D.C. Circuit emphasized that it "[took] no position on the ultimate enforceability of these awards."  *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1105 (D.C. Cir. 2024).  Rather, it was for district courts to determine "the merits question whether [the Energy Charter] Treaty's arbitration provision extends to EU nationals and thus whether Spain ultimately entered into legally valid agreements with the companies." *Id.* at 1104.  Spain now presents that unanswered "merits question,"  which EU law answers clearly:  Spain did not and could not offer to arbitrate with nationals of an EU Member State and, accordingly, there was no valid arbitration agreement and the resulting arbitration award is unenforceable.

Petitioners contend that, now that the D.C. Circuit has resolved the sovereign immunity issue, "[t]here remains no other basis for Spain to contest the Award" because it is entitled to full faith and credit.  ECF No. 98-1 at 5 ("Pet'rs' Suppl. MSJ") (citing 22 U.S.C. § 1650a(a)); *see also* ECF No. 96-1 at 3 ("Pet'rs' Renewed MSJ").  But the Court must determine whether the award is actually entitled to "full faith and credit" by considering the issues the D.C. Circuit flagged.  *See* 22 U.S.C. § 1650a(a).  "The *pecuniary obligations* imposed by" an ICSID arbitral award are entitled to full faith and credit only if they would be recognized as "a final judgment of a court of general jurisdiction of one of the several States." *Id.*  But the arbitration tribunal's assessment of

its own jurisdiction is a *non-pecuniary* aspect of the award and thus is not afforded any deference. *Id.* And, on that basis, federal courts should decline to enforce judgments where, as here, the original tribunal lacked jurisdiction.

Petitioners sought to initiate arbitration by accepting a purported offer to arbitrate in the Energy Charter Treaty ("ECT"), a multilateral investment treaty among fifty-three contracting parties, including Spain, a majority of the Member States of the EU, and the EU itself. But as the EU and its Member States have long maintained—since well before Petitioners brought their claims—the ECT's arbitration provision does not extend to disputes between Member States and nationals of Member States. Those disputes must be heard before EU courts.

Petitioners thus proceeded at their own risk when they chose arbitration—if the Member States were right about the ECT's arbitration provisions, any resulting award would be unenforceable. That risk materialized: In its *Achmea* and *Komstroy* decisions, the EU's highest court, the Court of Justice, held that such arbitration provisions are incompatible with EU law and void *ab initio*. In other words, under binding EU law, the ECT does not contain a valid offer to arbitrate on the part of Spain. That means the arbitral tribunal lacked jurisdiction over Spain because there was no offer for Petitioners to accept and no agreement to arbitrate. Moreover, the tribunal lacked subject-matter jurisdiction to issue an award of unlawful state aid.

In addition, enforcing the award would violate the foreign sovereign compulsion doctrine. Under EU law, payment of the award is unlawful because it would (i) constitute state aid that has not been approved by the European Commission and which Spain is therefore prohibited from paying; and (ii) compel Spain to violate decisions of the Court of Justice. Comity requires that U.S. courts not take action that would cause the violation of another nation's laws.

And in the almost-two years since the parties' last briefing in this case, intervening EU developments have only reinforced that the arbitrators who issued Petitioners' award lacked the

jurisdiction to do so because Spain could not and did not agree to arbitrate. Scores of EU courts have refused to enforce intra-EU awards like the one at issue here. *Infra* pp. 19–20. The EU and twenty-six of its Member States reiterated just last year that the ECT "could not" and "cannot" provide "a legal basis" for intra-EU arbitration. *Infra* pp. 9, 19–23. And various Member States have recently opted to withdraw from the ECT altogether partly because rogue arbitrators have nonetheless issued *ultra vires* intra-EU arbitral awards. *Infra* p. 10.

Basic tenets of EU law render Petitioners' award unenforceable. This Court should refuse Petitioners' gamesmanship in running to a U.S. court with no connection to this dispute to avoid binding law in its own country, deny Petitioners' motion for summary judgment, and dismiss their Petition with prejudice instead.

## BACKGROUND

This enforcement action arises out of an arbitration initiated by a Dutch company against Spain, alleging Spain violated the ECT when it modified its subsidy regime for renewable energy projects in the country. That proceeding was administered by the International Centre for the Settlement of Investment Disputes ("ICSID") and registered as Case No. ARB/14/11. The Tribunal issued an award against Spain on May 31, 2019, *see* ECF No. 1-4 (the "Award"). Petitioners filed this action to enforce the Award on June 3, 2019. *See* ECF No. 1 (the "Petition").

### A.    Spain's Renewable-Energy Subsidies and the Energy Charter Treaty

For years, Spain has supported the development of domestic renewable energy production in accordance with its national interests and the EU's binding objectives that EU Member States produce clean energy and reduce greenhouse gases. *See* Annex A to the Award ¶¶ 100–04, 108, 111. To further these objectives, Spain enacted a special subsidies regime in 1997 that guaranteed investors "reasonable rates of return" to encourage the production of renewable energy. *Id.* ¶¶ 102–10, 115. But the industry stalled notwithstanding these subsidies; so, in 2007, Spain

enhanced its subsidies to boost renewable energy projects by increasing the guaranteed rates of return for those projects.  *Id.* ¶¶ 116, 118–22.

In 2008, Petitioners invested in solar farms in Spain.  Petition ¶ 13; Annex A to the Award ¶ 94.  They purportedly expected the new Spanish subsidies to guarantee a risk-free, annual return above 11%.  Annex A to Award ¶ 437.  But then came the Great Recession.  Spain's unemployment rate increased and, alongside the economic slump, demand for electricity plummeted.  *Id.* ¶¶ 486, 563.  Spain's billions of euros in annual subsidies for renewable energy— and the associated windfall profits for investors—put the Spanish electrical system at risk of financial collapse.  *See id.* ¶¶ 128–30, 486; *see also* Tim Webb, *Spain's Financial Crisis Claims Another Victim: The Solar Power Industry*, Guardian (Mar. 30, 2011), https://bit.ly/40XAGgE.  In response, Spain moved to "control the cost" of its energy subsidies, including by reforming some subsidy programs from which Petitioners benefitted.  *See* Annex A to Award ¶¶ 129, 134–48.  But Spain still aimed to apply "the principle of reasonable return" to domestic and foreign investors alike.  *See id.* ¶ 473.  Still, Petitioners claimed that Spain's energy-sector reforms negatively impacted their investments, violating Spain's obligations under the ECT.

Signed in 1994, the ECT provides legal safeguards for investment in energy projects, including signatories' promise to treat foreign investors fairly and equitably.  ECT art. 10, ECF No. 1-6.  Petitioners accuse Spain of breaking that promise by modifying the subsidies for their solar farms.  *See* Petition ¶¶ 13–15.

To enforce its protections, the treaty includes an offer by signatory nations to investors from other signatory nations to resolve disputes via either litigation or arbitration.  ECT art. 26(2)– (3), (4)(a)(i).  Investors who choose arbitration can accept a signatory nation's standing offer by filing a request for arbitration with various international arbitral bodies, including ICSID.  *Id.*  But

arbitrations must occur "in accordance with th[e] Treaty and applicable rules and principles of international law." *Id.* art. 26(6).

### B.    European Union Law

This case centers on European Union law—the supreme law for EU Member States like Spain and the Netherlands, as well as Petitioners and other companies organized under EU Member States' laws. EU law constrains investors' options for enforcing the ECT, including with respect to Spain's renewable-energy subsidies.

### 1.    The legal order of the European Union.

Spain is one of the twenty-seven Member States of the European Union. European Union law—which derives from various EU treaties, *i.e.*, "international agreement[s] between the Member States"—supplants any contrary national laws or other international agreements. *Slovak Republic v. Achmea B.V.*, Case No. C-284/16, ECLI:EU:C:2018:158 ¶ 41 (Mar. 6, 2018) (attached as Exhibit 5 to Suppl. Decl. of Prof. Steffen Hindelang ("Suppl. Hindelang Decl.") (February 13, 2025)). EU law takes "primacy over the laws of the Member States." *In re ECHR*, Opinion 2/13, ECLI:EU:C:2014:2454 ¶ 166 (Dec. 18, 2014), Suppl. Hindelang Decl. Ex. 25.

Even international agreements between EU Member States "cannot apply in the relations between those States" if they contravene EU law. *Budějovický Budvar v. Rudolf Ammersin GmbH*, Case No. C-478/07, ECLI:EU:C:2009:521 ¶ 98 (Sept. 8, 2009), Suppl. Hindelang Decl. Ex. 14; *accord In re ECHR* ¶ 201. The same rule applies when non-EU states join the agreement: An "international agreement cannot affect the … autonomy of the [EU] legal system." *Kadi v. Council*, Case Nos. C-402/05 P and C-415/05 P, ECLI:EU:C:2008:461 ¶ 282 (Sept 3, 2008), Suppl. Hindelang Decl. Ex. 20. Between Member States, EU law reigns supreme.

### 2. EU law prohibits Member States from arbitrating with each other's nationals.

The European Court of Justice—the EU's Supreme Court—has held that the ECT's arbitration provision would contravene EU law as applied between investors from one EU member and other EU states. *Republic of Moldova v. Komstroy LLC*, Case No. C-741/19, ECLI:EU:C:2021:655 ¶ 66 (Sept. 2, 2021), Suppl. Hindelang Decl. Ex. 9. Under EU law, the treaty simply does not authorize EU members like Spain to offer to arbitrate with other EU nationals—so the treaty by definition cannot create an agreement to arbitrate. *See Achmea* ¶ 60.

The problem is this: a "keystone" of the EU legal system is the "uniform interpretation of EU law." *In re ECHR* ¶ 176. Thus, the European Court of Justice enjoys "exclusive jurisdiction" over EU-law questions. *Comm'n v. Ireland*, Case No. C-459/03, ECLI:EU:C:2006:345 ¶ 123 (May 30, 2006), Suppl. Hindelang Decl. Ex. 23. No other court or dispute-resolution forum— including arbitrators—can interpret EU law unless the Court of Justice can review those decisions. EU Member States expressly agreed in a foundational EU treaty "not to submit a dispute concerning the interpretation or application of the [EU] Treaties to any method of settlement" outside the EU judicial system. Consolidated Version of the Treaty on the Functioning of the European Union ("TFEU"), art. 344, Oct. 26, 2012, 2012 O.J. (C 326) 202/194 (first adopted in 1957), Suppl. Hindelang Decl. Ex. 4.

Arbitrations between EU members, however, put EU-law questions outside the Court of Justice's reach. *Poland v. PL Holdings Sàrl*, Case No. C-109/20, ECLI:EU:C:2021:875 ¶ 45 (Oct. 26, 2021), Suppl. Hindelang Decl. Ex. 8. Because EU law comprehensively regulates EU Member States' treatment of each other's nationals, intra-EU arbitrations would almost always implicate EU-law issues. *Achmea* ¶¶ 33, 41. Arbitrators would be called upon "to interpret, and even apply, EU law." *Komstroy* ¶ 50. But unlike the "court[s] or tribunal[s] of a Member State," arbitrators

6

cannot refer EU-law questions to the Court of Justice. *Achmea* ¶ 49. Nor do EU members' courts review arbitral awards de novo. *Id.* ¶ 53. Intra-EU arbitration thus risks having arbitrators resolve EU law, which jeopardizes the "consistency and uniformity . . . of EU law" that the EU treaties require. *Id.* ¶ 35.

As a result, the European Court of Justice has repeatedly voided treaty provisions that purport to authorize arbitrations between EU members, or between an EU member and nationals of another EU member. In 2006, the Court held that Ireland "breach[ed]" its EU treaty obligations by attempting to initiate arbitration against the United Kingdom (pre-Brexit) under the United Nations Convention on the Law of the Sea. *Ireland* ¶¶ 132–38, 184.

The Court of Justice's *Achmea* decision confirmed that EU Member States cannot offer to arbitrate with each other's investors, and voided such offers as contrary to EU law. *Achmea* held that, under "settled case-law," the EU treaties "preclud[ed]" an arbitration "provision in an international agreement concluded between Member States." *Achmea* ¶¶ 31–33, 62.

*Achmea* involved an investment treaty between Slovakia and the Netherlands. *Id.* ¶ 2. Dutch companies obtained an arbitral award against Slovakia, which moved to set aside the award in Germany. *Id.* ¶¶ 7, 9–12. Siding with Slovakia, the Court of Justice deemed the arbitration provision void: Any arbitration in which arbitrators might interpret EU law infringed "the autonomy of EU law." *Id.* ¶ 59. On remand, Germany's high court accordingly overturned the arbitral award because no "arbitration agreement exist[ed] between the parties." *Slovak Republic v. Achmea B.V.* (*Achmea II*), Case No. I ZB 2/15 (2018) (Ger.) ¶ 27, Suppl. Hindelang Decl. Ex. 84.

Thereafter, the European Commission and twenty-two Member States (including Spain and the Netherlands) recognized that *Achmea* foreclosed *all* intra-EU arbitration, including under the ECT. Eur. Comm'n, *Communication on the Protection of Intra-EU Investment* 2–4 (July 7,

2018), https://bit.ly/2J7h7hd; *Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in* Achmea *and on Investment Protection in the European Union* 1 (Jan. 15, 2019), ECF No. 15-58 (attached as Exhibit 52 to Decl. of Prof. Steffen Hindelang ("First Hindelang Decl.") (Oct. 11, 2019)).

The European Court of Justice's *Komstroy* decision expressly confirmed that intra-EU arbitration under the ECT is impermissible. The Court explained that, because the EU itself ratified the ECT, that treaty "is an act of EU law" as applied between Member States. *Komstroy* ¶¶ 23, 49. Arbitral panels formed under the ECT thus do not just run the risk of interpreting EU law (as in *Achmea*)—they are *required* to interpret EU law. *Id.* ¶ 50. But arbitrators have no way to refer questions to the Court of Justice or otherwise guarantee the uniformity of EU law. *Id.* ¶¶ 52–53. The Court of Justice thus held that the ECT's arbitration provision "must be interpreted as *not being applicable* to disputes between a Member State and an investor of another Member State." *Id.* ¶ 66 (emphasis added).

The Court of Justice's *European Food* decision confirmed that EU law prohibits intra-EU arbitration under the ICSID Convention. *Comm'n v. Eur. Food SA*, Case No. C-638/19 P, ECLI:EU:C:2022:50 ¶¶ 142–46 (Jan. 25, 2022), Suppl. Hindelang Decl. Ex. 53. Because the ICSID Convention places awards beyond "any review by a court of a Member State as to its compliance with EU law," intra-EU ICSID arbitrations are incompatible with EU law. *Id.* ¶ 142. The EU treaties "replaced [the ICSID] arbitration procedure" with a "system of judicial remedies" in European courts. *Id.* ¶ 145. Thus, ICSID arbitrations between EU members and EU nationals are prohibited. *See id.* ¶¶ 144–46 (explaining that ICSID arbitrations between EU members and EU nationals are incompatible).

Accordingly, EU courts have consistently "declined [to] enforc[e] intra-EU ICSID award[s]." Suppl. Hindelang Decl. ¶ 36 & n.73. Indeed, courts in France, Sweden, and

Luxembourg have recently "set aside" or "invalid[ated] intra-EU awards" like Petitioners' because, without a "valid arbitration agreement," such awards lack a "valid legal basis." *Id.* ¶¶ 35–36 (citations omitted).

Finally, on June 26, 2024, the EU and twenty-six of its Member States issued a formal declaration regarding the interpretation and application of the ECT as between them. *Id.* ¶¶ 26–31. "Regretting that [intra-EU ECT] arbitral awards are the subject of enforcement proceedings, including in third countries, that in pending intra-EU arbitration proceedings purportedly based on Article 26 of the Energy Charter Treaty arbitral tribunals do not decline competence and jurisdiction, and that arbitration institutions continue to register new arbitration proceedings and do not reject them as manifestly inadmissible due to lack of consent to submit to arbitration," the signatories "reaffirm[ed], for greater certainty," their "common understanding on the interpretation and application of the [ECT]"—that it "cannot and never could serve as a legal basis for intra-EU arbitration proceedings." *Declaration on the Legal Consequences of the Judgment of the Court of Justice in* Komstroy *and Common Understanding on the Non-Applicability of Article 26 of the Energy Charter Treaty as a Basis for Intra-EU Arbitration Proceedings* 4 (Aug. 6, 2024) ("2024 Decl."), Suppl. Hindelang Decl. Ex. 27. It "reiterate[s], expressly and unambiguously, the consistent position of the European Union and its Member States" that Article 26 of the ECT "could not in the past, and cannot now or in the future serve as a legal basis" for intra-EU arbitration. *Id.* at 2–3. In short, this declaration makes clear that the ECT is "an instrument of the European Union's external energy policy" that was never intended to unsettle the foundational primacy of the EU legal order. *Id.* at 2.

Thus, under the Court of Justice's precedents and Member States' consistent position, the ECT's guarantees remain in force. Investors from non-EU signatories can still invoke the arbitration provision against any EU signatory and EU investors can still arbitrate with the non-

EU signatories.  The ECT's standing offer to arbitrate is inapplicable only "in an intra-EU context," *i.e.*, when investors from EU Member States try to arbitrate with another EU Member State.  Suppl. Hindelang Decl. ¶ 26, 39–45.  Investors in that situation—like Petitioners here—can litigate their disputes in court.  *See, e.g.*, ECT art. 26(2)(a), Dec. 17, 1994, 2080 U.N.T.S. 95, Suppl. Hindelang Decl. Ex. 6 ("[T]he Investor party to the dispute may choose to submit it for resolution . . . to the courts or administrative tribunals of the Contracting Party.").  But EU law is clear that arbitration is not an option.  *See* Suppl. Hindelang Decl. ¶¶ 26–34.

Arbitrators have nonetheless continued to issue *ultra vires* intra-EU arbitral awards.  *See* Suppl. Hindelang Decl. ¶ 25.  The proliferation of such awards is one of the reasons various Member States, including France, Germany, Poland, Luxembourg, the Netherlands (NextEra's home country), Portugal, Slovenia, and Spain, have opted to "withdraw from the ECT altogether" since "investor-State arbitration on the basis of the ECT" between EU Member States was "never . . . envisaged" by ECT signatories. *Id.*

### 3.    EU law prohibits Member States from providing "state aid."

EU law also forecloses challenges to Spain's energy subsidies on the merits.  As noted, EU law supplants any contrary national law.  *Achmea* ¶¶ 32, 41.  And, under EU law, the renewable-energy subsidies Petitioners received were unlawful.

EU Member States cannot provide government subsidies (called "state aid") that "distort[] or threaten[] to distort competition."  TFEU art. 107(1).  Member States must report any aid in advance to the European Commission, which determines whether the aid would distort competition.  *Id.* at art. 108(2)–(3).  Absent Commission preapproval, the aid is unlawful.  *Id.* art. 108(3).

In 2014, the Court of Justice determined that Spain's longstanding subsidy regime amounted to "aid."  *Elcogás SA v. Administración del Estado*, Case No. C-275/13,

ECLI:EU:C:2014:2314 ¶ 33 (Oct. 22, 2014), Suppl. Hindelang Decl. Ex. 74; *see also* Suppl. Hindelang Decl. ¶ 49 & n.99. Spain self-reported to the European Commission, which found that Spain's subsidies were "state aid" and that Spain had "breached" EU law by not seeking preapproval. Eur. Comm'n Decision 2017/7384, at 20 (Nov. 10, 2017), Suppl. Hindelang Decl. Ex. 73. The Commission authorized these subsidies prospectively, but declared past, unapproved subsidies illegal. *Id.* at 20, 34. The Commission cautioned Spain that paying any arbitral award to investors would itself be illegal state aid absent preapproval. *Id.* at 32.

As a result, Spain, as an EU Member State, cannot pay any such award without the European Commission's prior review and authorization. *See* Suppl. Hindelang Decl. ¶¶ 49, 52, 56. EU law thus bars recovery for purported losses from Spain's withdrawal of subsidies unless and until the Commission authorizes Spain to pay out the Award. *See* First Hindelang Decl. ¶¶ 57–65 (courts in the European Union decline to enforce arbitral awards when, as here, doing so would violate state aid laws). If Spain pays out the Award before then, the Commission could bring infringement proceedings against Spain, where Spain risks being subject to financial sanctions that could "easily run into hundreds of millions of euros." Suppl. Hindelang Decl. ¶ 59.

## C.    Arbitration Proceedings

Dissatisfied with Spain's modified subsidies, Petitioners could have sued Spain in Spanish courts pursuant to the Energy Charter Treaty. *See* ECT art. 26(2)(a). But Petitioners would have been subject to EU law that forecloses their claims.

Instead, in May 2014, Petitioners requested arbitration under the ICSID rules—arbitral procedures the Court of Justice has deemed unlawful due to arbitrators' inability to refer EU-law questions to that Court, *see Eur. Food* ¶¶ 142–46. Spain objected to the arbitrators' jurisdiction, explaining that EU law precludes the formation of any putative arbitration agreement among EU members (here, Spain and EU nationals like Petitioners). Annex A to Award ¶¶ 187, 272–89.

Spain added that the parties' dispute implicated the European Commission's EU-law determination that the subsidies granted by Spain constituted state aid.  *Id.* ¶¶ 510–17.

In May 2019, the arbitrators expressly disagreed with the European Court of Justice about EU law and rejected Spain's jurisdictional objections.  The arbitrators dismissed the Court of Justice's holding in *Achmea* that the EU treaties require EU judges—not arbitrators—to decide EU law.  *Id.* ¶¶ 342, 349–51, 357.  The arbitrators also limited *Achmea*'s prohibition on intra-EU arbitration to bilateral agreements between EU members, not to the multilateral ECT.  *Id.* ¶ 342. Although the arbitrators noted Spain's state aid argument, *id.* ¶¶ 389-90, they chose not to apply the EU state aid law when evaluating the context of the specific issues raised under ECT.  Decision on Annulment, ¶¶ 262–67 ("Annulment Decision"), ECF No. 59-1.  In the end, the ICSID panel ruled for Petitioners and awarded approximately 290 million euros, plus costs and interest.  Award ¶¶ 37.

Consistent with its EU-law obligations, Spain promptly reported the Award to the European Commission for a ruling on whether paying the Award would violate the EU's state-aid laws.  The Commission has not yet issued its ruling.

In April 2020, Spain applied to ICSID to annul the arbitral award as a "manifest excess" of the arbitrators' powers.  *See* Annulment Decision ¶ 67; *see also* ICSID Convention art. 52(1)(b), (e), Mar. 18, 1965, 575 U.N.T.S. 159, Suppl. Hindelang Decl. Ex. 46.  The ICSID annulment committee dismissed Spain's application in March 2022.  Annulment Decision ¶ 526.  In doing so, the committee upheld the arbitrators' exercise of jurisdiction on the ground that the arbitrators were free to defy the EU principle of primacy because the ECT—not EU law—gave the arbitrators their powers.  *Id.* ¶¶ 229–34.  The committee awarded Petitioners $3.5 million in legal fees and expenses, with interest "at the rate of 0.234% compounded monthly."  *Id.* ¶ 533(3).

### D.    U.S. Proceedings

Petitioners could have sought to collect and enforce their arbitral award in Europe—where the underlying events occurred.  But again, EU law would have obligated the European courts to decline enforcement, both because EU law precluded Spain from forming an arbitration agreement with Petitioners and because ordering Spain to pay the Award absent Commission preapproval would be illegal state aid.

Instead, in June 2019, Petitioners filed this action to confirm and enforce their award against Spain.  Petitioners selected this forum even though the United States never signed the ECT and has nothing to do with Spain's energy subsidies.  Petitioners invoked legislation implementing the ICSID Convention, 22 U.S.C. § 1650a(a), under which U.S. courts enforce the "pecuniary obligations imposed by" an award rendered by ICSID arbitrators as if the award were a state-court "final judgment."  *See* Petition ¶¶ 22–29.

In October 2019, Spain filed a motion to dismiss the Petition.  *See* ECF No. 15.  The Court denied Spain's motion to dismiss without prejudice but stayed the case pending the ICSID annulment proceedings.  ECF Nos. 38-39.  The Court lifted that stay in April 2022, after ICSID rejected Spain's annulment application.  Apr. 29, 2022 Minute Order.  Spain then renewed its motion to dismiss, *see* ECF No. 62, which the Court denied in February 2023, holding that it had jurisdiction over Spain under the FSIA's arbitration exception.  ECF No. 84 at 7–14.  Shortly thereafter, Spain appealed to the D.C. Circuit.  ECF No. 87.

On August 16, 2024, the D.C. Circuit issued its decision in this case, holding that jurisdiction exists under the FSIA's arbitration exception because the ECT itself is an "arbitration agreement" that is "for the benefit of" private investors and therefore satisfies the FSIA's requirement that an arbitration agreement exists, though not necessarily between these two parties.

13

*NextEra*, 112 F.4th at 1102–03.[1]  But the D.C. Circuit was clear about the limits of its holding and the need for further proceedings:

> [W]e hold only that the district courts have jurisdiction to enforce these arbitration awards.  That does not mean they must or should do so.  By basing jurisdiction on the Energy Charter Treaty as an agreement "for the benefit" of foreign investors, ***we do not address the merits question*** whether that Treaty's arbitration provision extends to EU nationals and thus whether Spain ultimately entered into legally valid agreements with the companies.

*Id.* at 1104 (emphasis added).  Spain presents that unanswered "merits question" here.

Upon remand, Petitioners moved to renew summary judgment.  ECF No. 96.  Unprompted by the Court, Petitioners also filed a "supplemental" motion for summary judgment, seeking legal fees and expenses awarded by the annulment committee.  ECF No. 98-1 at 3.  They sought to do so with interest "compounded at 0.234% monthly," *id.*, whereas the committee awarded interest "at the rate of 0.234% compounded monthly," Annulment Decision ¶ 533(3).

For the reasons that follow, Spain respectfully requests that the Court deny Petitioners' renewed (and supplemental) motion for summary judgment, enter judgment for Spain, and dismiss the Petition with prejudice.

## STANDARD OF REVIEW

Summary judgment is proper under Rule 56 if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A fact is "material" if it could affect the outcome of the suit.  *Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  Where, as here, there are no factual disputes and the

---

[1] The D.C. Circuit also held that the Court abused its discretion in proscribing Spain from litigating against Petitioners abroad and vacated the anti-suit injunction.  *See NextEra*, 112 F.4th at 1105–11.

record is complete, a district court "may enter summary judgment . . . in favor of a party opposing summary judgment, even if . . . that party has not made a formal cross-motion for summary judgment." *W.C. & A.N. Miller Cos. v. United States*, 173 F.R.D. 1, 3 (D.D.C. 1997), *aff'd sub nom. Hicks v. United States*, 1999 WL 414253 (D.C. Cir. May 17, 1999); *see also Athridge v. Rivas*, 141 F.3d 357, 361 (D.C. Cir. 1998).

## ARGUMENT

## I.     THE AWARD IS NOT ENTITLED TO FULL FAITH AND CREDIT BECAUSE THE ARBITRATORS LACKED JURISDICTION.

By statute, the "pecuniary obligations imposed" by an ICSID award are "given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." 22 U.S.C. § 1650a(a).  Thus, the "same full faith and credit" standards apply to the pecuniary obligations of ICSID awards as to state-court judgments.  *Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela*, 87 F.4th 510, 519 (D.C. Cir. 2023); *see, e.g.*, *TECO Guatemala Holdings, LLC v. Republic of Guatemala*, 414 F. Supp. 3d 94, 101 (D.D.C. 2019) ("[I]n enforcing an ICSID award, district courts must "look to established procedures for enforcing state court judgments in federal court." (citation omitted)).  Spain is therefore entitled "to raise the same defenses" to the Award that "a party could raise to a federal court's enforcement of a state court judgment." *TECO Guatemala Holdings*, 414 F. Supp. 3d at 102; *contra* Pet'rs' Renewed MSJ at 3 (Petitioners claiming the Court is powerless to do anything other than examine the Award's authenticity and enforce its obligations); Pet'rs' Suppl. MSJ 5–7 (same).

Under "well-established" full-faith-and-credit standards, "want of jurisdiction [i]s an exceptional circumstance in which a judgment may be denied full faith and credit." *Valores Mundiales*, 87 F.4th at 519, 521; *see, e.g.*, *Underwriters Nat'l Assur. Co. v. N. Carolina Life & Acc. & Health Ins. Guar. Ass'n*, 455 U.S. 691, 704 (1982) ("[B]asic limitations on the full-faith-

and-credit principles" require that "'the court in the first State had power to pass on the merits—had jurisdiction, that is, to render the judgment.'") (quoting *Durfee v. Duke*, 375 U.S. 106, 110 (1963)). Accordingly, if ICSID arbitrators lack jurisdiction, the awards they issue are not owed full faith and credit. *See Valores Mundiales*, 87 F.4th at 519–20.

Here, the arbitrators lacked jurisdiction to issue the Award because: (1) Spain never agreed to arbitrate anything with Petitioners, and (2) the arbitrators exceeded any authority they supposedly had by awarding state aid. The Award is thus not entitled to full faith and credit.

## A.   There Was No Agreement to Arbitrate Between Spain and Petitioners.

EU law is pellucid that Spain lacked the capacity to agree to arbitrate intra-EU disputes that might let arbitrators, and not the European Court of Justice, resolve EU-law questions. *Supra* pp. 6–10. Spain never had the power to extend a standing offer to arbitrate to Petitioners, so the parties never formed an arbitration agreement and the arbitrators lacked jurisdiction.

### 1.   It is the Court's role to determine whether the Arbitral Tribunal had jurisdiction based on a valid agreement to arbitrate.

Petitioners insist that the arbitrators' conclusion that they had jurisdiction is itself entitled to full faith and credit under the ICSID statute. Pet'rs' MSJ, ECF No. 69 at 44; Pet'rs' Suppl. MSJ at 5. But the statute extends "full faith and credit" only to "*pecuniary* obligations imposed by such an award," *i.e.*, the monetary award itself. 22 U.S.C. § 1650a(a) (emphasis added). The arbitrators' assertion of its own jurisdiction is a *non-pecuniary* aspect of the award that gets no special deference.

Even as to state-court judgments, parties can collaterally attack a court's determination of its jurisdiction—and defeat full faith and credit—when the proceeding "substantially infringed the authority of another tribunal or agency of government." *Blinder, Robinson & Co. v. SEC*, 837 F.2d 1099, 1104 (D.C. Cir. 1988) (cleaned up). Here, the ICSID tribunal disregarded EU courts'

exclusive jurisdiction over EU law, infringing EU authority in a manner that risks undermining the "proper functioning of the EU." First Hindelang Decl. ¶ 28; *see also* Suppl. Hindelang Decl. ¶ 16. The arbitrators' jurisdictional rulings thus do not bind U.S. courts, and this Court must determine for itself whether the arbitrators had jurisdiction. Under governing EU law, that is not a close call. *Supra* pp. 6–10.

Petitioners also invoke the ICSID Convention's delegation clause, which provides that ICSID arbitrators "shall be the judge of [their] own competence." ICSID Convention art. 41(1); *see* Pet'rs' MSJ, at 29. But Spain challenges "whether a valid arbitration agreement exists" in the first instance, a question which "cannot be delegated to an arbitrator." *Dist. No. 1 v. Liberty Mar. Corp.*, 998 F.3d 449, 456–57 (D.C. Cir. 2021) (citation omitted). "'[A]rbitration is strictly a matter of consent,'" *Field Intel. Inc. v. Xylem Dewatering Sols. Inc.*, 49 F.4th 351, 356 (3d Cir. 2022) (citation omitted), which is why "contract formation is *always* an issue for the court, notwithstanding the presence of a delegation clause." *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 n.7 (9th Cir. 2022) (collecting cases from Second, Fourth, Fifth, Ninth, and Tenth Circuits); *accord Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010). Consent "is a crucial principle of arbitration generally, including in the international context." *China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 289 (3d Cir. 2003). After all, letting arbitrators decide whether an arbitration agreement exists would "force parties into arbitration when the parties dispute whether they ever consented to arbitrate anything in the first place." *Dr.'s Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019). A contract thus cannot give arbitrators "any power, much less the power to determine its own jurisdiction, if the parties never entered into it." *China Minmetals*, 334 F.3d at 288. As the Restatement of the U.S. Law of International Commercial Arbitration and Investor-State Arbitration explains:

Commentators widely agree that, even if competence-competence

language were to be understood, as a general matter, as constituting "clear and unmistakable" evidence of an intent to delegate some threshold questions to the arbitral tribunal, that delegation cannot properly extend to challenges that go to the very existence of the arbitration agreement itself. The rationale behind this position is that, if no arbitration agreement exists, the question of its existence cannot logically be placed in the hands of a body that owes its own very existence to the arbitration agreement being challenged. . . . [C]ourts should be especially cautious in inferring from an indirect and generalized reference to competence-competence in arbitration rules or laws a specific intention to transfer to arbitrators primary authority over challenges that implicate party consent as strongly as the 'whether' and 'who' questions do. . . .

Restatement (Third) U.S. Law of Int'l Com. Arb. § 2.8, reporters' note b(iii).  That is why international practice "overwhelmingly favors" some judicial review of an arbitral award when a party argues that "no valid arbitration agreement ever existed."  *China Minmetals*, 334 F.3d at 288–89.

Here, Spain challenges the arbitrators' authority to arbitrate *anything* between Spain and EU nationals, because letting anyone besides EU courts resolve EU-law questions threatens the uniformity of EU law.  The Court, accordingly, must determine at the very least whether the arbitral tribunal's jurisdiction was based on a valid arbitration agreement (it was not).

## 2.    EU law governs Spain's capacity to arbitrate.

Arbitration agreements are contracts, so courts usually determine whether an agreement exists by "apply[ing] ordinary state-law principles that govern the formation of contracts."  *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  Federal courts treat as "binding" "a decision of the State's highest court" articulating state contract law.  *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1874 (2018) (cleaned up).

Here, U.S. state law does not govern Spain's ability to contract with Dutch nationals. Instead, Spain and the Netherlands have agreed that EU law governs their relationship, including with each other's nationals.  *See Achmea* ¶ 33 (emphasizing the autonomy and primacy of EU law

over the laws of the Member States).  This Court should accordingly give binding deference on EU law to the European Court of Justice, the final arbiter of EU law.  *Cf. City of Harper Woods Emps.' Ret. Sys. v. Olver*, 589 F.3d 1292, 1299–1303 (D.C. Cir. 2009) (following English cases on English law).  Competing interpretations of EU law by U.S. and European courts would risk undermining the Court of Justice's "exclusive jurisdiction" over EU law.  *See Ireland* ¶ 123.

Under the EU's foundational treaties, EU law displaces contrary treaties between Member States.  *Budějovický* ¶ 98.  Having agreed to follow those EU treaties, EU Member States cannot make side deals to evade their EU-law obligations.  The EU would have crumbled decades ago if Member States could circumvent unfavorable Court of Justice decisions just by signing multilateral agreements to ignore them.  *See PL Holdings* ¶ 49.

That non-EU countries are parties to the ECT does not change the calculus.  EU law precludes arbitration only when the "bilateral relations" at issue are within the EU.  *See Komstroy* ¶¶ 64–65.  EU states remain free to agree to arbitration with non-EU states and their nationals.  *See id.* ¶¶ 65–66.  Spain is ready, willing, and able to arbitrate with investors from non-EU signatories.  But here, the relevant relationships—between Spain and the Netherlands—are encapsulated within the EU legal order and subject to the Court of Justice's "exclusive jurisdiction."  First Hindelang Decl. ¶ 20.  EU law thus controls Spain's capacity to agree to arbitration with Petitioners.

### 3.    EU law barred any arbitration agreement here.

The application of EU law is dispositive.  As the European Commission explained to the D.C. Circuit, the European Court of Justice has confirmed that EU law bars "Member States [from] . . . agree[ing] to arbitrate claims brought by EU nationals under the Energy Charter Treaty."  Eur. Comm'n Br. in *NextEra*, 2023 WL 3863247, at *14.  Twenty-six Member States have since affirmed, given "the primacy of European Union law," that the ECT "cannot and never could serve as a legal basis for intra-EU arbitration proceedings."  2024 Decl. at 4.  This Court

should heed those views and dispose of this case on that basis. *See Animal Sci.*, 138 S. Ct. at 1869 (foreign governments' views of their own laws is entitled to "respectful consideration").

The Court of Justice's *Komstroy* decision is unambiguous: "EU law precludes" the ECT's arbitration provision "from being imposed on Member States as between themselves." *Komstroy* ¶ 65. EU-law issues are endemic in intra-EU arbitrations. *See id.* ¶¶ 49–50; *see also* Suppl. Hindelang Decl. ¶¶ 26–34. But arbitrators have no way to refer EU-law questions to EU courts and thus cannot ensure "consistency and uniformity in the interpretation of EU law." *Komstroy* ¶¶ 45, 60. Thus, EU Member States may arbitrate with investors from outside the EU, but they cannot agree to arbitrate with EU investors. *Id.* ¶ 65.

*Komstroy*'s holding built on years of precedent recognizing that intra-EU arbitration is antithetical to Member States' EU-law obligations. *E.g.*, *Achmea* ¶ 55; *Ireland* ¶¶ 132–33. By joining the EU, Member States agreed to "replace[] [intra-EU] arbitration procedure[s]" with a "system of judicial remedies" that are exclusive to European courts. *Eur. Food* ¶ 145.

By holding that the ECT does not permit intra-EU arbitration, the Court of Justice rendered Spain's putative offer to arbitrate void "*ab initio.*" First Hindelang Decl. ¶ 48; *see also* Suppl. Hindelang Decl. ¶ 40. That holding has "retroactive (*ex tunc*) effect." Suppl. Hindelang Decl. ¶¶ 15, 31. So it applies to ongoing legal disputes arising before *Komstroy*, just like U.S. Supreme Court decisions presumptively apply to open cases. *See PL Holdings* ¶ 58; *cf. Danforth v. Minnesota*, 552 U.S. 264, 271 & n.5 (2008). Thus, faced with an analogous Court of Justice ruling invalidating an arbitration provision between Slovakia and the Netherlands, Germany's highest court refused to enforce an arbitral award. Slovakia did not "make a valid offer" to arbitrate, so no "arbitration agreement exist[ed] between the parties." *See Achmea II* ¶ 32. Since then, various other Member States' courts have "declined [to] enforce[]" intra-EU arbitral awards because "no valid arbitration agreement [could have] existed." Suppl. Hindelang Decl. ¶ 36 & nn.69–73

(collecting cases).  Similarly, no agreement exists between Spain and Petitioners.

### 4.    General treaty interpretation principles yield the same result.

Even if this Court interpreted the ECT for itself, Spain and Petitioners never formed an arbitration agreement.

Treaty interpretation is "a matter of determining the parties' intent." *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014).  The ECT purports to authorize arbitration of "[d]isputes between a Contracting Party and an Investor of another Contracting Party."  ECT art. 26(1).  But other treaty provisions make clear that it should not be read to cavalierly violate EU law.  For example, the treaty mandates that "applicable rules and principles of international law" govern arbitrations.  *Id.* art. 26(6).  International law includes the EU treaties, which are themselves "international agreement[s] between the Member States."  *Achmea* ¶ 41.  The treaty also defines a "Regional Economic Integration Organisation" ("REIO") (*i.e.*, the EU, which is the only REIO that has become a contracting party to the ECT) as an organization with "the authority to take decisions binding on [states] in respect of" "certain matters . . . governed by this Treaty."  ECT art. 1(3).

Put another way, the treaty both seeks to avoid conflict with other international law like the EU treaties and recognizes the EU's primacy over Member States.  Given these EU-respecting provisions, the most straightforward reading of the ECT avoids conflict with the EU treaties by not permitting intra-EU arbitration in the first place—*i.e.*, the interpretation the Court of Justice adopted in *Komstroy*.  *See Komstroy* ¶ 66.

Treaty interpretation also depends on "the postratification understanding of signatory nations."  *Medellín v. Texas*, 552 U.S. 491, 507 (2008) (citation omitted).  Here, the signatories' understandings uniformly favor Spain.  As noted, Spain, NextEra's home country of the Netherlands, and twenty-five other ECT signatories have stressed their "common understanding"

that the ECT "cannot and never could serve as a legal basis for intra-EU arbitration proceedings." 2024 Decl. at 4; *see* Suppl. Hindelang Decl. ¶¶ 26–31

Put another way, the Netherlands does "not understand the agreement [it] made with Spain [via the ECT] to obligate Spain to arbitrate with [Dutch] nationals" like Petitioners. *NextEra*, 112 F.4th at 1110. And, as the D.C. Circuit recognized, Petitioners' contrary interpretation is one "that the treaty signers reject." *Id.* This Court should not upend the signatories' consensus on an international agreement that the United States "does not belong" to and has no "direct interest" in. *Id.* at 1109.

### B. The Arbitrators Exceeded Any Authority They Did Have by Awarding State Aid.

"[A]rbitrators wield only the authority they are given." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019). "[T]hey derive their powers" from the particular terms of the parties' agreement. *Id.* (citations omitted); *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010). Here, the arbitrators invoked the ECT as the purported agreement to arbitrate between the parties. But that treaty limits the jurisdiction of arbitrators to "decid[ing] the issues in dispute in accordance with [the ECT] and applicable rules and principles of international law." ECT, Art. 26(6).

As explained above, EU law forms part of those "applicable rules and principles of international law," *id.*, thereby excluding from the arbitrators' jurisdiction matters that may not be decided by arbitration under EU law. And, under EU law, the authorization of state aid is the exclusive province of the European Commission. *See* TFEU, arts. 107(1), 108(3). Consequently, arbitral tribunals cannot award state aid. *Id.*; *see* Eur. Comm'n Decision 2017/7384 ¶¶ 165–66 (noting that this "[d]ecision is part of Union law, and as such also binding on Arbitration Tribunals, where they apply Union law."). Indeed, a court in the Netherlands recently held that certain intra-

EU arbitral awards, like the one at issue here, are unlawful state aid under EU law.  *See Koninkrijk Spanje v. AES Solar Energy Coöperatief U.A.*, Case No. C/13/728512 / HA ZA 23-64, ECLI:NL:RBAMS:2025:732 ¶ 8.3 (Feb. 5, 2025), Suppl. Hindelang Decl. Ex. 86[2]; *see also* Suppl. Hindelang Decl. ¶ 37 (explaining that, because it found that "[t]he recovery of damages under the intra-EU award" would be unlawful state aid, "[t]he Dutch court also ordered, subject to certain conditions, the original award creditors to pay to Spain any amount that Spain may be ordered to pay" their assignee).

Notwithstanding this restriction on the arbitrators' jurisdiction, the Award ordered Spain to pay compensation to Petitioners that constitutes unauthorized state aid.  Suppl. Hindelang Decl. ¶¶ 50, 59.  By trespassing on the European Commission's exclusive jurisdiction, the arbitrators rendered an *ultra vires* award that exceeds any jurisdiction they could have under Article 26 of the Energy Charter Treaty.  The Award is thus not owed full faith and credit.

*      *      *

The fact that there was no agreement to arbitrate—and that the Award is therefore unenforceable—should not be surprising.  The Award is "based on an interpretation of an international treaty that the treaty signers reject," *NextEra*, 112 F.4th at 1110, and arbitrators "derive[]" their power exclusively "from the agreement of the parties."  *Taylor v. Fannie Mae*, 839 F. Supp. 2d 259, 261 (D.D.C. 2012).  The decision of an arbitral tribunal constituted without such agreement has no legal effect and is not owed full faith and credit.

---

[2] As of the time of this filing, only a preliminary translation of the Dutch opinion is available. Spain will file a certified translation as supplemental authority once it is available.

## II.    THE FOREIGN SOVEREIGN COMPULSION DOCTRINE BARS ENFORCEMENT OF THE AWARD.

Even if the award were generally enforceable under the ICSID Convention's implementing statute, the foreign sovereign compulsion doctrine—and the principles of comity that underlie it—would independently bar enforcement.

Comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895).  It is a "golden rule among nations—that each must give the respect to the laws, policies and interests of others that it would have others give to its own in the same or similar circumstances." *Usoyan v. Republic of Turkey*, 6 F.4th 31, 48 (D.C. Cir. 2021) (citations omitted).

"The foreign sovereign compulsion doctrine 'reflects the practice of states in the interests of comity.'"  *Blasket Renewable Invs., LLC v. Kingdom of Spain*, No. 23-cv-2701, 2024 WL 4298808, at *12 (D.D.C. Sept. 26, 2024) (quoting Restatement (Fourth) of Foreign Relations Law § 442 cmt. 10 (2018)).  And, pursuant to that doctrine, a U.S. court should refrain from entering an order that would compel a party to act in contravention of the laws of a foreign sovereign. Indeed, the D.C. Circuit has instructed that "[p]rinciples of international comity *require* that domestic courts not take action that may cause the violation of another nation's laws." *FTC v. Compagnie de Saint-Gobain-Pont-à-Mousson*, 636 F.2d 1300, 1327 n.150 (D.C. Cir. 1980) (emphasis added); *see also In re Sealed Case*, 825 F.2d 494, 498–99 (D.C. Cir. 1987) ("We have little doubt . . . that our government and our people would be affronted if a foreign court tried to compel someone to violate our laws within our borders.").  The doctrine thus provides a "foreign party" with "protection from being caught between the jaws of [a U.S. court] judgment and the operation of laws in foreign countries."  Restatement (Third) of Foreign Relations Law § 441 (1987), reporters' note 1 (quotation marks omitted).

Here, Spain has a treaty obligation to keep EU-law disputes in the EU. *See* TFEU art. 344; *see also* Suppl. Hindelang Decl. ¶ 15. And, as noted, *supra* at pp. 22–23, because the Award itself is unapproved state aid, EU law "prohibit[s] Spain from paying the award[] unless and until the EC grant[s] approval to do so." *NextEra*, 112 F.4th at 1096.

The European Commission has not yet authorized payment of this award, so granting the petition would compel Spain to violate its EU-law obligations. *See* Eur. Comm'n Decision 2017/7384 ¶ 165; Suppl. Hindelang Decl. ¶ 54. Indeed, the European Commission, in an analogous case, determined that the "payment of the compensation awarded by [an ICSID] Tribunal to the claimants amounts to the granting of incompatible new aid which is incompatible with the [TFEU]." Eur. Comm'n Decision 2015/1470 ¶ 153 (Mar. 30, 2015), Suppl. Hindelang Decl. Ex. 75. And paying out the Award in spite of those obligations would subject Spain to "litigation in national courts" as well as infringement proceedings brought by the European Commission, where Spain would face the threat of financial sanctions that could "easily run into hundreds of millions of euros." Suppl. Hindelang Decl. ¶ 59. This Court should decline to issue an order that would place Spain "in violation of" EU law, Suppl. Hindelang Decl. ¶ 54, and instead issue judgment in favor of Spain.

## III. PETITIONERS INACCURATELY CHARACTERIZE THE INTEREST AWARD.

The annulment committee awarded Petitioners $3.5 million in legal fees and expenses, plus interest on that amount at "the rate of 0.234% compounded monthly." Annulment Decision ¶ 533(3). Although the Petition should be denied in its entirety, if the Court were to enforce this aspect of the arbitral award, it should reject Petitioners' characterization of the interest award on legal fees as "compounded at 0.234% monthly." ECF No. 98-1 at 3; *see also* ECF No. 98-2 ¶ 18

(same).[3]  Petitioners inaccurately imply that a monthly rather than an annual interest rate would govern.

Annual interest rates are the norm.  *See* Black's Law Dictionary (12th ed. 2024) (defining "interest rate" as "usu[ally] expressed as a percentage of the principal payable for a one-year period"); *see also Ratner v. Chem. Bank New York Tr. Co.*, 329 F. Supp. 270, 276 (S.D.N.Y. 1971) (noting that interest rates are "commonly given as annual, not monthly, rates"); Mark P. Cussen, *Interest Rates Explained: Nominal, Real, and Effective*, Investopedia (updated Jan. 15, 2025) (explaining that nominal interest rates, *i.e.*, the stated interest rates, "are typically expressed annually, such as 5%, 7%, or 10%"), https://www.investopedia.com/articles/investing/082113/ understanding-interest-rates-nominal-real-and-effective.asp.

That is likely why a similarly situated petitioner in this district, with a materially identical award, has *agreed* that an award of "interest at the rate of 1.6%, compounded monthly"—*i.e.*, similarly without expressly specifying whether the rate was annual or monthly—means "an annual rate of 1.6%, compounding monthly." *Compare* JGC Holdings Award ¶ 73(v), *Blasket Renewable Invs. LLC v. Kingdom of Spain*, No. 23-cv-2701, ECF No. 1-1 (filed Sep. 15, 2023), *with* Joint Status Report ¶ 4(b), *id.*, ECF No. 27 (filed Oct. 28, 2024).

Though subtle, the difference is material and would "result in a windfall," which courts attempt to avoid when determining interest rates.  *See, e.g.*, *In re Vivendi Universal, S.A. Secs. Litig.*, 284 F.R.D. 144, 164 (S.D.N.Y. 2012) (rejecting interest rate that would "provide plaintiffs with a windfall"); *Radtke v. Caschetta*, 254 F. Supp. 3d 163, 181 (D.D.C. 2017) (noting, on motion for attorney's fees, that interest "rates may be used so long as they do not create a windfall for

---

[3] Beyond the plain text of the Annulment Decision, the annulment committee expressly intended to "apply the same interest rate granted in the Award," Annulment Decision ¶ 532, which Petitioners accurately described in their Petition as "interest at the rate of 0.234%, compounded monthly," Petition ¶¶ 3, 21 (citing Award ¶ 37(2)–(3)).

plaintiffs' counsel").  For example, a monthly interest rate, compounded monthly, would accrue approximately $525,000 in interest on $3.5 million over five (5) years, while the standard annual interest rate, compounded monthly, would result in a little more than $40,000 in interest over that same period.  There is no reason to deviate from the typical understanding of interest rates as expressed annually here.

So, if the Court were to grant summary judgment in favor of Petitioners, the Court should confirm an award of interest on annulment proceeding attorneys' fees and expenses at an annual "rate of 0.234% compounded monthly" and reject an atypical monthly rate.

### CONCLUSION

Spain respectfully requests the Court deny Petitioners' motion for summary judgment, enter judgment for Spain, and dismiss the Petition with prejudice.

Dated:  February 14, 2025

Respectfully submitted,

/s/ Carter G. Phillips

| | |
|---|---|
| Eamon P. Joyce (D.C. Bar No. 483127) | Carter G. Phillips (D.C. Bar No. 264176) |
| Simon Navarro (admitted *pro hac vice*) | Peter A Bruland (D.C. Bar No. 1600717) |
| Tyler J. Domino (D.C. Bar No. 1619758) | Cody M. Akins (D.C. Bar No. 90012255) |
| SIDLEY AUSTIN LLP | SIDLEY AUSTIN LLP |
| 787 Seventh Avenue | 1501 K Street, NW |
| New York, NY 10019 | Washington, DC 20005 |
| Telephone: (212) 839-8555 | Telephone: (202) 736-8000 |
| Fax: (212) 839-5599 | Facsimile: (202) 736-8711 |
| ejoyce@sidley.com | cphillips@sidley.com |
| snavarro@sidley.com | pbruland@sidley.com |
| tdomino@sidley.com | cakins@sidley.com |

*Attorneys for Respondent Kingdom of Spain*