**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NEXTERA ENERGY GLOBAL HOLDINGS B.V. AND NEXTERA ENERGY SPAIN SPAIN HOLDINGS B.V. , <br><br>         Petitioners, <br><br><br>         v. <br><br><br> THE KINGDOM OF SPAIN, <br><br>         Respondent. | Civil Action No. 19-cv-01618-TSC |

<u>**SUPPLEMENTARY EXPERT DECLARATION OF**</u>

<u>**PROFESSOR STEFFEN HINDELANG**</u>

TABLE OF CONTENTS

I.      INTRODUCTION AND BACKGROUND ......................................................3

II.     SUMMARY OF PREVIOUS DECLARATIONS ...........................................6

III.    RECENT DEVELOPMENTS RELATING TO INTRA-EU ARBITRATION
        ...............................................................................................................11

        A.      Relevant measures taken by the EU and its Member States with regard
                to intra-EU arbitration..........................................................................11

        B.      The 2024 Declaration from the EU Member States............................14

                i.      The 2024 Declaration's content.................................................14

                ii.     The 2024 Declaration's effect...................................................16

        C.      Decisions from EU Member State Courts ...........................................17

        D.      Recent judgments of the CJEU ...........................................................20

                i.      The ICSID Convention in an intra-EU context.......................21

                ii.     Consequences of paying an intra-EU investment award absent
                        notification and pre-approval by the European Commission ..25

## I.    INTRODUCTION AND BACKGROUND

1.      I, Steffen Hindelang, provide this supplementary expert declaration in the above-captioned case ("*NextEra v. Spain*") based upon my personal knowledge. The statements in this declaration, and the information upon which they are based, are true to the best of my knowledge and belief.

2.      I am a German citizen, and I was born on December 6, 1978.

3.      I am Professor at the Faculty of Law of Uppsala University in Sweden. I teach and research in the areas of European Union ("EU") law, international economic law, in particular, international investment law, and German public law. Previously, I was Professor at the Department of Law of the University of Southern Denmark in Odense. Further, I was guest professor at the Faculty of Law of the University of Uppsala as a Swedish Prize Laureate (2018), Professor at the Freie Universität Berlin (2011-2017), senior research associate and senior lecturer at Humboldt-Universität zu Berlin (2010-2011), and research associate and lecturer at the Universität Tübingen (2004-2009). I am also a senior fellow at the Walter Hallstein-Institute of European Constitutional Law at Humboldt-Universität zu Berlin. My CV and the list of my publications are attached hereto as **Exhibit 01** and **Exhibit 02**, respectively.

4.      I have no familial or business relationship or affiliation with any of the parties to this case, except for the expert reports detailed below. I have never represented any of them in any capacity. I therefore confirm my independence from the parties to these proceedings and I understand that my duty is to provide my independent view for the benefit of this Court.

5.      I have previously submitted four expert declarations in the above-captioned case. In my First Declaration ("First Hindelang Declaration" or "First Declaration") dated 11 October 2019, First Reply Declaration dated 7 February 2020 ("Second Hindelang Declaration" or "Second Declaration"), Third Declaration outlining relevant developments at the time dated 2 May 2022 ("Third Hindelang Declaration" or "Third Declaration") and Second

Reply Declaration dated 29 June 2022 ("Fourth Hindelang Declaration" or "Fourth Declaration") to this Court in the present matters, I provided a list of previously submitted expert reports and opinions on EU and public international law in various fora, as well as of engagement as arbitrator, which is incorporated by reference herein.

6.    In the meanwhile, I submitted number of reports on EU law, including rebuttal reports, in support of the Kingdom of Spain's motions to dismiss in the following enforcement proceedings in the United States District Court for the District of Columbia:  (1) *AES Solar Energy Coöperatief U.A. and Ampere Equity Fund B.V. v. Kingdom of Spain*, Case No. 1:21-cv-03249-RJL; (2) *RWE Renewables GmbH and RWE Renewables Iberia S.A.U. v. Kingdom of Spain*, Case No. 1:21-cv-03232-JMC; (3) *BayWa r.e. AG v. Kingdom of Spain*, Case No. 1:22-cv-02403-APM; (4) *Swiss Renewable Power Partners SARL v. Kingdom of Spain*, Case No. 1:23-cv-00512-DDC.

7.    I have further submitted a report on EU law, including a rebuttal report, in support of the Republic of Poland in the United States District Court for the District of Columbia in *Mercuria Energy Group Limited v. Republic of Poland*, Case No. 1:23-cv-03572-TNM and in support of the Republic of Croatia in the United States District Court for the District of Columbia in *MOL Hungarian Oil and Gas PLC v. The Republic of Croatia*, Case No. 1:23-cv-00218 (RDM).

8.    Additionally, I have submitted a legal opinion in support of the Kingdom of Spain before the Jerusalem District Court in *Sun-Flower Olmeda GmbH & Co. KG v. Kingdom of Spain*, Case No. CivC 11552-02-23. I also submitted expert reports to the Federal Court of Australia in the following cases: (1) *9REN Holding S.à r.l. v. Kingdom of Spain*, Proceedings Number NSD365/2020; (2) *Watkins Holding S.à r.l. and Watkins (Ned) B.V. v. Kingdom of Spain*, Proceedings Number NSD449/2020; (3) *Blasket Renewable Investments LLC (formally assigned from RREEF Infrastructure (G.P.) Limited & RREEF Pan-European Infrastructure*

*Two Lux S.à r.l.) v. Kingdom of Spain,* Proceedings Number NSD 2169/2019; and (4) *NextEra Energy Global Holdings B. V. & ANOR,* Proceedings Number NSD 415/2023.

9.       I have also submitted expert opinions in the proceedings under the International Centre for Settlement of Investment Disputes ("ICSID") Rules in (1) *Spanish Solar 1 Limited and Spanish Solar 2 Limited v. The Kingdom of Spain,* ICSID Case No. ARB/21/39; (2) *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. The Kingdom of Spain* (Resubmission), ICSID Case No. ARB/13/36; and (3) *WOC Photovoltaik Portfolio GmbH & Co. KG and Others v. Kingdom of Spain*, ICSID Case No. ARB/22/12 and in the ICSID annulment proceedings in (1) *Sevilla Beheer BV and others v. Kingdom of Spain*, ICSID Case No. ARB/16/27; (2) *Infracapital F1 S.à r.l. and Infracapital Solar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/16/18; and (3) *Mathias Kruck and Others v. Kingdom of Spain*, ICSID Case No. ARB/15/23. From time to time, I have expressed my views in online commentaries, on social media, and in seminars and fora.

10.       All authorities I have relied upon are set forth at the end of my declaration and produced as Exhibits to this declaration.

11.       I do not express an opinion on any other law in this declaration other than EU and international law relevant to the issue I have been asked to address.

12.       I am being compensated at a rate of 895 EUR plus VAT per hour to prepare this expert declaration and, if required, to testify in this matter, without any fees contingent upon the outcome of this case.

13.       In this supplementary declaration, I express my views in two parts. Primarily, for the ease of recapitulation, I provide a very brief summary of my earlier  Declarations in the above-captioned case (Part II). Thereafter, I proceed to provide this Court with the recent developments concerning intra-EU investment arbitration that are legally relevant (Part III). I

hereby reaffirm all the findings and conclusions of my First and Second Declarations in light of these recent developments.

## II.    SUMMARY OF PREVIOUS DECLARATIONS

14.    In my earlier Declarations I demonstrated[1] that the Tribunal in *NextEra v. Spain* had to apply the Treaty on European Union ("TEU")[2] and the Treaty on the Functioning of the European Union ("TFEU")[3] (collectively "EU Treaties"), as well as the legal order flowing therefrom including the standing case law of the Court of Justice of the European Union ("CJEU" or "Court"). The EU Treaties "must be regarded [. . .] as deriving from *an international agreement between the [EU] Member States*."[4] EU law is therefore public international law when applied *between* the EU Member States and falls under the scope of "applicable rules and principles of international law" within the meaning of Article 26(6) of the of the Energy Charter Treaty ("ECT").[5]

15.    I also explained[6] the relevant governing international law rules and principles contained in the EU Treaties, applicable between the EU Member States, *i.e.*, the principles of autonomy and primacy. The principle of autonomy flows from Article 267 of the TFEU, which provides a mechanism for the courts and tribunals of the EU Member States to obtain preliminary rulings of the CJEU ("preliminary rulings") on questions concerning the interpretation and validity of EU Law; and from Article 344 of the TFEU, which prohibits EU

---

[1]  First Hindelang Declaration ¶¶ 15 *et seq.*; ¶¶ 48-51; Second Hindelang Declaration ¶¶ 13-20; Third Hindelang Declaration ¶¶ 15 *et seq.*, ¶¶ 52-55; Fourth Hindelang Declaration ¶¶ 6 *et seq.*

[2]  Treaty on the European Union ("TEU") (adopted 7 February 1992) OJ C 202 (**Exhibit 3**).

[3]  Treaty on the Functioning of the European Union ("TFEU") (adopted 13 December 2007, entered into force 1 December 2009) OJ C 202 (**Exhibit 4**).

[4]  CJEU, Case C-284/16, ECLI:EU:C:2018:158 ¶ 41 – *Achmea B.V. v. Slovak Republic* ("*Achmea*")(**Exhibit 5**) (emphasis added).

[5]  The Energy Charter Treaty ("ECT") (adopted 17 April 1994, entered into force 16 April 1998) 2080 UNTS 95 (**Exhibit 6**).

[6]  First Hindelang Declaration ¶¶ 19-36; Third Hindelang Declaration ¶¶ 19-38.

Member States from submitting a dispute concerning the interpretation or application of the EU Treaties to any method of settlement other than those provided in the EU Treaties. Further, preliminary rulings are binding *erga omnes* and have retroactive (*ex tunc*) effect, *i.e.*, the content and meaning of a given rule in a judgment "must be or ought to be understood and applied from the time of its coming into force."[7] Moreover, I explained[8] that the CJEU's ruling in *Achmea*,[9] as confirmed in *Komstroy*,[10] means that in terms of its temporal effect intra-EU investment arbitration has always been incompatible with the EU Treaties from the moment they, or their respective predecessor treaties entered into force.

16.     The principle of primacy of EU law provides, among others, that in case of a conflict between a public international law rule created between the EU Member States, like the ECT and the EU Treaties, EU law takes precedence and overrides such a rule.[11] I

---

[7] CJEU, Joined Cases 66, 127 and 128/79, ECLI:EU:C:1980:101 ¶ 9 – *Salumi* (**Exhibit 7**); CJEU, Case C-109/20, ECLI:EU:C:2021:875 ¶¶ 57-61 – *Republiken Polen v. PL Holdings Sàrl* ("*PL Holdings*") (**Exhibit 8**).

[8] First Hindelang Declaration ¶¶ 32-36, 44-56; Second Hindelang Declaration ¶¶ 84-85; Third Hindelang Declaration ¶¶ 34-38, 45-74.

[9] *Achmea* (**Exhibit 5**).

[10] CJEU, Case C-741/19, ECLI:EU:C:2021:655 – *Komstroy LLC, successor in law to the company Energoalians v. Republic of Moldova* ("*Komstroy*") (**Exhibit 09**).

[11] In CJEU, Case 106/77, ECLI:EU:C:1978:49 ¶ 24 – *Amministrazione delle Finanze dello Stato v. Simmenthal SpA* ("*Simmenthal II*") (**Exhibit 10**), the Court made the following seminal ruling:

> [A] national court which is called upon, within the limits of its jurisdiction, to apply provisions of Community [now Union] law is under a duty to give full effect to those provisions, if necessary refusing of its own motion to apply any conflicting provision of national legislation, even if adopted subsequently, and it is not necessary for the court to request or await the prior setting aside of such provision by legislative or other constitutional means.

*See also* CJEU, Opinion 1/91, ECLI:EU:C:1991:490 ¶ 21 – *EEA* ("*Opinion 1/91*") (**Exhibit 11**):

> The essential characteristics of the Community legal order which has thus been established are in particular its primacy over the law of the Member States and the direct effect of a whole series of provisions which are applicable to their nationals and to the Member States themselves.

CJEU, Joined Cases 205 to 215/82, ECLI:EU:C:1983:233 ¶¶ 17, 22 – *Deutsche Milchkontor* (**Exhibit 12**); CJEU, Case C-231/96, ECLI:EU:C:1998:401 – *Edis* (**Exhibit 13**).

demonstrated[12] that the principle of primacy of EU law extends beyond the EU Member States'
courts and tribunals to any competent authority required to apply the EU Treaties, such as the
Tribunal in *NextEra v. Spain*.[13] The fundamental importance of the principle of primacy to the
proper functioning of the EU is such that no derogation is permitted. Indeed, the EU cannot
exempt the Member States from observing this principle,[14] nor can the EU Member States
agree among each other on any other conflict rule to override the one established by the EU
Treaties.[15] The only way for the EU Member States to circumvent the principle of primacy is
to amend the EU Treaties by following the amendment procedure set out in Article 48 of the
TEU.

17.     I proceeded to explain[16] how the principles of autonomy and primacy as
articulated by the CJEU in *Achmea* and confirmed in *Komstroy* are applicable to *NextEra v.
Spain*. Because CJEU decisions determine the law as it stands from its enactment, Article 26
of the ECT is inoperative between EU Member States *ex tunc*, *i.e.*, from the time the ECT came
into force.[17] This in turn means that *from the moment the ECT was concluded*, no valid offer
could have been made by any EU Member State to arbitrate disputes with nationals of another
EU Member State. For this reason, there could not have been an arbitration agreement between
Spain, on the one hand, and investors from another EU Member State, like NextEra Energy

---

[12] First Hindelang Declaration ¶¶ 25-27; Second Hindelang Declaration ¶¶ 76-77, 80-97.

[13] *See* CJEU, Case C-478/07, ECLI:EU:C:2009:521 ¶ 98 – *Budějovický Budvar* ("*Budějovický Budvar*") (**Exhibit 14**); CJEU, Case 10/61, ECLI:EU:C:1962:2 – *European Commission v. Government of Italian Republic* ("*Commission v. Italian Republic*") (**Exhibit 15**); CJEU, Case C-3/91, ECLI:EU:C:1992:420 ¶ 8 – *Exportur* (**Exhibit 16**); CJEU, Case C-469/00, ECLI:EU:C:2003:295 ¶ 37 – *Ravil* (**Exhibit 17**); CJEU, Case C-546/07, ECLI:EU:C:2010:25 ¶ 44 – *European Commission v. Germany* ("*Commission v. Germany*") (**Exhibit 18**).

[14] *See* CJEU, Case 26/78, ECLI:EU:C:1978:172 ¶ 9 – *Viola* ("*Viola*") (**Exhibit 19**).

[15] *See* CJEU, Joined Cases C-402/05 P and C-415/05 P, ECLI:EU:C:2008:461 ¶ 285 – *Yassin Abdullah Kadi, Al Barakaat International Foundation* ("*Kadi*") (**Exhibit 20**); CJEU, Case C-266/16, ECLI:EU:C:2018:118 ¶ 46 – *Western Sahara Campaign UK* ("*Western Sahara*") (**Exhibit 21**).

[16] First Hindelang Declaration ¶¶ 43-56; Third Hindelang Declaration ¶¶ 45-74.

[17] *See, e.g.*, CJEU, Case C-292/04, ECLI:EU:C:2007:132 ¶ 34 – *Meilicke, et al. v. Finanzamt Bonn-Innenstadt* (**Exhibit 22**); *PL Holdings* ¶¶ 57-61 (**Exhibit 8**).

Global Holdings B.V. and NextEra Energy Spain Holdings B.V., on the other, under Article 26 of the ECT.

18.    The CJEU's holding was clear and unambiguous: A Member State may not enter into a

> treaty by which [it] agree[s] to remove from the jurisdiction of [its] own courts . . . disputes which may concern the application or interpretation of EU law.[18]

Such an agreement would be incompatible with the foundational EU Treaties. Agreeing to a mechanism in an international treaty by which an arbitral tribunal may render an unreviewable interpretation of EU law violates "the autonomy of the EU and its legal order", which the EU Member States obligated themselves to uphold when they acceded to the EU by way of concluding the EU Treaties which comprehensively govern their *inter se* relations.[19]

19.    This was re-confirmed by the CJEU in *Komstroy*:[20]

> [Article 26 of the ECT would] call into question the preservation of the autonomy and of the particular nature of the law established by the Treaties, ensured in particular by the preliminary ruling procedure provided for in Article 267 TFEU.[21]

20.    It follows from the above that any such provision in an international agreement that is incompatible with the EU Treaties would be precluded by the EU Treaties from having any legal effect.[22] This includes Article 26 of the ECT, which

> must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State

---

[18]  *Achmea* ¶ 55.

[19]  *Id.* ¶ 57. Following the CJEU's decision in *Achmea*, the German Federal Court of Justice annulled the award, holding that there was no valid arbitration agreement. The Slovak Republic never made a valid offer to arbitrate which could be accepted and, thus, there was no resulting agreement to arbitrate. Bundesgerichtshof [German Federal Court of Justice] ("BGH"), Case No. I ZB 2/15, Judgment (31 October 2018) - *Slovak Republic v. Achmea B.V.* (**Exhibit 84**).

[20]  *Komstroy* (**Exhibit 9**).

[21]  *Id.* ¶ 63.

[22]  *Achmea* ¶ 60 (**Exhibit 5**); *Komstroy* ¶ 66 (**Exhibit 9**).

concerning an investment made by the latter in the first Member State.[23]

Therefore, a putative offer to arbitrate extended by an EU Member State to an investor from another EU Member State, like Article 26 of the ECT, is rendered inapplicable and cannot be accepted to form an agreement to arbitrate.

21.    The CJEU in *Achmea* did not differentiate between bilateral and multilateral agreements between the EU Member States when holding that intra-EU investment arbitration is incompatible with the EU Treaties. Indeed, the application of the principle of autonomy is not limited to bilateral agreements but extends to all international agreements between EU Member States, irrespective of whether they are bilateral or multilateral,[24] with or without participation of the EU.[25] It was therefore no surprise when the CJEU confirmed in *Komstroy* that:

> *despite the multilateral nature* of the international agreement of which it forms part, a provision such as Article 26 ECT is intended, in reality, to govern bilateral relations between two of the Contracting Parties, *in an analogous way* to the provision of the bilateral investment treaty at issue in the case giving rise to the judgment of 6 March 2018, Achmea.[26]

22.    I concluded my analysis that the Tribunal in *NextEra v. Spain*, purportedly constituted under Article 26 of the ECT, would have been required to adjudicate in accordance with the EU Treaties and, consequently, to decline its jurisdiction.

---

[23]  *Komstroy* ¶ 66 (**Exhibit 9**).

[24]  *See* CJEU, Case C-459/03, ECLI:EU:C:2006:345 ¶¶ 169-171 – *Commission v. Ireland* ("*Mox Plant*") (**Exhibit 23**) (involving the multilateral UN Convention on the Law of the Sea).

[25]  Opinion 1/91 ¶¶ 40, 70 (**Exhibit 11**); CJEU, Opinion 1/09, ECLI:EU:C:2011:123 ¶¶ 74, 76 - *European and Community Patents Court* ("Opinion 1/09") (**Exhibit 24**) (addressing an agreement to create a unified patent litigation system); CJEU, Opinion 2/13, ECLI:EU:C:2014:2454 ¶¶ 182-183 – *ECHR* ("Opinion 2/13") (**Exhibit 25**); CJEU, Opinion 1/17, ECLI:EU:C:2019:341 ¶¶ 110, 111, 150 – *Comprehensive Economic and Trade Agreement between Canada, of the one part, and the European Union and its Member States, of the other part* ("*CETA*") ("Opinion 1/17") (**Exhibit 26**) (trade agreement).

[26]  *Komstroy* ¶ 64 (**Exhibit 9**)(emphasis added).

23.     Further, I explained[27] that any compensation awarded by the Tribunal would constitute State aid and thus remain subject to prior approval of the European Commission by virtue of Article 108(3) of the TFEU. Unless and until approved by the European Commission, any such State aid is unlawful under EU Treaties and cannot be lawfully implemented by Spain. If Spain were (forced) to pay nevertheless, it would be subject to severe legal sanctions under the EU Treaties.[28]

## III.    RECENT DEVELOPMENTS RELATING TO INTRA-EU ARBITRATION

24.     In order to provide this Court with an update on recent developments, I will offer a concise account of the reaction of the EU and its Member States to intra-EU arbitration (below A.). This will include a more detailed discussion of the "Declaration on the legal consequences of the judgment of the Court of Justice in Komstroy and common understanding on the non-applicability of Article 26 of the Energy Charter Treaty as a basis for intra-EU arbitration proceedings" ("2024 Declaration")[29] (below B.). I will also address new pertinent case law of the EU Member State courts (below C.) and of the CJEU that are relevant to the present proceedings (below D.).

### A.    Relevant measures taken by the EU and its Member States with regard to intra-EU arbitration

25.     An increasing number of EU Member States have grown frustrated with intra-EU investment tribunals, which lack authority to decide intra-EU disputes but have nonetheless

---

[27]  First Hindelang Declaration ¶¶ 57-65; Second Hindelang Declaration ¶¶ 98-107; Third Hindelang Declaration ¶¶ 75-85; Fourth Hindelang Declaration ¶¶ 76-83.

[28]  First Hindelang Declaration ¶ 62-63; Second Hindelang Declaration ¶ 106; Third Hindelang Declaration ¶¶ 82-83.

[29]  *Declaration on the legal consequences of the judgment of the Court of Justice in Komstroy and common understanding on the non-applicability of Article 26 of the Energy Charter Treaty as a basis for intra-EU arbitration proceedings* (6 August 2024), OJ L 2024/2121 ("2024 Declaration") (**Exhibit 27**).

rendered *ultra vires* awards.[30] Accordingly, some Member States have chosen to withdraw from the ECT altogether. For example, France and Germany[31] – making it clear that investor-State arbitration on the basis of the ECT has never been envisaged and its provisions have never been applicable in an intra-EU context – have already sent written notifications to the depository of the ECT, as did the EU,[32] the European Atomic Energy Community,[33] Poland,[34]

---

[30] The intra-EU tribunals in *Green Power Partners K/S, SCE Solar Don Benito APS v. Kingdom of Spain*, SCC Case No. V. 2016/135, Award (16 June 2022) ("*Green Power v. Spain*") (**Exhibit 28**); *Sapec, S.A. v. Kingdom of Spain*, ICSID Case No. ARB/19/23, Award (11 October 2024) ("*Sapec v. Spain*"); *European Solar Farms A/S v. Kingdom of Spain*, ICSID Case No. ARB/18/45, Award (11 October 2024) ("*ESF v. Spain*"), as reported by IA Reporter, Breaking: ICSID tribunal majorities uphold intra-EU objection in duo of ECT arbitrations against Spain (12 October 2024); and a dissenting opinion in *Portigon AG v. Kingdom of Spain*, ICSID Case No. ARB/17/15 ("*Portigon*"), Decision on Request for Reconsideration, Dissenting Opinion of Arbitrator Giorgio Sacerdoti (20 October 2022) (**Exhibit 29**) acknowledged the role of the EU Treaties in adjudicating disputes initiated under the ECT and declined its jurisdiction under the ECT.

[31] *Note Verbale from the authorities of the French Republic to the Energy Charter Secretariat and to the contracting parties to the Energy Charter Treaty* (19 December 2023) (**Exhibit 30**):

> . . . The authorities of the French Republic are of the opinion that the Energy Charter Treaty *was not intended to apply to so-called 'intra-EU' relations* between the French Republic and other Member States of the European Union or between the French Republic and the European Union and the European Atomic Energy Community (Euratom). Article 47, paragraph 3, *should accordingly not produce any legal effects in such intra-EU relations*.
>
> The authorities of the French Republic recall in any event that the *Komstroy judgement and the opinion 1/20* issued by the European Court of Justice have *confirmed* that *article 26, paragraph 2(c), of the Energy Charter Treaty ls inapplicable in intra-EU relations*. It shall accordingly not be validly invoked by French investors against other Member States, the European Union or Euratom or by investors originating from other Member States of the European Union against the French Republic. It shall also not be subject to any prolonged application in such intra-EU relations pursuant to article 47, paragraph 3./. [emphasis added; courtesy translation by the French Republic].

See also Note Verbale from the Embassy of the Federal Republic of Germany to the Energy Charter Secretariat and to the contracting parties to the Energy Charter Treaty (28 December 2023) (**Exhibit 31**).

[32] *Notification of the European Union and the European Atomic Energy Community to the Government of the Portuguese Republic, in its capacity as Depository of the Energy Charter Treaty* (27 June 2024) (**Exhibit 32**).

[33] *Id.*

[34] *Notification of the Republic of Poland to the Government of the Portuguese Republic, in its capacity as Depository of the Energy Charter Treaty* (28 December 2022) (**Exhibit 33**).

Luxembourg,[35] the Netherlands,[36] Spain,[37] Portugal,[38] and Slovenia,[39] Denmark and Ireland have announced their intention to withdraw.[40] The Commission in its recommendation of an EU-wide exit, approved by European Parliament[41] and Council,[42] among others, highlighted

> the need to eliminate the risk of conflict between the [EU] Treaties and the ECT as interpreted by some arbitral tribunals, which have held that the ECT applies to intra-EU disputes. That interpretation, if confirmed by the courts of a third country, would de facto turn into a legal conflict because arbitration awards violating EU law would circulate in the legal orders of third countries. . . . [P]roceedings to obtain and enforce awards issued by tribunals purportedly established pursuant to Article 26 ECT in intra-EU disputes continue unabated. . . . [The withdrawal] would have *no impact* on intra-EU relations, to which the ECT has never, does not and will never apply . . . The codification of the interpretation of the EU and its Member States in a separate treaty (something that is possible because of the bilateral nature of the obligations) is all the more pressing in the absence of the ECT modernisation that would have embedded in the text itself and via a "for greater certainty" clause, the understanding of all Contracting Parties that its Article 26 does not apply intra-EU.[43]

---

[35] *Notification of the Grand-Duchy of Luxembourg to the Government of the Portuguese Republic, in its capacity as Depository of the Energy Charter Treaty* (16 June 2023) (**Exhibit 34**).

[36] *Notification of the Kingdom of the Netherlands to the Government of the Portuguese Republic, in its capacity as Depository of the Energy Charter Treaty* (27 June 2024) (**Exhibit 35**).

[37] *Notification of the Kingdom of Spain to the Government of the Portuguese Republic, in its capacity as Depository of the Energy Charter Treaty* (16 April 2024) (**Exhibit 36**).

[38] *Notification of Portugal to the Government of the Portuguese Republic, in its capacity as Depository of the Energy Charter Treaty* (1 February 2024) (**Exhibit 37**).

[39] *Notification of Slovenia to the Government of the Portuguese Republic, in its capacity as Depository of the Energy Charter Treaty* (13 October 2023) (**Exhibit 38**).

[40] *See* EURACTIV, *Denmark to withdraw from Energy Charter Treaty* (14 April 2023, updated 24 April 2023) (**Exhibit 39**); Irish Legal News, *Ireland confirms withdrawal from Energy Charter Treaty* (4 June 2024) (**Exhibit 40**).

[41] *See* European Parliament, *Withdrawal of the Union from the Energy Charter Treaty* (24 April 2024) (**Exhibit 41**).

[42] Council Decision 6509/24 of the Council of the European Union on the withdrawal of the Union from the Energy Charter Treaty (4 March 2024) (**Exhibit 42**); Council Decision 6514/24 of the Council of the European Union on the approval of the withdrawal of the European Atomic Energy Community from the Energy Charter Treaty (4 March 2024) (**Exhibit 43**).

[43] European Commission, *Proposal for a Council Decision on the withdrawal of the Union from the Energy Charter Treaty* (7 July 2023) at 2 (**Exhibit 44**)(emphasis in the original).

**B.    The 2024 Declaration from the EU Member States**

26.    On 26 June 2024, the EU and twenty-six Member States[44] ("signatories") signed the 2024 Declaration. Its content (below i.) sets out the meaning of Article 26 of the ECT in a binding manner *ab initio*, meaning that it has never been applicable in an intra-EU context (below ii.).

### i.    The 2024 Declaration's content

27.    According to the 2024 Declaration,

> [t]he signatories hereby reaffirm, for greater certainty, that they share a common understanding on the interpretation and application of the Energy Charter Treaty, according to which Article 26 of that Treaty cannot and never could serve as a legal basis for intra-EU arbitration proceedings.[45]

The 2024 Declaration also confirms that the common understanding applies regardless of whether the arbitration is conducted under the ICSID Convention[46] or under other arbitration rules.[47]

28.    This authoritative interpretation of the ECT is the result of an interpretation and interaction of the EU Treaties with the ECT. The 2024 Declaration summarises the pertinent parts of the EU Treaties, as interpreted by the CJEU, and their relationship with an international agreement in its application between the EU Member States – the ECT – and highlights three key points.

---

[44]  Hungary issued its own unilateral declaration on the same day. *Declaration of the representative of the government of Hungary on the legal consequences of the judgment of the Court of Justice in Komstroy and common understanding on the non-applicability of Article 26 of the Energy Charter Treaty as a basis for intra-EU arbitration proceedings* (26 June 2024) ("2024 Hungarian Declaration") (**Exhibit 45**).

[45]  2024 Declaration at 4 (**Exhibit 27**).

[46]  Convention on the Settlement of Investment Disputes between States and Nationals of Other States ("ICSID Convention") (adopted 18 March 1965, entered into force 14 October 1966) 575 UNTS 159 (**Exhibit 46**).

[47]  2024 Declaration at 4 (**Exhibit 27**).

29.     *First*, the 2024 Declaration makes clear that Article 26 of the ECT violates, *i.e.*, conflicts with, the EU Treaties. As explained by the CJEU in *Achmea*, *Komstroy*, and elsewhere,[48] the EU Treaties preclude

> a provision in an international agreement concluded between Member States under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept which are thus in conflict with each other. The conflict is to be resolved in favour of the EU Treaties, which take precedence over the ECT.[49]

30.     *Second*, the 2024 Declaration stresses that the conflict between the ECT and the EU Treaties in an intra-EU context is (also) a *treaty conflict in public international law*. Therefore, it must be resolved in accordance with the special conflict rule provided for in the EU Treaties, *i.e.,* the principle of primacy of EU law, which is

> *a rule of international law* governing conflict of norms in [ . . . ] mutual relations [of the EU Member States] with the result that in any event Article 26 of the Energy Charter Treaty does not and could not apply as a basis for intra-EU arbitration proceedings.[50]

---

[48]  The judgments of the CJEU are in themselves authoritative interpretations of the EU Treaties and the ECT in an intra-EU context which are reiterated, clarified, and confirmed in the 2024 Declaration. The EU Member States have

> assigned that right of giving authoritative interpretation of Union . . . law to the Court of Justice of the European Union (CJEU), as explained by the CJEU in its judgment of 30 May 2006, in *Commission v Ireland (Mox Plant)*, C-459/03 (ECLI:EU:C:2006:345, paragraphs 129 to 137), where it held that the exclusive competence to interpret and apply Union . . . law extends to the interpretation and application of international agreements to which the European Union . . . and the Member States are parties, in the relationship between two Member States . . .

(*See* 2024 Declaration at 1 (**Exhibit 27**)).

[49]  *Id.* at 2.

[50]  *Id.* at 4 (emphasis added).

31.    *Third*, the 2024 Declaration reiterates that the authoritative interpretation of a treaty in public international law, "reflecting a general principle of international law [, . . . ] applies as of the approval"[51] of the respective treaty.  Accordingly, the CJEU's authoritative interpretation of the ECT applies with retroactive (*ex tunc*) effect.

### ii.  The 2024 Declaration's effect

32.    Considering that the EU Member States have transferred the competence to issue authoritative interpretations in an intra-EU context to the CJEU, the 2024 Declaration *restates* the authoritative interpretation of Article 26 of the ECT, as set out by the CJEU, applicable in an intra-EU context. It follows that Article 26 of the ECT must be interpreted as *never* having constituted a legal basis for intra-EU investment arbitration between Spain and an investor from the Netherlands. Both EU Member States have never consented to subject themselves to the jurisdiction of a tribunal settling investment disputes with nationals of the respective other EU Member State.

33.    The 2024 Declaration reiterates certain seminal judgments of the CJEU – *Achmea* and *Komstroy* among them – issued under the preliminary ruling procedure according to Article 267 of the TFEU. The EU Member States have, in their capacity as actors in public international law, conferred on the CJEU the power to interpret authoritatively the EU Treaties[52] as well as treaties to which the EU is a party, including the ECT, for their application

---

[51]  *Id.* at 2.

[52]  CJEU, Case C-689/13, ECLI:EU:C:2016:199 – *Puligienica Facility Esco SpA (PFE) v. Airgest SpA* ("*Puligienica*") (**Exhibit 47**):

> Article 267 TFEU is to be interpreted as meaning that, after receiving the answer of the Court of Justice of the European Union to a question concerning the interpretation of EU law which it has submitted to the Court, or where the case law of the Court of Justice of the European Union already provides a clear answer to that question, *a chamber of a court of final instance is itself required to do everything necessary to ensure that that interpretation of EU law is applied*.

in an intra-EU context.[53] The powers of authoritative interpretation conferred upon the CJEU are far-reaching. As explained in all my earlier Declarations[54], the CJEU's judgments in the preliminary ruling procedure are binding upon any competent authority deriving its powers from the EU Member States,[55] setting the content and meaning of a given rule *ab initio.*[56] No second-guessing of the interpretation provided by the CJEU – for example, by resorting to other means of interpretation – is permissible. The interpretations provided by the CJEU are of a binding, *i.e.*, compelling nature.[57] Attributing such compelling nature to an interpretation is something which sovereigns can readily do.[58]

34.    The CJEU in *Komstroy* and other judgments has conclusively determined that Article 26 of the ECT has never been applicable in an intra-EU context.

## C.    Decisions from EU Member State Courts

35.    The proliferation of intra-EU investment arbitration without a valid legal basis has faced resistance in the courts of the EU Member States. For example, German courts, including the Bundesgerichtshof, *i.e.* the German Supreme Court in civil and criminal matters ("German Supreme Court"), have set aside arbitral awards for lack of an arbitration

---

[53]    *See* 2024 Declaration at 1 (**Exhibit 27**); and direct quote in footnote 48 *above*. *See also Mox Plant* ¶¶ 129-137 (**Exhibit 23**).

[54]    First Hindelang Declaration ¶ 31-36; Second Hindelang Declaration ¶ 87; Third Hindelang Declaration ¶ 25, 38; Fourth Hindelang Declaration ¶¶ 26, 49.

[55]    *See, e.g.*, CJEU, Joined Cases 205 to 215/82, ECLI:EU:C:1983:233 ¶¶ 17, 22 – *Deutsche Milchkontor* (**Exhibit 12**); CJEU, Case C-231/96, ECLI:EU:C:1998:401 – *Edis* (**Exhibit 13**)*.*

[56]    *PL Holdings* ¶¶ 57-61 (**Exhibit 8**); CJEU, Joined Cases 66, 127 and 128/79, ECLI:EU:C:1980:101 ¶ 9 – *Salumi* (**Exhibit 7**).

[57]    *Puligienica* (**Exhibit 47**).

[58]    "Subsequent practice . . . would appear to be decisive of the meaning to be attached to the treaty, at any rate when it indicates that the parties consider the interpretation to be binding upon them." ILC, Yearbook of the International Law Commission, 1964, Volume II, Documents of the 16th session including the report of the Commission to the General Assembly, UN Doc. A/CN.4/SER.A/1964/ADD.1 at 60 ¶ 25 (**Exhibit 48**). *See also* ILC, Yearbook of the International Law Commission, 2018, Volume II, Part Two, Report of the Commission to the General Assembly on the work of its 70th session, UN Doc. A/CN.4/SER.A/2018/Add.1 (Part 2) ("ILC Draft conclusions") at 31 ¶ 5 (**Exhibit 49**).

agreement,[59] and have issued anti-arbitration injunctions against both non-ICSID[60] and ICSID awards[61]. With regard to ICSID awards, the German Supreme Court held in *The Netherlands v. RWE* that, in an intra-EU context, the presumed *Kompetenz-Kompetenz* of an ICSID tribunal under Article 41(1) of the ICSID Convention,[62] which – in isolation – may preclude the national court from intervening,[63] cannot protect it from an anti-arbitration injunction under German law when read in conjunction with the EU Treaties. As noted, the EU Treaties provide for the primacy of EU law, which must take precedence over public international law commitments of the EU Member States in an intra-EU context.[64] These decisions illustrate how, for the purposes of intra-EU arbitrations under the ECT, the EU Treaties (including the CJEU's judgments in *Achmea*, *Komstroy*, and others) are (also) public international law and thus applicable under Article 26(6) of the ECT.[65] Based on the *ratio decidendi* of the CJEU rulings on the non-enforceability of intra-EU ICSID awards[66] and the comparable situation, the German Supreme Court held that an anti-arbitration injunction was justified because:

> The arbitration proceedings are *inadmissible for lack of an effective arbitration agreement*. The entry into a *valid* arbitration agreement between the Parties is *precluded* by the fact that the *arbitration clause in Art. 26 (2) (c), ECT is not applicable to investment disputes in the intra-EU context* according to the case

---

[59] BGH, Case No. I ZB 2/15, Judgment (31 October 2018) – *Slovak Republic v. Achmea B.V.* (**Exhibit 84)**

[60] BGH, Case No. I ZB 16/21, Decision (17 November 2021) – *Croatia v. Raiffeisen International et al.* (**Exhibit 50**).

[61] BGH, Case No. I ZB 43/22, Decision (27 July 2023) – *Germany v. Mainstream Renewable Power et al.* (**Exhibit 51**); BGH, Case No. I ZB 75/22, Decision (27 July 2023) – *The Netherlands v. RWE* ("*The Netherlands v. RWE*") (**Exhibit 52**).

[62] The provision reads: "The Tribunal shall be the judge of its own competence."

[63] *The Netherlands v. RWE* ¶ 66 (**Exhibit 52**).

[64] *Id.*¶¶ 68, 79-80, 128-129 (**Exhibit 52**) referring to CJEU Case C-638/19 P, ECLI:EU:C:2022:50 – *Commission v. European Food and Others* ("*European Food and Others*") (**Exhibit 53**); CJEU, Case C-333/19, ECLI:EU:C:2022:749 – *Romatsa and Others* ("*Romatsa and Others*") (**Exhibit 54**).

[65] *The Netherlands v. RWE* ¶¶ 104, 110 (**Exhibit 52**).

[66] *European Food and Others* ¶ 145 (**Exhibit 53**); *Romatsa and Others* ¶ 44 (**Exhibit 54**).

law of the Court of Justice of the European Union.[67] . . . Due to [the . . . ] incompatibility [of Article 26 of the ECT] in particular with Articles 267, 344 TFEU, there is no effective consent and thus no offer by the claimant to conclude an arbitration agreement.[68]

36.    French courts have also set aside intra-EU investment awards for lack of jurisdiction.[69] Swedish courts have also consistently declared invalid[70] intra-EU awards based on the grounds of violation of European, and therefore, Swedish public policy[71] or non-arbitrability.[72] The Court of Cassation of the Grand Duchy of Luxembourg has declined enforcing an intra-EU ICSID award, confirming that purported award debtor State Romania enjoyed sovereign immunity since no valid arbitration agreement existed.[73]

---

[67] *The Netherlands v. RWE* ¶ 97 (**Exhibit 52**) (emphasis added).

[68] (translation by the author) *Id.*  ¶ 105.

[69] Cour d' Appel de Paris [Paris Court of Appeal], Case N° RG 20/14581 – N° Portalis 35L7-V-B7E-CCPBD, Decision (19 April 2022) – *Poland v. Slot Group et al.* (**Exhibit 55**).

[70] The Swedish Arbitration Act ("SAA") distinguishes between the invalidity of an arbitral award for reasons beyond the control of the disputing parties, contained in Art. 33 of the SAA, and the setting aside of an arbitral award for reasons within the control of the parties, contained in Art. 34 of the SAA. *See* Hobér, Kaj, International Commercial Arbitration in Sweden (Oxford University Press, 2nd ed. 2021) at 8.27 (**Exhibit 56**).

[71] Svea Hovrätt [Svea Court of Appeal], Case No T 2613-23, Judgment (23 December 2024) – *Poland v. Mercuria Energy Group Ltd* (not yet published); Svea Hovrätt [Svea Court of Appeal], Case No. T 1626-19, Judgment (28 June 2024) – *Spain v. Foresight Luxembourg Solar 1 S.à.r.l. and others* (**Exhibit 57**); Svea Hovrätt [Svea Court of Appeal], Case T-3229-19, Judgment (17 June 2024) – *Republic of Italy v. Athena Investments A/S and others* (**Exhibit 58**); Svea Hovrätt [Svea Court of Appeal], Case No. T 4236-19, Judgment (27 May 2024) – *Italy v. CEF Energia B.V.* (**Exhibit 59**); Svea Hovrätt [Svea Court of Appeal], Case No. T 15200-22, Judgment (27 March 2024) – *Spain v. Triodos SICAV II* (**Exhibit 60**); Svea Hovrätt [Svea Court of Appeal], Case No. T 12646-21, Judgment (20 December 2023) – *Festorino Investment Limited et al. v. Poland* (**Exhibit 61**); Högsta Domstolen [Swedish Supreme Court], Case No. T 1569-19, Judgment (14 December 2022) – *Poland v. PL Holdings S.á.r.l.* (**Exhibit 85**).

[72] Svea Hovrätt [Svea Court of Appeal], Case No. T 4658-18, Judgment (13 December 2022) – *Spain v. Novenergia II - Energy & Environment (SCA), SICAR* (**Exhibit 62**).

[73] Cour de cassation du Grand-Duché de Luxembourg [Court of Cassation of the Grand Duchy of Luxembourg], Case No. CAS-2021-00061, Decision (14 July 2022) (**Exhibit 63**); *See also* Conclusions du Parquet Général dans l'affaire de cassation État de Roumanie c/ M et Commission européenne (14 July 2022) at 50 (**Exhibit 64**): "Il en suit que la jurisprudence Achmea s'applique aux clauses d'arbitrage fondées sur la Convention CIRDI et, ainsi que la Cour de justice l'a formellement confirmé, à la clause d'arbitrage en cause en l'espèce". ("It follows that the Achmea case-law applies to arbitration clauses based on the ICSID Convention and, as the Court of Justice has formally confirmed, to the arbitration clause at issue in this case." (translation by the author)).

37.    It has recently been reported that the Amsterdam Court in the Netherlands – in line with the CJEU's jurisprudence[74] – has declared that certain intra-EU investment awards[75], like the one at issue in the present case, constitute unlawful State aid under the EU Treaties. The recovery of damages under the intra-EU award by an assignee (in the Dutch case Blasket Renewable Investments LLC) (or any other entity relying on the damages originally awarded to the award creditor (and assignor)) would be contrary to the EU Treaties as long as the State aid proceedings are pending, as they are. The Dutch court also ordered, subject to certain conditions, the original award creditors to pay to Spain any amount that Spain may be ordered to pay to Blasket (or any successor in title).[76]

### D.    Recent judgments of the CJEU

38.    Since I submitted my last Declaration[77] in the present proceedings, the CJEU has rendered several further decisions related to intra-EU investment arbitration, confirming its previous case-law and clarifying certain aspects. This relates in particular to the ICSID Convention, its non-application in an intra-EU context, the consequences for an enforcement of a purported intra-EU ICSID award outside the EU Member States (below i.), and the confirmation that the payment of certain purported intra-EU investment awards qualifies as State aid under EU law and, thus, absent notification to and pre-approval by the Commission, any such aid is unlawful under EU law and cannot be implemented (below ii.).

---

[74] *See below* ¶¶ 46 *et seq.*

[75] The reported Dutch case Rechtbank Amsterdam [Amsterdam Court of First Instance], Case No. C/13/728512 / HA ZA 23-64, ECLI:NL:RBAMS:2025:732, Judgment (05 February 2025) – *Koninkrijk Spanje v. AES Solar Energy Coöperatief U.A. and Ampere Equity Fund B.V.* (**Exhibit 86**) related to *The PV Investors v. The Kingdom of Spain*, PCA Case No. 2012-14, Award (28 February 2020).

[76] IA Reporter, Amsterdam court orders Dutch companies to pay Spain monies collected under intra-EU ECT award if the award is successfully enforced abroad (06 February 2025) (**Exhibit 87**).

[77] Fourth Hindelang Declaration on 29 June 2022.

i.   **The ICSID Convention in an intra-EU context**

39.    What the CJEU has already confirmed in terms of result in its brief order in

*Romatsa and Others*[78] was laid out in more detail in two subsequent decisions, *Commission v.*

*United Kingdom*[79] and *European Food and Others II*:[80] *Achmea* and *Komstroy* are also fully

applicable to intra-EU investment awards rendered under the ICSID Convention. An ICSID

award, rendered in an intra-EU context

> cannot . . . produce any effects and cannot thus be executed with
> a view to paying the compensation granted by that award.[81]

This is because

> the system of judicial remedies provided for by the [T]EU and
> [T]FEU . . . replaced the arbitration procedures established
> between the Member States.[82]

40.    These findings also have direct impact on the obligations owed under Article 53

and 54 of the ICSID Convention. Article 25 of the ICSID Convention requires for an ICSID

tribunal to exercise jurisdiction "between a Contracting State . . . and a national of another

Contracting State . . . [that] the parties to the dispute consent in writing to submit to" ICSID

arbitration. However, Spain has never provided an offer which could be accepted by an

---

[78] *Romatsa and Others* ¶ 44 (**Exhibit 54**): "Il convient, dès lors, de répondre aux deuxième et troisième questions posées que le droit de l'Union, en particulier ses articles 267 et 344 TFUE, doit être interprété en ce sens qu'une juridiction d'un État membre saisie de l'exécution forcée de la sentence arbitrale ayant fait l'objet de la décision 2015/1470 est tenue d'écarter cette sentence et, partant, ne peut en aucun cas procéder à l'exécution de celle-ci afin de permettre à ses bénéficiaires d'obtenir le versement des dommages et intérêts qu'elle leur accorde." ("The answer to the second and third questions referred is therefore that EU law, in particular Articles 267 and 344 TFEU thereof, must be interpreted as meaning that a court of a Member State seized of the enforcement of the [ICSID] arbitral award which was the subject of Decision 2015/1470 is required to set aside that award and, therefore, may not under any circumstances enforce the agreement in order to enable its beneficiaries to obtain payment of the damages awarded to them." (translation by the author)).

[79] CJEU, Case C-516/22, ECLI:EU:C:2024:231 – *Commission v. United Kingdom* ("*Commission v. United Kingdom*") (**Exhibit 65**).

[80] CJEU, Cases T-624/15 RENV, T-694/15 RENV and T-704/15 RENV, ECLI:EU:T:2024:659 – *European Food and Others II* ("*European Food and Others II*") (**Exhibit 66**).

[81] *Id.* ¶ 101.

[82] *Commission v. United Kingdom* ¶ 80 (**Exhibit 65**); *European Food and Others* ¶ 145 (**Exhibit 53**); *European Food and Others II* ¶ 99 (**Exhibit 66**).

investor, as Article 26(3), (4) of the ECT has been inapplicable in intra-EU investment disputes *ab initio*. The CJEU stated correctly in *European Food and Others* that consent purportedly provided towards an intra-EU investment arbitration based on the ICSID Convention "lacked any force."[83]

41.     The operation of the principles of autonomy and primacy in the EU Treaties has implications with respect to the recognition and enforcement of an ICSID award.  Any Contracting State to the ICSID Convention, here the United States, is under no international law obligation to recognize or enforce an intra-EU investment award that was rendered in violation of the EU Treaties, such as the Award in *NextEra v. Spain* based on Article 54(1) of the ICSID Convention, as Spain has not been in violation of Article 53(1) of the ICSID Convention.

42.     Spain does not bear any obligation to comply with the Award rendered in the *NextEra v. Spain* allegedly flowing from Article 53(1) of the ICSID Convention.  This is due to the fact that Article 53(1) of the ICSID Convention is in conflict with the EU Treaties and, thus, must be disapplied in an intra-EU context, where no third State rights or obligations are affected.[84]

43.     This is exactly what the CJEU held in *European Food and Others II*. "There was . . . no obligation for Romania [read Spain] to execute the arbitral award or, a fortiori, to

---

[83] *European Food and Others* ¶ 145 (**Exhibit 53**); *See also Romatsa and Others* ¶ 44 (**Exhibit 54**).

[84] The obligations under the Convention are bilateral in nature because they are founded on reciprocity amongst concerned parties only, *i.e.*, Spain and the Netherlands. Any modification would not affect the rights of contracting third parties or the effective performance of their obligations. (*See* in general on *inter se* modification von der Decken, Kerstin in: Dörr/Schmalenbach (eds), Vienna Convention on the Law of Treaties – A Commentary (Springer, 2nd ed. 2018), Article 41 ¶ 18 (**Exhibit 67**). Furthermore, *inter se* modification would neither create any burden for the other Contracting States to the Convention nor affect the effective performance of their obligations as none of its consequential effects would affect matters which are not *inter se* the EU Member States. The said modification would also not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole. The object and purpose of the ICSID Convention is, according to Art. 1(2), "to provide facilities for conciliation and arbitration of investment disputes between Contracting States and nationals of other Contracting States". This purpose is not affected by an *inter se* modification.

implement it, independently of any enforcement [in an intra-EU context. . . . ] Article 53 of the ICSID Convention, under which each party bound by the award must abide by and comply with its terms . . . did not . . . create obligations for Romania [read Spain]."[85] Not applying Article 53 of the ICSID Convention in an intra-EU context does not affect the rights of non-EU Contracting States of the ICSID Convention.[86] The Court stated:

> [D]espite its multilateral nature, [the ICSID Convention] is intended to govern bilateral relations between the contracting parties in an analogous way to a bilateral treaty. Although the applicants claim, in essence, that the third States which have concluded the ICSID Convention could have an interest in Romania complying with its obligations vis-à-vis another Member State by enforcing, in accordance with the provisions of that convention, an arbitral award falling within its scope, such a purely factual interest cannot be equated with a 'right' [ . . . of a third State] capable of justifying the application of that provision in an intra-EU context.[87]

This view appears to be shared by the United States Court of Appeals for the District of Columbia. In its recent discussion of sovereign interests involved in enforcing an ICSID award, it refers only to the home State of the investor vis-à-vis the award debtor State. The interests of third countries do not seem to come into play.[88]

44.    Furthermore, it is clear from the text of the ICSID Convention that where there is no obligation under Article 53(1) of the ICSID Convention, there is none under its Article 54(1). Article 53(1) creates an *obligation vis-à-vis the other State parties to the ICSID Convention* "to abide by the award under the ICSID Convention to which it is a party."[89] The

---

[85]  *European Food and Others II* ¶¶ 103-104 (**Exhibit 66**).

[86]  *Id.* ¶ 105.

[87]  *Id.* ¶ 106.

[88]  United States Court of Appeals for the District of Columbia, No. 23-7031, Judgment (16 August 2024) ¶¶ 39-40 – *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Spain* (**Exhibit 68**).

[89]  Reinisch, August in: Schill, *et al.* (eds), Schreuer's Commentary on the ICSID Convention: A Commentary on the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (Cambridge University Press, 3rd ed. 2022), Article 53 ¶ 15 (**Exhibit 69**). In this context

provision envisages that the award debtor is voluntarily complying with the ICSID award. If an award debtor voluntarily complies with an ICSID award, any further procedure to force such compliance would be rendered needless. Article 54(1) of the ICSID Convention stipulates a duty of cooperation of the Contracting States to the ICSID Convention in case the award is not voluntarily complied with.[90]

45.    Reading Articles 53(1) and 54(1) of the ICSID Convention together, it is clear that *only*[91] in the event of a failure of the award debtor to voluntarily comply with an ICSID award would another Contracting State to the ICSID Convention be called upon to recognise and enforce such award, *i.e.*, "converting" an ICSID award into a court judgement ordering the award debtor to comply with the said award and to provide for coercive measures that the award creditor can request the enforcing court to implement.  In a nutshell: "The need to resort to enforcement would be a *consequence of noncompliance in violation of Art. 53* [of the ICSID Convention]."[92] This, however, also means that if there is no obligation under Article 53(1) of the ICSID Convention in the first place, *none* of the Contracting States to the ICSID Convention are under *any* obligation to recognize or enforce such award according to Article 54(1) of the ICSID Convention. This is precisely the case here; Spain has not been in violation of Article 53(1) of the ICSID Convention. Thus, other Contracting States, like the United

---

it is important to recall that "the legal basis for the Award's binding force is not entirely symmetrical. ICSID proceedings, by necessity, involve a State party and a non-State party. Both are parties to the agreement to arbitrate." (*Id*. ¶ 15) In the case at hand, such agreement is allegedly based on the offer to arbitrate by Spain pursuant to Art. 26 of the ECT and the acceptance of the investor. Art. 53(1) of the ICSID Convention establishes an obligation which is to be differentiated from the one flowing from the aforesaid alleged agreement to arbitrate. Art. 53(1) creates an obligation *vis-à-vis* the other Contracting States to the ICSID Convention "to abide by the award under the ICSID Convention to which it is a party."

[90]    Reinisch, August in: Schill, *et al.* (eds), Schreuer's Commentary on the ICSID Convention: A Commentary on the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (Cambridge University Press, 3rd ed. 2022), Article 53 ¶ 14 (**Exhibit 69**).

[91]    *Id.* ¶ 37.

[92]    *Id.* (emphasis added).

States, are under no international law obligation to recognize or enforce the Award rendered in *NextEra v. Spain* based on Article 54(1) of the ICSID Convention. The EU Member States have chosen to exercise their sovereign rights in a way to give priority to the EU Treaties in their *inter se* relations. In concrete terms, this means that these States have agreed in public international law that their other *inter se* commitments are to be interpreted and applied in the light of, and in conformity with, the EU Treaties. Other sovereigns, including their domestic courts in which recognition and enforcement are sought, may reasonably be expected to respect that sovereign choice of the EU Member States with regard to their *inter se* relations. The EU Member States' very choice has no impact, in any manner whatsoever, on the rights and obligations of the Contracting States to the ICSID Convention, including the United States, which are not parties to the EU Treaties.  In contrast, disregarding the sovereign choice of the aforementioned EU Member States would mean negating and pushing them towards violating the *erga omnes partes* obligations flowing from the EU Treaties which are "based on the fundamental premiss that each EU Member State shares with all the other EU Member States, and recognises that they share with it, a set of common values on which the EU is founded, as stated in Article 2 TEU".[93]

> ## ii. Consequences of paying an intra-EU investment award absent notification and pre-approval by the European Commission

46.     As explained in all my earlier Declarations[94], the EU Treaties prohibit EU Member States from granting any subsidies to private actors ("State aid") that might disrupt or threaten to distort competition within the EU. The relevant provision of the TFEU provides as follows:

> [A]ny aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production

---

[93]  *Achmea* ¶ 34 (**Exhibit 5**).

[94]  First Hindelang Declaration ¶¶ 57-65; Second Hindelang Declaration ¶¶ 98-107; Third Hindelang Declaration ¶¶ 75-85; Fourth Hindelang Declaration ¶¶ 76-83.

> of certain goods shall, in so far as it affects trade between Member States, be *incompatible with the internal market*.[95]

State aid is a measure conferring a selective economic advantage on private operators. To be considered such aid, the measure must be imputable to the EU Member State; it must distort or threaten to distort competition and have the potential to affect trade between EU Member States.[96]

47.    Under the EU Treaties, subject to a few unrelated exceptions, State aid is permissible only when first notified to and approved by the European Commission. According to Article 108(3) of the TFEU, the Commission

> shall be informed, in sufficient time to enable it to submit its comments, of any plans to grant or alter aid.  If it considers that any such plan is not compatible with the internal market having regard to Article 107 [of the TFEU], it shall without delay initiate the procedure provided for in paragraph 2 [of Article 108 of the TFEU].  The Member State concerned shall not put its proposed measures into effect until this procedure has resulted in a final decision.

Absent notification and pre-approval the State aid is unlawful under EU law.

48.    To establish whether a particular measure constitutes State aid, the CJEU has adopted a broad reading of the notion:

> According to settled case-law, the concept of aid encompasses advantages granted by public authorities which, in various forms, mitigate the charges which are normally included in the budget of an undertaking.[97]

The intention or justification of an EU Member State are irrelevant to whether a measure is considered State aid.  It is the effects of the measure in question that are dispositive.[98]

---

[95]  Art. 107(1) of the TFEU (**Exhibit 4**) (emphasis added).

[96]  *See*, *e.g.*, CJEU, Case C-39/94, ECLI:EU:C:1996:285 ¶¶ 58 *et seq.* – *SFEI et al.* (**Exhibit 70**).

[97]  CJEU, Case C-310/99, ECLI:EU:C:2002:143 ¶ 51 – *European Commission v. Italian Republic* (**Exhibit 71**).

[98]  CJEU, Case C-382/99, ECLI:EU:C:2002:363 ¶¶ 60-61 – *European Commission v. The Netherlands* (**Exhibit 72**).

49.    In its Decision 7384, the Commission applied these factors in connection with arbitrations that have been commenced against Spain, such as the one initiated in the *NextEra v. Spain*, which seek compensation for the impact of governmental regulatory reforms that Spain adopted in its energy sector with respect to subsidies for renewable energy production.[99] It stated that awards which require the government of Spain to pay compensation to investors in these cases would constitute State aid. The Commission concluded that because such "Arbitration Tribunals are not competent to authorize the granting of State aid . . . [i]f they award compensation, . . . this compensation would be notifiable State aid" that cannot be paid by Spain, an EU Member State, unless authorized by the Commission.[100] This means that the damages awarded by the Tribunal in the present case, purporting to compensate the Claimant in *NextEra v. Spain* for their alleged losses resulting from governmental regulatory reforms in Spain's renewable energy sector' subsidies schemes, cannot be paid by Spain without the European Commission's prior approval. This is because such payments would effectively replace the subsidies paid under the Spanish schemes, which are themselves State aid.

---

[99]    *See* European Commission, Case No. SA.40348 (2015/NN), Decision 7384 on State Aid (10 November 2017) ¶ 165 – *Spain's support for electricity generation from renewable energy sources, cogeneration and waste* (**Exhibit 73**). *See also* CJEU, Case C-275/13, ECLI:EU:C:2014:2314 ¶ 33 – *Elcogás SA v. Administración del Estado* (**Exhibit 74**) where the CJEU found that the Spanish subsides scheme constituted State aid: "Il résulte des considérations qui précèdent qu'il y a lieu de répondre à la question préjudicielle que l'article 107, paragraphe 1, TFUE doit être interprété en ce sens que constituent une intervention de l'État ou au moyen de ressources d'État les montants alloués à une entreprise privée productrice d'électricité qui sont financés par l'ensemble des utilisateurs finaux d'électricité situés sur le territoire national et qui sont distribués aux entreprises du secteur électrique par un organisme public conformément à des critères légaux prédéterminés." ("It follows from the foregoing considerations that the answer to the question referred for a preliminary ruling is that Article 107(1) TFEU must be interpreted as meaning that amounts allocated [under Spanish Law 54/1997 and Spanish Royal Decree 2017/1997] to a private electricity-producing undertaking which are financed by all electricity end-users situated in the national territory and which are distributed to undertakings in the electricity sector by a public body in accordance with predetermined legal criteria constitute State intervention or State resources [within the definition of State aid]." (translation by the author)).

[100]    European Commission, Case No. SA.40348 (2015/NN), Decision 7384 on State Aid (10 November 2017) ¶ 165 – *Spain's support for electricity generation from renewable energy sources, cogeneration and waste* (**Exhibit 73**).

50.    The view taken in Decision 7384 and Spain's submissions are consistent with a previous decision by the European Commission that determined that payment by Romania of an arbitral award rendered by a tribunal constituted under an investment treaty with another EU Member State constituted unauthorized State aid to an investor.[101]

51.    In *European Food and Others*, the CJEU indicated with regard to Decision 7384 of the Commission that EU State aid law may well be violated by the payment of an award in an intra-EU context.[102] "[D]amages which national authorities may be ordered to pay to individuals in compensation for damage they have caused to those individuals"[103] are fundamentally different from an intra-EU arbitral award such as the one in the present proceedings  and, consequently, only the former are outside the scope of review under the EU State aid regime. In *European Food and Others II*, the CJEU expressly confirmed that the payment of an intra-EU investment award, compensating for the modification of State aid, constitutes an economic advantage,[104] is selective,[105] and is imputable to the State.[106] Consequentially, it is to be classified as State aid.

52.    Accordingly, the EU Treaties, and thus also State aid law, are applicable to intra-EU arbitral awards, and the payment of an intra-EU arbitral award without prior approval by the Commission would violate EU State aid law.  Exactly in the same light one must read the CJEU's order in *Romatsa and Others*,[107] where it held that an intra-EU investment award

---

[101]  *See* European Commission, Case No. SA.38517 (2014/C), Decision 1470 on State Aid (30 March 2015), OJ L 232, 43 ¶¶ 94 *et seq.* – *Arbitral award Micula v. Romania of 11 December 2013* (**Exhibit 75**).

[102]  *See European Food and Others* ¶¶ 131, 137 (**Exhibit 53**).

[103]  *Id.* ¶ 131.

[104]  *European Food and Others II* ¶¶ 113 *et seq*., esp. ¶¶ 170 *et seq*. (**Exhibit 66**).

[105]  *Id.* ¶ 193 (**Exhibit 66**).

[106]  *Id.* ¶¶ 201 *et seq.* (**Exhibit 66**).

[107]  *Romatsa and Others* ¶ 44 (**Exhibit 54**). The French original reads: "Il convient, dès lors, de répondre aux deuxième et troisième questions posées que le droit de l'Union, en particulier ses articles 267 et

which violates a European Commission decision stating that the award forms State aid cannot be enforced by a Member State court. The only difference to the case at hand is that in *NextEra v. Spain* the violation of EU law results not from a decision of the European Commission, but directly from the EU Treaties, *i.e.*, Article 108(3) of the TFEU and its standstill clause.

53.     Moreover, recently the European Commission opened an in-depth investigation into the arbitration award in favour of *Antin*[108] to be paid by Spain.[109] That means that the European Commission, at this stage of the proceedings on a preliminary basis, perceives the payment of the award to constitute State aid.

54.     Payment of the Award in the present case, even though ordered by the Tribunal, would have to be granted through Spain's state resources, is an economic advantage not available on the market, selective, and is imputable to the State,[110] and such payment would qualify as State aid to an investor. It is therefore subject to the obligation imposed by Article 108(3) of the TFEU that an EU Member State cannot put in effect any measures that constitute

---

344 TFUE, doit être interprété en ce sens qu'une juridiction d'un État membre saisie de l'exécution forcée de la sentence arbitrale ayant fait l'objet de la décision 2015/1470 est tenue d'écarter cette sentence et, partant, ne peut en aucun cas procéder à l'exécution de celle-ci afin de permettre à ses bénéficiaires d'obtenir le versement des dommages et intérêts qu'elle leur accorde." ("The answer to the second and third questions referred must therefore be that Union law, in particular Articles 267 TFEU and 344 TFEU, must be interpreted as meaning that a court of a Member State seized of the compulsory enforcement of the arbitration award which was the subject-matter of Decision 2015/1470 is required to set aside/disapply/disregard that award and, consequently, may not under any circumstances enforce it in order to enable its beneficiaries to obtain payment of the damages awarded to them." (my translation)).

[108]     *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. The Kingdom of Spain*, ICSID Case No. ARB/13/31, Award (15 June 2018) (**Exhibit 76**).

[109]     European Commission, Case No. SA.54155 (2021/C), Decision (19 July 2021) – *Arbitration award to Antin – Spain* (**Exhibit 77**); *See also* European Commission, Press Release IP/21/3783, *State aid: Commission opens in-depth investigation into arbitration award in favour of Antin to be paid by Spain* (19 July 2021) (**Exhibit 78**).

[110]     *See* European Commission, Case No. SA.38517 (2014/C), Decision 1470 on State Aid (30 March 2015), OJ L 232, 43 ¶¶ 93 *et seq.* – *Arbitral award Micula v. Romania* of *11 December 2013* (**Exhibit 75**).

State aid unless and until approved by the European Commission. The payment of an award would therefore be in violation of EU law.[111]

55.    Furthermore, the enforcement of an award that violates the EU Treaties would *also* be unlawful in any EU jurisdiction. As explained above, the EU Treaties preclude the application of the rules created by the EU Member States which conflict with the EU Treaties and the legal order they create. This includes situations where the application of such rules would prevent the respective court

> from drawing all the consequences of a breach of [EU State Aid rules] . . . because of a decision of a national court, which is res judicata . . . A significant obstacle to the effective application of EU law and, in particular, a principle as fundamental as that of the control of State aid cannot be justified either by the principle of res judicata or by the principle of legal certainty.[112]

This effect of EU law results equally in situations where the conflicting rule is contained in the domestic law of an EU Member State or was agreed to by EU Member States in an international agreement or treaty.

56.    Because payment of the Award in the case at hand without prior approval by the European Commission would also breach EU law on State aid, the enforcement of the Award in this matter would be in violation of the EU Treaties.

57.    For the avoidance of doubt, from the point of view of the EU Treaties, it makes no difference whether Spain is "made to pay" in an enforcement procedure or voluntarily pays an award made in breach of the EU State aid rules, such as the Award in the present case. In the circumstances where Spain has refused to pay voluntarily and has opposed enforcement of the award, the "payment" would still be imputable to Spain.  This is due to the fact that attribution, according to the CJEU's case law, is a broad concept guided by the idea to mitigate

---

[111]  *See European Food and Others* ¶ 131 in connection with ¶¶ 137-145 (**Exhibit 53**).

[112]  CJEU, Case C-505/14, ECLI:EU:C:2015:742 ¶ 45 – *Klausner Holz Niedersachsen GmbH v. Land Nordrhein-Westfalen* (**Exhibit 79**).

the "real risk that State aid may be granted through the intermediary . . . and in breach of the rules on State aid laid down by the Treaty."[113]  Therefore,

> it must be accepted that the imputability to the State of an aid measure  . . .  may be *inferred* from a set of *indicators* arising from the *circumstances* of the case and the *context* in which that measure was taken.[114]

It thus suffices that there are indications that an EU Member State contributed to the relevant aid measure. Spain created the "real risk that State aid may be granted through the intermediary . . .  and in breach of the rules on State aid laid down by the Treaty"[115] by ratifying the ECT and the ICSID Convention, and, thus, Spain contributed to the situation in which it is facing enforcement of an award in a foreign court in contravention of its obligations under Article 108(3) of the TFEU. Thus, under the EU Treaties, the enforcement actions undertaken in a foreign jurisdiction (and consequential payment) can be attributed to Spain.[116]

58.    In sum, because payment of the Award in favour of the Claimant without prior approval by the Commission would be unlawful under the EU Treaties, the enforcement of such Award would place Spain (again) in a situation where it violates the EU Treaties and, thus, it would result in a further conflict of Spain' obligations under public international law, which would have to be resolved in favour of the EU Treaties in accordance with the principle of primacy of EU law.

59.    If Spain should pay (or is forced to pay) the Award at issue and the Commission concludes at the end of its investigation that the State aid is incompatible with the internal market, it will typically instruct Spain to recover (or reclaim) the aid. This process is outlined

---

[113]   CJEU, Case C-482/99, ECLI:EU:C:2002:294 ¶ 53 – *French Republic v. European Commission* (**Exhibit 80**).

[114]   *Id.* ¶ 55 (emphasis added).

[115]   *Id.* ¶ 53.

[116]   *See also European Food and Others II* ¶¶ 201 *et seq.* (**Exhibit 66**).

in the "Commission Notice on the recovery of unlawful and incompatible State aid".[117] The recovery procedure involves close collaboration and oversight between the Commission and the Member State.[118] However, it can also result in litigation in national courts, such as when the beneficiary disputes the repayment or refuses to return the aid,[119] or when insolvency proceedings are necessary to recover the funds.[120] Should Spain fail to recover the aid, it could face legal action from the Commission under Article 258 of the TFEU,[121] If Spain, having been found by the CJEU to be in violation of the EU Treaties, does not take up the necessary measures to comply with the infringement judgment, the Commission may again address the CJEU, now under Article 260(2) of the TFEU, and propose to impose financial sanctions for failing to fulfil obligations under the Treaties. Sanctions can easily run into hundreds of millions of euros. Poland, for example, was hit by an initial fine of 1 Million euros per day for not complying with rulings of the CJEU.[122]

*      *      *

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on 13 February 2025, in Berlin, Germany.

(Steffen Hindelang)

---

[117]    European Commission, Case No. C/2019/5396, Communication from the Commission - Commission Notice on the recovery of unlawful and incompatible State aid (23 July 2019), OJ C 247, 1 (**Exhibit 81**).

[118]    *Id.* ¶ 65.

[119]    *Id.* ¶¶ 141-142.

[120]    *Id.* ¶¶ 127-135.

[121]    *Id.* ¶¶ 148-158.

[122]    European Commission, *Communication from the Commission, Update of data used to calculate financial sanctions proposed by the Commission to the Court of Justice of the European Union in infringement proceedings* (26 January 2024), C/2024/1123 (**Exhibit 82**); *See* CJEU, Case C-204/21 R, ECLI:EU:C:2021:878 – *Commission v. Republic of Poland* (**Exhibit 83**); two years later, the sanctions were reduced to half a million.