# EXHIBIT 3

**NOTE TO THE READER**

This publication contains the consolidated versions of the Treaty on European Union ('TEU') and of the Treaty on the Functioning of the European Union ('TFEU'), together with the annexes and protocols thereto, as they result from the amendments introduced by the Treaty of Lisbon, which was signed on 13 December 2007 in Lisbon and which entered into force on 1 December 2009. It also contains the declarations annexed to the Final Act of the Intergovernmental Conference which adopted the Treaty of Lisbon.

In addition, this publication contains an amendment effected by the Protocol amending the Protocol on Transitional Provisions annexed to the Treaty on European Union, to the Treaty on the Functioning of the European Union and to the Treaty establishing the European Atomic Energy Community and an amendment effected by Regulation (EU, Euratom) No 741/2012 of the European Parliament and of the Council of 11 August 2012 amending the Protocol on the Statute of the Court of Justice of the European Union and Annex I thereto, as well the amendments effected by European Council Decisions 2010/718/EU and 2012/419/EU of 29 October 2010 and of 11 July 2012 amending respectively the status with regard to the European Union of the island of Saint-Barthélemy and of Mayotte. Furthermore, this publication contains the addition of paragraph 3 to Article 136 TFEU, effected by European Council Decision 2011/199/EU of 25 March 2011 amending Article 136 of the Treaty on the Functioning of the European Union with regard to a stability mechanism for Member States whose currency is the euro, following the completion of the ratification procedures of the Member States. This publication also contains the amendments brought about by the Act of Accession of the Republic of Croatia. This publication also contains amendments effected by Regulation (EU, Euratom) 2015/2422 of the European Parliament and of the Council of 16 December 2015 amending the Protocol on the Statute of the Court of Justice of the European Union.

This publication also contains the corrigenda that were adopted up to March 2016.

This publication also contains the Charter of Fundamental Rights of the European Union which was proclaimed at Strasbourg on 12 December 2007 by the European Parliament, the Council and the Commission (OJ C 303, 14.12.2007, p. 1). This text repeats and adapts the Charter proclaimed on 7 December 2000, and replaces it with effect from 1 December 2009, the date of entry into force of the Treaty of Lisbon. By virtue of the first subparagraph of Article 6(1) of the Treaty on European Union, the Charter proclaimed in 2007 has the same legal value as the Treaties.

This publication has been produced for documentary purposes and does not involve the responsibility of the institutions of the European Union.

7.6.2016          EN          Official Journal of the European Union          C 202/1

# CONSOLIDATED VERSION OF

# THE TREATY ON EUROPEAN UNION

# Table of Contents

|  | Page |
|---|---|
| **CONSOLIDATED VERSION OF THE TREATY ON EUROPEAN UNION** . . . . . . | 13 |
| PREAMBLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 |
| TITLE I   COMMON PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 |
| TITLE II   PROVISIONS ON DEMOCRATIC PRINCIPLES . . . . . . . . . . . . . . . . . . . | 20 |
| TITLE III   PROVISIONS ON THE INSTITUTIONS . . . . . . . . . . . . . . . . . . . . . . . . | 22 |
| TITLE IV   PROVISIONS ON ENHANCED COOPERATION . . . . . . . . . . . . . . . . . . | 27 |
| TITLE V   GENERAL PROVISIONS ON THE UNION'S EXTERNAL ACTION AND SPECIFIC PROVISIONS ON THE COMMON FOREIGN AND SECURITY POLICY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28 |
| Chapter 1   General provisions on the Union's external action . . . . . . . . . . . . . . | 28 |
| Chapter 2   Specific provisions on the common foreign and security policy . . . . | 30 |
| Section 1   Common provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 |
| Section 2   Provisions on the common security and defence policy . . . . . . . | 38 |
| TITLE VI   FINAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 41 |

Page

**PROTOCOLS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    201

Protocol (No 1)    on the role of National Parliaments in the European Union  . . .    203

Protocol (No 2)    on the application of the principles of subsidiarity and propor-
                   tionality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    206

Protocol (No 3)    on the statute of the Court of Justice of the European Union    210

Protocol (No 4)    on the statute of the European System of Central Banks and of
                   the European Central Bank . . . . . . . . . . . . . . . . . . . . . . . . . . . .    230

Protocol (No 5)    on the statute of the European Investment Bank  . . . . . . . . . . .    251

Protocol (No 6)    on the location of the seats of the institutions and of certain
                   bodies, offices, agencies and departments of the European Union    265

Protocol (No 7)    on the privileges and immunities of the European Union  . . . . .    266

Protocol (No 8)    relating to article 6(2) of the Treaty on European Union on the
                   accession of the Union to the European Convention on the
                   Protection of Human Rights and Fundamental Freedoms . . . . . .    273

Protocol (No 9)    on the decision of the Council relating to the implementation of
                   Article 16(4) of the Treaty on European Union and article 238(2)
                   of the Treaty on the Functioning of the European Union between
                   1 November 2014 and 31 March 2017 on the one hand, and as
                   from 1 april 2017 on the other  . . . . . . . . . . . . . . . . . . . . . . .    274

Protocol (No 10)   on permanent structured cooperation established by Article 42 of
                   the Treaty on European Union . . . . . . . . . . . . . . . . . . . . . . . . .    275

Protocol (No 11)   on Article 42 of the Treaty on European Union  . . . . . . . . . . .    278

Protocol (No 12)   on the excessive deficit procedure  . . . . . . . . . . . . . . . . . . . . .    279

Protocol (No 13)   on the convergence criteria  . . . . . . . . . . . . . . . . . . . . . . . . . .    281

Protocol (No 14)   on the Euro Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    283

Page

Protocol (No 15)    on certain provisions relating to the United Kingdom of Great Britain and Northern Ireland . . . . . . . . . . . . . . . . . . . . . . . . . . .    284

Protocol (No 16)    on certain provisions relating to Denmark . . . . . . . . . . . . . . . .    287

Protocol (No 17)    on Denmark . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    288

Protocol (No 18)    on France . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    289

Protocol (No 19)    on the Schengen *acquis* integrated into the framework of the European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    290

Protocol (No 20)    on the application of certain aspects of Article 26 of the Treaty on the Functioning of the European Union to the United Kingdom and to Ireland . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    293

Protocol (No 21)    on the position of the United Kingdom and Ireland in respect of the area of freedom, security and justice . . . . . . . . . . . . . . . . . .    295

Protocol (No 22)    on the position of Denmark . . . . . . . . . . . . . . . . . . . . . . . . . . .    298

Protocol (No 23)    on external relations of the Member states with regard to the crossing of external borders . . . . . . . . . . . . . . . . . . . . . . . . . . . .    303

Protocol (No 24)    on asylum for nationals of Member States of the European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    304

Protocol (No 25)    on the exercise of shared competence . . . . . . . . . . . . . . . . . . . .    306

Protocol (No 26)    on services of general interest . . . . . . . . . . . . . . . . . . . . . . . . . .    307

Protocol (No 27)    on the internal market and competition . . . . . . . . . . . . . . . . . . .    308

Protocol (No 28)    on economic, social and territorial cohesion . . . . . . . . . . . . . . .    309

Protocol (No 29)    on the system of public broadcasting in the Member States . . .    311

Protocol (No 30)    on the application of the Charter of Fundamental Rights of the European Union to Poland and to the United Kingdom . . . . . .    312

Protocol (No 31)    concerning imports into the European Union of petroleum products refined in the Netherlands Antilles . . . . . . . . . . . . . . .    314

Protocol (No 32)    on the acquisition of property in Denmark . . . . . . . . . . . . . . .    317

Protocol (No 33)    concerning Article 157 of the Treaty on the Functioning of the European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    318

7.6.2016        EN        Official Journal of the European Union        C 202/9

|  |  | Page |
|---|---|---|
| Protocol (No 34) | on special arrangements for Greenland .................. | 319 |
| Protocol (No 35) | on Article 40.3.3 of the constitution of Ireland ............ | 320 |
| Protocol (No 36) | on transitional provisions ............................... | 321 |
| Protocol (No 37) | on the financial consequences of the expiry of the ECSC Treaty and on the Research fund for Coal and Steel .............. | 327 |

**DECLARATIONS** annexed to the final Act of the Intergovernmental Conference which adopted the Treaty of Lisbon, signed on 13 December 2007 .................. | 335

A.    DECLARATIONS CONCERNING PROVISIONS OF THE TREATIES ........... | 337

| 1. | Declaration concerning the Charter of Fundamental Rights of the European Union ................................................. | 337 |
|---|---|---|
| 2. | Declaration on Article 6(2) of the Treaty on European Union ............. | 337 |
| 3. | Declaration on Article 8 of the Treaty on European Union ............... | 337 |
| 4. | Declaration on the composition of the European Parliament ............... | 337 |
| 5. | Declaration on the political agreement by the European Council concerning the draft Decision on the composition of the European Parliament ............. | 337 |
| 6. | Declaration on Article 15(5) and (6), Article 17(6) and (7) and Article 18 of the Treaty on European Union ......................................... | 338 |
| 7. | Declaration on Article 16(4) of the Treaty on European Union and Article 238(2) of the Treaty on the Functioning of the European Union ................. | 338 |
| 8. | Declaration on practical measures to be taken upon the entry into force of the Treaty of Lisbon as regards the Presidency of the European Council and of the Foreign Affairs Council ........................................... | 340 |
| 9. | Declaration on Article 16(9) of the Treaty on European Union concerning the European Council decision on the exercise of the Presidency of the Council ... | 341 |
| 10. | Declaration on Article 17 of the Treaty on European Union .............. | 342 |
| 11. | Declaration on Article 17(6) and (7) of the Treaty on European Union ...... | 342 |
| 12. | Declaration on Article 18 of the Treaty on European Union .............. | 342 |

C 202/10    EN    Official Journal of the European Union    7.6.2016

Page

13. Declaration concerning the common foreign and security policy . . . . . . . . . . . .    343

14. Declaration concerning the common foreign and security policy . . . . . . . . . . . .    343

15. Declaration on Article 27 of the Treaty on European Union . . . . . . . . . . . . . .    343

16. Declaration on Article 55(2) of the Treaty on European Union . . . . . . . . . . . .    344

17. Declaration concerning primacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    344

18. Declaration in relation to the delimitation of competences . . . . . . . . . . . . . . . .    344

19. Declaration on Article 8 of the Treaty on the Functioning of the European
    Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    345

20. Declaration on Article 16 of the Treaty on the Functioning of the European
    Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    345

21. Declaration on the protection of personal data in the fields of judicial cooperation
    in criminal matters and police cooperation . . . . . . . . . . . . . . . . . . . . . . . . . . . .    345

22. Declaration on Articles 48 and 79 of the Treaty on the Functioning of the
    European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    346

23. Declaration on the second paragraph of Article 48 of the Treaty on the Func-
    tioning of the European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    346

24. Declaration concerning the legal personality of the European Union . . . . . . . . .    346

25. Declaration on Articles 75 and 215 of the Treaty on the Functioning of the
    European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    346

26. Declaration on non-participation by a Member State in a measure based on Title V
    of Part Three of the Treaty on the Functioning of the European Union . . . . . .    346

27. Declaration on Article 85(1), second subparagraph, of the Treaty on the Func-
    tioning of the European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    347

28. Declaration on Article 98 of the Treaty on the Functioning of the European
    Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    347

29. Declaration on Article 107(2)(c) of the Treaty on the Functioning of the European
    Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    347

30. Declaration on Article 126 of the Treaty on the Functioning of the European
    Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    347

31. Declaration on Article 156 of the Treaty on the Functioning of the European
    Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    348

32. Declaration on Article 168(4)(c) of the Treaty on the Functioning of the European
    Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    348

33. Declaration on Article 174 of the Treaty on the Functioning of the European
    Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    349

34. Declaration on Article 179 of the Treaty on the Functioning of the European
    Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    349

35. Declaration on Article 194 of the Treaty on the Functioning of the European
    Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    349

Page

36. Declaration on Article 218 of the Treaty on the Functioning of the European Union concerning the negotiation and conclusion of international agreements by Member States relating to the area of freedom, security and justice . . . . . . . . . .    349

37. Declaration on Article 222 of the Treaty on the Functioning of the European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    349

38. Declaration on Article 252 of the Treaty on the Functioning of the European Union regarding the number of Advocates-General in the Court of Justice . . . .    350

39. Declaration on Article 290 of the Treaty on the Functioning of the European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    350

40. Declaration on Article 329 of the Treaty on the Functioning of the European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    350

41. Declaration on Article 352 of the Treaty on the Functioning of the European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    350

42. Declaration on Article 352 of the Treaty on the Functioning of the European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    351

43. Declaration on Article 355(6) of the Treaty on the Functioning of the European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    351

B. DECLARATIONS CONCERNING PROTOCOLS ANNEXED TO THE TREATIES . .    352

44. Declaration on Article 5 of the Protocol on the Schengen acquis integrated into the framework of the European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    352

45. Declaration on Article 5(2) of the Protocol on the Schengen acquis integrated into the framework of the European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    352

46. Declaration on Article 5(3) of the Protocol on the Schengen acquis integrated into the framework of the European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    352

47. Declaration on Article 5(3), (4) and (5) of the Protocol on the Schengen acquis integrated into the framework of the European Union . . . . . . . . . . . . . . . . . . . .    352

48. Declaration concerning the Protocol on the position of Denmark . . . . . . . . . . .    353

49. Declaration concerning Italy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    353

50. Declaration concerning Article 10 of the Protocol on transitional provisions    354

C. DECLARATIONS BY MEMBER STATES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    355

51. Declaration by the Kingdom of Belgium on national Parliaments . . . . . . . . . . .    355

52. Declaration by the Kingdom of Belgium, the Republic of Bulgaria, the Federal Republic of Germany, the Hellenic Republic, the Kingdom of Spain, the Italian Republic, the Republic of Cyprus, the Republic of Lithuania, the Grand-Duchy of Luxembourg, the Republic of Hungary, the Republic of Malta, the Republic of Austria, the Portuguese Republic, Romania, the Republic of Slovenia and the Slovak Republic on the symbols of the European Union . . . . . . . . . . . . . . . . . .    355

53. Declaration by the Czech Republic on the Charter of Fundamental Rights of the European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    355

Page

54.    Declaration by the Federal Republic of Germany, Ireland, the Republic of Hungary, the Republic of Austria and the Kingdom of Sweden . . . . . . . . . . . . . . . . . . . .    356

55.    Declaration by the Kingdom of Spain and the United Kingdom of Great Britain and Northern Ireland . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    356

56.    Declaration by Ireland on Article 3 of the Protocol on the position of the United Kingdom and Ireland in respect of the area of freedom, security and justice . . .    356

57.    Declaration by the Italian Republic on the composition of the European Parliament . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    357

58.    Declaration by the Republic of Latvia, the Republic of Hungary and the Republic of Malta on the spelling of the name of the single currency in the Treaties . . .    357

59.    Declaration by the Kingdom of the Netherlands on Article 312 of the Treaty on the Functioning of the European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    357

60.    Declaration by the Kingdom of the Netherlands on Article 355 of the Treaty on the Functioning of the European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    358

61.    Declaration by the Republic of Poland on the Charter of Fundamental Rights of the European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    358

62.    Declaration by the Republic of Poland concerning the Protocol on the application of the Charter of Fundamental Rights of the European Union in relation to Poland and the United Kingdom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    358

63.    Declaration by the United Kingdom of Great Britain and Northern Ireland on the definition of the term "nationals" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    358

64.    Declaration by the United Kingdom of Great Britain and Northern Ireland on the franchise for elections to the European Parliament . . . . . . . . . . . . . . . . . . . . . .    358

65.    Declaration by the United Kingdom of Great Britain and Northern Ireland on Article 75 of the Treaty on the Functioning of the European Union . . . . . . . .    359

**Tables of equivalences** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    361

Treaty on European Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    361

7.6.2016     EN     Official Journal of the European Union     C 202/13

# CONSOLIDATED VERSION OF

# THE TREATY ON EUROPEAN UNION

# PREAMBLE

HIS MAJESTY THE KING OF THE BELGIANS, HER MAJESTY THE QUEEN OF DENMARK, THE PRESIDENT OF THE FEDERAL REPUBLIC OF GERMANY, THE PRESIDENT OF IRELAND, THE PRESIDENT OF THE HELLENIC REPUBLIC, HIS MAJESTY THE KING OF SPAIN, THE PRESIDENT OF THE FRENCH REPUBLIC, THE PRESIDENT OF THE ITALIAN REPUBLIC, HIS ROYAL HIGHNESS THE GRAND DUKE OF LUXEMBOURG, HER MAJESTY THE QUEEN OF THE NETHERLANDS, THE PRESIDENT OF THE PORTUGUESE REPUBLIC, HER MAJESTY THE QUEEN OF THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND, ($^1$)

RESOLVED to mark a new stage in the process of European integration undertaken with the establishment of the European Communities,

DRAWING INSPIRATION from the cultural, religious and humanist inheritance of Europe, from which have developed the universal values of the inviolable and inalienable rights of the human person, freedom, democracy, equality and the rule of law,

RECALLING the historic importance of the ending of the division of the European continent and the need to create firm bases for the construction of the future Europe,

CONFIRMING their attachment to the principles of liberty, democracy and respect for human rights and fundamental freedoms and of the rule of law,

CONFIRMING their attachment to fundamental social rights as defined in the European Social Charter signed at Turin on 18 October 1961 and in the 1989 Community Charter of the Fundamental Social Rights of Workers,

DESIRING to deepen the solidarity between their peoples while respecting their history, their culture and their traditions,

DESIRING to enhance further the democratic and efficient functioning of the institutions so as to enable them better to carry out, within a single institutional framework, the tasks entrusted to them,

RESOLVED to achieve the strengthening and the convergence of their economies and to establish an economic and monetary union including, in accordance with the provisions of this Treaty and of the Treaty on the Functioning of the European Union, a single and stable currency,

DETERMINED to promote economic and social progress for their peoples, taking into account the principle of sustainable development and within the context of the accomplishment of the internal market and of reinforced cohesion and environmental protection, and to implement policies ensuring that advances in economic integration are accompanied by parallel progress in other fields,

---

($^1$) The Republic of Bulgaria, the Czech Republic, the Republic of Estonia, the Republic of Croatia, the Republic of Cyprus, the Republic of Latvia, the Republic of Lithuania, the Republic of Hungary, the Republic of Malta, the Republic of Austria, the Republic of Poland, Romania, the Republic of Slovenia, the Slovak Republic, the Republic of Finland and the Kingdom of Sweden have since become members of the European Union.

RESOLVED to establish a citizenship common to nationals of their countries,

RESOLVED to implement a common foreign and security policy including the progressive framing of a common defence policy, which might lead to a common defence in accordance with the provisions of Article 42, thereby reinforcing the European identity and its independence in order to promote peace, security and progress in Europe and in the world,

RESOLVED to facilitate the free movement of persons, while ensuring the safety and security of their peoples, by establishing an area of freedom, security and justice, in accordance with the provisions of this Treaty and of the Treaty on the Functioning of the European Union,

RESOLVED to continue the process of creating an ever closer union among the peoples of Europe, in which decisions are taken as closely as possible to the citizen in accordance with the principle of subsidiarity,

IN VIEW of further steps to be taken in order to advance European integration,

HAVE DECIDED to establish a European Union and to this end have designated as their Plenipotentiaries:

*(List of plenipotentiaries not reproduced)*

WHO, having exchanged their full powers, found in good and due form, have agreed as follows:

## TITLE I

### COMMON PROVISIONS

*Article 1*

(ex Article 1 TEU) ([1])

By this Treaty, the HIGH CONTRACTING PARTIES establish among themselves a EUROPEAN UNION, hereinafter called 'the Union', on which the Member States confer competences to attain objectives they have in common.

This Treaty marks a new stage in the process of creating an ever closer union among the peoples of Europe, in which decisions are taken as openly as possible and as closely as possible to the citizen.

The Union shall be founded on the present Treaty and on the Treaty on the Functioning of the European Union (hereinafter referred to as 'the Treaties'). Those two Treaties shall have the same legal value. The Union shall replace and succeed the European Community.

---

([1]) These references are merely indicative. For more ample information, please refer to the tables of equivalences between the old and the new numbering of the Treaties.

## Article 2

The Union is founded on the values of respect for human dignity, freedom, democracy, equality, the rule of law and respect for human rights, including the rights of persons belonging to minorities. These values are common to the Member States in a society in which pluralism, non-discrimination, tolerance, justice, solidarity and equality between women and men prevail.

## Article 3

### (ex Article 2 TEU)

1.    The Union's aim is to promote peace, its values and the well-being of its peoples.

2.    The Union shall offer its citizens an area of freedom, security and justice without internal frontiers, in which the free movement of persons is ensured in conjunction with appropriate measures with respect to external border controls, asylum, immigration and the prevention and combating of crime.

3.    The Union shall establish an internal market. It shall work for the sustainable development of Europe based on balanced economic growth and price stability, a highly competitive social market economy, aiming at full employment and social progress, and a high level of protection and improvement of the quality of the environment. It shall promote scientific and technological advance.

It shall combat social exclusion and discrimination, and shall promote social justice and protection, equality between women and men, solidarity between generations and protection of the rights of the child.

It shall promote economic, social and territorial cohesion, and solidarity among Member States.

It shall respect its rich cultural and linguistic diversity, and shall ensure that Europe's cultural heritage is safeguarded and enhanced.

4.    The Union shall establish an economic and monetary union whose currency is the euro.

5.    In its relations with the wider world, the Union shall uphold and promote its values and interests and contribute to the protection of its citizens. It shall contribute to peace, security, the sustainable development of the Earth, solidarity and mutual respect among peoples, free and fair trade, eradication of poverty and the protection of human rights, in particular the rights of the child, as well as to the strict observance and the development of international law, including respect for the principles of the United Nations Charter.

6.    The Union shall pursue its objectives by appropriate means commensurate with the competences which are conferred upon it in the Treaties.

C 202/18    EN    Official Journal of the European Union    7.6.2016

## Article 4

1.    In accordance with Article 5, competences not conferred upon the Union in the Treaties remain with the Member States.

2.    The Union shall respect the equality of Member States before the Treaties as well as their national identities, inherent in their fundamental structures, political and constitutional, inclusive of regional and local self-government. It shall respect their essential State functions, including ensuring the territorial integrity of the State, maintaining law and order and safeguarding national security. In particular, national security remains the sole responsibility of each Member State.

3.    Pursuant to the principle of sincere cooperation, the Union and the Member States shall, in full mutual respect, assist each other in carrying out tasks which flow from the Treaties.

The Member States shall take any appropriate measure, general or particular, to ensure fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the Union.

The Member States shall facilitate the achievement of the Union's tasks and refrain from any measure which could jeopardise the attainment of the Union's objectives.

## Article 5

### (ex Article 5 TEC)

1.    The limits of Union competences are governed by the principle of conferral. The use of Union competences is governed by the principles of subsidiarity and proportionality.

2.    Under the principle of conferral, the Union shall act only within the limits of the competences conferred upon it by the Member States in the Treaties to attain the objectives set out therein. Competences not conferred upon the Union in the Treaties remain with the Member States.

3.    Under the principle of subsidiarity, in areas which do not fall within its exclusive competence, the Union shall act only if and in so far as the objectives of the proposed action cannot be sufficiently achieved by the Member States, either at central level or at regional and local level, but can rather, by reason of the scale or effects of the proposed action, be better achieved at Union level.

The institutions of the Union shall apply the principle of subsidiarity as laid down in the Protocol on the application of the principles of subsidiarity and proportionality. National Parliaments ensure compliance with the principle of subsidiarity in accordance with the procedure set out in that Protocol.

4.    Under the principle of proportionality, the content and form of Union action shall not exceed what is necessary to achieve the objectives of the Treaties.

The institutions of the Union shall apply the principle of proportionality as laid down in the Protocol on the application of the principles of subsidiarity and proportionality.

*Article 6*

(ex Article 6 TEU)

1.    The Union recognises the rights, freedoms and principles set out in the Charter of Fundamental Rights of the European Union of 7 December 2000, as adapted at Strasbourg, on 12 December 2007, which shall have the same legal value as the Treaties.

The provisions of the Charter shall not extend in any way the competences of the Union as defined in the Treaties.

The rights, freedoms and principles in the Charter shall be interpreted in accordance with the general provisions in Title VII of the Charter governing its interpretation and application and with due regard to the explanations referred to in the Charter, that set out the sources of those provisions.

2.    The Union shall accede to the European Convention for the Protection of Human Rights and Fundamental Freedoms. Such accession shall not affect the Union's competences as defined in the Treaties.

3.    Fundamental rights, as guaranteed by the European Convention for the Protection of Human Rights and Fundamental Freedoms and as they result from the constitutional traditions common to the Member States, shall constitute general principles of the Union's law.

*Article 7*

(ex Article 7 TEU)

1.    On a reasoned proposal by one third of the Member States, by the European Parliament or by the European Commission, the Council, acting by a majority of four fifths of its members after obtaining the consent of the European Parliament, may determine that there is a clear risk of a serious breach by a Member State of the values referred to in Article 2. Before making such a determination, the Council shall hear the Member State in question and may address recommendations to it, acting in accordance with the same procedure.

The Council shall regularly verify that the grounds on which such a determination was made continue to apply.

2.    The European Council, acting by unanimity on a proposal by one third of the Member States or by the Commission and after obtaining the consent of the European Parliament, may determine the existence of a serious and persistent breach by a Member State of the values referred to in Article 2, after inviting the Member State in question to submit its observations.

3.    Where a determination under paragraph 2 has been made, the Council, acting by a qualified majority, may decide to suspend certain of the rights deriving from the application of the Treaties to the Member State in question, including the voting rights of the representative of the government of that Member State in the Council. In doing so, the Council shall take into account the possible consequences of such a suspension on the rights and obligations of natural and legal persons.

C 202/20    EN    Official Journal of the European Union    7.6.2016

The obligations of the Member State in question under the Treaties shall in any case continue to be binding on that State.

4.    The Council, acting by a qualified majority, may decide subsequently to vary or revoke measures taken under paragraph 3 in response to changes in the situation which led to their being imposed.

5.    The voting arrangements applying to the European Parliament, the European Council and the Council for the purposes of this Article are laid down in Article 354 of the Treaty on the Functioning of the European Union.

### Article 8

1.    The Union shall develop a special relationship with neighbouring countries, aiming to establish an area of prosperity and good neighbourliness, founded on the values of the Union and characterised by close and peaceful relations based on cooperation.

2.    For the purposes of paragraph 1, the Union may conclude specific agreements with the countries concerned. These agreements may contain reciprocal rights and obligations as well as the possibility of undertaking activities jointly. Their implementation shall be the subject of periodic consultation.

## TITLE II

### PROVISIONS ON DEMOCRATIC PRINCIPLES

### Article 9

In all its activities, the Union shall observe the principle of the equality of its citizens, who shall receive equal attention from its institutions, bodies, offices and agencies. Every national of a Member State shall be a citizen of the Union. Citizenship of the Union shall be additional to and not replace national citizenship.

### Article 10

1.    The functioning of the Union shall be founded on representative democracy.

2.    Citizens are directly represented at Union level in the European Parliament.

Member States are represented in the European Council by their Heads of State or Government and in the Council by their governments, themselves democratically accountable either to their national Parliaments, or to their citizens.

3.    Every citizen shall have the right to participate in the democratic life of the Union. Decisions shall be taken as openly and as closely as possible to the citizen.

4.    Political parties at European level contribute to forming European political awareness and to expressing the will of citizens of the Union.

## Article 11

1.    The institutions shall, by appropriate means, give citizens and representative associations the opportunity to make known and publicly exchange their views in all areas of Union action.

2.    The institutions shall maintain an open, transparent and regular dialogue with representative associations and civil society.

3.    The European Commission shall carry out broad consultations with parties concerned in order to ensure that the Union's actions are coherent and transparent.

4.    Not less than one million citizens who are nationals of a significant number of Member States may take the initiative of inviting the European Commission, within the framework of its powers, to submit any appropriate proposal on matters where citizens consider that a legal act of the Union is required for the purpose of implementing the Treaties.

The procedures and conditions required for such a citizens' initiative shall be determined in accordance with the first paragraph of Article 24 of the Treaty on the Functioning of the European Union.

## Article 12

National Parliaments contribute actively to the good functioning of the Union:

(a) through being informed by the institutions of the Union and having draft legislative acts of the Union forwarded to them in accordance with the Protocol on the role of national Parliaments in the European Union;

(b) by seeing to it that the principle of subsidiarity is respected in accordance with the procedures provided for in the Protocol on the application of the principles of subsidiarity and proportionality;

(c) by taking part, within the framework of the area of freedom, security and justice, in the evaluation mechanisms for the implementation of the Union policies in that area, in accordance with Article 70 of the Treaty on the Functioning of the European Union, and through being involved in the political monitoring of Europol and the evaluation of Eurojust's activities in accordance with Articles 88 and 85 of that Treaty;

(d) by taking part in the revision procedures of the Treaties, in accordance with Article 48 of this Treaty;

(e) by being notified of applications for accession to the Union, in accordance with Article 49 of this Treaty;

(f) by taking part in the inter-parliamentary cooperation between national Parliaments and with the European Parliament, in accordance with the Protocol on the role of national Parliaments in the European Union.

# TITLE III

## PROVISIONS ON THE INSTITUTIONS

### Article 13

1.    The Union shall have an institutional framework which shall aim to promote its values, advance its objectives, serve its interests, those of its citizens and those of the Member States, and ensure the consistency, effectiveness and continuity of its policies and actions.

The Union's institutions shall be:

— the European Parliament,

— the European Council,

— the Council,

— the European Commission (hereinafter referred to as 'the Commission'),

— the Court of Justice of the European Union,

— the European Central Bank,

— the Court of Auditors.

2.    Each institution shall act within the limits of the powers conferred on it in the Treaties, and in conformity with the procedures, conditions and objectives set out in them. The institutions shall practice mutual sincere cooperation.

3.    The provisions relating to the European Central Bank and the Court of Auditors and detailed provisions on the other institutions are set out in the Treaty on the Functioning of the European Union.

4.    The European Parliament, the Council and the Commission shall be assisted by an Economic and Social Committee and a Committee of the Regions acting in an advisory capacity.

### Article 14

1.    The European Parliament shall, jointly with the Council, exercise legislative and budgetary functions. It shall exercise functions of political control and consultation as laid down in the Treaties. It shall elect the President of the Commission.

2.    The European Parliament shall be composed of representatives of the Union's citizens. They shall not exceed seven hundred and fifty in number, plus the President. Representation of citizens shall be degressively proportional, with a minimum threshold of six members per Member State. No Member State shall be allocated more than ninety-six seats.

The European Council shall adopt by unanimity, on the initiative of the European Parliament and with its consent, a decision establishing the composition of the European Parliament, respecting the principles referred to in the first subparagraph.

3.    The members of the European Parliament shall be elected for a term of five years by direct universal suffrage in a free and secret ballot.

4.    The European Parliament shall elect its President and its officers from among its members.

*Article 15*

1.    The European Council shall provide the Union with the necessary impetus for its development and shall define the general political directions and priorities thereof. It shall not exercise legislative functions.

2.    The European Council shall consist of the Heads of State or Government of the Member States, together with its President and the President of the Commission. The High Representative of the Union for Foreign Affairs and Security Policy shall take part in its work.

3.    The European Council shall meet twice every six months, convened by its President. When the agenda so requires, the members of the European Council may decide each to be assisted by a minister and, in the case of the President of the Commission, by a member of the Commission. When the situation so requires, the President shall convene a special meeting of the European Council.

4.    Except where the Treaties provide otherwise, decisions of the European Council shall be taken by consensus.

5.    The European Council shall elect its President, by a qualified majority, for a term of two and a half years, renewable once. In the event of an impediment or serious misconduct, the European Council can end the President's term of office in accordance with the same procedure.

6.    The President of the European Council:

(a)  shall chair it and drive forward its work;

(b)  shall ensure the preparation and continuity of the work of the European Council in cooperation with the President of the Commission, and on the basis of the work of the General Affairs Council;

(c)  shall endeavour to facilitate cohesion and consensus within the European Council;

(d)  shall present a report to the European Parliament after each of the meetings of the European Council.

The President of the European Council shall, at his level and in that capacity, ensure the external representation of the Union on issues concerning its common foreign and security policy, without prejudice to the powers of the High Representative of the Union for Foreign Affairs and Security Policy.

The President of the European Council shall not hold a national office.

## Article 16

1.    The Council shall, jointly with the European Parliament, exercise legislative and budgetary functions. It shall carry out policy-making and coordinating functions as laid down in the Treaties.

2.    The Council shall consist of a representative of each Member State at ministerial level, who may commit the government of the Member State in question and cast its vote.

3.    The Council shall act by a qualified majority except where the Treaties provide otherwise.

4.    As from 1 November 2014, a qualified majority shall be defined as at least 55 % of the members of the Council, comprising at least fifteen of them and representing Member States comprising at least 65 % of the population of the Union.

A blocking minority must include at least four Council members, failing which the qualified majority shall be deemed attained.

The other arrangements governing the qualified majority are laid down in Article 238(2) of the Treaty on the Functioning of the European Union.

5.    The transitional provisions relating to the definition of the qualified majority which shall be applicable until 31 October 2014 and those which shall be applicable from 1 November 2014 to 31 March 2017 are laid down in the Protocol on transitional provisions.

6.    The Council shall meet in different configurations, the list of which shall be adopted in accordance with Article 236 of the Treaty on the Functioning of the European Union.

The General Affairs Council shall ensure consistency in the work of the different Council configurations. It shall prepare and ensure the follow-up to meetings of the European Council, in liaison with the President of the European Council and the Commission.

The Foreign Affairs Council shall elaborate the Union's external action on the basis of strategic guidelines laid down by the European Council and ensure that the Union's action is consistent.

7.    A Committee of Permanent Representatives of the Governments of the Member States shall be responsible for preparing the work of the Council.

8.    The Council shall meet in public when it deliberates and votes on a draft legislative act. To this end, each Council meeting shall be divided into two parts, dealing respectively with deliberations on Union legislative acts and non-legislative activities.

9.    The Presidency of Council configurations, other than that of Foreign Affairs, shall be held by Member State representatives in the Council on the basis of equal rotation, in accordance with the conditions established in accordance with Article 236 of the Treaty on the Functioning of the European Union.

7.6.2016    EN    Official Journal of the European Union    C 202/25

## Article 17

1.    The Commission shall promote the general interest of the Union and take appropriate initiatives to that end. It shall ensure the application of the Treaties, and of measures adopted by the institutions pursuant to them. It shall oversee the application of Union law under the control of the Court of Justice of the European Union. It shall execute the budget and manage programmes. It shall exercise coordinating, executive and management functions, as laid down in the Treaties. With the exception of the common foreign and security policy, and other cases provided for in the Treaties, it shall ensure the Union's external representation. It shall initiate the Union's annual and multiannual programming with a view to achieving interinstitutional agreements.

2.    Union legislative acts may only be adopted on the basis of a Commission proposal, except where the Treaties provide otherwise. Other acts shall be adopted on the basis of a Commission proposal where the Treaties so provide.

3.    The Commission's term of office shall be five years.

The members of the Commission shall be chosen on the ground of their general competence and European commitment from persons whose independence is beyond doubt.

In carrying out its responsibilities, the Commission shall be completely independent. Without prejudice to Article 18(2), the members of the Commission shall neither seek nor take instructions from any Government or other institution, body, office or entity. They shall refrain from any action incompatible with their duties or the performance of their tasks.

4.    The Commission appointed between the date of entry into force of the Treaty of Lisbon and 31 October 2014, shall consist of one national of each Member State, including its President and the High Representative of the Union for Foreign Affairs and Security Policy who shall be one of its Vice-Presidents.

5.    As from 1 November 2014, the Commission shall consist of a number of members, including its President and the High Representative of the Union for Foreign Affairs and Security Policy, corresponding to two thirds of the number of Member States, unless the European Council, acting unanimously, decides to alter this number.

The members of the Commission shall be chosen from among the nationals of the Member States on the basis of a system of strictly equal rotation between the Member States, reflecting the demographic and geographical range of all the Member States. This system shall be established unanimously by the European Council in accordance with Article 244 of the Treaty on the Functioning of the European Union.

6.    The President of the Commission shall:

(a) lay down guidelines within which the Commission is to work;

(b) decide on the internal organisation of the Commission, ensuring that it acts consistently, efficiently and as a collegiate body;

(c)  appoint Vice-Presidents, other than the High Representative of the Union for Foreign Affairs and Security Policy, from among the members of the Commission.

A member of the Commission shall resign if the President so requests. The High Representative of the Union for Foreign Affairs and Security Policy shall resign, in accordance with the procedure set out in Article 18(1), if the President so requests.

7.   Taking into account the elections to the European Parliament and after having held the appropriate consultations, the European Council, acting by a qualified majority, shall propose to the European Parliament a candidate for President of the Commission. This candidate shall be elected by the European Parliament by a majority of its component members. If he does not obtain the required majority, the European Council, acting by a qualified majority, shall within one month propose a new candidate who shall be elected by the European Parliament following the same procedure.

The Council, by common accord with the President-elect, shall adopt the list of the other persons whom it proposes for appointment as members of the Commission. They shall be selected, on the basis of the suggestions made by Member States, in accordance with the criteria set out in paragraph 3, second subparagraph, and paragraph 5, second subparagraph.

The President, the High Representative of the Union for Foreign Affairs and Security Policy and the other members of the Commission shall be subject as a body to a vote of consent by the European Parliament. On the basis of this consent the Commission shall be appointed by the European Council, acting by a qualified majority.

8.   The Commission, as a body, shall be responsible to the European Parliament. In accordance with Article 234 of the Treaty on the Functioning of the European Union, the European Parliament may vote on a motion of censure of the Commission. If such a motion is carried, the members of the Commission shall resign as a body and the High Representative of the Union for Foreign Affairs and Security Policy shall resign from the duties that he carries out in the Commission.

### Article 18

1.   The European Council, acting by a qualified majority, with the agreement of the President of the Commission, shall appoint the High Representative of the Union for Foreign Affairs and Security Policy. The European Council may end his term of office by the same procedure.

2.   The High Representative shall conduct the Union's common foreign and security policy. He shall contribute by his proposals to the development of that policy, which he shall carry out as mandated by the Council. The same shall apply to the common security and defence policy.

3.   The High Representative shall preside over the Foreign Affairs Council.

4.    The High Representative shall be one of the Vice-Presidents of the Commission. He shall ensure the consistency of the Union's external action. He shall be responsible within the Commission for responsibilities incumbent on it in external relations and for coordinating other aspects of the Union's external action. In exercising these responsibilities within the Commission, and only for these responsibilities, the High Representative shall be bound by Commission procedures to the extent that this is consistent with paragraphs 2 and 3.

## Article 19

1.    The Court of Justice of the European Union shall include the Court of Justice, the General Court and specialised courts. It shall ensure that in the interpretation and application of the Treaties the law is observed.

Member States shall provide remedies sufficient to ensure effective legal protection in the fields covered by Union law.

2.    The Court of Justice shall consist of one judge from each Member State. It shall be assisted by Advocates-General.

The General Court shall include at least one judge per Member State.

The Judges and the Advocates-General of the Court of Justice and the Judges of the General Court shall be chosen from persons whose independence is beyond doubt and who satisfy the conditions set out in Articles 253 and 254 of the Treaty on the Functioning of the European Union. They shall be appointed by common accord of the governments of the Member States for six years. Retiring Judges and Advocates-General may be reappointed.

3.    The Court of Justice of the European Union shall, in accordance with the Treaties:

(a)  rule on actions brought by a Member State, an institution or a natural or legal person;

(b)  give preliminary rulings, at the request of courts or tribunals of the Member States, on the interpretation of Union law or the validity of acts adopted by the institutions;

(c)  rule in other cases provided for in the Treaties.

## TITLE IV

### PROVISIONS ON ENHANCED COOPERATION

## Article 20

(ex Articles 27*a* to 27*e*, 40 to 40*b* and 43 to 45 TEU and ex Articles 11 and 11*a* TEC)

1.    Member States which wish to establish enhanced cooperation between themselves within the framework of the Union's non-exclusive competences may make use of its institutions and exercise those competences by applying the relevant provisions of the Treaties, subject to the limits and in accordance with the detailed arrangements laid down in this Article and in Articles 326 to 334 of the Treaty on the Functioning of the European Union.

Enhanced cooperation shall aim to further the objectives of the Union, protect its interests and reinforce its integration process. Such cooperation shall be open at any time to all Member States, in accordance with Article 328 of the Treaty on the Functioning of the European Union.

2.    The decision authorising enhanced cooperation shall be adopted by the Council as a last resort, when it has established that the objectives of such cooperation cannot be attained within a reasonable period by the Union as a whole, and provided that at least nine Member States participate in it. The Council shall act in accordance with the procedure laid down in Article 329 of the Treaty on the Functioning of the European Union.

3.    All members of the Council may participate in its deliberations, but only members of the Council representing the Member States participating in enhanced cooperation shall take part in the vote. The voting rules are set out in Article 330 of the Treaty on the Functioning of the European Union.

4.    Acts adopted in the framework of enhanced cooperation shall bind only participating Member States. They shall not be regarded as part of the *acquis* which has to be accepted by candidate States for accession to the Union.

TITLE V

**GENERAL PROVISIONS ON THE UNION'S EXTERNAL ACTION AND SPECIFIC PROVISIONS ON THE COMMON FOREIGN AND SECURITY POLICY**

CHAPTER 1

GENERAL PROVISIONS ON THE UNION'S EXTERNAL ACTION

*Article 21*

1.    The Union's action on the international scene shall be guided by the principles which have inspired its own creation, development and enlargement, and which it seeks to advance in the wider world: democracy, the rule of law, the universality and indivisibility of human rights and fundamental freedoms, respect for human dignity, the principles of equality and solidarity, and respect for the principles of the United Nations Charter and international law.

The Union shall seek to develop relations and build partnerships with third countries, and international, regional or global organisations which share the principles referred to in the first subparagraph. It shall promote multilateral solutions to common problems, in particular in the framework of the United Nations.

2.    The Union shall define and pursue common policies and actions, and shall work for a high degree of cooperation in all fields of international relations, in order to:

(a)  safeguard its values, fundamental interests, security, independence and integrity;

(b) consolidate and support democracy, the rule of law, human rights and the principles of international law;

(c) preserve peace, prevent conflicts and strengthen international security, in accordance with the purposes and principles of the United Nations Charter, with the principles of the Helsinki Final Act and with the aims of the Charter of Paris, including those relating to external borders;

(d) foster the sustainable economic, social and environmental development of developing countries, with the primary aim of eradicating poverty;

(e) encourage the integration of all countries into the world economy, including through the progressive abolition of restrictions on international trade;

(f) help develop international measures to preserve and improve the quality of the environment and the sustainable management of global natural resources, in order to ensure sustainable development;

(g) assist populations, countries and regions confronting natural or man-made disasters; and

(h) promote an international system based on stronger multilateral cooperation and good global governance.

3.    The Union shall respect the principles and pursue the objectives set out in paragraphs 1 and 2 in the development and implementation of the different areas of the Union's external action covered by this Title and by Part Five of the Treaty on the Functioning of the European Union, and of the external aspects of its other policies.

The Union shall ensure consistency between the different areas of its external action and between these and its other policies. The Council and the Commission, assisted by the High Representative of the Union for Foreign Affairs and Security Policy, shall ensure that consistency and shall cooperate to that effect.

## Article 22

1.    On the basis of the principles and objectives set out in Article 21, the European Council shall identify the strategic interests and objectives of the Union.

Decisions of the European Council on the strategic interests and objectives of the Union shall relate to the common foreign and security policy and to other areas of the external action of the Union. Such decisions may concern the relations of the Union with a specific country or region or may be thematic in approach. They shall define their duration, and the means to be made available by the Union and the Member States.

The European Council shall act unanimously on a recommendation from the Council, adopted by the latter under the arrangements laid down for each area. Decisions of the European Council shall be implemented in accordance with the procedures provided for in the Treaties.

2.    The High Representative of the Union for Foreign Affairs and Security Policy, for the area of common foreign and security policy, and the Commission, for other areas of external action, may submit joint proposals to the Council.

CHAPTER 2

SPECIFIC PROVISIONS ON THE COMMON FOREIGN AND SECURITY POLICY

SECTION 1

COMMON PROVISIONS

*Article 23*

The Union's action on the international scene, pursuant to this Chapter, shall be guided by the principles, shall pursue the objectives of, and be conducted in accordance with, the general provisions laid down in Chapter 1.

*Article 24*

(ex Article 11 TEU)

1.    The Union's competence in matters of common foreign and security policy shall cover all areas of foreign policy and all questions relating to the Union's security, including the progressive framing of a common defence policy that might lead to a common defence.

The common foreign and security policy is subject to specific rules and procedures. It shall be defined and implemented by the European Council and the Council acting unanimously, except where the Treaties provide otherwise. The adoption of legislative acts shall be excluded. The common foreign and security policy shall be put into effect by the High Representative of the Union for Foreign Affairs and Security Policy and by Member States, in accordance with the Treaties. The specific role of the European Parliament and of the Commission in this area is defined by the Treaties. The Court of Justice of the European Union shall not have jurisdiction with respect to these provisions, with the exception of its jurisdiction to monitor compliance with Article 40 of this Treaty and to review the legality of certain decisions as provided for by the second paragraph of Article 275 of the Treaty on the Functioning of the European Union.

2.    Within the framework of the principles and objectives of its external action, the Union shall conduct, define and implement a common foreign and security policy, based on the development of mutual political solidarity among Member States, the identification of questions of general interest and the achievement of an ever-increasing degree of convergence of Member States' actions.

3.    The Member States shall support the Union's external and security policy actively and unreservedly in a spirit of loyalty and mutual solidarity and shall comply with the Union's action in this area.

The Member States shall work together to enhance and develop their mutual political solidarity. They shall refrain from any action which is contrary to the interests of the Union or likely to impair its effectiveness as a cohesive force in international relations.

The Council and the High Representative shall ensure compliance with these principles.

## Article 25

### (ex Article 12 TEU)

The Union shall conduct the common foreign and security policy by:

(a) defining the general guidelines;

(b) adopting decisions defining:

   (i) actions to be undertaken by the Union;

   (ii) positions to be taken by the Union;

   (iii) arrangements for the implementation of the decisions referred to in points (i) and (ii);

   and by

(c) strengthening systematic cooperation between Member States in the conduct of policy.

## Article 26

### (ex Article 13 TEU)

1.    The European Council shall identify the Union's strategic interests, determine the objectives of and define general guidelines for the common foreign and security policy, including for matters with defence implications. It shall adopt the necessary decisions.

If international developments so require, the President of the European Council shall convene an extraordinary meeting of the European Council in order to define the strategic lines of the Union's policy in the face of such developments.

2.    The Council shall frame the common foreign and security policy and take the decisions necessary for defining and implementing it on the basis of the general guidelines and strategic lines defined by the European Council.

The Council and the High Representative of the Union for Foreign Affairs and Security Policy shall ensure the unity, consistency and effectiveness of action by the Union.

3.    The common foreign and security policy shall be put into effect by the High Representative and by the Member States, using national and Union resources.

## Article 27

1.    The High Representative of the Union for Foreign Affairs and Security Policy, who shall chair the Foreign Affairs Council, shall contribute through his proposals to the development of the common foreign and security policy and shall ensure implementation of the decisions adopted by the European Council and the Council.

2.    The High Representative shall represent the Union for matters relating to the common foreign and security policy. He shall conduct political dialogue with third parties on the Union's behalf and shall express the Union's position in international organisations and at international conferences.

3.    In fulfilling his mandate, the High Representative shall be assisted by a European External Action Service. This service shall work in cooperation with the diplomatic services of the Member States and shall comprise officials from relevant departments of the General Secretariat of the Council and of the Commission as well as staff seconded from national diplomatic services of the Member States. The organisation and functioning of the European External Action Service shall be established by a decision of the Council. The Council shall act on a proposal from the High Representative after consulting the European Parliament and after obtaining the consent of the Commission.

## Article 28

### (ex Article 14 TEU)

1.    Where the international situation requires operational action by the Union, the Council shall adopt the necessary decisions. They shall lay down their objectives, scope, the means to be made available to the Union, if necessary their duration, and the conditions for their implementation.

If there is a change in circumstances having a substantial effect on a question subject to such a decision, the Council shall review the principles and objectives of that decision and take the necessary decisions.

2.    Decisions referred to in paragraph 1 shall commit the Member States in the positions they adopt and in the conduct of their activity.

3.    Whenever there is any plan to adopt a national position or take national action pursuant to a decision as referred to in paragraph 1, information shall be provided by the Member State concerned in time to allow, if necessary, for prior consultations within the Council. The obligation to provide prior information shall not apply to measures which are merely a national transposition of Council decisions.

4.    In cases of imperative need arising from changes in the situation and failing a review of the Council decision as referred to in paragraph 1, Member States may take the necessary measures as a matter of urgency having regard to the general objectives of that decision. The Member State concerned shall inform the Council immediately of any such measures.

5.    Should there be any major difficulties in implementing a decision as referred to in this Article, a Member State shall refer them to the Council which shall discuss them and seek appropriate solutions. Such solutions shall not run counter to the objectives of the decision referred to in paragraph 1 or impair its effectiveness.

## Article 29

*(ex Article 15 TEU)*

The Council shall adopt decisions which shall define the approach of the Union to a particular matter of a geographical or thematic nature. Member States shall ensure that their national policies conform to the Union positions.

## Article 30

*(ex Article 22 TEU)*

1.    Any Member State, the High Representative of the Union for Foreign Affairs and Security Policy, or the High Representative with the Commission's support, may refer any question relating to the common foreign and security policy to the Council and may submit to it, respectively, initiatives or proposals.

2.    In cases requiring a rapid decision, the High Representative, of his own motion, or at the request of a Member State, shall convene an extraordinary Council meeting within 48 hours or, in an emergency, within a shorter period.

## Article 31

*(ex Article 23 TEU)*

1.    Decisions under this Chapter shall be taken by the European Council and the Council acting unanimously, except where this Chapter provides otherwise. The adoption of legislative acts shall be excluded.

When abstaining in a vote, any member of the Council may qualify its abstention by making a formal declaration under the present subparagraph. In that case, it shall not be obliged to apply the decision, but shall accept that the decision commits the Union. In a spirit of mutual solidarity, the Member State concerned shall refrain from any action likely to conflict with or impede Union action based on that decision and the other Member States shall respect its position. If the members of the Council qualifying their abstention in this way represent at least one third of the Member States comprising at least one third of the population of the Union, the decision shall not be adopted.

2.    By derogation from the provisions of paragraph 1, the Council shall act by qualified majority:

— when adopting a decision defining a Union action or position on the basis of a decision of the European Council relating to the Union's strategic interests and objectives, as referred to in Article 22(1),

— when adopting a decision defining a Union action or position, on a proposal which the High Representative of the Union for Foreign Affairs and Security Policy has presented following a specific request from the European Council, made on its own initiative or that of the High Representative,

— when adopting any decision implementing a decision defining a Union action or position,

— when appointing a special representative in accordance with Article 33.

If a member of the Council declares that, for vital and stated reasons of national policy, it intends to oppose the adoption of a decision to be taken by qualified majority, a vote shall not be taken. The High Representative will, in close consultation with the Member State involved, search for a solution acceptable to it. If he does not succeed, the Council may, acting by a qualified majority, request that the matter be referred to the European Council for a decision by unanimity.

3.    The European Council may unanimously adopt a decision stipulating that the Council shall act by a qualified majority in cases other than those referred to in paragraph 2.

4.    Paragraphs 2 and 3 shall not apply to decisions having military or defence implications.

5.    For procedural questions, the Council shall act by a majority of its members.

### Article 32

(ex Article 16 TEU)

Member States shall consult one another within the European Council and the Council on any matter of foreign and security policy of general interest in order to determine a common approach. Before undertaking any action on the international scene or entering into any commitment which could affect the Union's interests, each Member State shall consult the others within the European Council or the Council. Member States shall ensure, through the convergence of their actions, that the Union is able to assert its interests and values on the international scene. Member States shall show mutual solidarity.

When the European Council or the Council has defined a common approach of the Union within the meaning of the first paragraph, the High Representative of the Union for Foreign Affairs and Security Policy and the Ministers for Foreign Affairs of the Member States shall coordinate their activities within the Council.

The diplomatic missions of the Member States and the Union delegations in third countries and at international organisations shall cooperate and shall contribute to formulating and implementing the common approach.

### Article 33

(ex Article 18 TEU)

The Council may, on a proposal from the High Representative of the Union for Foreign Affairs and Security Policy, appoint a special representative with a mandate in relation to particular policy issues. The special representative shall carry out his mandate under the authority of the High Representative.

## Article 34

(ex Article 19 TEU)

1.    Member States shall coordinate their action in international organisations and at international conferences. They shall uphold the Union's positions in such forums. The High Representative of the Union for Foreign Affairs and Security Policy shall organise this coordination.

In international organisations and at international conferences where not all the Member States participate, those which do take part shall uphold the Union's positions.

2.    In accordance with Article 24(3), Member States represented in international organisations or international conferences where not all the Member States participate shall keep the other Member States and the High Representative informed of any matter of common interest.

Member States which are also members of the United Nations Security Council will concert and keep the other Member States and the High Representative fully informed. Member States which are members of the Security Council will, in the execution of their functions, defend the positions and the interests of the Union, without prejudice to their responsibilities under the provisions of the United Nations Charter.

When the Union has defined a position on a subject which is on the United Nations Security Council agenda, those Member States which sit on the Security Council shall request that the High Representative be invited to present the Union's position.

## Article 35

(ex Article 20 TEU)

The diplomatic and consular missions of the Member States and the Union delegations in third countries and international conferences, and their representations to international organisations, shall cooperate in ensuring that decisions defining Union positions and actions adopted pursuant to this Chapter are complied with and implemented.

They shall step up cooperation by exchanging information and carrying out joint assessments.

They shall contribute to the implementation of the right of citizens of the Union to protection in the territory of third countries as referred to in Article 20(2)(c) of the Treaty on the Functioning of the European Union and of the measures adopted pursuant to Article 23 of that Treaty.

## Article 36

(ex Article 21 TEU)

The High Representative of the Union for Foreign Affairs and Security Policy shall regularly consult the European Parliament on the main aspects and the basic choices of the common foreign and security policy and the common security and defence policy and inform it of how those policies evolve. He shall ensure that the views of the European Parliament are duly taken into consideration. Special representatives may be involved in briefing the European Parliament.

The European Parliament may address questions or make recommendations to the Council or the High Representative. Twice a year it shall hold a debate on progress in implementing the common foreign and security policy, including the common security and defence policy.

## Article 37

### (ex Article 24 TEU)

The Union may conclude agreements with one or more States or international organisations in areas covered by this Chapter.

## Article 38

### (ex Article 25 TEU)

Without prejudice to Article 240 of the Treaty on the Functioning of the European Union, a Political and Security Committee shall monitor the international situation in the areas covered by the common foreign and security policy and contribute to the definition of policies by delivering opinions to the Council at the request of the Council or of the High Representative of the Union for Foreign Affairs and Security Policy or on its own initiative. It shall also monitor the implementation of agreed policies, without prejudice to the powers of the High Representative.

Within the scope of this Chapter, the Political and Security Committee shall exercise, under the responsibility of the Council and of the High Representative, the political control and strategic direction of the crisis management operations referred to in Article 43.

The Council may authorise the Committee, for the purpose and for the duration of a crisis management operation, as determined by the Council, to take the relevant decisions concerning the political control and strategic direction of the operation.

## Article 39

In accordance with Article 16 of the Treaty on the Functioning of the European Union and by way of derogation from paragraph 2 thereof, the Council shall adopt a decision laying down the rules relating to the protection of individuals with regard to the processing of personal data by the Member States when carrying out activities which fall within the scope of this Chapter, and the rules relating to the free movement of such data. Compliance with these rules shall be subject to the control of independent authorities.

## Article 40

(ex Article 47 TEU)

The implementation of the common foreign and security policy shall not affect the application of the procedures and the extent of the powers of the institutions laid down by the Treaties for the exercise of the Union competences referred to in Articles 3 to 6 of the Treaty on the Functioning of the European Union.

Similarly, the implementation of the policies listed in those Articles shall not affect the application of the procedures and the extent of the powers of the institutions laid down by the Treaties for the exercise of the Union competences under this Chapter.

## Article 41

(ex Article 28 TEU)

1.    Administrative expenditure to which the implementation of this Chapter gives rise for the institutions shall be charged to the Union budget.

2.    Operating expenditure to which the implementation of this Chapter gives rise shall also be charged to the Union budget, except for such expenditure arising from operations having military or defence implications and cases where the Council acting unanimously decides otherwise.

In cases where expenditure is not charged to the Union budget, it shall be charged to the Member States in accordance with the gross national product scale, unless the Council acting unanimously decides otherwise. As for expenditure arising from operations having military or defence implications, Member States whose representatives in the Council have made a formal declaration under Article 31(1), second subparagraph, shall not be obliged to contribute to the financing thereof.

3.    The Council shall adopt a decision establishing the specific procedures for guaranteeing rapid access to appropriations in the Union budget for urgent financing of initiatives in the framework of the common foreign and security policy, and in particular for preparatory activities for the tasks referred to in Article 42(1) and Article 43. It shall act after consulting the European Parliament.

Preparatory activities for the tasks referred to in Article 42(1) and Article 43 which are not charged to the Union budget shall be financed by a start-up fund made up of Member States' contributions.

The Council shall adopt by a qualified majority, on a proposal from the High Representative of the Union for Foreign Affairs and Security Policy, decisions establishing:

(a)  the procedures for setting up and financing the start-up fund, in particular the amounts allocated to the fund;

(b)  the procedures for administering the start-up fund;

(c) the financial control procedures.

When the task planned in accordance with Article 42(1) and Article 43 cannot be charged to the Union budget, the Council shall authorise the High Representative to use the fund. The High Representative shall report to the Council on the implementation of this remit.

SECTION 2

PROVISIONS ON THE COMMON SECURITY AND DEFENCE POLICY

## Article 42

(ex Article 17 TEU)

1.    The common security and defence policy shall be an integral part of the common foreign and security policy. It shall provide the Union with an operational capacity drawing on civilian and military assets. The Union may use them on missions outside the Union for peace-keeping, conflict prevention and strengthening international security in accordance with the principles of the United Nations Charter. The performance of these tasks shall be undertaken using capabilities provided by the Member States.

2.    The common security and defence policy shall include the progressive framing of a common Union defence policy. This will lead to a common defence, when the European Council, acting unanimously, so decides. It shall in that case recommend to the Member States the adoption of such a decision in accordance with their respective constitutional requirements.

The policy of the Union in accordance with this Section shall not prejudice the specific character of the security and defence policy of certain Member States and shall respect the obligations of certain Member States, which see their common defence realised in the North Atlantic Treaty Organisation (NATO), under the North Atlantic Treaty and be compatible with the common security and defence policy established within that framework.

3.    Member States shall make civilian and military capabilities available to the Union for the implementation of the common security and defence policy, to contribute to the objectives defined by the Council. Those Member States which together establish multinational forces may also make them available to the common security and defence policy.

Member States shall undertake progressively to improve their military capabilities. The Agency in the field of defence capabilities development, research, acquisition and armaments (hereinafter referred to as 'the European Defence Agency') shall identify operational requirements, shall promote measures to satisfy those requirements, shall contribute to identifying and, where appropriate, implementing any measure needed to strengthen the industrial and technological base of the defence sector, shall participate in defining a European capabilities and armaments policy, and shall assist the Council in evaluating the improvement of military capabilities.

EN

4.    Decisions relating to the common security and defence policy, including those initiating a mission as referred to in this Article, shall be adopted by the Council acting unanimously on a proposal from the High Representative of the Union for Foreign Affairs and Security Policy or an initiative from a Member State. The High Representative may propose the use of both national resources and Union instruments, together with the Commission where appropriate.

5.    The Council may entrust the execution of a task, within the Union framework, to a group of Member States in order to protect the Union's values and serve its interests. The execution of such a task shall be governed by Article 44.

6.    Those Member States whose military capabilities fulfil higher criteria and which have made more binding commitments to one another in this area with a view to the most demanding missions shall establish permanent structured cooperation within the Union framework. Such cooperation shall be governed by Article 46. It shall not affect the provisions of Article 43.

7.    If a Member State is the victim of armed aggression on its territory, the other Member States shall have towards it an obligation of aid and assistance by all the means in their power, in accordance with Article 51 of the United Nations Charter. This shall not prejudice the specific character of the security and defence policy of certain Member States.

Commitments and cooperation in this area shall be consistent with commitments under the North Atlantic Treaty Organisation, which, for those States which are members of it, remains the foundation of their collective defence and the forum for its implementation.

## Article 43

1.    The tasks referred to in Article 42(1), in the course of which the Union may use civilian and military means, shall include joint disarmament operations, humanitarian and rescue tasks, military advice and assistance tasks, conflict prevention and peace-keeping tasks, tasks of combat forces in crisis management, including peace-making and post-conflict stabilisation. All these tasks may contribute to the fight against terrorism, including by supporting third countries in combating terrorism in their territories.

2.    The Council shall adopt decisions relating to the tasks referred to in paragraph 1, defining their objectives and scope and the general conditions for their implementation. The High Representative of the Union for Foreign Affairs and Security Policy, acting under the authority of the Council and in close and constant contact with the Political and Security Committee, shall ensure coordination of the civilian and military aspects of such tasks.

## Article 44

1.    Within the framework of the decisions adopted in accordance with Article 43, the Council may entrust the implementation of a task to a group of Member States which are willing and have the necessary capability for such a task. Those Member States, in association with the High Representative of the Union for Foreign Affairs and Security Policy, shall agree among themselves on the management of the task.

2.    Member States participating in the task shall keep the Council regularly informed of its progress on their own initiative or at the request of another Member State. Those States shall inform the Council immediately should the completion of the task entail major consequences or require amendment of the objective, scope and conditions determined for the task in the decisions referred to in paragraph 1. In such cases, the Council shall adopt the necessary decisions.

*Article 45*

1.    The European Defence Agency referred to in Article 42(3), subject to the authority of the Council, shall have as its task to:

(a) contribute to identifying the Member States' military capability objectives and evaluating observance of the capability commitments given by the Member States;

(b) promote harmonisation of operational needs and adoption of effective, compatible procurement methods;

(c) propose multilateral projects to fulfil the objectives in terms of military capabilities, ensure coordination of the programmes implemented by the Member States and management of specific cooperation programmes;

(d) support defence technology research, and coordinate and plan joint research activities and the study of technical solutions meeting future operational needs;

(e) contribute to identifying and, if necessary, implementing any useful measure for strengthening the industrial and technological base of the defence sector and for improving the effectiveness of military expenditure.

2.    The European Defence Agency shall be open to all Member States wishing to be part of it. The Council, acting by a qualified majority, shall adopt a decision defining the Agency's statute, seat and operational rules. That decision should take account of the level of effective participation in the Agency's activities. Specific groups shall be set up within the Agency bringing together Member States engaged in joint projects. The Agency shall carry out its tasks in liaison with the Commission where necessary.

*Article 46*

1.    Those Member States which wish to participate in the permanent structured cooperation referred to in Article 42(6), which fulfil the criteria and have made the commitments on military capabilities set out in the Protocol on permanent structured cooperation, shall notify their intention to the Council and to the High Representative of the Union for Foreign Affairs and Security Policy.

2.    Within three months following the notification referred to in paragraph 1 the Council shall adopt a decision establishing permanent structured cooperation and determining the list of participating Member States. The Council shall act by a qualified majority after consulting the High Representative.

3.    Any Member State which, at a later stage, wishes to participate in the permanent structured cooperation shall notify its intention to the Council and to the High Representative.

The Council shall adopt a decision confirming the participation of the Member State concerned which fulfils the criteria and makes the commitments referred to in Articles 1 and 2 of the Protocol on permanent structured cooperation. The Council shall act by a qualified majority after consulting the High Representative. Only members of the Council representing the participating Member States shall take part in the vote.

A qualified majority shall be defined in accordance with Article 238(3)(a) of the Treaty on the Functioning of the European Union.

4.    If a participating Member State no longer fulfils the criteria or is no longer able to meet the commitments referred to in Articles 1 and 2 of the Protocol on permanent structured cooperation, the Council may adopt a decision suspending the participation of the Member State concerned.

The Council shall act by a qualified majority. Only members of the Council representing the participating Member States, with the exception of the Member State in question, shall take part in the vote.

A qualified majority shall be defined in accordance with Article 238(3)(a) of the Treaty on the Functioning of the European Union.

5.    Any participating Member State which wishes to withdraw from permanent structured cooperation shall notify its intention to the Council, which shall take note that the Member State in question has ceased to participate.

6.    The decisions and recommendations of the Council within the framework of permanent structured cooperation, other than those provided for in paragraphs 2 to 5, shall be adopted by unanimity. For the purposes of this paragraph, unanimity shall be constituted by the votes of the representatives of the participating Member States only.

## TITLE VI

### FINAL PROVISIONS

### Article 47

The Union shall have legal personality.

### Article 48

(ex Article 48 TEU)

1.    The Treaties may be amended in accordance with an ordinary revision procedure. They may also be amended in accordance with simplified revision procedures.

*Ordinary revision procedure*

2.    The Government of any Member State, the European Parliament or the Commission may submit to the Council proposals for the amendment of the Treaties. These proposals may, *inter alia,* serve either to increase or to reduce the competences conferred on the Union in the Treaties. These proposals shall be submitted to the European Council by the Council and the national Parliaments shall be notified.

3.    If the European Council, after consulting the European Parliament and the Commission, adopts by a simple majority a decision in favour of examining the proposed amendments, the President of the European Council shall convene a Convention composed of representatives of the national Parliaments, of the Heads of State or Government of the Member States, of the European Parliament and of the Commission. The European Central Bank shall also be consulted in the case of institutional changes in the monetary area. The Convention shall examine the proposals for amendments and shall adopt by consensus a recommendation to a conference of representatives of the governments of the Member States as provided for in paragraph 4.

The European Council may decide by a simple majority, after obtaining the consent of the European Parliament, not to convene a Convention should this not be justified by the extent of the proposed amendments. In the latter case, the European Council shall define the terms of reference for a conference of representatives of the governments of the Member States.

4.    A conference of representatives of the governments of the Member States shall be convened by the President of the Council for the purpose of determining by common accord the amendments to be made to the Treaties.

The amendments shall enter into force after being ratified by all the Member States in accordance with their respective constitutional requirements.

5.    If, two years after the signature of a treaty amending the Treaties, four fifths of the Member States have ratified it and one or more Member States have encountered difficulties in proceeding with ratification, the matter shall be referred to the European Council.

*Simplified revision procedures*

6.    The Government of any Member State, the European Parliament or the Commission may submit to the European Council proposals for revising all or part of the provisions of Part Three of the Treaty on the Functioning of the European Union relating to the internal policies and action of the Union.

The European Council may adopt a decision amending all or part of the provisions of Part Three of the Treaty on the Functioning of the European Union. The European Council shall act by unanimity after consulting the European Parliament and the Commission, and the European Central Bank in the case of institutional changes in the monetary area. That decision shall not enter into force until it is approved by the Member States in accordance with their respective constitutional requirements.

The decision referred to in the second subparagraph shall not increase the competences conferred on the Union in the Treaties.

7.    Where the Treaty on the Functioning of the European Union or Title V of this Treaty provides for the Council to act by unanimity in a given area or case, the European Council may adopt a decision authorising the Council to act by a qualified majority in that area or in that case. This subparagraph shall not apply to decisions with military implications or those in the area of defence.

Where the Treaty on the Functioning of the European Union provides for legislative acts to be adopted by the Council in accordance with a special legislative procedure, the European Council may adopt a decision allowing for the adoption of such acts in accordance with the ordinary legislative procedure.

Any initiative taken by the European Council on the basis of the first or the second subparagraph shall be notified to the national Parliaments. If a national Parliament makes known its opposition within six months of the date of such notification, the decision referred to in the first or the second subparagraph shall not be adopted. In the absence of opposition, the European Council may adopt the decision.

For the adoption of the decisions referred to in the first and second subparagraphs, the European Council shall act by unanimity after obtaining the consent of the European Parliament, which shall be given by a majority of its component members.

## Article 49

### (ex Article 49 TEU)

Any European State which respects the values referred to in Article 2 and is committed to promoting them may apply to become a member of the Union. The European Parliament and national Parliaments shall be notified of this application. The applicant State shall address its application to the Council, which shall act unanimously after consulting the Commission and after receiving the consent of the European Parliament, which shall act by a majority of its component members. The conditions of eligibility agreed upon by the European Council shall be taken into account.

The conditions of admission and the adjustments to the Treaties on which the Union is founded, which such admission entails, shall be the subject of an agreement between the Member States and the applicant State. This agreement shall be submitted for ratification by all the contracting States in accordance with their respective constitutional requirements.

## Article 50

1.    Any Member State may decide to withdraw from the Union in accordance with its own constitutional requirements.

2.    A Member State which decides to withdraw shall notify the European Council of its intention. In the light of the guidelines provided by the European Council, the Union shall negotiate and conclude an agreement with that State, setting out the arrangements for its withdrawal, taking account of the framework for its future relationship with the Union. That agreement shall be negotiated in accordance with Article 218(3) of the Treaty on the Functioning of the European Union. It shall be concluded on behalf of the Union by the Council, acting by a qualified majority, after obtaining the consent of the European Parliament.

3.    The Treaties shall cease to apply to the State in question from the date of entry into force of the withdrawal agreement or, failing that, two years after the notification referred to in paragraph 2, unless the European Council, in agreement with the Member State concerned, unanimously decides to extend this period.

4.    For the purposes of paragraphs 2 and 3, the member of the European Council or of the Council representing the withdrawing Member State shall not participate in the discussions of the European Council or Council or in decisions concerning it.

A qualified majority shall be defined in accordance with Article 238(3)(b) of the Treaty on the Functioning of the European Union.

5.    If a State which has withdrawn from the Union asks to rejoin, its request shall be subject to the procedure referred to in Article 49.

### Article 51

The Protocols and Annexes to the Treaties shall form an integral part thereof.

### Article 52

1.    The Treaties shall apply to the Kingdom of Belgium, the Republic of Bulgaria, the Czech Republic, the Kingdom of Denmark, the Federal Republic of Germany, the Republic of Estonia, Ireland, the Hellenic Republic, the Kingdom of Spain, the French Republic, the Republic of Croatia, the Italian Republic, the Republic of Cyprus, the Republic of Latvia, the Republic of Lithuania, the Grand Duchy of Luxembourg, the Republic of Hungary, the Republic of Malta, the Kingdom of the Netherlands, the Republic of Austria, the Republic of Poland, the Portuguese Republic, Romania, the Republic of Slovenia, the Slovak Republic, the Republic of Finland, the Kingdom of Sweden and the United Kingdom of Great Britain and Northern Ireland.

2.    The territorial scope of the Treaties is specified in Article 355 of the Treaty on the Functioning of the European Union.

### Article 53

(ex Article 51 TEU)

This Treaty is concluded for an unlimited period.

### Article 54

(ex Article 52 TEU)

1.    This Treaty shall be ratified by the High Contracting Parties in accordance with their respective constitutional requirements. The instruments of ratification shall be deposited with the Government of the Italian Republic.

2.    This Treaty shall enter into force on 1 January 1993, provided that all the Instruments of ratification have been deposited, or, failing that, on the first day of the month following the deposit of the Instrument of ratification by the last signatory State to take this step.

## Article 55

(ex Article 53 TEU)

1.    This Treaty, drawn up in a single original in the Bulgarian, Croatian, Czech, Danish, Dutch, English, Estonian, Finnish, French, German, Greek, Hungarian, Irish, Italian, Latvian, Lithuanian, Maltese, Polish, Portuguese, Romanian, Slovak, Slovenian, Spanish and Swedish languages, the texts in each of these languages being equally authentic, shall be deposited in the archives of the Government of the Italian Republic, which will transmit a certified copy to each of the governments of the other signatory States.

2.    This Treaty may also be translated into any other languages as determined by Member States among those which, in accordance with their constitutional order, enjoy official status in all or part of their territory. A certified copy of such translations shall be provided by the Member States concerned to be deposited in the archives of the Council.

IN WITNESS WHEREOF the undersigned Plenipotentiaries have signed this Treaty.

Done at Maastricht on the seventh day of February in the year one thousand nine hundred and ninety-two.

(*List of signatories not reproduced*)

_____

7.6.2016    EN    Official Journal of the European Union    C 202/201

PROTOCOLS

# PROTOCOL (No 1)

## ON THE ROLE OF NATIONAL PARLIAMENTS IN THE EUROPEAN UNION

THE HIGH CONTRACTING PARTIES,

RECALLING that the way in which national Parliaments scrutinise their governments in relation to the activities of the Union is a matter for the particular constitutional organisation and practice of each Member State,

DESIRING to encourage greater involvement of national Parliaments in the activities of the European Union and to enhance their ability to express their views on draft legislative acts of the Union as well as on other matters which may be of particular interest to them,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union, to the Treaty on the Functioning of the European Union and to the Treaty establishing the European Atomic Energy Community:

## TITLE I

### INFORMATION FOR NATIONAL PARLIAMENTS

*Article 1*

Commission consultation documents (green and white papers and communications) shall be forwarded directly by the Commission to national Parliaments upon publication. The Commission shall also forward the annual legislative programme as well as any other instrument of legislative planning or policy to national Parliaments, at the same time as to the European Parliament and the Council.

*Article 2*

Draft legislative acts sent to the European Parliament and to the Council shall be forwarded to national Parliaments.

For the purposes of this Protocol, "draft legislative acts" shall mean proposals from the Commission, initiatives from a group of Member States, initiatives from the European Parliament, requests from the Court of Justice, recommendations from the European Central Bank and requests from the European Investment Bank, for the adoption of a legislative act.

Draft legislative acts originating from the Commission shall be forwarded to national Parliaments directly by the Commission, at the same time as to the European Parliament and the Council.

Draft legislative acts originating from the European Parliament shall be forwarded to national Parliaments directly by the European Parliament.

C 202/204    EN    Official Journal of the European Union    7.6.2016

Draft legislative acts originating from a group of Member States, the Court of Justice, the European Central Bank or the European Investment Bank shall be forwarded to national Parliaments by the Council.

### Article 3

National Parliaments may send to the Presidents of the European Parliament, the Council and the Commission a reasoned opinion on whether a draft legislative act complies with the principle of subsidiarity, in accordance with the procedure laid down in the Protocol on the application of the principles of subsidiarity and proportionality.

If the draft legislative act originates from a group of Member States, the President of the Council shall forward the reasoned opinion or opinions to the governments of those Member States.

If the draft legislative act originates from the Court of Justice, the European Central Bank or the European Investment Bank, the President of the Council shall forward the reasoned opinion or opinions to the institution or body concerned.

### Article 4

An eight-week period shall elapse between a draft legislative act being made available to national Parliaments in the official languages of the Union and the date when it is placed on a provisional agenda for the Council for its adoption or for adoption of a position under a legislative procedure. Exceptions shall be possible in cases of urgency, the reasons for which shall be stated in the act or position of the Council. Save in urgent cases for which due reasons have been given, no agreement may be reached on a draft legislative act during those eight weeks. Save in urgent cases for which due reasons have been given, a ten-day period shall elapse between the placing of a draft legislative act on the provisional agenda for the Council and the adoption of a position.

### Article 5

The agendas for and the outcome of meetings of the Council, including the minutes of meetings where the Council is deliberating on draft legislative acts, shall be forwarded directly to national Parliaments, at the same time as to Member States' governments.

### Article 6

When the European Council intends to make use of the first or second subparagraphs of Article 48(7) of the Treaty on European Union, national Parliaments shall be informed of the initiative of the European Council at least six months before any decision is adopted.

### Article 7

The Court of Auditors shall forward its annual report to national Parliaments, for information, at the same time as to the European Parliament and to the Council.

## Article 8

Where the national Parliamentary system is not unicameral, Articles 1 to 7 shall apply to the component chambers.

## TITLE II

### INTERPARLIAMENTARY COOPERATION

## Article 9

The European Parliament and national Parliaments shall together determine the organisation and promotion of effective and regular interparliamentary cooperation within the Union.

## Article 10

A conference of Parliamentary Committees for Union Affairs may submit any contribution it deems appropriate for the attention of the European Parliament, the Council and the Commission. That conference shall in addition promote the exchange of information and best practice between national Parliaments and the European Parliament, including their special committees. It may also organise interparliamentary conferences on specific topics, in particular to debate matters of common foreign and security policy, including common security and defence policy. Contributions from the conference shall not bind national Parliaments and shall not prejudge their positions.

————

C 202/206    EN    Official Journal of the European Union    7.6.2016

# PROTOCOL (No 2)

## ON THE APPLICATION OF THE PRINCIPLES OF SUBSIDIARITY AND PROPORTIONALITY

THE HIGH CONTRACTING PARTIES,

WISHING to ensure that decisions are taken as closely as possible to the citizens of the Union,

RESOLVED to establish the conditions for the application of the principles of subsidiarity and proportionality, as laid down in Article 5 of the Treaty on European Union, and to establish a system for monitoring the application of those principles,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

### Article 1

Each institution shall ensure constant respect for the principles of subsidiarity and proportionality, as laid down in Article 5 of the Treaty on European Union.

### Article 2

Before proposing legislative acts, the Commission shall consult widely. Such consultations shall, where appropriate, take into account the regional and local dimension of the action envisaged. In cases of exceptional urgency, the Commission shall not conduct such consultations. It shall give reasons for its decision in its proposal.

### Article 3

For the purposes of this Protocol, "draft legislative acts" shall mean proposals from the Commission, initiatives from a group of Member States, initiatives from the European Parliament, requests from the Court of Justice, recommendations from the European Central Bank and requests from the European Investment Bank, for the adoption of a legislative act.

### Article 4

The Commission shall forward its draft legislative acts and its amended drafts to national Parliaments at the same time as to the Union legislator.

The European Parliament shall forward its draft legislative acts and its amended drafts to national Parliaments.

The Council shall forward draft legislative acts originating from a group of Member States, the Court of Justice, the European Central Bank or the European Investment Bank and amended drafts to national Parliaments.

Upon adoption, legislative resolutions of the European Parliament and positions of the Council shall be forwarded by them to national Parliaments.

### Article 5

Draft legislative acts shall be justified with regard to the principles of subsidiarity and proportionality. Any draft legislative act should contain a detailed statement making it possible to appraise compliance with the principles of subsidiarity and proportionality. This statement should contain some assessment of the proposal's financial impact and, in the case of a directive, of its implications for the rules to be put in place by Member States, including, where necessary, the regional legislation. The reasons for concluding that a Union objective can be better achieved at Union level shall be substantiated by qualitative and, wherever possible, quantitative indicators. Draft legislative acts shall take account of the need for any burden, whether financial or administrative, falling upon the Union, national governments, regional or local authorities, economic operators and citizens, to be minimised and commensurate with the objective to be achieved.

### Article 6

Any national Parliament or any chamber of a national Parliament may, within eight weeks from the date of transmission of a draft legislative act, in the official languages of the Union, send to the Presidents of the European Parliament, the Council and the Commission a reasoned opinion stating why it considers that the draft in question does not comply with the principle of subsidiarity. It will be for each national Parliament or each chamber of a national Parliament to consult, where appropriate, regional parliaments with legislative powers.

If the draft legislative act originates from a group of Member States, the President of the Council shall forward the opinion to the governments of those Member States.

If the draft legislative act originates from the Court of Justice, the European Central Bank or the European Investment Bank, the President of the Council shall forward the opinion to the institution or body concerned.

### Article 7

1.    The European Parliament, the Council and the Commission, and, where appropriate, the group of Member States, the Court of Justice, the European Central Bank or the European Investment Bank, if the draft legislative act originates from them, shall take account of the reasoned opinions issued by national Parliaments or by a chamber of a national Parliament.

Each national Parliament shall have two votes, shared out on the basis of the national Parliamentary system. In the case of a bicameral Parliamentary system, each of the two chambers shall have one vote.

2.    Where reasoned opinions on a draft legislative act's non-compliance with the principle of subsidiarity represent at least one third of all the votes allocated to the national Parliaments in accordance with the second subparagraph of paragraph 1, the draft must be reviewed. This threshold shall be a quarter in the case of a draft legislative act submitted on the basis of Article 76 of the Treaty on the Functioning of the European Union on the area of freedom, security and justice.

After such review, the Commission or, where appropriate, the group of Member States, the European Parliament, the Court of Justice, the European Central Bank or the European Investment Bank, if the draft legislative act originates from them, may decide to maintain, amend or withdraw the draft. Reasons must be given for this decision.

3.    Furthermore, under the ordinary legislative procedure, where reasoned opinions on the non-compliance of a proposal for a legislative act with the principle of subsidiarity represent at least a simple majority of the votes allocated to the national Parliaments in accordance with the second subparagraph of paragraph 1, the proposal must be reviewed. After such review, the Commission may decide to maintain, amend or withdraw the proposal.

If it chooses to maintain the proposal, the Commission will have, in a reasoned opinion, to justify why it considers that the proposal complies with the principle of subsidiarity. This reasoned opinion, as well as the reasoned opinions of the national Parliaments, will have to be submitted to the Union legislator, for consideration in the procedure:

(a)  before concluding the first reading, the legislator (the European Parliament and the Council) shall consider whether the legislative proposal is compatible with the principle of subsidiarity, taking particular account of the reasons expressed and shared by the majority of national Parliaments as well as the reasoned opinion of the Commission;

(b)  if, by a majority of 55 % of the members of the Council or a majority of the votes cast in the European Parliament, the legislator is of the opinion that the proposal is not compatible with the principle of subsidiarity, the legislative proposal shall not be given further consideration.

*Article 8*

The Court of Justice of the European Union shall have jurisdiction in actions on grounds of infringement of the principle of subsidiarity by a legislative act, brought in accordance with the rules laid down in Article 263 of the Treaty on the Functioning of the European Union by Member States, or notified by them in accordance with their legal order on behalf of their national Parliament or a chamber thereof.

In accordance with the rules laid down in the said Article, the Committee of the Regions may also bring such actions against legislative acts for the adoption of which the Treaty on the Functioning of the European Union provides that it be consulted.

7.6.2016          EN          Official Journal of the European Union          C 202/209

## *Article 9*

The Commission shall submit each year to the European Council, the European Parliament, the Council and national Parliaments a report on the application of Article 5 of the Treaty on European Union. This annual report shall also be forwarded to the Economic and Social Committee and the Committee of the Regions.

_____

C 202/210          EN          Official Journal of the European Union          7.6.2016

# PROTOCOL (No 3)

## ON THE STATUTE OF THE COURT OF JUSTICE OF THE EUROPEAN UNION

THE HIGH CONTRACTING PARTIES,

DESIRING to lay down the Statute of the Court of Justice of the European Union provided for in Article 281 of the Treaty on the Functioning of the European Union,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union, the Treaty on the Functioning of the European Union and the Treaty establishing the European Atomic Energy Community:

### Article 1

The Court of Justice of the European Union shall be constituted and shall function in accordance with the provisions of the Treaties, of the Treaty establishing the European Atomic Energy Community (the EAEC Treaty) and of this Statute.

## TITLE I

### JUDGES AND ADVOCATES-GENERAL

### Article 2

Before taking up his duties each Judge shall, before the Court of Justice sitting in open court, take an oath to perform his duties impartially and conscientiously and to preserve the secrecy of the deliberations of the Court.

### Article 3

The Judges shall be immune from legal proceedings. After they have ceased to hold office, they shall continue to enjoy immunity in respect of acts performed by them in their official capacity, including words spoken or written.

The Court of Justice, sitting as a full Court, may waive the immunity. If the decision concerns a member of the General Court or of a specialised court, the Court shall decide after consulting the court concerned.

Where immunity has been waived and criminal proceedings are instituted against a Judge, he shall be tried, in any of the Member States, only by the court competent to judge the members of the highest national judiciary.

7.6.2016    EN    Official Journal of the European Union    C 202/211

Articles 11 to 14 and Article 17 of the Protocol on the privileges and immunities of the European Union shall apply to the Judges, Advocates-General, Registrar and Assistant Rapporteurs of the Court of Justice of the European Union, without prejudice to the provisions relating to immunity from legal proceedings of Judges which are set out in the preceding paragraphs.

## Article 4

The Judges may not hold any political or administrative office.

They may not engage in any occupation, whether gainful or not, unless exemption is exceptionally granted by the Council, acting by a simple majority.

When taking up their duties, they shall give a solemn undertaking that, both during and after their term of office, they will respect the obligations arising therefrom, in particular the duty to behave with integrity and discretion as regards the acceptance, after they have ceased to hold office, of certain appointments or benefits.

Any doubt on this point shall be settled by decision of the Court of Justice. If the decision concerns a member of the General Court or of a specialised court, the Court shall decide after consulting the court concerned.

## Article 5

Apart from normal replacement, or death, the duties of a Judge shall end when he resigns.

Where a Judge resigns, his letter of resignation shall be addressed to the President of the Court of Justice for transmission to the President of the Council. Upon this notification a vacancy shall arise on the bench.

Save where Article 6 applies, a Judge shall continue to hold office until his successor takes up his duties.

## Article 6

A Judge may be deprived of his office or of his right to a pension or other benefits in its stead only if, in the unanimous opinion of the Judges and Advocates-General of the Court of Justice, he no longer fulfils the requisite conditions or meets the obligations arising from his office. The Judge concerned shall not take part in any such deliberations. If the person concerned is a member of the General Court or of a specialised court, the Court shall decide after consulting the court concerned.

The Registrar of the Court shall communicate the decision of the Court to the President of the European Parliament and to the President of the Commission and shall notify it to the President of the Council.

In the case of a decision depriving a Judge of his office, a vacancy shall arise on the bench upon this latter notification.

C 202/212    EN    Official Journal of the European Union    7.6.2016

### Article 7

A Judge who is to replace a member of the Court whose term of office has not expired shall be appointed for the remainder of his predecessor's term.

### Article 8

The provisions of Articles 2 to 7 shall apply to the Advocates-General.

## TITLE II

### ORGANISATION OF THE COURT OF JUSTICE

### Article 9

When, every three years, the Judges are partially replaced, one half of the number of Judges shall be replaced. If the number of Judges is an uneven number, the number of Judges who shall be replaced shall alternately be the number which is the next above one half of the number of Judges and the number which is next below one half.

The first paragraph shall also apply when the Advocates General are partially replaced, every three years.

### Article 9a

The Judges shall elect the President and the Vice-President of the Court of Justice from among their number for a term of three years. They may be re-elected.

The Vice-President shall assist the President in accordance with the conditions laid down in the Rules of Procedure. He shall take the President's place when the latter is prevented from attending or when the office of President is vacant.

### Article 10

The Registrar shall take an oath before the Court of Justice to perform his duties impartially and conscientiously and to preserve the secrecy of the deliberations of the Court of Justice.

### Article 11

The Court of Justice shall arrange for replacement of the Registrar on occasions when he is prevented from attending the Court of Justice.

### Article 12

Officials and other servants shall be attached to the Court of Justice to enable it to function. They shall be responsible to the Registrar under the authority of the President.

### Article 13

At the request of the Court of Justice, the European Parliament and the Council may, acting in accordance with the ordinary legislative procedure, provide for the appointment of Assistant Rapporteurs and lay down the rules governing their service. The Assistant Rapporteurs may be required, under conditions laid down in the Rules of Procedure, to participate in preparatory inquiries in cases pending before the Court and to cooperate with the Judge who acts as Rapporteur.

7.6.2016        EN        Official Journal of the European Union        C 202/213

The Assistant Rapporteurs shall be chosen from persons whose independence is beyond doubt and who possess the necessary legal qualifications; they shall be appointed by the Council, acting by a simple majority. They shall take an oath before the Court to perform their duties impartially and conscientiously and to preserve the secrecy of the deliberations of the Court.

### Article 14

The Judges, the Advocates-General and the Registrar shall be required to reside at the place where the Court of Justice has its seat.

### Article 15

The Court of Justice shall remain permanently in session. The duration of the judicial vacations shall be determined by the Court with due regard to the needs of its business.

### Article 16

The Court of Justice shall form chambers consisting of three and five Judges. The Judges shall elect the Presidents of the chambers from among their number. The Presidents of the chambers of five Judges shall be elected for three years. They may be re-elected once.

The Grand Chamber shall consist of 15 Judges. It shall be presided over by the President of the Court. The Vice- President of the Court and, in accordance with the conditions laid down in the Rules of Procedure, three of the Presidents of the chambers of five Judges and other Judges shall also form part of the Grand Chamber.

The Court shall sit in a Grand Chamber when a Member State or an institution of the Union that is party to the proceedings so requests.

The Court shall sit as a full Court where cases are brought before it pursuant to Article 228(2), Article 245(2), Article 247 or Article 286(6) of the Treaty on the Functioning of the European Union.

Moreover, where it considers that a case before it is of exceptional importance, the Court may decide, after hearing the Advocate-General, to refer the case to the full Court.

### Article 17

Decisions of the Court of Justice shall be valid only when an uneven number of its members is sitting in the deliberations.

Decisions of the chambers consisting of either three or five Judges shall be valid only if they are taken by three Judges.

Decisions of the Grand Chamber shall be valid only if 11 Judges are sitting.

Decisions of the full Court shall be valid only if 17 Judges are sitting.

In the event of one of the Judges of a chamber being prevented from attending, a Judge of another chamber may be called upon to sit in accordance with conditions laid down in the Rules of Procedure.

C 202/214          EN          Official Journal of the European Union          7.6.2016

*Article  18*

No Judge or Advocate-General may take part in the disposal of any case in which he has previously taken part as agent or adviser or has acted for one of the parties, or in which he has been called upon to pronounce as a member of a court or tribunal, of a commission of inquiry or in any other  capacity.

If, for some special reason, any Judge or Advocate-General considers that he should not take part in the judgment or examination of a particular case, he shall so inform the President. If, for some special reason, the President considers that any Judge or Advocate-General should not sit or make submissions in a particular case, he shall notify him accordingly.

Any difficulty arising as to the application of this Article  shall be settled by decision of the Court of  Justice.

A party may not apply for a change in the composition of the Court or of one of its chambers on the grounds of either the nationality of a Judge or the absence from the Court or from the chamber of a Judge of the nationality of that party.

## TITLE III

### PROCEDURE BEFORE THE COURT OF JUSTICE

*Article  19*

The Member States and the institutions of the Union shall be represented before the Court of Justice by an agent appointed for each case; the agent may be assisted by an adviser or by a lawyer.

The States, other than the Member States, which are parties to the Agreement on the European Economic Area and also the EFTA Surveillance Authority referred to in that Agreement shall be represented in same manner.

Other parties must be represented by a lawyer.

Only a lawyer authorised to practise before a court of a Member State or of another State which is a party to the Agreement on the European Economic Area may represent or assist a party before the  Court.

Such agents, advisers and lawyers shall, when they appear before the Court, enjoy the rights and immunities necessary to the independent exercise of their duties, under conditions laid down in the Rules of Procedure.

As regards such advisers and lawyers who appear before it, the Court shall have the powers normally accorded to courts of law, under conditions laid down in the Rules of Procedure.

University teachers being nationals of a Member State whose law accords them a right of audience shall have the same rights before the Court as are accorded by this Article to lawyers.

7.6.2016          EN          Official Journal of the European Union          C 202/215

## Article 20

The procedure before the Court of Justice shall consist of two parts: written and oral.

The written procedure shall consist of the communication to the parties and to the institutions of the Union whose decisions are in dispute, of applications, statements of case, defences and observations, and of replies, if any, as well as of all papers and documents in support or of certified copies of them.

Communications shall be made by the Registrar in the order and within the time laid down in the Rules of Procedure.

The oral procedure shall consist of the hearing by the Court of agents, advisers and lawyers and of the submissions of the Advocate-General, as well as the hearing, if any, of witnesses and experts.

Where it considers that the case raises no new point of law, the Court may decide, after hearing the Advocate-General, that the case shall be determined without a submission from the Advocate-General.

## Article 21

A case shall be brought before the Court of Justice by a written application addressed to the Registrar. The application shall contain the applicant's name and permanent address and the description of the signatory, the name of the party or names of the parties against whom the application is made, the subject-matter of the dispute, the form of order sought and a brief statement of the pleas in law on which the application is based.

The application shall be accompanied, where appropriate, by the measure the annulment of which is sought or, in the circumstances referred to in Article 265 of the Treaty on the Functioning of the European Union, by documentary evidence of the date on which an institution was, in accordance with those Articles, requested to act. If the documents are not submitted with the application, the Registrar shall ask the party concerned to produce them within a reasonable period, but in that event the rights of the party shall not lapse even if such documents are produced after the time limit for bringing proceedings.

## Article 22

A case governed by Article 18 of the EAEC Treaty shall be brought before the Court of Justice by an appeal addressed to the Registrar. The appeal shall contain the name and permanent address of the applicant and the description of the signatory, a reference to the decision against which the appeal is brought, the names of the respondents, the subject-matter of the dispute, the submissions and a brief statement of the grounds on which the appeal is based.

The appeal shall be accompanied by a certified copy of the decision of the Arbitration Committee which is contested.

If the Court rejects the appeal, the decision of the Arbitration Committee shall become final.

If the Court annuls the decision of the Arbitration Committee, the matter may be re-opened, where appropriate, on the initiative of one of the parties in the case, before the Arbitration Committee. The latter shall conform to any decisions on points of law given by the Court.

## Article 23

In the cases governed by Article 267 of the Treaty on the Functioning of the European Union, the decision of the court or tribunal of a Member State which suspends its proceedings and refers a case to the Court of Justice shall be notified to the Court by the court or tribunal concerned. The decision shall then be notified by the Registrar of the Court to the parties, to the Member States and to the Commission, and to the institution, body, office or agency of the Union which adopted the act the validity or interpretation of which is in dispute.

Within two months of this notification, the parties, the Member States, the Commission and, where appropriate, the institution, body, office or agency which adopted the act the validity or interpretation of which is in dispute, shall be entitled to submit statements of case or written observations to the Court.

In the cases governed by Article 267 of the Treaty on the Functioning of the European Union, the decision of the national court or tribunal shall, moreover, be notified by the Registrar of the Court to the States, other than the Member States, which are parties to the Agreement on the European Economic Area and also to the EFTA Surveillance Authority referred to in that Agreement which may, within two months of notification, where one of the fields of application of that Agreement is concerned, submit statements of case or written observations to the Court.

Where an agreement relating to a specific subject matter, concluded by the Council and one or more non-member States, provides that those States are to be entitled to submit statements of case or written observations where a court or tribunal of a Member State refers to the Court of Justice for a preliminary ruling a question falling within the scope of the agreement, the decision of the national court or tribunal containing that question shall also be notified to the non-member States concerned. Within two months from such notification, those States may lodge at the Court statements of case or written observations.

## Article 23a (*)

The Rules of Procedure may provide for an expedited or accelerated procedure and, for references for a preliminary ruling relating to the area of freedom, security and justice, an urgent procedure.

Those procedures may provide, in respect of the submission of statements of case or written observations, for a shorter period than that provided for by Article 23, and, in derogation from the fourth paragraph of Article 20, for the case to be determined without a submission from the Advocate General.

In addition, the urgent procedure may provide for restriction of the parties and other interested persons mentioned in Article 23, authorised to submit statements of case or written observations and, in cases of extreme urgency, for the written stage of the procedure to be omitted.

_____

(*) Article inserted by Decision 2008/79/EC, Euratom (OJ L 24, 29.1.2008, p. 42).

## Article 24

The Court of Justice may require the parties to produce all documents and to supply all information which the Court considers desirable. Formal note shall be taken of any refusal.

The Court may also require the Member States and institutions, bodies, offices and agencies not being parties to the case to supply all information which the Court considers necessary for the proceedings.

## Article 25

The Court of Justice may at any time entrust any individual, body, authority, committee or other organisation it chooses with the task of giving an expert opinion.

## Article 26

Witnesses may be heard under conditions laid down in the Rules of Procedure.

## Article 27

With respect to defaulting witnesses the Court of Justice shall have the powers generally granted to courts and tribunals and may impose pecuniary penalties under conditions laid down in the Rules of Procedure.

## Article 28

Witnesses and experts may be heard on oath taken in the form laid down in the Rules of Procedure or in the manner laid down by the law of the country of the witness or expert.

## Article 29

The Court of Justice may order that a witness or expert be heard by the judicial authority of his place of permanent residence.

The order shall be sent for implementation to the competent judicial authority under conditions laid down in the Rules of Procedure. The documents drawn up in compliance with the letters rogatory shall be returned to the Court under the same conditions.

The Court shall defray the expenses, without prejudice to the right to charge them, where appropriate, to the parties.

## Article 30

A Member State shall treat any violation of an oath by a witness or expert in the same manner as if the offence had been committed before one of its courts with jurisdiction in civil proceedings. At the instance of the Court of Justice, the Member State concerned shall prosecute the offender before its competent court.

C 202/218    EN    Official Journal of the European Union    7.6.2016

*Article 31*

The hearing in court shall be public, unless the Court of Justice, of its own motion or on application by the parties, decides otherwise for serious reasons.

*Article 32*

During the hearings the Court of Justice may examine the experts, the witnesses and the parties themselves. The latter, however, may address the Court of Justice only through their representatives.

*Article 33*

Minutes shall be made of each hearing and signed by the President and the Registrar.

*Article 34*

The case list shall be established by the President.

*Article 35*

The deliberations of the Court of Justice shall be and shall remain secret.

*Article 36*

Judgments shall state the reasons on which they are based. They shall contain the names of the Judges who took part in the deliberations.

*Article 37*

Judgments shall be signed by the President and the Registrar. They shall be read in open court.

*Article 38*

The Court of Justice shall adjudicate upon costs.

*Article 39*

The President of the Court of Justice may, by way of summary procedure, which may, in so far as necessary, differ from some of the rules contained in this Statute and which shall be laid down in the Rules of Procedure, adjudicate upon applications to suspend execution, as provided for in Article 278 of the Treaty on the Functioning of the European Union and Article 157 of the EAEC Treaty, or to prescribe interim measures pursuant to Article 279 of the Treaty on the Functioning of the European Union, or to suspend enforcement in accordance with the fourth paragraph of Article 299 of the Treaty on the Functioning of the European Union or the third paragraph of Article 164 of the EAEC Treaty.

7.6.2016          EN          Official Journal of the European Union          C 202/219

The powers referred to in the first paragraph may, under the conditions laid down in the Rules of Procedure, be exercised by the Vice-President of the Court of Justice.

Should the President and the Vice-President be prevented from attending, another Judge shall take their place under the conditions laid down in the Rules of Procedure.

The ruling of the President or of the Judge replacing him shall be provisional and shall in no way prejudice the decision of the Court on the substance of the case.

## Article 40

Member States and institutions of the Union may intervene in cases before the Court of Justice.

The same right shall be open to the bodies, offices and agencies of the Union and to any other person which can establish an interest in the result of a case submitted to the Court. Natural or legal persons shall not intervene in cases between Member States, between institutions of the Union or between Member States and institutions of the Union.

Without prejudice to the second paragraph, the States, other than the Member States, which are parties to the Agreement on the European Economic Area, and also the EFTA Surveillance Authority referred to in that Agreement, may intervene in cases before the Court where one of the fields of application of that Agreement is concerned.

An application to intervene shall be limited to supporting the form of order sought by one of the parties.

## Article 41

Where the defending party, after having been duly summoned, fails to file written submissions in defence, judgment shall be given against that party by default. An objection may be lodged against the judgment within one month of it being notified. The objection shall not have the effect of staying enforcement of the judgment by default unless the Court of Justice decides otherwise.

## Article 42

Member States, institutions, bodies, offices and agencies of the Union and any other natural or legal persons may, in cases and under conditions to be determined by the Rules of Procedure, institute third-party proceedings to contest a judgment rendered without their being heard, where the judgment is prejudicial to their rights.

## Article 43

If the meaning or scope of a judgment is in doubt, the Court of Justice shall construe it on application by any party or any institution of the Union establishing an interest therein.

## Article 44

An application for revision of a judgment may be made to the Court of Justice only on discovery of a fact which is of such a nature as to be a decisive factor, and which, when the judgment was given, was unknown to the Court and to the party claiming the revision.

The revision shall be opened by a judgment of the Court expressly recording the existence of a new fact, recognising that it is of such a character as to lay the case open to revision and declaring the application admissible on this ground.

No application for revision may be made after the lapse of 10 years from the date of the judgment.

## Article 45

Periods of grace based on considerations of distance shall be determined by the Rules of Procedure.

No right shall be prejudiced in consequence of the expiry of a time limit if the party concerned proves the existence of unforeseeable circumstances or of *force majeure*.

## Article 46

Proceedings against the Union in matters arising from non-contractual liability shall be barred after a period of five years from the occurrence of the event giving rise thereto. The period of limitation shall be interrupted if proceedings are instituted before the Court of Justice or if prior to such proceedings an application is made by the aggrieved party to the relevant institution of the Union. In the latter event the proceedings must be instituted within the period of two months provided for in Article 263 of the Treaty on the Functioning of the European Union; the provisions of the second paragraph of Article 265 of the Treaty on the Functioning of the European Union shall apply where appropriate.

This Article shall also apply to proceedings against the European Central Bank regarding non-contractual liability.

## TITLE IV

### GENERAL COURT

## Article 47

The first paragraph of Article 9, Article 9a, Articles 14 and 15, the first, second, fourth and fifth paragraphs of Article 17 and Article 18 shall apply to the General Court and its members.

The fourth paragraph of Article 3 and Articles 10, 11 and 14 shall apply to the Registrar of the General Court *mutatis mutandis*.

## Article 48

The General Court shall consist of:

(a) 40 Judges as from 25 December 2015;

(b) 47 Judges as from 1 September 2016;

(c) two Judges per Member State as from 1 September 2019.

7.6.2016    EN    Official Journal of the European Union    C 202/221

## Article 49

The Members of the General Court may be called upon to perform the task of an Advocate-General.

It shall be the duty of the Advocate-General, acting with complete impartiality and independence, to make, in open court, reasoned submissions on certain cases brought before the General Court in order to assist the General Court in the performance of its task.

The criteria for selecting such cases, as well as the procedures for designating the Advocates-General, shall be laid down in the Rules of Procedure of the General Court.

A Member called upon to perform the task of Advocate-General in a case may not take part in the judgment of the case.

## Article 50

The General Court shall sit in chambers of three or five Judges. The Judges shall elect the Presidents of the chambers from among their number. The Presidents of the chambers of five Judges shall be elected for three years. They may be re-elected once.

The composition of the chambers and the assignment of cases to them shall be governed by the Rules of Procedure. In certain cases governed by the Rules of Procedure, the General Court may sit as a full court or be constituted by a single Judge.

The Rules of Procedure may also provide that the General Court may sit in a Grand Chamber in cases and under the conditions specified therein.

## Article 51

By way of derogation from the rule laid down in Article 256(1) of the Treaty on the Functioning of the European Union, jurisdiction shall be reserved to the Court of Justice in the actions referred to in Articles 263 and 265 of the Treaty on the Functioning of the European Union when they are brought by a Member State against:

(a) an act of or failure to act by the European Parliament or the Council, or by those institutions acting jointly, except for:

— decisions taken by the Council under the third subparagraph of Article 108(2) of the Treaty on the Functioning of the European Union;

— acts of the Council adopted pursuant to a Council regulation concerning measures to protect trade within the meaning of Article 207 of the Treaty on the Functioning of the European Union;

— acts of the Council by which the Council exercises implementing powers in accordance with the second paragraph of Article 291 of the Treaty on the Functioning of the European Union;

(b) against an act of or failure to act by the Commission under the first paragraph of Article 331 of the Treaty on the Functioning of the European Union.

Jurisdiction shall also be reserved to the Court of Justice in the actions referred to in the same Articles when they are brought by an institution of the Union against an act of or failure to act by the European Parliament, the Council, both those institutions acting jointly, or the Commission, or brought by an institution of the Union against an act of or failure to act by the European Central Bank.

## Article 52

The President of the Court of Justice and the President of the General Court shall determine, by common accord, the conditions under which officials and other servants attached to the Court of Justice shall render their services to the General Court to enable it to function. Certain officials or other servants shall be responsible to the Registrar of the General Court under the authority of the President of the General Court.

## Article 53

The procedure before the General Court shall be governed by Title III.

Such further and more detailed provisions as may be necessary shall be laid down in its Rules of Procedure. The Rules of Procedure may derogate from the fourth paragraph of Article 40 and from Article 41 in order to take account of the specific features of litigation in the field of intellectual property.

Notwithstanding the fourth paragraph of Article 20, the Advocate-General may make his reasoned submissions in writing.

## Article 54

Where an application or other procedural document addressed to the General Court is lodged by mistake with the Registrar of the Court of Justice, it shall be transmitted immediately by that Registrar to the Registrar of the General Court; likewise, where an application or other procedural document addressed to the Court of Justice is lodged by mistake with the Registrar of the General Court, it shall be transmitted immediately by that Registrar to the Registrar of the Court of Justice.

Where the General Court finds that it does not have jurisdiction to hear and determine an action in respect of which the Court of Justice has jurisdiction, it shall refer that action to the Court of Justice; likewise, where the Court of Justice finds that an action falls within the jurisdiction of the General Court, it shall refer that action to the General Court, whereupon that Court may not decline jurisdiction.

Where the Court of Justice and the General Court are seised of cases in which the same relief is sought, the same issue of interpretation is raised or the validity of the same act is called in question, the General Court may, after hearing the parties, stay the proceedings before it until such time as the Court of Justice has delivered judgment or, where the action is one brought pursuant to Article 263 of the Treaty on the Functioning of the European Union, may decline jurisdiction so as to allow the Court of Justice to rule on such actions. In the same circumstances, the Court of Justice may also decide to stay the proceedings before it; in that event, the proceedings before the General Court shall continue.

Where a Member State and an institution of the Union are challenging the same act, the General Court shall decline jurisdiction so that the Court of Justice may rule on those applications.

*Article 55*

Final decisions of the General Court, decisions disposing of the substantive issues in part only or disposing of a procedural issue concerning a plea of lack of competence or inadmissibility, shall be notified by the Registrar of the General Court to all parties as well as all Member States and the institutions of the Union even if they did not intervene in the case before the General Court.

*Article 56*

An appeal may be brought before the Court of Justice, within two months of the notification of the decision appealed against, against final decisions of the General Court and decisions of that Court disposing of the substantive issues in part only or disposing of a procedural issue concerning a plea of lack of competence or inadmissibility.

Such an appeal may be brought by any party which has been unsuccessful, in whole or in part, in its submissions. However, interveners other than the Member States and the institutions of the Union may bring such an appeal only where the decision of the General Court directly affects them.

With the exception of cases relating to disputes between the Union and its servants, an appeal may also be brought by Member States and institutions of the Union which did not intervene in the proceedings before the General Court. Such Member States and institutions shall be in the same position as Member States or institutions which intervened at first instance.

*Article 57*

Any person whose application to intervene has been dismissed by the General Court may appeal to the Court of Justice within two weeks from the notification of the decision dismissing the application.

The parties to the proceedings may appeal to the Court of Justice against any decision of the General Court made pursuant to Article 278 or Article 279 or the fourth paragraph of Article 299 of the Treaty on the Functioning of the European Union or Article 157 or the third paragraph of Article 164 of the EAEC Treaty within two months from their notification.

The appeal referred to in the first two paragraphs of this Article shall be heard and determined under the procedure referred to in Article 39.

*Article 58*

An appeal to the Court of Justice shall be limited to points of law. It shall lie on the grounds of lack of competence of the General Court, a breach of procedure before it which adversely affects the interests of the appellant as well as the infringement of Union law by the General Court.

No appeal shall lie regarding only the amount of the costs or the party ordered to pay them.

C 202/224          EN          Official Journal of the European Union          7.6.2016

## Article 59

Where an appeal is brought against a decision of the General Court, the procedure before the Court of Justice shall consist of a written part and an oral part. In accordance with conditions laid down in the Rules of Procedure, the Court of Justice, having heard the Advocate-General and the parties, may dispense with the oral procedure.

## Article 60

Without prejudice to Articles 278 and 279 of the Treaty on the Functioning of the European Union or Article 157 of the EAEC Treaty, an appeal shall not have suspensory effect.

By way of derogation from Article 280 of the Treaty on the Functioning of the European Union, decisions of the General Court declaring a regulation to be void shall take effect only as from the date of expiry of the period referred to in the first paragraph of Article 56 of this Statute or, if an appeal shall have been brought within that period, as from the date of dismissal of the appeal, without prejudice, however, to the right of a party to apply to the Court of Justice, pursuant to Articles 278 and 279 of the Treaty on the Functioning of the European Union or Article 157 of the EAEC Treaty, for the suspension of the effects of the regulation which has been declared void or for the prescription of any other interim measure.

## Article 61

If the appeal is well founded, the Court of Justice shall quash the decision of the General Court. It may itself give final judgment in the matter, where the state of the proceedings so permits, or refer the case back to the General Court for judgment.

Where a case is referred back to the General Court, that Court shall be bound by the decision of the Court of Justice on points of law.

When an appeal brought by a Member State or an institution of the Union, which did not intervene in the proceedings before the General Court, is well founded, the Court of Justice may, if it considers this necessary, state which of the effects of the decision of the General Court which has been quashed shall be considered as definitive in respect of the parties to the litigation.

## Article 62

In the cases provided for in Article 256(2) and (3) of the Treaty on the Functioning of the European Union, where the First Advocate-General considers that there is a serious risk of the unity or consistency of Union law being affected, he may propose that the Court of Justice review the decision of the General Court.

The proposal must be made within one month of delivery of the decision by the General Court. Within one month of receiving the proposal made by the First Advocate-General, the Court of Justice shall decide whether or not the decision should be reviewed.

## Article 62a

The Court of Justice shall give a ruling on the questions which are subject to review by means of an urgent procedure on the basis of the file forwarded to it by the General Court.

7.6.2016          EN          Official Journal of the European Union          C 202/225

Those referred to in Article 23 of this Statute and, in the cases provided for in Article 256(2) of the EC Treaty, the parties to the proceedings before the General Court shall be entitled to lodge statements or written observations with the Court of Justice relating to questions which are subject to review within a period prescribed for that purpose.

The Court of Justice may decide to open the oral procedure before giving a ruling.

### *Article 62b*

In the cases provided for in Article 256(2) of the Treaty on the Functioning of the European Union, without prejudice to Articles 278 and 279 of the Treaty on the Functioning of the European Union, proposals for review and decisions to open the review procedure shall not have suspensory effect. If the Court of Justice finds that the decision of the General Court affects the unity or consistency of Union law, it shall refer the case back to the General Court which shall be bound by the points of law decided by the Court of Justice; the Court of Justice may state which of the effects of the decision of the General Court are to be considered as definitive in respect of the parties to the litigation. If, however, having regard to the result of the review, the outcome of the proceedings flows from the findings of fact on which the decision of the General Court was based, the Court of Justice shall give final judgment.

In the cases provided for in Article 256(3) of the Treaty on the Functioning of the European Union, in the absence of proposals for review or decisions to open the review procedure, the answer(s) given by the General Court to the questions submitted to it shall take effect upon expiry of the periods prescribed for that purpose in the second paragraph of Article 62. Should a review procedure be opened, the answer(s) subject to review shall take effect following that procedure, unless the Court of Justice decides otherwise. If the Court of Justice finds that the decision of the General Court affects the unity or consistency of Union law, the answer given by the Court of Justice to the questions subject to review shall be substituted for that given by the General Court.

### TITLE IVa

#### SPECIALISED COURTS

### *Article 62c*

The provisions relating to the jurisdiction, composition, organisation and procedure of the specialised courts established under Article 257 of the Treaty on the Functioning of the European Union are set out in an Annex to this Statute.

The European Parliament and the Council, acting in accordance with Article 257 of the Treaty on the Functioning of the European Union, may attach temporary Judges to the specialised courts in order to cover the absence of Judges who, while not suffering from disablement deemed to be total, are prevented from participating in the disposal of cases for a lengthy period of time. In that event, the European Parliament and the Council shall lay down the conditions under which the temporary Judges shall be appointed, their rights and duties, the detailed rules governing the performance of their duties and the circumstances in which they shall cease to perform those duties.

### TITLE V

#### FINAL PROVISIONS

### *Article 63*

The Rules of Procedure of the Court of Justice and of the General Court shall contain any provisions necessary for applying and, where required, supplementing this Statute.

*Article 64*

The rules governing the language arrangements applicable at the Court of Justice of the European Union shall be laid down by a regulation of the Council acting unanimously. This regulation shall be adopted either at the request of the Court of Justice and after consultation of the Commission and the European Parliament, or on a proposal from the Commission and after consultation of the Court of Justice and of the European Parliament.

Until those rules have been adopted, the provisions of the Rules of Procedure of the Court of Justice and of the Rules of Procedure of the General Court governing language arrangements shall continue to apply. By way of derogation from Articles 253 and 254 of the Treaty on the Functioning of the European Union, those provisions may only be amended or repealed with the unanimous consent of the Council.

―――

*ANNEX I*

## THE EUROPEAN UNION CIVIL SERVICE TRIBUNAL

*Article 1*

The European Union Civil Service Tribunal (hereafter "the Civil Service Tribunal") shall exercise at first instance jurisdiction in disputes between the Union and its servants referred to in Article 270 of the Treaty on the Functioning of the European Union, including disputes between all bodies or agencies and their servants in respect of which jurisdiction is conferred on the Court of Justice of the European Union.

*Article 2*

1. The Civil Service Tribunal shall consist of seven judges. Should the Court of Justice so request, the Council, acting by a qualified majority, may increase the number of judges.

The judges shall be appointed for a period of six years. Retiring judges may be reappointed.

Any vacancy shall be filled by the appointment of a new judge for a period of six years.

2. Temporary Judges shall be appointed, in addition to the Judges referred to in the first subparagraph of paragraph 1, in order to cover the absence of Judges who, while not suffering from disablement deemed to be total, are prevented from participating in the disposal of cases for a lengthy period of time.

*Article 3*

1. The judges shall be appointed by the Council, acting in accordance with the fourth paragraph of Article 257 of the Treaty on the Functioning of the European Union, after consulting the committee provided for by this Article. When appointing judges, the Council shall ensure a balanced composition of the Civil Service Tribunal on as broad a geographical basis as possible from among nationals of the Member States and with respect to the national legal systems represented.

2. Any person who is a Union citizen and fulfils the conditions laid down in the fourth paragraph of Article 257 of the Treaty on the Functioning of the European Union may submit an application. The Council, acting on a recommendation from the Court of Justice, shall determine the conditions and the arrangements governing the submission and processing of such applications.

3.    A committee shall be set up comprising seven persons chosen from among former members of the Court of Justice and the General Court and lawyers of recognised competence. The committee's membership and operating rules shall be determined by the Council, acting on a recommendation by the President of the Court of Justice.

4.    The committee shall give an opinion on candidates' suitability to perform the duties of judge at the Civil Service Tribunal. The committee shall append to its opinion a list of candidates having the most suitable high-level experience. Such list shall contain the names of at least twice as many candidates as there are judges to be appointed by the Council.

### Article 4

1.    The judges shall elect the President of the Civil Service Tribunal from among their number for a term of three years. He may be re-elected.

2.    The Civil Service Tribunal shall sit in chambers of three judges. It may, in certain cases determined by its rules of procedure, sit in full court or in a chamber of five judges or of a single judge.

3.    The President of the Civil Service Tribunal shall preside over the full court and the chamber of five judges. The Presidents of the chambers of three judges shall be designated as provided in paragraph 1. If the President of the Civil Service Tribunal is assigned to a chamber of three judges, he shall preside over that chamber.

4.    The jurisdiction of and quorum for the full court as well as the composition of the chambers and the assignment of cases to them shall be governed by the Rules of Procedure.

### Article 5

Articles 2 to 6, 14, 15, the first, second and fifth paragraphs of Article 17, and Article 18 of the Statute of the Court of Justice of the European Union shall apply to the Civil Service Tribunal and its members.

The oath referred to in Article 2 of the Statute shall be taken before the Court of Justice, and the decisions referred to in Articles 3, 4 and 6 thereof shall be adopted by the Court of Justice after consulting the Civil Service Tribunal.

### Article 6

1.    The Civil Service Tribunal shall be supported by the departments of the Court of Justice and of the General Court. The President of the Court of Justice or, in appropriate cases, the President of the General Court, shall determine by common accord with the President of the Civil Service Tribunal the conditions under which officials and other servants attached to the Court of Justice or the General Court shall render their services to the Civil Service Tribunal to enable it to function. Certain officials or other servants shall be responsible to the Registrar of the Civil Service Tribunal under the authority of the President of that Tribunal.

2.    The Civil Service Tribunal shall appoint its Registrar and lay down the rules governing his service. The fourth paragraph of Article 3 and Articles 10, 11 and 14 of the Statute of the Court of Justice of the European Union shall apply to the Registrar of the Tribunal.

### Article 7

1.    The procedure before the Civil Service Tribunal shall be governed by Title III of the Statute of the Court of Justice of the European Union, with the exception of Articles 22 and 23. Such further and more detailed provisions as may be necessary shall be laid down in the Rules of Procedure.

2.    The provisions concerning the General Court's language arrangements shall apply to the Civil Service Tribunal.

EN

3.    The written stage of the procedure shall comprise the presentation of the application and of the statement of defence, unless the Civil Service Tribunal decides that a second exchange of written pleadings is necessary. Where there is such second exchange, the Civil Service Tribunal may, with the agreement of the parties, decide to proceed to judgment without an oral procedure.

4.    At all stages of the procedure, including the time when the application is filed, the Civil Service Tribunal may examine the possibilities of an amicable settlement of the dispute and may try to facilitate such settlement.

5.    The Civil Service Tribunal shall rule on the costs of a case. Subject to the specific provisions of the Rules of Procedure, the unsuccessful party shall be ordered to pay the costs should the court so decide.

*Article 8*

1.    Where an application or other procedural document addressed to the Civil Service Tribunal is lodged by mistake with the Registrar of the Court of Justice or General Court, it shall be transmitted immediately by that Registrar to the Registrar of the Civil Service Tribunal. Likewise, where an application or other procedural document addressed to the Court of Justice or to the General Court is lodged by mistake with the Registrar of the Civil Service Tribunal, it shall be transmitted immediately by that Registrar to the Registrar of the Court of Justice or General Court.

2.    Where the Civil Service Tribunal finds that it does not have jurisdiction to hear and determine an action in respect of which the Court of Justice or the General Court has jurisdiction, it shall refer that action to the Court of Justice or to the General Court. Likewise, where the Court of Justice or the General Court finds that an action falls within the jurisdiction of the Civil Service Tribunal, the Court seised shall refer that action to the Civil Service Tribunal, whereupon that Tribunal may not decline jurisdiction.

3.    Where the Civil Service Tribunal and the General Court are seised of cases in which the same issue of interpretation is raised or the validity of the same act is called in question, the Civil Service Tribunal, after hearing the parties, may stay the proceedings until the judgment of the General Court has been delivered.

Where the Civil Service Tribunal and the General Court are seised of cases in which the same relief is sought, the Civil Service Tribunal shall decline jurisdiction so that the General Court may act on those cases.

*Article 9*

An appeal may be brought before the General Court, within two months of notification of the decision appealed against, against final decisions of the Civil Service Tribunal and decisions of that Tribunal disposing of the substantive issues in part only or disposing of a procedural issue concerning a plea of lack of jurisdiction or inadmissibility.

Such an appeal may be brought by any party which has been unsuccessful, in whole or in part, in its submissions. However, interveners other than the Member States and the institutions of the Union may bring such an appeal only where the decision of the Civil Service Tribunal directly affects  them.

*Article 10*

1.    Any person whose application to intervene has been dismissed by the Civil Service Tribunal may appeal to the General Court within two weeks of notification of the decision dismissing the  application.

2.    The parties to the proceedings may appeal to the General Court against any decision of the Civil Service Tribunal made pursuant to Article  278 or Article  279 or the fourth paragraph of Article  299 of the Treaty on the Functioning of the European Union or Article  157 or the third  paragraph of Article  164 of the EAEC Treaty within two months of its notification.

7.6.2016    EN    Official Journal of the European Union    C 202/229

3.    The President of the General Court may, by way of summary procedure, which may, in so far as necessary, differ from some of the rules contained in this Annex and which shall be laid down in the rules of procedure of the General Court, adjudicate upon appeals brought in accordance with paragraphs 1 and 2.

*Article 11*

1.    An appeal to the General Court shall be limited to points of law. It shall lie on the grounds of lack of jurisdiction of the Civil Service Tribunal, a breach of procedure before it which adversely affects the interests of the appellant, as well as the infringement of Union law by the Tribunal.

2.    No appeal shall lie regarding only the amount of the costs or the party ordered to pay them.

*Article 12*

1.    Without prejudice to Articles 278 and 279 of the Treaty on the Functioning of the European Union or Article 157 of the EAEC Treaty, an appeal before the General Court shall not have suspensory effect.

2.    Where an appeal is brought against a decision of the Civil Service Tribunal, the procedure before the General Court shall consist of a written part and an oral part. In accordance with conditions laid down in the rules of procedure, the General Court, having heard the parties, may dispense with the oral procedure.

*Article 13*

1.    If the appeal is well founded, the General Court shall quash the decision of the Civil Service Tribunal and itself give judgment in the matter. It shall refer the case back to the Civil Service Tribunal for judgment where the state of the proceedings does not permit a decision by the Court.

2.    Where a case is referred back to the Civil Service Tribunal, the Tribunal shall be bound by the decision of the General Court on points of law.

―――――――――

C 202/230          EN          Official Journal of the European Union          7.6.2016

# PROTOCOL (No 4)

## ON THE STATUTE OF THE EUROPEAN SYSTEM OF CENTRAL BANKS AND OF THE EUROPEAN CENTRAL BANK

THE HIGH CONTRACTING PARTIES,

DESIRING to lay down the Statute of the European System of Central Banks and of the European Central Bank provided for in the second paragraph of Article 129 of the Treaty on the Functioning of the European Union,

HAVE AGREED upon the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

## CHAPTER I

## THE EUROPEAN SYSTEM OF CENTRAL BANKS

### Article 1

**The European System of Central Banks**

In accordance with Article 282(1) of the Treaty on the Functioning of the European Union, the European Central Bank (ECB) and the national central banks shall constitute the European System of Central Banks (ESCB). The ECB and the national central banks of those Member States whose currency is the euro shall constitute the Eurosystem.

The ESCB and the ECB shall perform their tasks and carry on their activities in accordance with the provisions of the Treaties and of this Statute.

## CHAPTER II

## OBJECTIVES AND TASKS OF THE ESCB

### Article 2

**Objectives**

In accordance with Article 127(1) and Article 282(2) of the Treaty on the Functioning of the European Union, the primary objective of the ESCB shall be to maintain price stability. Without prejudice to the objective of price stability, it shall support the general economic policies in the Union with a view to contributing to the achievement of the objectives of the Union as laid down in Article 3 of the Treaty on European Union. The ESCB shall act in accordance with the principle of an open market economy with free competition, favouring an efficient allocation of resources, and in compliance with the principles set out in Article 119 of the Treaty on the Functioning of the European Union.

## Article 3

### Tasks

3.1.    In accordance with Article 127(2) of the Treaty on the Functioning of the European Union, the basic tasks to be carried out through the ESCB shall be:

— to define and implement the monetary policy of the Union;

— to conduct foreign-exchange operations consistent with the provisions of Article 219 of that Treaty;

— to hold and manage the official foreign reserves of the Member States;

— to promote the smooth operation of payment systems.

3.2.    In accordance with Article 127(3) of the Treaty on the Functioning of the European Union, the third indent of Article 3.1 shall be without prejudice to the holding and management by the governments of Member States of foreign-exchange working balances.

3.3.    In accordance with Article 127(5) of the Treaty on the Functioning of the European Union, the ESCB shall contribute to the smooth conduct of policies pursued by the competent authorities relating to the prudential supervision of credit institutions and the stability of the financial system.

## Article 4

### Advisory functions

In accordance with Article 127(4) of the Treaty on the Functioning of the European Union:

(a) the ECB shall be consulted:

— on any proposed Union act in its fields of competence;

— by national authorities regarding any draft legislative provision in its fields of competence, but within the limits and under the conditions set out by the Council in accordance with the procedure laid down in Article 41;

(b) the ECB may submit opinions to the Union institutions, bodies, offices or agencies or to national authorities on matters in its fields of competence.

## Article 5

### Collection of statistical information

5.1.    In order to undertake the tasks of the ESCB, the ECB, assisted by the national central banks, shall collect the necessary statistical information either from the competent national authorities or directly from economic agents. For these purposes it shall cooperate with the Union institutions, bodies, offices or agencies and with the competent authorities of the Member States or third countries and with international organisations.

5.2.    The national central banks shall carry out, to the extent possible, the tasks described in Article 5.1.

5.3.    The ECB shall contribute to the harmonisation, where necessary, of the rules and practices governing the collection, compilation and distribution of statistics in the areas within its fields of competence.

5.4.    The Council, in accordance with the procedure laid down in Article 41, shall define the natural and legal persons subject to reporting requirements, the confidentiality regime and the appropriate provisions for enforcement.

### Article 6

**International cooperation**

6.1.    In the field of international cooperation involving the tasks entrusted to the ESCB, the ECB shall decide how the ESCB shall be represented.

6.2.    The ECB and, subject to its approval, the national central banks may participate in international monetary institutions.

6.3.    Articles 6.1 and 6.2 shall be without prejudice to Article 138 of the Treaty on the Functioning of the European Union.

## CHAPTER III

## ORGANISATION OF THE ESCB

### Article 7

**Independence**

In accordance with Article 130 of the Treaty on the Functioning of the European Union, when exercising the powers and carrying out the tasks and duties conferred upon them by the Treaties and this Statute, neither the ECB, nor a national central bank, nor any member of their decision-making bodies shall seek or take instructions from Union institutions, bodies, offices or agencies, from any government of a Member State or from any other body. The Union institutions, bodies, offices or agencies and the governments of the Member States undertake to respect this principle and not to seek to influence the members of the decision-making bodies of the ECB or of the national central banks in the performance of their tasks.

### Article 8

**General principle**

The ESCB shall be governed by the decision-making bodies of the ECB.

## Article 9

### The European Central Bank

9.1.    The ECB which, in accordance with Article 282(3) of the Treaty on the Functioning of the European Union, shall have legal personality, shall enjoy in each of the Member States the most extensive legal capacity accorded to legal persons under its law; it may, in particular, acquire or dispose of movable and immovable property and may be a party to legal proceedings.

9.2.    The ECB shall ensure that the tasks conferred upon the ESCB under Article 127(2), (3) and (5) of the Treaty on the Functioning of the European Union are implemented either by its own activities pursuant to this Statute or through the national central banks pursuant to Articles 12.1 and 14.

9.3.    In accordance with Article 129(1) of the Treaty on the Functioning of the European Union, the decision making bodies of the ECB shall be the Governing Council and the Executive Board.

## Article 10

### The Governing Council

10.1.    In accordance with Article 283(1) of the Treaty on the Functioning of the European Union, the Governing Council shall comprise the members of the Executive Board of the ECB and the governors of the national central banks of the Member States whose currency is the euro.

10.2.    Each member of the Governing Council shall have one vote. As from the date on which the number of members of the Governing Council exceeds 21, each member of the Executive Board shall have one vote and the number of governors with a voting right shall be 15. The latter voting rights shall be assigned and shall rotate as follows:

— as from the date on which the number of governors exceeds 15, until it reaches 22, the governors shall be allocated to two groups, according to a ranking of the size of the share of their national central bank's Member State in the aggregate gross domestic product at market prices and in the total aggregated balance sheet of the monetary financial institutions of the Member States whose currency is the euro. The shares in the aggregate gross domestic product at market prices and in the total aggregated balance sheet of the monetary financial institutions shall be assigned weights of 5/6 and 1/6, respectively. The first group shall be composed of five governors and the second group of the remaining governors. The frequency of voting rights of the governors allocated to the first group shall not be lower than the frequency of voting rights of those of the second group. Subject to the previous sentence, the first group shall be assigned four voting rights and the second group eleven voting rights,

— as from the date on which the number of governors reaches 22, the governors shall be allocated to three groups according to a ranking based on the above criteria. The first group shall be composed of five governors and shall be assigned four voting rights. The second group shall be composed of half of the total number of governors, with any fraction rounded up to the nearest integer, and shall be assigned eight voting rights. The third group shall be composed of the remaining governors and shall be assigned three voting rights,

— within each group, the governors shall have their voting rights for equal amounts of time,

— for the calculation of the shares in the aggregate gross domestic product at market prices Article 29.2 shall apply. The total aggregated balance sheet of the monetary financial institutions shall be calculated in accordance with the statistical framework applying in the Union at the time of the calculation,

— whenever the aggregate gross domestic product at market prices is adjusted in accordance with Article 29.3, or whenever the number of governors increases, the size and/or composition of the groups shall be adjusted in accordance with the above principles,

— the Governing Council, acting by a two-thirds majority of all its members, with and without a voting right, shall take all measures necessary for the implementation of the above principles and may decide to postpone the start of the rotation system until the date on which the number of governors exceeds 18.

The right to vote shall be exercised in person. By way of derogation from this rule, the Rules of Procedure referred to in Article 12.3 may lay down that members of the Governing Council may cast their vote by means of teleconferencing. These rules shall also provide that a member of the Governing Council who is prevented from attending meetings of the Governing Council for a prolonged period may appoint an alternate as a member of the Governing Council.

The provisions of the previous paragraphs are without prejudice to the voting rights of all members of the Governing Council, with and without a voting right, under Articles 10.3, 40.2 and 40.3.

Save as otherwise provided for in this Statute, the Governing Council shall act by a simple majority of the members having a voting right. In the event of a tie, the President shall have the casting vote.

In order for the Governing Council to vote, there shall be a quorum of two-thirds of the members having a voting right. If the quorum is not met, the President may convene an extraordinary meeting at which decisions may be taken without regard to the quorum.

10.3.    For any decisions to be taken under Articles 28, 29, 30, 32 and 33, the votes in the Governing Council shall be weighted according to the national central banks' shares in the subscribed capital of the ECB. The weights of the votes of the members of the Executive Board shall be zero. A decision requiring a qualified majority shall be adopted if the votes cast in favour represent at least two thirds of the subscribed capital of the ECB and represent at least half of the shareholders. If a Governor is unable to be present, he may nominate an alternate to cast his weighted vote.

10.4.    The proceedings of the meetings shall be confidential. The Governing Council may decide to make the outcome of its deliberations public.

10.5.    The Governing Council shall meet at least 10 times a year.

*Article 11*

**The Executive Board**

11.1.    In accordance with the first subparagraph of Article 283(2) of the Treaty on the Functioning of the European Union, the Executive Board shall comprise the President, the Vice-President and four other members.

The members shall perform their duties on a full-time basis. No member shall engage in any occupation, whether gainful or not, unless exemption is exceptionally granted by the Governing Council.

11.2.    In accordance with the second subparagraph of Article 283(2) of the Treaty on the Functioning of the European Union, the President, the Vice-President and the other members of the Executive Board shall be appointed by the European Council, acting by a qualified majority, from among persons of recognised standing and professional experience in monetary or banking matters, on a recommendation from the Council after it has consulted the European Parliament and the Governing Council.

Their term of office shall be eight years and shall not be renewable.

Only nationals of Member States may be members of the Executive Board.

11.3.    The terms and conditions of employment of the members of the Executive Board, in particular their salaries, pensions and other social security benefits shall be the subject of contracts with the ECB and shall be fixed by the Governing Council on a proposal from a Committee comprising three members appointed by the Governing Council and three members appointed by the Council. The members of the Executive Board shall not have the right to vote on matters referred to in this paragraph.

11.4.    If a member of the Executive Board no longer fulfils the conditions required for the performance of his duties or if he has been guilty of serious misconduct, the Court of Justice may, on application by the Governing Council or the Executive Board, compulsorily retire him.

11.5.    Each member of the Executive Board present in person shall have the right to vote and shall have, for that purpose, one vote. Save as otherwise provided, the Executive Board shall act by a simple majority of the votes cast. In the event of a tie, the President shall have the casting vote. The voting arrangements shall be specified in the Rules of Procedure referred to in Article 12.3.

11.6.    The Executive Board shall be responsible for the current business of the ECB.

11.7.    Any vacancy on the Executive Board shall be filled by the appointment of a new member in accordance with Article 11.2.

## Article 12

### Responsibilities of the decision-making bodies

12.1.    The Governing Council shall adopt the guidelines and take the decisions necessary to ensure the performance of the tasks entrusted to the ESCB under these Treaties and this Statute. The Governing Council shall formulate the monetary policy of the Union including, as appropriate, decisions relating to intermediate monetary objectives, key interest rates and the supply of reserves in the ESCB, and shall establish the necessary guidelines for their implementation.

The Executive Board shall implement monetary policy in accordance with the guidelines and decisions laid down by the Governing Council. In doing so the Executive Board shall give the necessary instructions to national central banks. In addition the Executive Board may have certain powers delegated to it where the Governing Council so decides.

To the extent deemed possible and appropriate and without prejudice to the provisions of this Article, the ECB shall have recourse to the national central banks to carry out operations which form part of the tasks of the ESCB.

12.2.    The Executive Board shall have responsibility for the preparation of meetings of the Governing Council.

12.3.    The Governing Council shall adopt Rules of Procedure which determine the internal organisation of the ECB and its decision-making bodies.

12.4.    The Governing Council shall exercise the advisory functions referred to in Article 4.

12.5.    The Governing Council shall take the decisions referred to in Article 6.

## Article 13

### The President

13.1.    The President or, in his absence, the Vice-President shall chair the Governing Council and the Executive Board of the ECB.

13.2.    Without prejudice to Article 38, the President or his nominee shall represent the ECB externally.

## Article 14

### National central banks

14.1.    In accordance with Article 131 of the Treaty on the Functioning of the European Union, each Member State shall ensure that its national legislation, including the statutes of its national central bank, is compatible with these Treaties and this Statute.

14.2.    The statutes of the national central banks shall, in particular, provide that the term of office of a Governor of a national central bank shall be no less than five years.

A Governor may be relieved from office only if he no longer fulfils the conditions required for the performance of his duties or if he has been guilty of serious misconduct. A decision to this effect may be referred to the Court of Justice by the Governor concerned or the Governing Council on grounds of infringement of these Treaties or of any rule of law relating to their application. Such proceedings shall be instituted within two months of the publication of the decision or of its notification to the plaintiff or, in the absence thereof, of the day on which it came to the knowledge of the latter, as the case may be.

14.3.    The national central banks are an integral part of the ESCB and shall act in accordance with the guidelines and instructions of the ECB. The Governing Council shall take the necessary steps to ensure compliance with the guidelines and instructions of the ECB, and shall require that any necessary information be given to it.

14.4.    National central banks may perform functions other than those specified in this Statute unless the Governing Council finds, by a majority of two thirds of the votes cast, that these interfere with the objectives and tasks of the ESCB. Such functions shall be performed on the responsibility and liability of national central banks and shall not be regarded as being part of the functions of the ESCB.

## Article 15

### Reporting commitments

15.1.    The ECB shall draw up and publish reports on the activities of the ESCB at least quarterly.

15.2.    A consolidated financial statement of the ESCB shall be published each week.

15.3.    In accordance with Article 284(3) of the Treaty on the Functioning of the European Union, the ECB shall address an annual report on the activities of the ESCB and on the monetary policy of both the previous and the current year to the European Parliament, the Council and the Commission, and also to the European Council.

15.4.    The reports and statements referred to in this Article shall be made available to interested parties free of charge.

## Article 16

### Banknotes

In accordance with Article 128(1) of the Treaty on the Functioning of the European Union, the Governing Council shall have the exclusive right to authorise the issue of euro banknotes within the Union. The ECB and the national central banks may issue such notes. The banknotes issued by the ECB and the national central banks shall be the only such notes to have the status of legal tender within the Union.

The ECB shall respect as far as possible existing practices regarding the issue and design of banknotes.

CHAPTER IV

MONETARY FUNCTIONS AND OPERATIONS OF THE ESCB

*Article 17*

**Accounts with the ECB and the national central banks**

In order to conduct their operations, the ECB and the national central banks may open accounts for credit institutions, public entities and other market participants and accept assets, including book entry securities, as collateral.

*Article 18*

**Open market and credit operations**

18.1.    In order to achieve the objectives of the ESCB and to carry out its tasks, the ECB and the national central banks may:

— operate in the financial markets by buying and selling outright (spot and forward) or under repurchase agreement and by lending or borrowing claims and marketable instruments, whether in euro or other currencies, as well as precious metals;

— conduct credit operations with credit institutions and other market participants, with lending being based on adequate collateral.

18.2.    The ECB shall establish general principles for open market and credit operations carried out by itself or the national central banks, including for the announcement of conditions under which they stand ready to enter into such transactions.

*Article 19*

**Minimum reserves**

19.1.    Subject to Article 2, the ECB may require credit institutions established in Member States to hold minimum reserve on accounts with the ECB and national central banks in pursuance of monetary policy objectives. Regulations concerning the calculation and determination of the required minimum reserves may be established by the Governing Council. In cases of non-compliance the ECB shall be entitled to levy penalty interest and to impose other sanctions with comparable effect.

19.2.    For the application of this Article, the Council shall, in accordance with the procedure laid down in Article 41, define the basis for minimum reserves and the maximum permissible ratios between those reserves and their basis, as well as the appropriate sanctions in cases of non-compliance.

*Article 20*

**Other instruments of monetary control**

The Governing Council may, by a majority of two thirds of the votes cast, decide upon the use of such other operational methods of monetary control as it sees fit, respecting Article 2.

The Council shall, in accordance with the procedure laid down in Article 41, define the scope of such methods if they impose obligations on third parties.

*Article 21*

**Operations with public entities**

21.1.    In accordance with Article 123 of the Treaty on the Functioning of the European Union, overdrafts or any other type of credit facility with the ECB or with the national central banks in favour of Union institutions, bodies, offices or agencies, central governments, regional, local or other public authorities, other bodies governed by public law, or public undertakings of Member States shall be prohibited, as shall the purchase directly from them by the ECB or national central banks of debt instruments.

21.2.    The ECB and national central banks may act as fiscal agents for the entities referred to in Article 21.1.

21.3.    The provisions of this Article shall not apply to publicly owned credit institutions which, in the context of the supply of reserves by central banks, shall be given the same treatment by national central banks and the ECB as private credit institutions.

*Article 22*

**Clearing and payment systems**

The ECB and national central banks may provide facilities, and the ECB may make regulations, to ensure efficient and sound clearing and payment systems within the Union and with other countries.

*Article 23*

**External operations**

The ECB and national central banks may:

— establish relations with central banks and financial institutions in other countries and, where appropriate, with international organisations;

— acquire and sell spot and forward all types of foreign exchange assets and precious metals; the term "foreign exchange asset" shall include securities and all other assets in the currency of any country or units of account and in whatever form held;

— hold and manage the assets referred to in this Article;

— conduct all types of banking transactions in relations with third countries and international organisations, including borrowing and lending operations.

### Article 24

**Other operations**

In addition to operations arising from their tasks, the ECB and national central banks may enter into operations for their administrative purposes or for their staff.

### CHAPTER V

### PRUDENTIAL SUPERVISION

### Article 25

**Prudential supervision**

25.1.    The ECB may offer advice to and be consulted by the Council, the Commission and the competent authorities of the Member States on the scope and implementation of Union legislation relating to the prudential supervision of credit institutions and to the stability of the financial system.

25.2.    In accordance with any regulation of the Council under Article 127(6) of the Treaty on the Functioning of the European Union, the ECB may perform specific tasks concerning policies relating to the prudential supervision of credit institutions and other financial institutions with the exception of insurance undertakings.

### CHAPTER VI

### FINANCIAL PROVISIONS OF THE ESCB

### Article 26

**Financial accounts**

26.1.    The financial year of the ECB and national central banks shall begin on the first day of January and end on the last day of December.

26.2.    The annual accounts of the ECB shall be drawn up by the Executive Board, in accordance with the principles established by the Governing Council. The accounts shall be approved by the Governing Council and shall thereafter be published.

26.3.    For analytical and operational purposes, the Executive Board shall draw up a consolidated balance sheet of the ESCB, comprising those assets and liabilities of the national central banks that fall within the ESCB.

26.4.    For the application of this Article, the Governing Council shall establish the necessary rules for standardising the accounting and reporting of operations undertaken by the national central banks.

## Article 27

### Auditing

27.1.    The accounts of the ECB and national central banks shall be audited by independent external auditors recommended by the Governing Council and approved by the Council. The auditors shall have full power to examine all books and accounts of the ECB and national central banks and obtain full information about their transactions.

27.2.    The provisions of Article 287 of the Treaty on the Functioning of the European Union shall only apply to an examination of the operational efficiency of the management of the ECB.

## Article 28

### Capital of the ECB

28.1.    The capital of the ECB shall be euro 5 000 million. The capital may be increased by such amounts as may be decided by the Governing Council acting by the qualified majority provided for in Article 10.3, within the limits and under the conditions set by the Council under the procedure laid down in Article 41.

28.2.    The national central banks shall be the sole subscribers to and holders of the capital of the ECB. The subscription of capital shall be according to the key established in accordance with Article 29.

28.3.    The Governing Council, acting by the qualified majority provided for in Article 10.3, shall determine the extent to which and the form in which the capital shall be paid up.

28.4.    Subject to Article 28.5, the shares of the national central banks in the subscribed capital of the ECB may not be transferred, pledged or attached.

28.5.    If the key referred to in Article 29 is adjusted, the national central banks shall transfer among themselves capital shares to the extent necessary to ensure that the distribution of capital shares corresponds to the adjusted key. The Governing Council shall determine the terms and conditions of such transfers.

## Article 29

**Key for capital subscription**

29.1.    The key for subscription of the ECB's capital, fixed for the first time in 1998 when the ESCB was established, shall be determined by assigning to each national central bank a weighting in this key equal to the sum of:

— 50 % of the share of its respective Member State in the population of the Union in the penultimate year preceding the establishment of the ESCB;

— 50 % of the share of its respective Member State in the gross domestic product at market prices of the Union as recorded in the last five years preceding the penultimate year before the establishment of the ESCB.

The percentages shall be rounded up or down to the nearest multiple of 0,0001 percentage points.

29.2.    The statistical data to be used for the application of this Article shall be provided by the Commission in accordance with the rules adopted by the Council under the procedure provided for in Article 41.

29.3.    The weightings assigned to the national central banks shall be adjusted every five years after the establishment of the ESCB by analogy with the provisions laid down in Article 29.1. The adjusted key shall apply with effect from the first day of the following year.

29.4.    The Governing Council shall take all other measures necessary for the application of this Article.

## Article 30

**Transfer of foreign reserve assets to the ECB**

30.1.    Without prejudice to Article 28, the ECB shall be provided by the national central banks with foreign reserve assets, other than Member States' currencies, euro, IMF reserve positions and SDRs, up to an amount equivalent to euro 50 000 million. The Governing Council shall decide upon the proportion to be called up by the ECB following its establishment and the amounts called up at later dates. The ECB shall have the full right to hold and manage the foreign reserves that are transferred to it and to use them for the purposes set out in this Statute.

30.2.    The contributions of each national central bank shall be fixed in proportion to its share in the subscribed capital of the ECB.

30.3.    Each national central bank shall be credited by the ECB with a claim equivalent to its contribution. The Governing Council shall determine the denomination and remuneration of such claims.

30.4.    Further calls of foreign reserve assets beyond the limit set in Article 30.1 may be effected by the ECB, in accordance with Article 30.2, within the limits and under the conditions set by the Council in accordance with the procedure laid down in Article 41.

30.5.    The ECB may hold and manage IMF reserve positions and SDRs and provide for the pooling of such assets.

30.6.    The Governing Council shall take all other measures necessary for the application of this Article.

## Article 31

### Foreign reserve assets held by national central banks

31.1.    The national central banks shall be allowed to perform transactions in fulfilment of their obligations towards international organisations in accordance with Article 23.

31.2.    All other operations in foreign reserve assets remaining with the national central banks after the transfers referred to in Article 30, and Member States' transactions with their foreign exchange working balances shall, above a certain limit to be established within the framework of Article 31.3, be subject to approval by the ECB in order to ensure consistency with the exchange rate and monetary policies of the Union.

31.3.    The Governing Council shall issue guidelines with a view to facilitating such operations.

## Article 32

### Allocation of monetary income of national central banks

32.1.    The income accruing to the national central banks in the performance of the ESCB's monetary policy function (hereinafter referred to as "monetary income") shall be allocated at the end of each financial year in accordance with the provisions of this Article.

32.2.    The amount of each national central bank's monetary income shall be equal to its annual income derived from its assets held against notes in circulation and deposit liabilities to credit institutions. These assets shall be earmarked by national central banks in accordance with guidelines to be established by the Governing Council.

32.3.    If, after the introduction of the euro, the balance sheet structures of the national central banks do not, in the judgment of the Governing Council, permit the application of Article 32.2, the Governing Council, acting by a qualified majority, may decide that, by way of derogation from Article 32.2, monetary income shall be measured according to an alternative method for a period of not more than five years.

32.4.    The amount of each national central bank's monetary income shall be reduced by an amount equivalent to any interest paid by that central bank on its deposit liabilities to credit institutions in accordance with Article 19.

The Governing Council may decide that national central banks shall be indemnified against costs incurred in connection with the issue of banknotes or in exceptional circumstances for specific losses arising from monetary policy operations undertaken for the ESCB. Indemnification shall be in a form deemed appropriate in the judgment of the Governing Council; these amounts may be offset against the national central banks' monetary income.

32.5.    The sum of the national central banks' monetary income shall be allocated to the national central banks in proportion to their paid up shares in the capital of the ECB, subject to any decision taken by the Governing Council pursuant to Article 33.2.

32.6.    The clearing and settlement of the balances arising from the allocation of monetary income shall be carried out by the ECB in accordance with guidelines established by the Governing Council.

32.7.    The Governing Council shall take all other measures necessary for the application of this Article.

## Article 33

### Allocation of net profits and losses of the ECB

33.1.    The net profit of the ECB shall be transferred in the following order:

(a) an amount to be determined by the Governing Council, which may not exceed 20 % of the net profit, shall be transferred to the general reserve fund subject to a limit equal to 100 % of the capital;

(b) the remaining net profit shall be distributed to the shareholders of the ECB in proportion to their paid-up shares.

33.2.    In the event of a loss incurred by the ECB, the shortfall may be offset against the general reserve fund of the ECB and, if necessary, following a decision by the Governing Council, against the monetary income of the relevant financial year in proportion and up to the amounts allocated to the national central banks in accordance with Article 32.5.

## CHAPTER VII

## GENERAL PROVISIONS

## Article 34

### Legal acts

34.1.    In accordance with Article 132 of the Treaty on the Functioning of the European Union, the ECB shall:

— make regulations to the extent necessary to implement the tasks defined in Article 3.1, first indent, Articles 19.1, 22 or 25.2 and in cases which shall be laid down in the acts of the Council referred to in Article 41;

— take decisions necessary for carrying out the tasks entrusted to the ESCB under these Treaties and this Statute;

— make recommendations and deliver opinions.

34.2.    The ECB may decide to publish its decisions, recommendations and opinions.

34.3.    Within the limits and under the conditions adopted by the Council under the procedure laid down in Article 41, the ECB shall be entitled to impose fines or periodic penalty payments on undertakings for failure to comply with obligations under its regulations and decisions.

## Article 35

### Judicial control and related matters

35.1.    The acts or omissions of the ECB shall be open to review or interpretation by the Court of Justice of the European Union in the cases and under the conditions laid down in the Treaty on the Functioning of the European Union. The ECB may institute proceedings in the cases and under the conditions laid down in the Treaties.

35.2.    Disputes between the ECB, on the one hand, and its creditors, debtors or any other person, on the other, shall be decided by the competent national courts, save where jurisdiction has been conferred upon the Court of Justice of the European Union.

35.3.    The ECB shall be subject to the liability regime provided for in Article 340 of the Treaty on the Functioning of the European Union. The national central banks shall be liable according to their respective national laws.

35.4.    The Court of Justice of the European Union shall have jurisdiction to give judgment pursuant to any arbitration clause contained in a contract concluded by or on behalf of the ECB, whether that contract be governed by public or private law.

35.5.    A decision of the ECB to bring an action before the Court of Justice of the European Union shall be taken by the Governing Council.

35.6.    The Court of Justice of the European Union shall have jurisdiction in disputes concerning the fulfilment by a national central bank of obligations under the Treaties and this Statute. If the ECB considers that a national central bank has failed to fulfil an obligation under the Treaties and this Statute, it shall deliver a reasoned opinion on the matter after giving the national central bank concerned the opportunity to submit its observations. If the national central bank concerned does not comply with the opinion within the period laid down by the ECB, the latter may bring the matter before the Court of Justice of the European Union.

## Article 36

### Staff

36.1.    The Governing Council, on a proposal from the Executive Board, shall lay down the conditions of employment of the staff of the ECB.

36.2.    The Court of Justice of the European Union shall have jurisdiction in any dispute between the ECB and its servants within the limits and under the conditions laid down in the conditions of employment.

*Article 37* (ex Article 38)

**Professional secrecy**

37.1.    Members of the governing bodies and the staff of the ECB and the national central banks shall be required, even after their duties have ceased, not to disclose information of the kind covered by the obligation of professional secrecy.

37.2.    Persons having access to data covered by Union legislation imposing an obligation of secrecy shall be subject to such legislation.

*Article 38* (ex Article 39)

**Signatories**

The ECB shall be legally committed to third parties by the President or by two members of the Executive Board or by the signatures of two members of the staff of the ECB who have been duly authorised by the President to sign on behalf of the ECB.

*Article 39* (ex Article 40)

**Privileges and immunities**

The ECB shall enjoy in the territories of the Member States such privileges and immunities as are necessary for the performance of its tasks, under the conditions laid down in the Protocol on the privileges and immunities of the European Union.

CHAPTER VIII

AMENDMENT OF THE STATUTE AND COMPLEMENTARY LEGISLATION

*Article 40* (ex Article 41)

**Simplified amendment procedure**

40.1.    In accordance with Article 129(3) of the Treaty on the Functioning of the European Union, Articles 5.1, 5.2, 5.3, 17, 18, 19.1, 22, 23, 24, 26, 32.2, 32.3, 32.4, 32.6, 33.1(a) and 36 of this Statute may be amended by the European Parliament and the Council, acting in accordance with the ordinary legislative procedure either on a recommendation from the ECB and after consulting the Commission, or on a proposal from the Commission and after consulting the ECB.

40.2.    Article 10.2 may be amended by a decision of the European Council, acting unanimously, either on a recommendation from the European Central Bank and after consulting the European Parliament and the Commission, or on a recommendation from the Commission and after consulting the European Parliament and the European Central Bank. These amendments shall not enter into force until they are approved by the Member States in accordance with their respective constitutional requirements.

40.3.    A recommendation made by the ECB under this Article shall require a unanimous decision by the Governing Council.


### Article 41 (ex Article 42)

**Complementary legislation**

In accordance with Article 129(4) of the Treaty on the Functioning of the European Union, the Council, either on a proposal from the Commission and after consulting the European Parliament and the ECB or on a recommendation from the ECB and after consulting the European Parliament and the Commission, shall adopt the provisions referred to in Articles 4, 5.4, 19.2, 20, 28.1, 29.2, 30.4 and 34.3 of this Statute.


CHAPTER IX

TRANSITIONAL AND OTHER PROVISIONS FOR THE ESCB

### Article 42 (ex Article 43)

**General provisions**

42.1.    A derogation as referred to in Article 139 of the Treaty on the Functioning of the European Union shall entail that the following Articles of this Statute shall not confer any rights or impose any obligations on the Member State concerned: 3, 6, 9.2, 12.1, 14.3, 16, 18, 19, 20, 22, 23, 26.2, 27, 30, 31, 32, 33, 34, and 49.


42.2.    The central banks of Member States with a derogation as specified in Article 139(1) of the Treaty on the Functioning of the European Union shall retain their powers in the field of monetary policy according to national law.


42.3.    In accordance with Article 139 of the Treaty on the Functioning of the European Union, "Member States" shall be read as "Member States whose currency is the euro" in the following Articles of this Statute: 3, 11.2 and 19.


42.4.    "National central banks" shall be read as "central banks of Member States whose currency is the euro" in the following Articles of this Statute: 9.2, 10.2, 10.3, 12.1, 16, 17, 18, 22, 23, 27, 30, 31, 32, 33.2 and 49.


42.5.    "Shareholders" shall be read as "central banks of Member States whose currency is the euro" in Articles 10.3 and 33.1.


42.6.    "Subscribed capital of the ECB" shall be read as "capital of the ECB subscribed by the central banks of Member States whose currency is the euro" in Articles 10.3 and 30.2.

*Article  43* (ex Article  44)

**Transitional tasks of the ECB**

The ECB shall take over the former tasks of the EMI referred to in Article  141(2) of the Treaty on the Functioning of the European Union which, because of the derogations of one or more Member States, still have to be performed after the introduction of the euro.

The ECB shall give advice in the preparations for the abrogation of the derogations specified in Article  140 of the Treaty on the Functioning of the European Union.

*Article  44* (ex Article  45)

**The General Council of the ECB**

44.1.    Without prejudice to Article  129(1) of the Treaty on the Functioning of the European Union, the General Council shall be constituted as a third decision-making body of the ECB.

44.2.    The General Council shall comprise the President and Vice-President of the ECB and the Governors of the national central banks. The other members of the Executive Board may participate, without having the right to vote, in meetings of the General Council.

44.3.    The responsibilities of the General Council are listed in full in Article  46 of this Statute.

*Article  45* (ex Article  46)

**Rules of Procedure of the General Council**

45.1.    The President or, in his absence, the Vice-President of the ECB shall chair the General Council of the ECB.

45.2.    The President of the Council and a Member of the Commission may participate, without having the right to vote, in meetings of the General Council.

45.3.    The President shall prepare the meetings of the General Council.

45.4.    By way of derogation from Article  12.3, the General Council shall adopt its Rules of Procedure.

45.5.    The Secretariat of the General Council shall be provided by the ECB.

*Article  46* (ex Article  47)

**Responsibilities of the General Council**

46.1.    The General Council shall:

— perform the tasks referred to in Article  43;

— contribute to the advisory functions referred to in Articles 4 and 25.1.

46.2.    The General Council shall contribute to:

— the collection of statistical information as referred to in Article 5;

— the reporting activities of the ECB as referred to in Article 15;

— the establishment of the necessary rules for the application of Article 26 as referred to in Article 26.4;

— the taking of all other measures necessary for the application of Article 29 as referred to in Article 29.4;

— the laying down of the conditions of employment of the staff of the ECB as referred to in Article 36.

46.3.    The General Council shall contribute to the necessary preparations for irrevocably fixing the exchange rates of the currencies of Member States with a derogation against the euro as referred to in Article 140(3) of the Treaty on the Functioning of the European Union.

46.4.    The General Council shall be informed by the President of the ECB of decisions of the Governing Council.

### Article 47 (ex Article 48)

#### Transitional provisions for the capital of the ECB

In accordance with Article 29.1, each national central bank shall be assigned a weighting in the key for subscription of the ECB's capital. By way of derogation from Article 28.3, central banks of Member States with a derogation shall not pay up their subscribed capital unless the General Council, acting by a majority representing at least two thirds of the subscribed capital of the ECB and at least half of the shareholders, decides that a minimal percentage has to be paid up as a contribution to the operational costs of the ECB.

### Article 48 (ex Article 49)

#### Deferred payment of capital, reserves and provisions of the ECB

48.1.    The central bank of a Member State whose derogation has been abrogated shall pay up its subscribed share of the capital of the ECB to the same extent as the central banks of other Member States whose currency is the euro, and shall transfer to the ECB foreign reserve assets in accordance with Article 30.1. The sum to be transferred shall be determined by multiplying the euro value at current exchange rates of the foreign reserve assets which have already been transferred to the ECB in accordance with Article 30.1, by the ratio between the number of shares subscribed by the national central bank concerned and the number of shares already paid up by the other national central banks.

48.2.    In addition to the payment to be made in accordance with Article 48.1, the central bank concerned shall contribute to the reserves of the ECB, to those provisions equivalent to reserves, and to the amount still to be appropriated to the reserves and provisions corresponding to the balance of the profit and loss account as at 31 December of the year prior to the abrogation of the derogation.

The sum to be contributed shall be determined by multiplying the amount of the reserves, as defined above and as stated in the approved balance sheet of the ECB, by the ratio between the number of shares subscribed by the central bank concerned and the number of shares already paid up by the other central banks.

48.3.    Upon one or more countries becoming Member States and their respective national central banks becoming part of the ESCB, the subscribed capital of the ECB and the limit on the amount of foreign reserve assets that may be transferred to the ECB shall be automatically increased. The increase shall be determined by multiplying the respective amounts then prevailing by the ratio, within the expanded capital key, between the weighting of the entering national central banks concerned and the weighting of the national central banks already members of the ESCB. Each national central bank's weighting in the capital key shall be calculated by analogy with Article 29.1 and in compliance with Article 29.2. The reference periods to be used for the statistical data shall be identical to those applied for the latest quinquennial adjustment of the weightings under Article 29.3.

### Article 49 (ex Article 52)

#### Exchange of banknotes in the currencies of the Member States

Following the irrevocable fixing of exchange rates in accordance with Article 140 of the Treaty on the Functioning of the European Union, the Governing Council shall take the necessary measures to ensure that banknotes denominated in currencies with irrevocably fixed exchange rates are exchanged by the national central banks at their respective par values.

### Article 50 (ex Article 53)

#### Applicability of the transitional provisions

If and as long as there are Member States with a derogation, Articles 42 to 47 shall be applicable.

_____

# PROTOCOL (No 5)

## ON THE STATUTE OF THE EUROPEAN INVESTMENT BANK

THE HIGH CONTRACTING PARTIES,

DESIRING to lay down the Statute of the European Investment Bank provided for in Article 308 of the Treaty on the Functioning of the European Union,

HAVE AGREED upon the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

### Article 1

The European Investment Bank established by Article 308 of the Treaty on the Functioning of the European Union (hereinafter called the "Bank") is hereby constituted; it shall perform its functions and carry on its activities in accordance with the provisions of the Treaties and of this Statute.

### Article 2

The task of the Bank shall be that defined in Article 309 of the Treaty on the Functioning of the European Union.

### Article 3

In accordance with Article 308 of the Treaty on the Functioning of the European Union, the Bank's members shall be the Member States.

### Article 4

1.    The capital of the Bank shall be EUR 233 247 390 000, subscribed by the Member States as follows:

| | |
|---|---|
| Germany | 37 578 019 000 |
| France | 37 578 019 000 |
| Italy | 37 578 019 000 |
| United Kingdom | 37 578 019 000 |
| Spain | 22 546 811 500 |
| Belgium | 10 416 365 500 |
| Netherlands | 10 416 365 500 |
| Sweden | 6 910 226 000 |
| Denmark | 5 274 105 000 |
| Austria | 5 170 732 500 |
| Poland | 4 810 160 500 |
| Finland | 2 970 783 000 |

| | |
|---|---|
| Greece | 2 825 416 500 |
| Portugal | 1 820 820 000 |
| Czech Republic | 1 774 990 500 |
| Hungary | 1 679 222 000 |
| Ireland | 1 318 525 000 |
| Romania | 1 217 626 000 |
| Croatia | 854 400 000 |
| Slovakia | 604 206 500 |
| Slovenia | 560 951 500 |
| Bulgaria | 410 217 500 |
| Lithuania | 351 981 000 |
| Luxembourg | 263 707 000 |
| Cyprus | 258 583 500 |
| Latvia | 214 805 000 |
| Estonia | 165 882 000 |
| Malta | 98 429 500 |

The Member States shall be liable only up to the amount of their share of the capital subscribed and not paid up.

2.    The admission of a new member shall entail an increase in the subscribed capital corresponding to the capital brought in by the new member.

3.    The Board of Governors may, acting unanimously, decide to increase the subscribed capital.

4.    The share of a member in the subscribed capital may not be transferred, pledged or attached.

*Article 5*

1.    The subscribed capital shall be paid in by Member States to the extent of 5 % on average of the amounts laid down in Article 4(1).

2.    In the event of an increase in the subscribed capital, the Board of Governors, acting unanimously, shall fix the percentage to be paid up and the arrangements for payment. Cash payments shall be made exclusively in euro.

3.    The Board of Directors may require payment of the balance of the subscribed capital, to such extent as may be required for the Bank to meet its obligations.

Each Member State shall make this payment in proportion to its share of the subscribed capital.

### Article 6

*(ex Article 8)*

The Bank shall be directed and managed by a Board of Governors, a Board of Directors and a Management Committee.

### Article 7

*(ex Article 9)*

1.    The Board of Governors shall consist of the ministers designated by the Member States.

2.    The Board of Governors shall lay down general directives for the credit policy of the Bank, in accordance with the Union's objectives. The Board of Governors shall ensure that these directives are implemented.

3.    The Board of Governors shall in addition:

(a) decide whether to increase the subscribed capital in accordance with Article 4(3) and Article 5(2);

(b) for the purposes of Article 9(1), determine the principles applicable to financing operations undertaken within the framework of the Bank's task;

(c) exercise the powers provided in Articles 9 and 11 in respect of the appointment and the compulsory retirement of the members of the Board of Directors and of the Management Committee, and those powers provided in the second subparagraph of Article 11(1);

(d) take decisions in respect of the granting of finance for investment operations to be carried out, in whole or in part, outside the territories of the Member States in accordance with Article 16(1);

(e) approve the annual report of the Board of Directors;

(f) approve the annual balance sheet and profit and loss account;

(g) exercise the other powers and functions conferred by this Statute;

(h) approve the rules of procedure of the Bank.

4.    Within the framework of the Treaties and this Statute, the Board of Governors shall be competent to take, acting unanimously, any decisions concerning the suspension of the operations of the Bank and, should the event arise, its liquidation.

C 202/254        EN        Official Journal of the European Union        7.6.2016

### Article 8

(ex Article 10)

Save as otherwise provided in this Statute, decisions of the Board of Governors shall be taken by a majority of its members. This majority must represent at least 50 % of the subscribed capital.

A qualified majority shall require eighteen votes in favour and 68 % of the subscribed capital.

Abstentions by members present in person or represented shall not prevent the adoption of decisions requiring unanimity.

### Article 9

(ex Article 11)

1.    The Board of Directors shall take decisions in respect of granting finance, in particular in the form of loans and guarantees, and raising loans; it shall fix the interest rates on loans granted and the commission and other charges. It may, on the basis of a decision taken by a qualified majority, delegate some of its functions to the Management Committee. It shall determine the terms and conditions for such delegation and shall supervise its execution.

The Board of Directors shall see that the Bank is properly run; it shall ensure that the Bank is managed in accordance with the provisions of the Treaties and of this Statute and with the general directives laid down by the Board of Governors.

At the end of the financial year the Board of Directors shall submit a report to the Board of Governors and shall publish it when approved.

2.    The Board of Directors shall consist of twenty-nine directors and nineteen alternate directors.

The directors shall be appointed by the Board of Governors for five years, one nominated by each Member State, and one nominated by the Commission.

The alternate directors shall be appointed by the Board of Governors for five years as shown below:

— two alternates nominated by the Federal Republic of Germany,

— two alternates nominated by the French Republic,

— two alternates nominated by the Italian Republic,

— two alternates nominated by the United Kingdom of Great Britain and Northern Ireland,

— one alternate nominated by common accord of the Kingdom of Spain and the Portuguese Republic,

7.6.2016    EN    Official Journal of the European Union    C 202/255

— one alternate nominated by common accord of the Kingdom of Belgium, the Grand Duchy of Luxembourg and the Kingdom of the Netherlands,

— two alternates nominated by common accord of the Kingdom of Denmark, the Hellenic Republic, Ireland and Romania,

— two alternates nominated by common accord of the Republic of Estonia, the Republic of Latvia, the Republic of Lithuania, the Republic of Austria, the Republic of Finland and the Kingdom of Sweden,

— four alternates nominated by common accord of the Republic of Bulgaria, the Czech Republic, the Republic of Croatia, the Republic of Cyprus, the Republic of Hungary, the Republic of Malta, the Republic of Poland, the Republic of Slovenia and the Slovak Republic,

— one alternate nominated by the Commission.

The Board of Directors shall co-opt six non-voting experts: three as members and three as alternates.

The appointments of the directors and the alternates shall be renewable.

The Rules of Procedure shall lay down arrangements for participating in the meetings of the Board of Directors and the provisions applicable to alternates and co-opted experts.

The President of the Management Committee or, in his absence, one of the Vice-Presidents, shall preside over meetings of the Board of Directors but shall not vote.

Members of the Board of Directors shall be chosen from persons whose independence and competence are beyond doubt; they shall be responsible only to the Bank.

3.    A director may be compulsorily retired by the Board of Governors only if he no longer fulfils the conditions required for the performance of his duties; the Board must act by a qualified majority.

If the annual report is not approved, the Board of Directors shall resign.

4.    Any vacancy arising as a result of death, voluntary resignation, compulsory retirement or collective resignation shall be filled in accordance with paragraph 2. A member shall be replaced for the remainder of his term of office, save where the entire Board of Directors is being replaced.

5.    The Board of Governors shall determine the remuneration of members of the Board of Directors. The Board of Governors shall lay down what activities are incompatible with the duties of a director or an alternate.

C 202/256    EN    Official Journal of the European Union    7.6.2016

## Article 10

### (ex Article 12)

1.    Each director shall have one vote on the Board of Directors. He may delegate his vote in all cases, according to procedures to be laid down in the Rules of Procedure of the Bank.

2.    Save as otherwise provided in this Statute, decisions of the Board of Directors shall be taken by at least one third of the members entitled to vote representing at least fifty per cent of the subscribed capital. A qualified majority shall require eighteen votes in favour and sixty-eight per cent of the subscribed capital. The rules of procedure of the Bank shall lay down the quorum required for the decisions of the Board of Directors to be valid.

## Article 11

### (ex Article 13)

1.    The Management Committee shall consist of a President and eight Vice-Presidents appointed for a period of six years by the Board of Governors on a proposal from the Board of Directors. Their appointments shall be renewable.

The Board of Governors, acting unanimously, may vary the number of members on the Management Committee.

2.    On a proposal from the Board of Directors adopted by a qualified majority, the Board of Governors may, acting in its turn by a qualified majority, compulsorily retire a member of the Management Committee.

3.    The Management Committee shall be responsible for the current business of the Bank, under the authority of the President and the supervision of the Board of Directors.

It shall prepare the decisions of the Board of Directors, in particular decisions on the raising of loans and the granting of finance, in particular in the form of loans and guarantees; it shall ensure that these decisions are implemented.

4.    The Management Committee shall act by a majority when delivering opinions on proposals for raising loans or granting of finance, in particular in the form of loans and guarantees.

5.    The Board of Governors shall determine the remuneration of members of the Management Committee and shall lay down what activities are incompatible with their duties.

6.    The President or, if he is prevented, a Vice-President shall represent the Bank in judicial and other matters.

7.    The staff of the Bank shall be under the authority of the President. They shall be engaged and discharged by him. In the selection of staff, account shall be taken not only of personal ability and qualifications but also of an equitable representation of nationals of Member States. The Rules of Procedure shall determine which organ is competent to adopt the provisions applicable to staff.

8.    The Management Committee and the staff of the Bank shall be responsible only to the Bank and shall be completely independent in the performance of their duties.

## Article 12

(ex Article 14)

1.    A Committee consisting of six members, appointed on the grounds of their competence by the Board of Governors, shall verify that the activities of the Bank conform to best banking practice and shall be responsible for the auditing of its accounts.

2.    The Committee referred to in paragraph 1 shall annually ascertain that the operations of the Bank have been conducted and its books kept in a proper manner. To this end, it shall verify that the Bank's operations have been carried out in compliance with the formalities and procedures laid down by this Statute and the Rules of Procedure.

3.    The Committee referred to in paragraph 1 shall confirm that the financial statements, as well as any other financial information contained in the annual accounts drawn up by the Board of Directors, give a true and fair view of the financial position of the Bank in respect of its assets and liabilities, and of the results of its operations and its cash flows for the financial year under review.

4.    The Rules of Procedure shall specify the qualifications required of the members of the Committee and lay down the terms and conditions for the Committee's activity.

## Article 13

(ex Article 15)

The Bank shall deal with each Member State through the authority designated by that State. In the conduct of financial operations the Bank shall have recourse to the national central bank of the Member State concerned or to other financial institutions approved by that State.

## Article 14

(ex Article 16)

1.    The Bank shall cooperate with all international organisations active in fields similar to its own.

2.    The Bank shall seek to establish all appropriate contacts in the interests of cooperation with banking and financial institutions in the countries to which its operations extend.

## Article 15

(ex Article 17)

At the request of a Member State or of the Commission, or on its own initiative, the Board of Governors shall, in accordance with the same provisions as governed their adoption, interpret or supplement the directives laid down by it under Article 7 of this Statute.

## Article 16

(ex Article 18)

1.    Within the framework of the task set out in Article 309 of the Treaty on the Functioning of the European Union, the Bank shall grant finance, in particular in the form of loans and guarantees to its members or to private or public undertakings for investments to be carried out in the territories of Member States, to the extent that funds are not available from other sources on reasonable terms.

However, by decision of the Board of Governors, acting by a qualified majority on a proposal from the Board of Directors, the Bank may grant financing for investment to be carried out, in whole or in part, outside the territories of Member States.

2.    As far as possible, loans shall be granted only on condition that other sources of finance are also used.

3.    When granting a loan to an undertaking or to a body other than a Member State, the Bank shall make the loan conditional either on a guarantee from the Member State in whose territory the investment will be carried out or on other adequate guarantees, or on the financial strength of the debtor.

Furthermore, in accordance with the principles established by the Board of Governors pursuant to Article 7(3)(b), and where the implementation of projects provided for in Article 309 of the Treaty on the Functioning of the European Union so requires, the Board of Directors shall, acting by a qualified majority, lay down the terms and conditions of any financing operation presenting a specific risk profile and thus considered to be a special activity.

4.    The Bank may guarantee loans contracted by public or private undertakings or other bodies for the purpose of carrying out projects provided for in Article 309 of the Treaty on the Functioning of the European Union.

5.    The aggregate amount outstanding at any time of loans and guarantees granted by the Bank shall not exceed 250 % of its subscribed capital, reserves, non-allocated provisions and profit and loss account surplus. The latter aggregate amount shall be reduced by an amount equal to the amount subscribed (whether or not paid in) for any equity participation of the Bank.

The amount of the Bank's disbursed equity participations shall not exceed at any time an amount corresponding to the total of its paid-in subscribed capital, reserves, non-allocated provisions and profit and loss account surplus.

By way of exception, the special activities of the Bank, as decided by the Board of Governors and the Board of Directors in accordance with paragraph 3, will have a specific allocation of reserve.

This paragraph shall also apply to the consolidated accounts of the Bank.

6.    The Bank shall protect itself against exchange risks by including in contracts for loans and guarantees such clauses as it considers appropriate.

EN

## Article 17

(ex Article 19)

1.    Interest rates on loans to be granted by the Bank and commission and other charges shall be adjusted to conditions prevailing on the capital market and shall be calculated in such a way that the income therefrom shall enable the Bank to meet its obligations, to cover its expenses and risks and to build up a reserve fund as provided for in Article 22.

2.    The Bank shall not grant any reduction in interest rates. Where a reduction in the interest rate appears desirable in view of the nature of the investment to be financed, the Member State concerned or some other agency may grant aid towards the payment of interest to the extent that this is compatible with Article 107 of the Treaty on the Functioning of the European Union.

## Article 18

(ex Article 20)

In its financing operations, the Bank shall observe the following principles:

1.    It shall ensure that its funds are employed as rationally as possible in the interests of the Union.

It may grant loans or guarantees only:

(a) where, in the case of investments by undertakings in the production sector, interest and amortisation payments are covered out of operating profits or, in the case of other investments, either by a commitment entered into by the State in which the investment is made or by some other means; and

(b) where the execution of the investment contributes to an increase in economic productivity in general and promotes the attainment of the internal market.

2.    It shall neither acquire any interest in an undertaking nor assume any responsibility in its management unless this is required to safeguard the rights of the Bank in ensuring recovery of funds lent.

However, in accordance with the principles determined by the Board of Governors pursuant to Article 7(3)(b), and where the implementation of operations provided for in Article 309 of the Treaty on the Functioning of the European Union so requires, the Board of Directors shall, acting by a qualified majority, lay down the terms and conditions for taking an equity participation in a commercial undertaking, normally as a complement to a loan or a guarantee, in so far as this is required to finance an investment or programme.

3.    It may dispose of its claims on the capital market and may, to this end, require its debtors to issue bonds or other securities.

C 202/260    [EN]    Official Journal of the European Union    7.6.2016

4.    Neither the Bank nor the Member States shall impose conditions requiring funds lent by the Bank to be spent within a specified Member State.

5.    The Bank may make its loans conditional on international invitations to tender being arranged.

6.    The Bank shall not finance, in whole or in part, any investment opposed by the Member State in whose territory it is to be carried out.

7.    As a complement to its lending activity, the Bank may provide technical assistance services in accordance with the terms and conditions laid down by the Board of Governors, acting by a qualified majority, and in compliance with this Statute.

## Article 19

### (ex Article 21)

1.    Any undertaking or public or private entity may apply directly to the Bank for financing. Applications to the Bank may also be made either through the Commission or through the Member State on whose territory the investment will be carried out.

2.    Applications made through the Commission shall be submitted for an opinion to the Member State in whose territory the investment will be carried out. Applications made through a Member State shall be submitted to the Commission for an opinion. Applications made direct by an undertaking shall be submitted to the Member State concerned and to the Commission.

The Member State concerned and the Commission shall deliver their opinions within two months. If no reply is received within this period, the Bank may assume that there is no objection to the investment in question.

3.    The Board of Directors shall rule on financing operations submitted to it by the Management Committee.

4.    The Management Committee shall examine whether financing operations submitted to it comply with the provisions of this Statute, in particular with Articles 16 and 18. Where the Management Committee is in favour of the financing operation, it shall submit the corresponding proposal to the Board of Directors; the Committee may make its favourable opinion subject to such conditions, as it considers essential. Where the Management Committee is against granting the finance, it shall submit the relevant documents together with its opinion to the Board of Directors.

5.    Where the Management Committee delivers an unfavourable opinion, the Board of Directors may not grant the finance concerned unless its decision is unanimous.

6.    Where the Commission delivers an unfavourable opinion, the Board of Directors may not grant the finance concerned unless its decision is unanimous, the director nominated by the Commission abstaining.

7.6.2016    EN    Official Journal of the European Union    C 202/261

7.    Where both the Management Committee and the Commission deliver an unfavourable opinion, the Board of Directors may not grant the finance.

8.    In the event that a financing operation relating to an approved investment has to be restructured in order to safeguard the Bank's rights and interests, the Management Committee shall take without delay the emergency measures which it deems necessary, subject to immediate reporting thereon to the Board of Directors.

## Article 20

### (ex Article 22)

1.    The Bank shall borrow on the capital markets the funds necessary for the performance of its tasks.

2.    The Bank may borrow on the capital markets of the Member States in accordance with the legal provisions applying to those markets.

The competent authorities of a Member State with a derogation within the meaning of Article 139(1) of the Treaty on the Functioning of the European Union may oppose this only if there is reason to fear serious disturbances on the capital market of that State.

## Article 21

### (ex Article 23)

1.    The Bank may employ any available funds which it does not immediately require to meet its obligations in the following ways:

(a) it may invest on the money markets;

(b) it may, subject to the provisions of Article 18(2), buy and sell securities;

(c) it may carry out any other financial operation linked with its objectives.

2.    Without prejudice to the provisions of Article 23, the Bank shall not, in managing its investments, engage in any currency arbitrage not directly required to carry out its lending operations or fulfil commitments arising out of loans raised or guarantees granted by it.

3.    The Bank shall, in the fields covered by this Article, act in agreement with the competent authorities or with the national central bank of the Member State concerned.

## Article 22

(ex Article 24)

1.    A reserve fund of up to 10 % of the subscribed capital shall be built up progressively. If the state of the liabilities of the Bank should so justify, the Board of Directors may decide to set aside additional reserves. Until such time as the reserve fund has been fully built up, it shall be fed by:

(a) interest received on loans granted by the Bank out of sums to be paid up by the Member States pursuant to Article 5;

(b) interest received on loans granted by the Bank out of funds derived from repayment of the loans referred to in (a);

to the extent that this income is not required to meet the obligations of the Bank or to cover its expenses.

2.    The resources of the reserve fund shall be so invested as to be available at any time to meet the purpose of the fund.

## Article 23

(ex Article 25)

1.    The Bank shall at all times be entitled to transfer its assets in the currency of a Member State whose currency is not the euro in order to carry out financial operations corresponding to the task set out in Article 309 of the Treaty on the Functioning of the European Union, taking into account the provisions of Article 21 of this Statute. The Bank shall, as far as possible, avoid making such transfers if it has cash or liquid assets in the currency required.

2.    The Bank may not convert its assets in the currency of a Member State whose currency is not the euro into the currency of a third country without the agreement of the Member State concerned.

3.    The Bank may freely dispose of that part of its capital which is paid up and of any currency borrowed on markets outside the Union.

4.    The Member States undertake to make available to the debtors of the Bank the currency needed to repay the capital and pay the interest on loans or commission on guarantees granted by the Bank for investments to be carried out in their territory.

### Article 24

(ex Article 26)

If a Member State fails to meet the obligations of membership arising from this Statute, in particular the obligation to pay its share of the subscribed capital or to service its borrowings, the granting of loans or guarantees to that Member State or its nationals may be suspended by a decision of the Board of Governors, acting by a qualified majority.

Such decision shall not release either the State or its nationals from their obligations towards the Bank.

### Article 25

(ex Article 27)

1.    If the Board of Governors decides to suspend the operations of the Bank, all its activities shall cease forthwith, except those required to ensure the due realisation, protection and preservation of its assets and the settlement of its liabilities.

2.    In the event of liquidation, the Board of Governors shall appoint the liquidators and give them instructions for carrying out the liquidation. It shall ensure that the rights of the members of staff are safeguarded.

### Article 26

(ex Article 28)

1.    In each of the Member States, the Bank shall enjoy the most extensive legal capacity accorded to legal persons under their laws; it may, in particular, acquire or dispose of movable or immovable property and may be a party to legal proceedings.

2.    The property of the Bank shall be exempt from all forms of requisition or expropriation.

### Article 27

(ex Article 29)

Disputes between the Bank on the one hand, and its creditors, debtors or any other person on the other, shall be decided by the competent national courts, save where jurisdiction has been conferred on the Court of Justice of the European Union. The Bank may provide for arbitration in any contract.

The Bank shall have an address for service in each Member State. It may, however, in any contract, specify a particular address for service.

The property and assets of the Bank shall not be liable to attachment or to seizure by way of execution except by decision of a court.

## Article 28

(ex Article 30)

1.    The Board of Governors may, acting unanimously, decide to establish subsidiaries or other entities, which shall have legal personality and financial autonomy.

2.    The Board of Governors shall, acting unanimously, establish the Statutes of the bodies referred to in paragraph 1. The Statutes shall define, in particular, their objectives, structure, capital, membership, the location of their seat, their financial resources, means of intervention and auditing arrangements, as well as their relationship with the organs of the Bank.

3.    The Bank shall be entitled to participate in the management of these bodies and contribute to their subscribed capital up to the amount determined by the Board of Governors, acting unanimously.

4.    The Protocol on the privileges and immunities of the European Union shall apply to the bodies referred to in paragraph 1 in so far as they are incorporated under the law of the Union, to the members of their organs in the performance of their duties as such and to their staff, under the same terms and conditions as those applicable to the Bank.

Those dividends, capital gains or other forms of revenue stemming from such bodies to which the members, other than the European Union and the Bank, are entitled, shall however remain subject to the fiscal provisions of the applicable legislation.

5.    The Court of Justice of the European Union shall, within the limits hereinafter laid down, have jurisdiction in disputes concerning measures adopted by organs of a body incorporated under Union law. Proceedings against such measures may be instituted by any member of such a body in its capacity as such or by Member States under the conditions laid down in Article 263 of the Treaty on the Functioning of the European Union.

6.    The Board of Governors may, acting unanimously, decide to admit the staff of bodies incorporated under Union law to joint schemes with the Bank, in compliance with the respective internal procedures.

————————

7.6.2016        EN        Official Journal of the European Union        C 202/265

# PROTOCOL (No 6)

## ON THE LOCATION OF THE SEATS OF THE INSTITUTIONS AND OF CERTAIN BODIES, OFFICES, AGENCIES AND DEPARTMENTS OF THE EUROPEAN UNION

THE REPRESENTATIVES OF THE GOVERNMENTS OF THE MEMBER STATES,

HAVING REGARD to Article 341 of the Treaty on the Functioning of the European Union and Article 189 of the Treaty establishing the European Atomic Energy Community,

RECALLING AND CONFIRMING the Decision of 8 April 1965, and without prejudice to the decisions concerning the seat of future institutions, bodies, offices, agencies and departments,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union, and to the Treaty establishing the European Atomic Energy Community:

### Sole Article

(a) The European Parliament shall have its seat in Strasbourg where the 12 periods of monthly plenary sessions, including the budget session, shall be held. The periods of additional plenary sessions shall be held in Brussels. The committees of the European Parliament shall meet in Brussels. The General Secretariat of the European Parliament and its departments shall remain in Luxembourg.

(b) The Council shall have its seat in Brussels. During the months of April, June and October, the Council shall hold its meetings in Luxembourg.

(c) The Commission shall have its seat in Brussels. The departments listed in Articles 7, 8 and 9 of the Decision of 8 April 1965 shall be established in Luxembourg.

(d) The Court of Justice of the European Union shall have its seat in Luxembourg.

(e) The Court of Auditors shall have its seat in Luxembourg.

(f) The Economic and Social Committee shall have its seat in Brussels.

(g) The Committee of the Regions shall have its seat in Brussels.

(h) The European Investment Bank shall have its seat in Luxembourg.

(i) The European Central Bank shall have its seat in Frankfurt.

(j) The European Police Office (Europol) shall have its seat in The Hague.

————

# PROTOCOL (No 7)

## ON THE PRIVILEGES AND IMMUNITIES OF THE EUROPEAN UNION

THE HIGH CONTRACTING PARTIES,

CONSIDERING that, in accordance with Article 343 of the Treaty on the Functioning of the European Union and Article 191 of the Treaty establishing the European Atomic Energy Community ("EAEC"), the European Union and the EAEC shall enjoy in the territories of the Member States such privileges and immunities as are necessary for the performance of their tasks,

HAVE AGREED upon the following provisions, which shall be annexed to the Treaty on European Union, the Treaty on the Functioning of the European Union and the Treaty establishing the European Atomic Energy Community:

CHAPTER I

PROPERTY, FUNDS, ASSETS AND OPERATIONS OF THE EUROPEAN UNION

*Article 1*

The premises and buildings of the Union shall be inviolable. They shall be exempt from search, requisition, confiscation or expropriation. The property and assets of the Union shall not be the subject of any administrative or legal measure of constraint without the authorisation of the Court of Justice.

*Article 2*

The archives of the Union shall be inviolable.

*Article 3*

The Union, its assets, revenues and other property shall be exempt from all direct taxes.

The governments of the Member States shall, wherever possible, take the appropriate measures to remit or refund the amount of indirect taxes or sales taxes included in the price of movable or immovable property, where the Union makes, for its official use, substantial purchases the price of which includes taxes of this kind. These provisions shall not be applied, however, so as to have the effect of distorting competition within the Union.

No exemption shall be granted in respect of taxes and dues which amount merely to charges for public utility services.

## Article 4

The Union shall be exempt from all customs duties, prohibitions and restrictions on imports and exports in respect of articles intended for its official use: articles so imported shall not be disposed of, whether or not in return for payment, in the territory of the country into which they have been imported, except under conditions approved by the government of that country.

The Union shall also be exempt from any customs duties and any prohibitions and restrictions on import and exports in respect of its publications.

### CHAPTER II

### COMMUNICATIONS AND *LAISSEZ-PASSER*

## Article 5

### (ex Article 6)

For their official communications and the transmission of all their documents, the institutions of the Union shall enjoy in the territory of each Member State the treatment accorded by that State to diplomatic missions.

Official correspondence and other official communications of the institutions of the Union shall not be subject to censorship.

## Article 6

### (ex Article 7)

*Laissez-passer* in a form to be prescribed by the Council, acting by a simple majority, which shall be recognised as valid travel documents by the authorities of the Member States, may be issued to members and servants of the institutions of the Union by the Presidents of these institutions. These *laissez-passer* shall be issued to officials and other servants under conditions laid down in the Staff Regulations of Officials and the Conditions of Employment of other servants of the Union.

The Commission may conclude agreements for these *laissez-passer* to be recognised as valid travel documents within the territory of third countries.

### CHAPTER III

### MEMBERS OF THE EUROPEAN PARLIAMENT

## Article 7

### (ex Article 8)

No administrative or other restriction shall be imposed on the free movement of Members of the European Parliament travelling to or from the place of meeting of the European Parliament.

C 202/268    EN    Official Journal of the European Union    7.6.2016

Members of the European Parliament shall, in respect of customs and exchange control, be accorded:

(a) by their own government, the same facilities as those accorded to senior officials travelling abroad on temporary official missions;

(b) by the government of other Member States, the same facilities as those accorded to representatives of foreign governments on temporary official missions.

## Article 8

### (ex Article 9)

Members of the European Parliament shall not be subject to any form of inquiry, detention or legal proceedings in respect of opinions expressed or votes cast by them in the performance of their duties.

## Article 9

### (ex Article 10)

During the sessions of the European Parliament, its Members shall enjoy:

(a) in the territory of their own State, the immunities accorded to members of their parliament;

(b) in the territory of any other Member State, immunity from any measure of detention and from legal proceedings.

Immunity shall likewise apply to Members while they are travelling to and from the place of meeting of the European Parliament.

Immunity cannot be claimed when a Member is found in the act of committing an offence and shall not prevent the European Parliament from exercising its right to waive the immunity of one of its Members.

## CHAPTER IV

## REPRESENTATIVES OF MEMBER STATES TAKING PART IN THE WORK OF THE INSTITUTIONS OF THE EUROPEAN UNION

## Article 10

### (ex Article 11)

Representatives of Member States taking part in the work of the institutions of the Union, their advisers and technical experts shall, in the performance of their duties and during their travel to and from the place of meeting, enjoy the customary privileges, immunities and facilities.

This Article shall also apply to members of the advisory bodies of the Union.

## CHAPTER V

## OFFICIALS AND OTHER SERVANTS OF THE EUROPEAN UNION

### Article 11

(ex Article 12)

In the territory of each Member State and whatever their nationality, officials and other servants of the Union shall:

(a) subject to the provisions of the Treaties relating, on the one hand, to the rules on the liability of officials and other servants towards the Union and, on the other hand, to the jurisdiction of the Court of Justice of the European Union in disputes between the Union and its officials and other servants, be immune from legal proceedings in respect of acts performed by them in their official capacity, including their words spoken or written. They shall continue to enjoy this immunity after they have ceased to hold office;

(b) together with their spouses and dependent members of their families, not be subject to immigration restrictions or to formalities for the registration of aliens;

(c) in respect of currency or exchange regulations, be accorded the same facilities as are customarily accorded to officials of international organisations;

(d) enjoy the right to import free of duty their furniture and effects at the time of first taking up their post in the country concerned, and the right to re-export free of duty their furniture and effects, on termination of their duties in that country, subject in either case to the conditions considered to be necessary by the government of the country in which this right is exercised;

(e) have the right to import free of duty a motor car for their personal use, acquired either in the country of their last residence or in the country of which they are nationals on the terms ruling in the home market in that country, and to re-export it free of duty, subject in either case to the conditions considered to be necessary by the government of the country concerned.

### Article 12

(ex Article 13)

Officials and other servants of the Union shall be liable to a tax for the benefit of the Union on salaries, wages and emoluments paid to them by the Union, in accordance with the conditions and procedure laid down by the European Parliament and the Council, acting by means of regulations in accordance with the ordinary legislative procedure and after consultation of the institutions concerned.

They shall be exempt from national taxes on salaries, wages and emoluments paid by the Union.

*Article 13*

(ex Article 14)

In the application of income tax, wealth tax and death duties and in the application of conventions on the avoidance of double taxation concluded between Member States of the Union, officials and other servants of the Union who, solely by reason of the performance of their duties in the service of the Union, establish their residence in the territory of a Member State other than their country of domicile for tax purposes at the time of entering the service of the Union, shall be considered, both in the country of their actual residence and in the country of domicile for tax purposes, as having maintained their domicile in the latter country provided that it is a member of the Union. This provision shall also apply to a spouse, to the extent that the latter is not separately engaged in a gainful occupation, and to children dependent on and in the care of the persons referred to in this Article.

Movable property belonging to persons referred to in the preceding paragraph and situated in the territory of the country where they are staying shall be exempt from death duties in that country; such property shall, for the assessment of such duty, be considered as being in the country of domicile for tax purposes, subject to the rights of third countries and to the possible application of provisions of international conventions on double taxation.

Any domicile acquired solely by reason of the performance of duties in the service of other international organisations shall not be taken into consideration in applying the provisions of this Article.

*Article 14*

(ex Article 15)

The European Parliament and the Council, acting by means of regulations in accordance with the ordinary legislative procedure and after consultation of the institutions concerned, shall lay down the scheme of social security benefits for officials and other servants of the Union.

*Article 15*

(ex Article 16)

The European Parliament and the Council, acting by means of regulations in accordance with the ordinary legislative procedure, and after consulting the other institutions concerned, shall determine the categories of officials and other servants of the Union to whom the provisions of Article 11, the second paragraph of Article 12, and Article 13 shall apply, in whole or in part.

The names, grades and addresses of officials and other servants included in such categories shall be communicated periodically to the governments of the Member States.

CHAPTER VI

# PRIVILEGES AND IMMUNITIES OF MISSIONS OF THIRD COUNTRIES ACCREDITED TO THE EUROPEAN UNION

## Article 16

(ex Article 17)

The Member State in whose territory the Union has its seat shall accord the customary diplomatic immunities and privileges to missions of third countries accredited to the Union.

CHAPTER VII

## GENERAL PROVISIONS

## Article 17

(ex Article 18)

Privileges, immunities and facilities shall be accorded to officials and other servants of the Union solely in the interests of the Union.

Each institution of the Union shall be required to waive the immunity accorded to an official or other servant wherever that institution considers that the waiver of such immunity is not contrary to the interests of the Union.

## Article 18

(ex Article 19)

The institutions of the Union shall, for the purpose of applying this Protocol, cooperate with the responsible authorities of the Member States concerned.

## Article 19

(ex Article 20)

Articles 11 to 14 and Article 17 shall apply to the President of the European Council.

They shall also apply to Members of the Commission.

## Article 20

(ex Article 21)

Articles 11 to 14 and Article 17 shall apply to the Judges, the Advocates-General, the Registrars and the Assistant Rapporteurs of the Court of Justice of the European Union, without prejudice to the provisions of Article 3 of the Protocol on the Statute of the Court of Justice of the European Union relating to immunity from legal proceedings of Judges and Advocates-General.

## Article 21

### (ex Article 22)

This Protocol shall also apply to the European Investment Bank, to the members of its organs, to its staff and to the representatives of the Member States taking part in its activities, without prejudice to the provisions of the Protocol on the Statute of the Bank.

The European Investment Bank shall in addition be exempt from any form of taxation or imposition of a like nature on the occasion of any increase in its capital and from the various formalities which may be connected therewith in the State where the Bank has its seat. Similarly, its dissolution or liquidation shall not give rise to any imposition. Finally, the activities of the Bank and of its organs carried on in accordance with its Statute shall not be subject to any turnover tax.

## Article 22

### (ex Article 23)

This Protocol shall also apply to the European Central Bank, to the members of its organs and to its staff, without prejudice to the provisions of the Protocol on the Statute of the European System of Central Banks and the European Central Bank.

The European Central Bank shall, in addition, be exempt from any form of taxation or imposition of a like nature on the occasion of any increase in its capital and from the various formalities which may be connected therewith in the State where the bank has its seat. The activities of the Bank and of its organs carried on in accordance with the Statute of the European System of Central Banks and of the European Central Bank shall not be subject to any turnover tax.

_____

# PROTOCOL (No 8)

## RELATING TO ARTICLE 6(2) OF THE TREATY ON EUROPEAN UNION ON THE ACCESSION OF THE UNION TO THE EUROPEAN CONVENTION ON THE PROTECTION OF HUMAN RIGHTS AND FUNDAMENTAL FREEDOMS

THE HIGH CONTRACTING PARTIES,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

### Article 1

The agreement relating to the accession of the Union to the European Convention on the Protection of Human Rights and Fundamental Freedoms (hereinafter referred to as the "European Convention") provided for in Article 6(2) of the Treaty on European Union shall make provision for preserving the specific characteristics of the Union and Union law, in particular with regard to:

(a) the specific arrangements for the Union's possible participation in the control bodies of the European Convention;

(b) the mechanisms necessary to ensure that proceedings by non-Member States and individual applications are correctly addressed to Member States and/or the Union as appropriate.

### Article 2

The agreement referred to in Article 1 shall ensure that accession of the Union shall not affect the competences of the Union or the powers of its institutions. It shall ensure that nothing therein affects the situation of Member States in relation to the European Convention, in particular in relation to the Protocols thereto, measures taken by Member States derogating from the European Convention in accordance with Article 15 thereof and reservations to the European Convention made by Member States in accordance with Article 57 thereof.

### Article 3

Nothing in the agreement referred to in Article 1 shall affect Article 344 of the Treaty on the Functioning of the European Union.

―――――――――

## PROTOCOL (No 9)

### ON THE DECISION OF THE COUNCIL RELATING TO THE IMPLEMENTATION OF ARTICLE 16(4) OF THE TREATY ON EUROPEAN UNION AND ARTICLE 238(2) OF THE TREATY ON THE FUNCTIONING OF THE EUROPEAN UNION BETWEEN 1 NOVEMBER 2014 AND 31 MARCH 2017 ON THE ONE HAND, AND AS FROM 1 APRIL 2017 ON THE OTHER

THE HIGH CONTRACTING PARTIES,

TAKING INTO ACCOUNT the fundamental importance that agreeing on the Decision of the Council relating to the implementation of Article 16(4) of the Treaty on European Union and Article 238(2) of the Treaty on the Functioning of the European Union between 1 November 2014 and 31 March 2017 on the one hand, and as from 1 April 2017 on the other (hereinafter "the Decision"), had when approving the Treaty of Lisbon,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

*Sole Article*

Before the examination by the Council of any draft which would aim either at amending or abrogating the Decision or any of its provisions, or at modifying indirectly its scope or its meaning through the modification of another legal act of the Union, the European Council shall hold a preliminary deliberation on the said draft, acting by consensus in accordance with Article 15(4) of the Treaty on European Union.

_____

7.6.2016    EN    Official Journal of the European Union    C 202/275

# PROTOCOL (No 10)

## ON PERMANENT STRUCTURED COOPERATION ESTABLISHED BY ARTICLE 42 OF THE TREATY ON EUROPEAN UNION

THE HIGH CONTRACTING PARTIES,

HAVING REGARD TO Article 42(6) and Article 46 of the Treaty on European Union,

RECALLING that the Union is pursuing a common foreign and security policy based on the achievement of growing convergence of action by Member States,

RECALLING that the common security and defence policy is an integral part of the common foreign and security policy; that it provides the Union with operational capacity drawing on civil and military assets; that the Union may use such assets in the tasks referred to in Article 43 of the Treaty on European Union outside the Union for peace-keeping, conflict prevention and strengthening international security in accordance with the principles of the United Nations Charter; that the performance of these tasks is to be undertaken using capabilities provided by the Member States in accordance with the principle of a single set of forces,

RECALLING that the common security and defence policy of the Union does not prejudice the specific character of the security and defence policy of certain Member States,

RECALLING that the common security and defence policy of the Union respects the obligations under the North Atlantic Treaty of those Member States which see their common defence realised in the North Atlantic Treaty Organisation, which remains the foundation of the collective defence of its members, and is compatible with the common security and defence policy established within that framework,

CONVINCED that a more assertive Union role in security and defence matters will contribute to the vitality of a renewed Atlantic Alliance, in accordance with the Berlin Plus arrangements,

DETERMINED to ensure that the Union is capable of fully assuming its responsibilities within the international community,

RECOGNISING that the United Nations Organisation may request the Union's assistance for the urgent implementation of missions undertaken under Chapters VI and VII of the United Nations Charter,

RECOGNISING that the strengthening of the security and defence policy will require efforts by Member States in the area of capabilities,

CONSCIOUS that embarking on a new stage in the development of the European security and defence policy involves a determined effort by the Member States concerned,

RECALLING the importance of the High Representative of the Union for Foreign Affairs and Security Policy being fully involved in proceedings relating to permanent structured cooperation,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

## Article 1

The permanent structured cooperation referred to in Article 42(6) of the Treaty on European Union shall be open to any Member State which undertakes, from the date of entry into force of the Treaty of Lisbon, to:

(a) proceed more intensively to develop its defence capacities through the development of its national contributions and participation, where appropriate, in multinational forces, in the main European equipment programmes, and in the activity of the Agency in the field of defence capabilities development, research, acquisition and armaments (European Defence Agency), and

(b) have the capacity to supply by 2010 at the latest, either at national level or as a component of multinational force groups, targeted combat units for the missions planned, structured at a tactical level as a battle group, with support elements including transport and logistics, capable of carrying out the tasks referred to in Article 43 of the Treaty on European Union, within a period of five to 30 days, in particular in response to requests from the United Nations Organisation, and which can be sustained for an initial period of 30 days and be extended up to at least 120 days.

## Article 2

To achieve the objectives laid down in Article 1, Member States participating in permanent structured cooperation shall undertake to:

(a) cooperate, as from the entry into force of the Treaty of Lisbon, with a view to achieving approved objectives concerning the level of investment expenditure on defence equipment, and regularly review these objectives, in the light of the security environment and of the Union's international responsibilities;

(b) bring their defence apparatus into line with each other as far as possible, particularly by harmonising the identification of their military needs, by pooling and, where appropriate, specialising their defence means and capabilities, and by encouraging cooperation in the fields of training and logistics;

(c) take concrete measures to enhance the availability, interoperability, flexibility and deployability of their forces, in particular by identifying common objectives regarding the commitment of forces, including possibly reviewing their national decision-making procedures;

(d) work together to ensure that they take the necessary measures to make good, including through multinational approaches, and without prejudice to undertakings in this regard within the North Atlantic Treaty Organisation, the shortfalls perceived in the framework of the "Capability Development Mechanism";

(e) take part, where appropriate, in the development of major joint or European equipment programmes in the framework of the European Defence Agency.

*Article  3*

The European Defence Agency shall contribute to the regular assessment of participating Member States' contributions with regard to capabilities, in particular contributions made in accordance with the criteria to be established, *inter alia,* on the basis of Article  2, and shall report thereon at least once a year. The assessment may serve as a basis for Council recommendations and decisions adopted in accordance with Article  46 of the Treaty on European Union.

_____

C 202/278    EN    Official Journal of the European Union    7.6.2016

# PROTOCOL (No 11)

## ON ARTICLE 42 OF THE TREATY ON EUROPEAN UNION

THE HIGH CONTRACTING PARTIES,

BEARING IN MIND the need to implement fully the provisions of Article 42(2) of the Treaty on European Union,

BEARING IN MIND that the policy of the Union in accordance with Article 42 shall not prejudice the specific character of the security and defence policy of certain Member States and shall respect the obligations of certain Member States, which see their common defence realised in NATO, under the North Atlantic Treaty and be compatible with the common security and defence policy established within that framework,

HAVE AGREED UPON the following provision, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

The European Union shall draw up, together with the Western European Union, arrangements for enhanced cooperation between them.

————

# PROTOCOL (No 12)

## ON THE EXCESSIVE DEFICIT PROCEDURE

THE HIGH CONTRACTING PARTIES,

DESIRING TO lay down the details of the excessive deficit procedure referred to in Article 126 of the Treaty on the Functioning of the European Union,

HAVE AGREED upon the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

### Article 1

The reference values referred to in Article 126(2) of the Treaty on the Functioning of the European Union are:

— 3 % for the ratio of the planned or actual government deficit to gross domestic product at market prices;

— 60 % for the ratio of government debt to gross domestic product at market prices.

### Article 2

In Article 126 of the said Treaty and in this Protocol:

— "government" means general government, that is central government, regional or local government and social security funds, to the exclusion of commercial operations, as defined in the European System of Integrated Economic Accounts;

— "deficit" means net borrowing as defined in the European System of Integrated Economic Accounts;

— "investment" means gross fixed capital formation as defined in the European System of Integrated Economic Accounts;

— "debt" means total gross debt at nominal value outstanding at the end of the year and consolidated between and within the sectors of general government as defined in the first indent.

### Article 3

In order to ensure the effectiveness of the excessive deficit procedure, the governments of the Member States shall be responsible under this procedure for the deficits of general government as

defined in the first indent of Article 2. The Member States shall ensure that national procedures in the budgetary area enable them to meet their obligations in this area deriving from these Treaties. The Member States shall report their planned and actual deficits and the levels of their debt promptly and regularly to the Commission.

*Article 4*

The statistical data to be used for the application of this Protocol shall be provided by the Commission.

————

# PROTOCOL (No 13)

## ON THE CONVERGENCE CRITERIA

THE HIGH CONTRACTING PARTIES,

DESIRING to lay down the details of the convergence criteria which shall guide the Union in taking decisions to end the derogations of those Member States with a derogation, referred to in Article 140 of the Treaty on the Functioning of the European Union,

HAVE AGREED upon the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

### Article 1

The criterion on price stability referred to in the first indent of Article 140(1) of the Treaty on the Functioning of the European Union shall mean that a Member State has a price performance that is sustainable and an average rate of inflation, observed over a period of one year before the examination, that does not exceed by more than 1 ½ percentage points that of, at most, the three best performing Member States in terms of price stability. Inflation shall be measured by means of the consumer price index on a comparable basis taking into account differences in national definitions.

### Article 2

The criterion on the government budgetary position referred to in the second indent of Article 140(1) of the said Treaty shall mean that at the time of the examination the Member State is not the subject of a Council decision under Article 126(6) of the said Treaty that an excessive deficit exists.

### Article 3

The criterion on participation in the Exchange Rate mechanism of the European Monetary System referred to in the third indent of Article 140(1) of the said Treaty shall mean that a Member State has respected the normal fluctuation margins provided for by the exchange-rate mechanism on the European Monetary System without severe tensions for at least the last two years before the examination. In particular, the Member State shall not have devalued its currency's bilateral central rate against the euro on its own initiative for the same period.

### Article 4

The criterion on the convergence of interest rates referred to in the fourth indent of Article 140(1) of the said Treaty shall mean that, observed over a period of one year before the examination, a Member State has had an average nominal long-term interest rate that does not exceed by more

than two percentage points that of, at most, the three best performing Member States in terms of price stability. Interest rates shall be measured on the basis of long-term government bonds or comparable securities, taking into account differences in national definitions.

### Article 5

The statistical data to be used for the application of this Protocol shall be provided by the Commission.

### Article 6

The Council shall, acting unanimously on a proposal from the Commission and after consulting the European Parliament, the ECB and the Economic and Financial Committee, adopt appropriate provisions to lay down the details of the convergence criteria referred to in Article 140(1) of the said Treaty, which shall then replace this Protocol.

————

# PROTOCOL (No 14)

## ON THE EURO GROUP

THE HIGH CONTRACTING PARTIES,

DESIRING to promote conditions for stronger economic growth in the European Union and, to that end, to develop ever-closer coordination of economic policies within the euro area,

CONSCIOUS of the need to lay down special provisions for enhanced dialogue between the Member States whose currency is the euro, pending the euro becoming the currency of all Member States of the Union,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

### Article 1

The Ministers of the Member States whose currency is the euro shall meet informally. Such meetings shall take place, when necessary, to discuss questions related to the specific responsibilities they share with regard to the single currency. The Commission shall take part in the meetings. The European Central Bank shall be invited to take part in such meetings, which shall be prepared by the representatives of the Ministers with responsibility for finance of the Member States whose currency is the euro and of the Commission.

### Article 2

The Ministers of the Member States whose currency is the euro shall elect a president for two and a half years, by a majority of those Member States.

―――――――

C 202/284          EN          Official Journal of the European Union          7.6.2016

## PROTOCOL (No 15)

### ON CERTAIN PROVISIONS RELATING TO THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

THE HIGH CONTRACTING PARTIES,

RECOGNISING that the United Kingdom shall not be obliged or committed to adopt the euro without a separate decision to do so by its government and parliament,

GIVEN that on 16 October 1996 and 30 October 1997 the United Kingdom government notified the Council of its intention not to participate in the third stage of economic and monetary union,

NOTING the practice of the government of the United Kingdom to fund its borrowing requirement by the sale of debt to the private sector,

HAVE AGREED upon the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

1.    Unless the United Kingdom notifies the Council that it intends to adopt the euro, it shall be under no obligation to do so.

2.    In view of the notice given to the Council by the United Kingdom government on 16 October 1996 and 30 October 1997, paragraphs 3 to 8 and 10 shall apply to the United Kingdom.

3.    The United Kingdom shall retain its powers in the field of monetary policy according to national law.

4.    Articles 119, second paragraph, 126(1), (9) and (11), 127(1) to (5), 128, 130, 131, 132, 133, 138, 140(3), 219, 282(2), with the exception of the first and last sentences thereof, 282(5), and 283 of the Treaty on the Functioning of the European Union shall not apply to the United Kingdom. The same applies to Article 121(2) of this Treaty as regards the adoption of the parts of the broad economic policy guidelines which concern the euro area generally. In these provisions references to the Union or the Member States shall not include the United Kingdom and references to national central banks shall not include the Bank of England.

5.    The United Kingdom shall endeavour to avoid an excessive government deficit.

Articles 143 and 144 of the Treaty on the Functioning of the European Union shall continue to apply to the United Kingdom. Articles 134(4) and 142 shall apply to the United Kingdom as if it had a derogation.

6.    The voting rights of the United Kingdom shall be suspended in respect of acts of the Council referred to in the Articles listed in paragraph 4 and in the instances referred to in the first subparagraph of Article 139(4) of the Treaty on the Functioning of the European Union. For this purpose the second subparagraph of Article 139(4) of the Treaty shall apply.

The United Kingdom shall also have no right to participate in the appointment of the President, the Vice-President and the other members of the Executive Board of the ECB under the second subparagraph of Article 283(2) of the said Treaty.

7.    Articles 3, 4, 6, 7, 9.2, 10.1, 10.3, 11.2, 12.1, 14, 16, 18 to 20, 22, 23, 26, 27, 30 to 34 and 49 of the Protocol on the Statute of the European System of Central Banks and of the European Central Bank ("the Statute") shall not apply to the United Kingdom.

In those Articles, references to the Union or the Member States shall not include the United Kingdom and references to national central banks or shareholders shall not include the Bank of England.

References in Articles 10.3 and 30.2 of the Statute to "subscribed capital of the ECB" shall not include capital subscribed by the Bank of England.

8.    Article 141(1) of the Treaty on the Functioning of the European Union and Articles 43 to 47 of the Statute shall have effect, whether or not there is any Member State with a derogation, subject to the following amendments:

(a) References in Article 43 to the tasks of the ECB and the EMI shall include those tasks that still need to be performed in the third stage owing to any decision of the United Kingdom not to adopt the euro.

(b) In addition to the tasks referred to in Article 46, the ECB shall also give advice in relation to and contribute to the preparation of any decision of the Council with regard to the United Kingdom taken in accordance with paragraphs 9(a) and 9(c).

(c) The Bank of England shall pay up its subscription to the capital of the ECB as a contribution to its operational costs on the same basis as national central banks of Member States with a derogation.

9.    The United Kingdom may notify the Council at any time of its intention to adopt the euro. In that event:

(a) The United Kingdom shall have the right to adopt the euro provided only that it satisfies the necessary conditions. The Council, acting at the request of the United Kingdom and under the conditions and in accordance with the procedure laid down in Article 140(1) and (2) of the Treaty on the Functioning of the European Union, shall decide whether it fulfils the necessary conditions.

(b) The Bank of England shall pay up its subscribed capital, transfer to the ECB foreign reserve assets and contribute to its reserves on the same basis as the national central bank of a Member State whose derogation has been abrogated.

EN    Official Journal of the European Union    7.6.2016

(c) The Council, acting under the conditions and in accordance with the procedure laid down in Article 140(3) of the said Treaty, shall take all other necessary decisions to enable the United Kingdom to adopt the euro.

If the United Kingdom adopts the euro pursuant to the provisions of this Protocol, paragraphs 3 to 8 shall cease to have effect.

10.    Notwithstanding Article 123 of the Treaty on the Functioning of the European Union and Article 21.1 of the Statute, the Government of the United Kingdom may maintain its "ways and means" facility with the Bank of England if and so long as the United Kingdom does not adopt the euro.

_____

# PROTOCOL (No 16)

## ON CERTAIN PROVISIONS RELATING TO DENMARK

THE HIGH CONTRACTING PARTIES,

TAKING INTO ACCOUNT that the Danish Constitution contains provisions which may imply a referendum in Denmark prior to Denmark renouncing its exemption,

GIVEN THAT, on 3 November 1993, the Danish Government notified the Council of its intention not to participate in the third stage of economic and monetary union,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

1.    In view of the notice given to the Council by the Danish Government on 3 November 1993, Denmark shall have an exemption. The effect of the exemption shall be that all Articles and provisions of the Treaties and the Statute of the ESCB referring to a derogation shall be applicable to Denmark.

2.    As for the abrogation of the exemption, the procedure referred to in Article 140 shall only be initiated at the request of Denmark.

3.    In the event of abrogation of the exemption status, the provisions of this Protocol shall cease to apply.

_____

# PROTOCOL (No 17)

## ON DENMARK

THE HIGH CONTRACTING PARTIES,

DESIRING to settle certain particular problems relating to Denmark,

HAVE AGREED upon the following provisions, which shall be annexed to the Treaty on European Union and the Treaty on the Functioning of the European Union:

The provisions of Article 14 of the Protocol on the Statute of the European System of Central Banks and of the European Central Bank shall not affect the right of the National Bank of Denmark to carry out its existing tasks concerning those parts of the Kingdom of Denmark which are not part of the Union.

_____

# PROTOCOL (No 18)

## ON FRANCE

THE HIGH CONTRACTING PARTIES,

DESIRING to take into account a particular point relating to France,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

France will keep the privilege of monetary emission in New Caledonia, French Polynesia and Wallis and Futuna under the terms established by its national laws, and will be solely entitled to determine the parity of the CFP franc.

————

C 202/290    [EN]    Official Journal of the European Union    7.6.2016

PROTOCOL (No 19)

# ON THE SCHENGEN *ACQUIS* INTEGRATED INTO THE FRAMEWORK OF THE EUROPEAN UNION

THE HIGH CONTRACTING PARTIES,

NOTING that the Agreements on the gradual abolition of checks at common borders signed by some Member States of the European Union in Schengen on 14 June 1985 and on 19 June 1990, as well as related agreements and the rules adopted on the basis of these agreements, have been integrated into the framework of the European Union by the Treaty of Amsterdam of 2 October 1997,

DESIRING to preserve the Schengen *acquis*, as developed since the entry into force of the Treaty of Amsterdam, and to develop this *acquis* in order to contribute towards achieving the objective of offering citizens of the Union an area of freedom, security and justice without internal borders,

TAKING INTO ACCOUNT the special position of Denmark,

TAKING INTO ACCOUNT the fact that Ireland and the United Kingdom of Great Britain and Northern Ireland do not participate in all the provisions of the Schengen *acquis*; that provision should, however, be made to allow those Member States to accept other provisions of this *acquis* in full or in part,

RECOGNISING that, as a consequence, it is necessary to make use of the provisions of the Treaties concerning closer cooperation between some Member States,

TAKING INTO ACCOUNT the need to maintain a special relationship with the Republic of Iceland and the Kingdom of Norway, both States being bound by the provisions of the Nordic passport union, together with the Nordic States which are members of the European Union,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

## Article 1

The Kingdom of Belgium, the Republic of Bulgaria, the Czech Republic, the Kingdom of Denmark, the Federal Republic of Germany, the Republic of Estonia, the Hellenic Republic, the Kingdom of Spain, the French Republic, the Italian Republic, the Republic of Cyprus, the Republic of Latvia, the Republic of Lithuania, the Grand Duchy of Luxembourg, the Republic of Hungary, Malta, the Kingdom of the Netherlands, the Republic of Austria, the Republic of Poland, the Portuguese Republic, Romania, the Republic of Slovenia, the Slovak Republic, the Republic of Finland and the Kingdom of Sweden shall be authorised to establish closer cooperation among themselves in areas covered by provisions defined by the Council which constitute the Schengen *acquis* ([1]). This cooperation shall be conducted within the institutional and legal framework of the European Union and with respect for the relevant provisions of the Treaties.

---

([1]) In accordance with the Act of Accession of 9 December 2011, the Republic of Croatia has since become a member of the European Union.

## Article 2

The Schengen *acquis* shall apply to the Member States referred to in Article 1, without prejudice to Article 3 of the Act of Accession of 16 April 2003 or to Article 4 of the Act of Accession of 25 April 2005 (1). The Council will substitute itself for the Executive Committee established by the Schengen agreements.

## Article 3

The participation of Denmark in the adoption of measures constituting a development of the Schengen *acquis*, as well as the implementation of these measures and their application to Denmark, shall be governed by the relevant provisions of the Protocol on the position of Denmark.

## Article 4

Ireland and the United Kingdom of Great Britain and Northern Ireland may at any time request to take part in some or all of the provisions of the Schengen *acquis*.

The Council shall decide on the request with the unanimity of its members referred to in Article 1 and of the representative of the Government of the State concerned.

## Article 5

1.  Proposals and initiatives to build upon the Schengen *acquis* shall be subject to the relevant provisions of the Treaties.

In this context, where either Ireland or the United Kingdom has not notified the Council in writing within a reasonable period that it wishes to take part, the authorisation referred to in Article 329 of the Treaty on the Functioning of the European Union shall be deemed to have been granted to the Member States referred to in Article 1 and to Ireland or the United Kingdom where either of them wishes to take part in the areas of cooperation in question.

2.  Where either Ireland or the United Kingdom is deemed to have given notification pursuant to a decision under Article 4, it may nevertheless notify the Council in writing, within three months, that it does not wish to take part in such a proposal or initiative. In that case, Ireland or the United Kingdom shall not take part in its adoption. As from the latter notification, the procedure for adopting the measure building upon the Schengen *acquis* shall be suspended until the end of the procedure set out in paragraphs 3 or 4 or until the notification is withdrawn at any moment during that procedure.

3.  For the Member State having made the notification referred to in paragraph 2, any decision taken by the Council pursuant to Article 4 shall, as from the date of entry into force of the proposed measure, cease to apply to the extent considered necessary by the Council and under the conditions to be determined in a decision of the Council acting by a qualified majority on a proposal from the Commission. That decision shall be taken in accordance with the following criteria: the Council

---

(1) This provision shall also apply without prejudice to Article 4 of the Act of Accessio of 9 December 2011.

C 202/292    EN    Official Journal of the European Union    7.6.2016

shall seek to retain the widest possible measure of participation of the Member State concerned without seriously affecting the practical operability of the various parts of the Schengen *acquis*, while respecting their coherence. The Commission shall submit its proposal as soon as possible after the notification referred to in paragraph 2. The Council shall, if needed after convening two successive meetings, act within four months of the Commission proposal.

4.    If, by the end of the period of four months, the Council has not adopted a decision, a Member State may, without delay, request that the matter be referred to the European Council. In that case, the European Council shall, at its next meeting, acting by a qualified majority on a proposal from the Commission, take a decision in accordance with the criteria referred to in paragraph 3.

5.    If, by the end of the procedure set out in paragraphs 3 or 4, the Council or, as the case may be, the European Council has not adopted its decision, the suspension of the procedure for adopting the measure building upon the Schengen *acquis* shall be terminated. If the said measure is subsequently adopted any decision taken by the Council pursuant to Article 4 shall, as from the date of entry into force of that measure, cease to apply for the Member State concerned to the extent and under the conditions decided by the Commission, unless the said Member State has withdrawn its notification referred to in paragraph 2 before the adoption of the measure. The Commission shall act by the date of this adoption. When taking its decision, the Commission shall respect the criteria referred to in paragraph 3.

## Article 6

The Republic of Iceland and the Kingdom of Norway shall be associated with the implementation of the Schengen *acquis* and its further development. Appropriate procedures shall be agreed to that effect in an Agreement to be concluded with those States by the Council, acting by the unanimity of its Members mentioned in Article 1. Such Agreement shall include provisions on the contribution of Iceland and Norway to any financial consequences resulting from the implementation of this Protocol.

A separate Agreement shall be concluded with Iceland and Norway by the Council, acting unanimously, for the establishment of rights and obligations between Ireland and the United Kingdom of Great Britain and Northern Ireland on the one hand, and Iceland and Norway on the other, in domains of the Schengen *acquis* which apply to these States.

## Article 7

For the purposes of the negotiations for the admission of new Member States into the European Union, the Schengen *acquis* and further measures taken by the institutions within its scope shall be regarded as an *acquis* which must be accepted in full by all States candidates for admission.

―――――――――

# PROTOCOL (No 20)

## ON THE APPLICATION OF CERTAIN ASPECTS OF ARTICLE 26 OF THE TREATY ON THE FUNCTIONING OF THE EUROPEAN UNION TO THE UNITED KINGDOM AND TO IRELAND

THE HIGH CONTRACTING PARTIES,

DESIRING to settle certain questions relating to the United Kingdom and Ireland,

HAVING REGARD to the existence for many years of special travel arrangements between the United Kingdom and Ireland,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union and the Treaty on the Functioning of the European Union:

### Article 1

The United Kingdom shall be entitled, notwithstanding Articles 26 and 77 of the Treaty on the Functioning of the European Union, any other provision of that Treaty or of the Treaty on European Union, any measure adopted under those Treaties, or any international agreement concluded by the Union or by the Union and its Member States with one or more third States, to exercise at its frontiers with other Member States such controls on persons seeking to enter the United Kingdom as it may consider necessary for the purpose:

(a) of verifying the right to enter the United Kingdom of citizens of Member States and of their dependants exercising rights conferred by Union law, as well as citizens of other States on whom such rights have been conferred by an agreement by which the United Kingdom is bound; and

(b) of determining whether or not to grant other persons permission to enter the United Kingdom.

Nothing in Articles 26 and 77 of the Treaty on the Functioning of the European Union or in any other provision of that Treaty or of the Treaty on European Union or in any measure adopted under them shall prejudice the right of the United Kingdom to adopt or exercise any such controls. References to the United Kingdom in this Article shall include territories for whose external relations the United Kingdom is responsible.

### Article 2

The United Kingdom and Ireland may continue to make arrangements between themselves relating to the movement of persons between their territories ("the Common Travel Area"), while fully respecting the rights of persons referred to in Article 1, first paragraph, point (a) of this Protocol.

Accordingly, as long as they maintain such arrangements, the provisions of Article 1 of this Protocol shall apply to Ireland under the same terms and conditions as for the United Kingdom. Nothing in Articles 26 and 77 of the Treaty on the Functioning of the European Union, in any other provision of that Treaty or of the Treaty on European Union or in any measure adopted under them, shall affect any such arrangements.

## Article 3

The other Member States shall be entitled to exercise at their frontiers or at any point of entry into their territory such controls on persons seeking to enter their territory from the United Kingdom or any territories whose external relations are under its responsibility for the same purposes stated in Article 1 of this Protocol, or from Ireland as long as the provisions of Article 1 of this Protocol apply to Ireland.

Nothing in Articles 26 and 77 of the Treaty on the Functioning of the European Union or in any other provision of that Treaty or of the Treaty on European Union or in any measure adopted under them shall prejudice the right of the other Member States to adopt or exercise any such controls.

_____

# PROTOCOL (No 21)

## ON THE POSITION OF THE UNITED KINGDOM AND IRELAND IN RESPECT OF THE AREA OF FREEDOM, SECURITY AND JUSTICE

THE HIGH CONTRACTING PARTIES,

DESIRING to settle certain questions relating to the United Kingdom and Ireland,

HAVING REGARD to the Protocol on the application of certain aspects of Article 26 of the Treaty on the Functioning of the European Union to the United Kingdom and to Ireland,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union and the Treaty on the Functioning of the European Union:

### Article 1

Subject to Article 3, the United Kingdom and Ireland shall not take part in the adoption by the Council of proposed measures pursuant to Title V of Part Three of the Treaty on the Functioning of the European Union. The unanimity of the members of the Council, with the exception of the representatives of the governments of the United Kingdom and Ireland, shall be necessary for decisions of the Council which must be adopted unanimously.

For the purposes of this Article, a qualified majority shall be defined in accordance with Article 238(3) of the Treaty on the Functioning of the European Union.

### Article 2

In consequence of Article 1 and subject to Articles 3, 4 and 6, none of the provisions of Title V of Part Three of the Treaty on the Functioning of the European Union, no measure adopted pursuant to that Title, no provision of any international agreement concluded by the Union pursuant to that Title, and no decision of the Court of Justice interpreting any such provision or measure shall be binding upon or applicable in the United Kingdom or Ireland; and no such provision, measure or decision shall in any way affect the competences, rights and obligations of those States; and no such provision, measure or decision shall in any way affect the Community or Union *acquis* nor form part of Union law as they apply to the United Kingdom or Ireland.

### Article 3

1. The United Kingdom or Ireland may notify the President of the Council in writing, within three months after a proposal or initiative has been presented to the Council pursuant to Title V of Part Three of the Treaty on the Functioning of the European Union, that it wishes to take part in the adoption and application of any such proposed measure, whereupon that State shall be entitled to do so.

The unanimity of the members of the Council, with the exception of a member which has not made such a notification, shall be necessary for decisions of the Council which must be adopted unanimously. A measure adopted under this paragraph shall be binding upon all Member States which took part in its adoption.

Measures adopted pursuant to Article 70 of the Treaty on the Functioning of the European Union shall lay down the conditions for the participation of the United Kingdom and Ireland in the evaluations concerning the areas covered by Title V of Part Three of that Treaty.

For the purposes of this Article, a qualified majority shall be defined in accordance with Article 238(3) of the Treaty on the Functioning of the European Union.

2.    If after a reasonable period of time a measure referred to in paragraph 1 cannot be adopted with the United Kingdom or Ireland taking part, the Council may adopt such measure in accordance with Article 1 without the participation of the United Kingdom or Ireland. In that case Article 2 applies.

### Article 4

The United Kingdom or Ireland may at any time after the adoption of a measure by the Council pursuant to Title V of Part Three of the Treaty on the Functioning of the European Union notify its intention to the Council and to the Commission that it wishes to accept that measure. In that case, the procedure provided for in Article 331(1) of the Treaty on the Functioning of the European Union shall apply *mutatis mutandis*.

### Article 4a

1.    The provisions of this Protocol apply for the United Kingdom and Ireland also to measures proposed or adopted pursuant to Title V of Part Three of the Treaty on the Functioning of the European Union amending an existing measure by which they are bound.

2.    However, in cases where the Council, acting on a proposal from the Commission, determines that the non-participation of the United Kingdom or Ireland in the amended version of an existing measure makes the application of that measure inoperable for other Member States or the Union, it may urge them to make a notification under Article 3 or 4. For the purposes of Article 3, a further period of two months starts to run as from the date of such determination by the Council.

If at the expiry of that period of two months from the Council's determination the United Kingdom or Ireland has not made a notification under Article 3 or Article 4, the existing measure shall no longer be binding upon or applicable to it, unless the Member State concerned has made a notification under Article 4 before the entry into force of the amending measure. This shall take effect from the date of entry into force of the amending measure or of expiry of the period of two months, whichever is the later.

7.6.2016      EN      Official Journal of the European Union      C 202/297

For the purpose of this paragraph, the Council shall, after a full discussion of the matter, act by a qualified majority of its members representing the Member States participating or having participated in the adoption of the amending measure. A qualified majority of the Council shall be defined in accordance with Article 238(3)(a) of the Treaty on the Functioning of the European Union.

3.   The Council, acting by a qualified majority on a proposal from the Commission, may determine that the United Kingdom or Ireland shall bear the direct financial consequences, if any, necessarily and unavoidably incurred as a result of the cessation of its participation in the existing measure.

4.   This Article shall be without prejudice to Article 4.

### Article 5

A Member State which is not bound by a measure adopted pursuant to Title V of Part Three of the Treaty on the Functioning of the European Union shall bear no financial consequences of that measure other than administrative costs entailed for the institutions, unless all members of the Council, acting unanimously after consulting the European Parliament, decide otherwise.

### Article 6

Where, in cases referred to in this Protocol, the United Kingdom or Ireland is bound by a measure adopted by the Council pursuant to Title V of Part Three of the Treaty on the Functioning of the European Union, the relevant provisions of the Treaties shall apply to that State in relation to that measure.

### Article 6a

The United Kingdom and Ireland shall not be bound by the rules laid down on the basis of Article 16 of the Treaty on the Functioning of the European Union which relate to the processing of personal data by the Member States when carrying out activities which fall within the scope of Chapter 4 or Chapter 5 of Title V of Part Three of that Treaty where the United Kingdom and Ireland are not bound by the rules governing the forms of judicial cooperation in criminal matters or police cooperation which require compliance with the provisions laid down on the basis of Article 16.

### Article 7

Articles 3, 4 and 4a shall be without prejudice to the Protocol on the Schengen *acquis* integrated into the framework of the European Union.

### Article 8

Ireland may notify the Council in writing that it no longer wishes to be covered by the terms of this Protocol. In that case, the normal treaty provisions will apply to Ireland.

### Article 9

With regard to Ireland, this Protocol shall not apply to Article 75 of the Treaty on the Functioning of the European Union.

_____

# PROTOCOL (No 22)

## ON THE POSITION OF DENMARK

THE HIGH CONTRACTING PARTIES,

RECALLING the Decision of the Heads of State or Government, meeting within the European Council at Edinburgh on 12 December 1992, concerning certain problems raised by Denmark on the Treaty on European Union,

HAVING NOTED the position of Denmark with regard to Citizenship, Economic and Monetary Union, Defence Policy and Justice and Home Affairs as laid down in the Edinburgh Decision,

CONSCIOUS of the fact that a continuation under the Treaties of the legal regime originating in the Edinburgh decision will significantly limit Denmark's participation in important areas of cooperation of the Union, and that it would be in the best interest of the Union to ensure the integrity of the *acquis* in the area of freedom, security and justice,

WISHING therefore to establish a legal framework that will provide an option for Denmark to participate in the adoption of measures proposed on the basis of Title V of Part Three of the Treaty on the Functioning of the European Union and welcoming the intention of Denmark to avail itself of this option when possible in accordance with its constitutional requirements,

NOTING that Denmark will not prevent the other Member States from further developing their cooperation with respect to measures not binding on Denmark,

BEARING IN MIND Article 3 of the Protocol on the Schengen *acquis* integrated into the framework of the European Union,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union and the Treaty on the Functioning of the European Union:

## PART I

### *Article 1*

Denmark shall not take part in the adoption by the Council of proposed measures pursuant to Title V of Part Three of the Treaty on the Functioning of the European Union. The unanimity of the members of the Council, with the exception of the representative of the government of Denmark, shall be necessary for the decisions of the Council which must be adopted unanimously.

For the purposes of this Article, a qualified majority shall be defined in accordance with Article 238(3) of the Treaty on the Functioning of the European Union.

7.6.2016        EN        Official Journal of the European Union        C 202/299

## Article 2

None of the provisions of Title V of Part Three of the Treaty on the Functioning of the European Union, no measure adopted pursuant to that Title, no provision of any international agreement concluded by the Union pursuant to that Title, and no decision of the Court of Justice of the European Union interpreting any such provision or measure or any measure amended or amendable pursuant to that Title shall be binding upon or applicable in Denmark; and no such provision, measure or decision shall in any way affect the competences, rights and obligations of Denmark; and no such provision, measure or decision shall in any way affect the Community or Union *acquis* nor form part of Union law as they apply to Denmark. In particular, acts of the Union in the field of police cooperation and judicial cooperation in criminal matters adopted before the entry into force of the Treaty of Lisbon which are amended shall continue to be binding upon and applicable to Denmark unchanged.

## Article 2a

Article 2 of this Protocol shall also apply in respect of those rules laid down on the basis of Article 16 of the Treaty on the Functioning of the European Union which relate to the processing of personal data by the Member States when carrying out activities which fall within the scope of Chapter 4 or Chapter 5 of Title V of Part Three of that Treaty.

## Article 3

Denmark shall bear no financial consequences of measures referred to in Article 1, other than administrative costs entailed for the institutions.

## Article 4

1.    Denmark shall decide within a period of six months after the Council has decided on a proposal or initiative to build upon the Schengen *acquis* covered by this Part, whether it will implement this measure in its national law. If it decides to do so, this measure will create an obligation under international law between Denmark and the other Member States bound by the measure.

2.    If Denmark decides not to implement a measure of the Council as referred to in paragraph 1, the Member States bound by that measure and Denmark will consider appropriate measures to be taken.

## PART II

## Article 5

With regard to measures adopted by the Council pursuant to Article 26(1), Article 42 and Articles 43 to 46 of the Treaty on European Union, Denmark does not participate in the elaboration and the implementation of decisions and actions of the Union which have defence implications.

Therefore Denmark shall not participate in their adoption. Denmark will not prevent the other Member States from further developing their cooperation in this area. Denmark shall not be obliged to contribute to the financing of operational expenditure arising from such measures, nor to make military capabilities available to the Union.

The unanimity of the members of the Council, with the exception of the representative of the government of Denmark, shall be necessary for the acts of the Council which must be adopted unanimously.

For the purposes of this Article, a qualified majority shall be defined in accordance with Article 238(3) of the Treaty on the Functioning of the European Union.

## PART III

### Article 6

Articles 1, 2 and 3 shall not apply to measures determining the third countries whose nationals must be in possession of a visa when crossing the external borders of the Member States, or measures relating to a uniform format for visas.

## PART IV

### Article 7

At any time Denmark may, in accordance with its constitutional requirements, inform the other Member States that it no longer wishes to avail itself of all or part of this Protocol. In that event, Denmark will apply in full all relevant measures then in force taken within the framework of the European Union.

### Article 8

1.    At any time and without prejudice to Article 7, Denmark may, in accordance with its constitutional requirements, notify the other Member States that, with effect from the first day of the month following the notification, Part I shall consist of the provisions in the Annex. In that case Articles 5 to 8 shall be renumbered in consequence.

2.    Six months after the date on which the notification referred to in paragraph 1 takes effect all Schengen *acquis* and measures adopted to build upon this *acquis*, which until then have been binding on Denmark as obligations under international law, shall be binding upon Denmark as Union law.

_____

# ANNEX

### Article 1

Subject to Article 3, Denmark shall not take part in the adoption by the Council of measures proposed pursuant to Title V of Part Three of the Treaty on the Functioning of the European Union. The unanimity of the members of the Council, with the exception of the representative of the government of Denmark, shall be necessary for the acts of the Council which must be adopted unanimously.

For the purposes of this Article, a qualified majority shall be defined in accordance with Article 238(3) of the Treaty on the Functioning of the European Union.

### Article 2

Pursuant to Article 1 and subject to Articles 3, 4 and 8, none of the provisions in Title V of Part Three of the Treaty on the Functioning of the European Union, no measure adopted pursuant to that Title, no provision of any international agreements concluded by the Union pursuant to that Title, no decision of the Court of Justice of the European Union interpreting any such provision or measure shall be binding upon or applicable in Denmark; and no such provision, measure or decision shall in any way affect the competences, rights and obligations of Denmark; and no such provision, measure or decision shall in any way affect the Community or Union *acquis* nor form part of Union law as they apply to Denmark.

### Article 3

1. Denmark may notify the President of the Council in writing, within three months after a proposal or initiative has been presented to the Council pursuant to Title V of Part Three of the Treaty on the Functioning of the European Union, that it wishes to take part in the adoption and application of any such proposed measure, whereupon Denmark shall be entitled to do so.

2. If after a reasonable period of time a measure referred to in paragraph 1 cannot be adopted with Denmark taking part, the Council may adopt that measure referred to in paragraph 1 in accordance with Article 1 without the participation of Denmark. In that case Article 2 applies.

### Article 4

Denmark may at any time after the adoption of a measure pursuant to Title V of Part Three of the Treaty on the Functioning of the European Union notify its intention to the Council and the Commission that it wishes to accept that measure. In that case, the procedure provided for in Article 331(1) of that Treaty shall apply *mutatis mutandis*.

### Article 5

1. The provisions of this Protocol apply for Denmark also to measures proposed or adopted pursuant to Title V of Part Three of the Treaty on the Functioning of the European Union amending an existing measure by which it is bound.

2. However, in cases where the Council, acting on a proposal from the Commission, determines that the non-participation of Denmark in the amended version of an existing measure makes the application of that measure inoperable for other Member States or the Union, it may urge it to make a notification under Article 3 or 4. For the purposes of Article 3 a further period of two months starts to run as from the date of such determination by the Council.

C 202/302    EN    Official Journal of the European Union    7.6.2016

If, at the expiry of that period of two months from the Council's determination, Denmark has not made a notification under Article 3 or Article 4, the existing measure shall no longer be binding upon or applicable to it, unless it has made a notification under Article 4 before the entry into force of the amending measure. This shall take effect from the date of entry into force of the amending measure or of expiry of the period of two months, whichever is the later.

For the purpose of this paragraph, the Council shall, after a full discussion of the matter, act by a qualified majority of its members representing the Member States participating or having participated in the adoption of the amending measure. A qualified majority of the Council shall be defined in accordance with Article 238(3)(a) of the Treaty on the Functioning of the European Union.

3.    The Council, acting by a qualified majority on a proposal from the Commission, may determine that Denmark shall bear the direct financial consequences, if any, necessarily and unavoidably incurred as a result of the cessation of its participation in the existing measure.

4.    This Article shall be without prejudice to Article 4.

### Article 6

1.    Notification pursuant to Article 4 shall be submitted no later than six months after the final adoption of a measure if this measure builds upon the Schengen *acquis*.

If Denmark does not submit a notification in accordance with Articles 3 or 4 regarding a measure building upon the Schengen *acquis*, the Member States bound by that measure and Denmark will consider appropriate measures to be taken.

2.    A notification pursuant to Article 3 with respect to a measure building upon the Schengen *acquis* shall be deemed irrevocably to be a notification pursuant to Article 3 with respect to any further proposal or initiative aiming to build upon that measure to the extent that such proposal or initiative builds upon the Schengen *acquis*.

### Article 7

Denmark shall not be bound by the rules laid down on the basis of Article 16 of the Treaty on the Functioning of the European Union which relate to the processing of personal data by the Member States when carrying out activities which fall within the scope of Chapter 4 or Chapter 5 of Title V of Part Three of that Treaty where Denmark is not bound by the rules governing the forms of judicial cooperation in criminal matters or police cooperation which require compliance with the provisions laid down on the basis of Article 16.

### Article 8

Where, in cases referred to in this Part, Denmark is bound by a measure adopted by the Council pursuant to Title V of Part Three of the Treaty on the Functioning of the European Union, the relevant provisions of the Treaties shall apply to Denmark in relation to that measure.

### Article 9

Where Denmark is not bound by a measure adopted pursuant to Title V of Part Three of the Treaty on the Functioning of the European Union, it shall bear no financial consequences of that measure other than administrative costs entailed for the institutions unless the Council, with all its Members acting unanimously after consulting the European Parliament, decides otherwise.

7.6.2016          EN          Official Journal of the European Union          C 202/303

# PROTOCOL (No 23)

## ON EXTERNAL RELATIONS OF THE MEMBER STATES WITH REGARD TO THE CROSSING OF EXTERNAL BORDERS

THE HIGH CONTRACTING PARTIES,

TAKING INTO ACCOUNT the need of the Member States to ensure effective controls at their external borders, in cooperation with third countries where appropriate,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

The provisions on the measures on the crossing of external borders included in Article 77(2)(b) of the Treaty on the Functioning of the European Union shall be without prejudice to the competence of Member States to negotiate or conclude agreements with third countries as long as they respect Union law and other relevant international agreements.

————

C 202/304    EN    Official Journal of the European Union    7.6.2016

# PROTOCOL (No 24)

## ON ASYLUM FOR NATIONALS OF MEMBER STATES OF THE EUROPEAN UNION

THE HIGH CONTRACTING PARTIES,

WHEREAS, in accordance with Article 6(1) of the Treaty on European Union, the Union recognises the rights, freedoms and principles set out in the Charter of Fundamental Rights,

WHEREAS pursuant to Article 6(3) of the Treaty on European Union, fundamental rights, as guaranteed by the European Convention for the Protection of Human Rights and Fundamental Freedoms, constitute part of the Union's law as general principles,

WHEREAS the Court of Justice of the European Union has jurisdiction to ensure that in the interpretation and application of Article 6, paragraphs (1) and (3) of the Treaty on European Union the law is observed by the European Union,

WHEREAS pursuant to Article 49 of the Treaty on European Union any European State, when applying to become a Member of the Union, must respect the values set out in Article 2 of the Treaty on European Union,

BEARING IN MIND that Article 7 of the Treaty on European Union establishes a mechanism for the suspension of certain rights in the event of a serious and persistent breach by a Member State of those values,

RECALLING that each national of a Member State, as a citizen of the Union, enjoys a special status and protection which shall be guaranteed by the Member States in accordance with the provisions of Part Two of the Treaty on the Functioning of the European Union,

BEARING IN MIND that the Treaties establish an area without internal frontiers and grant every citizen of the Union the right to move and reside freely within the territory of the Member States,

WISHING to prevent the institution of asylum being resorted to for purposes alien to those for which it is intended,

WHEREAS this Protocol respects the finality and the objectives of the Geneva Convention of 28 July 1951 relating to the status of refugees,

7.6.2016      EN      Official Journal of the European Union      C 202/305

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

*Sole Article*

Given the level of protection of fundamental rights and freedoms by the Member States of the European Union, Member States shall be regarded as constituting safe countries of origin in respect of each other for all legal and practical purposes in relation to asylum matters. Accordingly, any application for asylum made by a national of a Member State may be taken into consideration or declared admissible for processing by another Member State only in the following cases:

(a)  if the Member State of which the applicant is a national proceeds after the entry into force of the Treaty of Amsterdam, availing itself of the provisions of Article 15 of the European Convention for the Protection of Human Rights and Fundamental Freedoms, to take measures derogating in its territory from its obligations under that Convention;

(b)  if the procedure referred to Article 7(1) of the Treaty on European Union has been initiated and until the Council, or, where appropriate, the European Council, takes a decision in respect thereof with regard to the Member State of which the applicant is a national;

(c)  if the Council has adopted a decision in accordance with Article 7(1) of the Treaty on European Union in respect of the Member State of which the applicant is a national or if the European Council has adopted a decision in accordance with Article 7(2) of that Treaty in respect of the Member State of which the applicant is a national;

(d)  if a Member State should so decide unilaterally in respect of the application of a national of another Member State; in that case the Council shall be immediately informed; the application shall be dealt with on the basis of the presumption that it is manifestly unfounded without affecting in any way, whatever the cases may be, the decision-making power of the Member State.

————————

C 202/306          EN          Official Journal of the European Union          7.6.2016

# PROTOCOL (No 25)

## ON THE EXERCISE OF SHARED COMPETENCE

THE HIGH CONTRACTING PARTIES,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

### Sole Article

With reference to Article 2(2) of the Treaty on the Functioning of the European Union on shared competence, when the Union has taken action in a certain area, the scope of this exercise of competence only covers those elements governed by the Union act in question and therefore does not cover the whole area.

————

7.6.2016            EN            Official Journal of the European Union            C 202/307

# PROTOCOL (No 26)

## ON SERVICES OF GENERAL INTEREST

THE HIGH CONTRACTING PARTIES,

WISHING to emphasise the importance of services of general interest,

HAVE AGREED UPON the following interpretative provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

### Article 1

The shared values of the Union in respect of services of general economic interest within the meaning of Article 14 of the Treaty on the Functioning of the European Union include in particular:

— the essential role and the wide discretion of national, regional and local authorities in providing, commissioning and organising services of general economic interest as closely as possible to the needs of the users;

— the diversity between various services of general economic interest and the differences in the needs and preferences of users that may result from different geographical, social or cultural situations;

— a high level of quality, safety and affordability, equal treatment and the promotion of universal access and of user rights.

### Article 2

The provisions of the Treaties do not affect in any way the competence of Member States to provide, commission and organise non-economic services of general interest.

————

C 202/308    EN    Official Journal of the European Union    7.6.2016

# PROTOCOL (No 27)

## ON THE INTERNAL MARKET AND COMPETITION

THE HIGH CONTRACTING PARTIES,

CONSIDERING that the internal market as set out in Article 3 of the Treaty on European Union includes a system ensuring that competition is not distorted,

HAVE AGREED that:

To this end, the Union shall, if necessary, take action under the provisions of the Treaties, including under Article 352 of the Treaty on the Functioning of the European Union.

This protocol shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union.

––––––––––

7.6.2016          EN          Official Journal of the European Union          C 202/309

# PROTOCOL (No 28)

## ON ECONOMIC, SOCIAL AND TERRITORIAL COHESION

THE HIGH CONTRACTING PARTIES,

RECALLING that Article 3 of the Treaty on European Union includes the objective of promoting economic, social and territorial cohesion and solidarity between Member States and that the said cohesion figures among the areas of shared competence of the Union listed in Article 4(2)(c) of the Treaty on the Functioning of the European Union,

RECALLING that the provisions of Part Three, Title XVIII, on economic, social and territorial cohesion as a whole provide the legal basis for consolidating and further developing the Union's action in the field of economic, social and territorial cohesion, including the creation of a new fund,

RECALLING that the provisions of Article 177 of the Treaty on the Functioning of the European Union envisage setting up a Cohesion Fund,

NOTING that the European Investment Bank is lending large and increasing amounts for the benefit of the poorer regions,

NOTING the desire for greater flexibility in the arrangements for allocations from the Structural Funds,

NOTING the desire for modulation of the levels of Union participation in programmes and projects in certain countries,

NOTING the proposal to take greater account of the relative prosperity of Member States in the system of own resources,

REAFFIRM that the promotion of economic, social and territorial cohesion is vital to the full development and enduring success of the Union,

REAFFIRM their conviction that the Structural Funds should continue to play a considerable part in the achievement of Union objectives in the field of cohesion,

REAFFIRM their conviction that the European Investment Bank should continue to devote the majority of its resources to the promotion of economic, social and territorial cohesion, and declare their willingness to review the capital needs of the European Investment Bank as soon as this is necessary for that purpose,

AGREE that the Cohesion Fund will provide Union financial contributions to projects in the fields of environment and trans-European networks in Member States with a per capita GNP of less than 90 % of the Union average which have a programme leading to the fulfilment of the conditions of economic convergence as set out in Article 126,

DECLARE their intention of allowing a greater margin of flexibility in allocating financing from the Structural Funds to specific needs not covered under the present Structural Funds regulations,

DECLARE their willingness to modulate the levels of Union participation in the context of programmes and projects of the Structural Funds, with a view to avoiding excessive increases in budgetary expenditure in the less prosperous Member States,

RECOGNISE the need to monitor regularly the progress made towards achieving economic, social and territorial cohesion and state their willingness to study all necessary measures in this respect,

DECLARE their intention of taking greater account of the contributive capacity of individual Member States in the system of own resources, and of examining means of correcting, for the less prosperous Member States, regressive elements existing in the present own resources system,

AGREE to annex this Protocol to the Treaty on European Union and the Treaty on the Functioning of the European Union.

_____

7.6.2016    EN    Official Journal of the European Union    C 202/311

# PROTOCOL (No 29)

## ON THE SYSTEM OF PUBLIC BROADCASTING IN THE MEMBER STATES

THE HIGH CONTRACTING PARTIES,

CONSIDERING that the system of public broadcasting in the Member States is directly related to the democratic, social and cultural needs of each society and to the need to preserve media pluralism,

HAVE AGREED UPON the following interpretive provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

The provisions of the Treaties shall be without prejudice to the competence of Member States to provide for the funding of public service broadcasting and in so far as such funding is granted to broadcasting organisations for the fulfilment of the public service remit as conferred, defined and organised by each Member State, and in so far as such funding does not affect trading conditions and competition in the Union to an extent which would be contrary to the common interest, while the realisation of the remit of that public service shall be taken into account.

————

C 202/312          EN          Official Journal of the European Union          7.6.2016

# PROTOCOL (No 30)

## ON THE APPLICATION OF THE CHARTER OF FUNDAMENTAL RIGHTS OF THE EUROPEAN UNION TO POLAND AND TO THE UNITED KINGDOM

THE HIGH CONTRACTING PARTIES,

WHEREAS in Article 6 of the Treaty on European Union, the Union recognises the rights, freedoms and principles set out in the Charter of Fundamental Rights of the European Union,

WHEREAS the Charter is to be applied in strict accordance with the provisions of the aforementioned Article 6 and Title VII of the Charter itself,

WHEREAS the aforementioned Article 6 requires the Charter to be applied and interpreted by the courts of Poland and of the United Kingdom strictly in accordance with the explanations referred to in that Article,

WHEREAS the Charter contains both rights and principles,

WHEREAS the Charter contains both provisions which are civil and political in character and those which are economic and social in character,

WHEREAS the Charter reaffirms the rights, freedoms and principles recognised in the Union and makes those rights more visible, but does not create new rights or principles,

RECALLING the obligations devolving upon Poland and the United Kingdom under the Treaty on European Union, the Treaty on the Functioning of the European Union, and Union law generally,

NOTING the wish of Poland and the United Kingdom to clarify certain aspects of the application of the Charter,

DESIROUS therefore of clarifying the application of the Charter in relation to the laws and administrative action of Poland and of the United Kingdom and of its justiciability within Poland and within the United Kingdom,

REAFFIRMING that references in this Protocol to the operation of specific provisions of the Charter are strictly without prejudice to the operation of other provisions of the Charter,

REAFFIRMING that this Protocol is without prejudice to the application of the Charter to other Member States,

REAFFIRMING that this Protocol is without prejudice to other obligations devolving upon Poland and the United Kingdom under the Treaty on European Union, the Treaty on the Functioning of the European Union, and Union law generally,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

### Article 1

1.    The Charter does not extend the ability of the Court of Justice of the European Union, or any court or tribunal of Poland or of the United Kingdom, to find that the laws, regulations or administrative provisions, practices or action of Poland or of the United Kingdom are inconsistent with the fundamental rights, freedoms and principles that it reaffirms.

2.    In particular, and for the avoidance of doubt, nothing in Title IV of the Charter creates justiciable rights applicable to Poland or the United Kingdom except in so far as Poland or the United Kingdom has provided for such rights in its national law.

### Article 2

To the extent that a provision of the Charter refers to national laws and practices, it shall only apply to Poland or the United Kingdom to the extent that the rights or principles that it contains are recognised in the law or practices of Poland or of the United Kingdom.

_____

C 202/314    EN    Official Journal of the European Union    7.6.2016

# PROTOCOL (No 31)

## CONCERNING IMPORTS INTO THE EUROPEAN UNION OF PETROLEUM PRODUCTS REFINED IN THE NETHERLANDS ANTILLES

THE HIGH CONTRACTING PARTIES,

BEING DESIROUS of giving fuller details about the system of trade applicable to imports into the European Union of petroleum products refined in the Netherlands Antilles,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

### Article 1

This Protocol is applicable to petroleum products coming under the Brussels Nomenclature numbers 27.10, 27.11, 27.12, ex 27.13 (paraffin wax, petroleum or shale wax and paraffin residues) and 27.14, imported for use in Member States.

### Article 2

Member States shall undertake to grant to petroleum products refined in the Netherlands Antilles the tariff preferences resulting from the association of the latter with the Union, under the conditions provided for in this Protocol. These provisions shall hold good whatever may be the rules of origin applied by the Member States.

### Article 3

1.    When the Commission, at the request of a Member State or on its own initiative, establishes that imports into the Union of petroleum products refined in the Netherlands Antilles under the system provided for in Article 2 above are giving rise to real difficulties on the market of one or more Member States, it shall decide that customs duties on the said imports shall be introduced, increased or re-introduced by the Member States in question, to such an extent and for such a period as may be necessary to meet that situation. The rates of the customs duties thus introduced, increased or re-introduced may not exceed the customs duties applicable to third countries for these same products.

2.    The provisions of paragraph 1 can in any case be applied when imports into the Union of petroleum products refined in the Netherlands Antilles reach two million metric tons a year.

3.    The Council shall be informed of decisions taken by the Commission in pursuance of paragraphs 1 and 2, including those directed at rejecting the request of a Member State. The Council shall, at the request of any Member State, assume responsibility for the matter and may at any time amend or revoke them.

## Article 4

1.    If a Member State considers that imports of petroleum products refined in the Netherlands Antilles, made either directly or through another Member State under the system provided for in Article 2 above, are giving rise to real difficulties on its market and that immediate action is necessary to meet them, it may on its own initiative decide to apply customs duties to such imports, the rate of which may not exceed those of the customs duties applicable to third countries in respect of the same products. It shall notify its decision to the Commission which shall decide within one month whether the measures taken by the State should be maintained or must be amended or cancelled. The provisions of Article 3(3) shall be applicable to such decision of the Commission.

2.    When the quantities of petroleum products refined in the Netherlands Antilles imported either directly or through another Member State, under the system provided for in Article 2 above, into a Member State or States of the European Union exceed during a calendar year the tonnage shown in the Annex to this Protocol, the measures taken in pursuance of paragraph 1 by that or those Member States for the current year shall be considered to be justified; the Commission shall, after assuring itself that the tonnage fixed has been reached, formally record the measures taken. In such a case the other Member States shall abstain from formally placing the matter before the Council.

## Article 5

If the Union decides to apply quantitative restrictions to petroleum products, no matter whence they are imported, these restrictions may also be applied to imports of such products from the Netherlands Antilles. In such a case preferential treatment shall be granted to the Netherlands Antilles as compared with third countries.

## Article 6

1.    The provisions of Articles 2 to 5 shall be reviewed by the Council, by unanimous decision, after consulting the European Parliament and the Commission, when a common definition of origin for petroleum products from third countries and associated countries is adopted, or when decisions are taken within the framework of a common commercial policy for the products in question or when a common energy policy is established.

2.    When such revision is made, however, equivalent preferences must in any case be maintained in favour of the Netherlands Antilles in a suitable form and for a minimum quantity of 21½ million metric tons of petroleum products.

3.    The Union's commitments in regard to equivalent preferences as mentioned in paragraph 2 of this Article may, if necessary, be broken down country by country taking into account the tonnage indicated in the Annex to this Protocol.

*Article 7*

For the implementation of this Protocol, the Commission is responsible for following the pattern of imports into the Member States of petroleum products refined in the Netherlands Antilles. Member States shall communicate to the Commission, which shall see that it is circulated, all useful information to that end in accordance with the administrative conditions recommended by it.

————

ANNEX TO THE PROTOCOL

For the implementation of Article 4(2) of the Protocol concerning imports into the European Union of petroleum products refined in the Netherlands Antilles, the High Contracting Parties have decided that the quantity of 2 million metric tons of petroleum products from the Antilles shall be allocated among the Member States as follows:

| | |
|---|---|
| Germany | 625 000 metric tons |
| Belgo-Luxembourg Economic Union | 200 000 metric tons |
| France | 75 000 metric tons |
| Italy | 100 000 metric tons |
| Netherlands | 1 000 000 metric tons |

————

7.6.2016    EN    Official Journal of the European Union    C 202/317

# PROTOCOL (No 32)

## ON THE ACQUISITION OF PROPERTY IN DENMARK

THE HIGH CONTRACTING PARTIES,

DESIRING to settle certain particular problems relating to Denmark,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

Notwithstanding the provisions of the Treaties, Denmark may maintain the existing legislation on the acquisition of second homes.

————

C 202/318        EN        Official Journal of the European Union        7.6.2016

# PROTOCOL (No 33)

## CONCERNING ARTICLE 157 OF THE TREATY ON THE FUNCTIONING OF THE EUROPEAN UNION

THE HIGH CONTRACTING PARTIES,

HAVE AGREED upon the following provision, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

For the purposes of Article 157 of the Treaty on the Functioning of the European Union, benefits under occupational social security schemes shall not be considered as remuneration if and in so far as they are attributable to periods of employment prior to 17 May 1990, except in the case of workers or those claiming under them who have before that date initiated legal proceedings or introduced an equivalent claim under the applicable national law.

_____

# PROTOCOL (No 34)

## ON SPECIAL ARRANGEMENTS FOR GREENLAND

*Sole Article*

1.    The treatment on import into the Union of products subject to the common organisation of the market in fishery products, originating in Greenland, shall, while complying with the mechanisms of the internal market organisation, involve exemption from customs duties and charges having equivalent effect and the absence of quantitative restrictions or measures having equivalent effect if the possibilities for access to Greenland fishing zones granted to the Union pursuant to an agreement between the Union and the authority responsible for Greenland are satisfactory to the Union.

2.    All measures relating to the import arrangements for such products, including those relating to the adoption of such measures, shall be adopted in accordance with the procedure laid down in Article 43 of the Treaty establishing the European Union.

————

C 202/320        EN        Official Journal of the European Union        7.6.2016

# PROTOCOL (No 35)

## ON ARTICLE 40.3.3 OF THE CONSTITUTION OF IRELAND

THE HIGH CONTRACTING PARTIES,

HAVE AGREED upon the following provision, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union and to the Treaty establishing the European Atomic Energy Community:

Nothing in the Treaties, or in the Treaty establishing the European Atomic Energy Community, or in the Treaties or Acts modifying or supplementing those Treaties, shall affect the application in Ireland of Article 40.3.3 of the Constitution of Ireland.

————

# PROTOCOL (No 36)

## ON TRANSITIONAL PROVISIONS

THE HIGH CONTRACTING PARTIES,

WHEREAS, in order to organise the transition from the institutional provisions of the Treaties applicable prior to the entry into force of the Treaty of Lisbon to the provisions contained in that Treaty, it is necessary to lay down transitional provisions,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union, to the Treaty on the Functioning of the European Union and to the Treaty establishing the European Atomic Energy Community:

### Article 1

In this Protocol, the words "the Treaties" shall mean the Treaty on European Union, the Treaty on the Functioning of the European Union and the Treaty establishing the European Atomic Energy Community.

## TITLE I

### PROVISIONS CONCERNING THE EUROPEAN PARLIAMENT

### Article 2

1.    For the period of the 2009-2014 parliamentary term remaining at the date of entry into force of this Article, and by way of derogation from Articles 189, second paragraph, and 190(2) of the Treaty establishing the European Community and Articles 107, second paragraph, and 108(2) of the Treaty establishing the European Atomic Energy Community, which were in force at the time of the European Parliament elections in June 2009, and by way of derogation from the number of seats provided for in the first subparagraph of Article 14(2) of the Treaty on European Union, the following 18 seats shall be added to the existing 736 seats, thus provisionally bringing the total number of members of the European Parliament to 754 until the end of the 2009-2014 parliamentary term:

| | | | |
|---|---|---|---|
| Bulgaria | 1 | Netherlands | 1 |
| Spain | 4 | Austria | 2 |
| France | 2 | Poland | 1 |
| Italy | 1 | Slovenia | 1 |
| Latvia | 1 | Sweden | 2 |
| Malta | 1 | United Kingdom | 1 |

2.    By way of derogation from Article 14(3) of the Treaty on European Union, the Member States concerned shall designate the persons who will fill the additional seats referred to in paragraph 1, in accordance with the legislation of the Member States concerned and provided that the persons in question have been elected by direct universal suffrage:

(a) in *ad hoc* elections by direct universal suffrage in the Member State concerned, in accordance with the provisions applicable for elections to the European Parliament;

C 202/322    EN    Official Journal of the European Union    7.6.2016

(b) by reference to the results of the European Parliament elections from 4 to 7 June 2009; or

(c) by designation, by the national parliament of the Member State concerned from among its members, of the requisite number of members, according to the procedure determined by each of those Member States.

3.    In accordance with the second subparagraph of Article 14(2) of the Treaty on European Union, the European Council shall adopt a decision determining the composition of the European Parliament in good time before the 2014 European Parliament elections.

## TITLE II

### PROVISIONS CONCERNING THE QUALIFIED MAJORITY

### Article 3

1.    In accordance with Article 16(4) of the Treaty on European Union, the provisions of that paragraph and of Article 238(2) of the Treaty on the Functioning of the European Union relating to the definition of the qualified majority in the European Council and the Council shall take effect on1 November 2014.

2.    Between 1 November 2014 and 31 March 2017, when an act is to be adopted by qualified majority, a member of the Council may request that it be adopted in accordance with the qualified majority as defined in paragraph 3. In that case, paragraphs 3 and 4 shall apply.

3.    Until 31 October 2014, the following provisions shall remain in force, without prejudice to the second subparagraph of Article 235(1) of the Treaty on the Functioning of the European Union.

For acts of the European Council and of the Council requiring a qualified majority, members' votes shall be weighted as follows:

| | | | |
|---|---|---|---|
| Belgium | 12 | Lithuania | 7 |
| Bulgaria | 10 | Luxembourg | 4 |
| Czech Republic | 12 | Hungary | 12 |
| Denmark | 7 | Malta | 3 |
| Germany | 29 | Netherlands | 13 |
| Estonia | 4 | Austria | 10 |
| Ireland | 7 | Poland | 27 |
| Greece | 12 | Portugal | 12 |
| Spain | 27 | Romania | 14 |
| France | 29 | Slovenia | 4 |
| Croatia | 7 | Slovakia | 7 |
| Italy | 29 | Finland | 7 |
| Cyprus | 4 | Sweden | 10 |
| Latvia | 4 | United Kingdom | 29 |

Acts shall be adopted if there are at least 260 votes in favour representing a majority of the members where, under the Treaties, they must be adopted on a proposal from the Commission. In other cases decisions shall be adopted if there are at least 260 votes in favour representing at least two thirds of the members.

A member of the European Council or the Council may request that, where an act is adopted by the European Council or the Council by a qualified majority, a check is made to ensure that the Member States comprising the qualified majority represent at least 62 % of the total population of the Union. If that proves not to be the case, the act shall not be adopted.

4.    Until 31 October 2014, the qualified majority shall, in cases where, under the Treaties, not all the members of the Council participate in voting, namely in the cases where reference is made to the qualified majority as defined in Article 238(3) of the Treaty on the Functioning of the European Union, be defined as the same proportion of the weighted votes and the same proportion of the number of the Council members and, if appropriate, the same percentage of the population of the Member States concerned as laid down in paragraph 3 of this Article.

## TITLE III

### PROVISIONS CONCERNING THE CONFIGURATIONS OF THE COUNCIL

#### *Article 4*

Until the entry into force of the decision referred to in the first subparagraph of Article 16(6) of the Treaty on European Union, the Council may meet in the configurations laid down in the second and third subparagraphs of that paragraph and in the other configurations on the list established by a decision of the General Affairs Council, acting by a simple majority.

## TITLE IV

### PROVISIONS CONCERNING THE COMMISSION, INCLUDING THE HIGH REPRESENTATIVE OF THE UNION FOR FOREIGN AFFAIRS AND SECURITY POLICY

#### *Article 5*

The members of the Commission in office on the date of entry into force of the Treaty of Lisbon shall remain in office until the end of their term of office. However, on the day of the appointment of the High Representative of the Union for Foreign Affairs and Security Policy, the term of office of the member having the same nationality as the High Representative shall end.

## TITLE V

### PROVISIONS CONCERNING THE SECRETARY-GENERAL OF THE COUNCIL, HIGH REPRESENTATIVE FOR THE COMMON FOREIGN AND SECURITY POLICY, AND THE DEPUTY SECRETARY-GENERAL OF THE COUNCIL

#### *Article 6*

The terms of office of the Secretary-General of the Council, High Representative for the common foreign and security policy, and the Deputy Secretary-General of the Council shall end on the date of entry into force of the Treaty of Lisbon. The Council shall appoint a Secretary-General in conformity with Article 240(2) of the Treaty on the Functioning of the European Union.

# TITLE VI

## PROVISIONS CONCERNING ADVISORY BODIES

### *Article 7*

Until the entry into force of the decision referred to in Article 301 of the Treaty on the Functioning of the European Union, the allocation of members of the Economic and Social Committee shall be as follows:

| | | | |
|---|---|---|---|
| Belgium | 12 | Lithuania | 9 |
| Bulgaria | 12 | Luxembourg | 6 |
| Czech Republic | 12 | Hungary | 12 |
| Denmark | 9 | Malta | 5 |
| Germany | 24 | Netherlands | 12 |
| Estonia | 7 | Austria | 12 |
| Ireland | 9 | Poland | 21 |
| Greece | 12 | Portugal | 12 |
| Spain | 21 | Romania | 15 |
| France | 24 | Slovenia | 7 |
| Croatia | 9 | Slovakia | 9 |
| Italy | 24 | Finland | 9 |
| Cyprus | 6 | Sweden | 12 |
| Latvia | 7 | United Kingdom | 24 |

### *Article 8*

Until the entry into force of the decision referred to in Article 305 of the Treaty on the Functioning of the European Union, the allocation of members of the Committee of the Regions shall be as follows:

| | | | |
|---|---|---|---|
| Belgium | 12 | Lithuania | 9 |
| Bulgaria | 12 | Luxembourg | 6 |
| Czech Republic | 12 | Hungary | 12 |
| Denmark | 9 | Malta | 5 |
| Germany | 24 | Netherlands | 12 |
| Estonia | 7 | Austria | 12 |
| Ireland | 9 | Poland | 21 |
| Greece | 12 | Portugal | 12 |
| Spain | 21 | Romania | 15 |
| France | 24 | Slovenia | 7 |
| Croatia | 9 | Slovakia | 9 |
| Italy | 24 | Finland | 9 |
| Cyprus | 6 | Sweden | 12 |
| Latvia | 7 | United Kingdom | 24 |

7.6.2016          EN          Official Journal of the European Union          C 202/325

# TITLE VII

## TRANSITIONAL PROVISIONS CONCERNING ACTS ADOPTED ON THE BASIS OF TITLES V AND VI OF THE TREATY ON EUROPEAN UNION PRIOR TO THE ENTRY INTO FORCE OF THE TREATY OF LISBON

### *Article 9*

The legal effects of the acts of the institutions, bodies, offices and agencies of the Union adopted on the basis of the Treaty on European Union prior to the entry into force of the Treaty of Lisbon shall be preserved until those acts are repealed, annulled or amended in implementation of the Treaties. The same shall apply to agreements concluded between Member States on the basis of the Treaty on European Union.

### *Article 10*

1.    As a transitional measure, and with respect to acts of the Union in the field of police cooperation and judicial cooperation in criminal matters which have been adopted before the entry into force of the Treaty of Lisbon, the powers of the institutions shall be the following at the date of entry into force of that Treaty: the powers of the Commission under Article 258 of the Treaty on the Functioning of the European Union shall not be applicable and the powers of the Court of Justice of the European Union under Title VI of the Treaty on European Union, in the version in force before the entry into force of the Treaty of Lisbon, shall remain the same, including where they have been accepted under Article 35(2) of the said Treaty on European Union.

2.    The amendment of an act referred to in paragraph 1 shall entail the applicability of the powers of the institutions referred to in that paragraph as set out in the Treaties with respect to the amended act for those Member States to which that amended act shall apply.

3.    In any case, the transitional measure mentioned in paragraph 1 shall cease to have effect five years after the date of entry into force of the Treaty of Lisbon.

4.    At the latest six months before the expiry of the transitional period referred to in paragraph 3, the United Kingdom may notify to the Council that it does not accept, with respect to the acts referred to in paragraph 1, the powers of the institutions referred to in paragraph 1 as set out in the Treaties. In case the United Kingdom has made that notification, all acts referred to in paragraph 1 shall cease to apply to it as from the date of expiry of the transitional period referred to in paragraph 3. This subparagraph shall not apply with respect to the amended acts which are applicable to the United Kingdom as referred to in paragraph 2.

The Council, acting by a qualified majority on a proposal from the Commission, shall determine the necessary consequential and transitional arrangements. The United Kingdom shall not participate in the adoption of this decision. A qualified majority of the Council shall be defined in accordance with Article 238(3)(a) of the Treaty on the Functioning of the European Union.

The Council, acting by a qualified majority on a proposal from the Commission, may also adopt a decision determining that the United Kingdom shall bear the direct financial consequences, if any, necessarily and unavoidably incurred as a result of the cessation of its participation in those acts.

5.     The United Kingdom may, at any time afterwards, notify the Council of its wish to participate in acts which have ceased to apply to it pursuant to paragraph 4, first subparagraph. In that case, the relevant provisions of the Protocol on the Schengen *acquis* integrated into the framework of the European Union or of the Protocol on the position of the United Kingdom and Ireland in respect of the area of freedom, security and justice, as the case may be, shall apply. The powers of the institutions with regard to those acts shall be those set out in the Treaties. When acting under the relevant Protocols, the Union institutions and the United Kingdom shall seek to re-establish the widest possible measure of participation of the United Kingdom in the *acquis* of the Union in the area of freedom, security and justice without seriously affecting the practical operability of the various parts thereof, while respecting their coherence.

_____

# PROTOCOL (No 37)

## ON THE FINANCIAL CONSEQUENCES OF THE EXPIRY OF THE ECSC TREATY AND ON THE RESEARCH FUND FOR COAL AND STEEL

THE HIGH CONTRACTING PARTIES,

RECALLING that all assets and liabilities of the European Coal and Steel Community, as they existed on 23 July 2002, were transferred to the European Community on 24 July 2002,

TAKING ACCOUNT of the desire to use these funds for research in sectors related to the coal and steel industry and therefore the necessity to provide for certain special rules in this regard,

HAVE AGREED UPON the following provisions, which shall be annexed to the Treaty on European Union and to the Treaty on the Functioning of the European Union:

### Article 1

1.    The net worth of these assets and liabilities, as they appear in the balance sheet of the ECSC of 23 July 2002, subject to any increase or decrease which may occur as a result of the liquidation operations, shall be considered as assets intended for research in the sectors related to the coal and steel industry, referred to as the "ECSC in liquidation". On completion of the liquidation they shall be referred to as the "assets of the Research Fund for Coal and Steel".

2.    The revenue from these assets, referred to as the "Research Fund for Coal and Steel", shall be used exclusively for research, outside the research framework programme, in the sectors related to the coal and steel industry in accordance with the provisions of this Protocol and of acts adopted on the basis hereof.

### Article 2

The Council, acting in accordance with a special legislative procedure and after obtaining the consent of the European Parliament, shall adopt all the necessary provisions for the implementation of this Protocol, including essential principles.

The Council shall adopt, on a proposal from the Commission and after consulting the European Parliament, measures establishing multiannual financial guidelines for managing the assets of the Research Fund for Coal and Steel and technical guidelines for the research programme of the Research Fund for Coal and Steel.

### Article 3

Except as otherwise provided in this Protocol and in the acts adopted on the basis hereof, the provisions of the Treaties shall apply.

_____

7.6.2016    EN    Official Journal of the European Union    C 202/335

# DECLARATIONS

## ANNEXED TO THE FINAL ACT OF THE INTERGOVERNMENTAL CONFERENCE WHICH ADOPTED THE TREATY OF LISBON,

*signed on 13 December 2007*

## A. DECLARATIONS CONCERNING PROVISIONS OF THE TREATIES

### 1. Declaration concerning the Charter of Fundamental Rights of the European Union

The Charter of Fundamental Rights of the European Union, which has legally binding force, confirms the fundamental rights guaranteed by the European Convention for the Protection of Human Rights and Fundamental Freedoms and as they result from the constitutional traditions common to the Member States.

The Charter does not extend the field of application of Union law beyond the powers of the Union or establish any new power or task for the Union, or modify powers and tasks as defined by the Treaties.

### 2. Declaration on Article 6(2) of the Treaty on European Union

The Conference agrees that the Union's accession to the European Convention for the Protection of Human Rights and Fundamental Freedoms should be arranged in such a way as to preserve the specific features of Union law. In this connection, the Conference notes the existence of a regular dialogue between the Court of Justice of the European Union and the European Court of Human Rights; such dialogue could be reinforced when the Union accedes to that Convention.

### 3. Declaration on Article 8 of the Treaty on European Union

The Union will take into account the particular situation of small-sized countries which maintain specific relations of proximity with it.

### 4. Declaration on the composition of the European Parliament

The additional seat in the European Parliament will be attributed to Italy.

### 5. Declaration on the political agreement by the European Council concerning the draft Decision on the composition of the European Parliament

The European Council will give its political agreement on the revised draft Decision on the composition of the European Parliament for the legislative period 2009-2014, based on the proposal from the European Parliament.

### 6. Declaration on Article 15(5) and (6), Article 17(6) and (7) and Article 18 of the Treaty on European Union

In choosing the persons called upon to hold the offices of President of the European Council, President of the Commission and High Representative of the Union for Foreign Affairs and Security Policy, due account is to be taken of the need to respect the geographical and demographic diversity of the Union and its Member States.

### 7. Declaration on Article 16(4) of the Treaty on European Union and Article 238(2) of the Treaty on the Functioning of the European Union

The Conference declares that the decision relating to the implementation of Article 16(4) of the Treaty on European Union and Article 238(2) of the Treaty on the Functioning of the European Union will be adopted by the Council on the date of the signature of the Treaty of Lisbon and will enter into force on the day that Treaty enters into force. The draft decision is set out below:

Draft Decision of the Council

relating to the implementation of Article 16(4) of the Treaty on European Union and Article 238(2) of the Treaty on the Functioning of the European Union between 1 November 2014 and 31 March 2017 on the one hand, and as from 1 April 2017 on the other

THE COUNCIL OF THE EUROPEAN UNION,

Whereas:

(1) Provisions should be adopted allowing for a smooth transition from the system for decision-making in the Council by a qualified majority as defined in Article 3(3) of the Protocol on the transitional provisions, which will continue to apply until 31 October 2014, to the voting system provided for in Article 16(4) of the Treaty on European Union and Article 238(2) of the Treaty on the Functioning of the European Union, which will apply with effect from 1 November 2014, including, during a transitional period until 31 March 2017, specific provisions laid down in Article 3(2) of that Protocol.

(2) It is recalled that it is the practice of the Council to devote every effort to strengthening the democratic legitimacy of decisions taken by a qualified majority,

7.6.2016    EN    Official Journal of the European Union    C 202/339

HAS DECIDED AS FOLLOWS:

## Section 1

### Provisions to be applied from 1 November 2014 to 31 March 2017

#### *Article 1*

From 1 November 2014 to 31 March 2017, if members of the Council, representing:

(a) at least three quarters of the population, or

(b) at least three quarters of the number of Member States

necessary to constitute a blocking minority resulting from the application of Article 16(4), first subparagraph, of the Treaty on European Union or Article 238(2) of the Treaty on the Functioning of the European Union, indicate their opposition to the Council adopting an act by a qualified majority, the Council shall discuss the issue.

#### *Article 2*

The Council shall, in the course of these discussions, do all in its power to reach, within a reasonable time and without prejudicing obligatory time limits laid down by Union law, a satisfactory solution to address concerns raised by the members of the Council referred to in Article 1.

#### *Article 3*

To this end, the President of the Council, with the assistance of the Commission and in compliance with the Rules of Procedure of the Council, shall undertake any initiative necessary to facilitate a wider basis of agreement in the Council. The members of the Council shall lend him or her their assistance.

## Section 2

### Provisions to be applied as from 1 April 2017

#### *Article 4*

As from 1 April 2017, if members of the Council, representing:

(a) at least 55 % of the population, or

(b) at least 55 % of the number of Member States

necessary to constitute a blocking minority resulting from the application of Article 16(4), first subparagraph, of the Treaty on European Union or Article 238(2) of the Treaty on the Functioning of the European Union, indicate their opposition to the Council adopting an act by a qualified majority, the Council shall discuss the issue.

### Article 5

The Council shall, in the course of these discussions, do all in its power to reach, within a reasonable time and without prejudicing obligatory time limits laid down by Union law, a satisfactory solution to address concerns raised by the members of the Council referred to in Article 4.

### Article 6

To this end, the President of the Council, with the assistance of the Commission and in compliance with the Rules of Procedure of the Council, shall undertake any initiative necessary to facilitate a wider basis of agreement in the Council. The members of the Council shall lend him or her their assistance.

### Section 3

### Entry into force

### Article 7

This Decision shall enter into force on the date of the entry into force of the Treaty of Lisbon.

### 8. Declaration on practical measures to be taken upon the entry into force of the Treaty of Lisbon as regards the Presidency of the European Council and of the Foreign Affairs Council

In the event that the Treaty of Lisbon enters into force later than 1 January 2009, the Conference requests the competent authorities of the Member State holding the six-monthly Presidency of the Council at that time, on the one hand, and the person elected President of the European Council and the person appointed High Representative of the Union for Foreign Affairs and Security Policy, on the other hand, to take the necessary specific measures, in consultation with the following six-monthly Presidency, to allow an efficient handover of the material and organisational aspects of the Presidency of the European Council and of the Foreign Affairs Council.

### 9. Declaration on Article 16(9) of the Treaty on European Union concerning the European Council decision on the exercise of the Presidency of the Council

The Conference declares that the Council should begin preparing the decision establishing the procedures for implementing the decision on the exercise of the Presidency of the Council as soon as the Treaty of Lisbon is signed, and should give its political approval within six months. A draft decision of the European Council, which will be adopted on the date of entry into force of the said Treaty, is set out below:

### Draft decision of the European Council
### on the exercise of the Presidency of the Council

#### Article 1

1.    The Presidency of the Council, with the exception of the Foreign Affairs configuration, shall be held by pre-established groups of three Member States for a period of 18 months. The groups shall be made up on a basis of equal rotation among the Member States, taking into account their diversity and geographical balance within the Union.

2.    Each member of the group shall in turn chair for a six-month period all configurations of the Council, with the exception of the Foreign Affairs configuration. The other members of the group shall assist the Chair in all its responsibilities on the basis of a common programme. Members of the team may decide alternative arrangements among themselves.

#### Article 2

The Committee of Permanent Representatives of the Governments of the Member States shall be chaired by a representative of the Member State chairing the General Affairs Council.

The Chair of the Political and Security Committee shall be held by a representative of the High Representative of the Union for Foreign Affairs and Security Policy.

The chair of the preparatory bodies of the various Council configurations, with the exception of the Foreign Affairs configuration, shall fall to the member of the group chairing the relevant configuration, unless decided otherwise in accordance with Article 4.

#### Article 3

The General Affairs Council shall ensure consistency and continuity in the work of the different Council configurations in the framework of multiannual programmes in cooperation with the Commission. The Member States holding the Presidency shall take all necessary measures for the organisation and smooth operation of the Council's work, with the assistance of the General Secretariat of the Council.

*Article 4*

The Council shall adopt a decision establishing the measures for the implementation of this decision.

## 10. Declaration on Article 17 of the Treaty on European Union

The Conference considers that when the Commission no longer includes nationals of all Member States, the Commission should pay particular attention to the need to ensure full transparency in relations with all Member States. Accordingly, the Commission should liaise closely with all Member States, whether or not they have a national serving as member of the Commission, and in this context pay special attention to the need to share information and consult with all Member States.

The Conference also considers that the Commission should take all the necessary measures to ensure that political, social and economic realities in all Member States, including those which have no national serving as member of the Commission, are fully taken into account. These measures should include ensuring that the position of those Member States is addressed by appropriate organisational arrangements.

## 11. Declaration on Article 17(6) and (7) of the Treaty on European Union

The Conference considers that, in accordance with the provisions of the Treaties, the European Parliament and the European Council are jointly responsible for the smooth running of the process leading to the election of the President of the European Commission. Prior to the decision of the European Council, representatives of the European Parliament and of the European Council will thus conduct the necessary consultations in the framework deemed the most appropriate. These consultations will focus on the backgrounds of the candidates for President of the Commission, taking account of the elections to the European Parliament, in accordance with the first subparagraph of Article 17(7). The arrangements for such consultations may be determined, in due course, by common accord between the European Parliament and the European Council.

## 12. Declaration on Article 18 of the Treaty on European Union

1.    The Conference declares that, in the course of the preparatory work preceding the appointment of the High Representative of the Union for Foreign Affairs and Security Policy which is due to take place on the date of entry into force of the Treaty of Lisbon in accordance with Article 18 of the Treaty on European Union and Article 5 of the Protocol on transitional provisions and whose term of office will be from that date until the end of the term of office of the Commission in office on that date, appropriate contacts will be made with the European Parliament.

2.    Furthermore, the Conference recalls that, as regards the High Representative of the Union for Foreign Affairs and Security Policy whose term of office will start in November 2009 at the same time and for the same duration as the next Commission, he or she will be appointed in accordance with the provisions of Articles 17 and 18 of the Treaty on European Union.

### 13. **Declaration concerning the common foreign and security policy**

The Conference underlines that the provisions in the Treaty on European Union covering the Common Foreign and Security Policy, including the creation of the office of High Representative of the Union for Foreign Affairs and Security Policy and the establishment of an External Action Service, do not affect the responsibilities of the Member States, as they currently exist, for the formulation and conduct of their foreign policy nor of their national representation in third countries and international organisations.

The Conference also recalls that the provisions governing the Common Security and Defence Policy do not prejudice the specific character of the security and defence policy of the Member States.

It stresses that the European Union and its Member States will remain bound by the provisions of the Charter of the United Nations and, in particular, by the primary responsibility of the Security Council and of its Members for the maintenance of international peace and security.

### 14. **Declaration concerning the common foreign and security policy**

In addition to the specific rules and procedures referred to in paragraph 1 of Article 24 of the Treaty on European Union, the Conference underlines that the provisions covering the Common Foreign and Security Policy including in relation to the High Representative of the Union for Foreign Affairs and Security Policy and the External Action Service will not affect the existing legal basis, responsibilities, and powers of each Member State in relation to the formulation and conduct of its foreign policy, its national diplomatic service, relations with third countries and participation in international organisations, including a Member State's membership of the Security Council of the United Nations.

The Conference also notes that the provisions covering the Common Foreign and Security Policy do not give new powers to the Commission to initiate decisions nor do they increase the role of the European Parliament.

The Conference also recalls that the provisions governing the Common Security and Defence Policy do not prejudice the specific character of the security and defence policy of the Member States.

### 15. **Declaration on Article 27 of the Treaty on European Union**

The Conference declares that, as soon as the Treaty of Lisbon is signed, the Secretary-General of the Council, High Representative for the common foreign and security policy, the Commission and the Member States should begin preparatory work on the European External Action Service.

## 16. **Declaration on Article 55(2) of the Treaty on European Union**

The Conference considers that the possibility of producing translations of the Treaties in the languages mentioned in Article 55(2) contributes to fulfilling the objective of respecting the Union's rich cultural and linguistic diversity as set forth in the fourth subparagraph of Article 3(3). In this context, the Conference confirms the attachment of the Union to the cultural diversity of Europe and the special attention it will continue to pay to these and other languages.

The Conference recommends that those Member States wishing to avail themselves of the possibility recognised in Article 55(2) communicate to the Council, within six months from the date of the signature of the Treaty of Lisbon, the language or languages into which translations of the Treaties will be made.

## 17. **Declaration concerning primacy**

The Conference recalls that, in accordance with well settled case law of the Court of Justice of the European Union, the Treaties and the law adopted by the Union on the basis of the Treaties have primacy over the law of Member States, under the conditions laid down by the said case law.

The Conference has also decided to attach as an Annex to this Final Act the Opinion of the Council Legal Service on the primacy of EC law as set out in 11197/07 (JUR 260):

"*Opinion of the Council Legal Service*

*of 22 June 2007*

*It results from the case-law of the Court of Justice that primacy of EC law is a cornerstone principle of Community law. According to the Court, this principle is inherent to the specific nature of the European Community. At the time of the first judgment of this established case law (Costa/ENEL,15 July 1964, Case 6/641 ([1])) there was no mention of primacy in the treaty. It is still the case today. The fact that the principle of primacy will not be included in the future treaty shall not in any way change the existence of the principle and the existing case-law of the Court of Justice.*

_____

([1]) *"It follows (…) that the law stemming from the treaty, an independent source of law, could not, because of its special and original nature, be overridden by domestic legal provisions, however framed, without being deprived of its character as Community law and without the legal basis of the Community itself being called into question." "*

## 18. **Declaration in relation to the delimitation of competences**

The Conference underlines that, in accordance with the system of division of competences between the Union and the Member States as provided for in the Treaty on European Union and the Treaty on the Functioning of the European Union, competences not conferred upon the Union in the Treaties remain with the Member States.

When the Treaties confer on the Union a competence shared with the Member States in a specific area, the Member States shall exercise their competence to the extent that the Union has not exercised, or has decided to cease exercising, its competence. The latter situation arises when the relevant EU institutions decide to repeal a legislative act, in particular better to ensure constant respect for the principles of subsidiarity and proportionality. The Council may, at the initiative of one or several of its members (representatives of Member States) and in accordance with Article 241 of the Treaty on the Functioning of the European Union, request the Commission to submit proposals for repealing a legislative act. The Conference welcomes the Commission's declaration that it will devote particular attention to these requests.

Equally, the representatives of the governments of the Member States, meeting in an Intergovernmental Conference, in accordance with the ordinary revision procedure provided for in Article 48(2) to (5) of the Treaty on European Union, may decide to amend the Treaties upon which the Union is founded, including either to increase or to reduce the competences conferred on the Union in the said Treaties.

## 19. Declaration on Article 8 of the Treaty on the Functioning of the European Union

The Conference agrees that, in its general efforts to eliminate inequalities between women and men, the Union will aim in its different policies to combat all kinds of domestic violence. The Member States should take all necessary measures to prevent and punish these criminal acts and to support and protect the victims.

## 20. Declaration on Article 16 of the Treaty on the Functioning of the European Union

The Conference declares that, whenever rules on protection of personal data to be adopted on the basis of Article 16 could have direct implications for national security, due account will have to be taken of the specific characteristics of the matter. It recalls that the legislation presently applicable (see in particular Directive 95/46/EC) includes specific derogations in this regard.

## 21. Declaration on the protection of personal data in the fields of judicial cooperation in criminal matters and police cooperation

The Conference acknowledges that specific rules on the protection of personal data and the free movement of such data in the fields of judicial cooperation in criminal matters and police cooperation based on Article 16 of the Treaty on the Functioning of the European Union may prove necessary because of the specific nature of these fields.

C 202/346    EN    Official Journal of the European Union    7.6.2016

## 22. Declaration on Articles 48 and 79 of the Treaty on the Functioning of the European Union

The Conference considers that in the event that a draft legislative act based on Article 79(2) would affect important aspects of the social security system of a Member State, including its scope, cost or financial structure, or would affect the financial balance of that system as set out in the second paragraph of Article 48, the interests of that Member State will be duly taken into account.

## 23. Declaration on the second paragraph of Article 48 of the Treaty on the Functioning of the European Union

The Conference recalls that in that case, in accordance with Article 15(4) of the Treaty on European Union, the European Council acts by consensus.

## 24. Declaration concerning the legal personality of the European Union

The Conference confirms that the fact that the European Union has a legal personality will not in any way authorise the Union to legislate or to act beyond the competences conferred upon it by the Member States in the Treaties.

## 25. Declaration on Articles 75 and 215 of the Treaty on the Functioning of the European Union

The Conference recalls that the respect for fundamental rights and freedoms implies, in particular, that proper attention is given to the protection and observance of the due process rights of the individuals or entities concerned. For this purpose and in order to guarantee a thorough judicial review of decisions subjecting an individual or entity to restrictive measures, such decisions must be based on clear and distinct criteria. These criteria should be tailored to the specifics of each restrictive measure.

## 26. Declaration on non-participation by a Member State in a measure based on Title V of Part Three of the Treaty on the Functioning of the European Union

The Conference declares that, where a Member State opts not to participate in a measure based on Title V of Part Three of the Treaty on the Functioning of the European Union, the Council will hold a full discussion on the possible implications and effects of that Member State's non-participation in the measure.

In addition, any Member State may ask the Commission to examine the situation on the basis of Article 116 of the Treaty on the Functioning of the European Union.

The above paragraphs are without prejudice to the entitlement of a Member State to refer the matter to the European Council.

### 27. **Declaration on Article 85(1), second subparagraph, of the Treaty on the Functioning of the European Union**

The Conference considers that the regulations referred to in the second subparagraph of Article 85(1) of the Treaty on the Functioning of the European Union should take into account national rules and practices relating to the initiation of criminal investigations.

### 28. **Declaration on Article 98 of the Treaty on the Functioning of the European Union**

The Conference notes that the provisions of Article 98 shall be applied in accordance with the current practice. The terms "such measures are required in order to compensate for the economic disadvantages caused by the division of Germany to the economy of certain areas of the Federal Republic affected by that division" shall be interpreted in accordance with the existing case law of the Court of Justice of the European Union.

### 29. **Declaration on Article 107(2)(c) of the Treaty on the Functioning of the European Union**

The Conference notes that Article 107(2)(c) shall be interpreted in accordance with the existing case law of the Court of Justice of the European Union regarding the applicability of the provisions to aid granted to certain areas of the Federal Republic of Germany affected by the former division of Germany.

### 30. **Declaration on Article 126 of the Treaty on the Functioning of the European Union**

With regard to Article 126, the Conference confirms that raising growth potential and securing sound budgetary positions are the two pillars of the economic and fiscal policy of the Union and the Member States. The Stability and Growth Pact is an important tool to achieve these goals.

The Conference reaffirms its commitment to the provisions concerning the Stability and Growth Pact as the framework for the coordination of budgetary policies in the Member States.

The Conference confirms that a rule-based system is the best guarantee for commitments to be enforced and for all Member States to be treated equally.

Within this framework, the Conference also reaffirms its commitment to the goals of the Lisbon Strategy: job creation, structural reforms, and social cohesion.

The Union aims at achieving balanced economic growth and price stability. Economic and budgetary policies thus need to set the right priorities towards economic reforms, innovation, competitiveness and strengthening of private investment and consumption in phases of weak economic growth. This should be reflected in the orientations of budgetary decisions at the national and Union level in

particular through restructuring of public revenue and expenditure while respecting budgetary discipline in accordance with the Treaties and the Stability and Growth Pact.

Budgetary and economic challenges facing the Member States underline the importance of sound budgetary policy throughout the economic cycle.

The Conference agrees that Member States should use periods of economic recovery actively to consolidate public finances and improve their budgetary positions. The objective is to gradually achieve a budgetary surplus in good times which creates the necessary room to accommodate economic downturns and thus contribute to the long-term sustainability of public finances.

The Member States look forward to possible proposals of the Commission as well as further contributions of Member States with regard to strengthening and clarifying the implementation of the Stability and Growth Pact. The Member States will take all necessary measures to raise the growth potential of their economies. Improved economic policy coordination could support this objective. This Declaration does not prejudge the future debate on the Stability and Growth Pact.

## 31. Declaration on Article 156 of the Treaty on the Functioning of the European Union

The Conference confirms that the policies described in Article 156 fall essentially within the competence of the Member States. Measures to provide encouragement and promote coordination to be taken at Union level in accordance with this Article shall be of a complementary nature. They shall serve to strengthen cooperation between Member States and not to harmonise national systems. The guarantees and practices existing in each Member State as regards the responsibility of the social partners will not be affected.

This Declaration is without prejudice to the provisions of the Treaties conferring competence on the Union, including in social matters.

## 32. Declaration on Article 168(4)(c) of the Treaty on the Functioning of the European Union

The Conference declares that the measures to be adopted pursuant to Article 168(4)(c) must meet common safety concerns and aim to set high standards of quality and safety where national standards affecting the internal market would otherwise prevent a high level of human health protection being achieved.

### 33. Declaration on Article 174 of the Treaty on the Functioning of the European Union

The Conference considers that the reference in Article 174 to island regions can include island States in their entirety, subject to the necessary criteria being met.

### 34. Declaration on Article 179 of the Treaty on the Functioning of the European Union

The Conference agrees that the Union's action in the area of research and technological development will pay due respect to the fundamental orientations and choices of the research policies of the Member States.

### 35. Declaration on Article 194 of the Treaty on the Functioning of the European Union

The Conference believes that Article 194 does not affect the right of the Member States to take the necessary measures to ensure their energy supply under the conditions provided for in Article 347.

### 36. Declaration on Article 218 of the Treaty on the Functioning of the European Union concerning the negotiation and conclusion of international agreements by Member States relating to the area of freedom, security and justice

The Conference confirms that Member States may negotiate and conclude agreements with third countries or international organisations in the areas covered by Chapters 3, 4 and 5 of Title V of Part Three in so far as such agreements comply with Union law.

### 37. Declaration on Article 222 of the Treaty on the Functioning of the European Union

Without prejudice to the measures adopted by the Union to comply with its solidarity obligation towards a Member State which is the object of a terrorist attack or the victim of natural or man-made disaster, none of the provisions of Article 222 is intended to affect the right of another Member State to choose the most appropriate means to comply with its own solidarity obligation towards that Member State.

### 38. Declaration on Article 252 of the Treaty on the Functioning of the European Union regarding the number of Advocates-General in the Court of Justice

The Conference declares that if, in accordance with Article 252, first paragraph, of the Treaty on the Functioning of the European Union, the Court of Justice requests that the number of Advocates-General be increased by three (eleven instead of eight), the Council will, acting unanimously, agree on such an increase.

In that case, the Conference agrees that Poland will, as is already the case for Germany, France, Italy, Spain and the United Kingdom, have a permanent Advocate-General and no longer take part in the rotation system, while the existing rotation system will involve the rotation of five Advocates-General instead of three.

### 39. Declaration on Article 290 of the Treaty on the Functioning of the European Union

The Conference takes note of the Commission's intention to continue to consult experts appointed by the Member States in the preparation of draft delegated acts in the financial services area, in accordance with its established practice.

### 40. Declaration on Article 329 of the Treaty on the Functioning of the European Union

The Conference declares that Member States may indicate, when they make a request to establish enhanced cooperation, if they intend already at that stage to make use of Article 333 providing for the extension of qualified majority voting or to have recourse to the ordinary legislative procedure.

### 41. Declaration on Article 352 of the Treaty on the Functioning of the European Union

The Conference declares that the reference in Article 352(1) of the Treaty on the Functioning of the European Union to objectives of the Union refers to the objectives as set out in Article 3(2) and (3) of the Treaty on European Union and to the objectives of Article 3(5) of the said Treaty with respect to external action under Part Five of the Treaty on the Functioning of the European Union. It is therefore excluded that an action based on Article 352 of the Treaty on the Functioning of the European Union would only pursue objectives set out in Article 3(1) of the Treaty on European Union. In this connection, the Conference notes that in accordance with Article 31(1) of the Treaty on European Union, legislative acts may not be adopted in the area of the Common Foreign and Security Policy.

### 42. Declaration on Article 352 of the Treaty on the Functioning of the European Union

The Conference underlines that, in accordance with the settled case law of the Court of Justice of the European Union, Article 352 of the Treaty on the Functioning of the European Union, being an integral part of an institutional system based on the principle of conferred powers, cannot serve as a basis for widening the scope of Union powers beyond the general framework created by the provisions of the Treaties as a whole and, in particular, by those that define the tasks and the activities of the Union. In any event, this Article cannot be used as a basis for the adoption of provisions whose effect would, in substance, be to amend the Treaties without following the procedure which they provide for that purpose.

### 43. Declaration on Article 355(6) of the Treaty on the Functioning of the European Union

The High Contracting Parties agree that the European Council, pursuant to Article 355(6), will take a decision leading to the modification of the status of Mayotte with regard to the Union in order to make this territory an outermost region within the meaning of Article 355(1) and Article 349, when the French authorities notify the European Council and the Commission that the evolution currently under way in the internal status of the island so allows.

## B. DECLARATIONS CONCERNING PROTOCOLS ANNEXED TO THE TREATIES

### 44. Declaration on Article 5 of the Protocol on the Schengen *acquis* integrated into the framework of the European Union

The Conference notes that where a Member State has made a notification under Article 5(2) of the Protocol on the Schengen *acquis* integrated into the framework of the European Union that it does not wish to take part in a proposal or initiative, that notification may be withdrawn at any moment before the adoption of the measure building upon the Schengen *acquis*.

### 45. Declaration on Article 5(2) of the Protocol on the Schengen acquis integrated into the framework of the European Union

The Conference declares that whenever the United Kingdom or Ireland indicates to the Council its intention not to participate in a measure building upon a part of the Schengen *acquis* in which it participates, the Council will have a full discussion on the possible implications of the non-participation of that Member State in that measure. The discussion within the Council should be conducted in the light of the indications given by the Commission concerning the relationship between the proposal and the Schengen *acquis*.

### 46. Declaration on Article 5(3) of the Protocol on the Schengen acquis integrated into the framework of the European Union

The Conference recalls that if the Council does not take a decision after a first substantive discussion of the matter, the Commission may present an amended proposal for a further substantive re-examination by the Council within the deadline of 4 months.

### 47. Declaration on Article 5(3), (4) and (5) of the Protocol on the Schengen *acquis* integrated into the framework of the European Union

The Conference notes that the conditions to be determined in the decision referred to in paragraphs 3, 4 or 5 of Article 5 of the Protocol on the Schengen *acquis* integrated into the framework of the European Union may determine that the Member State concerned shall bear the direct financial consequences, if any, necessarily and unavoidably incurred as a result of the cessation of its participation in some or all of the *acquis* referred to in any decision taken by the Council pursuant to Article 4 of the said Protocol.

## 48. **Declaration concerning the Protocol on the position of Denmark**

The Conference notes that with respect to legal acts to be adopted by the Council acting alone or jointly with the European Parliament and containing provisions applicable to Denmark as well as provisions not applicable to Denmark because they have a legal basis to which Part I of the Protocol on the position of Denmark applies, Denmark declares that it will not use its voting right to prevent the adoption of the provisions which are not applicable to Denmark.

Furthermore, the Conference notes that on the basis of the Declaration by the Conference on Article 222, Denmark declares that Danish participation in actions or legal acts pursuant to Article 222 will take place in accordance with Part I and Part II of the Protocol on the position of Denmark.

## 49. **Declaration concerning Italy**

The Conference notes that the Protocol on Italy annexed in 1957 to the Treaty establishing the European Economic Community, as amended upon adoption of the Treaty on European Union, stated that:

"THE HIGH CONTRACTING PARTIES,

DESIRING to settle certain particular problems relating to Italy,

HAVE AGREED UPON the following provisions, which shall be annexed to this Treaty:

THE MEMBER STATES OF THE COMMUNITY

TAKE NOTE of the fact that the Italian Government is carrying out a ten-year programme of economic expansion designed to rectify the disequilibria in the structure of the Italian economy, in particular by providing an infrastructure for the less developed areas in Southern Italy and in the Italian islands and by creating new jobs in order to eliminate unemployment;

RECALL that the principles and objectives of this programme of the Italian Government have been considered and approved by organisations for international cooperation of which the Member States are members;

RECOGNISE that it is in their common interest that the objectives of the Italian programme should be attained;

AGREE, in order to facilitate the accomplishment of this task by the Italian Government, to recommend to the institutions of the Community that they should employ all the methods and procedures provided in this Treaty and, in particular, make appropriate use of the resources of the European Investment Bank and the European Social Fund;

ARE OF THE OPINION that the institutions of the Community should, in applying this Treaty, take account of the sustained effort to be made by the Italian economy in the coming years and of the desirability of avoiding dangerous stresses in particular within the balance of payments or the level of employment, which might jeopardise the application of this Treaty in Italy;

RECOGNISE that in the event of Articles 109 H and 109 I being applied it will be necessary to take care that any measures required of the Italian Government do not prejudice the completion of its programme for economic expansion and for raising the standard of living of the population.".

## 50. Declaration concerning Article 10 of the Protocol on transitional provisions

The Conference invites the European Parliament, the Council and the Commission, within their respective powers, to seek to adopt, in appropriate cases and as far as possible within the five-year period referred to in Article 10(3) of the Protocol on transitional provisions, legal acts amending or replacing the acts referred to in Article 10(1) of that Protocol.

# C. DECLARATIONS BY MEMBER STATES

## 51. Declaration by the Kingdom of Belgium on national Parliaments

Belgium wishes to make clear that, in accordance with its constitutional law, not only the Chamber of Representatives and Senate of the Federal Parliament but also the parliamentary assemblies of the Communities and the Regions act, in terms of the competences exercised by the Union, as components of the national parliamentary system or chambers of the national Parliament.

## 52. Declaration by the Kingdom of Belgium, the Republic of Bulgaria, the Federal Republic of Germany, the Hellenic Republic, the Kingdom of Spain, the Italian Republic, the Republic of Cyprus, the Republic of Lithuania, the Grand-Duchy of Luxembourg, the Republic of Hungary, the Republic of Malta, the Republic of Austria, the Portuguese Republic, Romania, the Republic of Slovenia and the Slovak Republic on the symbols of the European Union

Belgium, Bulgaria, Germany, Greece, Spain, Italy, Cyprus, Lithuania, Luxemburg, Hungary, Malta, Austria, Portugal, Romania, Slovenia and the Slovak Republic declare that the flag with a circle of twelve golden stars on a blue background, the anthem based on the "Ode to Joy" from the Ninth Symphony by Ludwig van Beethoven, the motto "United in diversity", the euro as the currency of the European Union and Europe Day on 9 May will for them continue as symbols to express the sense of community of the people in the European Union and their allegiance to it.

## 53. Declaration by the Czech Republic on the Charter of Fundamental Rights of the European Union

1.    The Czech Republic recalls that the provisions of the Charter of Fundamental Rights of the European Union are addressed to the institutions and bodies of the European Union with due regard for the principle of subsidiarity and division of competences between the European Union and its Member States, as reaffirmed in Declaration (No 18) in relation to the delimitation of competences. The Czech Republic stresses that its provisions are addressed to the Member States only when they are implementing Union law, and not when they are adopting and implementing national law independently from Union law.

2.    The Czech Republic also emphasises that the Charter does not extend the field of application of Union law and does not establish any new power for the Union. It does not diminish the field of application of national law and does not restrain any current powers of the national authorities in this field.

3.    The Czech Republic stresses that, in so far as the Charter recognises fundamental rights and principles as they result from constitutional traditions common to the Member States, those rights and principles are to be interpreted in harmony with those traditions.

4.    The Czech Republic further stresses that nothing in the Charter may be interpreted as restricting or adversely affecting human rights and fundamental freedoms as recognised, in their respective field of application, by Union law and by international agreements to which the Union or all the Member States are party, including the European Convention for the Protection of Human Rights and Fundamental Freedoms, and by the Member States' Constitutions.

## 54. Declaration by the Federal Republic of Germany, Ireland, the Republic of Hungary, the Republic of Austria and the Kingdom of Sweden

Germany, Ireland, Hungary, Austria and Sweden note that the core provisions of the Treaty establishing the European Atomic Energy Community have not been substantially amended since its entry into force and need to be brought up to date. They therefore support the idea of a Conference of the Representatives of the Governments of the Member States, which should be convened as soon as possible.

## 55. Declaration by the Kingdom of Spain and the United Kingdom of Great Britain and Northern Ireland

The Treaties apply to Gibraltar as a European territory for whose external relations a Member State is responsible. This shall not imply changes in the respective positions of the Member States concerned.

## 56. Declaration by Ireland on Article 3 of the Protocol on the position of the United Kingdom and Ireland in respect of the area of freedom, security and justice

Ireland affirms its commitment to the Union as an area of freedom, security and justice respecting fundamental rights and the different legal systems and traditions of the Member States within which citizens are provided with a high level of safety.

Accordingly, Ireland declares its firm intention to exercise its right under Article 3 of the Protocol on the position of the United Kingdom and Ireland in respect of the area of freedom, security and justice to take part in the adoption of measures pursuant to Title V of Part Three of the Treaty on the Functioning of the European Union to the maximum extent it deems possible.

Ireland will, in particular, participate to the maximum possible extent in measures in the field of police cooperation.

Furthermore, Ireland recalls that in accordance with Article 8 of the Protocol it may notify the Council in writing that it no longer wishes to be covered by the terms of the Protocol. Ireland intends to review the operation of these arrangements within three years of the entry into force of the Treaty of Lisbon.

## 57. Declaration by the Italian Republic on the composition of the European Parliament

Italy notes that, pursuant to Articles 10 and 14 of the Treaty on European Union, the European Parliament is to be composed of representatives of the Union's citizens; this representation is to be degressively proportional.

Italy likewise notes that on the basis of Article 9 of the Treaty on European Union and Article 20 of the Treaty on the Functioning of the European Union, every national of a Member State is a citizen of the Union.

Italy therefore considers that, without prejudice to the decision on the 2009-2014 legislative period, any decision adopted by the European Council, at the initiative of the European Parliament and with its consent, establishing the composition of the European Parliament, must abide by the principles laid down out in the first subparagraph of Article 14.

## 58. Declaration by the Republic of Latvia, the Republic of Hungary and the Republic of Malta on the spelling of the name of the single currency in the Treaties

Without prejudice to the unified spelling of the name of the single currency of the European Union referred to in the Treaties as displayed on the banknotes and on the coins, Latvia, Hungary and Malta declare that the spelling of the name of the single currency, including its derivatives as applied throughout the Latvian, Hungarian and Maltese text of the Treaties, has no effect on the existing rules of the Latvian, Hungarian or Maltese languages.

## 59. Declaration by the Kingdom of the Netherlands on Article 312 of the Treaty on the Functioning of the European Union

The Kingdom of the Netherlands will agree to a decision as referred to in the second subparagraph of Article 312(2) of the Treaty on the Functioning of the European Union once a revision of the decision referred to in the third paragraph of Article 311 of that Treaty has provided the Netherlands with a satisfactory solution for its excessive negative net payment position *vis-à-vis* the Union budget.

C 202/358          EN          Official Journal of the European Union                    7.6.2016

### 60. Declaration by the Kingdom of the Netherlands on Article 355 of the Treaty on the Functioning of the European Union

The Kingdom of the Netherlands declares that an initiative for a decision, as referred to in Article 355(6) aimed at amending the status of the Netherlands Antilles and/or Aruba with regard to the Union, will be submitted only on the basis of a decision taken in conformity with the Charter for the Kingdom of the Netherlands.

### 61. Declaration by the Republic of Poland on the Charter of Fundamental Rights of the European Union

The Charter does not affect in any way the right of Member States to legislate in the sphere of public morality, family law, as well as the protection of human dignity and respect for human physical and moral integrity.

### 62. Declaration by the Republic of Poland concerning the Protocol on the application of the Charter of Fundamental Rights of the European Union in relation to Poland and the United Kingdom

Poland declares that, having regard to the tradition of social movement of "Solidarity" and its significant contribution to the struggle for social and labour rights, it fully respects social and labour rights, as established by European Union law, and in particular those reaffirmed in Title IV of the Charter of Fundamental Rights of the European Union.

### 63. Declaration by the United Kingdom of Great Britain and Northern Ireland on the definition of the term "nationals"

In respect of the Treaties and the Treaty establishing the European Atomic Energy Community, and in any of the acts deriving from those Treaties or continued in force by those Treaties, the United Kingdom reiterates the Declaration it made on 31 December 1982 on the definition of the term "nationals" with the exception that the reference to "British Dependent Territories Citizens" shall be read as meaning "British overseas territories citizens".

### 64. Declaration by the United Kingdom of Great Britain and Northern Ireland on the franchise for elections to the European Parliament

The United Kingdom notes that Article 14 of the Treaty on European Union and other provisions of the Treaties are not intended to change the basis for the franchise for elections to the European Parliament.

7.6.2016    EN    Official Journal of the European Union    C 202/359

### 65. Declaration by the United Kingdom of Great Britain and Northern Ireland on Article 75 of the Treaty on the Functioning of the European Union

The United Kingdom fully supports robust action with regard to adopting financial sanctions designed to prevent and combat terrorism and related activities. Therefore, the United Kingdom declares that it intends to exercise its right under Article 3 of the Protocol on the position of the United Kingdom and Ireland in respect of the area of freedom, security and justice to take part in the adoption of all proposals made under Article 75 of the Treaty on the Functioning of the European Union.

―――

7.6.2016          EN          Official Journal of the European Union          C 202/361

# TABLES OF EQUIVALENCES (*)

## Treaty on European Union

| Old numbering of the Treaty on European Union | New numbering of the Treaty on European Union |
|---|---|
| TITLE I – COMMON PROVISIONS | TITLE I – COMMON PROVISIONS |
| Article 1 | Article 1 |
|  | Article 2 |
| Article 2 | Article 3 |
| Article 3 (repealed) (¹) |  |
|  | Article 4 |
|  | Article 5 (²) |
| Article 4 (repealed) (³) |  |
| Article 5 (repealed) (⁴) |  |
| Article 6 | Article 6 |
| Article 7 | Article 7 |
|  | Article 8 |
| TITLE II – PROVISIONS AMENDING THE TREATY ESTABLISHING THE EUROPEAN ECONOMIC COMMUNITY WITH A VIEW TO ESTABLISHING THE EUROPEAN COMMUNITY | TITLE II – PROVISIONS ON DEMOCRATIC PRINCIPLES |
| Article 8 (repealed) (⁵) | Article 9 |
|  | Article 10 (⁶) |

(¹) Replaced, in substance, by Article 7 of the Treaty on the Functioning of the European Union ("TFEU") and by Articles 13(1) and 21, paragraph 3, second subparagraph of the Treaty on European Union ("TEU").
(²) Replaces Article 5 of the Treaty establishing the European Community ("TEC").
(³) Replaced, in substance, by Article 15.
(⁴) Replaced, in substance, by Article 13, paragraph 2.
(⁵) Article 8 TEU, which was in force until the entry into force of the Treaty of Lisbon (hereinafter "current"), amended the TEC. Those amendments are incorporated into the latter Treaty and Article 8 is repealed. Its number is used to insert a new provision.
(⁶) Paragraph 4 replaces, in substance, the first subparagraph of Article 191 TEC.

———

(*) Tables of equivalences as referred to in Article 5 of the Treaty of Lisbon. The original centre column, which set out the intermediate numbering as used in that Treaty, has been omitted.

C 202/362          EN          Official Journal of the European Union          7.6.2016

| Old numbering of the Treaty on European Union | New numbering of the Treaty on European Union |
|---|---|
| | Article 11 |
| | Article 12 |
| TITLE III – PROVISIONS AMENDING THE TREATY ESTABLISHING THE EUROPEAN COAL AND STEEL COMMUNITY | TITLE III – PROVISIONS ON THE INSTITUTIONS |
| Article 9 (repealed) (7) | Article 13 |
| | Article 14 (8) |
| | Article 15 (9) |
| | Article 16 (10) |
| | Article 17 (11) |
| | Article 18 |
| | Article 19 (12) |
| TITLE IV – PROVISIONS AMENDING THE TREATY ESTABLISHING THE EUROPEAN ATOMIC ENERGY COMMUNITY | TITLE IV – PROVISIONS ON ENHANCED COOPERATION |
| Article 10 (repealed) (13)<br>Articles 27a to 27e (replaced)<br>Articles 40 to 40b (replaced)<br>Articles 43 to 45 (replaced) | Article 20 (14) |

(7) The current Article 9 TEU amended the Treaty establishing the European Coal and Steel Community. This latter expired on 23 July 2002. Article 9 is repealed and the number thereof is used to insert another provision.

(8) — Paragraphs 1 and 2 replace, in substance, Article 189 TEC;
    — paragraphs 1 to 3 replace, in substance, paragraphs 1 to 3 of Article 190 TEC;
    — paragraph 1 replaces, in substance, the first subparagraph of Article 192 TEC;
    — paragraph 4 replaces, in substance, the first subparagraph of Article 197 TEC.

(9) Replaces, in substance, Article 4.

(10) — Paragraph 1 replaces, in substance, the first and second indents of Article 202 TEC;
    — paragraphs 2 and 9 replace, in substance, Article 203 TEC;
    — paragraphs 4 and 5 replace, in substance, paragraphs 2 and 4 of Article 205 TEC.

(11) — Paragraph 1 replaces, in substance, Article 211 TEC;
    — paragraphs 3 and 7 replace, in substance, Article 214 TEC.
    — paragraph 6 replaces, in substance, paragraphs 1, 3 and 4 of Article 217 TEC.

(12) — Replaces, in substance, Article 220 TEC.
    — the first subparagraph of paragraph 2 replaces, in substance, the first subparagraph of Article 221 TEC.

(13) The current Article 10 TEU amended the Treaty establishing the European Atomic Energy Community. Those amendments are incorporated into the Treaty of Lisbon. Article 10 is repealed and the number thereof is used to insert another provision.

(14) Also replaces Articles 11 and 11a TEC.

| Old numbering of the Treaty on European Union | New numbering of the Treaty on European Union |
|---|---|
| TITLE V – PROVISIONS ON A COMMON FOREIGN AND SECURITY POLICY | TITLE V – GENERAL PROVISIONS ON THE UNION'S EXTERNAL ACTION AND SPECIFIC PROVISIONS ON THE COMMON FOREIGN AND SECURITY POLICY |
|  | Chapter 1 – General provisions on the Union's external action |
|  | Article 21 |
|  | Article 22 |
|  | Chapter 2 – Specific provisions on the common foreign and security policy |
|  | Section 1 – Common provisions |
|  | Article 23 |
| Article 11 | Article 24 |
| Article 12 | Article 25 |
| Article 13 | Article 26 |
|  | Article 27 |
| Article 14 | Article 28 |
| Article 15 | Article 29 |
| Article 22 (moved) | Article 30 |
| Article 23 (moved) | Article 31 |
| Article 16 | Article 32 |
| Article 17 (moved) | Article 42 |
| Article 18 | Article 33 |
| Article 19 | Article 34 |
| Article 20 | Article 35 |
| Article 21 | Article 36 |
| Article 22 (moved) | Article 30 |
| Article 23 (moved) | Article 31 |
| Article 24 | Article 37 |

C 202/364 | EN | Official Journal of the European Union | 7.6.2016

| Old numbering of the Treaty on European Union | New numbering of the Treaty on European Union |
|---|---|
| Article 25 | Article 38 |
| | Article 39 |
| Article 47 (moved) | Article 40 |
| Article 26 (repealed) | |
| Article 27 (repealed) | |
| Article 27a (replaced) ($^{15}$) | Article 20 |
| Article 27b (replaced) ($^{15}$) | Article 20 |
| Article 27c (replaced) ($^{15}$) | Article 20 |
| Article 27d (replaced) ($^{15}$) | Article 20 |
| Article 27e (replaced) ($^{15}$) | Article 20 |
| Article 28 | Article 41 |
| | Section 2 – Provisions on the common security and defence policy |
| Article 17 (moved) | Article 42 |
| | Article 43 |
| | Article 44 |
| | Article 45 |
| | Article 46 |
| TITLE VI – PROVISIONS ON POLICE AND JUDICIAL COOPERATION IN CRIMINAL MATTERS (repealed) ($^{16}$) | |
| Article 29 (replaced) ($^{17}$) | |
| Article 30 (replaced) ($^{18}$) | |
| Article 31 (replaced) ($^{19}$) | |

($^{15}$) The current Articles 27a to 27e, on enhanced cooperation, are also replaced by Articles 326 to 334 TFEU.

($^{16}$) The current provisions of Title VI of the TEU, on police and judicial cooperation in criminal matters, are replaced by the provisions of Chapters 1, 4 and 5 of Title IV (renumbered V) of Part Three of the TFEU.

($^{17}$) Replaced by Article 67 TFEU.

($^{18}$) Replaced by Articles 87 and 88 TFEU.

($^{19}$) Replaced by Articles 82, 83 and 85 TFEU.

| Old numbering of the Treaty on European Union | New numbering of the Treaty on European Union |
|---|---|
| Article 32 (replaced) [20] | |
| Article 33 (replaced) [21] | |
| Article 34 (repealed) | |
| Article 35 (repealed) | |
| Article 36 (replaced) [22] | |
| Article 37 (repealed) | |
| Article 38 (repealed) | |
| Article 39 (repealed) | |
| Article 40 (replaced) [23] | Article 20 |
| Article 40 A (replaced) [23] | Article 20 |
| Article 40 B (replaced) [23] | Article 20 |
| Article 41 (repealed) | |
| Article 42 (repealed) | |
| TITLE VII – PROVISIONS ON ENHANCED COOPERATION (replaced) [24] | TITLE IV – PROVISIONS ON ENHANCED COOPERATION |
| Article 43 (replaced) [24] | Article 20 |
| Article 43 A (replaced) [24] | Article 20 |
| Article 43 B (replaced) [24] | Article 20 |
| Article 44 (replaced) [24] | Article 20 |
| Article 44 A (replaced) [24] | Article 20 |
| Article 45 (replaced) [24] | Article 20 |
| TITRE VIII – FINAL PROVISIONS | TITLE VI – FINAL PROVISIONS |
| Article 46 (repealed) | |
| | Article 47 |

[20] Replaced by Article 89 TFEU.
[21] Replaced by Article 72 TFEU.
[22] Replaced by Article 71 TFEU.
[23] The current Articles 40 to 40 B TEU, on enhanced cooperation, are also replaced by Articles 326 to 334 TFEU.
[24] The current Articles 43 to 45 and Title VII of the TEU, on enhanced cooperation, are also replaced by Articles 326 to 334 TFEU.

| Old numbering of the Treaty on European Union | New numbering of the Treaty on European Union |
| --- | --- |
| Article  47  (replaced) | Article  40 |
| Article  48 | Article  48 |
| Article  49 | Article  49 |
|  | Article  50 |
|  | Article  51 |
|  | Article  52 |
| Article  50  (repealed) |  |
| Article  51 | Article  53 |
| Article  52 | Article  54 |
| Article  53 | Article  55 |