# EXHIBIT 6



# THE INTERNATIONAL ENERGY CHARTER
# CONSOLIDATED ENERGY CHARTER TREATY

## with Related Documents



# THE INTERNATIONAL ENERGY CHARTER
# CONSOLIDATED ENERGY CHARTER TREATY

## with Related Documents

### Last Updated: 15 January 2016

## FOREWORD

*The Energy Charter Treaty* is a unique instrument for the promotion of international cooperation in the energy sector. The Treaty, which entered into force on 16 April 1998, and its related documents, all set out in a consolidated version in this booklet, provide an important legal and political basis for the creation of an open international energy market.

The Treaty was preceded by a political declaration, *the European Energy Charter* adopted in The Hague on 17 December 1991. The European Energy Charter contained a commitment to negotiate in good faith a legally binding Energy Charter Treaty and Protocols. *The International Energy Charter* is a further political declaration adopted and signed in The Hague on 20 May 2015. This more recent political declaration reflects global modern energy challenges and maps out common principles and areas of international cooperation in the field of energy for the 21st Century. As a result of the increased interest by the international community the Energy Charter Process has expanded to involve over 90 states from all continents.

For many years the primary focus of the Contracting Parties was to ensure full implementation of the Treaty's commitments. This entailed increased multilateral cooperation over transit, trade, investments, dispute resolution and energy efficiency. As global energy markets evolved, modernisation of the Energy Charter Process became a major objective for the Energy Charter constituency. Today there is a focus on the geographical expansion of the Energy Charter Treaty. The Treaty is open for accession by all countries and Regional Economic Integration Organisations (REIOs) committed to the observance of its principles of open and non-discriminatory energy markets. Several countries are today engaged in the accession process to the Treaty. Up-to-date information on the Energy Charter and its membership can be found at http://www.energycharter.org/.

There is recognition by all of the need to ensure that the Energy Charter Process continues to build on its core principles while adapting to new challenges. The Energy Charter stands ready to play a key role in international energy governance in the 21st Century.

Dr. Urban Rusnák
Secretary General
Energy Charter Secretariat
15 January 2016

**2**

# Table of Contents[1]

**FOREWORD** ........................................................................................................................ 2

**EXPLANATORY NOTE** .......................................................................................................... 8

**CONCLUDING DOCUMENT OF THE MINISTERIAL ("THE HAGUE II") CONFERENCE ON THE INTERNATIONAL ENERGY CHARTER** ...................................................................... 9

**INTERNATIONAL ENERGY CHARTER** ........................................................................... 10

Title I: Objectives .............................................................................................................. 13

Title II: Implementation ................................................................................................... 16

Title III: Specific Agreements .......................................................................................... 20

Title IV: Final Provisions .................................................................................................. 21

**ANNEX: OUTCOME DOCUMENTS OF ENERGY-RELATED REGIONAL AND INTERNATIONAL CONFERENCES AND OTHER EVENTS AS WELL AS INITIATIVES REFERRED TO ON PAGE 2** ............... 22

**CONCLUDING DOCUMENT OF THE HAGUE CONFERENCE ON THE EUROPEAN ENERGY CHARTER** .... 26

**EUROPEAN ENERGY CHARTER** ..................................................................................... 27

Title I: Objectives .............................................................................................................. 29

Title II: Implementation ................................................................................................... 31

Title III: Specific Agreements .......................................................................................... 34

Title IV: Final Provisions .................................................................................................. 35

**THE ENERGY CHARTER TREATY** .................................................................................... 37

Part I: Definitions and Purpose ....................................................................................... 39

    Article 1: Definitions ...................................................................................................... 39

    Article 2: Purpose of the Treaty .................................................................................... 44

Part II: Commerce ............................................................................................................. 44

    Article 3: International Markets ..................................................................................... 44

---

1    Numbered footnotes to this publication are editorial and must not be taken as part of any official document or as an interpretation of any provision therein.

Article 4: Non-Derogation from WTO Agreement..................................................................44

Article 5: Trade-Related Investment Measures ...................................................................45

Article 6: Competition ..............................................................................................................46

Article 7: Transit.........................................................................................................................48

Article 8: Transfer of Technology .........................................................................................51

Article 9: Access to Capital ....................................................................................................52

Part III: Investment Promotion and Protection ....................................................................53

Article 10: Promotion, Protection and Treatment of Investments.................................53

Article 11: Key Personnel.........................................................................................................59

Article 12: Compensation for Losses ...................................................................................59

Article 13: Expropriation ..........................................................................................................60

Article 14: Transfers Related to Investments .....................................................................60

Article 15: Subrogation ............................................................................................................64

Article 16: Relation to Other Agreements ...........................................................................65

Article 17: Non-Application of Part III in Certain Circumstances .................................65

Part IV: Miscellaneous Provisions ...........................................................................................66

Article 18: Sovereignty over Energy Resources ................................................................66

Article 19: Environmental Aspects ........................................................................................67

Article 20: Transparency ..........................................................................................................69

Article 21: Taxation ...................................................................................................................70

Article 22: State and Privileged Enterprises.......................................................................72

Article 23: Observance by Sub-National Authorities .......................................................73

Article 24: Exceptions ..............................................................................................................74

Article 25: Economic Integration Agreements...................................................................76

Part V: Dispute Settlement.........................................................................................................77

Article 26: Settlement of Disputes between an Investor and a Contracting Party .........78

Article 27: Settlement of Disputes between Contracting Parties ...................................81

Article 28: Non-Application of Article 27 to Certain Disputes ..............................................83

Part VI: Transitional Provisions .................................................................................................83

Article 29: Interim Provisions on Trade-Related Matters..................................................83

Article 30: Developments in International Trading Arrangements...................................88

Article 31: Energy-Related Equipment .......................................................................88

Article 32: Transitional Arrangements......................................................................89

Part VII: Structure and Institutions...............................................................................91

Article 33: Energy Charter Protocols and Declarations..........................................91

Article 34: Energy Charter Conference ....................................................................92

Article 35: Secretariat...............................................................................................96

Article 36: Voting .....................................................................................................96

Article 37: Funding Principles..................................................................................98

Part VIII: Final Provisions ...........................................................................................98

Article 38: Signature ...............................................................................................98

Article 39: Ratification, Acceptance or Approval....................................................98

Article 40: Application to Territories........................................................................99

Article 41: Accession ...............................................................................................99

Article 42: Amendments.........................................................................................100

Article 43: Association Agreements........................................................................100

Article 44: Entry into Force....................................................................................100

Article 45: Provisional Application ........................................................................101

Article 46: Reservations .........................................................................................103

Article 47: Withdrawal ...........................................................................................103

Article 48: Status of Annexes and Decisions .........................................................104

Article 49: Depositary ............................................................................................104

Article 50: Authentic Texts .....................................................................................104

**ANNEXES TO THE ENERGY CHARTER TREATY** ......................................................105

1.  Annex EM I: Energy Materials and Products .........................................................105

2.  Annex EM II: Energy Materials and Products ........................................................107

3.  Annex EQ I: List of Energy-Related Equipment ....................................................107

4.  Annex EQ II: List of Energy-Related Equipment ...................................................123

5.  Annex NI: Non-Applicable Energy Materials and Products for Definitions of
    "Economic Activity in the Energy Sector" ...............................................................123

6.  Annex TRM: Notification and Phase-Out (TRIMs)................................................124

7.  Annex N: List of Contracting Parties Requiring at least 3 Separate Areas
    to be Involved in a Transit ..........................................................................................126

8.  Annex VC: List of Contracting Parties which Have Made Voluntary Binding
    Commitments in respect of Article 10(3) ................................................................126

9.  Annex ID: List of Contracting Parties Not Allowing an Investor to Resubmit
    the Same Dispute to International Arbitration at a Later Stage under Article 26 .........126

10. Annex IA: List of Contracting Parties Not Allowing an Investor or Contracting
    Party to Submit a Dispute concerning the Last Sentence of Article 10(1) to
    International Arbitration..............................................................................................127

11. Annex P: Special Sub-National Dispute Procedure.................................................127

12. Annex W: Exceptions and Rules Governing the Application of the Provisions
    of the WTO Agreement..............................................................................................129

13. Annex TFU: Provisions regarding Trade Agreements between States which Were
    Constituent Parts of the Former Union of Soviet Socialist Republics...............................145

14. Annex BR: List of Contracting Parties which Shall Not Increase any Customs Duty
    or Other Charge above the Level Resulting from their Commitments or any
    Provisions Applicable to Them under the WTO Agreement ................................145

15. Annex BRQ: List of Contracting Parties which Shall Not Increase any Customs Duty
    or Other Charge above the Level Resulting from their Commitments or any
    Provisions Applicable to Them under the WTO Agreement ................................146

16. Annex D: Interim Provisions for Trade Dispute Settlement ................................146

17. Annex B: Formula for Allocating Charter Costs .....................................................155

18. Annex PA: List of Signatories which Do Not Accept the Provisional Application
    Obligation of Article 45(3)(B) ...................................................................................155

19. Annex T: Contracting Parties' Transitional Measures...........................................155

**ENERGY CHARTER PROTOCOL ON ENERGY EFFICIENCY AND RELATED
ENVIRONMENTAL ASPECTS**...........................................................................................156

PREAMBLE..........................................................................................................................156

Part I: Introduction ...........................................................................................................157

    Article 1: Scope and Objectives of the Protocol ....................................................157

    Article 2: Definitions ..................................................................................................157

Part II: Policy Principles....................................................................................................158

    Article 3: Basic Principles .........................................................................................158

Article 4: Division of Responsibility and Coordination .......................................................160

Article 5: Strategies and Policy Aims ..........................................................................................160

Article 6: Financing and Financial Incentives ..........................................................................160

Article 7: Promotion of Energy Efficient Technology ............................................................160

Article 8: Domestic Programmes.................................................................................................161

Part III: International Cooperation ................................................................................................162

Article 9: Areas of Cooperation...................................................................................................162

Part IV: Administrative and Legal Arrangements ....................................................................162

Article 10: Role of the Charter Conference ..............................................................................162

Article 11: Secretariat and Financing ........................................................................................162

Article 12: Voting ............................................................................................................................162

Article 13: Relation to the Energy Charter Treaty ..................................................................163

Part V: Final Provisons ....................................................................................................................164

Article 14: Signature.......................................................................................................................164

Article 15: Ratification, Acceptance or Approval ....................................................................164

Article 16: Accession ......................................................................................................................164

Article 17: Amendments ...............................................................................................................164

Article 18: Entry into Force ...........................................................................................................165

Article 19: Reservations.................................................................................................................165

Article 20: Withdrawal...................................................................................................................165

Article 21: Depositary ....................................................................................................................166

Article 22: Authentic Texts ...........................................................................................................166

Annex: Illustrative and Non-Exhaustive List of Possible Areas of Cooperation
pursuant to Article 9........................................................................................................................166

**DECISIONS OF THE ENERGY CHARTER CONFERENCE[2]**

---

2    Editor's note: Decisions adopted by the Energy Charter Conference (CCDECs) are
     published at http://www.energycharter.org/.

## EXPLANATORY NOTE

This publication reproduces:

- The Concluding Document of the Ministerial Conference on the International Energy Charter, as adopted in The Hague on 20 May 2015,

- The Concluding Document of the Hague Conference on the European Energy Charter, as signed at The Hague on 17 December 1991,

- The consolidated version of the Energy Charter Treaty based on the following texts (as contained in copies certified by the Depositary):

    Final Act of the European Energy Charter Conference, as opened for signature in Lisbon on 17 December 1994 and corrected by the Protocol of Correction of 2 August 1996,

    The Chairman's Statement at Adoption Session on 17 December 1994, as reported in the Note from the Secretariat 42/94 CONF 115,

    The Joint Memorandum of the Delegations of the Russian Federation and the European Communities on Nuclear Trade, as reported in the Note from the Secretariat 42/94 CONF 115,

    The exchange of letters between the European Communities and the Russian Federation on Decision No 3 of the Energy Charter Treaty,

    The Final Act of the International Conference and Decision by the Energy Charter Conference in respect of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty, as adopted on 24 April 1998,

    The Chairman's Statement at the Adoption Session on 24 April 1998, as reported in the Note from the Secretariat CS (98) 338 CC 124,

    The Chairman's Conclusion on Implementation of Trade-Related Rules, as reported in the Note from the Secretariat CS (98) 338 CC 124,

    Decisions with respect to the Energy Charter Treaty,

    Decisions in connection with the adoption of the Amendment to the Trade-related Provisions of the Energy Charter Treaty,

    Conference Decision CCDEC 2013 (17) TTG, of 6 December 2013, on technical changes to Annexes EM I, NI and EQ I.

- And the Energy Charter Protocol on Energy Efficiency and Related Environmental Aspects.

This publication has been produced for documentary purposes and does not involve any responsibility of the Energy Charter Conference and the Energy Charter Secretariat.[3]

---

3    Scanned copies of authenticated texts: http://www.energycharter.org/.

## CONCLUDING DOCUMENT OF THE MINISTERIAL ("THE HAGUE II") CONFERENCE ON THE INTERNATIONAL ENERGY CHARTER

The Ministerial ("The Hague II") Conference on the International Energy Charter was held in The Hague on 20th and 21st May 2015 to adopt the International Energy Charter as an update of the European Energy Charter. At that Conference, the high representatives of the signatories of the European Energy Charter of 1991, as well as non-signatories of the European Energy Charter of 1991, signed or expressed their consent to the International Energy Charter. The signatories of the International Energy Charter who signed it or expressed their consent at the Conference, or will do so after are hereinafter referred to as the "signatories".[4]

---

4    Actual signatories: http://www.energycharter.org/.

## INTERNATIONAL ENERGY CHARTER

The representatives of the signatories meeting in The Hague on 20th and 21st May 2015;

Desirous to better reflect the new realities of the energy sector, especially the growing weight from developing countries, including emerging economies, and to serve the interests of the existing and potential participants of the Energy Charter constituency;

Having regard to the European Energy Charter adopted in the Concluding Document of the Hague Conference on the European Energy Charter signed at The Hague on 17 December 1991 signature of which allows states and Regional Economic Integration Organisations to accede to the Energy Charter Treaty of 1994 and which will continue to exist for this purpose;

Recalling the Decision adopted by the Energy Charter Conference in its 23rd Meeting in Warsaw in 2012 to engage in a process that could lead to the adoption of an updated version of the European Energy Charter;

Aware that the concept of the International Energy Charter aims at enhancing international cooperation in order to meet common challenges related to energy at national, regional and international levels, including the evolution of global energy architecture;

Recalling the objectives of the International Energy Charter:

- to support the Charter's policy of Consolidation, Expansion and Outreach with the aim to facilitate the expansion of the geographical scope of the Energy Charter Treaty and Process;

- to engage in a structured dialogue with non-signatories of the European Energy Charter in order to promote the principles of the Charter and its framework for cooperation on the global scale;

- to modernise the European Energy Charter as the basic political declaration of the Energy Charter Process;

- to support active observership in the Energy Charter Conference, aiming at close political cooperation and early accession of observer countries to the Energy Charter Treaty;

Whereas the International Energy Charter is a declaration of political intention aiming at strengthening the energy cooperation between the signatories and does not bear any legally binding obligation;

Having regard to the principles of the UN Charter and to the outcome documents of various energy-related regional and international conferences and other events as well as initiatives listed in the Annex to this declaration;

Recognising the sovereignty of each State over its energy resources, and its rights to regulate energy transmission and transportation within its territory respecting all its relevant international obligations;

Recognising the global challenge posed by the trilemma between energy security, economic development and environmental protection, and efforts by all countries to achieve sustainable development;

Recognising the importance of energy security of energy producing, transit and consuming countries, regardless of their state of economic development, as well as access to modern energy services, which needs to be based on environmentally sound, socially acceptable and economically viable policies, with emphasis on mutual responsibilities and benefits;

Anxious to give a new impulse to the desire for enhanced regional and global cooperation based on mutual respect and confidence;

Resolved to promote long-term energy cooperation at regional and global levels within the framework of a market economy and based on mutual assistance and the principle of non discrimination, being understood as most-favoured nation treatment as a minimum standard;

Aware that account must be taken of the problems of construction and restructuring faced by a considerable number of countries, and that it is desirable for the signatories to participate in joint efforts aimed at facilitating and promoting market-oriented reforms and modernisation of energy sectors in these countries;

Certain that taking advantage of the complementary features of energy sectors in the markets represented by the signatories will benefit the world economy;

Acknowledging that enhanced energy trade is a powerful catalyst for strengthening regional and international cooperation in energy security and for sustainable use of energy among all stakeholders, including energy producing, transit and consuming countries;

Persuaded that broader energy cooperation among signatories is essential for economic progress and more generally for social development, energy poverty alleviation, and a better quality of life;

Convinced of the signatories' common interest in problems of energy security, safety of industrial plants, including nuclear facilities, and environmental protection;

Willing to do more to attain the objectives of energy security and efficient management and use of resources, and to utilise fully the potential for environmental improvement, in moving towards sustainable development;

Willing to develop cooperation with regional and international organisations for sharing experience and specific examples from national practice in the area of sustainable development, access to modern energy services, energy poverty reduction, green economy, clean energy, energy efficiency, as well as development, introduction and broader use of new clean technologies;

Convinced of the essential importance of efficient energy systems in the production, conversion, transport, distribution and use of energy for energy security and for the protection of the environment;

Convinced that investing in energy efficiency and renewable energies can enhance energy security and contribute to sustainable economic growth;

Encouraging synergies among energy-related multilateral fora;

Aware of the obligations under major relevant multilateral agreements, of the wide range of international energy cooperation, and of the extensive activities by existing international organisations in the energy field and willing to take full advantage of the expertise of these organisations in furthering the objectives of this Charter;

Recognising the role of entrepreneurs, operating within a transparent and equitable legal framework, in promoting cooperation under this Charter;

Determined to promote closer, mutually beneficial commercial relations and investments in the energy field;

Affirming the importance of freedom of movement of energy products, and of developing an efficient international energy infrastructure in order to facilitate the development of stable and transparent trade in energy;

Aware of the need to promote technical and technological cooperation among signatories;

Affirming that the energy policies of signatories are linked by common interests of all countries and that they should be implemented, including by taking the consequent action and applying the principles set out below;

**HAVE ADOPTED THE FOLLOWING**

## Title I: Objectives

The signatories are desirous of sustainable energy development, improving energy security and maximising the efficiency of production, conversion, transport, distribution and use of energy, to enhance safety in a manner which would be socially acceptable, economically viable, and environmentally sound.

Recognising the sovereignty of each State over its energy resources, and its rights to regulate energy transmission and transportation within its territory respecting all its relevant international obligations, and in a spirit of political and economic cooperation, they decide to promote the development of efficient, stable and transparent energy markets at regional and global levels based on the principle of non-discrimination and market-oriented price formation, taking into account environmental concerns and the role of energy in each country's national development.

They are determined to create a climate favourable to the operation of enterprises and to the flow of investments and technologies to achieve the above objectives.

To this end, and in line with these principles, they will take action in the following fields:

1.  Development of trade in energy consistent with major relevant multilateral agreements such as the WTO Agreement and its related instruments, where applicable, and nuclear non-proliferation obligations and undertakings, which will be achieved by means of:

    •   an open and competitive market for energy products, materials, equipment and services;

    •   access to energy resources, and exploration and development thereof on a commercial basis;

    •   access to national, regional and international markets;

- providing transparency for all segments of international energy markets (production/export, transit, consumption/import);

- removal of technical, administrative and other barriers to trade in energy and associated equipment, technologies and energy-related services;

- promoting the compatibility of national and regional energy systems and to create a common energy space;

- promotion of the harmonisation of rules, regulations and standards in the field of energy;

- promoting the realisation of infrastructure projects important for providing global and regional energy security;

- modernisation, renewal and rationalisation by industry of services and installations for the production, conversion, transport, distribution and use of energy;

- promoting the development and interconnection of energy transport infrastructure and the regional integration of energy markets;

- promoting best possible access to capital, particularly through appropriate existing financial institutions;

- facilitating access to transport infrastructure, for international transit purposes in line with the objectives of this Charter;

- access on commercial terms to technologies for the exploration, development, conversion and use of energy resources;

2. Cooperation in the energy field, which will entail:

- coordination of energy policies, as necessary for promoting the objectives of this Charter;

- exchange of information and experiences relevant for this Charter;

- enhancing capacity building of the countries involved;

- mutual access to technical and economic data, consistent with proprietary rights;

- formulation of stable and transparent legal frameworks creating conditions for the development of energy resources in the context of sustainable development;

**14**

- coordination and, where appropriate, harmonisation of safety principles and guidelines for energy products and their transport, as well as for energy installations, at a high level;

- facilitating the exchange of technology information and know-how in the energy and environment fields, including training activities;

- research, technological development, demonstration projects and their commercialisation;

- creating a favourable environment for investments, including joint venture investments, for design, construction and operation of energy installations.

3. Energy efficiency and environmental protection, which will imply:

- creating mechanisms and conditions for using energy as economically and efficiently as possible, including, as appropriate, regulatory and market based instruments;

- encouraging the clean and efficient use of fossil fuels;

- promotion of a sustainable energy mix designed to minimise negative environmental consequences in a cost-effective way through:

  i. market-oriented energy prices which more fully reflect environmental costs and benefits;

  ii. efficient and coordinated policy measures related to energy;

  iii. use of renewable energy sources and clean technologies, including clean fossil fuel technologies;

- achieving and maintaining a high level of nuclear safety and ensuring effective cooperation in this field;

- promotion of cooperation to reduce, as much as possible, gas flaring and venting;

- sharing of best practices on clean energy development and investment;

- promotion and use of low emission technologies.

### Title II: Implementation

In order to attain the objectives set out above, the signatories will, without prejudice to the sovereignty of each State over its energy resources, and its rights to regulate energy transmission and transportation within its territory respecting all its relevant international obligations, take coordinated action to achieve greater coherence of energy policies, which should be based on the principle of non discrimination and on market-oriented price formation, taking due account of environmental concerns.

They underline that practical steps to define energy policies are necessary in order to intensify cooperation in this sector and further stress the importance of regular exchanges of views on action taken, taking full advantage of the experience of existing international organisations and institutions in this field.

The signatories recognise that commercial forms of cooperation may need to be complemented by intergovernmental cooperation, particularly in the area of energy policy formulation and analysis, as well as in areas which are essential and not suitable to private capital funding.

They decide to pursue the objectives of this Charter by strengthening and integrating regional energy markets and enhancing the efficient functioning of the global energy market by joint or coordinated action under this Charter in the following fields:

- access to and development of energy sources;

- access to energy markets;

- liberalisation of trade in energy;

- promotion and protection of investments in all energy sectors;

- safety principles and guidelines;

- research, technological development technology transfer, innovation and dissemination;

- energy efficiency, environmental protection and sustainable and clean energy;

- access to sustainable energy;

- education and training;

- diversification of energy sources and routes.

In implementing this joint or coordinated action, they decide to foster private initiative, to make full use of the potential of enterprises, institutions and all available financial sources, and to facilitate cooperation including through technical cooperation, between such enterprises or institutions from different countries, acting on the basis of market principles.

The signatories will ensure that the international rules on the protection of industrial, commercial and intellectual property are respected.

1.    Access to and development of energy sources

Considering that efficient development of energy resources is a sine qua non for attaining the objectives of this Charter, the signatories decide to facilitate access to and development of resources by the interested operators. To this end, they will ensure that relevant rules are publicly available and transparent in consistence with domestic legislation and international obligations; they recognise the need to formulate such rules wherever this has not yet been done, and to take all necessary measures to coordinate their actions in this area. Development of energy resources should take place in economic and environmentally sound conditions.

With a view to facilitating the development and diversification of resources, the signatories decide to avoid imposing discriminatory rules on operators, notably rules governing the ownership of resources, internal operation of companies and taxation.

2.    Access to markets

The signatories will strongly promote access to national, regional and international markets for energy products for the implementation of the objectives of this Charter. Such access to markets should take account of the need to facilitate the operation of market forces, and promote competition.

3.    Liberalisation of trade in energy

In order to develop and diversify trade in energy, the signatories decide progressively to remove the barriers to such trade with each other in energy products, equipment and services in a manner consistent with the provisions of the WTO Agreement and its related instruments, where applicable, and nuclear non-proliferation obligations and undertakings.

They will work together in view of the further development of market-oriented energy prices.

The signatories recognise that transit of energy products through their territories is essential for the liberalisation of trade in energy products. Transit should take place in economic and environmentally and commercially sound conditions.

They stress the importance of the development of international energy transmission networks and their interconnection, including cross-border oil and gas networks and power grids. They recognise the need to intensify efforts to coordinate among themselves, and to encourage cooperation among relevant entities in view of their development, the compatibility of technical specifications governing the installation, and the operation of such networks.

4.    Promotion and protection of investments

In order to promote the international flow of investments, the signatories will make every effort to remove all barriers to investment in the energy sector and provide, at national level, for a stable, transparent legal framework for foreign investments, in conformity with the relevant international laws and rules on investment and trade.

They affirm that it is important for the signatory States to enter into bilateral and/or multilateral agreements on promotion and protection of investments which ensure a high level of legal security and enable the use of investment risk guarantee schemes.

The signatories affirm the importance of full access to adequate dispute settlement mechanisms, including national mechanisms and international arbitration in accordance with national laws and regulations, including investment and arbitration laws and rules, all the relevant bilateral and multilateral treaties and international agreements.

Moreover, the signatories recognise the right to repatriate profits or other payments relating to an investment and to obtain or use the convertible currency needed.

They also recognise the importance of the avoidance of double taxation to foster private investment.

5.    Safety principles and guidelines

Consistent with relevant major multilateral agreements, the signatories will:

- cooperate to implement safety principles and guidelines, designed to achieve and/or maintain high levels of safety standards and the protection of health and the environment;

**18**

- develop such common safety principles and guidelines as are appropriate and/or concur on the mutual recognition of their safety principles and guidelines.

6. Research, technological development technology transfer, innovation and dissemination

The signatories decide to promote exchanges of technology and cooperation on their technological development and innovation activities in the fields of energy production, conversion, transport, distribution and the efficient and clean use of energy, in a manner consistent with nuclear non-proliferation obligations and undertakings.

To this end, they will encourage cooperative efforts on:

- research and development activities;

- pilot or demonstration projects;

- the application of technological innovations;

- the dissemination and exchange of know-how and information on technologies.

7. Energy efficiency, environmental protection and sustainable and clean energy

The signatories confirm that cooperation is necessary in the field of efficient use of energy, development of renewable energy sources and energy-related environmental protection.

This should include:

- ensuring, in a cost-effective manner, consistency between relevant energy policies and environmental agreements and conventions;

- ensuring market-oriented price formation, including a fuller reflection of environmental costs and benefits;

- the use of transparent and equitable market-based instruments designed to achieve energy objectives and reduce environmental problems;

- the creation of framework conditions for the exchange of know-how regarding environmentally sound energy technologies, renewable energy sources and efficient use of energy;

- the creation of framework conditions for profitable investment in energy efficiency and environmental friendly energy projects.

**19**

8.    Access to sustainable energy

The signatories underline the importance of access to sustainable, modern, affordable, and cleaner energy, in particular in developing countries, which may contribute to energy poverty alleviation.

To this end, the signatories confirm that they will make efforts to strengthen their cooperation and to support initiatives and partnerships at international level which are conducive to these goals.

9.    Education and training

The signatories, recognising industry's role in promoting vocational education and training in the energy field, decide to cooperate in such activities, including:

- professional education;
- occupational training;
- public information in the energy efficiency and renewable energy field.

10.    Diversification of energy sources and supply routes

The signatories confirm that in order to enhance energy security, energy generation from a diverse set of sources and diversification of supply routes is of significant importance.

## Title III: Specific Agreements

The signatories decide to pursue the objectives and principles of this Charter and implement and broaden their cooperation, including in the following areas:

- horizontal and organisational issues;
- energy efficiency, including environmental protection;
- prospecting, production, transportation and use of oil and oil products and modernisation of refineries;
- prospecting, production and use of natural gas, interconnection of gas networks and transmission via high-pressure gas pipelines;
- all aspects of the nuclear fuel cycle including improvements in safety in that sector;

- modernisation of power stations, interconnection of power networks and transmission of electricity via high-voltage power lines;

- development of integrated regional energy markets;

- all aspects of the coal cycle, including clean coal technologies;

- development of renewable energy sources;

- access to sustainable energy;

- transfers of technology and encouragement of innovation;

- cooperation in dealing with the effects of major accidents, or of other events in the energy sector with transfrontier consequences.

### Title IV: Final Provisions

The original of this Charter will be transmitted to the Government of the Netherlands which will retain it in its archives. Each of the signatories will receive from the government of the Netherlands a true copy of the Charter.

The signatories request the Government of the Netherlands to transmit the text of the International Energy Charter, as adopted during the High Level Conference on the 20th and 21st May in The Hague, along with a note verbal to the Secretary General of the United Nations for his/her information and circulation among all UN Member States. The text of the International Energy Charter will be officially translated in Arabic, Chinese, French, German, Italian, Russian, and Spanish languages and distributed.

Done at The Hague on the 20th of May 2015.

## ANNEX: OUTCOME DOCUMENTS OF ENERGY-RELATED REGIONAL AND INTERNATIONAL CONFERENCES AND OTHER EVENTS AS WELL AS INITIATIVES REFERRED TO ON PAGE 2[5]

- The Energy Charter Protocol on Energy Efficiency and Related Environmental Aspects which entered into force on 16 April 1998 establishing an international framework encouraging cooperation in the field of energy efficiency in a way compatible with sustainable development;

- The Plan of Implementation of the World Summit on Sustainable Development adopted in Johannesburg on 4 September 2002, calling for enhancing international and regional cooperation to improve access to reliable, affordable, economically viable, socially acceptable and environmentally sound energy services, as an integral part of poverty reduction programmes, by facilitating the creation of enabling environments and addressing capacity-building needs, with special attention to rural and isolated areas, as appropriate;

- The declaration "Global Energy Security" of the Summit of the G8 in St. Petersburg on 16 July 2006 where the G8 Leaders expressed their support for the principles of the Energy Charter and the efforts of participating countries to improve international energy cooperation;

- The "Riyadh Declaration" of the Third OPEC Summit of 18 November 2007 in which the heads of State and Government underscored the interrelationships between global security of energy supply and security and predictability of demand. They also expressed their decision to strengthen and broaden the dialogue between energy producers and consumers through the relevant/competent international and regional fora, for the benefit of all;

- The Statute of the International Renewable Energy Agency (IRENA), signed at the Conference on the Establishment of the IRENA in Bonn on 26 January 2009, in which the parties express their desire to promote the increased adoption of renewable energy with a view to sustainable development and their firm belief in the vast opportunities offered by renewable energy for addressing and gradually alleviating problems of energy security and volatile energy prices;

---

5    Editor's note: Page 2 in this title refers to the document of the International Energy Charter, which corresponds to page 11 of the present document (see paragraph 2 of page 11).

- The Joint Statement by the G8 Energy Ministers Meeting in Rome on 25 May 2009, where the G8 Energy Ministers, the European Commissioner for Energy, and the Energy Ministers of Algeria, Australia, Brazil, China, Egypt, India, Indonesia, Korea, Libya, Mexico, Nigeria asked the Energy Charter Secretariat and International Financial Institutions to prepare a strategy for the development of energy networks and corridors assuring transit towards the integration of national energy markets in Africa, while identifying financing mechanisms;

- The Rome Statement adopted by the Energy Charter Conference on 9 December 2009 to address global energy challenges in the framework of the modernisation of the Energy Charter Process;

- The Agreements of the United Nations Climate Change Conference reached in Cancun on 11 December 2010, in which the international community agreed on a set of significant decisions to address the long-term challenge of climate change collectively and comprehensively and that the parties should take urgent action to meet this long-term goal with a view to reducing global greenhouse gas emissions so as to hold the increase in global average temperature below 2°C above pre-industrial levels;

- The International Energy Forum Charter approved and signed at the IEF Ministerial Meeting held in Riyadh on 22 February 2011 demonstrating a reinforced political commitment to an open global energy dialogue among the energy consuming and energy producing members of the IEF, including transit States, in order to ensure global energy security;

- The objectives under the global "Sustainable Energy for All" (SE4All) initiative of the UN of September 2011 and the "2014-2024 World Decade for Sustainable Energy" aiming to achieve universal energy access, improve energy efficiency and increase the use of renewable energy;

- The objectives under the "EU-Africa Energy Partnership";

- The Doha Declaration adopted at the First Summit of the Gas Exporting Countries Forum on 15 November 2011, which called for promotion and development of new and effective channels of dialogue between natural gas producers and consumers, through international and regional energy organisations and for a, for the purpose of ensuring technology transfer, market transparency, stability, and growth for the benefit of all.

- The conclusions of the Council of the European Union of 24 November 2011 on strengthening the external dimension of the EU energy policy

where EU called for a need of geographical enlargement of Energy Charter Treaty which will aim at strengthening the role of the Treaty as a global instrument, recognised as the basis for international energy regulation in its main fields of competence;

- The Outcome Document entitled 'The Future We Want' which was endorsed by the UN Conference on Sustainable Development of 22 June 2012 and was annexed in the UN General Assembly Resolution 66/288, which recognised the critical role that energy plays in the development process, as access to sustainable modern energy services contributes to poverty eradication, saves lives, improves health and helps provide basic human needs;

- "The St. Petersburg Resolution" of the 2012 APEC Energy Ministerial Meeting on 24-25 June 2012, in which APEC Energy Ministers recognise that enhancing energy security requires concerted action in many areas and commit to continue their efforts to improve the sustainability, efficiency, predictability and transparency of traditional energy markets;

- The OSCE Parliamentary Assembly Resolution "Promotion and use of new and renewable sources of energy" adopted at the 21st OSCE PA Annual Session in Monaco on 9 July 2012, stressing the crucial role of energy security in the new security environment and the imperative need for fairness and transparency, in accordance with international law and the European Energy Charter;

- The Final Document of the 16th Summit of Heads of State or Government of Non Aligned Movement, which took place on 26-31 August 2012 in Teheran, in which the Heads of State or Government stressed the importance of enhancing international Cooperation through partnership in all forms of energy including clean and renewable Energy. They called upon the developed countries to transfer more efficient and environmentally sound technologies to developing countries, and for the United Nations to promote and facilitate this;

- The Concluding Declaration of the Rabat Energy Forum of 21 September 2012 in which the Energy Charter was recognised as an efficient instrument to contribute and strengthen energy cooperation in the MENA region;

- UN General Assembly Resolution 67/263 "Reliable and stable transit of energy and its role in ensuring sustainable development and international cooperation" adopted on 17 May 2013, noting that

stable, efficient and reliable energy transportation, as a key factor of sustainable development, is in the interest of the entire international community, and welcoming the efforts at the national, bilateral, sub-regional, regional and international levels in building energy transportation systems and facilitating the trade of energy resources to promote sustainable development;

- The Ministerial declaration on regional cooperation for enhanced energy security and the sustainable use of energy in Asia and the Pacific adopted on the Asian and Pacific Energy Forum in Vladivostok, Russian Federation, on 30 May 2013 where energy security is recognised as a key development issue for all countries in the Asia-Pacific region and the crucial importance of energy as a prerequisite to poverty eradication and ensuring economic growth is stressed;

- The Leaders' Declaration of the Summit of the G20 in St. Petersburg on 5-6 September 2013 expressing their commitment to enhance energy cooperation, to make energy market data more accurate and available and to take steps to support the development of cleaner and more efficient energy technologies to enhance the efficiency of markets and shift towards a more sustainable energy future.

## CONCLUDING DOCUMENT OF THE HAGUE CONFERENCE ON THE EUROPEAN ENERGY CHARTER

The representatives of Albania, Armenia, Australia, Austria, Azerbaijan, Belgium, Belorussia, Bulgaria, Canada, Cyprus, Czechoslovakia, Denmark, Estonia, The European Communities, Finland, France, Georgia, Germany, Greece, Hungary, Iceland, The Interstate Economic Committee, Ireland, Italy, Japan, Kazakhstan, Kyrgyzstan, Latvia, Liechtenstein, Lithuania, Luxembourg, Malta, Moldova, The Netherlands, Norway, Poland, Portugal, Romania, The Russian Federation, Spain, Sweden, Switzerland, Tadjikistan,[6] Turkey, Turkmenistan, Ukraine, The United Kingdom of Great Britain and Northern Ireland, The Unites States of America, Uzbekistan, Yugoslavia convened in the Hague, The Netherlands, from 16 to 17 December 1991 in order to adopt the European Energy Charter.[7]

The Conference was opened and closed by the Minister of Economic Affairs of The Netherlands.

Her Majesty, Queen Beatrix of The Netherlands, attended the opening of the Conference.

The Prime Minister of The Netherlands and the Commissioner for Energy of the European Commission addressed the Conference.

During the Conference, contributions were received and statements made by delegates of the signatories.

Determined to give full effect to the results of the Conference, the representatives of the signatories adopted the following text for the European Energy Charter:

---

6    Editor's note: Spelling as in authenticated version.
7    Actual signatories: http://www.energycharter.org/.

### EUROPEAN ENERGY CHARTER

The representatives of the signatories meeting in The Hague on 16 and 17 December 1991,

Having regard to the Charter of Paris for a New Europe, signed in Paris on 21 November 1990 at the summit meeting of the Conference on Security and Co-operation in Europe (CSCE);

Having regard to the document adopted in Bonn on 11 April 1990 by the CSCE Conference on Economic Co-operation in Europe;

Having regard to the declaration of the London Economic Summit adopted on 17 July 1991;

Having regard to the report on the conclusions and recommendations of the CSCE meeting in Sofia on 3 November 1989, on the protection of the environment, as well as its follow-up;

Having regard to the Agreement establishing the European Bank for Reconstruction and Development signed in Paris on 29 May 1990;

Anxious to give formal expression to this new desire for a European-wide and global cooperation based on mutual respect and confidence;

Resolved to promote a new model for energy cooperation in the long term in Europe and globally within the framework of a market economy and based on mutual assistance and the principle of non-discrimination;

Aware that account must be taken of the problems of reconstruction and restructuring in the countries of Central and Eastern Europe and in the USSR and that it is desirable for the signatories to participate in joint efforts aimed at facilitating and promoting market-oriented reforms and modernisation of energy sectors in these countries;

Certain that taking advantage of the complementary features of energy sectors within Europe will benefit the world economy; persuaded that broader energy cooperation among signatories is essential for economic progress and more generally for social development and a better quality of life;

Convinced of the signatories' common interest in problems of energy supply, safety of industrial plants, particularly nuclear facilities, and environmental protection;

European Energy Charter

**27**

Willing to do more to attain the objectives of security of supply and efficient management and use of resources, and to utilise fully the potential for environmental improvement, in moving towards sustainable development;

Convinced of the essential importance of efficient energy systems in the production, conversion, transport, distribution and use of energy for security of supply and for the protection of the environment;

Recognising State sovereignty and sovereign rights over energy resources;

Assured of support from the European Community, particularly through completion of its internal energy market;

Aware of the obligations under major relevant multilateral agreements, of the wide range of international energy cooperation, and of the extensive activities by existing international organisations in the energy field and willing to take full advantage of the expertise of these organisations in furthering the objectives of the Charter;

Recognising the role of entrepreneurs, operating within a transparent and equitable legal framework, in promoting cooperation under the Charter;

Determined to establish closer, mutually beneficial commercial relations and promote energy investments;

Convinced of the importance of promoting free movement of energy products and of developing an efficient international energy infrastructure in order to facilitate the development of market-based trade in energy;

Aware of the need to promote technological cooperation among signatories;

Affirming that the energy policies of signatories are linked by interests common to all their countries and that they should be implemented in accordance with the principles set out below:

Affirming, finally, their desire to take the consequent action and apply the principles set out below:

**HAVE ADOPTED THE FOLLOWING DECLARATION CONSTITUTING THE "EUROPEAN ENERGY CHARTER"**

## Title I: Objectives

The signatories are desirous of improving security of energy supply and of maximising the efficiency of production, conversion, transport, distribution and use of energy, to enhance safety and to minimise environmental problems, on an acceptable economic basis.

Within the framework of State sovereignty and sovereign rights over energy resources and in a spirit of political and economic cooperation, they undertake to promote the development of an efficient energy market throughout Europe, and a better functioning global market, in both cases based on the principle of non-discrimination and on market-oriented price formation, taking due account of environmental concerns. They are determined to create a climate favourable to the operation of enterprises and to the flow of investments and technologies by implementing market principles in the field of energy.

To this end, and in accordance with these principles, they will take action in the following fields:

1.  Development of trade in energy consistent with major relevant multilateral agreements such as GATT, its related instruments, and nuclear non-proliferation obligations and undertakings, which will be achieved by means of:

    -   an open and competitive market for energy products, materials, equipment and services;

    -   access to energy resources, and exploration and development thereof on a commercial basis;

    -   access to local and international markets;

    -   removal of technical, administrative and other barriers to trade in energy and associated equipment, technologies and energy-related services;

    -   modernisation, renewal and rationalisation by industry of services and installations for the production, conversion, transport, distribution and use of energy;

    -   promoting the development and interconnection of energy transport infrastructure;

    -   promoting best possible access to capital, particularly through appropriate existing financial institutions;

**European Energy Charter**

- facilitating access to transport infrastructure, for international transit purposes in accordance with the objectives of the Charter expressed in the first paragraph of this Title;

- access on commercial terms to technologies for the exploration, development and use of energy resources;

2. Cooperation in the energy field, which will entail:

- coordination of energy policies, as necessary for promoting the objectives of the Charter;

- mutual access to technical and economic data, consistent with proprietary rights;

- formulation of stable and transparent legal frameworks creating conditions for the development of energy resources;

- coordination and, where appropriate, harmonisation of safety principles and guidelines for energy products and their transport, as well as for energy installations, at a high level;

- facilitating the exchange of technology information and know-how in the energy and environment fields, including training activities;

- research, technological development and demonstration projects.

3. Energy efficiency and environmental protection, which will imply:

- creating mechanisms and conditions for using energy as economically and efficiently as possible, including, as appropriate, regulatory and market-based instruments;

- promotion of an energy mix designed to minimise negative environmental consequences in a cost-effective way through:

    (i) market-oriented energy prices which more fully reflect environmental costs and benefits;

    (ii) efficient and coordinated policy measures related to energy;

    (iii) use of new and renewable energies and clean technologies;

- achieving and maintaining a high level of nuclear safety and ensuring effective cooperation in this field.

30

## Title II: Implementation

In order to attain the objectives set out above, the signatories will, within the framework of State sovereignty and sovereign rights over energy resources, take coordinated action to achieve greater coherence of energy policies, which should be based on the principle of non-discrimination and on market-oriented price formation, taking due account of environmental concerns.

They underline that practical steps to define energy policies are necessary in order to intensify cooperation in this sector and further stress the importance of regular exchanges of views on action taken, taking full advantage of the experience of existing international organisations and institutions in this field.

The signatories recognise that commercial forms of cooperation may need to be complemented by intergovernmental cooperation, particularly in the area of energy policy formulation and analysis as well as in areas which are essential and not suitable to private capital funding.

They undertake to pursue the objectives of creating a broader European energy market and enhancing the efficient functioning of the global energy market by joint or coordinated action under the Charter in the following fields:

- access to and development of energy resources;
- access to markets;
- liberalisation of trade in energy;
- promotion and protection of investments;
- safety principles and guidelines;
- research, technological development, innovation and dissemination;
- energy efficiency and environmental protection;
- education and training.

In implementing this joint or coordinated action, they undertake to foster private initiative, to make full use of the potential of enterprises, institutions and all available financial sources, and to facilitate cooperation between such enterprises or institutions from different countries, acting on the basis of market principles.

The signatories will ensure that the international rules on the protection of industrial, commercial and intellectual property are respected.

European Energy Charter

1. Access to and development of energy resources

Considering that efficient development of energy resources is a sine qua non for attaining the objectives of the Charter, the signatories undertake to facilitate access to and development of resources by the interested operators.

To this end, they will ensure that rules on the exploration, development and acquisition of resources are publicly available and transparent; they recognise the need to formulate such rules wherever this has not yet been done and to take all necessary measures to coordinate their actions in this area.

With a view to facilitating the development and diversification of resources, the signatories undertake to avoid imposing discriminatory rules on operators, notably rules governing the ownership of resources, internal operation of companies and taxation.

2. Access to Markets

The signatories will strongly promote access to local and international markets for energy products for the implementation of the objectives of the Charter. Such access to markets should take account of the need to facilitate the operation of market forces, and promote competition.

3. Liberalisation of trade in energy

In order to develop and diversify trade in energy, the signatories undertake progressively to remove the barriers to such trade with each other in energy products, equipment and services in a manner consistent with the provisions of GATT, its related instruments, and nuclear non-proliferation obligations and undertakings.

The signatories recognise that transit of energy products through their territories is essential for the liberalisation of trade in energy products. Transit should take place in economic and environmentally sound conditions.

They stress the importance of the development of commercial international energy transmission networks and their interconnection, with particular reference to electricity and natural gas and with recognition of the relevance of long-term commercial commitments. To this end, they will ensure the compatibility of technical specifications governing

the installation and operation of such networks, notably as regards the stability of electricity systems.

4.    Promotion and protection of investments

In order to promote the international flow of investments, the signatories will at national level provide for a stable, transparent legal framework for foreign investments, in conformity with the relevant international laws and rules on investment and trade.

They affirm that it is important for the signatory States to negotiate and ratify legally binding agreements on promotion and protection of investments which ensure a high level of legal security and enable the use of investment risk guarantee schemes.

Moreover, the signatories will guarantee the right to repatriate profits or other payments relating to an investment and to obtain or use the convertible currency needed.

They also recognise the importance of the avoidance of double taxation to foster private investment.

5.    Safety principles and guidelines

Consistent with relevant major multilateral agreements, the signatories will:

-       implement safety principles and guidelines, designed to achieve and/or maintain high levels of safety, in particular nuclear safety and the protection of health and the environment;

-       develop such common safety principles and guidelines as are appropriate and/or agree to the mutual recognition of their safety principles and guidelines.

6.    Research, technological development, innovation and dissemination

The signatories undertake to promote exchanges of technology and Cooperation on their technological development and innovation activities in the fields of energy production, conversion, transport, distribution and the efficient and clean use of energy, in a manner consistent with nuclear non-proliferation obligations and undertakings.

To this end, they will encourage cooperative efforts on:

-       research and development activities;

**European Energy Charter**

-        pilot or demonstration projects;

-        the application of technological innovations;

-        the dissemination and exchange of know-how and information on technologies.

7.    Energy efficiency and environmental protection

The signatories agree that cooperation is necessary in the field of efficient use of energy and energy-related environmental protection.

This should include:

-        ensuring, in a cost-effective manner, consistency between relevant energy policies and environmental agreements and conventions;

-        ensuring market-oriented price formation, including a fuller reflection of environmental costs and benefits;

-        the use of transparent and equitable market-based instruments designed to achieve energy objectives and reduce environmental problems;

-        the creation of framework conditions for the exchange of know-how regarding environmentally sound energy technologies and efficient use of energy;

-        the creation of framework conditions for profitable investment in energy efficiency projects.

8.    Education and training

The signatories, recognising industry's role in promoting vocational education and training in the energy field, undertake to cooperate in such activities, including:

-        professional education;

-        occupational training;

-        public information in the energy efficiency field.

### Title III: Specific Agreements

The signatories undertake to pursue the objectives and principles of the Charter and implement and broaden their cooperation as soon as possible by negotiating in good faith a Basic Agreement and Protocols.

**34**

Areas of cooperation could include:

- horizontal and organisational issues;

- energy efficiency, including environmental protection;

- prospecting, production, transportation and use of oil and oil products and modernisation of refineries;

- prospecting, production and use of natural gas, interconnection of gas networks and transmission via high-pressure gas pipelines;

- all aspects of the nuclear fuel cycle including improvements in safety in that sector;

- modernisation of power stations, interconnection of power networks and transmission of electricity via high-voltage power lines;

- all aspects of the coal cycle, including clean coal technologies;

- development of renewable energy sources;

- transfers of technology and encouragement of innovation;

- cooperation in dealing with the effects of major accidents, or of other events in the energy sector with transfrontier consequences.

The signatories will, in exceptional cases, consider transitional arrangements. They, in particular, take into account the specific circumstances facing some states of Central and Eastern Europe and the USSR as well as their need to adapt their economies to the market system, and accept the possibility of a stage-by-stage transition in those countries for the implementation of those particular provisions of the Charter, Basic Agreement and related Protocols that they are, for objective reasons, unable to implement immediately and in full.

Specific arrangements for coming into full compliance with Charter provisions as elaborated in the Basic Agreement and Protocols will be negotiated by each Party requesting transitional status, and progress towards full compliance will be subject to periodic review.

**Title IV: Final Provisions**

The signatories request the Government of The Netherlands, President-in-office of the Council of the European Communities, to transmit to the Secretary General of the United Nations the text of the European Energy Charter which is not eligible for registration under Article 102 of the Charter of the United Nations.

European Energy Charter

In adopting the European Energy Charter Ministers or their representatives record that the following understanding has been reached:

The representatives of the Signatories understand that in the context of the European Energy Charter, the principle of non-discrimination means Most-Favoured-Nation Treatment as a minimum standard. National Treatment may be agreed to in provisions of the Basic Agreement and/or Protocols.

The original of this Concluding Document, drawn up in English, French, German, Italian, Russian and Spanish texts, will be transmitted to the Government of the Kingdom of The Netherlands, which will retain it in its archives. Each of the Signatories will receive from the Government of the Kingdom of The Netherlands a true copy of the Concluding Document.

Done at The Hague on the seventeenth day of December in the year one thousand nine hundred and ninety-one.

36

## THE ENERGY CHARTER TREATY

(Annex 1 to the Final Act of the European Energy Charter Conference)

[UNDERSTANDING            With respect to the Treaty as a whole

(a)    The representatives underline that the provisions of the Treaty have been agreed upon bearing in mind the specific nature of the Treaty aiming at a legal framework to promote long-term cooperation in a particular sector and as a result cannot be construed to constitute a precedent in the context of other international negotiations.

(b)    The provisions of the Treaty do not:

    (i)    oblige any Contracting Party to introduce mandatory third party access; or

    (ii)   prevent the use of pricing systems which, within a particular category of consumers, apply identical prices to customers in different locations.

(c)    Derogations from most favoured nation treatment are not intended to cover measures which are specific to an Investor or group of Investors, rather than applying generally.][8]

[DECISION            With respect to the Treaty as a whole

In the event of a conflict between the treaty concerning Spitsbergen of 9 February 1920 (the Svalbard Treaty) and the Energy Charter Treaty, the treaty concerning Spitsbergen shall prevail to the extent of the conflict, without prejudice to the positions of the Contracting Parties in respect of the Svalbard Treaty. In the event of such conflict or a dispute as to whether there is such conflict or as to its extent, Article 16 and Part V of the Energy Charter Treaty shall not apply.][9]

### PREAMBLE

The Contracting Parties to this Treaty,

Having regard to the Charter of Paris for a New Europe signed on 21 November 1990;

Having regard to the European Energy Charter adopted in the Concluding Document of the Hague Conference on the European Energy Charter signed at The Hague on 17 December 1991;

---

8    Final Act of the European Energy Charter Conference, Understanding 1.
9    Decision 1 with respect to the Energy Charter Treaty (Annex 2 to the Final Act of the European Energy Charter Conference).

Recalling that all signatories to the Concluding Document of the Hague Conference undertook to pursue the objectives and principles of the European Energy Charter and implement and broaden their cooperation as soon as possible by negotiating in good faith an Energy Charter Treaty and Protocols, and desiring to place the commitments contained in that Charter on a secure and binding international legal basis;

Desiring also to establish the structural framework required to implement the principles enunciated in the European Energy Charter;

Wishing to implement the basic concept of the European Energy Charter initiative which is to catalyse economic growth by means of measures to liberalise investment and trade in energy;

Affirming that Contracting Parties attach the utmost importance to the effective implementation of full national treatment and most favoured nation treatment, and that these commitments will be applied to the Making of Investments pursuant to a supplementary treaty;

Having regard to the objective of progressive liberalisation of international trade and to the principle of avoidance of discrimination in international trade as enunciated in the Agreement Establishing the World Trade Organization[10] and as otherwise provided for in this Treaty;

Determined progressively to remove technical, administrative and other barriers to trade in Energy Materials and Products and Energy-Related Equipment,[11] technologies and services;

Looking to the eventual membership in the World Trade Organization[12] of those Contracting Parties which are not currently members thereof[13] and concerned to provide interim trade arrangements which will assist those Contracting Parties and not impede their preparation for such membership;

Mindful of the rights and obligations of certain Contracting Parties which are also members of the World Trade Organization;[14]

---

10   Modification based on Art. 2 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.
11   Id.
12   Id.
13   Id.
14   Id.

Having regard to competition rules concerning mergers, monopolies, anti-competitive practices and abuse of dominant position;

Having regard also to the Treaty on the Non-Proliferation of Nuclear Weapons, the Nuclear Suppliers Guidelines and other international nuclear non-proliferation obligations or understandings;

Recognising the necessity for the most efficient exploration, production, conversion, storage, transport, distribution and use of energy;

Recalling the United Nations Framework Convention on Climate Change, the Convention on Long-Range Transboundary Air Pollution and its protocols, and other international environmental agreements with energy-related aspects; and

Recognising the increasingly urgent need for measures to protect the environment, including the decommissioning of energy installations and waste disposal, and for internationally-agreed objectives and criteria for these purposes,

**HAVE AGREED AS FOLLOWS:**

## Part I: Definitions and Purpose

### Article 1: Definitions

As used in this Treaty:

(1)    "Charter" means the European Energy Charter adopted in the Concluding Document of the Hague Conference on the European Energy Charter signed at The Hague on 17 December 1991; signature of the Concluding Document is considered to be signature of the Charter.

(2)    "Contracting Party" means a state or Regional Economic Integration Organisation which has consented to be bound by this Treaty and for which the Treaty is in force.

(3)    "Regional Economic Integration Organisation" means an organisation constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters.

(4)    "Energy Materials and Products", based on the Harmonised System of the World Customs Organization and the Combined Nomenclature of

the European Communities, means the items included in Annexes EM I or EM II.[15]

(4[bis]) "Energy-Related Equipment", based on the Harmonised System of the World Customs Organization, means the items included in Annexes EQ I or EQ II.[16]

(5) "Economic Activity in the Energy Sector" means an economic activity concerning the exploration, extraction, refining, production, storage, land transport, transmission, distribution, trade, marketing, or sale of Energy Materials and Products except those included in Annex NI, or concerning the distribution of heat to multiple premises.

*[UNDERSTANDING        With respect to Article 1(5)*

*(a)    It is understood that the Treaty confers no rights to engage in economic activities other than Economic Activities in the Energy Sector.*

*(b)    The following activities are illustrative of Economic Activity in the Energy Sector:*

*(i)    prospecting and exploration for, and extraction of, e.g., oil, gas, coal and uranium;*

*(ii)    construction and operation of power generation facilities, including those powered by wind and other renewable energy sources;*

*(iii)    land transportation, distribution, storage and supply of Energy Materials and Products, e.g., by way of transmission and distribution grids and pipelines or dedicated rail lines, and construction of facilities for such, including the laying of oil, gas, and coal-slurry pipelines;*

*(iv)    removal and disposal of wastes from energy related facilities such as power stations, including radioactive wastes from nuclear power stations;*

*(v)    decommissioning of energy related facilities, including oil rigs, oil refineries and power generating plants;*

*(vi)    marketing and sale of, and trade in Energy Materials and Products, e.g., retail sales of gasoline; and*

*(vii)    research, consulting, planning, management and design activities related to the activities mentioned above, including those aimed at Improving Energy Efficiency.]*[17]

---

15    Modification based on Art. 2 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

16    Id.

17    Final Act of the European Energy Charter Conference, Understanding 2.

(6)  "Investment" means every kind of asset, owned or controlled directly or indirectly by an Investor and includes:

(a)  tangible and intangible, and movable and immovable, property, and any property rights such as leases, mortgages, liens, and pledges;

(b)  a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;

(c)  claims to money and claims to performance pursuant to contract having an economic value and associated with an Investment;

(d)  Intellectual Property;

(e)  Returns;

(f)  any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector.

A change in the form in which assets are invested does not affect their character as investments and the term "Investment" includes all investments, whether existing at or made after the later of the date of entry into force of this Treaty for the Contracting Party of the Investor making the investment and that for the Contracting Party in the Area of which the investment is made (hereinafter referred to as the "Effective Date") provided that the Treaty shall only apply to matters affecting such investments after the Effective Date.

"Investment" refers to any investment associated with an Economic Activity in the Energy Sector and to investments or classes of investments designated by a Contracting Party in its Area as "Charter efficiency projects" and so notified to the Secretariat.

*[UNDERSTANDING        With respect to Article 1(6)*

*For greater clarity as to whether an Investment made in the Area of one Contracting Party is controlled, directly or indirectly, by an Investor of any other Contracting Party, control of an Investment means control in fact, determined after an examination of the actual circumstances in each situation. In any such examination, all relevant factors should be considered, including the Investor's*

*(a)  financial interest, including equity interest, in the Investment;*

**Energy Charter Treaty**

**41**

(b)    *ability to exercise substantial influence over the management and operation of the Investment; and*

(c)    *ability to exercise substantial influence over the selection of members of the board of directors or any other managing body.*

*Where there is doubt as to whether an Investor controls, directly or indirectly, an Investment, an Investor claiming such control has the burden of proof that such control exists.][18]*

*[DECLARATION            With respect to Article 1(6)*

*The Russian Federation wishes to have reconsidered, in negotiations with regard to the supplementary treaty referred to in Article 10(4), the question of the importance of national legislation with respect to the issue of control as expressed in the Understanding to Article 1(6).][19]*

(7)    "Investor" means:

    (a)    with respect to a Contracting Party:

        (i)    a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law;

        (ii)    a company or other organisation organised in accordance with the law applicable in that Contracting Party;

    (b)    with respect to a "third state", a natural person, company or other organisation which fulfils, *mutatis mutandis*, the conditions specified in subparagraph (a) for a Contracting Party.

(8)    "Make Investments" or "Making of Investments" means establishing new Investments, acquiring all or part of existing Investments or moving into different fields of Investment activity.

*[UNDERSTANDING            With respect to Article 1(8)*

*Consistent with Australia's foreign investment policy, the establishment of a new mining or raw materials processing project in Australia with total investment of $A 10 million or more by a foreign interest, even where that foreign interest is already operating a similar business in Australia, is considered as the making of a new investment.][20]*

---

18    Final Act of the European Energy Charter Conference, Understanding 3.

19    Id, Declaration 1.

20    Id, Understanding 4.

(9)  "Returns" means the amounts derived from or associated with an Investment, irrespective of the form in which they are paid, including profits, dividends, interest, capital gains, royalty payments, management, technical assistance or other fees and payments in kind.

(10)  "Area" means with respect to a state that is a Contracting Party:

(a)  the territory under its sovereignty, it being understood that territory includes land, internal waters and the territorial sea; and

(b)  subject to and in accordance with the international law of the sea: the sea, sea-bed and its subsoil with regard to which that Contracting Party exercises sovereign rights and jurisdiction.

With respect to a Regional Economic Integration Organisation which is a Contracting Party, Area means the Areas of the member states of such Organisation, under the provisions contained in the agreement establishing that Organisation.

(11)  (a)  "WTO" means the World Trade Organization established by the Agreement Establishing the World Trade Organization.[21]

(b)  "WTO Agreement" means the Agreement Establishing the World Trade Organization, its Annexes and the decisions, declarations and understandings related thereto, as subsequently rectified, amended and modified from time to time.[22]

(c)  "GATT 1994" means the General Agreement on Tariffs and Trade as specified in Annex 1A to the Agreement Establishing the World Trade Organization, as subsequently rectified, amended or modified from time to time.[23]

(12)  "Intellectual Property" includes copyrights and related rights, trademarks, geographical indications, industrial designs, patents, layout designs of integrated circuits and the protection of undisclosed information.

*[UNDERSTANDING        With respect to Article 1(12)*

*The representatives recognise the necessity for adequate and effective protection of Intellectual Property rights according to the highest internationally-accepted standards.][24]*

---

21  Modification based on Art. 2 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

22  Id.

23  Id.

24  Final Act of the European Energy Charter Conference, Understanding 5.

(13)   (a)   "Energy Charter Protocol" or "Protocol" means a treaty, the negotiation of which is authorised and the text of which is adopted by the Charter Conference, which is entered into by two or more Contracting Parties in order to complement, supplement, extend or amplify the provisions of this Treaty with respect to any specific sector or category of activity within the scope of this Treaty, or to areas of cooperation pursuant to Title III of the Charter.

(b)   "Energy Charter Declaration" or "Declaration" means a non-binding instrument, the negotiation of which is authorised and the text of which is approved by the Charter Conference, which is entered into by two or more Contracting Parties to complement or supplement the provisions of this Treaty.

(14)   "Freely Convertible Currency" means a currency which is widely traded in international foreign exchange markets and widely used in international transactions.

## Article 2: Purpose of the Treaty

This Treaty establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter.

## Part II: Commerce

## Article 3: International Markets

The Contracting Parties shall work to promote access to international markets on commercial terms, and generally to develop an open and competitive market, for Energy Materials and Products and Energy-Related Equipment.[25]

## Article 4: Non-Derogation from WTO Agreement[26]

Nothing in this Treaty shall derogate, as between particular Contracting Parties which are members of the WTO,[27] from the provisions of the WTO Agreement[28] as they are applied between those Contracting Parties.

---

25   Modification based on Art. 2 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

26   Id.

27   Id.

28   Id.

**44**

## Article 5: Trade-Related Investment Measures[29]

*[DECLARATION          With respect to Articles 5 and 10(11)*

*Australia notes that the provisions of Articles 5 and 10(11) do not diminish its rights and obligations under the GATT, including as elaborated in the Uruguay Round Agreement on Trade-Related Investment Measures, particularly with respect to the list of exceptions in Article 5(3), which it considers incomplete.*

*Australia further notes that it would not be appropriate for dispute settlement bodies established under the Treaty to give interpretations of GATT articles III and XI in the context of disputes between parties to the GATT or between an Investor of a party to the GATT and another party to the GATT. It considers that with respect to the application of Article 10(11) between an Investor and a party to the GATT, the only issue that can be considered under Article 26 is the issue of the awards of arbitration in the event that a GATT panel or the WTO dispute settlement body first establishes that a trade-related investment measure maintained by the Contracting Party is inconsistent with its obligations under the GATT or the Agreement on Trade-Related Investment Measures.][30]*

(1)     A Contracting Party shall not apply any trade-related investment measure that is inconsistent with the provisions of article III or XI of the GATT 1994;[31] this shall be without prejudice to the Contracting Party's rights and obligations under the WTO Agreement[32] and Article 29.

*[UNDERSTANDING          With respect to Article 5(1)*

*The representatives' agreement to Article 5 is not meant to imply any position on whether or to what extent the provisions of the "Agreement on Trade-Related Investment Measures" annexed to the Final Act of the Uruguay Round of Multilateral Trade Negotiations are implicit in articles III and XI of the GATT.][33]*

(2)     Such measures include any investment measure which is mandatory or enforceable under domestic law or under any administrative ruling, or compliance with which is necessary to obtain an advantage, and which requires:

Energy Charter Treaty

---

29    See also Article 28 and Annex D.
30    Final Act of the European Energy Charter Conference, Declaration 2.
31    Modification based on Art. 2 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.
32    Id.
33    Final Act of the European Energy Charter Conference, Understanding 6.

(a)    the purchase or use by an enterprise of products of domestic origin or from any domestic source, whether specified in terms of particular products, in terms of volume or value of products, or in terms of a proportion of volume or value of its local production; or

(b)    that an enterprise's purchase or use of imported products be limited to an amount related to the volume or value of local products that it exports;

or which restricts:

(c)    the importation by an enterprise of products used in or related to its local production, generally or to an amount related to the volume or value of local production that it exports;

(d)    the importation by an enterprise of products used in or related to its local production by restricting its access to foreign exchange to an amount related to the foreign exchange inflows attributable to the enterprise; or

(e)    the exportation or sale for export by an enterprise of products, whether specified in terms of particular products, in terms of volume or value of products, or in terms of a proportion of volume or value of its local production.

(3)    Nothing in paragraph (1) shall be construed to prevent a Contracting Party from applying the trade-related investment measures described in subparagraphs (2)(a) and (c) as a condition of eligibility for export promotion, foreign aid, government procurement or preferential tariff or quota programmes.

(4)    Notwithstanding paragraph (1), a Contracting Party may temporarily continue to maintain trade-related investment measures which were in effect more than 180 days before its signature of this Treaty, subject to the notification and phase-out provisions set out in Annex TRM.

## Article 6: Competition

*[UNDERSTANDING        With respect to Article 6*

*(a)    The unilateral and concerted anti-competitive conduct referred to in Article 6(2) are to be defined by each Contracting Party in accordance with its laws and may include exploitative abuses.*

*b)    "Enforcement" and "enforces" include action under the competition laws of a Contracting Party by way of investigation, legal proceeding, or administrative*

*action as well as by way of any decision or further law granting or continuing an authorisation.]*[34]

(1)    Each Contracting Party shall work to alleviate market distortions and barriers to competition in Economic Activity in the Energy Sector.

(2)    Each Contracting Party shall ensure that within its jurisdiction it has and enforces such laws as are necessary and appropriate to address unilateral and concerted anti-competitive conduct in Economic Activity in the Energy Sector.

(3)    Contracting Parties with experience in applying competition rules shall give full consideration to providing, upon request and within available resources, technical assistance on the development and implementation of competition rules to other Contracting Parties.

(4)    Contracting Parties may cooperate in the enforcement of their competition rules by consulting and exchanging information.

(5)    If a Contracting Party considers that any specified anti-competitive conduct carried out within the Area of another Contracting Party is adversely affecting an important interest relevant to the purposes identified in this Article, the Contracting Party may notify the other Contracting Party and may request that its competition authorities initiate appropriate enforcement action. The notifying Contracting Party shall include in such notification sufficient information to permit the notified Contracting Party to identify the anti-competitive conduct that is the subject of the notification and shall include an offer of such further information and cooperation as the notifying Contracting Party is able to provide. The notified Contracting Party or, as the case may be, the relevant competition authorities may consult with the competition authorities of the notifying Contracting Party and shall accord full consideration to the request of the notifying Contracting Party in deciding whether or not to initiate enforcement action with respect to the alleged anti-competitive conduct identified in the notification. The notified Contracting Party shall inform the notifying Contracting Party of its decision or the decision of the relevant competition authorities and may if it wishes inform the notifying Contracting Party of the grounds for the decision. If enforcement action is initiated, the notified Contracting Party shall advise the notifying Contracting Party of its outcome and, to the extent possible, of any significant interim development.

Energy Charter Treaty

---

34    Final Act of the European Energy Charter Conference, Understanding 7.

(6)    Nothing in this Article shall require the provision of information by a Contracting Party contrary to its laws regarding disclosure of information, confidentiality or business secrecy.

(7)    The procedures set forth in paragraph (5) and Article 27(1) shall be the exclusive means within this Treaty of resolving any disputes that may arise over the implementation or interpretation of this Article.

## Article 7: Transit

*[DECLARATION          With respect to Article 7*

*The European Communities and their Member States and Austria, Norway, Sweden and Finland declare that the provisions of Article 7 are subject to the conventional rules of international law on jurisdiction over submarine cables and pipelines or, where there are no such rules, to general international law.*

*They further declare that Article 7 is not intended to affect the interpretation of existing international law on jurisdiction over submarine cables and pipelines, and cannot be considered as doing so.][35]*

(1)    Each Contracting Party shall take the necessary measures to facilitate the Transit of Energy Materials and Products consistent with the principle of freedom of transit and without distinction as to the origin, destination or ownership of such Energy Materials and Products or discrimination as to pricing on the basis of such distinctions, and without imposing any unreasonable delays, restrictions or charges.

(2)    Contracting Parties shall encourage relevant entities to cooperate in:

(a)    modernising Energy Transport Facilities necessary to the Transit of Energy Materials and Products;

(b)    the development and operation of Energy Transport Facilities serving the Areas of more than one Contracting Party;

(c)    measures to mitigate the effects of interruptions in the supply of Energy Materials and Products;

(d)    facilitating the interconnection of Energy Transport Facilities.

(3)    Each Contracting Party undertakes that its provisions relating to transport of Energy Materials and Products and the use of Energy Transport Facilities shall treat Energy Materials and Products in Transit in no less favourable a

---

35    Final Act of the European Energy Charter Conference, Declaration 3.

manner than its provisions treat such materials and products originating in or destined for its own Area, unless an existing international agreement provides otherwise.

(4)   In the event that Transit of Energy Materials and Products cannot be achieved on commercial terms by means of Energy Transport Facilities the Contracting Parties shall not place obstacles in the way of new capacity being established, except as may be otherwise provided in applicable legislation which is consistent with paragraph (1).

*[UNDERSTANDING          With respect to Article 7(4)*

*The applicable legislation would include provisions on environmental protection, land use, safety, or technical standards.][36]*

(5)   A Contracting Party through whose Area Energy Materials and Products may transit shall not be obliged to

(a)    permit the construction or modification of Energy Transport Facilities; or

(b)    permit new or additional Transit through existing Energy Transport Facilities,

which it demonstrates to the other Contracting Parties concerned would endanger the security or efficiency of its energy systems, including the security of supply.

Contracting Parties shall, subject to paragraphs (6) and (7), secure established flows of Energy Materials and Products to, from or between the Areas of other Contracting Parties.

(6)   A Contracting Party through whose Area Energy Materials and Products transit shall not, in the event of a dispute over any matter arising from that Transit, interrupt or reduce, permit any entity subject to its control to interrupt or reduce, or require any entity subject to its jurisdiction to interrupt or reduce the existing flow of Energy Materials and Products prior to the conclusion of the dispute resolution procedures set out in paragraph (7), except where this is specifically provided for in a contract or other agreement governing such Transit or permitted in accordance with the conciliator's decision.

Energy Charter Treaty

---

36    Final Act of the European Energy Charter Conference, Understanding 8.

(7)     The following provisions shall apply to a dispute described in paragraph (6), but only following the exhaustion of all relevant contractual or other dispute resolution remedies previously agreed between the Contracting Parties party to the dispute or between any entity referred to in paragraph (6) and an entity of another Contracting Party party to the dispute:

(a)     A Contracting Party party to the dispute may refer it to the Secretary General by a notification summarising the matters in dispute. The Secretary General shall notify all Contracting Parties of any such referral.

(b)     Within 30 days of receipt of such a notification, the Secretary General, in consultation with the parties to the dispute and the other Contracting Parties concerned, shall appoint a conciliator. Such a conciliator shall have experience in the matters subject to dispute and shall not be a national or citizen of or permanently resident in a party to the dispute or one of the other Contracting Parties concerned.

(c)     The conciliator shall seek the agreement of the parties to the dispute to a resolution thereof or upon a procedure to achieve such resolution. If within 90 days of his appointment he has failed to secure such agreement, he shall recommend a resolution to the dispute or a procedure to achieve such resolution and shall decide the interim tariffs and other terms and conditions to be observed for Transit from a date which he shall specify until the dispute is resolved.

(d)     The Contracting Parties undertake to observe and ensure that the entities under their control or jurisdiction observe any interim decision under subparagraph (c) on tariffs, terms and conditions for 12 months following the conciliator's decision or until resolution of the dispute, whichever is earlier.

(e)     Notwithstanding subparagraph (b) the Secretary General may elect not to appoint a conciliator if in his judgement the dispute concerns Transit that is or has been the subject of the dispute resolution procedures set out in subparagraphs (a) to (d) and those proceedings have not resulted in a resolution of the dispute.

(f)     The Charter Conference shall adopt standard provisions concerning the conduct of conciliation and the compensation of conciliators.

**50**

(8)   Nothing in this Article shall derogate from a Contracting Party's rights and obligations under international law including customary international law, existing bilateral or multilateral agreements, including rules concerning submarine cables and pipelines.

(9)   This Article shall not be so interpreted as to oblige any Contracting Party which does not have a certain type of Energy Transport Facilities used for Transit to take any measure under this Article with respect to that type of Energy Transport Facilities. Such a Contracting Party is, however, obliged to comply with paragraph (4).

(10)  For the purposes of this Article:

   (a)   "Transit" means

      (i)   the carriage through the Area of a Contracting Party, or to or from port facilities in its Area for loading or unloading, of Energy Materials and Products originating in the Area of another state and destined for the Area of a third state, so long as either the other state or the third state is a Contracting Party; or

      (ii)  the carriage through the Area of a Contracting Party of Energy Materials and Products originating in the Area of another Contracting Party and destined for the Area of that other Contracting Party, unless the two Contracting Parties concerned decide otherwise and record their decision by a joint entry in Annex N. The two Contracting Parties may delete their listing in Annex N by delivering a joint written notification of their intentions to the Secretariat, which shall transmit that notification to all other Contracting Parties. The deletion shall take effect four weeks after such former notification.

   (b)   "Energy Transport Facilities" consist of high-pressure gas transmission pipelines, high-voltage electricity transmission grids and lines, crude oil transmission pipelines, coal slurry pipelines, oil product pipelines, and other fixed facilities specifically for handling Energy Materials and Products.

### Article 8: Transfer of Technology

(1)   The Contracting Parties agree to promote access to and transfer of energy technology on a commercial and non-discriminatory basis to assist effective trade in Energy Materials and Products and Investment

and to implement the objectives of the Charter subject to their laws and regulations, and to the protection of Intellectual Property rights.

(2)   Accordingly, to the extent necessary to give effect to paragraph (1) the Contracting Parties shall eliminate existing and create no new obstacles to the transfer of technology in the field of Energy Materials and Products and related equipment and services, subject to non-proliferation and other international obligations.

### Article 9: Access to Capital

*[UNDERSTANDING          With respect to Articles 9, 10 and Part V*

*As a Contracting Party's programmes which provide for public loans, grants, guarantees or insurance for facilitating trade or Investment abroad are not Connected with Investment or related activities of Investors from other Contracting Parties in its Area, such programmes may be subject to constraints with respect to participation in them.]*[37]

(1)   The Contracting Parties acknowledge the importance of open capital markets in encouraging the flow of capital to finance trade in Energy Materials and Products and for the making of and assisting with regard to Investments in Economic Activity in the Energy Sector in the Areas of other Contracting Parties, particularly those with economies in transition. Each Contracting Party shall accordingly endeavour to promote conditions for access to its capital market by companies and nationals of other Contracting Parties, for the purpose of financing trade in Energy Materials and Products and for the purpose of Investment in Economic Activity in the Energy Sector in the Areas of those other Contracting Parties, on a basis no less favourable than that which it accords in like circumstances to its own companies and nationals or companies and nationals of any other Contracting Party or any third state, whichever is the most favourable.

(2)   A Contracting Party may adopt and maintain programmes providing for access to public loans, grants, guarantees or insurance for facilitating trade or Investment abroad. It shall make such facilities available, consistent with the objectives, constraints and criteria of such programmes (including any objectives, constraints or criteria relating to the place of business of an applicant for any such facility or the place of delivery of goods or services supplied with the support of any such facility) for Investments in the Economic

---

37   Final Act of the European Energy Charter Conference, Understanding 9.

**52**

Activity in the Energy Sector of other Contracting Parties or for financing trade in Energy Materials and Products with other Contracting Parties.

(3)    Contracting Parties shall, in implementing programmes in Economic Activity in the Energy Sector to improve the economic stability and investment climates of the Contracting Parties, seek as appropriate to encourage the operations and take advantage of the expertise of relevant international financial institutions.

(4)    Nothing in this Article shall prevent:

(a)    financial institutions from applying their own lending or underwriting practices based on market principles and prudential considerations; or

(b)    a Contracting Party from taking measures:

(i)    for prudential reasons, including the protection of Investors, consumers, depositors, policy-holders or persons to whom a fiduciary duty is owed by a financial service supplier; or

(ii)    to ensure the integrity and stability of its financial system and capital markets.

## Part III: Investment Promotion and Protection

## Article 10: Promotion, Protection and Treatment of Investments

*[UNDERSTANDING        With respect to Articles 9, 10 and Part V*

*As a Contracting Party's programmes which provide for public loans, grants, guarantees or insurance for facilitating trade or Investment abroad are not connected with Investment or related activities of Investors from other Contracting Parties in its Area, such programmes may be subject to constraints with respect to participation in them.][38]*

*[DECLARATION        With respect to Article 10*

*Canada and the United States each affirm that they will apply the provisions of Article 10 in accordance with the following considerations:*

*For the purposes of assessing the treatment which must be accorded to Investors of other Contracting Parties and their Investments, the circumstances will need to be*

Energy Charter Treaty

---

38    Final Act of the European Energy Charter Conference, Understanding 9.

*considered on a case-by-case basis. A comparison between the treatment accorded to Investors of one Contracting Party, or the Investments of Investors of one Contracting Party, and the Investments or Investors of another Contracting Party, is only valid if it is made between Investors and Investments in similar circumstances. In determining whether differential treatment of Investors or Investments is consistent with Article 10, two basic factors must be taken into account.*

*The first factor is the policy objectives of Contracting Parties in various fields insofar as they are consistent with the principles of non-discrimination set out in Article 10. Legitimate policy objectives may justify differential treatment of foreign Investors or their Investments in order to reflect a dissimilarity of relevant circumstances between those Investors and Investments and their domestic counterparts. For example, the objective of ensuring the integrity of a country's financial system would justify reasonable prudential measures with respect to foreign Investors or Investments, where such measures would be unnecessary to ensure the attainment of the same objectives insofar as domestic Investors or Investments are concerned. Those foreign Investors or their Investments would thus not be "in similar circumstances" to domestic Investors or their Investments. Thus, even if such a measure accorded differential treatment, it would not be contrary to Article 10.*

*The second factor is the extent to which the measure is motivated by the fact that the relevant Investor or Investment is subject to foreign ownership or under foreign control. A measure aimed specifically at Investors because they are foreign, without sufficient countervailing policy reasons consistent with the preceding paragraph, would be contrary to the principles of Article 10. The foreign Investor or Investment would be "in similar circumstances" to domestic Investors and their Investments, and the measure would be contrary to Article 10.][39]*

(1)    Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. Each Contracting Party shall observe

---

39    Final Act of the European Energy Charter Conference, Declaration 4.

any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.[40]

*[UNDERSTANDING          With respect to Articles 26 and 27*

*The reference to treaty obligations in the penultimate sentence of Article 10(1) does not include decisions taken by international organisations, even if they are legally binding, or treaties which entered into force before 1 January 1970.][41]*

*[CHAIRMAN'S STATEMENT    I would like to note that the Russian Federation believes that the reference to international law in Article 10(1) is not intended to impose most favoured nation obligations with regard to Making of Investments. This is clearly in accordance with the intent of the negotiators who decided not to include in this first Treaty MFN obligations for the pre-investment stage.][42]*

(2)    Each Contracting Party shall endeavour to accord to Investors of other Contracting Parties, as regards the Making of Investments in its Area, the Treatment described in paragraph (3).

(3)    For the purposes of this Article, "Treatment" means treatment accorded by a Contracting Party which is no less favourable than that which it accords to its own Investors or to Investors of any other Contracting Party or any third state, whichever is the most favourable.

(4)    A supplementary treaty shall, subject to conditions to be laid down therein, oblige each party thereto to accord to Investors of other parties, as regards the Making of Investments in its Area, the Treatment described in paragraph (3). That treaty shall be open for signature by the states and Regional Economic Integration Organisations which have signed or acceded to this Treaty. Negotiations towards the supplementary treaty shall commence not later than 1 January 1995, with a view to concluding it by 1 January 1998.

*[UNDERSTANDING          With respect to Article 10(4)*

*The supplementary treaty will specify conditions for applying the Treatment described in Article 10(3). Those conditions will include, inter alia, provisions relating to the sale or other divestment of state assets (privatisation) and to the dismantling of monopolies (demonopolisation).*

---

40    See Article 26(3)(c), Article 27(2), and Annex IA.
41    Final Act of the European Energy Charter Conference, Understanding 17.
42    Chairman's Statement at Adoption Session on 17 December 1994.

**Energy Charter Treaty**

**55**

*UNDERSTANDING          With respect to Articles 10(4) and 29(6)*

*Contracting Parties may consider any connection between the provisions of Article 10(4) and Article 29(6).][43]*

*[DECLARATION          With respect to Article 1(6)*

*The Russian Federation wishes to have reconsidered, in negotiations with regard to the supplementary treaty referred to in Article 10(4), the question of the importance of national legislation with respect to the issue of control as expressed in the Understanding to Article 1(6).][44]*

*[CHAIRMAN'S STATEMENT   In addition, the Russian Federation has expressed the view that the consideration of appropriate amendments to the Treaty pursuant to Article 30 affecting sectors of services within the scope of this Treaty to which measures of the GATS apply, and the negotiations towards the supplementary investment treaty provided for in Article 10(4), should be conducted in such a manner as to assure mutual consistency of the Treaty provisions arrived at. Here again, I am sure that all delegations would fully endorse the need to achieve such consistency in the future incorporation in the Treaty of the results of the Uruguay Round, and in negotiation of the second Treaty for the pre-investment stage.][45]*

(5)  Each Contracting Party shall, as regards the Making of Investments in its Area, endeavour to:

    (a)  limit to the minimum the exceptions to the Treatment described in paragraph (3);

    (b)  progressively remove existing restrictions affecting Investors of other Contracting Parties.

(6)  (a)  A Contracting Party may, as regards the Making of Investments in its Area, at any time declare voluntarily to the Charter Conference, through the Secretariat, its intention not to introduce new exceptions to the Treatment described in paragraph (3).

    (b)  A Contracting Party may, furthermore, at any time make a voluntary commitment to accord to Investors of other Contracting Parties, as regards the Making of Investments in some or all Economic Activities in the Energy Sector in its Area, the Treatment described in paragraph (3). Such commitments shall be notified to the Secretariat and listed in Annex VC and shall be binding under this Treaty.

---

43   Final Act of the European Energy Charter Conference, Understanding 10 and 11.
44   Id, Declaration 1.
45   Chairman's Statement at Adoption Session on 17 December 1994.

(7)    Each Contracting Party shall accord to Investments in its Area of Investors of other Contracting Parties, and their related activities including management, maintenance, use, enjoyment or disposal, treatment no less favourable than that which it accords to Investments of its own Investors or of the Investors of any other Contracting Party or any third state and their related activities including management, maintenance, use, enjoyment or disposal, whichever is the most favourable.

*[DECISION                  With respect to Article 10(7)*

*The Russian Federation may require that companies with foreign participation obtain legislative approval for the leasing of federally-owned property, provided that the Russian Federation shall ensure without exception that this process is not applied in a manner which discriminates among Investments of Investors of other Contracting Parties.][46]*

(8)    The modalities of application of paragraph (7) in relation to programmes under which a Contracting Party provides grants or other financial assistance, or enters into contracts, for energy technology research and development, shall be reserved for the supplementary treaty described in paragraph (4). Each Contracting Party shall through the Secretariat keep the Charter Conference informed of the modalities it applies to the programmes described in this paragraph.

(9)    Each state or Regional Economic Integration Organisation which signs or accedes to this Treaty shall, on the date it signs the Treaty or deposits its instrument of accession, submit to the Secretariat a report summarising all laws, regulations or other measures relevant to:

(a)    exceptions to paragraph (2); or

(b)    the programmes referred to in paragraph (8).

A Contracting Party shall keep its report up to date by promptly submitting amendments to the Secretariat. The Charter Conference shall review these reports periodically.

In respect of subparagraph (a) the report may designate parts of the energy sector in which a Contracting Party accords to Investors of other Contracting Parties the Treatment described in paragraph (3).

Energy Charter Treaty

---

46   Decision 2 with respect to the Energy Charter Treaty (Annex 2 to the Final Act of the European Energy Charter Conference).

In respect of subparagraph (b) the review by the Charter Conference may consider the effects of such programmes on competition and Investments.

(10)    Notwithstanding any other provision of this Article, the treatment described in paragraphs (3) and (7) shall not apply to the protection of Intellectual Property; instead, the treatment shall be as specified in the corresponding provisions of the applicable international agreements for the protection of Intellectual Property rights to which the respective Contracting Parties are parties.

(11)    For the purposes of Article 26, the application by a Contracting Party of a trade-related investment measure as described in Article 5(1) and (2) to an Investment of an Investor of another Contracting Party existing at the time of such application shall, subject to Article 5(3) and (4), be considered a breach of an obligation of the former Contracting Party under this Part.

*[DECLARATION           With respect to Articles 5 and 10(11)*

*Australia notes that the provisions of Articles 5 and 10(11) do not diminish its rights and obligations under the GATT, including as elaborated in the Uruguay Round Agreement on Trade-Related Investment Measures, particularly with respect to the list of exceptions in Article 5(3), which it considers incomplete.*

*Australia further notes that it would not be appropriate for dispute settlement bodies established under the Treaty to give interpretations of GATT articles III and XI in the context of disputes between parties to the GATT or between an Investor of a party to the GATT and another party to the GATT. It considers that with respect to the application of Article 10(11) between an Investor and a party to the GATT, the only issue that can be considered under Article 26 is the issue of the awards of arbitration in the event that a GATT panel or the WTO dispute settlement body first establishes that a trade-related investment measure maintained by the Contracting Party is inconsistent with its obligations under the GATT or the Agreement on Trade-Related Investment Measures.][47]*

(12)    Each Contracting Party shall ensure that its domestic law provides effective means for the assertion of claims and the enforcement of rights with respect to Investments, investment agreements, and investment authorisations.

---

47    Final Act of the European Energy Charter Conference, Declaration 2.

## Article 11: Key Personnel

(1)    A Contracting Party shall, subject to its laws and regulations relating to the entry, stay and work of natural persons, examine in good faith requests by Investors of another Contracting Party, and key personnel who are employed by such Investors or by Investments of such Investors, to enter and remain temporarily in its Area to engage in activities connected with the making or the development, management, maintenance, use, enjoyment or disposal of relevant Investments, including the provision of advice or key technical services.

(2)    A Contracting Party shall permit Investors of another Contracting Party which have Investments in its Area, and Investments of such Investors, to employ any key person of the Investor's or the Investment's choice regardless of nationality and citizenship provided that such key person has been permitted to enter, stay and work in the Area of the former Contracting Party and that the employment concerned conforms to the terms, conditions and time limits of the permission granted to such key person.

## Article 12: Compensation for Losses

(1)    Except where Article 13 applies, an Investor of any Contracting Party which suffers a loss with respect to any Investment in the Area of another Contracting Party owing to war or other armed conflict, state of national emergency, civil disturbance, or other similar event in that Area, shall be accorded by the latter Contracting Party, as regards restitution, indemnification, compensation or other settlement, treatment which is the most favourable of that which that Contracting Party accords to any other Investor, whether its own Investor, the Investor of any other Contracting Party, or the Investor of any third state.

(2)    Without prejudice to paragraph (1), an Investor of a Contracting Party which, in any of the situations referred to in that paragraph, suffers a loss in the Area of another Contracting Party resulting from

(a)    requisitioning of its Investment or part thereof by the latter's forces or authorities; or

(b)    destruction of its Investment or part thereof by the latter's forces or authorities, which was not required by the necessity of the situation,

shall be accorded restitution or compensation which in either case shall be prompt, adequate and effective.

Energy Charter Treaty

## Article 13: Expropriation

(1)    Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalised, expropriated or subjected to a measure or measures having effect equivalent to nationalisation or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:

    (a)    for a purpose which is in the public interest;

    (b)    not discriminatory;

    (c)    carried out under due process of law; and

    (d)    accompanied by the payment of prompt, adequate and effective compensation.

Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the "Valuation Date").

Such fair market value shall at the request of the Investor be expressed in a Freely Convertible Currency on the basis of the market rate of exchange existing for that currency on the Valuation Date. Compensation shall also include interest at a commercial rate established on a market basis from the date of Expropriation until the date of payment.

(2)    The Investor affected shall have a right to prompt review, under the law of the Contracting Party making the Expropriation, by a judicial or other competent and independent authority of that Contracting Party, of its case, of the valuation of its Investment, and of the payment of compensation, in accordance with the principles set out in paragraph (1).

(3)    For the avoidance of doubt, Expropriation shall include situations where a Contracting Party expropriates the assets of a company or enterprise in its Area in which an Investor of any other Contracting Party has an Investment, including through the ownership of shares.

## Article 14: Transfers Related to Investments

*[DECISION                With respect to Article 14*

*(1)    The term "freedom of transfer" in Article 14(1) does not preclude a Contracting Party (hereinafter referred to as the "Limiting Party") from applying restrictions on movement of capital by its own Investors, provided that:*

(a)   such restrictions shall not impair the rights granted under Article 14(1) to Investors of other Contracting Parties with respect to their Investments;

(b)   such restrictions do not affect Current Transactions; and

(c)   the Contracting Party ensures that Investments in its Area of the Investors of all other Contracting Parties are accorded, with respect to transfers, treatment no less favourable than that which it accords to Investments of Investors of any other Contracting Party or of any third state, whichever is the most favourable.

(2)   This Decision shall be subject to examination by the Charter Conference five years after entry into force of the Treaty, but not later than the date envisaged in Article 32(3).

(3)   No Contracting Party shall be eligible to apply such restrictions unless it is a Contracting Party which is a state that was a constituent part of the former Union of Soviet Socialist Republics, which has notified the provisional Secretariat in writing no later than 1 July 1995 that it elects to be eligible to apply restrictions in accordance with this Decision.[48]

(4)   For the avoidance of doubt, nothing in this Decision shall derogate, as concerns Article 16, from the rights hereunder of a Contracting Party, its Investors or their Investments, or from the obligations of a Contracting Party.

(5)   For the purposes of this Decision:

"Current Transactions" are current payments connected with the movement of goods, services or persons that are made in accordance with normal international practice, and do not include arrangements which materially constitute a combination of a current payment and a capital transaction, such as deferrals of payments and advances which is meant to circumvent respective legislation of the Limiting Party in the field.][49]

[CHAIRMAN'S STATEMENT   Having followed the long and difficult discussions on the Freedom of Transfers, I note that certain countries in transition have drawn attention to their interpretation of Decision No 3 which I think to be correct: the rights granted to Investors of other Contracting Parties under paragraph 1(a) of Decision No 3 do not preclude these countries from applying, without derogating from paragraphs 1(b) and (c), (2), (3) and (4) of that Decision, restrictions on movement of capital made by their Investors.][50]

---

48   Editor's note: a notification of the Russian Federation has been received by the provisional Secretariat on 29 June 1995.

49   Decision 3 with respect to the Energy Charter Treaty (Annex 2 to the Final Act of the European Energy Charter Conference).

50   Chairman's Statement at Adoption Session on 17 December 1994.

*[Letter from the European Communities to Russia*

*The purpose of this letter is to confirm that with regard to Decision No 3 of the Energy Charter Treaty (ECT) concerning transfer of payments and especially to the footnote[51] to this Decision, Article 105 in our Partnership and Cooperation Agreement (PCA), signed at Corfu, 24 June 1994, shall not have the effect of disapplying Article 16 of the ECT in relation to Decision No 3.*

*I propose that this letter and your reply will establish a formal agreement between us.*

_____

*Letter from the Russian Federation*

*I took note of your letter of 17 December 1994, the purpose of which is the confirmation that with regard to Decision N° 3 of the Energy Charter Treaty (ECT) concerning transfer of payments, and especially to the footnote[52] to this Decision, Article 105 of the Agreement on Partnership and Cooperation establishing a partnership between the Russian Federation, of the one part, and the European Communities and their Member States, of the other part (PCA), signed at Corfu on 24 June 1994, shall not have the effect of disapplying Article 16 of the ECT in relation to Decision N° 3.*

*I agree that your letter and this reply will establish a formal agreement between us.][53]*

(1)    Each Contracting Party shall with respect to Investments in its Area of Investors of any other Contracting Party guarantee the freedom of transfer into and out of its Area, including the transfer of:

    (a)    the initial capital plus any additional capital for the maintenance and development of an Investment;

    (b)    Returns;

    (c)    payments under a contract, including amortisation of principal and accrued interest payments pursuant to a loan agreement;

    (d)    unspent earnings and other remuneration of personnel engaged from abroad in connection with that Investment;

_____

51    Editor's note: This footnote which was deleted from the final text reads: "This Decision has been drafted on the understanding that Contracting Parties which intend to avail themselves of it and which have also entered into Partnership and Cooperation Agreements with the European Union and its member states containing an article disapplying those Agreements in favour of this Treaty will exchange letters of understanding which have the legal effect of making Article 16 of this Treaty applicable between them in relation to this Decision. The exchange of letters shall be completed in good time prior to signature."

52    Id.

53    Exchange of Letters with the European Communities on Decision No 3 of the Energy Charter Treaty.

(e)     proceeds from the sale or liquidation of all or any part of an Investment;

(f)     payments arising out of the settlement of a dispute;

(g)     payments of compensation pursuant to Articles 12 and 13.

(2)     Transfers under paragraph (1) shall be effected without delay and (except in case of a Return in kind) in a Freely Convertible Currency.

*[DECISION                With respect to Article 14(2)][54]*

(3)     Transfers shall be made at the market rate of exchange existing on the date of transfer with respect to spot transactions in the currency to be transferred. In the absence of a market for foreign exchange, the rate to be used will be the most recent rate applied to inward investments or the most recent exchange rate for conversion of currencies into Special Drawing Rights, whichever is more favourable to the Investor.

(4)     Notwithstanding paragraphs (1) to (3), a Contracting Party may protect the rights of creditors, or ensure compliance with laws on the issuing, trading and dealing in securities and the satisfaction of judgements in civil, administrative and criminal adjudicatory proceedings, through the equitable, non-discriminatory, and good faith application of its laws and regulations.

(5)     Notwithstanding paragraph (2), Contracting Parties which are states that were constituent parts of the former Union of Soviet Socialist Republics may provide in agreements concluded between them that transfers of payments shall be made in the currencies of such Contracting Parties, provided that such agreements do not treat Investments in their Areas of Investors of other Contracting Parties less favourably than either Investments of Investors of the Contracting Parties which have entered into such agreements or Investments of Investors of any third state.

*[UNDERSTANDING        With respect to Article 14(5)*

*It is intended that a Contracting Party which enters into an agreement referred to in Article 14(5) ensure that the conditions of such an agreement are not in contradiction*

------

54    Decision 4 with respect to the Energy Charter Treaty (Annex 2 to the Final Act of the European Energy Charter Conference): http://www.energycharter.org/. Editor's note: The applicability of this Decision terminated since Romania introduced full convertibility of its currency.

*with that Contracting Party's obligations under the Articles of Agreement of the International Monetary Fund.][55]*

(6)     Notwithstanding subparagraph (1)(b), a Contracting Party may restrict the transfer of a Return in kind in circumstances where the Contracting Party is permitted under Article 29(2)(a) or the WTO Agreement[56] to restrict or prohibit the exportation or the sale for export of the product constituting the Return in kind; provided that a Contracting Party shall permit transfers of Returns in kind to be effected as authorised or specified in an investment agreement, investment authorisation, or other written agreement between the Contracting Party and either an Investor of another Contracting Party or its Investment.

### Article 15: Subrogation

(1)     If a Contracting Party or its designated agency (hereinafter referred to as the "Indemnifying Party") makes a payment under an indemnity or guarantee given in respect of an Investment of an Investor (hereinafter referred to as the "Party Indemnified") in the Area of another Contracting Party (hereinafter referred to as the "Host Party"), the Host Party shall recognise:

(a)     the assignment to the Indemnifying Party of all the rights and claims in respect of such Investment; and

(b)     the right of the Indemnifying Party to exercise all such rights and enforce such claims by virtue of subrogation.

(2)     The Indemnifying Party shall be entitled in all circumstances to:

(a)     the same treatment in respect of the rights and claims acquired by it by virtue of the assignment referred to in paragraph (1); and

(b)     the same payments due pursuant to those rights and claims,

as the Party Indemnified was entitled to receive by virtue of this Treaty in respect of the Investment concerned.

(3)     In any proceeding under Article 26, a Contracting Party shall not assert as a defence, counterclaim, right of set-off or for any other reason, that indemnification or other compensation for all or part of the alleged

---

55    Final Act of the European Energy Charter Conference, Understanding 12.
56    Modification based on Art. 2 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

damages has been received or will be received pursuant to an insurance or guarantee contract.

### Article 16: Relation to Other Agreements

*[DECISION            With respect to the Treaty as a whole*

*In the event of a conflict between the treaty concerning Spitsbergen of 9 February 1920 (the Svalbard Treaty) and the Energy Charter Treaty, the treaty concerning Spitsbergen shall prevail to the extent of the conflict, without prejudice to the positions of the Contracting Parties in respect of the Svalbard Treaty. In the event of such conflict or a dispute as to whether there is such conflict or as to its extent, Article 16 and Part V of the Energy Charter Treaty shall not apply.][57]*

Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,

(1)    nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and

(2)    nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty,

where any such provision is more favourable to the Investor or Investment.

### Article 17: Non-Application of Part III in Certain Circumstances

Each Contracting Party reserves the right to deny the advantages of this Part to:

(1)    a legal entity if citizens or nationals of a third state own or control such entity and if that entity has no substantial business activities in the Area of the Contracting Party in which it is organised; or

(2)    an Investment, if the denying Contracting Party establishes that such Investment is an Investment of an Investor of a third state with or as to which the denying Contracting Party:

(a)       does not maintain a diplomatic relationship; or

---

57    Decision 1 with respect to the Energy Charter Treaty (Annex 2 to the Final Act of the European Energy Charter Conference).

(b)    adopts or maintains measures that:

(i)    prohibit transactions with Investors of that state; or

(ii)    would be violated or circumvented if the benefits of this Part were accorded to Investors of that state or to their Investments.

## Part IV: Miscellaneous Provisions

### Article 18: Sovereignty over Energy Resources

(1)    The Contracting Parties recognise state sovereignty and sovereign rights over energy resources. They reaffirm that these must be exercised in accordance with and subject to the rules of international law.

(2)    Without affecting the objectives of promoting access to energy resources, and exploration and development thereof on a commercial basis, the Treaty shall in no way prejudice the rules in Contracting Parties governing the system of property ownership of energy resources.

*[DECLARATION          The representatives declared that Article 18(2) shall not be construed to allow the circumvention of the application of the other provisions of the Treaty.][58]*

*[CHAIRMAN'S STATEMENT   In particular in the context of Article 18(2) they recalled that a party may not invoke the provisions of its internal law as justification for its failure to perform a treaty. The Treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of treaty in their context and in the light of its object and purpose.][59]*

(3)    Each state continues to hold in particular the rights to decide the geographical areas within its Area to be made available for exploration and development of its energy resources, the optimisation of their recovery and the rate at which they may be depleted or otherwise exploited, to specify and enjoy any taxes, royalties or other financial payments payable by virtue of such exploration and exploitation, and to regulate the environmental and safety aspects of such exploration, development and reclamation within its Area, and to participate in such exploration and

---

58    Final Act of the European Energy Charter Conference, Declaration V.
59    Chairman's Statement at Adoption Session on 17 December 1994.

exploitation, *inter alia*, through direct participation by the government or through state enterprises.

(4)  The Contracting Parties undertake to facilitate access to energy resources, *inter alia*, by allocating in a non-discriminatory manner on the basis of published criteria authorisations, licences, concessions and contracts to prospect and explore for or to exploit or extract energy resources.

## Article 19: Environmental Aspects

(1)  In pursuit of sustainable development and taking into account its obligations under those international agreements concerning the environment to which it is party, each Contracting Party shall strive to minimise in an economically efficient manner harmful Environmental Impacts occurring either within or outside its Area from all operations within the Energy Cycle in its Area, taking proper account of safety. In doing so each Contracting Party shall act in a Cost-Effective manner. In its policies and actions each Contracting Party shall strive to take precautionary measures to prevent or minimise environmental degradation. The Contracting Parties agree that the polluter in the Areas of Contracting Parties, should, in principle, bear the cost of pollution, including transboundary pollution, with due regard to the public interest and without distorting Investment in the Energy Cycle or international trade. Contracting Parties shall accordingly:

(a)  take account of environmental considerations throughout the formulation and implementation of their energy policies;

(b)  promote market-oriented price formation and a fuller reflection of environmental costs and benefits throughout the Energy Cycle;

(c)  having regard to Article 34(4), encourage cooperation in the attainment of the environmental objectives of the Charter and cooperation in the field of international environmental standards for the Energy Cycle, taking into account differences in adverse effects and abatement costs between Contracting Parties;

(d)  have particular regard to Improving Energy Efficiency, to developing and using renewable energy sources, to promoting the use of cleaner fuels and to employing technologies and technological means that reduce pollution;

(e)  promote the collection and sharing among Contracting Parties of information on environmentally sound and economically efficient energy policies and Cost-Effective practices and technologies;

**Energy Charter Treaty**

(f)    promote public awareness of the Environmental Impacts of energy systems, of the scope for the prevention or abatement of their adverse Environmental Impacts, and of the costs associated with various prevention or abatement measures;

(g)    promote and cooperate in the research, development and application of energy efficient and environmentally sound technologies, practices and processes which will minimise harmful Environmental Impacts of all aspects of the Energy Cycle in an economically efficient manner;

(h)    encourage favourable conditions for the transfer and dissemination of such technologies consistent with the adequate and effective protection of Intellectual Property rights;

(i)    promote the transparent assessment at an early stage and prior to decision, and subsequent monitoring, of Environmental Impacts of environmentally significant energy investment projects;

*[UNDERSTANDING         With respect to Article 19(1)(i)*

*It is for each Contracting Party to decide the extent to which the assessment and monitoring of Environmental Impacts should be subject to legal requirements, the authorities competent to take decisions in relation to such requirements, and the appropriate procedures to be followed.][60]*

(j)    promote international awareness and information exchange on Contracting Parties' relevant environmental programmes and standards and on the implementation of those programmes and standards;

(k)    participate, upon request, and within their available resources, in the development and implementation of appropriate environmental programmes in the Contracting Parties.

(2)    At the request of one or more Contracting Parties, disputes concerning the application or interpretation of provisions of this Article shall, to the extent that arrangements for the consideration of such disputes do not exist in other appropriate international fora, be reviewed by the Charter Conference aiming at a solution.

(3)    For the purposes of this Article:

---

60    Final Act of the European Energy Charter Conference, Understanding 13.

(a)    "Energy Cycle" means the entire energy chain, including activities related to prospecting for, exploration, production, conversion, storage, transport, distribution and consumption of the various forms of energy, and the treatment and disposal of wastes, as well as the decommissioning, cessation or closure of these activities, minimising harmful Environmental Impacts;

(b)    "Environmental Impact" means any effect caused by a given activity on the environment, including human health and safety, flora, fauna, soil, air, water, climate, landscape and historical monuments or other physical structures or the interactions among these factors; it also includes effects on cultural heritage or socio-economic conditions resulting from alterations to those factors;

(c)    "Improving Energy Efficiency" means acting to maintain the same unit of output (of a good or service) without reducing the quality or performance of the output, while reducing the amount of energy required to produce that output;

(d)    "Cost-Effective" means to achieve a defined objective at the lowest cost or to achieve the greatest benefit at a given cost.

### Article 20: Transparency

(1)    Laws, regulations, judicial decisions and administrative rulings of general application which affect trade in Energy Materials and Products or Energy Related Equipment[61] are, in accordance with Article 29(2)(a), among the measures subject to the transparency disciplines of the WTO Agreement.[62]

(2)    Laws, regulations, judicial decisions and administrative rulings of general application made effective by any Contracting Party, and agreements in force between Contracting Parties, which affect other matters covered by this Treaty shall also be published promptly in such a manner as to enable Contracting Parties and Investors to become acquainted with them. The provisions of this paragraph shall not require any Contracting Party to disclose confidential information which would impede law enforcement or otherwise be contrary to the public interest or would prejudice the legitimate commercial interests of any Investor.

Energy Charter Treaty

---

61    Modification based on Art. 2 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

62    Id.

(3)    Each Contracting Party shall designate one or more enquiry points to which requests for information about the above mentioned laws, regulations, judicial decisions and administrative rulings may be addressed and shall communicate promptly such designation to the Secretariat which shall make it available on request.

### Article 21: Taxation

(1)    Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.

(2)    Article 7(3) shall apply to Taxation Measures other than those on income or on capital, except that such provision shall not apply to:

(a)    an advantage accorded by a Contracting Party pursuant to the tax provisions of any convention, agreement or arrangement described in subparagraph (7)(a)(ii); or

(b)    any Taxation Measure aimed at ensuring the effective collection of taxes, except where the measure of a Contracting Party arbitrarily discriminates against Energy Materials and Products originating in, or destined for the Area of another Contracting Party or arbitrarily restricts benefits accorded under Article 7(3).

(3)    Article 10(2) and (7) shall apply to Taxation Measures of the Contracting Parties other than those on income or on capital, except that such provisions shall not apply to:

(a)    impose most favoured nation obligations with respect to advantages accorded by a Contracting Party pursuant to the tax provisions of any convention, agreement or arrangement described in subparagraph (7)(a)(ii) or resulting from membership of any Regional Economic Integration Organisation; or

(b)    any Taxation Measure aimed at ensuring the effective collection of taxes, except where the measure arbitrarily discriminates against an Investor of another Contracting Party or arbitrarily restricts benefits accorded under the Investment provisions of this Treaty.

(4)    Article 29(2) to (8)[63] shall apply to Taxation Measures other than those on income or on capital.

(5)    (a)    Article 13 shall apply to taxes.

(b)    Whenever an issue arises under Article 13, to the extent it pertains to whether a tax constitutes an expropriation or whether a tax alleged to constitute an expropriation is discriminatory, the following provisions shall apply:

(i)    The Investor or the Contracting Party alleging expropriation shall refer the issue of whether the tax is an expropriation or whether the tax is discriminatory to the relevant Competent Tax Authority. Failing such referral by the Investor or the Contracting Party, bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) shall make a referral to the relevant Competent Tax Authorities;

(ii)    The Competent Tax Authorities shall, within a period of six months of such referral, strive to resolve the issues so referred. Where non-discrimination issues are concerned, the Competent Tax Authorities shall apply the non-discrimination provisions of the relevant tax convention or, if there is no non-discrimination provision in the relevant tax convention applicable to the tax or no such tax convention is in force between the Contracting Parties concerned, they shall apply the non-discrimination principles under the Model Tax Convention on Income and Capital of the Organisation for Economic Cooperation and Development;

(iii)    Bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) may take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation. Such bodies shall take into account any conclusions arrived at within the six-month period prescribed in subparagraph (b)(ii) by the Competent Tax Authorities regarding whether the tax is discriminatory. Such bodies may also take into account any conclusions arrived at by the Competent Tax Authorities after the expiry of the six-month period;

(iv)    Under no circumstances shall involvement of the Competent Tax Authorities, beyond the end of the six-month period

Energy Charter Treaty

---

63    Modification based on Art. 2 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

referred to in subparagraph (b)(ii), lead to a delay of proceedings under Articles 26 and 27.

(6)    For the avoidance of doubt, Article 14 shall not limit the right of a Contracting Party to impose or collect a tax by withholding or other means.

(7)    For the purposes of this Article:

(a)    The term "Taxation Measure" includes:

(i)    any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and

(ii)    any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.

(b)    There shall be regarded as taxes on income or on capital all taxes imposed on total income, on total capital or on elements of income or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, or substantially similar taxes, taxes on the total amounts of wages or salaries paid by enterprises, as well as taxes on capital appreciation.

(c)    A "Competent Tax Authority" means the competent authority pursuant to a double taxation agreement in force between the Contracting Parties or, when no such agreement is in force, the minister or ministry responsible for taxes or their authorised representatives.

(d)    For the avoidance of doubt, the terms "tax provisions" and "taxes" do not include customs duties.

## Article 22: State and Privileged Enterprises

*[UNDERSTANDING        With respect to Articles 22 and 23*

*With regard to trade in Energy Materials and Products governed by Article 29, that Article specifies the provisions relevant to the subjects covered by Articles 22 and 23.][64]*

---

64    Final Act of the European Energy Charter Conference, Understanding 14.

(1)    Each Contracting Party shall ensure that any state enterprise which it maintains or establishes shall conduct its activities in relation to the sale or provision of goods and services in its Area in a manner consistent with the Contracting Party's obligations under Part III of this Treaty.

(2)    No Contracting Party shall encourage or require such a state enterprise to conduct its activities in its Area in a manner inconsistent with the Contracting Party's obligations under other provisions of this Treaty.

(3)    Each Contracting Party shall ensure that if it establishes or maintains an entity and entrusts the entity with regulatory, administrative or other governmental authority, such entity shall exercise that authority in a manner consistent with the Contracting Party's obligations under this Treaty.

(4)    No Contracting Party shall encourage or require any entity to which it grants exclusive or special privileges to conduct its activities in its Area in a manner inconsistent with the Contracting Party's obligations under this Treaty.

(5)    For the purposes of this Article, "entity" includes any enterprise, agency or other organisation or individual.

### Article 23: Observance by Sub-National Authorities

*[UNDERSTANDING          With respect to Articles 22 and 23*

*With regard to trade in Energy Materials and Products governed by Article 29 that Article specifies the provisions relevant to the subjects covered by Articles 22 and 23.][65]*

(1)    Each Contracting Party is fully responsible under this Treaty for the observance of all provisions of the Treaty, and shall take such reasonable measures as may be available to it to ensure such observance by regional and local governments and authorities within its Area.

(2)    The dispute settlement provisions in Parts II, IV and V of this Treaty may be invoked in respect of measures affecting the observance of the Treaty by a Contracting Party which have been taken by regional or local governments or authorities within the Area of the Contracting Party.

Energy Charter Treaty

---

65    Final Act of the European Energy Charter Conference, Understanding 14.

### Article 24: Exceptions

*[UNDERSTANDING          With respect to Article 24*

*Exceptions contained in the GATT and Related Instruments apply between particular Contracting Parties which are parties to the GATT, as recognised by Article 4. With respect to trade in Energy Materials and Products governed by Article 29, that Article specifies the provisions relevant to the subjects covered by Article 24.][66]*

(1)     This Article shall not apply to Articles 12, 13 and 29.

(2)     The provisions of this Treaty other than

    (a)     those referred to in paragraph (1); and

    (b)     with respect to subparagraph (i), Part III of the Treaty

shall not preclude any Contracting Party from adopting or enforcing any measure

    (i)     necessary to protect human, animal or plant life or health;

    (ii)    essential to the acquisition or distribution of Energy Materials and Products in conditions of short supply arising from causes outside the control of that Contracting Party, provided that any such measure shall be consistent with the principles that

        (A)    all other Contracting Parties are entitled to an equitable share of the international supply of such Energy Materials and Products; and

        (B)    any such measure that is inconsistent with this Treaty shall be discontinued as soon as the conditions giving rise to it have ceased to exist; or

    (iii)   designed to benefit Investors who are aboriginal people or socially or economically disadvantaged individuals or groups or their Investments and notified to the Secretariat as such, provided that such measure

        (A)    has no significant impact on that Contracting Party's economy; and

        (B)    does not discriminate between Investors of any other Contracting Party and Investors of that Contracting Party not included among those for whom the measure is intended,

---

66    Final Act of the European Energy Charter Conference, Understanding 15.

provided that no such measure shall constitute a disguised restriction on Economic Activity in the Energy Sector, or arbitrary or unjustifiable discrimination between Contracting Parties or between Investors or other interested persons of Contracting Parties. Such measures shall be duly motivated and shall not nullify or impair any benefit one or more other Contracting Parties may reasonably expect under this Treaty to an extent greater than is strictly necessary to the stated end.

(3) The provisions of this Treaty other than those referred to in paragraph (1) shall not be construed to prevent any Contracting Party from taking any measure which it considers necessary:

    (a) for the protection of its essential security interests including those

        (i) relating to the supply of Energy Materials and Products to a military establishment; or

        (ii) taken in time of war, armed conflict or other emergency in international relations;

    (b) relating to the implementation of national policies respecting the non-proliferation of nuclear weapons or other nuclear explosive devices or needed to fulfil its obligations under the Treaty on the Non-Proliferation of Nuclear Weapons, the Nuclear Suppliers Guidelines, and other international nuclear non-proliferation obligations or understandings; or

    (c) for the maintenance of public order.

Such measure shall not constitute a disguised restriction on Transit.

(4) The provisions of this Treaty which accord most favoured nation treatment shall not oblige any Contracting Party to extend to the Investors of any other Contracting Party any preferential treatment:

    (a) resulting from its membership of a free-trade area or customs union; or

*[DECISION           With respect to Articles 24(4)(a) and 25*

*An Investment of an Investor referred to in Article 1(7)(a)(ii), of a Contracting Party which is not party to an EIA or a member of a free-trade area or a customs union, shall be entitled to treatment accorded under such EIA, free-trade area or customs union, provided that the Investment:*

(a) *has its registered office, central administration or principal place of business in the Area of a party to that EIA or member of that free-trade area or customs union; or*

(b) *in case it only has its registered office in that Area, has an effective and Continuous link with the economy of one of the parties to that EIA or member of that free-trade area or customs union.][67]*

    (b)   which is accorded by a bilateral or multilateral agreement concerning economic cooperation between states that were constituent parts of the former Union of Soviet Socialist Republics pending the establishment of their mutual economic relations on a definitive basis.

## Article 25: Economic Integration Agreements

*[DECLARATION          With respect to Article 25*

*The European Communities and their Member States recall that, in accordance with article 58 of the Treaty establishing the European Community:*

a) *companies or firms formed in accordance with the law of a Member State and having their registered office, central administration or principal place of business within the Community shall, for the right of establishment pursuant to Part Three, Title III, Chapter 2 of the Treaty establishing the European Community, be treated in the same way as natural persons who are nationals of Member States; companies or firms which only have their registered office within the Community must, for this purpose, have an effective and continuous link with the economy of one of the Member States;*

(b) *"companies and firms" means companies or firms constituted under civil or commercial law, including cooperative societies, and other legal persons governed by public or private law, save for those which are non-profitmaking.*

    *The European Communities and their Member States further recall that:*

    *Community law provides for the possibility to extend the treatment described above to branches and agencies of companies or firms not established in one of the Member States; and that, the application of Article 25 of the Energy Charter Treaty will allow only those derogations necessary to safeguard the preferential treatment resulting from the wider process of economic integration resulting from the Treaties establishing the European Communities.][68]*

---

67   Decision 5 with respect to the Energy Charter Treaty (Annex 2 to the Final Act of the European Energy Charter Conference).

68   Final Act of the European Energy Charter Conference, Declaration 5.

*[DECISION            With respect to Articles 24(4)(a) and 25*

*An Investment of an Investor referred to in Article 1(7)(a)(ii), of a Contracting Party which is not party to an EIA or a member of a free-trade area or a customs union, shall be entitled to treatment accorded under such EIA, free-trade area or customs union, provided that the Investment:*

*(a)    has its registered office, central administration or principal place of business in the Area of a party to that EIA or member of that free-trade area or customs union; or*

*(b)    in case it only has its registered office in that Area, has an effective and continuous link with the economy of one of the parties to that EIA or member of that free-trade area or customs union.][69]*

(1)    The provisions of this Treaty shall not be so construed as to oblige a Contracting Party which is party to an Economic Integration Agreement (hereinafter referred to as "EIA") to extend, by means of most favoured nation treatment, to another Contracting Party which is not a party to that EIA, any preferential treatment applicable between the parties to that EIA as a result of their being parties thereto.

(2)    For the purposes of paragraph (1), "EIA" means an agreement substantially liberalising, *inter alia*, trade and investment, by providing for the absence or elimination of substantially all discrimination between or among parties thereto through the elimination of existing discriminatory measures and/or the prohibition of new or more discriminatory measures, either at the entry into force of that agreement or on the basis of a reasonable time frame.

(3)    This Article shall not affect the application of the WTO Agreement[70] according to Article 29.

## Part V: Dispute Settlement

*[UNDERSTANDING            With respect to Articles 9, 10 and Part V*

*As a Contracting Party's programmes which provide for public loans, grants, guarantees or insurance for facilitating trade or Investment abroad are not connected with Investment or related activities of Investors from other Contracting*

Energy Charter Treaty

---

69    Decision 5 with respect to the Energy Charter Treaty (Annex 2 to the Final Act of the European Energy Charter Conference).

70    Modification based on Art. 2 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

*Parties in its Area, such programmes may be subject to constraints with respect to participation in them.][71]*

*[DECISION*        *With respect to the Treaty as a whole*

*In the event of a conflict between the treaty concerning Spitsbergen of 9 February 1920 (the Svalbard Treaty) and the Energy Charter Treaty, the treaty concerning Spitsbergen shall prevail to the extent of the conflict, without prejudice to the positions of the Contracting Parties in respect of the Svalbard Treaty. In the event of such conflict or a dispute as to whether there is such conflict or as to its extent, Article 16 and Part V of the Energy Charter Treaty shall not apply.][72]*

### Article 26: Settlement of Disputes between an Investor and a Contracting Party

*[UNDERSTANDING*        *With respect to Articles 26 and 27*

*The reference to treaty obligations in the penultimate sentence of Article 10(1) does not include decisions taken by international organisations, even if they are legally binding, or treaties which entered into force before 1 January 1970.][73]*

(1)    Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

(2)    If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

(a)    to the courts or administrative tribunals of the Contracting Party party to the dispute;

*[UNDERSTANDING*        *With respect to Article 26(2)(a)*

*Article 26(2)(a) should not be interpreted to require a Contracting Party to enact Part III of the Treaty into its domestic law.][74]*

---

71    Final Act of the European Energy Charter Conference, Understanding 9.
72    Decision 1 with respect to the Energy Charter Treaty (Annex 2 to the Final Act of the European Energy Charter Conference).
73    Final Act of the European Energy Charter Conference, Understanding 17.
74    Id., Understanding 16.

(b)    in accordance with any applicable, previously agreed dispute settlement procedure; or

(c)    in accordance with the following paragraphs of this Article.

(3)  (a)    Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

(b)    (i)    The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).

    (ii)    For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.

(c)    A Contracting Party listed in Annex IA does not give such unconditional consent with respect to a dispute arising under the last sentence of Article 10(1).

(4)    In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:

(a)    (i)    The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention; or

    (ii)    The International Centre for Settlement of Investment Disputes, established pursuant to the Convention referred to in subparagraph (a)(i), under the rules governing the Additional Facility for the Administration of Proceedings by the Secretariat of the Centre (hereinafter referred to as the "Additional Facility Rules"), if the Contracting Party of the

        Investor or the Contracting Party party to the dispute, but not both, is a party to the ICSID Convention;

(b)    a sole arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (hereinafter referred to as "UNCITRAL"); or

(c)    an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce.

(5)    (a)    The consent given in paragraph (3) together with the written consent of the Investor given pursuant to paragraph (4) shall be considered to satisfy the requirement for:

    (i)    written consent of the parties to a dispute for purposes of Chapter II of the ICSID Convention and for purposes of the Additional Facility Rules;

    (ii)    an "agreement in writing" for purposes of article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, 10 June 1958 (hereinafter referred to as the "New York Convention"); and

    (iii)    "the parties to a contract [to] have agreed in writing" for the purposes of article 1 of the UNCITRAL Arbitration Rules.

(b)    Any arbitration under this Article shall at the request of any party to the dispute be held in a state that is a party to the New York Convention. Claims submitted to arbitration hereunder shall be considered to arise out of a commercial relationship or transaction for the purposes of article I of that Convention.

(6)    A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.

(7)    An Investor other than a natural person which has the nationality of a Contracting Party party to the dispute on the date of the consent in writing referred to in paragraph (4) and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting Party, shall for the purpose of article 25(2)(b) of the ICSID Convention be treated as a "national of another Contracting State" and shall for the purpose of article 1(6) of the Additional Facility Rules be treated as a "national of another State".

(8)    The awards of arbitration, which may include an award of interest, shall be final and binding upon the parties to the dispute. An award of arbitration concerning a measure of a sub-national government or authority of the disputing Contracting Party shall provide that the Contracting Party may pay monetary damages in lieu of any other remedy granted. Each Contracting Party shall carry out without delay any such award and shall make provision for the effective enforcement in its Area of such awards.

### Article 27: Settlement of Disputes between Contracting Parties

*[UNDERSTANDING*        *With respect to Articles 26 and 27*

*The reference to treaty obligations in the penultimate sentence of Article 10(1) does not include decisions taken by international organisations, even if they are legally binding, or treaties which entered into force before 1 January 1970.][75]*

(1)    Contracting Parties shall endeavour to settle disputes concerning the application or interpretation of this Treaty through diplomatic channels.

(2)    If a dispute has not been settled in accordance with paragraph (1) within a reasonable period of time, either party thereto may, except as otherwise provided in this Treaty or agreed in writing by the Contracting Parties, and except as concerns the application or interpretation of Article 6 or Article 19 or, for Contracting Parties listed in Annex IA, the last sentence of Article 10(1), upon written notice to the other party to the dispute submit the matter to an ad hoc tribunal under this Article.

(3)    Such an ad hoc arbitral tribunal shall be constituted as follows:

(a)    The Contracting Party instituting the proceedings shall appoint one member of the tribunal and inform the other Contracting Party to the dispute of its appointment within 30 days of receipt of the notice referred to in paragraph (2) by the other Contracting Party;

(b)    Within 60 days of the receipt of the written notice referred to in paragraph (2), the other Contracting Party party to the dispute shall appoint one member. If the appointment is not made within the time limit prescribed, the Contracting Party having instituted the proceedings may, within 90 days of the receipt of the written notice referred to in paragraph (2), request that the appointment be made in accordance with subparagraph (d);

*Energy Charter Treaty*

---

75    Final Act of the European Energy Charter Conference, Understanding 17.

(c)    A third member, who may not be a national or citizen of a Contracting Party party to the dispute, shall be appointed by the Contracting Parties parties to the dispute. That member shall be the President of the tribunal. If, within 150 days of the receipt of the notice referred to in paragraph (2), the Contracting Parties are unable to agree on the appointment of a third member, that appointment shall be made, in accordance with subparagraph (d), at the request of either Contracting Party submitted within 180 days of the receipt of that notice;

(d)    Appointments requested to be made in accordance with this paragraph shall be made by the Secretary General of the Permanent Court of International Arbitration within 30 days of the receipt of a request to do so. If the Secretary General is prevented from discharging this task, the appointments shall be made by the First Secretary of the Bureau. If the latter, in turn, is prevented from discharging this task, the appointments shall be made by the most senior Deputy;

(e)    Appointments made in accordance with subparagraphs (a) to (d) shall be made with regard to the qualifications and experience, particularly in matters covered by this Treaty, of the members to be appointed;

(f)    In the absence of an agreement to the contrary between the Contracting Parties, the Arbitration Rules of UNCITRAL shall govern, except to the extent modified by the Contracting Parties parties to the dispute or by the arbitrators. The tribunal shall take its decisions by a majority vote of its members;

(g)    The tribunal shall decide the dispute in accordance with this Treaty and applicable rules and principles of international law;

(h)    The arbitral award shall be final and binding upon the Contracting Parties parties to the dispute;

(i)    Where, in making an award, a tribunal finds that a measure of a regional or local government or authority within the Area of a Contracting Party listed in Part I of Annex P is not in conformity with this Treaty, either party to the dispute may invoke the provisions of Part II of Annex P;

(j)    The expenses of the tribunal, including the remuneration of its members, shall be borne in equal shares by the Contracting Parties parties to the dispute. The tribunal may, however, at its discretion

> direct that a higher proportion of the costs be paid by one of the Contracting Parties parties to the dispute;

(k)     Unless the Contracting Parties parties to the dispute agree otherwise, the tribunal shall sit in The Hague, and use the premises and facilities of the Permanent Court of Arbitration;

(l)     A copy of the award shall be deposited with the Secretariat which shall make it generally available.

## Article 28: Non-Application of Article 27 to Certain Disputes

A dispute between Contracting Parties with respect to the application or interpretation of Article 5 or 29 shall not be settled under Article 27 unless the Contracting Parties parties to the dispute so agree.

## Part VI: Transitional Provisions

## Article 29: Interim Provisions on Trade-Related Matters[76]

*[CHAIRMAN'S CONCLUSION ON THE IMPLEMENTATION OF TRADE-RELATED RULES:*

*The Chairman concluded with respect to the future implementation of trade-related rules that there was a consensus among delegations that the Secretariat was to be invited to develop the elements for one implementation system based on the regime in the Trade Amendment. In particular, where the Trade Amendment foresees notification requirements and procedures, including with regard to Understanding 2 to the Amendment,[77] they would follow WTO practice, provided that duplication of notifications with the WTO did not occur. ...[78]*

*Finally, whenever necessary to maintain the principle of harmonious implementation of trade-related rules based on WTO practice, appropriate rules of procedure should include the elements necessary to achieve that aim.][79]*

Energy Charter Treaty

---

76     As amended by Art. 1 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

77     Referring to Article 29(7).

78     Referring to Annex D.

79     Editor's note: Document CS (98) 338 CC 124, point 13, of 24 May 1998 (not published). The Conclusion was drawn by the Chairman to the first Energy Charter Conference on 24 April 1998. The Conference agreed without objection to this conclusion.

(1)   The provisions of this Article shall apply to trade in Energy Materials and Products and Energy-Related Equipment while any Contracting Party is not a member of the WTO.

(2)   (a)   Trade in Energy Materials and Products and Energy-Related Equipment between Contracting Parties at least one of which is not a member of the WTO shall be governed, subject to subparagraph (b) and to the exceptions and rules provided for in Annex W, by the provisions of the WTO Agreement, as applied and practised with regard to Energy Materials and Products and Energy-Related Equipment by members of the WTO among themselves, as if all Contracting Parties were members of the WTO.

*[UNDERSTANDING        With respect to Article 29(2)(a) and Annex W:*

*Notwithstanding the listing of paragraph 6 of article XXIV of the GATT 1994 in Annex W (A)(1)(a)(i), any signatory affected by an increase in customs duties or other charges of any kind imposed on or in connection with importation or exportation referred to in the first sentence of that paragraph, is entitled to seek consultations in the Charter Conference.]*[80]

*[UNDERSTANDING        With respect to Article 29(2)(a)*

*(a)   Where a provision of [WTO]*[81] *referred to in this paragraph provides for joint action by [Members of the WTO],*[82] *it is intended that the Charter Conference take such action.]*[83]

(b)   Such trade of a Contracting Party which is a state that was a constituent part of the former Union of Soviet Socialist Republics may instead be governed, subject to the provisions of Annex TFU, by an agreement between two or more such states, until 1 December 1999 or the admission of that Contracting Party to the WTO, whichever is the earlier.

(3)   (a)   Each signatory to this Treaty, and each state or Regional Economic Integration Organisation acceding to this Treaty before 24 April

---

80   Final Act in respect of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty, Understanding 1.

81   Original: "GATT 1947 or a Related Instrument", adapted by editors.

82   Original: "parties to the GATT", adapted by editors.

83   Final Act of the European Energy Charter Conference, Understanding 18. Part (b) of the Understanding became irrelevant following the entry into force of the Amendment to the Trade-Related Provisions of the ECT.

1998, shall on the date of its signature or of its deposit of its instrument of accession provide to the Secretariat a list of all customs duties and charges of any kind imposed on or in connection with importation or exportation of Energy Materials and Products, notifying the level of such customs duties and charges applied on such date of signature or deposit. Each signatory to this Treaty, and each state or Regional Economic Integration Organisation acceding to this Treaty before 24 April 1998, shall on that date provide to the Secretariat a list of all customs duties and charges of any kind imposed on or in connection with importation or exportation of Energy-Related Equipment, notifying the level of such customs duties and charges applied on that date.

(b)     Each state or Regional Economic Integration Organisation acceding to this Treaty on or after 24 April 1998, shall, on the date of its deposit of its instrument of accession, provide to the Secretariat a list of all customs duties and charges of any kind imposed on or in connection with importation or exportation of Energy Materials and Products and Energy-Related Equipment, notifying the level of such customs duties and charges applied on such date of deposit.

Any changes to such customs duties or charges of any kind imposed on or in connection with importation or exportation shall be notified to the Secretariat, which shall inform the Contracting Parties of such changes.

(4)   Each Contracting Party shall endeavour not to increase any customs duty or charge of any kind imposed on or in connection with importation or exportation:

(a)     in the case of the importation of Energy Materials and Products listed in Annex EM I or Energy-Related Equipment listed in Annex EQ I and described in Part I of the Schedule relating to the Contracting Party referred to in article II of the GATT 1994, above the level set forth in that Schedule, if the Contracting Party is a member of the WTO;

(b)     in the case of the exportation of Energy Materials and Products listed in Annex EM I or Energy-Related Equipment listed in Annex EQ I, and that of their importation if the Contracting Party is not a member of the WTO, above the level most recently notified

**Energy Charter Treaty**

to the Secretariat, except as permitted by the provisions made applicable by subparagraph (2)(a).

(5)   A Contracting Party may increase such customs duty or other charge above the level referred to in paragraph (4) only if:

(a)   in case of a customs duty or other charge imposed on or in connection with importation, such action is not inconsistent with the applicable provisions of the WTO Agreement, other than those provisions of the WTO Agreement listed in Annex W; or

(b)   it has, to the fullest extent practicable under its legislative procedures, notified the Secretariat of its proposal for such an increase, given other interested Contracting Parties reasonable opportunity for consultation with respect to its proposal, and accorded consideration to any representations from such Contracting Parties.

(6)   In respect of trade between Contracting Parties at least one of which is not a member of the WTO, no such Contracting Party shall increase any customs duty or charge of any kind imposed on or in connection with importation or exportation of Energy Materials and Products listed in Annex EM II or Energy-Related Equipment listed in Annex EQ II above the lowest of the levels applied on the date of the decision by the Charter Conference to list the particular item in the relevant Annex .

*[UNDERSTANDING        With respect to Articles 29(6) and (7) and 34(3)(o):*

*The Charter Conference shall conduct an annual review with respect to any possibility of moving items of Energy Materials and Products or Energy-Related Equipment from Annexes EM I or EQ I to Annexes EM II or EQ II][84]*

*[CHAIRMAN'S STATEMENT*

*In particular, where the Trade Amendment foresees notification requirements and procedures, including with regard to Understanding 2 to the Amendment, they would follow WTO practice, provided that duplication of notifications with the WTO did not occur.][85]*

A Contracting Party may increase such customs duty or other charge above that level only if:

---

84   Final Act in respect of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty, Understanding 3.

85   Chairman's Statement at the Adoption Session on 24 April 1998.

(a)     in case of a customs duty or other charge imposed on or in connection with importation, such action is not inconsistent with the applicable provisions of the WTO Agreement, other than those provisions of the WTO Agreement listed in Annex W; or

(b)     in exceptional circumstances not elsewhere provided for in this Treaty, the Charter Conference decides to waive the obligation otherwise imposed on a Contracting Party by this paragraph, consenting to an increase in a customs duty, subject to any conditions the Charter Conference may impose.

(7)     Notwithstanding paragraph (6), in the case of trade referred to in that paragraph, Contracting Parties listed in Annex BR in respect of Energy Materials and Products listed in Annex EM II, or in Annex BRQ in respect of Energy-Related Equipment listed in Annex EQ II, shall not increase any customs duty or other charge above the level resulting from their commitments or any provisions applicable to them under the WTO Agreement.

*[UNDERSTANDING with respect to Articles 29(6) and (7) and 34(3)(o):*

*The Charter Conference shall conduct an annual review with respect to any possibility of moving items of Energy Materials and Products or Energy-Related Equipment from Annexes EM I or EQ I to Annexes EM II or EQ II][86]*

*[UNDERSTANDING with respect to Article 29(7):*

*In the case of a signatory, not a member of the WTO, which is listed in Annexes BR or BRQ or both, any concession offered formally in the process of its accession to the WTO with respect to Energy Materials or Products listed in Annex EM II or Energy-Related Equipment listed in Annex EQ II shall, for the purpose of this Article, be regarded as a commitment under the WTO.][87]*

(8)     Other duties and charges imposed on or in connection with importation or exportation of Energy Materials and Products or Energy-Related Equipment shall be subject to the provisions of the Understanding on the Interpretation of Article II: 1(b) of the GATT 1994 as modified according to Annex W.

Energy Charter Treaty

---

86   Final Act in respect of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty, Understanding 3.

87   Id., Understanding 2.

(9)    Annex D shall apply:

    (a)    to disputes regarding compliance with provisions applicable to trade under this Article;

    (b)    to disputes regarding the application by a Contracting Party of any measure, whether or not it conflicts with the provisions of this Article, which is considered by another Contracting Party to nullify or impair any benefit accruing to it directly or indirectly under this Article; and

    (c)    unless the Contracting Parties parties to the dispute agree otherwise, to disputes regarding compliance with Article 5 between Contracting Parties at least one of which is not a member of the WTO,

Except that Annex D shall not apply to any dispute between Contracting Parties, the substance of which arises under an agreement that:

    (i)    has been notified in accordance with and meets the other requirements of sub-paragraph (2)(b) and Annex TFU; or

    (ii)    establishes a free-trade area or a customs union as described in article XXIV of the GATT 1994.

## Article 30: Developments in International Trading Arrangements[88]

Contracting Parties undertake that in the light of the results of the Uruguay Round of Multilateral Trade Negotiations embodied principally in the Final Act thereof done at Marrakesh, 15 April 1994, they will commence consideration not later than 1 July 1995 or the entry into force of this Treaty, whichever is the later, of appropriate amendments to this Treaty with a view to the adoption of any such amendments by the Charter Conference.

## Article 31: Energy-Related Equipment[89]

The provisional Charter Conference shall at its first meeting commence examination of the inclusion of energy-related equipment in the trade provisions of this Treaty.

---

88    Editor's note: this Article refers to the Amendment to the Trade-Related Provisions of the ECT adopted in 1998.

89    Editor's note: energy-related equipment was included by the Amendment to the Trade-Related Provisions of the ECT adopted in 1998.

## Article 32: Transitional Arrangements[90]

(1) In recognition of the need for time to adapt to the requirements of a market economy, a Contracting Party listed in Annex T may temporarily suspend full compliance with its obligations under one or more of the following provisions of this Treaty, subject to the conditions in paragraphs (3) to (6):

> Article 6(2) and (5)
>
> Article 7(4)
>
> Article 9(1)
>
> Article 10(7)      specific measures
>
> Article 14(1)(d)   related only to transfer of unspent earnings
>
> Article 20(3)
>
> Article 22(1) and (3)

(2) Other Contracting Parties shall assist any Contracting Party which has suspended full compliance under paragraph (1) to achieve the conditions under which such suspension can be terminated. This assistance may be given in whatever form the other Contracting Parties consider most effective to respond to the needs notified under subparagraph (4)(c) including, where appropriate, through bilateral or multilateral arrangements.

(3) The applicable provisions, the stages towards full implementation of each, the measures to be taken and the date or, exceptionally, contingent event, by which each stage shall be completed and measure taken are listed in Annex T for each Contracting Party claiming transitional arrangements. Each such Contracting Party shall take the measure listed by the date indicated for the relevant provision and stage as set out in Annex T. Contracting Parties which have temporarily suspended full compliance under paragraph (1) undertake to comply fully with the relevant obligations by 1 July 2001. Should a Contracting Party find it necessary, due to exceptional circumstances, to request that the period of such temporary suspension be extended or that any further temporary suspension not previously listed in Annex T be introduced, the decision on a request to amend Annex T shall be made by the Charter Conference.

**Energy Charter Treaty**

---

90  Editor's note: the applicability of these transitional arrangements (and of Annex T) terminated on 1 July 2001.

(4)    A Contracting Party which has invoked transitional arrangements shall notify the Secretariat no less often than once every 12 months:

   (a)    of the implementation of any measures listed in its Annex T and of its general progress to full compliance;

   (b)    of the progress it expects to make during the next 12 months towards full compliance with its obligations, of any problem it foresees and of its proposals for dealing with that problem;

   (c)    of the need for technical assistance to facilitate completion of the stages set out in Annex T as necessary for the full implementation of this Treaty, or to deal with any problem notified pursuant to subparagraph (b) as well as to promote other necessary market-oriented reforms and modernisation of its energy sector;

   (d)    of any possible need to make a request of the kind referred to in paragraph (3).

(5)    The Secretariat shall:

   (a)    circulate to all Contracting Parties the notifications referred to in paragraph (4);

   (b)    circulate and actively promote, relying where appropriate on arrangements existing within other international organisations, the matching of needs for and offers of technical assistance referred to in paragraph (2) and subparagraph (4)(c);

   (c)    circulate to all Contracting Parties at the end of each six month period a summary of any notifications made under subparagraph (4)(a) or (d).

(6)    The Charter Conference shall annually review the progress by Contracting Parties towards implementation of the provisions of this Article and the matching of needs and offers of technical assistance referred to in paragraph (2) and subparagraph (4)(c). In the course of that review it may decide to take appropriate action.

## Part VII: Structure and Institutions

### Article 33: Energy Charter Protocols and Declarations

*[UNDERSTANDING        With respect to Article 33[91]*

*The provisional Charter Conference should at the earliest possible date decide how best to give effect to the goal of Title III of the European Energy Charter that Protocols be negotiated in areas of cooperation such as those listed in Title III of the Charter.]*

(1)     The Charter Conference may authorise the negotiation of a number of Energy Charter Protocols or Declarations in order to pursue the objectives and principles of the Charter.

(2)     Any signatory to the Charter may participate in such negotiation.

(3)     A state or Regional Economic Integration Organisation shall not become a party to a Protocol or Declaration unless it is, or becomes at the same time, a signatory to the Charter and a Contracting Party to this Treaty.

(4)     Subject to paragraph (3) and subparagraph (6)(a), final provisions applying to a Protocol shall be defined in that Protocol.

(5)     A Protocol shall apply only to the Contracting Parties which consent to be bound by it, and shall not derogate from the rights and obligations of those Contracting Parties not party to the Protocol.

(6)     (a)     A Protocol may assign duties to the Charter Conference and functions to the Secretariat, provided that no such assignment may be made by an amendment to a Protocol unless that amendment is approved by the Charter Conference, whose approval shall not be subject to any provisions of the Protocol which are authorised by subparagraph (b).

(b)     A Protocol which provides for decisions thereunder to be taken by the Charter Conference may, subject to subparagraph (a), provide with respect to such decisions:

(i)   for voting rules other than those contained in Article 36;

(ii)  that only parties to the Protocol shall be considered to be Contracting Parties for the purposes of Article 36 or eligible to vote under the rules provided for in the Protocol.

*Energy Charter Treaty*

---

91    Final Act of the European Energy Charter Conference, Understanding 19.

## Article 34: Energy Charter Conference

*[UNDERSTANDING          With respect to Article 34*

*(a)   The provisional Secretary General should make immediate contact with other international bodies in order to discover the terms on which they might be willing to undertake tasks arising from the Treaty and the Charter. The provisional Secretary General might report back to the provisional Charter Conference at the meeting which Article 45(4) requires to be convened not later than 180 days after the opening date for signature of the Treaty.*

*(b)   The Charter Conference should adopt the annual budget before the beginning of the financial year.][92]*

(1)   The Contracting Parties shall meet periodically in the Energy Charter Conference (referred to herein as the "Charter Conference") at which each Contracting Party shall be entitled to have one representative. Ordinary meetings shall be held at intervals determined by the Charter Conference.

(2)   Extraordinary meetings of the Charter Conference may be held at such times as may be determined by the Charter Conference, or at the written request of any Contracting Party, provided that, within six weeks of the request being communicated to the Contracting Parties by the Secretariat, it is supported by at least one-third of the Contracting Parties.

(3)   The functions of the Charter Conference shall be to:

   (a)   carry out the duties assigned to it by this Treaty and any Protocols;

   (b)   keep under review and facilitate the implementation of the principles of the Charter and of the provisions of this Treaty and the Protocols;

   (c)   facilitate in accordance with this Treaty and the Protocols the coordination of appropriate general measures to carry out the principles of the Charter;

   (d)   consider and adopt programmes of work to be carried out by the Secretariat;

   (e)   consider and approve the annual accounts and budget of the Secretariat;

---

92   Final Act of the European Energy Charter Conference, Understanding 20.

(f)  consider and approve or adopt the terms of any headquarters or other agreement, including privileges and immunities considered necessary for the Charter Conference and the Secretariat;

(g)  encourage cooperative efforts aimed at facilitating and promoting market-oriented reforms and modernisation of energy sectors in those countries of Central and Eastern Europe and the former Union of Soviet Socialist Republics undergoing economic transition;

(h)  authorise and approve the terms of reference for the negotiation of Protocols, and consider and adopt the texts thereof and of amendments thereto;

(i)  authorise the negotiation of Declarations, and approve their issuance;

(j)  decide on accessions to this Treaty;

*[The provisional Charter Conference and the Charter Conference provided for in the Treaty shall henceforth be responsible for making decisions on requests to sign the Concluding Document of the Hague Conference on the European Energy Charter and the European Energy Charter adopted thereby.]*[93]

(k)  authorise the negotiation of and consider and approve or adopt association agreements;

(l)  consider and adopt texts of amendments to this Treaty;

(m)  consider and approve modifications of and technical changes to the Annexes to this Treaty;

*[UNDERSTANDING        With respect to Article 34(3)(m)*

*The technical changes to Annexes might for instance include, the listing of non-signatories or of signatories that have evinced their intention not to ratify, or additions to Annexes N and VC. It is intended that the Secretariat would propose such changes to the Charter Conference when appropriate.]*[94]

(n)  consider and approve the listing of signatories in Annexes BR or BRQ or in both these Annexes;[95]

Energy Charter Treaty

---

93   Final Act of the European Energy Charter Conference, VIII.
94   Id., Understanding 21.
95   Modification due to the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

*[DECISION         A signatory which does not apply the Amendment adopted on 24 April 1998 provisionally may at the time that it takes action to apply that Amendment, whether on a definitive or a provisional basis, notify the Secretariat in writing that until it is listed in Annexes BR and BRQ, it will apply the Amendment as if all items of Energy Materials and Products and of Energy-Related Equipment continued to be listed in Annexes EM I and EQ I.*

*The Amendment shall apply accordingly to such a signatory.*

*Any signatory may at any time withdraw the notification referred to above in writing to the Secretariat.][96]*

*[CHAIRMAN'S STATEMENT AT THE ADOPTION SESSION ON 24 APRIL 1998*

*"On the issue of future listing of countries on Annexes BR and BRQ, I conclude that all delegations are aware of the long standing positions of those delegations which like Australia, Hungary and Japan have repeatedly underlined that they support legally binding tariff commitments provided their commitments under the Energy Charter Treaty reflect their commitments in the WTO. This also reflects the position of other delegations, and there is a general acceptance among delegations that they will give positive consideration to that position at the time when the decision on legally binding tariff commitments is taken."][97]*

    (o)    consider and approve the addition of items to Annex EM II from Annex EM I with the corresponding deletion of those items from Annex EM I and consider and approve the addition of items to Annex EQ II from Annex EQ I with the corresponding deletion of those items from Annex EQ I;[98]

*[DECISION         A signatory which does not apply the Amendment adopted on 24 April 1998 provisionally may at the time that it takes action to apply that Amendment, whether on a definitive or a provisional basis, notify the Secretariat in writing that until it is listed in Annexes BR and BRQ, it will apply the Amendment as if all items of Energy Materials and Products and of Energy-Related Equipment continued to be listed in Annexes EM I and EQ I .*

---

96  Decision 1 in Connection with the Adoption of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty (Annex 2 to the Final Act).

97  Editor's note: Document CS(98) 338 CC 124, point 6, of 24 May 1998 (not published). This Statement was read out by the Chairman to the Adoption Session on 24 April 1998 and also circulated in written form. This Statement, which reflected the outcome of informal consultations, replaced a draft Declaration on the issue of listing on Annexes BR and BRQ, the text of which was consequently deleted from the text for adoption.

98  Modification due to the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

*The Amendment shall apply accordingly to such a signatory.*

*Any signatory may at any time withdraw the notification referred to above in writing to the Secretariat.][99]*

*[UNDERSTANDING        With respect to Article 29(7):*

*In the case of a signatory, not a member of the WTO, which is listed in Annexes BR or BRQ or both, any concession offered formally in the process of its accession to the WTO with respect to Energy Materials or Products listed in Annex EM II or Energy-Related Equipment listed in Annex EQ II shall, for the purpose of this Article, be regarded as a commitment under the WTO.][100]*

  (p)[101]    appoint the Secretary General and take all decisions necessary for the establishment and functioning of the Secretariat including the structure, staff levels and standard terms of employment of officials and employees.

(4)    In the performance of its duties, the Charter Conference, through the Secretariat, shall cooperate with and make as full a use as possible, consistently with economy and efficiency, of the services and programmes of other institutions and organisations with established competence in matters related to the objectives of this Treaty.

(5)    The Charter Conference may establish such subsidiary bodies as it considers appropriate for the performance of its duties.

(6)    The Charter Conference shall consider and adopt rules of procedure and financial rules.

(7)    In 1999 and thereafter at intervals (of not more than five years) to be determined by the Charter Conference, the Charter Conference shall thoroughly review the functions provided for in this Treaty in the light of the extent to which the provisions of the Treaty and Protocols have been implemented. At the conclusion of each review the Charter Conference may amend or abolish the functions specified in paragraph (3) and may discharge the Secretariat.

Energy Charter Treaty

---

99    Decision 1 in Connection with the Adoption of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty (Annex 2 to the Final Act).

100    Final Act in respect of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty, Understanding 2.

101    Originally, (n) (modification due to the Amendment to the Trade-Related Provisions of the Energy Charter Treaty).

## Article 35: Secretariat

(1)   In carrying out its duties, the Charter Conference shall have a Secretariat which shall be composed of a Secretary General and such staff as are the minimum consistent with efficient performance.

(2)   The Secretary General shall be appointed by the Charter Conference. The first such appointment shall be for a maximum period of five years.

(3)   In the performance of its duties the Secretariat shall be responsible to and report to the Charter Conference.

(4)   The Secretariat shall provide the Charter Conference with all necessary assistance for the performance of its duties and shall carry out the functions assigned to it in this Treaty or in any Protocol and any other functions assigned to it by the Charter Conference.

(5)   The Secretariat may enter into such administrative and contractual arrangements as may be required for the effective discharge of its functions.

## Article 36: Voting

(1)   Unanimity of the Contracting Parties Present and Voting at the meeting of the Charter Conference where such matters fall to be decided shall be required for decisions by the Charter Conference to:

(a)   adopt amendments to this Treaty other than amendments to Articles 34 and 35 and Annex T;

(b)   approve accessions to this Treaty under Article 41 by states or Regional Economic Integration Organisations which were not signatories to the Charter as of 16 June 1995;

(c)   authorise the negotiation of and approve or adopt the text of association agreements;

(d)   approve modifications to Annexes EM, NI, W[102] and B;

(e)   approve technical changes to the Annexes to this Treaty; and

(f)   approve the Secretary General's nominations of panelists under Annex D, paragraph (7).

---

102   Originally G (modification based on Art. 2 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty).

(g)     approve the addition of items to Annex EM II from Annex EM I with the corresponding deletion of those items from Annex EM I and approve the addition of items to Annex EQ II from Annex EQ I with the corresponding deletion of those items from Annex EQ I.[103]

The Contracting Parties shall make every effort to reach agreement by consensus on any other matter requiring their decision under this Treaty. If agreement cannot be reached by consensus, paragraphs (2) to (5) shall apply.

(2)     Decisions on budgetary matters referred to in Article 34(3)(e) shall be taken by a qualified majority of Contracting Parties whose assessed contributions as specified in Annex B represent, in combination, at least three-fourths of the total assessed contributions specified therein.

(3)     Decisions on matters referred to in Article 34(7) shall be taken by a three-fourths majority of the Contracting Parties.

(4)     Except in cases specified in subparagraphs (1)(a) to (g),[104] paragraphs (2) and (3), and subject to paragraph (6), decisions provided for in this Treaty shall be taken by a three-fourths majority of the Contracting Parties Present and Voting at the meeting of the Charter Conference at which such matters fall to be decided.

(5)     For purposes of this Article, "Contracting Parties Present and Voting" means Contracting Parties present and casting affirmative or negative votes, provided that the Charter Conference may decide upon rules of procedure to enable such decisions to be taken by Contracting Parties by correspondence.

(6)     Except as provided in paragraph (2), no decision referred to in this Article shall be valid unless it has the support of a simple majority of the Contracting Parties.

(7)     A Regional Economic Integration Organisation shall, when voting, have a number of votes equal to the number of its member states which are Contracting Parties to this Treaty; provided that such an Organisation

Energy Charter Treaty

---

103   Modification based on Art. 2 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

104   Originally (f), modification based on Art. 2 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

shall not exercise its right to vote if its member states exercise theirs, and vice versa.

(8)   In the event of persistent arrears in a Contracting Party's discharge of financial obligations under this Treaty, the Charter Conference may suspend that Contracting Party's voting rights in whole or in part.

### Article 37: Funding Principles

(1)   Each Contracting Party shall bear its own costs of representation at meetings of the Charter Conference and any subsidiary bodies.

(2)   The cost of meetings of the Charter Conference and any subsidiary bodies shall be regarded as a cost of the Secretariat.

(3)   The costs of the Secretariat shall be met by the Contracting Parties assessed according to their capacity to pay, determined as specified in Annex B, the provisions of which may be modified in accordance with Article 36(1)(d).

(4)   A Protocol shall contain provisions to assure that any costs of the Secretariat arising from that Protocol are borne by the parties thereto.

(5)   The Charter Conference may in addition accept voluntary contributions from one or more Contracting Parties or from other sources. Costs met from such contributions shall not be considered costs of the Secretariat for the purposes of paragraph (3).

### Part VIII: Final Provisions

### Article 38: Signature

This Treaty shall be open for signature at Lisbon from 17 December 1994 to 16 June 1995 by the states and Regional Economic Integration Organisations which have signed the Charter.

### Article 39: Ratification, Acceptance or Approval

This Treaty shall be subject to ratification, acceptance or approval by signatories. Instruments of ratification, acceptance or approval shall be deposited with the Depositary.

## Article 40: Application to Territories

*[DECLARATION            With respect to Article 40*

*Denmark recalls that the European Energy Charter does not apply to Greenland and the Faroe Islands until notice to this effect has been received from the local governments of Greenland and the Faroe Islands.*

*In this respect Denmark affirms that Article 40 of the Treaty applies to Greenland and the Faroe Islands.][105]*

(1)   Any state or Regional Economic Integration Organisation may at the time of signature, ratification, acceptance, approval or accession, by a declaration deposited with the Depositary, declare that the Treaty shall be binding upon it with respect to all the territories for the international relations of which it is responsible, or to one or more of them. Such declaration shall take effect at the time the Treaty enters into force for that Contracting Party.

(2)   Any Contracting Party may at a later date, by a declaration deposited with the Depositary, bind itself under this Treaty with respect to other territory specified in the declaration. In respect of such territory the Treaty shall enter into force on the ninetieth day following the receipt by the Depositary of such declaration.

(3)   Any declaration made under the two preceding paragraphs may, in respect of any territory specified in such declaration, be withdrawn by a notification to the Depositary. The withdrawal shall, subject to the applicability of Article 47(3), become effective upon the expiry of one year after the date of receipt of such notification by the Depositary.

(4)   The definition of "Area" in Article 1(10) shall be construed having regard to any declaration deposited under this Article.

## Article 41: Accession

This Treaty shall be open for accession, from the date on which the Treaty is closed for signature, by states and Regional Economic Integration Organisations which have signed the Charter, on terms to be approved by the Charter Conference. The instruments of accession shall be deposited with the Depositary.

Energy Charter Treaty

---

105   Final Act of the European Energy Charter Conference, Declaration 6.

## Article 42: Amendments

(1)    Any Contracting Party may propose amendments to this Treaty.

(2)    The text of any proposed amendment to this Treaty shall be communicated to the Contracting Parties by the Secretariat at least three months before the date on which it is proposed for adoption by the Charter Conference.

(3)    Amendments to this Treaty, texts of which have been adopted by the Charter Conference, shall be communicated by the Secretariat to the Depositary which shall submit them to all Contracting Parties for ratification, acceptance or approval.

(4)    Instruments of ratification, acceptance or approval of amendments to this Treaty shall be deposited with the Depositary. Amendments shall enter into force between Contracting Parties having ratified, accepted or approved them on the ninetieth day after deposit with the Depositary of instruments of ratification, acceptance or approval by at least three-fourths of the Contracting Parties. Thereafter the amendments shall enter into force for any other Contracting Party on the ninetieth day after that Contracting Party deposits its instrument of ratification, acceptance or approval of the amendments.

## Article 43: Association Agreements

(1)    The Charter Conference may authorise the negotiation of association agreements with states or Regional Economic Integration Organisations, or with international organisations, in order to pursue the objectives and principles of the Charter and the provisions of this Treaty or one or more Protocols.

(2)    The relationship established with and the rights enjoyed and obligations incurred by an associating state, Regional Economic Integration Organisation, or international organisation shall be appropriate to the particular circumstances of the association, and in each case shall be set out in the association agreement.

## Article 44: Entry into Force

(1)    This Treaty shall enter into force on the ninetieth day after the date of deposit of the thirtieth instrument of ratification, acceptance or approval

thereof, or of accession thereto, by a state or Regional Economic Integration Organisation which is a signatory to the Charter as of 16 June 1995.

(2)    For each state or Regional Economic Integration Organisation which ratifies, accepts or approves this Treaty or accedes thereto after the deposit of the thirtieth instrument of ratification, acceptance or approval, it shall enter into force on the ninetieth day after the date of deposit by such state or Regional Economic Integration Organisation of its instrument of ratification, acceptance, approval or accession.

(3)    For the purposes of paragraph (1), any instrument deposited by a Regional Economic Integration Organisation shall not be counted as additional to those deposited by member states of such Organisation.

### Article 45: Provisional Application

(1)    Each signatory agrees to apply this Treaty provisionally pending its entry into force for such signatory in accordance with Article 44, to the extent that such provisional application is not inconsistent with its constitution, laws or regulations.

(2)    (a)    Notwithstanding paragraph (1) any signatory may, when signing, deliver to the Depository a declaration that it is not able to accept provisional application. The obligation contained in paragraph (1) shall not apply to a signatory making such a declaration. Any such signatory may at any time withdraw that declaration by written notification to the Depository.

(b)    Neither a signatory which makes a declaration in accordance with subparagraph (a) nor Investors of that signatory may claim the benefits of provisional application under paragraph (1).

(c)    Notwithstanding subparagraph (a), any signatory making a declaration referred to in subparagraph (a) shall apply Part VII provisionally pending the entry into force of the Treaty for such signatory in accordance with Article 44, to the extent that such provisional application is not inconsistent with its laws or regulations.

(3)    (a)    Any signatory may terminate its provisional application of this Treaty by written notification to the Depository of its intention not to become a Contracting Party to the Treaty. Termination of provisional application for any signatory shall take effect upon

**Energy Charter Treaty**

the expiration of 60 days from the date on which such signatory's written notification is received by the Depository.

(b)    In the event that a signatory terminates provisional application under subparagraph (a), the obligation of the signatory under paragraph (1) to apply Parts III and V with respect to any Investments made in its Area during such provisional application by Investors of other signatories shall nevertheless remain in effect with respect to those Investments for twenty years following the effective date of termination, except as otherwise provided in subparagraph (c).

(c)    Subparagraph (b) shall not apply to any signatory listed in Annex PA. A signatory shall be removed from the list in Annex PA effective upon delivery to the Depository of its request therefor.

(4)    Pending the entry into force of this Treaty the signatories shall meet periodically in the provisional Charter Conference, the first meeting of which shall be convened by the provisional Secretariat referred to in paragraph (5) not later than 180 days after the opening date for signature of the Treaty as specified in Article 38.

(5)    The functions of the Secretariat shall be carried out on an interim basis by a provisional Secretariat until the entry into force of this Treaty pursuant to Article 44 and the establishment of a Secretariat.

(6)    The signatories shall, in accordance with and subject to the provisions of paragraph (1) or subparagraph (2)(c) as appropriate, contribute to the costs of the provisional Secretariat as if the signatories were Contracting Parties under Article 37(3). Any modifications made to Annex B by the signatories shall terminate upon the entry into force of this Treaty.

(7)    A state or Regional Economic Integration Organisation which, prior to this Treaty's entry into force, accedes to the Treaty in accordance with Article 41 shall, pending the Treaty's entry into force, have the rights and assume the obligations of a signatory under this Article.

*[Provisional Application of the Trade Amendment: Article 6 "Provisional Application" of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty:*

*(1)    Each signatory which applies the Energy Charter Treaty provisionally in accordance with Article 45(1) and each Contracting Party agrees to apply this Amendment provisionally pending its entry into force for such signatory*

*or Contracting Party to the extent that such provisional application is not inconsistent with its constitution, laws or regulations.*

*(2)    (a)    Notwithstanding paragraph (1):*

*(i)    any signatory which applies the Energy Charter Treaty provisionally or Contracting Party may deliver to the Depositary within 90 days from the date of the adoption of this Amendment by the Charter Conference a declaration that it is not able to accept the provisional application of this Amendment.*

*(ii)    Any signatory which does not apply the Energy Charter Treaty provisionally in accordance with Article 45(2) may deliver to the Depositary not later than the date on which it becomes a Contracting Party or begins to apply the Treaty provisionally a declaration that it is not able to accept the provisional application of this Amendment.*

*The obligation contained in paragraph (1) shall not apply to a signatory or Contracting Party making such a declaration. Any such signatory or Contracting Party may at any time withdraw that declaration by written notification to the Depositary.*

*(b)    Neither a signatory which makes a declaration in accordance with subparagraph (a) nor Investors of that signatory may claim the benefits of provisional application under paragraph (1).*

*(3)    Any signatory or Contracting Party may terminate its provisional application of this Amendment by written notification to the Depositary of its intention not to ratify, accept or approve this Amendment. Termination of provisional application for any signatory or Contracting Party shall take effect upon the expiration of 60 days from the date on which such signatory's or Contracting Party's written notification is received by the Depositary. Any signatory which terminates its provisional application of the Energy Charter Treaty in accordance with Article 45(3)(a) shall be considered as also having terminated its provisional application of this Amendment with the same date of effect.]*

### Article 46: Reservations

No reservations may be made to this Treaty.

### Article 47: Withdrawal

(1)    At any time after five years from the date on which this Treaty has entered into force for a Contracting Party, that Contracting Party may give written notification to the Depositary of its withdrawal from the Treaty.

(2)   Any such withdrawal shall take effect upon the expiry of one year after the date of the receipt of the notification by the Depositary, or on such later date as may be specified in the notification of withdrawal.

(3)   The provisions of this Treaty shall continue to apply to Investments made in the Area of a Contracting Party by Investors of other Contracting Parties or in the Area of other Contracting Parties by Investors of that Contracting Party as of the date when that Contracting Party's withdrawal from the Treaty takes effect for a period of 20 years from such date.

(4)   All Protocols to which a Contracting Party is party shall cease to be in force for that Contracting Party on the effective date of its withdrawal from this Treaty.

## Article 48: Status of Annexes and Decisions[106]

The Annexes to this Treaty and the Decisions set out in Annex 2 to the Final Act of the European Energy Charter Conference signed at Lisbon on 17 December 1994, as well as the Decisions adopted in connection with the adoption of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty are an integral part of the Energy Charter Treaty.

## Article 49: Depositary

The Government of the Portuguese Republic shall be the Depositary of this Treaty.

## Article 50: Authentic Texts

In witness whereof the undersigned, being duly authorised to that effect, have signed this Treaty in English, French, German, Italian, Russian and Spanish, of which every text is equally authentic, in one original, which will be deposited with the Government of the Portuguese Republic.

Done at Lisbon on the seventeenth day of December in the year one thousand nine hundred and ninety-four.[107]

---

106   As amended by Art. 7 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

107   For signatories: http://www.energycharter.org/.

## ANNEXES TO THE ENERGY CHARTER TREATY

1. **Annex EM I: Energy Materials and Products[108]**

   (in accordance with article 1(4))

### Nuclear energy

| | | |
|---|---|---|
| 26.12 | Uranium or thorium ores and concentrates. | |
| | 2612.10 | - Uranium ores and concentrates |
| | 2612.20 | - Thorium ores and concentrates |

Ex 28.44[109] Radioactive chemical elements and radioactive isotopes (including the fissile or fertile chemical elements and isotopes) and their compounds; mixtures and residues containing these products.

| | |
|---|---|
| Ex 2844.10 | - Natural uranium and its compounds |
| Ex 2844.20 | - Uranium enriched in U 235 and its compounds; plutonium and its compounds |
| Ex 2844.30 | - Uranium depleted in U 235 and its compounds; thorium and its compounds |
| Ex 2844.40 | - Radioactive elements and isotopes and compounds other than those of subheading 2844.10, 2844.20 or 2844.30 |
| 2844.50 | - Spent (irradiated) fuel elements (cartridges) of nuclear reactors |

Ex 28.45 Isotopes other than those of heading 28.44; compounds, inorganic or organic, of such isotopes, whether or not chemically defined.[110]

| | |
|---|---|
| 2845.10 | - Heavy water (deuterium oxide) |

### Coal, Natural Gas, Petroleum and Petroleum Products, Electrical Energy

27.01 Coal; briquettes, ovoids and similar solid fuels manufactured from coal.

Energy Charter Treaty

---

108 Originally, Annex EM (modification based on Art. 2 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty).
109 See CCDEC 2013 (17) TTG, of 6.12.2013 and correspondence table.
110 Editor's note: Heading inserted for information purposes.

27.02        Lignite, whether or not agglomerated, excluding jet.

27.03        Peat (including peat litter), whether or not agglomerated.

27.04        Coke and semi-coke of coal, of lignite or of peat, whether or not agglomerated; retort carbon.

27.05        Coal gas, water gas, producer gas and similar gases, other than petroleum gases and other gaseous hydrocarbons.

27.06        Tar distilled from coal, from lignite or from peat, and other mineral tars, whether or not dehydrated or partially distilled, including reconstituted tars.

27.07[111]    Oils and other products of the distillation of high temperature coal tar; similar products in which the weight of the aromatic constituents exceeds that of the non-aromatic constituents.

27.08        Pitch and pitch coke, obtained from coal tar or from other mineral tars.

27.09        Petroleum oils and oils obtained from bituminous minerals, crude.

Ex 27.10[112]  Petroleum oils and oils obtained from bituminous minerals, other than crude.

27.11[113]    Petroleum gases and other gaseous hydrocarbons.

27.13        Petroleum coke, petroleum bitumen and other residues of petroleum oils or of oils obtained from bituminous minerals.

27.14        Bitumen and asphalt, natural; bituminous or oil shale and tar sands; asphaltites and asphaltic rocks.

27.15        Bituminous mixtures based on natural asphalt, on natural bitumen, on petroleum bitumen, on mineral tar or on mineral tar pitch (for example, bituminous mastics, cut-backs).

27.16        Electrical energy.

---

111   See CCDEC 2013 (17) TTG, of 6.12.2013 and correspondence table.
112   Id.
113   Id.

**Other Energy**

Ex 44.01[114]   Fuel wood, in logs, in billets, in twigs, in faggots or in similar forms; wood in chips or particles; sawdust and wood waste and scrap, whether or not agglomerated in logs, briquettes, pellets or similar forms.

        4401.10         - Fuel wood, in logs, in billets, in twigs, in faggots or in similar forms

44.02[115]      Wood charcoal (including shell or nut charcoal), whether or not agglomerated.

**2.     Annex EM II: Energy Materials and Products[116]**

(in accordance with article 1(4))

**3.     Annex EQ I: List of Energy-Related Equipment[117]**

(in accordance with article 1(4bis))

For the purpose of this Annex, 'Ex' has been included to indicate that the product description referred to does not exhaust the entire range of products within the World Customs Organization Nomenclature headings or the Harmonised System codes listed below.

Ex 39.19       Self-adhesive plates, sheets, film, foil, tape, strip and other flat shapes, of plastics, whether or not in rolls.

        Ex 3919.10    - In rolls of a width not exceeding 20 cm

                -- To be used for oil and gas pipelines and sea lines protection[118]

Energy Charter Treaty

---

114   See CCDEC 2013 (17) TTG, of 6.12.2013 and correspondence table.
115   Id.
116   Modification based on Art. 5 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.
117   Id.
118   Editor's note: specifications beyond HS 2012 are shown with deeper indent.

Ex 73.04*[119]  Tubes, pipes and hollow profiles, seamless, of iron (other than cast iron) or steel.

|  |  | - Line pipe of a kind used for oil or gas pipelines: |
| --- | --- | --- |
| 7304.11 | -- Of stainless steel | |
| 7304.19 | -- Other | |
|  |  | - Casing, tubing and drill pipe, of a kind used in drilling for oil or gas: |
| 7304.22 | -- Drill pipe of stainless steel | |
| 7304.23 | -- Other drill pipe | |
| 7304.24 | -- Other, of stainless steel | |
| 7304.29 | -- Other | |

Ex 73.05  Other tubes and pipes (for example, welded, riveted or similarly closed), having circular cross-sections, the external diameter of which exceeds 406.4 mm, of iron or steel.

|  |  | - Line pipe of a kind used for oil or gas pipelines: |
| --- | --- | --- |
| 7305.11 | -- Longitudinally submerged arc welded | |
| 7305.12 | -- Other, longitudinally welded | |
| 7305.19 | -- Other | |
| 7305.20 | - Casing of a kind used in drilling for oil or gas | |

Ex 73.06*[120]  Other tubes, pipes and hollow profiles (for example, open seam or welded, riveted or similarly closed), of iron or steel.

|  |  | - Line pipe of a kind used for oil or gas pipelines: |
| --- | --- | --- |
| 7306.11 | -- Welded, of stainless steel | |
| 7306.19 | -- Other | |
|  |  | - Casing and tubing of a kind used in drilling for oil or gas: |
| 7306.21 | -- Welded, of stainless steel | |
| 7306.29 | -- Other | |

---

119  See CCDEC 2013 (17) TTG, of 6.12.2013 and correspondence table.

120  Id.

*  Except products for use in civil aircraft.

73.07          Tube or pipe fittings (for example, couplings, elbows, sleeves), of iron or steel.

Ex 73.08       Structures (excluding prefabricated buildings of heading 94.06) and parts of structures (for example, bridges, and bridge-sections, lock-gates, towers, lattice masts, roofs, roofing frame-works, doors and windows and their frames and thresholds for doors, shutters, balustrades, pillars and columns), of iron or steel; plates, rods, angles, shapes, sections, tubes and the like, prepared for use in structures, of iron or steel.

    7308.20        - Towers and lattice masts

    7308.40        - Equipment for scaffolding, shuttering, propping or pitpropping

    Ex 7308.90   - Other

        -- Parts for oil and gas drilling platforms

Ex 73.09       Reservoirs, tanks, vats and similar containers for any material (other than compressed or liquefied gas), of iron or steel, of a capacity exceeding 300 l, whether or not lined or heat-insulated, but not fitted with mechanical or thermal equipment.

    Ex 7309.00        -- For liquids

        -- Of a capacity exceeding 1,000,000 l, where specially designed for strategic oil reserves

        -- Heat insulated

Ex 73.11       Containers for compressed or liquefied gas, of iron or steel.

        -- Of more than 1,000 l

Ex 73.12*      Stranded wire, ropes, cables, plaited bands, slings and the like, of iron or steel, not electrically insulated.

    Ex 7312.10    - Stranded wires, ropes and cables

        -- Ropes and cables coated, non-coated or zinc coated of a kind used in the energy sector

Ex 73.26[121]  *(deleted, item now under 8536.70)*

    Ex 7326.90    - *(deleted, item now under 8536.70)*

---

121   See CCDEC 2013 (17) TTG, of 6.12.2013 and correspondence table.

*     Except products for use in civil aircraft.

Energy Charter Treaty

Ex 76.13    Aluminium containers for compressed or liquefied gas.

-- Of more than 1,000 l

Ex 76.14    Stranded wire, cables, plaited bands and the like, of aluminium, not electrically insulated.

Ex 7614.10    - With steel core

-- Of a kind used in electricity generation, transmission and distribution

Ex 7614.90    - Other

-- Of a kind used in electricity generation, transmission and distribution

Ex 78.06    Other articles of lead.

-- Containers with an anti-radiation lead covering, for the transport or storage of highly radioactive materials

Ex 81.09    Zirconium and articles thereof, including waste and scrap.

Ex 8109.90    - Other

-- Cartridges or tubes for nuclear fuel elements

Ex 82.07    Interchangeable tools for hand tools, whether or not power-operated, or for machine-tools (for example, for pressing, stamping, punching, tapping, threading, drilling, boring, broaching, milling, turning or screw driving), including dies for drawing or extruding metal, and rock drilling or earth boring tools.

- Rock drilling or earth boring tools:

8207.13    -- With working part of cermets

8207.19    -- Other, including parts

Ex 83.07*    Flexible tubing of base metal, with or without fittings.

-- For exclusive use in oil and gas wells

84.01    Nuclear reactors; fuel elements (cartridges), non-irradiated, for nuclear reactors; machinery and apparatus for isotopic separation.

---

\* Except products for use in civil aircraft.

84.02      Steam or other vapour generating boilers (other than central heating hot water boilers capable also of producing low pressure steam); super-heated water boilers.

84.03      Central heating boilers other than those of heading 84.02.

84.04      Auxiliary plant for use with boilers of heading 84.02 or 84.03 (for example, economisers, super-heaters, soot removers, gas recoverers); condensers for steam or other vapour power units.

84.05      Producer gas or water gas generators, with or without their purifiers; acetylene gas generators and similar water process gas generators, with or without their purifiers.

Ex 84.06   Steam turbines and other vapour turbines.

                      - Other turbines:

           8406.81      -- Of an output exceeding 40 MW

           8406.82      -- Of an output not exceeding 40 MW

           8406.90       - Parts

Ex 84.08*  Compression-ignition internal combustion piston engines (diesel or semi-diesel engines).

           Ex 8408.90   - Other engines

                      -- New, of a power exceeding 50 kW

Ex 84.09   Parts suitable for use solely or principally with the engines of heading 84.07 or 84.08.

           8409.99      -- Other

84.10      Hydraulic turbines, water wheels, and regulators therefor.

84.11*     Turbo-jets, turbo-propellers and other gas turbines.

84.13*     Pumps for liquids, whether or not fitted with a measuring device; liquid elevators.

<hr>

\*     Except products for use in civil aircraft.

Ex 84.14*   Air or vacuum pumps, air or other gas compressors and fans; ventilating or recycling hoods incorporating a fan, whether or not fitted with filters.

- Fans:

Ex 8414.59  -- Other

-- For use in mining and power plants

8414.80     - Other

8414.90     - Parts

84.16       Furnace burners for liquid fuel, for pulverised solid fuel or for gas; mechanical stokers, including their mechanical grates, mechanical ash dischargers and similar appliances.

Ex 84.17    Industrial or laboratory furnaces and ovens, including incinerators, non-electric.

Ex 8417.80  - Other

-- Exclusively waste incinerators, laboratory furnaces and ovens and uranium sintering ovens

Ex 8417.90  - Parts

-- Exclusively for waste incinerators, laboratory furnaces and ovens and uranium sintering ovens

Ex 84.18*[122]  Refrigerators, freezers, and other refrigerating or freezing equipment, electric or other; heat pumps other than air conditioning machines of heading 84.15.

- Other refrigerating or freezing equipment; heat pumps:

8418.61     -- Heat pumps other than air conditioning machines of heading 84.15

8418.69     -- Other

Ex 84.19*[123]  Machinery, plant or laboratory equipment, whether or not electrically heated (excluding furnaces, ovens and other equipment

---

*      Except products for use in civil aircraft.
122   See CCDEC 2013 (17) TTG, of 6.12.2013 and correspondence table.
123   Id.

of heading 85.14), for the treatment of materials by a process involving a change of temperature such as heating, cooking, roasting, distilling, rectifying, sterilising, pasteurising, steaming, drying, evaporating, vaporising, condensing or cooling, other than machinery or plant of a kind used for domestic purposes; instantaneous or storage water heaters, non-electric.

| | |
|---|---|
| 8419.50 | - Heat exchange units |
| 8419.60 | - Machinery for liquefying air or other gases |
| | - Other machinery, plant and equipment: |
| 8419.89 | -- Other |

Ex 84.21*    Centrifuges, including centrifugal dryers; filtering or purifying machinery and apparatus, for liquids or gases.

| | |
|---|---|
| | - Filtering or purifying machinery and apparatus for liquids: |
| 8421.21 | -- For filtering or purifying water |
| | - Filtering or purifying machinery and apparatus for gases: |
| 8421.39 | -- Other |

Ex 84.25*[124]    Pulley tackle and hoists other than skip hoists; winches and capstans; jacks.

| | |
|---|---|
| | - Winches; capstans: |
| Ex 8425.31 | -- Pit-head winding gear powered by electric motor; winches specially designed for use underground powered by electric motor |
| Ex 8425.39 | -- Other pit-head winding gear; other winches specially designed for use underground |

Ex 84.26*    Ships' derricks; cranes, including cable cranes; mobile lifting frames, straddle carriers and works trucks fitted with a crane.

| | |
|---|---|
| Ex 8426.20 | - Tower cranes |
| | -- For offshore platforms and onshore rigs |

___

*    Except products for use in civil aircraft.
124   See CCDEC 2013 (17) TTG, of 6.12.2013 and correspondence table.

- Other machinery:

Ex 8426.91  -- Designed for mounting on road vehicles

-- Lifting equipment for repairing and completion of wells

Ex 84.29    Self-propelled bulldozers, angledozers, graders, levellers, scrapers, mechanical shovels, excavators, shovel loaders, tamping machines and road rollers.

- Mechanical shovels, excavators and shovel loaders:

Ex 8429.51  -- Front-end shovel loaders

-- Loaders specially designed for underground use

Ex 84.30    Other moving, grading, levelling, scraping, excavating, tamping, compacting, extracting or boring machinery, for earth, minerals or ores; pile-drivers and pile-extractors; snow-ploughs and snow-blowers.

- Coal or rock cutters and tunnelling machinery:

8430.31     -- Self-propelled

8430.39     -- Other

- Other boring or sinking machinery:

Ex 8430.41  -- Self-propelled

-- For the discovery or exploitation of deposits of oil and gas

Ex 8430.49  -- Other

Ex 84.31    Parts suitable for use solely or principally with the machinery of heading 84.25 to 84.30.

-- Only for machinery covered

Ex 84.43*[125]  Printing machinery used for printing by means of plates, cylinders and other printing components of heading 84.42; other printers, copying machines and facsimile machines, whether or not combined; parts and accessories thereof.

---

*       Except products for use in civil aircraft.
125   See CCDEC 2013 (17) TTG, of 6.12.2013 and correspondence table.

- Other printers, copying machines and facsimile machines, whether or not combined:

Ex 8443.31  -- Machines which perform two or more of the functions of printing, copying or facsimile transmission, capable of connecting to an automatic data processing machine or to a network

Ex 8443.32  -- Other, capable of connecting to an automatic data processing machine or to a network

84.71*      Automatic data processing machines and units thereof; magnetic or optical readers, machines for transcribing data onto data media in coded form and machines for processing such data, not elsewhere specified or included.

Ex 84.74    Machinery for sorting, screening, separating, washing, crushing, grinding, mixing or kneading earth, stone, ores or other mineral substances, in solid (including powder or paste) form; machinery for agglomerating, shaping or moulding solid mineral fuels, ceramic paste, unhardened cements, plastering materials or other mineral products in powder or paste form; machines for forming foundry moulds of sand.

8474.10      - Sorting, screening, separating or washing machines

8474.20      - Crushing or grinding machines

Ex 8474.90   - Parts

                -- Of cast iron or cast steel

Ex 84.79*   Machines and mechanical appliances having individual functions, not specified or included elsewhere in this Chapter.[126]

                - Other machines and mechanical appliances:

Ex 8479.89  -- Other

                -- Mobile hydraulic powered mine roof support

Ex 84.81    Taps, cocks, valves and similar appliances for pipes, boiler shells, tanks, vats or the like, including pressure-reducing valves and thermostatically controlled valves.

8481.10      - Pressure-reducing valves

Energy Charter Treaty

---

\*       Except products for use in civil aircraft.

126    Chapter 84.

| | | |
|---|---|---|
| 8481.20 | - Valves for oleohydraulic or pneumatic transmissions | |
| 8481.40 | - Safety or relief valves | |
| 8481.80 | - Other appliances | |
| 8481.90 | - Parts | |

Ex 84.83    Transmission shafts (including cam shafts and crank shafts) and cranks; bearing housings and plain shaft bearings; gears and gearing; ball or roller screws; gear boxes and other speed changers, including torque converters; flywheels and pulleys, including pulley blocks; clutches and shaft couplings (including universal joints).

       Ex 8483.40   - Gears and gearing, other than toothed wheels, chain sprockets and other transmission elements presented separately; ball or roller screws; gear boxes and other speed changers, including torque converters

            -- Transmission elements exclusively for use in sucker rod pumping units in the oil and gas industry

Ex 84.84*   Gaskets and similar joints of metal sheeting combined with other material or of two or more layers of metal; sets or assortments of gaskets and similar joints, dissimilar in composition, put up in pouches, envelopes or similar packings; mechanical seals.

       8484.10    - Gaskets and similar joints of metal sheeting combined with other material or of two or more layers of metal

       8484.20    - Mechanical seals

85.01*     Electric motors and generators (excluding generating sets).

85.02*     Electric generating sets and rotary converters.

85.03*     Parts suitable for use solely or principally with the machines of heading 85.01 or 85.02.

Ex 85.04*   Electrical transformers, static converters (for example, rectifiers) and inductors.

            - Liquid dielectric transformers:

---

\*     Except products for use in civil aircraft.

8504.21    -- Having a power handling capacity not exceeding 650 kVA

8504.22    -- Having a power handling capacity exceeding 650 kVA but not exceeding 10,000 kVA

8504.23    -- Having a power handling capacity exceeding 10,000 kVA

         - Other transformers:

8504.33    -- Having a power handling capacity exceeding 16 kVA but not exceeding 500 kVA

8504.34    -- Having a power handling capacity exceeding 500 kVA

8504.40    - Static converters

8504.50    - Other inductors

8504.90    - Parts

Ex 85.07*    Electric accumulators, including separators therefor, whether or not rectangular (including square).

                    -- Excluding the use for non-energy sectors

85.14[127]    Industrial or laboratory electric furnaces and ovens (including those functioning by induction or dielectric loss); other industrial or laboratory equipment for the heat treatment of materials by induction or dielectric loss.

Ex 85.17*[128]    Telephone sets, including telephones for cellular networks or for other wireless networks; other apparatus for the transmission or reception of voice, images or other data, including apparatus for communication in a wired or wireless network (such as a local or wide area network), other than transmission or reception apparatus of heading 84.43, 85.25, 85.27 or 85.28.

         Ex 8517.62    -- Machines for the reception, conversion and transmission or regeneration of voice, images or other data, including switching and routing apparatus

**Energy Charter Treaty**

---

*    Except products for use in civil aircraft.

127   See CCDEC 2013 (17) TTG, of 6.12.2013 and correspondence table.

128   Id.

Ex 85.26*    Radar apparatus, radio navigational aid apparatus and radio remote control apparatus.

    8526.10    - Radar apparatus

             - Other:

    8526.91    -- Radio navigational aid apparatus

Ex 85.28*[129]    Monitors and projectors, not incorporating television reception apparatus; reception apparatus for television, whether or not incorporating radio-broadcast receivers or sound or video recording or reproducing apparatus.

             - Cathode-ray tube monitors:

    8528.41    -- Of a kind solely or principally used in an automatic data processing system of heading 84.71

             - Other monitors:

    8528.51    -- Of a kind solely or principally used in an automatic data processing system of heading 84.71

             - Projectors:

    8528.61    -- Of a kind solely or principally used in an automatic data processing system of heading 84.71

85.31*    Electric sound or visual signalling apparatus (for example, bells, sirens, indicator panels, burglar or fire alarms), other than those of heading 85.12 or 85.30.

Ex 85.32    Electrical capacitors, fixed, variable or adjustable (pre-set).

    8532.10    - Fixed capacitors designed for use in 50/60 Hz circuits and having a reactive power handling capacity of not less than 0.5 kvar (power capacitors)

85.35    Electrical apparatus for switching or protecting electrical circuits, or for making connections to or in electrical circuits (for example, switches, fuses, lightning arresters, voltage limiters, surge suppressors, plugs and other connectors, junction boxes), for a voltage exceeding 1,000 volts.

---

\*    Except products for use in civil aircraft.
129    See CCDEC 2013 (17) TTG, of 6.12.2013 and correspondence table.

Ex 85.36[130]    Electrical apparatus for switching or protecting electrical circuits, or for making connections to or in electrical circuits (for example, switches, relays, fuses, surge suppressors, plugs, sockets, lampholders and other connectors, junction boxes), for a voltage not exceeding 1,000 volts; connectors for optical fibres, optical fibre bundles or cables.

    Ex 8536.10    - Fuses

                -- Exceeding 63 ampere

    Ex 8536.20    - Automatic circuit breakers

                -- Exceeding 63 ampere

    Ex 8536.30    - Other apparatus for protecting electrical circuits

                -- Exceeding 16 ampere

     - Relays:

    8536.41    -- For a voltage not exceeding 60 V

    8536.49    -- Other

    Ex 8536.50    - Other switches

                -- For a voltage exceeding 60 V

    Ex 8536.70    - Connectors for optical fibre cables

85.37    Boards, panels, consoles, desks, cabinets and other bases, equipped with two or more apparatus of heading 85.35 or 85.36, for electric control or the distribution of electricity, including those incorporating instruments or apparatus of Chapter 90, and numerical control apparatus, other than switching apparatus of heading 85.17.

85.38    Parts suitable for use solely or principally with the apparatus of heading 85.35, 85.36 or 85.37.

Ex 85.41    Diodes, transistors and similar semiconductor devices; photosensitive semiconductor devices, including photovoltaic cells whether or not assembled in modules or made up into panels; light emitting diodes; mounted piezo-electric crystals.

    Ex 8541.40    - Photosensitive semiconductor devices, including photovoltaic cells whether or not assembled in

**Energy Charter Treaty**

---

130   See CCDEC 2013 (17) TTG, of 6.12.2013 and correspondence table.

modules or made up into panels; light emitting diodes

- Photosensitive semiconductor devices, including photovoltaic cells whether or not assembled in modules or made up into panels

Ex 85.44    Insulated (including enamelled or anodised) wire, cable (including co-axial cable) and other insulated electric conductors, whether or not fitted with connectors; optical fibre cables, made up of individually sheathed fibres, whether or not assembled with electric conductors or fitted with connectors.

8544.60    - Other electric conductors, for a voltage exceeding 1,000 V

8544.70    - Optical fibre cables

Ex 85.45    Carbon electrodes, carbon brushes, lamp carbons, battery carbons and other articles of graphite or other carbon, with or without metal, of a kind used for electrical purposes.

8545.20    - Brushes

85.46    Electrical insulators of any material.

85.47    Insulating fittings for electrical machines, appliances or equipment, being fittings wholly of insulating material apart from any minor components of metal (for example, threaded sockets) incorporated during moulding solely for purposes of assembly, other than insulators of heading 85.46; electrical conduit tubing and joints therefor, of base metal lined with insulating material.

Ex 87.04    Motor vehicles for the transport of goods.

- Other, with compression-ignition internal combustion piston engine (diesel or semi-diesel):

Ex 8704.21    -- g.v.w. not exceeding 5 tonnes

-- Specially designed for the transport of highly radioactive materials

Ex 8704.22    -- g.v.w. exceeding 5 tonnes but not exceeding 20 tonnes

**120**

-- Specially designed for the transport of highly radioactive materials

Ex 8704.23  -- g.v.w. exceeding 20 tonnes

-- Specially designed for the transport of highly radioactive materials

- Other, with spark-ignition internal combustion piston engine:

Ex 8704.31  -- g.v.w. not exceeding 5 tonnes

-- Specially designed for the transport of highly radioactive materials

Ex 8704.32  -- g.v.w. exceeding 5 tonnes

-- Specially designed for the transport of highly radioactive materials

Ex 87.05    Special purpose motor vehicles, other than those principally designed for the transport of persons or goods (for example, breakdown lorries, crane lorries, fire fighting vehicles, concrete-mixer lorries, road sweeper lorries, spraying lorries, mobile workshops, mobile radiological units).

8705.20      - Mobile drilling derricks

Ex 87.09    Works trucks, self-propelled, not fitted with lifting or handling equipment, of the type used in factories, warehouses, dock areas or airports for short distance transport of goods; tractors of the type used on railway station platforms; parts of the foregoing vehicles.

- Vehicles:

Ex 8709.11  -- Electrical

-- Specially designed for the transport of highly radioactive materials

Ex 8709.19  -- Other

-- Specially designed for the transport of highly radioactive materials

Ex 89.05    Light-vessels, fire-floats, dredgers, floating cranes, and other vessels the navigability of which is subsidiary to their main function; floating docks; floating or submersible drilling or production platforms.

|  | 8905.20 | - Floating or submersible drilling or production platforms |

Ex 90.15     Surveying (including photogrammetrical surveying), hydrographic, oceanographic, hydrological, meteorological or geophysical instruments and appliances, excluding compasses; rangefinders.

Ex 9015.80   - Other instruments and appliances

-- Geophysical instruments only

9015.90   - Parts and accessories

Ex 90.26*   Instruments and apparatus for measuring or checking the flow, level, pressure or other variables of liquids or gases (for example, flow meters, level gauges, manometers, heat meters), excluding instruments and apparatus of heading 90.14, 90.15, 90.28 or 90.32.

-- Except for use in the water distribution industry

90.27     Instruments and apparatus for physical or chemical analysis (for example polarimeters, refractometers, spectrometers, gas or smoke analysis apparatus); instruments and apparatus for measuring or checking viscosity, porosity, expansion, surface tension or the like; instruments and apparatus for measuring or checking quantities of heat, sound or light (including exposure meters); microtomes.

90.28     Gas, liquid or electricity supply or production meters, including calibrating meters therefor.

Ex 90.29*   Revolution counters, production counters, taximeters, mileometers, pedometers and the like; speed indicators and tachometers, other than those of heading 90.14 or 90.15; stroboscopes.

Ex 9029.10   - Revolution counters, production counters, taximeters, mileometers, pedometers and the like

-- Production counters

Ex 9029.90   - Parts and accessories

-- For production counters

Ex 90.30*[131]   Oscilloscopes, spectrum analysers and other instruments and apparatus for measuring or checking electrical quantities,

---

*     Except products for use in civil aircraft.
131   See CCDEC 2013 (17) TTG, of 6.12.2013 and correspondence table.

excluding meters of heading 90.28; instruments and apparatus for measuring or detecting alpha, beta, gamma, X-ray, cosmic or other ionising radiations.

Ex 9030.10 - Instruments and apparatus for measuring or detecting ionising radiations

-- For use in the energy sector

- Other instruments and apparatus, for measuring or checking voltage, current, resistance or power:

9030.31 -- Multimeters without a recording device

9030.33 -- Other, without a recording device

- Other instruments and apparatus:

Ex 9030.84 -- Other, with a recording device

-- For use in the energy sector

Ex 9030.89 -- Other

-- For use in the energy sector

Ex 9030.90 - Parts and accessories

-- For use in the energy sector

90.32* Automatic regulating or controlling instruments and apparatus.

**4.    Annex EQ II: List of Energy-Related Equipment[132]**

(in accordance with article 1(4bis))

**5.    Annex NI: Non-Applicable Energy Materials and Products for Definitions of "Economic Activity in the Energy Sector"**

(in accordance with article 1(5))

27.07[133] Oils and other products of the distillation of high temperature coal tar; similar products in which the weight of the aromatic constituents exceeds that of the non-aromatic constituents.

Energy Charter Treaty

---

* Except products for use in civil aircraft.

132 Modification based on Art. 5 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

133 See CCDEC 2013 (17) TTG, of 6.12.2013 and correspondence table.

Ex 44.01[134]   Fuel wood, in logs, in billets, in twigs, in faggots or in similar forms; wood in chips or particles; sawdust and wood waste and scrap, whether or not agglomerated in logs, briquettes, pellets or similar forms.

      4401.10     - Fuel wood, in logs, in billets, in twigs, in faggots or in similar forms.

44.02[135]   Wood charcoal (including shell or nut charcoal), whether or not agglomerated.

**6.    Annex TRM: Notification and Phase-Out (TRIMs)**

(in accordance with Article 5(4))

(1)    Each Contracting Party shall notify to the Secretariat all trade-related investment measures which it applies that are not in conformity with the provisions of Article 5, within:

    (a)    90 days after the entry into force of this Treaty if the Contracting Party is a member of the WTO;[136] or

    (b)    12 months after the entry into force of this Treaty if the Contracting Party is not a member of the WTO.[137]

Such trade-related investment measures of general or specific application shall be notified along with their principal features.

(2)    In the case of trade-related investment measures applied under discretionary authority, each specific application shall be notified. Information that would prejudice the legitimate commercial interests of particular enterprises need not be disclosed.

(3)    Each Contracting Party shall eliminate all trade-related investment measures which are notified under paragraph (1) within:

    (a)    two years from the date of entry into force of this Treaty if the Contracting Party is a member of the WTO;[138] or

---

134  See CCDEC 2013 (17) TTG, of 6.12.2013 and correspondence table.

135  Id.

136  Modification based on Art. 2 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

137  Id.

138  Id.

(b) three years from the date of entry into force of this Treaty if the Contracting Party is not a member of the WTO.[139]

(4) During the applicable period referred to in paragraph (3) a Contracting Party shall not modify the terms of any trade-related investment measure which it notifies under paragraph (1) from those prevailing at the date of entry into force of this Treaty so as to increase the degree of inconsistency with the provisions of Article 5 of this Treaty.

(5) Notwithstanding the provisions of paragraph (4), a Contracting Party, in order not to disadvantage established enterprises which are subject to a trade-related investment measure notified under paragraph (1), may apply during the phase-out period the same trade-related investment measure to a new Investment where:

(a) the products of such Investment are like products to those of the established enterprises; and

(b) such application is necessary to avoid distorting the conditions of competition between the new Investment and the established enterprises.

Any trade-related investment measure so applied to a new Investment shall be notified to the Secretariat. The terms of such a trade-related investment measure shall be equivalent in their competitive effect to those applicable to the established enterprises, and it shall be terminated at the same time.

(6) Where a state or Regional Economic Integration Organisation accedes to this Treaty after the Treaty has entered into force:

(a) the notification referred to in paragraphs (1) and (2) shall be made by the later of the applicable date in paragraph (1) or the date of deposit of the instrument of accession; and

(b) the end of the phase-out period shall be the later of the applicable date in paragraph (3) or the date on which the Treaty enters into force for that state or Regional Economic Integration Organisation.

Energy Charter Treaty

---

139  Modification based on Art. 2 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

**7.      Annex N: List of Contracting Parties Requiring at least 3 Separate Areas to be Involved in a Transit**

(in accordance with Article 7(10)(a))

1.      Canada and United States of America

**8.      Annex VC: List of Contracting Parties which Have Made Voluntary Binding Commitments in respect of Article 10(3)**

(in accordance with Article 10(6))

**9.      Annex ID: List of Contracting Parties Not Allowing an Investor to Resubmit the Same Dispute to International Arbitration at a Later Stage under Article 26**

(in accordance with Article 26(3)(b)(i))

1.      Australia

2.      Azerbaijan

3.      Bulgaria

4.      Canada

5.      Croatia

6.      Cyprus

7.      The Czech Republic

8.      European Union and EURATOM[140]

9.      Finland

10.     Greece

11.     Hungary

12.     Ireland

13.     Italy

14.     Japan

15.     Kazakhstan

16.     Norway

17.     Poland

---

140   Editor's note: originally, the European Communities.

18. Portugal

19. Romania

20. The Russian Federation

21. Slovenia

22. Spain

23. Sweden

24. United States of America

**10. Annex IA: List of Contracting Parties Not Allowing an Investor or Contracting Party to Submit a Dispute concerning the Last Sentence of Article 10(1) to International Arbitration**

(in accordance with Articles 26(3)(c) and 27(2))

1. Australia

2. Canada

3. Hungary

4. Norway

**11. Annex P: Special Sub-National Dispute Procedure**

(in accordance with Article 27(3)(i))

PART I

1. Canada

2. Australia

PART II

(1) Where, in making an award, the tribunal finds that a measure of a regional or local government or authority of a Contracting Party (hereinafter referred to as the "Responsible Party") is not in conformity with a provision of this Treaty, the Responsible Party shall take such reasonable measures as may be available to it to ensure observance of the Treaty in respect of the measure.

(2) The Responsible Party shall, within 30 days from the date the award is made, provide to the Secretariat written notice of its intentions as to ensuring observance of the Treaty in respect of the measure. The

Secretariat shall present the notification to the Charter Conference at the earliest practicable opportunity, and no later than the meeting of the Charter Conference following receipt of the notice. If it is impracticable to ensure observance immediately, the Responsible Party shall have a reasonable period of time in which to do so. The reasonable period of time shall be agreed by both parties to the dispute. In the event that such agreement is not reached, the Responsible Party shall propose a reasonable period for approval by the Charter Conference.

(3)   Where the Responsible Party fails, within the reasonable period of time, to ensure observance in respect of the measure, it shall at the request of the other Contracting Party party to the dispute (hereinafter referred to as the "Injured Party") endeavour to agree with the Injured Party on appropriate compensation as a mutually satisfactory resolution of the dispute.

(4)   If no satisfactory compensation has been agreed within 20 days of the request of the Injured Party, the Injured Party may with the authorisation of the Charter Conference suspend such of its obligations to the Responsible Party under the Treaty as it considers equivalent to those denied by the measure in question, until such time as the Contracting Parties have reached agreement on a resolution of their dispute or the non-conforming measure has been brought into conformity with the Treaty.

(5)   In considering what obligations to suspend, the Injured Party shall apply the following principles and procedures:

(a)   The Injured Party should first seek to suspend obligations with respect to the same Part of the Treaty as that in which the tribunal has found a violation.

(b)   If the Injured Party considers that it is not practicable or effective to suspend obligations with respect to the same Part of the Treaty, it may seek to suspend obligations in other Parts of the Treaty. If the Injured Party decides to request authorisation to suspend obligations under this subparagraph, it shall state the reasons therefor in its request to the Charter Conference for authorisation.

(6)   On written request of the Responsible Party, delivered to the Injured Party and to the President of the tribunal that rendered the award, the tribunal shall determine whether the level of obligations suspended by the Injured Party is excessive, and if so, to what extent. If the tribunal cannot be reconstituted, such determination shall be made by one or more arbitrators appointed by

the Secretary General. Determinations pursuant to this paragraph shall be completed within 60 days of the request to the tribunal or the appointment by the Secretary General. Obligations shall not be suspended pending the determination, which shall be final and binding.

(7)   In suspending any obligations to a Responsible Party, an Injured Party shall make every effort not to affect adversely the rights under the Treaty of any other Contracting Party.

## 12.   Annex W: Exceptions and Rules Governing the Application of the Provisions of the WTO Agreement[141]

(in accordance with article 29(2)(A))

*[UNDERSTANDING          with respect to Article 29(2)(a) and Annex W:*

*Notwithstanding the listing of paragraph 6 of article XXIV of the GATT 1994 in Annex W (A)(1)(a)(i), any signatory affected by an increase in customs duties or other charges of any kind imposed on or in connection with importation or exportation referred to in the first sentence of that paragraph, is entitled to seek consultations in the Charter Conference.][142]*

### (A)   Exceptions to the Application of the Provisions of the WTO Agreement.

The following provisions of the WTO Agreement shall not be applicable under Article 29(2)(a):[143]

(1)   Agreement Establishing the World Trade Organization

All except article IX, paragraphs 3 and 4 and XVI, paragraphs 1, 3 and 4

(a)      Annex 1A to the WTO Agreement:

Multilateral Agreements on Trade in Goods:

(i)   General Agreement on Tariffs and Trade 1994

Energy Charter Treaty

---

141   Modification based on Art. 4 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

142   Final Act in respect of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty, Understanding 1.

143   List of provisions of the WTO Agreement that are applicable under Article 29(2)(a) of the Energy Charter Treaty: http://www.energycharter.org/.

II        Schedules of Concessions, paragraphs (1)(a),(1)(b,1st sentence), (1)(c) and (7)

IV        Special Provisions relating to Cinematographic Films

XV        Exchange Arrangements

XVIII     Governmental Assistance to Economic Development

XXII      Consultation

XXIII     Nullification or[144] Impairment

XXIV      Customs Unions and Free-Trade Areas, paragraph 6

XXV       Joint Action by the Contracting Parties

XXVI      Acceptance, Entry into Force and Registration

XXVII     Withholding or Withdrawal of Concessions

XXVIII    Modification of Schedules

XXVIII[bis]  Tariff Negotiations

XXIX      The Relation of this Agreement to the Havana Charter

XXX       Amendments

XXXI      Withdrawal

XXXII     Contracting Parties

XXXIII    Accession

XXXV      Non-application of the Agreement between Particular Contracting Parties

XXXVI     Principles and Objectives

XXXVII    Commitments

XXXVIII   Joint Action

Annex H   Relating to Article XXVI

Annex I   Notes and Supplementary Provisions (related to the above-mentioned GATT provisions)

Understanding on the Interpretation of Article II: 1(b) of the GATT 1994

---

144  Editor's note: in accordance with WTO and former Annex G of ECT. The modification ("and") based on Art. 4 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty is interpreted as error and not considered here.

|   |   |
|---|---|
| 2 | Date of incorporation of other duties and charges into the schedule |
| 4 | Challenges, (1st sentence only) |
| 6 | Dispute settlement |
| 8 | Supersession of BISD 27S/24 |

Understanding on the Interpretation of Article XVII of the GATT 1994

|   |   |
|---|---|
| 1 | only the phrase "for review by the working party to be set up under paragraph (5)" |
| 5 | Working Party on state trading |

Understanding on the Balance-of-Payments Provisions of the GATT 1994

|   |   |
|---|---|
| 5 | Committee on Balance-of-Payments Restrictions, except last sentence |
| 7 | Review by the Committee, the phrase "or under paragraph 12(b) of Article XVIII" |
| 8 | Simplified consultation procedures |
| 13 | Conclusions of Balance-of-Payments consultations, first sentence, third sentence: the phrase "and XVIII: B, the 1979 Declaration" and last sentence. |

Understanding on the Interpretation of Article XXIV of the GATT 1994

All except paragraph 13

Understanding in Respect of Waivers of Obligations under the GATT 1994

|   |   |
|---|---|
| 3 | Nullification and Impairment |

Understanding on the Interpretation of Article XXVIII of the GATT 1994

Marrakesh Protocol to the GATT 1994

|   |   |
|---|---|
| (ii) | Agreement on Agriculture |
| (iii) | Agreement on the Application of Sanitary and Phytosanitary Measures |
| (iv) | Agreement on Textiles and Clothing |
| (v) | Agreement on Technical Barriers to Trade |
| | Preamble (paragraphs 1, 8, 9) |

**Energy Charter Treaty**

**131**

| 1.3 | General Provisions |
|---|---|
| 10.5 | The words "Developed country" and the words "French or Spanish" which shall be replaced by "Russian" |
| 10.6 | The phrase "and draw attention of developing country Members …. interest to them." |
| 10.9 | Information about technical regulations, standards and certification systems (languages) |
| 11 | Technical assistance to other Parties |
| 12 | Special and differential treatment of developing countries |
| 13 | The Committee on Technical Barriers to Trade |
| 14 | Consultation and Dispute Settlement |
| 15 | Final Provisions (other than 15.2 and 15.5) |
| Annex 2 | Technical Expert Groups |

(vi)    Agreement on Trade-Related Investment Measures

(vii)   Agreement on Implementation of Article VI of the GATT 1994 (Anti-dumping)

| 15 | Developing Country Members |
|---|---|
| 16 | Committee on Anti-Dumping Practices |
| 17 | Consultation and Dispute Settlement |
| 18 | Final Provisions, paragraphs 2 and 6 |

(viii)  Agreement on Implementation of Article VII of the GATT 1994 (Customs Valuation)

Preamble, paragraph 2, the phrase "and to secure additional benefits for the international trade of developing countries"

| 14 | Application of Annexes (second sentence except as far as it refers to Annex III paragraphs 6 and 7) |
|---|---|
| 18 | Institutions (Committee on Customs Valuation) |

| 19 | Consultation and Dispute Settlement |
| 20 | Special and differential treatment of developing countries |
| 21 | Reservations |
| 23 | Review |
| 24 | Secretariat |
| Annex II | Technical Committee on Customs Valuation |
| Annex III | Extra Provisions (except paragraphs 6 and 7) |

(ix)     Agreement on Preshipment Inspection

Preamble, paragraphs 2 and 3

| 3.3 | Technical Assistance |
| 6 | Review |
| 7 | Consultation |
| 8 | Dispute Settlement |

(x)     Agreement on Rules of Origin[145]

Preamble, 8th indent

| 4 | Institutions |
| 6 | Review |
| 7 | Consultation |
| 8 | Dispute Settlement |
| 9 | Harmonisation of Rules of Origin |
| Annex I | Technical Committee on Rules of Origin |

(xi)     Agreement on Import Licensing Procedures

| 1.4(a) | General Provisions (last sentence) |
| 2.2 | Automatic Import Licensing (footnote 5) |
| 3.5(iv) | Non-Automatic Import Licensing (last sentence) |
| 4 | Institutions |
| 6 | Consultations and Dispute Settlement |

Energy Charter Treaty

---

145   Editor's note: Art. 9 bears the title "Objectives and Principles". The title "Harmonisation of Rules of Origin" refers to Part IV, comprising only Art. 9.

| | | |
|---|---|---|
| | 7 | Review (except paragraph 3) |
| | 8 | Final provisions (except paragraph 2) |
| (xii) | Agreement on Subsidies and Countervailing Measures | |
| | 4 | Remedies (except paragraphs 4.1, 4.2 and 4.3) |
| | 5 | Adverse Effects, last sentence |
| | 6 | Serious Prejudice (paragraphs 6.6, the phrases "subject to the provisions of paragraph 3 of Annex V" and "arising under Article 7, and to the panel established pursuant to paragraph 4 of Article 7", 6.8 the phrase ", including information submitted in accordance with the provisions of Annex V" and 6.9) |
| | 7 | Remedies (except paragraphs 7.1, 7.2 and 7.3) |
| | 8 | Identification of Non-Actionable Subsidies, paragraph 8.5 and Footnote 25 |
| | 9 | Consultations and Authorised Remedies |
| | 24 | Committee on Subsidies and Countervailing Measures and Subsidiary Bodies |
| | 26 | Surveillance |
| | 27 | Special and Differential Treatment of Developing Country Members |
| | 29 | Transformation into Market Economy, paragraph 29.2 (except first sentence) |
| | 30 | Dispute Settlement |
| | 31 | Provisional Application |
| | 32.2, 32.7 and 32.8 (only insofar as it refers to Annexes V and VII) Final Provisions | |
| | Annex V | Procedures for Developing Information concerning Serious Prejudice |
| | Annex VII | Developing Countries |
| (xiii) | Agreement on Safeguards | |
| | 9 | Developing Country Members |

| | 12 | Notification and Consultation, paragraph 10 |
| | 13 | Surveillance |
| | 14 | Dispute Settlement |
| | | Annex Exception |

(b)    Annex 1B to the WTO Agreement:

General Agreement on Trade in Services

(c)    Annex 1C to the WTO Agreement:

Agreement on Trade-Related Aspects of Intellectual Property Rights

*[Signatories confirm their commitment to provide effective protection of intellectual property rights following the highest international standards.*

*Intellectual property rights include for the purpose of this Declaration in particular copyright and related rights (including computer programmes and data bases), trademarks, geographical indications, patents, designs, topographies of semiconductor products and undisclosed information.][146]*

(d)    Annex 2 to the WTO Agreement:

Understanding on Rules and Procedures Governing the Settlement of Disputes

(e)    Annex 3 to the WTO Agreement:

Trade Policy Review Mechanism

(f)    Annex 4 to the WTO Agreement:

Plurilateral Trade Agreements:

(i)    Agreement on Trade in Civil Aircraft

(ii)   Agreement on Government Procurement

(g)    Ministerial Decisions, Declarations and Understanding:

(i)    Decision on Measures in favour of Least-Developed Countries

(ii)   Declaration on the Contribution of the WTO to Achieving Greater Coherence in Global Economic Policy Making

**Energy Charter Treaty**

---

146  Final Act in respect of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty, Joint Declaration on Trade-Related Intellectual Property Rights.

**135**

(iii)    Decision on Notification Procedures

(iv)    Declaration on the Relationship of the WTO with the IMF

(v)    Decision on Measures Concerning the Possible Negative Effects of the Reform Programme on Least-Developed and Net Food-Importing Developing Countries

(vi)    Decision on Notification of First Integration under Article 2.6 of the Agreement on Textiles and Clothing

(vii)    Decision on Review of the ISO/IEC Information Centre Publication

(viii)    Decision on Proposed Understanding on WTO-ISO Standards Information System

(ix)    Decision on Anti-Circumvention

(x)    Decision on Review of Article 17.6 of the Agreement on Implementation of Article VI of the GATT 1994

(xi)    Declaration on Dispute Settlement pursuant to the Agreement on Implementation of Article VI of the GATT 1994 or Part V of the Agreement on Subsidies and Countervailing Measures

(xii)    Decision Regarding Cases Where Customs Administrations Have Reason to Doubt the Truth or Accuracy of the Declared Value

(xiii)    Decision on Texts Relating to Minimum Values and Imports by Sole Agents, Sole Distributors and Sole Concessionaires

(xiv)    Decision on Institutional Arrangements for the GATS

(xv)    Decision on certain Dispute Settlement Procedures for the GATS

(xvi)    Decision on Trade in Services and the Environment

(xvii)    Decision on Negotiations on Movement of Natural Persons

(xviii)    Decision on Financial Services

(xix)    Decision on Negotiations on Maritime Transport Services

(xx)     Decision on Negotiations on Basic Telecommunications

(xxi)    Decision on Professional Services

(xxii)   Decision on Accession to the Agreement on Government Procurement

(xxiv)   Decision on the Application and Review of the Understanding on Rules and Procedures Governing the Settlement of Disputes

(xxv)    Understanding on Commitments in Financial Services

(xxvi)   Decision on the Acceptance of and Accession to the Agreement Establishing the WTO

(xxvii)  Decision on Trade and Environment

(xxviii) Decision on Organisational and Financial Consequences Following from Implementation of the Agreement Establishing the WTO

(xxix)   Decision on the Establishment of the Preparatory Committee for the WTO

(2)  All other provisions in the WTO Agreement which relate to:

(a)  governmental assistance to economic development and the treatment of developing countries, except for paragraphs (1) to (4) of the Decision of 28 November 1979 (L/4903) on Differential and more Favourable Treatment, Reciprocity and Fuller Participation of Developing Countries;

(b)  the establishment or operation of specialist committees and other subsidiary institutions;

(c)  signature, accession, entry into force, withdrawal, deposit and registration.

(3)  All agreements, arrangements, decisions, understandings or other joint action pursuant to the provisions listed as not applicable in paragraphs (1) or (2).

Energy Charter Treaty

(4)  Trade in nuclear materials may be governed by agreements referred to in the Declarations related to this paragraph contained in the Final Act of the European Energy Charter Conference.[147]

*[The Russian Federation has raised the issue of trade in nuclear materials. The Russian Federation and the EU agreed that the Partnership and Cooperation Agreement between the Russian Federation, the European Union and its Member States, which entered into force on 1 December 1997, is the appropriate framework to deal with this issue, as confirmed in the conclusions of 27 January 1998 Cooperation Council.][148]*

*[DECLARATION          With respect to Annex [W(4)][149]*

(a)  *The European Communities and the Russian Federation declare that trade in nuclear materials between them shall be governed, until they reach another agreement, by the provisions of article 22 of the Agreement on Partnership and Cooperation establishing a partnership between the European Communities and their Member States, of the one part, and the Russian Federation, of the other part, signed at Corfu on 24 June 1994, the exchange of letters attached thereto and the related joint declaration, and disputes regarding such trade will be subject to the procedures of the said Agreement.*

(b)  *The European Communities and Ukraine declare that, in accordance with the Agreement on Partnership and Cooperation signed at Luxembourg on 14 June 1994 and the Interim Agreement thereto, initialled there the same day, trade in nuclear materials between them shall be exclusively governed by the provisions of a specific agreement to be concluded between the European Atomic Energy Community and Ukraine.*

*Until entry into force of this specific agreement, the provisions of the Agreement on Trade and Economic and Commercial Cooperation between the European Economic Community, the European Atomic Energy Community and the Union of Soviet Socialist Republics signed at Brussels on 18 December 1989 shall exclusively continue to apply for trade in nuclear materials between them.*

---

147  Editor's note: For countries having become members of WTO the rules and provisions of WTO are applicable to trade in nuclear materials.

148  Final Act in respect of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty, Joint Declaration by the Russian Federation and the European Union.

149  Original: "G(4)", adapted by editors.

(c)    *The European Communities and Kazakhstan declare that, in accordance with the Agreement on Partnership and Cooperation initialled at Brussels on 20 May 1994, trade in nuclear materials between them shall be exclusively governed by the provisions of a specific agreement to be concluded between the European Atomic Energy Community and Kazakhstan.*

*Until entry into force of this specific agreement, the provisions of the Agreement on Trade and Economic and Commercial Cooperation between the European Economic Community, the European Atomic Energy Community and the Union of Soviet Socialist Republics signed at Brussels on 18 December 1989 shall exclusively continue to apply for trade in nuclear materials between them.*

(d)    *The European Communities and Kyrgyzstan declare that, in accordance with the Agreement on Partnership and Cooperation initialled at Brussels on 31 May 1994, trade in nuclear materials between them shall be exclusively governed by the provisions of a specific agreement to be concluded between the European Atomic Energy Community and Kyrgyzstan.*

*Until entry into force of this specific agreement, the provisions of the Agreement on Trade and Economic and Commercial Cooperation between the European Economic Community, the European Atomic Energy Community and the Union of Soviet Socialist Republics signed at Brussels on 18 December 1989 shall exclusively continue to apply for trade in nuclear materials between them.*

(e)    *The European Communities and Tajikistan declare that trade in nuclear materials between them shall be exclusively governed by the provisions of a specific agreement to be concluded between the European Atomic Energy Community and Tajikistan.*

*Until entry into force of this specific agreement, the provisions of the Agreement on Trade and Economic and Commercial Cooperation between the European Economic Community, the European Atomic Energy Community and the Union of Soviet Socialist Republics signed at Brussels on 18 December 1989 shall exclusively continue to apply for trade in nuclear materials between them.*

(f)    *The European Communities and Uzbekistan declare that trade in nuclear materials between them shall be exclusively governed by the provisions of a specific agreement to be concluded between the European Atomic Energy Community and Uzbekistan.*

*Until entry into force of this specific agreement, the provisions of the Agreement on Trade and Economic and Commercial Cooperation between the European Economic Community, the European Atomic Energy Community and the Union of Soviet Socialist Republics signed at Brussels on 18 December 1989 shall exclusively continue to apply for trade in nuclear materials between them.]*[150]

*[JOINT MEMORANDUM OF THE DELEGATIONS OF THE RUSSIAN FEDERATION AND THE EUROPEAN COMMUNITIES ON NUCLEAR TRADE*[151]

*The delegations of the Russian Federation and of the European Communities have examined the situation of the nuclear trade between both Parties and they acknowledged the following:*

- *The statement of the European Commission in the Joint Committee held on 1 and 2 December 1994 clearly indicates that "the European Commission and the Euratom Supply Agency have never made it their policy to apply quotas on imports of nuclear materials from Russia and do not intend to do so in the future unless a situation should arise requiring safeguard measures in accordance with Article 15 of the Agreement between the European Economic Community, the European Atomic Energy Community and the Union of Soviet Socialist Republics on Trade and Economic and Commercial Cooperation signed in Brussels on 18 December 1989. This means, a fortiori, that no quotas have been or will be applied on a utility by utility basis".*

- *The relevant provisions of the Agreement on Partnership and Cooperation establishing a partnership between the European Communities and their Member States on the one part, and the Russian Federation on the other part, signed in Corfu on 24 June 1994, on national treatment with respect to nuclear materials imported from Russia are fully applicable.*

- *They acknowledge the intention expressed by the European Commission to look at the way the Euratom Supply Agency is implementing its supply policy, with a view to take full account of both Parties' legitimate interests, including inter alia the interest expressed by Russia in increasing the volume of trade.*

*Representatives of the Commission and of the Russian Government will meet in the near future in order to examine the difficulties encountered by Russian exporters of nuclear materials.]*

## (B)  Rules Governing the Application of Provisions of the WTO Agreement.

---

150   Final Act of the European Energy Charter Conference, Declaration 7.
151   Editor's note: Annex II to document CONF 115 of 6 January 1995 (not published).

(1)  In the absence of a relevant interpretation of the WTO Agreement adopted by the Ministerial Conference or the General Council of the World Trade Organization under paragraph 2 of article IX of the WTO Agreement concerning provisions applicable under Article 29(2)(a), the Charter Conference may adopt an interpretation.

(2)  Requests for waivers under Article 29(2) and (6)(b) shall be submitted to the Charter Conference, which shall follow, in carrying out these duties, the procedures of paragraphs 3 and 4 of article IX of the WTO Agreement.

(3)  Waivers of obligations in force in the WTO shall be considered in force for the purposes of Article 29 while they remain in force in the WTO.

(4)  The provisions of article II of the GATT 1994 which have not been disapplied shall, without prejudice to Article 29(4), (5) and (7), be modified as follows:

(i)  All Energy Materials and Products listed in Annex EM II and Energy-Related Equipment listed in Annex EQ II imported from or exported to any other Contracting Party shall also be exempt from all other duties or charges of any kind imposed on or in connection with importation or exportation, in excess of those imposed on the date of the standstill referred to in Article 29(6), first sentence, or under Article 29(7), or those directly and mandatorily required to be imposed thereafter by legislation in force in the importing or exporting territory on the date referred to in Article 29(6), first sentence.

(ii)  Nothing in article II of the GATT 1994 shall prevent any Contracting Party from imposing at any time on the importation or exportation of any product:

(a)  a charge equivalent to an internal tax imposed consistently with the provisions of paragraph 2 of article III of GATT 1994 in respect of the like domestic product or in respect of an article from which the imported product has been manufactured or produced in whole or in part;

(b)  any anti-dumping or countervailing duty applied consistently with the provisions of article VI of GATT 1994;

(c)  fees or other charges commensurate with the cost of services rendered.

(iii)  No Contracting Party shall alter its method of determining dutiable value or of converting currencies so as to impair the value of the standstill obligations provided for in Article 29(6) or (7).

(iv) If any Contracting Party establishes, maintains or authorises, formally or in effect, a monopoly of the importation or exportation of any Energy Material or Product listed in Annex EM II or in respect of Energy-Related Equipment listed in EQ II, such monopoly shall not operate so as to afford protection on the average in excess of the amount of protection permitted by the standstill obligation provided for in Article 29(6) or (7). The provisions of this paragraph shall not limit the use by Contracting Parties of any form of assistance to domestic producers permitted by other provisions of this Treaty.

(v) If any Contracting Party considers that a product is not receiving from another Contracting Party the treatment which the first Contracting Party believes to have been contemplated by the standstill obligation provided for in Article 29(6) or (7), it shall bring the matter directly to the attention of the other Contracting Party. If the latter agrees that the treatment contemplated was that claimed by the first Contracting Party, but declares that such treatment cannot be accorded because a court or other proper authority has ruled to the effect that the product involved cannot be classified under the tariff laws of such Contracting Party so as to permit the treatment contemplated in this Treaty, the two Contracting Parties, together with any other Contracting Parties substantially interested, shall enter promptly into further negotiations with a view to a compensatory adjustment of the matter.

(vi) (a) The specific duties and charges included in the Tariff Record relating to the Contracting Parties members of the International Monetary Fund, and margins of preference in specific duties and charges maintained by such Contracting Parties, are expressed in the appropriate currency at the par value accepted or provisionally recognised by the Fund at the date of the standstill referred to in Article 29(6), first sentence, or under Article 29(7). Accordingly, in case this par value is reduced consistently with the Articles of Agreement of the International Monetary Fund by more than twenty per centum, such specific duties and charges and margins of preference may be adjusted to take account of such reduction; Provided that the Conference concurs that such adjustments will not impair the value of the standstill obligation provided for in Article 29(6) or (7) or elsewhere in this Treaty, due account being taken of all factors which may influence the need for, or urgency of, such adjustments.

(b) Similar provisions shall apply to any Contracting Party not a member of the Fund, as from the date on which such Contracting Party becomes a member of the Fund or enters into a special exchange agreement in pursuance of Article XV of GATT 1994.

(vii) Each Contracting Party shall notify the Secretariat of the customs duties and charges of any kind applicable on the date of the standstill referred to in Article 29(6) first sentence. The Secretariat shall keep a Tariff Record of the customs duties and charges of any kind relevant for the purpose of the standstill on customs duties and charges of any kind under Article 29(6) or (7).

(5) The Decision of 26 March 1980 on "Introduction of a Loose-Leaf System for the Schedules of Tariff Concessions" (BISD 27S/24) shall not be applicable under Article 29(2)(a). The applicable provisions of the Understanding on the Interpretation of Article II:1(b) of the GATT 1994 shall, without prejudice to Article 29(4), (5) or (7), apply with the following modifications:

(i) In order to ensure transparency of the legal rights and obligations deriving from paragraph 1(b) of article II of GATT 1994, the nature and level of any "other duties or charges" levied on any Energy Materials and Products listed in Annex EM II or Energy-Related Equipment listed in Annex EQ II with respect to their importation or exportation, as referred to in that provision, shall be recorded in the Tariff Record at the levels applying at the date of the standstill referred to in Article 29(6), first sentence, or under Article 29(7) respectively, against the tariff item to which they apply. It is understood that such recording does not change the legal character of "other duties or charges".

(ii) "Other duties or charges" shall be recorded in respect of all Energy Materials and Products listed in Annex EM II and Energy-Related Equipment listed in Annex EQ II.

(iii) It will be open to any Contracting Party to challenge the existence of an "other duty or charge", on the ground that no such "other duty or charge" existed at the date of the standstill referred to in Article 29(6), first sentence, or the relevant date under Article 29(7), for the item in question, as well as the consistency of the recorded level of any "other duty or charge" with the standstill obligation provided for by Article 29(6) or (7), for a period of one year after the entry into force of the Amendment to the trade-related provisions of this Treaty, adopted by the Charter Conference on 24 April 1998, or one year after the notification to the Secretariat

of the level of customs duties and charges of any kind referred to in Article 29(6), first sentence, or Article 29(7), if that is the later.

(iv) The recording of "other duties or charges" in the Tariff Record is without prejudice to their consistency with rights and obligations under GATT 1994 other than those affected by sub-paragraph (iii) above. All Contracting Parties retain the right to challenge, at any time, the consistency of any "other duty or charge" with such obligations.

(v) "Other duties or charges" omitted from a notification to the Secretariat shall not subsequently be added to it and any "other duty or charge" recorded at a level lower than that prevailing on the applicable date shall not be restored to that level unless such additions or changes are made within six months of the notification to the Secretariat.

(6) Where the WTO Agreement refers to "duties inscribed in the Schedule" or to "bound duties", there shall be substituted "the level of customs duties and charges of any kind permitted under Article 29(4) to (8)".

(7) Where the WTO Agreement specifies the date of entry into force of the WTO Agreement (or an analogous phrase) as the reference date for an action, there shall be substituted the date of entry into force of the Amendment to the trade-related provisions of this Treaty adopted by the Charter Conference on 24 April 1998.

(8) With respect to notifications required by the provisions made applicable by Article 29(2)(a):

(a) Contracting Parties which are not members of the WTO shall make their notifications to the Secretariat. The Secretariat shall circulate copies of the notifications to all Contracting Parties. Notifications to the Secretariat shall be in one of the authentic languages of this Treaty. The accompanying documents may be solely in the language of the Contracting Party;

(b) such requirements shall not apply to Contracting Parties to this Treaty which are also members of the WTO which provides for its own notification requirements.

(9) Where Article 29(2)(a) or (6)(b) applies, the Charter Conference shall carry out any applicable duties that the WTO Agreement assigned to the relevant bodies under the WTO Agreement.

(10) (a) Interpretations of the WTO Agreement adopted by the Ministerial Conference or the General Council of the WTO under paragraph

2 of article IX of the WTO Agreement insofar as they interpret provisions applicable under Article 29(2)(a) shall apply.

(b)     Amendments to the WTO Agreement under article X of the WTO Agreement that are binding on all members of the WTO (other then those under paragraph 9 of article X) insofar as they amend or relate to provisions applicable under Article 29(2)(a), shall apply unless a Contracting Party requests the Charter Conference to disapply or modify such amendment. The Charter Conference shall take the decision by a three-fourths majority of the Contracting Parties and determine the date of the disapplication or modification of such amendment. A request for the disapplication or modification of such amendment may include a request that the application of the amendment be suspended pending the decision of the Charter Conference.

A request to the Charter Conference made under this paragraph shall be made within six months of the circulation of a notification from the Secretariat that the amendment has taken effect under the WTO Agreement.

(c)     Interpretations, amendments, or new instruments adopted by the WTO, other than the interpretations and amendments applied under paragraphs (a) and (b) shall not apply.

13.    **Annex TFU: Provisions regarding Trade Agreements between States which Were Constituent Parts of the Former Union of Soviet Socialist Republics**[152]

(in accordance with article 29(2)(B))

14.    **Annex BR: List of Contracting Parties which Shall Not Increase any Customs Duty or Other Charge above the Level Resulting from their Commitments or any Provisions Applicable to Them under the WTO Agreement**[153]

(in accordance with article 29 (7))

*[CHAIRMAN'S STATEMENT AT THE ADOPTION SESSION ON 24 APRIL 1998*

---

[152]   Editor's note: The applicability of Annex TFU terminated on 1 December 1999 as per Art. 29.2.b ECT. For the text of the Annex TFU and Understanding with respect to the Annex TFU: http://www.energycharter.org/.

[153]   Introduced by Art. 5 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

*"On the issue of future listing of countries on Annexes BR and BRQ, I conclude that all delegations are aware of the long standing positions of those delegations which like Australia, Hungary and Japan have repeatedly underlined that they support legally binding tariff commitments provided their commitments under the Energy Charter Treaty reflect their commitments in the WTO. This also reflects the position of other delegations, and there is a general acceptance among delegations that they will give positive consideration to that position at the time when the decision on legally binding tariff commitments is taken."]*[154]

**15.    Annex BRQ: List of Contracting Parties which Shall Not Increase any Customs Duty or Other Charge above the Level Resulting from their Commitments or any Provisions Applicable to Them under the WTO Agreement**[155]

(in accordance with article 29 (7))

*[CHAIRMAN'S STATEMENT AT THE ADOPTION SESSION ON 24 APRIL 1998*

*"On the issue of future listing of countries on Annexes BR and BRQ, I conclude that all delegations are aware of the long standing positions of those delegations which like Australia, Hungary and Japan have repeatedly underlined that they support legally binding tariff commitments provided their commitments under the Energy Charter Treaty reflect their commitments in the WTO. This also reflects the position of other delegations, and there is a general acceptance among delegations that they will give positive consideration to that position at the time when the decision on legally binding tariff commitments is taken."]*[156]

**16.    Annex D: Interim Provisions for Trade Dispute Settlement**[157]

(in accordance with Article 29(9))

---

154   Editor's note: Document CS(98) 338 CC 124, point 6, of 24 May 1998 (not published). This Statement was read out by the Chairman to the Adoption Session on 24 April 1998 and also circulated in written form. This Statement, which reflected the outcome of informal consultations, replaced a draft Declaration on the issue of listing on Annexes BR and BRQ, the text of which was consequently deleted from the text for adoption.

155   Introduced by Art. 5 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

156   Editor's note: Document CS(98) 338 CC 124, point 6, of 24 May 1998 (not published). This Statement was read out by the Chairman to the Adoption Session on 24 April 1998 and also circulated in written form. This Statement, which reflected the outcome of informal consultations, replaced a draft Declaration on the issue of listing on Annexes BR and BRQ, the text of which was consequently deleted from the text for adoption.

157   Modification based on Art. 3 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

*[CHAIRMAN'S CONCLUSION ON THE IMPLEMENTATION OF TRADE-RELATED RULES, AT THE ENERGY CHARTER CONFERENCE ON 24 APRIL 1998: There was furthermore a consensus that in developing dispute settlement rules and procedures WTO rules of procedure and practice would be followed and the roster of panellists to be adopted by the Conference would be drawn up in accordance with Article 3 of the Amendment.]*[158]

(1)   (a)   In their relations with one another, Contracting Parties shall make every effort through cooperation and consultations to arrive at a mutually satisfactory resolution of any dispute about existing measures that might materially affect compliance with the provisions applicable to trade under Article 5 or 29, or about any measures that might nullify or impair any benefit accruing to a Contracting Party directly or indirectly under the provisions applicable to trade under Article 29.[159]

   (b)   A Contracting Party may make a written request to any other Contracting Party for consultations regarding any existing measure of the other Contracting Party that it considers might affect materially compliance with provisions applicable to trade under Article 5 or 29, or any measure that might nullify or impair any benefit accruing to a Contracting Party directly or indirectly under the provisions applicable to trade under Article 29.[160] A Contracting Party which requests consultations shall to the fullest extent possible indicate the measure complained of and specify the provisions of Article 5 or 29 and of the WTO Agreement[161] that it considers relevant. Requests to consult pursuant to this paragraph shall be notified to the Secretariat, which shall periodically inform the Contracting Parties of pending consultations that have been notified.

   (c)   A Contracting Party shall treat any confidential or proprietary information identified as such and contained in or received in response to a written request, or received in the course of consultations, in the same manner in which it is treated by the Contracting Party providing the information.

Energy Charter Treaty

---

158   Editor's note: Document CS (98) 338 CC 124, point 13, of 24 May 1998 (not published). The Conclusion was drawn by the Chairman to the first Energy Charter Conference on 24 April 1998. The Conference agreed without objection to this conclusion.

159   Modification based on Art. 3 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

160   Id.

161   Id.

(d)    In seeking to resolve matters considered by a Contracting Party to affect compliance with provisions applicable to trade under Article 5 or 29 as between itself and another Contracting Party, or to nullify or impair any benefit accruing to it directly or indirectly under the provisions applicable to trade under Article 29,[162] the Contracting Parties participating in consultations or other dispute settlement shall make every effort to avoid a resolution that adversely affects the trade of any other Contracting Party.

(2)   (a)    If, within 60 days from the receipt of the request for consultation referred to in subparagraph (1)(b), the Contracting Parties have not resolved their dispute or agreed to resolve it by conciliation, mediation, arbitration or other method, either Contracting Party may deliver to the Secretariat a written request for the establishment of a panel in accordance with sub-paragraphs (b) to (f). In its request the requesting Contracting Party shall state the substance of the dispute and indicate which provisions of Article 5 or 29 and of the WTO Agreement[163] are considered relevant. The Secretariat shall promptly deliver copies of the request to all Contracting Parties.

(b)    The interests of other Contracting Parties shall be taken into account during the resolution of a dispute. Any other Contracting Party having a substantial interest in a matter shall have the right to be heard by the panel and to make written submissions to it, provided that both the disputing Contracting Parties and the Secretariat have received written notice of its interest no later than the date of establishment of the panel, as determined in accordance with subparagraph (c).

(c)    A panel shall be deemed to be established 45 days after the receipt of the written request of a Contracting Party by the Secretariat pursuant to subparagraph (a).

(d)    A panel shall be composed of three members who shall be chosen by the Secretary General from the roster described in paragraph (7). Except where the disputing Contracting Parties agree otherwise, the members of a panel shall not be citizens of Contracting Parties which either are party to the dispute or have notified their interest in accordance with sub-paragraph (b), or citizens of states members of a Regional Economic Integration

---

162  Modification based on Art. 3 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

163  Id.

Organisation which either is party to the dispute or has notified its interest in accordance with sub-paragraph (b).

(e)    The disputing Contracting Parties shall respond within ten working days to the nominations of panel members and shall not oppose nominations except for compelling reasons.

(f)    Panel members shall serve in their individual capacities and shall neither seek nor take instruction from any government or other body. Each Contracting Party undertakes to respect these principles and not to seek to influence panel members in the performance of their tasks. Panel members shall be selected with a view to ensuring their independence, and that a sufficient diversity of backgrounds and breadth of experience are reflected in a panel.

(g)    The Secretariat shall promptly notify all Contracting Parties that a panel has been constituted.

(3)  (a)    The Charter Conference shall adopt rules of procedure for panel proceedings consistent with this Annex. Rules of procedure shall be as close as possible to those of the WTO Agreement.[164] A panel shall also have the right to adopt additional rules of procedure not inconsistent with the rules of procedure adopted by the Charter Conference or with this Annex. In a proceeding before a panel each disputing Contracting Party and any other Contracting Party which has notified its interest in accordance with sub-paragraph (2)(b), shall have the right to at least one hearing before the panel and to provide a written submission. Disputing Contracting Parties shall also have the right to provide a written rebuttal. A panel may grant a request by any other Contracting Party which has notified its interest in accordance with sub-paragraph (2)(b) for access to any written submission made to the panel, with the consent of the Contracting Party which has made it.

The proceedings of a panel shall be confidential. A panel shall make an objective assessment of the matters before it, including the facts of the dispute and the compliance of measures with the provisions applicable to trade under Article 5 or 29. In exercising its functions, a panel shall consult with the disputing Contracting Parties and give them adequate opportunity to arrive at a mutually satisfactory solution. Unless otherwise agreed by the disputing Contracting Parties, a panel shall base its decision

Energy Charter Treaty

---

164    Modification based on Art. 3 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

on the arguments and submissions of the disputing Contracting Parties. Panels shall be guided by the interpretations given to the WTO Agreement within the framework of the WTO Agreement and shall not question the compatibility with Article 5 or 29 of practices applied by any Contracting Party which is a member of the WTO to other members of the WTO to which it applies the WTO Agreement and which have not been taken by those other members to dispute resolution under the WTO Agreement.[165]

Unless otherwise agreed by the disputing Contracting Parties, all procedures involving a panel, including the issuance of its final report, should be completed within 180 days of the date of establishment of the panel; however, a failure to complete all procedures within this period shall not affect the validity of a final report.

(b)    A panel shall determine its jurisdiction; such determination shall be final and binding. Any objection by a disputing Contracting Party that a dispute is not within the jurisdiction of the panel shall be considered by the panel, which shall decide whether to deal with the objection as a preliminary question or to join it to the merits of the dispute.

(c)    In the event of two or more requests for establishment of a panel in relation to disputes that are substantively similar, the Secretary General may with the consent of all the disputing Contracting Parties appoint a single panel.

(4)    (a)    After having considered rebuttal arguments, a panel shall submit to the disputing Contracting Parties the descriptive sections of its draft written report, including a statement of the facts and a summary of the arguments made by the disputing Contracting Parties. The disputing Contracting Parties shall be afforded an opportunity to submit written comments on the descriptive sections within a period set by the panel.

Following the date set for receipt of comments from the Contracting Parties, the panel shall issue to the disputing Contracting Parties an interim written report, including both the descriptive sections and the panel's proposed findings and conclusions. Within a period set by the panel a disputing Contracting Party may submit to the panel a written request that the panel review specific aspects of

---

165   Modification based on Art. 3 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

the interim report before issuing a final report. Before issuing a final report the panel may, in its discretion, meet with the disputing Contracting Parties to consider the issues raised in such a request.

The final report shall include descriptive sections (including a statement of the facts and a summary of the arguments made by the disputing Contracting Parties), the panel's findings and conclusions, and a discussion of arguments made on specific aspects of the interim report at the stage of its review. The final report shall deal with every substantial issue raised before the panel and necessary to the resolution of the dispute and shall state the reasons for the panel's conclusions.

A panel shall issue its final report by providing it promptly to the Secretariat and to the disputing Contracting Parties. The Secretariat shall at the earliest practicable opportunity distribute the final report, together with any written views that a disputing Contracting Party desires to have appended, to all Contracting Parties.

(b)    Where a panel concludes that a measure introduced or maintained by a Contracting Party does not comply with a provision of Article 5 or 29 or with a provision of the WTO Agreement[166] that applies under Article 29, the panel may recommend in its final report that the Contracting Party alter or abandon the measure or conduct so as to be in compliance with that provision.

(c)    Panel reports shall be adopted by the Charter Conference. In order to provide sufficient time for the Charter Conference to consider panel reports, a report shall not be adopted by the Charter Conference until at least 30 days after it has been provided to all Contracting Parties by the Secretariat. Contracting Parties having objections to a panel report shall give written reasons for their objections to the Secretariat at least 10 days prior to the date on which the report is to be considered for adoption by the Charter Conference, and the Secretariat shall promptly provide them to all Contracting Parties. The disputing Contracting Parties and Contracting Parties which notified their interest in accordance with sub-paragraph (2)(b) shall have the right to participate fully in the consideration of the panel report on that dispute by the Charter Conference, and their views shall be fully recorded.

**Energy Charter Treaty**

---

166   Modification based on Art. 3 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

(d)    In order to ensure effective resolution of disputes to the benefit of all Contracting Parties, prompt compliance with rulings and recommendations of a final panel report that has been adopted by the Charter Conference is essential. A Contracting Party which is subject to a ruling or recommendation of a final panel report that has been adopted by the Charter Conference shall inform the Charter Conference of its intentions regarding compliance with such ruling or recommendation. In the event that immediate compliance is impracticable, the Contracting Party concerned shall explain its reasons for non-compliance to the Charter Conference and, in light of this explanation, shall have a reasonable period of time to effect compliance. The aim of dispute resolution is the modification or removal of inconsistent measures.

(5)    (a)    Where a Contracting Party has failed within a reasonable period of time to comply with a ruling or recommendation of a final panel report that has been adopted by the Charter Conference, a Contracting Party to the dispute injured by such non-compliance may deliver to the non-complying Contracting Party a written request that the non-complying Contracting Party enter into negotiations with a view to agreeing upon mutually acceptable compensation. If so requested the non-complying Contracting Party shall promptly enter into such negotiations.

(b)    If the non-complying Contracting Party refuses to negotiate, or if the Contracting Parties have not reached agreement within 30 days after delivery of the request for negotiations, the injured Contracting Party may make a written request for authorisation of the Charter Conference to suspend obligations owed by it to the non-complying Contracting Party under Article 5 or 29.

(c)    The Charter Conference may authorise the injured Contracting Party to suspend such of its obligations to the non-complying Contracting Party, under provisions of Article 5 or 29 or under provisions of the WTO Agreement[167] that apply under Article 29, as the injured Contracting Party considers equivalent in the circumstances.

(d)    The suspension of obligations shall be temporary and shall be applied only until such time as the measure found to be inconsistent with Article 5 or 29 has been removed, or until a mutually satisfactory solution is reached.

---

167    Modification based on Art. 3 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

(6)  (a)  Before suspending such obligations the injured Contracting Party shall inform the non-complying Contracting Party of the nature and level of its proposed suspension. If the non-complying Contracting Party delivers to the Secretary General a written objection to the level of suspension of obligations proposed by the injured Contracting Party, the objection shall be referred to arbitration as provided below. The proposed suspension of obligations shall be stayed until the arbitration has been completed and the determination of the arbitral panel has become final and binding in accordance with subparagraph (e).

(b)  The Secretary General shall establish an arbitral panel in accordance with sub-paragraphs (2)(d) to (f), which if practicable shall be the same panel which made the ruling or recommendation referred to in sub-paragraph (4)(d), to examine the level of obligations that the injured Contracting Party proposes to suspend. Unless the Charter Conference decides otherwise the rules of procedure for panel proceedings shall be adopted in accordance with sub-paragraph (3)(a).

(c)  The arbitral panel shall determine whether the level of obligations proposed to be suspended by the injured Contracting Party is excessive in relation to the injury it experienced, and if so, to what extent. It shall not review the nature of the obligations suspended, except insofar as this is inseparable from the determination of the level of suspended obligations.

(d)  The arbitral panel shall deliver its written determination to the injured and the non-complying Contracting Parties and to the Secretariat within 60 days of the establishment of the panel or within such other period as may be agreed by the injured and the non-complying Contracting Parties. The Secretariat shall present the determination to the Charter Conference at the earliest practicable opportunity, and no later than the meeting of the Charter Conference following receipt of the determination.

(e)  The determination of the arbitral panel shall become final and binding 30 days after the date of its presentation to the Charter Conference, and any level of suspension of benefits allowed thereby may thereupon be put into effect by the injured Contracting Party in such manner as that Contracting Party considers equivalent in the circumstances, unless prior to the expiration of the 30 days period the Charter Conference decides otherwise.

Energy Charter Treaty

(f)     In suspending any obligations to a non-complying Contracting Party, an injured Contracting Party shall make every effort not to affect adversely the trade of any other Contracting Party.

(7)     Each Contracting Party may designate two individuals who shall, in the case of Contracting Parties which are also member of the WTO,[168] if they are willing and able to serve as panellists under this Annex, be persons whose names appear on the indicative list of governmental and non-governmental individuals, referred to in article 8 of the Understanding on Rules and Procedures Governing the Settlement of Disputes contained in Annex 2 to the WTO Agreement or who have in the past served as panellists on a GATT or WTO dispute settlement panel.[169] The Secretary General may also designate, with the approval of the Charter Conference, not more than ten individuals, who are willing and able to serve as panellists for purposes of dispute resolution in accordance with paragraphs (2) to (4). The Charter Conference may in addition decide to designate for the same purposes up to 20 individuals, who serve on dispute settlement rosters of other international bodies, who are willing and able to serve as panellists. The names of all of the individuals so designated shall constitute the dispute settlement roster. Individuals shall be designated strictly on the basis of objectivity, reliability and sound judgement and, to the greatest extent possible, shall have expertise in international trade and energy matters, in particular as relates to provisions applicable under Article 29. In fulfilling any function under this Annex, designees shall not be affiliated with or take instructions from any Contracting Party. Designees shall serve for renewable terms of five years and until their successors have been designated. A designee whose term expires shall continue to fulfil any function for which that individual has been chosen under this Annex. In the case of death, resignation or incapacity of a designee, the Contracting Party or the Secretary General, whichever designated said designee, shall have the right to designate another individual to serve for the remainder of that designee's term, the designation by the Secretary General being subject to approval of the Charter Conference.

(8)     Notwithstanding the provisions contained in this Annex, Contracting Parties are encouraged to consult throughout the dispute resolution proceeding with a view to settling their dispute.

(9)     The Charter Conference may appoint or designate other bodies or fora to perform any of the functions delegated in this Annex to the Secretariat and the Secretary General.

---

168   Modification based on Art. 3 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

169   Id.

(10)  Where a Contracting Party invokes Article 29(9)(b), this Annex shall apply, subject to the following modifications:[170]

    (a)  the complaining party shall present a detailed justification in support of any request for consultations or for the establishment of a panel regarding a measure which it considers to nullify or impair any benefit accruing to it directly or indirectly under Article 29;

    (b)  where a measure has been found to nullify or impair benefits under Article 29 without violation thereof, there is no obligation to withdraw the measure; however, in such a case the panel shall recommend that the Contracting Party concerned make a mutually satisfactory adjustment;

    (c)  the arbitral panel provided for in paragraph (6)(b), upon the request of either party, may determine the level of benefits that have been nullified or impaired, and may also suggest ways and means of reaching a mutually satisfactory adjustment; such suggestions shall not be binding upon the parties to the dispute.

## 17.  Annex B: Formula for Allocating Charter Costs

(in accordance with Article 37(3))

(1)  Contributions payable by Contracting Parties shall be determined by the Secretariat annually on the basis of their percentage contributions required under the latest available United Nations Regular Budget Scale of Assessment (supplemented by information on theoretical contributions for any Contracting Parties which are not UN members).

(2)  The contributions shall be adjusted as necessary to ensure that the total of all Contracting Parties' contributions is 100%.

## 18.  Annex PA: List of Signatories which Do Not Accept the Provisional Application Obligation of Article 45(3)(B)[171]

(in accordance with Article 45(3)(c))

## 19.  Annex T: Contracting Parties' Transitional Measures[172]

(in accordance with Article 32(1))

Energy Charter Treaty

---

170  Modification based on Art. 3 of the Amendment to the Trade-Related Provisions of the Energy Charter Treaty.

171  Editor's note: all signatories initially listed here already became full Contracting Parties. For the previously listed states: http://www.energycharter.org/.

172  Editor's note: The applicability of Annex T terminated on 1 July 2001. For the text of

## ENERGY CHARTER PROTOCOL ON ENERGY EFFICIENCY AND RELATED ENVIRONMENTAL ASPECTS

(Annex 3 to the Final Act of the European Energy Charter Conference)

### PREAMBLE

THE CONTRACTING PARTIES to this Protocol,

Having regard to the European Energy Charter adopted in the Concluding Document of the Hague Conference on the European Energy Charter, signed at The Hague on 17 December 1991; and in particular to the declarations therein that cooperation is necessary in the field of energy efficiency and related environmental protection;

Having regard also to the Energy Charter Treaty, opened for signature from 17 December 1994 to 16 June 1995;

Mindful of the work undertaken by international organisations and fora in the field of energy efficiency and environmental aspects of the energy cycle;

Aware of the improvements in supply security, and of the significant economic and environmental gains, which result from the implementation of cost-effective energy efficiency measures; and aware of their importance for restructuring economies and improving living standards;

Recognising that improvements in energy efficiency reduce negative environmental consequences of the energy cycle including global warming and acidification;

Convinced that energy prices should reflect as far as possible a competitive market, ensuring market-oriented price formation, including fuller reflection of environmental costs and benefits, and recognising that such price formation is vital to progress in energy efficiency and associated environmental protection;

Appreciating the vital role of the private sector including small and medium-sized enterprises in promoting and implementing energy efficiency measures, and intent on ensuring a favourable institutional framework for economically viable investment in energy efficiency;

---

Annex T: http://www.energycharter.org/.

Recognising that commercial forms of cooperation may need to be complemented by intergovernmental cooperation, particularly in the area of energy policy formulation and analysis as well as in other areas which are essential to the enhancement of energy efficiency but not suitable for private funding; and

Desiring to undertake cooperative and coordinated action in the field of energy efficiency and related environmental protection and to adopt a Protocol providing a framework for using energy as economically and efficiently as possible:

**HAVE AGREED AS FOLLOWS:**

### Part I: Introduction

### Article 1: Scope and Objectives of the Protocol

(1)    This Protocol defines policy principles for the promotion of energy efficiency as a considerable source of energy and for consequently reducing adverse Environmental Impacts of energy systems. It furthermore provides guidance on the development of energy efficiency programmes, indicates areas of cooperation and provides a framework for the development of cooperative and coordinated action. Such action may include the prospecting for, exploration, production, conversion, storage, transport, distribution, and consumption of energy, and may relate to any economic sector.

(2)    The objectives of this Protocol are:

(a)      the promotion of energy efficiency policies consistent with sustainable development;

(b)      the creation of framework conditions which induce producers and consumers to use energy as economically, efficiently and environmentally soundly as possible, particularly through the organisation of efficient energy markets and a fuller reflection of environmental costs and benefits; and

(c)      the fostering of cooperation in the field of energy efficiency.

### Article 2: Definitions

As used in this Protocol:

(1) "Charter" means the European Energy Charter adopted in the Concluding Document of the Hague Conference on the European Energy Charter signed at The Hague on 17 December 1991; signature of the Concluding Document is considered to be signature of the Charter.

(2) "Contracting Party" means a state or Regional Economic Integration Organisation which has consented to be bound by this Protocol and for which the Protocol is in force.

(3) "Regional Economic Integration Organisation" means an organisation constituted by states to which they have transferred competence over certain matters a number of which are governed by this Protocol, including the authority to take decisions binding on them in respect of those matters.

(4) "Energy Cycle" means the entire energy chain, including activities related to prospecting for, exploration, production, conversion, storage, transport, distribution and consumption of the various forms of energy, and the treatment and disposal of wastes, as well as the decommissioning, cessation or closure of these activities, minimising harmful Environmental Impacts.

(5) "Cost-Effectiveness" means to achieve a defined objective at the lowest cost or to achieve the greatest benefit at a given cost.

(6) "Improving Energy Efficiency" means acting to maintain the same unit of output (of a good or service) without reducing the quality or performance of the output, while reducing the amount of energy required to produce that output.

(7) "Environmental Impact" means any effect caused by a given activity on the environment, including human health and safety, flora, fauna, soil, air, water, climate, landscape and historical monuments or other physical structures or the interactions among these factors; it also includes effects on cultural heritage or socio-economic conditions resulting from alterations to those factors.

## Part II: Policy Principles

### Article 3: Basic Principles

Contracting Parties shall be guided by the following principles:

(1)   Contracting Parties shall cooperate and, as appropriate, assist each other in developing and implementing energy efficiency policies, laws and regulations.

(2)   Contracting Parties shall establish energy efficiency policies and appropriate legal and regulatory frameworks which promote, *inter alia*:

(a)   efficient functioning of market mechanisms including market-oriented price formation and a fuller reflection of environmental costs and benefits;

(b)   reduction of barriers to energy efficiency, thus stimulating investments;

(c)   mechanisms for financing energy efficiency initiatives;

(d)   education and awareness;

(e)   dissemination and transfer of technologies;

(f)   transparency of legal and regulatory frameworks.

(3)   Contracting Parties shall strive to achieve the full benefit of energy efficiency throughout the Energy Cycle. To this end they shall, to the best of their competence, formulate and implement energy efficiency policies and cooperative or coordinated actions based on Cost-Effectiveness and economic efficiency, taking due account of environmental aspects.

(4)   Energy efficiency policies shall include both short-term measures for the adjustment of previous practices and long-term measures to improve energy efficiency throughout the Energy Cycle.

(5)   When cooperating to achieve the objectives of this Protocol, Contracting Parties shall take into account the differences in adverse effects and abatement costs between Contracting Parties.

(6)   Contracting Parties recognise the vital role of the private sector. They shall encourage action by energy utilities, responsible authorities and specialised agencies, and close cooperation between industry and administrations.

(7)   Cooperative or coordinated action shall take into account relevant principles adopted in international agreements, aimed at protection and improvement of the environment, to which Contracting Parties are parties.

PEEREA

(8)   Contracting Parties shall take full advantage of the work and expertise of competent international or other bodies and shall take care to avoid duplication.

### Article 4: Division of Responsibility and Coordination

Each Contracting Party shall strive to ensure that energy efficiency policies are coordinated among all of its responsible authorities.

### Article 5: Strategies and Policy Aims

Contracting Parties shall formulate strategies and policy aims for Improving Energy Efficiency and thereby reducing Environmental Impacts of the Energy Cycle as appropriate in relation to their own specific energy conditions. These strategies and policy aims shall be transparent to all interested parties.

### Article 6: Financing and Financial Incentives

(1)   Contracting Parties shall encourage the implementation of new approaches and methods for financing energy efficiency and energy-related environmental protection investments, such as joint venture arrangements between energy users and external investors (hereinafter referred to as "Third Party Financing").

(2)   Contracting Parties shall endeavour to take advantage of and promote access to private capital markets and existing international financing institutions in order to facilitate investments in Improving Energy Efficiency and in environmental protection related to energy efficiency.

(3)   Contracting Parties may, subject to the provisions of the Energy Charter Treaty and to their other international legal obligations, provide fiscal or financial incentives to energy users in order to facilitate market penetration of energy efficiency technologies, products and services. They shall strive to do so in a manner that both ensures transparency and minimises the distortion of international markets.

### Article 7: Promotion of Energy Efficient Technology

(1)   Consistent with the provisions of the Energy Charter Treaty, Contracting Parties shall encourage commercial trade and cooperation in energy efficient and environmentally sound technologies, energy-related services and management practices.

(2)    Contracting Parties shall promote the use of these technologies, services and management practices throughout the Energy Cycle.

### Article 8: Domestic Programmes

(1)    In order to achieve the policy aims formulated according to Article 5, each Contracting Party shall develop, implement and regularly update energy efficiency programmes best suited to its circumstances.

(2)    These programmes may include activities such as the:

    (a)    development of long-term energy demand and supply scenarios to guide decision-making;

    (b)    assessment of the energy, environmental and economic impact of actions taken;

    (c)    definition of standards designed to improve the efficiency of energy using equipment, and efforts to harmonise these internationally to avoid trade distortions;

    (d)    development and encouragement of private initiative and industrial cooperation, including joint ventures;

    (e)    promotion of the use of the most energy efficient technologies that are economically viable and environmentally sound;

    (f)    encouragement of innovative approaches for investments in energy efficiency improvements, such as Third Party Financing and co-financing;

    (g)    development of appropriate energy balances and data bases, for example with data on energy demand at a sufficiently detailed level and on technologies for Improving Energy Efficiency;

    (h)    promotion of the creation of advisory and consultancy services which may be operated by public or private industry or utilities and which provide information about energy efficiency programmes and technologies, and assist consumers and enterprises;

    (i)    support and promotion of cogeneration and of measures to increase the efficiency of district heat production and distribution systems to buildings and industry;

    (j)    establishment of specialised energy efficiency bodies at appropriate levels, that are sufficiently funded and staffed to develop and implement policies.

PEEREA

(3)   In implementing their energy efficiency programmes, Contracting Parties shall ensure that adequate institutional and legal infrastructures exist.

## Part III: International Cooperation

### Article 9: Areas of Cooperation

The cooperation between Contracting Parties may take any appropriate form. Areas of possible cooperation are listed in the Annex.

## Part IV: Administrative and Legal Arrangements

### Article 10: Role of the Charter Conference

(1)   All decisions made by the Charter Conference in accordance with this Protocol shall be made by only those Contracting Parties to the Energy Charter Treaty who are Contracting Parties to this Protocol.

(2)   The Charter Conference shall endeavour to adopt, within 180 days after the entry into force of this Protocol, procedures for keeping under review and facilitating the implementation of its provisions, including reporting requirements, as well as for identifying areas of cooperation in accordance with Article 9.

### Article 11: Secretariat and Financing

(1)   The Secretariat established under Article 35 of the Energy Charter Treaty shall provide the Charter Conference with all necessary assistance for the performance of its duties under this Protocol and provide such other services in support of the Protocol as may be required from time to time, subject to approval by the Charter Conference.

(2)   The costs of the Secretariat and Charter Conference arising from this Protocol shall be met by the Contracting Parties to this Protocol according to their capacity to pay, determined according to the formula specified in Annex B to the Energy Charter Treaty.

## Article 12: Voting

(1)   Unanimity of Contracting Parties Present and Voting at the meeting of the Charter Conference where such matters fall to be decided shall be required for decisions to:

    (a)   adopt amendments to this Protocol; and

    (b)   approve accessions to this Protocol under Article 16.

    Contracting Parties shall make every effort to reach agreement by consensus on any other matter requiring their decision under this Protocol. If agreement cannot be reached by consensus, decisions on non-budgetary matters shall be taken by a three-fourths majority of Contracting Parties Present and Voting at the meeting of the Charter Conference at which such matters fall to be decided.

    Decisions on budgetary matters shall be taken by a qualified majority of Contracting Parties whose assessed contributions under Article 11(2) represent, in combination, at least three-fourths of the total assessed contributions.

(2)   For purposes of this Article, "Contracting Parties Present and Voting" means Contracting Parties to this Protocol present and casting affirmative or negative votes, provided that the Charter Conference may decide upon rules of procedure to enable such decisions to be taken by Contracting Parties by correspondence.

(3)   Except as provided in paragraph (1) in relation to budgetary matters, no decision referred to in this Article shall be valid unless it has the support of a simple majority of Contracting Parties.

(4)   A Regional Economic Integration Organisation shall, when voting, have a number of votes equal to the number of its member states which are Contracting Parties to this Protocol; provided that such an Organisation shall not exercise its right to vote if its member states exercise theirs, and vice versa.

(5)   In the event of persistent arrears in a Contracting Party's discharge of financial obligations under this Protocol, the Charter Conference may suspend that Contracting Party's voting rights in whole or in part.

**PEEREA**

### Article 13: Relation to the Energy Charter Treaty

(1)   In the event of inconsistency between the provisions of this Protocol and the provisions of the Energy Charter Treaty, the provisions of the Energy Charter Treaty shall, to the extent of the inconsistency, prevail.

(2)   Article 10(1) and Article 12(1) to (3) shall not apply to votes in the Charter Conference on amendments to this Protocol which assign duties or functions to the Charter Conference or the Secretariat, the establishment of which is provided for in the Energy Charter Treaty.

### Part V: Final Provisons

### Article 14: Signature

This Protocol shall be open for signature at Lisbon from 17 December 1994 to 16 June 1995 by the states and Regional Economic Integration Organisations whose representatives have signed the Charter and the Energy Charter Treaty.

### Article 15: Ratification, Acceptance or Approval

This Protocol shall be subject to ratification, acceptance or approval by signatories. Instruments of ratification, acceptance or approval shall be deposited with the Depositary.

### Article 16: Accession

This Protocol shall be open for accession, from the date on which the Protocol is closed for signature, by states and Regional Economic Integration Organisations which have signed the Charter and are Contracting Parties to the Energy Charter Treaty, on terms to be approved by the Charter Conference. The instruments of accession shall be deposited with the Depositary.

### Article 17: Amendments

(1)   Any Contracting Party may propose amendments to this Protocol.

(2)   The text of any proposed amendment to this Protocol shall be communicated to Contracting Parties by the Secretariat at least three months before the date on which it is proposed for adoption by the Charter Conference.

**164**

(3)    Amendments to this Protocol, texts of which have been adopted by the Charter Conference, shall be communicated by the Secretariat to the Depositary which shall submit them to all Contracting Parties for ratification, acceptance or approval.

(4)    Instruments of ratification, acceptance or approval of amendments to this Protocol shall be deposited with the Depositary. Amendments shall enter into force between Contracting Parties having ratified, accepted or approved them on the thirtieth day after deposit with the Depositary of instruments of ratification, acceptance or approval by at least three-fourths of the Contracting Parties. Thereafter the amendments shall enter into force for any other Contracting Party on the thirtieth day after that Contracting Party deposits its instrument of ratification, acceptance or approval of the amendments.

### Article 18: Entry into Force

(1)    This Protocol shall enter into force on the thirtieth day after the date of deposit of the fifteenth instrument of ratification, acceptance or approval thereof, or of accession thereto, by a state or Regional Economic Integration Organisation which is a signatory to the Charter and a Contracting Party to the Energy Charter Treaty or on the same date as the Energy Charter Treaty enters into force, whichever is later.

(2)    For each state or Regional Economic Integration Organisation for which the Energy Charter Treaty has entered into force and which ratifies, accepts, or approves this Protocol or accedes thereto after the Protocol has entered into force in accordance with paragraph (1), the Protocol shall enter into force on the thirtieth day after the date of deposit by such state or Regional Economic Integration Organisation of its instrument of ratification, acceptance, approval or accession.

(3)    For the purposes of paragraph (1), any instrument deposited by a Regional Economic Integration Organisation shall not be counted as additional to those deposited by member states of such Organisation.

### Article 19: Reservations

No reservations may be made to this Protocol.

## Article 20: Withdrawal

(1)  At any time after this Protocol has entered into force for a Contracting Party, that Contracting Party may give written notification to the Depositary of its withdrawal from the Protocol.

(2)  Any Contracting Party which withdraws from the Energy Charter Treaty shall be considered as also having withdrawn from this Protocol.

(3)  The effective date of withdrawal under paragraph (1) shall be ninety days after receipt of notification by the Depositary. The effective date of withdrawal under paragraph (2) shall be the same as the effective date of withdrawal from the Energy Charter Treaty.

## Article 21: Depositary

The Government of the Portuguese Republic shall be the Depositary of this Protocol.

## Article 22: Authentic Texts

In witness whereof the undersigned, being duly authorised to that effect, have signed this Protocol in English, French, German, Italian, Russian and Spanish, of which every text is equally authentic, in one original, which will be deposited with the Government of the Portuguese Republic.

Done at Lisbon on the seventeenth day of December in the year one thousand nine hundred and ninety-four.[173]

**Annex:**     **Illustrative and Non-Exhaustive List of Possible Areas of Cooperation pursuant to Article 9**

Development of energy efficiency programmes, including identifying energy efficiency barriers and potentials, and the development of energy labelling and efficiency standards;

Assessment of the Environmental Impacts of the Energy Cycle;

Development of economic, legislative and regulatory measures;

---

173  For signatories: http://www.energycharter.org/.

Technology transfer, technical assistance and industrial joint ventures subject to international property rights regimes and other applicable international agreements;

Research and development;

Education, training, information and statistics;

Identification and assessment of measures such as fiscal or other market based instruments, including tradeable[174] permits to take account of external, notably environmental, costs and benefits.

Energy analysis and policy formulation:

–    assessment of energy efficiency potentials;

–    energy demand analysis and statistics;

–    development of legislative and regulatory measures;

–    integrated resource planning and demand side management;

–    Environmental Impact assessment, including major energy projects.

Evaluation of economic instruments for Improving Energy Efficiency and environmental objectives.

Energy efficiency analysis in refining, conversion, transport and distribution of hydro carbons.

Improving Energy Efficiency in power generation and transmission:

–    cogeneration;

–    plant component (boilers, turbines, generators, etc.);

–    network integration.

Improving Energy Efficiency in the building sector:

–    thermal insulation standards, passive solar and ventilation;

–    space heating and air conditioning systems;

–    high efficiency low NOx burners;

–    metering technologies and individual metering;

–    domestic appliances and lighting.

PEEREA

---

174   Editor's note: spelling as in authenticated version.

Municipalities and local community services:

–    district heating systems;

–    efficient gas distribution systems;

–    energy planning technologies;

–    twinning of towns or of other relevant territorial entities;

–    energy management in cities and in public buildings;

–    waste management and energy recovery of waste.

Improving Energy Efficiency in the industrial sector:

–    joint ventures;

–    energy cascading, cogeneration and waste heat recovery;

–    energy audits.

Improving Energy Efficiency in the transport sector:

–    motor vehicle performance standards;

–    development of efficient transport infrastructures.

Information:

–    awareness creation;

–    data bases: access, technical specifications, information systems;

–    dissemination, collection and collation of technical information;

–    behavioural studies.

Training and education:

–    exchanges of energy managers, officials, engineers and students;

–    organisation of international training courses.

Financing:

–    development of legal framework;

–    Third Party Financing;

–    joint ventures;

–    co-financing.

**168**



**Energy Charter Secretariat**
**2015**

**Energy Charter Secretariat**

**Boulevard de la Woluwe, 56**
**B-1200 Brussels, Belgium**

**Tel.: +32 2 775 98 00**
**Fax: +32 2 775 98 01**

**Email: info@encharter.org**

**www.energycharter.org**