# EXHIBIT 8



Reports of Cases

JUDGMENT OF THE COURT (Grand Chamber)

26 October 2021 *

(Reference for a preliminary ruling  –  Agreement between the Government of the Kingdom of Belgium and the Government of the Grand Duchy of Luxembourg, of the one part, and the Government of the People's Republic of Poland, of the other, concerning the reciprocal promotion and protection of investments, signed on 19 May 1987  –  Arbitration proceedings  – Dispute between an investor from one Member State and another Member State  – Arbitration clause provided for in that agreement contrary to EU law  –  Invalidity  –  Ad hoc arbitration agreement between the parties to that dispute  –  Participation in the arbitration proceedings  –  Tacit expression by that other Member State of its intention to conclude that arbitration agreement  –  Unlawfulness)

In Case C-109/20,

REQUEST for a preliminary ruling under Article 267 TFEU from the Högsta domstolen (Supreme Court, Sweden), made by decision of 4 February 2020, received at the Court on 27 February 2020, in the proceedings

**Republiken Polen**

v

**PL Holdings Sàrl,**

THE COURT (Grand Chamber),

composed of K. Lenaerts, President, A. Arabadjiev, A. Prechal, K. Jürimäe, S. Rodin and I. Jarukaitis, Presidents of Chambers, J.-C. Bonichot M. Safjan, F. Biltgen, P.G. Xuereb, N. Piçarra, L.S. Rossi (Rapporteur) and A. Kumin, Judges,

Advocate General: J. Kokott,

Registrar: C. Strömholm, Administrator,

having regard to the written procedure and further to the hearing on 15 March 2021,

after considering the observations submitted on behalf of:

–  Republiken Polen, by F. Hoseinian, A.-M. Tamminen, J. Tavaststjerna and M. Wallin, advokater, and by L. Guterstam,

---

* Language of the case: Swedish.



– PL Holdings Sàrl, by R. Oldenstam, D. Sandberg and J. Rosell Svensson, advokater, L. Rees-Evans, counsel, P. Paschalidis, advocate, and S. Fietta QC,

– the Czech Government, by M. Smolek, J. Vláčil, T. Müller, I. Gavrilova, T. Machovičová and L. Březinová, acting as Agents,

– the German Government, by J. Möller and D. Klebs, acting as Agents,

– the Spanish Government, by S. Centeno Huerta and J. Ruiz Sánchez, acting as Agents,

– the French Government, by E. de Moustier and A. Daniel, acting as Agents,

– the Italian Government, by G. Palmieri and S. Fiorentino, acting as Agents,

– the Luxembourg Government, by C. Schiltz, A. Germeaux and T. Uri, acting as Agents,

– the Hungarian Government, by M.Z. Fehér and R. Kissné Berta, acting as Agents,

– the Netherlands Government, by M.K. Bulterman, C.S. Schillemans and J.M. Hoogveld, acting as Agents,

– the Polish Government, by B. Majczyna, M. Rzotkiewicz, M. Martyński, B. Soloch and J. Jackowska-Majeranowska, acting as Agents, and by J. Zasada, radca prawny,

– the Slovak Government, by B. Ricziová, acting as Agent,

– the Finnish Government, by H. Leppo, acting as Agent,

– the Swedish Government, by H. Shev, M. Salborn Hodgson, C. Meyer-Seitz, A.M. Runeskjöld, H. Eklinder, R. Shahsvan Eriksson and J. Lundberg, acting as Agents,

– the European Commission, by F. Erlbacher, K. Simonsson, L. Malferrari, T. Maxian Rusche and E. Ljung Rasmussen, acting as Agents,

after hearing the Opinion of the Advocate General at the sitting on 22 April 2021,

gives the following

## Judgment

1   This request for a preliminary ruling concerns the interpretation of Articles 267 and 344 TFEU.

2   The request has been made in proceedings between Republiken Polen (Republic of Poland) and PL Holdings Sàrl concerning the jurisdiction of an arbitration body which has made two arbitration awards in the context of a dispute between them.

**Legal context**

*International law*

*The BIT*

3    Article 9 of the Agreement between the Government of the Kingdom of Belgium and the Government of the Grand Duchy of Luxembourg, of the one part, and the Government of the People's Republic of Poland, of the other, concerning the reciprocal promotion and protection of investments, signed on 19 May 1987 ('the bilateral investment treaty', or 'the BIT'), provides as follows:

'1. (a)  Disputes between one of the Contracting Parties and an investor of the other Contracting Party shall be subject to a written notification accompanied by a detailed memorandum sent by that investor to the relevant Contracting Party.

(b)  Within the meaning of this Article, the term "disputes" refers to disputes with regard to the expropriation or nationalisation of, or any other measures similarly affecting, the investments, including the transfer of an investment to public ownership, placing it under public supervision, as well as any other deprivation or restriction of rights *in rem* by sovereign measures that might lead to consequences similar to those of expropriation.

(c)  Such disputes shall, as far as possible, be settled amicably between the relevant parties.

2.  If the dispute could not be so settled within six months from the date of the written notification specified in paragraph 1, it shall be submitted, at the choice of the investor, to arbitration before one of the bodies indicated below:

(a)  the Arbitration Institute of the Stockholm Chamber of Commerce [("the SCC")];

…

5.  The arbitration body should make its award on the basis of:

–  the national law of the Contracting Party that is a party to the dispute, in the territory of which the investment is located, including the rules relating to the conflict of laws;

–  the provisions of this Treaty;

–  the terms of any special agreement concerning the investment;

–  the generally accepted rules and principles of international law.

6.  The arbitration awards shall be final and binding on the parties to the dispute. Each Contracting Party undertakes to execute the awards in accordance with its national law.'

*Agreement for the termination of Bilateral Investment Treaties between the Member States of the European Union*

4    Article 4(1) of the Agreement for the termination of Bilateral Investment Treaties between the Member States of the European Union (OJ 2020 L 169, p. 1) states:

'The Contracting Parties hereby confirm that Arbitration Clauses [between an investor and a State in a Bilateral Investment Treaty] are contrary to the EU Treaties and thus inapplicable. As a result of this incompatibility between Arbitration Clauses and the EU Treaties, as of the date on which the last of the parties to a Bilateral Investment Treaty became a Member State of the European Union, the Arbitration Clause in such a Bilateral Investment Treaty cannot serve as legal basis for Arbitration Proceedings.'

5    Article 7 of that agreement provides:

'Where the Contracting Parties are parties to Bilateral Investment Treaties on the basis of which Pending Arbitration Proceedings or New Arbitration Proceedings were initiated, they shall:

(a)   inform, in cooperation with each other and on the basis of the statement in Annex C, arbitral tribunals about the legal consequences of the [judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158)] as described in Article 4; and

(b)   where they are party to judicial proceedings concerning an arbitral award issued on the basis of a Bilateral Investment Treaty, ask the competent national court, including in any third country, as the case may be, to set the arbitral award aside, annul it or to refrain from recognising and enforcing it.'

**Swedish law**

*The Law on arbitration*

6    Paragraph 1 of the lag om skiljeförfarande (Law on arbitration proceedings) (SFS 1999, No 116), in the version applicable to the dispute in the main proceedings ('the Law on arbitration'), is worded as follows:

'Disputes relating to matters which can be the subject of an amicable settlement between the parties may, by agreement between those parties, be referred to one or more arbitrators for settlement. Such an agreement may relate to future disputes relating to a legal relationship referred to in the agreement. The dispute can relate to the existence of a particular fact.

…'

7    Under Paragraph 2 of the Law on arbitration:

'Arbitrators may examine whether they have jurisdiction to settle the dispute.

If the arbitrators have concluded by decision that they have jurisdiction to settle the dispute, a party dissatisfied with that decision may request that the question be examined by a court of appeal. That action must be brought no later than 30 days after the date on which the arbitrators' decision

accepting jurisdiction was notified to that party. The arbitrators may continue the arbitration proceedings pending the decision from the court of appeal.

In the case of an action against an arbitration award involving a decision on jurisdiction, Paragraphs 34 and 36 shall apply.'

8   The first subparagraph of Paragraph 33 of that law states:

'An arbitration award shall be null and void:

1.  where it involves the examination of a question which, under Swedish law, may not be decided by arbitrators;

2.  where the arbitration award or the manner in which it was arrived at is manifestly incompatible with the Swedish legal order; or

…'

9   The second subparagraph of Paragraph 34 of that law states:

'A party shall not be entitled to rely on a fact which he or she, by participating in the proceedings without objection, or by any other conduct, may be regarded as having refrained from raising. The mere fact that a party has appointed an arbitrator does not necessarily mean that he or she has accepted the arbitrators' jurisdiction to rule upon the question referred. …'

10  According to the request for a preliminary ruling, it is apparent from the *travaux préparatoires* for Paragraph 34 of that law that it may be presumed, in general, that a party which participates in the proceedings, without raising any objection to the jurisdiction of the arbitration body at the outset, has accepted its jurisdiction to settle the dispute. The absence of any challenge to the validity of an arbitration agreement may also be regarded as being capable of binding the parties to arbitration on the basis of contract law. In that regard, the referring court states that, according to the general rules of contract law, a valid arbitration agreement may result, for example, from the implicit conduct of the parties or by the failure to act by one of them.

*Arbitration Rules*

11  Under Article 2 of the 2010 Arbitration Rules of the Arbitration Institute of the SCC, a request for arbitration must include, inter alia, 'a copy or description of the arbitration agreement or clause under which the dispute is to be settled'.

**The dispute in the main proceedings and the question referred for a preliminary ruling**

12  PL Holdings is a company incorporated under and subject to Luxembourg law. Between 2010 and 2013, it acquired shares in two Polish banks. As the latter merged in 2013, PL Holdings became the owner of 99% of the shares in the new bank arising from that merger.

13  In July 2013, the Komisja Nadzoru Finansowego (Polish Financial Supervision Authority), a body established under Polish law which is responsible for supervising banks and credit institutions in Poland, decided to suspend the voting rights attached to the shares in that new bank owned by PL Holdings and forced it to sell those shares.

JUDGMENT OF 26. 10. 2021 – CASE C-109/20
PL HOLDINGS

14    PL Holdings decided to initiate arbitration proceedings against the Republic of Poland before an arbitral tribunal at the Arbitration Institute of the SCC ('the arbitral tribunal').

15    In its request of 28 November 2014, PL Holdings relied on Article 9 of the BIT in order to show that that tribunal had jurisdiction to hear the dispute at issue in the main proceedings. It asked that tribunal to declare that the Republic of Poland had infringed the BIT and to order that Member State to pay damages.

16    On 30 November 2014, the Republic of Poland replied to that request, sending a letter to the SCC's secretariat in which it expressed its intention to challenge the claim that it had validly consented to the arbitration proceedings initiated by PL Holdings.

17    On 7 August 2015, PL Holdings lodged a request with the arbitral tribunal, setting out, inter alia, its complaints concerning the measures referred to in paragraph 13 above.

18    In its defence of 13 November 2015, the Republic of Poland challenged the jurisdiction of the arbitral tribunal on the ground that PL Holdings was not an 'investor' within the meaning of the BIT.

19    By pleading of 27 May 2016, the Republic of Poland put forward a further argument challenging the jurisdiction of the arbitral tribunal, contending that the arbitration clause in Article 9 of the BIT was contrary to EU law.

20    By the partial arbitral award of 28 June 2017, the arbitral tribunal declared that it had jurisdiction on the basis of Article 9 of the BIT. That tribunal found that, by ordering the forced sale of PL Holdings' shareholdings in the new Polish bank, the Republic of Poland had infringed the BIT and that PL Holdings could, therefore, claim damages.

21    By the final arbitration award of 28 September 2017, the arbitral tribunal ordered the Republic of Poland to pay PL Holdings damages and to pay the costs incurred by the latter in the arbitration proceedings.

22    On 28 September 2017, the Republic of Poland brought an action before the Svea hovrätt (Svea Court of Appeal, Stockholm, Sweden), seeking to have the arbitral awards of 28 June and 28 September 2017 set aside.

23    In support of that action, it argued that, first of all, Articles 267 and 344 TFEU preclude a dispute between an investor from one Member State and another Member State concerning investments from being brought before an arbitration body. Thus, Article 9 of the BIT was contrary to EU law, with the result that arbitration awards made on the basis of that article are incompatible with the EU legal order and, consequently, are invalid, pursuant to points 1 and 2 of the first subparagraph of Paragraph 33 of the Law on arbitration. Since those arbitral awards are invalid by virtue of the direct application of EU law, that ground can be raised by the court of its own motion.

24    Next, the Republic of Poland challenged the jurisdiction of the arbitral tribunal, within the period referred to in the second subparagraph of Paragraph 34 of the Law on arbitration, by arguing that Article 9 of the BIT was invalid. In any event, it argued that, if application of the second subparagraph of Paragraph 34 meant that the plea of lack of jurisdiction raised by the Republic of Poland was inadmissible, that provision would nevertheless have to be disregarded as it prevents EU law from being given full effect.

ECLI:EU:C:2021:875

25    Lastly, the Republic of Poland maintained that it had not decided against pursuing its claim that the arbitral tribunal lacked jurisdiction, with the result that it could not be inferred from its conduct following the submission of PL Holdings' request for arbitration that it intended tacitly to conclude an ad hoc arbitration agreement with PL Holdings in addition to the arbitration clause in Article 9 of the BIT.

26    PL Holdings disputed the Republic of Poland's arguments. It maintained that the dispute at issue in the main proceedings concerns issues, such as the Republic of Poland's failure to comply with its obligations under the BIT and PL Holdings' right to compensation, which may be decided by arbitration in accordance with Paragraph 1 of the Law on arbitration.

27    In the view of PL Holdings, Article 9 of the BIT is a valid 'offer of arbitration' made by the Republic of Poland, which PL Holdings accepted by making its request for arbitration. Moreover, the Republic of Poland challenged the validity of the arbitration clause out of time and the question whether that clause is contrary to EU law cannot be raised by the court of its own motion.

28    PL Holdings contends, in any event, that even if the Republic of Poland's 'offer of arbitration' stemming from Article 9 of the BIT were invalid, the fact remains that an ad hoc arbitration agreement was concluded between the parties to the dispute in the main proceedings, in accordance with Swedish law and the principles of commercial arbitration, having regard to the conduct of those parties. By making a request for arbitration, PL Holdings submitted an 'offer of arbitration' in accordance with the same conditions as those laid down in Article 9 of the BIT, and the Republic of Poland tacitly accepted that offer by refraining from validly challenging the jurisdiction of the arbitral tribunal on the basis of that agreement.

29    The Svea hovrätt (Svea Court of Appeal, Stockholm) decided to dismiss the Republic of Poland's action at first instance. That court held, first of all, that, even though the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158), which, in its view was applicable to the dispute in the main proceedings, meant that Article 9 of the BIT was invalid and that, consequently, the permanent offer made by the Republic of Poland to investors from other Member States – according to which a dispute concerning that agreement must be settled by an arbitration body – was also invalid, that invalidity did not prevent a Member State and an investor from another Member State from concluding an ad hoc arbitration agreement at a later stage in order to settle that dispute. Such an ad hoc arbitration agreement is based on the common intention of the parties to that dispute and is concluded according to the same principles as commercial arbitration proceedings.

30    The court then found that the arbitration awards at issue in the main proceedings related to issues which could be decided by arbitration and that their content was not contrary to the legal order, with the result that there was no need to set them aside them on the basis of point 1 or 2 of the first subparagraph of Paragraph 33 of the Law on arbitration.

31    Lastly, the Republic of Poland's challenge to the validity of the arbitration clause in Article 9 of the BIT was out of time and was, therefore, time-barred under the second subparagraph of Paragraph 34 of the Law on arbitration.

32    The Republic of Poland brought an appeal against the decision of the Svea hovrätt (Svea Court of Appeal, Stockholm), before the referring court, the Högsta domstolen (Supreme Court, Sweden), which considers it established that the arbitration clause in Article 9 of the BIT is contrary to EU

law. That being so, it finds it necessary to make a reference to the Court in order to be able to adjudicate on the positions of the parties, which have been reiterated before it, since it is not clear how it should interpret the provisions of EU law at issue.

33    In those circumstances the Högsta domstolen (Supreme Court) decided to stay the proceedings and to refer the following question to the Court of Justice for a preliminary ruling:

'Do Articles 267 and 344 TFEU, as interpreted in [the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158)], mean that an arbitration agreement is invalid if it has been concluded between a Member State and an investor – where an investment agreement contains an arbitration clause that is invalid as a result of the fact that the contract was concluded between two Member States – by virtue of the fact that the Member State, after arbitration proceedings were commenced by the investor, refrains, by the free will of the State, from raising objections as to jurisdiction?'

### Consideration of the question referred

34    It should be noted that, according to the settled case-law of the Court, in the procedure laid down by Article 267 TFEU providing for cooperation between national courts and the Court of Justice, it is for the latter to provide the national court with an answer which will be of use to it and enable it to decide the case before it. To that end, the Court should, where necessary, reformulate the questions referred to it (judgment of 15 July 2021, *Ministrstvo za obrambo*, C-742/19, EU:C:2021:597, paragraph 31 and the case-law cited).

35    According to the findings of the referring court, it is established, in the main proceedings, that the arbitration clause in Article 9 of the BIT is invalid on the ground that it undermines the autonomy, effectiveness and uniform application of EU law, and that no arbitration proceedings can validly be brought on the basis of that arbitration clause.

36    Although PL Holdings initially brought arbitration proceedings against the Republic of Poland on the basis of Article 9 of the BIT, it subsequently stated that, instead of constituting acceptance of the Republic of Poland's offer of arbitration in Article 9 of the BIT, its request for arbitration had to be regarded as constituting an offer of arbitration whose content was identical; that offer, it is argued, was implicitly accepted by the Republic of Poland, since it had not validly challenged the jurisdiction of the arbitral tribunal within the period prescribed for that purpose by Swedish law, applicable to those arbitration proceedings. That agreement therefore allegedly replaced that arbitration clause in the context of the BIT, which continued to apply to the same arbitration proceedings on that new legal basis. The Republic of Poland was ultimately found to have infringed the BIT.

37    In those circumstances, it must be held that, by its question, the referring court asks, in essence, whether Articles 267 and 344 TFEU must be interpreted as precluding national legislation which allows a Member State to conclude an ad hoc arbitration agreement with an investor from another Member State that makes it possible to continue arbitration proceedings initiated on the basis of an arbitration clause whose content is identical to that agreement, where that clause is contained in an international agreement concluded between those two Member States and is invalid on the ground that it is contrary to those articles.

38    As a preliminary point, it should be noted that that question is based on the premiss that, in the light of the invalidity of the arbitration clause in Article 9 of the BIT, the Republic of Poland tacitly accepted, on the basis of the applicable Swedish law, PL Holdings' offer of arbitration, by refraining from challenging in good time the jurisdiction of the arbitral tribunal, and therefore concluded with PL Holdings an ad hoc arbitration agreement which was distinct, but had identical content to the arbitration clause based on Article 9 of the BIT.

39    In that regard, it should be recalled that, in proceedings under Article 267 TFEU, which are based on a clear separation of functions between the national courts and the Court of Justice, any assessment of the facts is a matter for the national court (judgment of 6 March 2018, *SEGRO and Horváth*, C-52/16 and C-113/16, EU:C:2018:157, paragraph 98 and the case-law cited).

40    It is, therefore, for the referring court alone to assess, at the outset, all the facts surrounding the situation at issue in the main proceedings in order to establish whether the Republic of Poland did intend to accept PL Holdings' offer of arbitration, which it denies.

41    It should nevertheless be observed that it is apparent from the file submitted to the Court that the Republic of Poland did at the outset contest the jurisdiction of the arbitral tribunal on the basis of the BIT. First of all, in its letter of 30 November 2014 to the secretariat of the SCC, the Republic of Poland expressed its intention to argue that there was no valid arbitration agreement. Then, in its defence of 13 November 2015 lodged before the arbitral tribunal, it disputed the jurisdiction of that tribunal on the ground that PL Holdings was not an 'investor' within the meaning of the BIT. Lastly, in its pleading of 27 May 2016, a few days after the request for a preliminary ruling was lodged before the Court in the case that gave rise to the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158), it argued that the arbitral tribunal did not have jurisdiction to hear the dispute at issue in the main proceedings because the arbitration clause in Article 9 of the BIT – which was PL Holdings' sole basis for its request for arbitration – was invalid as it was contrary to EU law.

42    In that context, it is for the referring court to take account of the objections raised by the Republic of Poland throughout the arbitration proceedings, in order to establish whether, notwithstanding the invalidity of the arbitration clause in Article 9 of the BIT – and, therefore, of the legal basis relied on by PL Holdings in order to initiate the arbitration proceedings – the Republic of Poland intended to conclude an ad hoc arbitration agreement with content identical to that of that clause. In particular, that court should ascertain that PL Holdings' request for arbitration of 28 November 2014, in accordance with Article 2 of the 2010 Arbitration Rules of the Arbitration Institute of the SCC, together with the subsequent conduct of the Republic of Poland, allows a clear inference to be drawn that there was an ad hoc arbitration agreement between that investor and the Republic of Poland, and that the latter was thus in a position effectively to challenge the validity of that agreement before the arbitral tribunal.

43    It is, therefore, only if the referring court were to conclude that the Republic of Poland had in fact tacitly consented to be bound by such an ad hoc arbitration agreement with content identical to that of the arbitration clause in Article 9 of the BIT that it would be necessary to ascertain whether the conclusion of such an agreement in such circumstances is consistent with EU law.

44    In that regard, it should be observed that the Court has held that Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between two Member States under which an investor from one of those Member States may, in the event of a

dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept (judgment of 6 March 2018, *Achmea*, C-284/16, EU:C:2018:158, paragraph 60).

45    By concluding such an agreement, the Member States which are parties to it agree to remove from the jurisdiction of their own courts and, therefore, from the system of judicial remedies which the second subparagraph of Article 19(1) TEU requires them to establish in the fields covered by EU law (see, to that effect, judgment of 27 February 2018, *Associação Sindical dos Juízes Portugueses*, C-64/16, EU:C:2018:117, paragraph 34) disputes which may concern the application or interpretation of EU law. Such an agreement is, therefore, capable of preventing those disputes from being resolved in a manner that guarantees the full effectiveness of that law (see, to that effect, judgment of 2 September 2021, *Komstroy*, C-741/19, EU:C:2021:655, paragraphs 59 and 60 and the case-law cited).

46    It is common ground that the arbitration clause in Article 9 of the BIT is, like the clause at issue in the case which gave rise to the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158), capable of leading to a situation in which an arbitration body rules in disputes which may concern the application or interpretation of EU law. Accordingly, that arbitration clause is such as to call into question not only the principle of mutual trust between the Member States but also the preservation of the particular nature of EU law, ensured by the preliminary ruling procedure provided for in Article 267 TFEU. That clause is, therefore, incompatible with the principle of sincere cooperation set out in the first subparagraph of Article 4(3) TEU and has an adverse effect on the autonomy of EU law enshrined, inter alia, in Article 344 TFEU (see, to that effect, judgment of 6 March 2018, *Achmea*, C-284/16, EU:C:2018:158, paragraphs 58 and 59). Furthermore, as is confirmed by Article 4(1) of the Agreement for the termination of Bilateral Investment Treaties between the Member States of the European Union, from the date of accession of the Republic of Poland to the European Union on 1 May 2004, Article 9 of the BIT could no longer serve as the basis for arbitration proceedings between an investor and that Member State.

47    To allow a Member State, which is a party to a dispute which may concern the application and interpretation of EU law, to submit that dispute to an arbitral body with the same characteristics as the body referred to in an invalid arbitration clause contained in an international agreement such as the one referred to in paragraph 44 above, by concluding an ad hoc arbitration agreement with the same content as that clause, would in fact entail a circumvention of the obligations arising for that Member State under the Treaties and, specifically, under Article 4(3) TEU and Articles 267 and 344 TFEU, as interpreted in the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158).

48    First of all, such an ad hoc arbitration agreement would produce, with regard to the dispute in the context of which it was concluded, the same effects as those resulting from such a clause. The fundamental reason for that arbitration agreement is precisely to replace the arbitration clause in a provision such as Article 9 of the BIT in order to maintain its effects despite that provision's being invalid.

49    Next, as the European Commission has correctly pointed out, the consequences of that Member State's circumventing its obligations arising from the provisions referred to in paragraph 47 above are no less serious because this is an isolated case. The legal approach envisaged by PL Holdings could be adopted in a multitude of disputes which may concern the application and interpretation of EU law, thus allowing the autonomy of that law to be undermined repeatedly.

50   It should also be noted that each request for arbitration made to a Member State by an investor from another Member State, on the basis of an arbitration clause in a bilateral investment treaty between those two Member States, may, despite the invalidity of that clause, constitute an offer of arbitration to the defendant Member State concerned, which could then be regarded as having accepted that offer simply because it failed to put forward specific arguments against the existence of an ad hoc arbitration agreement. Such a situation would have the effect of maintaining the effects of the commitment – which was entered into by that Member State in breach of EU law and is, therefore, invalid – to accept the jurisdiction of the arbitration body before which the matter was brought.

51   Furthermore, the validity of the legal basis of an arbitration body's jurisdiction, in the light of Articles 267 and 344 TFEU, cannot depend on the conduct of the parties to the dispute concerned, and in particular on that of the Member State which infringed those articles, that conduct having caused the arbitration clause on the basis of which the matter was brought before the arbitration body to be invalid. If it were to be inferred from the conduct of a Member State that it manifested any intention to acknowledge the jurisdiction of that arbitration body, that intention must be the same as the intention it expressed when the arbitration clause was stipulated and cannot, therefore, form the basis of that jurisdiction.

52   Lastly, it follows both from the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158), and from the principles of the primacy of EU law and of sincere cooperation, not only that the Member States cannot undertake to remove from the judicial system of the European Union disputes which may concern the application and interpretation of EU law, but also that, where such a dispute is brought before an arbitration body on the basis of an undertaking which is contrary to EU law, they are required to challenge, before that arbitration body or before the court with jurisdiction, the validity of the arbitration clause or the ad hoc arbitration agreement on the basis of which the dispute was brought before that arbitration body.

53   That is also confirmed by Article 7(b) of the Agreement for the termination of Bilateral Investment Treaties between the Member States of the European Union, under which, where contracting parties are parties to bilateral investment treaties on the basis of which pending arbitration proceedings were initiated, they are, inter alia, where they are party to judicial proceedings concerning an arbitral award issued on the basis of a bilateral investment treaty, to ask the competent national court, as the case may be, to set the arbitral award aside, annul it or to refrain from recognising and enforcing it. That rule is applicable *mutatis mutandis* to a situation in which arbitration proceedings originally initiated on the basis of an arbitration clause, which is invalid because it does not comply with EU law, are continued on the basis of an ad hoc arbitration agreement concluded by the parties in accordance with the applicable national law, the content of which is identical to that of that clause.

54   Any attempt by a Member State to remedy the invalidity of an arbitration clause by means of a contract with an investor from another Member State would run counter to the first Member State's obligation to challenge the validity of the arbitration clause and would thus be liable to render the actual legal basis of that contract unlawful since it would be contrary to the provisions and fundamental principles governing the EU legal order referred to in paragraph 46 above.

55   In those circumstances, it is for the national court to uphold an application which seeks the setting aside of an arbitration award made on the basis of an arbitration agreement infringing Articles 267 and 344 TFEU and the principles of mutual trust, sincere cooperation and autonomy of EU law.

56    In the light of all the foregoing considerations, the answer to the question referred is that Articles 267 and 344 TFEU must be interpreted as precluding national legislation which allows a Member State to conclude an ad hoc arbitration agreement with an investor from another Member State that makes it possible to continue arbitration proceedings initiated on the basis of an arbitration clause whose content is identical to that agreement, where that clause is contained in an international agreement concluded between those two Member States and is invalid on the ground that it is contrary to those articles.

**Request that the Court limit the temporal effects of its judgment**

57    PL Holdings requested that, were the Court to find that Articles 267 and 344 TFEU must be interpreted as precluding an arbitration agreement concluded between a Member State and a private investor from another Member State, it should limit the temporal effects of the judgment that it delivers so that the latter does not affect arbitration proceedings that have been initiated in good faith on the basis of ad hoc arbitration agreements and concluded before the delivery of that judgment.

58    In order to rule on that request, it must be recalled that, according to settled case-law, the interpretation which the Court, in the exercise of the jurisdiction conferred on it by Article 267 TFEU, gives to a rule of EU law clarifies and defines the meaning and scope of that rule as it must be, or ought to have been, understood and applied from the date of its entry into force. It follows that the rule as thus interpreted may and must be applied by the courts to legal relationships arising and established before the judgment ruling on the request for interpretation, provided that in other respects the conditions for bringing an action relating to the application of that rule before the courts having jurisdiction are satisfied (judgment of 17 March 2021, *Academia de Studii Economice din Bucureşti*, C-585/19, EU:C:2021:210, paragraph 78 and the case-law cited).

59    It is only quite exceptionally that the Court may, in application of the general principle of legal certainty inherent in the EU legal order, be moved to restrict for any person concerned the opportunity of relying on a provision which it has interpreted with a view to calling into question legal relationships established in good faith. Two essential criteria must be fulfilled before such a limitation can be imposed: those concerned must have acted in good faith and there must be a risk of serious difficulties (judgment of 17 March 2021, *Academia de Studii Economice din Bucureşti*, C-585/19, EU:C:2021:210, paragraph 79 and the case-law cited).

60    More specifically, the Court has taken that step only in quite specific circumstances, notably where there was a risk of serious economic repercussions owing in particular to the large number of legal relationships entered into in good faith on the basis of rules considered to be validly in force and where it appeared that individuals and national authorities had been led to adopt practices which did not comply with EU law by reason of objective, significant uncertainty regarding the implications of provisions of EU law, to which the conduct of other Member States or the Commission may even have contributed (judgment of 17 March 2021, *Academia de Studii Economice din Bucureşti*, C-585/19, EU:C:2021:210, paragraph 80 and the case-law cited).

61    It should also be noted that restricting the temporal effects of the interpretation of a provision of EU law provided by the Court under Article 267 TFEU may be allowed only in the actual judgment ruling upon the interpretation requested. That principle guarantees the equal treatment of the

Member States and of other persons subject to EU law, under that law, fulfilling, at the same time, the requirements arising from the principle of legal certainty (judgment of 23 April 2020, *Herst*, C-401/18, EU:C:2020:295, paragraph 57 and the case-law cited).

62    In the present case, with regard, first, to the criterion relating to good faith, PL Holdings submits that this is the first case in which the Court is asked to adopt a position on the validity of an ad hoc arbitration agreement, such as that at issue in the main proceedings. In the view of PL Holdings, when that arbitration agreement was concluded, there was nothing to indicate that it was contrary to EU law, since the Court delivered the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158), only after the arbitral awards of 28 June and 28 September 2017 had been made. Moreover, PL Holdings relied on the conduct of the Republic of Poland, including its participation in the arbitration proceedings, in the context of which it did not raise in sufficient time a plea to the effect that, under EU law, the arbitral tribunal did not have jurisdiction.

63    As regards, secondly, the criterion relating to serious difficulties, PL Holdings submits that the judgment to be delivered is likely to affect a large number of those who have concluded arbitration agreements with Member States in the context of various types of contract. Moreover, in its view, there is nothing in the Court's case-law to indicate that the concept of 'serious difficulties' could not cover a situation in which a company established in the European Union, such as PL Holdings, acting in good faith, was first of all the subject of an unlawful expropriation in breach of EU law, and in particular in breach of its freedom of establishment guaranteed in Articles 49 and 54 TFEU, and subsequently deprived of its right to effective judicial protection, provided for in Article 47 of the Charter of Fundamental Rights of the European Union.

64    In that regard, as the Advocate General observed in point 84 of her Opinion, the Court points out that the factors for interpreting Articles 267 and 344 TFEU that are relevant for the purposes of the present case arise directly from the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158), the temporal effects of which were not limited by the Court.

65    Indeed, to allow a Member State to replace an arbitration clause, included in an international agreement between Member States, by concluding an ad hoc arbitration agreement in order to make it possible to pursue arbitration proceedings initiated on the basis of that clause, would, as has been held in paragraph 47 above, amount to circumventing that Member State's obligations under the Treaties and, specifically, under Article 4(3) TEU and Articles 267 and 344 TFEU, as interpreted in the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158).

66    Thus, a limitation of the temporal effects of the present judgment would, in actual fact, entail limiting the effects of the interpretation of those provisions provided by the Court in the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158).

67    Moreover, as regards the alleged serious difficulties, it should be noted that, as regards, first, the alleged impact that the present judgment might have on the arbitration agreements concluded by the Member States for various types of contract, the interpretation of EU law provided in the present judgment refers only to ad hoc arbitration agreements concluded in circumstances such as those at issue in the main proceedings and summarised, in particular, in paragraph 65 above.

68    Secondly, the individual rights which PL Holdings derives from EU law must be protected within the framework of the judicial system of the Member States, namely, in the present case, the Polish judicial system. Consequently, even if it were established that there is a lacuna in the protection of

those rights, as is alleged by PL Holdings, that lacuna would have to be filled within that system, if necessary with the cooperation of the Court in the context of its powers; however, such a lacuna cannot justify allowing a failure to comply with the provisions and fundamental principles referred to in paragraph 65 above.

69    In those circumstances, the Court must refuse PL Holding's request that the temporal effects of the judgment be limited, and there is no need to ascertain whether it acted in good faith.

**Costs**

70    Since these proceedings are, for the parties to the main proceedings, a step in the action pending before the national court, the decision on costs is a matter for that court. Costs incurred in submitting observations to the Court, other than the costs of those parties, are not recoverable.

On those grounds, the Court (Grand Chamber) hereby rules:

**Articles 267 and 344 TFEU must be interpreted as precluding national legislation which allows a Member State to conclude an ad hoc arbitration agreement with an investor from another Member State that makes it possible to continue arbitration proceedings initiated on the basis of an arbitration clause whose content is identical to that agreement, where that clause is contained in an international agreement concluded between those two Member States and is invalid on the ground that it is contrary to those articles.**

[Signatures]