# EXHIBIT 11

# OPINION 1/91 OF THE COURT
## 14 December 1991

The Court of Justice has received a request for an opinion, lodged at the Court Registry on 14 August 1991, which was made by the Commission of the European Communities pursuant to the second subparagraph of Article 228(1) of the Treaty establishing the European Economic Community, according to which:

'The Council, the Commission or a Member State may obtain beforehand the opinion of the Court of Justice as to whether an agreement envisaged is compatible with the provisions of this Treaty. Where the opinion of the Court of Justice is adverse, the agreement may enter into force only in accordance with Article 236.'

## I — Description of the request for an opinion

By this request, the Commission seeks the Court's opinion on the compatibility with the provisions of the EEC Treaty of a draft agreement relating to the creation of the European Economic Area (hereinafter referred to as 'the agreement' and 'the EEA', respectively) and more particularly of the judicial machinery which it is proposed to set up under that agreement. The agreement is an association agreement to be concluded by the Community on the basis of Article 238 of the Treaty.

The agreement has been the subject of negotiations between the Commission, which, pursuant to a mandate given by the Council on 18 March 1990, has acted on behalf of the Community in accordance with a Council decision, and the countries of the European Free Trade Association and the Principality of Liechtenstein, which officially submitted an application to join EFTA on 1 March 1991, (hereinafter referred to as 'the EFTA countries' or 'the EFTA States').

The text of the agreement (the wording of which was not definitive) was enclosed with the request for an opinion.

The Court's Opinion is given on the basis of the English version of the agreement. By letter dated 30 October 1991, the Commission communicated this document in its form prior to initialling.

The Commission justified its request for an opinion by pointing out that the agreement provides for a system of judicial supervision for the settlement of disputes between the Contracting Parties and the settlement of conflicts within EFTA, and procedures designed to strengthen the uniformity of the law within the EEA. Although the Commission firmly believes that the system in question offers positive safeguards for the Community, it considered, on grounds of concern for legal certainty, that it was appropriate to consult the Court under Article 228 of the Treaty, in particular on certain specific aspects of the proposed system.

OPINION PURSUANT TO ARTICLE 228 OF THE EEC TREATY

## II — Procedure

In accordance with Article 107(1) of the Court's Rules of Procedure, the request for an opinion has been served on the Council and on the Member States. Written observations have been submitted by the Commission and by the United Kingdom, the Kingdom of Belgium and the Kingdom of Spain.

The Court put a number of written questions to the Commission, the Council and the Governments of the Member States, which were represented at the hearing held in camera at the Court on 26 November 1991 at which they answered those questions.

The Advocates General were heard by the Court in closed session on 3 December 1991 in accordance with Article 108(2) of the Rules of Procedure.

## III — Appraisal of the agreement

*Background*

Since 1973 trading relations between the Community and the EFTA countries together with Liechtenstein have been governed by bilateral free trade agreements. In January 1989, the President of the Commission, addressing the European Parliament, proposed that relations between the Community and EFTA be improved and intensified. The proposal was welcomed by the EFTA countries, with the result that talks were held, culminating in a decision to commence formal negotiations. To that end, the Council authorized the Commission 'to open negotiations with the EFTA countries and Liechtenstein with a view to the conclusion of an agreement between the Community and those countries speaking with a single voice, for the creation of the European Economic Area'. The negotiations were officially opened on 1 July 1990.

*Content of the agreement*

The agreement consists of a preamble followed by nine parts as follows: (1) objectives and principles; (2) free movement of goods; (3) free movement of persons, services and capital; (4) competition and other common rules; (5) horizontal policies relevant to the above four freedoms (concerning social policy, consumer protection, the environment, statistics and company law); (6) cooperation outside the four freedoms; (7) institutional provisions; (8) fund; and (9) final provisions.

The sole recital in the preamble to the agreement reads as follows:

'Considering the objective to establish a dynamic and homogeneous European Economic Area, based on common rules and equal conditions of competition and providing for the adequate means of enforcement including at the judicial level, and achieved on the basis of equality and reciprocity and of an overall balance of benefits, rights and obligations for the Contracting Parties.'

Article 1(1) of the agreement provides as follows:

'The aim of this Agreement of association is to promote a continuous and balanced strengthening of trade and economic relations between the Contracting Parties with equal conditions of competition, and the respect of the same rules, with a view to creating a homogeneous European Economic Area, hereinafter referred to as the EEA.'

Article 6 of the agreement reads as follows:

'Without prejudice to future developments of case-law, the provisions of this Agreement, in so far as they are identical in substance to corresponding rules of the Treaty establishing the European Economic Community and the Treaty establishing the European Coal and Steel Community and to acts in application of these two Treaties, shall in their implementation and application be interpreted in conformity with the relevant rulings of the Court of Justice of the European Communities given prior to the date of signature of this Agreement.'

Article 7 of the agreement provides that:

'Acts referred to or contained in the Annexes to this Agreement or in decisions of the EEA Joint Committee shall be binding upon the Contracting Parties and be, or be made, part of their internal legal order as follows:

(a) an act corresponding to an EEC regulation shall as such be made part of the internal legal order of the Contracting Parties;

(b) an act corresponding to an EEC directive shall leave to the authorities of the Contracting Parties the choice of form and method of implementation.'

Protocol 35, entitled 'Protocol 35 on the implementation of EEA rules', of which Article 1 refers to Article 7 of the agreement (which is quoted above), reads as follows:

'Whereas this Agreement aims at achieving a homogeneous European Economic Area, based on common rules, without requiring any Contracting Party to transfer legislative powers to any institution of the European Economic Area;

and

whereas this consequently will have to be achieved through national procedures;

*Article 1*

The Contracting Parties take into account that when implementing a part of an act corresponding to an EEC directive, which is clear, precise and unconditional,

subparagraph (a) of Article 7 of the Agreement shall apply.

*Article 2*

For cases of possible conflicts between implemented EEA rules and other statutory provisions, the Contracting Parties undertake to introduce, if necessary, a statutory provision to the effect that EEA rules shall prevail in these cases.'

Part VII, entitled 'Institutional Provisions' (Articles 89 to 120) consists of four chapters. Chapter 1, entitled 'The structure of the Association' comprises five sections. Section 1 is concerned with the EEA Council, which is to consist of members of the Council and members of the Commission of the European Communities and one member of the Government of each of the EFTA States and is to be responsible in particular for laying down general guidelines and giving the political impetus in the implementation of the agreement. Section 2 is concerned with the EEA Joint Committee, which is to comprise representatives of the Contracting Parties and is to be responsible for the implementation and operation of the agreement. Section 3, entitled 'The EEA Courts', contains the following provisions:

'*Article 95*

1. An independent EEA Court, functionally integrated with the Court of Justice of the European Communities, is hereby established. The EEA Court shall exercise the functions which follow from Article 96. Each EFTA State shall nominate one Judge to the Court.

2. The Court, when sitting in plenary session,[1] shall be composed of five Judges of the Court of Justice of the European Communities and, on the basis of rotation, three of the Judges nominated by the EFTA States.

3. At the request of the Court, the EEA Council may allow it to establish Chambers, each consisting of three or five Judges.[2]

4. The Presidency of the Court shall be held alternatively by one of the Judges of the Court of Justice of the European Communities and by one of the Judges nominated by the EFTA States.

*Article 96*

1. The EEA Court is competent for:

(a) the settlement of disputes between the Contracting Parties;

(b) actions concerning the surveillance procedure regarding the EFTA States;

(c) appeals concerning decisions in the field of competition initiated by the EFTA Surveillance Authority.

2. The EEA Court may be seised by:

---

[1] — All disputes between Contracting Parties or cases when the EEA Court is seised by the EEA Joint Committee will be dealt with in plenary session.

[2] — An appropriate balance of ECJ and EFTA Judges, taking into account the nature of the cases, shall be laid down in the Statute of the EEA Court.

(a) the EEA Joint Committee or the Contracting Parties in cases for settlement of disputes in accordance with Article 117;

(b) a natural or legal person or by the EFTA Surveillance Authority on appeal against decisions given by the EEA Court of First Instance in the field of competition in accordance with Article 102;

(c) the EC Commission or the EFTA Surveillance Authority in cases of conflict of competence arising under the provisions of Chapter 1 of Part IV.

3. In addition, the EEA Court may be seised under the provisions of a separate agreement between the EFTA States establishing an EFTA Surveillance Authority by:

(a) the EFTA Surveillance Authority under the surveillance procedure referred to in Article 116 regarding the fulfilment of the obligations under this Agreement by the EFTA States;

(b) an EFTA State or a natural or legal person in actions against the EFTA Surveillance Authority.

*Article 97*

The Contracting Parties concerned, and the surveillance authorities, i. e. the EC Commission and the EFTA Surveillance Authority, as the case may be, shall take the necessary measures to comply with the judgments of the EEA Court.

*Article 98*

The EEA Court shall have unlimited jurisdiction in regard to penalties imposed by the EFTA Surveillance Authority.

*Article 99*

Actions brought before the EEA Court shall not have suspensory effect. The EEA Court may, however, if it considers that circumstances so require, order that application of the contested act be suspended.

*Article 100*

The EEA Court may, where seised in accordance with Article 96(2)(b) or (3), prescribe any necessary interim measures.

*Article 101*

1. An independent EEA Court of First Instance, attached to the EEA Court, is hereby established. It shall ensure the legal control of decisions of the EFTA Surveillance Authority relating to competition rules applicable to undertakings. Each EFTA State shall nominate one Judge to the Court.

2. The EEA Court of First Instance shall be composed of three of the Judges nominated by the EFTA States, on the basis of rotation, and two Judges of the First Instance of the European Communities.

3. The Presidency of the Court shall be held alternatively by one of the Judges

nominated by the EFTA States and by one of the Judges of the Court of First Instance of the European Communities.

*Article 102*

The EEA Court of First Instance shall have jurisdiction at first instance in actions brought by a natural or legal person against a decision by the EFTA Surveillance Authority, relating to the implementation of the competition rules applicable to undertakings, if that decision is addressed to that person or if it is of direct and individual concern to him.

In addition, the EEA Court of First Instance shall have the competences conferred on the EEA Court in Articles 98 to 110.

The EEA Court of First Instance shall also be competent to give rulings in actions against the EFTA Surveillance Authority in accordance with provisions to be laid down in a separate agreement between the EFTA States establishing the EFTA Surveillance Authority.

*Article 103*

1. The Statutes of the EEA Court and of the EEA Court of First Instance, including, in particular, the rules on the functioning of the two Courts, the appointment of the Judges and the Presidents and their terms of office are laid down in Protocol 33. [3]

    3 — The Statutes shall contain provisions on qualifications for the Judges.

2. The EEA Court and the EEA Court of First Instance shall adopt their rules of procedure, to be approved by the EEA Council.

*Article 104*

1. In order to ensure as uniform as possible an interpretation of this Agreement, in full deference to the independence of courts, the EEA Court, the EEA Court of First Instance, the Court of Justice of the European Communities, the Court of First Instance of the European Communities and the Courts of the EFTA States shall, when applying and interpreting respectively the provisions of this Agreement or provisions of the Treaty establishing the European Economic Community and the Treaty establishing the European Coal and Steel Community, as amended or supplemented, or of the acts adopted in pursuance thereof, which are identical in substance to the provisions of this Agreement, pay due account to the principles laid down by any relevant decisions delivered by the other Courts.

A system of exchange of information concerning judgments by courts of last instance shall be set up by the EEA Joint Committee. This system shall comprise:

(a) transmission to the Registrar of the EEA Court of judgments delivered by such courts on the interpretation and application of, on the one hand, this Agreement or, on the other hand, the Treaty establishing the European Economic Community and the Treaty establishing the European Coal and Steel Community, as amended or supplemented, as well as the acts adopted in pursuance thereof in so far

as they concern provisions which are identical in substance to those of this Agreements;

(b) classification of these judgments by the Registrar of the EEA Court including, as far as necessary, the drawing up and publication of translations and abstracts;

(c) communication by the Registrar of the EEA Court of the relevant documents to the competent national authorities, to be designated by each Contracting Party.

2. Provisions on the possibility for an EFTA State to allow a court or tribunal to ask the Court of Justice of the European Communities to express itself [4] on the interpretation of an EEA rule are laid down in Protocol 34.

*Article 105*

Decisions under this Agreement by the EFTA Surveillance Authority and the EC Commission which impose a pecuniary obligation on persons other than States, shall be enforceable. The same shall apply to such judgments under this Agreement by the EEA Court, the EEA Court of First Instance, the Court of Justice of the European Communities and the Court of First Instance of the European Communities.

Enforcement shall be governed by the rules of civil procedure in force in the State in the territory of which it is carried out. The order for its enforcement shall be appended to the decision, without other formality than verification of the authenticity of the decision, by the authority which each Contracting Party shall designate for this purpose and shall make known to the other Contracting Parties, the EFTA Surveillance Authority, the EC Commission, the EEA Court, the EEA Court of First Instance, the Court of Justice of the European Communities and the Court of First Instance of the European Communities.

When these formalities have been completed on application by the party concerned, the latter may proceed to enforcement in accordance with the law of the State in the territory of which enforcement is to be carried out, by bringing the matter directly before the competent authority.

Enforcement may be suspended only by decision of the EEA Court or of the EEA Court of First Instance. However, the courts of the States concerned shall have jurisdiction over complaints that enforcement is being carried out in an irregular manner.'

Protocol 34, to which Article 104(2) refers, is entitled 'Protocol 34 on the possibility for courts and tribunals of EFTA States to request the Court of Justice of the European Communities to express itself on the interpretation of EEA rules corresponding to EC rules' and reads as follows:

'*Article 1*

When a question of interpretation of provisions of the Agreement, which are identical in substance to the provisions of the Treaties establishing the European Communities, as amended or supplemented, or of acts adopted in pursuance thereof,

---

4 — in French 's'exprime'.

arises in a case pending before a court or tribunal of an EFTA State, the court or tribunal may, if it considers this necessary, ask the Court of Justice of the European Communities to express itself on such a question.

*Article 2*

An EFTA State which intends to make use of this Protocol shall notify the Depositary and the Court of Justice of the European Communities to what extent and according to what modalities the Protocol will apply to its courts and tribunals.

*Article 3*

The Depositary shall notify the Contracting Parties of any notification under Article 2.'

Sections 4 and 5 of Chapter 1 of Part VII of the agreement are concerned with parliamentary cooperation and with cooperation between economic and social partners, respectively.

Chapter 2 deals with the decision-making procedure.

Chapter 3, which is headed 'Surveillance procedure and settlement of disputes', contains the following provisions:

'*Article 116*

1. The EFTA States shall establish an independent surveillance authority (EFTA Surveillance Authority) as well as procedures similar to those existing in the Community including procedures for ensuring the fulfilment of obligations under this Agreement and for control of the legality of acts of the EFTA Surveillance Authority regarding competition.

The fulfilment of the obligations under this Agreement shall be monitored by, on the one hand, the EFTA Surveillance Authority and, on the other, the EC Commission acting in conformity with the Treaty establishing the European Economic Community, the Treaty establishing the European Coal and Steel Community and this Agreement.

2. In order to ensure a uniform surveillance throughout the EEA, the EFTA Surveillance Authority and the EC Commission shall cooperate, exchange information and consult each other on surveillance policy issues and individual cases.

3. The EC Commission and the EFTA Surveillance Authority shall receive any complaints concerning the application [5] of this Agreement. They shall inform each other of complaints received.

4. Each of these bodies shall examine all complaints falling within its competence and shall pass to the other body any complaints which fall within the competence of that body.

5. In case of disagreement between these two bodies with regard to the action to be taken in relation to a complaint or with regard to the result of the examination, either of the bodies may refer the matter to

---

5 — Agreed Minutes will ensure that the term 'application' also covers implementation of the Agreement.

the EEA Joint Committee which shall deal with it in accordance with Article 117.

*Article 117*

1. The EEA Joint Committee or a Contracting Party may bring a matter under dispute which concerns the application [6] of this Agreement before the EEA Court in accordance with the following provisions.

2. The EEA Joint Committee shall be provided with all information which might be of use in making possible an in-depth examination of the situation, with a view to settling the dispute and finding a solution acceptable to the Contracting Parties.

3. A Contracting Party may bring a matter under dispute before the EEA Court. In doing so it shall, however, first submit the matter to the EEA Joint Committee. If it is not resolved after two consecutive meetings of the Committee, either the Committee shall, unless otherwise decided, or a Contracting Party may, bring the matter before the EEA Court. For the Community, it shall be for the EC Commission to bring the matter before the EEA Court.'

## IV — Summary of the written observations submitted by the Institutions and the Governments

*General observations*

The *Commission* points out that the agreement is very different in kind to the association agreements concluded by the Community to date. The agreement will take over not only the *acquis communautaire* as at the date when the agreement is signed, but also future Community law relating to the fields covered by the agreement. As for the content of the agreement, the Commission stresses that the links between the Community and the EFTA countries are based directly on the EEC Treaty and on the measures adopted by the Community institutions pursuant thereto. The decision-taking procedure provided for in the agreement reflects, on the one hand, the interest in extending the *acquis communautaire* and its future development to the EEA whilst safeguarding autonomous decision-taking by the Community and, on the other hand, respect for the wishes of the sovereign States which intended neither to transfer powers nor to confer legislative power on the institutions set up by the agreement.

The aim of the agreement is to create a homogeneous economic area in which law, substantially identical to that which is in force within the EEC, is to be applied as uniformly as possible.

---

[6] — In an agreed Minute it will be clarified that this also includes interpretation in the sense of the Ministerial Declaration of 14 May 1991.

OPINION PURSUANT TO ARTICLE 228 OF THE EEC TREATY

After pointing out that the judicial system provided for in the agreement has three objectives, namely the settlement of disputes between the Contracting Parties, the settlement of disputes within EFTA and making for increased uniformity of the law within the EEA, the Commission states that the various functions will be carried out either by an EEA Court which is independent but functionally integrated with the Court of Justice, and an independent EEA Court of First Instance attached to the EEA Court, or by the Court of Justice itself. The composition of the EEA Court and of the EEA Court of First Instance will, in the Commission's view, enable the judges of the Court of Justice who sit on those two courts to bring their great experience, on the one hand, of Community law in the Community and, on the other, of its projection in the EEA to bear and thereby ensure its uniform application.

For the purposes of the settlement of disputes between the Contracting Parties, the EEA Court may be seised either by the Joint Committee or directly by a Contracting Party in the event that the Joint Committee has not resolved the dispute after two consecutive meetings.

As far as conflicts within EFTA are concerned, a distinction can be drawn between two types. First, there are disputes between the EFTA Surveillance Authority and EFTA member countries, that is to say, infringement proceedings brought by the EFTA Surveillance Authority against EFTA countries for failing to fulfil their obligations under the agreement and actions brought against decisions taken by the Surveillance Authority in the field of State aid. As far as such questions are concerned, jurisdiction will lie with the EEA Court.

Secondly, there are competition cases, in which the EEA Court of First Instance will have jurisdiction at first instance, whilst appeals against decisions of that court will lie to the EEA Court.

As far as increasing uniformity of the law is concerned, the agreement provides for three specific procedures. The first is largely based on the procedure created by Protocol 2 appended to the Convention on jurisdiction and the enforcement of judgments in civil and commercial matters (Lugano Convention) on the uniform interpretation of that Convention. The second relates to the possibility of EFTA countries to intervene in proceedings for preliminary rulings before the Court of Justice. Under the third procedure, courts in the EFTA countries will be able to apply to the Court of Justice for a preliminary ruling on any question relating to the interpretation of the agreement.

In the Commission's view, the proposed system of courts avoids a number of dangers. It means that no court other than the Court of Justice will have jurisdiction to give preliminary rulings on the interpretation of the agreement, that the EEA Court will not apply the agreement in ignorance of Community law or of the case-law of the Court of Justice, that the competition rules will not be applied in a disorganized manner, that economic agents will not be denied access to judicial review by the procedure for preliminary rulings, and that the EFTA countries will not be made subject to foreign judges.

The Commission wishes to have the Court's opinion on four points:

I - 6093

1. the question of the compatibility of the presence of judges of the Court of Justice on the EEA Court with the Court's Opinion 1/76 (on the draft agreement on the European laying-up fund for inland waterway vessels [1977] ECR 741);

2. the question of the compatibility with the EEC Treaty of extending to the EFTA countries the right to intervene in Community cases pending before the Court of Justice;

3. the question whether it is possible, without amending the EEC Treaty, to allow courts from EFTA countries to submit to the Court of Justice questions on the interpretation of the agreement;

4. the question whether the system of courts provided for in the agreement is permissible under Article 238 of the EEC Treaty.

*Participation of members of the Court of Justice in another court*

The *Commission* asks whether it must be considered, as in the case of Opinion 1/76, that judges from the Court of Justice may not sit on another court or whether the terms of that Opinion are irrelevant in this case. The Commission points out that the agreement differs from the agreement considered in Opinion 1/76. In the first place, unlike the Tribunal of the European laying-up fund for inland waterway vessels, the EEA Court would not have jurisdiction to give preliminary rulings on the interpretation of the agreement and, secondly, the EEA Court and the EEA Court of First Instance, albeit independent courts, would be functionally integrated with the Court of Justice.

In the view of the *Spanish Government*, for several reasons this question can be answered only in the negative. In the first place, the purpose of Article 167 of the EEC Treaty and of Articles 2, 4 and 16 of the Statute of the Court of Justice is to make sure that the Court can perform, totally impartially and avoiding any pressure or preconceived opinion, its role of ensuring that in the interpretation and application of the Treaties the law is applied.

Secondly, the Court held in Opinion 1/76 that the agreement on the European laying-up fund for inland waterway vessels was incompatible with the EEC Treaty on the ground that the Fund Tribunal provided for therein was composed of six members of the Court of Justice who might have to rule as members of the Tribunal on questions which they would also have to rule on as members of the Court of Justice, and that this would jeopardize the complete impartiality with which the Court must act. Such a situation is liable to arise again in this case. It is conceivable that judges from the Court of Justice would have to interpret and apply as members of the EEA Court Community rules which they would subsequently have to interpret and apply again as members of the Court of Justice. The Spanish Government considers that in such an event the judge who had taken part in the deliberations of the EEA Court would no longer show the requisite impartiality. If he refrained from acting in accordance with Article 16 of the Court's Statute, the Court might find it impossible, as the Opinion in Case 1/76 points out, to assemble the quorum stipulated in Article 15 of the Statute.

The Spanish Government makes three specific points. In the first place, it must be emphasized that, whereas the EEA Court

would have no jurisdiction to give preliminary rulings on the interpretation of the agreement, this is not true of the Court of Justice, which, according to its case-law, will still have jurisdiction to give preliminary rulings on the interpretation of any agreement concluded between the Community and the EFTA countries. Consequently, this does not affect or detract from the terms of Opinion 1/76.

The Spanish Government goes on to state that it disagrees with the Commission's view that Opinion 1/76 does not apply here on the ground that the EEA Court and the EEA Court of First Instance are to be functionally integrated with the Court of Justice. According to Article 7 of the institutional provisions of the agreement, the EEA Court is to be an independent body and in no way subordinate to the Court of Justice.

Lastly, the Spanish Government observes that Article 104 of the institutional provisions of the proposed agreement does not provide an answer to the question as to what extent a judgment of the EEA Court is to be binding on the Court of Justice when considering a point on which the EEA Court has already ruled.

The *Belgian Government* shares the Commission's view as to the relevance of Opinion 1/76. Unlike the Tribunal of the European laying-up fund, the EEA Court will not have jurisdiction to give preliminary rulings. Furthermore, the EEA Court will be functionally integrated with the Court of Justice, yet will preserve its full independence. The presence of judges from the Court of Justice does not alter the legal nature of the EEA Court. As regards its lack of jurisdiction to give preliminary rulings, the Belgian Government observes that both the Court of Justice and the EEA Court will be called upon to adjudicate on the same rules of Community law.

In the view of the *United Kingdom*, it is compatible with the EEC Treaty and Opinion 1/76 for judges of the Court of Justice to sit on the EEA Court. The reasoning of the Court of Justice in that case was affected by the consideration that the Fund Tribunal's jurisdiction to rule on the interpretation of the agreement would have been carried out in parallel with the exercise of the jurisdiction of the Court of Justice.

The first paragraph of Article 16 of the Statute of the Court of Justice, which provides that a judge may not take part in the disposal of a case in which he has previously taken part as a lawyer, counsel or judge, is an application of the principle *nemo iudex in causa sua*. It is not concerned with the position of a judge who successively sits in different cases dealing with similar or even identical points, as where, for example, the Court of Justice gives a preliminary ruling on points of law similar or identical to points on which it has already ruled in an action under Article 169 of the Treaty for failure to fulfil obligations. Since the Court is not bound by its previous decisions, it may at any time decide a case in a way which represents a departure from its previous case-law.

After analysing the agreement and related instruments which were the subject-matter of Opinion 1/76, the United Kingdom concludes that in that case the Community judges concerned might have been influenced by previous decisions of the Fund Tribunal. In this way, the *acquis communautaire* might have been indirectly compromised, for example, by the influence of principles of public international law which have been superseded in the context of the Community legal order. In the United Kingdom's view, this is the risk which prompted the Court of Justice in Opinion 1/76 to object to judges of the Court sitting on the Fund Tribunal. In

I - 6095

addition, the United Kingdom observes that the difficulties which have given rise to the request for Opinion 1/91 are very different from those discussed in Opinion 1/76. As far as the rules of the laying-up fund were concerned, the problem arose that judges of the Court of Justice called upon to sit on the Fund Tribunal would have had to perform two incompatible tasks. On the one hand, they would have been under a duty as members of the Court of Justice to safeguard the *acquis communautaire* in the interpretation of certain acts of the institutions; on the other, they would have been under a duty, as members of the Fund Tribunal, of supervising a legal regime based on principles of public international law different from those forming the *acquis communautaire*. In the United Kingdom's view, the proposed agreement will not raise any difficulty in that regard, in so far as the judges of the Court of Justice and the judges of the EEA Court will have to apply the same rules and principles and thus safeguard the *acquis communautaire*.

As far as the composition of the EEA Court is concerned, the United Kingdom observes that five of the thirteen members of the Court of Justice are to sit on that court. Given that a full court may be convened with seven judges, the possibility should exist for a full court to be convened without any of them having participated in a previous decision of the EEA Court. In the event that the participation of five judges of the Court of Justice in the activities of the EEA Court gives rise to administrative problems, Article 165 of the EEC Treaty provides a possible context for addressing the situation which would arise from the adoption of the agreement.

*The extended right of intervention*

According to the *Commission*, the Court of Justice has in the past given non-member countries leave to intervene on the basis of Article 37 of its Statute. But here the right would be more systematic, requiring questions referred for a preliminary ruling to be notified to the EFTA countries on the same footing as they are notified to the Member States. The Commission therefore asks if it is not necessary to amend Article 20 of the Statute of the Court of Justice as a result.

The *Spanish Government* considers that the second question must be answered in the affirmative. Article 20 of the Court's Statute is sufficiently clear. It expressly provides that only the parties to be notified, who are the subject of a limitative list, may submit written observations in proceedings for a preliminary ruling and participate in the hearing. Although the Court has never ruled on the possibility of a non-member country submitting observations in proceedings for a preliminary ruling, it has nevertheless put a restrictive interpretation on the list of interested parties set out in Article 20 of the Statute of the Court.

In the Spanish Government's view, in mentioning Article 37 of the Statute of the Court the Commission has confused two, radically different, types of procedure. In the case of an intervention in support of one of the parties, there are several parties defending several views, namely an applicant, a defendant and a third party who appears *ex post*. The term used for that third party in Spanish procedural law is 'coadyuvante'. That party must confine itself to supporting the submissions of one of the main parties. Regard must be had in this connection to the fact that under Article 37 the intervention of persons other than Member States and Community institutions is subject to two conditions: first, they must establish an interest in the result of the case and, secondly, the case must not be between Member States, between institutions of the Community or between Member States and institutions of the Community. It follows that before a non-member country can

intervene — as was authorized by the Court in Joined Cases 91 and 200/82 à Chris International Foods v *Commission* [1983] ECR 417 — those two conditions must be met.

The Spanish Government concludes that Article 20 of the Court's Statute should be amended if all the EFTA countries are to be able to submit observations in proceedings for preliminary rulings and if Article 37 is to remain limited to intervention, in a direct action, in support of the submissions of one of the main parties. Intervention is completely different from participation in proceedings for a preliminary ruling and, as a result, not even an extensive interpretation of Article 37 could alter the clear, precise content of Article 20.

The *Belgian Government* observes that Article 37 will have to be revised if EFTA countries are to be allowed to intervene in the three categories of proceedings in which intervention by a legal person is precluded. In order to authorize EFTA countries which are not parties to the proceedings to submit observations in proceedings for preliminary rulings, Article 20 should be revised.

The *United Kingdom* considers that the proposed arrangements for intervention by EFTA countries in proceedings before the Court of Justice would require amendments to be made to Article 37. It would not be sufficient to make provision in the agreement for a right of intervention for the EFTA countries, since this would not of itself amend the Statute. Consequently, recourse would have to be made to the procedure provided for in the second paragraph of Article 188 of the EEC Treaty. This provision states that the Council may amend Title III of the Statute at the request of the Court of Justice and after consulting the Commission and the European Parliament. The United Kingdom also considers that it would be necessary to amend Article 20 of the Statute so as to enable EFTA countries to make observations in references for preliminary rulings. It would also be necessary to amend Articles 17, 18 and 39 of the Statute.

*References for preliminary rulings from courts in EFTA countries*

The *Spanish Government* takes the view that the answer to the third question must be in the negative. References for preliminary rulings constitute an instrument for cooperation between the Court of Justice and the national courts. Its nature as a means of cooperation between courts directly implies that only judicial bodies in the Member States are entitled to make a reference to the Court under Article 177 of the EEC Treaty. In order for judicial bodies in the EFTA countries also to be able to make references for preliminary rulings to the Court of Justice, Article 177 of the EEC Treaty would have to be amended by adding after the words 'court or tribunal of a Member State' a reference to the judicial bodies of non-member countries with which the Community has concluded an international agreement.

The *Belgian Government* considers that Article 177 of the EEC Treaty should be revised in order to enable courts in EFTA countries to make references to the Court of Justice.

The *United Kingdom* observes first that Article 177 also applies to a court of a

Member State located in an overseas territory to which Part Four of the EEC Treaty applies (see the judgment in Joined Cases C-100/89 and 101/89 *Kaefer and Procacci* [1990] ECR I-4647). Although that provision applies *stricto sensu* only to the courts or tribunals of Member States, the Court of Justice has held that the second paragraph of that provision applies to a court which does not form part of the court system of a Member State but is located in a dependency of a Member State where Community law applies to a limited extent in the territory in question, and where Community law makes appropriate provision to such effect (judgment of 3 July 1991 in Case C-355/89 *DHSS* v *Barr and Montrose* [1991] I-3479).

The United Kingdom goes on to observe that the Court of Justice has jurisdiction under Article 177 to give preliminary rulings on the interpretation of international agreements to which the Community is party. The Court of Justice may also give preliminary rulings on the interpretation of agreements concluded under Article 220 of the Treaty. The proposed agreement will be an international agreement concluded under Article 238 of the Treaty. It will therefore constitute both an international agreement made pursuant to the Treaty and an act of the institutions. There can therefore be no objection to the Court of Justice giving preliminary rulings on the interpretation of the proposed agreement. The aforementioned judgments of the Court of Justice argue in favour of the compatibility of the proposed arrangements with the EEC Treaty.

*Article 238 of the Treaty*

The *Commission* asks whether a system of courts of the type envisaged in the agreement would be permissible under Article 238. If not, Article 238 should be amended so that the particular procedures provided for therein include the establishment of a system of courts, functionally integrated with the Court of Justice and guaranteeing the specific nature and the integrity of Community law.

The *Spanish Government* considers that Article 238 constitutes an adequate basis for the conclusion by the Community of an association agreement with a union of States or an international organization, such as the agreement to be concluded with EFTA. However, the situation is different if the content of such an agreement is incompatible with the Treaty. In this case, the incompatibility results from the proposed court machinery. As a result, the Treaty must be amended before the agreement is concluded.

The *Belgian Government* observes that as a result of Article 238 the proposed court system cannot be put in place without first amending the EEC Treaty. In principle, there is nothing to prevent an amendment of Article 238 of the Treaty. However, it would appear more judicious in this case to extend the amendment to cover the other relevant articles of the Treaty, as well as the articles of the Statute of the Court of Justice, in order to guarantee the utmost consistency and legal certainty.

The *United Kingdom* considers that the formulation 'common action and special procedures' in Article 238 of the Treaty is appropriate to enable judicial procedures to be included in agreements covered by that provision. Such procedures may even foster the sound functioning of such agreements. This is true in particular of the arrangements for the settlement of disputes by adjudication, since they would foster the due performance of the proposed agreement by the parties.

I - 6098