# EXHIBIT 24

OPINION 1/09 OF THE COURT (Full Court)

8 March 2011

Table of contents

The request for an Opinion ................................................................ I - 1147

The draft agreement on the European and Community Patents Court ....................... I - 1148

Provisions of the draft agreement ......................................................... I - 1150

Assessments made by the Council in its request for an Opinion ........................... I - 1154

Summary of observations submitted to the Court .......................................... I - 1155

    Observations on the admissibility of the request for an Opinion ....................... I - 1155

    Observations that the draft agreement is incompatible with the Treaties ............... I - 1156

    Observations that the draft agreement is incompatible with the Treaties unless altera-
    tions are made to the draft .......................................................... I - 1158

    Observations that the draft agreement is compatible with the Treaties ................. I - 1160

Position of the Court ..................................................................... I - 1163

    The admissibility of the request for an Opinion ....................................... I - 1163

    Substance ............................................................................ I - 1166

        Preliminary observations ......................................................... I - 1166

        The compatibility of the draft agreement with the Treaties ......................... I - 1167

In Opinion 1/09,

REQUEST to the Court for an Opinion pursuant to Article 218(11) TFEU, made on 6 July 2009 by the Council of the European Union,

THE COURT (Full Court)

composed of V. Skouris, President, J.N. Cunha Rodrigues, K. Lenaerts, J.-C. Bonichot, K. Schiemann, A. Arabadjiev, J.-J. Kasel and D. Šváby, Presidents of Chambers, A. Rosas, R. Silva de Lapuerta (Rapporteur), E. Juhász, G. Arestis, A. Borg Barthet, M. Ilešič, U. Lõhmus, E. Levits, A. Ó Caoimh, L. Bay Larsen, P. Lindh, T. von Danwitz, C. Toader, M. Safjan and M. Berger, Judges,

Registrar: M.-A. Gaudissart, Head of Unit,

having regard to the written procedure and further to the hearing on 18 May 2010,

after considering the observations submitted on behalf of:

— the Council of the European Union, by J.-C. Piris, F. Florindo Gijón, L. Karamountzos and G. Kimberley, acting as Agents,

— the Belgian Government, by C. Pochet, J.-C. Halleux and T. Materne, acting as Agents,

— the Czech Government, by M. Smolek, acting as Agent,

— the Danish Government, by V. Pasternak Jørgensen, R. Holdgaard and C. Vang, acting as Agents,

— the German Government, by M. Lumma and J. Kemper, acting as Agents,

— the Estonian Government, by L. Uibo, acting as Agent,

— Ireland, by D.J. O'Hagan, acting as Agent, and by E. Fitzsimons SC and N. Travers BL,

— the Greek Government, by A. Samoni-Rantou, G. Alexaki and K. Boskovits, acting as Agents,

— the Spanish Government, by N. Díaz Abad, acting as Agent,

OPINION PURSUANT TO ARTICLE 218(11) TFEU

— the French Government, by E. Belliard, B. Beaupere-Manokha, G. de Bergues and A. Adam, acting as Agents,

— the Italian Government, by G. Palmieri and M. Fiorilli, acting as Agents, and by G. Nori, vice-avvocato generale dello Stato,

— the Cypriot Government, by V. Khristoforou and M. Khatzigeorgiou, acting as Agents,

— the Lithuanian Government, by I. Jarukaitis, acting as Agent,

— the Luxembourg Government, by C. Schiltz, acting as Agent, and by P.-E. Partsch, avocat,

— the Netherlands Government, by C. Wissels and Y. de Vries, acting as Agents,

— the Polish Government, by M. Dowgielewicz and M. Szpunar, acting as Agents,

— the Portuguese Government, by L. Fernandez, J. Negrão and M.L. Duarte, acting as Agents,

— the Romanian Government, by A. Popescu and M.-L. Colonescu, acting as Agents, and by E. Gane and A. Stoia, counsellors,

— the Slovenian Government, by V. Klemenc and T. Mihelič Žitko, acting as Agents,

— the Finnish Government, by A. Guimaraes-Purokoski and J. Heliskoski, acting as Agents,

— the Swedish Government, by A. Falk and A. Engman, acting as Agents,

— the United Kingdom Government, by I. Rao and F. Penlington, acting as Agents, and by A. Dashwood, Barrister,

— the European Parliament, by E. Perillo, K. Bradley and M. Dean, acting as Agents,

— the European Commission, by L. Romero Requena, J.-P. Keppenne and H. Krämer, acting as Agents,

after hearing First Advocate General P. Mengozzi and Advocates General J. Kokott, E. Sharpston, Y. Bot, J. Mazák, V. Trstenjak,. N. Jääskinen and P. Cruz Villalón in closed session on 2 July 2010,

gives the following

## Opinion

## The request for an Opinion

1. The request submitted for the Opinion of the Court by the Council of the European Union is worded as follows:

'Is the envisaged agreement creating a Unified Patent Litigation System (currently named European and Community Patents Court) compatible with the provisions of the Treaty establishing the European Community?'

2. The following documents were sent by the Council to the Court as annexes to its request:

— Council Document 8588/09 of 7 April 2009 on a revised proposal for a Council Regulation on the Community patent, drawn up by the Council Presidency and addressed to the working party on Intellectual Property (Patents);

I - 1147

— Council Document 7928/09 of 23 March 2009 on a revised Presidency text of the draft agreement on the European and Community Patents Court and the draft Statute of that court;

— Council Document 7927/09 of 23 March 2009 concerning a recommendation from the Commission to the Council to authorise the Commission to open negotiations for the adoption of an international agreement 'creating a Unified Patent Litigation System' at European and Community level.

**The draft agreement on the European and Community Patents Court**

3.    The European Patent Convention ('the EPC'), signed at Munich on 5 October 1973, is a treaty to which 38 States, including all the Member States of the European Union, are now parties. The European Union is not a party to the EPC. That convention provides for a unitary procedure for granting European patents by the European Patent Office ('the EPO'). While the procedure for granting that right is unitary, the European patent breaks down into a bundle of national patents, each governed by the domestic law of the States which the holder of the right has designated.

4.    During the year 2000 the European Council reopened discussions on a future Community patent. On 5 July 2000 the European Commission presented a proposal for a Council Regulation on the Community patent (COM (2000) 412 final), providing for the accession of the Community to the EPC, the creation of a unitary industrial property right valid throughout the Community and the granting of that right by the EPO.

OPINION PURSUANT TO ARTICLE 218(11) TFEU

5. Following the conclusions of the Competitiveness Council of 4 December 2006 and of the European Council of 8 and 9 March 2007, the Commission presented to the European Parliament and to the Council, on 3 April 2007, a communication entitled 'Enhancing the patent system in Europe' (COM (2007) 165 final).

6. The Commission proposed, inter alia, the creation of an integrated system for the European patent and the future Community patent. The latter would be granted by the EPO pursuant to the provisions of the EPC. It would have a unitary and autonomous character, producing equal effect throughout the European Union, and could be granted, transferred, declared invalid or lapse only in respect of the whole of that territorial area. The provisions of the EPC would apply to the Community patent to the extent that no specific rules are provided for in the regulation on the Community patent.

7. Work by the Council also led to the drawing up of a draft international agreement to be concluded between the Member States, the European Union and third countries which are parties to the EPC ('the draft agreement'), creating a court with jurisdiction to hear actions related to European and Community patents.

8. The envisaged agreement would establish a European and Community Patents Court ('the PC') composed of a court of first instance, comprising a central division and local and regional divisions, and a court of appeal, that court having jurisdiction to hear appeals brought against decisions delivered by the court of first instance. The third body of the PC would be a joint registry.

**Provisions of the draft agreement**

9. Article 14a of the draft agreement provides:

'Applicable law

(1)  When hearing a case brought before it under this Agreement, the [Patent] Court shall respect Community law and base its decisions on:

 (a)  this Agreement;

 (b)  directly applicable Community law, in particular Council Regulation … on the Community patent, and national law of the Contracting States implementing Community law …;

 (c)  the European Patent Convention and national law which has been adopted by the Contracting States in accordance with the European Patent Convention;

OPINION PURSUANT TO ARTICLE 218(11) TFEU

(d) any provision of international agreements applicable to patents and binding on all the contracting parties.

(2) To the extent that the [Patent] Court shall base its decisions on national law of the Contracting States, the applicable law shall be determined:

(a) by directly applicable provisions of Community law; or

(b) in the absence of directly applicable provisions of Community law, by international instruments on private international law to which all Contracting Parties are parties; or

(c) in the absence of provisions referred to in (a) and (b), by national provisions on international private law as determined by the [Patent] Court.

(3) A Contracting State which is not a party to the Agreement on the European Economic Area shall bring into force the laws, regulations and administrative provisions necessary to comply with Community law relating to substantive patent law.'

I - 1151

10. Article 15 of the draft agreement is worded as follows:

'Jurisdiction

(1) The [Patent] Court shall have exclusive jurisdiction in respect of:

    (a) actions for actual or threatened infringements of patents and supplementary protection certificates and related defences, including counterclaims concerning licences;

    (a1) actions for declarations of non-infringement;

    (b) actions for provisional and protective measures and injunctions;

    (c) actions or counterclaims for revocation of patents;

    (d) actions for damages or compensation derived from the provisional protection conferred by a published patent application;

    (e) actions relating to the use of the invention prior to the granting of the patent or to the right based on prior use of the patent;

OPINION PURSUANT TO ARTICLE 218(11) TFEU

(f)  actions for the grant or revocation of compulsory licences in respect of Community patents; and

(g)  actions on compensation for licences …

(2)  The national courts of the Contracting States shall have jurisdiction in actions related to Community patents and European patents which do not come within the exclusive jurisdiction of the [Patent] Court. ’

11.  The territorial jurisdictions of the various divisions of the court of first instance of the PC are defined in Article 15a(1) of the draft agreement as follows:

‘Actions referred to in Article 15, paragraph 1(a), (b), (d) and (e) shall be brought before:

(a)  the local division hosted by the Contracting State where the actual or threatened infringement has occurred or may occur, or the regional division in which this Contracting State participates; or

(b)  the local division hosted by the Contracting State where the defendant is domiciled, or the regional division in which this Contracting State participates.

Actions against defendants domiciled outside the territory of the Contracting States shall be brought before the local or regional division in accordance with (a).

I - 1153

If the Contracting State concerned does not host a local division and does not partici-pate in a regional division, actions shall be brought before the central division.'

12. Article 48 of the draft agreement states:

'1. When a question of interpretation of the [EC Treaty] or the validity and interpre-tation of acts of the institutions of the European Community is raised before the Court of First Instance, it may, if it considers this necessary to enable it to give a decision, request the Court of Justice … to decide on the question. Where such question is raised before the Court of Appeal, it shall request the Court of Justice … to decide on the question.

2. The decision of the Court of Justice … on the interpretation of the [EC Treaty] or the validity and interpretation of acts of the institutions of the European Com-munity shall be binding on the Court of First Instance and the Court of Appeal.'

**Assessments made by the Council in its request for an Opinion**

13. The Council states that 'a majority of [its members] believe that the envisaged agree-ment constitutes a legally possible way to achieve the envisaged aims. However, a number of legal concerns have been expressed and discussed'. The Council points out that 'the presentation of the various issues is intended to be neutral, making no reference to the degree of support received by the various approaches and that [it] is taking side neither for one answer nor for the other'.

14. The Council considers that the effect of the envisaged agreement is not to change the essential character of the powers vested in the Court. Member States should be able to organise the structure of the envisaged judicial system as they think fit, including by setting up a court which is international in nature.

15. The Council observes that the obligation on the PC to respect European Union law is intended to have a very wide scope, covering not only the Treaties and acts of the institutions, but also the general principles of the European Union legal order and the case-law of the Court.

**Summary of observations submitted to the Court**

16. The following arguments are put forward in the observations submitted: that the request for an Opinion is inadmissible; that the draft agreement is incompatible with the Treaties; that it is necessary to make amendments to the draft agreement in order to ensure its compatibility with the Treaties, or that the envisaged agreement is compatible with the Treaties.

*Observations on the admissibility of the request for an Opinion*

17. The Parliament and the Spanish Government maintain, in essence, that the request for an Opinion is premature and that it is based on information which is incomplete and inadequate, taking into account the purpose of the envisaged agreement, the stage reached by preparatory work and the institutional and legal context. The Parliament, for its part, also considers that, since it was not consulted by the Council on the

draft regulation on the Community patent, the principle of institutional balance has been compromised.

18.  Ireland, while declaring that it supports the request for an Opinion, considers that the Court must satisfy itself that it has jurisdiction to give a ruling on that request, particularly in the light of the stage reached in the process of negotiation. The text submitted for the Opinion of the Court remains very much a working text which has not been agreed by all members of the Council.

*Observations that the draft agreement is incompatible with the Treaties*

19.  Ireland and the Greek, Spanish (in the alternative), Italian, Cypriot, Lithuanian and Luxembourg Governments consider that the draft agreement is incompatible with the Treaties.

20.  Ireland maintains that the draft agreement does not ensure that the primacy of provisions of European Union law which may be raised in disputes which come before the PC will be respected. Nor does the draft agreement guarantee that the PC would be subject to an interpretative obligation to avoid, to the maximum extent possible, clashes between provisions of European Union law that it would have to apply and other national and international legal provisions that might be applicable.

21.  The Greek Government observes that the provisions of the draft agreement concerning the creation and functioning of the divisions of the court of first instance of the PC sitting in third countries, with jurisdiction in respect of Community patents, raise the issue of preserving the autonomy of the European Union legal order and court

system. The Treaties have established a binding legal framework within which the institutions of the European Union and the Member States must act when they choose both the general method and the specific provisions relating to litigation in relation to industrial property rights.

22. The Spanish Government, in the alternative, maintains that the draft agreement is incompatible with the Treaties, given that it is in particular contrary to Articles 19 TEU and 344 TFEU since the exclusive jurisdiction of the Court to hear disputes concerning the field of European Union law is called into question. Moreover, the system envisaged does not guarantee the primacy of European Union law, since the PC will not be part of the court structure of any Member State and therefore any infringements of European Union law committed by such a court will not be subject to any form of review.

23. The Italian Government states that the draft agreement has the form of a measure of international law by which the Member States and the States which are parties to the EPC transfer to an international court their constitutional powers in relation to judicial matters. Given that, currently, there is no patent right covering the territory of all the Member States and no unitary system for dispute resolution in that area, the European Union has no power to transfer to an international body its powers in relation to courts and tribunals. The accession of the European Union to the EPC would not affect that assessment, because the international court whose creation is envisaged would not be a body falling under the EPC. Consequently, for want of a legal basis, the envisaged agreement is not compatible with the provisions of the Treaties.

24. The Cypriot Government considers that the creation of the PC runs counter to the exclusive powers assigned to the Court of Justice and the General Court as defined in the various forms of legal remedy provided for in the Treaties.

25. The Lithuanian Government considers that, given that the envisaged agreement could not be concluded on the basis of provisions of the Treaties, it would be incompatible with the Treaties. The draft agreement does not ensure that the autonomy of European Union law and the essential nature of the powers assigned by the Treaties to the institutions of the European Union are preserved.

26. The Luxembourg Government argues that the Treaties provide no legal basis to permit the transfer of powers such as those concerned in the draft agreement to a court such as the PC. The provisions of European Union law and the case-law of the Court covering the autonomy and homogeneity of the legal order and judicial system of the European Union preclude the creation of such a court. It is a requirement of the Treaties and the case-law of the Court that the powers which the envisaged agreement intends to assign to the PC can be exercised only by the Court itself.

*Observations that the draft agreement is incompatible with the Treaties unless alterations are made to the draft*

27. The Parliament, in the alternative, the Belgian and French Governments and the Commission, while considering that the draft agreement is, in principle, compatible with the Treaties, recommend that a number of alterations be made to the draft agreement.

28. In the event that the Court were to declare the Council's request to be admissible, the Parliament considers that it would be desirable to indicate, in the text of the agreement itself, the very wide scope of the obligation imposed on the PC to respect European Union law and the case-law of the Court, including future judgments of the Court. It would also be appropriate to clarify that the PC will be obliged to ensure the protection of fundamental rights.

OPINION PURSUANT TO ARTICLE 218(11) TFEU

29.   As regards the envisaged preliminary ruling procedure, the Parliament observes that it would be appropriate to introduce a system whereby the Commission could intervene in proceedings brought before the PC. It might also be helpful to provide for an express obligation on the PC to refer to the Court any question on the validity of a provision of European Union law.

30.   The Belgian Government proposes that the Court's answer to the Council's request for an Opinion should be that the envisaged agreement is compatible with the Treaties provided that the power granted to the Court of Justice in relation to preliminary rulings is supplemented by mechanisms to ensure respect for the primacy and effectiveness of European Union law.

31.   The French Government maintains that the draft agreement is, in principle, compatible with the Treaties. However, the planned preliminary ruling procedure ought to be supplemented by a mechanism open to parties and/or, when necessary, Member States and the Commission, designed to ensure that the PC respects European Union law and its primacy. There could also be envisaged the introduction of an appeal in the interest of the law, at the instance of the Commission or a Member State or a procedure for review by the Court of judgments of the Court of Appeal of the PC, where there is a serious risk of the unity or consistency of European Union law being affected.

32.   The Commission considers that the envisaged agreement is compatible with the provisions of the Treaties, if it is expressly provided that, at any time, not only third countries but also the European Union and Member States have the right to denounce the agreement.

I - 1159

*Observations that the draft agreement is compatible with the Treaties*

33.   The Czech, Danish, German, Estonian, Netherlands, Polish, Portuguese, Romanian, Slovenian, Finnish, Swedish and United Kingdom Governments maintain that the draft agreement is compatible with the Treaties.

34.   The Czech Government considers that the draft agreement is compatible with the Treaties since it respects the requirements relating to protecting the autonomy of European Union law and its primacy, the PC having in particular the power to refer questions to the Court for a preliminary ruling.

35.   The Danish Government observes that the draft agreement is not contrary to the institutional rules set out in the Treaties and that the agreement should be entered into both by the European Union and by its Member States, under Articles 81 TFEU and 114 TFEU.

36.   The German Government considers that the system for judicial review provided for in the draft agreement is consistent with the Treaties. In particular, Article 262 TFEU does not preclude that system. Moreover, the primacy and autonomy of the European Union legal order are preserved. The envisaged court system does not involve any change in the essential character of the Court's powers and does not make the European Union subject to a specific interpretation of the law relating to the exercise of its internal powers.

37.  The Estonian Government observes that the draft agreement concerns not only the powers of the European Union but also those of the Member States, and accordingly Article 352 TFEU constitutes the appropriate legal basis for the conclusion of the envisaged agreement. Neither the primacy and autonomy of the European Union legal order nor the powers of the Court are adversely affected by the draft agreement.

38.  The Netherlands Government states that Article 262 TFEU does not preclude the draft agreement. Moreover, the agreement does not harm the unity and integrity of European Union law. Further, the envisaged agreement does not alter or adversely affect the system of legal protection and judicial review practised by national courts and by the Courts of the European Union, as provided for in the Treaties.

39.  The Polish Government maintains that to grant the envisaged powers to the PC is in principle compatible with the Treaties and is not precluded by Article 262 TFEU. Taking into account the absence of a European Union measure relating to the field of patents, the Court cannot regard itself as having exclusive jurisdiction in that field. Moreover, the draft agreement does not adversely affect the primacy of European Union law. The planned preliminary ruling procedure safeguards the uniformity and consistency of European Union law in the field concerned.

40.  The Portuguese Government maintains that to grant the envisaged powers to the PC is compatible with the Treaties. The objections put forward in relation to risks concerning the primacy and autonomy of the European Union legal order are unfounded. Given the complexity of the matter and the objective of establishing a unitary system for the protection of intellectual property in Europe, 'flexible solutions', capable of meeting that objective, should be sought. The draft agreement is a response to that challenge.

41.   The Romanian Government observes that the autonomy of the European Union legal order is safeguarded by means of the obligation on the part of the PC to respect European Union law, by the fact that the PC either may or, as the case may be, must refer questions for a preliminary ruling to the Court, and by the binding effects of judgments handed down by the Court within that procedure. Further, there is no Treaty provision which precludes the conferral on the Court by an international agreement of jurisdiction to cover the interpretation of the provisions of such an agreement for the purposes of its possible application in third countries.

42.   The Slovenian Government considers that the award to the PC of exclusive jurisdiction in relation to litigation concerning the validity and/or the effects of a Community patent is compatible with the Treaties. Neither Article 257 TFEU nor Article 262 TFEU predetermines the choice of the relevant judicial framework. Articles 14a and 48 of the draft agreement safeguard the autonomy of, and the need to respect, the European Union legal order.

43.   The Finnish Government argues that, since the objective and content of the envisaged agreement concern the creation of an international court system in the field of patents, the conclusion of that agreement in the name of the European Union must be based on both Article 262 TFEU and Article 352 TFEU. Further, the draft agreement does not raise any problem of compatibility with the Treaties.

44.   The Swedish Government states that the draft agreement safeguards the uniform application of European Union law. The essential character of the Court's powers is not altered and the Court's exclusive power to review the lawfulness of acts of the European Union is not undermined.

45.   The United Kingdom Government considers that the envisaged agreement must be regarded as a mixed agreement. The essential character of the Court's powers is preserved within the litigation system provided for by the envisaged agreement, since

neither the exclusive jurisdiction of the Court nor the binding effect of its decisions are called into question. The conferral on the PC of jurisdiction in respect of cases relating to the validity and/or the application of Community patents is compatible with the FEU Treaty. Within the litigation system provided for by the envisaged agreement, the primacy of European Union law is safeguarded. The preliminary ruling procedure provided for in Article 48 of the draft agreement, giving to the PC the power to refer questions to the Court, is compatible with the Treaties.

**Position of the Court**

*The admissibility of the request for an Opinion*

46. The observations which were presented in relation to the admissibility of the request for an Opinion raise, in essence, three issues, namely, first, whether the content of the envisaged agreement is sufficiently precise, second, the stage reached in preparatory work and, third, respect for the institutional balance.

47. Before addressing those three issues, it must be borne in mind that, under Article 218(11) TFEU, the Parliament, the Council, the Commission or a Member State may obtain the Opinion of the Court of Justice as to whether an envisaged agreement is compatible with the provisions of the Treaties. That provision has the aim of forestalling complications which would result from legal disputes concerning the compatibility with the Treaties of international agreements binding upon the European Union (see Opinion 2/94 [1996] ECR I-1759, paragraph 3, and Opinion 1/08 [2009] ECR I-11129, paragraph 107).

48.  A possible decision of the Court, after the conclusion of an international agreement binding upon the European Union, to the effect that such an agreement is, by reason either of its content, or of the procedure adopted for its conclusion, incompatible with the provisions of the Treaties could not fail to provoke, not only in the internal European Union context, but also in that of international relations, serious difficulties and might give rise to adverse consequences for all interested parties, including third countries (see Opinion 3/94 [1995] ECR I-4577, paragraph 17).

49.  As regards, first, whether the draft agreement is framed in sufficiently precise terms, it should be recalled that, where the Court is required to rule on the compatibility of the provisions of an envisaged agreement with the rules of the Treaty, the Court must have sufficient information on the actual content of that agreement (see Opinion 2/94, paragraphs 20 to 22).

50.  In the present case, the Council has supplied the Court with the full text of the draft agreement which contains, inter alia, provisions on the organisation and *modus operandi* of the PC, its powers and the various types of actions, as well as the applicable law and the effects of that court's judgments.

51.  Moreover, it must be observed that the request for an Opinion makes reference to the background to the draft agreement. The draft agreement is part of a range of measures currently being studied by various bodies of the European Union, such as the creation of a Community patent as a new intellectual property right and the accession of the European Union to the EPC.

52.  In those circumstances, the Court considers that it has sufficient information both on the content of and background to the envisaged agreement.

OPINION PURSUANT TO ARTICLE 218(11) TFEU

53. As regards, secondly, the question of whether the decision-making process in relation to the draft agreement has reached a sufficiently advanced stage to enable the Court to rule on the compatibility of that draft with the Treaties, it must be recalled that a request for an Opinion can be submitted to the Court before the commencement of international negotiations, where the subject-matter of the envisaged agreement is known, even though there are a number of alternatives still open and differences of opinion on the drafting of the texts concerned, if the documents submitted to the Court make it possible for the Court to form a sufficiently certain judgment on the question raised by the Council (see, to that effect, Opinion 1/78 [1979] ECR 2871, paragraph 34) and that the admissibility of a request for an Opinion cannot be challenged on the ground that the Council has not yet adopted the decision to open the international negotiations (see Opinion 2/94, paragraph 13).

54. As regards the present request, it is worthy of note that the proposal to create a unified judicial system in the field of patents was being studied by the Council when the request was submitted to the Court. The fact that the draft agreement or particular draft legislative measures closely linked to it, such as the proposal for a regulation on the Community patent, do not currently enjoy unanimous support within the Council cannot, by itself, affect the admissibility of this request for an Opinion.

55. As regards, thirdly, the question raised as to institutional balance, it must be observed that it is not a prerequisite condition of being able to submit a request for an Opinion pursuant to Article 218(11) TFEU that the institutions concerned have reached final agreement. The right accorded to the Council, the Parliament, the Commission and the Member States to ask the Court for its Opinion can be exercised individually, without any coordinated action and without waiting for the final outcome of any related legislative procedure. In any event, the Parliament retains the right itself to submit a request for an Opinion.

56. Accordingly, the fact that the adoption of the agreement concerned cannot occur until after consulting, and obtaining the approval of, the Parliament, and that the adoption of any related legislative measures within the European Union, such as the future regulation on the Community patent, will be subject to a legislative procedure involving that institution, has no effect on the power accorded to the Council, under Article 218(11) TFEU, to request an Opinion from the Court.

57. The request for an Opinion presented by the Council is therefore admissible.

*Substance*

Preliminary observations

58. While this request for an Opinion and the observations submitted to the Court have referred to provisions of the EU Treaty and the EC Treaty, the questions raised must however be assessed on the basis of the provisions of the EU Treaty and the FEU Treaty which entered into force on 1 December 2009, in other words after the lodging of the Council's request on 6 July 2009.

59. It should also be made clear that the question at the heart of this request for an Opinion concerns not the powers of the PC in the field of the European patent, but its powers relating to the future Community patent.

The compatibility of the draft agreement with the Treaties

60.  First, the Court considers it useful to respond to arguments put forward by a number of Member States to the effect that Articles 262 TFEU and 344 TFEU might preclude the envisaged transfer of powers.

61.  As regards Article 262 TFEU, that article cannot preclude the creation of the PC. While it is true that under that provision there can be conferred on the Court some of the powers which it is proposed to grant to the PC, the procedure described in that article is not the only conceivable way of creating a unified patent court.

62.  Article 262 TFEU provides for the option of extending the jurisdiction of the European Union courts to disputes relating to the application of acts of the European Union which create European intellectual property rights. Consequently, that article does not establish a monopoly for the Court in the field concerned and does not predetermine the choice of judicial structure which may be established for disputes between individuals relating to intellectual property rights.

63.  Nor can the creation of the PC be in conflict with Article 344 TFEU, given that that article merely prohibits Member States from submitting a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the Treaties. The jurisdiction which the draft agreement intends to grant to the PC relates only to disputes between individuals in the field of patents.

64.   Since the draft agreement establishes, in essence, a new court structure, it is appropriate to bear in mind, first, the fundamental elements of the legal order and judicial system of the European Union, as designed by the founding Treaties and developed by the case-law of the Court, in order to assess whether the creation of the PC is compatible with those elements.

65.   It is apparent from the Court's settled case-law that the founding treaties of the European Union, unlike ordinary international treaties, established a new legal order, possessing its own institutions, for the benefit of which the States have limited their sovereign rights, in ever wider fields, and the subjects of which comprise not only Member States but also their nationals (see, inter alia, Case 26/62 *van Gend & Loos* [1963] ECR 1, 12 and Case 6/64 *Costa* [1964] ECR 585, 593). The essential characteristics of the European Union legal order thus constituted are in particular its primacy over the laws of the Member States and the direct effect of a whole series of provisions which are applicable to their nationals and to the Member States themselves (see Opinion 1/91 [1991] ECR I-6079, paragraph 21).

66.   As is evident from Article 19(1) TEU, the guardians of that legal order and the judicial system of the European Union are the Court of Justice and the courts and tribunals of the Member States.

67.   Moreover, it is for the Court to ensure respect for the autonomy of the European Union legal order thus created by the Treaties (see Opinion 1/91, paragraph 35).

68.   It should also be observed that the Member States are obliged, by reason, inter alia, of the principle of sincere cooperation, set out in the first subparagraph of Article 4(3) TEU, to ensure, in their respective territories, the application of and respect for

OPINION PURSUANT TO ARTICLE 218(11) TFEU

European Union law (see, to that effect, Case C-298/96 *Oelmühle and Schmidt Söhne* [1998] ECR I-4767, paragraph 23). Further, pursuant to the second subparagraph of Article 4(3) TEU, the Member States are to take any appropriate measure, general or particular, to ensure fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the European Union. In that context, it is for the national courts and tribunals and for the Court of Justice to ensure the full application of European Union law in all Member States and to ensure judicial protection of an individual's rights under that law (see, to that effect, Case C-432/05 *Unibet* [2007] ECR I-2271, paragraph 38 and case-law cited).

69.  The national court, in collaboration with the Court of Justice, fulfils a duty entrusted to them both of ensuring that in the interpretation and application of the Treaties the law is observed (see Case 244/80 *Foglia* [1981] ECR 3045, paragraph 16, and Joined Cases C-422/93 to C-424/93 *Zabala Erasun and Others* [1995] ECR I-1567, paragraph 15).

70.  The judicial system of the European Union is moreover a complete system of legal remedies and procedures designed to ensure review of the legality of acts of the institutions (see, inter alia, Case C-50/00 P *Unión de Pequeños Agricultores* v *Council* [2002] ECR I-6677, paragraph 40).

71.  As regards the characteristics of the PC, it must first be observed that that court is outside the institutional and judicial framework of the European Union. It is not part of the judicial system provided for in Article 19(1) TEU. The PC is an organisation with a distinct legal personality under international law.

72.  In accordance with Article 15 of the draft agreement, the PC is to be vested with exclusive jurisdiction in respect of a significant number of actions brought by individuals in the field of patents. That jurisdiction extends, in particular, to actions

for actual or threatened infringements of patents, counterclaims concerning licences, actions for declarations of non-infringement, actions for provisional and protective measures, actions or counterclaims for revocation of patents, actions for damages or compensation derived from the provisional protection conferred by a published patent application, actions relating to the use of the invention before the granting of the patent or to the right based on prior use of the patent, actions for the grant or revocation of compulsory licences in respect of Community patents, and actions for compensation for licences. To that extent, the courts of the contracting States, including the courts of the Member States, are divested of that jurisdiction and accordingly retain only those powers which are not subject to the exclusive jurisdiction of the PC.

73. It must be added that, in accordance with Article 14a of the draft agreement, the PC, in carrying out its tasks, has the duty to interpret and apply European Union law. The draft agreement confers on that court the main part of the jurisdiction *ratione materiae* held, normally, by the national courts, to hear disputes in the Community patent field and to ensure, in that field, the full application of European Union law and the judicial protection of individual rights under that law.

74. As regards an international agreement providing for the creation of a court responsible for the interpretation of its provisions, the Court has, it is true, held that such an agreement is not, in principle, incompatible with European Union law. The competence of the European Union in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit itself to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions (see Opinion 1/91, paragraphs 40 and 70).

OPINION PURSUANT TO ARTICLE 218(11) TFEU

75. Moreover, the Court has stated that an international agreement concluded with third countries may confer new judicial powers on the Court provided that in so doing it does not change the essential character of the function of the Court as conceived in the EU and FEU Treaties (see, by analogy, Opinion 1/92 [1992] ECR I-2821, paragraph 32).

76. The Court has also declared that an international agreement may affect its own powers provided that the indispensable conditions for safeguarding the essential character of those powers are satisfied and, consequently, there is no adverse effect on the autonomy of the European Union legal order (see Opinion 1/00 [2002] ECR I-3493, paragraphs 21, 23 and 26).

77. However, the judicial systems under consideration in the abovementioned Opinions were designed, in essence, to resolve disputes on the interpretation or application of the actual provisions of the international agreements concerned. Further, while providing particular powers to the courts of third countries to refer cases to the Court for a preliminary ruling, those systems did not affect the powers of the courts and tribunals of Member States in relation to the interpretation and application of European Union law, nor the power, or indeed the obligation, of those courts and tribunals to request a preliminary ruling from the Court of Justice and the power of the Court to reply.

78. By contrast, the international court envisaged in this draft agreement is to be called upon to interpret and apply not only the provisions of that agreement but also the future regulation on the Community patent and other instruments of European Union law, in particular regulations and directives in conjunction with which that regulation would, when necessary, have to be read, namely provisions relating to other bodies of rules on intellectual property, and rules of the FEU Treaty concerning the internal market and competition law. Likewise, the PC may be called upon to determine a dispute pending before it in the light of the fundamental rights and general principles of European Union law, or even to examine the validity of an act of the European Union.

79.   As regards the draft agreement submitted for the Court's consideration, it must be observed that the PC:

— takes the place of national courts and tribunals, in the field of its exclusive jurisdiction described in Article 15 of that draft agreement,

— deprives, therefore, those courts and tribunals of the power to request preliminary rulings from the Court in that field,

— becomes, in the field of its exclusive jurisdiction, the sole court able to communicate with the Court by means of a reference for a preliminary ruling concerning the interpretation and application of European Union law and

— has the duty, within that jurisdiction, in accordance with Article 14a of that draft agreement, to interpret and apply European Union law.

80.   While it is true that the Court has no jurisdiction to rule on direct actions between individuals in the field of patents, since that jurisdiction is held by the courts of the Member States, nonetheless the Member States cannot confer the jurisdiction to resolve such disputes on a court created by an international agreement which would deprive those courts of their task, as 'ordinary' courts within the European Union legal order, to implement European Union law and, thereby, of the power provided

for in Article 267 TFEU, or, as the case may be, the obligation, to refer questions for a preliminary ruling in the field concerned.

81. The draft agreement provides for a preliminary ruling mechanism which reserves, within the scope of that agreement, the power to refer questions for a preliminary ruling to the PC while removing that power from the national courts.

82. It must be emphasised that the situation of the PC envisaged by the draft agreement would differ from that of the Benelux Court of Justice which was the subject of Case C-337/95 *Parfums Christian Dior* [1997] ECR I-6013, paragraphs 21 to 23. Since the Benelux Court is a court common to a number of Member States, situated, consequently, within the judicial system of the European Union, its decisions are subject to mechanisms capable of ensuring the full effectiveness of the rules of the European Union.

83. It should also be recalled that Article 267 TFEU, which is essential for the preservation of the Community character of the law established by the Treaties, aims to ensure that, in all circumstances, that law has the same effect in all Member States. The preliminary ruling mechanism thus established aims to avoid divergences in the interpretation of European Union law which the national courts have to apply and tends to ensure this application by making available to national judges a means of eliminating difficulties which may be occasioned by the requirement of giving European Union law its full effect within the framework of the judicial systems of the Member States. Further, the national courts have the most extensive power, or even the obligation, to make a reference to the Court if they consider that a case pending before them raises issues involving an interpretation or assessment of the validity of the provisions of European Union law and requiring a decision by them (see, to that effect, Case 166/73 *Rheinmühlen-Düsseldorf* [1974] ECR 33, paragraphs 2 and 3, and Case C-458/06 *Gourmet Classic* [2008] ECR I-4207, paragraph 20).

84.   The system set up by Article 267 TFEU therefore establishes between the Court of Justice and the national courts direct cooperation as part of which the latter are closely involved in the correct application and uniform interpretation of European Union law and also in the protection of individual rights conferred by that legal order.

85.   It follows from all of the foregoing that the tasks attributed to the national courts and to the Court of Justice respectively are indispensable to the preservation of the very nature of the law established by the Treaties.

86.   In that regard, the Court has stated that the principle that a Member State is obliged to make good damage caused to individuals as a result of breaches of European Union law for which it is responsible applies to any case in which a Member State infringes European Union law, whichever is the authority of the Member State whose act or omission was responsible for the breach, and that principle also applies, under specific conditions, to judicial bodies (see, to that effect, Case C-224/01 *Köbler* [2003] ECR I-10239, paragraphs 31 and 33 to 36; Case C-173/03 *Traghetti del Mediterraneo* [2006] ECR I-5177, paragraphs 30 and 31, and judgment of 12 November 2009 in Case C-154/08 *Commission* v *Spain*, paragraph 125).

87.   It must be added that, where European Union law is infringed by a national court, the provisions of Articles 258 TFEU to 260 TFEU provide for the opportunity of bringing a case before the Court to obtain a declaration that the Member State concerned has failed to fulfil its obligations (see Case C-129/00 *Commission* v *Italy* [2003] ECR I-14637, paragraphs 29, 30 and 32).

88.   It is clear that if a decision of the PC were to be in breach of European Union law, that decision could not be the subject of infringement proceedings nor could it give rise to any financial liability on the part of one or more Member States.

OPINION PURSUANT TO ARTICLE 218(11) TFEU

89. Consequently, the envisaged agreement, by conferring on an international court which is outside the institutional and judicial framework of the European Union an exclusive jurisdiction to hear a significant number of actions brought by individuals in the field of the Community patent and to interpret and apply European Union law in that field, would deprive courts of Member States of their powers in relation to the interpretation and application of European Union law and the Court of its powers to reply, by preliminary ruling, to questions referred by those courts and, consequently, would alter the essential character of the powers which the Treaties confer on the institutions of the European Union and on the Member States and which are indispensable to the preservation of the very nature of European Union law.

Consequently, the Court (Full Court) gives the following Opinion:

**The envisaged agreement creating a unified patent litigation system (currently called 'European and Community Patents Court') is not compatible with the provisions of the EU Treaty and the FEU Treaty.**

[Signatures]