# EXHIBIT 28

**ARBITRATION INSTITUTE OF THE STOCKHOLM CHAMBER OF COMMERCE**

**SCC ARBITRATION V (2016/135)**

In the arbitration proceedings between

**GREEN POWER PARTNERS K/S
SCE SOLAR DON BENITO APS**

Claimants

And

**THE KINGDOM OF SPAIN**

Respondent

---

**AWARD**

---

*Arbitral Tribunal*

Professor Hans van Houtte, *Chairperson*
Dr. Inka Hanefeld, *Co-Arbitrator*
Professor Jorge E. Viñuales, *Co-Arbitrator*

# TABLE OF CONTENTS

I.     **THE PARTIES** ................................................................................................................. 1
    A.  *The Claimants* ............................................................................................. *1*
    B.  *The Respondent* .......................................................................................... *1*

II.    **THE DISPUTE** ................................................................................................................ 1

III.   **THE ARBITRATION CLAUSE** ..................................................................................... 2

IV.   **ARBITRATION TRIBUNAL** ........................................................................................ 2

V.     **PROCEDURAL HISTORY** ........................................................................................... 3

VI.   **REQUESTS FOR RELIEF** ............................................................................................ 8
    A.  *The Claimants' Requests for Relief* ........................................................... *8*
    B.  *The Respondent's Requests for Relief* ........................................................ *8*

VII.  **FACTUAL BACKGROUND** .......................................................................................... 9
    A.  *The Policy with regard to Solar Energy* ..................................................... *9*
    B.  *Characteristics of Solar Energy Production* ............................................. *10*
    C.  *Spain's Regulatory framework for solar energy and photovoltaic facilities* ... *10*
    D.  *The Claimants' investment in the Spanish electricity market* ................... *18*
    E.  *Measures challenged by the Claimants* ..................................................... *23*

VIII. **JURISDICTION AND ADMISSIBILITY** ................................................................... 26
    SECTION A.    PRELIMINARY MATTERS ................................................................ 26
    A.  *Basis of jurisdiction* .................................................................................. *26*
    B.  *Overview of objections to jurisdiction and admissibility* .......................... *27*
    C.  *The Tribunal determines its jurisdiction ex officio* ................................... *28*
    SECTION B.    THE LAW APPLICABLE TO THE DETERMINATION OF JURISDICTION ......... 29
    SECTION C.    GENERAL OBJECTION TO JURISDICTION *RATIONE PERSONAE* ............... 40
    A.  *The Respondent's arguments* ..................................................................... *40*
    B.  *The Claimants' arguments* ........................................................................ *40*
    C.  *The Commission's Amicus Curiae Brief* .................................................... *42*
    D.  *The Tribunal's decision* ............................................................................ *42*
    SECTION D.    GENERAL OBJECTION TO JURISDICTION *RATIONE VOLUNTATIS* ........... 44
    A.  *The Respondent's arguments* ..................................................................... *45*
    B.  *The Claimants' arguments* ........................................................................ *59*
    C.  *The Commission's Amicus Curiae brief* .................................................... *76*
    D.  *The Tribunal's decision* ............................................................................ *79*
    SECTION E.    PARTIAL OBJECTIONS TO JURISDICTION AND ADMISSIBILITY ............... 123

IX.   **COSTS** ........................................................................................................................ 123

X.     **DECISION OF THE TRIBUNAL** .............................................................................. 125

**LIST OF DEFINED TERMS**

| | |
|---|---|
| *Achmea Judgement* | *Slowakische Republik (Slovak Republic) v. Achmea BV,* CJEU (Grand Chamber), Case C-284/16, Judgment, 6 March 2018 |
| *Amicus Curiae* Brief | European Commission's *Amicus Curiae* Submission, 14 December 2018 |
| CJEU (or in citations from sources ECJ) | Court of Justice of the European Union, and its previous designations |
| Claimants | Green Power Partners K/S and SCE Solar Don Benito APS |
| Claimants' Additional Observations 2022 | Claimants' Additional Brief und (sic.) Jurisdiction following Procedural Order No. 9, 12 March 2022 |
| Claimants' Comments | Claimants' Response to the European Commission's *Amicus Curiae* Brief, 14 January 2019 |
| Claimants' Comments regarding Costs | Claimants' Comments on the Respondent's Statement of Costs, 22 April 2022 |
| Claimants' Comments regarding Respondent's Answer | Claimants' Comments regarding Respondent's Answer, 21 October 2016 |
| Claimants' Post-Hearing Brief | Claimants' Post-Hearing Submission, 1 March 2019 |
| Claimants' Rejoinder | Claimants' Rejoinder Memorial on Jurisdictional Objections, 10 September 2018 |
| Claimants' Reply | Claimants' Reply on Merits and Counter-Memorial on Jurisdictional Objections, 26 March 2018 |
| Claimants' Response to *Amicus Curiae* Brief | Claimants' Response to the European Commission's Application to Intervene as a Non-Disputing Party, 23 November 2018 |
| Claimants' Statement of Costs | Claimants' Statement of Costs, 13 April 2022 |
| Claimants' Submission on Opinion 1/17 | Claimant's Additional Submission on ECJ's Opinion 1/17, 24 May 2019 |
| CNE | Spanish National Energy Commission |
| CPI | Consumer Price Index |

1

| | |
|---|---|
| CPI-CT | Consumer Price Index at constant taxes, excluding unprocessed food and energy products |
| Declaration I | Declaration of the EU Commission on behalf of the EU, 20 May 2015, made at the time of signing the International Energy Charter |
| Declaration II | Declaration of the Representatives of the Governments of Member States of 15 January 2019 on the legal consequences of the Judgment of the Court of Justice in Achmea and on investment protection in the European Union |
| Declaration III | Declaration of the Representatives of the Governments of the Member States, of 16 January 2019 on the enforcement of the judgment of the Court of Justice in Achmea and on investment protection on the European Union |
| ECT | Energy Charter Treaty, executed in Lisbon on 17 December 1994 |
| EPC | Engineering, procurement and construction |
| EU | European Union |
| FiT | Feed-in tariff |
| European Commission's Request | European Commission's Application for leave to intervene as a Non-Disputing Party, 9 November 2018 |
| Green Power | Green Power Partners K/S |
| Hearing (1) | Hearing in Stockholm on 7 and 8 February 2019 |
| Hearing (2) | Hearing online of 22 March 2022 |
| Hindelang Opinion | Legal Opinion of Prof. S. Hindelang, 13 March 2022 |
| Idea | Institute for the Diversification and Saving of Energy |
| *Komstroy Judgement* | *Republic of Moldova v. Komstroy LLC, successor in law to the company Energoalians,* CJEU (Grand Chamber) Case C-741/19, Judgment, 2 September 2021 |
| Law 54/1997 | Law 54/1997 of 27 November 1997 on the Electricity Sector |
| MO IET/1045/2014 | Ministerial Order IET/1045/2014 |

| MO ETU/130/2017 | Ministerial Order ETU/130/2017 |
|---|---|
| PER 2005-2010 | Spain's Renewable Energies Plan |
| *PL Holdings Judgment* | *Republiken Polen (Republic of Poland) v. PL Holdings Sarl*, CJEU (Grand Chamber) Case C-109/20, Judgment, 26 October 2021 |
| PV | Photovoltaic |
| RAIPRE | Registry of Assignment of Remuneration |
| RD 413/2014 | Royal Decree 413/2014 |
| RD 436/2004 | Royal Decree 436/2004 |
| RD 661/2007 | Royal Decree 661/2007 |
| RD 1565/2010 | Royal Decree 1565/2010 |
| RD 1578/2008 | Royal Decree 1578/2008 |
| RD 2818/1998 | Royal Decree 2818/1998 |
| RD-Law 1/2012 | Royal Decree Law 1/2012 |
| RD-Law 2/2013 | Royal Decree Law 2/2013 |
| RD-Law 6/2009 | Royal Decree-Law 6/2009 |
| RD-Law 7/2006 | Royal Decree Law 7/2006 |
| RD-Law 9/2013 | Royal Decree Law 9/2013 |
| RD-Law 13/2012 | Royal Decree Law 13/2012 |
| RD-Law 14/2010 | Royal Decree Law 14/2010 |
| REIO | Regional Economic Integration Organisation |
| Report 2/2012 | CNE's report on the Spanish Energy Sector of 7 March 2012 |
| Request for Arbitration | Claimants' Request for Arbitration, 8 September 2016 |
| Respondent | The Kingdom of Spain |
| Respondent's Additional Comments 2022 | Respondent's additional comments on the intra-EU objection following Procedural Order No. 9, 13 March 2022 |

3

| | |
|---|---|
| Respondent's Answer | Respondent's Answer to the Request for Arbitration, received by the SCC on 11 October 2016 |
| Respondent's Comments | Comments to the European Commission's *Amicus Curiae* Brief and its intervention in the hearing, 15 January 2019 |
| Respondent's Counter-Memorial | Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction, 4 October 2017 |
| Respondent's Observations | Respondent's Observations on Claimants' Comments regarding Costs, 29 April 2022 |
| Respondent's Post-Hearing Brief | Respondent's Post-Hearing Brief, 1 March 2019 |
| Respondent's Rejoinder | Respondent's Rejoinder Memorial on the Merits and Reply on Jurisdiction, 27 June 2018 |
| Respondent's Response on *Amicus Curiae* Brief | Respondent's Observations on the European Commission's Application for leave to intervene as a Non-Disputing Party, 23 November 2018 |
| Respondent's Statement of Costs | Respondent's Statement of Costs, 13 April 2022 |
| Respondent's Submission on Opinion 1/17 | Respondent's Submission on Opinion 1/17 in relation with the dispute before the Tribunal, 24 May 2019 |
| SAA | Swedish Arbitration Act |
| SCC | Arbitration Institute of the Stockholm Chamber of Commerce |
| SCC Rules | SCC Arbitration Rules (2010) |
| SCE | SCE Solar Don Benito APS |
| Spain | The Kingdom of Spain |
| Statement of Claim | Claimants' Statement of Claim, 12 May 2017 |
| TAXUD | General Directorate of Taxation and Customs Union of the European Commission |
| TFEU | Treaty on the Functioning of the European Union |
| TMR | Reference tariff for electricity |
| Transcript Hearing (2) | Transcript of Hearing (2), jointly submitted by the Parties on 5 April 2022 |

| TVPEE | Tax on the value of the production of electrical energy |
| VCLT | Vienna Convention on the Law of Treaties of 23 May 1969 |

# I.  THE PARTIES

## A.  The Claimants

1.  Green Power Partners K/S ('**Green Power**' or '**the First Claimant**') is a Danish company ('*Kommanditselskab*'), with business address at Weidekampsgad 6, 2300 Copenhagen, Denmark, registered under company registration number (CVR number) 32258611 and Danish VAT number 32258611.

    SCE Solar Don Benito APS ('**SCE**' or '**the Second Claimant**') is a Danish private limited company ('*Anpartsselskab*'), with business address at Silkeborgvej, 8000 Aarhus C/Denmark, registered under company registration number (CVR number) 30834062 and without Danish VAT registration.[1]

    The First and Second Claimant are jointly referred to as '**the Claimants**'.

2.  Claimants were initially represented by Dr. Heiko Büsing and Mr. Moritz Pottek, PricewaterhouseCoopers Legal AG Rechtsanwaltsgesellschaft ('**PWC Legal**'), Alsterufer 1, 20354 Hamburg, Germany. On 26/27 October 2021, the Tribunal was informed that Oliver Bolthausen, DWF Germany Rechtsanwaltsgesellschaft mbH ('**DWF**'), Prinzregentenstraße 78, 81675 München had been entrusted with the mandate to represent Claimants in these proceedings.

## B.  The Respondent

3.  The Kingdom of Spain ('**Spain**' or '**the Respondent**') is the Respondent in this arbitration. For the purposes of these proceedings, Respondent's address is: Direccion del Servicio Juridico del Estado, c/ Ayala nr. 5, 28001 Madrid (Spain).

4.  Respondent is represented by Spain's Attorney General's Office ('**State Attorney**'), Abogacía General del Estado, Dpto. Arbitrajes Internacionales, c/Marqués de la Ensenada, 14-16, 2ª planta, 28004 Madrid (Spain).

# II.  THE DISPUTE

5.  The current dispute pertains to different investments in photovoltaic plants ('**PV plants**') in the Spanish solar energy market. The relevant investments were made between 2008 and 2011, and allegedly intended to profit from the applicable regulatory framework providing, *inter alia*, a

---

[1]  Confirmation from Claimants' Counsel in response to inquiry dated 25 April 2019 from SCC Secretariat.

favourable tariff regime based on State subsidies. As a result of different factors, the Respondent adopted several measures between 2010 and 2014 which altered this regulatory framework. The Claimants argue that these alterations violated the Respondent's obligations under the Energy Charter Treaty ('**ECT**') and international law and impacted its investments in the Spanish energy market. The Claimants accordingly claim payment of compensation.

## III. THE ARBITRATION CLAUSE

6.   The Claimants have started the present arbitration proceedings by their Request for Arbitration of 8 September 2016, submitted to the Arbitration Institute of the Stockholm Chamber of Commerce ('**SCC**'), and referring to Article 26 of the ECT, which entered into force for both, the Kingdom of Denmark and the Kingdom of Spain, on 16 April 1998.[2] Article 26(4)(c) ECT provides for 'arbitration proceedings under the Arbitration Institution of the Stockholm Chamber of Commerce'.

## IV. ARBITRATION TRIBUNAL

7.   The Arbitration Tribunal ('**the Tribunal**'), appointed under Article 13 of the SCC Arbitration Rules ('**SCC Rules**'), consists of:

Prof. Dr. Hans van Houtte
Van Houtte Partners
A.Smetsplein 3 D, # 4.02
3000 Leuven
Belgium
<u>Chairperson</u>

Dr. Inka Hanefeld
Hanefeld Rechtsanwälte Rechtsanwaltsgesellschaft GmbH
Brooktorkai 20
20457 Hamburg
Germany
<u>Co-Arbitrator</u>

Prof. Dr. Jorge E. Viñuales
Maison de la Paix, PT-715
Ch Eugene-Rigot 2, 1202.
PO Box 1672
CH-1211 Geneva 1
Switzerland
<u>Co-Arbitrator</u>

---

[2]   The Kingdom of Spain signed the ECT on 17 December 1994 and ratified it on 11 December 1997; the Kingdom of Denmark signed the ECT on17 December 1994 and ratified it on 22 August 1997.

## V. PROCEDURAL HISTORY

8.  On 8 September 2016, the Claimants submitted their Request for Arbitration (**'Request for Arbitration'**).

9.  On 12 September 2016, the SCC transmitted the Request for Arbitration to the Respondent, requiring it to submit an Answer to the SCC pursuant to Article 5 of the SCC Rules by 12 October 2016.

10. On 11 October 2016, the SCC confirmed receipt of the Answer submitted by the Respondent (**'Respondent's Answer'**).

11. On 21 October 2016, the Claimants submitted their comments regarding the Respondent's Answer (**'Claimants' Comments regarding Respondent's Answer'**).

12. Pursuant to Article 20 of the SCC Rules, and in accordance with the letter dated 15 December 2016 of the Board of the Arbitration Institute of the Stockholm Chamber of Commerce, the seat of arbitration is Stockholm, Sweden.

13. On 19 January 2017, the Tribunal and the Parties participated in a telephone conference to discuss the procedural modalities of the present proceedings.

14. On 25 January 2017, the Arbitral Tribunal issued Procedural Order No. 1, confirming *inter alia* that the 2010 version of the SCC Rules was applicable and establishing the further procedural framework of the arbitration proceedings.

15. On 15 February 2017, the Tribunal issued Procedural Order No. 2 to establish the procedural calendar.

16. On 15 May 2017, the Claimants submitted their Statement of Claim (**'Statement of Claim'**).

17. On 4 October 2017, the Respondent submitted its Counter-Memorial on the Merits and Memorial on Jurisdiction (**'Respondent's Counter-Memorial'**)

18. On 17 and 22 December 2017 respectively, the Tribunal issued Procedural Orders Nos. 3 and 4 with regard to the Parties' respective requests for document production.

19. On 26 March 2018, the Claimants submitted their Reply on the Merits and Counter-Memorial on Jurisdictional Objections (**'Claimants' Reply'**).

3

20. On 27 June 2018, the Respondent submitted its Rejoinder Memorial on the Merits and Reply on Jurisdiction ('**Respondent's Rejoinder**').

21. On 10 September 2018, the Claimants submitted their Rejoinder Memorial on Jurisdictional Objections ('**Claimants' Rejoinder**').

22. On 9 November 2018, and in light of recent developments in the law, the Tribunal suggested the Parties to bifurcate the proceedings and to limit the hearing, planned in February 2019, to issues of jurisdiction and admissibility.

23. On 19 November 2018, following acceptance by both Parties of the Tribunal's suggestion to bifurcate the proceedings, the Tribunal confirmed that the February 2019 hearing would only cover issues of jurisdiction and admissibility.

24. On 9 November 2018, the European Commission filed an Application for leave to intervene as a Non-Disputing Party ('**European Commission's Request**').

25. On 23 November 2018, the Claimants and the Respondent submitted their comments concerning the European Commission's Request (hereafter, respectively, the '**Claimants' Response to Amicus Curiae Brief**' and the '**Respondent's Response to Amicus Curiae Brief**').

26. On 30 November 2018, the Tribunal allowed the European Commission to submit an *amicus curiae* brief and determined the modalities of such submission.

27. On 14 December 2018, the European Commission submitted its *Amicus Curiae* brief ('**the Amicus Curiae Brief**').

28. On respectively 14 and 15 January 2019, the Claimants and the Respondent submitted their comments on the *Amicus Curiae* brief (hereafter, respectively, the '**Claimants' Comments**' and the '**Respondent's Comments**').

29. On 30 January 2019, the Tribunal issued Procedural Order No. 5 regarding the organisation of a hearing on jurisdiction and admissibility of the claim, planned for 7 and 8 February 2019.

30. On 7 and 8 February 2019, a hearing (hereafter '**Hearing (1)**') took place at the Stockholm Hearing Center Centralen.

    Present were for the Claimants:    Heiko Büsing, PWC Legal
    Moritz Pottek, PWC Legal
    Loretta van Winkoop, PWC Legal
    Lars Christian Gaarn-Larsen, Green Power
    Pablo Galvan, Green Power

Present were for the Respondent:    Roberto Fernandez Castillo, State Attorney
Maria José Ruiz-Sanchez, State Attorney
Almudena Pérez-Zurita Gutierrez, State Attorney

31.  On 8 February 2019, the Tribunal issued Procedural Order No. 6 concerning the post-hearing procedural steps.

32.  On 1 March 2019, both Parties submitted their post-hearing briefs in accordance with Procedural Order No. 6 (hereafter, respectively, '**Claimants' Post-Hearing Brief**' and '**Respondent's Post-Hearing Brief**').

33.  On 3 April 2019, the Tribunal with Procedural Order No. 7 closed the proceedings pursuant to Article 34 of the SCC Rules and invited the Parties to submit their costs, as defined by Article 44 of the SCC Rules.

34.  On 6 May 2019, the Claimants applied for a re-opening of the proceedings pursuant to Article 34 *in fine* SCC Rules. They asked to be entitled to add the Opinion 1/17 of the Court of Justice of the European Union ('**CJEU**'), published on 30 April 2019, and requested a hearing to discuss the relevance of Opinion 1/17 for the dispute before the Tribunal.

35.  On 9 May 2019, the Respondent replied to the Claimants' submission concurring with the request to re-open the proceedings in the light of Opinion 1/17.

36.  On 9 May 2019, the Parties submitted their respective costs. Procedural Order No. 7 had initially invited the Parties to make this submission by 15 April 2019. Upon request from the Parties, this deadline was extended successively to 3 May and 10 May 2019.

37.  On 14 May 2019, the Parties submitted a Joint Agreement on the further course of the proceedings, in which they indicated that they would submit their observations on Opinion 1/17 by 24 May 2019. They also indicated that a decision on jurisdiction was no longer requested and that they had agreed to hold a hearing on 16-20 December 2019 covering both Opinion 1/17 and the merits of the dispute, after which the Tribunal would render an award covering jurisdiction and merits.

38.  On 20 May 2019, the Tribunal issued Procedural Order No. 8, whereby it re-opened the proceedings, invited the Parties to make additional submissions by 24 May 2019 and reserved a period in December to hold the requested hearing.

39.  On 24 May 2019, both Parties submitted their additional briefs on Opinion 1/17 (hereafter, respectively, '**Claimants' Submission on Opinion 1/17**' and '**Respondent's Submission on Opinion 1/17**').

40. By agreement of the Parties communicated by emails on 30 September 2019, 20 January 2020, 14-15 October 2020 and 8 June 2021, the Parties requested the Tribunal to postpone the hearing.

41. By letter of 4 December 2019, the Respondent requested leave to submit the award rendered in *Stadtwerke München GmbH, RWE Innogy GmbH and Others v. the Kingdom of Spain,* ICSID Case No. ARB/15/1, and the decision on jurisdiction, liability and directions on quantum rendered in *BayWa R.E. Renewable Energy GmbH and BayWa R.E. Asset Holding GmbH v. the Kingdom of Spain*, ICSID Case No. ARB/15/16 into the record. By e-mail of 9 December 2019, the Tribunal granted the request.

42. By emails of 26 and 27 October 2021, the Tribunal was informed that Oliver Bolthausen, DWF, had been entrusted with the mandate to represent the Claimants in these proceedings.

43. By email of 20 January 2022, the Claimants requested the resumption of the proceedings, bifurcating the jurisdictional and merits/quantum phases and proposing one further round of parallel submissions of the Claimants and the Respondent. The same day, the Respondent agreed to resume the proceedings in a bifurcated manner, accepted the proposal for one additional simultaneous submission of the Parties, and requested the organisation of a one-day hearing.

44. By emails of 8 and 9 February 2022, the Claimants and the Respondent sent the Tribunal their joint proposal for the procedural timetable for the jurisdiction phase.

45. On 10 February 2022, the Tribunal issued Procedural Order No. 9, whereby it set 13 March 2022 as the deadline for the Parties to submit their additional observations on legal developments following Opinion 1/17 and confirmed the organisation of a hearing on jurisdiction to be held virtually on 22 March 2022 ('**Hearing (2)**').

46. On 13 March 2022, the Claimants submitted their additional observations ('**Claimants' Additional Observations 2022**'). On 13 March 2022, the Respondent submitted its additional comments on the intra-EU objection ('**Respondent's Additional Comments 2022**') as well as a Legal opinion of Prof. Hindelang ('**Hindelang Opinion**').

47. On 22 March 2022, the Tribunal held Hearing (2) in virtual form.

| | |
|---|---|
| Present were for the Claimants: | Oliver Bolthausen (DWF) |
| | Lea Christ (DWF) |
| | Andreas Panzer (DWF) |
| | Michael Zierhut (DWF) |
| | |
| Present were for the Respondent: | Rafael Gil Nievas (State attorney) |
| | Javier Comerón (State attorney) |

Lorena Fatás Pérez (State attorney)
Maria del Socorro Garrido Moreno (State attorney)
Elena Oñoro Sainz (State attorney)
Prof. Steffen Hindelang (Legal Expert)

48. Following Hearing (2), on 23 March 2022, the Tribunal issued Procedural Order No. 10 on post-hearing arrangements, whereby *inter alia* it took note that the Parties did not consider necessary to submit post-hearing briefs and requested them to submit certain additional documents by 6 April 2022 and to submit their updated submissions on costs by 13 April 2022.

49. On 24 March 2022, as per Procedural Order No. 10, the Claimants submitted a copy of their Powerpoint Presentation, presented in the Hearing (2), the decision of the Ad Hoc Committee in *SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID ARB/15/38, of 16 March 2020 (as **CL-349**) and Council and Commission Decision 98/181/EG of 23 September 1997 on the conclusion, by the European Communities, of the Energy Charter Treaty and the Energy Charter Protocol on energy efficiency and related environmental aspects (as **CL-350**) into the record and provided an updated comprehensive list of all exhibits and legal authorities submitted by the Claimants. On the same day, as per Procedural Order No. 10, the Respondent submitted a copy of its Powerpoint Presentation, presented in the Hearing (2).

50. On 5 April 2022, as per Procedural Order No. 10, the Parties jointly submitted the written transcript of the Hearing (2) ('**Transcript Hearing (2)**').

51. On 13 April 2022, both Parties submitted their updated statement of costs (hereafter, respectively, '**Claimants' Statement of Costs**' and '**Respondent's Statement of Costs**'). Claimants also submitted Exhibits **C3Costs** and Legal Authority **CL-351** as well as an updated version of the List of Exhibits.

52. On 22 April 2022, Claimants submitted their comments on the Respondent's Statement of Costs (hereafter '**Claimants' Comments regarding Costs**').

53. On 22 April 2022, Respondent submitted the Power Point Presentation, presented at the hearing and Commission Decision AS 54155 (as **RL-169**) as well and an updated comprehensive list of legal authorities.

54. On 29 April 2022, Respondent submitted its Observations on Claimants' Comments regarding Costs (hereafter '**Respondent's Observations**').

55. By 4 May 2022, the Tribunal with Procedural Order No. 11 closed the proceedings pursuant to Article 34 of the SCC rules.

## VI. REQUESTS FOR RELIEF

### A. The Claimants' Requests for Relief

56. In accordance with Article 24 of the SCC Rules, the Claimants request the following relief[3]:

  (a) *A declaration that the dispute is within the jurisdiction and competence of the Arbitral Tribunal;*

  (b) *A declaration that Spain has violated the ECT and international law with respect to Claimants' investments, and thus engages its international responsibility;*

  (c) *An order directing Spain to pay monetary damages to Claimant Green Power in an amount of EUR 43,204,887.00, and to Claimant SCE in an amount of EUR 31,122,645.00;*

  (d) *An order directing Spain to pay pre- and post-award interest, including compound interest, to Claimants at the applicable rate until the date of Spain's full and effective payment;*

  (e) *An order directing Spain to pay the costs of this arbitration proceeding, including the costs of the Arbitral Tribunal, the SCC Registration Fee, as well as the legal and other costs, inclusive of all attorney's fees incurred by Claimants, on a full indemnity basis, together with interest on such costs, in an amount to be determined by the Arbitral Tribunal with applicable law;*

  (f) *Any other relief the Arbitral Tribunal may deem just and appropriate, in the circumstances.*

57. In their Reply on the Merits and Counter-Memorial on Jurisdiction, the Claimants further requested the Tribunal:

  (g) *To dismiss Respondent's motion lit (d) that Claimants shall pay 'ICSID administrative expenses';*

  (h) *To dismiss Respondent's motion/reservation under para. 1406 of the Counter Memorial to be allowed to 'supplement, modify or complement these allegations and present any and all additional arguments that may be necessary in accordance with the ICSID Convention, the ICSID Rules of Arbitration'.*

The Claimants have reserved their rights pursuant to Article 25 of the SCC Rules to amend or supplement their claims; '*in particular Claimant Green Power reserved the right to amend the respective request made under Section IX lit (c) of the Statement of Claim, by claiming monetary damages of up to EUR 45.78 million*'.[4]

### B. The Respondent's Requests for Relief

58. The Respondent requests that the Tribunal[5]:

  (a) *[…] [D]eclares its lack of jurisdiction to hear the claims of the Claimants, or where appropriate, the inadmissibility of the same, […];*

---

[3]    Request for Arbitration, para. 96; Statement of Claim, para. 647; Claimants' Reply, para 1770-1772.
[4]    Claimants' Reply, para. 1771.
[5]    Respondent's Counter-Memorial, para. 1405; Respondent's Rejoinder, para. 1626.

(b) *Secondarily [Subsidiarily] in the event that the Arbitral Tribunal were to decide that it has jurisdiction to hear the present dispute, it should reject all the claims of the Claimants on the merits, since the Kingdom of Spain has not in any way breached the ECT, […];*

(c) *Secondarily [Subsidiarily], dismiss all of the Claimants' compensatory claims, as the Claimants have no right to compensation, […]; and*

(d) *Order the Claimants to pay all costs and expenses derived from this arbitration, including SCC administrative expenses, arbitrators' fees, and the fees of the legal representatives of the Kingdom of Spain, their experts and advisors, as well as any other cost or expense that has been incurred, all of this including a reasonable rate of interest from the date on which these costs are incurred and the date of their actual payment.*

# VII.  FACTUAL BACKGROUND

## A.  The Policy with regard to Solar Energy

59.  Because of its geographic configuration on the Iberian Peninsula, Spain may be classified as an 'energy island', which necessitates an independent electricity production and network structure, as it cannot rely on electricity import through interconnection.[6]

60.  Spain's energy policy and corresponding regulatory framework for renewable energy started already in 1994 when the Spanish legislature introduced a Special Regime for the production of Renewable Energy in order to reduce greenhouse gas emissions from traditional energy sources.[7] In pursuit of the same policy, the European Union ('**EU**') and its Member States signed the Kyoto Protocol on 28 April 1998.[8] To meet the objectives of the Kyoto Protocol, the European Parliament and Council adopted Directive 2001/77/EC on the Promotion of Electricity Produced from Renewable Energy Sources in the Internal Electricity Market, which sets out targets for the production of electricity from renewable energy sources for each Member State. Accordingly, the Respondent was required to reach a renewable energy production level of 29.4% by 2010.[9] Directive 2009/28/EC adjusted this target to 20% by 2020.[10] To achieve these targets, Member States were allowed to introduce support schemes, such as subsidies, to producers of electricity.[11] Over the last two decades, the Respondent implemented various measures and incentives to reach

---

[6]  Statement of Claim, para. 57; Respondent's Counter-Memorial, para. 252.

[7]  Royal Decree 2366/1994, of December 9th, 1994, regulating the generation of electricity using hydro plants, cogeneration, and other facilities using renewable energy sources, published in Spain Official Gazette (BOE) December 31st, 1994 **(Exh. CL-8)**.

[8]  Statement of Claim, para. 61.

[9]  Statement of Claim, para. 63; Respondent's Counter-Memorial, para. 293.

[10]  Respondent's Counter-Memorial, para. 295.

[11]  Article 4 of Directive 2001/77/EC of the European Parliament and of the Council of 27 September 2001 on the promotion of electricity produced from renewable energy sources in the internal electricity market **(Exh. RL-15)**; Article 3 of Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009 on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC **(Exh. RL-17)**; Respondent's Counter-Memorial, para. 294-296.

the EU targets and to establish a sustainable energy system, largely dependent on renewable energy sources.

**B.    Characteristics of Solar Energy Production**

61.    Considering Spain's ample wind and sunny climate, the Respondent specifically elected to pursue the development of wind and solar energy as renewable energy sources. For producing electricity out of solar energy, often PV plants, which consist of a large number of solar panels and other infrastructure, are used. PV plants require large up-front investment costs for planning, construction and installation and have relatively low operational and maintenance costs.[12] The return on investment has to come from the sale of electricity over the course of the PV plant's operational life.

62.    Due to the high capital costs of PV plants, the market price of electricity generated from conventional energy sources, such as fossil fuels, is lower than those produced by PV plants. Operators of PV plants could not cover their operating and maintenance costs, repay the up-front investments made and yield a reasonable return on investment without a regime of State subsidies, such as feed-in tariffs, which allow operators of PV plants to be competitive in spite of their relatively higher costs.[13]

**C.    Spain's Regulatory framework for solar energy and photovoltaic facilities**

63.    Like many other EU Member States, Spain decided to incentivize and facilitate the development of renewable energy projects, including PV plants, through a regime of State subsidies and other regulatory measures.

64.    The legal framework surrounding this regime was principally based upon a Statute, *e.g.* the **Law 54/1997 of 27 November 1997 on the Electricity Sector ('Law 54/1997')**. The support scheme was further implemented through a cascade of other legal instruments, namely through Royal Decree Laws, Royal Decrees and Ministerial Orders respectively. Royal Decree Laws are regulations with the force of law, which are promulgated by the government in situations of urgency, but which require subsequent parliamentary approval. Royal Decrees are regulations enacted by the government which serve to complement or implement a Law approved by Parliament, such as Law 54/1997. Ministerial Orders are regulations issued by the relevant ministerial department in affairs relating to their department, such as the energy framework.

---

[12]  Statement of Claim, paras. 127-130, referring to **Exh. C-24**, Fraunhofer ISE (2015), *Current and Future Cost of Photovoltaics. Long-term scenarios for Market Development, System Prices and LCOE of Utility-Scale PV Systems.* Study on behalf of Agora Energiewende.
[13]  Statement of Claim, paras. 138-142, referring to **Exh. C-29**, Excerpt from NREL Technical Report *'A Policymaker's Guide to Feed-in Tariff Policy Design'*, July 2010, p. 1 and 5.

65. Well before the Claimants had invested in PV plants on Spanish territory in the period 2008-2010, Spain introduced several regimes to incentivize the production of solar electricity. A brief overview of the successive regulations from 1997 until 2009 is hereby given as follows:

*(a) Law 54/1997*

66. The **Law 54/1997 of 27 November 1997 on the Electricity Sector ('Law 54/1997')**, which remained in force until 2013, provided for the legal framework of the support scheme for renewable energy sources, specifically PV energy. It transposed into Spanish law EU Directive 96/92 EC on the internal market in electricity and regulated as well as liberalised the electricity sector. It aimed at reaching 12% primary energy consumption from renewable sources in Spain by 2010[14] and introduced a 'Special Regime' for energy production from non-consumable renewable energy sources, such as solar energy.[15]

67. The Special Regime *inter alia* guaranteed access to the grid and provided for a premium complementing the normal market price in order for the investor to receive a reasonable rate of return.[16] The Law 54/1997 did not specifically define the economic terms of the premium but indicated the parameters which had to be followed and left the specific determination to subsequent government regulations, such as Royal Decrees.[17]

*(b) Regulatory implementation regimes prior to the Claimants' investments*

68. **Royal Decree 2818/1998 ('RD 2818/1998')** guaranteed PV plant operators, which had fulfilled certain prerequisites, such as registration, to either sell their electricity with a premium above the market price or at a price fixed in advance.[18] The premiums for renewable energy other than solar energy were annually adjusted and every four years all premiums were completely reviewed.[19] The Claimants contend that the discretion in the reviewing process and the risk of retroactive changes made RD 2818/1998 not successful in attracting the necessary investments in renewable energy.[20]

69. The system introduced by RD 2818/1998 was amended in 2004 by **Royal Decree 436/2004 ('RD 436/2004')**.[21] More specifically, the complementary premium became a percentage of the reference

---

[14] Statement of Claim, para. 69, referring to the last paragraph of the preamble of Law 54/1997; Respondent's Counter-Memorial, para. 313, referring to **Exh. R-59**, *The Sixteenth Transitory Provision of Law 54/1997*.

[15] Statement of Claim, para. 70; Respondent's Counter-Memorial, para. 307, referring to **Exh. R-59**, Art. 27(1) Law 54/1997.

[16] Claimants' Reply, para. 358, referring to **Exh. CL-12**, Article 30 (4) of Law 54/199[7]; Respondent's Counter-Memorial, paras. 320-321, Respondent's Rejoinder, paras. 328-330.

[17] Statement of Claim, para. 70.

[18] Statement of Claim, para 71; Respondent's Counter-Memorial, paras. 377-378, with reference to **Exh. R-67**, Art. 26 and 28 (3) RD 2818/1998.

[19] Claimants' Reply, para. 389, referring to **Exh. CL-13**, Article 28 and 32 RD 2818/1998; Respondent's Counter-Memorial, paras. 379 and 386.

[20] Statement of Claim, para. 74; Claimants' Reply, paras. 390-391.

[21] Statement of Claim, para. 77; Respondent's Counter-Memorial, para. 405.

tariff for electricity ('**TMR**'). After 25 years, the applicable percentile for the tariff and premium was reduced for the rest of the operational life of the plant.[22] Moreover, paragraph 3 of Article 40 RD 436/2004 excluded retroactivity: any future revisions to the tariffs, premiums and incentives would not apply to facilities already registered and in operation under the existing support scheme.[23]

70. RD 436/2004 did not have the desired impact on investment in the Spanish renewable energy market. Spain's **Renewable Energies Plan 2005-2010 ('PER 2005-2010')**, approved by the Council of Ministers, found that the '*growth rate in the renewable energy sector was insufficient to achieve the stated commitments*',[24] *i.e.* to meet at least 12% of total energy use from renewable sources by 2010.[25] In order to reach that target, substantial private investments from third parties would be required.[26] To remunerate the investors, PER 2005-2010 suggested a new methodology which differentiated between four standard categories of PV plants, depending on the technology used and their connection to the grid. It also suggested specific parameters for feed-in tariffs ('**FiT**') and premiums to allow for an approximately 7% return on investment before financing and after taxes, which PER 2005-2010 considered a reasonable return.[27]

71. At the start, PER 2005-2010 was off track: where it had targeted a PV capacity of 400 MW by 2010, as of 2006 Spain's installed PV capacity was a mere 84 MW.[28] On the other hand, by mid-2006, because remuneration was coupled to the TMR, renewable wind-energy producers were apparently over-remunerated.[29] As a measure of urgency, **Royal Decree Law 7/2006 ('RD-Law 7/2006')** was passed on 23 June 2006 to correct the situation. It temporarily froze the tariffs, premiums and incentives set out by RD 436/2004 until a new measure would decouple these remunerations from the TMR.[30]

72. In February 2007, a report from the Spanish National Energy Commission ('**CNE**') considered subsidies and incentives to be necessary to promote the development of renewable energy production in Spain. It emphasised that these incentives had to be stable, predictable, transparent

---

[22] Statement of Claim, para. 78, referring to **Exh. CL-15**, Art. 22 RD 436/2004; Respondent's Counter-Memorial, para. 409.

[23] Respondent's Counter-Memorial, para. 422, referring to **Exh. R-69**, Article 40 RD 436/2004.

[24] Statement of Claim, para. 84, referring to **Exh. C-3**, *Renewable Energies Plan for the period 2005-2010 approved on 8 August 2005*.

[25] Respondent's Counter-Memorial, para. 429.

[26] Statement of Claim, para. 86-87.

[27] Respondent's Counter-Memorial, paras. 438-441, referring to **Exh. R-92**, Spain Renewable Energies' Plan 2005-2010. pp. 167-170, 274 and 294-298; Claimants' Reply, paras. 433-434, referring to **Exh. R-92**, pp. 295-298; para. 586, referring to **Exh. C-44**, p. 5 (Claimants challenge Respondent's statement that PER 2005-2010 provided for a return on investment of *approximately* 7%; instead they contend that it provided for a *minimum* rate of return of 7%).

[28] Statement of Claim, para. 87; Report on the Degree of Fulfillment of the National Indicative Targets for Renewable Electricity Consumption in 2010 – Year 2016, pp. 12, 17.

[29] Respondent's Counter-Memorial, para. 445, referring to **Exh. RWE-1**, Statement by Mr. Carlos Montoya, paras. 21 to 30; Respondent's Rejoinder, paras. 692-693.

[30] Statement of Claim, paras. 472 and 489; Respondent's Counter-Memorial, paras. 448-449.

and had to last for the entire operational life of a facility, in order to minimise regulatory uncertainty.[31]

*(c)   Regulatory framework at the time of the investment: Royal Decrees 661/2007 and 1578/2008*

73.   On 26 May 2007, RD 436/2004 was replaced by **Royal Decree 661/2007 ('RD 661/2007')**, introducing a new Special Regime for renewable energy production.[32] It was hoped that the predictable and stable regime introduced by RD 661/2007 would promote the necessary investments in renewable energy while correcting the over-remuneration because the previous tariffs and premiums were linked to the TMR.[33] RD 661/2007 aimed at a FiT which would ensure a return on investment of 7-8%.*[34]*

74.   Like RD 436/2004, the new economic regime of RD 661/2007 for energy production under the Special Regime allowed producers to annually choose between two different tariffs: (i) a fixed FiT per unit of production (kWh), or (ii) a premium on top of the market price. However, operators of PV plants were excluded from this option: they could only receive a FiT for each unit of electricity produced from solar energy.[35] Such FiTs were no longer defined as a percentage of the TMR, but as a fixed amount per kWh for the whole life of a facility, depending on the capacity of the plant. The Parties' positions differ on whether or not the new fixed FiT under RD 661/2007 resulted in an effective increase of remuneration compared to the previous tariffs and premiums under RD 436/2004.[36]

75.   RD 661/2007 did neither set a limit on the total operational lifetime of a plant nor on the duration of the remuneration. However, after the first 25 years from the commissioning of the PV plant, the fixed FiTs were reduced to 80% for the rest of the operational life of the plant. [37]

---

[31]   Statement of Claim, para. 88 referring to **Exh. C-4**, Spain National Energy Commission Report 3/2007, in connection with draft of royal decree regulating the electricity production in Special Regime and of certain facilities. February 14, 2007.

[31]   **Exh. CL-16; Exh. R-71**; Royal Decree 661/2007, regulating the activity of electrical energy generation by means of renewable facilities (Spain Official Gazette May 26th, 2007).

[32]   **Exh. CL-16; Exh. R-71**; Royal Decree 661/2007, regulating the activity of electrical energy generation by means of renewable facilities (Spain Official Gazette May 26th, 2007).

[33]   Statement of Claim, para. 90-92; Respondent's Counter-Memorial, para. 470-471 and 475-476 (The Claimants partially concur with this position by stating *'In order to solve these problems with RD 436/2004, Spain decided to enact RD 661/2007 which entailed a clear rule, i.e. a feed-in tariff rate in absolute figures (Euro cents per kWh) instead of a pegging of a tariff to a somewhat floating Average Electricity Tariff'*, Claimants' Reply para. 397-398).

[34]   Respondent's Counter-Memorial, para. 497, referring to **Exh. R-49**.

[35]   Respondent's Counter-Memorial, para. 477.

[36]   Statement of Claim, para. 96; Claimants' Reply, paras. 468-470, referring to **Exh. C-4**, Spain National Energy Commission Report 3/2007, p. 21; Respondent's Counter-Memorial, paras. 463-469 and 483, referring to **Exh. R-49**, Report on Regulatory Impact of RD 661/2007.

[37]   Claimants' Reply, paras. 447-452.

13

76. RD 661/2007 further guaranteed access to the grid with the fixed FiT.[38] However, as the FiTs were no longer adjusted in connection with the TMR, to counter inflation they were to be updated annually based on an adjusted Consumer Price Index ('**CPI**').[39]

77. To be eligible for the remuneration under RD 661/2007, PV plant operators had to obtain a 'Final Commissioning Certificate' and to register in the Registry of Assignment of Remuneration ('**RAIPRE**').[40]

78. RD 661/2007, in its Article 44, also contained a revision clause to review in 2010 – and every four years thereafter – the tariffs, premiums, incentives and upper and lower limits of the economic regime according to specific criteria. These criteria were: (i) the degree of fulfilment of PER 2005-2010 and of the Energy Efficiency and Savings Strategy in Spain, (ii) the targets of the subsequent Renewable Energy Plan 2011-2020, (iii) the costs associated with each of the technologies, (iv) the degree of participation of the Special Regime in covering the electricity demand, and (v) the impact of the Special Regime on the technical and economic management of the energy system.[41] The purpose of the review was to achieve '*a reasonable rate of return of the investment ... with reference to the cost of money in the capital markets*', as required by Article 30(4) of Law 54/1997.[42]

79. Article 44(3) of RD 661/2007 also exempted some facilities from the impact of recent revisions:

> '*The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed.*'

80. The Parties differ as to whether Article 44(3) of RD 661/2007 constitutes a guarantee against tariff changes for commissioned PV plants. According to the Respondent, Article 44(3) only applies to the specific revision mechanism contained in that article and cannot be read as a stabilisation clause shielding investors from other unrelated necessary changes to the economic regime applicable to PV plants, such as (i) changes arising from the adoption of macroeconomic control measures, or (ii) changes to avoid over-remuneration or unreasonable rate of return situations, or (iii) changes to

---

[38]  Statement of Claim, para. 94, referring to **Exh. C-16**, Art. 17 (e) RD 661/2007.
[39]  Statement of Claim, para. 97, referring to **Exh. C-16**, Art. 44.1 and the First Additional Provision of RD 661/2007; Respondent's Counter-Memorial, para. 476.
[40]  Statement of Claim, para. 32; Respondent's Counter-Memorial, paras. 531-550; Claimants' Reply, paras. 463-465; Respondent's Rejoinder, paras. 766-776. RAIPRE stands for '*Registro de Instalaciones de Produccion en Regimen Especial*' which is the Spanish 'Registry of Power Installations under the Special Regime'. The RAIPRE is therefore the official Registry for renewable projects.
[41]  Statement of Claim, para. 101, referring to **Exh. C-16**, Art. 44 RD 661/2007; Respondent's Counter-Memorial, paras. 510-516; Respondent's Rejoinder, paras. 720-728.
[42]  Law 54/1997, 27 November 1997 on the Electric Power Sector (Spain Official Gazette 28 November 1997). Exhibit CL-12.

guarantee the economic sustainability of the energy system.[43] According to the Claimants, Article 44(3) constitutes the one and only legal basis for any tariff revision and therefore explicitly prohibits any retroactive changes to the precise remuneration regime of RD 661/2007 for commissioned PV plants.[44]

81. Article 22 of RD 661/2007 contained a final mechanism to update the applicable tariffs and premiums. A target was set for the maximum capacity of each category of production technology. For PV plants, this target was 371 MW. Once 85 % of this capacity was reached, the Respondent would update the FiTs for new PV plants in a new Royal Decree. However, the new Decree could only be issued minimum 12 months after notification that the threshold was reached in order to allow investors to have their unfinished PV plants commissioned and registered before the new Royal Decree was issued so that they could still receive the former FiT.[45]

82. RD 661/2007 proved to be a success. It attracted an influx of investors to the Spanish renewable energies market. Within three months after RD 661/2007 came into force, Spain had already reached 91 percent of its 371 MW target for PV capacity. By September 2008, RD 661/2007 had prompted a huge influx of installed PV capacity. The installed PV capacity exceeded 3,000 MW, *i.e.* more than eight times the intended target of 371 MW.[46] In 2008, the yearly installed capacity had risen approximately 2,500% from the capacity installed in 2006 (*i.e.* before RD 661/2007 was in place).[47]

83. The following diagram indicates the exponential growth of PV capacity between 2006 and 2008, which resulted in an equivalent rise in costs of the FiTs for the Respondent.



---

[43]  Respondent's Counter-Memorial, paras. 508-519; Respondent's Rejoinder, paras. 625-631 and 716-731.
[44]  Claimants' Reply, paras. 442-462.
[45]  Statement of Claim, para. 106, referring to **Exh. C-16**, Art. 22 RD 661/2007; Claimants' Reply, paras. 333-337.
[46]  Statement of Claim, para. 114.
[47]  Claimants' Reply, para. 789, referring to **Exh. C-72**, IEA PVPS Report, *Trends in Photovoltaic Applications - Survey Report of Selected IEA Countries between 1992 and 2008*, p. 15 *et seq.*

*Figure 1. Annual installed capacity of PV Plants in Spain, 1999-2012[48]*

84. This increase triggered the notification and revision mechanism of Article 22, prompting Spain to update the FiTs after 12 months in a new Royal Decree.

85. Subsequently, in September 2008 and in application of Article 22 of RD 661/2007, the Respondent approved **Royal Decree 1578/2008 ('RD 1578/2008')**, which again modified the remuneration and regulatory framework for PV plants registered after 29 September 2008. The tariffs established in RD 1578/2008 were reduced by approximately 30% for these new PV plants to take into account, *inter alia,* their rapidly declining development costs.

86. Apart from lowering the FiT, RD 1578/2008 also limited the maximum capacity of future PV plants. The maximum annual capacity was moreover determined by respective quarterly calls. At each call, investors could apply for registration in a newly established pre-allocation registry, which formed part of RAIPRE, until the capacity was reached.[49] This way, RD 1278/2008 intended to slow down PV plant deployment and reduce costs to address concerns about the unexpectedly large growth in PV capacity which had resulted from RD 661/2007.

87. The FiT established by RD 1578/2008 was similar – albeit lower – than the one RD 661/2007 had introduced. It consisted of a fixed amount per kWh produced but would be progressively reduced for new PV plants up to 10 percent annually after further calls. An important distinction between the remuneration regimes of RD 1578/2008 and that of RD 661/2007 was that after 25 years from the start of the operation of the PV plant or from the registration in the pre-allocation registry (whichever was the latest), the former no longer provided for FiTs whereas RD 661/2007 still provided for a reduced feed-in tariff.[50]

88. RD 1578/2008 finally provided that:

> '*During 2012, in view of the technological development of the sector and the market and the operation of the remuneration regime, there may be modifications to the remuneration of the activity of electric energy production through solar photovoltaic technology.*'[51]

Apart from this provision, RD 1578/2008 does not provide for a revision of the regime as Article 44 (3) RD 661/2007 did.[52]

---

[48]  **Exh. C-70**, GSI/IISD, Pablo del Río/Pere Mir-Artuigues, *A Cautionary Tale: Spain's Solar PV Investment Bubble*, 2014, p. 10.

[49]  Statement of Claim, para. 119, referring to **Exh. CL-17**, Art. 4 and 5 RD 1578/2008.

[50]  **Exh. CL-17**, Art. 11 (5) RD 1578/2008.

[51]  Respondent's Counter-Memorial, para. 485; Respondent's Rejoinder, paras. 754-756; Claimants' Reply, para. 746.

[52]  Article 12 of RD 1578/2008 does account for the actualisation of the tariffs on the basis of the adjusted CPI by referring to article 44 (1) RD 661/2007.

89. The difference between the legal regime under RD 661/2007 and 1578/2008 can be summarised as follows:

| Regime | RD 661/2007 | RD 1578/2008 |
|---|---|---|
| Date of application | Applies from 25 May 2007; applicable to existing PV plants subject to transitory provisions | Applies to installations registered after 28 September 2008 |
| Limitation on capacity | Unlimited | Annual capacity quotas divided into quarterly calls |
| Duration of support | Whole lifetime of the PV plant; reduced feed-in tariff after 25 years | Feed-in tariff payments limited to 25 years |
| Tariff levels | Fixed feed-in tariff rates | Fixed feed-in tariff rates (reduced by approx. 30% compared to RD 661/2007) |
| Revisions of support levels | Every four years from 2010 and only for new PV plants (not applicable to commissioned PV plants) | Remuneration to solar PV plants can be changed during 2012 in view of the technological evolution of the sector and the market and the functioning of the remuneration scheme |

90. Although the annual capacity quotas that RD 1578/2008 introduced successfully slowed down the investment influx in PV plants, the registered PV capacity under its regime still increased to 1,250 MW over the next four years. Each quarterly call applications exceeded the capacity targets. In spite of lower FiTs and a 25-year limitation, investors still invested much in PV facilities under RD 1578/2008.[53]

91. Between 2007 and 2009, the benefits from RD 661/2007 and later RD 1578/2008 were internationally propagated by Spanish governmental agencies and organisations, such as 'Invest in Spain', the CNE and the Institute for the Diversification and Saving of Energy ('**IDAE**') through publications, presentations and flyers.[54] 'Invest in Spain', an organisation which describes itself as '*the leading government organisation that supports foreign companies seeking to set up or expand their business in Spain*', for instance, organised and attended several foreign events and seminars to promote the renewable energy framework of RD 661/2007 and RD 1578/2008.[55]

*(d)    Royal Decree Law 6/2009*

92. RD 661/2007 and RD 1578/2008, combined with the exponential growth in PV capacity, substantially increased the renewable energy 'tariff deficit', *i.e.* the gap between the revenues

---

[53]   Statement of Claim, para. 124, referring to **Exh. C-20**, Official Ministerial press releases dated December 7th, 2009, 20 July 2010 and 10 November 2011.

[54]   Statement of Claim, para. 109, referring to **Exh. C-9, C-10, C-11** and **C-12** and para. 123, referring to **Exh. C-17, C-18** and **C-19**; Claimants' Reply, paras. 732-773; Respondent's Counter-Memorial, paras. 606-635; Respondent's Rejoinder, paras. 777-784.

[55]   Claimants' Reply, paras. 737-753; Respondent's Counter-Memorial, paras. 628-632.

received from consumers and the costs of the FiT paid.[56] As a matter of urgency **Royal Decree-Law 6/2009** ('**RD-Law 6/2009**') was issued to somewhat remedy the situation. Its preamble specified:

> *'The growing tariff deficit [...] is causing serious problems which, in the current international context of financial crisis, is deeply affecting the system and puts not only the financial situation of the electricity sector companies at risk, but also the sustainability of the system itself.'[57]*

And further:

> *'Due to its increasing incidence on the tariff deficit, mechanisms are established in regard to the repayment system of installations of the special regime. [...] Thus, it has become necessary to adopt a measure of urgency to guarantee the necessary legal security for those who have made investments, and set the basis for the establishment of new economic regimes that enhance compliance with the intended objectives.'[58]*

93. One of the measures to reduce the tariff deficit was to introduce for all renewable energy technologies the pre-allocation registry, which already applied to PV plants under RD 1578/2008. Moreover, measures were taken to increase the access fee for consumers.

94. For the Respondent, although the effects of RD-Law 6/2009 on existing PV investments under RD 661/2007 and RD 1578/2008 were limited, it clearly sets out the Respondent's intention of adopting further measures to reduce and eventually eliminate the tariff deficit existing at the time.

## D. The Claimants' investment in the Spanish electricity market

95. The Claimants' investments did not occur at the initial stages of the planning and development phase of the PV plants at hand. Instead, the Claimants invested by acquiring existing project companies and/or taking-over existing engineering, procurement and construction ('**EPC**') contracts. These acquisitions were made either directly or through a 100% interest in different holding companies.[59]

*Green Power's investments*

96. **Green Power** is a company registered in Denmark as a so-called *Kommanditselskab*, which might be best characterized as a limited partnership. The general partner of Green Power is KGPP ApS.

---

[56] Respondent's Counter-Memorial, paras. 283-290; Claimants' Reply, para. 340.
[57] Respondent's Counter-Memorial, para. 557, referring to **Exh. R-57**, RD-Law 6/2009, of 30 April, on certain measures in the energy sector and approving the social bond; Respondent's Rejoinder, para. 374.
[58] Claimants' Reply, para. 520; Respondent's Counter-Memorial, para. 559.
[59] Statement of Claim, paras. 172-174 and 191-196; Respondent's Counter-Memorial, para. 636, referring to Econ One Report, Section III 'Ownership Structure of the PV Plants'.

The material shareholders of Green Power are three Danish pension funds by the name of AP Pension Livsforsikringsaktieselskab, PensionDenmark, and Pædagogernes Pensionskasse.

97. Green Power has invested in several PV projects in Spain between 16 July 2008 and 16 December 2010 through four lines of investment.[60] The total investment costs amounted to approximately EUR 62.4 - 65.6 million.[61]

98. One line of investment was the direct acquisition of five PV plant operating companies. The other three lines of investment occurred through three holding companies (Proark Solar Spanien I Aps, Solar Rooftops Spanien II Aps and Solar Rooftops Spanien II Aps) of which Green Power is the sole shareholder. These three holding companies in turn are the sole shareholders of several PV plant operating companies owning in total 10 PV plants in Spain.

---

[60] Claimants' Reply, para. 1116; Respondent's Counter-Memorial, para. 636.
[61] Statement of Claim, para. 191, where it is indicated that Green powers' investment amounted to EUR 64,119,112.00; Claimants adjusted this amount to EUR 65,646,374.00 in Claimants' Reply, para. 1116; Respondent's Rejoinder, para. 1043, where it is indicated that the Econ One Expert Report adjusted the total investment amount to EUR 62.4 million, referring to Second Econ One Expert Report, para. 47.

99.  Green Power's investments are structured as follows:[62]



100. Under the first line of investment, Green Power acquired (i) the company Svendborg PV III, S.L.U., which was the owner of a PV facility in Torres de Segre, on 17 September 2009; (ii) the company Tirstrup PV XII, S.L.U., which was the owner of a PV facility in La Portella, on 20 October 2009; (iii) the company Sumba PV III, S.L.U., which was the owner of a PV facility in La Vall d'Uxió, on 11 February 2010; (iv) the company Ringsted PV XI, S.L.U., which was the owner of a PV facility in Vilanova Del Cami, on 11 February 2010; and (v) the company Gadstrup PV, S.L.U., which was the owner of a PV facility in Vila Real, on 7 September 2010.[63] The direct acquisition of these five companies included the takeover of the related EPC contracts for the development and completion of the relevant PV facilities.[64] All these acquisitions were made through equity investments by Green Power thanks to shareholder loans from its three material shareholders (the

---

[62]  Statement of Claim, paras. 191 and 196.
[63]  Statement of Claim, para. 198, referring to **Exh. C1-3 – C1-17**; Claimants' Reply, para. 1122, referring to **Exh. C1-4, C1-7, C1-10, C1-13 and C1-16**; Respondent's Rejoinder, para. 271, referring to First Report by Econ One.
[64]  Statement of Claim, para. 200.

pension funds AP Pension Livsforsikringsaktieselskab, Pension Denmark, and Paedagogernes Pensionskasse).[65]

101. A second line of investment occurred through the acquisition of the Danish holding company Proark Solar Spanien I Aps on 10 June 2009.[66] This holding company had acquired on 16 July 2008 all shares of three secondary holding companies, namely (i) Proark Solar Spain I, S.L., which was the sole shareholder of the owner of a PV facility in Bellvis; (ii) Suip Infone-Gocio, S.L., which was the sole shareholder of the owner of a PV facility in El Palau D'Anglesola; and (iii) Tomesa Gestion, S.L., which was the sole shareholder of the owner of a PV facility in Linyola.[67] These investments were largely financed by the bank Dexia Credit Local S.A under a Term Loan Facility Agreement which was restructured in 2014 to implement a longer payback time.[68]

102. The third line of investment went through a holding company, Solar Rooftop Spanien II Aps, that Green Power had established in August 2010, and a secondary holding company, Solar Rooftop S II K/S, that Solar Rooftop Spanien II Aps in turn had established on the same day. In turn, Solar Rooftop S II K/S had acquired two operating companies, which by way of purchase and EPC agreements had acquired: (i) a PV facility in Almussafes on 8 August 2010; (ii) a PV facility in Masnou on 9 May 2010; (iii) a PV facility in Griñon on 17 February 2010; (iv) a PV facility in Lorca on 9 July 2010; and a PV facility in Ibi on 7 May 2010.[69] This third line of investment was made by Green Power and largely financed by shareholder loans from Green Power's material shareholders.[70]

103. In the fourth line of investment, on 10 May 2010, Green Power established a holding company, Solar Rooftop Spanien III Aps, which in turn established a secondary holding company, Solar Rooftop S III K/S. The latter, through a Spanish branch, established on 28 September 2010, acquired (i) the shares and EPC contract of an owner of a PV facility in Daganzo on 28 September 2010 and (ii) the shares and EPC contract of an owner of a PV facility in Meco on 16 December 2010.[71] Green Power financed these investments with shareholder loans from its material shareholders.[72]

---

[65] Claimants' Reply, paras. 1116-1117.
[66] Statement of Claim, para. 204, referring to **Exh. C1-20**.
[67] Statement of Claim, para. 207, referring to **Exh. C1-28-C1-52**; Claimants' Reply, para. 1123, referring to **Exh. C1-132, C1-133** and **C1-134**.
[68] Claimants' Reply, paras. 1120-1121, referring to **Exh. C1-130** and **Exh. C1-131**.
[69] Statement of Claim, paras. 211-125, referring to **Exh. C1-53-C1-68**.
[70] Claimants' Reply, paras. 1116-1117.
[71] Statement of Claim, paras. 223-227, referring to **Exh. C1-76-C1-85**.
[72] Claimants' Reply, paras. 1116-1117.

104. To summarise, Green Power acquired, either directly or indirectly through holding companies and acquisitions of operating companies, a 100 % interest in 15 PV facilities in Spain from July 2008 until December 2010. These PV plants all came into operation after Green Power, or its holding companies, had acquired the operating companies and related EPC agreements. The 15 PV plants are subject either to the regime of RD 661/2007 or RD 15778/2008. The timing, capacity and economic regime applicable to each of these PV Plants is as follows:[73]

**Table 1**
**Characteristics of the Green Power PV Plants[62]**

| Plant Name | Acquisition and/or EPC Takeover Date | Start-Up Date | Installed Nominal Capacity (MW) | Tracking Technology | Economic Regime |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| 1. Vila Real PV | 9/7/2010 | 11/25/2010 | 0.60 | Fixed | RD1578 |
| 2. La Vall d'Uixó PV | 2/11/2010 | 6/14/2010 | 0.50 | Fixed | RD1578 |
| 3. Torres de Segre PV | 09/17/2009 | 12/28/2009 | 1.00 | Fixed | RD1578 |
| 4. Vilanova del Camí PV | 2/11/2010 | 11/25/2010 | 1.50 | Fixed | RD1578 |
| 5. La Portella PV | 10/29/2009 | 4/8/2010 | 1.00 | Fixed | RD1578 |
| 6. El Palau d'Anglesola PV | 7/16/2008 | 8/29/2008 | 0.69 | 2 axis | RD661 |
| 7. Delvis PV | 7/16/2008 | 8/8/2008 | 0.54 | 2 axis | RD661 |
| 8. Linyola PV | 7/16/2008 | 8/27/2008 | 0.56 | 2 axis | RD661 |
| 9. Almussafes PV | 8/8/2010 | 5/17/2011 | 1.10 | Fixed | RD1578 |
| 10. El Masnou PV | 5/9/2010 | 3/1/2011 | 0.44 | Fixed | RD1578 |
| 11. Griñón PV | 2/17/2010 | 6/8/2010 | 0.55 | Fixed | RD1578 |
| 12. Lorca PV | 7/8/2010 | 11/2/2010 | 0.50 | Fixed | RD1578 |
| 13. Ibi PV | 5/7/2010 | 9/21/2010 | 0.60 | Fixed | RD1578 |
| 14. Daganzo PV | 9/28/2010 | 3/15/2011 | 1.98 | Fixed | RD1578 |
| 15. Meco PV | 12/16/2010 | 8/2/2011 | 2.00 | Fixed | RD1578 |

*SCE's investments*

105. **SCE** has been established as a so-called *Anpartsselskab* which might be best characterized as a private limited company.[74] On 24 July 2009, it acquired from Scan Energy Solar A/S the shares of what is now named SCE Solar Don Benito GmbH & Co. KG.[75] The latter is a special purpose vehicle, which had acquired in 2008 100 % of the respective shares in the Spanish companies Planta Fotovoltaica Zujar I, S.L. and Planta Fotovoltaica Zujar II, S.L. Said Spanish companies have been

---

[73] Respondent's Rejoinder, para. 271, referring to First Report by Econ One, table 1. Table 1 of the Report indicates that the five plants directly acquired by Green Power (Vila Real, La Vall d'Uxió, Torres de Segre, Vilanova del Cami and La Portella) are subject to the regime of RD 1578/2008. However, the Claimants' maintain that these PV plants are subject to the economic regime of RD 661/2007, Statement of Claim, para. 197-202.

[74] Request for Arbitration, paras. 3-6; Statement of Claim, paras. 12-16.

[75] Statement of Claim, para. 174 *et seqq.*, referring to **Exh. C2-6, C2-7** and **C2-8**; Respondent's Counter-Memorial, para. 639 *et seqq.*; Claimants' Reply, para. 1173 *et seqq.*, referring to **Exh. C2-17** to **C2-22**; Respondent's Rejoinder, para. 1519.

the owners and operators of the solar park Don Benito in the Spanish province of Badajoz (Extremadura) since 2008. The diagram of SCE's investments is as follows:[76]



106. According to the Claimants, the total investment costs for SCE allegedly amounted to approximately EUR 50.6 million.[77]

**E.    Measures challenged by the Claimants**

107. From 2010 onwards, the Respondent began to progressively introduce additional measures that in essence reduced the benefits of the FiT system. The Claimants suggest that this occurred once the Respondent had achieved its goals of a large state-of-the-art solar energy industry, which it had obtained very quickly as a result of very generous 2007-2008 incentives.

108. On 19 November 2010, Spain introduced **Royal Decree 1565/2010 ('RD 1565/2010')**, which reduced the duration of FiTs, established in RD 661/2007, to 25 years.[78]

109. The next month, on 23 December 2010, Spain enacted **Royal Decree Law 14/2010 ('RD-Law 14/2010')**, which created the concept of 'equivalent operating hours' to limit the production

---

[76]    Statement of Claim, para. 175.
[77]    Statement of Claim, paras. 168 and 178, referring to **Exh. C1W-1** and **C2W-1**, Witness Statements from Mr. Anders Marcus and Mr. Lars Christian Gaarn-Larsen.
[78]    Statement of Claim, para. 258 *et seqq.*, referring to **Exh. CL-18**, Royal Decree 1565/2010, of 19 November 2010; Respondent's Counter-Memorial, para. 705 *et seqq.*; Claimants' Reply, para. 263 *et seqq.*

available for FiTs in function of each plant's characteristics and location.[79] RD-Law 14/2010 also introduced a toll for the transmission and distribution of energy.[80]

110. After a change of government in December 2011, the new Spanish government enacted **Royal Decree Law 1/2012 ('RD-Law 1/2012')** on 27 January 2012. RD-Law 1/2012 suspended the ongoing pre-allocation registration for new renewable energy facilities and economic incentives for renewable energies.[81] Also on 27 January 2012, the Spanish government requested the CNE to issue a report on regulatory adjustment measures to ensure the economic sustainability of the Spanish energy sector.[82] In its 'Report 2/2012', issued on 7 March 2012, the CNE recommended short-term and medium-term measures.[83]

111. On 30 March 2012, the Spanish government approved **Royal Decree Law 13/2012 ('RD-Law 13/2012')** to resolve the structural problem of the economic deficit with the contribution and effort of all parties involved, including businesses that carry out their activity in the electricity sector.[84]

112. On 27 December 2012, the Spanish Parliament adopted **Law 15/2012**, introducing *inter alia* a new 7% 'tax on the value of production of electric energy' ('**TVPEE**'). Law 15/2012 entered into force on 1 January 2013. The TVPEE – which the Claimants consider to be a tariff cut[85] – applied to all income received from electricity production, regardless of whether the income was generated from the regular sale of energy or as FiT under the solar energy support regime.[86]

113. On 1 February 2013, **Royal Decree Law 2/2013 ('RD-Law 2/2013')** replaced as from 1 January 2013 the CPI with the 'Consumer Price Index at constant Taxes', excluding unprocessed Food and Energy Products ('**CPI-CT**'), as the new basis for the annual adaption of the FiT in the renewable energy sector.[87]

114. On 12 July 2013, **Royal Decree Law 9/2013 ('RD-Law 9/2013')** repealed RD 661/2007 and RD 1578/2008. RD-Law 9/2013 also announced Spain's intention to create a new regulatory regime

---

[79] Statement of Claim, para. 266 *et seqq.*, referring to **Exh. CL-19**, Royal Decree-Law 14/2010 of 23 December 2010; Respondent's Counter-Memorial, para. 715 et seqq.
[80] Respondent's Counter-Memorial, para. 754 *et seqq.*; Claimants' Reply, para. 564.
[81] Statement of Claim, para. 275 *et seqq.*; Respondent's Counter-Memorial, para. 770 *et seqq.*.
[82] Respondent's Counter-Memorial, para. 772 *et seqq.*, referring to **Exh. R-170**, Letter of 27 January 2012 from the Secretary of State for Energy to the President of the National Energy Commission.
[83] Respondent's Counter-Memorial, para. 772 *et seqq.*, referring to **Exh. R-105**, Report on the Spanish Energy Sector Part I, Measures to guarantee the financial-economic sustainability of the Electricity sector, National Energy Commission, 7 March 2012.
[84] Respondent's Counter-Memorial, para. 778, referring to **Exh. R-61**, RD-Law 13/2012.
[85] Statement of Claim, para. 290; Claimants' Reply, para. 194 *et seqq.*.
[86] Statement of Claim, paras. 258, 284 *et seqq.*, referring to **Exh. CL-20**, Law 15/2012 of 27 December 2012 on tax measures for the energy sustainability; Respondent's Counter-Memorial, para. 798 *et seqq.*; Claimants' Reply, para. 565 *et seqq.*; Respondent's Rejoinder, para. 968 *et seqq.*.
[87] Statement of Claim, para. 291 *et seqq.*; Respondent's Counter-Memorial, para. 809 *et seqq.*; Claimants' Reply, para. 573 *et seqq.*; Respondent's Rejoinder, para. 973 *et seqq.*.

for renewable energy facilities (the '**New Regulatory Regime**') which required PV producers to sell their electricity on the wholesale market instead of benefiting from the FiTs, granted under RD 661/2007 or RD 1578/2008.[88]

115. On 26 December 2013, **Law 24/2013** enabled the Respondent to defer 'specific remuneration' payments to renewable energy plants until the details for the New Regulatory Regime were worked out. Spain's New Regulatory Regime was effectively put in place with the introduction of **Royal Decree 413/2014 ('RD 413/2014')** and **Ministerial Order IET/1045/2014 ('MO IET/1045/2014')**.[89] The New Regulatory Regime calculates the amount of 'specific remuneration' (on top of market revenue) on the basis of the hypothetical investment and operating cost of a 'standard installation'. Under the new regime, the operator of the hypothetical 'standard installation' would obtain a pre-defined 'reasonable rate of return' (or 'target rate of return'), initially valued at 300 basis points above the historical average yield (over ten years) on Spanish ten-year treasury bonds, which was 7.398% before taxes. The regime defines floors and caps regarding the investment and operating incentives which a renewable project can obtain taking into account the respective operating hour thresholds, different for the different 'standard installations'.[90]

116. The New Regulatory Regime provides periodical reviews to allow Spain (i) to adjust or adapt the parameters and criteria to calculate investment and operating incentives, and (ii) to update the 'target rate of return'. On 17 February 2017, Spain thus approved **Ministerial Order ETU/130/2017 ('MO ETU/130/2017')**, which updated the remuneration parameters for the period between 1 January 2017 and 31 December 2019.[91] The Claimants maintain that, due to Spain's regulatory changes in the energy sector, its PV installations will have passed from an initial rate of

---

[88]   Statement of Claim, para. 295 *et seqq.*, referring to **Exh. CL-27**, Royal Decree-Law 9/2013 of 12 July 2013, enacting urgent measures to ensure the financial stability of the electricity system; Respondent's Counter-Memorial, para. 817 *et seqq.*; Claimants' Reply, para. 581 *et seqq.*; Respondent's Rejoinder, para. 977 *et seqq.*.

[89]   Statement of Claim, para. 300 *et seqq.*, referring to **Exh. CL-28**, Law 24/2013 of 26 December 2013 on the Electric Sector, **Exh. CL-29**, Royal Decree 413/2014 of 6 June 2014, regulating the activity of electrical power generation by means of renewable energy, cogeneration and waste sources (Spain Official Gazette 10 June 2014), **Exh. CL-30**, Ministerial Order IET/1045/2014 of 6 June 2014, approving the remuneration parameters of standard facilities applicable to certain facilities of electrical power generation by means of renewable energy, cogeneration and waste sources (Spanish Official Gazette 20 June 2014); Respondent's Counter-Memorial, para. 820 *et seqq.*; Claimants' Reply, para. 581 *et seqq.*; Respondent's Rejoinder, para. 977 *et seqq.*.

[90]   Statement of Claim, para. 304 *et seqq.*; Respondent's Counter-Memorial, para. 817 *et seqq.*, 880 *et seqq.*; Claimants' Reply, para. 585 *et seqq.*; Respondent's Rejoinder, para. 1004 *et seqq.*.

[91]   Statement of Claim, paras. 314-319, 324 *et seqq.*, referring to **Exh. CL-31**, Ministerial Order ETU/130/2017 of 17 February 2017 updating the remuneration parameters of standard facilities applicable to certain facilities of electrical power generation by means of renewable energy, cogeneration and waste sources to be applicable to the regulatory sub-period started on 1 January 2017 (Spain Official Gazette 22 February 2017); Respondent's Counter-Memorial, para. 915 *et seqq.*.

return of 9.1% before taxes to a rate of return of 7.398% before taxes for the years 2014 to 2019 and to 4.57% before taxes for the years 2020 to 2025.[92]

# VIII. JURISDICTION AND ADMISSIBILITY

## Section A.    Preliminary matters

### A.    *Basis of jurisdiction*

117. The Claimants rely on Article 26 ECT ['*Settlement of Disputes between an Investor and a Contracting Party*'] as the basis for the Tribunal's jurisdiction. Article 26 ECT reads in relevant parts:[93]

> '*(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.*
>
> *(2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:*
>
> *(a) to the courts or administrative tribunals of the Contracting Party party to the dispute;*
>
> *(b) in accordance with any applicable, previously agreed dispute settlement procedure; or*
>
> *(c) in accordance with the following paragraphs of this Article.*
>
> *(3) (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.*
>
> *[...]*
>
> *(4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:*
>
> *(a) (i) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention; or*
>
> *[...]*
>
> *(c) an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce.*'

---

[92]  Claimants' Reply, para. 607.
[93]  **Exh. CL-1.**

118. The Claimants submit that all requirements pertaining to the Tribunal's jurisdiction have been met.[94]

## B.    *Overview of objections to jurisdiction and admissibility*

119. The Respondent has raised four objections to the jurisdiction of the Tribunal and the admissibility of certain claims. These objections were raised in the Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction, in conformity with Article 5(1)(i) of the SCC Rules, and they were further discussed in the light of subsequent developments in the Respondent's Submission on Opinion 1/17 and in the Respondent's Additional Comments 2022. The first two objections were initially presented as a single general objection. In its Rejoinder on the Merits and Reply on Jurisdiction, filed after the CJEU's *Achmea Judgment*, the Respondent formulated the two main dimensions of the initial objection into two separate objections. The Tribunal considers that the second formulation, which relies primarily on Articles 267 and 344 of the Treaty on the Functioning of the European Union ('**TFEU**'), was already contained in the first, and that it better reflects the issues that the Tribunal has to address. It therefore deems these objections timely submitted. The four objections are as follows:

120. First, the Respondent submits that Article 26 ECT does not apply because the Claimants do not originate from the territory of another ECT Contracting Party, as both Denmark and the Kingdom of Spain are Member States of the EU. This is hence an objection for lack of jurisdiction *ratione personae* (*infra* **Section C**).

121. Secondly, the Respondent submits that Article 26 ECT does not apply due to the primacy of EU law, which makes its offer to arbitrate under Article 26 ECT inapplicable and prevents this dispute from being submitted to arbitration. This is hence an objection for lack of jurisdiction *ratione voluntatis* (*infra* **Section D**).

122. Thirdly, the Respondent submits that there is no consent to arbitrate as far as TVPEE is concerned. The Respondent relies on Article 21 ECT, which provides that the ECT does not generate obligations regarding taxation measures (*infra* **Section E**).

123. Fourthly, the Respondent alleges that the expropriation claim is inadmissible since the issue has not been referred to the competent national tax authorities as required by Article 21(5)(b) ECT (also *infra* **Section E**).

124. The first and the second objections to the Tribunal's jurisdiction are of a general character ('**General Objections**'). If one of them is sustained, the Tribunal lacks jurisdiction to hear the

---

[94]    Statement of Claim, para. 20.

entire set of claims brought by the Claimants. The third objection to jurisdiction and the fourth objection, which focus on the inadmissibility of a specific claim, are of a partial character only (‘**Partial Objections**’). For this reason, the Tribunal will begin with the analysis of the General Objections, and it will consider the Partial Objections only to the extent necessary.

### C. *The Tribunal determines its jurisdiction ex officio*

125. The Tribunal notes that, in the exercise of its *compétence de la compétence*, it must satisfy itself that it has jurisdiction over each of the claims brought by the Claimants in this arbitration. In doing so, the Tribunal must carefully consider all the arguments raised by the Parties, but it must also consider *ex officio* all the relevant considerations that may affect the principle and scope of its jurisdiction.

126. The foregoing point is relevant in connection with the Tribunal's consideration of the arguments submitted in the *Amicus Curiae* Brief of the European Commission. For the Claimants, the Tribunal should not take into account the *Amicus Curiae* Brief of the European Commission, which is not a party to the present dispute. The Claimants refer in this regard to their objection to the European Commission's Request.[95] The Respondent admits, referring to the award rendered in *Wirtgen v. Czech Republic*, that '*it is not open to a non-disputing party to raise a defence of lack of jurisdiction.*'[96] However, the Respondent correctly notes that the Tribunal should review its jurisdiction *ex officio*.

127. It is on this basis that the Tribunal will give due consideration to the *Amicus Curiae* Brief submitted by the European Commission in these proceedings. The Tribunal refers, in this regard, to the Decision on Jurisdiction, Applicable Law and Liability rendered by the tribunal in *Electrabel v. Hungary*, on which both Parties to the present proceedings have extensively relied. Facing a more extreme configuration of arguments, that tribunal came to the following conclusion:

> '*As far as jurisdiction is concerned, the Tribunal notes that the Respondent has not raised any like objection to jurisdiction as that made by the European Commission. It is however the Tribunal's duty independently to check whether or not it has jurisdiction to decide the Parties' dispute, particularly when such jurisdiction is contested by the European Commission based on the interpretation and application of EU law*'[97]

---

[95] Claimants' Response to *Amicus Curiae* Brief.
[96] *Mr. Jürgen Wirtgen, Mr. Stefan Wirtgen, and JSW Solar (zwei) GmbH & Co.KG v. Czech Republic*, PCA 1 Nr. 2014-03, Award, 11 October 2017, para. 250, **Exh. RL-102.**
[97] *Electrabel S.A. v. Republic of Hungary*, ICSID case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 4.115, **Exh. RL-2; CL-141.**

128. In the present proceedings, however, the configuration of arguments is such that, in addressing the contents of the *Amicus Curiae* Brief, the Tribunal is indeed addressing the objections raised or espoused by the Respondent or arguments exchanged among the disputing Parties.

## Section B.    The law applicable to the determination of jurisdiction

129. The Parties disagree as to the nature and scope of the law that the Tribunal must apply to determine whether it has jurisdiction to hear the claims brought by the Claimants. Both Parties have submitted detailed arguments on different dimensions of this question.

130. However, given the importance of the question for the analysis of the objections raised by the Respondent, the Tribunal deems it useful to address this question as a preliminary matter.

131. The Tribunal has carefully considered all the arguments made by the Parties with respect to the law applicable to jurisdictional matters, including those made in the context of the Parties' argumentation relating to each objection. The following summary of the Parties' positions is not intended to be exhaustive but only to place the decision of the Tribunal on this question in its context.

## A.    The Respondent's arguments

132. Article 26(6) ECT requires the Tribunal to decide the '*issues in dispute in accordance with this Treaty and applicable rules and principles of international law*'. According to the Respondent, the applicable law thus includes EU law, which is international law.[98]

133. The Respondent specifies that EU law as a whole (and thus not only the EU Treaties) must be regarded as part of public international law.[99] Relying on the awards in *Electrabel v. Hungary*[100] and *Blusun v. Italy*,[101] on the decision in *Vattenfall v. Germany* on the 'Achmea issue',[102] and on the judgment of the CJEU Grand Chamber in the *Achmea* case[103] (the '***Achmea Judgment***'), which all recognise that EU law operates as international law,[104] the Respondent emphasises that the entire EU legal order, which stems from treaties that are part of international law, is itself part of

---

[98] Respondent's Counter Memorial, para. 80.

[99] Respondent's Response on Amicus Curiae Brief, para. 3; Hindelang, Transcript Hearing (2), p. 86,89.

[100] *Electrabel S.A. v. Republic of Hungary*, ICSID case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 4.20, **Exh. RL-2; CL-141**.

[101] *Blusun S.A. e.a. v. Italian Republic*, ICSID ARB/14/3, Award, 27 December 2016, paras. 277-278, **Exh. RL-90**.

[102] *Vattenfall AB e.a. v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, paras. 145-150, **Exh. CL-215a**

[103] *Slowakische Republik (Slovak Republic) v. Achmea BV*, CJEU (Grand Chamber), Case C-284/16, Judgment, 6 March 2018, **Exh. CL-151; CL-215; RL-105; RL-160**.

[104] Hearing (1) Respondent Slides 5-8.

international law.[105] The Respondent also refers, in this connection, to the case law of the CJEU, *inter alia Budějovický Budvar, národní podnik v. Rudolf Ammersin GmbH*[106] as well as to the judgment of the German *Bundesgerichtshof* of 31 October 2018,[107] which annulled the arbitral award in *Achmea v. Slovakia*.[108]

134. Thus, according to the Respondent, within the body of international law applicable to the dispute, the Tribunal has to apply EU law, including the EU rules governing the Internal Electricity Market as part of its implementation of the EU fundamental freedoms.

135. The Respondent submits that under Article 26(6) ECT, international law not only applies to the merits of the dispute but also to jurisdictional matters.[109] In its Additional Comments 2022, the Respondent further emphasises, by reference of the judgment of the CJEU Grand Chamber in the *Komstroy* case[110] (the '***Komstroy Judgment***'), that EU law must be necessarily applied to the determination of jurisdiction in the present proceedings because the ECT itself, as an international agreement ratified by an EU act, is part of the EU law.

136. On this basis, the Respondent derives a number of conclusions regarding the lack of jurisdiction of the Tribunal to hear this dispute, which will be analysed in the context of each one of the objections raised by it.

137. In addition, the Respondent observes that the present arbitration, conducted under the SCC Rules, has its seat in Sweden and is therefore governed by the Swedish Arbitration Act ('**SAA**').[111] This factor distinguishes the present arbitration from other arbitration proceedings, such as the *Vattenfall v. Germany* Decision on the *Achmea* Issue, governed by the ICSID Convention and not subject to the domestic *lex arbitri* of the seat in an EU Member State. ICSID awards are therefore less relevant for the present proceedings.[112]

---

[105] Respondent's Rejoinder, para. 90-94; Hearing (1), Day 2, 17'-19'. The Tribunal hereby clarifies that reference to the arguments submitted on Day 2 of the Hearing (1), is made on the basis of the minutes of the audio-registration as it was agreed between the Parties and the Tribunal that no official typed transcript would be prepared.

[106] Respondent's Response on Amicus Curiae Brief, para. 7, referring to Judgment in *Budějovický Budvar*, C-478/07, paraf. 97-99; see also the earlier judgments in *Conegate*, C-121/85, ECLI:EU:C:1986:114, para. 25; *Matteucci v. Communauté française de Belgique*, C-235/87, ECLI:EU:C:1988:460, para. 22; and *Exportur*, C-3/91, ECLI:EU:C:1992:420, para. 8, referred to in **Annex EC-17**.

[107] *Bundesgerichtshof*, Judgment of 31 October 2018, **Annex EC-9**.

[108] *Bundesgerichtshof*, Judgment of 31 October 2018, **Annex EC-9**; Respondent's Response on *Amicus Curiae* Brief, para. 8.

[109] Respondent's Rejoinder, para. 87; Hearing (1) Respondent, Slide 9; Hindelang, Transcript Hearing (2), p. 94.

[110] *Republic of Moldova v. Komstroy LLC, successor in law to the company Energoalians*, CJEU (Grand Chamber) Case C-741/19, Judgment, 2 September 2021, **Exh. CL-316; RL-164**.

[111] Respondent's Post-Hearing Brief, paras. 3-6 and 17-19.

[112] Hearing (1) Day 2, 11'-12'.

138. The Respondent notes that Section 2 SAA recognises the power of arbitral tribunals to decide on their own jurisdiction.[113] According to the Respondent, the law governing the arbitration agreement may be different from the law governing the merits of the dispute.[114] Under Section 48 SAA, the Tribunal has to decide on the validity of the arbitration agreement under the law chosen by the Parties or, in the absence of such choice, under the law of the seat of the arbitration, namely Swedish law including EU law, which is fully applicable in Sweden, Sweden being an EU Member State.[115]

139. The Respondent moreover observes that the *lex arbitri* is relevant to determine which matters are arbitrable under Swedish law, hence under EU law, and to determine the validity of the offer to arbitrate, hence of the arbitration agreement.[116] In this context, the Respondent notes by reference to the *Achmea Bundesgerichtshof* Judgment that exclusive competences transferred to the EU, including matters relating to State aid, are not arbitrable.[117]

140. The Respondent further observes[118] that it is on this basis that Swedish courts are required to apply the rulings of the CJEU and will on that basis annul decisions by arbitral tribunals asserting jurisdiction in contradiction with such rulings. This argument is made by reference to the referral by the Swedish Supreme Court to the CJEU under Article 267 TFEU in the case *Poland v. PL Holdings*, leading to a CJEU Judgment in this case[119] (the '***PL Holdings Judgment***'), and the withdrawal by the Svea Court of Appeals of another Article 267 TFEU referral, in the case *Italy v. Athena*[120], upon reception of the CJEU's *Komstroy Judgment* and *PL Holdings Judgment*.[121] The Respondent sees these developments as an indication of the accuracy of its arguments.[122]

## B.   The Claimants' arguments

141. The Claimants submit that the relevant applicable law for determining the Tribunal's jurisdiction is public international law, not EU law.[123]

---

[113] Respondent's Post-Hearing Brief, para. 24.
[114] Respondent's Post-Hearing Brief, para. 16.
[115] Respondent's Post-Hearing Brief, para. 11.
[116] Respondent's Post-Hearing Brief, paras. 5, 17-18.
[117] Respondent's Post-Hearing Brief, paras. 23, 43 and 48.
[118] Respondent's Additional Comments 2022, paras. 6-7.
[119] *Republiken Polen (Republic of Poland) v. PL Holdings Sarl*, CJEU (Grand Chamber) Case C-109/20, Judgment, 26 October 2021, **Exh. RL-168**; Hindelang,
[120] Svea Court of Appeals, *Italy v. Athena et al*, Case T 3229-19, Transcript of 12 November 2021, **Exh. RL-167**.
[121] *Charlotin, Damien*, Svea Court of Appeal rescinds Request for a Preliminary Ruling from the European Court of Justice in Light of the European Court's Komstroy and PL Holdings Decisions, IAReporter, 30 November 2021, **Exh. RL-165**.
[122] Respondent's Post-Hearing Brief, paras. 74-77; Respondent's Additional Comments of 2022, para. 7.
[123] Claimants' Reply, para.76.

142. As the Tribunal has been established under a public international law instrument – the ECT – its perspective as regards its jurisdiction must be that of public international law.[124] In other words, '[t]*he Arbitral Tribunal is not incorporated into the EU sub-system, therefore, it must not take a vantage point from within the system [when it comes to determining its jurisdiction].*'[125]

143. The Claimants argue that the Tribunal on the contrary must take an '*outsider's perspective*' vis-à-vis EU law,[126] and that EU law is thus not automatically to be seen as '*supreme*'.[127]

144. Contrary to the Respondent's position,[128] the Claimants observe that Article 26(6) ECT, which sets out the law applicable to '*the issues in dispute*',[129] only refers to the law applicable to the '*merits*'. The Tribunal's jurisdiction is, instead, determined by the general principles of international law as well as by the law that has been agreed upon by the Parties, namely the ECT.[130]

145. The Claimants argue that this view is supported by Article 22 SCC Rules, which likewise only applies to the merits of the dispute.[131] Thus, they contend that neither Article 22 SCC Rules nor Article 26(6) ECT are relevant to the question of the Tribunal's jurisdiction, a position likewise supported by the *Vattenfall* arbitral decision.[132]

146. The Claimants ascertain that even if Article 26(6) ECT referred to the law applicable to jurisdiction, rules of international law in terms of Article 26(6) ECT would not include EU law. In this regard, the Claimants rely on para. 133-134 of Opinion 1/17 in which the CJEU concluded with regard to a similarly worded provision in the CETA that "*the CETA Appellate Tribunal* [will not] *be called upon to interpret or apply the rules of EU law other than the provisions of the CETA.*"[133] Further, the Claimants contend that EU law cannot be qualified as public international law. While the basis for public international law is consensus of the participating states, the basis of EU law is the sovereign command or the institutionally guaranteed regulation of a superior coercive organisation.[134]

147. The Claimants acknowledge that the arbitral tribunal in *Vattenfall v. Germany* admitted that in arbitrations subject to the SCC Rules – instead of to the ICSID Convention, as in *Vattenfall* – '*the*

---

[124] Claimants' Rejoinder, para. 12.
[125] Claimants' Rejoinder, para. 120.
[126] Claimants' Rejoinder, para. 87; Transcript Hearing (2), p. 14.
[127] Claimants' Reply, para. 111.
[128] See Respondent's Rejoinder, para. 87.
[129] To be determined '…*in accordance with this Treaty and applicable rules and principles of international law*': Art. 26(6) ECT.
[130] Claimants' Rejoinder, para. 14; *Vattenfall AB e.a. v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, **Exh. CL-215a;** Transcript Hearing (2), p. 32.
[131] Claimants' Reply, paras. 76-79.
[132] Claimants' Rejoinder, para.18 ; *Vattenfall v. Germany*, paras. 116, 121 *et seqq.*, **Exh. CL-215a.**
[133] Claimants' Submission on Opinion 1/17, paras. 49-55.
[134] Claimants' Additional Observations 2022, p. 5.

*arbitral jurisdiction may be circumscribed by the local arbitration law of the place of arbitration*'.[135] However, the Claimants argue that in the present case the Parties did not choose Stockholm as the seat of arbitration but that it was the SCC Board which selected that seat after the Respondent's arbitration offer became an arbitration agreement by the submission of the Claimants' Request for Arbitration. In their view, since the seat in Sweden is fortuitous, the arbitration agreement should only be affected by international law, from which it emanated.

148. In their Post-Hearing Brief, the Claimants admit that they voluntarily proposed Stockholm as the arbitration seat in a letter dated 21 October 2016.[136] The Claimants also recognise that, Stockholm being the seat of the arbitration, Swedish law, particularly the SAA, is the applicable *lex arbitri*.[137] However, the Claimants contend, relying *inter alia* on the work of one Swedish legal commentator, that the *lex arbitri* is only relevant for the proceedings but has no bearing on jurisdictional matters.[138]

149. The Claimants further consider that the *lex arbitri* is only relevant insofar as it encompasses public international law.[139] When the arbitration agreement was concluded, no other law than international law was chosen. According to the Claimants, Swedish arbitration law thus has no impact on the validity of that agreement. In investment arbitration, where jurisdiction is based upon an investment treaty, the need for coherence entails that the arbitration agreement is only governed by international law, and not by the fortuitous domestic law of the occasional seat.[140] For the Claimants, the law applicable to the arbitration agreement cannot be changed later because of the determination of the seat.[141]

150. Moreover, also under Section 48 SAA, the arbitration agreement is governed by the law agreed upon by the Parties for the arbitration agreement, i.e. by international law, which governs Article 26 ECT. Under international law, a unilateral offer to arbitrate which has been accepted is binding and cannot be unilaterally revoked.[142]

---

[135] *Vattenfall AB e.a. v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 127, **Exh. CL-215a**; Hearing (1), Day 2, 30'.
[136] Claimants' Post-Hearing Brief, para. 5; Claimants' Comments regarding Respondent's Answer, para. 3 *et seqq.*, **Exh. C -152.**
[137] Claimants' Post-Hearing Brief, paras. 6 and 10.
[138] Claimants' Post-Hearing Brief, paras. 14 and 20, referring i.a. to Eliasson, *Stockholm as a Forum for Investment Arbitration*, in: Franke/Magnusson/Ragnwaldh/Wallin: *International Arbitration in Sweden. A Practitioner's Guide*, p. 33, **Exh. CL-289.**
[139] Claimants' Post-Hearing Brief, paras. 21-24.
[140] Hearing (1), Day 2, 51'.
[141] Hearing (1), Day 2, 30'- 32'.
[142] Claimants' Post-Hearing Brief, paras. 26-35.

151. The Claimants also refer to Section 2 SAA, which confirms the power of the Tribunal to decide on its own jurisdiction.[143]

152. The Claimants admit that the *lex arbitri* provides the basis to challenge an award before Swedish courts.[144] However, they do not see in some earlier developments invoked by the Respondent, such as the stay by the Svea Court of Appeals, on 16 May 2018, of the enforcement of the award rendered in *Novenergia II-Energy & Environment, SICAR vs. Kingdom of Spain*, any confirmation of the accuracy of the Respondent's arguments.[145]

## C. The Tribunal's decision

153. At the outset, the Tribunal notes that it is required to determine *ex officio* whether it has jurisdiction to hear the claims brought by the Claimants (*supra* paragraphs 125-128). The principle according to which the Tribunal has *compétence de la compétence* includes the power to determine the law applicable to jurisdiction in the light of all the relevant circumstances of the case, particularly the existence of an agreement between the Parties on this issue.

*Did the Parties agree on the law applicable to the determination of jurisdiction?*

154. The Tribunal must first ascertain whether the Parties have agreed on the law applicable to the determination of jurisdiction. In this regard, the Tribunal notes that it is common ground between the Parties that the law governing the agreement to arbitrate may not necessarily be the same as the law governing other questions, such as the merits of the dispute or the conduct of the proceedings.[146]

155. The starting point of the analysis, as was mentioned in Procedural Order No. 1, paragraph 3, is Article 26 ECT. Specifically, Article 26(6) ECT contains a 'choice of law' clause according to which '*A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law'.* However, the Parties disagree on the interpretation of this provision and, specifically, as to whether this provision attracts the application of EU law into these proceedings for jurisdictional matters. For the Respondent, the ordinary meaning of the terms '*applicable rules and principles of international law'* plainly encompasses EU law as a whole, including for jurisdictional matters. Moreover, the ECT itself, including Article 26 ECT, would in all events have to be considered as EU law, as noted in the *Komstroy* Judgment. The Claimants argue instead that EU law, due to its specificities, would not be covered by this clause or only to a limited extent with respect to the merits of the dispute.

---

[143] Hearing (1), Claimants' Slide 11.
[144] Claimants' Post-Hearing Brief, para. 15.
[145] Claimants' Post-Hearing Brief, paras. 44-45.
[146] Respondent's Post-Hearing Brief, paras. 16-17; Claimants' Post-Hearing Brief, para. 8.

156. The Tribunal considers that, although constituting a 'choice of law' clause in the ECT, Article 26(6) ECT does not provide a conclusive answer regarding the law applicable to jurisdiction. The ordinary meaning of the terms '*issues in dispute in accordance with this Treaty and applicable rules and principles of international law*' would admit several interpretations, including those advanced by the Parties.

157. However, a contextual interpretation of this provision relying on Article 26(1) ECT to ascertain the meaning of '*issues in dispute*' clarifies the scope of Article 26(6) ECT significantly. Indeed, Article 26(1) ECT refers to disputes '*which concern an alleged breach of an obligation* [...] *under Part III*' of the ECT. This leads to the conclusion that Article 26(6) ECT only contains a choice of law rule for the *merits* of the dispute, and not for the jurisdictional assessment. The Tribunal notes that the arbitral tribunal in *Vattenfall v. Germany* reached the same conclusion,[147] and so did the tribunal in *Sevilla Beheer v. Spain*,[148] on which the Claimants rely to challenge the relevance of the *Komstroy* Judgment.[149]

158. For present purposes, this conclusion means that the Parties have not agreed on the law applicable to jurisdictional matters under Article 26(6) ECT. The agreement of the Parties on the arbitration rules applicable to the present proceedings, *i.e.*, the SCC Rules, does not assist in the resolution of this question, either. Indeed, as rightly noted by the Claimants, Article 22 SCC Rules concerns the law applicable to the merits of the dispute, as it has been noted by the Tribunal in Procedural Order No. 1, paragraph 4.

*The law applicable to the Tribunal's jurisdiction*

159. Absent an explicit or implicit choice of law in the ECT or the SCC Rules, the Tribunal must then ascertain the law applicable to its jurisdiction, taking as a starting point Article 26 ECT. This was also the position taken by the *Vattenfall* tribunal, which held that: '*In the absence of any choice of law clause for the law applicable to the Tribunal's jurisdiction, it follows that questions of the Tribunal's jurisdiction must be answered under the terms of the ECT itself, and in particular Article 26 thereof.*'[150]

160. However, considering Article 26 ECT as the starting point for the Tribunal's determination does not mean that it is the only provision relevant for jurisdictional purposes. Other provisions of the

---

[147] *Vattenfall AB e.a. v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 121, **Exh. CL-215a**

[148] *Sevilla Beheer B. V. et al. v. Spain*, ICSID Case No. ARB/16/27, Decision on Jurisdiction, Liability and the Principles of Quantum, 11 February 2022, para. 620, **Exh. CL-310.**

[149] Claimants' Additional Observations 2022, p. 18.

[150] *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, 31 August 2018, para. 124, **Exh. CL-215a.**

ECT and of international law, whether customary or treaty law, may also be relevant and applicable. Arbitral tribunals constituted under the ICSID Convention likewise routinely rely on such Convention, particularly – but not only – on its Article 25, as part of the law applicable to the determination of jurisdiction. Such was the case of the arbitral tribunals in *Electrabel v. Hungary*[151] and *Vattenfall v. Germany*,[152] which both operated under the ICSID Convention, and which both Parties in this arbitration have extensively quoted in their pleadings. Similarly, the tribunal in *Sevilla Beheer v. Spain*, which also operated under the ICSID Convention, reasoned that the jurisdiction was to be determined under Article 26 ECT, but it also relied on Article 25 of the ICSID Convention.[153]

161. The reasoning of these tribunals, as well as of some others referred to by the Parties for several purposes in their pleadings, is also noteworthy to highlight a significant difference between ICSID proceedings and arbitration proceedings such as the present one. As noted by the arbitral tribunal in *Electrabel v. Hungary*: '*this ICSID arbitration does not have its seat or legal place of arbitration in Hungary or elsewhere in the European Union. Such an arbitral seat could trigger the application of the lex loci arbitri and give rise to the jurisdiction of the local courts in regard to the arbitral process, including challenges to the award*' (emphasis added).[154] Similarly, in *Vattenfall v. Germany*, addressing specifically the implications of the *Achmea Judgment*, the arbitral tribunal observed that: '*In contrast, in cases where the investor opts for another forum, such as an ad hoc UNCITRAL arbitration or arbitration under the SCC Rules, that tribunal's jurisdiction may be circumscribed by the local arbitration law of the place of arbitration*' (emphasis added).[155]

162. This observation is relevant for the present case, in which the Claimants could have opted for an ICSID arbitration under Article 26(4)(a)(i) ECT, given that both Denmark and Spain are – and were at the time the arbitration was commenced – parties to the ICSID Convention. The Claimants opted instead to conduct the proceedings under the SCC Rules and, upon the Claimants' proposal in a letter dated 21 October 2016, the seat of the arbitration was set in Stockholm.[156] Both Parties agree

---

[151] *Electrabel S.A. v. Republic of Hungary*, ICSID case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 3.46, **Exh. RL-2; CL-141.**

[152] *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 161 *et seq.*, **Exh. CL-215a.**

[153] *Sevilla Beheer B. V. et al. v. Spain*, ICSID Case No. ARB/16/27, Decision on Jurisdiction, Liability and the Principles of Quantum, 11 February 2022, para. 626, **Exh. CL-310.**

[154] *Electrabel S.A. v. Republic of Hungary*, ICSID case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 4.122, **Exh. RL-2; CL-141.**

[155] *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 127, **Exh. CL-215a.**

[156] Decision of the SCC Board, 15 December 2016; Claimants' Comments regarding Respondent's Answer, para. 15, **Exh. C -153.**

36

that this determination of the seat attracts the application of Swedish arbitration law, particularly the SAA, as the applicable *lex arbitri*.[157]

163. In point of fact, the application of this *lex arbitri* and the control exercised by the Swedish courts was one of the considerations for which the Claimants opted for a SCC arbitration in Stockholm. As noted in the aforementioned letter of 21 October 2016: '*The reference in Article 26 (4) (c) of the ECT to SCC arbitration at Stockholm has, at least impliedly, also <u>granted to Claimants the advantages of the pertinent lex arbitri, i.e. the Swedish Arbitration Act as the law governing the arbitral proceedings which take place in Sweden</u>*' (emphasis added).[158]

164. The Claimants now argue that the *lex arbitri* is only relevant to govern the arbitral proceedings *stricto sensu*,[159] although they admit that it also governs other matters such as annulment and set aside proceedings before Swedish courts.[160] Importantly, however, the *lex arbitri* may also have implications as the law applicable to jurisdictional matters. These implications have also been noted in the aforementioned quotes from the decisions in *Electrabel* and *Vattenfall*.

165. Specifically, pursuant to Section 48 SAA: '*Where an arbitration agreement has an international connection, the agreement shall be governed by the law agreed upon by the parties. <u>Where the parties have not reached such an agreement, the arbitration agreement shall be governed by the law of the country in which, by virtue of the agreement, the proceedings have taken place or shall take place</u>*' (emphasis added). As the Parties have not explicitly agreed on the law governing the arbitration agreement and neither the ECT nor the SCC Rules, to which the Parties have agreed, determines the law applicable to the arbitration agreement, it follows that, pursuant to Section 48 SAA, Swedish law, i.e. the law of the seat, is applicable to the determination of jurisdictional matters.

166. The selection of the seat in Sweden, an EU Member State, also attracts the application of EU law, which is part of the law in force in every EU Member State, including Sweden. As noted by the CJEU Grand Chamber in the *Achmea Judgment*, where the underlying arbitration had its seat in Germany: '[g]*iven the nature and characteristics of EU law [...] that law must be regarded both as forming part of the law in force in every Member State and as deriving from an international agreement between the Member States*'.[161] This conclusion has been confirmed by the CJEU Grand Chamber in the *Komstroy Judgment*, where the seat of the arbitration was in France: '*in any event, it should be noted that the parties to the dispute [...] chose [...] to submit that dispute to an ad hoc*

---

[157] Respondent's Post-Hearing Brief, paras. 3-6 and 17-19; Claimants' Post-Hearing Brief, para. 10.
[158] Claimants' Comments regarding Respondent's Answer, para. 20, **Exh. C-152.**
[159] Claimants' Post-Hearing Brief, paras. 14 and 20.
[160] Claimants' Post-Hearing Brief, para. 15.
[161] *Slowakische Republik (Slovak Republic) v. Achmea BV*, CJEU (Grand Chamber), Case C-284/16, Judgment, 6 March 2018, para. 41, **Exh. CL-151; CL-215; RL-105; RL-160.**

*tribunal [...] and agreed [...] that the seat of the arbitration should be established in Paris. That choice, made freely by those parties, has the effect of rendering applicable French law as the lex fori to the dispute [...] under the conditions and within the limits laid down by that law. [...] EU law forms part of the law in force in every Member State. Consequently, the establishment of the seat of arbitration on the territory of a Member State, in this case France, entails, for the purposes of the proceedings brought in that Member State, the application of EU law, compliance with which the court hearing the case is obliged to ensure in accordance with Article 19 TEU*.[162]

167. However, that is not the end of the matter. International and domestic law, and also EU law, whether seen as part of one or the other, apply to the extent relevant to determine the issues arising in a case. In the present proceedings, the pleadings of the Parties require for instance, already at the jurisdictional stage, consideration of several questions that call for the application of more than one body of law. A non-exhaustive list of such possible questions includes the nationality of the Claimants, the capacity of the Parties to agree to arbitration, the validity and scope of the consent to arbitration given by the Respondent, the scope and effects of the acceptance of the offer by the Claimants, and whether certain measures adopted by the Respondent should be considered as taxation measures under domestic law, among others.

168. Furthermore, it is the peculiarity of investment treaty arbitration to oppose private persons (whether physical or legal) and States, a feature which requires the determination, at the jurisdictional stage and beyond, of a range of legal questions that cannot be fully subsumed under domestic law alone. Swedish arbitration law can only to some extent deal with the matters relevant for the determination of jurisdiction in the present case. Some other matters must necessarily be analysed under international law, including – potentially – the interpretation under the law of treaties of certain provisions, such as Articles 21, 25 and 26 ECT, which have been raised in the Respondent's jurisdictional and admissibility objections.

169. In conclusion, the Tribunal considers that both under international law, in the exercise of its *compétence de la compétence*, and under the applicable *lex arbitri*, it is required to take as a starting point Article 26 ECT and then consider and, if necessary, apply other rules of both international law and domestic law, as relevant for each question.

*EU Law and jurisdiction*

170. The main point of disagreement between the Parties at this stage concerns the application of EU law to determine jurisdictional matters. The Tribunal considers that the relevance and application

---

[162] *Republic of Moldova v. Komstroy LLC, successor in law to the company Energoalians*, CJEU (Grand Chamber) Case C-741/19, Judgment, 2 September 2021, paras. 32-34, **Exh. CL-316; RL-164.**

of EU law to certain questions arising in these proceedings is inescapable, regardless of whether such law is characterised as part of international law or as part of domestic law.

171. The reasoning of the arbitral tribunal in *Electrabel v. Hungary* on this point is apposite here: '*EU law has a multiple nature: <u>on the one hand, it is an international legal regime; but on the other hand, once introduced in the national legal orders of EU Member States, it becomes also part of these national legal orders</u>*' (emphasis added).[163] The *Electrabel* tribunal concluded that '*EU law as a whole is part of the international legal order*'[164] on the grounds that '*it would be artificial to categorise, as an international legal rule, Article 87 EC (precluding 'any aid granted by a Member State or through State resources…incompatible with the internal market'), and refuse that same status to the necessary implementation of that international rule by the non-national organ created by the same EU treaty [ … ] For this international rule to be translated into legal obligations binding on EU Member States, decisions have to be taken by the European Commission.*'[165] The tribunal thus considered EU law as a whole to be applicable as international law, including for jurisdictional purposes, but it concluded that there was '*no relevant inconsistency between EU law, the ECT and the ICSID Convention in the present case, as regards both the merits of the Parties' dispute and the Tribunal's jurisdiction to decide this dispute.*'[166]

172. With respect to the application of EU law as part of domestic law, the *Electrabel* tribunal noted that '*when it is not applied as international rules under the ECT, EU law must in any event be considered as part of the Respondent's national legal order, i.e. to be treated as a 'fact' before this international tribunal.*'[167] Irrespective of whether or not considering domestic law as a 'fact' is an appropriate approach in the specific context of ICSID arbitration proceedings, a context which the arbitral tribunal in *Electrabel* repeatedly recalled,[168] it is certainly not so under Section 48 SAA in respect of the law governing the 'arbitration agreement'. EU law is unquestionably part of the Swedish legal system, as of that of other EU Member States, and it therefore has a bearing on some questions arising under the SAA, such as matters of arbitrability, public policy, and validity of the arbitration agreement under Sections 33 and 34 SAA. It must therefore be applied to determine the jurisdiction of the Tribunal in the present case.

---

[163] *Electrabel S.A. v. Republic of Hungary*, ICSID case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 4.118, **Exh. RL-2; CL-141.**

[164] *Electrabel S.A. v. Republic of Hungary*, ICSID case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 4.122, **Exh. RL-2; CL-141.**

[165] *Electrabel S.A. v. Republic of Hungary*, ICSID case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 4.123, **Exh. RL-2; CL-141.**

[166] *Electrabel S.A. v. Republic of Hungary*, ICSID case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 5.33, **Exh. RL-2; CL-141.**

[167] *Electrabel S.A. v. Republic of Hungary*, ICSID case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 4.127, **Exh. RL-2; CL-141.**

[168] *Electrabel S.A. v. Republic of Hungary*, ICSID case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 4.112 and 4.153, **Exh. RL-2; CL-141.**

## Section C.    General objection to jurisdiction *ratione personae*

### A.    The Respondent's arguments

173. The Respondent's first argument is that the wording of Article 26(1) ECT excludes any case where an investor of one EU Member State has a dispute with another EU Member State in relation to its investment in that State because, pursuant to Article 26 ECT, a dispute must be between a '*Contracting Party*' and an '*investor of another Contracting Party*'.[169]

174. The Respondent contends that the Tribunal does not have jurisdiction *ratione personae* as the EU itself is also a '*Contracting Party*' to the ECT, and both Denmark and Spain are EU Member States. Accordingly, the dispute does not involve an investor who comes from the territory of *another* Contracting Party, as required by Article 26 ECT.[170]

175. The Respondent also contends in its Rejoinder on the Merits that the Claimants' double Danish and European nationality excludes this dispute from the jurisdiction of the Tribunal. In particular, the Respondent argues that Article 26(1) ECT requires a diversity of nationalities in arbitration procedures.[171] The Respondent makes this argument by analogy with the diversity requirement in Article 25(2) ICSID Convention.[172] Because both Spain and Denmark are EU Member States, the Denmark-based Claimants hold both Danish and European nationality under Article 20 TFEU.[173] Therefore, Claimants cannot be considered foreign investors in Spain as there is no diversity of nationality, Denmark and Spain sharing the European nationality.

### B.    The Claimants' arguments

176. The Claimants disagree with the Respondent's argument that they are not investors from *'another Contracting Party'* for the purposes of Article 26(1) ECT merely because both Spain and Denmark are EU Member States.

177. The Claimants argue that the jurisdictional requirement *ratione personae* in Article 26(1) ECT is met because the Respondent is a '*Contracting Party*' to the ECT and, as Danish nationals, the Claimants are '*Investor*[s] *of another Contracting Party*' to the ECT, *i.e.* Denmark.[174]

---

[169] Respondent's Counter Memorial, para. 55; Respondent's Rejoinder, para. 71.
[170] Respondent's Counter Memorial, para. 57.
[171] The Respondent has also included references to Art. 25.2 ICSID Convention, likely only for guidance purposes as this is not an ICSID proceeding, Respondent's Rejoinder, para. 78.
[172] Respondent's Rejoinder, para. 78.
[173] Respondent's Rejoinder, para. 75 *et seqq.*; Article 20 TFEU, **Exh.RL-1**: '*Citizenship of the Union is hereby established. Every person holding the nationality of a Member State shall be a citizen of the Union. Citizenship of the Union shall be additional to and not replace national citizenship*'.
[174] Claimants' Reply, para. 56 *et seqq.*, **Exh. CL-1**.

178. In support of their interpretation of Article 26(1) ECT, the Claimants rely on Article 31(1) of the VCLT, which provides that: *'A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose'.*[175]

179. According to the Claimants, relying, amongst others, on *Kruck v. Spain*, the '*ordinary meaning*' of the terms '*an Investor of another Contracting Party*' in Article 26(1) ECT does not, within an intra-EU context, exclude investors from EU Member States. Rather, if one considers the definition of '*Contracting Party*' in Article 1(2) ECT,[176] each EU Member State in relation to another EU Member State is '*another Contracting Party'*. It follows that investors from one EU Member State investing in another EU Member State are '*Investors of another Contracting Party'* under Article 26(1) ECT.[177]

180. The Claimants further argue that nothing in the 'context' of Article 26(1) ECT suggests that '*because the European Union, as a REIO, also ratified the ECT, the Member States ceased to be distinguishable Contracting Parties'.*[178]

181. The Claimants also rely on the definition of 'Area' in Article 1(10) ECT to support their position. They say that the definition of 'Area' must be read in the context of Article 26(1) and, relying on the arbitral decision in *Charanne v. Spain*, they argue that the territory of the EU does not replace the territories of the Member States. The Claimants further note that this interpretation was confirmed in *Isolux v. Spain*, where the Respondent raised the same argument.[179]

182. Rather, while the EU is a Contracting Party to the ECT and may be sued for matters within its scope of activity, its Member States have not ceased to be '*Contracting Parties*' as a result. To this end, the concept of '*Area*' in Article 1(10) ECT refers to both the territory of the Contracting States and the EU territory, meaning that an investment may still be made in the 'Area' of Respondent (Spain), and that a claim may be brought against a respondent Member State that is not the EU in relation to an investment in response to that State exercising its sovereignty in its Area.[180] Therefore, in referring to investments made '*in the territory*' of a Contracting Party, Article 26(1)

---

[175] Claimants' Reply, para. 58, **Exh. RL-10**.
[176] '*'Contracting Party' means a state or Regional Economic Integration Organisation which has consented to be bound by this Treaty and for which the Treaty is in force'*, **Exh. CL-1**.
[177] Claimants' Reply, paras. 59, 60, **Exh. CL-1**; Claimants' Additional Observations 2022, pp.10 and 11; *Matthias Kruck et al. v. Kingdom of Spain*, ICSID case No. ARB/15/23, Decision on Jurisdiction and Admissibility, 19 April 2021, para. 288; **Exh. CL-314**.
[178] Claimants' Reply, para. 62; **Exh. CL-1**.
[179] Claimants' Reply, para. 68; **Exh. CL-1**; *Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain*, SCC Arbitration Case No. V2013/153, Award of 12 July 2016, paras. 634-635, **Exh. RL-4**.
[180] Claimants' Reply, para. 70; *Charanne BV and Construction Investment S.A.R.L. v. Spain*, SCC Arb. No. 062/2012, Award, 21 January 2016, para. 429, **Exh. RL-49**.

ECT encompasses both possibilities. For claims against an EU Member State, it refers to the territory of a State, whereas for claims brought against the EU as an ECT Contracting Party, it refers to the territory of the EU. Which territory is relevant then depends on the claims which are brought.[181]

## C. The Commission's *Amicus Curiae* Brief

183. For the European Commission, Article 26 ECT does not apply to intra-EU investment disputes. It notes that the ECT, as well as its predecessor, the European Energy Charter, were from the outset EU projects whereby the EU and the Member States acted as a single contracting party. Consequently, for the European Commission, it was clear from the very beginning that the ECT was not designed to apply amongst EU Member States for matters where competence was transferred to the EU.[182]

184. The European Commission also refers to its Declaration at the time the ECT was concluded, according to which the European Communities and a Member State are to decide among themselves who is the defendant in a case where both are sued under Article 26 ECT by an investor from a third State. It considers this Declaration as evidence that only investors from third countries – but not from another Member State – were seen as entitled to bring claims against a Member State under the ECT.[183]

## D. The Tribunal's decision

185. The Tribunal does not agree with the Respondent's contention that the investment dispute between the Danish Claimants and the Kingdom of Spain is not a dispute between '*a Contracting Party*' and '*an investor of another Contracting Party*', as required by Article 26(1) ECT.

186. The fact that the EU itself, as a REIO, is also a Contracting Party to the ECT and that Denmark and Spain are EU Member States, does not affect the reality that Denmark and Spain are also Contracting Parties to the ECT in their own right.

187. Under Article 31(1) VCLT, the terms '*Contracting Party*' and '*investor of another Contracting Party*' in Article 26(1) ECT have to be interpreted '*in accordance with the ordinary meaning to be given to the terms*'. In this light, there is nothing in Article 26(1) ECT that prevents Denmark and Spain as EU Member States from constituting a '*Contracting Party*' under the ECT in respect of each other. In this regard, the Tribunal takes notes of the similarly-minded decision of the arbitral tribunal in *Kruck v. Spain* which stated: "*But nothing in the wording of ECT Article 26 points to*

---

[181] Claimants' Reply, para. 70; **Exh. CL-1;** *Charanne BV and Construction Investment S.A.R.L. v. Spain*, SCC Arb. No. 062/2012, Award, 21 January 2016, para. 429, **Exh. RL-49.**
[182] Amicus Curiae Brief, paras. 9-10.
[183] Amicus Curiae Brief, paras. 12-13.

*the conclusion that because the EU is itself a Contracting Party,* [Member States] *cease to be distinct Contracting Parties vis-à-vis another.*"[184]

188. The Tribunal is not convinced by the argument that Article 26 ECT does not apply to intra-EU investment disputes because the ECT, as well as its predecessor, the European Energy Charter, were from the outset EU projects whereby the EU and the Member States acted as a single Contracting Party. Both projects served several interests, including but not limited to those of the EU and its Member States. Moreover, although the EU and its Member States certainly coordinated their positions, each of them also continued to act within their own sphere.

189. Even if the arguments of the Respondent regarding the application of EU law in the relations among EU Member States were taken at face value, that would not mean that EU Member States cease to be ECT Contracting Parties with respect to each other for a range of matters governed by the ECT. This conclusion is without prejudice to the possibility that EU law, as a key component of the network of legal relations among EU Member States, may exclude reliance on the ECT for some specific aspects in such relations.

190. The coincidence that, under Article 20 TFEU, the Danish investors have, besides the Danish nationality, also an EU nationality, which they happen to share with Spanish nationals, does not erase their Danish nationality.

191. Nor is it relevant that, to define the territorial application of the ECT in the EU, under Article 1(10) ECT, the EU has an '*Area*' which encompasses the territories of the EU Member States. Indeed, this does not mean that each EU Member State, for the purpose of the ECT, has ceased to have its own territory. The Tribunal agrees with the conclusions of the arbitral tribunals in *Charanne v. Spain* and *Isolux v. Spain*, according to which the territory of the EU does not replace the territory of the EU Member States.[185]

192. When the ECT was concluded, the EU was aware that an investor from '*another*' ECT Contracting Party could potentially bring a claim against both the EU and an EU Member State. In the *Statement submitted by the European Communities to the Secretariat of the Energy Charter pursuant to Article 26(3)(b)(ii) of the Energy Charter Treaty,* which was made at the time of ratification of the ECT, the then European Communities expressly stated that '[t]*he Communities and the Member*

---

[184] *Matthias Kruck et al. v. Kingdom of Spain*, ICSID case No. ARB/15/23, Decision on Jurisdiction and Admissibility, 19 April 2021, para. 288; **Exh. CL-314.**

[185] *Charanne BV and Construction Investment S.A.R.L. v. Spain*, SCC Arb. No. 062/2012, Award, 21 January 2016, para. 429, **Exh. RL-49,** and *Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain*, SCC Arbitration Case No. V2013/153, Award of 12 July 2016, paras. 633-636, **Exh. RL-4.**

*States will, if necessary, determine among them who is the respondent party to arbitration proceedings initiated by an Investor of another Contracting Party.*'[186]

193. This Statement suggests that, in addition to the EU Area, the territory of an EU Member State remains an Area for purposes of Article 1(10) ECT, and the two Areas coexist when a claim is brought against both the EU and an EU Member State. The content of the notion of '*Area*' then depends on who the defendant is: the entire EU territory is the '*Area*' whenever a claim is brought against the EU for matters within its scope of activity within the EU; the specific national territory of an EU Member State is the '*Area*' whenever a claim is brought against that Member State for alleged breaches of the ECT within its territory.

194. In the present case, the claims concern alleged breaches of the ECT by Spain. Consequently, the relevant '*Area*' where such alleged breaches occurred is the territory of the Kingdom of Spain. The '*Area*' of Denmark, where the Claimants are established, is clearly distinct from the '*Area*' of Spain. Consequently, the Danish Claimants are '*investors from another Contracting Party*' as required by Article 26(1) ECT.

195. As noted earlier, however, this conclusion is without prejudice to the possibility that reliance on Article 26 ECT may be precluded in some aspects of the relations among EU Member States, despite their capacity as ECT Contracting Parties.

## Section D.    General objection to jurisdiction *ratione voluntatis*

196. Aside from the requisite jurisdiction *ratione personae*, the Parties have extensively argued as to whether or not Article 26 ECT provides the requisite consent for the Tribunal's jurisdiction. Their arguments are complex and address different legal issues from the perspectives of both the ECT and EU law. Fleshing out these two perspectives and the emphasis placed by each Party on them is useful to provide context of the Tribunal's analysis of the objection to jurisdiction *ratione voluntatis*. The Tribunal has carefully considered all the arguments made by the Parties in their written and oral submissions. As before, the following summary of the Parties' positions is not intended to be exhaustive but only to identify the main questions raised and to place the decision of the Tribunal in their context.

---

[186] Transparency Document, Annex ID, p. 6, **Exh. EC-6.**

### A. The Respondent's arguments

### 1. *Lack of jurisdiction under EU law*

#### (a) *EU Law is applicable to the dispute*

197. The dispute before the Tribunal concerns investments made by two companies, established in one of the EU Member States, *i.e.* Denmark, in another EU Member State, *i.e.* Spain. According to the Respondent, this dispute affects one of the four fundamental freedoms of the EU, *i.e.* free movement of capital between Member States.

198. Moreover, the dispute involves the granting of subsidies, which the European Commission has qualified as State aid. The Respondent observes that, in the distribution of powers between the Member States and the EU, the European Commission has the exclusive competence to decide on the lawfulness of State aid.[187] The European Commission, so the Respondent observes, has already decided that the incentives provided under RD 661/2007 and 1578/2008 constitute State aid.[188] The Respondent adds that the Claimants have not challenged this Decision before the CJEU.

#### (b) *The EU legal system is autonomous*

199. The Respondent contends that EU law is an autonomous legal system with its own legislative, executive and judicial institutions. The protection provided by EU law rests on a complete system of judicial remedies to guarantee the correct application of EU law, granted by the national courts of the Member States and the CJEU.[189]

200. The Respondent observes that the harmonised EU Internal Energy Market and intra-EU investments in the energy sector are thus supplemented by a system of institutional and judicial protection which provides the appropriate means and legal actions without distinguishing between investors from one Member State or another.[190] Moreover, the Respondent emphasises that since the entry into force of the Treaty of Lisbon, the EU has exclusive competence over foreign direct investment.[191]

201. The Respondent submits that the fact that the ECT has not only been entered into by the EU, but also by the EU Member States, does not contradict the principle of autonomy of EU law.[192] For the intra-EU relations, the ECT has to be integrated with EU law. As noted by the CJEU in the

---

[187] Respondent's Rejoinder, paras. 88 and 96.
[188] Respondent's Rejoinder, para. 98 *et seqq.*; Commission Reply of 29 February 2016 on Petition No. 2520/2014, **Exh. R-160**; State Aid Decision of 10 November 2017 (SA 40348(2015/NN), para. 156, **Exh. RL-89**.
[189] Respondent's Rejoinder, para. 72; Hearing (1), Respondent, Slides 13-14; Hindelang Opinion, paras. 24-31.
[190] Respondent's Rejoinder, para. 84.
[191] Respondent's Additional Comments 2022, para. 17.
[192] Respondent's Rejoinder, paras. 153-162.

*Komstroy Judgment*, the ECT is itself part of EU law[193] and, when signing and applying the ECT, Member States have to respect the principles and obligations of the EU legal order.[194]

202. The CJEU has exclusive jurisdiction to examine how the provisions of the ECT apply in relation to the commitments between Member States under EU law as a whole, *i.e.* whether actions of the Member States – including when based on ECT provisions – are compatible with other aspects of EU law. The CJEU is thereby entitled to examine the ECT's binding effect on Member States within the EU.

203. The Respondent concludes that an arbitral tribunal cannot rule on the rights of a European investor in the Internal Market. Such interference by an arbitral tribunal in the EU legal order and in the EU fundamental freedoms would be incompatible with EU law. In support of this view, the Respondent refers to the CJEU's Opinion 1/91 regarding the Agreement to create a European Economic Area.[195]

204. The Respondent also refers to the *Achmea Judgment*,[196] which it considers very clear on the matter and which excludes any further detailed consideration of the Advocate General's contrary opinion. Indeed, for the Respondent, the *Achmea Judgment* implies that, when Member States submit disputes to arbitral tribunals, which are not part of the EU court system and cannot request preliminary rulings from the CJEU on the interpretation of the EU Treaties, the autonomy of EU law would be undermined. The CJEU has maintained and further clarified this position with respect to arbitral tribunals hearing disputes arising from the ECT in the *Komstroy Judgment*[197] and with respect to domestic laws admitting *ad hoc* arbitration agreements between an EU Member State and an investor of another EU Member State in the *PL Holdings Judgment*.[198] Both subsequent decisions confirm the underlying reasoning of the *Achmea Judgment* for the issues and contexts they discuss.[199]

---

[193] Respondent's additional comments 2022, para. 17; *Republic of Moldova v. Komstroy LLC, successor in law to the company Energoalians*, CJEU (Grand Chamber) Case C-741/19, Judgment, 2 September 2021, para. 23-27, **Exh. CL-316; RL-164.**

[194] Hearing (1), Respondent, Slide 12.

[195] Respondent's Counter-Memorial, para. 83 *et seqq.*, with reference to Opinion 1/91 of 14 December 1991 issued by the Court of Justice of the European Union regarding the 'Agreement to Create a European Economic Area' (EEA), **Exh. R-1.**

[196] *Slowakische Republik (Slovak Republic) v. Achmea BV,* CJEU (Grand Chamber), Case C-284/16, Judgment, 6 March 2018, **Exh. CL-151; CL-215; RL-105; RL-160.**

[197] *Republic of Moldova v. Komstroy LLC, successor in law to the company Energoalians*, CJEU (Grand Chamber) Case C-741/19, Judgment, 2 September 2021, para. 66, **Exh. CL-316; RL-164.**

[198] *Republiken Polen (Republic of Poland) v. PL Holdings Sarl*, CJEU (Grand Chamber) Case C-109/20, Judgment, 26 October 2021, para. 65, **Exh. RL-168.**

[199] *Republic of Moldova v. Komstroy LLC, successor in law to the company Energoalians*, CJEU (Grand Chamber) Case C-741/19, Judgment, 2 September 2021, para. 64, **Exh. CL-316; RL-164**; *Republiken Polen (Republic of Poland) v. PL Holdings Sarl*, CJEU (Grand Chamber) Case C-109/20, Judgment, 26 October 2021, para. 65, **Exh. RL-168.**

46

205. The starting point of the *Achmea Judgment*,[200] according to the Respondent, is that the autonomy of the Union has to be ensured by the EU judicial system, with at its core the possibility to refer questions for a preliminary ruling to the CJEU under Article 267 TFEU.[201] The Tribunal, the creation of which rests on Article 26 ECT, is not part of the EU judicial system and has no possibility to refer questions for preliminary rulings to the CJEU under Article 267 TFEU.

206. The Respondent concedes that the *Achmea Judgment*, in paragraphs 57-58, states that an international agreement which has established a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, is not in principle incompatible with EU law when the autonomy of the EU legal order is not jeopardized.[202] Such a possibility has been confirmed by the CJEU in its *Opinion 1/17*[203] and in the *Komstroy Judgment*.[204] However, such international agreements would only be compatible with EU law '*provided that the autonomy of the EU and its legal order is respected*'. International agreements providing for their own specific dispute settlement mechanisms, which do not respect the autonomy of the EU and its legal order, are incompatible with EU law.

207. For the Respondent, in the present proceedings, the dispute involves the free movement of capital within the EU and the granting of State aid. Because the Tribunal cannot refer questions concerning EU law or the interpretation and application of the ECT in intra-EU disputes for a preliminary ruling to the CJEU, the Tribunal's jurisdiction is incompatible with the autonomy of EU law.[205]

208. The Respondent further refers to Article 344 TFEU pursuant to which: '*The Member States undertake not to submit a dispute concerning the interpretation and application of the Treaties to any method of settlement of disputes other that those provided for therein*'. The Respondent observes that it follows from Article 344 TFEU and the case law of the CJEU, that a Member State is not entitled to remove intra-EU disputes involving the interpretation or application of EU law from the judicial system organised by the Union.[206]

209. Article 344 TFEU applies regardless of whether the Member State's counterparty is another Member State or a private investor from such Member State.[207] Unlike a provision such as Article

---

[200] *Slowakische Republik (Slovak Republic) v. Achmea BV,* CJEU (Grand Chamber), Case C-284/16, Judgment, 6 March 2018, paras. 35-37, **Exh. CL-151; CL-215; RL-105; RL-160**.

[201] *Slowakische Republik (Slovak Republic) v. Achmea BV,* CJEU (Grand Chamber), Case C-284/16, Judgment, 6 March 2018, para. 37, **Exh. CL-151; CL-215; RL-105; RL-160**.

[202] Respondent's Comments, para. 27.

[203] *Opinion 1/17 of the Court (EU-Canada CET Agreement)*, 30 April 2019, EU:C:2019:341, para. 106, **Exh. CL-315; RL-161**.

[204] *Republic of Moldova v. Komstroy LLC, successor in law to the company Energoalians*, CJEU (Grand Chamber) Case C-741/19, Judgment, 2 September 2021, para. 61, **Exh. CL-316; RL-164.**

[205] Respondent's Comments, para. 28.

[206] Respondent's Comments, paras. 27-29; Respondent's Additional Comments 2022, para. 41.

[207] Respondent's Comments, paras. 21-22.

273 TFEU which expressly states that it applies '*between Member States*', the wording of Article 344 TFEU does not contain this limitation, and it therefore concerns also investment disputes between an EU Member State and an investor of another EU Member State.[208] This has been confirmed by the CJEU in the *Achmea Judgment* and in the *Komstroy Judgment* to which Respondent refers.[209] Article 344 TFEU prevents Spain from referring any dispute with an investor concerning the application or interpretation of EU law, including one relating to the Internal Electricity Market, to international arbitration[210] because this method of dispute settlement would not guarantee the autonomy of EU law, as required under Article 344 TFEU.[211]

210. The Respondent affirms that the impact of the *Achmea Judgment*, which concerned an intra-EU case relating to the Bilateral Investment Treaty ('**BIT**') between The Netherlands and the Slovak Republic ('**Netherlands-Slovakia BIT**'), cannot be limited to BITs but also applies to multilateral investment treaties such as the ECT.[212] Indeed, it is the circumvention of the judicial system established by the EU Treaties by a whole category of disputes, whether on the basis of a BIT or of a multilateral investment treaty, that violates fundamental EU law principles and undermines the autonomy of the EU.[213]

211. In this context, the Respondent observes that the CJEU refers in the *Achmea Judgment* to '*a provision in an <u>international agreement</u> concluded between Member States*' that provides for investor-State arbitration. This wording clearly includes treaties such as the ECT, if applied in an intra-EU context.[214] The Respondent maintains that, if the CJEU had wanted to limit its ruling to bilateral treaties between the EU Member States, it could have said so explicitly. Yet, according to the Respondent, the CJEU did precisely the opposite. Indeed, the *question* from the German *Bundesgerichtshof* in the *Achmea* case referred to '*a provision in a <u>bilateral investment protection agreement</u>*', but the CJEU formulated its *judgment* in wider terms, referring to '*a provision in <u>an international agreement</u> concluded between Member States*'. Thus, the CJEU made a conscious decision to give a ruling which is not limited to bilateral investment treaties between the Member States but also concerns the intra-EU application of the ECT.[215]

---

[208] Respondent's Comments, paras. 21-22.
[209] Respondent's Comments, paras. 21-22; Respondent's Additional Comments 2022, paras. 41 and 47; Hindelang Opinion, paras.39, 50.
[210] Respondent's Counter-Memorial, para. 82.
[211] Respondent's Rejoinder, para. 142.
[212] Respondent's Rejoinder, para. 140; *Slowakische Republik (Slovak Republic) v. Achmea BV*, CJEU (Grand Chamber), Case C-284/16, Judgment, 6 March 2018, para. 60, **Exh. CL-151; CL-215; RL-105; RL-160**. For the Respondent, the English version of *Achmea* stated '<u>*such as* Article 8 of the BIT</u>' (emphasis added), which shows even more clearly that the CJEU did not intend to limit the reach of *Achmea* to only encompass the relevant BIT.
[213] Respondent's Comments, para. 23.
[214] Respondent's Rejoinder, paras. 143-144.
[215] Respondent's Comments, para. 29.

212. The Respondent observes that any doubt regarding the relevance of the *Achmea Judgment* for arbitration proceedings based on Article 26 of the ECT has now been removed by the *Komstroy Judgment*, where the CJEU Grand Chamber reproduced the holdings made in *Achmea* and expressly noted that '*it must be concluded that Article 26, paragraph 2, letter c), of the TEC [i.e. the ECT] must be interpreted in the sense that it is not applicable to the disputes between a Member State and an investor from another Member State in relation to an investment made by the latter in the first Member State*'[216]

213. The Respondent concludes that the principles of the *Achmea Judgment* apply to the ECT, whenever the dispute requires the application or interpretation of EU law and may therefore affect the autonomy of the EU legal system.[217] For the Respondent, the underlying rationale of the *Achmea* Judgment extends to the ECT, as confirmed in the *Komstroy Judgment*, because the conditions and characteristics remain the same with respect to the issue at stake, which moreover raises matters of EU public policy.[218]

214. Referring to the decision of the arbitral tribunal in *Vattenfall v. Germany*, the Respondent points out that the CJEU's interpretation of Articles 267 and 344 TFEU in the *Achmea Judgment* is part of EU law, and therefore it is binding on all instances where these provisions have to be interpreted and applied.[219] The Respondent submits that the arbitration clause of the ECT excludes from the jurisdiction of the EU judicial system the dispute between an investor of an EU Member State and an EU Member State, and that it is therefore inconsistent with the autonomy of EU law.

*(c)  Primacy of EU Law*

215. The Respondent notes that the primacy of EU law has been recognised since the early years of European integration. This primacy has been established by leading precedents such as *Van Gend & Loos*[220] and *Costa v. Enel*,[221] and it is confirmed by the conclusion of the Lisbon Treaty (TFEU).[222] The ECT, as a treaty entered into by the EU as well as by the Member States, is part of the EU legal order, and it is therefore subject to the primacy of EU law.[223]

---

[216] Respondent's Additional Comments 2022, paras. 27-28, quoting *Slowakische Republik (Slovak Republic) v. Achmea BV*, CJEU (Grand Chamber), Case C-284/16, Judgment, 6 March 2018, para. 66, **Exh. CL-151; CL-215; RL-105; RL-160**.

[217] Respondent's Rejoinder, paras. 140-141.

[218] Hearing (1) Day 2, 4'; Respondent's Additional Comments 2022, paras. 9-49.

[219] *Vattenfall AB e.a. v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 148, **Exh. CL-215a**; Hearing (1) Day 2, 5'.

[220] *NV Algemene Transport- en Expeditie Onderneming Van Gend en Loos v. Netherlands Inland Revenue Administration*, CJEU, Case 26/62, Judgement,5 February 1963.

[221] *Flaminio Costa v. E.N.E.L.*, CJEU, Case 6/64, Judgment,15 July 1964.

[222] See Declaration 17 annexed to the Final Act of the Intergovernmental Conference which adopted the Treaty of Lisbon, **Exh. EC-17**; Hearing (1), Day 2, 27'.

[223] Hearing (1), Day 2, 16' – 17'.

216. As noted earlier in connection with the law applicable to jurisdiction, the Respondent argues that EU law as a whole (and thus not only the EU Treaties) must be regarded as part of public international law.[224] Referring to the *Achmea Judgment*[225] and to the decision in *Electrabel v. Hungary*,[226] the Respondent emphasises that the entire EU legal order, which stems from treaties that are part of international law, is itself part of international law.[227] The Respondent refers, in this connection, also to the case law of the CJEU, including *Budějovický Budvar, národní podnik v. Rudolf Ammersin GmbH*[228], as well as to the judgment of the German *Bundesgerichtshof* of 31 October 2018.[229]

217. The primacy of EU law implies that, whenever the competence of the EU over a specific matter is exclusive, Member States lose their treaty-making power.[230] For 'mixed' agreements, which cover matters within the competence of the Member States as well as of the EU, and which are signed by both, the Member States have to respect the principles and obligations of the EU legal order.[231] The fact that the EU has made use of its external competence to conclude a treaty on specific matters takes away the power of the Member States to address the same matters in intra-EU relations.[232]

218. The Respondent concludes that the EU's own intra-EU investor protection system prevails over protection granted by other international treaties. For the Respondent, as confirmed by established case law of the CJEU, Member States are not allowed to exercise rights emanating from international conventions in their internal relations, because these are subject to EU law.[233] In the relations between EU Member States, EU law takes precedence over the commitments by Member States under international agreements.

219. The Respondent observes, by reference to Article 10(8) ECT, that the ECT does not regulate 'financial assistance' granted to investments in the energy sector, while the regulation of State aid is essential for the operation of the common market within the EU.[234] It follows from the *Achmea*

---

[224] Respondent's Comments, para. 3.
[225] *Slowakische Republik (Slovak Republic) v. Achmea BV*, CJEU (Grand Chamber), Case C-284/16, Judgment, 6 March 2018, para. 1, **Exh. CL-151; CL-215; RL-105; RL-160.**
[226] *Electrabel S.A. v. Republic of Hungary*, ICSID case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, **Exh. RL-2; CL-141**
[227] Hearing (1), Day 2, 17'-19'.
[228] *Budějovický Budvar, národní podnik v. Rudolf Ammersin GmbH*, Case C-478/07, Judgment of 8 September 2009, **Exh. 14 Hindelang Opinion.**
[229] Respondent's Comments, para 7-8; German Bundesgerichtshof, 31 October 2018, **Exh. 36 Hindelang Opinion; EC-9.**
[230] Hearing (1), Respondent, slide 12.
[231] Hearing (1), Respondent, slide 12.
[232] Hearing (1), Day 2, 19'-21'.
[233] *Amicus Curiae* Brief, footnote 44: *Commission v. Austria*, Case C-147/03, 7 July 2005, para. 58, ECLI:EU:C:2005:427; *Commission v. Luxembourg*, Case C-473/93, 17 July 2014, para. 40, ECLI:EU:C:2014:2095.
[234] Respondent's Rejoinder, para. 162.

*Judgment* that the ECT, where it is incompatible with EU law, has no legal effect in intra-EU relations.[235]

220. According to the Respondent, the primacy of EU law is not affected by temporal relations between the EU Treaties and other agreements. It relies on the aforementioned judgment of the *Bundesgerichtshof* for the proposition that EU law prevails over the Netherlands-Slovakia BIT without temporal restrictions.[236] It further relies on the CJEU's *PL Holdings Judgment* with which the CJEU rejected to limit the temporal effects of its *Komstroy Judgment*.[237] For the Respondent, the primacy of EU law remains similarly unaffected by the fact that the ECT was concluded after the Treaty of Rome, establishing the European Economic Community, and the Respondent notes that, in all events, the Lisbon Treaty which redrafted the basic principles governing the EU and allocated exclusive competence over foreign direct investment to the Union was concluded after the ECT.[238]

221. For the Respondent, the Tribunal cannot assert jurisdiction over intra-EU disputes because this would imply that (i) priority would be given to the ECT regulation and protection of the energy market despite the fact that this market is regulated and protected in a far superior manner by EU law; (ii) jurisdiction over disputes with a Member State are taken away from the CJEU so that the autonomy of EU law would be at risk; and (iii) EU nationals would be denied the legal and judicial protection they enjoy under the EU legal system.[239] Moreover, according to the Respondent, such consequences would also be incompatible with the ECT's overall purpose.[240]

222. Referring to the *Achmea Judgment*, as subsequently confirmed by the *Komstroy Judgment*, the Respondent contends that it could not be deemed to have offered arbitration as a means to settle the present dispute under Article 26 ECT because: (i) the dispute before the Tribunal requires the interpretation and application of EU law, including the ECT itself, matters of foreign direct investment and State aid, which are under the Union's exclusive competence, as well as, ultimately, the fundamental freedoms of the EU[241]; (ii) the present arbitration proceedings could not respect the autonomy of EU law to the extent that the ECT would not be capable of '*guaranteeing the full application of EU legislation in all Member States and guaranteeing the judicial protection of*

---

[235] Respondent's Comments, para. 14.
[236] Respondent's Comments, para. 12. The Respondent objects to the conclusion in *Novenergia* that arbitration agreements already entered into are not affected. 'The reason for this is unclear' (Respondent's Comments, para. 45).
[237] Respondent's Additional Comments 2022, paras. 145/146.
[238] Respondent's Comments, para. 15; Respondent's Additional Comments 2022, paras. 39, 48.
[239] Respondent's Counter-Memorial, para. 91.
[240] Respondent's Counter-Memorial, paras. 91-94.
[241] Respondent's Rejoinder, para. 146 ; Respondent's Additional Comments 2022, para. 49.

*people's rights pursuant to the Law'*[242]; and (iii) the Tribunal's award would not be subject to a sufficient degree of review by a court of a Member State.[243]

223. The Respondent further notes that the autonomy and the primacy of EU law excludes the Tribunal's jurisdiction over the present dispute because, as noted by the CJEU in the *Achmea Judgment* and subsequently confirmed in the *Komstroy Judgment*, under EU law '*an international agreement cannot affect the allocation of powers fixed by the Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the [CJEU]*'. [244]The Respondent emphasises that State aid is a central issue of EU Law and falls within the exclusive powers of the European Commission. A ruling by the Tribunal concerning State aid would thus be a radical infringement of the order of competences set by the EU Treaties and of its autonomy as a legal system. Therefore, the Respondent stresses that Denmark and Spain are obliged to preserve this autonomy and primacy and that the Tribunal lacks adjudicative power to rule on the case.[245]

224. The Respondent also notes that the arbitral awards relied on by the Claimants to challenge the primacy of EU law insufficiently analyse the relevance of the primacy of EU law in intra-EU relations.[246] According to the Respondent, the only valid interpretation of the ECT which is compatible with EU law is that Article 26 ECT only contains an offer to arbitrate by EU Member States to investors of third States, meaning those who are not from a EU Member State, but that this offer is not addressed to investors from EU Member States.[247]

225. The Respondent also objects to the reasoning in the *Novenergia* award according to which the *Achmea Judgment* does not concern the actual application of dispute settlement mechanisms in investment treaties, but only the competence to conclude such provision. If provisions of EU law preclude the inclusion in a treaty of a dispute settlement mechanism incompatible with the EU judicial system, such provisions must not be applied. The applicability of a provision is determined by the provision's admissibility. It is unthinkable that the CJEU would accept that a provision, which unequivocally undermines the autonomy of EU law, could still be applied without hindrance. If a provision is precluded, it must not be given effect.[248]

226. In all events, and in subsidiary order, the Respondent argues that, even if it were considered that Spain may have consented to intra-EU arbitration of investment disputes in Article 26 of the ECT,

---

[242] *Slowakische Republik (Slovak Republic) v. Achmea BV,* CJEU (Grand Chamber), Case C-284/16, Judgment, 6 March 2018, para. 43, **Exh. CL-151; CL-215; RL-105; RL-160.,** quoted in Respondent's Rejoinder, para. 146.
[243] Respondent's Rejoinder, paras. 145-151.
[244] Respondent's Rejoinder, para. 70 ; Respondent's Additional Comments 2022, para. 41.
[245] Respondent's Rejoinder, para. 104.
[246] Respondent's Rejoinder para. 73.
[247] Respondent's Rejoinder, paras. 10, 68-81.
[248] Respondent's Comments, para. 45.

such consent would not be valid, as authoritatively stated by the CJEU in its *Achmea Judgment*,[249] and subsequently confirmed in the *Komstroy Judgment*.[250]

227. The Respondent further refers to the judgment of the German *Bundesgerichtshof* setting aside the *Achmea* award according to which: '*By acceding to the EU the Member States limited their freedom of action in international law and renounced the exercise between themselves of rights in international law that conflicted with EU law... In that respect, the primacy of EU law has the consequence that a provision in an agreement operating between Member States inside the EU cannot apply even as a provision of international law.*'[251]

228. The Respondent also notes, as an indication that such position would also be followed in the seat of the present arbitration proceedings, that after receiving from the CJEU the *Komstroy Judgment* and the *PL Holdings Judgment*, the Svea Court of Appeals decided to withdraw a referral request to the CJEU made in the case *Italy v. Athena*.[252]

*(d)  EU law takes precedence over the ECT under international law*

229. For the Respondent, also under international law, the EU Treaties prevail over the ECT by virtue of Articles 30 and 59 VCLT.[253] The Lisbon Treaty, which excludes ECT arbitration for intra-EU investment disputes in its Article 344 TFEU, was concluded in 2007, while the ECT was concluded in 1994. Under Articles 30 and 59 VCLT, Article 344 TFEU would thus prevail over a prior provision, *i.e.* Article 26 ECT. Consequently, also from this perspective, Article 26 ECT is no longer applicable for intra-EU investment disputes covered by Article 344 TFEU.[254]

230. The Respondent moreover contends that '*because of the peculiar nature of the EU*', the EU law on transfer of capital and treatment of intra-EU investments, with its specific and detailed rules, prevails over the more general rules of the ECT, including the application in an intra-EU context of its arbitration provision of Article 26 ECT.[255] Moreover, according to the Respondent, the Treaties establishing the European Community, signed before the ECT, by far exceeded the

---

[249] Respondent's Rejoinder, paras. 10, 74, with reference to *Slowakische Republik (Slovak Republic) v. Achmea BV*, CJEU (Grand Chamber), Case C-284/16, Judgment, 6 March 2018, **Exh. CL-151; CL-215; RL-105; RL-160**; Respondent's additional comments 2022, para. 47.

[250] Respondent's additional comments 2022, paras. 47-49, with reference to *Republic of Moldova v. Komstroy LLC, successor in law to the company Energoalians*, CJEU (Grand Chamber), Case-C-741/19, Judgment, 2 September 2021, paras. 62-63, **Exh. CL-316; RL-164**.

[251] Respondent's Comments, para 7-8; German Bundesgerichtshof, 31 October 2018, **Exh. 36 Hindelang Opinion; EC-9**, para. 41, **Exh. Annex EC-9**; Hearing (1) Respondent Slide 48.

[252] Respondent's Additional Comments 2022, para. 7, referring to IA Reporter, 'Svea court of Appeal rescinds request', **Exh. RL-165**.

[253] Respondent's Rejoinder, para. 178; Respondent's Additional Comments 2022, para. 117.

[254] Respondent's Additional Comments 2022, para. 122.

[255] Respondent Counter-Memorial, para. 72.

objectives of the ECT although, because of the primacy of EU law in intra-EU relations, it is irrelevant whether EU law offers a more or less favourable protection than the ECT.[256]

231. The Respondent argues that, as a result, a disconnection clause within the ECT is unnecessary, as the ECT cannot affect the existing community law.[257] The Respondent relies in this respect on the CJEU's *Opinion 1/03* of 7 February 2006, stating that '*given that the agreement envisaged covers areas for which a complete harmonization has been carried out, the existence of a disconnection clause is entirely without relevance*'.[258] It further refers to the disconnection practice of intra-EU matters in numerous cases where no express disconnection clause appears in the relevant treaty and where disconnection is achieved by means of EU legislation or by a generally recognised practice accepted as binding by EU Member States and acknowledged by third States.[259]

*(e)  Conclusion*

232. On the basis of the foregoing arguments, the Respondent concludes that the Tribunal has no jurisdiction to decide an intra-EU dispute which requires the application or interpretation of EU law. [260]

**2.  *Lack of jurisdiction under the ECT***

*(a)  The ECT does not apply to intra-EU investments*

233. The Respondent argues that there was no valid offer to arbitrate under Article 26 ECT. It refers to the judgment of the German *Bundesgerichtshof* setting aside the *Achmea* award which held with regard to Article 8 of the Netherlands-Slovakia BIT that: '*Neither of the parties could by means of Article 8(2) of the BIT give the other party a valid undertaking that it would consent to the determination of the disputes referred to in article 8(1) by the arbitral tribunal. This meant that the applicant [Slovakia] had made no offer to conclude an arbitration agreement with the investors from the Netherlands that the defendant could then accept.*'[261]

234. The Respondent furthermore refers to the Member States' '*Declaration of 15 January 2019 on the legal consequences of the Judgment of the Court of Justice in Achmea and on the investment protection in the European Union*', which confirmed that Article 26 ECT was not applicable

---

[256] Respondent's Rejoinder, paras. 178-181
[257] Respondent's Rejoinder, paras. 182-183.
[258] Hearing (1), Day 1, Respondent slide 41.
[259] Respondent's Submission on Opinion 1/17, paras. 95-113; Respondent's Additional Comments 2022, paras. 74-97.
[260] Respondent's Counter-Memorial, para. 81 *et seqq.*; Respondent's Rejoinder, para. 95.
[261] German Bundesgerichtshof, 31 October 2018, paras. 26-27, **Exh. 36 Hindelang Opinion; EC-9**, para. 41, **Exh. Annex EC-9**.

between EU Member States.[262] For the Respondent, this Declaration is not only a political statement, but also, under Article 31 VCLT, an important expression of the EU Member States which signed the Declaration on their understanding of Article 26 ECT.[263]

235. Regarding CJEU's *Opinion 1/17*, the Respondent observes that, although in that case the investor-State dispute settlement (**'ISDS'**) system contained in the CETA was deemed to be compatible with the autonomy of the EU legal order, the CJEU's reasoning is fully consistent with its previous conclusions in the *Achmea Judgment* and their extension to the ECT. This is because the essence of *Opinion 1/17* is, according to the Respondent, that an '*international treaty can only be compatible with EU Law as far as it does not impede the application of the EU Laws. Contrario sensu, if there were rules in the CETA that would impede the application of the EU Legal Framework those rules should not be applied within the EU as it happens with Article 26 of the ECT that must not be applied for intra-EU affairs*'.[264]

236. The Respondent further notes that, any doubt pertaining to the application of the CJEU's conclusions in the *Achmea Judgment* to Article 26 ECT has been put to rest by the CJEU's reasoning in the *Komstroy Judgment*, where the Grand Chamber expressly stated that '*it must be concluded that Article 26, paragraph 2, letter c), of the TEC [i.e. the ECT] must be interpreted in the sense that it is not applicable to the disputes between a Member State and an investor from another Member State in relation to an investment made by the latter in the first Member State*'.[265]

*(b)    The ECT grants priority to EU law for intra-EU investments*

237. Relying on the reasoning of the tribunal in *Electrabel v. Hungary*, the Respondent observes that the ECT should be interpreted, as far as possible, in harmony with EU law. For the Respondent, several provisions within the ECT, if properly analysed, indicate that the ECT can operate in harmony with EU law as it does not apply to intra-EU investments.[266]

238. The Respondent considers that the primacy of the EU legal system is recognised *inter alia* in the text of Article 1(3) ECT, which admits Regional Economic Integration Organisations (**'REIO'**) as Contracting Parties and expressly recognises the decisions taken by a REIO as '*binding on [its Member-States] in respect to those matters*'. The EU is the only REIO that is party to the ECT.[267]

---

[262]  Declaration of the Respresentatives of the Governments of the Member States of 15 January 2019, **Exh. RL-156;** Hearing (1), Day 1, Respondent Slide 43.

[263]  Hearing (1), Day 2, 7'-8'; Respondent's additional Comments, paras 119 *et seqqs*.

[264]  Respondent's Submission on Opinion 1/17, para. 9.

[265]  Respondent's Additional Comments 2022, paras. 27-28, quoting *Republic of Moldova v. Komstroy LLC, successor in law to the company Energoalians*, CJEU (Grand Chamber) Case C-741/19, Judgment, 2 September 2021, para. 66, **Exh. CL-316; RL-164**.

[266]  *Electrabel S.A. v. Republic of Hungary*, ICSID case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 4.130-4.142, **Exh. RL-2; CL-141.**

[267]  Respondent's Counter-Memorial, paras. 73-80.

Consequently, according to the Respondent, for matters over which competence has been transferred to the EU, the Member States are *inter se* bound by EU law and no longer by the ECT.[268]

239. Moreover, for the Respondent, Article 25 ECT, which provides that the ECT's most-favoured-nation obligation does not extend any preferential treatment given to Member States of an Economic Integration Area ('**EIA**') (such as the EU) to countries which are not part of that area, also suggests that the ECT recognises the preferential nature of the EU protection system, which is thus not extended beyond intra-EU relations.[269]

240. The Respondent furthermore notes that the principle according to which the EU stands in the shoes of its Member States in areas where it has competence, is also reflected by Article 36(7) ECT, which accords a REIO, hence the EU, a number of votes equivalent to the number of its Member States for matters over which the REIO has competence.[270] The Respondent finally observes that its interpretation of the ECT is confirmed by the ECT's purpose.[271]

*(c)   The ECT grants priority to EU law as it comprises more favourable provisions*

241. The Respondent's primary contention under this heading remains that the objectives of the EU Treaties, *i.e.* a common market based on the principle of non-discrimination and price formation in accordance with the rules of the market, were not similar to those of the ECT, but in fact exceeded them. However, even if the ECT could be said to cover the same subject-matter as the EU Treaties, the regime introduced by the EU Treaties would still prevail over the ECT under Article 16 ECT, because the ECT grants less favourable substantive rights to the investor than EU law does. Nor is arbitration, provided for in Article 26 ECT as one of several possibilities, a more favourable dispute resolution mechanism, because under the ECT no discrimination or illegal State aid in the investment process is sanctioned.[272]

*(d)   Under Article 26 ECT, the Tribunal has to apply EU law to the dispute and decline jurisdiction*

242. As noted earlier in the discussion of the law applicable to jurisdiction, the Respondent submits that under Article 26(6) ECT, international law not only applies to the merits of the dispute but also determines whether the Tribunal can assume jurisdiction over a dispute.[273] According to the Respondent, the international law that the Tribunal is required to apply under Article 26(6) ECT comprises EU law, which is contained in or follows from an international treaty such as the

---

[268]  Respondent's Counter-Memorial, paras. 74-76.
[269]  Respondent's Counter-Memorial, para. 78; Respondent's Rejoinder, para. 185.
[270]  Respondent's Counter-Memorial, para. 79; Respondent's Rejoinder, para. 172.
[271]  Respondent's Counter-Memorial, paras. 91-94.
[272]  Respondent's Rejoinder, para. 184 *et seq.*.
[273]  Hearing (1), Day 1, Respondent Slide 9.

TFEU.[274] The Respondent extensively relies on the award in *Electrabel v. Hungary*[275], the award in *Blusun v. Italy*,[276] and the decision of the arbitral tribunal in *Vattenfall v. Germany*,[277] which all recognised that EU law operates as international law.[278] Within the body of international law applicable to the dispute, the Tribunal therefore has to apply EU law - including the EU rules governing the Internal Electricity Market - as part of its implementation of the EU fundamental freedoms. Moreover, following the *Komstroy Judgment*, the Respondent also notes that EU law would apply to the present dispute because the ECT itself is part of EU law as well as because foreign direct investment and State aid law are exclusive competences of the EU.[279]

243. However, the contention of the Respondent is that EU law prevails and applies as an autonomous body of law. The EU judicial system, encompassing the courts of the Member States and headed by the CJEU, is entrusted to supervise the correct implementation of EU law. The overall argument of the Respondent, as it is stated in its Additional Comments of 2022, is that: '*(1) the ECT, foreign direct investment and state aid are EU Law; (2) EU Law must be exclusively interpreted by national courts and the CJEU; (3) therefore no intra-EU investment arbitrations under the ECT are possible. Consequently, it is obvious that, respectfully, the Tribunal lacks jurisdiction*'.[280]

244. The Respondent therefore stresses that the autonomy and primacy of EU law excludes the Tribunal's jurisdiction under Article 26(6) ECT for intra-EU investment disputes. The Respondent moreover observes that Article 344 TFEU specifically prohibits the submission by EU Member States of disputes that concern the interpretation and application of the EU Treaties to dispute resolution mechanisms other than those foreseen in the EU Treaties (*i.e.* the CJEU and the Member States domestic courts).[281] This prohibition not only covers disputes which directly concern the EU Treaties, but also disputes which indirectly involve such treaties.[282]

245. The Respondent further adds that Article 26 ECT must be interpreted in the light of the EU's 1997 '*Statement pursuant to Article 26(3)(b)(ii) to the ECT*' as part of the relevant interpretive context

---

[274] Respondent's Rejoinder, paras. 90-94.
[275] *Electrabel S.A. v. Republic of Hungary*, ICSID case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 4.20, **Exh. RL-2; CL-141**.
[276] *Blusun S.A. e.a. v. Italian Republic*, ICSID ARB/14/3, Award, 27 December 2016, paras. 277-278, **Exh. RL-90**.
[277] *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the Achmea Issue, 31 August 2018, paras. 145-150, **Exh. CL-215 a.**
[278] Hearing Day 1, Respondent Slides 5-8.
[279] Respondent's Additional Comments 2022, para. 48, referring to *Republic of Moldova v. Komstroy LLC, successor in law to the company Energoalians*, CJEU (Grand Chamber) Case C-741/19, Judgment, 2 September 2021, paras. 62-63, **Exh. CL-316; RL-164**.
[280] Respondent's Additional Comments 2022, para. 49.
[281] Respondent's Counter-Memorial, paras. 82, 99.
[282] Hearing, Day 2, 22'-23'; *Commission of the European Communities v. Ireland*, CJEU, Case 459/2003, 30 May 2006, ECLI:EU:C:2006:345.

under Article 31(2)(b) VCLT. According to the Respondent, this interpretation leads to the result that Article 26 ECT is not applicable in intra-EU relations where EU law applies.[283]

246. The Respondent also emphasises that the EU has consistently made it clear towards all ECT Contracting Parties that Article 26 ECT does not apply to intra-EU investments. According to the Respondent, this is confirmed by the 2015 formal Declaration issued by the EU on the occasion of the drafting of the International Energy Charter, the political basis for the ECT, that '*due to the nature of the EU internal order, the text in Title II, Heading 4, of the International Energy Charter on dispute settlement mechanisms cannot be construed so as to mean that any such mechanism would become applicable in relations between the European Union and its Member States, or between the said Member States, on the basis of that text*'.[284]

247. The Respondent further observes that the present arbitration, conducted under the SCC Rules, has its seat in Sweden and is therefore governed by the SAA.[285] This is relevant because, according to the Respondent, under Sections 2, 33 and 34 SAA, Swedish courts have the final word regarding the invalidity (*e.g.* as a result of non-arbitrability or public policy) and the set aside of an award (*e.g.* when it is based on an invalid arbitration agreement).[286] In this context, the Respondent emphasises that State aid is one of the '*prime examples of what is considered to be non-arbitrable issues under Section 33, first paragraph, item 1, SAA. For this reason, an award regarding this issue will be invalid*'.[287]

248. More generally, the Respondent emphasises by reference to the *Komstroy Judgment* that the selection of the seat of this arbitration in Stockholm necessarily attracts the application of EU law. Extrapolating from the specific wording in the *Komstroy Judgment*, where the seat of the arbitration was in Paris, the Respondent paraphrases the reasoning of the CJEU in *Komstroy* as applied to the present arbitration as follows: '*the establishment of the seat of arbitration on the territory of a Member States, in this case Sweden* [France]*, entails, for the purposes of the proceedings brought in that Member State, the application of EU law, compliance with which the court hearing the case is obliged to ensure in accordance with Article 19 TEU*'.[288]

249. Referring to Section 34 SAA, the Respondent concludes that '*the ECT is an international agreement between EU Member States and in particular between Denmark and Spain. Because*

---

[283] Respondent's Response on *Amicus Curiae* Brief, para. 38; Energy Charter Secretariat, *Policies, Practices and Conditions of Contracting Parties listed in Annex ID*, **Exh. Annex EC-6**; see Hearing, Day 2, 26'-27'.

[284] See, referred to in *Amicus Curiae* Brief, footnote 30; Hearing (1), Day 2, 6'.

[285] Respondent's Post-Hearing Brief, paras. 3-6 and 17-19.

[286] Hearing (1), Day 2, 13'; Respondent's Post-Hearing Brief, paras. 10 and 33.

[287] Respondent's Post-Hearing Brief, para. 48.

[288] Respondent's Additional Comments 2022, para. 20, paraphrasing para. 34 of *Republic of Moldova v. Komstroy LLC, successor in law to the company Energoalians*, CJEU (Grand Chamber), Case C-741/19, Judgment, 2 September 2021, **Exh. CL-316; RL-164**

*Articles 267 and 344 TFEU preclude a provision such as the arbitration clause contained in Article 26 of the ECT, this clause did not contain a valid offer to arbitrate on the part of Spain vis-à-vis the Claimants. Because Article 26 of the ECT did not contain a valid offer to arbitrate on the part of Spain, the Claimants could not accept an offer to arbitrate when it filed its request for arbitration. Consequently, there was no valid agreement to arbitrate between the parties'.[289]*

250. The Respondent observes that the non-arbitrability of the dispute and/or invalidity of the arbitration agreement because of EU law is part of the domestic law of the Member States and concludes that, regardless of whether the Tribunal decides its jurisdiction under international law, as Article 26 ECT suggests, under Swedish law (*i.e.* the law of the seat), or under Spanish and Danish law (*i.e.* the law of the Parties), the result is that it has no jurisdiction over the present dispute.[290]

*(e)   Conclusion: Article 26 does not grant jurisdiction to the Tribunal*

251. On the basis of the foregoing arguments, the Respondent contends that it is for the national courts of the Member States and for the CJEU to guarantee the full application of EU law in all Member States. Consequently, EU Member States cannot consent to arbitration of investment disputes with investors of other Member States under Article 26 ECT which concern the interpretation and application of EU law.[291] Therefore, the dispute resolution mechanisms established in the ECT do not apply to intra-EU disputes.[292]

**B.   The Claimants' arguments**

**1.   *The Tribunal's jurisdiction under the ECT***

*(a)   The ECT applies to intra-EU investment disputes*

252. For the Claimants, the ECT contains the Respondent's offer, governed by international law, to unconditionally consent to arbitration, which is met by the Claimants' consent through the Request for Arbitration, equally governed by international law.[293]   Under Article 216(2) TFEU, the EU Institutions and the Member States are bound by the ECT.[294]

253. The Claimants observe that the separability of the arbitration clause implies that the arbitration agreement may be governed by a different law than the one applicable to the merits. Even in the event that EU law would be applicable to the merits the arbitration agreement continues to be governed by international law and is not affected by EU law. The decision of the German

---

[289] Respondent's Post-Hearing Brief, para. 72.
[290] Respondent's Response on *Amicus Curiae* Brief, para.44; Hearing (1), Day 2 13.'-14'.
[291] Respondent's Rejoinder, para. 137.
[292] Respondent's Rejoinder, para. 163 *et seqq*.
[293] Hearing (1), Day 1, Claimant Slides 4-5.
[294] Hearing (1), Day 1, Claimant, Slide 41.

*Bundesgerichtshof* of 31 October 2018 failed to recognise this doctrine of separability, so the Claimants argue.[295]

254. The Claimants further argue that the Tribunal, established under a public international law instrument, the ECT, has to take an '*outsider's perspective*' vis-à-vis EU law and that EU law is thus not (automatically) to be seen as '*supreme*'.[296] The Claimants rely on the award rendered in *Electrabel v. Hungary,* which indicated that '*the Tribunal is required to operate in the international framework of the ECT and the ICSID Convention, outside the European Union*'.[297] They moreover refer to the award rendered in *RREEF v. Spain*, according to which '*in case of any contradiction between the ECT and EU law, the Tribunal would have to insure the full application of its 'constitutional' instrument upon which its jurisdiction is founded.*'[298] They also note that in *Landesbank Baden-Württemberg et al. v. Kingdom of Spain*, the Tribunal stated that "[it] *does not [...] operate under EU law but under international law and, in particular, the terms of the ECT.*"[299]

255. For the Claimants, the Respondent cannot pretend not to be bound by the ECT for intra-EU investment disputes on the grounds that the ECT is incompatible with the fundamental principles of EU law with regard to the fourth freedom and the harmonisation of the EU Internal Energy Market. Referring to *Western Sahara Campaign UK*,[300] the Claimants submit that the CJEU itself recognised that the EU is bound by the international treaties it has concluded. According to the Claimants, the EU and the Member States cannot invalidate existing international treaties. Therefore, the *Achmea Judgment* cannot be interpreted to invalidate investment treaty arbitration clauses such as Article 26 ECT.[301] The Claimants further note that "*whenever the ECJ refers to certain international agreements being incompatible with EU law, it is necessary to check whether said agreement is already in force or not. [...] Whenever reference is made [...] with regard to the compatibility of the EEA Agreement, the Accession of the EU to the ECHR or the Opinion on the Patent Court, one has to bear in mind that the respective international agreements were subject to opinion procedures **before the EU's accession to them**.*"[302]

---

[295] Hearing (1), Day 2, 32'.

[296] Claimants' Reply, paras. 81-82; Claimants' Rejoinder on Jurisdiction, para. 109.

[297] Hearing (1), Day 1, Claimants Slide 6; *Electrabel S.A. v. Republic of Hungary*, ICSID case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 4.112, **Exh. RL-2; CL-141.**

[298] Hearing (1) Day 1, Claimants Slide 6; *RREEFF Infrastructure v. Spain,* ICSID ARB 13/30, 6 June 2016, para. 75, **Exh. CL-142.**

[299] Claimants' Additional Observations 2022, pp. 3 and 4; *Landesbank Baden-Würtemberg et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/45, Decision on the "intra-EU" jurisdiction objection, 25 February 2019, para. 178, **Exh. CL-305.**

[300] *Western Sahara Campaign UK*, CJEU Case C-266/16, 27 February 2018, para. 47 *et seq.*, ECLI:EU:C:2018:118, referred to by Wuschka, *Investment Protection and the EU after Achmea*, p. 43, **Exh. CL-224.**

[301] Claimants' Rejoinder, paras. 159-162.

[302] Claimants' Submission on Opinion 1/17, paras. 5 and 6.

256. The Claimants dispute the Respondent's contention that, when ratifying the ECT, Spain could not have made an offer to arbitrate under Article 26 ECT because of the 'prevailing' framework of the EU Internal Energy Market. For the Claimants, Article 46 VCLT does not allow Spain to allege that it could not bind itself to the ECT because it would thereby allegedly violate provisions of internal law (including EU law).[303] As stated in Article 27 VCLT, the Respondent can neither invoke its domestic law or EU law to justify its breach of ECT obligations. Indeed, EU law, in its double capacity of institutional law of the EU and domestic law of the Member States, does not allow to deviate from the principle of *pacta sunt servanda*.[304] Referring to previous intra-EU cases,[305] decisions in WTO Dispute Settlement proceedings[306] and other multilateral treaties such as CETA,[307] the Claimants urge the Tribunal to consider EU law as a factual element of municipal law, in an arbitration under the ECT, where international law applies to the merits. EU law thus should only be considered as a fact.[308]

257. For the Claimants, any analogy with the CJEU's considerations about the EU's accession to the treaty regime of the ECHR or the establishment of the EEA/EFTA Court is inapplicable to the ECT's arbitration provisions. The Claimants further submitted that the very fact that an opinion from the CJEU regarding the compatibility of the ECT has never been sought demonstrates that both the European Commission and the EU Member States were fully convinced that the ECT was compatible with EU law.[309] Any finding by the CJEU that EU Treaties might be superior and primary applied, arises out of EU law, not out of international law. According to the Claimants, '*[i]nternational dispute settlement bodies located outside the EU framework are free to arrive at a different conclusion*'.[310]

258. The Claimants moreover argue that, at the time the ECT was concluded in 1994, the exclusive competence in the field of investment protection was with the Member States. It was only in 2007 that the Treaty of Lisbon deferred in Article 207 TFEU the exclusive competence for common commercial policy to the EU. At that time, Spain did not withdraw its consent to arbitrate intra-EU disputes, as allowed by the VCLT.[311] Consequently, Spain is still bound by its consent to investment arbitration under Article 26 ECT.

---

[303] Claimants' Reply, para. 84; Claimants' Additional Observations 2022, p. 8.
[304] Claimants' Rejoinder, paras. 87-129.
[305] Claimants' Rejoinder, paras. 97-98 and 101-102.
[306] Claimants' Rejoinder, para. 100.
[307] Claimants' Rejoinder, paras. 103-105.
[308] Claimants' Rejoinder, paras. 97-105.
[309] Claimants' Rejoinder, paras. 179-188.
[310] Claimants' Rejoinder, para. 187, quoting Binder/Hofbauer, *The Perception of the EU legal Order in International Law*, p. 145, footnote 35, **Exh. CL-219**.
[311] Claimants' Reply, paras. 86-87.

259. Moreover, the Claimants argue that, at present, the competence relating to energy is still shared between the Member States and the EU, where the Member States remain competent for dispute settlement and the European Commission did not regulate the internal energy market. [312]

260. Furthermore, the Claimants observe that, while specific provisions were made for the WTO[313] and the Svalbard Treaty,[314] the ECT does not contain a disconnection clause to limit its application in the event of intra-EU investment disputes.[315] Indeed, unlike several other mixed agreements, the ECT does not contain a clause indicating that EU law shall apply in the Member States' mutual relations.[316] Referring to *Verburg* and *Lavranos*, the Claimants note that the European Commission unsuccessfully advocated for the inclusion of an explicit disconnection clause in the ECT.[317] Neither does the ECT contain an implicit disconnection clause. On the contrary, according to the Claimants, both the ordinary meaning and the purpose of the ECT confirm that it grants intra-EU investment protection.[318] The Claimants add that the drafting history of the ECT and a survey of legal commentary lead to the same conclusion.[319]

261. The Claimants note that the absence of a disconnection clause has been acknowledged by tribunals in other intra-EU arbitrations under the ECT.[320] For example, in *Foresight Luxembourg Solar 1 S.Á.R.L et. al. vs. Kingdom of Spain*, the tribunal asserted: "*The ECT does not contain a disconnection clause. Further, the Tribunal can discern no attempt in the ECT's provisions to carve out 'intra-EU' investor State disputes from the protections afforded by the treaty.*"[321] More so, in *FREIF Eurowind Holdings Ltd. v. Kingdom of Spain*, the tribunal emphasized that "[t]*he lack of any express carve out is of particular note given that the ECT allows ORIEs such as the EU to become Contracting Parties […]. If the ECT intended to exclude the jurisdiction of arbitral tribunals when competence over certain matters governed by the ECT has been transferred to an ORIE, Spain's complaints ought to have been front of mind in the drafting of Article 26 […].*"[322]

---

[312] Hearing (1), Day 2, 55'- 58'.

[313] At the Hearing (1), the Claimants have elaborated on the difference between the WTO and the ECT – dispute settlement, *e.g.* that in the WTO, only the EU – and not the Member States are party to a dispute settlement mechanism (Hearing (1), Day 2, 48').

[314] Claimants' Rejoinder, para. 67.

[315] Claimants' Reply, paras. 88-108; Claimants' Rejoinder, para. 236.

[316] Claimants' Reply, para. 89.

[317] Claimants' Response on *Amicus Curiae* Brief, para 30, referring to Cees Verburg and Nikos Lavranos, '*Recent Awards in Spanish Renewable Energy Cases and the Potential Consequences of the Achmea Judgment for intra-EU ECT Arbitrations*' in: Mistelis & Lavranos, European Investment Law and Arbitration Review, Volume 3, 2018, p. 218, **Exh. CL-280.**

[318] Claimants' Reply, paras. 93-102.

[319] Claimants' Reply, paras. 103-109.

[320] Claimants' Additional Observations 2022, p. 4.

[321] *Foresight Luxembourg Solar 1 S.Á.R.L. et al. v. Kingdom of Spain*, SCC Arb. 2015/150, Award, 14 November 2018, para. 316, **Exh. CL-306.**

[322] *FREIF Eurowind Holdings Ltd. v. Kingdom of Spain*, SCC Arb. 2017/060, Award, 8 March 2021, para. 316, **Exh. CL-307.**

*(b)  Relations between the ECT and EU law*

262. Even if EU law could be considered to be part of international law – or international law *sui generis* as the EU institutions see it – it would not prevail over the provisions of the ECT.[323] The Claimants argue that, when previous tribunals recognised EU law as international law, they meant that EU law must be applied at the same level as other treaties.[324] For the Claimants, the ECT and EU law do not cover the same subject-matter. State aid, which is a major concern under EU law, is, for instance, only an ancillary matter in the present dispute and is irrelevant for the Tribunal's jurisdiction.[325]

263. EU law does not contain any rules on investor-State arbitration or a substantive protection standard such as Articles 10 and 13 ECT.[326] The Claimants refer in this regard to the decision on the *Achmea* issue rendered by the arbitral tribunal in *Vattenfall v. Germany*, which noted also that Articles 267 and 344 TFEU do not concern the same subject matter as Part III and V of the ECT.[327] Articles 267 and 344 TFEU are not a stumbling block for the compatibility of EU law with Article 26 ECT.[328]

264. Article 267 TFEU concerns the interpretation of the EU Treaties, not of the ECT. Moreover, the CJEU could also rule on the accession by the EU to the ECT, but it has not done so.[329] For the Claimants, Article 344 TFEU is equally not at stake as it only relates to disputes and proceedings between Member States with regard to EU law.[330] Member States may, for instance, submit disputes with regard to the law of the sea to the International Tribunal on the Law of the Sea or with regard to international law to the International Court of Justice.[331] For the Claimants, the ECT and EU law are not incompatible and can be applied together.[332]

265. Besides, even if Articles 267 and 344 TFEU were incompatible with Article 26 ECT, the latter provision would be the overarching *lex specialis* confirming the effectiveness of Article 26 ECT and an investor's right to dispute resolution, notwithstanding any less favourable terms under the EU Treaties.

---

[323] Claimants' Rejoinder, paras. 106-121.
[324] Claimants' Rejoinder, paras. 107, 109.
[325] Hearing (1), Day 2, 47'; Claimants' Additional Observations 2022, p. 37.
[326] Claimants' Response on *Amicus Curiae* Brief, para. 31.
[327] *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the Achmea Issue, 31 August 2018, para. 194, **Exh. CL-215 a.**
[328] Claimants' Rejoinder, paras. 205-208; *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, 31 August 2018, paras. 214, 217-218, 229, **Exh. CL-215 a.**
[329] Hearing (1), Day 1, Claimant Slides 38-39; *Kadi and Barakaat International Foundation v. Council and Commission*, Case 402/05, (I), 3 September 2008, ECLI:EU:C:2008:461.
[330] Hearing (1) Day 1, Claimants Slide 37; Day 2, 35'; Claimants' Additional Observations 2022, pp. 6-7.
[331] Hearing (1), Day 2, 59'-1 h.
[332] Claimants' Rejoinder, paras. 42, 61,114-121.

266. The Claimants disagree with the Respondent that, under Articles 30(3) and 59(1) VCLT, EU law would prevail over the ECT.[333] They observe that for Articles 30(3) and 59(1) VCLT to apply, the ECT and EU law must cover the same subject-matter. This is not the case because the substantive protection standard granted to an investor in the ECT is far more specific than any rules available under EU law.[334]

267. With respect to Article 30 VCLT, the Claimants more specifically submit that this Article does not preclude the application of ECT -provisions in intra-EU arbitrations.[335] Article 30 VCLT only governs the issue of incompatible provisions in successive treaties.[336] However, the Claimants reiterate that no incompatibility exists between the ECT and EU law because they cover a different subject-matter.

268. In the event of any incompatibility, the EU and the Member States would certainly have adopted a subordination clause to indicate which body of rules prevails, as foreseen in Article 30(2) VCLT. However, neither the ECT nor the EU Treaties contain such a clause.[337]

269. Finally, even assuming that the ECT and EU law were covering the same subject-matter and were incompatible, the Claimants still argue that the ECT would prevail over EU law under the explicit collision rule of Article 16 ECT.[338] For the Claimants, Article 16 ECT establishes the ECT's priority over any other prior or subsequent treaty which is less favourable for the investor (such as the EU Treaties).[339] The Claimants rely in this regard on the award in *RREEF v. Spain*, which concluded that what is more favourable has to be '*determined from the perspective of public international law, not of EU law.*'[340]

270. In the Claimants' view, the ECT is indeed more favourable for investors than EU law because Article 26 ECT does not limit the ability of the investor to pursue its claim before the national courts of the host State; in addition, it confers the right to bring its claim before a neutral forum, *i.e.* international arbitration. EU law or Spanish national law do not contain any comparable, effective and neutral dispute settlement mechanism for investor claims against sovereign States.[341] Quite to the contrary, they prohibit that mechanism of dispute resolution. According to the Claimants, empirical data shows that international arbitration is clearly more favourable to the

---

[333] Claimants' Rejoinder, paras. 25, 30.
[334] Claimants' Rejoinder, para. 25 with reference to Binder/Hofbauer, *The Perception of the EU legal Order in International Law*, p. 182, **Exh. CL- 219**.
[335] Claimants' Rejoinder, paras. 35-40.
[336] Claimants' Rejoinder, para. 26.
[337] Claimants' Rejoinder, para. 36.
[338] Claimants' Rejoinder, paras. 75-76, 90, 121; Claimants' Additional Observations 2022, pp. 26-29.
[339] Claimants' Rejoinder, paras. 41-70.
[340] Hearing (1), Day 1, Claimants, slide 33; *RREEFF Infrastructure v. Spain*, ICSID ARB 13/30, Decision on Jurisdiction, 6 June 2016, para. 72, **Exh. CL-142**.
[341] Statement of Claim, paras. 348-356; Claimants' Rejoinder, paras. 49-61; Claimants' Reply, para. 1211 *et seqq.*.

investor than court settlement.[342] Moreover, for the Claimants, the *SolEs Badajoz, Masdar* and *Oostergetel* awards, and the *Vattenfall v. Germany* decision have confirmed that the right enjoyed by investors under the ECT to bring claims directly against the Contracting Party in international neutral arbitration proceedings is more favourable to the investor than the investor's standing under EU law.[343] Also, given that the Claimants initiated this arbitration as the legal protection procedure of their choice, it further stands to reason that they judged it to be the most favorable for them.[344] The right to international arbitration under Article 26 ECT would therefore trump EU law in a conflict.

271. The Claimants furthermore refer to Article 16 ECT, which, as they see it, endeavours to make overlapping treaties as much as possible compatible.[345] The Claimants point out that the Netherlands-Slovakia BIT at stake in the *Achmea Judgment* did not contain a *lex specialis* provision like Article 16 ECT. The *Achmea Judgment* thus could not consider a provision like Article 16 ECT. Also for that reason, the Claimants argue that the *Achmea Judgment* is not a relevant precedent to assess cases arising under the ECT.[346]

*(c)   The Tribunal's jurisdiction under Article 26 ECT*

272. The Claimants first argue that Article 26(6) ECT only refers to the law applicable to the 'merits'. They rely on the *Vattenfall v. Germany* decision, which held that Article 26 ECT concerns investment disputes (Part III ECT), not disputes over dispute settlement (Part V ECT).[347] The law applicable to the determination of the Tribunal's jurisdiction is, instead, the general principles of international law as well as the law that has been agreed by the Parties, *i.e.* the ECT.[348] The Claimants argue moreover that, similarly, the applicable law provision of Article 22 SCC Rules does not refer to jurisdiction but only applies to the merits of the dispute.[349]

273. The Claimants submit that the Tribunal's jurisdiction stems from Article 26 ECT. The ECT, which is a valid treaty under public international law, must be interpreted and applied in accordance with

---

[342] Claimants' Rejoinder, paras. 56-59.
[343] *SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/38, Award, 31 July 2019, para. 250; **Exh. CL-317**; *Masdar v. Kingdom of Spain*, ICSID ARB 14/1, Award, 16 May 2018, para. 332, **Exh. CL-228; CL-311**; *Jan Oostergetel and Theodora Laurentius v. the Slovak Republic*, UNCITRAL Decision on Jurisdiction, 30 April 2010, para. 77, **Exh. CL-234;** *Vattenfall et al. v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, paras. 202, 229, **Exh. CL-312**.
[344] Claimants' Additional Observations 2022, p. 28.
[345] Claimants' Rejoinder, para. 37.
[346] Claimants' Rejoinder, para. 64.
[347] Hearing (1), Day 1, Claimants Slide 10; *Vattenfall AB e.a. v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, paras. 116, 121 *et seqq.*, **Exh. CL-215a**
[348] Claimants' Rejoinder, para. 14.
[349] Claimants' Reply, paras. 76-79.

the relevant rules of the VCLT.[350] Specifically, Article 31(1) VCLT requires the Tribunal to follow the ordinary meaning of Article 26(6) ECT.

274. For the Claimants, the Respondent is not entitled to negate the binding force of the arbitration provision of Article 26 ECT in the present proceedings. The EU, as well as its Member States, are obliged under public international law to fulfil their commitments under the ECT.[351] The ECT is an international treaty that binds the EU Member States, the EU institutions and non-member States that are parties to the ECT. Because of the mixed nature of the ECT, the CJEU has no competence to declare the ECT invalid, according to the Claimants. Any hypothetical finding of incompatibility between investment arbitration under the ECT and EU law would need to be sorted out through political and diplomatic means or by the mechanisms prescribed by the VCLT.[352]

275. The Claimants observe that Article 26(6) ECT clearly indicates that the Tribunal has to apply the provisions of the ECT and the principles of public international law – not EU law – to the dispute, including disputes about its own jurisdiction.[353] It is not bound to apply the EU law on the fundamental freedoms set forth in the European Treaties.[354] It is also not bound to apply the EU law based on the premises that any possible payment on a prospective award would qualify as state aid.[355]

276. In the event the Tribunal would be required to apply EU law to intra-EU investment disputes, the Claimants observe that the Respondent's reasoning would lead to diverging levels of protection depending on whether a Contracting Party was an EU Member State or not at the moment the ECT was signed and/or ratified. Such a result would be unacceptable according to the Claimants who refer, on this point, to the *Masdar v. Spain* and the *Vattenfall v. Germany* decisions.[356]

277. The Claimants argue that the historical context, emphasised by the European Commission in paragraphs 9-12 of its *Amicus Curiae* brief to reveal the scope of its consent under Article 26 ECT, concerns the legislative history of the ECT which, under Article 32 VCLT, merely qualifies as a supplementary means of interpretation, while under Article 31 VCLT the starting point of any interpretation is the ordinary meaning of the relevant terms in the treaty.[357]

---

[350] Claimants' Rejoinder, para. 9.
[351] Claimants' Rejoinder, paras. 79-86.
[352] Claimants' Rejoinder, paras. 81-84.
[353] Claimants' Reply, paras. 76-82.
[354] Claimants' Rejoinder, para. 168.
[355] Claimants' Additional Observations 2022, pp. 37-43.
[356] Claimants' Rejoinder, paras. 238-241; *Masdar v. Kingdom of Spain*, ICSID ARB 14/1, Award 16 May 2018, para. 314, **Exh. CL-228;** *Vattenfall AB e.a. v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 155 *et seqq.*, **Exh. CL-215a.**
[357] Claimants' Response on *Amicus Curiae* Brief, para. 10.

278. More specifically, the Claimants note that the Declaration the EU made in 1997 pursuant to Article 26 (3) b (ii) ECT cannot be seen as evidence that, when the ECT was concluded, the EU excluded the intra-EU application of the ECT. According to the Claimants, this Declaration only excludes the possibility of jurisdiction under Article 26 ECT against the EU when the investor has first started an action before the CJEU; it does not affect jurisdiction over a claim from an EU investor against an EU Member State. Moreover, the Declaration was not made at the moment of the conclusion or ratification of the ECT as required by the VCLT. Furthermore, it was only made by the EU, and not by the Member States.[358]

279. The Claimants further note that the Declaration made by the EU at the occasion of the drafting of the International Energy Charter in 2015 is likewise irrelevant for the interpretation of the 1994 ECT. This Declaration, although more precise about the allocation of competences within the EU, has no legal impact as it was made in the context of the International Energy Charter, which itself is only a declaration of a political intention but was never intended to create legal obligations.[359]

280. The Claimants furthermore object to the suggestion that the ECT is a 'European project', steered by the EU and/or the European Commission. The Energy Charter Conference is an international organization and clearly not a derivative of the EU. Moreover, according to the Claimants, a cursory survey of the list of signatories to the ECT suffices to detect countries like Australia, Japan, Afghanistan, Uzbekistan, and Kazakhstan, which are certainly not part of a 'European project'.

281. Furthermore, the indication in Article 26(6) ECT that the Tribunal has to apply the 'applicable rules and principles of international law' cannot be read to include EU law. Relying on the decision in *Vattenfall v. Germany*, the Claimants argue that '*EU law does not constitute such principles of international law, since [EU law] is not general law applicable as such to the interpretation and application of the arbitration clause in another treaty, such as the ECT.*'[360] To include EU law within international law would lead to a fragmentation of the meaning and application of the ECT.[361] The Claimants point out that the *Vattenfall v. Germany* decision stressed that consistency of interpretation and application are of paramount importance for a multilateral treaty such as the ECT.[362]

---

[358] Hearing (1), Day 2, 52'-54'.

[359] Hearing (1), Day 2, 36'-37'.

[360] Claimants' Rejoinder, para. 22; *Vattenfall AB e.a. v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 132 *et seqq.*, **Exh. CL-215a.**

[361] Claimants' Rejoinder, paras. 93-96; Claimants' Additional Observations 2022, p. 11.

[362] Claimants' Rejoinder, paras. 199-200; Claimants' Additional Observations 2022, p. 11; *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the Achmea Issue, 31 August 2018, paras. 154-156, 165, **Exh. CL-215a.**

282. Moreover, referring *inter alia* to the *Vattenfall v. Germany* decision, the Claimants point out that the purpose of the ECT is to protect investors and to guarantee their access to investor-state arbitration.[363] In this context, the Claimants argue that the notion of 'effective interpretation', which the Respondent applies to the EU Treaties, should apply to the ECT as well.[364] The Claimants further observe that the majority of the ECT Contracting Parties are EU Member States. An effective treaty interpretation would therefore exclude an outcome which dramatically reduces the scope and the relevance of the ECT by barring intra-EU investment disputes from the ECT dispute settlement regime.[365]

283. For the Claimants, Articles 16, 15, 36 and 2 ECT as well as the ECT's purpose exclude the possibility that certain investments (*i.e.* intra-EU investments) may be deemed to fall outside the scope of Article 26 ECT. Such exclusion would render the ECT's provisions ineffective.[366] The Claimants observe that the *Vattenfall v. Germany* decision did not rule out intra-EU disputes from the scope of Article 26 ECT. [367] The Claimants also refer to two decisions from arbitration tribunals, *Infracapital v. Spain*[368] and *Sevilla Beheer v. Spain*,[369] which considered the implications of the *Komstroy Judgment* but nevertheless upheld their jurisdiction under the ECT.[370]

284. For the Claimants, the Respondent is obliged by the principle *pacta sunt servanda*, contained in Article 26 VCLT, to honour its commitment to resolve disputes by international arbitration as provided under Article 26 ECT.[371]

285. The Claimants further point out that no carve-out or disconnection clause has been included for the EU Treaties, even though the EU and the Member States included such clauses in other treaties, and the ECT has carved-out the Svalbard Treaty concerning Spitsbergen (Article 16 ECT) and Economic Integration Agreements (Article 25 ECT).[372] The Claimants further refer to a 1993

---

[363] Claimants' Rejoinder, para. 203; *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the Achmea Issue, 31 August 2018, para. 198, **Exh. CL-215a.**

[364] Claimants' Rejoinder, para. 189-195.

[365] Claimants' Response, para. 15.

[366] Claimants' Reply, paras. 93-102; Claimants' Rejoinder, paras. 192-194.

[367] Claimants' Rejoinder, para. 201; *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the Achmea Issue, 31 August 2018, paras. 180-188, **Exh. CL-215 a.**

[368] Transcript Hearing (2), p. 31-32; *Infracapital F1 S.a.r.l. et al. v. Spain*, ICSID Case No. ARB/16/18, Decision on Respondent's Request for Reconsideration regarding the Intra-EU Objection and the Merits, 1 February 2022, **Exh. CL-321.**

[369] Claimants' Additional Observations 2022, p. 36, referring to *Sevilla Beheer B. V. et al. v. Spain*, ICSID Case No. ARB/16/27, Decision on Jurisdiction, Liability and the Principles of Quantum, 11 February 2022,para. 678, **Exh. CL-310.**

[370] Claimants' Additional Observations 2022, pp. 35-36.

[371] Claimants' Reply, paras. 52-55, 91; Claimants' Rejoinder, para. 23 ; Claimants' Additional Observations 2022, p. 7.

[372] Claimants' Rejoinder, para. 67; Claimants' Response on *Amicus Curiae* Brief, para. 14; *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, paras. 202-204, **Exh. CL-215 a .**

document from the archives of the Energy Charter Secretariat referring to a proposed disconnection clause for intra-EU matters, which would have appeared in what is today Article 24 ECT, but which was apparently not retained.[373]

286. For the Claimants, the statement submitted by the EU to the ECT Secretariat is not a disconnecting notification under Article 41 VCLT to exclude jurisdiction over intra-EU investment disputes. It excludes the consent of the Union itself in case the investor has previously approached the CJEU. It does not cover intra-EU investment disputes and the consent among the Member States.[374]

287. The Claimants conclude that neither the EU nor the EU Member States have made any valid reservations for their allocation of internal competence to be considered for the interpretation and implementation of the ECT.[375]

288. In short, for the Claimants, the ECT neither contains a disconnection clause, nor any other equivalent clause, whether express or implied, allowing the Respondent to depart from its obligation under Article 26 ECT.[376] Referring to *Landesbank Baden-Württemberg et al. v. Kingdom of Spain*[377] and *Vattenfall AB et al. v. Federal Republic of Germany*,[378] the Claimants ascertain that the absence of such a disconnection clause becomes particularly significant, when one considers, that other treaties by the EU and its Member States with third parties do indeed include such clauses (*argumentum e contrario*).[379]

289. The Claimants challenge the Respondent's argument that the special regime applicable to Economic Integration Agreements, granted by Article 25 ECT, implies a preference to settle intra-EU disputes in the Member-State courts. For the Claimants, Article 25 ECT does not contain any indication on that issue.[380] Nothing prevents an investor protected under the ECT from bringing claims before international neutral arbitration bodies in intra-EU disputes.[381]

---

[373] Claimants' Additional Observations 2022, p. 21.
[374] Claimants' Response on *Amicus Curiae* Brief, para. 16, referring to Christian Tietje, *The Applicability of the Energy Charter Treaty in ICSID Arbitration of EU Nationals vs. EU Member States*, p. 9, **Exh. CL-140.** In the Claimants' Response on *Amicus Curiae* Brief, paras. 23-29 the Claimants analyse in detail and challenge the European Commission's criticism of C. Tietje.
[375] Claimants' Response on *Amicus Curiae* Brief, para. 18.
[376] Claimants' Reply, paras. 88-109; Claimants' Rejoinder, para. 23.
[377] *Landesbank Baden-Württemberg et al. v. Kingdom of Spain*, ICSID Case No. ARTB714/45, Decision on the "intra-EU" jurisdictional objection, 25 February 2019, para. 117, **Exh. CL-305**.
[378] *Vattenfall AB et al. v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* issue, 31 August 2018, paras. 202-206, **Exh. CL-312**.
[379] Claimants' Additional Observations 2022, pp. 9 and 10.
[380] Claimants' Rejoinder, para. 60.
[381] Claimants' Rejoinder, paras. 62-66.

69

290. The Claimants conclude that all conditions of Article 26 ECT to establish the Tribunal's jurisdiction are met.[382]

## 2. *EU law has no bearing on Tribunal's jurisdiction*

### (a) *The dispute is covered by the ECT*

291. The Claimants first note that, pursuant to Articles 4(2) and 194 TFEU, the competence in the field of energy is a so-called 'shared competence' between the EU and the Member States.[383]

292. The Claimants further argue that Directive 2001/77 is not based on an external competence of the EU, but on Article 192(1) TFEU (then Article 175), and it grants regulatory freedom on matters such as the remuneration of energy investments to the Member States.[384]

293. The Claimants further observe that the relevant question for the Tribunal to rule on is whether or not the enactment of Spanish legislation violates certain provisions of the ECT which protect the interests of private investors.[385] The Claimants argue that the Tribunal is not asked to rule on EU State aid law or to decide on the legality, compatibility or incompatibility of the Respondent's conduct vis-à-vis administrative bodies of the EU such as the DG Competition.[386] The Claimants further add that Spain's failure to notify the support regime to the European Commission only results in a stand-still as to the day of the Commission has taken a decision on the relevant regime.[387]

294. According to the Claimants, the European Commission has never considered or qualified RD 661/2007 and RD 1578/2008 as illegal State aid.[388] The Claimants further point out that the relevance of the Commission's 2017 State Aid Decision SA.40348 2014/N on the present case is unclear. This decision only dealt with the legality of the support regime from 2014 onwards. For the Claimants, this decision implies that any arbitral award, based upon Spain's violation of the ECT, may be subject to a State aid review by the Commission, but it does not affect the Tribunal's jurisdiction.

295. In addition, regarding the question of whether the Claimants were aware of the Respondent's alleged non-compliance with EU State aid law, the Claimants observe that this is a question of fact and merits, not of jurisdiction.[389] The Claimants contest the Respondent's thesis that the Tribunal's

---

[382] Statement of Claim, paras. 20-54; Claimants' Rejoinder, para. 230.
[383] Hearing (1), Day 1, Claimants Slide 46.
[384] Hearing (1), Day 1, Claimants Slide 47.
[385] Claimants' Rejoinder, para. 210.
[386] Claimants' Rejoinder, para. 211.
[387] Hearing (1), Day 1, Claimants Slides 43-44.
[388] Claimants' Rejoinder, para. 217; Claimants' Additional Observations 2022, p. 41.
[389] Claimants' Rejoinder, para. 212.

jurisdiction is affected by the possibility that the dispute before the Tribunal may require the application of EU State aid law.[390]

296. Moreover, so the Claimants further argue, the issue whether the Tribunal had to apply the EU law on State aid and whether it did so correctly may arise after the award is rendered in the course of possible enforcement proceedings. As stated – amongst others – by the arbitral tribunals in *BayWa v. Spain* and *Vattenfall vs. Germany*, it is not in the purview of the Tribunal to look into potential enforcement issues to decide on its jurisdiction.[391] The Claimants further refer, in this regard, to the decision in *Sevilla Beheer v. Spain*, where the tribunal observed that '*the enforceability issues are irrelevant for the purposes of deciding on this jurisdictional objection*'.[392]

*(b)  No primacy of EU Law*

297. The Claimants preliminarily contend that the Respondent has not objected to the Tribunal's jurisdiction in due time. In fact, for the Claimants, the international law principle of estoppel prevents the Respondent from pleading that EU law sets aside Article 26 ECT.[393]

298. The Claimants further argue that the Respondent has failed to show how the alleged need to guarantee the autonomy and primacy of EU law are a legal basis for Respondent's objection to the Tribunal's jurisdiction.[394]

299. For the Claimants, the Respondent has failed to establish why the internal rules of the supranational EU order should be granted primacy. Such an intention has not been incorporated in the ECT, though this would have been possible.[395] The Claimants further observe that the EU, in Article 21 TFEU *in fine*, commits itself to promote multilateral solutions to common problems, such as international energy production and exchanges, which are addressed by the ECT.[396]

300. According to the Claimants, the Declaration of 22 EU Member States of 15 January 2019 stating that the Member States should terminate the intra-EU BITs and inform arbitral tribunals that investment treaties (including the ECT) are to be 'disapplied' is only a political statement. In this Declaration, EU Member States incorrectly seek to undermine retroactively the validity of the ECT.

---

[390] Claimants' Rejoinder, paras. 209-229.
[391] Claimants' Rejoinder, paras. 216, 227-229; Claimants' Additional Observations 2022, p. 42, referring to *BayWa R.E. Renewable Energy GmbH et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Award, 25 January 2021, para. 568, **Exh. CL-348**, and quoting *Vattenfall et al. v. Federal Republic of Germany,* ICSID Case No. ARB/12/12, Decision on the *Achmea* issue, 31. August 2018, para. 230, **Exh. CL-312**.
[392] Claimants' Additional Observations 2022, p. 43, referring to *Sevilla Beheer B. V. et al. v. Spain*, ICSID Case No. ARB/16/27, Decision on Jurisdiction, Liability and the Principles of Quantum, 11 February 2022, para. 677, **Exh. CL-310.**
[393] Claimants' Rejoinder, paras. 218-226.
[394] Claimants' Reply, para. 56; Claimants' Rejoinder, paras. 109, 231.
[395] Claimants' Rejoinder, para. 129.
[396] Hearing (1), Day 1, Claimants Slide 27.

The Claimants observe that, even if the ECT were terminated as amongst EU Member States – as called for in the Declaration – such termination would not affect the application of the ECT to investments made before the termination.[397] Besides, there is no consensus among the signatories with regard to the ECT as 6 Member States, including Sweden (where the seat of these arbitration proceedings is located), noted that the *Achmea Judgment* was silent on the investor-State arbitration clause (Article 26) in the ECT, and refused '*to express views as regards the compatibility with Union law of the intra EU application of the Energy Charter Treaty*'.[398]

301. The Claimants refer to CJEU's *Opinion 1/17*, which assessed the compatibility of CETA's ISDS mechanism with the autonomy of the EU legal order.[399] The Claimants note that, in this decision, the CJEU considered *inter alia* that the CETA ISDS mechanism was outside of the EU judicial system but that it did not adversely affect the autonomy of the EU legal order. According to the Claimants, contrary to what an extrapolation of the reasoning of the *Achmea Judgment* to the ECT would suggest, the mechanisms established in Article 26 ECT are not incompatible with the autonomy of the EU legal order.[400] This is because, as the Claimants contend, the arbitral tribunals operating on the basis of Article 26 ECT comply with the compatibility requirements set by the CJEU, *i.e.* that '*the envisaged arbitral tribunals must not have jurisdiction to interpret and apply rules of EU law other than the provisions of the CETA*' and, even when this requirement is met, the additional requirement that '*the issued awards must not have the effect of preventing the EU institutions from operating in accordance with the EU constitutional framework*'.[401]

302. With respect to the *Komstroy Judgment*, which expressly addresses Article 26 ECT in the light of the *Achmea Judgment*, the Claimants argue that '[t]*he CJEU rested its reasoning* [ … ] *on premises that are dogmatically unsubstantiated, unsustainable and solely politically motivated*'.[402] They content that,  mainly because the CJEU mischaracterises the multilateral nature of the ECT, it ignores that a disconnection clause for intra-EU matters was unsuccessfully proposed during ECT negotiations, and it is contradictory in its consideration of the ECT as EU law.[403] The Claimants also note that the CJEU's discussion of intra-EU matters in the *Komstroy Judgment* exceeded its competence, that they are merely non-binding *obiter dicta* and that, in all events, relying on them would amount to a retroactive application of law.[404]

---

[397] Hearing (1), Day 2, 51'-52' referring to ECT, Article 47.3.
[398] Hearing (1), Day 1, Claimants Slides 50-51.
[399] Claimants' Submission on Opinion 1/17.
[400] Claimants Submission on Opinion 1/17, paras. 10, 15.
[401] Claimants Submission on Opinion 1/17, para. 14.
[402] Claimants' Additional Observations 2022, p. 19.
[403] Claimants' Additional Observations 2022, pp. 19-22.
[404] Claimants' Additional Observations 2022, pp. 22-24.

303. Furthermore, the Claimants do not consider Declaration 17 to the Treaty of Lisbon, to which the European Commission refers in its *Amicus Curiae* brief,[405] as evidence of the primacy of EU law over the ECT. That Declaration refers to '*the conditions laid down by said case law*', *i.e.* the case law based on the *Costa/ENEL* judgment, where the now CJEU established for the first time the primacy principle. However, that case law does not relate to international law. *Costa/ENEL* concerns the primacy of EU law over the law of the Member States. For the Claimants, the ECT is not on the same level as national law but enjoys a higher rank in the hierarchy of norms.[406]

304. The Claimants also disagree with the Respondent's reference to Article 25 ECT, which states that obligations from Economic Integration Agreements (such as the EU Treaties) do not have to be extended to outside parties, as a basis to sustain the principle of primacy of EU Law in intra-EU relations.[407]

305. For the Claimants, a preliminary ruling from the CJEU, such as the *Achmea Judgment*, is only binding upon the court which has requested the ruling. *A fortiori* it is not binding on the Tribunal, which is not an institution of the EU.[408]

306. The CJEU has moreover no monopoly to interpret international treaties.[409] Furthermore, the statement in *Achmea* that EU law has primacy over the laws of Member States[410] does not mean that EU law also has primacy over international law in intra-EU relations, as argued by the Respondent. Indeed, the Claimants consider the reference to the *Opinion 2/13*, which was rendered under the Article 218(11) TFEU procedure before the accession of the EU to the ECHR, to be of no support for the contention that the autonomy of EU law would exclude intra-EU investment disputes from the remit of Article 26 ECT. The Claimants further consider that *Opinion 1/17* was also rendered before the relevant parts of the CETA, notably Chapter 8 on Investment Protection, were in force.[411]

307. *A contrario*, in all the situations in which the EU has already acceded to a treaty, for better or worse, the binding effect of an international treaty prevails over the autonomy of EU law and can only be overcome by the discontinuation of the treaty or conclusion of a new treaty under the applicable rules of the VCLT.[412] Therefore, the EU cannot walk away from its international obligations.

---

[405] *Amicus Curiae* Brief, para. 45.
[406] Claimants' Response, para. 42.
[407] Respondent's Rejoinder, para. 169.
[408] Hearing (1), Day 2, 34'-35'.
[409] Claimants' Rejoinder, paras. 124, 127.
[410] *Slowakische Republik (Slovak Republic) v. Achmea BV,* CJEU (Grand Chamber), Case C-284/16, Judgment, 6 March 2018, para. 58, **Exh. CL-151, CL-215, RL-105, RL-160**. .
[411] Claimants' Submission on Opinion 1/17, paras. 5, 6.
[412] Claimants' Response, para. 37.

308. Regarding the *Budějovický Budvar* judgment of the CJEU, referred to in the European Commission's *Amicus Curiae* brief, the Claimants consider it irrelevant. This is because it concerned a conflict between a BIT and the EC Treaties in a purely intra-EU situation, while the ECT, at stake in the present proceedings, involves also third countries. The Claimants observe that Article 307 EC (now 351 TFEU) would have applied if a third country had been party to the BIT.[413]

309. For the Claimants, the TFEU and TEU do not form *'part of a single regime'* with investment treaties. They are not *'institutionally linked'*. Consequently, even if the EU court system has exclusive jurisdiction over the TFEU and TEU, *'from a public international law perspective'* it has no exclusive jurisdiction to decide on investment treaties.[414] The Claimants conclude that the European Commission has failed to establish how EU law, or rather State aid law, overcomes the *pacta sunt servanda* principle with regard to the ECT.[415]

*(c)   Irrelevance of the Achmea Judgment and the Komstroy Judgment*

310. The Claimants admit that the CJEU has jurisdiction to decide issues of interpretation and application of EU law. But it is not in its purview to nullify international treaties or some of their provisions.[416] Furthermore, the ECT does not name in its Articles 42 and 47 judgments or opinions of the CJEU – or any national court for that matter – as mechanism to amend or terminate the ECT.[417]

311. According to the Claimants, the *Achmea Judgment* is not relevant for the present case. It is limited to a specific bilateral treaty and cannot be taken out of context and transferred to a different multilateral treaty.[418] In this context, the Claimants observe that Article 8 of the Netherlands–Slovakia BIT, which was considered in *Achmea*, directs arbitration tribunals to take into account *'the law in force of the Contracting Party concerned'*, *i.e.* national law, which would include EU law,[419] whereas, under Article 26 ECT, the present Tribunal has to apply the ECT and international law, not EU law. For the Claimants, the secondary EU law, *i.e.* the provisions not contained in the EU Treaties themselves, such as the EU rules on the energy market and State aid, are certainly not part of international law. The Tribunal should consider these EU rules as a fact. By doing so, the

---

[413] Claimants' Response, para. 47.
[414] Claimants' Response, para. 33. They are not institutionally linked since they were mostly entered into between what were, at the time they were entered into, EU Member States and non-member states. [...]' Victoria Barausova, *'Slovak Republic v. Achmea from a Public International Law Perspective: Is State Consent to Arbitrate Under Intra-EU BITs Still Valid?'* in: Mistelis & Lavranos ed., European Investment Law and Arbitration Review, Volume 3, 2018, p. 135 *et seqq.*, **Exh. CL-281.**
[415] Claimants' Response, para. 6.
[416] Claimants' Response, para. 38.
[417] Claimants' Additional Observations 2022, pp. 24-26.
[418] Claimants' Rejoinder, paras. 130-208.
[419] Claimants' Rejoinder, paras. 138

74

Claimants argue, the Tribunal does not undermine the autonomy and primacy of the EU legal order.[420]

312. The Claimants moreover observe that the *Achmea Judgment* concerned a BIT which was concluded by the Slovak Republic before this country joined the EU in 2003. As the German *Bundesgerichtshof* correctly observed,[421] the issue in *Achmea* was therefore that once the Slovak Republic had joined the EU, this BIT became incompatible with EU law (although Article 351 TFEU (Article 307 TEC) provided for a grace period).[422] The issue in the present case is different: Denmark and Spain were already Member States when they concluded the ECT together with the EU. Article 46 VCLT does not allow them to rebut their international obligations by invoking an alleged violation of internal law with regard to their competence to conclude the ECT. Moreover, the ECT – contrary to the Netherlands-Slovakia BIT – is a mixed agreement, entered into by the EU as well as by the Member States. Because the Member States were allowed to become parties to the ECT, they could assume that they had competence to do so, even for intra-EU investments. For the Claimants, any allegation that the ECT would circumvent EU law is absurd. In fact, the ECT itself became part of EU law through the accession of the EU.[423] The Claimants further observe that the CJEU has confirmed that, even after conclusion of the Lisbon Treaty, the Member States retained their competence for dispute settlement in another mixed agreement, *i.e.* the Singapore Free Trade Agreement.[424]

313. For the Claimants, the ruling of the *Achmea Judgment* does not apply to the ECT, which is a mixed agreement, entered into by the Member States as well as by the EU. The Claimants admit that the *Achmea Judgment*, in paragraphs 60 and 62, formulates its holding as applying to '*a provision in an international agreement concluded between Member States*'. However, the ECT is not an agreement between Member States, but an agreement concluded between Member States, the EU and many third States.[425] The fact that the EU itself partakes in an international agreement, such as the ECT, causes international law to have a direct effect in the EU legal order.[426]

314. As regards the *Komstroy Judgment*, which extends the reasoning in the *Achmea Judgment* to the ECT context, the Claimants argue, as noted earlier, that '[t]*he CJEU rested its reasoning* [ … ] *on premises that are dogmatically unsubstantiated, unsustainable and solely politically motivated*'.[427]

---

[420] Claimants' Rejoinder, paras. 170-174.
[421] *Bundesgerichtshof*, Judgment of 31 October 2018, para. 20, **Exh. EC-9**; **Hindelang 36.**
[422] Hearing (1) Day 2, 40.5-41.25.
[423] Hearing (1) Day 2, 38.18- 40.19.
[424] Claimants' Response on *Amicus Curiae* Brief, para. 19.
[425] Claimants' Response on *Amicus Curiae* Brief, para. 35.
[426] Claimants' Rejoinder, paras. 151-152,
[427] Claimants' Additional Observations 2022, p. 19.

Given its deficiencies[428] and the fact that other investment tribunals acting under the ECT have upheld their jurisdiction despite the CJEU's reasoning in the *Komstroy Judgment*,[429] the ruling has no effect on the jurisdiction of the Tribunal in the present proceedings.[430]

315. The Claimants further note that the *Achmea Judgment* concerned an investor's claim regarding the BIT's access regime, which overlaps with the EU internal market's regime, while in the present arbitration investment protection rather than access is at stake.[431] The scope of the arbitration proceedings under the ECT is, however, more limited than under the Netherlands-Slovakia BIT and are unrelated to EU law, according to the Claimants.[432] The *Achmea* case thus clearly concerned the EU's internal market regime on the free movement of capital, while the present claims are based upon Articles 10 and 13 ECT, with no need to interpret EU law.[433] The Claimants conclude that, as the Tribunal has only to interpret the ECT, the autonomy of the EU is not at stake.

## C.    The Commission's *Amicus Curiae* brief

316. For the European Commission, the dispute before the Tribunal falls squarely within the scope of EU law. The contested measures not only transpose into Spanish law the Directive on Renewable Energy but the Spanish initial support system also constitutes illegal State aid under EU law. The compensation claimed before the Tribunal would equally be considered State aid which needs to be approved by the European Commission.[434]

317. The European Commission's *Amicus Curiae* brief notes that, under Articles 1(3) and 26 ECT, the Tribunal has to apply to the present intra-EU investment dispute EU law as part of international law.[435] Referring to the *Achmea Judgment*, to its Decision SA 40348 of November 2017[436] and to its Communication of 19 July 2018,[437] the European Commission states that Articles 267 and 344 TFEU make Article 26 ECT inapplicable for intra-EU investment disputes.

---

[428] Claimants' Additional Observations 2022, pp. 19-24.

[429] Claimants' Additional Observations 2022, pp. 18, 29, referring to *Sevilla Beheer B.V. et al. V. Kingdom of Spain*, ICISD Case No. ARB/16/27, Decision on Jurisdiction, Liability and the Principles of Quantum, 11 February 2022, para. 676, **Exh. CL-310**, and *Infracapital F1 S.à.r.l. et al. v. Kingdom of Spain*, ICSID Case No. ARB/16/18, Decisions on Respondent's Request for Reconsideration Regarding the Intra-EU Objection and the Merits, 1 February 2022, paras. 113-116, **Exh. CL-321**.

[430] Claimants' Additional Observations 2022, p. 29.

[431] Claimants' Rejoinder, para. 135.

[432] Claimants' Rejoinder, paras. 136-139.

[433] Claimants' Rejoinder, paras. 135-137; Claimants' Response on *Amicus Curiae* Brief, para. 43.

[434] *Amicus Curiae* Brief, paras. 3-5.

[435] *Amicus Curiae* Brief, paras. 6-7.

[436] *Official Journal of the European Union*, OJ C 442, 22, 22.12.2017.

[437] Communication by the EC on the 'Protection of Intra-EU Investment' of 19 July 2018, COM (2018) 547/2, pp. 3-4, attached as Annex I to the EC Application for Leave to Intervene of 15 November 2018.

318. The European Commission observes that the Claimants enjoy complete, strong and effective protection of their intra-EU investment under EU law, including in particular the protection of legitimate expectations.[438]

## 1. *No intra-EU application for Article 26 ECT*

319. The European Commission points out that the *Achmea Judgment*, which states EU law *ex tunc*, clarified that Articles 267 and 344 TFEU preclude intra-EU investment arbitration on the basis of Article 26 ECT.[439] The *Achmea Judgment* – so the European Commission observes - does not only affect the validity of arbitration provisions in intra-EU bilateral investment treaties, but also applies to the intra-EU relations within a multilateral treaty like the ECT.[440] Many Member States, such as Hungary, the Czech Republic, Spain, Italy but also Germany and the Netherlands, have confirmed that the ECT does not apply to intra-EU investments.[441] -

## 2. *The Tribunal is entitled to rule on its own jurisdiction*

320. The European Commission points out that an arbitral tribunal has the competence to decide on its own jurisdiction. In this case, Article 26 ECT instructs the Tribunal to assess its jurisdiction under international law. For the European Commission, EU law is part of international law and has to be applied by the Tribunal to rule on its jurisdiction over an intra-EU investment dispute.[442]

## 3. *In case of conflict, EU Treaties prevail over the ECT under EU law*

321. The European Commission notes that EU law prevails over the ECT. It refers *inter alia* to the award in *Electrabel v. Hungary*, which established the primacy of EU law on the basis of Article 351 TFEU, which in turn reflects international customary law, as codified in Article 30 VCLT.

322. The CJEU has also confirmed, on several occasions, that Member States have to recognise the primacy of EU law over international treaties. The European Commission points out that the EU and the Member States moreover have confirmed the unquestionable primacy of EU law over the law of the Member States in Declaration 17 to the Treaty of Lisbon.[443]

## 4. *In case of conflict, EU law prevails over the ECT under Article 30(4) VCLT*

323. The European Commission considers that in all events the *inter se* obligations between Member States under the 1994 ECT are superseded by the 2007 Treaty of Lisbon pursuant to Article 30(4)(a)

---

[438] *Amicus Curiae* Brief, para. 6.
[439] *Amicus Curiae* Brief, paras. 34-38.
[440] *Amicus Curiae* Brief, para. 41.
[441] *Amicus Curiae* Brief, para. 43.
[442] *Amicus Curiae* Brief, paras. 47-49.
[443] *Amicus Curiae* Brief, para. 45, **Exh. EC-17**.

VCLT. For the European Commission, the ECT and the EU Treaties have the same subject matter and are conflicting. Consequently, the ECT does not apply to intra-EU investment disputes.[444]

### 5. *Article 16 ECT does not apply*

324. For the European Commission, Article 16 ECT does not apply because this provision concerns the mutual interpretation of two treaties and does not contain a rule for conflicting treaties. However, the ECT and the EU Treaties are in conflict. Moreover, Article 16 ECT has been overtaken by the later Declaration 17 of the Treaty of Lisbon, which establishes the primacy of EU law.[445]

### 6. *The ECT does not apply to intra-EU disputes where the EU has exclusive external competence*

325. Even if intra-EU investments had been covered by the ECT at the outset, the European Commission observes that this would no longer be the case when the dispute concerns matters which have become the exclusive competence of the EU. Indeed, as the European Commission sees it, Articles 1(2), 1(3) and 1(10) and 36(7) ECT, which consider the EU as well as the Member States to be parties to the ECT, recognise the transfer of competences from the Member States to the EU and the consequences thereof.[446]

326. In this context, the European Commission notes that the EU has exclusive external competence with regard to the Renewable Energy Directive, as confirmed by the CJEU.[447] In this situation, the EU – rather than the Member States – is the relevant party to the ECT.[448]

327. The European Commission further points out that, in the event an intra-EU investment dispute could be brought before an arbitration tribunal under Article 26 ECT, the investor would be allowed to indirectly challenge EU law, as applied by the Member State in which it invested, before a non-EU tribunal, despite the fact that such challenges must be brought before EU jurisdictions.[449]

328. The European Commission moreover observes that the absence of an explicit disconnection clause in the ECT cannot be taken to mean that the ECT remains applicable to intra-EU disputes. For the European Commission, the ECT has admitted the EU as a Party in its own right and the ECT no longer applies to intra-EU disputes in matters where the EU has exclusive competence.[450]

---

[444] *Amicus Curiae* Brief, paras. 58-64.
[445] *Amicus Curiae* Brief, para. 66.
[446] *Amicus Curiae* Brief, paras. 15-19.
[447] *Amicus Curiae* Brief, para 21, referring to *Green Network*, C-66/13, ECLI:EU:C:2014:2399, para 65.
[448] *Amicus Curiae* Brief, paras. 23-25.
[449] *Amicus Curiae* Brief, para. 27.
[450] *Amicus Curiae* Brief, paras. 28-33.

### 7. *Final considerations*

329. The European Commission finally observes that the Claimants are not entitled to invoke legitimate expectations. Nor can they invoke Article 70 VCLT, which governs the consequences of the termination of a treaty, as this provision is not concerned with the rights of individuals, to rely on Article 26 ECT.[451]

330. The Tribunal considers that the European Commission's other considerations, *i.e.* on the merits and on the enforceability of the Tribunal's award[452], are outside of the scope of the *Amicus Curiae* brief, as permitted by the Tribunal in its letter of 30 November 2018. Therefore, they are not taken into account here.

### D. The Tribunal's decision

### 1. *Preliminary Considerations*

331. The summary of the positions of the Parties provided in the foregoing paragraphs gives a sense of the complexity of the argumentative line followed by each Party. Throughout these proceedings, the Parties have reframed their arguments both in order to take into account several relevant developments occurring in parallel to this arbitration and in order to re- or de-emphasise different aspects of their argumentation in this light. Moreover, each Party has presented its arguments on two planes, the ECT and EU law, each emphasising the plane that better serves its position but also placing itself on the other plane and defending its position in the alternative.

332. The Tribunal considers that the distinction made between separate planes is artificial and obscures the issues that must be decided. Yet, it also considers that it has the duty to discuss all the major arguments presented by the Parties, even if that requires in some cases an analytical detour. Ultimately, the resolution of the Respondent's general jurisdictional objection *ratione voluntatis* must overcome the binary logic of an either 'insider' or 'outsider' perspective with respect to EU law and focus on the situation as it appears to the Tribunal.

333. In such circumstances, the law applicable to the determination of jurisdiction cannot be circumscribed on the basis of rigid categories such as the EU law or public international law, the use of which would purportedly entail inclusions or exclusions *en bloc* of certain norms. The analysis must be conducted at a finer-grained level whereby certain questions are governed by the combined operation of certain specific norms, whether from international or domestic law.

---

[451] *Amicus Curiae* Brief, para. 67.
[452] *Amicus Curiae* Brief, paras. 68-81.

334. Specifically, the Tribunal must determine whether Article 26 ECT can operate in the relations between Denmark and Spain, two EU Member States bound by a complex network of legal relations, as a basis for investors from Denmark, whose action unfolds within this network of legal relations taken as whole, to rely on as a valid unilateral offer by Spain to arbitrate a dispute raising specific matters regulated by EU law in proceedings based in Stockholm, Sweden, another EU Member State.

335. As noted in connection with the law applicable to jurisdiction (*supra* paragraphs 153-172), Article 26 ECT provides the starting point of the Tribunal's analysis. The Tribunal will first review several arguments advanced by the Parties with respect to the ECT. Subsequently, it will analyse the validity of the arbitration agreement under the law applicable to jurisdiction, which includes *inter alia* certain EU norms applicable both as a matter of international law and of domestic law.

**2.   *Analysis under the ECT***

*(a)   Starting point of the analysis*

336. The starting point for the Tribunal's determination of its jurisdiction is Article 26 ECT, which reads as follows:

> '*Article 26: Settlement of Disputes between an Investor and a Contracting Party*
>
> *(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.*
>
> *(2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:*
>
>> *(a) to the courts or administrative tribunals of the Contracting Party party to the dispute;*
>>
>> *(b) in accordance with any applicable, previously agreed dispute settlement procedure; or*
>>
>> *(c) in accordance with the following paragraphs of this Article.*
>
> *(3)   (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.*
>
>> *(b)   (i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).*
>>
>> *(ii) For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in*

*accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.*

(c)  *A Contracting Party listed in Annex IA does not give such unconditional consent with respect to a dispute arising under the last sentence of Article 10(1).*

*(4) In the event that an <u>Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to</u>:*

(a)  *(i) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the 'ICSID Convention'), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention; or*

*(ii) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention referred to in subparagraph (a)(i), under the rules governing the Additional Facility for the Administration of Proceedings by the Secretariat of the Centre (hereinafter referred to as the 'Additional Facility Rules'), if the Contracting Party of the Investor or the Contracting Party party to the dispute, but not both, is a party to the ICSID Convention;*

(b)  *a sole arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (hereinafter referred to as 'UNCITRAL'); or*

(c)  *<u>an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce.</u>*

(5)  *<u>(a) The consent given in paragraph (3) together with the written consent of the Investor given pursuant to paragraph (4)</u> shall be considered to satisfy the requirement for:*

*(i) written consent of the parties to a dispute for purposes of <u>Chapter II of the ICSID Convention and for purposes of the Additional Facility Rules</u>;*

*(ii) an <u>'agreement in writing' for purposes of article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, 10 June 1958</u> (hereinafter referred to as the 'New York Convention'); and*

*(iii)<u>'the parties to a contract [to] have agreed in writing' for the purposes of article 1 of the UNCITRAL Arbitration Rules.</u>*

*(b) Any arbitration under this Article shall at the request of any party to the dispute be held in a state that is a party to the New York Convention. Claims submitted to arbitration hereunder shall be considered to arise out of a commercial relationship or transaction for the purposes of article I of that Convention.*

(6)  *<u>A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.</u>*

(7)  *An Investor other than a natural person which has the nationality of a Contracting Party party to the dispute on the date of the consent in writing*

> *referred to in paragraph (4) and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting Party, shall for the purpose of article 25(2)(b) of the ICSID Convention be treated as a 'national of another Contracting State' and shall for the purpose of article 1(6) of the Additional Facility Rules be treated as a 'national of another State'*
>
> (8) *The awards of arbitration, which may include an award of interest, shall be final and binding upon the parties to the dispute. An award of arbitration concerning a measure of a sub-national government or authority of the disputing Contracting Party shall provide that the Contracting Party may pay monetary damages in lieu of any other remedy granted. Each Contracting Party shall carry out without delay any such award and shall make provision for the effective enforcement in its Area of such awards.'*
> (emphasis added)

337. Article 26 ECT, as a provision of an international treaty, has to be interpreted in accordance with the rules of treaty interpretation formulated in Article 31 VCLT, which reads:

> *'1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in light of its object and purpose.*
>
> *2. The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:*
>
> *(a) Any agreement relating to the treaty which was made between all the parties in connexion with the conclusion of the treaty;*
>
> *(b) Any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.*
>
> *3. There shall be taken into account, together with the context:*
>
> *(a) Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;*
>
> *(b) Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;*
>
> *(c) Any relevant rules of international law applicable in the relations between the parties.*
>
> *4. A special meaning shall be given to a term if it is established that the parties so intended.'*

338. Thus, the Tribunal must begin its analysis by considering the ordinary meaning of the relevant ECT's terms, their context and the object and purpose of the ECT, pursuant to Article 31 VCLT.

*(b)  Ordinary meaning.*

339. Article 31 VCLT requires the Tribunal to begin by examining the ordinary meaning of the relevant terms of Article 26 ECT.

340. Of particular relevance for the ascertainment of consent to arbitration under this provision is Article 26(3)(a) ECT, according to which each Contracting Party gives '*its unconditional consent to the submission of a dispute to international arbitration … in accordance with the provisions of this Article*'.

341. On its wording, the offer to arbitrate in this sentence is unqualified by any carve-out for intra-EU investor-State arbitrations, and it is '*unconditional*'.

342. Also of note are three additional specifications arising from the terms of Article 26 ECT. First, Article 26(3)(a) ECT is formulated as a unilateral act emanating from each Contracting Party. Secondly, this understanding is confirmed by Articles 26(4) (chapeau) and 26(5)(a) ECT, which both state the need for the investor to further provide its consent in writing to accept the unilateral offer. Thus, the agreement to arbitrate rests on two different elements, a unilateral offer and its acceptance. Thirdly, for the avoidance of doubt, Article 26(5)(a) ECT expressly contemplates that an agreement to arbitrate consisting of these two components is deemed to satisfy the requirements of other potentially applicable norms. It is therefore clear that other norms may be applicable to determine the validity of the agreement to arbitrate.

343. Although the Tribunal could consider the ordinary meaning to be clear and stop its analysis here, or merely search for confirmatory clues in the context, object and purpose and possibly the preparatory works of the ECT, proceeding in such a manner would overlook, indeed ignore the complexities of this case.

344. Failing to keep specifically in mind the circumstances of the case in its assessment of the ordinary meaning of the wording of Article 26 ECT would not only disregard the extensive and detailed arguments of the Parties but, more generally, it would turn the interpretation effort into an exercise in abstraction, whereas treaty interpretation should be precisely the opposite. The ordinary meaning of the terms must be clear not only on paper but as applied to the relevant facts of the case. This conclusion follows from the requirement of good faith.

345. The International Court of Justice ('**ICJ**') came to a similar conclusion in the case concerning the *Gabčíkovo-Nagymaros Project*, where it noted by reference to the treaty at stake in that case that: '*it is the purpose of the Treaty, and the intentions of the parties in concluding it, which should prevail over its literal application. The principle of good faith obliges the Parties to apply it in a reasonable way and in such a manner that its purpose can be realized*'.[453]

---

[453] *Gabčíkovo-Nagymaros Project (Hungary/Slovakia)*, Judgment of 25 September 1997, ICJ Reports 1997, p. 7, para. 142.

346. From this vantage point, the Tribunal would not be discharging its duty if it simply stopped at this stage. It therefore needs to review the other arguments and the evidence adduced in support of them, which it hereafter undertakes to do following the sequence mentioned in Articles 31 and 32 VCLT.

*(c)   Context*

347. The next step under Article 31(1) VCLT is to consider the context of Article 26 ECT. There are two inquiries that must be conducted in this regard. First, the Tribunal must determine the specific aim of resorting to the context of a provision and, more specifically, it must identify the term or terms of the treaty for which a contextual interpretation must be conducted as well as the specific interpretive outcome that may be derived from it. Secondly, the Tribunal must determine the relevant context to be considered for the first inquiry. Article 31(2) and (3) VCLT only provide guidance on the scope of the second inquiry, clarifying what can be considered as part of the context.

348. However, in the examination of the objection *ratione voluntatis*, the first inquiry cannot be confined to the determination of the meaning of '*Contracting Party*', used in several paragraphs of Article 26 ECT. Even if EU Member States are Contracting Parties (see *supra* paragraphs 185-195), it is still necessary to consider whether a unilateral offer to arbitrate under Article 26(3)(a) ECT can be validly given by an EU Member State to the investors of another EU Member State despite the existence of another agreement between these EU Member States which prevents them from making such an offer.

349. With the first inquiry thus reformulated, the second inquiry, *i.e.* the scope of what must be considered as part of the context, also needs reformulation. The provisions and instruments that form the context for this question include, in accordance with Article 31(1), (2) and (3) VCLT, not only the entire text of the ECT (Article 31(2) chapeau VCLT) but also other instruments *'made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty'* (Article 31(2)(b) VCLT), subsequent agreements and practice (Article 31(3)(a)-(b) VCLT), and '*[a]ny relevant rules of international law applicable in the relations between the parties'* (Article 31(3)(c) VCLT). The Tribunal will now analyse these different elements of the context from the perspective of the first inquiry.

*Text of the treaty*

350. The text of the ECT expressly recognises the possibility for a group of States to enter into a network of special legal relations among them. Four main provisions of the ECT are relevant in this regard. Article 1(2) ECT defines '*Contracting Party*' as follows:

> *''Contracting Party' means a state or <u>Regional Economic Integration Organisation</u> which has consented to be bound by this Treaty and for which the Treaty is in force.'* (emphasis added)

Under Article 1(3) ECT, a Regional Economic Integration Organisation (**'REIO'**) means:

> *'an organisation constituted by states to which <u>they have transferred competence over certain matters</u> a <u>number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters.</u>'* (emphasis added)

Article 1(10) ECT defines what is meant by the *'Area'* of a *'Contracting Party'*, including that of a REIO:

> *''Area' means with respect to a state that is a Contracting Party:*
>
> *(a) the territory under its sovereignty, it being understood that territory includes land, internal waters and the territorial sea; and*
>
> *(b) subject to and in accordance with the international law of the sea: the sea, sea-bed and its subsoil with regard to which that Contracting Party exercises sovereign rights and jurisdiction.*
>
> *<u>With respect to a Regional Economic Integration Organisation which is a Contracting Party, Area means the Areas of the member states of such Organisation, under the provisions contained in the agreement establishing that Organisation.</u>'* (emphasis added)

Article 25 ECT recognises that the network of legal relations among the States that are parties to a REIO may be different from the relations between a State party to such REIO and an ECT Contracting Party which is not a party to such REIO:

> *'(1) <u>The provisions of this Treaty shall not be so construed as to oblige a Contracting Party which is party to an Economic Integration Agreement (hereinafter referred to as 'EIA') to extend, by means of most favoured nation treatment, to another Contracting Party which is not a party to that EIA, any preferential treatment applicable between the parties to that EIA as a result of their being parties thereto.</u>*
>
> *(2) For the purposes of paragraph (1), 'EIA' means an agreement substantially liberalising, inter alia, trade and investment, by providing for the absence or elimination of substantially all discrimination between or among parties thereto through the elimination of existing discriminatory measures and/or the prohibition of new or more discriminatory measures, either at the entry into force of that agreement or on the basis of a reasonable time frame.*
>
> *[…]'* (emphasis added)

351. The EU is a REIO (Regional Economic Integration Organisation) based *inter alia* on an EIA (Economic Integration Agreement) concluded among EU Member States. Spain and Denmark, as EU Member States, are part of this REIO. The provisions reproduced in the foregoing paragraph expressly recognise, therefore, that EU Member States may grant each other special benefits arising from the special network of relations that they have established among them (Article 25 ECT) and

that they may also be subject to special requirements as a result of such network (Article 1(3) ECT). Significantly, Article 1(3) ECT expressly acknowledges in the very definition of a REIO the possibility for EU Member States to transfer competence over certain matters to a REIO such as the EU and, equally importantly, to be bound by decisions taken by the EU, and its organs, in respect of such matters.

352. In the context of the discussion as to whether the ECT contains a so-called 'disconnection clause', the Claimants have expressly recognised that Article 25 ECT is a '*carve-out for economic integration agreements*'.[454] Given the fact that the EU, as a REIO, relies historically and at present on such an economic integration agreement (albeit the degree of integration is much deeper in a common internal market), the Tribunal cannot follow the argument of the Claimants that a so-called 'disconnection clause' was needed in the ECT to carve out the internal electricity market. What appears unquestionable to the Tribunal, even at this preliminary stage in the examination of the arguments, is that the special situation of EU Member States is clearly taken into account or, to use the terms selected by the Claimants, it is '*carved-out*'. Such conclusion does not mean, as correctly noted by the Claimants,[455] that Article 25 ECT *automatically* carves-out from the remit of Article 26 ECT disputes between members of a REIO based on an EIA. But Article 25 ECT, as part of the immediate context of Article 26 ECT, does place the meaning of the latter in a different light.

353. Article 1(3) ECT, however, expressly recognises that members of a REIO may be subject to special requirements as a result of their membership. The ECT does not purport to regulate those special requirements. It simply acknowledges that the matters concerned may, to some extent, overlap with those governed by the ECT (Article 1(3) ECT refers to '*certain matters a number of which are governed by this Treaty*') and that the REIO may adopt '*decisions binding on [States parties to the REIO] in respect of those matters*'. But Articles 25(1) ECT ('*as a result of being parties thereto*') and 1(10) ECT ('*under the provisions contained in the agreement establishing that Organisation*') clearly indicate that the special relations among States members to such a REIO arise from the network of legal relations established among them.

354. In the network of relations established among EU Member States, including Spain and Denmark, but also Sweden, which is relevant as the seat of this arbitration, certain matters are subject to special requirements. Among such matters and requirements, the Tribunal must mention two which are raised in the Respondent's objection *ratione voluntatis*, namely (i) the competence to determine State aid, which has been transferred to the EU and is subject to the exclusive jurisdiction of the

---

[454] Claimants' Comments, para. 14.
[455] Claimants' Rejoinder, para. 60.

European Commission[456], and (ii) the requirement under Article 344 TFEU for EU Member States not to submit a dispute concerning the interpretation or application of the EU Treaties to any method of settlement other than those provided for in the EU Treaties.

355. The Tribunal will analyse the implications of these two elements for the relations among EU Member States in the context of its examination of EU law (*infra* paragraphs 413-478). For now, it observes that the relevance of certain provisions of EU law for matters governed by the ECT is expressly acknowledged and incorporated by the text of the ECT.

*Instruments made in connection with the conclusion of the treaty*

356. The next aspect of the context of Article 26 ECT, in accordance with Article 31(2)(b) VCLT, concerns other instruments '*made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty*'.

357. In this regard, the Tribunal notes that, under Declaration 5, included in the Final Act of the European Energy Charter Conference in connection with Article 25 ECT, the EU (then the European Communities) and its Member States '*recall*[ed] *that: Community law provides for the possibility to extend the treatment described above [of branches and agencies based in the EU] to branches and agencies of companies or firms not established in one of the Member States; and that, the application of Article 25 of the Energy Charter Treaty will allow only those derogations necessary to safeguard the preferential treatment resulting from the wider process of economic integration resulting from the Treaties establishing the European Communities.*'[457]

358. This contemporaneous Declaration states that the purpose of Article 25 ECT, as understood by the EU and its Member States, was '*to safeguard the preferential treatment resulting from the wider process of economic integration resulting from the Treaties establishing the European Communities*' (emphasis added). For the Tribunal, this Declaration is clear evidence that Article 25 ECT, which, as noted earlier, the Claimants see as a carve-out clause, was specifically intended to apply to the EU as a process of economic integration. The Tribunal has no difficulty in accepting that this wider process of economic integration includes matters relating to the internal electricity market, State aid, the freedoms of movement envisioned in the EU Treaties, and the need for autonomy and primacy of EU law guaranteed by the system laid out in the EU Treaties.

359. At the time of ratification, which under Part II, Section I VCLT is part of the process of conclusion, by the EU (then the European Communities) of the ECT, the EU made a *Statement submitted by*

---

[456] Article 108 TFEU and European Commission, Decision SA.40348 2014/N of 13 November 2017, para. 165, **Exh. RL-89.**
[457] Energy Charter Treaty. English version. 17 December 1991. Consolidated version, p. 76, **Exh. RL-6.**

*the European Communities to the Secretariat of the Energy Charter pursuant to Article 26(3)(b)(ii) of the Energy Charter Treaty.*[458]

360. The Parties have exchanged arguments regarding certain portions of this Statement and the consequences to be derived from it. The Tribunal observes that the sixth paragraph of this Statement specifically notes: '*Given that the Communities' legal system provides for means of such action [claims brought by an investor], the European Communities have not given their unconditional consent to the submission of a dispute to international arbitration or conciliation*' (emphasis added). This is a clear and unequivocal indication that the EU saw the EU legal system as the natural means of dispute settlement of investor claims, and therefore withheld its unconditional consent to arbitration.

361. It could still be considered that this withholding of consent only applies to claims against the EU as a Contracting Party. Yet, there are two further indications that, at least among EU Member States and in their relations with the EU, the consent to arbitration was not understood to apply intra-EU.

362. First, as the Respondent has correctly noted, the fourth paragraph of the Statement clearly suggests that the scenario envisaged is a claim by an investor of an ECT Contracting Party which is not a EU Member State: '*The Communities and the Member States will, if necessary, determine among them who is the respondent party to arbitration proceedings initiated by an Investor of another Contracting Party. In such case, upon the request of the Investor, the Communities and the Member States concerned will make such determination within a period of 30 days*'. In this paragraph, the EU and its Member States are understood to be acting as a whole with respect to '*another*' Contracting Party. That does not prevent each EU Member State from itself also being considered, as such, as a 'Contracting Party' for ECT purposes: The Statement expressly mentions that the EU and EU Member States have both concluded the ECT and remain responsible for the discharge of the obligations '*in accordance with their respective competences*'. But it suggests that international investor-State arbitration under the ECT was envisaged as operating between, on the one hand, the EU and EU Member States, and on the other hand, other ECT Contracting States.

363. Secondly, the fifth paragraph of the Statement recalls, in an unqualified manner, that '[t]*he Court of Justice of the European Communities, as the judicial institution of the Communities, is competent to examine any question relating to the application and interpretation of the constituent treaties and acts adopted thereunder, including international agreements concluded by the Communities, which under certain conditions may be invoked before the Court of Justice.*' This portion of the Statement, which was issued specifically in connection with the possibility of investor-State arbitration, leaves no doubt as to the understanding, since the conclusion of the ECT, that the CJEU

---

[458] Transparency Document, Annex ID, p.6, **Exh. EC-6.**

remains competent to '*examine any question relating to the application and interpretation of the constituent treaties and acts adopted thereunder*'. The Tribunal understands this sentence as expressing, at the time of ratification of the ECT, a similar position as the one taken by the CJEU in its *Achmea Judgment* and its *Komstroy Judgment* with respect to Articles 267 and 344 TFEU. Both decisions are examined later in this Award (*infra* paragraphs 416-445).

*Subsequent agreements and subsequent practice*

364. Under Article 31(3)(a)-(b) VCLT, the Tribunal shall take into account '*together with the context: (a) Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions; (b) Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation*'.

365. The Parties have referred in their arguments to three declarations which were made after the conclusion of the ECT, and which could potentially fall under Article 31(3)(a)-(b) VCLT: (i) the *Declaration of the EU Commission on behalf of the EU*, 20 May 2015, made at the time of signing the International Energy Charter ('**Declaration I**');[459] (ii) the *Declaration of the Representatives of the Governments of Member States of 15 January 2019 on the legal consequences of the Judgment of the Court of Justice in Achmea and on investment protection in the European Union*[460] (made by representatives of Austria, Belgium, Bulgaria, Croatia, Cyprus, the Czech Republic, Denmark, Estonia, France, Germany, Greece, Ireland, Italy, Latvia, Lithuania, The Netherlands, Poland, Portugal, Romania, Slovakia, Spain, United Kingdom) ('**Declaration II**'); and (iii) the *Declaration of the Representatives of the Governments of the Member States, of 16 January 2019 on the enforcement of the judgment of the Court of Justice in Achmea and on investment protection on the European Union*[461] (made by representatives of Finland, Luxembourg, Malta, Slovenia, Sweden) ('**Declaration III**').

366. Declarations II and III expressly relate to the ECT, whereas Declaration I concerns an instrument, the International Energy Charter, which is closely related to the ECT. The three Declarations specifically address matters of dispute settlement between investors and EU Member States. In the three cases, the Declarations are made by a sub-set of the parties to the ECT.

---

[459] Declaration of 20 May 2015, Hearing (1), Day 2, 6'; available at:
http://www.energycharter.org/fileadmin/DocumentsMedia/Legal/EU_IEC_Declaration.pdf .
[460] **Exh. RL-156**; available at:
https://ec.europa.eu/info/sites/info/files/business_economy_euro/banking_and_finance/documents/190117-bilateral-investment-treaties_en.pdf.
[461] **Exh. RL-157**; available at:
https://ec.europa.eu/info/sites/info/files/business_economy_euro/banking_and_finance/documents/190117-bilateral-investment-treaties_en.pdf.

367. Declaration I states: '*It is declared that due to the nature of the EU internal order, the text in Title II, Heading 4, of the International Energy Charter on dispute settlement mechanisms cannot be construed so as to mean that any such mechanisms would become applicable in relations between the European Union and its Member States, or between the said Member States, on the basis of that text*'.[462] Title II, Heading 4, of the International Energy Charter is devoted to the 'Promotion and protection of investments', and it contains a paragraph stating that '*[t]he signatories affirm the importance of full access to adequate dispute settlement mechanisms, including national mechanisms and international arbitration in accordance with national laws and regulations, including investment and arbitration laws and rules, all the relevant bilateral and multilateral treaties and international agreements*'.

368. The Tribunal understands the text of Declaration I as emphasising that intra-EU investment disputes are subject to a special regime of dispute settlement. This understanding is consistent with what can be gathered from other aspects of the context of Article 26 ECT.

369. However, the Tribunal considers that, whereas Declaration I may be indicative of the general views of the EU, represented by the European Commission, with respect to investment promotion and protection, including dispute settlement, it relates to a declaration of political intention, the International Energy Charter, and therefore it cannot be considered as a 'subsequent agreement' '*regarding the interpretation of the [ECT] or the application of its provisions*' under Article 31(3)(a) VCLT. Moreover, Declaration I has been made by the European Commission on behalf of the EU, rather than by all ECT parties. A similar conclusion applies to whether Declaration I can constitute relevant '*subsequent practice*' under Article 31(3)(b) VCLT. This provision refers to subsequent practice '*in the application of the treaty*'. The Tribunal considers that the relation of Declaration I with the actual application of the ECT is insufficient to conclude that it amounts to '*subsequent practice in the application*' of the ECT '*which establishes the agreement of the [ECT] parties regarding its interpretation*'. This said, Declaration I provides factual evidence suggesting consistency in the understanding of the EU regarding the operation of investor-State arbitration in the broad – by contrast to the specific – context of the ECT.

370. Declaration II, made on 15 January 2019, specifically refers to the '*interpretation of the [ECT] or the application of its provisions*' and could potentially be considered as both a '*subsequent agreement*' and '*subsequent practice*' regarding the ECT, under Article 31(3)(a)-(b) VCLT, but only for a sub-set of the ECT parties. As such, its relevance would be limited to the 22 EU Member States which signed Declaration II and it would reflect their authentic interpretation of the meaning of certain legal relations *inter se*. Significantly, it must be noted that the list of signatories includes

---

[462] Declaration of 20 May 2015, Hearing (1), Day 2, 6'; available at:
http://www.energycharter.org/fileadmin/DocumentsMedia/Legal/EU_IEC_Declaration.pdf.

Spain, the Respondent in these proceedings, and Denmark, the EU Member State where both Claimants are based. For present purposes, this means that Declaration II may only be relevant as an authentic interpretation, *i.e.* an interpretation shared by Spain and Denmark, of the instruments defining their legal relations as both EU Member States and ECT Contracting Parties, with respect to the applicability of the offer of arbitration contained in Article 26 ECT.

371. This shared understanding of the legal relations that are binding upon Spain and Denmark include the following:

> '*international agreements concluded by the Union, <u>including the Energy Charter Treaty, are an integral part of the EU legal order and must therefore be compatible with the Treaties. Arbitral tribunals have interpreted the Energy Charter Treaty as also containing an investor-State arbitration clause applicable between Member States. Interpreted in such a manner, that clause would be incompatible with the Treaties and thus would have to be disapplied</u>* […]*
>
> By the present declaration, Member States <u>inform investment arbitration tribunals about the legal consequences of the Achmea judgment, as set out in this declaration, in all pending intra-EU investment arbitration proceedings brought</u>* either under bilateral investment treaties concluded between Member States or *<u>under the Energy Charter Treaty</u>* […]*
>
> In cooperation with a defending Member State, the Member State, in which an investor that has brought such an action is established, will take the necessary measures <u>to inform</u> the investment arbitration tribunals concerned of those consequences'* (footnotes omitted and emphasis added)

372. This Declaration clearly states that the shared understanding of Spain and Denmark of their legal relationships, including under EU law <u>and</u> the ECT, and of the operation of the arbitration clause in pending arbitration proceedings under the ECT, is the one provided by the CJEU in its *Achmea Judgment* and subsequently confirmed, with explicit reference to the ECT, in its *Komstroy Judgment*. Specifically, this joint authentic interpretation stands for the following propositions: the reasoning of the *Achmea Judgment* is fully applicable to the ECT, as it has been confirmed after the issuance of Declaration II in the *Komstroy Judgment*; an interpretation of the arbitration clause in the ECT (*i.e.* Article 26) as applying to intra-EU relations is incompatible with the EU Treaties; that clause is therefore to be '*disapplied*' in pending proceedings; the home state, in cooperation with the host state, shall '*inform*' the arbitration tribunal of these consequences.

373. In the opinion of the Tribunal, this authentic interpretation raises three main questions in the context of the present proceedings. The first concerns the meaning of the term '*disapplied*'. The second is whether the dates of Declaration II and of the *Achmea Judgment* (to which Declaration II refers) make them irrelevant for an arbitration commenced before their adoption. The third concerns the legal consequences of this Declaration.

374. The first question can be answered by reference to the Judgment of the German *Bundesgerichtshof* of 31 October 2018 setting aside the award in *Achmea*. The German *Bundesgerichtshof* noted that, in accordance with the CJEU's *Achmea Judgment*, Article 8(2) of the Netherlands-Slovakia BIT was contrary to Articles 267 and 344 TFEU. It then reasoned that:

> '*if Article 8(2) of the BIT is thus contrary to Articles 267 and 344 TFEU, it cannot apply* […] *and no effective arbitration agreement has been concluded between the parties* […] *neither of the parties could by means of Article 8(2) of the BIT give the other party a valid undertaking that it would consent to the determination of the disputes referred to in Article 8(1) by an arbitral tribunal. This meant that the applicant had made no offer to conclude an arbitration agreement with investors from the Netherlands that the defendant could then accept.*'[463]

375. Following this reasoning, if a provision is incompatible with the EU Treaties '*it cannot apply*'. In the context of the ECT, stating that Article 26(3)(a) ECT '*cannot apply*' is, in the view of the Tribunal, the same as to state that it must be '*disapplied*'. Specifically, it means that when its application is incompatible with the EU Treaties – as is the case when an investor of an EU Member State brings an investor-State arbitration claim against another EU Member State – this provision cannot serve as a basis for a unilateral offer of arbitration that an investor could potentially accept. Conversely, when its application is not incompatible with the EU Treaties – as is the case when an investor of another ECT Contracting State, which is not an EU Member State, brings a claim against either an EU Member State, the EU or another ECT Contracting State – then Article 26(3)(a) ECT may serve as a basis for a unilateral offer of arbitration that an investor can potentially accept. The term '*disapplied*' thus emphasises that the unilateral '*offer*' is not applied in a given context irrespective of its validity in other contexts.

376. The second question concerns the relevance of the date of Declaration II as well as of the underlying *Achmea Judgment*, which both came after the commencement of arbitration proceedings in this case. The Tribunal considers that the answer to the first question pre-determines the answer to the second question. Indeed, if the offer of arbitration is '*disapplied*', it is so since the date of the incompatibility between Article 26(3)(a) ECT and Articles 267 and 344 TFEU (and their predecessors) and not since the date of the *Achmea Judgment* or of Declaration II. This is because both the *Achmea Judgment* and Declaration II are interpretations.

377. In its *Amicus Curiae* brief, the European Commission provided a useful reference to the case *Association Vent de colère*, where the CJEU (Second Chamber) noted, with respect to the operation of the preliminary ruling procedure under Article 267 TFEU that:

> '*It should be recalled in this connection that, according to settled case-law, the interpretation which, in the exercise of the jurisdiction conferred upon it by Article*

---

[463] *Bundesgerichtshof*, Judgment of 31 October 2018, paras. 25-26, **Annex EC-9.**

> *267 TFEU, the Court gives to a rule of European Union law clarifies and defines the meaning and scope of that rule as it must be, or ought to have been, understood and applied from the time of its coming into force. It follows that the rule as thus interpreted may, and must, be applied by the courts to legal <u>relationships arising and established before the judgment ruling</u> on the request for interpretation, provided that in other respects the conditions for bringing before the courts having jurisdiction an action relating to the application of that rule are satisfied'*[464]

378. This has been further confirmed by the CJEU's *PL Holdings Judgment*, with respect to the effects and implications of the *Achmea Judgment*:

> *'[I]t must be recalled that, according to settled case-law, the interpretation which the Court, in the exercise of the jurisdiction conferred on it by Article 267 TFEU, gives to a rule of EU law clarifies and defines the meaning and scope of that rule as it must be, or ought to have been, understood and applied from the date of its entry into force. It follows that the rule as thus interpreted may and must be applied by the courts to the legal relationships arising and established before the judgment ruling on the request for interpretation'*[465]

Thus, the fact that the *Achmea Judgment*, Declaration II and, indeed, the *Komstroy Judgment* post-date the commencement of arbitration proceedings in the present case does not affect their relevance.

379. This is not a solution peculiar to EU law. The same considerations apply to the authentic interpretation of the terms of a treaty by its parties in public international law. As noted by the UN International Law Commission in the Commentary to its Draft Articles on the Law of Treaties, which led to the adoption of the VCLT: *'[A]n agreement as to the interpretation of a provision reached after the conclusion of the treaty represents an authentic interpretation by the parties which must be read into the treaty for purposes of its interpretation'*.[466] In the case concerning the *Kasikili/Sedudu Island (Botswana/Namibia)*,[467] the ICJ referred with assent to this paragraph of the ILC Commentary, and recalled another paragraph of this Commentary according to which: *'The importance of such subsequent practice in the application of the treaty, as an element of interpretation, is obvious; for it constitutes objective evidence of the understanding of the parties as to the meaning of the treaty'*.[468] The Court also noted, by reference to its case law, that *'in the*

---

[464] *Association Vent de colère*, Judgment of 19 December 2013, C-262/12, para. 39, ECLI:EU:C:2013:851.

[465] *Republiken Polen (Republic of Poland) v. PL Holdings Sarl*, CJEU (Grand Chamber) Case C-109/20, Judgment, 26 October 2021, para. 58, **Exh. RL-168.**

[466] Yearbook of the International Law Commission, 1966, vol. II, A/CN.4/SER. A/1966/Add.1, p. 221, para. 14.

[467] *Kasikili/Sedudu Island (Botswana/Namibia)*, Judgment of 13 December 1999, ICJ Reports 1999, p. 1045.

[468] *Kasikili/Sedudu Island (Botswana/Namibia)*, Judgment of 13 December 1999, ICJ Reports 1999, p. 1045, p. 1075 *et seq.*, para. 49, referring to the Yearbook of the International Law Commission, 1966, vol. II, A/CN.4/SER. A/1966/Add.1, p. 221, para. 15.

*past, when called upon to interpret the provisions of a treaty, the Court has itself frequently examined the subsequent practice of the parties in the application of that treaty'.*[469]

380. In the case of investment arbitration, the operation of authentic interpretation presents some peculiarities. These result from the nature of proceedings opposing a State, which, as one of the parties to the applicable treaty, may liaise with its counterparts to interpret and potentially modify the treaty's meaning. This can be contrasted to a private party, which does not have such power. Yet, in the present case, the Tribunal does not see the interpretation contained in Declaration II as an attempt to retroactively modify the meaning of the terms of the ECT. The context of the ECT shows several prior indications (see *supra* paragraphs 356-363) of the shared understanding conveyed by Spain and Denmark, as well as 20 other EU Member States, of the relations between EU law and the ECT on the specific issue of investment arbitration.

381. Moreover, the authorities in a different context, that of the North-American Free Trade Agreement ('**NAFTA**'), confirm the relevance of Article 31(3)(a)-(b) VCLT in the context of investment arbitration. In *Methanex v. United States*,[470] the arbitral tribunal took stock of several prior decisions addressing the effects of an authentic interpretation (by the Free Trade Commission ('**FTC**')) which had intervened while the relevant arbitration proceedings were pending. The investor challenged the relevance of the FTC interpretation as a retroactive amendment.[471] The United States replied that irrespective of the validity of the FTC interpretation under Article 1131(2) NAFTA, which attached binding force to the FTC note, such interpretation evidenced a subsequent agreement among the NAFTA States parties as to the meaning of Article 1105 of the NAFTA.[472] On this question, the tribunal: '*ha*[d] *no difficulty in deciding that the FTC's Interpretation of 31ˢᵗ July 2001 is properly characterized as a 'subsequent agreement' on interpretation falling within the scope of Article 31(3)(a) of the Vienna Convention'.*[473] The arbitral tribunal then added that, as a subsequent agreement, independently of Article 1131(2), the FTC interpretation carried great weight:

> '*Leaving to one side the impact of Article 1131(2) NAFTA, the FTC's interpretation must also be considered in the light of Article 31(3)(a) of the Vienna Convention as it constitutes a subsequent agreement between the NAFTA Parties on the interpretation of Article 1105 NAFTA (without here deciding Methanex's*

---

[469] *Kasikili/Sedudu Island (Botswana/Namibia)*, Judgment of 13 December 1999, ICJ Reports 1999, p. 1045, p. 1076, para. 50.

[470] *Methanex Corporation v. United States of America*, Final Award of the Tribunal on Jurisdiction and Merits, UNCITRAL, 3 August 2005.

[471] *Methanex Corporation v. United States of America*, Final Award of the Tribunal on Jurisdiction and Merits, UNCITRAL, 3 August 2005, Part IV - Chapter C - p. 2, para. 4.

[472] *Methanex Corporation v. United States of America*, Final Award of the Tribunal on Jurisdiction and Merits, UNCITRAL, 3 August 2005, Part II - Chapter B - p. 8 *et seqq.*, para. 19.

[473] *Methanex Corporation v. United States of America*, Final Award of the Tribunal on Jurisdiction and Merits, UNCITRAL, 3 August 2005, Part II - Chapter B - p. 10, para. 21.

*claim that the interpretation of 31st July 2001 is in truth an amendment, not an interpretation). It follows that any interpretation of Article 1105 should look to the ordinary meaning of the provision in accordance with Article 31(1) of the Vienna Convention, and also take into account the interpretation of 31st July 2001 pursuant to Article 31(3)(a) of the Vienna Convention. Indeed, according to Oppenheim's, an authentic interpretation by treaty parties overrides the ordinary principles of interpretation'.*[474]

382. Finally, when interpreting the meaning of Article 1105 of the NAFTA, the arbitral tribunal emphasised the merely declaratory effect of the FTC interpretation: '[f]*or, as far as Methanex's textual claim under Article 1105(1) was concerned, the [FTC] interpretation changed nothing.'*[475]

383. The Tribunal shares the understanding of the *Methanex* tribunal regarding the operation of Article 31(3)(a)-(b) VCLT and, as noted earlier, it considers that Declaration II cannot be said to have modified retroactively the understanding of the relations between the ECT and EU law, which had already been expressed prior to the commencement of the present proceedings. This observation answers the third question identified above with respect to the effect of Declaration II. The Tribunal concludes that the effect of the Declaration is only of an interpretive nature. It provides an additional indication of how Spain and Denmark understood and understand their legal relations under the ECT and EU law, including the application in such relations of a unilateral offer of arbitration by one of these countries made to an investor of the other.

384. Regarding Declaration III, made by 5 EU Member States on 16 January 2019, the Tribunal is aware that the position taken by such Member States with respect to the scope of the *Achmea Judgment* is similar for bilateral investment treaties but more nuanced for the implications for the ECT. In this regard, Declaration III states the following:

> '*The [five] Member States note that the Achmea judgment is silent on the investor-state arbitration clause in the Energy Charter Treaty. A number of international arbitration tribunals post the Achmea judgment have concluded that the Energy Charter Treaty contains an investor-state arbitration clause applicable between EU Member States. This interpretation is currently contested before a national court in a Member State. Against this background, the Member States underline the importance of allowing for due process and consider that it would be inappropriate, in the absence of a specific judgment on this matter, to express views as regards the compatibility with Union law of the intra EU application of the Energy Charter Treaty*'[476]

---

[474] *Methanex Corporation v. United States of America*, Final Award of the Tribunal on Jurisdiction and Merits, UNCITRAL, 3 August 2005, Part II - Chapter H - p. 11, para. 23, citing *Oppenheim's International Law*, 9th ed., Volume 1, p. 630.

[475] *Methanex Corporation v. United States of America*, Final Award of the Tribunal on Jurisdiction and Merits, UNCITRAL, 3 August 2005, Part IV - Chapter C - p. 9, para. 18.

[476] **Exh. RL-157**, p. 3; available at:
https://ec.europa.eu/info/sites/info/files/business_economy_euro/banking_and_finance/documents/190117-bilateral-investment-treaties_en.pdf

385. The Tribunal notes that this Declaration contains a sufficiently specific reference to the ECT to fall under Article 31(3)(a)-(b) VCLT. The Tribunal must take a position on the application of the *Achmea Judgment* to the ECT, and it will do so at a later stage in the light of the relevant interpretive guidance, including the *Komstroy Judgment*. But such position is not relevant for the assessment of Declaration III. What may be relevant for this assessment is, first, the content of the Declaration as regards the ECT and, secondly, the fact that Sweden, which is the seat of the present arbitration, is among the signatories of this Declaration.

386. Regarding the first point, the Tribunal observes that the Declaration does not take a position as to whether the interpretation of *inter alia* Articles 267 and 344 TFEU by the CJEU in the *Achmea Judgment* is applicable or not to Article 26 ECT. The Parties disagree as to the reasons why these 5 Member States deemed it necessary to express their views on this matter. The Tribunal can only rely on the text of the Declaration, which justifies this position by reference to the fact that '*[t]his interpretation is currently contested before a national court in a Member State. Against this background, the Member States underline the importance of allowing for due process and consider that it would be inappropriate, in the absence of a specific judgment on this matter, to express views*' (footnotes omitted). The Tribunal is satisfied with this explanation, which was offered by the Respondent, and simply takes note that no views, whether to include Article 26 ECT in the scope of the *Achmea Judgment* or to exclude it from it, are expressed by the signatories at this stage.

387. With respect to the identity of the signatories, the Tribunal observes that Sweden, which is the seat of this arbitration, is among the 5 Member States which made this separate Declaration. The Tribunal understands that the national court of a Member State referred to in the Declaration is the Svea Court of Appeals, in Sweden. It is understandable for Sweden to wait for the position of its own courts before committing to a position in Declaration III. The consequence, as far as Declaration III is concerned, is that it does not provide clear interpretive guidance on which the Tribunal could rely.

*Systemic integration*

388. Article 31(3)(c) VCLT provides that, '[t]*here shall be taken into account, together with the context:* […] *(c) Any relevant rules of international law applicable in the relations between the parties*'.

389. This provision is generally understood to require the systemic integration of the provision or the treaty which is interpreted in its wider context, defined by Article 31(3)(c) VCLT as '*international law*'. The '*rules*' to be '*taken into account*' are circumscribed by reference to two considerations, namely their applicability '*between the parties*' and their '*relevant*' character to the interpretive exercise. The Tribunal will clarify these two considerations before analysing the implications of systemic integration for the resolution of the jurisdictional objection *ratione voluntatis*.

390. The rule must be applicable '*between the parties*'. The term '*parties*' in this provision is ambiguous. It may refer to either the parties of the treaty which is being interpreted, the parties to the dispute, or some understandings in-between. A detailed study on treaty interpretation by R. K. Gardiner, which reviews the main arguments and the practice on this issue, comes to the conclusion that there is no settled answer to this question and offers the following guidance:

> '*In the immediate context of article 31(3)(c), the further qualification of relevant rules of international law requiring that these be 'applicable in the relations between the parties' gives an impression that the phrase must narrow the interpretative quest by excluding some rules of international law that are not applicable in such relations. Setting to one side peremptory norms of general international law (jus cogens), as described in article 53 of the Vienna Convention and being rules from which departure is not permitted, <u>states may generally come to their own agreements on the rules that are to apply between themselves, provided they do not violate their obligations to others. Even where rules are set out in a multilateral treaty, permitted reservations modify the rules applicable in relations between parties and permissive rules may be exercised in ways which create a variety of possible obligations. Thus, article 31(3)(c) has been drawn wide enough to cover rules of international law subject to, or including, any permissible modification or extension by treaty applicable to those states involved in the particular interpretative process.</u>*'[477] (emphasis added)

391. This author further refers to the report of the UN International Law Commission on the fragmentation of international law, which reaches a consistent conclusion with regard to this aspect of Article 31(3)(c) VCLT:

> '*Application of other treaty rules. Article 31(3)(c) also requires the interpreter to consider other treaty-based rules so as to arrive at a consistent meaning. Such other rules <u>are of particular relevance</u> where parties to the treaty under interpretation are also parties to the other treaty, where the treaty rule has passed into or expresses customary international law or where they provide evidence of the common understanding of the parties as to the object and purpose of the treaty under interpretation or as to the meaning of a particular term*'[478] (emphasis added)

392. The Tribunal gathers from R. K. Gardiner's analysis that not every party to the treaty which is interpreted needs to be also a party to the other treaty for such other treaty to be considered '*applicable between the parties*'. However, the lack of full correspondence between the two sets of States must be considered when '*taking into account*' the relevance of these other applicable rules. The application of EU law, specifically through the operation of Article 31(3)(c) VCLT, would thus not be precluded by the fact that the Contracting Parties to the ECT are not all EU Member States. However, this mismatch must be taken into account when considering the weight to be given

---

[477] R. K. Gardiner, *Treaty Interpretation* (Oxford University Press, 2nd edition, 2015), p. 303.
[478] ILC Report on the work of its Fifty-eighth Session (2006), General Assembly, Official Records, Sixty-first Session, Supplement No 10 (A/61/10), 414–15, para. 21, reproduced in R. K. Gardiner, *Treaty Interpretation* (Oxford University Press, 2nd edition, 2015), p. 317 (emphasis added).

to this means of interpretation. The mismatch would, for example, exclude consideration of EU law in the relations between an EU Member State and an ECT Contracting Party which is not an EU Member State. By contrast, consideration would not be excluded in the relations between EU Member States that are also ECT Contracting Parties.

393. Gardiner's study also sheds light on the meaning of '*relevant*' rules of international law, which he characterises as '*referring to those [rules] touching on the same subject matter as the treaty provision or provisions being interpreted or which in any way affect that interpretation*'.[479] The Parties have argued extensively as to whether EU law and the ECT as a whole cover the same subject-matter or not. However, for present purposes the question is whether EU law and the ECT address the issue of the validity or applicability of the unilateral offer to arbitrate investor-State disputes for alleged breaches of the ECT. On that issue, the Tribunal considers that the *Achmea Judgment*, the *Komstroy Judgment* as well as the other developments reviewed so far, including the three Declarations analysed by the Tribunal in the foregoing paragraphs, make clear that EU law may be relevant for the question before the Tribunal. Thus, the Tribunal concludes that EU law can indeed be considered as '*relevant*' under Article 31(3)(c) VCLT.

394. The conclusions of the Tribunal on the applicability and relevance of certain rules of EU law under Article 31(3)(c) VCLT raise a third question, namely that of the consequences for the interpretation of the ECT of taking into account EU law for systemic integration purposes. At the outset, the Tribunal notes that Article 31(3)(c) VCLT considers the relevant rules applicable between the parties as a vector of interpretation of a treaty, not of its modification. The Tribunal observes that the *Vattenfall vs. Germany* decision also considered EU law from the perspective of Article 31(3)(c) VCLT, but it rejected the argument on the grounds that the result sought by the European Commission in that case contradicted the ordinary meaning of Article 26 ECT and could generate potentially different interpretations of the same ECT provision.[480] The Tribunal, however, reaches a different conclusion for three reasons.

395. First, whereas it seems appropriate to consider that recourse to Article 31(3)(c) VCLT cannot change an interpretation already reached through the means identified in Article 31(1) VCLT, such proposition is only true if there is sufficient convergence of these other interpretive means on one meaning. Thus, such proposition is true if recourse to Article 31(3)(c) VCLT pursues a confirmatory purpose, but not if the meaning is unsettled when the analysis reaches that stage. The Tribunal understands that in the *Vattenfall vs. Germany* decision, where the arbitrators had already reached the conclusion that EU law did not affect the ECT, the recourse to Article 31(3)(c) VCLT

---

[479] R. K. Gardiner, *Treaty Interpretation* (Oxford University Press, 2ⁿᵈ edition, 2015), p. 299.
[480] *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, paras. 152-165, **Exh. CL-215 a**.2; see more generally paras. 152-165.

was envisaged as confirmation. In the circumstances of this case, however, for the reasons so far discussed, the Tribunal has not been persuaded that one clear meaning of Article 26 ECT has emerged.

396. Secondly, unlike the *Vattenfall vs. Germany* decision, this Tribunal considers that EU law is also relevant for the interpretation of other provisions of the ECT, such as Articles 1(2), 1(3), 1(10) and 25 ECT, which affect the interpretation of Article 26 ECT.

397. Thirdly, Article 31(3)(c) VCLT is only one of the gateways through which a tribunal may consider other applicable rules that are relevant for the interpretation of certain treaty terms. As such, even if the Tribunal were to retain a narrow operation of Article 31(3)(c) VCLT as in *Vattenfall vs. Germany*, that would not limit the application of the relevant rules of EU law on other grounds, whether on the basis of a reference in another provision of the ECT which is relevant for the interpretation of Article 26 ECT or as a matter of applicable law, as the Tribunal has concluded (*supra* in paragraphs 153-172).

398. Thus, the analysis of the operation of Article 31(3)(c) VCLT in the present case, although inconclusive when considered in an isolated manner, provides further confirmation that EU law is relevant for the interpretation of the ECT. The Tribunal will discuss the implications of applying EU law to the present case at a later stage (*infra* paragraphs 413-478).

*(d)  Object and purpose*

399. Article 31(1) VCLT directs the interpreter to ascertain '*the ordinary meaning to be given to the terms of the treaty in their context and in light of its object and purpose*'. The Tribunal has reviewed the overall context of the relevant terms of the ECT and it now turns to the examination of the ECT's object and purpose.

400. The ECT contains a specific provision, Article 2, entitled 'Purpose of the Treaty'. This provision reads as follows: '*This Treaty establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter*'. Under Article 1(1) ECT, the '*Charter*' means: '*the European Energy Charter adopted in the Concluding Document of the Hague Conference on the European Energy Charter signed at The Hague on 17 December 1991*'. Pursuant to Article 2 ECT, the generic purpose of promoting '*long-term cooperation in the energy field, based on complementarities and mutual benefits*' is therefore further clarified by '*the objectives and principles*' of the European Energy Charter.

401. Title I of the European Energy Charter is devoted to '*Objectives*'. The contents of Title I are unspecific with respect to the issue at hand. No express reference is made to international arbitration or dispute settlement. The Tribunal has examined the different elements of the European Energy Charter and the ECT which the Parties have emphasised, but it considers them generally inconclusive.

402. Some elements of the European Energy Charter are, however, worth recalling. First, under Title I, the Charter states that the signatories: '*undertake to promote the development of an efficient energy market throughout Europe, and a better functioning global market, in both cases based on the principle of non-discrimination and on market-oriented price formation, taking due account of environmental concerns.*' This paragraph is an indication of the main principles on which the Charter relies. As rightly noted by the Claimants, these principles are non-discrimination and market-oriented price formation. Secondly, under Title II, the Charter refers to several '*fields*' of implementation, including a heading 4 on '*Promotion and protection of investments*'. Under this heading, the Charter states that: '[in] *order to promote the international flow of investments, the signatories will at national level provide for a stable, transparent legal framework for foreign investments, in conformity with the relevant international laws and rules on investment and trade. They affirm that it is important for the signatory States to negotiate and ratify legally binding agreements on promotion and protection of investments which ensure a high level of legal security and enable the use of investment risk guarantee schemes*' (emphasis added). The reference to the promotion of investment agreements is unequivocal. Yet, the Charter also makes an explicit reference, in its preamble, to the '*support from the European Community, particularly through completion of its internal energy market*' (emphasis added). Neither the reference to promotion and protection of investments nor the preambular reference can be said to constitute '*objectives*' or '*principles*' under the text of the Charter. Both references, together with the text of Title I, are certainly relevant, but they are too unspecific to rely on them and derive conclusions on the validity of intra-EU arbitration.

403. The conclusion reached by the *Vattenfall vs. Germany* tribunal, according to which the ECT aims to promote cooperation and the flow of international investment in the energy field to serve the ultimate goal of creating and maintaining a stable and efficient energy market, is correct.[481] But it does not necessarily follow from this broad purpose that investor-State arbitration is to apply to intra-EU investment disputes, given the clear reference in the preamble of the European Energy Charter to the '*completion of its internal energy market*' as a key step in reaching the overall objectives of the Charter.

---

[481] *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 198, **Exh. CL-215 a.**

404. This ambiguity is sustained by the fact that the internal market, with its freedoms of establishment and capital movements as well as with the prohibition of State aid, specifically supports the principles of non-discrimination and market-oriented price formation. Yet, at the same time, there are indications that the internal energy market is carved-out from the ECT. One of the last paragraphs of the European Energy Charter contains a statement according to which: '[t]*he representatives of the Signatories understand that in the context of the European Energy Charter, the principle of non-discrimination means Most-Favoured-Nation Treatment as a minimum standard. National Treatment may be agreed to in provisions of the Basic Agreement and/or Protocols*'. This narrowing down of non-discrimination to the most-favoured-nation clause ('**MFN**') is significant when placed in the light of Article 25 ECT, which carves out the special arrangements among EU Members States from MFN treatment (see *supra* paragraphs 350-352).

405. On the basis of the above, the Tribunal considers that the reference to the object and purpose of the ECT is not conclusive without further examination of EU law, particularly as regards the organisation of the internal energy market.

*(e) Preparatory work and circumstances of conclusion*

406. Article 32 VCLT reads, in relevant part, that '[r]*ecourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31: (a) Leaves the meaning ambiguous or obscure*'.

407. The Parties have referred to the preparatory works and the circumstances of the conclusion of the ECT in two main respects. First, the Claimants have pointed out that, at the time of the negotiation of the ECT, the European Commission unsuccessfully sought the inclusion of a so-called 'disconnection clause'. Secondly, the Respondent has argued that the European Energy Charter and the ECT were initiatives of the EU (then the European Communities) to achieve energy liberalisation with the countries of the former Soviet bloc and, as a result, it seems unlikely that the EU would advocate for a treaty framework that undermines its own internal energy market.

408. Both Parties agree, and it is generally understood in international law, that the '*supplementary means of interpretation*' envisaged in Article 32 VCLT are of a subsidiary nature, and that they only come into operation to corroborate one of the interpretations suggested by the use of the principal means of interpretation.

409. Regarding, first, the reference to a failed attempt by the European Commission to have an explicit disconnection clause introduced in the ECT during the negotiations of its text, the Claimants refer

to an academic article, which in turn refers to a Letter by Secretary-General Clive Jones to Ambassador Rutten dated 19 February 1993.[482] According to this academic paper, the Letter stated the text of the proposed disconnection clause: '*In their mutual relations, Contracting Parties which are members of the EC shall apply Community rules and shall not therefore apply the rules arising from this Agreement except insofar as there is no Community rule governing the particular subject concerned*'. No specific discussion of the circumstances and reasons why this proposed clause was not introduced in the final text has been provided. On its face, the Tribunal notes that the text would have introduced a very comprehensive carve-out applicable well beyond the internal market. In addition, as the Tribunal has noted earlier (see *supra* paragraphs 350-352), Article 25 ECT does introduce a carve-out covering the development of the EU internal market. The rejection of the proposed clause may have been due to the intention of EU Member States to consider themselves bound by the ECT, including its investor-State dispute settlement system. But it may also have been due to the over-broad language used or to the inclusion of sufficient indications of a carve-out in other clauses. These are all possible conclusions, which the Claimants have not investigated further. Under these circumstances, the reference to the preparatory works, without further substantiation, cannot provide clear guidance.

410. Similarly inconclusive is the broad reference made by the Respondent as well as by the European Commission in its *Amicus Curiae* brief to the circumstances of the conclusion of the ECT by reference to an apparently unpublished doctoral dissertation.[483] As with the academic paper relied upon by the Claimants in relation to the rejection of a disconnection clause, the Tribunal does not question the academic value of this work. However, the argument that the Respondent seeks to derive from it, namely that the EU (then the European Communities) could not have intended to conclude an agreement such as the ECT that interfered with the internal energy market has not been specifically substantiated to derive any conclusions from it.

411. Thus, the Tribunal considers that recourse to the preparatory works and the circumstances of the conclusion of the ECT is of limited use in this case. The context of Article 26 ECT provides, in the Tribunal's view, a clearer indication that EU Member States and, specifically, Denmark and Spain, intended to organise their *inter se* relations in a special manner.

*(f)  Conclusion*

---

[482] Referred to in Cees Verburg and Nikos Lavranos, '*Recent Awards in Spanish Renewable Energy Cases and the Potential Consequences of the Achmea Judgment for intra-EU ECT Arbitrations*' in: Mistelis & Lavranos, European Investment Law and Arbitration Review, Volume 3, 2018, p. 218, footnote 117, **Exh. CL-280**.

[483] J. Basedow, The European Union's International Investment Policy, Thesis LSE, November 2014, **Exh. EC-1**.

412. On the basis of the foregoing considerations, the Tribunal reaches the conclusion that interpreting Article 26 ECT without resorting to EU law is inconclusive in the circumstances of this case. In the context of intra-EU cases, Article 26 ECT could be interpreted as rendering the Respondent's offer to arbitrate invalid in the sense of '*to be disapplied*', to use the terminology of the German *Bundesgerichtshof* after the *Achmea Judgment*. Therefore, as discussed next, the Tribunal must determine whether such conclusion would be the correct one when Article 26 is interpreted in the light of the wider body of legal relations between Denmark and Spain, specifically, the relevant norms of EU law. The seat of the arbitration being Sweden, *i.e.* an EU Member State, EU law is also applicable on this basis (see *supra* paragraphs 153-172).

## 3. *Continuation of the analysis applying the relevant norms of EU law*

413. The Tribunal has concluded in paragraph 169 *supra* that, in order to determine whether it has jurisdiction to hear the claims brought by the Claimants, it must take Article 26 ECT as a starting point and then consider and, if necessary, apply other rules of both international law and domestic law, as relevant for each question.

414. Such applicable rules include the rules of EU law relevant for the determination of the jurisdictional objection *ratione voluntatis*, whether EU law is applied as international law or as part of the law governing the agreement to arbitrate in accordance with Swedish law, being the law of the seat.

415. In paragraph 412 *supra*, the Tribunal has further concluded that the interpretation of the ECT without regard for EU law is inconclusive under the circumstances of the present case. Therefore, the Tribunal will now consider the relevance of EU law and then apply it to resolve the issues raised by the jurisdictional objection *ratione voluntatis*.

## (a) *Relevance of the Achmea Judgment and the Komstroy Judgment*

416. In the *Achmea Judgment*, the CJEU Grand Chamber addressed specifically the question of the validity of an investor-State arbitration clause under the applicable EU law in the context of an intra-EU dispute.

417. The *Achmea Judgment* has been rendered in the context of set aside proceedings before German courts concerning the arbitral award in the case *Achmea v. Slovak Republic*, PCA Case No 2008-13, Award (7 December 2012). On 3 March 2016, the German *Bundesgerichtshof* decided to refer three questions to the CJEU under the preliminary ruling procedure in Article 267 TFEU. The questions were as follows:

> '*(1) Does Article 344 TFEU preclude the application of a provision in a bilateral investment protection agreement between Member States of the European Union (a so-called intra-EU BIT) under which an investor of a Contracting State, in the*

*event of a dispute concerning investments in the other Contracting State, may bring proceedings against the latter State before an arbitral tribunal where the investment protection agreement was concluded before one of the Contracting States acceded to the European Union but the arbitral proceedings are not to be brought until after that date?*

*If Question 1 is to be answered in the negative:*

*(2) Does Article 267 TFEU preclude the application of such a provision?*

*If Questions 1 and 2 are to be answered in the negative:*

*(3) Does the first paragraph of Article 18 TFEU preclude the application of such a provision under the circumstances described in Question 1?'*

418. The CJEU Grand Chamber responded only to the first and second questions , finding the third question moot in light of the response given to the previous two questions. The two provisions mentioned in questions 1 and 2, Articles 267 and 344 TFEU, read as follows:

> *'Article 267 (ex Article 234 TEC)*
>
> *The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:*
>
> *(a) the interpretation of the Treaties;*
>
> *(b) the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union;*
>
> *Where such a question is raised before any court or tribunal of a Member State, that court or tribunal may, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court to give a ruling thereon.*
>
> *Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court.*
>
> *If such a question is raised in a case pending before a court or tribunal of a Member State with regard to a person in custody, the Court of Justice of the European Union shall act with the minimum of delay.'*

> *'Article 344 (ex Article 292 TEC)*
>
> *Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.'*

419. Responding to questions 1 and 2 from the German *Bundesgerichtshof,* the CJEU concluded that:

'*Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.*'[484] This ruling was later confirmed in the

---

[484] *Slowakische Republik (Slovak Republic) v. Achmea BV,* CJEU (Grand Chamber), Case C-284/16, Judgment, 6 March 2018, para. 60, **Exh. CL-151; CL-215; RL-105; RL-160**.

*PL Holdings Judgment*, which concerned the compatibility of an ad-hoc arbitration agreement (allegedly) concluded in lieu of an BIT arbitration agreement with EU law,[485] and further referenced in *European Commission v. European Food*.[486]

420. The CJEU's response led the German *Bundesgerichtshof* to set aside both the order of the lower court, against which an appeal had been formed, and the arbitral award in *Achmea v. Slovak Republic*.[487] The German *Bundesgerichtshof* noted *inter alia* that:

> '*If Article 8(2) of the BIT is thus contrary to Articles 267 and 344 TFEU, it cannot apply (Court of Justice of the EU in Matteucci [1988] ECR 5589, paragraph 22; Exportur, reported in GRUR Int. 1993, 76, paragraph 8; American Bud II, reported in GRUR 2010, 143, paragraph 98; Commission v Germany, reported in EuZW 2010, 217, paragraph 44), and no effective arbitration agreement has been concluded between the parties [...]*
>
> *[N]either of the parties could by means of Article 8(2) of the BIT give the other party a valid undertaking that it would consent to the determination of the disputes referred to in Article 8(1) by an arbitral tribunal. This meant that the applicant had made no offer to conclude an arbitration agreement with investors from the Netherlands that the defendant could then accept'*.[488]

421. The reasoning of the CJEU Grand Chamber in the *Achmea Judgment* is relevant, for present purposes, for three main reasons.

422. First, the CJEU Grand Chamber clearly states its understanding regarding the applicability of EU law to determine the validity of the offer to arbitrate by an EU Member State. It observes, in this regard, that: '*Given the nature and characteristics of EU law mentioned in paragraph 33 above, that law must be regarded both as forming part of the law in force in every Member State and as deriving from an international agreement between the Member States.*'[489] As noted earlier (see *supra* paragraphs 170-172), the Tribunal has reached a similar conclusion. It is also worth-noting that the arbitral tribunal in *Electrabel* had also understood EU law as having '*a multiple nature: on the one hand, it is an international legal regime; but on the other hand, once introduced in the national legal orders of EU Member States, it becomes also part of these national legal orders.*'[490] That tribunal further concluded, after a detailed analysis of the relations between the ECT and EU law, that '*from whatever perspective the relationship between the ECT and EU law is examined,*

---

[485] *Republiken Polen (Republic of Poland) v. PL Holdings Sarl*, CJEU (Grand Chamber), C-109/20, Judmgent, 26 October 2021, para. 44, **Exh. RL-168**.
[486] *European Commission v. European Food SA et al.*, CJEU (Grand Chamber), C-638/19 P, Judgment, 25 January 2022 para. 138, **Exh. CL-338**.
[487] *Bundesgerichtshof*, Judgment of 31 October 2018, operative part, **Annex EC-9.**
[488] *Bundesgerichtshof*, Judgment of 31 October 2018, paras. 25-26, **Annex EC-9.**
[489] *Slowakische Republik (Slovak Republic) v. Achmea BV*, CJEU (Grand Chamber), Case C-284/16, Judgment, 6 March 2018, para. 41, **Exh. CL-151; CL-215; RL-105; RL-160**.
[490] *Electrabel S.A. v. Republic of Hungary*, ICSID case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 4.118, **Exh. RL-2; CL-141**.

*the Tribunal concludes that EU law would prevail over the ECT in case of any material inconsistency'.*[491]

423. Secondly, the *Achmea Judgment* states that, when properly interpreted, Articles 267 and 344 TFEU are in conflict with a provision in an international agreement whereby an EU Member State gives a unilateral offer to arbitrate disputes with investors from another EU Member State which is a party to that agreement. The tribunal in *Electrabel*, which did not have the benefit of the CJEU's rulings on the matter, had instead concluded that no material conflict existed between EU law and the ECT. Two issues arising from the reasoning of the *Electrabel* tribunal call for further comment.

424. One is the *Electrabel* tribunal's interpretation of Articles 267 and 344 TFEU. Specifically, that tribunal noted that Article 344 TFEU only applies in disputes between EU Member States but not in investor-State proceedings.[492] This interpretation has been shared by the arbitral tribunals in *The PV Investors v. Spain*,[493] *Stadtwerke München v. Spain*[494] and *Sevilla Beheer v. Spain*.[495] However, this Tribunal recalls that this interpretation, which has no express support in the wording of Article 344 TFEU, has been corrected by the CJEU in paragraph 60 of the *Achmea Judgment*, according to which Articles 267 and 344 TFEU render an offer to arbitrate intra-EU investor-State disputes inapplicable. This is the case irrespective of whether the *Achmea Judgment* applies to Article 26 ECT or not. Indeed, the CJEU has clearly stated that those provisions of the TFEU are applicable to "*any method of settlement other than those provided for in the Treaties*",[496] meaning, at the very least, to what the *Electrabel* tribunal called '*mixed dispute settlement mechanisms*'.

425. The other issue that requires further comment is whether there is a difference of nature between investor-State arbitration clauses in BITs and Article 26 ECT, such that the rationale of the *Achmea Judgment* is only relevant for the former but not for the latter. The Tribunal considers that there is no support for such a distinction, as it will become clear in the next paragraphs.

426. The third reason why the *Achmea Judgment* is relevant for the present case is that it clarifies the rationale underlying the interpretation of Articles 267 and 344 TFEU as precluding a unilateral offer to arbitrate intra-EU disputes. The CJEU developed this point in detail, but the essence of this

---

[491] *Electrabel S.A. v. Republic of Hungary*, ICSID case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 4.191, **Exh. RL-2; CL-141**.

[492] *Electrabel S.A. v. Republic of Hungary*, ICSID case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 4.151, **Exh. RL-2; CL-141**.

[493] *The PV Investors v. Kingdom of Spain*, PCA Case No. 2021-14, Preliminary Award on Jurisdiction, 14 October 2014, para. 189, **Exh. CL-308**.

[494] *Stadtwerke München GmbH et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019, para. 135, **Exh. CL-309**.

[495] *Sevilla Beheer B.V. et al. v. Kingdom of Spain*, ICSID Case No. ARB/16/27, Decision on Jurisdiction, Liability and the Principles of Quantum, 11 February 2022, paras. 636-638, **Exh. CL-310**.

[496] *Slowakische Republik (Slovak Republic) v. Achmea BV*, CJEU (Grand Chamber), Case C-284/16, Judgment, 6 March 2018, para. 32, **Exh. CL-151; CL-215; RL-105; RL-160**

rationale is summarised in paragraph 35 of the *Achmea Judgment*: '[i]*n order to ensure that the specific characteristics and the autonomy of the EU legal order are preserved, the Treaties have established a judicial system intended to ensure consistency and uniformity in the interpretation of EU law*'.

427. The Tribunal considers that this rationale is fully applicable to investor-State disputes under the ECT. In cases concerning State aid by EU Member States and determination of its compatibility with the internal market, Articles 107 and 108 TFEU provide for the exclusive competence of the European Commission. An arbitral tribunal reviewing such cases from the perspective of the ECT would need to interpret the EU Treaties, at the very least to assess the relevance of these provisions. As a result, the reasoning of the CJEU in the *Achmea Judgment* would apply, both to the merits of the dispute and to jurisdictional matters. This is because, as the Tribunal noted when analysing Article 1(3) ECT (see *supra* paragraph 353), this provision expressly recognises the power of a REIO such as the EU to adopt decisions that are binding on its Member States. Given that, under EU law, determinations on State aid are under the exclusive jurisdiction of the European Commission, an arbitral tribunal would not have jurisdiction to make determinations on matters of State aid in the relations between EU Member States, even if the determination were to be formulated by reference to the provisions of the ECT.

428. The Tribunal recognises that intra-EU investor-State disputes may also concern matters unrelated to State aid. Indeed, even for cases where matters of State aid do not arise, the *Achmea Judgment* remains fully relevant and it cannot be seriously contended that investment arbitration tribunals could not affect the interpretation of the EU Treaties in a manner which is detrimental to the consistent and uniform interpretation of EU law.

429. In the past, several arbitral tribunals have interpreted Article 344 TFEU.[497] Some doubt as to the application of Article 344 TFEU to investment arbitration may have been understandable before

---

[497] *PV Investors et al. v. Kingdom of Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction, 14 October 2014, para. 189, **Exh. CL-308**; *Electrabel S.A. v. Republic of Hungary*, ICSID case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, para. 4.151, **Exh. RL-2; CL-141**; *Charanne BV and Construction Investment S.A.R.L. v. Spain*, SCC Arb. No. 062/2012, Award, 21 January 2016, paras. 441-447, **Exh. RL-49**; *RREEFF Infrastructure v. Spain*, ICSID ARB 13/30, Decision on Jurisdiction, 6 June 2016, paras. 78-80, **Exh. CL-142**; *Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain*, SCC Arbitration Case No. V2013/153, Award of 12 July 2016, paras. 649-656, **Exh. RL-4**; *Blusun S.A. e.a. v. Italian Republic*, ICSID ARB/14/3, Award, 27 December 2016, para. 289, **Exh. RL-90**; *Anglia Auto Accessories Ltd. v. Czech Republic*, SCC Case V 2014/181, Final Award, 10 March 2017, paras. 126-128, **Exh. CL-331**; *Ivan Peter Busta et al. v. Czech Republic*, SCC Case V 2015/014, Final Award, 10 March 2017, paras. 126-128, **Exh. CL-332**; *Eiser Infra. Ltd. et al v. Spain*, ICSID ARB 13/36, 4 May 2017, para. 204, **Exh. RL-79**; *Novenergia II – Energy & Environment (SCA), SICAR v. Spain*, SCC Arbitration (2015/063), Award, 15 February 2018, paras. 438-442, **Exh. RL-106**; *Masdar v. Kingdom of Spain*, ICSID ARB 14/1, Award 16 May 2018, paras. 333-341, **Exh. CL-228; CL-311**; *Antin Infrastructure Services Luxembourg S.a.r.l. et al. v. Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018, paras. 227-228

the *Achmea Judgment*, on the grounds that no conflict between EU law and investor-State arbitration clauses existed,[498] but the CJEU has now specifically addressed how to interpret Article 344 TFEU in the clearest terms.

430. Even after the *Achmea Judgment*, some doubt may have persisted regarding the differences between that context (an arbitration seated in an EU Member State and based on an investor-State arbitration clause in a BIT between EU Member States) and that of ECT-based tribunals and/or arbitral tribunals operating under the ICSID Convention.[499]

431. But these doubts have now been dispelled by the CJEU Grand Chamber *Komstroy Judgment*.

432. In the *Komstroy Judgment*, the CJEU Grand Chamber revisited the question of the validity of an investor-State arbitration clause under the applicable EU law in the context of an intra-EU dispute. This time, however, it specifically addressed the question in regard of Article 26 ECT.

---

(rejecting the objection in one line, by reference to the arguments of the claimants), **Exh. CL-335**; *Foresight Luxembourg Solar 1 S.a.r.l. et al. v. Spain*, SCC Arbitration V (2015/150), Award, 14 November 2018, para. 219-220, **Exh. CL-306**; *FREIF Eurowind Holdings Ltd. v. Spain*, SCC Case V 2017/060, Award, 8 March 2021, para. 323-324, **Exh. CL-307**; *Stadtwerke München et al. v. Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019, para. 135, **Exh. CL-309**; *Infracapital F1 S.a.r.l. et al. v. Spain*, ICSID Case No. ARB/16/18, Decision on Respondent's Request for Reconsideration regarding the Intra-EU Objection and the Merits, 1 February 2022, para. 107 (rejecting the application of EU law to matters of jurisdiction and thereby excluding the relevance of Article 344 TFEU for such matters), **Exh. CL-321**; *Sevilla Beheer B. V. et al. v. Spain*, ICSID Case No. ARB/16/27, Decision on Jurisdiction, Liability and the Principles of Quantum, 11 February 2022, para. 636, **Exh. CL-310.**

[498] Some tribunals expressly noted the need for more clarity. See *e.g. Jan Oostergetel and Theodora Laurentius v. the Slovak Republic*, UNCITRAL Decision on Jurisdiction, 30 April 2010, para. 109 ('*the Tribunal concludes that the Dutch-Slovak BIT was not terminated upon Respondent's accession to the EU and therefore the EC Treaty is not an obstacle for this Tribunal to settle the present dispute under the applicable BIT. This is especially so considering the absence of any conclusive position of the EC or the ECJ on this question*' (emphasis added)), **Exh. CL -234** (seat in Switzerland); *WNC Factoring Ltd. v. Czech Republic*, UNCITRAL, PCA Case No. 2014-34, Award, 22 February 2017, para. 311 ('*Of course EU law was modified by the Treaty of Lisbon, and the EC has been developing its views of the legal questions involved with intra-EU investment treaties; the European Court of Justice has also expressed views about related questions of competence and will no doubt define its position more precisely in due course. The Tribunal recognizes that a different view may eventually prevail*'), **Exh. CL-330.**

[499] *Vattenfall AB e.a. v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, para. 194, **Exh. CL-215a**; *Cube Infra. Fund SICAV et al. v. Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019, paras. 128-160 (stressing that, as an ICSID tribunal, it is in a different position from the arbitration assessed in the *Achmea Judgment*; noting that under Article 16 ECT, the ECT would prevail over the EU treaties; and further noting that the *Achmea Judgment* concerned a bilateral treaty rather an multilateral treaty, such as the ECT, to which the EU itself is a party), **Exh. CL-336**; *Landesbank Baden-Württenberg et al. v. Spain*, ICSID Case No. ARB/15/25, Decision on the 'Intra-EU' Jurisdiction Objection, 25 February 2019, para. 146 (after finding that the rationale of the *Achmea Judgment* could have some relevance for the ECT, it is noted '[n]evertheless, the Tribunal considers that the differences between its situation, as a tribunal established under Article 25 of the ICSID Convention and Article 26 of the ECt, and that of the tribunal in *Achmea* are more significant than the similarities', **Exh. CL-305**; *Mathias Kruck et al. v. Spain*, ICSID Case No. ARB/15/23, Decision on Jurisdiction and Admissibility, 19 April 2021, paras. 280-295 (emphasising that the tribunal is constituted under ICSID and that, by reference to Article 16 ECT, it cannot uphold the supremacy of EU law), **Exh. CL-314.**

108

433. The *Komstroy Judgment* has been rendered in the context of annulment proceedings before the Paris Court of Appeal concerning an arbitral award in the case between a Ukrainian electricity distributor named *Energoalians* [nowadays, as its successor in law, *Komstroy*] and the *Republic of Moldova*. Before the Paris Court of Appeal, the Republic of Moldova submitted, *inter alia*, that the arbitral tribunal should have declined jurisdiction, given that the subject-matter in question did not involve an '*investment*', within the meaning of Article 26(1) ECT, read in the light of Article 1(6). On 24 September 2019, the Paris Court of Appeal decided to refer three questions to the CJEU under the preliminary ruling procedure. The questions were as follows:

> '(1) Must [Article 1 (6) ECT] be interpreted as meaning that a claim which arose from a contract for the sale of electricity and which did not involve any economic contribution on the part of the investor in the host State can constitute "investment" within the meaning of that article?
>
> (2) Must [Article 26(1) ECT] be interpreted as meaning that the acquisition, by an investor of a Contracting Party, of a claim established by an economic operator which is not from one of the States that are Contracting Parties to that treaty constitutes an investment?
>
> (3) Must [Article 26(1) ECT] be interpreted as meaning that a claim held by an investor, which arose from a contract for the sale of electricity supplied at the border of the host State, can constitute an investment made in the area of another Contracting Party, in the case where the investor does not carry out any economic activity in the territory of that latter Contracting Party?'

434. The CJEU responded only to the first question, finding that there is no need to answer the second and third questions in the light of the response given to the first one.

435. Even though the case involved an extra-European arbitration, the CJEU found it also '*necessary [...] to specify which disputes between one Contracting Party and an investor of another Contracting Party concerning an investment made by the latter in the area of the former may be brought before an arbitral tribunal pursuant to Article 26 ECT.*'[500] In that regard the CJEU concluded that '*Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State*'.[501] Hence, the relevance of the *Achmea Judgment* with respect to Article 26 ECT is now beyond question.

436. For this reason, there cannot be any doubt that the rationale of the *Achmea Judgment* is relevant, indeed decisive, for the analysis of investor-State arbitration clauses in general, whether these are included in intra-EU BITs or in a multilateral treaty such as the ECT.

---

[500] *Republic of Moldova v. Komstroy LLC, successor in law to the company Energoalians*, CJEU (Grand Chamber) Case C-741/19, Judgment, 2 September 2021, para. 40, **Exh. CL-316; RL-164**.

[501] *Republic of Moldova v. Komstroy LLC, successor in law to the company Energoalians*, CJEU (Grand Chamber) Case C-741/19, Judgment, 2 September 2021, para. 66, **Exh. CL-316; RL-164**.

437. The Tribunal is mindful of the decisions by the arbitral tribunals in *Vattenfall v. Germany* and *Masdar v. Spain*, to which both Parties have referred in their submissions. In *Masdar*, the arbitral tribunal summarily dismissed the relevance of the *Achmea Judgment* on the grounds that the ECT is a multilateral treaty.[502]It relied on the Opinion of Advocate General Wathelet of 19 September 2017, despite the fact that the *Achmea Judgment* did not follow this Opinion, and it assumed without any clear explanation that the CJEU, by not expressly rejecting the sections of the Opinion concerning the ECT, had somewhat endorsed them. The Tribunal disagrees. As noted by the German *Bundesgerichtshof* in its decision setting aside the *Achmea* award: '[t]*here is no reason to suppose that in its judgment the Court of Justice failed to consider the arguments put forward by [...] Advocate General Wathelet. It simply did not accept them. In any event, the jurisdiction of the Court of Justice as such would remain intact even if it failed to consider certain arguments.*'[503]

438. The *Vattenfall* tribunal took a position similar to that of the *Masdar* tribunal with respect to the lack of relevance of the *Achmea Judgment* for Article 26 ECT. According to that arbitral tribunal:

> '*It remains unclear what alleged rule of international law arising from the ECJ Judgment exists and is of application to the present case. The ECJ's reasoning was not specifically addressed to investor-State dispute settlement under the ECT. While there is a certain breadth to the Court's wording, addressing provisions 'such as' the dispute resolution provision of the BIT in that case, it is an open question whether the same considerations necessarily apply to the ECT.*'[504]

However, as noted earlier, the Tribunal cannot follow this reasoning. On the contrary, the Tribunal considers that the *Achmea Judgment*, with its express reference to an '*international agreement*' does indeed extend to the ECT. This conclusion is not only supported by the wording used by the CJEU Grand Chamber ('*international agreement concluded between Member States*'), which is clearly broader than the terms used in the question put to the Court ('*bilateral investment protection agreement between Member States of the European Union*') but also by the absence of a convincing explanation of why the ECT could not be considered an '*international agreement concluded between Member States*'. The presence of the EU as a Contracting Party does not change the fact that the ECT is an '*international agreement*' and that it is '*concluded between Member States*'. If the CJEU had wished to limit the scope of the *Achmea Judgment*, it could have simply used the terminology employed by the referring court in its first question. Yet, the CJEU Grand Chamber specifically used a broader term, which clearly encompasses multilateral treaties such as the ECT. In all events, the position of the CJEU Grand Chamber with respect to Article 26 ECT is now expressly stated at paragraph 66 of the *Komstroy Judgment*. Whether the relevant paragraphs appear

---

[502] *Masdar v. Kingdom of Spain*, ICSID ARB 14/1, Award, 16 May 2018, para. 679, **Exh. CL-228; CL-311**.
[503] *Bundesgerichtshof*, Judgment of 31 October 2018, para. 6, **Annex EC-9**.
[504] *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, paras. 161 *et seq*., **Exh. CL-215a**.

in the operative part of the *Komstroy Judgment* or in the reasoning leading to them is without relevance. The position of the CJEU Grand Chamber is clear: the principles developed in the *Achmea Judgment* also concern Article 26 ECT.

439. The Tribunal has also considered the decisions of the arbitral tribunals in *Infracapital v. Spain*[505] and *Sevilla Beheer v. Spain*,[506] which were referred to by the Claimants in their pleadings. In addition to the considerations made by the Tribunal in the previous paragraphs, it should be observed that, like *Vattenfall v. Germany* and *Masdar v. Spain,* these two cases are ICSID arbitrations and, as a result, the reasoning did not take into account the relevance for jurisdictional matters of the applicable law attracted by the selection of the seat in an EU Member State. Referring to a prior decision on objections to jurisdiction, the *Infracapital v. Spain* tribunal premised its reasoning in its decision on the relevance of the *Komstroy Judgment* on the inapplicability of EU law: '[f]*rom the outset, the Tribunal makes it clear that, as it affirmed in the Decision, EU law is not applicable to jurisdiction. As a result, the Komstroy Judgment is irrelevant to the question of jurisdiction. The applicable law to jurisdiction and the merits of the dispute is international law, and not principles of sub-systems of international law such as EU treaties.*'[507] A similar conclusion was reached by the *Sevilla Beheer v. Spain* tribunal, which also rejected the contention that EU law was relevant for the determination of jurisdiction.[508] This Tribunal, which is concerned with arbitration proceedings between EU investors and an EU Member State, with the arbitration seat in Sweden, another EU Member State, has reached a different conclusion in the circumstances of the present case. Unlike the tribunals in *Infracapital v. Spain* and *Sevilla Beheer v. Spain*, this Tribunal considers that EU law is part of the law applicable to the determination of jurisdiction. For these reasons, the Tribunal considers the reasoning of those ICSID tribunals on this issue inapposite for present purposes.

440. In addition, the Tribunal has already noted that the CJEU's judgments are to be generally qualified as interpretations of the law (see *supra* paragraphs 376-379). Therefore, this Tribunal cannot share the conclusion reached by the arbitral tribunal in *Infracapital F1 v. Spain* that '*it would be improper to affect Claimants by removing the jurisdiction of the Tribunal to decide their claims based on the*

---

[505] *Infracapital F1 S.a.r.l. et al. v. Spain*, ICSID Case No. ARB/16/18, Decision on Respondent's Request for Reconsideration regarding the Intra-EU Objection and the Merits, 1 February 2022, **Exh. CL-321.**
[506] *Sevilla Beheer B. V. et al. v. Spain*, ICSID Case No. ARB/16/27, Decision on Jurisdiction, Liability and the Principles of Quantum, 11 February 2022, **Exh. CL-310.**
[507] *Infracapital F1 S.a.r.l. et al. v. Spain*, ICSID Case No. ARB/16/18, Decision on Respondent's Request for Reconsideration regarding the Intra-EU Objection and the Merits, 1 February 2022, para. 107, **Exh. CL-321.**
[508] *Sevilla Beheer B. V. et al. v. Spain*, ICSID Case No. ARB/16/27, Decision on Jurisdiction, Liability and the Principles of Quantum, 11 February 2022, para. 620, **Exh. CL-310.**

*Komstroy Judgment when the latter was issued several years after the Claimants filed their Request for Arbitration, and ICSID registered it.*'[509]

441. As for the decision of the ICSID Ad Hoc Committee in *SoLEs Badajoz v. Spain*,[510] mentioned by the Claimants during Hearing (2) and only introduced into the record after it, its relevance for present purposes is doubly limited. First, the Committee reviewed an award rendered under the ICSID Convention, not one having its seat in an EU Member State, as is the case in the present arbitration. The question of whether or not EU law applies to the determination of jurisdiction and, if so, the extent to which it does so, does not arise in the same manner in the circumstances of this Request for Arbitration as in ICSID proceedings. In the circumstances of the present arbitration, and after having reviewed afresh all the relevant instruments and decisions available to it, the Tribunal has concluded that both the ECT and EU law, the latter as international law and also as part of the law of the seat, must be applied. Secondly, the scope of review of an Ad Hoc Committee under Article 52 of the ICSID Convention is extremely limited. The Ad Hoc Committee stressed this aspect before embarking on the analysis of the first annulment ground invoked by Spain, which concerned the law applicable to jurisdiction:

> '*At the outset, the Committee reiterates that in order to justify annulment on the ground that there has been a manifest excess of power, the excess of power must be discernable from a plain reading of the award and perceived or recognized as such by an annulment committee without difficulty. The Committee notes that this claim of manifest excess of power encompasses an alleged misapplication or misinterpretation of the applicable law in respect of the establishment of jurisdiction in the dispute. As noted above, <u>in this type of situation, the threshold for finding an annullable error of law must be very high and should require the finding of an erroneous interpretation or misapplication of the law "so gross or egregious as substantially to amount to failure to apply the proper law"</u>.*'
> (emphasis added)[511]

Thereafter, the Committee examined the reasoning of the tribunal and rejected this ground for annulment, noting that it had '*not been able to identify a gross or egregious error in the Tribunal's interpretation and application of Article 26 and other related provisions of the ECT in the establishment of the Tribunal's jurisdiction pursuant to the ECT*'.[512]

---

[509] *Infracapital F1 S.à.r.l. et al. v. Kingdom of Spain*, ICSID Case No. ARB/16/18, Decision on Respondent's Request for Reconsideration Regarding the Intra-EU Objection and the Merits, 1 February 2022, para. 115, **Exh. CL-321.**

[510] *SoLES Badajoz Gmbh v. Spain*, ICSID Case No. ARB/15/38, Decision on Annulment, 16 March 2022, **Exh. CL-349.**

[511] *SoLES Badajoz Gmbh v. Spain*, ICSID Case No. ARB/15/38, Decision on Annulment, 16 March 2022, **Exh. CL-349**. para. 115.

[512] *SoLES Badajoz Gmbh v. Spain*, ICSID Case No. ARB/15/38, Decision on Annulment, 16 March 2022, **Exh. CL-349**. para. 128.

442. Moreover, the relevance of the *Achmea Judgment* for the analysis of Article 26 ECT is also expressly accepted by the EU Member States whose relations are concerned in this dispute, here Denmark and Spain, as expressed in their Declaration of 15 January 2019, although the Tribunal notes that in its Declaration of 16 January 2019, Sweden abstained from taking a position on the ECT. As noted earlier (see *supra* paragraph 370), the Tribunal considers the Declaration of 15 January 2019 as an authentic interpretation.

443. This is likewise the position taken by the European Commission in its *Amicus Curiae* brief of 14 December 2018 where it observes that Spain could not validly make an offer to Claimants under the ECT because EU law prevents it from doing so.[513]

444. This is further supported by the Statement submitted by the European Commission on behalf of the EU and the Member States to the ECT Secretariat on 17 November 1997, which declared that '[t]*he Court of Justice of the European Communities, as the judicial institution of the Communities, is competent to examine any question relating to the application and interpretation of the constituent treaties and acts adopted thereunder, including international agreements concluded by the Communities, which under certain conditions may be invoked before the Court of Justice.*'[514]

445. For all the above reasons, the Tribunal concludes that the CJEU Grand Chamber's *Achmea Judgment* is fully relevant for the question raised by the Respondent in its jurisdictional objection *ratione voluntatis*, and that it leads to a clear answer to such question, as further confirmed in the CJEU Grand Chamber's *Komstroy Judgment*. This answer is that Spain's offer to arbitrate under the ECT is not applicable in intra-EU relations and hence there is no offer of arbitration that the Claimants could accept.

*(b) Application of the CJEU's reasoning in Achmea to the present case*

446. The Tribunal will now apply EU law together with the ECT to resolve the issues raised by the jurisdictional objection *ratione voluntatis*.

447. The Tribunal recalls that the relevant provisions of EU law, including *inter alia* Articles 107, 108(2), 267 and 344 TFEU, must be applied – either as part of international law or as part of the law applicable to the arbitration agreement pursuant to the Swedish *lex arbitri* – to assess the validity of the Respondent's unilateral offer to arbitrate intra-EU investment disputes under Article 26 ECT.

---

[513] *Amicus Curiae* Brief, para. 50 *et seqq.*
[514] Energy Charter Secretariat, Transparency Document – Annex ID, p. 9, **Exh. EC-6**.

*State aid*

448. Regarding Articles 107 and 108(2) TFEU, the Parties disagree on the extent to which the Tribunal would have to take a position on matters of State aid to decide the present dispute. The Tribunal notes, in this regard, that both the CJEU and the European Commission considered the support scheme for renewable energy generation at stake in the present proceeding to fall under the EU regime governing State aid.

449. In *Elcogas*, responding to a request for a preliminary ruling from the Spanish *Tribunal Supremo*, the CJEU concluded that '*Article 107(1) TFEU must be interpreted as meaning that the sums allocated to a private undertaking producing electricity which are financed by all end users of electricity in the national territory and which are distributed to undertakings in the electricity sector by a public body in accordance with predetermined legal criteria constitute aid granted by a Member State or through State resources.*' [515]

450. In Decision SA.40348 2014/N of 10 November 2017,[516] the European Commission explicitly stated: '*The Commission recalls that any compensation which an Arbitration Tribunal were to grant to an investor on the basis that Spain has modified the premium economic scheme [i.e. the Special Regime, being RD 661/2007 and RD 1578/2008] by the notified scheme would constitute in and of itself State aid. <u>However, the Arbitration Tribunals are not competent to authorise the granting of State aid. That is an exclusive competence of the Commission</u>. If they award compensation, such as in Eiser v. Spain, or were to do so in the future, this compensation would be notifiable State aid pursuant to Article 108(3) TFEU and be subject to the standstill obligation.*'[517] (emphasis added).

451. In a letter of 19 July 2021, mentioned by the Respondent during Hearing (2) and only introduced into the record after it, the European Commission informed Spain that it had initiated State aid proceedings (SA.54155 2021/NN), in connection with compensation awarded by an arbitral tribunal (in the case *Antin v. Spain*[518]). In this letter, the Commission confirmed that '[a]*n arbitration tribunal is not competent to declare a State aid measure compatible with the internal market. <u>This is an exclusive competence of the Commission</u>*'[519] (emphasis added).

---

[515] *Elcogás SA v. Administración del Estado and Iberdrola SA*, Case C-275/13, Order of the Court of 22 October 2014, **Exh. RL-87**.

[516] Decision European Commission 40348, 10 November 2017, **Exh. RL-89**.

[517] Decision European Commission 40348, 10 November 2017, para. 165, **Exh. RL-89**.

[518] *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. vs Spain*, ICSID Case No ARB/13/31, Award (as amended on 29 January 2019).

[519] European Commission, *State aid SA.54155 (2021/NN) — Arbitration award to Antin — Spain*, Letter of 19 July 2021, para. 90, **Exh. RL-169**.

452. It must be recalled in this context that Article 1(3) ECT expressly recognises that ECT Contracting Parties may be members of '*an organisation constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters.*' (emphasis added).

453. State aid is clearly one such matter and, in the light of *Elcogas*, Decision SA.40348 2014/N and the Commission's letter in proceedings SA.54155 2021/NN, it is unquestionably at stake in the present proceedings.

454. If the Tribunal were to assert jurisdiction over the claims brought by the Claimants, it would have to decide the merits of claims relating to matters that pursuant to the EU Treaties are under the exclusive competence of the European Commission, and it would do so despite the fact that such transfer of jurisdiction to a REIO, *in casu* the EU, is expressly recognised in the text of the ECT. Under such conditions, the Tribunal considers that it would be overstepping its powers under the ECT, properly interpreted in the light of the relevant provisions of EU law.

455. The Claimants have argued that Spain is estopped from invoking the State aid defence. The Tribunal is unpersuaded by this argument because it overlooks the nature of State aid determinations as a matter of public policy under EU law, which is also recognised by the ECT. Moreover, even if such were not the case, the Claimants have failed to establish the specific conditions required for the determination of estoppel. To prove so for present purposes, they would have to begin by establishing, according to their own reference to *Brownlie's Principles of International Law*, an unambiguous statement of fact. The Claimants refer to Spain's '*statement to the public that the enacted royal decrees constitute the law of the land and that investors can rely on the material contents of said decrees, thereby, at least, communicating that said support schemes were of course lawful*'.[520] Aside from the fact that the relevant decrees, even if they could be considered as a '*statement*', were only made '*to the public (at large)*', as the Claimants admit, it must also be noted that they do not give any specific assurance regarding the submission of any potential disputes to international arbitration under the ECT while in the present arbitration proceedings 'jurisdiction' – and not 'merits'–is the issue at stake. Claimants' additional argument that '*mere administrative deeds such as State Aid decision S.A. 40348 (2015/NN) may not be invoked vis-á-vis international law*'[521] is also groundless, as it is based on the incorrect assumption that EU law cannot be considered as part of international law. The

---

[520] Claimants' Rejoinder, para. 218.
[521] Claimants' Rejoinder, para. 224.

Tribunal has rejected this argument when determining the law applicable to jurisdictional matters (see *supra* paragraphs 153-172).

*Validity of the unilateral offer to arbitrate*

456. Moreover, even if the Tribunal were to consider that matters of State aid are not essential for the present case or cannot be legitimately raised, it would still lack jurisdiction as a result of the autonomy and primacy of the EU legal order and Spain is precluded under Articles 267 and 344 TFEU to offer to submit to arbitration a dispute with investors from another EU Member State, such as the Claimants.

457. As noted by the CJEU Grand Chamber in the *Achmea Judgment*: '*Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.*'[522]

458. The Tribunal considers that Article 26 ECT is '*a provision in an international agreement*', *i.e.* the ECT, '*concluded between Member States*', *i.e.* Spain and Denmark, *inter alia*, '*under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept*'. Such arbitration agreement is precluded by the operation of Articles 267 and 344 TFEU, properly interpreted, '[i]*n order to ensure that the specific characteristics and the autonomy of the EU legal order are preserved*'.[523]

459. The Tribunal's interpretation finds further support in the reasoning of the CJEU Grand Chamber in the *Komstroy Judgment*, according to which '*it must be concluded that Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State*'.[524]

460. And this must be so because such was and is the intent of the relevant ECT Contracting Parties, Spain and Denmark, when they defined their legal relations through a complex network of

---

[522] *Slowakische Republik (Slovak Republic) v. Achmea BV*, CJEU (Grand Chamber), Case C-284/16, Judgment, 6 March 2018, para. 60, **Exh. CL-151; CL-215; RL-105; RL-160**.

[523] *Slowakische Republik (Slovak Republic) v. Achmea BV*, CJEU (Grand Chamber), Case C-284/16, Judgment, 6 March 2018, para. 35, **Exh. CL-151; CL-215; RL-105; RL-160**.

[524] *Republic of Moldova v. Komstroy LLC, successor in law to the company Energoalians*, CJEU (Grand Chamber) Case C-741/19, Judgment, 2 September 2021, para. 66, **Exh. CL-316; RL-164**.

instruments, including the ECT and EU law. Such understanding of their relations has been confirmed in the Declaration II, which, as already noted, is the authentic interpretation of the signatories regarding the issues addressed in it. This Declaration is very clear on the issue at hand:

> 'international agreements concluded by the Union, <u>including the Energy Charter Treaty</u>, are an integral part of the EU legal order and must therefore be compatible with the Treaties. <u>Arbitral tribunals have interpreted the Energy Charter Treaty as also containing an investor-State arbitration clause applicable between Member States. Interpreted in such a manner, that clause would be incompatible with the Treaties and thus would have to be disapplied'</u> (emphasis added)

461. This Declaration must also be understood as the shared understanding of the signatories on the scope and implications of the primacy of EU law. Far from a retroactive modification of existing legal relationships between Spain and Denmark, such understanding is but a restatement of a long-held principle,[525] which has been reaffirmed by the CJEU several times, including in connection with investment treaties[526] and even with respect to a legal regime that protects values as fundamental as human dignity.[527]

462. Thus, in the *MOX Plant case*, the CJEU recalled that:

> '*The Court has already pointed out that an international agreement cannot affect the allocation of responsibilities defined in the Treaties and, consequently, the autonomy of the Community legal system, compliance with which the Court ensures under Article 220 EC. That exclusive jurisdiction of the Court is confirmed by Article 292 EC* [now Article 344 TFEU]*, by which Member States undertake not to submit a dispute concerning the interpretation or application of the EC Treaty to any method of settlement other than those provided for therein.*'[528]

463. In *Opinion 2/13* regarding the Accession of the EU to the European Convention on Human Rights, the CJEU stated:

> '*the Court of Justice has also declared that an international agreement may affect its own powers only if the indispensable conditions for safeguarding the essential character of those powers are satisfied and, consequently, there is no adverse effect on the autonomy of the EU legal order*'[529]

---

[525] *Flamino Costa v. E.N.E.L.*, Case 6/64, Judgment,15 July 1964, ECLI:ECLI:EU:C:1964:66. The principle of primacy was restated in Declaration 17 annexed to the Final Act of the Intergovernmental Conference which adopted the Treaty of Lisbon, **Exh. EC-17**.

[526] *Slowakische Republik (Slovak Republic) v. Achmea BV*, CJEU (Grand Chamber), Case C-284/16, Judgment, 6 March 2018, para. 33, **Exh. CL-151; CL-215; RL-105; RL-160**.

[527] *Opinion 2/13 (Accession of the EU to the ECHR)*, 18 December 2014, ECLI:EU:C:2014:2454, paras. 165-167, **Exh. RL-110**.

[528] *Commission v. Ireland*, Case C-459/03, 30 May 2006, ECLI:EU:C:2006:345, para. 123, **Exh. RL-116**.

[529] *Opinion 2/13 (Accession of the EU to the ECHR)*, 18 December 2014, ECLI:EU:C:2014:2454, para. 183, **Exh. RL-110**.

464. The same principle has been stated with respect to investment agreements, with specific reference to the risks that the interpretation or application of the EU Treaties by investment tribunals poses to the nature and operation of EU law:

> '*the judicial system as thus conceived has as its keystone the preliminary ruling procedure provided for in Article 267 TFEU, which, by setting up a dialogue between one court and another, specifically between the Court of Justice and the courts and tribunals of the Member States, has the object of securing uniform interpretation of EU law, thereby serving to ensure its consistency, its full effect and its autonomy as well as, ultimately, the particular nature of the law established by the Treaties*'[530]

465. Similarly, in its *Opinion 1/17* on the CETA investor-State dispute settlement mechanism, the CJEU emphasised again that the EU legal order places limits to ensure that its autonomy is not adversely affected by dispute settlement mechanisms in international agreements entered into by the Union:

> '*An international agreement entered into by the Union may, moreover, affect the powers of the EU institutions, provided, however, that the indispensable conditions for safeguarding the essential character of those powers are satisfied and, consequently, there is no adverse effect on the autonomy of the EU legal order* […] *It follows that the CETA* […] *a process of submitting to judicial adjudication the resolution of disputes between investors and States* […] *may be compatible with EU law only if it has no adverse effect on the autonomy of the EU legal order.*'[531]

466. With specific reference to investor-State arbitration under Article 26 ECT, the CJEU has made clear, in the *Komstroy Judgment*, that it would be incompatible with the autonomy of the EU legal order only in intra-EU matters, not in matters involving non-EU Members States or investors from such States:

> [T]*he exercise of the European Union's competence in international matters cannot extend to permitting, in an international agreement, <u>a provision according to which a dispute between an investor of one Member State and another Member State concerning EU law may be removed from the judicial system of the European Union such that the full effectiveness of that law is not guaranteed</u>* [ … ]
>
> *<u>Such a possibility would</u>, as the Court held in the case giving rise to the judgment of 6 March 2018, Achmea (C-284/16, EU:C:2018:158, paragraph 58) and as the Advocate General observed in essence in point 83 of his Opinion, <u>call into question the preservation of the autonomy and of the particular nature of the law established by the Treaties</u>, ensured in particular by the preliminary ruling procedure provided for in Article 267 TFEU* [ … ]
>
> *It should be noted in that regard that, despite the multilateral nature of the international agreement of which it forms part, <u>a provision such as Article 26 ECT is intended, in reality, to govern bilateral relations between two of the Contracting</u>*

---

[530] *Slowakische Republik (Slovak Republic) v. Achmea BV*, CJEU (Grand Chamber), Case C-284/16, Judgment, 6 March 2018, para. 37, **Exh. CL-151; CL-215; RL-105; RL-160**.

[531] *Opinion 1/17 of the Court (EU-Canada CET Agreement)*, 30 April 2019, EU:C:2019:341, paras. 107, 108, **Exh. CL-315; RL-161**.

> _Parties, in an analogous way to the provision of the bilateral investment treaty at issue in the case giving rise to the judgment of 6 March 2018, Achmea_ [ … ]
>
> _It follows that, although the ECT may require Member States to comply with the arbitral mechanisms for which it provides in their relations with investors from third States who are also Contracting Parties to that treaty as regards investments made by the latter in those Member States, preservation of the autonomy and of the particular nature of EU law precludes the same obligations under the ECT from being imposed on Member States as between themselves._' (emphasis added)[532]

467. Furthermore, the primacy of EU law was also recognised in the relations between EU law and the ECT by the _Electrabel_ tribunal, whose reasoning has been extensively relied upon by subsequent arbitral tribunals and by both Parties in this arbitration. After an examination of possible conflicts between EU law and the ECT, the _Electrabel_ tribunal came to the conclusion that: '_from whatever perspective the relationship between the ECT and EU law is examined, the Tribunal concludes that EU law would prevail over the ECT in case of any material inconsistency_'.[533] As noted above, the _Electrabel_ tribunal did not have the benefit of the CJEU Grand Chamber's _Achmea Judgment_ and _Komstroy Judgment_, which identify a material inconsistency between provisions of the EU Treaties as fundamental as Articles 267 and 344 TFEU and the operation of investor-State arbitration clauses in intra-EU disputes, but the Tribunal finds the reasoning of the _Electrabel_ tribunal on this point sound and persuasive.

_Priority of application in the relations between EU law and the ECT_

468. Relying on previous decisions of arbitration tribunals and the CJEU, the Parties have argued matters of priority of application between the ECT and EU law by reference to different provisions embodying different logics, such as Article 16 ECT, Articles 30 and 59 VCLT and Articles 344 and 351 TFEU. Whereas it is understandable that complex questions, such as the existence of a normative conflict and the appropriate legal framing of its resolution, may have been open to different views before the _Achmea Judgment_, the guidance now provided by the CJEU in the latter case, as subsequently confirmed in the _Komstroy Judgment_ and also in the _PL Holdings Judgment_, cannot be ignored.

469. The Tribunal deems important to note that the primacy of EU law in the relations between EU Member States, such as Denmark and Spain, is not a matter of _lex specialis_ or of _lex posterior_, but one of _lex superior_. EU Member States are part of a network of legal relations, including the ECT, EU law and many other norms and agreements. Some of these norms, including provisions of the

---

[532] _Republic of Moldova v. Komstroy LLC, successor in law to the company Energoalians_, CJEU (Grand Chamber) Case C-741/19, Judgment, 2 September 2021, paras. 62-65, **Exh. CL-316; RL-164.**

[533] _Electrabel S.A. v. Republic of Hungary_, ICSID case No. ARB/07/19, Decision on Jurisdiction, 30 November 2012, para. 4.191, **Exh. RL-2.**

EU Treaties, are deemed by them as superior and overriding with respect to some other norms. Which specific norms can display this overriding character can be ascertained by reference to the case law of the CJEU. Indeed, when recalling the long-held principle of the primacy of EU law, in the Declaration 17 to the Final Act of the Intergovernmental Conference which adopted the Treaty of Lisbon, EU Member States placed particular emphasis of the CJEU case law:

> '*The Conference recalls that, <u>in accordance with well settled case law of the Court of Justice of the European Union</u>, the Treaties and the law adopted by the Union on the basis of the Treaties have primacy over the law of Member States, <u>under the conditions laid down by the said case law</u>.*' (emphasis added)[534]

The CJEU has consistently held this principle to be applicable to the relations between the EU Treaties and other treaties concluded by EU Member States in their *inter se* relations.[535] If any doubt could remain about the primacy of EU law, particularly Articles 267 and 344 TFEU, over Article 26 ECT in the relations among EU Member States, it has now been dispelled by the *Komstroy Judgment*.

470. The argumentation of the Claimants in this arbitration relating to the operation of Article 16 ECT overlooks this important point. If Article 16 ECT were to be considered the pivotal conflict norm on the grounds that this Tribunal needs to use the ECT as a *lex fori*, that would lead to disregard the overriding character of a *lex superior* deemed as such by the relevant States: Denmark, Spain, Sweden and indeed all EU Member States. If the analogy of the *lex fori* is at all applicable to an international tribunal such as the Tribunal, such *lex fori* would be international law, not the ECT. The ECT is the starting point of the analysis, but the limitations it imposes on the Tribunal with respect to its scope of jurisdiction must not be misunderstood as limitations on the applicable law preventing it from applying rules that are deemed to be overriding by the very States whose relations are at stake in the present arbitration. In an extreme case, such a misunderstanding would require an international tribunal to apply the ECT instead of norms that are unquestionably recognised as *lex superior*, such as the peremptory norms of international law, the very rules codified in Articles 53 or 64 VCLT, as part of the law of treaties recalling the priority of peremptory norms, or overriding obligations under Article 103 of the UN Charter.[536] This can certainly not be the case. Seen from a *lex superior* perspective, the ECT could only override EU law in intra-EU

---

[534] Declaration 17 annexed to the Final Act of the Intergovernmental Conference which adopted the Treaty of Lisbon, **Exh. EC-17**.

[535] Legal Expert Declaration by Professor Steffen Hindelang, 13 March 2022 (**'Hindelang ER'**), para. 32-37, referring *inter alia* to *Budějovický Budvar*, Case C-478/07, ECLI:EU:C:2009:521, para. 98, **Hindelang ER Exh. 14**; *Commission v. Government of Italian Republic*, Case 10/61, ECLI:EU:C:1962:2, p. 10; **Hindelang ER Exh. 31**; *Exportur*, Case C-3/91, ECLI:EU:C:1992:420, para. 8, **Hindelang ER Exh. 32**; *Ravil*, Case C-469/00, ECLI:EU:C:2003:295, para. 37, **Hindelang ER Exh. 33**; *Commission v. Germany*, Case C-546/07, ECLI:EU:C:2010:25, para. 44, **Hindelang ER Exh. 34**.

[536] *Questions of Interpretation and Application of the 1971 Montreal Convention arising from the Aerial Incident at Lockerbie (Libyan Arab Jamahiriya v. United Kingdom)*, Provisional Measures, Order of 14 April 1992, ICJ Reports 1992, p. 3, para. 39 *in fine*.

relations if the ECT, including its Article 16, could be considered as *lex superior* with respect to the relevant norms of EU law, including Articles 267 and 344 TFEU and the principle of primacy. The Tribunal considers that there are no grounds on which the ECT could have such an overriding character in the circumstances of this case.

471. It is instructive in this regard that the CJEU has considered in *Opinion 2/13,* which concerned a treaty protecting the fundamental value of human dignity, that the limitations flowing from the autonomy and primacy of EU also operate in this context: '*an international agreement may affect its own powers only if* [ … ] *there is no adverse effect on the autonomy of the EU legal order'.*[537] To the extent that no such adverse effect can be expected, the primacy of EU law would not prevent EU Member States from submitting a dispute to international adjudication.

472. This is also how the Tribunal understands the *Opinion 2/15*, to which the Claimants have referred. Indeed, in that Advisory Opinion, the CJEU did not address the primacy of EU law as regards intra-EU disputes. It specifically noted, in this regard, that:

> '*As Chapter 15 of the envisaged agreement relates to disputes between the European Union and the Republic of Singapore regarding the interpretation and application of that agreement, <u>neither does this opinion cover the issue of the jurisdiction of the Court so far as concerns the settlement of disputes within the European Union relating to the interpretation of EU law</u> (see inter alia, in respect of that jurisdiction, judgment of 30 May 2006, Commission v Ireland (MOX plant), C-459/03, EU:C:2006:345, paragraph 132, and Opinion 1/09 (Agreement creating a Unified Patent Litigation System) of 8 March 2011, EU:C:2011:123, paragraph 78).'*[538] (emphasis added).

The CJEU made this statement in connection with inter-State disputes, but it is clearly applicable to disputes between, on the one hand, a Singaporean (or EU/EU Member State) investor and, on the other hand, the EU/EU Member State (or Singapore), as made clear by the observation that '*neither does <u>this opinion</u> cover the issue of the jurisdiction of the Court*' (emphasis added).

473. Similar considerations underpin the conclusions of the CJEU in its *Opinion 1/17* with respect to the compatibility of the CETA investor-State dispute settlement mechanism with the autonomy of the EU legal order. The CJEU distinguished on that basis the situation of the CETA mechanism and that of mechanisms concerning intra-EU investor-State arbitration:

> '*Section F of Chapter Eight of the CETA must also be distinguished from the investment agreement at issue in the case that gave rise to the judgment of 6 March 2018, Achmea (C-284/16, EU:C:2018:158), since, as stated by the Court in paragraphs 42, 55 and 56 of that judgment, that agreement established a*

---

[537] *Opinion 2/13 (Accession of the EU to the ECHR)*, 18 December 2014, ECLI:EU:C:2014:2454, para. 183, **Exh. RL-110.**
[538] *Opinion 2/15 (EU-Singapore FTA)*,16 May 2017, ECLI:EU:C:2017:376, para. 302, **Exh. CL-279**.

> *tribunal that would be called upon to give rulings on disputes that might concern the interpretation or application of EU law [ ... ]*
>
> *That judgment concerned, moreover, an agreement <u>between Member States. The question of the compatibility, with EU law, of the creation or preservation of an investment tribunal by means of such an agreement must be distinguished from the question of the compatibility, with EU law, of the creation of such a tribunal by means of an agreement between the Union and a non-Member State'</u>* (emphasis added)[539]

474. By contrast, the *Achmea Judgment*, the *Komstroy Judgment* and the *PL Holdings Judgment* specifically address dispute settlement mechanisms potentially applicable to intra-EU disputes, including the ECT investment arbitration mechanism, which can adversely affect the autonomy of the EU legal order. In the latter context, the primacy of EU law fully applies.

475. The Tribunal further observes that Swedish law, which is applicable through the operation of Section 48 SAA, recognises the primacy of EU law. Although the Tribunal is not aware of a decision from the competent Swedish courts specifically addressing the relations between the ECT and EU law, it is conscious that the Svea Court of Appeal withdrew its petition for a preliminary ruling on these relations on the basis of the *Komstroy Judgment* of the Court of Justice, indicating in this way that its questions were addressed by the *Komstroy Judgment*. [540] The Tribunal moreover finds guidance in the decision of a court from another EU Member State, the German *Bundesgerichtshof*, which set aside the *Achmea* award, expressly referring to the primacy of EU law.[541]

476. The primacy of EU law has been clearly recognised in all the foregoing cases and, very specifically, precluded the unilateral offer to arbitrate in Article 26 ECT because inconsistent with the autonomy and primacy of EU law.

477. It is therefore the unanimous view of the Tribunal that the same considerations apply to the offer to arbitrate by Spain under Article 26 ECT. Seated in an EU Member State, it likewise cannot apply the consent to arbitrate by the Respondent and affirm its jurisdiction. Following the reasoning of the CJEU Grand Chamber in the *Achmea Judgment* and subsequently confirmed in the *Komstroy Judgment*, this Tribunal considers that the offer of the Respondent, as an EU Member State, to arbitrate under Article 26 ECT a dispute with investors of another EU Member State which would,

---

[539] *Opinion 1/17 of the Court (EU-Canada CET Agreement)*, 30 April 2019, EU:C:2019:341, paras. 126-127, **Exh. CL-315**.

[540] Order of November 12, 2021 of the Svea Court of Appeal, **Exh. RL-167**; IAReporter 30 November 2021, **Exh. RL-165**; Respondent's Powerpoint Presentation On-line hearing, p. 31.

[541] *Bundesgerichtshof*, Judgment of 31 October 2018, paras. 20-22, **Annex EC-9**, with reference i.a. to the CJEU decisions *Matteucci v. Communauté française de Belgique*, C-235/87, ECLI:EU:C:1988:460; *Exportur*, C-3/91, ECLI:EU:C:1992:420.

of necessity, require this Tribunal to interpret and apply the EU Treaties, is precluded. Therefore, there is no unilateral offer by the Respondent which the Claimants could accept.

*(c)   Conclusion on the jurisdictional objection ratione voluntatis*

478. Based on the foregoing reasons, the jurisdictional objection *ratione voluntatis* raised by the Respondent is sustained, and the Tribunal does not have jurisdiction to hear the claims brought by the Claimants.

## Section E.    Partial objections to jurisdiction and admissibility

479. Relying on Article 21 ECT, the Respondent has also raised two partial objections to the jurisdiction of the Tribunal and the admissibility of parts of the Claimants' claims.

480. Given the conclusion of the Tribunal on the general objection to jurisdiction *ratione voluntatis* (*supra* paragraph 478), the Tribunal lacks jurisdiction to hear any of the claims brought by the Claimants, and there is no need to address the two partial objections raised by the Respondent.

# IX. COSTS

481. Pursuant to Article 43 SCC Rules, the Tribunal has requested the Board of the SCC to determine the costs of the arbitration and to specify the individual fees and expenses of each Member of the Tribunal and of the SCC.

482. The Board of the SCC has determined and specified the costs of the arbitration as follows:

The fees of the Chairperson Hans van Houtte amount to € 203,910  and the reimbursement of expenses to € 1,621, plus any VAT.

The fees of Arbitrator I. Hanefeld amount to € 122,346 and the reimbursement of expenses to € 2,641.31, plus any VAT ,

The fees of Arbitrator J. E. Viñuales amount to € 122,346 and the reimbursement of expenses to € 1,996.

The Administrative Fees of the SCC amount to €  53,466 and the reimbursement of expenses to € 20,106.73 and SEK 21,900, plus any VAT.

483. Pursuant to Article 43(4) SCC Rules, the Tribunal has to apportion the above-mentioned costs between the Parties, having regard to the outcome of the case and the other relevant circumstances.

484. The Tribunal observes that the Claimants' claims have been dismissed because of lack of jurisdiction, but that nothing in the briefs submitted by the Claimants on jurisdictional and admissibility matters as well as on the merits suggests that the claims lacked reasonable grounds to be brought or could otherwise be considered frivolous.

485. The Tribunal further observes that the Claimants, which accepted to bifurcate the proceedings and to discuss the Tribunal's jurisdiction first, have contributed to the efficiency of the arbitral proceedings. In fact, in the course of the arbitration proceedings, which started on 8 September 2016, legal argumentation became substantially affected by intervening awards and court decisions, especially by the *Achmea Judgment* of 6 March 2018 and by the *Komstroy Judgment* of 2 September 2021 from the CJEU.

486. The Tribunal therefore considers it appropriate that each of the Claimants bears 25 % of the costs of arbitration and that the Respondent bears 50 % of the costs of arbitration.

487. The Tribunal also notes that each Party has also requested the Tribunal to order the other Party to reimburse its legal expenses, such as the costs for legal representation, as provided by Article 44 SCC Rules.

488. On 9 May 2019, the Claimants and the Respondent submitted their respective Statements of Costs related to the arbitration proceedings till that date.

489. On 13 April 2022, the Claimants and the Respondent submitted their respective Statements on Further Costs. The Respondent had no comments on the Claimants' Statement. However, on 22 April 2022, the Claimants objected to Respondent's Statement which they considered inacceptable in form and substance because it did not reflect the fact that the Respondent is allegedly conducting over fifty parallel proceedings. On 29 April 2022, Respondent addressed the Claimants' objections.

490. The Claimants claim reimbursement of costs amounting to € 2,575,177.21, *i.e.*

    <u>For Green Power</u>:

| | |
|---|---|
| Legal Fees: | € 1,130,233.34 |
| Experts: | €  188,916.00 |
| Disbursements and Arbitration Costs: | €   177,508.85 |

For SCE:

| | | |
|---|---|---|
| Legal Fees: | € | 840,263.83 |
| Experts: | € | 69,165.80 |
| Disbursements and Arbitration Costs: | € | 169,089.39 |

491. The Respondent claims reimbursement of costs amounting to € 1,243,449.60., *i.e.*

| | | |
|---|---|---|
| Legal Fees: | € | 352,593.98 |
| Experts: | € | 514,999.00 |
| Disbursements and Arbitration Costs: | € | 375,856.63 |

492. For the reasons mentioned *supra* in paragraphs 484-486, the Tribunal considers it appropriate, in the circumstances of the case, for each Party to bear its own costs.


# X. DECISION OF THE TRIBUNAL

493. The Tribunal hereby:

    (i)      Declares that it has no jurisdiction to hear and decide the claims;

    (ii)     Dismisses the Claimants' claims;

    (iii)   Dismisses the Respondent's Claim to dismiss the Claimants' claims as to the merits and for damages;

    (iv)   Dismisses the Parties' claims that the other Party pays for the costs and expenses of the arbitration proceedings;

    (v)     Orders the Claimant Green Power to pay 25 % of the costs of arbitration as specified *supra* in para. 482.

    (vi)   Orders the Claimant SCE to pay 25 % of the costs of arbitration as specified *supra* in para. 482.

    (vii)  Orders the Respondent, Kingdom of Spain, to pay 50 % of the costs of arbitration as specified *supra* in para. 482.

125

(viii)   Orders that each Party bears the costs of its legal representation and other expenses to conduct the arbitration proceedings.

Seat: Stockholm

Date:   1 6  June 2022

Hans van Houtte
Chairperson

Inka Hanefeld
Co-Arbitrator

Jorge Viñuales
Co-Arbitrator