# EXHIBIT 29

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**PORTIGON AG**
(Claimant)
**vs**
**KINGDOM OF SPAIN**
(Respondent)

**(ICSID Case No. ARB/17/15)**

---

# DECISION ON REQUEST FOR RECONSIDERATION
# DISSENTING OPINION
**of**
**Arbitrator Giorgio Sacerdoti**

**The Tribunal lacks jurisdiction because, by codifying in the Lisbon Treaty (2007) the primacy of EU law – whose principle of autonomy does not allow intra EU arbitration under BITs and the ECT (as clarified by the CJEU in *Achmea* and *Komstroy*) – EU Members States have withdrawn *inter se* their consent to Article 26 ECT arbitration, acting in conformity with Article 41 VCLT ("Agreements to modify a multilateral treaty between certain parties only"). Therefore, when Claimant initiated the present arbitration in 2017 there was no advanced consent by Spain under Article 26 ECT to ICSID arbitration of the present dispute.**

## TABLE OF CONTENTS *

**I.** INTRODUCTION AND SUMMARY ..................................................................... 2

**II.** THE REASONING OF THE TRIBUNAL'S DECISION POST *ACHMEA* UPHOLDING ITS JURISDICTION ON THE PRESENT ECT INTRA-EU DISPUTE ...................................... 9

**III.** THE *KOMSTROY* JUDGMENT OF THE CJEU ............................................... 13

**IV.** THE RELEVANCE OF *KOMSTROY* FOR CLARIFYING ICSID TRIBUNALS' LACK OF JURISDICTION ON ECT INTRA-EU DISPUTE ..................................... 20

    A. The novelty of *Komstroy* ........................................................................... 20

    B. Applying *Komstroy*: as a consequence of EU Member States' lack of competence to accept ECT intra-EU arbitration, the Tribunal is deprived of jurisdiction on the present dispute ........................................................................... 22

    C. The interpretation under EU law of Article 26 ECT by the CJEU in Komstroy as excluding intra-EU disputes is not to be followed by ICSID tribunals operating under international law, but this does not undermine the conclusion that the Tribunal lacks jurisdiction ........................................................................... 26

D.   The EU law preclusion to subjecting intra-EU disputes under the ECT to arbitration derives from the Lisbon Treaty (2009) rather than dating back to the conclusion of the ECT (1998) ................................................................................................ 29

V.   CONFORMITY WITH THE VCLT AND THE ICSID CONVENTION OF THE WITHDRAWAL OF CONSENT BY SPAIN TO ECT INTRA-EU ARBITRATION BY EFFECT OF THE LISBON TREATY ........................................................................................ 35

A.   Compatibility of the withdrawal by Spain of its consent to ICSID arbitration of the present ECT intra-EU dispute by effect of the Lisbon Treaty with Article 25(1) ICSID Convention whereby "When the parties have given their consent, no party may withdraw its consent unilaterally" ................................................................ 35

B.   Effectiveness of the Lisbon Treaty as an *inter se* agreement in conformity with Article 41 VCLT to modify the ECT between EU Member States, withdrawing their consent to ECT intra-EU arbitration, regardless of its notification to other parties ................. 37

C.   Irrelevance of Article 46 VCLT in respect of the withdrawal of EU Member States from ECT intra-EU arbitration by effect of the Lisbon Treaty .................................... 41

D.   Impact of the "lex posterior" principle and non-applicability of Article 16 ECT ........ 43

E.   Compatibility of the conclusion that the Tribunal lacks jurisdiction with the principles of non-retroactivity and the rule of law ....................................................... 45

## I.   INTRODUCTION AND SUMMARY

1.   For the reasons spelled out herein after I do not agree with the Decision on the Request for Reconsideration of my colleagues in the Arbitration Tribunal to uphold the Tribunal's jurisdiction notwithstanding the EU Court of Justice ("**CJEU**" or the "**Court**") judgment of 2 September 2021 in the case C-741/19 *Komstroy v. Moldova* (the "**CJEU judgment**" or "***Komstroy***").

2.   By a petition submitted on 13 October 2021 (the "**Petition**"), Respondent Kingdom of Spain has requested the Tribunal to reconsider its Decision on Jurisdiction dated 20 August 2020 (the "**Decision**" or the "**Decision on Jurisdiction**") by which the Tribunal *inter alia* rejected Respondent's objection to the Tribunal's jurisdiction under Article 26 of the ECT based on the intra-EU nature of the dispute submitted to it and affirmed its jurisdiction in the merits.

3.   The Petition is grounded on the subsequent issuance by the CJEU of the judgment in *Komstroy* which has *inter alia* dealt with the compatibility with EU law of Article 26 ECT in respect of the settlement by arbitration of disputes under the ECT between an investor of an EU Member

State and another EU Member State ("**ECT intra-EU disputes**" or "**intra-EU investment arbitration**").[1]

4.    In this respect, the Court held that:

> [...] although the ECT may require Member States to comply with the arbitral mechanisms for which it provides in their relations with investors from third States who are also Contracting Parties to that treaty as regards investments made by the latter in those Member States, preservation of the autonomy and of the particular nature of EU law precludes the same obligations under the ECT from being imposed on Member States as between themselves.[2]

5.    Therefore, the CJEU concluded that:

> In the light of the foregoing, it must be concluded that Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State.[3]

6.    This Tribunal has to decide on Respondent's Petition for Reconsideration. In so doing, it cannot ignore that the issue before it has been or is being raised before a number of arbitral tribunals presently dealing with ECT intra-EU disputes, that all tribunals (except *Green Power v. Spain* in June 2022) have rejected the petitions and that the issue has considerable systemic implications. At the same time, the present Tribunal must analyse independently and impartially the issue and render its carefully considered decision.

7.    Looking at the matter more broadly, the context is one of *ad hoc* arbitral investment tribunals hearing intra-EU investment disputes, endowed with limited jurisdiction and sometimes also with limited knowledge of public international law, pitched against the CJEU in asserting their jurisdiction based on Article 26 ECT, in opposition to the conclusive holding to the contrary

---

- Legal sources whose citations hereunder lack an exhibit number are not part of the record, but are publicly available, either on the internet or as published in books and journals. I believe that they have to be considered in deciding the matter before the Tribunal following the principle *jura novit curia*, and in view of the systemic relevance of the issue *sub judice* to be decided.

[1] **RL-0207**, *Komstroy v. Republic of Moldova*, CJEU Case C-741/19, Judgment, 2 September 2021 ("***Komstroy***"). Subsequently, on 27 June 2022, Respondent Spain requested the permission (which was granted) to introduce four new judicial decisions among which was *Green Power Partners K.S. and SCE Solar Don Benito APS v. Spain,* SCC Case 2016/135, Award, 16 June 2022 ("***Green Power***") (**RL-0239**). In this award the arbitral tribunal, seated in Stockholm and having Swedish law as *lex fori,* followed the principles affirmed by the CJEU in *Komstroy* and denied its jurisdiction, holding that EU law, applicable to jurisdictional issues as part of the *lex fori,* prevented the application of Article 26 ECT to intra-EU disputes, such as the one in that case.

[2] **RL-0207**, *Komstroy*, para. 65.

[3] *Id*., para. 66.

of the CJEU in *Komstroy*. Arbitration tribunals support their position on their reading of international law rules dealing with the relations between successive treaties (the ECT versus the EU Treaties) and between parties which are in part different. The CJEU relies instead on the primacy[4] and the autonomy[5] principles of EU law and its prohibition of nationality-based discrimination within the EU, to assert that EU law prevails and precludes ECT intra-EU arbitration (as it had decided three years before in *Achmea* in respect of intra-EU BITs.)[6] These are among the basic principles that underpin the progressive establishment of an "*ever closer Union among the peoples of Europe*" as proclaimed in the preamble to the Treaty on the European Union ("**TEU**").

8.    I do not share the disregard shown in this matter by some ECT intra-EU arbitral tribunals towards the reasoned judgments of the knowledgeable Court of Justice of the EU, one of the most respected, well-established and legitimate among international/supranational courts. A court which is at the same time the common highest court in matters of EU law of the twenty-seven member States of the EU (which also subscribed to the ECT in 1994).[7] As such, the CJEU is the final authentic interpreter of EU law, issuing judgments that are binding upon the Member States and have a direct impact on the position of EU natural and legal persons, including investors of a Member State performing investment in another Member State. To summarily dismiss its reasoning and holdings on EU law, of whose interpretation the Court is the ultimate judge, as some investment tribunals have done, is not consonant in my view with the duties of responsible international adjudicators and should be rejected.[8]

9.    Faced with the conclusion of the CJEU based on EU law that Article 26 ECT, interpreted in the light of EU law, is not applicable to intra-EU arbitration, arbitral tribunals have denied the relevance of the reasoning and the holding of the Court for arbitral tribunals not subject to the

---

[4] See Expert Declaration by Prof. S. Hindelang, 28 October 2021 (hereinafter "**Hindelang**"), submitted by Spain in support of the Petition for Reconsideration, paras. 35-43.

[5] See Hindelang, paras. 44-52.

[6] **RL-0065**, *Achmea B.V. v. Slovak Republic*, CJEU Case C-284/16, Judgment, 6 March 2018 ("***Achmea***").

[7] See e.g. **CL-0338**, IA Reporter Article, 13 December 2021 on *Landesbank Baden-Würtenberg and Others v. Spain*, ICSID Case No. ARB/15/45, Decision on Reconsideration, 11 November 2021 stating that this Decision has deemed the "comments" of the CJEU in *Komstroy* on the ECT to be *obiter dicta* and that "they bind no-one." The tribunal in *Infracapital v. Spain*, ICSID Case ARB/16/18, Decision on Reconsideration, 1 February 2022, though acknowledging that *Komstroy* is "*a relevant decision on the interpretation by the CJEU of the EU Treaties*" considered the approach of the CJEU "*clearly inappropriate*" and held *Komstroy* to be "*entirely irrelevant to the Tribunal's ruling on jurisdiction and liability*" (at paras. 93, 111 and 116).

[8] This is not the case of the Decision on Reconsideration of the majority, see para. 166: "*The first point to note is that the prestige and the authority of the CJEU regarding the interpretation of EU law is not under question. However, it is a different matter whether its conclusions are binding on this Tribunal or have a decisive impact on this Tribunal's decision, which is not the case as it is an international tribunal constituted under international treaties: the ECT and the ICSID Convention.*"

EU legal system, such as, typically, ICSID tribunals.[9] As I will recall in more details here after, in a nutshell these tribunals have held that (a) they are under a duty to apply international law, specifically the Vienna Convention on the Law of Treaties of 1969 ("**VCLT**"), and not EU law to determine the proper ambit of Article 26 ECT; (b) that the conflict between EU law – that is the Treaty of the Functioning of the European Union ("**TFEU**"), last amended by the Lisbon Treaty of 2007 which entered into force in 2009 – and the text of Article 26 ECT is to be resolved by application of the rules of the VCLT; (c) that under those rules Article 26 must be interpreted as including intra-EU arbitration and as prevailing on EU law; (d) that should a conflict between the ECT and EU law (specifically the Lisbon Treaty) be found, the ECT prevails, though earlier in time. This is so either because the two treaties do not deal with the "*same subject-matter*" so that the conflict rule of *lex posterior* enshrined in Article 30 VCLT does not apply or by application of Article 16 ECT.  According to this article, the ECT prevails over less favourable (for investors) subsequent treaty provisions, such being the case of the relationship between the ECT and the Lisbon Treaty in respect of dispute settlement by arbitration, which the latter instrument does not provide for.

10.    I share the view of arbitral tribunals, including this Tribunal, that for tribunals operating outside the EU legal system the solution of this clash is to be based on the proper construction and analysis of international law principles on interpretation and application of treaties, considering the ambit and effect of the ECT and of the EU Treaties, respectively.[10] In this respect, I also agree that the reasoning and conclusions of the CJEU, based as they are on EU law, are not *per se* binding nor determinative for non-EU arbitral tribunals. I believe however that in their reasoning arbitral tribunals have not properly considered the effect that the Court's determination of the incompatibility of EU law with ECT intra-EU arbitration (and the reasons thereof) has on EU Member States participation to the ECT.  By holding that EU law *prevents* Member States from agreeing on intra-EU arbitration under the ECT – due to the primacy of EU law over the law of the EU Member States –  the CJEU has implicitly stated that they

---

[9] I acknowledge that all arbitration tribunals to which Spain and Italy have asked for reconsideration of their decisions on jurisdiction in light of *Komstroy* have rejected the respective petitions. In the present case Claimant has introduced as **CL-0337**, *Mathias Kruck and Others v. Spain*, ICSID Case No. ARB/15/23, Decision on Reconsideration, 6 December 2021 ("*Kruck*"); as **CL-0338** a summary (from IA Reporter of 13 December 2021) of the negative Decision of 11 November 2021 by the tribunal in *Landesbank Baden-Wuerttemberg and Others v. Spain*, ICSID Case No. ARB/15/45; as **CL-0339**, a summary (from IA Reporter of 22 December 2021) of the negative Decision of 20 December 2021 by the tribunal in *Rockhopper v. Italy*, ICSID Case No. ARB/17/14.  Other known similar decisions are by the tribunals in *Cavalum v. Spain*, ICSID Case No. ARB/15/34, Decision of 10 January 2022;  *Infracapital v. Spain,* ICSID Case No. ARB /16/18, Decision of 1 February 2022; *Sevilla Beheer et al. v. Spain,* ICSID Case No. ARB/16/27, Decision of 11 February 2022.

[10] The *Kruck* tribunal, **CL-0337** at para. 46, has called this clash a "*a clash of Grundnormen.*"

lacked or have lost the competence, under their own constitutional law, to agree on such arbitration. Accordingly, as the CJEU has more recently held, the "*consent given to that effect by* [Member States], *from that time onwards, lacked any force.*"[11]

11. Even admitting that EU Member States could have agreed or subscribed to intra-EU arbitration when they signed the ECT in 1994, and that they did so without breaching EU law at the time, they lost in any case this power at the latest in 2009 by effect of the Lisbon Treaty in which the principle of primacy of EU law on the Member States' domestic law was codified and given for the first time a treaty base. As a consequence, EU Member States (including Germany and Spain as Claimant's home and host States) ceased to be bound by Article 26 ECT coverage of intra-EU arbitration. The Lisbon Treaty thus operated and has to be recognized as an "*Agreement to modify multilateral treaties between certain of the parties only*" in conformity with Article 41 VCLT.[12]

12. As a consequence, ECT intra-EU tribunals lack jurisdiction because of the absence of the required undertaking by the relevant home and host States to accept such arbitration. More specifically, Spain's consent was lacking when the Claimant in the present arbitration (as is the case of claimants in all other RE disputes against Spain), subsequently initiated (in 2017) arbitral proceedings against Spain under the ECT, several years after the Lisbon Treaty.

13. This situation has been clarified for the first time by the CJEU in *Komstroy*. In this respect, I recall that the *Komstroy* judgment is an interpretative decision of a provision of EU law, as the CJEU is called to render in proceedings governed by Article 267 of the Treaty on the Functioning of the EU ("**TFEU**") such as *Komstroy v. Moldova*.[13] As such, an interpretative

---

[11] **RL-0236**, *European Commission v. European Food SA et al*, CJEU Case C-638/19 P, Judgment, 25 January 2022, para. 145.

[12] **CL-0073**, VCLT, Article 41:

"*Agreements to modify multilateral treaties between certain parties only*

*1. Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:*

*(a) the possibility of such a modification is provided for by the treaty; or*

*(b) the modification in question is not prohibited by the treaty and:*

*(i) does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;*

*(ii) does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.*

*2. Unless in a case falling under paragraph 1(a) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.*"

[13] According to Article 267 TFEU (**CL-0230**) (initially Article 177 of the Treaty of Rome of 1957 establishing the European Economic Community, and thereafter Article 235 of the European Communities Treaty):

decision under Article 267 TFEU is retrospective, that is it applies to the EU law provision or principles being interpreted since they entered into force.

14. Previously, in 2018, the CJEU had addressed in the *Achmea* case the compatibility of investment arbitration under a bilateral investment treaty ("**BIT**") with the EU legal framework, declaring that such an investment arbitration was incompatible with, and prevented by the EU legal system, specifically by Articles 267 and 344 TFEU. The Court carefully avoided even mentioning the ECT, thus leaving the issue open whether the principles of *Achmea* could be applied also to ECT intra-EU arbitration.

15. By extending in *Komstroy* the rationale of *Achmea* to intra-EU investment arbitration under the ECT, the CJEU has resolved those doubts. The Court has declared that also such arbitration under the ECT is incompatible with basic principles of EU law, asserting that EU law precludes EU Member States from undertaking such an obligation.[14] The CJEU has thus dispelled any previously legitimate doubts as to whether the similar holding expressed in the *Achmea* case in respect of intra-EU arbitration based on specific BITs was applicable also to intra-EU arbitration under the ECT. I recall that the uncertainty of this issue was one of the reasons on which this Tribunal relied for upholding its jurisdiction in the Decision on Jurisdiction.[15]

16. It is precisely because of this development in the CJEU jurisprudence that Respondent has petitioned reconsideration of the 2020 Decision on Jurisdiction.[16] Respondent is of the opinion that the decision of the CJEU denying arbitral investment tribunals' jurisdiction on intra-EU disputes under Article 26 ECT, also due to the transfer to the EU of the Member States'

---

"*The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:*

*(a) the interpretation of the Treaties;*

*(b) the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union.*

*Where such a question is raised before any court or tribunal of a Member State, that court or tribunal may, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court to give a ruling thereon.*

*Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court.* […]"

[14] **RL-0207**, *Komstroy*, para. 65.

[15] See for instance Decision on Jurisdiction, para. 220: "*For the following reasons it is not clear to the Tribunal that the above interpretation of Articles 267 and 344 of the TFEU by the CJEU in Achmea constitutes clearly determinable 'relevant rules of international law' applicable to the ECT*", and para. 221: "*Firstly, the Tribunal notes that it is unclear from the Achmea Judgment whether the CJEU intended for it to apply to multilateral conventions such as the ECT.*" See also paras. 223, 225 and 228 quoted hereafter.

[16] Respondent's Petition for Reconsideration, paras. 117, 145.

previous individual competence on foreign direct investment, is de facto binding upon this Tribunal and prevents it from exercising jurisdiction on the present dispute for a variety of reasons.[17] First, "*the effect of the autonomy and primacy of EU Law is to allow the EU and Member States to disconnect from international treaties for intra-EU affairs, even if those treaties do not have a disconnection clause.*"[18] Secondly, resorting to the rules of Article 30 of the VCLT, the primacy of EU law also prevails as *lex posterior* since, as stated in the First Declaration on *Achmea*, the principle of primacy of EU Law was codified in Declaration 17 annexed to the Treaty of Lisbon in 2007, and therefore subsequent to the ECT. Moreover, according to Respondent, Article 16 ECT is not a rule of conflict but rather an interpretative precept.[19]

17.   The position of Claimant is instead that EU law and the CJEU judgment in *Komstroy* bear "*no relevance on the jurisdiction of ICSID tribunals. Arbitration consented by the Contracting States to the ICSID Convention belong to a self-contained, autonomous international legal order created by those Contracting States through the ICSID Convention itself. As such, the ICSID Convention's legal order is not linked, bound to, nor depends on any Contracting States' jurisdiction or other autonomous international legal order which all or some of ICSID Contracting States have established.*"[20]

18.   In a nutshell, both Parties rely on the element of consent to the present ICSID arbitration by Germany and Spain. However, for Respondent by effect of the Treaty of Lisbon, a subsequent treaty which codified the primacy of EU law and transferred the competence on foreign direct investment from the individual Member States to the EU, their consent has ceased to be effective so that Article 26 ECT does not sustain the jurisdiction of the Tribunal. For the Claimant the content of EU law cannot prevail on the self-contained ICSID system within which Spain has consented to this ECT arbitration.

19.   I believe that the careful and extensive 2020 Decision on Jurisdiction of this Tribunal was and would remain sound, but for the decisive impact of *Komstroy*. Respondent stresses the novelty of *Komstroy* to support its Petition. In my view, this judgment can be even more radically

---

[17] Respondent's Petition for Reconsideration, paras. 95, 96, 117 ff., 145. 150.

[18] Respondent's Petition for Reconsideration, paras. 41, 68.

[19] Respondent's Petition for Reconsideration, para. 94. See also para. 97: "*If it is not considered that the disconnection of the EU and its member states from article 26 took place upon ratification of the ECT, this disconnection occurred subsequently as a necessary effect of the ratification of the Lisbon Treaty by the member states.*"

[20] Claimant's Further Observations, para. 20.

described as a decisive "game changer" in framing the relation between EU law and the ECT in respect of the subject matter.

20.    In order to evaluate the relevance of *Komstroy* for the jurisdiction of this Tribunal, I am proceeding as follows in my analysis:

    (a)    Firstly, I will recall and summarize the reasoning of this Tribunal in its Decision on Jurisdiction of 2020 to support its conclusion that EU law in the matter, including the decision of the CJEU invoked at the time by Respondent (the *Achmea* judgment of 2018), did not preclude its jurisdiction as an ICSID tribunal on an intra-EU dispute such as the present one.

    (b)    Secondly, I will sum up the reasoning and findings of the CJEU to the contrary in *Komstroy*.

    (c)    Thirdly, I will explain the reasons why, in my opinion, *Komstroy* should lead this Tribunal to change its position and find by application of principles and rules of international law applicable to the matter that it lacks jurisdiction to hear the present ECT intra-EU dispute.

## II.    THE REASONING OF THE TRIBUNAL'S DECISION POST *ACHMEA* UPHOLDING ITS JURISDICTION ON THE PRESENT ECT INTRA-EU DISPUTE

21.    The reasoning of the Tribunal in the Decision on Jurisdiction for rejecting Respondent's argument that Article 26(6) ECT does not include intra-EU arbitration by effect of EU law principles to the contrary, can be summarized as follows:

    (a)    Article 26 ECT must be interpreted in accordance with the principles of treaty interpretation contained in the VCLT.

    (b)    EU law constitutes (also) international law, since it is based on treaties between EU Member States and thus qualifies for being "*taken into account together with the context*" under Article 31(3)(c) VCLT for interpreting the ECT as an international treaty.

    (c)    However, this cannot lead to giving to a provision of the ECT (such as Article 26) a different meaning in the relations between ECT parties who are also members of the

EU in respect of cases when parties to the ECT who are not members of the EU are involved.[21]

(d)  Moreover, it is unclear whether EU law, as stated by the CJEU in *Achmea* (also in the light of the subsequent "*Achmea* Declarations" of various EU Members) precludes intra-EU arbitration under Article 26 ECT, since the *Achmea* judgment was rendered in respect of a BIT (between the Netherlands and Slovakia) and not the ECT. Moreover, Article 8 of such BIT expressly empowers the arbitral tribunal to also apply EU law, which is not the case of Article 26 ECT. It is therefore not clear that the same conclusion would apply to intra-EU arbitration under the ECT under the very reasoning of the CJEU.[22]

(e)  On this basis this Tribunal has concluded that EU law does not form part, either directly (under Article 26(6) ECT), or indirectly (by reference to Article 31(3)(c) VCLT) of the law applicable to the jurisdictional issue before it.

22.  The conclusion reached by this Tribunal on the basis of *Achmea,* that Article 26 ECT cannot be interpreted as excluding intra-EU arbitration because EU law precludes it, is in line with all the decisions on the matter rendered by investment arbitral tribunals established under Article 26(6) ECT (up to *Green Power)*, as emphasized by Claimant.[23] Some of the relevant

---

[21] The Decision on Jurisdiction reasoned as follows at para. 215 (footnotes omitted): "*The Tribunal concurs with the Eskosol tribunal that the 'text of a multilateral treaty must have a consistent and objective meaning, not different meanings determined separately and subjectively for each different subset of States that may be involved in a particular future dispute.'  The need for a single, coherent and uniform interpretation and application of the ECT provisions vis-à-vis all the Contracting Parties is also underscored in the VCLT, which emphasizes on the 'universal' recognition of  'the principles of free consent and of good faith and the pacta sunt servanda rule.'*"

[22] See Decision on Jurisdiction, para. 220: "*For the following reasons it is not clear to the Tribunal that the above interpretation of Articles 267 and 344 of the TFEU by the CJEU in Achmea constitutes clearly determinable 'relevant rules of international law' applicable to the ECT.  The Tribunal clarifies that its analysis below is limited to an examination of whether the Achmea findings constitute a clearly determinable rule of international law with respect to their applicability to the ECT, and the Tribunal is not examining the merits of the CJEU's interpretation of Articles 267 and 344 of the TFEU.*"

[23] **CL-0172**, *Greentech Energy Systems A/S, NovEnergia II Energy & Environment (SCA) SICAR, and NovEnergia II Italian Portfolio SA v. Italian Republic,* SCC Case No. 2015/095, Final Award, 23 December 2018 ("*Greentech*"), paras. 335-355; **CL-0173**, *Foresight Luxembourg Solar (1&2) Sàrl, Greentech Energy Systems AS, GWM Renewable Energy (1&2) v. Kingdom of Spain*, SCC Case No. 2015/150, Final Award, 14 November 2018 ("*Foresight*"), para. 221; **CL-0157**, *UP and CD Holding Internationale v. Republic Hungary*, ICSID Case No. ARB/13/35, Award, 9 October 2018 ("*UP*"), paras. 252-267; **CL-0158**, *Vattenfall AB and Others v. Federal Republic of Germany,* ICSID Case No. ARB/12/12, Decision on the Achmea Issue, 31 August 2018 ("*Vattenfall*"), para. 232; **CL-0047**, *Antin Infrastructure Services Luxembourg Sàrl and Antin Energía Termosolar BV v. Kingdom of Spain,* ICSID Case No. ARB/13/31, Award, 15 June 2018 ("*Antin*"), paras. 204-230; **CL-0046**, *Masdar Solar & Wind Cooperatief UA v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 ("*Masdar*"), paras. 296-342; **CL-0037**, *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain*, SCC Case No. 2015/063, Final Award, 15 February 2018 ("*Novenergia*"), paras. 431-466; **CL-0074**, *Eiser Infrastructure Limited and Energía Solar Luxembourg Sàrl v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017 ("*Eiser*"), paras. 179-207; **CL-0096**, *Blusun SA, Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016

holdings of these tribunals in the matter have been referred to and quoted in the Decision on Jurisdiction, as results from the paragraphs reproduced above.

23.     Authors and commentators of *Achmea* have been divided whether *Achmea* could be extrapolated to make also intra-EU arbitration under Article 26 ECT incompatible with EU law. Those against have also referred to the Opinion of Advocate General Wathelet in the *Achmea* case who opined that Article 8 of the BIT was compatible with EU law, a view that the Court rejected.[24]

---

("*Blusun*"), paras. 277-303; **RL-0004**, *Isolux Infrastructure Netherlands, BV v. Kingdom of Spain*, SCC Case No. V2013/153, Award, 17 July 2016 ("*Isolux*"), paras. 622-660; **CL-0038**, *RREEF Infrastructure (GP) Limited and RREEF Pan-European Infrastructure Two Lux Sàrl v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016 ("*RREEF Jurisdiction*"), paras. 71-90; **CL-0045**, *Charanne BV and Construction Investments Sàrl v. Kingdom of Spain*, SCC Case No. 062/2012, Final Award, 21 January 2016 ("*Charanne*"), paras. 424-450; **CL-0048**, *Electrabel SA v. Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 ("*Electrabel*"), paras. 5.31-5.60; **CL-0174**, *Eastern Sugar BV v. Czech Republic*, SCC Case No. 088/2004, Partial Award, 27 March 2007 ("*Eastern Sugar*"), para. 181; **CL-0175**, *Binder v. Czech Republic*, UNCITRAL, Award on Jurisdiction, 6 June 2007 ("*Binder*"), paras. 66-67; **CL-0176**, *Jan Oostergetel and Theodora Laurentius v. Slovak Republic*, UNCITRAL, Decision on Jurisdiction, 30 April 2010 ("*Jan Oostergetel*"), para. 109; **CL-0177**, *Achmea BV (formerly Eureko) v. Slovak Republic*, UNCITRAL, Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010 ("*Achmea Award*"), para. 293; **CL-0178**, *European American Investment Bank AG (EURAM) v. Slovak Republic*, UNCITRAL, Award on Jurisdiction, 22 October 2012 ("*EURAM*"), paras. 181, 212; **CL-0179**, *Marfin Investment Group Holdings SA and Others v. Republic of Cyprus*, ICSID Case No. ARB/13/27, Award, 26 July 2018 ("*Marfin*"), para. 595; **CL-0180**, *WNC Factoring Ltd v. Czech Republic*, UNCITRAL, Award, 22 February 2017 ("*WNC*"), para. 301; **CL-0181**, *A11Y Ltd v. Czech Republic*, ICSID Case No. UNCT/15/1, Decision on Jurisdiction, 9 February 2017 ("*A11Y*"), para. 171 *et seq*.    With the Rejoinder on Jurisdiction, Claimant added references to: **CL-0221**, *9REN Holding Sarl v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019 ("*9REN*"); **CL-0222**, *Cube Infrastructure Fund SICAV and Others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum, 29 February 2019 ("*Cube*"); **CL-0223 / CL-0249**, *Landesbank Baden-Württemberg and Others v. Kingdom of Spain*, ICSID Case No. ARB/15/45 ("*Landesbank*"), Decision on the "Intra-EU" Jurisdictional Objection, 25 February 2019 (as reported by IA Reporter on 11 July 2019, and later introduced by agreement as CL-0249 on 22 November 2019 prior to the Hearing on Jurisdiction); **CL-0224**, *NextEra Energy Global Holdings BV and NextEra Energy Spain Holdings BV v. Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Quantum Principles, 12 March 2019 ("*NextEra*"); **CL-0225 / CL-0250**, *SolEs Badajoz GmbH v Kingdom of Spain*, ICSID Case No. ARB/15/38 ("*SolEs Badajoz*") Award, 31 July 2019 (as reported by IA Reporter on 1 August 2019 and later introduced by agreement as CL-0250 on 22 November 2019 prior to the Hearing on Jurisdiction); **CL-0248**, *InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*, ICSID Case No. ARB/14/12 ("*InfraRed*"), as reported by IA Reporter on 8 August 2019. *See also*, Tr. Jur. Day [1] [Mr. Wendler] [178:7-25] referring to **CD-004**, Cl. Opening Statement Jur., slide 21, which added reference to **CL-0251**, *OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain*, ICSID Case No. ARB/15/36, Award, 6 September 2019 ("*OperaFund*").

[24]  See among many E. Gaillard, *L'Affaire Achmea ou les conflits de la logique*, Rec. crit. dr. int. privé 2018, p. 616; B. Hess, *The Fate of the Investment Dispute Resolution after the Achmea Decision*, Max Plack Institute for Procedural Law Luxemburg – Paper Series n. 2, 2018; Cl. Nagy, *Intra-EU Bilateral Investment Treaties and EU Law after Achmea*, German Law J., 2018, p. 982, 986; C. Binder, *A Treaty Law Perspective on Intra-EU BITs*, JWIT 2016, 17, p. 964 ff; P. Paschalidis, *International Investment Law and EU Law: Are there Systemic Conflicts and Incompatibilities?* in EU Law and Investment Arbitration, H. Ruiz-Fabri and E. Gaillard eds., Juris 2018, p. 5 ff, at p. 45 ff; S. Gáspár-Szilágyi and M. Usynin, *The Uneasy Relationship between Intra-Eu Investment Tribunals and the Court of Justice's Achmea Judgement*, Eur. Investment Law and Arbitration Review, 2019, p. 29, p. 35; A. Dashwood, *Article 26 ECT and Intra-EU Disputes – the Case against an Expansive Reading of Achmea*, ELR 2021, p. 415, p. 423; Q. Declève and I. Van Damme, *Investment Arbitration under Intra-EU BITs*, in International Arbitration and EU Law, J.R. Mata Dona and N. Lavranos eds., Elgar 2021, p. 291 ff; J. Sullivan and D. Ingle, *Arbitration under the ECT: The Relevance of EU Law*, p. 320 ff.

24.   Other commentators considered instead that the principle of primacy of EU law and the reliance of the CJEU on Articles 267 and 344 TFEU as preventing intra-EU BIT arbitration was necessarily implying that also Article 26 intra-EU arbitration was inadmissible.[25] Other commentators have criticized the Court for its alleged disrespect of international law in pursuing the primacy of EU law, not only in respect of the domestic law of the Member States but also towards international law, the very law which underpins EU law itself.[26] Finally, some other commentators have pointed out that the Termination Agreement between Member States of 5 May 2020, providing for the termination of all the intra-EU BITs, somehow undermines the position of the Commission that these BITs are per se incompatible with EU law.[27]

25.   The ambiguity was rooted in the text of the *Achmea* judgment itself. On the one hand, the Court has made general statements on the fundamental features of the EU legal system that prevents resolving by arbitration investment disputes on the basis of intra-EU BITs, such as in paragraphs 33, 35 and 36. On the other hand, the Court has pointed to the text of the BIT at issue that directed a tribunal to apply EU law (a requirement that, absent such a specific text, investment tribunals have denied, holding that EU law is not part of the applicable law under Article 26(6) ECT).[28]

26.   As well-known, a lively institutional debate followed within the EU as to whether the incompatibility extended to all intra-EU BITs as well as to the ECT. It involved the EC Commission (Communication of 2018),[29] which considered that the *Achmea* ruling equally applied to the ECT and that protection of investments (as freedom to provide transborder services, capital movement and right of establishment) were fully ensured in the EU single market, and Member States which expressed different positions on the issue (three

---

[25] A. Pinna, *The Incompatibility of Intra-EU BITs with EU Law*, Les Cahiers de l'Arbitrage 2018, p. 73; S. Hindelang, *Conceptualization and Application of the Principle of Autonomy of EU Law - The CJEU's Judgement in Achmea Put in Perspective*, European L. Rev. 2019, p. 44; J. Basedow, *The Achmea Judgement and the Applicability of the ECT in Intra-EU Investment Arbitration*, JIEL 2020, p. 271. A similar position has been taken by Prof. Marcelo Kohen in his dissent in *Adamakopoulos v. Cyprus*, ICSID Case No. ARB/15/49 of 3 February 2020.

[26] See A. Briguglio, *Achmea and the Day After*, Rivista dell'Arbitrato 2018, p. 504; A. Reuter, *Taking Investors' Rights Seriously, The Achmea and CETA Rulings of the European Court of Justice Do not Bar Intra-EU Investment Arbitration*, ZaöRV/Heidelberg J. Int. L. 2020, 80/2, pp. 379-427; C. Contartatese and M. Andenas, *EU Autonomy and Investor-State Dispute Settlement under Inter se Agreements between EU Member States*, CML Rev. 2019, p. 157; J. Odermatt, *International Law and the European Union,* CUP 2021, p. 180.

[27] See A. Carlevaris, A. Ciampi, *Beyond Achmea: Implications for EU Member States, Arbitrators, National Courts and European Investors*, Rivista dell'Arbitrato, 2020, pp. 661-707, p. 673.

[28] See especially **RL-0065**, *Achmea*, paras. 39 and 58.

[29] **RL-0071**, Communication on the Protection of intra-EU investment, COM (2918) 547/2, 19 July 2018. On the issue see also D. Moskvan, *Protection of Foreign Investments in an Intra-EU Context. Not One BIT?*, Elgar 2022.

Declarations of 2019).[30] Finally, a "Termination Agreement" was concluded between 23 Member States[31] in 2020 to terminate all existing intra-EU BITs.[32] These divergent positions justified in my view the rejection by arbitral tribunals, including this Tribunal, of the intra-EU jurisdictional objection under the ECT notwithstanding the *Achmea* judgment.[33]

## III. THE *KOMSTROY* JUDGMENT OF THE CJEU

27. Against this backdrop, on 2 September 2021 the CJEU rendered its Judgment in *Komstroy* addressing specifically the compatibility of intra-EU arbitration under Article 26 ECT with EU law. Before summarizing the reasoning and the holding of the CJEU on the matter it is appropriate to briefly recall the nature of the proceedings in which the CJEU issued its judgment (on the basis of a preliminary reference under Article 267 TFEU) and the factual elements of the dispute brought to the Court. This is necessary in order (a) to determine the authority under EU law of *Komstroy* beyond the specific dispute in which it was rendered, and (b) the relevance it has for an investment arbitral tribunal such as the present one, which is established under the ICSID Convention, is not seated within the EU and is not subject to the EU legal system.

28. I recall that the Court has issued its *Komstroy* judgment pursuant to a request of the Court of Appeals of Paris under Article 267 TFEU by which that court had asked the CJEU to render a preliminary ruling concerning the interpretation of Article 1(6) and Article 26(1) ECT.

29. It is established in EU law that the preliminary reference mechanism of Article 267 ECT is of fundamental importance in the framework of EU law that goes far beyond that of just giving to a court of any EU Member State a (binding) interpretation of a specific provision of a EU Treaty or any other rule of EU law.[34] As to the latter aspect, the interpretation is binding for

---

[30] **RL-0120**, First *Achmea* Declaration, 15 January 2019, by 22 States including Germany and Spain; **RL-0121**, Second *Achmea* Declaration, 16 January 2019, by five States; **RL-0122**, Hungary's *Achmea* Declaration, 16 January 2019.

[31] Excluding Finland, Sweden, Austria and Ireland, possibly because these countries had no intra-EU BITs still in force.

[32] Hindelang **Exh. 014**, Agreement for the Termination of Bilateral Investment Treaties between the Member States of the EU, OJ L 169, 29 May 2020, pp. 1-41. The Termination Agreement has been signed by 23 Member States (excluding Austria, Ireland, Finland and Sweden), entered in force on 20 August 2020.

[33] See also the judgment of the BGH (the German Federal Court) of 31 October 2018 which had requested the opinion of the CJEU in the *Achmea* case pending before it (in proceedings for the annulment of the *Achmea v. Slovak Republic* award in Germany) and which annulled the award on the basis of the CJEU decision. The BGH clarified that under the approach followed by the CJEU objecting to the application of EU law by arbitrators "[I]*t does not matter whether the arbitration tribunal did in fact not apply and did not have to apply European Law*." Hindelang **Exh. 69**, para. 32.

[34] See U. Villani, *Istituzioni di Diritto dell'Unione europea*, 5th ed., Cacucci, Bari 2017, p. 403: "*The competence of the Court as to preliminary references is the one based on which not only the Court has issued the majority of its judgements, but also the most significant, the 'historical one', by which it has built and developed the Union's legal system, spelling out its fundamental principles and features*" (my translation).

the requesting court in the dispute before it, which if necessary, must disapply any contrary subsequent domestic provision.[35]

30.    The interpretation of the provision by the CJEU is moreover authoritative and binding for any court in the EU and for any other authority that has to apply such provision. Its determination of the correct interpretation of the provision at issue applies thus *erga omnes*. Since in an Article 267 proceedings the Court *declares* the "*state of the law*", such an interpretation rendered by the Court applies in principle to the provision at issue from the time it has entered into force, thus retrospectively, except in respect of decisions which have become final.[36]

31.    As a consequence, domestic courts do not need to refer further to the CJEU requests for interpretation of provisions that the CJEU has already interpreted in a decision under Article 267 TFEU. In case there are requests pending from other domestic courts for resolving interpretation doubts that have been answered in the meantime, or can be considered having been resolved by a previous interpretation, the CJEU will refer the requesting court to such interpretation, as happened after *Komstroy* was rendered.[37]

32.    The preliminary ruling mechanism has been defined by the CJEU as the "*keystone*" of the judicial system which, by setting up a dialogue between the Court of Justice and the courts and tribunals of the Member States to ensure the full application of EU law in all Member States and judicial protection of the rights of individuals under that law. The preliminary ruling mechanism is fundamental in order to secure the uniform interpretation of EU law,

---

[35] See CJEU, *Benedetti*, Case C-52/76, Judgment, 3 February 1977, Rec. p. 163; *Ciola*, Case C-224/77, Judgment, 29 April 1999, Rec. p. I-2517, point 26 ff.

[36] CJEU, *Kuene & Heitz NV v. Productsshap voor Pluimvee en Eieren*, Case C-453/00, Judgment, 13 January 2004, paras. 21-25; *Vent de Colère*, Case C-262/12, Judgment, 19 December 2013 (Hindelang **Exh. 89**), para. 39 (to which also *Green Power* refers, at paras 377-378): "*It should be recalled in this connection that, according to settled case-law, the interpretation which, in the exercise of the jurisdiction conferred upon it by Article 267 TFEU, the Court gives to a rule of European Union law clarifies and defines the meaning and scope of that rule as it must be, or ought to have been, understood and applied from the time of its coming into force. It follows that the rule as thus interpreted may, and must, be applied by the courts to legal relationships arising and established before the judgment ruling on the request for interpretation, provided that in other respects the conditions for bringing before the courts having jurisdiction an action relating to the application of that rule are satisfied* […]."

[37]  After the issuance of *Komstroy,* the CJEU referred the Svea Court of Appeal of Stockholm to the *Komstroy* and *Poland v. PL Holdings* rulings in relation with its request of preliminary ruling on the admissibility of ECT intra-EU arbitration in the proceedings, pending before it for the recognition of an SCC award in the dispute *Greentech and Novenergia v. Italy*. Thereupon, the Swedish court withdrew by order of 24 November 2021 its request as having become moot in light of the two rulings of the CJEU, see **RL-0233**, **RL-0234** and **RL-0235**.

thereby supporting its consistency, its full effect and its autonomy, in conformity with the particular nature of the law established by the Treaties.[38]

33.    Based on that provision, for the purpose of deciding whether an arbitral tribunal established under Article 26 ECT, seated in Paris, rendering a decision on dispute between Komstroy (a Ukrainian company) and Moldova, had jurisdiction under that provision, the Court of Paris asked the CJEU to give its interpretation of the concept of "*investment*" under Articles 1(6) and 26(1) ECT. It must be underlined in this respect that neither party to the dispute was a EU person so that the arbitral award that had resolved the dispute (and that was under challenge in Paris because Paris was the seat of the ICC arbitration) had decided a "non-intra-EU" arbitration.

34.    This circumstance was considered by the CJEU to be irrelevant for establishing its competence to accept the request of preliminary interpretation, because what matters in this respect is whether in accordance with Article 267 TFEU the act to be interpreted is an act of an institution, body, office or agency of the EU.[39] An international agreement such as the ECT is considered part of EU law, because it is settled case-law of the Court that "*an agreement concluded by the Council, pursuant to Articles 217 and 218 TFEU constitutes, as regards the European Union, an act of one of its institutions, that the provisions of such an agreement form an integral part of the legal order of the European Union from the time it enters into force and that, in the context of that legal order the Court has jurisdiction to give a preliminary ruling on the interpretation of that agreement.*"[40]

35.    On this basis the CJEU examined Articles 1(6) and 26(6) ECT and rendered the interpretation requested, stating that "*Article 1(6) and Article 26(1) of the Energy Charter Treaty, signed at Lisbon on 17 December 1994, approved on behalf of the European Communities by Council and Commission Decision 98/181/EC, ECSC, Euratom of 23 September 1997, must be interpreted as meaning that the acquisition, by an undertaking of a Contracting Party to that treaty, of a claim arising from a contract for the supply of electricity, which is not connected with an investment, held by an undertaking of a third State against a public undertaking of*

---

[38] **RL-0065**, *Achmea*, paras. 36 and 37 with reference to Opinion 2/13 (Accession of the EU to the ECHR) of 18 December 2014, para. 176.

[39] **RL-0207**, *Komstroy*, para. 22. To the contrary, as stated in para. 21, "*The Council of the European Union, the Hungarian, Finnish and Swedish Governments and Komstroy are, in essence, of the view that the Court does not have jurisdiction to provide answers to the questions referred because EU law is inapplicable to the dispute at issue in the main proceedings as the parties to that dispute are external to the European Union.*"

[40] **RL-0207**, *Komstroy*, paras. 23 and 49-50 (reference to case-law omitted).

*another Contracting Party to that treaty, does not constitute an 'investment' within the meaning of those provisions.*"[41]

36.     The peculiarity of the *Komstroy* judgment and its relevance for the jurisdiction of arbitral tribunals established to settle intra-EU disputes resides, however, in the interpretation rendered by the CJEU on a different issue (which the Court however considered relevant as being preliminary in respect of the question submitted to it), namely whether intra-EU arbitration under the ECT is compatible with EU law. The Court answered in the negative in paragraphs 65-66: "*It follows that, although the ECT may require Member States to comply with the arbitral mechanisms for which it provides in their relations with investors from third States who are also Contracting Parties to that treaty as regards investments made by the latter in those Member States, preservation of the autonomy and of the particular nature of EU law precludes the same obligations under the ECT from being imposed on Member States as between themselves. In the light of the foregoing, it must be concluded that Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State.*"[42]

37.     A first observation on this decision is that the Court of Paris did not ask the CJEU to opine whether Article 26(2)(c) ECT is applicable to intra-EU arbitration, this being an issue not before it and of no relevance to the dispute between Komstroy and Moldova, both parties being external to the EU. It is interesting to observe that accordingly, the *dispositif* of the *Komstroy* judgment does not include the above holding on the ECT compatibility with EU law, but only the above quoted interpretation of Articles 1(6) and 26(1) ECT as requested by the Paris court. The issue was thus addressed by the CJEU *motu proprio* although several intervening parties, EU Member States and especially the Commission, had pleaded vigorously to the CJEU to do so.[43] This choice by the Court is all more remarkable considering that *Komstroy*, as had been the case of *Achmea*, was rendered by the CJEU in the composition

---

[41] **RL-0207**, *Komstroy*, final ruling (*dispositif*).

[42] **RL-0207**, *Komstroy*, paras. 65-66. For a critical analysis see M.R. Mauro, *Diritto dell'UE e arbitrato sugli investimenti: recenti sviluppi alla luce della sentenza Komstroy*, Diritto del Commercio Internazionale, 36.2, 2022, pp. 277-342.

[43] The reasons for the CJEU to enter into the matter are spelled out in paras. 29 and 40-41 of the judgment in order to avoid conflicting interpretation of the ECT and "*specify which disputes between one Contracting Party and an investor of another Contracting Party concerning an investment made by the latter in the area of the former may be brought before an arbitral tribunal pursuant to Article 26 ECT.*"

of Grand Chamber made of 15 judges (including the presidents of six chambers) and was presided over by the president of the CJEU, Mr. K. Lenaerts.[44]

38.    It must be recalled however that the authoritative and definitive value or effect of an interpretation rendered by the CJEU pursuant to an Article 267 TFEU proceeding is not affected nor diminished by the fact that the interpretation rendered was not asked for by the requesting domestic court and that the holding is not contained in the *dispositif*.[45] In any case, the Court has explained why it found appropriate to address the matter.[46] Contrary to the self-serving view expressed by the ICSID tribunal (boldly but without any underpinning in EU law) in *Landesbank Bank Baden-Würtenberg and Others v. Spain,* the interpretation of the CJEU on the matter cannot be summarily dismissed as an irrelevant *obiter dictum*.[47] While the distinction between *rationes decidendi* and *obiter dicta* is not typical in the judicial approach of the CJEU, in comparison to common law judges, this argument, in any case, would not hold since in its preliminary ruling decision the Court has also rendered its interpretation of Article 26(2)(c) ECT, albeit not included in the final *dispositif*.

39.    At this point, it is appropriate to quote *in extenso* some of the relevant paragraphs of *Komstroy* where the CJEU recalls the basic principles of the EU law system that precludes intra-EU disputes under the ECT from being resolved by arbitral tribunals established under Article 26(2)(c) ECT.

40.    The CJEU has reasoned as follows in the relevant paragraphs of *Komstroy*:

> 42. The Court has consistently held that an international agreement cannot affect the allocation of powers laid down by the Treaties and, hence, the

---

[44]  It seems more likely that it was the issue of intra-EU arbitration that prompted the *Komstroy* case (just as *Achmea*) to be decided by the Grand Chamber, rather than the interpretation of the term investment in the ECT. Both judgments, as well as **RL-0233**, *Poland v. PL Holdings Sarl*, CJEU Case C-109/20, Judgment, 26 October 2021 ("***PL Holdings***") on a related issue, had the same judge rapporteur, Prof. Lucia Serena Rossi of Bologna University.

[45]  In any case the Court rendered its interpretation in a specific paragraph of the judgment and not just in its reasoning, see **RL-0207**, *Komstroy*, para. 66, quoted above: "*In the light of the foregoing, it must be concluded that Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State.*" (underlining added).

[46]  See **RL-0207**, *Komstroy*, para. 40, where the Court states that in order to answer the question submitted to it, "*it is necessary, first of all, as several Member States which have participated in the proceedings have observed, to specify which disputes between one Contracting Party and an investor of another Contracting Party concerning an investment made by the latter in the area of the former may be brought before an arbitral tribunal pursuant to Article 26 ECT.*"

[47]  **CL-0338**, IA Reporter Article, 13 December 2021 stating that *Landesbank Baden-Wuertenberg and Others v. Spain* ICSID Case No. ARB 15/45, Decision on Reconsideration, 11 November 2021, after having held that its previous Decision on Jurisdiction of 2019 was *res iudicata* (a proposition that this Tribunal has rejected following the better prevailing interpretation of ICSID Convention in this respect) has considered that the "comments" of the CJEU in Komstroy on the ECT were not an essential part of the decision, that they were *obiter dicta* and that "they bind no-one" (sic).

autonomy of the EU legal system, observance of which is ensured by the Court. That principle is enshrined in particular in Article 344 TFEU, under which the Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the Treaties (judgment of 6 March 2018, *Achmea*, C-284/16, EU:C:2018:158, paragraph 32 and the case-law cited).

43. According to further settled case-law of the Court, the autonomy of EU law with respect both to the law of the Member States and to international law is justified by the essential characteristics of the European Union and its law, relating in particular to the constitutional structure of the European Union and the very nature of that law […].

45. In order to ensure that those specific characteristics and the autonomy of the legal order thus created are preserved, the Treaties have established a judicial system intended to ensure consistency and uniformity in the interpretation of EU law. […] To that end, that system includes, in particular, the preliminary ruling procedure provided for in Article 267 TFEU (judgment of 6 March 2018, *Achmea*, C-284/16, EU:C:2018:158, paragraphs 35 and 36 and the case-law cited, and Opinion 1/17 *(EU-Canada CET Agreement)*, of 30 April 2019, EU:C:2019:341, paragraph 111 and the case-law cited).

[…]

48. To that end, in the first place, it should be noted that, in accordance with Article 26(6) ECT, the arbitral tribunal provided for in paragraph 4 of that article is to rule on the issues in dispute in accordance with the ECT and with the applicable rules and principles of international law.

49. As stated in paragraph 23 of this judgment, the ECT itself is an act of EU law.

50. It follows that an arbitral tribunal such as that referred to in Article 26(6) ECT is required to interpret, and even apply, EU law.

[…]

53. That characteristic of such an arbitral tribunal means that it cannot, in any event, be classified as a court or tribunal 'of a Member State' within the meaning of Article 267 TFEU, and is not therefore entitled to make a reference to the Court for a preliminary ruling (see, by analogy, judgment of 6 March 2018, *Achmea*, C-284/16, EU:C:2018:158, paragraphs 46 and 49)

41.    The CJEU went on to draw the following conclusions on its above reasoning:

> 62.    However, <u>the exercise of the European Union's competence in international matters cannot extend to permitting, in an international agreement, a provision according to which a dispute between an investor of one Member State and another Member State concerning EU law may be removed from the judicial system of the European Union</u> such that the full effectiveness of that law is not guaranteed.[48]

> 63.    Such a possibility would, as the Court held in the case giving rise to the judgment of 6 March 2018, *Achmea* (C‑284/16, EU:C:2018:158, paragraph 58) and as the Advocate General observed in essence in point 83 of his Opinion, call into question the preservation of the autonomy and of the particular nature of the law established by the Treaties, ensured in particular by the preliminary ruling procedure provided for in Article 267 TFEU.

42.    Based on the above reasoning the Court concluded in paragraphs 65 and 66 with the following interpretative holding that:

> 65.    It follows that, although the ECT may require Member States to comply with the arbitral mechanisms for which it provides in their relations with investors from third States who are also Contracting Parties to that treaty as regards investments made by the latter in those Member States, <u>preservation of the autonomy and of the particular nature of EU law precludes the same obligations under the ECT from being imposed on Member States as between themselves.</u>[49]

> 66.    In the light of the foregoing, it must be concluded that Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State.

43.    Most relevant in the present context is the principle of primacy of EU law vis‑à‑vis the legal systems of the Member States. Due to such primacy, EU Member States are prevented (i.e., do not have the power) to disregard autonomy, which has as a key element the possibility of domestic jurisdictions to refer questions of interpretation of EU law to the CJEU.[50] This principle, as the Court has clarified in *Achmea,* prohibits Member States from removing from

---

[48] The underlining of this sentence is mine. This sentence holds in substance that EU Member States did not have the competence to agree on Article 26 in respect of intra-EU arbitration, this being in my view the decisive holding of the CJEU based on which arbitration tribunals have to declare that they lack jurisdiction.

[49] I have underlined this sentence that in substance holds that EU Member States did not have the competence to agree on Article 26 in respect of intra-EU arbitration. This is in my view the decisive holding of the CJEU based upon which ICSID tribunals, though not subject to the authority of the CJEU, have to declare that they lack jurisdiction because EU Member States lack the competence to accept it.

[50] See **RL-0066**, CJEU, Opinion 2/13, para. 201 (referred to by Hindelang, paras. 36-37): "*an international agreement cannot affect the allocation of powers fixed in the* [EU] *Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the* [CJEU]."

their judicial systems in favor of arbitration the competence to rule on ECT disputes between EU investors and  EU Member States, because the supervision of the CJEU by way of preliminary ruling based on Article 267 TFEU would be thereby excluded.[51] The effect of this prohibition is, as I reason hereunder, that Article 26 ECT is not binding on EU member States in respect of intra-EU arbitration because they lacked or lost the competence to accept such obligation.

## IV.   THE RELEVANCE OF *KOMSTROY*  FOR CLARIFYING ICSID TRIBUNALS' LACK OF JURISDICTION ON ECT INTRA-EU DISPUTE

### A.   THE NOVELTY OF *KOMSTROY*

44.   The clear statements in *Komstroy* quoted above have completely changed the picture in respect of the compatibility of ECT intra-EU arbitration with EU Treaties and EU law. Until and after *Achmea*, authors and investment tribunals have speculated that principles stated by the CJEU in *Achmea* in respect of an intra-EU BIT might not be applicable to the ECT. As mentioned *supra* at paragraph 21(d), this was at the time not an untenable position (also this Tribunal has unanimously adopted that position) in view of the fact that *Achmea* did not include any mention as to its applicability to a multilateral treaty such as the ECT and appeared in its holdings to be narrow and case-specific. The incompatibility also of ECT intra-EU arbitration with EU law enjoying primacy has been clarified beyond any doubt by *Komstroy*.

45.   I recall that this was the position of the EU Commission, and that a number of EU Members States concluded that the *Achmea* principles were equally applicable to the ECT. Thus, the Commission in its Communication of 19 July 2018 adopted the following position:

> The Achmea judgment is also relevant for the investor-State arbitration mechanism established in Article 26 of the Energy Charter Treaty as regards intra-EU relations. This provision, if interpreted correctly, does not provide for an investor-State arbitration clause applicable between investors from a Member State of the EU and another Member State of the EU. Given the primacy of Union law, that clause, if interpreted as applying intra-EU, is incompatible with EU primary law and thus inapplicable. Indeed, the reasoning of the Court in Achmea applies equally to the intra-EU application of such a clause which, just like the clauses of intra-EU BITs, opens the possibility of submitting those disputes to a body which is not part of the judicial system of the EU. The fact that the EU is also a party to the Energy Charter Treaty does not affect this conclusion: the participation of the EU in that Treaty has only created rights and obligations between the

---

[51] See **RL-0207**, *Komstroy*, paras. 62-63.

EU and third countries and has not affected the relations between the EU Member States.[52]

46.    In the First "*Achmea* Declaration" of 15 January 2019 twenty-two Member States (including Spain and Germany) took the same position.[53] First, all the signatories recalled that:

>   Member States are bound to draw all necessary consequences from that judgment pursuant to their obligations under Union law.

47.    The consequences the signatories drew were as follows:

>   Union law takes precedence over bilateral investment treaties concluded between Member States.[54] As a consequence, all investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are contrary to Union law and thus inapplicable […] An arbitral tribunal established on the basis of investor-State arbitration clauses lacks jurisdiction, due to a lack of a valid offer to arbitrate by the Member State party to the underlying bilateral investment Treaty. Furthermore, international agreements concluded by the Union, including the Energy Charter Treaty, are an integral part of the EU legal order and must therefore be compatible with the Treaties.[55] Arbitral tribunals have interpreted the Energy Charter Treaty as also containing an investor-State arbitration clause applicable between Member States. Interpreted in such a manner, that clause would be incompatible with the Treaties and thus would have to be disapplied.

48.    In the final paragraph (no. 9) of the Declaration the signatories stated the following:

>   Beyond actions concerning the Energy Charter Treaty based on this declaration, Member States together with the Commission will discuss without undue delay whether any additional steps are necessary to draw all the consequences from the *Achmea* judgment in relation to the intra-EU application of the Energy Charter Treaty.

---

[52] **RL-0071**, Communication from the Commission to the European Parliament and the Council, *Protection of intra-EU investment,* COM (2018) 547 final, pp. 3-4; Hindelang **Exh. 25**.

[53] **RL-0120**, Declaration of the Representatives of the Governments of the Member States, of 15 January 2019 on the legal consequences of the judgment of the Court of Justice in *Achmea* and on investment protection in the European Union, available at https://ec.europa.eu/info/publications/190117-bilateral-investment-treaties_en ("**First *Achmea* Declaration**"). For the Second *Achmea* Declaration, see **RL-0121**; for the Hungary *Achmea* Declaration, see **RL-0122**.

[54] (**RL-0120**, Original fn. 1) "*With regard to agreements concluded between Member States, see judgments in Matteucci, 235/87, EU:C:1988:460, paragraph 21; and Budějovický Budvar, EU:C:2009:521, C-478/07, paragraphs 98 and 99, and Declaration 17 to the Treaty of Lisbon on primacy of Union law. The same result follows also under general public international law, in particular from the relevant provisions of the Vienna Convention on the Law of the Treaties and customary international law (lex posterior).*" (underlining added).

[55] (**RL-0120**, Original fn. 2) "*Judgment in Western Sahara, C-266/16, EU:C:2018:118, paragraphs 42 to 51. For the Energy Charter Treaty, its systemic interpretation in conformity with the Treaties precludes intra-EU investor-State arbitration.*"

49.     In fact, these twenty-two Member States took no action in respect of intra-EU arbitration under the ECT. They just waited for the outcome of *Komstroy*, as five other Members had expressly signaled in a different Declaration their intention to do so (the "Second *Achmea* Declaration").[56] These five other States stated:

> The Member States note that the *Achmea* judgment is silent on the investor-state arbitration clause in the Energy Charter Treaty. A number of international arbitration tribunals post the *Achmea* judgment have concluded that the Energy Charter Treaty contains an investor-State arbitration clause applicable between EU Member States. This interpretation is currently contested before a national court in a Member State. Against this background, the Member States underline the importance of allowing for due process and consider that it would be inappropriate, in the absence of a specific judgment on this matter, to express views as regards the compatibility with Union law of the intra EU application of the Energy Charter Treaty.

50.     In unanimously rejecting the position of the CJEU in *Achmea* in respect of the ECT, arbitral tribunals have relied instead on the margin of uncertainty that that judgment allowed, and reasoned that *Achmea* was inapplicable in respect of a different multilateral treaty, such as the ECT, which binds all EU Members[57] and had the EU itself as a party. This is however not possible anymore without getting in contradiction.[58]

### B.   APPLYING *KOMSTROY*: AS A CONSEQUENCE OF EU MEMBER STATES' LACK OF COMPETENCE TO ACCEPT ECT INTRA-EU ARBITRATION, THE TRIBUNAL IS DEPRIVED OF JURISDICTION ON THE PRESENT DISPUTE

51.     With *Komstroy* the CJEU has dissipated all doubts, explicitly extending the principles of *Achmea* to the ECT. This is clearly stated at paragraph 62 of *Komstroy*: "*the exercise of the European Union's competence in international matters cannot extend to permitting, in an international agreement, a provision according to which a dispute between an investor of one Member State and another Member State concerning EU law may be removed from the judicial system of the European Union such that the full effectiveness of that law is not guaranteed.*"[59]

---

[56] **RL-0121**, Second *Achmea* Declaration by five States, 16 January 2019, p. 3 (footnotes omitted).

[57] Except Italy which withdrew on 31 December 2014.

[58] See e.g., **CL-0337**, *Kruck*, para. 36. As an example of such a contradiction see also para. 101 of the *Infracapital v. Spain*, Decision on Reconsideration of 1 February 2022.

[59] **RL-0207**, *Komstroy*, para. 62.

52.    The CJEU has anchored its conclusion that ECT intra-EU arbitration is incompatible and precluded by EU law on two considerations:

(a)    The *first* is that primacy of EU law has rendered Member States incompetent to accept intra-EU investment arbitration since this procedure is incompatible with the principle of autonomy of EU law.

(b)    The *second* is that Article 26 ECT interpreted as part a provision of EU law (since the ECT has become EU law by effect of the EU being a party to it) does not include intra-EU arbitration.

53.    Looking at the effects of the *Komstroy* judgment from outside the EU, it is fundamental to distinguish these two holdings. The supervenient lack of competence of the Member States under their own domestic systems as an effect of EU law to accept intra-EU arbitration under the ECT cannot but lead to the conclusion that ECT-based investment arbitration tribunals lack jurisdiction on intra-EU disputes. This conclusion resolves in my view the issue, irrespective of the position which one may take on the applicability by non-EU tribunals of the second holding of the CJEU on the interpretation of Article 26 ECT. For the reasons expounded hereafter in the next Section, the reasoning underpinning the interpretation of Article 26 by the CJEU based on EU law is not binding for arbitration tribunals operating outside the EU legal system, besides its correctness under international law being open to doubt. This however does not undermine the first conclusion, that EU Member States had not (or lost) the competence to accept intra-EU arbitration under the ECT so that, as a consequence, arbitration tribunals, including those operating outside the EU, such as under ICSID, lack jurisdiction.

54.    I believe that arbitral tribunals in rejecting any effect on their jurisdiction of the *Komstroy* judgment have failed to distinguish these two holdings. They have looked (wrongly in my view) only at the second one, where the CJEU has interpreted Article 26 ECT as a provision of EU law, to deem the judgment as irrelevant.

55.    Going back to the first holding of *Komstroy*, the statements of the CJEU in its paragraphs 62 and 65[60] clarifies that EU law "*precludes*" Member States from agreeing *inter se* to such arbitration, since so agreeing (should one believe that EU law had deprived them of the treaty-making power in this respect already before 1998), or continuing to agree (if, more

---

[60] See their texts *supra* at paras. 41-42.

convincingly, as explained hereunder, it was the Lisbon Treaty that deprived them of such competence) would be in breach of the principle of autonomy. Moreover, due to the primacy of EU law in respect of their domestic legal system, EU Member States are under their own law limited in their treaty-making power from accepting or continuing to accept ECT intra-EU arbitration.[61] The authentic interpretative statement by the CJEU certifies that Member States do not have (or have lost) the competence to do so, including under their domestic law due to its subordination to fundamental principles of EU law.[62]

56.   What are the consequences of EU Member States having been deprived of the competence to accept Article 26 ECT as an international obligation in respect of intra-EU disputes under their own domestic law? I believe that a correct answer is found in the First *Achmea* Declaration where it states  that "[a]*n arbitral tribunal established on the basis of investor-State arbitration clauses lacks jurisdiction, due to a* <u>*lack of a valid offer to arbitrate*</u> *by the Member State party to the underlying bilateral investment Treaty*" and that this principle applies also to intra-EU arbitration under the ECT.[63] More specifically, in respect of the present case, Spain and Germany could not and have not accepted the conferral (have not given their "*unconditional consent*" under Article 26(3) ECT to ICSID or other arbitration tribunals listed in Article 26(4) ECT to decide intra-EU disputes as the one at issue here.

57.   ICSID tribunals have no competence to challenge these holdings by the CJEU in *Achmea* and *Komstroy*. It is for the CJEU to determine with a final say the relationship between Member States and the EU under EU law. It is ultimately immaterial whether the CJEU is right or wrong in its interpretation of Article 26 ECT, whether the TFEU is a subsequent treaty on the same matter which under the VCLT should prevail on the ECT, or whether the TFEU does not prevail because it is not allegedly "the same matter" by virtue of Article 16 ECT.

58.   ICSID tribunals have only to acknowledge that for whatever reason, in the EU legal system, as determined by its supreme court (the CJEU) with binding effects on all Member States (as

---

[61] Cf. **RL-0065**, *Achmea*, para. 41: "*Given the nature and characteristics of EU law* [. . .] *that law must be regarded both as forming part of the law in force in every Member State and as deriving from an international agreement between the Member States.*"

[62] See **RL-0207**, *Komstroy*, paras. 46-47, 65-66. See also the BGH of 31 October 2018 (Hindelang **Exh. 69**) holding that the decision of the CJEU in *Achmea* indicates there was no valid arbitration agreement between *Achmea* and the Slovak Republic because the latter could not (and was not able due to EU law) to "*make an effective offer to conclude an arbitration agreement*" to the other party.

[63] **RL-0120**, First *Achmea* Declaration, 15 January 2019, p. 1 (emphasis added). For the equivalent statement by the EU Commission see the Communication of 2018 (**RL-0071**), pp. 3-4: "[…] *all investor-State arbitration clauses in intra-EU BITS are inapplicable and that any arbitration tribunal established on the basis of such clauses lacks jurisdiction* <u>*due to the absence of a valid arbitration agreement*</u>." (underlining added). Indeed, the reasoning of the Court in *Achmea* applies equally to the intra-EU application of clauses based on Article 26 ECT.

well as for their nationals, including Portigon), superior EU law has deprived Member States of this competence. It is sufficient (but also necessary) for a tribunal in the jurisdictional phase to ascertain that EU Member States did not have, or have lost at some point in time such competence, so that they are not bound by Article 26 ECT coverage of intra-EU disputes by arbitration and that such absence of competence is effective under international law.

59.    An investment tribunal faced with this issue must just ascertain that this is indeed the legal situation in both countries directly or indirectly involved in a dispute, the home and the host State, here Germany and Spain. As a consequence, once the present investment Tribunal has ascertained that the provisions of the ECT allowing this arbitration at ICSID have not been accepted or have ceased to be in force between Spain and Germany before the date of the filing (April 2017) or registration by ICSID of the Request of Arbitration (May 2017), as demonstrated above, the Tribunal cannot but acknowledge that it lacks jurisdiction under Article 26(4) ECT since this provision is not in force between Spain and Germany in relevant part. An obvious precondition for an investor to be able to avail itself of such arbitration is that the relevant provisions have been accepted and are in force in its home State (here Germany); thus, once ascertained that Germany's acceptance was lacking at the time of the arbitration request, this arbitration Tribunal lacks jurisdiction to entertain further such intra-EU disputes under the ECT.[64]

60.    In order to conduct a proper analysis as to the lack of consent by Spain and Germany and the consequential lack of its jurisdiction, it is necessary for the Tribunal to ascertain that this situation predates the filing of the Request of Arbitration by the Claimant, and hence to investigate the circumstance and basis of this situation. Specifically, whether the EU Member States lacked this competence when they subscribed to the ECT in 1994 or whether they lost it by the Treaty of Lisbon in 2007.

61.    Before going into analyzing the question from a public international law/treaty law perspective, and notwithstanding the fact that the question of the interpretation of Article 26 ECT by the CJEU is irrelevant for the lack of jurisdiction of the Tribunal, I believe it appropriate to address the interpretation of Article 26 ECT by the Court. Two observations

---

[64]  See Decision on Jurisdiction, para. 226: "*Claimant's standing to initiate arbitration proceedings against Spain in relation to disputes concerning its investment in the Spain is derived from the international law obligations undertaken by Germany and Spain when they became Contracting Parties to the ECT.*" If such international law obligations were not effective or in force when Claimant initiated this arbitration, then Claimant has no standing under Article 25 ICSID Convention.

should be made in this respect. First, that the Court's interpretation, based on EU law,[65] is as such not binding for arbitral tribunals operating outside the EU legal system. Secondly, such interpretation is not convincing if one follows instead the interpretative criteria of the VCLT as required by international tribunals.[66]

### C. THE INTERPRETATION UNDER EU LAW OF ARTICLE 26 ECT BY THE CJEU IN KOMSTROY AS EXCLUDING INTRA-EU DISPUTES IS NOT TO BE FOLLOWED BY ICSID TRIBUNALS OPERATING UNDER INTERNATIONAL LAW, BUT THIS DOES NOT UNDERMINE THE CONCLUSION THAT THE TRIBUNAL LACKS JURISDICTION

62.    The holding of the CJEU in *Komstroy* that a treaty such as the ECT is "*an integral part*" of the legal order of the EU because it has been "*concluded by the* [EU] *Council, pursuant to Articles 217 and 218 TFEU,*"[67] is immaterial for arbitral tribunals operating outside of the EU legal framework, such as, in any case, ICSID tribunals. For such tribunals, the ECT is just an international treaty, governed by the rules and principles of public international law, and is in no way an instrument of EU law. An ICSID tribunal must interpret the ECT in accordance with customary international law interpretation principles enshrined in Articles 31-33 VCLT. The CJEU instead relies on the principle of "*interpretation of treaties in conformity with European law.*"[68] The CJEU has accordingly interpreted the ECT in *Komstroy* in a way that accords with the requirements of the EU Treaties. This approach, which subordinates international law to the needs of EU law and is inspired by an entrenched dualistic theory,[69] cannot be accepted by an ICSID arbitration tribunal faced with interpretating and applying Article 26 ECT under international law, irrespective of whether the outcome under the VCLT might be the same.[70]

---

[65] The relationship between the ICSID Convention and EU law has been addressed in detail (though the authors' conclusions that ICSID prevails over EU law on the basis of EU law itself are open to doubt) in a recent paper by C. Tietje, D. Ruff, M. Schmitt, *Final Countdown in EU Investment Protection Law: Does the ECJ's Komstroy Ruling also Apply in intra-EU ICSID Proceedings?* Paper 178, Institute Transnational Econ. Law., M. Luther Univ. Halle-Wittemberg, available from Google Scholar Alerts, 2022.

[66] See N. Lavranos, *Regime Interaction in Investment Arbitration; EU Law; From Peaceful Coexistence to Permanent Conflict,* Kluwer Arbitration Blog, 13 January 2022.

[67] See **RL-0207**, *Komstroy*, para. 23.

[68] This now well-established principle was spelled out for the first time by the CJEU in *Murphy*, Case 157/86 (Hindeland **Exh. 60**). On the other hand, the Court has recognized in CJEU, *Western Sahara*, Case C-266/16, 27 February 2018 (Hindeland **Exh. 56**), para. 58, that in order to interpret provisions of a treaty between the EU and a third state: "*it is necessary to refer to the rules of customary international law reflected by Article 31 of the Vienna Convention, which are binding on the EU institutions and are part of the EU legal order (see, to that effect, judgment of 25 February 2010, Brita, C-386/08, EU:C:2010:91, paragraphs 40 to 43 and the case-law cited)* […]."

[69] See J. Odermatt, *Is EU Law International? Case C-741 Republic of Moldova v Komstroy LLC and the Autonomy of the EU Legal Order*, European Papers 23.12.2021, available at www.europeanpapers.eu.

[70] ICSID tribunals operate outside domestic legal systems, including the EU legal system, in contrast to those investment arbitral tribunals seated in an EU Member State and having the law of a EU Member State as their *lex arbitri*. This was

63.    I recall that, in application of EU law, the CJEU has concluded that "*Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State*."[71]

64.    Article 26 ECT however, interpreted in conformity with the interpretational canons of the VCLT (first on the basis of Article 31, considering text, context, object and purpose in a holistic exercise), does not indicate that paragraph 4 of Article 26 providing for arbitration is inapplicable to intra-EU disputes as the CJEU has held.[72] The fact that EU Member States are "*precluded*" by EU law from accepting arbitration as a method to settle such disputes is not a valid reason under the ECT to interpret Article 26(4) as excluding intra-EU investment arbitration from its coverage, in the absence of any textual underpinning of such carve-out in the ECT itself.[73] There are no preparatory works, nor contemporary declarations or similar acts to this effect.

65.    It is true that the purpose of the ECT, which was proposed originally by the Members of the EU and the EU Commission (when the EU was composed of just 15 Western European countries), was to promote investment from the West in the energy sector in Eastern European and former Soviet republics under a stable legal framework, building upon the non-binding Declaration on the Energy Charter signed in 1991.[74] This does not justify finding that its text excludes the treatment of energy investments within the EU from its coverage.

---

the case of the arbitration tribunal in the dispute between Komstroy and Moldova whose award was challenged before the Court of Appeals of Paris, and is in general the case of arbitral tribunals under the Stockholm Arbitration Rules referred to in Article 26(4)(c) ECT.

[71] **RL-0207**, *Komstroy*, para. 66.

[72] In *Komstroy* the CJEU has analyzed under EU law both Article 26(6) ECT, as concerns ECT intra-EU arbitration, and Article 1(6) together with Article 26 (1) ECT as requested by the Paris Court of Appeals to determine whether the contract at issue in the arbitration was an investment. It is not apparent in what respect the Court's interpretation of those ECT provisions in the context of EU law differs from an interpretation conducted under the VCLT.

[73] See the Opinion by AG Wathelet in *Achmea* quoted *infra* at para. 73, pointing to the contrary. The *Green Power* tribunal in its award (**RL-0239**), at paras. 353, 400-412, 427, has analyzed contextual elements, concluding that, possibly, the Parties to the ECT intended to exclude from its coverage relations internal to Regional Economic International Organization (REIO), as defined in Article 1 (3), the only one existing being the EU. It is not possible to discuss here the issue, but these elements seem to me weak, (the award admits that they are "*inconclusive*" on the issue) also in view of the contrary opinion held at the time of the negotiations and conclusions of the ECT by EU authorities, see *infra* para. 69.

[74]  See EU Commission, 16 December 1994, Energy Charter Treaty - Background Note, Memo/94/75: "*Objectives - The main idea behind the Energy Charter is to make available know-how, technology and  financial resources of Western companies for the development  and trade of energy resources in the  eastern side of Europe. The Energy Charter Treaty will establish a closer cooperation between the European Union and the East European countries.  This cooperation will contribute to a sustainable economic and social development in the East European countries.  An efficient European energy market and security to investors are created. It will also lead to greater security and a more environmentally sustainable supply and use of energy in Europe.*" See also the mention in **RL-0001**, Final Act of the European Energy

66.     As this Tribunal (like others) has pointed out in its Decision on Jurisdiction, a provision of a multilateral treaty cannot be interpreted differently depending on which of its parties are involved in the dispute.[75] The process of interpreting a treaty provision is an objective one. The inapplicability of Article 26 ECT to intra-EU disputes stems instead from the fact that EU Member States have withdrawn their consent to its coverage of intra-EU disputes because "superior" EU law imposed them to do so.

67.     As explained above however, this criticism does not diminish the effect of the judgment of the Court in having authoritatively clarified the lack of competence of Member States to accept intra-EU arbitration under the ECT. The Court has reaffirmed, as it is accepted doctrine, that EU law, while deriving from treaties that are part of international law, is also part of the domestic law of the Member States alongside their norms stemming from domestic sources. It is also an accepted principle, reaffirmed by the Court throughout the decades, that EU law prevails over domestic law in case of conflict and that it must be respected and applied with priority in respect of domestic law in case of antinomy.[76] Directly applicable EU law displaces any contrary domestic legislation, which must be disapplied.[77] Such primacy is ensured by domestic courts and ultimately by the CJEU thanks to the preliminary ruling

---

Charter Conference, Lisbon 17 December 1994, which adopted the ECT, that the ECT was "*designed to promote East-West industrial cooperation,*" available at www.energychartertreaty.org.

[75] See Decision on Jurisdiction, paras. 215-216 reproduced above: "*applying EU law in the interpretation of Article 26 of the ECT in case of intra-EU disputes would potentially lead to an anomalous result allowing for different interpretations of the same treaty provision*" quoting **CL-0227**, *Eskosol SpA in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Jurisdictional Objection based on Inapplicability of the Energy Charter Treaty to intra-EU Disputes, 7 May 2019 ("*Eskosol*"), para. 125. A different interpretation (or rather application) of an ECT provision between EU Members States could only result from recourse to the interpretative tool of Article 31(3)(c) VCLT, that is taking into account "*any relevant rules of international law applicable in the relations between the parties.*" As a consequence, it is conceivable that, for instance, the qualifications of loans as investment under Article 1 (6)(b) and (c) ECT be restricted in intra-EU relations to loans that qualify as investments under EU law and OECD principles (loans made "*for the purpose of establishing lasting economic relations with an undertaking such as, in particular, investments which give the possibility of exercising an effective influence on the management thereof*"). See in this respect my Dissent to the Decision on Jurisdiction, paras. 18-33. This is not however the interpretative approach that the CJEU took in concluding in *Komstroy* (at paras. 82, 85), without any substantive explanation, neither under EU nor under international law, that the contract at issue in the arbitration was not an investment.

[76] This principle dates back to the seminal **RL-0110**, *Costa v. Enel*, Judgment, 15 July 1964, Case 6/64, [1964] ECR:594: "*the law stemming from the Treaty, an independent source of law, could not, because of its special and original nature, be overridden by domestic legal provisions, however framed, without being deprived of its character as Community law and without the legal basis of the Community itself being called into question. The transfer by the States from their domestic legal system to the Community legal system of the rights and obligations arising under the Treaty carries with it a permanent limitation of their sovereign rights, against which a subsequent unilateral act incompatible with the concept of the Community cannot prevail. Consequently Article 177 is to be applied regardless of any domestic law, whenever questions relating to the interpretation of the Treaty arise*" (emphasis added). See our dissertation on the subject, *L'efficacia del diritto delle Comunità europee nell'ordinamento giuridico italiano*, Giuffrè, Milano, 1966.

[77] See M. Dougan, *Primacy and the Remedy of Disapplication*, in *Common Market Law Review*, vol. 56, 2019, pp. 1459–1508.

mechanism of Article 267 TFEU.[78] The binding conclusion of the Court in the exercise of this competence in *Komstroy,* that Member States are precluded from agreeing to ECT intra-EU arbitration and are deprived of such competence, defines the issue also for non-EU authorities (such as ICSID tribunals). At least since the Lisbon Treaty they have been deprived of the domestic constitutional power to agree on ECT intra-EU arbitration since such proceedings are incompatible with the overriding EU law principle of autonomy.

D.    **THE EU LAW PRECLUSION TO SUBJECTING INTRA-EU DISPUTES UNDER THE ECT TO ARBITRATION DERIVES FROM THE LISBON TREATY (2009) RATHER THAN DATING BACK TO THE CONCLUSION OF THE ECT (1998)**

68.    The next issue to be determined is whether the lack of consent dates from the very conclusion or entry into force of the ECT (1994/1998) or whether it was brought about by subsequent development of EU law effected by the Treaty of Lisbon of 2007, which entered in force in 2009. In order to preclude jurisdiction, the relevant date must precede that of the submission by Claimant to ICSID of its Request of Arbitration in 2017 whereby Claimant expressed its consent to the jurisdiction of ICSID pursuant to Article 25(1) ICSID Convention. This is obviously the case in respect of both dates (1998 and 2009), but the issue is not irrelevant. Determining when and how the EU Member States withheld or withdrew their consent to intra-EU arbitration under Article 26 sheds light on this "carving-out" or "disconnection" relating to the settlement of intra-EU investment disputes and reinforces my conclusions, especially in the face of the different holdings of other ICSID tribunals faced with the same issue.

69.    At the time of the negotiations and the conclusion of the ECT, no thoughts were devoted to the possible incompatibility of intra-EU arbitration with EU law. The prevailing opinion is that, more generally, the invocation of the ECT standards of protection by investors of a EU Member State vis-à-vis another EU Member State had not been envisaged, so that no carve-out was introduced in the text of the ECT, annexes or connected declarations.[79] Various textual elements have been invoked to this effect, such as the existence of certain other limitations on the application of the ECT in respect of other treaties in the ECT itself as opposed to the lack of any exclusion for intra-EU arbitration.[80] Another element referred to is that the provisions on "Regional Economic Integration Organizations" (a concept introduced

---

[78] See **RL-0207**, *Komstroy*, para. 43.
[79] See however the partly different view of the *Green Power* award, *supra* note 73.
[80] See Decision on Jurisdiction, para. 128.

in the ECT to cover the EU) does not limit the applicability of Article 26 as to relations between their members.[81]

70.   An additional element for doubting that already in 1994-1998 EU Member States did not have the competence to agree on intra-EU investment arbitration under the ECT stems from the progressive affirmation of the principle of supremacy of EU law. This principle has been developed by the CJEU over time, without it being mentioned in the EU Treaties in force at those times. Primacy is fundamental in EU law, but is somehow a side effect of the Court having stated early in the process of European integration that the "*States have acknowledged that community law has an authority which can be invoked by their nationals before national courts and tribunals, the Court's task being that of securing to them uniform interpretation of EU law under the guidance of the Court thanks to the mechanism of preliminary referral.*" The Court has emphasized since its early case-law that "*the Community constitutes a new legal order of international law for the benefit of which the States have limited their sovereign rights, albeit within limited fields, and the subjects of which comprise not only the Member States but also their nationals.*"[82]

71.   The key holding in paragraph 43 of *Komstroy* is but a derivation of these principles:[83]

> According to further settled case-law of the Court, the autonomy of EU law with respect both to the law of the Member States and to international law is justified by the essential characteristics of the European Union and its law, relating in particular to the constitutional structure of the European Union and the very nature of that law. EU law is characterized by the fact that it stems from an independent source of law, the Treaties, by its primacy over the laws of the Member States, and by the direct effect of a whole series of provisions which are applicable to their nationals and to the Member States themselves. Those characteristics have given rise to a structured network of principles, rules and mutually interdependent legal relations binding the European Union and its Member States reciprocally and binding its Member States to each other (judgment of 6 March 2018, *Achmea*, C-284/16, EU:C:2018:158, paragraph 33 and the case-law cited, and Opinion 1/17 (EU-Canada CET Agreement), of 30 April 2019, EU:C:2019:341, paragraph 109 and the case-law cited).

72.   Primacy of EU law has also impacted the field of the international relations of the EU. The CJEU has repeatedly decided that international treaties concluded or to be concluded by the

---

[81] See **RL-0001**, ECT, Article 1(3) "Definitions" and Article 25, and the discussion of the issue in the Decision on Jurisdiction, paras. 128, 249-251.

[82] **RL-0205**, *Van Gend and Loos*, Case 26/62, Judgment, 5 February 1963 [1963] ECR 1.

[83] **RL-0207**, *Komstroy*, para. 43.

EU itself or by Member States between themselves or with third States cannot conflict with EU law. Should such a conflict exist, such agreement cannot enter into force or are inoperative as concerns Member States.[84] However, in respect of the ECT no preventive opinion had been requested from nor handed down by the CJEU on compatibility (as is possible in accordance with Article 218(11) TFEU), nor had the Court ruled on the matter before *Komstroy*.[85]

73.    To support my disbelief that the jurisprudential principle of primacy, coupled with that of autonomy, already in 1994 prevented the EU and its Member States from agreeing on investment arbitration in the ECT, I will rely on the following quote from Advocate General Wathelet's Opinion in *Achmea* (paragraph 40 ff):[86]

> 40. For a very long time, the argument of the EU institutions, including the Commission, was that, far from being incompatible with EU law, BITs were instruments necessary to prepare for the accession to the Union of the countries of Central and Eastern Europe. The Association Agreements between the Union and candidate countries also contained provisions for the conclusion of BITs between Member States and candidate countries.

> 41. At the hearing, the Commission attempted to explain that change in its position on the incompatibility of BITs with the EU and FEU Treaties, maintaining that the agreements in question were necessary in order to prepare for the accession of the candidate countries. However, if those BITs were justified only during the association period and each party was aware that they would become incompatible with the EU and FEU Treaties as soon as the third State concerned had become a member of the Union, why did the accession treaties not provide for the termination of those agreements, thus leaving them in uncertainty which has lasted more than 30 years in the case of some Member States and 13 years in the case of many others?

> 42. In addition, in the European Union, there are no investment treaties solely between market-economy countries and countries which previously

---

[84] See CJEU, *Commission v. Ireland* ("*Mox Plant*"), Case C-459/03, paras. 169-171 (Hindelang **Exh. 44**); Opinion 1/09, paras. 74-76 (on the proposed agreement to establish a unified patent litigation system) (Hindelang **Exh. 40**); Opinion 2/13, paras. 182, 183 (on the proposed adhesion of the EU to the ECHR) (Hindelang **Exh. 41**); Opinion 1/17 (on CETA), paras. 110, 111, 150 (Hindelang **Exh. 43**); Hindelang, paras. 48-52. See the latest restatements of these principles in **RL-0065**, *Achmea*, para. 32, and **RL-0207**, *Komstroy*, paras. 42, 62.

[85] See in the same vein, **CL-0250**, *SolEs Badajoz*, para. 234: "*The Tribunal does not find in this Opinion* [Opinion 1/91 of the CJEU on the EEA Treaty] *and other authorities cited by Respondent a principle of EU primacy over non-EU treaties that was so obvious in the early 1990s that there was no need for an express exclusion of intra-EU disputes from the investor-State arbitration provisions of the ECT. Even decades later, a number of arbitral tribunals and the Advocate General of the ECJ have concluded that Article 344 of the TFEU (which is identical in substance to former Article 219 of the EEC Treaty) does not even address the same subject matter as the investor-State provisions of an investment treaty and thus that EU law does not conflict with the investment treaty at issue. It cannot be the case that the opposite conclusion was so obvious to participants in the negotiations of the ECT that no express exception was needed.*" I co-authored this text as a member of the arbitral tribunal in that case.

[86] **CL-0163**, Opinion of Advocate General Wathelet, Case C-284/16, *Slovak Republic v Achmea BV*, 19 September 2017 (original footnotes omitted).

had controlled economies or between Member States and candidate countries for accession, as the Commission has suggested.

43. Furthermore, all the Member States and the Union have ratified the Energy Charter Treaty, signed at Lisbon on 19 December 1994. That multilateral treaty on investment in the field of energy operates even between Member States, since it was concluded not as an agreement between the Union and its Member States, of the one part, and third countries, of the other part, but as an ordinary multilateral treaty in which all the Contracting Parties participate on an equal footing. In that sense, the material provisions for the protection of investments provided for in that Treaty and the ISDS mechanism also operate between Member States. I note that if no EU institution and no Member State sought an opinion from the Court on the compatibility of that treaty with the EU and FEU Treaties, that is because none of them had the slightest suspicion that it might be incompatible.

74.    It is with the Lisbon Treaty of 2007, the most recent updating of the EU basic treaties (the TEU and the TFEU), that the principle of supremacy was given for the first time a treaty recognition.[87] It might also be noted that the Lisbon Treaty also conferred to the EU exclusive competence on foreign direct investment as specified in the amended texts of Articles 206 and 207 TFEU.[88]

75.    Following the progressive consistent affirmation by the CJEU through its case law of the principle of primacy, the Member States agreed to have it spelled out in a Declaration (no. 17) annexed to the Treaty of Lisbon as follows:[89]

17. Declaration concerning primacy

The Conference recalls that, in accordance with well settled case law of the Court of Justice of the European Union, the Treaties and the law adopted by the Union on the basis of the Treaties have primacy over the law of Member States, under the conditions laid down by the said case law. The Conference has also decided to attach as an Annex to the Final Act the Opinion of the Council Legal Service on the primacy of EC law as set out in 11197/07 (JUR 260):

---

[87]  Primacy was to be explicitly codified in Article I-6 of the EU Constitutional Treaty which would have replaced the TEU and the TFEU, signed in 2004 but which did not enter into force due to its rejection in the referendum held in France and the Netherlands in 2005. As a result of the subsequent choice to avoid constitutional changes in the existing treaties in the Treaty of Lisbon the principle found its way in Declaration no.17, see Dougan, *op. cit. supra* fn. 77, p. 1460.

[88] The CJEU however held in Opinion 2/15 of 16 May 2017 (as mentioned in *Komstroy*, para. 26) on the proposed free-trade agreement between the EU and Singapore that ISDS falls within the shared competence of the EU and Member States.

[89] **RL-0126**, Treaty of Lisbon, 2007/C 306/01, 17 December 2007, Declarations, Declaration No. 17.

'Opinion of the Council Legal Service of 22 June 2007

It results from the case-law of the Court of Justice that primacy of EC law is a cornerstone principle of Community law. According to the Court, this principle is inherent to the specific nature of the European Community. At the time of the first judgment of this established case law (Costa/ENEL, 15 July 1964, Case 6/64 [1]) there was no mention of primacy in the treaty. It is still the case today. The fact that the principle of primacy will not be included in the future treaty shall not in any way change the existence of the principle and the existing case-law of the Court of Justice.'

[1] 'It follows […] that the law stemming from the treaty, an independent source of law, could not, because of its special and original nature, be overridden by domestic legal provisions, however framed, without being deprived of its character as Community law and without the legal basis of the Community itself being called into question.'

76.    The termination or lapsing of the Member States competence on foreign direct investments, including that of concluding individual BITs, and the codification in the Lisbon Treaty of the principle of primacy are the basis for concluding that, at the very latest since the entry into force of the Lisbon Treaty, intra-EU arbitration under Article 26 ECT is certainly precluded by EU law.[90] In other words, EU Member States have lost their competence in this respect so that, as a consequence, investors from a EU Member State can no longer rely on such provision to initiate arbitration for breach of the ECT against another Member State.[91]

77.    Since 2009 Article 26 ECT has thus ceased to be a legal basis for intra-EU investment disputes because the competence of Member States to agree on them has lapsed (i.e., has been preempted by EU law). The constitutional treaty-making competence of Member States has been restricted accordingly, due to the supervening "expansion" of the principle of supremacy coupled with the exclusive competence of EU law to regulate foreign direct investment. In other words, through the Lisbon Treaty and as a necessary effect of it, all EU Member States, including Spain and Germany, have agreed among themselves, as a consequence of having accepted the principle of EU primacy therein, to withdraw their consent to ECT intra-EU arbitration.

---

[90] It is telling that the First *Achmea* Declaration by twenty-two Members (including Spain and Germany) explicitly refers to Declaration 17 and to the primacy of EU law as the source of the incompatibility of intra-EU investment arbitration with EU law.

[91] This is also the thesis of Respondent, see Respondent's Petition for Reconsideration, para. 97: "*If it is not considered that the disconnection of the EU and its member states from Article 26 took place upon the ratification of the ECT, this disconnection occurred subsequently as a necessary effect of the ratification of the Lisbon treaty by the member states.*"

78.    Spain has all along pleaded in this case (just as in the other cases brought against it by EU investors under the ECT) that EU law prevents Article 26 ECT from representing a legal basis to sustain jurisdiction in respect of an intra-EU arbitration and so this Tribunal lacks jurisdiction.[92] More specifically, in line with my reasoning, Spain has argued that "[m]*oreover, the ratification of the Lisbon Treaty that occurred after the ratification of the ECT, determines that the member states accept the principles of the Lisbon Treaty, including assigning the EU exclusive competence on the matter of foreign investments, the principles of autonomy and primacy of EU Law and the binding effect of the decisions of the CJEU.*"[93]

79.    As to Germany, Spain has pointed out that in the *Vattenfall* proceedings Germany, as respondent in that case, also pleaded the inapplicability of Article 26 of the ECT to intra-EU disputes.[94]

80.    In the First "*Achmea* Declaration" the signatories, including Spain and Germany, declared that "[a]*rbitral tribunals have interpreted the Energy Charter Treaty as also containing an investor-State arbitration clause applicable between Member States. Interpreted in such a manner, <u>that clause would be incompatible with the Treaties and thus would have to be disapplied.</u>*"[95]    The Declaration concludes *inter alia* that "[b]*eyond actions concerning the Energy Charter Treaty based on this declaration, Member States together with the Commission will discuss without undue delay whether any additional steps are necessary to draw all the consequences from the Achmea judgment in relation to the intra-EU application of the Energy Charter Treaty.*"[96] With its binding judgment in *Komstroy*, where it has held that EU law prevents intra-EU arbitration under Article 26 ECT, the Court has resolved the issue, rendering the further discussions and "*additional steps*" envisaged in the Declaration unnecessary.

---

[92] See Respondent's Petition for Reconsideration, paras. 93-101, specifically relying on the Lisbon Treaty and Declaration 17.

[93] Respondent's Petition for Reconsideration, para. 105.

[94] **CL-0158**, *Vattenfall*, para. 56, summing up the arguments of Germany on this point as follows: "*Thus, Respondent is not unilaterally withdrawing its offer to arbitrate, but rather such offer, even if deemed to have once existed, has become inapplicable as a consequence of the ECJ Judgment.*" See also Hindelang, para. 96, pointing out that by the First *Achmea* Declaration the signatories (among which Germany and Spain) "*affirmed* […] *that Article 26 ECT violates the EU Treaties and, hence, is <u>inoperative</u>, at least between EU Member States and nationals of EU Member States;*" and para. 97 stating that "[a]*ccordingly, <u>Spain did not make a legally valid offer</u> under Article 26(3) ECT to arbitrate disputes that concern matters of EU law – including, as relevant here, the dispute with Portigon.*" (underlining added).  Hindelang, para. 99 quotes to the same effect the German Federal Court's judgment of 31 October 2018 (Hindelang **Exh. 69**), which in application of the holding of the CJEU in *Achmea* annulled the award before it because there was no, and could be no, arbitral agreement between the parties.

[95] **RL-0120**, First *Achmea* Declaration, 15 January 2019, p. 2 (underlining added).

[96] **RL-0120**, First *Achmea* Declaration, 15 January 2019, p. 4.

## V.  CONFORMITY WITH THE VCLT AND THE ICSID CONVENTION OF THE WITHDRAWAL OF CONSENT BY SPAIN TO ECT INTRA-EU ARBITRATION BY EFFECT OF THE LISBON TREATY

81.    Before finally concluding that indeed this Tribunal lacks jurisdiction, it is appropriate to address the various possible doubts that may arise as to the compatibility with the VCLT and the ICSID Convention with the above conclusion that EU Member States have withdrawn their consent to ECT intra-EU arbitration by effect of the Lisbon Treaty.[97] The relevant questions are the following:

(a)    Compatibility of the withdrawal by Spain of its consent to ICSID arbitration of the present ECT intra-EU dispute by effect of the Lisbon Treaty with Article 25(1) ICSID Convention whereby "[w]*hen the parties have given their consent, no party may withdraw its consent unilaterally*."

(b)    Validity of the withdrawal of consent to ECT intra-EU arbitration by effect of the Lisbon Treaty as an *inter se* agreement modifying the ECT between EU Member States, in conformity with Article 41 VCLT ("*Agreements to modify multilateral treaties between certain of the parties only*"), regardless of its notification to other ECT Contracting Parties.

(c)    Irrelevance of Article 46 VCLT on internal law in matters of competence to conclude treaties, in respect of the withdrawal of EU Member States from ECT intra-EU arbitration by effect of the Lisbon Treaty.

(d)    Impact of the "*lex posterior*" principle and irrelevance of Article 16 ECT.

(e)    Compatibility of the conclusion, following *Komstroy*, that the Tribunal lacks jurisdiction with the principles of non-retroactivity and the rule of law.

### A.  COMPATIBILITY OF THE WITHDRAWAL BY SPAIN OF ITS CONSENT TO ICSID ARBITRATION OF THE PRESENT ECT INTRA-EU DISPUTE BY EFFECT OF THE LISBON TREATY WITH ARTICLE 25(1) ICSID CONVENTION WHEREBY "WHEN THE PARTIES HAVE GIVEN THEIR CONSENT, NO PARTY MAY WITHDRAW ITS CONSENT UNILATERALLY"

82.    First of all, there is no issue of retroactivity here since by effect of the Lisbon Treaty EU Member States lost the relevant competence for the future. Confirmation can be found looking

---

[97] Italy has invoked the non-applicability of Article 26 ECT due to the Lisbon Treaty being an *inter se* agreement in **CL-0172**, *Greentech*, para. 265 and in *Belenergia v. Italy*, ICSID Case No. ARB/15/40, Award, 6 August 2019, para. 185.

at the implementation of the amended Article 207 TFEU on the competence of EU Member States to further conclude BITs with third countries. A "grandfathering regulation" has been necessary in order to maintain in force existing BITs by Member States with non-EU Members until EU-wide investment treaties are concluded.[98]

83.    As to the prohibition of Article 25(1) ICSID Convention to unilaterally withdrawing consent to arbitration once given, there is no doubt that the prohibition operates once consent has become binding, such as by effect of reciprocal commitments under an investment contract, or once an offer to arbitrate by a party in a BIT (or in another type of IIA such as the ECT) has been accepted by an investor ("perfected consent").[99] Until then, an ICSID Contracting State is free to terminate its participation to ICSID, to any BIT containing such an offer, or abrogate a domestic statute on foreign investment so providing.[100]

84.    There is no question of compatibility with Article 25(1) ICSID Convention in the present case, because the present arbitration was initiated in 2017, that is many years after the Lisbon Treaty. This is the situation of all disputes arising out of the changes of the Spain's Renewable Energy (RE) legislation. The first arbitration under the ECT against Spain, challenging the first prejudicial changes of that legislation (RD 1565/2010), dates back to 2010.[101] Other arbitral proceedings by foreign investors against Spain affected by that change and the subsequent ones from the years 2012-2013, as in the present arbitration,[102] have been initiated later.

85.    It is beyond doubt that when Claimant initiated the present arbitration in 2017, Spain had already lawfully terminated, withdrawn or revoked its consent to intra-EU arbitration under the ECT by virtue of the Lisbon Treaty many years before. An investor cannot rely on a

---

[98] See to this effect various "whereas" of Regulation (EU) No. 1219/2012 of 12 December 2012 "*establishing transitional arrangements for bilateral investment agreements between Member States and third countries*": (1) "*only the Union may legislate and adopt legally binding acts within that area. The Member States are able to do so themselves only if so empowered by the Union, in accordance with Article 2(1) TFEU*"; and (7) "*This Regulation should address the status under Union law of bilateral investment agreements of the Member States signed before 1 December 2009. Those agreements can be maintained in force, or enter into force, in accordance with this Regulation.*"

[99] See C. Schreuer *et al*., *The ICSID Convention, A Commentary*, 2nd ed. 2009, Article 25, paras. 429 ff, at p. 599: "*The irrevocability of consent operates only after the consent has been perfected.*"

[100] See R. Dolzer, U. Kriebaum and C. Schreuer, *Principles of International Investment Law,* 3rd ed. OUP 2202, p. 369: "*In the case of national legislation and treaty clauses providing for arbitration, the investor must have accepted the consent in writing to make it irrevocable.*"

[101] In the first such case, *Charanne v. Spain*, the notice of dispute was notified by Claimant to Respondent on 28 April 2011 and the notice of arbitration is dated 7 May 2012. **CL-0045**, *Charanne*, paras. 17-18.

[102] See Claimant's Request for Arbitration, paras. 105-111.

terminated ISDS clause of an IIA to initiate an investment arbitration because of the lack of the necessary consent by the host State at that moment.[103]

**B. EFFECTIVENESS OF THE LISBON TREATY AS AN *INTER SE* AGREEMENT IN CONFORMITY WITH ARTICLE 41 VCLT TO MODIFY THE ECT BETWEEN EU MEMBER STATES, WITHDRAWING THEIR CONSENT TO ECT INTRA-EU ARBITRATION, REGARDLESS OF ITS NOTIFICATION TO OTHER PARTIES**

86.    Article 41 VCLT provides as follows:

AGREEMENTS TO MODIFY MULTILATERAL TREATIES BETWEEN CERTAIN OF THE PARTIES ONLY

1. Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:

(a) the possibility of such a modification is provided for by the treaty; or

(b) the modification in question is not prohibited by the treaty and:

(i) does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;

(ii) does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.

2. Unless in a case falling under paragraph 1(a) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.

87.    Some arbitral tribunals have considered that in order to terminate or withdraw their consent to intra-EU arbitration under the ECT, EU Member States should have concluded a specific agreement in compliance with Article 41 VCLT. These tribunals have concluded that in the

---

[103] See C. Schreuer, *The ICSID Convention*, *op. cit. supra* fn. 99, Article 25, para. 429: "*It is clear that a BIT, in order to provide a basis for ICSID jurisdiction, must be in force at the relevant time.*" See also in more detail A. Reinisch and S. Mansour Fallah, *Post-Termination Responsibility of States?— The Impact of Amendment/Modification, Suspension and Termination of Investment Treaties on (Vested) Rights of Investors*, ICSID Rev. 2022, p. 1 ff. at p. 11: "*When States terminate investment treaties containing offers of consent, such offers are equally terminated and can no longer be accepted. Thus, as a matter of principle the possibility of investors instituting legal proceedings on the basis of offers of consent contained in terminated investment agreements no longer exists. The notion of 'perfected consent' implies, however, that if a host State's offer of consent to investment arbitration has already been accepted by an investor before the termination of the treaty it can be regarded as 'perfected' and thus having become irrevocable […] Thus, as a matter of principle, the termination of investment treaties containing offers of consent implies that such offers are equally terminated and can no longer be accepted.*"

absence of such an agreement Article 26 ECT continues to cover ECT intra-EU arbitration.[104] However, as explained hereunder, there is no support for this opinion in international law.

88.    Even in the absence of any provision in the ECT allowing its modification between some parties only in accordance with Article 41(1)(a) VCLT, the Members of the EU may modify Article 26 ECT, carving-out intra-EU arbitration, since the other conditions of paragraph (1) of Article 41 VCLT are met. Indeed, such a modification is not prohibited by the ECT, is manifestly not incompatible with its object and purpose and  does not affect the rights of other parties.[105] As the CJEU has underlined at paragraph 64 of *Komstroy*: "*despite the multilateral nature of the international agreement of which it forms part, a provision such as Article 26 ECT is intended, in reality, to govern bilateral relations between two of the Contracting Parties, in an analogous way to the provision of the bilateral investment treaty at issue in the case giving rise to the judgment of 6 March 2018, Achmea (C-284/16, EU:C:2018:158, paragraph 58).*"[106]

89.    The object and purpose of the ECT is identified in Article 2, including by reference to the broad purposes of the European Energy Charter of 1991.[107] As stated in *Green Power* at paragraph 403: "[t]*he conclusion reached by the Vattenfall vs. Germany tribunal, according to which the ECT aims to promote cooperation and the flow of international investment in the energy field to serve the ultimate goal of creating and maintaining a stable and efficient energy market, is correct.*[108] *But it does not necessarily follow from this broad purpose that investor-State arbitration is to apply to intra-EU investment disputes, given the clear*

---

[104] See **CL-0337**, *Kruck*, paras. 44-45. The relevance of the Lisbon Treaty as a modification agreement under Article 41 VCLT has been denied by the tribunals in **CL-0227**, *Eskosol*, para. 150, and **CL-0158**, *Vattenfall*, para. 221, respectively because "[n]*othing in the Lisbon Treaty refers to the ECT*" and it was "*unclear what precise modifications of the ECT* [was] *alleged to have taken place.*"

[105] The relevance of Article 41 VCLT has been raised at the Hearing of 18 January 2022 on Reconsideration and has been acknowledged by Prof. Hindelang when examined as an expert for Respondent, see Transcript 18 January 2022, page 226 ff.

[106] **RL-0207**, *Komstroy*, para. 64.

[107] See **RL-0001**, ECT, Article 2: "*Purpose of the Treaty.  This Treaty establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter.*" In turn the Objectives of the Charter focus on "*improving security of energy supply and of maximizing the efficiency of production* […] *and use of energy, to enhance safety and to minimize environmental problems, and on an acceptable economic basis* […] *in a spirit of political and economic cooperation* […] *to promote the development of an efficient energy market throughout Europe, and a better functioning global market, in both cases based on the principle of non-discrimination and on market-oriented price formulation, taking due account of environmental concerns.*"  **RL-0001**, European Energy Charter, Title I.

[108] Citing **CL-0158**, *Vattenfall*, para. 198.

*reference in the preamble of the European Energy Charter of the 'completion of its internal energy market'* [by the EU] *as a key step in reaching the overall objectives of the Charter.*"[109]

90.    An additional element in support of considering that the non-availability of arbitration within a RIEO which ensures effective judicial remedies to foreign investors (such as the EU), i.e. opting out from intra-EU arbitration under Article 26 ECT, is not against the object and purpose of the ECT stems from the recent agreement among all its parties to amend several of its provisions in order to modernize it. In this "modernization agreement", whose negotiations have been concluded in June 2022, it has been agreed *inter alia* to exclude investment arbitration within a RIEO (*i.e.* among members of the EU).[110] It is difficult to admit that such an amendment could have been adopted if investment arbitration in its entirety had been an element of the object and purpose of the ECT.

91.    There is nothing to prevent that such modification, or "contracting-out" be effected, even just by implication, by an agreement devoted also, or even predominantly, to other matters, as is the case of the Lisbon Treaty. There is no basis in public international law for the proposition that a specific agreement on the model of that envisioned by Article 41 VCLT is required.[111] A specific agreement patterned after Article 41 might be considered desirable for legal security, but is in no way prescribed.

92.    As to the notification to other treaty parties, this procedural requirement is not *ad substantiam*. The lack of proper notification may entail international responsibility but does not prevent the operation of the *inter se* agreement.[112] Other parties may complain of this procedural defect and may raise the issue – should this be the case – that in their view the modification does not

---

[109] **RL-0239**, *Green Power*, para. 403.

[110] See the EC Trade Directorate announcement of 24 June 2022: "*Agreement in principle reached on Modernised Energy Charter Treaty*" https://policy.trade.ec.europa.eu/news/agreement-principle-reached-modernised-energy-charter-treaty-2022-06-24_en: "*The new text will also confirm that an investor from a Contracting Party that is part of a Regional Economic Integration Organisation (REIO), like the EU, cannot bring an Investor-state dispute settlement ('ISDS') claim against another Contracting Party member of the same REIO. This shall finally bring an end to the intra-EU applications under the ECT that are contrary to the EU law and recent judgments by the Court of Justice of the EU.*"

[111] On Article 41 VCLT see generally O. Corten, P. Klein (eds.), *The Vienna Conventions on the Law of Treaties: A Commentary*, Oxford, 2011, p. 986, sub. Article 41(a) (commentary by A. Rigaux, D. Simon, J. Spanoudis, E. Weemaels); M. Villiger, *Commentary to the 1969 Vienna Convention on the Law of Treaties*, Brill 2009, p. 534 ff.; O. Dörr, K. Schmalenbach, *Vienna Convention on the Law of Treaties. A Commentary*, Spring 2012, vol. 1, p. 719 ff. (by K. Odendahl). Specifically on the issue discussed see G. Lampo, *The Relationship between Intra-EU Investment Arbitration under the ECT and the Lisbon Treaty in Light of Article 41 VCLT*, G. Pascale, S. Tonolo (eds.), *The Vienna Convention on the Law of Treaties, The Role of the Treaty on Treaties in Contemporary International Law*, ESI, Napoli 2022, p. 314, p. 329: "*The circumstance that the Lisbon Treaty does not express any intention of the Parties to modify the ECT in their inter se relations does not seem compelling at all. Indeed, nothing in Art. 41 suggests that the modifications must be manifest.*" On the issue see also M.R. Mauro, *op. cit . supra* fn. 42, p. 295.

[112] As also submitted by G. Lampo, *op. cit . supra* fn. 111, pp. 329-330.

comply with the requirements of Article 41. Even in such a case, the validity of the *inter se* modification agreement is not affected.[113]

93.    As argued by Respondent,[114] there are significative precedents of EU Members States ceasing to apply a multilateral treaty between themselves as a consequence of having transferred the competence on the subject matter to the European Union, without having concluded any *ad hoc* treaty patterned after Article 41 VCLT and, apparently, without notifying the other treaty parties either. This is the case of the Hague conventions on cooperation in civil matters as a consequence of the competence in this area having been transferred to the EU pursuant to the Amsterdam Treaty of 1997, resulting in a new text for the then Article 65, now Article 81 TFEU.

94.    The first regulation adopted by the EU to govern matters whose competence had been transferred to the EU pursuant to the Amsterdam Treaty (1997) was Council Regulation (EC) No. 1348/2000 of 29 May 2000 on the service in the Member States of judicial and extrajudicial documents in civil or commercial matters.[115] Article 20 ("*Relationship with agreements or arrangements to which Member States are Parties*") provides as follows: *"1. This Regulation shall, in relation to matters to which it applies, prevail over other provisions contained in bilateral or multilateral agreements or arrangements concluded by the Member States, and in particular Article IV of the Protocol to the Brussels Convention of 1968 and the Hague Convention of 15 November 1965.*"[116] A similar final provision is found in Article 21.1 "*Relationship with existing or future agreements or arrangements between Member States*" of Regulation No. 1206/2001 of 28 May 2001 "*on cooperation between the courts of the Member States in the taking of evidence in civil or commercial matters,*" which replaced among EU Member States the Hague Convention of 1970 on the same subject.[117]

95.    EU Member States thus ceased to apply a multilateral agreement with other parties *inter se* by means of EU regulation and not by an international agreement patterned after Article 41

---

[113] See O. Dörr, K. Schmalenbach, *op. cit. supra* fn. 111, p. 721.

[114] Respondent's Petition for Reconsideration, paras. 61-67 with mention of a number of other multilateral conventions replaced by EU Regulations as between EU Member States.

[115] **RL-0194**, Council Regulation (EC) No. 1348/2000, 29 May 2000.  Regulation 1348/2000 has been replaced since by Regulation 1393/2007 currently in force.

[116] **RL-0194**, Council Regulation (EC) No. 1348/2000, 29 May 2000, Article 20.

[117] **RL-0198**, Council Regulation (EC) No. 1206/2001, 28 May 2001, Article 21.1: "*This Regulation shall, in relation to matters to which it applies, prevail over other provisions contained in bilateral or multilateral agreements or arrangements concluded by the Member States and in particular the Hague Convention of 1 March 1954 on Civil Procedure and the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, in relations between the Member States party thereto.*"

VCLT.[118] The website of the Hague Conference on Private International Law ("**HCPIL**") does not mention that EU Member States have notified, in accordance with Article 41 VCLT, the HCPIL as depository, or the other parties, that they have ceased to apply such conventions among themselves, replacing them *inter se* with EU regulations adopted on the basis of having transferred to the EU their competence in those matters. Thus, there is actual State practice militating against the conclusion that a "hard" obligation is in place to notify such steps as indicated by Article 41(2) VCLT.[119] This uncontested practice, that Spain argues has acquired thereby a customary character,[120] concerns specifically this side-effect of the transfer of powers from the Members States to the EU in the process of furthering European integration.

C.   **IRRELEVANCE OF ARTICLE 46 VCLT IN RESPECT OF THE WITHDRAWAL OF EU MEMBER STATES FROM ECT INTRA-EU ARBITRATION BY EFFECT OF THE LISBON TREATY**

96.   I recall that Article 46 VCLT reads as follows:

PROVISIONS OF INTERNAL LAW REGARDING COMPETENCE TO CONCLUDE TREATIES

1. A State may not invoke the fact that its consent to be bound by a treaty has been expressed in violation of a provision of its internal law regarding competence to conclude treaties as invalidating its consent unless that violation was manifest and concerned a rule of its internal law of fundamental importance.

2. A violation is manifest if it would be objectively evident to any State conducting itself in the matter in accordance with normal practice and in good faith.

97.   The issue here is whether Article 46 is an impediment to Spain relying on having withdrawn its consent to ECT intra-EU arbitration, because this would be a case of incompetence under domestic law which is unopposable to another treaty party for lack of the prerequisite of being "*manifest*" as required by Article 46.

---

[118] The Amsterdam Treaty would have had the same effect of an *inter se* agreement in respect of the Hague Conventions as the Lisbon Treaty in respect of Article 26 ECT.

[119] According to O. Corten, P. Klein (eds.), *op cit. supra* fn. 111, p. 720, such an agreement may even not be in written form.

[120] Respondent's Petition for Reconsideration, paras. 56 ff, an argument that shows that the defense of the *inter se* agreement in conformity with Article 41 VCLT – which I consider decisive – has been raised by Spain in these proceedings, albeit not in in the clearest possible terms.

98.     There are however three arguments justifying a negative answer to the above doubts. Firstly, as explained above, the situation is not one of lack of competence by EU Member States *ab initio* when they concluded the ECT. Member States have instead lost the competence to further offer ECT intra-EU arbitration due to the codification of the primacy principle in the Lisbon Treaty. The issue is not the alleged "invalidity" of Spain's consent to Article 26 ECT, but one of termination of the undertaking. Article 46 VCLT on the breach of provisions of internal law regarding competence to conclude treaties is therefore inapplicable to the facts of the case. Indeed, it is not my position that in 1994-1998 the "*consent to be bound by*" Article 26 ECT had "*been expressed in violation of a provision of* [their] *internal law regarding competence to conclude treaties*" by EU Member States.

99.     Secondly, the prevailing interpretation of Article 46 is that it concerns the domestic subdivision of the competence to conclude treaties (including ratification) among different organs and the power to represent the State.[121] Typical examples are (a) that of a State representative purporting to have power to engage the State by an international agreement, without the domestic constitution granting the necessary powers to that person, and (b) the lack of the constitutionally required parliamentary approval or authorization to the executive branch in order to engage the State.[122] This is not the case here, where the EU Member States have lost their competence to conclude treaties in respect of ECT intra-EU disputes and cannot further accept such arbitration, pursuant to an agreement (the Lisbon Treaty) whereby they have given primacy over their domestic law, including constitutional law, to EU law, which does not allow them to go on doing so.

100.    Thirdly, both Spain and Germany are in the same situation of having withdrawn their consent. Germany has not invoked Article 26 ECT vis-à-vis Spain arguing that Spain, by denying the Tribunal's jurisdiction on Portigon's claims, would be in breach of that provision. Nor has Spain, in response, invoked the fact that its consent to be bound by Article 26 ECT with reference to intra-EU arbitration would have been expressed in violation of its domestic law as supplemented by EU law. None of the parties involved has raised the issue of any "invalidity" of Spain's consent to be bound by the ECT. Finally, Germany would have been

---

[121] O. Corten, P. Klein (eds.), *op cit. supra* fn. 111, Commentary to Article 46 by M. Bothe, p. 1093.

[122] See T. Meron, *Article 46 of the VCLT (*Ultra Vires *Treaties), Some Recent Cases*, BYIL 1978, p. 175, and more recently M.C. Vitucci, *La competenza a rappresentare lo Stato nella conclusione dei trattati e la validità degli accordi tra diritto interno e diritto internazionale*, Riv. diritto internazionale 2018, p. 715 ff.

estopped from doing so, because Germany has taken the same position in respect to intra-EU arbitration under the ECT. Hence, the context envisaged by Article 46 VCLT is not at hand.

### D. IMPACT OF THE "LEX POSTERIOR" PRINCIPLE AND NON-APPLICABILITY OF ARTICLE 16 ECT

101.    The Lisbon Treaty of 2007, in force since 2009, is clearly *lex posterior* in respect of the ECT which entered into force in 1998. Therefore, under Articles 30(3) and 30(4)(a) VCLT (assuming that the two treaties are "*relating to the same subject-matter*", which seems to me difficult to deny,[123] "*the earlier treaty*" (ECT) applies only to the extent that its provisions are compatible with those of the later treaty (Lisbon Treaty). As a consequence, in the conflict between Article 26 ECT and the prohibition of ECT intra-EU arbitration resulting from the supremacy of EU law enshrined in the Lisbon Treaty, the latter must prevail.

102.    The application of the *lex posterior* principle would be apparently prevented by Article 16 ECT, a provision which has been one of the *pièce de resistance* in the hands of arbitral tribunals in order to uphold their jurisdiction on ECT intra-EU disputes notwithstanding EU law to the contrary. Article 16 ("*Relation to Other Agreements*") lays down a peculiar exception to the *lex posterior* principle where it states that:

> Where two or more Contracting Parties […] <u>enter into a subsequent international agreement</u>, whose terms […] concern the subject matter of Part III or V of this Treaty, […] (2) <u>nothing in such terms of the other agreement shall be construed to derogate</u> from any provision of Part III or V of this Treaty or <u>from any right to dispute resolution with respect thereto under this Treaty</u>, where <u>any such provision is more favourable to the Investor or Investment</u>.[124]

103.    Arbitral tribunals, including the present Tribunal, and commentators are generally of the view that the availability of investor-State arbitration under the ECT represents such a "*more*

---

[123] This has been denied by a number of investment tribunals, but this view appears groundless. According to Article 26 TFEU, the internal (single) market of the European Union is an area without internal frontiers in which the free movement of goods, services, capital and persons – including in respect of energy (Article 194) – is ensured in accordance with the provisions of the EU Treaties. The single market represents a central piece of the EU (Article 2 TEU). On the other hand, the ECT provides for a more limited freedom of movement and of investment for foreign investors between its parties under a standard of fair and equitable treatment in the specific energy sector. The ECT thus governs partially what is a subpart of the broader subject-matter regulated by the EU. See P. Paschalidis, *International Investment Law and EU Law*, *op. cit. supra* fn. 24, pp.155 ff.

[124] **RL-0001**, ECT, Article 16 (underlining added).

*favourable*" regime than the one under EU law, so that the later Lisbon Treaty could not prevail in respect of intra-EU arbitration under the ECT.[125]

104.    Reliance on this argument is however inapposite to the withdrawal of consent to ECT intra-EU arbitration by EU Member States by effect of the Lisbon Treaty, as clarified above. The statement of Article 16 ECT that the ECT shall prevail over later less favourable treaty provisions cannot limit the EU Member States' liberty to withdraw from the ECT or to revoke their consent to intra-EU arbitration, in conformity with international law requirements. Article 16 ECT cannot prevent them from doing so, nor does it limit their treaty power to modify, amend or terminate the ECT. As a consequence of the withdrawal by the EU Member States of their consent to intra-EU arbitration by the Lisbon Treaty, arbitration tribunals called to decide an ECT intra-EU dispute have no jurisdiction. As a consequence, they cannot enter into the merits of the relation between Article 16 ECT and EU law, specifically with respect of its principle of primacy.[126]

105.    In order to reach the above conclusion, it is not necessary to rely on Article 31(3)(c) VCLT that directs an interpreter to "*take into account*" for purpose of interpretation also "[a]*ny relevant rules of international law applicable in the relations between the parties*."[127] I stand with the unanimous statement of this Tribunal at paragraph 214 of the Decision on Jurisdiction that EU law does not constitute relevant rules applicable in the relations between the parties for the purposes of an ICSID tribunal <u>interpreting</u> Article 26 of the ECT. This does not exclude, however, that by effect of the interplay between the ECT and EU law based on the Lisbon Treaty (which is clearly a rule of international law applicable in the relations between EU Member States) Article 26 may be and has been rendered inapplicable as concerns the availability of intra-EU arbitration.[128]

---

[125] See Decision on Jurisdiction, para. 271, with references.  See also ex *multis*, *Belenergia S.A. v. Italian Republic*, ICSID Case No. ARB/15/40, Award, 6 August 2019, para. 319.

[126] Should, *quod non*, such a comparison be called for, the acceptance by effect of the Lisbon Treaty of the principle of primacy of EU law should lead to a recognition that EU Member States have thereby also modified or restricted in their mutual relations the effects of Article 16 ECT as far as it makes the ECT prevail over EU law. Such an *inter se* amendment in conformity with Article 41 VCLT could not be hindered by the special interpretative conflict rule of Article 16 ECT.

[127] On this provision see C. McLachlan, *The Principle of Systemic Integration and Article 31(3)(c) of the Vienna Convention*, ICLQ 2005, 54, p. 279 ff.

[128] The *Green Power* award (**RL-0239**), at para. 469, has resolved the issue by relying on the EU principle of *lex superior* (primacy of EU law) which would moot the choice between *lex posterior* and *lex specialis.* Such an approach was justified because the *Green Power* tribunal applied EU law also to jurisdiction, since EU law was part of its Swedish *lex fori*. An ICSID tribunal, such as the present one, cannot follow that approach but has to come to the same conclusion (that EU law renders Article 26 ECT inapplicable to intra EU arbitration) by application of the *lex posterior* principle and of Article 41 VCLT.

E.    COMPATIBILITY OF THE CONCLUSION THAT THE TRIBUNAL LACKS JURISDICTION
WITH THE PRINCIPLES OF NON-RETROACTIVITY AND THE RULE OF LAW

106.    Influential commentators have submitted that by proclaiming the incompatibility of intra-EU BITs arbitration with EU law with "*immediate effect so as to invalidate ongoing procedures and even past awards*," *Achmea* raises the question whether such retrospective consequences "*are consistent with fundamental rights, or indeed with the international rule of law*."[129] The same concern has been raised in respect of  the "*retroactive*" effects of the interpretation laid down by *Komstroy* on the intra-EU application of the ECT by authors,[130] and some arbitral tribunals.[131]

107.    There are two answers to this argument. First, Article 37(2) VCLT on "*Revocation or modification of obligations or rights of third States*" protects States not private parties, such as investors holding a derivative right under a BIT or the ECT, from the termination of the treaty granting them such rights, even if the treaty empowers them to access directly an international tribunal in order to vindicate their rights. The same principle applies in respect of more limited amendments agreed between the signatories States.[132]

108.    Secondly, such a concern would be justified, especially under EU law, if the *Achmea* and the *Komstroy* judgments would represent new law with retroactive effect.[133] As we have recalled

---

[129] See Former Advocate General Sir Francis G. Jacobs, *Foreword* to *The EU and the Rule of Law in International Economic Relations*, A. Biondi and G. Sanguolo eds., Elgar 2021, at xii, and the contribution of the editors at pp. 14-15 there, *Three years after Achmea: What is said, what is unsaid, and what could follow* (this volume was published before *Komstroy*).

[130] A. Reuter, *Taking Investors' Rights Seriously: The Achmea and CETA Rulings of the ECJ do not Bar Intra-EU Investment Arbitration*, ICSID Rev. 2021, 36, pp. 34, 41, relying on the arguments of "*Investors' rights under the ECT as public international rights of third parties*" and of "*Private Investors as third-parties entitled to rely on the 'pacta sunt servanda rule'*."

[131] See notably **CL-0158**, *Vattenfall*, para. 155; *Infracapital v. Spain,* Decision on Reconsideration cit, para. 115: "*it would be improper to affect Claimants by removing the jurisdiction of the Tribunal to decide their claims based on the Komstroy Judgment when the latter was issued several years after the Claimants filed their Request for Arbitration and ICSID registered it.*"

[132] In respect of Article 37 see A. Reinisch and S. Mansour Fallah, *op. cit. supra* fn. 103, p. 15: "*article 37(2) VCLT limits the power of States to revoke or modify a right a third party has assented to without the consent of such third party. However, the wording of the VCLT very clearly relates to 'third States' and although the ILC initially considered including other third parties, such as individuals and juristic persons, it expressly confined itself to suggesting a third-party regime limited to States.*" The case of an authentic interpretation by the CJEU appears different from that on which **CL-0227**, *Eskosol*, para. 226 took position: "*In the Tribunal's view, it would be inconsistent with general notions of acquired rights under international law to permit States effectively to non-suit an investor part-way through a pending case, simply by issuing a joint document purporting to interpret longstanding treaty text so as to undermine the tribunal's jurisdiction to proceed.*" Similarly, also in respect of the First *Achmea* Declaration, *AMF v. Czech Republic*, PCA Case No. 2017-15, Final Award, 11 May 2020, paras 336–8, to the effect that the principle of acquired rights "*does not permit States to deprive investors of their right to arbitration under a long-standing BIT mid-way through the arbitration by simply issuing an interpretative declaration.*" See also Binder, *op. cit. supra* fn. 24, p. 979.

[133] The CJEU may, and has sometimes limited the temporal (retrospective) effects of an interpretation issued in an Article 267 proceeding as an exception to the principle that, as stated at **RL-0233**, *PL Holdings*, para. 58: "*the rule as thus interpreted may and must be applied by the courts to legal relationships arising and established before the judgment*

above this is however not the case when the CJEU renders an authentic interpretation of EU law.[134] As such "[t]*he interpretation which, in the exercise of jurisdiction conferred on it by Article 234 EC* [now Article 257 TFEU], *the Court gives a rule of Community law clarifies and defines, where necessary, the meaning and scope of that rule as it must be or ought to have been understood and applied from the time of its coming into force*."[135] Such a normal retrospective effect of an authentic interpretation cannot be confused with an amendment of a treaty provision, purporting to have a retroactive effect, contrary to vested rights and legitimate expectations of the beneficiaries as far as they are protected at the national level.[136]

109.    This means, as I have indicated already above, that the interpretation retroacts to the time when the EU provision or principle under review has entered in force (*in casu* from the date in 2009 when the Lisbon Treaty including Declaration No. 17 entered into force). It is applicable as such also "*to legal relationships arising and established before the judgment ruling on the request for interpretation*." The principle of legal certainty, one of the general principles recognized by EU law, prevents on the other hand the reopening of situations or decisions that have become final.[137]

110.    This is not the case of ECT intra-EU arbitrations which have not been concluded, and where the issue of jurisdiction can still be decided or even reconsidered, as in the present case under the rules applicable to ICSID arbitration. There is an additional argument, which in my view is even more substantial, because it goes beyond the consideration of procedural time-limits. It is based on the fact that serious doubts on, and challenges to, the jurisdiction of intra-EU arbitration under BITs and the ECT, because of its possible incompatibility with fundamental principles of EU law, had been raised already before the Lisbon Treaty.[138] The position of EU

---

*ruling on the request for interpretation* […] *(judgment of 17 March 2021, Academia de Studii Economice din Bucaresti, C-585/19, EU:C:2021:210, paragraph 78 and the case-law cited).*" The conditions are that the limitation should concern persons who have acted in good faith and there must be a risk of serious difficulties. In *Poland v. PL Holding*, PL Holding had petitioned for such a limitation in case the Court would have ruled the arbitration agreement between the parties invalid by application of the *Achmea* principle, as the Court did. The CJEU refused however to limit the temporal effect of its decision, since this would have limited the very effect of *Achmea* and "*amount to circumventing that Member State's obligations under the Treaties and, specifically, under Article 4(3) TEU and Articles 267 and 344 TFEU*" as interpreted in *Achmea*. **RL-0233**, *PL Holdings*, para. 65.

[134] See *supra*, para. 30 and fn. 36 with quotations of the relevant holdings of the Court on the issue.

[135] CJEU, *Kuehne & Heitz v. Productschap voor Pluimvee en Eieren*, Case C-453/00, 13 January 2004, [2004] ECR I-837, para. 21.

[136] See A. Reinisch and S. Mansour Fallah, *op. cit. supra* fn. 103, at p.18: "*Where a State or States terminated a treaty by following rules of the treaty or the VCLT, it is difficult to assume that rights acquired through the treaty continue to remain in effect against the explicit will of the masters of the treaty.*"

[137] See **RL-0233**, *PL Holdings*, para. 58.

[138] See Hindelang, p. 9: "[f]*rom around 2006 onwards, the EU represented by the European Commission as well as various defendant EU Member States have argued that intra-EU investment agreements are incompatible with EU law*

authorities and Member States against the admissibility of intra-EU arbitration under the ECT has been officially stated well before the initiation of the present case and others against Spain, challenging the RE regime changes from 2010 onwards.[139]

111.   It is regrettable that these doubts have not been resolved and dispelled promptly by the EU legislative branch, or by the Member States acting collectively, be it by an *ad hoc* agreement or by outright termination of their participation to the ECT, to hint at some of the possible solutions.[140] It has thus been necessary to wait more than 10 years until the CJEU gave its definitive word on the matter. On the other hand, courts decide cases when litigants bring them to their adjudication and the CJEU has no authority to promote a test case.[141]

112.   Investors from one EU Member State which have relied on ISDS provisions in BITs and under the ECT to challenge legislation and measures of another Member State cannot be said to have been surprised in their good faith and their legitimate expectations, should such a jurisdictional objection be upheld.[142] From the early 2000s, when, as recalled above, the EU Commission started challenging the applicability of intra-EU BITs, they knew or should have known the legal risk they were incurring. EU Member States as respondents in such arbitration under BITs and the ECT have systematically, though unsuccessfully, raised this argument as a jurisdictional objection. It can be even said that, from an efficiency and judicial economy

---

(intra-EU objections)," referencing *Eastern Sugar v. Czech Republic*, SCC Case No 088/2004, Partial Award, 27 March 2007, para. 119 (Hindelang **Exh. 09**). See recently the judgment of the Supreme Court of Lithuania of 18 February 2022 holding that the Lithuania – France BIT has become invalid with Lithuania's accession to the EU in 2004, as reported in IA Reporter, 18 February 2022.

[139] A little known but significant official expression of this position has been articulated by the EU Commission "*on behalf of the EU*" in respect of the International Energy Charter (IEC) which in 2015 supplemented the Energy Charter Treaty of 1991. The IEC contains in its Title II "*Implementation*" the following Heading No. 4 on Promotion and Protection of Investments: "*The signatories affirm the importance of full access to adequate dispute settlement mechanisms, including national mechanisms and international arbitration in accordance with national laws and regulations, including investment and arbitration laws and rules, all the relevant bilateral and multilateral treaties and international agreements.*" The EU Declaration is as follows: "*it is declared that, due to the nature of the EU internal legal order, the text in Title II, Heading 4, of the International Energy Charter on dispute settlement mechanisms cannot be construed so as to mean that any such mechanism would become applicable in relations between the European Union and its Member States, or between the said Member States, on the basis of that text,*" available at www.energycharter.org/fileadmin/DocumentsMedia/Legal/EU_IEC_Declaration.pdf.

[140] See now the Modernizing Treaty of June 2022, *supra* fn. 110, para. 88.

[141] As shown by the Termination Agreement of intra-EU BITs of 2020, political solutions also have their shortcomings since they are the result of political negotiations and compromises. In this treaty, the parties agreed on a kind of grandfathering of existing BITs, although under the *Achmea* judgment these BITs should be considered as not any more in force with effects also on pending cases (as decided on remand by the BGH, *see supra* fn. 33). See on this issue, the questioning of Prof. Hindelang by arbitrator van den Berg at the Hearing on Reconsideration of 18 January 2022, p. 231 of the Transcript.

[142] For the latest case on (the limited recognition of) legitimate expectations of investors under EU law see *ANIE and others v. Ministero Sviluppo Economico and GSE*, Case No. C-798 and 799/18, Judgment, 15 April 2021 (preliminary ruling), in respect of the Italian RE incentive regime, reviewed by G. Dall' Agnola, *Diritto Commercio Internazionale - The Law of Int'l Trade*, 2021, p. 783 ff.

point of view, it is preferable that such issues be resolved by investment tribunals rather than through a later finding of lack of jurisdiction at a subsequent phase of annulment, denial of recognition or enforcement.

113. Another solution that would increase legal certainty may have been, or could still be a notification by the EU and its Member States to the other ECT Contracting Parties in conformity with Article 41(2) VCLT that they have modified *inter se* Article 16 and 26 ECT by the Lisbon Treaty, as clarified by the CJEU in *Komstroy*.

114. Based on the above reasons, <u>I conclude that this Tribunal lacks jurisdiction on the dispute between Portigon and Spain</u>. This is essentially due to the impact of the Lisbon Treaty as an agreement modifying the ECT between the EU Member States parties to it, by which they have withdrawn their consent to ECT intra-EU arbitration in conformity with Article 41 VCLT. This includes Spain, and occurred before the filing of the Request for Arbitration by Portigon. Ignoring these international law aspects of the case amounts in my opinion to a failure to apply the proper law.[143]

Giorgio Sacerdoti, Arbitrator

20 October 2022

---

[143] Cf. *SolEs Badajoz v. Spain*, ICSID Case No. ARB/15/38, Decision on Annulment, 16 March 2022, para. 115.