# EXHIBIT 48

# YEARBOOK OF THE INTERNATIONAL LAW COMMISSION 1964

## Volume II

*Documents of the sixteenth session including the report of the Commission to the General Assembly*



UNITED NATIONS

# YEARBOOK

# OF THE

# INTERNATIONAL

# LAW COMMISSION

# 1964

Volume *II*

*Documents of the sixteenth session*
*including the report of the Commission*
*to the General Assembly*

UNITED NATIONS
New York, 1965

NOTE

Symbols of United Nations documents are composed of capital letters combined with figures. Mention of such a symbol indicates a reference to a United Nations document.

A/CN.4/SER.A/1964/ADD.1

UNITED NATIONS PUBLICATION

Sales No. 65.V.2

Price: U.S. $ 2.50
(or equivalent in other currencies)

# CONTENTS

*Page*

FILLING OF CASUAL VACANCIES IN THE COMMISSION (Agenda item 1)

*Document A/CN.4/168:* Note by the Secretariat ........................................    3

LAW OF TREATIES (Agenda item 3)

*Document A/CN.4/167 and Add.1-3:* Third report on the law of treaties, by Sir Humphrey
    Waldock, Special Rapporteur .........................................................    5

SPECIAL MISSIONS (Agenda item 4)

*Document A/CN.4/166:* Report on Special missions, by Mr. Milan Bartoš, Special Rapporteur ..    67

CO-OPERATION WITH OTHER BODIES (Agenda item 8)

*Document A/CN.4/172:* Report on the sixth session of the Asian-African Legal Consultative Com-
    mittee (Cairo, February-March 1964), by Mr. Eduardo Jiménez de Aréchaga, Observer for
    the Commission ................................................................    119

STATE RESPONSIBILITY

*Document A/CN.4/165:* Summary of the discussions in various United Nations organs and the
    resulting decisions: working paper prepared by the Secretariat ..........................    125

*Document A/CN.4/169:* Digest of the decisions of international tribunals relating to State res-
    ponsibility, prepared by the Secretariat .............................................    132

REPORT OF THE COMMISSION TO THE GENERAL ASSEMBLY

*Document A/5809:* Report of the International Law Commission covering the work of its sixteenth
    session, 11 May-24 July 1964 ......................................................    173

CHECK LIST OF DOCUMENTS REFERRED TO IN THIS VOLUME ................................    228

CHECK LIST OF DOCUMENTS OF THE SIXTEENTH SESSION NOT REPRODUCED IN THIS VOLUME ......    230

# FILLING OF CASUAL VACANCIES IN THE COMMISSION

[Agenda item 1]

## DOCUMENT A/CN.4/168

### Note by the Secretariat

*[Original text : French]*
*[8 April 1964]*

1. Following the election on 21 October 1963 of Mr. André Gros and Mr. Luís Padilla Nervo as judges of the International Court of Justice, two seats have become vacant on the International Law Commission.

2. In this case, article 11 of the Statute of the Commission is applicable. It stipulates :

" In the case of a casual vacancy, the Commission itself shall fill the vacancy having due regard to the provisions contained in articles 2 and 8 above."

3. Article 2 stipulates :

" 1. The Commission shall consist of twenty-five members who shall be persons of recognized competence in international law.

"2. No two members of the Commission shall be nationals of the same State.

" 3. In case of dual nationality a candidate shall be deemed to be a national of the State in which he ordinarily exercises civil and political rights."

4. Article 8 stipulates :

" At the election the electors shall bear in mind that the persons to be elected to the Commission should individually possess the qualifications required and that in the Commission as a whole representation of the main forms of civilization and of the principal legal systems of the world should be assured."

5. The term of office of the two members elected to fill the vacancies will expire at the end of 1966.

# LAW OF TREATIES

[Agenda item 3]

## DOCUMENT A/CN.4/167 and Add.1-3

### Third Report on the Law of Treaties, by Sir Humphrey Waldock, Special Rapporteur

[*Original text : English*]
[*3 March, 9 June, 12 June and 7 July 1964*]

## CONTENTS

| | Page |
|---|---|
| INTRODUCTION | |
| A. The basis of the present report | 6 |
| B. The scope and arrangement of the present group of draft articles | 6 |
| | |
| PART III. APPLICATION, EFFECTS, REVISION AND INTERPRETATION OF TREATIES | |
| *Section I. The application and effects of treaties* | 7 |
| Article 55 : *Pacta sunt servanda* | 7 |
| Commentary | 7 |
| Article 56 : The inter-temporal law | 8 |
| Commentary | 9 |
| Article 57 : Application of treaty provisions *ratione temporis* | 10 |
| Commentary | 10 |
| Article 58 : Application of a treaty to the territories of a contracting State | 12 |
| Commentary | 12 |
| Article 59 : Extension of a treaty to the territory of a State with its authorization | 15 |
| Commentary | 15 |
| Article 60 : Application of a treaty concluded by one State on behalf of another | 16 |
| Commentary | 16 |
| Article 61 : Treaties create neither obligations nor rights for third States | 17 |
| Commentary | 17 |
| Article 62 : Treaties providing for obligations of rights of third States | 19 |
| Commentary | 20 |
| Article 63 : Treaties providing for objective régimes | 26 |
| Commentary | 27 |
| Article 64 : Principles of a treaty extended to third States by formation of international custom | 34 |
| Commentary | 34 |
| Article 65 : Priority of conflicting treaty provisions | 34 |
| Commentary | 35 |
| Article 65A : The effect of breach of diplomatic relations on the application of treaties | 44 |
| Commentary | 44 |
| Article 66 : Application of treaties to individuals | 45 |
| Commentary | 45 |
| *Section II. The amendment and revision of treaties* | |
| Article 67 : Proposals for amending or revising a treaty | 47 |
| Article 68 : Right of a party to be consulted in regard to the amendment or revision of a treaty | 47 |
| Article 69 : Effect of an amending or revising instrument on the rights and obligations of the parties | 47 |
| Commentary | 47 |

CONTENTS *(continued)*

*Page*

*Section III.  Interpretation of treaties*

Article 70 :   General rules ............................................................... 52

Article 71 :   Application of the general rules ............................................ 52

Article 72 :   Effective interpretation of the terms ...................................... 53

Article 73 :   Effect of a later customary rule or of a later agreement on interpretation of a
treaty ...................................................................... 53
Commentary ............................................................... 53

Article 74 :   Treaties drawn up in two or more languages ............................... 62

Article 75 :   Interpretation of treaties having two or more texts or versions ................. 62
Commentary ............................................................... 62

---

## Introduction

### A.  *The basis of the present report*

1.   At its fourteenth and fifteenth sessions the Commission provisionally adopted parts I and II of its draft articles on the law of treaties, consisting respectively of twenty-nine articles on the conclusion, entry into force and registration of treaties and twenty-five articles on the invalidity and termination of treaties.[1] In adopting parts I and II the Commission decided, in accordance with articles 16 and 21 of its Statute, to submit them, through the Secretary-General, to Governments for their observations. At its fifteenth session the Commission decided to continue its work on the law of treaties at its next session, and to take up at that session the questions of the application, interpretation and effects of treaties. The Special Rapporteur accordingly now submits to the Commission his third report dealing with these aspects of the law of treaties.

2.   In considering the effects of treaties on third States and the application of conflicting treaties, the Special Rapporteur came to the conclusion that the Commission might find it desirable to study the question of the revision of treaties in conjunction with its study of those two topics. As the Commission has not yet taken up this question nor assigned any specific place to it in the law of treaties, the Special Rapporteur decided to insert in this report a section on the revision of treaties immediately after that dealing with the application and effects of treaties.

3.   The revision and the interpretation of treaties are topics which have not been the subject of reports by any of the Commission's three previous Special Rapporteurs on the law of treaties. The topic of the application of treaties, on the other hand, was the subject of a full study by Sir Gerald Fitzmaurice in his fourth and fifth reports in 1959 and 1960.[2] However, owing to the pressure of other work the Commission was not then able to take up its examination of those reports. The Special Rapporteur has

naturally given full consideration to those reports in drafting the articles on the application of treaties now submitted to the Commission.

4.   As to the particular question of conflicts between treaties, this was discussed by Sir H. Lauterpacht in successive reports in 1953[3] and 1954[4] in the context of the validity of treaties, and again by Sir G. Fitzmaurice in his third report[5] in 1958 in the same context. The present Special Rapporteur also examined this question in the context of " validity " in his second report,[6] presented to the Commission at its fifteenth session, but in that report he suggested that the question ought rather to be considered in the context of the " application " of treaties. The Commission, without in any way prejudging its position on the point, decided to postpone its consideration of the question of conflicts between treaties until its sixteenth session, when it would have before it the present report, covering the application of treaties.[7] The Special Rapporteur, for reasons explained in the commentary to article 65 of the present report, felt it advisable to submit to the Commission a fresh study of this question oriented to the " application " rather than to the " validity " of treaties.

### B.  *The scope and arrangement of the present group of draft articles*

5.   The present group of draft articles thus covers the broad topics of (a) application and effects of treaties (including conflicts between treaties), (b) the revision of treaties, and (c) the interpretation of treaties ; and the articles have correspondingly been arranged in three sections dealing with these topics. As stated in paragraph 18 of its report for 1962[8] and recalled in

---

[1] *Yearbook of the International Law Commission, 1962*, vol. II, p. 159 *et seq.*, and *1963*, vol. II, pp. 189 *et seq.*

[2] *Yearbook of the International Law Commission, 1959*, vol. II, pp. 37-81, and *1960*, vol. II, pp. 69-107.

[3] *Yearbook of the International Law Commission, 1953*, vol. II, p. 156.

[4] *Yearbook of the International Law Commission, 1954*, vol. II, p. 133.

[5] *Yearbook of the International Law Commission, 1958*, vol. II, pp. 27 and 41.

[6] *Yearbook of the International Law Commission, 1963*, vol. II, p. 53, article 14 and commentary.

[7] *Ibid.*, p. 189, para. 15.

[8] *Yearbook of the International Law Commission, 1962*, vol. II, p. 160.

paragraph 12 of its report for 1963,[9] the Commission's plan is to prepare three groups of the draft articles covering the principal topics of the law of treaties and, when these have been completed, to consider whether they should be amalgamated to form a single draft convention or whether the codification of the law of treaties should take the form of a series of related conventions. The Special Rapporteur has therefore prepared the present draft in the form of a third self-contained group of articles closely related to those in parts I and II, which have already been transmitted to Governments for their observations. However, in accordance with the Commission's decision at its fifteenth session, the Special Rapporteur has not given the articles in the present group a separate set of numbers, but has numbered them consecutively after the last article of part II — the first article being numbered 55.

6.  " Application of treaties " overlaps to a certain extent with two topics which are the subject of separate studies by the Commission and which it has assigned to other Special Rapporteurs, namely, the responsibility of States and the succession of States and Governments.[10] In the case of the responsibility of States, the problem that faced the Special Rapporteur on the law of treaties was how far he should go into the legal liability arising from a failure to perform treaty obligations. This question involves not only the general principles governing the reparation to be made for a breach of a treaty but also the grounds upon which a breach may or, alternatively, may not be justified or excused, e.g. self-defence, reprisals, deficiencies in the internal law of the State, etc. From the point of view of State responsibility the breach of a treaty obligation does not appear to be materially different from the breach of any other form of international obligation ; and the Special Rapporteur concluded that, if he were to deal with the principles of responsibility and of reparation in the draft articles on the law of treaties, it would be found that he had covered a substantial part of the law of State responsibility. To do this would not, he considered, be in accord with the decisions of the Commission regarding its programme of work. The present group of draft articles does not therefore contain detailed provisions regarding the principles of responsibility or of reparation for a failure to perform treaty obligations. Instead, there is a general provision in the first article — article 55 — laying down the principle of State responsibility for breach of a treaty as one of the facets of the *pacta sunt servanda* rule and at the same time incorporating in this rule by reference the justifications and exemptions admitted in the law of State responsibility. In the case of State succession, the overlap relates to the question of the effects of treaties on third States. Here again, although the area of the overlap may be somewhat smaller, to examine how far successor States may constitute exceptions to the *pacta tertiis nec nocent nec prosunt* rule would be to deal with a major point of principle which is of the very essence of the topic of

State succession. Consequently, this aspect of the effects of treaties on third States has been omitted from the Special Rapporteur's study of that subject.

7.  In this part, as in parts I and II, the Special Rapporteur has sought to codify the modern rules of international law on the topics with which the report deals. On some questions, however, the articles formulated in the report contain elements of the progressive development as well as of the codification of the applicable law.

### Part III.  Application, effects, revision and interpretation of treaties

#### Section I : The application and effects of treaties

##### *Article 55.* — *Pacta sunt servanda*

1.  A treaty in force is binding upon the parties and must be applied by them in good faith in accordance with its terms and in the light of the general rules of international law governing the interpretation of treaties.

2.  Good faith, *inter alia,* requires that a party to a treaty shall refrain from any acts calculated to prevent the due execution of the treaty or otherwise to frustrate its objects.

3.  The obligations in paragraphs 1 and 2 apply also —
    (a) to any State to the territory of which a treaty extends under article 59 ; and
    (b) to any State to which the provisions of a treaty may be applicable under articles 62 and 63, to the extent of such provisions.

4.  The failure of any State to comply with its obligations under the preceding paragraphs engages its international responsibility, unless such failure is justifiable or excusable under the general rules of international law regarding State responsibility.

*Commentary*

(1) The articles so far adopted by the Commission in parts I and II do not contain any formulation of the basic rule of the law of treaties, *pacta sunt servanda ;* and the appropriate place in which to state the rule appears to be at the beginning of the present part dealing with the application and effects of treaties. At this date in history it hardly seems necessary to adduce authority or precedents to support or explain the principle of the binding character of treaties [11] which is enshrined in the preambles to both the Covenant of the League and the Charter of the United Nations. On the other hand, in commenting upon the rule it may be desirable to underline a little that the obligation to observe treaties is one of good faith and not *stricti juris.*

[9] *Yearbook of the International Law Commission, 1963,* vol. II, p. 189.
[10] *Ibid.,* p. 224, paras. 55 and 61.

[11] See the full discussion of the principle *pacta sunt servanda* in the commentary to article 20 of the *Harvard Research Draft, A.J.I.L.,* 1935, Special Supplement, p. 977 ; J.L. Kunz, *A.J.I.L.,* 1945, pp. 180-197 ; C. Rousseau, *Principes généraux du droit international public* (1944), pp. 355-364.

(2) The rule *pacta sunt servanda* is itself founded upon good faith and there is much authority for the proposition that the application of treaties is governed by the principle of good faith.[12] So far as the Charter is concerned, Article 2, paragraph 2, expressly provides that Members are to " fulfil in good faith the obligations assumed by them in accordance with the present Charter ". In its opinion on *Admission of a State to Membership in the United Nations*,[13] the Court, without referring to Article 2, paragraph 2, said that the conditions for admission laid down in Article 4 did not prevent a Member from taking into account in voting " any factor which it is possible *reasonably and in good faith* to connect with the conditions laid down in that Article ". Again, speaking of certain valuations to be made under Articles 95 and 96 of the Act of Algeciras, the Court said in the *Rights of United States Nationals in Morocco* case : [14] "The power of making the valuation rests with the Customs authorities, but it is a power which must be exercised reasonably and in good faith ". Similarly, the Permanent Court, in applying treaty clauses prohibiting discrimination against minorities, insisted in a number of cases [15] that the clauses must be so applied as to ensure the absence of discrimination in fact as well as in law ; in other words, the obligation must not be evaded by a merely literal application of the clauses. Numerous other instances where international tribunals have insisted upon good faith in the interpretation and application of treaties could be mentioned, but it must suffice to give one precedent from the jurisprudence of arbitral tribunals. In the *North Atlantic Coast Fisheries Arbitration* the Tribunal, dealing with Great Britain's right to regulate fisheries in Canadian waters in which she had granted certain fishing rights to United States nationals by the Treaty of Ghent, said : [16]

> " From the Treaty results an obligatory relation whereby the right of Great Britain to exercise its right of sovereignty by making regulations is limited to such regulations as are made in good faith, and are not in violation of the treaty."

(3) *Paragraph 1* of the article accordingly provides that a treaty in force is binding upon the parties and must be applied by them in good faith in accordance with its terms. It has also been thought desirable to continue with the words " in the light of the generally accepted rules of international law governing the interpretation of treaties ", not as a qualification of than as an addition to the rule. The reason is that " interpretation " is an essential element in the application of treaties. Moreover, divergent interpretations are one of the main problems in the application of treaties, and it seems desirable to connect the obligation of good faith with the interpretation of the treaty no less than with

its performance. Pending the Commission's decision whether or not to codify the rules for the interpretation of treaties, it seems sufficient here to refer to the " general rules of international law governing the interpretation of treaties ".

(4) The Commission has already recognized in article 17, paragraph 2, of the present articles [17] that even before a treaty comes into force a State which has established its consent to be bound by the treaty is under an obligation of good faith to " refrain from acts calculated to frustrate the objects of the treaty, if and when it comes into force ". *A fortiori*, when the treaty is in force the parties are under an obligation of good faith to refrain from such acts. Indeed, when the treaty is in force such acts are not only contrary to good faith but also to the undertaking to perform the treaty according to its terms which is implied in the treaty itself. *Paragraph 2* of the present article therefore provides that a party must refrain from " any acts calculated to prevent the due execution of the treaty or otherwise to frustrate its objects ".

(5) Paragraphs 1 and 2 apply the rule *pacta sunt servanda* to the actual parties to the treaty, and that is the way in which the rule is usually formulated. The question, however, arises as to the application of the rule to States which, though not parties, are subject to the régimes of the treaty or to certain of its provisions either by an extension of the treaty to their territory under article 59 or under one of the exceptions to the *pacta tertiis* rule recognized in articles 62 and 63. It seems logical that paragraphs 1 and 2 should apply to these States to the extent to which they are subject to the régime of the treaty ; and *paragraph 3* so provides.

(6) As recalled in the introduction to this report, the Commission is undertaking a separate study of the general principles of State responsibility, which will therefore be formulated in another set of draft articles. Although, in consequence, the inclusion in the present articles of detailed provisions regarding the impact of the principles of State responsibility upon the rule *pacta sunt servanda* would appear to be inappropriate, some reference to them is necessary, because they obviously may mitigate the rigour of the rule in particular cases. It further seems necessary to lay down somewhere in the draft article the principle, however self-evident, that failure to carry out obligations undertaken in a treaty engages the State's responsibility. These considerations also arise with respect to third States in any case where they may be bound by the obligations of a treaty. Accordingly, there has been added in *paragraph 4* a general provision covering the question of the responsibility of the State in the event of a failure to perform a treaty and incorporating by reference any exceptions or defences that may be applicable under the general rules governing State responsibility.

### Article 56. — The inter-temporal law

1. A treaty is to be interpreted in the light of the law in force at the time when the treaty was drawn up.

---

[12] See especially Bin Cheng, *General Principles of Law,* chapter 3.

[13] I.C.J. *Reports, 1948*, p. 63.

[14] I.C.J. *Reports, 1952*, p. 212.

[15] E.g. *Treatment of Polish Nationals in Danzig, P.C.I.J.* (1932), Series A/B, No. 44, p. 28 ; *Minority Schools in Albania, P.C.I.J.* (1935), Series A/B, No. 64, pp. 19-20.

[16] (1910) *U.N.R.I.A.A.* Vol. XI, p. 188. The Tribunal also referred expressly to "the principle of international law that treaty obligations are to be executed in perfect good faith ".

[17] *Yearbook of the International Law Commission, 1962,* vol. II, p. 175.

2. Subject to paragraph 1, the application of a treaty shall be governed by the rules of international law in force at the time when the treaty is applied.

*Commentary*

(1) Article 56 concerns the impact of the " inter-temporal law " upon the application of treaties. This law was formulated by Judge Huber in the *Island of Palmas* arbitration [18] as follows :

" . . . . . a juridical fact must be *appreciated* in the light of the law contemporary with it, and not of the law in force at the time when a dispute in regard to it arises or falls to be settled."

The context in which Judge Huber made this observation was the discovery and occupation of territory and the changes which have taken place in this branch of international law since the Middle Ages. But treaties also are " juridical facts " to which the inter-temporal law applies.

(2) Well-known instances of the application of the inter-temporal law to treaties are to be found in the *Grisbadarna* [19] and in the *North Atlantic Coast Fisheries* [20] arbitrations. In the former the land boundary between Norway and Sweden had been established by treaty in the seventeenth century. Disputes having arisen in the early years of the present century concerning certain lobster and shrimp fisheries, it became necessary to delimit the course of the boundary seaward to the limit of territorial waters. The Tribunal declined to use either the median-line or thalweg principles for delimiting the maritime boundary under the treaty, on the ground that neither of these principles had been recognized in the international law of the seventeenth century. Instead, it adopted the principle of a line perpendicular to the general direction of the land as being more in accord with the " notions of law prevalent at that epoch ". So too in the *North Atlantic Coast Fisheries* arbitration the Tribunal refused to interpret a treaty by reference to a legal concept which did not exist at the time of its conclusion. The Treaty of Ghent of 1818 had excluded United States nationals from fishing in Canadian " bays ", and thereafter disputes constantly arose as to what exactly was the extent of the waters covered by the words " bays ". The Tribunal, in interpreting the language of the 1818 Treaty, excluded from its consideration the so-called ten-mile rule for bays,[21] which had not made its appearance in international practice until twenty-one years after the conclusion of the treaty.[22] The inter-temporal law was also applied to a treaty by the International Court of Justice in the case of *Rights of Nationals of the United States of America*

*in Morocco.*[23] Called upon to determine the extent of the consular jurisdiction granted to the United States by treaties of 1787 and 1836 and to construe for that purpose the expression " any dispute ", the Court said : " It is necessary to take into account the meaning of the word ' dispute ' *at the times when the two treaties were concluded* ".

(3) *Paragraph 1* of the article therefore formulates for the purposes of the law of treaties the primary principle of the inter-temporal law as enunciated by Judge Huber in the passage cited above, and as applied in the cases just mentioned. This aspect of the inter-temporal law may, it is true, appear to be a rule for the interpretation as much as for the *application* of treaties. But " interpretation " and " application " of treaties are closely inter-linked, and it is considered convenient to deal with the inter-temporal law in the present section because its second aspect, which is covered in paragraph 2 of the Article, is clearly a question of " application " rather than of " interpretation ".

(4) In the *Island of Palmas* arbitration Judge Huber emphasized that the inter-temporal law results in another and no less important rule : [24]

" The same principle which subjects the act creative of a right to the law in force at the time the right arises, demands that the existence of the right, in other words its continued manifestation, shall follow the conditions required by the evolution of the law."

Applying this rule, he held that even if the mere discovery of Palmas could be considered to have conferred on Spain a full and perfect title under the law of the seventeenth century, it would not constitute a good title today unless Spain's sovereignty had been maintained in accordance with the requirements of the modern law of effective occupation. What this rule means in the law of treaties is that the *application* of a treaty must, at any given time, take account of the general rules of international law in force at that time. If certain problems may arise as to the exact relation between the two branches of the inter-temporal law, the second rule appears to be no less valid than the first. Indeed, article 45 of part II of these articles, which was adopted by the Commission at its fifteenth session,[25] and under which a treaty may become void in consequence of the emergence of a new peremptory norm of general international law, is simply a particular application of the second rule.

(5) *Paragraph 2* therefore completes and limits the rule in paragraph 1 by providing that, although the provisions of a treaty are to be interpreted in the light of the law in force when it was drawn up, the application of the treaty, as so interpreted, is governed by the general rules of international law in force at the time when the treaty is applied. The formulation of this provision is not free from difficulty, because it is here that the problem of the relation between the two bránches of the inter-temporal law arises. The problem

---

[18] (1928) *U.N.R.I.A.A.* vol. II, p. 845.

[19] (1909) *U.N.R.I.A.A.* vol. XI, pp. 159-160.

[20] (1910) *U.N.R.I.A.A.* vol. XI, p. 196.

[21] " So-called " because in the *Anglo-Norwegian Fisheries* case the International Court rejected the pretensions of this " rule " to be a customary rule of international law ; I.C.J. *Reports, 1951,* p. 131.

[22] Cf. the *Abu Dhabi Arbitration (International Law Reports,* 1951, p. 144), where Lord Asquith, as arbitrator, refused to interpret an oil concession granted in 1938 by reference to the continental shelf doctrine, which only made its appearance in international law a few years later.

[23] I.C.J. *Reports, 1951,* p. 189.

[24] (1928) *U.N.R.I.A.A.,* vol. II, p. 845.

[25] *Yearbook of the International Law Commission, 1963,* vol. II, p. 211.

may be illustrated by reference to the *Grisbadarna* and *North Atlantic Coast Fisheries* arbitrations. In the *Grisbadarna* arbitration the object of the seventeenth-century treaty had been to settle definitively the boundary between the two countries, and the tribunal, in effect, held that the parties must have intended to settle their maritime frontier on seventeenth-century principles, i.e. by a line perpendicular to the general direction of the land. But this treaty did not purport to fix the width of the territorial sea of the two countries, and it seems clear that the *application* of the treaty delimitation of the frontier at any given time would follow the evolution of the general rules of international law in force concerning the extent of the territorial sea. The reason why, on the other hand, a change in the general rules of international law from the principle of the perpendicular line, to the line of equidistance would not modify the application of the treaty with respect to the maritime frontier is that the treaty was intended by the parties to constitue a definitive settlement of their boundary — in other words, to have dispositive and final effects on the basis then agreed. Similarly, in the *North Atlantic Coast Fisheries* arbitration the Treaty of 1818 was intended to be a definitive settlement, as between Canada and the United States, of the areas exclusively reserved to Canadian fisheries, and the meaning attached by the parties in 1818 to the word " bays " would therefore be decisive as to the dispositive effects of the Treaty. At that date, the rules of international law regarding bays were not yet formed, and the Tribunal held that by the word " bays " the parties had intended the popular and geographical, *not legal,* concept of " bays ". If, however, there had been a recognizable legal concept of a bay at that date and the Tribunal had concluded that the parties intended the word " bay " to have its legal meaning, a nice question of interpretation would have arisen. Did the parties mean " bays as then understood and delimited in international law " or did they mean " any waters then or in future considered by international law to be bays under the sovereignty of a coastal State " ? In the latter case, the application of the treaty would " follow the conditions required by the evolution of the law ", to use Judge Huber's phrase ; but in the former case it would not. Having regard to the evolution which has been taking place in the law regarding coastal waters and the continental shelf, the problems discussed in the previous paragraph cannot be dismissed as academic.

(6) The solution proposed in paragraph 2 is that for purposes of interpretation, the law in force at the time of the conclusion of the treaty prevails. But, the interpretation of the treaty having been ascertained in accordance with that law, the application of the treaty, as so interpreted, is subject to the law in force at the date of application.

### Article 57. — *Application of treaty provisions ratione temporis*

1. Unless a treaty expressly or impliedly provides otherwise, its provisions apply to each party only with respect to facts or matters arising or subsisting while the treaty is in force with respect to that party.

2. On the termination or suspension of the operation of a treaty, its provisions remain applicable for the purpose of determining the rights and obligations of the parties with respect to facts or matters which arose or subsisted whilst it was in force.

*Commentary*

(1) Articles 23 and 24 of part I deal with the entry into force of a treaty, while articles 38 to 45 of part II deal with its termination. The present article concerns the related but distinct problem of the temporal scope of the provisions of a treaty that is in force. It is implicit in the very concept of a treaty's being in force that it should govern the relations of the parties with respect to all facts or matters which occur or arise during the period while it is in force and which fall within its provisions. But it is a question as to whether and to what extent a treaty may apply to facts or matters which (i) occurred or arose before it came into force and (ii) occur or arise after it has terminated.

(2) *Prior facts or matters.* The rights and obligations created by a treaty cannot, of course, come into force until the treaty itself is in force, either definitively or provisionally under article 24. But there is nothing to prevent the parties from giving a treaty, or some of its provisions, retroactive effects if they think fit.[26] It is essentially a question of the intention of the parties. The general rule is that a treaty is not to be regarded as intended to have retroactive effects unless such an intention is expressed in the treaty or is clearly to be implied from its terms. This rule was endorsed and acted upon by the International Court of Justice in the *Ambatielos* case,[27] where the Greek Government contended that under a treaty of 1926 it was entitled to present a claim based on acts which had taken place in 1922 and 1923. The Greek Government, recognizing that its argument ran counter to the general principle that a treaty does not have retroactive effects, sought to justify its contention as a special case by arguing that during the years 1922 and 1923 an earlier treaty of 1886 had been in force between Greece and the United Kingdom containing provisions similar to those of the 1926 Treaty. This argument was rejected by the Court, which said :

> " To accept this theory would mean giving retroactive effect to Article 29 of the Treaty of 1926, whereas Article 32 of this Treaty states that the Treaty, which must mean all the provisions of the Treaty, shall come into force immediately upon ratification. Such a conclusion might have been rebutted if there had been any special clause or any special object necessitating retroactive interpretation. There is no such clause or object in the present case. It is therefore impossible to hold that any of its provisions must be deemed to have been in force earlier."

A good example of a treaty having such a "special clause " or " special object " necessitating retroactive interpretation is to be found in the *Mavrommatis*

---

[26] Subject to any general rule restricting retrospective legislation, such as that involved in the maxim *nullum crimen sine lege.*

[27] (Jurisdiction), *I.C.J. Reports,* 1952, p. 40.

*Palestine Concessions* case.[28] The United Kingdom contested the Court's jurisdiction on the ground, *inter alia*, that the acts complained of had taken place before Protocol XII to the Treaty of Lausanne had come into force, but the Court said :

"Protocol XII was drawn up in order to fix the conditions governing the recognition and treatment by the Contracting Parties of certain concessions granted by the Ottoman authorities before the conclusion of the Protocol. An essential characteristic therefore of Protocol XII is that its effects extend to legal situations dating from a time previous to its own existence. If provision were not made in the clauses of the Protocol for the protection of the rights recognized therein as against infringements before the coming into force of that instrument, the Protocol would be ineffective as regards the very period at which the rights in question are most in need of protection. The Court therefore considers that the Protocol guarantees the rights recognized in it against any violation regardless of the date at which it may have taken place."

(3) The non-retroactivity principle has come under consideration in international tribunals most frequently in connexion with jurisdictional clauses. When the treaty is purely and simply a treaty of arbitration or judicial settlement, the jurisdictional clause will normally provide for the submission to an international tribunal of "disputes", or specified categories of "disputes", between the parties. Then the word "disputes" according to its natural meaning is apt to cover any dispute which *exists* between the parties after the coming into force of the treaty. It matters not either that the dispute concerns events which took place prior to that date or that the dispute itself arose prior to it ; for the parties have agreed to submit to arbitration or judicial settlement all their *existing* disputes without qualification. Thus, being called upon to determine the effect of Article 26 of the Palestine Mandate, the Permanent Court said in the *Mavrommatis Palestine Concessions case :* [29]

"The Court is of opinion that in cases of doubt, jurisdiction based on an international agreement embraces all disputes referred to it after its establishment. In the present case, this interpretation appears to be indicated by the terms of Article 26 itself, where it is laid down that "any dispute whatsoever ... which may arise" shall be submitted to the Court. The reservation made in many arbitration treaties regarding disputes arising out of events previous to the conclusion of the treaty seems to prove the necessity for an explicit limitation of jurisdiction and, consequently, the correctness of the rule of interpretation enunciated above."

The reservations and limitations of jurisdiction to which the Court there referred are clauses restricting the acceptance of jurisdiction to disputes "arising after the entry into force of the instrument and with regard to situations or facts subsequent to that date". In a

later case — the *Phosphates in Morocco* case [30] the Permanent Court referred to these clauses as having been "inserted [in arbitration treaties] *with the object of depriving the acceptance of the compulsory jurisdiction of any retroactive effects,* in order both to avoid, in general, a revival of old disputes, and to preclude the possibility of the submission to the Court ... of situations or facts dating from a period when the State whose action was impugned was not in a position to foresee the legal proceedings to which these facts and situations might give rise". In substance this statement is, of course, true. But in the present connexion it needs to be emphasized that the Court was not, strictly speaking, correct in implying that a treaty which provides for acceptance of jurisdiction with respect to "disputes" between the parties is one which has "retroactive effects" ; because the treaty, for the very reason that it cannot have retroactive effects, applies only to *disputes* arising or *continuing to exist* after its entry into force. What the limitation clauses really do is to limit the scope of the acceptance of jurisdiction to "new" disputes rather than to deprive the treaty of "retroactive effects".[31]

(4) On the other hand, when a jurisdictional clause is found not in a treaty of arbitration or judicial settlement but attached to the substantive clauses of a treaty as a means of securing their due application, the non-retroactivity principle does operate indirectly to limit *ratione temporis* the application of the jurisdictional clause. The reason is that the "disputes" with which the clause is concerned are *ex hypothesi* limited to "disputes" regarding the interpretation and application of the substantive provisions of the treaty which, as has been seen, do not normally extend to matters occurring before the treaty came into force. In short, the disputes clause will only cover pre-treaty occurrences in exceptional cases, like Protocol XII to the Treaty of Lausanne,[32] where the parties have expressly or by clear implication indicated their intention that the substantive provisions of the treaty are to have retroactive effects. Thus no such intention is to be found in the European Convention for the Protection of Human Rights and Fundamental Freedoms, and the European Commission of Human Rights has accordingly held in numerous cases that it is incompetent to entertain complaints regarding alleged violations of human rights said to have occurred prior to the entry into force of the Convention with respect to the State in question.[33]

[28] *P.C.I.J.* (1924) Series A, No. 2, p. 34.
[29] *Ibid.*, p. 35.

[30] *P.C.I.J.* (1938) Series A/B, No. 74, p. 24.

[31] The application of the different forms of clause limiting *ratione temporis* the acceptance of the jurisdiction of international tribunals has not been free from difficulty and the case-law of the two World Courts now contains a quite extensive jurisprudence on the matter. Important although this jurisprudence is in regard to the Court's jurisdiction, it concerns the application of particular treaty clauses, and the Special Rapporteur does not consider that it calls for detailed examination in the context of the general law of treaties.

[32] See paragraph (2) of this commentary.

[33] See *Yearbook of the European Convention of Human Rights* (1955-1957), pp. 153-159 ; (1958-1959), pp. 214, 376, 382, 407, 412, 492-494 ; (1960), pp. 222, 280, 444 ; and (1961), pp. 128, 132-145, 240, 325.

(5) The fact that a matter first arose prior to the entry into force of a treaty does not, however, prevent it from being caught by the provisions of the treaty if the matter still continues to arise after the treaty has come into force. The non-retroactivity principle can never be infringed by applying a treaty to matters that arise when the treaty is in force, even if they first began at an earlier date. Thus, while the European Commission of Human Rights has not considered itself competent to inquire into the propriety of legislative, administrative or judicial acts completed and made final before the entry into force of the European Convention, it has not hesitated to assume jurisdiction where there were fresh proceedings or recurring applications of those acts after the Convention was in force. In the case of *De Becker*,[34] for example, the applicant had been convicted by Belgian military courts prior to the entry into force of the European Convention of collaboration with the enemy, and had in consequence been automatically deprived for life of certain civil rights by the operation of article 123 *sexies* of the Belgian Penal Code. The Commission, while underlining its lack of competence to inquire into the judgements of the military courts, admitted De Becker's application in so far as it related to the continuing deprivation of his civil rights after Belgium became a party to the Convention. The matter that was held to fall under the jurisdiction of the Commission was not the conviction of the applicant as a collaborator, but the compatibility of article 123 *sexies* of the Penal Code with the Convention after its entry into force with respect to Belgium. The mere continuance of a situation after a treaty comes into force does not suffice to bring the fact which produced that situation within the régime of the treaty. The matter claimed to fall under the provisions of the treaty must itself occur or arise after the treaty came into force. Accordingly, the European Commission has expressly held in other cases that the mere fact that the applicant is still serving his sentence does not have the effect of bringing under the provisions of the Convention the judicial proceedings which are the source of that sentence, when the judgement was already final before the Convention came into force.[35]

(6) It scarcely needs to be pointed out that the non-retroactivity principle discussed in the preceding paragraphs and embraced in the present article is quite independent of the question of the non-retroactive effect of " ratification " dealt with in article 23, paragraph 4, of part I. That provision, as pointed out in the Commentary to article 23, simply negatives the idea that a " ratification ", when it takes place, brings the treaty into force for the parties retroactively as from the date of signature. The non-retroactivity principle dealt with in the present article is a general principle excluding the application of treaties to facts or matters antecedent to their entry into force, by whatever process this may take place.

(7) *Subsequent facts or matters.* Equally, a treaty is not to be considered as having any effects with regard

to facts or matters occurring or arising after its termination, unless a contrary intention is expressed in the treaty or is clearly to be implied from its terms. A fact or matter which occurs or arises after the termination of a treaty is not brought within its provisions merely because it is a recurrence or continuation of a fact or matter which occurred or arose during the period of the treaty and was then governed by its provisions.

(8) *Paragraph 1* of the article accordingly states that, unless a treaty expressly or impliedly provides otherwise, the application of its provisions is limited for each party to facts or matters arising or subsisting while the treaty is in force with respect to the party in question.

(9) *Paragraph 2*, underlines that the termination of a treaty or the suspension of its operation does not put an end to the rights and obligations of the parties under the treaty with respect to facts or matters which arose or subsisted whilst it was in force. The point almost goes without saying, but it seems desirable to state it in order to prevent any misunderstanding and to avoid any appearance of inconsistency with the provisions of article 53 regarding the legal consequences of the termination of treaties.

*Article 58. — Application of a treaty to the territories of a contracting State*

A treaty applies with respect to all the territory or territories for which the parties are internationally responsible unless a contrary intention

    (*a*) is expressed in the treaty ;

    (*b*) appears from the circumstances of its conclusion or the statements of the parties ;

    (*c*) is contained in a reservation effective under the provisions of articles 18 to 20 of these articles.

*Commentary*

(1) Sometimes the provisions of a treaty expressly relate to a particular territory or area, e.g. the Antarctic Treaty ;[36] and in that event the territory or area in question is undoubtedly the object to which the treaty applies. But this is not what the territorial application of a treaty really signifies, nor in such a case is the application of the treaty confined to the particular territory or area. The " territorial application " of a treaty signifies the territories which the parties have purported to bind by the treaty and which, therefore, are the territories affected by the rights and obligations set up by the treaty. Thus, although the enjoyment of the rights and the performance of the obligations contained in a treaty may be localized in a particular territory or area, as in the case of Antarctica, it is the territories with respect to which each party contracted in entering into the treaty which determine its territorial scope.

(2) The territorial application of a treaty is essentially a question of the intention of the parties. Some treaties contain clauses dealing specifically with their territorial scope. For example, certain League of Nations treaties

[34] See *Yearbook of the European Convention of Human Rights* (1958-1959), pp. 230-235.

[35] E.g. Application No. 655/59 ; *Yearbook of the European Convention of Human Rights* (1960), p. 284.

[36] Dated 1 December 1959 ; text in *United Nations Treaty Series*, vol. 402.

concerning opium were specifically restricted to the Far Eastern territories of the contracting States.[37] Other cases are the so-called " colonial " and " federal " clauses,[38] by which it is sought to make special provision regarding the application of a treaty to the dependent territories of a colonial Power, or for its application to the component territories of a federal State. Again, treaties, although they do not deal specifically with the question, may indicate their territorial scope by reason of their subject-matter, their terms or the circumstances of their conclusion. For example, when the Ukraine and Byelorussia are signatories to a treaty as well as the USSR, the implication is that the territorial scope of the latter's signature is restricted to the other thirteen States of Soviet Union. Where the intention of the parties as to the territorial scope of the treaty has, in one way or another, been made clear, that intention necessarily determines the matter.

(3) The object of the present article is to provide a rule to cover the cases where the intention of the parties concerning the territorial scope of the treaty is not clear. If regard is had only to the " metropolitan " territories of the contracting States, there seems to be complete agreement that in entering into a treaty a State is to be presumed to intend to engage its responsibility with respect to all the " metropolitan " territories over which it has sovereignty. Thus, one writer on the law of treaties formulates the general principle as follows : [39]

" En règle générale, le traité international déploie ses effets sur l'ensemble du territoire soumis à la compétence plénière (souveraineté) de l'Etat, si l'on suppose celui-ci doté d'une structure simple ou unitaire. En d'autres termes, il y a coïncidence exacte entre la sphère d'application spatiale du traité et l'étendue territoriale soumise à la souveraineté étatique."

And the same writer points out that French treaties are automatically applicable to the whole of metropolitan France, that is to continental France and to the adjacent islands, including Corsica. A recent English work [40] on the law of treaties also states :

" The treaty, however, may be of such a kind that it contains no obvious restriction of its application to any particular geographical area, e.g. a treaty of extradition, or a treaty undertaking to punish genocide, or the slave traffic, or abuse of the Red Cross emblem ; in such a case the rule is that, subject to express or implied provision to the contrary, the treaty applies to all the territory of the contracting party."

Indeed, this book adds the words " whether metropolitan or not ", but the question of non-metropolitan

territories is more controversial and will receive detailed consideration in paragraphs (6)-(9) below.

(4) The rule that a treaty is to be presumed to apply with respect to all the territories under the sovereignty of the contracting parties means that each State must make its intention plain, expressly or by implication, in any case where it does not intend to enter into the engagements of the treaty on behalf of and with respect to all its territory. Such a rule seems to be essential if contracting States are to have any certainty and security as to the territorial scope of each other's undertakings. That this is the rule acted upon in State practice is borne out by the fact that States intending to contract with respect to all the metropolitan territory under their sovereignty do not usually specify that they are so doing. They rely upon the general presumption to that effect, and mention particular territories only when there are special reasons for doing so. This is well illustrated by the practice of the United Kingdom with regard to the Channel Islands and the Isle of Man, which have their own systems of law and government. Formerly, these several islands were regarded as belonging to the metropolitan territory of the United Kingdom, and no special mention was normally made of them in United Kingdom treaty practice.[41] But the large measure of autonomy possessed by these islands led in 1950 to a change in the practice. " Metropolitan " treaties of the United Kingdom are now either made in the name only of Great Britain and Northern Ireland [42] or the treaty defines the territory to which it applies in such a way as to limit its application to Great Britain and Northern Ireland.[43] Where the island governments desire to be included in such treaties they are specially mentioned ; [44] and in treaties of a general character which provide for extension to non-metropolitan territories, they now appear amongst the latter.[45] They are covered by the signature of the United Kingdom only when there is nothing to indicate that it does not extend to all the territories for which the United Kingdom is internationally responsible ; in other words, when the presumption operates.[46]

(5) Similarly, it was the very fact that a State will normally be presumed to enter into the engagements of

---

[37] E.g. Geneva Agreement of 11 February 1925 concerning the Suppression of the Manufacture of, Internal Trade in, and Use of Prepared Opium, *League of Nations, Treaty Series*, vol. 51 ; Hudson, *International Legislation*, vol. III. p. 1580.

[38] See examples in the United Nations *Handbook of Final Clauses* (ST/Leg/6), pp. 81-90.

[39] C. Rousseau, *Principes généraux du droit international public* (1944), p. 379.

[40] Lord McNair, *Law of Treaties* (1961), pp. 116 and 117.

[41] See Lord McNair, *op. cit.*, p. 118, note 2 ; this note is correct as to the former but not as to the present practice.

[42] E.g. Agreement between the Government of Great Britain and Northern Ireland and the USSR on Relations in the Scientific, Technological, Educational and Social Fields 1963-1965 (United Kingdom Treaty Series No. 42 of 1963).

[43] E.g. the Convention of 1961 between Austria and Great Britain for the Reciprocal Recognition and Enforcement of Foreign Judgments defines the United Kingdom as comprising England and Wales, Scotland and Northern Ireland (United Kingdom Treaty Series No. 70 of 1962).

[44] E.g. an Exchange of Notes with Honduras for the Abolition of Visas refers to the United Kingdom of Great Britain and Northern Ireland, the Channel Islands and the Isle of Man (United Kingdom Treaty Series No. 62 of 1962).

[45] E.g. European Convention on Human Rights and Fundamental Freedoms of 1950 ; Geneva Convention of 1956 on Taxation of Motor Vehicles (United Kingdom Treaty Series No. 43 of 1963) ; International Wheat Agreement of 1962 (United Kingdom Treaty Series No. 15 of 1963).

[46] E.g. The Geneva Convention of 1958 on the High Seas (United Nations Treaty Series, Vol. 450).

a treaty with respect to all its territory that led some federal States to seek the insertion of a " federal " clause in treaties which deal with matters reserved under their constitutions to the component states of the federation. The aim of this type of clause is to prevent those provisions of the treaty which concern matters falling within the competence of the individual component states from becoming binding upon the federation until each component state has taken the necessary legislative action to ensure the implementation of those provisions. Under the Constitution of the International Labour Organisation conventions drawn up by that Organisation are subject to such a clause. " Federal " clauses also appear in a number of other kinds of multilateral treaty, though in recent years opposition has developed in the United Nations to their use in multilateral instruments drawn up within or under the auspices of the Organisation.

(6) The question remains as to whether any different rule obtains in the case of territories not geographically part of or adjacent to the principal territory of the State. In one case [47] the Supreme Court of Cuba, when declining to apply a Cuban-United States commercial treaty of 1902 to Philippine products, said : " The generally recognized custom in the international agreements of colonizing nations or of those possessing separate territories of different ethnic unity, was to refer to such possessions either by name, when making such treaties, or to extend the provisions to all such possessions by a provision in the treaty ". The same view was expressed in 1944 by the French writer cited in paragraph (3) of this commentary : [48] "Réserve faite de l'hypothèse où, par son objet, un traité concerne exclusivement des colonies, les traités conclus par un Etat ne s'étendent pas de plein droit à ses colonies." This statement seems, however, to have been based primarily upon the position of France's overseas territories under the pre-1946 French Constitution and on the jurisprudence of French tribunals, although this jurisprudence was to some extent divided on the point. At any rate, in a later work [49] the same writer has explained that under the post-war French Constitution : " Sauf précisions spéciales, un instrument de ratification ' au nom de la République Française ' s'étend à tous les territoires visés à l'Article 60 de la Constitution, c'est-à-dire à la France métropolitaine, aux départements et aux territoires d'outre-mer."

(7) State practice does not, in fact, appear to justify the conclusion that a treaty applies to overseas territories only if they are specifically mentioned in the treaty. On the contrary, it seems to have been based on the opposite hypothesis, i.e. that a treaty automatically embraces all the territories of the contracting parties unless a contrary intention has been expressly stated or can be inferred. Denmark, for example, seems from quite early times to have con-

sidered it necessary to provide specifically for the exclusion of her overseas possessions whenever she desired to limit the scope of her engagements to Denmark itself. This practice, it happens, came under the notice of the Permanent Court in the *Eastern Greenland* case : [50]

" In order to establish the Danish contention that Denmark has exercised in fact sovereignty over all Greenland for a long time, Counsel for Denmark have laid stress on the long series of conventions —mostly commercial in character — which have been concluded by Denmark and in which, with the concurrence of the other contracting Party, a stipulation has been inserted to the effect that the convention shall not apply to Greenland. In date, these conventions cover the period from 1782 onwards ... In many of these cases, the wording is quite specific ; for instance, Article 6 of the Treaty of 1826 with the United States of America : ' The present Convention shall not apply to the Northern possessions of His Majesty the King of Denmark, that is to say, Iceland, the Faroe Islands and Greenland '."

Similarly, it was only because British treaties were presumed to apply to all territories for which Great Britain was internationally responsible that she began about 1880 to ask for the insertion of the so-called " colonial " clause in treaties dealing with commerce or internal affairs.[51] The growing autonomy of Canada, Australia, New Zealand and other territories made it unacceptable for Great Britain to commit them to be bound by these treaties without their concurrence in the text of the treaty. Accordingly, at this date there began to appear in many treaties, both bilateral and multilateral, a clause providing that the treaty was not to apply to overseas territories unless and until notification had been given to that effect.[52] It is true that these clauses have equally often been framed in an affirmative form, authorizing the parties to " extend " the application of the treaty to non-metropolitan territories or to declare the treaty applicable with respect to them.[53] But these affirmative forms of the clause do not seem to have been based on a view that, in the absence of any territorial application clause, the operation of the treaty would have been confined to metropolitan territory. On the contrary, they seem to have been designed to negative by implication the automatic application of the treaty to non-metropolitan territories and to provide in its place a convenient procedure for the piecemeal extension of the treaty

---

[47] Reciprocity Treaty (Philippine Islands) case, 1929-30, *Annual Digest of International Law Cases*, Case No. 231.

[48] C. Rousseau, *Principes généraux du droit international public* (1944), p. 381.

[49] C. Rousseau, "L'évolution du droit public", *Etudes en l'honneur d'Achille Mestre* (1956), p. 490 ; see also the same writer in *Droit international public* (1953), p. 45.

[50] *P.C.I.J.* (1933) Series A/B No. 53, at p. 51.

[51] See generally J. E. S. Fawcett, *British Yearbook of International Law* (1949), vol. 26, pp. 93-100 ; Lord McNair, *Law of Treaties* (1961), pp. 116-119.

[52] E.g. Anglo-Italian Treaty of Commerce and Navigation of 1883 (Hertslet, *Commercial Treaties*, vol. XV, p. 776 ; Geneva Convention of 1923 for the Simplification of Customs Formalities (*League of Nations Treaty Series*, vol. 30 ; Hudson, *International Legislation*, vol. II, pp. 1118-1119). Twenty treaties with clauses of this kind negativing the application of the treaty to overseas territories are listed by Rousseau, *Principes généraux du droit international public* (1944), p. 385.

[53] E.g. the Convention of 1886 for the Protection of Literary and Scientific Works (*British and Foreign State Papers*, vol. 77, p. 28) ; and for modern examples see the United Nations *Handbook of Final Clauses* (ST/Leg/6), pp. 81-84 and 87-89.

to these territories as and when any necessary consents of the autonomous governments were obtained. In any event, the general understanding today clearly is that, in the absence of any territorial clause or other indication of a contrary intention, a treaty is presumed to apply to all the territories for which the contracting States are internationally responsible.[54] That this is the general understanding appears from the statements of delegates in debates on the colonial clause in the United Nations,[55] while the Secretariat of the United Nations has more than once stated that it is upon this view of the law that the Secretary-General bases his practice as depositary of multilateral agreements.[56] Thus, paragraph 138 of the Secretariat memorandum on succession of States in relation to treaties of which the Secretary-General is depositary (A/CN.4/150) summarizes the United Nations practice as follows: " If there is no provision on territorial application action has been based on the principle, frequently supported by representatives in the General Assembly, that the treaty was automatically applicable to all the dependent territories of every party."

(8) The territorial scope of a treaty, as previously stated, is essentially a question of the intention of the parties, and in recent years the insertion of territorial application clauses in certain multilateral treaties has met with opposition.[57] However, the present article is concerned only with the cases where the parties have not made any special provision, either expressly or impliedly, in regard to the territorial scope of the treaty and, for the reasons given above, it is thought that the appropriate and generally accepted rule in such cases is that the treaty applies to all the territories for which the contracting States are internationally responsible. It is this rule, therefore, which is expressed in the article.

*Article 59. — Extension of a treaty to the territory of a State with its authorization*

The application of a treaty extends to the territory of a State which is not itself a contracting party if —

   (a) the State authorized one of the parties to bind its territory by concluding the treaty;

   (b) the other parties were aware that the party in question was so authorized; and

---

[54] See Lord McNair, *Law of Treaties* (1961), pp. 116 and 117; S. Rosenne, *Recueil des Cours de l'Académie de droit International* (1954), vol. II, pp. 374 and 375.

[55] See *Summary of Practice of the Secretary-General as Depositary of Multilateral Agreements* (ST/Leg/7), p. 49; cf. also the contention of the United Kingdom that the absence of such a clause would make it necessary for her to delay acceptance of the treaty with respect to her metropolitan territory until the assent of non-metropolitan territories had been obtained.

[56] See *Summary of Practice, etc.* (ST/Leg/7), paras. 102-103; *Succession of States in relation to General Multilateral Treaties of which the Secretary-General is Depositary* in Yearbook of the International Law Commission, 1962, vol. II, p. 115, paras. 73 and 74 and p. 123, para. 138.

[57] See Yuen-li Liang, *A.J.I.L.*, 1951, p. 108; R. Higgins, *The Development of International Law through the Political Organs of the United Nations* (1963), pp. 309-316.

(c) the party in question intended to bind the territory of that State by concluding the treaty.

*Commentary*

(1) The previous article covers the application of a treaty to a State's own territories. The present Article deals with the different case of the application of a treaty made by one State to the territory of another State by reason of an authority conferred by the latter upon the former to include its territory within the régime of the treaty. When one State delegates to another authority to enter into a treaty or into certain categories of treaties on its behalf, it is possible to envisage two different solutions. The intention may be to constitute the State on whose behalf the treaty is concluded an actual party to the treaty, or it may merely be to bring that State within the treaty régime under the umbrella of the State negotiating the treaty. The latter type of case appears to be essentially one of the " territorial application " of treaties, and it is this type with which the present Article deals.

(2) The commercial and customs treaties of Liechtenstein are a good example of the cases covered by this Article. The Swiss-Liechtenstein Treaty of 1923 for the incorporation of Liechtenstein in the Swiss Customs Territory[58] provided in article 7:

   "En vertu du présent traité, les traités de commerce et de douane conclus par la Suisse avec des Etats tiers s'appliqueront dans la Principauté de la même manière qu'en Suisse, sous réserve des engagements qui résultent pour la Suisse de traités déjà en vigueur."

In article 8 there was an undertaking by Liechtenstein not to conclude treaties on its own account, and the article then continued:

   " La Principauté de Liechtenstein autorise la Confédération Suisse à la représenter dans les négociations qui auront lieu avec les Etats tiers, pendant la durée du présent traité, en vue de la conclusion de traités de commerce et de douane, et à conclure ces traités avec pleins effets pour la Principauté."

The combined result of these two articles clearly is that an express authority is conferred upon Switzerland to conclude commercial and customs treaties having territorial application to Liechtenstein; and that is the way in which these articles seem to have been interpreted in the bilateral treaty-practice of the two States. The commercial and customs treaties of Switzerland apply equally in Liechtenstein.

(3) Application of a treaty to the territory of a State not an actual party to the treaty in consequence of a delegation of treaty-making authority also appears to occur in the case of some treaties made by international organizations, where the treaty is concluded not merely for the organization as such but also for the individual member States. Thus, article 228 of the Treaty of 1957 establishing the European Economic Community,[59] after providing for the conclusion of certain types of

---

[58] *League of Nations Treaty Series*, vol. 21, p. 232.

[59] *United Nations Treaty Series*, vol. 298 [English translation].

agreements by the Community through its Council, states: " Agreements concluded under the conditions laid down above shall be binding on the institutions of the Community and on Member States." This article would appear to make the Community itself the party to the agreements which it concludes and the Member States territories to which the agreements apply. Article 206 of the Treaty of 1957 establishing the European Atomic Energy Community[60] also provides that this Community may conclude certain types of agreement but does not make any statement as to the binding effects of the agreements. However, it seems that Euratom treaties, though regarded as made by the Community alone, apply automatically in the territories of the Member States. The Agreements of 1958 for Co-operation between Euratom and the United States of America[61] for example, actually defines the term " parties " as meaning the Government of the United States and Euratom, whereas the detailed provisions of the treaty clearly assume that the treaty will be binding on the territories of the Member States.[62] In drawing attention to these cases the Special Rapporteur does not wish to be understood as taking any definite position in regard to the territorial application of treaties concluded by organizations. The cases are mentioned merely for the purpose of illustrating the possible significance of the principle formulated in this article in connexion with the treaties of international organizations.

(4) A nice question may sometimes, however, arise as to whether a delegation of authority has the effect of extending the territorial application of the treaty to the State conferring the authority or whether it constitutes that State an actual party to the treaty. The treaties made by Belgium for the Belgo-Luxembourg Economic Union, for example, do not appear to fall under the present article ; they appear rather to fall under the next article, which concerns cases where a State does not itself participate in the conclusion of a treaty but becomes an actual party to it through the agency of another State. Article 5 of the Belgo-Luxembourg Convention of 1921[63] for establishing the Economic Union contained a clause under which Belgium undertook to try and bring about the extension of *existing* Belgian economic and commercial treaties to Luxembourg. It then provided: " Les futurs traités de commerce et accords économiques seront conclus · par la Belgique au nom de l'Union douanière." If this language may be a little equivocal on the point now under discussion, treaty practice seems to show that Luxembourg is itself a party to " Union " treaties concluded by Belgium under that article. Thus, the preamble to a Commercial Agreement between the Union and Mexico in 1950[64] reads: "Le Gouvernement belge, agissant tant en son nom qu'au nom du Gouvernement luxembourgeois en vertu d'accords existants." The question whether the case is to be considered as one of territorial

application or participation through an agent would seem essentially to depend on the intention of the States concerned and of the other parties to the treaty. The present article, as already pointed out, is confined to cases of the territorial application of a treaty made by one State to the territory of another in virtue of a delegated authority to make the treaty so applicable.

(5) The article therefore lays down that when a party (i.e. either a State or an organization) to a treaty is duly authorized by a State to bind that State's territory, and the other parties are aware of the authorization, the treaty applies to the territory of that State, provided always that such was the intention of the party in question.

*Article 60. — Application of a treaty
concluded by one State on behalf of another*

1.   When a State, duly authorized by another State to do so, concludes a treaty on behalf and in the name of the other State, the treaty applies to that other State in the capacity of a party to the treaty. It follows that the rights and obligations provided for in the treaty may be invoked by or against the other State in its own name.

2.   Similarly, when an international organization, duly authorized by its constituent instrument or by its established rules, concludes a treaty with a non-member State in the name both of the organization and of its Member States, the rights and obligations provided for in the treaty may be invoked by or against each Member State.

*Commentary*

(1) The difference between the cases covered by this article and those dealt with in the previous article has already been referred to in paragraph (4) of the commentary to the previous article. In the cases here in question one State gives its consent to a treaty through the agency of another, with the intention of becoming a party to the treaty. The concept of agency has received comparatively little development in the law of treaties. The multiplicity of international conferences today and the volume of international intercourse has made it not uncommon for one State to use the services of another for the conclusion of a treaty, more especially a treaty in simplified form.[65] But when this occurs, what usually happens is that one State lends the services of its diplomatic agent to another State for the purpose of the conclusion of a treaty by him in the name of that other State. The other State, by the issue of "full powers" or other credentials, invests the diplomatic agent with its authority to conclude the treaty, and the diplomat, for the purposes of the treaty, has the character of a diplomatic agent of that State. This is not, of course, a case of one *State* acting for another, and it is not the kind of agency with which the present article is concerned.

[60] *Ibid* [English translation].

[61] *United Nations Treaty Series*, vol. 335 and vol. 338.

[62] See generally P. Pescatore, *Recueil des Cours de l'Académie de droit international, 1961*, vol. II, pp. 133-137.

[63] *League of Nations Treaty Series*, vol. IX.

[64] *United Nations Treaty Series*, vol. 188.

[65] See, for example, the incident mentioned by H. Blix. *Treaty-Making Power*, p. 12, where a Norwegian delegate signed a Convention on behalf both of Norway and Sweden. Commonwealth States on occasions use the services of United Kingdom representatives in this way.

(2) The commercial and economic treaties of the Belgo-Luxembourg Economic Union were mentioned in paragraph (4) of the commentary to the previous article as examples of treaties made by one State through the agency of another. Although the instances may not be numerous,[66] the expanding diplomatic activity of States and the variety of their associations with one another may lead more frequently to cases where one State acts for another in the conclusion of a treaty. Accordingly, it seems desirable to provide for this contingency in the draft articles on the law of treaties.

(3) *Paragraph 1* of the article therefore provides for such cases as the commercial and economic treaties entered into by the Belgo-Luxembourg Union by recognizing the possibility of a State's becoming an actual party to a treaty through another State's conclusion of the treaty on its behalf. In such cases it would seem only logical that, being a party, the former State may invoke the treaty, and be liable to have the treaty invoked against it, in its own name.

(4) The question may also be posed as to how far the institution of "agency" may play a rôle in cases where treaties are concluded by international organizations on behalf of their members. In paragraph (3) of the commentary to the previous article reference was made to treaties concluded by the European Economic Community and by Euratom where the principle of territorial application appears to be contemplated rather than that of agency. It is easy, however, to imagine cases, especially in the economic sphere, where the Organization intends to conclude a treaty with a third State on behalf of its Member States in such a manner as to place them individually in the position of parties to the treaty.

(5) Two recent judgements of the International Court, in the *South West Africa* cases [67] and in the *Northern Cameroons* case,[68] have been concerned with the rights of members of an organization under treaties concluded pursuant to a provision contained in the constitution of the organization. In the *South West Africa* cases the complexity of the legal acts creating the Mandate gave rise to sharp divisions in the Court as to its legal basis, some Judges considering that it was constituted by a treaty, others that it resulted from a legislative act by the Council of the League. The majority of the Court upheld both the character of the Mandate as a "treaty in force" and the right of two States to avail themselves of a provision in the Mandate conferring a right upon "Members of the League of Nations". But it is not easy to discern in the judgements exactly what legal relation the Court considered the two States to have to the treaty. One Judge, it is true, placed himself squarely upon the principle of *stipulation pour autrui*, rejecting the idea that the plaintiff States could be considered "parties" to the Mandate. The other

Judges in the majority did not push their analysis of the legal position to the point of indicating whether they regarded the two States as "parties", either directly or indirectly, to the Mandate treaty, or as beneficiaries of a *stipulation pour autrui*, or as entitled to exercise the right conferred by the Mandate on some other basis connected with their membership of the Organization. In the *Northern Cameroons* case the legal basis of the Trusteeship Agreement was less complex and received little examination from the majority of the Judges, while the Court decided the case on a special ground. Although references were made in the main judgement and in individual opinions to the rights of Members of the United Nations under the Agreement, these references were in terms which left open the question of the true juridical relation of Members of the Organization to the Agreement. These two cases do not therefore provide any clear guidance on this issue ; and in any event, whether or not the treaties in these cases are properly to be considered as having been made by the Organization, the treaties were made with Members of the Organization. Such treaties raise special problems of the law governing international organizations which it seems advisable to leave for consideration by the Commission in connexion with its study of the relations between States and intergovernmental organizations. Accordingly, paragraph 2 of the present article is confined to treaties made by organizations with third States.

(6) *Paragraph 2* therefore provides that the same result will follow as in paragraph 1 when an organization contracts with a third State not merely on behalf of the organization as a collective legal person but also on behalf of its Member States individually.

### Article 61. — Treaties create neither obligations nor rights for third States

1. Except as provided in article 62 and 63, a treaty applies only between the parties and does not

    (a) impose any legal obligations upon States not parties to the treaty or modify in any way their legal rights ;

    (b) confer any legal rights upon States not parties to the treaty.

2. Paragraph 1 is without prejudice to any obligations and rights which may attach to a State with respect to a treaty under part I of these articles prior to its having become a party.

*Commentary*

(1) There appears to be almost universal agreement that the rule laid down in paragraph 1 of this article — that a treaty applies only between parties — is the fundamental rule governing the effect of treaties upon third States.[69] It appears originally to have been derived

---

[66] In the light of the Court's statement in the case of the *Rights of United States Nationals in Morocco* that even during the Protectorate Morocco retained her personality as a State (*I.C.J. Reports, 1962*, pp. 185 and 188), it may be that there was an element of "agency" in the treaties concluded by France on behalf of Morocco during the Protectorate.

[67] *I.C.J. Reports, 1962*, p. 319.

[68] *I.C.J. Reports, 1963*, p. 15.

[69] Professor G. Scelle, stressing the difference in character between treaties and private law contracts, went so far as to object to the application between States of the principle *pacta tertiis nec nocent nec prosunt*, a principle devised for the private law contractual relations of individuals (*Précis de droit des gens*, tome II, 1934, pp. 345-346 and 367-368). But he is alone in disputing the validity in international law of the *pacta tertiis* principle as a general principle of the law of treaties.

from Roman law in the form of the well-known maxim *pacta tertiis nec nocent nec prosunt* — agreements neither impose obligations nor confer benefits upon third parties. In international law, however, the justification for the rule does not rest simply on this general concept of the law of contract but on the sovereignty and independence of States. Moreover, treaties have special characteristics which distinguish them in important respects from civil law agreements, and it seems more correct today to regard the rule that a treaty applies only between the parties as an independent rule of customary international law. Whatever may be its basis, there is abundant evidence of the recognition of the rule in State practice and in the decisions of international tribunals, as well as in the writings of jurists. Indeed, so clearly established is the general rule that it is thought sufficient for the purposes of the present report to draw attention to some of the principal pronouncements of international tribunals in which the rule has been recognized. These pronouncements cover both aspects of the rule — the imposition of obligations and the conferment of rights.

(2) *Obligations*. International tribunals have been extremely firm in laying down that in principle treaties, whether bilateral or multilateral, neither impose any obligation on States which are not parties to them nor modify in any way their legal rights without their consent. That this is the position with regard to bilateral treaties was considered by Judge Huber in the *Island of Palmas* case [70] to be elementary. Dealing with a supposed recognition of Spain's title to the island in treaties concluded by that country with other States, he said : "it appears further to be evident that Treaties concluded by Spain with third Powers recognizing her sovereignty over the "Philippines" could not be binding upon" the Netherlands.[71] Again, dealing with the possible effect on the Netherlands' titles of the Treaty of Paris of 1898 concluded between Spain and the United States, he said : [72] "Whatever may be the right construction of a treaty, it cannot be interpreted as disposing of the rights of independent third Powers" ; and in a later passage [73] he emphasized that "the inchoate title of the Netherlands could not have been modified by a treaty concluded between third Powers". According to Judge Huber, therefore, treaties concluded by Spain with the United States or with other third States were *res inter alios acta* which could not, as treaties, be in any way binding upon the Netherlands.

(3) In the case of the *Free Zones of Upper Savoy and the District of Gex* [74] it was a major multilateral treaty — the Versailles Peace Treaty — which was in question, and France took the position that article 435 of the Treaty had had the effect of abolishing the free customs zones set up between herself and Switzerland under territorial arrangements drawn up at the Congress of Vienna in 1815. The Permanent Court found that

article 435 could not in fact be read as providing for the automatic abolition of the free zones ; but it then added :

"even were it otherwise, it is certain that, in any case, Article 435 of the Treaty of Versailles is not binding upon Switzerland, who is not a Party to that Treaty, except to the extent to which that country accepted it."

In the *River Oder Commission* case [75] the Permanent Court declined to regard a general multilateral treaty of a law-making character — the Barcelona Convention of 1921 on the Régime of Navigable Waterways of International Concern — as binding upon Poland, which was not a party to the treaty. The facts of that case make the precedent a particularly strong one. The Treaty of Versailles in establishing an international régime for the River Oder had provided for the super-session of this régime by a new one "to be laid down in a general convention drawn up by the Allied and Associated Powers, and approved by the League of Nations". Although Poland was a party to the Treaty of Versailles, and although the Barcelona Convention was the "general convention" provided for in the Treaty and had been signed by Poland, the Court held that the general convention was not binding upon her because she had failed to ratify it. Nor in the *Eastern Carelia* case [76] did the Permanent Court take any different position with regard to the Covenant of the League of Nations itself. Called upon to consider the effect of Article 17 on the obligations of a non-member State respecting the pacific settlement of disputes, the Court said :

"As concerns States not Members of the League, the situation is quite different ; they are not bound by the Covenant. The submission . . . . . of a dispute between them and a Member of the League for solution according to the methods provided for in the Covenant, could take place only by virtue of their consent. Such consent, however, has never been given by Russia."

Similarly, the present Court has held in the case of the *Aerial Incident of 27 July 1955* [77] that Article 36, paragraph 5, of the Statute of the Court, which is an integral part of the Charter of the United Nations, was "without legal force so far as non-signatory States were concerned", and could not affect the position of States which were not Members of the United Nations at the time when the Permanent Court ceased to exist.

(4) *Rights*. The leading statement of the rule that a treaty does not normally confer any rights upon non-parties is perhaps that of the Permanent Court in the case of certain *German Interests in Polish Upper Silesia*.[78] In that case Poland sought to claim rights under the Armistice Convention of the First World War and under the Protocol of Spa, although not a signatory to either of these instruments. Her argument was that she ought to be considered as having tacitly

[70] (1928) *U.N.R.I.A.A.* vol. II, p. 831.
[71] *Ibid.*, p. 850.
[72] *Ibid.*, p. 842.
[73] *Ibid.*, p. 870.
[74] *P.C.I.J.* (1932) Series A/B No. 46, p. 141 ; and see also (1929) Series A No. 22, p. 17.

[75] *P.C.I.J.* (1929) Series A No. 23, pp. 19-22.
[76] *P.C.I.J.* (1923) Series B/5, pp. 27-28.
[77] *I.C.J. Reports, 1959*, p. 138.
[78] *P.C.I.J.* (1926) Series A No. 7.

adhered or acceded to them. To this argument the Court replied :

"The instruments in question make no provision for a right on the part of other States to adhere to them. It is, however, just as impossible to presume the existence of such a right — at all events in the case of an instrument of the nature of the Armistice Convention — as to presume that the provisions of these instruments can *ipso facto* be extended to apply to third States. A treaty only creates law as between the States which are parties to it ; in case of doubt, no rights can be deduced from it in favour of third States."

In that case, it will be observed, Poland did not claim as a third-party beneficiary of the substantive rights created by the Armistice Convention and the Protocol of Spa. She claimed rather to have had a third-party right to adhere or accede to the treaties, and by that means to have become entitled to enforce them. The Court, however, said categorically that a treaty only creates law between the parties and that, in case of doubt as to the intentions of the parties, no right, whether a substantive right or a right to become a party, can be deduced from a treaty in favour of a third State.

(5) Examples of the application of this rule to sub-stantive rights can readily be found in the jurisprudence of arbitral tribunals. Thus, in the *Pablo Nájera* arbitra-tion [79] the question arose whether Mexico, which was not a Member of the League of Nations, could invoke Article 18 of the Covenant for the purpose of contesting France's right to bring a claim before the Tribunal under a Franco-Mexican Convention of 1924. Article 18 prescribed that every treaty entered into by any Member of the League should forthwith be registered with the Secretariat and should not be binding until so registered. Mexico contended that France, not having registered the 1924 Convention, could not put it forward as a valid treaty in her relations with Mexico. This conten-tion was rejected by the tribunal, which said that a non-member State was "tout à fait étranger à l'engage-ment contracté par les membres" and that Mexico was not therefore entitled to invoke a provision of the Covenant against France. Similarly, in the *Clipperton Island* [80] arbitration the arbitrator held that Mexico was not entitled to invoke against France the provision of the Act of Berlin requiring notification of occupations of territory, *inter alia*, on the ground that Mexico was not a signatory to that Convention. In the *Forests of Central Rhodope* case [81] Greece made a claim on behalf of Greek nationals whose property rights in the forests of Rhodope had been set aside by Bulgaria. The forests in question had been ceded by Turkey to Bulgaria in 1913 by the Treaty of Constantinople subject to the express provision that property rights, real or personal, acquired before the cession, were to be respected. Greece was not a party to that treaty, but after the First World War the Treaty of Neuilly, to which both she and Bulgaria were parties, provided

that transfers of territory under this treaty were not to prejudice the private rights protected under the Treaty of Constantinople. The arbitrator, whilst upholding Greece's claim on the basis of the provision in the Treaty of Neuilly, went out of his way to say : "jusqu'à la mise en vigueur du Traité de Neuilly le Gouvernement hellénique, n'étant pas signataire du Traité de Constantinople, n'avait pas de base juridique pour faire une réclamation appuyée sur les stipulations matérielles de ce Traité ".

(6) The general question as to how far the rule *pacta tertiis nec nocent nec prosunt* admits of exceptions in international law, which is one of some difficulty, is dealt with in the next article. The object of *paragraph 2* of the present article is simply to point out and to safe-guard certain apparent exceptions to the rule which are found in the treaty-making processes dealt with in part I of these articles. The most obvious case, perhaps, is the right attaching to a State under articles 8 and 9 to become a party to a treaty in the drawing up of which it had no hand. But the treaty-making procedures used for multilateral treaties make it quite normal for a State to have obligations and rights with respect to a treaty to which it is not yet a party. Thus, under articles 11, 16 and 17 a State may be under a certain obligation of good faith with respect to a treaty to which it has not yet become a party, while under other articles it may have certain procedural rights and obligations relating to ratification, accession, acceptance, approval, reservations, registration, the correction of errors, etc. The truth is that in inter-national law a State is frequently in the position of not being a party to a treaty and of yet not being entirely a stranger to it. Whether the obligations and rights of the State in these cases flow from the treaty itself or from another form of implied agreement linked to the treaty may be a question. But it seems desirable in the present article, in order to avoid any possibility of inconsistency, to make a general reservation regard-ing any obligations or rights which may attach to a State under part I with respect to a treaty prior to its having become a party. Paragraph 2 so provides.

### *Article 62. — Treaties providing for obligations or rights of third States*

1.  A State is bound by a provision of a treaty to which it is not a party if —

(a) the parties to the treaty intended that the provision in question should be the means of creating a legal obligation binding upon that particular State or a class of States to which it belongs ; and

(b) that State has expressly or impliedly con-sented to the provision.

2.  Subject to paragraph 3, a State is entitled to invoke a right provided for in a treaty to which it is not a party when —

(a) the parties to the treaty intended that the provision in question should create an actual right upon which that particular State, or a class of States to which it belongs, could rely ; and

(b) the right has not been rejected, either expressly or impliedly, by that State.

---

[79] (1928) *U.N.R.I.A.A.*, vol. V, p. 466.
[80] (1931) *U.N.R.I.A.A.*, vol. II, p. 1105.
[81] (1933) *U.N.R.I.A.A.*, vol. III, pp. 1405-1417.

3. The provision in question may be amended or revoked at any time by the parties to the treaty without the consent of the State entitled to the right created thereby, unless —

(a) the parties to the treaty entered into a specific agreement with the latter with regard to the creation of the right ; or

(b) a contrary intention appears from the terms of the treaty, the circumstances of its conclusion or the statements of the parties.

4. A State exercising a right created by a provision of a treaty to which it is not a party is bound to comply with any conditions laid down in that provision or elsewhere in the treaty for the exercise of the right.

*Commentary*

(1) If the question is not free from controversy, there is much authority for the view that certain exceptions to the rule *pacta tertiis nec nocent nec prosunt* are admitted in modern international law. Some writers support this view by pointing to the exceptions to the rule now admitted in the law of contract in many countries, and by suggesting that stipulations in favour of third parties ought today to be regarded as a "general principle of law recognized by civilized nations" susceptible of application under Article 38, paragraph 1 (c) of the International Court's Statute. Pertinent analogies undoubtedly exist in national systems of contract law, while private law concepts such as the *stipulation pour autrui* and the "trust" have clearly influenced the thinking of international judges and lawyers regarding the effects of treaties on third States. But it is by no means clear that the admission of exceptions to the *pacta tertiis* rule in State practice or in the jurisprudence of international tribunals has been based directly upon an analogy from private law rather than upon the consent of States and the requirements of international life. Thus, in accepting the idea that a treaty may create a right in favour of a third State in the *Free Zones* case, the Permanent Court was content to say : "There is, however, nothing to prevent the will of sovereign States from having this object and this effect".[82] Furthermore, owing to the great difference between States and individuals as contracting parties, and to the special character of treaty-making procedures, some caution seems necessary in applying to treaties principles taken from national systems of contract law. Accordingly, the Special Rapporteur considers that, while taking due note of the analogies which exist in national systems of contract law, the Commission should base its proposals on State practice and on the jurisprudence of international tribunals.

(2) The present article seeks to lay down the general conditions under which a State may become subject to an obligation or entitled to a right under a treaty to which it is not a party. It does not cover the question whether certain kinds of treaty are to be regarded as having "objective" effects. This question, it is true, overlaps to some extent with the matters falling under

the present article. But it raises special problems which it seems more convenient to deal with in a separate article.

(3) *Paragraph 1* deals with the case of *obligations* and formulates the general conditions under which a State may become subject to an obligation under a treaty to which it is not a party. The primary rule, as already seen in the previous article, is that the parties to a treaty cannot *impose* an obligation on a third State or modify its legal rights in any way without its consent. This rule is one of the bulwarks of the independence and equality of States, and paragraph 1 does not depart from it. On the contrary, the paragraph specifies that under this article the consent of a State is always necessary if it is to be bound by a provision contained in a treaty to which it is not a party. Under the paragraph, two conditions have to be fulfilled before a third State can become bound : first, the parties to the treaty must have intended the provision in question to be the means of creating a legal obligation affecting that State or a category of States to which it belongs ; and secondly the third State must have consented to the provision either expressly or by implication. No doubt, it may be said that when these conditions are fulfilled there is, in effect, a second collateral agreement between the parties to the treaty, on the one hand, and the third State on the other ; and that the true juridical basis of the third State's obligation is not the treaty but this collateral agreement. However, even if the matter is viewed in this way, the case remains one where a provision of a treaty concluded between certain States is directly binding upon another State without the latter's becoming a party to the treaty itself. Accordingly, it seems appropriate to deal with the case under the present article as a form of exception to the *pacta tertiis* rule.

(4) The application of the rule contained in paragraph 1 is well illustrated by the Court's approach to article 435 of the Treaty of Versailles in the *Free Zones* case.[83] By that article the parties to the Treaty of Versailles declared that certain provisions of treaties, conventions and declarations and other supplementary acts concluded at the end of the Napoleonic wars with regard to the neutralized zone of Savoy "are no longer consistent with present conditions" ; took note of an agreement reached between the French and Swiss Governments to negotiate the abrogation of the stipulations relating to this Zone ; and added that those stipulations "are and remain abrogated". Switzerland, having been a neutral in the 1914-1918 war, was not a party to the Treaty of Versailles, but the text of the article had been referred to her before the conclusion of the Treaty. The Swiss Federal Council had further addressed a Note [84] to the French Government informing it that Switzerland found it possible to "acquiesce" in article 435, but only on certain conditions. And one of these conditions was that the Federal Council made the most express reservations as to the statement that

83 *P.C.I.J.* (1929) Series A, No. 22, pp. 17-18 ; *P.C.I.J.* (1932) Series A/B, No. 46, at p. 141.

84 The text of the relevant part of this Note was annexed to article 435 of the Treaty of Versailles.

the provisions of the old treaties, conventions, etc., were no longer consistent with present conditions, and said that it would not wish its acceptance of the article to lead to the conclusion that it would agree to the suppression of the régime of the free zones. Failing to arrive at any agreement with Switzerland for the abolition of the free zones, France brought the matter before the Court, where she contended that the provisions of the old treaties, conventions, etc., concerning the free zones had been abrogated by article 435. In rejecting this contention, the Permanent Court pointed out [85] that Switzerland had not accepted that part of article 435 which asserted the obsolescence and abrogation of the free zones :

> "Whereas, in any event, Article 435 of the Treaty of Versailles is not binding on Switzerland, which is not a Party to this Treaty, except to the extent to which that country has itself accepted it ; as this extent is determined by the note of the Swiss Federal Council of May 5th, 1919, an extract from which constitutes Annex 1 to this article ; as it is by this action and by this action alone that the Swiss Government has "acquiesced" in the "provisions of Article 435", namely "under the conditions and reservations" which are set out in the said note ;".

Having regard to Switzerland's express rejection in her Note of the view that the régime of the free zones was inconsistent with present conditions, and her refusal to agree to their suppression, the Court held that she was not bound by the declaration of their abrogation in article 435 of the Versailles Treaty.

(5) *Paragraph 2* deals with the case of *rights,* and formulates the conditions under which a State will be entitled to invoke in its favour a provision of a treaty to which it is not a party. These conditions are both more complex and more controversial than those formulated in paragraph 1 for the creation of an obligation binding upon a third State. The reason is that the question of the need for the consent of the third State presents itself in a somewhat different light under paragraph 2. The parties to a treaty cannot, in the nature of things, *impose* a right on a third State because a right, even when effectively granted, may always be disclaimed or waived. Consequently, under paragraph 2 the question is not whether the third State's consent is required so as to protect it against encroachment upon its independence, but whether its "acceptance" of the provisions is an essential condition of its acquiring the right. Further, if the view is taken that the treaty provision is by itself enough to establish the third State's right, a question also arises as to whether the parties to the treaty are or are not afterwards entitled to revoke or modify the right without the third State's consent.

(6) A number of writers,[86] including the authors of both the principal text-books on the law of treaties,

maintain that, leaving aside treaties of an "objective" character, a treaty cannot of its own force create an actual *right* in favour of a third State. Broadly, the view of these writers is that, while a treaty may certainly confer, either by design or by its incidental effects, a *benefit* on a third State, the latter can only acquire an actual right through some form of collateral agreement between it and the parties to the treaty. In other words, they hold that a right will be created only when the treaty provision is intended to constitute an offer of a right to the third State which the latter has accepted. Similarly, for these writers it goes without saying that, in the absence of such a collateral agreement, the parties to a treaty are completely free, without obtaining the consent of the third State, to abrogate or amend the provision creating the benefit in its favour. They take the position that neither State practice nor the pronouncements of the Permanent Court in the *Free Zones* case [87] furnish any clear evidence of the recognition of the institution of *stipulation pour autrui* in international law.

(7) Another group of writers,[88] which includes the three previous Special Rapporteurs on the law of treaties, takes a quite different position. Broadly, the view of these writers is that there is nothing in international law to prevent two or more States from effectively creating a right in favour of another State by treaty, if they so intend ; and that it is always a question of the intention of the parties in concluding the particular treaty. According to them, a distinction has to be drawn between a treaty in which the intention of the parties is merely to confer a benefit on a third State and one in which their intention is to invest it with an actual right. In the latter case, these writers hold that the third State acquires a legal right to invoke directly and on its own account the provision conferring the benefit, and does not need to enlist the aid of one of the parties to the treaty in order to obtain the execution of the provision. This right is not, in their opinion, conditional upon any specific act of acceptance by the third State — any collateral agreement between it and the parties to the treaty. On the other hand, they consider that normally the right exists only so long as the provision creating it is kept in force by the parties to the treaty, who remain free to abrogate or amend it as and when they think fit, without obtaining the consent of the third-party beneficiary. These writers maintain that, on the whole, modern treaty practice confirms the recognition in international law of the principle that a treaty may confer an enforceable right on a State not a party to it ; and they maintain that express authority for the application of this principle in international law is to be found in the judgement of the Permanent Court in the *Free Zones* case and in other international decisions.

---

[85] *P.C.I.J.* (1932), Series A/B, No. 46, p. 141.

[86] E.g. C. Rousseau, *Principes généraux du droit international public* (1944), pp. 468-477 ; Lord McNair, *Law of Treaties* (1961), pp. 309-312 ; Podestá Costa, *Manual de Derecho Internacional Público,* para. 157 ; Salvioli, *Recueil des Cours de l'Académie de droit international,* vol. 46 (1933), pp. 29-30.

[87] *P.C.I.J.* (1932), Series A/B, No. 46, p. 147.

[88] E.g. J. L. Brierly, *Law of Nations* (5th edition), pp. 251-252 ; Sir H. Lauterpacht, *Development of International Law by the International Court* (1958), pp. 306-310 ; Sir G. Fitzmaurice, Fifth report on the law of treaties, *Yearbook of the International Law Commission, 1960,* vol. II, pp. 81 and 102-104 ; E. Jiménez de Aréchaga, "Treaty stipulations in favor of third States", *A.J.I.L.* (1956), pp. 358-387 ; *Harvard Research Draft,* pp. 924-937.

(8) The present Special Rapporteur considers that the view of the second group should be the one accepted by the Commission. Admittedly, the State practice, taken by itself, may not be very conclusive and the earlier practice may even seem to incline towards the position of the first group. But the more recent practice and the jurisprudence of international tribunals appear, on balance, to justify the position taken by the second group.

(9) Some of the pre-League of Nations precedents commonly cited in the present connexion are clearly cases where there was no intention on the part of the contracting States to confer a right, as distinct from an incidental benefit, on the interested third States ; for example, the recognition of the exclusive right of the signatories to the Treaty of Berlin of 1878 to enforce the minorities provisions of that Treaty.[89] The same appears to be true of the provision in the Treaty of Prague, the abrogation of which by Austria and Prussia without the consent of Denmark has sometimes been represented as a decisive refutation of the idea that treaties may confer actual rights on third States.[90] By article 5 of this Treaty Austria transferred all her rights over Holstein and Schleswig to Prussia, subject to a reservation that, if the inhabitants of Northern Schleswig voted by a plebiscite in favour of union with Denmark, that area should be ceded to Denmark, which was not a party to the Treaty. In 1878, Austria and Prussia abrogated the provision relating to the plebiscite without referring to Denmark, and most jurists have considered them entitled to do so. In point of fact, the provision had been inserted in the Treaty at the request of France, not of Denmark, and there does not seem to have been any basis for imputing to Austria and Prussia an intention to confer a right on Denmark. Prussia, however, in reply to Denmark's protest, simply stated that Austria alone was entitled to invoke the Treaty of Prague ; and at that date this reply would probably have been regarded by legal opinion as a sufficient answer to any State claiming to invoke the provision of a treaty to which it was not a party — except possibly in the case of some treaties having the character of "international settlements". Indeed, even in this instance Denmark based her protest on the Treaty's having been accepted by all Europe as part of its public order, rather than on a claim to third-party rights under the Treaty.[91]

(10) Nevertheless, the treaty-practice of the pre-League of Nations period showed numerous examples of treaties concluded by the leading Powers which contained provisions for the general benefit : treaties for the regulation of international rivers and of maritime canals and waterways, treaties of guarantee, treaties of neutralization and treaty provisions for the protection of minorities.[92] If in most cases the intention of the

Powers concerned may have been to reserve to themselves the enforcement of these treaties, there were some treaties, like those opening maritime canals or international rivers to vessels of all flags, which seemed to establish something very like a right of user in States not parties to them. Whether these treaties created rights in favour of non-parties or only conferred benefits, or whether they were rather the starting-point of a practice which gave rise to a customary right of user are questions which are controversial, and their discussion belongs rather to the next article. Their relevance here is that the existence of these forms of international régime probably made it easier for jurists and States later on to accept the idea that actual rights might be created by a treaty in favour of a State not a party to it.

(11) The territorial changes after the First World War, the growing interdependence of States and the development of international organization led to the conclusion of further treaties containing provisions designed to serve either the general interest or the interests of individual States or, indeed, the interests not of States but of groups of individuals. The Versailles Treaty, for example, contained provisions for the equal treatment of vessels of all flags on certain international rivers,[93] for free passage through the Kiel Canal,[94] for the maintenance of free zones in certain German ports,[95] for the cession of part of Schleswig to Denmark,[96] and for the grant of certain rights to Switzerland.[97] So, too, the other Peace Treaties and the Mandate Agreements contained stipulations in favour of non-parties and also of minority groups.

(12) During the League period the question whether a State may claim rights under a treaty to which it is not a party came up for judicial consideration on a number of occasions. In the *German Interests in Polish Upper Silesia, Austro-German Customs Union* and other cases mentioned in paragraphs (4) and (5) of the commentary to the previous article, there was no stipulation in the treaty in favour of the third State, and the Court rejected its claim under the *pacta tertiis* rule. In the *Aaland Islands* affair [98] there was equally no mention of Sweden in the Convention of 1856 concluded between France, Great Britain and Russia for the neutralization of those islands. But Sweden was one of the States most directly interested in the demilitarization of the islands, and she invoked the Convention in 1920 in her dispute with Finland before the Council of the League. This dispute having been referred to a Committee of Jurists for an advisory opinion on the legal issues, Sweden's claim to be a third-party beneficiary under the 1856 Convention came before the Committee. The latter upheld the Swedish claim on this point, not on the ground of a stipulation in

---

[89] See R. F. Roxburgh, *International Conventions and Third States* (1917), chapter V.

[90] See R. F. Roxburgh, *op. cit.*, pp. 42-44 ; C. Rousseau, *Principes généraux du droit international public* (1944), pp. 470-471.

[91] See *Harvard Research Draft*, p. 928.

[92] See Roxburgh, *op. cit.*, pp. 56-95.

[93] Articles 332 and 335.

[94] Article 380.

[95] Article 328.

[96] Article 109.

[97] Articles 358 and 374.

[98] League of Nations, *Official Journal*, Special Supplement No. 3 (October 1920), p. 18 ; see also *Harvard Research Draft*, pp. 927-928.

favour of a third State but on the ground of the objective nature of the Convention, i.e. under the principle laid down in the next article. Nevertheless, even when rejecting Sweden's claim to be the beneficiary of a *stipulation pour autrui*, the Committee recognized the possibility of creating a right by treaty in favour of a third party :

> "As concerns Sweden, no doubt she has no contractual right under the provisions of 1856 as she was not a signatory Power, Neither can she make use of these provisions as a third party in whose favour the contracting parties had created a right under the Treaty, since — though it may, generally speaking, be possible to create a right in favour of a third party in an international convention — it is clear that this possibility is hardly admissible in the case in point, seeing that the Convention of 1856 does not mention Sweden, either as having any direct rights under its provisions, or even as being intended to profit indirectly by the provisions . . .".

The Committee, it seems from this passage, declined to regard Sweden as the possessor of a third-party right only because there was no indication in the particular case of any intention on the part of the contracting States to create such a right in her favour.

(13) The question of third-party rights under treaties came up again in the *Free Zone* case,[99] and was debated at length on two separate occasions in the course of the long proceedings in that case. As the two judgements in that case have given rise to somewhat divergent interpretations of the views of the Permanent Court regarding stipulations in favour of third States, a short examination of the salient points in those judgements is necessary. Three separate free customs zones had been created by various treaties, declarations and acts concluded in 1814-1815 in connexion with the settlement of the frontiers of Switzerland and its neutralization, and Switzerland claimed that under these treaties, declarations and acts she possessed legal rights to the three zones which it was not competent for the parties to the Treaty of Versailles to abrogate by article 435 of that Treaty. The facts concerning the free zones were somewhat complicated, owing to their having been created by a considerable number of interlocking instruments. As to the two zones of Upper Savoy — the Sardinian zone and the zone of St. Gingolph — the Court had no doubt that Switzerland was either directly or indirectly an actual party to the relevant instruments and therefore had *contractual* rights of which the Treaty of Versailles could not deprive her without her consent. The position in regard to the third zone — the zone of Gex — was less clear, but after reviewing the various instruments the Court arrived at the conclusion that the creation of that zone also was a result of an agreement between Switzerland and the Powers, including France, and that the agreement "conferred on this zone the character of a contract to which Switzerland is a party". At the first stage of the proceedings in 1929 the Court, which was not then called upon to render a definitive judgement

on the case,[100] contented itself with adding : [101] "the Court, having reached this conclusion simply on the basis of an examination of the situation of fact in regard to this case, need not decide as to the extent to which international law takes cognizance of the principle of 'stipulations in favour of third parties'." Having regard to the very clear reservation of the point in this passage, the Special Rapporteur does not think that the Court's Order of 1929 can be treated as an acceptance of a general doctrine of the effectiveness of stipulations in favour of third States to create actual rights. What the Court did in this Order was to hold that instruments to which France had been a party contained a provision for the creation of the free zone in favour of Switzerland, that these instruments had been formally communicated to Switzerland and that the provision concerning the free zone had been accepted by her. This seems to constitute an acquisition of a third-party right by a collateral agreement, not by a simple *stipulation pour autrui*.

(14) Three of the twelve judges, however, dissented from the Court's conclusions and, in consequence, felt called upon to consider Switzerland's secondary claim to a right created on the principle of *stipulation pour autrui*. Of these judges two — Judge Nyholm [102] and Judge *ad hoc* Dreyfus [103] — rejected altogether the principle of *stipulation pour autrui* as being inadmissible in international law ; and they took the position that it is only through a collateral agreement with the parties to the treaty that a third State can acquire an actual right to the execution of one of its provisions. The third, Deputy-Judge Negulesco,[104] also expressed the view that a collateral agreement is necessary for the creation of a third-party right. But he further said that, if the principle of *stipulation pour autrui* were regarded as admissible in international law, it still could not be applied in a case where the stipulation did not mention the name of the State to be benefited ; and that in any event such a stipulation would always be revocable by the parties to the treaty without the consent of the third State.

(15) France and Switzerland having failed to arrive at an agreement, final judgement [105] was given in the case by a Court composed of seven of the judges [106] who had participated in the previous decision and four new judges. The Court re-examined the case *de novo*, and by a majority of six to five arrived at the same conclusions as those of the majority in 1929, finding that Switzerland had *contractual* rights to all three zones. The Court said that, in consequence, it "need not consider the legal nature of the Gex Zone from the point

---

⁹⁹ *P.C.I.J.* (1929) Series A, No. 22 ; and *P.C.I.J.* (1932) Series A/B, No. 46.

¹⁰⁰ The parties were still hopeful of arriving at an agreement upon a new régime for the three zones in question and the object of the Court's Order was merely to indicate to the parties the result of its deliberations on the question whether article 435 had or had not abrogated the free zones.

¹⁰¹ *P.C.I.J.* (1929), Series A, No. 22, p. 20.

¹⁰² *Ibid.*, pp. 26-27.

¹⁰³ *Ibid.*, pp. 43-44.

¹⁰⁴ *Ibid.*, pp. 36-38.

¹⁰⁵ *P.C.I.J.* (1932), Series A/B, No. 46.

¹⁰⁶ Including Mr. Dreyfus, the Judge *ad hoc*.

of view of whether it constitutes a stipulation in favour of a third party". Nevertheless, it went on to examine that question, saying that if the matter were to be envisaged from this aspect, it would be necessary to make the following observations : [107]

> "It cannot be lightly presumed that stipulations favourable to a third State have been adopted with the object of creating an actual right in its favour. There is however nothing to prevent the will of sovereign States from having this object and this effect. The question of the existence of a right acquired under an instrument drawn between other States is therefore one to be decided in each particular case : it must be ascertained whether the States which have stipulated in favour of a third State meant to create for that State an actual right which the latter has accepted as such."

The Court further found that in the case before it the instruments relating to the Gex zone and the circumstances in which they were drawn up established that "the intention of the parties had been to create in favour of Switzerland a right, on which that country could rely, to the withdrawal of the French customs zones behind the political frontier".

(16) Judges Negulesco [108] and Dreyfus [109] again dissented. Both, however, directed their opinions to other aspects of the case, only Judge Dreyfus stating, *en passant*, that he adhered to his previous opinion concerning the abrogation of the stipulations creating the free zones. Another judge, one of the new members, dissented without giving reasons. The remaining dissentients, Judges Altamira (one of the majority in 1929) and Hurst (a new member), although basing their dissent on a quite different part of the case, concluded their joint opinion with the following observation : [110]

> "In conclusion, we wish to make every reservation in regard to a theory seeking to lay down, as a principle, that rights accorded to third Parties by international conventions, to which the favoured State is not a Party, cannot be amended or abolished, even by the States which accorded them, without the consent of the third State ; such a theory would be fraught with so great peril for the future of conventions of this kind now in force, that it would be most dangerous to rely on it in support of any conclusion whatever."

This observation, it seems clear, does not contest the Court's proposition that a treaty may create an actual rhight in favour of a State not a party to it if such was the intention of the Contracting States ; on the contrary, it seems to assume the correctness of that proposition. What these two judges questioned in their reservation was rather the theory of the irrevocable character of a *stipulation pour autrui* which had been put forward by Switzerland and not disavowed by the Court in the above-quoted passage of its judgement.

(17) The Court, it is true, rested its recognition of Switzerland's rights to the free zones primarily upon contractual agreements between her and the Powers in 1814-1815. But, as appears in paragraph (15) above, it also stated in clear enough terms that a treaty may create an actual right in favour of a third State if such is the intention of the parties ; and went on to make an express finding of fact that the parties to the 1814-1815 instruments had had that intention. Accordingly, to see in the *Free Zones* case a precedent supporting the doctrine of stipulations in favour of third parties in international law seems to be entirely justifiable.[111] On the other hand, it is a precedent which leaves some points in that doctrine undefined : (a) did the Court, when it spoke of an "actual right" in favour of the third State "which the latter has accepted as such", mean that there must be some form of "acceptance" of the stipulation before it can create a "right" ; and (b) did it consider, as Judges Hurst and Altamira seem to have feared, that a right resulting from a third-party stipulation is in every case irrevocable except with the consent of the beneficiary State ?

(18) The peace treaties concluded after the Second World War all contain provisions [112] by which the defeated State, on behalf of itself and its nationals, waived all claims arising directly out of the war etc. against any of the United Nations which, without going to war, had broken off relations with that State and co-operated with the Allied and Associated Powers. These provisions constitute stipulations in favour of third parties, since the beneficiary States, not having been at war with the defeated State in question, are not parties to the treaty ; and in two instances discussion has arisen as to their legal effect.[113] The first was in 1947, when the former owners of an Italian ship, the *S.S. Fausto*, which had been requisitioned by Uruguay during the war, instituted a claim for compensation in the Uruguayan courts. Uruguay, not having declared war on Italy, was not a party to the Italian Peace Treaty, but the Government was held to be entitled to invoke the waiver clause in article 76 of that Treaty as a bar to the claim.

(19) The second instance was in 1948, when the effect of the waiver clause in article 29 of the Finnish Peace Treaty became the subject of debate internally in the United States, a country which had not been at war with Finland and was not a party to that Treaty.[114]

---

[107] *P.C.I.J.* (1932), Series A/B, No. 46, pp. 147-148.

[108] *Ibid.*, p. 186.

[109] *Ibid.*, p. 200.

[110] *Ibid.*, p. 185.

[111] Sir G. Fitzmaurice, *Yearbook of the International Law Commission, 1960*, Vol. II, p. 103 ; Sir H. Lauterpacht, *Development of International Law by the International Court*, pp. 306-308 ; J. L. Brierly, *Law of Nations*, 5th edition, pp. 251-252 ; E. Jiménez de Aréchaga, *A.J.I.L.* (1956), pp. 341-344 ; *Harvard Research Draft*, p. 935 ; M. Lachs *Recueil des Cours de l'Académie de droit international* (1937), Vol. 92, pp. 313-314. The reasons given by C. Rousseau, *Principes généraux du droit international public*, pp. 473-477, and by Lord McNair, *Law of Treaties, 1961*, pp. 311-312 for taking a contrary view do not appear to be convincing.

[112] Finland (art. 29), Italy (art. 76), Bulgaria (art. 28), Hungary (art. 32), Roumania (art. 30).

[113] See E. Jiménez de Aréchaga, *A.J.I.L.* (1956), pp. 338-357.

[114] *Ibid.* ; and see House of Representatives, Committee on Foreign Affairs, Report No. 1457, *Settlement of Certain Finnish Claims* (October 1949).

Numerous Finnish ships had been requisitioned during the war in United States ports, and the claims of the Finnish owners to compensation clearly fell within article 29 of the Peace Treaty. On the other hand, for reasons of foreign policy the executive branch of the Government preferred not to enforce the waiver and informed the Finnish Government through the diplomatic channel that the United States was "not disposed to invoke in this instance" the provisions of article 29. At the same time the Department of State explained the Government's action in a press announcement as follows : "As the United States is not a signatory of the Finnish Peace Treaty it occupies the status of a third-party beneficiary, with respect to article 29, and thus may choose whether or not it will claim the rights offered". The Comptroller General's Department then challenged the power of the executive branch to dispose of the rights of the United States under article 29 of the Treaty without the authority of Congress. Remarking that "it seems established that a country having the status of a third State to a treaty may nevertheless acquire rights and benefits thereunder if the signatory Powers clearly indicate an intention to create rights in favour of such a State", the Comptroller General argued that article 29 had of its own force had the effect of releasing the United States from its obligations with respect to the Finnish ships. On this basis, he considered that the "reinstatement" of this obligation involved an exercise of the treaty-making power requiring the authority of Congress. In reply the State Department took the position that article 29 did not, by itself, vest any rights in the United States, saying : "Since the United States was not a party to the treaty of peace with Finland, the United States had no legal right to benefit therefrom unless it performed some affirmative act indicating acceptance of the benefit". In support of this position it referred to the *Free Zones* case, underlining the words in the judgement *"which the latter has accepted as such"* and interpreting them as requiring an act of acceptance by the third State to perfect its third-party rights. It also relied on article 9 of the Havana Convention on Treaties of 1928 [115] which reads : "The acceptance or non-acceptance of provisions in a treaty, for the benefit of a third State which was not a contracting party, depends exclusively upon the latter's decision." Finally, it pointed to the specific "assumption" by Congress in 1921 of the benefits conferred upon the United States by the Treaty of Versailles, to which it was not a party, and the United States Government's Note of 10 August 1922 informing the German Government that the United States did not intend to press any claims falling within paragraphs (5)-(7) of the Annex to article 244 of that Treaty, as further evidence of the need for an act of acceptance. In fact, the precedents cited by the Department of State appear to be equally consistent with a view that a treaty provision in favour of a third State suffices to create its "right", but that the third State is completely free to take up or reject the right as it thinks fit. In the event, the question of the Finnish ships was disposed of by legislative

action and no final conclusion was reached on the issue of the legal effect of third-party stipulations.[116]

(20) Further instances of the recognition of third-party rights can be found in treaties intended to create objective international régimes, for example in treaties establishing freedom of navigation through maritime canals, in Mandate and Trusteeship Agreements and in the Charter of the United Nations itself.[117] Whether these instances ought to be regarded simply as particular applications of the principles contained in the present article or as a special category falling under a separate principle is a question upon which it will be necessary for the Commission to take a position. But they are certainly cases of rights created by treaty in favour of third States and, if the Commission should not favour making a special category of treaties intended to have objective effects, it would be necessary to cover these cases in the present Article. ·

(21) The formulation of the rule in paragraph 2 is based upon the interpretation of the judgement in the *Free Zones* case which has been given above. Accordingly, under *paragraph 2 (a)*, the creation of a third-party right is made dependent upon the condition that the parties to the treaty should have had a specific intention to confer an "actual right", as distinct from a mere benefit, upon a State or category of States. Paragraph 2 (a) rejects the view, expressed by Deputy-Judge Negulesco in his dissenting opinion in the *Free Zones* case, that the treaty must have designated the beneficiary State by name. This view seems indefensible on principle, since the relevant question is whether the parties had a specific intention to create a right, and if such an intention is proved it must have its appropriate effects.[118] In the *Free Zones* case itself Switzerland was not mentioned in the instrument by which France accepted the obligation to withdraw her customs line behind the political frontier. In any event, it is perfectly normal in most systems of law to have beneficiaries designated by description or as a class, and treaty practice shows that this is also perfectly normal in international law. The *stipulations pour autrui* in the Peace Treaties discussed in paragraphs

[115] Text in Supplement to *A.J.I.L.* 22 (1928).

[116] The Committee on Foreign Affairs, it is true, observed in its report : "The Committee wishes to record its doubts that third-party action, independent of the assent of· this Government, can properly vest rights in this Government. The doctrine that a sovereign can involuntarily become a beneficiary through third-party action implies the obverse — that a sovereign can involuntarily be divested of rights by third-party action. Looked at in this light, the proposition becomes mischievous in the Committee's judgement." But as one commentator has pointed out, the Committee was clearly wrong in thinking that the second proposition is in any way implied in the first ; see E. Jiménez de Aréchaga, *A.J.I.L.* (1956), p. 355.

[117] E.g. Article 32 gives a non-member State the right to be invited to participate in the discussion in the Security Council of a dispute to which it is a party ; and Article 35 gives non-members the right to bring before the Security Council or General Assembly certain categories of disputes to which they may be parties.

[118] See *Harvard Research Draft*, p. 935 ; E. Jiménez de Aréchaga, *A.J.I.L.* (1956), p. 356 ; Sir G. Fitzmaurice, *Yearbook of the International Law Commission, 1960*, vol. II, p. 103.

(18) and (19) above were of this kind, e.g. "any of the United Nations whose diplomatic relations with Finland were broken off during the war and which took action in co-operation with the Allied and Associated Powers". So too were article 8 of the South West Africa Mandate and article 19 of the Trusteeship Agreement for the Cameroons, which have recently been before the International Court in the *South West Africa* cases and in the *Northern Cameroons* case.[119]

(22) *Paragraph 2 (b)* is based on the view that the intention of the parties to the treaty is sufficient of itself to create the third-party right without the conclusion of a collateral contract between them and the third State.[120] It is not thought that in the *Free Zones* case the words "which the latter has accepted as such" were intended by the Court to convey that no right comes into existence at all under the treaty without a specific act of acceptance by the third State.[121] Sometimes there may be a specific acceptance of the right by the third-party beneficiary as in the *Free Zones* case. But in other cases, such as the clauses of the Peace Treaties waiving claims against any of the United Nations or treaties opening canals or rivers to freedom of navigation, there is nothing in the nature of a specific acceptance ; there is merely a reliance on or exercise of the right. No doubt, anyone who invokes or seeks to exercise a right accepts it by implication. But it seems somewhat artificial and not in accord with the realities of the situation[122] to regard these cases as cases of rights created by collateral agreement rather than as a reliance on or exercise of an already created right. As already pointed out, there is no question of the *imposition* of the right on the third State, since it is under no obligation to make use of the right. The true position, it is thought, is that so long as the particular provision remains in force the third State possesses the right of which it may or may not avail itself as it thinks fit. It may waive, or refrain from using, the right on a particular occasion or it may reject the right altogether. If it does the latter, the right is, of course, destroyed and can then only be *re*-established by a new agreement. In other words, the right is always exercisable by the third State unless it has been expressly or impliedly rejected by that State ; and this is the rule proposed in paragraph 2 (b).

(23) *Paragraph 3* lays down that in cases falling under this Article a *stipulation pour autrui* is subject to amendment or termination at the will of the parties to a treaty, subject to two exceptions. The revocability or irrevocability of the stipulation must, it is thought, be essentially a question of the intention of the parties. Giving all due weight to the warning of Judges Altamira and Hurst on this point in the *Free Zones* case,[123] it

seems difficult to see why the parties to a treaty should be regarded as incompetent to confer an irrevocable right on a third State, if that is what they clearly intended to do. The most that it seems right to say is that, unless there is evidence to the contrary, the parties are to be presumed to have intended to retain in their own hands the power to amend or to terminate the treaty without obtaining the consent of the third State. *Pace* Judges Hurst and Altamira, the *Free Zones* case was a case in which it was reasonable on the facts to hold, as the majority of the Court apparently did hold, that the parties intended the *stipulation pour autrui* in favour of Switzerland to be irrevocable except with her consent ; for the stipulation was linked to a territorial rearrangement intended to establish an enduring international settlement of the frontiers of Switzerland. Furthermore, it was a case where there was clear evidence of a specific collateral agreement between the parties to the treaty and the third-party beneficiary with respect to the creation of the right, and in such cases the consent of the third State would seem necessary, in principle, for the modification or revocation of the collateral agreement, unless otherwise provided in this agreement. Accordingly, paragraph 3 of the article states that the *stipulation pour autrui* is subject to amendment or revocation without the consent of the third State except where (*a*) there was a specific collateral agreement or (*b*) there is evidence that the parties to the treaty intended otherwise.

(24) *Paragraph 4* underlines that a State invoking a right as a third-party beneficiary may only do so subject to any conditions regarding its exercise laid down either in the particular provision or elsewhere in the treaty. This may be self-evident, but still needs to be stated. A third-party beneficiary, even in a case where there is a specific agreement between it and the parties, is in no sense itself a party to the treaty. By exercising the right it does not put itself in the same position as a party with respect to the treaty as a whole. But it is subject to all the terms and conditions of the treaty relating to the exercise of the right.

*Article 63.* — *Treaties providing for objective régimes*

1.   A treaty establishes an objective régime when it appears from its terms and from the circumstances of its conclusion that the intention of the parties is to create in the general interest general obligations and rights relating to a particular region, State, territory, locality, river, waterway, or to a particular area of sea, sea-bed, or air-space ; provided that the parties include among their number any State having territorial competence with reference to the subject-matter of the treaty, or that any such State has consented to the provision in question.

2.   (*a*) A State not a party to the treaty, which expressly or impliedly consents to the creation or to the application of an objective régime, shall be considered to have accepted it.

    (*b*) A State not a party to the treaty, which does not protest against or otherwise manifest its opposition to the régime within a period of X years of the registration of the treaty with the Secretary-General of the

---

[119] See paragraph (12) of the commentary to the next article.

[120] See E. Jiménez de Aréchaga, *A.J.I.L.* (1956), pp. 351-355.

[121] See Sir H. Lauterpacht, *The Development of International Law through the International Court*, p. 306 ; Judge Jessup in his separate opinion in the *South West Africa* cases, *I.C.J. Reports*, 1962, p. 410.

[122] See E. Jiménez de Aréchaga, *A.J.I.L.* (1956), pp. 351-355.

[123] See *supra* para. (16).

United Nations, shall be considered to have impliedly accepted the régime.

3.   A State which has accepted a régime of the kind referred to in paragraph 1 shall be —

   (a) bound by any general obligations which it contains ; and

   (b) entitled to invoke the provisions of the régime and to exercise any general right which it may confer, subject to the terms and conditions of the treaty.

4.   Unless the treaty otherwise provides, a régime of the kind referred to in paragraph 1 may be amended or revoked by the parties to the treaty only with the concurrence of those States which have expressly or impliedly accepted the régime and have a substantial interest in its functioning.

*Commentary*

(1) The previous Special Rapporteur's treatment of the question of the effects of treaties on third States in his fifth report was very comprehensive.[124] Approaching the matter from the point of view of a "code", his draft was divided into three groups of articles. The first group, which was of an introductory character, contained the basic rule, *pacta tertiis nec nocent nec prosunt*. The second dealt with the cases where a treaty may have effects *in detrimentum tertiis* and the third with the cases where it may have effects *in favorem tertiis*. The second group consisted of ten articles and the third group eleven, so that there were no less than twenty-one separate articles directed to special cases of the effects of treaties on third States. Some of the points dealt with in these twenty-one articles are covered in the present report in a compressed form in article 62. Others, such as the right to become a party to a treaty, belong to other parts of the draft articles, according to the scheme now being followed by the Commission. Again, the second and third groups each contain an article relating to "unilateral declarations", whereas the Commission by its definition of a "treaty" in article 1 (a) has excluded purely unilateral declarations from the scope of its draft articles on the law of treaties. Even so, there remain a number of points in Sir Gerald Fitzmaurice's draft articles which require examination.

(2) In his second and third sections dealing respectively with the effects of treaties *in detrimentum tertiis* and *in favorem tertiis* Sir Gerald Fitzmaurice included articles [125] entitled "Case of customary international law obligations/rights mediated through the operation of law-making or norm-enunciating treaties". At the same time, he emphasized that these articles described a process rather than laid down a rule. Strictly speaking, he said, the treaty binds the parties alone, but may prove to be a vehicle for the general acceptance of a specific formulation of a norm of customary law, and then non-parties become bound by the customary rules which it contains, though not by the treaty itself. He conceded that the material source of the obligations

and rights of third States under this "process" is custom, not the legal effect of the treaty as such. Nevertheless, he considered that the process should be given a place amongst the rules concerning the legal effects of treaties on third States. The role played by custom in expanding the effects of law-making treaties beyond the contracting States is certainly important, and the inclusion of provisions on this point in the comprehensive form of code envisaged by the previous Special Raporteur was, no doubt, appropriate. But in the draft convention on the law of treaties that is now in contemplation it seems necessary to separate more sharply those obligations and rights which are generated by the treaty itself from those which are generated through the grafting of an international custom onto the provisions of a treaty. Where the latter process occurs, it is not strictly a case where the treaty has legal effects for third parties ; it is rather a case where principles formulated in a treaty are binding upon other States as being an embodiment of the accepted customary law, although the treaty itself is not binding upon them. Treaty and custom are distinct sources of law, and it seems undesirable to blur the line between them in setting out the legal effects of *treaties* upon States not parties to them. It is therefore thought preferable in a draft convention on the law of treaties not to include positive provisions regarding the role of custom in expanding the effects of law-making treaties, but merely to note and recognize it in a general reservation. Such a "saving" reservation is formulated in article 64.

(3) If general law-making treaties are excluded, the main question is the extent to which treaties, or particular classes of treaties, can be said to have "objective" effects so as to create legal obligations and rights for third States. The previous Special Rapporteur dealt with this question under three main rubrics : (1) "Cases of the use of maritime or land territory under a treaty or international régime" (articles 14 and 26 of his draft) ; (2) "General duty of all States to respect and not impede or interfere with the operation of lawful and valid treaties entered into between other States" (article 17) ; and (3) "General duty of all States to recognize and respect situations of law or of fact established under lawful and valid treaties" (articles 18 and 29). As the present Special Rapporteur does not feel able to adopt his predecessor's approach to this admittedly difficult and controversial question, some preliminary explanations are necessary.

(4) The crux of this whole question is the range of treaties either creating international régimes for the use of a waterway or piece of land or attaching a special régime to a particular territory or locality ; in other words, treaties providing for the navigation of international rivers or waterways, for the neutralization or demilitarization of particular territories or localities, for mandates or trusteeships of particular territories, for the establishment of a new State or international organization, treaties of cession and boundary treaties, etc. The previous Special Rapporteur, as appears from the first rubric, dealt with treaties concerning the use of maritime or land territory as a separate case. Although thinking it necessary to make special mention of them

---

[124] *Yearbook of the International Law Commission, 1960,* vol. II, pp. 72-107.

[125] Articles 16 and 28.

in a separate article, he rejected the view taken by some jurists that they form a class of treaties which, by their very nature, have "objective" effects, that is, effects *erga omnes*. Other treaties creating international régimes he placed under the third rubric — "general duty to recognize and respect situations of law or fact established under lawful and valid treaties". These treaties also he declined to regard as treaties which *by their very nature* have objective effects, while "not denying that in the result they do". He explained that to him it seemed preferable to reach this result :

"... not on the esoteric basis of some *mystique* attaching to certain types of treaties, but simply on that of a general duty for States — which can surely be postulated at this date (and which is a necessary part of the international order if chaos is to be avoided) to respect, recognize and, in the legal sense, accept, the consequences of lawful and valid international acts entered into between other States, which do not infringe the legal rights of States not parties to them in the legal sense".[126]

The second rubric appears to be a more generalized version of the principle upon which the third is based. It is framed in terms applicable to all treaties and affirms that all States are under a duty not to interfere with or impede the due performance and execution of lawful treaties to which they are not parties, except where the treaty deprives them of their legal rights or imposes disabilities upon them without their consent. The hesitation of the present Special Rapporteur to follow the scheme of his predecessor is due to doubts as to the validity of the general principles formulated in the second and third rubrics and doubts as to his treatment of international régimes governing the use of maritime or land territory.

(5) As to the second rubric, the general duty there predicated for all States to respect and not impede the operation of lawful treaties, even when limited to treaties not impairing their rights or imposing disabilities upon them, seems to go beyond the existing law. Nor is it easy to see exactly what this duty would entail in many cases, e.g. in the case of political, commercial or fiscal treaties. The existing rule seems rather to be that, in principle, a treaty is *res inter alios acta* for a State not a party to it. If article 17 of the Commission's draft articles qualifies this rule to some extent in the case of a State which has participated in the drawing up of a treaty that has not become a party to it, that is because a State which is in this position is not a total stranger to the treaty. In fact, in adopting that article, the Commission seems to have assumed that in general a State which is not a party to a treaty is under no obligation with respect to it.

(6) A similar doubt arises in regard to the existence in international law of the general duty, predicated in the third rubric. It may freely be conceded that certain kinds of treaty, e.g. treaties creating territorial settlements or régimes of neutralization or demilitarization, treaties of cession and boundary treaties, either have

or acquire an objective character. But the question is whether this objective character derives from such a general duty to recognize and respect situations of law or of fact established under a lawful and valid treaty, or from the particular nature of the treaty, or from the subsequent recognition or acquiescence of other States, or indeed from a combination of these elements. There are, it is thought, two obstacles to admitting the general duty predicated in the third rubric as an explanation of the objective effects of treaties creating international settlements or régimes. First, there is the difficulty of reconciling such a duty with the principle that, in general, a treaty is *res inter alios acta* for other States. Secondly, if there does exist such a general duty to recognize and respect situations of law resulting from treaties concluded between other States, it is not easy to explain why any difference should be made between one type of treaty and another in this connexion. Every treaty sets up a situation of law between the contracting parties, and in that sense every treaty creates an "international régime". Yet the general opinion certainly is that the question of "objective effects" arises only with regard to certain categories of treaties. The previous Special Rapporteur himself seems to have felt this difficulty, because he limited the application of the duty in his draft article (article 18) to "situations or facts established by lawful and valid treaties *tending by their nature to have effects erga omnes*" ; and he went on to list the "more important types of treaties producing effects of this kind". Clearly, the "mystique attaching to certain types of treaties" is not altogether absent from the draft article.

(7) The previous Special Rapporteur dealt with treaties concerning the use of maritime or land territory as a special case, on the ground that, unlike other international régime, they involve an active element. The third State makes use of the international canal, river, etc., and if it does so, must conform to the conditions laid down in the treaty for that user. It is, of course, a fundamental principle of law that no one may at the same time claim to enjoy a right and to be free of the obligations attaching to it. Certainly, this principle may be advanced as an explanation of the duty which rests upon a State making use of an international canal, river, etc., to comply with the provisions of the treaty regulating such user. But it does not explain the third State's *right* of user, nor does it answer the question whether, quite apart from cases of actual use of the canal, river, etc., the third State may be under a general obligation to respect the international régime established by the treaty. The previous Special Rapporteur was not very specific as to the third State's *right* of user, and did not establish any particular connexion between these cases and the principle of *stipulation pour autrui*, which he included in another article. In general, he seems to have regarded the right in these cases as based upon a compound of treaty régime, implied consent and custom.

(8) The present Special Rapporteur feels that to make a special case of treaties providing for the use of maritime or land territory on the ground of the "active" element present in them and to subsume them under a different principle from other forms of inter-

---

[126] *Yearbook of the International Law Commission, 1960,* vol. II, p. 98, para. 71.

national régime affecting the use of territory may sometimes appear a little artificial. The Antarctic Treaty,[127] for example, provides in article 2 for a right of use for scientific investigation ; but in article 1 it also provides for a demilitarization régime which goes beyond, and is independent of, the use of Antarctica for scientific purposes. Similarly, article 1 of the Suez Canal Convention [128] contains an absolute prohibition on the "blockade" of the canal which is independent of the use of the canal. Again, the Montreux Convention [129] establishes a mixed régime, being in part a régime providing for the use of the Straits [of the Bosphorus and the Dardanelles] and in part one forbidding or limiting their use by military vessels. Furthermore, however relevant and important in these cases may be the principle, that a State exercising a right must conform to the conditions attaching to it, the question of the existence of a general duty to respect and a general right to invoke the international régime set up by the treaty appears to the present Special Rapporteur to be one which is wider than that principle; and this question appears not to be essentially different in cases concerning the use of maritime or land territory from that which arises in the case of demilitarization or neutralization treaties. The intention of the parties in both types of case is to set up a régime applicable *erga omnes* and the crucial point is whether that intention has special effects in the law of treaties or whether any general régime that may result is to be regarded as essentially a *customary* régime built around the treaty.

(9) State practice furnishes considerable evidence of the admission in international law of a concept of international régimes or settlements affecting territory or waterways and applicable *erga omnes* ; but the evidence is not equally clear as to the legal process by which they come into existence.[130] Numerous nineteenth-century treaties, for example, provided for the free navigation of particular European rivers, and these régimes were regarded as conferring rights on third States. Similarly, the Berlin Act of 1885 provided for a régime of free navigation on the Rivers Congo and Niger.[131] Many of these treaties have been replaced or revised, but the régimes of free navigation have been maintained in the new or revised instruments, and today it is possible to regard these rivers as subject to customary régimes. But from the beginning the treaties themselves seem to have been regarded as having created the international régimes in question. Thus, within two years of the conclusion of the Berlin Act of 1885 and before it was reasonable to speak of any "custom", the United States, which was not a party to that Act, contested the legality of a decree of the Congo

State as being incompatible with the régime of free navigation, without its right to do so being challenged.[182]

(10) The Suez Canal Convention of 1888 has in some of its aspects had a chequered history,[133] but it cannot be doubted that the Convention had, or came to have, the effect of creating an international régime of free navigation, applicable *erga omnes* subject to the conditions which it laid down. From the earliest days it seems to have been recognized that for the purposes of the régime of free passage there was no difference between signatories and non-signatories;[184] and in 1956, when the Suez Canal Company was nationalized, Egypt emphasized that this régime of free navigation through the Canal would not be affected. No doubt, where a régime of this kind has been maintained for three-quarters of a century, custom as well as treaty may be invoked as its basis. But the fact is that States have throughout treated the Convention as the legal source of the international régime. The position in regard to the Panama Canal differs in two respects from that in the case of the Suez Canal. First, the Hay-Pauncefote Treaty of 1901 was bilateral. Second and more important, the *travaux préparatoires* show that, while the treaty provides for freedom of navigation and prohibits blockade of the Canal or belligerent acts within it, the intention to confer an "actual right" of passage on third States, as distinct from a mere privilege, was lacking on the part of the United States ; and they also show that Great Britain was doubtful whether the neutralization provisions could be made effective against third States unless it was expressly laid down that observance of those provisions should be a condition of free passage.[185] It is unnecessary to go further into the question as to what today is the actual status of this Canal, which the United States has in the past asserted not to be subject to a general *right* of passage but which the Permanent Court treated in the *Wimbledon* case [186] as an example of an artificial waterway "permanently dedicated to the use of the whole world". It suffices to point out that such doubts as may exist concerning the régime of the Panama Canal under the Hay-Pauncefote Treaty are caused by the asserted absence of any original intention in the Treaty to confer an " actual right " on third States. In the *Wimbledon* case itself the Permanent Court was concerned with the effect of articles 380-385 of the Treaty of Versailles on the status of the Kiel Canal. The principal provision was that in article 380, which declared : "The Kiel Canal and its approaches shall be maintained free and open to the vessels of commerce and of war of all nations at peace with Germany on

---

[127] *United Nations Treaties Series*, vol. 402.

[128] Convention of Constantinople of 29 October 1888.

[129] Of 20 July 1936.

[130] See generally R. F. Roxburgh, *International Conventions and Third States* ; C. Rousseau, *Principes généraux du droit international public* (1944), pp. 477-484.

[131] See Oppenheim, *International Law* (1961), vol. 1, pp. 465-474 ; Fauchille, *Traité de droit international public* (1925), tome I, sections 525-531 ; T. O. Elias, *A.J.I.L.* (1963), pp. 873-882.

[132] See R. F. Roxburgh, *International Conventions and Third States*, pp. 49-50.

[133] Apart from recent events, the technical position with regard to the entry into force of the Conventions was obscured by British reservations.

[134] Great Britain so informed the United States in 1898 during the Spanish-American War ; Buell, *Revue générale de droit international public* (1936), vol. 51, p. 57.

[135] See R. F. Roxburgh, *International Conventions and Third States*, pp. 63-70, where the relevant *travaux préparatoires* are set out.

[136] *P.C.I.J.* (1923), Series A/1, p. 28.

terms of entire equality". The Court said that the terms of this article were categorical, and went on : [137]

> "It follows that the canal has ceased to be an internal and national navigable waterway, the use of which by the vessels of states other than the riparian state is left entirely to the discretion of that state, and that it has become an international waterway intended to provide under treaty guarantee easier access to the Baltic for the benefit of all nations of the world."

In later passages [138] the Court emphasized the "intention of the authors of the Treaty of Versailles to facilitate access to the Baltic by establishing an international régime" and, as previously indicated, spoke of the great maritime canals as artificial waterways permanently *dedicated* to the use of the whole world. If the language of the judgement is taken at its face value, the Court certainly seems to have regarded the international status of the Canal as having been established by the force of the treaty itself, without the aid of custom or recognition. Moreover, in subordinating Germany's obligations as a neutral in the Russo-Polish war to her obligations under the international régime, the Court gave the international régime precedence over the interests of a third State — Russia — in the observance by Germany of her obligations as a neutral. In appreciating the implications of the Court's language, however, it has to be borne in mind that all the parties in the case were parties to the Versailles Treaty, so that the Court may not have addressed itself to the question of the interests of third States so fully as it might otherwise have been required to do.

(11) Treaties concluded in the general interest for the neutralization or demilitarization of specific territories or localities constitute an analogous form of "international régime" or "international settlement". If their purpose is primarily negative — the prohibition of military activity — they create an international status for the territory the maintenance of which may be of vital interest to third States as well as to the parties themselves. The classic example is the permanent neutralization of Switzerland by the agreements concluded in 1815 at the Congress of Vienna. Although on one occasion France contended that the neutrality régime was only facultative so far as Switzerland herself and Sardinia were concerned, the general character of the régime established by the agreements as part of the "public order of Europe" does not seem to have been questioned. The same can be said of the neutralization of Belgium in 1831 by article 7 of the Treaty of London. As to demilitarization, the most significant precedent is the opinion given by the Committee of Jurists to the Council of the League concerning Sweden's right to invoke the demilitarization provisions of the Aaland Islands Convention, of which mention has already been made in paragraph (12) of the Commentary to the previous article.[139] By this Convention, concluded in 1856 between Russia, France and Great Britain, Russia

which was then the territorial Power, undertook that the Aaland Islands would not be fortified nor any military or naval base maintained or created there. In 1920, Sweden, as a State directly affected, claimed to be entitled to hold Finland, now the territorial Power, to compliance with the demilitarization régime imposed upon the Islands by the Convention. The Committee of Jurists, as pointed out in the commentary to the previous article, expressly refused to treat the case as one of *stipulation pour autrui* by reason of the absence of any *particular* intention to benefit Sweden, but nevertheless upheld her claim on the ground of the objective nature of the Convention. On the latter point the Committee said : [140]

> "Nevertheless by reason of the objective nature of the settlement of the Aaland Islands question by the Treaty of 1856, Sweden may, as a Power directly interested, insist upon compliance with the provisions of this Treaty in so far as the contracting parties have not cancelled it. This is all the more true owing to the fact that Sweden has always made use of it [the right] and [it] has never been called in question by the signatory Powers."

And in another passage it explained :

> "These provisions were laid down in European interests. They constituted a special international status relating to military considerations, for the Aaland Islands. It follows that until these provisions are duly replaced by others, every State interested has the right to insist upon compliance with them."

Reference has already been made in paragraph (8) above to the Antarctic Treaty as an example of a treaty providing at once for demilitarization and for freedom of user. This Treaty was drawn up in 1959 by twelve States, which included amongst their number all those States having pretensions to territorial competence with respect to Antarctica. The Treaty provides for periodic meetings of representatives of the parties to formulate and recommend measures in furtherance of the objectives of the Treaty and it also provides for a right of accession. Although the parties evidently contemplated that States desiring to use Antarctica for scientific purposes would normally accede to the Treaty, their intention to create an objective legal régime for Antarctica seems clear, both from the Preamble to the Treaty and from the objective formulation of the basic principles of the régime in articles 1 and 2. Moreover, in article 10 each contracting party undertakes to exert appropriate efforts, consistent with the Charter, to the end that no one engages in any activity in Antarctica contrary to the purposes of the Treaty.

(12) Mandates and trusteeships represent another kind of international régime affecting territory which the International Court has treated as possessing an objective character. Thus, in its advisory opinion on the *International Status of South West Africa* the Court said : [141]

---

[137] *Ibid.*, p. 22.

[138] *Ibid.*, pp. 23 and 28.

[139] See generally F. de Visscher, *Revue de droit international et de législation comparée*, 3rd Series (1921), vol. 2, p. 262.

[140] *League of Nations Official Journal*, Special Supplement No. 3 (October 1920), p. 18.

[141] *I.C.J. Reports*, 1950, p. 132 ; see also the Separate Opinion of Judge McNair, pp. 153-155.

"The Mandate was created, in the interest of the inhabitants of the territory, and of humanity in general, as an international institution with an international object — a sacred trust of civilisation . . . The international rules regulating the Mandate constituted an international status for the Territory recognised by all the Members of the League of Nations, including the Union of South Africa."

In its recent judgement in the *South West Africa* cases (Preliminary Objections),[142] the Court again spoke of the Mandate as constituting "a new international institution" and as "a special type of instrument composite in nature and instituting a novel international régime"; and it upheld the claim of Ethiopia and Liberia to be entitled to invoke the right conferred upon Members of the League to bring a dispute as to the application of the Mandate before the Court. Again, in the even more recent *Northern Cameroons* case,[143] the Court seems to have acted on the same view of the nature of a Trusteeship Agreement, and to have been ready in principle to concede the right of any Member of the United Nations to invoke a jurisdictional clause in a Trusteeship Agreement for the purpose of referring a question concerning its application to the Court. These cases are somewhat special, owing to the particular character of the Mandate and Trusteeship agreements, the conclusion of which involved decisions respectively by the Council of the League and the General Assembly. Certain judges[144] were, in consequence, inclined to regard Mandates and Trusteeships as régimes established by legislative act of the Council or General Assembly, rather than by Treaty. The majority, however, seemed disposed to regard them as agreements concluded by the organ in question on behalf of the Organization and its Members.[145] Whatever is considered to be the correct juridical explanation of Mandates and Trusteeships, the members of the particular organization are not wholly strangers to the transaction establishing the régime. On the contrary, they are parties to the instrument — the Covenant and the Charter respectively — from which the organ's authority to establish the régime was derived, and they are members of the organization supervising the implementation of the régime. Even so, the emphasis placed by the Court on the effect of Mandates and Trusteeships in establishing an international *status* or *institution* is significant.

(13) The common elements which are present in the several categories of treaties discussed in the preceding paragraphs are that in all of them the parties intend *in the general interest to create a régime of general obligations and rights for a region, territory or locality which is subject to the treaty-making competence of one or more of them*. It is the fact that one or more of the parties has a particular competence with respect to the subject-matter of the treaty which differentiates these cases from the case of general law-making treaties. In the latter case no one State has any greater competence than another with respect to the subject-matter of the treaty; and for this reason it is not possible to attribute the same measure of objective effect to the treaty.

(14) A case of a different kind, since it does not relate to any particular territory or area, is that of general international organizations. In its opinion in the case of *Reparation for Injuries suffered in the Service of the United Nations,* the Court, having found that the United Nations possesses international personality, expressly held that this personality was of an objective character not limited to the parties to the Charter. It said : [146]

"Fifty States, representing the vast majority of the members of the international community, had the power, in conformity with international law, to bring into being an entity possessing objective international personality and not merely personality recognized by them alone, together with capacity to bring international claims."

It is true that the non-member State in question — Israel — had not in fact said anything to indicate that it contested the objective existence or personality of the United Nations. But the Court's pronouncement in the above passage is entirely general in its terms, and appears to lay down that under international law the legal personality of the United Nations is opposable to a non-member independently of its recognition by the latter. As the Court gave no other explanation of its reasons for attributing objective effects to the legal personality of the United Nations created by the Charter, it is not easy to deduce from its decision the precise nature of the principle on which it relied. However, the emphasis which it placed on the fact that the founding States represented the "vast majority of the members of the international community" and the importance which it gave to the intentions of the contracting States in holding that the Organization had legal personality and capacity to act on the international plane suggests that the Court may have deduced the objective character of the personality of the Organization from the intention of the founding States to create an organization of a universal character. As to the competence of the contracting States to invest the Organization with objective personality, the Court gave no other explanation than the fact that they represented the "vast majority of the members of the international community". In the *Aerial Incident* case [147] (Israel v. Bulgaria) this fact was not regarded by the Court as sufficient to clothe Article 35 (5) of the Statute of the Court with objective effects. Whether the Court would have pronounced in favour of the objective character of the United Nations in the *Reparations* opinion if it had been confronted by a State refusing to "recognize" the Organization can only be a matter for speculation. On the face of it, the Court has ruled that a general international organization is a special form of international settlement and that a vast majority of the members of the international community have the necessary competence to give such an organization objective personality.

---

[142] *I.C.J. Reports, 1962,* pp. 329 and 331.

[143] *I.C.J. Reports, 1963,* p. 29.

[144] See joint dissenting opinion of Judges Spender and Fitzmaurice, *I.C.J. Reports, 1962,* pp. 474-479.

[145] See *South West Africa* cases, *I.C.J. Reports,* 1962, p. 331.

[146] *I.C.J. Reports,* 1949, p. 185.

[147] *I.C.J. Reports, 1959,* pp. 136-138.

(15) Other treaties frequently mentioned as having objective effects are treaties for the cession of territory, boundary treaties, etc.[148] These treaties, it is true, create territorial settlements between the parties which produce objective effects in general international relations. Thus, a treaty of cession or a boundary treaty affects the application territorially of any treaty afterwards concluded by either contracting party with another State, and the application of the general rules of international law with regard to such matters as territorial waters, air space, nationality, etc. But it is the dispositive effect of the treaty — the situation which results from it — rather than the treaty itself which produces these objective effects. These treaties differ from the other categories of treaties previously discussed in that their purpose is to regulate the particular interests of the parties rather than to establish a general régime in the general interest. Other States, no doubt, may be affected — even to an important extent — by the conclusion of the treaty, but they are affected by the treaty only incidentally, not by the direct application of the provisions of the treaty itself. Nor have the parties manifested any intention that other States should have or acquire any right or interest in the treaty, and other States cannot, in consequence, derive from the treaty any *legal* title for claiming a *locus standi* with regard to the maintenance or revision of the settlement established by the treaty. Accordingly, while not wishing to minimize in any way the importance of the dispositive effects of these forms of territorial settlement, the Special Rapporteur doubts whether it would be appropriate to include them in the present article.

(16) The opinion of writers is divided as to the conclusions to be drawn from State practice and the jurisprudence of international tribunals. Some writers [149] take the view that, strictly speaking, no treaty can be regarded as having, by its very nature, objective effects upon third States. Where a treaty is generally accepted as being a source of obligations and rights for third States, they consider that this is not due to any objective effects of the treaty but is the result of a gradual formation of an international custom through acquiescence in the treaty. Other writers,[150] though cautious as to the precise process by which this occurs, are more inclined to recognize that certain categories of treaties, intended by the parties to operate *erga omnes*, produce objective effects. The previous Special Rapporteur, as pointed out in paragraphs (4) to (6) of the present commentary, was not disposed to recognize that any special categories of treaties are inherently of a legislative character. Summarizing his own attitude in paragraph 71 of his fifth report, he said : [151]

" The considerable lack of enthusiasm evinced over the supposedly inherently legislative effect of some

kinds of treaties is evidence of a certain uneasiness at the idea. Exactly which classes have this effect, and why and how ? It is easy to see that some treaties trigger off, so to speak, a law-making process. Again, some treaties are valid as against third States because the latter actively avail themselves of the treaty. It is less easy to see why others, even if they do embody ' international settlements ', should be regarded as having an automatic effect *erga omnes.*"

Nevertheless, by introducing the doctrine of a general *duty* to respect lawful treaties and to recognize and respect situations of law or fact established under lawful treaties, he went near to admitting by the back door the concept which he rejected at the front.

(17) The present Special Rapporteur, as will be apparent from the preceding paragraphs and from the commentary to the previous article, has felt considerable doubts and hesitations on the whole question of exceptions to the rule *pacta tertiis nec nocent nec prosunt.* One possible solution would be for the Commission to limit its proposals to the statement of the *pacta tertiis* rule in article 61 and to the *stipulation pour autrui* exceptions formulated in article 62 ; and to leave aside all other cases as being essentially cases of custom or recognition not falling within the purview of the law of treaties. However, this solution scarcely accounts for the undoubted fact that certain kinds of treaties do appear to create objective régimes, if not at once, at least after only a brief interval. The present Special Rapporteur shares the doubts of his predecessor as to whether States are yet prepared to regard any treaty as being automatically binding upon them regardless of their opposition to it. But this leads him also to doubt whether States would be any more ready to accept the concept of a general duty to respect or recognize a treaty to which they might be opposed ; in other connexions [152] the notion of a legal duty to recognize has been the subject of acute differences of opinion. On the other hand, it seems to the Special Rapporteur that, on the evidence examined in this commentary, there may be a case for attributing special effects to treaties where the parties both have territorial competence with respect to the subject-matter of the treaty and have the intention to create a general régime in the general interest. A possible solution in these cases, it is thought, may be to have recourse to the principle of tacit recognition — tacit assent — the importance of which in the law of treaties was recognized by the International Court in its Advisory Opinion on *Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide.*[153]

(18) The present article has therefore been formulated on the basis that treaties intended by the parties to provide a general régime for particular regions, States, territories, etc., constitute a special category of treaties which, in the absence of timely opposition from other States, will be considered to have objective effects with regard to them. *Paragraph 1* of the article defines the category of treaties which falls under its provisions,

---

[148] See Lord McNair, *Law of Treaties* (1961), pp. 256-259.
[149] E.g. R. F. Roxburgh, *International Conventions and Third States,* pp. 81-82 ; *Harvard Research Draft,* pp. 922-923.
[150] E.g. Lord McNair, *Law of Treaties* (1961), chapter XIV ; C. Rousseau, *Principes généraux du droit international public* (1944), pp. 462-464 and 477-484 ; M. Lachs, *Recueil des Cours de l'Académie de droit international,* 1957, vol. I, pp. 315-317.
[151] *Yearbook of the International Law Commission, 1960,* vol. II, p. 98.

[152] Recognition of States and Governments.
[153] *I.C.J. Reports, 1951,* p. 21.

and the essential elements of the definition are : (i) the intention of the parties must be to create general rights and obligations in the general interest relating to a particular region, State, territory, etc., and (ii) the parties must include amongst their number the State or States having territorial competence with reference to the subject-matter of the treaty or, at least, that State or States must have expressly assented to the provisions creating the régime. The limitation to cases where the territorial Power participates in or consents to the creation of the régime is important from two points of view. First, it protects the territorial Power against any attempt by others to impose the régime upon it without its consent. Secondly, it excludes from the article cases where the parties have a general treaty-making competence with respect to the subject-matter of the treaty but no general competence in the matter than any other State ; in other words, it excludes law-making treaties concerned with general international law or with areas not subject to the exclusive juris-diction of any State. Reasons for regarding any objective régimes that may result from such treaties as deriving their force more from "custom" than from the treaty have already been given in paragraph (3) of this commentary. While recognizing that there is some similarity between the two cases, the Special Rapporteur considers that under the present article the treaty provisions themselves more directly constitute the legal source of the régime.

(19) The definition in paragraph 1 does not, therefore, include treaties dealing with the high seas or with outer space, or with particular areas of the high seas or outer space. It does not, for example, cover the Geneva Conventions of 1958 on the Régime of the High Seas and on Fishing and Conservation of the Living Re-sources of the High Seas ;[154] nor does it cover the Nuclear Test-Ban Treaty. These treaties belong to the category of general law-making treaties rather than to the category of treaties with which this article deals. The rules which they contain may come to be regarded as general rules of international law either through the number of accessions[155] or through general acceptance as custom. In some cases, as in that of the Nuclear Test-Ban Treaty, this may happen rapidly. But more often it is a gradual process and conventions like the Geneva Convention on Fishing and Conservation of Living Resources show how difficult it would be to place these treaties under the present article.

(20) The limitation to cases where the parties have territorial competence also excludes from the scope of the present article the case of treaties creating international organizations. Although the case of the objective personality of international organizations may be analogous to the cases covered in the present article, the principle involved is not thought to be precisely the same as that on which the present article rests. The question of the objective personality of organizations seems to contain a larger and more definite element

of "recognition" than do cases under the present article. True, cases under the present article can be, and sometimes are, dealt with in terms of recognition ; but it seems entirely legitimate to view these cases as instances of acceptance of treaty provisions. Furthermore, it would be difficult to formulate satisfactory provisions concerning the objective effects of treaties creating international organizations without anticipating and prejudging in some measure the work of the Commission on the relations between States and inter-governmental organizations, which it has entrusted to another Special Rapporteur.[156] Certainly, the pronouncement of the International Court in the *Reparations for Injuries* case cited in paragraph (14) of this commentary leaves too much room for argument as to what exactly was the principle on which it acted for it to be possible simply to recast the opinion of the Court in the form of a draft article dealing with the objective effects of treaties.[157] The Special Rapporteur accordingly considers that this point should be omitted from the present articles and left to be dealt with at some future date as part of the law of international organization.

(21) *Paragraph 2 (a)* lays down the general principle that where an intention to create an objective régime of the kind defined in paragraph 1 is present, any State which expressly or impliedly assents to its creation or to its execution will be considered as having accepted the general provisions of the régime. This is not to say that the State becomes a party to the treaty ; it becomes subject to the general provisions — the provisions intended to operate *erga omnes* — and that is all. Treaties of this kind not infrequently contain guarantee clauses or other provisions intended to operate only between the contracting parties, so that the distinction between being a party to the treaty and being subject to the provisions of the general régime is an important one.

(22) *Paragraph 2 (b)*, in order to take account of the objective effects apparently attributed to these treaties in some cases by the World Court, and in order to remove doubts, tentatively proposes that, as in the case of reservations, the Commission should set a time-limit after which tacit assent should be conclusively presumed from the absence of any apparent opposition to the régime provided for in the treaty. The length of the period would be a matter for decision after obtaining the views of Governments, but a period of the order of five years seems not unreasonable.

(23) *Paragraph 3* spells out in terms of obligations and rights the consequences of the acceptance of an objective régime. It emphasizes again that it is only the *general* obligations and rights of the treaty to which the third State becomes subject. At the same time paragraph 2 (b) makes it clear that any exercise

<hr>

[154] *United Nations Conference on the Law of the Sea, Official Records,* United Nations publication, Sales No. 58.V.4, vol. II.

[155] As in the case of the Kellogg-Briand Pact and the Nuclear Test-Ban Treaty.

[156] Mr. El-Erian ; see *Yearbook of the International Law Commission, 1962,* vol. II, p. 192, para. 75.

[157] Cf. G. Schwarzenberger, *International Law,* vol. 1, 3rd edition, pp. 128-130 ; Finn Seyersted, *Objective Personality of Inter-governmental Organizations* (1963) ; Bindschedler, "Die Anerkennung im Völkerrecht ", *Archiv des Völkerrechts,* IX (1961-1962), pp. 387-388.

of a right by a third State under the régime is subject to the terms of the treaty as a whole; for the treaty may contain provisions which, although they do not relate directly to the régime itself, are intended to govern the whole operation of the treaty. The mere fact that certain provisions of a treaty may constitute an objective régime does not mean that they are to be regarded as independent of the rest of the treaty.

(24) *Paragraph 4* deals with the delicate question of the competence of the parties to modify or terminate the régime. Some treaties creating objective régimes, as for example the Montreux Convention and the Antarctic Treaty, contain specific provisions regarding the procedure for their amendment. In that event, the procedure laid down in the treaty would seem necessarily to determine the question of the right to participate in any decision to modify or terminate the régime. Other treaties, such as the Suez Canal Convention and the Versailles Treaty, do not contain any such provisions, and the question whether third States interested in the functioning of the régime are to have any voice in its amendment or termination is one of considerable importance. In the case of *stipulation pour autrui* it has been proposed in the previous article that the parties should remain free to amend or revoke the right unless its creation was a matter of express agreement with the third State or the parties can be shown to have intended the right to be irrevocable. In cases falling under the present article, however, the intention of the parties to create a general régime in the general interest seems to justify a rule more favourable to third States. Furthermore, the growing interdependence of States seems to make it desirable that at any rate those States which are substantially interested in the functioning of the régime should be allowed a voice in its amendment or termination.

(25) This seems to have been the general opinion of States at the time of the Suez Canal crisis of 1956, when invitations were sent by two of the parties to the 1888 Convention to twenty-four States to attend the London Conference for the purpose of considering the possible revision of the operating arrangements for the Canal.[158] Those responsible for the invitations purported to justify them on the ground that these States were either parties to the Convention or "largely concerned in the use of the Canal". The President of Egypt, in rejecting the invitation, strongly criticized the manner of the invitations and the actual selection of the States to whom they were sent, but he did not question the right of interested States to be consulted. On the contrary, he expressly said: " Egypt is ready to co-operate with the other Governments signatories of the Constantinople Agreement of 1888 to meet us at a conference to which other Governments whose ships use the Canal would be invited." Similarly, although the actual list of States invited was sharply criticized by some States at the London Conference, the complaint was that more, not fewer, States making substantial use of the Canal ought to have been invited.

Whether the Canal-using States were regarded as having a right to a voice in the drawing up of the new agreement or only a right to be consulted was not made clear; but the latter appears to have been the general assumption.

(26) Admittedly, in the past, even parties to general régimes have not always been invited to participate in their revision. But the Commission can only propose the rule which seems to it correct in principle, and the rule suggested in paragraph 4 is that third States substantially interested in the functioning of the régime should be regarded as entitled to participate in any decision to amend or terminate an objective régime. This would not give them any say in the modification of provisions of the treaty which do not affect the functioning of the régime. But if their interest in the régime is to be taken into account in connexion with its revision, a right to participate in the new agreement would seem to be more satisfactory than a mere right to be consulted.

*Article 64. — Principles of a treaty extended to third States by formation of international custom*

Nothing in articles 61 to 63 is to be understood as precluding principles of law laid down in a treaty from becoming applicable to States not parties thereto in consequence of the formation of an international custom embodying those principles.

*Commentary*

The operation of "custom" in extending the effects of law-making treaties to third States has already been discussed in paragraph (2) of the commentary to the previous article. Although law-making treaties are, no doubt, the most important and commonest cases where this process occurs, it is not confined to such treaties. Purely contractual treaties may have the same result if principles which they formulate are subsequently endorsed and acted on by other States. However, for the reasons given in the commentary to the preceding article, it is not thought appropriate to deal with the extension of the effects of treaties through the growth of custom as a true case of the legal effects of treaties on third States. The proper course, it is thought, is simply to reserve the point, emphasizing that nothing in the preceding articles is to be taken as precluding the extension of principles contained in a treaty to third States as a result of the formation of an international custom embodying those principles.

*Article 65. — Priority of conflicting treaty provisions*

1. Subject to Article 103 of the Charter of the United Nations, the obligations of a State which is a party to two treaties whose provisions are in conflict shall be determined as follows.

2. Whenever it appears from the terms of a treaty, the circumstances of its conclusion or the statements of the parties that their intention was that its provisions should be subject to their obligations under another treaty, the first-mentioned treaty shall be applied so far as possible in a manner compatible with the

---

[158] See generally E. Hoyt, *The Unanimity Rule in the Revision of Treaties* (1959), pp. 234-241; *The Suez Canal Problem*, Department of State Publication 6392.

provisions of the other treaty. In the event of a conflict, the other treaty shall prevail.

3. (a) Where all the parties to a treaty, either with or without the addition of other States, enter into a further treaty which conflicts with it, article 41 of these articles applies.

(b) If in such a case the earlier treaty is not to be considered as having been terminated or suspended under the provisions of article 41, the earlier treaty shall continue to apply at between the parties thereto, but only to the extent that its provisions are not in conflict with those of the later treaty.

4. When two treaties are in conflict and the parties to the later treaty do not include all the parties to the earlier treaty —

(a) as between a State party to both treaties and a State party only to the earlier treaty, the earlier treaty prevails ;

(b) as between States parties to both treaties, the later treaty prevails ;

(c) as between a State party to both treaties and a State party only to the later treaty, the later treaty prevails, unless the second State was aware of the existence of the earlier treaty and that it was still in force with respect to the first State.

*Commentary*

(1) The legal effects of conflicts between treaties were examined at some length by the Special Rapporteur in his previous report [159] in the commentaries to his draft articles 14 and 19, where he dealt with them in the contexts respectively of the "invalidity" and of the "termination" of treaties. In those commentaries he took the position that : (i) conflicts between treaties in cases where the parties to the later treaty do not include all the parties to the earlier one appear to raise questions of priority rather than of invalidity (article 14) ; and (ii) a conflict between two treaties where all the parties to the earlier treaty are also parties to the later treaty raises only the question of the amendment or termination of the earlier treaty (article 19).

(2) As to the first category of case — where the parties to the later treaty do not include *all* the parties to the earlier — the Commission discussed the Special Rapporteur's proposals at its 685th, 687th and 703rd meetings.[160] The majority of the Commission were inclined to share his view that, leaving aside the case of conflict with a rule of *jus cogens,* which is an independent principle, the fact that a treaty is incompatible with the provisions of an earlier treaty binding upon some of its parties does not deprive the later treaty of validity ; and that, accordingly, this type of case raises primarily questions of priority and of State responsibility. Some members, however, although agreeing that this was true as a general rule, were not

convinced that it necessarily held good in every case. In particular, these members expressed doubts as to the validity of a treaty which conflicts a prior treaty neutralizing or demilitarizing a territory or embodying a political settlement of great importance. During the discussion reference was also made to : (i) clauses found in certain treaties, e.g. Article 103 of the Charter, which claim priority for their provisions over those of any other treaty ; (ii) clauses found in some treaties dealing specifically with their relation to previous treaties ; and (iii) possible cases of conflict between treaties having entirely different parties. Another point mentioned was the relation of the question of conflicts between treaties to that of the revision of treaties. In general, the Commission felt that these cases of conflict with prior treaties raised questions of considerable complexity and that it would be in a better position to arrive at firm conclusions concerning them after receiving the Special Rapporteur's report on the application of treaties. It accordingly decided [161] to adjourn its consideration of these cases until its sixteenth session and to settle at that session the appropriate position in which to place them in its draft articles on the law of treaties.

(3) As to the second category of case — where all the parties to the earlier treaty are also parties to the later — the Commission recognized that there is always a preliminary question of construction of the two treaties in order to determine the extent of their incompatibility and the intentions of the parties with respect to the maintenance in force of the earlier treaty. Some members of the Commission considered that for this reason this type of case ought not to be dealt with under the head of "implied termination of treaties" but should be covered in the present report under the head of "application of treaties". The Commission, however, decided that, even if there were a preliminary question of interpretation in these cases, there was still the question of the conditions under which that interpretation should be regarded as leading to the conclusion that the treaty has been terminated. Accordingly, it examined this question in the context of the termination of treaties, and adopted an article — article 41 — providing for the implied termination of a treaty as a result of the subsequent conclusion of another treaty conflicting with it. The Commission also decided provisionally, and subject to reconsideration at its sixteenth session, to retain the article in the section dealing with termination of treaties.[162]

(4) Thus, the Commission has decided that at its forthcoming session it will re-examine both categories of conflicts between treaties in connexion with its discussion of the application of treaties. At the fifteenth session [163] the Special Rapporteur explained that, although not himself persuaded that invalidity ever results from mere conflict with an earlier treaty, he had felt bound to include the question in his section on

[159] Second report on the law of treaties, in *Yearbook of the International Law Commission, 1963,* vol. II, pp. 53 and 71.

[160] For the summary records of those meetings, see *Yearbook of the International Law Commission, 1963,* vol. I.

[161] *Yearbook of the International Law Commission, 1963,* vol. II, p. 189, para. 15.

[162] *Ibid.,* p. 204, commentary to article 41.

[163] *Yearbook of the International Law Commission, 1963,* vol. I, summary record of the 685th meeting, para. 53.

the invalidity of treaties because the last two Special Rapporteurs and both the modern textbooks on the law of treaties dealt with the question of conflicts between treaties in the context of invalidity. The draft article — article 14 — and commentary submitted to the Commission at that session were therefore oriented towards a discussion of the validity of treaties which conflict with earlier treaties. This being so, and as the question is now to be examined by the Commission in connexion with the application of treaties, the Special Rapporteur believes that it will be helpful to the Commission if he submits a new draft article and commentary on conflicts between treaties which is oriented more to the application than to the validity of treaties. This also has the advantage of making it possible to submit proposals to the Commission which take account of points made in the discussion of this topic at the previous session.

(5) The question of conflicts between treaties, considered from the point of view of "application of treaties", has close connexions both with the provisions of articles 61 to 63 concerning the legal effects of treaties on third States and with the revision of treaties. Thus, the principle that a treaty cannot impose obligations on a third State or deprive it of its legal rights is of paramount importance in those cases of conflict where the parties to the later treaty do not include all the parties to the earlier one. Accordingly, if the Commission should arrive at the conclusion that conflict with an earlier treaty is not a cause of nullity except when the conflict is with a rule of *jus cogens,* there will be an obvious convenience in dealing with conflicts between treaties here immediately after the articles concerned with the legal effects of treaties on third States. As to the link with "revision of treaties", a revising instrument is all too frequently another treaty the parties to which do not include all the parties to the earlier treaty, so that the revision gives rise to a case of conflict between treaties. Indeed, it can safely be said that the majority of conflicts between treaties are the product of such revisions. Consequently, there may also be advantage in examining the question of "conflicts between treaties" in close proximity to "revision" which the Special Rapporteur has therefore dealt with in the next section.

(6) The draft article (article 14) submitted by the Special Rapporteur in his previous report [164] contained in paragraph 3 (b) a rule repeating textually Article 103 of the Charter, which states : "In the event of a conflict between the obligations of the Members of the United Nations under the Charter and their obligations under any other international agreement, their obligations under the Charter shall prevail." Paragraph 4 of the draft also made a general reservation concerning cases where a treaty conflicts with a provision of another treaty that embodies a rule having the character of *jus cogens,* in which event the treaty conflicting with that provision was to be void under another article. The suggestion was made at the fifteenth

session [165] that both these rules — Article 103 of the Charter and the invalidity of a treaty conflicting with a *jus cogens* provision — should be moved up to the head of the article in order to emphasize their overriding character. While agreeing in principle with the suggestion, the Special Rapporteur doubts whether it is necessary in *paragraph 1* of the present article to do more than proclaim the priority of Article 103 of the Charter over the general provisions formulated in the article.

(7) The Commission has already specified in articles 37 and 45, adopted at its fifteenth session, that a treaty which conflicts with a peremptory norm of general international law having the character of *jus cogens* is void, and this provision clearly applies whether or not that norm has its origin in customary law or in a treaty provision. If one of two conflicting treaties is void, it is not a treaty in force and there is no question of its application. It does not therefore seem necessary to repeat the *jus cogens* rule in the present article, which concerns the application of treaties.

(8) As to Article 103 of the Charter, the application of the rule which it contains is in terms confined to the obligations of Members of the United Nations, while the Court itself has held that the Charter, viewed simply as a treaty, is not binding upon non-members. [166] In consequence, doubt exists as to what exactly is the effect of Article 103 where the treaty which is in conflict with the Charter has been concluded with a non-member. Some authorities, [167] it is true, have been ready to see in Article 103 a provision which gives priority to the Charter over any treaty concluded by a Member which is inconsistent with its obligations under the Charter, even to the extent of overriding the rights of non-members. The more general opinion, [168] however, seems to be that, while Article 103 precludes the Member State from executing the treaty which is inconsistent with the Charter, the non-member remains entitled to hold the Member responsible for a breach of the treaty. Moreover, as pointed out in the present Special Rapporteur's previous report, [169] the very language of Article 103 makes it clear that it prescribes the *priority* of the Charter, not the *invalidity* of treaties conflicting with it. Having regard to the nearly universal membership of the United Nations and to the special place occupied by the Charter in the international law

---

[164] *Yearbook of the International Law Commission, 1963,* vol. II, p. 54.

[165] M. Lachs, *Yearbook of the International Law Commission, 1963,* vol. I, summary record of the 687th meeting, paras. 4 and 14.

[166] *Aerial Incident Case* (Israel v. Bulgaria), *I.C.J. Reports, 1959,* p. 138.

[167] E.g. P. Guggenheim, *Traité de droit international,* vol. I, p. 147 ; Lord McNair, *Law of Treaties* (1961), p. 218, but only, it seems, with regard to subsequent treaties ; cf. Oppenheim, *International Law* (eighth edition by Lauterpacht), vol. I, p. 896, footnote 1.

[168] E.g. Sir G. Fitzmaurice, third report, *Yearbook of the International Law Commission, 1958,* vol. II, p. 43, and fourth report, *Yearbook of the International Law Commission, 1959,* vol. II, p. 62 ; J. Leca, *Les Techniques de revision des Conventions Internationales* (1961), pp. 182-187.

[169] Paragraph 10 of the commentary to article 14, in *Yearbook of the International Law Commission, 1963,* vol. II, p. 55.

of today, it is considered to be entirely justifiable to recognize in the present article the overriding character of Article 103 of the Charter with respect to any treaty obligations of Members that conflict with their obligations under the Charter. But in doing so it may be advisable for the Commission simply to rest on the language of Article 103 and not to seek to draw from it conclusions as to the effect of the Article on treaties concluded by Members with non-members. The question was discussed in the meetings of the Collective Measures Committee [170] but was not resolved. Clearly, where the conflict is with a Charter provision like Article 2, paragraph 4, which embodies a rule of *jus cogens*, the conflicting treaty will be void under article 37 of the present articles with respect to a non-member no less than with respect to a Member. Moreover, the near universality of the membership of the United Nations has greatly reduced the area for the application of Article 103.

(9) Accordingly, for the reasons that have been given, *paragraph 1* simply provides that the rules laid down in the present article for regulating conflicts between treaties are subject to Article 103 of the Charter.

(10) The practice of inserting a clause in a treaty for the purpose of determining the relation of its provisions to those of other treaties entered into by the contracting States appears to be on the increase, and is clearly to be recommended whenever there is a possibility of a conflict. These clauses are of various kinds, some of which do not appear to do more than confirm the general rules of priority contained in paragraphs 3 and 4 of this article. For example, a clause such as that found in article 234 of the Treaty establishing the European Economic Community [171] and in article 14 of the Convention of 25 May 1962 on the Liability of Operators of Nuclear Ships,[172] which disavows any intention to disregard the rights of third States under existing treaties, merely confirms the general rule *pacta tertiis non nocent*, which is expressed in paragraph 4. Similarly, a clause such as that in article 18 of the Universal Copyright Convention of 1952,[173] providing that as between States parties to Pan-American Copyright Conventions the convention which is later in time is to prevail, merely confirms the general rule expressed in paragraph 3 of the present article. Nor does a clause like article 73, paragraph 2, of the Vienna Convention of 1963 on Consular Relations,[174] which recognizes the right to *supplement* its provisions by bilateral agreements, appear to touch the rules concerning conflicts between treaties ; for it merely confirms the legitimacy of bilateral agreements which deal with the same subject and do not derogate from the obligations of the

general Convention. Certain other clauses do, however, appear to influence the operation of the general rules, and therefore to require special mention.

(11) A number of treaties contain a clause in which the contracting States declare either that the treaty is not incompatible with, or that it does not affect, their obligations under another designated treaty or, alternatively, under other treaties generally. Thus, many treaties [175] concluded during the period of the League of Nations had clauses providing that nothing contained in them was to be regarded as imposing upon the parties obligations inconsistent with their obligations under the Covenant. A similar clause disavowing any incompatibility with the Charter is to be found in a number of treaties which set up regional organizations.[176] Among other examples are : article 17 of the Universal Copyright Convention of 1952, which disavows any intention to affect the provisions of the Berne Convention for the Protection of Literary and Artistic Works ; article 30 of the Geneva Convention of 1958 on the High Seas [177] and article 73 of the Vienna Convention on Consular Relations,[178] both of which disavow any intention to override existing treaties. These clauses, in so far as they cover existing treaties concluded by the contracting States with third States, merely confirm the general rule *pacta tertiis non nocent*. But these clauses go beyond that rule, because they affect the priority of the respective treaties as between parties to both treaties, and because in some cases they concern the relationship between the treaty and *future* treaties concluded by a contracting State with a third State. These clauses appear to amount to a declaration of intention that the treaties which contain them are to give way before either another designated treaty or generally before any other treaties of the contracting States. In other words, these clauses appear in any case of conflict to give priority to the other treaty, and therefore to be of decisive effect in the application of the two treaties. Accordingly, even if in particular instances the application of these clauses may not differ from the general rules of priority set out in paragraphs 3 and 4, it is thought that they should be made the subject of a special paragraph in the present article.

(12) *Paragraph 2* therefore provides that, whenever it appears that the intention of the parties to a treaty was that its provisions should be subject to their obligations under another treaty, the first-mentioned treaty is to be applied so far as possible in a manner compatible with the other treaty ; but that, in the event

[170] See *Repertory of Practice of United Nations Organs*, United Nations publication, Sales No. 1955.V.2, vol. V, pp. 316-318 ; cf. also the *Report of the Blockade Committee of the League of Nations*, Document A.14, 1927, V., p. 86.

[171] *United Nations Treaty Series*, vol. 298 [English translation].

[172] *A.J.I.L.* (1963), p. 275.

[173] *United Nations Treaty Series*, vol. 216.

[174] *United Nations Conference on Consular Relations, Official Records*, vol. II (A/CONF.25/16/Add.1), United Nations publication, Sales No. 64.X.1.

[175] See article 16 of the Statute of 1921 on the Régime of Navigable Waterways of International Concern (*League of Nations Treaty Series*, vol. 7) ; article 6 of the Pan-American Convention of 1936 on Good Offices and Mediation (*League of Nations Treaty Series*, vol. 188) and the further list of treaties cited in C. Rousseau, *Principes généraux du droit international public* (1948), pp. 789-790.

[176] E.g. article 10 of the Inter-American Treaty of Reciprocal Assistance, *United Nations Treaty Series*, vol. 21.

[177] *United Nations Conference on the Law of the Sea, Official Records*, United Nations publication, Sales No. 58.V.4, vol. II.

[178] See footnote 174 above.

of a conflict, the other treaty is to prevail. Normally, such an intention would be expressed in the treaty itself by means of a clause of the kind already described. It seems possible, however, that the parties might have discussed and agreed upon the relation between the treaty and their other treaty obligations in the course of the *travaux préparatoires* without actually providing for it in the treaty. It also seems possible that this might be done after the conclusion of the treaty in some form of mutual understanding as to the effect of the treaty. Consequently, *paragraph 2* has been formulated in terms wide enough to cover these possibilites.

(13) Certain treaties contain a clause of the reverse type by which it is sought to give the treaty priority over another treaty incompatible with it. One form of such clause looks only to the past, and provides for the priority of the treaty over existing treaties of the contracting States which are in conflict with it. Another form looks only to the future, and specifically requires the contracting States not to enter into any future agreement which would conflict with its obligations under the treaty. Some treaties, like the Statute on the Régime of Navigable Waterways of International Concern,[179] contain both forms of clause ; a few, like the Covenant (Article 20) and the Charter (Article 103), contain single clauses which look both to the past and the future. If Article 103 of the Charter is left out of the discussion for the reasons already indicated, it is clear that quite different legal considerations apply to clauses that look to the past from those which apply to clauses that look to the future.

(14) A clause purporting to override an *earlier* treaty presents no difficulty when all the parties to the earlier treaty are also parties to the treaty which seeks to overrid it. As the Commission pointed out in its commentary to article 41, adopted at its fifteenth session,[180] the parties to the earlier treaty are always competent to abrogate it, whether in whole or in part, by concluding another treaty with that object. That being so, when they conclude a second treaty incompatible with the first, they are to be presumed to have intended to terminate the first treaty or to modify it to the extent of the incompatibility, unless there is evidence of a contrary intention. Accordingly, in these cases the inclusion of a clause in the second treaty expressly proclaiming its priority over the first does no more than confirm the absence of any contrary intention and call for the application of the general rule contained in paragraph 3. When, on the other hand, the parties to a treaty containing a clause purporting to override an earlier treaty do not include all the parties to the earlier one, the rule *pacta tertiis non nocent* automatically restricts the legal effect of the clause. The later treaty, *clause or no clause,* cannot deprive a State which is not a party of its rights under the earlier treaty. Consequently, the insertion of such a clause is without any effect in modifying the application of the general rule in paragraph 4 (a), which

provides that in such cases the rights of the third State under the earlier treaty are to prevail. It is, indeed, clear that an attempt by some parties to a treaty to deprive others of their rights under it by concluding amongst themselves a later treaty conflicting with those rights would constitute an infringement of the earlier treaty. For this reason clauses of this kind are normally so framed as expressly to limit their effects to States parties to the later treaty. Article 14 of the Convention of 25 May 1962 on the Liability of Operators of Nuclear Ships,[181] for example, provides :

"This Convention shall supersede any International Conventions in force or open for signature, ratification or accession at the date on which this Convention is opened for signature, but only to the extent that such Conventions would be in conflict with it ; however, nothing in this Article shall affect the obligations of contracting States to non-contracting States arising under such International Conventions."

Similarly, many treaties revising or amending earlier treaties provide for the supersession of the earlier treaty in whole or in part, but at the same time confine the operation of the revising instrument to those States which become parties to it.[182] The effect of this clause is that the amendments come into force only for the parties to the later treaty in their relations *inter se,* while the earlier treaty remains applicable in their relations with States which are parties to the earlier but not to the later treaty.[183] In other words, as between two States which are parties to both treaties, the later treaty prevails, but as between a State party to both treaties and a State party only to the earlier treaty, the earlier treaty prevails. These are the rules laid down in paragraph 4 of the article, so that the insertion of this type of clause in no way modifies the application of the normal rules.

(15) When a treaty contains a clause purporting to override *future* treaties inconsistent with it, the clause can be of no significance if all the parties to the earlier treaty are also parties to the later one. Clause or no clause, when concluding the later treaty they are fully competent to abrogate or modify the earlier treaty which they themselves drew up. It is simply a question of what they intend by the provisions of the later

---

[179] Articles 13 and 18 ; *League of Nations Treaty Series,* vol. 7.

[180] *Yearbook of the International Law Commission, 1963,* vol. II, p. 203.

[181] *A.J.I.L.* (1963), p. 275.

[182] Article 1 of all the United Nations Protocols amending League of Nations treaties declares : "The Parties to the present Protocol undertake that *as between themselves* they will, in accordance with the provisions of the present Protocol, attribute full legal force and effect to, and duly apply, the amendments to this instrument as they are set forth in the annex to the present Protocol". See, for example, Protocol of 1948 amending the International Convention of 1928 relating to Economic Statistics (*United Nations Treaty Series,* vol. 20) ; Protocol of 1953, amending the Geneva Slavery Convention of 1926 (*United Nations Treaty Series,* vol. 182). Cf. also article 59 of the Geneva Convention 1949 for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field (*United Nations Treaty Series,* vol. 75).

[183] Clumsy drafting made the clause in the Geneva Convention of 1906 revising the 1864 Convention for the Amelioration of the Condition of the Wounded or Sick in Armies in the Field appear to lay down a slightly different rule ; see 99 *British and Foreign State Papers,* p. 968. But the error does not appear in the 1929 and 1949 Conventions.

treaty, and the existence of the clause in the earlier treaty can hardly affect the answer to that question, once the later treaty is seen to contain provisions incompatible with the earlier one.

(16) More difficult and more important is the effect of such a clause in cases where the parties to the later treaty do not include all the parties to the earlier one. The clause in the earlier treaty may be so framed as to prohibit the parties from concluding with any State whatever a treaty conflicting with the earlier treaty ; e.g. article 2 of the Nine-Power Pact of 1922 with respect to China.[184] Or it may refer only to agreements with third States, as in the case of article 18 of the Statute on the Régime of Navigable Waterways of International Concern : [185] "Each of the contracting States undertakes not to grant, either by agreement or in any other way, to a non-contracting State, treatment with regard to navigation over a navigable waterway of international concern which, as between contracting States, would be contrary to the provisions of this Statute". Or, again, the aim of the clause may be to prohibit the contracting States from entering into agreements *inter se* which would derogate from their general obligations under the convention.[186] As pointed out in his previous report,[187] it seems to the Special Rapporteur very doubtful whether any of these clauses can be said to modify the application of the normal rules for resolving conflicts between treaties. These clauses are certainly relevant in considering whether or not the later treaty is incompatible with the earlier one and may in that way affect their application. Some obligations contained in treaties are in the nature of things intended to apply generally to all the parties all the time. An obvious example is the Nuclear Test-Ban Treaty, and a subsequent agreement entered into by any individual party contracting out of its obligations under that treaty would manifestly be incompatible with the Treaty. Other obligations, however, such as those in the Vienna Convention on Consular Relations, are of a purely reciprocal kind, so that a bilateral treaty modifying the application of the Convention *inter se* the contracting States is perfectly compatible with its provisions. But the parties may in particular cases decide to establish a single compulsory régime in matters susceptible of being dealt with on a reciprocal basis, e.g. copyright or the protection of industrial property. The chief legal relevance of a clause asserting the priority of a treaty over subsequent treaties which conflict with it therefore appears to be in making explicit the intention of the parties to create a single

"integral" or "interdependent" treaty régime not open to any contracting out. In short, by expressly forbidding contracting out the clause predicates in unambiguous terms the incompatibility with the treaty of any subsequent agreement concluded by a party which derogates from the provisions of the treaty. But it is not believed that the mere insertion of such a clause can in any other respect give a treaty a higher sanctity or priority than attaches to it by the fact of its being earlier in point of time.

(17) Any treaty laying down "integral" or "interdependent" obligations not open to contracting out must be regarded as containing an implied undertaking not to enter into subsequent agreements which conflict with those obligations. The very fact that a State accepts obligations of that nature in a treaty implies also its acceptance of an obligation not to conclude any subsequent agreement conflicting with the treaty except with the consent of the other parties. If it does so, it violates its obligations to the other parties under the treaty and, by reason of the rule *pacta tertiis non nocent*, it cannot invoke the subsequent agreement to relieve it of its responsibility for that violation. In consequence, as between that State and any party to the earlier treaty which has not consented to the later treaty, the obligations of the earlier treaty prevail. This is the normal rule of priority formulated in paragraph 4 (a), and the insertion of a special clause in the earlier treaty claiming priority for its provisions merely confirms, and does not modify, the operation of that rule. The implications of taking any different view would really be quite inadmissible. Many treaties laying down the most fundamental "integral" or "interdependent" obligations do not contain any explicit undertaking against contracting out or any clause claiming special priority for their provisions. The Kellogg-Briand Pact, the Genocide Convention, and the Nuclear Test-Ban Treaty are examples, and it is impossible to suppose that the absence from such treaties of any explicit undertaking against contracting out and of any special priority clause weakens or affects their impact upon a subsequent agreement which is incompatible with their provisions. Accordingly, it is not believed that the presence or absence of a specific clause regarding future treaties has any bearing on the formulation of the rules governing the *priority* of conflicting treaties. This does not mean that such clauses are without any effect. But, as already pointed out, their relevance comes at an earlier stage in determining whether or not the prior treaty permits contracting out and whether accordingly the later agreement is or is not compatible with the prior treaty.

(18) It follows that for the reasons given in paragraphs (10) to (17) the Special Rapporteur does not think that any of the clauses found in treaty practice asserting the priority of a particular treaty over other treaties require special mention in the present article, apart from Article 103 of the Charter. *Viewing the matter simply as one of the application of treaties in force*, none of these clauses appears to modify the operation of the normal rules of priority formulated in paragraphs 3 and 4 of the article. In consequence,

[184] *League of Nations Treaty Series*, vol. 38 : "The Contracting Powers agree not to enter into any treaty, agreement, arrangement, or understanding, either with one another, or, individually or collectively, with any Power or Powers which would infringe or impair the principles stated in paragraph 1."

[185] *League of Nations Treaty Series*, vol. 7.

[186] E.g. Article 15 of the 1883 Convention for the International Protection of Industrial Property (de Martens, *Nouveau Recueil général*, 2ᵉ série, vol. X) ; article 20, the Berlin Convention of 1908 for the Protection of Literary Property (de Martens, *Nouveau Recueil général*, 3ᵉ série, vol. IV).

[187] Second report on the law of treaties, in *Yearbook of the International Law Commission, 1963*, vol. II, pp. 57 and 58, paragraph 19 of the commentary to article 14.

the article does not contain any rule relating to the effect of these clauses. The real issue is a different one — the question, discussed in a preliminary way by the Commission at its fifteenth session, whether a subsequent agreement which conflicts with a treaty containing "integral" or "interdependent" type obligations is merely incapable of being invoked against parties to the earlier treaty or whether it is wholly void. This question, which again does not turn on the presence or absence of a special clause but on the nature of the obligations undertaken in the earlier treaty, is examined below in commenting upon paragraph 4 of the article.

(19) *Paragraph 3* deals with cases where all the parties to a treaty, whether with or without additional States, enter into a later treaty which conflicts with the earlier one. In short, it covers the same ground as article 41 adopted at the fifteenth session and raises the question which was then reserved by the Commission as to the appropriate place for article 41 in the draft articles on the law of treaties. The provisional decision of the Commission to characterize these cases as instances of implied termination of an earlier treaty by entering into a subsequent treaty is believed to be entirely justified. No doubt, the two treaties have to be interpreted and compared in order to determine whether the later treaty was intended to supersede or to leave in being the earlier treaty. But if the resulting conclusion is that supersession was intended, the earlier treaty must *ex hypothesi* be regarded as having been terminated by the later one, so that there are not two treaties in force and it is not a case of two conflicting treaty *obligations*. It is therefore proposed that article 41 should be retained in its present place in section III of part II, which deals with the termination of treaties.

(20) On the other hand, the fact that the question of the "implied termination" of the earlier treaty can be determined only after ascertaining the extent of the conflict between the two treaties does give these cases a certain connexion with the present article. It therefore seems desirable in any event to mention these cases in paragraph 3, with a cross-reference to article 41. But the Special Rapporteur believes that a minor modification of article 41 may be desirable, so as to transfer cases of a partial conflict between two treaties to the present article. Article 41 reads as follows :

*"Termination implied from entering into a subsequent treaty*

"1. A treaty shall be considered as having been impliedly terminated in whole or in part if all the parties to it, either with or without the addition of other States, enter into a further treaty relating to the same subject-matter and either :

"(*a*) The parties in question have indicated their intention that the matter should thereafter be governed by the later treaty ; or

"(*b*) The provisions of the later treaty are so far incompatible with those of the earlier one that the two treaties are not capable of being applied at the same time.

"2. However, the earlier treaty shall not be

considered as having been terminated where it appears from the circumstances that the later treaty was intended only to suspend the operation of the earlier treaty."

As at present drafted, the opening phrase of paragraph 1 speaks of termination "*in whole or in part*", but the distinction between total and partial termination (or suspension) is not continued in the drafting of the rest of the article. Some modification of the wording of the rest of that article might therefore be necessary in any case. However, the Special Rapporteur is inclined to think that the appropriate course may be to eliminate the words "in whole or in part" from article 41 and to assign to the present article cases of partial conflict in which there does not appear to be any intention to terminate the earlier treaty.

(21) Sub-paragraph (a) of paragraph 3 therefore provides, in effect, that, where there is evidence of an intention that the later treaty should govern the whole matter, or where the two treaties are not capable of being applied at the same time, article 41 applies and terminates the treaty. Sub-paragraph (b), on the other hand, provides that, where article 41 (as amended by the deletion of the words "in whole or in part") does not terminate it, the earlier treaty continues to apply but only to the extent that it does not conflict with the later treaty.

(22) *Paragraph 4* deals with cases where some, but not all, the parties to a treaty participate in the conclusion of a new treaty which conflicts with their obligations under the earlier treaty. In such cases the rule *pacta tertiis non nocent* precludes the later treaty from depriving the other parties to the earlier treaty of their rights under that treaty. Then, if the question is viewed simply as one of the priority of the obligations and rights of the interested States and of State responsibility for breach of treaty obligations, the applicable rules appear to be fairly clear. These are the rules formulated in paragraph 4 of this article, under which —

(*a*) in the relations between a State that is a party to both treaties and a State that is a party only to the earlier treaty, the earlier treaty prevails (*pacta tertiis non nocent*) ;

(*b*) in the relations between two States that are parties to both treaties, the later treaty prevails (i.e. the later treaty applies to these States *inter se*, simply because it is a more recent expression of their wills in their mutual relations) ;

(*c*) in the relations between a State that is a party to both treaties and a State that is a party only to the later treaty, the later treaty prevails, unless the second State was aware of the existence of the earlier treaty and that it was still in force for the other State.

The rules in sub-paragraphs (a) and (b) can hardly be open to doubt, as they are the assumed basis of law upon which many revisions of multilateral treaties, including the United Nations Protocols for revising League of Nations Treaties, have taken place.[188] As to

---

[188] See Resolutions of the General Assembly concerning the Law of Treaties, document A/CN.4/154, in *Yearbook of the International Law Commission, 1963*, vol. II, pp. 1-36.

sub-paragraph (c), it seems clear that a State which has entered into both treaties is in principle liable, as between itself and parties to the later treaty, for any failure to perform its obligations under that treaty. Some authorities,[189] however, consider that the parties to the later treaty are not entitled to invoke the treaty against that State if they themselves were aware that in concluding the later treaty it was violating its obligations under the earlier one. This view seems correct in principle, and the general rule in sub-paragraph (c) has been so formulated.

(23) The critical question remains whether it is correct to deal with all these cases exclusively as questions of priority and of State responsibility for breach of treaty obligations or whether in some instances the later treaty is to be considered void. This question was discussed by the Special Rapporteur at some length in paragraphs (6) to (30) of the commentary to article 14 of his second report,[190] where he also summarized and examined the views of the two previous Special Rapporteurs. Here it is proposed only to repeat paragraphs (14) to (19) of the commentary, which explain the considerations that led the present Special Rapporteur not to suggest a rule predicating the complete nullity of a treaty in case of conflict with an earlier treaty, even if of an "integral" or "interdependent" type. The next six paragraphs which follow are therefore taken from the Special Rapporteur's previous report.[191]

(24) Treaties today serve many different purposes ; legislation, conveyance of territory, administrative arrangement, constitution of an international organization, etc., as well as purely reciprocal contracts ; and, even if it can be accepted that the illegality of a contract to break a contract is a general principle of law — a point open to question — it does not at all follow that the principle should be applied to treaties infringing prior treaties. The imperfect state of international organization and the manifold uses to which treaties are put seem to make it necessary for the Commission to be cautious in laying down rules which brand treaties as illegal and void. This is not to say that to enter into treaty obligations which infringe the rights of another State under an earlier treaty does not involve a breach of international law involving legal liability to make redress to the State whose rights have been infringed. But it is another thing to say that the second treaty is void for illegality and a complete nullity as between the parties to it.

(25) The attitude adopted by the Permanent Court in the Oscar Chinn and European Commission of the Danube cases hardly seems consistent with the existence in international law of a general doctrine invalidating treaties entered into in violation of the provisions of a prior treaty. In the Oscar Chinn case [192] the earlier

treaty was the General Act of Berlin of 1885, which established an international régime for the Congo Basin. That treaty contained no provision authorizing the conclusion of bilateral arrangements between particular parties ; on the contrary it contained a provision expressly contemplating that any modification or improvement of the Congo régime should be introduced by "common accord" of the signatory States. Nevertheless in 1919 certain of the parties to the Berlin Act, without consulting the others, concluded the Convention of St. Germain whereby, as between themselves, they abrogated a number of the provisions of the Berlin Act, replacing them with a new régime for the Congo. The Court contented itself with observing that, no matter what interest the Berlin Act might have in other respects, the Convention of St. Germain had been relied on by both the litigating States as the source of their obligations and must be regarded by the Court as the treaty which it was asked to apply. Admittedly, the question of the legality of the Convention of St. Germain had not been raised by either party. But the question was dealt with at length by Judges Van Eysinga and Schücking in dissenting judgements [193] and had, therefore, evidently been debated within the Court. Moreover, these Judges had expressly taken the position that the question of the validity or invalidity of the treaty was not one which could depend on whether any Government had challenged its legality, but was a question of public order which the Court was bound itself to examine ex officio. In these circumstances, it is difficult to interpret the Court's acceptance of the Convention of St. Germain as the treaty which it must apply, as anything other than a rejection of the doctrine of the absolute invalidity of a treaty which infringes the rights of third States under a prior treaty.

(26) The line taken by the Court in its advisory opinion on the European Commission of the Danube [194] was much the same. The Versailles Treaty contained certain provisions concerning the international régime for the Danube, including provisions concerning the composition and powers of the European Commission for that river ; at the same time it looked forward to the early conclusion of a further convention establishing a definitive status for the Danube. A further convention was duly concluded, the parties to which did not comprise all the parties to the Treaty of Versailles but did include all the States which were concerned in the dispute giving rise to the request for the advisory opinion. In this case the question of the capacity of the States at the later conference to conclude a treaty modifying provisions of the Treaty of Versailles was raised in the arguments presented to the Court, which pronounced as follows :

"In the course of the present dispute, there has been much discussion as to whether the Conference which framed the Definitive Statute had authority to make any provisions modifying either the composition or the powers and functions of the European Commission, as laid down in the Treaty of Versailles,

[189] E.g. Lord McNair, Law of Treaties (1961), p. 222.

[190] Yearbook of the International Law Commission, 1963, vol. II, pp. 55-60.

[191] The first sentence of paragraph (14) of the previous commentary is omitted.

[192] P.C.I.J. (1934), Series A/B, No. 63.

[193] Ibid., pp. 132-136 and 148-150 ; see also Judge Hurst's explicit reference to the question, pp. 122-123.

[194] P.C.I.J. (1927), Series B, No. 14.

and as to whether the meaning and the scope of the relevant provisions of both the Treaty of Versailles and the Definitive Statute are the same or not. But in the opinion of the Court, as all the Governments concerned in the present dispute have signed and ratified both the Treaty of Versailles and the Definitive Statute, they cannot, as between themselves, contend that some of its provisions are void as being outside the mandate given to the Danube Conference under Article 349 of the Treaty of Versailles." [195]

Here again, it is difficult not to see in the Court's pronouncement a rejection of the doctrine of the absolute invalidity of a later treaty which infringes the rights of third States under a prior treaty.[196] The *Mavrommatis Palestine Concessions* case [197] was, it is true, a somewhat different type of case, but it also appears to proceed on a basis quite inconsistent with the idea that a later treaty will be void to the extent that it conflicts with an earlier multilateral treaty.

(27) In its advisory opinion on the *Austro-German Customs Union* [198] the Court was only called upon to consider the compatibility of the Protocol of Vienna with the Treaty of St. Germain; it was not asked to pronounce upon the legal consequences in the event of its being found incompatible with the earlier treaty. In two cases concerning Nicaragua's alleged violation of the prior treaty rights of Costa Rica and Salvador by concluding the Bryan-Chamorro Pact with the United States, the Central American Court of Justice considered itself debarred from pronouncing upon the validity of the later treaty in the absence of the United States, over which it had no jurisdiction. It therefore limited itself to holding that Nicaragua had violated her treaty obligations to the other two States by concluding a later inconsistent treaty with the United States.

(28) International jurisprudence is not perhaps entirely conclusive on the question whether and, if so, in what circumstances, a treaty may be rendered void by reason of its conflict with an earlier treaty. Nevertheless, it seems to the present Special Rapporteur strongly to discourage any large notions of a general doctrine of the nullity of treaties infringing the provisions of earlier treaties; [199] and it accordingly also lends point to the hesitations of Sir G. Fitzmaurice in admitting any cases of nullity where the conflict is with an earlier treaty of a "mutual reciprocating type".

[195] *Ibid.*, p. 23.
[196] The more so as two Judges, Nyholm and Negulesco, took a different line from the Court, holding that any provision of the Statute which conflicted with the Treaty of Versailles would be "null"; *ibid.*, pp. 73 and 129.
[197] *P.C.I.J.* (1924), Series A, No. 2.
[198] *P.C.I.J.* (1931), Series A/B, No. 41.
[199] See G. Schwarzenberger, *International Law*, pp. 482-487; and see also article 18 of the Havana Convention of 1928 on Treaties (Supplement to *A.J.I.L.* 22 (1928); Harvard Law School *Research in International Law*, part III, *Law of Treaties*, p. 1207) which provided: "Two or more States may agree that their relations are to be governed by rules other than those established in general conventions concluded by them with other States".

(29) The two cases of nullity tentatively suggested by him,[200] although they are supported by the Harvard Research Draft, hardly seem consistent with the attitude of the Court in the *Oscar Chinn* and *European Commission of the Danube* cases. In the former case there was an express stipulation that any modifications of the Berlin Act should be by "common accord", yet the Court considered it sufficient that no State had challenged the Convention of St. Germain. It does not seem that the Court would have adopted any different view if the stipulation had taken the form of an express prohibition against contracting out of the treaty otherwise than by "common accord". It is also arguable that there is implied in every multilateral treaty an undertaking not to violate its provisions by entering into inconsistent bilateral agreements.[201] Accordingly, it hardly seems justifiable to provide, as a special case, that a later treaty shall be void if it conflicts with a prior treaty which contains an *express* prohibition against inconsistent bilateral agreements. An undertaking in a treaty not to enter into a conflicting treaty does not, it is thought, normally affect the treaty-making *capacity* of the States concerned, but merely places them under a contractual obligation not to exercise their treaty-making powers in a particular way. A breach of this obligation engages their responsibility; but the later treaty which they conclude is not a nullity. Similarly, if the general view be adopted — as it was by the previous Special Rapporteur — that a later treaty concluded between a limited group of the parties to a multilateral treaty is not normally rendered void by the fact that it conflicts with the earlier treaty, his second tentative exception to the rule does not appear to justify itself. This exception concerned cases where the later treaty "necessarily involves for the parties to it action in direct breach of their obligations under the earlier treaty". The question of nullity does not arise at all unless the later treaty materially conflicts with the obligations of the parties under the earlier treaty. Can it make any difference whether the infringement of those obligations is direct or indirect, if it is the logical effect of the later treaty? Of course, if the later treaty is susceptible of different interpretations or is capable of performance in different ways, it may not be possible to know whether there is any conflict with the earlier treaty until the later treaty has been interpreted and applied by the States concerned. But if it is in fact interpreted and applied in a manner which violates the earlier treaty, can it reasonably be differentiated from a treaty whose terms *unambiguously* violate the earlier treaty?

(30) Further examination of the jurisprudence of the Court and of State practice has only served to confirm the Special Rapporteur in his belief that under the existing law and practice conflicts between treaties of whatever type are regarded as raising questions of the priority rather than of the validity of treaties. Close

[200] See paragraph 13 of the commentary to article 14, in the present Special Rapporteur's second report on the law of treaties, in *Yearbook of the International Law Commission*, *1963*, vol. II, p. 56.
[201] See the general discussion of this point in paragraphs (16) and (17) above.

study of the judgements of the Court and of individual judges in the *Oscar Chinn* [202] and *European Commission of the Danube* [203] cases makes it crystal clear that in both cases the Court had fully considered the question of the impact of the earlier treaty on the validity of the later one and deliberately dealt with the rights of the States before the Court in each case on the basis of the validity of the later treaty as between the parties to it — i.e. it applied the *inter se* principle. True, in neither case was the validity of the later treaty being challenged in the proceedings by a party to the earlier treaty, but the dissenting judges pointed out that, if the later treaties were in law to be considered as objectively affected with nullity, it was a question to be raised *proprio motu* by the Court. An analogous question arose, if in somewhat special circumstances, before the present Court in the *Norwegian Loans* case [204] when France filed an application based upon a Declaration under the Optional Clause containing a so-called "automatic" or "self-judging" reservation and Norway invoked the reservation instead of challenging the validity of the Declaration itself. The Court expressly declined to examine whether the French reservation was compatible with Article 36, paragraph 6, of the Statute of the Court, saying : [205]

> "The validity of the reservation has not been questioned by the Parties. It is clear that France fully maintains its Declaration, including the reservation, and that Norway relies upon the reservation.

> "In consequence, the Court has before it a provision which both parties to the dispute regard as constituting an expression of their common will relating to the competence of the Court."

In short, the Court was content to rest on the *inter se* agreement of the two States reached in the proceedings before it, without examining the compatibility of that agreement with the prior treaty. If this decision has not commended itself to some judges and commentators, it is primarily because of the *jus cogens* character which they consider that paragraph 6 of Article 36 of the Statute possesses.

(31) In both the *Oscar Chinn* and the *European Commission of the Danube* cases the later treaty was concluded for the purpose of replacing or revising a treaty creating an international régime for an international river ; and there are a number of further precedents in State practice with regard to the revision of treaties which appear to support the relativity of obligations principle applied by the Court in those cases. Thus the successive revisions in 1923, 1928, 1945 and 1956 of the international régime for Tangier evoked protests from certain States which considered that their rights or interests under earlier instruments had been disregarded ; but the treaties came into force *inter se* the contracting States. Similarly, the revisions of the Danube régime in 1921 and in 1948 evoked strong objections from interested States ; but the régimes came into effect *inter se* the contracting States,

as the Court itself held with regard to the 1921 Convention. The United States, it is true, in its protest [206] regarding the Belgrade Convention of 1948, declared that it did not recognize that Convention "as having any valid international effect", and stated that it would consider the 1921 Statute still to be in force for the entire Danube River. But it may be doubted whether the terms of this protest reflected a view of the absolute nullity of the 1948 Convention *inter se* the contracting States so much as a view that the new Convention was to be considered as completely without effect *vis-à-vis* the States which refused to recognize it. [207] The list of treaties revising international régimes which have first come into force on an *inter se* basis could well be extended — e.g. the Montreux Convention for the Straits. [208] The Special Rapporteur, in mentioning these historical instances, is not to be understood as expressing any opinion as to the legality or illegality of the acts of the States concerned. The precedents are referred to simply as corroborating the conclusion drawn from the jurisprudence of the Court that conflicts between treaties of whatever kind are to be determined under the existing law on the basis of the relative priority — the relative operation — of the different treaties as between the interested States.

(32) As the previous Special Rapporteur pointed out, [209] chains of multilateral treaties dealing with the same subject-matter are extremely common, and are based on the assumed possibility of some of the parties to a treaty concluding a new treaty modifying or superseding the earlier one in their relations *inter se*, while leaving it in force with respect to States which do not become parties to the new treaty. It is the exception rather than the rule for all the parties to the first treaty to become parties to the revising instrument, and until the state of international relations permits a much larger acceptance of majority decisions, the *inter se* principle is likely to remain an essential instrument for bringing treaty situations up to date. Moreover, multilateral treaties creating "interdependent" or "integral" type obligations are the very classes of treaty in which a "chain" of instruments is found, e.g. the Hague Conventions, the Geneva Conventions on prisoners of war, etc., the "river" Conventions and large numbers of technical Conventions. Accordingly, as already emphasized, it seems necessary to be very cautious in proclaiming the absolute nullity of any type of agreement purely on the ground of its conflict with an earlier one.

(33) To attach the sanction of nullity to an agreement is to deny that the parties possessed any competence under international law to conclude it. If in any given

[202] *P.C.I.J.* (1934), Series A/B, No. 64.

[203] *P.C.I.J.* (1927), Series B, No. 14.

[204] *I.C.J. Reports, 1957*, p. 9.

[205] *Ibid.*, pp. 25-27.

[206] For the text of the protest, see H. W. Briggs, *Law of Nations*, p. 277 ; similar protests were made by the United Kingdom, France, Italy, Greece and Belgium.

[207] It is true, however, that this was a case where it was scarcely feasible simultaneously to operate the régime of 1948 *inter se* the parties and the régime of 1921 *vis-à-vis* the States which objected to the 1948 Convention.

[208] See E. Hoyt, *The Unanimity Rule in the Revision of Treaties*, pp. 162-176.

[209] In his third report, *Yearbook of the International Law Commission, 1958*, vol. II, document A/CN.4/115, para. 88.

case such a lack of competence results from the conclusion of a prior treaty, it is suggested that it will be because of the subject-matter of the obligations and not because of their "integral" or "interdependent" character alone. As pointed out in the present Special Rapporteur's second report,[210] "integral" or "interdependent" obligations may vary widely in importance. Some, although important enough in their own spheres, may deal with essentially technical matters ; while others deal with matters of vital public concern, such as the maintenance of peace, nuclear tests, traffic in women and children or in narcotics. Some of the rules laid down in treaties touching these matters may be of a *jus cogens* character, and the Commission has made specific provision in articles 37 and 45 for the nullity of treaties which conflict with such rules. The Special Rapporteur doubts whether the Commission should go beyond that unless it is prepared to specify particular categories of treaties as treaties conflict with which will entail the nullity of a later treaty ; and in that event the Commission will virtually have specified those treaties as laying down rules of *jus cogens*.

(34) For the above reasons the Special Rapporteur adheres to the view that paragraph 4 of the present article should be based on the relative priority, rather than the nullity, of the conflicting treaties. To do so is not to condone the conclusion of a treaty the effect of which is to violate obligations under an earlier treaty ; nor is it to authorize departures from the rules concerning the consents required for the revision of treaties. If a State in concluding a treaty sets aside its obligations to another State under an earlier treaty without the latter's consent, it engages its international responsibility for the breach of the earlier treaty. But it is believed that in the present condition of international law the matter is to be resolved on the plane of the legal responsibility and not of the competence of the offending State.

(35) Accordingly, the article does not provide for any exceptions to the rules stated in paragraph 4, other than the general exceptions of conflict with a rule of *jus cogens* and conflict with an obligation of Members of the United Nations under the Charter.

### Article 65A. — *The effect of breach of diplomatic relations on the application of treaties*

Subject to article 43 the severance of diplomatic relations between parties to a treaty does not affect the legal relations between them established by the treaty and, in particular, their obligation under article 55.

*Commentary*

(1) During the Commission's fifteenth session, when the question of the effect of the breach of diplomatic relations was raised in the discussion of articles 21 and 22 of the Special Rapporteur's second report,[211]

the Commission agreed to the Special Rapporteur's suggestion that the matter should be examined in connexion with the application of treaties.[212]

(2) This article contemplates only the situation which arises when diplomatic relations are severed between two parties to a treaty, whether bilateral or multilateral, between which normal diplomatic relations had previously subsisted. For the reasons stated in paragraph 14 of the Commission's report for 1963,[213] the question of the effect upon treaties of the outbreak of hostilities — which may obviously be a case when diplomatic relations are severed — is not being included in the draft articles on the law of treaties. Similarly, the problems arising in the sphere of treaties from the absence or withdrawal of recognition, which were mentioned in the 726th meeting, do not appear to be such as should be covered in a statement of the general law of treaties. It is thought more appropriate to deal with them in the context of other topics with which they are closely related, either that of succession of States and Governments, which is excluded from the present discussion for the reasons indicated in paragraph 6 of the introduction to the present report, or that of recognition of States and Governments, which the Commission, in 1949, decided to include in its provisional list of topics selected for codification.[214]

(3) The effect of the severance of diplomatic relations upon treaties was examined by the previous Special Rapporteur, Sir Gerald Fitzmaurice. Article 5 (iii) of his second report[215] stated that the existence of a dispute or disagreement between the parties, or a state of strained relations, or the fact that diplomatic relations had been broken off between them, were not recognized grounds for the termination or suspension of the operation of a treaty. Then in paragraph (34) of his commentary the previous Special Rapporteur pointed out that if any of those happenings do affect the treaty relationships between the parties, it will be *aliunde,* by reason of circumstances with which the breaking off of diplomatic relations may be connected, but which are independent of it. He also maintained that any practical difficulties in implementing the treaty that might occur could be met by using the good offices of another State, or by appointing a protecting State. In article 4 of his fourth report,[216] dealing with the obligatory character of treaties, he repeated that, *inter alia,* the circumstance that diplomatic relations had been broken off could not in itself justify non-performance of a treaty obligation, and he referred to his previous commentary on the matter.

(4) There is wide support for the general proposition that the severance of diplomatic relations does not in

---

[210] *Yearbook of the International Law Commission, 1963,* vol. II. p. 59, commentary to article 14, para. 26.

[211] *Yearbook of the International Law Commission, 1963,* vol. II, pp. 77 and 79.

[212] *Yearbook of the International Law Commission, 1963,* vol. 1, see summary record of the 697th meeting, para. 56.

[213] *Yearbook of the International Law Commission, 1963,* vol. II, p. 189.

[214] *Yearbook of the International Law Commission, 1949,* p. 281.

[215] *Yearbook of the International Law Commission, 1957,* vol. II, p. 42.

[216] *Yearbook of the International Law Commission, 1959,* vol. II, p. 54.

itself lead to the termination of treaty relation-
ships between the States concerned, and the Special
Rapporteur is not aware of any authority for the
contrary proposition. The Commission itself, as already
recalled in paragraph (1), was unwilling to deal with
this matter in the context of the termination of treaties,
and this position corresponds with that of many
authorities who do not include the breach of diplomatic
relations in their discussion of the grounds for the
termination or suspension of the operation of treaties.[217]
That the breaking off of diplomatic relations does not as
such affect the operation of the rules of law dealing
with other aspects of international intercourse is
recognized, for instance, in article 2 (3) of the Vienna
Convention on Consular Relations of 1963 which
provides : "The severance of diplomatic relations shall
not *ipso facto* involve the severance of consular
relations" : while the Vienna Convention on Diplomatic
Relations of 1961 contains an article — article 45 —
dealing specifically with the rights and obligations of
the parties in the event that diplomatic relations are
broken off. It therefore seems correct to state that in
principle the mere breaking off of diplomatic relations
does not of itself affect the continuance in force of the
treaty, or the continuance of the obligation of the parties
to apply it in accordance with the rule *pacta sunt
servanda*.

(5) On the other hand, the effect of the severance of
diplomatic relations on the continued operation of the
treaty must be considered in the light of the decisions
already reached by the Commission on the termination
and suspension of the operation of treaties. In those
cases where the execution of the treaty is dependent
upon the uninterrupted maintenance of diplomatic
relations between the parties the question of the
termination or of the suspension of the operation
of the treaty clearly arises.[218] True, it has been
suggested [219] that in practice difficulties in imple-
menting the treaty could be overcome by using the
good offices of another State or by appointing a
protecting State. No doubt in many cases this might
be so. But a State does not appear to be under any
obligation to accept the good offices of another State,
or to recognize the nomination of a protecting State in
the event of a severance of diplomatic relations, and
articles 45 and 46 of the Vienna Convention on
Diplomatic Relations of 1961 expressly require the
consent of the receiving State in either case. Further-
more, that Convention does not define what is included
within the scope of the protection of the interests of

a third State. It therefore seems necessary to recognize
that cases of supervening impossibility of performance
may occur in consequence of the severance of diplomatic
relations.

(6) If the severance of diplomatic relations should
render it impossible for the treaty to be performed,
then article 43 of part II of these draft articles would
be applicable, and the impossibility of performance
could be invoked as a ground for terminating the
treaty or, as the case might be, for suspending its
operation. In either case the treaty would remain in
operation until lawfully terminated or suspended in
accordance with the procedures laid down in section V
of part II. Then the position of the parties would be
governed by article 53 or article 54, whichever was
appropriate.

(7) The article accordingly provides that, subject to
article 43 (supervening impossibility of performance),
the severance of diplomatic relations between parties
to a treaty does not affect the legal relations established
between them by the treaty and, in particular, their
obligation under article 55 (*pacta sunt servanda*). The
expression "severance of diplomatic relations" has
been used in preference to the expression "breaking
off of diplomatic relations" found in article 45 of the
Vienna Convention of 1961 on Diplomatic Relations.
The former expression is thought to be the better one
and it is used not only in Article 41 of the Charter,
but also in article 2 (3) of the Vienna Convention
of 1963 on Consular Relations.

*Article 66. — Application of treaties to individuals*

Where a treaty provides for obligations or rights
which are to be performed or enjoyed by individuals,
juristic persons, or groups of individuals, such obliga-
tions or rights are applicable to the individuals, juristic
persons, or groups of individuals in question :

(*a*) through the contracting States by their national
systems of law ;

(*b*) through such international organs and pro-
cedures as may be specially provided for in the
treaty or in any other treaties or instruments in force.

*Commentary*

(1) The controversial nature of the question whether
or to what extent an individual may be regarded as a
subject of international law requires no emphasis,[220]
but the Special Rapporteur does not think that there
is any need for the Commission to become involved in
this controversy in considering the points dealt with
in the present article. Whatever answer may be given
to that question, the application of treaties with respect
to individuals under the existing rules of international
law appears to be fairly well defined. In general they
are applied to individuals through the contracting States
and through the instrumentality of their respective
national legal systems. If there had been no exceptions

---

[217] Included in this category are Rousseau, *Principes géné-
raux du droit international public*, tome I (1944) ; Academy
of Sciences of the USSR, Institute of State and Law, *Inter-
national Law* (1961) ; the American Law Institute, Restatement
of the Law, *The Foreign Relations Law of the United States*,
proposed official draft (1962).

[218] Harvard Law School, *Research in International Law*,
part III, Law of Treaties, pp. 1055-1066. And cf. McNair,
*Law of Treaties*, 1961, pp. 672-676.

[219] By the previous Special Rapporteur, in the passage cited
in paragraph (3) of this commentary, and again by several
members in the Commission's 726th meeting (for summary
record of that meeting see *Yearbook of the International Law
Commission, 1964, vol. I).

[220] See the present Special Rapporteur's review of the
question in *Recueil des Cours de l'Académie de droit inter-
national, 1962*, vol. 2, pp. 192-229.

to this rule, it may be questioned whether there would be any need in the present articles for an article concerning the application of treaties with respect to individuals. But that is not the case.

(2) On the contrary, there are a number of well known examples of treaties which have provided special international tribunals or procedures for applying to individuals rights or obligations arising under treaties. Thus, the Convention of 1907 setting up the Central American Court of Justice gave that Court jurisdiction over cases between a Government and a national of another State, if the cases were of an international character or concerned alleged violations of a treaty or convention.[221] Article 304 of the Treaty of Versailles provided for the establishment of Mixed Arbitral Tribunals to deal with disputes concerning the payments of debts alleged to be owed by Germany to Allied nationals, restitution of Allied property, etc.; and individuals were to have direct access to these tribunals. Similar tribunals were provided for in other peace treaties after the First World War, and a large number of claims were submitted by individuals to these international tribunals under the treaties.[222] Another example is the Upper-Silesian Arbitral Tribunal created under the German-Polish Convention of 1922 for the protection of minorities and the safeguarding of property rights.[223] The Charter itself, in Article 87 (b), provides for the right of the General Assembly and Trusteeship Council to accept petitions from inhabitants of Trusteeship Territories. Again, the European Convention on Human Rights and Fundamental Freedoms provides in article 25 for the grant to individuals of a right to refer complaints regarding alleged violations of human rights directly to the European Commission of Human Rights.[224] Finally, if the national or international character of war crimes jurisdiction may in general be controversial, the Nuremberg and Tokyo Charters appear clearly to have been treaties which were intended by their parties to establish international machinery for dealing with the international obligations of individuals.[225]

(3) Some authorities[226] interpret the Permanent Court's Opinion on the *Jurisdiction of the Courts of Danzig*[227] as recognizing that international rights and duties can be directly conferred or imposed on individuals by treaty. Others have doubted whether it has this significance.[228] But, whatever may be the true juridical relation between the individual and the treaty in the examples mentioned in the preceding paragraph,

the treaty operates upon the individual not only through his national system of law but also through the international procedures prescribed in the treaty, and in that sense there seems to be an application of the treaty directly to him. At any rate, without going further into the matter, the Special Rapporteur has prepared the present article in order that the Commission may consider whether or not it wishes to include an article dealing with the application of treaties to individuals.

(4) *Paragraph 1* of the article simply states that, where a treaty provides for obligations or rights relating to individuals, the treaty is applicable to them (a) through the Contracting States and their national systems of law, and (b) through such international organs and procedures as may be specially provided for in the treaty or in any other treaties in force. True, sub-paragraph (a) embodies a general rule applicable to customary as well as treaty obligations, but sub-paragraph (b) is essentially concerned with the application of treaty provisions and it is this sub-paragraph that may call for mention of the application of treaties to individuals.

(5) The previous Special Rapporteur in his fourth report[229] dealt with the effects of treaties on individuals from a somewhat different angle. He included two articles in that report concerning treaties involving respectively obligations and benefits for private individuals; and he formulated them in terms of the duty of the Contracting State to ensure the effective application of the treaty to the individuals in good faith on the *internal* plane. Having regard to the emphasis placed in the Charter and other instruments on human rights, there is a certain attraction in the idea of underlining a State's obligation to make treaty provisions regarding individuals effective by taking the necessary measures on the internal plane. But to spell out the obligation of the contracting State in that way would do little more than repeat the *pacta sunt servanda* rule in the particular context of treaties affecting individuals. Clearly, the duty of a State to take the necessary measures on the internal plane to implement its treaty obligations is a general one. Accordingly, if an article were to be included formulating this obligation for the case of individuals, it would be necessary to have a further article laying down the obligation in general terms for all treaties requiring any form of action on the internal plane, as indeed Sir G. Fitzmaurice's fourth report did. The present Special Rapporteur recognizes to the full the importance of the principles that a State must take effective measures in its internal law to fulfil its treaty obligations, and that a State may not plead the deficiencies of its internal law in justification of a failure to perform its treaty obligations. But both these principles are general principles of State responsibility which apply to any form of international obligation and, under the Commission's plan of codification, it seems to the Special Rapporteur that their formulation belongs to the responsibility of States rather than to the law of treaties. For the purposes of the law of treaties it is clear that both principles are implicit in

---

[221] See M. Hudson, *Permanent Court of International Justice*, p. 49.

[222] See the ten volumes of the *Recueil des Tribunaux Arbitraux Mixtes*.

[223] See Steiner and Gross v. Polish State, 1927-28 *Annual Digest of International Law Cases*, Case No. 188.

[224] See *Yearbook of the European Commission of Human Rights*, 1955-57.

[225] L. B. Sohn, *Cases and Materials on United Nations Law*, p. 858.

[226] E.g. Sir H. Lauterpacht, *Development of International Law through the International Court*, p. 173.

[227] *P.C.I.J.* (1928), Series B, No. 15, pp. 16-24.

[228] Lord McNair, *Law of Treaties* (1961), p. 337.

[229] *Yearbook of the International Law Commission, 1959*, vol. II, pp. 49 and 78 and 79.

and covered by the *pacta sunt servanda* rule formulated in article 55. Accordingly, the Special Rapporteur has felt that he should refrain from including these principles in the present report, either in a general article covering all treaty obligations or in the present article dealing with the application of treaties to individuals. It is for this reason that the present article does not underline the duty of States to take the necessary measures on the internal plane to make the application of treaties with respect to individuals effective.

SECTION II : THE AMENDMENT AND REVISION OF TREATIES

*Article 67. — Proposals for amending or revising a treaty*

Subject to the provisions of the treaty —

(*a*) a party may at any time notify the other parties, either directly or through the depositary, of a proposal for its amendment or revision ;

(*b*) the other parties are bound to consider in good faith, and in consultation with the party concerned, what action, if any, should be taken in regard to the proposal.

*Article 68. — Right of a party to be consulted in regard to the amendment or revision of a treaty*

1. Every party has the right to be notified of any proposal to amend or revise the treaty and to be consulted with regard to the conclusion of any instrument designed to amend or revise it.

2. Paragraph 1 does not apply to an amendment by which certain of the parties propose to modify the application of the treaty as between themselves alone, if such amendment of the treaty as between the parties in question —

(*a*) does not affect the enjoyment by the other parties of their rights under the treaty ;

(*b*) does not relate to a provision derogation from which is incompatible with the effective execution of the objects and purposes of the treaty as a whole ; and

(*c*) is not prohibited by the treaty.

3. Except in so far as the treaty may otherwise provide, the rules laid down in part I of these articles apply to the conclusion and entry into force of any instrument designed to amend or revise a treaty.

*Article 69. — Effect of an amending or revising instrument on the rights and obligations of the parties*

1. An instrument amending or revising a treaty does not affect the rights or obligations under the treaty of any party which does not become a party to the amending or revising instrument unless —

(*a*) the treaty itself otherwise provides ; or

(*b*) the constitution of an international organization lays down a different rule for treaties concluded within the organization.

2. The bringing into force of an amending or revising instrument *inter se* the parties thereto may not, however, be considered by any other party as a violation of its rights under the treaty if, after having been notified and consulted in conformity with article 68, paragraph 1 —

(*a*) it took part in the adoption of the amending or revising instrument ; or

(*b*) it made no objection to the proposed amendment or revision, though not taking part in the adoption of that instrument.

3. (*a*) Subject to paragraphs 1 and 2, the effect of an instrument amending or revising a treaty on the rights and obligations of the parties to the treaty is governed by articles 41 and 65 of these articles.

(*b*) If the bringing into force of an amendment or revision of a treaty between some only of its parties constitutes a violation of the treaty *vis-à-vis* the other parties, the other parties may terminate or suspend the operation of the treaty under the conditions laid down in article 42.

*Commentary*

(1) A number of the rules contained in previous articles touch one aspect or another of the revision of treaties. The right of denunciation or withdrawal dealt with in articles 38 and 39 furnishes a means by which a party may apply pressure for the amendment or revision of a treaty which it considers to be out of date or defective. The provisions of articles 43 and 44 regarding the termination of treaty clauses by reason of a supervening impossibility of performance or a fundamental change of circumstances may, under the principle of separability laid down in article 46, have the effect of amending a treaty by operation of law. Article 61, paragraph 1, protects a State from having its rights under a treaty modified by a later treaty unless it is a party to the later treaty or has consented to the modification in question. Articles 62 and 63 contemplate that in certain special cases a State not a party to a treaty may be entitled to be consulted with regard to the amendment of particular provisions which create legal rights in its favour. Even more important, however, are articles 41 and 65, which deal with the effect of a later treaty upon an earlier treaty covering the same subject-matter : for this is precisely the situation which exists when a treaty is concluded, either between all or some of the parties to an earlier treaty, for the purpose of amending or revising the earlier treaty. Article 41 contemplates cases where there is an implied termination of the early treaty in whole or in part ; while article 65 provides for the relative priority of the two treaties as between all the parties to them, in cases where the earlier treaty is not to be considered as having been terminated in whole or in part under article 41.

(2) The substantive aspects of the revision of treaties are to a large extent covered by the above-mentioned articles. Moreover, since the instrument for carrying out the deliberate amendment of a treaty is a new treaty, the procedural aspects of revision are to a large extent covered by the provisions of part I relating to the conclusion, entry into force and registration of treaties. The question remains, however, as to whether

there are any rules specifically concerned with the revision of treaties which require to be given a place in the draft articles.

(3) Most of the authorities appear to take the view that, however desirable it may be for orderly processes of revision to be developed, the amendment and revision of treaties is still essentially a political question. One modern text-book, for example, states : [230]

"As a question of law, there is not much to be said upon the revision of treaties. It frequently happens that a change in circumstances may induce a Government on political grounds to accede to the request of another Government for the termination of a treaty or for its revision in the light of new circumstances. But, as a matter of principle, no State has a legal right to demand the revision of a treaty in the absence of some provision to that effect contained in that treaty or in some other treaty to which it is a party ; a revised treaty is a new treaty, and subject to the same limitation, no State is legally obliged to conclude a treaty. Accordingly, treaty revision is a matter for politics and diplomacy . . . ."

A similar emphasis on the political character of the process of revision is to be found amongst members of a Committee of the Institute of International Law which examined the modification of collective treaties in 1960.[231] Members of this Committee, while stressing the importance of inserting in multilateral treaties appropriate legal provisions to facilitate their future revision, showed no disposition to recognize any specific rules regarding the revision process in international law.

(4) The basic principle being that the rights of each individual State under a treaty may not be modified without its consent, and there being no international organ invested with general authority to legislate with respect to the revision of treaties, it is scarcely surprising that recourse has been had to expedients such as the *rebus sic stantibus* doctrine and the *inter se* principle for the purpose of achieving the revision of a treaty régime considered to be out of date or otherwise unsatisfactory. Under the so-called Concert of Europe the leading Powers tended to assume a mandate to revise the major political treaties in the general interest and not infrequently concluded new treaties without obtaining the consent of all the parties to the previous treaties. The creators of the League of Nations recognized the problem presented by the need for the peaceful revision of situations established by treaty and its bearing on the maintenance of peace. They provided in Article 19 of the Covenant that the Assembly might "from time to time advise the reconsideration by Members of the League of treaties which have become inapplicable, and the consideration of international conditions whose continuance might endanger the peace of the world." But, although much was said and written during the League period concerning the importance of providing for the peaceful revision of out-of-date or burdensome treaties, Article 19 was from first to last a dead-letter. As to the Charter, if Article 14 contains

a general provision empowering the General Assembly to consider measures for the peaceful adjustment of any situation regardless of its origin, there is nowhere any mention of the revision of treaties as a specific function of the United Nations. And in point of fact both during the League of Nations and United Nations periods instances have been common enough of treaties affecting particular territories, rivers or waterways, being replaced or revised by treaties concluded by the States most directly concerned without all the parties to the previous treaties having been consulted.[232]

(5) On the other hand, the development of international organization and the tremendous growth of multilateral treaty-making has made a considerable impact on the revision of treaties. In the first place, the revision of many multilateral treaties is now a matter which concerns an international organization. This is clearly the case where the treaty is the constituent instrument of an organization or where the treaty, like international labour conventions, is drawn up within an organization. But it is also to some extent the case where the treaty is concluded under the auspices of an organization and the secretariat of the organization is made the depositary for executing its procedural provisions. In all these cases the drawing up of an amending or revising instrument ceases to be something which can be effected by some Powers only and is automatically caught up in the machinery of the organization or in the functions of the depositary. As a result, the right of each individual party to be consulted with regard to the amendment or revision of the treaty is safeguarded. In the second place, the proliferation of multilateral treaties has led to an increased awareness of the importance of making provision in advance, in the treaty itself, for the possibility of its future revision.[233] In the third place, the expedient of *inter se* agreements has been increasingly employed for revising multilateral treaties, especially technical conventions, as between those States willing to accept the revision while at the same time leaving in force the existing régime with respect to the other parties to the earlier treaty.[234]

(6) The Secretariat's *Handbook of Final Clauses* [235] distinguishes between clauses for the amendment and clauses for the revision of treaties, the former concerning particular proposals for changing individual provisions of the treaty and the latter concerning proposals for a general review of the whole treaty. If this distinction has a certain convenience, it is not one which is made uniformly in the State practice, and the legal process appears to be the same in both cases. The amendment and revision clauses found in multilateral treaties take a great variety of forms, as appears from the examples given in the *Handbook of Final Clauses* [236] and from a recent analysis of revision clauses in a report

---

[229] Lord McNair, *Law of Treaties* (1961), p. 534.

[230] See *Annuaire de l'Institut de droit international* (1961), vol. I, pp. 229-291.

[232] See E. C. Hoyt, *The Unanimity Rule in the Revision of Treaties* (1959), chapters 3-6.

[233] See *Annuaire de l'Institut de droit international* (1961). vol. I, pp. 95-153.

[234] E. C. Hoyt. *op. cit.*, pp. 28-51.

[235] ST/LEG/6, pp. 130 and 150. Articles 108 and 109 of the Charter also distinguish between the procedures for "amending" and "reviewing" the Charter.

[236] *Ibid.*, pp. 130-152.

to the Institute of International Law.[237] Despite their variety, many amendment and revision clauses are far from dealing comprehensively with the legal aspects of revision.[238] Some, for example, merely specify the conditions under which a proposal for amendment or revision may be put forward, without providing for the procedure for considering it. Others, while also specifying the procedure for considering a proposal, do not deal with the conditions under which an amendment or revision may be adopted and come into force, or do not define the exact effect on the parties to the existing treaty. As to clauses regarding the adoption and entry into force of an amendment or revision, some require its acceptance by all the parties to the treaty, but many admit some form of qualified majority as sufficient. In general, the variety of the clauses makes it difficult to deduce from the practice the development of customary rules regarding the amendment and revision of multilateral treaties.

(7) History furnishes many instances of treaty régimes amended or revised by a new treaty concluded between some only of the parties to the earlier treaty.[239] Sometimes the assent of the other parties was afterwards obtained to the amendment or revision. Not infrequently, however, the new treaty was brought into force simply on an *inter se* basis. Sometimes, the other parties made protests against the conclusion of the new treaty and reserved their rights under the earlier one. These cases raise the question of the priority of conflicting treaty obligations which is dealt with in article 65 and may also raise a question of State responsibility. But the use of *inter se* agreements now appears to be an established technique for the amendment and revision of multilateral treaties. Quite apart from the frequent recourse to *inter se* agreements by groups of Powers for revising territorial settlements and régimes for international rivers or waterways, the *inter se* technique is now a normal method of revising general multilateral treaties. Indeed, reliance on the *inter se* technique for the revision of general multilateral treaties is almost inevitable owing to the improbability that all the parties to the original treaties will take the necessary steps to ratify or otherwise give their consent to the new treaty. Thus, in 1906 the Geneva Convention of 1864 for the Amelioration of the Condition of Wounded in Armies in the Field was revised by a new Convention which expressly provided that, when duly ratified, it should supersede the 1864 Convention in the relations between the contracting States, but that the 1864 Convention should remain in force in the relations of parties to that Convention who did not ratify the new Convention. A similar provision was inserted in the Hague Convention of 1907 on the Laws and Customs of War on Land, which revised the earlier Convention of 1899. There are numerous later examples of the same technique, notably the United Nations Protocols revising certain League of Nations Conventions. In a memorandum in 1951 the Legal Department of the United Nations

Secretariat, referring to a projected Convention for amending and consolidating agreements relating to narcotic drugs, commented :

"In the past . . . the entry into force of the amendments depended upon unanimous concurrence on the part of the old Parties. This rule has changed in the course of time and the modern view is that, even if the possibility of amendments coming into force as the result of a decision by a certain majority of the original contracting Parties was not contemplated in the initial Convention — and that was the case of the present international instruments on narcotic drugs — that fact did not prevent these amendments from coming into force. But in this instance one firm principle has emerged, which is that States which remain Parties to earlier instruments are bound by the texts of these instruments, without *ipso facto* being bound by the amendments."

(8) Plainly there is a considerable difference between the use of the *inter se* technique in cases where all the parties to the original treaty take part in the adoption of a new treaty providing for amendments to come into force *inter se* and its use in cases where some of the parties have no part in the drawing up of the amending treaty. In the former case the *inter se* revision takes place by consent, even if not all the parties ratify the new treaty ; in the latter case it does not. It must, however, be admitted that in the past, revision through the conclusion of an *inter se* agreement has in many cases taken place without all the parties to the original . even having been invited to participate in the revising instrument. The rule requiring the unanimous consent of all the original parties for revision, as one writer has said,[240] has in the past been honoured more in the breach than in the observance ; and this assessment of the practice in regard to *inter se* revision has been endorsed in a recent study of the subject.[241] The fact that *inter se* amendment often takes place without the concurrence of all the original parties was also noted — if in more cautious language — in the memorandum of the Legal Department of the Secretariat referred to in the previous paragraph :

"Over the years, ideas have changed concerning conditions which have to be fulfilled before international treaties can be amended. Whereas in the past the opinion used to be that multilateral conventions could not be amended except with the unanimous consent of all the original contracting Parties, the point has now been reached where the possibility of amending multilateral agreements with the concurrence of a more or less large number of the original parties is admitted."

It also noted that quite frequently States participate in the revision conference which were not parties to the original treaty.

(9) The diversity of State practice makes it difficult to frame a comprehensive system of rules regarding the

[237] E. Giraud, *Annuaire de l'Institut de droit international* (1961), vol. I, pp. 95-103.

[238] See C. W. Jenks, *ibid.*, pp. 254-264.

[239] This is true both of "political" and of "non-political" treaties ; see E. C. Hoyt, *op. cit.*, chapters 1-6.

[240] P. C. Jessup, *A Modern Law of Nations*, p. 144.

[241] E. C. Hoyt, *The Unanimity Rule in the Revision of Treaties*, 1959, chapter VIII ; see also Jean Leca, *Les Techniques de Revision des Conventions Internationales*, chapitre IV.

revision of treaties. Certain points, however, which seem to merit consideration, have been embodied in articles 67-69 in order that the Commission may decide whether or not to include them in the draft articles.

### Article 67

(10) This article deals with the right of a party to a treaty to propose its amendment or revision to the other parties, and, secondly, with their obligation to give the proposal due consideration. No doubt, it can be said that the right to make a proposal goes without saying. But it may be desirable to include a provision on this point for two reasons. First, in the case of a multilateral treaty, it seems necessary to indicate whether it is open to the parties alone to make a proposal for its amendment or revision or whether it is also open to a State which took part in the adoption of the treaty to do so, although it has not yet become a party. It is conceivable that such a State might wish to propose an amendment in order to make possible its own ratification, acceptance or approval of the treaty. The general practice, however, seems to be to confine the right to propose an amendment or revision of the treaty to the parties. Admittedly, in the case of a treaty, like an international labour convention, concluded within an international organization for the purpose of fulfilling its purposes, it may be open to a member of the organization, as such, to propose an amendment or revision of the treaty. But the right will then derive from membership of the organization rather than from the law of treaties. The second reason is that treaties not infrequently contain provisions regulating the right to make proposals for their amendment or revision. Some require that the proposal should be put forward by a specified number or proportion of the parties, some only permit the making of a proposal after the lapse of a certain time, or after a stated date or event, or at periodical intervals or under specified conditions.[242] This being so, it seems desirable to state the general rule.

(11) The general rule, it seems to be agreed, is that, unless the treaty provides otherwise, any party may at any time present a proposal for its amendment or revision. Accordingly, sub-paragraph (a) states that "subject to the provisions of the treaty a party may at any time notify the other parties, either directly or through the depositary, of a proposal for its amendment or revision". The words "subject to provisions of the treaty" are used because the treaty, while not otherwise restrictive of the right to propose its amendment or revision, may prescribe procedural requirements for doing so.

(12) Sub-paragraph (b) lays upon the other parties to the treaty the obligation to examine the proposal in good faith and to consult with the party making it as to the action, if any, to be taken concerning the proposal. Admittedly, this is an imperfect obligation the observance or non-observance of which it may not always be easy to appreciate. Nevertheless, having regard to the problem which the revision of treaties presents in international law, it is thought useful to state

that the parties to a treaty are mutually bound to give due consideration to any proposal made by one of them for its amendment or revision.

### Article 68

(13) Paragraph 1 of this article states that every party to a treaty has the right to be consulted with regard to any proposal for its amendment or revision and with regard to the conclusion of any instrument designed to amend or revise the treaty. This is a point upon which it seems important that the Commission should take a clear position. As already mentioned in paragraph (8) of this commentary, treaties have often in the past been amended or revised by certain of the parties without consultation with the others.[243] This has led one recent writer [244] to state : "Though they must be consulted if they are to be bound by a new agreement, the parties to a treaty have no general right to take part in all negotiations respecting revision. The question of which States should be invited to join in discussions of revision is practical rather than legal". Endorsing this conclusion, another authority [245] has said : "Practice does not indicate that all the parties to an earlier treaty have any general right to take part in negotiations respecting revision, although they cannot be bound by some new treaty concluded without their participation or consent". Another recent writer [246] has independently arrived at a similar conclusion : "*Il n'y a donc aucune obligation juridique de convoquer toutes les parties originales à une conférence préparatoire à un nouveau traité. Si une telle règle existait, ce serait sans doute un instrument puissant — propre à prévenir les conflits — ce serait aussi un facteur redoutable de stagnation*". Although recognizing that instances have been common enough in which individual parties to a treaty have not been consulted in regard to its revision, the Special Rapporteur does not think that the State practice necessarily leads to the conclusion reached by these writers or that the view expressed by them should be the one to be adopted by the Commission.

(14) If a group of parties has sometimes succeeded in effecting an *inter se* revision of a treaty without consulting the other parties, equally States left out of a revision have from time to time reacted against the failure to bring them into consultation as a violation of their rights as parties.[247] Moreover, there are also numerous cases where the parties have, as a matter of course, all been consulted. A refusal to bring a particular party or parties into consultation has usually been a political decision taken on political grounds, and the question whether it was legally justified in the particular case has been left unresolved. All that the State practice

---

[241] See E. Giraud, *Annuaire de l'Institut de droit international* (1961), vol. I, pp. 108-123.

[242] Well-known examples are the Conventions of 1923, 1928 and 1956 dealing with the status of Tangier, the revision of the Acts of Berlin (1885) and Brussels (1890) by the Treaty of St. Germain, the revision of the Treaty of Lausanne (1923) by the Montreux Convention (1936).

[243] E. C. Hoyt, *op. cit.*, p. 250.

[244] P. C. Jessup, in a foreword to E. C. Hoyt's book, at p. VII.

[245] Jean Leca, *op. cit.*, p. 204.

[246] E.g. Italy, the Soviet Union, Sweden, Spain at various times in regard to the revision of one of the Tangier treaties.

seems to show is that a revision effected by an *inter se*
agreement without some of the parties having been
consulted is not *void*, but raises a question of conflicting
treaty obligations falling under article 65. Whether the
conclusions of such an *inter se* agreement constitutes an
infringement of the rights of the other parties under
the treaty is another question. The answer to it may to
some extent depend on the nature of the revision and
on the particular facts of the case. For example, an
agreement which supplements or varies the treaty
as between particular parties without in any way
prejudicing the rights of the other parties or the
effective execution of the objects and purposes of the
treaty may not constitute any breach of the rights of
the other parties ; and in such a case it may be that
there is no obligation to consult the other parties with
regard to the modification of the treaty *inter se* the
particular parties. In general, however, the very nature
of the legal relation established by a treaty requires
that every party should be consulted in regard to any
amendment or revision of the treaty. The fact that this
has not always happened in the past is not considered
to be a sufficient reason for setting aside a principle
which seems to flow directly from the obligation
assumed by the parties to perform the treaty in good
faith. There may be special circumstances when it is
justifiable not to bring a particular party into consulta-
tion, as in the case of the General Assembly's omission
to consult some of the parties to League of Nations
treaties when drawing up the United Nations Protocols
revising those treaties. But the general rule is believed
to be that every party is entitled to be brought into
consultation with regard to any amendment or revision
of the treaty ; and *paragraph 1* of article 68 so states
the law.

(15) *Paragraph 2* of article 68 excepts from that general
rule only such *inter se amendments* of a treaty as do
not prejudice the rights of the other parties under the
treaty and are not incompatible with the effective
execution of the objects and purposes of the treaty as
a whole. This exception is intended to cover only
*inter se* agreements which either supplement and do
not vary the application of the treaty or vary the
application of provisions that operate bilaterally in
the relations between one party and another and the
operation of which between any two parties exclusively
concerns those parties alone. Naturally, if the treaty
expressly forbids "contracting out" the conclusion of
any *inter se* agreement without consulting all the parties
is inadmissible and paragraph 2 (c) so provides.

(16) *Paragraph 3* of article 68 specifies that, except
in so far as the treaty may otherwise provide, the rules
laid down in part I concerning the conclusion and entry
into force of treaties apply to any instrument designed
to amend or revise a treaty. It may be said that this
does not need stating since an amending or revising
instrument, being a treaty, necessarily falls under
part I. Nevertheless, it is thought advisable to state the
point for two reasons. First, it is today by no means
uncommon for a multilateral treaty to contain provisions
regulating the procedure for its future revision ; and
in that event the treaty provisions would naturally apply.
Secondly, it seems desirable to leave no doubts as to

the application to amending or revising instruments of
article 6 regarding the adoption of a text and of
article 23 regarding the entry into force of a treaty.
The rule of unanimity means that a party cannot be
held bound by an amendment or revision to which it
has not itself consented. It does not preclude the parties,
when drawing up an amending or revising instrument,
from deciding to apply a majority voting rule for the
purpose of adopting its text or from providing that
the instrument shall come into force upon a given
number of ratifications, acceptances or accessions. For
example, the United Nations Protocols were drawn up
under the voting rules of the Organization and were
expressed to come into force upon a limited number of
ratifications ; and there are many other examples.[248]

*Article 69*

(17) *Paragraph 1* of article 69 is for the most
part simply an application to amending or revising
instruments of the general rule in article 61 that a
treaty does not impose any obligations upon a State
not a party to it. Nevertheless, without paragraph 1
the question might be left open as to whether by its
very nature an instrument amending or revising a prior
treaty has effects for parties to the treaty. Furthermore,
the general rule in article 61 is sometimes displaced
by a different provision laid down in the original treaty
or by a contrary rule applied to treaties concluded
within a particular international organization.[249]
Article 3 of the Geneva Convention on Road Traffic
(1949),[249a] for example, provides that any amendment
adopted by a two-thirds majority of a conference shall
come into force for all parties except those which make
a declaration that they do not adopt the amendment.
Article 16 of the International Convention of 1952 to
Facilitate the Crossing of Frontiers for Goods Carried
by Rail provides for amendments to come into force
for all parties unless it is objected to by at least one-
third. Article 52 of the IMCO Constitution[250] contains
a provision similar to that in the Road Traffic
Convention as does also article 22 of the WHO
Constitution[251] for regulations adopted by the WHO
Assembly. Paragraph 1 therefore states that an amend-
ing or revising instrument is not binding on a party
which has not become a party to it unless a different
rule is laid down in the treaty or in the Constitution of
an organization for treaties concluded within the
organization.

(18) *Paragraph 2* deals with situations which frequently
arise in practice and for which it seems desirable to
make express provision in the draft articles. Some of
the parties, having been duly consulted, take part in
the drawing up and adoption of an amending or revising
instrument, but do not notify it or, alternatively, do
not voice any objection to the proposed amendment or
revision though refraining from taking part in the

[248] See generally E. C. Hoyt, *op. cit.*, chapter 1.
[249] See the *Handbook of Final Clauses*, pp. 135-148 ;
E. Giraud, *Annuaire de l'Institut de droit international* (1961),
vol. 1, pp. 139-149.
[249a] *United Nations Treaty Series*, vol. 125.
[250] *United Nations Treaty Series*, vol. .11.
[251] *United Nations Treaty Series*, vol. 14.

drawing up and adoption of the instrument. In the first of these situations it seems proper to infer that, by consenting to the adoption of the amending or revising instrument, the parties concerned have waived any right that they might have had to treat the bringing into force of the amendment or revision as a violation of their rights under the treaty. They may still invoke their rights under the earlier treaty in their relations with the other States, but may not contest the application of the amendment or revision as between the parties which have accepted it. It is also thought legitimate to make the same inference in the case of a State which, although invited to take part in the consideration of a proposed amendment or revision, does not do so while manifesting no objection to the proposal. Paragraph 2 is thought both to reflect the existing practice and to be desirable in order to regularize the position in *inter se* amendments or revisions of treaties carried out after due consultation with the other parties.

(19) *Paragraph 3 (a)* merely provides that, subject to the previous paragraphs, the legal effect of an amending or revising instrument is governed by articles 40, 41 (termination by subsequent agreement) and 65 (priority of conflicting treaty obligations). Article 40 needs to be mentioned because some revising instruments provide expressly for the revocation of the original treaty, although it is more common to leave the treaty in force in the relations of those of its parties which do not become parties to the revising instrument. On the other hand, if all the parties to the original treaty eventually become parties to the revising instrument, the question of the implied termination of the treaty under article 41 will arise. Where both instruments are in force at the same time, their legal effects for their respective parties depends upon which instrument is to prevail, and that is a question which falls under article 65. Indeed, many of the cases of the priority of conflicting treaty provisions covered by article 65 arise from *inter se* amendments or revisions of multilateral treaties where not all the parties to the treaty become parties to the amending or revising instruments.

(20) *Paragraph 3 (b)* raises the question of the right of a party to terminate or withdraw from the treaty when two or more of the other parties have brought into force *inter se* an amendment or revision of the treaty. At first glance it might seem that any party which declines to accept an amendment or revision should be allowed to withdraw from the treaty. If the amending or revising instrument were binding on such a party, that would, no doubt, be the appropriate rule. But, except in the comparatively rare case where the treaty or the law of an organization otherwise provides, the amending or revising instrument is not binding on a party which does not accept it. Again, there are often several parties to the treaty which fail to become parties to the instrument and account has to be taken of the rights and obligations of these parties under the treaty. Moreover, to admit a unilateral right of withdrawal in all cases might seriously detract from the usefulness in many fields of the present technique of progressive amendment of a multilateral treaty *inter se* without losing what was gained by acceptance of the original treaty. Accordingly, what paragraph 3 (b) proposes is

that parties to a treaty which do not accept an amendment or revision brought into force *inter se* by other parties may terminate or suspend the operation of the treaty only under the conditions laid down in article 42, i.e. in the case of a material breach of the treaty and by the common agreement of the parties victims of the breach.

SECTION III — INTERPRETATION OF TREATIES

*Article 70. — General rules*

1. The terms of a treaty shall be interpreted in good faith in accordance with the natural and ordinary meaning to be given to each term —

   (*a*) in its context in the treaty and in the context of the treaty as a whole ; and

   (*b*) in the context of the rules of international law in force at the time of the conclusion of the treaty.

2. If the natural and ordinary meaning of a term leads to an interpretation which is manifestly absurd or unreasonable in the context of the treaty as a whole, or if the meaning of a term is not clear owing to its ambiguity or obscurity, the term shall be interpreted by reference to —

   (*a*) its context and the objects and purposes of the treaty ; and

   (*b*) the other means of interpretation mentioned in article 71, paragraph 2.

3. Notwithstanding paragraph 1, a meaning other than its natural and ordinary meaning may be given to a term if it is established conclusively that the parties employed the term in the treaty with that special meaning.

*Article 71. — Application of the general rules*

1. In the application of article 70 the context of the treaty as a whole shall be understood as comprising in addition to the treaty (including its preamble) —

   (*a*) any agreement arrived at between the parties as a condition of the conclusion of the treaty or as a basis for its interpretation ;

   (*b*) any instrument or document annexed to the treaty ;

   (*c*) any other instrument related to, and drawn up in connexion with the conclusion of, the treaty.

2. Reference may be made to other evidence or indications of the intentions of the parties and, in particular, to the preparatory work of the treaty, the circumstances surrounding its conclusion and the subsequent practice of parties in relation to the treaty, for the purpose of —

   (*a*) confirming the meaning of a term resulting from the application of paragraph 1 of article 70 ;

   (*b*) determining the meaning of a term in the application of paragraph 2 of that article ;

   (*c*) establishing the special meaning of a term in the application of paragraph 3 of that article.

*Article 72. — Effective interpretation of the terms*
(ut res magis valeat quam pereat)

In the application of articles 70 and 71 a term of a treaty shall be so interpreted as to give it the fullest weight and effect consistent —

(*a*) with its natural and ordinary meaning and that of the other terms of the treaty ; and

(*b*) with the objects and purposes of the treaty.

*Article 73. — Effect of a later customary rule or of a later agreement on interpretation of a treaty*

The interpretation at any time of the terms of a treaty under articles 70 and 71 shall take account of —

(*a*) the emergence of any later rule of customary international law affecting the subject-matter of the treaty and binding upon all the parties ;

(*b*) any later agreement between all the parties to the treaty and relating to its subject-matter ;

(*c*) any subsequent practice in relation to the treaty evidencing the consent of all the parties to an extension or modification of the treaty.

*Commentary*

(1) The utility and even the existence of rules of international law governing the interpretation of treaties are questions which are not free from controversy.[252] One commentary [253] on the law of treaties, for example, states :

"It seems evident that the prescription in advance of hard and fast rules of interpretation . . . contains an element of danger which is to be avoided. In their context . . . the rules . . . seem eminently reasonable and convincing. The difficulty, however, is that, detached from that context they still retain a certain fictitious ring of unassailable truth, and tend, as do all neatly turned maxims, to imbed themselves in the mind. The resulting danger is that the interpreter, well-versed in such rules, may approach his task with a mind partly made up rather than with a mind open to all evidence which may be brought before him. This is to misconceive the function of interpretation.

"The process of interpretation, rightly conceived, cannot be regarded as a mere mechanical one of drawing inevitable meanings from the words in a text, or of searching for and discovering some pre-existing specific intention of the parties with respect to every situation arising under a treaty . . . In most instances interpretation involves *giving* a meaning to a text — not just any meaning which appeals to the interpreter, to be sure, but a meaning which, in the light of the text under consideration and of all the concomitant circumstances of the particular case at hand, appears in his considered judgment to be one which is logical, reasonable, and most likely to accord with and to effectuate the larger general purpose which the parties desired the treaty to serve.

This is obviously a task which calls for investigation, weighing of evidence, judgment, foresight, and a nice appreciation of a number of factors varying from case to case. No canons of interpretation can be of absolute and universal utility in performing such a task, and it seems desirable that any idea that they can be should be dispelled."

(2) Similarly, a recent writer [254] has said : "we are amongst those who are sceptical as to the value of those so-called rules and are sympathetic to the process of their gradual devaluation, of which indications exist. The many maxims and phrases which have crystallized out and abound in the textbooks and elsewhere are mere *prima facie* guides to the intention of the parties in a particular case". The first two [255] of the Commission's Special Rapporteurs on the law of treaties in their private writings also expressed doubts as to the existence in international law of any technical rules for the interpretation of treaties.

(3) Another group of writers,[256] although they may have reservations as to the obligatory character of certain of the so-called canons of interpretation, have shown less hesitation in recognizing the existence of some general rules for the interpretation of treaties. To this group belongs Sir G. Fitzmaurice, the previous Special Rapporteur [257] on the Law of Treaties, who in his private writings has deduced six principles from the jurisprudence of the World Court which he regards as the major principles of interpretation. Moreover, in 1956 the Institute of International Law [258] drew up a resolution in which it formulated, if in somewhat cautious language, two articles containing a small number of basic principles of interpretation.

(4) Writers also differ to some extent in their basic approach to the interpretation of treaties according to the relative weight which they give to —

(*a*) the text of the treaty as the authentic expression of the intentions of the parties ;

(*b*) the intentions of the parties as a subjective element distinct from the text ; and

(*c*) the declared or apparent objects and purposes of the treaty.

Some, like Sir H. Lauterpacht,[259] place the main emphasis on the intentions of the parties and in consequence admit a liberal recourse to the *travaux préparatoires* and to other evidence of the intentions of the

[252] See Harvard Law School, *Research in International Law*, part III, Law of Treaties, article 19, p. 939.

[253] *Ibid.*, p. 946.

[254] Lord McNair, *Law of Treaties* (1961), p. 366.

[255] J. L. Brierly, *Law of Nations* (6th ed.), p. 325. Sir H. Lauterpacht, *Rapport à l'Institut de droit international, Annuaire de l'Institut, 1950*, vol. 1, pp. 336-374.

[256] E.g. C. Rousseau, *Principes généraux de droit international public* (1944), pp. 676 *et seq.*; Sir E. Beckett, *Annuaire de l'Institut de droit international, 1950*, vol. 1, pp. 435-444 ; V. M. Chourchalov, *Fundamental Questions in the Theory of International Law* (1959), pp. 383-402 ; C. de Visscher, *Problèmes d'interprétation judiciaire en droit international public* (1963), pp. 50 *et seq.*

[257] *British Yearbook of International Law*, vol. 33 (1957), pp. 210-212.

[258] *Annuaire de l'Institut de droit international, 1956*, p. 359.

[259] *Annuaire de l'Institut de droit international, 1950*, pp. 377-402.

contracting States as means of interpretation. Some [260] give great weight to the objects and purposes of the treaty and are in consequence more ready, especially in the case of general multilateral treaties, to admit teleological interpretations of the text which go beyond, or even diverge from, the original intentions of the parties as expressed in the text. The majority of modern writers, however, insists upon the primacy of the text as the basis for the interpretation of a treaty, while at the same time giving a certain place to extrinsic evidence of the intentions of the parties and to the objects and purposes of the treaty as means for correcting or, in limited measure, supplementing the text. It is this view which is reflected in the 1956 resolution of the Institute of International Law mentioned in the previous paragraph.

(5) The great majority of cases submitted to international adjudication involves the interpretation of treaties, and the jurisprudence of international tribunals is rich in references to principles and maxims of interpretation.[261] In fact, statements can be found in the decisions of international tribunals to support the use of almost every principle or maxim of which use is made in national systems of law in the interpretation of statutes and contracts ; for example, those frequently referred to in their Latin forms, *ut res magis valeat quam pereat, contra proferentem, eiusdem generis, expressio unius est exclusio alterius, generalia specialibus non derogant*.[262] Treaty interpretation is, of course, equally part of the everyday work of Foreign Ministries and, if it is less easy to give chapter and verse than in the case of arbitral jurisprudence, it may safely be said that appeal to these principles and maxims of interpretation is no less frequent in State practice.[263]

(6) In short, it would be possible to find sufficient evidence of recourse to these principles and maxims in international practice to justify their inclusion in a codification of the law of treaties, if the question were simply one of their relevance on the international plane. But, as appears from the passages cited in paragraphs (1) and (2) above, the question posed by many jurists is rather as to the non-obligatory character of many of these principles and maxims ; and it is a question which arises in national systems of law no less than in international law. They are, for the most part, principles of logic and good sense valuable only as guides to assist in appreciating the meaning which the parties may have intended to attach to the expressions which they employed in a document. Their suitability for use in any given case hinges on a variety of considerations which have first to be appreciated by the interpreter of the document : the particular arrangement of the words and sentences, their relation to each other and to other parts of the document, the general nature and subject-matter of the document, the circumstances in which it was drawn up, etc. Even when a possible occasion for their application may appear to exist, their application is not automatic but depends on the conviction of the interpreter that it is appropriate in the particular circumstances of the case. In other words, recourse to many of these principles is discretionary rather than obligatory, and the interpretation of documents is to some extent an art, not an exact science.

(7) The position in regard to the methods of interpretation is somewhat analogous. The jurisprudence of international tribunals furnishes examples of all the different approaches to interpretation — textual, subjective and teleological. But it also shows that, if the textual method of interpretation predominates, none of these approaches is exclusively the correct one, and that their use in any particular case is to some extent a matter of choice and appreciation. This does not necessarily mean that there is no obligatory rule in regard to methods of interpretation ; but it does mean that there is a certain discretionary element also on this point.

(8) Any attempt to codify the conditions for the application of principles whose appropriateness in any given case depends so much on the particular context and on a subjective appreciation of varying circumstances would clearly be inadvisable for the reasons given in the passage cited in paragraph (1) above. The furthest that it would be safe to go would be a permissive provision simply stating that recourse may be had to the principles in question for the purpose of interpreting a treaty. But such a provision seems undesirable as there would be a danger that the inadvertent omission of a principle from the list might be thought to throw doubt upon its status even as a subsidiary aid to the interpretation of treaties. Accordingly, the choice before the Commission is believed to be either to omit the topic of interpretation of treaties altogether from the draft articles or to seek to isolate and to codify the comparatively few rules which appear to constitute the strictly legal basis of the interpretation of treaties. Admittedly, the task of formulating these rules is a delicate one, but the Commission may think it useful to attempt it. One reason is that the interpretation of treaties without arbitrariness and according to law is a necessary linch-pin of the *pacta sunt servanda* rule. Secondly, doctrinal differences concerning the methods of interpretation have tended to weaken the significance of the text as the expression of the will of the parties, and it seems desirable that the Commission should take a clear position in regard to the role of the text in treaty interpretation. Thirdly, a number of articles provisionally adopted by the Commission contain phrases such as "unless a contrary intention appears from the treaty" and the effect of these reservations cannot be properly appreciated if no indication is given in the draft articles as to whether this intention must appear on the face of the text or whether it may be established by reference to other evidence. It may

---

[260] E.g. L. Cavaré, *Le droit international public positif*, vol. II, p. 94 ; Judge Alvarez in the *Reservations to the Genocide Convention case, I.C.J. Reports*, 1951, p. 53.

[261] See Sir G. Fitzmaurice, *British Yearbook of International Law*, vol. 28 (1951), p. 1, and vol. 33 (1957), p. 203 ; C. Rousseau, *Principes généraux de droit international public* (1944), pp. 676-764 ; and V. D. Degan, *L'Interprétation des accords en droit international*, pp. 76-148.

[262] See Hackworth, *Digest of International Law*, vol. 5, pp. 232-234 ; C. de Visscher, *Problèmes d'interprétation judiclaire*, pp. 84-92 and 104-113 ; Lord McNair, *Law of Treaties* (1961), chapter 22.

[263] Some instances may be found in chapters 20-22 of Lord McNair's *Law of Treaties*.

be added that the establishment of some measure of agreement in regard to the basic rules of interpretation is important not only for the application but also for the drafting of treaties.

(9) The Special Rapporteur has accordingly prepared for the consideration of the Commission four draft articles dealing generally with the interpretation of treaties. These are articles 70-73, which are set out at the head of the present commentary. In addition, he has prepared two further articles dealing with the special problem of treaties which have plurilingual texts, a problem of increasing importance (see articles 74 and 75 below). Some writers in their exposition of the principles of treaty interpretation distinguish between law-making and other treaties.[264] It is true that the character of a treaty may affect the question whether the application of a particular principle, maxim or method of interpretation is suitable in a particular case.[265] But it is not thought necessary or appropriate to distinguish between law-making and other treaties for the purpose of formulating the general rules of interpretation — quite apart from the difficulties involved in making that distinction.

(10) Articles 70-73 take their inspiration from the 1956 resolution of the Institute of International Law [266] and from Sir G. Fitzmaurice's formulation of the "major principles" of interpretation in an article on the law and procedure of the International Court published in 1957.[267] The texts of the resolution and of Sir G. Fitzmaurice's formulation are therefore set out in the next two paragraphs for ease of comparison.

(11) *Resolution of the Institute of International Law.* "When a treaty is to be interpreted, States and international organizations and tribunals might be guided by the following principles :

"*Article 1*

"1. The agreement of the parties having been reached on the text of the treaty, the natural and ordinary meaning of the terms of that text should be taken as the basis of interpretation. The terms of the provisions of the treaty should be interpreted in the context as a whole, in accordance with good faith and in the light of the principles of international law.

"2. However, if it is established that the terms employed should be understood in another sense, the natural and ordinary meaning of those terms is set aside.

"*Article 2*

"1. In the case of a dispute brought before an international tribunal, it will be for the tribunal, taking into account the provisions of article 1 to determine whether and to what extent other means of interpretation should be employed.

"2. The following are among the legitimate means of interpretation :

"(*a*) consultation of the *travaux préparatoires* ;

"(*b*) the practice followed in the actual application of the treaty ;

"(*c*) the consideration of the objects of the treaty."

It will be noted that, whereas the preamble to the resolution contemplates that both articles should be applicable to interpretation by "States and international organizations and tribunals", article 2 is in terms restricted to interpretation by international tribunals. The rule in article 2 is certainly applicable also to interpretation by States and organizations and the drafting of the resolution is in this respect infelicitous.

(12) *Sir G. Fitzmaurice's formulation* (based on the jurisprudence of the World Court) —

"I. *Principle of actuality (or textuality).* Treaties are to be interpreted primarily as they stand, and on the basis of their actual texts.

"II. *Principle of the natural and ordinary meaning.* Subject to principle VI below, where applicable, particular words and phrases are to be given their normal, natural, and unstrained meaning in the context in which they occur. This meaning can only be displaced by direct evidence that the terms used are to be understood in another sense than the natural and ordinary one, or if such an interpretation would lead to an unreasonable or absurd result. Only if the language employed is fundamentally obscure or ambiguous may recourse be had to extraneous means of interpretation, such as consideration of the surrounding circumstances, or *travaux préparatoires.*

"III. *Principle of integration.* Treaties are to be interpreted as a whole, and particular parts, chapters or sections also as a whole.

"*Subject to the foregoing principles*

"IV. *Principle of effectiveness* (ut res magis valeat quam pereat). Treaties are to be interpreted with reference to their declared or apparent objects and purposes ; and particular provisions are to be interpreted so as to give them their fullest weight and effect consistent with the normal sense of the words and with other parts of the text, and in such a way that a reason and a meaning can be attributed to every part of the text.

"V. *Principle of subsequent practice.* In interpreting a text, recourse to the subsequent conduct and practice of the parties in relation to the treaty is permissible, and may be desirable, as affording the best and most reliable evidence, derived from how the treaty has been interpreted in practice, as to what its correct interpretation is.

"*Footnote to this principle.* Where the practice has brought about a change or development in the meaning of the treaty through a *revision* of its terms, by conduct, it is permissible to give effect to this change or development as an agreed revision but not as an interpretation of its original terms.

---

[264] E.g. C. Rousseau, *Principes généraux de droit international public* (1944), p. 677.

[265] E.g. the *contra proferentem* principle or the use of *travaux préparatoires.*

[266] *Annuaire de l'Institut de droit international, 1956,* pp. 364-365.

[267] *British Yearbook of International Law,* vol. 33 (1957), pp. 211-212.

"VI. *Principle of contemporaneity*. The terms of a treaty must be interpreted according to the meaning which they possessed, or which would have been attributed to them, and in the light of current linguistic usage, at the time when the treaty was originally concluded."

*Article 70*

(13) This article corresponds to article 1 of the Institute's resolution and to major principles I to III and VI in the Fitzmaurice formulation. It takes as the basic rule of treaty interpretation the primacy of the text as evidence of the intentions of the parties. It accepts the view that the text must be presumed to be the authentic expression of the intentions of the parties ; and that, in consequence, the starting point and purpose of interpretation is to elucidate the meaning of the text, not to investigate *ab initio* the intentions of the parties. While not excluding recourse to other indications of the intentions of the parties in appropriate cases, it makes the actual text the dominant factor in the interpretation of the treaty. The Institute of International Law adopted this — the textual — approach to treaty interpretation, despite its first Rapporteur's [268] strong advocacy of a more subjective, "intentions of the parties", approach. The objections to giving too large a place to the intentions of the parties as an independent basis of interpretation find cogent expression in the proceedings of the Institute.[269] The textual approach, on the other hand, justifies itself by the simple fact that, as one authority [270] has put it, *"le texte signé est, sauf de rares exceptions, la seule et la plus récente expression de la volonté commune des parties"*. Moreover, the jurisprudence of the World Court contains many pronouncements from which it is permissible to conclude that the textual approach to treaty interpretation is regarded by the Court as established law.[271] In particular, it has more than once stressed that it is not the function of interpretation to revise treaties or to read into them what they do not expressly or by necessary implication contain.[272]

(14) *Paragraph 1* contains four separate principles. The first — interpretation in good faith — flows directly from the rule *pacta sunt servanda*. The second — natural and ordinary meaning of the terms — is the very essence of the textual approach ; the parties are to be presumed to have that intention which appears from the natural and ordinary meaning of the terms used by them. The third principle — referred to by

Sir G. Fitzmaurice as the principle of integration — is one both of common sense and good faith ; the natural and ordinary meaning of terms is not to be determined in the abstract but by reference to the context in which they occur. The second and third principles have repeatedly been affirmed by the World Court.[273] Here it will suffice to cite the pronouncement of the International Court in its Opinion on the Competence of the General Assembly in the Admission of a State to the United Nations : [274]

"The Court considers it necessary to say that the first duty of a tribunal which is called upon to interpret and apply the provisions of a treaty, is to endeavour to give effect to them in their natural and ordinary meaning in the context in which they occur. If the relevant words in their natural and ordinary meaning make sense in their context, that is an end of the matter."

That the context is not merely the article or section of the treaty in which the term occurs, but also the context of the treaty as a whole, was stressed by the Permanent Court in an early Opinion : [275]

"In considering the question before the Court upon the language of the treaty, it is obvious that the treaty must be read as a whole, and that its meaning is not be determined merely upon particular phrases which, if detached from the context, may be interpreted in more than one sense."

And the Court has more than once had recourse to the statement of the objects of the treaty in the preamble for the purpose of interpreting a particular provision.[276]

(15) The fourth principle contained in paragraph 1 — Sir G. Fitzmaurice's principle No. VI, the principle of interpretation by reference to the linguistic usage current at the time of the conclusion of the treaty — is a reformulation of the first aspect of Judge Huber's "inter-temporal" law submitted to the Commission in article 56. After discussing that article at the 728th meeting [277] the Commission postponed consideration of the principles involved, with a view to re-examining them in connexion with the rules of interpretation. Taking account of the views expressed at that meeting, the Special Rapporteur has included the first branch of the inter-temporal law in the present article.[278] Sir G. Fitzmaurice, although recognizing the affinities of this principle with the "natural and ordinary meaning rule", preferred to treat it as an independent principle. But is constitutes one of the conditions for determining the natural and ordinary meaning [279] and

---

[268] Sir H. Lauterpacht. At the final discussion of the subject in 1956 Sir H. Lauterpacht, having been elected to the Court, was replaced by Sir G. Fitzmaurice who, in common with the majority of the members, favoured the textual approach.

[269] See in particular Sir E. Beckett, *Annuaire 1950*, vol. 1, pp. 435-444 ; Max Huber, *Annuaire 1952*, vol. 1, pp. 198-202 ; and the deliberations in *Annuaire 1952*, vol. 2, pp. 369-382.

[270] Max Huber, *Annuaire de l'Institut de droit international, 1952*, vol. 1, p. 199.

[271] See examples in V. D. Degan, *L'interprétation des accords en droit international*, pp. 79-83 ; and in *British Yearbook of International Law*, vol. 28 (1951), pp. 10-11 and vol. 33 (1957), pp. 212-214.

[272] E.g. in the *United States Nationals in Morocco* case, *I.C.J. Reports, 1952*, pp. 196 and 199.

[273] See instances cited in V. D. Degan, *L'interprétation des accords en droit international*, pp. 96-98 ; and in *British Yearbook of International Law*, vol. 28 (1951), pp. 10-11 and 18.

[274] *I.C.J. Reports, 1950*, p. 8.

[275] *Competence of the ILO to Regulate Agricultural Labour*, *P.C.I.J.* (1922), Series B, Nos. 2 and 3, p. 23 ; and see Lord McNair, *Law of Treaties* (1961), pp. 381-382.

[276] E.g. *United States Nationals in Morocco* case, *I.C.J. Reports, 1952*, pp. 183-184 and pp. 197-198.

[277] For summary record see *Yearbook of the International Law Commission, 1964*, vol. I.

[278] The second branch is included in article 73.

[279] It is so treated in the resolution of the Institute of International Law.

therefore seems properly to belong to paragraph 1 of the present article. Instances of the application of this principle have been given in the commentary to article 56 and there is no need to repeat them here. The formulation of the principle has here been widened to cover not only the rules of international law but also the linguistic usage current at the time of the conclusion of the treaty. The application of the principle in the *United States Nationals in Morocco* case [280] concerned linguistic usage rather than rules of law.

(16) *Paragraph 2* concerns cases where either the natural and ordinary meaning of the terms in their context does not give a viable result or for one reason or another the meaning is not clear. In these cases, and in these cases only, it is permissible to fix the meaning of the terms by reference to evidence or indications of the intentions of the parties outside the ordinary sense of their words. The World Court has frequently stated that, where the natural and ordinary meaning of the words is clear and makes sense in the context, there is no occasion to have recourse to other means or principles of interpretation. Many of these statements relate to the use of *travaux préparatoires*. The passage from the Court's Opinion on the Competence of the General Assembly in the Admission of a State to the United Nations, cited in paragraph (14) above, is one example, and another is its earlier Opinion regarding admission to the United Nations : [281]

"The Court considers that the text is sufficiently clear ; consequently, it does not feel that it should deviate from the consistent practice of the Permanent Court of International Justice, according to which there is no occasion to resort to preparatory work if the text of a Convention is sufficiently clear in itself".

Similarly, the Court has refused to admit principles such as *ut res magis valeat* and that favouring restrictive interpretation when to do so would run counter to the clear meaning of a text.[282] On the other hand, it has recognized that the "clear meaning" rule is not applicable if an interpretation on the basis of the natural and ordinary meaning of the terms "would lead to something unreasonable or absurd".[283] This exception to the clear meaning rule must, it is thought, be considered as strictly limited to cases where the natural and ordinary meaning gives a result which *in the context is objectively and manifestly* absurd or unreasonable ; for otherwise it might unduly weaken the rule. The limited nature of this exception is confirmed by the rarity of the cases in which the Court has applied it. A recent instance is the *South West Africa* cases where, dealing with the contention that today there is no such thing as "another Member of the League" for the purposes of the South West Africa Mandate, the Court said : "This contention is claimed to be based upon

the natural and ordinary meaning of the words employed in the provision. But this rule of interpretation is not an absolute one. Where such a method of interpretation results in a meaning incompatible with the spirit, the purpose and context of the clause or instrument in which the words are contained, no reliance can be validly placed on it".[284] The great bulk of the cases which fall under paragraph 2 are, of course, those where owing to its ambiguity or obscurity the meaning of a term is not clear. Admittedly, subjective elements may enter into the determination of the natural and ordinary meaning of a text and lead to different opinions as to its clarity. Some element of subjectivity is inherent in the process of interpretation and the general rule remains valid that only when interpretation in good faith leaves a real doubt as to the meaning is it permissible to set aside the natural and ordinary meaning of the terms of the treaty in favour of some other meaning.

(17) The question remains whether in cases falling under paragraph 2 there is any general principle which governs the determination of the meaning. The answer, it is suggested, is that (i) the term in question must still be interpreted in its context in the treaty and in the light of the objects and purposes of the treaty as a whole ; and (ii) subject to these controls, the meaning of the term is to be established by any relevant evidence or indications of the intention of the parties in using the term.

(18) *Paragraph 3* admits as an exception to the natural and ordinary meaning rule cases where it is established conclusively that the parties employed a particular term with a special meaning. The Court, while it has more than once recognized the existence of this exception, has stressed that only decisive proof of a special meaning will suffice to displace the natural and ordinary meaning.[285]

## Article 71

(19) *Paragraph 1* of this article seeks to define what is comprised in the "context of the treaty as a whole" for the purposes of interpretation. This is important not only for the general application of the rules of interpretation but also, as pointed out above, for indicating the scope of the term "unless it appears from the treaty" which appears, in one form or another, quite frequently in these draft articles. That the preamble forms part of a treaty for purposes of interpretation is too well settled to require comment.[286] More difficult is the question how far documents connected with the treaty are to be regarded as forming part of the "context of the treaty as a whole" for the purposes of interpretation. Paragraph 1 proposes that the documents which should be so regarded are : agreements arrived at between the parties as a condition of the conclusion of the treaty

[280] *I.C.J. Reports, 1952,* p. 189.

[281] *I.C.J. Reports, 1948,* p. 63.

[282] E.g. *The Interpretation of the Peace Treaties* (second phase), *I.C.J. Reports, 1950,* p. 229 ; the *Wimbledon, P.C.I.J.* (1923), Series A, No. 1, pp. 24-25.

[283] *Polish Postal Service in Danzig, P.C.I.J.* (1925), Series B, No. 11, p. 39 ; *Competence of the General Assembly in the Admission of a State to the United Nations, I.C.J., 1950,* p. 8.

[284] *I.C.J. Reports, 1962,* pp. 335-336. For another example, see *Designation of the Netherlands Workers Delegate to the ILO, P.C.I.J.* (1922), Series B, No. 1, p. 22.

[285] *Eastern Greenland Case, P.C.I.J.* (1933), Series A/B, No. 53, p. 49 ; *Conditions of Admission to Membership of the United Nations, I.C.J. Reports,* 1947-48, p. 63.

[286] See C. Rousseau, *Principes généraux de droit international public* (1944), pp. 717-719.

or as a basis for its interpretation, instruments or documents annexed to the treaty, and any other instruments related to, and drawn up in connexion with the conclusion of, the treaty. This is not to suggest that these documents are necessarily to be considered as an integral part of the treaty. Whether they are an actual part of the treaty depends on the intention of the parties in each case.[287] What is proposed in paragraph 1 is that, for purposes of interpreting the treaty, the specified categories of documents should not be regarded as mere evidence to which recourse may be had for the purpose of resolving an ambiguity or obscurity but as part of the context for the purpose of arriving at the natural and ordinary meaning of the terms of the treaty. Particularly important is the question whether an agreed statement or understanding as to the meaning of a provision prior to the conclusion of the treaty is to be considered as part of the context or merely as part of the *travaux préparatoires*. The majority of the Court adopted the latter view in *Conditions of Admission to Membership* case [288] but the Special Rapporteur considers that the Commission should prefer the line taken by the Court in the *Ambatielos* case [289] where it said : "The provisions of the Declaration are in the nature of an interpretation clause, and, as such, should be regarded as an integral part of the Treaty."

(20) *Paragraph 2* is permissive in character and recognizes the propriety of recourse to extraneous evidence or indications of the intentions of the parties for the purpose of : (a) *confirming* the natural and ordinary meaning of a term ; (b) *determining* the meaning of an ambiguous or obscure term or of a term whose natural and ordinary meaning gives an absurd or unreasonable result ; and (c) *establishing* the use of a term by the parties with a special meaning. Recourse to extraneous evidence for purposes (b) and (c) calls for no comments, as these points have already been covered. Recourse to it — and especially to *travaux préparatoires* — for the purpose of confirming the natural and ordinary meaning is more open to question, having regard to the consistent rejection by the Court of recourse to *travaux préparatoires* when the natural and ordinary meaning is clear. There is, however, a difference between examining and basing a finding upon *travaux préparatoires*, and the Court itself has more than once referred to them as confirming an interpretation otherwise arrived at from a study of the text.[290] Moreover, it is the constant practice of States and tribunals to examine any relevant *travaux préparatoires* for such light as they may throw upon the treaty. It would therefore be unrealistic to suggest, even by implication, that there is any actual bar upon mere reference to *travaux préparatoires* whenever the meaning of the terms is clear.

(21) Under this article, therefore, *travaux préparatoires* are treated only as a subsidiary means of interpretation except in the case of a preparatory document coming within one of the categories mentioned in paragraph 1. Recourse to *travaux préparatoires* as a subsidiary means of interpreting the text, as already indicated, is frequent both in State practice and in cases before international tribunals.[291] Today, it is generally recognized that some caution is needed in the use of *travaux préparatoires* as a means of interpretation.[292] They are not, except in the case mentioned, an authentic means of interpretation. They are simply evidence to be weighed against any other relevant evidence of the intentions of the parties, and their cogency depends on the extent to which they furnish proof of the *common* understanding of the parties as to the meaning attached to the terms of the treaty. Statements of individual parties during the negotiations are therefore of small value in the absence of evidence that they were assented to by the other parties. Since *travaux préparatoires* are not, as such, an authentic means of interpretation but merely evidence, it is not thought that anything would be gained by trying to define them ; indeed, to do so might only lead to the possible exclusion of relevant evidence. More delicate is the question whether, in regard to multilateral treaties, the article should authorize the use of *travaux préparatoires* only as between States which took part in the negotiations or, alternatively, only if they have been published. In the *River Oder Commission* case [293] the Permanent Court excluded from its consideration the *travaux préparatoires* of certain provisions of the Treaty of Versailles on the ground that three of the States before the Court had not participated in the conference which prepared the Treaty of Versailles ; and in making this ruling it expressly refused to differentiate between published and unpublished documents. It may be doubted, however, whether this ruling represents the actual practice in regard to multilateral treaties open to accession by States which did not attend the conference at which they were drawn up.[294] Moreover, the principle behind the ruling is by no means so compelling as might appear from the language of the Court in that case. A State acceding to a treaty in the drafting of which it did not participate is perfectly entitled to ask to see the *travaux préparatoires*, if it wishes, before acceding. Nor, it is thought, would the rule be practically convenient, having regard to the many important multilateral treaties open generally to accession. These considerations apply to unpublished, but accessible, *travaux préparatoires* as well as to published ones ; and in the case of bilateral treaties or "closed" treaties between small groups of States unpublished *travaux préparatoires* will usually be in the hands of all the parties. Accordingly, the

---

[287] *Ambatielos* case (Preliminary Objection) *I.C.J. Reports*, 1952, pp. 43 and 75.

[288] *I.C.J. Reports*, 1948, p. 63 ; but see Judge Azevedo's contrary opinion in the second *Admissions* case *I.C.J. Reports*, 1950, pp. 30-31.

[289] (Preliminary Objection) *I.C.J. Reports*, 1952, p. 44.

[290] See Lord McNair, *Law of Treaties* (1961), p. 44.

[291] For examples, see V. D. Degan, *L'interprétation des accords en droit international*, pp. 126-129 ; Lord McNair, *Law of Treaties* (1961), chapter 23 ; C. Rousseau, *Principes généraux de droit international public* (1944), pp. 738-739.

[292] See C. de Visscher, *Problèmes d'interprétation judiciaire en droit international public* (1963).

[293] *P.C.I.J.* (1929), Series A, No. 23.

[294] See S. Rosenne, "Travaux préparatoires", *International and Comparative Law Quarterly* (1963), pp. 1378-1383.

Case 1:19-cv-01618-TSC     Document 109-48     Filed 02/14/25     Page 63 of 237

Special Rapporteur suggests that it may be preferable not to make participation in the conference or publication the basis of formal restrictions upon the use of *travaux préparatoires*.

(22) *Paragraph 2* also makes special reference to the circumstances surrounding the conclusion of the treaty. This broad phrase is intended to cover both the contemporary circumstances and the historical context [295] in which the treaty was concluded.

(23) A third means of interpretation specially mentioned in the paragraph is the subsequent practice of the parties in relation to the treaty. The probative value of subsequent practice is well recognized.[296] As Sir G. Fitzmaurice has said, while *travaux préparatoires* contain only the statement of the intention of the parties, subsequent practice shows the putting into operation of that intention.[297] The use of this means of interpretation is well established in the jurisprudence of international tribunals and, more especially, of the World Court.[298] The Court appears, in general, to put subsequent practice as a means of interpretation on the same basis as *travaux préparatoires* — as evidence to be used for confirming the natural and ordinary meaning or for ascertaining the meaning in cases of doubt. Thus in its opinion on the Competence of the ILO [299] the Permanent Court said :

"If there was any ambiguity, the Court might, for the purpose of arriving at the true meaning, consider the action which has been taken under the treaty."

At the same time, the Court [300] referred to subsequent practice in confirmation of the meaning which it had deduced from the text and which it considered to be unambiguous. Again in the *Interpretation of the Treaty of Lausanne opinion,*[301] it said :

"The facts subsequent to the conclusion of the Treaty of Lausanne can only concern the Court in so far as they are calculated to throw light on the intention of the parties at the time of the conclusion of that treaty."

In the *Corfu Channel* case,[302] the International Court similarly said :

"The subsequent attitude of the parties shows that it has not been their intention, by entering into

the Special Agreement, to preclude the Court from fixing the amount of the compensation."

Other pronouncements of the World Court [303] confirm that, in principle, subsequent practice is to be regarded as a subsidiary means of interpretation and it therefore seems right to place it in paragraph 2 alongside *travaux préparatoires*.

(24) As in the case of *travaux préparatoires*, the probative value of subsequent practice varies according as it shows the *common* understanding of the parties as to the meaning of the terms. The practice of an individual State may, however, have special cogency when it relates to the performance of an obligation which particularly concerns that State. Thus, in the *Status of South West Africa* Opinion [304] the Court said :

"Interpretations placed upon legal instruments by the parties to them, though not conclusive as to their meaning, have considerable probative value when they contain recognition by a party of its own obligations under an instrument."

Again, in the *Temple* case [305] it held that the practice of one party to a bilateral treaty precluded it from afterwards contesting an interpretation of a particular clause to which it had apparently assented. Clearly, if the practice is not consistent, its probative value diminishes.[306]

(24a) Certain of the cases in which the Court has had recourse to subsequent practice have concerned the interpretation of the constitutions of international organizations.[307] The most notable is its recent Opinion on *Certain Expenses of the United Nations,*[308] in which the Court made a large use of the subsequent practice of organs of the United Nations as a basis for its findings on a number of points. The problem of the effect of the practice of organs of an international organization upon the interpretation of its constituent instrument raises an important constitutional issue as to how far individual Member States are bound by the practice. Although the practice of the organ as such may be consistent, it may have been opposed by individual Members or by a group of Members which have been outvoted.[309] This special problem appears to relate to the law of international organizations rather than to the general law of treaties, and the Special

[295] For an example, see *European Commission of the Danube*, P.C.I.J. (1927), Series B, No. 14, p. 57.

[296] See Lord McNair, *Law of Treaties* (1961), chapter 24 ; C. de Visscher, *Problèmes d'interprétation judiciaire en droit international public*, pp. 121-127.

[297] *British Yearbook of International Law*, vol. 33 (1957), p. 223. In the *Russian Indemnity* case the Permanent Court of Arbitration said : "*L'exécution des engagements est, entre Etats, comme entre particuliers, le plus sûr commentaire du sens de ces engagements*", U.N.R.I.A.A., vol. XI, p. 421.

[298] See examples in Lord McNair, *Law of Treaties* (1961), chapter 24 ; C. de Visscher, *op. cit.*, pp. 121-127 and V. D. Degan, *L'interprétation des accords en droit international*, pp. 130-132.

[299] *P.C.I.J.* (1922), Series B, No. 2, p. 39.

[300] *Ibid.*, pp. 40-41.

[301] *P.C.I.J.* (1925), Series B, No. 2, p. 24.

[302] *I.C.J. Reports*, 1949, p. 25.

[303] E.g. the *Brazilian Loans* case, *P.C.I.J.* (1929), Series A, Nos. 20-21, p. 119.

[304] *I.C.J. Reports, 1950*, pp. 135-136.

[305] *I.C.J. Reports, 1962*, pp. 32-35.

[306] In the *United States Nationals in Morocco* case the Court for this reason declined to be guided by the practice subsequent to the Act of Algeciras, *I.C.J. Reports, 1952*, p. 210 ; four judges, however, finding less inconsistency in the practice accepted its probative value ; see page 231.

[307] E.g. the *Competence of the ILO* Opinions, *P.C.I.J.* (1922), Series B, Nos. 2 and 3, pp. 38-40 ; *Competence of the General Assembly regarding Admission, I.C.J. Reports, 1950*, p. 9 ; *Composition of the Committee of I.M.C.O., I.C.J. Reports, 1960*, pp. 167 *et seq.*

[308] *I.C.J. Reports, 1962*, at pp. 157 *et seq.*

[309] The constitutional issue is examined in the separate opinion of Judge Spender in the *Expenses* case (at pp. 187 *et seq*) ; and also, although less directly, by Judge Fitzmaurice (at pp. 201 *et seq*).

Rapporteur suggests that it would not be appropriate to attempt to deal with it in the present articles.

(25) Subsequent practice when it is consistent and embraces all the parties would appear to be decisive of the meaning to be attached to the treaty, at any rate when it indicates that the parties consider the interpretation to be binding upon them. In these cases, subsequent practice as an element of treaty interpretation and as an element in the formation of a tacit agreement overlap and the meaning derived from the practice becomes an authentic interpretation established by agreement.[310] Furthermore, if the interpretation adopted by the parties diverges, as sometimes happens, from the natural and ordinary meaning of the terms, there may be a blurring of the line between the *interpretation* and the *amendment* of a treaty by subsequent practice. In the *Temple* case,[311] for example, the boundary line acted on in practice was not reconcilable with the natural and ordinary meaning of the terms of the treaty and the effect of the subsequent practice was to amend the treaty. Again, in a recent arbitration between France and the United States regarding the interpretation of an Air Transport Service Agreement [312] the Tribunal, speaking of the subsequent practice of the parties said :

> "This course of conduct may, in fact, be taken into account not merely as a means useful for interpreting the Agreement, but also as something more : that is, as a possible source of a subsequent modification, arising out of certain actions or certain attitudes, having a bearing on the rights that each of the parties could properly claim." [312a]

And the Tribunal in fact found that the Agreement had been modified in a certain respect by the subsequent practice. Although, as already stated, the line may sometimes be blurred between interpretation and amendment through subsequent practice, legally the processes are quite distinct. Accordingly, the process of amendment through subsequent practice is dealt with in article 73 as an aspect of the inter-temporal law.

(26) *Paragraph 2,* although it makes special mention of *travaux préparatoires,* surrounding circumstances and subsequent practice, permits recourse to any other relevant evidence or indications of the intentions of the parties. Relevant here means relevant to the objective proof of the intentions of the parties regarding the meaning of the terms employed in the treaty.

*Article 72*

(27) The Special Rapporteur hesitated for two reasons to propose the inclusion of the principle of "effective" interpretation among the general rules. First, there is some tendency to equate and confuse "effective" with "extensive" or "teleological" interpretation, and to give it too large a scope. Secondly, "effective" interpretation, correctly understood, may be said to be implied in interpretation made in good faith. On balance, however, it seems desirable to include the principle, properly limited, in the draft articles. Properly limited, it does not call for "extensive" or "liberal" interpretation in the sense of an interpretation going beyond what is expressed or necessarily implied in the terms. As one previous Special Rapporteur [313] has written, "The principle *ut res magis valeat quam pereat* does not mean that the maximum of effectiveness must be given to an instrument purporting to create an international obligation ; it means that the maximum of effectiveness should be given to it consistently with the intention — the common intention — of the parties." Nor does it necessarily lead to an extensive rather than a restrictive view of the effects of the treaty, as is pointed out in a recent book : [314]

> "Une interprétation ne se conçoit comme extensive ou restrictive qu'en fonction d'un principe reconnu ou d'un degré de normalité généralement accepté. Quand donc on parle d'interprétation extensive ou restrictive, c'est la résultante d'un travail d'interprétation que l'on a en vue. Une interprétation extensive ou restrictive ne se dégage qu'après que l'interprète s'est convaincu que le sens naturel des termes employés reste en deçà ou va au-delà de la véritable intention des parties. Parler d'interprétation extensive ou restrictive comme de critères ou de présomptions, c'est anticiper sur les résultats du travail interprétatif et méconnaître le processus dynamique de toute interprétation."

(28) It is true that, when international tribunals have had recourse to the principle in their jurisprudence, it has usually been for the purpose of rejecting a restrictive interpretation which was being urged upon them by one of the parties.[315] But in most of these cases the restrictive interpretation was one which would have defected or largely defeated the intention of the parties as it appeared from the natural meaning of the terms of the treaty ; and the interpretation adopted by the tribunal was an application, not an extension, of the natural meaning of the terms. Thus in its Opinion on the *Acquisition of Polish Nationality* [316] the Permanent Court, in rejecting a restrictive interpretation, said :

> "If this were not the case, the value and sphere of application of the Treaty would be greatly diminished. But in the Advisory Opinion given with regard to the questions put concerning the German colonists in Poland, the Court has already expressed

---

[310] See the *Arbitral Award of the King of Spain, I.C.J. Reports, 1960,* p. 192 ; C. de Visscher, *Problèmes d'interprétation judiciaire en droit international public,* p. 127.

[311] *I.C.J. Reports, 1962,* pp. 32-33 ; and see Sir G. Fitzmaurice. *British Yearbook of International Law,* vol. 33 (1957), pp. 252-253.

[312] Decided at Geneva on 22 December 1963, the arbitrators being R. Ago (President), P. Reuter and H. P. de Vries.

[312a] American Society of International Law, *International Legal Materials — Current Documents,* vol. III, No. 4 (July 1964), p. 713.

[313] Sir H. Lauterpacht, *The Development of International Law by the International Court,* p. 229.

[314] C. de Visscher, *Problèmes d'interprétation judiciaire en droit international public,* pp. 87-88.

[315] For the jurisprudence, see C. Rousseau, *Principes généraux du droit international public* (1944), pp. 680-683 ; V. D. Degan, *L'interprétation des accords en droit international,* pp. 103-106 ; C. de Visscher, *op. cit.* pp. 84-92.

[316] *P.C.I.J.* (1923), Series B, No. 7, pp. 16-17 ; see also *The Exchange of Greek and Turkish Populations, P.C.I.J.* (1925), Series B, No. 10, p. 25.

the view that an interpretation which would deprive the Minorities Treaty of a great part of its value is inadmissible. In the present case it would be still less admissible since it would be contrary to the actual terms of the Treaty."

Similarly, in the *Corfu Channel* case [317] the present Court interpreting a Special Agreement said :

"It would indeed be incompatible with the generally accepted rules of interpretation to admit that a provision of this sort occurring in a Special Agreement should be devoid of purport or effect."

And the Court referred to a previous decision of the Permanent Court to the same effect in the *Free Zones* case.[318]

(29) If the principle of effective interpretation may be said to be implicit in the requirement of good faith, there are, it is thought, two reasons which may make it desirable to formulate it in a separate article. The first is that the principle has special significance as the basis upon which it is justifiable to imply terms in a treaty for the purpose of giving efficacy to an intention *necessarily* to be inferred from the express provisions of the treaty. The second is that in this sphere — the sphere of implied terms — there is a particular need to indicate the proper limits of the application of the principle if too wide a door is not to be opened to purely teleological interpretations. The point is of particular consequence in the interpretation of constituent treaties of international organizations and although those treaties, by their functional nature, may legitimately be more subject to teleological interpretations, there is evidently some limit to what may be deduced from them and still be considered "interpretation". The Court, which has by no means adopted a narrow view of the extent to which it is proper to imply terms in treaties, has nevertheless insisted that there are definite limits to the use which may be made of the principle *ut res magis valeat* for this purpose. Thus in the *Reparation for Injuries* Opinion, while deducing by implication from the language of the Charter the international personality of the United Nations and its capacity to bring international claims, it was careful to stress that this personality and capacity arose by *necessary* implication or *necessary* intendment from the terms of the Charter. Moreover, in its *Interpretation of the Peace Treaties* Opinion [319] it said :

"The principle of interpretation expressed in the maxim : *ut res magis valeat quam pereat*, often referred to as the rule of effectiveness, cannot justify the Court in attributing to the provisions for the settlement of disputes in the Peace Treaties a meaning which . . . would be contrary to their letter and spirit."

And it emphasized that to adopt an interpretation which ran counter to the clear meaning of the terms would not be to interpret but to revise the treaty.

(30) In the light of the above considerations article 72 has been formulated so as to make the principle of

effectiveness subject to (a) the natural and ordinary meaning of the terms and (b) the objects and purposes of the treaty. This formulation, it is thought, while containing the principle of effectiveness within the four corners of the treaty, still leaves room for such measure of teleological interpretation as can legitimately be considered to fall within the legal boundaries of interpretation.

*Article 73*

(31) Article 73 concerns the second branch of the inter-temporal law which was included in article 56, paragraph 2, in more general terms and in the context of "application" of treaties. As already mentioned in paragraph (15) of this commentary, the Commission at its 728th meeting postponed consideration of the principles involved in that article with a view to re-examining them in the context of interpretation of treaties. The first branch of the inter-temporal law — the principle that the terms of a treaty are to be interpreted in the light of the rules of international law and of the linguistic usage current at the time of its conclusion — has, as explained in paragraph (15), been embodied in article 70, paragraph 1 (b). The second branch — the principle that the legal effects of a treaty, as of any other legal act, are influenced by the evolution of the law — now requires to be dealt with. Whereas the first branch of the inter-temporal law clearly concerns the interpretation of treaties, the second can be regarded either as a question of the interpretation of the treaty or of the application of the rules of international law to it.

(32) There appear to be three ways in which the law may evolve with effects upon the interpretation and application of the treaty : (a) emergence of a rule of customary law outside the treaty but affecting its subject matter ; (b) the conclusion of a later agreement between parties to the treaty ; and (c) development of a subsequent practice in the application of the treaty which evidences a tacit agreement amongst the parties to extend or modify the treaty. The rule proposed in article 73 provides that the interpretation at any time of the terms of a treaty must *take account of* any one of these possible alterations in the legal relations between the parties. The term "take account of" is used rather than "be subject to" or any similar term because, if the rule is formulated as one of interpretation, it seems better, at any rate in sub-paragraphs (a) and (b), to use words that leave open the results of the interpretation. Where a later rule of customary law emerges or a later agreement is concluded, the question may arise as to how far they ought to be regarded as intended to supersede the treaty in the relations between the parties — a question touched on, in the case of later agreements, in article 41. If the treaty was intended to create a special régime between the particular parties, they might not intend it to be displaced by the emergence of a new general régime created by treaty or custom. Accordingly, it seems prudent to state only the broad principle and not attempt to define its results. Otherwise, it would seem necessary to elaborate the provisions of the article considerably by reference to the possible differences in the intentions of the parties.

[317] *I.C.J. Reports, 1949*, p. 24.
[318] *P.C.I.J.* (1929), Series A, No. 22, p. 13.
[319] *I.C.J. Reports*, 1950, p. 229.

(33) Sub-paragraph (a), which deals with the evolution of customary international law, has already been commented upon in paragraphs (4) and (5) of the commentary to article 56. It is true that those comments were made in the context of "application" of treaties. But they retain their general validity in the context also of interpretation and, as the Commission has already had a preliminary discussion of the problem, it is not thought necessary to add anything further here. Sub-paragraph (b), deals with the effects of later treaties, a topic which has already come under prolonged examination by the Commission in connexion with articles 41 and 65. Here again, therefore, it is not thought necessary to add any further comments. As to sub-paragraph (c), the question of a subsequent practice which evidences a tacit agreement amongst the parties to extend or modify the agreement has already been explored in paragraph (32) of the present commentary. No doubt, it might be possible to regard the subsequent practice as generating a special customary rule having its effects on the interpretation of the treaty, in which event the case would be more analogous to sub-paragraph (a). It is believed, however, to be more appropriate and more usual to classify it as a case of variation of the treaty by tacit agreement.

*Article 74. — Treaties drawn up in two or more languages*

1. When the text of a treaty has been authenticated in accordance with the provisions of article 7 in two or more languages, the texts of the treaty are authoritative in each language except in so far as a different rule may be laid down in the treaty.

2. A version drawn up in a language other than one in which the text of the treaty was authenticated shall also be considered an authentic text and be authoritative if —

 (a) the treaty so provides or the parties so agree ; or

 (b) an organ of an international organization so prescribes with respect to a treaty drawn up within the organization.

*Article 75. — Interpretation of treaties having two or more texts or versions*

1. The expression of the terms of a treaty is of equal authority in each authentic text, subject to the provisions of the present article. The terms are to be presumed to be intended to have the same meaning in each text and their interpretation is governed by articles 70-73.

2. When a comparison between two or more authentic texts discloses a difference in the expression of a term and any resulting ambiguity or obscurity as to the meaning of the term is not removed by the application of articles 70-73, the rules contained in paragraphs 3-5 apply, unless the treaty itself provides that, in the event of divergence, a particular text or method of interpretation is to prevail.

3. If in each of two or more authentic texts a term is capable of being given more than one meaning compatible with the objects and purposes of the treaty, a meaning which is common to both or all the texts is to be adopted.

4. If in one authentic text the natural and ordinary meaning of a term is clear and compatible with the objects and purposes of the treaty, whereas in another it is uncertain owing to the obscurity of the term, the meaning of the term in the former text is to be adopted.

5. If the application of the foregoing rules leaves the meaning of a term, as expressed in the authentic text or texts, ambiguous or obscure, reference may be made to a text or version which is not authentic in so far as it may throw light on the intentions of the parties with respect to the term in question.

*Commentary*

(1) The phenomenon of treaties drawn up in two or more languages has become increasingly familiar since 1919 and, with the advent of the United Nations, general multilateral treaties drawn up, or finally expressed, in five different languages have become not uncommon. When a treaty is plurilingual, there may or may not be a difference in the status of the texts for the purposes of interpretation. Each of the texts may have the status of an authentic text of the treaty ; or one or more of them may be merely an "official text", that is a text which has been signed by the negotiating States but not accepted as authoritative,[320] or one or more of them may be merely an "official translation", that is a translation prepared by the parties or an individual Government or by an organ of an international organization. Whenever there are two or more texts a question may arise either as to what is the effect of a plurality of authentic texts on the interpretation of the treaty, or as to what recourse may be had to an official text or translation as an aid to the interpretation of the authentic text or texts of the treaty.[321]

*Article 74*

(2) The first need clearly is to establish which of the texts are to be regarded as authentic and it is this point with which article 74 deals. Today the majority of more formal treaties contain an express provision determining the status of the texts. If there is no such provision, it seems to be generally accepted that each of the versions in which the text of the treaty was "drawn up" is to be considered authentic and, therefore, authoritative for purposes of interpretation.[322] In other words, the general rule is the equality of the languages and the equal authenticity of the texts in the absence of any provision to the contrary. In formulating this general rule *paragraph 1* refers to languages in which the text of the treaty has been "authenticated" rather than "draw up" or "adopted". This is to take account

---

[319] E.g. the Italian text of the Treaty of Peace with Italy is "official", but not "authentic", since article 90 designates only the French, English and Russian texts as authentic.

[320] See generally a valuable study of the interpretation of plurilingual treaties by J. Hardy, *British Yearbook of International Law*, vol. 37 (1961), pp. 72-155.

[321] Lord McNair, *Law of Treaties* (1961), p. 61 ; L. Ehrlich, *Recueil des Cours de l'Académie de droit international* (1928), vol. IV, p. 98.

of article 7 of the present articles in which the Commission recognized "authentication of the text" as a distinct procedural step in the conclusion of a treaty even although, in the case of authentication by signature, the act of authentication may also have other functions.[323]

(3) The proviso "except in so far as a different rule may be laid down in the treaty" is necessary for two reasons. First, treaties sometimes provide expressly that only certain texts are to be authoritative, as in the case of the Peace Treaties concluded after the Second World War which make the French, English and Russian texts authentic while leaving the Italian, Bulgarian, Hungarian, etc. texts merely "official".[324] Indeed, cases have been known where one text has been made authentic between some parties and a different text between others.[325] Secondly, a plurilingual treaty may provide that in the event of divergence between the texts a specified text is to prevail. Indeed, it is not uncommon for a treaty between two States, because the language of one is not well-understood by the other or because neither State wishes to recognize the supremacy of the other's language, to designate a text in a third language as authentic and make it authoritative in case of divergence. A recent example is the Treaty of Friendship concluded between Japan and Ethiopia in 1957[326] in Japanese, Amharic and French, article 6 of which makes the French text authentic *en cas de divergence d'interprétation.* A somewhat special case was that of the Peace Treaties of St. Germain, Neuilly and Trianon which were drawn up in French, English and Italian and which provided that in case of divergence the French text should prevail, except with regard to Parts I and XII, containing respectively the Covenant and the articles concerning the International Labour Organisation.

(4) *Paragraph 2* covers the case of a version of the treaty which is not "adopted" or "authenticated" as a text in the sense of articles 6 or 7, but which is nevertheless prescribed by the treaty or accepted by the parties as authentic for purposes of interpretation. For example, a boundary treaty of 1897 between Great Britain and Ethiopia was drawn up in English and Amharic and it was stated that both texts were to be considered authentic,[327] but a French translation was annexed to the treaty which was to be authoritative in the event of dispute. Paragraph 2 also provides for the possibility that, when a treaty is concluded within an organization, the organ concerned may, by resolution or otherwise, prescribe that texts shall be prepared in

other official languages of the organization and be considered authentic. The phrase "organ of international organization so prescribes" is intended to cover not only an express provision in the resolution adopting the text of the treaty, but also an implied authority to the depositary resulting from the practice of the organization. For it appears from the *Summary of the Practice of the Secretary-General as Depositary of Multilateral Treaties*[328] that his usual practice, in the absence of any express provision in the treaty or in the resolution, is to prepare texts in all five official languages of the United Nations and consider them all as authentic. The practice is said not to have been uniform, and it may therefore be doubtful whether it amounts to an "established rule" of the Organization. But as no objection is taken to the practice when it is followed, it would seem that in these cases the General Assembly by implication authorizes and prescribes the making of the five texts authentic.

*Article 75*

(5) The plurality of the authentic texts of a treaty is always a material factor in its interpretation, since both or all the texts authoritatively state the terms of the agreement between the parties. But it needs to be stressed that in law there is only one treaty — one set of terms accepted by the parties and one common intention with respect to those terms — even when two authentic texts appear to diverge. In practice, the existence of authentic texts or versions in two or more languages sometimes complicates and sometimes facilitates the interpretation of a treaty. Few plurilingual treaties containing more than one or two articles are without some discrepancy between the texts. The different genius of the languages, the absence of a complete *consensus ad idem,* lack of sufficient time to co-ordinate the texts or unskilful drafting may result in minor or even major discrepancies in the meaning of the texts. In that event the plurality of the texts may be a serious additional source of ambiguity or obscurity in the terms of the treaty. On the other hand, when the meaning of terms is ambiguous or obscure in one language but it is clear and convincing as to the intentions of the parties in another, the plurilingual character of the treaty facilitates interpretation of the text the meaning of which is doubtful.

(6) The existence of more than one authentic text clearly introduces a new element — comparison of the texts — into the interpretation of the treaty. But it does not involve a different *system* of interpretation. Plurilingual in expression, the treaty remains a single treaty with a single set of terms the interpretation of which is governed by the same rules as unilingual treaties, that is, by the rules set out in articles 70-73. The unity of the treaty and of each of its terms is of fundamental importance in the interpretation of plurilingual treaties and it is safeguarded by combining with the principle of the equal authority of authentic texts the presumption that the terms are intended to have the same meaning in each text. This presumption requires that every effort should be made to find a

---

[323] See the commentary to article 7.

[324] See the Peace Treaties with Italy (article 90), Bulgaria (article 38), Hungary (article 42), Romania (article 40) and Finland (article 36).

[325] Treaty of Brest-Litovsk of 1918 (article 10).

[326] *United Nations Treaty Series,* vol. 325; see other examples mentioned by J. Hardy, *op. cit.,* pp. 126-128.

[327] The treaty actually said "official", but it seems clear that in this instance by "official" was meant "authentic"; Hertslet, *The Map of Africa by Treaty* (3rd ed.), vol. 2, pp. 424-427; cf. the Convention for the Unification of Certain Rules concerning Collisions in Inland Navigation, Hudson, *International Legislation,* vol. 5, pp. 819-822.

[328] ST/LEG/7, p. 8.

common meaning for the texts before preferring one to another. A term of the treaty may be ambiguous or obscure because it is so in all the authentic texts, or because it is so in one text only but it is not certain whether there is a difference between the texts, or because on their face the authentic texts seem not to have exactly the same meaning. But whether the ambiguity or obscurity is inherent in all the texts, or arises from the plurilingual form of the treaty, the first rule for the interpreter is to look for the meaning intended by the parties to be attached to the term by applying the standard rules for the interpretation of treaties. The plurilingual form of the treaty does not justify the interpreter in simply preferring one text to another and discarding the normal means of resolving an ambiguity or obscurity on the basis of the objects and purposes of the treaty, *travaux préparatoires*, the surrounding circumstances, subsequent practice, etc. On the contrary, the equality of the texts requires that every effort should first be made to reconcile the texts and to ascertain the intention of the parties by recourse to the normal means of interpretation.[329]

(7) *Paragraph 1* of article 75 accordingly states that (i) the expression of the terms is of equal authority in each authentic text (subject to the later provisions of the article) ; (ii) the terms are to be presumed to be intended to have the same meaning in each text, and (iii) their interpretation is governed by articles 70-73. *Paragraph 2* by implication requires recourse to the normal rules of interpretation in articles 70-73 as the first step in cases where a difference in the expression of a term results in ambiguity or obscurity. It admits the possibility of preference being given to one of the texts under the rules in paragraphs 3 and 4 of the article only when the ambiguity or obscurity has not been removed by the application of articles 70-73 or when the parties themselves expressly provide that, in the case of divergence a particular text or method of interpretation is to prevail. Provisions of this kind are quite common and some more special examples of treaties which give decisive authority to a particular text in case of a divergence have already been mentioned in paragraph (3) of this commentary. A few treaties, while not designating a particular text as having decisive authority, prescribe the method of interpretation which is to prevail in case of a divergence. Thus, an Extradition Convention of 1869 between Austria, Hungary and Italy provided that, in case of divergence, the interpretation most favourable to the extradition of the accused should be followed. Provisions of this kind may raise a difficult problem as to the exact point in the interpretation process at which the provision should be put into operation. Should the "master" text be applied automatically as soon as the slightest difference appears in the wording of the texts ? Or should recourse first be had to all, or at any rate some, of the normal means of interpretation in an attempt to reconcile the texts before concluding that there is a case of "divergence". The jurisprudence of international tribunals throws a somewhat uncertain light on the

solution of this problem.[330] Sometimes the tribunal has simply applied the "master" text at once without going into the question whether there was an actual divergence between the authentic texts, as indeed the Permanent Court appears to have done in the case concerning the interpretation of the Treaty of Neuilly.[331] Sometimes, the tribunal has made some comparison at least of the different texts in an attempt to ascertain the intention of the parties.[332] This was also the method adopted by the Supreme Court of Poland in the case of the *Archdukes of the Habsburg-Lorraine House v. The Polish State Treasury*[333] and this method is regarded as correct in one recent textbook.[334] The question is essentially one of the intention of the parties in inserting the provision in the treaty, and the Special Rapporteur doubts whether it would be appropriate for the Commission to try to resolve the problem in a formulation of the general rules of interpretation. Accordingly, it seems sufficient in paragraph 2 to make a general reservation of cases where the treaty contains this type of provision.

(8) *Paragraph 3* provides that, where there is a possibility of more than one meaning in each of the authentic texts, a meaning which is common to the texts is to be adopted. This provision gives effect to the rule of the equality of the texts where there is an ambiguity. Of course, if the ambiguity takes precisely the same form in each of the texts, it will not be resolved by this rule. There will remain an over-all ambiguity in the text which can only be resolved by making a presumption in favour of one or other interpretation.[335] In the *Mavrommatis Palestine Concessions* case,[336] the Permanent Court, indeed, was thought by some to go rather further when it said :

"Where two versions possessing equal authority exist, one of which appears to have a wider bearing than the other, it is bound to adopt the more limited interpretation which can be made to harmonize with both versions and which, as far as it goes, is doubtless in accordance with the common intention of the parties. In the present case this conclusion is indicated with especial force because the question concerns an instrument laying down the obligations of Great Britain in her capacity of Mandatory for Palestine and because the original draft of this instrument was probably made in English".

But, as has been pointed out by a recent writer,[337] the Court does not necessarily appear to have intended by the first sentence of this passage to lay down as a

[329] See J. Hardy, *op. cit.*, pp. 91-111 for some of the relevant jurisprudence of international tribunals.

[330] For the cases see J. Hardy, *op. cit.*, pp. 128-136.

[331] *P.C.I.J.*, Series A, No. 3.

[332] E.g. *De Paoli v. Bulgarian State, Tribunaux arbitraux mixtes, Recueil des décisions*, vol. 6, p. 456.

[333] *Annual Digest of International Law Cases*, 1929-1930, Case No. 235.

[334] Lord McNair, *Law of Treaties* (1961), p. 435.

[335] Bearing in mind that this rule will only operate when recourse to *travaux préparatoires* and the other subsidiary means of interpretation mentioned in article 71 has failed to remove the ambiguity.

[336] *P.C.I.J.* (1924), Series A, No. 2, p. 19.

[337] J. Hardy, *op. cit.*, pp. 76-81, where is a penetrating examination of this precedent.

general rule that *the more limited interpretation* which can be made to harmonize with both texts is the one which must always be adopted. Restrictive interpretation was appropriate in that case. But the question whether in case of ambiguity a restrictive interpretation ought to be adopted is a more general one the answer to which hinges on the nature of the treaty and the particular context in which the ambiguous term occurs, as has clearly been explained in the commentary to article 72. The mere fact that the ambiguity arises from a difference of expression in a plurilingual treaty does not alter the principles by which the presumption should or should not be made in favour of a restrictive interpretation. Accordingly, while the *Mavrommatis* case [338] gives strong support to the principle of conciliating, or harmonizing, the texts, it is not thought to call for a general rule laying down a presumption in favour of restrictive interpretation in the case of an ambiguity in plurilingual texts.[339]

(9) *Paragraph 4* provides that where the natural and ordinary meaning of one text is clear and compatible with the objects and purposes of the treaty, while that of the other is not, the clear meaning is the one to be adopted. Although a presumption in favour of a clear, as against an obscure, text is suggested as a matter of common sense, the Special Rapporteur had some hesitation in formulating it as a general rule. It is certainly not an absolute rule ; and if reference to the *travaux préparatoires* or other extrinsic means shows what the obscure text was intended to mean, the equality of the texts is maintained and, if their meanings diverge, they must be reconciled.[340] But it is believed that, *when after the application of the rules of interpretation in articles 70-73*, the meaning of one text is still obscure, it is legitimate to make a presumption in favour of the clearer text.

(10) *Paragraph 5* provides that if other means of interpretation have failed to solve the ambiguity or obscurity under the rules contained in the preceding paragraphs, then recourse may be had to non-authentic texts or versions for such light as they may throw on the matter. The proposal in effect is that non-authentic texts, versions or translations may be used as subsidiary evidence of the intention of the parties in the last resort.

---

[338] Cf. *Venezuelan Bond* cases, Moore, *International Arbitrations*, vol. 4, p. 3623 ; and *German Reparations under Article 260 of the Treaty of Versailles* (1924), U.N.R.I.A.A., vol. I, pp. 437-439.

[339] See also J. Hardy, *op. cit.*, pp. 113-115.

---

[340] For a discussion of the cases, see J. Hardy, *op. cit.* pp. 87-91.

# SPECIAL MISSIONS

[Agenda item 4]

## DOCUMENT A/CN.4/166

### Report on Special Missions by Mr. Milan Bartoš, Special Rapporteur

*[Original text : French]*
*[1 April 1964]*

## CONTENTS

| | *Page* |
|---|---|
| PRELIMINARY NOTE ................................................................. | 69 |
| INTRODUCTION | |
| 1. History of the idea of defining the rules relating to *ad hoc* diplomacy in the United Nations .. | 69 |
| 2. Object of this report and the practical importance of the question ........................ | 70 |
| 3. Preliminary question : should the rules governing special missions cover the regulation of the legal status of delegations and delegates to international conferences and congresses ? ........ | 73 |
| 4. Preliminary question : with respect to special missions, should there or should there not be an additional protocol to the Vienna Convention on Diplomatic Relations or a special draft linked to that Convention by a reference clause ? ..................................... | 74 |
| 5. Is it possible in this connexion to seek historical continuity with the rules relating to special missions which formerly existed (explanation of the method to be used in seeking sources) ? .. | 74 |
| 6. Are there or are there not any rules of positive public international law concerning special missions ? ................................................................. | 75 |
| 7. Controversies concerning the concept of special missions ............................... | 80 |
| 8. Some special aspects of special missions ........................................... | 83 |
| A. Special missions with ceremonial functions ...................................... | 83 |
| B. *Ad hoc* diplomacy with special functions ........................................ | 83 |
| C. The *ad hoc* diplomat as messenger ............................................. | 84 |
| D. Secret emissaries .............................................................. | 85 |
| E. Observers as *ad hoc* diplomats ................................................ | 86 |
| F. Ambassadors at large .......................................................... | 87 |
| G. The suite of a Head of State considered as an *ad hoc* mission ...................... | 87 |
| H. Political agents not possessing diplomatic status ................................. | 87 |
| I. Private agents ................................................................. | 88 |
| DRAFT ARTICLES ON SPECIAL MISSIONS ................................................ | 89 |
| Article 1 : ....................................................................... | 89 |
| Commentary ..................................................................... | 89 |
| Article 2 : The assignment of a special mission ...................................... | 90 |
| Commentary ..................................................................... | 90 |
| Article 3 : Appointment of the head and members of the special mission ................... | 90 |
| Commentary ..................................................................... | 91 |
| Article 4 : Persons declared *persona non grata* ..................................... | 91 |
| Commentary ..................................................................... | 91 |
| Article 5 : Appointment of a special mission to more than one State ...................... | 92 |
| Commentary ..................................................................... | 92 |
| Article 6 : Composition of the special mission ........................................ | 93 |
| Commentary ..................................................................... | 93 |
| Article 7 : Notification of arrival and departure ...................................... | 94 |
| Commentary ..................................................................... | 95 |

CONTENTS (*continued*)

| | Page |
|---|---|
| Article 8 : Precedence | 95 |
| Commentary | 95 |
| Article 9 : Precedence among special ceremonial and formal missions | 98 |
| Commentary | 98 |
| Article 10 : Commencement of the function of the special mission | 99 |
| Commentary | 99 |
| Article 11 : End of the function of the special mission | 100 |
| Commentary | 100 |
| Article 12 : Seat of the special mission | 101 |
| Commentary | 101 |
| Article 13 : Nationality of the head and the members of the special mission | 101 |
| Commentary | 101 |
| Article 14 : Intercourse and activities of special missions in the territory of a third State | 102 |
| Commentary | 102 |
| Article 15 : Right of special missions to use the flag and armorial bearings of the sending State | 103 |
| Commentary | 103 |

*Facilities, privileges and immunities*

| | |
|---|---|
| General considerations | 103 |
| Article 16 : General facilities | 106 |
| Commentary | 106 |
| Article 17 : Accommodation of the mission and its members | 107 |
| Commentary | 107 |
| Article 18 : Inviolability of the premises of the special mission | 107 |
| Commentary | 107 |
| Article 19 : Inviolability of archives and documents | 108 |
| Commentary | 108 |
| Article 20 : Free movement | 108 |
| Commentary | 108 |
| Article 21 : Freedom of communication | 109 |
| Commentary | 109 |
| Article 22 : Exemption of the mission from taxation | 110 |
| Commentary | 110 |
| Article 23 : Inviolability of the property of the special mission | 110 |
| Commentary | 110 |
| Article 24 : Personal inviolability | 110 |
| Commentary | 110 |
| Article 25 : Inviolability of residence | 111 |
| Commentary | 111 |
| Article 26 : Immunity from jurisdiction | 111 |
| Commentary | 111 |
| Article 27 : Exemption from social security legislation | 112 |
| Commentary | 112 |
| Article 28 : Exemption from personal services and contributions | 113 |
| Commentary | 113 |
| Article 29 : Exemption from customs duties and inspection | 113 |
| Commentary | 113 |
| Article 30 : Status of family members | 114 |
| Commentary | 114 |
| Article 31 : Status of personal servants | 115 |
| Commentary | 115 |
| Article 32 : Privileges and immunities of nationals of the receiving State | 116 |
| Commentary | 116 |
| Article 33 : Duration of privileges and immunities | 116 |
| Commentary | 116 |
| Article 34 : Death of the head or a member of the special mission or of a member of its staff | 116 |
| Commentary | 116 |

## CONTENTS (continued)

| | Page |
|---|---|
| Article 35 : Enjoyment of facilities, privileges and immunities while in transit through the territory of a third State | 117 |
| Commentary | 117 |
| Article 36 : Professional activity | 117 |
| Commentary | 117 |
| GENERAL AND FINAL CLAUSES | 117 |

### Preliminary note

1. In submitting this report, the Special Rapporteur wishes to make the following points clear :

(a) This should be viewed as a preliminary, not a final, report, for the question is one on which no clearly defined solutions have crystallized either in the literature or in the precedents and, consequently, the Commission will have to be consulted before definitive positions and decisions are adopted.

(b) There are no world-wide established precedents on a number of problems covered by this subject, and practice is very varied, differing from one country to another ; it is therefore difficult to refer authoritatively to existing solutions. This explains the absence of quotations from established sources in previous statements of specific positions. The Special Rapporteur considers it his duty to make this preliminary observation.

(c) Accordingly, this report for the Commission's 1964 session should not be regarded as final, nor should it be assumed that the Special Rapporteur has decided not to make further additions and corrections.

(d) The purpose of this report is to raise a number of problems, to place them before the Commission with a view to obtaining from it suggestions and instructions for the preparation of the final draft.

2. Since we are dealing with a new question so far as the establishment of rules is concerned and indeed a new phenomenon in international relations, the Special Rapporteur felt that some questions should be put forward and explained in greater detail than usual, so that the members of the Commission might be better informed about them.

### Introduction

#### 1. History of the idea of defining rules relating to ad hoc diplomacy in the United Nations

3. In discussing whether it was necessary to define on a modern basis the rules relating to diplomatic relations [1] the International Law Commission noted very particularly that there were questions relating to ad hoc diplomacy, that is to say, to temporary envoys entrusted with special missions for limited purposes, which should not be considered as identical with resident diplomacy. The Commission decided at its eleventh session (1959) to include the question of ad hoc diplomacy as a special topic on the agenda of its twelfth session (1960).

4. Mr. A. E. F. Sandström, the Special Rapporteur of the Commission, submitted his report [2] to the twelfth session, and on the basis of this report the Commission took decisions and made recommendations for the rules concerning special missions. The Commission's draft was very brief. It took the view that the rules on diplomatic relations in general prepared by the Commission should on the whole be applied to ad hoc diplomacy by analogy. The Commission expressed the opinion that this brief draft on ad hoc diplomacy based on the idea of applying the general rules by analogy should also be transmitted to the Conference on Diplomatic Intercourse and Immunities which was to convene at Vienna in the spring of 1961. But the Commission nevertheless stressed that it had not been able to give this subject the thorough study it would normally have done. For that reason the Commission regarded its draft as only a preliminary survey, carried out in order to put forward certain ideas and suggestions which could be taken into account at the Vienna Conference.[3]

5. At its plenary meeting on 12 December 1960 [4] the United Nations General Assembly decided, on the recommendation of the Sixth Committee, that these draft articles should be referred to the Vienna Conference with the recommendation that the Conference should consider them together with the draft articles on diplomatic intercourse and immunities. The Vienna Conference placed this question on its agenda and appointed a special Sub-Committee.[5]

6. The Sub-Committee noted that these draft articles did little more than indicate which of the rules on permanent missions applied to special missions and

---

[1] The question was raised in the United Nations General Assembly by Yugoslavia, and, on the latter's proposal, it was referred to the International Law Commission of the United Nations, which was asked to find a solution. This initiative led to the adoption of the Vienna Convention on Diplomatic Relations in 1961.

[2] Yearbook of the International Law Commission, 1960, vol. II, p. 108.

[3] Ibid., p. 179.

[4] Resolution 1504 (XV).

[5] The Sub-Committee was composed of the representatives of Ecuador, Iraq, Italy, Japan, Senegal, USSR, United Kingdom, United States of America, and Yugoslavia. See the Sub-Committee's report in United Nations Conference on Diplomatic Intercourse and Immunities, 1961, Official Records, vol. II.

which did not. The Sub-Committee adopted the view that the draft articles were unsuitable for inclusion in the final convention without long and detailed study which could take place only after a set of rules on permanent missions had been finally adopted.[6] For this reason the Sub-Committee recommended that the Conference should refer this question back to the General Assembly so that the Assembly could recommend to the International Law Commission further study of the topic, i.e., that it continue to study the topic in the light of the Vienna Convention on Diplomatic Relations which was to be established. At a plenary meeting of the Vienna Conference on 10 April 1961, the Sub-Committee's recommendation was adopted.[7]

7. The matter was again submitted to the United Nations General Assembly. On 18 December 1961, the General Assembly on the recommendation of the Sixth Committee decided to request the International Law Commission to study the subject further and to report thereon to the General Assembly.[8]

8. Pursuant to this decision, the question was referred back to the International Law Commission, which decided to place it on its agenda (decision of 27 June 1962).[9] The Commission requested the United Nations Secretariat for its part to prepare a memorandum[10] which would serve as a basis for the discussions on this topic at its 1963 session. Thereafter the Commission placed this question on the agenda of its fifteenth session (1963).

9. At its fifteenth session, the Commission decided to entrust this question to the Special Rapporteur. In that connexion, the Commission took the following decision:[11]

"With regard to the approach to the codification of the topic, the Commission decided that the Special Rapporteur should prepare a draft of articles. These articles should be based on the provisions of the Vienna Convention on Diplomatic Relations, 1961, but the Special Rapporteur should keep in mind that special missions are, both by virtue of their functions and by their nature, an institution distinct from permanent missions. In addition, the Commission thought that the time was not yet ripe for deciding whether the draft articles on special missions should be in the form of an additional protocol to the Vienna Convention, 1961, or should be embodied in a separate convention or in any other appropriate form, and that the Commission should await the Special Rapporteur's recommendations on that subject."

10. In addition, the Commission considered again whether the topic of special missions should also cover

the status of representatives of States at congresses and conferences. On this point, the Commission at its fifteenth session inserted in its annual report to the United Nations General Assembly the following paragraph:[12]

"With regard to the scope of the topic, the members agreed that the topic of special missions should also cover itinerant envoys, in accordance with its decision at its 1960 session. At that session the Commission had also decided not to deal with the privileges and immunities of delegates to congresses and conferences as part of the study of special missions, because the topic of diplomatic conferences was connected with that of relations between States and inter-governmental organizations. At the present session, the question was raised again, with particular reference to conferences convened by States. Most of the members expressed the opinion, however, that for the time being the terms of reference of the Special Rapporteur should not cover the question of delegates to congresses and conferences."

## 2. *The object of this report and the practical importance of the question*

11. The problem of *ad hoc* diplomacy is becoming increasingly important in international law and in international relations, where it appears in a new form while at the same time, in theory, it has remained, as it were, non-existent — or rather, writers on international law do not make it a special object of their research and mention it only in passing, as an adjunct to the general notion of diplomacy.

12. Many writers are still in bondage to the "classic" conception of this notion. They speak of *ad hoc* diplomacy in the past tense, as though it were something fallen into disuse and displaced by resident, permanent diplomacy. There are writers, even today, who regard *ad hoc* diplomacy as simply a matter of ceremonial or etiquette missions, which they believe to have been for some time past the only occasions for the dispatch of special ambassadors, all other diplomatic affairs having been transferred to permanent missions. Other writers, more realistic in outlook, concede that the assignment of special envoys and missions of sovereign States to international congresses and conferences, which are becoming increasingly frequent, also constitutes *ad hoc* diplomacy in the form of special delegations and delegates, and they rightly regard this as a virtual revival of the institution of *ad hoc* diplomacy. This is not all, however. The ever-growing influence of political control, the democratization of State political systems in general, the increasingly active participation of politicians, and particularly of Heads of Government and Ministers for Foreign Affairs, in international relations, and the closer and more direct "summit" and "high-level" contacts have resulted in the transference of a large volume of affairs from resident to *ad hoc* diplomacy. As statesmen become more mobile,

---

[6] *Loc. cit.*

[7] *Ibid.*, Document A/CONF.20/10/Add.1, Resolution I.

[8] Resolution 1687 (XVI).

[9] *Yearbook of the International Law Commission, 1962*, vol. II, p. 192, para. 76.

[10] Memorandum circulated as document A/CN.4/155, printed in *Yearbook of the International Law Commission, 1963*, vol. II.

[11] See *ibid.*, p. 225, para. 64.

[12] *Loc. cit.*, para. 63.

communications more rapid, and the diplomatic apparatus more bureaucratic, and as it becomes necessary to find speedy solutions to international political problems, *ad hoc* diplomacy has assumed new forms and a new content. The real importance of "flying diplomacy" increases daily. Travel by high-ranking representatives of States, contacts between them, rapid discussions of a range of subjects, and "high-level" negotiations between States, have never been so common as they are today. It is no exaggeration to state that the regular duties of Ministers for Foreign Affairs include flying to other States for negotiations, or to prepare for negotiations, with their colleagues, and in turn receiving these in their own home countries. One of the chroniclers of our age tells us that, in the great capital cities, there are "queues" of ministers from foreign countries "awaiting their turn", because *ad hoc* diplomacy has not yet succeeded in emancipating itself from certain rules of protocol which prohibit the simultaneous reception of more than one senior official if they are not taking part in joint negotiations. He foresees that this rule of protocol will soon have to be dropped, so that "flying diplomacy" may be recorded in a number of separate columns in the host's appointments book. This alone suffices to show how far *ad hoc* diplomacy has become a real necessity in advanced international relations and in their emancipation from the monopoly of resident diplomacy as the sole instrument of international negotiations, outside international congresses and conferences.

13.   A further point is that international relations are no longer purely political and consular. There is no field of social life today in which direct contacts between States are lacking. It would be wrong to assume that technical contacts between sovereign States are concentrated entirely in such international organizations as the specialized agencies. On the contrary, the specialized agencies, despite their desire to become centres of international life in specific technical fields, generally stimulate and encourage direct bilateral contacts among their own members ; in some cases, the agencies even impose an obligation on their members to maintain relations with each other, either permanently or at intervals, for negotiations, the conclusion of agreements, the exchange of information, and the solution of current affairs. A mere glance at the activities of this kind carried on by the International Civil Aviation Organization suffices to prove this. The practical implementation of its instruments, as multilateral treaties, requires permanent contacts between the member countries of the Organization, while the latter confines itself to registering and studying the results of those contacts and taking action to smooth out any resulting difficulties. The list of contracts registered — bilateral, multilateral, restricted and regional — which is published by ICAO shows clearly how many international contacts were necessary before results were achieved. In studying documents of this kind, the Special Rapporteur could not fail to note that most of the contracts to which they relate were brought into being through *ad hoc* diplomacy, whereas arrangements concluded through negotiations and contacts between resident missions and representatives of the receiving

State in which the treaty was concluded are very rare. Needless to say, this example applies to all fields.

14.   In his desire to go thoroughly into the question of *ad hoc* diplomacy, the Special Rapporteur is obliged to point out that, according to one school of thought, such diplomacy is limited entirely to strictly political missions, and the notion of *ad hoc* diplomacy does not extend to "technical" missions. In his view, this conception is fundamentally unsound and not in keeping with the notion of diplomacy in general. The characteristic of diplomacy is that it represents the State in its relations with another State (or with other subjects of international law). The object of these relations is any situation in which the relation of sovereignty is manifest. Any action in this category is international in nature, and consequently political in nature also ; for all such questions are complex, in that they have both a technical aspect and a political aspect, although the latter is not present to the same degree in all such matters. It emerges more clearly in some situations, less clearly in others, but it is nevertheless everywhere present, and any international relation is a relation between sovereignties. Whenever any international contact takes place, it is the duty or diplomacy to represent the State in relations of that kind, and therefore special missions and special delegates responsible for dealing with these problems are *ad hoc* diplomats. It may be that, apart from the general rules, certain special rules also apply to such diplomats, because of the specific nature of their functions, but their status must be, in substance, that of *ad hoc* diplomats, and everything which in general attaches to the status of *ad hoc* diplomats therefore, of necessity, applies also to them.

15.   In view of the multiplicity of special missions and of special delegates with technical functions, and of the fact that international co-operation is constantly expanding in these areas and that such functions are of a recent character, it is clear that the notion of *ad hoc* diplomacy is acquiring new and greater importance and must be given special attention. This special attention must be devoted, not only to studies of an international phenomenon, but also to the need for establishing adequate rules of positive law setting out with precision the rights and obligations of *ad hoc* diplomacy and, as a corollary, regulating mutual relations between States which send and receive representatives of this kind.

16.   The lack of special rules on this subject in positive public international law is due to the traditional idea that the time of *ad hoc* diplomacy is past, that it is now only employed in exceptional cases (ceremonial missions and international meetings), that it is limited to official visits of Heads of States and Governments (for which there are, moreover, special rules), and that its sporadic manifestations may be regulated by the analogous application of the rules of public international law concerning resident diplomacy. It took courage to present the problem of *ad hoc* diplomacy as a special subject for study and regulation, first to the International Law Commission and later to the General Assembly of the United Nations. This proposal was received

favourably in principle, but it did not bear fruit. Established traditions, indeed, are not easily changed. For this, new conceptions are necessary, and as a first step, the new phenomena must be faced and analysed. The Special Rapporteur would not venture to assert that the idea of establishing rules on this subject on new foundations was entirely rejected. However, the only result of this proposal within the Commission was the confirmation of the old rule concerning the application by analogy of the rules governing resident diplomacy. This was due, on the one hand, to lack of time for a detailed survey of a new phenomenon, which had been inadequately explored in theoretical studies despite the abundant practice, and, on the other hand, to an error in the choice of method used in approaching the problem. According to Article 13 of the United Nations Charter and to the Statute of the International Law Commission, there are undoubtedly two methods of formulating rules of international law, namely codification and progressive development. Although the Commission acknowledges in theory the need for an interpenetration of these two methods, the Special Rapporteur, as a member of that Commission who has participated in its work for the past seven years, must nevertheless confess that preference is still given to the straight codification method. In the present case, the Commission has also sought substantiation in existing positive international law. It is the Commission's practice, in adapting the existing system to new developments to amend and correct it.[13] However, it has not hitherto shown either enough determination or enough courage to take account of recent developments in international relations and, abandoning rules previously in force which are already obsolete in practice, to establish adequate new rules. That is why its 1960 draft convention on *ad hoc* diplomacy proved abortive at the Vienna Conference on Diplomatic Relations (1961). The brief reference to the application by analogy of the rules governing permanent missions appeared weak and inadequate to the States participating in that Conference. They sought sounder and more comprehensive solutions, more consistent with the increasingly frequent instances of *ad hoc* diplomacy. That Conference, moreover, took the functional theory as its starting point and as the fundamental idea for permanent diplomatic missions. In the Vienna Convention on Diplomatic Relations all the provisions were thought out in terms of the actual situation and the functioning of the permanent missions. To put forward the abstract idea that the functioning of *ad hoc* diplomacy was identical with that of permanent missions would be to ignore the facts. However, in order to bring these facts to light and to establish the legal rules appropriate to them, a detailed analysis must be made of international relations as they really exist. That is why this problem is again

on the agenda of the International Law Commission. The international community of today expects that this question will be resolved as soon as possible and that the convention on *ad hoc* diplomacy will become the third chapter in a code of modern diplomatic law, the first two chapters of which have already been written.[14] A decision has already been taken to prepare the fourth chapter also (on the relations between States and international organizations), which — as conceived by the International Law Commission — will include certain matters concerning *ad hoc* diplomacy (question of the status of State delegations to international meetings).[15] State practice is impatiently awaiting this part of the diplomatic code. It would not be wrong to say that it is an absolute necessity of contemporary international law. To meet the needs, however, this part should not only be based on thorough analysis and be in accord with the functional theory of the position of the organs whose status it is to regulate, but should also take account in its rules of the contemporary conditions of the international community and of the progress and transformation of international law. In other words, these rules should be a contribution to the further progressive evolution of international law, chiefly by their adaptation to the principles serving the further development of friendly and peaceful relations among peoples, and should seek to be an instrument of peaceful coexistence.

17.  The Special Rapporteur will seek in this report to set out, from the legal viewpoint, the status of *ad hoc*

---

[13] Admittedly the Commission had deliberately abandoned this method and was seeking new solutions, when it displayed a preference for the progressive development of international law in its draft which. at the first Conference on the Law of the Sea (Geneva, 1958) gave rise to Convention III (on the Living Resources of the High Seas), but the reason for that is to be found in the relevant resolutions of FAO and the United Nations General Assembly.

[14] These are the Vienna Convention on Diplomatic Relations, 1961, i.e., on the legal relations applicable to permanent diplomatic missions, and the Vienna Convention on Consular Relations, 1963.

[15] In the Special Rapporteur's view, the considerations that led the Commission to isolate the legal status of State delegations to international meetings from the domain of *ad hoc* diplomacy and to transfer it to the system of rules governing international organizations were unduly pragmatic and practical. The Commission's decision was based on two special considerations : (a) since most present-day international meetings are held under the auspices of international organizations and the latter have standardized rules concerning the status of delegations participating in such meetings, the Commission in practice made no distinction between those meetings and the meetings of the main and subsidiary organs of the international organizations (which, in the Special Rapporteur's opinion, is not correct) ; (b) the legal rules concerning meetings held under the auspices of international organizations must be expected to crystallize and be applied also to other international meetings not convened by or connected with international organizations. To try to find and codify special legal rules for this second group would be a duplication of work. The task will be easier when the rules to be applied to meetings taking place under the auspices of international organizations have been established. It should be noted that for both groups there are abundant positive law sources not only in the standardized provisions of international organizations (although these have their distinguishing features — for example, the system of *curiae* in the International Labour Organisation), but also in the customary rules and the regulations of a number of international conferences and congresses. In both cases the Commission could make much more use of the codification method, using for this purpose also the abundant literature dealing with the practice, customs and rules pertaining to international meetings. This literature has developed principally in commentaries and studies on the functioning of the League of Nations, the United Nations, the specialized agencies and their organs.

diplomacy, the ways and prospects of finding solutions, and the rules governing *ad hoc* diplomacy in public international law, confining himself exclusively to that area of *ad hoc* diplomacy which should constitute a separate subject, according to the conception of the International Law Commission. Consequently, he will exclude from his report certain phenomena which otherwise, in his opinion, would form an integral part of the notion of *ad hoc* diplomacy. Accordingly, in this report he does not propose to deal with matters relating to :

(a) visits by Heads of States and Governments and by Ministers for Foreign Affairs, when they are State or official visits to another State, even though on such occasions certain diplomatic actions may be undertaken and consequently, such visits represent, in substance, the performance of an *ad hoc* diplomatic mission. The reason for excluding them is that the status of the participants in these actions and that of their collaborators and of the persons in their party are regulated by special rules hallowed by usage which distinguish this group of actions from the notion of *ad hoc* diplomacy ;

(b) specialized permanent missions existing side by side with or replacing the ordinary diplomatic missions, for these are extraordinary permanent missions and not *ad hoc* diplomatic missions and consequently by definition they do not come under the notion of *ad hoc* diplomacy. At present there are no general rules of international law applicable to these missions, but their status is generally regulated by treaty between the sending State and the receiving State ;

(c) the activities, even if performed regularly, of delegates of States to institutional commissions which are established by international agreement and whose status is regulated in advance. These are permanent organs in which *ad hoc* diplomats participate, but their status is the subject of special provisions ;

(d) delegates and delegations to permanent international organizations. This is a new form of resident diplomacy, which is wholly unrelated to *ad hoc* diplomacy.

18.   On the other hand, it should be understood, even when it is not stated explicitly, that the Special Rapporteur's report covers the notion of *ad hoc* diplomacy in the more limited sense, including not only periodic missions and delegates with purely political functions, but also those whose tasks are considered as being of a technical character. He regards them all as *ad hoc* diplomats. Modern international relations can no longer remain wedded to the conservative view that *ad hoc* diplomacy is composed of special missions of a ceremonial character or possibly of persons who carry out certain political missions or hold a specific diplomatic rank. Even the functions of resident diplomats are today no longer exclusively diplomatic and political. More new technical activities are assigned to them each day, in the light of the development of international relations at the present time. For this reason permanent missions today include an ever increasing number of experts styled special attachés,

and of advisers of diplomatic rank or at least with diplomatic status. As long as they perform their functions by representing their sovereign State and maintaining international relations, nobody thinks of contesting their diplomatic character. If this is true of the members of permanent missions, it should *a fortiori* be true of the members of special missions and special delegates. They should, indeed they must, be included in the ranks of *ad hoc* diplomats.

19.   Consequently, this report deals with a specific international phenomenon which, the Special Rapporteur is convinced, has particular importance for modern international relations.

*3.   Preliminary question : should the rules governing special missions cover the regulation of the legal status of delegations and delegates to international conferences and congresses ?*

20.   At its fifteenth session, the International Law Commission did not take a definitive position on this question. It decided not to take a final decision until it had received the recommendations of the Special Rapporteur on the topic of special missions and of the Special Rapporteur on the relations between States and inter-governmental organizations.

21.   The Special Rapporteur on the topic of special missions has come to believe that the status of delegations and delegates to international inter-governmental conferences and congresses should be viewed from two angles. On the one hand, consideration should be given to congresses and conferences convened by international organizations or held under their auspices. In view of the wide-spread and, today, almost universally adopted practice whereby the status of such delegations and delegates is determined in advance either by the rules of the organization convening the conference or congress or by the letter of convocation, and whereby, in such cases, a legal relationship is created between the delegations and delegates to such meetings, on the one hand, and, simultaneously, the convening organization and the participating States on the other hand, the Special Rapporteur considers that the status of such delegations and delegates could be regulated under the legal rules governing the relations between States and international organizations, even though these delegations are essentially identical with those taking part in conferences and congresses held outside international organizations. The status of delegations and delegates to conferences and congresses convened by one or more States outside the international organizations is similar in all respects to the status of special missions and, in the Special Rapporteur's opinion, should be regulated by the rules on special missions. He would point out, however, that the distinction between the two types of delegations is purely formal, the criterion being who convenes the meeting.

22.   The Special Rapporteur suggests that, as this question is a preliminary one, it should be discussed before the main question is taken up.

23.   It should here be noted that delegates attending international conferences and congresses are the most

common example of *ad hoc* diplomats. Although the Special Rapporteur does not intend to deal with this category of diplomacy which, in the opinion of the International Law Commission, should be considered with the rules concerning relations between States and inter-governmental organizations (a view with which he is only partly in agreement), he is nevertheless compelled to stress here one point only referring to this kind of *ad hoc* diplomacy. The membership of special missions of this kind sometimes includes representatives of the sending State who are diplomats already permanently accredited to particular States. Since other rules exist concerning the activities in public of permanently accredited diplomats (courteous conduct in public with respect to the State to which they are accredited) and there is the rule regarding the full freedom of representation of a State at international conferences, even though the State concerned may be exposed to severe judgements and possibly violent opposition and critical statements in the public meetings of the conference, there is undeniably a certain conflict in this case, at least so far as protocol is concerned. However, the idea that during the conference and in the performance of the delegate's function, his status as an *ad hoc* diplomat takes precedence over his status as a resident diplomat [16] is gaining more and more ground.

24. During the period that such a representative is an *ad hoc* diplomat, he does not cease to be a resident diplomatic agent as well. That depends on the circumstances and the capacity in which he acts. Undeniably such situations are not always desirable or agreeable. That is why, when preparations are being made for a conference of this kind and if the situation during the conference is likely to be unpleasant, heads of permanent diplomatic missions urge their Governments to excuse them from the responsibility of acting as the head or a member of such delegations and recommend that these missions should be entrusted to third persons. They generally argue that such missions may adversely affect the performance of their diplomatic functions after the conference has ended.[17]

25. On the other hand, the sending States consider it practical and less expensive to entrust these functions to the heads of their permanent diplomatic missions at the place where the conference is to be held.

26. Obviously, when the head of the permanent mission ceases to act as an *ad hoc* diplomat, he retains his standing as a resident diplomat and loses his duality of functions. He can no longer act in the receiving

State as an *ad hoc* diplomat, with respect to the State to which he is accredited.

4. *Preliminary question : with respect to special missions, should there or should there not be an additional protocol to the Vienna Convention on Diplomatic Relations or a special draft linked to that Convention by a reference clause ?*

27. This question was left pending by the International Law Commission at its fifteenth session, in the belief that the time was not yet ripe for deciding it and that the Commission should await the Special Rapporteur's recommendation on the subject.

28. The Special Rapporteur believes that it would be wrong to append the draft articles on special missions to the Vienna Convention on Diplomatic Relations as a mere additional protocol ; for he cannot lose sight of the basic idea of the decision taken by the Commission, namely, that the Special Rapporteur "should keep in mind that special missions are, both by virtue of their functions and by their nature, an institution distinct from permanent missions". His study of the functioning of special missions has convinced the Special Rapporteur that simply to append the draft articles to the rules governing diplomatic relations would not be adequate for some special missions, so far as their status is concerned.

29. The Special Rapporteur has also adopted in part, the argument, put forward at the meetings of the Commission by Mr. Rosenne, that although special missions represent sovereign States in international relations they cannot, because of their functions, always be treated as diplomatic missions but should, in some cases, be treated as consular missions.[18] Consequently, it must be anticipated that the rules relating to special missions will contain a reference to the Vienna Convention on Consular Relations also. This reference will be parallel to the reference to the Vienna Convention on Diplomatic Relations, and will depend on the nature of the special mission and on the requirements of each individual case.

30. The Special Rapporteur believes, however, that no attempt should be made to settle this question until the final clauses of the draft rules are taken up.

5. *Is it possible in this connexion to seek historical continuity with the rules relating to special missions which formerly existed (explanation of the method to be used in seeking sources) ?*

31. The Special Rapporteur will not dwell on the well-known historical truth that permanent diplomatic missions are of comparatively recent origin. All sources show that, in the earliest years of the modern era, Heads of State exchanged temporary agents and emissaries for specific purposes and on limited missions, with the result that several special envoys from one Head of State might be present at one court at the same time. The question how long permanent diplomatic missions

---

[16] At the Vienna Conferences on Diplomatic Relations (1961) and Consular Relations (1963) many States had appointed the heads of their permanent diplomatic missions accredited in Austria to head their delegations. In some cases they were obliged to challenge the views of the Austrian delegation or else those of the President of the Conference, who was the head of the Austrian delegation. Nevertheless, both sides should have understood that the delegations in question were acting in a dual capacity.

[17] This is one of the reasons why the ambassadors of the United States and the United Kingdom were not included in the delegations of their States to the Vienna Conferences in 1961 and 1963.

[18] See summary record of the 712th meeting, para. 77, in *Yearbook of the International Law Commission, 1963,* vol. I.

have existed is of little importance for the purposes of this report, although it has given rise to much debate and to attempts to establish that this historic turning-point came in the period between the Treaties of Westphalia (1648) and the Congress of Vienna (1815).

32. Suffice it to note that, between the Congress of Vienna and the outbreak of the Second World War, *ad hoc* missions occurred only sporadically, and their use has declined with the growth of permanent diplomatic missions.

33. A survey of diplomatic practice, as it grew up during the Second World War, and more particularly since 1945, discloses that *ad hoc* missions have taken on a new lease of life. They are becoming more and more frequent, more and more important in the functions they perform, and more and more diversified in the subjects with which they have to deal.

34. The question arose whether this was a revival of something which had died out, or at least had become more rare ; is the repeated use of such missions something new, or is it an extension of something which existed in the past ? There are two opposing schools of thought on this question. The first holds that *ad hoc* missions never ceased to be used ; they declined in number, but the institution remained in existence. Consequently, if their use has been revived, there has been no substantial change in the notion and the workings of the institution itself ; there has merely been an increase in the number of instances. It follows that the institution as such must be re-examined, since there is an historical continuity between what was in the past and what is now, and we are thus dealing with a single juridical phenomenon in public international law, with all its legality. What was valid in the past and was maintained through sporadic application still remains the legal rule and must be applied. Opposed to this interpretation is another school of thought, which asserts that special missions generally have changed in substance and have acquired new importance and a new content. It follows that, although the *ad hoc* diplomacy of the past resembles that of the present day in a formal sense — since we are accustomed to classify institutions according to their outward forms — we are now dealing with something entirely different in substance. The spirit and the needs of the new age have perhaps not entirely destroyed the old form of *ad hoc* diplomacy, and more particularly its representative character, but they have produced, side by side with it, a new form which is usually functional in character. Special missions are dispatched, not solely for the purpose of communicating the will of the sovereign, but primarily to settle the political and technical problems which confront States. This is a natural consequence of the evolution of social life and of relations within the international community, and this is why a legal institution, ancient in its form, has become new in its content. This very fact makes it necessary to provide for a new legal regulation of this phenomenon. The old rules have become inadequate and, indeed, too cumbersome because, as a logical result of the representative character of *ad hoc* missions, they attached too much importance to the ceremonial and etiquette

aspect. These rules could no longer serve the new *ad hoc* diplomacy, and they are not in keeping with current conceptions of life in the international community. The tendency to dispense with empty forms of protocol, the rapid pace of life, and the sphere of action of the new *ad hoc* diplomacy require new legal rules for the latter, adequate to protect its functioning. Some writers draw attention to the fact that the multiplicity of *ad hoc* missions in the present age is one factor necessitating the simplification of the old rules in the interest of the receiving State, which is no longer able to receive, escort and offer hospitality to the *ad hoc* missions coming to its territory. It is necessary to reduce all this to reasonable proportions, to stop being guided by the representative principles of an earlier age, and to adapt to the necessities imposed by reality, by applying the functional theory to *ad hoc* diplomacy.

35. The foregoing shows that, in these times, legal arguments concerning *ad hoc* diplomacy can scarcely remain the same as in a period when it was something sporadic and representative in character. With the change in its character, its substance has also changed, and that is why new forms have appeared in States which dispatch *ad hoc* diplomats. It follows that it would be vain to attempt to argue on the juridical basis of a certain continuity between the old and the new *ad hoc* diplomacy, irrespective of all other considerations. This does not mean that some *ad hoc* missions have not retained a representative character and are not treated according to the old rules of protocol ; but in these days they are, if not an anachronism, at least rare vestiges of the past, which are dying out with the passing of the remnants of conservative forms of political structure.

36. There is, however, one norm which shows why the quest for historical and legal continuity between the old and the new *ad hoc* diplomacy must be abandoned ; it is the general conception of the nature of diplomacy. On the occasion of the most recent codification of diplomatic law relating to permanent missions (Vienna Convention on Diplomatic Relations, 1961), it was made clear that the guiding principle of the new clauses must be the functional theory. Once this is accepted for permanent missions, it applies even more to *ad hoc* diplomacy, which is seeking, in new forms, appropriate solutions which the old rules governing *ad hoc* diplomacy could not provide. It follows from the foregoing that continuity irrespective of all other considerations is impossible. In the new circumstances, a new study of the institution and new rules for its operation are needed.

*6. Are there or are there not any rules of positive public international law concerning special missions ?*

37. All the research carried out by the Special Rapporteur to establish the existence of universally applicable rules of positive law in this matter has produced very little result. Despite abundant examples of the use of special missions, the Special Rapporteur has failed to establish the existence of any great number of sources of law of more recent origin which might serve as a reliable basis for the formulation of rules

concerning special missions. His research has led him to the following conclusions:

38. (I) Although the dispatch of special missions and itinerant envoys has been common practice in recent times and, as the Special Rapporteur would agree, represents the use of the most practical institutions for the settlement of questions outside the ordinary run of affairs arising in international relations, whether multilateral or bilateral, they have no firm foundation in law. Whereas ordinary matters remain within the exclusive competence of permanent missions and there are many sources of positive international law which relate to these organs of international relations — in fact, a complete system, with the Vienna Convention on Diplomatic Relations (1961) as its culminating point — the rules of law relative to *ad hoc* diplomacy and the sources from which they are drawn are scanty and unreliable. There are very few studies which relate to the period prior to the Treaties of Westphalia (1648), or even to that prior to the Congress of Vienna (1815), in which juridical sources for this matter can be sought. It is probable that the increased use and expansion of permanent missions, and even the work of temporary delegates in co-operation with permanent missions, have somewhat obscured this juridical matter. The Special Rapporteur is prepared to admit that the provisions of the Regulation of Vienna (1815) are much to blame for this, although concerned merely with rank.[19] In article 3 it is stated that "diplomatic officials on extraordinary missions shall not by this fact be entitled to any superiority of rank".

39. From the records and documentation of the Congress of Vienna, it might be deduced that the rule applied only to special formal or ceremonial missions, and that other missions were not taken into consideration. Hence the belief that those missions are on the same footing as permanent missions with regard to rank, that their heads should have the rank of ambassador,[20] in order to have representative character, and that the general rules of diplomatic law apply to those missions. This, in the Special Rapporteur's opinion, had two consequences:

(*a*) first, after the Congress of Vienna, *ad hoc* diplomacy was involved only in the case of special ambassadors, i.e., those with ceremonial or etiquette functions;

(*b*) second, the old rules governing *ad hoc* diplomacy, which covered special missions and itinerant envoys used for other purposes, were abandoned.

40. (II) One question has exercised jurists, both as a matter of practice and of doctrine: what is the scope of the facilities, privileges and immunities to which such missions are entitled and which the receiving States are obliged to guarantee to them? In the absence of other rules, attempts have been made to find rules in

the comity of nations and to discover analogies with the rules of diplomatic law.

41. When *ad hoc* diplomacy was once again practised on a larger scale, there was little time or opportunity to undertake the codification of the question, although it raised difficult problems for the League of Nations and aroused special concern in the Preparatory Commission of the United Nations. As a result, at the first regular session of the United Nations General Assembly (London, 1946), the question arose in connexion not only with the privileges and immunities of the United Nations staff, but also with those of the representatives of the States participating in the work of the United Nations.[21] Although the International Law Commission now considers that the question of the regulation of the status of *ad hoc* diplomats should be distinguished from the question of relations between States and inter-governmental organizations and that of delegates sent by a State to international conferences (whether or not under the auspices of international organizations), the rules of *ad hoc* diplomacy established in the United Nations are of great importance for the future development of the system of rules of public international law relating to *ad hoc* diplomacy. In the first place, it was not quite certain whether the position adopted was that the rules applicable to *ad hoc* diplomacy should be identical with or analogous to those applying to resident diplomacy. With regard to the regulations required for the functioning of the United Nations, the representative principle was rejected in favour of the functional theory,[22] together with the theory that immunities belong not to the *ad hoc* diplomat personally but to his State, as guarantees of the normal exercise of his functions without interference on the part of foreign States.

42. (III) This state of affairs was reflected in the literature also. Most writers on public international law have touched on the question of special missions and *ad hoc* delegates, with particular reference to the sending of special missions for ceremonial purposes as a special form of *ad hoc* diplomacy, but without going into details regarding the determination of the status of such missions.[23] Hence, the work of the majority of

---

[19] G. F. de Martens, *Nouveau Recueil général de traités*, vol. II, p. 449; the text of the Regulation is also cited in *Yearbook of the International Law Commission, 1957*, vol. II, p. 135, footnote 6.

[20] Article 2 of the Regulation of Vienna on the classification of diplomatic agents.

[21] When the draft Convention on the Privileges and Immunities of the United Nations with particular reference to representatives of States was discussed at Church House, London, no clear idea of the status of permanent delegations and representatives to the United Nations had yet emerged, so that at that time the question remained more or less unresolved. Attention was devoted exclusively to *ad hoc* representatives.

[22] This theory was also adopted at the Vienna Conference on Diplomatic Intercourse and Immunities (1961) and was inserted in the preamble to the Convention on Diplomatic Relations. The theory of functional immunity has prevailed and has been adopted as a general principle. The emphasis on the special representative character of the *ad hoc* diplomat, recognized under article 2 of the Vienna Protocol only in the case of ambassadors has been generally abandoned. This is a result of the trend towards the equalization — still incomplete — of the various classes of heads of diplomatic missions, as they all now bear the single title of ambassador, and towards the general use of the rank of ambassador. Ambassadors are no longer merely the representatives exchanged exclusively by the great Powers.

[23] A similar notion is to be found in the principal works dealing with the status or history of diplomacy, of which the

authors could not serve as a guide in preparing future draft rules of law on the subject along any specific lines. Without making any comprehensive analysis of the subject, they repeated the rule relating to the right of *ad hoc* diplomacy to benefit by such rules as exist in positive international law concerning resident diplomacy. Writers on international law, obsessed with this idea, have generally been blind to the special problems raised by *ad hoc* diplomacy.

43. (IV) There is a whole series of bilateral conventions which regulate the status of *ad hoc* diplomats in their ordinary relations, covering, for instance, the guarantee of complete diplomatic immunity to members of frontier demarcation commissions or the right of return of envoys. Among these, however, isolated and widely differing *ad hoc* solutions would appear to predominate, offering nothing that may be regarded as evidence of any uniform international practice and, accordingly, useless as sources of international law except as concerns relations between the contracting parties. In these circumstances, where there are no general conventions and where bilateral conventions are sporadic and differ not only as between different States but also as between the same States at different periods and under different circumstances, there can hardly be said to be any conventional sources of international law on this subject capable of supporting certain broader conclusions; it is very doubtful, indeed, whether these sources are worth quoting here, as they are not in the nature of universal rules of law.

44. (V) With no well-established juridical customs and no clearly defined practice, with changes occurring in general criteria, even in those relating to resident diplomacy, with no well-grounded positions in the literature and with no institutions which can be described as accepted by the civilized nations (i.e. the nations at present forming the international community), it is interesting to find that those who have sought to create international law *de lege ferenda* have failed to make any advance. All the proposals made for this purpose merely mention the existence of *ad hoc* diplomacy and recognize its rights by analogy with the status of resident diplomacy. That was the case at the meetings of the Institute of International Law (Cambridge 1895), of the International Law Association (Vienna 1926) and of the Sixth International American Conference of States (Havana 1928).

following are cited as examples: Krause, *Die Entwicklung der Ständigen Diplomatie*, Leipzig, 1885 ; Potemkin, *Histoire de la diplomatie*, Paris, 1948 ; Wriston, "The Special Envoy" (*Foreign Affairs*, January 1960) ; Waters, "The Ad Hoc Diplomat" (*Wayne Law Review*, 1959-1960) ; Wriston, *Executive Agents in American Foreign Relations*, Baltimore, 1929 ; Hackworth, *Digest of International Law*, vol. IV ; Satow, *Guide to Diplomatic Practice*, London, 1957 ; Feller and Hudson, *Diplomatic and Consular Laws and Regulations*, Washington 1931 ; Bluntschli, *Le Droit international codifié*, Paris, 1870 ; Fiore, *International Law Codified*, New York, 1918 ; Pessôa, *Projecto de Código de Direito Internacional Público*, Rio de Janeiro, 1911 ; Lord Phillimore, *Proposed Codification of the Law Regarding the Representation of States*, London, 1926 ; K. Strupp, *Réforme et codification du droit international*, Vienna, 1926 ; Waters, *The Ad Hoc Diplomat — A Study in Municipal and International Law*, The Hague, 1963 ; Philippe Cahier, *Le droit diplomatique contemporain*, Geneva, 1962.

45. This general paucity of rules of positive law on the subject eliminated all possibility of codification by the method of collecting and redrafting existing rules of international law and integrating them into a system. Moreover, the confusion caused by differences in past and present realities created fresh difficulties when attempts were made to apply in combination the methods of codification and progressive development of international law. These combined methods together represent the evolution both of existing trends and of developments it is desired to bring about, i.e. the unification of the rules *de lege lata* and the rules *de lege ferenda* in a single consistent system. It is difficult to apply this method when there are no established rules and it is not clear what rules should be introduced.

46. (VI) The International Law Commission was faced with this situation when it had to make a decision on the establishment of the rules of law relating to special missions. It was clear to all the members of the Commission that there were no definite rules of positive law which could serve as a basis for the preparation of the rules of law on *ad hoc* diplomacy. The Secretariat reached the following conclusion :

> "Whilst the various instruments and studies referred to above do not purport to reflect the actual practice of States in every particular, it is probable that they represent the position adopted by the majority of States in respect to special missions. Four broad principles at least appear to be generally recognized : (*i*) that, subject to consent, special missions may be sent ; (*ii*) that such missions, being composed of State representatives, are entitled to diplomatic privileges and immunities ; (*iii*) that they receive no precedence *ex proprio vigore* over permanent missions ; and (*iv*) that the mission is terminated when the object is achieved." [24]

47. But these four principles extracted from the abundant sources on special missions were not sufficient to guide the Commission in the task of preparing the new positive law concerning special missions.

48. (VII) The Secretariat of the International Law Commission had received the impression that there were only three different positions on this subject in the Commission, namely :

(*a*) What might be described as the idea of the *limited application* to *ad hoc* diplomacy of the rules relating to permanent missions. This was the idea of the Commission's previous Special Rapporteur, Mr. A. E. F. Sandström, who made the following general statement :

> "Broadly speaking, it seems natural that rules relating to special features of a permanent mission which do not obtain in respect of special missions should not apply, whereas rules inspired by considerations of the similar nature and aims of the functions in question should be applied." [25]

[24] From the Secretariat memorandum on special missions, document A/CN.4/155, para. 11, in *Yearbook of the International Law Commission, 1963*, vol. II.

[25] *Yearbook of the International Law Commission, 1960*, vol. II, p. 108, para. 7.

49. The present Special Rapporteur cannot endorse that idea and considers the theory false, although it was accepted by the majority in the Commission. Not only do special missions not have all the features of permanent diplomatic missions, but they have their own special features. These would lead us not only to apply to *ad hoc* diplomacy the rules governing permanent diplomacy and to determine whether all those rules are applicable but also to seek solutions in accordance with those rules. It is difficult in life generally, and hence in international relations also, to follow a set path and to classify everything under existing headings. Life gives rise to and shapes the most diverse events. Each of those events requires legal regulation, and although social events may be influenced by means of legal rules, the law itself must none the less reflect social reality. Its object cannot be to have everything that deviates from the norm considered as a departure from the legal system. Although the Special Rapporteur does not accept "case law" and is not in favour of the establishment of exceptions at any price, it is nevertheless true that those responsible for formulating rules of law must bear in mind that the law is only the product of society. The international community as a social form is constantly subject to transformations, which have become especially marked since the end of the Second World War. *Ad hoc* diplomacy is in fact a new phenomenon, because it can hardly be described as a mere revival of past practice ; in this Rapporteur's view, it would in fact be wrong to do so. New forms of *ad hoc* diplomacy have been evolved which must be regulated, and this cannot be done by a mere blanket rejection of everything which does not apply to *ad hoc* diplomacy but continues to apply to resident diplomacy.

50. Although he is a member of the International Law Commission, the Special Rapporteur considers that the Commission is very far from having found a satisfactory solution to the problem. Because of the limited time it had at its disposal, the Commission was unable to get to the heart of the matter. It is difficult to speak of any complete analogy between two institutions which have neither the same purpose nor the same consequences. That, in the Special Rapporteur's opinion, is why a more thorough analysis should first have been made : if that had been done the Commission would not have remained wedded to this theory.

(*b*) The dissenting opinion concerning the Sandström report expressed in the Commission by Mr. Jiménez de Aréchaga [26] is considered as constituting the second approach.

51. In stating his views before the Commission, Mr. Jiménez de Aréchaga took the position that all provisions of diplomatic law concerning permanent missions applied also to special missions, with the difference that additional provisions were required arising out of the special nature or specific assignments of special missions. From this point of view, his theory might be called an *integration* theory. He himself expresses it as follows :

"... all the provisions of the 1958 draft are relevant to special missions and should be made applicable to them, with the proviso that article 3 (Functions of a diplomatic mission) should be interpreted as applying only within the scope of the specific task assigned to the special mission.

"The only additional provision which seems to be required in the case of special missions is one concerning termination of the mission on fulfilment of the entrusted assignment . . .".[27]

52. The Special Rapporteur cannot say that he entirely agrees with this theory of integration either. In the first place, it is not correct that all the provisions of public international law relating to permanent missions should be applied to special missions. Among those provisions, there are some which are not consistent with the very nature of an *ad hoc* mission. On the other hand, the rule formulated by Mr. Jiménez de Aréchaga is correct in the sense that the nature of an *ad hoc* mission also calls for special rules ; in other words, it is necessary to elaborate them and to include them in a document with supplementary material.

(*c*) The third approach formulated in this connexion is that reflected in the suggestion by Sir Gerald Fitzmaurice that the draft rules relating to permanent diplomacy should in principle apply to *ad hoc* diplomacy, but only *mutatis mutandis*.[28] According to this theory, there is unquestionably a similarity of situation between permanent missions and *ad hoc* missions but there are also differences. That was why Sir Gerald expressed the view that the rules relating to permanent missions should be applied to *ad hoc* diplomacy in principle but such application should be limited to the extent that the rules are applicable to the particular case. Thus, Sir Gerald's suggestion was also based on the idea of analogy. On the other hand, his suggestion also reflects the general approach of Anglo-Saxon law — a great latitude in the application of general rules by relying on the rule of reason, so that by use of the "case method" a uniform body of law is developed for those cases which do not fit the general rule. If international law at its present stage of development offered the necessary guarantees for the evolution of a uniform system of applying rules in accordance with the principles mentioned above, the Special Rapporteur could agree with Sir Gerald's proposal. However, it must be borne in mind that the provisions of international law have to be universal in their application, they have to be applied by the most diverse agencies of all States using the most varied legal criteria and they have to lend themselves to concrete analysis. That is why international law demands specific solutions for specific circumstances. It seeks rules that are not liable to very broad interpretation and consequently to circumvention. They are supposed to eliminate disputes, and not to give rise to new disputes in connexion with their interpretation and application. For this, the method of analogy quite obviously does not offer the necessary guarantees. If, in addition,

[26] *Ibid.*, pp. 115 *et seq.*

[27] *Ibid.*, p. 117, paras. 18 and 19.

[28] *Yearbook of the International Law Commission, 1960*, vol. I, summary record of the 565th meeting, para. 16.

this method is to be applied *mutatis mutandis*, it will become impossible with such an approach to achieve the objective set by the United Nations General Assembly or to establish order and a firm foundation for the application of international law in this field.

53. (VIII) In not accepting any one of these three approaches, the International Law Commission adopted a position of principle, though taking as its point of departure for the study of the status of *ad hoc* diplomacy the rules applicable to permanent missions. This position of principle is expressed by the idea that in view of the similarity between the activities of permanent missions and those of special missions, it is natural that the rules governing the status of permanent missions should to a large extent also apply to special missions.[29]

54. Nevertheless, the Commission was not able to establish this similarity as an absolute rule. It was obliged to note that there were many institutions and provisions relating to permanent missions which could not be applied to special missions. These are the rules dealing with the establishment, functioning and status of permanent diplomatic missions. On the other hand, the nature of the activities the two types of mission engaged in calls for the same guarantees. That was why the Commission took the view that the provisions of sections II, III and IV of the 1958 draft on diplomatic intercourse (i.e. the Vienna Convention of 1961) should also apply to *ad hoc* diplomacy.[30]

55. The Special Rapporteur is quite convinced that this approach is wrong in its very essence. The functions are not the same in the two cases, and it is with an eye to the security of functions that the rules relating to permanent diplomatic missions were drawn up. He is of the opinion that each question should be studied in greater detail and a solution found which is not based on the *mutatis mutandis* rule but on the needs, which are different.

56. The *mutatis mutandis* method is too abstract. It does not take account of real needs but limits itself to the course of least resistance. The Special Rapporteur recognizes that it is very difficult to find a sure way of resolving all these problems. That is why the International Law Commission has tried to dispose of this question by agreeing to a kind of solution which, by its own admission, was not based on "the thorough study it would normally . . ." have given the topic.[31]

57. (IX) What is its normal way of studying a topic ? An attempt to initiate a normal study was made by Mr. Sandström, the previous Special Rapporteur. He outlined two alternative approaches to a solution of this problem which would have resulted in a study of the application of certain rules of resident diplomacy

to *ad hoc* diplomacy. These outlines had gaps ; they had not been thoroughly analysed and were therefore wide open to criticism. Moreover, the Commission had very little time in which to prepare the text containing the rules relating to *ad hoc* diplomacy wanted for the Vienna Conference, which was soon to convene. All this contributed to the Commission's deciding on a principle. It did so, basically, by turning to the *mutatis mutandis* theory.[32]

58. However, this solution was not accepted at the Vienna Conference in 1961. The representatives of States were not satisfied with a procedure that consisted simply in stating a principle, and they were not convinced of that that was an adequate solution of the problem. They wanted the problem restudied, and precise rules worked out consistent with the nature of *ad hoc* diplomacy. It was the private opinion of most of the members of the Sub-Committee, of which the Special Rapporteur as head of the Yugoslav delegation had the honour to be a member, that it would have been better to do without any new rule of law than to give an indication which every State could interpret as it pleased. Above all, it was argued that the functional theory should be taken as the point of departure and that the status of *ad hoc* diplomacy should be regulated in the light of actual needs and circumstances and not in accordance with certain standards which would not always be applicable to actual conditions but which would serve the purposes of *ad hoc* diplomacy by conceding to it more than is strictly necessary.

59. (X) The Special Rapporteur believes that the positive sources of public international law relating to *ad hoc* diplomacy are, at present, in a condition which is worse than critical. There is not even an authoritative text *de lege ferenda*, for the Vienna Conference on Diplomatic Intercourse and Immunities did not adopt the International Law Commission's draft which was submitted to it for approval. In effect, it rejected the draft with a polite explanation :

". . . although the draft articles provided an adequate basis for discussions, they were unsuitable for inclusion in a final convention without extensive and time-consuming study, which could only properly take place after a complete set of rules on permanent missions had been approved. In view of the short time available to the Sub-Committee in which to carry out such a study, or for its results to be considered by the Committee of the Whole and by the Conference itself, the Sub-Committee determined that it should recommend to the Committee of the Whole that the Conference should refer the question of special missions back to the General Assembly ; it was suggested that the Assembly should recommend to the International Law Commission the task of further study of the topic in the light of the Convention to be established by the Conference." [32 a]

[29] This thought is expressed in paragraph (1) of the commentary of the International Law Commission to article 2 of the draft articles on special missions. See *Yearbook of the International Law Commission, 1960*, vol. II, p. 180.

[30] See the reservations in paragraphs (2) to (6) of the commentary to article 2 and in the text of, and commentary to, article 3 of the Commission's 1960 draft, *loc. cit.*

[31] *Ibid.*, p. 179, para. 37.

[32] Although the Commission rejected Sir Gerald's suggestions in a formal vote.

[32 a] From the Secretariat memorandum on special missions (A/CN.4/155, para. 44), in *Yearbook of the International Law Commission, 1963* vol. II.

60. The present situation demands that a solid foundation for a positive system of law in this field be laid without delay and the rules of such a system formulated in detail. The old has been found wanting, the new does not exist, and every day brings new concrete situations which require a solution. Reality demands it.

### 7. Controversies concerning the concept of special missions

61. (I) There is much controversy about what is comprised in modern *ad hoc* diplomacy. It is a question with which the International Law Commission, too, had to deal in drafting rules concerning special missions. After several detours the Commission arrived at the following definition :

> "The expression 'special mission' means an official mission of State representatives sent by one State to another in order to carry out a special task. It also applies to an itinerant envoy who carries out special tasks in the States to which he proceeds."[33]

62. This might be called definition by specification. The point of departure is the view that a "special mission" is an exception to the rule, which is the resident diplomatic mission. This is a view that is also found in Satow, i.e. that, in addition to the head of the permanent mission, another diplomatic agent may be accredited for special purposes.[34]

63. The Special Rapporteur considers that this approach is too incomplete to serve as a sufficient basis for a definition. Apart from the distinction between a special mission and a permanent mission of a general character, an *ad hoc* diplomat should not be entrusted with a special mission if it is of a lasting nature. More and more frequently in recent times, in addition to the regular general diplomatic missions, recourse is being had to the creation of specialized but permanent diplomatic missions. In performing special duties they function in the foreign countries concerned side by side with the regular general diplomatic mission, in the same State and in the same place but with a specific task. This category of missions includes, for example, a reparations delegation of one State in another (but not a delegation to an international organization). Also in this category are separate permanent diplomatic missions concerned with economic and technical co-operation between two countries, etc. These are specialized permanent missions, a particular type of resident diplomacy, and not special missions or *ad hoc* diplomacy. The distinguishing feature of a mission dealt with through *ad hoc* diplomacy is its limited and provisional character. A few words are in order on the question of this provisional character. "Provisional" does not mean "brief" in the strict sense ; but even if the mission is prolonged, its duration depends on

the completion of a specific task, which may take a relatively long time.[35]

64. In the opinion of the Special Rapporteur, the concept of *ad hoc* diplomacy also embraces the delegates which represent a State at certain international meetings : congresses, conferences, etc. This was also the view of Mr. Sandström, the previous Special Rapporteur.[36] However, the Commission, without rejecting this idea, took the position that such delegates were a special kind of State representatives, that they ought to be dealt with separately and that it was more correct to treat them as members of missions concerned with relations between States and international organizations, including diplomatic conferences. That is why today such missions are not technically covered by the concept of *ad hoc* diplomacy, although logically they should be. The reason is probably that a constantly growing number of special legal rules and even separate systems and régimes are being created for this type of *ad hoc* diplomacy, so that it is assuming a distinct and special form.[37] To try to bring it within the general rules of *ad hoc* diplomacy might lead to a twofold confusion. On the one hand, the special rules already established for such missions do not correspond in all respects with the rules relating to diplomacy in general, and it would be difficult to form a common system. On the other hand, the contractual privileges granted to delegates attending meetings of the United Nations and the specialized agencies could not, without difficulty, be recognized as general standards applicable to *ad hoc* diplomacy as a whole. For those two reasons, a technical distinction has to be made between this type of periodic diplomacy and the general concept of *ad hoc* diplomacy.

65. The International Law Commission drew the practical consequences of this approach. It took the position that diplomatic missions which are responsible for relations of States with international organizations or which take part in international conferences or congresses should be studied as a separate topic and it appointed a Special Rapporteur for the purpose. This is why the author has decided to omit treatment of this topic from the present report, although he realizes that the matter could have been handled in other ways.[38]

---

[33] *Yearbook of the International Law Commission, 1960*, vol. II, p. 179.

[34] Sir Ernest Satow, *A Guide to Diplomatic Practice*, London, 1957, p. 115. It must be pointed out that in paragraph 186 of his book Satow does not regard a person as an *ad hoc* diplomat unless he is accredited for reasons of ceremony or protocol.

[35] For example, delegations responsible for the demarcation of frontiers, but not missions for the maintenance of order and the settlement of incidents, which are permanent functions; the United States diplomatic missions after the Second World War responsible for tracing the whereabouts of the remains of United States soldiers and for their transportation to the United States, but not the missions for the maintenance of military cemeteries ; repatriation missions, but not missions responsible for dealing with a country's own citizens in a foreign country, etc.

[36] *Yearbook of the International Law Commission, 1960*, vol. II, pp. 113 and 114.

[37] It is sufficient to note that for this type of diplomacy — periodic State delegations and delegates — the United Nations and the specialized agencies have drawn up a series of conventions, laid down detailed procedures and concluded special treaties with the States in which their headquarters are situated or in which their international conferences are held.

[38] Decision of the Commission at its fourteenth session (1962). Mr. Abdullah El-Erian was appointed Special Rapporteur (see *Yearbook of the International Law Commission, 1962*, vol. II, p. 192, para. 75).

66. Nevertheless, the procedure of the International Law Commission described above involved a logical as well as a practical error. There are some international conferences which are not connected with international organizations, and in those cases *ad hoc* diplomacy is involved ; in their case, the rules which led the Commission to take into account the newly formed juridical systems concerning delegations and delegates of States to international meetings do not apply. Such cases, in the opinion of the Special Rapporteur, are cases of *ad hoc* diplomacy in the full meaning of the term.

67. In connexion with this reduction in the number of missions and persons that fall under the concept of *ad hoc* diplomacy, the Special Rapporteur considers it necessary to note that most writers on diplomatic law in fact include the representatives of States to congresses and conferences in the concept of *ad hoc* diplomacy.[89]

68. The Special Rapporteur has already indicated in the introduction the limitations of the concept of *ad hoc* diplomacy and considers that in its strict sense *ad hoc* diplomacy should be understood to apply only to State agents having the following characteristics :

    (*a*) they must be delegated or appointed by a State for the purpose of carrying out a special task with respect to another State ;

    (*b*) their mission must not be regarded as permanent but must be linked to the performance of a specific temporary function ;

    (*c*) their task must consist in representing the State as the lawful holder of sovereignty *vis-à-vis* the other State and must not be concerned with matters in which the State does not appear as the holder of sovereignty or with relations with particular individuals or bodies corporate which are not subjects of public international law.

69. The Special Rapporteur is convinced that unless these three constituent elements are all present a case cannot be deemed to fall within the sphere of *ad hoc* diplomacy.

70. On the other hand, he rejects certain criteria which have been laid down for the purpose of determining whether a particular agent of a foreign State is, or owing to certain circumstances is not, an *ad hoc* diplomat. Among these criteria he would include those resulting from the view :

    (*a*) that a person cannot be considered an *ad hoc* diplomat unless he holds diplomatic rank. Under present circumstances this condition has become meaningless.

    (*b*) that he is engaged purely in a so-called "diplomatic" mission, or ceremonial and representative mission, to the exclusion of any idea that

the mission of an *ad hoc* diplomat may include technical duties. Present-day diplomacy is marked by its functional and not its representative character. On the other hand, the functions of diplomacy are expanding as is the whole sphere of international relations. The narrow approach characteristic of the aristocratic conception of the diplomat, which held diplomacy to be purely political and representative and which persisted even after its bureaucratization, rejected the very notion that a diplomat could perform technical duties. Little by little, diplomacy began to bring economic and financial relations within its scope. This marked the beginning of its transformation. The technical duties with which diplomacy was concerned continued to increase. Technical assistants became more and more numerous in permanent missions. Thus life itself imposed a change in the concept of diplomatic duties. Ultimately, it was concluded that any action implying the representation of the sovereign State at the international level in its relations with other subjects of public international law comes within the scope of diplomacy in general, and consequently, of *ad hoc* diplomacy also.

71. The question is whether the agents of a State who are not part of its internal diplomatic machinery or, more specifically, of its Ministry for Foreign Affairs, and who are not career diplomats, may be classed as diplomats if they are given the task of representing their State's interests temporarily in contacts, generally in the form of negotiations, with the representatives of other States, even if those contacts take place in the territory of their own State. This is what generally happens in bilateral negotiations. In principle, the negotiators on both sides — those of the foreign country and those of the host country — have the same duties and character. Strictly speaking, therefore, the agents of the host State, though performing their task in their own territory, are *ad hoc* diplomats. Consequently, they should be regarded as *ad hoc* diplomats during the exercise of their functions or at least in their relations with their foreign counterparts. However, because they are in the territory of their own State and, consequently, cannot claim any special privileges, their character as diplomats is generally disregarded in practice as well as in theory. The question is not even raised with much insistence. Nevertheless, the Special Rapporteur believes that this is wrong and that these diplomats, at least in their relations with their foreign counterparts, should be aware of their diplomatic role and of their duty to comport themselves as *ad hoc* diplomats towards them, since in these relations, except for certain specific features, the rights and duties of the two parties are equal although the host country has more duties. The Special Rapporteur will limit himself here to emphasizing that these persons, under certain specific conditions, fall within the category of *ad hoc* diplomats, and it is not his intention, in the remainder of this report, to enter too deeply into a study of their status.

72. (II) As already mentioned above, the notion of *ad hoc* diplomacy requires some study of the causes of the recent numerical increase in the functions of *ad hoc*

---

[89] Sir Ernest Satow, *op. cit.*, p. 208 ; Convention regarding diplomatic officers adopted by the Sixth International American Conference, signed at Havana, 20 February 1928, article 2 *in fine* (text in League of Nations *Treaty Series*, vol. CLV ; also in United Nations Legislative Series, *Laws and Regulations regarding Diplomatic and Consular Privileges and Immunities*, United Nations publication, Sales No. 58.V.3) ; Dr. Karl Strupp, *Réforme et Codification du droit international* — Report of the Thirty-Fourth Conference of the International Law Association, London, 1927, pp. 426 *et seq.*

diplomacy. In this connexion, the following points may be noted:

73. There is much discussion of the question of the nature of the special missions which have become increasingly frequent since the Second World War and of the reasons why, despite an expansion of the staffs of permanent diplomatic missions, the services of *ad hoc* diplomacy are being used more and more.

74. In looking closely at the development of international relations, the Special Rapporteur cannot help noting that diplomatic missions are being progressively reduced to the level of bureaucratic machines and that embassies are becoming a kind of headquarters for the organization of work, for observation, and for the performance of the special tasks for which they are responsible. For this reason, regular diplomatic missions are increasingly being relieved of high political functions and also of purely technical duties.

75. In the first place, many political questions of principle have been removed from the ambit of bilateral relations to that of meetings at the headquarters of international organizations and at wider international conferences. This does not mean, however, that embassies are relieved of the duty to deal with these questions, but they do not participate in their settlement at the decisive stage. The final settlement is a matter for international meetings. Nevertheless, resident diplomacy continues to be responsible for testing reactions to proposals, for obtaining information on the attitudes of the other State, for bringing the desired influence to bear, and even for seeking proper instructions for delegations participating in such meetings. Similarly, resident diplomacy resumes its activities — once a decision has been taken in the organizations or at international meetings — in connexion with the attitude of States towards the measures adopted, the way in which and the extent to which they are implemented, and even the sabotaging of such decisions. This indicates that, although many of the duties of resident diplomacy which are of general interest have been transferred to a special type of *ad hoc* diplomacy — to delegations — it would nevertheless be a mistake to believe that, generally speaking, such work has been taken completely out of the hands of the regular diplomatic machinery. In a sense, it forms an integral part of the link between the regular diplomatic machinery and *ad hoc* diplomacy, since the representation of a State in international relations should be regarded as an integrated whole.

76. It has also been noted that negotiation and the search for answers to certain political questions of the highest importance are more and more frequently carried on, in relations between the State to which the permanent mission belongs and the State to which it is accredited, without the participation of the regular ambassadors. There is a vast difference between the conferences of ambassadors which used to meet in London before the First World War to decide the fate of the world and the contacts between ambassadors in a capital city in the present age. When the settlement of an important political question is to be worked out, there appears on the scene — notwithstanding

preliminary feelers and negotiations through the regular diplomatic channel — *ad hoc* diplomacy, personified in meetings between the highest representatives of the States involved, often Heads of Government (less frequently Heads of State, although this practice has been revived in recent years) or Ministers for Foreign Affairs. At these meetings, and during these contacts, decisions are taken on vital political and military questions affecting the mutual relations of the participating States. Although ambassadors are not reduced to the role of passive observers in these activities and are not relieved of the duty to prepare for the negotiations and although in most cases they are members of the delegations, there is little doubt that their importance in this respect is diminishing, that they are usually assigned a secondary role in the negotiations, and that the lustre of their rank is dimmed by the presence of leaders who take the most prominent part in contacts of this kind. On the one hand, regular diplomacy is being relieved of the most important political questions, and on the other, such questions are passing more and more into the competence of *ad hoc* diplomacy, as represented at the appropriate time by responsible political figures from the countries invited to take part, with the result that the importance of such *ad hoc* diplomats undoubtedly exceeds that of regular diplomats.

77. A further point is that the volume of affairs which give rise to the formation of international relations, the widening competence of the international organs, and the growing importance of the machinery of State in connexion with specific matters involved in bilateral relations, are bringing about qualitative changes in the functions of regular diplomacy. Some diplomatic historians state that the "classic" diplomat of the second half of the nineteenth century had to be guided by questions of protocol and by an understanding of the political interests of his own country. High politics and routine diplomatic work were the typical functions of regular diplomatic missions. With the passage of time, many purely technical tasks were also transferred to diplomacy, and this modified its structure in two ways. In addition to his regular staff, versed in general diplomacy, the head of the regular diplomatic mission acquires an ever-increasing number of specialized technical staff who have, in a sense, a particular sphere of competence and are subject only to the over-all political supervision of the head of the diplomatic mission. They establish relations — albeit through the diplomatic channel — with the technical organs of the receiving State. It becomes necessary, from time to time, to enter into negotiations or to discuss the most important problems of this kind between the two States. For such negotiations a country must, of course, delegate qualified experts with authority to seek a settlement of the problems involved. This is a new kind of *ad hoc* diplomacy, and it places regular diplomacy in a very precarious position. The permanent missions maintained at first that such special diplomats occupied a secondary position and were merely assistants to the head of the permanent diplomatic mission. In time, however, such "technical" missions, or negotiators, were able to free themselves almost completely from

the influence of the regular missions. They would arrive from their own country with quite precise instructions, with special full powers, and with the right and the duty to maintain direct relations with the competent central authorities ; as a result, their position was soon consolidated and they were emancipated from the machinery of the permanent missions, to which they were linked only through the central organs of government. Consequently, these *ad hoc* diplomats, during their stay in a country, did not become part of the permanent mission.

78. It follows from the foregoing that *ad hoc* diplomacy appears in two forms, according to its functions. It may be responsible for the most important political functions, or it may be a mission qualified to maintain technical relations. The latter, a complete enumeration of which is difficult because of their great diversity, may be said to include primarily trade relations, financial relations, cultural relations, scientific relations, relations in the matter of communications, and in particular sea and air transport, and so forth. A certain rivalry exists between permanent missions and *ad hoc* diplomacy with respect to their mutual relations. The permanent missions assert their primacy, and *ad hoc* diplomacy its authority to treat directly at the international level ; but in relation to the outside world, i.e. to the receiving country, *ad hoc* diplomats have a special legal status and do not form an integral part of the permanent mission.

### 8.  Some special aspects of special missions

79. The Special Rapporteur believes that the first questions to be settled are whether certain types of missions may be regarded as special missions, and where the demarcation line separating them from regular diplomacy lies. He is of the opinion that the categories listed below should be considered special missions. The question whether the status of these categories should be governed by the legal rules relating to special missions depends on the preliminary decision of the Commission. The Special Rapporteur believes that these categories should be recognized as special missions (with the possible exception of categories D, G, H, and I, where he hesitates between the arguments for and against, since in practice they appear to be equally plausible).

### A.  Special missions with ceremonial functions

80. The Special Rapporteur will not deal at great length with this category of *ad hoc* diplomacy, although it was for a time the most common type and has remained largely in use up to the present day. It is mentioned only for the sake of completeness. It should be pointed out that the generally accepted practice before the First World War was to appoint ambassadors, other than the permanent diplomatic representatives, as special envoys of a State for special missions to another State on extraordinary occasions. The Soviet author Potemkin supposes them to be ambassadors appointed to represent their countries at such national ceremonies as the coronation, marriage or funeral of a sovereign or of his heir. Conversely, Potemkin says, it was

customary for kings and emperors to send special ambassadors to one another to announce their accession to the throne. These ambassadors, of course, had purely ceremonial functions.[40]

81. Potemkin regards the dispatch of such occasional ambassadors as not only customary but required by etiquette.[41] Failure to send such ambassadors was interpreted as a breach of the rule that honour should be rendered where it was due. Consequently, Potemkin says, if the State in question was unable, for justifiable reasons, to send an ambassador of this kind, its omission might nevertheless be regarded as a breach of etiquette. In order to avoid this, the practice grew up of designating the permanent diplomatic representative in the country in question as special, or *ad hoc*, ambassador to the very country to which he was accredited. Two offices are then merged in the person of the one ambassador, but only for the duration of the ceremonies. Throughout that period — before, during and after the ceremony — he is still the head of the permanent mission, and during the ceremonies he is also the *ad hoc* ambassador. This is important, as emphasizing the presence of a special ambassador ; moreover, during the ceremony, *ad hoc* ambassadors have precedence over regularly accredited ambassadors. Notwithstanding the fact that an ambassador may be regularly accredited, he must be specially accredited as *ad hoc* ambassador.

82. In the countries of Latin America, the rule that *ad hoc* ambassadors should participate in the ceremonies known as the inauguration of the President of the Republic is jealousy applied.

83. As a general rule, where an *ad hoc* mission is sent to such a ceremony, the head of the permanent mission in the country concerned is not usually head of the *ad hoc* mission, but is simply one of its members. In this case, he occupies his special rank in the *ad hoc* mission, which differs from the rank to which he is entitled as head of the permanent diplomatic mission.

84. Genet refers to a mission of this kind as a courtesy mission. It is interesting to note that he also regards missions of apology, which no longer exist today, as occasional missions. The custom now is not to send special missions or a special ambassador to apologize, but to perform this act through resident diplomacy.[42]

### B.  Ad hoc *diplomacy with special functions*

85. As has been noted above, such special functions may be very diverse, and the essential point appears to be that they should be defined by agreements (formal or tacit).

86. The Special Rapporteur's researches have shown that various categories of special missions, classified according to the tasks they are required to perform, are encountered in practice. The main categories are :

[40] V. Potemkin, *Histoire de la diplomatie*, Paris, 1947, vol. III, p. 800.

[41] *Loc. cit.*

[42] Raoul Genet, *Traité de Diplomatie et de Droit Diplomatique*, Paris, 1931, vol. I, pp. 85-92.

(a) Special missions with purely political functions, either in bilateral relations or at multilateral meetings, organized outside the international organizations and without their participation. Some of these missions have been not only highly political, but also historic ; one need only mention special missions for the conclusion of political or peace treaties.

(b) Special missions with military functions. This category includes not only missions responsible for concluding military agreements, but also missions with specific operational military assignments. Some authorities also include among these missions the representatives of foreign armed forces attending manoeuvres of other armed forces.

(c) Special missions for the settlement of frontier problems, and in particular for the tracing and maintenance of demarcation lines and the placing of frontier marks.

(d) Special missions with police functions, operating either within the framework of co-operation between the States concerned or in frontier areas.

(e) Special missions to negotiate on transport questions. In practice, such missions are considered to be political in nature where they are concerned with policy relating to all forms of transport (sea, air, rail, river, road, and posts and telecommunications), while they are regarded as technical missions if they are concerned only with the practical application of established principles.

(f) Special missions concerned with water-supply problems. These missions are sub-divided in the same way as those mentioned in group (e).

(g) Special economic missions, including, in particular, missions for the purpose of concluding agreements on questions of trade, finance, and currency.

(h) Special missions to resolve specific customs problems.

(i) Special missions concerned with veterinary and phytopathological services.

(j) Special missions concerned with questions relating to health services.

(k) Special missions for the purpose of tracing and repatriating citizens of the sending State.

(l) Special missions of a humanitarian character, which may be very varied in nature.

(m) Special missions for the recruitment of labour and the control of immigration.

(n) Special missions for the purpose of tracing the graves of soldiers killed in action and repatriating their remains.

87.  The purpose of this list, which is by no means exhaustive, is simply to draw the Commission's attention to the fact that special missions are very varied in nature and, consequently, have different functional needs. There has for years been a difference of opinion, in the various meetings connected with the Committee for co-ordination between the United Nations and the specialized agencies, as to whether all such missions should be placed in one category, so that they

would all be subject to the same rules of international law, particularly as regards facilities, privileges and immunities, or whether a distinction should be drawn between missions to be recognized as diplomatic in nature and others of a strictly technical nature, which could operate normally without being treated as diplomatic in nature. The latter might, perhaps, be granted something akin to consular status. Some of them require special rules. The Special Rapporteur considers it would be premature, however, to make a final determination of the status to be granted to individual types of missions before Member States have expressed their views. For the present, he will refrain from drawing any distinction.

88.  In presenting this report to the Commission, the Special Rapporteur considers it essential that the Commission should establish guide-lines and decide whether the legal rules should include detailed provisions concerning the individual types of special missions, according to their functions and nature, or whether they should be confined to generalizations. His own suggestion is that both missions of diplomatic and political importance and those of a strictly technical nature should be recognized as special missions. The first type should be granted a status based on the rules which apply to diplomatic relations, while the other group should be given a different status, perhaps akin to that of consular agents. Within each group, however, account must be taken of the specific nature of the missions and of the different and varied conditions required for their regular functioning, and the basic rules should be varied accordingly — a task which the Commission should bear in mind, and on which it should take a decision before proceeding to a discussion of the actual rules of law.

### C. The ad hoc diplomat as messenger

89.  There very often appears in a third country an *ad hoc* diplomat of a special kind. He is usually a person of high political standing or occupying an important post in his country's administration who is sent on a special mission by the Head of State or Head of Government to carry, present or communicate a message to a high official of the same rank in the other country. Such an envoy is not a delegate, since he does not enter into negotiations. He may possibly receive a reply or comments on the written or oral message which he has conveyed. He is not a diplomatic courier, because the message he brings is delivered directly either to the Head of State or to a high official of a foreign country, whereas the diplomatic courier operates between the administration of his State and its representative abroad. A messenger of this kind is today regarded as an *ad hoc* diplomat, and not as a courier, and he is received with special courtesy.

90.  Here again, the question of the relations between an *ad hoc* diplomat of this kind and the permanent diplomatic mission arises. Protocol practice does not always dissociate this category of *ad hoc* diplomat from the permanent mission. As a rule, the permanent mission requests that the messenger should be accepted and received. He is introduced, on rare occasions accompanied (depending on the messenger's rank), and

presented by the head of the permanent diplomatic mission. However, the latter is not necessarily aware of the terms of the message and does not always have to be present at the discussion between the messenger and the person to whom the message has been delivered. It might be said that, in this case, there is only an outward link between the *ad hoc* diplomat and the permanent mission, and that so far as the substance of his assignment is concerned there is no link.

91. The practice of sending messengers as *ad hoc* diplomats was very common in the past, particularly in relations between monarchs. Special messengers of very high rank were the bearers of messages known as *lettres de cabinet*. Very often, these were family letters or courtesy communications on such occasions as a marriage, a birth or the presentation of condolences, or they might be notes concerning changes in the family affairs of the sender. Even then, however, it was common, and it has become more so today, to employ such messengers for missions whose purpose was to transmit political communications, containing notices of action to be taken, appeals for joint action, statements of views and positions on important political problems, or warnings from the Head of State or of Government to his counterpart concerning the serious consequences which might arise in a period of crisis. Several examples of the use of messengers in modern times may be cited — for instance, the famous mission of Colonel Donovan, who took a message from President Roosevelt of the United States to the Heads of State of the Balkan countries on the eve of Hitler's drive into the Balkans (1941). At the time of the Cuban crisis (1962), there was a many-sided exchange of messages by special messenger between Heads of State. In this connexion, a distinction should be drawn, from the political but not from the juridical standpoint, between the dispatch of a messenger to a given country with a special message and what are known as circular messages, delivered to various countries by one messenger. This makes no difference from the juridical standpoint, and the messenger's status is the same in both cases.

92. The question arises whether a diplomat who is the head, or a member, of a permanent mission, when performing the function of a messenger to the Head of State or any official of the State to which he or his mission is accredited, has the status of a permanent diplomat or that of an *ad hoc* diplomat. The existence of such a distinction is assumed by analogy to the distinction between the functions of a permanent ambassador and those of a special envoy merged in one person in cases where the head of the permanent mission is given special powers or credentials to represent his State, particularly on ceremonial occasions (e.g., a wedding or an enthronement). It is asserted, on the other hand — and the Special Rapporteur agrees with this view — that the transmission of written or oral messages is one of the normal functions of the head of the resident diplomatic mission, and that in transmitting or forwarding such messages he retains his status as a permanent diplomat. This is important for certain courtesy reasons and also, more particularly, for political reasons. The sending of certain messages

by special messenger was regarded, in the case of etiquette messages, as a gesture of special courtesy, and in the case of political messages this act accentuated the special importance of the message, whereas its importance is definitely diminished when it is delivered through the regular diplomatic channel.

93. As regards the question of the messenger as an *ad hoc* diplomat, it is often emphasized that messengers were used much more often before the age of open diplomacy, for usually the messengers were also secret emissaries, and it was only in exceptional circumstances that the arrival of the messenger and the contents of the message were made public. In the past, the normal practice was to give publicity to such missions and messages in the case of ceremonial and formal missions, while in the case of political messages publicity was very rare, and indeed exceptional, being given especially when it was intended, in certain circumstances, to make clear to world public opinion the importance of the agreement which had been reached or the notice which had been received. Today, however, publicity is much more general, but it would be a mistake to believe that the messenger is not, even now, sometimes a secret messenger, that public opinion is always informed of the contents of the message, and in particular that the full text of the latter is sure to be published.

94. The Special Rapporteur ought to draw attention to one characteristic of the messenger as an *ad hoc* diplomat — his representative character. Irrespective of the powers given to him, the messenger represents the person who commissioned him to deliver the message, and for this reason he is treated with the courtesy due, not to his personal rank, but to the rank to which a special envoy of the author of the message is entitled. Precisely because of this capacity, however, it is customary for the messenger, as an *ad hoc* diplomat, to be of special personal standing or to occupy a high position in his own country. It is discourteous to entrust a mission of this kind to persons of inferior rank, although, even if that were done, such an *ad hoc* diplomat would possess in every respect the legal status of a messenger. It is known that on several occasions during the Second World War, the Heads of State of the United Nations coalition made use of such messengers, who were military officers of no particularly high rank. They were known as liaison officers, but no one questioned either their status as messengers or their capacity as *ad hoc* diplomats. They were regarded, in their capacity as the technical bearers of messages, as persons enjoying special confidence.

D. *Secret emissaries*

95. The oldest type of *ad hoc* diplomat is probably the so-called secret emissary, who is instructed by one State, which he represents, to make contact with another State, neither State having the right to disclose his presence or the nature of his functions, by virtue of an agreement between them and in the light of the circumstances.

96. A secret emissary may be sent by one Government to another, whether or not normal diplomatic channels exist. Where such relations exist, it is presumed

that the head of the permanent diplomatic mission is not aware of the nature of the secret emissary's mission, or at least that it lies outside his own sphere of activity (this often causes the permanent ambassador to protest or even to resign, since strictly speaking all relations are within his competence). Where there are no normal diplomatic channels, the two Governments, or at least one of them, do not wish the existence of such contacts to be divulged.[43]

97. In the practice, references are found to several categories of secret emissaries, who may be regarded as *ad hoc* diplomats. Among such emissaries, the following should be noted :

(*a*) The secret messenger, who has been discussed in a separate section. He is usually regarded today as being relatively secret. In many cases, his role, or at least his visit, is not made public until he has left the country in which he had a function to perform. Whether the contents of the message he was carrying will be published is a question apart, the answer to which depends on agreements between the Governments.

(*b*) The confidential envoy or secret negotiator. He discusses or concludes, on behalf of his Government, agreements on matters which must be kept secret, at least during the conversations. With the establishment of the rule that international treaties must be made public, this category is disappearing, although secret negotiations still take place. It would be a mistake to believe that this category of agent no longer exists at all. There are numerous instances to prove that States still resort to the practice of using secret emissaries who put out feelers, i.e., pass on information and study the possibilities of opening official negotiations on specific matters. Such was the mission of Prince Sixtus of Bourbon-Parma, who in 1917 probed the possibility of concluding a separate peace between Austria-Hungary and the Entente Powers ; and such is the role of those who today prepare the ground for either the resumption of diplomatic relations which have been broken off between two States or the recognition of a new State.

(*c*) The confidential observer residing in the territory of a State, who has the secret mission of sending information to his Government, with the permission of the country of residence, but whose mission is regarded as temporary, who is not a member of the diplomatic mission, and whose presence is not made public.

(*d*) The secret agent who keeps watch on citizens of the sending State and who has been authorized by the receiving State to do so (generally in close collaboration with the security organs or intelligence service of the latter). In this connexion, mention may be made in particular of the police of Czarist Russia and the intelligence service of Nazi Germany in countries where the Hitler régime had influence.

98. A distinctive characteristic of these categories of secret envoys and others who are accorded the status of *ad hoc* diplomats is that the receiving State has

agreed to admit them to its territory and has granted them the right to perform specific activities (often by tacit agreement). The two parties are bound to regard these agents and their mission as confidential and to ensure that their activities are not discovered. Another characteristic of these categories of envoys is that they are accorded the privileges and immunities necessary for the performance of their duties.

99. Not to be confused with envoys whose functions come under the heading of *ad hoc* diplomacy are the agents whom a Government unilaterally sends to the territory of a foreign State, including those whose presence is tolerated by the State of residence even though without any obligation to accord them recognition. There are a number of categories of such agents, including unofficial observers, unauthorized informants (who may be spies) and voluntary envoys, who often have a decisive influence on relations between the countries concerned and are more reliable channels of communication than the permanent ambassadors but nevertheless do not have the status of *ad hoc* diplomats.[44]

## E. *Observers as* ad hoc *diplomats*

100. Potemkin notes the existence of a special category of *ad hoc* diplomats — the observers who appear on the international scene as special diplomatic envoys to attend international conferences or other meetings to which their States have been invited but in which they have refused to participate. This refusal may be prompted by considerations of principle, where the State in question does not approve of the meeting and its purpose, or may be due to its inability or unwillingness to adopt that particular course of action. Potemkin points out that, although such a country declines actually to participate in the meeting, the sending of observers shows that it takes a special interest in the matter under consideration and wishes either to influence the course of deliberations through its observers or to obtain direct information. Potemkin attributes this practice to the United States.[45] In the opinion of the Special Rapporteur, however, this is a more general phenomenon whose causes can be traced back further than the period between the two wars ; today, the practice is widespread.

---

[43] Raoul Genet, *op. cit.*, vol. I, p. 31.

[44] Genet (*loc. cit.*) cites one such voluntary envoy who worked on behalf of the Duc de Richelieu. The envoy in question was Fr. Joseph Leclerc du Tremblay, who was referred to by his contemporaries as the *Eminence grise*. During the Second World War, Hitler made use of such secret envoys in every State on which he wished to exert pressure, choosing them from among the nationals of the State concerned. Through these individuals, he was able to hint at the direst consequences without accepting any responsibility for their statements, even though it was perfectly obvious that they were authorized to make them. According to a book published in Yugoslavia in 1941 during the occupation of that country, the author, Dr. Danilo Gregoric, played such a role in Yugoslavia on the eve of the war. There were envoys of this kind in every European country at that time. Important though they in fact were, however, they must be distinguished from secret envoys having the status of *ad hoc* diplomats. Under international law, they are regarded as mere agents.

[45] V. Potemkin, *op. cit.*, vol. III, p. 880. Raoul Genet, *op. cit.*, vol. I, p. 97.

101.   The role of an observer is by its very nature a diplomatic one. It is temporary and is limited to the period of the meeting. The status of an observer varies in accordance with the meeting's rules of procedure or its decisions. Nowadays, it is the practice in all cases to permit an observer to take part in discussions, though without the right to participate in votes or in decisions. As a general rule, observers are accorded the same honours, privileges and immunities as delegates to the conference.[46]

102.   In United States diplomatic practice, according to Genet, observers are divided into two categories: official observers, who represent their Government, and unofficial observers, who are confined to the role of technical observers. The Soviet Union followed this practice for a time. The Swiss Government has recognized the existence of these two categories, the practical line of demarcation between which is not very clear, since both make the same claim to all privileges and immunities and in fact enjoy them. In theory, observers of the first type are entitled to make observations on behalf of their Governments, whereas unofficial observers merely gather information and passively attend meetings and negotiations.[47]

103.   Mention might also be made of those observers who are secret envoys. In their case, however, the special rules apply.

F.   *Ambassadors at large*

104.   The diplomatic machinery of some States includes a category of special officials whose predetermined function it is to carry out ad hoc diplomatic missions. In the United States, it is customary to give these officials the title of "ambassadors at large". They are not accredited to a particular country but are empowered to conduct negotiations with various States on behalf of their own State and to attend various international conferences. When they deal with foreign countries, they are accorded the same honours as ambassadors.[48]

105.   Genet holds that it is possible not only for ambassadors but for all diplomatic agents to be, in a broad sense, without ties to any particular Government. In his opinion, however, they are also a part of general diplomacy.[49]

---

[46]   Protests have been raised by other participants in negotiations against the right of observers to take part in discussions or to make suggestions and statements of any kind. In the opinion of the Turkish delegation to the Lausanne Conference, for example, their presence gives rise to a situation of inequality between States. Although observers do not have the right to vote, since they do not wish to have it, they assume the right to make suggestions and to sound warnings; thus, the influence they wield is of an irresponsible kind, since the adoption of any suggestion they make is not binding on the State they represent. For that reason, the Turkish delegation took the position that observers should confine themselves to a passive role, so that theirs would be a function of secret diplomacy (of observation).

[47]   Genet, *loc. cit.*

[48]   V. Potemkin, *op. cit.*, vol. III, p. 800.

[49]   Raoul Genet, *op. cit.*, vol. I, p. 79.

G.   *The suite of a Head of State considered as an ad hoc mission*

106.   Some writers hold that the suite accompanying a Head of State on an official visit to another State constitutes a special mission, regardless of the powers conferred on its members, and that the latter are in all cases to be regarded as *ad hoc* diplomats.[50]

107.   The Special Rapporteur is undecided about the status of these persons. They are *ad hoc* diplomats, since as members of the suite they perform an official function and the person whom they are accompanying is carrying out a mission as a representative of his State. On the other hand, it is difficult to define what is their personal role in the performance of this function. Hence, there is probably equal justification for taking a different view, viz. that these are distinguished foreigners who must be shown special courtesy. The Special Rapporteur is undecided on this point because he knows from personal observation of such missions that the suite includes both persons with duties to perform and persons who are simply "guests" of the Head of State and who form what is known as the private section of the suite, which, as a matter of courtesy on the part of the host State, is not separated from the official party (for example, an intimate friend of the Head of State accompanying him on an official journey). This point is even clearer if the Head of State is on a private rather than an official visit.

108.   Those members of the suite who are responsible for the personal safety of the Head of State receive special attention, and it might also be noted that a special body of practice is developing with regard to the authority granted to such persons and the manner in which they work with the security organs of the receiving State.

109.   Of late, the crews of the means of transport employed (particularly the crews of vessels, aircraft, trains and special coaches, drivers, etc.) have also come to be regarded as part of the suite. It is becoming customary to treat them as also forming a special category under the heading of *ad hoc* diplomacy. Higher-level personnel, including officers, are placed on an equal footing with persons performing functions of *ad hoc* diplomacy who possess diplomatic status, while lower-level personnel are, in practice, grouped with the technical personnel of permanent diplomatic missions. In all cases, all members of the suite come within the ambit of *ad hoc* diplomacy in the broad sense.

H.   *Political agents not possessing diplomatic status*

110.   Genet includes in this category all temporary envoys (and even permanent ones, who are not under discussion here) sent by one State to another State or Government for the purpose of carrying out a political mission.[51] According to Genet, these agents do not have diplomatic status because they are not part of the diplomatic corps. He also includes in this category

---

[50]   Sir Ernest Satow, *op. cit.*, p. 43.

[51]   Raoul Genet, *op. cit.*, vol. I, p. 80.

the delegates of States whose sovereignty has not been recognized (a situation which antedates the adoption of the United Nations Charter), of *de facto* Governments (i.e. those which have not yet obtained international recognition), and of insurgents who are recognized as belligerents in a civil war (the representatives of forces participating in the colonial peoples' struggle for independence, such as the FLA delegates at Evian, may also be placed in this category).

111.    The Special Rapporteur includes in this group, in particular, the envoys of Governments which are in process of formation and of embryonic political bodies in developing countries, i.e. envoys who function during a period of transition towards independence and the assumption of sovereignty. Modern history contains a number of instances of the so-called peaceful transfer of sovereignty, so that this question is not necessarily linked — although it may be — with civil war and the armed struggle of peoples in exercise of their right of self-determination. One such instance was the case of Kenya during the interval between the decision to grant the country its independence in the near future — a period during which it already had its own Government — and the time of its assumption of sovereign rights over its national territory, i.e. the so-called effective date of sovereignty. In the case of Kenya and in those of a number of other countries, these "States about to be born" entered into *de facto* diplomatic relations through special missions before the effective date of sovereignty. The Special Rapporteur believes that such political agents should be accorded the status of special missions. However, the Commission will have to take a decision on this point.

112.    The Rapporteur considers that the functions of these envoys are at least partly diplomatic in nature, even though they are not part of the diplomatic corps. In his opinion, what is involved is *ad hoc* diplomacy *sui generis*, and experience shows that the treatment of such envoys reflects recognition of that fact.

### I.    Private agents

113.    The so-called private agents of a Head of State are also regarded as *ad hoc* diplomats. The Head of State sends them abroad on his own behalf and not on behalf of the State which he represents. Genet [52] denies diplomatic status to such agents. A similar view can be inferred from the definition given by the International Law Commission, according to which an agent, to qualify for recognition as an *ad hoc* diplomat, must be entrusted by one State with the carrying out of a task in another State.[53]

114.    Genet says that the Head of State usually entrusts such agents with certain matters of a private, non-diplomatic nature, such as handling personal relations and private business and managing his property abroad. Because of this, Genet states categorically that the individuals in question never have diplomatic status.

115.    The Special Rapporteur cannot accept this view.

He considers that private agents are often entrusted with political functions, and in particular with taking political soundings in matters regarding which the Head of State has no authority to send official agents without the consent of some other organ. This is true of the personal envoys whom the President of the United States sends on his own behalf and who are essentially — even though the nature of their functions is such that they do not represent the State but merely the Head of State as an individual — equivalent to the *ad hoc* diplomats of other States. All special ambassadors who are sent on a ceremonial mission should also be included in this category if they act on behalf of the Head of State and not on behalf of the State itself. Owing to certain traditional usages, however, this practice is not followed.

116.    Nevertheless, since the State's sphere of competence is constantly expanding by virtue of the sovereign authority it wields in economic relations with foreign countries, the question arises whether the status of private agents or that of *ad hoc* diplomats should be accorded to envoys sent to foreign countries by some States (and not by the Heads of State) in order to negotiate and establish economic relations and conclude specific transactions, e.g. to negotiate a loan, conduct exploratory talks or conclude a delivery contract (regardless of whether the State in question is placing the order or making the delivery). The trend is increasingly towards the view that such individuals should be accepted as *ad hoc* diplomats by the host State. This practice is often carried even further in that the envoys in question are accorded this status even when they conduct their business with persons who are not subjects of international law (e.g. a banking syndicate with which they are negotiating a State loan). This shows that the notion of what constitutes an *ad hoc* diplomat is becoming broader, but it is uncertain whether this broadening process rests on international law (which seems doubtful) or on such precarious foundations as tolerance and courtesy. The Special Rapporteur is inclined to take the latter view. The difference is not a very great one, however, since in either case the host State has the right to deny its hospitality. Yet, a difference exists, in that the State in question, while declining to accord the status of *ad hoc* diplomats to such agents, should not deny them hospitality ; it can simply inform them that they will no longer enjoy the privileges, facilities and immunities previously accorded to them and that they will be subject to its jurisdiction in all respects. Hence, these envoys' status as *ad hoc* diplomats is a precarious one.

117.    The Special Rapporteur believes that each of these categories should have a place in the body of legal rules relating to special missions, and he will endeavour to submit appropriate proposals to the Commission.

118.    Of late, however, certain types of special missions have appeared which, in the opinion of the Special Rapporteur, cannot be said to represent universally accepted practice under international law. He considers, therefore, that the proposed rules should make no provision for missions of these types, which are the following :

[52] Raoul Genet, *op. cit.*, vol. I, p. 83.

[53] *Yearbook of the International Law Commission, 1960*, vol. II, p. 179, draft article 1.

(a) joint State and party delegations of the kind exchanged by the socialist States and the States developing along socialist lines ;

(b) technical assistance missions, which do not follow any uniform practice and are usually based on bilateral agreements (the general rules should apply here, unless new rules are established at the United Nations Conference on Trade and Development, as proposed by the developing countries) ;

(c) visits made for study purposes, by prior agreement between the Governments concerned, which do not constitute missions, since their object is not the performance of an official task within the scope of international relations as between States.

119. The Special Rapporteur has also thought it inadvisable to deal with the status of distinguished foreigners or with semi-official visits by prominent persons, even if arranged officially.

### Draft articles on special missions

#### Article 1

1. For the performance of special and specific assignments, States may send temporary special missions, with the consent of the State to which they are sent.

2. The existence of regular diplomatic or consular relations between the States concerned is not a prerequisite for the sending and reception of special missions.

*Commentary*

(1) A special mission must possess the following characteristics :

(a) It *must be sent by a State,* which is a subject of international law, to another State, which is also a subject of international law. Special missions cannot be considered to include missions sent by political movements to establish contact with a particular State, or missions sent by States to establish contact with a movement. In the case of insurrection or civil war, however, any such movements which have been recognized as belligerents and thus have become, even if only provisionally, subjects of international law, have the capacity to send and receive special missions ;

(b) It *must not be in the nature of a mission responsible for maintaining general diplomatic relations between the States ;* its assignment must be limited and precisely defined. Any act by such a mission which exceeded the limits of its assignment would be *ultra vires ;*

(c) *A State is not obliged to receive a special mission from another State unless it has undertaken in advance to do so.* In practice, such an undertaking is generally given only by informal agreement ; less frequently, it is given by formal treaty providing that a specific problem will be discussed through the special mission ; one characteristic of a special mission is, therefore, that consent for it must have been given

in advance for a specific purpose (see paragraph (3) of the commentary on this article) ;

(d) It is of a *temporary* nature. Its temporary nature may be established either by the term fixed for the duration of the mission or by its being given a specific assignment or assignments, the mission being terminated either on the expiry of its term or on the completion of its assignment. However, a permanent specialized mission which has a specific sphere of competence and may exist side by side with the regular permanent diplomatic mission is not a special mission and does not possess the characteristics of a special mission. Examples of permanent specialized missions are the United States missions for economic co-operation and assistance to certain countries, the Australian immigration missions, the socialist countries' industrial co-operation missions, and commercial missions or delegations which are of a diplomatic nature. This is a new form of permanent specialized diplomacy which co-exists with the permanent general diplomatic mission.

(2) The sending and reception of special missions may — and most frequently does — occur between States which maintain regular diplomatic or consular relations with each other, but the existence of such relations is not an essential prerequisite. Where such relations exist and the regular diplomatic mission is functioning, the special mission's particular assignment may be one which would have been within the competence of the ordinary mission if there had been no special mission. During the existence of the special mission, however, States are entitled to conduct through the special mission relations which are within the competence of the general mission.

(3) The manner in which the agreement for sending and receiving a special mission is concluded is a separate question. In practice, there are a number of ways of achieving this purpose, viz :

(a) An informal diplomatic agreement providing that a special mission with specific assignments will be sent and received ;

(b) A formal treaty providing that certain questions will be discussed and settled through the sending of a special mission ;

(c) An offer by one State to send a special mission for a specific purpose, and the tacit acceptance of such a mission by the other State ;

(d) An invitation from one party to the other to send a special mission for a specific purpose, and the acceptance of the invitation by the other party.

(4) Where regular diplomatic relations are not in existence between the States concerned — whether because such relations have been broken off or because armed hostilities are in progress between the States — the sending and reception of special missions are subject to the same rules cited above. Experience shows that special missions are often used for the settlement of preliminary questions with a view to the establishment of regular diplomatic relations, or for the settlement of preliminary questions on which the establishment of such relations depends.

(5) The fact that a special mission is sent and received does not mean that the two States will entrust to special missions the settlement of the relations which are the subject of the special mission's assignment. This process very often takes place through the intermediary of the special missions of the two sides. The current practice is that negotiations with the delegation sent by a State for a specific purpose are conducted by a special mission of the host State also, i.e. by a delegation of that State specially appointed to conduct the negotiations. However, an alternative practice is that a delegation sent as a special mission is received by the Ministry of Foreign Affairs (or some other competent organ) of the host State, which discusses and decides upon the questions that are the subject of the talks without appointing a particular delegation as a special mission. Both these practices are considered to be in order, and in the second case the special mission acts on the one side and the Ministry (or some permanent regular organ) on the other.

(6) Cases also arise in practice in which a specific delegation, composed of the head or of members of the regular permanent diplomatic mission accredited to the country in which the negotiations are taking place, appears in the capacity of a special mission. Practice provides no clear-cut answer to the question whether this is a special mission in the proper sense or an activity of the permanent mission.

### Article 2. — The assignment of a special mission

1. The assignment of the special mission must be specified by the sending State and consented to by the receiving State.

2. The special mission may carry out on behalf of the sending State only those assignments which are within its competence.

3. The assignment of the mission may be exceeded only by the mutual consent of the States concerned.

4. During the existence of the special mission, its assignment shall be deemed to be excluded from the competence of the regular diplomatic mission.

#### Commentary

(1) The scope and content of the assignment are determined by consent. Such consent may be arrived at by any of the means indicated in paragraph (3) of the commentary on article 1. In practice, however, the instrument by which the sending and reception of special missions is agreed on is usually of an informal nature, often merely stating the purpose of the mission. In most cases, the exact scope of the assignment becomes clear only during the negotiations, and it frequently depends on the full powers or the authority conferred on the representatives of the negotiating parties.

(2) Diplomatic history records a number of cases where special missions have exceeded the assignment for which they were sent and received. The customary comment is that this is done to take advantage of the opportunity, and that any good diplomat makes use of such opportunities. There are also a number of cases showing that special missions for ceremonial and etiquette purposes have taken advantage of a propitious atmosphere to conclude certain beneficial treaties. Such actions should be regarded as *ultra vires*, but they may be validated by subsequent ratification or approval. The limits of the capacity of a special mission to transact business are normally determined by full powers, given in good and due form.

(3) The assignments of a special mission are very often determined by prior treaties or by the agreement concerning the sending and acceptance of the special mission. In this case, the special mission's assignment and the extent of its powers depend on a prior treaty or agreement. This is so, for instance, in the case of commissions appointed to draw up trading plans for a specific period under a permanent trade treaty.

(4) The most difficult juridical and political question which arises in connexion with the assignment and the limit of the powers of a special mission is whether its existence encroaches upon the competence of the regular diplomatic mission of the sending State accredited to the other party. Regular diplomatic missions consider themselves entitled to intervene in the negotiations at any time and to override the special mission. However, the interests of good legal order in the relations between States require that the other negotiator should be able to rely in good faith on the statements of intention made by the special mission on behalf of its State, and consequently, that interference by the permanent diplomatic mission should not be permitted to take him unawares. Nevertheless, it is generally agreed that the permanent mission retains its competence, even during the existence of the special mission, to transmit to the other contracting party, to which it is accredited, communications from its Government concerning the limit of the special mission's powers and, if need be, the complete revocation of the full powers given to it or the breaking-off of the negotiations ; but all such actions can apply only to future acts of the special mission.

(5) If the special mission's activity or existence comes to an end, the full competence of the regular diplomatic mission is usually restored, even with respect to matters within the scope of the special mission's assignment, except in cases where special missions have been given a certain competence, by treaty, to regulate relations between the States concerned.

### Article 3. — Appointment of the head and members of the special mission

1. The sending State is normally free to appoint the head of the special mission and its members, and it is unnecessary to request *agrément* for their appointments unless there is a prior special agreement (or unless the other State objects to the selection of the person appointed).

2. The prior agreement may provide that the head of the special mission or certain of its members shall possess specific qualifications or hold specific posts in the sending State.

*Commentary*

(1) The general rule that a State is not obliged to receive a special mission has been stated above. This was also the view of Mr. Sandström, the previous Special Rapporteur of the International Law Commission.[54] The Commission did not, however, consider it necessary to include this rule in its 1960 draft on special missions.[55] But apart from the agreement on the acceptance of the mission, the problem of the specific acceptance of an *ad hoc* diplomat also arises.

(2) It is scarcely feasible, in practice, to require a special procedure for the *agrément* or acceptance of and *ad hoc* diplomat. Nevertheless, the present Special Rapporteur believes that Mr. Sandström's view is correct, that a State is not obliged to receive an undesirable person even in this capacity, and that it may therefore object to his being sent or, if he arrives notwithstanding, refuse all contact with him. The present Special Rapporteur does not, however, share the opinion, expressed by Mr. Sandström, that a declaration of acceptance of an *ad hoc* diplomat is implicit in the agreement to accept a special mission or an itinerant envoy. The acceptance of a diplomatic mission should not, in the present Rapporteur's view, imply consent to a specific person ; on the contrary, the two things may be separated from each other. The individual is often appointed later, especially if the mission is not sent until an invitation has been issued or an agreement in principle has been reached to resort to *ad hoc* diplomacy.

(3) Mr. Jiménez de Aréchaga also expressed support in the International Law Commission for the view that *agrément* should be required. His memorandum on the subject stressed two points : that the question whether or not it should receive a special mission was decided by the State concerned, and that provisions concerning *agrément* were advantageous and desirable.[56]

(4) The present Special Rapporteur considers that the receiving State has the right to stipulate that contacts with a special mission or an *ad hoc* diplomat shall be subject to its prior consent, even though such consent is usually given informally. In most cases, consent is given in the form of a visa, issued in response to a request from the sending State indicating the purpose of the journey, or in the form of acceptance of the notice of the arrival of a specific person on a special mission. The States also usually agree in advance on the level of the delegations, the date and place of the meeting, and the subject of the conversations.

(5) In practice, the formal or informal agreement concerning the sending and reception of a special mission sometimes includes the clause mentioned by Mr. Sand-

ström, specifically designating the person or persons who will form the special mission. In this case, the sending State cannot make any changes in the composition of the special mission without the prior consent of the State to which it is being sent. Such consent need not always be express. In practice, all that is done is to send notice of the change in good time, and in the absence of any reaction, the other party is presumed to have accepted the notice without any reservation.

(6) In some cases, although less frequently, it is stipulated that the receiving State must give its consent. This occurs primarily where important and delicate subjects are to be dealt with through the special mission, and especially in cases where the head of the mission and its members must be eminent politicians.

(7) The question arises whether the receiving State is held to have the right to make acceptance of the person appointed conditional upon its own consent. In this case, it sometimes happens that the State which raises the objection asks to be consulted on the selection of the person. Its refusal does not mean that it considers the person proposed *persona non grata*, being of an objective and procedural rather than personal nature, although it is difficult to separate these two aspects in practice. The Special Rapporteur is not sure that this is a generally adopted practice.

(8) In many cases, the head of the special mission and its members are not designated by name in the prior agreement, but an indication is given of the qualifications they should possess. This applies either to meetings at a specific level (e.g. meetings of Ministers for Foreign Affairs or of heads of other departments) or to missions which must be composed of specially qualified experts (e.g. meetings of hydraulic engineers). In such cases, the special mission is regularly composed if its head and its members possess certain qualifications or hold certain posts, and thus the sending State is subject to certain restrictions with respect to the sending and the composition of its special mission.

*Article 4.* — *Persons declared* persona non grata

In the absence of prior consent to the appointment of a specific person or a person holding a specific post as the head or as a member of the mission, the receiving State may at any time notify the State sending the special mission that it regards the head or any other member of the mission as *persona non grata* and refuses to accept him. In this case, the sending State shall appoint another person in place of the person concerned.

*Commentary*

(1) Whether or not the receiving State has accepted the mission or delegate, it unquestionably has the right to declare an *ad hoc* diplomat *persona non grata* at any time. It is not obliged to state its reasons for this decision.[57]

(2) It may be added that an *ad hoc* diplomat is seldom declared *persona non grata* after he has been accepted, although this may happen. The receiving State does not usually take advantage of this prerogative, but

[54] *Yearbook of the International Law Commission, 1960,* vol. II, pp. 112-115, draft articles.

[55] *Ibid.,* p. 179. The Commission rejected, in article 2 of that draft, the rules concerning accreditation and acceptance contained in the 1958 draft (*Yearbook of the International Law Commission, 1958,* vol. II, pp. 89 *et seq.*) on diplomatic relations, retaining only the obligation to give notice of the arrival of an *ad hoc* diplomat.

[56] *Yearbook of the International Law Commission, 1960,* vol. II, pp. 115-117.

[57] This is also the opinion of the International Law Commission. See *ibid.,* pp. 112-115 and 180.

sometimes a receiving State may inform the other party, through the regular diplomatic channel, that the head of the special mission or a certain member represents an obstacle to the fulfilment of the special mission's assignment. Where negotiations are involved, they are usually suspended and the special mission leaves the receiving country temporarily, returning after a time with a new membership not including the person declared *persona non grata.*

(3) In practice, it is not the custom to make frequent use of this right of the State to declare the head or a member of the special mission *persona non grata.* After all, such missions are of short duration and have limited assignments. Nevertheless, instances do occur. In one case, the head of the mission sent to the minister of the receiving State a letter considered offensive by that State, which therefore announced that it would have no further relations with the writer. As a result, the activities of the special mission were virtually paralysed, and the sending State was obliged to recall the head of the special mission and to replace him.

(4) Where the meetings with the special mission are to be held at a specific level, or where the head or the members of the mission are required to possess certain specific qualifications and no other person in the sending State possesses such qualifications, the Special Rapporteur believes that it is quite impossible to declare the person concerned *persona non grata,* and that the only course is to break off the conversations, since the receiving State is not in a position to choose among several persons with the necessary qualifications. It cannot, for instance, ask the sending State to change its Minister for Foreign Affairs because he is regarded as *persona non grata,* for that would constitute interference in the domestic affairs of the sending State. Nevertheless, it is under no obligation to enter into contact with so undesirable a person, if it considers that refusal to do so is more advantageous to it than the actual contact with the other State ; this, however, is in no way a juridical question.

### Article 5. — Appointment of a special mission to more than one State

A State may send the same special mission, with the same assignments, to more than one State, provided that none of the States concerned objects.

*Commentary*

(1) The International Law Commission scarcely considered this question, and it has received scant attention in the literature. The Commission took the view that it was completely unnecessary to make provision for the matter, and its previous Special Rapporteur, Mr. Sandström, believed that the question did not arise at all.[58] Mr. Jiménez de Aréchaga, however, considered that this was not correct and that the situation envisaged was by no means unusual. Indeed, he believed that special missions were sent to a number of neighbouring States when changes of Government took place in the sending States and on ceremonial occasions.[59]

(2) According to the present Special Rapporteur's observations of practice, there are two cases in which the problem of the appointment of a special mission to more than one State clearly arises. They are the following :

(a) Where the same special mission, with the same membership and the same assignment, is sent to more than one State (usually neighbours or situated in the same geographical region). In the case of political missions (e.g., good-will missions), there have been instances of States refusing to enter into contact with a mission appointed to several other States with which they did not enjoy good relations. On one occasion, India indicated that it was not prepared to receive a good-will mission of that kind which would also be going to Pakistan. Thus, the question is not simply one of relations between the sending and receiving States, but also of relations between the States to which the special mission is sent. Although this raises a political issue, the effect from the juridical standpoint is that there is a condition that where special missions are appointed to more than one State, simultaneously or successively, the consent of each of the States concerned must be obtained.

(b) Although, according to the strict rule, a special mission is accredited individually, either simultaneously or successively, to each of the States with which contacts are desired, certain exceptions arise in practice. One custom is that known as circular appointment, which — rightly, in the view of the present Special Rapporteur — is considered discourteous by experts in diplomatic protocol. A special mission or an itinerant envoy is given full powers to visit more than one country, or a circular note is sent to the missions of more than one country informing them of the intention to send an *ad hoc* diplomat of this kind. If the mission is an important one, protests are lodged against this breach of courtesy. If the mission is sent for informational purposes in connexion with preliminary technical negotiations, the matter is usually overlooked, although it may be observed that such *ad hoc* diplomats are placed on the level of a commercial traveller with general powers of agency. A distinction must be made in the case of an *ad hoc* diplomat authorized to conduct negotiations for the conclusion of a multilateral convention which is not of general concern. In this case, his full powers may consist of a single document accrediting him to all the States with which the convention is to be concluded (e.g., the Bulgarian-Greek-Yugoslav negotiations for a settlement of certain questions relating to the common frontier of the three countries).

(3) It should also be mentioned that, in practice, a special mission of the kind referred to in paragraph 2 (a) above, having been accepted in principle, sometimes finds itself in the position of being requested, because of certain positions it has adopted during its contacts with the representatives of the first State visited, not to make contact with another specific State to which it is being sent. This occurs particularly in cases where it is announced that the special mission has granted to the first State certain preferences which conflict with the

---

[58] *Ibid., loc. cit.*
[59] *Ibid.,* p. 116, para. 8.

interests of the second State. The latter may consider that the matter to be dealt with has thus been prejudged, and may announce that the special mission which it had already accepted has become pointless. This is not the same as declaring the head and members of the mission *persona non grata*, since, in this case, the refusal to accept them is based not on their subjective qualities but on the objective political situation created by the special mission's actions and by the position taken by the sending State. It is, as it were, a restriction of diplomatic relations, expressed solely in the revocation of the *agrément* given to the special mission. This clearly demonstrates the delicacy of the situation created by the practice of sending the same special mission to more than one State.

(4) The facts set out above show that the International Law Commission's argument that the question does not arise at all is untenable, and that a separate solution is required to cover the case of *ad hoc* diplomacy.

*Article 6. — Composition of the special mission*

1. The special mission is composed of its head and, as necessary, of members of the mission. The special mission may also have a staff.

2. If the special mission is composed of several members, the sending State shall be required to appoint a head of mission, who shall be regarded as authorized to make statements on behalf of the mission, and the receiving State shall pass all its communications to the special mission through him.

3. The full powers given by the sending State to the special mission shall specify who is authorized to make valid statements on behalf of the State. These full powers may be individual, when issued for the head of the special mission; collective, when issued for the head and some members of the mission; or supplementary, when issued for particular members of the mission acting on behalf of the special mission by authorization or where the head of mission is prevented from carrying out his functions.

4. The sending State is free to determine the size of the special mission, failing a contrary arrangement entered into by agreement or unless the receiving State, in the absence of an arrangement on this matter, requires that the number of members or staff be kept within reasonable limits, having regard to the assignment entrusted to the special mission.

*Commentary*

(1) The special mission may be composed of only one member or of several members. If the *ad hoc* mission is entrusted to only one member, the latter is then a special delegate. If it has two members, then, according to Potemkin, if both are delegates, the sending State decides which of the two will be first delegate. If the special mission consists of three or more members, the rule requires that a head (chairman) of the delegation should be designated.[60]

(2) Precedence within the delegation is fixed, according to general practice, by the sending State, and is communicated to the other party or published in the manner normally adopted with respect to multilateral meetings. Neither the rank of the delegates in the State appointing the delegation nor the title or function of the individual delegates authorizes any change in the order of precedence established in the list communicated to the receiving State. However, according to international custom a member of the Government takes precedence of other officials and the head of delegation must not have lower diplomatic rank than the members of the delegation.

(3) In addition to the head and his deputy and the delegates and their deputies, the delegation may include other members such as counsellors, experts, secretaries and technical staff. The rule is that, except as otherwise provided, privileges and immunities are accorded to all members of the delegation.[61]

(4) In its draft on special missions, the International Law Commission considered it unnecessary to deal with this question; yet the problem of the number of members of a mission is linked to it. Mr. Sandström, the Commission's previous Special Rapporteur, did not refer to the question of the size of the special mission, but Mr. Jiménez de Aréchaga, a member of the Commission, considered that the matter should be dealt with, for in the absence of a rule on the subject "special missions [might] claim the right to have an unlimited staff", which in his view would be unjustified.[62]

(5) According to the results of the present Special Rapporteur's own research, it is customary for the receiving State to notify the sending State that it wishes the size of the mission to be limited because, for example, it is able to offer housing, transport and other facilities to only a certain number of persons.

(6) Less frequently, in practice, the agreement on the establishment or reception of the *ad hoc* mission limits the size of the mission; in some cases the agreement specifies a minimum number of members (meetings of delegations of equal size) and even calls for a mission specifically composed of members having stated qualifications (generally according to the problems to be treated).

(7) With respect to the size of the mission, attention should also be drawn to the practice of "balancing rank". It is customary, during preliminary conversations and negotiations on the sending and receiving of a mission, to designate the rank and status of the head and members of the special mission, so that the other party may act accordingly and thus avoid any disparity, for if an *ad hoc* diplomat were received by a person of lower rank than his own it might be considered an affront to his country. This, however, is a question of protocol rather than of law.

(8) *Head of the* ad hoc *mission.* As explained above, if the mission is composed of three or more members it must as a general rule have a head. If it is composed

⁶⁰ V. Potemkin, *op. cit.*, vol. III, p. 837.

⁶¹ V. Potemkin, *op. cit.*, p. 838.

⁶² *Yearbook of the International Law Commission, 1960*, vol. II, p. 116 and pp. 179-180.

of only two members, the sending State decides whether one shall bear the title of first delegate or head of mission. Whether he is called first delegate or head of mission, he will be regarded as the head of the *ad hoc* mission by the receiving State, which will communicate with him and receive from him statements on behalf of the special mission or of the sending State. For this reason the question of the existence of a head of mission is one of great practical importance, notwithstanding the fact that the International Law Commission failed to deal with it. Mr. Jiménez de Aréchaga, on the other hand, considers that in practice an *ad hoc* mission has a head, but he does not go into the question in detail.[63] In the Special Rapporteur's opinion, the matter of the appointment of a head of the *ad hoc* mission is important not only from the practical but also from the legal standpoint.

(9) *Deputy head of* ad hoc *mission*. In speaking of the composition of the *ad hoc* mission, it was said that a deputy head of mission was also appointed. The deputy's function is indicated by the fact that he is designated by the organ of the sending State which also appointed the head of mission, and that as a general rule the deputy head (who in practice is often called the vice-chairman of the delegation) acts without special appointment as head of the *ad hoc* mission whenever and wherever the head of mission is absent, unable to carry out his functions or recalled (in the last case, until the appointment of a new head has been notified to the other party).

(10) From the international standpoint, the deputy head's rank in the delegation is considered to be next below that of the head of the *ad hoc* mission. However, the deputy head of the delegation does not take precedence over the members of the missions of other States with which his delegation enters into contact. His status as deputy head is effective only when he acts as head.

(11) From the technical standpoint, a member of the *ad hoc* mission whom the head of mission himself has designated as his deputy (i.e. the administrator of the mission) is not regarded as a deputy head.

(12) The International Law Commission did not deal with this question.

(13) Chargé d'affaires ad interim *of a special mission*. Very frequently the special mission arrives without its head or deputy head, that is to say, before them, since contact must be established and affairs conducted before their arrival. The *ad hoc* mission may also be without its head or deputy head during the course of its activities. In this case, a member of the mission provisionally assumes the duties of head of mission, acting on behalf of the head if the latter has so provided. The International Law Commission did not study this problem and did not suggest that the rules of diplomatic law relating to *chargés d'affaires ad interim* should apply, in this connexion, to *ad hoc* missions.[64]

Mr. Jiménez de Aréchaga, on the other hand, believes that the question of appointing a *chargé d'affaires ad interim* may also arise in the case of an *ad hoc* mission — in the event, for example, of the principal negotiator's falling ill during the course of a transaction.[65] The Special Rapporteur believes that Mr. Jiménez de Aréchaga is on the right track. However, the rule should not be restricted to the single case of the sickness of the head of the *ad hoc* mission ; it should apply in all cases where he is unable to perform his functions or is absent, except where a deputy head has been designated and the other party has been notified of the fact.

(14) When a member of the mission is designated as *chargé d'affaires ad interim*, the rule in practice is that the appointment of the person to be entrusted with this function is notified by the sending State's regular diplomatic mission. This often occurs if the head of mission is recalled "tacitly", if he leaves his post suddenly (as frequently happens when he returns home for fresh instructions and remains there for some time) or if the mission arrives at its destination without its head and without his having given authorization in writing to the presumptive *chargé d'affaires*.

(15) There is some justification, however, for the International Law Commission's attitude. In the case of *ad hoc* ceremonial missions, the rule is that a special head of mission, usually a special ambassador, is named. He is then regarded as representing the Head of the sending State, and nobody can take his place in the performance of his ceremonial functions. Any substitution of this kind would detract from the mission's importance and rob it of its representative character, which attaches to a particular person even when the mission is composed of several members. From the standpoint of protocol, the other members are considered as the suite of the head of the mission and as not having capacity to perform his functions.

*Article 7. — Notification of arrival and departure*

1. The regular permanent mission of the sending State shall notify the Ministry of Foreign Affairs of the receiving State in the regular way of the composition of the special mission, of the arrival and departure of its members and staff and of the arrival and departure of the persons accompanying them.

2. When notification of the special mission has been given and the special mission has begun to function, subsequent changes in the composition of the special mission and its staff, not including the replacement of its head and the final departure of the whole mission, may be made also by the head of the special mission, or by a member of the mission or staff designated by the head of the special mission after duly notifying the representative of the State with which he is conducting the negotiations.

3. The foregoing provision shall also apply to notification of the engagement and discharge of locally recruited staff or servants.

4. (Notification concerning members or staff of the special mission who are members of the armed forces

---

[63] *Ibid., loc. cit.*

[64] *Ibid.*, p. 110, para. 21, and pp. 179-180. Mr. Sandström, the previous Special Rapporteur, is even of the opinion that this has no bearing on *ad hoc* missions.

[65] *Ibid.*, p. 116, para. 14.

shall be given in the regular way before their arrival in the territory of the receiving State.)

*Commentary*

(1) In the case of *ad hoc* diplomacy too, the question arises to what extent the sending State is obliged to notify the arrival and departure of the head and members of the special mission. The International Law Commission adopted the position put forward by Mr. Sandström, its previous Special Rapporteur, that in this respect the general rules on notification relating to permanent diplomatic missions were valid for special missions and for itinerant envoys.[66]

(2) This idea is basically correct, in the present Special Rapporteur's opinion. In practice, however, the notification is not identical with that given in the case of permanent diplomatic missions. In the first place, notification of the arrival of a special mission or of an *ad hoc* delegate usually takes place in two stages. The first is the preliminary notice, i.e., an announcement of arrival. This preliminary notice should contain brief particulars concerning the persons arriving in the special mission and should be communicated in good time, so that the competent authorities of the receiving State (and the persons who, on its behalf, will maintain contact) may be informed. The preliminary notice, may be delivered to the Ministry of Foreign Affairs of the receiving State or to its permanent diplomatic mission in the sending State. The second stage is the regular notification given through the diplomatic channel, i.e., through the permanent mission in the receiving State (the special mission itself gives this notification directly only if the sending State has no permanent mission in the receiving State and has not entrusted the mission of a third State with the protection of its interests there).

(3) Consequently, there are in practice certain special rules for the notification of the special mission's arrival. They arise from the need to inform the receiving State in a manner different from that used for permanent missions. The International Law Commission failed to take this fact into account. On the other hand, it is not customary to give separate notification of the special mission's departure. It is presumed that the mission will leave the receiving State after its assignment has been fulfilled. However, it is customary for the head and the members of the special mission to inform the representatives of the receiving State with whom they are in contact verbally, either during the course of their work or at the end of their mission, of the date and hour of their departure and the means of transport they propose to use.

(4) A separate question is whether a head or member of a special mission who remains in the territory of the receiving State after his official mission has ended but while his visa is still valid should give notice of his extended stay. Opinion is divided on this question, and the answer given depends on the receiving State's general laws governing aliens. If an extended stay of this kind occurs, however, it is an open question what point of time should be regarded as that at which the

official stay becomes a private stay. Courtesy demands that the situation should be treated with some degree of tolerance. The Special Rapporteur considers it unnecessary to include provisions governing this case in the text of the rules.

(5) The right to recruit auxiliary staff for special missions locally is in practice limited to the recruitment of auxiliary staff without diplomatic rank or expert status, persons performing certain strictly technical functions (e.g., chauffeurs), and service staff. The rule is that the receiving State should make provision for such services, for the performance of the functions of the *ad hoc* mission is often dependent on them. The International Law Commission did not discuss this problem, but the Special Rapporteur was convinced that the availability of these services to *ad hoc* missions should be viewed as part of their general privileges. However, the territorial State may ask to be advised of any recruitment of its nationals by special missions ; and in the Special Rapporteur's view a special mission has a duty to keep the authorities of the territorial State regularly informed concerning the engagement and discharge of such staff, although all engagements of this kind, like the special mission itself, are of limited duration.

(6) Some States require the names of military personnel participating in special missions to be communicated in advance to and even approved by the receiving State. The Special Rapporteur is not certain that this is a general practice. Support for it may be found in the rule that prior consent must be obtained for diplomatic staff of regular resident diplomatic missions who are members of the armed forces.

## Article 8. — Precedence

1. Where several special missions meet in order to carry out the same assignment, precedence among the heads of the special missions shall follow the alphabetical order of the titles of their respective States, in the English versions in use at the United Nations.

2. The rule laid down in paragraph 1 shall also apply where two special missions meet on the territory of a third State.

3. At meetings between the special mission and organs of the receiving State, no order of precedence shall be established.

4. The order of precedence among the other members and the staff of their special missions shall be determined by the heads of the missions.

5. The order of precedence *inter se* of delegates who are not heads of mission and of members of the staff of special missions shall correspond to the rank *inter se* of their heads of mission and their own rank within their mission.

*Commentary*

(1) The rules of precedence among the heads of permanent diplomatic missions are not in practice applied with respect to the rank of heads of special missions. Moreover, the question of rank arises only

[66] *Ibid.*, p. 113, draft article 12, and pp. 179-180.

when several special missions meet or when two missions meet on the territory of a third State.

(2) The question of rank does not arise when a special mission meets with a delegation or organ of the receiving State. In practice, the special rules of courtesy apply. The organ or delegation of the receiving State pays its compliments to the foreign special mission and the mission pays its respects to its host, but there is no question of precedence, properly so-called.

(3) The Special Rapporteur believes that it would be wrong to include in these articles a rule that the order of precedence of heads of special missions should be determined by the diplomatic classes to which their titles would assign them under the general rules on classes of heads of regular missions. The essential question that arises in this connexion is whether the rule on classes of heads of mission laid down in the Vienna Convention on Diplomatic Relations should prevail or the principle of the sovereign equality of States proclaimed by the United Nations Charter.

(4) Of particular significance is the fact that many heads of special missions have no diplomatic rank at all, and that heads of special missions are often personalities standing above all diplomatic rank. Some States make provision for such cases in their domestic law and in their practice, and give precedence to ministers who are members of the Cabinet and to certain other high officials.

(5) The Special Rapporteur wishes to stress that these rules are not valid with respect to meetings of special missions having ceremonial functions. This question will be dealt with in the following article.

(6) The Special Rapporteur considers that the rank of heads of special missions should be determined on the basis of the following considerations. Although in the case of *ad hoc* ceremonial diplomacy, the heads of special missions are still divided into diplomatic classes (e.g., special ambassador, special envoy), the current practice is not to give them any special diplomatic title. All heads of *ad hoc* missions represent their States and are equal among themselves in accordance with the principle of the equality of States. Except in matters of personal courtesy, the diplomatic title of the head is of no significance.

(7) The International Law Commission did not take up this question at all. Mr. Jiménez de Aréchaga, on the other hand, considers (erroneously, in the present writer's opinion) that the rules on classes of heads of missions apply equally to special missions, and he does not restrict that conclusion to ceremonial missions.[67]

(8) The practice developed in relations between States since the formation of the United Nations ignores the division of heads of *ad hoc* missions into classes according to their ranks, except in the case of ceremonial missions.

(9) The Special Rapporteur will nevertheless endeavour to set out in more detail the different views existing concerning the rank of *ad hoc* diplomats.

(10) There are two views concerning precedence among *ad hoc* diplomats. According to the first, the question

of rank does not arise at all in *ad hoc* diplomacy, this being considered to follow from the legal rule laid down by article 3 of the Vienna Regulations of 19 March 1815. This provides that diplomatic agents on special mission shall not on that account be entitled to any precedence in rank. Genet[68] deduces from this rule that they have no special rank by virtue of their mission, although they have diplomatic status. However, Satow[69] takes a different view. Although they are not ranked in the same order as the heads of the permanent diplomatic missions, there exists nevertheless an order by which their precedence can be established. This, says Satow, is an order *inter se*. It is based on their actual rank; and where they perform identical functions, precedence among them is determined on the basis of the order of presentation of their credentials or full powers.

(11) In his 1960 proposal,[70] Mr. A. E. F. Sandström, the previous Special Rapporteur of the International Law Commission, took the view that although under the Vienna Regulation a special mission enjoys no superiority in rank, the heads of special missions, at least ceremonial missions, nevertheless rank among themselves according to the order of the presentation of their credentials. Yet while advancing this opinion in the preliminary part of his report, in his draft of the operative provisions (alternative I, article 10, and alternative II, article 3) he simply inserted the negative provision that an *ad hoc* delegate or the head of a special mission should not, by virtue of such position only, be entitled to any superiority of rank.

(12) Mr. Sandström took as his starting point the idea that rank was defined by membership in the diplomatic service or by diplomatic category. He therefore made a distinction between political missions, regarded as being diplomatic, and technical missions, which are not of a diplomatic character. The present Special Rapporteur considers this to be fundamentally wrong.

(13) In the first place, it is not true that the person heading a special diplomatic mission of a political character is necessarily a member of the diplomatic service and necessarily holds diplomatic rank. Such missions may be headed by other persons, so that diplomatic rank is a very unreliable criterion. Why should a high official of the State (for example, a member of the Government) necessarily be ranked lower than a person bearing the title of ambassador? This would be incompatible with the current functional conception of diplomacy. On the other hand, the present Special Rapporteur considers that it would be erroneous to classify heads of mission having diplomatic rank according to their titles (for example, ambassador and minister plenipotentiary). They are all heads of diplomatic missions and have the same authority to represent their sovereign States, which, under the United Nations Charter, have the right to sovereign equality (Article 2). It follows, in the Special Rapporteur's view, that precedence *inter se* cannot be determined on the basis

[68] Raoul Genet, *op. cit.*, vol. I, p. 86.

[69] Sir Ernest Satow, *op. cit.*, p. 41.

[70] *Yearbook of the International Law Commission, 1960,* vol. II, p. 109, para. 18.

of diplomatic rank, at least in so far as juridical treatment is concerned (this does not affect the matter of courtesy towards the head of mission).

(14) The idea that different principles apply to so-called technical missions is mistaken. Such missions are today usually headed by a career diplomat, and the assignment of every technical mission includes some political elements.

(15) It would also be a mistake to follow Satow on this point. Precedence can hardly be established according to the order of the presentation of credentials. At most meetings of *ad hoc* diplomats the presumption, consistent with the facts, is that they arrive simultaneously,[71] and the individual and ceremonious presentation of credentials is a distinct rarity. For this reason, the date of presentation is without significance in practice.

(16) Precedence among *ad hoc* diplomats, limited as it is in its effect to their relations *inter se*, is important only in the case of a multilateral meeting or of contacts among three States, or between two States not counting the receiving State. In contacts between the *ad hoc* diplomats of a foreign State and the representatives of the receiving State alone, the question of precedence does not arise : as a matter of courtesy, the host treats his guest with high consideration, but the latter is obliged to act in the same manner towards his host.

(17) The Special Rapporteur is convinced that as a result, firstly, of the change which has taken place in the fundamental conception of the character of diplomacy, especially the abandonment of the theory of the representative character of diplomacy and the adoption of the functional theory, and secondly, of the acceptance of the principle of the sovereign equality of States, the legal rules relating to precedence in *ad hoc* diplomacy have undergone a complete transformation. The principles of the Vienna Regulation (1815) are no longer in force. No general principle can be inferred, on the basis of analogy, from the rules of precedence governing permanent missions. For this reason, more and more use is being made of an automatic method of determining the precedence of heads of special missions or *ad hoc* diplomats, namely, the classification of delegates and delegations according to the alphabetical order of the names of the participating countries. In view of the linguistic differences in the names of States, the custom is also to state the language in which the classification will be made.[72] This is the only procedure which offers an order by which that based on rank can be superseded, while at the same time ensuring the application of the rules on the sovereign equality of States.[73]

(18) For the sake of completeness, it should be mentioned that the principles of classification *inter se* and of the order of presentation of full powers are still applied in the case of special envoys to formal ceremonies, the Vienna Regulation (1815), which provides that a special mission does not convey any superiority in rank, being ignored on such occasions. During solemnities of this kind, special missions enjoy precedence from the standpoint of protocol and ceremony. This consideration is shown by the receiving State out of regard for the special courtesy displayed by the sending State in delegating an extraordinary mission or envoy.

(19) The rule that special missions enjoy a particular rank during formal court ceremonies and are seated immediately next to the members of the royal families was included in the permanent rules on precedence at the British court.

(20) However, if an *ad hoc* ambassador or envoy requests and is granted an audience, the court etiquette at his reception is the same as for a permanent ambassador.

(21) The International Law Commission did not go into the question of precedence within an *ad hoc* mission, putting the matter aside. The Special Rapporteur believes that this attitude is correct and that each State must itself determine the internal order of precedence among the members of the special mission and that this is a matter of protocol only, the order of precedence being sent to the receiving State by the head of the *ad hoc* mission either direct or through the permanent diplomatic mission which notifies arrivals and subsequent changes.

(22) The Special Rapporteur also believes that there are no legal rules determining the order of precedence as between members of different *ad hoc* missions, or as between them and members of permanent diplomatic missions, or as between them and the administrative officials of the receiving State.

(23) It frequently happens that special missions meet in the territory of a third State which is not involved in their assignment. In this case, it is important to the host State that the precedence of the heads of special missions or rather of the missions themselves should be fixed, so that it does not, as host, run the risk of favouring one of them or of being guided by subjective considerations in determining their precedence.

(24) A brief comment must be made on the question of the use of the alphabetical order of names of States as a basis for determining the order of precedence of special missions. At the present time, the rule in the United Nations and in all the specialized agencies, in accordance with the principle of the sovereign equality of States, is to follow this method. While considering it to be the most correct one, the Special Rapporteur concedes that the rule need not be strictly interpreted as requiring the use of the alphabetical order of the names of States in the English language. Some experts have drawn attention to the possibility of applying the same method but on the basis of the alphabetical order of names of States used in the official diplomatic list of

[71] Thus, Jiménez de Aréchaga : *ibid.*, p. 116, para. 13.

[72] Mr. Sandström in his draft used this method in dealing with the question of the participation of *ad hoc* diplomats in congresses and conferences (*ibid.*, p. 114, chap. II, art. 6).

[73] In order to bring the practice further into line with the principle of equality, it is now customary for lots to be drawn, the initial letter of the name of the State thus chosen indicating the beginning of the *ad hoc* alphabetical order. At United Nations meetings and meetings organized by the United Nations, lots are drawn at the opening of the session, to assign seats to the participating States for the duration of the session, and whenever a roll-call vote is taken.

the receiving State. The important thing is that the system applied should be objective and consistent with the principle of the sovereign equality of States.

### Article 9. — Precedence among special ceremonial and formal missions

1. Where two or more special missions meet on a formal or ceremonial occasion (for example, a marriage, christening, coronation, installation of Head of State, funeral, etc.), precedence among the heads of the missions shall be determined in accordance with the class to which each head of mission belongs by virtue of his diplomatic title, and within each class in accordance with the alphabetical order of the names of the States.

2. Heads of State, members of ruling families, chairmen of councils and ministers who are members of the Government represent special classes having precedence over the class of ambassadors.

3. Heads of special missions who do not possess the diplomatic rank of ambassador or minister plenipotentiary and who do not belong to the groups specified in paragraph 2 of this article shall constitute, irrespective of the functions they perform, a special group next following that of heads of special missions having the rank of minister plenipotentiary.

4. The diplomatic title used in determining precedence for the purposes of this article, except in the case of persons mentioned in paragraph 2, shall be that indicated in the credentials issued for the performance of the ceremonial or protocol function.

5. Heads of regular diplomatic missions shall not be considered to be heads of special missions for ceremonial or formal functions unless they have presented credentials issued specially for this particular purpose.

6. The rank of the staff of special ceremonial and formal missions shall be determined in accordance with the rank of the heads of mission.

7. When they appear at the ceremony to which their formal or ceremonial function relates, heads of special missions shal take precedence over the heads of regular diplomatic missions.

*Commentary*

(1) The sending of diplomatic missions of a ceremonial and formal nature was not abandoned in practice even after the establishment of regular resident diplomacy, and it continues to this day.

(2) On such occasions, the representatives of States customarily bear the title of special ambassadors extraordinary. Even a regularly accredited ambassador, when assigned to represent his country on a ceremonial occasion, is given the title of *ad hoc* ambassador. This is regarded as a point of international courtesy.

(3) In accordance with a time-honoured interpretation of article 3 of the Vienna Regulation of 1815, the *prior tempore* rule is held to apply even to these ambassadors, i.e. the rule that they take precedence in the order of

the time of presentation of the letters of credence issued for the *ad hoc* occasion. In practice, however, this rule has proved almost unworkable. The funeral of King George VI of Great Britain was a case in point. A number of special missions were unable, for lack of time, to present their letters of credence, or even copies of them, to the new Queen before the funeral ceremony. Moreover, several missions arrived in London simultaneously, so that the rule for determining precedence according to the order of arrival was also inapplicable. For this reason, the Special Rapporteur believes that it would be preferable to select another criterion, more objective and closer to the principle of the sovereign equality of States, while retaining the division of heads of special missions into classes.

(4) It is becoming an increasingly frequent practice to send special delegates of higher rank than ambassador to be present on ceremonial occasions. Some countries consider that to give them the title of *ad hoc* ambassador would be to lower their status, for it is increasingly recognized that Heads of Government and ministers rank above all officials, including ambassadors. In practice the domestic laws of a number of countries give such persons absolute precedence over diplomats.

(5) However, persons who do not belong to the groups mentioned in paragraph 2 are also sent as special *ad hoc* ambassadors, but are not given diplomatic titles because they do not want them. Very often, these are distinguished persons in their own right. In practice, there has been some uncertainty as to the rules applicable to their situation. One school of thought opposes the idea that such persons also take precedence over *ad hoc* ambassadors, and the Special Rapporteur agrees with the arguments in favour of this viewpoint, which are based on the fact that, if the State sending an emissary of this kind wishes to ensure that both the head of the special mission and itself are given preference, it should appoint him *ad hoc* ambassador. Any loss of precedence is the fault of the sending State.

(6) In such cases, the diplomatic status of the head of the special mission is determined *ad hoc,* irrespective of what is called in the French text-books the *grade réel.* The title of *ad hoc* ambassador is very often given, especially on such occasions, either to persons who do not belong to the diplomatic career service or to heads of regular missions who belong to the second class. This fact should be explicitly mentioned in the special letters of credence for the performance of the ceremonial or formal function.

(7) The issuance of special letters of credence covering a specific function of this kind is a customary practice. They should be in good and due form, like those of regular ambassadors, but they differ from the latter in their terms, since the mission's assignment is strictly limited to a particular ceremonial or formal function. The issuance of such letters of credence is regarded as an international courtesy, and that is why heads of regular diplomatic missions are expected to have such special letters of credence.

(8) Great difficulties are caused by the uncertainty of the rules of law concerning the relative rank of the head of a special mission for a ceremonial and formal function

and the head of the mission regularly accredited to the Government of the country in which the ceremonial occasion takes place. An examination of the protocol instructions of the Court of St. James shows that the heads of special missions have precedence at the ceremonies, while the heads of regularly accredited diplomatic missions occupy the rank immediately below them, unless they are acting in both capacities on the specific occasion in question. In the view of the Special Rapporteur, this solution is correct and is dictated by the very nature of the function, for otherwise it would be quite meaningless to send a special mission.

(9) The Special Rapporteur is unable to ascertain the exact position of the members of a special mission of a ceremonial or formal nature in cases where the members are designated as equals and are given collective letters of credence for the performance of the ceremonial or formal function in question. Practice varies in this matter. Some States regard as the head of such a mission the first person mentioned in the letters of credence issued for the special occasion. Other States, and particularly those sending delegations, claim that all the members delegated to serve on a mission of this kind should be recognized as having equal rights. This is frequently the case where the mission is composed of several members of a coalition Government or of members of the legislature representing different political groups. Those who uphold the notion of common rank *in corpore* base themselves on the argument that the composition of the delegation is a manifestation of the unanimity of sentiment and equal importance of the members of the delegation. As practice is not uniform in this matter, the Special Rapporteur is uncertain what solution should be proposed for the draft article.

### Article 10. — Commencement of the function of the special mission

1. The special function shall commence when the special mission or special missions enter into official contact with the organs of the host State.

2. The commencement of the function shall not be contingent upon official presentation by the regular diplomatic mission or upon the presentation of letters of credence or full powers.

3. The host State shall prescribe uniform rules for the reception of all special missions of the same kind, unless this matter is otherwise regulated by a special arrangement between the States concerned.

### Commentary

(1) *Commencement of the function of an* ad hoc *diplomat.* The International Law Commission takes the view that, so far as the commencement of the function of the head and members of a special mission is concerned, the rules applicable to permanent diplomatic missions do not apply. Mr. Jiménez de Aréchaga entirely disagrees.[74]

(2) The Special Rapporteur believes that there are special rules on this subject. A special function which has been the subject of prior notice and acknowledgement must be deemed to begin when the *ad hoc* diplomat arrives in the territory of the receiving State, unless he arrives prematurely — a situation which depends on the circumstances and on the notion of what constitutes a reasonable interval of time. If there has been no prior notice, the function is deemed to begin at the time of notification [of arrival] ; if there has been neither prior notice nor notification of arrival, it is deemed to begin when the first international contact is made. A further point is that, in the case of special missions, the commencement of the function need not be deemed to take place only when copies of the letters of credence or full powers are presented, although this is taken into account in the case of *ad hoc* ambassadors. Other *ad hoc* diplomats, even in cases where they must have full powers, do not now present either the original or a copy in advance, but only when the time comes to prove their authority to assume obligations on behalf of the sending State. Thus, there is a legal difference with respect to determining when the function commences, as compared with the case of the heads of permanent missions.

(3) All the instructions for the exercise of functions related to diplomatic protocol are found to contain more rules on the procedure for welcoming a ceremonial *ad hoc* mission when it arrives and escorting it when it leaves than on its reception, with consists of an audience with the Minister for Foreign Affairs to introduce the mission, or the presentation of letters of introduction or copies of credentials. Even less is said of audiences by Heads of State for the presentation of letters of credence. Even if an *ad hoc* diplomat arrives with special letters of credence addressed to the Head of State, the practice is to present them more expeditiously — i.e., through the Chief of Protocol — and the function commences immediately. An example of the propriety of this custom is the case of an *ad hoc* mission sent to present the condolences of its own Head of State to the Head of State of another country upon the death of his predecessor or of a member of the royal family. In such a case, formal receptions are hardly in order ; besides, there is usually little time. Nevertheless, missions are treated according to the rules of protocol, both on arrival and when they leave.

(4) Contacts between *ad hoc* missions appointed to conduct political negotiations also generally take place immediately following the so-called protocol visit to the competent official with whom the negotiations are to be held.

(5) In the case of *ad hoc* missions appointed to conduct technical negotiations, it is not the practice to have either a ceremonial reception or a ceremonial presentation of credentials. It is customary, however, to make an introductory visit or, if the parties already know each other, a visit for the purpose of establishing contact. There is a growing tendency to abandon even the custom whereby the head of the *ad hoc* mission is accompanied on his first visit by the head of the diplomatic mission permanently accredited to the receiving

[74] *Yearbook of the International Law Commission, 1960,* vol. II, p. 116, para. 11, and p. 180.

State, or by some member of that mission, if the head of the *ad hoc* mission or his opposite number who is to receive him is of lower rank than the head of the permanent mission.

(6) It should be noted that there is an essential difference between the reception of the head of an *ad hoc* mission and the presentation of his letters of credence or full powers on the one hand and the reception of the heads of permanent missions and the presentation of their credentials on the other.

(7) This difference relates, first of all, to the person from whom the full powers emanate, in cases other than that of a special ambassador or an *ad hoc* ceremonial mission. A special ambassador and the head of an *ad hoc* ceremonial mission receive their letters of credence from the Head of State, as do the regular heads of diplomatic missions of the first and second classes, and they are addressed to the Head of the State to which the persons concerned are being sent. This procedure is not necessarily followed in the case of other *ad hoc* missions. In accordance with a recently established custom, and by analogy to the rules concerning the regularity of credentials in the United Nations, full powers are issued either by the Head of State or of Government or by the Minister for Foreign Affairs, regardless of the rank of the delegate or of the head of the *ad hoc* mission.

(8) Again, this difference is seen in the fact that the letters of credence of the head of a permanent diplomatic mission are always in his name, while this is not so in the case of *ad hoc* missions, where even for a ceremonial mission, the letters of credence may be collective, in the sense that not only the head of the mission but the other members also are appointed to exercise certain functions (a situation which could not occur in the case of regular missions, where there is no collective accreditation). Full powers may be either individual or collective, or possibly supplementary (granting authority only to the head of the mission, or stipulating that declarations on behalf of the State will be made by the head of the mission and by certain members or by one or more persons named in the full powers, irrespective of their position in the mission). It has recently become increasingly common to provide *ad hoc* missions with supplementary collective full powers for the head of the mission or a particular member; for this is a practical solution (in case the head of the mission should be unable to be present throughout the negotiations).

(9) In practice, the members and staff of a special mission are deemed to commence their function at the same time as the head of the mission, provided that they arrived together when the mission began its activities, If they arrived later, their function is deemed to commence on the day of their arrival, duly notified to the host State.

(10) It is becoming increasingly rare to accord a formal welcome to special missions when they arrive at their destination, i.e., at the place where the negotiations are to be held. In the case of important political missions, however, the rules concerning reception are strictly observed but the Special Rapporteur considers this to be of significance only from the standpoint of formal courtesy and immaterial from the point of view of the law.

(11) Members of regular diplomatic missions who become members of a special mission are considered, despite their work with the special mission, to retain their status as regular diplomats; consequently, the question of the commencement of their functions in the special mission is of secondary importance.

*Article 11.* — *End of the function of the special mission*

The function of the special mission shall come to an end, *inter alia*:

(*a*) Upon the expiry of the term of duration of the special mission, unless prolonged by an agreement between the parties;

(*b*) Upon the accomplishment of the special mission's assignment;

(*c*) Upon the interruption or formal suspension of negotiations or deliberations within the competence of the special mission;

(*d*) Upon the conclusion of the session or conference for which the special mission was sent;

(*e*) Upon the ending of the ceremony, in the case of a special mission of a ceremonial or formal nature;

(*f*) Upon notification of the recall of the special mission by the sending State;

(*g*) Upon notification by the host State that it considers the mission terminated.

*Commentary*

(1) As a general rule, the mission of an *ad hoc* diplomat comes to an end for the same reasons as the functions of diplomatic agents of regular missions. The International Law Commission accepted this opinion on the termination of the functions of special missions in its 1960 draft articles on *ad hoc* diplomacy.[75] In those draft articles, however, the accomplishment of its assignment by a special mission was added, as a special reason for the termination of its functions.[76] In the first proposal he submitted as the Commission's Special Rapporteur, Mr. Sandström expressed the opinion that it was desirable also to consider the function of an *ad hoc* diplomat ended when the transactions which had been his aim were interrupted.[77] A resumption of negotiations would then be regarded as a new *ad hoc* mission.

(2) This idea, namely, that the functions of an *ad hoc* mission come to an end if its assignment is accomplished, if the ceremony in which it was to take part is completed, or if negotiations are broken off, was also held by Satow.[78] He puts forward the same special reasons for the termination of a special mission and he adds that, in such cases, it is quite unnecessary for the special mission or the *ad hoc* delegate to be formally recalled.

[75] *Ibid.*, p. 180.

[76] This addition was proposed by Mr. Jiménez de Aréchaga; *ibid.*, p. 115.

[77] *Ibid.*, p. 113, draft article 15.

[78] Sir Ernest Satow, *op. cit.*, p. 274.

### Article 12. — Seat of the special mission

1. For the duration of its function, a special mission shall either have its seat at the place designated by the receiving State or shall be ambulatory, according to the nature of its assignment.

2. The mission may have its seat outside such place and its members may reside elsewhere, but only with the consent of the receiving State (*alternative* : only if the receiving State does not object).

3. If the mission's assignment entails travel, it may have its seat at the Ministry of Foreign Affairs or at a place of its own choice, but only if the receiving State is notified of and does not object to the choice.

#### Commentary

(1) Very little has been written on this question, and the International Law Commission did not consider it necessary to deal with it at length. Its basic thought was that the rules applicable to resident diplomacy in this connexion were not relevant to *ad hoc* missions.

(2) One member of the Commission, Mr. Jiménez de Aréchaga, did not entirely agree, because the absence of rules on the subject might encourage *ad hoc* missions to claim the right to choose their domicile at will and to "open offices in any part of the territory of the receiving State".[79]

(3) Mr. Jiménez de Aréchaga's view appears to the Special Rapporteur to be correct and consistent with practice. *Ad hoc* missions normally remain at the place designated by the receiving State and establish their offices near the locality where their functions are to be performed (if the place in question is the capital city of the receiving State and there are regular diplomatic relations between the two States, the official offices of the special mission are usually on the premises of the sending State's regular diplomatic mission, which is its official address for communication purposes, unless otherwise indicated).

(4) In the view of the Special Rapporteur, it is established by practice that a special mission is not entitled to choose its members' residence and the location of its office at will outside the place where it is to perform its assignment and the immediate environs thereof, unless the receiving State has given its consent.

(5) This restriction should not be equated with the question of the freedom of movement of the members of a special mission in the territory of the receiving State, which is a matter of privileges and immunities.

### Article 13. — Nationality of the head and the members of the special mission

1. The head, the members and the staff of a special mission should in principle be of the nationality of the sending State.

2. The members of a special mission may not include nationals of the receiving State, except with the prior consent of that State.

3. A State may refuse to recognize as members or staff of a special mission of another State persons who are nationals of a third State or who are stateless.

#### Commentary

(1) The International Law Commission did not consider it necessary to express an opinion on the question whether the rules concerning nationals of the receiving State acting as diplomatic agents of another country should also apply to *ad hoc* diplomats and members of special diplomatic missions. It even formulated the rule that the relevant article of its 1958 draft — article 7 — did not apply directly to *ad hoc* diplomats.[80]

(2) Satow, on the other hand, does not consider it impossible for nationals of a country to be admitted by that country as members of special missions, but he stresses that the problem has been dealt with differently by various countries at various times.[81]

(3) In the view of the Special Rapporteur, there is no reason why nationals of the receiving State should not be admitted as *ad hoc* diplomats of another State, but this requires the consent of the receiving State. This is also the opinion of Mr. Jiménez de Aréchaga.[82]

(4) Apart from the question whether a national of the receiving State can perform the functions of *ad hoc* diplomat of another State, the problem arises whether an *ad hoc* diplomat must possess the nationality of the State on whose behalf he carries out his mission. Here again, the International Law Commission expressed no opinion, but the view taken in recent practice has been that nationals of third States, and even stateless persons, may act as *ad hoc* diplomats of a State, although it is not desirable at the present time that they should do so. Practical reasons sometimes make it necessary to adopt this expedient, and it is for the receiving State alone to decide whether or not such persons are recognized as *ad hoc* diplomats.

(5) The Special Rapporteur has deliberately omitted from the text any reference to the possibility that the head of a special mission or one of its members or staff might have dual nationality. He believes that, in the case of a person who also possesses the nationality of the State to which a special mission is being sent, the receiving State has the right, in accordance with the existing rules on nationality in international law and with the practice of some countries, to consider such a person on the basis of the characterization theory, as one of its own nationals, without concerning itself with his other nationality or nationalities. In most States, unfortunately, the idea still prevails that the nationality of the State in question excludes any other nationality, and the argument that effective nationality excludes nominal nationality is not accepted in this case. The case of a person possessing several foreign nationalities is juridically irrelevant, since it would be covered by paragraph 3 of this article.

(6) The Special Rapporteur has also refrained from

[79] *Yearbook of the International Law Commission, 1960*, vol. II, p. 116, para. 10.

[80] *Ibid.*, p. 180.

[81] Sir Ernest Satow, *op. cit.*, pp. 138-141.

[82] *Yearbook of the International Law Commission, 1960*, vol. II, p. 116, para. 9.

discussing whether persons possessing refugee status who are not natives of the receiving State may be employed, without the special approval of that State, as heads or members of special missions or their staffs. Persons who possess regular refugee status but whose original nationality was that of the receiving State are covered, in the view of the Special Rapporteur, by paragraph (5) of this commentary. It should be pointed out that some States frequently employ refugees on special missions, mainly because of their knowledge of languages and of local conditions ; the resulting situations usually give rise to misunderstandings, if not disputes.

(7) As regards nationals of the receiving State engaged locally by the special mission as auxiliary staff, and persons having a permanent domicile in its territory, the Special Rapporteur believes that they should not be subject to the provisions of this article, but rather to the régime applicable in this respect under the domestic law of the receiving State. The reason is, on the one hand, that the receiving State has the sovereign right to maintain civic discipline, and on the other hand, that it is necessary to engage such persons locally if the special mission is to function normally. Nevertheless, this argument entails serious complications, because the special mission should be free to choose the persons it recruits — as is not always the case — and should not be restricted in its recruitment to a set of persons designated for the purpose by the receiving State.

(8) Nor has the Special Rapporteur considered the question — to which attention has been drawn principally by Australian, United States and African jurists — whether, in this respect, aliens and stateless persons having a permanent domicile in the territory of the receiving State should be treated in the same way as nationals of that State.

(9) On the question of the privileges and immunities of the head of a mission and its members and staff who are nationals of the receiving State or have a permanent domicile there, see the article entitled "Privileges and immunities of nationals of the receiving State".

### Article 14. — Intercourse and activities of special missions in the territory of a third State

1. Special missions of foreign States may accomplish their assignments in the territory of a third State only with the prior consent of that State. Such consent shall be requested through the diplomatic channel.

2. A State which consents to activities by special missions in its territory but does not itself take any part in such activities may impose conditions which must be strictly observed by the parties whose special missions meet on its territory.

3. The third State may at any time withdraw its hospitality from such special missions.

*Commentary*

(1) Very often, *ad hoc* missions from different States meet and carry on their activities in the territory of a third State. This is a very ancient practice, particularly in the case of meetings between *ad hoc* missions or diplomats belonging to States which are in armed conflict. The International Law Commission did not take note of this case ; nor have writers paid much attention to it, but some of them mention it, particularly the case where the contact takes place through the third State. Whether or not the third State engages in mediation or extends its good offices, courtesy undoubtedly requires that it should be informed, and it is entitled *to object* to such meetings in its territory.

(2) Thus, the States concerned are not entitled to make arbitrary use of the territory of a third State for meetings of their missions, if this is contrary to the wishes of that State. However, if the third State has been duly informed and does not express any objection (its formal consent is not necessary), it has a duty to treat *ad hoc* missions sent in these circumstances with every consideration, to provide the conditions necessary for their activities, and to offer them every facility, while the two parties concerned, for their part, must refrain from any action which might harm the interests of the State in whose territory they carry on their activities.

(3) In practice, the prior approval of the third State often consists simply of taking note of the notification that it is intended to send a special mission to its territory. If the third State makes no objection to the notification and allows the special mission to arrive in its territory, approval is deemed to have been given.

(4) The Special Rapporteur regards as correct the practice of some States — for example, Switzerland during the war — of imposing certain conditions which must be observed by parties sending special missions, whether or not there is any objective evidence to show that their activities may be prejudicial to the interests of the State in whose territory they are carried on.

(5) Another question which arises in practice is whether the third State must not only behave correctly and impartially towards the States whose missions meet in its territory by according them equal treatment, but must also respect any declarations it may itself have made in giving its prior approval. Since such approval can be given implicitly, it must be considered that a third State which goes even further by taking note, without objection, of a request for permission to use its territory, commits itself, in accordance with the theory of unilateral juridical acts in international law, to the consequences arising from the request of the parties concerned, unless it has made certain reservations.

(6) Intercourse between a special mission of one State and the regular diplomatic mission of another State accredited to the receiving State must be accorded the same treatment as the intercourse and activities of special missions in the territory of the third State. Such contacts are frequent, and they are referred to by legal writers as irregular means of diplomatic communication. They make direct intercourse possible between States which do not maintain mutual diplomatic relations, even when the States concerned are in armed conflict.

(7) The right of the third State, at any time and without being obliged to give any reason, to withdraw its

hospitality from special missions in its territory and to prohibit them from engaging in any activity must be recognized. In such cases, the sending States are obliged to recall their missions immediately, and the missions themselves are required to cease their activities as soon as they learn that hospitality has been withdrawn. The exercise of this right by the third State does not mean that diplomatic relations with the States in question are broken off or that the mission as a whole, or any of its members, is declared *persona non grata*. The revocation of the third State's consent to the activities of special missions in its territory is a practice apart.

(8) A solution to this problem, with which Switzerland in particular was confronted during the war, has been sought, in public international law, not so much in the context of rules on *ad hoc* diplomacy as in that of the rules on neutrality.

*Article 15. — Right of special missions to use the flag and armorial bearings of the sending State*

1. A special mission shall have the right to use the flag and armorial bearings of the sending State. It may raise them on the building in which its seat is situated, on the residence of the head of the mission, and on the means of transport used by the head of the mission.

2. The mission may also use the national emblem on all the buildings in which the different sections of the mission are situated and on all the vehicles which the mission uses locally, if the receiving State does not object.

3. The receiving State may require the national flag of the sending State to be flown on all means of transport used by the special mission for local travel.

*Commentary*

(1) The International Law Commission recognizes the right of *ad hoc* diplomacy to use the national flag of the sending State upon the same conditions as permanent diplomatic missions.[83] In practice, conditions are not identical, but nevertheless there are some instances where this is possible. The Commission's previous Special Raporteur, Mr. Sandström, cites as one such instance the flying of the flag on the motor vehicle of the head of a ceremonial mission. Mr. Jiménez de Aréchaga believes that all special missions (and not only ceremonial missions) have the right to use such flags on the ceremonial occasions where their use would be particularly appropriate.[84]

(2) The present Special Rapporteur considers that current practice should be based on both a wider and a narrower approach : wider, because this right is not restricted to ceremonial missions but depends on the general circumstances (e.g., *ad hoc* delegations of a technical nature moving in a frontier zone or on certain formal occasions) ; and narrower, because this usage is now limited in fact to the most formal occasions or to circumstances which warrant it, in the judgement of the mission itself. In practice, however, such cases are

held within reasonable limits, and the tendency is towards restriction.

(3) All the rules applicable to the use of the national flag apply equally to the use of the national armorial bearings, both in practice and in the opinion of the International Law Commission.

FACILITIES, PRIVILEGES AND IMMUNITIES

*General considerations*

(1) In the literature, in practice, and in the drafting of texts *de lege ferenda* on the law relating to *ad hoc* diplomacy, apart from matters of rank and etiquette, special attention has been given to the question what facilities, privileges and immunities are enjoyed by *ad hoc* diplomacy. Even on this fundamental question, however, opinions are not unanimous. While the drafts of proposed rules (Institute of International Law, London, 1895 ; International Law Association, Vienna, 1924 ; Sixth International Conference of American States, Havana, 1928 ; International Law Commission of the United Nations, Geneva, 1960) all agree that *ad hoc* diplomacy has in the past been entitled to privileges by legal custom, and should in the future be entitled to them under a law-making treaty, the literature and the practice are still uncertain about the question whether such privileges attach to *ad hoc* diplomacy as of right or by virtue either of the comity of nations or of mere courtesy. One school of thought goes so far as to assert that the recognition of this legal status in the case of *ad hoc* diplomacy rests entirely on the good-will of the receiving State or even, perhaps, on mere tolerance.

(2) The question of the legal right of *ad hoc* diplomacy to the enjoyment of facilities, privileges and immunities is, of course, one of substance. It arises, perhaps, more in connexion with the consequences which may result in the rare cases where they are denied or refused than in regular practice. So long as they are granted, no one asks on what grounds ; but if they are refused, the first question which arises is on what basis and to what extent the diplomat in question had any right to them. At the same time a further question arises : does this right attach to the *ad hoc* diplomat himself or to his State ? For this reason, the Special Rapporteur feels obliged to consider all the arguments relating to the grounds on which the juridical status of *ad hoc* diplomacy is based. He will begin with those which he considers least sound and will emphasize, in the case of each, the following points : the obligation of the receiving State, the right of the *ad hoc* diplomat, and the right of the sending State.

(3) If mere tolerance is taken as the basis, the whole structure becomes precarious. In this case, the *ad hoc* diplomat has no right to the enjoyment of facilities, privileges and immunities. Indeed, the receiving State may at any time declare or avow that no such tolerance exists (although some authorities maintain that it must be presumed to exist until such time as the receiving State expresses a contrary intention) ; or, if it has been practised in the past, whether in general or in a specific

[83] *Ibid.*, p. 110, para. 22, and p. 180.
[84] *Ibid.*, p. 116, para. 14.

instance, that it may be discontinued. According to this view, in other words, the receiving State has no obligation in this respect towards an *ad hoc* diplomat, and the latter has no ground for asserting his rights against the receiving State. In these circumstances, the sending State can clearly have no legal authority either to demand the enjoyment of such privileges or to protest against their denial. All it can do in such a case is to make political representations or objections, according to the benefit or the harm which might accrue to good and smooth international relations through such action.

(4) As will be indicated below, the Special Rapporteur has no hesitation in rejecting this theory summarily, since it is not in conformity with the principles essential to the maintenance of international relations — respect for State sovereignty and the establishment of conditions ensuring the normal functioning of the special mission assigned to the *ad hoc* diplomat and the latter's freedom and security.

(5) The case is similar, though by no means identical, if the enjoyment of these privileges by an *ad hoc* diplomat is based on the good-will of the receiving State. In this event the good-will displayed — provided that the other party has been notified of it — at least constitutes an autonomous source of public international law which may be invoked by foreigners and by foreign States. This is an action by the receiving State falling within the category of unilateral juridical acts under public international law.[85] Consequently, a State is obliged to keep such unilateral promises, at least for so long as the *ad hoc* diplomats with respect to whom the sending State has been notified that such good-will exists, in the form of a unilateral act, remain in its territory. This does not mean that a unilateral promise of this kind could not have been revoked, but such revocation would have no effect on situations already created and established ; at the very most, it could be binding only for future cases.

(6) Thus an *ad hoc* diplomat may invoke a promise made by unilateral act, whether or not he or his State has been notified of the act. Similarly, the sending State has the legal right to demand the fulfilment of the unilateral promise.

(7) The Special Rapporteur must reject this theory also, even though it is less stringent than that of mere tolerance. His reasons for doing so are the same as in the preceding case. Nevertheless, he is prepared to accept, at least in part, the application of the theory of the unilateral good-will of the receiving State, though only in cases where a unilateral promise of the kind referred to improves the conditions of *ad hoc* diplomacy, and to the extent that it does so effectively by granting to the latter more than is necessary to conform to the principles essential to the maintenance of international relations, mentioned above, and to existing juridical customs in the matter (although there is some doubt as to their true significance). A sovereign State may grant to other States more than the minimum it is obliged to grant under positive international law, but it may not wilfully deny them this minimum.

(8) The theory of courtesy does not differ in any respect from the foregoing. In this case also, it depends on the good-will of the State whether the rules of courtesy should be applied, and to what extent. There is, however, a shade of difference in the way this good-will is formed. Convenience is not the sole criterion, as in the preceding case (para. 5). Here again, the receiving State acts in accordance with its own notions of courtesy, which usually tell it that courtesy is obligatory, at least between States maintaining good relations with each other. In this case, however, there is a presumption of reciprocal observance of the rules of the comity of nations, and a presumption of the right of the receiving State not to apply those rules if its expectations of reciprocity are not fulfilled.

(9) The Special Rapporteur believes that in this instance both the *ad hoc* diplomat and the sending State may demand the enjoyment of facilities and privileges, and if they are denied, may challenge this breach of the rules of courtesy by protesting in moderate terms. In the view of the Special Rapporteur, such demands and protests would be of a purely diplomatic nature. Considerations of law may enter in two cases, namely :

(*a*) If the other State grants the same privileges in its own territory to *ad hoc* diplomats of the receiving State. Where this is the case, the sending State may consider that the reciprocal granting of privileges has established a *modus vivendi* and that the two States, by practice have adopted the rule *do ut des* ; consequently, the denial of such privileges is regarded as an infringement of the *modus vivendi* and a breach of the duty to requite what has been received. In this instance, the State whose diplomat has not been allowed such privileges is entitled to demand its due by legal means ;

(*b*) If the receiving State does not give identical treatment, from the standpoint of courtesy, to all the *ad hoc* diplomats of various States. In this case, the legal ground for complaint and protest is not a breach of the rules of courtesy, but a violation of the general principle of non-discrimination.[86] In this case, however, the sending State must offer the same facilities (principle of reciprocity) since, according to the general principle, there is no discrimination if the State does not grant to other States the privileges which it claims for itself.

(10) The Special Rapporteur believes that this system also is unacceptable in principle. One can speak of courtesy only if the range of facilities is to be extended, whereas the basic facilities are granted *ex jure*, and not by the comity of nations.

(11) A superior basis would be a bilateral treaty between the States concerned, and this is undoubtedly the juridical basis frequently applied in this connexion. However, the agreements of this kind known to the Special Rapporteur are either very brief (containing references to the general rules of diplomatic law on

---

[85] Eric Suy, *Les actes juridiques unilatéraux en droit international public*, Paris, 1962.

[86] This principle was adopted as applying to diplomatic law in the Vienna Convention on Diplomatic Relations, 1961, and its applicability to *ad hoc* diplomacy was envisaged by the International Law Commission in its draft rules on special missions.

facilities, privileges and immunities) or very specific, in which case they lay down the particular powers given to the special missions or itinerant envoys in question (for instance, an agreement between Italy and Yugoslavia on the joint use of an aqueduct having its sources in Yugoslav territory and administered by the Yugoslav State specifies the rights of the Italian inspectors in the performance of their functions ; many bilateral conventions providing for the linking of electricity supply systems specify the rights of delegates of the respective States with respect to checking the quality and quantity of the electric power, etc.). There thus arise two series of legal questions, namely :

(a) What is meant by the right of *ad hoc* diplomacy to the enjoyment of diplomatic facilities, privileges and immunities ? Does it mean the right to a status identical with, or similar to, that of permanent missions ? In the view of the Special Rapporteur, it simply implies the application to *ad hoc* diplomacy by the States concerned of the general treatment given in principle to resident diplomacy. The whole matter, however, even in a case explicitly provided for in a treaty, depends on the nature of the special mission's functions.

(b) Where the treaty grants specific exceptional rights to the special missions without mentioning the general code of treatment, does this mean that the special missions enjoy only the rights provided in the treaty, and not other rights also ? The Special Rapporteur's view is that in this case the special missions, in addition to being covered by the normal rules relating to the status of diplomats, enjoy facilities which are not the customary rule but are essential to the performance of their assignment.

(12) The Special Rapporteur believes that in either case both the *ad hoc* diplomat and the sending State are entitled to demand of the receiving State *ex jure* the application of the rules on facilities, privileges and immunities which are valid for *ad hoc* diplomacy and, in addition, of the provisions specifically laid down in the agreement. This, however, leaves unresolved the main question what these general rules are and what their scope is by analogy to the rules governing the treatment of the head and members of a permanent diplomatic mission. Thus, there is a certain vagueness about this whole question.

(13) There still remains the fundamental question — what is the general legal custom (since codified rules are as yet lacking) with regard to the legal status of *ad hoc* diplomacy as regards the enjoyment of facilities, privileges and immunities ? On this point theory, practice and the authors of the draft for the future regulation of this question agree. The International Law Commission took as its starting-point the assumption that *ad hoc* missions, being composed of State representatives, are entitled to diplomatic privileges and immunities.[88] This, however, does not answer the question ; for it has not yet been determined, either by

the Commission or in practice, precisely to what extent *ad hoc* diplomacy enjoys these diplomatic facilities. The Commission itself wavered between the application of the *mutatis mutandis* principle and the direct (or analogous) application of the rules relating to permanent diplomatic relations. In any event, before a decision can be reached further studies will be needed, in order either to codify the undetermined and imprecise cases of application in practice (e.g. topics which are not yet ripe for codification) or to apply, by means of rational solutions, the method of the progressive development of international law.

(14) Whichever course is adopted, however, the method of approach must be decided upon. What notion should be followed — the theory of representation or the functional theory ?

(15) The representative nature of diplomacy in general, which was recognized in the Vienna Regulation (1815) in the case of ambassadors, has lost all significance with the passage of time. The Head of State is no longer the absolute repository of the diplomatic capacity of his State. Democratic methods of State administration, irrespective of the forms of democracy, link the process of representation of the State in international relations to the constitutional order of the sending State. Diplomats represent the State, not the Head of State. The Vienna Convention on Diplomatic Relations therefore rejected any idea of the representative nature of resident diplomacy. It would be logical to assume that, if this is so in the case of permanent missions, it must be even more so in the case of *ad hoc* missions. The Special Rapporteur considers that this is correct in principle ; but here again the notion of relativity in legal matters re-emerges, for there is no rule without an exception. Special ambassadors appointed for certain ceremonial or formal missions would be the exception. Although, even in these cases, it is increasingly clear that all acts are performed on behalf of the State, and not on behalf of the Head of State, there still remain vestiges of the former representative nature of such special ambassadors, and this is reflected, in the law, in certain norms of custom and protocol. As an increasing number of *ad hoc* missions have come to perform essentially political or technical tasks, however, the approach based on representation can no longer serve to determine the extent of the diplomatic facilities granted to *ad hoc* diplomats.

(16) On the other hand, the functional theory of privileges and immunities adopted at the Vienna Conference (1961) as the starting-point for understanding and determining the status of resident diplomacy, together with the similar notion applied in the Convention on the Privileges and Immunities of the United Nations (1946) and the Convention on the Privileges and Immunities of the Specialized Agencies, indicate the best approach to determining the extent of the facilities which the receiving State is legally obliged to grant to special missions and itinerant envoys. These represent the sovereign State, its dignity and its interests. They perform certain specific tasks on behalf of that State, and they should enjoy all the guarantees they need in order to carry out, freely and without hindrance,

---

[88] See the working paper on special missions prepared by the United Nations Secretariat, document A/CN.4/155, para. 11, in *Yearbook of the International Law Commission, 1963*, vol. II.

the mission entrusted to them. For this reason, the receiving State is required to give them all the facilities appropriate to their mission and to grant them all the privileges which are conferred on such representatives of the sending State and all the guarantees and immunities without which a mission of this kind could not be accomplished in a free and normal manner. All these privileges and facilities, however, are not granted by the receiving State to *ad hoc* diplomats in their personal capacity ; they are enjoyed by them only because this assists them in the discharge of their duties and is necessary to their State. Thus according to the functional theory there is a direct juridical relation between the receiving State and the sending State. It is only by reflection that *ad hoc* diplomats enjoy such rights and privileges, their status depending on the rights which belong to their State and on the latter's willingness to ensure their enjoyment of them (the State is entitled to waive the immunity enjoyed by the *ad hoc* diplomat, since such immunity attaches to the State and not to the diplomat in question).

(17) Thus, there is a general legal rule concerning the duty to grant facilities, privileges and immunities to *ad hoc* diplomacy ; but in view of the functional basis on which this legal custom is applied, there is a need to draft legal rules specifying to what extent and in what circumstances the enjoyment of such rights is necessary to *ad hoc* diplomacy, for the rules at present in existence are imprecise and the criteria are vague.

(18) In presenting this argument, the Special Rapporteur believes that he has provided guide-lines for a substantially correct solution. The juridical nature of these privileges, the legal relationship between States in matters affecting their mutual respect, is the linking of these privileges to function in international relations, and the effect of these rules *ex lege* and *ipso facto,* are the criteria on which the study and determination of the particular forms of facilities, privileges and immunities applicable to *ad hoc* diplomacy should be founded.

### Article 16. — General facilities

A receiving State shall offer the special mission all the facilities necessary for the smooth and regular discharge of its assignment, due regard being had to the nature of the mission.

### Commentary

(1) Proceeding from the fundamental principle that the direct effect of the rules on the facilities due to *ad hoc* diplomacy depends on their relevance to the function of the special mission in question, the Special Rapporteur considers that what is necessary to ensure is the regular functioning of special missions and itinerant envoys. He does not, in this connexion, share the view of the International Law Commission that all the provisions applicable to permanent missions should also be applied to *ad hoc* missions. He is more inclined to follow the fundamental idea underlying the resolution adopted by the Vienna Conference of 1961,[89] namely, that the problem of the application of the rules

governing permanent missions to *ad hoc* missions deserves detailed study. In his opinion, this means that these rules may not all be applicable to the same extent, and that each one must be considered separately.

(2) It is undeniable that the receiving State has a legal obligation to provide an *ad hoc* mission with all the facilities necessary for it to carry out its functions. In the literature, this rule is generally criticized on the ground that it is vague. The Special Rapporteur considers that its content changes according to the assignment of the mission in question, and that the facilities to be provided by the receiving State vary. Accordingly, the legal issue concerns not only the obligation to make such facilities available, but also the adequacy of the facilities provided, which depends not only on the mission's assignment, but also on the circumstances in which it is carried out. Consequently, the extent and nature of this obligation cannot be fixed absolutely.

(3) The Special Rapporteur is of the opinion that the difficulties which arise in practice are due to the fact that some special missions consider the receiving State obliged to provide them with all the facilities normally given to regular diplomatic missions. He is more inclined to agree with the approach of those States which in practice offer a special mission only such facilities as are necessary, or at least useful, according to some objective criterion, for the accomplishment of its assignment, whether or not they correspond to the list of facilities to be granted to diplomat missions enumerated in the Vienna Convention on Diplomatic Relations. Special missions may, however, in some cases, enjoy more facilities than regular diplomatic missions, when this is necessary for the accomplishment of special assignments outside the field of competence of the regular diplomatic missions. This argument is consistent with the resolution on special missions adopted by the Vienna Conference of 1961.

(4) The Special Rapporteur believes that, as often happens in practice, the parties may specify in treaties what facilities should be provided for special missions. When this is done, the receiving State has the further duty to offer to special missions any other facilities they need for the accomplishment of their assignments. The fact that facilities are listed in a treaty simply means that the facilities mentioned in the treaty must be made available to the special mission as an obligation ; it does not follow that the parties have waived all other facilities that may be needed if the special mission's assignment is to be accomplished in a smooth and regular manner. Facilities that are not listed may be required and due under the general norms of international law.

(5) The facilities offered to a special mission should include those which are essential to the normal life of its members. They must be enabled to lead a civilized life, since a special mission cannot be considered in a position to carry out its assignment properly if the receiving State makes it impossible for its members to enjoy civilized standards in such matters as hygiene. For example, they must have the right to medical care and personal services (e.g., hairdressing) according to

---

[89] See footnote 7 above.

universal standards, or at least of the highest quality available in the receiving State, due allowance being made for the specific circumstances.

(6) It is open to question whether these facilities should include everything which constitutes courteous treatment of the special mission and its members, even if not essential to the accomplishment of its assignment. The Special Rapporteur believes that a special mission should receive this special consideration.

### Article 17. — Accommodation of the mission and its members

1. The receiving State shall facilitate the accommodation of the special mission in the place where it is to perform its assignment or in the immediate vicinity.

2. If the special mission, owing to the nature of its assignment, has to change the locale of its operations, the receiving State shall enable it to remove to other accommodation at any place where its activities are to be pursued.

3. This rule also applies to the accommodation of the members and staff of the special mission.

*Commentary*

(1) *Ad hoc* diplomacy, too, must have its accommodation guaranteed, and the accommodation must be adequate. In this respect, the same rules should apply as in the case of permanent missions. In the view of the Special Rapporteur, however, there is no obligation upon the receiving State to permit the acquisition of premises in its territory on behalf of the sending State, although this does not exclude the possibility that some States my require or rent premises for the accommodation of a number of successive missions.

(2) According to the normal criteria, if there is a sufficient number of hotels, the question does not arise in practice. If, however, the hotel facilities are not satisfactory, the Special Rapporteur believes that the protocol department of the receiving State is obliged to provide comfortable accommodation in an adequate hotel with the usual amenities. This question has arisen on several occasions in the United States in connexion with *ad hoc* diplomats not of the white race, and the State Department has had to obtain accommodation for these delegates in hotels normally occupied by other delegations.

(3) This question is of particular importance, however, in places where there are not enough hotels — for example, in the case of *ad hoc* missions concerned with frontier demarcation, or where negotiations are held in small towns. When several *ad hoc* missions from different States meet for the same occasion, it must be borne in mind that the rules of non-discrimination must be respected. On such occasions, in the absence of special agreements, each mission is provided with an equal number of rooms in hotels of specified categories so that its staff members are accommodated according to the rank they hold in their own country.

(4) In some cases there is a legal question of the cost of accommodation. Is the receiving State obliged to prevent overcharging?

(5) A similar question arises with regard to food and other services needed by the special mission, if they are not available or are not of the desired standard at the place where the meeting is held. The Special Rapporteur considers that the receiving State has a legal obligation to supply all these needs.

(6) This rule does not exclude some differentiation with regard to the custom of providing *ad hoc* missions with courtesy accommodation in luxuriously appointed villas and the like. There is no legal obligation in this connexion, but it would be considered an infringement of the law if any appreciable discrimination were shown in bestowing such honours on different missions.

(7) In article 2 of its draft articles on special missions (1960), the International Law Commission took this case into account and considered that the rules applicable to permanent missions should apply.[90]

### Article 18. — Inviolability of the premises of the special mission

1. The premises of a special mission shall be inviolable. This rule shall apply even if the special mission is accommodated in a hotel or other public building, provided that the premises used by the special mission are déterminate.

2. The receiving State has a duty to take all appropriate steps for the protection of the premises of the special mission, and in particular to prevent any intrusion or damage, and disturbance of the special mission in its premises, or any impairment of its dignity.

3. Agents of the receiving State shall not enter the premises without the special consent of the head of the special mission or the permission of the head of the regular diplomatic mission of the sending State.

*Commentary*

(1) The International Law Commission considered that, even in this matter, the rules applicable to permanent missions should also apply to *ad hoc* missions. The Commission's previous Special Rapporteur, in his first draft, took the view that "the official premises of . . . a special mission . . . shall enjoy . . . inviolability . . .".[91]

(2) The present Special Rapporteur cannot agree with this view, and he believes that special provisions are necessary for special missions, primarily because as regards accommodation their position is not always comparable to that of regular diplomatic missions. In addition, the premises of a special mission are often together with the living quarters of the members and staff of the mission. It is for these reasons that special provisions are needed.

(3) As a rule, the offices of *ad hoc* missions do not occupy special premises (most often, they are located in the premises of the permanent mission, if there is one at the place). If, however, the *ad hoc* mission occupies special premises, the guarantee of inviolability must be respected, in order that the mission may

---

[90] *Yearbook of the International Law Commission, 1960*, vol. II, pp. 179-180.

[91] *Ibid.*, p. 112, draft article 5.

perform its functions without hindrance and in privacy, irrespective of the location of the premises in question. This inviolability is distinct from that of the domicile. It follows that, in cases where the mission premises are installed in a hotel, the conduct of certain local authorities which claim that the inviolability does not apply to hotel rooms is injustifiable.

(4) In practice, the head of a special mission sometimes refuses to allow representatives of the authorities of the receiving State, for good reasons, to enter the premises of the special mission. In such cases, the Ministry of Foreign Affairs asks the head of the regular diplomatic mission of the sending State for permission, on behalf of the sending State, to enter the premises occupied by the special mission. What is in issue here is the protection of the interests of the State, and not those of the special mission. The Special Rapporteur therefore considers that the necessity of obtaining such permission is a sufficient guarantee for the sending State.

(5) Paragraph 2 of the proposed article corresponds to article 22, paragraph 2, of the Vienna Convention on Diplomatic Relations.

(6) The protection of the premises of a special mission is more important in practice than that of the premises of a regular diplomatic mission, for several reasons. It should be noted, in particular, that unless a special mission is accommodated in the permanent mission's building, it has less means for its own protection and is less able to exercise effective control (for instance, in a hotel); in addition, a special mission does not often have settled premises (if its assignment involves travel). For this reason, States rent or acquire the ownership of private buldings in certain centres, particularly where they have no permanent diplomatic mission or where the permanent mission's premises are inadequate, in order to ensure the inviolability of the premises of special missions. Immediately after the Second World War, the great Powers rented entire floors in large hotels for this purpose and protected their own security by denying any outsider entry to these premises. This is still being done, but more discreetly.

(7) The question arises in practice whether it is possible to distinguish between the official premises of a special mission and the living quarters of its members and staff, since in most cases both are in the same premises. The Special Rapporteur considers that this is a question of fact.

(8) A separate question is that of secret intrusion into the premises of a special mission — in other words, the installation of special listening devices used by the intelligence service of the receiving State. The Special Rapporteur considers this, from the legal standpoint, a breach of the inviolability of the premises of the special mission.

## Article 19. — Inviolability of archives and documents

The archives and documents of a special mission shall be inviolable at any time and wherever they may be. Documents in the possession of members of the mission or of its staff or in the rooms occupied by them shall be considered to be documents of the special mission.

### Commentary

(1) In this case, too, the International Law Commission took the view that the rules applicable to permanent missions applied also to *ad hoc* missions, which otherwise would scarcely be able to function normally.

(2) It is important, in this connexion, to bear in mind that archives and documents are often in the possession of certain members of the *ad hoc* mission, and that in such cases the rule included in the Vienna Convention on Consular Relations (1963) that documents are inviolable wherever they may be, must apply.

(3) Because of various controversies which arise in practice, the Special Rapporteur considers it particularly important to stress the point concerning documents in the possession of the members or staff of a mission. This is especially pertinent in the case of a special mission which does not have premises of its own or which is ambulatory. In such cases, the documents which it transports from place to place in the performance of its assignment are mobile archives, rather than a part of the mission's baggage.

## Article 20. — Free movement

1. The members and staff of a special mission shall have the right to freedom of movement in the receiving State for the purpose of proceeding to the place where the special mission performs its assignment, returning thence to their own country, and travelling in the area where the mission exercises its functions.

2. If the special mission performs its assignment elsewhere than at the place at which the permanent diplomatic mission of the sending State has its seat, the members and staff of the special mission shall have the right to movement in the territory of the receiving State for the purpose of proceeding to the seat of the permanent diplomatic mission and returning to the place at which the special mission performs its assignment.

3. If the special mission performs its assignment by teams or at stations situated at different places, the members and staff of the special mission shall have the right to unhindered movement between the seat of the special mission and such stations or the seats of such teams.

4. When travelling in zones which are prohibited or specially regulated for reasons of national security, the members and staff of the special mission shall have the right to freedom of movement, if the special mission is to perform its assignment in precisely those zones. In such a case, the members and staff of the mission shall be deemed to have been granted the right to freedom of movement in such zones, but they shall be required to comply with the special rules applicable to movement in such zones, unless other rules have been agreed upon between the States concerned or unless this results from the mission's assignment itself.

### Commentary

(1) The Special Rapporteur does not agree with the International Law Commission that special missions must be given the same treatment as permanent missions.

in this respect. General freedom of movement in the territory of the receiving State (except in prohibited areas) is granted to permanent missions because permanent missions are authorized to observe events in the country. *Ad hoc* missions, on the other hand, have limited assignments. From this derives the rule that they are guaranteed freedom of movement only to the extent necessary for the performance of their assignments (this does not mean that they cannot go to other parts of the territory of the receiving State, subject to the normal conditions applicable to other aliens). It is considered, however, that the receiving State has a legal obligation to ensure freedom of movement to the members of an *ad hoc* mission in prohibited areas (e.g., along the border or in entering and remaining in military areas), if this is necessary for the accomplishment of their assignment. Thus, certain exceptions, both negative and positive, are in order in the case of *ad hoc* missions.

(2) As a practical illustration, *ad hoc* missions which have functions to perform at the United Nations are considered in the United States to have the right to freedom of movement only in the New York area (and between New York and Washington for the purpose of maintaining contact with their embassies). Travel in other parts of the United States is not guaranteed, although it is not prevented in practice. Special permits are issued for such journeys, but they are seldom applied for.

(3) This difference in status between *ad hoc* and permanent missions is particularly important in States which impose restrictions on the movement of aliens in their territory. In such countries, *ad hoc* missions are in effect confined to the places at which they perform their functions.

(4) Guaranteed freedom for the members and staff of special missions to go to the seat of the permanent diplomatic mission of the sending State and to return to the place at which the special mission performs its assignment is, in practice, not only a daily occurrence, but also a necessity. The reasons for this are that the special mission usually receives its instructions through the regular diplomatic mission and also that the latter is the protector of the special mission and has a direct interest in being kept informed of the progress of its assignment.

(5) One of the peculiarities of special missions is that they may operate through stations or teams situated in different places or responsible for specific tasks in the field. Because of the need for constant liaison between the different sections of a special mission — a need which permanent missions do not experience — there should be freedom of movement between the main body of the mission and the individual stations or the seats of the special teams.

(6) Another specific characteristic of special missions which has been noted in practice is that they are often in touch with their own country across the frontier. Thus, special missions often perform their assignment in a neighbouring country during the day and return to their own country at night. They also return to their own country on days when they are not working, unlike regular diplomatic missions.

(7) Very often, the bilateral treaties by which States agree on the *modus operandi* of special missions make provision for the right of the special missions to freedom of movement in the territory of the other State. Such clauses are a regular feature of agreements concerning special missions to establish or maintain frontier markers and demarcation lines, to inquire into frontier incidents, and to settle matters relating to territorial servitudes, water supplies and other border questions. However, these agreements should also be regarded as formulating in greater detail the general rules relating to the rights of the members and staff of missions and to the right to movement in the area where the mission performs its assignment, without affecting the validity of these general rules.

(8) These rules concerning freedom of movement also apply where the special mission performs its assignment in the territory of a third State.

(9) The Special Rapporteur has not touched on the question whether the members and staff of the special mission are also entitled to freedom of movement for the purpose of going to the seat of the consulate of the sending State within whose jurisdictional territory the special mission is performing its assignment (or to the nearest consulate). He is of the opinion that the same rules should apply as in the case where the special mission goes to the seat of the permanent diplomatic mission. He wonders whether a provision to this effect should be included in the text.

*Article 21. — Freedom of communication*

1. Unless otherwise provided by the special rules contained in international agreements, special missions shall have the right to communicate freely with their State in the same manner as permanent diplomatic missions.

2. They shall have, first and foremost, the right to permanent contact with the regular diplomatic mission of their State accredited to the country in which they are performing their assignment and with the consuls of their own State within whose jurisdictional territory they are exercising their functions.

3. Special missions shall not have the right to send messages in code or cipher unless they have been accorded this right by an international agreement or by an authorization of the receiving State.

4. Special missions may send *ad hoc* couriers to communicate in both directions with the organs of their State. Only members of the mission or of its staff may act as couriers.

*Commentary*

(1) The International Law Commission took the position that *ad hoc* missions enjoy the same rights as permanent missions in this respect. In principle, this is correct.

(2) It should be noted, however, that in practice *ad hoc* missions are not always granted the right to use code or cipher messages.

(3) For the most part, information and correspondence are forwarded through the permanent mission of the

sending State, if there is one in the receiving State. If there is no permanent mission, complications may arise. It is customary for the *ad hoc* mission to conduct all its relations through the permanent mission. For that reason, it has the right to send and to receive the courier who maintains relations between it and the permanent mission.

(4) If the *ad hoc* mission is operating in a frontier area, it is generally accorded the right to maintain relations by courier with the territory of its own country, without the intermediary of the permanent mission.

(5) Special missions are not usually allowed to use wireless transmitters, unless there is a special agreement on the subject or a permit is given by the receiving State. This prohibition is generally very strict in frontier zones.

(6) The members or staff of special missions do not always travel by normal public transport. They often use motor-cars or special buses, but these means of transport should be duly registered in the sending State and their drivers should be in possession of the regular papers required for crossing the frontier and driving abroad. If the special mission uses special aircraft — particularly helicopters — for its movements in the field, or if it uses special maritime or river vessels, there is, in practice, a requirement to give notice of the use of such means of transport in due time and to obtain permission for their use from the receiving State — or at least, the latter should not have opposed their use after receiving the notice. The Special Rapporteur wonders whether the rule on this point should be included in the draft article.

### Article 22. — *Exemption of the mission from taxation*

1. The sending State, the special mission, its head and its members shall be exempt from all State, regional or municipal dues and taxes in respect of the use of the mission premises, whoever may be the owner thereof, other than such as represent payment for certain specific services rendered.

2. The special mission may not, as a general rule, levy any dues or taxes in the territory of the other State, except as provided by special international agreement.

#### Commentary

(1) The International Law Commission took the view that, in this respect, all the provisions of the legal rules relating to diplomatic relations were applicable to special missions. The Special Rapporteur considers this correct as regards the matter dealt with in paragraph 1 of the above article, which simply reproduces article 23, paragraph 1, of the Vienna Convention on Diplomatic Relations.

(2) Despite the considerations and views set forth by the International Law Commission regarding the application of the Vienna Convention on Diplomatic Relations to special missions, the Special Rapporteur believes that article 28 of the Vienna Convention on Diplomatic Relations cannot be applied in its entirety to special missions. As a general rule, special missions

have no authority to levy any dues or taxes in a foreign territory except as provided in special cases by international agreements. However, it would be incorrect to deduce from this that special missions do not charge such dues ; they do so in certain exceptional case provided for in international agreements.

### Article 23. — *Inviolability of the property of the special mission*

All property used in the operation of the special mission, for such time as the special mission is using it, and all means of transport used by the special mission, shall be immune from attachment, confiscation, expropriation or requisition and from execution or inspection by the organs of the receiving State. The same shall apply to property belonging to the members or staff of the special mission.

#### Commentary

(1) The Special Rapporteur is of the opinion that a broader approach to the inviolability of property should be adopted in the case of special missions than in that of permanent diplomatic missions, since it is very difficult in practice to determine what belongs to the mission and what belongs to its members and staff.

(2) In this connexion, the International Law Commission is of the opinion that the rules applicable to permanent missions apply also to *ad hoc* missions. The Special Rapporteur agrees ; but in view of the temporary nature of *ad hoc* missions, this guarantee should be restricted to property which is linked with the mission's work and with the personal needs of its members while they are carrying out their assignment. Thus, it is restricted to articles which are necessary to the accomplishment of the mission (e.g., office equipment, seals and books), to personal baggage, articles required for personal needs, means of transport (e.g., motor-cars and boats) and cash.

(3) Very often, in practice, measures of execution are taken under regular court orders, for the purpose of harassment, against property leased by the special mission for the performance of its functions. A guarantee must therefore be provided with respect to such property also, and it is logical that a similar guarantee should extend to property which may belong to others, so long as it is being used by members of the *ad hoc* mission (e.g., the furnishings of their rooms).

### Article 24. — *Personal inviolability*

The head of the special mission, its members and its staff shall enjoy personal inviolability. They shall not be liable to arrest or detention in any form. The receiving State shall treat them with respect and shall take appropriate steps to prevent any attack on their persons, their freedom or their dignity.

#### Commentary

(1) This article is simply a restatement of the general rules set forth in article 29 of the Vienna Convention on Diplomatic Relations.

(2) The principle of the inviolability of the *ad hoc* diplomat is respected in practice. This is also the view of the International Law Commission, to which the Special Rapporteur would have nothing to add. The only question is to what extent the host State treats him with the respect which is due to him. This is generally less than in the case of career diplomats who are members of permanent missions.

### Article 25. — Inviolability of residence

The residences of the head of the special mission, its members and its staff shall enjoy inviolability and the protection of the receiving State whether they reside in a separate building, in certain parts of another building, or even in a hotel.

#### Commentary

(1) This article reproduces article 30 of the Vienna Convention on Diplomatic Relations. Paragraph 2 of that article is omitted because, in the view of the Special Rapporteur, the point was already covered in the article entitled "Inviolability of archives and documents". An explanation was given in paragraph (3) of the commentary on that article.

(2) It may be questioned whether the above solution is correct, for it goes beyond article 30 of the Vienna Convention on Diplomatic Relations, which restricts these guarantees to "diplomatic agents" alone, whereas the text of the draft article above extends the guarantee to all members of the staff of the special mission, including those who cannot, perhaps, be treated on the same footing as diplomatic agents. The Special Rapporteur believes, however, that this guarantee also is necessary in order to ensure the normal functioning of the *ad hoc* mission, and it should therefore cover the members of the mission, regardless of their place of residence.

### Article 26. — Immunity from jurisdiction

1. The head of the special mission, its members and its staff shall enjoy immunity from the criminal jurisdiction of the receiving State.

2. They shall also enjoy immunity from its civil and administrative jurisdiction on the same terms as diplomatic agents.

#### Commentary

(1) The International Law Commission considers that the rules of immunity from jurisdiction which apply to members of permanent missions [92] are applicable in every respect to *ad hoc* missions and itinerant envoys. While in principle this should be the case, in practice the matter gives rise to certain problems. The first and most important problem is whether this rule applies equally to all *ad hoc* missions, regardless of the nature of their assignment. In practice, it was formerly the custom to make a distinction between political (diplomatic) and technical missions. The former were in principle accorded complete immunity, while the latter

were granted only what is known as minor (functional) immunity, which means that a member of such a mission is not subject to the jurisdiction of the receiving State in respect of any act committed by him in connexion with the exercise of his functions. In the view of the Special Rapporteur, however, this point became unimportant, once the difference between the enjoyment of privileges and immunities by diplomatic agents on the one hand and by the administrative and technical staff of permanent missions on the other was eliminated. Since these two groups have been put on an equal footing, there is no longer any reason to make distinctions among *ad hoc* missions according to the nature of their assignments.

(2) Another question arises in principle : should the members of *ad hoc* missions be granted complete and unlimited immunity from jurisdiction, or only to the extent necessary to the performance of their functions ? United Nations practice inclines towards this latter point of view, which has not been adopted by the International Law Commission.

(3) In the view of the Special Rapporteur, the proper solution would be to grant functional immunity in principle to all *ad hoc* missions. He believes that there should be no deviation from this rule, except in the matter of immunity from criminal jurisdiction ; for any interference with the liberty of the person, on whatever grounds, prevents the free and unfettered accomplishment of the mission's assignments. It is appreciated, however, that there is some merit in the notion that members of *ad hoc* technical missions should not enjoy more extensive guarantees than those accorded to consuls (who may be arrested if they have committed a grave crime not connected with their functions [93]).

(4) There is some basis for the idea, put forward by Mr. Rosenne in the International Law Commission, that the immunity of the members and staff of special missions should, in certain cases, be determined in accordance with the rules governing consular rather than diplomatic relations. It would probably be excessive and wrong that, in matters within the competence of consuls, special missions should enjoy granter privileges and guarantees than the consuls themselves. However, the Special Rapporteur cannot go into this matter more deeply until the Commission has taken a position regarding the criteria for distinguishing, if necessary, between special missions of a diplomatic nature and those of a consular nature. The Special Rapporteur has been unable to find such criteria in practice. In certain bilateral conventions, however, there is some functional limitation of immunity, and in such cases the members of special missions are guaranteed only minor functional immunity.

(5) The above text gives no details concerning immunity from the civil and administrative jurisdiction of the receiving State. All that is needed, in principle, is to apply to special missions the relevant provisions of

---

[92] See article 31 of the Vienna Convention on Diplomatic Relations (1961).

[93] Article 41 of the Vienna Convention on Consular Relations (1963). The question arises whether the receiving State should not intervene in a case where a murder has been committed by a member of an *ad hoc* mission.

article 31 of the Vienna Convention on Diplomatic Relations.

(6) Nor does the text mention the question of giving evidence as a witness. This means that the rule set forth in the Vienna Convention on Diplomatic Relations should apply, but it should be mentioned that a member of a mission, while exercising his functions, ought not to be summoned for questioning or called as a witness by the organs of the receiving State, since this might affect the performance of his assignment and his personal psychological condition. Nor should measures of execution be taken against his property which, as stated above, enjoys the guarantee of inviolability.

(7) It goes without saying that he should also enjoy immunity from any measures which would impair his right of communication or the confidential nature of information and documents (this is why any kind of search, whether of his person or of his property, is prohibited).

(8) The Special Rapporteur also considers the fact that the mission is a temporary one to be of particular importance in determining the proper scope of immunity from jurisdiction, as is the further fact that its members, as a rule, have their domicile in the sending State and actions may be brought against them there.

(9) Another question which arises in this connexion and which has not been settled even as regards resident diplomacy concerns the obligation of the sending State either to waive immunity or to undertake to bring the matter before its own courts. The Special Rapporteur is inclined to favour the broader use of the waiver of immunity for all acts of *ad hoc* diplomats which are not of a functional character. He believes that, according to his text, this question is covered by article 32 of the Vienna Convention on Diplomatic Relations.

(10) In the draft article proposed above, the Special Rapporteur has not referred to the question of measures of execution, as he considers this matter to be covered by the article entitled "Inviolability of the property of the special mission". The mission, its members and its staff need the same guarantees as regular permanent missions. But this means that only the movable property of the head of the special mission and of its members and its staff which is used in the performance of their assignment, and their personal baggage, enjoy protection.

## Article 27. — *Exemption from social security legislation*

1. The head, the members and the staff of the special mission shall be exempt, while in the foreign territory for the purpose of carrying out the assignments of the special mission, from the application of the social security provisions of the receiving State.

2. The provisions of paragraph 1 of this article shall not apply to nationals or permanent inhabitants of the receiving State, regardless of the position they may hold in the special mission.

3. Locally recruited temporary staff of the special mission, irrespective of nationality, shall be subject to the provisions of social security legislation.

*Commentary*

(1) This article does not entirely correspond to article 33 of the Vienna Convention on Diplomatic Relations, but it conforms to the actual conditions usually encountered in special missions.

(2) Exemption from social security legislation is one of the privileges concerning which the International Law Commission has, in principle, laid down the rule that what is valid for permanent diplomatic missions is also applicable to special missions. In view of the fact that the special mission's stay in the territory of the receiving State is temporary, this question is not of great importance for the actual members of special missions, and hardly arises even as regards persons domiciled in the receiving State and employed by the mission or by its members.

(3) In practice, it has been found necessary, for a number of reasons, not to exempt from the social security system of the territory persons locally employed for the work of the special mission. The office of the Director-General of Social Security of Yugoslavia suggests the following reasons : the short duration of the special mission ; the great danger to life and health frequently presented by the difficulty of the mission's assignment, especially in the case of special missions working in the field ; and the still unsettled question of insurance after the period of employment and the termination of the special mission, if the employee was not engaged through the intermediary and with the responsibility of the permanent diplomatic mission. In addition, difficulties have arisen with regard to the collection of insurance contributions. Consequently, it has been decided that a Yugoslav national or a person permanently domiciled in Yugoslavia is personally responsible for paying these contributions while employed by a special mission. Experience shows that owing to the short duration of its stay in the country, the special mission, too, is not in a position to comply with the formalities connected with making the necessary reports for the social security record of such persons.

(4) Many countries, and especially the United Kingdom and nearly all the socialist countries, consider that the head, the members and the staff of a special mission are automatically entitled (subject to reciprocity) to medical assistance during their stay in the territory of the foreign State, apart from any bilateral agreements on the matter, which, in practice, are becoming more and more frequent. Yugoslavia, for example, has concluded twelve such agreements. Some countries offer this protection to the entire special mission when needed, as a matter of courtesy. There are two categories of countries in this respect : those which defray the cost of such protection, and those which present a bill for the cost later unless it has been paid in the interval. Since this practice is becoming increasingly common, the question arises whether it should be made a rule of international law that the receiving State is required to offer this protection to the entire special mission. The Special Rapporteur considers that the granting of this protection is a humanitarian obligation and, since it is becoming

increasingly the practice for the receiving State to defray the cost of medical assistance, he thinks that this should be included as a new rule.

*Article 28. — Exemption from personal services and contributions*

1. The head, the members and the staff of the special mission shall be exempt from personal services and contributions of any kind, from any compulsory participation in public works and from all military obligations relating to requisitioning, military contributions or the billeting of troops on premises which are in their possession or which they use.

2. The receiving State may not require the personal services or contributions mentioned in the preceding paragraph even of its own nationals while they take part in the activities of the special mission.

*Commentary*

(1) Although this question has not been discussed only in the context of special missions, the International Law Commission considers that *ad hoc* diplomats should enjoy the same exemptions as members of permanent diplomatic missions. That is quite understandable, since *ad hoc* diplomats would be limited in their personal freedom if they rendered personal services and contributions.

(2) In drafting this article the Special Rapporteur started with the ideas underlying article 35 of the Vienna Convention on Diplomatic Relations, but he has expanded the article in the following way :

(*a*) He has extended these exemptions to the entire staff and not only to the head and members of the mission. In his view, it is not possible otherwise to ensure the mission's regular operation ;

(*b*) It is also his view that exemption from personal services and contributions must also be accorded to locally recruited staff regardless of nationality or domicile, since otherwise the special mission would be placed in a difficult position and would not be able to carry out its assignment until it succeeded in finding other staff exempt from such services and contributions. Calling on special mission staff to render such services or contributions could be used as a powerful weapon by the receiving State to harass the special mission. On the other hand, the receiving State would not be imperilled by these exemptions, since special missions are generally of very short duration.

(3) In spite of the above rules, the question arises in practice whether the head, the members and the staff of the special mission have an obligation to furnish personal services and contributions dictated by humanitarian considerations. The Special Rapporteur is aware of a conflict of this kind in practice. Is the head of the special mission bound to take into his motorcar a person who has been injured on the road if instructed to do so by the traffic police, refusal to comply with such an order generally being considered in all countries as an offence ? The Special Rapporteur has not covered this question by the actual text of this article, because

he is not sure that a special mission should tolerate such a limitation of its liberty, although he is convinced that no one is exempt from obligations of a humanitarian nature, regardless of the legal penalty, which in this case would not apply. He considers, however, that in the case described, depending on its gravity, the receiving State is entitled to declare the individual concerned *persona non grata*.

*Article 29. — Exemption from customs duties and inspection*

The receiving State shall grant exemption from the payment of all customs duties, all taxes and other duties — with the exception of loading, unloading and handling charges and charges for other special services — connected with import and export, and shall arrange for the free import and export of all articles, namely :

(*a*) articles for the official use of the special mission ;

(*b*) articles for the personal use of the head, the members and the staff of the mission which constitute their personal baggage, as well as articles serving the needs of family members accompanying the head, the members and the staff of the special mission, unless restrictions have been specified or notified in advance on the inclusion of such persons in the special mission.

*Commentary*

(1) The Special Rapporteur took as his starting point article 36 of the Vienna Convention on Diplomatic Relations, but he could not adopt the entire text of that article. He feels that such an article would go too far in granting facilities and privileges to special missions.

(2) In this case, too, the International Law Commission takes as its basis the rule that all the privileges granted to permanent missions and their members are applicable to the members of the special missions. Actually, such privileges are less broad in the case of a special mission, depending on the nature of its assignment. In general, the exemption amounts to no more than an exemption from customs duties on articles used by the mission in carrying out its assignment and on the personal baggage of its members.

(3) Baggage is not usually inspected, except in cases where the baggage of members of permanent diplomatic missions is also inspected. In a number of countries, however, the inspection of baggage in the case of the staff of special missions depends on the type of passports issued to the members and staff of the missions. Persons who do not hold a diplomatic passport are not exempt from the ordinary inspection. For this reason, the Special Rapporteur has not included in the text the provision contained in article 36, paragraph 2, of the Vienna Convention on Diplomatic Relations. This is a matter for the Commission to decide.

(4) The question of applying to *ad hoc* missions the rules exempting permanent missions and their members from the payment of customs duties on articles imported for the establishment of the mission or its members

seldom arises, although it may do so (e.g., in the case of special receptions or special machine installations).

(5) While provision must be made for exemption from customs duties and other taxes at the time of importation, and for the free import and export of articles for the official use of the special mission — as is often done in practice, particularly in the case of missions having technical assignments — the Special Rapporteur does not believe that provision should be made for any facilities for the importation of household articles, since the head of the special mission, its members and its staff are usually only temporary residents of the place at which the special mission performs its assignment. This should therefore be the general rule, any departures from it being specified in each individual case ; for the Special Rapporteur appreciates that such needs may exist.

(6) Customs facilities should also normally be granted to members of the families of the head of the special mission, its members and its staff, but only in the cases — admittedly rare — in which restrictions on the entry of the family members have not been notified or specified in advance, as is done in practice in respect of certain delicate missions or because of difficult local conditions.

(7) The Special Rapporteur has not specified what articles may be exported from the country by the special mission or by its head, its members or its staff. Here again, in his view, the rule that the customs and police regulations of the receiving State must be observed applies, but no restrictions may be placed on the mission's right to import and export articles used for the performance of its assignment. In this case, the rule of international law which guarantees the right of the special mission to exercise its function fully and without impediment prevails over the rule of domestic law.

(8) The claims of certain special missions that they themselves, or their members, are exempt from the payment of customs duties on the importation of consumer goods, specially of beverages and foodstuffs for use in official entertainment, and cigarettes, have been challenged in practice. There are differences of opinion on this subject, the *ad hoc* missions claiming that these are articles for the use of the mission itself and for the performance of its assignment.

(9) In most countries, the Ministry of Foreign Affairs and the central customs administration determine whether the importation of such articles is justified and impose restrictions on the amount to be imported, in the light of the size of the mission, the length of its stay in the country, and the type of official receptions it holds. Most States do not allow the importation of articles for presentation as gifts to nationals of the receiving State or for use in advertising goods produced in the sending State. As a matter of courtesy, however, the category of articles enjoying exemption is permitted to include gifts which the special mission presents officially to certain specified persons, provided that the persons in question are known in advance.

(10) It has been noticed that the rules concerning customs privileges for special missions find little applica-tion in actual customs practice, because the missions generally channel their imports and exports through the permanent regular missions, limiting themselves in most cases to their personal baggage. Practice does not prohibit the free movement of bonded goods between the permanent diplomatic mission and special missions of the same State in the territory of the receiving State. This procedure is therefore regarded as more advantageous to both parties and as removing causes of dispute.

### Article 30. — Status of family members

1. The receiving State may restrict the entry of members of the families of the head of the special mission, its members or its staff. If such restriction has not been agreed upon between the States concerned, it must be notified in due time to the sending State. The restriction may be general (applying to the entire mission) or individual (some members are exempt from restriction), or it may relate only to certain periods of the special mission's visit or to access to certain parts of the country.

2. If such restriction has not been agreed upon or notified, it shall be deemed to be non-existent.

3. If the special mission performs its assignment in military or prohibited zones, family members must be in possession of a special permit from the receiving State authorizing them to enter such zones.

4. If the entry of members of the families of the head of the special mission, its members and its staff, is not subject to restrictions, and in areas where restrictions on entry do not apply, family members accompanying the head of the mission, its members or its staff shall enjoy the same privileges and immunities as are enjoyed by the persons whom they are accompanying.

*Commentary*

(1) The Special Rapporteur has taken as the basis of this provision article 37 of the Vienna Convention on Diplomatic Relations, but he considers that that article cannot be applied in its entirety to special missions and that some major changes are called for.

(2) During its discussion in 1960, the International Law Commission took as its starting-point the idea that it was here dealing with a matter to which the rules applicable to regular diplomatic missions could be applied as they stood. In practice, however, the question arises whether these privileges also attach to family members accompanying an *ad hoc* diplomat. One school of thought maintains that there can be no grounds for limiting the enjoyment of privileges exclusively to the *ad hoc* diplomat unless, owing to the nature of the work he will be doing (involving travel) or by prior arrangement, the presence of the members of his family in the territory of the receiving State is excluded in advance. Consequently, unless the restriction is agreed upon or notified — and such cases are exceptional — the legal rule is that the head of the special mission, its members and its staff may be accompanied by members of their families.

(3) The Special Rapporteur has not undertaken the task of determining what persons are covered by the

expression "members of the families". At both of the Vienna Conferences (1961 and 1963), attempts to enumerate these persons ended in failure. His personal view is that only the closest relatives should be counted among the members of the family, but in the case of temporary residence he does not consider it important that the relative concerned should be a regular member of the household of the person he is accompanying. A married daughter often accompanies her father to look after his health.

(4) Restrictions may be general (applying to all members and staff of the mission), individual (excluding certain persons who usually belong to the family of the head of the mission), or applicable to all but a specified number of family members (usually the wife or one member of the family); they may apply to certain periods of the special mission's visit (during its work in the field) or to access to certain parts of the territory (it is usually considered that a general permit has been given to members of the family, authorizing them to enter prohibited or military zones to which the mission goes to perform its assignment). Even if there are restrictions, family members may still be able to be present in the territory in question on other grounds, but they cannot then claim any facilities, privileges or immunities.

(5) There has been some debate, in practice, about whether such restrictions are a breach of courtesy or even an infringement of the rights of the special mission, by analogy to the provisions of the General Convention on the Privileges and Immunities of the United Nations,[94] which provides that family members enjoy the same privileges and immunities as the representatives of States whom they are accompanying. It is difficult, however, to base this right on an analogy, because of the circumstances which may arise in bilateral relations. In many cases, States cannot provide for family members, accommodation, other facilities and means of transport when the special mission is travelling in the field, and so forth. Nevertheless, it would be discourteous to deny such persons entry into the territory of a country if the regulations generally applied in that country to aliens allow free entry. Where this is so, however, such persons, if there are restrictions, cannot claim more extensive rights than are accorded to all aliens under the general regulations.

### Article 31. — Status of personal servants

1.   Personal servants of the head, the members or the staff of the special mission may be received in that capacity in the territory of the receiving State, provided that they are not subject to any restrictions in this connexion as a result of decisions or measures taken by the receiving State.

2.   If such persons are admitted to the territory of the receiving State and are not nationals of that State or permanently domiciled in its territory, they shall be exempt from the payment of dues and taxes on the emoluments they receive by reason of their employment.

3.   The receiving State shall have the right to decide, whether, and to what extent, such persons shall enjoy privileges and immunities. However, the receiving State must exercise its jurisdiction over such persons in such a manner as not to interfere unduly with the functioning of the special mission.

*Commentary*

(1) The Special Rapporteur has taken as his starting-point the idea expressed in article 37, paragraph 4, of the Vienna Convention on Diplomatic Relations, but the formulation has been changed to conform with the basic idea that the receiving State is not required to admit such persons to its territory. The reasons mentioned in connexion with the article on "Status of family members" apply in this case also.

(2) The International Law Commission took as its starting-point the idea that the head, the members and the staff of the special mission should be allowed to bring with them persons of this kind, who in many cases might be essential to their personal comfort or health, or even to the regular performance of the special mission's functions. There is some logic in this reasoning, and more attention should perhaps be given to this notion than has been done by the Special Rapporteur in his proposed article. This is a point to be decided by the Commission.

(3) In practice, however, the question arises whether the special mission has the right *de jure* to bring such persons with it. As mentioned above, the Special Rapporteur considers that a decision on this point is within the discretionary power of the receiving State, which may therefore impose restrictions. However, where there are no such restrictions or where the receiving State grants permission, the question arises, in practice, whether the privileges and immunities extend also to the *ad hoc* diplomat's personal servants whom he brings with him. There are no special rules on this subject. The International Law Commission favoured the notion that the rules relating to permanent diplomatic missions applied in this case also. Thus, such persons are automatically entitled only to immunity from taxation, and then solely in respect of the remuneration they receive for their services; in all other respects, they are in the power of the receiving State.

(4) The Special Rapporteur is of the opinion that these persons should also be guaranteed minor immunity from criminal jurisdiction with respect to duties they normally perform on the orders of their employers, e.g., in ejecting an undesirable guest from a protected residence with the use of sufficient force to overcome whatever resistance may be offered.

(5) The Special Rapporteur has considered it unnecessary to retain article 37, paragraphs 2 and 3, of the Vienna Convention on Diplomatic Relations, since the subject matter is already covered by the fact that no distinction has been made between the diplomatic staff of the special mission and the administrative and technical staff, identical treatment being given to all

---

[94] *United Nations Treaty Series*, vol. 1; text also in United Nations Legislative Series, *Legislative Texts and Treaty Provisions concerning the Legal Status, Privileges and Immunities of International Organizations* (ST/LEG/SER.B/10), United Nations publication, Sales No. 60.V.2, p. 184.

staff members in every article where mention is made of the staff of the special mission. This applies also to the service staff of the special mission, which is often of exceptional importance to the functioning of the mission (e.g., chauffeurs, drivers, etc.).

*Article 32. — Privileges and immunities of nationals of the receiving State*

1. Nationals of the receiving State and persons permanently domiciled in its territory who are admitted by the receiving State as the head, as members or as staff of the special mission shall enjoy in the receiving State only immunity from jurisdiction, and inviolability, in respect of official acts performed in the exercise of the functions of the special mission.

2. Certain other privileges and immunities may also be granted to such persons by mutual agreement or by a decision of the receiving State.

3. The receiving State shall itself determine the nature and extent of the privileges and immunities granted to any personal servants of the head, the members and the staff of the Special Mission who are its own nationals or are permanently domiciled in its territory.

4. Jurisdiction over the persons mentioned in this article must in all cases be exercised by the receiving State in such a manner as not to interfere unnecessarily with the performance of the functions of the special mission.

*Commentary*

(1) This article is based on article 38 of the Vienna Convention on Diplomatic Relations, but the texts are not identical. The Special Rapporteur has taken as his starting-point the idea that the receiving State is not obliged to admit, as members or staff of the special mission, its own nationals or persons permanently domiciled in its own territory. This idea has been set forth in connexion with the draft article entitled "Nationality of the head and the members of the special mission".

(2) The International Law Commission in taking a decision on this point in 1960, adopted the view that, in this case also, the rules relating to ordinary diplomatic missions ought to apply in their entirety. In practice, however, there are other opinions on this question ; it is maintained, in particular, that persons whose duties with the special mission do not place them in the category of senior staff should not, if they are nationals of the receiving State or are permanently domiciled in its territory, enjoy any privilege or immunity as of right, but only at the discretion of the receiving State. The Special Rapporteur believes that any person belonging, in whatever capacity, to the special mission should enjoy such immunities from the jurisdiction of the receiving State as relate to official acts performed in the exercise of the functions of the special mission, for otherwise the very freedom of operation of the special mission would be placed in jeopardy.

(3) The difference between the article entitled "Nationality of the head and the members of the special mission" and the present article is that, in the latter,

persons permanently domiciled in the territory of the receiving State are treated in precisely the same manner as nationals of the receiving State. The Special Rapporteur suggests that perhaps the provisions of the two articles should be made uniform.

(4) In the light of constant practice, the Special Rapporteur has made it clear that the privileges and immunities of the persons mentioned in this article may be expanded, not only by a decision of the receiving State, but also by a mutual international agreement between the States concerned. Such agreements very often provide guarantees of this kind, according to the nature of the special mission's assignment.

*Article 33. — Duration of privileges and immunities*

1. The head, the members and the staff of the special mission, and members of their families, shall enjoy facilities, privileges and immunities in the territory of the receiving State from the moment they enter the territory of the receiving State for the purpose of performing the assignments of the special mission or, if already in its territory, from the moment when their appointment as members of the special mission is notified to the Ministry of Foreign Affairs.

2. The enjoyment of such facilities, privileges and immunities shall cease at the moment when such persons leave the territory of the receiving State, or when their functions in connexion with the special mission have come to an end, or when the activities of the special mission have come to an end.

*Commentary*

(1) This, in substance, is simply an abridgement of the provisions of article 39 of the Vienna Convention on Diplomatic Relations. The Special Rapporteur therefore considers that no further commentary is necessary.

*Article 34. — Death of the head or a member of the special mission or of a member of its staff*

1. In the event of the death of the head or of a member of the special mission or of a member of its staff who is not a national of or permanently resident in the receiving State, the receiving State shall be obliged to permit the removal of his remains to the sending State or decent burial in its own territory, at the option of the family or of the representative of the sending State. It shall also facilitate the collection of the movable effects of the deceased, and shall deliver them to the representative of the family or of the sending State, permitting them to be exported without hindrance.

2. This provision shall apply also in the event of the death of a member of the family of the head of the special mission, of one of its members, or of a member of its staff, who has been allowed to accompany the person in question to the territory of the receiving State.

*Commentary*

(1) This is simply an abridgment of the text of paragraphs 3 and 4 of article 39 of the Vienna Convention on Diplomatic Relations and contains no more than is

needed in the case of special missions, which are not of the same nature as permanent diplomatic missions.

*Article 35. — Enjoyment of facilities, privileges and immunities while in transit through the territory of a third State*

1.   If the head or a member of the special mission or a member of its staff passes or is in transit through the territory of a third State, which has granted him a passport visa if such visa was necessary, while proceeding to the place where he will perform the functions assigned to the special mission or while returning from such place to his own country, the third State shall be obliged to accord him such inviolability and immunities as may be required for his unhindered transit through its territory. The same shall apply in the case of members of the family who accompany the head or the member of the special mission, or the member of its staff.

2.   During such transit, such persons shall enjoy the right to inviolability of official correspondence and of other communications in transit.

3.   The third State shall be bound to comply with these obligations only if it has been informed in advance, either in the visa application or by notification, of the purpose of the special mission, and has raised no objection to such transit.

4.   Subject to the provisions of the preceding paragraph, the State shall also accord the necessary guarantees and immunities to diplomatic couriers and to diplomatic bags in which correspondence and other official communications in transit are carried, in either direction, for the purpose of maintaining contact between the special mission and the Government of the sending State.

5.   All the provisions set forth above shall also apply to the persons mentioned in paragraph 1 of this article, to diplomatic couriers and to diplomatic bags, whose presence in the territory of the third State is due to *force majeure.*

*Commentary*

(1) The above text corresponds to that of article 40 of the Vienna Convention on Diplomatic Relations. The difference is that whereas facilities, privileges and immunities must be granted to the head and the staff of the ordinary diplomatic mission in all circumstances, the duty of the third State is restricted entirely to cases where it does not object to the transit through its own territory of the entire special mission.

(2) One point in dispute is whether the third State has the right to request information concerning the assignment of the special mission to which it grants free transit through its territory. It is noted that the sending State often gives no information concerning the true purpose of the assignment and that the third State should not interfere in the relations between other States, as it might be doing if it considered itself entitled to evaluate the special mission's assignments.

*Article 36. — Professional activity*

The head, the members and the staff of the special mission shall not, during the term of the mission, practise for personal profit any professional or commercial activity in the receiving State, and they may not do so for the profit of the sending State unless the receiving State has given its prior consent.

*Commentary*

(1) This provision corresponds to the rule laid down in article 42 of the Vienna Convention on Diplomatic Relations. It differs from it in requiring the prior consent of the receiving State even in the case of professional or commercial activity practised for the profit of the sending State ; for special missions very often take advantage of their presence in the territory of the other State to conclude certain business for the profit of their own State, without the receiving State's having been informed in advance. There is no merit in the argument that permanent missions do not ask for prior consent. Permanent missions and their staffs operate within more or less established limits, and the institution of *persona non grata* is available as a sanction against them. Special missions are in the territory of the receiving State only temporarily and, consequently, this sanction is quite ineffectual in their case.

## General and Final Clauses

The Special Rapporteur considers that the following general clauses of the Vienna Convention on Diplomatic Relations can be adopted :

Article 41 concerning the respect of local laws ;

Article 47 on non-discrimination.

Some of the general clauses, however, cannot be adopted, because they cannot be applied *mutatis mutandis* to special missions. Among these clauses the Special Rapporteur includes the following :

Article 44, which would refer to the withdrawal of the special mission in case of armed conflict ; some special missions operate in precisely such circumstances ;

Article 45, concerning the situation if diplomatic relations are broken off ; the existence of diplomatic relations is not a prerequisite for the sending and reception of special missions ;

the second contingency envisaged in Article 45, which would mean the recall of the special mission ; in such circumstances, the special mission is wound up and the questions covered by sub-paragraphs (*a*), (*b*) and (*c*) do not arise ;

Article 46, which would relate to the protection of the special mission by a third State ; this question also does not arise.

As regards the final clauses (Articles 48-53), the Special Rapporteur believes that it would be desirable to adopt the provisions of the Vienna Convention on Diplomatic Relations.

# CO-OPERATION WITH OTHER BODIES

[Agenda item 8]

### DOCUMENT A/C N. 4/172

**Report on the sixth session of the Asian-African Legal Consultative Committee (Cairo, February-March 1964) by Eduardo Jiménez de Aréchaga, Observer for the Commission**

*[Original text : English]*
*[11 May 1964]*

### Observer's Report

In accordance with the decision taken by the Commission during the fifteenth session at its 715th meeting,[1] I had the privilege to attend the sixth session of the Asian-African Legal Consultative Committee held at Cairo from 23 February to 6 March 1964, in the capacity of observer on behalf of the International Law Commission.

The session was attended by delegates from Ceylon, Ghana, India, Indonesia, Iraq, Japan, Thailand and the United Arab Republic. The Governments of Burma and Pakistan, which are participating countries in the Committee, were unable to be represented at the sixth session.

Besides these delegates there were observers from Lebanon, Liberia, Mali, Nigeria, Phillipines, the International Law Commission, the Organization of American States and the League of Arab States. There were also observers on behalf of the Secretary-General of the United Nations and of the United Nations Office of the High Commissioner for Refugees.

M. Hafez Sabek, the leader of the United Arab Republic delegation was unanimously elected President of the session and Mr. J. K. Abensetts, the leader of the delegation from Ghana, was unanimously elected Vice-President of the session. Mr. B. Sen was re-appointed as Secretary of the Committee for a further term of two years.

The main subjects that were taken up for consideration by the Committee during the session were :

(1) The question of legality of nuclear tests.
(2) The United Nations Charter from the point of view of the Asian-African countries.
(3) Dual nationality.

### I. THE LEGALITY OF NUCLEAR TESTS

On this subject the Committee approved unanimously on 4 March 1964 the following resolution :

"*Considering* that the Committee at its Third Session had decided to take up for consideration questions relating to the Legality of Nuclear Tests on a reference made by the Government of India as being a legal matter of common concern between the participating countries,

"*Considering* that the subject was discussed by the Committee at its Fourth and Fifth Sessions on the basis of a Memorandum prepared by the Secretariat setting forth the scientific evidence regarding the effects of nuclear explosions and the relevant legal aspects,

"*Considering* that the Secretariat of the Committee had prepared and presented the draft of a Report on the subject for consideration of the Committee at its Fifth Session, which Report had been circulated to the Governments of the participating countries,

"*Considering* that the subject has further been discussed at the Sixth Session of the Committee in the light of the comments made by the Governments of the participating countries,

"*And considering* that the Committee has fully discussed the subject and has reached unanimity in its conclusions,

"*Noting* with satisfaction the conclusion of the Treaty signed by the United States of America, the United Kingdom of Great Britain and Northern Ireland and the Union of Soviet Socialist Republics on the 5 August 1963 prohibiting nuclear weapon test explosions, to which Treaty the member States of this Committee have acceded,

"*The Committee decides* to adopt the Report annexed hereto and to submit the same to the Government of India and the Governments of other participating countries ;

"*And the Committee expresses* the hope that Governments of all countries will accede to the Treaty Prohibiting Nuclear Tests concluded on the 5 August 1963."

In the annexed report the Committee formulated the following conclusions, stating that they apply equally to test explosions of nuclear weapons carried out by anyone for whose action the State is responsible in international law.

---

[1] Summary record of the 715th meeting in *Yearbook of the International Law Commission, 1963*, vol. I.

"*Conclusions*

"1.  As sufficient evidence regarding the harmful effects of the underground test explosions of nuclear weapons is not at present available to the Committee, the Committee is unable at this stage to express any opinion on the legality or otherwise of such test explosions. The conclusions hereinafter set out are therefore referable to all test explosions of nuclear weapons other than underground test explosions.

"2.  Scientific evidence examined by the Committee shows that every test explosion of nuclear weapons results in widespread damage, immediate or delayed, or is capable of resulting in such damage ; the present state of scientific knowledge does not indicate that the harmful effects of such test explosions can reasonably be eliminated. Such test explosions not only cause direct damage, but pollute the atmosphere and cause fall-out of radioactive material and also increase atomic radiation, which are detrimental to the well-being of man and also affect future generations.

"3.  Having regard to its harmful effects, as shown by scientific data, a test explosion of nuclear weapons constitutes an international wrong. Even if such tests are carried out within the territory of the testing State, they are liable to be regarded as an abuse of rights (*abus de droit*).

"4.  The principle of absolute liability for harbouring dangerous substances or carrying on dangerous activities is recognized in international law. A State carrying out test explosions of nuclear weapons is therefore absolutely liable for the damage caused by such test explosions.

"5.  Test explosions of nuclear weapons are also contrary to the principles contained in the United Nations Charter and the Declaration of Human Rights.

"6.  Test explosions of nuclear weapons carried out in the high seas and in the airspace thereabove also violate the principle of the freedom of the seas and the freedom of flying above the high seas, as such test explosions interfere with the freedom of navigation and of flying above the high seas and result in pollution of the water and destruction of the living and other resources of the sea.

"7.  Test explosions of nuclear weapons carried out in trust territories and non-self-governing territories also violate Articles 73 and 74 of the United Nations Charter."

## II.  THE UNITED NATIONS CHARTER FROM THE POINT OF VIEW OF THE ASIAN-AFRICAN COUNTRIES

On this subject the Committee approved unanimously on 4 March 1964, the following resolution :

"*Considering* that the Government of the United Arab Republic by a reference made under article 3 (b) of the Statutes has requested the Committee to examine the provisions of the Charter of the United Nations from the legal point of view taking into account in particular the changed composition of the United Nations by the admission of newly independent Asian-African States,

"*And considering* that the Governments of the United Arab Republic and India have presented memoranda on the subject, and that the delegations present at the sixth session of the Committee have made statements expressing their views on the various questions relating to this subject,

"*Noting* with satisfaction the adoption of the resolutions by the General Assembly of the United Nations on 17 December 1963 on the question of equitable representation on the Security Council and the Economic and Social Council (resolution 1991 A and B (XVIII),

"*The committee decides* to direct its Secretariat to continue its study of the subject and to present a Report at the next session of the Committee ;

"*The committee recommends* to the Governments of the participating countries to ratify the amendments set out in aforesaid resolutions adopted by the General Assembly on 17 December 1963 according to their respective constitutional processes as soon as possible, and at any rate before 1 September 1965 ;

"*The committee appeals* to all Member States of the United Nations to ratify before 1 September 1965 the said amendments as called upon by the General Assembly ;

"*And the committee directs* the Secretariat to send copies of this resolution to the Secretary-General of the United Nations with the request that they may be transmitted to all Member States of the United Nations."

### III.  DUAL NATIONALITY

On the subject of dual nationality the following articles were adopted as a set of model rules incorporating certain principles and provisions independent of each other.

"Article 1

It is for each State to determine under its own law who are its nationals. This law itself shall be recognized by other States in so far as it is consistent with international conventions, international customs, and the principles of law generally recognized with regard to nationality.

Article 2

Questions as to whether a person possesses the nationality of a particular State, shall be determined in accordance with the law of that State.

Article 3

Alternative (A)

For the purpose of these model articles the age of majority of a person shall be determined according to the law of the State the nationality of which is to be acquired, retained, or renounced.

Alternative (B)

The age of majority shall be determined according to the laws of the State, the nationality of which is relevant for the matter under consideration, provided

that for the purposes of article 5 and of article 7, the majority of age (in the event of any conflict of State laws) shall be the majority age under the law of the State which prescribes a higher age.

*"Nationality of married women.*

Article 4

(1) If a woman who is a national of one State marries a national of another State, or if a husband acquires a nationality other than that he had on the date of marriage, the nationality of the wife shall not be affected.

(2) Nevertheless if she, in either of such cases voluntarily acquires the nationality of her husband she loses *ipso facto* the other nationality.

*"Nationality of children.*

Article 5

(1) A minor follows ordinarily his father's nationality. If the minor is born out of wedlock, or if the nationality of his father is unknown or if his father has no nationality, he follows his mother's nationality.

(2) Nevertheless if a minor born to a national of one State in another State is deemed in accordance with the laws of each of the two States to be its national he should opt for one of these two nationalities within one year from the date of attaining his majority age in accordance with the provisions of article 7.

*"Adoption.*

Article 6

In case of valid adoption, the adopted minor shall follow his adopter's nationality,

*"Option.*

Article 7

A person who knows that he possesses two nationalities acquired without any voluntary act on his part should renounce one of them in accordance with the law of the State whose nationality he desires to renounce, within twelve months of his knowing that fact or within twelve months of attaining his majority age, whichever time is the latter.

*"Active nationality.*

Article 8

A person having more than one nationality, shall be treated as having only one nationality in a third State. A third State, should, however, recognize exclusively the nationality of the State in which he is habitually and principally resident or the nationality of the State with which in the circumstances he appears to be in fact most closely connected.

Article 9

A person possessing two or more nationalities of the contracting States, who has his habitual and principal residence within the territory of one of these States with which he is in fact most closely connected,

shall be exempt from all military obligations in the other State or States.

Article 10

Without prejudice to the provisions of article 9, if a person possesses the nationality of two or more States, and under the law of any one of such States has the right, on attaining his majority age, to renounce or decline the nationality of that State, he shall be exempt from military service in such State during his minority."

## IV. OTHER SUBJECTS

(1) The Committee considered the question relating to the rights of refugees referred to it by the Government of the United Arab Republic, and received a memorandum presented by the United Nations High Commissioner for Refugees. The Committee directed its Secretariat "to collect the laws, constitutional provisions and state practices on the various topics listed in the United Arab Republic memorandum and particularly on the question of the right of repatriation, the right of asylum and the right of the refugee to claim compensation". The Committee also requested the Secretariat to prepare a report and present the same at its next session.

(2) The Committee adopted the draft articles on immunities and privileges of the Committee which are appended as annex 2 to the present report, and recommended to the Governments of the participating countries to implement them by appropriate measures.

(3) The Committee also requested the Governments of the participating countries to give their comments on a questionnaire submitted by the Government of India on the Vienna Conventions on Diplomatic Relations, Consular Relations and Civil Liability for Nuclear Damage ; to ask the Secretariat to prepare a report on the basis of these comments and, finally, decided that the subject should be placed on the agenda for discussion at the seventh session of this Committee if so requested by the Government of any of the participating countries. The questionnaire is appended as annex 3.

(4) On the subject of relief against double taxation, a sub-committee was appointed and held a preliminary exchange of views. The sub-committee recommended that a detailed discussion should be postponed until the next session, requesting the Secretariat to complete the compilation of information on the rules, regulations and practices of all member countries and all agreements made by the participating countries.

(5) On the question of the recognition and enforcement of foreign judgements, the service of process and the recording of evidence in civil and criminal cases a sub-committee was appointed and it placed before the Committee two draft agreements : one on the recognition and enforcement of judgements in civil proceedings, and the other on the subject of service of process and the recording of evidence. The Committee decided that the report of the sub-committee should be placed on the agenda for discussion at its next session.

## V. Relations with the International Law Commission

On the basis of the report of its administrative sub-committee, the Committee expressed its satisfaction that the Secretary-General of the United Nations, the International Law Commission, the League of Arab States, the United Nations High Commissioner for Refugees and the Organization of American States were able to send their representatives as observers to the Sixth Session of the Committee.

On behalf of this Commission I stated, as recorded in the minutes "that the International Law Commission attaches great importance to the work of this Committee, principally for two reasons, namely: the high level of political and judicial opinion that is reflected in this Committee and also because the Committee represents the legal thought of the vast area covered by the Asian-African continents. He called for closer and continued co-operation between the International Law Commission and this Committee and said that it would be of considerable assistance to the International Law Commission if the Committee would give its views on the subjects of law of treaties, State succession and State responsibility. He drew attention to the fact that in the work of the International Law Commission, the viewpoints of Asian-African countries were being increasingly represented, as part of progressive development of international law".

The leader of the delegation from Ceylon, Mr. H. W. Tambiah, presented his report on the work done at the fifteenth session of the International Law Commission which he had attended in the capacity of observer on behalf of the Committee. He particularly referred to the Commission's work on the law of treaties, State responsibility and State succession and suggested that the Committee should study these subjects carefully and send its observations to the International Law Commission.

It was unanimously decided that Mr. Hafez Sabek, President of the Committee, should be requested to attend the sixteenth session of the International Law Commission as observer on behalf of the Committee.

The Committee by resolution No. VI (9) decided to extend a standing invitation to the International Law Commission, the Legal Counsel of the United Nations, the Pan American Union, the Organization of African Unity and the League of Arab States to be represented at the future sessions of the Committee.

A general and very interesting discussion was held on the subject of the law of treaties, as codified by the Commission, and it was decided that the Secretariat should study the matter fully, particularly the specific questions raised by the delegates in the course of discussions at the sixth session of the Committee. It was further decided to request the Governments of the participating countries to communicate their viewpoints on the draft articles on the law of treaties drawn up by the International Law Commission also to the Secretariat of the Committee. The Secretariat was directed to prepare a report on the basis of all available material and present the same at the next session of the Com-

mittee to be held at Baghdad in February 1965. It was further decided to give priority to this item in the agenda of the next session of the Committee. The Secretariat was also requested to prepare a study on the subject of State succession.

At the last working meeting of the Committee I had the opportunity to express my heartfelt gratitude to the Committee, to its President and Secretary, and to the authorities of the United Arab Republic for the kind reception and wonderful hospitality received at their hands. I also had occasion to state how much I was impressed with the high level of deliberations, the importance of the resolutions adopted and the expeditious manner in which the discussions were conducted, on the basis of excellent preparatory work carried out by the Secretary-General and his staff, who on many subjects acted really as Special Rapporteur. I requested and it was agreed that not only the minutes of the session but also several sets of the four mimeographed volumes of background material prepared by the Secretariat would be sent to Geneva and placed at the disposal of the members of the International Law Commission.

### ANNEX 1

#### List of delegates and observers at the sixth session of the Asian-African Legal Consultative Committee

[not reproduced]

### ANNEX 2

#### Draft articles on the immunities and privileges of the Asian-African Legal Consultative Committee

As adopted by the Committee at its sixth session

##### Article I

Privileges and immunities are accorded under this instrument, not to benefit individuals but to ensure the efficient performance of the functions of the Committee. Consequently, the Committee and the participating Governments have not only the right but also a duty to waive the immunity in any case where in their opinion the immunity would impede the course of justice and where it can be waived without prejudice to the purpose for which the immunity is accorded.

##### Article II. — Juridical personality

The Committee shall possess juridical personality and shall have the capacity to contract, to acquire and dispose of immovable and movable property and to institute legal proceedings in its name.

##### Article III. — Property, funds and assets

(a) The Committee, its property and assets wherever located and by whomsoever held, shall enjoy immunity from every form of legal process, except in so far as in any particular case the Committee has expressly waived its immunity. It is, however, understood, that no waiver of immunity shall extend to any measure of execution.

(b) The Committee, its property and assets as also its archives shall be inviolable and shall be immune from search, requisition, confiscation, expropriation and any other form of interference whether by executive, administrative, juridical or

legislative action in any of the participating countries. The premises occupied by the Committee for its Secretariat shall be likewise inviolable and immune from search provided the said premises are solely used for the purposes of the Committee.

(c) The Committee shall be immune from the regulations relating to exchange control in the matter of holding or transfer of its funds from one participating country to another. In exercising this right, the Committee shall pay due regard to any representations made by the Government of any participating country, in so far as it is considered that effect can be given to such representations without detriment to the interests of the Committee. However, the Committee shall not take out of any participating country more than what the Committee has brought in.

(d) The Committee, its assets, income and other property whether owned or occupied by it, shall be exempt from all direct taxes; it is understood, however, that the Committee will not claim exemption from taxes which are in fact no more than charges for public utility services.

(e) The Committee shall be exempt from payment of Customs duty as also prohibitions and restrictions on imports and exports in respect of articles or publications imported or exported by it for its official use. It is understood that articles imported under such exemption will not be sold in the country to which they are imported except under such conditions as have been agreed upon with the Government of that country, which in any case shall not exceed those extended to similar inter-governmental organizations.

### Article IV. — Facilities in respect of communications

(a) The Committee and its Secretariat shall enjoy in each of the participating countries freedom of communication and no censorship shall be applied to the official correspondence of the Committee certified as such and bearing the official seal of the Committee.

(b) Nothing in this article shall be construed to preclude the adoption of appropriate security precautions to be determined by agreement between the participating Governments and the Committee.

### Article V. — Representatives of the participating countries, observers, and the Secretary of the Committee

Representatives of the participating countries designated as members, alternate members and advisers as also observers, and the Secretary or the Acting Secretary of the Committee shall during their stay in the country in which the Session of the Committee is held and also during their journey to and from that country, enjoy the following : —

(a) Immunity from personal arrest or detention and from seizure of their personal baggage and immunity from legal procedure in respect of words spoken or written and all acts done by them in their official capacity ;

(b) Inviolability of all papers and documents ;

(c) The right to receive papers or correspondence in sealed covers ;

(d) Exemption in respect of themselves and their spouses from immigration restrictions, aliens registration or national service obligations in the country in which the session of the Committee is held and in the participating countries through which they are in transit for the purpose of attending the session of the Committee ;

(e) The same facilities in respect of currency or exchange restrictions as are accorded to temporary diplomatic missions ;

(f) The same immunities and privileges in respect of their personal baggage as are accorded to diplomatic agents. The words "personal baggage" in this section shall not be interpreted to include an automobile and other means of transportation. Personal baggage shall not, however, be sold

in the country in which the session of the Committee is held without an express authorization from the Government of that country ;

(g) Such other privileges and immunities and facilities not inconsistent with the foregoing as the diplomatic agents enjoy, except that they shall have no right to claim exemption from customs duties on goods imported (otherwise than as part of their personal baggage) or from excise duties or sales-taxes.

Provided always that the immunities specified in the foregoing clauses can be waived in any individual case in regard to a member of the delegation, by the Government of the participating country which the individual represents.

(h) The provisions of article V are not applicable as between a representative and the authorities of the country of which he is a national or of which he is or has been the representative.

(i) Where the incidence of any form of taxation depends upon residence, the periods during which the representatives of participating countries to the Committee and to conferences convened by the Committee are present in a participating country for the discharge of their duties, shall not be considered as periods of their residence.

### Article VI. — Officials of the Secretariat

1. Officials of the Committee shall :

(a) Be immune from legal process in respect of words spoken or written and all acts performed by them in their official capacity ;

(b) Enjoy the same exemptions from taxation in respect of the salaries and emoluments paid to them by the Committee and on the same conditions as are enjoyed by officials of the United Nations ;

(c) Be immune, together with their spouses and relatives dependent on them from immigration restrictions and aliens registration ;

(d) Be accorded the same privileges in respect of exchange facilities as are accorded to officials of comparable rank of diplomatic missions ;

(e) Be given, together with their spouses and relatives dependent on them, the same repatriation facilities in time of international crises as officials of comparable rank of diplomatic missions ;

(f) Have the right to import free of duty furniture and effects within one year of the time when they first take up their posts in the country in question ; the term "effects" in this section shall not be interpreted to include an automobile or other means of transportation ;

(g) Be exempt from national service obligations.

2. The immunities and privileges except those specified in clause 1 (a) above shall not be applicable to the nationals of the country in question unless expressly extended by the participating country.

3. The Secretary of the Committee, with the approval of the Committee, shall communicate, to the Governments of participating countries the categories of the officials to whom the provisions of this article shall apply.

4. The immunities specified in the foregoing clauses can be waived in any individual case, in regard to an official of the Secretariat by the Secretary of the Committee, and in case of the Secretary, by the Committee itself.

5. The Committee shall co-operate at all times with the appropriate authorities of participating countries to facilitate the proper administration of justice, secure the observance of police regulations and prevent the occurrence of any abuses in connexion with the privileges, immunities and facilities mentioned in this article.

*Article VII. — Settlement of differences*

If any participating country considers that there has been an abuse of any privilege or immunity conferred by this instrument, consultations shall be held between that country and the Committee to determine whether any such abuse has occurred and if so to attempt to ensure that no repetition occurs.

## ANNEX 3

**Points on which the government of India requests information and views of other delegations in relation to the Vienna Convention on Diplomatic Relations, 1961, the Vienna Convention on Consular Relations, 1963, and the Vienna Convention on Nuclear Damage, 1963.**

1. To what extent are the provisions of these three Conventions acceptable to the Government of your country ?

2. Are there any provisions in these three Conventions which the Government of your country does not approve ? If so, what are the reasons ?

3. Does the Government of your country propose any revision or modification of any of the provisions of these three Conventions ? If so, what are the reasons ?

4. Does the Government of your country suggest any additional provisions to these three Conventions ? If so, what are the reasons ?

5. Does the Government of your country propose to ratify or accede to all or any of these Conventions ? If so, when ?

6. Are there any bilateral or multilateral treaties between the Government of your country and the Governments of any other countries on the subject matter of these three Conventions ? If so, what would be the position of these treaties if the Government of your country ratifies or accedes to these Conventions ?

# STATE RESPONSIBILITY

## DOCUMENT A/CN. 4/165

**Summary of the discussions in various United Nations organs and the resulting decisions : Working paper prepared by the Secretariat**

*[Original text : French]*
*[7 February 1964]*

### CONTENTS

| | | Paragraph | Page |
|---|---|---|---|
| INTRODUCTION | .......................................................... | 1-3 | 125 |
| SUMMARY OF THE DISCUSSIONS AND DECISIONS CONCERNING STATE RESPONSIBILITY | | | |
| I. | Convention on the Prevention and Punishment of the Crime of Genocide ... | 4-11 | 125 |
| II. | Reparation for injuries incurred in the service of the United Nations ....... | 12-18 | 127 |
| III. | Draft code of offences against the peace and security of mankind .......... | 19 | 128 |
| IV. | Formulation of the Nürnberg principles ................................. | 20-21 | 128 |
| V. | Peaceful uses of outer space ........................................... | 22-36 | 128 |
| VI. | The effects of atomic radiation ........................................ | 37-41 | 130 |
| VII. | State responsibility for nuclear hazards ................................. | 42-43 | 131 |
| VIII. | Permanent sovereignty over natural resources ........................... | 44-54 | 131 |
| ANNEX: LIST OF GENERAL ASSEMBLY RESOLUTIONS CITED IN THIS DOCUMENT .................... | | | 132 |

## Introduction

1. This working paper has been prepared in response to a wish expressed at the 686th meeting of the International Law Commission.[1] It consists of a summary of the discussions in various organs of the United Nations and the decisions taken by those organs between 1946 and 1963, concerning the question of State responsibility.

2. It must be pointed out, however, that it does not contain a summary of the discussions which took place in the International Law Commission or the Sixth Committee on the scope of the topic of State responsibility and the best way to deal with it, because the report of the Sub-Committee on State Responsibility, which was unanimously adopted by the Commission at its fifteenth session, has already dealt with these questions.[2]

3. A list of the resolutions cited in this document is given in an annex.

---

[1] See *Yearbook of the International Law Commission, 1963*, vol. I, summary record of the 686th meeting, paras. 54, 72 and 75.

[2] See "Report of the International Law Commission on the work of its fifteenth session", *Official Records of the General Assembly, Eighteenth Session*, Supplement No. 9 (A/5509), para. 55 and Annex 1 ; see also *Yearbook of the International*

## Summary of the discussions and decisions of various United Nations organs on the question of State responsibility

### I. *Convention on the Prevention and Punishment of the Crime of Genocide*

4. Certain aspects of the topic of State responsibility were considered when the draft Convention on the Prevention and Punishment of the Crime of Genocide was discussed in the Sixth Committee at the third session of the General Assembly. Opinions on the criminal responsibility of States were put forward during the discussion of the amendments to articles V, VII and X of that draft, in particular as regards the responsibility of States for acts of genocide committed or tolerated by them.[3]

5. Article V provided that those responsible for punishable acts should be punished "whether they are

---

*Law Commission, 1963*, vol. II, p. 224 and pp. 227-259. For the previous discussions in the Commission and the Sixth Committee, see *Yearbook of the International Law Commission, 1959*, vol. I, 515th meeting, and *1961*, vol. I, 614th to 616th meetings ; *Official Records of the General Assembly, Fifteenth Session, Sixth Committee*, 649th to 672nd meetings ; *ibid., Seventeenth Session, Sixth Committee*, 734th to 752nd meetings.

[3] *Official Records of the General Assembly, Third Session, Part I, Sixth Committee*, 92nd, 93rd to 100th, and 103rd to 105th meetings.

constitutionally responsible rulers, public officials or private individuals".[4] The United Kingdom proposed a new version of the article reading as follows :

"Criminal responsibility for any act of genocide as specified in articles II and IV shall extend not only to all private persons or associations, but also to States, governments, or organs or authorities of the State or government, by whom such acts are committed. Such acts committed by or on behalf of States or governments constitute a breach of the present Convention." [5]

The sponsor later withdrew that part of the amendment referring to criminal responsibility but maintained the second part of the sentence for incorporation in article V of the draft.[6]

6. The majority of the representatives taking part in the debate expressed objections to this amendment even after the sponsor had withdrawn the part relating to criminal responsibility. To some the idea that States or Governments could be the authors of an act of genocide was unacceptable because such acts can be committed only by individuals acting on behalf of the State. Some others found the amendment ambiguous and inadequate, as its adoption would mean the inclusion in a document of criminal law of a provision establishing the civil responsibility of a State guilty of the crime of genocide. Representatives in favour of the amendment pointed out that because of the complex structure of the modern State acts could often not be imputed to an individual but only to a whole system and that while criminal sanctions could not be applied to States there were other sanctions which could be applied, such as "the dissolution of a criminal police or the seizure of material goods or financial resources belonging to the responsible Government".[7] The amendment was eventually rejected (by 24 votes to 22).[8]

7. Article VII of the draft provided for the punishment of genocide by national tribunals or by an international tribunal. An amendment submitted by the United Kingdom proposed the deletion of the article and its replacement by the following text :

"Where the act of genocide as specified by articles II and IV is, or is alleged to be the act of the State or government itself or of any organ or authority of the State or government, the matter shall, at the request of any other party to the present Convention, be referred to the International Court of Justice, whose decision shall be final and binding. Any acts or measures found by the Court to constitute acts of genocide shall be immediately discontinued or rescinded and if already suspended shall not be resumed or reimposed." [9]

8. It was pointed out during the discussion of this article that the amendment in question had already been implicitly rejected by the rejection of the amendment to article V. It was thereupon decided that bodies corporate such as States and Governments should not be considered responsible for acts of genocide. Some representatives, however, expressed the view that responsibility for genocide lay with both States and individuals and that the proposed Convention should deal separately with the criminal responsibility of individuals and the international responsibility of States. The representative of Poland established a further difference with regard to the responsibility of States, namely, that it would be direct when they committed genocide, or indirect when they aided and abetted or tolerated the commission of the crime.[10]

9. The United Kingdom amendment was withdrawn, and its sponsor proposed that further consideration of the question should be deferred until the amendment to article X of the draft was discussed.[11]

10. Article X dealt with the jurisdiction of the International Court of Justice in disputes relating to the interpretation or application of the Convention. An amendment submitted jointly by Belgium and the United Kingdom was designed to extend the jurisdiction of the Court through the addition of the words "including disputes relating to the responsibility of a State for any of the acts enumerated in articles II and IV" [12] (article II of the draft containing the definition of genocide, and article IV enumerating all the punishable acts relating to it).

11. The United Kingdom representative, who had introduced the amendment, explained that it referred to civil responsibility.[13] Some representatives opposed the amendment, on the ground (among others) that the notion of State responsibility was vague, particularly in so far as genocide was concerned. Even if civil responsibility alone was taken into account, a number of problems would arise, and in particular that of the beneficiary of the compensation payable in cases where genocide was committed on the territory and against the citizens of the State concerned. In the opinion of most members of the Committee, however, article X was the proper place for establishing the responsibility of States in respect of crimes of genocide and for determining the international authority competent to try them. The amendment was eventually adopted with some slight modifications.[14] Article X became article IX of the final text of the draft adopted by the General Assembly on 9 December 1948 (resolution 260 A (III)), which reads as follows :

"Disputes between the Contracting Parties relating to the interpretation, application or fulfilment of the present Convention, including those relating to the responsibility of the State for genocide or any of the other acts enumerated in article III, shall be

---

[4] For the full text of the draft, see : *Official Records of the Economic and Social Council, Third Year, Seventh Session, Supplement No. 6*, pp. 18 and 19.

[5] *Official Records of the General Assembly, Third Session, Part I, Sixth Committee, Annexes*, document A/C.6/236 and Corr.1.

[6] *Ibid., Sixth Committee*, 95th meeting, p. 346.

[7] *Ibid.*, 96th meeting, p. 350.

[8] *Ibid.*, p. 355.

[9] *Ibid., Annexes*, document A/C.6/236 and Corr.1.

[10] *Ibid., Sixth Committee*, 98th meeting, p. 376.

[11] *Ibid.*, 100th meeting, p. 394.

[12] *Ibid., Annexes*, document A/C.6/258.

[13] *Ibid., Sixth Committee*, 103rd meeting, p. 440.

[14] *Ibid.*, 104th meeting, p. 447.

submitted to the International Court of Justice at the request of any of the parties to the dispute."

## II. Reparation for injuries incurred in the service of the United Nations

12. Some problems connected with State responsibility were raised during the consideration by the Sixth Committee of the "Memorandum of the Secretary-General relating to reparation for injuries incurred in the service of the United Nations" (A/674).[15] In the memorandum, the Secretary-General presented the following questions for consideration by the General Assembly :

"1. Whether, in the view of the General Assembly, a State may have a responsibility as against the United Nations for injury to or death of an agent of the United Nations ;

"2. What should be the general policy with respect to the reparations or measure of damages which should be claimed ;

"3. What should be the procedure for the presentation and settlement of claims."[16]

13. Although the discussion was devoted mainly to the question of the legal personality of the Organization and problems of procedure, some opinions concerning the international responsibility of States were expressed. For instance the question was raised whether a State could be held responsible in relation to the United Nations for the death or injury of a member of the United Nations staff. It was stated that there were no rules of customary or conventional law providing for such responsibility. Reference was made to the principle of international law according to which the right of one State to take action against another State to obtain compensation for injury caused to one of its nationals was based on the ties of nationality existing between the former State and the victim. As the tie between the United Nations and its staff was not one of nationality, there was no basis in international law for the Organization to make a claim for injury caused to a member of its staff.

14. Some representatives pointed out, however, that the reason why such rules did not exist was that there had not previously been any need for them. In any case, because of the need to ensure protection for international civil servants in the performance of their duties, the United Nations could not be presumed to have no right of recourse against the guilty State.

15. Some speakers who were opposed to admitting that the United Nations had the right to claim damages for injury incurred by a member of its staff referred to the possibility of double liability towards the Organization and towards the State of which the victim was a national. Reference was also made to the somewhat peculiar situation that would arise if the staff member sustaining the injury was a national of the State responsible. In response to the first objection, it was pointed out that a distinction must be drawn between the different elements

of the injury, namely : the harm suffered by the victim and the persons entitled through him ; the loss to the Organization of a member of its staff ; the moral damage sustained by the Organization ; and the financial loss to the Organization, which would have to pay compensation to the victim or to the persons entitled through him. In the latter three cases, according to that view, the right to claim damages would vest solely in the Organization.

16. Moreover, all representatives were of the opinion that compensation should be payable only for injury actually incurred, "exemplary" or "punitive" damages thus being barred.

17. The General Assembly adopted resolution 258 (III) on 3 December 1948, operative paragraph 1 of which reads as follows :

"*Decides* to submit the following legal questions to the International Court of Justice for an advisory opinion :

" ' I.   In the event of an agent of the United Nations in the performance of his duties suffering injury in circumstances involving the responsibility of a State, has the United Nations, as an Organization, the capacity to bring an international claim against the responsible *de jure* or *de facto* Government with a view to obtaining the reparation due in respect of the damage caused (a) to the United Nations, (b) to the victim or to persons entitled through him ?

" ' II.   In the event of an affirmative reply on point I (b), how is action by the United Nations to be reconciled with such rights as may be possessed by the State of which the victim is a national ? '

"*Instructs* the Secretary-General, after the Court has given its opinion, to prepare proposals in the light of that opinion, and to submit them to the General Assembly at its next regular session."

18. The International Court of Justice rendered its advisory opinion on 11 April 1949,[17] giving an affirmative reply to the first question and establishing a general criterion to reconcile any conflict between the action of the Organization and such rights as the victim's national State might possess. At its fourth session, the General Assembly adopted resolution 365 (IV) of 1 December 1949, the operative part of which reads :

"1.   *Authorizes* the Secretary-General, in accordance with his proposals, to bring an international claim against the Government of a State, Member or non-member of the United Nations, alleged to be responsible, with a view to obtaining the reparation due in respect of the damage caused to the United Nations and in respect of the damage caused to the victim or to persons entitled through him and, if necessary, to submit to arbitration, under appropriate procedures, such claims as cannot be settled by negotiation ;

[15] *Official Records of the General Assembly, Third Session, Part 1, Sixth Committee*, 112th to 124th meetings.

[16] *Ibid., Annexes*, document A/674.

[17] *Official Records of the General Assembly, Fourth Session, Sixth Committee, Annexes*, document A/955. *I.C.J. Reports*, 1949, pp. 187-188. Unanimous decision with regard to question I (a) ; decision taken by 11 votes to 4 on question I (b). See the dissenting opinions of Judges Badawi Pasha, Hackworth, Krylov and Winiarski, pp. 189 and 196-219.

"2. *Authorizes* the Secretary-General to take the steps and to negotiate in each particular case the agreements necessary to reconcile action by the United Nations with such rights as may be possessed by the State of which the victim is a national ;

"3. *Requests* the Secretary-General to submit an annual report to subsequent sessions of the General Assembly on the status of claims for injuries incurred in the service of the United Nations, and proceedings in connexion with them."

### III. *Draft code of offences against the peace and security of mankind*

19. The International Law Commission dealt briefly with the question of State responsibility when, pursuant to General Assembly resolution 95 (I) of 11 December 1946, it considered at its second session the draft Code of offences against the peace and security of mankind.[18] Mr. J. Spiropoulos, the Special Rapporteur on the subject, pointed out in his report to the Commission [19] that although the criminal responsibility of States was much discussed in theory, there had been no precedent concerning it in international practice. He reached the following conclusion :

"Following international practice up to this time, and particularly in view of the pronouncements of the Nürnberg Tribunal, the establishment of the criminal responsibility of States — at least for the time being — does not seem advisable.[22]

---

[22] It might be remembered that the limitation of criminal responsibility to individuals in no way affects the traditional responsibility of States, under international law, for reparation, a topic which is independent of the question of criminal responsibility."

After a brief exchange of views, the members of the Commission decided to deal only with the responsibility of individuals in the draft Code, it being understood, however, that the Commission was free to resume the consideration of State responsibility at a later time.

### IV. *Formulation of the Nürnberg principles*

20. At the fifth session of the General Assembly the Sixth Committee raised the issue of the criminal responsibility of States in its consideration of the report of the International Law Commission on the work of its second session.[20] Part III of that report was devoted to the formulation of the Nürnberg principles. The Commission had formulated principle I as follows : "Any person who commits an act which constitutes a crime under international law is responsible therefor and liable to punishment." In its comments on that principle, the Commission had quoted the following sentence from the judgement of the Nürnberg Tribunal : "Crimes against international law are committed by men, not by abstract entities, and only by punishing

individuals who commit such crimes can the provision of international law be enforced." [21]

21. The discussion of this principle in the Sixth Committee dealt chiefly with the possibility of regarding the individual as a subject of international law. Although the members of the Sixth Committee expressed differing opinions on this point, they agreed in rejecting the concept of the criminal responsibility of the State, since a State can be regarded as responsible only from the civil and administrative points of view.[22] The obligation of the State is to punish those who commit crimes or to permit other States or an international tribunal to punish them.

### V. *Peaceful uses of outer space*

22. By virtue of resolution 1472 (XIV) of 12 December 1959, the General Assembly established a Committee on the Peaceful Uses of Outer Space and requested it to study, *inter alia*, "the nature of legal problems which may arise from the exploration of outer space".

23. In its resolution 1721 A (XVI) of 20 December 1961, the General Assembly repeated its request in the following terms :

"*The General Assembly,*

" . . .

"*Invites* the Committee on the Peaceful Uses of Outer Space to study and report on the legal problems which may arise from the exploration and use of outer space."

24. At its ninth meeting, the Committee decided to establish two sub-committees of the whole, one of which was entrusted with the study of legal questions.

25. Among the topics considered by the Legal Sub-Committee at its first session, held in 1962, was a United States draft proposal on liability for space-vehicle accidents.[23] At the first meeting the United States representative said that the problem of legal and financial liability for damage caused by space-vehicle accidents should be solved at the earliest possible date. He suggested two principles to govern such liability : "First, the liability of a launching State or organization should be absolute ; to require proof of negligence would generally be tantamount to denying the possibility of compensation. Second, liability should attach whether injury or damage occurred on land, on the sea or in the air." [24] He also suggested that a treaty would be the most appropriate form for handling the subject.

26. Although the majority of the members of the Sub-Committee recognized the importance of the problem of liability for damage caused by space exploration operations to third parties, some representatives maintained that before taking up specific questions such

---

[18] *Yearbook of the International Law Commission, 1950,* vol. I, summary record of the 54th meeting.

[19] *Yearbook of the International Law Commission, 1950,* vol. II, p. 261, para. 53.

[20] *Ibid.,* p. 364.

[21] *Ibid.,* paras. 98-99.

[22] *Official Records of the General Assembly, Fifth Session, Sixth Committee,* 231st to 236th meetings.

[23] *Official Records of the General Assembly, Seventeenth Session, Annexes,* agenda item 27, document A/5181, annex III D.

[24] A/AC.105/C.2/SR.1, p. 9.

as those of liability or of assistance to space vehicles, Governments should first acknowledge the basic principles of international law which governed relations between States in the exploration and use of outer space and which would serve as a guide for later agreements on more specific matters. Those representatives therefore recommended that priority should be given to the consideration of a draft declaration which had been submitted to the Sub-Committee concerning the basic principles which should govern the activities of States in the exploration and use of outer space.

27. In the course of the discussion various representatives laid stress on particular aspects of the question of liability which, in their view, should be included in the proposed study. These included : the fixing of liability in the case of space vehicles orbited by several States acting jointly or by an international organization, or in a case in which the builder and owner of a space vehicle was a State other than the launching State ; liability for pollution of the atmosphere ; identification of the vehicle and its parts ; the case of space experiments which might prevent or hinder the scientific activities of other countries ; the nature of the damage ; the principles on which liability should be based ; the body competent to rule on compensation for damage, and so on.[25]

28. The Sub-Committee submitted a report on the work of its first session to the Committee without having come to any agreement.[26] The proposals submitted to the Sub-Committee, including the abovementioned United States proposal, were transmitted to the Committee and reproduced in its report.[27]

29. After considering the report of the Committee on the Peaceful Uses of Outer Space, the General Assembly, in resolution 1802 (XVII) of 14 December 1962, stressed "the necessity of the progressive development of international law pertaining to the further elaboration of basic legal principles governing the activities of States in the exploration and use of outer space and to the liability for space-vehicle accidents and to assistance to and return of astronauts and space vehicles and to other legal problems". In addition, it requested the Committee "to continue urgently its work on the further elaboration of basic legal principles governing the activities of States in the exploration and use of outer space and on liability for space-vehicle accidents and on assistance to and return of astronauts and space vehicles and on other legal problems".

30. The Legal Sub-Committee again took up the question of State responsibility at its second session, in 1963.[28] In the course of that session the representatives agreed on the advisability of adopting a declaration of basic principles governing the activities of States in the exploration and use of outer space. Reference was also made to a number of those principles, including that of the liability of States for damage caused by space activities to a foreign State or to natural or juridical persons in that State.

31. Among the documents considered by the Sub-Committee were a working paper submitted by the Belgian delegation (A/AC.105/C.2/L.7)[29] on the unification of certain rules governing liability for damage caused by space devices ; the draft proposal on liability for space-vehicle accidents submitted at the preceding session (A/5181, annex III D) ; and a draft declaration of basic principles governing the activities of States in the exploration and use of outer space, which included the principle of State responsibility (A/5181, annex III A).

32. The problems relating to State responsibility which had been raised at the first session were taken up again and considered more carefully at the second session. A further report was submitted by the Sub-Committee to the Committee, part III of which (Summary of results) reads in part as follows :

"II.   As to two specific issues, namely :

(a) rescue of astronauts and space vehicles making emergency landings, and

(b) liability for space vehicles and accidents, a certain rapprochement and clarification of ideas were recorded and agreement was reached that the relevant instruments should take the shape of international agreements.

"III.   With a view to the desirability of reaching full agreement on the issues on the agenda of the Sub-Committee, the delegations taking part in its work recommend that contacts and exchanges of views should continue, on which further action by the Committee and Sub-Committee will depend. It would be desirable that these consultations should take place prior to the next session of the Committee on the Peaceful Uses of Outer Space."[30]

33. The Committee on the Peaceful Uses of Outer Space submitted to the General Assembly at its eighteenth session a report reproducing item II above.[31] Subsequently, the Committee held its fifth session in November 1963[32] in order to consider a new working paper drawn up as a result of the latest consultations and exchanges of views between the representatives. This document contained a "draft declaration of legal principles governing the activities of States in the exploration and use of outer space", Principles 5 and 8 of which read as follows :

"5. States bear international responsibility for national activities in outer space, whether carried on by governmental agencies or by non-governmental entities, and for assuring that national activities are carried on in conformity with the principles set forth in this Declaration. The activities of nongovernmental entities in outer space shall require authorization and continuing supervision by the State

---

[25] A/AC.105/C.2/SR.1-15.

[26] A/AC.105/C.2/3 and A/AC.105/6.

[27] *Official Records of the General Assembly, Seventeenth Session, Annexes*, agenda item 27, document A/5181, annex III.

[28] A/AC.105/C.2/SR.16-28.

[29] Also A/5549, annex III H.

[30] A/AC.105/12.

[31] A/5549, para. 19.

[32] Twenty-fourth meeting of the Committee, A/5549/Add.1, annex.

concerned. When activities are carried on in outer space by an international organization, responsibility for compliance with the principles set forth in this Declaration shall be borne by the international organization and by the States participating in it."

. . . . .

"8. Each State which launches or procures the launching of an object into outer space, and each State from whose territory or facility an object is launched, is internationally liable for damage done to a foreign State or to its natural or juridical persons by such object or its component parts on the earth, in air space or in outer space." [33]

34. During the consideration of the draft declaration, several representatives (United States, Australia, France, United Kingdom) pointed out the absence of any reference to international organizations in Principle 8. They concluded, however, that that paragraph should be interpreted in the light of the last sentence of Principle 5, which establishes the responsibility of international organizations and the States participating in them and which applies not only to that paragraph but also to all the principles enunciated in the draft declaration.

35. The Australian representative observed that Principle 8 did not establish any difference, as regards liability, between the State launching an object into space and the State from whose territory or facility the object was launched. In his view, the "lending" State should not be held liable for subsequent damage. Although some liability might properly rest with that State, the primary responsibility should rest with the launching State. It was also pointed out that the draft made no express reference to joint liability in the case of activities carried out jointly by two or more States.

36. At the twenty-fourth meeting the Committee unanimously decided to submit to the General Assembly an additional report containing the text of the proposed draft declaration.[34] The General Assembly approved the draft declaration by resolution 1962 (XVIII) of 13 December 1963. In resolution 1963 (XVIII), adopted on the same date, the General Assembly:

"1. *Recommends* that consideration should be given to incorporating in international agreement form, in the future as appropriate, legal principles governing the activities of States in the exploration and use of outer space;

"2. *Requests* the Committee on the Peaceful Uses of Outer Space to continue to study and report on legal problems which may arise in the exploration and use of outer space, and in particular to arrange for the prompt preparation of draft international agreements on liability for damage caused by objects launched into outer space and on assistance to and return of astronauts and space vehicles;

"3. *Further requests* the Committee on the Peaceful Uses of Outer Space to report to the General Assembly at its nineteenth session on the results achieved in preparing these two agreements;"

## VI. The effects of atomic radiation

37. The question of the effects of atomic radiation was included in the agenda of the First Committee at the tenth, twelfth and thirteenth sessions of the General Assembly and in the agenda of the Special Political Committee beginning with the fifteenth session. The discussion was concerned chiefly with the technical and political aspects of the problem.

38. However, at the sixteenth session, when the report of the United Nations Scientific Committee on the Effects of Atomic Radiation was being considered in the Special Political Committee, some legal considerations affecting State responsibility were touched on.[35] A twenty-four-Power draft resolution (A/SPC/L.69 and Add.1) referred in its operative paragraph 1 to the responsibility of States concerning actions which might have harmful consequences for mankind, by increasing the levels of radioactive fall-out.

39. While a majority of the Committee agreed with the draft resolution, some representatives expressed disagreement, particularly with regard to operative paragraph 1. In their view, the provision contained in that paragraph had unwarranted political overtones that were out of place in a resolution on the technical activities of a group of scientists. The representative of Ceylon remarked that the provision was based on "principles of international law which were not yet settled, such as that of the illegality of nuclear and thermo-nuclear tests, which was open to question, or that of the responsibility of States". He also said that the International Law Commission had not given priority to the topic of State responsibility, as the General Assembly had asked it to do in resolution 799 (VIII), and he recalled that in the case, which had been cited in the debate, of the Japanese fishermen who had suffered from the effects of one thermo-nuclear explosion, the payment of compensation had been made *ex gratia* and had not been based on State responsibility.[36]

40. The draft resolution (A/SPC/L.69 and Add.1) was eventually approved by the Special Political Committee and was adopted by the General Assembly at its 1043rd plenary meeting. Operative paragraph 1 of the resolution reads as follows:

"*The General Assembly,*

" . . .

"1. *Declares* that both concern for the future of mankind and the fundamental principles of international law impose a responsibility on all States concerning action which might have harmful biological consequences for the existing and future generations of peoples of other States, by increasing the levels of radioactive fall-out;" [37]

41. General Assembly resolutions 1764 (XVII) of 20 November 1962 and 1896 (XVIII) of 11 November 1963, dealing with the same matter, make no reference to the question of responsibility.

---

[33] A/5549/Add.1, para. 6.

[34] A/5549/Add.1.

[35] *Official Records of the General Assembly, Sixteenth Session, Special Political Committee,* 262nd to 266th meetings.

[36] *Ibid.,* 265th meeting, para. 23.

[37] Resolution 1629 (XVI) of 27 October 1961.

## VII. State responsibility for nuclear hazards

42. The International Atomic Energy Agency has also concerned itself with the problem of State responsibility. In its report to the General Assembly covering the period from 1 July 1958 to 30 June 1959, it stated that the Director General had selected a panel of legal experts " to advise him on any action that might seem desirable in the field of civil liability and State responsibility for non-military nuclear hazards ".[38]

43. On the basis of the work accomplished by this panel, a draft international convention setting up minimum international rules on civil liability for nuclear damage was prepared. The Agency convened an international conference, which on 19 May 1963 adopted the Vienna Convention on Civil Liability for Nuclear Damage.[39] Also under the auspices of the Agency, the Diplomatic Conference on Maritime Law held an *ad hoc* session at Brussels in May 1962, during which it completed and adopted the text of a Convention on the Liability of Operators of Nuclear Ships.[40]

## VIII. Permanent sovereignty over natural resources

44. A particular aspect of the question of State responsibility — that of the responsibility of States for damage suffered by aliens in cases of expropriation — was discussed at length during the debates on " permanent sovereignty over natural resources " held in the Second Committee, the Economic and Social Council and the United Nations Commission on Permanent Sovereignty over Natural Resources.[41]

45. The Commission prepared a draft declaration designed to strengthen the right of peoples and nations to permanent sovereignty over their natural wealth and resources and decided to recommend it to the General Assembly for adoption. Opinion in the three above-mentioned bodies was divided on paragraph 4 of the draft declaration, dealing with the right of nationalization, expropriation or requisitioning and the conditions to which that right should be subject.[42]

46. On the one hand, it was asserted that the nationalization or expropriation of foreign property is generally subject to a rule which requires the State taking such action to compensate the owner. Compensation should be paid in accordance with the rules in force in the State nationalizing or expropriating the property in the exercise of its sovereignty and in accordance with international law. Moreover, expropriation, nationalization or requisitioning should not be the result of arbitrary measures but should be based on valid reasons of public utility, security or the national interest. Under these conditions the sovereign rights of States over their natural resources are affirmed, and at the same time international economic co-operation is ensured by adequate protection for foreign interests in accordance with the rules of international law. The representative of the United Arab Republic in the United Nations Commission on Permanent Sovereignty over Natural Resources also pointed out [43] that the right of any State to expropriate for reasons of public utility against payment of equitable compensation had been confirmed in the draft codification of the principles of international law governing State responsibility, which the International Law Commission was in process of preparing.[44]

47. The contrary opinion held that to require payment of compensation to the nationalized or expropriated enterprise restricted the principle of State sovereignty, since such a requirement would often make nationalization impossible. The objections of a number of delegations were directed primarily against the automatic character of such compensation. Since, in their view, there can be no other legal basis for nationalization procedures than national law, the State alone can judge whether or not the payment of compensation is justified. The supporters of this view also held that to require nationalization or expropriation to be justified by reasons of public utility, security or the national interest is to restrict the exercise of State sovereignty.

48. The General Assembly, in resolution 1803 (XVII) of 14 December 1962, adopted the draft declaration proposed by the Commission on Permanent Sovereignty over Natural Resources, with the amendments introduced by the Second Committee.

49. The final text of paragraph 4 of the declaration reads as follows :

" Nationalization, expropriation or requisitioning shall be based on grounds or reasons of public utility, security or the national interest which are recognized as overriding purely individual or private interests, both domestic and foreign. In such cases the owner shall be paid appropriate compensation, in accordance with the rules in force in the State taking such measures in the exercise of its sovereignty and in accordance with international law. In any case where the question of compensation gives rise to a controversy, the national jurisdiction of the State taking such measures shall be exhausted. However, upon agreement by sovereign States and other parties concerned, settlement of the dispute should be made through arbitration or international adjudication."

---

[38] International Atomic Energy Agency, *Report to the General Assembly of the United Nations covering the period from 1 July 1958 to 30 June 1959,* INFCIRC/10, para. 208.

[39] International Atomic Energy Agency, *Annual Report of the Board of Governors to the General Conference,* 1 July 1962-30 June 1963, GC (VII) 228, para. 97. Text of the Convention in *Documents of the Conference on Civil Responsibility for Nuclear Damage,* CN-12/46.

[40] *Ibid.,* 1 July 1961 - 30 June 1962, GC (VI) 195, para. 91. See English text in *A.J.I.L.,* vol. 57, pp. 268-278, and French text in *Revue générale de droit international public,* 1962, No. 4, pp. 894-904.

[41] *Official Records of the General Assembly, Seventeenth Session, Second Committee,* 834th, 835th to 843rd, 845th, 846th, 850th to 861st, 864th, 872nd and 876th meetings ; *Official Records of the Economic and Social Council, Thirty-Second Session,* 1177th to 1179th and 1181st meetings ; United Nations Commission on Permanent Sovereignty over Natural Resources, Third Session, A/AC.97/SR.19-33. See also the *Report of the Commission on Permanent Sovereignty over Natural Resources.* United Nations publication, Sales No. 62. V.6, part II.

[42] *Ibid.,* Annex.

[43] A/AC.97/SR.20.

[44] *Yearbook of the International Law Commission, 1958,* vol. II, document, p. 72, article 9.

50. In the course of the discussion in the Second Committee, attention was drawn on several occasions to the connexion between the subject under discussion and the work on the codification of the topic of State responsibility in the Sixth Committee. In part II of the above-mentioned resolution, the General Assembly:

" ...

" *Welcomes* the decision of the International Law Commission to speed up its work on the codification of the topic of responsibility of States for the consideration of the General Assembly."

51. In addition, the Secretariat prepared a study on " The Status of the Question of Permanent Sovereignty over Natural Wealth and Resources " (A/AC.97/5/Rev.2),[45] chapter III of which contains a summary of international adjudication and studies of draft codification relating to the responsibility of States in regard to the property and contracts of aliens.

52. This study was followed by another report by the Secretary-General (E/3840) prepared in accordance with the terms of part III of General Assembly resolution 1803 (XVII), in which the Secretary-General was requested " to continue the study of the various aspects of permanent sovereignty over natural resources ... and to report to the Economic and Social Council...".

53. This report includes a part III (B) (paras. 221-239) dealing with State responsibility for property rights of aliens in cases of State succession. In this part of the report, consideration is given to State responsibility for State contracts, and specifically to the questions of subrogation of the successor State in respect of rights and duties under the concession contract, respect for private acquired rights, observance in good faith of agreements, requirement for compensation in the event of a taking, and standards of compensation.

54. Moreover, in part III (C) (paras. 240-244) of the report, reference is made to the studies of the International Law Commission, and in particular to the reports of the Sub-Committee on State Responsibility and of the Sub-Committee on the Succession of States and Governments.

—————
[45] United Nations publication, Sales No. 62.V.6, part I.

**Annex**

*List of General Assembly resolutions cited*

|  | Paragraph |
|---|---|
| Resolution 258 (III) of 3 December 1948: Reparation for injuries incurred in the service of the United Nations ..................... | 17 |
| Resolution 260 A (III) of 9 December 1948: Prevention and punishment of the crime of genocide ................................. | 11 |
| Resolution 365 (IV) of 1 December 1949: Reparation for injuries incurred in the service of the United Nations ..................... | 18 |
| Resolution 799 (VIII) of 7 December 1953: Request for the codification of the principles of international law governing State responsibility ................................... | 39 |
| Resolution 1472 (XIV) of 12 December 1959: International co-operation in the peaceful uses of outer space ........................... | 22 |
| Resolution 1629 (XVI) of 27 October 1961: Report of the United Nations Scientific Committee on the Effects of Atomic Radiation .. | 40 |
| Resolution 1721 A (XVI) of 20 December 1961: International co-operation in the peaceful uses of outer space ........................... | 23 |
| Resolution 1764 (XVII) of 20 November 1962: Report of the United Nations Scientific Committee on the Effects of Atomic Radiation .. | 41 |
| Resolution 1802 (XVII) of 14 December 1962: International co-operation in the peaceful uses of outer space ........................... | 29 |
| Resolution 1803 (XVII) of 14 December 1962: Permanent sovereignty over natural resources | 48 |
| Resolution 1896 (XVIII) of 11 November 1963: Effects of atomic radiation ................. | 41 |
| Resolution 1962 (XVIII) of 13 December 1963: Declaration of legal principles governing the activities of States in the exploration and use of outer space ........................... | 36 |
| Resolution 1963 (XVIII) of 13 December 1963: International co-operation in the peaceful uses of outer space ........................... | 36 |

# DOCUMENT A/CN. 4/169

**Digest of the decisions of international tribunals relating to State responsibility, prepared by the Secretariat**

[*Original text : English*]
[*16 April 1964*]

## CONTENTS

|  | Paragraph | Page |
|---|---|---|
| INTRODUCTION ......................................................... | 1-2 | 133 |
| I. ORIGIN OF INTERNATIONAL RESPONSIBILITY : INTERNATIONAL WRONGFUL ACT ..... | 3-25 | 133 |
| II. STATE RESPONSIBILITY IN RESPECT OF ACTS OF LEGISLATIVE, ADMINISTRATIVE AND OTHER STATE ORGANS ............................................... | 26-103 | 138 |
| A. Legislative organs ............................................... | 26-27 | 138 |
| B. Executive and administrative organs ............................... | 28-52 | 138 |

**State Responsibility**                                                    **133**

CONTENTS (continued)

| | | Paragraph | Page |
|---|---|---|---|
| C. | Judicial organs .................................................. | 53-66 | 143 |
| D. | Members of armed forces ......................................... | 67-77 | 145 |
| E. | Police organs ................................................... | 78-103 | 148 |
| | (i) Members of police force ....................................... | 78-85 | 148 |
| | (ii) Arrest and imprisonment ......................................... | 86-95 | 149 |
| | (iii) Due diligence and the punishment of offenders .................... | 96-103 | 150 |
| III. | STATE RESPONSIBILITY IN RESPECT OF ACTS OF PRIVATE PERSONS, INCLUDING THOSE ENGAGED IN REVOLUTIONS OR CIVIL WARS ................................. | 104-115 | 152 |
| IV. | RESPONSIBILITY OF FEDERAL STATES AND STATES REPRESENTING OTHERS IN INTERNATIONAL RELATIONS .................................................. | 116-118 | 154 |
| V. | EXHAUSTION OF LOCAL REMEDIES AND DETERMINATION OF THE *Tempus Commissi Delicti* ........................................................ | 119-140 | 155 |
| VI. | CIRCUMSTANCES IN WHICH AN ACT IS NOT WRONGFUL ........................ | 141-161 | 159 |
| | A. General ....................................................... | 141-152 | 159 |
| | B. War measures ................................................. | 153-161 | 161 |
| VII. | THE DUTY TO MAKE REPARATION, ITS FORMS AND EXTENT ..................... | 162-199 | 163 |
| INDEX | ........................................................... | | 170 |

## Introduction

1. At its 686th meeting, on 24 May 1963, the International Law Commission requested the Secretariat to prepare a digest of the decisions of international tribunals in the matter of State responsibility.[1] The following digest has been compiled to cover the pertinent decisions of the International Court of Justice, the Permanent Court of International Justice, the Permanent Court of Arbitration and of other international tribunals whose awards are contained in the *Reports of International Arbitral Awards*, vols. I-XI. Reference has been made only to the more general aspects of the decisions in question.

2. The decisions have been arranged alphabetically under subject headings which follow as far as possible within the limits of the available material the programme of work approved by the International Law Commission at its 686th meeting. Cross-references have been made to decisions under other subject headings where appropriate. The heading of each case lists the title ; date ; parties ; arbitrator or tribunal ; and source reference. An index of cases is at the back of the digest.

## I. Origin of international responsibility : international wrongful act

*Administrative Decision No. II (1923)*

*Germany, United States*

*Germany-United States Mixed Claims Commission : Umpire : Parker (United States of America) ; Kiesselbach (Germany) ; Anderson (United States of America)*

---

[1] Summary record of the 686th meeting in *Yearbook of the International Law Commission, 1963*, vol. I ; see also *Yearbook 1963*, vol. II, p. 224, para. 55.

*Reports of International Arbitral Awards, Vol. VII. p. 23*

3. It was contended by the United States that under the relevant section of a Resolution of Congress and Article 231 of the Treaty of Versailles, both of which had been incorporated in the Treaty of Berlin between Germany and the United States, Germany was responsible for all damage caused to United States nationals as a result of the 1914-1918 War, irrespective of the direct cause of the particular injury. The Commission held that although it was immaterial whether the United States national was injured directly or indirectly, as a stockholder or otherwise, " a clear unbroken connexion " (p. 29) was required between Germany's act and the loss complained of. " It matters not how many links there may be in the chain of causation connecting Germany's act and the loss sustained, provided there is no break in the chain and the loss can be clearly, unmistakably, and definitely traced, link by link, to Germany's act .... All indirect losses are covered, provided only that in legal contemplation Germany's act was the efficient and proximate cause and source from which they flowed " (pp. 29-30). Accordingly, the Commission rejected the United States contention under which Germany would have been responsible for all consequences of the war. The Commission distinguished between Article 231 of the Versailles Treaties, which amounted to an acceptance by Germany of moral responsibility, and Article 232 and the Annex pertaining thereto, where Germany's financial responsibility for losses occurring during belligerency was limited and clearly defined (p. 31).

For a similar decision by the same Tribunal see the *War Risks Insurance Premium Claims*, R.I.A.A., Vol. VII, p. 44 at pp. 55-63.

*Case concerning the Factory at Chorzow (Claim for Indemnity) (Jurisdiction) (1927)*
*Germany v. Poland*
*Permanent Court of International Justice, Series A, No. 9*

4. Under the Geneva Convention of 1922, concluded between Germany and Poland, no dispossession of German interests could be effected before notice had been given to the owner, thus affording him an opportunity of being heard by the competent arbitral tribunal. The Permanent Court held that the Polish Government could not therefore require the German claimants to seek redress before the arbitral tribunals following dispossession because the only remedy then available was reparation, whilst if the correct procedure had been followed the wrong itself might not have occurred. The Court declared that it was:

" ... a principle generally accepted in the jurisprudence of international arbitration, as well as by municipal courts that one Party cannot avail himself of the fact that the other has not fulfilled some obligation or has not had recourse to some means of redress, if the former Party has, by some illegal act, prevented the latter from fulfilling the obligation in question, or from having recourse to the tribunal which would have been open to him " (p. 31).

*The Corfu Channel Case (Merits) (1949)*
*United Kingdom v. Albania*
*International Court of Justice Reports, 1949, p. 4*

5. In October 1946, two British naval vessels were mined whilst sailing through the Corfu Channel ; in November three weeks later a minesweeping operation was carried out by British ships, within Albanian territorial waters, despite the lack of consent of the Albanian Government. After diplomatic negotiations, the Parties submitted two questions to the International Court under a Special Agreement : firstly, was Albania responsible under international law for the damage and loss of life caused by the sinking of one of the British vessels and the damage done to the other, and in consequence under a duty to pay compensation ; and, secondly, had the United Kingdom violated Albanian sovereignty by reason of the entry into Albanian territorial waters of British ships in October and November 1946, and was there any duty to give satisfaction ?

6. The United Kingdom alleged that the two ships had been struck by mines which formed part of a minefield laid in the Channel with the knowledge or connivance of Albania. The Channel had been swept and declared free of mines in 1944 and 1945. In considering this allegation (pp. 18 *et seq.*) the Court declared that knowledge of the minelaying could not be imputed to Albania by reason merely of the fact that a minefield discovered in Albanian territorial waters had caused the explosions. Such an occurrence did, however, require an explanation from the territorial State concerned and that State's responsibilities in this regard could not be evaded by stating that it was ignorant of the circumstances of the act. At the same time it could not be concluded from the mere fact of the control exercised by a State

over its territory and waters that that State necessarily knew, or ought to have known, of the unlawful act. " This fact by itself and apart from other circumstances, neither involves *prima facie* responsibility nor shifts the burden of proof " (p. 18).

7. The Court nevertheless held that the exclusive territorial control exercised by a State has a bearing upon the methods of proof available to establish the knowledge of that state. The other State, which had been a victim of a breach of international law, should be allowed a more liberal recourse to inferences of fact and circumstantial evidence. The Court determined that, by virtue of inferences which left no room for reasonable doubt, Albania had knowledge of the minelaying in her waters independently of any connivance on her part in the operation. The Court further determined that in the circumstances Albania had been under an obligation to notify shipping of the existence of the minefield — an obligation based on " elementary considerations of humanity ...; the principle of the freedom of maritime communication ; and every State's obligation not to allow knowingly its territory to be used for acts contrary to the rights of other States " (p. 22). Nevertheless, though the Albanian authorities had had an opportunity to do so, they had not attempted to prevent the disaster. " These grave omissions involve the international responsibility of Albania ". (p. 23).

8. Regarding the second question the Court held that the passage of British ships through the Channel in October 1946 was in exercise of the right to pass through an international highway and that no breach of international law was involved (pp. 28-30). The minesweeping operation carried out on two days in November 1946, however, against the express wishes of the Albanian Government, was found to be a violation of Albanian sovereignty. The Court rejected the argument of the British Government that this operation was necessary in order to secure the *corpus delicti*. The Court stated that the exercise of a right of intervention of this nature was unacceptable on the ground that it constituted a manifestation of a policy of force which had no place in international law (pp. 34-35).

On the measure of damages awarded by the Court, see para. 167 and paras. 173-174 *infra*.

*Dickson Car Wheel Case (1931)*
*Mexico, United States*
*Mexico-United States General Claims Commission : President : Alfaro (Panama) ; Macgregor (Mexico) ; Nielsen (United States of America)*
*Reports of International Arbitral Awards, Vol. IV, p. 669*

9. The United States of America presented a claim in respect of certain car wheels sold to the National Railways of Mexico shortly before the Mexican Government took over the Railways Company. The Government operated the railways for ten years without paying any revenue to the Railways Company ; the property was then restored to private management. The Commission held that the Government was not responsible, by virtue of its action in taking over the railways, for the destruc-

tion of the rights held by the Dickson Car Wheel Company. The Railways Company had never lost its own juridical identity and it would have been possible for the Dickson Car Wheel Company to have sued the Railways Company before the Mexican court during the period of possession by the Government (pp. 674-675). The Commission also rejected a contention that the Government had obtained an unjust enrichment at the expense of the Dickson Car Wheel Company. Before a State could be held to have incurred responsibility, " it is necessary that an unlawful international act be imputed to it, that is, that there exists a violation of a duty imposed by an international juridical standard " (p. 678). Under the Convention establishing the Commission the further requirement was added that a national of the claimant Government should have suffered damage. The fact that an individual suffered injury was insufficient to create responsibility on the part of the Government towards the individual, but only towards his Government. After examining the arguments put forward in previous cases, the Commission reached the following conclusions :

" I.   A State does not incur international responsibility from the fact that a subject of the claimant State suffers damages as a corollary or result of an injury which the defendant State has inflicted upon one of its own nationals or upon an individual of a nationality other than that of the claimant country, with whom the claimant is united by ties of friendship.
" II.   A State does not incur international responsibility from the fact that an individual or company of the nationality of another State suffers a pecuniary injury as the corollary or result of an injury which the defendant State has inflicted upon an individual or company irrespective of nationality when the relations between the former and the latter are of a contractual nature " (p. 681).

10.   The damage suffered by the Dickson Car Wheel Company was of a provisional character. Moreover, even if the Company had been unable to collect the amount due to it from the Railways Company, that Company had been placed in a special position by reason of the fact that the Government had to take over the railways in order to face an emergency which endangered the nation. No responsibility arose from the act. " States have always resorted to extraordinary measures to save themselves from imminent dangers and the injuries to foreigners resulting from these measures do not generally afford a basis for Claims " (p. 681).

11.   See also the *International Fisheries Company* case, R.I.A.A., Vol. IV, p. 691, where the Tribunal declared :

" It is necessary that the loss which the national entity of the respondent country has suffered be one of the kind which gives rise or ground to an international claim in the supposition that that entity were an alien and therefore had the right to make a claim. States according to a thoroughly established rule of international law, are responsible only for those injuries which are inflicted through an act which violates some principle of international law " (p. 701).

*Case of the Free Zones of Upper Savoy and the District of Gex. (Second Phase) (1930)*
*France v. Switzerland*
*Permanent Court of International Justice, Series A, No. 24*

12.   This case concerned the effect of Article 435, paragraph 2, of the Treaty of Versailles upon earlier treaties which defined the customs and economic régime of the Free Zones of Upper Savoy and the District of Gex. The Court held that a reservation should be made in respect of a possible abuse of the right of the French Government to apply French fiscal legislation in the territory of the Zones, as in any other part of French territory, but that such an abuse could not be presumed by the Court (p. 12).

See also *Case of the Free Zones of Upper Savoy and the District of Gex, (1932) P.C.I.J., Series A/B, No. 46*, esp. at p. 167.

**S.S. I'm Alone** *(1933 and 1935)*
*Canada, United States*
*Arbitrators : Duff (Canada) ; Van Devanter (United States of America)*
*Reports of International Arbitral Awards, Vol. III, p. 1609*

13.   The *I'm Alone*, a British ship of Canadian registry, was sunk by a United States coast guard vessel some 200 miles off the coast of the United States. The ship had refused to stop when hailed outside the three mile limit but within the limits set by a Convention, entered into between Great Britain and the United States, permitting search and other measures to be taken by the United States authorities. Canada protested that the sinking was an illegal act which was not justified under the terms of the Convention. The Arbitrators held that, although necessary and reasonable force might be used in searching ships suspected of smuggling, the admittedly intentional sinking of the *I'm Alone* was unjustified under the Convention or under any principle of international law (p. 1617). On the measure of damages awarded, see para. 176 *infra*.

*The Mavrommatis Palestine Concession (1924)*
*Greece v. United Kingdom*
*Permanent Court of International Justice, Series A, No. 2*

14.   The Greek Government claimed that the British authorities in Palestine had refused to recognize the rights granted to Mr. Mavrommatis, a Greek national, under certain concessionary contracts which he had concluded with the Ottoman authorities prior to the establishment of the British mandate over Palestine. In giving judgement the Permanent Court of International Justice emphasized that, when a dispute between a State and an alien is taken up by the latter's Government, the dispute enters upon a new phase and becomes a dispute in international law. The fact that the injury was inflicted upon a private interest was irrelevant ; in taking up the case of one of its subjects a State was asserting its own right to ensure, in the person of its subjects, respect for the rules of law (p. 12).

The Permanent Court made similar statements in the *Case concerning the payment of various Serbian Loans issued in France* and the *Case concerning the payment in gold of the Brazilian Federal Loans issued in France*, P.C.I.J., Series A, Nos. 20/21, at pp. 17-20, and in the *Panevezys-Saldutiskis Railway* case, P.C.I.J., Series A/B, No. 76 at p. 16.

*Lighthouses Concession Case (1956)*

*France, Greece*

*Permanent Court of Arbitration: President: Verzijl (Netherlands); Mestre (France); Charbouris (Greece)*

*Protocole des Séances, Ordonnances de Procédure et Sentences avec Annexes du Tribunal d'Arbitrage constitué en vertu du compromis signé à Paris le 15 juillet 1931 entre la France et la Grèce, Bureau international de la Cour Permanente d'Arbitrage, pp. 88-91 and 98-100*

*Claim No. 1*

15. Greece refused to pay lighthouse dues for requisitioned ships on the ground that these were " warships properly so-called " and therefore exempt under the terms of the lighthouse concession held by the French claimants. This position was maintained both when Greece was the occupying Power and after she had acquired sovereignty over the parts of former Turkish territory concerned. The Tribunal held that the claim of the French firm should succeed except in respect of requisitioned ships which Greece could prove had been converted so as to enable them to take part effectively in military operations. The Tribunal declared that the claim was to be judged in the same light despite the fact that the juridical foundation of Greece's responsibility was different for the two periods — " *excès de ses pouvoirs internationaux de puissance occupante, dans un cas, non-observation des clauses du contrat de concession en qualité d'Etat concédant par subrogation dans l'autre* " (p. 98).

*Lighthouses Concession Case (1956)*

*France, Greece*

*Permanent Court of Arbitration: President: Verzijl (Netherlands); Mestre (France); Charbouris (Greece)*

*Protocole des Séances, Ordonnances de Procédure et Sentences avec Annexes du Tribunal d'Arbitrage constitué en vertu du compromis signé à Paris le 15 juillet 1931 entre la France et la Grèce, Bureau international de la Cour Permanente d'Arbitrage, pp. 100-101*

*Claim No. 5*

16. The French firm presented a claim for compensation on the ground that they had lost revenue owing to the failure of the Greek Government to lend its authority to the collection of lighthouse dues payable under the terms of their concession. The Tribunal upheld the contention of the French Government that the Greek Government had negligently or deliberately failed to assist in ensuring the collection of dues, despite the clear terms of the concession obliging it to render such assistance. It was held that the plain duty of the grantor State was not neutralized by a clause stating that

the dues were to be collected by the concessionnaire in the Government's name without the concessionnaire being able to claim any compensation in respect thereof from the Government. The Tribunal found that this clause was intended to protect the State against the wrongs of others, for example the non-payment of dues owing to the insolvency of a shipping company, but did not operate to prevent it from remaining responsible for its own wrongs. On the measure of damages awarded by the Tribunal in this claim, see para. 187 *infra*.

*Treaty of Neuilly, Article 179, Paragraph 4 (Interpretation) (1924)*

*Bulgaria v. Greece*

*Permanent Court of International Justice, Series A, No. 3*

17. Article 179, paragraph 4, of the Treaty of Neuilly provided that all property, rights and interests of Bulgarian nationals within the territory of the Allied or Associated Powers might be liquidated and charged, *inter alia*, with the payment of claims brought by the nationals of those Powers in respect of acts committed by the Bulgarian Government or authorities after 11 October 1915. The Court held that the expression " acts committed " (*actes commis*) contemplated " acts contrary to the law of nations and involving an obligation to make reparation " (p. 8).

For similar *dicta* see the *Goldenberg* case (1928), R.I.A.A., Vol. II, p. 901, at pp. 906-908 and *Responsibility of Germany for Damage caused in Portuguese Colonies in South Africa (Merits) (1928)*, R.I.A.A., Vol. II, p. 1011, at p. 1016.

*Interpretation of the Peace Treaties with Bulgaria, Hungary and Romania (Second Phase) (1950)*

*International Court of Justice Reports, 1950, p. 221*

18. In an earlier Advisory Opinion (*I.C.J. Reports 1950*, p. 65) the International Court held that the Governments of Bulgaria, Hungary and Romania were under an obligation to appoint their representatives to the Commissions established under the Peace Treaties concluded after the war of 1939-1945. Following the refusal of those States to appoint representatives, the Court stated that " . . . it is clear that refusal to fulfil a treaty obligation involves international responsibility " (p. 228). The Court held, however, that this refusal did not alter the conditions contemplated in the Treaties for the exercise by the Secretary-General of the United Nations of a power of appointment. " The failure of machinery for settling disputes by reason of the practical impossibility of creating the Commission provided for in the Treaty is one thing ; international responsibility is another " (p. 229).

*Responsibility of Germany for acts committed after 31 July 1914 and before Portugal entered the War*

*Portugal, Germany*

*Arbitrators : de Meuron, Fazy, Guex (Switzerland)*

*Reports of International Arbitral Awards, Vol. II, p. 1035*

19. In the course of its decision regarding a number of claims in respect of various requisitions and acts of

pillage of Portuguese property in Belgium during the period of German military occupation, the Tribunal stated that the plaintiff State was bound to prove : (i) the existence of an act, contrary to international law, which had caused the damage ; (ii) that the act had been caused by the German State or by German authorities ; (iii) the fact that the act was committed between 31 July 1914, and 9 March 1916, when Portugal entered the war ; and (iv), the amount of the damage. The Tribunal declared that the German invasion of Belgium did not in itself give rise to responsibility in respect of the Portuguese claims since, although it had furnished the occasion, it had not been the cause of the concrete acts of requisition and pillage (p. 1040). On the question of damages, see para. 194 infra.

*Responsibility of Germany for damage caused in the Portuguese Colonies in South Africa (Merits) (1928)*

*Portugal, Germany*

*Arbitrators : de Meuron, Fazy, Guex (Switzerland)*

*Reports of International Arbitral Awards, Vol. II, p. 1011*

20. Portugal claimed that Germany was responsible for the damage caused in its African colonies by an invasion of German troops prior to the entry of Portugal into the 1914-1918 War. The Tribunal found that the principal incident at Naulilaa followed a frontier incident in which several Germans had been killed as a result of a misunderstanding (pp. 1023-1025) and that no violation of international law had occurred on the part of Portugal justifying the German reprisal (pp. 1025-1028). The reprisal was therefore itself in breach of international law and Germany was liable to pay for the damage directly caused by German troops (p. 1029).

21. Portugal claimed that Germany should also be held responsible for the indirect damage caused by the invasion, in particular for the consequences of the withdrawal of Portuguese troops. The Tribunal held that, although Germany could not be held solely responsible for the consequences of the withdrawal, nevertheless Germany was responsible for such indirect losses as could reasonably have been foreseen (pp. 1029-1032). On the question of damages, see para. 195 infra.

*The Savarkar Case (1911)*

*France, United Kingdom*

*Permanent Court of Arbitration : Beernaert (Belgium) ; Renault (France) ; Gram (Norway) ; Savornin Lohman (Netherlands) ; Desert (United Kingdom)*

*Reports of International Arbitral Awards, Vol. XI, p. 243*

22. Savarkar, a British subject, escaped at Marseilles from a British merchant ship which was transporting him from England to India where he was to be tried on a charge of abetting a murder. Whilst being pursued by Indian policemen from the ship he was captured by a French police official who returned him to the ship, which sailed the next day. Subsequently France sought the return of the fugitive on the ground that

his delivery to the British prison officers was contrary to international law. The Permanent Court of Arbitration held that, although there had been an " irregularity " in the arrest of Savarkar and in his being handed over to the British officers, there was no rule of international law requiring Great Britain to return him. The Court also stated that the case was manifestly not one of recourse to fraud or force in order to obtain possession of a person who had taken refuge in a foreign country and that, in the circumstances, no violation of French sovereignty had occurred (pp. 253-254). *Cf.* the *Colunje* case, R.I.A.A., Vol. VI, p. 342 ; para. 86 infra.

*Spanish Zone of Morocco Claims (1925)*

*Spain, United Kingdom*

*Rapporteur : Huber (Switzerland)*

*Reports of International Arbitral Awards, Vol. II, p. 615*

23. Great Britain put forward a series of claims on behalf of British subjects and protected persons who had suffered losses or injuries in the Spanish Zone of Morocco between 1913 and 1921. Before dealing with the individual claims the Rapporteur, whose functions approximated to those of an Arbitrator, laid down certain general principles in regard to State responsibility (pp. 639-650). With reference to the conflicting interests of the territorial State and the State seeking to protect its nationals, he declared that, for international responsibility to arise.

" . . . il est nécessaire qu'il y ait soit violation d'une clause prescrivant un traitement particulier de l'étranger, soit violation manifeste et grave des règles applicables aux nationaux au même titre qu'aux étrangers " (p. 641).

Foreign intervention could only be exercised by way of an exception to the fundamental principle of respect for territorial sovereignty. Nevertheless, up to a certain point the interest of the State in being able to protect its nationals must carry more weight than the considerations of territorial sovereignty.

" Ce droit d'intervention a été revendiqué par tous les Etats : ses limites seules peuvent être discutées. En le niant, on arriverait à des conséquences inadmissibles : on désarmerait le droit international vis-à-vis d'injustices équivalant à la négation de la personnalité humaine ; car c'est à cela que revient tout déni de justice " (ibid.).

Whilst the fact that an alien was a victim of an ordinary offence was insufficient in itself to make the matter an international one, even if the subsequent proceedings proved unsuccessful, the limitation imposed on the right of States to intervene,

" . . . présuppose que la sécurité générale dans les pays de résidence de ceux-ci ne tombe pas au-dessous d'un certain niveau, et qu'au moins leur protection par la justice ne devienne pas purement illusoire "

(p. 642). See also pp. 645-646.

*The Trail Smelter Case (1938 and 1941)*

*Canada, United States*

*Arbitrators : Hostie (Belgium) ; Greenshields (Canada) ; Warren (United States of America)*

*Reports of International Arbitral Awards, Vol. III, p. 1905*

24.   A smelter plant situated in Canada was alleged to have caused damage in the State of Washington in the United States by reason of the sulphur dioxide fumes emitted from the plant and carried by wind and air currents over the frontier. After examining United States cases, in the absence of international decisions dealing with similar situations, the Tribunal concluded that " under the principles of international law, as well as the law of the United States, no State has the right to use or permit the use of its territory in such a manner as to cause injury by fumes in or to the territory of another or the properties or persons therein, when the case is of serious consequence and the injury is established by clear and convincing evidence " (p. 1965). Considering the circumstances of the case the Tribunal therefore found Canada responsible in international law for the conduct of the Smelter, irrespective of the undertakings on the part of Canada contained in the Convention (pp. 1965-1966). In accordance with the terms of the Convention, the Tribunal laid down a series of measures to be adopted by the Trail Smelter in order to prevent further damage (pp. 1934-1937 ; 1966-1980). On the question of the measure of damages, see para. 199 *infra*.

*The S.S. Wimbledon (1923)*

*Allied Powers v. Germany*

*Permanent Court of International Justice, Series A, No. 1*

25.   The *S.S. Wimbledon*, an English steamship chartered by a French company, was refused passage through the Kiel Canal by the German authorities on the ground that the ship's transit for the purpose of carrying munitions to the Polish Naval Base in Danzig would constitute a violation of German neutrality in view of the war then being waged between Poland and Russia. The Permanent Court of International Justice found that, by virtue of Article 380 of the Treaty of Versailles, the Canal had become an international waterway and that Germany was not entitled to prohibit the passage of ships of nations at peace with Germany, nor was her neutrality infringed by the passage of ships carrying contraband. The Court held that, having wrongfully refused passage, Germany was responsible for the loss occasioned by the ship's delay and was obliged to compensate the French Government on behalf of the charterers (p. 30). Regarding the measure of damages awarded by the Permanent Court, see para. 165 *infra*.

## II. State responsibility in respect of acts of legislative, administrative and other State organs

### (A) LEGISLATIVE ORGANS

*Case concerning Certain German Interests in Polish Upper Silesia. (The Merits) (1926)*

*Germany v. Poland*

*Permanent Court of International Justice, Series A, No. 7*

26.   The German Government claimed that certain legislative measures taken by the Polish Government affecting German interests in Upper Silesia were in breach of Poland's international obligations. The Court declared that municipal laws are " facts which express the will and constitute the activities of States, in the same manner as do legal decisions or administrative measures " (p. 19) and found that the Polish legislation in question was contrary to the German-Polish Convention protecting the German interests concerned.

*German Settlers in Poland (1923)*

*Permanent Court of International Justice, Series B, No. 6*

27.   The Court was asked to give an advisory opinion on certain questions relating to settlers of German origin in the territory ceded by Germany to Poland, in particular the compatibility with the international obligations accepted by Poland of Polish legislative measures affecting contracts entered into by the settlers with the Prussian Government. The Court determined that, under the Minorities Treaty, Poland had agreed that all Polish nationals, including those of German origin, should receive the same civil and legal rights. The Court found that the legislative measures taken by the Polish Government amounted to a virtual annulment of the private rights which the settlers had acquired under their contracts with the Prussian Government and which subsisted even after the change of sovereignty. The Court therefore held that the measures adopted by the Polish Government were not in conformity with Poland's international obligations (pp. 19-20 ; 35-38, esp. at p. 36).

### (B) EXECUTIVE AND ADMINISTRATIVE ORGANS

*Aboilard Case (1925)*

*Haiti, France*

*Arbitral Commission : Vignaud (Umpire) ; Renault (France) ; Ménos (Haiti)*

*Reports of International Arbitral Awards, Vol. XI, p. 71*

28.   The Government of Haiti challenged the validity of certain concessionary contracts which Aboilard, a French national, had concluded with the authorities of Haiti, on the ground that the contracts were null and void since they had not received legislative approval. The Arbitral Commission established to consider the case held that the responsibility of Haiti was engaged as a result of the conclusion of the contracts by the executive ; Aboilard had had every reason to believe that the contracts were properly concluded. The damages and rate of interest awarded by the Commission

for the withdrawal of the concessions were, however, less than would have been the case had the contracts received legislative approval (pp. 79-81).

*Aguilar-Amory and Royal Bank of Canada Claims (1923)*
*Costa Rica, United Kingdom*
*Arbitrator : Taft (United States of America)*
*Reports of International Arbitral Awards, Vol. I, p. 369*

29.   President Tinoco held power in Costa Rica between 1917 and 1919. The succeeding Government passed a Law nullifying the contracts entered into by President Tinoco and certain of the decrees which he had enacted. The British Government submitted two claims, one in respect of the alleged indebtedness of the Bank and Government of Costa Rica to the Royal Bank of Canada, by reason of sums paid to President Tinoco, and the other regarding an oil-exploring concession which President Tinoco had granted to a company owned by a British company. The Costa Rican Government argued, *inter alia,* that the Tinoco régime had never been recognized as the *de facto* or *de jure* Government by Great Britain and that the acts of Tinoco were void as being in violation of the Constitution.

30.   The Arbitrator found that the Tinoco régime had been a *de facto* Government and that Tinoco's acts were binding on the State (pp. 377-381). The fact that Great Britain had not recognized Tinoco's Government, although of evidential weight, did not preclude a claim being brought (pp. 382-384). The Arbitrator determined that the Royal Bank of Canada could not recover sums paid to Tinoco and his brother at a time when the Bank must have known that those sums were to be used for their personal expenditure, after taking refuge abroad, and not for legitimate government expenditure. The Arbitrator held that, since the nullifying law did not constitute an international wrong, on grounds of equity the Bank should be subrogated to the title of Costa Rica in a mortgage of Tinoco's estate, granted by Tinoco's widow (pp. 394-395). As regards the Aguilar-Amory oil contract, the Arbitrator held that this was invalid under Costa Rican law at the time it was granted in 1917 and that the claim could not therefore be sustained (pp. 395-399).

31.   See also the *French Claims Against Peru*, R.I.A.A., Vol. I, p. 215, where an attempt by the Peruvian Congress to nullify the acts of the President was set aside on the ground that it could not be applied to foreigners who had acted in good faith.

*Robert E. Brown Case (1923)*
*United Kingdom, United States*
*United Kingdom-United States Arbitral Tribunal : President : Fromageot (France) ; Mitchell-Innes (United Kingdom) ; Olds (United States of America)*
*Reports of International Arbitral Awards, Vol. VI, p. 120*

32.   In 1895 Brown, an American citizen, pegged out a number of claims in an area which had been proclaimed a public gold field by the President of the South African Republic. The proclamation was withdrawn and new regulations were issued governing the issue of mining claims in the area of question. The High Court of the South African Republic gave judgement in Brown's favour and held that he was entitled to damages in the event that he was unable to peg off his original claims. The licences subsequently issued by the South African authorities in respect of Brown's claims were of no practical value, however. Brown sought to obtain damages but his case was dismissed after the executive had brought pressure to bear on the judiciary and had dismissed the Chief Justice. Brown did not start a new action, although it was open to him to do so.

33.   The Tribunal held that Brown had acquired rights of a substantial character under the laws in force in 1895 and that the various steps taken by the South African authorities in order to defeat Brown's claim amounted to a clear denial of justice. Brown's claim was not defeated by a failure to exhaust local remedies, the futility of further proceedings having been fully demonstrated (pp. 128-129). The Tribunal found that Brown's claim could nevertheless not succeed as against the British Government since that Government was not liable as a succeeding State, nor as a former suzerain over the South African Republic (pp. 129-130).

*The Oscar Chinn Case (1934)*
*United Kingdom v. Belgium*
*Permanent Court of International Justice, Series A/B, No. 63*

34.   Mr. Chinn owned a transport and shipbuilding business operating in the Belgian Congo. As a result of measures taken by the Belgian Government to make good the losses sustained by another transport company, in which the Belgian State had a large interest, Mr. Chinn was forced to wind up his business. The United Kingdom brought a claim against Belgium for the loss and damage sustained by Mr. Chinn, alleging, *inter alia,* that the measures taken by the Belgian Government constituted a violation of the obligation, incumbent on all States, to respect the vested rights of foreigners in their territories. Whilst agreeing that such an obligation existed in international law, the Court found that, in the circumstances of the case, Mr. Chinn's original position characterized by the possession of customers and the possibility of making a profit, did not constitute a genuine vested right (pp. 87-88).

*Compagnie Générale des Asphaltes de France Case (1903)*
*United Kingdom, Venezuela*
*United Kingdom-Venezuela Mixed Claims Commission : Umpire : Plumley (United States of America) ; Harrison (United Kingdom) ; Grisanti (Venezuela)*
*Reports of International Arbitral Awards, Vol. IX, p. 389*

35.   The Venezuelan Consul in Trinidad refused to clear the company's vessels for Venezuela unless he was paid in advance the full duties chargeable in Venezuela on the goods being imported into that country and unless passports were obtained from him before-

hand. He later refused to clear the company's ships on the ground that the company had complained to the British authorities and that the permit permitting him to clear vessels had been withdrawn. The Umpire held that the collection of import duties was " an act of Venezuelan sovereignty on British soil " and constituted " a just cause of offence " (p. 392). The responsibility of Venezuela for the consul's act was the same, whether it authorized and directed them, " or only ratified them by silence and acquiescence " (p. 396).

*George W. Cook Case (1927)*
*Mexico, United States*
*Mexico-United States General Claims Commission:
President: van Vollenhoven (Netherlands); Mac-
gregor (Mexico); Nielsen (United States of America)*
*Reports of International Arbitral Awards, Vol. IV,
p. 213*

36. Cook purchased a number of postal money orders which the Mexican authorities refused to honour when he presented them within the due period. Mexico contended that the claim presented by the United States was barred under the Mexican Statute of Limitations. It was held that the United States was not debarred by virtue of Mexican law from pursuing its international claim in respect of the money wrongfully withheld. Although the nature of contractual rights is determined by local law, the responsibility of a Government is to be determined solely by reference to international law (pp. 214-215).

See also the *Hopkins* case, R.I.A.A., Vol. IV, p. 41 ; para. 43, *infra.*

*Joseph E. Davies Case (1927)*
*Mexico, United States*
*Mexico-United States General Claims Commission:
President: van Vollenhoven (Netherlands); Mac-
gregor (Mexico); Nielsen (United States of America)*
. *Reports of International Arbitral Awards, Vol. IV,
p. 139*

37. This claim for payment for legal services rendered under a contract made by the claimant with the agency of the *de facto* Mexican Government was allowed as regards the unpaid balance of the first year's salary, which was payable immediately on the conclusion of the contract (p. 141). The contract contained a clause expressly limiting the agent's authority to bind the incoming Mexican Government. The Commission held that the claimant was bound by this explicit notice as regards subsequent payments otherwise due under the contract (pp. 143-144).

*De Sabla Case (1933)*
*Panama, United States*
*Panama-United States General Claims Commission:
President: van Heeckeren (Netherlands); Alfaro
(Panama); Root (United States of America)*
*Reports of International Arbitral Awards, Vol. VI,
p. 358*

38. Owing to the chaotic conditions of the land registries the Government of Panama had no knowledge of the precise extent of public lands. It therefore adopted a system of granting applications [for adjudication] of public land and calling upon the private owner, if any, to defend his title. A large number of such adjudications were granted in respect of property owned by the De Sabla family although, as the Commission found, the Government had knowledge of the precise extent of the De Sabla property. Panama contended that the system did not constitute expropriation by international standards since private owners were given an opportunity to defend their title. The Commission held that the large numbers of applications filed rendered it extremely difficult for the claimants to defend their title and that no adequate protection was in fact provided. Panama could not therefore avoid liability because of the claimants' failure to oppose each application (p. 363). In view of the fact that Panama had notice over a long period of the extent of the property owned by the claimants, the grant of adjudications and licences constituted wrongful acts for which Panama was internationally responsible (p. 366).

*Deutz Case (1929)*
*Mexico, United States*
*Mexico-United States General Claims Commission;
President :Sindballe (Denmark); Macgregor (Mexico);
Nielsen (United States of America)*
*Reports of International Arbitral Awards, Vol. IV,
p. 472*

39. The Mexican Government placed several orders for textiles with the firm of Deutz. Deutz rendered partial delivery but the Mexican Government refused to accept the goods, without giving any reason. The firm sold the goods at a loss and ceased further deliveries. The Commission held that Mexico was liable for breach of contract and should pay damages ; as to the delivered goods, the claimants were entitled to the difference between the contract price and the cost price, plus the loss suffered on resale, and, as to the undelivered goods, their loss of profit.

*El Emporio Del Café Case (1926)*
*Mexico, United States*
*Mexico-United States General Claims Commission:
President: van Vollenhoven (Netherlands); Mac-
gregor (Mexico); Parker (United States of America)*
*Reports of International Arbitral Awards, Vol. IV,
p. 17*

40. The Mexican Government submitted a claim on behalf of El Emporio del Café to recover export dues paid to United States authorities on goods exported during the occupation of Vera Cruz by the United States in 1914. The consignments concerned were reshipped to other parts of Mexico. The United States contended that the Commission lacked competence to consider the claim. The Commission held that, although it could not examine a claim that the United States authorities were not entitled to perform administrative acts in Vera Cruz, since that would constitute a controversy between the two Governments lying outside its jurisdiction, it could examine the pertinent acts of the United States authorities in order to determine whether they had inflicted any damage on

the rights of Mexican citizens. In the event that it was proved that the dues should be repaid under Mexican law, which the United States authorities had applied, then the claimant company was entitled to a refund.

### Hemming Case (1920)
### United Kingdom, United States
*United Kingdom-United States Arbitral Tribunal : President : Fromageot (France) ; Fitzpatrick (United Kingdom) ; Anderson (United States of America)*
*Reports of International Arbitral Awards, Vol. VI, p. 51*

41.  Hemming, an English lawyer, was engaged in 1894 by the United States Consul in Bombay in connexion with the prosecution of certain persons accused of counterfeiting United States coins. The United States contended that the Consul was not authorized to hire an attorney in this way. It was held that, since the United States had not objected to Hemming's employment at the time, although it had been aware of it, the United States was subsequently bound by the terms of the contract (p. 53).

### Henriquez Case (1903)
### Netherlands, Venezuela
*Netherlands-Venezuela Mixed Claims Commission ; Umpire : Plumley (United States of America) ; Hellmund (Netherlands), who was succeeded by Möller ; Iribarren (Venezuela)*
*Reports of International Arbitral Awards, Vol. X, p. 713*

42.  The Umpire stated that, in accordance with the accepted rules of international law, for Venezuela to be held responsible for the seizure of goods or property the seizure must have been made through the Government's own authorities or by those who had a right to act in the name and on behalf of the Government, or by some one having authority to express the governmental will and purpose (pp. 714-715).

For a similar decision see the *Crossman* case, R.I.A.A., Vol. X, p. 356.

### Hopkins Case (1926)
### Mexico, United States
*Mexico-United States General Claims Commission : President : van Vollenhoven (Netherlands) ; Macgregor (Mexico) ; Parker (United States of America)*
*Reports of International Arbitral Awards, Vol. IV, p. 41*

43.  The United States presented this claim on behalf of Hopkins, a United States citizen, who had bought money orders issued by a *de facto* Mexican Government. After this régime had been overthrown the incoming Government annulled the acts of its predecessor and refused to pay the orders. The Commission held that the Government was bound to respect the validity of the acts of the *de facto* Government in so far as that Government had exercised real control over most of the country and had performed normal governmental acts (pp. 42-46). Since both these factors had

been present, the Government was bound to honour the orders, which constituted a vested right held by an alien. The Commission held that it made no difference that this could enable aliens to enjoy rights against Mexico which were withheld from Mexican citizens under the latter's municipal law (pp. 46-47).

For similar decisions see the *Peerless Motor Car Company* case, R.I.A.A., Vol. IV, p. 203, and the *Patton* case, R.I.A.A., Vol. V, p. 224.

### Illinois Central Railroad Company Case (1926)
### Mexico, United States
*Mexico-United States General Claims Commission : President : van Vollenhoven (Netherlands) ; Macgregor (Mexico) ; Parker (United States of America)*
*Reports of International Arbitral Awards, Vol. IV, p. 21*

44.  The Illinois Central Railroad Company presented a claim for money due for the sale of railway engines to the Mexican National Railway. The Commission held that, upon an examination of international jurisprudence, there was no ground for stating that contract claims are cognizable only where denial of justice or some other form of government responsibility was involved. No general rule could be discovered " according to which mere non-performance of contractual obligations by a Government in its civil capacity withholds jurisdiction, whereas it grants jurisdiction when the non-performance is accompanied by some feature of the public capacity of the Government as an authority " (p. 22). The Commission subsequently awarded damages against the Mexican Government for the railway engines which had been delivered (p. 134).

### The Jessie, *the* Thomas F. Bayard *and the* Pescawha Cases (1921)
### United Kingdom, United States
*United Kingdom-United States Arbitral Tribunal : President : Fromageot (France) ; Fitzpatrick (United Kingdom) ; Anderson (United States of America)*
*Reports of International Arbitral Awards, Vol. VI, p. 57*

45.  Three British vessels, the *Jessie, Thomas F. Bayard* and *Pescawha,* were seized by a United States revenue cutter while hunting sea otters in a fur-sealing zone of the North-East Pacific. The firearms and ammunition found on board were sealed by the United States officials. The United States contended that the American officer had acted in the *bona fide* belief that his action was authorized under an agreement between Great Britain and the United States designed to protect fur seals. It was admitted that no such agreement existed at the date of the seizure. The Tribunal stated that,

"... any Government is responsible to other Governments for errors in judgment of its officials purporting to act within the scope of their duties and vested with power to enforce their demands " (p. 59).

A similar decision was reached in the *Wanderer* case, R.I.A.A., Vol. VI, p. 68, where the United States was held liable for the seizure of a British ship by United

States authorities who purported to act under an authorization granted by a British statute. The Tribunal found that the United States officials had acted outside the ambit of the authority delegated to them by the statute.

46. In the *Coquitlam* case, R.I.A.A., Vol. VI, p. 45, a British ship had been seized by a United States customs officer in the belief that United States revenue laws had been infringed; it was later determined by a United States court that no infringement had in fact occurred. The Tribunal held that the United States was liable for the error of judgement shown by the official, despite the fact that he had had reasonable cause to believe that the revenue laws had been infringed (p. 47).

*Cf.* the *Tattler* case, R.I.A.A., Vol. VI, p. 48.

*Lalanne and Ledoux Case (1902)*

*France, Venezuela*

*France-Venezuela Mixed Claims Commission : Umpire : Plumley (United States of America); Rocca (France); Paul (Venezuela)*

*Reports of International Arbitral Awards, Vol. X, p. 17*

47. A Venezuelan official, acting in his capacity as an active member of a commercial firm, refused to grant the necessary clearance to enable the claimants to make a shipment of cattle. The Commission found that the official's act amounted to " an abuse of authority ", which had been sustained by the local customs officer. This use of public authority in order to obtain pecuniary benefits was held to entail the responsibility of Venezuela which was required to pay an indemnity to the claimants (p. 18). See the *Ballistini* case, R.I.A.A., Vol. X, p. 18, for a similar case based on the same incident.

*Landreau Claim (1922)*

*Peru, United States*

*Arbitrators : Prevost (Peru) ; Finlay (United Kingdom) ; Smith (United States of America)*

*Reports of International Arbitral Awards, Vol. I, p. 347*

48. This was a claim brought by the United States on behalf of the heir and assigns of John Célestin Landreau, a United States citizen, arising out of a Peruvian decree of 1865 providing for the payment of a reward to John Théophile Landreau, the brother of Célestin, for the discovery of guano deposits, and out of contracts entered into by the two brothers in 1859 and 1875.

49. In 1865 the Peruvian Government published a decree in which it agreed to enter into a contract with Théophile Landreau and to pay him a reward for the discovery of guano deposits. Under various agreements between the two brothers Célestin was to receive a share of the reward. In 1868, after Théophile had submitted a list of discoveries, the Peruvian Government declared the contracts entered into in 1865 void and offered the reward on different terms. The Tribunal declared that " ... no authority has been produced for the proposition that the Government could justifiably put an end to a contract such as that of 1865 " (p. 356).

The Tribunal found, however, that Célestin, unlike Théophile, had accepted the cancellation of the 1865 contract. The claim by Célestin's representatives in respect of the breach of that contract failed accordingly. On the other hand the Peruvian Government never established the basis for the new contract, as provided under the 1868 decree, and took advantage of Théophile's discoveries by working for its own benefit the guano deposits which he had located. " From this ", declared the Tribunal, " there inevitably follows a liability to pay to Théophile Landreau, his representatives and assigns the fair value of the discoveries so communicated " (p. 364). The Tribunal held that the Government was bound to pay on a *quantum meruit* basis for the discoveries which it had appropriated for its own benefit. (*ibid.*)

*William A. Parker Case (1926)*

*Mexico, United States*

*Mexico-United States General Claims Commission : President : van Vollenhoven (Netherlands) ; Macgregor (Mexico) ; Parker (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 35*

50. Parker, a United States citizen, submitted a claim in respect of certain goods which he had sold to various Government departments in Mexico. The Mexican Government challenged the claim, on the grounds (among others) of the alleged inadequacy of proof submitted by Parker and the [lack of] power of the individual officials who had purported to represent and bind the Mexican Government in entering into the contracts in question. The Commission held that the facts alleged were within the special knowledge of the Government, which should make a full disclosure. In any case " ... whether the individuals to whom deliveries were made had, or had not, authority to contract for Mexico, certain it is that if the respondent actually received and retained for its benefit the property which the claimant testifies he delivered to it, then it is liable to pay therefor under a tacit or implied contract even if the individual to whom delivery was made had neither express nor apparent authority to contract for it " (p. 40).

*Rudloff Case (1903)*

*United States, Venezuela*

*United States-Venezuela Mixed Claims Commission : Umpire : Barge (Netherlands) ; Bainbridge (United States of America) ; Paul (Venezuela)*

*Reports of International Arbitral Awards, Vol. IX, p. 244*

51. Rudloff entered into a building contract with the Venezuelan minister of public works and the governor of the Federal district, both of whom had been authorized by the chief of the Executive to conclude contracts of the kind in question. Work was halted by order of the Venezuelan authorities. The Commission held that the contract was binding on the Venezuelan Government which was liable for the wrong done (pp. 257-258). A claim for the expected profits of the venture was

disallowed on the grounds that any damage so sustained was merely speculative (p. 259).

*Venable Case (1927)*

*Mexico, United States*

*Mexico-United States General Claims Commission : President : van Vollenhoven (Netherlands) ; Macgregor (Mexico) ; Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 219*

52.  Mexico was held responsible for the acts of a railway official in violating the contractual rights of the claimant, despite the fact that the official did not know of the existence of the rights in question. " Direct responsibility for acts of executive officials does not depend on the existence on their part of aggravating circumstances such as outrage, wilful neglect of duty, etc." (p. 224).

(C) JUDICIAL ORGANS

*Ambatielos Case, Merits : Obligation to Arbitrate (1953)*

*Greece v. United Kingdom*

*International Court of Justice Reports, 1953, p. 10*

53.  After an earlier decision (*I.C.J. Reports, 1952,* p. 28) in which the Court had held that it had jurisdiction to decide whether the United Kingdom was under an obligation to submit to arbitration its dispute with the Greek Government over the Ambatielos claim, the Greek Government requested the International Court to hold that the United Kingdom was under such an obligation under the terms of certain treaty provisions between the two countries. The Court was only concerned, therefore, with determining whether a sufficient connexion existed between the treaty provisions and the claim presented on behalf of Mr. Ambatielos, a Greek national, by his Government, as to give rise to an obligation to arbitrate ; it did not enter into the merits of the claim as such. However, in the course of the proceedings the United Kingdom advanced a number of arguments designed to show that the facts alleged by the Greek Government, if true, would amount to a denial of justice, and that an allegation of denial of justice must be based on general principles of international law and could not be premised on the provisions of a Treaty of Commerce and Navigation entered into in 1886 and designed to provide " most-favoured-nation " treatment between nationals of the two countries (p. 21). In reply, the Greek Government argued that "most-favoured-nation" treatment included the administration of justice and equity on a par with that shown to nationals of other States. The Parties also disputed the meaning to be given to the phrase " free access to Courts of Justice " used in the Treaty. The United Kingdom asserted that this meant access on an equal footing with that enjoyed by British subjects, whilst the Greek Government claimed that it entailed judicial freedom from restrictions imposed by the executive authorities and that, when Mr. Ambatielos had presented his claim, vital evidence had been withheld

by the executive authorities (p. 22). The Court concluded that, having regard to the terms of the Treaty and the arguments put forward, the claim presented by the Greek Government was based on the provisions of the 1886 Treaty and gave rise to an obligation to arbitrate binding on the United Kingdom.

*John Chase Case (1928)*

*Mexico, United States*

*Mexico-United States General Claims Commission : President : Sindballe (Denmark); Macgregor (Mexico); Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 337*

54.  Mexico was found responsible for a denial of justice in not pursuing the case against a Mexican named Flores, who had had an argument with Chase which had ended in Chase being shot ; it was not determined whether or not Flores had acted in self-defence. The Commission held that the failure of the court to pursue the matter or to give a decision after some fourteen years had elapsed involved the international responsibility of Mexico.

See also the *Fabiani* case, R.I.A.A., Vol. X, p. 83, where it was held that judicial delay may constitute a denial of justice.

*Chattin Case (1927)*

*Mexico, United States*

*Mexico-United States General Claims Commission : President : van Vollenhoven (Netherlands) ; Macgregor (Mexico) ; Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 282*

55.  Chattin was arrested on a charge of embezzlement and sentenced to two years' imprisonment by a Mexican court. The United States alleged that the arrest, trial and sentence amounted to a denial of justice. The Commission distinguished cases of so-called indirect liability, where the judicial authorities failed to take proper steps after an alien had been wrongfully damaged, whether by a private citizen or by an executive official, from instances of direct responsibility incurred on account of the acts of the Government itself, or its officials, unconnected with any previous wrongful act of a citizen. When the acts of the judiciary fell in this category the expression " denial of justice " became inappropriate since the basis of resulting claims was the injustice done by the courts themselves, not their failure to provide redress for a wrong already done (pp. 285-286). The importance of the distinction lay in the fact that in cases of direct responsibility involving the executive and legislative branches the Government was liable even in the absence of bad faith, wilful neglect or other obvious insufficiency of action. In the case of the judiciary, however, bad faith or other manifestly insufficient action was required in respect of both categories of responsibility, as determined according to international standards (pp. 287-288). The Commission found that there had been an " astonishing lack of seriousness on the part of the Court " (p. 292). The

accused had not been informed of the charge and there had been no attempt to secure the principal items of evidence or major witnesses, nor to conduct a proper examination. The Commission concluded that the criminal proceedings had been far below the international standard and that Mexico should accordingly be held liable.

See also the *Parrish* case, R.I.A.A., Vol. IV, p. 314.

*Chazen Case (1930)*

*Mexico, United States*

*Mexico–United States General Claims Commission : President : Alfaro (Panama) ; Macgregor (Mexico) ; Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 564*

56.   Mexico was held liable for the delay which occurred between Chazen's arrest on a charge of smuggling and the date when he was handed over to the judicial authorities, although the arrest itself was found to be lawful (pp. 568-569). A second claim was presented in respect of the merchandise on which Chazen had failed to pay duty and which was auctioned after the expiry of the time limits prescribed by Mexican law. The Commission held that, " . . . this delay cannot give rise to international responsibility, since in order that a particular formality of a proceeding which in general has been followed in strict accordance with the law, may cause such responsibility, it must be shown that it is cause of the failure of the general proceedings to do justice, or, that it be shown that such particular formality causes in itself an injury to the claimant " (p. 572).

*De Galván Case (1927)*

*Mexico, United States*

*Mexico–United States General Claims Commission : President : van Vollenhoven (Netherlands) ; Macgregor (Mexico) ; Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 273*

57.   The United States was held liable for the failure of Texas courts to prosecute the murderer of a Mexican subject. The murderer was indicted by a grand jury but never brought to trial during a period of six years.

For a similar decision see the *Richards* case, R.I.A.A., Vol. IV, pp. 275-277.

*El Oro Mining and Railway Company Case (1931)*

*Mexico, United Kingdom*

*Mexico–United Kingdom Claims Commission : President : Zimmerman (Netherlands) ; Flores (Mexico) ; Stoker (United Kingdom)*

*Reports of International Arbitral Awards, Vol. V, p. 191*

58.   Mexico was found liable on grounds of an undue delay of justice on the part of the Mexican courts, despite the existence of a Calvo clause in the concessionary contract held by the claimant. The Mexican courts failed to give any hearing or to make an award, despite the lapse of nine years since application was made in respect of the claimant's losses.

*Garcia and Garza Case (1926)*

*Mexico, United States*

*Mexico–United States General Claims Commission : President : van Vollenhoven (Netherlands) ; Macgregor (Mexico) ; Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 119*

59.   This claim was presented by the Mexican Government on behalf of the parents of a Mexican girl who was shot, whilst crossing the Rio Grande on a raft, by a United States officer who suspected that she was engaged in liquor smuggling. The officer was court martialled and sentenced to be dismissed from military service ; however, the President of the United States reversed the findings of the court martial and restored the officer to duty. The crossing of the river was illegal under the laws of both countries at the place in question.

60.   The Commission held that the problem before it, namely whether, under international law, the American officer was entitled to shoot in the direction of the raft, was to be determined solely by reference to the international standard regarding the taking of human life (p. 120). The officer was found to have acted in violation of that standard having regard to the lack of proportion between his resort to firearms, so as to endanger human life, and the supposed offence, and that the United States should pay damages accordingly (pp. 121-122). The Commission dismissed a Mexican allegation that there had been a denial of justice in the reversal of the decision of the court martial. " In order to assume such a denial there should be convincing evidence that, put to the test of international standards, the disapproval of the sentence of the court martial by the President acting in his judicial capacity amounted to an outrage, to bad faith, to wilful neglect of duty, or to an insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily recognize its insufficiency " (p. 123).

*Kennedy Case (1927)*

*Mexico, United States*

*Mexico–United States General Claims Commission : President : van Vollenhoven (Netherlands) ; Macgregor (Mexico) ; Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 194*

61.   Kennedy was fired upon by a Mexican with the result that he had to spend several months in hospital and was permanently crippled. His assailant was sentenced to two months' imprisonment, the judge's decision not being in full accordance with Mexican law. It was held that the serious negligence on the part of the judge and the inadequacy of the punishment constituted a denial of justice for which Mexico was liable (p. 198).

*The Case of the* S.S. *Lotus (1927)*
*France v. Turkey*
*Permanent Court of International Justice, Series A, No. 10.*

62. Under the Treaty of Lausanne it was provided that, as between Turkey and the other contracting Powers, questions of personal jurisdiction should be decided in accordance with the principles of international law. The French ship *Lotus* collided with the *Boz-Kourt*, a Turkish vessel, on the high seas. When the *Lotus* arrived at a Turkish port criminal proceedings were instituted against the French officer who had been in charge of the ship at the time of the collision. The French Government protested on the ground that this exercise of jurisdiction was contrary to international law.

63. In considering the case the Court dealt with the possibility of an error in municipal law, or of a lack of conformity between the municipal provision applied and international law. The Court stated that :

" The fact that the judicial authorities may have committed an error in their choice of the legal provision applicable to the particular case and compatible with international law only concerns municipal law and can only affect international law in so far as a treaty provision enters into account, or the possibility of a denial of justice arises " (p. 24).

*Martini Case (1930)*
*Italy, Venezuela*

*Arbitrators : Tumedei (Italy) ; Unden (Sweden) ; Alfaro (Venezuela)*

*Reports of International Arbitral Awards, Vol. II, p. 975*

64. In 1898, the Venezuelan Government granted a railroad and mining contract to Martini and Company, the partners of which were Italian subjects. In 1902, the Company suspended operations owing to revolutionary disturbances. In 1904, the Company was awarded damages for the loss incurred as a result of the disturbances by an Italian-Venezuelan Mixed Claims Commission (Ralston, Arbitrator). The Government then brought an action against the Company before the Venezuelan Courts for breach of contract. In 1905, the Federal Court of Cassation cancelled the concession and awarded damages against the Company. The Italian Government took up the claim and under an arbitration agreement concluded in 1920 it was agreed that the Arbitrators should be asked to decide whether the decision of the Venezuelan Court amounted to a denial of justice or manifest injustice, or a violation of an Italian-Venezuelan Treaty providing for equality of treatment of the nationals of each country.

65. The Arbitrators held that, although they were unable to determine whether or not the Court's judgement was erroneous or unjust on a basis of the arguments and facts presented to the Court (pp. 988-994) nevertheless the decision constituted a breach of an international obligation imposed on Venezuela as a result of the earlier arbitral award.

" *D'après les règles admises pour la responsabilité des Etats, le Venezuela est par conséquent responsable si l'attitude d'un tribunal vénézuelien est incompatible avec une sentence arbitrale internationale prononcée conformément à un traité international dont le Venezuela est partie contractante* " (pp. 995-996).

The Tribunal therefore concluded that the decision of the Venezuelan Court was manifestly unjust under the arbitration agreement (pp. 994-996). On the measure of damages, see para. 186 *infra.*

*Treatment of Polish Nationals and other Persons of Polish Origin or Speech in the Danzig Territory (1932)*

*Permanent Court of International Justice Series A/B, No. 44*

66. The Court was asked to give an advisory opinion on the question whether the treatment of Polish nationals in Danzig was to be determined by reference to international treaty obligations binding on Danzig or also by reference to the Constitution of Danzig. The Court observed that, in the same way as a State cannot rely as against another State on the latter's Constitution, but only on international law and international obligations duly accepted, so a State cannot adduce its own Constitution with a view to evading international obligations incumbent upon it under international law or treaties in force (p. 24). The Court accordingly concluded that the treatment to be afforded to Polish nationals by Danzig was to be determined exclusively on a basis of international law and the treaty provisions in force. This general conclusion was distinguished, however, from the possibility of a case of denial of justice arising out of the application of the Danzig Constitution or of a decision of the Danzig courts, where international responsibility would arise not from the Constitution and other laws as such, but from their application in violation of the rules of international law (pp. 24-25).

(D) MEMBERS OF ARMED FORCES

*J. B. Claire Case (1929)*
*France, Mexico*
*French-Mexican Claims Commission : President : Verzijl (Netherlands) ; Ayguesparsse (France) ; Roa (Mexico)*

*Reports of International Arbitral Awards, Vol. V, p. 516*

67. Claire was shot after failing to provide a sum of money which two Mexican army officers demanded. Mexico denied liability on a number of grounds, claiming that the officers were bandits or members of insurrectionary forces, whose acts fell outside the Convention, or that, if they were revolutionary soldiers for whom Mexico was responsible under the Convention, no responsibility was incurred owing to the private nature of the acts in question. The President of the Claims Commission held that the general principles of law in relation to State responsibility must be regarded in the light of the doctrine of objective responsibility, under

which a State might incur responsibility despite the absence of any fault on its part. A State was responsible for all acts constituting delinquencies under international law committed by its officials or organs, irrespective of whether or not the officials or organs concerned had acted within the limits of their competence. However, in order to justify the admission of the doctrine of objective responsibility in respect of acts committed by officials outside their competence, it was necessary that they should have acted, at least apparently, as authorized officers, or that, in acting, they should have exercised powers connected with their official duties. Accordingly, Mexico was liable for the acts of the two officers despite the private nature of their crime (pp. 528-532).

*Earnshaw and Others : The* Zafiro *Case (1925)*
*United Kingdom, United States*
*United Kingdom-United States Arbitral Tribunal : President : Nerincx (Belgium) ; Fitzpatrick (United Kingdom) ; Pound (United States of America)*
*Reports of International Arbitral Awards, Vol. VI, p. 160*

68. The *Zafiro*, which had been recently registered as an American merchant vessel, was used as a supply ship in connexion with United States naval operations during the Spanish-American war. Whilst in port at Cavite, in the Philippines, the crew looted private property belonging to British nationals. The United States contended that the vessel was not a public ship for whose conduct the United States could be held liable. The Tribunal found that the vessel formed part of United States forces and was under the command of a United States naval officer. The Tribunal distinguished between sending sailors ashore " in a policed port where social order is maintained by the ordinary agencies of government ", and the circumstances of the present case, where " the nature of the crew, the absence of a régime of civil or military control ashore, and the situation of the neutral property " called for diligence to be exercised. The United States was held liable for failure to provide effective control of the crew and ordered to pay damages for all the damage done, despite the fact that some portion of it had been caused by unknown wrongdoers who did not form part of the crew. In view of this circumstance, however, no interest was awarded on the claims (pp. 163-164).

See also the *Diaz* case, R.I.A.A., Vol. VI, p. 341, where the United States was held liable " under international law " for the acts of United States sailors who trespassed in the claimant's coco-nut plantation and took and consumed coco-nuts.

*Falcón Case (1926)*
*Mexico, United States*
*Mexico-United States General Claims Commission : President : van Vollenhoven (Netherlands) ; Macgregor (Mexico) ; Nielsen (United States of America)*
*Reports of International Arbitral Awards, Vol. IV, p. 104*

69. Falcón, a Mexican citizen, was shot by United States soldiers whilst bathing in the Rio Grande. The soldiers suspected Falcón of smuggling and ordered him to halt ; when he failed to do so they fired a shot in the air. They were then fired on from the other side of the river and Falcón was killed in the ensuing exchange. The United States authorities did not bring the two soldiers concerned to trial and declared that they had been acting in the discharge of their duty ; even if they had erred in firing the first shot, the subsequent firing had been in self-defence. The Commission held that the use of firearms was a wrongful act, contrary to United States military regulations, and the United States was liable to pay damages.

For a similar case regarding shooting by a soldier see the *Garcia and Garza* case, R.I.A.A., Vol. IV, pp. 120-122 ; see paras. 59-60 *supra*.

*Gordon Case (1930)*
*Mexico, United States*
*Mexico-United States General Claims Commission : President : Alfaro (Panama) ; Macgregor (Mexico) ; Nielsen (United States of America)*
*Reports of International Arbitral Awards, Vol. IV, p. 586*

70. Mexico was held not liable for the acts of two Mexican officers who injured an American citizen whilst they were engaged in shooting practice. The two officers were acquitted by a civil court since it could not be proved which of them had caused the injury. The Commission found that the act in question was outside the line of service and was a private act for which Mexico was not directly responsible. " The principle is that the personal acts of officials not within the scope of their authority do not entail responsibility upon a State " (p. 588). The acquittal of the two officers was held not to constitute a denial of justice.

*Cf.* the *Morton* case, R.I.A.A., Vol. IV, p. 428.

*Kling Case (1930)*
*Mexico, United States*
*Mexico-United States General Claims Commission : President : Alfaro (Panama) ; Macgregor (Mexico) ; Nielsen (United States of America)*
*Reports of International Arbitral Awards, Vol. IV, p. 575*

71. Mexico was held responsible for the shooting of a United States citizen by Mexican troops, after shots had been fired in the air for fun by several of the American's companions. The Commission declared that, in the circumstances, the action of the troops had been " indiscreet, unnecessary and unwarranted " (p. 580). The behaviour of the American in firing into the air was regarded as imprudent and damages were mitigated accordingly (p. 585).

*Kunhardt and Co. Case (1903)*
*United States, Venezuela*
*United States-Venezuela Mixed Claims Commission : Umpire : Barge (Netherlands) ; Bainbridge (United States of America) ; Paul (Venezuela)*
*Reports of International Arbitral Awards, Vol. IX, p. 171*

72. The Commission held that the destruction or removal of property by soldiers gave rise to a right to

compensation whenever it could be shown that the act had been done in the presence of superior officers who could have prevented the outrage but failed to do so p. 178).

For a similar decision see the *Irene Roberts* case, R.I.A.A., Vol. IX, pp. 206-208.

*Maninat Case (1902)*

*France, Venezuela*

*France-Venezuela Mixed Claims Commission : Umpire : Plumley (United States of America); Rocca (France); Paul (Venezuela)*

*Reports of International Arbitral Awards, Vol. X, p. 55*

73.   Maninat was ordered to present himself at the headquarters of a general commanding a division of the Venezuelan army. He was there struck and injured, by order of the general, and imprisoned, without any justifying reasons. The Venezuelan Government failed to reprove the general, or the officers under him who inflicted the wounds, when the matter was brought to its attention. It was held that Venezuela was responsible for the fatal injuries inflicted on Maninat and compensation was awarded to the surviving French heir (pp. 79-81).

*Solis Case (1928)*

*Mexico, United States*

*Mexico-United States General Claims Commission : President : Sindballe (Denmark); Macgregor (Mexico); Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 358*

74.   The United States presented a claim on behalf of Solis in respect of cattle taken from his ranch both by insurgent and by regular forces. The claim was rejected as regards the acts of revolutionary forces in view of the extent of the revolt and the absence of negligence on the part of the Mexican authorities (p. 362). The claim based on the acts of regular troops succeeded. About 100 soldiers had been stationed on the ranch for a month and it could not be presumed that they were all stragglers, no longer under the command of an officer (pp. 362-363).

*Spanish Zone of Morocco Claims (1925)*

*Spain, United Kingdom*

*Rapporteur : Huber (Switzerland)*

*Reports of International Arbitral Awards, Vol. II, p. 615*

75.   Referring to the question of responsibility for damage caused during military operations, the Rapporteur stated that, although a State is not responsible for acts committed by its troops in the course of restoring order or when fighting an enemy, international jurisdiction may be invoked in a case of manifest abuse of the exercise of military powers and that a State is bound to exercise special supervision to prevent its troops from committing acts in violation of military law and discipline (p. 645).

*Stephens Case (1927)*

*Mexico, United States*

*Mexico-United States General Claims Commission : President : van Vollenhoven (Netherlands); Macgregor (Mexico) ; Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 265*

76.   Stephens was shot by a sentry belonging to certain auxiliary forces after the car in which he was travelling failed to stop. The sentry, who had not given any warning of his intention to fire, was arrested but later released. The officer who permitted his release was sentenced to imprisonment but acquitted on appeal. The Commission held that Mexico was directly responsible for the reckless use of firearms on the part of the sentry ; members of the auxiliary forces were to be considered as soldiers despite their irregular status (p. 267). Mexico was also held liable for denial of justice in that neither the sentry nor the officer were punished (p. 268).

*Youmans Case (1926)*

*Mexico, United States*

*Mexico-United States General Claims Commission : President : van Vollenhoven (Netherlands); Macgregor (Mexico) ; Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 110*

77.   Three United States citizens were killed by a Mexican mob in 1880 after a dispute with a labourer. The mayor of the town sent a State lieutenant, together with troops, to quell the riot. The troops, instead of dispersing the mob, opened fire on the house in which the Americans had taken refuge and killed one of them. The other two were then killed by troops and members of the mob. Eighteen persons were subsequently arrested, though none was sentenced, and five were convicted *in absentia*. The Commission held that the record showed " a lack of diligence in the punishment of the persons implicated in the crime " (p. 115). As regards the participation of the troops, the Commission held that this imposed a direct responsibility on the Mexican Government ; in view of the fact that the troops were on duty and under the immediate supervision of their commanding officer they could not be said to have acted in their private capacity. " Soldiers inflicting personal injuries or committing wanton destruction or looting always act in disobedience of some rules laid down by superior authority. There could be no liability whatever for such misdeeds if the view were taken that any acts committed by soldiers in contravention of instructions must always be considered as personal acts " (p. 116).

See also the *Connelly* case, R.I.A.A., Vol. IV, p. 117.

(E) POLICE ORGANS

(i) *Members of police force*

*Adams Case (1933)*
*Panama, United States*
*Panama-United States General Claims Commission:
President: van Heeckeren (Netherlands); Alfaro
(Panama); Root (United States of America)*
*Reports of International Arbitral Awards, Vol. VI,
p. 321*

78. Adams was robbed and assaulted by a Panamanian policeman whilst the latter was on duty. The policeman was dismissed from the force and sentenced to ninety days' imprisonment for breach of discipline and of the police regulations. Criminal proceedings were not pursued, although the policeman was held for some ten weeks during preliminary investigations.

79. Panama was held liable for failure to punish the policeman adequately. The Commission did not find it necessary " to pass upon the question of whether a State is liable for the wrongful act of a police officer irrespective of failure to punish, or of whether the rule regarding liability for the acts of police applies in a case like this where the officer being on duty and in uniform does an act clearly outside of his duty and inconsistent with his duty to protect " (p. 323).

*Baldwin and Others Case (1933)*
*Panama, United States*
*Panama-United States General Claims Commission:
President: van Heeckeren (Netherlands); Alfaro
(Panama); Root (United States of America)*
*Reports of International Arbitral Awards, Vol. VI,
p. 328*

80. The United States presented a group of claims in respect of injuries sustained by a number of American soldiers and one civilian during a riot which broke out in the Cocoa Grove district of the City of Panama in the course of a carnival. The United States authorities provided a military patrol but Panamanian police retained primary responsibility for the maintenance of law and order. The Commission found that, although some American soldiers had behaved improperly, this did not justify the Panamanian police in attacking the soldiers or allowing civilians generally to do so, particularly as there had been sufficient police present to control the situation. Since the United States patrol was found to have performed its task efficiently, the Commission did not have to consider whether the rights of claimants would have been impaired if the patrol had been insufficient. Responsibility for the maintenance of order rested with the territorial sovereign (p. 331).

81. In the *Richeson, Klimp, Langdon and Day* case, R.I.A.A., Vol. VI, p. 325, a number of Americans were injured in a fight between Panamanian citizens and American soldiers and one, Langdon, shot by an unidentified Panamanian policeman. The Commission found that Langdon's death was attributable to inadequate police protection and improper police action.

An award was made, expressed as " the very minimum of the reparation due ", despite the fact that none of Langdon's heirs were financially dependent on him (p. 327).

*Cesarino Case (1903)*
*Italy, Venezuela*
*Italy-Venezuela Mixed Claims Commission: Umpire:
Ralston (United States of America); Agnoli (Italy);
Zuloaga (Venezuela)*
*Reports of International Arbitral Awards, Vol. X,
p. 598*

82. The Government of Venezuela was held liable for the wanton act of a police official who shot an Italian subject, the killing being, in the words of the Umpire, " utterly causeless, while deliberate ".

*Mallén Case (1927)*
*Mexico, United States*
*Mexico-United States General Claims Commission:
President: van Vollenhoven (Netherlands); Macgregor (Mexico); Nielsen (United States of America)*
*Reports of International Arbitral Awards, Vol. IV,
p. 173*

83. This claim was put forward by the Government of Mexico on behalf of Mallén, a Mexican consul, who had twice been assaulted by an American policeman. On the first occasion, when the policeman threatened to kill Mallén and struck him, the policeman was fined $5 for disturbing the peace. It was held that this sentence in itself did not amount to a denial of justice. The United States authorities were held to have acted improperly, however, in failing to punish the policeman or to warn him of the consequences of repeating his misconduct (p. 175). Mallén was severely injured by the second assault and taken to the county gaol; the Commission held that the policeman's act was an official one which entailed liability on the part of the American authorities (p. 177). The policeman was fined $100 for the second assault. The Commission determined that, although the decision of the American court could not be said to amount to a denial of justice having regard to the nature of the evidence presented to it, nevertheless a denial of justice arose from the fact that the policeman had not paid the fine, and had not been imprisoned (the alternative penalty). " Punishment without execution of the penalty constitutes a basis for assuming a denial of justice " (p. 178). It was recognized that in principle special damages should be awarded in respect of the indignity suffered, lack of protection and denial of justice, in addition to compensation for the physical injuries, although the high sums awarded in the past in order to uphold consular dignity had been in cases where the country's honour had been involved, or " to consuls in backward countries where their position approaches that of a diplomat " (pp. 179-180).

See also *Chapman* case, R.I.A.A., Vol. IV, p. 632, where it was held that Mexico was liable for a failure to provide the special protection due to a consular officer.

*Roper Case (1927)*

*Mexico, United States*

*Mexico-United States General Claims Commission: President: van Vollenhoven (Netherlands); Macgregor (Mexico); Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 145*

84. The Mexican Government was held responsible for the shooting of an American subject by Mexican police on the ground that, in accordance with the principles underlying the Commission's decisions in the *Swinney, Falcón* and *Garza* cases, the use of firearms had been reckless and unnecessary (pp. 146-147). The Commission rejected a contention that the Mexican Government should not be held responsible for the acts of such minor officials as policemen. The Commission held that it was entitled to examine the investigation of the occurrence held by a Mexican judge, which it found to have been inadequate (pp. 147-148).

85. In the *Swinney* case, R.I.A.A., Vol. IV, p. 101, Swinney was shot by two Mexican officials when in a boat on the Rio Grande ; it was not clear whether the officials had acted in self-defence or in the discharge of their official duties. It was held that Mexico was liable to pay damages for the failure to hold an open trial.

(ii) <em>Arrest and imprisonment</em>

*Colunje Case (1933)*

*Panama, United States*

*Panama-United States General Claims Commission: President: van Heeckeren (Netherlands); Alfaro (Panama); Root (United States of America)*

*Reports of International Arbitral Awards, Vol. VI, p. 342*

86. Colunje was induced by the false pretences of a Canal Zone detective to come to the Canal Zone, where he was arrested on a criminal charge. He was released on a bond after several hours' imprisonment. The case against him was dismissed after the District Attorney had entered a *nolle prosequi* and his bond was returned to him. It was held that the United States was responsible for the illegal arrest of Colunje. " It is evident that the police agent of the Zone by inducing Colunje by false pretences to come with him to the Zone with intent of arresting him there unduly exercised authority within the jurisdiction of the Republic of Panama to the prejudice of a Panamanian citizen, who, as a result thereof, suffered the humiliation incident to a criminal proceeding. For this act of a police agent in the performance of his functions, the United States of America should be held responsible " (pp. 343-344).

*Chevreau Case (1931)*

*France, United Kingdom*

*Arbitrator: Beichman (Norway)*

*Reports of International Arbitral Awards, Vol. II, p. 1113*

87. France presented a claim on behalf of Chevreau, a French citizen, who was arrested by British troops in 1918 in the course of military operations conducted in Persia with the consent of the Persian Government. The Arbitrator held that the arrest was itself lawful, having regard to the need of the British forces to take necessary measures to protect themselves against harmful acts, and that Chevreau had not been maltreated during his detention. He found, however, that the British Government had failed to initiate proper inquiries into the accuracies of charges on which Chevreau had been arrested (p. 1129), and was accordingly liable to pay for the moral and material injury suffered.

*Cibich Case (1926)*

*Mexico, United States*

*Mexico-United States General Claims Commission: President: van Vollenhoven (Netherlands); Macgregor (Mexico); Parker (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 57*

88. Cibich was arrested by the Mexican police for drunkenness. His money, which had been taken by the police for safe custody, was stolen by a gang of liberated prisoners and faithless policemen. The claim for the recovery of the money was dismissed on the ground that the claimant had been legally taken into custody and the evidence failed to show any lack of reasonable care on the part of the Mexican authorities.

*Faulkner Case (1926)*

*Mexico, United States*

*Mexico-United States General Claims Commission: President: van Vollenhoven (Netherlands); Macgregor (Mexico); Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 67*

89. Mexico was held liable for the " apparent international insufficiency " of the treatment given to Faulkner whilst in prison, and ordered to pay damages (p. 71).

See also the *Adler* case, R.I.A.A., Vol. IV, p. 74.

*Quintanilla Case (1926)*

*Mexico, United States*

*Mexico-United States General Claims Commission: President: van Vollenhoven (Netherlands); Macgregor (Mexico); Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 101*

90. This claim was presented by Mexico on behalf of the parents of Quintanilla, a Mexican who was arrested by a deputy sheriff in Texas after an incident in which he had lassoed a girl on horseback and thrown her from the horse. Quintanilla's corpse was found by the side of the road several days later. The deputy sheriff and one of his assistants were arrested, but released on bail. The case was submitted to a grand jury, which failed to take any action. The Commission held that the United States was liable to pay damages in respect of an international delinquency ; a State is under a duty to account for an alien taken into custody by a State official (p. 103).

91. See also the *Turner* case, R.I.A.A., Vol. IV, p. 278. " If having a man in custody obligates a Government to account for him, having a man in *illegal* custody doubtless renders a Government liable for dangers and disasters which would not have been his share, or in a less degree, if he had been at liberty " (p. 281). (Italics in the original.)

*Kalklosh Case (1928)*

*Mexico, United States*

*Mexico-United States General Claims Commission : President : Sindballe (Denmark); Macgregor (Mexico); Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 412*

92. The Commission held that Kalklosh's arrest without warrant or other legal authority and without evidence indicating that he was guilty of any crime constituted a denial of justice for which Mexico was liable.

For a closely similar claim see the *Clark* case, R.I.A.A., Vol. IV, p. 415.

*Koch Case (1928)*

*Mexico, United States*

*Mexico-United States General Claims Commission : President : Sindballe (Denmark); Macgregor (Mexico); Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 408*

93. The Commission held that Mexico was liable for the acts of Mexican customs officials who, without uniform, boarded Koch's vessel and brutally attacked him in the course of arrest.

*Harry Roberts Case (1926)*

*Mexico, United States*

*Mexico-United States General Claims Commission : President : van Vollenhoven (Netherlands) ; Macgregor (Mexico) ; Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 77*

94. Roberts was arrested and detained in prison for nearly nineteen months on a charge of house assault. A claim was presented on the grounds of his prolonged detention and of cruel and inhuman treatment during imprisonment. As regards his detention (pp. 79-80), the Commission held that although no fixed period was prescribed by international law, the imprisonment was excessively long. The period violated that laid down by Mexican law and it was no defence that, if he had been condemned, his previous imprisonment would have been taken into account. The Commission held that, on the evidence, the treatment given to Roberts whilst in prison was cruel and inhuman. It dismissed the argument of the Mexican Government that the treatment was the same as that given to nationals. The test to be observed was an international one (p. 80). Roberts was accordingly awarded damages.

*Tribolet Case (1930)*

*Mexico, United States*

*Mexico-United States General Claims Commission : President : Alfaro (Panama) ; Macgregor (Mexico) ; Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 598*

95. Tribolet was arrested by Mexican soldiers on a charge of having participated in a robbery in which a Mexican had been killed. Mexico was held responsible for his execution two days later, without trial or investigation, and without having been given an opportunity to defend himself.

See also the *Dillon* case, R.I.A.A., Vol. IV, p. 368.

(iii) *Due diligence and the punishment of offenders*

*The Borchgrave Case (Preliminary Objections) (1937)*
*Belgium v. Spain*

*Permanent Court of International Justice, Series A/B, No. 72*

96. Belgium alleged that the responsibility of the Spanish Government was involved on account of the murder of Baron de Borchgrave, an employee of the Belgian Embassy in Madrid, and by reason also of a failure to use sufficient diligence in the apprehension and prosecution of the persons guilty of the offence. The Spanish Government claimed that the Court lacked jurisdiction under the Special Agreement signed by the two States to consider the second allegation. The Court determined, however, on a basis of the interpretation of the Special Agreement, that it might determine the question of the alleged lack of due diligence. An objection put forward by the Spanish Government, that local remedies had not been exhausted, was withdrawn. The two States subsequently agreed to discontinue the case.

*Canahl Case (1928)*

*Mexico, United States*

*Mexico-United States General Claims Commission : President : Sindballe (Denmark); Macgregor (Mexico); Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 389*

97. The Federal Government of Mexico was held responsible for failure to punish the murderers of Canahl although the territory where the act took place had been under the command of revolutionary forces at the time the act occurred. Control of the territory changed hands some three weeks after the murder had been committed.

*Janes Case (1925)*

*Mexico, United States*

*Mexico-United States General Claims Commission : President : van Vollenhoven (Netherlands) ; Macgregor (Mexico) ; Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 82*

98. Janes, the superintendent of a United States mining company operating in Mexico, was shot by a Mexican

employee who had been discharged. The killing took place before a considerable number of people. The local police chief, who was promptly informed of the murder, took half an hour to assemble his men and insisted that they should be mounted. The pursuers failed to catch the murderer who had gone off on foot. The murderer spent a week at a ranch six miles away and was then reported to have moved some seventy miles further south. This information was communicated to the Mexican authorities without result. The Commission declared that there had been " . . . clearly such a failure on the part of the Mexican authorities to take prompt and efficient action to apprehend the slayer as to warrant an award of indemnity " (p. 85).

99. The United States claimed $25,000 in respect of the loss and damage suffered by Janes's widow and children. In determining the measure of damages (pp. 86-90) the Commission distinguished between the individual liability of the culprit and that of the State. " The culprit is liable for having killed or murdered an American national ; the Government is liable for not having measured up to its duty of diligently prosecuting and properly punishing the offender " (p. 87). Accordingly, whilst the damage caused by the culprit was that done to Janes's relatives, the damage caused by the Government's negligence was that resulting from the non-punishment of the murderer. The Commission held that the case before them was an instance of denial of justice and that, " in cases of improper governmental action of this type, a nation is never held to be liable for anything else than the damage caused by what the executive or legislature committed or omitted itself " (p. 88). The Commission concluded that the indignity done to the relatives of Janes by non-punishment had been a damage directly caused by the Government. In determining the measure of damages, however, the Commission held that not only should the individual grief of the claimants be taken into account, but also " a reasonable and substantial redress . . . for the mistrust and lack of safety, resulting from the Government's attitude " (p. 89). In view of all the elements involved, the Commission awarded $12,000, without interest, on behalf of the claimants. On the measure of damages, see para. 177 infra.

In the Spanish Zone of Morocco Claims, Claim No. 39, Menebhi Claim, R.I.A.A., Vol. II, pp. 707-710, it was held that Spain should pay one half of a ransom paid for the release of cattle in view of the fact that the Spanish authorities took no action to bring the raiders to justice after being officially notified of the offence.

Massey Case (1927)
Mexico, United States
Mexico-United States General Claims Commission : President : van Vollenhoven (Netherlands) ; Macgregor (Mexico) ; Nielsen (United States of America)
Reports of International Arbitral Awards, Vol. IV, p. 155

100. A Mexican subject was arrested and imprisoned for killing Massey. The accused managed to escape from prison with the help of the assistant gaol-keeper. The

gaol-keeper was arrested but the Mexican authorities did not succeed in apprehending the murderer. Mexico objected to the claim on the ground that Massey's own misconduct had contributed to his death. This argument was rejected as immaterial to the right of the United States to invoke the rule of international law requiring Governments to take proper measures to punish nationals who have committed wrongs against aliens (p. 156). Secondly, Mexico argued that no denial of justice arose from the acts of a minor official, acting in violation of law and of his own duty, if the State concerned punished him. The American Commissioner, for the Commission, held that a " nation must bear the responsibility for the wrongful acts of its servants " irrespective of their role or status under domestic law (p. 159). Since the assistant gaol-keeper, though arrested for a time, was not punished and no effective action appeared to have been taken to apprehend the murderer, Mexico was found responsible for denial of justice.

See also the Way case, R.I.A.A., Vol. IV pp. 391-400 ; Stephens case, R.I.A.A., Vol. IV, pp. 265-268 ; para. 76 supra ; and Youmans case, R.I.A.A., Vol. IV, pp. 110-115 ; para. 77 supra.

Neer Case (1926)
Mexico, United States
Mexico-United States General Claims Commission : President : van Vollenhoven (Netherlands) ; Macgregor (Mexico) ; Nielsen (United States of America)
Reports of International Arbitral Awards, Vol. IV, p. 60

101. This claim was presented by the United States on behalf of the heirs of Neer, who had been shot by a number of armed men. It was alleged that there had been an unwarrantable lack of diligence on the part of the Mexican authorities in prosecuting the culprits. The Commission found that the authorities had inspected the scene of the killing on the night it had occurred ; interrogated witnesses the following day ; and taken a number of suspected persons into custody, although it had eventually released them owing to lack of sufficient evidence. The Commission held that, although a more efficient course of procedure might have been followed, the record did not present such a lack of diligence as to constitute an international delinquency (p. 61). The Commission declared that the propriety of governmental acts should be put to the test of international standards and, to constitute an international delinquency, the treatment of an alien " . . . should amount to an outrage, to bad faith, to wilful neglect of duty, or to an insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily recognize its insufficiency " (pp. 61-62).

This decision was followed in the Miller, Eitelman and Eitelman case, R.I.A.A., Vol. IV, p. 336. See also the Mecham case, R.I.A.A., Vol. IV, p. 440, where the Commission held that : " even though more efficacious measures might perhaps have been employed to apprehend the murderers of Mecham, that is not the question but rather whether what was done shows such a degree of negligence, defective administration of

justice, or bad faith, that the procedure falls below the standards of international law " (p. 443).

*Putman Case (1927)*

*Mexico, United States*

*Mexico-United States General Claims Commission : President : van Vollenhoven (Netherlands) ; Macgregor (Mexico) ; Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 151*

102.   A Mexican policeman who killed Putman was sentenced to death by a lower court on grounds of homicide ; perpetrated without provocation, and treachery. The sentence was commuted by a higher court to eight years' imprisonment. It was held that Mexico was not responsible for a denial of justice by reason of the lesser penalty imposed by the higher court (pp. 153-154). The Commission held that Mexico was liable for the release of the policeman by a local military commander before the expiry of the sentence, since it could not be said that in these circumstances Mexico had entirely fulfilled its duty to punish the murderer (p. 154).

103.   See also the *Denham* case, R.I.A.A., Vol. VI, p. 312, where the Panama-United States General Claims Commission held that the reduction of an originally adequate sentence as a result of an amnesty gave rise to international liability on the part of Panama. *Cf.* the *Wenzel* case, R.I.A.A., Vol. X, p. 428, where the German-Venezuelan Mixed Claims Commission held that the release of a revolutionary leader by the Chief Executive of Venezuela, acting in excess of his powers, did not render Venezuela liable for the damage caused to German property during an uprising led by the revolutionary leader.

## III. State responsibility in respect of acts of private persons, including those engaged in revolutions or civil wars

*Aroa Mines Case (1903)*

*United Kingdom, Venezuela*

*United Kingdom-Venezuela Mixed Claims Commission : Umpire : Plumley (United States of America) ; Harrison (United Kingdom) ; Grisanti (Venezuela)*

*Reports of International Arbitral Awards, Vol. IX, p. 402*

104.   After an exhaustive survey of the authorities the Umpire determined that the Government of Venezuela was not responsible for any injury suffered by British subjects in the course of an unsuccessful insurrection or civil war unless fault or want of due diligence on the part of the Venezuelan authorities could be proved (pp. 439-445).

*French Company of Venezuela Railroads Case (1902)*

*France, Venezuela*

*France-Venezuela Mixed Claims Commission : Umpire : Plumley (United States of America) ; Rocca (France) ; Paul (Venezuela)*

*Reports of International Arbitral Awards, Vol. X, p. 285*

105.   The Umpire declared that the Venezuelan Government could not be held liable for the dislocation of trade and the loss of business caused to the Company as a result of a revolutionary uprising, in particular since the Company must have envisaged this possibility when it decided to undertake operations in the country. Nevertheless, the revolution having been successful, the Government was held responsible "for all the necessary, natural, and consequential injuries which resulted to the railroad and its properties when used by either the revolutionary or the governmental forces " (p. 354).

See also the *Dix* case, R.I.A.A., Vol. IX, p. 119 ; para. 175 *infra*.

*Home Frontier and Foreign Missionary Society Case (1920)*

*United Kingdom, United States*

*United Kingdom-United States Arbitral Tribunal : President : Fromageot (France) ; Fitzpatrick (United Kingdom) ; Anderson (United States of America)*

*Reports of International Arbitral Awards, Vol. VI, p. 42*

106.   The United States presented this claim in respect of the loss suffered by the Home Frontier and Foreign Missionary Society during a rebellion in 1898 in the then British Protectorate of Sierra Leone. It was alleged that the rebellion followed the imposition of a "hut tax" and that the British Government, knowing that the tax was resented, should have taken more adequate measures to maintain law and order. The Tribunal held that Great Britain was not liable. The Tribunal declared :

> "It is a well-established principle of international law that no government can be held responsible for the act of rebellious bodies of men committed in violation of its authority, where it is itself guilty of no breach of good faith, or of no negligence in suppressing insurrection " (p. 44).

Reference was also made to the fact that the Missionary Society must have been aware of the dangers of their mission.

*Home Insurance Company Case (1926)*

*Mexico, United States*

*Mexico-United States General Claims Commission : President : van Vollenhoven (Netherlands) ; Macgregor (Mexico) ; Parker (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 48*

107.   The United States presented a claim on behalf of the Home Insurance Company which had paid money under two insurance policies in order to indemnify another United States company against loss caused by "confiscation, detention or sequestration by the constituted authorities for the time being, whether local or federal". The property concerned had been seized by revolutionary forces whilst being transported on the Government railway. The Commission held that the

liability of the Government when acting as a carrier was no greater than that of a private concern, and that it had acted without negligence (p. 51). As regards the duty of the Government to protect the persons and property within its jurisdiction, the Commission found that there had been no failure in this respect in view of the suddenness and extent of the revolt (p. 52). The claim was therefore dismissed.

108. *Cf.* the *Eagle Star and British Dominion Insurance Company* case, R.I.A.A., Vol. V, p. 139, where the Mexico-United Kingdom Claims Commission held that it had no jurisdiction to consider a claim submitted on behalf of British insurance companies for an amount paid to a Mexican company which had suffered loss owing to the acts of revolutionary forces. Insurers were to be distinguished from other claimants in that they undertook, on a professional basis, to run the risks involved (pp. 141-142).

*Kummerow, Redler and Co., Fulda, Fischbach, and Friedericky Cases (1903)*

*Germany, Venezuela*

*Germany-Venezuela Mixed Claims Commission : Umpire : Duffield (United States of America) ; Goetsch (Germany) ; Zuloaga (Venezuela)*

*Reports of International Arbitral Awards, Vol. X, p. 369*

109.  In giving his opinion on these cases the Umpire stated that, under general principles of international law, Venezuela was not liable for injuries to German nationals or their property caused during a civil war since, from its outset, the war had been beyond the power of the Government to control (p. 400). Venezuela had, however, accepted liability under an agreement between the two countries for injuries or wrongful seizures of property by members of the revolutionary forces.

*Mexico City Bombardment Claims (1930)*

*Mexico, United Kingdom*

*Mexico-United Kingdom Claims Commission : President : Zimmerman (Netherlands) ; Flores (Mexico) ; Percival (United Kingdom)*

*Reports of International Arbitral Awards, Vol. V, p. 76*

110.  Mexican revolutionary forces occupied the hostel of the Young Men's Christian Association in Mexico City and forced the claimants to leave. Upon their return the claimants found that their personal property had been destroyed or looted. The Commission held that, under the terms of the convention establishing the Commission, Mexico was liable ; the occupying and looting of the building must have been known to the authorities but no evidence had been produced showing that any suppressive measures had been adopted (pp. 79-80).

The reasoning in the above decision was followed in the *Gill* case, R.I.A.A., Vol. V, p. 157 at pp. 159-160.

*Noyes Case (1933)*

*Panama, United States*

*Panama-United States General Claims Commission : President : van Heeckeren (Netherlands) ; Alfaro (Panama) ; Root (United States of America)*

*Reports of International Arbitral Awards, Vol. VI, p. 308*

111.  Whilst driving through a village near Panama City, Noyes was attacked and wounded by a crowd which had gathered to attend a political meeting. A policeman protected him at the time of the assault, but Noyes was attacked again shortly after he had continued on his journey ; he was then rescued by the Commander of the Panama City police. The United States contended that Panama was liable since the authorities had not taken the precaution of increasing the police force at the village although it had been known in advance that the meeting would take place there.

112.  The Commission held that no liability arose under international law merely by reason of the fact that an alien had been injured by private persons and the injury could have been prevented by the presence of a sufficient police force.

"There must be shown special circumstances from which the responsibility of the authorities arises ; either their behavior in connection with particular occurrence, or a general failure to comply with their duty to maintain order, to prevent crimes or to prosecute and punish criminals " (p. 311).

In the absence of any such circumstances the Commission held Panama not liable.

*Georges Pinson Case (1928)*

*France, Mexico*

*French-Mexican Claims Commission : President : Verzijl (Netherlands) ; Ayguesparsse (France) ; Roa (Mexico)*

*Reports of International Arbitral Awards, Vol. V, p. 327*

113.  The Convention establishing the terms of reference of the Commission provided that claims were to be settled on an equitable basis. Thus questions as to the scope of State responsibility under international law only arose incidentally, for example in connexion with the contention of the Mexican Government that the Convention should be strictly construed since both the Convention and international law rejected the principle of State responsibility for damage caused to aliens in the course of revolutions or uprisings, or of their suppression. The President of the Commission declared that, although he was prepared to agree that positive international law did not yet recognize a general obligation that States should compensate aliens for losses suffered in the course of riots or civil wars, nevertheless there were many instances in which States were bound to provide compensation. In addition to the Government's own wrongful acts, it was liable for the acts of its forces in excess of military necessity, acts of

pillage, and for failure to take adequate steps to suppress mutinies or riots (pp. 352-354). As regards the juridical acts or international delinquencies of revolutionaries, the State could only be held responsible if the revolutionaries were successful in gaining supreme power, when responsibility became retroactive to the date when the revolution broke out (pp. 419-433, esp. pp. 426-431).

*Sambiaggio Case (1903)*

*Italy, Venezuela*

*Italy-Venezuela Mixed Claims Commission : Umpire : Ralston (United States of America) ; Agnoli (Italy) ; Zuloga (Venezuela)*

*Reports of International Arbitral Awards, Vol. X, p. 499*

114.   An Italian claim for property taken by revolutionists failed on the ground that the Venezuelan Government could not be held responsible for those who had escaped its restraint. The Umpire stated that :

"The ordinary rule is that a government, like an individual, is only to be held responsible for the acts of its agents or for acts the responsibility for which is expressly assumed by it."

Since there was no evidence that the Government had failed to use its constituted authority promptly and with appropriate force, the Government was not liable for the acts of those seeking to overthrow it (pp. 512-513).

*Spanish Zone of Morocco Claims (1925)*

*Spain, United Kingdom*

*Rapporteur : Huber (Switzerland)*

*Reports of International Arbitral Awards, Vol. II, p. 615*

115.   Dealing with the question of responsibility for civil disturbances, revolts and wars, the Rapporteur declared :

"*Il paraît incontestable que l'Etat n'est pas responsable pour le fait d'une émeute, révolte, guerre civile ou guerre internationale, ni pour le fait que ces événements provoquent des dommages sur son territoire. Il se peut qu'il fût plus ou moins possible de faire la preuve d'erreurs commises par le gouvernement, mais faute de clauses spécifiques d'un traité ou accord, l'investigation nécessaire à cette fin n'est pas admise. Ces événements doivent être considérés comme des cas de force majeure*" (p. 642).

Nevertheless, the fact that the State was not responsible for causing the event did not exclude the duty to act with a certain degree of vigilance. The principle of non-intervention was posited on the maintenance of internal peace and social order in the territorial State. Thus, if a State was not responsible for the revolutionary acts themselves, "*il peut être néanmoins responsable de ce que les autorités font ou ne font pas, pour parer, dans la mesure possible, aux suites*" (*ibid*) ; see also pp. 656-659.

## IV. Responsibility of Federal States and States representing others in international relations

*Cayuga Indians Case (1926)*

*United Kingdom, United States*

*United Kingdom-United States Arbitral Tribunal : President : Nerincx (Belgium) ; Fitzpatrick (United Kingdom) ; Pound (United States of America)*

*Reports of International Arbitral Awards, Vol. VI, p. 173*

116.   Great Britain presented a claim on behalf of the Cayuga Indians living in Canada who failed to receive an annuity from the State of New York due under contracts entered into in 1789, 1790 and 1795 in respect of the cession of lands in that state, although payments continued to be made to the Cayuga Indians who remained in the United States. It was held that since the agreement concluded in 1795 was not a Federal treaty and did not involve a matter of Federal concern, the United States was not responsible for the failure of the State of New York to make payment (pp. 186-188). The Tribunal found, however, that a claim might lie against the United States under the Treaty of Ghent. See para. 120 *infra*.

In the *De Galvàn* case, R.I.A.A., Vol. IV, p. 273 the United States was held liable for the failure of Texas courts to prosecute the murderer of a Mexican subject. See para. 57 *supra*.

*Pellat Case (1929)*

*France, Mexico*

*French-Mexican Claims Commission : President : Verzijl (Netherlands) ; Ayguesparsse (France) ; Roa (Mexico)*

*Reports of International Arbitral Awards, Vol. V, p. 534*

117.   The Federal Government of Mexico was held liable for the acts of a member State which caused damage to a French claimant, despite the fact that the Central Government lacked power under the Constitution to control the acts of member States or to demand that their conduct should be in uniformity with international law (p. 536).

*Spanish Zone of Morocco Claims (1925)*

*Spain, United Kingdom*

*Rapporteur : Huber (Switzerland)*

*Reports of International Arbitral Awards, Vol. II, p. 615*

118.   The Rapporteur held that, since Spain represented the Spanish Zone of Morocco in international relations, to the exclusion of any other sovereign body, the responsibility of Morocco was merged with that of Spain, which alone was responsible at international law (pp. 647-649).

*Cf.* the *Robert E. Brown* case, R.I.A.A., Vol. VI, p. 120 at pp. 129-130, where Great Britain was held not liable for the acts of the South African Republic committed during the period of British suzerainty. See paras. 32-33 *supra*.

## V. Exhaustion of local remedies and determination of the *Tempus Commissi Delicti*

*Aguilar-Amory and Royal Bank of Canada Claims (1923)*

*Costa Rica, United Kingdom*

*Arbitrator : Taft (United States of America)*

*Reports of International Arbitral Awards, Vol. I, p. 369*

119. A British company and the Royal Bank of Canada entered into contracts with the Government of Costa Rica at a period when power was held by President Tinoco. The Arbitrator held that the two companies were not obliged to proceed with whatever remedies were available to them before the Costa Rican courts after a subsequent Government passed a law nullifying the acts of President Tinoco (pp. 384-387).

*Cayuga Indians Case (1929)*

*United Kingdom, United States*

*United Kingdom-United States Arbitral Tribunal : President : Nerincx (Belgium) ; Fitzpatrick (United Kingdom) ; Pound (United States of America)*

*Reports of International Arbitral Awards, Vol. VI, p. 173*

120. The British Government presented a claim on behalf of the Cayuga Indians living in Canada who had failed to receive after 1810 certain payments due to them from the State of New York. The Tribunal found that a claim lay under the Treaty of Ghent, in which the United States had covenanted that the Indians should be restored to the position which they had occupied before the War of 1812. However, no claim accrued against the United States under international law until the State of New York had definitely refused the claim of the Cayuga Indians living in Canada and the United States Government had failed to take steps to carry out its treaty obligations after the matter had been brought to its attention (p. 188).

*Central Rhodope Forests Case (Merits) (1933)*

*Bulgaria, Greece*

*Arbitrator : Undén (Sweden)*

*Reports of International Arbitral Awards, Vol. III, p. 1405*

121. Greece presented a number of claims on behalf of persons, asserting themselves to be Greek subjects, whose property and contractual rights in forests situated in Central Rhodope were alleged to have been disregarded by Bulgaria in violation of the Treaty of Neuilly. It was contended by Bulgaria that the claimants had not exhausted local remedies. The Arbitrator held that the examination made by the Bulgarian administrative authorities of the titles of the claimants was insufficient to annul the titles and contracts concerned, since the Treaty of Constantinople, transferring the territory concerned from Turkey to Bulgaria, created a presumption in favour of such rights unless there was legal proof to the contrary. This presumption necessarily restricted the application of the local remedies rule. He added :

"*En outre, la règle de l'épuisement des recours locaux ne s'applique pas, en général, lorsque le fait incriminé consiste en des mesures prises par le Gouvernement ou par un membre du Gouvernement, dans l'exercice de ses fonctions officielles. Il est rare qu'il existe des remèdes locaux contre les actes des organes les plus autorisés de l'Etat* " (p. 1420).

The Arbitrator concluded that the claimants had been justified in considering that any action before the courts against the action taken by the Bulgarian authorities with respect to their rights and titles would be useless (pp. 1418-1420). On the question of restitution of the property concerned and the award of damages, see para 171 *infra*.

122. In the *Robert E. Brown* case, R.I.A.A., Vol. VI, p. 120 at pp. 128-129, the Tribunal held that Brown's claim was not defeated by a failure to exhaust local remedies in view of the various steps taken by the South African authorities, including the removal of the Chief Justice, to defeat his claim. See paras. 32-33 *supra*.

*The Electricity Company of Sofia and Bulgaria Case (Preliminary Objection) (1939)*

*Belgium v. Bulgaria*

*Permanent Court of International Justice, Series A/B No. 77*

123. Belgium claimed that Bulgaria had acted in breach of her international obligations by reason of certain measures which had been taken affecting the rights of the Electricity Company of Sofia and Bulgaria, a Belgian Company. The Company had been taken over by the Municipality of Sofia during the 1914-1918 War. Under the Treaty of Neuilly, Bulgaria was obliged to restore the Company to its owners and to pay an indemnity assessed by a Mixed Arbitral Tribunal ; the Treaty also provided for the adaptation of the Company's concession to the change in economic conditions. In 1925, the Belgo-Bulgarian Mixed Arbitral Tribunal assessed the amount of the indemnity, after taking into account the new economic situation. A dispute arose, however, as to the application of the formula to be adopted by the Company for the calculation of the selling price of electricity. The Sofia Municipality brought a successful action against the Company before the Regional Court of Sofia in 1936 ; this was followed by an appeal to the Sofia Court of Appeal. A further appeal was made by the Company from the decision of the latter Court to the Court of Cassation.

124. At this juncture the case was taken up by the Belgian Government which alleged, *inter alia*, that the judgement of the Court of Appeal disregarded the rights of the Company as established by the Mixed Arbitral Tribunal and entitled the Belgian Government to bring the case before the Permanent Court under the terms of a Treaty of conciliation, arbitration and judicial settlement entered into between Belgium and Bulgaria in 1931 and by virtue of the declarations which both Governments had made, accepting the compulsory jurisdiction of the Court. The major part of the Court's judgement was therefore devoted to

determining the precise implication of these instruments to the facts of the case. The Court found that, under the 1931 Treaty, application might only be made to it after the competent local authority had given a decision with final effect, and that the decision of the Court of Appeal could not be so characterized (pp. 79-80). The Court also examined (pp. 81-83) the argument of the Bulgarian Government that, although the dispute had arisen in 1937 and the acceptance of the Permanent Court's jurisdiction dated from 1926, the situation giving rise to the dispute, in particular the decisions of the Mixed Arbitral Tribunal, dated back to a period before 1926 and that the Court therefore lacked jurisdiction owing to a limitation *ratione temporis* contained in the Belgian declaration. The Court dismissed this argument, however, on the grounds that, although the Tribunal's decisions had been the source of the rights claimed by the Company, they had not been the source of the dispute as such. The Court considered that :

"It is true that a dispute may presuppose the existence of some prior situation or fact, but it does not follow that the dispute arises in regard to that situation or fact. A situation or fact in regard to which a dispute is said to have arisen must be the real cause of the dispute " (p. 82).

Upon the facts of the case, the Court found that the central point of the complaints made by the Belgian Government related to events subsequent to 1926. The Court therefore upheld the objection of the Bulgarian Government as regards part of the submission and overruled it as to the remainder.

*Claim of Finnish Shipowners against Great Britain in respect of the use of certain Finnish Vessels during the War (1934)*

*Finland, United Kingdom*

*Arbitrator : Bagge (Sweden)*

*Reports of International Arbitral Awards, Vol. III, p. 1479*

125. A number of Finnish ships were seized in July 1916 and March 1917 whilst in British ports and were used by British authorities for the remainder of the war. At that time Finland formed part of Russia and the requisition was carried out under an agreement between Russia and Great Britain. After the war, the Finnish shipowners submitted a claim in respect of the hire of the vessels and the loss of three which had been sunk. The British Government maintained that the Russian Government was responsible for the requisition and for any compensation to be paid to the shipowners. The shipowners brought an action against the Crown before an Admiralty Board, from whose decisions there was no appeal except on points of law. The Board found that the requisition had been carried out by Russia and not by Great Britain. The shipowners did not appeal from this decision and the Finnish Government raised the matter before the League of Nations. The parties agreed, upon the recommendation of the League, to submit to arbitration the preliminary question of whether the Finnish shipowners had exhausted the local remedies available to them under English law.

126. The principal question before the Arbitrator was whether the right of appeal from the Admiralty Board constituted an effective remedy which the shipowners were obliged to exhaust. In order to determine this question the Arbitrator had to consider a number of preliminary points relating to the method of determination to be adopted (pp. 1497-1505). The Arbitrator distinguished, on the one hand, the case of an alleged failure of municipal courts to fulfil the requirements of international law, and, on the other, the case of an alleged initial breach of international law, in the present instance, the alleged taking and using of the Finnish ships by the British Government without paying for them. The Arbitrator pointed out that the parties were in agreement that a breach of international law may occur by reason of the very acts complained of and before any recourse has been had to municipal tribunals. "These acts", he stated, "must be committed by the respondent Government or its officials, since it has no direct responsibility under international law for the acts of private individuals " (p. 1501). Since the Finnish Government claimed that its case arose directly from the acts of the British Government, the Arbitrator held that the rule of the exhaustion of local remedies had reference only to the contentions of fact and propositions of law which the claimant State put forward in international procedures (p. 1503). The Arbitrator considered that the proposition advanced at the Codification Conference of 1930, that State responsibility does not come into existence until the private claim has been rejected by the local courts, whilst making recourse a matter of substance and not of procedure, did not affect the immediate question before him. In considering whether there was an effective local remedy, he held that the claim must be regarded as though the various contentions of fact put forward by the claimant were true and the legal arguments correct (pp. 1503-1504). The Arbitrator found that the appealable points of law which existed in relation to the Admiralty Board's decision would have been insufficient to reverse that decision (pp. 1535-1543) and that no other municipal remedies were in fact available to the shipowners (pp. 1535-1550). Accordingly, the Finnish shipowners had exhausted the municipal remedies available to them.

*Interhandel Case (Preliminary Objections) (1959)*
*Switzerland v. United States*
*International Court of Justice Reports, 1959, p. 6*

127. Acting under war legislation, in 1942 the United States seized the assets of the Interhandel company as being German enemy property. The Swiss Government contested this action on the ground that the company was Swiss and claimed that the United States was under an obligation to restore the assets or, alternatively, to submit the dispute to arbitration or to a conciliation procedure.

128. The United States presented a number of objections to the Court's exercise of jurisdiction. The third of these objections was that the company had not exhausted the local remedies available to it in the United States courts. In considering this objection (pp. 26-29) the Court found that a suit brought by

Interhandel was in fact still pending in the United States courts. More generally, the Court observed that the rule requiring local remedies to be exhausted before international proceedings may be instituted was a " well established rule of customary international law " (p. 27) designed to provide the State concerned with an opportunity to redress the violation by its own means, within the framework of its own domestic legal system. The Swiss Government, whilst not challenging the rule itself, contended, however, that the present case was governed by an exception to the rule in that United States representatives had admitted on several occasions that Interhandel had exhausted the available local remedies. The Court set aside this assertion since these opinions had been based on a view which had subsequently proved unfounded. The Swiss Government further argued that the rule was not applicable because the measure taken against Interhandel had been taken, not by a subordinate authority, but by the Government of the United States itself. The Court rejected this contention in view of the fact that the United States legislation in question provided adequate remedies to enable interested persons to defend their rights against the Executive. The Court also dismissed an argument put forward by the Swiss Government that the United States courts were not in a position to adjudicate in accordance with the rules of international law. The Court found that United States courts were competent to apply international law in their decisions when necessary, but that the proceedings had not reached the stage of adjudication of the merits in which considerations of international law became pertinent. The Court did not consider it necessary to determine the question of the effect before United States courts of Executive Agreements, or the basis which those courts might adopt for their final decision.

129.   Lastly, the Swiss Government claimed that a decision given by the Swiss Authority of Review and based on an international instrument known as the Washington Accord, was an international judicial decision which the United States had declined to execute. The Swiss Government argued that : "When an international decision has not been executed, there are no local remedies to exhaust, for the inquiry has been caused directly to the injured State " (p. 28). The Swiss Government thus contended that the failure by the United States to implement the decision constituted a direct breach of international law, causing immediate injury to the rights of Switzerland. The Court found, however, that the operative part of the decision of the Swiss Authority of Review related to the unblocking of the assets of Interhandel in Switzerland ; it had no bearing on the present claim which involved the restitution of the assets in the United States. The Court therefore upheld the United States objection to jurisdiction based on the non-exhaustion of local remedies.

130.   As regards the alternative claim of the Swiss Government, that the Court should declare that the United States was under an obligation to submit the dispute to arbitration or conciliation, the Court held that ". . . the grounds on which the rule of the exhaustion of local remedies is based are the same, whether in the case of an international court, arbitral tribunal,

or conciliation commission " (p. 29). The Court accordingly upheld the United States objection in respect of the alternative claim also.

*Lighthouses Concession Case (1956)*
*France, Greece*
*Permanent Court of Arbitration : President : Verzijl (Netherlands) ; Mestre (France) ; Charbouris (Greece)*
*Protocole des Séances, Ordonnances de Procédure et Sentences avec Annexes du Tribunal d'Arbitrage constitué en vertu du Compromis signé à Paris le 15 juillet 1931 entre la France et la Grèce, Bureau international de la Cour Permanente d'Arbitrage, pp. 92-93*
*Claim No. 3*

131.   This was one of a complex group of claims arising out of a lighthouse concession contract entered into between the French firm Collas et Michel and the Ottoman Government in 1913. Claim No. 3 related to the non-payment by Greece of a retroactive increase in lighthouse dues, payable in respect of ships which had been requisitioned by Greece and which used the port of Constantinople in 1919. Greece paid the original amount of the dues on 14 December 1921. On 7 January 1922, however, the Allied High Commissioners in Constantinople tripled the tariff with retroactive effect to 17 May 1919. Greece claimed that the payment made in December 1921 had extinguished the debt, as in private law, and that article 137 of the Treaty of Lausanne maintaining certain decisions of the Allied High Commissioners did not apply to the decision in question.

132.   The Tribunal held that article 137 of the Treaty of Lausanne covered the decision of the Allied High Commissioners, notwithstanding the earlier payment by Greece, and there were no grounds for giving the provision a restrictive interpretation. In the opinion of the Tribunal, the argument drawn from private law could not prevail in view of the express provision in the Treaty of Lausanne. The claim on behalf of the French firm was accordingly admitted.

*S.S. Lisman. Disposal of Pecuniary Claims Arising Out of the Recent War (1914-1918), (1937)*
*United Kingdom, United States*
*Arbitrator : Hutcheson (United States of America)*
*Reports of International Arbitral Awards, Vol. III, p. 1767*

133.   The United States and the United Kingdom agreed in 1927 not to present against each other any claims arising out of damage suffered or supplies or services furnished during the 1914-1918 War. The United States agreed to satisfy any claims of its nationals which it regarded as meritorious where the claimant had already exhausted the legal remedies available to him in British courts. It was claimed on behalf of Interoceanic Transportation Company that the Company had suffered loss as a result of the detention of one of its ships, the *S.S. Lisman,* in a British port. The Company had brought an unsuccessful action before

the British Prize Court. The United States argued that the present case could not be entertained since the Company had not appealed against the Prize Court's decision. The Arbitrator held that although this acted as a *prima facie* bar, it was open to the claimant to show that no useful object would have been served in making an appeal (pp. 1773-1774). With regard to the claimant's argument that a denial of justice had occurred by reason of the Prize Court's finding that the British Government had not been at fault since there had been no undue delay in the return of the vessel, the Arbitrator declared that this argument could only succeed in the absence of any credible evidence to support the decision of the Prize Court. The Arbitrator found that, on the facts, the decision of the Prize Court was a just and reasonable one (pp. 1792-1793).

See also *S.S. Segurança* case, R.I.A.A., Vol. III, p. 1801, for a similar claim.

*Mariposa Development Company Case (1933)*
*Panama, United States*
*Panama-United States General Claims Commission : President : van Heeckeren (Netherlands) ; Alfaro (Panama) ; Root (United States of America)*
*Reports of International Arbitral Awards, Vol. VI, p. 339*

134.   On 27 December 1928 a law was enacted by the legislature of Panama allowing private persons to sue for the recovery, on behalf of the State, of public properties in the hands of private persons who had acquired them illegally. In May 1929 a Panamanian citizen brought an action before a First Circuit Judge to recover an estate which had been purchased by the Mariposa Development Company, an American firm. The validity of the Company's title was upheld in a judgement given on 3 October 1930. This decision was reversed on 20 October 1931 when the Supreme Court declared the land was national property and ordered that the Company's title should be cancelled. The United States presented a claim for expropriation. The Commission held that it had no jurisdiction to consider claims arising after 3 October 1931, the date of the exchange of ratifications of the Claims Convention between the United States and Panama. The major point at issue therefore concerned the date when the claim arose. The Commission determined that it was not until after the Supreme Court's opinion that the title of the Mariposa Development was interfered with, so as to give rise to an international claim. In the opinion of the Commission, the mere enactment of legislation by which property might be expropriated without compensation should not normally create at once an international claim. "There should be a *locus penitentiae* for diplomatic representation and executive forbearance " (p. 341). Accordingly, the Commission held that no damage to sustain a claim had arisen before the decision of the Supreme Court on 20 October 1931 and in consequence the Commission lacked jurisdiction to consider the matter (pp. 340-341).

*Mexican Union Railway Case (1930)*
*Mexico, United Kingdom*

*Mexico-United Kingdom Claims Commission : President : Zimmerman (Netherlands) ; Flores (Mexico) ; Percival (United Kingdom)*
*Reports of International Arbitral Awards, Vol. V, p. 115*

135.   The Mexican Union Railway, a British company, entered into a concessionary contract with the Mexican Government whereby it agreed to be treated as a Mexican company, to submit to the jurisdiction of Mexican courts, and not to request diplomatic intervention. Following the decision in the *North American Dredger Company* case, R.I.A.A., Vol. IV, p. 26, the Commission held that it lacked jurisdiction. The Commission distinguished, however, between submission to the Mexican courts and the right to apply for diplomatic intervention. An application might be made to the claimant's Government in the event that denial or undue delay of justice resulted from an appeal to the local courts. The company had neglected to place its case before the Mexican courts, however, so that no international delinquency had been shown to have been caused (pp. 120-122). The Commission declared that : "It is one of the recognized rules of international law that the responsibility of the State under international law can only commence when the persons concerned have availed themselves of all remedies open to them under the national laws of the State in question " (p. 122).

136.   See also *MacNeill* case, R.I.A.A., Vol. V, p. 135, where the Commission held that it had jurisdiction and distinguished the *Mexican Union Railway* case on the grounds that the contract in question was with a local authority, not with the Government itself, and the Calvo clause drafted in such a way that it was uncertain what rights had been waived by the concessionnaire. *The Mexican Union Railway* case was followed in the *Interoceanic Railway of Mexico* case, R.I.A.A., Vol. V, p. 178.

*The Panevezys-Saldutiskis Railway Case (Preliminary Objections) (1939)*
*Esthonia v. Lithuania*
*Permanent Court of International Justice, Series A/B No. 76*

137.   This case was brought by Esthonia on the ground that Lithuania had refused to recognize the rights of an Esthonian company, as the successor of a pre-1917 Russian company, to the Panevezys-Saldutiskis railway, which had been seized and operated by the Lithuanian Government. Lithuania raised two objections to the Court's jurisdiction : firstly, that Esthonia was unable to satisfy the rule of the nationality of claims, namely, that the claim must be held by a national both at the time of presentation and when the injury was suffered ; and, secondly, that local remedies available before the Lithuanian courts had not been exhausted. Lithuania also submitted a counterclaim. The Court held that, on the facts of the case, it could not give a ruling on the first objection without passing on the merits of the case as a whole, and therefore declined to admit the objection. Regarding the second objection put forward by the Lithuanian Government, the Court

agreed in principle with the counter arguments of the Esthonian Government, namely that there are exceptions to the rule of international law requiring the exhaustion of local remedies in the case where municipal courts lack jurisdiction to grant relief, or if resort to those courts would produce a repetition of a decision already given. However, the Court found that these two admitted exceptions did not in fact apply in respect of the claim of the Esthonian company and that the local remedies available in Lithuanian courts had not been exhausted. The Court therefore upheld the Lithuanian objection and did not consider the merits of the case. (pp. 18-21).

*Phosphates in Morocco (Preliminary Objections) (1938)*
*Italy v. France*
*Permanent Court of International Justice, Series A/B No. 74*

138. The French authorities in Morocco adopted a number of measures which, in the opinion of the Italian Government, amounted to monopolization of the phosphates industry in violation of the international obligations imposed on Morocco. The various measures taken included the dispossession of the phosphates interests held by an Italian national in 1925 as a result of a decision of the Mines Department, a branch of the French administration. The French Government's acceptance of the compulsory jurisdiction of the Permanent Court only became effective, however, in 1931. The Italian Government argued that the 1925 decision and the policy of monopolization formed part of a continuing and progressive unlawful action which was only completed by certain acts subsequent to the critical date when France's acceptance of jurisdiction became effective. The Court did not accept this argument and did not therefore proceed to consider the merits of the case or to examine the grounds upon which the Italian Government relied in claiming that a denial of justice had followed the Mine Department's decision. The Court did, however, state that, if the Italian allegation that the 1925 decision was an unlawful international act was accepted, then that decision would constitute "a definitive act which would, by itself, directly involve international responsibility". (p. 28). The Court continued, "This act being attributable to the State and described as contrary to the treaty rights of another State, international responsibility would be established immediately as between the two States. In these circumstances the alleged denial of justice, resulting either from a lacuna in the judicial organization or from the refusal of administrative or extraordinary methods of redress designed to supplement its deficiencies, merely results in allowing the unlawful act to subsist. It exercises no influence either on the accomplishment of the act or on the responsibility ensuing from it." (*ibid.*).

*Selwyn Case (1903)*
*United Kingdom, Venezuela*
*United Kingdom-Venezuela Mixed Claims Commission : Umpire : Plumley (United States of America) ; Harrison (United Kingdom) ; Grisanti (Venezuela).*
*Reports of International Arbitral Awards, Vol. IX, p. 380.*

139. Venezuela objected to the jurisdiction of the Commission on the ground that a suit was pending before the Venezuelan courts based on the same right of action. The Umpire declared :

"International arbitration is not affected jurisdictionally by the fact that the same question is in the courts of one of the nations. Such international tribunal has power to act without reference thereto, and if judgement has been pronounced by such court, to disregard the same so far as it affects the indemnity to the individual, and has power to make an award in addition thereto or in aid thereof as in the given case justice may require." (p. 381)

*Spanish Zone of Morocco Claims (1925)*
*Spain, United Kingdom*
*Rapporteur : Huber (Switzerland)*
*Reports of International Arbitral Awards, Vol. II, p. 615*
*Claim No. 53 Ziat Ben Kiran Case (pp. 729-732)*

140. Great Britain presented this claim on behalf of a British protected person for damage caused during a riot. The claimant had notified the local commander of his losses and the British embassy in Madrid had also transmitted his claim to the Spanish Government. It was held that the claim based on an alleged denial of justice must fail since the available local remedies had not been exhausted.

## VI. Circumstances in which an act is not wrongful

### (A) GENERAL

*Boffolo Case (1903)*
*Italy, Venezuela*
*Italy-Venezuela Mixed Claims Commission : Umpire : Ralston (United States of America) ; Agnoli (Italy) ; Zuloaga (Venezuela).*
*Reports of International Arbitral Awards, Vol. X, p. 528.*

141. The Italian Government presented a claim on behalf of Boffolo who had been summarily expelled from Venezuela. The Umpire held that, although a State possesses a general right of expulsion, it may only exercise it in extreme instances and in a manner least injurious to the person concerned ; in the event that the country concerned fails to state the reason for the expulsion before an international tribunal it must accept the consequences. The Umpire found that the only reasons given for the expulsion were contrary to the Venezuelan Constitution and could not be accepted as sufficient. Damages were awarded accordingly (pp. 534-537).

For similar decisions see the *Maal* case, RIAA, Vol. X, p. 730, *Oliva* case, RIAA, Vol. X, p. 600 and *Paquet* case, RIAA, Vol. IX, p. 323.

*Company General of the Orinoco Case (1902)*
*France, Venezuela*

*France-Venezuela Mixed Claims Commission: Umpire:*
*Plumley (United States of America); Rocca (France);*
*Paul (Venezuela)*

*Reports of International Arbitral Awards, Vol. X,*
*p. 184*

142. The Company held two concessionary contracts
for the exploitation of minerals and the development
of transport facilities in a large region of Venezuela.
The Venezuelan Government rescinded the contracts
and refused to give effect to an assignment which the
Company had made in exercise of its rights under
the contracts. It was held that although Venezuela was
entitled to abrogate the contracts, which were the cause
of bad relations with a neighbouring State, the Company
was entitled to compensation in respect of the failure
of the assignment.

> "As to the Government of Venezuela, whose duty
> of self-preservation rose superior to any question of
> contract, it had the power to abrogate the contract
> in whole or in part. It exercised that power and
> cancelled the provision of unrestricted assignment.
> It considered the peril superior to the obligation and
> substituted therefore the duty of compensation."
> (p. 280. See generally pp. 279-282).

143. See also the *Great Venezuelan Railroad* case,
RIAA, Vol. X, p. 468, at p. 471, where the German-
Venezuelan Mixed Claims Commission held that an
agreement in which the Venezuelan Government had
undertaken to indemnify the Railroad for any damage
suffered whilst carrying troops or munitions during
efforts to put down a revolution was absolutely void as
being contrary to public policy, which required that
the safety of the State be preserved at all costs.

*The Deutsche Amerikanische Petroleum Gesellschaft*
*Oil Tankers (1926)*

*United States, Reparation Commission: Arbitrators:*
*Sjoeborg (Sweden); Lyon (France); Bayne (United*
*States of America).*

*Reports of International Arbitral Awards, Vol. II,*
*p. 777.*

144. The Standard Oil Company, a United States
corporation, claimed the beneficial ownership of certain
oil tankers which Germany had handed over to the
Reparations Commission in 1919. The arbitration
agreement provided that if the Standard Oil Company
failed to establish beneficial ownership it might neverthe-
less receive reimbursement through the transfer to it
of tankers of equal value. The Company's claim to
compensation was dismissed on the ground that the
German Government had not discriminated between
the Deutsche Amerikanische Petroleum Gesellschaft
(which was a German corporation, owned by the
Standard Oil Company) and non-German shipping
companies as regards payment of compensation. Since
any person taking up residence or investing capital in a
foreign country must submit, under reservation of any
discrimination against him as a foreigner, to the laws

of that country, the Standard Oil Company had no
justification for claiming compensation (pp. 793-795).

145. Cf. the statement of the Permanent Court of
International Justice, in the course of giving judgement
in the *Peter Pázmány* case: "... a measure prohibited
by an international agreement cannot become lawful
under that instrument simply by reason of the fact that
the State concerned also applies the measure to its own
nationals." (p. 243). Appeal from a judgement of the
Hungaro-Czechoslovak Mixed Arbitral Tribunal [*The
Peter Pázmány University v. the State of Czechoslovakia
(1933)*], *P.C.I.J., Series A/B No. 61.*

*In the matter of the Death of James Pugh (1933)*
*Panama, United Kingdom*

*Arbitrator: Lenihan (United States of America)*

*Reports of International Arbitral Awards, Vol. III,*
*p. 1439*

146. James Pugh, a national of the Irish Free State,
died as a result of injuries received whilst resisting arrest
in Panama. The Arbitrator held that the Panamanian
Government was not responsible. Pugh's death was the
result of his own fault in resisting arrest; the police had
not acted in excess of their powers. (pp. 1447-1451).

See also the *Massey* case, RIAA, Vol. IV, p. 155,
where a contention that the claimant's own misconduct
had contributed to his death was rejected; para. 100
*supra.* In the *Kling* case, RIAA, Vol. IV, p. 575,
however, damages were reduced in view of the imprud-
ent behaviour of Kling and his companions. See
para. 71, *supra.*

*Case concerning the payment of various Serbian Loans*
*issued in France (1929).*

*Case concerning the payment in gold of the Brazilian*
*Federal Loans issued in France (1929).*

*France v. Brazil*

*France v. Serb-Croat-Slovene State*

*Permanent Court of International Justice, Series A*
*Nos. 20/21*

147. The dispute submitted to the Court in these two
cases related to the alleged failure of the Serbian and
Brazilian Governments to service the obligations which
they assumed in respect of the French bond holders
of certain loans. In the course of its judgement the
Court rejected the argument that the First World War,
and the economic dislocation which ensued, constituted
a defence of *force majeure*, releasing the debtor State
from the legal obligations. The Court also rejected
the argument of impossibility of performance because
of the inability to obtain gold coins *in specie*, on the
ground that the promise was to be regarded as one for
the payment of gold value. (pp. 39-40; p. 120).

148. In the *Russian Indemnity* case, RIAA, Vol. XI,
p. 421 at p. 443, the Permanent Court of Arbitration
rejected the contention of the Ottoman Government
that *force majeure*, in the form of financial difficulties,
had prevented prompt settlement of the payments due,
on the ground that the sums in question could not be

said to have imperilled the existence of the Ottoman Empire or seriously to have compromised its internal or external situation. On the question of damages, see para. 196 *infra*.

*The "Société Commerciale de Belgique" (1939)*
*Belgium v. Greece*
*Permanent Court of International Justice, Series A/B No. 78*

149. The Société Commerciale de Belgique entered into a contract with the Greek Government in 1925 for the construction of certain railway lines. The work to be undertaken was financed by the Company which lent money to the Government in return for the issue of bonds ; these bonds became part of the Greek public debt. In 1932, as a result of the general financial crisis, the Greek Government defaulted in its service of the debt. An Arbitral Commission, established under the contract, determined that the 1925 contract should be cancelled and awarded the Company 6,721,868 gold dollars, with interest at 5 per cent. The Greek Government refused to pay this sum on the ground that the amount due to the Company should be considered part of the Greek public debt, with interest and mode of settlement being determined accordingly.

150. In 1937, the Belgian Government took up the case. In the course of proceedings before the Permanent Court the Belgian Government dropped its original allegation that the disregard of the arbitral awards by the Greek Government constituted a violation of that Government's international obligations, and sought merely a declaration that the awards were definitive and obligatory. Since the Greek Government expressly acknowledged that the awards had the force of *res judicata*, the Court held that there was no material difference between these two submissions. However, the Greek Government also stated that by reason of its budgetary and monetary situation it was materially impossible for it to execute the awards as formulated. The Court declared that, even if this should be so, it was unable to ask the Company to reach a settlement on the basis of the position adopted vis-à-vis other bondholders of the public debt. The Court also stated that it could not entertain the Greek submission as amounting to a justification that, owing to *force majeure*, it could not execute the awards, having regard to the fact that the question of Greece's capacity to pay was outside the scope of the proceedings before the Court. (pp. 176-178).

*Salem Case (1932).*
*Egypt, United States.*
*Arbitrators : Simons (Germany) ; Badawi (Egypt) ; Nielsen (United States of America).*
*Reports of International Arbitral Awards, Vol. II, p. 1161.*

151. In the course of this case the United States alleged that the Mixed Courts in Egypt had committed a denial of justice. The Tribunal dismissed this argument on the ground that the Egyptian Government lacked power to remedy the faults of those Courts. "The

responsibility of a State can only go as far as its sovereignty ; in the same measure as the latter is restricted, that is to say as the State cannot act in a free and independent manner, the liability of the State must also be restricted." (p. 1203).

*Toberman, Mackey and Company Case (1927)*
*Mexico, United States.*
*Mexico-United States General Claims Commission : President : van Vollenhoven (Netherlands) ; Mac-Gregor (Mexico); Nielsen (United States of America).*
*Reports of International Arbitral Awards, Vol. IV, p. 205.*

152. The Company claimed that its property had been damaged owing to the negligence of Mexican customs officials and that the Mexican Government was liable under the general principles of law, as well as under the provisions of its own customs regulations. It was held that there was no principle of international law obliging a Government to take special care of merchandise in its customs houses for the mere purpose of exercising the sovereign right of collecting customs duties (p. 206). The parties concerned had failed to comply with Mexican law, and it was their negligence which threw an undue burden of care on the customs authorities. The claim was accordingly dismissed.

### (B) War measures

*American Electric and Manufacturing Co. Case (1903)*
*United States, Venezuela*
*United States-Venezuela Mixed Claims Commission : Umpire : Barge (Netherlands) ; Bainbridge (United States of America) ; Paul (Venezuela)*
*Reports of International Arbitral Awards, Vol. IX, p. 145*

153. The American Electric and Manufacturing Co. was held entitled to compensation for the seizure of property by the Venezuelan Government and for the damage which the property suffered in the course of military operations against revolutionaries (p. 146). A claim for damages suffered during a Government bombardment was disallowed as being an "incidental and necessary consequence of a legitimate act of war" (p. 147).

The decision was followed by the France-Venezuela Mixed Claims Commission in the *Petrocelli* case, RIAA, Vol. X, p. 591.

See also the *Luzon Sugar Refining Co.* case, RIAA, Vol. VI, p. 165, where a claim for damage to neutral property inflicted during military operations against insurgents was refused.

*Bembelista Case (1903)*
*Netherlands, Venezuela*
*Netherlands-Venezuela Mixed Claims Commission : Umpire : Plumley (United States of America) ; Hellmund (Netherlands), who was succeeded by Möller ; Iribarren (Venezuela)*

*Reports of International Arbitral Awards, Vol. X, p. 717*

154. The Umpire denied the claimant's request for compensation on the ground that the damage to his property had been inflicted during the "rightful and successful attempt of the Government to repossess itself of one of its important towns", and constituted "one of the ordinary incidents of battle" (pp. 717-718).

*The Carthage Case (1913)*

*France-Italy*

*Permanent Court of Arbitration : Renault (France) ; Kriege (Germany) ; Fusinato (Italy) ; de Taube (Russia) ; Hammarskjöld (Sweden)*

*Reports of International Arbitral Awards, Vol. XI, p. 449*

155. The *Carthage*, a French vessel, was stopped by an Italian naval ship when sailing from Marseilles to Tunis during the Turco-Italian war in Africa in 1912. The *Carthage* had an aeroplane on board which the Italian Government claimed was war contraband, although it was destined for a private consignee. The *Carthage* was detained in an Italian port for some days before being allowed to resume her voyage. The aeroplane, which had been landed at the Italian port, was released at the same time. France presented a claim for the insult to the French flag, for the violation of international law, and for the damage suffered by the *Carthage* and her voyage. The Italian Government put forward a counter-claim for its expenses in seizing the ship. The Permanent Court of Arbitration held that the general right of belligerents to search neutral ships was limited, as regards subsequent acts, by the presence or absence of contraband or of adequate legal grounds to believe that contraband may exist. In the particular case the fact that the aeroplane was destined for Tunis was found insufficient to establish that it was contraband ; accordingly, the capture of the vessel and its detention were illegal (pp. 459-460). For a similar decision see the *Manouba* case, RIAA, Vol. XI, p. 463.

*Coleman Case (1928)*

*Mexico, United States*

*Mexico-United States General Claims Commission : President : Sindballe (Denmark) ; MacGregor (Mexico) ; Nielsen (United States of America)*

*Reports of International Arbitral Awards, Vol. IV, p. 365*

156. After Coleman had been wounded by revolutionary troops, his employees sent a boat to enable him to be moved to a place where he could receive the medical treatment he needed. The Mexican Federal Officer in charge of the locality detained the boat for three days and used it to transport troops and equipment. The seizure of the ship having been made without compensation and without any grounds of imperative military necessity having been shown, Mexico was held liable to pay compensation for the serious consequences of the delay on the claimant's health. (p. 367).

*Goldenberg Case (1928)*

*Germany, Romania*

*Arbitrator : Fazy (Switzerland)*

*Reports of International Arbitral Awards, Vol. II, p. 901*

157. Goods belonging to Goldenberg and Sons, a Romanian Company, were requisitioned in Belgium by German troops before Romania entered the war. In 1921 the German Government paid compensation equal to one-sixth of the purchaseprice. The Arbitrator held that, although a State may derogate from the principle of respect for private rights on grounds of public utility, of which requisition in time of war formed an example, nevertheless the seizure by German troops became illegal after the failure to pay an equitable amount of compensation within a reasonable time (p. 909). Accordingly the requisition constituted an "act contrary to international law", and Germany was liable to compensate the Romanian firm.

158. For a similar decision see *Responsibility of Germany for acts committed after 31 July 1914 and before Portugal entered the War*, RIAA, Vol. II, p. 1035 at p. 1039. *Cf.* the *Bischoff* case, RIAA, Vol. X, p. 420, where the German-Venezuelan Mixed Claims Commission held that the Venezuelan Government was liable for the detention of property for an unreasonable length of time although the original seizure had been justified as a proper exercise of discretion following a smallpox epidemic. In the *Upton* case, RIAA, Vol. IX, p. 234 at p. 236, the Venezuelan Government was held liable for the seizure of Upton's ship for use against revolutionary forces. The United States-Venezuela Mixed Claims Commission declared : "The right of the State, under stress of necessity, to appropriate private property for public use is unquestioned, but always with the corresponding obligation to make just compensation to the owner thereof".

*Norwegian Shipowners Claims (1922)*

*Norway, United States*

*Arbitrators : Vogt (Norway) ; Valloton (Switzerland) ; Anderson (United States of America)*

*Reports of International Arbitral Awards, Vol. I, p. 307.*

159. Whilst upholding the right of the United States as a belligerent to seize neutral property for public needs, the Tribunal found that the contracts placed by the Norwegian claimants had themselves been seized, in addition to the physical properties, and that there had been undue delay in returning the claimant's property or paying compensation after the emergency had ended in 1919. The Tribunal rejected the contention of the United States that, since the seizure had been carried out in consequence of *force majeure* or "restraint of princes", no liability had been incurred. The Tribunal declared that, although "restraint of princes" might be invoked in disputes between private citizens, it could not be invoked in an international claim between Governments.

"International law and justice are based upon the principle of equality between States. No State can

exercise towards the citizens of another civilized State the 'power of eminent domain' without respecting the property of such foreign citizens or without paying just compensation as determined by an impartial tribunal, if necessary." (p. 338)

160.  The Tribunal concluded that, whilst in view of the war conditions which had prevailed it could not be said that the discrimination against the claimants had been sufficiently arbitrary as to justify a special claim for damages, nevertheless the United States had made ". . . a discriminating use of the power of eminent domain towards citizens of a foreign nation, and they are liable for the damaging action of their officials and agents towards these citizens of the Kingdom of Norway". (p. 339) The Tribunal awarded compensation to each claimant based on an assessment *ex aequo et bono* of the market value of the shipbuilding contracts, together with a lump sum in respect of interest for five years from 1917. (pp. 339-342) The United States paid the amount awarded but stated that it would not accept the bases of the award as being declaratory of international law or as being binding as a precedent. (pp. 344-346)

*Spanish Zone of Morocco Claims (1925)*
*Spain, United Kingdom*
*Rapporteur : Huber (Switzerland)*
*Reports of International Arbitral Awards, Vol. II, p. 615*
*Claim No. 25. Beru - Madan Rzini Case (pp. 696-697)*

161.  The Rapporteur held that an indemnity was due in respect of cattle killed by Spanish soldiers in the course of operations against rebellious Moroccan tribes since the killing had not been justified by military necessity.

**VII. The duty to make reparation, its forms and extent**

*Administrative Decision No. III (1923)*
*Germany, United States*
*Germany-United States Mixed Claims Commission : Umpire : Parker (United States of America) ; Kiessel- bach (Germany) ; Anderson (United States of America)*
*Reports of International Arbitral Awards, Vol. VII, p. 64.*

162.  In this decision the Commission laid down rules to govern the computation of compensation in respect of claims falling within the Commission's *Adminis- trative Decision No. I*, RIAA, Vol. VII, p. 21, and with respect to the measure of damages for all property taken. The Commission held that there was no basis for awarding damages in the nature of interest where the loss was neither liquidated nor capable of being computed ; losses due in respect of personal injuries fell into this class (p. 65). In cases of property losses, however, it was held that interest might be awarded together with damages for the loss. In reliance on its

interpretation of the relevant treaty provisions the Commission decided that, in claims for property taken or destroyed during the period of American neutrality, the compensation awarded should consist of the value of the property taken, assessed at the date of taking, plus 5 per cent interest representing the loss suffered by the claimant during the period he was deprived of his property (p. 66). A similar rule was applied in the case of property taken during the period of German belligerency. Interest was awarded from 18 November 1918 in respect of other instances of material damage. In all other cases, interest was awarded as from the date of the Commission's award (p. 70).

*Administrative Decision No. V (1924)*
*Germany, United States*
*Germany-United States Mixed Claims Commission : Umpire : Parker (United States of America) ; Kiessel- bach (Germany) ; Anderson United States of America)*
*Reports of International Arbitral Awards, Vol. VII, p. 119.*

163.  In the course of this decision regarding the jurisdiction of the Commission as determined by the rule of the nationality of claims, the Umpire declared that :

". . . the generally accepted theory formulated by Vattel, which makes the injury to the national an injury to the nation and internationally therefore a national claim which may and should be espoused by the nation injured, must not be permitted to obscure the realities or blind us to the fact that the ultimate object of asserting the claim is to provide reparation for the private claimant . . ." (p. 153).

*Case of the Ship Cape Horn Pigeon (1902)*
*Russia, United States*
*Arbitrator : Asser (Netherlands)*
*Reports of International Arbitral Awards, Vol. IX, p. 51.*

164.  The *Cape Horn Pigeon*, an American whaling ship, was seized by a Russian cruiser when on the high seas. Russia recognized responsibility and the sole issue before the Arbitrator was that of the amount of damages to be awarded. He held that the damages payable should include not only an amount in respect of the damage actually suffered, but also any loss of profits incurred as a result of the seizure (p. 65).

165.  For a similar decision see the *Shufeldt* case, RIAA, Vol. II, p. 1079, where the Arbitrator held that the compensation payable should include a sum in respect of future profits. In the *Wimbledon* case, P.C.I.J., Series A, No. 1, at pp. 31-32, the damages awarded by the Permanent Court included the cost of demurrage and of the ship's deviation through the Danish Straits ; an application for damages based on the ship's contribution to the charterer's general expenses was refused however. See para. 25 *supra*.

*The Carthage Case (1913)*

*France, Italy*

*Permanent Court of Arbitration: Renault (France); Kriege (Germany); Fusinato (Italy); de Taube (Russia); Hammarskjöld (Sweden).*

*Reports of International Arbitral Awards, Vol. IX, p. 449.*

166.  The Court awarded damages for the damage suffered by the private parties concerned but refused to award damages in respect of the other claims put forward by France, or of the counter-claim put forward by Italy, declaring that the establishment by an arbitral tribunal that one State has failed in its international obligations to another in itself constitutes a serious penalty (pp. 460-461). See para. 155 *supra.*

167.  In the *Corfu Channel* case (*Merits*), I.C.J. Reports, 1949, p. 4, the International Court of Justice refused to grant any monetary compensation for the intervention of British ships in Albanian territorial waters and stated that its finding that the act had been in violation of Albanian sovereignty and was therefore wrongful under international law in itself constituted appropriate satisfaction (p. 36). See paras. 5-8 *supra.*

*Case concerning the Factory at Chorzow. (Claim for Indemnity) (Merits) (1928)*

*Germany v. Poland*

*Permanent Court of International Justice Series A, No. 17*

168.  Following the determination by the Permanent Court that it had jurisdiction (P.C.I.J., Series A, No. 9), the Court considered the merits of the dispute between Germany and Poland over the factory at Chorzow which had previously been owned and managed by two German companies. Regarding the general issues involved, the Court declared that:

"It is a principle of international law that the reparation of a wrong may consist in an indemnity corresponding to the damage which the nationals of the injured State have suffered as a result of the act which is contrary to international law . . . The reparation due by one State to another does not, however, change its character by reason of the fact that it takes the form of an indemnity for the calculation of which the damage suffered by a private person is taken as the measure. The rules of law governing the reparation are the rules of international law in force between the two States concerned, and not the law governing relations between the State which has committed a wrongful act and the individual who has suffered damage. Rights or interests of an individual, the violation of which causes damage, are always on a different plane to rights belonging to a State, which rights may also be infringed by the same act. The damage suffered by an individual is never therefore identical in kind with that which will be suffered by a State; it can only afford a convenient scale for the calculation of the reparation due to the State." (pp. 27-28)

The Court also observed that, ". . . it is a principle of international law, and even a general conception of

law, that any breach of an engagement involves an obligation to make reparation." (p. 29)

169.  Turning to the assessment of the damage caused by an unlawful act, the Court held that ". . . only the value of property, rights and interests which have been affected and the owner of which is the person on whose behalf compensation is claimed, or the damage done to whom is to serve as a means of gauging the reparation claimed, must be taken into account." (p. 31) More generally, the Court stated that:

"The essential principle contained in the actual notion of an illegal act — a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals — is that reparation must, as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if the act had not been committed. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it — such are the principles which should serve to determine the amount of compensation due for an act contrary to international law." (p. 47)

170.  The Court found that, in the particular circumstances, restitution was not possible and that damages would have to be assessed in lieu, on a lump sum basis. In calculating the damages, the Court considered that this might include any margin of profit which was found to remain after deducting operational and other costs. The Court held, however, that any damage arising out of the competition of the Chorzow factory with the former German operating company was too indeterminate to be taken into account. As regards the forms and method of payment, the Court determined that, in view of its jurisdiction to determine whether reparation was due *vel non*, ". . . it may well determine to whom the payment shall be made, in what place and at what moment; in a lump sum or maybe by instalments; where payment shall be made; who shall bear the costs, etc." (p. 61; generally on the question of assessment of compensation see pp. 47-61). See also, *Case Concerning the Factory at Chorzow (Claim for Indemnity) (Jurisdiction), Permanent Court of International Justice, Series A, No. 9, at p. 21.*

171.  In the *Central Rhodope Forests* case (*Merits*), RIAA, Vol. III, p. 1405, the Arbitrator held that restitution of the property concerned would be impracticable in the circumstances and awarded damages in lieu, based on the value of the contracts at the date of dispossession (pp. 1434-1435). See para. 121 *supra.*

*The Expropriated Religious Properties Case (1920)*

*France, Spain and United Kingdom v. Portugal*

*Arbitrators: de Savornin Lohman (Netherlands); Lardy (Switzerland); Root (United States of America)*

*Reports of International Arbitral Awards, Vol. I, p. 7*

172.  Portugal seized certain church properties alleged to belong to nationals of France, Great Britain and

Spain. The Governments concerned agreed to submit the resulting claims to a tribunal established in accordance with the 1907 Hague Convention for the Pacific Settlement of International Disputes. One claim put forward by the French Government was dismissed since the nationality of the claimant had not been proved and one British claim was abandoned. As regards the other claims of British and French nationals, the Tribunal held that it would be just and equitable for Portugal to retain the properties, subject to payment of monetary compensation, at 6 per cent annual interest, that being the legal interest rate in Portugal. The decision was reached having regard to the fact that Portugal had not seized the properties for pecuniary gain. Of the nineteen Spanish claims, seventeen were held to be inadmissible owing to lack of proof of Spanish nationality.

*The Corfu Channel Case (Assessment of the Amount of Compensation) (1949)*
*United Kingdom v. Albania*
*International Court of Justice Reports, 1949, p. 222*

173.   The Court decided in its earlier judgement (*I.C.J. Reports 1949*, p. 4 ; see paras. 5-8 and 167 *supra*) that further proceedings would be necessary in order to determine the amount of reparation due to the British Government in respect of the damage its ships had suffered. Albania disputed the jurisdiction of the Court with regard to the assessment of damages, but its arguments were not accepted by the Court and eventually damages were awarded although Albania failed to appear before the Court.

174.   The British claim for reparation fell under three headings. The first claim, for the replacement cost of the ship which had been sunk, assessed at the time of loss, was accepted by the Court (pp. 248-249). The second claim, for the damage done to the second ship, was also regarded as a fair and accurate estimate, on the basis of a review carried out by independent experts appointed by the Court (p. 249). Lastly, the British claim in respect of the pensions and other grants given to naval personnel killed or injured, together with the costs of administration, medical treatment, etc., was accepted by the Court as having been established to its satisfaction (pp. 249-250).

*Dix Case (1903)*
*United States, Venezuela*
*United States-Venezuela Mixed Claims Commission : Umpire : Barge (Netherlands) ; Bainbridge (United States of America) ; Paul (Venezuela)*
*Reports of International Arbitral Awards, Vol. IX, p. 119*

175.   Cattle belonging to Dix, a United States citizen, were taken by members of a revolutionary army in Venezuela. The Commission held that the acts of the successful revolutionaries were to be regarded as those of a *de facto* Government and that Venezuela was accordingly liable to pay compensation (p. 120). Dix sold the remaining cattle at a loss and paid damages owing to his failure to fulfil a contract which he had

entered into earlier. It was held that his claim under these two heads must be dismissed on the grounds that "international as well as municipal law denies compensation for remote consequences, in the absence of evidence of deliberate intention to injure". (p. 121)

Cf. the *Deutz* case, RIAA, Vol. IV, p. 472, on the question of damages for breach of contract, para. 39 *supra*.

*S.S. I'm Alone (1933 and 1935)*
*Canada, United States*
*Arbitrators : Duff (Canada) ; Van Devanter (United States of America)*
*Reports of International Arbitral Awards, Vol. III, p. 1609*

176.   In view of the fact that the *I'm Alone*, although registered in Canada, was *de facto* owned and controlled by a group of persons almost all of whom were United States citizens, the Arbitrators held that no compensation should be paid for the loss of the ship or its cargo. They stated that the United States should formally acknowledge the illegality of the seizure, apologize to the Canadian Government and, as a material amend for the wrong, pay that Government $25,000. The Arbitrators also recommended that compensation should be paid by the United States for the benefit of the crew, none of whom had been a party to the attempted smuggling (p. 1618). See also para. 13 *supra*.

*Janes Case (1925)*
*Mexico, United States*
*Mexico-United States General Claims Commission : President : van Vollenhoven (Netherlands) ; MacGregor (Mexico) ; Nielsen (United States of America)*
*Reports of International Arbitral Awards, Vol. IV, p. 82*

177.   The Commission distinguished between the individual liability of the culprit who had killed Janes and that of the State which had failed to prosecute the offender. In determining the measure of damages the Commission held that not only should the individual grief of the claimants be taken into account, but also "a reasonable and substantial redress . . . for the mistrust and lack of safety resulting from the Government attitude". (p. 89) See paras. 98-99 *supra*.

In the *Almaguer* case, RIAA, Vol. IV, p. 523, at p. 529, the Commission followed the *Janes* case in holding that regard should be had to the degree of denial of justice in assessing damages.

*Landreau Claim (1922)*
*Peru, United States*
*Arbitrators : Prevost (Peru) ; Finlay (United Kingdom) ; Smith (United States of America)*
*Reports of International Arbitral Awards, Vol. I, p. 347*

178.   The Tribunal held that the Peruvian Government was bound to pay on a *quantum meruit* basis for the

**Yearbook of the International Law Commission, Vol. II**

discoveries which Théophile Landreau had communicated to the Government and which the Government had appropriated for its own benefit (p. 364). See paras. 48-49 *supra*.

*Lighthouses Concession Case (1956)*

*France, Greece*

*Permanent Court of Arbitration: President: Verzijl (Netherlands); Mestre (France); Charbouris (Greece)*

*Protocole des Séances, Ordonnances de Procédure et Sentences avec Annexes du Tribunal d'Arbitrage constitué en vertu du compromis signé à Paris le 15 juillet 1931 entre la France et la Grèce, Bureau international de la Cour Permanente d'Arbitrage, p. 120*

*Claim No. 18*

179. Collas et Michel presented a claim for various retirement pensions which they paid to employees whom they had had to dismiss after the cancellation of their concession. The firm admitted that the pensions had been granted on moral or humanitarian grounds. The Tribunal held that the claim must be dismissed in the absence of any legal obligation.

*Lighthouses Concession Case (1956)*

*France, Greece*

*Permanent Court of Arbitration: President: Verzijl (Netherlands); Mestre (France); Charbouris (Greece)*

*Protocole des Séances, Ordonnances de Procédure et Sentences avec Annexes du Tribunal d'Arbitrage constitué en vertu du compromis signé à Paris le 15 juillet 1931 entre la France et la Grèce, Bureau international de la Cour Permanente d'Arbitrage, p. 103*

*Claim No. 19 (and No. 21 in part)*

180. In 1915 Collas et Michel were evicted from the offices in Salonika on the ground that one of their employees was suspected of spying. In April 1917 the firm was allowed to return, but before they could do so their stores, which had been placed in temporary premises, were destroyed in a fire. The firm claimed the expenses caused by their enforced removal (Claim No. 21, in part) and the value of the stores (Claim No. 19).

181. The Tribunal found that the enforced removal had been justified, having been based on adequate grounds of grave suspicion of espionage which led to the eventual prosecution of the person concerned. It held that this fact did not, however, prevent Greece from incurring financial responsibility for the expense of the removal. The claim for the value of the lost stores, on the other hand, was dismissed on the ground that there was no causal relationship between the removal and the fire which caused the loss of the stores. "Les dégâts n'étaient ni une conséquence prévisible ou normale de l'évacuation, ni attribuables à un manque de précaution de la part de la Grèce". (p. 103)

*Lighthouses Concession Case (1956)*

*France, Greece*

*Permanent Court of Arbitration: President: Verzijl (Netherlands); Mestre (France); Charbouris (Greece)*

*Protocole des Séances, Ordonnances de Procédure et Sentences avec Annexes du Tribunal d'Arbitrage constitué en vertu du compromis signé à Paris le 15 juillet 1931 entre la France et la Grèce, Bureau international de la Cour Permanente d'Arbitrage, pp. 109-114.*

*Claim No. 26*

182. Collas et Michel sought compensation for the fact that, during the period 1919-1929, they were able to collect lighthouse dues only according to a tariff expressed in drachmas which were falling in value, while the original tariff had been based on gold values. The Tribunal rejected the arguments put forward by the firm that a "gold tariff" had been incorporated in the original concessions and should therefore be continued in the future. The Tribunal nevertheless held that the Greek Government was bound by the principle of good faith to take the necessary measures to ensure the continuation of the concession, which was for public services, on an equitable basis. The Greek Government was found to have acted in default in not taking the appropriate steps in time. The Tribunal declined to accept the proposal of the Greek Government to allow Collas et Michel to profit by the increases in the tariffs for other public services which had been enacted by Greek legislation in view of the international aspect of the concession.

The Tribunal decided that it was necessary that an expert inquiry should be held to estimate what costs would have fallen on Collas et Michel if the firm had functioned in normal conditions. On a basis of this inquiry it could be possible to determine what increase there ought to be in income, while avoiding the two extreme solutions which had been put forward, both of which the Tribunal found inadmissible (pp. 111-114).

*Lighthouses Concession Case (1956)*

*France, Greece*

*Permanent Court of Arbitration: President: Verzijl (Netherlands); Mestre (France); Charbouris (Greece)*

*Protocole des Séances, Ordonnances de Procédure et Sentences avec Annexes du Tribunal d'Arbitrage constitué en vertu du compromis signé à Paris le 15 juillet 1931 entre la France et la Grèce, Bureau international de la Cour Permanente d'Arbitrage, pp. 132-135.*

*Claim No. 27*

183. In 1929 the Greek Government seized the lighthouse administration of Collas et Michel without compensation. The Tribunal held that the grantor State had the right to put an end unilaterally to the concession at any time, subject to one fundamental and strict condition, namely, the payment, or guarantee of payment, of a sum equitably determined. In view of its failure to observe this condition the Greek Government, regarded as successor by subrogation to the concession,

had committed an act which was contrary to one of the essential provisions of the contract. The firm was therefore entitled to compensation which ought, so far as possible, to be equal to the benefit of which they were deprived by reason of the curtailment of the concession twenty-five years before its due expiry date. In assessing that compensation, regard was to be had solely to data available at the date of termination, by calculating the net annual profits which Collas et Michel would have earned had they operated the concession for the remainder of its term. The annual figure, calculated according to past figures, was to be converted into United States dollars at the average rate for the years taken in making the calculation, and then converted into French francs at the dollar rate on the date on which the definitive award determining the compensation was given. The Tribunal ordered that an inquiry should be held regarding the details of the calculation. (pp. 132-134).

*Opinion in the Lusitania Case (1923)*
*Germany, United States*
*Germany-United States Mixed Claims Commission : Umpire : Parker (United States of America) ; Kiesselbach (Germany) ; Anderson (United States of America)*
*Reports of International Arbitral Awards, Vol. VII, p. 32*

184.   Under the Treaty of Berlin Germany accepted an obligation to pay compensation to the United States in respect of the loss of life caused by the sinking of the *Lusitania* in 1915. The Commission was therefore concerned with calculating the measure of damages. It was decided that, in cases of death, the basis of damages should not be the suffering of the deceased or the loss to his estate, but the loss sustained by his dependants. In calculating the compensation to be paid, regard was to be had not only to the loss of financial support of the deceased's personal services, but also to the mental suffering caused to the claimant as a result of the violent nature of death (pp. 35-37). The Commission held that the amount of compensation to be paid should not be reduced to take account of payments made to claimants under insurance policies on the life of the deceased (pp. 37-38). A United States contention that exemplary or punitive damages should be awarded, was rejected. The Commission distinguished between damages, aimed at providing reparation for a loss or compensation for a wrong, and a penalty, designed to act as a deterrent to punish the wrongdoer. Although municipal courts had on occasions awarded punitive damages, no international arbitral tribunal had ever done so against a sovereign nation in favour of another. Moreover, in the terms of the Treaty of Berlin, which determined the conditions under which the Commission was to operate, no direct reference was made to the award of a penalty, nor was any claim put forward in respect of the losses which the United States Government itself, as opposed to its nationals, had incurred as a result of the war. The Commission therefore concluded that it was "without power to impose penalties for the use and benefit of private claimants

when the Government of the United States has exacted none". (p. 44 ; see pp. 38-44).

See *Administrative Decision No. VI*, RIAA, Vol. VII, p. 155, where the Commission upheld the claim of United States citizens to receive compensation in respect of the loss sustained as the result of the death of a British subject who had been a passenger on the *Lusitania*.

*The Mavrommatis Jerusalem Concessions (1925)*
*Greece v. United Kingdom*
*Permanent Court of International Justice, Series A, No. 5*

185.   The Permanent Court of International Justice held that, although another concessionary had been granted the right to demand the annulment of certain concessions held by Mr. Mavrommatis, in breach of the international obligations accepted by Great Britain as the Mandatory for Palestine, nevertheless, since no loss to Mr. Mavrommatis resulting from this circumstance had been proved, the Greek Government's claim for an indemnity should be dismissed.

186.   See also the *Martini* case, RIAA, Vol. II, p. 975, where the Tribunal determined that no pecuniary reparation should be made for the cancellation of a concessionary contract in the absence of proof of any loss ; certain payments which the claimants had been ordered to make were annulled however (pp. 1000-1002). See also paras. 64-65 *supra*.

187.   In the *Lighthouses Concession* case, *Claim No. 5*, the Tribunal awarded to the claimants the token sum of one franc in view of the fact that they were unable to establish the amount of their loss. See para. 18 *supra*.

*Miliani Case (1903)*
*Italy, Venezuela*
*Italy-Venezuela Mixed Claims Commission : Umpire : Ralston (United States of America) ; Agnoli (Italy) ; Zuloaga (Venezuela).*
*Reports of International Arbitral Awards, Vol. X, p. 584*

188.   In the course of this case involving the double nationality of the claimant the Umpire declared that, irrespective of the attitude which might be adopted in diplomatic negotiations, international commissions could normally only award damages to a national of the claimant country. If the injured person changed his nationality, the former State was rarely able to present a claim or to recover damages, however much its own dignity might have been affected by the treatment of its subject, unless its own pecuniary rights were involved (p. 591).

*Provident Mutual Life Insurance Company and Others : Life-Insurance Claims (1924)*
*Germany, United States*
*Germany-United States Mixed Claims Commission : Umpire : Parker (United States of America) ; Kiesselbach (Germany) ; Anderson (United States of America)*

*Reports of International Arbitral Awards, Vol. VII, p. 91.*

189.    The United States presented a group of claims on behalf of American insurance companies who had made payments under polices insuring the lives of passengers lost on the *Lusitania*. It was claimed that the sinking of the ship had forced premature payment to be made and had caused a loss to the insurers equal to the difference between the value of the policies and the reserve which had been accumulated on the basis of actuarial tables excluding war risks.

190.    The Commission rejected this contention, holding that the insurance companies should have regard to every possible risk when offering the policies (pp. 106-107). Moreover under the terms of the Treaty of Berlin Germany was under no obligation to compensate for losses of this kind.

"Although the act of Germany was the immediate cause of maturing the contracts . . . *this effect* so produced was a circumstance incidental to, but not flowing from such act as the normal consequence thereof, and was, therefore, in legal contemplation remote — not in time — but in natural and normal sequence." (Umpire Parker at p. 113 ; italics in original)

Reference was also made to the fact that no international arbitral award had been given upholding the claim of an insurer to recover in respect of the loss suffered as a result of the death of the insured person (pp. 114-116).

191.    It may be noted that in *Administrative Decision No. II,* RIAA, Vol. VI, p. 212, given by the Tripartite Claims Commission set up by Austria, Hungary and the United States, Mr. Parker, the sole Commissioner, held that although Austria and Hungary remained primarily liable for their respective public debts, they were not liable for the debts of their nationals to United States nationals in the absence of any act on the part of the Government concerned operating upon such debts to the prejudice of United States creditors.

"The suggestion that, in the absence of such act by the Austrian (Hungarian) Government, it is obligated to pay American creditors for losses sustained by them due to depreciation during and after the war in the exchange value of Austro-Hungarian currency can be sustained only on the theory that Austria (Hungary) is liable for all of the direct and indirect, immediate and ultimate consequences of the war." (pp. 222-223)

Such a view, declared the Commissioner, was clearly unjustified.

*Reparation for Injuries Suffered in the Service of the United Nations (1949)*

*International Court of Justice Reports, 1949, p. 174*

192.    The Advisory Opinion given by the International Court in this case was chiefly concerned with determining whether or not the United Nations had capacity to bring an international claim against a State in the event that an agent of the United Nations suffered injury

in circumstances involving the responsibility of the State concerned. However, in formulating its opinion the Court gave several rulings applicable in the case of any international claim. Thus, as regards the question of damages, the Court declared that the measure of the reparation which the United Nations would be entitled to recover should depend upon the amount of damage which the Organization has suffered as a result of the wrongful act and should be calculated in accordance with the rules of international law. This might include, for example, reimbursement of any reasonable compensation which the United Nations had had to pay, or expenses incurred in replacing the agent who had died or been disabled. (p. 181)

193.    The Court also declared that the rule of nationality of claims provided no obstacle to the presentation of a claim by the United Nations. That rule rested upon the principle that, in bringing a claim, a State was acting to secure respect for obligations due towards itself, a principle equally applicable in the case of the United Nations. In the event that a claim was brought by the national State and by the United Nations, there could be no question of requiring the defendant State to pay reparation twice over. (pp. 185-186)

*Responsibility of Germany for acts committed after 31 July 1914 and before Portugal entered the War (1930)*

*Germany, Portugal*

*Arbitrators : de Meuron ; Fazy ; Guex (Switzerland)*

*Reports of International Arbitral Awards, Vol. II, p. 1035*

194.    In dealing with the question of damages in respect of various requisitions and acts of pillage of Portuguese property in Belgium during the period of German military occupation, the Tribunal distinguished between acts, such as requisitions, which were authorized within certain limits and those absolutely prohibited such as pillage. In the first case the damages awarded could not exceed the amount which should have been paid earlier so as to exclude international responsibility, whilst in the case of pillage the indemnity should at least be equal to the value of the goods which disappeared in the course of pillage. (p. 1040) See paras. 19 and 58 *supra.*

195.    As regards the acts of German forces in the Portuguese Colonies the Tribunal refused to award penal damages as compensation for the violation of Portuguese sovereignty and offences against international law committed by Germany. The Tribunal considered that penal damages would constitute a deterrent punishment and that it lacked power to inflict punishment, as opposed to determining the amount of damages due by way of indemnity. (pp. 1074-1077). See paras. 17 and 20-21 *supra.*

*Russian Indemnity Case (1912)*

*Russia, Turkey*

*Permanent Court of Arbitration : Lardy (Switzerland) ; de Taube and Mandelstam (Russia) ; Abro and Réchid (Turkey).*

*Reports of International Arbitral Awards, Vol. XI, p. 421.*

196. Under the Treaty of Constantinople Turkey agreed to indemnify Russian subjects for damage sustained during the war of 1877-1878 between the two countries. The payments to be made by Turkey having been delayed, Russia presented a claim for interest on the deferred payments. In considering the question of damages the Court stated as follows :

> "*Le tribunal est d'avis que tous les dommages-intérêts sont toujours la réparation, la compensation d'une faute. A ce point de vue, tous les dommages-intérêts sont compensatoires, peu importe le nom qu'on leur donne . . . Il est certain en effet que toutes les fautes, quelle qu'en soit l'origine, finissent par être évaluées en argent et transformées en obligation de payer ; elles aboutissent toutes, ou peuvent aboutir, en dernière analyse, à une dette d'argent. — Il n'est donc pas possible au tribunal d'apercevoir des différences essentielles entre les diverses responsabilités. Identiques dans leur origine, la faute, elles sont les mêmes dans leurs conséquences, la réparation en argent.*" (p. 440)

Accordingly, the Court held that Turkey was, in principle, responsible for the payment of interest. The Court dismissed a Turkish contention that *force majeure*, in the form of financial difficulties, had prevented prompt payment, on the ground that the sums in question could not be said to have imperilled the existence of the Ottoman Empire or seriously to have compromised its internal or external situation. (p. 443) The Court found, however, on the facts that Russia had renounced her claim for interest in referring, in correspondence with the Turkish Government, to the balance of the principal as the balance of the indemnity, without reserving her right to interest on the principal, and was subsequently estopped from reopening the question. (pp. 445-446) See para. 148 *supra*.

*Spanish Zone of Morocco Claims (1925)*
*Spain, United Kingdom*
*Rapporteur : Huber (Switzerland)*
*Reports of International Arbitral Awards, Vol. II, p. 615*

197. Before considering the individual claims the Rapporteur dealt with the question of interest. (pp. 650-651) The British Government sought compound interest at 7 per cent whilst the Spanish Government was only prepared to give simple interest at 5 per cent. The Rapporteur determined that 7 per cent should be the

rate of interest, this being within the normal rate of interest in Morocco at the time of the occurrences. Compound interest was not awarded however, on the ground that this had been refused by all previous international tribunals.

In the *French Claims Against Peru*, RIAA, Vol. I, p. 215, the Tribunal refused to award compound interest on the ground that this required the express consent of the debtor which had not been given. See para. 31 *supra*.

*Torrey Case (1903)*
*United States, Venezuela*
*United States - Venezuela Mixed Claims Commission : Umpire : Barge (Netherlands) ; Bainbridge (United States of America) ; Paul (Venezuela)*
*Reports of International Arbitral Awards, Vol. IX, p. 225*

198. Torrey was arrested by mistake by the Venezuelan authorities. He was promptly released and an apology given. It was held that damages should be awarded for the personal inconvenience suffered but that punitive damages should be refused.

*The Trail Smelter Case (1938 and 1941)*
*Canada, United States*
*Arbitrators : Hostie (Belgium) ; Greenshields (Canada) ; Warren (United States of America)*
*Reports of International Arbitral Awards, Vol. III, p. 1905*

199. In accordance with the terms of its Convention the Tribunal followed precedents in United States cases in determining points at issue, in particular as regards the measure of damages. (pp. 1924-1933 ; p. 1950). The Tribunal rejected a claim for loss of business caused to commercial enterprises on the ground that such loss caused by a nuisance, even if proved, was too indirect and remote to become the basis of an indemnity. (p. 1931) The Tribunal refused to award a sum in respect of the wrong done to the United States in violation of its sovereignty, as sought by the United States, on the ground that any sum so awarded would fall outside the ambit of the damages envisaged under the Convention ; the Tribunal distinguished the case of the *I'm Alone* (paras. 13 and 176 *supra*), where such damages were awarded. (pp. 1932-1933 ; pp. 1954-1955) The Tribunal also refused to award damages in respect of monies spent in ascertaining the existence and extent of the damageable consequences of an injury, as opposed to sums spent in mending such consequences. (pp. 1959-1962)

# Index

*Paragraph*

Aboilard ........................................... 28
Adams ............................................. 78-79
Adler ............................................. 89
Administrative Decision No. II ................... 191
  (Tripartite Claims Commission)
Administrative Decision No. II ................... 3
Administrative Decision No. III .................. 162
Administrative Decision No. V .................... 163
Administrative Decision No. VI ................... 184
Aguilar-Amory and Royal Bank of Canada .... 29-30 ; 119
Almaguer ......................................... 177
Ambatielos ....................................... 53
American Electricity and Manufacturing Co. ...... 153
Aroa ............................................. 104

Baldwin .......................................... 80
Ballistini ....................................... 47
Bembelista ....................................... 154
Bischoff ......................................... 158
Boffolo .......................................... 141
Borchgrave ....................................... 96
Brazilian Loans .............................. 14 ; 147
Brown ........................... 32-33 ; 118 ; 122

Canahl ........................................... 97
Cape Horn Pigeon ................................. 164
Carthage ..................................... 155 ; 166
Cayuga Indians ............................... 116 ; 120
Central Rhodope .............................. 121 ; 171
Cesarius ......................................... 82
Chapman .......................................... 83
Chase ............................................ 54
Chattin .......................................... 55
Chazen ........................................... 56
Chevreau ......................................... 87
Chinn ............................................ 34
Chorzow Factory (Jurisdiction) ................... 4 ; 170
Chorzow Factory (Merits) ......................... 168-170
Cibich ........................................... 88
Claire ........................................... 67
Clark ............................................ 92
Coleman .......................................... 156
Colunje ...................................... 22 ; 86
Company General of the Orinoco ................... 142
Compagnie Générale des Asphaltes de France .... 35
Connelly ......................................... 77
Cook ............................................. 36
Coquitlam ........................................ 46
Corfu Channel (Merits) ....................... 5-8 ; 167
Corfu Channel (Assessment of Compensation) .... 173-174
Crossman ......................................... 42

Davies ........................................... 37
De Galván .................................... 57 ; 116
Denham ........................................... 103

De Sabla ......................................... 38
Deutsche Amerikanische Oil Tankers .............. 144
Deutz ........................................ 39 ; 175
Diaz ............................................. 68
Dickson Car Wheel ................................ 9-10
Dillon ........................................... 95
Dix .......................................... 105 ; 175

Eagle Star Insurance ............................. 108
Earnshaw and Others : The Zafiro ................ 68
Electricity Company of Sofia and Bulgaria ........ 123-124
El Emporio del Café .............................. 40
El Oro Mining and Railway ........................ 58
Expropriated Religious Properties ................ 172
Fabiani .......................................... 54
Falcón ....................................... 69 ; 84
Faulkner ......................................... 89
Finnish Shipowners ............................... 125-126
Free Zones of Upper Savoy and District of Gex .. 12
French Claims Against Peru ................... 31 ; 197
French Company of Venezuela Railroads ........ 105
García and Garza ...................... 59-60 ; 69 ; 84
German Interests in Polish Upper Silesia .......... 26
German Settlers in Poland ........................ 27
Gill ............................................. 110
Goldenberg ................................... 17 ; 157
Gordon ........................................... 70
Great Venezuelan Railroad ........................ 143

Hemming .......................................... 41
Henriquez ........................................ 42
Home Frontier and Foreign Missionary Society .... 106
Home Insurance Company .......................... 107
Hopkins ...................................... 36 ; 43

Illinois Central Railroad Company ............... 44
I'm Alone .................................... 13 ; 176
Interhandel ...................................... 127-130
International Fisheries Company .................. 11
Interoceanic Railway of Mexico .................. 136

Janes ....................................... 98-99 ; 177
Jessie, Bayard and Pescawha ..................... 45
Kalklosh ......................................... 92
Kennedy .......................................... 61
Kling ........................................ 71 ; 146
Koch ............................................. 93
Kummerow, Redler and Company .............. 109
Kunhardt and Company ........................... 72

Lalanne and Ledoux ............................... 47
Landrew ...................................... 48-49 ; 178
Lighthouses Concession
  Claim No. 1 ................................. 15
  Claim No. 3 ................................. 131-132
  Claim No. 5 ............................... 16 ; 187

*Paragraph*

Claim No. 18 .............................. 179
Claims No. 19 and 21 ..................... 180-181
Claim No. 26 .............................. 182
Claim No. 27 .............................. 183
Lisman .................................... 133
Lotus ..................................... 62-63
Lusitania ................................. 184
Luzon Sugar Refining Company ............. 153

Maal ...................................... 141
MacNeill .................................. 136
Mallén .................................... 83
Maninat ................................... 76
Manouba ................................... 155
Mariposa Development Company ............. 134
Martini ................................... 64-65 ; 186
Massey .................................... 100 ; 146
Mavrommatis Jerusalem Concessions ........ 185
Mavrommatis Palestine Concessions ........ 14
Mecham .................................... 101
Mexican Union Railway .................... 135-136
Mexico City Bombardment Claims ........... 110
Miliani ................................... 188
Miller, Eitelman and Eitelman ............ 101
Morton .................................... 70

Neer ...................................... 101
Neuilly, Treaty of ....................... 17
North American Dredger Company ........... 135
Norwegian Shipowners ..................... 159-160
Noyes ..................................... 111-112

Oliva ..................................... 141

Panevezys-Saldutiskis Railway Company .... 14 ; 137
Paquer .................................... 141
Parker .................................... 50
Parrish ................................... 55
Patton .................................... 43
Peace Treaties with Bulgaria, Hungary and Romania  18
Peerless Motor Car Company ............... 43
Pellat .................................... 117
Peter Pázmány University ................. 145
Petrocelli ................................ 153
Phosphates in Morocco .................... 138
Pinson .................................... 113
Provident Mutual Life Insurance Company .. 189-190
Polish Nationals in Danzig ............... 66
Pugh ...................................... 146
Putman .................................... 102

*Paragraph*

Quintanilla ............................... 90

Reparation for Injuries ................... 192-193
Responsibility of Germany for acts committed after 31 July 1914 and before Portugal entered the War  19 ; 158 ; 194
Responsibility of Germany for acts committed after Portuguese Colonies in South Africa .... 17 ; 20-21 ; 195
Richards .................................. 57
Richeson, Klimp, Langdon and Day ......... 81
Roberts, Harry ............................ 94
Roberts, Irene ............................ 72
Roper ..................................... 84
Rudloff ................................... 51
Russian Indemnity ......................... 148 ; 196

Salem ..................................... 151
Sambiaggio ................................ 114
Savarkar .................................. 22
Segurança ................................. 133
Selwyn .................................... 139
Serbian Loans Case ........................ 14 ; 147
Shufeldt .................................. 165
Société Commerciale de Belgique .......... 149-150
Solis ..................................... 74
Spanish Zone of Morocco Claims . 23 ; 75 ; 115 ; 118 ; 197
Claim No. 25 .............................. 161
Claim No. 39 .............................. 99
Claim No. 53 .............................. 140
Stephens .................................. 76 ; 100
Swinney ................................... 84 ; 85

Tattler ................................... 46
Toberman, Mackey and Company ............. 152
Torrey .................................... 198
Trail Smelter ............................. 24 ; 199
Tribolet .................................. 95
Turner .................................... 91

Union Bridge Company ...................... 6
Upton ..................................... 158

Venable ................................... 52

Wanderer .................................. 45
War Risks Insurance Premium .............. 3
Way ....................................... 100
Wenzel .................................... 103
Wimbledon ................................. 25 ; 165

Youmans ................................... 77 ; 100

# REPORT OF THE COMMISSION TO THE GENERAL ASSEMBLY

## DOCUMENT A/5809*

**Report of the International Law Commission covering the work of its sixteenth session, 11 May — 24 July 1964**

### CONTENTS

| Chapter | | Paragraphs | Page |
|---|---|---|---|
| I. | Organization of the session | 1-11 | 173 |
| | A. Membership and attendance | 2-3 | 173 |
| | B. Officers | 4-9 | 174 |
| | C. Agenda | 10-11 | 174 |
| II. | Law of treaties | 12-24 | 174 |
| | A. Introduction | 12-24 | 174 |
| | B. Draft articles on the law of treaties | — | 176 |
| III. | Special missions | 25-35 | 208 |
| | A. Introduction | 25-35 | 208 |
| | B. Draft articles 1 to 16 and commentary | — | 210 |
| IV. | Programme of work and organization of future sessions | 36-40 | 226 |
| V. | Other decisions and conclusions of the Commission | 41-52 | 226 |
| | A. Relations between States and inter-governmental organizations | 41-42 | 226 |
| | B. Co-operation with other bodies | 43-49 | 227 |
| | C. Date and place of the next session | 50 | 227 |
| | D. Representation at the nineteenth session of the General Assembly | 51 | 227 |
| | E. Tribute to the Secretary of the Commission | 52 | 227 |

* Also issued as *Official Records of the General Assembly, Nineteenth Session, Supplement No. 9.*

---

## Chapter I

### Organization of the Session

1. The International Law Commission, established in pursuance of General Assembly resolution 174 (II) of 21 November 1947, and in accordance with its Statute annexed thereto, as subsequently amended, held its sixteenth session at the European Office of the United Nations, Geneva. The session had been scheduled to last from 11 May to 17 July and was extended to 24 July by a decision adopted by the Commission at its 728th meeting of 21 May 1964. The work of the Commission during this session is described in this report. Chapter II of the report contains nineteen articles on the application, effects, modification and interpretation of treaties. Chapter III contains sixteen articles on the topic of special missions. Chapter IV relates to the programme of work and organization of future sessions of the Commission. Chapter V deals with a number of administrative and other questions.

### A. Membership and attendance

2. The Commission consists of the following members :

Mr. Roberto Ago (Italy)
Mr. Gilberto Amado (Brazil)
Mr. Milan Bartoš (Yugoslavia)
Mr. Herbert W. Briggs (United States of America)
Mr. Marcel Cadieux (Canada)
Mr. Erik Castrén (Finland)
Mr. Abdullah El-Erian (United Arab Republic)
Mr. Taslim O. Elias (Nigeria)
Mr. Eduardo Jiménez de Aréchaga (Uruguay)
Mr. Victor Kanga (Cameroon)
Mr. Manfred Lachs (Poland)
Mr. Liu Chieh (China)
Mr. Antonio de Luna (Spain)
Mr. Radhabinod Pal (India)

Mr. Angel M. Paredes (Ecuador)
Mr. Obed Pessou (Dahomey)
Mr. Paul Reuter (France)
Mr. Shabtai Rosenne (Israel)
Mr. José María Ruda (Argentina)
Mr. Abdul Hakim Tabibi (Afghanistan)
Mr. Senjin Tsuruoka (Japan)
Mr. Grigory I. Tunkin (Union of Soviet Socialist Republics)
Mr. Alfred Verdross (Austria)
Sir Humphrey Waldock (United Kingdom of Great Britain and Northern Ireland)
Mr. Mustafa Kamil Yasseen (Iraq)

3. On 12 May 1964, the Commission elected Mr. Paul Reuter (France) and Mr. José María Ruda (Argentina) to fill the vacancies which had arisen in consequence of the election of Mr. André Gros (France) and Mr. Luis Padilla Nervo (Mexico) as judges of the International Court of Justice.

## B. Officers

4. At its 722nd meeting, held on 11 May 1964, the Commission elected the following officers :
*Chairman* : Mr. Roberto Ago
*First Vice-Chairman* : Mr. Herbert W. Briggs
*Second Vice-Chairman* : Mr. Grigory I. Tunkin
*Rapporteur* : Mr. Mustafa Kamil Yasseen

5. At its 727th meeting, held on 20 May 1964, the Commission appointed a Drafting Committee composed as follows :
*Chairman* : Mr. Herbert W. Briggs
*Members* : Mr. Taslim O. Elias ; Mr. Eduardo Jiménez de Aréchaga ; Mr. Antonio de Luna ; Mr. Paul Reuter ; Mr. Shabtai Rosenne ; Mr. Grigory I. Tunkin ; Sir Humphrey Waldock ; Mr. Mustafa Kamil Yasseen. Mr. Milan Bartoš took part in the Committee's work as a Special Rapporteur on special missions when the articles relating to that topic were considered. In addition, the Commission, at its 762nd meeting held on 9 July, appointed Mr. Obed Pessou as a member of the Committee. At its 727th meeting, the Commission also decided to request the Drafting Committee to assume responsibility for the preparation of the Spanish texts of the draft articles, in addition to the English and French texts.

6. The Secretary-General of the United Nations attended the 767th meeting, held on 16 July 1964. The Chairman of the Commission and the Secretary-General made statements on that occasion.

7. The Chairman stressed that at the time the United Nations was founded no one could have realized the extent and the urgency which the task of the International Law Commission, established under Article 13 of the Charter, would have in the future. However, a great revolution was now taking place in the world society under the auspices and with the encouragement of the United Nations, which had given independence to a great number of States. That event

had thrust into the foreground the pressing need for the codification and evolution of the law of the community of States. The Commission was devoting itself to the revision, clarification and codification of the main topics of international law, where principles demanded to be restated on the basis of the widest possible agreement of States and on a sound, scientific foundation, in matters like the law of treaties and State responsibility. The Chairman expressed his conviction that should the Commission complete its ambitious programme, and if the States consummated this work in diplomatic conferences, progress without precedent since the time of Grotius would have been achieved.

8. The Secretary-General, in reply to the Chairman of the International Law Commission, stated that from all available accounts the Commission's work was quite impressive. He stressed that one of the basic principles of the Charter was that all Member States should practise tolerance, live as good neighbours and unite towards the achievement of common objectives. He felt confident that the founding fathers of the Charter had in mind the harmonizing of all United Nations activities — political, economic, social and legal.

9. Mr. Constantin A. Stavropoulos, Legal Counsel, attended the 760th meeting, held on 7 July 1964. Mr. Yuen-li Liang, Director of the Codification Division of the Office of Legal Affairs, represented the Secretary-General and acted as Secretary to the Commission.

## C. Agenda

10. The Commission adopted an agenda for the sixteenth session consisting of the following items :
1. Filling of casual vacancies in the Commission (article 11 of the Statute).
2. Prolongation of the session.
3. Law of treaties.
4. Special missions.
5. Relations between States and inter-governmental organizations.
6. Organization of future sessions.
7. Date and place of the seventeenth session.
8. Co-operation with other bodies.
9. Other business.

11. In the course of the session, the Commission held fifty-three public meetings and four private meetings. In addition, the Drafting Committee held ten meetings. The Commission considered all the items on its agenda.

## Chapter II

## Law of Treaties

### A. Introduction

*Summary of the Commission's proceedings*

12. At its fourteenth and fifteenth sessions the Commission provisionally adopted parts I (articles 1-29) [1]

---

[1] *Yearbook of the International Law Commission, 1962,* vol. II, pp. 161-186.

and II (articles 30-54) [2] of its draft articles on the law of treaties, consisting respectively of twenty-nine articles on the conclusion, entry into force and registration of treaties and twenty-five articles on the invalidity and termination of treaties. In adopting parts I and II the Commission decided, in accordance with articles 16 and 21 of its Statute, to submit them, through the Secretary-General, to Governments for their observations. At its fifteenth session the Commission decided to continue its study of the law of treaties at its next session, to give the topic priority, and to take up at that session the questions of the application, interpretation and effects of treaties.

13.  At the present session of the Commission, the Special Rapporteur accordingly submitted a report (A/CN.4/167 and Add.1-3) on the application, effects, revision and interpretation of treaties. The Commission considered that report at its 726th-755th, 759th-760th, 764th-767th and 770th meetings and adopted a provisional draft of articles upon the topics mentioned, which is reproduced in the present chapter together with commentaries upon the articles. These articles (articles 55-73) constitute part III — the final part — of the Commission's draft on the law of treaties.

14.  The modification and interpretation of treaties are topics which have not been the subject of reports by any of the Commission's three previous Special Rapporteurs on the law of treaties. The topic of the application and effects of treaties, on the other hand, was the subject of a study by Sir Gerald Fitzmaurice in his fourth and fifth reports in 1959 and 1960.[3] The Commission duly took these reports into account at the present session.

15.  As stated in paragraph 18 of its report for 1962 [4] and repeated in paragraph 12 of its report for 1963,[5] the Commission will at a later stage consider whether the three parts on the law of treaties should be amalgamated to form a single draft convention or whether the codification of the law of treaties should take the form of a series of related conventions. In accordance with its decisions at its two previous sessions, the Commission has provisionally prepared the present draft in the form of a third group of articles closely related to parts I and II which have already been transmitted to Governments for their observations. The present draft has therefore been designated "The Law of Treaties — Part III". At the same time, following its decision at its previous session, and without thereby prejudging in any way its decision concerning the form in which its work on the law of treaties should ultimately be presented, the articles in part III have been numbered consecutively after the last article of part II — the first article being numbered 55. The Commission now intends, at its session in 1965, to

commence its re-examination of all the draft articles in the light of the observations to be received from Governments. In the course of the present session the Commission has noted that apart from any matters of substance that may be raised in the future, certain of the articles already provisionally adopted require further consideration in order to ensure their proper co-ordination with other articles. It has also noted that, while the juxtaposition of some topics had been convenient for purposes of study, it may not necessarily be appropriate in the final arrangement of the draft articles, and that in consequence some readjustment of the material in the different parts and sections of the draft may be found to be desirable. At the same time, it recognized that special attention will have to be given to ensuring as full consistency as is possible in the use of terminology in the final drafts.

16.  In accordance with articles 16 and 21 of its Statute, the Commission decided to transmit its draft concerning the effects, application, modification and interpretation of treaties, through the Secretary-General, to Governments for their observations. The Commission, in this connexion, wishes to recall its decision of 1958 [6] that the Commission should prepare its final draft only at the second session following that in which its first draft had been prepared. However, it expresses its hope that the observations of Governments on part III of the law of treaties may be available to it before the commencement of its eighteenth session in 1966.

### The scope of the present group of draft articles

17.  The present group of draft articles covers the broad topics of the application, effects, modification and interpretation of treaties. Following the decision of the Commission in 1963 to postpone consideration of the question of conflicts between treaties until its sixteenth session, the Commission has now re-examined that question, which it found to be closely connected above all with the rules concerning the modification and interpretation of treaties. It has therefore included an article — article 63 — on that matter in the present group of draft articles. At the same time the Commission re-affirmed its provisional decision of 1963, referred to in paragraph (2) of the commentary to article 41, to retain article 41 for the time being in part II.

18.  The matters dealt with in part III have a certain connexion with two topics which are to be the subject of separate studies by the Commission and which were, in 1963, assigned to two other Special Rapporteurs, namely, State responsibility, and succession of States and Governments. In the case of the responsibility of States, the Commission considered how far it should formulate provisions regarding the legal liability arising from a failure to perform treaty obligations. This question involves not only the general principles governing the reparation to be made for a breach of a treaty, but also the grounds that may be invoked in justification of the non-performance of a

[2] *Yearbook of the International Law Commission, 1963,* vol. II, pp. 189-217.

[3] *Yearbook of the International Law Commission, 1959,* vol. II, p. 37, and *Yearbook of the International Law Commission, 1960,* vol. II, p. 69.

[4] *Yearbook of the International Law Commission, 1962,* vol. II, p. 160.

[5] *Yearbook of the International Law Commission, 1963,* vol. II, p. 189.

[6] *Yearbook of the International Law Commission, 1958,* vol. II, pp. 107 and 108, paras, 60-61.

treaty. The Commission decided to exclude from its codification of the law of treaties matters related to the topic of State responsibility, and to take them up when it comes to deal with that topic itself.[7] In the case of succession of States and Governments, the question was whether this topic should or should not be dealt with in connexion with the territorial scope of treaties and with the effects of treaties on third States. The Commission decided that this question should be left aside from the present group of draft articles. The Commission, as already indicated in the decision recorded in paragraph 58 of its report for 1963, intends to study the question on the basis of a report to be submitted by the Special Rapporteur on the topic of succession of States and Governments.

19.   In examining the question of the territorial application of treaties, the Commission considered whether it should include provisions dealing with the possibility of the extension of a treaty to the territory of a third State with its authorization. The Commission concluded that although instances of these practices are found, they are rare, and turn upon special circumstances, so that particular treatment of them in the form of draft articles in part III would not be warranted.

20.   The Commission also considered whether it should include an article covering the making of treaties by one State on behalf of another or by an international organization on behalf of a member State. As to the latter type of case, some members felt that it was too closely connected with the general problem of the relations between an international organization and its member States to be dealt with conveniently as part of the general law of treaties. Other members took the view that cases — and these are found in practice — where an international organization enters into a treaty not simply on its own behalf but in the name of its members may constitute the latter actual parties to the treaty and should therefore be covered in the general law of treaties. As to the former type of case — where one State authorizes another to conclude a treaty in its name and thereby make it a party to the treaty — some members noted that, although instances occurred, they were infrequent, and these members felt hesitation about including specific provisions to cover this practice from the point of view of the principle of the equality and independence of States. Other members pointed out that the practice, if not extensive, has a certain importance with regard to economic unions, such as the Belgo-Luxembourg Economic Union, where treaties may be concluded by one State on behalf of the Union. These members also felt that the expanding diplomatic and commercial activity of States and the variety of their associations with one another might lead to an increase in cases of this type, and that it was, on the whole, desirable to provide for them in the draft articles. The Commission decided that, in any event, the question really belonged to part I of the draft articles since it concerned the conclusion rather than the appli-

cation of treaties. It therefore postponed its decision regarding the inclusion of an article on this question until its next session when it intends to re-examine its draft of part I.

21.   In examining the question of treaties and third States, the Commission considered a proposal that it should include a provision formally reserving from the operation of articles 58 to 61 the so-called "most-favoured-nation clause". In support of this view it was urged that the broad and general terms in which those articles had been provisionally adopted might blur the distinction between provisions in favour of third States and the operation of the most-favoured-nation clause, a matter that might be of particular importance in connexion with article 61, dealing with the revocation or amendment of provisions regarding obligations or rights of States not parties to treaties. The Commission, however, while recognizing the importance of not prejudicing in any way the operation of most-favoured-nation clauses, did not consider that these clauses are in any way touched by articles 58 to 61 and for that reason decided that there was no need to include a saving clause of the kind proposed. In regard to most-favoured-nation clauses in general, the Commission did not think it advisable to deal with them in the present codification of the general law of treaties, although it felt that they might at some future time appropriately form the subject of a special study.

22.   The Commission also considered the application of treaties providing for obligations or rights to be performed or enjoyed by individuals. Some members of the Commission desired to see a provision on that question included in the present group of draft articles, but other members considered that such a provision would go beyond the present scope of the law of treaties, and in view of the division of opinion the Special Rapporteur withdrew the proposal.

23.   The draft articles have provisionally been arranged in three sections covering : (i) the application and effects of treaties, (ii) the modification of treaties, and (iii) the interpretation of treaties. The definitions contained in article 1 of part I are applicable also to part III and it was not found necessary to add any further definitions for the purposes of this part. The articles formulated by the Commission in this part, as in parts I and II, contain elements of progressive development as well as of codification of the law.

24.   The text of draft articles 55-73 and the commentaries as adopted by the Commission on the proposal of the Special Rapporteur are reproduced below :

**B.   DRAFT ARTICLES ON THE LAW OF TREATIES**

*Part III. — Application, effects, modification and interpretation of treaties*

*Section I : The application and effects of treaties*

**Article 55. Pacta sunt servanda**

**A treaty in force is binding upon the parties to it and must be performed by them in good faith.**

---

[7]  However, a specific reservation on this matter is included in article 63, paragraph 5, for the reasons given in the commentary to that article.

*Commentary*

(1) *Pacta sunt servanda* [8] — the rule that treaties are binding on the parties and must be performed in good faith — is the fundamental principle of the law of treaties. Its importance is emphasized by the fact that it is enshrined in the preamble to the Charter of the United Nations. So far as the obligations of the Charter itself are concerned, paragraph 2 of Article 2 expressly provides that Members are to "fulfil in good faith the obligations assumed by them in accordance with the present Charter".

(2) There is much authority in the jurisprudence of international tribunals for the proposition that in the present context the principle of good faith is a legal principle which forms an integral part of the rule *pacta sunt servanda*.[9] In its opinion on the admission of a State to the United Nations (Article 4 of the Charter)[10] the International Court of Justice, without referring to paragraph 2 of Article 2, said that the conditions for admission laid down in Article 4 did not prevent a Member from taking into account in voting "any factor which it is possible reasonably and in good faith to connect with the conditions laid down in that Article". Again, speaking of certain valuations to be made under articles 95 and 96 of the Act of Algeciras, the Court said in the *Case concerning rights of nationals of the United States of America in Morocco (Judgement of 27 August 1952)* : [11] "The power of making the valuations rests with the Customs authorities, but it is a power which must be exercised reasonably and in good faith". Similarly, the Permanent Court of International Justice, in applying treaty clauses prohibiting discrimination against minorities, insisted in a number of cases [12] that the clauses must be so applied as to ensure the absence of discrimination in fact as well as in law ; in other words, the obligation must not be evaded by a merely literal application of the clauses. Numerous precedents could also be found in the jurisprudence of arbitral tribunals. To give only one example, in the *North Atlantic Coast Fisheries Arbitration* the Tribunal, dealing with Great Britain's right to regulate fisheries in Canadian waters in which she had granted certain fishing rights to United States nationals by the Treaty of Ghent, said :

"... from the Treaty results an obligatory relation whereby the right of Great Britain to exercise its right of sovereignty by making regulations is

limited to such regulations as are made in good faith, and are not in violation of the Treaty." [13]

(3) Accordingly, the article provides that "a treaty in force is binding upon the parties to it and must be performed by them in good faith". Some members hesitated to include the words "in force" as possibly lending themselves to interpretations which might weaken the clear statement of the rule. Other members, however, considered that the words give expression to an element which forms part of the rule and that, having regard to other provisions of the draft articles, it was necessary on logical grounds to include them. The Commission had adopted a number of articles which dealt with the entry into force of treaties, with cases of provisional entry into force, with certain obligations resting upon the contracting States prior to entry into force, with the nullity of treaties and with their termination. Consequently, from a drafting point of view, it seemed necessary to specify that it is treaties in force in accordance with the provisions of the present articles to which the *pacta sunt servanda* rule applies.

(4) Some members felt that there might be advantage in also stating that a party must abstain from acts calculated to frustrate the objects and purposes of the treaty. The Commission, however, considered that this was implicit in the obligation to perform the treaty in good faith and that the rule should be stated in as positive and simple a form as possible.

## Article 56. Application of a treaty in point of time

**1. The provisions of a treaty do not apply to a party in relation to any fact or act which took place or any situation which ceased to exist before the date of entry into force of the treaty with respect to that party, unless the contrary appears from the treaty.**

**2. Subject to article 53, the provisions of a treaty do not apply to a party in relation to any fact or act which takes place or any situation which exists after the treaty has ceased to be in force with respect to that party, unless the treaty otherwise provides.**

*Commentary*

(1) The present article concerns the temporal scope of the provisions of a treaty. It is implicit in the very concept of a treaty's being in force that it should govern the relations of the parties with respect to all facts, acts or situations which occur or arise during the period while it is in force and which fall within its provisions. But it is a question as to whether and to what extent a treaty may apply to facts, acts or situations which occurred or arose before it came into force or occur or arise after it has terminated.

(2) *Prior facts, acts or situations.* There is nothing to prevent the parties from giving a treaty, or some of its provisions, retroactive effects if they think fit. It is

---

[8] See the full discussion of the principle *pacta sunt servanda* in the commentary to article 20 of Harvard Law School, Research in International Law, part III, Law of Treaties, *American Journal of International Law* (1935), Supplement No. 4, p. 977 ; J. L. Kunz, "The Meaning and the Range of the Norm *Pacta Sunt Servanda*", *American Journal of International Law*, vol. 39 (1945), pp. 180-197 ; C. Rousseau, *Principes généraux du droit international public* (1944), pp. 355-364.

[9] See especially Bin Cheng, *General Principles of Law* (1953), chapter III.

[10] *I.C.J. Reports 1948*, p. 63.

[11] *I.C.J. Reports 1952*, p. 212.

[12] For example, *Treatment of Polish Nationals and other persons of Polish origin or speech in the Danzig territory*, *P.C.I.J.* (1932), Series A/B, No. 44, p. 28 ; *Minority Schools in Albania, P.C.I.J.* (1935), Series A/B, No. 64, pp. 19-20.

[13] *Reports of International Arbitral Awards*, vol. XI, p. 188. The Tribunal also referred expressly to "the principle of international law that treaty obligations are to be executed in perfect good faith".

essentially a question of their intention. The general rule, however, is that a treaty is not to be regarded as intended to have retroactive effects unless such an intention is expressed in the treaty or is clearly to be implied from its terms. This rule was endorsed and acted upon by the International Court of Justice in the *Ambatielos* case (jurisdiction),[14] where the Greek Government contended that under a treaty of 1926 it was entitled to present a claim based on acts which had taken place in 1922 and 1923. Recognizing that its argument ran counter to the general principle that a treaty does not have retroactive effects, that Government sought to justify its contention as a special case by arguing that during the years 1922 and 1923 an earlier treaty of 1886 had been in force between the parties containing provisions similar to those of the 1926 Treaty. This argument was rejected by the Court which said :

"To accept this theory would mean giving retro-active effect to Article 29 of the Treaty of 1926, whereas Article 32 of this Treaty states that the Treaty, which must mean all the provisions of the Treaty, shall come into force immediately upon rati-fication. Such a conclusion might have been rebutted if there had been any special clause or any special object necessitating retroactive interpretation. There is no such clause or object in the present case. It is therefore impossible to hold that any of its provisions must be deemed to have been in force earlier."

A good example of a treaty having such a " special clause" or "special object" necessitating retroactive interpretation is to be found in the *Mavrommatis Palestine Concessions* case.[15] The United Kingdom contested the Court's jurisdiction on the ground, *inter alia*, that the acts complained of had taken place before Protocol XII to the Treaty of Lausanne had come into force, but the Court said :

"Protocol XII was drawn up in order to fix the conditions governing the recognition and treatment by the contracting Parties of certain concessions granted by the Ottoman authorities before the con-clusion of the Protocol. An essential characteristic therefore of Protocol XII is that its effects extend to legal situations dating from a time previous to its own existence. If provision were not made in the clauses of the Protocol for the protection of the rights recognized therein as against infringements before the coming into force of that instrument, the Protocol would be ineffective as regards the very period at which the rights in question are most in need of protection. The Court therefore considers that the Protocol guarantees the rights recognized in it against any violation regardless of the date at which it may have taken place."

(3) The non-retroactivity principle has come under consideration in international tribunals most frequently in connexion with jurisdictional clauses providing for the submission to an international tribunal of "dis-putes", or specified categories of "disputes", between the parties. Then the word " disputes " is apt to cover

any dispute which exists between the parties after the coming into force of the treaty. It matters not either that the dispute concerns events which took place prior to that date or that the dispute itself arose prior to it ; for the parties have agreed to submit to arbitration or judicial settlement all their existing disputes without qualification. The Permanent Court said in the *Mavrommatis Palestine Concessions* case :

"The Court is of opinion that, in cases of doubt, jurisdiction based on an international agreement embraces all disputes referred to it after its establish-ment. . . . The reservation made in many arbitration treaties regarding disputes arising out of events previous to the conclusion of the treaty seems to prove the necessity for an explicit limitation of juris-diction and, consequently, the correctness of the rule of interpretation enunciated above." [16]

When a jurisdictional clause is attached to the sub-stantive clauses of a treaty as a means of securing their due application, the non-retroactivity principle may operate indirectly to limit *ratione temporis* the applica-tion of the jurisdictional clause. Thus in numerous cases under the European Convention for the Protection of Human Rights and Fundamental Freedoms the Euro-pean Commission of Human Rights has held that it is incompetent to entertain complaints regarding alleged violations of human rights said to have occurred prior to the entry into force of the Convention with respect to the State in question.[17]

(4) If, however, a fact, act or situation which first occurred or arose prior to the entry into force of a treaty continues to occur or exist after the treaty has come into force it will be caught by the provisions of the treaty. The non-retroactivity principle cannot be infringed by applying a treaty to matters that occur or exist when the treaty is in force, even if they first began at an earlier date. Thus, while the European Commis-sion of Human Rights has not considered itself com-petent to inquire into the propriety of legislative, administrative or judicial acts completed and made final before the entry into force of the European Convention, it has assumed jurisdiction where there were fresh proceedings or recurring applications of those acts after the Convention was in force.[18]

(5) Paragraph 1 of the article accordingly states that the "provisions of a treaty do not apply to a party

---

[14] Judgement of 1 July 1952 ; *I.C.J. Reports 1952*, p. 40.

[15] *P.C.I.J.* (1924), Series A, No. 2, p. 34.

[14] *Ibid.*, p. 35 ; cf. the *Phosphates in Morocco* case, *P.C.I.J.* (1938), Series A/B, No. 74, p. 24. The application of the differ-ent forms of clause limiting *ratione temporis* the acceptance of the jurisdiction of international tribunals has not been free from difficulty, and the case law of the Permanent Court of Inter-national Justice and the International Court of Justice now con-tains a quite extensive jurisprudence on the matter. Important though this jurisprudence is in regard to the Court's jurisdic-tion, it concerns the application of particular treaty clauses, and the Commission does not consider that it calls for detailed examination in the context of the general law of treaties.

[17] See *Yearbook of the European Convention of Human Rights* (1955-1957), pp. 153-159 ; *ibid.* (1958-1959), pp. 214, 376, 382, 407, 412, 492-494 ; *ibid.* (1960), pp. 222, 280, 444 ; and *ibid.* (1961), pp. 128, 132-145, 240, 325.

[18] Case of De Becker, see *Yearbook of the European Con-vention of Human Rights* (1958-1959), pp. 230-235 ; Applica-tion No. 655/59, *Yearbook of the European Convention of Human Rights* (1960), p. 284.

in relation to any fact or act which took place or any situation which ceased to exist before the date of entry into force of the treaty with respect to that party, unless the contrary appears from the treaty". In other words, the treaty will not apply to facts or acts which are completed or to situations which have ceased (and do not recur) before the treaty comes into force. The more general phrase "unless the contrary appears from the treaty" is used in preference to "unless the treaty otherwise provides" in order to allow for cases where the very nature of the treaty indicates that it is intended to have certain retroactive effects.

(6) *Subsequent facts, acts or situations.* After its termination a treaty *ex hypothesi* does not operate upon any fact or act which then occurs or any situation which then arises or exists ; nor is a fact, act or situation which then occurs or exists brought within the treaty merely because it is a recurrence or continuation of one which occurred or existed during the period while the treaty was in force. Moreover, it is only in rare cases, such as article XIX of the Convention on the Liability of the Operators of Nuclear Ships, that a provision is expressed to be applicable after the termination of the treaty. On the other hand, the treaty continues to have effects for the purpose of determining the legality or illegality of any act done while the treaty was in force or of any situation resulting from its application ; in other words, rights acquired under the treaty, whether in consequence of its performance or its breach do not lapse on its termination.[19] This aspect of the matter is covered in article 53 which deals with the legal consequences of the termination of a treaty.[20]

(7) Paragraph 2 of the present article accordingly provides that "subject to article 53, the provisions of a treaty do not apply to a party in relation to any fact or act which takes place or any situation which exists after the treaty has ceased to be in force with respect to that party, unless the treaty otherwise provides". In re-examining article 53 in connexion with the drafting of the present article, the Commission noted that its wording might need some adjustment in order to take account of acquired rights resulting from the illegality of acts done while the treaty was in force.

### Article 57. The territorial scope of a treaty

**The scope of application of a treaty extends to the entire territory of each party, unless the contrary appears from the treaty.**

*Commentary*

(1) Certain types of treaty, by reason of their subject matter, are hardly susceptible of territorial appli-

cation in the ordinary sense. Most treaties, however, have their effect territorially and a question may then arise as to what is their precise territorial scope. In some cases the provisions of the treaty expressly relate to a particular territory or area, for example the Treaty of 21 October 1920 recognizing the sovereignty of Norway over Spitzbergen [21] and the Antarctic Treaty of 1 December 1959.[22] In other cases, the terms of the treaty indicate that it relates to particular areas. Certain United Kingdom treaties dealing with domestic matters are expressly limited to Great Britain and Northern Ireland and do not relate to the Channel Islands and the Isle of Man.[23] So, too, after the creation of the United Arab Republic certain treaties were concluded by it whose scope was limited territorially to one part of the Republic. Again, States whose territory includes a free zone may find it necessary to except this zone from the scope of a commercial treaty. Another example is a boundary treaty which applies to particular areas and regulates problems arising from mixed populations, such as the languages used for official purposes. On the other hand, many treaties, which are applicable territorially, contain no indication of any restriction of their territorial scope, for example treaties of extradition or for the execution of judgements.

(2) The Commission considers that the territorial scope of a treaty depends on the intention of the parties and that it is only necessary in the present articles to formulate the general rule which should apply in the absence of any specific provision or indication in the treaty as to its territorial scope. State practice, the jurisprudence of international tribunals and the writings of jurists appear to support the view that a treaty is to be presumed to apply to all the territory of each party unless a contrary intention appears from the treaty.[24] Accordingly, it is this rule which is formulated in the present article.

(3) The term "the entire territory of each party" is a comprehensive term designed to embrace all the land and appurtenant territorial waters and air space which constitute the territory of the State. The Commission preferred this term to the term "all the territory or territories for which the parties are internationally responsible", which is found in some recent multilateral conventions. It desired to avoid the nuances and con-

---

[19] Thus, in the *Case concerning the Northern Cameroons* (I.C.J. Reports 1963, p. 15), the International Court assumed that a State remains responsible after the termination of a treaty for any breach that may have occurred while it was in force. However, no reparation was claimed in that case and, owing to the special circumstances, the Court declined, after the termination of the Trusteeship Agreement, to adjudicate upon the question whether or not it had been infringed.
[20] *Yearbook of the International Law Commission, 1963,* vol. II, p. 216.

[21] League of Nations, *Treaty Series,* vol. II, p. 8.
[22] United Nations, *Treaty Series,* vol. 402, p. 71.
[23] For example, the Agreement between the Government of Great Britain and Northern Ireland and the USSR on Relations in the Scientific, Technological, Educational and Social Fields 1963-1965 (United Kingdom Treaty Series No. 42 of 1963) ; the Convention of 1961 between Austria and Great Britain for the Reciprocal Recognition and Enforcement of Foreign Judgements defines the UK as comprising England and Wales, Scotland and Northern Ireland (United Nations, *Treaty Series,* vol. 453, p. 268).
[24] See Lord McNair, *Law of Treaties* (1961), pp. 116-117 ; S. Rosenne, "United Nations Treaty Practice", *Recueil des Cours de l'Académie de droit international,* vol. 86 (1954), pp. 374-375 ; Summary of practice of the Secretary-General as depositary of multilateral agreements (ST/LEG/7), paras. 102-103 ; Succession of States in relation to General Multilateral Treaties of which the Secretary-General is Depositary (A/CN.4/150), paras. 73-74 and 138 (*Yearbook of the International Law Commission, 1962,* vol. II, pp. 115, 123).

troversy arising from the association of the latter term with the so-called "colonial clause". It held that its task in codifying the modern law of treaties should be confined to formulating the general rule regarding the territorial scope of a treaty.

(4) The point was made during the discussion that the territorial scope of a treaty may be affected by questions of State succession. The Commission, as already indicated in paragraph 18 above, decided that this aspect of the territorial scope of treaties should be examined in connexion with its study of the topic of succession of States and Governments.

## Article 58. General rule limiting the effects of the treaties to the parties

A treaty applies only between the parties and neither imposes any obligations nor confers any rights upon a State not party to it without its consent.

*Commentary*

(1) There appears to be almost universal agreement that the rule laid down in this article — that a treaty applies only between the parties — is the fundamental rule governing the effect of a treaty upon States not parties.[25] It appears originally to have been derived from Roman law in the form of the well-known maxim *pacta tertiis nec nocent nec prosunt* — agreements neither impose obligations nor confer benefits upon third parties. In international law, however, the justification for the rule does not rest simply on this general concept of the law of contract but on the sovereignty and independence of States. There is abundant evidence of the recognition of the rule in State practice and in the decisions of international tribunals, as well as in the writings of jurists. In the *Case concerning certain German interests in Polish Upper Silesia*[26] the Permanent Court said that "A treaty only creates law as between the States which are parties to it; in case of doubt, no rights can be deduced from it in favour of third States".

(2) *Obligations.* International tribunals have been firm in laying down that in principle treaties, whether bilateral or multilateral, neither impose any obligation on States which are not parties to them nor modify in any way their legal rights without their consent. In the *Island of Palmas* case,[27] for example, dealing with a supposed recognition of Spain's title to the island in treaties concluded by that country with other States, Judge Huber said: "It appears further to be evident that Treaties concluded by Spain with third Powers recognizing her sovereignty over the "Philippines" could

not be binding upon the Netherlands. . . ".[28] In another passage he said: [29] ". . . whatever may be the right construction of a treaty, it cannot be interpreted as disposing of the rights of independent third Powers "; and in a third passage [30] he emphasized that ". . . the inchoate title of the Netherlands could not have been modified by a treaty concluded between third Powers". In short, treaties concluded by Spain with other States were *res inter alios acta* which could not, as treaties, be in any way binding upon the Netherlands. In the *Case of the Free Zones of Upper Savoy and the District of Gex*[31] it was a major multilateral treaty — the Versailles Peace Treaty — which was in question, and the Permanent Court held that article 435 of the Treaty was "not binding upon Switzerland, who is not a Party to that Treaty, except to the extent to which that country accepted it". Similarly, in the *River Oder Commission* case [32] the Permanent Court declined to regard a general multilateral treaty of a law-making character — the Barcelona Convention of 1921 on the Régime of Navigable Waterways of International Concern — as binding upon Poland, who was not a party to the treaty. Nor in the *Eastern Carelia* case [33] did the Permanent Court take any different position with regard to the Covenant of the League of Nations.

(3) *Rights.* Examples of the application of this rule to substantive rights can also be found in the jurisprudence of arbitral tribunals. In the *Clipperton Island* [34] arbitration the arbitrator held that Mexico was not entitled to invoke against France the provision of the Act of Berlin of 1885 requiring notification of occupations of territory, *inter alia*, on the ground that Mexico was not a signatory to that Act. In the *Forests of Central Rhodopia* case [35] the arbitrator, whilst upholding Greece's claim on the basis of the provision in the Treaty of Neuilly, went on to say:

"... until the entry into force of the Treaty of Neuilly, the Greek Government, not being a signatory of the Treaty of Constantinople, had no legal grounds to set up a claim based upon the relevant stipulations of that Treaty." [36]

(4) The question whether the rule *pacta tertiis nec nocent nec prosunt* admits of any actual exceptions in international law is a controversial one which divided the Commission. There was complete agreement amongst the members that there is no exception in the case of obligations; a treaty never by its own force alone creates obligations for non-parties. The division of opinion related to the question whether a treaty may of its own

---

[25] Professor G. Scelle, stressing the difference in character between treaties and private law contracts, went so far as to object to the application between States of the principle *pacta tertiis nec nocent nec prosunt*, a principle devised for the private law contractual relations of individuals [*Précis de droit des gens* (1934), vol. II, pp. 345-346 and 367-368]. But he is alone in disputing the validity in international law of the *pacta tertiis* principle as a general principle of the law of treaties.

[26] *P.C.I.J.* (1926), Series A, No. 7, p. 29.

[27] *Reports of International Arbitral Awards*, vol. II, p. 831.

[28] *Ibid.*, p. 850.

[29] *Ibid.*, p. 842.

[30] *Ibid.*, p. 870.

[31] *P.C.I.J.* (1932), Series A/B, No. 46, p. 141; and *ibid.* (1929), Series A, No. 22, p. 17.

[32] *Ibid.* (1929), Series A, No. 23, pp. 19-22.

[33] *Ibid.* (1923), Series B, No. 5, pp. 27-28; cf. the somewhat special case of the *Aerial Incident of 27 July 1955, I.C.J. Reports 1959*, p. 138.

[34] *Reports of International Arbitral Awards*, vol. II, p. 1105.

[35] *Ibid.*, vol. III, p. 1405.

[36] English translation from *Annual Digest and Reports of International Law Cases*, 1933-1934, case No. 39, at p. 92.

force confer rights upon a non-party. One group of members considered that, if the parties so intend, a treaty may have this effect, although the non-party is not, of course, obliged to accept or exercise the right. Another group of members considered that no actual right exists in favour of the non-party unless and until it is accepted by the non-party. The Commission was able to agree upon a formulation of article 60 under which it is said that a right may arise for a State from a provision of a treaty to which it is not a party, if it expressly or impliedly assents thereto. The matter is discussed more fully in the commentary to article 60 and is mentioned here only because the division of opinion in the Commission on this point complicated the drafting of the present article. The first group of members would have preferred in the present article to qualify the general statement of the *pacta tertiis* rule by the words "subject to article 60". The second group, however, considered that this would have presented article 60 as an actual exception to the rule and have thereby implied that in certain cases a treaty may of its own force create a right in favour of a non-party. The solution arrived at to preserve an equilibrium between the respective doctrinal points of view was to entitle the present article "General rule limiting the effects of treaties to the parties", thus indicating that there are further rules in the following articles, but without indicating whether or not they are to be regarded as exceptions to the general rule. The words " without its consent" were included at the end of the article purely for logical reasons, since both articles 59 and 60 mention the element of consent and thereby safeguard the position of the non-party with regard to the rejection of the obligation or right.

### Article 59. Treaties providing for obligations for third States

**An obligation may arise for a State from a provision of a treaty to which it is not a party if the parties intend the provision to be the means of establishing that obligation and the State in question has expressly agreed to be so bound.**

*Commentary*

(1) The primary rule, formulated in the previous article, is that the parties to a treaty cannot impose an obligation on a third State without its consent. That rule is one of the bulwarks of the independence and equality of States, and the present article does not depart from it. On the contrary, it underlines that the consent of a State is always necessary if it is to be bound by a provision contained in a treaty to which it is not a party. Under it two conditions have to be fulfilled before a non-party can become bound : first, the parties to the treaty must have intended the provision in question to be the means of establishing an obligation for the State not a party to the treaty ; and, secondly, the third State must have expressly agreed to be bound by the obligation. The Commission recognized that when these conditions are fulfilled there is, in effect, a second collateral agreement between the parties to the treaty, on the one hand,

and the third State on the other ; and that the juridical basis of the latter's obligation is not the treaty itself but the collateral agreement. However, even if the matter is viewed in this way, the case remains one where a provision of a treaty concluded between certain States becomes directly binding upon another State which is not and does not become a party to the treaty.

(2) The application of this article is illustrated by the Permanent Court's approach to article 435 of the Treaty of Versailles in the *Free Zones* case.[37] By that article the parties to the Treaty of Versailles declared that certain provisions of treaties, conventions and declarations and other supplementary acts concluded at the end of the Napoleonic wars with regard to the neutralized zone of Savoy "are no longer consistent with present conditions" ; took note of an agreement reached between the French and Swiss Governments to negotiate the abrogation of the stipulations relating to this Zone ; and added that those stipulations "are and remain abrogated". Switzerland was not a party to the Treaty of Versailles, but the text of the article had been referred to her prior to the conclusion of the Treaty. The Swiss Federal Council had further addressed a note [38] to the French Government informing it that Switzerland found it possible to "acquiesce" in article 435, but only on certain conditions. One of those conditions was that the Federal Council made the most express reservations as to the statement that the provisions of the old treaties, coventions, etc., were no longer consistent with present conditions, and said that it would not wish its acceptance of the article to lead to the conclusion that it would agree to the suppression of the régime of the free zones. France contended before the Court that the provisions of the old treaties, conventions, etc., concerning the free zones had been abrogated by article 435. In rejecting this contention, the Court pointed out that Switzerland had not accepted that part of article 435 which asserted the obsolescence and abrogation of the free zones :

"Whereas, in any event, Article 435 of the Treaty of Versailles is not binding on Switzerland, which is not a Party to this Treaty, except to the extent to which that country has itself accepted it ; as this extent is determined by the note of the Swiss Federal Council of May 5th, 1919, an extract from which constitutes Annex I to this article ; as it is by this action and by this action alone that the Swiss Government has 'acquiesced' in the 'provisions of Article 435 ', namely 'under the conditions and reservations ' which are set out in the said note."

(3) During the discussion some members referred to treaty provisions imposed upon an aggressor State and raised the question of the application of the present article to such provisions. The Commission recognized that they would fall outside the principle laid down in the present article, and would concern the question of the sanctions for violations of international law. At the same time, it noted that article 36, which provides for

[37] *P.C.I.J.* (1929), Series A, No. 22, pp. 17-18 ; *ibid.* (1932), Series A/B, No. 46, p. 141.

[38] The text of the relevant part of this note was annexed to article 435 of the Treaty of Versailles.

the nullity of any treaty procured by the threat or use of force, is confined to cases where the threat or use of force is "in violation of the principles of the Charter of the United Nations". A treaty provision imposed upon an aggressor State not a party to the treaty would not infringe article 36.

### Article 60. Treaties providing for rights for third States

1. **A right may arise for a State from a provision of a treaty to which it is not a party if (a) the parties intend the provision to accord that right either to the State in question or to a group of States to which it belongs or to all States, and (b) the State expressly or impliedly assents thereto.**

2. **A State exercising a right in accordance with paragraph 1 shall comply with the conditions for its exercise provided for in the treaty or established in conformity with the treaty.**

*Commentary*

(1) This article deals with the case of rights and formulates the conditions under which a State may be entitled to invoke a provision of a treaty to which it is not a party. The case of rights, as already explained in the commentary to article 58, is more controversial than that of obligations. The reason is that the question of the need for the consent of the third State presents itself in a somewhat different light than in the case of obligations. The parties to a treaty cannot, in the nature of things, impose a right on a third State because a right, even when effectively granted, may always be disclaimed or waived. Consequently, under the present article the question is not whether the third State's consent is required in order to protect it against any derogation from its independence, but whether its "acceptance" of the provisions is or is not essential to the creation of the right.

(2) The Commission noted that treaty practice shows a not inconsiderable number of treaties containing stipulations in favour of States not parties to them. In some instances, the stipulation is in favour of individual States, as, for example, provisions in the Treaty of Versailles in favour of Denmark [39] and Switzerland.[40] In some instances, it is in favour of a group of States, as in the case of the provisions in the Peace Treaties after the two world wars which stipulated that the defeated States should waive any claims arising out of the war in favour of certain States not parties to the treaties.[41] A further case is Article 35 of the United Nations Charter, which stipulates that non-members have a right to bring disputes before the Security Council or General Assembly. Again, the Mandate and Trusteeship Agreements contain provisions stipulating

for certain rights in favour respectively of Members of the League and of the United Nations, though in these cases the stipulations are of a special character as being by one member of an international organization in favour of the rest.[42] In other instances, the stipulation is in favour of States generally, as in the case of provisions concerning freedom of navigation in certain international rivers, and through certain maritime canals and straits.

(3) A number of writers,[43] including the authors of both the principal textbooks on the law of treaties, maintain that a treaty cannot of its own force create an actual right in favour of a third State. Broadly, the view of these writers is that, while a treaty may certainly confer, either by design or by its incidental effects, a benefit on a third State, the latter can only acquire an actual right through some form of collateral agreement between it and the parties to the treaty. In other words, they hold that a right will be created only when the treaty provision is intended to constitute an offer of a right to the third State which the latter has accepted. Similarly, for these writers it goes without saying that, in the absence of such a collateral agreement, the parties to a treaty are completely free, without obtaining the consent of the third State, to abrogate or amend the provision creating the benefit in its favour. They take the position that neither State practice nor the pronouncements of the Permanent Court in the *Free Zones* case [44] furnish any clear evidence of the recognition of the institution of *stipulation pour autrui* in international law.

(4) Another group of writers,[45] which includes the three previous Special Rapporteurs on the law of treaties, takes a quite different position. Broadly, the view of these writers is that there is nothing in international law to prevent two or more States from effectively creating a right in favour of another State by treaty, if they so intend ; and that it is always a question of the intention of the parties in concluding the particular treaty. According to them, a distinction has to be drawn between a treaty in which the intention of the parties is merely to confer a benefit on the other State and one in which their intention is to invest it with an

---

[39] Article 109 of the Treaty of Versailles.

[40] Articles 358 and 374 of the Treaty of Versailles.

[41] See E. Jiménez de Aréchaga, "Treaty Stipulations in favor of Third States", *American Journal of International Law*, vol. 50 (1956), p. 355.

[42] See the *South-West Africa* Cases, *I.C.J. Reports 1962*, pp. 329-331 and p. 410 ; the *Northern Cameroons* Case, *I.C.J. Reports 1963*, p. 29.

[43] For example, C. Rousseau, *Principes généraux du droit international public* (1944), pp. 468-477 ; Lord McNair, *Law of Treaties* (1961), pp. 309-312 ; L. A. Podestá Costa, *Manual de Derecho Internacional Público*, para. 157 ; G. Salvioli, *Les règles générales de la Paix, Recueil des Cours de l'Académie de droit international*, vol. 46 (1933), pp. 29-30.

[44] *P.C.I.J.* (1932), series A/B, No. 46, p. 147.

[45] For example, J. L. Brierly, *Law of Nations* (5th edition, 1955), pp. 251-252 ; Sir Hersch Lauterpacht, *Development of International Law by the International Court* (1958), pp. 306-310 ; Sir Gerald Fitzmaurice, Fifth Report on the Law of Treaties, *Yearbook of the International Law Commission, 1960*, vol. II, pp. 81 and 102-104 ; E. Jiménez de Aréchaga, "Treaty Stipulations in favor of Third States", *American Journal of International Law*, vol. 50 (1956), pp. 358-387 ; Harvard Law School, *Research in International Law, American Journal of International Law*, vol. 29, Supplement (1935), part III, Law of Treaties, pp. 924-937 ; M. Lachs, *Le développement et les fonctions des traités internationaux, Recueil des Cours de l'Académie de droit international*, vol. 92 (1957), pp. 313-314.

actual right. In the latter case these writers hold that the other State acquires a legal right to invoke directly and on its own account the provision conferring the benefit, and does not need to enlist the aid of one of the parties to the treaty in order to obtain the execution of the provision. This right is not, in their opinion, conditional upon any specific act of acceptance by the other State — any collateral agreement between it and the parties to the treaty. These writers maintain that, on the whole, modern State practice confirms the recognition in international law of the principle that a treaty may confer an enforceable right on a State not a party to it. They also maintain that authority for this view is to be found in the report of the Committee of Jurists to the Council of the League on the Aaland Islands question [46] and more especially in the judgement of the Permanent Court in 1932 in the *Free Zones* case where it said :

"It cannot be lightly presumed that stipulations favourable to a third State have been adopted with the object of creating an actual right in its favour. There is however nothing to prevent the will of sovereign States from having this object and this effect. The question of the existence of a right acquired under an instrument drawn between other States is therefore one to be decided in each particular case : it must be ascertained whether the States which have stipulated in favour of a third State meant to create for that State an actual right which the latter has accepted as such." [47]

(5) The opinion of the Commission, as stated in the commentary to article 58, was divided on this question. Some members in general shared the views of the first group of writers set out in paragraph 3 above, while other members in general shared the views of the second group set out in paragraph 4. The Commission, however, concluded that this division of opinion amongst its members was primarily of a doctrinal character and that the two opposing doctrines did not differ very substantially in their practical effects. Both groups considered that a treaty provision may be a means of establishing a right in favour of a third State ; and that the third State is free to accept or reject the right as it thinks fit. The difference was that according to one group the treaty provision constitutes no more than the offer of a right until the beneficiary State has in some manner manifested its acceptance of the right, whereas according to the other group the right arises at once and exists unless and until disclaimed by the beneficiary State. The first group, on the other hand, conceded that acceptance of a right by a third State, unlike acceptance of an obligation, need not be express but may take the form of a simple exercise of the right offered in the treaty. Moreover, the second group, for its part, conceded that a disclaimer of what they considered

to be an already existing right need not be express but may in certain cases occur tacitly through failure to exercise it. Consequently, it seemed to the Commission that in practice the two doctrines would be likely to give much the same results in almost every case. Nor did the Commission consider that the difference in doctrine necessarily led to different conclusions in regard to the right of the parties to the treaty to revoke or amend the provisions relating to the right. On the contrary, it was unanimous in thinking that until the beneficiary State had manifested its assent to the grant of the right, the parties should remain free to revoke or amend the provision without its consent ; and that afterwards its consent should always be required unless it appeared from the treaty that the provision was intended to be revocable. Being of the opinion that the two doctrines would be likely to produce different results only in very exceptional circumstances,[48] the Commission decided to frame the article in a neutral form which, while meeting the requirements of State practice, would not prejudge the doctrinal basis of the rule.

(6) Paragraph 1 therefore lays down that a right may arise for a State from a provision of a treaty to which it is not a party under two conditions. First, the parties must intend the provision to accord the right either to the particular State in question or to a group of States to which it belongs or to States generally. The intention to accord the right is of cardinal importance, since it is only when the parties have such an intention that a legal right, as distinct from a mere benefit, may arise from the provision. Examples of stipulations in favour of individual States, groups or States generally have already been mentioned in paragraph 2. The second condition is the express or implied assent of the beneficiary State. The formulation of this condition in the present tense "if the State expressly or impliedly assents thereto" is designed to leave open the doctrinal question whether juridically the right is created by the treaty or by the beneficiary State's act of acceptance. According to one school, of thought, as already explained, the assent of the intended beneficiary, even though it may merely be implied from the exercise of the right, constitutes an "acceptance" of an offer made by the parties ; according to the other school of thought, assent is only significant as an indication that the right is not disclaimed by the beneficiary.

(7) Paragraph 2 merely specifies that in exercising the right a beneficiary State must comply with the conditions for its exercise provided for in the treaty or established in conformity with the treaty. The words "or established in conformity with the treaty" take account of the fact that not infrequently conditions for the exercise of the right may be laid down in a supplementary instrument or in some cases unilaterally by one of the parties. For example, in the case of a provi-

---

[46] League of Nations, *Official Journal*, Special Supplement No. 3 (October 1920), p. 18 ; see also Harvard Law School, *Research in International Law*, A.J.I.L., vol. 29, Supplement (1935), part III, Law of Treaties, pp. 927-928.

[47] *P.C.I.J.* (1932), Series A/B. No. 46, pp. 147-148 ; in the course of that case, however, three judges expressly dissented from the view that a stipulation in favour of a State not a party to the treaty may of itself confer an actual right upon that State.

[48] See, for example, the controversy between the United States Treasury, and the State Department as to whether the Finnish Peace Treaty had actually vested a right in the United States to avail itself or not to avail itself of a waiver of Finland's claims ; E. Jiménez de Aréchaga, "Treaty Stipulations in favor of Third States", *American Journal of International Law*, vol. 50 (1956), p. 355.

sion allowing freedom of navigation in an international river or maritime waterway, the territorial State has the right in virtue of its sovereignty to lay down relevant conditions for the exercise of the right provided, of course, that they are in conformity with its obligations under the treaty.

### Article 61. Revocation or amendment of provisions regarding obligations or rights of third States

When an obligation or right has arisen under article 59 or 60 for a State from a provision of a treaty to which it is not a party, the provision may be revoked or amended only with the consent of that State, unless it appears from the treaty that the provision was intended to be revocable.

### Commentary

(1) Article 61 deals with the position of the parties to a treaty in regard to the revocation or amendment of a provision intended to give rise to an obligation or right for a State not a party to the treaty. The Commission, as already stated in paragraph (5) of the commentary to the previous article, was unanimously of the view that in the case of a right, the parties are free to revoke or amend the provision at any time before the beneficiary State has manifested its assent ; but that afterwards they may do so only with its consent, unless it appears from the treaty that the provision was intended to be revocable. It considered that the same rule should apply in the case of an obligation. Although a beneficiary State would not normally have any interest in objecting to the revocation of a provision subjecting it to an obligation, this might not always be so ; and its consent was certainly necessary for any amendment of a provision under which it had accepted an obligation.

(2) The article accordingly lays down that when under article 59 or 60 a State not a party to a treaty has accepted an obligation or assented to a right, the provision relating to such obligation or right may be revoked or amended only with the consent of that State, unless it appears from the treaty that the provision was intended to be revocable. Thus, by implication, the article also lays down that prior to such assent the provision may be revoked or amended by agreement between the parties alone. The Commission recognized that the revocable character of the provision might also appear from transactions made between the parties and the beneficiary State. It felt, however, that this would constitute an agreement between the parties and the beneficiary and need not be mentioned in the present article.

### Article 62. Rules in a treaty becoming generally binding through international custom

Nothing in articles 58 to 60 precludes rules set forth in a treaty from being binding upon States not parties to that treaty if they have become customary rules of international law.

### Commentary

(1) The role played by custom in sometimes extending the application of rules contained in a treaty beyond the contracting States is well recognized. A treaty concluded between certain States may formulate a rule, or establish a territorial, fluvial or maritime régime, which afterwards comes to be generally accepted by other States as customary international law, as, for example, the Hague Conventions regarding the rules of land warfare,[49] the agreements for the neutralization of Switzerland, and various treaties regarding international riverways and maritime waterways. Or a multilateral treaty, formulating new general norms of international law and drawn up between a large number of States, may be ratified only by some of the negotiating States and yet come to be generally accepted as enunciating rules of customary law. So too a codifying convention purporting to state existing rules of customary law may come to be regarded as the generally accepted formulation of the customary rules in question even by States not parties to the convention.

(2) In none of these cases, however, can it properly be said that the treaty itself has legal effects for States not parties to it. They are cases where, without establishing any treaty relation between themselves and the parties to the treaty, other States recognize rules formulated in a treaty as binding customary law. In short, for these States the source of the binding force of the rules is custom, not the treaty. For this reason the Commission did not think that this process should be included in the draft articles as a case of a treaty having legal effects for third States. It did not, therefore, formulate any specific provisions concerning the operation of custom in extending the application of treaty rules beyond the contracting States. On the other hand, having regard to the importance of the process and to the nature of the provisions in articles 58 to 60, it decided to include in the present article a general reservation stating that nothing in those articles precludes treaty rules from being binding on non-parties if they have become customary law.

(3) In connexion with its examination of article 59 and of the present article, the Commission considered whether treaties creating so-called "objective régimes", that is, obligations and rights valid erga omnes, should be dealt with separately as a special case of treaties having effects for third States.[50] Some members of the Commission favoured this course, expressing the view that the concept of treaties creating objective régimes existed in international law and merited special treatment in the draft articles. In their view, treaties which fall within this concept are treaties for the neutralization or demilitarization of particular territories or areas, treaties providing for freedom of navigation in inter-

---

[49] Held by the International Military Tribunal at Nürnberg to enunciate rules which had become generally binding rules of customary law.

[50] See generally Sir Gerald Fitzmaurice's Fifth Report on the Law of Treaties, *Yearbook of the International Law Commission, 1960,* vol. II, pp. 69-107 ; and Sir Humphrey Waldock's Third Report, *vide supra,* pp. 5-65, article 63 and commentary.

national rivers or maritime waterways ; and they cited the Antarctic Treaty as a recent example of such a treaty.[51] Other members, however, while recognizing that in certain cases treaty rights and obligations may come to be valid *erga omnes,* did not regard these cases as resulting from any special concept or institution of the law of treaties. They considered that these cases resulted either from the application of the principle in article 59 or from the grafting of an international custom upon a treaty under the process which is the subject of the reservation in the present article. As the theory of treaties creating objective régimes was controversial and its acceptability to States somewhat doubtful, the Commission concluded that to recognize that such treaties create special legal effects for non-parties would be premature at the present stage of the development of international relations. It considered that article 60, which provides for treaties where the parties intend to create rights in favour of States generally, together with the process mentioned in the present article, furnish a legal basis for the establishment of treaty obligations and rights valid *erga omnes,* which, if it falls short of what some members of the Commission regard as desirable, goes as far as is likely to be acceptable to States. Accordingly, it decided not to formulate any special provisions on treaties creating so-called objective régimes.

## Article 63. Application of treaties having incompatible provisions

1. **Subject to Article 103 of the Charter of the United Nations, the obligations of States parties to treaties, the provisions of which are incompatible, shall be determined in accordance with the following paragraphs.**

2. **When a treaty provides that it is subject to, or is not inconsistent with, an earlier or a later treaty, the provisions of that other treaty shall prevail.**

3. **When all the parties to a treaty enter into a later treaty relating to the same subject matter, but the earlier treaty is not terminated under article 41 of these articles, the earlier treaty applies only to the extent that its provisions are not incompatible with those of the later treaty.**

4. **When the provisions of two treaties are incompatible and the parties to the later treaty do not include all the parties to the earlier one :**

   (a) **As between States parties to both treaties, the same rule applies as in paragraph 3 ;**

   (b) **As between a State party to both treaties and a State party only to the earlier treaty, the earlier treaty applies ;**

   (c) **As between a State party to both treaties and a State party only to the later treaty, the later treaty applies.**

5. **Paragraph 4 is without prejudice to any responsibility which a State may incur by concluding or applying a treaty the provisions of which are incompatible with its obligations towards another State under another treaty.**

*Commentary*

(1) The question of conflicts between incompatible provisions of successive treaties was discussed by Sir Hersch Lauterpacht in successive reports in 1953 [52] and 1954 [53] in the context of the validity of treaties, and again by Sir Gerald Fitzmaurice in his third report [54] in 1958 in the same context. The present Special Rapporteur also examined this question in the context of "validity" in his second report [55] presented to the Commission in 1963, but in that report he suggested that the question ought rather to be considered in the context of the "application" of treaties, and the Commission, without in any way prejudging its position on the point, decided to postpone its consideration of the question until its present session.[56]

(2) One type of case is where the parties to a later treaty do not include all the parties to an earlier treaty with which its provisions are incompatible. The majority of the members of the Commission who took part in the discussion in 1963 were inclined to take the view that leaving aside the case of conflict with a rule of *jus cogens,* which is an independent principle governed by the provisions of articles 37 and 45 of part II, the fact that a treaty is incompatible with the provisions of an earlier treaty binding upon some of its parties does not deprive the later treaty of validity ; and that, accordingly, this type of case raises primarily questions of priority of application and of State responsibility. Some members, however, although agreeing that this was true as a general rule, were not convinced that it necessarily held good in every case. In particular, these members expressed doubts as to the validity of a treaty which conflicts with a prior treaty neutralizing or demilitarizing a territory or embodying a political settlement of general importance. During that discussion reference was also made to : (1) clauses found in certain treaties, e.g. Article 103 of the United Nations Charter, which claim priority for their provisions over those of any other treaty ; (2) clauses found in some treaties dealing specifically with their relation to previous treaties ; and (3) possible cases of conflict between treaties having entirely different parties. Another point mentioned was the relation of the question of conflicts between treaties to that of the modification of treaties. The other type of case is where all the parties to the earlier treaty are also parties to the later one. The Commission in 1963 recognized that in those cases there is always

[51] See also Lord McNair, *Law of Treaties* (1961), chapter XIV ; C. Rousseau, *Principes généraux du droit international public* (1948), pp. 462-464 and 477-484 ; M. Lachs, *Le développement et les fonctions des traités internationaux, Recueil des Cours de l'Académie de droit international,* vol. 92 (1957), pp. 315-317.

[52] *Yearbook of the International Law Commission, 1953,* vol. II, p. 156.
[53] *Yearbook of the International Law Commission, 1954,* vol. II, p. 133.
[54] *Yearbook of the International Law Commission, 1958,* vol. II, pp. 27 and 41.
[55] *Yearbook of the International Law Commission, 1963,* vol. II, pp. 53-54, article 14 and commentary.
[56] *Ibid.,* p. 189, para. 15 ; see also discussion at the 685th, 687th and 703rd meetings of the Commission.

a preliminary question of construction of the two treaties in order to determine the extent of their incompatibility and the intentions of the parties with respect to the maintenance in force of the earlier treaty. Some members considered that for this reason these cases ought not to be dealt with in part II under the heading, "implied termination of treaties" but in the present part under the heading, "application of treaties". The Commission, however, decided that, even if there were a preliminary question of interpretation in these cases, there was still the problem of the conditions under which that interpretation should be regarded as leading to the conclusion that the treaty has been terminated, and it adopted article 41 concerning the implied termination of a treaty as a result of the subsequent conclusion of another treaty wholly incompatible with it. The Commission also decided provisionally to retain the article in the section dealing with termination of treaties but to reconsider it at the sixteenth session.[57] Accordingly the Commission has re-examined both categories of conflicts between treaties in connexion with its discussion of the application of treaties on the basis of a fresh study by the Special Rapporteur oriented to the application instead of to the validity of treaties.

(3) The question of treaties having incompatible provisions, considered from the point of view of "application of treaties", has close connexions both with the provisions of articles 58 to 60 concerning the legal effects of treaties on third States, and with articles 65 to 68 concerning the modification of treaties. Thus, the principle that a treaty cannot impose obligations on a third State or deprive it of its legal rights is of paramount importance in those cases of incompatibility where the parties to the later treaty do not include all the parties to the earlier one. As to the link with modification of treaties, an amending instrument is frequently another treaty the parties to which do not include all the parties to the earlier treaty, so that the amendment gives rise to a case of incompatible treaties.

(4) In the discussion in 1963, some members of the Commission considered that the article should emphasize the invalidity of a treaty which conflicts with a *jus cogens* provision.[58] However, in the light of articles 37 and 45, one of the two treaties will be void; and since that treaty is not a treaty in force there can be no question of its application. For this reason, the Commission recognized that it is unnecessary to repeat the *jus cogens* rule in the present article, which concerns the application of incompatible treaties.

(5) It was also suggested, in the discussion in 1963, that the overriding character of Article 103 of the Charter should find expression in the article. At the present session the Commission, without prejudging in any way the interpretation of Article 103 or its application by the competent organs of the United Nations, decided to recognize in the present article the overriding character of Article 103 of the Charter with respect to any treaty obligations of Members, and paragraph 1 accordingly provides that the rules laid down in the present article

for regulating the obligations of States parties to successive treaties which are incompatible with one another are subject to Article 103 of the Charter.

(6) Paragraph 2 concerns clauses inserted in a treaty for the purpose of determining the relation of its provisions to those of other treaties entered into by the contracting States. Some of these clauses do no more than confirm the general rules of priority contained in paragraphs 3 and 4 of this article. Others, like paragraph 2 of article 73 of the Vienna Convention of 1963 on Consular Relations,[59] which recognizes the right to supplement its provisions by bilateral agreements, merely confirm the legitimacy of bilateral agreements which do not derogate from the obligations of the general Convention. Certain types of clause may, however, influence the operation of the general rules, and therefore require special consideration. For example, a number of treaties contain a clause in which the parties declare either that the treaty is not incompatible with, or that it is not to affect, their obligations under another designated treaty. Many older treaties[60] provided that nothing contained in them was to be regarded as imposing upon the parties obligations inconsistent with their obligations under the Covenant of the League ; and today a similar clause giving pre-eminence to the Charter is found in certain regional treaties.[61] Other examples are : article XVII of the Universal Copyright Convention of 1952,[62] which disavows any intention to affect the provisions of the Berne Convention for the Protection of Literary and Artistic Works ; article 30 of the Geneva Convention of 1958 on the High Seas[63] and article 73 of the Vienna Convention on Consular Relations, all of which disavow any intention of overriding existing treaties. Such clauses, in so far as they relate to existing treaties concluded by the contracting States with third States, merely confirm the general rule *pacta tertiis non nocent*. But they may go beyond that rule because in some cases not only do they affect the priority of the respective treaties as between States parties to both treaties, but they may also concern future treaties concluded by a contracting State with a third State. They appear in any case of incompatibility to give pre-eminence to the other treaty. Accordingly, even if in particular instances the application of these clauses may not differ from the general rules of priority set out in paragraphs 3 and 4, it is thought that they should be made the subject of a separate rule in the present article. Paragraph 2 accordingly lays down that, whenever a treaty provides that it is subject to, or is not inconsistent with, an earlier

[57] *Yearbook of the International Law Commission, 1963,* vol. II, p. 203, para. (2).
[58] *Ibid.,* pp. 198-199, commentary to article 37.
[59] United Nations Conference on Consular Relations, *Official Records,* vol. II, p. 187.
[60] See article 16 of the Statute of 1921 on the Régime of Navigable Waterways of International Concern (League of Nations, *Treaty Series,* vol. VII, p. 61) ; Article 4 of the Pan-American Treaty of 1936 on Good Offices and Mediation (League of Nations, *Treaty Series,* vol. CLXXXVIII, p. 82) and the further list of treaties cited in C. Rousseau, *Principes généraux du droit international public* (1944), pp. 789-790.
[61] For example, Article 10 of the Inter-American Treaty of Reciprocal Assistance (United Nations, *Treaty Series,* vol. 21, p. 101).
[62] United Nations, *Treaty Series,* vol. 216, p. 148.
[63] United Nations Conference on the Law of the Sea, 1958, *Official Records,* vol. II, p. 138.

or a later treaty, the provisions of that other treaty should prevail.

(7) Certain treaties contain a clause of the reverse type by which it is sought to give the treaty priority over another treaty incompatible with it. One form of such clause looks only to the past, and provides for the priority of the treaty over existing treaties of the contracting States which are incompatible with it. Another form looks only to the future, and specifically requires the contracting States not to enter into any future agreement which would be inconsistent with its obligations under the treaty. Some treaties, like the Statute on the Régime of Navigable Waterways of International Concern,[64] contain both forms of clause ; a few, like the League Covenant (Article 20) and the United Nations Charter (Article 103), contain single clauses which look both to the past and the future. Leaving Article 103 of the Charter out of the discussion for the reasons already indicated, it is clear that quite different legal considerations apply to clauses that look to the past from those which apply to clauses that look to the future.

(8) A clause purporting to override an earlier treaty presents no difficulty when all the parties to the earlier treaty are also parties to the treaty which seeks to override it. As the Commission pointed out in its commentary to article 41,[65] the parties to the earlier treaty are always competent to abrogate it, whether in whole or in part, by concluding another treaty with that object. That being so, when they conclude a second treaty incompatible with the first, they are to be presumed to have intended to terminate the first treaty or to modify it to the extent of the incompatibility, unless there is evidence of a contrary intention. Accordingly, in these cases the inclusion of a clause in the second treaty expressly proclaiming its priority over the first does no more than confirm the absence of any contrary intention. When, on the other hand, the parties to a treaty containing a clause purporting to override an earlier treaty do not include all the parties to the earlier one, the rule *pactas tertiis non nocent* automatically restricts the legal effect of the clause. The later treaty, clause or no clause, cannot deprive a State which is not a party thereto of its rights under the earlier treaty. It is, indeed, clear that an attempt by some parties to a treaty to deprive others of their rights under it by concluding amongst themselves a later treaty incompatible with those rights would constitute an infringement of the earlier treaty. For this reason clauses of this kind are normally so framed as expressly to limit their effects to States parties to the later treaty. Article XIV of the Convention of 25 May 1962 on the Liability of Operators of Nuclear Ships, for example, provides :

"This Convention shall supersede any International Conventions in force or open for signature, ratification or accession at the date on which this Convention is opened for signature, but only to the extent that such Conventions would be in conflict with it ;

however, nothing in this Article shall affect the obligations of Contracting States to non-Contracting States arising under such International Conventions." [66]

Similarly, many treaties amending earlier treaties provide for the supersession of the earlier treaty in whole or in part, but at the same time confine the operation of the amending instrument to those States which become parties to it.[67] The effect then is that the amendments come into force only for the parties to the later treaty in their relations *inter se*, while the earlier treaty remains applicable in their relations with States which are parties to the earlier but not to the later treaty. In other words, as between two States which are parties to both treaties, the later treaty prevails, but as between a State party to both treaties and a State party only to the earlier treaty, the earlier treaty prevails. These are the rules laid down in paragraph 4 (*a*) and (*b*) of the article, so that the insertion of this type of clause in no way modifies the application of the normal rules.

(9) When a treaty contains a clause purporting to override *future* treaties inconsistent with it, the clause can be of no significance if all the parties to the earlier treaty are also parties to the later one, because when concluding the later treaty they are fully competent to abrogate or modify the earlier treaty which they themselves drew up. More difficult, however, and more important, is the effect of such a clause in cases where the parties to the later treaty do not include all the parties to the earlier one. The clause in the earlier treaty may be so framed as to prohibit the parties from concluding with any State whatever a treaty conflicting with the earlier treaty ; e.g. article 2 of the Nine-Power Pact of 1922 with respect to China.[68] Or it may refer only to agreements with third States, as in the case of article 18 of the Statute on the Régime of Navigable Waterways of International Concern :

"Each of the Contracting States undertakes not to grant, either by agreement or in any other way, to a non-Contracting State treatment with regard to navigation over a navigable waterway of international concern which, as between Contracting States, would be contrary to the provisions of this Statute." [69]

---

[64] Articles 13 and 18, League of Nations, *Treaty Series*, vol. VII, p. 36.

[65] *Yearbook of the International Law Commission, 1963*, vol. II, p. 203.

[66] *American Journal of International Law*, vol. 57 (1963), p. 275.

[67] Article 1 of all the United Nations protocols amending League of Nations treaties declares : "The Parties to the present Protocol undertake that as between themselves they will, in accordance with the provisions of the present Protocol, attribute full legal force and effect to, and duly apply, the amendments to this instrument as they are set forth in the annex to the present Protocol". See, for example, Protocol of 1948 amending the International Convention of 1928 relating to Economic Statistics (United Nations, *Treaty Series*, vol. 20, p. 229) ; Protocol of 1953 amending the Geneva Slavery Convention of 1926 (United Nations, *Treaty Series*, vol. 182, p. 51). Cf. also article 59 of the Geneva Convention 1949 for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field (United Nations, *Treaty Series*, vol. 75, p. 66).

[68] League of Nations, *Treaty Series*, vol. XXXVIII, p. 281 : "The Contracting Powers agree not to enter into any treaty, agreement, arrangement, or understanding, either with one another, or, individually or collectively, with any Power or Powers, which would infringe or impair the principles stated in article 1."

[69] League of Nations, *Treaty Series*, vol. VII, pp. 36-61.

Or, again, the aim of the clause may be to prohibit the contracting States from entering into agreements *inter se* which would derogate from their general obligations under a convention.[70] These clauses do not appear to modify the application of the normal rules for resolving conflicts between incompatible treaties. Some obligations contained in treaties are in the nature of things intended to apply generally to all the parties all the time. An obvious example is the Nuclear Test-Ban Treaty, and a subsequent agreement entered into by any individual party contracting out of its obligations under that Treaty would manifestly be incompatible with the Treaty. Other obligations may be of a purely reciprocal kind, so that a bilateral treaty modifying the application of the convention *inter se* the Contracting States is compatible with its provisions. But even then the parties may in particular cases decide to establish a single compulsive régime for matters susceptible of being dealt with on a reciprocal basis, e.g., copyright or the protection of industrial property. The chief legal relevance of a clause asserting the priority of a treaty over subsequent treaties which conflict with it therefore appears to be in making explicit the intention of the parties to create a single "integral" or "interdépendent" treaty régime not open to any contracting out. In short, by expressly forbidding contracting out, the clause predicates in unambiguous terms the incompatibility with the treaty of any subsequent agreement concluded by a party which derogates from the provisions of the treaty. But it is not believed that the insertion of such a clause can in any other respect give a treaty any greater priority than attaches to it by the fact of its being earlier in point of time.

(10) Any treaty laying down "integral" or "interdependent" obligations not open to contracting out must be regarded as containing an implied undertaking not to enter into subsequent agreements with conflict with those obligations, and some members of the Commission considered that this should be specifically provided for in the article itself. The very fact that a State accepts obligations of that nature in a treaty implies also its acceptance of an obligation not to conclude any subsequent agreement conflicting with the treaty except with the consent of the other parties. If it does so, it violates its obligations to the other parties under the treaty and, by reason of the rule *pacta tertiis non nocent* (article 58), it cannot invoke the subsequent agreement to relieve it of its responsibility for that violation. In consequence, as between that State and any party to the earlier treaty which has not consented to the later treaty, the obligations of the earlier treaty prevail. This is the normal rule of priority formulated in paragraph 4 (*b*), and the insertion of a special clause in the earlier treaty claiming priority for its provisions merely confirms, and does not modify, the operation of that rule. To attribute special effects to the insertion of such a clause would lead to absurd results.

Many treaties laying down the most fundamental "integral" or "interdependent" obligations do not contain any explicit undertaking against contracting out or any clause claiming special priority for their provisions. The Kellogg-Briand Pact, the Genocide Convention, and the Nuclear Test-Ban Treaty are examples, and it is impossible to suppose that the absence from such treaties of any explicit undertaking against contracting out and of any special priority clause weakens or affects their impact upon a subsequent agreement which is incompatible with their provisions. Accordingly, the majority of the Commission took the view that the presence or absence of a specific clause regarding future treaties has no bearing on the formulation of the rules governing the *priority* of conflicting treaties.

(11) It follows from paragraphs (5) to (10) above that none of the clauses found in treaty practice asserting the priority of a particular treaty over other treaties requires special mention in the present article, apart from Article 103 of the Charter. Viewing the matter as one of the application of treaties in force, none of these clauses appears to modify the operation of the normal rules of priority. The real issue is a different one — the question discussed in a preliminary way by the Commission in 1963, whether a subsequent agreement which conflicts with a treaty containing "interdependent" or "integral" type obligations is merely incapable of being invoked against parties to the earlier treaty or whether it is wholly void. This question, which is examined in paragraphs (14) to (17) of this commentary, does not turn on the presence or absence of a special clause but on the "interdependent" or "integral" character of the obligations undertaken in the earlier treaty.[71]

(12) Paragraph 3 deals with cases where all the parties to a treaty, whether with or without additional States, enter into a later treaty which is incompatible with the earlier one, and from a different angle it covers the same ground as article 41 adopted at the previous session. The provisional decision of the Commission in 1963 to characterize these cases as instances of implied termination of an earlier treaty was confirmed by the majority of members who took part in

---

[70] For example, article 15 of the 1883 Convention for the International Protection of Industrial Property (de Martens, *Nouveau Recueil général*, 2ème série, vol. X, p. 133) ; article 20, Berlin Convention of 1908 for the Protection of Literary Property (de Martens, *Nouveau Recueil général*, 3ème série, vol. IV, p. 590).

[71] A treaty containing "interdependent type" obligations as defined by a previous Special Rapporteur (Sir Gerald Fitzmaurice, Third Report in *Yearbook of the International Law Commission, 1958*, vol. II, article 19 and commentary) is one where the obligations of each party are only meaningful in the context of the corresponding obligations of every other party, so that the violation of its obligations by one party prejudices the treaty régime applicable between them all and not merely the relations between the defaulting State and the other parties. Examples given by him were treaties of disarmament, treaties prohibiting the use of particular weapons, treaties requiring abstention from fishing in certain areas or during certain seasons, etc. A treaty containing "integral type" obligations was defined by the same Special Rapporteur as one where the force of the obligation is "self-existent, absolute and inherent for each party and not dependent on a corresponding performance by the others". The examples given by him were the Genocide Convention, Human Rights Conventions, the Geneva Conventions of 1949 on prisoners of war, etc., International Labour Conventions and treaties imposing an obligation to maintain a certain régime or system in a given area, such as the régime of the Sounds and the Belts at the entrance to the Baltic Sea.

the discussion at the present session. On the other hand, the fact that the question of the "implied termination" of the earlier treaty can be determined only after ascertaining the extent of the conflict between the two treaties gives these cases a certain connexion with the present article. It therefore seems desirable to mention these cases in paragraph 3, with a cross-reference to article 41. In examining the question at the present session the Commission felt that a minor modification to article 41 may be desirable so as to transfer cases of a partial conflict between two treaties from article 41 to the present article. As adopted in 1963, the opening phrase of paragraph 1 of article 41 speaks of termination "in whole or in part", but the distinction between total and partial termination (or suspension) is not continued in the drafting of the rest of the article. Some modification of the wording of the rest of that article might therefore be necessary in any case. Without deciding at this stage on the final form of article 41, opinion in the Commission inclined to accept the view that the appropriate course would be to eliminate the words "in whole or in part" from article 41 and to assign to article 63 cases of partial conflict in which there does not appear to be any intention to terminate the earlier treaty. Paragraph 3 therefore provides, in effect, that, where there is evidence of an intention that the later treaty should govern the whole matter, or where the two treaties are not capable of being applied at the same time, article 41 applies and terminates the earlier treaty, and that in other cases the earlier treaty should apply to the extent that its provisions are not incompatible with those of the later treaty.

(13) Paragraph 4 deals with cases where some, but not all, the parties to an earlier treaty are parties to a later treaty which conflicts with their obligations under the earlier treaty. In such cases the rule *pacta tertiis non nocent* precludes the later treaty from depriving the other parties to the earlier treaty of their rights under that treaty. Then, if the question is viewed simply as one of the priority of the obligations and rights of the interested States and of State responsibility for breach of treaty obligations, the applicable rules appear to be fairly clear. These are the rules formulated in paragraph 4 of this article, under which :

(*a*) In the relations between two States that are parties to both treaties the later treaty prevails as being a more recent expression of their wills in their mutual relations, i.e., the case is governed by the same rule as in paragraph 3.

(*b*) In the relations between a State that is a party to both treaties and a State that is a party only to the earlier treaty, the earlier treaty prevails (*pacta tertiis non nocent*).

(*c*) In the relations between a State that is a party to both treaties and a State that is a party only to the later treaty, the later treaty prevails.

The rules in sub-paragraphs (*a*) and (*b*) can hardly be open to doubt, as they are the assumed basis of law upon which many revisions of multilateral treaties, including the United Nations protocols for revising League of Nations treaties, have taken place.[72] As to sub-paragraph (*c*), it seems clear that a State which has entered into both treaties is in principle liable, as between itself and parties to the later treaty, for any failure to perform its obligations under that treaty. Paragraph 5 accordingly reserves the question of responsibility incurred by a State in concluding or applying a treaty the provisions of which are incompatible with its obligations towards another State under another treaty.

(14) The Commission re-examined the question whether all these cases should be dealt with exclusively as questions of priority and of State responsibility for breach of treaty obligations, or whether in some instances the later treaty should be considered void. This question was discussed by the Special Rapporteur at some length in the commentary to article 14 of his second report,[73] where he also summarized and examined the views of the two previous Special Rapporteurs. The Commission, without adopting any position on the detailed considerations advanced by the Special Rapporteur, decided to include below, for purposes of information, certain passages in the second report of the Special Rapporteur on the Law of Treaties commenting upon this question.

". . . Treaties today serve many different purposes : legislation, conveyance of territory, administrative arrangement, constitution of an international organization, etc., as well as purely reciprocal contracts ; and, even if it can be accepted that the illegality of a contract to break a contract is a general principle of law — a point open to question — it does not at all follow that the principle should be applied to treaties infringing prior treaties. The imperfect state of international organization and the manifold uses to which treaties are put seem to make it necessary for the Commission to be cautious in laying down rules which brand treaties as illegal and void. This is not to say that to enter into treaty obligations which infringe the rights of another State under an earlier treaty does not involve a breach of international law involving legal liability to make redress to the State whose rights have been infringed. But it is another thing to say that the second treaty is void for illegality and a complete nullity as between the Parties to it.

"The attitude adopted by the Permanent Court in the *Oscar Chinn* and *European Commission of the Danube* cases hardly seems consistent with the existence in international law of a general doctrine invalidating treaties entered into in violation of the provisions of a prior treaty. In the *Oscar Chinn* case [74] the earlier treaty was the General Act of Berlin of 1885, which established an international régime for the Congo Basin. That treaty contained no provision authorizing the conclusion of bilateral arrangements between particular parties ; on the contrary it con-

---

[72] See "Resolutions of the General Assembly concerning the Law of Treaties" (A/CN.4/154), in *Yearbook of the International Law Commission, 1963*, vol. II, pp. 6-9.

[73] *Ibid.*, pp. 55-60, paras. 6-30.

[74] *P.C.I.J.* (1934), Series A/B, No. 63.

tained a provision expressly contemplating that any modification or improvement of the Congo régime should be introduced by 'common accord' of the signatory States. Nevertheless in 1919 certain of the parties to the Berlin Act, without consulting the others, concluded the Convention of St. Germain whereby, as between themselves, they abrogated a number of the provisions of the Berlin Act, replacing them with a new régime for the Congo. The Court contented itself with observing that, no matter what interest the Berlin Act might have in other respects, the Convention of St. Germain had been relied on by both the litigating States as the source of their obligations and must be regarded by the Court as the treaty which it was asked to apply. Admittedly, the question of the legality of the Convention of St. Germain had not been raised by either party. But the question was dealt with at length by Judges Van Eysinga and Schücking in dissenting opinions [75] and had, therefore, evidently been debated within the Court. Moreover, these Judges had expressly taken the position that the question of the validity or otherwise of the treaty was not one which could depend on whether any Government had challenged its legality, but was a question of public order which the Court was bound itself to examine *ex officio*. In these circumstances, it is difficult to interpret the Court's acceptance of the Convention of St. Germain as the treaty which it must apply, as anything other than a rejection of the doctrine of the absolute invalidity of a treaty which infringes the rights of third States under a prior treaty.

"The line taken by the Court in its advisory opinion on the *European Commission of the Danube* [76] was much the same. The Versailles Treaty contained certain provisions concerning the international régime for the Danube, including provisions concerning the composition and powers of the European Commission for that river ; at the same time it looked forward to the early conclusion of a further Convention establishing a definitive status for the Danube. A further Convention was duly concluded, the parties to which did not comprise all the parties to the Treaty of Versailles but did include all the States which were concerned in the dispute giving rise to the request for the advisory opinion. In this case the question of the capacity of the States at the later conference to conclude a treaty modifying provisions of the Treaty of Versailles was raised in the arguments presented to the Court, which pronounced as follows :

" 'In the course of the present dispute, there has been much discussion as to whether the Conference which framed the Definitive Statute had authority to make any provisions modifying either the composition or the powers and functions of the European Commission, as laid down in the Treaty of Versailles, and as to whether the meaning and the scope of the relevant provisions of both the Treaty of Versailles and the Definitive Statute are the same or not. But in the opinion of the Court, as all the Governments

concerned in the present dispute have signed and ratified both the Treaty of Versailles and the Definitive Statute, they cannot, as between themselves, contend that some of its provisions are void as being outside the mandate given to the Danube Conference under Article 349 of the Treaty of Versailles.' [77]

Here again, it is difficult not to see in the Court's pronouncement a rejection of the doctrine of the absolute invalidity of a later treaty which infringes the rights of third States under a prior treaty.[78] The *Mavrommatis Palestine Concessions* case [79] was, it is true, a somewhat different type of case, but it also appears to proceed on a basis quite inconsistent with the idea that a later treaty will be void to the extent that it conflicts with an earlier multilateral treaty.

"In its advisory opinion on the Austro-German Customs Union [80] the Court was only called upon to consider the compatibility of the Protocol of Vienna with the Treaty of St. Germain ; it was not asked to pronounce upon the legal consequences in the event of its being found incompatible with the earlier treaty. In two cases concerning Nicaragua's alleged violation of the prior treaty rights of Costa Rica and Salvador by concluding the Bryan-Chamorro Pact with the United States, the Central American Court of Justice considered itself debarred from pronouncing upon the validity of the later treaty in the absence of the United States, over which it had no jurisdiction. It therefore limited itself to holding that Nicaragua had violated her treaty obligations to the other two States by concluding a later inconsistent treaty with the United States.

"International jurisprudence is not perhaps entirely conclusive on the question whether and, if so, in what circumstances, a treaty may be rendered void by reason of its conflict with an earlier treaty. Nevertheless, it seems to the present Special Rapporteur strongly to discourage any large notions of a general doctrine of the nullity of treaties infringing the provisions of earlier treaties,[81] and it accordingly also lends point to the hesitations of Sir G. Fitzmaurice in admitting any cases of nullity where the conflict is with an earlier treaty of a 'mutual reciprocating type '.

"The two cases of nullity tentatively suggested by him,[82] . . . although they are supported by the Harvard

[75] *Ibid.*, pp. 132-136 and pp. 148-150 ; see also Judge Hursts' explicit reference to the question, pp. 122-123.
[76] *P.C.I.J.* (1927), Series B, No. 14.
[77] *Ibid.*, p. 23.
[78] The more so as two Judges, Nyholm and Negulesco, took a different line from the Court, holding that any provision of the Statute which conflicted with the Treaty of Versailles would be "null" ; *P.C.I.J.* (1927), Series B, No. 14, pp. 73 and 129.
[79] *P.C.I.J.* (1924), Series A, No. 2.
[80] *Ibid.* (1931), Series A/B, No. 41.
[81] See G. Schwarzenberger, *International Law*, pp. 482-487 ; see also article 18 of the Havana Convention of 1928 on Treaties (Harvard Law School, *Research in International Law*, part III, Law of Treaties, p. 1207) which provided : "Two or more States may agree that their relations are to be governed by rules other than those established in general conventions concluded by them with other States".
[82] See paragraph 13 of the commentary to article 14 in the present Special Rapporteur's Second Report on the Law of Treaties, *Yearbook of the International Law Commission, 1963*, vol. II, p. 56.

Research Draft, hardly seem consistent with the attitude of the Court in the *Oscar Chinn* and *European Commission of the Danube* cases. In the former case there was an express stipulation that any modifications of the Berlin Act should be by 'common accord', yet the Court considered it sufficient that no State had challenged the Convention of St. Germain. It does not seem that the Court would have adopted any different view, if the stipulation had taken the form of an express prohibition against contracting out of the treaty otherwise than by 'common accord'. It is also arguable that there is implied in every multilateral treaty an undertaking not to violate its provisions by entering into inconsistent bilateral agreements.[88] Accordingly, it hardly seems justifiable to provide, as a special case, that a later treaty shall be void, if it conflicts with a prior treaty which contains an express prohibition against inconsistent bilateral agreements. An undertaking in a treaty not to enter into a conflicting treaty does not, it is thought, normally affect the treaty-making capacity of the States concerned, but merely places them under a contractual obligation not to exercise their treaty-making powers in a particular way. A breach of this obligation engages their responsibility ; but the later treaty which they conclude is not a nullity. Similarly, if the general view be adopted — as it was by the previous Special Rapporteur — that a later treaty concluded between a limited group of the parties to a multilateral treaty is not normally rendered void by the fact that it conflicts with the earlier treaty, his second tentative exception to the rule does not appear to justify itself. This exception was cases where the later treaty ' necessarily involves for the parties to it action in direct breach of their obligations under the earlier treaty '. The question of nullity does not arise at all unless the later treaty materially conflicts with the obligations of the parties under the earlier treaty. Can it make any difference whether the infringement of those obligations is direct or indirect, if it is the logical effect of the later treaty ? Of course, if the later treaty is susceptible of different interpretations or is capable of performance in different ways, it may not be possible to know whether there is any conflict with the earlier treaty until the later treaty has been interpreted and applied by the States concerned. But if it is in fact interpreted and applied in a manner which violates the earlier treaty, can it reasonably be differentiated from a treaty whose terms unambiguously violate the earlier treaty ?"

(15) A number of precedents in State practice with regard to the modification of treaties appear to support the relativity of obligations principle applied by the Court in the cases examined in the above passages of the Special Rapporteur's second report. Furthermore, as a previous Special Rapporteur pointed out,[84] chains of multilateral treaties dealing with the same subject-matter are extremely common, and are based on the

assumed possibility of some of the parties to a treaty concluding a new treaty modifying or superseding the earlier one in their relations *inter se*, while leaving it in force with respect to States which do not become parties to the new treaty. It is the exception rather than the rule for all the parties to the first treaty to become parties to the revising instrument, and until the state of international relations permits a much larger acceptance of majority decisions, the *inter se* principle is likely to remain an essential instrument for bringing treaty situations up to date. Moreover, multilateral treaties creating "interdependent" or "integral" type obligations are the very classes of treaty in which a "chain" of instruments is found, e.g. the Hague Conventions on the rules of warfare, the Geneva Conventions on prisoners of war, etc., the "river" conventions and large numbers of technical conventions. Accordingly, it seemed to the majority of the members of the Commission necessary to be cautious in proclaiming the absolute nullity of any type of agreement purely on the ground of its conflict with an earlier one.

(16) The nullity of a treaty may result from a lack of competence of the parties to conclude it. If in any given case such a lack of competence results from the conclusion of a prior treaty, it is thought that it will be because of the particular subject-matter of the obligations and not because of their "integral" or "interdependent" character alone. "Integral" or "interdependent" obligations may vary widely in importance. Some, although important enough in their own spheres, may deal with essentially technical matters ; while others deal with matters of vital public concern, such as the maintenance of peace, nuclear tests, traffic in women and children, or in narcotics. Some of the rules laid down in treaties touching these matters may be of a *jus cogens* character, and the Commission has made specific provision in articles 37 and 45 for the nullity of treaties which conflict with such rules. The majority of the members of the Commission felt that it would be undesirable to go beyond that. Paragraph 4 of the present article is therefore based on the relative priority, rather than the nullity, of the conflicting treaties, and paragraph 5, as stated, reserves all question of State responsibility. To draw up the article in this way is not to condone the conclusion of a treaty the effect of which is to violate obligations under an earlier treaty ; nor is it to authorize departures from the rules concerning the consents required for the modification of treaties, as specified in articles 65 to 68. If a State in concluding a treaty sets aside its obligations to another State under an earlier treaty without the latter's consent, it engages its international responsibility for the breach of the earlier treaty. But it is believed that in the present condition of international law the matter is to be resolved on the plane of State responsibility and not of the competence of the offending State.

(17) Accordingly, no exceptions to the rules stated in paragraph 4 are provided, other than the general exceptions of conflict with a rule of *jus cogens* and conflict with an obligation of Members of the United Nations under the Charter. Paragraph 5, however, underlines that even if a later treaty may under these

[88] See the general discussion of this point in paragraph (10) above.

[84] Sir Gerald Fitzmaurice, Third Report, *Yearbook of the International Law Commission, 1958*, vol. II, p. 43, para. 88.

rules be valid and prevail in the relations of the parties to that treaty, it does not mean that they may not be liable under the principle of State responsibility for any breach of their obligations under another treaty which the conclusion or application of the later treaty may involve.

## Article 64. The effect of severance of diplomatic relations on the application of treaties

**1. The severance of diplomatic relations between parties to a treaty does not affect the legal relations between them established by the treaty.**

**2. However, such severance of diplomatic relations may be invoked as a ground for suspending the operation of the treaty if it results in the disappearance of the means necessary for the application of the treaty.**

**3. Under the conditions specified in article 46, if the disappearance of such means relates to particular clauses of the treaty, the severance of diplomatic relations may be invoked as a ground for suspending the operation of those clauses only.**

*Commentary*

(1) This article contemplates only the situation which arises when diplomatic relations are severed between two parties to a treaty, whether bilateral or multilateral, between which normal diplomatic relations had previously subsisted. For the reasons stated in paragraph 14 of the Commission's report for 1963,[85] the question of the effect upon treaties of the outbreak of hostilities — which may obviously be a case when diplomatic relations are severed — is not being included in the draft articles on the law of treaties. Similarly, any problems that may arise in the sphere of treaties from the absence of recognition of a government do not appear to be such as should be covered in a statement of the general law of treaties. It is thought more appropriate to deal with them in the context of other topics with which they are closely related, either succession of States and Governments, which is excluded from the present discussion for the reasons indicated in paragraph 18 above, or recognition of States and Governments, which the Commission, in 1949, decided to include in its provisional list of topics selected for codification.[86]

(2) There is wide support for the general proposition that the severance of diplomatic relations does not in itself lead to the termination of treaty relationships between the States concerned.[87] The Commission itself, in 1963, was disinclined to deal with this matter in

the context of the termination of treaties,[88] and this position corresponds with that of many authorities who do not include the severance of diplomatic relations in their discussion of the grounds for the termination or suspension of the operation of treaties.[89] That the breaking off of diplomatic relations does not as such affect the operation of the rules of law dealing with other aspects of international intercourse is indeed recognized in article 2, paragraph 3, of the Vienna Convention on Consular Relations, 1963, which provides : "The severance of diplomatic relations shall not *ipso facto* involve the severance of consular relations" ; while the Vienna Convention on Diplomatic Relations of 1961 contains an article — article 45 — dealing specifically with the rights and obligations of the parties in the event that diplomatic relations are broken off. It therefore seems correct to state that in principle the mere breaking off of diplomatic relations does not of itself affect the continuance in force of the treaty, or the continuance of the obligation of the parties to apply it in accordance with the rule *pacta servanda sunt.*

(3) On the other hand, the effect of the severance of diplomatic relations on the continued operation of the treaty has to be considered in the light of the decisions already reached by the Commission on the termination and suspension of the operation of treaties. In those cases where the execution of the treaty is dependent upon the uninterrupted maintenance of diplomatic relations between the parties the question of the termination or of the suspension of the operation of the treaty clearly arises.[90] It is sometimes suggested that in practice difficulties in implementing the treaty could be overcome by using the good offices of another State or by appointing a protecting State. No doubt in many cases this might be so. But a State does not appear to be under any obligation to accept the good offices of another State, or to recognize the nomination of a protecting State in the event of a severance of diplomatic relations ; and articles 45 and 46 of the Vienna Convention on Diplomatic Relations of 1961 expressly require the consent of the receiving State in either case. Furthermore, that Convention does not define what is included within the scope of the protection of the interests of a third State. It therefore seems necessary to recognize that cases of supervening impossibility of performance leading to the temporary suspension of the operation of the treaty may occur in consequence of the severance of diplomatic relations.

(4) The Commission was accordingly agreed that, if the severance of the diplomatic relations does not of itself terminate the treaty relationships, it could nevertheless produce cases of supervening impossibility of performance leading to the temporary suspension of the

[85] *Yearbook of the International Law Commission, 1963,* vol. II, p. 189.

[86] *Yearbook of the International Law Commission, 1949,* p. 281.

[87] Cf. Sir Gerald Fitzmaurice, Second Report on the Law of Treaties, article 5 (iii) and para. 34 of the commentary, *Yearbook of the International Law Commission, 1957,* vol. II, p. 42 ; and Fourth Report on the Law of Treaties, article 4, *Yearbook of the International Law Commission, 1959,* vol. II, p. 54.

[88] *Yearbook of the International Law Commission, 1963.* vol. I, 697th meeting, p. 161, para. 56.

[89] Included in this category are C. Rousseau, *Principes généraux du droit international public,* tome I (1944) ; Academy of Sciences of the USSR, Institute of State and Law, *International Law* (1961) ; the American Law Institute. Restatement of the Law, *The Foreign Relations Law of the United States.* proposed official draft (1962).

[90] Harvard Law School, *Research in International Law, III. Law of Treaties,* pp. 1055-1066 ; and cf. Lord McNair, Law of Treaties (1961), pp. 672-676.

operation of a treaty. Some members of the Commission considered that, since the severance of diplomatic relations indicated an abnormal state of political relations between the two countries concerned, a criterion may also be found in the nature of the treaty ; the continued implementation of certain treaties, according to those members, would be incompatible with the severance of diplomatic relations. The view which prevailed, however, was that the situation was analogous to that covered by article 43, paragraph 2, and article 54, of part II, dealing respectively with supervening impossibility of performance and the legal consequences of the suspension of the operation of a treaty.

(5) Paragraph 1 accordingly provides, following the language of article 54, paragraph 1 (b), that the severance of diplomatic relations between parties to a treaty does not affect the legal relations between them established by the treaty. The expression "severance of diplomatic relations", which appears in article 41 of the Charter and in article 2, paragraph 3, of the Vienna Convention on Consular Relations, 1963, is used in preference to the expression "breaking off of diplomatic relations" found in article 45 of the Vienna Convention of 1961 on Diplomatic Relations. Paragraph 2 provides that the severance of diplomatic relations may be invoked as a ground for suspending the operation of a treaty if, but only if, it results in the disappearance of the means necessary for the application of the treaty — above all where the application of the treaty is dependent upon the existence of the diplomatic channels. Paragraph 3 applies the principle of the separability of treaty provisions as set forth in article 46 of part II, to cases of severance of diplomatic relations. In other words, if the absence of diplomatic relations frustrates the execution only of a particular provision which is separable from the remainder of the treaty under the conditions laid down in that article, it is that provision only the operation of which will be suspended by the severance of diplomatic relations.

*Section II : Modification of treaties*

## Article 65.  Procedure for amending treaties

A treaty may be amended by agreement between the parties. If it is in writing, the rules laid down in part I apply to such agreement except in so far as the treaty or the established rules of an international organization may otherwise provide.

## Article 66.  Amendment of multilateral treaties

1.  Whenever it is proposed that a multilateral treaty should be amended in relation to all the parties, every party has the right to have the proposal communicated to it, and, subject to the provisions of the treaty or the established rules of an international organization :

(a) To take part in the decision as to the action, if any, to be taken in regard to it ;

(b) To take part in the conclusion of any agreement for the amendment of the treaty.

2.  Unless otherwise provided by the treaty or by the established rules of an international organization :

(a) An agreement amending a treaty does not bind any party to the treaty which does not become a party to such agreement ;

(b) The effect of the amending agreement is governed by article 63.

3.  The application of an amending agreement as between the States which become parties thereto may not be invoked by any other party to the treaty as a breach of the treaty if such party signed the text of the amending agreement or has otherwise clearly indicated that it did not oppose the amendment.

*Commentary*

(1) A number of the rules contained in articles adopted by the Commission touch one aspect or another of the modification of treaties. The right of denunciation or withdrawal dealt with in articles 38 and 39 furnishes a means by which a party may apply pressure for the amendment of a treaty which it considers to be out of date or defective. The provisions of articles 43 and 44 regarding the termination of treaty clauses by reason of a supervening impossibility of performance or a fundamental change of circumstances may, under the principle of separability laid down in article 46, have the effect of modifying a treaty. Article 58 protects a State from having its rights under a treaty modified by a later treaty unless it is a party to the later treaty or has consented to the modification in question. Article 61 contemplates that in certain special cases a State not a party to a treaty may be entitled to be consulted with regard to the amendment of particular provisions which create legal rights in its favour. Even more important, however, are articles 41 and 63, which deal with the effect of a later treaty upon an earlier treaty covering the same subject-matter ; for this is precisely the situation which exists when a treaty is concluded, either between all or some of the parties to an earlier treaty, for the purpose of amending or modifying the earlier treaty. Article 41 contemplates cases where there is an implied termination of the earlier treaty, while article 65 provides for the relative priority of the treaties as between the parties to them, in cases where the earlier treaty is not to be considered as having been terminated under article 41.

(2) Some of the substantive aspects of the modification of treaties are thus covered by the above-mentioned articles ; and, since the means for carrying out the deliberate amendment of a treaty is a new treaty, the procedural aspects are largely covered by the provisions of part I relating to the conclusion, entry into force and registration of treaties. The only question, therefore, for the Commission's consideration was whether there are any rules specifically concerned with the modification of treaties which require to be given a place in the draft articles.

(3) Most jurists appear to take the view that, however desirable it may be for orderly processes for modifying treaties to be developed, the modification of

treaties is still essentially a political process. One modern text-book, for example, states :

"As a question of law, there is not much to be said upon the revision of treaties. It frequently happens that a change in circumstances may induce a Government on political grounds to accede to the request of another Government for the termination of a treaty and for its revision in the light of new circumstances. But, as a matter of principle, no State has a legal right to demand the revision of a treaty in the absence of some provision to that effect contained in that treaty or in some other treaty to which it is a party ; a revised treaty is a new treaty, and, subject to the same limitation, no State is legally obliged to conclude a treaty.

"Accordingly, treaty revision is a matter for politics and diplomacy ...".[91]

A similar emphasis on the political character of the process of the amendment of treaties is to be found amongst members of a Committee of the Institute of International Law which examined the modification of collective treaties in 1960.[92] Members of this Committee, while stressing the importance of inserting in multilateral treaties appropriate legal provisions to facilitate their future amendment, showed no disposition to recognize any specific rules regarding the process of amendment in international law. The Covenant of the League of Nations provided in Article 19 that the Assembly might "from time to time advise the reconsideration by Members of the League of treaties which have become inapplicable and the consideration of international conditions whose continuance might endanger the peace of the world". But, although much was said and written during the League period concerning the importance of providing for the peaceful change of out-of-date or burdensome treaties, Article 19 was practically a deadletter. As to the Charter, if Article 14 contains a general provision empowering the General Assembly to consider measures for the peaceful adjustment of any situation regardless of its origin, there is no mention of the modification of treaties as a specific function of the United Nations.[93]

(4) Nevertheless, the development of international organization and the tremendous increase in multilateral treaty-making has made a considerable impact on the process of amending treaties. In the first place, the amendment of many multilateral treaties is now a matter which concerns an international organization. This is clearly the case where the treaty is the constituent instrument of an organization or where the treaty, like the international labour conventions, is drawn up within an organization. But it is also to some extent the case where the treaty is concluded under the auspices of an organization and the secretariat of the organization is made the depositary for executing its procedural provisions. In all these cases the drawing up of an amending instrument is caught up in the machinery of the organization or in the functions of the depositary. As a result, the right of each party to be consulted with regard to the amendment or revision of the treaty is largely safeguarded. In the second place, the proliferation of multilateral treaties has led to an increased awareness of the importance of making provision in advance, in the treaty itself, for the possibility of its future amendment.[94] In the third place, the growth of multilateral treaties having a very large number of parties has made it virtually impossible to limit the amending process to amendments brought into force by an agreement entered into by all the parties to the original treaty ; and has led to an increasing practice, especially in the case of technical conventions, of bringing amending agreements into force as between those States willing to accept the amendment while at the same time leaving the existing régime in force with respect to the other parties to the earlier treaty.[95] Thus, in 1906 the Geneva Convention of 1864 for the Amelioration of the Condition of Wounded in Armies in the Field was revised by a new Convention which expressly provided that, when duly ratified, it should supersede the 1864 Convention in the relations between the contracting States, but that the 1864 Convention should remain in force in the relations of parties to that Convention who did not ratify the new Convention. A similar provision was inserted in the Hague Convention of 1907 on the Laws and Customs of War on Land, which revised the earlier Convention of 1899. There are numerous later examples of the same technique, notably the United Nations protocols revising certain League of Nations conventions.

(5) Some treaties contain clauses for the amendment and clauses for the revision of treaties,[96] the former term being used for changing individual provisions of the treaty and the latter for a general review of the whole treaty. If this phraseology has a certain convenience, it is not one which is found uniformly in State practice, and there does not appear to be any difference in the legal process. The Commission therefore considered it sufficient in the present articles to speak of "amendment" as being a term which covers both the amendment of particular provisions and a general review of the whole treaty.[97] As to the term " revision ", the Commission recognized that it is the term commonly found in State practice and that it is also used in some treaties. Nevertheless, having regard to the nuances that became attached to the phrase "revision of treaties" in the period preceding the Second

---

[91] Lord McNair, *Law of Treaties* (1961), p. 534.

[92] *Annuaire de l'Institut de droit international*, vol. 49, tome 1 (1961), pp. 229-291.

[93] In this connexion it may be recalled that the Commission at its fifteenth session in 1963 suggested that the General Assembly should take the necessary steps to initiate an examination of general multilateral treaties concluded under the auspices of the League of Nations with a view to determining what action might be necessary to adapt them to contemporary conditions. *Yearbook of the International Law Commission, 1963*, vol. II, p. 223, para. 50 (e).

[94] *Annuaire de l'Institut de droit international*, vol. 49, tome 1 (1961), pp. 95-153.

[95] E. C. Hoyt, *The Unanimity Rule in the Revision of Treaties* (1959), pp. 28-51.

[96] Articles 108 and 109 of the Charter ; see also *Handbook of Final Clauses* (ST/LEG/6), pp. 130 and 150.

[97] Thus, while Chapter XVIII of the Charter is entitled "Amendments", Article 109 speaks of "reviewing" the Charter.

World War, the Commission preferred the term "amendment". The more general term "modification" is used in article 69, which deals with *inter se* agreements, to cover transactions which may vary the treaty between certain of the parties only.

(6) Amendment clauses found in multilateral treaties take a great variety of forms, as appears from the examples given in the *Handbook of Final Clauses*[98] and from a recent analysis of amendment clauses in a report to the Institute of International Law.[99] Despite their variety, many amendment clauses are far from dealing comprehensively with the legal aspects of revision.[100] Some, for example, merely specify the conditions under which a proposal for amendment may be put forward, without providing for the procedure for considering it. Others, while also specifying the procedure for considering a proposal, do not deal with the conditions under which an amendment may be adopted and come into force, or do not define the exact effect on the parties to the existing treaty. As to clauses regarding the adoption and entry into force of an amendment, some require its acceptance by all the parties to the treaty, but many admit some form of qualified majority as sufficient. In general, the variety of the clauses makes it difficult to deduce from treaty practice the development of detailed customary rules regarding the amendment of multilateral treaties ; and the Commission did not therefore think that it would be appropriate for it to try and frame a comprehensive code of rules regarding the amendment of treaties. On the other hand, it seemed to the Commission desirable that the draft articles should include a formulation of certain general rules concerning the process of amendment and the use of *inter se* agreements. These general rules are contained in the two articles here under consideration and in article 67, while article 68 deals with certain special cases of the modification of treaties.

### Article 65

(7) Article 65 specifies the process by which amendment takes place : a treaty may be amended by agreement between the parties and, if the agreement is in writing, the rules laid down in part I apply to it except in so far as the treaty or the established rules of an international organization may otherwise provide. Having regard to the modern practice of amending multilateral treaties by another multilateral treaty which comes into force for those States which ratify it or otherwise become bound by it, the Commission did not specify that the agreement must be between all the parties, as in the case of termination of a treaty under article 40. It felt that the procedure for the adoption of the text and the entry into force of the amending agreement should be governed by articles 6, 23 and 24 of part I. On the other hand, it sought in article 66 to lay down strict rules guaranteeing the right of each party to participate in the process of amendment. The amendment of a treaty is normally effected through the

conclusion of another treaty in written form. However, the Commission recognized that amendment sometimes takes place by oral agreement or by an agreement arrived at tacitly in the application of the treaty. Accordingly, in stating that the rules in part I concerning the conclusion, entry into force and registration of treaties apply to amending agreements, article 65 excepts oral agreements from that provision since they fall outside those rules. It further qualifies that provision "in so far as the treaty or the established rules of an international organization may otherwise provide". This is to take account, first, of the growing practice of including special provisions in multilateral treaties regarding their future amendment and, secondly, of the fact that the constituent instrument or the established practice of many international organizations lays down special rules regarding the amendment either of the constituent instrument or of treaties concluded within the organization.

### Article 66

(8) This article deals with the complex process of the amendment of multilateral treaties. The Commission considered whether to formulate any rule specifically for bilateral treaties, but concluded that it would not serve any useful purpose. Where only two parties are involved, the question is essentially one of negotiation and agreement between them, and the rules contained in parts I and II appear to suffice to regulate the procedure and to protect the positions of the individual parties. Moreover, although the Commission was of the opinion that a party is under a certain obligation of good faith to give due consideration to a proposal from the other party for the amendment of a treaty, it felt that such a principle would be difficult to formulate as a legal rule without opening the door to arbitrary denunciations of treaties on the pretended ground that the other party had not given serious attention to a proposal for amendment.

(9) Article 66 is concerned only with the amendment *stricto sensu* of multilateral treaties, that is, with transactions designed to alter provisions of a treaty with respect to all its parties. The intention is to draw up an agreement between the parties generally for modifying the operation of the treaty between them all and not to draw up an agreement between certain parties only for the purpose of modifying its operation between themselves alone. The Commission recognized that an amending instrument drawn up between the parties generally may not infrequently come into force only with respect to some of them, owing to the failure of the others to proceed to ratification, acceptance or approval of the instrument. Nevertheless, it considered that there is an essential difference between amending agreements designed to amend a treaty between the parties generally and agreements designed *ab initio* to modify the operation of the treaty as between certain of the parties only, that is, as *inter se* agreements. Although an amending instrument may equally turn out to operate only between certain of the parties, the Commission considered that a clear-cut distinction must be made between the amendment process *stricto sensu* and

---

[98] ST/LEG/6, pp. 130-152.

[99] E. Giraud, *Annuaire de l'Institut de droit international*, vol. 49, tome 1 (1961), pp. 95-103.

[100] C. W. Jenks, *ibid.*, pp. 254-264.

*inter se* agreements modifying the operation of the treaty between a restricted circle of the parties. For this reason, *inter se* agreements are dealt with separately in article 67, while the opening words of the present article underline that it is concerned only with proposals to amend the treaty as between all the parties.

(10) Paragraph 1 provides that every party to a multilateral treaty has the right to be informed of any proposal for its amendment, to take part in the decision as to the action, if any, to be taken in regard to the proposal, and to take part in the conclusion of any agreement designed to amend the treaty. Treaties have often in the past been amended or revised by certain of the parties without consultation with the others.[101] This has led one recent writer [102] to state : " Though they must be consulted if they are to be bound by a new agreement, the parties to a treaty have no general right to take part in all negotiations respecting revision. The question of which States should be invited to join in discussions of revision is practical rather than legal." Endorsing this conclusion, another authority [103] has said : " Practice does not indicate that all the parties to an earlier treaty have any general right to take part in negotiations respecting revision, although they cannot be bound by some new treaty concluded without their participation or consent." Another recent writer [104] has independently arrived at a similar conclusion : " Thus, there is no legal obligation to invite all the original parties to a preparatory conference for a new treaty. Such a rule, if it existed, might be a powerful instrument for preventing disputes, but it would also be a formidable factor of stagnation." Although recognizing that instances have been common enough in which individual parties to a treaty have not been consulted in regard to its revision, the Commission does not think that the State practice leads to the conclusion reached by these writers or that the view expressed by them should be the one adopted by the Commission.

(11) If a group of parties has sometimes succeeded in effecting an amendment of a treaty régime without consulting the other parties, equally States left out of such a transaction have from time to time reacted against the failure to bring them into consultation as a violation of their rights as parties.[105] Moreover, there are also numerous cases where the parties have, as a matter of course, all been consulted. A refusal to bring a particular party or parties into consultation has usually been a political decision taken on political grounds and the question whether it was legally justified in the particular case has been left unresolved. The Commission, however, considers that the very nature of the

legal relation established by a treaty requires that every party should be consulted in regard to any amendment or revision of the treaty. The fact that this has not always happened in the past is not a sufficient reason for setting aside a principle which seems to flow directly from the obligation assumed by the parties to perform the treaty in good faith. There may be special circumstances when it is justifiable not to bring a particular party into consultation, as in the case of an aggressor. But the general rule is believed to be that every party is entitled to be brought into consultation with regard to an amendment of the treaty ; and paragraph 1 of article 66 so states the law.

(12) Paragraph 2 (*a*) is an application to amending instruments of the general rule in article 58 that a treaty does not impose any obligations upon a State not a party to it. Nevertheless, without this paragraph the question might be left open as to whether by its very nature an instrument amending a prior treaty has legal effects for parties to the treaty. Furthermore, the general rule in article 58 is sometimes displaced by a different provision laid down in the original treaty or by a contrary rule applied to treaties concluded within a particular international organization.[106] Article 3 of the Geneva Convention on Road Traffic (1949),[107] for example, provides that any amendment adopted by a two-thirds majority of a conference shall come into force for all parties except those which make a declaration that they do not adopt the amendment. Article 16 of the International Convention to Facilitate the Crossing of Frontiers for Goods Carried by Rail provides for amendments to come into force for all parties unless it is objected to by at least one-third. Article 52 of the IMCO Constitution contains a provision similar to that in the Road Traffic Convention as does also article 22 of the WHO Constitution for regulations adopted by the WHO Assembly. Paragraph 2 (*a*) therefore states that an amending instrument is not binding on a party which has not become a party to it unless a different rule is laid down by the treaty or by the established rules of an international organization. Paragraph 2 (*b*) then provides that the legal effect of amending agreements is governed by the rules regarding the application of treaties having incompatible provisions contained in article 63. Under modern treaty practice, as previously stated, it not infrequently happens that an amending agreement is not ratified by all the parties to the treaty. In that event, there will be two treaties in existence at the same time the provisions of which, *ex hypothesi,* are incompatible and the parties to which are not identical. This is precisely the situation to which paragraphs 4 and 5 of article 63 apply. On the other hand, if all the parties to the treaty become parties also to the amending agreement, then the case will fall under paragraph 3 of that article.

(13) Paragraph 3 deals with the cases, mentioned in previous paragraphs as common in practice, where an agreement, drawn up for the purpose of amending a multilateral treaty generally between the parties, is

---

[101] Well-known examples are the Conventions of 1923, 1928 and 1956 dealing with the status of Tangier, the revision of the Acts of Berlin (1885) and Brussels (1890) by the Treaty of St. Germain, the revision of the Treaty of Lausanne (1923) by the Montreux Convention (1936).

[102] E. C. Hoyt, *The Unanimity Rule in the Revision of Treaties* (1959), p. 250.

[103] P. C. Jessup, in a foreword to E. C. Hoyt's book, at p. VII.

[104] Jean Leca, *Les Techniques de révision des conventions internationales* (1961), p. 204.

[105] e.g., Italy, the Soviet Union, Sweden, Spain, at various times in regard to the revision of one of the Tangier treaties.

[106] See the *Handbook of Final Clauses* (ST/LEG/6), pp. 135-148 ; E. Giraud, *Annuaire de l'Institut de droit international*, vol. 49, tome 1 (1961), pp. 139-149.

[107] United Nations, *Treaty Series*, vol. 125, p. 22.

ratified only by some of them and does not come into force for the others. In principle — and this is recognized in article 63 — when States enter into treaties the provisions of which are incompatible with their obligations under a prior treaty, a question of State responsibility may arise. On the other hand, if a party, having been duly consulted under paragraph 1 of the present article concerning a proposal to amend the treaty, afterwards signs the text of the amending agreement or otherwise clearly indicates that it does not oppose the amendment, it would hardly seem to be entitled afterwards to allege that the bringing into force of the amendment between the States accepting it is a breach of the treaty. Some members hesitated to lay down a specific rule on the point suggesting that the point could be left to be settled on the facts of each case by reference to the general principle *Nemo potest venire contra factum proprium*. The majority, however, considered that the inclusion of a specific provision was desirable having regard to the extent and importance of the modern practice under which an agreement amending a multilateral treaty comes into force between the States accepting it, while the original treaty is left in force unamended in the relations of those States which do not become parties to it. Paragraph 3 therefore provides that a party to a treaty which signs the text of an amending instrument or otherwise clearly indicates that it does not oppose the amendment may not afterwards complain of a breach of the treaty because of the amendment being brought into force between the parties ratifying the amending instrument. The object of the provision is to put into the form of a rule what appears to the majority of the Commission to be the existing understanding in regard to the practice in question and to protect in such cases the position of .parties which in good faith ratify the amending agreement. The provision does not in any other respect affect the rights of a State which does not accept the amendment. The treaty remains in force for it unamended in its relations with all the original parties, including those who have accepted the amendment. It may still invoke its rights under the earlier treaty. It is precluded only from contesting the right of the other parties to bring the amendment into force as between themselves.

### Article 67. Agreements to modify multilateral treaties between certain of the parties only

**1. Two or more of the parties to a multilateral treaty may enter into an agreement to modify the treaty as between themselves alone if :**

> **(a) The possibility of such agreements is provided for by the treaty ; or**
>
> **(b) The modification in question :**
>
>> **(i) Does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations ;**
>>
>> **(ii) Does not relate to a provision derogation from which is incompatible with the effective execution of the objects and purposes of the treaty as a whole ; and**
>>
>> **(iii) Is not prohibited by the treaty.**

**2. Except in a case falling under paragraph 1 (a), the conclusion of any such agreement shall be notified to the other parties to the treaty.**

*Commentary*

(1) This article, as already explained in the commentary to articles 65 and 66, deals not with " amendment " of treaties but with " *inter se* agreements " ; that is, with agreements entered into by some only of the parties to a multilateral treaty and designed *ab initio* to modify it between themselves alone. Clearly, a transaction in which two or a small group of parties set out to modify the treaty between themselves alone without giving the other parties the option of participating in it is on a somewhat different footing from an amending agreement drawn up between the parties generally, even if ultimately they do not all ratify it. For an *inter se* agreement is more likely to have an aim and effect incompatible with the object and purpose of the treaty. History furnishes a number of instances of *inter se* agreements which substantially changed the régime of the treaty and which overrode the objections of interested States. Nor can there be any doubt that the application, and even the conclusion, of an *inter se* agreement incompatible with the objects and purposes of the treaty may raise a question of State responsibility. Under the present article, therefore, the main issue is the conditions under which *inter se* agreements may be regarded as permissible.

(2) Paragraph 1 (a) first states the obvious principle that an *inter se* agreement is permissible if the possibility of such an agreement was provided for in the treaty ; in other words, if " contracting out " was contemplated in the treaty. Then, under paragraph 1 (b), *inter se* agreements are stated to be permissible in other cases only if three conditions are fulfilled. First, the modification must not affect the enjoyment of the rights or the performance of the obligations of the other parties ; that is, it must not prejudice their rights or add to their burdens. Secondly, it must not relate to a provision derogation from which is incompatible with the effective execution of the objects and purposes of the treaty ; for example, an *inter se* agreement modifying substantive provisions of a disarmament or neutralization treaty would be incompatible with its objects and purposes and not permissible under the present article. Thirdly, the modification must not be one prohibited by the treaty, as for example the prohibition on contracting out contained in article 20 of the Berlin Convention of 1908 for the Protection of Literary Property. These conditions are not alternative, but cumulative. The second and third conditions, it is true, overlap to some extent since an *inter se* agreement incompatible with the objects and purposes of the treaty may be said to be impliedly prohibited by the treaty. Nevertheless, the Commission thought it desirable for the principle contained in the second condition to be stated separately ; and it is always possible that the parties themselves might explicitly forbid any *inter se* modifications, thus excluding even minor modifications not caught by the second condition.

(3) Paragraph 2 seeks to add a further protection

to the parties against illegitimate modifications of the treaty by some of the parties through an *inter se* agreement. Unless the treaty itself provides for the possibility of *inter se* agreements, the conclusion of an *inter se* agreement modifying a multilateral treaty between some only of the parties is required by paragraph 2 to be notified to other parties. The Commission was of the opinion that such notification is necessary if the rights of the other parties are to be adequately safeguarded. It recognized that an amending agreement would in due course have to be registered and published. But in most cases there is a considerable time lag before publication of a treaty in the United Nations *Treaty Series* takes place. Indeed, some members would have preferred paragraph 2 to be so worded as to require notification not of the conclusion of an *inter se* agreement but of any proposal to conclude such an agreement. The Commission, however, felt that timely notification of the conclusion of the agreement was sufficient.

### Article 68. Modification of a treaty by a subsequent treaty, by subsequent practice or by customary law

**The operation of a treaty may also be modified :**

(a) **By a subsequent treaty between the parties relating to the same subject matter to the extent that their provisions are incompatible ;**

(b) **By subsequent practice of the parties in the application of the treaty establishing their agreement to an alteration or extension of its provisions ; or**

(c) **By the subsequent emergence of a new rule of customary law relating to matters dealt with in the treaty and binding upon all the parties.**

*Commentary*

(1) Article 68 covers three other cases where the modification of a treaty may be brought about by the common consent of the parties. Paragraph (a) is the case where the parties enter into a subsequent treaty, not designed as an amending agreement, but relating to the same subject-matter and to some extent incompatible with the prior treaty. The second treaty, being a later expression of the will of the parties, prevails in accordance with article 63, paragraph 3, with respect to any matter where the provisions of the two treaties are not compatible ; and, by implication, modifies the earlier treaty to the extent of the incompatibility.

(2) Paragraph (b) is the case where the parties by common consent in fact apply the treaty in a manner inconsistent with its provisions. Subsequent practice in the application of a treaty, as stated in paragraph 13 of the commentary to article 69, is decisive as to the interpretation of a treaty when the practice is consistent, embraces all the parties, and shows their common · understanding regarding the meaning of the treaty. Equally, a consistent practice, embracing all the parties and establishing their common consent to the application of the treaty in a manner different from that laid down in certain of its provisions, may have

the effect of modifying the treaty. In the *Case concerning the Temple of Preah Vihear*,[108] for exemple, the boundary line acted on in practice was not reconciliable with the ordinary meaning of the terms of the treaty, and the effect of the subsequent practice was to amend the treaty. Again, in a recent arbitration between France and the United States regarding the interpretation of an Air Transport Services Agreement the Tribunal, speaking of the subsequent practice of the parties, said :

" This course of conduct may, in fact, be taken into account not merely as a means useful for interpreting the Agreement, but also as something more : that is, as a possible source of a subsequent modification, arising out of certain actions or certain attitudes, having a bearing on the juridical situation of the Parties and on the rights that each of them could properly claim." [109]

And the Tribunal in fact found that the Agreement had been modified in a certain respect by the subsequent practice. Although the line may sometimes be blurred between interpretation and amendment to a treaty through subsequent practice, legally the processes are quite distinct. Accordingly, the effect of subsequent practice in amending a treaty is dealt with in the present article in the section on modification of treaties.

(3) Paragraph (c) is the case where a new rule of customary international law emerges which relates to matters dealt with in the treaty and is binding on all the parties. If a treaty has to be interpreted in the light of the general rules of international law in force at the time of its conclusion in order to establish the meaning of its terms,[110] it also has at any given date to be applied in the light of the law in force at that date. This follows from the principle of the so-called inter-temporal law which, in the context of territorial sovereignty, Judge Huber in the *Island of Palmas* arbitration formulated as follows :

" The same principle which subjects the act creative of a right to the law in force at the time the right arises, demands that the existence of the right, in other words its continued manifestation, shall follow the conditions required by the evolution of the law." [111]

In the law of treaties this means that in the application of a treaty account must at any given time be taken of the " evolution of the law ". A particular instance of the working of this principle already appears in article 45 of part II adopted at the fifteenth session under which a treaty or some of its provisions may become void in consequence of the emergence of a new peremptory norm of international law. Paragraph (c) of the present article formulates the general rule under which a treaty may be modified by the emergence

---

[108] *I.C.J. Reports 1962*, p. 6 ; and see Sir Gerald Fitzmaurice, " The Law and Procedure of the International Court of Justice, 1951-54 ", *British Year Book of International Law*, vol. 33 (1957), pp. 252-253.

[109] Decided at Geneva on 22 December 1963, the arbitrators being R. Ago (President), P. Reuter and H. P. de Vries (mimeographed text of decisions of the Tribunal, pp. 104-105).

[110] See article 69, paragraph 1 (b).

[111] *Reports of International Arbitral Awards*, vol. II, p. 845.

of a new rule of customary law affecting the scope or operation of its provisions.

*Section III. Interpretation of treaties*

### Article 69. General rule of interpretation

**1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to each term :**

   (a) **In the context of the treaty and in the light of its objects and purposes ; and**

   (b) **In the light of the rules of general international law in force at the time of its conclusion.**

**2. The context of the treaty, for the purposes of its interpretation, shall be understood as comprising in addition to the treaty, including its preamble and annexes, any agreement or instrument related to the treaty and reached or drawn up in connexion with its conclusion.**

**3. There shall also be taken into account, together with the context :**

   (a) **Any agreement between the parties regarding the interpretation of the treaty ;**

   (b) **Any subsequent practice in the application of the treaty which clearly establishes the understanding of all the parties regarding its interpretation.**

### Article 70. Further means of interpretation

**Recourse may be had to further means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to verify or confirm the meaning resulting from the application of article 69, or to determine the meaning when the interpretation according to article 69 :**

   (a) **Leaves the meaning ambiguous or obscure ; or**

   (b) **Leads to a result which is manifestly absurd or unreasonable in the light of the objects and purposes of the treaty.**

### Article 71. Terms having a special meaning

**Notwithstanding the provisions of paragraph 1 of article 69, a meaning other than its ordinary meaning may be given to a term if it is established conclusively that the parties intended the term to have that special meaning.**

*Commentary*

(1) The utility and even the existence of rules of international law governing the interpretation of treaties have sometimes been questioned.[112] One commentary on the law of treaties, for example, states :

   " It seems evident that the prescription in advance of hard and fast rules of interpretation . . . contains

an element of danger which is to be avoided. In their context . . . the rules . . . seem eminently reasonable and convincing. The difficulty, however, is that, detached from that context, they still retain a certain fictitious ring of unassailable truth, and tend, as do all neatly turned maxims, to imbed themselves in the mind. The resulting danger is that the interpreter, well versed in such rules, may approach his task with a mind partly made up rather than with a mind open to all evidence which may be brought before him. This is to misconceive the function of interpretation.

   " The process of interpretation, rightly conceived, cannot be regarded as a mere mechanical one of drawing inevitable meanings from the words in a text, or of searching for and discovering some pre-existing specific intention of the parties with respect to every situation arising under a treaty . . . In most instances . . . interpretation involves giving a meaning to a text — not just any meaning which appeals to the interpreter, to be sure, but a meaning which, in the light of the text under consideration and of all the concomitant circumstances of the particular case at hand, appears in his considered judgement to be one which is logical, reasonable, and most likely to accord with and to effectuate the larger general purpose which the parties desired the treaty to serve. This is obviously a task which calls for investigation, weighing of evidence, judgement, foresight, and a nice appreciation of a number of factors varying from case to case. No canons of interpretation can be of absolute and universal utility in performing such a task, and it seems desirable that any idea that they can be should be dispelled." [113]

Similarly, a recent book on the law of treaties states :

   " The many maxims and phrases which have crystallized out and abound in the text books and elsewhere are merely *prima facie* guides to the intention of the parties and must always give way to contrary evidence of the intention of the parties in a particular case." [114]

The first two [115] of the Commission's Special Rapporteurs on the law of treaties in their private writings also expressed doubts as to the existence in international law of any technical rules for the interpretation of treaties.

(2) Another group of writers,[116] although they may have reservations as to the obligatory character of certain of the so-called canons of interpretation, have shown less hesitation in recognizing the existence of some general rules for the interpretation of treaties. To

---

[112] *Ibid.,* p. 946.

[113] Lord McNair, *Law of Treaties* (1961), p. 366.

[114] J. L. Brierly, *Law of Nations* (6th edition, 1963), p. 325. Sir Hersch Lauterpacht, *Rapport à l'Institut de droit international, Annuaire de l'Institut,* vol. 43, tome 1 (1950), pp. 336-374.

[115] For example, C. Rousseau, *Principes généraux du droit international public* (1944), pp. 676 *et seq* ; Sir E. Beckett, *Annuaire de l'Institut de droit international,* vol. 43, tome 1 (1950), pp. 435-444 ; V. M. Chourchalov, *Fundamental Questions in the Theory of International Law* (1959), pp. 382-402 ; C. De Visscher, *Problèmes d'interprétation judiciaire en droit international public* (1963), pp. 50 *et seq.*

---

[111] See Harvard Law School, *Research in International Law,* part III, Law of Treaties (article 19), p. 939.

this group belongs Sir Gerald Fitzmaurice, the previous Special Rapporteur on the law of treaties, who in his private writings [117] deduced six principles from the jurisprudence of the Permanent Court and the International Court which he regarded as the major principles of interpretation. In 1956, the Institute of International Law [118] adopted a resolution in which it formulated, if in somewhat cautious language, two articles containing a small number of basic principles of interpretation.

(3) Writers also differ to some extent in their basic approach to the interpretation of treaties according to the relative weight which they give to :

  (a) The text of the treaty as the authentic expression of the intentions of the parties ;

  (b) The intentions of the parties as a subjective element distinct from the text ; and

  (c) The declared or apparent objects and purposes of the treaty. Some [119] place the main emphasis on the intentions of the parties and in consequence admit a liberal recourse to the *travaux préparatoires* and to other evidence of the intentions of the contracting States as means of interpretation. Some [120] give great weight to the objects and purposes of the treaty and are in consequence more ready, especially in the case of general multilateral treaties, to admit teleological interpretations of the text which go beyond, or even diverge from, the original intentions of the parties as expressed in the text. The majority of modern writers, however, emphasize the primacy of the text as the basis for the interpretation of a treaty, while at the same time giving a certain place to extrinsic evidence of the intentions of the parties and to the objects and purposes of the treaty as means of interpretation. It is this view which is reflected in the 1956 resolution of the Institute of International Law mentioned in the previous paragraph.

(4) The great majority of cases submitted to international adjudication involve the interpretation of treaties, and the jurisprudence of international tribunals is rich in reference to principles and maxims of interpretation.[121] In fact, statements can be found in the decisions of international tribunals to support the use of almost every principle or maxim of which use is made in national systems of law in the interpretation of statutes and contracts.[122] Treaty interpretation is, of course, equally part of the everyday work of Foreign Ministries.

(5) Thus, it would be possible to find sufficient evidence of recourse to principles and maxims in international practice to justify their inclusion in a codification of the law of treaties, if the question were simply one of their relevance on the international plane. But, as appears from the passages cited in paragraph (1) above, the question posed by jurists is rather as to the non-obligatory character of many of these principles and maxims ; and it is a question which arises in national systems of law no less than in international law. They are, for the most part, principles of logic and good sense valuable only as guides to assist in appreciating the meaning which the parties may have intended to attach to the expressions that they employed in a document. Their suitability for use in any given case hinges on a variety of considerations which have first to be appreciated by the interpreter of the document ; the particular arrangement of the words and sentences, their relation to each other and to other parts of the document, the general nature and subject-matter of the document, the circumstances in which it was drawn up, etc. Even when a possible occasion for their application may appear to exist, their application is not automatic but depends on the conviction of the interpreter that it is appropriate in the particular circumstances of the case. In other words, recourse to many of these principles is discretionary rather than obligatory and the interpretation of documents is to some extent an art, not an exact science.

(6) Any attempt to codify the conditions of the application of those principles of interpretation whose appropriateness in any given case depends on the particular context and on a subjective appreciation of varying circumstances would clearly be inadvisable for the reasons given in the passage cited in paragraph (1). Accordingly the Commission confined itself to trying to isolate and codify the comparatively few general principles which appear to constitute general rules for the interpretation of treaties. Admittedly, the task of formulating even these rules is not easy, but the Commission considered that there were cogent reasons why it should be attempted. First, the interpretation of treaties in good faith and according to law is essential if the *pacta sunt servanda* rule is to have any real meaning. Secondly, having regard to doctrinal differences concerning methods of interpretation, it seems desirable that the Commission should take a clear position in regard to the role of the text in treaty interpretation. Thirdly, a number of articles provisionally adopted by the Commission contain phrases such as " unless a contrary intention appears from the treaty " and the effect of these reservations cannot be properly appreciated if no indication is given in the draft articles as to whether this intention must appear on the face of the text or whether it may be established by reference to other

[117] " The Law and Procedure of the International Court of Justice 1951-54 ", *British Year Book of International Law*, vol. 33 (1957), pp. 210-212.

[118] *Annuaire de l'Institut de droit international*, vol. 46 (1956), p. 359.

[119] For example, Sir Hersch Lauterpacht, *Annuaire de l'Institut de droit international*, vol. 43, tome I (1950), pp. 377-402.

[120] For example, L. Cavaré, *Le droit international public positif*, 2nd edition (1962), vol. II, p. 112 ; Judge Alvarez in the *Reservations to the Genocide Convention Case, I.C.J. Reports 1951*, p. 53.

[121] See Sir Gerald Fitzmaurice, *British Year Book of International Law*, vol. 28 (1951), p. 1, and vol. 33 (1957), p. 203 ; C. Rousseau, *Principes généraux du droit international public* (1944), pp. 676-764 ; and V. D. Degan, *L'interprétation des accords en droit international* (1963), pp. 76-148.

[122] See G. Hackworth, *Digest of International Law*, vol. 5, pp. 232-234 ; C. De Visscher, *Problèmes d'interprétation judiciaire* (1963), pp. 84-92 and 104-113 ; Lord McNair, *Law of Treaties* (1961), chapters 20-22.

evidence. In addition, the establishment of some measure of agreement in regard to the basic rules of interpretation is important not only for the application but also for the drafting of treaties.

(7) The Commission adopted three articles dealing generally with the interpretation of treaties, namely articles 69-71, the texts of which are set out at the head of the present commentary,[123] and two further articles dealing with treaties which have plurilingual texts (see articles 72 and 73 below). Some writers in their exposition of the principles of treaty interpretation distinguish between law-making and other treaties.[124] It is true that the character of a treaty may affect the question whether the application of a particular principle, maxim or method of interpretation is suitable in a particular case.[125] But for the purpose of formulating the general rules of interpretation the Commission did not think it necessary to make any other distinction between different categories of treaties other than that between unilingual and plurilingual treaties.[126]

(8) In examining the above-mentioned general rules the Commission considered whether the principle expressed in the maxim *Ut res magis valeat quam pereat*, often referred to as the principle of effective interpretation, should be formulated as one of them.[127] It recognized that in certain circumstances recourse to the principle may be appropriate and that it has sometimes been invoked by the Court. In the *Corfu Channel* case,[128] for example, in interpreting a Special Agreement the Court said :

"It would indeed be incompatible with the generally accepted rules of interpretation to admit that a provision of this sort occurring in a special agreement should be devoid of purport or effect."

And it referred to a previous decision of the Permanent Court to the same effect in the *Free Zones* case.[129] The Commission, however, took the view that, in so far as the maxim *Ut res magis valeat quam pereat* reflects a true general rule of interpretation, it is embodied in article 69, paragraph 1, which requires that a treaty shall be interpreted in good faith in accordance

with the ordinary meaning to be given to its terms in the context of the treaty and in the light of its objects and purposes. When a treaty is open to two interpretations one of which does and the other does not enable the treaty to have appropriate effects, good faith and the objects and purposes of the treaty demand that the former interpretation should be adopted. Properly limited and applied, the maxim does not call for an " extensive " or " liberal " interpretation in the sense of an interpretation going beyond what is expressed or necessarily to be implied in the terms of the treaty.[130] Accordingly, it did not seem to the Commission that there was any need to include a separate provision on this point. Moreover, to do so might encourage attempts to extend the meaning of treaties illegitimately on the basis of the so-called principle of " effective interpretation ". The Court, which has by no means adopted a narrow view of the extent to which it is proper to imply terms in treaties, has nevertheless insisted that there are definite limits to the use which may be made of the principle *Ut res magis valeat* for this purpose. In the *Interpretation of the Peace Treaties* Opinion [131] it said :

"The principle of interpretation expressed in the maxim : *Ut res magis valeat quam pereat*, often referred to as the rule of effectiveness, cannot justify the Court in attributing to the provisions for the settlement of disputes in the Peace Treaties a meaning which . . . would be contrary to their letter and spirit."

And it emphasized that to adopt an interpretation which ran counter to the clear meaning of the terms would not be to interpret but to revise the treaty. The draft articles do not therefore contain any separate provision regarding the principle of " effective interpretation ".

## Article 69

(9) This article is based on the view that the text must be presumed to be the authentic expression of the intentions of the parties ; and that, in consequence, the starting point of interpretation is the elucidation of the meaning of the text, not an investigation *ab initio* into the intentions of the parties. The Institute of International Law adopted this — the textual — approach to treaty interpretation, despite its first Rapporteur's [132] strong advocacy of a more subjective, " intentions of the parties ", approach. The objections to giving too large a place to the intentions of the parties as an independent basis of interpretation find expression in the proceedings of the Institute.[133] The textual approach, on the

---

[123] See also the formulation of general rules of treaty interpretation by the Institute of International Law, *Annuaire*, vol. 46 (1956), pp. 364-365, and by Sir Gerald Fitzmaurice, *British Year Book of International Law*, vol. 33 (1957) pp. 211-212.

[124] For example C. Rousseau, *Principes généraux du droit international public* (1944), p. 677.

[125] For example, the *contra proferentem* principle or the use of *travaux préparatoires*.

[126] For the special problem of the effect of the subsequent practice of an international organization on the interpretation of its constituent instrument, see paragraph (14) of the present commentary.

[127] See generally C. Rousseau, *Principes généraux du droit international public* (1944), pp. 680-688 ; V. D. Degan, *L'interprétation des accords en droit international* (1963), pp. 103-106 ; C. De Visscher, op. cit., pp. 84-92.

[128] *I.C.J. Reports 1949*, p. 24.

[129] *P.C.I.J.* (1929), Series A, No. 22, p. 13 ; cf. *Acquisition of Polish Nationality, P.C.I.J.* (1923), Series B, No. 7, pp. 16-17 and *The Exchange of Greek and Turkish Populations, P.C.I.J.* (1925), Series B, No. 10, p. 25.

[130] See C. De Visscher, *Problèmes d'interprétation judiciaire en droit international public* (1963), pp. 87-88 ; Sir Hersch Lauterpacht, *The Development of International Law by the International Court* (1958), p. 229.

[131] *I.C.J. Reports 1950*, p. 229.

[132] Sir Hersch Lauterpacht. At the final discussion on the subject in 1956 Sir Hersch Lauterpacht, having been elected to the Court, was replaced by Sir Gerald Fitzmaurice who, in common with the majority of the members favoured the textual approach.

[133] See in particular Sir E. Beckett, *Annuaire*, vol. 43, tome 1 (1950), pp. 435-444 ; Max Huber, *Annuaire*, vol. 44, tome 1 (1952), pp. 198-202 ; and the deliberations in *Annuaire, ibid.*, tome 2, pp. 369-382.

other hand, commends itself by the fact that, as one authority [134] has put it, " *le texte signé est, sauf de rares exceptions, la seule et la plus récente expression de la volonté commune des parties* ". Moreover, the jurisprudence of the Court contains many pronouncements from which it is permissible to conclude that the textual approach to treaty interpretation is regarded by it as established law.[135] In particular, the Court has more than once stressed that it is not the function of interpretation to revise treaties or to read into them what they do not, expressly or by necessary implication, contain.[136]

(10) Paragraph 1 contains four separate principles. The first — interpretation in good faith — flows directly from the rule *pacta sunt servanda*. The second principle is the very essence of the textual approach : the parties are to be presumed to have that intention which appears from the ordinary meaning of the terms used by them. The third principle is one both of common sense and good faith : the ordinary meaning of a term is not to be determined in the abstract but in the context of the treaty and in the light of its objects and purposes. These principles have repeatedly been affirmed by the Court.[137] The present Court in its Opinion on the *Competence of the General Assembly regarding admission to the United Nations* said : [138]

" The Court considers it necessary to say that the first duty of a tribunal which is called upon to interpret and apply the provisions of a treaty, is to endeavour to give effect to them in their natural and ordinary meaning in the context in which they occur. If the relevant words in their natural and ordinary meaning make sense in their context, that is an end of the matter."

And the Permanent Court in an early Opinion [139] stressed that the context is not merely the article or section of the treaty in which the term occurs, but the treaty as a whole :

" In considering the question before the Court upon the language of the Treaty, it is obvious that the Treaty must be read as a whole, and that its meaning is not to be determined merely upon particular phrases which, if detached from the context, may be interpreted in more than one sense."

Again the Court has more than once had recourse to the statement of the objects and purposes of the treaty

in the preamble in order to interpret a particular provision.[140]

(11) The fourth principle is the application to treaties of the " inter-temporal " law which, in the words of M. Huber in the *Island of Palmas* arbitration, requires that :

" . . . a juridical fact must be appreciated in the light of the law contemporary with it, and not of the law in force at the time when a dispute in regard to it arises or falls to be settled." [141]

Instances of the application of this principle to treaties are to be found in the *Grisbadarna* [142] and in the *North Atlantic Coast Fisheries* [143] arbitrations. In the former the land boundary between Norway and Sweden had been established by treaty in the seventeenth century. Disputes having arisen in the present century concerning certain fisheries, it became necessary to delimit the course of the boundary seaward to the limit of territorial waters. The Tribunal rejected the medianline and thalweg principles for delimiting the maritime boundary on the ground that these principles had not been recognized in the international law of the seventeenth century. Instead, it adopted a line perpendicular to the general direction of the land as being more in accord with the "notions of law prevailing at that time". Similarly in the *North Atlantic Coast Fisheries* arbitration the Treaty of Ghent of 1818 had excluded United States nationals from fishing in Canadian " bays ", and thereafter disputes arose as to what exactly was the extent of the waters covered by the word " bays ". The Tribunal, in interpreting the language of the 1818 Treaty, excluded from its consideration the so-called ten-mile rule for bays [144] which had not made its appearance in international practice until twenty-one years after the conclusion of the treaty.[145] Again when called upon to construe the expression " any dispute " in treaties of 1787 and 1836 in the *Rights of Nationals of the USA in Morocco* [146] case, the International Court said : " . . . it is necessary to take into account the meaning of the word ' dispute ' at the times when the two treaties were concluded ". Accordingly, paragraph 1 (*b*) provides that the meaning to be given to the terms of a treaty is to be appreciated in the light of the general rules of international law in force at the time of the conclusion of the treaty. Some members of the Commission, while accepting that the initial meaning of the terms of a treaty is governed by the law

[134] Max Huber, *Annuaire de l'Institut de droit international*, vol. 44, tome 1 (1952), p. 199.

[135] See examples in V. D. Degan, *L'interprétation des accords en droit international* (1963), pp. 79-83 ; and Fitzmaurice in *British Year Book of International Law*, vol. 28 (1951), pp. 10-11 and vol. 33 (1957), pp. 212-214.

[136] For example, in the *United States Nationals in Morocco Case*, *I.C.J. Reports 1952*, pp. 196 and 199.

[137] See instances cited in V. D. Degan, *L'interprétation des accords en droit international* (1963), pp. 96-98 ; and in *British Year Book of International Law*, vol. 28 (1951), pp. 10-11 and 18.

[138] *I.C.J. Reports 1950*, p. 8.

[139] *Competence of the ILO to Regulate Agricultural Labour*, *P.C.I.J.* (1922), Series B, Nos. 2 and 3, p. 23 ; and see Lord McNair, *Law of Treaties* (1961), pp. 381-382.

[140] For example, *United States Nationals in Morocco Case*, *I.C.J. Reports 1952*, pp. 183-184 and pp. 197-198.

[141] *Reports of International Arbitral Awards*, vol. II, p. 845.

[142] *Ibid.*, vol. XI, pp. 159-160. English translation in J. B. Scott, *The Hague Court Reports* (1916), p. 129.

[143] *Ibid.*, vol. XI, p. 196.

[144] " So-called " because in the *Anglo-Norwegian Fisheries* case the International Court rejected the pretensions of this " rule " to be a customary rule of international law ; *I.C.J. Reports 1951*, p. 131.

[145] Cf. the *Abu Dhabi Arbitration* (*International Law Reports*, 1951, p. 144), where Lord Asquith, as arbitrator, refused to interpret an oil concession granted in 1938 by reference to the continental shelf doctrine which only made its appearance in international law a few years later.

[146] *I.C.J. Reports 1952*, p. 189.

in force at the time of its conclusion, considered that the interpretation of the treaty may be affected by changes in the general rules of international law; and they would have preferred to omit the words " in force at the time of its conclusion ". The majority, however, considered that the effect of changes in the law upon a treaty is rather a question of the application of the new law to the treaty — a question of the modification of the rule laid down in the treaty by a later legal rule rather than one of the interpretation of the terms. They recognized that the " scope " of a term may sometimes be altered by a change in the law. For example, if it appears from a treaty that the parties have used terms such as " bay " or " piracy " intending them to have whatever meaning they may be given in general international law, a change in the law will affect the scope of the terms. But the majority considered that whether a change in the law will have this effect depends on the initial intention of the parties in using the terms and that the effect of the change in the law should be regarded as a matter of the application of the law rather than of a rule of interpretation. They preferred in the present article to confine the statement of the rules of interpretation to those dealing with the establishment of the initial meaning of the terms. They felt that the question of the impact of a change in the general rules of international law upon a treaty is sufficiently covered by article 68, paragraph 3, which deals with the modification of treaties by the emergence of new rules of international law.

(12) Paragraph 2 seeks to define what is comprised in the " context of the treaty as a whole " for the purposes of interpretation. This is important not only for the general application of the rules of interpretation but also, as pointed out above, for indicating the scope of the term " unless it appears from the treaty " which is found, in one form or another, quite frequently in these draft articles. That the preamble forms part of a treaty for purposes of interpretation is too well settled to require comment; and this would seem also to be the case with documents which are specifically made annexes to the treaty.[147] More difficult is the question how far other documents connected with the treaty are to be regarded as forming part of the " context of the treaty " for the purposes of interpretation. Paragraph 2 proposes that documents which should be so regarded are agreements and instruments related to the treaty and reached or drawn up in connexion with its conclusion. This is not to suggest that these documents are necessarily to be considered as an integral part of the treaty. Whether they are an actual part of the treaty depends on the intention of the parties in each case.[148] What is proposed in paragraph 2 is that, for purposes of interpreting the treaty, these categories of documents should not be treated as mere evidence to which recourse may be had for the purpose of resolving an ambiguity or obscurity but as part of the context for the purpose of arriving at the ordinary meaning of the terms of the treaty.

(13) Paragraph 3 specifies as further authentic elements of interpretation: (a) agreements between the parties regarding the interpretation of the treaty, and (b) any subsequent practice in the application of the treaty which clearly established the understanding of all the parties regarding its interpretation. As to agreements, a question of fact may sometimes arise as to whether an understanding reached during the negotiations concerning the meaning of a provision is or is not intended to constitute an agreed basis for its interpretation.[149] But it is well settled that when an agreement as to the interpretation of a provision is established as having been reached before or at the time of the conclusion of the treaty, it is to be regarded as forming part of the treaty. Thus, in the *Ambatielos* case [150] the Court said: " ... the provisions of the Declaration are in the nature of an interpretation clause, and, as such, should be regarded as an integral part of the Treaty ... ". Similarly, an agreement as to the interpretation of a provision reached after the conclusion of the treaty represents an authentic interpretation by the parties which must be read into the treaty for purposes of its interpretation. As to subsequent practice in the application of the treaty, its importance as an element of interpretation is obvious; [151] for it constitutes objective evidence of the understanding of the parties as to the meaning of the treaty.[152] Recourse to it as a means of interpretation is well established in the jurisprudence of international tribunals.[153] In its opinion on the *Competence of the ILO* [154] the Permanent Court said:

> " If there were any ambiguity, the Court might, for the purpose of arriving at the true meaning, consider the action which has been taken under the Treaty."

At the same time, the Court [155] referred to subsequent practice in confirmation of the meaning which it had deduced from the text and which it considered to be unambiguous. Similarly, in the *Corfu Channel* case,[156] the International Court said:

---

[147] See C. Rousseau, *Principes généraux du droit international public* (1944), pp. 717-719.

[148] *Ambatielos Case (Preliminary Objection), I.C.J. Reports 1952*, pp. 43 and 75.

[149] Cf. the *Conditions of Admission to Membership* case, *I.C.J. Reports 1948*, p. 63.

[150] (Preliminary Objection), *I.C.J. Reports 1952*, p. 44.

[151] See Lord McNair, *Law of Treaties* (1961), chapter 24; C. De Visscher, *Problèmes d'interprétation judiciaire en droit international public* (1963), pp. 121-127.

[152] See Sir Gerald Fitzmaurice, *British Year Book of International Law*, vol. 33 (1957), p. 223. In the *Russian Indemnity* case the Permanent Court of Arbitration said: " ... l'exécution des engagements est, entre Etats, comme entre particuliers, le plus sûr commentaire du sens de ces engagements." *Reports of International Arbitral Awards*, vol. XI, p. 433. [" ... the fulfilment of engagements between States, as between individuals, is the surest commentary on the effectiveness of those engagements." English translation from J. B. Scott, *The Hague Court Reports* (1916), p. 302].

[153] See examples in Lord McNair, *Law of Treaties* (1961), chapter 24; C. De Visscher, op. cit., pp. 121-127 and V. D. Degan, *L'interprétation des accords en droit international* (1963), pp. 130-132.

[154] *P.C.I.J.* (1922), Series B, No. 2, p. 39; see also *Interpretation of the Treaty of Lausanne*, P.C.I.J. (1925), Series B, No. 2, p. 24; the *Brazilian Loans* case, *P.C.I.J.* (1929), Series A, Nos. 20-21, p. 119.

[155] *Ibid.*, pp. 40-41.

[156] *I.C.J. Reports 1949*, p. 25.

" The subsequent attitude of the Parties shows that it has not been their intention, by entering into the Special Agreement, to preclude the Court from fixing the amount of the compensation."

The value of subsequent practice varies according as it shows the common understanding of the parties as to the meaning of the terms. The practice of an individual State may, it is true, have special relevance when it relates to the performance of an obligation which particularly concerns that State. Thus in the *Status of South West Africa* Opinion [157] the Court said :

" Interpretations placed upon legal instruments by the parties to them, though not conclusive as to their meaning, have considerable probative value when they contain recognition by a party of its own obligations under an instrument."

But, in general, the practice of an individual party or of only some parties as an element of interpretation is on a quite different plane from a concordant practice embracing all the parties and showing their common understanding of the meaning of the treaty. Subsequent practice of the latter kind evidences the agreement of the parties as to the interpretation of the treaty and is analogous to an interpretative agreement. For this reason the Commission considered that subsequent practice establishing the common understanding of all the parties regarding the interpretation of a treaty should be included in paragraph 3 as an authentic means of interpretation alongside interpretative agreements. The practice of individual States in the application of a treaty, on the other hand, may be taken into account only as one of the " further " means of interpretation mentioned in article 70.

(14) In examining the question of subsequent practice the Commission noted that certain of the cases in which the Court had had recourse to this means of interpretation have concerned the interpretation of the constitutions of international organizations,[158] as for example in its recent Opinion on *Certain Expenses of the United Nations,*[159] where it made large use of the subsequent practice of organs of the United Nations as a basis for its findings on a number of points. The problem of the effect of the practice of organs of an international organization upon the interpretation of its constituent instrument raises the question how far individual Member States are bound by the practice. Although the practice of the organ as such may be consistent, it may have been opposed by individual Members or by a group of Members which have been outvoted.[160] This special problem appears to relate to the law of international organizations rather than to the general law of treaties, and the Commission did not consider that it would be appropriate to deal with it in the present articles.

*Article 70*

(15) The International Court, and the Permanent Court before it, have frequently stated that where the ordinary meaning of the words is clear and makes sense in the context, there is no occasion to have recourse to other means of interpretation. Many of these statements relate to the use of *travaux préparatoires.* The passage from the Court's Opinion on the *Competence of the General Assembly regarding Admission to the United Nations* cited in paragraph (10) above is one example, and another is its earlier Opinion on *Admission of a State to the United Nations* : [161]

" The Court considers that the text is sufficiently clear ; consequently it does not feel that it should deviate from the consistent practice of the Permanent Court of International Justice, according to which there is no occasion to resort to preparatory work if the text of a convention is sufficiently clear in itself."

Similarly, the Court has refused to apply the maxim *Ut res magis valeat* and the principle favouring restrictive interpretation when to do so would run counter to a clear meaning.[162] The Commission accordingly considered whether it should limit recourse to means of interpretation outside those mentioned in article 69 to cases where interpretation of the treaty in accordance with article 69 gives either no clear meaning or a meaning which is wholly unreasonable. As already indicated, the Commission's approach to treaty interpretation was on the basis that the text of the treaty must be presumed to be the authentic expression of the intentions of the parties, and that the elucidation of the meaning of the text rather than an investigation *ab initio* of the supposed intentions of the parties constitutes the object of interpretation. It formulated article 69 on that basis, making the ordinary meaning of the terms, the context of the treaty, its objects and purposes, and the general rules of international law, together with authentic interpretations by the parties, the primary criteria for interpreting a treaty. Nevertheless, it felt that it would be unrealistic and inappropriate to lay down in the draft articles that no recourse whatever may be had to extensive means of interpretation, such as *travaux préparatoires,* until after the application of the rules contained in article 69 has disclosed no clear or reasonable meaning. In practice, international tribunals, as well as States and international organizations, have recourse to subsidiary means of interpretation, more especially *travaux préparatoires,* for the purpose of verifying or confirming the meaning that appears to result from an interpretation of the treaty in accordance with article 69. The Court itself has on numerous occasions referred to the *travaux préparatoires* for the purpose of confirming its conclusions as to the "ordinary" meaning of the text. For example, in its opinion on the *Interpretation of the Convention of*

[157] *I.C.J. Reports 1950,* pp. 135-136.

[158] For example, *The Competence of the ILO,* Opinions, *P.C.I.J.* (1922), Series B, Nos. 2 and 3, pp. 38-40 ; *Competence of the General Assembly regarding Admission, I.C.J. Reports 1950,* p. 9 ; *Composition of the Maritime Safety Committee of IMCO, I.C.J. Reports 1960,* pp. 167 *et seq.*

[159] *I.C.J. Reports 1962,* pp. 157 *et seq.*

[160] This question is examined in the separate opinion of Judge Spender in the *Expenses* case (pp. 187 *et seq.*) ; and also, although less directly, by Judge Fitzmaurice (pp. 201 *et seq.*).

[161] *I.C.J. Reports 1948,* p. 63.

[162] For example, *The interpretation of the Peace Treaties* (second phase), *I.C.J. Reports 1950,* p. 229 ; the *Wimbledon,. P.C.I.J.* (1923), Series A, No. 1, pp. 24-25.

*1919 concerning the Work of Women by Night*[168]
the Permanent Court said :

> " The preparatory work thus confirms the conclusion reached on a study of the text of the Convention that there is no good reason for interpreting article 3 otherwise than in accordance with the natural meaning of the words."

(16) Accordingly, the Commission decided to specify in article 70 that recourse to further means of interpretation, including preparatory work, is permissible for the purpose of verifying or confirming the meaning resulting from the application of article 69 and for the purpose of determining the meaning when the interpretation according to article 69 :

   (a) Leaves the meaning ambiguous or obscure ; or

   (b) Leads to a result which is manifestly absurd or unreasonable.

The word " further " emphasizes that article 70 does not provide for alternative, autonomous means of interpretation but only for means to supplement an interpretation governed by the principles contained in article 69. Sub-paragraph (a) admits the use of these means for the purpose of determining the meaning in cases where there is no clear meaning. Sub-paragraph (b) does the same in cases where interpretation according to article 69 gives a meaning which is " manifestly absurd or unreasonable in the light of the objects and purposes of the treaty ". The Court has recognized[164] this exception to the rule that the ordinary meaning of the terms must prevail. On the other hand, the comparative rarity of the cases in which it has done so and the language which it used in the most recent instance — the *South-West Africa* Cases — suggest that it regards this exception as limited to cases where the absurd or unreasonable character of the " ordinary " meaning is manifest. In the *South-West Africa* Cases,[165] dealing with the contention that today there is no such thing as " another Member for the League " for the purposes of the South West Africa Mandate, the Court said :

> " This contention is claimed to be based upon the natural and ordinary meaning of the words employed in the provision. But this rule of interpretation is not an absolute one. Where such a method of interpretation results in a meaning incompatible with the spirit, purpose and context of the clause or instrument in which the words are contained, no reliance can be validly placed on it."

The Commission considered that the exception must be strictly limited, if it is not to weaken unduly the authority of the ordinary meaning of the terms. Sub-paragraph (b) is accordingly confined to cases where interpretation under article 69 gives a result which is manifestly absurd or unreasonable in the light of the objects and purposes of the treaty.

(17) The Commission did not think that anything would be gained by trying to define *travaux préparatoires* ; indeed, to do so might only lead to the possible exclusion of relevant evidence.[166] It also considered whether, in regard to multilateral treaties, the article should authorize the use of *travaux préparatoires* only as between States which took part in the negotiations or, alternatively, only if they have been published. In the *River Oder Commission* Case the Permanent Court excluded from its consideration the *travaux préparatoires* of certain provisions of the Treaty of Versailles on the ground that three of the States before the Court had not participated in the conference which prepared the Treaty of Versailles ; and in making this ruling it expressly refused to differentiate between published and unpublished documents. The Commission doubted, however, whether this ruling reflects the actual practice regarding the use of *travaux préparatoires* in the case of multilateral treaties that are open to accession by States which did not attend the conference at which they were drawn up.[167] Moreover, the principle behind the ruling did not seem to be so compelling as might appear from the language of the Court in that case. A State acceding to a treaty in the drafting of which it did not participate is perfectly entitled to request to see the *travaux préparatoires*, if it wishes, before acceding. Nor did the rule seem likely to be practically convenient, having regard to the many important multilateral treaties open generally to accession. These considerations apply to unpublished, but accessible, *travaux préparatoires* as well as to published ones ; and in the case of bilateral treaties or " closed " treaties between small groups of States, unpublished *travaux préparatoires* will usually be in the hands of all the parties. Accordingly, the Commission concluded that it should not include any special provision in the article regarding the use of *travaux préparatoires* in the case of multilateral treaties.

*Article 71*

(18) Article 71 admits as an exception to the ordinary meaning rule laid down in article 69 cases where it is established conclusively that the parties employed a particular term. Some members doubted the need to include a special provision on this point, although they recognized that parties to a treaty not infrequently employ a term with a technical or other special meaning. They pointed out that technical or special use of the term normally appears from the context and the technical or special meaning becomes, as it were, the ordinary meaning in the particular context. Other members, while not disputing that the technical or special meaning of the term may often appear from the context, considered that there was a certain utility in laying down a specific rule on the point, if only to emphasize that the burden of proof lies on the party invoking the special meaning of the term, and the strictness of the proof required. They pointed out that the exception had been referred to more than once by

---

[168] *P.C.I.J.* (1932), Series A/B, No. 50, p. 380 ; cf. the *Serbian and Brazilian Loans* cases, *P.C.I.J.* (1929), Series A, Nos. 20-21, p. 30.

[164] For example, *Polish Postal Service in Danzig, P.C.I.J.* (1925), Series B, No. 11, p. 39 ; *Competence of the General Assembly regarding Admission to the United Nations, I.C.J. Reports 1950*, p. 8.

[165] *I.C.J. Reports 1962*, pp. 335-336.

[166] *P.C.I.J.* (1929), Series A, No. 23.

[167] See S. Rosenne, " Travaux préparatoires ", *International and Comparative Law Quarterly*, vol. 12 (1963), p. 1378-1383.

the Court. In the *Legal Status of Eastern Greenland* case, for example, the Permanent Court had said :

" The geographical meaning of the word ' Greenland ' i.e., the name which is habitually used in the maps to denominate the whole island, must be regarded as the ordinary meaning of the word. If it is alleged by one of the Parties that some unusual or exceptional meaning is to be attributed to it, it lies on that Party to establish its contention." [168]

And the present Court in its *Admission to the United Nations* Opinion both recognized the rule and the strictness of the proof required :

" To warrant an interpretation other than that which ensues from the natural meaning of the words, a decisive reason would be required which has not been established." [169]

The present article thus reflects the position taken by the Court on this point.

### Article 72. Treaties drawn up in two or more languages

**1. When the text of a treaty has been authenticated in accordance with the provisions of article 7 in two or more languages, the text is authoritative in each language, except in so far as a different rule may be agreed upon by the parties.**

**2. A version drawn up in a language other than one of those in which the text of the treaty was authenticated shall also be authoritative and be considered as an authentic text if :**

**(a) The parties so agree ; or**

**(b) The established rules of an international organization so provide.**

### Article 73. Interpretation of treaties having two or more texts

**1. The different authentic texts of a treaty are equally authoritative in each language, unless the treaty itself provides that, in the event of divergence, a particular text shall prevail.**

**2. The terms of a treaty are presumed to have the same meaning in each text. Except in the case referred to in paragraph 1, when a comparison between two or more authentic texts discloses a difference in the expression of a term and any resulting ambiguity or obscurity is not removed by the application of articles 69-72, a meaning which so far as possible reconciles the different texts shall be adopted.**

#### Commentary

(1) The phenomenon of treaties drawn up in two or more languages has become increasingly familiar since 1919 and, with the advent of the United Nations, general multilateral treaties drawn up, or finally ex-pressed, in five different languages have become not uncommon.[170] When a treaty is plurilingual, there may or may not be a difference in the status of the different language versions for the purposes of interpretation. Each of the versions may have the status of an authentic text of the treaty ; or one or more of them may be merely an " official text ", that is, a text which has been signed by the negotiating States but not accepted as authoritative ; [171] or one or more of them may be merely an " official translation ", that is, a translation prepared by the parties or an individual government or by an organ of an international organization. Whenever there are two or more texts, a question may arise either as to what is the effect of a plurality of authentic texts on the interpretation of the treaty, or as to what recourse may be had to an official text or translation as an aid to the interpretation of the authentic text or texts of the treaty.[172]

#### Article 72

(2) The first need clearly is to establish which of the different language versions are to be regarded as authentic texts and it is this point with which article 72 deals. Today the majority of more formal treaties contain an express provision determining the status of the different language versions. If there is no such provision, it seems to be generally accepted that each of the versions in which the text of the treaty was " drawn up " is to be considered authentic, and therefore authoritative for purposes of interpretation.[173] In other words, the general rule is the equality of the languages and the equal authenticity of the texts in the absence of any provision to the contrary. In formulating this general rule, paragraph 1 refers to languages in which the text of the treaty has been " authenticated " rather than " drawn up " or " adopted ". This is to take account of article 7 of the present articles in which the Commission recognized " authentication of the text " as a distinct procedural step in the conclusion of a treaty even although, in the case of authentication by signature, the act of authentication may also have other functions.[174]

(3) The proviso " except in so far as a different rule may be agreed upon by the parties " is necessary for two reasons. First, treaties sometimes provide expressly that only certain texts are to be authoritative, as in the case of the Peace Treaties concluded after the Second World War which make the French, English and Russian texts authentic while leaving the Italian,

---

[168] *P.C.I.J.* (1933), Series A/B, No. 53, p. 49.

[169] *I.C.J. Reports 1947-1948*, p. 63.

[170] The Commission requested the Secretariat to furnish further information regarding the practice of the United Nations in drawing up the texts of multilingual instruments.

[171] For example, the Italian text of the Treaty of Peace with Italy is " official ", but not " authentic ", since article 90 designates only the French, English and Russian texts as authentic.

[172] See generally the valuable study by J. Hardy, " The Interpretation of Plurilingual Treaties by International Courts and Tribunals ", *British Year Book of International Law*, vol. 37 (1961), pp. 72-155.

[173] Lord McNair, *Law of Treaties* (1961), p. 61 ; L. Ehrlich, " L'interprétation des traités ", *Recueil des Cours de l'Académie de droit international*, vol. 24 (1928), vol. IV, p. 98.

[174] See the commentary to article 7.

Bulgarian, Hungarian, etc. texts merely " official ".[175] Indeed, cases have been known where one text has been made authentic between some parties and a different text between others.[176] Secondly, a plurilingual treaty may provide that in the event of divergence between the texts a specified text is to prevail. Indeed, it is not uncommon for a treaty between two States, because the language of one is not well understood by the other or because neither State wishes to recognize the supremacy of the other's language, to agree upon a text in a third language and designate it as the authoritative text in case of divergence. A recent example is the Treaty of Friendship concluded between Japan and Ethiopia in 1957 [177] in Japanese, Amharic and French, article 6 of which makes the French text authentic *en cas de divergence d'interprétation*. A somewhat special case was that of the Peace Treaties of St. Germain, Neuilly and Trianon, which were drawn up in French, English and Italian and which provided that in case of divergence the French text should prevail, except with regard to parts I and XII, containing respectively the Covenant of the League of Nations and the articles concerning the International Labour Organisation.

(4) Paragraph 2 covers the case of a version of the treaty which is not " authenticated " as a text in the sense of article 7, but which is nevertheless prescribed by the treaty or accepted by the parties as authentic for purposes of interpretation. For example, a boundary treaty of 1897 between Great Britain and Ethiopia was drawn up in English and Amharic and it was stated that both texts were to be considered authentic,[178] but a French translation was annexed to the treaty which was to be authoritative in the event of a dispute. Paragraph 2 also provides for the possibility that, when a treaty is concluded within an organization, the established rules of the organization may prescribe that texts shall be prepared in other official languages of the organization and be considered authentic.[179]

### Article 73

(5) The plurality of the authentic texts of a treaty is always a material factor in its interpretation, since both or all the texts authoritatively state the terms of the agreement between the parties. But it needs to be stressed that in law there is only one treaty — one set of terms accepted by the parties and one common intention with respect to those terms — even when two authentic texts appear to diverge. In practice, the existence of authentic texts in two or more languages

sometimes complicates and sometimes facilitates the interpretation of a treaty. Few plurilingual treaties containing more than one or two articles are without some discrepancy between the texts. The different genius of the languages, the absence of a complete *consensus ad idem*, lack of sufficient time to co-ordinate the texts or unskilful drafting may result in minor or even major discrepancies in the meaning of the texts. In that event the plurality of the texts may be a serious additional source of ambiguity or obscurity in the terms of the treaty. On the other hand, when the meaning of terms is ambiguous or obscure in one language but it is clear and convincing as to the intentions of the parties in another, the plurilingual character of the treaty facilitates interpretation of the text the meaning of which is doubtful.

(6) The existence of more than one authentic text clearly introduces a new element — comparison of the texts — into the interpretation of the treaty. But it does not involve a different system of interpretation. Plurilingual in expression, the treaty remains a single treaty with a single set of terms, the interpretation of which is governed by the same rules as unilingual treaties, that is, by the rules set out in articles 69-71. The unity of the treaty and of each of its terms is of fundamental importance in the interpretation of plurilingual treaties and it is safeguarded by combining with the principle of the equal authority of authentic texts the presumption that the terms are intended to have the same meaning in each text. This presumption requires that every effort should be made to find a common meaning for the texts before preferring one to another. A term of the treaty may be ambiguous or obscure because it is so in all the authentic texts, or because it is so in one text only but it is not certain whether there is a difference between the texts, or because on their face the authentic texts seem not to have exactly the same meaning. But whether the ambiguity or obscurity is inherent in all the texts, or arises from the plurilingual form of the treaty, the first rule for the interpreter is to look for the meaning intended by the parties to be attached to the term by applying the standard rules for the interpretation of treaties. The plurilingual form of the treaty does not justify the interpreter in simply preferring one text to another and discarding the normal means of resolving an ambiguity or obscurity on the basis of the objects and purposes of the treaty, *travaux préparatoires*, the surrounding circumstances, subsequent practice, etc. On the contrary, the equality of the texts requires that every reasonable effort should first be made to reconcile the texts and to ascertain the intention of the parties by recourse to the normal means of interpretation.[180]

(7) Paragraph 1 of article 73 accordingly states that the different authentic texts of a treaty are equally authoritative in each language except when the parties themselves expressly provide that in the case of divergence a particular text is to prevail. Provisions of this kind are quite common and some examples of treaties which give decisive authority to a particular text in

[175] See the Peace Treaties with Italy (article 90), Bulgaria (article 38), Hungary (article 42), Romania (article 40) and Finland (article 36).

[176] Treaty of Brest-Litovsk of 1918 (article 10).

[177] United Nations, *Treaty Series*, vol. 325, p. 91 ; see other examples mentioned by J. Hardy, op. cit., pp. 126-128.

[178] The treaty actually said " official ", but it seems clear that in this instance by " official " was meant " authentic " ; Hertslet, *The Map of Africa by Treaty* (third edition), vol. 2, pp. 424-427 ; cf. the Convention for the Unification of Certain Rules concerning Collisions in Inland Navigation, Hudson, *International Legislation*, vol. 5, pp. 819-822.

[179] See *Summary of the Practice of the Secretary-General as Depositary of Multilateral Treaties* (ST/LEG/7), p. 8.

[180] See J. Hardy, op. cit., pp. 91-111, for some of the relevant jurisprudence of international tribunals.

case of a divergence have already been mentioned in paragraph (3) of this commentary.[181] The application of these provisions may raise a difficult problem as to the exact point in the interpretation process at which the provision should be put into operation. Should the " master " text be applied automatically as soon as the slightest difference appears in the wording of the texts ? Or should recourse first be had to all, or at any rate some, of the normal means of interpretation in an attempt to reconcile the texts before concluding that there is a case of " divergence " ? The jurisprudence of international tribunals throws a somewhat uncertain light on the solution of this problem.[182] Sometimes the tribunal has simply applied the " master " text at once without going into the question whether there was an actual divergence between the authentic texts, as indeed the Permanent Court appears to have done in the case concerning the interpretation of the Treaty of Neuilly.[183] Sometimes the tribunal has made some comparison at least of the different texts in an attempt to ascertain the intention of the parties.[184] This was also the method adopted by the Supreme Court of Poland in the case of the *Archdukes of the Habsburg-Lorraine House* v. *The Polish State Treasury* [185] and this method is regarded as correct in one recent textbook.[186] The question is essentially one of the intention of the parties in inserting the provision in the treaty, and the Commission doubted whether it would be appropriate for it to try and resolve the problem in a formulation of the general rules of interpretation. Accordingly, it seemed to the Commission sufficient in paragraph 1 to make a general reservation of cases where the treaty contains this type of provision.

(8) Paragraph 2 provides, first, that the terms of a treaty are presumed to have the same meaning in each text. Then it provides that — apart from cases where the parties have agreed upon the priority of a particular text — in the event of a divergence between authentic texts a meaning which so far as possible reconciles the different texts shall be adopted. These provisions give effect to the principle of the equality of texts. In the *Mavrommatis Palestine Concessions* case,[187] the Permanent Court was thought by some jurists to lay down a general rule of restrictive interpretation in cases of divergence between authentic texts when it said :

> " . . . where two versions possessing equal authority exist one of which appears to have a wider bearing than the other, it [the Court] is bound to adopt the more limited interpretation which can be made to harmonise with both versions and which, as far as it goes, is doubtless in accordance with the common

intention of the Parties. In the present case this conclusion is indicated with especial force because the question concerns an instrument laying down the obligations of Great Britain in her capacity as Mandatory for Palestine and because the original draft of this instrument was probably made in English ".

But, as has been pointed out by a recent writer,[188] the Court does not necessarily appear to have intended by the first sentence of this passage to lay down as a general rule that the more limited interpretation which can be made to harmonize with both texts is the one which must always be adopted. Restrictive interpretation was appropriate in that case. But the question whether in case of ambiguity a restrictive interpretation ought to be adopted is a more general one the answer to which hinges on the nature of the treaty and the particular context in which the ambiguous term occurs, as has been explained in the commentary to article 71. The mere fact that the ambiguity arises from a difference of expression in a plurilingual treaty does not alter the principles by which the presumption should or should not be made in favour of a restrictive interpretation. Accordingly, while the *Mavrommatis* case [189] gives strong support to the principle of conciliating — i.e., harmonizing — the texts, it is not thought to call for a general rule laying down a presumption in favour of restrictive interpretation in the case of an ambiguity in plurilingual texts.[190]

(9) The Commission considered whether there were any further principles which it might be appropriate to codify as general rules for the interpretation of plurilingual treaties. For example, it examined whether it should be specified that there is a legal presumption in favour of the text with a clear meaning. It felt, however, that to state this as a general rule might be going too far, since much might depend on the circumstances of each case and the evidence of the intention of the parties. Nor did it think that it would be appropriate to formulate any general rule regarding recourse to non-authentic versions, though these are sometimes referred to for such light as they may throw on the matter.

## CHAPTER III

## Special Missions

### A. INTRODUCTION

*History of the idea of defining rules relating to special missions in the United Nations*

25.   At its tenth session, in 1958, the International Law Commission adopted a set of draft articles on diplomatic intercourse and immunities. The Commis-

---

[181] A few treaties, while not designating a particular text as having decisive authority, prescribe a method of interpretation which is to prevail in case of divergence.

[182] For the cases see J. Hardy, op. cit., pp. 128-136.

[183] *P.C.I.J.*, Series A, No. 3.

[184] For example, *De Paoli* v. *Bulgarian State, Tribunaux arbitraux mixtes, Recueil des décisions*, vol. 6, p. 456.

[185] *Annual Digest of International Law Cases*, 1929-1930, case No. 235.

[186] Lord McNair, *Law of Treaties* (1961), p. 435.

[187] *P.C.I.J.* (1924), series A, No. 2, p. 19.

[188] J. Hardy, op. cit., pp. 76-81, where there is a thorough examination of this precedent.

[189] Cf. *Venezuelan Bond* cases, Moore, *International Arbitrations*, vol. 4, p. 3623 ; and *German Reparations under article 260 of the Treaty of Versailles* (1924), *Reports of International Arbitral Awards*, vol. I, pp. 437-439.

[190] See also J. Hardy, op. cit., pp. 113-115.

sion observed, however, that the draft " deals only with permanent diplomatic missions. Diplomatic relations between States also assume other forms that might be placed under the heading of ' *ad hoc* diplomacy ', covering itinerant envoys, diplomatic conferences and special missions sent to a State for limited purposes. The Commission considered that these forms of diplomacy should also be studied, in order to bring out the rules of law governing them, and requested the special rapporteur to make a study of the question and to submit his report at a future session." [191] The Commission decided at its eleventh session (1959)[192] to include the question of *ad hoc* diplomacy as a special topic on the agenda of its twelfth session (1960).

26.    Mr. A. E. F. Sandström was appointed Special Rapporteur. He submitted his report at the twelfth session,[193] and on the basis of this report the Commission took decisions and drew up recommendations for the rules concerning special missions. The Commission's draft was very brief. It was based on the idea that the rules on diplomatic relations in general prepared by the Commission should on the whole be applied to special missions by analogy. The Commission expressed the opinion that this brief draft should be referred to the Conference on Diplomatic Intercourse and Immunities convened at Vienna in the spring of 1961. But the Commission stressed the fact that it had not been able to give this subject the thorough study it would normally have done. For that reason, the Commission regarded its draft as only a preliminary survey, carried out in order to put forward certain ideas and suggestions which should be taken into account at the Vienna Conference.[194]

27.    At its 943rd plenary meeting on 12 December 1960, the United Nations General Assembly decided,[195] on the recommendation of the Sixth Committee, that these draft articles should be referred to the Vienna Conference with the recommendation that the Conference should consider them together with the draft articles on diplomatic intercourse and immunities. The Vienna Conference placed this question on its agenda and appointed a special Sub-Committee.[196]

28.    The Sub-Committee noted that these draft articles did little more than indicate which of the rules on permanent missions applied to special missions and which did not. The Sub-Committee took the view that the draft articles were unsuitable for inclusion in the final convention without long and detailed study which could take place only after a set of rules on permanent

missions had been finally adopted.[197] For this reason, the Sub-Committee recommended that the Conference should refer this question back to the General Assembly so that the Assembly could recommend to the International Law Commission further study of the topic, i.e., that it continue to study the topic in the light of the Vienna Convention on Diplomatic Relations which was then drawn up. At a plenary meeting of the Vienna Conference on 10 April 1961, the Sub-Committee's recommendation was adopted.[198]

29.    The matter was again submitted to the United Nations General Assembly. On 18 December 1961, the General Assembly, on the recommendation of the Sixth Committee, adopted resolution 1687 (XVI) in which the International Law Commission was requested to study the subject further and to report thereon to the General Assembly.

30.    Pursuant to this decision, the question was referred back to the International Law Commission, which, at its 669th meeting on 27 June 1962, decided to place it on its agenda.[199] The Commission requested the United Nations Secretariat to prepare a working paper [200] which would serve as a basis for the discussions on this topic at its 1963 session. The Commission then placed this question on the agenda of its fifteenth session (1963).

31.    During its fifteenth session, at the 712th meeting, the Commission appointed Mr. Milan Bartoš as Special Rapporteur for the topic of special missions.[201]

32.    In that connexion, the Commission took the following decision :

" With regard to the approach to the codification of the topic, the Commission decided that the Special Rapporteur should prepare a draft of articles. These articles should be based on the provisions of the Vienna Convention on Diplomatic Relations, 1961, but the Special Rapporteur should keep in mind that special missions are, both by virtue of their functions and by their nature, an institution distinct from permanent missions. In addition, the Commission thought that the time was not yet ripe for deciding whether the draft articles on special missions should be in the form of an additional protocol to the Vienna Convention, 1961, or should be embodied in a separate convention or in any other appropriate form, and that the Commission should await the Special Rapporteur's recommendations on that subject." [202]

33.    In addition, the Commission considered again whether the topic of special missions should also cover

---

[191] *Yearbook of the International Law Commission, 1958,* vol. II, p. 89, para. 51.

[192] *Yearbook of the International Law Commission, 1959,* vol. II, p. 122, para. 43.

[193] *Yearbook of the International Law Commission, 1960,* vol. II, pp. 108-115.

[194] *Ibid.,* p. 179.

[195] Resolution 1504 (XV).

[196] The Sub-Committee was composed of the representatives of Ecuador, Iraq, Italy, Japan, Senegal, USSR, United Kingdom, United States and Yugoslavia. See *Yearbook of the International Law Commission, 1963,* vol. II, p. 157, para. 44.

[197] United Nations Conference on Diplomatic Intercourse and Immunities, *Official Records,* vol. II (document A/CONF.20/C.1/L.315), p. 45.

[198] *Ibid.* (document A/CONF.20/10/Add.1, resolution I), p. 89.

[199] *Yearbook of the International Law Commission, 1962,* vol. II, p. 196, para. 76.

[200] Working paper issued as document A/CN.4/155, published in *Yearbook of the International Law Commission, 1963,* vol. II, pp. 151-158.

[201] *Ibid.,* p. 225, para. 65.

[202] *Ibid.,* para. 64.

the status of government delegates to congresses and conferences. On this point, the Commission at its fifteenth session inserted the following paragraph in its annual report to the United Nations General Assembly :

" With regard to the scope of the topic, the members agreed that the topic of special missions should also cover itinerant envoys, in accordance with its decision at its 1960 session.[203] At that session the Commission had also decided not to deal with the privileges and immunities of delegates to congresses and conferences as part of the study of special missions, because the topic of diplomatic conferences was connected with that of relations between States and inter-governmental organizations. At the present session, the question was raised again, with particular reference to conferences convened by States. Most of the members expressed the opinion, however, that for the time being the terms of reference of the Special Rapporteur should not cover the question of delegates to congresses and conferences." [204]

34.    The Special Rapporteur submitted his report,[205] which was placed on the agenda of the Commission's sixteenth session.

35.    The Commission considered the report twice. First, at the 723rd, 724th and 725th meetings, it engaged in a general discussion and gave the Special Rapporteur general instructions on continuing his study and submitting the rest of his report at the following session. Secondly, at the 757th-758th, 760th-763rd and 768th-770th meetings, it examined a number of draft articles and adopted the sixteen articles reproduced in the draft below, to be supplemented, if necessary, during its seventeenth session. These articles are submitted to the General Assembly and to the Governments of Member States for information.

B. DRAFT ARTICLES 1 TO 16 AND COMMENTARY

*Part I*

*Section I. General rules* [206]

**Article 1.[207] The sending of special missions**

**1.    For the performance of specific tasks, States may send temporary special missions with the consent of the State to which they are to be sent.**

**2.    The existence of diplomatic or consular relations between States is not necessary for the sending or reception of special missions.**

---

[203] *Yearbook of the International Law Commission, 1960,* vol. I, 565th meeting, para. 26.

[204] *Yearbook of the International Law Commission, 1963,* vol. II, p. 225, para. 63.

[205] A/CN.4/166, *vide supra,* pp. 67-117.

[206] Articles 1 to 12 were adopted by the Commission at its 768th and 769th meetings, on 17 July 1964, and articles 13 to 16 were adopted at the 770th meeting, on 20 July 1964.

[207] The Commission decided that this article would be preceded by a definitions article.

*Commentary*

(1) Article 1 of the draft on special missions differs from the provisions of the Vienna Convention on Diplomatic Relations. The difference is due to the fact that the tasks and duration of special missions differ from those of regular missions.

(2) A special mission must possess the following characteristics :

(a) It *must be sent by a State* to another State. Special missions cannot be considered to include missions sent by political movements to establish contact with a particular State, or missions sent by States to establish contact with a movement. In the case of insurrection or civil war, however, any such movements which have been recognized as belligerents and have become subjects of international law have the capacity to send and receive special missions. The same concept will be found in the Vienna Convention on Diplomatic Relations [article 3, paragraph 1 (a)].

(b) It *must not be in the nature of a mission responsible for maintaining general diplomatic relations between the States* ; its task must be precisely defined. But the fact that a task is defined does not mean that its scope is severely limited ; in practice, some special missions are given far-reaching tasks of a general nature, including the review of relations between the States concerned and even the formulation of the general policy to be followed in their relations. But the task of a special mission is in any case specified and it differs from the functions of a permanent diplomatic mission, which acts as a general representative of the sending State [article 3, paragraph 1 (a) of the Vienna Convention on Diplomatic Relations]. In the Commission's view, the specified task of a special mission should be to represent the sending State in political or technical matters.

(c) *A State is not obliged to receive a special mission from another State unless it has undertaken in advance to do so.* Here, the draft follows the principle set out in article 2 of the Vienna Convention, but the Commission points out that the way in which consent is expressed to the sending of a permanent diplomatic mission differs from that used in connexion with the sending of a special mission. In the case of a special mission, consent usually takes a more flexible form. In practice, such an undertaking is generally given only by informal agreement ; less frequently, it is given by formal treaty providing that a specific task will be entrusted to the special mission ; one characteristic of a special mission, therefore, is that consent for it must have been given in advance for a specific purpose.

(d) It is of a *temporary* nature. Its temporary nature may be established either by the term fixed for the duration of the mission or by its being given a specific task, the mission usually being terminated either on the expiry of its term or on the completion of its task.[208] Regular diplomatic missions are not of this temporary nature, since they are permanent (article 2 of the Vienna Convention on Diplomatic Relations).

---

[208] See article 12.

However, a permanent specialized mission which has a specific sphere of competence and may exist side by side with the regular permanent diplomatic mission is not a special mission and does not possess the characteristics of a special mission. Examples of permanent specialized missions are the United States missions for economic co-operation and assistance to certain countries, the Australian immigration missions, the industrial co-operation missions of the socialist countries, and commercial missions or delegations which are of a diplomatic nature, etc.

(3)  The sending and reception of special missions may — and most frequently does — occur between States which maintain regular diplomatic or consular relations with each other, but the existence of such relations is not an essential prerequisite. Where such relations do exist and the regular diplomatic mission is functioning, the special mission's particular task may be one which would have been within the competence of the ordinary mission if there had been no special mission. During the existence of the special mission, however, States are entitled to conduct through the special mission relations which are within the competence of the general mission. The Commission deemed it advisable to stress that the existence of diplomatic or consular relations between the States in question is not a prerequisite for the sending and reception of special missions. The Commission considered that special missions can be even more useful where such relations do not exist. The question whether special missions can be used between States or Governments which do not recognize each other was also raised. The Commission considered that, even in those cases, special missions could be helpful in improving relations between States, but it did not consider it necessary to add a clause to that effect to article 1.

(4)  The manner in which the agreement for sending and receiving a special mission is concluded is a separate question. In practice, there are a number of ways of doing so, namely :

  (a) An informal diplomatic agreement providing that a special mission will be sent and received ;

  (b) A formal treaty providing that certain questions will be discussed and settled through a special mission ;

  (c) An offer by one State to send a special mission for a specific purpose, and the acceptance, even tacit, of such a mission by the other State ;

  (d) An invitation from one party to the other to send a special mission for a specific purpose, and the acceptance of the invitation by the other party.

(5)  Where regular diplomatic relations are not in existence between the States concerned — whether because such relations have been broken off or because armed hostilities are in progress between the States — the sending and reception of special missions are subject to the same rules cited above. Experience shows that special missions are often used for the settlement of preliminary questions with a view to the establishment of regular diplomatic relations.

(6)  The fact that a special mission is sent and received does not mean that both States must entrust the settlement of the problem in question to special missions appointed by the two parties. Negotiations with a delegation sent by a State for a specific purpose may also be conducted by the regular organs of the receiving State without a special mission being appointed. Both these practices are considered to be usual, and in the second case the special mission acts on the one side and the Ministry (or some other permanent organ) on the other. The Commission did not deem it necessary to refer to this concept in the text.

(7)  Cases also arise in practice in which a specific delegation, composed of the head or of members of the regular permanent diplomatic mission accredited to the country in which the negotiations are taking place, appears in the capacity of a special mission. Practice provides no clear-cut answer to the question whether this is a special mission in the proper sense or an activity of the permanent mission.

### Article 2.  The task of a special mission

**The task of a special mission shall be specified by mutual consent of the sending State and of the receiving State.**

*Commentary*

(1)  The text of this article differs from the corresponding article (article 4) of the Vienna Convention on Diplomatic Relations.

(2)  The scope and content of the task of a special mission are determined by mutual consent. Such consent may be expressed by any of the means indicated in paragraph (4) of the commentary on article 1. In practice, however, the agreement to the sending and reception of special missions is usually of an informal nature, often merely stating the purpose of the mission. In most cases, the exact scope of the task becomes clear only during the negotiations, and it frequently depends on the full powers or the authority conferred on the representatives of the negotiating parties.

(3)  Diplomatic history records a number of cases where special missions have exceeded the task for which they were sent and received. The customary comment is that this is done to take advantage of the opportunity, and that any good diplomat makes use of such opportunities. There are also a number of cases showing that special missions for ceremonial and formal purposes have taken advantage of propitious circumstances to conduct negotiations on other matters. The limits of the capacity of a special mission to transact business are normally determined by full powers, given in good and due form, but in practice the legal validity of acts by special missions which exceed the missions' powers often depends upon their acceptance by the respective governments. Though the Commission considered this question to be of importance to the stability of relations between States, it did not deem it necessary to propose an article dealing with it and considered that its solution was closely related to section II (Conclusion of

treaties by States) of part I of the draft articles on the law of treaties.[209]

(4) The tasks of a special mission are sometimes determined by a prior treaty. In this case, the special mission's task and the extent of its powers depend on the treaty. This is so, for instance, in the case of commissions appointed to draw up trading plans for a specific period under a trade treaty. However, these cases must be regarded as exceptional. In most cases, on the contrary, the task is determined by informal, *ad hoc* mutual agreement.

(5) In connexion with the task and the extent of the powers of a special mission, the question also arises whether its existence encroaches upon the competence of the regular diplomatic mission of the sending State accredited to the other party. It is generally agreed that the permanent mission retains its competence, even during the existence of the special mission, to transmit to the other contracting party, to which it is accredited, communications from its Government concerning, *inter alia,* the limit of the special mission's powers and, if need be, the complete or partial revocation of the full powers given to it or the decision to break off or suspend the negotiations ; but all such actions can apply only to future acts of the special mission. The question of the parallel existence of permanent and special missions, and the problem of overlapping authority, are of considerable importance for the validity of acts performed by special missions. Some members of the Commission held that, during the existence of the special mission, its task is assumed to be excluded from the competence of the permanent diplomatic mission. The Commission decided to draw the attention of Governments to this point and to ask them to decide whether or not a rule on the matter should be included in the final text of the articles, and if so to what effect.

(6) If the special mission's activity or existence comes to an end, the full competence of the permanent diplomatic mission is usually restored, even with respect to matters relating to the special mission's task, except in cases where special missions have been given exclusive competence, by treaty, to regulate relations in respect of certain matters between the States concerned.

### Article 3. Appointment of the head and members of the special mission or of members of its staff

**Except as otherwise agreed, the sending State may freely appoint the head of the special mission and its members as well as its staff. Such appointments do not require the prior consent of the receiving State.**

*Commentary*

(1) In regard to the head of the special mission, the text of article 3 differs from the rule in article 4 of the Vienna Convention on Diplomatic Relations. Whereas the head of a permanent diplomatic mission must receive the *agrément* of the receiving State, as a general

rule no *agrément* is required for the appointment of the head of a special mission. In regard to the members and staff of the special mission, article 3 is based on the idea expressed in the first sentence of article 7 of the Vienna Convention on Diplomatic Relations : that the sending State may freely appoint them.

(2) The Commission notes that, in State practice, consent to the sending and receiving of a special mission does not ordinarily imply acceptance of its head, members or staff. The Commission does not share the view that the declaration of acceptance of the persons forming the special mission should be included in the actual agreement to receive the mission ; it considered that consent to receive a special mission and consent to the persons forming it are two distinct matters.[210]

(3) The proposition that no *agrément* or prior consent shall be required for the head, members or staff of a special mission in no way infringes the sovereign rights of the receiving State. Its sovereign rights and interests are safeguarded by article 4 (persons declared *non grata* or not acceptable).

(4) In practice, there are several ways in which, in the absence of prior agreement, the receiving State can limit the sending State's freedom of choice. The following instances may be quoted :

(*a*) Consent can be given in the form of a visa issued in response to a request from the sending State indicating the purpose of the journey, or in the form of acceptance of the notice of the arrival of a specific person on a special mission.

(*b*) The receiving State can express its wishes with regard to the level of the delegations.

(*c*) In practice the formal or informal agreement concerning the sending and reception of a special mission sometimes includes a clause specifically designating the person or persons who will form the special mission. In this case the sending State cannot make any changes in the composition of the special mission without the prior consent of the State to which it is being sent. In practice all that is done is to send notice of the change in good time, and in the absence of any reaction, the other party is presumed to have accepted the notice without any reservation.

(5) In some cases, although less frequently, it is stipulated in a prior agreement that the receiving State must give its consent. This occurs primarily where important and delicate subjects are to be dealt with through the special mission, and especially in cases where the head of the mission and its members must be eminent politicians.

(6) The question arises whether the receiving State is recognized as having the right to make acceptance of the person appointed conditional upon its own consent. In this case it sometimes happens that the State which raises the objection asks to be consulted on the selection of the person. Its refusal does not mean that it considers the person proposed *persona non grata,* being of an ob-

---

[209] *Yearbook of the International Law Commission, 1962,* pp. 164-166, articles 4 and 5.

[210] For the contrary view, see *Yearbook of the International Law Commission, 1960,* vol. II, pp. 112-117.

jective and procedural rather than a personal nature, although it is difficult to separate these two aspects in practice. The Commission considers that this is not the general practice and that provision for such a situation should be made in a special agreement.

(7) The head of the special mission and its members are not in practice designated by name in the prior agreement, but in certain cases an indication is given of the qualifications they should possess. This applies either to meetings at a specific level (e.g., meetings of Ministers for Foreign Affairs or of other eminent persons) or to missions which must be composed of specially qualified experts (e.g., meetings of hydraulic engineers or other experts). In such cases, the special mission is regularly composed if its head and its members possess certain qualifications or hold certain posts, and thus the sending State is subject to certain restrictions with respect to the selection and the composition of its special mission. Even though this is a widespread practice, the Commission considered that there was no need to include a rule to that effect in article 3, but that the situation was already covered by the proviso " except as otherwise agreed ".

(8) The Commission also took into consideration the practice whereby certain States (by analogy with the provision contained in the last sentence of article 7 of the Vienna Convention on Diplomatic Relations) require prior consent in the case of members of the armed forces and persons of similar standing. The Commission considers that this rule is out of date and not universally applied.

### Article 4. Persona declared *non grata* or not acceptable

**1. The receiving State may, at any time and without having to explain its decision, notify the sending State that the head or any other member of the special mission or a member of its staff is *persona non grata* or not acceptable.**

**2. In any such case, the sending State shall either recall the person concerned or terminate his functions with the special mission. If the sending State refuses to carry out this obligation, the receiving State may refuse to recognize the person concerned as the head or a member of the special mission or as a member of its staff.**

*Commentary*

(1) The text of article 4 follows article 9 of the Vienna Convention on Diplomatic Relations.

(2) Whether or not the receiving State has accepted the mission, it unquestionably has the right to declare the head or a member of a special mission or a member of the mission's staff *persona non grata* or not acceptable at any time. It is not obliged to state its reasons for this decision.[211]

---

[211] This was also the opinion of the International Law Commission in 1960. See *Yearbook of the International Law Commission, 1960*, vol. II, pp. 112-115 and p. 180.

(3) It may be added that, in practice, a person is seldom declared *persona non grata* or not acceptable if the receiving State has already signified its acceptance of a particular person ; but the majority of the Commission takes the view that even in that case the receiving State is entitled to make such a declaration. Nevertheless, the receiving State very rarely takes advantage of this prerogative ; but in practice it may sometimes inform the sending State, through the regular diplomatic channel, that the head or a certain member of the special mission, even though consent has already been given to his appointment, represents an obstacle to the fulfilment of the mission's task.

(4) In practice, the right of the receiving State to declare the head or a member of the special mission *persona non grata* or not acceptable is not often exercised inasmuch as such missions are of short duration and have specific tasks. Nevertheless, instances do occur. In one case, the head of a special mission sent the minister of the receiving State a letter considered offensive by that State, which therefore announced that it would have no further relations with the writer. As a result, the activities of the special mission were virtually paralysed, and the sending State was obliged to recall the head of the special mission and to replace him.

(5) Where the meetings with the special mission are to be held at a specific level, or where the head or the members of the mission are required to possess certain specific qualifications and no other person in the sending State possesses such qualifications, it must be presumed that in practice the person concerned cannot be declared *persona non grata* or not acceptable, and that the only course is to break off the conversations, since the sending State is not in a position to choose among several persons with the necessary qualifications. The receiving State cannot, for instance, ask the sending State to change its Minister for Foreign Affairs because he is regarded as *persona non grata*, for that would constitute interference in the domestic affairs of the sending State. Nevertheless, it is under no obligation to enter into contact with an undesirable person, if it considers that refusal to do so is more advantageous to it than the actual contact with the other State. This, however, is not a juridical question, and the Commission therefore decided not to deal with this situation or to regulate it in the text of the article.

### Article 5. Sending the same special mission to more than one State

**A State may send the same special mission to more than one State. In that case the sending State shall give the States concerned prior notice of the sending of that mission. Each of those States may refuse to receive such a mission.**

*Commentary*

(1) There is no corresponding provision in the Vienna Convention on Diplomatic Relations.

(2) The International Law Commission scarcely considered this question in 1960, and it has been given

scant attention in the literature. At that time the majority of the Commission took the view that it was completely unnecessary to make provision for the matter, and the previous Special Rapporteur, Mr. Sandström, believed that the question did not arise at all.[212] Mr. Jiménez de Aréchaga, however, expressed the view on that occasion that the situation envisaged was by no means unusual. He pointed out that special missions were sent to a number of neighbouring States when changes of government took place in the sending States and on ceremonial occasions.[213] Subsequently studies have shown that cases of special missions being sent to more than one State occur in practice.

(3) Observations of practice indicate that there are two cases in which the problem of the appointment of a special mission to more than one State clearly arises. They are the following:

(a) Where the same special mission, with the same membership and the same task, is sent to several States, which are usually neighbours or situated in the same geographical region. In the case of political missions (e.g., goodwill missions), there have been instances of States refusing to enter into contact with a mission appointed to several other States with which they did not enjoy good relations. Thus the question is not simply one of relations between the sending and receiving States, but also of relations between the States to which the special mission is sent. Although this raises a political issue, it is tantamount, from the juridical standpoint, to a proviso that where special missions are sent to more than one State, simultaneously or successively, consent must be obtained from each of the States concerned.

(b) Although, according to the strict rule, a special mission is appointed individually, either simultaneously or successively, to each of the States with which contacts are desired, certain exceptions arise in practice. One custom is that known as circular appointment, which — rightly, in the view of the Commission — is considered discourteous by experts in diplomatic protocol. In this case a special mission or an itinerant envoy is given full powers to visit move than one country, or a circular note is sent to more than one State informing them of the intention to send a special mission of this kind. If the special mission is an important one, the general practice is to lodge a protest against this breach of courtesy. If the special mission is sent to obtain information regarding future technical negotiations, the matter is usually overlooked, although it may be observed that such special missions are placed on the level of a commercial traveller with general powers of agency. A distinction must be made between this practice of so-called circular appointment and the case of a special mission authorized to conduct negotiations for the conclusion of a multilateral convention which is not of general concern. In this case its full powers may consist of a single document accrediting it to all the States with which the convention is to be concluded (e.g. the

[212] *Yearbook of the International Law Commission, 1960,* vol. II, p. 109 and p. 180.
[213] *Ibid.,* p. 116.

Bulgarian-Greek-Yugoslav negotiations or a settlement of certain questions connected with their common frontier).

(4) It should also be mentioned that, in practice, a special mission of the kind referred to in paragraph 3 (a) above, having been accepted in principle, sometimes finds itself in the position of being requested, because of the position it has adopted during its contacts with the representatives of the first State visited, to make no contact with another specific State to which it is being sent. This occurs particularly in cases where it is announced that the special mission has granted the first State certain advantages which are contrary to the interests of the second State. The latter may consider that the matter to be dealt with has been prejudged, and may announce that the special mission which it had already accepted has become pointless. This is not the same as declaring the head and members of the mission *persona non grata,* since in this case the refusal to accept them is based not on their subjective qualities but on the objective political situation created by the special mission's actions and the position taken by the sending State. It is, as it were, a restriction of diplomatic relations expressed solely in the revocation of the consent of the receiving State to accept the special mission. This clearly demonstrates the delicacy of the situation created by the practice of sending the same special mission to more than one State.

(5) The Commission found that in this case the sending State is required to give prior notice to the States concerned of its intention to send such a special mission to more than one State. This prior notice is needed in order to inform the States concerned in due time not only of the task of a special mission but also of its itinerary. This information is deemed necessary in order to enable the States concerned to decide in advance whether they will receive the proposed special mission. The Commission stressed that it was essential that the States so notified should be entitled only to state their position on the receivability of the special mission, and not to request that such a mission should not be sent to another State as well.

## Article 6. Composition of the special mission

1. The special mission may consist of a single representative or of a delegation composed of a head and other members.

2. The special mission may include diplomatic staff, administrative and technical staff and service staff.

3. In the absence of an express agreement as to the size of the staff of a special mission, the receiving State may require that the size of the staff be kept within limits considered by it to be reasonable and normal, having regard to circumstances, to the tasks and to the needs of the special mission.

*Commentary*

(1) The text of article 6, paragraphs (2) and (3), adopted by the Commission is based on article 1 (c) and article 11, paragraph 1, of the Vienna Convention

on Diplomatic Relations. The text of paragraph 1 of article 6 reflects the special features of the institution of special missions.

(2)  In practice, a special mission may be composed of only one member or of several members. If the special mission is entrusted to only one member, the latter is then a special delegate, described by the Commission in article 6 as a " representative ". If it has two members, the sending State decides which of the two will be the head or first delegate. If the special mission consists of three or more members, the rule observed in practice is that a head of the mission (chairman of the delegation) should be designated.

(3)  Precedence within the delegation is fixed, according to general practice, by the sending State, and is communicated to the receiving State or published in the manner normally adopted with respect to multilateral meetings. Neither the rank of the delegates according to the protocol of the sending State nor the title or function of the individual delegates authorizes *ex jure* any automatic change in the order of precedence established in the list communicated, without subsequent communication of an official rectification to the receiving State. However, according to international custom, a member of the Government takes precedence over other officials, and the head of delegation must not have lower diplomatic rank than the members of the delegation ; but, as this custom is not observed in all cases and is not regarded as obligatory, it is not reflected in the text.

(4)  In practice a special mission may include, in addition to the head, his deputy, the other titular members and their deputies. The Commission considered that the composition of the special mission and the titles of its members were a matter exclusively within the competence of the sending State and that in the absence of an agreement on it by the parties it was not governed by any international rule. Accordingly, the Commission did not think it necessary to include a rule on it in the article.

(5)  Whether a special mission is composed of a single representative or of a delegation, it may be accompanied by the necessary staff. The Commission accepted the designation of the staff set out in article 1 (c) of the Vienna Convention on Diplomatic Relations, but pointed out that the staff of special missions often includes specific categories such as advisers and experts. The Commission considered that these were included in the category of diplomatic staff.

(6)  In practice, even in special missions the problem of limiting the size of the mission arises. The rule relating to permanent missions is contained in article 11 of the Vienna Convention on Diplomatic Relations and the text of article 6, paragraph 3, proposed by the Commission is based on that rule.

(7)  With regard to the limitation of the size of the special mission, attention should be drawn not only to the general rule, but also to certain particular cases which occur in practice. On this point :

(a)  It is customary for the receiving State to notify the sending State that it wishes the size of the mission to be restricted because, for example, the housing, transport and other facilities it can offer are limited.

(b)  Less frequently, in practice, the agreement on the establishment or reception of the special mission limits the size of the mission ; in some cases the agreement specifies a minimum number of members (joint meetings) and even calls for a mission specifically composed of members having stated qualifications (generally according to the problems to be treated).

(c)  With respect to the size of the mission, attention should also be drawn to the practice of " balancing rank ". It is customary, during preliminary conversations and negotiations on the sending and receiving of a mission, to designate the rank and status of the head and members of the special mission, so that the other party may act accordingly and thus avoid any disparity, for if representatives were received by a person of lower rank than their own, it might be considered an affront to their country. This, however, is a question of protocol rather than of law.

### Article 7. Authority to act on behalf of the special mission

**1.  The head of the special mission is normally the only person authorized to act on behalf of the special mission and to send communications to the receiving State. Similarly, the receiving State shall normally address its communications to the head of the mission.**

**2.  A member of the mission may be authorized either by the sending State or by the head of the special mission to replace the head of the mission if the latter is unable to perform his functions, and to perform particular acts on behalf of the mission.**

*Commentary*

(1)  Article 7 is not derived directly from the Vienna Convention on Diplomatic Relations. Its text was drawn up on the basis of contemporary international practice.

(2)  The main question from the legal point of view is to determine the rules concerning authority to act on behalf of the special mission. Only the head of the special mission is normally authorized to act on behalf of the special mission and to address communications to the receiving State. The Commission laid stress on the word " normally ", as the parties may also make provision for other persons than its head to act on behalf of a special mission. These other possibilities are, however, exceptional.[214]

(3)  *Head of the special mission.* As explained in the commentary on the preceding article, if the mission is composed of three or more members, it must as a general rule have a head. If it is composed of only two members, the sending State decides whether one shall bear the title of first delegate or head of the special mission. Whether he is called first delegate or

---

[214]  See paragraphs (4)-(11) of this commentary.

head of mission, he will be regarded as the head of the special mission by the receiving State, which will communicate with him and receive from him statements on behalf of the special mission. For this reason, the question of the existence of a head of mission is one of great importance, notwithstanding the fact that the International Law Commission did not deal with it in 1960. Mr. Jiménez de Aréchaga, on the other hand, considers that in practice a special mission has a head, but he does not go further into the question.[215] In the Commission's opinion, as expressed at its sixteenth session, the matter of the appointment of a head of the special mission is important from the legal standpoint.

(4)   In article 7, paragraph 1, the Commission established a mere presumption that the head of the special mission is the person who gives any authorizations that may be required, but the sending State may in addition authorize the other members of the special mission to act on its behalf by giving them full powers. There are in practice instances of special missions whose members are delegates with equal rights under collective letters of credence for performing the tasks assigned to the special mission. Practice is not, however, uniform. Some States hold that the person mentioned first in the letters of credence issued to the special mission is its head. Others, particularly States which send delegations, claim equal rights for all members of such delegations. A common example is a mission composed of several members of a coalition government or of members of parliament representing various political groups. The advocates of the *in corpore* concept of equal rank argue that the composition of the delegation is a manifestation of the common outlook and the equal standing of the members of the delegation. The practice is not uniform.

(5)   There are also instances in practice where the right to act on behalf of a special mission is held to vest only in some of its members who possess a collective authority (for the head and certain members of the mission to act collectively on its behalf) or a subsidiary authority (for a member of a mission to act on its behalf if the head of the mission is unable to perform his functions or if he authorizes him to do so). The Commission considers that these are exceptional cases falling outside normal practice and are determined by the practice of the sending State. It considered that there was no need to include rules covering such cases in the body of the article.

(6)   The Commission did not cover in article 7, paragraph 1, the problem of the limits of the authority given to special missions. That is a question governed by the general rules.

(7)   *Deputy head of special mission.* In speaking of the composition of the special mission, it was said that sometimes a deputy head of mission was also appointed. The deputy's function is indicated by the fact that he is designated by the organ of the sending State which also appointed the head of the special mission, and that as a general rule the deputy head (who in practice

is often called the vice-chairman of the delegation) acts without special appointment as head of the special mission whenever and wherever the head of mission is absent, unable to carry out his functions or recalled (in the last case, until the appointment of a new head has been notified to the other party). From the international standpoint, the rank of the deputy head in the special mission is considered to be next below that of the head of the mission. However, the deputy head does not take precedence of the members of the missions of other States with which his delegation enters into contact. His status as deputy head is effective only when he acts as head. The position of the deputy head of a special mission is referred to in article 7, paragraph 2.

(8)   From the technical standpoint, a member of the special mission whom the head of the mission himself has designated as his deputy (i.e., the administrator of the mission) is not in practice regarded as the deputy head. The Commission did not, however, differentiate between these two classes of deputy head ; it regarded them both as having the same status.

(9)   *Chargé d'affaires ad interim of a special mission.* Very frequently the special mission arrives without its head or deputy head, that is to say, before them, since contact must be established and affairs conducted before their arrival. There may also be occasions when both its head and deputy head are absent during the course of its activities. In this case, a member of the mission provisionally assumes the duties of head of mission, acting on behalf of the head if the latter has so provided. The International Law Commission did not study this problem in 1960 and did not suggest that the rules of diplomatic law relating to *chargés d'affaires ad interim* should apply, in this connexion, to special missions.[216]

(10)   When a member of the mission is designated as *chargé d'affaires ad interim,* the rule in practice is for the appointment of the person to be entrusted with this function to be notified by the regular diplomatic mission of the sending State. This often occurs if the head of the mission is recalled " tacitly ", if he leaves his post suddenly (as frequently happens when he returns to his country to get new instructions and remains there for some time) or if the mission arrives at its destination without its head and without his having given authorization in writing to the presumptive *chargé d'affaires.* The Commission regarded the position of such a person as comparable to that of an acting deputy and it provided that authority for him to carry out his duties could be given either by the sending State or by the head of the special mission.

(11)   In the case of special missions dealing with a complex task, certain members of the special mission or of its staff are in practice given power to carry out specific acts on behalf of the special mission. The Commission considered this practice to be important from the legal point of view and it included a rule on the subject in the text (paragraph 2, *in fine*).

---

[215] *Yearbook of the International Law Commission, 1960,* vol. II, p. 116 and pp. 179-180.

[216] *Ibid.,* p. 110 and pp. 179-180. Mr. Sandström, the Special Rapporteur, was even of the opinion that this had no bearing on special missions.

(12)   The Commission takes the view that the rules applicable to the head of the special mission also apply to a single delegate, described in the text of article 6 as the " representative ".

### Article 8.  Notification

**1.  The sending State shall notify the receiving State of :**

   **(a)  The composition of the special mission and of its staff, and any subsequent changes ;**

   **(b)  The arrival and final departure of such persons and the termination of their functions with the mission ;**

   **(c)  The arrival and final departure of any person accompanying the head or a member of the mission or a member of its staff ;**

   **(d)  The engagement and discharge of persons residing in the receiving State as members of the mission or as private servants of the head or of a member of the mission or of a member of the mission's staff.**

**2.  If the special mission has already commenced its functions, the notifications referred to in the preceding paragraph may be communicated by the head of the special mission or by a member of the mission or of its staff designated by the head of the special mission.**

*Commentary*

(1)   Article 8 is modelled on article 10, paragraph 1, of the Vienna Convention on Diplomatic Relations, with the changes required by the special features of the institution of special missions.

(2)   In the case of special missions, too, the question arises to what extent the sending State is obliged to notify the composition of the special mission and the arrival and departure of its head, members and staff. As early as 1960, the International Law Commission adopted the position that in this respect the general rules on notification relating to permanent diplomatic missions are valid for special missions.[217]

(3)   In practice, however, the notification is not identical with that effected in the case of permanent diplomatic missions. In the first place, notification of the composition of a special mission usually takes place in two stages. The first is the preliminary notice, i.e., an announcement of arrival. This preliminary notice of the composition of the special mission should contain brief information concerning the persons arriving in the special mission and should be remitted in good time, so that the competent authorities of the receiving State (and the persons who, on its behalf, will maintain contact) are kept informed. The preliminary notice may in practice be remitted to the Ministry of Foreign Affairs of the receiving State or to its permanent diplomatic mission in the sending State. The second stage is the regular notification given through the diplomatic channel, i.e., through the permanent mission in the receiving State (in practice, the special mission itself

gives this notification directly only if the sending State has no permanent mission in the receiving State and there is no mission there of a third State to which the sending State has entrusted the protection of its interests). The Commission has not indicated these two stages of notification in the text, but has merely laid down the duty of the sending State to give the notification.

(4)   Consequently, there are in practice certain special rules for notification of the composition and arrival of a special mission. They arise from the need to inform the receiving State in a manner different from that used for permanent missions. The International Law Commission did not refer to this fact in 1960.

(5)   On the other hand, it is not customary to give separate notifications of the special mission's departure. It is presumed that the mission will leave the receiving State after its task has been fulfilled. However, it is customary for the head and members of the special mission to inform the representatives of the receiving State with whom they are in contact verbally, either during the course of their work or at the end of their mission, of the date and hour of their departure and the means of transport they propose to use. The Commission took the view that even in this case a regular notification should be given.

(6)   A separate question is whether a head or member of a special mission who remains in the territory of the receiving State after his official mission has ended but while his visa is still valid should give notice of his extended stay. Opinion is divided on this question, and the answer depends on the receiving State's general laws governing aliens. If an extended stay of this kind does occur, however, it is an open question at what point of time the official stay becomes a private stay. Courtesy demands that the situation should be treated with some degree of tolerance. The Commission considers it unnecessary to include provisions governing this case in the text of the article.

(7)   The right to recruit auxiliary staff for special missions locally is in practice limited to the recruitment of auxiliary staff without diplomatic rank or expert status, persons performing strictly technical functions (e.g., chauffeurs), and service staff. The rule observed in practice is that the receiving State should ensure the availability of such services, for the performance of the functions of the special mission is often dependent on them. In 1960 the International Law Commission inclined to the view that the availability of these services to special missions should be regarded as part of their general privileges. However, the receiving State is entitled to information on any local recruitment by special missions and, in the Commission's view, the latter must see that the authorities of the receiving State are kept regularly informed concerning the engagement and discharge of such staff, although all engagements of this kind, like the special mission itself, are of limited duration.

(8)   In order to make notification easy and flexible in practice, the special mission, as soon as it begins to discharge its functions, effects notification direct, and not necessarily through the permanent diplomatic

---

[217] *Ibid.*, p. 113 and pp. 179-180.

mission. The Commission has found this a sensible custom and has included a rule to that effect in the text of article 8, paragraph 2.

### Article 9. General rules concerning precedence

**1. Except as otherwise agreed, where two or more special missions meet in order to carry out a common task, precedence among the heads of the special missions shall be determined by alphabetical order of the names of the States.**

**2. The precedence of the members and the staff of the special mission shall be notified to the appropriate authority of the receiving State.**

*Commentary*

(1) The question of precedence among the heads of special missions arises only when several special missions meet, or when two missions meet on the territory of a third State. In practice, the rules of precedence among the heads of permanent diplomatic missions are not applied. The Commission did not consider that precedence among the heads of special missions should be governed by the provisions of the Vienna Convention, which are based on the presentation of credentials or on the date of arrival and on classes of heads of permanent missions — institutions irrelevant to special missions.

(2) The question of rank does not arise when a special mission meets with a delegation or organ of the receiving State. In practice, the rules of courtesy apply. The organ or delegation of the receiving State pays its compliments to the foreign special mission and the mission pays its respects to its host, but there is no question of precedence, properly so-called. The Commission has not dealt with this situation in the text of the articles, since it considers the rules of courtesy sufficient.

(3) The Commission believes that it would be wrong to include a rule that the order of precedence of heads of special missions should be determined by the diplomatic rank to which their titles would assign them under the general rules on classes of heads of permanent missions.

(4) Of particular significance is the fact that many heads of special missions have no diplomatic rank, and that heads of special missions are often personalities standing above all diplomatic rank. Some States make provision for such cases in their domestic law and in their practice, and give precedence to ministers who are members of the cabinet and to certain other high officials.

(5) The Commission wishes to stress that the rules or article 9 are not valid with respect to special missions having ceremonial or formal functions. This question is dealt with in article 10.

(6) The Commission considers that the rank of heads of special missions should be determined on the basis of the following considerations. Although in the case of *ad hoc* ceremonial diplomacy the heads of special

missions are still divided into diplomatic classes (e.g., special ambassador, special envoy), the current practice is not to assign them any special diplomatic title. All heads of special missions represent their States and are equal among themselves in accordance with the principle of the equality of States.

(7) The International Law Commission did not take up this question in 1960. During the Commission's debates in 1960, however, Mr. Jiménez de Aréchaga expressed the view that the rules on classes of heads of missions applied equally to special missions, and he did not restrict that conclusion to ceremonial missions.[218]

(8) The practice developed in relations between States since the formation of the United Nations ignores the division of heads of special missions into classes according to their ranks, except in the case of ceremonial missions.

(9) There are two views concerning precedence among heads of special missions. According to the first, the question of rank does not arise with special missions. This follows from the legal rule laid down by article 3 of the Regulation of Vienna of 19 March 1815. This provides that diplomatic agents on special mission shall not by this fact be entitled to any superiority of rank. Genet [219] deduces from this rule that they have no special rank by virtue of their mission, although they do have diplomatic status. However, Satow [220] takes a different view. Although the heads of special missions are not ranked in the same order as the heads of the permanent diplomatic missions, there does exist an order by which their precedence can be established. This, says Satow, is an order *inter se*. It is based on their actual diplomatic rank ; and where they perform identical functions, precedence among them is determined on the basis of the order of presentation of their credentials or full powers.

(10) In his 1960 proposal,[221] Mr. A. E. F. Sandström, Special Rapporteur of the International Law Commission, took the view that although, under the Regulation of Vienna, a special mission enjoys no superiority of rank, the heads of special missions, at least ceremonial missions, nevertheless rank among themselves according to the order of the presentation of their credentials. Yet while advancing this opinion in the preliminary part of his report, he limited himself in his operative proposal (alternative I, article 10, and alternative II, article 3) to inserting the negative provision that the head of a special mission should not, by such position only, be entitled to any superiority of rank.

(11) Mr. Sandström took as his starting point the idea that rank was defined by membership in the diplomatic service or by diplomatic category. He therefore

---

[218] *Ibid.*, p. 116.

[219] Raoul Genet, *Traité de diplomatie et de droit diplomatique*, Paris, 1931, vol. I, p. 86.

[220] Sir Ernest Satow, *A Guide to Diplomatic Practice*, 4th edition, London, 1957, p. 41.

[221] *Yearbook of the International Law Commission, 1960*, vol. II, p. 109.

made a distinction between diplomatic missions, missions regarded as being diplomatic, and technical missions, which are not of a diplomatic character.

(12)   In the first place, the Commission, at its sixteenth session, held that it is not true that the person heading a special diplomatic mission of a political character will necessarily be a member of the diplomatic service and have diplomatic rank. Such missions may be headed by other persons, so that diplomatic rank is a very unreliable criterion. Why should a high official of the State (for example, a member of the Government) necessarily be ranked lower than a person bearing the title of ambassador ? This would be incompatible with the current functional conception of diplomacy. On the other hand, it is considered that it would be erroneous to classify heads of mission having diplomatic rank according to their titles (for example, ambassador and minister plenipotentiary). They are all heads of diplomatic missions and have the same authority to represent their sovereign States, which, under Article 2 of the United Nations Charter, enjoy the right to sovereign equality. It follows that precedence *inter se* cannot be determined on the basis of diplomatic rank, at least in so far as juridical treatment is concerned (this does not affect the matter of courtesy towards the head of the special mission).

(13)   Secondly, the Commission discarded the idea that different principles apply to so-called technical missions. Such missions are today usually headed by a career diplomat, and the task of every technical mission includes some political and representative elements.

(14)   Again, precedence can hardly be established according to the order of the presentation of credentials by the heads of special missions. At most meetings of special missions the presumption, consistent with the facts, is that they arrive simultaneously,[222] and the individual and ceremonial presentation of credentials is a distinct rarity. For this reason, the date of presentation is without significance in practice.

(15)   Precedence among heads of special missions, limited as it is in its effect to their relations *inter se*, is important only in the case of a multilateral meeting or of contacts among two or three States, not counting the receiving State. In contacts between the special mission and the representatives of the receiving State alone, the question of precedence does not arise : as a matter of courtesy the host treats its guest with high consideration, and the latter is obliged to act in the same manner towards its host.

(16)   The Commission considers that as a result, first, of the change which has taken place in the conception of the character of diplomacy, especially the abandonment of the theory of the exclusively representative character of diplomacy and the adoption of the functional theory,[223] and secondly, of the acceptance of the

principle of the sovereign equality of States, the legal rules relating to precedence among heads of special missions have undergone a complete transformation. The principles of the Regulation of Vienna (1815) are no longer applicable. No general principle can be inferred, on the basis of analogy, from the rules of precedence governing permanent missions. For this reason, more and more use is being made of an automatic method of determining the precedence of heads of special missions, namely, the classification of delegates and delegations according to the alphabetical order of the names of the participating States. In view of the linguistic differences in the names of States, the custom is also to state the language in which the classification will be made.[224] This is the only procedure which offers an order capable of replacing that based on rank, while at the same time ensuring the application of the rules on the sovereign equality of States.[225]

(17)   The International Law Commission did not go into the question of precedence within a special mission. It believes that each State must itself determine the internal order of precedence among the members of the special mission and that this is a matter of protocol only, the order of precedence being sent to the receiving State by the head of the special mission either direct or through the permanent diplomatic mission. This rule forms the subject of article 9, paragraph 2.

(18)   The Commission also believes that there are no universal legal rules determining the order of precedence as between members of different special missions, or as between them and members of permanent diplomatic missions, or as between them and the administrative officials of the receiving State.

(19)   It frequently happens that special missions meet in the territory of a third State which is not involved in their work. In this case it is important to the receiving State that the precedence of the heads of the special missions, or rather of the missions themselves, should be fixed, so that it does not, as host, run the risk of favouring one of them or of being guided by subjective considerations in determining their precedence.

(20)   A brief comment must be made on the question of the use of the alphabetical order of names of States as a basis for determining the order of precedence of special missions. At the present time, the rule in the United Nations and in all the specialized agencies, in accordance with the principle of the sovereign equality of States, is to follow this method. While considering it to be the most correct one, the Commission concedes that the rule need not be strictly interpreted as requiring the use of the alphabetical order of the names of States

---

[221] Thus, Jiménez de Aréchaga ; see *Yearbook of the International Law Commission, 1960*, vol. II, p. 116, para. 13.

[222] This cumulation of the functional and the representative character is confirmed by the fourth paragraph of the Preamble and by article 3 of the Vienna Convention on Diplomatic Relations.

[224] Mr. Sandström too used this method in his draft in dealing with the question of the participation of *ad hoc* diplomats in congresses and conferences (chap. II, art. 6).

[225] In order to bring the practice further into line with the principle of equality, it is now customary for lots to be drawn, the initial letter of the name of the State thus chosen indicating the beginning of the *ad hoc* alphabetical order. At United Nations meetings and meetings organized by the United Nations, lots are drawn at the opening of the session, to assign seats to the participating States for the duration of the session and whenever a roll-call vote is taken.

in a specified language — English, for example. Some experts have drawn attention to the possibility of applying the same method but on the basis of the alphabetical order of names of States used in the official diplomatic list of the receiving State. The important thing is that the system applied should be objective and consistent with the principle of the sovereign equality of States. For this reason, the Commission adopted the principle of the alphabetical order of the names of States. The members of the Commission were divided on the question whether the order adopted should be that used by the United Nations or that used in the official diplomatic list of the receiving State.

(21) The Commission considers that everything stated in this article with regard to heads of special missions is also applicable to single representatives.

### Article 10. Precedence among special ceremonial and formal missions

**Precedence among two or more special missions which meet on a ceremonial or formal occasion shall be governed by the protocol in force in the receiving State.**

*Commentary*

(1) The Vienna Convention on Diplomatic Relations confines itself to provisions concerning permanent diplomatic missions and does not take into account either special missions or diplomatic ceremonial and formal missions, which have continued to exist in practice even after the establishment of permanent resident diplomacy, and continue to exist to this day.

(2) The Commission observed that the rules governing special ceremonial and formal missions vary from State to State. The question arises whether a selection should be made among the different customs, or whether the rule universally observed in practice should be adopted, namely, that the receiving State is competent to settle the order of precedence among special missions meeting in its territory on the occasion of a ceremony or a formal manifestation. The Commission favoured the second proposal.

(3) The different customs found in practice include the following :

(a) On such occasions the representatives of States customarily bear the title of special ambassadors extraordinary. Even a regularly accredited ambassador, when assigned to represent his country on a ceremonial occasion, is given the title of *ad hoc* ambassador. This is regarded as a point of international courtesy.

(b) In accordance with the established interpretation of article 3 of the Regulation of Vienna of 1815, the *prior tempore* rule is held to apply even to these ambassadors, who should take precedence in the order of the time of presentation of the letters of credence issued for the *ad hoc* occasion. In practice, however, it has proved almost impossible to implement this rule. The funeral of King George VI of Great Britain was a case in point. A number of

special missions were unable, for lack of time, to present their letters of credence, or even copies of them, to the new Queen before the funeral ceremony. Moreover, several missions arrived in London simultaneously, so that the rule providing for the determination of precedence according to the order of arrival was also inapplicable. For this reason, it was maintained that it would be preferable to select another criterion, more objective and closer to the principle of the sovereign equality of States, while retaining the division of heads of special missions into classes.

(c) It is becoming an increasingly frequent practice to send special delegates of higher rank than ambassador to be present on ceremonial occasions. Some countries consider that to give them the title of *ad hoc* ambassador would be to lower their status, for it is increasingly recognized that Heads of Government and ministers rank above all officials, including ambassadors. In practice, the domestic laws of a number of countries give such persons absolute precedence over diplomats.

(d) However, persons who do not belong to the groups mentioned in sub-paragraph (a) above are also sent as special *ad hoc* ambassadors, but are not given diplomatic titles because they do not want them. Very often these are distinguished persons in their own right. In practice there has been some uncertainty as to the rules applicable to their situation. One school of thought opposes the idea that such persons also take precedence over *ad hoc* ambassadors ; and there are some who agree with the arguments in favour of this viewpoint, which are based on the fact that, if the State sending an emissary of this kind wishes to ensure that both the head of the special mission and itself are given preference, it should appoint him *ad hoc* ambassador. Any loss of precedence is the fault of the sending State.

(e) In such cases, the diplomatic status of the head of the special mission is determined *ad hoc*, irrespective of what is called (in the French texts) the *rang diplomatique réel*. The title of *ad hoc* ambassador is very often given, for a particular occasion, either to persons who do not belong to the diplomatic career service or to heads of permanent missions who belong to the second class. This fact should be explicitly mentioned in the special letters of credence for ceremonial or formal occasions.

(f) The issuance of special letters of credence covering a specific function of this kind is a customary practice. They should be in good and due form, like those of permanent ambassadors, but they differ from the latter in their terms, since the mission's task is strictly limited to a particular ceremonial or formal function. The issuance of such letters of credence is regarded as an international courtesy, and that is why heads of permanent diplomatic missions are expected to have such special letters of credence.

(g) Great difficulties are caused by the uncertainty of the rules of law concerning the relative rank of the head of a special mission for a ceremonial and formal function and the head of the mission regularly

accredited to the Government of the country in which the ceremonial occasion takes place. Under the protocol instructions of the Court of St. James, the heads of special missions have precedence, the heads of regularly accredited diplomatic missions occupying the rank immediately below them, unless they are themselves acting in both capacities on the specific occasion in question. This solution is manifestly correct and is dictated by the very nature of the function, since otherwise it would be utterly pointless to send a special mission.

(*h*) The situation of the members of a special mission of a ceremonial or formal nature in cases where the members are designated as equals and are given collective letters of credence for the performance of the ceremonial or formal function in question is not precisely known. As stated in paragraph (4) of the commentary on article 7, practice in this matter is not uniform.

(4)    Some members of the Commission requested that, despite the Commission's unanimous decision to accept the rule incorporated in article 10, the Special Rapporteur's original text should also be included in the present report for purposes of information.[226] This text is as follows :

"  1.    Where two or more special missions meet on a formal or ceremonial occasion (for example, a marriage, christening, coronation, installation of Head of State, funeral, etc.), precedence among the heads of mission shall be determined in accordance with the class to which each head of mission belongs by virtue of his diplomatic title, and within each class in accordance with the alphabetical order of the names of the States.

"  2.    Heads of State, members of ruling families, chairmen of councils and ministers who are members of the Government represent special classes having precedence over the class of ambassadors.

"  3.    Heads of special missions who do not possess the diplomatic rank of ambassador or minister plenipotentiary and who do not belong to the groups specified in paragraph 2 of this article shall constitute, irrespective of the functions they perform, a special group next following that of heads of special missions having the rank of minister plenipotentiary.

"  4.    The diplomatic title used in determining precedence for the purposes of this article, except in the case of persons mentioned in paragraph 2, shall be that indicated in the credentials issued for the performance of the ceremonial or protocol function.

"  5.    Heads of regular diplomatic missions shall not be considered to be heads of special missions for ceremonial or formal functions unless they have presented credentials issued specially for this particular purpose.

"  6.    The rank of the staff of special ceremonial and formal missions shall be determined in accordance with the rank of the heads of mission.

"  7.    When they appear at the ceremony to which their formal or ceremonial function relates, heads of

special missions shall take precedence over the heads of regular diplomatic missions."

This text was communicated to the Commission, but the Commission did not consider it in detail because it had decided in principle to regulate the matter by reference rather than by substantive provisions.

### Article 11.  Commencement of the functions of a special mission

**The functions of a special mission shall commence as soon as that mission enters into official contact with the appropriate organs of the receiving State. The commencement of its functions shall not depend upon presentation by the regular diplomatic mission or upon the submission of letters of credence or full powers.**

*Commentary*

(1)    The Vienna Convention on Diplomatic Relations contains no express provisions on the commencement of the functions of permanent diplomatic missions.

(2)    The International Law Commission takes the view that, where the commencement of the functions of a special mission is concerned, the rules applicable to permanent diplomatic missions do not apply.[227]

(3)    In practice, this matter is governed by a special usage. The functions of the special mission which have been the subject of prior notice and acknowledgement begin when the special mission arrives in the territory of the receiving State, unless it arrives prematurely — a situation which depends on the circumstances and on the notion of what constitutes a reasonable interval of time. If there has been no prior notice, the functions are deemed to begin when contact is made with the organs of the receiving State. A further point is that, in the case of special missions, the commencement of the function need not be deemed to take place only when copies of the letters of credence or full powers are presented, although this is taken into account in the case of *ad hoc* ambassadors. Heads of special missions in general, even in case where they must have full powers, do not now present either the original or a copy in advance, but only when the time comes to prove their authority to assume obligations on behalf of the sending State. Thus there is a legal difference with respect to determining when the function commences, as compared with the case of the heads of permanent missions.

(4)    Almost all the instructions by States concerning the exercise of functions related to diplomatic protocol are found to contain more rules on the procedure for welcoming a ceremonial *ad hoc* mission when it arrives and escorting it when it leaves than on its reception, which consists of an audience with the Minister for Foreign Affairs to introduce the mission, or the presentation of letters of introduction or copies of credentials. There are even fewer rules on audiences by Heads of State for the presentation of letters of

---

[226] *Vide supra*, p. 98, article 9.

[227] *Yearbook of the International Law Commission, 1960,* vol. II, p. 116 and p. 180.

Case 1:19-cv-01618-TSC    Document 109-48    Filed 02/14/25    Page 227 of 237

**222**        **Yearbook of the International Law Commission, Vol. II**

credence. Even if the head of a special mission arrives with special letters of credence addressed to the Head of State, the practice is to present them more expeditiously — i.e., though the Chief of Protocol — and the functions of the mission commence immediately. An example of this custom is the case of an *ad hoc* mission sent to present the condolences of its own Head of State to the Head of State of another country upon the death of his predecessor or of a member of the royal family. In such a case, formal receptions are hardly in order ; besides, there is usually little time. Nevertheless, missions of special importance are treated according to the general rules of protocol, both on arrival and when they leave.

(5)  Contacts between special missions appointed to conduct political negotiations also generally take place immediately following the so-called protocol visit to the competent official with whom the negotiations are to be held.

(6)  In the case of special missions appointed to conduct technical negotiations, it is not the practice to have either a ceremonial reception or a ceremonial presentation of credentials. It is customary, however, to make an introductory visit or, if the parties already know each other, a visit for the purpose of establishing contact. There is a growing tendency to abandon the custom whereby the head of the special mission is accompanied on his first visit by the head of the diplomatic mission permanently accredited to the receiving State, or by some member of that mission, if the head of the special mission or his opposite number who is to receive him is of lower rank than the head of the permanent mission. In practice, however, this formality of introduction is becoming obsolete, and the Commission does not deem it essential.

(7)  It should be noted that there is an essential difference between the reception of the head of a special mission and the presentation of his letters of credence or full powers on the one hand and the reception of the heads of permanent missions and the presentation of their credentials on the other. This difference relates, first of all, to the person from whom the full powers emanate, in cases other than that of a special ambassador or an *ad hoc* ceremonial mission. A special ambassador and the head of an *ad hoc* ceremonial mission receive their letters of credence from the Head of State, as do the regular heads of diplomatic missions of the first and second classes, and they are addressed to the Head of the State to which the persons concerned are being sent. This procedure is not necessarily followed in the case of other special missions. In accordance with a recently established custom, and by analogy to the rules concerning the regularity of credentials in the United Nations, full powers are issued either by the Head of State or of Government or by the Minister for Foreign Affairs, regardless of the rank of the delegate or of the head of the special mission.

(8)  Again, this difference is seen in the fact that the letters of credence of the head of a permanent diplomatic mission are always in his name, while this is not so in the case of special missions, where even for a ceremonial mission, the letters of credence may be collective, in the sense that not only the head of the mission but the other members also are appointed to exercise certain functions (a situation which could not occur in the case of regular missions, where there is no collective accreditation). Full powers may be either individual or collective, or possibly supplementary (granting authority only to the head of the mission, or stipulating that declarations on behalf of the State will be made by the head of the mission and by certain members or by one or more persons named in the full powers, irrespective of their position in the mission). It has recently become increasingly common to provide special missions with supplementary collective full powers for the head of the mission or a particular member. This is a practical solution (in case the head of the mission should be unable to be present throughout the negotiations).

(9)  In practice, the members and staff of a special mission are deemed to commence their function at the same time as the head of the mission, provided that they arrived together when the mission began its activities. It they arrived later, their function is deemed to commence on the day of their arrival, duly notified to the receiving State.

(10)  It is becoming increasingly rare to accord a formal welcome to special missions when they arrive at their destination, i.e., at the place where the negotiations are to be held. In the case of important political missions, however, the rules concerning reception are strictly observed but this is of significance only from the standpoint of formal courtesy and has no legal effect.

(11)  Members of permanent diplomatic missions who become members of a special mission are considered, despite their work with the special mission, to retain their capacity as permanent diplomats ; consequently, the question of the commencement of their functions in the special mission is of secondary importance.

(12)  In practice, States complain of discrimination by the receiving State in the reception of special missions and the way in which they are permitted to begin to function even among special missions of the same character. The Commission believes that any such discrimination is contrary to the general principles governing international relations. It believes that the principle of non-discrimination should operate in this case too ; and it requests Governments to advise it whether an appropriate rule should be included in the article. The reason why the Commission has refrained from drafting a provision on this subject is that very often differences in treatment are due to the varying degree or cordiality of relations between States.

**Article 12. End of the functions of a special mission**

**The functions of a special mission shall come to an end,** inter alia, **upon :**

   (a) **The expiry of the duration assigned for the special mission ;**

   (b) **The completion of the task of the special mission ;**

(c) Notification of the recall of the special mission by the sending State ;

(d) Notification by the receiving State that it considers the mission terminated.

*Commentary*

(1)   The Vienna Convention on Diplomatic Relations contains no rules dealing directly with the end of the functions of permanent diplomatic missions. Its treatment of the subject is limited to one provision on the end of the function of a diplomatic agent (article 43) and the provision concerning the case of the breaking off of diplomatic relations or the recall of the mission (article 45).

(2)   In its deliberations in 1960,[228] the International Law Commission accepted the view that a special mission came to an end for the same reasons as those terminating the functions of diplomatic agents belonging to permanent missions. However, the accomplishment of a special mission's task was added as a special reason for the termination of its functions.[229]

(3)   The Commission accepted the view of the majority of authors that the task of a special mission sent for a ceremony or for a formal occasion should be regarded as accomplished when the ceremony or occasion is over.

(4)   In the first proposal he submitted in 1960 as the Commission's Special Rapporteur, Mr. Sandström expressed the opinion that it was desirable also to consider the functions of the special mission ended when the transactions which had been its aim were interrupted. A resumption of negotiations would then be regarded as the commencement of the functions of another special mission. Some authors adopt the same view and consider that in such cases it is unnecessary for the special mission to be formally recalled. The Commission regarded as well-founded the argument that the functions of a special mission are ended, to all practical purposes, by the interruption or suspension *sine die* of negotiations or other deliberations. It considered it preferable, however, to leave it to the sending and receiving States to decide whether they deemed it necessary in such cases to bring the mission to an end by application of the provisions of article 12 (*c*) and (*d*).

**Article 13.   Seat of the special mission**

**1.   In the absence of prior agreement, a special mission shall have its seat at the place proposed by the receiving State and approved by the sending State.**

**2.   If the special mission's tasks involve travel or are performed by different sections or groups, the special mission may have more than one seat.**

*Commentary*

(1)   The provision of article 13 is not identical to that contained in the Vienna Convention on Diplomatic

Relations (article 12). In the first place, permanent missions must have their seats in the same locality as the seat of the Government. The permanent mission is attached to the capital of the State to which it is accredited, whereas the special mission is usually sent to the locality in which it is to carry out its task. Only in exceptional cases does a permanent mission set up offices in another locality, whereas it frequently occurs that, for the performance of its task, a special mission has to move from place to place and its functions have to be carried out simultaneously by a number of groups or sections. Each group or section must have its own seat.

(2)   Very little has been written on this question, and in 1960 the Commission did not consider it necessary to deal with it at length. Its basic thought was that the rules applicable to permanent missions in this connexion were not relevant to special missions and that no special rules on the subject were needed. Some members of the Commission did not entirely agree, however, because the absence of rules on the subject might encourage special missions to claim the right to choose their seat at will and to " open offices in any part of the territory of the receiving State ".[230]

(3)   In practice, special missions normally remain at the place designated by mutual agreement, which, in most cases, is not formally established by the sending State and the receiving State. Under that agreement the special mission generally establishes its offices near the locality where its functions are to be performed. If the place in question is the capital city of the receiving State and there are regular diplomatic relations between the two States, the official offices of the special mission are usually on the premises of the sending State's regular diplomatic mission, which (unless otherwise indicated) is its official address for communication purposes. Even in this case, however, the special mission may have a seat other than the embassy premises.

(4)   It is very rare, in practice, for the seat of a special mission not to be chosen by prior agreement. In the exceptional case where the special mission's seat is not established, in advance by agreement between the States concerned, the practice is that the receiving State proposes a suitable locality for the special mission's seat, chosen in the light of all the circumstances affecting the mission's efficient functioning. Opinion is divided on whether the sending State is required to accept the place chosen by the receiving State. It has been held that such a requirement would conflict with the principle of the United Nations Charter concerning the sovereign equality of States if the receiving State were to impose the choice of the seat. The Commission has suggested a compromise, namely, that the receiving State should have the right to propose the locality, but that in order to become effective, that choice should be accepted by the sending State. That solution would have certain shortcomings in cases where the proposal was not accepted. The Commission has left the question open.

[228]   *Ibid.*, p. 179-180.
[229]   This addition was proposed by Mr. Jiménez de Aréchaga ; see *ibid.*, p. 115.

[230]   *Yearbook of the International Law Commission, 1960*, vol. II, p. 116 and pp. 179-180.

(5) The Commission did not go into the details of rules to determine the difference between the main seat and other seats where the special mission's task makes it necessary for it to have more than one seat. Usage varies in practice. One solution proposed to the Commission was that the main seat should be in the locality in which the seat of the Ministry of Foreign Affairs of the receiving State is situated, or in some other locality chosen by mutual agreement, and that the other seats should be established with a view to facilitating the work of the sections or teams. However, the Commission preferred to leave this question to be settled by agreement of the parties.

### Article 14. Nationality of the head and the members of the special mission and of members of its staff

**1. The head and members of a special mission and the members of its staff should in principle be of the nationality of the sending State.**

**2. Nationals of the receiving State may not be appointed to a special mission except with the consent of that State, which may be withdrawn at any time.**

**3. The receiving State may reserve the right provided for in paragraph 2 with regard to the nationals of a third State who are not also nationals of the sending State.**

*Commentary*

(1) Article 14 corresponds to article 8 of the Vienna Convention on Diplomatic Relations.

(2) In 1960 the International Law Commission did not consider it necessary to express an opinion on the question whether the rules concerning the nationality of diplomatic agents of permanent missions should also apply to special missions. It even formulated the rule that the relevant article of its 1958 draft — article 7 — did not apply directly to special missions.[281]

(3) The relevant literature, on the other hand, does not consider it impossible for nationals of a country to be admitted by that country as members of special missions, but stresses that the problem has been dealt with differently by various countries at various times.[282]

(4) In the Commission's view, there is no reason why nationals of the receiving State should not be employed as *ad hoc* diplomats of another State, but for that purpose the consent of the receiving State has to be obtained.

(5) Apart from the question whether a national of the receiving State can perform the functions of *ad hoc* diplomat of another State, the problem arises whether an *ad hoc* diplomat must possess the nationality of the State on whose behalf he carries out his mission. Here again, the International Law Commission ex-

pressed no opinion in 1960. Recent practice shows that nationals of third States, and even stateless persons, may act as *ad hoc* diplomats of a State, although some members of the Commission held it to be undesirable that they should do so. Practical reasons sometimes make it necessary to adopt this expedient and in practice it is for the receiving State alone to decide whether or not such persons should be recognized as *ad hoc* diplomats.

(6) The Commission has not specifically referred in the text to the possibility that the head of a special mission or one of its members of staff might have dual nationality. It believes that, in the case of a person who also possesses the nationality of the receiving State, that State has the right, in accordance with the existing rules on nationality in international law and with the practice of some countries, to consider such a person on the basis of the characterization theory, exclusively as one of its own nationals. In most States, the idea still prevails that nationality of the receiving State excludes any other nationality, and the argument that effective nationality excludes nominal nationality is not accepted in this case. The case of a person possessing more than one foreign nationality is juridically irrelevant, since it would be covered by paragraph 3 of this article.

(7) The Commission has also not considered whether persons possessing refugee status who are not natives of the receiving State can be employed, without the special approval of the receiving State, as heads or members of special missions or of their staffs.

(8) As regards nationals of the receiving State engaged locally by the special mission as auxiliary staff, and persons having a permanent domicile in its territory, the Special Rapporteur believes that they should not be subject to the provisions of this article, but rather to the régime applicable in this respect under the domestic law of the receiving State. The Commission did not deem it necessary to adopt a special rule on the subject.

(9) Nor did the Commission express any views on the question whether, in this respect, aliens and stateless persons having a permanent domicile in the territory of the receiving State should be treated in the same way as nationals of that State.

### Article 15. Right of special missions to use the flag and emblem of the sending State

**A special mission shall have the right to display the flag and emblem of the sending State on the premises of the mission, on the residence of the head of the mission and on the means of transport of the mission.**

*Commentary*

(1) Article 15 is modelled on article 20 of the Vienna Convention on Diplomatic Relations.

(2) The Commission reserves the right to decide at a later stage whether article 15 should be placed in

---

[281] *Ibid.*, pp. 179-180.
[282] Sir Ernest Satow, *A Guide to Diplomatic Practice*, 4th edition, London, 1957, pp. 138-141.

the section of the draft dealing with general matters or in the special section concerning facilities, privileges and immunities.

(3) In 1960, the International Law Commission recognized the right of special missions to use the national flag of the sending State upon the same conditions as permanent diplomatic missions.[233] In practice, the conditions are not identical, but nevertheless there are some instances where this is possible. The Commission's Special Rapporteur, Mr. Sandström, cited the case of the flying of the flag on the motor vehicle of the head of a ceremonial mission. During the discussion which took place in the Commission in 1960, Mr. Jiménez de Aréchaga expressed the view that all special missions (and not only ceremonial missions) have the right to use such flags on the ceremonial occasions where their use would be particularly appropriate.[234]

(4) Current practice should be based on both a wider and a narrower approach : wider, because this right is not restricted to ceremonial missions but depends on the general circumstances (e.g., special missions of a technical nature moving in a frontier zone and all special missions on certain formal occasions) ; and narrower, because this usage is now limited in fact to the most formal occasions or to circumstances which warrant it, in the judgement of the mission. In practice, however, such cases are held within reasonable limits, and the tendency is towards restriction.

(5) All the rules applicable to the use of the national flag apply equally to the use of the national emblem, both in practice and in the opinion of the International Law Commission.

(6) In practice, some receiving States assert that they have the right to require that the flag of the sending State should be flown on all means of transport used by the special mission when it is travelling in a particular area. It is claimed in support of this requirement that measures to protect the special mission itself will be easier to carry out if the attention of the authorities of the receiving State is drawn by an external distinguishing mark, particularly in frontier security zones and military zones and in special circumstances. Some States, however, object to this practice on the grounds that it very often causes difficulties and exposes the special mission to discrimination. The Commission holds that this practice is not universally recognized and it has therefore not included a rule regarding it in the text of article 15.

### Article 16. Activities of special missions in the territory of a third State

1. Special missions may not perform their functions in the territory of a third State without its consent.

2. The third State may impose conditions which must be observed by the sending State.

*Commentary*

(1) There is no corresponding rule in the Vienna Convention on Diplomatic Relations, but article 7 of the Vienna Convention on Consular Relations of 1963 provides that a consular post established in a particular State may not exercise consular functions in another State if the latter objects.

(2) Very often, special missions from different States meet and carry on their activities in the territory of a third State. This is a very ancient practice, particularly in the case of meetings between *ad hoc* missions or diplomats belonging to States which are in armed conflict. The International Law Commission did not take note of this circumstance in 1960 ; nor have writers paid much attention to it, but some of them mention it, particularly where the contact takes place through the third State. Whether or not the third State engages in mediation or extends its good offices, courtesy undoubtedly requires that it should be informed, and it is entitled to object to such meetings in its territory.

(3) Thus, the States concerned are not entitled to make arbitrary use of the territory of a third State for meetings of their special missions, if this is contrary to the wishes of that State. However, if the third State has been duly informed and does not express any objection (its formal consent is not necessary), it has a duty to treat special missions sent in these circumstances with every consideration, to assure them the necessary conditions to carry on their activities, and to offer them every facility, while the parties concerned, for their part, must refrain from any action which might harm the interests of the third State in whose territory they carry on their activities.

(4) In practice, the prior approval of the third State is often simply a matter of taking note of the intention to send a special mission to its territory (such intention may even be notified orally). If the third State makes no objection to the notification and allows the special mission to arrive in its territory, approval is considered to have been given.

(5) The Commission regards as correct the practice of some States — for example, Switzerland during the war — in imposing certain conditions which must be observed by parties sending special missions. The duty to comply with these conditions is without prejudice to the question whether, objectively, the missions' activities are considered to be prejudicial to the interests of the third State in whose territory they are carried on.

(6) A question which arises in practice is whether the third State must not only behave correctly and impartially towards the States whose missions meet in its territory by according them equal treatment, but must also respect any declarations it may itself have made in giving its prior approval. Since such approval can be given implicitly, it must be considered that a third State which goes even further by taking note, without objection, of a request for permission to use its territory is, in accordance with the theory of unilateral juridical acts in international law, bound by the request of the parties concerned, unless it has made certain reservations.

---

[233] *Yearbook of the International Law Commission, 1960,* vol. II, p. 108, p. 180.

[234] *Ibid.,* p. 116.

(7) Intercourse between a special mission of one State and the permanent diplomatic mission of another State accredited to the receiving State must be accorded the same treatment as the intercourse and activities of special missions in the territory of the third State. Such contacts are frequent, and they are referred to by legal writers as irregular means of diplomatic communication. They make direct intercourse possible between States which do not maintain mutual diplomatic relations, even when the States concerned are in armed conflict.

(8) The right of the third State, at any time and without being obliged to give any reason, to withdraw its hospitality from special missions in its territory and to prohibit them from engaging in any activity is recognized. In such cases, the sending States are obliged to recall their special missions immediately, and the missions themselves are required to cease their activities as soon as they learn that hospitality has been withdrawn. The exercise of this right by the third State does not mean that diplomatic relations with the States in question are broken off or that the head of the mission or its members are declared *persona non grata*. It merely means that the third State's consent to the activities of special missions in its territory has been revoked. The Commission held that article 16, paragraph 1, was sufficient and that the word " consent " means that the consent of the third State continues to be required throughout the period during which the activities of the special missions of the other States are taking place.

## Chapter IV
### Programme of Work and Organization of Future Sessions

36. After discussion at two private meetings held on 19 and 22 June 1964 and consideration by the officers of the Commission and the Special Rapporteurs, the Commission, at its 749th meeting, adopted its programme of work for 1965 and 1966. It decided to complete the study of the law of treaties and of special missions within that period. As to the other subjects on its agenda, the Commission decided to give priority to its work on relations between States and inter-governmental organizations. The questions of succession of States and Governments and State responsibility will be dealt with as soon as the subjects previously mentioned have been completed.

37. These decisions were taken having regard, in particular, to the fact that the term of office of the present members of the Commission expires at the end of 1966 and that it is desirable to complete, before that date, not only the study of the law of treaties, but also the study of special missions. That topic was chosen in preference to relations between States and inter-governmental organizations in the light of General Assembly resolution 1289 (XIII) of 5 December 1958, which provided that the question of relations between States and inter-governmental international organizations should be considered " at the appropriate time, after study of diplomatic intercourse and immunities, consular intercourse and immunities and *ad*

*hoc* diplomacy has been completed by the United Nations . . . ". A draft on special missions had already been prepared, and several articles of that draft were discussed at the present session.

38. The need to complete the study of several topics before the end of 1966 led the Commission to raise the question of the duration of sessions. In order to complete its programme for 1964, the Commission decided to extend its present session by one week. It regretted the fact that, by reason of external circumstances such as the postponement of the dates of the nineteenth session of the General Assembly, it was not possible for the Commission to hold a supplementary winter session in 1965, as it had intended. The Commission believes, however, that it is essential to hold a four-week winter session in 1966, in order to have at its disposal the minimum time necessary for the completion of the heavy programme of work it has to complete before the end of the 1966 session.

39. The Commission intends in 1965, after considering the comments received from Governments, to conclude the second reading of the first part, and as many further articles as possible of the second part, of its draft on the law of treaties, in accordance with suggestions of the Special Rapporteur. At the same session, the Commission will continue its study of special missions and of relations between States and inter-governmental organizations. In 1966, the Commission will complete the remaining articles of its draft on the law of treaties and the draft on special missions. At the same time and within the limits of the time available, the Commission will also continue its study of relations between States and inter-governmental organizations and undertake further preparatory work on succession of States and Governments and State responsibility, which are to be the main subjects of its concern during sessions held after 1966.

40. It was therefore decided to ask the Secretariat to request Governments to submit their comments on the second part of the draft on the law of treaties by January 1965 at the latest, so that the Commission can consider them at its 1965 session; it was also decided to request Governments to submit their comments as soon as possible on the third part of the draft on the law of treaties completed in 1964 by the Commission, so that the whole of the work on the law of treaties could be completed before the end of 1966. The draft on special missions will be sent to Governments for comments when it is completed in 1965, and Governments will then be requested to submit their comments in time for the Commission to complete its work on the topic in 1966.

## Chapter V
### Other Decisions and Conclusions of the Commission

#### A. Relations between States and Inter-governmental Organizations

41. The Commission continued the discussion of the first report (A/CN.4/161 and Add.1) submitted

in 1963 by the Special Rapporteur, Mr. El-Erian.[235] In conjunction therewith the Commission examined a list of questions suggested by the Special Rapporteur in a working paper (A/CN.4/L.104) as a basis of discussion for the definition of the scope and mode of treatment of the topic. The questions related to:

(a) The scope of the subject [interpretation of General Assembly resolution 1289 (XIII)];

(b) The approach to the subject (either as an independent subject or as collateral to the treatment of other topics);

(c) The mode of treatment (whether priority should be given to " diplomatic law " in its application to relations between States and international organizations);

(d) The order of priorities (whether the status of permanent missions accredited to international organizations and delegations to organs of and conferences convened by international organizations should be taken up before the status of international organizations and their agents);

(e) The question whether the Commission should concentrate in the first place on international organizations of a universal character or should deal also with regional organizations.

42. At its 755th to 757th meetings, the Commission discussed these questions, and certain other related questions that arose in connexion therewith. The majority of the Commission, while agreeing in principle that the topic had a broad scope, expressed the view that for the purpose of its immediate study the question of diplomatic law in its application to relations between States and inter-governmental organizations should receive priority. Other suggestions made by members of the Commission will be considered in the preparation of a second report by the Special Rapporteur.

## B. CO-OPERATION WITH OTHER BODIES

43. At its 768th meeting, held on 17 July, the Commission considered the item concerning co-operation with other bodies.

44. It took note of the report by Mr. Eduardo Jiménez de Aréchaga (A/CN.4/172)[236] on the work of the sixth session of the Asian-African Legal Consultative Committee, held at Cairo from 23 February to 6 March 1964, which he had attended as observer for the Commission.

45. The Asian-African Legal Consultative Committee was represented by Mr. Hafez Sabek, who addressed the Commission.

46. After considering the standing invitation addressed to it by the Secretary of the Asian-African Legal Consultative Committee to attend the Committee's sessions, the Commission requested its Chairman, Mr. Roberto Ago, to attend the next session of the Committee as an observer or, if he were unable to do so, to appoint another member of the Commission or its Secretary to represent the Commission at that meeting. The next session of the Committee is to be held in Baghdad in February 1965.

47. No communication was received at the present session from the legal bodies of the Organization of American States regarding the next session of the Inter-American Council of Jurists.

48. The Commission considered a letter addressed to the Secretary of the Commission by Mr. F. Dumon, President of the International Union of Judges, requesting that the Union should be authorized to collaborate with the International Law Commission. As the Union's agenda does not for the time being include items similar to those studied by the Commission, the latter requested the Secretary to ask the Union to inform him when it proposed to study matters relating to those considered by the Commission, so that the Union's request to collaborate with the International Law Commission could then be resubmitted to the Commission.

49. At its 768th meeting, the Commission took note of the memorandum prepared by the Secretariat (A/CN.4/171) concerning the distribution of the documents of the Commission. This memorandum was submitted in response to the Commission's request, at its fifteenth session [237] in connexion with its consideration of the item on co-operation with other bodies. After an exchange of views, the Commission considered the possibility of establishing at its next session a small committee to study the problems involved.

## C. DATE AND PLACE OF THE NEXT SESSION

50. The Commission decided to hold its next session at the European Office of the United Nations from 3 May to 9 July 1965.

## D. REPRESENTATION AT THE NINETEENTH SESSION OF THE GENERAL ASSEMBLY

51. The Commission decided that it would be represented at the nineteenth session of the General Assembly, for purposes of consultation, by its Chairman, Mr. Roberto Ago.

## E. TRIBUTE TO THE SECRETARY OF THE COMMISSION

52. At its 767th meeting, held on 16 July, the Commission paid tribute to Dr. Yuen-li Liang, Director, Codification Division, Office of Legal Affairs of the United Nations, who has acted with high distinction as Secretary of the Commission since 1949, and who will retire after the present session.

---

[235] *Yearbook of the International Law Commission, 1963*, vol. II, pp. 159-185. The discussion of the report was begun at the fifteenth session of the Commission and a working paper (A/CN.4/L.103) (*ibid.*, p. 186) was submitted by the Special Rapporteur. It was intended to continue the discussion at a session in January 1964, which session, however, was not held.

[236] *Vide supra*, pp. 119-124.

[237] *Yearbook of the International Law Commission, 1963*, vol. II, p. 225, para. 70.

# CHECK LIST OF DOCUMENTS REFERRED TO IN THIS VOLUME

| Document | Title | Observations and references |
|---|---|---|
| A/925 | Report of the International Law Commission covering its first session, 12 April-9 June 1949 | *Official Records of the General Assembly, Fourth Session, Supplement No. 10 ; also published in Yearbook of the International Law Commission, 1949.* |
| A/1316 | Report of the International Law Commission covering its second session, 5 June-29 July 1950 | *Official Records of the General Assembly, Fifth Session, Supplement No. 12 ; also published in Yearbook of the International Law Commission, 1950, vol. II.* |
| A/3859 and Corr.1 | Report of the International Law Commission covering the work of its tenth session, 28 April-4 July 1958 | *Official Records of the General Assembly, Thirteenth Session, Supplement No. 9 ; also published in Yearbook of the International Law Commission, 1958, vol. II.* |
| A/4425 | Report of the International Law Commission covering the work of its twelfth session, 25 April-1 July 1960 | *Official Records of the General Assembly, Fifteenth Session, Supplement No. 9 ; also published in Yearbook of the International Law Commission, 1960, vol. II.* |
| A/5209 and Corr.1 | Report of the International Law Commission covering the work of its fourteenth session, 24 April-29 June 1962 | *Official Records of the General Assembly, Seventeenth Session, Supplement No. 9 ; also published in Yearbook of the International Law Commission, 1962, vol. II.* |
| A/5509 | Report of the International Law Commission covering the work of its fifteenth session, 6 May-12 July 1963 | *Official Records of the General Assembly, Eighteenth Session, Supplement No. 9 ; also published in Yearbook of the International Law Commission, 1963, vol. II.* |
| A/CN.4/63 | Law of treaties : report by H. Lauterpacht, Special Rapporteur | *Yearbook of the International Law Commission, 1953, vol. II.* |
| A/CN.4/87 | Law of treaties : second report by H. Lauterpacht, Special Rapporteur | *Yearbook of the International Law Commission, 1954, vol. II.* |
| A/CN.4/107 | Law of treaties : second report by Sir Gerald Fitzmaurice, Special Rapporteur | *Yearbook of the International Law Commission, 1957, vol. II.* |
| A/CN.4/111 | State responsibility : International responsibility : third report by F. V. García Amador, Special Rapporteur | *Yearbook of the International Law Commission, 1958, vol. II.* |
| A/CN.4/115 and Corr.1 | Law of treaties : third report by Sir Gerald Fitzmaurice, Special Rapporteur | *Ibid.* |
| A/CN.4/119 | State responsibility : International responsibility : fourth report by F. V. García Amador, Special Rapporteur | *Yearbook of the International Law Commission, 1959, vol. II.* |
| A/CN.4/120 | Law of treaties : fourth report by Sir Gerald Fitzmaurice, Special Rapporteur | *Ibid.* |
| A/CN.4/129 | Ad hoc diplomacy : report by A. E. F. Sandström, Special Rapporteur | *Yearbook of the International Law Commission, 1960, vol. II.* |
| A/CN.4/130 | Law of treaties ; fifth report by Sir Gerald Fitzmaurice, Special Rapporteur | *Ibid.* |

Check list of documents referred to in this volume                                    **229**

| Document | Title | Observations and references |
|---|---|---|
| A/CN.4/150 and Corr.1 | Succession of States in relation to multilateral treaties of which the Secretary-General is the depositary : memorandum prepared by the Secretariat | *Yearbook of the International Law Commission, 1962*, vol. II. |
| A/CN.4/154 | Resolutions of the General Assembly concerning the law of treaties : memorandum prepared by the Secretariat | *Yearbook of the International Law Commission, 1963*, vol. II. |
| A/CN.4/155 | Special missions : working paper prepared by the Secretariat | *Ibid.* |
| A/CN.4/156 and Add.1-3 | Law of treaties : second report by Sir Humphrey Waldock, Special Rapporteur | *Ibid.* |
| A/CN.4/165 | State responsibility : Summary of the discussions in various United Nations organs and the resulting decisions : working paper prepared by the Secretariat | Printed in this volume, pp. 125-132. |
| A/CN.4/166 | Special missions : report by Milan Bartoš, Special Rapporteur | Printed in this volume, pp. 67-177. |
| A/CN.4/167 and Add.1-3 | Law of treaties : third report by Sir Humphrey Waldock, Special Rapporteur | Printed in this volume, pp. 5-65. |
| A/CN.4/168 | Nominations to fill vacancies : Note by the Secretariat | Printed in this volume, p. 3. |
| A/CN.4/169 | Digest of the decisions of international tribunals relating to State responsibility, prepared by the Secretariat | Printed in this volume, pp. 132-171. |
| A/CN.4/172 | Report on the sixth session of the Asian-African Legal Consultative Committee (Cairo, February-March 1964), by Eduardo Jiménez de Aréchaga, observer for the Commission | Printed in this volume, pp. 119-124. |
| A/CN.4/L.87 | Provisions proposed by Mr. Jiménez de Aréchaga for insertion in the draft articles on diplomatic intercourse and immunities prepared by the International Law Commission at its tenth session | *Yearbook of the International Law Commission, 1960*, vol. II. |
| A/CN.4/L.88 | Memorandum by Mr. Jiménez de Aréchaga in explanation of his proposal concerning *ad hoc* diplomacy | *Ibid.* |
| A/CN.4/L.103 | Relations between States and inter-governmental organizations : working paper by A. El-Erian, Special Rapporteur | *Yearbook of the International Law Commission, 1963*, vol. II. |

**CHECK LIST OF DOCUMENTS OF THE SIXTEENTH SESSION NOT REPRODUCED IN THIS VOLUME**

| Document | Title | Observations and references |
|---|---|---|
| A/CN.4/164 | Provisional agenda | Mimeographed. |
| A/CN.4/168/ Add.1 | Nominations to fill vacancies: addendum to the note by the Secretariat: list and curriculum vitae of candidates | Mimeographed. |
| A/CN.4/170 | Prolongation of the sixteenth session | Mimeographed. |
| A/CN.4/171 | Co-operation with other bodies: distribution of the documents of the Commission: memorandum prepared by the Secretariat | Mimeographed. |
| A/CN.4/173 and Corr.1 | Report of the International Law Commission on the work of its 16th session | Same as document A/5809 printed in this volume p. 173. |
| A/CN.4/L.104 | Relations between States and inter-governmental organizations: suggested list of questions as basis of discussion for the definition of the scope and mode of treatment: working paper prepared by Mr. Abdullah El-Erian, Special Rapporteur | See chapter V of the Commission's report on its 16th session (A/5809) for the substance of this paper. |
| A/CN.4/L.105 | Question of the organization of future sessions: statement of the Secretariat concerning financial implications of a four-week session during the winter of 1966 | Mimeographed. |
| A/CN.4/L.106 and Add.1-14 | Draft report of the International Law Commission covering the work of its 16th session | Mimeographed. |

## HOW TO OBTAIN UNITED NATIONS PUBLICATIONS

United Nations publications may be obtained from bookstores and distributors throughout the world. Consult your bookstore or write to: United Nations, Sales Section, New York or Geneva.

## COMMENT SE PROCURER LES PUBLICATIONS DES NATIONS UNIES

Les publications des Nations Unies sont en vente dans les librairies et les agences dépositaires du monde entier. Informez-vous auprès de votre librairie ou adressez-vous à: Nations Unies, Section des ventes, New York ou Genève.

## COMO CONSEGUIR PUBLICACIONES DE LAS NACIONES UNIDAS

Las publicaciones de las Naciones Unidas están en venta en librerías y casas distribuidoras en todas partes del mundo. Consulte a su librero o diríjase a: Naciones Unidas, Sección de Ventas, Nueva York o Ginebra.

Printed in France                  Price : $U.S. 2.50                  United Nations publication
13001 — December 1965 — 2,325     (or equivalent in other currencies)        Sales No. : 65.V.2
                                                                      A/CN.4/SER.A/1964/Add.1