# EXHIBIT 49



**HEINONLINE**

DATE DOWNLOADED: Tue Sep 10 08:26:15 2024
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
Report of the International Law Commission on the Work of Its Seventieth Session (30
April - 1 June and 2 July - 10 August 2018), 2018 U.N.Y.B. Int'l L. Comm'n 1 (2018).

ALWD 7th ed.
, Report of the International Law Commission on the Work of Its Seventieth Session
(30 April - 1 June and 2 July - 10 August 2018), 2018 U.N.Y.B. Int'l L. Comm'n 1
(2018).

APA 7th ed.
(2018). Report of the International Law Commission on the Work of Its Seventieth
Session (30 April 1 June and July 10 August 2018). United Nations Yearbook of the
International Law Commission, 2018, 1-230.

Chicago 17th ed.
"Report of the International Law Commission on the Work of Its Seventieth Session (30
April - 1 June and 2 July - 10 August 2018)," United Nations Yearbook of the
International Law Commission 2018 (2018): 1-230

McGill Guide 9th ed.
"Report of the International Law Commission on the Work of Its Seventieth Session (30
April - 1 June and 2 July - 10 August 2018)" [2018] 2018 UNYB Int'l L Comm'n 1.

AGLC 4th ed.
'Report of the International Law Commission on the Work of Its Seventieth Session (30
April - 1 June and 2 July - 10 August 2018)' [2018] 2018 United Nations Yearbook of
the International Law Commission 1

MLA 9th ed.
"Report of the International Law Commission on the Work of Its Seventieth Session (30
April - 1 June and 2 July - 10 August 2018)." United Nations Yearbook of the
International Law Commission, 2018, 2018, pp. 1-230. HeinOnline.

OSCOLA 4th ed.
'Report of the International Law Commission on the Work of Its Seventieth Session (30
April - 1 June and 2 July - 10 August 2018)' (2018) 2018 UNYB Int'l L Comm'n 1
Please note: citations are provided as a general guideline. Users should consult
their preferred citation format's style manual for proper citation formatting.

Provided by:
European University Institute

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*

# DOCUMENT A/73/10*

## Report of the International Law Commission on the work of its seventieth session
### (30 April–1 June and 2 July–10 August 2018)

## CONTENTS

*Page*

Abbreviations ................................................................................................................................................ 6

Note concerning quotations ......................................................................................................................... 7

Multilateral instruments cited in the present volume .................................................................................. 9

| *Chapter* | | | *Paragraphs* | |
|---|---|---|---|---|
| I. | ORGANIZATION OF THE SESSION ................................................................ | | 1–13 | 17 |
| | A. | Membership ...................................................................................... | 2 | 17 |
| | B. | Casual vacancy ................................................................................. | 3 | 17 |
| | C. | Officers and the Enlarged Bureau .................................................... | 4–6 | 17 |
| | D. | Drafting Committee .......................................................................... | 7–8 | 18 |
| | E. | Working groups ................................................................................ | 9–11 | 18 |
| | F. | Secretariat ........................................................................................ | 12 | 19 |
| | G. | Agenda .............................................................................................. | 13 | 19 |
| II. | SUMMARY OF THE WORK OF THE COMMISSION AT ITS SEVENTIETH SESSION ......... | | 14–31 | 20 |
| III. | SPECIFIC ISSUES ON WHICH COMMENTS WOULD BE OF PARTICULAR INTEREST TO THE COMMISSION ......... | | 32–38 | 22 |
| | A. | Peremptory norms of general international law (*jus cogens*) ............ | 33 | 22 |
| | B. | Immunity of State officials from foreign criminal jurisdiction ......... | 34 | 22 |
| | C. | Protection of the environment in relation to armed conflicts ............ | 35 | 22 |
| | D. | Succession of States in respect of State responsibility ..................... | 36 | 22 |
| | E. | New topics ........................................................................................ | 37–38 | 22 |
| IV. | SUBSEQUENT AGREEMENTS AND SUBSEQUENT PRACTICE IN RELATION TO THE INTERPRETATION OF TREATIES ......... | | 39–52 | 23 |
| | A. | Introduction ...................................................................................... | 39–43 | 23 |
| | B. | Consideration of the topic at the present session ............................. | 44–48 | 23 |
| | C. | Recommendation of the Commission ................................................ | 49 | 24 |
| | D. | Tribute to the Special Rapporteur .................................................... | 50 | 24 |
| | E. | Text of the draft conclusions on subsequent agreements and subsequent practice in relation to the interpretation of treaties ......... | 51–52 | 24 |
| | | 1. Text of the draft conclusions ...................................................... | 51 | 24 |
| | | 2. Text of the draft conclusions and commentaries thereto ............ | 52 | 25 |

| | | | Page |
|---|---|---|---|
| Part One. | Introduction ................................................................................ | | 25 |
| Conclusion 1. | Scope .......................................................................................... | | 25 |
| | Commentary ................................................................................ | | 25 |
| Part Two. | Basic rules and definitions ......................................................... | | 26 |
| Conclusion 2. | General rule and means of treaty interpretation ......................... | | 26 |
| | Commentary ................................................................................ | | 26 |
| Conclusion 3. | Subsequent agreements and subsequent practice as authentic means of interpretation ......... | | 30 |
| | Commentary ................................................................................ | | 30 |
| Conclusion 4. | Definition of subsequent agreement and subsequent practice ......... | | 32 |
| | Commentary ................................................................................ | | 32 |
| Conclusion 5. | Conduct as subsequent practice .................................................. | | 39 |
| | Commentary ................................................................................ | | 39 |

---

* Initially distributed as *Official Records of the General Assembly, Seventy-third Session, Supplement No. 10.*

| Chapter | | | Paragraphs | Page |
|---|---|---|---|---|
| | Part Three. | General aspects | | 42 |
| | Conclusion 6. | Identification of subsequent agreements and subsequent practice.................................. | | 42 |
| | | Commentary.................................................................................................................... | | 43 |
| | Conclusion 7. | Possible effects of subsequent agreements and subsequent practice in interpretation ........ | | 47 |
| | | Commentary.................................................................................................................... | | 48 |
| | Conclusion 8. | Interpretation of treaty terms as capable of evolving over time .................................... | | 56 |
| | | Commentary.................................................................................................................... | | 56 |
| | Conclusion 9. | Weight of subsequent agreements and subsequent practice as a means of interpretation ..... | | 60 |
| | | Commentary.................................................................................................................... | | 60 |
| | Conclusion 10. | Agreement of the parties regarding the interpretation of a treaty .................................. | | 63 |
| | | Commentary.................................................................................................................... | | 63 |
| | Part Four. | Specific aspects | | 67 |
| | Conclusion 11. | Decisions adopted within the framework of a Conference of States Parties .................... | | 67 |
| | | Commentary.................................................................................................................... | | 67 |
| | Conclusion 12. | Constituent instruments of international organizations .................................................. | | 74 |
| | | Commentary.................................................................................................................... | | 74 |
| | Conclusion 13. | Pronouncements of expert treaty bodies ...................................................................... | | 82 |
| | | Commentary.................................................................................................................... | | 82 |
| V. | IDENTIFICATION OF CUSTOMARY INTERNATIONAL LAW ................................................................ | | 53–66 | 89 |
| A. | Introduction ................................................................................................................................... | | 53–55 | 89 |
| B. | Consideration of the topic at the present session........................................................................... | | 56–62 | 89 |
| C. | Recommendation of the Commission.............................................................................................. | | 63 | 89 |
| D. | Tribute to the Special Rapporteur .................................................................................................. | | 64 | 90 |
| E. | Text of the draft conclusions on identification of customary international law ................................ | | 65–66 | 90 |
| 1. | Text of the draft conclusions ................................................................................................ | | 65 | 90 |
| 2. | Text of the draft conclusions and commentaries thereto .......................................................... | | 66 | 91 |
| | General commentary................................................................................................................... | | | 91 |
| | Part One. | Introduction ................................................................................................................ | | 92 |
| | Conclusion 1. | Scope............................................................................................................................ | | 92 |
| | | Commentary.................................................................................................................... | | 92 |
| | Part Two. | Basic approach ............................................................................................................ | | 93 |
| | Conclusion 2. | Two constituent elements .............................................................................................. | | 93 |
| | | Commentary.................................................................................................................... | | 93 |
| | Conclusion 3. | Assessment of evidence for the two constituent elements ............................................... | | 94 |
| | | Commentary.................................................................................................................... | | 94 |
| | Part Three. | A general practice ........................................................................................................ | | 96 |
| | Conclusion 4. | Requirement of practice ................................................................................................ | | 96 |
| | | Commentary.................................................................................................................... | | 96 |
| | Conclusion 5. | Conduct of the State as State practice ........................................................................... | | 98 |
| | | Commentary.................................................................................................................... | | 98 |
| | Conclusion 6. | Forms of practice .......................................................................................................... | | 98 |
| | | Commentary.................................................................................................................... | | 98 |
| | Conclusion 7. | Assessing a State's practice ........................................................................................... | | 99 |
| | | Commentary.................................................................................................................... | | 99 |
| | Conclusion 8. | The practice must be general ......................................................................................... | | 100 |
| | | Commentary.................................................................................................................... | | 100 |
| | Part Four. | Accepted as law (opinio juris) ...................................................................................... | | 102 |
| | Conclusion 9. | Requirement of acceptance as law (opinio juris)............................................................ | | 102 |
| | | Commentary.................................................................................................................... | | 102 |
| | Conclusion 10. | Forms of evidence of acceptance as law (opinio juris)................................................... | | 103 |
| | | Commentary.................................................................................................................... | | 103 |
| | Part Five. | Significance of certain materials for the identification of customary international law ...... | | 104 |
| | Conclusion 11. | Treaties......................................................................................................................... | | 105 |
| | | Commentary.................................................................................................................... | | 105 |
| | Conclusion 12. | Resolutions of international organizations and intergovernmental conferences .................. | | 107 |
| | | Commentary.................................................................................................................... | | 107 |

*Chapter*                                                                          *Paragraphs*   *Page*

              Conclusion 13.  Decisions of courts and tribunals........................................................................    109
                              Commentary...........................................................................................................    109
              Conclusion 14.  Teachings.............................................................................................................    110
                              Commentary...........................................................................................................    110
              Part Six.        Persistent objector.................................................................................................    110
              Conclusion 15.  Persistent objector.................................................................................................    110
                              Commentary...........................................................................................................    111
              Part Seven.      Particular customary international law ................................................................    112
              Conclusion 16.  Particular customary international law ................................................................    112
                              Commentary...........................................................................................................    112

VI.  PROTECTION OF THE ATMOSPHERE...................................................................................................    67–78   114
     A.  Introduction ..............................................................................................................................    67–68   114
     B.  Consideration of the topic at the present session................................................................    69–76   114
     C.  Text of the draft guidelines on the protection of the atmosphere, together with preamble, adopted by the
         Commission on first reading...........................................................................................................    77–78   115
         1.  Text of the draft guidelines, together with preamble......................................................    77     115
         2.  Text of the draft guidelines, together with preamble, and commentaries thereto .....................    78     116
             General commentary....................................................................................................................    116
                              Preamble ...............................................................................................................    116
                              Commentary...........................................................................................................    116
             Guideline 1.     Use of terms..........................................................................................................    121
                              Commentary...........................................................................................................    121
             Guideline 2.     Scope of the guidelines .........................................................................................    123
                              Commentary...........................................................................................................    123
             Guideline 3.     Obligation to protect the atmosphere ....................................................................    124
                              Commentary...........................................................................................................    125
             Guideline 4.     Environmental impact assessment .........................................................................    126
                              Commentary...........................................................................................................    126
             Guideline 5.     Sustainable utilization of the atmosphere ..............................................................    127
                              Commentary...........................................................................................................    127
             Guideline 6.     Equitable and reasonable utilization of the atmosphere ........................................    128
                              Commentary...........................................................................................................    128
             Guideline 7.     Intentional large-scale modification of the atmosphere .........................................    129
                              Commentary...........................................................................................................    129
             Guideline 8.     International cooperation .......................................................................................    130
                              Commentary...........................................................................................................    130
             Guideline 9.     Interrelationship among relevant rules...................................................................    132
                              Commentary...........................................................................................................    132
             Guideline 10.    Implementation .....................................................................................................    137
                              Commentary...........................................................................................................    137
             Guideline 11.    Compliance ............................................................................................................    138
                              Commentary...........................................................................................................    138
             Guideline 12.    Dispute settlement.................................................................................................    139
                              Commentary...........................................................................................................    139

VII.  PROVISIONAL APPLICATION OF TREATIES .......................................................................................    79–90   141
     A.  Introduction ..............................................................................................................................    79–82   141
     B.  Consideration of the topic at the present session................................................................    83–88   141
     C.  Text of the draft Guide to Provisional Application of Treaties, adopted by the Commission on first reading...    89–90   142
         1.  Text of the draft Guide to Provisional Application of Treaties.........................................    89     142
         2.  Text of the draft Guide to Provisional Application of Treaties and commentaries thereto .....................    90     143
             General commentary ...................................................................................................................    143
             Guideline 1.     Scope....................................................................................................................    144
                              Commentary...........................................................................................................    144
             Guideline 2.     Purpose..................................................................................................................    145
                              Commentary...........................................................................................................    145

*Chapter*                                                                                                         *Paragraphs*    *Page*

    Guideline 3.    General rule ............................................................................................................................    145
                          Commentary ........................................................................................................................    145
    Guideline 4.    Form of agreement ...............................................................................................................    147
                          Commentary ........................................................................................................................    147
    Guideline 5.    Commencement of provisional application ..........................................................................    148
                          Commentary ........................................................................................................................    148
    Guideline 6.    Legal effect of provisional application ...............................................................................    149
                          Commentary ........................................................................................................................    149
    Guideline 7.    Reservations .........................................................................................................................    150
                          Commentary ........................................................................................................................    150
    Guideline 8.    Responsibility for breach .....................................................................................................    150
                          Commentary ........................................................................................................................    150
    Guideline 9.    Termination and suspension of provisional application .......................................................    151
                          Commentary ........................................................................................................................    151
    Guideline 10.  Internal law of States and rules of international organizations, and the observance of provisionally applied treaties ..............................................................................................    152
                          Commentary ........................................................................................................................    153
    Guideline 11.  Provisions of internal law of States and rules of international organizations regarding competence to agree on the provisional application of treaties ...............................    153
                          Commentary ........................................................................................................................    154
    Guideline 12.  Agreement to provisional application with limitations deriving from internal law of States and rules of international organizations ...............................................................    154
                          Commentary ........................................................................................................................    154

VIII.  PEREMPTORY NORMS OF GENERAL INTERNATIONAL LAW (*JUS COGENS*) ........................................    91–163    155
    A.  Introduction ...............................................................................................................................    91–93    155
    B.  Consideration of the topic at the present session ......................................................................    94–163    155
        1.  Introduction by the Special Rapporteur of the third report ...............................................    98–110    156
        2.  Summary of the debate .......................................................................................................    111–152    158
            (*a*)  General comments ......................................................................................................    111–116    158
            (*b*)  Specific comments on the draft conclusions .............................................................    117–152    159
        3.  Concluding remarks of the Special Rapporteur ...............................................................    153–163    163

IX.  PROTECTION OF THE ENVIRONMENT IN RELATION TO ARMED CONFLICTS ..........................................    164–218    165
    A.  Introduction ...............................................................................................................................    164–166    165
    B.  Consideration of the topic at the present session ......................................................................    167–216    165
        1.  Introduction by the Special Rapporteur of her first report ...............................................    174–182    166
        2.  Summary of the debate .......................................................................................................    183–207    167
            (*a*)  General comments ......................................................................................................    183–193    167
            (*b*)  Comments on draft principle 19 .................................................................................    194–198    168
            (*c*)  Comments on draft principle 20 .................................................................................    199–203    168
            (*d*)  Comments on draft principle 21 .................................................................................    204–205    168
            (*e*)  Future work ................................................................................................................    206–207    168
        3.  Concluding remarks of the Special Rapporteur ...............................................................    208–216    169
    C.  Text of the draft principles on protection of the environment in relation to armed conflicts provisionally adopted so far by the Commission ...................................................................    217–218    170
        1.  Text of the draft principles ................................................................................................    217    170
        2.  Text of the draft principles and commentaries thereto provisionally adopted by the Commission at its seventieth session ...............................................................................    218    171
            Principle 4.    Measures to enhance the protection of the environment ....................................    171
                          Commentary ....................................................................................................    171
            Principle 6.    Protection of the environment of indigenous peoples ........................................    174
                          Commentary ....................................................................................................    174
             Principle 7.    Agreements concerning the presence of military forces in relation to armed conflict ....................................................................................................................    175
                          Commentary ....................................................................................................    175
             Principle 8.    Peace operations .................................................................................................    177
                          Commentary ....................................................................................................    177
             Principle 14.  Peace processes ..................................................................................................    178
                          Commentary ....................................................................................................    178

| *Chapter* | | | | *Paragraphs* | *Page* |
|---|---|---|---|---|---|

| | Principle 15. | Post-armed conflict environmental assessments and remedial measures ............ | | | 180 |
| | | Commentary................................................................................. | | | 180 |
| | Principle 16. | Remnants of war ......................................................................... | | | 180 |
| | | Commentary................................................................................. | | | 181 |
| | Principle 17. | Remnants of war at sea ................................................................. | | | 182 |
| | | Commentary................................................................................. | | | 182 |
| | Principle 18. | Sharing and granting access to information......................................... | | | 183 |
| | | Commentary................................................................................. | | | 183 |
| X. | | SUCCESSION OF STATES IN RESPECT OF STATE RESPONSIBILITY............................................... | | 219–266 | 187 |
| | A. | Introduction ............................................................................................... | | 219–220 | 187 |
| | B. | Consideration of the topic at the present session.................................................... | | 221–266 | 187 |
| | | 1. | Introduction by the Special Rapporteur of the second report............................ | 226–233 | 188 |
| | | 2. | Summary of the debate ................................................................... | 234–254 | 189 |
| | | | (a) | General comments.................................................................... | 234–239 | 189 |
| | | | (b) | Specific comments................................................................... | 240–252 | 190 |
| | | | (c) | Final form ............................................................................ | 253 | 191 |
| | | | (d) | Future programme of work ......................................................... | 254 | 191 |
| | | 3. | Concluding remarks of the Special Rapporteur............................................. | 255–266 | 192 |
| XI. | | IMMUNITY OF STATE OFFICIALS FROM FOREIGN CRIMINAL JURISDICTION.................................... | | 267–330 | 194 |
| | A. | Introduction ............................................................................................... | | 267–269 | 194 |
| | B. | Consideration of the topic at the present session.................................................... | | 270–330 | 194 |
| | | 1. | Introduction by the Special Rapporteur of the sixth report .............................. | 273–292 | 195 |
| | | 2. | Summary of the debate ................................................................... | 293–330 | 197 |
| | | | (a) | General comments.................................................................... | 294–298 | 197 |
| | | | (b) | Comments on the summary of the debate on draft article 7...................... | 299 | 198 |
| | | | (c) | Comments on the procedural aspects dealt with in the sixth report............. | 300–320 | 198 |
| | | | (d) | Comments on procedural safeguards and guarantees ............................. | 321–325 | 200 |
| | | | (e) | Future work .......................................................................... | 326–330 | 201 |
| XII. | | COMMEMORATION OF THE SEVENTIETH ANNIVERSARY OF THE COMMISSION ............................... | | 331–362 | 202 |
| | A. | Introduction ............................................................................................... | | 331–333 | 202 |
| | B. | Seventieth anniversary session of the International Law Commission ............................. | | 334–362 | 202 |
| XIII. | | OTHER DECISIONS AND CONCLUSIONS OF THE COMMISSION............................................... | | 363–413 | 205 |
| | A. | General principles of law ............................................................................... | | 363 | 205 |
| | B. | Requests by the Commission for the Secretariat to prepare and update studies on topics on the Commission's agenda ...................................................................................................... | | 364–365 | 205 |
| | C. | Programme, procedures and working methods of the Commission and its documentation............ | | 366–394 | 205 |
| | | 1. | Working Group on the long-term programme of work ................................... | 368–370 | 205 |
| | | 2. | Working Group on methods of work of the Commission.................................. | 371 | 205 |
| | | 3. | Consideration of General Assembly resolution 72/119 of 7 December 2017 on the rule of law at the national and international levels .......................................................... | 372–380 | 205 |
| | | 4. | Consideration of paragraphs 13 and 14 of resolution 72/116 of 7 December 2017 on the report of the International Law Commission on the work of its sixty-ninth session ..................... | 381 | 206 |
| | | 5. | Honoraria ................................................................................. | 382 | 206 |
| | | 6. | Documentation and publications ......................................................... | 383–389 | 207 |
| | | 7. | *Yearbook of the International Law Commission* ......................................... | 390–391 | 207 |
| | | 8. | Assistance of the Codification Division ................................................. | 392 | 208 |
| | | 9. | Websites.................................................................................. | 393 | 208 |
| | | 10. | United Nations Audiovisual Library of International Law............................... | 394 | 208 |
| | D. | Date and place of the seventy-first session of the Commission .................................... | | 395 | 208 |
| | E. | Cooperation with other bodies .......................................................................... | | 396–399 | 208 |
| | F. | Representation at the seventy-third session of the General Assembly .............................. | | 400 | 208 |
| | G. | International Law Seminar ............................................................................... | | 401–413 | 209 |
| ANNEXES | | | | | |
| I. | | Universal criminal jurisdiction ......................................................................... | | | 211 |
| II. | | Sea-level rise in relation to international law............................................................ | | | 224 |

# ABBREVIATIONS

| | |
|---|---|
| EFTA | European Free Trade Association |
| ICRC | International Committee of the Red Cross |
| ICSID | International Centre for Settlement of Investment Disputes |
| ILO | International Labour Organization |
| IMO | International Maritime Organization |
| IPCC | Intergovernmental Panel on Climate Change |
| NATO | North Atlantic Treaty Organization |
| OAS | Organization of American States |
| UNCITRAL | United Nations Commission on International Trade Law |
| UNDP | United Nations Development Programme |
| UNEP | United Nations Environment Programme |
| UNESCO | United Nations Educational, Scientific and Cultural Organization |
| UNHCR | Office of the United Nations High Commissioner for Refugees |
| WHO | World Health Organization |
| WTO | World Trade Organization |

*

*    *

| | |
|---|---|
| ECHR | European Court of Human Rights, *Reports of Judgments and Decisions*. All judgments and decisions of the Court, including those not published in the official series, can be consulted in the database of the Court (HUDOC), available from the Court's website (www.echr.coe.int). |
| *I.C.J. Reports* | International Court of Justice, *Reports of Judgments, Advisory Opinions and Orders*. All judgments, advisory opinions and orders of the Court are available from the Court's website (www.icj-cij.org). |
| ILM | *International Legal Materials* |
| ILR | *International Law Reports* |
| *ITLOS Reports* | International Tribunal for the Law of the Sea, *Reports of Judgments, Advisory Opinions and Orders*. The Tribunal's case law is available from its website (www.itlos.org). |
| *P.C.I.J., Series A* | Permanent Court of International Justice, *Collection of Judgments* (Nos. 1–24: up to and including 1930) |
| *P.C.I.J., Series B* | Permanent Court of International Justice, *Collection of Advisory Opinions* (Nos. 1–18: up to and including 1930) |
| UNRIAA | United Nations, *Reports of International Arbitral Awards* |

*

*    *

In the present volume, "International Tribunal for the Former Yugoslavia" refers to the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia since 1991; and "International Criminal Tribunal for Rwanda" refers to the International Criminal Tribunal for the Prosecution of Persons Responsible for Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide and Other Such Violations Committed in the Territory of Neighbouring States between 1 January and 31 December 1994.

*

*    *

## NOTE CONCERNING QUOTATIONS

In quotations, words or passages in italics followed by an asterisk were not italicized in the original text.

Unless otherwise indicated, quotations from works in languages other than English have been translated by the Secretariat.

*

*     *

Information on uniform resource locators and links to websites contained in the present publication are provided for the convenience of the reader and are correct at the time of issuance. The United Nations takes no responsibility for the continued accuracy of that information or for the content of any external website.

*

*     *

The Internet address of the International Law Commission is **https://legal.un.org/ilc/**.

# MULTILATERAL INSTRUMENTS CITED IN THE PRESENT VOLUME

*Source*

| | |
|---|---|
| Geneva Convention for the Amelioration of the Condition of the Wounded in Armies in the Field (Geneva, 22 August 1864) | ICRC, *Handbook of the International Red Cross and Red Crescent Movement*, 14th ed., Geneva, 2008, p. 21. |
| Convention for the Protection of Submarine Telegraph Cables (Paris, 14 March 1884) | *International Law Handbook: Collection of Instruments*, Book Three, New York, United Nations, 2017, p. 204, available from the Audiovisual Library of International Law (www.un.org/law/avl). |
| The Hague Conventions of 1899 and 1907 respecting the Laws and Customs of War on Land: Convention II (The Hague, 29 July 1899); Convention IV (The Hague, 18 October 1907); and Regulations respecting the Laws and Customs of War on Land (annexed to the Hague Conventions II of 1899 and IV of 1907) | *The Hague Conventions and Declarations of 1899 and 1907*, J. B. Scott (ed.), New York, Oxford University Press, 1915. |
| General Act of the International Conference at Algeciras (Algeciras, 7 April 1906) | *United States Statutes at Large,* vol. 34 (1905–1907), p. 2905. |
| Treaty of Peace between the Allied and Associated Powers and Germany (Treaty of Versailles) (Versailles, 28 June 1919) | *British and Foreign State Papers, 1919*, vol. CXII, London, H. M. Stationery Office, 1922, p. 1. |
| Covenant of the League of Nations (Versailles, 28 June 1919) | League of Nations, *Official Journal*, No. 1, February 1920, p. 3. |
| Constitution of the International Labour Organization (Versailles, 28 June 1919) (amended in 1922, 1945, 1946, 1953, 1962, 1972 and 1997) | Available from the ILO website (www.ilo.org). |
| International Convention for the Suppression of the Circulation of and Traffic in Obscene Publications (Geneva, 12 September 1923) | League of Nations, *Treaty Series*, vol. XXVII, No. 685, p. 213. |
| International Convention for the Suppression of Counterfeiting Currency (Geneva, 20 April 1929) | *Ibid.*, vol. CXII, No. 2623, p. 371. |
| Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armies in the Field (Geneva, 27 July 1929) | *Ibid.*, vol. CXVIII, No. 2733, p. 303. |
| Convention for the Unification of Certain Rules relating to International Carriage by Air (Warsaw, 12 October 1929) | *Ibid.*, vol. CXXXVII, No. 3145, p. 11. |
| Protocol to amend the Convention for the Unification of Certain Rules relating to International Carriage by Air (The Hague, 28 September 1955) | United Nations, *Treaty Series*, vol. 478, No. 6943, p. 371. |
| Convention on Certain Questions relating to the Conflict of Nationality Laws (The Hague, 12 April 1930) | League of Nations, *Treaty Series*, vol. CLXXIX, No. 4137, p. 89. |
| Convention on Political Asylum (Montevideo, 26 December 1933) | OAS, *Treaty Series*, No. 34. |
| Convention on International Civil Aviation (Chicago, 7 December 1944) | United Nations, *Treaty Series*, vol. 15, No. 102, p. 295. See also International Civil Aviation Organization (ICAO), Doc. 7300/9 (2006) and *Annex 16: Environmental Protection*, vol. I: *Aircraft Noise*, 5th ed. (July 2008), available from the ICAO website: www.icao.int. |
| Convention on the Privileges and Immunities of the United Nations (New York, 13 February 1946) | United Nations, *Treaty Series*, vol. 1, No. 4, p. 15, and vol. 90, p. 327. |
| Constitution of the World Health Organization (New York, 22 July 1946) | *Ibid.*, vol. 14, No. 221, p. 185. |
| International Convention for the Regulation of Whaling (Washington, D.C., 2 December 1946) | *Ibid.*, vol. 161, No. 2124, p. 72. |
| General Agreement on Tariffs and Trade (GATT) (Geneva, 30 October 1947) | *Ibid.*, vol. 55, No. 814, p. 187. |
| Convention on the International Maritime Organization (Geneva, 6 March 1948) | *Ibid.*, vol. 289, No. 4214, p. 3, and vol. 1276, p. 468. |
| Convention on the Prevention and Punishment of the Crime of Genocide (Paris, 9 December 1948) | *Ibid.*, vol. 78, No. 1021, p. 277. |
| North Atlantic Treaty (Washington, D.C., 4 April 1949) | *Ibid.*, vol. 34, No. 541, p. 243. |
| Geneva Conventions for the protection of war victims (1949 Geneva Conventions) (Geneva, 12 August 1949) | *Ibid.*, vol. 75, Nos. 970–973. |
| Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field (First Geneva Convention) | *Ibid.*, No. 970, p. 31. |

| | *Source* |
|---|---|
| Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea (Second Geneva Convention) | *Ibid.*, No. 971, p. 85. |
| Geneva Convention relative to the Treatment of Prisoners of War (Third Geneva Convention) | *Ibid.*, No. 972, p. 135. |
| Geneva Convention relative to the Protection of Civilian Persons in Time of War (Fourth Geneva Convention) | *Ibid.*, No. 973, p. 287. |
| Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts (Protocol I); Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II) (Geneva, 8 June 1977); and Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Adoption of an Additional Distinctive Emblem (Protocol III) (Geneva, 8 December 2005) | *Ibid.*, vol. 1125, Nos. 17512–17513, pp. 3 and 609 (Protocols I and II) and vol. 2404, No. 43425, p. 261 (Protocol III). |
| Convention for the Protection of Human Rights and Fundamental Freedoms (European Convention on Human Rights) (Rome, 4 November 1950) | *Ibid.*, vol. 213, No. 2889, p. 221. |
| Protocol to the Convention for the Protection of Human Rights and Fundamental Freedoms (Protocol No. 1) (Paris, 20 March 1952) | *Ibid.* |
| Protocol No. 13 to the Convention for the Protection of Human Rights and Fundamental Freedoms, concerning the Abolition of the Death Penalty in All Circumstances (Vilnius, 3 May 2002) | *Ibid.*, vol. 2246, No. 2889, p. 110. |
| Protocol No. 14 to the Convention for the Protection of Human Rights and Fundamental Freedoms, amending the Control System of the Convention (Strasbourg, 13 May 2004) | *Ibid.*, vol. 2677, No. 2889, p. 3. |
| Agreement on the Provisional Application of Certain Provisions of Protocol No. 14 [to the Convention for the Protection of Human Rights and Fundamental Freedoms, amending the Control System of the Convention] Pending its Entry into Force (Agreement of Madrid) (Madrid, 12 May 2009) | Council of Europe, *Council of Europe Treaty Series*, No. 194. |
| Agreement between the Parties to the North Atlantic Treaty regarding the Status of their Forces (London, 19 June 1951) | United Nations, *Treaty Series*, vol. 199, No. 2678, p. 67. |
| Agreement to Supplement the Agreement between the Parties to the North Atlantic Treaty regarding the Status of their Forces with respect to Foreign Forces Stationed in the Federal Republic of Germany (Bonn, 3 August 1959), amended by the agreements of 21 October 1971 and 18 March 1993 | *Ibid.*, vol. 481, No. 6986, p. 262. The text of the 1971 agreement is available in *ibid.*, vol. 1203, p. 338. |
| Convention relating to the Status of Refugees (Geneva, 28 July 1951) | *Ibid.*, vol. 189, No. 2545, p. 137. |
| Protocol relating to the Status of Refugees (New York, 31 January 1967) | *Ibid.*, vol. 606, No. 8791, p. 267. |
| Agreement on German External Debts (London, 27 February 1953) | *Ibid.*, vol. 333, No. 4764, p. 3. |
| Convention for the Establishment of a European Organization for Nuclear Research (Paris, 1 July 1953) | *Ibid.*, vol. 200, No. 2701, p. 149. |
| Convention for the Protection of Cultural Property in the Event of Armed Conflict (with Regulations and Protocol) (The Hague, 14 May 1954) | *Ibid.*, vol. 249, No. 3511, p. 215. |
| Treaty establishing the European Economic Community (Rome, 25 March 1957) | *Ibid.*, vol. 298, No. 4300, p. 3. See also the consolidated version of the Treaty establishing the European Community, *Official Journal of the European Communities*, C340, 10 November 1997, p. 173. |
| ILO Convention (No. 107) concerning the Protection and Integration of Indigenous and Other Tribal and Semi-Tribal Populations in Independent Countries (Geneva, 26 June 1957) | United Nations, *Treaty Series*, vol. 328, No. 4738, p. 247. |
| Geneva Conventions on the Law of the Sea (Geneva, 29 April 1958) | |
| Convention on the High Seas | *Ibid.*, vol. 450, No. 6465, p. 11. |
| Convention on the Continental Shelf | *Ibid.*, vol. 499, No. 7302, p. 311. |
| Single Convention on Narcotic Drugs, 1961 (New York, 30 March 1961) | *Ibid.*, vol. 520, No. 7515, p. 151. |
| Vienna Convention on Diplomatic Relations (Vienna, 18 April 1961) | *Ibid.*, vol. 500, No. 7310, p. 95. |
| Treaty Banning Nuclear Weapon Tests in the Atmosphere, in Outer Space and Under Water (Moscow, 5 August 1963) | *Ibid.*, vol. 480, No. 6964, p. 43. |
| Convention on Offences and Certain Other Acts Committed on Board Aircraft (Tokyo, 14 September 1963) | *Ibid.*, vol. 704, No. 10106, p. 219. |

| | *Source* |
|---|---|
| Convention and Statutes relating to the Development of the Chad Basin (Fort Lamy, 22 May 1964) | *Journal officiel de la République du Cameroun*, 15 September 1964, p. 1003; or *Treaties concerning the Utilization of International Watercourses for Other Purposes than Navigation: Africa*, Natural Resources/Water Series No. 13 (United Nations publication, Sales No. E/F.84.II.A.7), p. 8. |
| Convention on the Settlement of Investment Disputes between States and Nationals of Other States (Washington, D.C., 18 March 1965) | United Nations, *Treaty Series*, vol. 575, No. 8359, p. 159. |
| International Convention on the Elimination of All Forms of Racial Discrimination (New York, 21 December 1965). Opened for signature at New York on 7 March 1966. | *Ibid.*, vol. 660, No. 9464, p. 195. |
| International Covenant on Economic, Social and Cultural Rights (New York, 16 December 1966) | *Ibid.*, vol. 993, No. 14531, p. 3. |
| Optional Protocol to the International Covenant on Economic, Social and Cultural Rights (New York, 10 December 2008) | *Ibid.*, vol. 2922, No. 14531, p. 29. |
| International Covenant on Civil and Political Rights (New York, 16 December 1966) | *Ibid.*, vol. 999, No. 14668, p. 171. |
| Optional Protocol to the International Covenant on Civil and Political Rights (New York, 16 December 1966) | *Ibid.* |
| Second Optional Protocol to the International Covenant on Civil and Political Rights, Aiming at the Abolition of the Death Penalty (New York, 15 December 1989) | *Ibid.*, vol. 1642, No. 14668, p. 414. |
| Treaty on Principles Governing the Activities of States in the Exploration and Use of Outer Space, Including the Moon and Other Celestial Bodies (Moscow, London and Washington, D.C., 27 January 1967) | *Ibid.*, vol. 610, No. 8843, p. 205. |
| Treaty on the Non-Proliferation of Nuclear Weapons (London, Moscow and Washington, D.C., 1 July 1968) | *Ibid.*, vol. 729, No. 10485, p. 161. |
| Vienna Convention on the Law of Treaties (1969 Vienna Convention) (Vienna, 23 May 1969) | *Ibid.*, vol. 1155, No. 18232, p. 331. |
| American Convention on Human Rights: "Pact of San José, Costa Rica" (San José, 22 November 1969) | *Ibid.*, vol. 1144, No. 17955, p. 123. |
| Statutes of the World Tourism Organization (Mexico City, 27 September 1970) and amendment to article 14 of the Statutes (New Delhi, 14 October 1983) | *Ibid.*, vol. 985, No. 14403, p. 339. The text of the amendment is available in *ibid.*, vol. 2930, p. 21. |
| Convention for the Suppression of Unlawful Seizure of Aircraft (The Hague, 16 December 1970) | *Ibid.*, vol. 860, No. 12325, p. 105. |
| Convention on Wetlands of International Importance especially as Waterfowl Habitat (Ramsar, Iran, 2 February 1971) | *Ibid.*, vol. 996, No. 14583, p. 245. |
| Protocol to Amend the Convention on Wetlands of International Importance especially as Waterfowl Habitat (Paris, 3 December 1982) | *Ibid.*, vol. 1437, No. 14583, p. 344. |
| Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation (Montreal, 23 September 1971) | *Ibid.*, vol. 974, No. 14118, p. 177. |
| Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction (London, Moscow and Washington, D.C., 10 April 1972) | *Ibid.*, vol. 1015, No. 14860, p. 163. |
| Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter (London, Mexico City, Moscow and Washington, D.C., 29 December 1972) | *Ibid.*, vol. 1046, No. 15749, p. 120. |
| 1996 Protocol to the Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter, 1972 (London, 7 November 1996) | ILM, vol. 36 (1997), p. 7. |
| Convention on International Trade in Endangered Species of Wild Fauna and Flora (Washington, D.C., 3 March 1973) | United Nations, *Treaty Series*, vol. 993, No. 14537, p. 243. |
| International Convention for the Prevention of Pollution from Ships, 1973 (London, 2 November 1973), as amended by the Protocol of 1978 (London, 17 February 1978) | *Ibid.*, vol. 1340, No. 22484, p. 61. |
| Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents (New York, 14 December 1973) | *Ibid.*, vol. 1035, No. 15410, p. 167. |
| Convention on the Protection of the Marine Environment of the Baltic Sea Area (Helsinki, 22 March 1974) | *Ibid.*, vol. 1507, No. 25986, p. 166. |
| Convention on the International Maritime Satellite Organization (INMARSAT) (with annex and Operating Agreement) (London, 3 September 1976) | *Ibid.*, vol. 1143, No. 17948, p. 105. |

| | *Source* |
|---|---|
| Convention on the Prohibition of Military or Any Other Hostile Use of Environmental Modification Techniques (New York, 10 December 1976) | *Ibid.*, vol. 1108, No. 17119, p. 151. |
| Kuwait Regional Convention for Cooperation on the Protection of the Marine Environment from Pollution (Kuwait, 24 April 1978) | *Ibid.*, vol. 1140, No. 17898, p. 133. |
| Protocol for the Protection of the Marine Environment against Pollution from Land-based Sources to the Kuwait Regional Convention (Kuwait, 21 February 1990) | *Ibid.*, vol. 2399, No. 17898, p. 3. |
| Vienna Convention on Succession of States in Respect of Treaties (Vienna, 23 August 1978) | *Ibid.*, vol. 1946, No. 33356, p. 3. |
| Convention on Long-range Transboundary Air Pollution (Geneva, 13 November 1979) | *Ibid.*, vol. 1302, No. 21623, p. 217. |
| Protocol to the 1979 Convention on Long-range Transboundary Air Pollution on Long-term Financing of the Cooperative Programme for Monitoring and Evaluation of the Long-range Transmission of Air Pollutants in Europe (EMEP) (Geneva, 28 September 1984) | *Ibid.*, vol. 1491, No. 25638, p. 167. |
| Protocol to the 1979 Convention on Long-range Transboundary Air Pollution on the Reduction of Sulphur Emissions or their Transboundary Fluxes by at Least 30 Per Cent (Helsinki, 8 July 1985) | *Ibid.*, vol. 1480, No. 25247, p. 215. |
| Protocol to the 1979 Convention on Long-range Transboundary Air Pollution concerning the Control of Emissions of Nitrogen Oxides or their Transboundary Fluxes (Sofia, 31 October 1988) | *Ibid.*, vol. 1593, No. 27874, p. 287. |
| Protocol to the 1979 Convention on Long-range Transboundary Air Pollution concerning the Control of Emissions of Volatile Organic Compounds or their Transboundary Fluxes (Geneva, 18 November 1991) | *Ibid.*, vol. 2001, No. 34322, p. 187. |
| Protocol to the 1979 Convention on Long-range Transboundary Air Pollution on Further Reduction of Sulphur Emissions (Oslo, 14 June 1994) | *Ibid.*, vol. 2030, No. 21623, p. 122. |
| Protocol to the 1979 Convention on Long-range Transboundary Air Pollution on Persistent Organic Pollutants (Aarhus (Denmark), 24 June 1998) | *Ibid.*, vol. 2230, No. 21623, p. 79. |
| Protocol to the 1979 Convention on Long-range Transboundary Air Pollution on Heavy Metals (Aarhus (Denmark), 24 June 1998) | *Ibid.*, vol. 2237, No. 21623, p. 4. |
| Protocol to the 1979 Convention on Long-range Transboundary Air Pollution to Abate Acidification, Eutrophication and Ground-level Ozone (Gothenburg, Sweden, 30 November 1999) and amendments to the Protocol and its annexes (Geneva, 4 May 2012) | *Ibid.*, vol. 2319, No. 21623, p. 80. The text of the amendments of 4 May 2012 is available from the United Nations Treaty Collection website: https://treaties.un.org (*Depositary, Status of Treaties*, chap. XXVII). |
| International Convention against the Taking of Hostages (New York, 17 December 1979) | United Nations, *Treaty Series*, vol. 1316, No. 21931, p. 205. |
| Convention on the Elimination of All Forms of Discrimination against Women (New York, 18 December 1979) | *Ibid.*, vol. 1249, No. 20378, p. 13. |
| Protocol for the Protection of the Mediterranean Sea against Pollution from Land-based Sources (Athens, 17 May 1980) | *Ibid.*, vol. 1328, No. 22281, p. 105. |
| Convention on Prohibitions or Restrictions on the Use of Certain Conventional Weapons Which May Be Deemed to Be Excessively Injurious or to Have Indiscriminate Effects (Convention on Certain Conventional Weapons), with protocols (Geneva, 10 October 1980) | *Ibid.*, vol. 1342, No. 22495, p. 137. |
| Protocol on Prohibitions or Restrictions on the Use of Mines, Booby-Traps and Other Devices (Protocol II) (Geneva, 10 October 1980) and Protocol II as amended on 3 May 1996 annexed to the Convention (Geneva, 3 May 1996) | *Ibid.* Protocol II as amended on 3 May 1996 is available in *ibid.*, vol. 2048, p. 93. |
| Protocol on Explosive Remnants of War (Protocol V) (Geneva, 28 November 2003) | *Ibid.*, vol. 2399, No. 22495, p. 100. |
| Convention on the Civil Aspects of International Child Abduction (The Hague, 25 October 1980) | *Ibid.*, vol. 1343, No. 22514, p. 89. |
| African Charter on Human and Peoples' Rights (Nairobi, 27 June 1981) | *Ibid.*, vol. 1520, No. 26363, p. 217. |
| United Nations Convention on the Law of the Sea (Montego Bay, 10 December 1982) | *Ibid.*, vol. 1834, No. 31363, p. 3. |
| Agreement relating to the Implementation of Part XI of the United Nations Convention on the Law of the Sea of 10 December 1982 (New York, 28 July 1994) | *Ibid.*, vol. 1836, No. 31364, p. 3. |
| Agreement for the Implementation of the Provisions of the United Nations Convention on the Law of the Sea of 10 December 1982 relating to the Conservation and Management of Straddling Fish Stocks and Highly Migratory Fish Stocks (New York, 4 August 1995) | *Ibid.*, vol. 2167, No. 37924, p. 3. |
| Vienna Convention on Succession of States in respect of State Property, Archives and Debts (Vienna, 8 April 1983) | United Nations, *Juridical Yearbook 1983* (Sales No. E.90.V.1), p. 139. |
| Protocol for the Protection of the South-East Pacific against Pollution from Land-based Sources (Quito, 22 July 1983) | United Nations, *Treaty Series*, vol. 1648, No. 28327, p. 73. |

|  | *Source* |
|---|---|
| Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (New York, 10 December 1984) | *Ibid.*, vol. 1465, No. 24841, p. 85. |
| Vienna Convention for the Protection of the Ozone Layer (Vienna, 22 March 1985) | *Ibid.*, vol. 1513, No. 26164, p. 293. |
|     Montreal Protocol on Substances that Deplete the Ozone Layer (Montreal, 16 September 1987) | *Ibid.*, vol. 1522, No. 26369, p. 3. For the Copenhagen and Beijing amendments, see *ibid.*, vol. 1785, p. 517, and vol. 2173, p. 183, respectively. The consolidated version of the Protocol is reproduced in UNEP, *Handbook for the Montreal Protocol on Substances that Deplete the Ozone Layer*, 11th ed., 2017. |
| Vienna Convention on the Law of Treaties between States and International Organizations or between International Organizations (1986 Vienna Convention) (Vienna, 21 March 1986) | A/CONF.129/15, reproduced in *Official Records of the United Nations Conference on the Law of Treaties between States and International Organizations or between International Organizations, Vienna, 18 February–21 March 1986*, vol. II, A/CONF.129/16/Add.1 (United Nations publication, Sales No. E.94.V.5), p. 93. |
| Convention for the Suppression of Unlawful Acts against the Safety of Maritime Navigation (Rome, 10 March 1988) | United Nations, *Treaty Series*, vol. 1678, No. 29004, p. 201. |
|     Protocol for the Suppression of Unlawful Acts against the Safety of Fixed Platforms Located on the Continental Shelf (Rome, 10 March 1988) | *Ibid.* |
| Basel Convention on the Control of Transboundary Movements of Hazardous Wastes and Their Disposal (Basel, 22 March 1989) | *Ibid.*, vol. 1673, No. 28911, p. 57. |
| ILO Convention (No. 169) concerning Indigenous and Tribal Peoples in Independent Countries (Geneva, 27 June 1989) | *Ibid.*, vol. 1650, No. 28383, p. 383. |
| Convention on the Rights of the Child (New York, 20 November 1989) | *Ibid.*, vol. 1577, No. 27531, p. 3. |
| International Convention against the Recruitment, Use, Financing and Training of Mercenaries (New York, 4 December 1989) | *Ibid.*, vol. 2163, No. 37789, p. 75. |
| Treaty on Conventional Armed Forces in Europe (Paris, 19 November 1990) | *Ibid.*, vol. 2441, No. 44001, p. 285. |
|     Document agreed among the States parties to the Treaty on Conventional Armed Forces in Europe of 19 November 1990 (Vienna, 31 May 1996) | *Ibid.*, vol. 2980, No. 44001, p. 195. |
| International Convention on the Protection of the Rights of All Migrant Workers and Members of Their Families (New York, 18 December 1990) | *Ibid.*, vol. 2220, No. 39481, p. 3. |
| Convention on Environmental Impact Assessment in a Transboundary Context (Espoo, Finland, 25 February 1991) | *Ibid.*, vol. 1989, No. 34028, p. 309. |
|     Protocol on Strategic Environmental Assessment to the Convention on Environmental Impact Assessment in a Transboundary Context (Kiev, 21 May 2003) | *Ibid.*, vol. 2685, No. 34028, p. 140. |
| Treaty on European Union (Maastricht Treaty) (Maastricht, 7 February 1992) | *Ibid.*, vol. 1755, No. 30615, p. 3. |
| Convention on the Protection and Use of Transboundary Watercourses and International Lakes (Helsinki, 17 March 1992) | *Ibid.*, vol. 1936, No. 33207, p. 269. |
| United Nations Framework Convention on Climate Change (New York, 9 May 1992) | *Ibid.*, vol. 1771, No. 30822, p. 107. |
|     Kyoto Protocol to the United Nations Framework Convention on Climate Change (Kyoto, 11 December 1997) and Doha Amendment (Doha, 8 December 2012) | *Ibid.*, vol. 2303, No. 30822, p. 162, and FCCC/KP/CMP/2012/13/Add.1, Doha Amendment. |
| Convention on Biological Diversity (Rio de Janeiro, 5 June 1992) | United Nations, *Treaty Series*, vol. 1760, No. 30619, p. 79. |
|     Cartagena Protocol on Biosafety to the Convention on Biological Diversity (Montreal, 29 January 2000) | *Ibid.*, vol. 2226, No. 30619, p. 208. |
| Convention for the Protection of the Marine Environment of the North-East Atlantic (OSPAR Convention) (Paris, 22 September 1992) | *Ibid.*, vol. 2354, No. 42279, p. 67. |
| North American Free Trade Agreement (NAFTA) (Mexico City, Ottawa and Washington, D.C., 17 December 1992) | Washington, D.C., United States Government Printing Office, 1993. |

| | Source |
|---|---|
| Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction (opened for signature at Paris on 13 January 1993) | United Nations, *Treaty Series*, vol. 1974, No. 33757, p. 45. |
| International Cocoa Agreement, 1993 (Geneva, 16 July 1993) | *Ibid.*, vol. 1766, No. 30692, p. 3. |
| North American Agreement on Environmental Cooperation between the Government of the United States of America, the Government of Canada and the Government of the United Mexican States (Mexico City, Washington, D.C. and Ottawa, 8, 9, 12 and 14 September 1993) | ILM, vol. 32, No. 6 (November 1993), p. 1480. |
| International Tropical Timber Agreement, 1994 (Geneva, 26 January 1994) | United Nations, *Treaty Series*, vol. 1955, No. 33484, p. 81. |
| Marrakesh Agreement Establishing the World Trade Organization (Marrakesh, 15 April 1994) | *Ibid.*, vols. 1867–1869, No. I-31874. |
| General Agreement on Tariffs and Trade 1994 (annex 1A) | |
| Agreement on Technical Barriers to Trade (TBT Agreement) (annex 1A) | |
| Agreement on Trade-related Aspects of Intellectual Property Rights (TRIPs Agreement) (annex 1C) | |
| Understanding on Rules and Procedures Governing the Settlement of Disputes (DSU) (annex 2) | |
| Inter-American Convention on the Forced Disappearance of Persons (Belém do Pará, Brazil, 9 June 1994) | ILM, vol. 33, No. 6 (November 1994), p. 1529. |
| Convention defining the Statute of the European Schools (Luxembourg, 21 June 1994) | *Official Journal of the European Communities*, L212, 17 August 1994, p. 3. |
| United Nations Convention to Combat Desertification in Those Countries Experiencing Serious Drought and/or Desertification, Particularly in Africa (Paris, 14 October 1994) | United Nations, *Treaty Series*, vol. 1954, No. 33480, p. 3. |
| Convention on the Safety of United Nations and Associated Personnel (New York, 9 December 1994) | *Ibid.*, vol. 2051, No. 35457, p. 363. |
| The Energy Charter Treaty (Lisbon, 17 December 1994) | *Ibid.*, vol. 2080, No. 36116, p. 95. |
| Statutes of the Community of Portuguese-speaking Countries (Lisbon, 17 July 1996) | *Ibid.*, vol. 2233, No. 39756, p. 207. |
| Comprehensive Nuclear-Test-Ban Treaty (New York, 10 September 1996) | A/50/1027, annex. |
| Convention on the Law of the Non-navigational Uses of International Watercourses (New York, 21 May 1997) | United Nations, *Treaty Series*, vol. 2999, No. 52106, p. 77. |
| Joint Convention on the Safety of Spent Fuel Management and on the Safety of Radioactive Waste Management (Vienna, 5 September 1997) | *Ibid.*, vol. 2153, No. 37605, p. 303. |
| Convention on the Prohibition of the Use, Stockpiling, Production and Transfer of Anti-Personnel Mines and on Their Destruction (Oslo, 18 September 1997) | *Ibid.*, vol. 2056, No. 35597, p. 211. |
| Convention on Access to Information, Public Participation in Decision-Making and Access to Justice in Environmental Matters (Aarhus (Denmark), 25 June 1998) | *Ibid.*, vol. 2161, No. 37770, p. 447. |
| Rome Statute of the International Criminal Court (Rome, 17 July 1998) | *Ibid.*, vol. 2187, No. 38544, p. 3. |
| Rotterdam Convention on the Prior Informed Consent Procedure for Certain Hazardous Chemicals and Pesticides in International Trade (Rotterdam, 10 September 1998) | *Ibid.*, vol. 2244, No. 39973, p. 337. |
| Constitutive Act of the African Union (Lomé, 11 July 2000) | *Ibid.*, vol. 2158, No. 37733, p. 3. |
| Agreement Establishing the "Karanta" Foundation for Support of Non-Formal Education Policies and Including in Annex the Statutes of the Foundation (Dakar, 15 December 2000) | *Ibid.*, vol. 2341, No. 41941, p. 3. |
| Stockholm Convention on Persistent Organic Pollutants (Stockholm, 22 May 2001) | *Ibid.*, vol. 2256, No. 40214, p. 119. |
| Revised Treaty of Chaguaramas Establishing the Caribbean Community including the Caribbean Community (CARICOM) Single Market and Economy (with annexes, schedules and Protocol of provisional application) (Nassau, 5 July 2001) | *Ibid.*, vol. 2259, No. 40269, pp. 293 and 440 (Protocol). |
| Agreement Establishing the Caribbean Community Climate Change Centre (Belize City, 4 February 2002) | *Ibid.*, vol. 2946, No. 51181, p. 145. |
| Protocol on the Provisional Application of the Agreement Establishing the Caribbean Community Climate Change Centre (Belize City, 5 February 2002) | *Ibid.*, vol. 2953, No. 51181, p. 181. |

| | *Source* |
|---|---|
| London Scheme for Extradition Within the Commonwealth (Kingstown, 21 November 2002) | *Commonwealth Law Bulletin 2002*, vol. 28, No. 2, p. 1196. |
| Framework Agreement on the Sava River Basin (Kranjska Gora (Slovenia), 3 December 2002) | United Nations, *Treaty Series*, vol. 2366, No. 42662, p. 479. |
|     Protocol on the Navigation Regime to the Framework Agreement on the Sava River Basin (Kranjska Gora, 3 December 2002) | *Ibid.*, vol. 2367, No. 42662, p. 688. |
|     Agreement on the Amendments to the Framework Agreement on the Sava River Basin and the Protocol on the Navigation Regime to the Framework Agreement on the Sava River Basin (Ljubljana, 2 April 2004) | *Ibid.*, No. 42662, p. 697. |
| Framework Agreement on a Multilateral Nuclear Environmental Programme in the Russian Federation and Protocol on Claims, Legal Proceedings and Indemnification (Stockholm, 21 May 2003) | *Ibid.*, vol. 2265, No. 40358, pp. 5 and 35 (Protocol). |
| WHO Framework Convention on Tobacco Control (Geneva, 21 May 2003) | *Ibid.*, vol. 2302, No. 41032, p. 166. |
| Agreement between the Member States of the European Union concerning the status of military and civilian staff seconded to the institutions of the European Union, of the headquarters and forces which may be made available to the European Union in the context of the preparation and execution of the tasks referred to in Article 17 (2) of the Treaty on European Union, including exercises, and of the military and civilian staff of the Member States put at the disposal of the European Union to act in this context (EU SOFA) (Brussels, 17 November 2003) | *Official Journal of the European Union*, C321, 31 December 2003, p. 6. |
| United Nations Convention on Jurisdictional Immunities of States and Their Property (New York, 2 December 2004) | *Official Records of the General Assembly, Fifty-ninth Session, Supplement No. 49* (A/59/49), vol. I, resolution 59/38, annex. |
| International Agreement on Olive Oil and Table Olives, 2005 (Geneva, 29 April 2005) | United Nations, *Treaty Series*, vol. 2684, No. 47662, p. 63. |
| Trans-Pacific Strategic Economic Partnership Agreement (Wellington, 18 July 2005) | *Ibid.*, vol. 2592, No. 46151, p. 225. |
| Free Trade Agreement between the European Free Trade Association (EFTA) States and the Southern African Customs Union (SACU) States (Höfn (Iceland), 26 June 2006) | Available from the EFTA website: www .efta.int, *Global Trade Relations*. |
| Convention on the Rights of Persons with Disabilities (New York, 13 December 2006) | United Nations, *Treaty Series*, vol. 2515, No. 44910, p. 3. |
| International Convention for the Protection of All Persons from Enforced Disappearance (New York, 20 December 2006) | *Ibid.*, vol. 2716, No. 48088, p. 3. |
| Convention on Cluster Munitions (Dublin, 30 May 2008). Opened for signature at Oslo on 3 December 2008 | *Ibid.*, vol. 2688, No. 47713, p. 39. |
| Eastern Africa Regional Framework Agreement on Air Pollution (Nairobi, 23 October 2008) | Available from https://web.archive .org/web/20111226174901/http:/ www.unep.org/urban_envir onment/PDFs/EABAQ2008 -AirPollutionAgreement.pdf. |
| West and Central Africa Regional Framework Agreement on Air Pollution (Abidjan (Côte d'Ivoire), 22 July 2009) | Available from https://web.archive.org /web/20111224143143/http:/www .unep.org/urban_environment/PDFs /BAQ09_AgreementEn.pdf. |
| International Cocoa Agreement, 2010 (Geneva, 25 June 2010) | United Nations, *Treaty Series*, vol. 2871, No. 50115, p. 3. |
| Treaty Establishing the European Stability Mechanism (Brussels, 2 February 2012) | Council of Europe, T/ESM 2012-LT/en. |
| Agreement on a Unified Patent Court (Brussels, 19 February 2013) | *Official Journal of the European Union*, C 175, 20 June 2013, p. 1. |
|     Protocol to the Agreement on a Unified Patent Court on Provisional Application (Brussels, 1 October 2015) | Available from www.unified-patent-court .org/en/court/legal-documents/67. |
| Arms Trade Treaty (New York, 2 April 2013) | United Nations, *Treaty Series*, vol. 3013, No. 52373, p. 269. |
| Minamata Convention on Mercury (Kumamoto (Japan), 10 October 2013) | *Ibid.*, vol. [not yet published], No. 54669; text available from https://treaties .un.org. |

| | *Source* |
|---|---|
| Inter-American Convention on Protecting the Human Rights of Older Persons (Washington, D.C., 15 June 2015) | *Ibid.*, vol. [not yet published], No. 54318; text available from https://treaties .un.org. See also OAS, General Assembly, forty-fifth regular session, Washington, D.C., 15–16 June 2015, *Proceedings*, vol. I, OEA/Ser.P/ XLV-O.2, resolution AG/RES.2875 (XLV-O/15). |
| Paris Agreement (Paris, 12 December 2015) | United Nations, *Treaty Series*, vol. [not yet published], No. 54113; text available from https://treaties.un.org. |
| Regional Agreement on Access to Information, Public Participation and Justice in Environmental Matters in Latin America and the Caribbean (Escazú, Costa Rica, 4 March 2018) | Text available from the website of the United Nations Treaty Collection: https://treaties.un.org (*Depositary, Status of Treaties*, chap. XXVII). |

# Chapter I

# ORGANIZATION OF THE SESSION

1.   The International Law Commission held the first part of its seventieth session from 30 April to 1 June 2018 in New York and the second part from 2 July to 10 August 2018 at its seat at the United Nations Office at Geneva. The session was opened by Mr. Georg Nolte, Chair of the Commission at its sixty-ninth session.

## A.   Membership

2.   The Commission consists of the following members:

Mr. Ali Mohsen Fetais AL-MARRI (Qatar)

Mr. Carlos J. ARGÜELLO GÓMEZ (Nicaragua)

Mr. Bogdan AURESCU (Romania)

Mr. Yacouba CISSÉ (Côte d'Ivoire)

Ms. Concepción ESCOBAR HERNÁNDEZ (Spain)

Ms. Patrícia GALVÃO TELES (Portugal)

Mr. Juan Manuel GÓMEZ ROBLEDO (Mexico)

Mr. Claudio GROSSMAN GUILOFF (Chile)

Mr. Hussein A. HASSOUNA (Egypt)

Mr. Mahmoud D. HMOUD (Jordan)

Mr. Huikang HUANG (China)

Mr. Charles Chernor JALLOH (Sierra Leone)

Mr. Ahmed LARABA (Algeria)

Ms. Marja LEHTO (Finland)

Mr. Shinya MURASE (Japan)

Mr. Sean D. MURPHY (United States of America)

Mr. Hong Thao NGUYEN (Viet Nam)

Mr. Georg NOLTE (Germany)

Ms. Nilüfer ORAL (Turkey)

Mr. Hassan OUAZZANI CHAHDI (Morocco)

Mr. Ki Gab PARK (Republic of Korea)

Mr. Chris Maina PETER (United Republic of Tanzania)

Mr. Ernest PETRIČ (Slovenia)

Mr. Aniruddha RAJPUT (India)

Mr. August REINISCH (Austria)

Mr. Juan José RUDA SANTOLARIA (Peru)

Mr. Gilberto Vergne SABOIA (Brazil)

Mr. Pavel ŠTURMA (Czech Republic)

Mr. Dire D. TLADI (South Africa)

Mr. Eduardo VALENCIA-OSPINA (Colombia)

Mr. Marcelo VÁZQUEZ-BERMÚDEZ (Ecuador)

Mr. Amos S. WAKO (Kenya)

Sir Michael WOOD (United Kingdom of Great Britain and Northern Ireland)

Mr. Evgeny ZAGAYNOV (Russian Federation)

## B.   Casual vacancy

3.   At its 3391st meeting, on 1 May 2018, the Commission elected Mr. Evgeny Zagaynov (Russian Federation) to fill the casual vacancy occasioned by the resignation of Mr. Roman A. Kolodkin.

## C.   Officers and the Enlarged Bureau

4.   At its 3390th meeting, on 30 April 2018, the Commission elected the following officers:

*Chair*:   Mr. Eduardo Valencia-Ospina (Colombia)

*First Vice-Chair*:   Mr. Pavel Šturma (Czech Republic)

*Second Vice-Chair*:   Mr. Hong Thao Nguyen (Viet Nam)

*Chair of the Drafting Committee*:   Mr. Charles Chernor Jalloh (Sierra Leone)

*Rapporteur*:   Ms. Patrícia Galvão Teles (Portugal)

5.   The Enlarged Bureau of the Commission was composed of the officers for the present session, the previous Chairs of the Commission[1] and the Special Rapporteurs.[2]

---

[1] Mr. Georg Nolte and Mr. Ernest Petrič.

[2] Ms. Concepción Escobar Hernández, Mr. Juan Manuel Gómez Robledo, Ms. Marja Lehto, Mr. Shinya Murase, Mr. Sean D. Murphy, Mr. Georg Nolte, Mr. Pavel Šturma, Mr. Dire D. Tladi and Sir Michael Wood.

6.   At its 3390th meeting, on 30 April 2018, the Commission set up a Planning Group composed of the following members: Mr. Pavel Šturma (Chair), Mr. Yacouba Cissé, Ms. Concepción Escobar Hernández, Mr. Juan Manuel Gómez Robledo, Mr. Claudio Grossman Guiloff, Mr. Hussein A. Hassouna, Mr. Mahmoud D. Hmoud, Mr. Huikang Huang, Mr. Charles Chernor Jalloh, Ms. Marja Lehto, Mr. Shinya Murase, Mr. Sean D. Murphy, Mr. Hong Thao Nguyen, Mr. Georg Nolte, Ms. Nilüfer Oral, Mr. Hassan Ouazzani Chahdi, Mr. Ki Gab Park, Mr. Ernest Petrič, Mr. Aniruddha Rajput, Mr. August Reinisch, Mr. Juan José Ruda Santolaria, Mr. Gilberto Vergne Saboia, Mr. Dire D. Tladi, Mr. Eduardo Valencia-Ospina, Mr. Marcelo Vázquez-Bermúdez, Sir Michael Wood, Mr. Evgeny Zagaynov and Ms. Patrícia Galvão Teles (*ex officio*).

## D.   Drafting Committee

7.   At its 3391st, 3395th, 3401st, 3409th, 3413th, 3431st and 3435th meetings, on 1, 4, 11, 22 and 29 May and on 17 and 24 July 2018, the Commission established a Drafting Committee, composed of the following members for the topics indicated:

(*a*)   *Peremptory norms of general international law* (*jus cogens*): Mr. Charles Chernor Jalloh (Chair), Mr. Dire D. Tladi (Special Rapporteur), Mr. Carlos J. Argüello Gómez, Mr. Yacouba Cissé, Ms. Concepción Escobar Hernández, Mr. Juan Manuel Gómez Robledo, Mr. Claudio Grossman Guiloff, Mr. Mahmoud D. Hmoud, Mr. Huikang Huang, Ms. Marja Lehto, Mr. Shinya Murase, Mr. Sean D. Murphy, Mr. Georg Nolte, Mr. Hong Thao Nguyen, Ms. Nilüfer Oral, Mr. Hassan Ouazzani Chahdi, Mr. Ki Gab Park, Mr. Ernest Petrič, Mr. Aniruddha Rajput, Mr. August Reinisch, Mr. Juan José Ruda Santolaria, Mr. Gilberto Vergne Saboia, Mr. Pavel Šturma, Mr. Marcelo Vázquez-Bermúdez, Sir Michael Wood, Mr. Evgeny Zagaynov and Ms. Patrícia Galvão Teles (*ex officio)*;

(*b*)   *Subsequent agreements and subsequent practice in relation to the interpretation of treaties*: Mr. Charles Chernor Jalloh (Chair), Mr. Georg Nolte (Special Rapporteur), Mr. Bogdan Aurescu, Mr. Yacouba Cissé, Mr. Juan Manuel Gómez Robledo, Mr. Claudio Grossman Guiloff, Mr. Mahmoud D. Hmoud, Mr. Shinya Murase, Mr. Sean D. Murphy, Mr. Hong Thao Nguyen, Mr. Hassan Ouazzani Chahdi, Mr. Ki Gab Park, Mr. Aniruddha Rajput, Mr. August Reinisch, Mr. Juan José Ruda Santolaria, Mr. Pavel Šturma, Mr. Dire D. Tladi, Mr. Marcelo Vázquez-Bermúdez, Sir Michael Wood and Ms. Patrícia Galvão Teles (*ex officio*);

(*c*)   *Identification of customary international law*: Mr. Charles Chernor Jalloh (Chair), Sir Michael Wood (Special Rapporteur), Mr. Carlos J. Argüello Gómez, Mr. Bogdan Aurescu, Mr. Juan Manuel Gómez Robledo, Mr. Claudio Grossman Guiloff, Mr. Mahmoud D. Hmoud, Mr. Huikang Huang, Ms. Marja Lehto, Mr. Shinya Murase, Mr. Sean D. Murphy, Mr. Hong Thao Nguyen, Mr. Georg Nolte, Ms. Nilüfer Oral, Mr. Ki Gab Park, Mr. Aniruddha Rajput, Mr. August Reinisch, Mr. Juan José Ruda Santolaria, Mr. Gilberto Vergne Saboia, Mr. Dire D. Tladi, Mr. Marcelo Vázquez-Bermúdez and Ms. Patrícia Galvão Teles (*ex officio*);

(*d*)   *Provisional application of treaties*: Mr. Charles Chernor Jalloh (Chair), Mr. Juan Manuel Gómez Robledo (Special Rapporteur), Mr. Carlos J. Argüello Gómez, Mr. Bogdan Aurescu, Mr. Yacouba Cissé, Ms. Concepción Escobar Hernández, Mr. Claudio Grossman Guiloff, Mr. Huikang Huang, Ms. Marja Lehto, Mr. Sean D. Murphy, Mr. Hassan Ouazzani Chahdi, Mr. Ki Gab Park, Mr. Aniruddha Rajput, Mr. August Reinisch, Mr. Juan José Ruda Santolaria, Mr. Pavel Šturma, Mr. Marcelo Vázquez-Bermúdez, Sir Michael Wood, Mr. Evgeny Zagaynov and Ms. Patrícia Galvão Teles (*ex officio*);

(*e*)   *Protection of the atmosphere*: Mr. Charles Chernor Jalloh (Chair), Mr. Shinya Murase (Special Rapporteur), Mr. Bogdan Aurescu, Mr. Claudio Grossman Guiloff, Mr. Huikang Huang, Ms. Marja Lehto, Mr. Sean D. Murphy, Mr. Hong Thao Nguyen, Mr. Georg Nolte, Ms. Nilüfer Oral, Mr. Ki Gab Park, Mr. Aniruddha Rajput, Mr. August Reinisch, Mr. Juan José Ruda Santolaria, Mr. Marcelo Vázquez-Bermúdez, Sir Michael Wood and Ms. Patrícia Galvão Teles (*ex officio*);

(*f*)   *Protection of the environment in relation to armed conflicts*: Mr. Charles Chernor Jalloh (Chair), Ms. Marja Lehto (Special Rapporteur), Mr. Bogdan Aurescu, Mr. Yacouba Cissé, Ms. Concepción Escobar Hernández, Mr. Juan Manuel Gómez Robledo, Mr. Claudio Grossman Guiloff, Mr. Mahmoud D. Hmoud, Mr. Huikang Huang, Mr. Shinya Murase, Mr. Sean D. Murphy, Mr. Hong Thao Nguyen, Ms. Nilüfer Oral, Mr. Ki Gab Park, Mr. Aniruddha Rajput, Mr. Juan José Ruda Santolaria, Mr. Gilberto Vergne Saboia, Sir Michael Wood and Ms. Patrícia Galvão Teles (*ex officio*);

(*g*)   *Succession of States in respect of State responsibility*: Mr. Charles Chernor Jalloh (Chair), Mr. Pavel Šturma (Special Rapporteur), Mr. Carlos J. Argüello Gómez, Mr. Bogdan Aurescu, Ms. Concepción Escobar Hernández, Mr. Claudio Grossman Guiloff, Mr. Sean D. Murphy, Mr. Georg Nolte, Ms. Nilüfer Oral, Mr. Ki Gab Park, Mr. Ernest Petrič, Mr. Aniruddha Rajput, Mr. August Reinisch, Mr. Juan José Ruda Santolaria, Sir Michael Wood, Mr. Evgeny Zagaynov and Ms. Patrícia Galvão Teles (*ex officio*);

8.   The Drafting Committee held a total of 32 meetings on the seven topics indicated above.

## E.   Working groups

9.   At its 3394th meeting, on 3 May 2018, the Commission established a Working Group on protection of the environment in relation to armed conflicts, composed of the following members: Mr. Marcelo Vázquez-Bermúdez (Chair), Ms. Marja Lehto (Special Rapporteur), Mr. Yacouba Cissé, Mr. Claudio Grossman Guiloff, Mr. Mahmoud D. Hmoud, Mr. Charles Chernor Jalloh, Mr. Shinya Murase, Mr. Sean D. Murphy, Mr. Hong Thao Nguyen, Ms. Nilüfer Oral, Mr. Hassan Ouazzani Chahdi, Mr. Aniruddha Rajput, Mr. Juan José Ruda Santolaria, Mr. Gilberto Vergne Saboia, Sir Michael Wood and Ms. Patrícia Galvão Teles (*ex officio*).

10.   At its 3404th meeting, on 16 May 2018, the Commission established a Working Group on identification of

customary international law, composed of the following members: Mr. Marcelo Vázquez-Bermúdez (Chair), Sir Michael Wood (Special Rapporteur), Mr. Carlos J. Argüello Gómez, Mr. Yacouba Cissé, Mr. Claudio Grossman Guiloff, Mr. Huikang Huang, Mr. Charles Chernor Jalloh, Ms. Marja Lehto, Mr. Shinya Murase, Mr. Sean D. Murphy, Mr. Georg Nolte, Ms. Nilüfer Oral, Mr. Hassan Ouazzani Chahdi, Mr. Ki Gab Park, Mr. Aniruddha Rajput, Mr. August Reinisch, Mr. Juan José Ruda Santolaria, Mr. Gilberto Vergne Saboia and Ms. Patrícia Galvão Teles (*ex officio*).

11.    The Planning Group established the following working groups:

(*a*) *Working Group on the long-term programme of work*: Mr. Mahmoud D. Hmoud (Chair), Mr. Bogdan Aurescu, Mr. Yacouba Cissé, Ms. Concepción Escobar Hernández, Mr. Juan Manuel Gómez Robledo, Mr. Claudio Grossman Guiloff, Mr. Hussein A. Hassouna, Mr. Huikang Huang, Mr. Charles Chernor Jalloh, Ms. Marja Lehto, Mr. Shinya Murase, Mr. Sean D. Murphy, Mr. Hong Thao Nguyen, Ms. Nilüfer Oral, Mr. Hassan Ouazzani Chahdi, Mr. Ki Gab Park, Mr. Chris Maina Peter, Mr. Aniruddha Rajput, Mr. August Reinisch, Mr. Juan José Ruda Santolaria, Mr. Gilberto Vergne Saboia, Mr. Pavel Šturma, Mr. Dire D. Tladi, Mr. Marcelo Vázquez-Bermúdez, Mr. Amos S. Wako, Sir Michael Wood, Mr. Evgeny Zagaynov and Ms. Patrícia Galvão Teles (*ex officio*).

(*b*) *Working Group on methods of work*: Mr. Hussein A. Hassouna (Chair), Mr. Bogdan Aurescu, Mr. Yacouba Cissé, Ms. Concepción Escobar Hernández, Mr. Claudio Grossman Guiloff, Mr. Huikang Huang, Mr. Charles Chernor Jalloh, Ms. Marja Lehto, Mr. Shinya Murase, Mr. Sean D. Murphy, Mr. Hong Thao Nguyen, Mr. Georg Nolte, Ms. Nilüfer Oral, Mr. Hassan Ouazzani Chahdi, Mr. Ki Gab Park, Mr. Ernest Petrič, Mr. Aniruddha Rajput, Mr. August Reinisch, Mr. Juan José Ruda Santolaria, Mr. Gilberto Vergne Saboia, Mr. Pavel Šturma, Mr. Dire D. Tladi, Mr. Marcelo Vázquez-Bermúdez, Sir Michael Wood, Mr. Evgeny Zagaynov and Ms. Patrícia Galvão Teles (*ex officio*).

## F.    Secretariat

12.    Mr. Miguel de Serpa Soares, Under-Secretary-General for Legal Affairs and United Nations Legal Counsel, represented the Secretary-General. Mr. Huw Llewellyn, Director of the Codification Division of the Office of Legal Affairs, acted as Secretary to the Commission and, in the absence of the Legal Counsel, represented the Secretary-General. Mr. Arnold Pronto and Ms. Jessica Elbaz, Principal Legal Officers, served as Principal Assistant Secretaries to the Commission. Mr. Trevor Chimimba, Senior Legal Officer, served as Senior Assistant Secretary to the Commission. Mr. David Nanopoulos and Mr. Francesco Messineo, Legal Officers, and Ms. Christiane Ahlborn and Mr. Bart Smit Duijzentkunst, Associate Legal Officers, served as Assistant Secretaries to the Commission.

## G.    Agenda

13.    At its 3390th meeting, on 30 April 2018, the Commission adopted an agenda for its seventieth session consisting of the following items:

1.    Organization of the work of the session.

2.    Filling of casual vacancies.

3.    Immunity of State officials from foreign criminal jurisdiction.

4.    Subsequent agreements and subsequent practice in relation to the interpretation of treaties.

5.    Provisional application of treaties.

6.    Identification of customary international law.

7.    Protection of the environment in relation to armed conflicts.

8.    Protection of the atmosphere.

9.    Peremptory norms of general international law (*jus cogens*).

10.    Succession of States in respect of State responsibility.

11.    Commemoration of the seventieth anniversary of the Commission.

12.    Programme, procedures and working methods of the Commission and its documentation.

13.    Date and place of the seventy-first session of the Commission.

14.    Cooperation with other bodies.

15.    Other business.

# Chapter II

# SUMMARY OF THE WORK OF THE COMMISSION AT ITS SEVENTIETH SESSION

14. With respect to the topic "Subsequent agreements and subsequent practice in relation to the interpretation of treaties", the Commission had before it the fifth report of the Special Rapporteur (A/CN.4/715), as well as comments and observations received from Governments (A/CN.4/712 and Add.1). The fifth report addressed the comments and observations made by States on the draft conclusions and commentaries adopted on first reading and made recommendations for each draft conclusion.

15. The Commission adopted, on second reading, a set of 13 draft conclusions, together with commentaries thereto, on subsequent agreements and subsequent practice in relation to the interpretation of treaties. In accordance with article 23 of its statute, the Commission recommended that the General Assembly take note in a resolution of the draft conclusions on subsequent agreements and subsequent practice in relation to the interpretation of treaties, annex the draft conclusions to the resolution, and ensure their widest dissemination; and commend the draft conclusions, together with the commentaries thereto, to the attention of States and all who may be called upon to interpret treaties (chap. IV).

16. With regard to the topic "Identification of customary international law", the Commission had before it the fifth report of the Special Rapporteur (A/CN.4/717 and Add.1), which addressed the comments and observations made by States on the draft conclusions and commentaries adopted on first reading, as well as ways and means for making the evidence of customary international law more readily available.

17. The Commission also had before it an updated bibliography on the topic contained in the addendum to that report, the comments and observations received from Governments (A/CN.4/716) and the memorandum by the Secretariat on ways and means for making the evidence of customary international law more readily available (A/CN.4/710).

18. The Commission adopted, on second reading, a set of 16 draft conclusions, together with commentaries thereto, on identification of customary international law. In accordance with article 23 of its statute, the Commission recommended that the General Assembly, *inter alia*, take note in a resolution of the draft conclusions on identification of customary international law, annex the draft conclusions to the resolution, and ensure their widest dissemination; commend the draft conclusions, together with the commentaries thereto, to the attention of States and all who may be called upon to identify rules of customary international law; and follow up the suggestions in the Secretariat memorandum (chap. V).

19. With respect to the topic "Protection of the atmosphere", the Commission had before it the fifth report of the Special Rapporteur (A/CN.4/711), which was devoted to questions concerning implementation, compliance and dispute settlement.

20. Following the plenary debate, the Commission decided to refer the three draft guidelines, as contained in the Special Rapporteur's fifth report, to the Drafting Committee. As a result of its consideration of the topic at the present session, the Commission adopted, on first reading, a draft preamble and 12 draft guidelines, together with commentaries thereto, on the protection of the atmosphere. The Commission decided, in accordance with articles 16 to 21 of its statute, to transmit the draft guidelines, through the Secretary-General, to Governments and international organizations for comments and observations, with the request that such comments and observations be submitted to the Secretary-General by 15 December 2019 (chap. VI).

21. With regard to the topic "Provisional application of treaties", the Commission had before it the fifth report of the Special Rapporteur (A/CN.4/718 and Add.1), which continued the analysis of views expressed by Member States, provided additional information on the practice of international organizations, and addressed the topics of termination or suspension of the provisional application of a treaty as a consequence of its breach, and formulation of reservations and amendments. It also provided a bibliography on the topic contained in the addendum to the report. In addition, the Commission had before it the memorandum by the Secretariat reviewing State practice in respect of treaties (bilateral and multilateral), deposited or registered in the last 20 years with the Secretary-General, that provide for provisional application, including treaty actions related thereto.[3]

22. Following the plenary debate, the Commission decided to refer the draft guidelines and model clauses proposed by the Special Rapporteur, as well as the draft guidelines previously adopted by the Commission, to the Drafting Committee. Upon consideration of the report of the Drafting Committee, the Commission adopted on first reading a set of 12 draft guidelines, with commentaries thereto, entitled "Guide to Provisional Application of Treaties". The Commission decided, in accordance with articles 16 to 21 of its statute, to transmit the draft guidelines, through the Secretary-General, to Governments and international organizations for comments and observations, with the request that such comments and observations be submitted to the Secretary-General by 15 December 2019 (chap. VII).

---

[3] *Yearbook … 2017*, vol. II (Part One), document A/CN.4/707.

23. With respect to the topic "Peremptory norms of general international law (*jus cogens*)", the Commission had before it the third report of the Special Rapporteur (A/CN.4/714), which set out the previous consideration of the topic in the Commission and the Sixth Committee, and discussed the consequences of peremptory norms of general international law (*jus cogens*) in general, for treaty law and for the law of State responsibility, as well as other effects of peremptory norms of general international law (*jus cogens*). The Commission subsequently decided to refer draft conclusions 10 to 23, as proposed in the report, to the Drafting Committee. The Commission took note of the interim reports of the Chair of the Drafting Committee on draft conclusions 8 and 9, as well as 10 to 14, provisionally adopted by the Committee, which were presented to the Commission for information only (chap. VIII).

24. With respect to the topic "Protection of the environment in relation to armed conflicts", the Commission had before it the first report of the Special Rapporteur (A/CN.4/720), which addressed the protection of the environment in situations of occupation. The report offered a general introduction to the protection of the environment under the law of occupation and addressed the complementarity between the law of occupation, international human rights law and international environmental law. The report contained three draft principles relating to the protection of the environment in situations of occupation. Following the plenary debate, the Commission decided to refer the draft principles, as contained in the report of the Special Rapporteur, to the Drafting Committee. The Commission subsequently received the report of the Drafting Committee, and took note of draft principles 19 to 21, provisionally adopted by the Drafting Committee. Furthermore, the Commission provisionally adopted draft principles 4, 6 to 8, and 14 to 18, which had been provisionally adopted by the Drafting Committee at the sixty-eighth session, together with commentaries thereto (chap. IX).

25. With respect to the topic "Succession of States in respect of State responsibility", the Commission had before it the second report of the Special Rapporteur (A/CN.4/719), which addressed the legality of succession, the general rules on succession of States in respect of State responsibility, and certain special categories of State succession to the obligations arising from responsibility. Following the plenary debate, the Commission decided to refer draft articles 5 to 11, as contained in the report of the Special Rapporteur, to the Drafting Committee. The Commission subsequently took note of the interim report of the Chair of the Drafting Committee on draft article 1, paragraph 2, and draft articles 5 and 6 provisionally adopted by the Committee, which was presented to the Commission for information only (chap. X).

26. With regard to the topic "Immunity of State officials from foreign criminal jurisdiction", the Commission had before it the sixth report of the Special Rapporteur (A/CN.4/722), which was devoted to addressing procedural aspects of immunity from foreign criminal jurisdiction, in particular, analysing the way in which procedural aspects had been dealt with previously in the work of the Commission, how such procedural aspects fit within the overall boundaries of the present topic and the approach which the Special Rapporteur intended to follow when further analysing procedural aspects; and providing an analysis of three components of procedural aspects related to the concept of jurisdiction, namely: (*a*) timing; (*b*) kinds of acts affected; and (*c*) the determination of immunity. There were no draft articles proposed for consideration at the present session. The debate of the Commission on the sixth report was partial and will be completed at the seventy-first session (chap. XI).

27. Concerning the seventieth anniversary of the Commission, commemorative events were held, in New York on 21 May 2018 and in Geneva on 5 and 6 July 2018, under the theme "70 years of the International Law Commission—Drawing a balance for the future". The commemorative events in both New York and Geneva consisted of two segments, a solemn part followed by a series of panel discussions. The keynote address in New York was delivered by Mr. Nico Schrijver, Professor of Public International Law, Grotius Centre for International Legal Studies, Leiden University, and President of the Institute of International Law. The keynote address in Geneva was delivered by Mr. Abdulqawi Ahmed Yusuf, President of the International Court of Justice (chap. XII).

28. As regards other decisions and conclusions of the Commission, the Commission decided to include the topic "General principles of law" in its programme of work and to appoint Mr. Marcelo Vázquez-Bermúdez as Special Rapporteur for the topic (chap. XIII, sect. A).

29. The Commission re-established a Planning Group to consider its programme, procedures and working methods, which in turn decided to re-establish the Working Group on the long-term programme of work, chaired by Mr. Mahmoud D. Hmoud, and the Working Group on methods of work, chaired by Mr. Hussein A. Hassouna (chap. XIII, sect. C). The Commission decided to include in its long-term programme of work the topics (*a*) Universal criminal jurisdiction and (*b*) Sea-level rise in relation to international law (chap. XIII, sect. C.1, and annexes I and II).

30. The Commission continued its traditional exchanges of information with the Inter-American Juridical Committee and the Committee of Legal Advisers on Public International Law of the Council of Europe. Members of the Commission also held an informal exchange of views with the International Committee of the Red Cross (chap. XIII, sect. E).

31. The Commission decided that its seventy-first session would be held in Geneva from 29 April to 7 June and from 8 July to 9 August 2019 (chap. XIII, sect. D).

# Chapter III

# SPECIFIC ISSUES ON WHICH COMMENTS WOULD BE OF PARTICULAR INTEREST TO THE COMMISSION

32. The Commission would welcome the submission, by 31 December 2018, of any information on the following issues, in order for it to be taken into account in the respective reports of the Special Rapporteurs.

## A. Peremptory norms of general international law (*jus cogens*)

33. The Commission considers the request for information on the topic "Peremptory norms of general international law (*jus cogens*)",[4] contained in chapter III of the report on the work of its sixty-seventh session (2015), still to be relevant and would welcome any additional information.

## B. Immunity of State officials from foreign criminal jurisdiction

34. The Commission would welcome any information that States could provide on their national legislation and practice (of a judicial, administrative or any other nature) concerning procedures for dealing with immunity, in particular the invocation and waiver of immunity, as well as on mechanisms for communication, consultation, cooperation and international judicial assistance that they may use in relation to situations in which the immunity of State officials from foreign criminal jurisdiction is being or may be examined by their national authorities. Similarly, it would be useful to have any information that international organizations could provide on international cooperation mechanisms which, within their area of competence, may affect immunity of State officials from foreign criminal jurisdiction.

## C. Protection of the environment in relation to armed conflicts

35. The Commission considers the request for information on this topic contained in chapter III of the report on the work of its sixty-seventh session (2015)[5] still to be relevant and would welcome any additional information in this regard. Furthermore, the Commission would appreciate receiving any information States may be in a position to provide concerning responsibility, liability or reparation for harm caused to the environment in relation to armed conflict, *inter alia* case law or agreements or arrangements between the parties.

## D. Succession of States in respect of State responsibility

36. The Commission would appreciate being provided by States with information on their practice relevant to the succession of States in respect of State responsibility. The Commission would particularly appreciate receiving examples of:

(*a*)  treaties, including relevant multilateral and bilateral agreements;

(*b*)  domestic law relevant to the topic, including legislation implementing multilateral or bilateral agreements;

(*c*)  decisions of domestic, regional and subregional courts and tribunals addressing issues involving the succession of States in respect of State responsibility.

## E. New topics

37. The Commission decided to include in its long-term programme of work two new topics, namely (*a*) Universal criminal jurisdiction; and (*b*) Sea-level rise in relation to international law. In the selection of those topics, the Commission was guided by the following criteria that it had agreed upon at its fiftieth session (1998): (*a*) the topic should reflect the needs of States in respect of the progressive development and codification of international law; (*b*) the topic should be at a sufficiently advanced stage in terms of State practice to permit progressive development and codification; (*c*) the topic should be concrete and feasible for progressive development and codification; and (*d*) the Commission should not restrict itself to traditional topics, but could also consider those that reflect new developments in international law and pressing concerns of the international community as a whole.[6] The Commission would welcome the views of States on those new topics.

38. In addition, the Commission would welcome any proposals that States may wish to make concerning possible topics for inclusion in its long-term programme of work. It would be helpful if such proposals could be accompanied by a statement of reasons in support of their inclusion, taking into account the above-mentioned criteria for the selection of topics.

---

[4] *Yearbook … 2015*, vol. II (Part Two), para. 31.

[5] *Ibid.*, paras. 27–28.

---

[6] *Yearbook … 1998*, vol. II (Part Two), para. 553.

# Chapter IV

# SUBSEQUENT AGREEMENTS AND SUBSEQUENT PRACTICE IN RELATION TO THE INTERPRETATION OF TREATIES

## A.  Introduction

39.    The Commission, at its sixtieth session (2008), decided to include the topic "Treaties over time" in its programme of work and to establish a Study Group on the topic at its following session.[7] At its sixty-first session (2009), the Commission established the Study Group on treaties over time, chaired by Mr. Georg Nolte. At that session, the Study Group focused its discussions on the identification of the issues to be covered, the working methods of the Study Group and the possible outcome of the Commission's work on the topic.[8]

40.    From the sixty-second to the sixty-fourth session (2010–2012), the Study Group was reconstituted under the chairpersonship of Mr. Georg Nolte. The Study Group examined three reports presented informally by the Chair, which addressed, respectively, the relevant jurisprudence of the International Court of Justice and arbitral tribunals of *ad hoc* jurisdiction;[9] the jurisprudence under special regimes relating to subsequent agreements and subsequent practice;[10] and the subsequent agreements and subsequent practice of States outside judicial and quasi-judicial proceedings.[11]

41.    At the sixty-fourth session (2012), the Commission, on the basis of a recommendation of the Study Group,[12] decided: (*a*) to change, with effect from its sixty-fifth session (2013), the format of the work on this topic as suggested by the Study Group; and (*b*) to appoint Mr. Georg Nolte as Special Rapporteur for the topic "Subsequent agreements and subsequent practice in relation to the interpretation of treaties".[13]

42.    From its sixty-fifth (2013) to sixty-eighth (2016) sessions, the Commission considered the topic on the basis of four successive reports submitted by the Special Rapporteur.[14]

43.    At its sixty-eighth session (2016), the Commission adopted on first reading a set of 13 draft conclusions on subsequent agreements and subsequent practice in relation to the interpretation of treaties, together with commentaries thereto.[15] It decided, in accordance with articles 16 to 21 of its statute, to transmit the draft conclusions, through the Secretary-General, to Governments for comments and observations.[16]

## B.  Consideration of the topic at the present session

44.    At the present session, the Commission had before it the fifth report of the Special Rapporteur (A/CN.4/715), as well as comments and observations received from Governments (A/CN.4/712 and Add.1).

45.    At its 3390th, 3391st and 3393rd to 3396th meetings, from 30 April to 7 May 2018, the Commission considered the fifth report of the Special Rapporteur and instructed the Drafting Committee to commence the second reading of the entire set of draft conclusions on the basis of the proposals of the Special Rapporteur, taking into account the comments and observations of Governments and the plenary debate on the Special Rapporteur's report.

46.    The Commission considered the report of the Drafting Committee (A/CN.4/L.907) at its 3406th meeting, on 18 May 2018, and adopted the entire set of draft conclusions on subsequent agreements and subsequent practice in relation to the interpretation of treaties on second reading (sect. E.1 below).

47.    At its 3444th to 3448th meetings, from 6 to 8 August 2018, the Commission adopted the commentaries to the aforementioned draft conclusions (sect. E.2 below).

48.    In accordance with its statute, the Commission submits the draft conclusions to the General Assembly, together with the recommendation set out below.

---

[7] At its 2997th meeting, on 8 August 2008. See *Yearbook ... 2008*, vol. II (Part Two), para. 353; and for the syllabus of the topic, *ibid.*, annex I. The General Assembly, in paragraph 6 of its resolution 63/123 of 11 December 2008, took note of the decision.

[8] See *Yearbook ... 2009*, vol. II (Part Two), paras. 220–226.

[9] See *Yearbook ... 2010*, vol. II (Part Two), paras. 345–354; and *Yearbook ... 2011*, vol. II (Part Two), para. 337.

[10] See *Yearbook ... 2011*, vol. II (Part Two), paras. 338–341; and *Yearbook ... 2012*, vol. II (Part Two), paras. 230–231.

[11] See *Yearbook ... 2012*, vol. II (Part Two), paras. 232–234. At the sixty-third session (2011), the Chair of the Study Group presented nine preliminary conclusions, reformulated in the light of the discussions in the Study Group (*Yearbook ... 2011*, vol. II (Part Two), para. 344). At the sixty-fourth session (2012), the Chair presented the text of six additional preliminary conclusions, also reformulated in the light of the discussions in the Study Group (*Yearbook ... 2012*, vol. II (Part Two), para. 240). The Study Group also discussed the format in which the further work on the topic should proceed and the possible outcome of the work. A number of suggestions were formulated by the Chair and agreed upon by the Study Group (*ibid.*, paras. 235–239).

[12] *Yearbook ... 2012*, vol. II (Part Two), paras. 226 and 239.

[13] *Ibid.*, para. 227.

[14] *Yearbook ... 2013*, vol. II (Part One), document A/CN.4/660 (first report); *Yearbook ... 2014*, vol. II (Part One), document A/CN.4/671 (second report); *Yearbook ... 2015*, vol. II (Part One), document A/CN.4/683 (third report); and *Yearbook ... 2016*, vol. II (Part One), document A/CN.4/694 (fourth report).

[15] *Yearbook ... 2016*, vol. II (Part Two), paras. 75–76.

[16] *Ibid.*, para. 73.

## C.    Recommendation of the Commission

49.    At its 3448th meeting, on 8 August 2018, the Commission decided, in accordance with article 23 of its statute, to recommend that the General Assembly:

(*a*)    take note in a resolution of the draft conclusions on subsequent agreements and subsequent practice in relation to the interpretation of treaties, annex the draft conclusions to the resolution, and ensure their widest dissemination; and

(*b*)    commend the draft conclusions, together with the commentaries thereto, to the attention of States and all who may be called upon to interpret treaties.

## D.    Tribute to the Special Rapporteur

50.    At its 3448th meeting, on 8 August 2018, the Commission, after adopting the draft conclusions on subsequent agreements and subsequent practice in relation to the interpretation of treaties, adopted the following resolution by acclamation:

*The International Law Commission,*

*Having adopted* the draft conclusions on subsequent agreements and subsequent practice in relation to the interpretation of treaties,

*Expresses* to the Special Rapporteur, Mr. Georg Nolte, its deep appreciation and warm congratulations for the outstanding contribution he has made to the preparation of the draft conclusions through his tireless efforts and devoted work, and for the results achieved in the elaboration of the draft conclusions on subsequent agreements and subsequent practice in relation to the interpretation of treaties.

## E.    Text of the draft conclusions on subsequent agreements and subsequent practice in relation to the interpretation of treaties

### 1.    TEXT OF THE DRAFT CONCLUSIONS

51.    The text of the draft conclusions adopted by the Commission at its seventieth session is reproduced below.

**SUBSEQUENT AGREEMENTS AND SUBSEQUENT PRACTICE IN RELATION TO THE INTERPRETATION OF TREATIES**

#### PART ONE

#### INTRODUCTION

*Conclusion 1.    Scope*

The present draft conclusions concern the role of subsequent agreements and subsequent practice in the interpretation of treaties.

#### PART TWO

#### BASIC RULES AND DEFINITIONS

*Conclusion 2.    General rule and means of treaty interpretation*

1.    Articles 31 and 32 of the Vienna Convention on the Law of Treaties set forth, respectively, the general rule of interpretation and the recourse to supplementary means of interpretation. These rules also apply as customary international law.

2.    A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in the light of its object and purpose, as provided in article 31, paragraph 1.

3.    Article 31, paragraph 3, provides, *inter alia*, that there shall be taken into account, together with the context, (*a*) any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions; and (*b*) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation.

4.    Recourse may be had to other subsequent practice in the application of the treaty as a supplementary means of interpretation under article 32.

5.    The interpretation of a treaty consists of a single combined operation, which places appropriate emphasis on the various means of interpretation indicated, respectively, in articles 31 and 32.

*Conclusion 3.    Subsequent agreements and subsequent practice as authentic means of interpretation*

Subsequent agreements and subsequent practice under article 31, paragraph 3 (*a*) and (*b*), being objective evidence of the understanding of the parties as to the meaning of the treaty, are authentic means of interpretation, in the application of the general rule of treaty interpretation reflected in article 31.

*Conclusion 4.    Definition of subsequent agreement and subsequent practice*

1.    A subsequent agreement as an authentic means of interpretation under article 31, paragraph 3 (*a*), is an agreement between the parties, reached after the conclusion of a treaty, regarding the interpretation of the treaty or the application of its provisions.

2.    A subsequent practice as an authentic means of interpretation under article 31, paragraph 3 (*b*), consists of conduct in the application of a treaty, after its conclusion, which establishes the agreement of the parties regarding the interpretation of the treaty.

3.    A subsequent practice as a supplementary means of interpretation under article 32 consists of conduct by one or more parties in the application of the treaty, after its conclusion.

*Conclusion 5.    Conduct as subsequent practice*

1.    Subsequent practice under articles 31 and 32 may consist of any conduct of a party in the application of a treaty, whether in the exercise of its executive, legislative, judicial or other functions.

2.    Other conduct, including by non-State actors, does not constitute subsequent practice under articles 31 and 32. Such conduct may, however, be relevant when assessing the subsequent practice of parties to a treaty.

#### PART THREE

#### GENERAL ASPECTS

*Conclusion 6.    Identification of subsequent agreements and subsequent practice*

1.    The identification of subsequent agreements and subsequent practice under article 31, paragraph 3, requires, in particular, a determination whether the parties, by an agreement or a practice, have taken a position regarding the interpretation of the treaty. Such a position is not taken if the parties have merely agreed not to apply the treaty temporarily or agreed to establish a practical arrangement (*modus vivendi*).

2.    Subsequent agreements and subsequent practice under article 31, paragraph 3, may take a variety of forms.

3.    The identification of subsequent practice under article 32 requires, in particular, a determination whether conduct by one or more parties is in the application of the treaty.

*Conclusion 7.    Possible effects of subsequent agreements and subsequent practice in interpretation*

1.    Subsequent agreements and subsequent practice under article 31, paragraph 3, contribute, in their interaction with other means of interpretation, to the clarification of the meaning of a treaty. This may result in narrowing, widening, or otherwise determining the

range of possible interpretations, including any scope for the exercise of discretion which the treaty accords to the parties.

2.   Subsequent practice under article 32 may also contribute to the clarification of the meaning of a treaty.

3.   It is presumed that the parties to a treaty, by an agreement or a practice in the application of the treaty, intend to interpret the treaty, not to amend or to modify it. The possibility of amending or modifying a treaty by subsequent practice of the parties has not been generally recognized. The present draft conclusion is without prejudice to the rules on the amendment or modification of treaties under the Vienna Convention on the Law of Treaties and under customary international law.

### Conclusion 8.   Interpretation of treaty terms as capable of evolving over time

Subsequent agreements and subsequent practice under articles 31 and 32 may assist in determining whether or not the presumed intention of the parties upon the conclusion of the treaty was to give a term used a meaning which is capable of evolving over time.

### Conclusion 9.   Weight of subsequent agreements and subsequent practice as a means of interpretation

1.   The weight of a subsequent agreement or subsequent practice as a means of interpretation under article 31, paragraph 3, depends, *inter alia*, on its clarity and specificity.

2.   In addition, the weight of subsequent practice under article 31, paragraph 3 (*b*), depends, *inter alia*, on whether and how it is repeated.

3.   The weight of subsequent practice as a supplementary means of interpretation under article 32 may depend on the criteria referred to in paragraphs 1 and 2.

### Conclusion 10.   Agreement of the parties regarding the interpretation of a treaty

1.   An agreement under article 31, paragraph 3 (*a*) and (*b*), requires a common understanding regarding the interpretation of a treaty which the parties are aware of and accept. Such an agreement may, but need not, be legally binding for it to be taken into account.

2.   The number of parties that must actively engage in subsequent practice in order to establish an agreement under article 31, paragraph 3 (*b*), may vary. Silence on the part of one or more parties may constitute acceptance of the subsequent practice when the circumstances call for some reaction.

### Part Four

### SPECIFIC ASPECTS

### Conclusion 11.   Decisions adopted within the framework of a Conference of States Parties

1.   A Conference of States Parties, under these draft conclusions, is a meeting of parties to a treaty for the purpose of reviewing or implementing the treaty, except where they act as members of an organ of an international organization.

2.   The legal effect of a decision adopted within the framework of a Conference of States Parties depends primarily on the treaty and any applicable rules of procedure. Depending on the circumstances, such a decision may embody, explicitly or implicitly, a subsequent agreement under article 31, paragraph 3 (*a*), or give rise to subsequent practice under article 31, paragraph 3 (*b*), or to subsequent practice under article 32. Decisions adopted within the framework of a Conference of States Parties often provide a non-exclusive range of practical options for implementing the treaty.

3.   A decision adopted within the framework of a Conference of States Parties embodies a subsequent agreement or subsequent practice under article 31, paragraph 3, insofar as it expresses agreement in substance between the parties regarding the interpretation

of a treaty, regardless of the form and the procedure by which the decision was adopted, including adoption by consensus.

### Conclusion 12.   Constituent instruments of international organizations

1.   Articles 31 and 32 apply to a treaty which is the constituent instrument of an international organization. Accordingly, subsequent agreements and subsequent practice under article 31, paragraph 3, are, and subsequent practice under article 32 may be, means of interpretation for such treaties.

2.   Subsequent agreements and subsequent practice of the parties under article 31, paragraph 3, or subsequent practice under article 32, may arise from, or be expressed in, the practice of an international organization in the application of its constituent instrument.

3.   Practice of an international organization in the application of its constituent instrument may contribute to the interpretation of that instrument when applying articles 31 and 32.

4.   Paragraphs 1 to 3 apply to the interpretation of any treaty which is the constituent instrument of an international organization without prejudice to any relevant rules of the organization.

### Conclusion 13.   Pronouncements of expert treaty bodies

1.   For the purposes of these draft conclusions, an expert treaty body is a body consisting of experts serving in their personal capacity, which is established under a treaty and is not an organ of an international organization.

2.   The relevance of a pronouncement of an expert treaty body for the interpretation of a treaty is subject to the applicable rules of the treaty.

3.   A pronouncement of an expert treaty body may give rise to, or refer to, a subsequent agreement or subsequent practice by parties under article 31, paragraph 3, or subsequent practice under article 32. Silence by a party shall not be presumed to constitute subsequent practice under article 31, paragraph 3 (*b*), accepting an interpretation of a treaty as expressed in a pronouncement of an expert treaty body.

4.   This draft conclusion is without prejudice to the contribution that pronouncements of expert treaty bodies make to the interpretation of the treaties under their mandates.

### 2.   Text of the draft conclusions and commentaries thereto

52.   The text of the draft conclusions, together with commentaries thereto, adopted by the Commission is reproduced below.

## SUBSEQUENT AGREEMENTS AND SUBSEQUENT PRACTICE IN RELATION TO THE INTERPRETATION OF TREATIES

### Part One

## INTRODUCTION

### Conclusion 1.   Scope

The present draft conclusions concern the role of subsequent agreements and subsequent practice in the interpretation of treaties.

### Commentary

(1)   As is always the case with the Commission's output, the draft conclusions are to be read together with the commentaries.

(2)   The present draft conclusions aim at explaining the role that subsequent agreements and subsequent practice play in the interpretation of treaties. They are based on the Vienna Convention on the Law of Treaties of 1969 (1969 Vienna Convention). The draft conclusions situate subsequent agreements and subsequent practice within the framework of the rules of the 1969 Vienna Convention on interpretation by identifying and elucidating relevant aspects, and by addressing certain questions that may arise when applying those rules.

(3)   The draft conclusions do not address all conceivable circumstances in which subsequent agreements and subsequent practice may play a role in the interpretation of treaties. For example, one aspect not dealt with generally is the relevance of subsequent agreements and subsequent practice in relation to treaties between States and international organizations or between international organizations.[17] The practice of international organizations is only addressed to a limited extent in draft conclusion 12, paragraph 3. The draft conclusions also do not address the interpretation of rules adopted by an international organization, the identification of customary international law or general principles of law. They are without prejudice to the other means of interpretation under article 31, including paragraph 3 (*c*), according to which the interpretation of a treaty shall take into account any relevant rules of international law applicable in the relations between the parties.

(4)   The draft conclusions aim to facilitate the work of those who are called on to interpret treaties. Apart from international courts and tribunals, they offer guidance for States, including their courts, and international organizations, as well as all others who are called upon to interpret treaties.

## Part Two

## BASIC RULES AND DEFINITIONS

### Conclusion 2.   General rule and means of treaty interpretation

1.   **Articles 31 and 32 of the Vienna Convention on the Law of Treaties set forth, respectively, the general rule of interpretation and the recourse to supplementary means of interpretation. These rules also apply as customary international law.**

2.   **A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in the light of its object and purpose, as provided in article 31, paragraph 1.**

3.   **Article 31, paragraph 3, provides, *inter alia*, that there shall be taken into account, together with the context, (*a*) any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions; and (*b*) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation.**

4.   **Recourse may be had to other subsequent practice in the application of the treaty as a supplementary means of interpretation under article 32.**

5.   **The interpretation of a treaty consists of a single combined operation, which places appropriate emphasis on the various means of interpretation indicated, respectively, in articles 31 and 32.**

### *Commentary*

(1)   Draft conclusion 2 situates subsequent agreements and subsequent practice as a means of treaty interpretation within the framework of the rules on the interpretation of treaties set forth in articles 31 and 32 of the 1969 Vienna Convention. The title "General rule and means of treaty interpretation" signals two points. First, article 31, as a whole, is the "general rule" of treaty interpretation.[18] Second, articles 31 and 32 together list a number of "means of interpretation", which shall (art. 31) or may (art. 32) be taken into account in the interpretation of treaties.[19]

*Paragraph 1, first sentence—relationship between articles 31 and 32*

(2)   Paragraph 1 of draft conclusion 2 emphasizes the interrelationship between articles 31 and 32, as well as the fact that these provisions, together, reflect customary international law. The reference to both articles 31 and 32 clarifies from the start the general context in which subsequent agreements and subsequent practice are addressed in the draft conclusions.

(3)   Whereas article 31 sets forth the general rule and article 32 the recourse to supplementary means of interpretation, these rules[20] must be read together as they constitute an integrated framework for the interpretation of treaties. Article 32 includes thresholds between the application of the primary means of interpretation according to article 31,[21] all of which are to be taken into account in the process of interpretation, and "supplementary means of interpretation" set forth in article 32. Recourse may be

---

[17] See Vienna Convention on the Law of Treaties between States and International Organizations or between International Organizations of 1986 (1986 Vienna Convention, not yet in force). Some materials relating to such treaties, but which are also of general relevance, are used in these commentaries.

[18] Title of article 31 of the 1969 Vienna Convention.

[19] See the first report on subsequent agreements and subsequent practice in relation to the interpretation of treaties (A/CN.4/660) (footnote 14 above), p. 56, para. 8; see also M. E. Villiger, "The 1969 Vienna Convention on the Law of Treaties: 40 years after", *Collected Courses of the Hague Academy of International Law, 2009*, vol. 344, pp. 9–133, at pp. 118–119 and 126–128.

[20] On the meaning of the term "rules" in this context, see *Yearbook … 1966*, vol. II, document A/6309/Rev.1 (Part II) (commentary, introduction); see also R. K. Gardiner, *Treaty Interpretation*, 2nd ed., Oxford, Oxford University Press, 2015, pp. 36–38.

[21] *Yearbook … 1966*, vol. II, document A/6309/Rev.1 (Part II), p. 223, commentary to draft article 28, para. (19); third report on the law of treaties by Sir Humphrey Waldock, Special Rapporteur, *Yearbook … 1964*, vol. II, document A/CN.4/167 and Add.1–3, pp. 58–59, para. 21; M. K. Yasseen, "L'interprétation des traités d'après la Convention de Vienne sur le droit des traités", *Collected Courses of the Hague Academy of International Law, 1976-III*, vol. 151, pp. 1–114, at p. 78; I. Sinclair, *The Vienna Convention on the Law of Treaties*, 2nd rev. ed., Manchester, Manchester University Press, 1984, pp. 141–142; Villiger, "The 1969 Vienna Convention …" (see footnote 19 above), pp. 127–128.

had to the supplementary means of interpretation either in order to confirm the meaning resulting from the application of article 31 or to determine the meaning when the interpretation according to article 31 leaves the meaning of the treaty or its terms ambiguous or obscure or leads to a result that is manifestly absurd or unreasonable.

*Paragraph 1, second sentence—the Vienna Convention rules on interpretation and customary international law*

(4)   The second sentence of paragraph 1 of draft conclusion 2 confirms that the rules set forth in articles 31 and 32 reflect customary international law.[22] International courts and tribunals have acknowledged the customary character of these rules. This is true, for example, for the International Court of Justice,[23] the International Tribunal for the Law of the Sea,[24] inter-State arbitral tribunals,[25] the Appellate Body of the World Trade Organization (WTO),[26]

the European Court of Human Rights,[27] the Inter-American Court of Human Rights,[28] the Court of Justice of the European Union,[29] and international investment tribunals, including those established by the International Centre for Settlement of Investment Disputes (ICSID)[30] under the Convention on the Settlement of Investment Disputes between States and Nationals of Other States. Hence, the rules contained in articles 31 and 32 apply as treaty law in relation to those States that are parties to the 1969 Vienna Convention, and as customary international law between all States, including to treaties which were concluded before the entry into force of the Vienna Convention for the States parties concerned.

(5)   Article 33 may also be relevant for draft conclusions on the topic of "Subsequent agreements and subsequent practice in relation to the interpretation of treaties". A "subsequent agreement" under article 31, paragraph 3 (*a*), for example, could be formulated in two or more languages, and there could be questions regarding the relationship of any subsequent agreement to different language versions of the treaty itself. The Commission nevertheless decided not to address such questions, including the question of how far article 33 reflects customary international law.[31]

---

[22] Y. le Bouthillier, "1969 Vienna Convention. Article 32: Supplementary means of interpretation", in O. Corten and P. Klein (eds.), *The Vienna Conventions on the Law of Treaties: A Commentary*, vol. I, Oxford, Oxford University Press, 2011, pp. 841–865, at pp. 843–846, paras. 4–8; P. Daillier, M. Forteau and A. Pellet, *Droit international public*, 8th ed., Paris, Librairie générale de droit et de jurisprudence, 2009, pp. 285–286; Gardiner, *Treaty Interpretation* (see footnote 20 above), pp. 13–20; Villiger, "The 1969 Vienna Convention …" (see footnote 19 above), pp. 132–133.

[23] *Pulp Mills on the River Uruguay (Argentina v. Uruguay), Judgment* [of 20 April 2010], *I.C.J. Reports 2010*, p. 14, at p. 46, para. 65 (1969 Vienna Convention, art. 31); *Dispute regarding Navigational and Related Rights (Costa Rica v. Nicaragua), Judgment, I.C.J. Reports 2009*, p. 213, at p. 237, para. 47; *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v. Serbia and Montenegro), Judgment, I.C.J. Reports 2007*, p. 43, at p. 109–110, para. 160; *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory, Advisory Opinion, I.C.J. Reports 2004*, p. 136, at p. 174, para. 94; *Avena and Other Mexican Nationals (Mexico v. United States of America), Judgment, I.C.J. Reports 2004*, p. 12, at p. 48, para. 83; *Sovereignty over Pulau Ligitan and Pulau Sipadan (Indonesia/Malaysia), Judgment, I.C.J. Reports 2002*, p. 625, at p. 645–646, para. 37; *LaGrand (Germany v. United States of America), Judgment, I.C.J. Reports 2001*, p. 466, at p. 501, para. 99 (1969 Vienna Convention, art. 31); *Kasikili/Sedudu Island (Botswana/Namibia), Judgment, I.C.J. Reports 1999*, p. 1045, at p. 1059, para. 18 (1969 Vienna Convention, art. 31); *Territorial Dispute (Libyan Arab Jamahiriya/Chad), Judgment, I.C.J. Reports 1994*, p. 6, at pp. 21–22, para. 41 (1969 Vienna Convention, art. 31, without expressly mentioning art. 32 of the 1969 Vienna Convention, but referring to supplementary means of interpretation).

[24] *Responsibilities and obligations of States with respect to activities in the Area, Advisory Opinion*, 1 February 2011, *ITLOS Reports 2011*, p. 10, at p. 28, para. 57.

[25] *Arbitration regarding the Iron Rhine ("Ijzeren Rijn") Railway between the Kingdom of Belgium and the Kingdom of the Netherlands*, decision of 24 May 2005, UNRIAA, vol. XXVII (Sales No. E/F.06.V.8), pp. 35–125, at p. 62, para. 45 (1969 Vienna Convention, arts. 31–32).

[26] Article 3, paragraph 2, of the WTO Understanding on Rules and Procedures Governing the Settlement of Disputes provides that "it serves to … clarify the existing provisions of [the WTO-covered] agreements in accordance with customary rules of interpretation of public international law", but does not specifically refer to articles 31 and 32 of the 1969 Vienna Convention. However, the Appellate Body has consistently recognized that articles 31 and 32 reflect rules of customary international law and has resorted to them by reference to article 3, paragraph 2, of the Understanding on Rules and Procedures Governing the Settlement of Disputes. See, for example, WTO, Appellate Body Report, *United States—Standards for Reformulated and Conventional Gasoline (United States—Gasoline)*, WT/DS2/AB/R, adopted 20 May 1996, sect. III.B (1969 Vienna Convention, art. 31, para 1); and WTO, Appellate Body Report, *Japan—Taxes on Alcoholic Beverages (Japan—Alcoholic Beverages II)*, WT/DS8/AB/R, WT/DS9/AB/R, WT/DS11/AB/R, adopted 1 November 1996, sect. D (1969 Vienna Convention, arts. 31–32). See also G. Nolte, "Jurisprudence under

[27] *Golder v. the United Kingdom*, no. 4451/70, 21 February 1975, Series A, no. 18, para. 29; *Witold Litwa v. Poland*, no. 26629/95, 4 April 2000, ECHR 2000-III, para. 58 (1969 Vienna Convention, art. 31); *Demir and Baykara v. Turkey* [GC], no. 34503/97, 12 November 2008, ECHR 2008, para. 65 (by implication, 1969 Vienna Convention, arts. 31–33); *Hassan v. the United Kingdom* [GC], no. 29750/09, 16 September 2014, ECHR 2014, para. 100.

[28] *The effect of reservations on the entry into force of the American Convention on Human Rights (Arts. 74 and 75)*, Advisory Opinion OC-2/82, 24 September 1982, Inter-American Court of Human Rights, Series A, No. 2, para. 19 (by implication, 1969 Vienna Convention, arts. 31–32); *Hilaire, Constantine and Benjamin et al. v. Trinidad and Tobago, Judgment (Merits, Reparations and Costs)*, 21 June 2002, Inter-American Court of Human Rights, Series C, No. 94, para. 19 (1969 Vienna Convention, art. 31, para. 1); more decisions are referred to by C. E. Arévalo Narváez and P. A. Patarroyo Ramírez, "Treaties over time and human rights: a case law analysis of the Inter-American Court of Human Rights", *Anuario Colombiano de Derecho Internacional*, vol. 10 (2017), pp. 295–331, at p. 315, footnote 88.

[29] *Firma Brita GmbH v. Hauptzollamt Hamburg-Hafen*, case C-386/08, Judgment of 25 February 2010, *European Court Reports 2010*, p. I-01289, paras. 41–43 (1969 Vienna Convention, art. 31).

[30] *National Grid plc v. the Argentine Republic*, decision on jurisdiction, United Nations Commission on International Trade Law (UNCITRAL), 20 June 2006, para. 51 (1969 Vienna Convention, arts. 31–32); *Canfor Corporation v. United States of America, and Tembec et al. v. United States of America, and Terminal Forest Products Ltd. v. United States of America*, Order of the Consolidation Tribunal, 7 September 2005, para. 59 (1969 Vienna Convention, arts. 31–32); see also *The Renco Group Inc. v. Republic of Peru*, partial award on jurisdiction, 15 July 2016, ICSID Case No. UNCT/13/1, para. 69; and *Venezuela US, S.R.L. v. the Bolivarian Republic of Venezuela*, interim award on jurisdiction, Permanent Court of Arbitration, 26 July 2016, Case No. 2013-34, para. 49 (available from the Court's website at https://pca-cpa.org/, *Cases*).

[31] The International Court of Justice has recognized that paragraph 4 of article 33 reflects customary international law: *LaGrand* (see footnote 23 above), p. 502, para. 101; the WTO Appellate Body has held that the rules in paragraphs 3 and 4 reflect customary law: WTO, Appellate Body Report, *United States—Final Countervailing Duty Determination with Respect to Certain Softwood Lumber from Canada*, WT/DS257/AB/R, adopted 17 February 2004, para. 59 (1969 Vienna Convention,

(*Continued on next page.*)

*Paragraph 2—article 31, paragraph 1*

(6)    Paragraph 2 of draft conclusion 2 reproduces the text of article 31, paragraph 1, of the 1969 Vienna Convention given its importance for the topic. Article 31, paragraph 1, is the point of departure for any treaty interpretation according to the general rule contained in article 31 as a whole. The reference to it is intended to ensure the balance, in the process of interpretation, between an assessment of the terms of the treaty in their context and in the light of its object and purpose, on the one hand, and the considerations regarding subsequent agreements and subsequent practice in the present draft conclusions, on the other. The reiteration of article 31, paragraph 1, as a separate paragraph is not, however, meant to suggest that this paragraph, and the means of interpretation mentioned therein, possess a primacy in substance within the context of article 31 itself. All means of interpretation in article 31, including the elements of context mentioned in paragraph 2, are part of a single integrated rule.[32]

*Paragraph 3—article 31, paragraph 3*

(7)    Paragraph 3 reproduces the language of article 31, paragraph 3 (*a*) and (*b*), of the 1969 Vienna Convention, in order to situate subsequent agreements and subsequent practice, as the main focus of the topic, within the general legal framework of the interpretation of treaties. Accordingly, the chapeau of article 31, paragraph 3, "[t]here shall be taken into account, together with the context", is maintained in order to emphasize that the assessment of the means of interpretation mentioned in paragraph 3 (*a*) and (*b*) of article 31 is an integral part of the general rule of interpretation set forth in article 31.[33]

*Paragraph 4—subsequent practice under article 32*

(8)    Paragraph 4 clarifies that subsequent practice in the application of the treaty which does not meet all the criteria of article 31, paragraph 3 (*b*), nevertheless falls within the scope of article 32. Article 32 includes a non-exhaustive list of supplementary means of interpretation.[34]

Paragraph 4 borrows the language "recourse may be had" from article 32 to maintain the distinction between the mandatory character of the taking into account of the means of interpretation, which are referred to in article 31, and the discretionary nature of the use of the supplementary means of interpretation under article 32.

(9)    In particular, subsequent practice in the application of the treaty which does not establish the agreement of all parties to the treaty, but only of one or more parties, may be used as a supplementary means of interpretation. This was stated by the Commission,[35] and has since been recognized by international courts and tribunals[36] and in the literature[37] (see, in more detail, paras. (23)–(35) of the commentary to draft conclusion 4).

(10)    The Commission did not, however, consider that subsequent practice which is not "in the application of the treaty" should be dealt with, in the present draft conclusions, as a supplementary means of interpretation. Such practice may, under certain circumstances, also be a possible supplementary means of interpretation.[38] But such practice is beyond what the Commission now addresses under the present topic, except insofar as it may contribute to "assessing" relevant subsequent practice in the application of a treaty (see draft conclusion 5 and accompanying commentary). Thus, paragraph 4 of draft conclusion 2 refers to any subsequent practice "in the application of the treaty", as does paragraph 3 of draft conclusion 4, which defines "subsequent practice under article 32".

---

*(Footnote 31 continued)*

art. 33, para. 3); WTO, Appellate Body Report, *Chile—Price Band System and Safeguard Measures Relating to Certain Agricultural Products*, WT/DS207/AB/R and Corr.1, adopted 23 October 2002, para. 271 (1969 Vienna Convention, art. 33, para. 4); the International Tribunal for the Law of the Sea and the European Court of Human Rights have gone one step further and stated that article 33 as a whole reflects customary law: see *Responsibilities and obligations of States with respect to activities in the Area*, Advisory Opinion of the International Tribunal for the Law of the Sea (footnote 24 above); *Golder v. the United Kingdom*, judgment of the European Court of Human Rights (footnote 27 above), para. 29; *Witold Litwa v. Poland*, judgment of the European Court of Human Rights (footnote 27 above), para. 59; and *Demir and Baykara v. Turkey* [GC], judgment of the European Court of Human Rights (footnote 27 above), para. 65 (1969 Vienna Convention, arts. 31–33).

[32] *Yearbook … 1966*, vol. II, document A/6309/Rev.1 (Part II), pp. 219–220, para. (8). See below, in detail, para. (12) of the commentary to draft conclusion 2, para. 5.

[33] *Yearbook … 1966*, vol. II, document A/6309/Rev.1 (Part II), pp. 219–220, para. (8); and G. Nolte, "Jurisprudence of the International Court of Justice and arbitral tribunals of *ad hoc* jurisdiction relating to subsequent agreements and subsequent practice: introductory report for the ILC Study Group on treaties over time", in Nolte (ed.), *Treaties and Subsequent Practice* (see footnote 26 above), p. 169, at p. 177.

[34] Yasseen, "L'interprétation des traités …" (see footnote 21 above), p. 79.

[35] *Yearbook … 1964*, vol. II, document A/5809, pp. 203–204, commentary to draft article 69, para. (13).

[36] *Kasikili/Sedudu Island*, judgment of the International Court of Justice (see footnote 23 above), p. 1096, paras. 79–80; *Loizidou v. Turkey* (preliminary objections), no. 15318/89, 23 March 1995, European Court of Human Rights, Series A, no. 310, paras. 79–81; *Hilaire, Constantine and Benjamin et al.*, judgment of the Inter-American Court of Human Rights (see footnote 28 above), para. 92; *Southern Bluefin Tuna (New Zealand v. Japan; Australia v. Japan)*, provisional measures, order of the International Tribunal for the Law of the Sea of 27 August 1999, *ITLOS Reports 1999*, p. 280, at para. 50; WTO, Appellate Body Report, *European Communities—Customs Classification of Certain Computer Equipment (EC—Computer Equipment)*, WT/DS62/AB/R, WT/DS67/AB/R and WT/DS68/AB/R, adopted 22 June 1998, para. 90; see also WTO, Appellate Body Reports, *United States—Certain Country of Origin Labelling (COOL) Requirements (United States—COOL)*, WT/DS384/AB/R and WT/DS386/AB/R, adopted 23 July 2012, para. 452.

[37] Yasseen, "L'interprétation des traités …" (see footnote 21 above), p. 52 ("*la Convention de Vienne ne retient pas comme élément de la règle générale d'interprétation la pratique ultérieure en général, mais une pratique ultérieure spécifique, à savoir* une pratique ultérieure non seulement concordante, mais également commune à toutes les parties. … Ce qui reste de la pratique ultérieure peut être un moyen complémentaire d'interprétation, selon l'article 32 de la Convention de Vienne*"); Sinclair, *The Vienna Convention …* (see footnote 21 above), p. 138: "paragraph 3 (*b*) of [a]rticle 31 of the Convention [covers] … only a specific form of subsequent practice—that is to say, *concordant subsequent practice common to all the parties. Subsequent practice which does not fall within this narrow definition may nonetheless constitute a supplementary means of interpretation within the meaning of [a]rticle 32 of the Convention*"; S. Torres Bernárdez, "Interpretation of treaties by the International Court of Justice following the adoption of the 1969 Vienna Convention on the Law of Treaties", in G. Hafner and others (eds.), *Liber Amicorum: Professor Ignaz Seidl-Hohenveldern, in honour of his 80th birthday*, The Hague, Kluwer Law International, 1998, pp. 721–748, at p. 726; M. E. Villiger, *Commentary on the 1969 Vienna Convention on the Law of Treaties*, Leiden, Martinus Nijhoff, 2009, pp. 431–432.

[38] L. Boisson de Chazournes, "Subsequent practice, practices, and 'family resemblance': towards embedding subsequent practice in its operative milieu", in Nolte (ed.), *Treaties and Subsequent Practice* (see footnote 26 above), pp. 53–63, at pp. 59–62.

*Paragraph 5—"a single combined operation"*

(11)   The Commission considered it important to end draft conclusion 2 by emphasizing in paragraph 5[39] that, notwithstanding the structure of draft conclusion 2, moving from the general to the more specific, the process of interpretation is a "single combined operation", which requires that "appropriate emphasis" be placed on various means of interpretation.[40] The expression "single combined operation" is drawn from the Commission's commentary to the 1966 draft articles on the law of treaties.[41] There, the Commission also stated that it intended "to emphasize that the process of interpretation is a unity".[42]

(12)   Paragraph 5 of draft conclusion 2 also explains that appropriate emphasis must be placed, in the course of the process of interpretation as a "single combined operation", on the various means of interpretation, which are referred to in articles 31 and 32 of the 1969 Vienna Convention. The Commission did not, however, consider it necessary to include a reference, by way of example, to one or more specific means of interpretation in the text of paragraph 5 of draft conclusion 2.[43] This avoids a possible misunderstanding that any one of the different means of interpretation has priority over others, regardless of the specific treaty provision or the case concerned.

(13)   Paragraph 5 uses the term "means of interpretation". This term captures not only the "supplementary means of interpretation", which are referred to in article 32, but also the elements mentioned in article 31.[44] Whereas the Commission, in its commentary to the draft articles on the law of treaties, used the terms "means of interpretation" and "elements of interpretation" interchangeably, for the purpose of the present topic the Commission retained only the term "means of interpretation" because it also describes their function in the process of interpretation as a tool or an instrument.[45] The term "means" does not set apart from each other the different elements that are mentioned in articles 31 and 32. It rather indicates that these elements each have a function in the process of interpretation, which is a "single", and at the same time a "combined", operation.[46] Just as courts typically begin their reasoning by looking at the terms of the treaty, and then continue, in an interactive process,[47] to analyse those terms in their context and in the light of the object and purpose of the treaty,[48] the precise relevance of different means of interpretation must first be identified in any case of treaty interpretation before they can be "thrown into the crucible"[49] in order to arrive at a proper interpretation, by giving them appropriate weight in relation to each other.

(14)   The obligation to place "appropriate emphasis on the various means of interpretation" may, in the course of the interpretation of a treaty in specific cases, result in a different emphasis on the various means of interpretation depending on the treaty or treaty provisions concerned.[50] This is not to suggest that a court or any other interpreter is more or less free to choose how to use and apply the different means of interpretation. The interpreter needs to identify the relevance of different means of interpretation in a specific case and determine their interaction with the other means of interpretation by placing a proper emphasis on them in good faith, as required by the treaty rule to be applied.[51] Draft conclusion 9 on the weight of subsequent agreements and subsequent practice as a means of interpretation, and the commentary thereto, provide some guidance for the required evaluation.

(15)   Draft conclusion 2 does not refer to the "nature" of the treaty as a factor that would typically be relevant in determining whether more or less weight should be given to certain means of interpretation.[52] The jurisprudence of different international courts and tribunals nevertheless

---

[39] First report of the Special Rapporteur on subsequent agreements and subsequent practice in relation to the interpretation of treaties (A/CN.4/660) (see footnote 14 above); and Nolte, "Jurisprudence of the International Court of Justice ..." (see footnote 33 above), pp. 171 and 177.

[40] On the different function of subsequent agreements and subsequent practice in relation to other means of interpretation, see the first report of the Special Rapporteur (A/CN.4/660) (footnote 14 above), paras. 42–57; see also Nolte, "Jurisprudence of the International Court of Justice ..." (footnote 33 above), p. 183.

[41] *Yearbook ... 1966*, vol. II, document A/6309/Rev.1 (Part II), pp. 219–220, para. (8).

[42] *Ibid.*

[43] See the first report of the Special Rapporteur (A/CN.4/660) (footnote 14 above), paras. 8–28.

[44] See also above the commentary to draft conclusion 2, para. 1; see also Villiger, "The 1969 Vienna Convention ..." (footnote 19 above), p. 129; and Daillier, Forteau and Pellet, *Droit international public* (footnote 22 above), pp. 284–289.

[45] See the provisional summary record of the 3172nd meeting, held on 31 May 2013, *Yearbook ... 2013*, vol. I, p. 47, para. 3.

[46] *Yearbook ... 1966*, vol. II, document A/6309/Rev.1 (Part II), pp. 219–220, para. (8).

[47] *Ibid.*

[48] *Ibid.*, p. 219, para. (6). See also Yasseen, "L'interprétation des traités ..." (footnote 21 above), p. 58; Sinclair, *The Vienna Convention ...* (footnote 21 above), p. 130; J. Klabbers, "Treaties, object and purpose", *Max Planck Encyclopedia of Public International Law* (online edition: https://opil.ouplaw.com/home/MPIL), para. 7; Villiger, *Commentary ...* (footnote 37 above), p. 427, para. 11; *Border and Transborder Armed Actions (Nicaragua v. Honduras)*, Jurisdiction and Admissibility, Judgment, *I.C.J. Reports 1988*, p. 69, at p. 89, paras. 45–46; and *Delimitation of the Continental Shelf between the United Kingdom of Great Britain and Northern Ireland, and the French Republic*, decision of 30 June 1977, UNRIAA, vol. XVIII (Sales No. E/F.80.V.7), pp. 3–413, at pp. 32–33, para. 39.

[49] *Yearbook ... 1966*, vol. II, document A/6309/Rev.1 (Part II), p. 220, para. (8).

[50] Draft conclusion 1, para. 2, as proposed in the first report of the Special Rapporteur (A/CN.4/660) (see footnote 14 above), para. 28, and, generally, paras. 10–27.

[51] Decisions of domestic courts have not been uniform as regards the relative weight that subsequent agreements and subsequent practice possess in the process of treaty interpretation. See United Kingdom of Great Britain and Northern Ireland, House of Lords, *R (Mullen) v. Secretary of State for the Home Department* [2004] UKHL 18, paras. 47–48 (Lord Steyn); and *Deep Vein Thrombosis and Air Travel Group Litigation* [2005] UKHL 72, para. 31 (Lord Steyn); United States of America, Supreme Court: *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176 (1982), pp. 183–185; *O'Connor v. United States*, 479 U.S. 27 (1986), pp. 31–32; and *United States v. Stuart*, 489 U.S. 353 (1989), where a dissenting judge (Justice Scalia) criticized the majority of the Court for relying on "[t]he practice of treaty signatories" (p. 369), which, according to him, need not be consulted, since when the "Treaty's language resolves the issue presented, there is no necessity of looking further" (p. 371); Switzerland: Federal Administrative Court, judgment of 21 January 2010, BVGE 2010/7, para 3.7.11; and Federal Supreme Court, *A v. B*, appeal judgment of 8 April 2004, No. 4C.140/2003, BGE, vol. 130 III, p. 430, at p. 439.

[52] Draft conclusion 1, para. 2, as proposed in the first report of the Special Rapporteur (A/CN.4/660) (see footnote 14 above), para. 28, and analysis at paras. 8–27.

suggests that the nature of the treaty may sometimes be relevant for the interpretation of a treaty.[53] The concept of the nature of a treaty is not alien to the 1969 Vienna Convention (see, for example, article 56, paragraph 1 (*b*))[54] and a reference to the nature of the treaty or of treaty provisions has been included in other work of the Commission.[55] The Commission, however, decided that the draft conclusion should not refer to the nature of the treaty in order to avoid calling into question the unity of the interpretation process and to avoid any categorization of treaties. It is, in any case, difficult to distinguish the "nature of the treaty" from the object and purpose of the treaty.[56]

### Conclusion 3. Subsequent agreements and subsequent practice as authentic means of interpretation

**Subsequent agreements and subsequent practice under article 31, paragraph 3 (*a*) and (*b*), being objective evidence of the understanding of the parties as to the meaning of the treaty, are authentic means of interpretation, in the application of the general rule of treaty interpretation reflected in article 31.**

### Commentary

(1)   By characterizing subsequent agreements and subsequent practice under article 31, paragraph 3 (*a*) and (*b*), of the 1969 Vienna Convention as "authentic" means of interpretation, the Commission indicates why they have an important role in the interpretation of treaties.[57] The Commission thereby follows its 1966 commentary to the draft articles on the law of treaties, which described subsequent agreements and subsequent practice under article 31, paragraph 3 (*a*) and (*b*), as "authentic means of interpretation" and which underlined that:

The importance of such subsequent practice in the application of the treaty, as an element of interpretation, is obvious; for it constitutes objective evidence of the understanding of the parties as to the meaning of the treaty.[58]

(2)   Subsequent agreements and subsequent practice under article 31, paragraph 3 (*a*) and (*b*), are, however, not the only "authentic means of interpretation". As the Commission has explained:

the Commission's approach to treaty interpretation was on the basis that the text of the treaty must be presumed to be the authentic expression of the intentions of the parties, … making the ordinary meaning of the terms, the context of the treaty, its objects and purposes, and the general rules of international law, together with authentic interpretations by the parties, the primary criteria for interpreting a treaty.[59]

The term "authentic" thus refers to different forms of "objective evidence" or "proof" of conduct of the parties, which reflects the "common understanding of the parties" as to the meaning of the treaty.

(3)   By describing subsequent agreements and subsequent practice under article 31, paragraph 3 (*a*) and (*b*), as "authentic" means of interpretation, the Commission recognizes that the common will of the parties, which underlies the treaty, possesses a specific authority regarding the identification of the meaning of the treaty, even after the conclusion of the treaty. The 1969 Vienna Convention thereby accords the parties to a treaty a role that may be uncommon for the interpretation of legal instruments in some domestic legal systems.

(4)   The characterization of subsequent agreements and subsequent practice of the parties under article 31, paragraph 3 (*a*) and (*b*), as "authentic means of interpretation" does not, however, imply that these means necessarily possess a conclusive effect. According to the chapeau of article 31, paragraph 3, subsequent agreements and subsequent practice shall, after all, only "be taken into account" in the interpretation of a treaty, which consists of a "single

---

[53] WTO panels and the Appellate Body, for example, seem to emphasize more the terms of the respective WTO-covered agreement (for example, WTO Appellate Body, *Brazil—Export Financing Programme for Aircraft, Recourse by Canada to Article 21.5 of the DSU*, WT/DS46/AB/RW, adopted 4 August 2000, para. 45), whereas the European Court of Human Rights and the Inter-American Court of Human Rights highlight the character of the Convention for the Protection of Human Rights and Fundamental Freedoms (European Convention on Human Rights) or the American Convention on Human Rights, respectively, as a human rights treaty (for example, *Mamatkulov and Askarov v. Turkey* [GC], nos. 46827/99 and 46951/99, ECHR 2005-I, para. 111; *The Right to Information on Consular Assistance in the Framework of the Guarantees of the Due Process of Law*, Advisory Opinion OC-16/99, 1 October 1999, Inter-American Court of Human Rights, Series A, No. 16, para. 58); see also *Yearbook … 2011*, vol. II (Part Two), chap. XI, sect. B.3, pp. 169–171; and Nolte, "Jurisprudence under special regimes …" (footnote 26 above), pp. 216, 244–246, 249–262 and 270–275.

[54] M. Forteau, "Les techniques interprétatives de la Cour internationale de Justice", *Revue générale de droit international public*, vol. 115, No. 2 (2011), p. 399, at pp. 406–407 and 416; *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)*, Advisory Opinion, *I.C.J. Reports 1971*, p. 16, separate opinion of Judge Dillard, p. 150, at p. 154, footnote 1.

[55] Articles on the effects of armed conflicts on treaties (art. 6 (*a*)), General Assembly resolution 66/99 of 9 December 2011, annex; see the draft articles adopted by the Commission and the commentaries thereto in *Yearbook … 2011*, vol. II (Part Two), paras. 100–101. See also the Guide to Practice on Reservations to Treaties, *ibid.*, vol. II (Part Two), chap. IV, para. 75, and *ibid.*, vol. II (Part Three) and Corr.1–2; the text of the guidelines constituting the Guide to Practice appears in the annex to General Assembly resolution 68/111 of 16 December 2013; guideline 4.2.5 refers to the nature of obligations of the treaty, rather than the nature of the treaty as such.

[56] See e.g. para. (3) of the commentary to guideline 4.2.5 of the Guide to Practice on Reservations to Treaties, *Yearbook … 2011*, vol. II (Part Three) and Corr.1–2, p. 274. On the other hand, article 6 of the articles on the effects of armed conflicts on treaties suggests "a series of factors pertaining to the nature of the treaty, particularly its subject matter, its object and purpose, its content and the number of parties to the treaty", *ibid.*, vol. II (Part Two), p. 113, commentary to draft article 6, para. (3).

[57] See R. Jennings and A. Watts (eds.), *Oppenheim's International Law*, 9th ed., vol. I, Harlow, Longman, 1992, p. 1268, para. 630; G. Fitzmaurice, "The law and procedure of the International Court of Justice 1951–4: treaty interpretation and other treaty points", *British Year Book of International Law 1957*, vol. 33, pp. 203–293, at pp. 223–225; WTO, Panel Report, *United States—Measures Affecting Trade in Large Civil Aircraft (second complaint) (United States—Large Civil Aircraft (2nd complaint))*, WT/DS353/R, adopted 23 March 2012, para. 7.953.

[58] *Yearbook … 1966*, vol. II, document A/6309/Rev.1 (Part II), p. 221, para. (15).

[59] *Yearbook … 1964*, vol. II, document A/5809, pp. 204–205, para. (15); see also *ibid.*, pp. 203–204, para. (13): "Paragraph 3 specifies as *further\** authentic elements of interpretation: (*a*) agreements between the parties regarding the interpretation of the treaty, and (*b*) any subsequent practice in the application of the treaty which clearly established the understanding of all the parties regarding its interpretation"; on the other hand, Waldock explained in his third report on the law of treaties that "*travaux préparatoires* are not, as such, an authentic means of interpretation", *ibid.*, document A/CN.4/167 and Add.1–3, pp. 58–59, para. (21).

combined operation" with no hierarchy among the means of interpretation that are referred to in article 31 (see draft conclusion 2, paragraph 5).[60] For this reason, and notwithstanding the suggestions of some commentators,[61] subsequent agreements and subsequent practice that establish the agreement of the parties regarding the interpretation of a treaty are not necessarily legally binding.[62] This is confirmed in draft conclusion 10, paragraph 1. Thus, when the Commission characterized a "subsequent agreement" as representing "an authentic interpretation by the parties which must be read into the treaty for purposes of its interpretation",[63] it did not go quite as far as saying that such an interpretation is necessarily conclusive in the sense that it overrides all other means of interpretation.

(5)   This does not exclude that the parties to a treaty, if they wish, may reach a binding agreement regarding the interpretation of a treaty. The Special Rapporteur on the law of treaties, Sir Humphrey Waldock, stated in his third report that it may be difficult to distinguish between subsequent practice of the parties under what became article 31, paragraph 3 (*a*) and (*b*)—which is only to be taken into account, among other means, in the process of interpretation—and a later agreement that the parties consider to be binding:

> Subsequent practice when it is consistent and embraces all the parties would appear to be decisive of the meaning to be attached to the treaty, *at any rate*\* when it indicates that the parties consider the interpretation to be binding upon them. In these cases, subsequent practice as an element of treaty interpretation and as an element in the formation of a tacit agreement overlap and the meaning derived from the practice becomes an authentic interpretation established by agreement.[64]

(6)   The possibility of arriving at a binding subsequent interpretative agreement is expressly recognized in some treaties. Article 1131, paragraph 2, of the North American Free Trade Agreement, for example, provides that: "An interpretation by the [intergovernmental] Commission of a provision of this Agreement shall be binding on a Tribunal established under this Section."[65] The existence of such a special procedure or an agreement regarding the authoritative interpretation of a treaty that the parties consider binding may or may not preclude additional recourse to subsequent agreements or subsequent practice under article 31, paragraph 3 (*a*) and (*b*), of the 1969 Vienna Convention.[66]

(7)   The Commission has continued to use the term "authentic means of interpretation" in order to describe the not necessarily conclusive, but authoritative, character of subsequent agreements and subsequent practice under article 31, paragraph 3 (*a*) and (*b*). The Commission has not employed the terms "authentic interpretation" or "authoritative interpretation" in draft conclusion 3 since these concepts are often understood to mean a necessarily conclusive, or binding, agreement between the parties regarding the interpretation of a treaty.[67]

(8)   Domestic courts have sometimes explicitly recognized that subsequent agreements and subsequent practice under article 31, paragraph 3 (*a*) and (*b*), are "authentic" means of interpretation.[68] They have, however, not always been consistent regarding the legal consequences that this characterization entails. Whereas some courts have assumed that subsequent agreements and practice by the parties under the treaty may produce certain binding

---

[60] *Yearbook … 1966*, vol. II, document A/6309/Rev.1 (Part II), pp. 219–220, paras. (8) and (9).

[61] M. E. Villiger, "The rules on interpretation: misgivings, misunderstandings, miscarriage? The 'crucible' intended by the International Law Commission", in E. Cannizzaro (ed.), *The Law of Treaties Beyond the Vienna Convention*, Oxford, Oxford University Press, 2011, pp. 105–122, at p. 111; Gardiner, *Treaty Interpretation* (see footnote 20 above), p. 34; O. Dörr, "Article 31: General rule of interpretation", in O. Dörr and K. Schmalenbach (eds.), *Vienna Convention on the Law of Treaties: A Commentary*, 2nd ed., Berlin, Springer, 2018, pp. 559–616, at pp. 593–595, paras. 72–76; K. Skubiszewski, "Remarks on the interpretation of the United Nations Charter", in R. Bernhardt and others (eds.), *Völkerrecht als Rechtsordnung, Internationale Gerichtsbarkeit, Menschenrechte—Festschrift für Hermann Mosler*, Berlin, Springer, 1983, pp. 891–902, at p. 898.

[62] H. Fox, "Article 31 (3) (*a*) and (*b*) of the Vienna Convention and the *Kasikili/Sedudu Island* case", in M. Fitzmaurice, O. Elias and P. Merkouris (eds.), *Treaty Interpretation and the Vienna Convention on the Law of Treaties: 30 Years on*, Leiden, Martinus Nijhoff, 2010, pp. 59–74, at pp. 61–63; A. Chanaki, *L'adaptation des traités dans le temps*, Brussels, Bruylant, 2013, pp. 313–315; M. Benatar, "From probative value to authentic interpretation: the legal effects of interpretative declarations", *Revue belge de droit international*, vol. 44 (2011), pp. 170–196, at pp. 194–195; cautiously: J. M. Sorel and V. Boré Eveno, "1969 Vienna Convention, Article 31: General rule of interpretation", in Corten and Klein (eds.), *The Vienna Conventions …* (see footnote 22 above), pp. 804–837, at p. 825, paras. 42–43; see also G. Nolte, "Subsequent agreements and subsequent practice of States outside of judicial or quasi-judicial proceedings: third report for the ILC Study Group on treaties over time", in Nolte (ed.), *Treaties and Subsequent Practice* (footnote 26 above), pp. 307–386, at p. 375.

[63] *Yearbook … 1966*, vol. II, document A/6309/Rev.1 (Part II), p. 221, para. (14).

[64] *Yearbook … 1964*, vol. II, document A/CN.4/167 and Add.1–3, p. 60, para. (25).

[65] *Mesa Power Group, LLC v. Government of Canada*, UNCITRAL arbitration under Chapter Eleven of the North American Free Trade Agreement, award, 24 March 2016, Permanent Court of Arbitration Case No. 2012-17, paras. 478–480; available from the website of the Permanent Court of Arbitration at https://pca-cpa.org/, *Cases*.

[66] See also: the Marrakesh Agreement Establishing the World Trade Organization, 1994, art. IX, para. 2; WTO, Appellate Body Report, *European Communities—Customs Classification of Frozen Boneless Chicken Cuts (EC—Chicken Cuts)*, WT/DS269/AB/R and Corr.1, WT/DS286/AB/R and Corr.1, adopted 27 September 2005, para. 273; and WTO, Appellate Body Reports, *European Communities—Regime for the Importation, Sale and Distribution of Bananas, Second Recourse to Article 21.5 of the DSU by Ecuador (EC—Bananas III (Article 21.5—Ecuador II))*, WT/DS27/AB/RW2/ECU and Corr.1, adopted 11 December 2008, and *European Communities—Regime for the Importation, Sale and Distribution of Bananas, Recourse to Article 21.5 of the DSU by the United States (EC—Bananas III (Article 21.5—United States))*, WT/DS27/AB/RW/USA and Corr.1, adopted 22 December 2008, paras. 383 and 390.

[67] See, for example, *Methanex Corporation v. United States of America*, UNCITRAL arbitration under Chapter Eleven of the North American Free Trade Agreement, Final Award on Jurisdiction and Merits, 3 August 2005, part II, chap. H, para. 23 (with reference to Jennings and Watts (footnote 57 above), p. 1268, para. 630); Gardiner, *Treaty Interpretation* (footnote 20 above), p. 34; U. Linderfalk, *On the Interpretation of Treaties*, Dordrecht, Springer, 2007, p. 153; Skubiszewski, "Remarks on the interpretation of the United Nations Charter" (footnote 61 above), p. 898; and G. Haraszti, *Some Fundamental Problems of the Law of Treaties*, Budapest, Akadémiai Kiadó, 1973, p. 43; see also Nolte, "Jurisprudence under special regimes …" (footnote 26 above), p. 240, para. 4.5.

[68] Switzerland, Federal Supreme Court, *A v. B*, appeal judgment of 8 April 2004 (see footnote 51 above), p. 439 (where the Court speaks of the parties as being "masters of the treaty" ("*Herren der Verträge*"); judgment of 19 September 2012, No. 2C_743/2011, BGE, vol. 138 II, p. 524, at pp. 527–528. Germany, Federal Constitutional Court, BVerfGE, vol. 90, p. 286, at p. 362. See also India, Supreme Court, *Godhra Electricity Co. Ltd. and Another v. The State of Gujarat and Another* [1975] AIR 32. Available from https://indiankanoon.org/doc/737188.

effects,[69] others have rightly emphasized that article 31, paragraph 3, only requires that subsequent agreements and subsequent practice "be taken into account".[70]

(9) The term "authentic means of interpretation" encompasses a factual and a legal element. The factual element is indicated by the expression "objective evidence", whereas the legal element is contained in the concept of "understanding of the parties". Accordingly, the Commission characterized a "subsequent agreement" as representing "an authentic interpretation by the parties which must be read into the treaty for purposes of its interpretation",[71] and stated that subsequent practice "similarly … constitutes objective evidence of the understanding of the parties as to the meaning of the treaty".[72] Given the character of treaties as embodiments of the common will of their parties, "objective evidence" of the "understanding of the parties" possesses considerable authority as a means of interpretation.[73]

(10) The distinction between any "subsequent agreement" (art. 31, para. 3 (a)) and "subsequent practice … which establishes the agreement of the parties" (art. 31, para. 3 (b)) does not denote a difference concerning their authentic character.[74] The Commission rather considers that a "subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions" ipso facto has the effect of constituting an authentic interpretation of the treaty, whereas a "subsequent practice" only has this effect if it "shows the common understanding of the parties as to the meaning of the terms".[75] Thus, the difference between a "subsequent agreement between the parties" and a "subsequent practice … which establishes the agreement of the parties" lies in the manner of establishing the agreement of the parties regarding the interpretation of a treaty, with the difference being in the greater ease with which an agreement is established.[76]

(11) Subsequent agreements and subsequent practice as authentic means of treaty interpretation are not to be confused with interpretations of treaties by international courts, tribunals or expert treaty bodies in specific cases. Subsequent agreements or subsequent practice under article 31, paragraph 3 (a) and (b), are "authentic" means of interpretation because they are expressions of the understanding of the treaty by the parties themselves.

The authority of international courts, tribunals and expert treaty bodies derives from other sources, including from the treaty that is to be interpreted. Judgments and other pronouncements of international courts, tribunals and expert treaty bodies, however, may be indirectly relevant for the identification of subsequent agreements and subsequent practice as authentic means of interpretation if they reflect, give rise to or refer to such subsequent agreements and practice of the parties themselves.[77]

(12) Draft conclusions 2 and 4 distinguish between "subsequent practice" establishing the agreement of the parties under article 31, paragraph 3 (b), of the 1969 Vienna Convention, on the one hand, and subsequent practice (in a broad sense) by one or more, but not all, parties to the treaty that may be relevant as a supplementary means of interpretation under article 32.[78] Such subsequent practice under article 32 that does not establish the agreement of all the parties cannot constitute an "authentic" interpretation of a treaty by all its parties and thus will not possess the same weight for the purpose of interpretation (see draft conclusion 9).[79]

(13) The last part of draft conclusion 3 makes it clear that any reliance on subsequent agreements and subsequent practice as authentic means of interpretation should occur as part of the application of the general rule of treaty interpretation reflected in article 31 of the 1969 Vienna Convention.

### Conclusion 4. Definition of subsequent agreement and subsequent practice

**1. A subsequent agreement as an authentic means of interpretation under article 31, paragraph 3 (a), is an agreement between the parties, reached after the conclusion of a treaty, regarding the interpretation of the treaty or the application of its provisions.**

**2. A subsequent practice as an authentic means of interpretation under article 31, paragraph 3 (b), consists of conduct in the application of a treaty, after its conclusion, which establishes the agreement of the parties regarding the interpretation of the treaty.**

**3. A subsequent practice as a supplementary means of interpretation under article 32 consists of conduct by one or more parties in the application of the treaty, after its conclusion.**

### Commentary

### General aspects

(1) Draft conclusion 4 defines the three different "subsequent" means of treaty interpretation that are mentioned in draft conclusion 2, paragraphs 3 and 4, namely "subsequent agreement" under article 31, paragraph 3 (a),

---

[69] Germany, Federal Fiscal Court, BFHE, vol. 215, p. 237, at p. 241; ibid., vol. 181, p. 158, at p. 161.

[70] New Zealand, Court of Appeal, Attorney-General v. Zaoui and Others (No. 2) [2005] 1 NZLR 690, para. 130; Hong Kong, China, Court of Final Appeal, Ng Ka Ling and Another v. The Director of Immigration [1999] 1 HKLRD 315, 354; Austria, Supreme Administrative Court, VwGH, judgment of 30 March 2006, 2002/15/0098, 2, 5.

[71] Yearbook … 1966, vol. II, document A/6309/Rev.1 (Part II), p. 221, para. (14).

[72] Ibid., para. (15).

[73] Gardiner, Treaty Interpretation (see footnote 20 above), pp. 34 and 414–415; Linderfalk, On the Interpretation of Treaties (see footnote 67 above), pp. 152–153.

[74] First report of the Special Rapporteur (A/CN.4/660) (see footnote 14 above), para. 69.

[75] Yearbook … 1966, vol. II, document A/6309/Rev.1 (Part II), pp. 221–222, para. (15); see also W. Karl, Vertrag und spätere Praxis im Völkerrecht, Berlin, Springer, 1983, p. 294.

[76] Kasikili/Sedudu Island (see footnote 23 above), p. 1087, para. 63; see also below draft conclusion 4 and the commentary thereto.

[77] See below draft conclusion 13; see also Nolte, "Subsequent agreements and subsequent practice of States …" (footnote 62 above), pp. 381 et seq., para. 17.3.1.

[78] See below, in particular paras. (23)–(35) of the commentary to draft conclusion 4, para. 3.

[79] See below also para. (33) of the commentary to draft conclusion 4, para. 3.

"subsequent practice" under article 31, paragraph 3 (b), and "subsequent practice" under article 32.

(2)  In all three cases, the term "subsequent" refers to acts occurring "after the conclusion of a treaty".[80] This point in time is often earlier than the moment when the treaty enters into force (article 24 of the 1969 Vienna Convention). Various provisions of the 1969 Vienna Convention (for example, article 18) show that a treaty may be "concluded" before its actual entry into force.[81] For the purposes of the present topic, "conclusion" is whenever the text of the treaty has been established as definitive within the meaning of article 10 of the Vienna Convention. It is after conclusion, not just after entry into force, of a treaty that subsequent agreements and subsequent practice can occur. Indeed, it is difficult to identify a reason why an agreement or practice that takes place between the moment when the text of a treaty has been established as definitive and the entry into force of that treaty should not be relevant for the purpose of interpretation.[82]

(3)  Article 31, paragraph 2, of the 1969 Vienna Convention provides that the "context" of the treaty includes certain "agreements" and "instruments"[83] that are "made in connection with the conclusion of the treaty". The phrase "in connection with the conclusion of the treaty" should be understood as including agreements and instruments that are made in a close temporal and contextual relation with the conclusion of the treaty.[84] If they are made after this period, then such "agreements" and agreed upon "instruments" constitute "subsequent agreements" or subsequent practice under article 31, paragraph 3.[85]

*Paragraph 1—definition of "subsequent agreement" under article 31, paragraph 3 (a)*

(4)  Paragraph 1 of draft conclusion 4 provides the definition of a "subsequent agreement" under article 31,

paragraph 3 (a). The term "the parties" indicates that such an agreement must be reached between all the parties to the treaty.

(5)  Article 31, paragraph 3 (a), uses the term "subsequent agreement" and not the term "subsequent treaty". A "subsequent agreement" is, however, not necessarily less formal than a "treaty". Whereas a treaty within the meaning of the 1969 Vienna Convention must be in written form (art. 2, para. 1 (a)), the customary international law on treaties knows no such requirement.[86] The term "agreement" in the 1969 Vienna Convention[87] and in customary international law does not imply any particular degree of formality. Article 39 of the 1969 Vienna Convention, which lays down the general rule according to which "[a] treaty may be amended by agreement between the parties", has been explained by the Commission to mean that "[a]n amending agreement may take whatever form the parties to the original treaty may choose".[88] In the same way, the Vienna Convention does not envisage any particular formal requirements for agreements and practice under article 31, paragraph 3 (a) and (b).[89]

(6)  While every treaty is an agreement, not every agreement is a treaty. Indeed, a "subsequent agreement" under article 31, paragraph 3 (a), "shall" only "be taken into account" in the interpretation of a treaty. Therefore, it is not necessarily binding. The question is addressed more specifically in draft conclusion 10.

(7)  The 1969 Vienna Convention distinguishes a "subsequent agreement" under article 31, paragraph 3 (a), from "any subsequent practice ... which establishes the agreement of the parties regarding its interpretation" under article 31, paragraph 3 (b). This distinction is not always clear and the jurisprudence of international courts and other adjudicative bodies shows a certain reluctance to assert it. In *Territorial Dispute (Libyan Arab Jamahiriya/Chad)*, the International Court of Justice used the expression "subsequent attitudes" to denote both what it later described as "subsequent agreements" and as subsequent unilateral "attitudes".[90] In the case concerning

---

[80]  *Yearbook ... 1966*, vol. II, document A/6309/Rev.1 (Part II), p. 221, para. (14).

[81]  See the second report on the law of treaties by J. L. Brierly, Special Rapporteur, *Yearbook ... 1951*, vol. II, document A/CN.4/43, pp. 70 *et seq.*; see also the first report on the law of treaties by G. G. Fitzmaurice, Special Rapporteur, *Yearbook ... 1956*, vol. II, document A/CN.4/101, p. 104, at p. 112; see also S. Rosenne, "Treaties, conclusion and entry into force", in R. Bernhardt (ed.), *Encyclopedia of Public International Law*, vol. 7, Amsterdam, North Holland, 2000, p. 465 ("Strictly speaking it is the negotiation that is concluded through a treaty"); and Villiger, *Commentary ...* (footnote 37 above), pp. 78–80, paras. 9–14.

[82]  See, for example, Declaration on the European Stability Mechanism, agreed on by the parties to the Treaty Establishing the European Stability Mechanism, 27 September 2012.

[83]  See *Yearbook ... 1966*, vol. II, document A/6309/Rev.1 (Part II), p. 221, para. (13). The German Federal Constitutional Court has held that this term may include unilateral declarations if the other party did not object to them; see German Federal Constitutional Court, BVerfGE, vol. 40, p. 141, at p. 176; see, generally, Gardiner, *Treaty Interpretation* (footnote 20 above), pp. 240–242.

[84]  Yasseen, "L'interprétation des traités ..." (see footnote 21 above), p. 38; Jennings and Watts (eds.), *Oppenheim's International Law* (see footnote 57 above), p. 1274, para. 632 ("but, on the other hand, too long a lapse of time between the treaty and the additional agreement might prevent it being regarded as made in connection with 'the conclusion of' the treaty").

[85]  See *Yearbook ... 1966*, vol. II, document A/6309/Rev.1 (Part II), p. 221, para. (14); see also Villiger, *Commentary ...* (footnote 37 above), p. 431, paras. 20–21; see also K. J. Heller, "The uncertain legal status of the aggression understandings", *Journal of International Criminal Justice*, vol. 10 (2012), pp. 229–248, at p. 237.

[86]  Villiger, *Commentary ...* (see footnote 37 above), p. 80, para. 15; P. Gautier, "1969 Vienna Convention, Article 2: Use of terms", in Corten and Klein (eds.), *The Vienna Conventions ...* (see footnote 22 above), vol. II, pp. 38–40, paras. 14–18; J. Klabbers, *The Concept of Treaty in International Law*, The Hague, Kluwer Law International, 1996, pp. 49–50; see also A. Aust, "The theory and practice of informal international instruments", *International and Comparative Law Quarterly*, vol. 35, No. 4 (October 1986), pp. 787–812, at pp. 794 *et seq.*

[87]  See arts. 2, para. 1 (a), 3, 24, para. 2, 39–41, 58 and 60.

[88]  *Yearbook ... 1966*, vol. II, document A/6309/Rev.1 (Part II), pp. 232–233 (para. (4) of the commentary to art. 35); see also Villiger, *Commentary ...* (footnote 37 above), p. 513, para. 7; and P. Sands, "1969 Vienna Convention, Article 39: General rules regarding the amendment of treaties", in Corten and Klein (eds.), *The Vienna Conventions ...* (footnote 22 above), vol. II, pp. 971–972, paras. 31–34.

[89]  Draft article 27, paragraph 3 (b), which later became article 31, paragraph 3 (b), of the 1969 Vienna Convention, contained the word "understanding", which was changed to "agreement" at the United Nations Conference on the Law of Treaties. This change was "related to the drafting only"; see *Official Records of the United Nations Conference on the Law of Treaties, First session, Vienna, 26 March–24 May 1968, Summary records of the plenary meetings and of the meetings of the Committee of the Whole* (A/CONF.39/11, United Nations publication, Sales No. E.68.V.7), p. 169; and Fox, "Article 31 (3) (a) and (b) ..." (footnote 62 above), p. 63.

[90]  See *Territorial Dispute* (footnote 23 above), pp. 34 *et seq.*, paras. 66 *et seq.*

*Sovereignty over Pulau Ligitan and Pulau Sipadan*, the International Court of Justice left open the question of whether the use of a particular map could constitute a subsequent agreement or subsequent practice.[91] WTO panels and the Appellate Body have also not always distinguished between a subsequent agreement and subsequent practice under article 31, paragraph 3 (*a*) and (*b*).[92]

(8)   The Tribunal established pursuant to the North American Free Trade Agreement in *C.C.F.T. v. United States*,[93] however, has addressed this distinction. In that case the United States of America asserted that a number of unilateral actions by the three parties to the Agreement could, if considered together, constitute a subsequent agreement.[94] In a first step, the Tribunal did not find that the evidence was sufficient to establish such a subsequent agreement under article 31, paragraph 3 (*a*).[95] In a second step, however, the Tribunal concluded that the very same evidence constituted a relevant subsequent practice that established an agreement between the parties regarding the interpretation:

> The question remains: is there "subsequent practice" that establishes the agreement of the NAFTA Parties on this issue within the meaning of Article 31 (3) (*b*)? The Tribunal concludes that there is. Although there is, to the Tribunal, insufficient evidence on the record to demonstrate a "subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions," the available evidence cited by the Respondent demonstrates to us that there is nevertheless a "subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its applications".[96]

(9)   This reasoning may suggest that one difference between a "subsequent agreement" and "subsequent practice" under article 31, paragraph 3, lies in the different manifestations of the "authentic" expression of the will of the parties. Indeed, by distinguishing between "any subsequent agreement" under article 31, paragraph 3 (*a*), and "subsequent practice … which establishes the understanding of the parties" under article 31, paragraph 3 (*b*), of the 1969 Vienna Convention, the Commission did not intend to denote a difference concerning their possible legal effect.[97] The difference between the two concepts, rather, lies in the fact that a "subsequent agreement between the parties" *ipso facto* has the effect of constituting an authentic means of interpretation of the treaty, whereas a "subsequent practice" only has this effect if its different elements, taken together, show "the common understanding of the parties as to the meaning of the terms".[98]

(10)   Subsequent agreements and subsequent practice under article 31, paragraph 3, are hence distinguished based on whether an agreement of the parties can be identified as such, in a common act or undertaking, or whether it is necessary to identify an agreement through separate acts that in combination demonstrate a common position. A "subsequent agreement" under article 31, paragraph 3 (*a*), must therefore be "reached" and presupposes a deliberate common act or undertaking by the parties, even if it consists of individual acts by which they manifest their common understanding regarding the interpretation of the treaty or the application of its provisions.[99]

(11)   "Subsequent practice" under article 31, paragraph 3 (*b*), on the other hand, encompasses all (other) relevant forms of subsequent conduct by the parties to a treaty that contribute to the identification of an agreement, or "understanding",[100] of the parties regarding the interpretation of the treaty. It is, however, possible that "practice" and "agreement" coincide in specific cases and cannot be distinguished. This explains why the term "subsequent practice" is sometimes used in a more general sense, which encompasses both means of interpretation that are referred to in article 31, paragraph 3 (*a*) and (*b*).[101]

(12)   A group of separate subsequent agreements, each between a limited number of parties, but which, taken together, establish an agreement between all the parties to a treaty regarding its interpretation is not necessarily "a"

---

[91] *Sovereignty over Pulau Ligitan and Pulau Sipadan* (see footnote 23 above), p. 656, para. 61; in the *Gabčíkovo-Nagymaros* case, the Court spoke of "subsequent positions" in order to establish that "[t]he explicit terms of the Treaty itself were therefore in practice acknowledged by the parties to be negotiable", *Gabčíkovo-Nagymaros Project (Hungary/Slovakia)*, Judgment, *I.C.J. Reports 1997*, p. 7, at p. 77, para. 138; see also *Maritime Delimitation and Territorial Questions between Qatar and Bahrain, Jurisdiction and Admissibility*, Judgment, *I.C.J. Reports 1995*, p. 6, at p. 16, para. 28 ("subsequent conduct").

[92] See "Scheduling Guidelines" in WTO, Panel Report, *Mexico—Measures Affecting Telecommunications Services*, WT/DS204/R, adopted 1 June 2004, and in WTO, Appellate Body Report, *United States—Measures Affecting the Cross-Border Supply of Gambling and Betting Services*, WT/DS285/AB/R and Corr.1, adopted 20 April 2005; to qualify a "1981 Understanding", see WTO, Panel Report, *United States—Tax Treatment for "Foreign Sales Corporations"*, WT/DS108/R, adopted 20 March 2000; "Tokyo Round SCM Code" in WTO, Panel Report, *Brazil—Measures Affecting Desiccated Coconut*, WT/DS22/R, adopted 20 March 1997; and a "waiver" in WTO, Appellate Body Reports, *EC—Bananas III (Article 21.5—Ecuador II) / EC—Bananas III (Article 21.5—United States)* (footnote 66 above).

[93] *Canadian Cattlemen for Fair Trade (C.C.F.T.) v. United States*, UNCITRAL arbitration under Chapter Eleven of the North American Free Trade Agreement, Award on Jurisdiction, 28 January 2008; see also *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, Decision on the Challenge to the President of the Committee, 3 October 2001, ICSID Case No. ARB/97/3, *ICSID Reports*, vol. 6 (2004), p. 327, at p. 334, or *ICSID Review—Foreign Investment Law Journal*, vol. 17, No. 1 (2002), p. 168, at p. 174, para. 12; and M. Fitzmaurice and P. Merkouris, "Canons of treaty interpretation: selected case studies from the World Trade Organization and the North American Free Trade Agreement", in Fitzmaurice, Elias and Merkouris (eds.), *Treaty Interpretation …* (footnote 62 above), pp. 153–237, at pp. 217–233.

[94] *C.C.F.T. v. United States* (see footnote 93 above), paras. 174–177.

[95] *Ibid.*, paras. 184–187.

[96] *Ibid.*, para. 188, and see also para. 189; in a similar sense, see *Aguas del Tunari S.A. v. Republic of Bolivia* (Netherlands/Bolivia bilateral investment treaty), Decision on Respondent's Objections to Jurisdiction, ICSID Case No. ARB/02/3, 21 October 2005, *ICSID*

*Review—Foreign Investment Law Journal*, vol. 20, No. 2 (2005), p. 450, at pp. 528 *et seq.*, paras. 251 *et seq.* For the text of the Agreement on Encouragement and Reciprocal Protection of Investments between the Kingdom of the Netherlands and the Republic of Bolivia, done at La Paz on 10 March 1992, see United Nations, *Treaty Series*, vol. 2239, No. 39849, p. 505.

[97] *Yearbook … 1966*, vol. II, document A/6309/Rev.1 (Part II), pp. 221–222, para. (15).

[98] *Ibid.*; see also Karl, *Vertrag und spätere Praxis …* (footnote 75 above), p. 294.

[99] A common act or undertaking may consist of an exchange of letters or some other form of agreement.

[100] The word "understanding" had been used by the Commission in the corresponding draft article 27, para. 3 (*b*), on the law of treaties (see footnote 89 above).

[101] *Pulp Mills on the River Uruguay (Argentina v. Uruguay)*, Provisional Measures, Order of 13 July 2006, *I.C.J. Reports 2006*, p. 113, at pp. 127–128, para. 53: in this case, even an explicit subsequent verbal agreement was characterized by one of the parties as "subsequent practice".

subsequent agreement under article 31, paragraph 3 (*a*). The term "subsequent agreement" under article 31, paragraph 3 (*a*), is limited to a common act or undertaking between all the parties (see para. (10) above).[102] Different later agreements between a limited number of parties that, taken together, establish an agreement between all the parties regarding the interpretation of a treaty constitute subsequent practice under article 31, paragraph 3 (*b*). Various such agreements between a limited number of parties that, even taken together, do not establish an agreement between all the parties regarding the interpretation of a treaty may have interpretative value as a supplementary means of interpretation under article 32 (see below at paras. (23) and (24)).

(13)    A subsequent agreement under article 31, paragraph 3 (*a*), is an agreement "regarding" the interpretation of the treaty or the application of its provisions. The parties must therefore intend, possibly among other aims, to clarify the meaning of a treaty or how it is to be applied.[103]

(14)    Whether an agreement is one "regarding" the interpretation or application of a treaty can sometimes be determined by some reference that links the "subsequent agreement" to the treaty concerned. Such a reference may be explicit, but may also be comprised in a later treaty.[104] In the *Jan Mayen* case between Denmark and Norway, for example, the International Court of Justice appears to have accepted that a "subsequent treaty" between the parties "in the same field" could be used for the purpose of the interpretation of the previous treaty. In that case, however, the Court ultimately declined to use the subsequent treaty for that purpose because it did not in any way "refer" to the previous treaty.[105]

(15)    The Court of Final Appeal in Hong Kong, China, has provided an example of a rather strict approach when it was called upon to interpret the Sino-British Joint Declaration in the case of *Ng Ka Ling and Another v. The Director of Immigration*.[106] In this case, one party alleged that the Sino-British Joint Liaison Group, consisting of

representatives of China and the United Kingdom under article 5 of the Joint Declaration, had come to an agreement regarding the interpretation of the Joint Declaration. As evidence, the party pointed to a booklet that stated that it was compiled "on the basis of the existing immigration regulations and practices and the common view of the British and Chinese sides in the [Joint Liaison Group]". The Court, however, did not find that the purpose of the booklet was "interpretation or application" of the Joint Declaration within the meaning of article 31, paragraph 3 (*a*).[107]

*Paragraph 2—definition of subsequent practice under article 31, paragraph 3 (*b)

(16)    Paragraph 2 of draft conclusion 4 is not intended to provide a general definition for any form of subsequent practice that may be relevant for the purpose of the interpretation of treaties. Paragraph 2 is limited to subsequent practice as an authentic means of interpretation that establishes the agreement of all the parties to the treaty, as formulated in article 31, paragraph 3 (*b*). Such subsequent practice (in a narrow sense) is distinguishable from subsequent practice (in a broad sense) under article 32 of the 1969 Vienna Convention by one or more parties that does not establish the agreement of the parties, but may nevertheless be relevant as a subsidiary means of interpretation (see draft conclusion 4, paragraph 3).[108]

(17)    Subsequent practice under article 31, paragraph 3 (*b*), may consist of any "conduct". The word "conduct" is used in the sense of article 2 of the Commission's articles on responsibility of States for internationally wrongful acts.[109] It may thus include not only acts, but also omissions, including relevant silence, which contribute to establishing agreement.[110] The question of the circumstances under which omissions, or silence, can contribute to an agreement of all the parties regarding the interpretation of a treaty is addressed in draft conclusion 10, paragraph 2.

(18)    Subsequent practice under article 31, paragraph 3 (*b*), must be conduct "in the application of the treaty". This includes not only official acts at the international or at the internal level that serve to apply the treaty, including to respect or to ensure the fulfilment of treaty obligations, but also, *inter alia*, official statements regarding its interpretation, such as statements at a

---

[102] See WTO, Appellate Body Report, *United States—Measures Concerning the Importation, Marketing and Sale of Tuna and Tuna Products*, WT/DS381/AB/R, adopted 13 June 2012, para. 371.

[103] *Ibid.*, paras. 366–378, in particular para. 372; e.g. agreements which are arrived at under a clause in a bilateral tax treaty mirroring article 25, paragraph 3, of the Model Tax Convention on Income and on Capital, Organisation for Economic Co-operation and Development, *Model Tax Convention on Income and on Capital: Condensed Version 2017*, Paris, 2017, p. 44; Linderfalk, *On the Interpretation of Treaties* (see footnote 67 above), pp. 164 *et seq.*

[104] *Orascom TMT Investments S.à r.l. v. People's Democratic Republic of Algeria*, award, 31 May 2017, ICSID Case No. ARB/12/35, paras. 302–303.

[105] *Maritime Delimitation in the Area between Greenland and Jan Mayen*, Judgment, *I.C.J. Reports 1993*, p. 38, at p. 51, para. 28. In the *Dispute regarding Navigational and Related Rights* case between Costa Rica and Nicaragna, Judge *ad hoc* Guillaume referred to a memorandum of understanding between the two States (*Dispute regarding Navigational and Related Rights* (see footnote 23 above), declaration of Judge *ad hoc* Guillaume, p. 290, at pp. 298–299, para. 16). It was not clear, however, whether this particular memorandum was meant by the parties to serve as an interpretation of the boundary treaty under examination.

[106] See *Ng Ka Ling and Another v. The Director of Immigration* (footnote 70 above). For the text of the Joint Declaration of the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the People's Republic of China on the Question

of Hong Kong, signed at Beijing on 19 December 1984, see United Nations, *Treaty Series*, vol. 1399, No. 23391, p. 33.

[107] *Ng Ka Ling and Another v. The Director of Immigration* (see footnote 70 above), paras. 150 and 152–153.

[108] On the distinction between the two forms of subsequent practice see below, paras. (23) and (24) of the present commentary.

[109] *Yearbook … 2001*, vol. II (Part Two) and corrigendum, pp. 34–35, paras. (2)–(4) of the commentary.

[110] See the third report on the law of treaties by Sir Humphrey Waldock, Special Rapporteur, *Yearbook … 1964*, vol. II, document A/CN.4/167 and Add.1–3, pp. 61–62, paras. (32)–(33); see also *Case concerning the Temple of Preah Vihear (Cambodia v. Thailand)*, Merits, Judgment of 15 June 1962, *I.C.J. Reports 1962*, p. 6, at p. 23; *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America)*, Jurisdiction and Admissibility, Judgment, *I.C.J. Reports 1984*, p. 392, at p. 410, para. 39; and *Dispute between Argentina and Chile concerning the Beagle Channel*, decision of 18 February 1977, UNRIAA, vol. XXI (Sales No. E/F.95.V.2), pp. 53–264, at pp. 185–187, paras. 168–169.

diplomatic conference, statements in the course of a legal dispute, or judgments of domestic courts; official communications to which the treaty gives rise; or the enactment of domestic legislation or the conclusion of international agreements for the purpose of implementing a treaty even before any specific act of application takes place at the internal or at the international level.

(19)   It may be recalled that, in one case, a panel constituted under the North American Free Trade Agreement denied that internal legislation can be used as an interpretative aid:

> Finally, in light of the fact that both Parties have made references to their national legislation on land transportation, the Panel deems it appropriate to refer to Article 27 of the Vienna Convention, which states that "A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty." This provision directs the Panel not to examine national laws but the applicable international law. Thus, neither the internal law of the United States nor the Mexican law should be utilized for the interpretation of NAFTA. To do so would be to apply an inappropriate legal framework.[111]

Whereas article 27 of the 1969 Vienna Convention is certainly valid and important, this rule does not signify that national legislation may not be taken into account as an element of subsequent practice in the application of the treaty. There is a difference between invoking internal law as a justification for a failure to perform a treaty, on the one hand, and referring to internal law for the purpose of interpreting a provision of a treaty, on the other. Accordingly, international adjudicatory bodies, in particular the WTO Appellate Body and the European Court of Human Rights, have recognized and regularly distinguished between internal legislation (and other implementing measures at the internal level) that violates treaty obligations, and internal legislation or other measures that can serve as a means to interpret the treaty.[112] It should be noted, however, that an element of good faith is necessary in any "subsequent practice in the application of the treaty". A manifest misapplication of a treaty, as opposed to a *bona fide* application (even if erroneous), is therefore not an "application of the treaty" in the sense of articles 31 and 32.

(20)   The requirement that subsequent practice in the application of a treaty under article 31, paragraph 3 (*b*),

must establish an agreement "regarding its interpretation" has the same meaning as the parallel requirement under article 31, paragraph 3 (*a*) (see paras. (13) and (14) above). It may often be difficult to distinguish between subsequent practice that implies a contribution to the interpretation of a treaty and other practice "in the application of the treaty".

(21)   The question of the circumstances under which an "agreement of the parties regarding the interpretation of a treaty" is actually "established" is addressed in draft conclusion 10.

(22)   Article 31, paragraph 3 (*b*), does not explicitly require that the practice must be the conduct of the parties to the treaty themselves. It is, however, the parties themselves, acting through their organs,[113] or by way of conduct in the application of the treaty, who engage in practice that may establish their agreement. The question of whether other actors can generate relevant subsequent practice is addressed in draft conclusion 5.[114]

*Paragraph 3—subsequent practice under article 32*

(23)   Paragraph 3 of draft conclusion 4 addresses subsequent practice under article 32, that is subsequent practice other than that referred to in article 31, paragraph 3 (*b*). This paragraph concerns "subsequent practice in the application of the treaty as a supplementary means of interpretation under article 32", as mentioned in paragraph 4 of draft conclusion 2. This form of subsequent practice, which does not require the agreement of all the parties, was originally referred to in the commentary of the Commission to the draft articles on the law of treaties as follows:

> But, in general, the practice of an individual party or of only some parties as an element of interpretation is on a quite different plane from a concordant practice embracing all the parties and showing their common understanding of the meaning of the treaty. Subsequent practice of the latter kind evidences the agreement of the parties as to the interpretation of the treaty and is analogous to an interpretative agreement. For this reason the Commission considered that subsequent practice establishing the common understanding of all the parties regarding the interpretation of a treaty should be included in paragraph 3 [of the draft provision that became article 31 of the 1969 Vienna Convention] as an authentic means of interpretation alongside interpretative agreements. The practice of individual States in the application of a treaty, on the other hand, may be taken into account only as one of the "further" means of interpretation mentioned in article 70 [which became article 32].[115]

(24)   Paragraph 3 of draft conclusion 4 does not enunciate a requirement, like that in article 31, paragraph 3 (*b*), that the relevant practice be "regarding the interpretation" of the treaty. Thus, for the purposes of paragraph 3, any practice in the application of the treaty that may provide indications as to how the treaty is to be interpreted may be a relevant supplementary means of interpretation under article 32.

(25)   Subsequent practice under article 32 has since the adoption of the 1969 Vienna Convention been recognized

---

[111] Final Report of the Arbitral Panel established under the North American Free Trade Agreement, *Cross-Border Trucking Services (Mexico v. United States of America)*, No. USA-MEX-98-2008-01, adopted 6 February 2001, para. 224.

[112] For example, WTO, Panel Report, *United States—Section 110 (5) of the US Copyright Act*, WT/DS160/R, adopted 27 July 2000, para. 6.55; WTO, Panel Report, *United States—Continued Existence and Application of Zeroing Methodology (United States—Continued Zeroing)*, WT/DS350/R, adopted 19 February 2009 (amended by Appellate Body Report WT/DS350/AB/R), para. 7.173; WTO, Appellate Body Report, *United States—Definitive Anti-Dumping and Countervailing Duties on Certain Products from China*, WT/DS379/AB/R, adopted 25 March 2011, paras. 335–336; *CMS Gas Transmission Company v. Argentine Republic* (United States/Argentina bilateral investment treaty [Treaty between the United States of America and the Argentine Republic concerning the Reciprocal Encouragement and Protection of Investment, done at Washington, D.C., on 14 November 1991, available from https://investmentpolicy.unctad.org, *International Investment Agreements*]), Decision on Objections to Jurisdiction, 17 July 2003, ICSID Case No. ARB/01/8, *ICSID Reports*, vol. 7 (2003), p. 492, para. 47; *V. v. the United Kingdom* [GC], no. 24888/94, 16 December 1999, ECHR 1999-IX, para. 73; *Kart v. Turkey* [GC], no. 8917/05, 3 December 2009, ECHR 2009-VI, para. 54; *Sigurður A. Sigurjónsson v. Iceland*, no. 16130/90, 30 June 1993, European Court of Human Rights, Series A, no. 264, para. 35.

[113] Karl, *Vertrag und spätere Praxis ...* (see footnote 75 above), pp. 115 *et seq.*

[114] See draft conclusion 5, para. 2.

[115] *Yearbook ... 1964*, vol. II, document A/5809, p. 204, para. (13); see also *Yearbook ... 1966*, vol. II, document A/6309/Rev.1 (Part II), pp. 221–222, para. (15).

and applied by international courts and other adjudicatory bodies as a means of interpretation (see paras. (26)–(32) below). It should be noted, however, that the WTO Appellate Body, in *Japan—Alcoholic Beverages II*,[116] has formulated a definition of subsequent practice for the purpose of treaty interpretation that seems to suggest that only such "subsequent practice in the application of the treaty" "which establishes the agreement of the parties regarding its interpretation" can at all be relevant for the purpose of treaty interpretation and not any other form of subsequent practice by one or more parties: "subsequent practice in interpreting a treaty has been recognized as a 'concordant, common and consistent' sequence of acts or pronouncements which is sufficient to establish a discernable pattern implying the agreement of the parties regarding its interpretation".[117] However, the jurisprudence of the International Court of Justice and other international courts and tribunals, and even that of the WTO Dispute Settlement Body (see paras. (31)–(32) below), demonstrates that subsequent practice which fulfils all the conditions of article 31, paragraph 3 (*b*), of the 1969 Vienna Convention is not the only form of subsequent practice by parties in the application of a treaty that may be relevant for the purpose of treaty interpretation.

(26)    In the case of *Kasikili/Sedudu Island*, for example, the International Court of Justice held that a report by a technical expert that had been commissioned by one of the parties and that had "remained at all times an internal document",[118] while not representing subsequent practice that establishes the agreement of the parties under article 31, paragraph 3 (*b*), could "nevertheless support the conclusions" that the Court had reached by other means of interpretation.[119]

(27)    The European Court of Human Rights held in *Loizidou v. Turkey* that its interpretation was "confirmed by the subsequent practice of Contracting Parties",[120] that is "the evidence of a practice denoting practically universal agreement amongst Contracting Parties that [a]rticles 25 and 46 … of the [European] Convention [on Human Rights] do not permit territorial or substantive restrictions".[121] More often the European Court of Human Rights has relied on—not necessarily uniform—subsequent practice of the parties by referring to national legislation and domestic administrative practice as a means of interpretation. In the case of *Demir and Baykara v. Turkey*, for example, the Court held that "[a]s to the practice of European States, it can be observed that, in the vast majority of them, the right for public servants to bargain collectively with the authorities has been recognised"[122]

and that "[t]he remaining exceptions can be justified only by particular circumstances".[123]

(28)    The Inter-American Court of Human Rights, when taking subsequent practice of the parties into account, has also not limited its use to cases in which the practice established the agreement of the parties. Thus, in the case of *Hilaire, Constantine and Benjamin et al. v. Trinidad and Tobago* the Inter-American Court of Human Rights held that the mandatory imposition of the death penalty for every form of conduct that resulted in the death of another person was incompatible with article 4, paragraph 2, of the American Convention on Human Rights (imposition of the death penalty only for the most serious crimes). In order to support this interpretation, the Court held that it was "useful to consider some examples in this respect, taken from the legislation of those American countries that maintain the death penalty".[124]

(29)    The Human Rights Committee established by the International Covenant on Civil and Political Rights is open to arguments based on subsequent practice in a broad sense (under article 32 of the 1969 Vienna Convention) when it comes to the justification of interferences with the rights set forth in the Covenant.[125] Interpreting the rather general terms contained in article 19, paragraph 3, of the Covenant (permissible restrictions on freedom of expression), the Committee observed that "similar restrictions can be found in many jurisdictions",[126] and concluded that the aim pursued by the contested law did not, as such, fall outside the legitimate aims of article 19, paragraph 3, of the Covenant.[127]

(30)    The International Tribunal for the Former Yugoslavia, referring to the Convention on the Prevention and Punishment of the Crime of Genocide, noted in the *Jelisić* judgment that:

the Trial Chamber … interprets the Convention's terms in accordance with the general rules of interpretation of treaties set out in Articles 31 and 32 of the Vienna Convention on the Law of Treaties. … The Trial Chamber also took account of subsequent practice grounded upon the Convention. Special significance was attached to the Judgments rendered by the Tribunal for Rwanda … The practice of States, notably through their national courts, and the work of international authorities in this field have also been taken into account.[128]

(31)    The WTO dispute settlement bodies also occasionally distinguish between "subsequent practice" that

[116] WTO, Appellate Body Report, *Japan—Alcoholic Beverages II* (see footnote 26 above), and WTO, Panel Report, WT/DS8/R, WT/DS10/R and WT/DS11/R, adopted 1 November 1996.

[117] *Ibid*. (WTO, Appellate Body Report), sect. E, p. 13.

[118] *Kasikili/Sedudu Island* (see footnote 23 above), p. 1078, para. 55.

[119] *Ibid*., p. 1096, para. 80.

[120] *Loizidou v. Turkey* (see footnote 36 above), para. 79.

[121] *Ibid*., para. 80; it is noteworthy that the Court described "such a … State practice" as being "uniform and consistent" despite the fact that it had recognized that two States possibly constituted exceptions (Cyprus and the United Kingdom; "[w]hatever [their] meaning"), paras. 80 and 82.

[122] *Demir and Baykara v. Turkey* [GC] (see footnote 27 above), para. 52.

[123] *Ibid*., para. 151; similarly, *Jorgic v. Germany*, no. 74613/01, 12 July 2007, ECHR 2007-III, para. 69.

[124] *Hilaire, Constantine and Benjamin et al.* (see footnote 28 above), concurring separate opinion of Judge Sergio García Ramírez, para. 12; *Artavia Murillo et al. ("In vitro fertilization") v. Costa Rica*, Judgment (Preliminary Objections, Merits, Reparations and Costs), 28 November 2012, Inter-American Court of Human Rights, Series C, No. 257, paras. 245–256.

[125] *Jong-Cheol v. The Republic of Korea*, Views, 27 July 2005, communication No. 968/2001, Report of the Human Rights Committee, *Official Records of the General Assembly, Sixtieth Session, Supplement No. 40* (A/60/40), vol. II, annex V, G.

[126] *Ibid*., para. 8.3.

[127] *Ibid*.; see also *Yoon and Choi v. Republic of Korea*, Views, 3 November 2006, communications No. 1321/2004 and No. 1322/2004, *ibid., Sixty-second Session, Supplement No. 40* (A/62/40), vol. II, annex VII, V, para. 8.4.

[128] *Prosecutor v. Goran Jelisić*, case No. IT-95-10-T, Trial Chamber, Judgment, 14 December 1999, para. 61; similarly, *Prosecutor v. Radislav Krstić*, case No. IT-98-33-T, Trial Chamber, Judgment, 2 August 2001, para. 541.

satisfies the conditions of article 31, paragraph 3 (*b*), and other forms of subsequent practice in the application of the treaty that they also recognize as being relevant for the purpose of treaty interpretation. In *United States—Section 110 (5) of the US Copyright Act*[129] (not appealed), for example, the Panel had to determine whether a "minor exceptions doctrine" concerning royalty payments applied.[130] The Panel found evidence in support of the existence of such a doctrine in several member States' national legislation and noted:

we recall that [a]rticle 31(3) of the Vienna Convention provides that together with the context (*a*) any subsequent agreement, (*b*) subsequent practice, or (*c*) any relevant rules of international law applicable between the parties, shall be taken into account for the purposes of interpretation. We note that the parties and third parties have brought to our attention several examples from various countries of limitations in national laws based on the minor exceptions doctrine. In our view, [S]tate practice as reflected in the national copyright laws of Berne Union members before and after 1948, 1967 and 1971, as well as of WTO Members before and after the date that the TRIPS Agreement became applicable to them, confirms our conclusion about the minor exceptions doctrine.[131]

And the Panel added the following cautionary footnote: "By enunciating these examples of [S]tate practice we do not wish to express a view on whether these are sufficient to constitute 'subsequent practice' within the meaning of [a]rticle 31 (3) (*b*) of the Vienna Convention."[132]

(32) In *European Communities—Customs Classification of Certain Computer Equipment*, the WTO Appellate Body criticized the Panel for not having considered decisions by the Harmonized System Committee of the World Customs Organization (WCO) as a relevant subsequent practice:

A proper interpretation also would have included an examination of the existence and relevance of subsequent practice. We note that the United States referred, before the Panel, to the decisions taken by the Harmonized System Committee of the WCO in April 1997 on the classification of certain LAN equipment as ADP machines. Singapore, a third party in the panel proceedings, also referred to these decisions. The European Communities observed that it had introduced reservations with regard to these decisions … However, we consider that in interpreting the tariff concessions in Schedule LXXX, decisions of the WCO may be relevant ….[133]

Thus, on closer inspection, the WTO dispute settlement bodies also recognize the distinction between "subsequent practice" under article 31, paragraph 3 (*b*), and a broader concept of subsequent practice (under article 32) that does not presuppose an agreement between all the parties to the treaty.[134]

(33) In using subsequent practice by one or more, but not all, parties to a treaty as a supplementary means of

interpretation under article 32 one must, however, always remain conscious of the fact that "[t]he view of one State does not make international law".[135] In any case, the distinction between agreed subsequent practice under article 31, paragraph 3 (*b*), as an authentic means of interpretation, and other subsequent practice (in a broad sense) under article 32, implies that a greater interpretative value should be attributed to the former. Domestic courts have sometimes not clearly distinguished between subsequent agreements and subsequent practice under article 31, paragraph 3, and other subsequent practice under article 32.[136]

(34) The distinction between subsequent practice under article 31, paragraph 3 (*b*), and subsequent practice under article 32 also contributes to answering the question of whether subsequent practice requires repeated action with some frequency[137] or whether a one-time application of the treaty may be enough.[138] In the WTO framework, the Appellate Body has found: "An isolated act is generally not sufficient to establish subsequent practice; it is a sequence of acts establishing the agreement of the parties that is relevant."[139] If, however, the concept of subsequent practice as a means of treaty interpretation is distinguished from a possible agreement between the parties, frequency is not a necessary element of the definition of the concept of "subsequent practice" in the broad sense (under article 32).[140]

(35) Thus, "subsequent practice" in the broad sense (under article 32) covers any application of the treaty by one or more (but not all) parties. It can take various forms.[141] Such "conduct by one or more parties in the application of the treaty" may, in particular, consist of a direct application of the treaty in question, conduct that is

---

[129] WTO, Panel Report, *United States—Section 110 (5) of the US Copyright Act* (see footnote 112 above).

[130] See Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPs Agreement), art. 9, para. 1.

[131] WTO, Panel Report, *United States—Section 110 (5) of the US Copyright Act* (see footnote 112 above), para. 6.55.

[132] *Ibid.*, footnote 68.

[133] WTO, Appellate Body Report, *EC—Computer Equipment* (see footnote 36 above), para. 90; see also I. van Damme, *Treaty Interpretation by the WTO Appellate Body*, Oxford, Oxford University Press, 2009, p. 342.

[134] See also WTO, Appellate Body Reports, *United States—COOL* (footnote 36 above), para. 452.

[135] *Sempra Energy International v. Argentine Republic*, Award, 28 September 2007, ICSID Case No. ARB/02/16, para. 385; see also *Enron Corporation and Ponderosa Assets, L. P. v. Argentine Republic*, Award, 22 May 2007, ICSID Case No. ARB/01/3, para. 337; WTO, Panel Report, *United States—Large Civil Aircraft (2nd complaint)* (footnote 57 above), footnote 2420 in para. 7.953; and *Philip Morris Brands Sàrl, Philip Morris Products S.A. and Abal Hermanos S.A. v. Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Award, 8 July 2016, para. 476.

[136] See, for example: United Kingdom, House of Lords, *Deep Vein Thrombosis and Air Travel Group Litigation* (footnote 51 above), paras. 54–55 and 66–85 (Lord Mance); United Kingdom, House of Lords, *R (Al-Jedda) v. Secretary of State for Defence* [2007] UKHL 58, para. 38; United Kingdom, House of Lords, *R (Mullen) v. Secretary of State for the Home Department* (footnote 51 above), para. 47 (Lord Steyn); United Kingdom, House of Lords, *King v. Bristow Helicopters Ltd. (Scotland)* [2002] UKHL 7, para. 80 (Lord Hope); New Zealand, Court of Appeal, *Attorney-General v. Zaoui and Others (No. 2)* (footnote 70 above), para. 130 (Judge Glazebrook); New Zealand, Court of Appeal, *P. v. Secretary for Justice, ex parte A.P.* [2004] 2 NZLR 28, para. 61 (Judge Glazebrook); Germany, Federal Administrative Court, BVerwGE, vol. 104, p. 254, at pp. 256–257; and judgment of 29 November 1988, 1 C 75/86 [1988], *Neue Zeitschrift für Verwaltungsrecht*, 1989, p. 765, at p. 766.

[137] Villiger, *Commentary …* (see footnote 37 above), p. 431, para. 22.

[138] Linderfalk, *On the Interpretation of Treaties* (see footnote 67 above), p. 166.

[139] WTO Appellate Body Report, *Japan—Alcoholic Beverages II*, WT/DS8/AB/R, WT/DS10/AB/R and WT/DS11/AB/R, adopted 1 November 1996, section E, p. 13.

[140] See para. (11) of the commentary to draft conclusion 9, para. 2; see also R. Kolb, *Interprétation et création du droit international*, Brussels, Bruylant, 2006, pp. 506–507.

[141] Aust, *Modern Treaty Law and Practice*, 3rd ed., Cambridge, Cambridge University Press, 2013, p. 239.

attributable to a State party as an application of the treaty, a statement or a judicial pronouncement regarding its interpretation or application. Such conduct may include official statements concerning the treaty's meaning, protests against non-performance or tacit acceptance of statements or acts by other parties.[142]

### Conclusion 5.  *Conduct as subsequent practice*

**1. Subsequent practice under articles 31 and 32 may consist of any conduct of a party in the application of a treaty, whether in the exercise of its executive, legislative, judicial or other functions.**

**2. Other conduct, including by non-State actors, does not constitute subsequent practice under articles 31 and 32. Such conduct may, however, be relevant when assessing the subsequent practice of parties to a treaty.**

### *Commentary*

(1) Draft conclusion 5 addresses the question of possible authors of subsequent practice under articles 31 and 32 of the 1969 Vienna Convention. The phrase "under articles 31 and 32" makes it clear that this draft conclusion applies both to subsequent practice as an authentic means of interpretation under article 31, paragraph 3 (*b*), and to subsequent practice as a supplementary means of interpretation under article 32. Paragraph 1 of draft conclusion 5 defines positively whose conduct in the application of the treaty may constitute subsequent practice under articles 31 and 32, whereas paragraph 2 states negatively which conduct does not, but which may nevertheless be relevant when assessing the subsequent practice of parties to a treaty. Since the draft conclusions do not deal specifically with treaties between States and international organizations or between international organizations, the practice of international organizations is addressed only to a limited extent in draft conclusion 12, paragraph 3, but not in draft conclusion 5.[143]

### *Paragraph 1—conduct constituting subsequent practice*

(2) Paragraph 1 of draft conclusion 5, by using the phrase "any conduct of a party", borrows language from article 2 (*a*) of the articles on responsibility of States for internationally wrongful acts.[144] Accordingly, the term "any conduct" encompasses actions and omissions. It is not limited to conduct of the organs of a State, but may also cover conduct of private actors acting under delegated public authority. The expression "whether in the exercise of its executive, legislative, judicial or other functions" focuses on the functions of a State, rather than

on its organs.[145] The relevant conduct must be "in the application of a treaty".[146] The borrowing of language from the articles on responsibility of States for internationally wrongful acts does not, however, extend to the concept of attribution and to the requirement that the conduct in question be "internationally wrongful". Since the concept of "application of the treaty" requires conduct in good faith, a manifest misapplication of a treaty falls outside this scope.[147]

(3) An example of relevant conduct that arises only indirectly from the conduct of the parties, but nevertheless may give rise to State practice, has been identified by the International Court of Justice in the *Kasikili/Sedudu Island* case. There the Court considered whether the regular use of an island on the border between Namibia (former South West Africa) and Botswana (former Bechuanaland) by members of a local tribe, the Masubia, could be regarded as subsequent practice in the sense of article 31, paragraph 3 (*b*), of the Vienna Convention. The Court concluded that subsequent practice could be found if such conduct:

was linked to a belief on the part of the Caprivi authorities that the boundary laid down by the 1890 Treaty followed the southern channel of the Chobe; and, second, that the Bechuanaland authorities were fully aware of and accepted this as a confirmation of the Treaty boundary.[148]

(4) By referring to any conduct of a party in the application of the treaty, however, paragraph 1 does not imply that any such conduct necessarily constitutes, in a given case, subsequent practice for the purpose of treaty interpretation. The use of the phrase "may consist" is intended to reflect this point. This clarification is particularly important in relation to conduct of State organs that might contradict an officially expressed position of the State with respect to a particular matter and thus contribute to an equivocal conduct by the State.

(5) Given the significant differences in the internal organization of States, it is difficult to determine the conditions under which the conduct of lower State organs is relevant subsequent practice for purposes of treaty interpretation. The relevant criterion is less the position of the organ in the hierarchy of the State than its function in interpreting and applying any particular treaty.

(6) Subsequent practice of States in the application of a treaty may certainly be performed by the high-ranking government officials mentioned in article 7 of the 1969 Vienna Convention. Yet, since most treaties typically are not applied by such high officials, international courts and tribunals have recognized that the conduct of lower authorities may also, under certain conditions, constitute relevant subsequent practice in the application of a treaty.

---

[142] Karl, *Vertrag und spätere Praxis …* (see footnote 75 above), pp. 114 *et seq.*

[143] See para. (3) of the commentary to draft conclusion 1 above.

[144] *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 35, para. (4) of the commentary to article 2. The articles on responsibility of States for internationally wrongful acts adopted by the Commission at its fifty-third session are reproduced in the annex to General Assembly resolution 56/83 of 12 December 2001. The question of the attribution of relevant subsequent conduct to international organizations for the purpose of treaty interpretation is addressed in draft conclusion 12 below.

[145] *Cf.* arts. 4 and 5 of the articles on responsibility of States for internationally wrongful acts, General Assembly resolution 56/83, annex. For the commentaries thereto, see *Yearbook … 2001*, vol. II (Part Two) and corrigendum, pp. 40–43.

[146] See para. (18) of the commentary to draft conclusion 4 above.

[147] See para. (19) of the commentary to draft conclusion 4 above.

[148] *Kasikili/Sedudu Island* (see footnote 23 above), p. 1094, para. 74. For the Agreement between Great Britain and Germany signed at Berlin on 1 July 1890, see *British and Foreign State Papers, 1889–1890*, vol. 82, p. 35.

Accordingly, the International Court of Justice recognized in the *Case concerning rights of nationals of the United States of America in Morocco* that article 95 of the General Act of the International Conference at Algeciras (1906) had to be interpreted flexibly in light of the inconsistent practice of local customs authorities.[149] The jurisprudence of arbitral tribunals confirms that relevant subsequent practice may emanate from lower officials. In the *German External Debts* decision, the Arbitral Tribunal considered a letter from the Bank of England to the German Federal Debt Administration as relevant subsequent practice.[150] And in the case of *Tax regime governing pensions paid to retired UNESCO officials residing in France*, the Arbitral Tribunal accepted, in principle, the practice of the French tax administration of not collecting taxes on the pensions of retired United Nations Educational, Scientific and Cultural Organization (UNESCO) employees as being relevant subsequent practice. Ultimately, however, the Arbitral Tribunal considered some contrary official pronouncements by a higher authority, the French Government, to be decisive.[151]

(7)    The practice of lower and local officials may thus be subsequent practice "of a party in the application of a treaty" if this practice is sufficiently unequivocal and if the Government can be expected to be aware of this practice and has not contradicted it within a reasonable time.[152]

*Paragraph 2—conduct not constituting subsequent practice*

(8)    Paragraph 2 of draft conclusion 5 comprises two sentences. The first sentence indicates that conduct other than that envisaged in paragraph 1, including by non-State actors, does not constitute subsequent practice under articles 31 and 32. The phrase "other conduct" was introduced in order clearly to establish the distinction between the conduct contemplated in paragraph 2 and that contemplated in paragraph 1. At the same time, conduct not covered by paragraph 1 may be relevant when "assessing" the subsequent practice of parties to a treaty.[153]

(9)    "Subsequent practice in the application of a treaty" will be brought about by those who are called on to apply the treaty, which are normally the States parties themselves. The general rule has been formulated by the Iran–United States Claims Tribunal as follows:

It is a recognized principle of treaty interpretation to take into account, together with the context, any subsequent practice in the application of an international treaty. This practice must, however, be a practice of the parties to the treaty and one which establishes the agreement of the parties regarding the interpretation of that treaty.

Whereas one of the participants in the settlement negotiations, namely Bank Markazi, is an entity of Iran and thus its practice can be attributed to Iran as one of the parties to the Algiers Declarations, the other participants in the settlement negotiations and in actual settlements, namely the United States banks, are not entities of the Government of the United States, and their practice cannot be attributed as such to the United States as the other party to the Algiers Declarations.[154]

(10)    The first sentence of paragraph 2 of draft conclusion 5 is intended to reflect this general rule. It emphasizes the primary role of the States parties to a treaty, who are the masters of the treaty and are ultimately responsible for its application. This does not exclude that conduct by non-State actors may constitute a form of application of the treaty if it amounts to an exercise of executive or other functions of a State party. For example, a State party may be acting through private entities, whether State-owned or not, or authorizing them to exercise governmental authority with respect to the implementation of a treaty.

(11)    "Other conduct" in the sense of paragraph 2 of draft conclusion 5 may be that of different actors. Such conduct may, in particular, be practice of parties that is not "in the application of the treaty" or statements by a State that is not party to a treaty about the latter's interpretation,[155] or a pronouncement by an independent treaty monitoring body

---

[149] *Case concerning rights of nationals of the United States of America in Morocco*, Judgment of August 27th, 1952, *I.C.J. Reports 1952*, p. 176, at p. 211.

[150] *Case concerning the question whether the re-evaluation of the German Mark in 1961 and 1969 constitutes a case for application of the clause in article 2 (e) of Annex I A of the 1953 Agreement on German External Debts between Belgium, France, Switzerland, the United Kingdom of Great Britain and Northern Ireland and the United States of America on the one hand and the Federal Republic of Germany on the other*, Decision, 16 May 1980, UNRIAA, vol. XIX (Sales No. E/F.90.V.7), pp. 67–145, at pp. 103–104, para. 31.

[151] *Question of the tax regime governing pensions paid to retired UNESCO officials residing in France*, Decision, 14 January 2003, *ibid.*, vol. XXV (Sales No. E/F.05.V.5), pp. 231–266, at p. 257, para. 66, and p. 259, para. 74.

[152] See Chanaki, *L'adaptation des traités …* (footnote 62 above), pp. 323–328; Gardiner, *Treaty Interpretation* (footnote 20 above), pp. 269–270; M. Kamto, "La volonté de l'État en droit international", *Collected Courses of the Hague Academy of International Law, 2004*, vol. 310, pp. 9–428, at pp. 142–144; and Dörr, "Article 31 …" (footnote 61 above), p. 597, para. 79.

[153] The Commission has adopted the same approach in draft conclusion 4, paragraph 3, on identification of customary international law. According to this draft conclusion: "[c]onduct of other actors is not practice that contributes to the formation, or expression, of rules of customary international law, but may be relevant when assessing the practice referred to in paragraphs 1 and 2" (chap. V, sect. E.1, para. 65 below).

[154] Iran–United States Claims Tribunal, *United States of America et al. v. Islamic Republic of Iran et al.*, Award No. 108-A-16/582/591-FT, *Iran–United States Claims Tribunal Reports*, vol. 5 (1984), p. 57, at p. 71; similarly, Iran–United States Claims Tribunal, *The Islamic Republic of Iran v. The United States of America*, Interlocutory Award No. ITL 83-B1-FT (Counterclaim), *ibid.*, vol. 38 (2004–2009), p. 77, at pp. 124–125, paras. 127–128; see also Iran–United States Claims Tribunal, *International Schools Services, Inc. (ISS) v. National Iranian Copper Industries Company (NICICO)*, Interlocutory Award No. ITL 37-111-FT, *ibid.*, vol. 5 (1984), p. 338, dissenting opinion of President Lagergren, p. 348, at p. 353: "the provision in the Vienna Convention on subsequent agreements refers to agreements between States parties to a treaty, and a settlement agreement between two arbitrating parties can hardly be regarded as equal to an agreement between the two States that are parties to the treaty, even though the Islamic Republic of Iran was one of the arbitrating parties in the case". For the Algiers Declarations (Declaration of the Government of the Democratic and Popular Republic of Algeria and Declaration of the Government of the Democratic and Popular Republic of Algeria concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran), see ILM, vol. 20, No. 1 (1981), pp. 224 and 230 (respectively), at pp. 232–233.

[155] See, for example, "Observations of the United States of America on the Human Rights Committee's General Comment 33: The Obligations of States Parties under the Optional Protocol to the International Covenant on Civil and Political Rights", 22 December 2008, p. 1, para. 3 (available from https://2009-2017.state.gov/documents/organization/138852.pdf). To the extent that the statement by the United States relates to the interpretation of the Optional Protocol to the International Covenant on Civil and Political Rights, to which the United States is not a party or a contracting State, its statement constitutes "other conduct" under draft conclusion 5, para. 2.

in relation to the interpretation of the treaty concerned,[156] or acts of technical bodies that are tasked by Conferences of States Parties to advise on the implementation of treaty provisions, or different forms of conduct or statements of non-State actors.

(12)    The phrase "assessing the subsequent practice" in the second sentence of paragraph 2 should be understood in a broad sense as covering both the identification of the existence of a subsequent practice and the determination of its legal significance. Statements or conduct of other actors, such as other States, international organizations or non-State actors, can reflect, or initiate, relevant subsequent practice of the parties to a treaty.[157] Such reflection or initiation of subsequent practice of the parties by the conduct of other actors should not, however, be conflated with the practice by the parties to the treaty themselves. Activities of actors that are not parties to a treaty may, however, be relevant when assessing subsequent practice of the States parties to a treaty.

(13)    Decisions, resolutions and other practice by international organizations can be relevant for the interpretation of treaties in their own right. This is recognized, for example, in article 2 (j) of the 1986 Vienna Convention, which mentions the "established practice of the organization" as one form of the "rules of the organization".[158] Draft conclusion 5 only concerns the question of whether the practice of international organizations may be relevant when assessing the subsequent practice by States parties to a treaty. The practice of international organizations in the application of their constituent instruments is addressed in draft conclusion 12, paragraph 3.

(14)    Reports by international organizations which are prepared on the basis of a mandate to provide accounts on State practice in a particular field may be very important when assessing such practice. For example, the *Handbook and Guidelines on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* of the Office of the United Nations High Commissioner for Refugees (UNHCR) is an important work that reflects and thus provides guidance for State practice.[159] The

same is true for the so-called 1540 Matrix, which is a systematic compilation by the Security Council Committee established pursuant to resolution 1540 (2004) on implementation measures taken by Member States.[160] As far as the Matrix relates to the implementation of the 1972 Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction, as well as to the 1993 Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, it constitutes evidence for and an assessment of subsequent State practice to those treaties.[161]

(15)    Other non-State actors may also play a role when assessing subsequent practice of the parties in the application of a treaty. A pertinent example is the International Committee of the Red Cross (ICRC).[162] Apart from fulfilling a general mandate conferred on it by the Geneva Conventions for the protection of war victims (1949 Geneva Conventions) and by the Statutes of the International Red Cross and Red Crescent Movement,[163] ICRC occasionally provides interpretative guidance on the 1949 Geneva Conventions and the Additional Protocols[164] on the basis of a mandate from the Statutes of the Movement. Article 4, paragraph 1 (g), of the Statutes of the International Committee of the Red Cross,[165] and article 5, paragraph 2 (g), of the Statutes of the International Red Cross and Red Crescent Movement provide that the role of ICRC is "to work for the understanding and dissemination of knowledge of international humanitarian law applicable in armed conflicts and to prepare any development thereof". On the basis of this mandate, ICRC, for example, published in 2009 its *Interpretive Guidance on the Notion of Direct Participation in Hostilities under*

---

[156] See, for example, International Law Association, Committee on International Human Rights Law and Practice, "Final report on the impact of findings of the United Nations human rights treaty bodies", *Report of the Seventy-first Conference held in Berlin, 16–21 August 2004*, p. 621, paras. 21 *et seq.*

[157] See Gardiner, *Treaty Interpretation* (footnote 20 above), p. 270.

[158] See paras. (40)–(42) of the commentary to draft conclusion 12 below.

[159] See UNHCR, *Handbook and Guidelines on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* (reissued December 2011), HCR/1P/4/ENG/REV.3 (www.refworld.org/docid/4f33c8d92.html), Foreword; the view that the UNHCR *Handbook* itself expresses State practice has correctly been rejected by the Federal Court of Australia in *Semunigus v. Minister for Immigration and Multicultural Affairs* [1999] FCA 422 (1999), Judgment, 14 April 1999, paras. 5–13; the *Handbook* nevertheless possesses considerable evidentiary weight as a correct statement of subsequent State practice. Its authority is based on article 35, paragraph 1, of the Convention relating to the Status of Refugees, 1951, according to which "[t]he Contracting States undertake to co-operate with the Office of the United Nations High Commissioner for Refugees ... in the exercise of its functions, and shall in particular facilitate its duty of supervising the application of the provisions of this Convention".

[160] Security Council resolution 1540 (2004) of 28 April 2004, para. 8 (c); according to the Committee's website, "the 1540 Matrix has functioned as the primary method used by the 1540 Committee to organize information about implementation of UN Security Council resolution 1540 by Member States" (www.un.org/en/sc/1540/national-implementation/1540-matrices.shtml).

[161] See, generally, Gardiner, *Treaty Interpretation* (footnote 20 above), p. 270.

[162] H.-P. Gasser, "International Committee of the Red Cross (ICRC)", *Max Planck Encyclopedia of Public International Law* (online edition: https://opil.ouplaw.com/home/MPIL), para. 20.

[163] Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field (First Geneva Convention), art. 3 and art. 9; Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea (Second Geneva Convention), art. 3 and art. 9; Geneva Convention relative to the Treatment of Prisoners of War (Third Geneva Convention), art. 3 and art. 9; and Geneva Convention relative to the Protection of Civilian Persons in Time of War (Fourth Geneva Convention), art. 3 and art. 10; Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts (Protocol I), 1977, art. 81; and Statutes of the International Red Cross and Red Crescent Movement, adopted by the 25th International Conference of the Red Cross at Geneva in 1986 and amended in 1995 and 2006, art. 5 (available from www.icrc.org/eng/assets/files/other/statutes-en-a5.pdf).

[164] Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts (Protocol I) and Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II).

[165] Adopted at the Assembly meeting on 21 December 2017 and came into force on 1 January 2018. Available from www.icrc.org/data/rx/en/resources/documents/misc/icrc-statutes-080503.htm.

*International Humanitarian Law.*[166] The guidance is the outcome of an "expert process" based on an analysis of State treaty and customary practice and it "reflect[s] the ICRC's institutional position as to how existing [international humanitarian law] should be interpreted".[167] In this context it is, however, important to note that States have reaffirmed their primary role in the development of international humanitarian law. Resolution 1 of the 31st International Conference of the Red Cross and Red Crescent (2011), while recalling "the important roles of the [ICRC]", "emphasiz[es] the primary role of States in the development of international humanitarian law".[168]

(16)   Another example of conduct of non-State actors that may be relevant when assessing the subsequent practice of States parties is the Landmine and Cluster Munition Monitor, an initiative of the International Campaign to Ban Landmines-Cluster Munition Coalition. The Monitor acts as a *de facto* monitoring regime[169] for the 1997 Convention on the Prohibition of the Use, Stockpiling, Production and Transfer of Anti-Personnel Mines and on Their Destruction (Ottawa Convention) and the 2008 Convention on Cluster Munitions (Oslo Convention). The Monitor lists pertinent statements and practice by States parties and signatories and identifies, *inter alia*, interpretative issues concerning the Oslo Convention.[170]

(17)   The examples of ICRC and the Monitor show that non-State actors can provide valuable information about subsequent practice of parties, contribute to assessing this information and even solicit its coming into being. However, non-State actors can also pursue their own goals, which may be different from those of States parties. Their documentation and their assessments must thus be critically reviewed.

(18)   The text of draft conclusion 5 does not refer to "social practice" as an example of "other conduct" which may "be relevant when assessing the subsequent practice of parties to a treaty".[171] The European Court of Human Rights has occasionally considered "increased social acceptance"[172] and "major social changes"[173] to be relevant for the purpose of treaty interpretation. The invocation of "social changes" or "social acceptance" by the Court, however, has ultimately remained linked to the practice of States parties.[174] This is true, in particular, for the leading cases of *Dudgeon v. the United Kingdom*[175] and

*Christine Goodwin v. the United Kingdom.*[176] In *Dudgeon v. the United Kingdom*, the Court found that there was an "increased tolerance of homosexual behaviour" by pointing to the fact "that in the great majority of the member States of the Council of Europe it is no longer considered to be necessary or appropriate to treat homosexual practices of the kind now in question as in themselves a matter to which the sanctions of the criminal law should be applied" and that it could therefore not "overlook the marked changes which have occurred in this regard in the domestic law of the member States".[177] The Court further pointed to the fact that "[i]n Northern Ireland itself, the authorities have refrained in recent years from enforcing the law".[178] And in *Christine Goodwin v. the United Kingdom*, the Court attached importance "to the clear and uncontested evidence of a continuing international trend in favour not only of increased social acceptance of transsexuals but of legal recognition of the new sexual identity of post-operative transsexuals".[179]

(19)   The European Court of Human Rights thus verifies whether social developments are actually reflected in the practice of States parties. This was true, for example, in cases concerning the status of children born out of wedlock[180] and in cases that concerned the alleged right of certain Roma people to have a temporary place of residence assigned by municipalities in order to be able to pursue their itinerant lifestyle.[181]

(20)   It can be concluded that mere (subsequent) social practice, as such, is not sufficient to constitute relevant subsequent practice of the parties in the application of a treaty. Social practice has, however, occasionally been recognized by the European Court of Human Rights as contributing to the assessment of State practice.

PART THREE

**GENERAL ASPECTS**

*Conclusion 6.   Identification of subsequent agreements and subsequent practice*

**1.   The identification of subsequent agreements and subsequent practice under article 31, paragraph 3, requires, in particular, a determination whether the**

---

[166] Geneva, 2009, p. 10; available from www.icrc.org.

[167] *Ibid.*, p. 9.

[168] Resolution 1: Strengthening legal protection for victims of armed conflicts, 1 December 2011.

[169] See www.the-monitor.org.

[170] See, for example, *Cluster Munition Monitor 2011*, pp. 24–31.

[171] See the first report of the Special Rapporteur (A/CN.4/660) (footnote 14 above), paras. 129 *et seq.*

[172] *Christine Goodwin v. the United Kingdom* [GC], no. 28957/95, 11 July 2002, ECHR 2002-VI, para. 85.

[173] *Ibid.*, para. 100.

[174] See also *I. v. the United Kingdom* [GC], no. 25680/94, 11 July 2002, para. 65; *Burden and Burden v. the United Kingdom*, no. 13378/05, 12 December 2006, para. 57; *Shackell v. the United Kingdom* (dec.), no. 45851/99, 27 April 2000, para. 1; and *Schalk and Kopf v. Austria*, no. 30141/04, 24 June 2010, ECHR 2010, para. 58.

[175] *Dudgeon v. the United Kingdom*, no. 7525/76, 22 October 1981, European Court of Human Rights, Series A, no. 45, in particular para. 60.

[176] *Christine Goodwin v. the United Kingdom* [GC] (see footnote 172 above), in particular para. 85.

[177] *Dudgeon v. the United Kingdom* (see footnote 175 above), para. 60.

[178] *Ibid.*

[179] *Christine Goodwin v. the United Kingdom* [GC] (see footnote 172 above), para. 85; see also *ibid.*, para. 90.

[180] *Mazurek v. France*, no. 34406/97, 1 February 2000, ECHR 2000-II, para. 52; see also *Marckx v. Belgium*, no. 6833/74, 13 June 1979, European Court of Human Rights, Series A, no. 31, para. 41; *Inze v. Austria*, no. 8695/79, 28 October 1987, European Court of Human Rights, Series A, no. 126, para. 44; and *Brauer v. Germany*, no. 3545/04, 28 May 2009, para. 40.

[181] *Chapman v. the United Kingdom* [GC], no. 27238/95, 18 January 2001, ECHR 2001-I, paras. 70 and 93; see also *Lee v. the United Kingdom* [GC], no. 25289/94, 18 January 2001, paras. 95–96; *Beard v. the United Kingdom* [GC], no. 24882/94, 18 January 2001, paras. 104–105; *Coster v. the United Kingdom* [GC], no. 24876/94, 18 January 2001, paras. 107–108; and *Jane Smith v. the United Kingdom* [GC], no. 25154/94, 18 January 2001, paras. 100–101.

parties, by an agreement or a practice, have taken a position regarding the interpretation of the treaty. Such a position is not taken if the parties have merely agreed not to apply the treaty temporarily or agreed to establish a practical arrangement (*modus vivendi*).

2. **Subsequent agreements and subsequent practice under article 31, paragraph 3, may take a variety of forms.**

3. **The identification of subsequent practice under article 32 requires, in particular, a determination whether conduct by one or more parties is in the application of the treaty.**

*Commentary*

(1)   The purpose of draft conclusion 6 is to indicate how subsequent agreements and subsequent practice, as means of interpretation, are to be identified.

*Paragraph 1, first sentence—the term "regarding the interpretation"*

(2)   The first sentence of paragraph 1 recalls that the identification of subsequent agreements and subsequent practice for the purposes of article 31, paragraph 3 (*a*) and (*b*), requires particular consideration of the question of whether the parties, by an agreement or a practice, have taken a position regarding the interpretation of a treaty or whether they were motivated by other considerations.

(3)   Subsequent agreements under article 31, paragraph 3 (*a*), must be "regarding the interpretation of the treaty or the application of its provisions" and subsequent practice under article 31, paragraph 3 (*b*), must be "in the application of the treaty" and thereby establish an agreement "regarding its interpretation".[182] The relationship between the terms "interpretation" and "application" in article 31, paragraph 3, is not clear-cut. "Interpretation" is the process by which the meaning of a treaty, including of one or more of its provisions, is clarified. "Application" encompasses conduct by which the rights under a treaty are exercised or its obligations are complied with, in full or in part. "Interpretation" refers to a mental process, whereas "application" focuses on actual conduct (acts and omissions). In this sense, the two concepts are distinguishable, and may serve different purposes under article 31, paragraph 3 (see paras. (4)–(6) below), but they are also closely interrelated and build upon each other.

(4)   Whereas there may be aspects of "interpretation" that remain unrelated to the "application" of a treaty,[183] application of a treaty almost inevitably involves some element of interpretation—even in cases in which the rule

in question appears to be clear on face value.[184] Therefore, an agreement or conduct "regarding the interpretation" of the treaty and an agreement or conduct "in the application" of the treaty both imply that the parties assume a position regarding the interpretation of the treaty.[185] Whereas in the case of a "subsequent agreement between the parties regarding the interpretation of the treaty" under article 31, paragraph 3 (*a*) (first alternative), the position regarding the interpretation of a treaty is specifically and purposefully assumed by the parties, this may be less clearly identifiable in the case of a "subsequent agreement … regarding … the application of its provisions" under article 31, paragraph 3 (*a*) (second alternative).[186] Assuming a position regarding interpretation "by application" is also implied in simple acts of application of the treaty under article 31, paragraph 3 (*b*), that is, in "every measure taken on the basis of the interpreted treaty".[187] The word "or" in article 31, paragraph 3 (*a*), thus does not describe a mutually exclusive relationship between "interpretation" and "application".

(5)   The significance of an "application" of a treaty, for the purpose of its interpretation, is, however, not limited to the identification of the position that the State party concerned thereby assumes regarding its interpretation. Indeed, the way in which a treaty is applied contributes not only to determining the meaning of the treaty, but also to identifying the degree to which the interpretation that the States parties have assumed is "grounded" and thus more or less firmly established.

(6)   It should be noted that an "application" of the treaty does not necessarily reflect the position of a State party that such application is the only legally possible one under the treaty and under the circumstances.[188] Further, the concept of "application" does not exclude conduct by non-State actors which the treaty recognizes as

---

[182]   See draft conclusion 4 and commentary thereto, paras. (17)–(20), above.

[183]   According to Haraszti, "interpretation has the elucidation of the meaning of the text as its objective, while application implies the specifying of the consequences devolving on the contracting parties" (Haraszti, *Some Fundamental Problems …* (footnote 67 above), p. 18); he recognizes, however, that "[a] legal rule manifesting itself in whatever form cannot be applied unless its content has been elucidated" (*ibid.*, p. 15).

[184]   "Harvard Draft Convention on the Law of Treaties", *American Journal of International Law Supp.*, vol. 29 (1935), p. 653, at pp. 938–939; A. McNair, *The Law of Treaties*, Oxford, Clarendon Press, 1961, p. 372; Sinclair, *The Vienna Convention …* (see footnote 21 above), p. 116; "Fragmentation of international law: difficulties arising from the diversification and expansion of international law", report of the Study Group of the International Law Commission finalized by Martti Koskenniemi, *Yearbook … 2006*, vol. II (Part One) (Add.2), document A/CN.4/L.682 and Add.1, para. 423; Gardiner, *Treaty Interpretation* (see footnote 20 above), pp. 28–30 and 238; Yasseen, "L'interprétation des traités …" (see footnote 21 above), p. 47; U. Linderfalk, "Is the hierarchical structure of articles 31 and 32 of the Vienna Convention real or not? Interpreting the rules of interpretation", *Netherlands International Law Review*, vol. 54, No. 1 (2007), pp. 133–154, at pp. 141–144 and p. 147; G. Distefano, "La pratique subséquente des États parties à un traité", *Annuaire français de droit international*, vol. 40 (1994), p. 44; Villiger, "The rules on interpretation …" (see footnote 61 above), p. 111.

[185]   Gardiner, *Treaty Interpretation* (see footnote 20 above), p. 266; Linderfalk, *On the Interpretation of Treaties* (see footnote 67 above), p. 162; Karl, *Vertrag und spätere Praxis …* (see footnote 75 above), pp. 114 and 118; Dörr, "Article 31 …" (see footnote 61 above), pp. 598–599, paras. 81 and 83.

[186]   This second alternative was introduced at the proposal of Pakistan, but its scope and purpose were never addressed or clarified (see *Official Records of the United Nations Conference on the Law of Treaties, First session …* (A/CONF.39/11) (footnote 89 above), 31st meeting of the Committee of the Whole, 19 April 1968, p. 168, para. 53.

[187]   Linderfalk, *On the Interpretation of Treaties* (see footnote 67 above), pp. 164–165 and 167; see also draft conclusions 2, para. 4, and 4, para. 3.

[188]   See draft conclusion 7, para. 1.

forms of its application[189] and which can hence constitute practice establishing the agreement of the parties. Finally, the legal significance of a particular conduct in the application of a treaty is not necessarily limited to its possible contribution to interpretation under article 31, but may also contribute to meeting the burden of proof[190] or to fulfilling the conditions of other rules.[191]

(7)    Subsequent conduct that is not motivated by a treaty obligation is not "in the application of the treaty" or "regarding" its interpretation, within the meaning of article 31, paragraph 3. In the *Certain expenses of the United Nations* case, for example, some judges doubted whether the continued payment by the States Members of the United Nations of their membership contributions signified acceptance of a certain practice of the Organization.[192] Judge Fitzmaurice formulated a well-known warning in this context, according to which "[t]he argument drawn from practice, if taken too far, can be question-begging".[193] According to Fitzmaurice, it would be "hardly possible to infer from the mere fact that Member States pay, that they necessarily admit in all cases a positive legal obligation to do so".[194]

(8)    Similarly, in the *Maritime Delimitation and Territorial Questions between Qatar and Bahrain* case, the International Court of Justice held that an effort by the parties to the Agreement of 1987 (on the submission of a dispute to the jurisdiction of the Court) to conclude an additional special agreement (which would have specified the subject matter of the dispute) did not mean that the conclusion of such an additional agreement was actually considered by the parties to be required for the establishment of the jurisdiction of the Court.[195]

(9)    Another example of a voluntary practice that is not meant to be "in application of" or "regarding the interpretation" of a treaty concerns "complementary protection" in the context of refugee law. Persons who are denied refugee status under the Convention relating to the Status of Refugees are nonetheless often granted "complementary protection", which is equivalent to that under the Convention. States that grant complementary protection, however, do not consider themselves as acting "in the application of" the Convention or "regarding its interpretation".[196]

(10)    It is sometimes difficult to distinguish relevant subsequent agreements or subsequent practice regarding the interpretation or in the application of a treaty under article 31, paragraph 3 (*a*) and (*b*), from other conduct or developments in the wider context of the treaty, including from "contemporaneous developments" in the subject area of the treaty. Such a distinction is, however, important since only conduct regarding interpretation by the parties introduces their specific authority into the process of interpretation. The general rule seems to be that the more specifically an agreement or a practice is related to a treaty the more interpretative weight it can acquire under article 31, paragraph 3 (*a*) and (*b*).[197]

(11)    The characterization of a subsequent agreement or subsequent practice under article 31, paragraph 3 (*a*) and (*b*), as assuming a position regarding the interpretation of a treaty often requires a careful factual and legal analysis. This point can be illustrated by examples from judicial and State practice.

(12)    The jurisprudence of the International Court of Justice provides a number of examples. On the one hand, the Court did not consider the "joint ministerial communiqués" of two States to "be included in the conventional basis of the right of free navigation" since the "modalities for co-operation which they put in place are likely to be revised in order to suit the Parties".[198] The Court has also held, however, that the lack of certain assertions regarding the interpretation of a treaty, or the absence of certain forms of its application, constituted a practice that indicated the legal position of the parties according to which nuclear weapons were not prohibited under various treaties regarding poisonous weapons.[199] In any case, the exact significance of a collective expression of views of the parties can only be identified by a careful consideration as to whether and to what extent such expression is

---

[189] See Boisson de Chazournes, "Subsequent practice, …" (footnote 38 above), p. 53, at pp. 54, 56 and 59–60.

[190] In the case concerning *Application of the International Convention on the Elimination of All Forms of Racial Discrimination (Georgia v. Russian Federation)*, Preliminary Objections, Judgment, *I.C.J. Reports 2011*, p. 70, at p. 117, para. 105, the International Court of Justice denied that certain conduct (statements) satisfied the burden of proof with respect to the compliance of the Russian Federation with its obligations under the International Convention on the Elimination of All Forms of Racial Discrimination between 1999 and July 2008, in particular because the conduct was not found to specifically relate to the Convention. According to Judge Simma, the burden of proof had been met to some degree (see separate opinion of Judge Simma, *ibid.*, pp. 199–223, paras. 23–57).

[191] In the *Kasikili/Sedudu Island* case (see footnote 23 above), the International Court of Justice analysed subsequent practice not only in the context of treaty interpretation but also in the context of acquisitive prescription (pp. 1092–1093, para. 71, p. 1096, para. 79, and p. 1105, para. 97).

[192] *Certain expenses of the United Nations (Article 17, paragraph 2, of the Charter)*, Advisory Opinion of 20 July 1962, *I.C.J. Reports 1962*, p. 151, at pp. 201–202 (separate opinion of Judge Fitzmaurice) and pp. 189–195 (separate opinion of Judge Spender).

[193] *Ibid.*, p. 201.

[194] *Ibid.*

[195] *Maritime Delimitation and Territorial Questions between Qatar and Bahrain* (see footnote 91 above), p. 16, para. 28.

[196] See A. Skordas, "General provisions: article 5", in A. Zimmermann (ed.), *The 1951 Convention relating to the Status of Refugees and its 1967 Protocol: A Commentary*, Oxford, Oxford University Press, 2011, p. 682, para. 30; and J. McAdam, *Complementary Protection in International Refugee Law*, Oxford, Oxford University Press, 2007, p. 21.

[197] On the "weight" of an agreement or practice as a means of interpretation, see draft conclusion 9; for an example of the need, and also the occasional difficulty, to distinguish between specific conduct by the parties regarding the interpretation of a treaty and more general developments, see *Maritime Dispute (Peru v. Chile)*, Judgment, *I.C.J. Reports 2014*, p. 3, at pp. 41–58, paras. 103–151.

[198] *Dispute regarding Navigational and Related Rights* (see footnote 23 above), pp. 234–235, para. 40; see also *Kasikili/Sedudu Island* (footnote 23 above), p. 1091, para. 68, where the Court implied that one of the parties did not consider that certain forms of practical co-operation were legally relevant for the purpose of the question of the boundary at issue and thus did not agree with a contrary position of the other party.

[199] *Legality of the Threat or Use of Nuclear Weapons*, Advisory Opinion, *I.C.J. Reports 1996*, p. 226, at p. 248, paras. 55–56; see also *Oil Platforms (Islamic Republic of Iran v. United States of America)*, Preliminary Objection, Judgment [of 12 December 1996], *I.C.J. Reports 1996*, p. 803, at p. 815, para. 30; and Gardiner, *Treaty Interpretation* (footnote 20 above), pp. 262–264.

meant to be "regarding the interpretation" of the treaty. Accordingly, the Court held in the *Whaling in the Antarctic* case that "relevant resolutions and Guidelines [of the International Whaling Commission] that have been approved by consensus call upon States parties to take into account whether research objectives can practically and scientifically be achieved by using non-lethal research methods, but they do not establish a requirement that lethal methods be used only when other methods are not available".[200]

(13)    When the Iran–United States Claims Tribunal was confronted with the question of whether the Claims Settlement Declaration obliged the United States to return military property to Iran, the Tribunal found, referring to the subsequent practice of the parties, that this treaty contained an implicit obligation of compensation in case of non-return:

> 66.    ... Although Paragraph 9 of the General Declaration does not expressly state any obligation to compensate Iran in the event that certain articles are not returned because of the provisions of U.S. law applicable prior to 14 November 1979, the Tribunal holds that such an obligation is implicit in that Paragraph.
>
> ...
>
> 68.    Moreover, the Tribunal notes that the interpretation set forth in paragraph 66 above is consistent with the subsequent practice of the Parties in the application of the Algiers Accords and, particularly, with the conduct of the United States. Such a practice, according to Article 31 (3) (*b*) of the Vienna Convention, is also to be taken into account in the interpretation of a treaty. In its communication informing Iran, on 26 March 1981, that the export of defense articles would not be approved, the United States expressly stated that "Iran will be reimbursed for the cost of equipment in so far as possible".[201]

This position was criticized by Judge Holtzmann in his dissenting opinion:

> Subsequent conduct by a State Party is a proper basis for interpreting a treaty only if it appears that the conduct was motivated by the treaty. Here there is no evidence, or even any argument, that the United States' willingness to pay Iran for its properties was in response to a perceived obligation imposed by Paragraph 9. Such conduct would be equally consistent with a recognition of a contractual obligation to make payment. In the absence of any indication that conduct was motivated by the treaty, it is incorrect to use that conduct in interpreting the treaty.[202]

Together, the majority opinion and the dissent clearly identify the need to analyse carefully whether the parties, by an agreement or a practice, assume a position "regarding the interpretation" of a treaty.

(14)    The fact that States parties assume a position regarding the interpretation of a treaty may sometimes also be inferred from the character of the treaty or of a specific provision.[203] Whereas subsequent practice in the application of a treaty often consists of conduct by different organs of the State (executive, legislative, judicial

or other) in the conscious application of a treaty at different levels (domestic and international), the European Court of Human Rights, for example, does not, for the most part, explicitly address the question of whether a particular practice establishes an agreement "regarding the interpretation" of the European Convention on Human Rights.[204] Thus, when describing the domestic legal situation in the member States, the Court rarely asks whether a particular legal situation results from a legislative process during which the possible requirements of the Convention were discussed. The Court rather presumes that the member States, when legislating or otherwise acting in a particular way, are conscious of their obligations under the Convention and that they act in a way that reflects their understanding of their obligations.[205] The Inter-American Court of Human Rights has also on occasion used legislative practice as a means of interpretation.[206] Like the International Court of Justice, the European Court of Human Rights has occasionally even considered that the "lack of any apprehension" of the parties regarding a certain interpretation of the Convention may be indicative of their assuming a position regarding the interpretation of the treaty.[207]

(15)    Article 118 of the Geneva Convention relative to the Treatment of Prisoners of War provides that: "Prisoners of war shall be released and repatriated without delay after the cessation of active hostilities." The will of a prisoner of war not to be repatriated was intentionally not declared to be relevant by the States parties in order to prevent States from abusively invoking the will of prisoners of war in order to delay repatriation.[208] ICRC has, however, always insisted as a condition for its participation that it may independently ascertain the will of a prisoner of war to be repatriated.[209] This approach, as far as it has been reflected in the practice of States parties, suggests that article 118 does not impose an absolute obligation to repatriate. It does not necessarily mean, however, that article 118 should be interpreted even more restrictively as demanding that the repatriation of a prisoner of war must not be carried out against his or her will. The ICRC study on customary international humanitarian law carefully notes in its commentary on rule 128 A:

---

[200] *Whaling in the Antarctic (Australia v. Japan: New Zealand intervening)*, Judgment, *I.C.J. Reports 2014*, p. 226, at p. 257, para. 83.

[201] Iran–United States Claims Tribunal, *The Islamic Republic of Iran v. The United States of America*, Partial Award No. 382-B1-FT (31 August 1988), *Iran–United States Claims Tribunal Reports*, vol. 19 (1988-II), p. 273, at pp. 294–295.

[202] Separate opinion of Judge Holtzmann, concurring in part, dissenting in part, *ibid.*, p. 304.

[203] See the second report of the Special Rapporteur (A/CN.4/671) (footnote 14 above), para. 15.

[204] See, for example, *Soering v. the United Kingdom*, no. 14038/88, 7 July 1989, European Court of Human Rights, Series A, no. 161, para. 103; *Dudgeon v. the United Kingdom* (footnote 175 above), para. 60; and *Demir and Baykara v. Turkey* [GC] (footnote 27 above), para. 48; however, by way of contrast, compare with *Mamatkulov and Askarov v. Turkey* [GC] (footnote 53 above), para. 146; and *Cruz Varas and Others v. Sweden*, no. 15576/89, 20 March 1991, European Court of Human Rights, Series A, no. 201, para. 100.

[205] See footnote 204 above; see further *Marckx v. Belgium* (footnote 180 above), para. 41; *Jorgic v. Germany* (footnote 123 above), para. 69; and *Mazurek v. France* (footnote 180 above), para. 52.

[206] See, for example, *Hilaire, Constantine and Benjamin et al.* (footnote 28 above), para. 12.

[207] *Banković and Others v. Belgium and Others* (dec.) [GC], no. 52207/99, ECHR 2001-XII, para. 62.

[208] See C. Shields Delessert, *Release and Repatriation of Prisoners of War at the End of Active Hostilities*, Zurich, Schulthess, 1977, pp. 145–156 and 171–175; see in general, on the duty to repatriate, S. Krähenmann, "Protection of prisoners in armed conflict", in D. Fleck (ed.), *The Handbook of International Humanitarian Law*, 3rd ed., Oxford, Oxford University Press, 2013, pp. 359–412, at pp. 409–410.

[209] Thus, by its involvement, ICRC tries to reconcile the interests of speedy repatriation and respect for the will of prisoners of war (see Krähenmann, "Protection of prisoners in armed conflict" (footnote 208 above), pp. 409–410).

According to the Fourth Geneva Convention, no protected person may be transferred to a country "where he or she may have reason to fear persecution for his or her political opinions or religious beliefs" [article 45, paragraph 4, of the Fourth Geneva Convention]. While the Third Geneva Convention does not contain a similar clause, practice since 1949 has developed to the effect that in every repatriation in which the ICRC has played the role of neutral intermediary, the parties to the conflict, whether international or non-international, have accepted the ICRC's conditions for participation, including that the ICRC be able to check prior to repatriation (or release in case of a non-international armed conflict), through an interview in private with the persons involved, whether they wish to be repatriated (or released).[210]

(16)   This formulation suggests that States have accepted that there be an inquiry as to the will of the prisoner of war in cases in which ICRC is involved and in which the organization has formulated such a condition. States have drawn different conclusions from this practice.[211] The 2004 United Kingdom *Manual of the Law of Armed Conflict* provides that:

A more contentious issue is whether prisoners of war *must* be repatriated even against their will. Recent practice of [S]tates indicates that they should not. It is United Kingdom policy that prisoners of war should not be repatriated against their will.[212]

(17)   This particular combination of the words "must" and "should" indicates that the United Kingdom, like other States, considers the subsequent practice as demonstrating an interpretation of the treaty according to which the declared will of the prisoner of war may, but need not necessarily, be respected.[213]

(18)   The preceding examples from case law and State practice substantiate the need to identify and interpret carefully subsequent agreements and subsequent practice, in particular to ask whether the parties, by an agreement or a practice, assume a position regarding the interpretation of a treaty or whether they are motivated by other considerations.[214]

*Paragraph 1, second sentence—temporary non-application of a treaty or* modus vivendi

(19)   The second sentence of paragraph 1 is merely illustrative. It specifically refers to two types of cases that need to be distinguished from practice regarding the interpretation of a treaty, and leaves room for other such cases.

(20)   A common subsequent practice does not necessarily indicate an agreement between the parties regarding the interpretation of a treaty, but may instead signify their agreement temporarily not to apply the treaty,[215] or an agreement on a practical arrangement (*modus vivendi*).[216] The following example is illustrative.

(21)   Article 7 of the 1864 Geneva Convention for the Amelioration of the Condition of the Wounded in Armies in the Field provides that: "A distinctive and uniform flag shall be adopted for hospitals, ambulances and evacuation parties. … [The] flag … shall bear a red cross on a white ground." During the Russo–Turkish War of 1877–1878, the Ottoman Empire declared that it would in the future use the red crescent on a white ground to mark its own ambulances, while respecting the red cross sign protecting enemy ambulances, and stated that the distinctive sign of the Convention "'had so far prevented Turkey from exercising its rights under the Convention because it gave offence to Muslim soldiers'".[217] This declaration led to a correspondence between the Ottoman Empire, Switzerland (as depositary) and the other parties, which resulted in the acceptance of the red crescent only for the duration of the conflict.[218] At the Hague Peace Conferences of 1899 and 1907 and during the 1906 Conference for the Revision of the Geneva Convention of 1864, the Ottoman Empire, Persia and Siam unsuccessfully requested the inclusion of the red crescent, the red lion and sun, and the red flame in the Convention.[219] The Ottoman Empire and Persia, however, at least gained the acceptance of "reservations" that they formulated to that effect in 1906.[220] This acceptance of the reservations of the Ottoman Empire and Persia in 1906 did not mean, however, that the parties had accepted that the 1864 Geneva Convention had been interpreted in a particular way prior to 1906 by subsequent unopposed practice. The practice by the Ottoman Empire and Persia was seen rather, at least until 1906, as not being covered by the 1864 Geneva Convention, but it was accepted as a

---

[210] J.-M. Henckaerts and L. Doswald-Beck, *Customary International Humanitarian Law, Volume I: Rules*, Cambridge, International Committee of the Red Cross and Cambridge University Press, 2005, p. 455.

[211] J.-M. Henckaerts and L. Doswald-Beck (eds.), *Customary International Humanitarian Law, Volume II: Practice*, Cambridge, International Committee of the Red Cross and Cambridge University Press, 2005, pp. 2893–2894, paras. 844–855, and online update for Australia, Israel, the Netherlands and Spain, available from https://ihl-databases .icrc.org/customary-ihl/eng/docs/v2_rul_rule128_SectionD.

[212] United Kingdom, Ministry of Defence, *The Manual of the Law of Armed Conflict*, Oxford, Oxford University Press, 2004, p. 205, para. 8.170 (footnote omitted).

[213] See also United States, Department of Defense, *Law of War Manual*, 2015 (updated 2016), sect. 9.37.4.2.: "[T]he [Geneva Convention relative to the Treatment of Prisoners of War] does not itself change accepted principles of international law under which asylum is applicable to [prisoners of war], and the Detaining Power may, but is not required to, grant asylum." Available from www.defense.gov.

[214] See the second report of the Special Rapporteur (A/CN.4/671) (footnote 14 above), paras. 11–18. See also L. Crema, "Subsequent agreements and subsequent practice within and outside the Vienna Convention", in Nolte (ed.), *Treaties and Subsequent Practice* (footnote 26 above), pp. 25–26.

[215] See the second report of the Special Rapporteur (A/CN.4/671) (footnote 14 above), para. 71.

[216] *Dispute regarding Navigational and Related Rights* (see footnote 23 above), pp. 234–235, para. 40; *Pulp Mills on the River Uruguay*, Judgment of 20 April 2010 (see footnote 23 above), pp. 65–66, paras. 138–140; J. Crawford, "A consensualist interpretation of article 31 (3) of the Vienna Convention on the Law of Treaties", in Nolte (ed.), *Treaties and Subsequent Practice* (see footnote 26 above), p. 32; for another example, see the second report of the Special Rapporteur (A/CN.4/671) (footnote 14 above), para. 72; see also J. R. Crook (ed.), "Contemporary practice of the United States relating to international law", *American Journal of International Law*, vol. 105, No. 4 (2011), pp. 775 *et seq.*, at pp. 809–812.

[217] *Bulletin international des Sociétés de Secours aux Militaires blessés*, No. 29 (January 1877), pp. 35–37, quoted in F. Bugnion, *The Emblem of the Red Cross. A brief history*, Geneva, ICRC, 1977, p. 15.

[218] *Bulletin international des Sociétés de Secours aux Militaires blessés*, No. 31 (July 1877), p. 89, quoted in Bugnion, *The Emblem of the Red Cross …* (see footnote 217 above), p. 18.

[219] See Bugnion, *The Emblem of the Red Cross …* (footnote 217 above), pp. 19–31.

[220] Joined by Egypt upon accession in 1923, see Bugnion, *The Emblem of the Red Cross …* (footnote 217 above), pp. 23–26; it was only on the occasion of the revision of the Geneva Conventions in 1929, when Turkey, Persia and Egypt claimed that the use of other emblems had become a *fait accompli* and that those emblems had been used in practice without giving rise to any objections, that the red crescent and the red lion and sun were finally recognized as distinctive signs by article 19 of the 1929 Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armies in the Field.

temporary and exceptional measure that left the general treaty obligation unchanged.

*Paragraph 2—variety of forms*

(22)   The purpose of paragraph 2 of draft conclusion 6 is to acknowledge the variety of forms that subsequent agreements and subsequent practice can take under article 31, paragraph 3 (*a*) and (*b*). The Commission has recognized that subsequent practice under article 31, paragraph 3 (*b*), consists of any "conduct" in the application of a treaty, including, under certain circumstances, inaction, which may contribute to establishing an agreement regarding the interpretation of the treaty.[221] Depending on the treaty concerned, this includes not only externally oriented conduct, such as official acts, statements and voting at the international level, but also internal legislative, executive and judicial acts, and may even include conduct by non-State actors on behalf of one or more States parties that falls within the scope of what the treaty conceives as forms of its application.[222] Thus, the individual conduct that may contribute to a subsequent practice under article 31, paragraph 3 (*b*), need not meet any particular formal criteria.[223]

(23)   Subsequent practice at the international level need not necessarily be joint conduct.[224] A parallel conduct by parties may suffice. It is a separate question whether parallel activity actually articulates a sufficient common understanding (agreement) regarding the interpretation of a treaty in a particular case (see draft conclusion 10, paragraph 1).[225] Subsequent agreements can be found in legally binding treaties as well as in non-binding instruments such as memorandums of understanding.[226] Subsequent agreements can also be found in certain decisions of a conference of States parties (see draft conclusion 11).

*Paragraph 3—identification of subsequent practice under article 32*

(24)   Paragraph 3 of this draft conclusion provides that in identifying subsequent practice under article 32, the interpreter is required to determine whether, in particular, conduct by one or more parties is in the application of the treaty.[227] The Commission decided to treat such subsequent

practice under article 32 (see draft conclusion 4, paragraph 3)[228] in a separate paragraph for the sake of analytical clarity (see draft conclusion 7, paragraph 2, and draft conclusion 9, paragraph 3), but it does not thereby call into question the unity of the process of interpretation. The considerations that are pertinent for the identification of subsequent agreements and subsequent practice under article 31, paragraph 3 (*a*) and (*b*), also apply, *mutatis mutandis*, to the identification of subsequent practice under article 32. Thus, agreements between less than all parties to a treaty regarding the interpretation of a treaty or its application are a form of subsequent practice under article 32.

(25)   An example of a practical arrangement involving fewer than all of the parties to a treaty is the Memorandum of Understanding between the Department of Transportation of the United States of America and the Secretaría de Comunicaciones y Transportes of the United Mexican States on International Freight Cross-Border Trucking Services of 6 July 2011.[229] The Memorandum of Understanding does not refer to Canada, the third party of the North American Free Trade Agreement, and specifies that it "is without prejudice to the rights and obligations of the United States and Mexico under the [Treaty]". These circumstances suggest that the Memorandum of Understanding does not claim to constitute an agreement regarding the interpretation of the Treaty under articles 31, paragraph 3 (*a*) or (*b*), and 32, but that it rather remains limited to being a practical arrangement between a limited number of parties.

### Conclusion 7.   Possible effects of subsequent agreements and subsequent practice in interpretation

**1.   Subsequent agreements and subsequent practice under article 31, paragraph 3, contribute, in their interaction with other means of interpretation, to the clarification of the meaning of a treaty. This may result in narrowing, widening, or otherwise determining the range of possible interpretations, including any scope for the exercise of discretion which the treaty accords to the parties.**

**2.   Subsequent practice under article 32 may also contribute to the clarification of the meaning of a treaty.**

**3.   It is presumed that the parties to a treaty, by an agreement or a practice in the application of the treaty, intend to interpret the treaty, not to amend or to modify it. The possibility of amending or modifying a treaty by subsequent practice of the parties has not been generally recognized. The present**

---

[221] See commentary to draft conclusion 4, paras. (17)–(20), above.

[222] See, for example, commentary to draft conclusion 5 above; see also Boisson de Chazournes, "Subsequent practice …" (footnote 38 above), pp. 54, 56 and 59–60; and Gardiner, *Treaty Interpretation* (footnote 20 above), pp. 257–259; see also *Maritime Dispute (Peru v. Chile)* (footnote 197 above), pp. 41–45, paras. 103–111, and pp. 48–49, paras. 119–122, and p. 50, para. 126; and Dörr, "Article 31 …" (footnote 61 above), pp. 597–598, para. 79.

[223] Gardiner, *Treaty Interpretation* (see footnote 20 above), pp. 254–255.

[224] *Case concerning the Temple of Preah Vihear*, Judgment of 15 June 1962 (see footnote 110 above), p. 33; *Kasikili/Sedudu Island* (see footnote 23 above), p. 1213, para. 17 (dissenting opinion of Judge Parra-Aranguren).

[225] *Territorial and Maritime Dispute between Nicaragua and Honduras in the Caribbean Sea (Nicaragua v. Honduras)*, Judgment, *I.C.J. Reports 2007*, p. 659, at p. 737, para. 258; but see *Continental Shelf (Tunisia/Libyan Arab Jamahiriya)*, Judgment, *I.C.J. Reports 1982*, p. 18, at pp. 83–84, para. 117, where the Court recognized concessions granted by the parties to the dispute as evidence of their tacit agreement; see also *Maritime Dispute (Peru v. Chile)* (footnote 197 above).

[226] Gardiner, *Treaty Interpretation* (see footnote 20 above), pp. 244 and 250.

[227] See paras. (1)–(4) of the present commentary, above; see also the second report of the Special Rapporteur (A/CN.4/671) (footnote 14

above), paras. 3–5.

[228] See commentary to draft conclusion 2, para. (10), above.

[229] See Crook (ed.), "Contemporary practice of the United States …" (footnote 216 above), pp. 809–812; see also: Mexico, *Diario Oficial de la Federación* (7 July 2011), Decreto por el que se modifica el artículo 1 del diverso por el que se establece la Tasa Aplicable durante 2003, del Impuesto General de Importación, para las mercancías originarias de América del Norte, publicado el 31 de diciembre de 2002, por lo que respecta a las mercancías originarias de los Estados Unidos de América [Decree amending Article 1 of the Decree establishing the General Import Tax Rate applicable during 2003 for goods originating in North America, published on 31 December 2002, with respect to goods originating in the United States of America] (www.dof.gob.mx).

draft conclusion is without prejudice to the rules on the amendment or modification of treaties under the Vienna Convention on the Law of Treaties and under customary international law.

### Commentary

*Paragraph 1, first sentence—clarification of the meaning of a treaty*

(1)   Draft conclusion 7 deals with the possible effects of subsequent agreements and subsequent practice on the interpretation of a treaty. The purpose is to indicate how subsequent agreements and subsequent practice may contribute to the clarification of the meaning of a treaty. Paragraph 1 emphasizes that subsequent agreements and subsequent practice must be seen in their interaction with other means of interpretation (see draft conclusion 2, para. 5).[230] They are therefore not necessarily in themselves conclusive.

(2)   Subsequent agreements and subsequent practice, like all means of interpretation, may have different effects on the interactive process of interpretation of a treaty, which consists of placing appropriate emphasis in any particular case on the various means of interpretation in a "single combined operation".[231] The taking into account of subsequent agreements and subsequent practice under articles 31, paragraph 3, and 32 may thus contribute to a clarification of the meaning of a treaty[232] in the sense of a narrowing down (specifying) of possible meanings of a particular term or provision, or of the scope of the treaty as a whole (see paras. (4), (6), (7), (10) and (11) below). Alternatively, such taking into account may contribute to a clarification in the sense of confirming a wider interpretation. Finally, it may contribute to understanding the range of possible interpretations available to the parties, including the scope for the exercise of discretion by the parties under the treaty (see paras. (12)–(15) below).

(3)   International courts and tribunals usually begin their reasoning in a given case by determining the "ordinary meaning" of the terms of the treaty.[233] Subsequent agreements and subsequent practice mostly enter into their reasoning at a later stage when courts ask whether such conduct confirms or modifies the result arrived at by the initial interpretation of the ordinary meaning (or by other means of interpretation).[234] If the parties do not wish to convey the ordinary meaning of a term, but rather a special meaning in the sense of article 31, paragraph 4, subsequent

agreements and subsequent practice may also shed light on this special meaning. The following examples[235] illustrate how subsequent agreements and subsequent practice as means of interpretation can contribute, in their interaction with other means in the process of interpretation, to the clarification of the meaning of a treaty.

(4)   Subsequent agreements and subsequent practice can help identify the "ordinary meaning" of a particular term by confirming a narrow interpretation among different possible shades of meaning of the term. This was the case, for example,[236] in the *Legality of the Threat or Use of Nuclear Weapons* advisory opinion where the International Court of Justice determined that the expressions "poison or poisoned weapons":

> have been understood, in the practice of States, in their ordinary sense as covering weapons whose prime, or even exclusive, effect is to poison or asphyxiate. This practice is clear, and the parties to those instruments have not treated them as referring to nuclear weapons.[237]

(5)   On the other hand, subsequent practice may avoid limiting the meaning of a general term to just one of different possible meanings.[238] For example, in the *Case concerning rights of nationals of the United States of America in Morocco*, the Court stated:

> The general impression created by an examination of the relevant materials is that those responsible for the administration of the customs … have made use of all the various elements of valuation available to them, though perhaps not always in a consistent manner.[239]

> In these circumstances, the Court is of the opinion that Article 95 [of the General Act of Algeciras] lays down no strict rule on the point in dispute. It requires an interpretation which is more flexible than either of those which are respectively contended for by the Parties in this case.[239]

(6)   Different forms of practice may contribute to both a narrow and a broad interpretation of different terms in the same treaty.[240]

(7)   A treaty shall be interpreted in accordance with the ordinary meaning of its terms "in their context" (art. 31, para. 1). Subsequent agreements and subsequent practice, in interaction with this particular means of interpretation, may also contribute to identifying a narrower or broader interpretation of a term of a treaty.[241] In the advisory opinion on the *Constitution of the Maritime Safety Committee of the Inter-Governmental Maritime Consultative Organization* [which became the International Maritime

---

[230] See commentary to draft conclusion 2, paras. (12)–(15), above.

[231] *Ibid.*

[232] The terminology follows guideline 1.2 (Definition of interpretative declarations) of the Commission's Guide to Practice on Reservations to Treaties: "'Interpretative declaration' means a unilateral statement … whereby [a] State or [an] organization purports to specify or clarify the meaning or scope of a treaty or of certain of its provisions" (*Yearbook … 2011*, vol. II (Part Two), chap. IV, para. 75, and *ibid.*, vol. II (Part Three) and Corr.1–2, p. 51; see also commentary to guideline 1.2, para. (18) (*ibid.*, vol. II (Part Three) and Corr.1–2, p. 54).

[233] See commentary to draft conclusion 2, para. (14), above; see also *Competence of Assembly regarding admission to the United Nations*, Advisory Opinion, *I.C.J. Reports 1950*, p. 4, at p. 8.

[234] See, for example, *Sovereignty over Pulau Ligitan and Pulau Sipadan* (footnote 23 above), p. 656, paras. 59–61 and p. 665, para. 80; *Territorial Dispute* (footnote 23 above), pp. 34–37, paras. 66–71; and *Dispute regarding Navigational and Related Rights* (footnote 23 above), p. 290 (declaration of Judge *ad hoc* Guillaume).

[235] For more examples see Nolte, "Jurisprudence under special regimes …" (footnote 26 above).

[236] See also *Oil Platforms* (footnote 199 above), p. 815, para. 30; *Land and Maritime Boundary between Cameroon and Nigeria*, Preliminary Objections, Judgment [of 11 June 1998], *I.C.J. Reports 1998*, p. 275, at pp. 306–307, para. 67; and *Competence of Assembly regarding admission to the United Nations* (footnote 233 above), p. 9.

[237] *Legality of the Threat or Use of Nuclear Weapons* (see footnote 199 above), p. 248, para. 55.

[238] *Reservations to the Convention on Genocide*, Advisory Opinion, *I.C.J. Reports 1951*, p. 15, at p. 25.

[239] *Case concerning rights of nationals of the United States of America in Morocco* (see footnote 149 above), p. 211.

[240] See, *mutatis mutandis*, *Certain expenses of the United Nations* (footnote 192 above), advisory opinion in which the International Court of Justice interpreted the term "expenses" broadly and "action" narrowly in the light of the respective subsequent practice of the United Nations, at pp. 158–161 ("expenses") and pp. 164–165 ("action").

[241] See, for example, *Border and Transborder Armed Actions* (footnote 48 above), p. 87, para. 40.

Organization (IMO)], for example, the International Court of Justice had to determine the meaning of the expression "eight … largest ship-owning nations" under article 28 (*a*) of the Convention on the Intergovernmental Maritime Consultative Organization since this concept of "largest ship-owning nations" permitted different interpretations (such as determination by "registered tonnage" or "ownership by nationals"), and since there was no pertinent practice of the organization or its members under article 28 (*a*) itself, the Court turned to practice under other provisions in the Convention and held:

> This reliance upon registered tonnage in giving effect to different provisions of the Convention … persuade[s] the Court to the view that it is unlikely that when [article 28 (*a*)] was drafted and incorporated into the Convention it was contemplated that any criterion other than registered tonnage should determine which were the largest ship-owning nations.[242]

(8)  Together with the text and the context, article 31, paragraph 1, accords importance to the "object and purpose" for its interpretation.[243] Subsequent agreements and subsequent practice may also contribute to a clarification of the object and purpose of a treaty[244] or reconcile invocations of the "object and purpose" of a treaty with other means of interpretation.

(9)  In the *Maritime Delimitation in the Area between Greenland and Jan Mayen*[245] and *Oil Platforms* cases,[246] for example, the International Court of Justice clarified the object and purpose of bilateral treaties by referring to subsequent practice of the parties. And in the *Land and Maritime Boundary between Cameroon and Nigeria* case, the Court held:

> From the treaty texts and the practice analysed at paragraphs 64 and 65 above, it emerges that the Lake Chad Basin Commission is an international organization exercising its powers within a specific geographical area; that it does not however have as its purpose the settlement at a regional level of matters relating to the maintenance of international peace and security and thus does not fall under Chapter VIII of the Charter [of the United Nations].[247]

*Paragraph 1, second sentence—narrowing or widening or otherwise determining the range of possible interpretations*

(10)  State practice confirms that subsequent agreements and subsequent practice not only contribute to specifying the meaning of a term in the sense of narrowing the possible meanings of the rights and obligations under a treaty, but may also indicate a wider range of possible interpretations or a certain scope for the exercise of discretion that a treaty grants to States.[248]

(11)  For example, whereas the ordinary meaning of the terms of article 5 of the 1944 Convention on International Civil Aviation does not appear to require a charter flight to obtain permission to land while *en route*, long-standing State practice requiring such permission has led to general acceptance that this provision is to be interpreted as requiring permission.[249] Another case is article 22, paragraph 3, of the 1961 Vienna Convention on Diplomatic Relations, which provides that the means of transport used by a mission shall be immune from search, requisition, attachment or execution. While police enforcement against diplomatic premises or by stopping and searching means of transport will usually be met with protests by States,[250] the towing of diplomatic cars that have violated local traffic and parking laws generally has been regarded as permissible in practice.[251] This practice suggests that, while punitive measures against diplomatic vehicles are forbidden, cars can be stopped or removed if they prove to be an immediate danger or obstacle for traffic and/or

[242] *Constitution of the Maritime Safety Committee of the Inter-Governmental Maritime Consultative Organization*, Advisory Opinion of 8 June 1960, *I.C.J. Reports 1960*, p. 150, at p. 169; see also *ibid.*, pp. 167–169; and *obiter dicta*: *Proceedings pursuant to the OSPAR Convention (Ireland–United Kingdom)*, *Dispute concerning access to information under article 9 of the OSPAR Convention between Ireland and the United Kingdom of Great Britain and Northern Ireland, Final Award*, decision of 2 July 2003, UNRIAA, vol. XXIII (Sales No. E/F.04.V.15), pp. 59–151, at p. 99, para. 141.

[243] Gardiner, *Treaty Interpretation* (see footnote 20 above), pp. 211 and 219.

[244] *Ibid.*, pp. 212–215; see also *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)* (footnote 54 above), pp. 31–32, para. 53; *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (footnote 23 above), p. 179, para. 109; R. Higgins, "Some observations on the inter-temporal rule in international law", in J. Makarczyk (ed.), *Theory of International Law at the Threshold of the 21st Century: Essays in honour of Krzysztof Skubiszewski*, The Hague, Kluwer Law International, 1996, pp. 173–181, at p. 180; Distefano, "La pratique subséquente …" (footnote 184 above), pp. 52–54; and Crema, "Subsequent agreements and subsequent practice …" (footnote 214 above), p. 21.

[245] *Maritime Delimitation in the Area between Greenland and Jan Mayen* (see footnote 105 above), pp. 50–51, para. 27.

[246] *Oil Platforms* (see footnote 199 above), pp. 813–815, paras. 27 and 30.

[247] *Land and Maritime Boundary between Cameroon and Nigeria*, Preliminary Objections, Judgment [of 11 June 1998] (see footnote 236 above), pp. 306–307, para. 67.

[248] This is not to suggest that there may ultimately be different interpretations of a treaty, but rather that the treaty may accord the parties the possibility to choose from a spectrum of different permitted acts, see Gardiner, *Treaty Interpretation* (footnote 20 above), pp. 32–33 and p. 268, quoting the House of Lords in *R v. Secretary of State for the Home Department, ex parte Adan* [2001] 2 AC 477: "It is necessary to determine the autonomous meaning of the relevant treaty provision. … It follows that, as in the case of other multilateral treaties, the Refugee Convention must be given an independent meaning derivable from the sources mentioned in articles 31 and 32 [of the 1969 Vienna Convention] and without taking colour from distinctive features of the legal system of any individual contracting [S]tate. In principle therefore there can only be one true interpretation of a treaty. … In practice it is left to national courts, faced with a material disagreement on an issue of interpretation, to resolve it. But in doing so it must search, untrammelled by notions of its national legal culture, for the true autonomous and international meaning of the treaty. And there can only be one true meaning" (*The Law Reports, Appeal Cases 2001*, vol. 2, pp. 515–517 (Lord Steyn)).

[249] S. D. Murphy, "The relevance of subsequent agreement and subsequent practice for the interpretation of treaties", in Nolte (ed.), *Treaties and Subsequent Practice* (see footnote 26 above), p. 85; Aust, *Modern Treaty Law and Practice* (see footnote 141 above), p. 215.

[250] E. Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations*, 4th ed., Oxford, Oxford University Press, 2016, pp. 131–133; J. Salmon, *Manuel de droit diplomatique*, Brussels, Bruylant, 1994, pp. 207–208, para. 315.

[251] See, for example, Australia, Department of Foreign Affairs and Trade, *Privileges and Immunities of Foreign Representatives* (https://web.archive.org/web/20170616031126/http://dfat.gov.au/about-us/publications/corporate/protocol-guidelines/Documents/A21.pdf); Iceland, Protocol Department, Ministry of Foreign Affairs, *Diplomatic Handbook*, Reykjavik, 2009, p. 14 (www.government.is/media/utanrikisraduneyti-media/media/PDF/Diplomatic_Handbook_March2010.pdf); United Kingdom, statement by the Parliamentary Under-Secretary of State, Home Office (Lord Elton) in the House of Lords, HL Deb, 12 December 1983, vol. 446 cc3–4; and United States, M. Nash (Leich), "Contemporary practice of the United States relating to international law", *American Journal of International Law*, vol. 88, No. 2 (April 1994), p. 312, at pp. 312–313.

public safety.[252] In that sense, the meaning of the term "execution"—and, thus, the scope of protection accorded to means of transportation—is specified by the subsequent practice of parties.

(12)   Another example concerns article 12 of Protocol II to the 1949 Geneva Conventions, which provides:

> Under the direction of the competent authority concerned, the distinctive emblem of the red cross, red crescent or red lion and sun on a white ground shall be displayed by medical and religious personnel and medical units, and on medical transports. It shall be respected in all circumstances. It shall not be used improperly.

Although the term "shall" suggests that it is obligatory for States to use the distinctive emblem for marking medical personnel and transports under all circumstances, subsequent practice suggests that States may possess some discretion with regard to its application.[253] As armed groups have in recent years specifically attacked medical convoys that were well recognizable due to the protective emblem, States have in certain situations refrained from marking such convoys with a distinctive emblem. Responding to a parliamentary question on its practice in Afghanistan, the Government of Germany has stated that:

> Like other contributors of ISAF contingents, the Federal Armed Forces have found that marked medical vehicles have been targeted. Occasionally, these medical units and vehicles, clearly distinguished as such by their protective emblem, have even been preferred as targets. The Federal Armed Forces have thus, along with Belgium, France, the United Kingdom, Canada and the United States, decided within ISAF to cover up the protective emblem on medical vehicles.[254]

(13)   Such practice by States may confirm an interpretation of article 12 according to which the obligation to use the protective emblem[255] under exceptional circumstances allows a margin of discretion for the parties.

(14)   A treaty provision that grants States parties an apparently unconditional right may raise the question of whether their discretion in exercising this right is limited by the purpose of the rule. For example, according to article 9 of the Vienna Convention on Diplomatic Relations, the receiving State may notify the sending State, without having to give reasons, that a member of the mission is *persona non grata*. States mostly issue such notifications in cases in which members of the mission were found or suspected to have engaged in espionage activities or to have committed other serious violations of the law of the receiving State or caused significant

political irritation.[256] However, States have also made such declarations in other circumstances, such as when envoys caused serious injury to a third party,[257] or committed repeated infringements of the law,[258] or even to enforce their drink-driving laws.[259] It is even conceivable that declarations are made without clear reasons or for purely political motives. Other States do not seem to have asserted that such practice constitutes an abuse of the power to declare members of a mission as *personae non gratae*. Thus, such practice confirms that article 9 provides an unconditional right.[260]

*Paragraph 2—subsequent practice under article 32*

(15)   Paragraph 2 of draft conclusion 7 concerns possible effects of subsequent practice under article 32 (see draft conclusion 4, paragraph 3), which does not reflect an agreement of all parties regarding the interpretation of a treaty. Such practice, as a supplementary means of interpretation, can confirm the interpretation that the interpreter has reached in the application of article 31, or determine the meaning when the interpretation according to article 31 leaves the meaning ambiguous or obscure or leads to a result that is manifestly absurd or unreasonable. Article 32 thereby makes a distinction between a use of preparatory work or of subsequent practice to confirm a meaning arrived at under article 31 and its use to "determine" the meaning. Hence, recourse may be had to subsequent practice under article 32 not only to determine the meaning of the treaty in certain circumstances, but also—and always—to confirm the meaning resulting from the application of article 31.[261]

---

[252] Denza, *Diplomatic Law ...* (see footnote 250 above), pp. 132–133; M. Richtsteig, *Wiener Übereinkommen über diplomatische und konsularische Beziehungen: Entstehungsgeschichte, Kommentierung, Praxis*, 2nd ed., Baden-Baden, Germany, Nomos, 2010, p. 70.

[253] Y. Sandoz, C. Swinarski and B. Zimmermann (eds.), *Commentary on the Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 August 1949*, Geneva, ICRC and Martinus Nijhoff, 1987, p. 1440, paras. 4742–4744; H. Spieker, "Medical transportation", *Max Planck Encyclopedia of Public International Law*, vol. VII, Oxford, Oxford University Press, 2012, pp. 54–55, paras. 7–12 (online edition: https://opil.ouplaw.com/home/MPIL). See also the less stringent future tense in the French version "*sera arboré*".

[254] Deutscher Bundestag, "Antwort der Bundesregierung: Rechtlicher Status des Sanitätspersonals der Bundeswehr in Afghanistan", 9 April 2010, *Bundestagsdrucksache 17/1338*, p. 2 (translation by the Special Rapporteur).

[255] Spieker, "Medical transportation" (see footnote 253 above), p. 55, para. 12.

[256] See Denza, *Diplomatic Law ...* (footnote 250 above), pp. 64–73, with further references to declarations in relation to espionage; see also Salmon, *Manuel de droit diplomatique* (footnote 250 above), p. 484, para. 630; and Richtsteig, *Wiener Übereinkommen über diplomatische ...* (footnote 252 above), p. 30.

[257] Netherlands, Protocol Department, Ministry of Foreign Affairs, *Protocol Guide for Diplomatic Missions and Consular Posts*, available from www.government.nl/government/documents/leaflets/2015/04/15/protocol-guide-for-diplomatic-missions-en-consular-posts.

[258] France, Ministry of Foreign Affairs and International Development, *Guide for Foreign Diplomats Serving in France: Immunities—Respect for Local Laws and Regulations* (www.diplomatie.gouv.fr/en/ministry/guide-for-foreign-diplomats/immunities/article/respect-for-local-laws-and); Turkey, Ministry of Foreign Affairs, traffic regulations to be followed by foreign missions in Turkey, Principal Circular Note 63552, Traffic Regulations 2005/PDGY/63552 (6 April 2005) (www.mfa.gov.tr/06_04_2005--63552-traffic-regulations.en.mfa); United Kingdom, Foreign and Commonwealth Office, Circular dated 19 April 1985 to the Heads of Diplomatic Missions in London, reprinted in G. Marston (ed.), "United Kingdom materials on international law 1985", *British Year Book of International Law 1985*, vol. 56, p. 437.

[259] See Canada, Foreign Affairs, Trade and Development, Revised Impaired Driving Policy (www.international.gc.ca/protocol-protocole/vienna_convention_idp-convention_vienne_vfa.aspx?lang=eng); and United States, Department of State, Diplomatic Note 10-181 of the Department of State (24 September 2010) (https://2009-2017.state.gov/documents/organization/149985.pdf), pp. 8–9.

[260] See G. Hafner, "Subsequent agreements and practice: between interpretation, informal modification, and formal amendment", in Nolte (ed.), *Treaties and Subsequent Practice* (footnote 26 above), p. 105, at p. 112, for an even more far-reaching case under article 9 of the Vienna Convention on Diplomatic Relations.

[261] WTO, Appellate Body Report, *China—Measures Affecting Trading Rights and Distribution Services for Certain Publications and Audiovisual Entertainment Products*, WT/DS363/AB/R, adopted 19 January 2010, para. 403: "Although the Panel's application of [a]rticle 31 of the *Vienna Convention* to 'Sound recording distribution

(16)   Subsequent practice under article 32 may contribute, for example, to reducing possible conflicts when the "object and purpose" of a treaty as a whole appears to be in tension with specific purposes of certain of its rules.[262] In the *Kasikili/Sedudu Island* case, the International Court of Justice emphasized that the "parties sought both to secure for themselves freedom of navigation on the river and to delimit as precisely as possible their respective spheres of influence".[263] The Court thereby might be regarded as reconciling a possible tension by taking into account a certain subsequent practice by only one of the parties.[264]

(17)   Another example of subsequent practice under article 32 concerns the term "feasible precautions" in article 57, paragraph 2 (*a*) (ii), of Protocol I to the 1949 Geneva Conventions. This term has been used in effect by article 3, paragraph 4, of the Protocol on Prohibitions or Restrictions on the Use of Mines, Booby-Traps and Other Devices (Protocol II) annexed to the Convention on Prohibitions or Restrictions on the Use of Certain Conventional Weapons Which May Be Deemed to Be Excessively Injurious or to Have Indiscriminate Effects, of 10 October 1980, which provides that: "Feasible precautions are those precautions which are practicable or practically possible taking into account all circumstances ruling at the time, including humanitarian and military considerations." This language has come to be accepted by way of subsequent practice in many military manuals as a general definition of "feasible precautions" for the purpose of article 57, paragraph (2) (*a*) (ii), of Protocol I to the 1949 Geneva Conventions.[265]

(18)   The identification of subsequent practice under articles 31, paragraph 3 (*b*), and 32 has sometimes led

domestic courts to arrive at broad or narrow interpretations. For example, the United Kingdom House of Lords interpreted the term "damage" under article 26, paragraph 2, of the 1929 Convention for the Unification of Certain Rules Relating to International Carriage by Air, as amended by the 1955 Protocol, as more generally including "loss", invoking the subsequent conduct of the parties.[266] On the other hand, the United States Supreme Court, having regard to the subsequent practice of the parties, decided that the term "accident" in article 17 of the 1929 Warsaw Convention should be interpreted narrowly in the sense that it excluded events that were not caused by an unexpected or unusual event.[267] Another example of a restrictive interpretation is a decision in which the Federal Court of Australia interpreted the term "impairment of ... dignity" under article 22 of the Vienna Convention on Diplomatic Relations as only requiring the receiving State to protect against breaches of the peace or the disruption of essential functions of embassies, and not against any forms of nuisance or insult.[268]

(19)   Domestic courts, in particular, sometimes refer to decisions from other domestic jurisdictions and thus engage in a "judicial dialogue" even if no agreement of the parties can thereby be established.[269] Apart from thereby applying article 32, such references may add to the development of a subsequent practice together with other domestic courts.[270] Lord Hope of the United Kingdom House of Lords, quoting the 1969 Vienna Convention rules of interpretation, provided a general orientation when he stated:

In an ideal world the Convention should be accorded the same meaning by all who are party to it. So case law provides a further potential source of evidence. Careful consideration needs to be given to the reasoning of courts of other jurisdictions which have been called upon to deal with the point at issue, particularly those which are of high standing. Considerable weight should be given to an interpretation which has received general acceptance in other jurisdictions. On the

---

services' led it to a 'preliminary conclusion' as to the meaning of that entry, the Panel nevertheless decided to have recourse to supplementary means of interpretation to *confirm* that meaning. We note, in this regard, that China's argument on appeal appears to assume that the Panel's analysis under [a]rticle 32 of the *Vienna Convention* would *necessarily* have been different if the Panel had found that the application of [a]rticle 31 left the meaning of 'Sound recording distribution services' ambiguous or obscure, and if the Panel had, therefore, resorted to [a]rticle 32 to *determine*, rather than to *confirm*, the meaning of that term. We do not share this view. The elements to be examined under [a]rticle 32 are distinct from those to be analyzed under [a]rticle 31, but it is the same elements that are examined under [a]rticle 32 irrespective of the outcome of the [a]rticle 31 analysis. Instead, what may differ, depending on the results of the application of [a]rticle 31, is the weight that will be attributed to the elements analyzed under [a]rticle 32." See also Villiger, *Commentary ...* (footnote 37 above), p. 447, para. 11.

[262] See WTO, Appellate Body Report, *United States—Import Prohibition of Certain Shrimp and Shrimp Products (United States—Shrimp)*, WT/DS58/AB/R, adopted 6 November 1998, para. 17 ("most treaties have no single, undiluted object and purpose but rather a variety of different, and possibly conflicting, objects and purposes"); see also Gardiner, *Treaty Interpretation* (footnote 20 above), p. 216.

[263] *Kasikili/Sedudu Island* (see footnote 23 above), p. 1074, para. 45.

[264] *Ibid.*, p. 1096, para. 80.

[265] For the military manuals of Argentina (1989) and Canada (2001), see Henckaerts and Doswald-Beck (eds.), *Customary International Humanitarian Law, Volume II: Practice* (footnote 211 above), pp. 359–360, paras. 160–164, and the online update for the military manual of Australia (2006) (www.icrc.org/customary-ihl/eng/docs/v2_rul_rule15_sectionc); for the military manual of the United Kingdom (2004), see https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/27874/JSP3832004Edition.pdf. See also Sandoz, Swinarski and Zimmermann, *Commentary on the Additional Protocols ...* (footnote 253 above), p. 683, para. 2202.

[266] United Kingdom, House of Lords, *Fothergill v. Monarch Airlines Ltd.* [1981] AC 251, at p. 278 (Lord Wilberforce) and p. 279 (Lord Diplock); similarly, Germany, Federal Court (Civil Matters), BGHZ, vol. 84, p. 339, at pp. 343–344.

[267] United States, Supreme Court, *Air France v. Saks*, 470 U.S. 392, pp. 403–404.

[268] Australia, Federal Court of Australia, *Commissioner of the Australian Federal Police and the Commonwealth of Australia v. Geraldo Magno and Ines Almeida* [1992] FCA 566, paras. 30–35 (Judge Einfeld); see also United Kingdom, House of Lords, *R (Mullen) v. Secretary of State for the Home Department* (footnote 51 above), paras. 47–48 (Lord Steyn).

[269] See, for example, United States, Supreme Court, *Air France v. Saks* (footnote 267 above), pp. 397–407; United States, Supreme Court, *Abbott v. Abbott*, 560 U.S. 1 (2010), Opinion of the Court (delivered by Justice Kennedy), Slip Opinion (www.supremecourt.gov/opinions/09pdf/08-645.pdf), at pp. 12–16; Germany, Federal Administrative Court, BVerwGE, vol. 139, p. 272, at pp. 288–289; High Court of Australia, *Andrew John Macoun v. Commissioner of Taxation* [2015] HCA 44, paras. 75–82; and P. Wall, "A marked improvement: the High Court of Australia's approach to treaty interpretation in *Macoun v. Commissioner of Taxation* [2015] HCA 44" (case note), *Melbourne Journal of International Law*, vol. 17, No. 1 (June 2016), pp. 170–187.

[270] A. Tzanakopoulos, "Judicial dialogue as a means of interpretation", in H. P. Aust and G. Nolte (eds.), *The Interpretation of International Law by Domestic Courts: Uniformity, Diversity, Convergence*, Oxford, Oxford University Press, 2016, p. 72, at p. 94; E. Benvenisti, "Reclaiming democracy: the strategic uses of foreign and international law by national courts", *American Journal of International Law*, vol. 102, No. 2 (2008), pp. 241–274.

other hand a discriminating approach is required if the decisions conflict, or if there is no clear agreement between them.[271]

(20)   It may be appropriate, in a case in which the practice in different domestic jurisdictions diverges, to emphasize the practice of a representative group of jurisdictions and to give more weight to the decisions of higher courts.[272]

*Paragraph 3—interpretation versus amendment or modification*

(21)   Paragraph 3 of draft conclusion 7 addresses the question of how far the interpretation of a treaty can be influenced by subsequent agreements and subsequent practice in order to remain within the realm of what is considered interpretation under article 31, paragraph 3 (*a*) and (*b*). The paragraph reminds the interpreter that agreements may serve to amend or modify a treaty, but that such subsequent agreements are subject to article 39 of the 1969 Vienna Convention and should be distinguished from subsequent agreements under article 31, paragraph 3 (*a*). The second sentence, while acknowledging that there are examples to the contrary in case law and diverging opinions in the literature, stipulates that the possibility of amending or modifying a treaty by subsequent practice of the parties has not been generally recognized.

(22)   Article 39 of the 1969 Vienna Convention provides: "A treaty may be amended by agreement between the parties." Article 31, paragraph 3 (*a*), on the other hand, refers to subsequent agreements "between the parties regarding the interpretation of the treaty or the application of its provisions", and does not seem to address the question of amendment or modification. As the WTO Appellate Body has held:

the term "application" in Article 31 (3) (*a*) relates to the situation where an agreement specifies how existing rules or obligations in force are to be "applied"; the term does not connote the creation of new or the extension of existing obligations that are subject to a temporal limitation and are to expire.[273]

(23)   Articles 31, paragraph 3 (*a*), and 39, if read together, demonstrate that agreements that the parties reach subsequently to the conclusion of a treaty can interpret and amend or modify the treaty.[274] An agreement under article 39 need not display the same form as the treaty that it amends.[275] As the International Court of Justice held in the *Pulp Mills on the River Uruguay* case:

Whatever its specific designation and in whatever instrument it may have been recorded (the [Administrative Commission of the River Uruguay] minutes), this "understanding" is binding on the Parties, to the extent that they have consented to it and must be observed by them in good faith. They are entitled to depart from the procedures laid down by the 1975 Statute, in respect of a given project pursuant to an appropriate bilateral agreement.[276]

(24)   It may sometimes be difficult to draw a distinction between agreements of the parties under a specific treaty provision that attributes binding force to subsequent agreements, simple subsequent agreements under article 31, paragraph 3 (*a*), which are not binding as such, and, finally, agreements on the amendment or modification of a treaty under articles 39 to 41.[277] There do not seem to be any formal criteria other than those set forth in article 39, if applicable, apart from the ones that may be provided for in the applicable treaty itself, which are recognized as distinguishing these different forms of subsequent agreements. It is clear, however, that States and international courts are generally prepared to accord parties a rather wide scope for the interpretation of a treaty by way of a subsequent agreement. This scope may even go beyond the ordinary meaning of the terms of the treaty. The recognition of this scope for the interpretation of a treaty goes hand in hand with the reluctance of States and courts to recognize that an agreement relating to the application of a treaty actually has the effect of amending or modifying the treaty.[278] An agreement to modify a treaty is thus not excluded, but also not to be presumed.[279]

---

[271] United Kingdom, House of Lords, *King v. Bristow Helicopters Ltd (Scotland)* (see footnote 136 above), para. 81. See also United Kingdom, Supreme Court, *R (Adams) v. Secretary of State for Justice* [2011] UKSC 18, para. 17 (Lord Phillips) ("[t]his practice on the part of only one of the many signatories to the [International Covenant on Civil and Political Rights] does not provide a guide to the meaning of article 14 (6) … It has not been suggested that there is any consistency of practice on the part of the signatories that assists in determining the meaning of article 14 (6)").

[272] United Kingdom, House of Lords, *Sidhu v. British Airways* [1997] AC 430, at p. 453 (Lord Hope); *Fothergill v. Monarch Airlines Ltd.* (see footnote 266 above), pp. 275–276 (Lord Wilberforce). See also Canada, Supreme Court, *Yugraneft Corp. v. Rexx Management Corp.* [2010] 1 SCR 649, para. 21 (Judge Rothstein).

[273] WTO, Appellate Body Reports, *EC—Bananas III (Article 21.5—Ecuador II) / EC—Bananas III (Article 21.5—United States)* (see footnote 66 above), para. 391.

[274] Murphy, "The relevance of subsequent agreement …" (see footnote 249 above), p. 88.

[275] Sinclair, *The Vienna Convention …* (see footnote 21 above), p. 107, with reference to Waldock, *Official Records of the*

[276] *United Nations Conference on the Law of Treaties, First session … (A/CONF.39/11)* (see footnote 89 above), 37th meeting of the Committee of the Whole, 24 April 1968, p. 204, para. 15; Villiger, *Commentary …* (see footnote 37 above), pp. 513–514, paras. 7, 9 and 11; K. Odendahl, "Article 39: General rule regarding the amendment of treaties", in Dörr and Schmalenbach (eds.), *Vienna Convention on the Law of Treaties …* (see footnote 61 above), p. 706, para. 16.

[276] *Pulp Mills on the River Uruguay*, Judgment of 20 April 2010 (see footnote 23 above), p. 62, para. 128; see also p. 63, para. 131; the Court then concluded, in the case under review, that these conditions had not been fulfilled, pp. 62–66, paras. 128–142. For the Statute of the River Uruguay, signed at Salto, Uruguay, on 26 February 1975, see United Nations, *Treaty Series*, vol. 1295, No. 21425, p. 331.

[277] In judicial practice, it is sometimes not necessary to determine whether an agreement has the effect of interpreting or modifying a treaty, see *Territorial Dispute* (footnote 23 above), p. 31, para. 60 ("in the view of the Court, for the purposes of the present Judgment, there is no reason to categorize it either as a confirmation or as a modification of the Declaration [of 21 March 1899 completing the Franco–British Convention of 14 June 1898]"); it is sometimes considered that an agreement under article 31, paragraph 3 (*a*), can also have the effect of modifying a treaty (see Aust, *Modern Treaty Law and Practice* (footnote 141 above), pp. 212–214 with examples). For the Convention between Great Britain and France, for the Delimitation of their respective Possessions to the West of the Niger, and of their respective Possessions and Spheres of Influence to the East of that River, signed at Paris on 14 June 1898, and the Declaration completing the Convention, signed at London on 21 March 1899, see *British and Foreign State Papers, 1898–1899*, vol. 91, pp. 38 and 55 respectively.

[278] *Pulp Mills on the River Uruguay*, Judgment of 20 April 2010 (see footnote 23 above), p. 63, para. 131, and p. 66, para. 140; Crawford, "A consensualist interpretation of article 31 (3) …" (see footnote 216 above), p. 32; Iran–United States Claims Tribunal, *The Islamic Republic of Iran v. The United States of America*, Interlocutory Award No. ITL 83-B1-FT (Counterclaim) (see footnote 154 above), pp. 125–126, para. 132; in diplomatic contexts outside court proceedings, States tend to acknowledge more openly that a certain agreement or common practice amounts to a modification of a treaty, see Murphy, "The relevance of subsequent agreement …" (footnote 249 above), p. 83.

[279] *Pulp Mills on the River Uruguay*, Judgment of 20 April 2010 (see footnote 23 above), p. 66, para. 140; Crawford, "A consensualist interpretation of article 31 (3) …" (see footnote 216 above), p. 32.

(25)   Turning to the question of whether the parties can amend or modify a treaty by a common subsequent practice, the Commission originally proposed, in its draft articles on the law of treaties, to include the following provision in the 1969 Vienna Convention, which would have explicitly recognized the possibility of a modification of treaties by subsequent practice:

*Article 38.   Modification of treaties by subsequent practice*

A treaty may be modified by subsequent practice in the application of the treaty establishing the agreement of the parties to modify its provisions.[280]

(26)   This draft article gave rise to an important debate at the United Nations Conference on the Law of Treaties (Vienna Conference).[281] An amendment to delete draft article 38 was put to a vote and was adopted by 53 votes to 15, with 26 abstentions. After the Vienna Conference, the question was discussed whether the rejection of draft article 38 meant that the possibility of a modification of a treaty by subsequent practice of the parties had thereby been excluded. Many writers came to the conclusion that the negotiating States simply did not wish to address this question in the 1969 Vienna Convention and that treaties can, as a general rule under the customary law of treaties, indeed be modified by subsequent practice that establishes the agreement of the parties to that effect.[282] International courts and tribunals, on the other hand, have since the adoption of the 1969 Vienna Convention mostly refrained from recognizing this possibility.

(27)   In the case concerning the *Dispute regarding Navigational and Related Rights*, the International Court of Justice held that "subsequent practice of the parties, within the meaning of Article 31 (3) (*b*) of the Vienna Convention, can result in a departure from the original intent on

the basis of a tacit agreement".[283] It is not entirely clear whether the Court thereby wanted to recognize that subsequent practice under article 31, paragraph 3 (*b*), may also have the effect of amending or modifying a treaty, or whether it was merely making a point relating to the interpretation of treaties, as the "original" intent of the parties is not necessarily conclusive for the interpretation of a treaty. Indeed, the Commission recognizes in draft conclusion 8 that subsequent agreements and subsequent practice, like other means of interpretation, "may assist in determining whether or not the presumed intention of the parties upon the conclusion of the treaty was to give a term used a meaning which is capable of evolving over time".[284] The scope for "interpretation" is therefore not necessarily determined by a fixed "original intent", but must rather be determined by taking into account a broader range of considerations, including certain later developments. This somewhat ambiguous dictum of the Court raises the question of how far subsequent practice under article 31, paragraph 3 (*b*), can contribute to "interpretation" and whether subsequent practice may have the effect of amending or modifying a treaty. Indeed, the dividing line between the interpretation and the amendment or modification of a treaty is in practice sometimes "difficult, if not impossible, to fix".[285]

(28)   Apart from raising the question in its dictum in *Dispute regarding Navigational and Related Rights*,[286] the International Court of Justice has not explicitly recognized that a particular subsequent practice has had the effect of modifying a treaty. This is true, in particular, of the advisory opinions in the cases *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)*[287] and *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*,[288] in which the Court recognized

---

[280] *Yearbook … 1966*, vol. II, document A/6309/Rev.1 (Part II), p. 236 (footnote omitted).

[281] See *Official Records of the United Nations Conference on the Law of Treaties, First session …* (A/CONF.39/11) (footnote 89 above), pp. 207–215; second report of the Special Rapporteur (A/CN.4/671) (footnote 14 above), paras. 119–121; and Distefano, "La pratique subséquente …" (footnote 184 above), pp. 55–61.

[282] Sinclair, *The Vienna Convention …* (see footnote 21 above), p. 138; Gardiner, *Treaty Interpretation* (see footnote 20 above), pp. 275–280; Yasseen, "L'interprétation des traités …" (see footnote 21 above), pp. 51–52; Kamto, "La volonté de l'État …" (see footnote 152 above), pp. 134–141, at p. 134; Aust, *Modern Treaty Law and Practice* (see footnote 141 above), p. 213; Villiger, *Commentary …* (see footnote 37 above), p. 432, para. 23; Dörr, "Article 31 …" (see footnote 61 above), pp. 595–596, para. 77 (in accord, Odendahl, "Article 39 …" (see footnote 275 above), pp. 702–704, paras. 10–11); Distefano, "La pratique subséquente …" (see footnote 184 above), pp. 62–67; H. Thirlway, "The law and procedure of the International Court of Justice 1960–1989: supplement, 2006—part three", *British Year Book of International Law 2006*, vol. 77, pp. 1–82, at p. 65; M. N. Shaw, *International Law*, 7th ed., Cambridge, Cambridge University Press, 2014, p. 677; I. Buga, "Subsequent practice and treaty modification", in M. J. Bowman and D. Kritsiotis (eds.), *Conceptual and Contextual Perspectives on the Modern Law of Treaties*, Cambridge, Cambridge University Press, 2018, pp. 363–391, at p. 374, footnote 73 with further references; disagreeing with this view, in particular, and stressing the solemnity of the conclusion of a treaty in contrast to the informality of practice, Murphy, "The relevance of subsequent agreement …" (see footnote 249 above), pp. 89–90; see also Hafner, "Subsequent agreements and practice …" (footnote 260 above), pp. 115–117 (differentiating between the perspectives of courts and States, as well as emphasizing the importance of amendment provisions in this context).

[283] *Dispute regarding Navigational and Related Rights* (see footnote 23 above), p. 242, para. 64; see also *Question of the tax regime governing pensions paid to retired UNESCO officials residing in France* (footnote 151 above), p. 256, para. 62; Yasseen, "L'interprétation des traités …" (see footnote 21 above), p. 51; Kamto, "La volonté de l'État …" (see footnote 152 above), pp. 134–141; and R. Bernhardt, *Die Auslegung völkerrechtlicher Verträge*, Cologne/Berlin, Heymanns, 1963, p. 132.

[284] See draft conclusion 8 and commentary thereto, paras. (1)–(18), below.

[285] Sinclair, *The Vienna Convention …* (see footnote 21 above), p. 138; see also Gardiner, *Treaty Interpretation* (footnote 20 above), p. 275; Murphy, "The relevance of subsequent agreement …" (footnote 249 above), p. 90; B. Simma, "Miscellaneous thoughts on subsequent agreements and practice", in Nolte (ed.), *Treaties and Subsequent Practice* (footnote 26 above), p. 46; Karl, *Vertrag und spätere Praxis …* (footnote 75 above), pp. 42–43; Sorel and Boré Eveno, "1969 Vienna Convention, Article 31 …" (footnote 62 above), pp. 825–826, para. 42; and Dörr, "Article 31 …" (footnote 61 above), pp. 595–596, para. 77; this is true even if the two processes can theoretically be seen as being "legally quite distinct", see the dissenting opinion of Judge Parra-Aranguren in *Kasikili/Sedudu Island* (footnote 23 above), pp. 1212–1213, para. 16; similarly, Hafner, "Subsequent agreements and practice …" (see footnote 260 above), p. 114; and Linderfalk, *On the Interpretation of Treaties* (see footnote 67 above), p. 168.

[286] *Dispute regarding Navigational and Related Rights* (see footnote 23 above), p. 242, para. 64.

[287] *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)* (see footnote 54 above).

[288] *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (see footnote 23 above).

that subsequent practice had an important effect on the determination of the meaning of the treaty, but stopped short of explicitly recognizing that such practice had led to an amendment or modification of the treaty.[289] Since these opinions concerned treaties establishing an international organization it seems difficult to derive a general rule of the law of treaties from them. The questions of subsequent agreements and subsequent practice relating to constituent instruments of international organizations are addressed in draft conclusion 12.[290]

(29)   Other important cases in which the International Court of Justice has raised the issue of possible modification by the subsequent practice of the parties concern boundary treaties. As the Court said in the case concerning the *Land and Maritime Boundary between Cameroon and Nigeria (Cameroon v. Nigeria: Equatorial Guinea intervening)*:

  Hence the conduct of Cameroon in that territory has pertinence only for the question of whether it acquiesced in the establishment of a change in treaty title, which cannot be wholly precluded as a possibility in law …[291]

(30)   The Court found such acquiescence in the case concerning the *Temple of Preah Vihear*, where it placed decisive emphasis on the fact that there had been clear assertions of sovereignty by one side (France), which, according to the Court, required a reaction on the part of the other side (Thailand).[292] This judgment, however, was rendered before the adoption of the 1969 Vienna Convention and thus, at least implicitly, was taken into account by States in their debate at the Vienna Conference.[293] The judgment also stops short of explicitly recognizing the modification of a treaty by subsequent practice as the Court left open whether the line on the French map was compatible with the watershed line that had been agreed upon in the original boundary treaty between the two States—although it is often assumed that this was not the case.[294]

(31)   Thus, while leaving open the possibility that a treaty might be modified by the subsequent practice of

the parties, the International Court of Justice has so far not explicitly recognized that such an effect has actually been produced in a specific case. Rather, the Court has reached interpretations that were difficult to reconcile with the ordinary meaning of the text of the treaty, but which were in line with the identified practice of the parties.[295] Contrary holdings by arbitral tribunals have been either characterized as an "isolated exception"[296] or rendered before the Vienna Conference and critically referred to there.[297]

(32)   The WTO Appellate Body has made clear that it would not accept an interpretation that would result in a modification of a treaty obligation, as this would not be an "application" of an existing treaty provision.[298] The Appellate Body's position may be influenced by article 3, paragraph 2, of the Understanding on Rules and Procedures Governing the Settlement of Disputes, according to which: "Recommendations and rulings of the [Dispute Settlement Body] cannot add to or diminish the rights and obligations provided in the covered agreements."

(33)   The European Court of Human Rights has occasionally recognized the subsequent practice of the parties as a possible source for a modification of the European Convention on Human Rights. In the *Öcalan v. Turkey* case, the Court confirmed:

  that an established practice within the member States could give rise to an amendment of the Convention. In that case the Court accepted that subsequent practice in national penal policy, in the form of a generalised abolition of capital punishment, could be taken as establishing the agreement of the Contracting States to abrogate the exception provided for under Article 2 § 1 and hence remove a textual limit on the scope for

---

[289] Thirlway, "The law and procedure of the International Court of Justice 1960–1989: supplement, 2006—part three" (see footnote 282 above), p. 64.

[290] See *Yearbook … 2012*, vol. II (Part Two), para. 238, and *Yearbook … 2008*, vol. II (Part Two), annex I, p. 159, para. 42.

[291] *Land and Maritime Boundary between Cameroon and Nigeria (Cameroon v. Nigeria: Equatorial Guinea intervening), Judgment* [of 10 October 2002], *I.C.J. Reports 2002*, p. 303, at p. 353, para. 68.

[292] *Case concerning the Temple of Preah Vihear*, Judgment of 15 June 1962 (see footnote 110 above): "an acknowledgment by conduct was undoubtedly made in a very definite way … it is clear that the circumstances were such as called for some reaction" (p. 23); "[a] clearer affirmation of title on the French Indo-Chinese side can scarcely be imagined" and therefore "demanded a reaction" (p. 30).

[293] M. G. Kohen, "*Uti possidetis*, prescription et pratique subséquente à un traité dans l'affaire de l'*Île de Kasikili/Sedudu* devant la Cour internationale de justice", *German Yearbook of International Law*, vol. 43 (2000), p. 253, at p. 272.

[294] *Case concerning the Temple of Preah Vihear*, Judgment of 15 June 1962 (see footnote 110 above), p. 26: "a fact which, if true, must have been no less evident in 1908". Judge Parra-Aranguren opined that the *Temple of Preah Vihear* case demonstrated "that the effect of subsequent practice on that occasion was to amend the [t]reaty" (*Kasikili/Sedudu Island* (footnote 23 above), dissenting opinion of Judge Parra-Aranguren, p. 1213, para. 16); Buga, "Subsequent practice and treaty modification" (see footnote 282 above), at p. 380, footnote 120.

[295] In particular, the *Namibia* advisory opinion (*Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)* (see footnote 54 above)) has been read as implying that subsequent practice has modified Article 27, paragraph 3, of the Charter of the United Nations (see A. Pellet, "Article 38", in A. Zimmermann and others (eds.), *The Statute of the International Court of Justice: A Commentary*, 2nd ed., Oxford, Oxford University Press, 2012, p. 844, para. 279, footnote 809); see also the second report of the Special Rapporteur (A/CN.4/671) (footnote 14 above), paras. 124–126.

[296] M. G. Kohen, "Keeping subsequent agreements and practice in their right limits", in Nolte (ed.), *Treaties and Subsequent Practice* (see footnote 26 above), pp. 34 *et seq.*, at p. 42, regarding *Decision regarding delimitation of the border between Eritrea and Ethiopia*, 13 April 2002, UNRIAA, vol. XXV (Sales No. E/F.05.V.5), pp. 83–195, at pp. 110–111, paras. 3.6–3.10; see also *Case concerning the location of boundary markers in Taba between Egypt and Israel*, 29 September 1988, UNRIAA, vol. XX (Sales No. E/F.93.V.3), pp. 1–118, see pp. 56–57, paras. 209–210, in which the Arbitral Tribunal held, in an *obiter dictum*, "that the demarcated boundary line would prevail over the Agreement [of 1 October 1906] if a contradiction could be detected" (*ibid.*, p. 57); but see R. Kolb, "La modification d'un traité par la pratique subséquente des parties", *Revue suisse de droit international et de droit européen*, vol. 14 (2004), pp. 9–32, at p. 20. The Agreement signed at Rafah on 1 October 1906 is reproduced in UNRIAA, vol. XX, *Case concerning boundary markers in Taba*, appendix B, p. 114.

[297] *Interpretation of the Air Transport Services Agreement between the United States of America and France*, 22 December 1963, UNRIAA, vol. XVI (Sales No. E/F.69.V.1), pp. 5–74, at pp. 62–63; *Official Records of the United Nations Conference on the Law of Treaties, First session …* (A/CONF.39/11) (see footnote 89 above), 37th meeting of the Committee of the Whole, 24 April 1968, p. 208, para. 58 (Japan); Murphy, "The relevance of subsequent agreement …" (footnote 249 above), p. 89.

[298] WTO, Appellate Body Reports, *EC—Bananas III (Article 21.5—Ecuador II) / EC—Bananas III (Article 21.5—United States)* (see footnote 66 above), paras. 391–393.

evolutive interpretation of Article 3 [*Soering v. the United Kingdom*, no. 14038/18, 7 July 1989, Series A, No. 161], § 103).[299]

(34)   Applying this reasoning, the Court came to the following conclusion in *Al-Saadoon and Mufdhi v. the United Kingdom*:

> It can be seen, therefore, that the Grand Chamber in *Öcalan* did not exclude that Article 2 had already been amended so as to remove the exception permitting the death penalty. Moreover, as noted above, the position has evolved since then. All but two of the member States have now signed Protocol No. 13 [to the European Convention on Human Rights] and all but three of the States which have signed it have ratified it. These figures, together with consistent State practice in observing the moratorium on capital punishment, are strongly indicative that Article 2 has been amended so as to prohibit the death penalty in all circumstances. Against this background, the Court does not consider that the wording of the second sentence of Article 2 § 1 continues to act as a bar to its interpreting the words "inhuman or degrading treatment or punishment" in Article 3 as including the death penalty (compare *Soering*, cited above, §§ 102-04).[300]

(35)   The case law of international courts and tribunals allows the following conclusions: the WTO context suggests that a treaty may preclude the subsequent practice of the parties from having a modifying effect. Conversely, the European Court of Human Rights cases suggest that a treaty may permit the subsequent practice of the parties to have a modifying effect. Thus, ultimately, the treaty itself governs the question in the first place and much depends on the treaty or on the treaty provisions concerned.[301]

(36)   The situation is more complicated in the case of treaties for which such indications do not exist. No clear residual rule for such cases can be discerned from the jurisprudence of the International Court of Justice. The conclusion could perhaps be drawn, however, that the Court, while finding that the possibility of a modification of a treaty by subsequent practice of the parties "cannot be wholly precluded as a possibility in law",[302] considered that finding such a modification should be avoided, if at all possible. Instead, the Court seems to prefer to accept broad interpretations of the ordinary meaning of the terms of the treaty.

(37)   This conclusion from the jurisprudence of the International Court of Justice is in line with certain considerations that were articulated during the debates among States on draft article 38 of the 1969 Vienna Convention.[303] Today, the consideration that amendment procedures that are provided for in a treaty are not to be circumvented by informal means seems to have gained

more weight in relation to the equally true general observation that international law is often not as formalist as national law.[304] The concern that was expressed by a number of States at the Vienna Conference, according to which the possibility of modifying a treaty by subsequent practice could create difficulties for domestic constitutional law, has also since gained in relevance.[305] And, while the principle *pacta sunt servanda* is not formally called into question by an amendment or modification of a treaty by subsequent practice that establishes the agreement of all the parties, it is equally true that the stability of treaty relations may be called into question if an informal means of identifying agreement as subsequent practice could easily modify a treaty.[306]

(38)   In conclusion, while there exists some support in international case law for the view that, absent indications in the treaty to the contrary, the agreed subsequent practice of the parties theoretically may lead to modifications of a treaty, the actual occurrence of that effect is not to be presumed, and the possibility of amending or modifying a treaty by subsequent practice has not been generally recognized.[307]

---

[299] *Öcalan v. Turkey* [GC], no. 46221/99, 12 May 2005, ECHR 2005-IV, para. 163, referring to *Soering v. the United Kingdom* (see footnote 204 above), para. 103. See also *Al-Saadoon and Mufdhi v. the United Kingdom*, no. 61498/08, 2 March 2010 (final 4 October 2010), ECHR 2010, paras. 119–120.

[300] *Al-Saadoon and Mufdhi v. the United Kingdom* (see footnote 299 above), para. 120; see also B. Malkani, "The obligation to refrain from assisting the use of the death penalty", *International and Comparative Law Quarterly*, vol. 62, No. 3 (July 2013), pp. 523–556; confirmed in *Hassan v. the United Kingdom* [GC] (see footnote 27 above), para. 101.

[301] See Buga, "Subsequent practice and treaty modification" (footnote 282 above), p. 380 *et seq.*, footnotes 126–132.

[302] *Land and Maritime Dispute between Cameroon and Nigeria (Cameroon v. Nigeria: Equatorial Guinea intervening), Judgment of* 10 October 2002 (see footnote 291 above), p. 353, para. 68.

[303] See the second report of the Special Rapporteur (A/CN.4/671) (footnote 14 above), paras. 119–121.

[304] Murphy, "The relevance of subsequent agreement …" (see footnote 249 above), p. 89; Simma, "Miscellaneous thoughts on subsequent agreements …" (footnote 285 above), p. 47; Hafner, "Subsequent agreements and practice …" (see footnote 260 above), pp. 115–117; J. E. Alvarez, "Limits of change by way of subsequent agreements and practice", in Nolte (ed.), *Treaties and Subsequent Practice* (see footnote 26 above), p. 130.

[305] See *NATO Strategic Concept Case*, German Federal Constitutional Court, Judgment of 22 November 2001, Application 2 BvE 6/99, paras. 19–21 (English translation available from www.bundesverfassungsgericht.de/entscheidungen/es20011122_2bve000699en.html); German Federal Fiscal Court, BFHE, vol. 157, p. 39, at pp. 43–44; *ibid.*, vol. 227, p. 419, at p. 426; *ibid.*, vol. 181, p. 158, at p. 161; S. Kadelbach, "Domestic constitutional concerns with respect to the use of subsequent agreements and practice at the international level", in Nolte (ed.), *Treaties and Subsequent Practice* (footnote 26 above), pp. 145–148; Alvarez, "Limits of change …" (footnote 304 above), p. 130; I. Wuerth, "Treaty interpretation, subsequent agreements and practice, and domestic constitutions", in Nolte (ed.), *Treaties and Subsequent Practice* (footnote 26 above), pp. 154–159; and H. Ruiz Fabri, "Subsequent practice, domestic separation of powers, and concerns of legitimacy", *ibid.*, pp. 165–166.

[306] See, for example, Kohen, "*Uti possidetis*, prescription et pratique subséquente …" (footnote 293 above), p. 274 (in particular with respect to boundary treaties).

[307] Instead, States and courts prefer to make every effort to conceive of an agreed subsequent practice of the parties as an effort to interpret the treaty in a particular way. Such efforts to interpret a treaty broadly are possible since article 31 of the 1969 Vienna Convention does not accord primacy to one particular means of interpretation contained therein, but rather requires the interpreter to take into account all means of interpretation as appropriate (see draft conclusion 2, para. 5, and the commentary thereto, above; see also Hafner, "Subsequent agreements and practice …" (footnote 260 above), p. 117; some authors support the view that the range of what is conceivable as an "interpretation" is wider in case of a subsequent agreement or subsequent practice under article 31, paragraph 3, than in the case of interpretations by other means of interpretation, including the range for evolutive interpretations by courts or tribunals, for example, Gardiner, *Treaty Interpretation* (see footnote 20 above), p. 275; Dörr, "Article 31 …" (see footnote 61 above), pp. 595–596, para. 77). In this context, an important consideration is how far an evolutive interpretation of the treaty provision concerned is possible (see draft conclusion 8; in the case concerning the *Dispute regarding Navigational and Related Rights*, for example, the International Court of Justice could leave open the question as to whether the term "*comercio*" had been modified by the subsequent practice of the parties since it decided that it was possible to give this term an evolutive interpretation, *Dispute regarding Navigational and Related Rights* (see footnote 23 above), pp. 242–243, paras. 64–66).

### Conclusion 8.    Interpretation of treaty terms as capable of evolving over time

**Subsequent agreements and subsequent practice under articles 31 and 32 may assist in determining whether or not the presumed intention of the parties upon the conclusion of the treaty was to give a term used a meaning which is capable of evolving over time.**

#### Commentary

(1)    Draft conclusion 8 addresses the role that subsequent agreements and subsequent practice may play in the context of the more general question of whether the meaning of a term of a treaty is capable of evolving over time.

(2)    In the case of treaties, the question of the so-called intertemporal law[308] has traditionally been put in terms of whether a treaty should be interpreted in the light of the circumstances and the law at the time of its conclusion ("contemporaneous" or "static" interpretation), or in the light of the circumstances and the law at the time of its application ("evolutive", "evolutionary", or "dynamic" interpretation).[309] Arbitrator Max Huber's dictum in the *Island of Palmas* case according to which "a juridical fact must be appreciated in the light of the law contemporary with it"[310] led many international courts and tribunals, as well as many writers, to generally favour contemporaneous interpretation.[311] At the same time, the Arbitral Tribunal in the *Iron Rhine Railway* case asserted that there was "general support among the leading writers today for evolutive interpretation of treaties".[312]

(3)    The Commission, in its commentary on the draft articles on the law of treaties, considered in 1966 that "to attempt to formulate a rule covering comprehensively

the temporal element would present difficulties" and it therefore "concluded that it should omit the temporal element".[313] Similarly, the debates within the Commission's Study Group on fragmentation of international law led to the conclusion in 2006 that it is difficult to formulate and to agree on a general rule that would give preference either to a "principle of contemporaneity" or to one that generally recognizes the need to take account of an "evolving meaning" of treaties.[314]

(4)    Draft conclusion 8 should not be read as taking any position regarding the appropriateness of a more contemporaneous or a more evolutive approach to treaty interpretation in general. Draft conclusion 8 rather emphasizes that subsequent agreements and subsequent practice, like any other means of treaty interpretation, can support both a contemporaneous and an evolutive interpretation (or, as it is often called, evolutionary interpretation), where appropriate. The Commission, therefore, concluded that these means of treaty interpretation "may assist in determining whether or not" an evolutive interpretation is appropriate with regard to a particular treaty term.

(5)    This approach is confirmed by the jurisprudence of international courts and tribunals. The various international courts and tribunals that have engaged in evolutive interpretation—albeit to varying degrees—appear to have followed a case-by-case approach in determining, through recourse to the various means of treaty interpretation that are referred to in articles 31 and 32, whether or not a treaty term should be given a meaning capable of evolving over time.

(6)    The International Court of Justice, in particular, is seen as having developed two strands of jurisprudence, one tending towards a more "contemporaneous" and the other towards a more "evolutionary" interpretation, as Judge *ad hoc* Guillaume pointed out in his declaration in *Dispute regarding Navigational and Related Rights*.[315] The decisions that favour a more contemporaneous approach mostly concern specific treaty terms ("water-parting";[316] "main channel or Thalweg";[317] names of places;[318] and "mouth" of a

---

[308] T. O. Elias, "The doctrine of intertemporal law", *American Journal of International Law*, vol. 74 (1980), pp. 285 *et seq.*; D. W. Greig, *Intertemporality and the Law of Treaties*, London, British Institute of International and Comparative Law, 2001; M. Fitzmaurice, "Dynamic (evolutive) interpretation of treaties, Part I", *Hague Yearbook of International Law*, vol. 21 (2008), pp. 101–153; M. Kotzur, "Intertemporal law", *Max Planck Encyclopedia of Public International Law* (online edition: https://opil.ouplaw.com/home/MPIL); U. Linderfalk, "Doing the right thing for the right reason: why dynamic or static approaches should be taken in the interpretation of treaties", *International Community Law Review*, vol. 10 (2008), pp. 109 *et seq.*; A. Verdross and B. Simma, *Universelles Völkerrecht*, 3rd ed., Berlin, Duncker & Humblot, 1984, pp. 496 *et seq.*, paras. 782 *et seq.*

[309] M. Fitzmaurice, "Dynamic (evolutive) interpretation …" (see footnote 308 above).

[310] *Island of Palmas case (Netherlands/United States of America)*, Award of 4 April 1928, UNRIAA, vol. II (Sales No. 1949.V.1), pp. 829–871, at p. 845.

[311] *Yearbook … 1966*, vol. II, document A/6309/Rev.1 (Part II), pp. 220–221, para. (11).

[312] *Iron Rhine Railway* (see footnote 25 above), para. 81; see, for example, Aust, *Modern Treaty Law and Practice* (footnote 141 above), pp. 215–216; M. Fitzmaurice, "Dynamic (evolutive) interpretation …" (footnote 308 above); G. Distefano, "L'interprétation évolutive de la norme internationale", *Revue générale de droit international public*, vol. 115, No. 2 (2011), pp. 373–396, at pp. 384 and 389 *et seq.*; Higgins, "Some observations on the inter-temporal rule …" (footnote 244 above), pp. 174 *et seq.*; Sorel and Boré Eveno, "1969 Vienna Convention, Article 31 …" (footnote 62 above), pp. 807–808, para. 8; P.-M. Dupuy, "Evolutionary interpretation of treaties: between memory and prophecy", in Cannizzaro (ed.), *The Law of Treaties …* (footnote 61 above), pp. 125 *et seq.*; and Kotzur, "Intertemporal law" (footnote 308 above), para. 14.

[313] *Yearbook … 1966*, vol. II, document A/6309/Rev.1 (Part II), p. 222, para. (16); Higgins, "Some observations on the inter-temporal rule …" (see footnote 244 above), p. 178.

[314] Report of the Study Group on fragmentation of international law (A/CN.4/L.682 and Add.1) (see footnote 184 above), para. 478.

[315] *Dispute regarding Navigational and Related Rights* (see footnote 23 above), declaration of Judge *ad hoc* Guillaume, p. 290, at pp. 294 *et seq.*, paras. 9 *et seq.*; see also *Yearbook … 2005*, vol. II (Part Two), para. 479; report of the Study Group on fragmentation of international law (A/CN.4/L.682 and Add.1) (footnote 184 above), para. 478; and Institut de droit international, resolution on "Le problème intertemporel en droit international public", *Annuaire de l'Institut de droit international*, vol. 56 (session of Wiesbaden, 1975), pp. 536 *et seq.* (available from the Institute's website at www.idi-iil.org, *Resolutions*).

[316] *Case concerning a boundary dispute between Argentina and Chile concerning the delimitation of the frontier line between boundary post 62 and Mount Fitzroy*, decision of 21 October 1994, UNRIAA, vol. XXII (Sales No. E/F.00.V.7), pp. 3–149, at p. 43, para. 130; see also, with respect to the term "watershed", *Case concerning the Temple of Preah Vihear*, Judgment of 15 June 1962 (footnote 110 above), pp. 16–22.

[317] *Kasikili/Sedudu Island* (see footnote 23 above), pp. 1060–1062, paras. 21 and 25.

[318] *Decision regarding delimitation of the border between Eritrea and Ethiopia* (see footnote 296 above), p. 110, para. 3.5.

river[319]). On the other hand, the cases that support an evolutive interpretation seem to relate to more general terms. This is true, in particular, for terms that are by definition evolutionary, such as "the strenuous conditions of the modern world", "the well-being and development of such peoples", and "sacred trust" in Article 22 of the Covenant of the League of Nations. The International Court of Justice, in its *Namibia* advisory opinion, gave "sacred trust" an evolving meaning so as to conclude "that the ultimate objective of the sacred trust was the self-determination and independence of the peoples concerned".[320] The "generic" nature of a particular term in a treaty[321] and the fact that the treaty is designed to be "of continuing duration"[322] may also give rise to an evolving meaning.

(7)    Other international judicial bodies sometimes also employ an evolutive approach to interpretation, though displaying different degrees of openness towards such interpretation. The WTO Appellate Body has only occasionally resorted to evolutive interpretation. In a well-known case it has, however, held that "the generic term 'natural resources' in [a]rticle XX (g) is not 'static' in its content or reference but is rather 'by definition, evolutionary'".[323] The Seabed Disputes Chamber of the International Tribunal for the Law of the Sea has held that the meaning of certain obligations to ensure[324] "may change over time",[325] and has emphasized that the rules of State liability in the United Nations Convention on the Law of the Sea are apt to follow developments in the law and are "not considered to be static".[326] The European Court of Human Rights has held more generally "that the Convention is a living instrument which … must be interpreted in the light of present-day conditions".[327] The Inter-American Court of Human Rights also more generally follows an evolutive approach to interpretation, in particular in connection with its socalled *pro homine* approach.[328] In the *Iron Rhine Railway* case, the continued viability and effectiveness of a multidimensional cross-border railway arrangement was an important reason for the Arbitral Tribunal to accept that even rather technical rules may have to be given an evolutive interpretation.[329]

(8)    In the final analysis, most international courts and tribunals have not recognized evolutive interpretation as a separate form of interpretation, but instead have arrived at such an evolutive interpretation in application of the various means of interpretation that are mentioned in articles 31 and 32 of the 1969 Vienna Convention, by considering certain criteria (in particular those mentioned in para. (6) above) on a case-by-case basis. Any evolutive interpretation of the meaning of a term over time must therefore result from the ordinary process of treaty interpretation.[330]

(9)    The Commission considers that this state of affairs confirms its original approach to treaty interpretation:

the Commission's approach to treaty interpretation was on the basis that the text of the treaty must be presumed to be the authentic expression of the intentions of the parties, and that the elucidation of the meaning of the text rather than an investigation *ab initio* of the supposed intentions of the parties constitutes the object of interpretation … making the ordinary meaning of the terms, the context of the treaty, its objects and purposes, and the general rules of international law, together with authentic interpretations by the parties, the primary criteria for interpreting a treaty.[331]

Accordingly, draft conclusion 8, by using the phrase "presumed intention", refers to the intention of the parties as determined through the application of the various means of interpretation that are recognized in articles 31 and 32. The "presumed intention" is thus not a separately identifiable original will, and the *travaux préparatoires* are not the primary basis for determining the presumed intention of the parties, but they are only, as article 32 indicates, a supplementary means of interpretation. And although

---

[319] *Land and Maritime Boundary between Cameroon and Nigeria (Cameroon v. Nigeria: Equatorial Guinea intervening)*, Judgment of 10 October 2002 (see footnote 291 above), pp. 338–339, para. 48, and p. 346, para. 59.

[320] *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)* (see footnote 54 above), p. 31, para. 53.

[321] *Aegean Sea Continental Shelf*, Judgment, *I.C.J. Reports 1978*, p. 3, at p. 32, para. 77; report of the Study Group on fragmentation of international law (A/CN.4/L.682 and Add.1) (see footnote 184 above), para. 478.

[322] *Dispute regarding Navigational and Related Rights* (see footnote 23 above), p. 243, para. 66.

[323] WTO, Appellate Body Report, *United States—Shrimp* (see footnote 262 above), para. 130.

[324] See United Nations Convention on the Law of the Sea, art. 153, para. 4, and art. 4, para. 4, in annex III.

[325] *Responsibilities and obligations of States with respect to activities in the Area* (see footnote 24 above), p. 43, para. 117.

[326] *Ibid.*, para. 211.

[327] *Tyrer v. the United Kingdom*, no. 5856/72, 25 April 1978, Series A, no. 26, para. 31; *Güzelyurtlu and Others v. Cyprus and Turkey*, no. 36925/07, 4 April 2017, para. 286; see also *Magyar Helsinki Bizottság v. Hungary* [GC], no. 18030/11, 8 November 2016, paras. 138 and 150; and *Biao v. Denmark* [GC], no. 38590/10, 24 May 2016, para. 131.

[328] *The Right to Information on Consular Assistance in the Framework of the Guarantees of the Due Process of Law* (see footnote 53 above), para. 114 ("This guidance is particularly relevant in the case of international human rights law, which has made great headway thanks to an evolutive interpretation of international instruments of protection. That evolutive interpretation is consistent with the general rules of treaty interpretation established in the 1969 Vienna Convention. Both this Court, in the Advisory Opinion on the Interpretation of the American Declaration of the Rights and Duties of Man (1989) and the European Court of Human Rights, in *Tyrer v. United Kingdom* (1978), *Marckx v. Belgium* (1979), *Loizidou v. Turkey* (1995), among others, have held that human rights treaties are living instruments whose interpretation must consider the changes over time and present-day conditions"); see also Arévalo Narváez and Patarroyo Ramírez, "Treaties over Time and human rights …" (see footnote 28 above).

[329] See *Iron Rhine Railway* (footnote 25 above), para. 80: "In the present case it is not a conceptual or generic term that is in issue, but rather new technical developments relating to the operation and capacity of the railway"; and also *Aegean Sea Continental Shelf* (footnote 321 above), p. 32, para. 77; *Case concerning the delimitation of the maritime boundary between Guinea-Bissau and Senegal*, Award, 31 July 1989, UNRIAA, vol. XX (Sales No. E/F.93.V.3), pp. 119–213, at pp. 151–152, para. 85.

[330] As the Study Group on fragmentation of international law phrased it in its 2006 report, "[t]he starting point must be … the fact that deciding [the] issue [of evolutive interpretation] is a matter of interpreting the treaty itself" (A/CN.4/L.682 and Add.1) (see footnote 184 above), para. 478.

[331] *Yearbook … 1964*, vol. II, document A/5809, pp. 204–205, para. (15); see also para. (13): "[p]aragraph 3 specifies as further authentic elements of interpretation: (*a*) agreements between the parties regarding the interpretation of the treaty, and (*b*) any subsequent practice in the application of the treaty which clearly established the understanding of all the parties regarding its interpretation" (*ibid.*, pp. 203–204); on the other hand, Waldock in his third report on the law of treaties explained that *travaux préparatoires* are not, as such, an authentic means of interpretation (*ibid.*, document A/CN.4/167 and Add.1–3, pp. 58–59, para. (21)).

interpretation must seek to identify the intention of the parties, this must be done by the interpreter on the basis of the means of interpretation that are available at the time of the act of interpretation and that include subsequent agreements and subsequent practice of parties to the treaty. The interpreter thus has to answer the question of whether parties can be presumed to have intended, upon the conclusion of the treaty, to give a term used a meaning that is capable of evolving over time.

(10)   Draft conclusion 8 does not take a position regarding the question of the appropriateness of a more contemporaneous or a more evolutive approach to treaty interpretation in general (see above commentary, at para. (4)). The conclusion should, however, be understood as indicating the need for some caution with regard to arriving at a conclusion in a specific case whether to adopt an evolutive approach. For this purpose, draft conclusion 8 points to subsequent agreements and subsequent practice as means of interpretation that may provide useful indications to the interpreter for assessing, as part of the ordinary process of treaty interpretation, whether the meaning of a term is capable of evolving over time.[332]

(11)   This approach is based on and confirmed by the jurisprudence of the International Court of Justice and other international courts and tribunals. In the *Namibia* advisory opinion, the International Court of Justice referred to the practice of United Nations organs and of States in order to specify the conclusions that it derived from the inherently evolutive nature of the right to self-determination.[333] In the *Aegean Sea* case, the Court found it "significant" that what it had identified as the "ordinary, generic sense" of the term "territorial status" was confirmed by the administrative practice of the United Nations and by the behaviour of the party that had invoked the restrictive interpretation in a different context.[334] In any case, the decisions in which the International Court of Justice has undertaken an evolutive interpretation have not strayed from the possible meaning of the text and from the presumed intention of the parties to the treaty, as they had also been expressed in their subsequent agreements and subsequent practice.[335]

(12)   The judgment of the International Court of Justice in *Dispute regarding Navigational and Related Rights* illustrates how subsequent agreements and subsequent practice of the parties can assist in determining whether a term has to be given a meaning that is capable of evolving over time. Interpreting the term "comercio" in a treaty of 1858, the Court held:

On the one hand, the subsequent practice of the parties, within the meaning of [a]rticle 31 (3) (*b*) of the Vienna Convention, can result in a departure from the original intent on the basis of a tacit agreement between the parties. On the other hand, there are situations in which the parties' intent upon conclusion of the treaty was … to give the terms used … a meaning or content capable of evolving, not one fixed once and for all, so as to make allowance for, among other things, developments in international law.[336]

The Court then found that the term "*comercio*" was a "generic term" of which "the parties necessarily" had "been aware that the meaning … was likely to evolve over time" and that "the treaty has been entered into for a very long period" and concluded that "the parties must be presumed … to have intended" this term to "have an evolving meaning".[337] Judge Skotnikov, in a separate opinion, while disagreeing with this reasoning, ultimately arrived at the same result by accepting a more recent subsequent practice of Costa Rica related to tourism on the San Juan River "for at least a decade" against which Nicaragua had "never protested" but rather "engaged in a consistent practice of allowing tourist navigation" and concluded that this "suggests that the [p]arties have established an agreement regarding its interpretation".[338]

(13)   The International Tribunal for the Former Yugoslavia has sometimes taken more general forms of State practice into account, including trends in the legislation of States that, in turn, can give rise to a changed interpretation of the scope of crimes or their elements. In *Prosecutor v. Furundžija*,[339] for example, the Trial Chamber of the International Tribunal for the Former Yugoslavia, in search of a definition for the crime of rape as prohibited by article 27 of the Geneva Convention relative to the Protection of Civilian Persons in Time of War, article 76, paragraph 1, of the first Additional Protocol (Protocol I) and article 4, paragraph 2 (*e*), of the second Additional Protocol (Protocol II), examined the principles of criminal law common to the major legal systems of the world and held:

that a trend can be discerned in the national legislation of a number of States of broadening the definition of rape so that it now embraces acts that were previously classified as comparatively less serious offences, that is sexual or indecent assault. This trend shows that at the national level States tend to take a stricter attitude towards serious forms of sexual assault.[340]

(14)   The "living instrument" approach of the European Court of Human Rights is also based, *inter alia*, on different forms of subsequent practice.[341] While the Court does

[332] See also Gardiner, *Treaty Interpretation* (footnote 20 above), pp. 292–294; Kolb, *Interprétation et création du droit international* (footnote 140 above), pp. 488–501; J. Arato, "Subsequent practice and evolutive interpretation: techniques of treaty interpretation over time and their diverse consequences", *The Law & Practice of International Courts and Tribunals*, vol. 9, No. 3 (2010), pp. 443–494, at pp. 444–445 and 465 *et seq.*

[333] *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)* (see footnote 54 above), pp. 30–31, paras. 49–51.

[334] *Aegean Sea Continental Shelf* case (see footnote 321 above), p. 31, para. 74.

[335] See *Case concerning the delimitation of the maritime boundary between Guinea-Bissau and Senegal* (footnote 329 above), pp. 151–152, para. 85.

[336] *Dispute regarding Navigational and Related Rights* (see footnote 23 above), p. 242, para. 64. For the Treaty of Territorial Limits between Costa Rica and Nicaragua, see *ibid.*, application instituting proceedings filed in the Registry of the Court on 29 September 2005, attachment 1.

[337] *Dispute regarding Navigational and Related Rights* (see footnote 23 above), p. 243, paras. 66–68.

[338] *Ibid.*, separate opinion of Judge Skotnikov, p. 283, at p. 285, paras. 9–10.

[339] *Prosecutor v. Anto Furundžija*, case No. IT-95-17/1-T, International Tribunal for the Former Yugoslavia, Trial Chamber, Judgment, 10 December 1998, *Judicial Reports 1998*, vol. I, p. 467, at pp. 581 *et seq.*, paras. 165 *et seq.*

[340] *Ibid.*, para. 179; similarly *The Prosecutor v. Alfred Musema*, case No. ICTR-96-13-T, International Criminal Tribunal for Rwanda, Trial Chamber I, Judgment, 27 January 2000, paras. 220 *et seq.*, in particular para. 228 (*Reports of Orders, Decisions and Judgements 2000*, vol. II, p. 1512).

[341] See Nolte, "Jurisprudence under special regimes …" (footnote 26 above), pp. 246 *et seq.*

not generally require "the agreement of the parties regarding its interpretation" in the sense of article 31, paragraph 3 (b), the decisions in which it adopts an evolutive approach are regularly supported by an elaborate account of subsequent practice.[342]

(15) The Inter-American Court of Human Rights, despite its relatively rare mentioning of subsequent practice, has frequently referred to broader international developments, an approach that falls somewhere between subsequent practice and other "relevant rules" under article 31, paragraph 3 (c).[343] In the case of *Mayagna (Sumo) Awas Tingni Community v. Nicaragua*, for example, the Court pointed out that:

human rights treaties are live instruments ["instrumentos vivos"] whose interpretation must adapt to the evolution of the times and, specifically, to current living conditions.[344]

(16) The Human Rights Committee has also on occasion adopted an evolutive approach that is based on developments of State practice. Thus, in *Judge v. Canada*, the Committee abandoned its repeated pronouncements based on *Kindler*,[345] elaborating that:

The Committee is mindful of the fact that the above-mentioned jurisprudence was established some 10 years ago, and that since that time there has been a broadening international consensus in favour of abolition of the death penalty, and in States which have retained the death penalty, a broadening consensus not to carry it out.[346]

In *Yoon and Choi*, the Committee stressed that the meaning of any right contained in the International Covenant on Civil and Political Rights evolved over time and concluded that article 18, paragraph 3, now provided at least some protection against being forced to act against genuinely held religious beliefs. The Committee reached this conclusion since "an increasing number of those States parties to the Covenant which have retained compulsory military service have introduced alternatives to compulsory military service".[347]

(17) Finally, the tribunals established under the auspices of ICSID have emphasized that subsequent practice can be a particularly important means of interpretation for those provisions that the parties to the treaty intended to evolve in the light of their subsequent treaty practice.[348]

(18) The jurisprudence of international courts and tribunals and pronouncements of expert treaty bodies thus confirm that subsequent agreements and subsequent practice under articles 31 and 32 "may assist in determining" whether or not a "term" shall be given "a meaning which is capable of evolving over time". The expression "term" is not limited to specific words (such as "commerce", "territorial status", "rape" or "investment"), but may also encompass more interrelated or cross-cutting concepts (such as "by law" (article 9 of the International Covenant on Civil and Political Rights) or "necessary" (article 18 of the Covenant), as they exist, for example, in human rights treaties). Since the "terms" of a treaty are elements of the rules which are contained therein, the rules concerned are covered accordingly.

(19) In a similar manner, subsequent practice under articles 31, paragraph 3 (b), and 32 has contributed to whether domestic courts arrive at a more evolutive or static interpretation of a treaty. For example, in a case concerning the Convention on the Civil Aspects of International Child Abduction, the New Zealand Court of Appeal interpreted the term "custody rights" as encompassing not only legal rights, but also "*de facto*" rights. On the basis of a review of legislative and judicial practice in different States and referring to article 31, paragraph 3 (b), the Court reasoned that this practice "evidence[d] a fundamental change in attitudes", which then led it to adopt a modern understanding of the term "custody rights" rather than an understanding "through a 1980 lens".[349] The German Federal Constitutional Court, in a series of cases concerning the interpretation of the North Atlantic Treaty in the light of the changed security context after the end of the cold war, also held that subsequent agreements and subsequent practice under article 31, paragraph 3 (b), "could acquire

---

[342] *Öcalan v. Turkey* [GC] (see footnote 299 above), para. 163; *Vo v. France* [GC], no. 53924/00, ECHR 2004-VIII, paras. 4 and 70; *Johnston and Others. v. Ireland*, no. 9697/82, 18 December 1986, Series A, no. 112, para. 53; *Bayatyan v. Armenia* [GC], no. 23459/03, ECHR 2011, para. 63; *Soering v. the United Kingdom* (see footnote 204 above), para. 103; *Al-Saadoon and Mufdhi v. the United Kingdom* (see footnote 299 above), paras. 119–120; *Demir and Baykara v. Turkey* [GC] (see footnote 27 above), para. 76; *Christine Goodwin v. the United Kingdom* [GC] (see footnote 172 above).

[343] See, for example, *Velásquez-Rodríguez v. Honduras*, Judgment (Merits), 29 July 1988, Inter-American Court of Human Rights, Series C, No. 4, para. 151; and *The Right to Information on Consular Assistance in the Framework of the Guarantees of the Due Process of Law* (footnote 53 above), paras. 130–133 and 137.

[344] *Mayagna (Sumo) Awas Tingni Community v. Nicaragua*, Judgment (Merits, Reparations and Costs), 31 August 2001, Series C, No. 79, para. 146; see also *Interpretation of the American Declaration of the Rights and Duties of Man within the Framework of Article 64 of the American Convention on Human Rights*, Advisory Opinion OC-10/89, 14 July 1989, Series A, No. 10, para. 38.

[345] *Kindler v. Canada*, Views, 30 July 1993, communication No. 470/1991, report of the Human Rights Committee, *Official Records of the General Assembly, Forty-eighth Session, Supplement No. 40* (A/48/40), vol. II, annex XII, U.

[346] *Judge v. Canada*, Views, 5 August 2003, communication No. 829/1998, *ibid., Fifty-eighth Session, Supplement No. 40* (A/58/40), vol. II, annex V, G, para. 10.3.

[347] *Yoon and Choi v. Republic of Korea* (see footnote 127 above), para. 8.4.

[348] See *Mihaly International Corporation v. Democratic Socialist Republic of Sri Lanka* (United States/Sri Lanka bilateral investment treaty), Award and Concurring Opinion, 15 March 2002, ICSID Case No. ARB/00/2, *ICSID Reports*, vol. 6 (2004), pp. 308 *et seq.*, at p. 317, para. 33 (see also *ICSID Review—Foreign Investment Law Journal*, vol. 17, No. 1 (2002), pp. 151 and 161); similarly, *Autopista Concesionada de Venezuela, CA v. Bolivarian Republic of Venezuela*, Decision on Jurisdiction, 27 September 2001, ICSID Case No. ARB/00/5, *ICSID Reports*, vol. 6 (2004), p. 439, para. 97. The text of the Treaty between the United States of America and the Democratic Socialist Republic of Sri Lanka concerning the Encouragement and Reciprocal Protection of Investment, done at Colombo on 20 September 1991, is available from http://investmentpolicyhub.unctad.org, *Policy Tools, International Investment Agreements*.

[349] New Zealand, Court of Appeal, *C v. H* [2009] NZCA 100, paras. 175–177 and 195–196 (Judge Baragwanath); see also para. 31 (Judge Chambers): "Revision of the text as drafted and agreed in 1980 is simply impracticable, given that any revisions would have to be agreed among such a large body of Contracting States. Therefore evolutions necessary to keep pace with social and other trends must be achieved by evolutions in interpretation and construction. This is a permissible exercise given the terms of the Vienna Convention on the Law of Treaties, which also came into force in 1980. Article 31 (3) (b) permits a construction that reflects 'any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation'." Similarly, Canada, Supreme Court, *Pushpanathan v. Canada (Minister of Citizenship and Immigration)* [1998] 1 SCR 982, para. 129 (Judge Cory).

significance for the meaning of the treaty" and ultimately held that this had been the case.[350]

(20)   Other decisions of domestic courts have confirmed that subsequent agreements and subsequent practice under articles 31, paragraph 3, and 32 do not necessarily support evolutive interpretations of a treaty. In *Eastern Airlines, Inc. v. Floyd et al.*, for example, the United States Supreme Court was confronted with the question of whether the term "bodily injury" in article 17 of the 1929 Convention for the Unification of Certain Rules Relating to International Carriage by Air covered not only physical but also purely mental injuries. The Court, taking account of the "post-1929 'conduct' and 'interpretations of the signatories'", emphasized that, despite some initiatives to the contrary, most parties had always continued to understand that the term covered only bodily injuries.[351]

### Conclusion 9.   Weight of subsequent agreements and subsequent practice as a means of interpretation

**1.   The weight of a subsequent agreement or subsequent practice as a means of interpretation under article 31, paragraph 3, depends, *inter alia*, on its clarity and specificity.**

**2.   In addition, the weight of subsequent practice under article 31, paragraph 3 (*b*), depends, *inter alia*, on whether and how it is repeated.**

**3.   The weight of subsequent practice as a supplementary means of interpretation under article 32 may depend on the criteria referred to in paragraphs 1 and 2.**

### Commentary

(1)   Draft conclusion 9 identifies some criteria that may be helpful in determining the interpretative weight to be accorded to a specific subsequent agreement or subsequent practice in the process of interpretation in a particular case. Naturally, the weight accorded to subsequent agreements or subsequent practice must also be determined in relation to other means of interpretation (see draft conclusion 2, paragraph 5).

### Paragraph 1—weight: clarity, specificity and other factors

(2)   Paragraph 1 addresses the weight of a subsequent agreement or subsequent practice under article 31, paragraph 3, thus dealing with both subparagraphs (*a*) and (*b*) from a general point of view. Paragraph 1 specifies that the weight to be accorded to a subsequent agreement or subsequent practice as a means of interpretation depends,

*inter alia*, on its clarity and specificity. The use of the term "*inter alia*" indicates that these criteria should not be seen as exhaustive. Other criteria may relate to the time when the agreement or practice occurred,[352] the emphasis given by the parties to a particular agreement or practice, or the applicable burden of proof.

(3)   The interpretative weight of subsequent agreements or practice in relation to other means of interpretation often depends on their clarity and specificity in relation to the treaty concerned.[353] This is confirmed, for example, by decisions of the International Court of Justice, arbitral awards and reports of the WTO panels and Appellate Body.[354] The award of the ICSID Tribunal in *Plama v. Bulgaria* is instructive:

> It is true that treaties between one of the Contracting Parties and third States may be taken into account for the purpose of clarifying the meaning of a treaty's text at the time it was entered into. The Claimant has provided a very clear and insightful presentation of Bulgaria's practice in relation to the conclusion of investment treaties subsequent to the conclusion of the Bulgaria-Cyprus [bilateral investment treaty] in 1987. In the 1990s, after Bulgaria's communist regime changed, it began concluding [bilateral investment treaties] with much more liberal dispute resolution provisions, including resort to ICSID arbitration. However, that practice is not particularly relevant in the present case since subsequent negotiations between Bulgaria and Cyprus indicate that these Contracting Parties did not intend the [most favoured nation] provision to have the meaning that otherwise might be inferred from Bulgaria's subsequent treaty practice. Bulgaria and Cyprus negotiated a revision of their [bilateral investment treaty] in 1998. The negotiations failed but specifically contemplated a revision of the dispute settlement provisions … It can be inferred from these negotiations that the Contracting Parties to the [treaty] themselves did not consider that the [most favoured nation] provision extends to dispute settlement provisions in other [bilateral investment treaties].[355]

(4)   Whereas the International Court of Justice and arbitral tribunals tend to accord more interpretative weight to rather specific subsequent practice by States, the European Court of Human Rights often relies on broad comparative assessments of the domestic legislation or international positions adopted by States.[356] In this latter context, it should be borne in mind that the rights and obligations under the European Convention on Human Rights must be correctly transposed, within the given

---

[350]   Germany, Federal Constitutional Court, BVerfGE, vol. 90 (see footnote 68 above), pp. 363–364, para. 276; *ibid.*, vol. 104, p. 151, at pp. 206–207.

[351]   United States, Supreme Court, *Eastern Airlines, Inc. v. Floyd et al.*, 499 U.S. 530, pp. 546–549; see also United Kingdom, House of Lords, *King v. Bristow Helicopters Ltd. (Scotland)* (see footnote 136 above), paras. 98 and 125 (Lord Hope).

[352]   In the case concerning the *Maritime Dispute (Peru v. Chile)*, the Court privileged the practice that was closer to the date of entry into force, *Maritime Dispute (Peru v. Chile)* (see footnote 197 above), p. 50, para. 126.

[353]   Murphy, "The relevance of subsequent agreement …" (see footnote 249 above), p. 91.

[354]   See, for example, *Maritime Delimitation in the Area between Greenland and Jan Mayen* (footnote 105 above), p. 55, para. 38; *Question of the tax regime governing pensions paid to retired UNESCO officials residing in France* (footnote 151 above), p. 259, para. 74; WTO, Panel Report, *United States—Continued Zeroing* (footnote 112 above); and WTO, Appellate Body Report, *United States—Subsidies on Upland Cotton*, WT/DS267/AB/R, adopted 21 March 2005, para. 625.

[355]   *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Decision on Jurisdiction, 8 February 2005, *ICSID Review—Foreign Investment Law Journal*, vol. 20, No. 1 (Spring 2005), p. 262, at pp. 323–324, para. 195. For the bilateral Agreement between Bulgaria and Cyprus on Mutual Encouragement and Protection of Investments, signed at Nicosia on 12 November 1987, see *Republic of Cyprus Official Gazette* S.VII 2314, 31 March 1988, p. 19; also available from http://investmentpolicyhub.unctad.org.

[356]   See, for example, *Cossey v. the United Kingdom*, no. 10843/84, 27 September 1990, Series A, no. 184, para. 40; *Tyrer v. the United Kingdom* (footnote 327 above), para. 31; and *Norris v. Ireland*, no. 10581/83, 26 October 1988, Series A, no. 142, para. 46.

margin of appreciation, into the law, the executive practice and international arrangements of the respective State party. For this purpose, sufficiently strong commonalities in the national legislation of its States parties can be relevant for the determination of the scope of a human right or the necessity of its restriction. In addition, the character of certain rights or obligations sometimes speaks in favour of taking less specific practice into account. For example, in the case of *Rantsev v. Cyprus and Russia*, the Court held that:

> It is clear from the provisions of these two [international] instruments that the Contracting States ... have formed the view that only a combination of measures addressing all three aspects can be effective in the fight against trafficking ... Accordingly, the duty to penalise and prosecute trafficking is only one aspect of member States' general undertaking to combat trafficking. The extent of the positive obligations arising under Article 4 [prohibition of forced labour] must be considered within this broader context.[357]

(5)    On the other hand, in the case of *Chapman v. the United Kingdom*, the Court observed "that there may be said to be an emerging international consensus amongst the Contracting States of the Council of Europe recognising the special needs of minorities and an obligation to protect their security, identity and lifestyle",[358] but ultimately said that it was "not persuaded that the consensus is sufficiently concrete for it to derive any guidance as to the conduct or standards which Contracting States consider desirable in any particular situation".[359]

*Paragraph 2—weight: repetition of a practice and other factors*

(6)    Paragraph 2 of draft conclusion 9 deals only with subsequent practice under article 31, paragraph 3 (*b*), and specifies that, in addition to the criteria mentioned in paragraph 1, the weight of subsequent practice also depends, *inter alia*, on whether and how it is repeated. This formula "whether and how it is repeated" brings in the elements of time and of the character of a repetition. It indicates, for example, that, depending on the treaty concerned, something more than just a technical or unmindful repetition of a practice may contribute to its interpretative value in the context of article 31, paragraph 3 (*b*). The elements of time and the character of the repetition also serve to indicate the "grounding" of a particular position of the parties regarding the interpretation of a treaty. Moreover, the non-implementation of a subsequent agreement may suggest that it lacks weight as a means of interpretation under article 31, paragraph 3 (*a*).[360]

(7)    The question of whether "subsequent practice" under article 31, paragraph 3 (*b*),[361] requires more than a one-off application of the treaty was addressed by the WTO Appellate Body in *Japan—Alcoholic Beverages II*:

subsequent practice in interpreting a treaty has been recognized as a "concordant, common and consistent" sequence of acts or pronouncements which is sufficient to establish a discernable pattern implying the agreement of the parties regarding its interpretation.[362]

(8)    This definition suggests that subsequent practice under article 31, paragraph 3 (*b*), requires more than one "act or pronouncement" regarding the interpretation of a treaty; rather action of such frequency and uniformity that it warrants a conclusion that the parties have reached a settled agreement regarding the interpretation of the treaty. Such a threshold would imply that subsequent practice under article 31, paragraph 3 (*b*), requires a broad-based, settled and qualified form of common practice in order to establish agreement among the parties regarding interpretation.

(9)    The International Court of Justice, on the other hand, has applied article 31, paragraph 3 (*b*), more flexibly, without adding further conditions. This is true, in particular, for its judgment in the case of *Kasikili/Sedudu Island*.[363] Other international courts have mostly followed the approach of the International Court of Justice. This is true for the Iran–United States Claims Tribunal[364] and the European Court of Human Rights.[365]

(10)    The difference between the standard formulated by the WTO Appellate Body, on the one hand, and the approach of the International Court of Justice, on the other, is, however, more apparent than real. The WTO Appellate Body seems to have taken the "concordant, common and consistent" formula from a publication[366] that stated that "[t]he value ... of subsequent practice will naturally depend on the extent to which it is concordant, common and consistent".[367] The formula "concordant, common and consistent" thus provides an indication as to the circumstances under which subsequent practice under article 31, paragraph 3 (*b*), has more or less weight as a means of interpretation in a process of interpretation,

---

[357] *Rantsev v. Cyprus and Russia*, no. 25965/04, ECHR 2010 (extracts), para. 285; see also paras. 273–274.

[358] *Chapman v. the United Kingdom* [GC] (see footnote 181 above), para. 93.

[359] *Ibid.*, para. 94.

[360] *Pulp Mills on the River Uruguay*, Judgment of 20 April 2010 (see footnote 23 above), p. 63, para. 131.

[361] See draft conclusion 4, para. 2.

[362] WTO, Appellate Body Report, *Japan—Alcoholic Beverages II* (see footnote 26 above), pp. 12–13.

[363] *Kasikili/Sedudu Island* (see footnote 23 above), pp. 1075–1076, paras. 47–50, and p. 1087, para. 63; *Territorial Dispute* (see footnote 23 above), pp. 34–37, paras. 66–71.

[364] Iran–United States Claims Tribunal, *The Islamic Republic of Iran v. The United States of America*, Interlocutory Award No. ITL 83-B1-FT (Counterclaim) (see footnote 154 above), pp. 116–126, paras. 109–133.

[365] *Soering v. the United Kingdom* (see footnote 204 above), para. 103; *Loizidou v. Turkey* (see footnote 36 above), paras. 73 and 79–82; *Banković and Others v. Belgium and Others* (dec.) [GC] (see footnote 207 above), paras. 56 and 62; concerning the jurisprudence of ICSID tribunals, see O. K. Fauchald, "The legal reasoning of ICSID Tribunals—An empirical analysis", *The European Journal of International Law*, vol. 19, No. 2 (2008), p. 301, at, p. 345; see also A. Roberts, "Power and persuasion in investment treaty interpretation: The dual role of States", *American Journal of International Law*, vol. 104, No. 2 (2010), pp. 207–215.

[366] Sinclair, *The Vienna Convention* ... (see footnote 21 above), p. 137; see also Yasseen, "L'interprétation des traités..." (footnote 21 above), pp. 48–49; while "*commune*" is taken from the work of the International Law Commission, "*d'une certaine constance*" and "*concordante*" are conditions that Yasseen derives through further reasoning; see *Yearbook ... 1966*, vol. II, document A/CN.4/186 and Add.1–7, pp. 98–99, paras. 17–18, and document A/6309/Rev.1 (Part II), pp. 221–222, para. (15).

[367] Sinclair, *The Vienna Convention* ... (see footnote 21 above), p. 137; Iran–United States Claims Tribunal, *The Islamic Republic of Iran v. The United States of America*, Interlocutory Award No. ITL 83-B1-FT (Counterclaim) (see footnote 154 above), p. 118, para. 114.

rather than require any particular frequency in the practice.[368] The WTO Appellate Body itself on occasion has relied on this nuanced view.[369]

(11) The Commission, while finding that the formula "concordant, common and consistent" may be useful for determining the weight of subsequent practice in a particular case, also considers it as not being sufficiently well established to articulate a minimum threshold for the applicability of article 31, paragraph 3 (*b*), and as carrying the risk of being misconceived as overly prescriptive. Ultimately, the Commission continues to find that: "The value of subsequent practice varies according as it shows the common understanding of the parties as to the meaning of the terms."[370] This implies that a one-time practice of the parties that establishes their agreement regarding the interpretation needs to be taken into account under article 31, paragraph 3 (*b*).[371]

(12) The weight of a subsequent practice may also ("*inter alia*") depend on other factors, such as consistency and breadth. A subsequent practice is more or less consistent depending on whether and how far conduct exceptionally deviates from the otherwise established pattern of practice. The breadth of a practice refers to the number of parties which engage in it and by which the agreement of all the parties is established.

*Paragraph 3—weight of subsequent practice under article 32*

(13) Paragraph 3 of draft conclusion 9 addresses the weight that should be accorded to subsequent practice under article 32 (see draft conclusion 4, paragraph 3). It does not address when and under which circumstances such practice can be considered. The WTO Appellate Body has emphasized, in a comparable situation, that those two issues must be distinguished from each other:

we consider that the European Communities conflates the preliminary question of what may qualify as a 'circumstance' of a treaty's conclusion with the separate question of ascertaining the degree of relevance that may be ascribed to a given circumstance, for purposes of interpretation under Article 32.[372]

The Appellate Body also held that:

first, the Panel did *not* examine the classification practice in the European Communities during the Uruguay Round negotiations *as a supplementary means of interpretation* within the meaning of Article 32 of the *Vienna Convention*; and, second, the value of the classification practice as a supplementary means of interpretation.[373]

In order to determine the "relevance" of such subsequent practice, the Appellate Body referred to "objective factors":

These include the type of event, document, or instrument and its legal nature; temporal relation of the circumstance to the conclusion of the treaty; actual knowledge or mere access to a published act or instrument; subject matter of the document, instrument, or event in relation to the treaty provision to be interpreted; and whether or how it was used or influenced the negotiations of the treaty.[374]

(14) Whereas the Appellate Body did not use the term "specificity", it referred to the criteria mentioned above. Instead of clarity, the Appellate Body spoke of "consistency" and stated that consistency should not set a benchmark but rather determine the degree of relevance. "Consistent prior classification practice may often be significant. Inconsistent classification practice, however, *cannot* be relevant in interpreting the meaning of a tariff concession".[375]

(15) A further factor that helps determine the relevance under article 32 may be the number of affected States that engage in that practice. The Appellate Body has stated:

To establish this intention, the prior practice of only *one* of the parties may be relevant, but it is clearly of more limited value than the practice of all parties. In the specific case of the interpretation of a tariff concession in a Schedule, the classification practice of the importing Member, in fact, may be of great importance.[376]

At the same time it is true that

[i]t would be quite novel and potentially raise due process concerns in investment arbitration cases if a subsequent unilateral statement by one State could be given substantial, let alone decisive, weight.[377]

---

[368] *Dispute between Argentina and Chile concerning the Beagle Channel* (see footnote 110 above), p. 187, para. 169; J.-P. Cot, "La conduite subséquente des parties à un traité", *Revue générale de droit international public*, vol. 70, No. 3 (1966), pp. 644–647 ("*valeur probatoire*"); Distefano, "La pratique subséquente ..." (see footnote 184 above), p. 46; Dörr, "Article 31 ..." (see footnote 61 above), p. 598, para. 80; see also the oral argument before the International Court of Justice in *Maritime Dispute (Peru v. Chile)*, CR 2012/33, pp. 32–36, paras. 7–19 (Wood), and CR 2012/36, pp. 13–18, paras. 6–21 (Wordsworth), available from www.icj-cij.org/en/case/137/oral-proceedings.

[369] WTO, Appellate Body Report, *EC—Computer Equipment* (see footnote 36 above), para. 93.

[370] *Yearbook ... 1966*, vol. II, document A/6309/Rev.1 (Part II), p. 222, para. (15); see also Cot, "La conduite subséquente des parties ..." (footnote 368 above), p. 652.

[371] In practice, a one-off practice will often not be sufficient to establish an agreement of the parties regarding a treaty's interpretation; as a general rule, however, subsequent practice under article 31, paragraph 3 (*b*), does not require any repetition but only an agreement regarding the interpretation. The likelihood of an agreement established by a one-off practice thus depends on the act and the treaty in question, see E. Lauterpacht, "The development of the law of international organization by the decisions of international tribunals", *Collected Courses of the Hague Academy of International Law, 1976*, vol. 152, pp. 377–466, at p. 457; Linderfalk, *On the Interpretation of Treaties* (footnote 67 above), p. 166; and C. F. Amerasinghe, "Interpretation of texts in open international organizations", *British Year Book of International Law 1994*, vol. 65, p. 175, at p. 199. Villiger argues in favour of a certain frequency, but emphasizes that the important point is the establishment of an agreement: Villiger, *Commentary ...* (see footnote 37 above), p. 431, para. 22. Yasseen and Sinclair write that practice cannot "in general" be established by one single act: Yasseen, "L'interprétation des traités ..." (see footnote 21 above), p. 47; Sinclair, *The Vienna Convention ...* (see footnote 21 above), p. 137; see also Nolte, "Subsequent agreements and subsequent practice of States ..." (footnote 62 above), p. 310.

[372] WTO, Appellate Body Report, *EC—Chicken Cuts* (see footnote 66 above), para. 297.

[373] WTO, Appellate Body Report, *EC—Computer Equipment* (see footnote 36 above), para. 92 (footnote omitted).

[374] *EC—Chicken Cuts* (see footnote 66 above), para. 291 (footnote omitted).

[375] *Ibid.*, para. 307 (footnote omitted); *cf.* also *EC—Computer Equipment* (footnote 36 above), para. 95.

[376] *EC—Computer Equipment* (see footnote 36 above), para. 93 (original emphasis).

[377] *Philip Morris Brands Sàrl, Philip Morris Products S.A. and Abal Hermanos S.A. v. Oriental Republic of Uruguay* (see footnote 135 above), para. 476.

### Conclusion 10.    Agreement of the parties regarding the interpretation of a treaty

**1.    An agreement under article 31, paragraph 3 (*a*) and (*b*), requires a common understanding regarding the interpretation of a treaty which the parties are aware of and accept. Such an agreement may, but need not, be legally binding for it to be taken into account.**

**2.    The number of parties that must actively engage in subsequent practice in order to establish an agreement under article 31, paragraph 3 (*b*), may vary. Silence on the part of one or more parties may constitute acceptance of the subsequent practice when the circumstances call for some reaction.**

#### Commentary

*Paragraph 1, first sentence—"common understanding"*

(1)    The first sentence of paragraph 1 sets forth the principle that an "agreement" under article 31, paragraph 3 (*a*) and (*b*), requires a common understanding by the parties regarding the interpretation of a treaty. In order for that common understanding to have the effect provided for under article 31, paragraph 3, the parties must be aware of it and accept the interpretation contained therein. While the difference regarding the form of an "agreement" under subparagraph (*a*) and subparagraph (*b*) has already been set out in draft conclusion 4 and its accompanying commentary,[378] paragraph 1 of draft conclusion 10 intends to capture what is common in the two subparagraphs, which is the agreement between the parties, in substance, regarding the interpretation of the treaty.

(2)    The element that distinguishes subsequent agreements and subsequent practice as authentic means of interpretation under article 31, paragraph 3 (*a*) and (*b*), on the one hand, and other subsequent practice as a supplementary means of interpretation under article 32,[379] on the other, is the "agreement" of all the parties regarding the interpretation of the treaty. It is this agreement of the parties that provides the means of interpretation under article 31, paragraph 3,[380] their specific function and weight for the interactive process of interpretation under the general rule of interpretation of article 31.[381]

(3)    Conflicting positions regarding interpretation expressed by different parties to a treaty preclude the existence of an agreement. This has been confirmed, *inter alia*, by the Arbitral Tribunal in the case of *German External Debts*, which held that a "tacit subsequent understanding" could not be derived from a number of communications by administering agencies since one of those agencies, the Bank of England, had expressed a divergent position.[382]

(4)    However, agreement is only absent to the extent that the positions of the parties conflict and for as long as their positions conflict. The fact that parties apply a treaty differently does not, as such, permit a conclusion that there are conflicting positions regarding the interpretation of the treaty. Such a difference may indicate a disagreement over the one correct interpretation, but it may also simply reflect a common understanding that the treaty permits a certain scope for the exercise of discretion in its application.[383] Treaties relating to human rights, for example, tend to aim at a uniform interpretation but also to leave room for the exercise of discretion by States.

(5)    Whereas equivocal conduct by one or more parties will normally prevent the identification of an agreement,[384] not every element of the conduct of a State that does not fully fit into a general picture necessarily renders the conduct of that State equivocal. The Court of Arbitration in the *Beagle Channel* case, for example, found that although at one point the parties had a difference of opinion regarding the interpretation of a treaty, that fact did not necessarily establish that the lack of agreement was permanent:

> In the same way, negotiations for a settlement, that did not result in one, could hardly have any permanent effect. At the most they might temporarily have deprived the acts of the Parties of probative value in support of their respective interpretations of the [Boundary] Treaty [of 1881], insofar as these acts were performed during the progress of the negotiations. The matter cannot be put higher than that.[385]

(6)    Similarly, in *Loizidou v. Turkey*, the European Court of Human Rights held that the scope of the restrictions that the parties could place on their acceptance of the competence of the European Commission on Human Rights and the Court was "confirmed by the subsequent practice of Contracting Parties", that is, "the evidence of a practice denoting practically universal agreement amongst Contracting Parties that Articles 25 and 46 … of the [European] Convention [on Human Rights] do not permit territorial or substantive restrictions".[386] The Court, applying article 31, paragraph 3 (*b*), described "such a … State practice" as being "uniform and consistent", despite the fact that it simultaneously recognized that two States

---

[378] See commentary to draft conclusion 4, para. (10), above.

[379] See draft conclusions 3 and 4, para. 3.

[380] See Crawford, "A consensualist interpretation of article 31 (3) …" (footnote 216 above), p. 30: "There is no reason to think that the word 'agreement' in para. (*b*) has any different meaning as compared to the meaning it has in para. (*a*)."

[381] See commentary to draft conclusion 2, paras. (12)–(15), above; article 31 must be "read as a whole" and conceives of the process of interpretation as "a single combined operation" and is not "laying down a legal hierarchy of norms for the interpretation of treaties" (*Yearbook … 1966*, vol. II, document A/6309/Rev.1 (Part II), p. 219, para. (8), and p. 220, para. (9)).

[382] *Case concerning the question whether the re-evaluation of the German Mark in 1961 and 1969 constitutes a case for application of the clause in article 2 (e) of Annex I A of the 1953 Agreement on German External Debts between Belgium, France, Switzerland, the United Kingdom of Great Britain and Northern Ireland and the United States of America on the one hand and the Federal Republic of Germany on the other* (see footnote 110 above), pp. 103–104, para. 31; see also WTO, Appellate Body Report, *EC—Computer Equipment* (footnote 36 above), para. 95; and *Case concerning the delimitation of the maritime boundary between Guinea and Guinea-Bissau*, Award of 14 February 1985, UNRIAA, vol. XIX (Sales No. E/F.90.V.7), p. 175, para. 66.

[383] See commentary to draft conclusion 7, paras. (12)–(15), above.

[384] *Question of the tax regime governing pensions paid to retired UNESCO officials residing in France* (see footnote 151 above), p. 258, para. 70; Kolb, "La modification d'un traité …" (see footnote 296 above), p. 16.

[385] *Dispute between Argentina and Chile concerning the Beagle Channel* (see footnote 36 above), p. 188, para. 171. For the Boundary Treaty between the Argentine Republic and the Republic of Chile, signed at Buenos Aires on 23 July 1881, see United Nations, *Treaty Series*, vol. 2384, No. 1295, p. 205.

[386] *Loizidou v. Turkey* (see footnote 36 above), paras. 79 and 80.

possibly constituted exceptions.[387] The decision suggests that interpreters, at least under the European Convention on Human Rights, possess some margin when assessing whether an agreement of the parties regarding a certain interpretation is established.[388]

(7) The term "agreement" in the 1969 Vienna Convention[389] does not imply any particular requirements of form,[390] including for an "agreement" under article 31, paragraph 3 (*a*) and (*b*).[391] The Commission, however, has noted that, in order to distinguish a subsequent agreement under article 31, paragraph 3 (*a*), and a subsequent practice that "establishes the agreement" of the parties under article 31, paragraph 3 (*b*), the former presupposes a "common act".[392] There is no requirement that an agreement under article 31, paragraph 3 (*a*), be published or registered under Article 102 of the Charter of the United Nations.[393]

(8) For an agreement under article 31, paragraph 3 (*a*) and (*b*), to be "common", it is sometimes sufficient that the parties reach the same understanding individually, but sometimes necessary that the parties have a mutual awareness of a shared understanding. In the *Kasikili/Sedudu Island* case, the International Court of Justice required that, for practice to fall under article 31, paragraph 3 (*b*), the "Bechuanaland authorities were fully aware of and accepted" the interpretation of the Caprivi authorities with respect to the boundary laid down by the 1890 Treaty.[394] In certain circumstances, the awareness

and acceptance of the position of the other party or parties may be assumed, particularly in the case of treaties that are implemented at the national level.

*Paragraph 1, second sentence—possible legal effects of agreement under article 31, paragraph 3 (*a*) and (*b*)*

(9) The aim of the second sentence of paragraph 1 is to reaffirm that "agreement", for the purpose of article 31, paragraph 3, need not, as such, be legally binding, in contrast to other provisions of the 1969 Vienna Convention in which the term "agreement" is used in the sense of a legally binding instrument.[396]

(10) This is confirmed by the fact that the Commission, in its final draft articles on the law of treaties, used the expression "any subsequent practice … which establishes the understanding of the parties".[397] The expression "understanding" indicates that the term "agreement" in article 31, paragraph 3, does not require that the parties thereby undertake or create any legal obligation existing in addition to, or independently from, the treaty.[398] The Vienna Conference replaced the expression "understanding" by the word "agreement" not for any substantive reason but for reasons "related to the drafting only" in order to emphasize that the understanding of the parties was to be their "common" understanding.[399] An "agreement" under article 31, paragraph 3 (*a*), equally need not be legally binding.[400]

[387] *Ibid.*, paras. 80 and 82; the case did not concern the interpretation of a particular human right, but rather the question of whether a State was bound by the European Convention on Human Rights at all.

[388] The more restrictive jurisprudence of the WTO Dispute Settlement Body suggests that different interpreters may evaluate matters differently; see Panel Report, *United States—Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing")*, WT/DS294/R, adopted 9 May 2006 and amended by Appellate Body Report WT/DS294/AB/R, para. 7.218: "even if it were established conclusively that all the 76 Members referred to by the European Communities have adopted a [certain] practice … this would only mean that a considerable number of WTO Members have adopted an approach different from that of the United States. … We note that one third party in this proceeding submitted arguments contesting the view of the European Communities".

[389] See articles 2, para. 1 (*a*), 3, 24, para. 2, 39–41, 58 and 60.

[390] See commentary to draft conclusion 4, para. (5), above; confirmed by the Permanent Court of Arbitration in the *Bay of Bengal Maritime Boundary Arbitration (Bangladesh v. India)*, Award of 7 July 2014, available from the Court's website at https://pca-cpa.org/, *Cases*, p. 47, para. 165; see also Yasseen, "L'interprétation des traités …" (footnote 21 above), p. 45; and Distefano, "La pratique subséquente …" (footnote 184 above), p. 47.

[391] See commentary to draft conclusion 4, para. (5), above; see also Gardiner, *Treaty Interpretation* (footnote 20 above), pp. 231–232 and 243–247; Aust, *Modern Treaty Law and Practice* (footnote 141 above), p. 213; Dörr, "Article 31 …" (footnote 61 above), p. 594, para. 75; and R. Gardiner, "The Vienna Convention rules on treaty interpretation", in D. B. Hollis (ed.), *The Oxford Guide to Treaties*, Oxford, Oxford University Press, 2012, pp. 475 and 483.

[392] See commentary to draft conclusion 4, para. (10), above; a "common act" may also consist of an exchange of letters, see *European Molecular Biology Laboratory Arbitration (EMBL v. Germany)*, 29 June 1990, ILR, vol. 105 (1997), p. 1, at pp. 54–56; Fox, "Article 31 (3) (*a*) and (*b*) …" (footnote 62 above), p. 63; and Gardiner, *Treaty Interpretation* (footnote 20 above), pp. 248–249.

[393] Aust, "The theory and practice of informal international instruments" (see footnote 86 above), pp. 789–790.

[394] *Kasikili/Sedudu Island* (see footnote 23 above), p. 1094, para. 74 ("occupation of the Island by the Masubia") and pp. 1077–1078,

para. 55 ("Eason Report", which "appears never to have been made known to Germany"); Dörr, "Article 31 …" (see footnote 61 above), pp. 602–603, para. 89.

[395] See commentary to draft conclusion 4, para. (6), above; see also P. Gautier, "Non-binding agreements", *Max Planck Encyclopedia of Public International Law* (online edition: https://opil.ouplaw.com/home/MPIL), para. 14; Benatar, "From probative value to authentic interpretation …" (footnote 62 above), pp. 194–195; Aust, *Modern Treaty Law and Practice* (footnote 141 above), p. 213; and Gardiner, *Treaty Interpretation* (footnote 20 above), p. 244; see also Nolte, "Subsequent agreements and subsequent practice of States …" (footnote 62 above), p. 375.

[396] See articles 2, para. 1 (*a*), 3, 24, para. 2, 39–41, 58 and 60.

[397] See *Yearbook … 1966*, vol. II, document A/6309/Rev.1 (Part II), p. 221, para. (15).

[398] *Dispute between Argentina and Chile concerning the Beagle Channel* (see footnote 110 above), p. 187, para. 169; *Case concerning the question whether the re-evaluation of the German Mark in 1961 and 1969 constitutes a case for application of the clause in article 2 (e) of Annex I A of the 1953 Agreement on German External Debts between Belgium, France, Switzerland, the United Kingdom of Great Britain and Northern Ireland and the United States of America on the one hand and the Federal Republic of Germany on the other* (see footnote 150 above), pp. 103–104, para. 31; Karl, *Vertrag und spätere Praxis …* (see footnote 75 above), pp. 190–195; Kolb, "La modification d'un traité …" (see footnote 296 above), pp. 25–26; Linderfalk, *On the Interpretation of Treaties* (see footnote 67 above), pp. 169–171.

[399] See *Official Records of the United Nations Conference on the Law of Treaties, First session …* (A/CONF.39/11) (footnote 89 above), 31st meeting, 19 April 1968, p. 169, paras. 59–60 (Australia); see also P. Gautier, "Les accords informels et la Convention de Vienne sur le droit des traités entre États", in N. Angelet and others (eds.), *Droit du pouvoir, pouvoir du droit: mélanges offerts à Jean Salmon*, Brussels, Bruylant, 2007, pp. 425–454, at pp. 430–431: "La lettre a) du paragraphe 3 fait référence à un accord interprétatif et l'on peut supposer que le terme 'accord' est ici utilisé dans un sens générique, qui ne correspond pas nécessairement au 'traité' défini à l'article 2 de la [C]onvention de Vienne. Ainsi, l'accord interprétatif ultérieur pourrait être un accord verbal, voire un accord politique" (footnote omitted).

[400] See Gautier, "Non-binding agreements" (footnote 395 above), para. 14; and Aust, *Modern Treaty Law and Practice* (footnote 141 above), pp. 211 and 213.

(11)   It is thus sufficient that the parties, by a subsequent agreement or a subsequent practice under article 31, paragraph 3, attribute a certain meaning to the treaty[401] or, in other words, adopt a certain "understanding" of the treaty.[402] Subsequent agreements and subsequent practice under article 31, paragraph 3 (a) and (b), even if they are not in themselves legally binding, can thus nevertheless, as means of interpretation, give rise to legal consequences as part of the process of interpretation according to article 31.[403] Accordingly, international courts and tribunals have not required that an "agreement" under article 31, paragraph 3, reflect the intention of the parties to create new, or separate, legally binding undertakings.[404] Similarly, memorandums of understanding have been recognized, on occasion, as "a potentially important aid to interpretation"—but "not a source of independent legal rights and duties".[405]

*Paragraph 2—forms of participation in subsequent practice*

(12)   The first sentence of paragraph 2 confirms the principle that not all the parties must engage in a particular practice to constitute agreement under article 31, paragraph 3 (b). The second sentence clarifies that acceptance of such practice by those parties not engaged in the practice can under certain circumstances be brought about by silence or inaction.

(13)   From the outset, the Commission has recognized that an "agreement" deriving from subsequent practice

under article 31, paragraph 3 (b), can result, in part, from silence or inaction by one or more parties. Explaining why it used the expression "the understanding of the parties" in draft article 27, paragraph 3 (b) (which later became "the agreement" in article 31, paragraph 3 (b) (see para. (10) above)), and not the expression "the understanding of *all* the parties", the Commission stated that:

[i]t considered that the phrase "the understanding of the parties" necessarily means "the parties as a whole". It omitted the word "all" merely to avoid any possible misconception that every party must individually have engaged in the practice where it suffices that it should have accepted the practice.[406]

(14)   The International Court of Justice has also recognized the possibility of expressing agreement regarding interpretation by silence or inaction by stating, in the case concerning the *Temple of Preah Vihear*, that where "it is clear that the circumstances were such as called for some reaction, within a reasonable period", the State confronted with a certain subsequent conduct by another party "must be held to have acquiesced".[407] This general proposition of the Court regarding the role of silence for the purpose of establishing agreement regarding the interpretation of a treaty by subsequent practice has been confirmed by later decisions,[408] and is generally supported by writers.[409] The "circumstances" that will "call for some reaction" include the particular setting in which the States parties interact with each other in respect of the treaty.[410]

(15)   The Court of Arbitration in the *Beagle Channel* case[411] dealt with the contention by Argentina that acts of jurisdiction by Chile over certain islands could not be counted as relevant subsequent conduct, since Argentina had not reacted to these acts. The Court, however, held that:

---

[401] This terminology follows the commentary to guideline 1.2 (Definition of interpretative declarations) of the Commission's Guide to Practice on Reservations to Treaties (*Yearbook ... 2011*, vol. II (Part Three) and Corr.1–2, p. 54, paras. (18) and (19)).

[402] See *Yearbook ... 1966*, vol. II, document A/6309/Rev.1 (Part II), pp. 221–222, paras. (15) and (16) (uses of the term "understanding" both in the context of what became article 31, para. 3 (a), as well as what became article 31, para. 3 (b)).

[403] *United States–United Kingdom Arbitration concerning Heathrow Airport User Charges, Award on the First Question*, 30 November 1992, UNRIAA, vol. XXIV (Sales No. E/F.04.V.18), pp. 1–359, at p. 131, para. 6.8; Aust, "The theory and practice of informal international instruments" (see footnote 86 above), pp. 787 and 807; Linderfalk, *On the Interpretation of Treaties* (see footnote 67 above), p. 173; Hafner, "Subsequent agreements and practice ..." (see footnote 260 above), pp. 110–113; Gautier, "Les accords informels et la Convention de Vienne ..." (see footnote 399 above), p. 156.

[404] For example, "pattern implying the agreement of the parties regarding its interpretation" (WTO, Appellate Body Report, *Japan–Alcoholic Beverages II* (see footnote 26 above), p. 13); or "pattern ... must imply *agreement* on the interpretation of the relevant provision" (WTO, Panel Reports, *European Communities and its member States—Tariff Treatment of Certain Information Technology Products*, WT/DS375/R, WT/DS376/R and WT/DS377/R, adopted 21 September 2010, para. 7.558); or "practice [that] reflects an agreement as to the interpretation" (Iran–United States Claims Tribunal, *The Islamic Republic of Iran v. The United States of America*, Interlocutory Award No. ITL 83-B1-FT (Counterclaim) (see footnote 154 above), p. 119, para. 116); or that "State practice" was "indicative of a lack of any apprehension on the part of the Contracting States" (*Banković and Others v. Belgium and Others* (dec.) [GC] (see footnote 207 above), para. 62); "[T]he Tribunal is not bound by the views of either State Party. Although the Tribunal must 'take into account' any subsequent agreement between the State Parties pursuant to Article 31 (3) (a) of the [1969 Vienna Convention], the proper interpretation of Article 10.18 and how it should be applied to the facts of this case are tasks which reside exclusively with this Tribunal" (*The Renco Group Inc. v. Republic of Peru* (see footnote 30 above), para. 156).

[405] *United States–United Kingdom Arbitration concerning Heathrow Airport User Charges* (see footnote 403 above), p. 131, para. 6.8; see also *Iron Rhine Railway* (footnote 25 above), p. 98, para. 157.

[406] *Yearbook ... 1966*, vol. II, document A/6309/Rev.1 (Part II), p. 222, para. (15).

[407] *Case concerning the Temple of Preah Vihear*, Judgment of 15 June 1962 (see footnote 110 above), p. 23.

[408] *Oil Platforms* (see footnote 199 above), p. 815, para. 30; *Military and Paramilitary Activities in and against Nicaragua. Jurisdiction and Admissibility*, Judgment of 26 November 1984 (see footnote 110 above), p. 410, para. 39; *Prosecutor v. Anto Furundžija* (see footnote 339 above), para. 179; *Rantsev v. Cyprus and Russia* (see footnote 357 above), para. 285; cautiously: WTO, Appellate Body Report, *EC—Chicken Cuts* (see footnote 66 above), para. 272; see also, for a limited holding, Iran–United States Claims Tribunal, *RayGo Wagner Equipment Company v. Iran Express Terminal Corporation*, Award No. 30-16-3 (18 March 1983), *Iran–United States Claims Tribunal Reports*, vol. 2 (1983-I), p. 141, at p. 144; and *Case concerning the question whether the re-evaluation of the German Mark in 1961 and 1969 constitutes a case for application of the clause in article 2 (e) of Annex I A of the 1953 Agreement on German External Debts between Belgium, France, Switzerland, the United Kingdom of Great Britain and Northern Ireland and the United States of America on the one hand and the Federal Republic of Germany on the other* (footnote 150 above), pp. 103–104, para. 31.

[409] Kamto, "La volonté de l'État ..." (see footnote 152 above), pp. 134–141; Yasseen, "L'interprétation des traités ..." (see footnote 21 above), p. 49; Gardiner, *Treaty Interpretation* (see footnote 20 above), p. 267; Villiger, *Commentary ...* (see footnote 37 above), p. 431, para. 22; Dörr, "Article 31 ..." (see footnote 61 above), pp. 599–600 and 601–602, paras. 84 and 87.

[410] For example, when acting within the framework of an international organization: see *Application of the Interim Accord of 13 September 1995 (the former Yugoslav Republic of Macedonia v. Greece)*, Judgment of 5 December 2011, *I.C.J. Reports 2011*, p. 644, at pp. 675–676, paras. 99–101; and Kamto, "La volonté de l'État ..." (footnote 152 above), p. 136.

[411] *Dispute between Argentina and Chile concerning the Beagle Channel* (see footnote 110 above).

The terms of the Vienna Convention do not specify the ways in which "agreement" may be manifested. In the context of the present case the acts of jurisdiction were not intended to establish a source of title independent of the terms of the Treaty; nor could they be considered as being in contradiction of those terms as understood by Chile. The evidence supports the view that they were public and well-known to Argentina, and that they could only derive from the Treaty. Under these circumstances the silence of Argentina permits the inference that the acts tended to confirm an interpretation of the meaning of the Treaty independent of the acts of jurisdiction themselves.[412]

In the same case, the Court of Arbitration considered that:

The mere publication of a number of maps of (as the Court has already shown) extremely dubious standing and value, could not—even if they nevertheless represented the official Argentine view—preclude or foreclose Chile from engaging in acts that would, correspondingly, demonstrate her own view of what were her rights under the 1881 Treaty,—nor could such publication of itself absolve Argentina from all further necessity for reaction in respect of those acts, if she considered them contrary to the Treaty.[413]

(16)    The significance of silence also depends on the legal situation to which the subsequent practice by the other party relates and on the claim thereby expressed. Thus, in the case concerning the *Land and Maritime Boundary between Cameroon and Nigeria (Cameroon v. Nigeria: Equatorial Guinea intervening)*, the International Court of Justice held that:

Some of these activities—the organization of public health and education facilities, policing, the administration of justice—could normally be considered to be acts *à titre de souverain*. The Court notes, however, that, as there was a pre-existing title held by Cameroon in this area of the lake, the pertinent legal test is whether there was thus evidenced acquiescence by Cameroon in the passing of title from itself to Nigeria.[414]

(17)    This judgment suggests that in cases that concern treaties delimiting a boundary the circumstances will only very exceptionally call for a reaction with respect to conduct that runs counter to the delimitation. In such situations, there appears to be a strong presumption that silence or inaction does not constitute acceptance of a practice.[415]

(18)    The relevance of silence or inaction for the establishment of an agreement regarding interpretation depends to a large extent on the circumstances of the specific case. Decisions of international courts and tribunals demonstrate that acceptance of a practice by one or more parties by way of silence or inaction is not easily established.

(19)    International courts and tribunals have, for example, been reluctant to accept that parliamentary proceedings or domestic court judgments can be considered as subsequent practice under article 31, paragraph 3 (*b*), to which other parties to the treaty would be expected to

react, even if such proceedings or judgments had come to their attention through other channels, including by their own diplomatic service.[416]

(20)    Further, even where a party, by its conduct, expresses a certain position towards another party (or parties) regarding the interpretation of a treaty, this does not necessarily call for a reaction by the other party or parties. In the *Kasikili/Sedudu Island* case, the International Court of Justice held that a State that did not react to the findings of a joint commission of experts, which had been entrusted by the parties to determine a particular factual situation with respect to a disputed matter, did not thereby provide a ground for the conclusion that an agreement had been reached with respect to the dispute.[417] The Court found that the parties had considered the work of the experts as being merely a preparatory step for a separate decision subsequently to be taken at the political level. At a more general level, the WTO Appellate Body has held that:

in specific situations, the "lack of reaction" or silence by a particular treaty party may, in the light of attendant circumstances, be understood as acceptance of the practice of other treaty parties. Such situations may occur when a party that has not engaged in a practice has become or has been made aware of the practice of other parties (for example, by means of notification or by virtue of participation in a forum where it is discussed), but does not react to it.[418]

The International Tribunal for the Law of the Sea has confirmed this approach. Taking into account the practice of States in interpreting articles 56, 58 and 73 of the United Nations Convention on the Law of the Sea, the Tribunal stated:

The Tribunal acknowledges that the national legislation of several States, not only in the West African region, but also in some other regions of the world, regulates bunkering of foreign vessels fishing in their exclusive economic zones in a way comparable to that of Guinea-Bissau. The Tribunal further notes that there is no manifest objection to such legislation and that it is, in general, complied with.[419]

(21)    Decisions by domestic courts have also recognized that silence on the part of a party to a treaty can only be taken to mean acceptance "if the circumstances call for some reaction".[420] Such circumstances have sometimes been recognized in certain cooperative contexts, for example under a bilateral treaty that provides for a particularly close form of cooperation.[421] This may be different if the cooperation that is envisaged by the treaty takes place in the context of an international organization whose

---

[412] *Ibid.*, p. 187, para. 169 (*a*).

[413] *Ibid.*, p. 188, para. 171.

[414] *Land and Maritime Boundary between Cameroon and Nigeria (Cameroon v. Nigeria: Equatorial Guinea intervening)*, Judgment of 10 October 2002 (see footnote 291 above), p. 353, para. 67.

[415] *Ibid.*, p. 351, para. 64: "The Court notes, however, that now that it has made its findings that the frontier in Lake Chad was delimited …, it necessarily follows that any Nigerian *effectivités* are indeed to be evaluated for their legal consequences as acts *contra legem*"; see also *Frontier Dispute (Burkina Faso/Republic of Mali)*, Judgment, *I.C.J. Reports 1986*, p. 554, at p. 586, para. 63; and *Case concerning the delimitation of the maritime boundary between Guinea-Bissau and Senegal* (footnote 329 above), p. 181, para. 70.

[416] *Sovereignty over Pulau Ligitan and Pulau Sipadan* (see footnote 23 above), pp. 650–651, para. 48; WTO, Appellate Body Report, *EC—Chicken Cuts* (see footnote 66 above), para. 334 ("mere access to a published judgment cannot be equated with acceptance"); see also Court of Justice of the European Union, *Council v. Front Polisario*, Case C-104/16 P, Judgment of 21 December 2016, para. 118 (published in the digital Court Reports of the Court of Justice).

[417] *Kasikili/Sedudu Island* (see footnote 23 above), pp. 1089–1091, paras. 65–68.

[418] WTO, Appellate Body Report, *EC—Chicken Cuts* (see footnote 66 above), para. 272 (footnote omitted).

[419] *The M/V "Virginia G" Case (Panama/Guinea-Bissau)*, Judgment of 14 April 2014, *ITLOS Reports 2014*, para. 218.

[420] Switzerland, Federal Court, judgment of 17 February 1971, BGE, vol. 97 I, p. 359, at pp. 370–371.

[421] See United States, Supreme Court, *O'Connor v. United States* (footnote 51 above), pp. 33–35; Germany, Federal Constitutional Court, BVerfGE, vol. 59, p. 63, at pp. 94–95.

rules preclude using the practice of the parties, and their silence, for the purpose of interpretation.[422]

(22)   The possible legal significance of silence or inaction in the face of a subsequent practice of a party to a treaty is not limited to contributing to a possible underlying common agreement, but may also play a role for the operation of non-consent-based rules, such as estoppel, preclusion or prescription.[423]

(23)   Once established, an agreement between the parties under article 31, paragraph 3 (*a*) and (*b*), can eventually be terminated. The parties may replace it by another agreement with a different scope or content under article 31, paragraph 3. In this case, the new agreement replaces the previous one as an authentic means of interpretation from the date of its existence, at least with effect for the future.[424] Such situations, however, should not be lightly assumed as States usually do not change their interpretation of a treaty according to short-term considerations.

(24)   It is also possible for a disagreement to arise between the parties regarding the interpretation of a treaty after they had reached a subsequent agreement regarding such interpretation. Such a disagreement, however, normally will not replace the prior subsequent agreement, since the principle of good faith prevents a party from simply disavowing the legitimate expectations that have been created by a common interpretation.[425] On the other hand, clear expressions of disavowal by one party of a previous understanding arising from common practice "do reduce in a major way the significance of the practice … after that date", without, however, diminishing the significance of the previous common practice.[426]

### PART FOUR

### SPECIFIC ASPECTS

#### Conclusion 11.   Decisions adopted within the framework of a Conference of States Parties

1.   **A Conference of States Parties, under these draft conclusions, is a meeting of parties to a treaty for the purpose of reviewing or implementing the treaty, except where they act as members of an organ of an international organization.**

2.   **The legal effect of a decision adopted within the framework of a Conference of States Parties depends primarily on the treaty and any applicable rules of procedure. Depending on the circumstances, such a decision may embody, explicitly or implicitly, a subsequent agreement under article 31, paragraph 3 (*a*), or give rise to subsequent practice under article 31, paragraph 3 (*b*), or to subsequent practice under article 32. Decisions adopted within the framework of a Conference of States Parties often provide a non-exclusive range of practical options for implementing the treaty.**

3.   **A decision adopted within the framework of a Conference of States Parties embodies a subsequent agreement or subsequent practice under article 31, paragraph 3, insofar as it expresses agreement in substance between the parties regarding the interpretation of a treaty, regardless of the form and the procedure by which the decision was adopted, including adoption by consensus.**

#### Commentary

(1)   Draft conclusion 11 addresses a particular form of action by States that may result in a subsequent agreement or subsequent practice under article 31, paragraph 3, or subsequent practice under article 32, namely, decisions adopted within the framework of Conferences of States Parties.[427]

*Paragraph 1—definition of Conferences of States Parties*

(2)   Conferences of States Parties are a form of action for the continuous process of multilateral treaty review and implementation.[428] Such Conferences can be roughly divided into two basic categories. First, some Conferences are actually an organ of an international organization within which States parties act in their capacity as members of that organ (for example, meetings of the parties of the World Trade Organization, the Organisation for the Prohibition of Chemical Weapons or the International Civil Aviation Organization).[429] Such Conferences do not fall within the scope of draft conclusion 11, which does not address the subsequent practice of and within international organizations.[430] Second, other Conferences of States Parties are convened with respect to treaties that do not establish an international organization; rather, the treaty simply provides, or allows, for more or less periodic meetings of the

---

[422] See United Kingdom, Supreme Court: on the one hand, *Assange v. The Swedish Prosecution Authority* [2012] UKSC 22, paras. 68–71 (Lord Phillips); and, on the other, *Bucnys v. Ministry of Justice, Lithuania* [2013] UKSC 71, paras. 39–43 (Lord Mance).

[423] *Certain expenses of the United Nations* (see footnote 192 above), p. 182 (separate opinion of Judge Spender).

[424] Hafner, "Subsequent agreements and practice …" (see footnote 260 above), p. 118; this means that the interpretative effect of an agreement under article 31, paragraph 3, does not necessarily go back to the date of the entry into force of the treaty, as Yasseen maintains, "L'interprétation des traités…" (see footnote 21 above), p. 47.

[425] Karl, *Vertrag und spätere Praxis …* (see footnote 75 above), p. 151.

[426] *Maritime Dispute (Peru v. Chile)* (see footnote 197 above), p. 56, para. 142.

[427] Other designations include "Meetings of the Parties" or "Assemblies of the States Parties".

[428] See V. Röben, "Conference (Meeting) of States Parties", *Max Planck Encyclopedia of Public International Law*, vol. II, Oxford, Oxford University Press, 2012, p. 605 (online edition: https://opil.ouplaw.com/home/MPIL); R. R. Churchill and G. Ulfstein, "Autonomous institutional arrangements in multilateral environmental agreements: a little-noticed phenomenon in international law", *American Journal of International Law*, vol. 94, No. 4 (2000), pp. 623–659; J. Brunnée, "COPing with consent: law-making under multilateral environmental agreements", *Leiden Journal of International Law*, vol. 15, No. 1 (2002), pp. 1–52; A. Wiersema, "The new international law-makers? Conferences of the Parties to multilateral environmental agreements", *Michigan Journal of International Law*, vol. 31, No. 1 (2009), pp. 231–287; and L. Boisson de Chazournes, "Environmental treaties in time", *Environmental Policy and Law*, vol. 39 (2009), pp. 293–298.

[429] Marrakesh Agreement Establishing the World Trade Organization (1994); Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction (1993); Convention on International Civil Aviation (1944).

[430] See draft conclusion 12.

parties for their review and implementation. Such review conferences are frameworks for parties' cooperation and subsequent conduct with respect to the treaty. Either type of Conference of States Parties may also have specific powers concerning amendments and/or the adaptation of treaties. Examples include the review conference process of the 1972 Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction,[431] the Review Conference under article VIII, paragraph 3, of the 1968 Treaty on the Non-Proliferation of Nuclear Weapons,[432] and Conferences of the Parties established by international environmental treaties.[433] The International Whaling Commission established under the 1946 International Convention for the Regulation of Whaling[434] is a borderline case between the two basic categories of Conferences of States Parties and its subsequent practice was considered in the judgment of the International Court of Justice in the *Whaling in the Antarctic* case.[435]

(3)   Since Conferences of States Parties are usually established by treaties they are, in a sense, "treaty bodies". However, they should not be confused with bodies that are comprised of independent experts (see draft conclusion 13) or bodies with a limited membership. Conferences of States Parties are more or less periodical meetings that are open to all of the parties to a treaty. Conferences of States Parties may be established by treaties with a universal membership, as well as by treaties with a more limited membership.

(4)   In order to acknowledge the wide diversity of Conferences of States Parties and the rules under which they operate, paragraph 1 provides a broad definition of the term "Conference of States Parties" for the purpose of these draft conclusions, which only excludes action of States as members of an organ of an international organization (which will be the subject of a later draft

conclusion). The term thus also includes conferences of the parties to a treaty whose parties are not only States.

*Paragraph 2, first sentence—legal effect of decisions*

(5)   The first sentence of paragraph 2 recognizes that the legal significance of any acts undertaken by Conferences of States Parties depends, in the first instance, on the rules that govern the Conferences of States Parties, notably the constituent treaty and any applicable rules of procedure. Conferences of States Parties perform a variety of acts, including reviewing the implementation of the treaty, reviewing the treaty itself and taking decisions under amendment procedures.[436]

(6)   The powers of a Conference of States Parties can be contained in general clauses or in specific provisions, or both. For example, article 7, paragraph 2, of the United Nations Framework Convention on Climate Change begins with the following general language, before enumerating 13 specific tasks for the Conference, one of which concerns examining the obligations of the parties under the treaty:

> The Conference of the Parties, as the supreme body of this Convention, shall keep under regular review the implementation of the Convention and any related legal instruments that the Conference of the Parties may adopt, and shall make, within its mandate, the decisions necessary to promote the effective implementation of the Convention.

(7)   Specific provisions contained in various treaties refer to the Conference of the Parties proposing "guidelines" for the implementation of particular treaty provisions[437] or defining "the relevant principles, modalities, rules and guidelines" for a treaty scheme.[438]

(8)   Amendment procedures (in a broad sense of the term) include procedures by which the primary text of the treaty may be amended (the result of which mostly requires ratification by States parties according to their constitutional procedures), as well as tacit acceptance and opt-out procedures[439] that commonly apply to annexes containing lists of substances, species or other elements that need to be updated regularly.[440]

---

[431] Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction, art. XI. According to this mechanism, States parties meeting in a review conference shall "review the operation of the Convention, with a view to assuring that the purposes of the preamble and the provisions of the Convention … are being realised. Such review shall take into account any new scientific and technological developments relevant to the Convention" (art. XII).

[432] Article VIII, paragraph 3, of the Treaty on the Non-Proliferation of Nuclear Weapons (1968), United Nations, *Treaty Series*, vol. 729, No. 10485, p. 161, provides that a review conference shall be held five years after its entry into force, and, if so decided, at intervals of five years thereafter "in order to review the operation of this Treaty with a view to assuring that the purposes of the Preamble and the provisions of the Treaty are being realised". By way of such decisions, States parties review the operation of the Treaty on the Non-Proliferation of Nuclear Weapons, article by article, and formulate conclusions and recommendations on follow-on actions.

[433] Examples include the Conference of the Parties to the United Nations Framework Convention on Climate Change (1992), the Conference of the Parties serving as the Meeting of the Parties to the Kyoto Protocol to the United Nations Framework Convention on Climate Change (1997) and the Conference of the Contracting Parties to the Convention on Wetlands of International Importance especially as Waterfowl Habitat (1971).

[434] The Convention is often described as establishing an international organization, but it does not do so clearly, and it provides the International Whaling Commission with features that fit the present definition of a Conference of States Parties.

[435] *Whaling in the Antarctic (Australia v. Japan: New Zealand intervening)* (see footnote 200 above), p. 248, para. 46.

[436] Convention on Wetlands of International Importance especially as Waterfowl Habitat: art. 6, para. 2, on review functions and art. 10 *bis* (1982 protocol of amendment, art. 1) on amendments; United Nations Framework Convention on Climate Change, art. 7, para. 2, on review powers, and art. 15 on amendments; Kyoto Protocol to the United Nations Framework Convention on Climate Change, art. 13, para. 4, on review powers of the Conference of the Parties serving as the Meeting of the Parties to the Kyoto Protocol, and art. 20 on amendment procedures; Convention on International Trade in Endangered Species of Wild Fauna and Flora, art. XI on the Conference of the Parties, and art. XVII on amendment procedures; Treaty on the Non-Proliferation of Nuclear Weapons; WHO Framework Convention on Tobacco Control, art. 23, para. 5 (review powers), art. 28 (amendments) and art. 33 (protocols).

[437] Arts. 7 and 9 of the WHO Framework Convention on Tobacco Control.

[438] Article 17 of the Kyoto Protocol to the United Nations Framework Convention on Climate Change provides an example; see Churchill and Ulfstein, "Autonomous institutional arrangements in multilateral environmental agreements …" (footnote 428 above), p. 639; and J. Brunnée, "Reweaving the fabric of international law? Patterns of consent in environmental framework agreements", in R. Wolfrum and V. Röben (eds.), *Developments of International Law in Treaty Making*, Berlin, Springer, 2005, pp. 110–115.

[439] See J. Brunnée, "Treaty amendments", in Hollis (ed.), *The Oxford Guide to Treaties* (footnote 391 above), pp. 354–360.

[440] *Ibid.*

(9)   As a point of departure, paragraph 2 provides that the legal effect of a decision adopted within the framework of a Conference of States Parties depends primarily on the treaty in question and any applicable rules of procedure. The word "primarily" leaves room for subsidiary rules "unless the treaty otherwise provides" (see, for example, articles 16; 20; 22, para. 1; 24; 70, para. 1; and 72, para. 1; of the 1969 Vienna Convention). The word "any" clarifies that rules of procedure of Conferences of States Parties, if they exist, will apply, given that there may be situations where such conferences operate with no specifically adopted rules of procedure.[441]

*Paragraph 2, second sentence—decisions as possibly embodying a subsequent agreement or subsequent practice*

(10)   The second sentence of paragraph 2 recognizes that decisions of Conferences of States Parties may constitute subsequent agreement or subsequent practice for treaty interpretation under articles 31 and 32 of the 1969 Vienna Convention. Decisions adopted within the framework of Conferences of States Parties can perform an important function for determining the Parties' common understanding of the meaning of the treaty.

(11)   Decisions of Conferences of States Parties, *inter alia*, may constitute or reflect subsequent agreements under article 31, paragraph 3 (*a*), by which the parties interpret the underlying treaty. For example, the Review Conference of the States Parties to the Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction has regularly adopted "additional understandings and agreements" regarding the interpretation of the Convention's provisions. These agreements have been adopted by States parties within the framework of the review conferences, by consensus, and they "have evolved across all articles of the treaty to address specific issues as and when they arose".[442] Through these understandings, States parties interpret the provisions of the Convention by defining, specifying or otherwise elaborating on the meaning and scope of the provisions, as well as through the adoption of guidelines on their implementation. The Biological Weapons Convention Implementation Support Unit[443] defines an "additional understanding or agreement" as one which:

(*a*)   interprets, defines or elaborates the meaning or scope of a provision of the Convention; or

(*b*)   provides instructions, guidelines or recommendations on how a provision should be implemented.[444]

(12)   Similarly, the Conference of States Parties under the Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter has adopted resolutions interpreting that Convention. The IMO Sub-Division for Legal Affairs, upon a request from the governing bodies, opined as follows in relation to an "interpretative resolution" of the Conference of States Parties under the Convention:

According to Article 31 (3) (*a*) of the Vienna Convention on the Law of Treaties … subsequent agreements between the Parties shall be taken into account in the interpretation of a treaty. The article does not provide for a specific form of the subsequent agreement containing such interpretation. This seems to indicate that, provided its intention is clear, the interpretation could take various forms, including a resolution adopted at a meeting of the Parties, or even a decision recorded in the summary records of a meeting of the Parties.[445]

(13)   In a similar vein, the WHO Legal Counsel has stated in general terms that:

Decisions of the Conference of the Parties, as the supreme body comprising all Parties to the FCTC, undoubtedly represent a "subsequent agreement between the Parties regarding the interpretation of the treaty", as stated in Article 31 of the Vienna Convention.[446]

(14)   Commentators have also viewed decisions of Conferences of States Parties as being capable of embodying subsequent agreements[447] and have observed that:

Such declarations are not legally binding in and of themselves, but they may have juridical significance, especially as a source of authoritative interpretations of the treaty.[448]

(15)   The International Court of Justice has held with respect to the role of the International Whaling Commission under the International Convention for the Regulation of Whaling:

Article VI of the Convention states that "[t]he Commission may from time to time make recommendations to any or all Contracting Governments on any matters which relate to whales or whaling and to the objectives and purposes of this Convention". These recommendations, which take the form of resolutions, are not binding. However, when they are adopted by consensus or by a unanimous vote, they may be relevant for the interpretation of the Convention or its Schedule.[449]

---

States Parties to the Convention, entitled "Additional understandings and agreements reached by previous Review Conferences relating to each article of the Convention" (BWC/CONF.VI/INF.5) (updated later to include the understandings and agreements reached by that Conference, Geneva, 2012), para. 1.

[445] Agenda item 4 (Ocean fertilization), submitted by the IMO secretariat on procedural requirements in relation to a decision on an interpretive resolution: views of the IMO Sub-Division of Legal Affairs, document LC 33/J/6, para. 3.

[446] Conference of the Parties to the WHO Framework Convention on Tobacco Control, Intergovernmental Negotiating Body on a Protocol on Illicit Trade in Tobacco Products, "Revised Chairperson's text on a protocol on illicit trade in tobacco products, and general debate: legal advice on the scope of the protocol", note by the WHO Legal Counsel on the scope of the protocol on illicit trade in tobacco products (WHO, document FCTC/COP/INB-IT/3/INF.DOC./6, annex, para. 8); see also S. F. Halabi, "The World Health Organization's Framework Convention on Tobacco Control: an analysis of guidelines adopted by the Conference of the Parties", *Georgia Journal of International and Comparative Law*, vol. 39, No. 1 (2010), pp. 121–183.

[447] D. H. Joyner, *Interpreting the Nuclear Non-Proliferation Treaty*, Oxford, Oxford University Press, 2011, p. 83 (with respect to the Treaty on the Non-Proliferation of Nuclear Weapons); Aust, *Modern Treaty Law and Practice* (see footnote 141 above), pp. 213–214.

[448] B. M. Carnahan, "Treaty review conferences", *American Journal of International Law*, vol. 81 (1987), pp. 226–230, at p. 229.

[449] *Whaling in the Antarctic (Australia v. Japan: New Zealand intervening)* (see footnote 200 above), p. 248, para. 46.

---

[441] This is the case, for example, for the United Nations Framework Convention on Climate Change.

[442] See P. Millett, "The Biological Weapons Convention: securing biology in the twenty-first century", *Journal of Conflict and Security Law*, vol. 15 (2010), pp. 25–43, at p. 33.

[443] The Implementation Support Unit was created by the Conference of States Parties in order to provide administrative support to the Conference and to enhance confidence-building measures among States parties (see Final Document of the Sixth Review Conference of the States Parties to the Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction (BWC/CONF.VI/6), part III (decisions and recommendations), para. 5).

[444] Background information document submitted by the Implementation Support Unit, prepared for the Seventh Review Conference of the

(16)   The following examples from the practice of Conferences of States Parties support the proposition that decisions by such Conferences may embody subsequent agreements under article 31, paragraph 3 (*a*).

(17)   Article I, paragraph 1, of the Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction provides that States parties undertake never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:

microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes.

(18)   At the third Review Conference (1991), States parties specified that the prohibitions established in this provision relate to "microbial or other biological agents or toxins harmful to plants and animals, as well as humans".[450]

(19)   Article 4, paragraph 9, of the Montreal Protocol on Substances that Deplete the Ozone Layer has given rise to a debate about the definition of its term "State not party to this Protocol". According to article 4, paragraph 9:

For the purposes of this Article, the term "State not party to this Protocol" shall include, with respect to a particular controlled substance, a State or regional economic integration organization that has not agreed to be bound by the control measures in effect for that substance.

(20)   In the case of hydrochlorofluorocarbons, two relevant amendments to the Montreal Protocol[451] impose obligations that raised the question of whether a State, in order to be "not party to this Protocol", has to be a non-party with respect to both amendments. The Meeting of the Parties decided that:

The term "State not party to this Protocol" includes all other States and regional economic integration organizations that have not agreed to be bound by the Copenhagen and Beijing Amendments.[452]

(21)   Whereas the acts that are the result of a tacit acceptance procedure[453] are not, as such, subsequent agreements by the parties under article 31, paragraph 3 (*a*), they can, in addition to their primary effect under the treaty, under certain circumstances imply such a subsequent agreement. One example concerns certain decisions of the Conference of the Parties to the Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter. At its sixteenth meeting, held in 1993, the Consultative Meeting of Contracting Parties adopted three amendments to annex I by way of the tacit acceptance procedure provided for in the Convention.[454] As such, these amendments were not subsequent agreements. They did, however, also imply a wide-ranging interpretation of the underlying treaty itself.[455] The amendment refers to and builds on a resolution that was adopted by the Consultative Meeting held three years earlier, which had established the agreement of the parties that: "The London Dumping Convention is the appropriate body to address the issue of low-level radioactive waste disposal into sub-sea-bed repositories accessed from the sea."[456] The resolution has been described as "effectively expand[ing] the definition of 'dumping' under the Convention by deciding that this term covers the disposal of waste into or under the seabed from the sea but not from land by tunneling".[457] Thus, the amendment confirmed that the interpretative resolution contained a subsequent agreement regarding the interpretation of the treaty.

(22)   The Basel Convention on the Control of Transboundary Movements of Hazardous Wastes and Their Disposal provides in article 17, paragraph 5, that: "Amendments … shall enter into force between Parties having accepted them on the ninetieth day after the receipt by the Depositary of their instrument of ratification, approval, formal confirmation or acceptance by at least three-fourths of the Parties who accepted [them] …". Led by an Indonesian-Swiss initiative, the Conference of the Parties decided to clarify the requirement of the acceptance by three fourths of the parties, by agreeing:

---

[450] Final Document of the Third Review Conference of the Parties to the Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction, Geneva, 9–27 September 1991 (BWC/CONF. III/23), part II, Final Declaration, p. 11.

[451] Copenhagen Amendment (1992) and Beijing Amendment (1999) to the Montreal Protocol on Substances that Deplete the Ozone Layer.

[452] Decision XV/3 on obligations of parties to the 1999 Beijing Amendment under article 4 of the Montreal Protocol with respect to hydrochlorofluorocarbons; the definition itself is formulated as follows: "(*a*) The term 'State not party to this Protocol' in Article 4, paragraph 9 does not apply to those States operating under Article 5, paragraph 1, of the Protocol until January 1, 2016 when, in accordance with the Copenhagen and Beijing Amendments, hydrochlorofluorocarbon production and consumption control measures will be in effect for States that operate under Article 5, paragraph 1, of the Protocol; (*b*) The term 'State not party to this Protocol' includes all other States and regional economic integration organizations that have not agreed to be bound by the Copenhagen and Beijing Amendments; (*c*) Recognizing, however, the practical difficulties imposed by the timing associated with the adoption of the foregoing interpretation of the term 'State not party to this Protocol,' paragraph 1 (*b*) shall apply unless such a State has by 31 March 2004: (i) Notified the Secretariat that it intends to ratify, accede or accept the Beijing Amendment as soon as possible; (ii) Certified that it is in full compliance with Articles 2, 2A to 2G and Article 4 of the Protocol, as amended by the Copenhagen Amendment; (iii) Submitted data on (i) and (ii) above to the Secretariat, to be updated on 31 March 2005, in which case that State shall fall outside the definition of 'State not party to this Protocol' until the conclusion of the Seventeenth Meeting of the Parties" (Report of the Fifteenth

Meeting of the Parties to the Montreal Protocol on Substances that Deplete the Ozone Layer (UNEP/OzL.Pro.15/9), chap. XVIII. sect. A, decision XV/3, para. 1).

[453] See para. (8) of the present commentary, above.

[454] See resolutions LC.49(16), LC.50(16) and LC.51(16), of 12 November 1993, adopted at the Sixteenth Consultative Meeting of the Contracting Parties (United Nations, *Treaty Series*, vol. 1775, No. 15749, p. 395). First, the Meeting decided to amend the phasing-out of the dumping of industrial waste by 31 December 1995. Second, it banned the incineration at sea of industrial waste and sewage sludge. And, finally, it decided to replace paragraph 6 of annex I, thereby banning the dumping of radioactive wastes or other radioactive matter; see also "Dumping at sea: the evolution of the Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter (LC), 1972", *Focus on IMO* (IMO, July 1997), p. 11.

[455] It has even been asserted that these amendments to annex I of the Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter "constitute major changes in the Convention" (Churchill and Ulfstein, "Autonomous institutional arrangements in multilateral environmental agreements …" (footnote 428 above), p. 638).

[456] IMO, Report of the Thirteenth Consultative Meeting of Contracting Parties to the Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter (LDC 13/15), annex 7, resolution LDC.41(13), para. 1.

[457] Churchill and Ulfstein, "Autonomous institutional arrangements in multilateral environmental agreements …" (see footnote 428 above), p. 641.

without prejudice to any other multilateral environmental agreement, that the meaning of paragraph 5 of Article 17 of the Basel Convention should be interpreted to mean that the acceptance of three-fourths of those parties that were parties at the time of the adoption of the amendment is required for the entry into force of such amendment, noting that such an interpretation of paragraph 5 of Article 17 does not compel any party to ratify the Ban Amendment.[458]

The parties adopted this decision on the interpretation of article 17, paragraph 5, by consensus, with many States Parties underlining that the Conferences of States Parties to any convention are "the ultimate authority as to its interpretation".[459] While this suggests that the decision embodies a subsequent agreement of the parties under article 31, paragraph 3 (a), the decision was taken after a debate about whether a formal amendment of the Convention was necessary to achieve this result.[460] It should also be noted that the delegation of Japan, requesting that this position be reflected in the Conference's report, stated that it "supported the current-time approach to the interpretation of the provision of the Convention regarding entry into force of amendments, as described in the legal advice provided by the United Nations Office of Legal Affairs as the Depositary,[461] and had accepted the fixed-time approach enunciated in the decision on the Indonesian-Swiss country-led initiative *only in this particular instance\**.*"[462]

(23)    The preceding examples demonstrate that decisions of Conferences of States Parties may embody under certain circumstances subsequent agreements under article 31, paragraph 3 (a). Such decisions may also give rise to subsequent practice under article 31, paragraph 3 (b), or to other subsequent practice under article 32 if they do not reflect agreement of the parties. The respective character of a decision of a Conference of States Parties, however, must always be carefully identified. For this purpose, the specificity and the clarity of the terms chosen in the light of the text of the Conference of States Parties' decision as a whole, its object and purpose, and the way in which it is applied, need to be taken into account. The parties often do not intend that such a decision should have any particular legal significance.

*Paragraph 2, third sentence—decisions as possibly providing a range of practical options*

(24)    The last sentence of paragraph 2 of draft conclusion 11 reminds the interpreter that decisions of

Conferences of States Parties often provide a range of practical options for implementing the treaty. Those decisions may not necessarily embody a subsequent agreement or subsequent practice for the purpose of treaty interpretation, even if the decision is adopted by consensus. Indeed, Conferences of States Parties often do not explicitly seek to resolve or address questions of interpretation of a treaty.

(25)    A decision by the Conference of the Parties to the WHO Framework Convention on Tobacco Control provides an example. Articles 9 and 10 of the Convention deal, respectively, with the regulation of the contents of tobacco products, and with the regulation of the disclosure of information regarding the contents of such products. Acknowledging that such measures require the allocation of significant financial resources, the States Parties agreed, under the title of "practical considerations" for the implementation of articles 9 and 10, on "some options that Parties could consider using", such as:

(a)    designated tobacco taxes;

(b)    tobacco manufacturing and/or importing licensing fees;

(c)    tobacco product registration fees;

(d)    licensing of tobacco distributors and/or retailers;

(e)    non-compliance fees levied on the tobacco industry and retailers; and

(f)    annual tobacco surveillance fees (tobacco industry and retailers).[463]

This decision provides a non-exhaustive range of practical options for implementing articles 9 and 10 of the Convention. The parties have thereby, however, implicitly agreed that the stated "options" would, as such, be compatible with the Convention.

*Paragraph 2 as a whole*

(26)    It follows that decisions of Conferences of States Parties may have different legal effects. Such decisions are often not intended to embody a subsequent agreement under article 31, paragraph 3 (a), by themselves because they are not meant to be a statement regarding the interpretation of the treaty. In other cases, the parties have made it sufficiently clear that the Conference of State Parties decision embodies their agreement regarding the interpretation of the treaty. They may also produce an effect in combination with a legal duty to cooperate under the treaty, and the parties "thus should give due regard" to such a decision.[464] In any case, it cannot simply be said that because the treaty does not accord the Conference of States Parties a competence to take legally binding decisions, their decisions are necessarily legally irrelevant and constitute only political commitments.[465]

---

[458] Report of the Conference of the Parties to the Basel Convention on the Control of Transboundary Movements of Hazardous Wastes and Their Disposal on its tenth meeting (Cartagena, Colombia, 17–21 October 2011), UNEP/CHW.10/28, annex 1, Decision BC-10/3 (Indonesian-Swiss country-led initiative to improve the effectiveness of the Basel Convention), para. 2.

[459] *Ibid.*, chap. III.A, para. 65.

[460] See G. Handl, "International 'lawmaking' by conferences of the parties and other politically mandated bodies", in Wolfrum and Röben (eds.), *Developments of International Law in Treaty Making* (footnote 438 above), pp. 127–143, at p. 132.

[461] The "current-time approach" favoured by the Legal Counsel of the United Nations stipulates that: "Where the treaty is silent or ambiguous on the matter, the practice of the Secretary-General is to calculate the number of acceptances on the basis of the number of parties to the treaty at the time of deposit of each instrument of acceptance of an amendment." See extracts from the memorandum of 8 March 2004 received from the Office of Legal Affairs of the United Nations, available from www.basel.int/TheConvention/Overview/Amendments/Background/tabid/2760/Default.aspx.

[462] Report of the Conference of the Parties to the Basel Convention, UNEP/CHW.10/28 (see footnote 458 above), para. 68.

[463] Partial guidelines for implementation of Articles 9 and 10 of the WHO Framework Convention on Tobacco Control (*Regulation of the contents of tobacco products and Regulation of tobacco product disclosures*), FCTC/COP4(10), annex, adopted at the fourth session of the Conference of the Parties to the WHO Framework Convention on Tobacco Control (Punta del Este, Uruguay, 15–20 November 2010), FCTC/COP/4/DIV/6, p. 52, guideline 2.3.

[464] *Whaling in the Antarctic (Australia v. Japan: New Zealand intervening)* (see footnote 200 above), p. 257, para. 83.

[465] *Ibid.*, p. 248, para. 46.

(27)  Ultimately, the effect of a decision of a Conference of States Parties depends on the circumstances of each particular case and such decisions need to be properly interpreted. A relevant consideration may be whether States parties uniformly or without challenge apply the treaty as interpreted by the Conference of States Parties' decision. Discordant practice following a decision of the Conference of States Parties may be an indication that States did not assume that the decision would be a subsequent agreement under article 31, paragraph 3 (*a*).[466] Conference of States Parties' decisions that do not qualify as subsequent agreements under article 31, paragraph 3 (*a*), or as subsequent practice under article 31, paragraph 3 (*b*), may nevertheless be a subsidiary means of interpretation under article 32.[467]

*Paragraph 3—an agreement regarding the interpretation of the treaty*

(28)  Paragraph 3 sets forth the principle that agreements among all the parties regarding the interpretation of a treaty under article 31, paragraph 3, must relate to the content of the treaty. Thus, what is important is the substance of the agreement embodied in the decision of the Conference of States Parties and not the form or procedure by which that decision is reached. Acts that originate from Conferences of States Parties may have different forms and designations and they may be the result of different procedures. Conferences of States Parties may even operate without formally adopted rules of procedure.[468] If the decision of the Conference of States Parties is based on a unanimous vote in which all parties participate, it may clearly embody a "subsequent agreement" under article 31, paragraph 3 (*a*), provided that it is "regarding the interpretation of the treaty".

(29)  Conference of States Parties' decisions regarding review and implementation functions, however, are normally adopted by consensus. This practice derives from rules of procedure that usually require States parties to make every effort to achieve consensus on substantive matters. An early example can be found in the provisional rules of procedure for the Review Conference of the Parties to the Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological

(Biological) and Toxin Weapons and on Their Destruction. According to rule 28, paragraph 2:

> The task of the Review Conference being to review the operation of the Convention with a view to assuring that the purposes of the preamble and the provisions of the Convention are being realized, and thus to strengthen its effectiveness, every effort should be made to reach agreement on substantive matters by means of consensus. There should be no voting on such matters until all efforts to achieve consensus have been exhausted.[469]

This formula, with only minor variations, has become the standard with regard to substantive decision-making procedures at Conferences of States Parties.

(30)  In order to address concerns relating to decisions adopted by consensus, the phrase "including adoption by consensus" was introduced at the end of paragraph 3 in order to dispel the notion that a decision adopted by consensus would necessarily be equated with agreement in substance. Indeed, consensus is not a concept that necessarily indicates any particular degree of agreement on substance. According to the comments on some procedural questions issued by the Office of Legal Affairs of the United Nations Secretariat in accordance with General Assembly resolution 60/286:[470]

> Consensus is generally understood as a decision-taking process consisting in arriving at a decision without formal objections and vote. It may however not necessarily reflect "unanimity" of opinion on the substantive matter. It is used to describe the practice under which every effort is made to achieve general agreement and no delegation objects explicitly to a consensus being recorded.[471]

(31)  It follows that adoption by consensus is not a sufficient condition for an agreement under article 31, paragraph 3 (*a*) or (*b*), to be established. The rules of procedure of Conferences of States Parties do not usually give an indication of the possible legal effect of a resolution as a subsequent agreement under article 31, paragraph 3 (*a*), or a subsequent practice under article 31, paragraph 3 (*b*). Such rules of procedure only determine how the Conference of States Parties shall adopt its decisions, not their possible legal effect as a subsequent agreement under article 31, paragraph 3. Although subsequent agreements under article 31, paragraph 3 (*a*), need not be binding as such, the 1969 Vienna Convention attributes them a legal effect under article 31 only if there exists agreement in substance among the parties concerning the interpretation of a treaty. The International Court of Justice has confirmed that the distinction between the form of a collective decision and the agreement in substance is pertinent in such a context.[472]

---

[466] See commentary to draft conclusion 10, paras. (23)–(24), above.

[467] *Whaling in the Antarctic (Australia v. Japan: New Zealand intervening)* (see footnote 200 above) (separate opinion of Judge *ad hoc* Charlesworth, p. 454, para. 4: "I note that resolutions adopted by a vote of the [International Whaling Commission] have some consequence although they do not come within the terms of [a]rticle 31, paragraph 3, of the Vienna Convention").

[468] The Conference of the Parties to the United Nations Framework Convention on Climate Change provisionally applies the draft rules of procedure of the Conference of the Parties and its subsidiary bodies (FCCC/CP/1996/2), with the exception of draft rule 42 in the chapter on "Voting", since no agreement has been reached so far on one of the two voting alternatives contained therein. See Report of the Conference of the Parties on its first session (Berlin, 28 March to 7 April 1995) (FCCC/CP/1995/7), p. 8, para. 10; and Report of the Conference of the Parties on its nineteenth session (Warsaw, 11 to 23 November 2013) (FCCC/CP/2013/10), p. 6, para. 4; similarly, the Conference of the Parties to the 1992 Convention on Biological Diversity did not adopt rule 40, paragraph 1 (Voting), of the rules of procedure "because of the lack of consensus among the Parties concerning the majority required for decision-making on matters of substance", see Report of the Eleventh Meeting of the Conference of the Parties to the Convention on Biological Diversity (Hyderabad, India, 8–19 October 2012) (UNEP/CBD/COP/11/35), para. 65.

[469] Provisional rules of procedure for the Review Conference of the Parties to the Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological and Toxin Weapons and on Their Destruction, held in Geneva from 3 to 21 March 1980 (BWC/CONF.I/2), p. 8.

[470] General Assembly resolution 60/286 of 8 September 2006 on revitalization of the General Assembly, requesting the Office of Legal Affairs of the Secretariat "to make precedents and past practice available in the public domain with respect to rules and practices of the intergovernmental bodies of the Organization" (annex, para. 24).

[471] Comments on some procedural questions: "Consensus in UN practice: General", paper prepared by the Secretariat, available from https://legal.un.org/ola/media/GA_RoP/GA_RoP_EN.pdf; see also R. Wolfrum and J. Pichon, "Consensus", *Max Planck Encyclopedia of Public International Law* (online edition: https://opil.ouplaw.com/home/MPIL), paras. 3–4 and 24.

[472] *Whaling in the Antarctic (Australia v. Japan: New Zealand intervening)* (see footnote 200 above), p. 257, para. 83.

(32)    That certain decisions, despite having been adopted by consensus, cannot represent a subsequent agreement under article 31, paragraph 3 (*a*), is especially true when there exists an objection by one or more States parties to that consensus.

(33)    For example, at its Sixth Meeting, in 2002, the Conference of the Parties to the Convention on Biological Diversity worked on formulating guiding principles for the prevention, introduction and mitigation of impacts of alien species that threaten ecosystems, habitats or species.[473] After several efforts to reach an agreement had failed, the President of the Conference of the Parties proposed that the decision be adopted and the reservations that Australia had raised be recorded in the final report of the meeting. The representative of Australia, however, reiterated that Australia "could not accept the guiding principles" and that "[h]is formal objection therefore stood".[474] The President declared the debate closed and, "following established practice", declared the decision adopted without a vote, clarifying that the objections of the dissenting States would be reflected in the final report of the meeting. Following the adoption, Australia reiterated its view that "consensus was adoption without formal objection" and expressed "concerns about the legality of the adoption procedure" for the draft decision. As a result, a footnote to decision VI/23 indicates that "[o]ne representative entered a formal objection during the process leading to the adoption of this decision and underlined that he did not believe that the Conference of the Parties could legitimately adopt a motion or a text with a formal objection in place".[475]

(34)    In this situation, the Executive Secretary of the Convention on Biological Diversity requested a legal opinion from the United Nations Legal Counsel.[476] The opinion by the Legal Counsel[477] expressed the view that a party could "disassociate itself from the substance or text … of the document[,] indicate that its joining in the consensus does not constitute acceptance of the substance or text of parts of the document[,] and/or present any other restrictions on its Government's position on substance or text of … the document".[478] Thus, it is clear that a decision that was adopted by consensus can occur in the face of rejection of the substance of the decision by one or more of the States parties.

(35)    The decision under the Convention on Biological Diversity, as well as a similar decision reached in Cancún in 2010 by the Meeting of the Parties to the Kyoto Protocol to the United Nations Framework Convention on Climate Change (Bolivia's objection notwithstanding),[479] raise the

important question of what "consensus" means.[480] However, this question, which does not fall within the scope of the present topic, must be distinguished from the question of whether all the parties to a treaty have arrived at an agreement in substance on matters of interpretation of that treaty under article 31, paragraph 3 (*a*) and (*b*). Decisions by Conferences of States Parties that do not reflect agreement in substance among all the parties do not qualify as agreements under article 31, paragraph 3, although they may be a form of "other subsequent practice" under article 32 (see draft conclusion 4, para. 3).

(36)    A different issue concerns the legal effect of a decision of a Conference of States Parties once it qualifies as an agreement under article 31, paragraph 3. In 2011, the IMO Sub-Division for Legal Affairs was asked to "advise the governing bodies … about the procedural requirements in relation to a decision on an interpretative resolution and, in particular, whether or not consensus would be needed for such a decision".[481] In its response, while confirming that a resolution by the Conference of States Parties can constitute, in principle, a subsequent agreement under article 31, paragraph 3 (*a*), the IMO Sub-Division for Legal Affairs advised the governing bodies that even if the Conference were to adopt a decision based on consensus, that would not mean that the decision would be binding on all the parties.[482]

(37)    Although the opinion of the IMO Sub-Division for Legal Affairs proceeded from the erroneous assumption that a "subsequent agreement" under article 31, paragraph 3 (*a*), would only be binding "as a treaty, or an amendment thereto",[483] it came to the correct conclusion that even if the consensus decision by a Conference of States Parties embodies an agreement regarding interpretation in substance it is not (necessarily) binding upon the parties.[484] Rather, as the Commission has indicated, a subsequent agreement under article 31, paragraph 3 (*a*), is only one of different means of interpretation to be taken into account in the process of interpretation.[485]

(38)    Thus, interpretative resolutions by Conferences of States Parties, even if they are not legally binding as such, can nevertheless be subsequent agreements under article 31, paragraph 3 (*a*), or subsequent practice under article 31, paragraph 3 (*b*), if there are sufficient indications that was the intention of the parties at the time of the adoption of the decision or if the subsequent practice of the parties establishes an agreement on the interpretation

[473]  Report of the sixth meeting of the Conference of the Parties to the Convention on Biological Diversity (UNEP/CBD/COP/6/20), annex I, decision VI/23.

[474]  *Ibid.*, para. 313.

[475]  *Ibid.*, paras. 316, 318 and 321; for the discussion, see paras. 294–324. All the decisions of the Conference of the Parties are available online from www.cbd.int/decisions/.

[476]  Available from the secretariat of the Convention on Biological Diversity, document SCBD/SEL/DBO/30219 (6 June 2002).

[477]  Letter dated 17 June 2002, transmitted by facsimile.

[478]  *Ibid.*

[479]  See the report of the Conference of the Parties serving as the meeting of the Parties to the Kyoto Protocol on its sixth session, held

in Cancún from 29 November to 10 December 2010 (FCCC/KP/CMP/2010/12 and Add.1), decision 1/CMP.6 (The Cancún Agreements: Outcome of the work of the Ad Hoc Working Group on Further Commitments for Annex I Parties under the Kyoto Protocol at its fifteenth session) and decision 2/CMP.6 (The Cancún Agreements: Land use, land-use change and forestry); as well as the proceedings of the Conference of the Parties serving as the Meeting of the Parties to the Kyoto Protocol, para. 29.

[480]  See Nolte, "Subsequent agreements and subsequent practice of States …" (footnote 62 above), pp. 372–377.

[481]  IMO, report of the 3rd Meeting of the Intersessional Working Group on Ocean Fertilization (LC 33/4), para. 4.15.2.

[482]  IMO, document LC 33/J/6 (see footnote 445 above), para. 3.

[483]  *Ibid.*, para. 8.

[484]  See commentary to draft conclusion 10, paras. (9)–(11), above.

[485]  Commentary to draft conclusion 3, para. (4), above.

of the treaty.[486] The interpreter must give appropriate weight to such an interpretative resolution under article 31, paragraph 3 (*a*) and (*b*), but not necessarily treat it as legally binding.[487]

### Conclusion 12. Constituent instruments of international organizations

1. **Articles 31 and 32 apply to a treaty which is the constituent instrument of an international organization. Accordingly, subsequent agreements and subsequent practice under article 31, paragraph 3, are, and subsequent practice under article 32 may be, means of interpretation for such treaties.**

2. **Subsequent agreements and subsequent practice of the parties under article 31, paragraph 3, or subsequent practice under article 32, may arise from, or be expressed in, the practice of an international organization in the application of its constituent instrument.**

3. **Practice of an international organization in the application of its constituent instrument may contribute to the interpretation of that instrument when applying articles 31 and 32.**

4. **Paragraphs 1 to 3 apply to the interpretation of any treaty which is the constituent instrument of an international organization without prejudice to any relevant rules of the organization.**

### Commentary

#### General aspects

(1)   Draft conclusion 12 refers to a particular type of treaty, namely constituent instruments of international organizations, and the way in which subsequent agreements or subsequent practice shall or may be taken into account in their interpretation under articles 31 and 32 of the 1969 Vienna Convention.

(2)   Constituent instruments of international organizations are specifically addressed in article 5 of the 1969 Vienna Convention, which provides:

> The present Convention applies to any treaty which is the constituent instrument of an international organization and to any treaty adopted within an international organization without prejudice to any relevant rules of the organization.[488]

(3)   A constituent instrument of an international organization under article 5, like any treaty, is an international agreement "whether embodied in a single instrument or in two or more related instruments" (art. 2, para. 1 (*a*)). The provisions that are contained in such a treaty are part of the constituent instrument.[489]

(4)   As a general matter, article 5, by stating that the 1969 Vienna Convention applies to constituent instruments of international organizations without prejudice to any relevant rules of the organization,[490] follows the general approach of the Convention according to which treaties between States are subject to the rules set forth in the Convention "unless the treaty otherwise provides".[491]

(5)   Draft conclusion 12 only refers to the interpretation of constituent instruments of international organizations. It therefore does not address every aspect of the role of subsequent agreements and subsequent practice in relation to the interpretation of treaties involving international organizations. In particular, it does not apply to the interpretation of treaties adopted within an international organization or to treaties concluded by international organizations that are not themselves constituent instruments of international organizations.[492] In addition, draft conclusion 12 does not apply to the interpretation of decisions by organs of international organizations as such,[493] including to the interpretation of decisions by international courts[494] or to the effect of a "clear and constant jurisprudence"[495] ("*jurisprudence constante*") of courts or tribunals.[496] Finally, the draft conclusion does not

---

[486] *Whaling in the Antarctic (Australia v. Japan: New Zealand intervening)* (see footnote 200 above), separate opinion of Judge Greenwood, pp. 407–408, para. 6, and separate opinion of Judge *ad hoc* Charlesworth, pp. 453–454, para. 4.

[487] See commentary to draft conclusion 3, para. (4), above.

[488] See also the parallel provision of article 5 of the 1986 Vienna Convention.

[489] Article 20, paragraph 3, of the 1969 Vienna Convention requires the acceptance, by the competent organ of the organization,

of reservations relating to its constituent instrument. See the twelfth report on reservations to treaties, *Yearbook … 2007*, vol. II (Part One), document A/CN.4/584, p. 47, paras. 75–77; S. Rosenne, *Developments in the Law of Treaties 1945–1986* (Cambridge, Cambridge University Press, 1989), p. 204.

[490] See *Yearbook … 1966*, vol. II, document A/6309/Rev.1 (Part II), p. 191 (draft article 4); and K. Schmalenbach, "Article 5. Treaties constituting international organizations and treaties adopted within an international organization", in Dörr and Schmalenbach (eds.), *Vienna Convention on the Law of Treaties …* (footnote 61 above), p. 89, para. 1.

[491] See, for example, articles 16; 19 (*a*) and (*b*); 20, paras. 1 and 3–5; 22; 24, para. 3; 25, para. 2; 44, para. 1; 55; 58, para. 2; 70, para. 1; 72, para. 1; and 77, para. 1, of the 1969 Vienna Convention.

[492] The latter category is addressed by the 1986 Vienna Convention.

[493] *Accordance with International Law of the Unilateral Declaration of Independence in Respect of Kosovo*, Advisory Opinion, *I.C.J. Reports 2010*, p. 403, at p. 442, para. 94: "While the rules on treaty interpretation embodied in [a]rticles 31 and 32 of the Vienna Convention on the Law of Treaties may provide guidance, differences between Security Council resolutions and treaties mean that the interpretation of Security Council resolutions also require that other factors be taken into account"; see also H. Thirlway, "The law and procedure of the International Court of Justice 1960–1989, part eight", *British Year Book of International Law 1996*, vol. 67, p. 1, at p. 29; M. C. Wood, "The interpretation of Security Council resolutions", *Max Planck Yearbook of United Nations Law*, vol. 2 (1998), p. 73, at p. 85; Gardiner, *Treaty Interpretation* (footnote 20 above), p. 128.

[494] *Request for Interpretation of the Judgment of 15 June 1962 in the Case concerning the Temple of Preah Vihear (Cambodia v. Thailand) (Cambodia v. Thailand)*, Judgment, *I.C.J. Reports 2013*, p. 281, at p. 307, para. 75: "A judgment of the Court cannot be equated to a treaty, an instrument which derives its binding force and content from the consent of the contracting States and the interpretation of which may be affected by the subsequent conduct of those States, as provided by the principle stated in Article 31, paragraph 3 (*b*), of the 1969 Vienna Convention on the Law of Treaties."

[495] See *Regina v. Secretary of State for the Environment, Transport and the Regions ex parte Alconbury Developments Limited and others* [2001] UKHL 23; *Regina v. Special Adjudicator (Respondent) ex parte Ullah (FC) (Appellant) Do (FC) (Appellant) v. Secretary of State for the Home Department (Respondent)* [2004] UKHL 26 [20] (Lord Bingham of Cornhill); and *R (on the application of Animal Defenders International) (Appellants) v. Secretary of State for Culture, Media and Sport (Respondent)* [2008] UKHL 15.

[496] Such jurisprudence may be a means for the determination of rules of law as indicated, in particular, by Article 38, paragraph 1 (*d*), of the Statute of the International Court of Justice.

specifically address questions relating to pronouncements by a treaty monitoring body consisting of independent experts. The latter are addressed in draft conclusion 13.

## Paragraph 1—applicability of articles 31 and 32

(6)   The first sentence of paragraph 1 of draft conclusion 12 recognizes the applicability of articles 31 and 32 of the 1969 Vienna Convention to treaties that are constituent instruments of international organizations.[497] The International Court of Justice has confirmed this point in its advisory opinion on the *Legality of the Use by a State of Nuclear Weapons in Armed Conflict*:

From a formal standpoint, the constituent instruments of international organizations are multilateral treaties, to which the well-established rules of treaty interpretation apply.[498]

(7)   The Court has held with respect to the Charter of the United Nations:

On the previous occasions when the Court has had to interpret the Charter of the United Nations, it has followed the principles and rules applicable in general to the interpretation of treaties, since it has recognized that the Charter is a multilateral treaty, albeit a treaty having certain special characteristics.[499]

(8)   At the same time, article 5 suggests, and decisions by international courts confirm, that constituent instruments of international organizations are also treaties of a particular type that may need to be interpreted in a specific way. Accordingly, the International Court of Justice has stated:

But the constituent instruments of international organizations are also treaties of a particular type; their object is to create new subjects of law endowed with a certain autonomy, to which the parties entrust the task of realizing common goals. Such treaties can raise specific problems of interpretation owing, *inter alia*, to their character which is conventional and at the same time institutional; the very nature of the organization created, the objectives which have been assigned to it by its founders, the imperatives associated with the effective performance of its functions, as well as its own practice, are all elements which may deserve special attention when the time comes to interpret these constituent treaties.[500]

(9)   The second sentence of paragraph 1 of draft conclusion 12 more specifically refers to elements of articles 31 and 32 that deal with subsequent agreements and subsequent practice as means of interpretation and confirms that subsequent agreements and subsequent practice under article 31, paragraph 3, are, and other subsequent practice under article 32 may be, means of interpretation for constituent instruments of international organizations.

(10)   The International Court of Justice has recognized that article 31, paragraph 3 (*b*), is applicable to constituent instruments of international organizations. In its advisory opinion on the *Legality of the Use by a State of Nuclear Weapons in Armed Conflict*, after describing constituent instruments of international organizations as

being treaties of a particular type, the Court introduced its interpretation of the Constitution of the World Health Organization by stating:

According to the customary rule of interpretation as expressed in Article 31 of the 1969 Vienna Convention on the Law of Treaties, the terms of a treaty must be interpreted "in their context and in the light of its object and purpose" and there shall be "taken into account, together with the context:

…

(*b*)   any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation".[501]

Referring to different precedents from its own case law in which it had, *inter alia*, employed subsequent practice under article 31, paragraph 3 (*b*), as a means of interpretation, the Court announced that it would apply article 31, paragraph 3 (*b*):

in this case for the purpose of determining whether, according to the WHO Constitution, the question to which it has been asked to reply arises "within the scope of [the] activities" of that Organization.[502]

(11)   The *Land and Maritime Boundary between Cameroon and Nigeria* case is another decision in which the Court has emphasized, in a case involving the interpretation of a constituent instrument of an international organization,[503] the subsequent practice of the parties. Proceeding from the observation that "Member States have also entrusted to the [Lake Chad Basin] Commission certain tasks that had not originally been provided for in the treaty texts",[504] the Court concluded that:

From the treaty texts and the practice [of the parties] analysed at paragraphs 64 and 65 … it emerges that the Lake Chad Basin Commission is an international organization exercising its powers within a specific geographical area; that it does not however have as its purpose the settlement at a regional level of matters relating to the maintenance of international peace and security and thus does not fall under Chapter VIII of the Charter [of the United Nations].[505]

(12)   Article 31, paragraph 3 (*a*), is also applicable to constituent treaties of international organizations.[506] Self-standing subsequent agreements between the member States regarding the interpretation of constituent instruments of international organizations, however, are not common. When questions of interpretation arise with respect to such an instrument, the parties mostly act as members within the framework of the plenary organ of the organization. If there is a need to modify, to amend, or to supplement the treaty, the member States either use the amendment procedure that is provided for in the treaty or they conclude a further treaty, usually a protocol.[507] It is,

---

[497]   See Gardiner, *Treaty Interpretation* (footnote 20 above), pp. 281–282.

[498]   *Legality of the Use by a State of Nuclear Weapons in Armed Conflict*, Advisory Opinion, *I.C.J. Reports 1996*, p. 66, at p. 74, para. 19.

[499]   *Certain expenses of the United Nations* (see footnote 192 above), p. 157.

[500]   *Legality of the Use by a State of Nuclear Weapons in Armed Conflict* (see footnote 498 above), p. 75, para. 19.

[501]   *Ibid.*

[502]   *Ibid.*

[503]   See article 17 of the Statute annexed to the 1964 Convention relating to the Development of the Chad Basin; generally: P. H. Sand, "Development of international water law in the Lake Chad Basin", *Heidelberg Journal of International Law*, vol. 34 (1974), pp. 52–76.

[504]   *Land and Maritime Boundary between Cameroon and Nigeria*, Preliminary Objections, Judgment of 11 June 1998 (see footnote 236 above), p. 305, para. 65.

[505]   *Ibid.*, pp. 306–307, para. 67.

[506]   *Whaling in the Antarctic (Australia v. Japan: New Zealand intervening)* (see footnote 200 above); see also below footnote 533 and accompanying text.

[507]   See articles 39–41 of the 1969 Vienna Convention.

however, also possible that the parties act as such when they meet within a plenary organ of the respective organization. In 1995:

> The Governments of the 15 Member States [of the European Union] have achieved the common agreement that this decision is the agreed and definitive interpretation of the relevant Treaty [on European Union] provisions.[508]

That is to say that:

> the name given to the European currency shall be Euro. ... The specific name Euro will be used instead of the generic term "ecu" used by the Treaty to refer to the European currency unit.[509]

This decision of the "Member States meeting within" the European Union has been regarded, in the literature, as a subsequent agreement under article 31, paragraph 3 (a).[510]

(13) It is sometimes difficult to determine whether "Member States meeting within" a plenary organ of an international organization intend to act in their capacity as members of that organ, as they usually do, or whether they intend to act in their independent capacity as States parties to the constituent instrument of the organization.[511] The Court of Justice of the European Union, when confronted with this question, initially proceeded from the wording of the act in question:

> It is clear from the wording of that provision that acts adopted by representatives of the Member States acting, not in their capacity as members of the Council, but as representatives of their governments, and thus collectively exercising the powers of the Member States, are not subject to judicial review by the Court.[512]

Later, however, the Court accorded decisive importance to the "content and all the circumstances in which [the decision] was adopted" in order to determine whether the decision was that of the organ or of the member States themselves as parties to the treaty:

> Consequently, it is not enough that an act should be described as a "decision of the Member States" for it to be excluded from review under Article 173 of the Treaty [establishing the European Economic Community]. In order for such an act to be excluded from review, it must still be determined whether, having regard to its content and all the circumstances in which it was adopted, the act in question is not in reality a decision of the Council.[513]

(14) Apart from subsequent agreements or subsequent practice that establish the agreement of all the parties under article 31, paragraph 3 (a) and (b), subsequent practice by one or more parties under article 32 in the application of the constituent instrument of an international organization may also be relevant for the interpretation

of that treaty.[514] Constituent instruments of international organizations, like other multilateral treaties, are, for example, sometimes implemented by subsequent bilateral or regional agreements or practice. Such bilateral treaties are not, as such, subsequent agreements under article 31, paragraph 3 (a), if only because they are concluded between a limited number of the parties to the multilateral constituent instrument. They may, however, imply assertions concerning the interpretation of the constituent instrument itself and may serve as supplementary means of interpretation under article 32.

*Paragraph 2—subsequent agreements and subsequent practice of States parties as "arising from" or "being expressed in" the practice of an international organization*

(15) Paragraph 2 of draft conclusion 12 highlights a particular way in which subsequent agreements and subsequent practice of States parties under articles 31, paragraph 3, and 32 may arise or be expressed. Subsequent agreements and subsequent practice of States parties may "arise from" their reactions to the practice of an international organization in the application of a constituent instrument. Alternatively, subsequent agreements and subsequent practice of States parties to a constituent agreement may be "expressed in" the practice of an international organization in the application of its constituent instrument. "Arise from" is intended to encompass the generation and development of subsequent agreements and subsequent practice by States parties, while "expressed in" is used in the sense of reflecting and articulating such agreements and practice. Either variant of the practice in, or arising from, an international organization may be relevant for the identification of subsequent agreements or subsequent practice by the States parties to the constituent instrument of the organization (see draft conclusion 4).[515]

(16) In its advisory opinion on the *Legality of the Use by a State of Nuclear Weapons in Armed Conflict*, the International Court of Justice recognized the possibility that the practice of an organization may reflect an agreement or the practice of the member States as parties to the treaty themselves, but found that the practice in that case did not "express or ... amount ... to" a subsequent practice under article 31, paragraph 3 (b):

> Resolution WHA46.40 itself, adopted, not without opposition, as soon as the question of the legality of the use of nuclear weapons was raised at the WHO, could not be taken to express or to amount on its own to a practice establishing an agreement between the members of the Organization to interpret its Constitution as empowering it to address the question of the legality of the use of nuclear weapons.[516]

(17) In this case, when considering the relevance of a resolution of an international organization for the interpretation of its constituent instrument, the Court

---

[508] See Madrid European Council, Conclusions of the Presidency, *Bulletin of the European Union*, No. 12 (1995), p. 9, at p. 10, sect. I.A.I.

[509] *Ibid.*

[510] See Aust, *Modern Treaty Law and Practice* (footnote 141 above), p. 215; and Hafner, "Subsequent agreements and practice ..." (footnote 260 above), pp. 109–110.

[511] See P. J. G. Kapteyn and P. VerLoren van Themaat (L. W. Gormley, ed.), *Introduction to the Law of the European Communities*, 3rd ed., London, Kluwer Law International, 1998, pp. 340–343.

[512] *European Parliament v. Council of the European Communities and Commission of the European Communities* [1993], joined cases C-181/91 and C-248/91, *European Court Reports 1993*, p. I-3713, at p. I-3717, para. 12.

[513] *Ibid.*, para. 14.

[514] See draft conclusions 2, para. 4, and 4, para. 3, and commentary thereto, respectively, para. (10) and paras. (23)–(35), above.

[515] R. Higgins, "The development of international law by the political organs of the United Nations", *Proceedings of the American Society of International Law at its Fifty-Ninth Annual Meeting held at Washington, D.C., April 22–24, 1965*, pp. 116–124, at p. 119; the practice of an international organization may also be a means of interpretation in itself under paragraph 3 (see below at paras. (25)–(35) of the present commentary).

[516] *Legality of the Use by a State of Nuclear Weapons in Armed Conflict* (see footnote 498 above), p. 81, para. 27.

considered, in the first place, whether the resolution expressed or amounted to "a practice establishing an agreement between the members of the Organization" under article 31, paragraph 3 (b).[517]

(18)   In a similar way, the WTO Appellate Body has stated in general terms:

> Based on the text of Article 31 (3) (a) of the *Vienna Convention*, we consider that a decision adopted by Members may qualify as a "subsequent agreement between the parties" regarding the interpretation of a covered agreement or the application of its provisions if: (i) the decision is, in a temporal sense, adopted subsequent to the relevant covered agreement; and (ii) the terms and content of the decision express an *agreement* between Members on the *interpretation* or *application* of a provision of WTO law.[518]

(19)   Regarding the conditions under which a decision of a plenary organ may be considered to be a subsequent agreement under article 31, paragraph 3 (a), the WTO Appellate Body held:

> 263.   With regard to the first element, we note that the Doha Ministerial Decision was adopted by consensus on 14 November 2001 on the occasion of the Fourth Ministerial Conference of the WTO. ... With regard to the second element, the key question to be answered is whether paragraph 5.2 of the Doha Ministerial Decision expresses an *agreement* between Members on the *interpretation* or *application* of the term "reasonable interval" in Article 2.12 of the *TBT Agreement*.

> 264.   We recall that paragraph 5.2 of the Doha Ministerial Decision provides:

> > Subject to the conditions specified in paragraph 12 of Article 2 of the Agreement on Technical Barriers to Trade, the phrase "reasonable interval" shall be understood to mean normally a period of not less than 6 months, except when this would be ineffective in fulfilling the legitimate objectives pursued.

> 265.   In addressing the question of whether paragraph 5.2 of the Doha Ministerial Decision expresses an agreement between Members on the interpretation or application of the term "reasonable interval" in Article 2.12 of the *TBT Agreement*, we find useful guidance in the Appellate Body reports in *EC—Bananas III (Article 21.5—Ecuador II) / EC—Bananas III (Article 21.5—US)*. The Appellate Body observed that the International Law Commission (the "ILC") describes a subsequent agreement within the meaning of Article 31 (3) (a) of the *Vienna Convention* as "a further *authentic element of interpretation* to be taken into account together with the context". According to the Appellate Body, "by referring to 'authentic interpretation', the ILC reads Article 31 (3) (a) as referring to *agreements bearing specifically upon the interpretation of the treaty*." Thus, we will consider whether paragraph 5.2 bears specifically upon the interpretation of Article 2.12 of the *TBT Agreement*.

> ...

> 268.   For the foregoing reasons, we *uphold* the Panel's finding ... that paragraph 5.2 of the Doha Ministerial Decision constitutes a subsequent agreement between the parties, within the meaning of Article 31 (3) (a) of the *Vienna Convention*, on the interpretation of the term "reasonable interval" in Article 2.12 of the *TBT Agreement*.[519]

[517] The Permanent Court of International Justice had adopted this approach in its advisory opinion on *Competence of the International Labour Organization to regulate, incidentally, the personal work of the employer*, 23 July 1926, *P.C.I.J., Series B, No. 13*, at pp. 19–20; see S. Engel, "'Living' international constitutions and the World Court (the subsequent practice of international organs under their constituent instruments)", *International and Comparative Law Quarterly*, vol. 16 (1967), pp. 865–910, at p. 871.

[518] WTO, Appellate Body Report, *United States—Measures Affecting the Production and Sale of Clove Cigarettes (United States—Clove Cigarettes)*, WT/DS406/AB/R, adopted 24 April 2012, para. 262.

[519] *Ibid.*, paras. 263–265 and 268; although the Doha Ministerial Decision does not concern a provision of the WTO Agreement itself, it

(20)   The International Court of Justice, although it did not expressly mention article 31, paragraph 3 (a), when relying on the Declaration on Principles of International Law concerning Friendly Relations and Cooperation among States in accordance with the Charter of the United Nations[520] for the interpretation of Article 2, paragraph 4, of the Charter, emphasized the "attitude of the Parties and the attitude of States towards certain General Assembly resolutions" and their consent thereto.[521] In this context, a number of writers have concluded that subsequent agreements within the meaning of article 31, paragraph 3 (a), may, under certain circumstances, arise from or be expressed in acts of plenary organs of international organizations,[522] such as the General Assembly of the United Nations.[523] Indeed, as the WTO Appellate Body has

concerns an annex to that Agreement (the "TBT Agreement"), which is an "integral part" of the Marrakesh Agreement Establishing the World Trade Organization (art. 2, para. 2, of the WTO Agreement). For the Commission text included in the quotation, see *Yearbook ... 1966*, vol. II, document A/6309/Rev.1 (Part II), p. 221, para. (14).

[520] General Assembly resolution 2625 (XXV) of 24 October 1970, annex.

[521] *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America)*, Merits, Judgment, *I.C.J. Reports 1986*, p. 14, at p. 100, para. 188: "The effect of consent to the text of such resolutions cannot be understood as merely that of a 'reiteration or elucidation' of the treaty commitment undertaken in the Charter. On the contrary, it may be understood as an acceptance of the validity of the rule or set of rules declared by the resolution by themselves". This statement, whose primary purpose is to explain the possible role of General Assembly resolutions for the formation of customary law, also recognizes the treaty-related point that such resolutions may serve to express the agreement, or the positions, of the parties regarding a certain interpretation of the Charter of the United Nations as a treaty ("elucidation"); similarly: *Accordance with International Law of the Unilateral Declaration of Independence in Respect of Kosovo*, Advisory Opinion (see footnote 493 above), p. 437, para. 80; in this sense, for example, L. B. Sohn, "The UN system as authoritative interpreter of its law", in O. Schachter and C. C. Joyner (eds.), *United Nations Legal Order*, vol. 1, Cambridge, American Society of International Law/Cambridge University Press, 1995, pp. 169–229, at p. 177 (noting in regard to the *Nicaragua* case that "[t]he Court accepted the Friendly Relations Declaration as an authentic interpretation of the Charter").

[522] H. G. Schermers and N. M. Blokker, *International Institutional Law*, 5th rev. ed., Leiden/Boston, Martinus Nijhoff, 2011, p. 854 (referring to interpretations by the Assembly of the Oil Pollution Compensation Fund regarding the constituent instruments of the Fund); M. Cogen, "Membership, associate membership and pre-accession arrangements of CERN, ESO, ESA, and EUMETSAT", *International Organizations Law Review*, vol. 9 (2012), pp. 145–179, at pp. 157–158 (referring to a unanimously adopted decision of the Council of the European Organization for Nuclear Research (CERN) of 17 June 2010 interpreting the admission criteria established in the Convention for the Establishment of a European Organization for Nuclear Research as a subsequent agreement under article 31, paragraph 3 (a), of the 1969 Vienna Convention).

[523] See E. Jiménez de Aréchaga, "International law in the past third of a century", *Collected Courses of the Hague Academy of International Law, 1978-1*, vol. 159, pp. 1–334, at p. 32 (stating in relation to the Declaration on Principles of International Law concerning Friendly Relations and Cooperation among States in accordance with the Charter of the United Nations that "[t]his Resolution ... constitutes an authoritative expression of the views held by the totality of the parties to the Charter as to these basic principles and certain corollaries resulting from them. In the light of these circumstances it seems difficult to deny the legal weight and authority of the Declaration both as a resolution recognizing what the Members themselves believe constitute existing rules of customary law and as an interpretation of the Charter by the subsequent agreement and the subsequent practice of all its members"); O. Schachter, "International law in theory and practice. General course in public international law", *Collected Courses of the Hague Academy of International Law, 1982-V*, vol. 178, pp. 9–396, at

(Continued on next page.)

indicated with reference to the Commission,[524] the characterization of a collective decision as an "authentic element of interpretation" under article 31, paragraph 3 (*a*), is only justified if the parties to the constituent instrument of an international organization acted as such and not, as they usually do, institutionally as members of the respective plenary organ.[525]

(21)  Paragraph 2 refers to the practice of an international organization, rather than to the practice of an organ of an international organization. Although the practice of an international organization usually arises from the conduct of an organ, it can also be generated by the conduct of two or more organs.

(22)  Subsequent agreements and subsequent practice of the parties, which may "arise from, or be expressed in" the practice of an international organization, may sometimes be very closely interrelated with the practice of the organization as such. For example, in its *Namibia* advisory opinion, the International Court of Justice arrived at its interpretation of the term "concurring votes" in Article 27, paragraph 3, of the Charter of the United Nations as including abstentions primarily by relying on the practice of the competent organ of the Organization in combination with the fact that this practice was then "generally accepted" by Member States:

the proceedings of the Security Council extending over a long period supply abundant evidence that presidential rulings and the positions taken by members of the Council, in particular its permanent members, have consistently and uniformly interpreted the practice of voluntary abstention by a permanent member as not constituting a bar to the adoption of resolutions. ... This procedure followed by the Security Council, which has continued unchanged after the amendment in 1965 of Article 27 of the Charter, has been generally accepted by Members of the United Nations and evidences a general practice of that Organization.[526]

In this case, the Court emphasized both the practice of one or more organs of the international organization and the "general acceptance" of that practice by the Member States and characterized the combination of those two elements

as being a "general practice of the Organization".[527] The Court followed this approach in its advisory opinion regarding *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* by stating that:

The Court considers that the *accepted*\* practice of the General Assembly, as it has evolved, is consistent with Article 12, paragraph 1, of the Charter.[528]

By speaking of the "accepted practice of the General Assembly", the Court implicitly affirmed that acquiescence on behalf of the Member States regarding the practice followed by the organization in the application of the treaty permits to establish the agreement regarding the interpretation of the relevant treaty provision.[529] Similarly, the Court of Justice of the European Union, in its judgment in *Europäische Schule München*, held that "[t]he case-law of the Complaints Board of the European Schools ... should be considered to be a subsequent practice in the application of the Convention defining the Statute of the European Schools within the meaning of Article 31 (3) (*b*) of the Vienna Convention". Since that practice "has never been the subject of challenge by the parties to that convention", "[t]he absence of any challenge by those parties must be regarded as reflecting their tacit agreement to such a practice".[530]

(23)  On this basis it is reasonable to consider "that relevant practice will usually be that of those on whom the obligation of performance falls",[531] in the sense that "where [S]tates by treaty entrust performance of activities to an organization, how those activities are conducted can constitute practice under the treaty; but whether such practice establishes agreement of the parties regarding the treaty's interpretation may require account to be taken of further factors".[532]

(24)  Accordingly, in the *Whaling in the Antarctic* case, the International Court of Justice referred to (non-binding) recommendations of the International Whaling Commission (which is both the name of an international organization established by the International Convention

---

(*Footnote 523 continued.*)

p. 113 ("the law-declaring resolutions that construed and 'concretized' the principles of the Charter—whether as general rules or in regard to particular cases—may be regarded as authentic interpretation by the parties of their existing treaty obligations. To the extent that they were interpretation, and agreed by all the member States, they fitted comfortably into an established source of law" (footnotes omitted)); P. Kunig, "United Nations Charter, interpretation of", *Max Planck Encyclopedia of Public International Law*, vol. X, Oxford, Oxford University Press, 2012, p. 272, at p. 275 (stating that, "[i]f passed by consensus, [General Assembly resolutions] are able to play a major role in the ... interpretation of the UN Charter") (online edition: https://opil.ouplaw.com/home /MPIL); and Aust, *Modern Treaty Law and Practice* (footnote 141 above), p. 213 (mentioning that General Assembly resolution 51/210 of 17 December 1996 on measures to eliminate international terrorism "can be seen as a subsequent agreement about the interpretation of the UN Charter"). All resolutions to which the writers are referring have been adopted by consensus.

[524] WTO, Appellate Body Report, *United States—Clove Cigarettes* (see footnote 518 above), para. 265.

[525] Y. Bonzon, *Public Participation and Legitimacy in the WTO*, Cambridge, Cambridge University Press, 2014, pp. 114–115.

[526] *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)*, Advisory Opinion, *I.C.J. Reports 1971*, p. 16, at p. 22.

[527] H. Thirlway, "The law and procedure of the International Court of Justice 1960–1989, part two", *British Year Book of International Law 1990*, vol. 61, pp. 1–133, at p. 76 (mentioning that "[t]he Court's reference to the practice as being 'of' the Organization is presumably intended to refer, not to a practice followed by the Organization as an entity in its relations with other subjects of international law, but rather a practice followed, approved or respected throughout the Organization. Seen in this light, the practice is ... rather a recognition by the other members of the Security Council at the relevant moment, and indeed by all member States by tacit acceptance, of the validity of such resolutions").

[528] *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (see footnote 23 above), p. 150.

[529] See commentary to draft conclusion 11, para. 2, second sentence, paras. (13)–(23), above; see also Villiger, *Commentary ...* (footnote 37 above), pp. 431–432, para. 22; and J. Arato, "Treaty interpretation and constitutional transformation: informal change in international organizations", *Yale Journal of International Law*, vol. 38, No. 2 (2013), pp. 289–357, at p. 322.

[530] *Europäische Schule München v. Silvana Oberto and Barbara O'Leary*, Joined Cases C-464/13 and C-465/13, Judgment of 11 March 2015, paras. 65–66 (published in the digital Court Reports of the Court of Justice).

[531] Gardiner, *Treaty Interpretation* (see footnote 20 above), p. 281.

[532] *Ibid.*

for the Regulation of Whaling[533] and that of an organ thereof), and clarified that when such recommendations are "adopted by consensus or by a unanimous vote, they may be relevant for the interpretation of the Convention or its Schedule".[534] At the same time, however, the Court also expressed a cautionary note according to which:

Australia and New Zealand overstate the legal significance of the recommendatory resolutions and Guidelines on which they rely. First, many IWC resolutions were adopted without the support of all States parties to the Convention and, in particular, without the concurrence of Japan. Thus, such instruments cannot be regarded as subsequent agreement to an interpretation of Article VIII, nor as subsequent practice establishing an agreement of the parties regarding the interpretation of the treaty within the meaning of subparagraphs (a) and (b), respectively, of paragraph (3) of Article 31 of the Vienna Convention on the Law of Treaties.[535]

(25)    This cautionary note does not, however, exclude that a resolution that has been adopted without the support of all member States may give rise to, or express, the position or the practice of individual member States in the application of the treaty under article 32.[536]

*Paragraph 3—the practice of an international organization itself*

(26)    Paragraph 3 of draft conclusion 12 refers to another form of practice that may be relevant for the interpretation of a constituent instrument of an international organization: the practice of the organization *as such*, meaning its "own practice", as distinguished from the practice of the member States. The International Court of Justice has in some cases taken the practice of an international organization into account in its interpretation of constituent instruments without referring to the practice or acceptance of the States members of the organization. In particular, the Court has stated that the international organization's "own practice ... may deserve special attention" in the process of interpretation.[537]

(27)    For example, in its advisory opinion on the *Competence of the General Assembly for the Admission of a State to the United Nations*, the Court stated that:

The organs to which Article 4 entrusts the judgment of the Organization in matters of admission have consistently interpreted the text in the sense that the General Assembly can decide to admit only on the basis of a recommendation of the Security Council.[538]

(28)    Similarly, in *Applicability of Article VI, Section 22, of the Convention on the Privileges and Immunities of the United Nations*, the Court referred to acts of organs of the Organization when it referred to the practice of "the United Nations":

In practice, according to the information supplied by the Secretary-General, the United Nations has had occasion to entrust missions—increasingly varied in nature—to persons not having the status of United Nations officials. ... In all these cases, the practice of the United Nations shows that the persons so appointed, and in particular the members of these committees and commissions, have been regarded as experts on missions within the meaning of Section 22.[539]

(29)    In its advisory opinion on the *Constitution of the Maritime Safety Committee of the Inter-Governmental Maritime Consultative Organization*, the International Court of Justice referred to "the practice followed by the Organization itself in carrying out the Convention [for the Establishment of the Inter-Governmental Maritime Consultative Organization]" as a means of interpretation.[540]

(30)    In its advisory opinion on *Certain expenses of the United Nations*, the Court explained why the practice of an international organization, as such, including that of a particular organ, may be relevant for the interpretation of its constituent instrument:

Proposals made during the drafting of the Charter to place the ultimate authority to interpret the Charter in the International Court of Justice were not accepted; the opinion which the Court is in course of rendering is an *advisory* opinion. As anticipated in 1945, therefore, each organ must, in the first place at least, determine its own jurisdiction. If the Security Council, for example, adopts a resolution purportedly for the maintenance of international peace and security and if, in accordance with a mandate or authorization in such resolution, the Secretary-General incurs financial obligations, these amounts must be presumed to constitute "expenses of the Organization".[541]

(31)    Many international organizations share the same characteristic of not providing for an "ultimate authority to interpret" their constituent instrument. The conclusion that the Court has drawn from this circumstance is therefore now generally accepted as being applicable to international organizations.[542] The identification of a presumption, in the *Certain expenses of the United Nations* advisory opinion, which arises from the practice of an international organization, including by one or more of its organs, is a way of recognizing such practice as a means of interpretation.[543]

---

[533] S. Schiele, *Evolution of International Environmental Regimes: The Case of Climate Change*, Cambridge, Cambridge University Press, 2014, pp. 37–38; A. Gillespie, *Whaling Diplomacy: Defining Issues in International Environmental Law*, Cheltenham, Edward Elgar, 2005, p. 411.

[534] *Whaling in the Antarctic (Australia v. Japan: New Zealand intervening)* (see footnote 200 above), para. 46.

[535] *Ibid.*, p. 257, para. 83.

[536] See *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (footnote 23 above), p. 149, para. 27 (referring to General Assembly resolution 1600 (XV) of 15 April 1961 (adopted with 60 votes in favour, 23 abstentions and 16 votes against, including by the Soviet Union and other States of Eastern Europe) and resolution 1913 (XVIII) of 3 December 1963 (adopted by 91 votes to 2 (Spain and Portugal)).

[537] *Legality of the Use by a State of Nuclear Weapons in Armed Conflict* (see footnote 498 above), p. 75, para. 19; see also D. Simon, *L'interprétation judiciaire des traités d'organisations internationales*, Paris, Pedone, 1981, pp. 379–384.

[538] *Competence of Assembly regarding admission to the United Nations* (see footnote 233 above), p. 9.

[539] *Applicability of Article VI, Section 22, of the Convention on the Privileges and Immunities of the United Nations*, Advisory Opinion, *I.C.J. Reports 1989*, p. 177, at p. 194, para. 48.

[540] *Constitution of the Maritime Safety Committee of the Inter-Governmental Maritime Consultative Organization* (see footnote 242 above), p. 169.

[541] *Certain expenses of the United Nations* (see footnote 192 above), p. 168.

[542] See J. Klabbers, *An Introduction to International Organizations Law*, 3rd ed., Cambridge, Cambridge University Press, 2015, p. 86; C. F. Amerasinghe, *Principles of the Institutional Law of International Organizations*, 2nd ed., Cambridge, Cambridge University Press, 2005, p. 25; J. E. Alvarez, *International Organizations as Law-makers*, Oxford, Oxford University Press, 2005, p. 80; and Rosenne, *Developments in the Law of Treaties ...* (footnote 489 above), pp. 224–225.

[543] See Lauterpacht, "The development of the law of international organization ..." (footnote 371 above), p. 460; and N. Blokker, "Beyond 'Dili': on the powers and practice of international organizations", in G. Kreijen (ed.), *State, Sovereignty, and International Governance*, Oxford, Oxford University Press, 2002, pp. 299–322, at pp. 312–318.

(32)   Whereas it is generally agreed that the interpretation of the constituent instruments of international organizations by the practice of their organs constitutes a relevant means of interpretation,[544] certain differences exist among writers about how to explain the relevance, for the purpose of interpretation, of an international organization's "own practice" in terms of the Vienna rules of interpretation.[545] The International Court of Justice, referring to acts of international organizations that were adopted against the opposition of certain member States,[546] has recognized that such acts may constitute practice for the purposes of interpretation, but not a (more weighty) practice that establishes agreement between the parties regarding the interpretation and that would fall under article 31, paragraph 3. It is largely agreed, however, that the practice of an international organization, as such, will often also be relevant and thus may contribute to the interpretation of that instrument when applying articles 31 and 32.[547]

(33)   The Commission has confirmed, in its commentary to draft conclusion 2, that given instances of subsequent practice and subsequent agreements contribute, or not, to the determination of the ordinary meaning of the terms in their context and in the light of the object and purpose of the treaty.[548] These considerations also apply, *mutatis mutandis*, to the practice of an international organization itself.

(34)   The possible relevance of an international organization's "own practice" can thus be derived from articles 31 and 32 of the 1969 Vienna Convention. Those rules permit, in particular, taking into account practice of an organization itself, including by one or more of its organs, as being relevant for the determination of the function of the international organization concerned.[549] It is clear, however, that the practice of an international organization is not a subsequent practice of the parties themselves under article 31, paragraph 3 (*b*).

(35)   Thus, article 5 of the 1969 Vienna Convention allows for the application of the rules of interpretation in articles 31 and 32 in a way that takes account of the practice of an international organization in the interpretation of its constituent instrument, including taking into account its institutional character.[550] Such elements may thereby also contribute to identifying whether, and if so how, the meaning of a provision of a constituent instrument of an international organization is capable of evolving over time.[551]

(36)   Paragraph 3, like paragraph 2, refers to the practice of an international organization as a whole, rather than to the practice of an organ of an international organization. The practice of the international organization in question can arise from the conduct of an organ, but can also be generated by the conduct of two or more organs. It is understood that the practice of an international organization can only be relevant for the interpretation of its constituent instrument if that organization has acted within its competence, since it is a general requirement that international organizations do not act *ultra vires*.[552]

(37)   Paragraph 3 of draft conclusion 12 builds on draft conclusion 5, which addresses "subsequent practice" by parties to a treaty in the application of that treaty, as defined in draft conclusion 4. Draft conclusion 5 does not imply that the practice of an international organization, as such, in the application of its constituent instrument cannot be relevant practice under articles 31 and 32.[553]

*Paragraph 4—without prejudice to the "rules of the organization"*

(38)   Paragraph 4 of draft conclusion 12 reflects article 5 of the 1969 Vienna Convention and its formulation borrows from that article. The paragraph applies to the situations covered under paragraphs 1 to 3 and ensures that the rules referred to therein are applicable, interpreted and applied "without prejudice to any relevant rules of the organization". The term "rules of the organization" is to be understood in the same way as in article 2, paragraph 1 (*j*), of the 1986 Vienna Convention, as well as in article 2 (*b*)

[544] See C. Brölmann, "Specialized rules of treaty interpretation: international organizations", in Hollis (ed.), *The Oxford Guide to Treaties* (footnote 391 above), pp. 520–521; S. Kadelbach, "The interpretation of the Charter", in B. Simma and others (eds.), *The Charter of the United Nations: A Commentary*, 3rd ed., vol. I, Oxford, Oxford University Press, 2012, p. 71, at p. 80; and Gardiner, *Treaty Interpretation* (footnote 20 above), pp. 127 and 281.

[545] See Gardiner, *Treaty Interpretation* (footnote 20 above), p. 282; Schermers and Blokker, *International Institutional Law* (footnote 522 above), p. 844; J. Crawford, *Brownlie's Principles of Public International Law*, 8th ed., Oxford, Oxford University Press, 2012, p. 187; and Klabbers, *An Introduction to International Organizations Law* (footnote 542 above), pp. 85–86; see also *Partial Award on the lawfulness of the recall of the privately held shares on 8 January 2001 and the applicable standards for valuation of those shares*, 22 November 2002, UNRIAA, vol. XXIII (Sales No. E/F.04.V.15), pp. 183–251, at p. 224, para. 145.

[546] See footnote 536 above.

[547] The International Court of Justice used the expression "purposes and functions as specified or implied in its constituent documents and developed in practice", *Reparation for injuries suffered in the service of the United Nations*, Advisory Opinion, *I.C.J. Reports 1949*, p. 174, at p. 180.

[548] See para. (15) of the commentary to draft conclusion 2 and footnote 58 above; see also *Land and Maritime Boundary between Cameroon and Nigeria*, Preliminary Objections, Judgment of 11 June 1998 (footnote 236 above), pp. 306–307, para. 67.

[549] See *South-West Africa—Voting Procedure*, Advisory Opinion of June 7th, 1955, *I.C.J. Reports 1955*, p. 67, at p. 106 (separate opinion of Judge Lauterpacht: "A proper interpretation of a constitutional instrument must take into account not only the formal letter of the original instrument, but also its operation in actual practice and in the light of the revealed tendencies in the life of the Organization").

[550] Commentators are debating whether the specific institutional character of certain international organizations, in combination with the principles and values that are enshrined in their constituent instruments, could also yield a "constitutional" interpretation of such instruments that receives inspiration from national constitutional law; see, for example, J. E. Alvarez, "Constitutional interpretation in international organizations", in J.-M. Coicaud and V. Heiskanen (eds.), *The Legitimacy of International Organizations*, Tokyo, United Nations University Press, 2001, pp. 104–154; A. Peters, "L'acte constitutif de l'organisation internationale", in E. Lagrange and J.-M. Sorel (eds.), *Droit des organisations internationales*, Paris, Librairie générale de droit et de jurisprudence, 2013, pp. 216–218; and J. Klabbers, "Constitutionalism lite", *International Organizations Law Review*, vol. 1 (2004), pp. 31–58, at pp. 50–54.

[551] *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)* (see footnote 54 above), pp. 31–32, para. 53; see also draft conclusion 8 and commentary thereto, paras. (24)–(30); see also Dörr, "Article 31 ..." (footnote 61 above), p. 575, para. 30; and Schmalenbach, "Article 5 ..." (footnote 490 above), p. 92, para. 7.

[552] *Certain expenses of the United Nations* (see footnote 192 above), p. 168: "[b]ut when the Organization takes action which warrants the assertion that it was appropriate for the fulfilment of one of the stated purposes of the United Nations, the presumption is that such action is not *ultra vires* the Organization").

[553] See commentary to draft conclusion 5, para. (14), above.

of the articles on the responsibility of international organizations adopted by the Commission in 2011.[554]

(39)   The Commission has stated in its general commentary to the 2011 draft articles on the responsibility of international organizations:

There are very significant differences among international organizations with regard to their powers and functions, size of membership, relations between the organization and its members, procedures for deliberation, structure and facilities, as well as the primary rules including treaty obligations by which they are bound.[555]

(40)   Paragraph 4 implies, *inter alia*, that more specific "relevant rules" of interpretation that may be contained in a constituent instrument of an international organization may take precedence over the general rules of interpretation under the 1969 Vienna Convention.[556] If, for example, the constituent instrument contains a clause, such as article IX, paragraph 2, of the Marrakesh Agreement Establishing the World Trade Organization, according to which the interpretation of the instrument is subject to a special procedure, it is to be presumed that the parties, by reaching an agreement after the conclusion of the treaty, do not wish to circumvent such a procedure by reaching a subsequent agreement under article 31, paragraph 3 (*a*). The special procedure under the treaty and a subsequent agreement under article 31, paragraph 3 (*a*), may, however, be compatible if they "serve different functions and have different legal effects".[557] Few constituent instruments contain explicit procedural or substantive rules regarding their interpretation.[558] Specific "relevant rules" of interpretation need not be formulated explicitly in the constituent instrument; they may also be implied therein, or derived from the "established practice of the organization".[559] The "established practice of the organization" is a term that is narrower in scope than the term "practice of the organization".

(41)   The Commission has noted in its commentary to article 2, paragraph 1 (*j*), of the draft articles on the law of treaties between States and international organizations or between international organizations, adopted by the Commission at its thirty-third and thirty-fourth sessions, that the significance of a particular practice of an organization may depend on the specific rules and characteristics of the respective organization, as expressed in its constituent instrument:

It is true that most international organizations have, after a number of years, a body of practice which forms an integral part of their rules. However, the reference in question is in no way intended to suggest that practice has the same standing in all organizations; on the contrary, each organization has its own characteristics in that respect.[560]

(42)   In this sense, the "established practice of the organization" may also be a means for the interpretation of constituent instruments of international organizations. Article 2, paragraph 1 (*j*), of the 1986 Vienna Convention and article 2 (*b*) of the articles on the responsibility of international organizations[561] recognize the "established practice of the organization" as a "rule of the organization". Such practice may produce different legal effects in different organizations and it is not always clear whether those effects should be explained primarily in terms of traditional sources of international law (treaty or custom) or of institutional law.[562] As far as the constituent treaties of the European Union (European Union primary law) are concerned, for example, the Court of Justice of the European Union has never discussed or applied subsequent practice of the parties under article 31, paragraph 3, of the 1969 Vienna Convention, explaining on one occasion that even an agreement among all member States to defer implementation of a particular provision of the respective treaty was not sufficient to override its object and purpose.[563] But even if it is difficult to make general statements, the "established practice of the organization" usually encompasses a specific form of practice,[564] one which has generally been accepted by the members of the organization, albeit sometimes tacitly.[565]

---

[554] General Assembly resolution 66/100 of 9 December 2011, annex; for the commentaries thereto, see *Yearbook … 2011*, vol. II (Part Two), para. 88.

[555] *Yearbook … 2011*, vol. II (Part Two), p. 47, general commentary, para. (7).

[556] See, for example, Klabbers, *An Introduction to International Organizations Law* (footnote 542 above), p. 84; Schmalenbach, "Article 5 …" (footnote 490 above), p. 89, para. 1, and p. 96, para. 15; Brölmann, "Specialized rules of treaty interpretation …" (footnote 544 above), p. 522; and Dörr, "Article 31 …" (footnote 61 above), pp. 576–577, para. 31.

[557] WTO, Appellate Body Report, *United States—Clove Cigarettes* (see footnote 518 above), paras. 252–257, at para. 257.

[558] Most so-called interpretation clauses determine which organ is competent authoritatively to interpret the treaty, or certain of its provisions, but do not formulate specific rules "on" interpretation itself; see C. Fernández de Casadevante y Romani, *Sovereignty and Interpretation of International Norms*, Berlin/Heidelberg, Springer, 2007, pp. 26–27; and Dörr, "Article 31 …" (footnote 61 above), p. 576, para. 31.

[559] See 1986 Vienna Convention, art. 2, para. 1 (*j*), and the Commission's articles on the responsibility of international organizations, art. 2 (*b*), *Yearbook … 2011*, vol. II (Part Two), para. 87; see also C. Peters, "Subsequent practice and established practice of international organizations: two sides of the same coin?", *Göttingen Journal of International Law*, vol. 3 (2011), pp. 617–642.

[560] *Yearbook … 1982*, vol. II (Part Two), p. 21, commentary to draft article 2, para. (25).

[561] *Yearbook … 2011*, vol. II (Part Two), para. 87.

[562] See Higgins, "The development of international law …" (footnote 515 above), p. 121 ("aspects of treaty interpretation and customary practice in this field merge very closely"); and Peters, "Subsequent practice and established practice …" (footnote 559 above), pp. 630–631 ("should be considered a kind of customary law of the organization"); it is not persuasive to limit the "established practice of the organization" to so-called internal rules since, according to the Commission, "there would have been problems in referring to the 'internal' law of an organization, for while it has an internal aspect, this law also has in other respects an international aspect" (*Yearbook … 1982*, vol. II (Part Two), p. 21 (para. (25) of the commentary to article 2 of the draft articles on the law of treaties between States and international organizations or between international organizations, adopted by the Commission at its thirty-third and thirty-fourth sessions)); see also Schermers and Blokker, *International Institutional Law* (footnote 522 above), p. 766; but see C. Ahlborn, "The rules of international organizations and the law of international responsibility", *International Organizations Law Review*, vol. 8 (2011), pp. 397–482, at pp. 424–428.

[563] *Gabrielle Defrenne v. Société anonyme belge de navigation aérienne Sabena*, Case 43/75, judgment of 8 April 1976, *European Court Reports 1976*, p. 456, at p. 478, para. 57; see also Nolte, "Jurisprudence under special regimes …" (footnote 26 above), pp. 210–306, at pp. 297–300.

[564] Blokker, "Beyond 'Dili' …" (see footnote 543 above), p. 312.

[565] See Lauterpacht, "The development of the law of international organization …" (footnote 371 above), p. 464 ("consent of the general body of membership"); Higgins, "The development of international law …" (footnote 515 above), p. 121 ("[t]he degree and length of acquiescence need here perhaps to be less marked than elsewhere, because the U.N. organs undoubtedly have initial authority to make such decisions [concerning their own jurisdiction and competence]"); and Peters, "Subsequent practice and established practice …" (footnote 559 above), pp. 633–641.

### Conclusion 13.   Pronouncements of expert treaty bodies

**1.   For the purposes of these draft conclusions, an expert treaty body is a body consisting of experts serving in their personal capacity, which is established under a treaty and is not an organ of an international organization.**

**2.   The relevance of a pronouncement of an expert treaty body for the interpretation of a treaty is subject to the applicable rules of the treaty.**

**3.   A pronouncement of an expert treaty body may give rise to, or refer to, a subsequent agreement or subsequent practice by parties under article 31, paragraph 3, or subsequent practice under article 32. Silence by a party shall not be presumed to constitute subsequent practice under article 31, paragraph 3 (*b*), accepting an interpretation of a treaty as expressed in a pronouncement of an expert treaty body.**

**4.   This draft conclusion is without prejudice to the contribution that pronouncements of expert treaty bodies make to the interpretation of the treaties under their mandates.**

### Commentary

*Paragraph 1—definition of the term "expert treaty body"*

(1)   Some treaties establish bodies, consisting of experts who serve in their personal capacity, which have the task of monitoring or contributing in other ways to the application of those treaties. Examples of such expert treaty bodies are the committees established under various human rights treaties at the universal level,[566] for example, the Committee on the Elimination of Racial Discrimination,[567] the Human Rights Committee,[568] the Committee on the Elimination of Discrimination against Women,[569] the Committee on the Rights of Persons with Disabilities,[570] the Committee on the Rights of the Child[571] and the Committee against Torture.[572] Other expert treaty bodies include the Commission on the Limits of the Continental Shelf under the United Nations Convention on the Law of the Sea,[573] the Compliance Committee under the Convention on Access to Information, Public

Participation in Decision-Making and Access to Justice in Environmental Matters,[574] and the International Narcotics Control Board under the 1961 Single Convention on Narcotic Drugs.[575]

(2)   Paragraph 1 defines the term "expert treaty body" only "[f]or the purposes of these draft conclusions".

(3)   The term "serving in their personal capacity" means that the members of an expert treaty body are not subject to instructions when they act in that capacity.[576] Draft conclusion 13 is not concerned with bodies that consist of State representatives. The output of a body that is composed of State representatives, and that is not an organ of an international organization, is a form of practice by those States that thereby act collectively within its framework.[577]

(4)   Draft conclusion 13 also does not apply to bodies that are organs of an international organization.[578] The exclusion of bodies that are organs of international organizations from the scope of draft conclusion 13 has been made for reasons of consistency, since the present draft conclusions are not focused on the relevance of the practice of international organizations for the application of the rules of interpretation of the 1969 Vienna Convention except as far as the interpretation of their constituent instruments is concerned (see draft conclusion 12, in particular paragraph 3). This does not exclude that the substance of the present draft conclusion may apply, *mutatis mutandis*, to pronouncements of independent expert bodies that are organs of international organizations.

(5)   The expression "established under a treaty" means that the establishment or a competence of a particular expert body is provided under a treaty. In most cases it is clear whether these conditions are satisfied, but there may also be borderline cases. The Committee on

---

[566] See N. S. Rodley, "The role and impact of treaty bodies", in D. Shelton (ed.), *The Oxford Handbook of International Human Rights Law*, Oxford, Oxford University Press, 2013, pp. 621–641, at pp. 622–623.

[567] Articles 8–14 of the International Convention on the Elimination of All Forms of Racial Discrimination.

[568] Articles 28–45 of the International Covenant on Civil and Political Rights.

[569] Articles 17–22 of the Convention on the Elimination of All Forms of Discrimination against Women.

[570] Articles 34–39 of the Convention on the Rights of Persons with Disabilities.

[571] Articles 43–45 of the Convention on the Rights of the Child.

[572] Articles 17–24 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

[573] The Commission on the Limits of the Continental Shelf was established under article 76, paragraph 8, of the United Nations Convention on the Law of the Sea and annex II to the Convention.

[574] The Compliance Committee under the Convention on Access to Information, Public Participation in Decision-Making and Access to Justice in Environmental Matters was established under article 15 of the Convention and decision I/7 on review of compliance, adopted at the first meeting of the parties, held in 2002 (ECE/MP.PP/2/Add.8).

[575] The International Narcotics Control Board was established under article 5 of the 1961 Single Convention on Narcotic Drugs.

[576] See, e.g., article 28, paragraph 3, of the International Covenant on Civil and Political Rights; see also C. Tomuschat, *Human Rights: Between Idealism and Realism*, 3rd ed., Oxford, Oxford University Press, 2014, p. 219.

[577] This is true, in particular, for decisions of Conferences of States Parties; see draft conclusion 12.

[578] The Committee of Experts on the Application of Conventions and Recommendations of the International Labour Organization (ILO) is an important example of an expert body that is an organ of an international organization. It was established in 1926 to examine government reports on ratified conventions. It is composed of 20 eminent jurists from different geographic regions, legal systems and cultures, who are appointed by the governing body of ILO for three-year terms; see www.ilo.org and information provided by ILO to the Commission, which is available from the Commission's website at http://legal.un.org /ilc/guide/1_11.shtml. The Working Group on Arbitrary Detention is an example of a body of experts serving in their personal capacity that is mandated by the Human Rights Council under its resolution 24/7 of 26 September 2013, *Official Records of the General Assembly, Sixty-eighth Session, Supplement No. 53A* (A/68/53/Add.1). Being a subsidiary organ of the Council, it is not an expert treaty body in the sense of draft conclusion 13; see www.ohchr.org/EN/Issues/Detention/Pages /WGADIndex.aspx.

Economic, Social and Cultural Rights, for example, is a body that was established by a resolution of an international organization,[579] but which was later given the competence to "consider" certain "communications" by the Optional Protocol to the International Covenant on Economic, Social and Cultural Rights.[580] Such a body is an expert treaty body within the meaning of draft conclusion 13, as a treaty provides for the exercise of certain competences by the Committee. Another borderline case is the Compliance Committee under the Kyoto Protocol to the United Nations Framework Convention on Climate Change, the establishment of which—by a decision of the Conference of the Parties—is implicitly envisaged in article 18 of the Protocol.[581]

*Paragraph 2—primacy of the rules of the treaty*

(6)   Treaties use various terms for designating the forms of action of expert treaty bodies, for example, "views",[582] "recommendations",[583] "comments",[584] "measures"[585] and "consequences".[586] Draft conclusion 13 employs, for the purpose of the present draft conclusion, the general term "pronouncements".[587] This term covers all relevant factual and normative assessments by expert treaty bodies. Other general terms that are in use for certain bodies include

(7)   Paragraph 2 serves to emphasize that any possible legal effect of a pronouncement by an expert treaty body depends, first and foremost, on the specific rules of the applicable treaty. Such possible legal effects may therefore be very different. They must be determined by way of applying the rules on treaty interpretation set forth in the 1969 Vienna Convention. The ordinary meaning of the term by which a treaty designates a particular form of pronouncement, or its context, usually gives a clear indication that such pronouncements are not legally binding.[590] This is true, for example, for the terms "views" (article 5, paragraph 4, of the Optional Protocol to the International Covenant on Civil and Political Rights), "suggestions and recommendations" (article 14, paragraph 8, of the International Convention on the Elimination of All Forms of Racial Discrimination) and "recommendations" (article 76, paragraph 8, of the United Nations Convention on the Law of the Sea). The words "the treaty" may refer to the treaty establishing the expert treaty body, as well as to the treaty being interpreted. These can be two different instruments, and expert treaty bodies may thus sometimes be authorized

---

[579] Economic and Social Council, resolution 1985/17 of 28 May 1985.

[580] See articles 1–15 of the Optional Protocol to the International Covenant on Economic, Social and Cultural Rights, annexed to General Assembly resolution 63/117 of 10 December 2008.

[581] The Compliance Committee under the Kyoto Protocol to the United Nations Framework Convention on Climate Change was established under article 18 of the Protocol and decision 24/CP.7 on procedures and mechanisms relating to compliance under the Kyoto Protocol, adopted by the Conference of the Parties at its seventh session (report of the Conference of the Parties on its seventh session, held at Marrakesh from 29 October to 10 November 2001, FCCC/CP/2001/13/Add.3).

[582] International Covenant on Civil and Political Rights, art. 42, para. 7 (*c*); Optional Protocol to the International Covenant on Civil and Political Rights, art. 5, para. 4; Optional Protocol to the International Covenant on Economic, Social and Cultural Rights, art. 9, para. 1.

[583] International Convention on the Elimination of All Forms of Racial Discrimination, art. 9, para. 2; Convention on the Elimination of All Forms of Discrimination against Women, art. 21, para. 1; Convention on the Rights of the Child, art. 45 (*d*); International Convention for the Protection of All Persons from Enforced Disappearance, art. 33, para. 5; and United Nations Convention on the Law of the Sea, art. 76, para. 8.

[584] Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 19, para. 3; International Covenant on Civil and Political Rights, art. 40, para. 4; and International Convention on the Protection of the Rights of All Migrant Workers and Members of Their Families, art. 74.

[585] Decision I/7 on review of compliance, adopted at the first meeting of the parties to the Convention on Access to Information, Public Participation in Decision-Making and Access to Justice in Environmental Matters (see footnote 574 above), annex, paras. 36–37; 1961 Single Convention on Narcotic Drugs, art. 14.

[586] Decision 24/CP.7 on procedures and mechanisms relating to compliance under the Kyoto Protocol to the United Nations Framework Convention on Climate Change (see footnote 581 above), annex, sect. XV.

[587] *Yearbook … 2015*, vol. II (Part Two), para. 26 (*b*); see also International Law Association, "Final report on the impact of findings of the United Nations human rights treaty bodies", *Report of the Seventy-first Conference …* (footnote 156 above), pp. 626–627, para. 15; and European Commission for Democracy through Law (Venice Commission), "Report on the implementation of international human rights treaties in domestic law and the role of courts" (CDL-AD(2014)036), adopted by the Venice Commission at its 100th plenary session (Rome, 10–11 October 2014), p. 31, para. 78.

[588] *Ahmadou Sadio Diallo (Republic of Guinea v. Democratic Republic of the Congo)*, Merits, Judgment [of 30 November 2010], *I.C.J. Reports 2010*, p. 639, at pp. 663–664, para. 66; Rodley, "The role and impact of treaty bodies" (see footnote 566 above), p. 640; A. Andrusevych and S. Kern (eds.), *Case Law of the Aarhus Convention Compliance Committee (2004–2014)*, 3rd ed., Lviv, Resource and Analysis Center "Society and Environment", 2016; and "Compilation of findings of the Aarhus Convention Compliance Committee adopted 18 February 2005 to date", available from www.unece.org/fileadmin/DAM/env/pp/compliance/Compilation_of_CC_findings.pdf.

[589] R. Van Alebeek and A. Nollkaemper, "The legal status of decisions by human rights treaty bodies in national law", in H. Keller and G. Ulfstein (eds.), *UN Human Rights Treaty Bodies: Law and Legitimacy*, Cambridge, Cambridge University Press, 2012, pp. 356–413, at p. 402; Rodley, "The role and impact of treaty bodies" (see footnote 566 above), p. 639; K. Mechlem, "Treaty bodies and the interpretation of human rights", *Vanderbilt Journal of Transnational Law*, vol. 42 (2009), pp. 905–947, at p. 908.

[590] This is generally accepted in the literature; see International Law Association, "Final report on the impact of findings of the United Nations human rights treaty bodies", *Report of the Seventy-first Conference …* (footnote 156 above), p. 627, para. 18; Rodley, "The role and impact of treaty bodies" (footnote 566 above), p. 639; Tomuschat, *Human Rights: Between Idealism and Realism …* (footnote 576 above), pp. 233 and 267; D. Shelton, "The legal status of normative pronouncements of human rights treaty bodies", in H. P. Hestermeyer and others (eds.), *Coexistence, Cooperation and Solidarity, Liber Amicorum Rüdiger Wolfrum*, vol. I, Leiden/Boston, Martinus Nijhoff, 2012, pp. 553–575, at p. 559; H. Keller and L. Grover, "General comments of the Human Rights Committee and their legitimacy", in Keller and Ulfstein (eds.), *UN Human Rights Treaty Bodies …* (footnote 589 above), pp. 116–198, at p. 129; and Venice Commission, "Report on the implementation of international human rights treaties …" (footnote 587 above), p. 30, para. 76; for the term "determine" in article 18 of the Kyoto Protocol to the United Nations Framework Convention on Climate Change and decision 24/CP.7 on procedures and mechanisms relating to compliance under the Kyoto Protocol (see footnote 581 above), see G. Ulfstein and J. Werksman, "The Kyoto compliance system: towards hard enforcement", in O. S. Stokke, J. Hovi and G. Ulfstein (eds.), *Implementing the Climate Regime: International Compliance*, London, Earthscan, 2005, pp. 39–62, at pp. 55–56.

to interpret treaties other than those under which they are established.[591]

(8)  It is not necessary, for present purposes, to describe the competences of different expert treaty bodies in detail. Pronouncements of expert treaty bodies under human rights treaties, for example, are usually either adopted in reaction to State reports (for example, "concluding observations"), or in response to individual communications (for example, "views"), or regarding the implementation or interpretation of the respective treaties generally (for example, "general comments").[592] Whereas such pronouncements are governed by different specific provisions of the treaty that primarily determine their legal effect, they often, explicitly or implicitly, interpret the treaty in a way that raises some general issues that draft conclusion 13 seeks to address.[593]

*Paragraph 3, first sentence—"may give rise to, or refer to, a subsequent agreement or subsequent practice"*

(9)  A pronouncement of an expert treaty body cannot as such constitute a subsequent agreement or subsequent practice under article 31, paragraph 3 (a) or (b), since this provision requires an agreement of the parties or subsequent practice of the parties that establishes their agreement regarding the interpretation of the treaty. This has been confirmed, for example, by the reaction of States parties to a draft proposition of the Human Rights Committee according to which its own "general body of jurisprudence", or the acquiescence by States to that jurisprudence, would constitute subsequent practice under article 31, paragraph 3 (b). The proposition of the Human Rights Committee was:

> In relation to the general body of jurisprudence generated by the Committee, it may be considered that it constitutes "subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation" within the sense of article 31 (3) (b) of the Vienna Convention on the Law of Treaties, or, alternatively, the acquiescence of States parties in those determinations constitutes such practice.[594]

(10)  After this proposition was criticized by some States,[595] the Committee did not pursue its proposal and adopted its general comment No. 33 without a reference to article 31, paragraph 3 (b).[596] This confirms that pronouncements of expert treaty bodies cannot as such constitute subsequent practice under article 31, paragraph 3 (b).[597]

(11)  Pronouncements of expert treaty bodies may, however, give rise to, or refer to, a subsequent agreement or a subsequent practice by the parties which establish their agreement regarding the interpretation of the treaty under article 31, paragraph 3 (a) or (b). This possibility has been recognized by States,[598] by the Commission[599] and also by the International Law Association[600] and by a significant number of authors.[601] There is indeed no reason why a subsequent agreement between the parties or subsequent practice that establishes the agreement of the parties themselves regarding the interpretation of a treaty could not arise from, or be referred to by, a pronouncement of an expert treaty body.

(12)  Whereas a pronouncement of an expert treaty body can, in principle, give rise to a subsequent agreement or a subsequent practice by the parties themselves under article 31, paragraph 3 (a) and (b), this result is not easily achieved in practice. Most treaties that establish expert treaty bodies at the universal level have many parties. It will often be difficult to establish that all parties have accepted, explicitly or implicitly, that a particular pronouncement of an expert treaty body expresses a particular interpretation of the treaty.

(13)  One possible way of identifying an agreement of the parties regarding the interpretation of a treaty that is reflected in a pronouncement of an expert treaty body is to look at resolutions of organs of international organizations as well as of Conferences of States Parties. General Assembly resolutions may, in particular, explicitly or implicitly refer to pronouncements of expert treaty bodies. This is true, for example, for two resolutions

---

[591] See, for example, articles 1 and 2 of the Optional Protocol to the International Covenant on Economic, Social, and Cultural Rights.

[592] W. Kälin, "Examination of state reports", in Keller and Ulfstein (eds.), *UN Human Rights Treaty Bodies …* (see footnote 589 above), pp. 16–72; G. Ulfstein, "Individual complaints", *ibid.*, pp. 73–115; Mechlem, "Treaty bodies …" (see footnote 589 above), pp. 922–930; the legal basis for general comments under the International Covenant on Civil and Political Rights is article 40, paragraph 4, but this practice has been generally accepted also with regard to other expert bodies under human rights treaties, see Keller and Grover, "General comments …" (footnote 590 above), pp. 127–128.

[593] For example, Rodley, "The role and impact of treaty bodies" (see footnote 566 above), p. 639; Shelton, "The legal status of normative pronouncements …" (see footnote 590 above), pp. 574–575; A. Boyle and C. Chinkin, *The Making of International Law*, Oxford, Oxford University Press, 2007, p. 155.

[594] Draft general comment No. 33 (The obligations of States parties under the Optional Protocol to the International Covenant on Civil and Political Rights), second revised version as of 18 August 2008 (CCPR/C/GC/33/CRP.3), 25 August 2008, para. 18; this position has also been put forward by several authors: see Keller and Grover, "General comments …" (footnote 590 above), pp. 130–132, with further references.

[595] See, for example, "Comments of the United States of America on the Human Rights Committee's 'Draft general comment 33: The Obligations of States Parties under the Optional Protocol to the International Covenant on Civil and Political Rights'", 17 October 2008, para. 17. Available from https://2009-2017.state.gov/documents/organization/138851.pdf.

[596] Report of the Human Rights Committee, *Official Records of the General Assembly, Sixty-fourth Session, Supplement No. 40* (A/64/40), vol. I, annex V.

[597] Dörr, "Article 31 …" (see footnote 61 above), p. 600, para. 85.

[598] See, for example, A/C.6/70/SR.22, para. 46 (United States: "States parties' reactions to the pronouncements or activities of a treaty body might, in some circumstances, constitute subsequent practice (of those States) for the purposes of article 31, paragraph 3").

[599] See para. (11) of the commentary to draft conclusion 3, above.

[600] See International Law Association, "Final report on the impact of findings of the United Nations human rights treaty bodies", *Report of the Seventy-first Conference …* (footnote 156 above), pp. 628–629, para. 21.

[601] See, for example, M. Kanetake, "UN human rights treaty monitoring bodies before domestic courts", *International and Comparative Law Quarterly*, vol. 67 (January 2018), pp. 201–232, at p. 218; Mechlem, "Treaty bodies …" (see footnote 589 above), pp. 920–921; B. Schlütter, "Aspects of human rights interpretation by the UN treaty bodies", in Keller and Ulfstein (eds.), *UN Human Rights Treaty Bodies …* (footnote 589 above), p. 261, at pp. 289–290; E. Klein and D. Kretzmer, "The UN Human Rights Committee: the general comments—the evolution of an autonomous monitoring instrument", *German Yearbook of International Law*, vol. 58 (2015), pp. 189–229, at pp. 205–206; and Ulfstein, "Individual complaints" (footnote 592 above), p. 96.

of the General Assembly on the "protection of human rights and fundamental freedoms while countering terrorism",[602] which expressly refer to general comment No. 29 of the Human Rights Committee on derogations from provisions of the International Covenant on Civil and Political Rights during a state of emergency.[603] Both resolutions reaffirm the obligation of States to respect certain rights under the Covenant as non-derogable in any circumstances and underline the "exceptional and temporary nature" of derogations by way of using the terms used in general comment No. 29 when interpreting and thereby specifying the obligation of States under article 4 of the Covenant.[604] These resolutions were adopted without a vote by the General Assembly, and hence would reflect a subsequent agreement under article 31, paragraph 3 (a) or (b), if the consensus constituted the acceptance by all the parties of the interpretation that is contained in the pronouncement.[605]

(14)   The pronouncement of the Committee on Economic, Social and Cultural Rights, in its general comment No. 15 (2002), according to which articles 11 and 12 of the International Covenant on Economic, Social and Cultural Rights imply a human right to water,[606] offers another illustration of the way in which an agreement of the parties may come about. After a debate over a number of years, the General Assembly on 17 December 2015 adopted a resolution, without a vote, that defines the human right to safe drinking water by using the language that the Committee employed in its general comment No. 15 in order to interpret the right.[607] That resolution may refer to an agreement under article 31, paragraph 3 (a) or (b), depending on whether the consensus constituted the acceptance by all parties of the interpretation that is contained in the pronouncement.[608]

(15)   Other General Assembly resolutions explicitly refer to pronouncements of expert treaty bodies[609] or call upon States to take into account the recommendations, observations and general comments of treaty bodies relevant to the topic on the implementation of the related treaties.[610] Resolutions of Conferences of States Parties may do the same, as with regard to recommendations of the Compliance Committee under the Convention on Access to Information, Public Participation in Decision-Making and Access to Justice in Environmental Matters.[611] Such resolutions should, however, be approached with caution before reaching any conclusion as to whether they imply a subsequent agreement or subsequent practice of the parties under article 31, paragraph 3 (a) or (b).

(16)   Even if a pronouncement of an expert treaty body does not give rise to, or refer to, a subsequent agreement or a subsequent practice that establishes the agreement of all parties to a treaty, it may be relevant for the identification of other subsequent practice under article 32 that does not establish such agreement. There are, for example, resolutions of the Human Rights Council that refer to general comments of the Human Rights Committee or of the Committee on Economic, Social and Cultural Rights.[612] Even if the membership of the Council is limited, such resolutions may be relevant for the interpretation of a treaty as expressing other subsequent practice under article 32. Another example concerns the International Narcotics Control Board.[613] A number of States have engaged in subsequent practice under article 32 by disagreeing with the proposals of the Board regarding the establishment of so-called safe injection rooms and other harm reduction measures,[614] criticizing the Board for following too rigid an interpretation of the drug conventions and as acting beyond its mandate.[615]

[602] General Assembly resolutions 65/221 of 21 December 2010, para. 5, footnote 8, and 68/178 of 18 December 2013, para. 5, footnote 8.

[603] Report of the Human Rights Committee, *Official Records of the General Assembly, Fifty-sixth Session, Supplement No. 40* (A/56/40), vol. I, annex VI.

[604] *Ibid.*, para. 2.

[605] See, above, draft conclusion 11, para. 3, and the commentary thereto.

[606] Committee on Economic, Social and Cultural Rights, general comment No. 15 (2002), *Official Records of the Economic and Social Council, 2003, Supplement No. 2* (E/2003/22–E/C.12/2002/13), annex IV, para. 2 ("The human right to water entitles everyone to sufficient, safe, acceptable, physically accessible and affordable water for personal and domestic uses").

[607] General Assembly resolution 70/169 of 17 December 2015 recalls general comment No. 15 of the Committee on Economic, Social and Cultural Rights on the right to water (see footnote 606 above) and uses the same language: "*Recognizes* that the human right to safe drinking water entitles everyone, without discrimination, to have access to sufficient, safe, acceptable, physically accessible and affordable water for personal and domestic use" (para. 2).

[608] See, above, draft conclusion 11, para. 3, and the commentary thereto, paras. (31)–(38); in the case of resolution 70/169 on the right to water (see footnote 607 above) "the United States dissociated itself from the consensus on paragraph 2 on the grounds that the language used to define the right to water and sanitation was based on the views of the Committee on Economic, Social and Cultural Rights and the Special Rapporteur only and did not appear in any international agreement or reflect any international consensus" (A/C.3/70/SR.55, para. 144). It is not entirely clear whether the United States thereby wished to merely restate its position that the resolution did not recognize a particular effect of the pronouncement of the Committee, as such, or whether it disagreed with the definition in substance.

[609] See General Assembly resolution 69/166 of 18 December 2014, adopted without a vote, recalling general comment No. 16 of the Human Rights Committee on the right to respect of privacy, family, home and correspondence, and protection of honour and reputation (*Official Records of the General Assembly, Forty-third Session, Supplement No. 40* (A/43/40), annex VI).

[610] See General Assembly resolution 69/157 of 18 December 2014, adopted without a vote, and resolution 68/147 of 18 December 2013, adopted without a vote.

[611] Decision I/7 on review of compliance, adopted at the first meeting of the parties to the Convention on Access to Information, Public Participation in Decision-Making and Access to Justice in Environmental Matters (see footnote 574 above), para. 37; V. Koester, "The Convention on Access to Information, Public Participation in Decision-Making and Access to Justice in Environmental Matters (Aarhus Convention)", in G. Ulfstein and others (eds.), *Making Treaties Work: Human Rights, Environment and Arms Control*, Cambridge, Cambridge University Press, 2007, pp. 179–217, at p. 203.

[612] See Human Rights Council resolutions 28/16 of 26 March 2015 and 28/19 of 27 March 2015, adopted without a vote (*Official Records of the General Assembly, Seventieth Session, Supplement No. 53* (A/70/53)).

[613] See footnote 575 above.

[614] See *Report of the International Narcotics Control Board for 2009* (E/INCB/2009/1, United Nations publication, Sales No. E.10.XI.1), para. 278; see also P. Gallahue, "International drug control", in A. Nollkaemper and I. Plakokefalos (eds.), *The Practice of Shared Responsibility in International Law*, Cambridge, Cambridge University Press, 2017, pp. 162–183, at p. 171, footnote 55.

[615] See D. Barrett, *"Unique in International Relations"? A Comparison of the International Narcotics Control Board and the UN Human Rights Treaty Bodies*, London, International Harm Reduction Association, 2008, p. 8; and D. R. Bewley-Taylor, *International Drug Control: Consensus Fractured*, Cambridge, Cambridge University Press, 2012, pp. 124–126.

(17)   Paragraph 3, first sentence, circumscribes the ways in which a pronouncement by an expert treaty body may be relevant for subsequent agreements and subsequent practice of parties to a treaty by using the terms "may give rise to" and "or refer to". The expression "may give rise to" addresses situations in which a pronouncement comes first and the practice and the possible agreement of the parties occur thereafter. In this situation, the pronouncement may serve as a catalyst for the subsequent practice of States parties.[616] The term "refer to", on the other hand, covers situations in which the subsequent practice and a possible agreement of the parties have developed before the pronouncement, and where the pronouncement is only an indication of such an agreement or practice. Paragraph 3 uses the term "refer to" rather than "reflect" in order to make clear that any subsequent practice or agreement of the parties is not comprised in the pronouncement itself. This term does not, however, require that the pronouncement refer to such subsequent practice or agreement explicitly.[617]

### Paragraph 3, second sentence—presumption against silence as constituting acceptance

(18)   An agreement of all the parties to a treaty, or even only a large part of them, regarding the interpretation that is articulated in a pronouncement is often only conceivable if the absence of objections could be taken as agreement by State parties that have remained silent. Draft conclusion 10, paragraph 2, provides, as a general rule: "Silence on the part of one or more parties may constitute acceptance of the subsequent practice when the circumstances call for some reaction." Paragraph 3, second sentence, does not purport to recognize an exception to this general rule, but rather intends to specify and apply this rule to the typical cases of pronouncements of expert bodies.

(19)   This means, in particular, that it cannot usually be expected that States parties take a position with respect to every pronouncement by an expert treaty body, be it addressed to another State or to all States generally.[618] On the other hand, States parties may have an obligation, under a duty to cooperate under certain treaties, to take into account and to react to a pronouncement of an expert treaty body that is specifically addressed to

them,[619] or to individual communications regarding their own conduct.[620]

### Paragraph 4—without prejudice to other contribution

(20)   Draft conclusion 13 only addresses the possible contribution of expert treaty bodies to the interpretation of a treaty by giving rise to, or referring to, subsequent agreements or subsequent practice of the parties themselves under articles 31, paragraph 3 (a) and (b), and 32. Paragraph 4 provides that this draft conclusion is without prejudice to the contribution that such bodies make to the interpretation of treaties under their mandates.

(21)   The International Court of Justice has confirmed, in particular in the *Ahmadou Sadio Diallo* case, that pronouncements of the Human Rights Committee are relevant for the purpose of the interpreting of the International Covenant on Civil and Political Rights, irrespective of whether such pronouncements give rise to, or refer to, an agreement of the parties under article 31, paragraph 3:

> Since it was created, the Human Rights Committee has built up a considerable body of interpretative case law, in particular through its findings in response to the individual communications which may be submitted to it in respect of States parties to the first Optional Protocol [to the International Covenant on Civil and Political Rights], and in the form of its "General Comments".
>
> Although the Court is in no way obliged, in the exercise of its judicial functions, to model its own interpretation of the Covenant on that of the Committee, it believes that it should ascribe great weight to the interpretation adopted by this independent body that was established specifically to supervise the application of that treaty. The point here is to achieve the necessary clarity and the essential consistency of international law, as well as legal security, to which both the individuals with guaranteed rights and the States obliged to comply with treaty obligations are entitled.[621]

(22)   Regional human rights courts and bodies have also used pronouncements of expert treaty bodies as an aid for the interpretation of treaties that they are called

---

[616] See e.g. Committee on the Elimination of Discrimination against Women, general recommendation No. 35 (2017) on gender-based violence against women, updating general recommendation No. 19 (CEDAW/C/GC/35): "For more than 25 years, in their practice, States parties have endorsed the Committee's interpretation. The *opinio juris* and State practice suggest that the prohibition of gender-based violence against women has evolved into a principle of customary international law" (para. 2), quoting State practice and *opinio juris* as well as judicial decisions in support of the statement that "[g]eneral recommendation No. 19 has been a key catalyst for that process" (*ibid.*).

[617] Expert treaty bodies under human rights treaties have rarely attempted to specifically identify the practice of the parties for the purpose of interpreting a particular treaty provision; see examples in Nolte, "Jurisprudence under special regimes ..." (footnote 26 above), pp. 210–278; and Schlütter, "Aspects of human rights interpretation ..." (footnote 601 above), p. 318.

[618] See Ulfstein, "Individual complaints" (footnote 592 above), p. 97; and Van Alebeek and Nollkaemper, "The legal status of decisions by human rights treaty bodies ..." (footnote 589 above), p. 410.

[619] Such as a pronouncement regarding the permissibility of a reservation that it has formulated. See guideline 3.2.3 of the Guide to Practice on Reservations to Treaties and para. (3) of the commentary thereto, adopted by the Commission in 2011, *Yearbook ... 2011*, vol. II (Part Three) and Corr.1–2, p. 239.

[620] C. Tomuschat, "Human Rights Committee", *Max Planck Encyclopedia of Public International Law* (online edition: https://opil.ouplaw.com/home/MPIL), para. 14 ("States parties cannot simply ignore [the Committee's views on individual communications], but have to consider them in good faith (*bona fide*). ... Not to react at all ... would appear to amount to a violation ..."); in this sense, see also Venice Commission, "Report on the implementation of international human rights treaties ..." (footnote 587 above), paras. 78–79.

[621] *Ahmadou Sadio Diallo (Republic of Guinea v. Democratic Republic of the Congo)*, Merits, Judgment of 30 November 2010 (see footnote 588 above), p. 664, para. 66; see also *Judgment No. 2867 of the Administrative Tribunal of the International Labour Organization upon a Complaint Filed against the International Fund for Agricultural Development*, Advisory Opinion, *I.C.J. Reports 2012*, p. 10, at p. 27, para. 39; *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (footnote 23 above), pp. 179–181, paras. 109–110 and 112, and pp. 192–193, para. 136, in which the Court referred to various pronouncements of the Human Rights Committee and the Committee on Economic, Social and Cultural Rights; see also *Questions relating to the Obligation to Prosecute or Extradite (Belgium v. Senegal)*, Judgment, *I.C.J. Reports 2012*, p. 422, at p. 457, para. 101, referring to pronouncements of the Committee against Torture when determining the temporal scope of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

on to apply.[622] Various domestic courts have considered that pronouncements of expert treaty bodies under human rights treaties, while not being legally binding on them as such,[623] nevertheless "deserve to be given considerable weight in determining the meaning of a relevant right and the existence of a violation".[624]

(23)    The Commission itself, in its commentary to the Guide to Practice on Reservations to Treaties, addressed the question of the relevance of pronouncements of expert treaty bodies under human rights treaties with respect to reservations.[625]

(24)    Court decisions have not always fully explained the relevance of pronouncements by expert treaty bodies for the purpose of the interpretation of a treaty. In the advisory opinion on *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, the International Court of Justice referred to the "constant practice of the Human Rights Committee" in order to support its own interpretation of a provision of the International Covenant on Civil and Political Rights.[626] This suggests that pronouncements of expert treaty bodies are to be used in the discretionary way in which article 32 describes supplementary means of interpretation[627] and that they also "contribute to the determination of the ordinary meaning of the terms in their context and in the light of the object and purpose of the treaty".[628] Whereas pronouncements of expert treaty bodies are not practice of a party to the treaty, they are nevertheless conduct mandated by the treaty, the purpose of which is to contribute to the treaty's proper application. Assuming that "different activities of [treaty] bodies cut across the different sources", reference has also been made to Article 38, paragraph 1 (*d*), of the Statute of the International Court of Justice, thereby characterizing the legal significance of their pronouncements as "subsidiary means for the determination of rules of law".[629]

---

[622] Inter-American Court of Human Rights, *Case of the Constitutional Tribunal (Camba Campos et al.) v. Ecuador*, Judgment (Preliminary Objections, Merits, Reparations and Costs), 28 August 2013, Series C, No. 268, paras. 189 and 191; African Commission on Human and Peoples' Rights, *Civil Liberties Organisation and others v. Nigeria*, communication No. 218/98, Decisions on communications brought before the Commission, twenty-ninth ordinary session, Tripoli, May 2001, para. 24 ("In interpreting and applying the [African] Charter [on Human and Peoples' Rights], the Commission ... is also enjoined by the Charter and international human rights standards which include decisions and general comments by the UN treaty bodies"); African Commission on Human and Peoples' Rights, *Social and Economic Rights Action Center and Center for Economic and Social Rights v. Nigeria*, communication No. 155/96, Decisions on communications brought before the Commission, thirtieth ordinary session, Banjul, October 2001, para. 63 ("draws inspiration from the definition of the term 'forced evictions' by the Committee on Economic Social and Cultural Rights [in its general comment No. 7]"); European Court of Human Rights, *Magyar Helsinki Bizottság v. Hungary* [GC] (see footnote 327 above), para. 141; *Marguš v. Croatia* [GC], no. 4455/10, ECHR 2014 (extracts), paras. 48–50; *Baka v. Hungary*, no. 20261/12, 27 May 2014, para. 58; *Othman (Abu Qatada) v. the United Kingdom*, no. 8139/09, ECHR 2012 (extracts), paras. 107–108, 147–151, 155 and 158; *Gäfgen v. Germany* [GC], no. 22978/05, ECHR 2010, paras. 68 and 70–72; see also International Law Association, "Final report on the impact of findings of the United Nations human rights treaty bodies", *Report of the Seventy-first Conference ...* (footnote 156 above), pp. 662–675, paras. 116–155.

[623] See the decisions quoted in Venice Commission, "Report on the implementation of international human rights treaties ..." (footnote 587 above), p. 31, para. 76, footnotes 172 and 173 (Ireland, Supreme Court, *Kavanagh (Joseph) v. the Governor of Mountjoy Prison and the Attorney General* [2002] IESC 13 (1 March 2002), para. 36; France, Council of State, *Hauchemaille v. France*, case No. 238849, 11 October 2001, para. 22).

[624] International Law Association, "Final report on the impact of findings of the United Nations human rights treaty bodies", *Report of the Seventy-first Conference ...* (see footnote 156 above), p. 684, para. 175; see also e.g. Germany, Federal Administrative Court, BVerwGE, vol. 134, p. 1, at p. 22, para. 48; Colombia, Constitutional Court, Sentencia T-077/13 (2013), 14 February 2013; India, High Court of Delhi, *Laxmi Mandal v. Deen Dayal Harinagar Hospital & Ors*, WP(C) Nos. 8853 of 2008, and 10700 of 2009 (2010), Judgment of 4 June 2010, para 23; Bangladesh, High Court Division of the Supreme Court, *Bangladesh Legal Aid and Services Trust and ors v. Government of Bangladesh*, Writ Petitions Nos. 5863 of 2009, No. 754 of 2010, No. 4275 of 2010, ILDC 1916 (BD 2010), 8 July 2010, para. 45; but see Spain, Tribunal Supremo de España, sentencia núm. 1263/2018, 17 July 2018, séptimo fundamento de derecho, pp. 23–24.

[625] "Of course, if such bodies have been vested with decision-making power, the parties must respect their decisions, but this is currently not the case in practice except for some regional human rights courts. In contrast, the other monitoring bodies lack any juridical decision-making power, either in the area of reservations or in other areas in which they possess declaratory powers. Consequently, their conclusions are not legally binding, and States parties are obliged only to 'give consideration' to their assessments in good faith" (*Yearbook ... 2011*, vol. II (Part Three) and Corr.1–2, p. 239, para. (3) of the commentary to guideline 3.2.3).

[626] *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (see footnote 23 above), p. 179, para. 109.

[627] The High Court of Osaka has explicitly stated: "One may consider that the 'general comments' and 'views'... should be relied upon as supplementary means of interpretation of the [International Covenant on Civil and Political Rights]." Osaka High Court, Judgment of 28 October 1994, as quoted in International Law Association, "Final report on the impact of findings of the United Nations human rights treaty bodies", *Report of the Seventy-first Conference ...* (see footnote 156 above), p. 652, para. 85, footnote 178, also available in *Japanese Annual of International Law*, vol. 38 (1995), p. 118, at pp. 129–130; see also, for example, Netherlands, Central Appeals Tribunal, *Appellante v. de Raad van Bestuur van de Sociale Verzekeringsbank* (available from https://deeplink.rechtspraak.nl/uitspraak?id=ECLI:NL:CRVB:2006:AY5560); United Kingdom, on the one hand, House of Lords, *Jones v. Saudi Arabia*, 14 June 2006 [2006] UKHL 26 ("no value") and, on the other hand, House of Lords, *A. v. Secretary of State for the Home Department* [2005] UKHL 71, paras. 34–36 (relying on treaty body pronouncements to establish an exclusionary rule of evidence that prevents the use of information obtained by means of torture) and Court of Appeal, *R. (on the application of Al-Skeini) v. Secretary of State for Defence, application for judicial review* (2005) EWCA Civ 1609 (2006) HRLR 7, para. 101 (citing general comment No. 31 of the Human Rights Committee to establish the extraterritorial application of the Human Rights Act 1998); South Africa, on the one hand, High Court Witwatersrand, *Residents of Bon Vista Mansions v. Southern Metropolitan Local Council*, 2002 (6) BCLR, p. 625, at p. 629 ("General Comments have authoritative status under international law"), as quoted in International Law Association, "Final report on the impact of findings of the United Nations human rights treaty bodies", *Report of the Seventy-first Conference ...* (footnote 156 above), p. 625, para. 11, and, on the other hand, Constitutional Court, *Minister of Health and Others v. Treatment Action Campaign and Others (No. 2)* (CCT 8/02) [2002] ZACC 15, paras. 26 and 37 (rejecting [application of] the "minimum core" standard set out by the Committee on Economic, Social and Cultural Rights in general comment No. 3 (*Official Records of the Economic and Social Council, 1991, Supplement No. 3* (E/1991/23-E/C.12/1990/8 and Corr.1), annex III, p. 83); Japan, Tokyo District Court, Judgment of 15 March 2001, 1784 *Hanrei Jiho* 67, p. 74 ("the General Comment neither represents authoritative interpretation of the ICCPR nor binds the interpretation of the treaty in Japan"), as quoted in International Law Association, *Report of the Seventy-first Conference ...* (footnote 156 above), p. 652, para. 87.

[628] See, above, para. (15) of the commentary to draft conclusion 2; see also draft conclusion 12, para. 3.

[629] C. Chinkin, "Sources", in D. Moeckli and others (eds.), *International Human Rights Law*, 3rd ed., Oxford, Oxford University Press, 2018, pp. 63–85, at pp. 78–80, as teachings and also possibly judicial decisions; in that direction also: Van Alebeek and Nollkaemper, "The legal status of decisions by human rights treaty bodies ..." (see footnote 589 above), pp. 408 and 410 *et seq*.

(25)   The expression "under their mandates" reaffirms paragraph 2 of draft conclusion 13, which specifies that the relevance of a pronouncement of an expert treaty body for the interpretation of a treaty is subject to the applicable treaty rules under which such bodies operate.

Paragraph 4 applies in principle to all expert treaty bodies. However, the extent to which pronouncements of expert treaty bodies contribute to the interpretation of the treaties "under their mandates" will vary, as indicated by the use of the plural.

# Chapter V

# IDENTIFICATION OF CUSTOMARY INTERNATIONAL LAW

## A.  Introduction

53.  At its sixty-fourth session (2012), the Commission decided to include the topic "Formation and evidence of customary international law" in its programme of work and appointed Sir Michael Wood as Special Rapporteur.[630] In paragraph 7 of its resolution 67/92 of 14 December 2012, the General Assembly noted with appreciation the decision of the Commission to include the topic in its programme of work. At its sixty-fifth session (2013), the Commission decided to change the title of the topic to "Identification of customary international law".[631]

54.  From its sixty-fifth (2013) to sixty-eighth (2016) sessions, the Commission considered four reports by the Special Rapporteur,[632] as well as two memorandums by the Secretariat.[633]

55.  At its sixty-eighth session (2016), the Commission adopted, on first reading, a set of 16 draft conclusions on identification of customary international law, together with commentaries thereto.[634] It decided, in accordance with articles 16 to 21 of its statute, to transmit the draft conclusions, through the Secretary-General, to Governments for comments and observations.[635]

## B.  Consideration of the topic at the present session

56.  At the present session, the Commission had before it the fifth report of the Special Rapporteur (A/CN.4/717 and Add.1), with an updated bibliography on the topic, as well as comments and observations received from Governments (A/CN.4/716). The Commission also had before it a memorandum by the Secretariat on ways and means

for making the evidence of customary international law more readily available (A/CN.4/710).

57.  The Commission considered the fifth report of the Special Rapporteur at its 3396th to 3402nd meetings, from 7 to 14 May 2018. At its 3402nd meeting, held on 14 May 2018, the Commission referred draft conclusions 1 to 16 to the Drafting Committee, with the instruction that the Drafting Committee commence the second reading of the draft conclusions on the basis of the proposals of the Special Rapporteur, taking into account the comments and observations of Governments and the plenary debate on the Special Rapporteur's report.

58.  The Commission considered the report of the Drafting Committee (A/CN.4/L.908) at its 3412th meeting, held on 25 May 2018, and adopted the entire set of draft conclusions on identification of customary international law on second reading (sect. E.1 below).

59.  At its 3402nd meeting, on 14 May 2018, the Commission decided to establish a working group, to be chaired by Mr. Marcelo Vázquez-Bermúdez, to assist the Special Rapporteur in the preparation of the draft commentaries to the draft conclusions to be adopted by the Commission. The working group held two meetings in May 2018.

60.  At its 3441st to 3443rd meetings, on 2 and 3 August 2018, the Commission adopted the commentaries to the aforementioned draft conclusions (sect. E.2 below).

61.  At its 3441st meeting, on 2 August 2018, the Commission requested that the memorandum by the Secretariat on ways and means for making the evidence of customary international law more readily available (A/CN.4/710) be reissued to reflect the text of the draft conclusions and commentaries adopted on second reading.

62.  In accordance with its statute, the Commission submits the draft conclusions to the General Assembly, together with the recommendation set out below.

## C.  Recommendation of the Commission

63.  At its 3444th meeting, on 6 August 2018, the Commission decided, in accordance with article 23 of its statute, to recommend that the General Assembly:

(a)  take note in a resolution of the draft conclusions on identification of customary international law, annex the draft conclusions to the resolution, and ensure their widest dissemination;

---

[630] At its 3132nd meeting, on 22 May 2012 (see *Yearbook … 2012*, vol. II (Part Two), para. 157). The topic had been included in the long-term programme of work of the Commission during its sixty-third session (2011), on the basis of the proposal contained in annex I to the report of the Commission on the work of that session (*Yearbook … 2011*, vol. II (Part Two), paras. 365–367, and annex I, pp. 183–188). In its resolution 66/98 of 9 December 2011, the General Assembly took note of the inclusion of the topic in the long-term programme of work of the Commission.

[631] *Yearbook … 2013*, vol. II (Part Two), para. 65.

[632] *Ibid.*, vol. II (Part One), document A/CN.4/663 (first report); *Yearbook … 2014*, vol. II (Part One), document A/CN.4/672 (second report); *Yearbook … 2015*, vol. II (Part One), document A/CN.4/682 (third report); and *Yearbook … 2016*, vol. II (Part One), document A/CN.4/695 and Add.1 (fourth report).

[633] *Yearbook … 2013*, vol. II (Part One), document A/CN.4/659, and *Yearbook … 2016*, vol. II (Part One), document A/CN.4/691.

[634] *Yearbook … 2016*, vol. II (Part Two), paras. 57 and 59.

[635] *Ibid.*, para. 60.

(*b*)    commend the draft conclusions, together with the commentaries thereto, to the attention of States and all who may be called upon to identify rules of customary international law;

(*c*)    note the bibliography prepared by the Special Rapporteur and presented in his fifth report;

(*d*)    note the memorandum by the Secretariat on ways and means for making the evidence of customary international law more readily available (A/CN.4/710), which surveys the present state of evidence of customary international law and makes suggestions for its improvement;

(*e*)    follow up the suggestions in the memorandum by the Secretariat by:

(i)    calling to the attention of States and international organizations the desirability of publishing digests and surveys of their practice relating to international law, of continuing to make the legislative, executive and judicial practice of States widely available, and of making every effort to support existing publications and libraries specialized in international law;

(ii)    requesting the Secretariat to continue to develop and enhance United Nations publications providing evidence of customary international law, including their timely publication; and

(iii)    also requesting the Secretariat to make available the information contained in the annexes to the memorandum on ways and means for making the evidence of customary international law more readily available (A/CN.4/710) through an online database to be updated periodically based on information received from States, international organizations and other entities concerned.[636]

### D.    Tribute to the Special Rapporteur

64.    At its 3444th meeting, held on 6 August 2018, the Commission, after adopting the draft conclusions on identification of customary international law, adopted the following resolution by acclamation:

*The International Law Commission,*

*Having adopted* the draft conclusions on identification of customary international law,

*Expresses* to the Special Rapporteur, Sir Michael Wood, its deep appreciation and warm congratulations for the outstanding contribution he has made to the preparation of the draft conclusions through his tireless efforts and devoted work, and for the results achieved in the elaboration of the draft conclusions on identification of customary international law.

### E.    Text of the draft conclusions on identification of customary international law

#### 1.    Text of the draft conclusions

65.    The text of the draft conclusions adopted by the Commission at its seventieth session is reproduced below.

---

[636] See paragraphs 7–10 of the memorandum by the Secretariat (A/CN.4/710).

### IDENTIFICATION OF CUSTOMARY INTERNATIONAL LAW

#### Part One

#### INTRODUCTION

*Conclusion 1.    Scope*

The present draft conclusions concern the way in which the existence and content of rules of customary international law are to be determined.

#### Part Two

#### BASIC APPROACH

*Conclusion 2.    Two constituent elements*

To determine the existence and content of a rule of customary international law, it is necessary to ascertain whether there is a general practice that is accepted as law (*opinio juris*).

*Conclusion 3.    Assessment of evidence for the two constituent elements*

1.    In assessing evidence for the purpose of ascertaining whether there is a general practice and whether that practice is accepted as law (*opinio juris*), regard must be had to the overall context, the nature of the rule and the particular circumstances in which the evidence in question is to be found.

2.    Each of the two constituent elements is to be separately ascertained. This requires an assessment of evidence for each element.

#### Part Three

#### A GENERAL PRACTICE

*Conclusion 4.    Requirement of practice*

1.    The requirement of a general practice, as a constituent element of customary international law, refers primarily to the practice of States that contributes to the formation, or expression, of rules of customary international law.

2.    In certain cases, the practice of international organizations also contributes to the formation, or expression, of rules of customary international law.

3.    Conduct of other actors is not practice that contributes to the formation, or expression, of rules of customary international law, but may be relevant when assessing the practice referred to in paragraphs 1 and 2.

*Conclusion 5.    Conduct of the State as State practice*

State practice consists of conduct of the State, whether in the exercise of its executive, legislative, judicial or other functions.

*Conclusion 6.    Forms of practice*

1.    Practice may take a wide range of forms. It includes both physical and verbal acts. It may, under certain circumstances, include inaction.

2.    Forms of State practice include, but are not limited to: diplomatic acts and correspondence; conduct in connection with resolutions adopted by an international organization or at an intergovernmental conference; conduct in connection with treaties; executive conduct, including operational conduct "on the ground"; legislative and administrative acts; and decisions of national courts.

3.    There is no predetermined hierarchy among the various forms of practice.

*Conclusion 7.    Assessing a State's practice*

1.    Account is to be taken of all available practice of a particular State, which is to be assessed as a whole.

2.  Where the practice of a particular State varies, the weight to be given to that practice may, depending on the circumstances, be reduced.

### Conclusion 8.   The practice must be general

1.  The relevant practice must be general, meaning that it must be sufficiently widespread and representative, as well as consistent.

2.  Provided that the practice is general, no particular duration is required.

## PART FOUR

## ACCEPTED AS LAW (*OPINIO JURIS*)

### Conclusion 9.   Requirement of acceptance as law (opinio juris)

1.  The requirement, as a constituent element of customary international law, that the general practice be accepted as law (*opinio juris*) means that the practice in question must be undertaken with a sense of legal right or obligation.

2.  A general practice that is accepted as law (*opinio juris*) is to be distinguished from mere usage or habit.

### Conclusion 10.   Forms of evidence of acceptance as law (opinio juris)

1.  Evidence of acceptance as law (*opinio juris*) may take a wide range of forms.

2.  Forms of evidence of acceptance as law (*opinio juris*) include, but are not limited to: public statements made on behalf of States; official publications; government legal opinions; diplomatic correspondence; decisions of national courts; treaty provisions; and conduct in connection with resolutions adopted by an international organization or at an intergovernmental conference.

3.  Failure to react over time to a practice may serve as evidence of acceptance as law (*opinio juris*), provided that States were in a position to react and the circumstances called for some reaction.

## PART FIVE

## SIGNIFICANCE OF CERTAIN MATERIALS FOR THE IDENTIFICATION OF CUSTOMARY INTERNATIONAL LAW

### Conclusion 11.   Treaties

1.  A rule set forth in a treaty may reflect a rule of customary international law if it is established that the treaty rule:

(*a*)   codified a rule of customary international law existing at the time when the treaty was concluded;

(*b*)   has led to the crystallization of a rule of customary international law that had started to emerge prior to the conclusion of the treaty; or

(*c*)   has given rise to a general practice that is accepted as law (*opinio juris*), thus generating a new rule of customary international law.

2.  The fact that a rule is set forth in a number of treaties may, but does not necessarily, indicate that the treaty rule reflects a rule of customary international law.

### Conclusion 12.   Resolutions of international organizations and intergovernmental conferences

1.  A resolution adopted by an international organization or at an intergovernmental conference cannot, of itself, create a rule of customary international law.

2.  A resolution adopted by an international organization or at an intergovernmental conference may provide evidence for determining the existence and content of a rule of customary international law, or contribute to its development.

3.  A provision in a resolution adopted by an international organization or at an intergovernmental conference may reflect a rule of customary international law if it is established that the provision corresponds to a general practice that is accepted as law (*opinio juris*).

### Conclusion 13.   Decisions of courts and tribunals

1.  Decisions of international courts and tribunals, in particular of the International Court of Justice, concerning the existence and content of rules of customary international law are a subsidiary means for the determination of such rules.

2.  Regard may be had, as appropriate, to decisions of national courts concerning the existence and content of rules of customary international law, as a subsidiary means for the determination of such rules.

### Conclusion 14.   Teachings

Teachings of the most highly qualified publicists of the various nations may serve as a subsidiary means for the determination of rules of customary international law.

## PART SIX

## PERSISTENT OBJECTOR

### Conclusion 15.   Persistent objector

1.  Where a State has objected to a rule of customary international law while that rule was in the process of formation, the rule is not opposable to the State concerned for so long as it maintains its objection.

2.  The objection must be clearly expressed, made known to other States, and maintained persistently.

3.  The present draft conclusion is without prejudice to any question concerning peremptory norms of general international law (*jus cogens*).

## PART SEVEN

## PARTICULAR CUSTOMARY INTERNATIONAL LAW

### Conclusion 16.   Particular customary international law

1.  A rule of particular customary international law, whether regional, local or other, is a rule of customary international law that applies only among a limited number of States.

2.  To determine the existence and content of a rule of particular customary international law, it is necessary to ascertain whether there is a general practice among the States concerned that is accepted by them as law (*opinio juris*) among themselves.

### 2.   TEXT OF THE DRAFT CONCLUSIONS AND COMMENTARIES THERETO

66.   The text of the draft conclusions, together with commentaries thereto, adopted by the Commission is reproduced below.

# IDENTIFICATION OF CUSTOMARY INTERNATIONAL LAW

## *General commentary*

(1)   As is always the case with the Commission's output, the draft conclusions are to be read together with the commentaries.

(2)   The present draft conclusions concern the methodology for identifying rules of customary international law. They seek to offer practical guidance on how the existence of rules of customary international law, and

their content, are to be determined. This is not only of concern to specialists in public international law: others, including those involved with national courts, are increasingly called upon to identify rules of customary international law. In each case, a structured and careful process of legal analysis and evaluation is required to ensure that a rule of customary international law is properly identified, thus promoting the credibility of the particular determination as well as that of customary international law more broadly.

(3)   Customary international law is unwritten law deriving from practice accepted as law. It remains an important source of public international law.[637] Customary international law is among the sources of international law listed in Article 38, paragraph 1, of the Statute of the International Court of Justice, which refers, in subparagraph (b), to "international custom, as evidence of a general practice accepted as law".[638] This wording reflects the two constituent elements of customary international law: a general practice and its acceptance as law (the latter often referred to as *opinio juris*).[639]

(4)   The identification of customary international law is a matter on which there is a wealth of material, including case law and scholarly writings.[640] The draft conclusions reflect the approach adopted by States, as well as by international courts and organizations and most authors. Recognizing that the process for the identification of customary international law is not always susceptible

of exact formulations, the draft conclusions aim to offer clear guidance without being overly prescriptive.

(5)   The 16 draft conclusions are divided into seven parts. Part One deals with scope and purpose. Part Two sets out the basic approach to the identification of customary international law, the "two-element" approach. Parts Three and Four provide further guidance on the two constituent elements of customary international law, which also serve as the criteria for its identification: "a general practice" and "acceptance as law" (*opinio juris*). Part Five addresses certain categories of materials that are frequently invoked in the identification of rules of customary international law. Whereas rules of customary international law are binding on all States, Parts Six and Seven deal with two exceptional cases: the persistent objector, and particular customary international law (rules of customary international law that apply only among a limited number of States).

## PART ONE

## INTRODUCTION

Part One, comprising a single draft conclusion, defines the scope of the draft conclusions, outlining their function and purpose.

### *Conclusion 1.   Scope*

**The present draft conclusions concern the way in which the existence and content of rules of customary international law are to be determined.**

### *Commentary*

(1)   Draft conclusion 1 is introductory in nature. It provides that the draft conclusions concern the way in which rules of customary international law are to be determined; that is, the legal methodology for undertaking that exercise.

(2)   The term "customary international law" is used throughout the draft conclusions, being in common use and most clearly reflecting the nature of this source of international law. Other terms that are sometimes found in legal instruments, in case law and in scholarly writings include "custom", "international custom" and "international customary law" as well as "the law of nations" and "general international law".[641]

(3)   The reference to "rules" of customary international law in the present draft conclusions and commentaries includes rules of customary international law that may be

---

[637] Some important fields of international law are still governed essentially by customary international law, with few if any applicable treaties. Even where there is a treaty in force, the rules of customary international law continue to govern questions not regulated by the treaty and continue to apply in relations with and among non-parties to the treaty. In addition, treaties may refer to rules of customary international law, and such rules may be taken into account in treaty interpretation in accordance with article 31, paragraph 3 (*c*), of the Vienna Convention on the Law of Treaties (1969 Vienna Convention). Moreover, it may sometimes be necessary to determine the law applicable at the time when certain acts occurred ("the intertemporal law"), which may be customary international law even if a treaty is now in force. In any event, a rule of customary international law may continue to exist and be applicable, separately from a treaty, even where the two have the same content and even among parties to the treaty (see *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America)*, Merits, Judgment, *I.C.J. Reports 1986*, p. 14, at pp. 93–96, paras. 174–179; and *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Croatia v. Serbia)*, Judgment, *I.C.J. Reports 2015*, p. 3, at pp. 47–48, para. 88).

[638] This wording was proposed by the Advisory Committee of Jurists, established by the League of Nations in 1920 to prepare a draft statute for the Permanent Court of International Justice; it was retained, without change, in the Statute of the International Court of Justice in 1945. While the drafting has been criticized as imprecise, the formula is nevertheless widely considered as capturing the essence of customary international law.

[639] The Latin term *opinio juris* has been retained in the draft conclusions and commentaries alongside "acceptance as law" because of its prevalence in legal discourse (including in the case law of the International Court of Justice), and also because it may capture better the particular nature of the subjective element of customary international law as referring to legal conviction and not to formal consent.

[640] The present commentary does not contain references to scholarly writings in the field, though they may be useful (and were referred to extensively in the Special Rapporteur's reports). For a bibliography, including sections that correspond to issues covered by individual draft conclusions, as well as sections addressing customary international law in various fields, see annex II to the fifth report (A/CN.4/717 and Add.1).

[641] Some of these terms may be used in other senses; in particular, "general international law" is used in various ways (not always clearly specified), including to refer to rules of international law of general application, whether treaty law or customary international law or general principles of law. For a judicial discussion of the term "general international law" see *Certain Activities Carried Out by Nicaragua in the Border Area (Costa Rica v. Nicaragua)* and *Construction of a Road in Costa Rica along the San Juan River (Nicaragua v. Costa Rica)*, Judgment, *I.C.J. Reports 2015*, p. 665, at p. 782 (separate opinion of Judge Donoghue, para. 2) and pp. 846–849 (separate opinion of Judge *ad hoc* Dugard, paras. 12–17).

referred to as "principles" because of their more general and more fundamental character.[642]

(4)   The terms "identify" and "determine" are used interchangeably in the draft conclusions and commentaries. The reference to determining the "existence and content" of rules of customary international law reflects the fact that while often the need is to identify both the existence and the content of a rule, in some cases it is accepted that the rule exists but its precise content is disputed. This may be the case, for example, where the question arises as to whether a particular formulation (usually set out in texts such as treaties or resolutions) does in fact correspond precisely to an existing rule of customary international law, or whether there are exceptions to a recognized rule of customary international law.

(5)   Dealing as they do with the identification of rules of customary international law, the draft conclusions do not address, directly, the processes by which customary international law develops over time. Yet in practice identification cannot always be considered in isolation from formation; the identification of the existence and content of a rule of customary international law may well involve consideration of the processes by which it has developed. The draft conclusions thus inevitably refer in places to the formation of rules of customary international law. They do not, however, deal systematically with how such rules emerge, change, or terminate.

(6)   A number of other matters fall outside the scope of the draft conclusions. First, they do not address the substance of customary international law: they are concerned only with the methodological issue of how rules of customary international law are to be identified.[643] Second, no attempt is made to explain the relationship between customary international law and other sources of international law listed in Article 38, paragraph 1, of the Statute of the International Court of Justice (international conventions, whether general or particular, and general principles of law); the draft conclusions touch on the matter only insofar as is necessary to explain how rules of customary international law are to be identified. Third, the draft conclusions are without prejudice to questions of hierarchy among rules of international law, including those concerning peremptory norms of general international law (*jus cogens*), or questions concerning the *erga omnes* nature of certain obligations. Fourth, the draft conclusions do not address the position of customary international law within national legal systems. Finally, the draft conclusions do not deal in general terms with the question of a possible burden of proof of customary international law.

## PART TWO

## BASIC APPROACH

Part Two sets out the basic approach to the identification of customary international law. Comprising two draft conclusions, it specifies that determining a rule of customary international law requires establishing the existence of two constituent elements: a general practice, and acceptance of that practice as law (*opinio juris*). This requires a careful analysis of the evidence for each element.

### *Conclusion 2.   Two constituent elements*

**To determine the existence and content of a rule of customary international law, it is necessary to ascertain whether there is a general practice that is accepted as law (*opinio juris*).**

### *Commentary*

(1)   Draft conclusion 2 sets out the basic approach, according to which the identification of a rule of customary international law requires an inquiry into two distinct, yet related, questions: whether there is a general practice, and whether such general practice is accepted as law (that is, accompanied by *opinio juris*). In other words, one must look at what States actually do and seek to determine whether they recognize an obligation or a right to act in that way. This methodology, the "two-element approach", underlies the draft conclusions and is widely supported by States, in case law, and in scholarly writings. It serves to ensure that the exercise of identifying rules of customary international law results in determining only such rules as actually exist.[644]

(2)   A general practice and acceptance of that practice as law (*opinio juris*) are the two constituent elements of customary international law: together they are the essential conditions for the existence of a rule of customary international law. The identification of such a rule thus involves a careful examination of available evidence to establish their presence in any given case. This has been confirmed, *inter alia*, in the case law of the International Court of Justice, which refers to "two conditions [that] must be fulfilled"[645] and has repeatedly laid down that "the existence of a rule of customary international law requires that there be 'a settled practice' together with *opinio juris*".[646] To establish that a claim concerning the existence or the

---

[642] See also *Delimitation of the Maritime Boundary in the Gulf of Maine Area*, Judgment, *I.C.J. Reports 1984*, p. 246, at pp. 288–290, para. 79: "the association of the terms 'rules' and 'principles' is no more than the use of a dual expression to convey one and the same idea, since in this context [of defining the applicable international law] 'principles' clearly means principles of law, that is, it also includes rules of international law in whose case the use of the term 'principles' may be justified because of their more general and more fundamental character".

[643] Thus, reference in these commentaries to particular decisions of courts and tribunals is made in order to illustrate the methodology of the decisions, not for their substance.

[644] The shared view of parties to a case is not sufficient; it must be ascertained that a general practice that is accepted as law actually exists. See *Military and Paramilitary Activities in and against Nicaragua* (footnote 637 above), p. 98, para. 184: "Where two States agree to incorporate a particular rule in a treaty, their agreement suffices to make that rule a legal one, binding upon them; but in the field of customary international law, the shared view of the Parties as to the content of what they regard as the rule is not enough. The Court must satisfy itself that the existence of the rule in the *opinio juris* of States is confirmed by practice."

[645] *North Sea Continental Shelf*, Judgment, *I.C.J. Reports 1969*, p. 3, at p. 44, para. 77.

[646] *Jurisdictional Immunities of the State (Germany v. Italy: Greece intervening)*, Judgment, *I.C.J. Reports 2012*, p. 99, at pp. 122–123, para. 55; see also, for example, *Continental Shelf (Libyan Arab Jamahiriya/Malta)*, Judgment, *I.C.J. Reports 1985*, p. 13, at pp. 29–30, para. 27; and *North Sea Continental Shelf* (see footnote 645 above), p. 44, para. 77.

content of a rule of customary international law is well founded thus entails a search for a practice that has gained such acceptance among States that it may be considered to be the expression of a legal right or obligation (namely, that it is required, permitted or prohibited as a matter of law).[647] The test must always be: is there a general practice that is accepted as law?

(3)   Where the existence of a general practice accepted as law cannot be established, the conclusion will be that the alleged rule of customary international law does not exist. In the *Asylum* case, for example, the International Court of Justice considered that the facts relating to the alleged existence of a rule of (particular) customary international law disclosed:

> so much uncertainty and contradiction, so much fluctuation and discrepancy in the exercise of diplomatic asylum and in the official views expressed on various occasions, there has been so much inconsistency in the rapid succession of conventions on asylum, ratified by some States and rejected by others, and the practice has been so much influenced by considerations of political expediency in the various cases, that it is not possible to discern in all this any constant and uniform usage, accepted as law, with regard to the alleged rule of unilateral and definitive qualification of the offence.[648]

(4)   As draft conclusion 2 makes clear, the presence of only one constituent element does not suffice for the identification of a rule of customary international law. Practice without acceptance as law (*opinio juris*), even if widespread and consistent, can be no more than a non-binding usage, while a belief that something is (or ought to be) the law unsupported by practice is mere aspiration; it is the two together that establish the existence of a rule of customary international law.[649] While writers have from time to time sought to devise alternative approaches to the

identification of customary international law, emphasizing one constituent element over the other or even excluding one element altogether, such theories have not been adopted by States or in the case law.

(5)   The two-element approach is often referred to as "inductive", in contrast to possible "deductive" approaches by which rules might be ascertained other than by empirical evidence of a general practice and its acceptance as law (*opinio juris*). The two-element approach does not in fact preclude a measure of deduction as an aid, to be employed with caution, in the application of the two-element approach, in particular when considering possible rules of customary international law that operate against the backdrop of rules framed in more general terms that themselves derive from and reflect a general practice accepted as law,[650] or when concluding that possible rules of international law form part of an "indivisible regime".[651]

(6)   The two-element approach applies to the identification of the existence and content of rules of customary international law in all fields of international law. This is confirmed in the practice of States and in the case law, and is consistent with the unity and coherence of international law, which is a single legal system and is not divided into separate branches with their own approach to sources.[652] While the application in practice of the basic approach may well take into account the particular circumstances and context in which an alleged rule has arisen and operates,[653] the essential nature of customary international law as a general practice accepted as law (accompanied by *opinio juris*) must always be respected.

### Conclusion 3.   Assessment of evidence for the two constituent elements

**1.   In assessing evidence for the purpose of ascertaining whether there is a general practice and whether that practice is accepted as law (*opinio juris*), regard must be had to the overall context, the nature of the rule and the particular circumstances in which the evidence in question is to be found.**

**2.   Each of the two constituent elements is to be separately ascertained. This requires an assessment of evidence for each element.**

#### Commentary

(1)   Draft conclusion 3 concerns the assessment of evidence for the two constituent elements of customary international law.[654] It offers general guidance for the process

---

[647] For example, in the *Jurisdictional Immunities of the State* case, an extensive survey of the practice of States in the form of national legislation, judicial decisions, and claims and other official statements, which was found to be accompanied by *opinio juris*, served to identify the scope of State immunity under customary international law (*Jurisdictional Immunities of the State* (see footnote 646 above), pp. 122–139, paras. 55–91).

[648] *Colombian-Peruvian asylum case*, Judgment of November 20th, 1950, *I.C.J. Reports 1950*, p. 266, at p. 277.

[649] In the *Right of Passage over Indian Territory* case, for example, the International Court of Justice found that there was nothing to show that the recurring practice of passage through Indian territory of Portuguese armed forces and armed police between Daman and the Portuguese enclaves in India, or between the enclaves themselves, was permitted or exercised as of right. The Court explained that: "Having regard to the special circumstances of the case, this necessity for authorization before passage could take place constitutes, in the view of the Court, a negation of passage as of right. The practice predicates that the territorial sovereign had the discretionary power to withdraw or to refuse permission. It is argued that permission was always granted, but this does not, in the opinion of the Court, affect the legal position. There is nothing in the record to show that grant of permission was incumbent on the British or on India as an obligation" (*Case concerning Right of Passage over Indian Territory (Merits)*, Judgment of 12 April 1960, *I.C.J. Reports 1960*, p. 6, at pp. 42–43). In *Legality of the Threat or Use of Nuclear Weapons*, the International Court of Justice considered that: "The emergence, as *lex lata*, of a customary rule specifically prohibiting the use of nuclear weapons as such is hampered by the continuing tensions between the nascent *opinio juris* on the one hand, and the still strong adherence to the practice of deterrence on the other" (*Legality of the Threat or Use of Nuclear Weapons*, Advisory Opinion, *I.C.J. Reports 1996*, p. 226, at p. 255, para. 73). See also *Prosecutor v. Sam Hinga Norman*, Case No. SCSL-2004-14-AR72(E), decision on preliminary motion based on lack of jurisdiction (child recruitment) of 31 May 2004, Special Court for Sierra Leone, p. 13, para. 17.

[650] This appears to be the approach in *Pulp Mills on the River Uruguay (Argentina v. Uruguay)*, Judgment, *I.C.J. Reports 2010*, p. 14, at pp. 55–56, para. 101.

[651] *Territorial and Maritime Dispute (Nicaragua v. Colombia)*, Judgment, *I.C.J. Reports 2012*, p. 624, at p. 674, para. 139.

[652] See also conclusions of the work of the Study Group on fragmentation of international law, *Yearbook … 2006*, vol. II (Part Two), para. 251 (1).

[653] See draft conclusion 3.

[654] The term "evidence" is used here as a broad concept relating to all the materials that may be considered as a basis for the identification of customary international law, not in any technical sense as used by particular courts or in particular legal systems.

of determining the existence and content of a rule of customary international law from the various pieces of evidence available at the time of the assessment, which reflects both the systematic and rigorous analysis required and the dynamic nature of customary international law as a source of international law.

(2)    Paragraph 1 sets out an overarching principle that underlies all of the draft conclusions, namely that the assessment of any and all available evidence must be careful and contextual. Whether a general practice that is accepted as law (accompanied by *opinio juris*) exists must be carefully investigated in each case, in the light of the relevant circumstances.[655] Such analysis not only promotes the credibility of any particular decision, but also allows the two-element approach to be applied, with the necessary flexibility, in all fields of international law.

(3)    The requirement that regard be had to the overall context reflects the need to apply the two-element approach while taking into account the subject matter that the alleged rule is said to regulate. This implies that in each case any underlying principles of international law that may be applicable to the matter ought to be taken into account.[656] Moreover, the type of evidence consulted (and consideration of its availability or otherwise) depends on the circumstances, and certain forms of practice and certain forms of evidence of acceptance as law (*opinio juris*) may be of particular significance, according to the context. For example, in the *Jurisdictional Immunities of the State* case, the International Court of Justice considered that:

> In the present context, State practice of particular significance is to be found in the judgments of national courts faced with the question whether a foreign State is immune, the legislation of those States which have enacted statutes dealing with immunity, the claims to immunity advanced by States before foreign courts and the statements made by States, first in the course of the extensive study of the subject by the International Law Commission and then in the context

---

[655]    See also *North Sea Continental Shelf* (footnote 645 above), dissenting opinion of Judge Tanaka, p. 175: "To decide whether these two factors in the formative process of a customary law exist or not, is a delicate and difficult matter. The repetition, the number of examples of State practice, the duration of time required for the generation of customary law cannot be mathematically and uniformly decided. Each fact requires to be evaluated relatively according to the different occasions and circumstances". See also *Freedom and Justice Party v. Secretary of State for Foreign and Commonwealth Affairs*, Court of Appeal of England and Wales, [2018] EWCA Civ 1719 (19 July 2018), para. 19 ("the ascertainment of customary international law involves an exhaustive and careful scrutiny of a wide range of evidence").

[656]    In the *Jurisdictional Immunities of the State* case, the International Court of Justice considered that the customary rule of State immunity derived from the principle of sovereign equality of States and, in that context, had to be viewed together with the principle that each State possesses sovereignty over its own territory and that there flows from that sovereignty the jurisdiction of the State over events and persons within that territory (*Jurisdictional Immunities of the State* (see footnote 646 above), pp. 123–124, para. 57). See also *Certain Activities Carried Out by Nicaragua in the Border Area* and *Construction of a Road in Costa Rica along the San Juan River* (footnote 641 above), separate opinion of Judge Donoghue (paras. 3–10). It has also been explained that "a rule of international law, whether customary or conventional, does not operate in a vacuum; it operates in relation to facts and in the context of a wider framework of legal rules of which it forms only a part" (*Interpretation of the Agreement of 25 March 1951 between the WHO and Egypt*, Advisory Opinion, *I.C.J. Reports 1980*, p. 73, at p. 76, para. 10).

---

of the adoption of the United Nations Convention [on Jurisdictional Immunities of States and Their Property]. *Opinio juris* in this context is reflected in particular in the assertion by States claiming immunity that international law accords them a right to such immunity from the jurisdiction of other States; in the acknowledgment, by States granting immunity, that international law imposes upon them an obligation to do so; and, conversely, in the assertion by States in other cases of a right to exercise jurisdiction over foreign States.[657]

(4)    The nature of the rule in question may also be of significance when assessing evidence for the purpose of ascertaining whether there is a general practice that is accepted as law (accompanied by *opinio juris*). In particular, where prohibitive rules are concerned, it may sometimes be difficult to find much affirmative State practice (as opposed to inaction);[658] cases involving such rules are more likely to turn on evaluating whether the inaction is accepted as law.

(5)    Given that conduct may be fraught with ambiguities, paragraph 1 further indicates that regard must be had to the particular circumstances in which any evidence is to be found; only then may proper weight be accorded to it. In the *United States Nationals in Morocco* case, for example, the International Court of Justice, in seeking to ascertain whether a rule of (particular) customary international law existed, said:

> There are isolated expressions to be found in the diplomatic correspondence which, if considered without regard to their context, might be regarded as acknowledgments of United States claims to exercise consular jurisdiction and other capitulatory rights. On the other hand, the Court can not ignore the general tenor of the correspondence, which indicates that at all times France and the United States were looking for a solution based upon mutual agreement and that neither was Party intended to concede its legal position.[659]

Similarly, when considering legislation as practice, what may sometimes matter more than the actual text is how it has been interpreted and applied. Decisions of national courts will count less if they are reversed by the legislature or remain unenforced because of concerns about their compatibility with international law. Statements made casually, or in the heat of the moment, will usually carry less weight than those that are carefully considered; those made by junior officials may carry less weight than those voiced by senior members of the Government. The

---

[657]    *Jurisdictional Immunities of the State* (see footnote 646 above), p. 123, para. 55. In the *Navigational and Related Rights* case, where the question arose whether long-established practice of fishing for subsistence purposes (acknowledged by both parties to the case) has evolved into a rule of (particular) customary international law, the International Court of Justice observed that "the practice, by its very nature, especially given the remoteness of the area and the small, thinly spread population, is not likely to be documented in any formal way in any official record. For the Court, the failure of Nicaragua to deny the existence of a right arising from the practice which had continued undisturbed and unquestioned over a very long period, is particularly significant" (*Dispute regarding Navigational and Related Rights (Costa Rica v. Nicaragua)*, Judgment, *I.C.J. Reports 2009*, p. 213, at pp. 265–266, para. 141). The Appeals Chamber of the International Tribunal for the Former Yugoslavia has noted the difficulty of observing State practice on the battlefield: *Prosecutor v. Tadić*, Case No. IT-94-1-AR72, Decision on the Defence Motion for Interlocutory Appeal on Jurisdiction of 2 October 1995, para. 99 (*Judicial Reports 1994–1995*, vol. I, p. 353, at p. 465).

[658]    On inaction as a form of practice, see draft conclusion 6 and para. (3) of the commentary thereto, below.

[659]    *Case concerning rights of nationals of the United States of America in Morocco*, Judgment of Augnst 27th, 1952, *I.C.J. Reports 1952*, p. 176, at p. 200.

significance of a State's failure to protest will depend upon all the circumstances, but may be particularly significant where concrete action has been taken, of which that State is aware and which has an immediate negative impact on its interests. Practice of a State that goes against its clear interests or entails significant costs for it is more likely to reflect acceptance as law.

(6)   Paragraph 2 states that to identify the existence and content of a rule of customary international law each of the two constituent elements must be found to be present, and explains that this calls for an assessment of evidence for each element. In other words, while practice and acceptance as law (*opinio juris*) together supply the information necessary for the identification of customary international law, two distinct inquiries are to be carried out. The constituent elements may be intertwined in fact (in the sense that practice may be accompanied by a certain motivation), but each is conceptually distinct for purposes of identifying a rule of customary international law.

(7)   Although customary international law manifests itself in instances of conduct that are accompanied by *opinio juris*, acts forming the relevant practice are not as such evidence of acceptance as law. Moreover, acceptance as law (*opinio juris*) is to be sought with respect not only to those taking part in the practice but also to those in a position to react to it.[660] No simple inference of acceptance as law may thus be made from the practice in question; in the words of the International Court of Justice, "acting, or agreeing to act in a certain way, does not of itself demonstrate anything of a juridical nature".[661]

(8)   Paragraph 2 emphasizes that the existence of one element may not be deduced merely from the existence of the other, and that a separate inquiry needs to be carried out for each. Nevertheless, the paragraph does not exclude that the same material may be used to ascertain practice and acceptance as law (*opinio juris*). A decision by a national court, for example, could be relevant practice as well as indicate that its outcome is required under customary international law. Similarly, an official report issued by a State may serve as practice (or contain information as to that State's practice) as well as attest to the legal views underlying it. The important point remains, however, that the material must be examined as part of two distinct inquiries, to ascertain practice and to ascertain acceptance as law.

(9)   While in the identification of a rule of customary international law the existence of a general practice is often the initial factor to be considered, and only then is an inquiry made into whether such general practice is accepted as law, this order of examination is not mandatory. Thus, the identification of a rule of customary international law may also begin with appraising a written text allegedly expressing a widespread legal conviction and then seeking to verify whether there is a general practice corresponding to it.

PART THREE

A GENERAL PRACTICE

As stated in draft conclusion 2, above, the indispensable requirement for the identification of a rule of customary international law is that both a general practice and acceptance of such practice as law (*opinio juris*) be ascertained. Part Three offers more detailed guidance on the first of these two constituent elements of customary international law, "a general practice". Also known as the "material" or "objective" element,[662] it refers to those instances of conduct that (when accompanied by acceptance as law) are creative, or expressive, of customary international law. A number of factors must be considered in evaluating whether a general practice does in fact exist.

### Conclusion 4.   Requirement of practice

**1.   The requirement of a general practice, as a constituent element of customary international law, refers primarily to the practice of States that contributes to the formation, or expression, of rules of customary international law.**

**2.   In certain cases, the practice of international organizations also contributes to the formation, or expression, of rules of customary international law.**

**3.   Conduct of other actors is not practice that contributes to the formation, or expression, of rules of customary international law, but may be relevant when assessing the practice referred to in paragraphs 1 and 2.**

### Commentary

(1)   Draft conclusion 4 specifies whose practice is to be taken into account when determining the existence and content of rules of customary international law.

(2)   Paragraph 1 makes clear that it is primarily the practice of States that is to be looked to in determining the existence and content of rules of customary international law: the material element of customary international law is indeed often referred to as "State practice".[663] Being the primary subjects of the international legal system and possessing a general competence, States play a pre-eminent

---

[660] See also para. (5) of the commentary to draft conclusion 9, below.

[661] *North Sea Continental Shelf* (see footnote 645 above), p. 44, para. 76. In the *Lotus* case, the Permanent Court of International Justice likewise held that: "Even if the rarity of the judicial decisions to be found among the reported cases were sufficient to prove in point of fact the circumstance alleged … it would merely show that States had often, in practice, abstained from instituting criminal proceedings, and not that they recognized themselves as being obliged to do so; for only if such abstention were based on their being conscious of having a duty to abstain would it be possible to speak of an international custom. The alleged fact does not allow one to infer that States have been conscious of having such a duty" (*The Case of the S.S. "Lotus"*, P.C.I.J., Series A, No. 10 (1927), p. 28). See also draft conclusion 9, paragraph 2, below.

[662] Sometimes also referred to as *usus* (usage), but this may lead to confusion with "mere usage or habit", which is to be distinguished from customary international law: see draft conclusion 9, paragraph 2.

[663] State practice serves other important functions in public international law, including in relation to treaty interpretation, but these are not within the scope of the present draft conclusions.

role in the formation of customary international law, and it is principally their practice that has to be examined in identifying it. Indeed, in many cases, it will only be State practice that is relevant for determining the existence and content of rules of customary international law. As the International Court of Justice stated in *Military and Paramilitary Activities in and against Nicaragua*, in order "to consider what are the rules of customary international law applicable to the present dispute ... it has to direct its attention to the practice and *opinio juris* of States".[664]

(3)    The word "primarily" serves a dual purpose. In addition to emphasizing the primary role of State practice in the formation and expression of rules of customary international law, it serves to refer the reader to the other practice that contributes, in certain cases, to the formation, or expression, of rules of customary international law, which is the subject of paragraph 2.

(4)    Paragraph 2 indicates that "[i]n certain cases", the practice of international organizations also contributes to the formation and expression of rules of customary international law.[665] While international organizations often serve as arenas or catalysts for the practice of States, the paragraph deals with practice that is attributed to international organizations themselves, not practice of States acting within or in relation to them (which is attributed to the States concerned).[666] In those cases where the practice of international organizations themselves is of relevance (as described below), references in the draft conclusions and commentaries to the practice of States should be read as including, *mutatis mutandis*, the practice of international organizations.

(5)    International organizations are not States.[667] They are entities established and empowered by States (or by States and/or other international organizations) to carry out certain functions, and to that end have international legal personality, that is, they have their own rights and obligations under international law. The practice of international organizations in international relations[668] (when accompanied by *opinio juris*) may count as practice that gives rise or attests to rules of customary international law, but only those rules (*a*) whose subject matter falls within the mandate of the organizations, and/or (*b*) that are addressed specifically to them (such as those on their international responsibility or relating to treaties to which international organizations may be parties). The words "in certain cases" in paragraph 2 indeed serve to indicate that the practice of international organizations will not be relevant to the identification of all rules of customary international law, and further that it may be the practice of only some, not all, international organizations that is relevant.

(6)    Within this framework, the practice falling under paragraph 2 arises most clearly where member States have transferred exclusive competences to the international organization, so that the latter exercises some of the public powers of its member States and hence the practice of the organization may be equated with the practice of those States. This is the case, for example, for certain competences of the European Union. Practice within the scope of paragraph 2 may also arise where member States have not transferred exclusive competences, but have conferred competences upon the international organization that are functionally equivalent to powers exercised by States. Thus the practice of international organizations when concluding treaties, serving as treaty depositaries, deploying military forces (for example, for peacekeeping), administering territories, or taking positions on the scope of the privileges and immunities of the organization and its officials may contribute to the formation, or expression, of rules of customary international law in those areas.[669]

(7)    At the same time, caution is required in assessing the weight of the practice of an international organization as part of a general practice. International organizations vary greatly, not just in their powers, but also in their membership and functions. As a general rule, the more directly a practice of an international organization is carried out on behalf of its member States or endorsed by them, and the larger the number of such member States, the greater weight it may have in relation to the formation, or expression, of rules of customary international law. Among other factors that may need to be considered in weighing the

---

[664] *Military and Paramilitary Activities in and against Nicaragua* (see footnote 637 above), p. 97, para. 183. In the *Continental Shelf (Libyan Arab Jamahiriya/Malta)* case, the Court similarly stated that "[i]t is of course axiomatic that the material of customary international law is to be looked for primarily in the actual practice and *opinio juris* of States ..." (*Continental Shelf (Libyan Arab Jamahiriya/Malta)* (see footnote 646 above), p. 29, para. 27); and in the *Jurisdictional Immunities of the State* case, the Court again confirmed that it is "State practice from which customary international law is derived" (*Jurisdictional Immunities of the State* (see footnote 646 above), p. 143, para. 101).

[665] The term "international organizations" refers, in these draft conclusions, to organizations that are established by instruments governed by international law (usually treaties), and possess their own international legal personality. The term does not include non-governmental organizations.

[666] See also draft conclusions 6, 10 and 12, below, which refer, *inter alia*, to the practice, and acceptance as law, of States within international organizations.

[667] See also the draft articles on the responsibility of international organizations adopted by the Commission in 2011, para. (7) of the general commentary: "International organizations are quite different from States, and in addition present great diversity among themselves. In contrast with States, they do not possess a general competence and have been established in order to exercise specific functions ('principle of speciality'). There are very significant differences among international organizations with regard to their powers and functions, size of membership, relations between the organization and its members, procedures for deliberation, structure and facilities, as well as the primary rules including treaty obligations by which they are bound" (*Yearbook ... 2011*, vol. II (Part Two), p. 47). See also *Reparation for injuries suffered in the service of the United Nations*, Advisory Opinion, *I.C.J. Reports 1949*, p. 174, at p. 178: "The subjects of law in any legal system are not necessarily identical in their nature or in the extent of their rights."

[668] "Established practice" of the organization (that is, practice forming part of the rules of the organization within the meaning of article 2, paragraph 1 (*j*), of the 1986 Vienna Convention on the Law of Treaties between States and International Organizations or between International Organizations) is not within the scope of the present conclusions.

[669] In this vein, the Standard Terms and Conditions for loan, guarantee and other financing agreements of the European Bank for Reconstruction and Development and the General Conditions for Sovereign-backed Loans of the Asian Infrastructure Investment Bank both recognize that the sources of public international law that may be applicable in the event of dispute between the Bank and a party to a financing agreement include, *inter alia*, "... forms of international custom, including the practice of States *and international financial institutions*\* of such generality, consistency and duration as to create legal obligations" (European Bank for Reconstruction and Development, Standard Terms and Conditions (1 December 2012), Sect. 8.04 (*b*) (vi) (C); Asian Infrastructure Investment Bank, General Conditions for Sovereign-backed Loans (1 May 2016), Sect. 7.04 (*a*) (vii) (C)).

practice are: the nature of the organization; the nature of the organ whose conduct is under consideration; whether the conduct is *ultra vires* the organization or organ; and whether the conduct is consonant with that of the States members of the organization.

(8)  Paragraph 3 makes explicit that the conduct of entities other than States and international organizations—for example, non-governmental organizations and private individuals, but also transnational corporations and non-State armed groups—is neither creative nor expressive of customary international law. As such, their conduct does not contribute to the formation, or expression, of rules of customary international law, and may not serve as direct (primary) evidence of the existence and content of such rules. The paragraph recognizes, however, that such conduct may have an indirect role in the identification of customary international law, by stimulating or recording the practice and acceptance as law (*opinio juris*) of States and international organizations.[670] For example, the acts of private individuals may sometimes be relevant to the formation or expression of rules of customary international law, but only to the extent that States have endorsed or reacted to them.[671]

(9)  Official statements of the International Committee of the Red Cross (ICRC), such as appeals for and memorandums on respect for international humanitarian law, may likewise play an important role in shaping the practice of States reacting to such statements; and publications of ICRC may assist in identifying relevant practice. Such activities may thus contribute to the development and determination of customary international law, but they are not practice as such.[672]

### Conclusion 5.    Conduct of the State as State practice

**State practice consists of conduct of the State, whether in the exercise of its executive, legislative, judicial or other functions.**

#### Commentary

(1)  Although in their international relations States most frequently act through the executive branch, draft conclusion 5 explains that State practice consists of any conduct of the State, whatever the branch concerned and functions at issue. In accordance with the principle of the unity of the State, this includes the conduct of any organ of the State forming part of the State's organization and acting in that capacity, whether in exercise of executive, legislative, judicial or "other" functions, such as commercial activities or the giving of administrative guidance to the private sector.

(2)  To qualify as State practice, the conduct in question must be considered conduct "of the State". The conduct of any State organ is to be considered conduct of that State, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central government or of a territorial unit of the State. An organ includes any person or entity that has that status in accordance with the internal law of the State; the conduct of a person or entity otherwise empowered by the law of the State to exercise elements of governmental authority is also conduct "of the State", provided the person or entity is acting in that capacity in the particular instance.[673]

(3)  The relevant practice of States is not limited to conduct *vis-à-vis* other States or other subjects of international law; conduct within the State, such as a State's treatment of its own nationals, may also relate to matters of international law.

(4)  State practice may be that of a single State or of two or more States acting together. Examples of practice of the latter kind may include joint action by several States patrolling the high seas to combat piracy or cooperating in launching a satellite into orbit. Such joint action is to be distinguished from action by international organizations.[674]

(5)  In order to contribute to the formation and identification of rules of customary international law, practice must be known to other States (whether or not it is publicly available).[675] Indeed, it is difficult to see how confidential conduct by a State could serve such a purpose unless and until it is known to other States.

### Conclusion 6.    Forms of practice

**1.  Practice may take a wide range of forms. It includes both physical and verbal acts. It may, under certain circumstances, include inaction.**

**2.  Forms of State practice include, but are not limited to: diplomatic acts and correspondence; conduct in connection with resolutions adopted by an international organization or at an intergovernmental conference; conduct in connection with treaties; executive conduct, including operational conduct "on the ground"; legislative and administrative acts; and decisions of national courts.**

**3.  There is no predetermined hierarchy among the various forms of practice.**

#### Commentary

(1)  Draft conclusion 6 indicates the types of conduct that are covered under the term "practice", providing

---

[670]  In the latter capacity, their output may fall within the ambit of draft conclusion 14. The Commission has considered a similar point with respect to practice by "non-State actors" under its topic "Subsequent agreements and subsequent practice in relation to the interpretation of treaties": see draft conclusion 5, paragraph 2, adopted on second reading under that topic (chap. IV above).

[671]  See, for example, *Dispute regarding Navigational and Related Rights* (footnote 657 above), pp. 265–266, para. 141.

[672]  This is without prejudice to the significance of acts of ICRC in exercise of specific functions conferred upon it, in particular by the Geneva Conventions for the protection of war victims (1949 Geneva Conventions).

[673]  See articles 4 and 5 of the articles on responsibility of States for internationally wrongful acts, General Assembly resolution 56/83 of 12 December 2001, annex. For the draft articles adopted by the Commission and the commentaries thereto, see *Yearbook … 2001*, vol. II (Part Two) and corrigendum, paras. 76–77.

[674]  See also draft conclusion 4, paragraph 2, above, and the commentary thereto.

[675]  In the case of particular customary international law, the practice must be known to at least one other State or group of States concerned (see draft conclusion 16, below).

examples thereof and stating that no form of practice has *a priori* primacy over another in the identification of customary international law. It refers to forms of practice as empirically verifiable facts and avoids, for present purposes, a distinction between an act and its evidence.

(2) Given that States exercise their powers in various ways and do not confine themselves only to some types of acts, paragraph 1 provides that practice may take a wide range of forms. While some have argued that it is only what States "do" rather than what they "say" that may count as practice for purposes of identifying customary international law, it is now generally accepted that verbal conduct (whether written or oral) may also count as practice; indeed, practice may at times consist entirely of verbal acts, for example, diplomatic protests.

(3) Paragraph 1 further makes clear that inaction may count as practice. The words "under certain circumstances" seek to caution, however, that only deliberate abstention from acting may serve such a role: the State in question needs to be conscious of refraining from acting in a given situation, and it cannot simply be assumed that abstention from acting is deliberate. Examples of such omissions (sometimes referred to as "negative practice") may include abstaining from instituting criminal proceedings against foreign State officials; refraining from exercising protection in favour of certain naturalized persons; and abstaining from the use of force.[676]

(4) Paragraph 2 provides a list of forms of practice that are often found to be useful for the identification of customary international law. As the words "but are not limited to" emphasize, this is a non-exhaustive list: given the inevitability and pace of change, both political and technological, it would be impractical to draw up an exhaustive list of all the forms that practice might take.[677] The forms of practice listed are no more than examples, which, moreover, may overlap (for example, "diplomatic acts and correspondence" and "executive conduct").

(5) The order in which the forms of practice are listed in paragraph 2 is not intended to be significant. Each of the forms listed is to be interpreted broadly to reflect the multiple and diverse ways in which States act and react. The expression "executive conduct", for example, refers comprehensively to any form of executive act, including executive orders, decrees and other measures; official statements on the international plane or before a legislature; and claims before national or international courts and tribunals. The expression "legislative and administrative acts" similarly embraces the various forms of regulatory disposition effected by a public authority. The term "operational conduct 'on the ground'" includes law enforcement and seizure of property as well as battlefield or other military activity, such as the movement of troops or vessels, or deployment of certain weapons. The words

"conduct in connection with treaties" cover acts related to the negotiation and conclusion of treaties, as well as their implementation; by concluding a treaty a State may be engaging in practice in the domain to which the treaty relates, such as maritime delimitation agreements or host country agreements. The reference to "conduct in connection with resolutions adopted by an international organization or at an intergovernmental conference" likewise includes acts by States related to the negotiation, adoption and implementation of resolutions, decisions and other acts adopted within international organizations or at intergovernmental conferences, whatever their designation and whether or not they are legally binding. Whether any of these examples of forms of practice are in fact relevant in a particular case will depend on the specific rule under consideration and all the relevant circumstances.[678]

(6) Decisions of national courts at all levels may count as State practice[679] (though it is likely that greater weight will be given to the higher courts); decisions that have been overruled on the particular point are generally not considered relevant. The role of decisions of national courts as a form of State practice is to be distinguished from their potential role as a "subsidiary means" for the determination of rules of customary international law.[680]

(7) Paragraph 2 applies *mutatis mutandis* to the forms of practice of international organizations in those cases where, in accordance with draft conclusion 4, paragraph 2, above, such practice contributes to the formation, or expression, of rules of customary international law.

(8) Paragraph 3 clarifies that no form of practice has a higher probative value than others in the abstract. In particular cases, however, as explained in the commentaries to draft conclusions 3 and 7 above, it may be that different forms (or instances) of practice ought to be given different weight when they are assessed in context.

### Conclusion 7.     Assessing a State's practice

**1.     Account is to be taken of all available practice of a particular State, which is to be assessed as a whole.**

**2.     Where the practice of a particular State varies, the weight to be given to that practice may, depending on the circumstances, be reduced.**

### Commentary

(1) Draft conclusion 7 concerns the assessment of the practice of a particular State in order to determine the position of that State as part of assessing the existence of a general practice (which is the subject of draft conclusion 8). As the two paragraphs of draft conclusion 7

---

[676] For illustrations, see *The Case of the S.S. "Lotus"* (footnote 661 above), p. 28; *Nottebohm Case (second phase), Judgment of April 6th, 1955, I.C.J. Reports 1955*, p. 4, at p. 22; and *Jurisdictional Immunities of the State* (footnote 646 above), pp. 134–135, para. 77.

[677] See also "Ways and means for making the evidence of customary international law more readily available", *Yearbook ... 1950*, vol. II, document A/1316 (Part II), p. 368, para. 31; and the memorandum by the Secretariat on ways and means for making the evidence of customary international law more readily available (A/CN.4/710).

[678] See para. (3) of the commentary to draft conclusion 3, above.

[679] See, for example, *Jurisdictional Immunities of the State* (footnote 646 above), pp. 131–135, paras. 72–77; and *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v. Belgium)*, Judgment, *I.C.J. Reports 2002*, p. 3, at p. 24, para. 58. The term "national courts" may also include courts with an international element operating within one or more domestic legal systems, such as courts or tribunals with mixed national and international composition.

[680] See draft conclusion 13, paragraph 2, below. Decisions of national courts may also serve as evidence of acceptance as law (*opinio juris*), on which see draft conclusion 10, paragraph 2, below.

make clear, it is necessary to take account of and assess as a whole all available practice of the State concerned on the matter in question, including its consistency.

(2)    Paragraph 1 states, first, that in seeking to determine the position of a particular State on the matter in question, account is to be taken of all available practice of that State. This means that the practice examined should be exhaustive (having regard to its availability) and include the relevant practice of all of the State's organs and all relevant practice of a particular organ. The paragraph also makes it clear that relevant practice is to be assessed not in isolation but as a whole; only then can the actual position of the State be determined.

(3)    The need to assess available practice "as a whole" is illustrated by the *Jurisdictional Immunities of the State* case, in which the International Court of Justice took note of the fact that although the Hellenic Supreme Court had decided in one case that, by virtue of the "territorial tort principle", State immunity under customary international law did not extend to the acts of armed forces during an armed conflict, a different position was adopted by the Greek Special Supreme Court; by the Government of Greece when refusing to enforce the Hellenic Supreme Court's judgment, and in defending this position before the European Court of Human Rights; and by the Hellenic Supreme Court itself in a later decision. Assessing such practice "as a whole" led the Court to conclude "that Greek State practice taken as a whole actually contradicts, rather than supports, Italy's argument" that State immunity under customary international law does not extend to the acts of armed forces during an armed conflict.[681]

(4)    Paragraph 2 refers explicitly to situations where there is or appears to be inconsistent practice of a particular State. As just indicated, this may be the case where different organs or branches within the State adopt different courses of conduct on the same matter or where the practice of one organ varies over time. If in such circumstances a State's practice as a whole is found to be inconsistent, that State's contribution to "a general practice" may be reduced.

(5)    The words "may, depending on the circumstances" in paragraph 2 indicate that such assessment needs to be approached with caution, and the same conclusion would not necessarily be drawn in all cases. In the *Fisheries case*, for example, the International Court of Justice held that "too much importance need not be attached to the few uncertainties or contradictions, real or apparent … in Norwegian practice. They may be easily understood in the light of the variety of the facts and conditions prevailing in the long period".[682] Thus, a difference in the practice of lower and higher organs of the same State is unlikely to result in less weight being given to the practice of the higher organ. Practice of organs of a central government will usually be more significant than that of constituent units of a federal State or political subdivisions of the State. The practice of the executive branch is often the most relevant on the international plane and thus has particular weight in connection with the identification of customary international law, though account may need to be taken of the constitutional position of the various organs in question.[683]

### Conclusion 8.    The practice must be general

**1.    The relevant practice must be general, meaning that it must be sufficiently widespread and representative, as well as consistent.**

**2.    Provided that the practice is general, no particular duration is required.**

*Commentary*

(1)    Draft conclusion 8 concerns the requirement that the practice must be general; it seeks to capture the essence of this requirement and the inquiry that is needed in order to verify whether it has been met in a particular case.

(2)    Paragraph 1 explains that the notion of generality, which refers to the aggregate of the instances in which the alleged rule of customary international law has been followed, embodies two requirements. First, the practice must be sufficiently widespread and representative. Second, the practice must exhibit consistency. In the words of the International Court of Justice in the *North Sea Continental Shelf* cases, the practice in question must be "both extensive and virtually uniform":[684] it must be a "settled practice".[685] As is explained below, no absolute standard can be given for either requirement; the threshold that needs to be attained for each has to be assessed taking account of context.[686] In each case, however, the practice should be of such a character as to make it possible to discern a virtually uniform usage. Contradictory or inconsistent practice is to be taken into account in evaluating whether such a conclusion may be reached.[687]

(3)    The requirement that the practice be "widespread and representative" does not lend itself to exact formulations, as circumstances may vary greatly from one case to another (for example, the frequency with which circumstances calling for action arise).[688] As regards diplomatic

---

[681] *Jurisdictional Immunities of the State* (see footnote 646 above), p. 134, para. 76, and p. 136, para. 83. See also *Military and Paramilitary Activities in and against Nicaragua* (footnote 637 above), p. 98, para. 186.

[682] *Fisheries case*, Judgment of December 18th, 1951, *I.C.J. Reports 1951*, p. 116, at p. 138.

[683] See, for example, *Jurisdictional Immunities of the State* (footnote 646 above), p. 136, para. 83 (where the Court noted that "under Greek law" the view expressed by the Special Supreme Court prevailed over that of the Hellenic Supreme Court).

[684] *North Sea Continental Shelf* (see footnote 645 above), p. 43, para. 74. A wide range of terms has been used to describe the requirement of generality, including by the International Court of Justice, without any real difference in meaning being implied.

[685] *Ibid.*, p. 44, para. 77.

[686] See also draft conclusion 3.

[687] Divergences from the alleged rule may suggest that no rule exists or point, *inter alia*, to an admissible customary exception that has arisen; a change in a previous rule; a rule of particular customary international law; or the existence of one or more persistent objectors. It might also be relevant to consider when the inconsistent practice occurred, in particular whether it lay in the past, after which consistency prevailed.

[688] See also the judgment of 4 February 2016 of the Federal Court of Australia in *Ure v. The Commonwealth of Australia* [2016] FCAFC 8,

relations, for example, in which all States regularly engage, a practice may have to be widely exhibited, while with respect to some other matters, the amount of practice may well be less. This is captured by the word "sufficiently", which implies that the necessary number and distribution of States taking part in the relevant practice (like the number of instances of practice) cannot be identified in the abstract. It is clear, however, that universal participation is not required: it is not necessary to show that all States have participated in the practice in question. The participating States should include those that had an opportunity or possibility of applying the alleged rule.[689] It is important that such States be representative, which needs to be assessed in light of all the circumstances, including the various interests at stake and/or the various geographical regions.

(4)   Thus, in assessing generality, an indispensable factor to be taken into account is the extent to which those States that are particularly involved in the relevant activity or are most likely to be concerned with the alleged rule ("specially affected States") have participated in the practice.[690] While in many cases all or virtually all States will be equally affected, it would clearly be impractical to determine, for example, the existence and content of a rule of customary international law relating to navigation in maritime zones without taking into account the practice of relevant coastal States and flag States, or the existence and content of a rule on foreign investment without evaluating the practice of the capital-exporting States as well as that of the States in which investment is made. It should be made clear, however, that the term "specially affected States" should not be taken to refer to the relative power of States.

(5)   The requirement that the practice be consistent means that where the relevant acts are divergent to the extent that no pattern of behaviour can be discerned, no general practice (and thus no corresponding rule of customary international law) can be said to exist. For example, in the *Fisheries case*, the International Court of Justice found that "although the ten-mile rule has been adopted by certain States … other States have adopted a different limit. Consequently, the ten-mile rule has not acquired the authority of a general rule of international law".[691]

(6)   In examining whether the practice is consistent it is of course important to consider instances of conduct that are in fact comparable, that is, where the same or similar issues have arisen so that such instances could indeed constitute reliable guides. The Permanent Court of International Justice referred in the *Lotus* case to "precedents offering a close analogy to the case under consideration; for it is only from precedents of this nature that the existence of a general principle [of customary international law] applicable to the particular case may appear".[692]

(7)   At the same time, complete consistency in the practice of States is not required. The relevant practice needs to be virtually or substantially uniform, meaning that some inconsistencies and contradictions are not necessarily fatal to a finding of "a general practice". In *Military and Paramilitary Activities in and against Nicaragua*, the International Court of Justice held that:

[i]t is not to be expected that in the practice of States the application of the rules in question should have been perfect … The Court does not consider that, for a rule to be established as customary, the corresponding practice must be in absolutely rigorous conformity with the rule. In order to deduce the existence of customary rules, the Court deems it sufficient that the conduct of States should, in general, be consistent with such rules …[693]

(8)   When inconsistency takes the form of breaches of a rule, this, too, does not necessarily prevent a general practice from being established. This is particularly so when the State concerned denies the violation or expresses support for the rule. As the International Court of Justice has observed:

instances of State conduct inconsistent with a given rule should generally have been treated as breaches of that rule, not as indications of the recognition of a new rule. If a State acts in a way *prima facie* incompatible with a recognized rule, but defends its conduct by appealing to exceptions or justifications contained within the rule itself, then whether or not the State's conduct is in fact justifiable on that basis, the significance of that attitude is to confirm rather than to weaken the rule.[694]

(9)   Paragraph 2 refers to the time element, making clear that a relatively short period in which a general practice is followed is not, in and of itself, an obstacle to determining that a corresponding rule of customary international law exists. While a long duration may result in more extensive practice, time immemorial or a considerable or fixed duration of a general practice is not a condition for the

---

para. 37: "we would hesitate to say that it is impossible to demonstrate the existence of a rule of customary international [law] from a small number of instances of State practice. We would accept the less prescriptive proposition that as the number of instances of State practice decreases the task becomes more difficult".

[689] A relatively small number of States engaging in a certain practice might thus suffice if indeed such practice, as well as other States' inaction in response, is generally accepted as law (accompanied by *opinio juris*).

[690] The International Court of Justice has said that "an indispensable requirement would be that within the period in question, short though it might be, State practice, including that of States whose interests are specially affected, should have been both extensive and virtually uniform", *North Sea Continental Shelf* (see footnote 645 above), p. 43, para. 74.

[691] *Fisheries case* (see footnote 682 above), p. 131. A chamber of the International Court of Justice held in the *Gulf of Maine* case that where the practice demonstrates "that each specific case is, in the final analysis, different from all the others. … This precludes the possibility of those conditions arising which are necessary for the formation of principles and rules of customary law" (*Delimitation of the Maritime Boundary in the Gulf of Maine Area* (see footnote 668 above), p. 290, para. 81). See also, for example, *Colombian-Peruvian asylum case*

(footnote 648 above), p. 277 ("The facts brought to the knowledge of the Court disclose so much uncertainty and contradiction, so much fluctuation and discrepancy in the exercise of diplomatic asylum … that it is not possible to discern in all this any constant and uniform usage … with regard to the alleged rule of unilateral and definitive qualification of the offence"); and *Interpretation of the air transport services agreement between the United States of America and Italy*, advisory opinion of 17 July 1965, UNRIAA, vol. XVI (Sales No. E/F.69.V.1), pp. 75–108, at p. 100 ("It is correct that only a constant practice, observed in fact and without change can constitute a rule of customary international law").

[692] *The Case of the S.S. "Lotus"* (see footnote 661 above), p. 21. See also *North Sea Continental Shelf* (footnote 671 above), p. 45, para. 79; and *Prosecutor v. Moinina Fofana and Allieu Kondewa*, Case No. SCSL-04-14-A, Judgment (Appeals Chamber) of 28 May 2008, Special Court for Sierra Leone, para. 406.

[693] *Military and Paramilitary Activities in and against Nicaragua* (see footnote 637 above), p. 98, para. 186.

[694] *Ibid.* See also, for example, *Prosecutor v. Sam Hinga Norman* (footnote 649 above), para. 51. The same is true when assessing a particular State's practice: see draft conclusion 7, above.

existence of a customary rule.[695] The International Court of Justice confirmed this in the *North Sea Continental Shelf* cases, holding that "the passage of only a short period of time is not necessarily, or of itself, a bar to the formation of a new rule of customary international law".[696] As this passage makes clear, however, some period of time must elapse for a general practice to emerge; there is no such thing as "instant custom".

PART FOUR

## ACCEPTED AS LAW (*OPINIO JURIS*)

Establishing that a certain practice is followed consistently by a sufficiently widespread and representative number of States does not in itself suffice in order to identify a rule of customary international law. Part Four concerns the second constituent element of customary international law, sometimes referred to as the "subjective" or "psychological" element, which requires that in each case, it is also necessary to be satisfied that there exists among States an acceptance as law (*opinio juris*) as to the binding character of the practice in question.

### Conclusion 9.   Requirement of acceptance as law (opinio juris)

**1.   The requirement, as a constituent element of customary international law, that the general practice be accepted as law (*opinio juris*) means that the practice in question must be undertaken with a sense of legal right or obligation.**

**2.   A general practice that is accepted as law (*opinio juris*) is to be distinguished from mere usage or habit.**

#### Commentary

(1)   Draft conclusion 9 seeks to encapsulate the nature and function of the second constituent element of customary international law, acceptance as law (*opinio juris*).

(2)   Paragraph 1 explains that acceptance as law (*opinio juris*), as a constituent element of customary international law, refers to the requirement that the relevant practice must be undertaken with a sense of legal right or obligation, that is, it must be accompanied by a conviction that it is permitted, required or prohibited by customary international law.[697] It is thus crucial to establish, in each case, that States have acted in a certain way because they felt or believed themselves legally compelled or entitled to do so by reason of a rule of customary international law: they must have pursued the practice as a matter of

right, or submitted to it as a matter of obligation. As the International Court of Justice stressed in the *North Sea Continental Shelf* judgment:

Not only must the acts concerned amount to a settled practice, but they must also be such, or be carried out in such a way, as to be evidence of a belief that this practice is rendered obligatory by the existence of a rule of law requiring it. The need for such a belief, i.e., the existence of a subjective element, is implicit in the very notion of the *opinio juris sive necessitatis*. The States concerned must therefore feel that they are conforming to what amounts to a legal obligation.[698]

(3)   Acceptance as law (*opinio juris*) is to be distinguished from other, extralegal motives for action, such as comity, political expediency or convenience: if the practice in question is motivated solely by such other considerations, no rule of customary international law is to be identified. Thus in the *Asylum* case the International Court of Justice declined to recognize the existence of a rule of customary international law where the alleged instances of practice were not shown to be, *inter alia*:

exercised by the States granting asylum as a right appertaining to them and respected by the territorial States as a duty incumbent on them and not merely for reasons of political expediency. … considerations of convenience or simple political expediency seem to have led the territorial State to recognize asylum without that decision being dictated by any feeling of legal obligation.[699]

(4)   Seeking to comply with a treaty obligation as a treaty obligation, much like seeking to comply with domestic law, is not acceptance as law for the purpose of identifying customary international law: practice undertaken with such intention does not, by itself, lead to an inference as to the existence of a rule of customary international law.[700] A State may well recognize that it is bound by a certain obligation by force of both customary international law and treaty, but this would need to be proved. On the other hand, when States act in conformity with a treaty provision by which they are not bound, or apply conventional provisions in their relations with non-parties to the treaty, this may evidence the existence of acceptance as law (*opinio juris*) in the absence of any explanation to the contrary.

(5)   Acceptance as law (*opinio juris*) is to be sought with respect to both the States engaging in the relevant practice

---

[695] In fields such as international space law or the law of the sea, for example, customary international law has sometimes developed rapidly.

[696] *North Sea Continental Shelf* (see footnote 645 above), p. 43, para. 74.

[697] While acceptance of a certain practice as law (*opinio juris*) has often been described in terms of "a sense of legal obligation", draft conclusion 9 uses the broader language "a sense of legal right or obligation" as States have both rights and obligations under customary international law and they may act in the belief that they have a right or an obligation. The draft conclusion does not suggest that, where there is no prohibition, a State needs to point to a right to justify its action.

[698] *North Sea Continental Shelf* (see footnote 645 above), p. 44, para. 77; see also paragraph 76 (referring to the requirement that States "believed themselves to be applying a mandatory rule of customary international law"). The Court has also referred, *inter alia*, to "a practice illustrative of belief in a kind of general right for States" (*Military and Paramilitary Activities in and against Nicaragua* (see footnote 637 above), p. 108, para. 206).

[699] *Colombian-Peruvian asylum case* (see footnote 648 above), pp. 277 and 286. See also *The Case of the S.S. "Lotus"* (footnote 661 above), p. 28 ("Even if the rarity of the judicial decisions to be found among the reported cases were sufficient to prove in point of fact the circumstance alleged … it would merely show that States had often, in practice, abstained from instituting criminal proceedings, and not that they recognized themselves as being obliged to do so; for only if such abstention were based on their being conscious of having a duty to abstain would it be possible to speak of an international custom. The alleged fact does not allow one to infer that States have been conscious of having such a duty; on the other hand … there are other circumstances calculated to show that the contrary is true"); and *Military and Paramilitary Activities in and against Nicaragua* (footnote 637 above), pp. 108–110, paras. 206–209.

[700] See, for example, *North Sea Continental Shelf* (footnote 645 above), p. 43, para. 76. A particular difficulty may thus arise in ascertaining whether a rule of customary international law has emerged where a non-declaratory treaty has attracted virtually universal participation.

and those in a position to react to it, who must be shown to have understood the practice as being in accordance with customary international law.[701] It is not necessary to establish that all States have recognized (accepted as law) the alleged rule as a rule of customary international law; it is broad and representative acceptance, together with no or little objection, that is required.[702]

(6)   Paragraph 2 emphasizes that, without acceptance as law (*opinio juris*), a general practice may not be considered as creative, or expressive, of customary international law; it is mere usage or habit. In other words, practice that States consider themselves legally free either to follow or to disregard does not contribute to or reflect customary international law (unless the rule to be identified itself provides for such a choice).[703] Not all observed regularities of international conduct bear legal significance: diplomatic courtesies, for example, such as the provision of red carpets for visiting Heads of State, are not accompanied by any sense of legal obligation and thus could not generate or attest to any legal duty or right to act accordingly.[704]

### Conclusion 10.   Forms of evidence of acceptance as law (opinio juris)

**1.   Evidence of acceptance as law (*opinio juris*) may take a wide range of forms.**

**2.   Forms of evidence of acceptance as law (*opinio juris*) include, but are not limited to: public statements made on behalf of States; official publications; government legal opinions; diplomatic correspondence; decisions of national courts; treaty provisions; and conduct in connection with resolutions**

---

[701] See *Military and Paramilitary Activities in and against Nicaragua* (footnote 637 above), p. 109, para. 207: "Either the States taking such action or other States in a position to react to it, must have behaved so that their conduct is 'evidence of a belief that this practice is rendered obligatory by the existence of a rule of law requiring it'" (citing the *North Sea Continental Shelf* judgment).

[702] Thus, where "the members of the international community are profoundly divided" on the question of whether a certain practice is accompanied by acceptance as law (*opinio juris*), no such acceptance as law could be said to exist: see *Legality of the Threat or Use of Nuclear Weapons* (footnote 649 above), p. 254, para. 67.

[703] In the *Right of Passage over Indian Territory* case, the International Court of Justice thus observed, with respect to the passage of armed forces and armed police, that "[t]he practice predicates that the territorial sovereign had the discretionary power to withdraw or to refuse permission. It is argued that permission was always granted, but this does not, in the opinion of the Court, affect the legal position. There is nothing in the record to show that grant of permission was incumbent on the British or on India as an obligation" (*Case concerning Right of Passage over Indian Territory* (see footnote 649 above), pp. 42–43). In line the *Jurisdictional Immunities of the State* case, the International Court of Justice similarly held, in seeking to determine the content of a rule of customary international law, that, "[w]hile it may be true that States sometimes decide to accord an immunity more extensive than that required by international law, for present purposes, the point is that the grant of immunity in such a case is not accompanied by the requisite *opinio juris* and therefore sheds no light upon the issue currently under consideration by the Court" (*Jurisdictional Immunities of the State* (see footnote 646 above), p. 123, para. 55).

[704] The International Court of Justice observed that indeed "[t]here are many international acts, e.g., in the field of ceremonial and protocol, which are performed almost invariably, but which are motivated only by considerations of courtesy, convenience or tradition, and not by any sense of legal duty" (*North Sea Continental Shelf* (see footnote 645 above), p. 44, para. 77).

**adopted by an international organization or at an intergovernmental conference.**

**3.   Failure to react over time to a practice may serve as evidence of acceptance as law (*opinio juris*), provided that States were in a position to react and the circumstances called for some reaction.**

### Commentary

(1)   Draft conclusion 10 concerns the evidence from which acceptance of a given practice as law (*opinio juris*) may be ascertained. It reflects the fact that acceptance as law may be made known through various manifestations of State behaviour, which should be carefully assessed to determine whether, in any given case, they actually reflect a State's views on the current state of customary international law.

(2)   Paragraph 1 sets forth the general proposition that acceptance as law (*opinio juris*) may be reflected in a wide variety of forms. States may express their recognition (or rejection) of the existence of a rule of customary international law in many ways. Such conduct indicative of acceptance as law supporting an alleged rule encompasses, as the subsequent paragraphs make clear, both statements and physical actions (as well as inaction) concerning the practice in question.

(3)   Paragraph 2 provides a non-exhaustive list of forms of evidence of acceptance as law (*opinio juris*), including those most commonly resorted to for such purpose.[705] Such forms of evidence may also indicate lack of acceptance as law. There is some common ground between the forms of evidence of acceptance as law and the forms of State practice referred to in draft conclusion 6, paragraph 2, above;[706] in part, this reflects the fact that the two elements may at times be found in the same material (but, even then, their identification requires a separate exercise in each case).[707] In any event, statements are more likely to embody the legal conviction of the State, and may often be more usefully regarded as expressions of acceptance as law (or otherwise) rather than instances of practice.

(4)   Among the forms of evidence of acceptance as law (*opinio juris*), an express public statement on behalf of a State that a given practice is permitted, prohibited or mandated under customary international law provides the clearest indication that the State has avoided or undertaken such practice (or recognized that it was rightfully undertaken or avoided by others) out of a sense of legal right or obligation. Similarly, the effect of practice in line with the supposed rule may be nullified by contemporaneous statements that no such rule exists.[708] Either way, such statements could be made, for example, in debates

---

[705] See the memorandum by the Secretariat on ways and means for making the evidence of customary international law more readily available (A/CN.4/710).

[706] There are also differences between the lists, as they are intended to refer to the principal examples connected with each of the constituent elements.

[707] See draft conclusion 3, paragraph 2, above.

[708] At times the practice itself is accompanied by an express disavowal of legal obligation, such as when States pay compensation *ex gratia* for damage caused to foreign diplomatic property.

in multilateral settings; when introducing draft legislation before the legislature; as assertions made in written and oral pleadings before courts and tribunals; in protests characterizing the conduct of other States as unlawful; and in response to proposals for codification. They may be made individually or jointly with others.

(5)   The other forms of evidence listed in paragraph 2 may also be of particular assistance in ascertaining the legal position of States in relation to certain practices. Among these, the term "official publications" covers documents published in the name of a State, such as military manuals and official maps, in which acceptance as law (*opinio juris*) may be found. Published opinions of government legal advisers may likewise shed light on a State's legal position, though not if the State declined to follow the advice. Diplomatic correspondence may include, for example, circular notes to diplomatic missions, such as those on privileges and immunities. National legislation, while it is most often the product of political choices, may be valuable as evidence of acceptance as law, particularly where it has been specified (for example, in connection with the passage of the legislation) that it is mandated under or gives effect to customary international law. Decisions of national courts may also contain such statements when pronouncing upon questions of international law.

(6)   Multilateral drafting and diplomatic processes may afford valuable and accessible evidence as to the legal convictions of States with respect to the content of customary international law; hence the reference to "treaty provisions" and to "conduct in connection with resolutions adopted by an international organization or at an intergovernmental conference". Their potential utility in the identification of rules of customary international law is examined in greater detail in draft conclusions 11 and 12, below.

(7)   Paragraph 2 applies *mutatis mutandis* to the forms of evidence of acceptance of law (*opinio juris*) of international organizations.

(8)   Paragraph 3 provides that, under certain conditions, failure by States to react, within a reasonable time, may also, in the words of the International Court of Justice in the *Fisheries case*, "[bear] witness to the fact that they did not consider [a certain practice undertaken by others] to be contrary to international law".[709] Tolerance of a certain

practice may indeed serve as evidence of acceptance as law (*opinio juris*) when it represents concurrence in that practice. For such a lack of open objection or protest to have this probative value, however, two requirements must be satisfied in the circumstances of each case in order to ensure that such inaction does not derive from causes unrelated to the legality of the practice in question.[710] First, it is essential that a reaction to the practice in question would have been called for:[711] this may be the case, for example, where the practice is one that affects—usually unfavourably—the interests or rights of the State failing or refusing to act.[712] Second, the reference to a State being "in a position to react" means that the State concerned must have had knowledge of the practice (which includes circumstances where, because of the publicity given to the practice, it must be assumed that the State had such knowledge), and that it must have had sufficient time and ability to act. Where a State did not or could not have been expected to know of a certain practice, or has not yet had a reasonable time to respond, inaction cannot be attributed to an acknowledgement that such practice was mandated (or permitted) under customary international law. A State may also provide other explanations for its inaction.

## PART FIVE

## SIGNIFICANCE OF CERTAIN MATERIALS FOR THE IDENTIFICATION OF CUSTOMARY INTERNATIONAL LAW

(1)   Various materials other than primary evidence of alleged instances of practice accepted as law (accompanied by *opinio juris*) may be consulted in the process of determining the existence and content of rules of customary international law. These commonly include written texts bearing on legal matters, in particular treaties, resolutions of international organizations and intergovernmental conferences, judicial decisions (of both international and national courts), and scholarly works. Such texts may assist in collecting, synthesizing or interpreting practice relevant to the identification of customary international law, and may offer precise formulations to frame and guide an inquiry into its two constituent elements. Part Five seeks to explain the potential significance of these materials, making clear that it is of critical importance to study carefully both the content of such materials and the context within which they were prepared.

(2)   The output of the International Law Commission itself merits special consideration in the present context. As has been recognized by the International Court of

---

[709] *Fisheries case* (see footnote 682 above), p. 139. See also *The Case of the S.S. "Lotus"* (footnote 661 above), p. 29 ("the Court feels called upon to lay stress upon the fact that it does not appear that the States concerned have objected to criminal proceedings in respect of collision cases before the courts of a country other than that the flag of which was flown, or that they have made protests: their conduct does not appear to have differed appreciably from that observed by them in all cases of concurrent jurisdiction. This fact is directly opposed to the existence of a tacit consent on the part of States to the exclusive jurisdiction of the State whose flag is flown, such as the Agent for the French Government has thought it possible to deduce from the infrequency of questions of jurisdiction before criminal courts. It seems hardly probable, and it would not be in accordance with international practice, that the French Government in the *Ortigia–Oncle-Joseph* case and the German Government in the *Ekbatana–West-Hinder* case would have omitted to protest against the exercise of criminal jurisdiction by the Italian and Belgian Courts, if they had really thought that this was a violation of international law"); and *Priebke, Erich s/ solicitud de extradición*, Case No. 16.063/94, Judgment of 2 November 1995, Supreme Court of Justice of Argentina, vote of Judge Gustavo A. Bossert, para. 90.

[710] See also, more generally, *North Sea Continental Shelf* (footnote 645 above), p. 27, para. 33.

[711] The International Court of Justice has observed, in a different context, that "[t]he absence of reaction may well amount to acquiescence. ... That is to say, silence may also speak, but only if the conduct of the other State calls for a response" (*Sovereignty over Pedra Branca/Pulau Batu Puteh, Middle Rocks and South Ledge (Malaysia/Singapore)*, Judgment, *I.C.J. Reports 2008*, p. 12, at pp. 50–51, para. 121). See also *Dispute regarding Navigational and Related Rights* (footnote 657 above), pp. 265–266, para. 141 ("For the Court, the failure of Nicaragua to deny the existence of a right arising from the practice which had continued undisturbed and unquestioned over a very long period, is particularly significant").

[712] It may well be that a certain practice would be seen as affecting all or virtually all States.

Justice and other courts and tribunals,[713] a determination by the Commission affirming the existence and content of a rule of customary international law may have particular value, as may a conclusion by it that no such rule exists. This flows from the Commission's unique mandate, as a subsidiary organ of the United Nations General Assembly, to promote the progressive development of international law and its codification;[714] the thoroughness of its procedures (including the consideration of extensive surveys of State practice and *opinio juris*); and its close relationship with the General Assembly and States (including receiving oral and written comments from States as it proceeds with its work). The weight to be given to the Commission's determinations depends, however, on various factors, including the sources relied upon by the Commission, the stage reached in its work, and above all upon States' reception of its output.[715]

### Conclusion 11.    Treaties

1.    **A rule set forth in a treaty may reflect a rule of customary international law if it is established that the treaty rule:**

(*a*)    **codified a rule of customary international law existing at the time when the treaty was concluded;**

(*b*)    **has led to the crystallization of a rule of customary international law that had started to emerge prior to the conclusion of the treaty; or**

(*c*)    **has given rise to a general practice that is accepted as law (*opinio juris*), thus generating a new rule of customary international law.**

2.    **The fact that a rule is set forth in a number of treaties may, but does not necessarily, indicate that the treaty rule reflects a rule of customary international law.**

### Commentary

(1)    Draft conclusion 11 concerns the significance of treaties for the identification of customary international law. The draft conclusion does not address conduct in connection with treaties as a form of practice, a matter covered in draft conclusion 6, nor does it directly concern the treaty-making process or draft treaty provisions, which may themselves give rise to State practice and

evidence of acceptance as law (*opinio juris*) as indicated in draft conclusions 6 and 10.

(2)    While treaties are, as such, binding only on the parties thereto, they "may have an important role to play in recording and defining rules deriving from custom, or indeed in developing them".[716] Their provisions (and the processes of their adoption and application) may shed light on the content of customary international law.[717] Clearly expressed treaty provisions may offer particularly convenient evidence as to the existence or content of rules of customary international law when they are found to be declaratory of such rules. Yet the words "may reflect" caution that, in and of themselves, treaties cannot create a rule of customary international law or conclusively attest to its existence or content.

(3)    The number of parties to a treaty may be an important factor in determining whether particular rules set forth therein reflect customary international law; treaties that have obtained near-universal acceptance may be seen as particularly indicative in this respect.[718] But treaties that are not yet in force or which have not yet attained widespread participation may also be influential in certain circumstances, particularly where they were adopted without opposition or by an overwhelming majority of States.[719] In any case, the attitude of States not party to a widely ratified treaty, both at the time of its conclusion and subsequently, will also be of relevance.

(4)    Paragraph 1 sets out three circumstances in which rules set forth in a treaty may be found to reflect customary

---

[713] See, for example, *Gabčíkovo-Nagymaros Project (Hungary/Slovakia)*, Judgment, *I.C.J. Reports 1997*, p. 7, at p. 40, para. 51; *Responsibilities and obligations of States with respect to activities in the Area*, Advisory Opinion, 1 February 2011, *ITLOS Reports 2011*, p. 10, at p. 56, para. 169; *Prosecutor v. Elizaphan Ntakirutimana and Gérard Ntakirutimana*, cases Nos. ICTR-96-10-A and ICTR-96-17-A, International Criminal Tribunal for Rwanda, Judgment (Appeals Chamber) of 13 December 2004, para. 518; *Dubai-Sharjah Border Arbitration* (1981), ILR, vol. 91, pp. 543–701, at p. 575; and 2 BvR 1506/03, German Federal Constitutional Court, order of the Second Senate of 5 November 2003, para. 47.

[714] See the statute of the International Law Commission (1947), adopted by the General Assembly in resolution 174 (II) of 21 November 1947.

[715] Once the General Assembly has taken action in relation to a final draft of the Commission, such as by annexing it to a resolution and commending it to States, the output of the Commission may also fall to be considered under draft conclusion 12.

[716] *Continental Shelf (Libyan Arab Jamahiriya/Malta)* (see footnote 646 above), pp. 29–30, para. 27: "It is of course axiomatic that the material of customary international law is to be looked for primarily in the actual practice and *opinio juris* of States, even though multilateral conventions may have an important role to play in recording and defining rules deriving from custom, or indeed in developing them." Article 38 of the 1969 Vienna Convention refers to the possibility of "a rule set forth in a treaty … becoming binding upon a third State as a customary rule of international law, recognized as such".

[717] See *Jurisdictional Immunities of the State* (footnote 646 above), p. 128, para. 66; and "Ways and means for making the evidence of customary international law more readily available" (A/1316) (footnote 677 above), p. 368, para. 29: "not infrequently conventional formulation by certain States of a practice also followed by other States is relied upon in efforts to establish the existence of a rule of customary international law. Even multipartite conventions signed but not brought into force are frequently regarded as having value as evidence of customary international law."

[718] See, for example, Eritrea–Ethiopia Claims Commission, *Partial Award: Prisoners of War, Ethiopia's Claim 4*, 1 July 2003, UNRIAA, vol. XXVI (Sales No. B.06.V.7), pp. 73–114, at pp. 86–87, para. 31 ("Certainly, there are important, modern authorities for the proposition that the Geneva Conventions of 1949 have largely become expressions of customary international law, and both Parties to this case agree. The mere fact that they have obtained nearly universal acceptance supports this conclusion" (footnote omitted)); and *Prosecutor v. Sam Hinga Norman* (footnote 649 above), paras. 17–20 (referring, *inter alia*, to the "huge acceptance, the highest acceptance of all international conventions" as indicating that the relevant provisions of the Convention on the Rights of the Child had come to reflect customary international law).

[719] See, for example, *Continental Shelf (Libyan Arab Jamahiriya/Malta)* (footnote 646 above), p. 30, para. 27: "it cannot be denied that the 1982 [United Nations] Convention [on the Law of the Sea—which was not then in force] is of major importance, having been adopted by an overwhelming majority of States; hence it is clearly the duty of the Court, even independently of the references made to the Convention by the Parties, to consider in what degree any of its relevant provisions are binding upon the Parties as a rule of customary international law".

international law, distinguished by the time when the rule of customary international law was (or began to be) formed. The use of the term "rule set forth in a treaty" seeks to indicate that a rule may not necessarily be contained in a single treaty provision, but could be reflected by two or more provisions read together.[720] The words "if it is established that" make it clear that establishing whether a conventional rule does in fact correspond to an alleged rule of customary international law cannot be done just by looking at the text of the treaty: in each case the existence of the rule must be confirmed by practice (together with acceptance as law). It is important that States can be shown to engage in the practice not (solely) because of the treaty obligation, but out of a conviction that the rule embodied in the treaty is or has become a rule of customary international law.[721]

(5)   Subparagraph (*a*) concerns the situation where it is established that a rule set forth in a treaty is declaratory of a pre-existing rule of customary international law.[722] In inquiring whether this is the case with respect to an alleged rule of customary international law, regard should first be had to the treaty text, which may contain an express statement on the matter.[723] The fact that reservations are expressly permitted to a treaty provision may suggest that the treaty provision does not reflect customary international law, but is not necessarily conclusive.[724] Such indications within the text, however, may be lacking, or may refer to the treaty in general rather than to any specific rule contained therein;[725] in such case, resort

may be had to the treaty's preparatory work (*travaux préparatoires*),[726] including any statements by States in the course of the drafting process that may disclose an intention to codify an existing rule of customary international law. If it is found that the negotiating States had indeed considered that the rule in question was a rule of customary international law, this would be evidence of acceptance as law (*opinio juris*), and would carry greater weight the larger the number of negotiating States. There would, however, still remain a need to consider whether sufficiently widespread and representative, as well as consistent, instances of the relevant practice supported the existence of a rule of customary international law (as distinct from a treaty obligation). This is both because the fact that the parties assert that the treaty is declaratory of existing law is no more than one piece of evidence to that effect, and because the rule of customary international law underlying a treaty text may have changed or been superseded since the conclusion of the treaty. In other words, relevant practice will need to confirm, or exist in conjunction with, the *opinio juris*.

(6)   Subparagraph (*b*) concerns the case where it is established that a general practice that is accepted as law (accompanied by *opinio juris*) has crystallized around a treaty rule elaborated on the basis of only a limited amount of State practice. In other words, the treaty rule has consolidated and given further definition to a rule of customary international law that was only emerging at the time when the treaty was being drawn up, thereby later becoming reflective of it.[727] Here, too, establishing that this is indeed the case requires an evaluation of whether the treaty formulation has been accepted as law and does in fact find support in a general practice.[728]

---

[720] It may also be the case that a single provision only partly reflects customary international law.

[721] In the *North Sea Continental Shelf* cases, this consideration led to the disqualification of several of the invoked instances of State practice (*North Sea Continental Shelf* (see footnote 645 above), p. 43, para. 76).

[722] See, for example, *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Croatia v. Serbia)* (footnote 637 above), pp. 46–47, para. 87.

[723] In the 1948 Convention on the Prevention and Punishment of the Crime of Genocide, for example, the parties "*confirm\** that genocide, whether committed in time of peace or in time of war, is a crime under international law" (art. I); and the 1958 Geneva Convention on the High Seas contains the following preambular paragraph: "*Desiring* to codify the rules of international law relating to the high seas". A treaty may equally indicate that it embodies progressive development rather than codification; in the *Colombian-Peruvian asylum case*, for example, the International Court of Justice found that the preamble to the 1933 Montevideo Convention on Political Asylum, which states that it modifies a previous convention (and the limited number of States that have ratified it), runs counter to the argument that the Convention "merely codified principles which were already recognized by … custom" (*Colombian-Peruvian asylum case* (see footnote 648 above), p. 277).

[724] See also the Guide to Practice on Reservations to Treaties, adopted by the Commission at its sixty-third session, guidelines 3.1.5.3 (Reservations to a provision reflecting a customary rule) and 4.4.2 (Absence of effect on rights and obligations under customary international law), *Yearbook … 2011*, vol. II (Part Two), chap. IV, para. 75, and *ibid.*, vol. II (Part Three) and Corr.1–2; the text of the guidelines constituting the Guide to Practice appears in the annex to General Assembly resolution 68/111 of 16 December 2013.

[725] The 1930 Convention on Certain Questions relating to the Conflict of Nationality Laws, for example, provides that: "The inclusion of the above-mentioned principles and rules in the Convention shall in no way be deemed to prejudice the question whether they do or do not already form part of international law" (art. 18). Sometimes a general reference is made to both codification and development: in the 1969 Vienna Convention, for example, the States parties express in the preamble their belief that "codification and progressive development of the law of treaties [are] achieved in the present Convention"; in the 2004 United Nations Convention on Jurisdictional Immunities of States

and Their Property, the States parties consider in the preamble "that the jurisdictional immunities of States and their property are generally accepted as a principle of customary international law" and express their belief that the Convention "would contribute to the codification and development of international law and the harmonization of practice in this area". See also *Benkharbouche v. Secretary of State for Foreign and Commonwealth Affairs* and *Secretary of State for Foreign and Commonwealth Affairs and Libya v. Janah*, United Kingdom Supreme Court [2017] UKSC 62 (18 October 2017), para. 32.

[726] In examining in the *North Sea Continental Shelf* cases whether article 6 of the 1958 Convention on the Continental Shelf reflected customary international law when the Convention was drawn up, the International Court of Justice held that "[t]he status of the rule in the Convention therefore depends mainly on the processes that led the [International Law] Commission to propose it. These processes have already been reviewed in connection with the Danish-Netherlands contention of an *a priori* necessity for equidistance [in maritime delimitation], and the Court considers this review sufficient for present purposes also, in order to show that the principle of equidistance, as it now figures in Article 6 of the Convention, was proposed by the Commission with considerable hesitation, somewhat on an experimental basis, at most *de lege ferenda*, and not at all *de lege lata* or as an emerging rule of customary international law. This is clearly not the sort of foundation on which Article 6 of the Convention could be said to have reflected or crystallized such a rule" (*North Sea Continental Shelf* (see footnote 645 above), p. 38, para. 62). See also *Jurisdictional Immunities of the State* (footnote 646 above), pp. 138–139, para. 89.

[727] Even where a treaty provision could not eventually be agreed, it remains possible that customary international law has later evolved "through the practice of States on the basis of the debates and near-agreements at the Conference [where a treaty was negotiated]" (*Fisheries Jurisdiction (Federal Republic of Germany v. Iceland)*, Merits, Judgment, *I.C.J. Reports 1974*, p. 175, at pp. 191–192, para. 44).

[728] See, for example, *Continental Shelf (Libyan Arab Jamahiriya/Malta)* (footnote 646 above), p. 33, para. 34: "It is in the Court's view incontestable that … the institution of the exclusive economic zone,

(7)   Subparagraph (*c*) concerns the case where it is established that a rule set forth in a treaty has generated a new rule of customary international law.[729] This is a process that is not lightly to be regarded as having occurred. As the International Court of Justice explained in the *North Sea Continental Shelf* cases, for it to be established that a rule set forth in a treaty has produced the effect that a rule of customary international law has come into being:

[i]t would in the first place be necessary that the provision concerned should, at all events potentially, be of a fundamentally norm-creating character such as could be regarded as forming the basis of a general rule of law. ... [A]n indispensable requirement would be that within the period in question, short though it might be, State practice, including that of States whose interests are specially affected, should have been both extensive and virtually uniform in the sense of the provision invoked;—and should moreover have occurred in such a way as to show a general recognition that a rule of law or legal obligation is involved.[730]

In other words, a general practice accepted as law (accompanied by *opinio juris*) "in the sense of the provision invoked" must be observed. Given that the concordant behaviour of parties to the treaty among themselves could presumably be attributed to the treaty obligation, rather than to acceptance of the rule in question as binding under customary international law, the practice of such parties in relation to non-parties to the treaty, and of non-parties in relation to parties or among themselves, will have particular value.

(8)   Paragraph 2 seeks to caution that the existence of similar provisions in a number of bilateral or other treaties, thus establishing similar rights and obligations for a possibly broad array of States, does not necessarily indicate that a rule of customary international law is reflected in such provisions. While it may indeed be the case that such repetition attests to the existence of a corresponding rule of customary international law (or has given rise to it), it "could equally show the contrary" in the sense that States enter into treaties because of the absence of any rule or in order to derogate from an existing but different rule of customary international law.[731] Again, an investigation

into whether there are instances of practice accepted as law (accompanied by *opinio juris*) that support the written rule is required.

## Conclusion 12.   Resolutions of international organizations and intergovernmental conferences

1.   **A resolution adopted by an international organization or at an intergovernmental conference cannot, of itself, create a rule of customary international law.**

2.   **A resolution adopted by an international organization or at an intergovernmental conference may provide evidence for determining the existence and content of a rule of customary international law, or contribute to its development.**

3.   **A provision in a resolution adopted by an international organization or at an intergovernmental conference may reflect a rule of customary international law if it is established that the provision corresponds to a general practice that is accepted as law (*opinio juris*).**

### Commentary

(1)   Draft conclusion 12 concerns the role that resolutions adopted by international organizations or at intergovernmental conferences may play in the determination of rules of customary international law. It provides that, while such resolutions, of themselves, can neither constitute rules of customary international law nor serve as conclusive evidence of their existence and content, they may have value in providing evidence of existing or emerging law and may contribute to the development of a rule of customary international law.[732]

(2)   As in draft conclusion 6, the word "resolution" refers to resolutions, decisions and other acts adopted by international organizations or at intergovernmental conferences, whatever their designation[733] and whether or not they are legally binding. Special attention should be paid in the present context to resolutions of the General Assembly, a plenary organ of the United Nations with virtually universal participation, that may offer important evidence of the collective opinion of its Members. Resolutions adopted by organs (or at conferences) with more limited membership may also be relevant, but their weight in identifying a rule of customary international law is likely to be less.

---

with its rule on entitlement by reason of distance, is shown *by the practice of States*\* to have become a part of customary law".

[729] As the International Court of Justice confirmed, "this process is a perfectly possible one and does from time to time occur: it constitutes indeed one of the recognized methods by which new rules of customary international law may be formed" (*North Sea Continental Shelf* (see footnote 645 above), p. 41, para. 71). One example frequently cited is the Hague Regulations annexed to the 1907 Fourth Hague Convention respecting the Laws and Customs of War on Land: although these were prepared, according to the Convention, "to revise the general laws and customs of war" existing at that time (and thus did not codify existing customary international law), they later came to be regarded as reflecting customary international law (see *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, Advisory Opinion, *I.C.J. Reports 2004*, p. 136, at p. 172, para. 89).

[730] *North Sea Continental Shelf* (see footnote 645 above), pp. 41–43, paras. 72 and 74 (cautioning, at para. 71, that "this result is not lightly to be regarded as having been attained"). See also *Military and Paramilitary Activities in and against Nicaragua* (footnote 637 above), p. 98, para. 184: "Where two States agree to incorporate a particular rule in a treaty, their agreement suffices to make that rule a legal one, binding upon them; but in the field of customary international law, the shared view of the Parties as to the content of what they regard as the rule is not enough. The Court must satisfy itself that the existence of the rule in the *opinio juris* of States is confirmed by practice."

[731] See *Ahmadou Sadio Diallo (Republic of Guinea v. Democratic Republic of the Congo)*, Preliminary Objections, Judgment [of 24 May

2007], *I.C.J. Reports 2007*, p. 582, at p. 615, para. 90: "The fact invoked by Guinea that various international agreements, such as agreements for the promotion and protection of foreign investments and the Washington Convention [on the Settlement of Investment Disputes between States and Nationals of Other States], have established special legal régimes governing investment protection, or that provisions in this regard are commonly included in contracts entered into directly between States and foreign investors, is not sufficient to show that there has been a change in the customary rules of diplomatic protection; it could equally show the contrary."

[732] See *Legality of the Threat or Use of Nuclear Weapons* (footnote 649 above), pp. 254–255, para 70; *SEDCO Inc. v. National Iranian Oil Company and the Islamic Republic of Iran*, second interlocutory award, Award No. ITL 59-129-3 of 27 March 1986, ILR, vol. 84, pp. 483–592, at p. 526.

[733] There is a wide range of designations, such as "declaration" or "declaration of principles".

(3)  Although resolutions of organs of international organizations (unlike resolutions of intergovernmental conferences) emanate, strictly speaking, not from the member States but from the organization, in the context of the present draft conclusion what is relevant is that they may reflect the collective expression of the views of such States: when they purport (explicitly or implicitly) to touch upon legal matters, the resolutions may afford an insight into the attitudes of the member States towards such matters. Much of what has been said of treaties in relation to draft conclusion 11 applies to resolutions; however, unlike treaties, resolutions are normally not legally binding documents, and generally receive less legal review than treaty texts. Like treaties, resolutions cannot be a substitute for the task of ascertaining whether there is in fact a general practice that is accepted as law (accompanied by *opinio juris*).

(4)  Paragraph 1 makes clear that resolutions adopted by international organizations or at intergovernmental conferences cannot independently constitute rules of customary international law. In other words, the mere adoption of a resolution (or a series of resolutions) purporting to lay down a rule of customary international law does not create such law: it has to be established that the rule set forth in the resolution does in fact correspond to a general practice that is accepted as law (accompanied by *opinio juris*). There is no "instant custom" arising from such resolutions on their own account.[734]

(5)  Paragraph 2 states, first, that resolutions may nevertheless assist in the determination of rules of customary international law by providing evidence of their existence and content. The word "may" seeks to caution that not all resolutions serve such a role. As the International Court of Justice has observed, resolutions "even if they are not binding … can, in certain circumstances, provide evidence important for establishing the existence of a rule or the emergence of an *opinio juris*".[735] This is particularly so when a resolution purports to be declaratory of an existing rule of customary international law, in which case it may serve as evidence of the acceptance as law of such a rule by those States supporting the resolution. In other words, "[t]he effect of consent to the text of such resolutions … may be understood as an acceptance of the validity of the rule or set of rules declared by the resolution".[736] Conversely, negative votes, abstentions or disassociations from a consensus, along with general statements and explanations of positions, may be evidence that there is no acceptance as law.

(6)  Because the attitude of States towards a given resolution (or a particular rule set forth in a resolution), expressed by vote or otherwise, is often motivated by political or other non-legal considerations, ascertaining acceptance as law (*opinio juris*) from such resolutions

must be done "with all due caution".[737] This is denoted by the word "may". In each case, a careful assessment of various factors is required in order to verify whether indeed the States concerned intended to acknowledge the existence of a rule of customary international law. As the International Court of Justice indicated in *Legality of the Threat or Use of Nuclear Weapons*:

it is necessary to look at [the resolution's] content and the conditions of its adoption; it is also necessary to see whether an *opinio juris* exists as to its normative character. Or a series of resolutions may show the gradual evolution of the *opinio juris* required for the establishment of a new rule.[738]

The precise wording used is the starting point in seeking to evaluate the legal significance of a resolution; reference to international law, and the choice (or avoidance) of particular terms in the text, including the preambular as well as the operative language, may be significant.[739] Also relevant are the debates and negotiations leading up to the adoption of the resolution and especially explanations of vote and similar statements given immediately before or after adoption.[740] The degree of support for the resolution (as may be observed in the size of the majority and where there are negative votes or abstentions) is critical. Differences of opinion expressed on aspects of a resolution may indicate that no general acceptance as law (*opinio juris*) exists, at least on those aspects, and resolutions which attract negative votes or abstentions are unlikely to be regarded as reflecting customary international law.[741]

(7)  Paragraph 2 further acknowledges that resolutions adopted by international organizations or at intergovernmental conferences, even when devoid of legal force of their own, may sometimes play an important role in the development of customary international law. This may be the case when, as with a treaty, a resolution (or a series of resolutions) provides inspiration and impetus for the growth of a general practice accepted as law (accompanied by *opinio juris*) conforming to its terms, or when it crystallizes an emerging rule.

(8)  Paragraph 3 makes it clear that provisions of resolutions adopted by an international organization or at an intergovernmental conference cannot in and of themselves serve as conclusive evidence of the existence and content of rules of customary international law. This follows from the indication that, for the existence of a rule to be demonstrated, the *opinio juris* of States, as may be evidenced by a resolution, must be borne out by practice;

---

[734] See also para. (9) of the commentary to draft conclusion 8, above.

[735] *Legality of the Threat or Use of Nuclear Weapons* (see footnote 649 above), pp. 254–255, para. 70 (referring to General Assembly resolutions).

[736] *Military and Paramilitary Activities in and against Nicaragua* (see footnote 637 above), p. 100, para. 188. See also *The Government of the State of Kuwait v. The American Independent Oil Company (AMINOIL)*, Final Award of 24 March 1982, ILR, vol. 66, pp. 518–627, at pp. 601–602, para. 143.

[737] *Military and Paramilitary Activities in and against Nicaragua* (see footnote 637 above), p. 99, para. 188.

[738] *Legality of the Threat or Use of Nuclear Weapons* (see footnote 649 above), p. 255, para. 70.

[739] In resolution 96 (I) of 11 December 1946, for example, the General Assembly "[a]ffirm[ed] that genocide is a crime under international law", language that suggests that the paragraph was intended to be declaratory of existing customary international law.

[740] In the General Assembly, explanations of vote are often given upon adoption by a Main Committee, in which case they are not usually repeated in plenary.

[741] See, for example, *Legality of the Threat or Use of Nuclear Weapons* (footnote 649 above), p. 255, para. 71: "several of the resolutions under consideration in the present case have been adopted with substantial numbers of negative votes and abstentions; thus, although those resolutions are a clear sign of deep concern regarding the problem of nuclear weapons, they still fall short of establishing the existence of an *opinio juris* on the illegality of the use of such weapons".

other evidence is thus required, in particular to show whether the alleged rule is in fact observed in the practice of States.[742] A provision of a resolution cannot be evidence of a rule of customary international law if practice is absent, different or inconsistent.

### Conclusion 13.    Decisions of courts and tribunals

**1.   Decisions of international courts and tribunals, in particular of the International Court of Justice, concerning the existence and content of rules of customary international law are a subsidiary means for the determination of such rules.**

**2.   Regard may be had, as appropriate, to decisions of national courts concerning the existence and content of rules of customary international law, as a subsidiary means for the determination of such rules.**

#### Commentary

(1)   Draft conclusion 13 concerns the role of decisions of courts and tribunals, both international and national, as an aid in the identification of rules of customary international law. It should be recalled that decisions of national courts may serve a dual role in the identification of customary international law. On the one hand, as draft conclusions 6 and 10 indicate, they may serve as practice as well as evidence of acceptance as law (*opinio juris*) of the forum State. Draft conclusion 13, on the other hand, indicates that such decisions may also serve as a subsidiary means (*moyen auxiliaire*) for the determination of rules of customary international law when they themselves examine the existence and content of such rules.

(2)   Draft conclusion 13 follows closely the language of Article 38, paragraph 1 (*d*), of the Statute of the International Court of Justice, according to which, while decisions of the Court have no binding force except between the parties, judicial decisions are a subsidiary means for the determination of rules of international law, including rules of customary international law. The term "subsidiary means" denotes the ancillary role of such decisions in elucidating the law, rather than being themselves a source of international law (as are treaties, customary international law and general principles of law). The use of the term "subsidiary means" does not, and is not intended to, suggest that such decisions are not important for the identification of customary international law.

(3)   Decisions of courts and tribunals on questions of international law, in particular those decisions in which the existence of rules of customary international law is considered and such rules are identified and applied, may offer valuable guidance for determining the existence or otherwise of rules of customary international law. The value of such decisions varies greatly, however, depending both on the quality of the reasoning (including primarily the extent to which it results from a thorough examination of evidence of an alleged general practice accepted as law) and on the reception of the decision, in particular by States and in subsequent case law. Other considerations might, depending on the circumstances, include the nature of the court or tribunal; the size of the majority by which the decision was adopted; and the rules and the procedures applied by the court or tribunal. It needs to be borne in mind, moreover, that judicial pronouncements on customary international law do not freeze the law; rules of customary international law may have evolved since the date of a particular decision.

(4)   Paragraph 1 refers to "international courts and tribunals", a term intended to cover any international body exercising judicial powers that is called upon to consider rules of customary international law. Express mention is made of the International Court of Justice, the principal judicial organ of the United Nations, whose Statute is an integral part of the Charter of the United Nations and whose members are elected by the General Assembly and Security Council, in recognition of the significance of its case law and its particular position as the only standing international court of general jurisdiction.[743] In addition to the predecessor of the International Court of Justice, the Permanent Court of International Justice, the term "international courts and tribunals" includes (but is not limited to) specialist and regional courts, such as the International Tribunal for the Law of the Sea, the International Criminal Court and other international criminal tribunals, regional human rights courts and the World Trade Organization (WTO) Dispute Settlement Body. It also includes inter-State arbitral tribunals and other arbitral tribunals applying international law. The skills and the breadth of evidence usually at the disposal of international courts and tribunals may lend significant weight to their decisions, subject to the considerations mentioned in the preceding paragraph.

(5)   For the purposes of this draft conclusion, the term "decisions" includes judgments and advisory opinions, as well as orders on procedural and interlocutory matters. Separate and dissenting opinions may shed light on the decision and may discuss points not covered in the decision of the court or tribunal, but they need to be approached with caution since they reflect the viewpoint of the individual judge and may set out points not accepted by the court or tribunal.

(6)   Paragraph 2 concerns decisions of national courts (also referred to as domestic or municipal courts).[744] The distinction between international and national courts is not

---

[742] See, for example, *KAING Guek Eav alias Duch*, Case No. 001/18-07-2007-ECCC/SC, Appeal Judgment, Extraordinary Chambers in the Courts of Cambodia, Supreme Court Chamber (3 February 2012), para. 194: "The 1975 Declaration on Torture [resolution 3452 (XXX) of 9 December 1975, Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment] is a non-binding General Assembly resolution and thus more evidence is required to find that the definition of torture found therein reflected customary international law at the relevant time."

[743] Although there is no hierarchy of international courts and tribunals, decisions of the International Court of Justice are often regarded as authoritative by other courts and tribunals. See, for example, *Jones and Others v. the United Kingdom*, nos. 34356/06 and 40528/06, European Court of Human Rights, ECHR 2014, para. 198; *M/V "SAIGA" (No. 2) (Saint Vincent and the Grenadines v. Guinea)*, Judgment, *ITLOS Reports 1999*, p. 10, paras. 133–134; and WTO, Appellate Body Report, *Japan—Taxes on Alcoholic Beverages*, WT/DS8/AB/R, WT/DS10/AB/R and WT/DS11/AB/R, adopted on 1 November 1996, sect. D.

[744] On decisions of national courts as a subsidiary means for the determination of rules of customary international law see, for example, *Mohammed and others v. Ministry of Defence*, United Kingdom, Supreme Court [2017] UKSC 2 (17 January 2017), paras. 149–151 (Lord Mance).

always clear-cut; in these draft conclusions, the term "national courts" includes courts with an international composition operating within one or more domestic legal systems, such as "hybrid" courts and tribunals involving mixed national and international composition and jurisdiction.

(7)   Some caution is called for when seeking to rely on decisions of national courts as a subsidiary means for the determination of rules of customary international law.[745] This is reflected in the different wording of paragraphs 1 and 2, in particular the use of the words "[r]egard may be had, as appropriate" in paragraph 2. National courts operate within a particular legal system, which may incorporate international law only in a particular way and to a limited extent. Their decisions may reflect a particular national perspective. Unlike most international courts, national courts may sometimes lack international law expertise and may have reached their decisions without the benefit of hearing argument advanced by States.[746]

### Conclusion 14.   Teachings

**Teachings of the most highly qualified publicists of the various nations may serve as a subsidiary means for the determination of rules of customary international law.**

#### Commentary

(1)   Draft conclusion 14 concerns the role of teachings (in French, *doctrine*) in the identification of rules of customary international law. Following closely the language of Article 38, paragraph 1 (*d*), of the Statute of the International Court of Justice, it provides that such works may be resorted to as a subsidiary means (*moyen auxiliaire*) for determining rules of customary international law, that is to say, when ascertaining whether there is a general practice that is accepted as law (accompanied by *opinio juris*). The term "teachings", often referred to as "writings", is to be understood in a broad sense; it includes teachings in non-written form, such as lectures and audiovisual materials.

(2)   As with decisions of courts and tribunals, referred to in draft conclusion 13, writings are not themselves a source of international law, but may offer guidance for the determination of the existence and content of rules of customary international law. This auxiliary role recognizes the value that teachings may have in collecting and assessing State practice; in identifying divergences in State practice and the possible absence or development of rules; and in evaluating the law.

(3)   There is need for caution when drawing upon writings, since their value for determining the existence of a rule of customary international law varies: this is reflected in the words "may serve as". First, writers sometimes seek not merely to record the state of the law as it is (*lex lata*) but to advocate its development (*lex ferenda*). In doing so, they do not always distinguish (or distinguish clearly) between the law as it is and the law as they would like it to be. Second, writings may reflect the national or other individual viewpoints of their authors. Third, they differ greatly in quality. Assessing the authority of a given work is thus essential; the United States Supreme Court in the *Paquete Habana Case* referred to:

the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is.[747]

(4)   The term "publicists", which comes from the Statute of the International Court of Justice, covers all those whose writings may elucidate questions of international law. While most such writers will, in the nature of things, be specialists in public international law, others are not excluded. The reference to "the most highly qualified" publicists emphasizes that attention ought to be paid to the writings of those who are eminent in the field. In the final analysis, however, it is the quality of the particular writing that matters rather than the reputation of the author; among the factors to be considered in this regard are the approach adopted by the author to the identification of customary international law and the extent to which his or her text remains loyal to it. The reference to publicists "of the various nations" highlights the importance of having regard, so far as possible, to writings representative of the principal legal systems and regions of the world and in various languages when identifying customary international law.

(5)   The output of international bodies engaged in the codification and development of international law may provide a useful resource in this regard.[748] Such collective bodies include the Institute of International Law (*Institut de droit international*) and the International Law Association, as well as international expert bodies in particular fields and from different regions. The value of each output needs to be carefully assessed in the light of the mandate and expertise of the body concerned, the extent to which the output seeks to state existing law, the care and objectivity with which it works on a particular issue, the support a particular output enjoys within the body, and the reception of the output by States and others.

### Part Six

### PERSISTENT OBJECTOR

Part Six comprises a single draft conclusion, on the persistent objector rule.

### Conclusion 15.   Persistent objector

**1.   Where a State has objected to a rule of customary international law while that rule was in the process of formation, the rule is not opposable to the State concerned for so long as it maintains its objection.**

---

[745] See also *Minister of Justice and Constitutional Development v. Southern African Litigation Centre and others*, Supreme Court of Appeal of South Africa (2016) 3 SA 317 (SCA) (15 March 2016), para. 74.

[746] See also "Ways and means for making the evidence of customary international law more readily available" (A/1316) (footnote 677 above), p. 370, para. 53.

[747] *The Paquete Habana and The Lola*, United States, Supreme Court, 175 U.S. 677 (1900), p. 700. See also *The Case of the S.S. "Lotus"* (footnote 661 above), pp. 26 and 31.

[748] The special consideration to be given to the output of the International Law Commission is described in para. (2) of the general commentary to the present Part (Part Five) above.

**2. The objection must be clearly expressed, made known to other States, and maintained persistently.**

**3. The present draft conclusion is without prejudice to any question concerning peremptory norms of general international law (*jus cogens*).**

*Commentary*

(1) Rules of customary international law, "by their very nature, must have equal force for all members of the international community, and cannot therefore be the subject of any right of unilateral exclusion exercisable at will by any one of them in its own favour".[749] Nevertheless, when a State has persistently objected to an *emerging* rule of customary international law, and maintains its objection after the rule has crystallized, that rule is not opposable to it. This is sometimes referred to as the persistent objector "rule" or "doctrine" and not infrequently arises in connection with the identification of rules of customary international law. As the draft conclusion seeks to convey, the invocation of the persistent objector rule is subject to stringent requirements.

(2) The persistent objector is to be distinguished from a situation where the objection of a significant number of States to the emergence of a new rule of customary international law prevents its crystallization altogether (because there is no general practice accepted as law).[750]

(3) A State objecting to an emerging rule of customary international law by arguing against it or engaging in an alternative practice may adopt one or both of two stances: it may seek to prevent the rule from coming into being; or it may aim to ensure that, if it does emerge, the rule will not be opposable to it. An example would be the opposition of certain States to the then-emerging rule permitting the establishment of a maximum 12-mile territorial sea. Such States may have wished to consolidate a three-, four- or six-mile territorial sea as a general rule, but in any event were not prepared to have wider territorial seas enforced against them.[751] If a rule of customary international law is found to have emerged, it will be for the State concerned to establish the right to benefit from persistent objector status.

(4) The persistent objector rule is not infrequently invoked and recognized, both in international and

domestic case law[752] and in other contexts.[753] While there are differing views, the persistent objector rule is widely accepted by States and writers as well as by scientific bodies engaged in international law.[754]

(5) Paragraph 1 makes it clear that the objection must have been made while the rule in question was in the process of formation. The timeliness of the objection is critical: the State must express its opposition before a given practice has crystallized into a rule of customary international law, and its position will be best assured if it did so at the earliest possible moment. While the line between objection and violation may not always be an easy one to draw, there is no such thing as a subsequent objector rule: once the rule has come into being, an objection will not avail a State wishing to exempt itself.

(6) If a State establishes itself as a persistent objector, the rule is not opposable to it for so long as it maintains the objection; the expression "not opposable" is used in order to reflect the exceptional position of the persistent objector. As the paragraph further indicates, once an objection is abandoned (as it may be at any time, expressly or otherwise), the State in question becomes bound by the rule.

(7) Paragraph 2 clarifies the stringent requirements that must be met for a State to establish and maintain persistent objector status *vis-à-vis* a rule of customary international law. In addition to being made before the practice crystallizes into a rule of law, the objection must be clearly expressed, meaning that non-acceptance of the emerging rule or the intention not to be bound by it must be unambiguous.[755] There is, however, no requirement that

---

[749] *North Sea Continental Shelf* (see footnote 645 above), pp. 38–39, para. 63. This is true of rules of "general" customary international law, as opposed to "particular" customary international law (on which see draft conclusion 16, below).

[750] See, for example, *Entscheidungen des Bundesverfassungsgerichts* (German Federal Constitutional Court), vol. 46 (1978), Judgment of 13 December 1977, 2 BvM 1/76, No. 32, pp. 34–404, at pp. 388–389, para. 6: "This concerns not merely action that a State can successfully uphold from the outset against application of an existing general rule of international law by way of perseverant protestation of rights (in the sense of the ruling of the International Court of Justice in the Norwegian *Fisheries case* …); instead, the existence of a corresponding general rule of international law cannot at present be assumed."

[751] In due course, and as part of an overall package on the law of the sea, States did not in fact maintain their objections. While the ability effectively to preserve a persistent objector status over time may sometimes prove difficult, this does not call into question the existence of the rule reflected in draft conclusion 15.

[752] See, for example, the *Fisheries case* (footnote 682 above), p. 131; *Michael Domingues v. United States*, Case No. 12.285 (2002), Inter-American Commission on Human Rights, report No. 62/02, paras. 48–49; *Sabeh El Leil v. France* [GC], no. 34869/05, European Court of Human Rights, 29 June 2011, para. 54; WTO, Panel Reports, *European Communities—Measures Affecting the Approval and Marketing of Biotech Products*, WT/DS291/R, WT/DS292/R and WT/DS293/R [and Corr.1 and Add.1–9], adopted 21 November 2006, p. 335, footnote 248; and *Siderman de Blake v. Republic of Argentina*, United States Court of Appeals for the Ninth Circuit, 965 F.2d 699, p. 715, para. 54.

[753] See, for example, the intervention by Turkey in 1982 at the Third United Nations Conference on the Law of the Sea, *Official Records of the Third United Nations Conference on the Law of the Sea, Volume XVII (Plenary Meetings, Summary Records and Verbatim Records, as well as Documents of the Conference, Resumed Eleventh Session and Final Part Eleventh Session and Conclusion)* (United Nations publication, Sales No. E.84.V.3), 189th meeting (A/CONF.62/SR.189), p. 76, para. 150 (available from https://legal.un.org/diplomaticconferences/1973_los/vol17.shtml); and United States Department of Defense, *Law of War Manual*, Office of General Counsel, Washington, D.C., December 2016, pp. 29–34, sect. 1.8 (Customary international law), in particular p. 30, para. 1.8 ("Customary international law is generally binding on all States, but States that have been persistent objectors to a customary international law rule during its development are not bound by that rule") and p. 34, para. 1.8.4.

[754] The Commission itself recently referred to the rule in its Guide to Practice on Reservations to Treaties, where it stated that "a reservation may be the means by which a 'persistent objector' manifests the persistence of its objection; the objector may certainly reject the application, through a treaty, of a rule which cannot be invoked against it under general international law" (see para. (7) of the commentary to guideline 3.1.5.3, *Yearbook … 2011*, vol. II (Part Three) and Corr.1–2, p. 222).

[755] See, for example, *C v. Director of Immigration and another*, Hong Kong Court of Appeal [2011] HKCA 159, CACV 132/2008 (2011), para. 68 ("Evidence of objection must be clear").

the objection be made in a particular form. A clear verbal objection, in either written or oral form, as opposed to physical action, will suffice to preserve the legal position of the objecting State.

(8)   The requirement that the objection be made known to other States means that the objection must be communicated internationally; it cannot simply be voiced internally. It is for the objecting State to ensure that the objection is indeed made known to other States.

(9)   The requirement that the objection be maintained persistently applies both before and after the rule of customary international law has emerged. Assessing whether this requirement has been met needs to be done in a pragmatic manner, bearing in mind the circumstances of each case. The requirement signifies, first, that the objection should be reiterated when the circumstances are such that a restatement is called for (that is, in circumstances where silence or inaction may reasonably lead to the conclusion that the State has given up its objection). It is clear, however, that States cannot be expected to react on every occasion, especially where their position is already well known. Second, such repeated objections must be consistent overall, that is, without significant contradictions.

(10)   Paragraph 3 provides expressly that draft conclusion 15 is without prejudice to any question concerning peremptory norms of general international law (*jus cogens*). The commentary to draft conclusion 1 already makes clear that all of the present draft conclusions are without prejudice to questions of hierarchy among rules of international law, including those concerning peremptory norms of general international law (*jus cogens*), or questions concerning the *erga omnes* nature of certain obligations.[756]

## Part Seven

## PARTICULAR CUSTOMARY INTERNATIONAL LAW

Part Seven consists of a single draft conclusion, dealing with particular customary international law (sometimes referred to as "regional custom" or "special custom"). While rules of general customary international law are binding on all States, rules of particular customary international law apply among a limited number of States. Even though they are not frequently encountered, they can play a significant role in inter-State relations, accommodating differing interests and values peculiar to only some States.[757]

### Conclusion 16.   Particular customary international law

1.   A rule of particular customary international law, whether regional, local or other, is a rule of customary international law that applies only among a limited number of States.

2.   To determine the existence and content of a rule of particular customary international law, it is necessary to ascertain whether there is a general practice among the States concerned that is accepted by them as law (*opinio juris*) among themselves.

*Commentary*

(1)   That rules of customary international law that are not general in nature may exist is undisputed. The case law of the International Court of Justice confirms this, having referred, *inter alia*, to customary international law "particular to the inter-American legal system"[758] or "limited in its impact to the African continent as it had previously been to Spanish America",[759] "a local custom",[760] and customary international law "of a regional nature".[761] Cases where the identification of such rules was considered include the *Asylum* case[762] and the *Right of Passage over Indian Territory* case.[763] The term "particular customary international law" refers to these rules in contrast to rules of customary international law of general application. It is used in preference to "particular custom" to emphasize that the draft conclusion is concerned with rules of law, not mere customs or usages; there may well be "local customs" among States that do not amount to rules of international law.[764]

(2)   Draft conclusion 16 has been placed at the end of the set of draft conclusions since the preceding draft conclusions generally apply also in respect of the determination of rules of particular customary international law, except as otherwise provided in the present draft conclusion. In particular, the two-element approach applies, as described in the present commentary.[765]

(3)   Paragraph 1, which is definitional in nature, explains that particular customary international law applies only among a limited number of States. It is to be distinguished from general customary international law, that is, customary international law that in principle applies to all States. A rule of particular customary international law itself thus creates neither obligations nor rights for third States.[766]

(4)   Rules of particular customary international law may apply among various types of groupings of States. Reference is often made to customary rules of a regional nature, such as those "peculiar to Latin-American States" (the institution of diplomatic asylum commonly being

---

[756] See para. (5) of the commentary to draft conclusion 1, above.

[757] It is not to be excluded that such rules may evolve, over time, into rules of general customary international law.

[758] *Military and Paramilitary Activities in and against Nicaragua* (see footnote 637 above), p. 105, para. 199.

[759] *Frontier Dispute (Burkina Faso/Republic of Mali)*, Judgment, *I.C.J. Reports 1986*, p. 554, at p. 565, para. 21.

[760] *Case concerning rights of nationals of the United States of America in Morocco* (see footnote 659 above), p. 200; and *Right of Passage over Indian Territory* (see footnote 649 above), p. 39.

[761] *Dispute regarding Navigational and Related Rights* (see footnote 657 above), p. 233, para. 34.

[762] *Colombian-Peruvian asylum case* (see footnote 648 above).

[763] *Right of Passage over Indian Territory* (see footnote 649 above).

[764] See also draft conclusion 9, paragraph 2, above.

[765] The International Court of Justice has treated particular customary international law as falling within Article 38, paragraph 1 (*b*), of its Statute: see *Colombian-Peruvian asylum case* (footnote 648 above), pp. 276–277.

[766] The position is similar to that set out in the provisions of the 1969 Vienna Convention concerning treaties and third States (part III, sect. 4).

cited).[767] Particular customary international law may cover a smaller geographical area, such as a subregion, or even bind as few as two States. In the *Right of Passage over Indian Territory* case the International Court of Justice explained that:

> It is difficult to see why the number of States between which a local custom may be established on the basis of long practice must necessarily be larger than two. The Court sees no reason why long continued practice between two States accepted by them as regulating their relations should not form the basis of mutual rights and obligations between the two States.[768]

Cases in which assertions of such rules of particular customary international law have been examined have concerned, for example, a right of access to enclaves in foreign territory;[769] a co-ownership (condominium) of historic waters by three coastal States;[770] a right to subsistence fishing by nationals inhabiting a river bank serving as a border between two riparian States;[771] a right of cross-border/international transit free from immigration formalities;[772] and an obligation to reach agreement in administering the generation of power on a river constituting a border between two States.[773]

(5)   While some geographical relationship usually exists between the States among which a rule of particular

---

[767] *Colombian-Peruvian asylum case* (see footnote 648 above), p. 276.

[768] *Right of Passage over Indian Territory* (see footnote 649 above), p. 39.

[769] *Ibid.*, p. 6.

[770] See the claim by Honduras in *Land, Island and Maritime Frontier Dispute (El Salvador/Honduras: Nicaragua intervening)*, Judgment of 11 September 1992, *I.C.J. Reports 1992*, p. 351, at p. 597, para. 399.

[771] *Dispute regarding Navigational and Related Rights* (see footnote 657 above), pp. 265–266, paras. 140–144; see also the separate opinion of Judge Sepúlveda-Amor, pp. 278–282, paras. 20–36.

[772] *Nkondo v. Minister of Police and Another*, South African Supreme Court, 1980 (2) SA 894 (O), 7 March 1980, ILR, vol. 82, pp. 358–375, at pp. 368–375 (Judge Smuts holding that: "There was no evidence of long standing practice between the Republic of South Africa and Lesotho which had crystallized into a local customary right of transit free from immigration formalities" (p. 359)).

[773] *Kraftwerk Reckingen AG v. Canton of Zurich and others*, Appeal Judgment, BGE, vol. 129 II 114, 10 October 2002, Switzerland, Federal Supreme Court [BGer]; Public Law Chamber II, para. 4.

customary international law applies, that may not necessarily be the case. The expression "whether regional, local or other" is intended to acknowledge that although particular customary international law is mostly regional, subregional or local, there is no reason in principle why a rule of particular customary international law could not also develop among States linked by a common cause, interest or activity other than their geographical position, or constituting a community of interest, whether established by treaty or otherwise.

(6)   Paragraph 2 addresses the substantive requirements for identifying a rule of particular customary international law. In essence, determining whether such a rule exists consists of a search for a general practice prevailing among the States concerned that is accepted by them as governing their relations *inter se*. The International Court of Justice in the *Asylum* case provided guidance on this matter, holding with respect to the argument by Colombia as to the existence of a "regional or local custom peculiar to Latin-American States" that:

> The Party which relies on a custom of this kind must prove that this custom is established in such a manner that it has become binding on the other Party. The Colombian Government must prove that the rule invoked by it is in accordance with a constant and uniform usage practised by the States in question, and that this usage is the expression of a right appertaining to the State granting asylum and a duty incumbent on the territorial State. This follows from Article 38 of the Statute of the Court, which refers to international custom "as evidence of a general practice accepted as law".[774]

(7)   The two-element approach requiring both a general practice and its acceptance as law (*opinio juris*) thus also applies in the case of identifying rules of particular customary international law, however, the practice must be general in the sense that it is a consistent practice "among the States concerned", that is, all the States among which the rule in question applies. Each of these States must have accepted the practice as law among themselves. In this respect, the application of the two-element approach is stricter in the case of rules of particular customary international law.

---

[774] *Colombian-Peruvian asylum case* (see footnote 648 above), pp. 276–277.

# Chapter VI

# PROTECTION OF THE ATMOSPHERE

## A. Introduction

67. At its sixty-fifth session (2013), the Commission decided to include the topic "Protection of the atmosphere" in its programme of work, subject to an understanding, and appointed Mr. Shinya Murase as Special Rapporteur.[775]

68. The Commission received and considered the first report of the Special Rapporteur at its sixty-sixth session (2014); the second report at its sixty-seventh session (2015); the third report at its sixty-eighth session (2016); and the fourth report at its sixty-ninth session (2017).[776] On the basis of the draft guidelines proposed by the Special Rapporteur in the second, third and fourth reports, the Commission provisionally adopted nine draft guidelines and eight preambular paragraphs, together with commentaries thereto.[777]

## B. Consideration of the topic at the present session

69. At the present session, the Commission had before it the fifth report of the Special Rapporteur (A/CN.4/711), in which the Special Rapporteur, first, addressed the question of implementation of the draft guidelines at the national level. In that regard, he underlined the various modes of such implementation depending on the nature

of the obligations concerned, and extraterritorial application of national law in certain situations. Second, he examined the situations in which there was a failure to implement the obligations concerned. Turning to the question of compliance at the international level, the Special Rapporteur explained that he favoured cooperative compliance mechanisms, meant to give assistance to a non-compliant party, over punitive or enforcement mechanisms, which were based on the responsibility of States and intended to impose penalties on the non-compliant party. Third, the Special Rapporteur considered the question of dispute settlement. In that connection, he emphasized both the need for the peaceful settlement of disputes and the need to take into account the science-dependent and fact-intensive character of environmental disputes, which led to a requirement to assess scientific evidence and ensure that adequate rules of procedure applied to such disputes.

70. Based on his analysis, the Special Rapporteur proposed three additional draft guidelines concerning implementation (draft guideline 10), compliance (draft guideline 11) and dispute settlement (draft guideline 12). Furthermore, the Special Rapporteur expressed the hope that the first reading of the draft guidelines could be concluded at the current session.

71. The Commission considered the fifth report of the Special Rapporteur at its 3405th and 3409th to 3413th meetings, on 17, 22 to 25 and 29 May 2018, respectively.

72. Following its debate on the report, the Commission, at its 3413th meeting, on 29 May 2018, decided to refer draft guidelines 10 to 12, as contained in the Special Rapporteur's fifth report, to the Drafting Committee, taking into account the debate in the Commission.

73. At its 3417th meeting, on 2 July 2018, the Commission received and considered the report of the Drafting Committee (A/CN.4/L.909), and provisionally adopted the draft guidelines on the protection of the atmosphere on first reading (see section C.1, below).

74. At its 3448th to 3450th meetings, on 8 and 9 August 2018, the Commission adopted the commentaries to the draft guidelines (see section C.2, below).

75. At its 3450th meeting, on 9 August 2018, the Commission expressed its deep appreciation for the outstanding contribution of the Special Rapporteur, Mr. Shinya Murase, which had enabled the Commission to bring to a successful conclusion its first reading of the draft guidelines on the protection of the atmosphere.

---

[775] At its 3197th meeting, on 9 August 2013 (see *Yearbook ... 2013*, vol. II (Part Two), para. 168). The Commission included the topic in its programme of work on the understanding that: "(*a*) work on the topic will proceed in a manner so as not to interfere with relevant political negotiations, including on climate change, ozone depletion and long-range transboundary air pollution. The topic will not deal with, but is also without prejudice to, questions such as liability of States and their nationals, the polluter-pays principle, the precautionary principle, common but differentiated responsibilities and the transfer of funds and technology to developing countries, including intellectual property rights; (*b*) the topic will also not deal with specific substances, such as black carbon, tropospheric ozone and other dual-impact substances, which are the subject of negotiations among States. The project will not seek to 'fill' gaps in the treaty regimes; (*c*) questions relating to outer space, including its delimitation, are not part of the topic; (*d*) the outcome of work on the topic will be draft guidelines that do not seek to impose on current treaty regimes legal rules or legal principles not already contained therein. The Special Rapporteur's reports would be based on such an understanding." The General Assembly, in paragraph 6 of its resolution 68/112 of 16 December 2013, took note of the decision of the Commission to include the topic in its programme of work. The topic had been included in the long-term programme of work of the Commission during its sixty-third session (2011), on the basis of the proposal contained in annex II to the report of the Commission on the work of that session (*Yearbook ... 2011*, vol. II (Part Two), paras. 365 and pp. 189–197).

[776] *Yearbook ... 2014*, vol. II (Part One), document A/CN.4/667; *Yearbook ... 2015*, vol. II (Part One), document A/CN.4/681; *Yearbook ... 2016*, vol. II (Part One), document A/CN.4/692; and *Yearbook ... 2017*, vol. II (Part One), document A/CN.4/705, respectively.

[777] *Yearbook ... 2015*, vol. II (Part Two), paras. 53–54; *Yearbook ... 2016*, vol. II (Part Two), paras. 95–96; and *Yearbook ... 2017*, vol. II (Part Two), paras. 66–67.

76.   At its 3450th meeting, on 9 August 2018, the Commission decided, in accordance with articles 16 to 21 of its statute, to transmit the draft guidelines on the protection of the atmosphere (see section C below), through the Secretary-General, to Governments and international organizations for comments and observations, with the request that such comments and observations be submitted to the Secretary-General by 15 December 2019.

## C.   Text of the draft guidelines on the protection of the atmosphere, together with preamble, adopted by the Commission on first reading

### 1.   TEXT OF THE DRAFT GUIDELINES, TOGETHER WITH PREAMBLE

77.   The text of the draft guidelines on the protection of the atmosphere, together with preamble, adopted by the Commission on first reading is reproduced below.

### Preamble

*Acknowledging* that the atmosphere is essential for sustaining life on Earth, human health and welfare, and aquatic and terrestrial ecosystems,

*Bearing in mind* that the transport and dispersion of polluting and degrading substances occur within the atmosphere,

*Noting* the close interaction between the atmosphere and the oceans,

*Recognizing* therefore that the protection of the atmosphere from atmospheric pollution and atmospheric degradation is a pressing concern of the international community as a whole,

*Aware* of the special situation and needs of developing countries,

*Aware also*, in particular, of the special situation of low-lying coastal areas and small island developing States due to sea-level rise,

*Noting* that the interests of future generations of humankind in the long-term conservation of the quality of the atmosphere should be fully taken into account,

*Recalling* that the present draft guidelines are not to interfere with relevant political negotiations, including those on climate change, ozone depletion, and long-range transboundary air pollution, and that they also neither seek to "fill" gaps in treaty regimes nor impose on current treaty regimes legal rules or legal principles not already contained therein,

### Guideline 1.   Use of terms

For the purposes of the present draft guidelines:

(*a*)   "atmosphere" means the envelope of gases surrounding the Earth;

(*b*)   "atmospheric pollution" means the introduction or release by humans, directly or indirectly, into the atmosphere of substances contributing to deleterious effects extending beyond the State of origin of such a nature as to endanger human life and health and the Earth's natural environment;

(*c*)   "atmospheric degradation" means the alteration by humans, directly or indirectly, of atmospheric conditions having significant deleterious effects of such a nature as to endanger human life and health and the Earth's natural environment.

### Guideline 2.   Scope of the guidelines

1.   The present draft guidelines concern the protection of the atmosphere from atmospheric pollution and atmospheric degradation.

2.   The present draft guidelines do not deal with, but are without prejudice to, questions concerning the polluter-pays principle, the precautionary principle, common but differentiated responsibilities, the liability of States and their nationals, and the transfer of funds and technology to developing countries, including intellectual property rights.

3.   The present draft guidelines do not deal with specific substances, such as black carbon, tropospheric ozone and other dual-impact substances, which are the subject of negotiations among States.

4.   Nothing in the present draft guidelines affects the status of airspace under international law nor questions related to outer space, including its delimitation.

### Guideline 3.   Obligation to protect the atmosphere

States have the obligation to protect the atmosphere by exercising due diligence in taking appropriate measures, in accordance with applicable rules of international law, to prevent, reduce or control atmospheric pollution and atmospheric degradation.

### Guideline 4.   Environmental impact assessment

States have the obligation to ensure that an environmental impact assessment is undertaken of proposed activities under their jurisdiction or control which are likely to cause significant adverse impact on the atmosphere in terms of atmospheric pollution or atmospheric degradation.

### Guideline 5.   Sustainable utilization of the atmosphere

1.   Given that the atmosphere is a natural resource with a limited assimilation capacity, its utilization should be undertaken in a sustainable manner.

2.   Sustainable utilization of the atmosphere includes the need to reconcile economic development with protection of the atmosphere.

### Guideline 6.   Equitable and reasonable utilization of the atmosphere

The atmosphere should be utilized in an equitable and reasonable manner, taking into account the interests of present and future generations.

### Guideline 7.   Intentional large-scale modification of the atmosphere

Activities aimed at intentional large-scale modification of the atmosphere should be conducted with prudence and caution, subject to any applicable rules of international law.

### Guideline 8.   International cooperation

1.   States have the obligation to cooperate, as appropriate, with each other and with relevant international organizations for the protection of the atmosphere from atmospheric pollution and atmospheric degradation.

2.   States should cooperate in further enhancing scientific knowledge relating to the causes and impacts of atmospheric pollution and atmospheric degradation. Cooperation could include exchange of information and joint monitoring.

### Guideline 9.   Interrelationship among relevant rules

1.   The rules of international law relating to the protection of the atmosphere and other relevant rules of international law, including, *inter alia*, the rules of international trade and investment law, of the law of the sea and of international human rights law, should, to the extent possible, be identified, interpreted and applied in order to give rise to a single set of compatible obligations, in line with the principles of harmonization and systemic integration, and with a view to avoiding conflicts. This should be done in accordance with the relevant rules set forth in the Vienna Convention on the Law of Treaties of 1969, including articles 30 and 31, paragraph 3 (*c*), and the principles and rules of customary international law.

2.   States should, to the extent possible, when developing new rules of international law relating to the protection of the atmosphere and other relevant rules of international law, endeavour to do so in a harmonious manner.

3.   When applying paragraphs 1 and 2, special consideration should be given to persons and groups particularly vulnerable to atmospheric pollution and atmospheric degradation. Such groups may include, inter alia, indigenous peoples, people of the least developed countries and people of low-lying coastal areas and small island developing States affected by sea-level rise.

### Guideline 10.   Implementation

1.   National implementation of obligations under international law relating to the protection of the atmosphere from atmospheric pollution and atmospheric degradation, including those referred to in the present draft guidelines, may take the form of legislative, administrative, judicial and other actions.

2.   States should endeavour to give effect to the recommendations contained in the present draft guidelines.

### Guideline 11.   Compliance

1.   States are required to abide with their obligations under international law relating to the protection of the atmosphere from atmospheric pollution and atmospheric degradation in good faith, including through compliance with the rules and procedures in the relevant agreements to which they are parties.

2.   To achieve compliance, facilitative or enforcement procedures may be used, as appropriate, in accordance with the relevant agreements:

(a)   facilitative procedures may include providing assistance to States, in cases of non-compliance, in a transparent, non-adversarial and non-punitive manner to ensure that the States concerned comply with their obligations under international law, taking into account their capabilities and special conditions;

(b)   enforcement procedures may include issuing a caution of non-compliance, termination of rights and privileges under the relevant agreements, and other forms of enforcement measures.

### Guideline 12.   Dispute settlement

1.   Disputes between States relating to the protection of the atmosphere from atmospheric pollution and atmospheric degradation are to be settled by peaceful means.

2.   Given that such disputes may be of a fact-intensive and science-dependent character, due consideration should be given to the use of technical and scientific experts.

2.   Text of the draft guidelines, together with preamble, and commentaries thereto

78.   The text of the draft guidelines, together with preamble, and commentaries thereto, adopted by the Commission on first reading at its seventieth session is reproduced below.

## PROTECTION OF THE ATMOSPHERE

### General commentary

(1)   As is always the case with the Commission's output, the draft guidelines are to be read together with the commentaries.

(2)   The Commission recognizes the importance of being fully engaged with the international community's present-day needs. It is acknowledged that both the human and natural environments can be adversely affected by certain changes in the condition of the atmosphere mainly caused by the introduction of harmful substances, causing transboundary air pollution, ozone depletion and changes in the atmospheric conditions leading to climate change. The Commission seeks, through the progressive development of international law and its codification, to provide guidelines that may assist the international community as it addresses critical questions relating to transboundary and global protection of the atmosphere. In doing so, the Commission does not desire to interfere with relevant political negotiations, including those on long-range transboundary air pollution, ozone depletion and climate change, seek to "fill" gaps in treaty regimes nor to impose on current treaty regimes legal rules or legal principles not already contained therein.

### Preamble

*Acknowledging* that the atmosphere is essential for sustaining life on Earth, human health and welfare, and aquatic and terrestrial ecosystems,

*Bearing in mind* that the transport and dispersion of polluting and degrading substances occur within the atmosphere,

*Noting* the close interaction between the atmosphere and the oceans,

*Recognizing* therefore that the protection of the atmosphere from atmospheric pollution and atmospheric degradation is a pressing concern of the international community as a whole,

*Aware* of the special situation and needs of developing countries,

*Aware also*, in particular, of the special situation of low-lying coastal areas and small island developing States due to sea-level rise,

*Noting* that the interests of future generations of humankind in the long-term conservation of the quality of the atmosphere should be fully taken into account,

*Recalling* that the present draft guidelines are not to interfere with relevant political negotiations, including those on climate change, ozone depletion, and long-range transboundary air pollution, and that they also neither seek to "fill" gaps in treaty regimes nor impose on current treaty regimes legal rules or legal principles not already contained therein,

### Commentary

(1)   On previous occasions, preambles have been prepared once the Commission has concluded work on a particular topic.[778] In the present case, however, due to

---

[778] In the past, the Commission has generally presented to the General Assembly an outcome of its work without a draft preamble, leaving its elaboration to States. However, there have also been precedents

the way in which the guidelines have evolved, a draft preamble has been elaborated during the drafting process. The Commission, for example, referred draft guideline 3 (on the common concern of humankind), as contained in the Special Rapporteur's second report,[779] to the Drafting Committee for consideration in the context of a possible preamble.

(2)    The preamble seeks to provide a contextual framework for the draft guidelines. The first preambular paragraph is overarching in acknowledging the essential importance of the atmosphere for sustaining life on Earth, human health and welfare, and aquatic and terrestrial ecosystems. The atmosphere is the Earth's largest single natural resource and one of its most important. It was listed as a natural resource—along with mineral, energy and water resources—by the former Committee on Natural Resources of the Economic and Social Council,[780] as well as in the 1972 Declaration of the United Nations Conference on the Human Environment (Stockholm Declaration)[781] and in the 1982 World Charter for Nature.[782] The atmosphere provides renewable "flow resources" essential for human, plant and animal survival on the planet, and it serves as a medium for transportation and communication. As a natural resource, the atmosphere was long considered to be non-exhaustible and non-exclusive, since it was assumed that everyone could benefit from it without depriving others.

That view is no longer held.[783] It must be borne in mind that the atmosphere is a limited resource with limited assimilation capacity.

(3)    The second preambular paragraph addresses the functional aspect of the atmosphere as a medium through which transport and dispersion of polluting and degrading substances occur. The Commission considered it appropriate to refer to this functional aspect in the preamble. This decision reflects a concern that the inclusion of the functional aspect as part of the definition, as originally proposed, may suggest that this transport and dispersion is desirable, which is not the intention of the Commission. Long-range transboundary movement of polluting and degrading substances is recognized as one of the major problems of the present-day atmospheric environment,[784] with the Arctic region being identified as one of the areas most seriously affected by the worldwide spread of deleterious pollutants.[785]

(4)    The third preambular paragraph acknowledges the "close interaction" that arises from, as a factual matter, the physical relationship between the atmosphere and the oceans. A significant proportion of the pollution of the marine environment from or through the atmosphere originates from land-based sources, including from anthropogenic activities on land.[786] Scientific research shows that human activities are also responsible for global warming, which causes a rise in temperature of the oceans and in turn results in extreme atmospheric conditions of flood

in which the Commission has prepared such preambles. This was the case, for instance, with respect to the draft convention on the elimination of future statelessness (1954), *Yearbook ... 1954*, vol. II, document A/2693, para. 25, and the draft convention on the reduction of future statelessness (1954), *ibid.*; the model rules on arbitral procedure (1958), *Yearbook ... 1958*, vol. II, document A/3859, para. 22 (the preamble reflected fundamental rules for an undertaking to arbitrate); the draft articles on nationality of natural persons in relation to the succession of States (1999), *Yearbook ... 1999*, vol. II (Part Two), para. 47 (reproduced in General Assembly resolution 55/153 of 12 December 2000, annex); the draft articles on prevention of transboundary harm from hazardous activities (2001), *Yearbook ... 2001*, vol. II (Part Two) and corrigendum, para. 97 (reproduced in General Assembly resolution 62/68 of 6 December 2007, annex); the Guiding Principles applicable to unilateral declarations of States capable of creating legal obligations (2006), *Yearbook ... 2006*, vol. II (Part Two), para. 176; the draft principles on the allocation of loss in the case of transboundary harm arising out of hazardous activities (2006), *ibid.*, para. 66 (reproduced in General Assembly resolution 61/36 of 4 December 2006, annex); and the draft articles on the law of transboundary aquifers (2008), *Yearbook ... 2008*, vol. II (Part Two), para. 53 (reproduced in General Assembly resolution 63/124 of 11 December 2008, annex).

[779] *Yearbook ... 2015*, vol. II (Part One), document A/CN.4/681, para. 39.

[780] The inclusion of "atmospheric resources" among "other natural resources" by the former Committee on Natural Resources was first mentioned in the Committee's report on its first session (*Official Records of the Economic and Social Council, Fiftieth Session, Supplement No. 6* (E/4969-E/C.7/13)), sect. 4 (Other natural resources), para. 94 (*d*). The work of the Committee (later the Committee on Energy and Natural Resources for Development) was subsequently transferred to the Commission on Sustainable Development.

[781] The "natural resources of the earth, including the air ... must be safeguarded for the benefit of present and future generations through careful planning or management, as appropriate" (*Report of the United Nations Conference on the Human Environment, Stockholm, 5–16 June 1972* (United Nations publication, Sales No. E.73.II.A.14 (A/CONF.48/14/Rev.1), part one, chap. I, p. 4, principle 2). The Declaration was adopted at Stockholm on 16 June 1972.

[782] "[A]tmospheric resources that are utilized by man, shall be managed to achieve and maintain optimum sustainable productivity" (General Assembly resolution 37/7 of 28 October 1982, annex, general principles, para. 4).

[783] The World Trade Organization (WTO) Panel and Appellate Body recognized in the *United States—Gasoline* case of 1996 that clean air was an "exhaustible natural resource" that could be "depleted" (Appellate Body Report, *United States—Standards for Reformulated and Conventional Gasoline*, WT/DS2/AB/R, adopted 20 May 1996).

[784] See the 2001 Stockholm Convention on Persistent Organic Pollutants, which notes in the preamble that "persistent organic pollu-tants ... are transported, through air ... across international boundaries and deposited far from their place of release, where they accumulate in terrestrial and aquatic ecosystems". The 2012 amendment to the Gothenburg Protocol to the 1979 Convention on Long-range Transboundary Air Pollution to Abate Acidification, Eutrophication and Ground-level Ozone indicates in the fourth preambular paragraph: "*Concerned* ... that emitted [chemical substances] are transported in the atmosphere over long distances and may have adverse transboundary effects". The Minamata Convention on Mercury recognizes mercury as "a chemical of global concern owing to its long-range atmospheric transport" (first preambular paragraph). See J. S. Fuglestvedt and others, "Transport impacts on atmosphere and climate: metrics", *Atmospheric Environment*, vol. 44, No. 37 (December 2010), pp. 4648–4677; D. J. Wuebbles, H. Lei and J.-T. Lin, "Inter-continental transport of aerosols and photochemical oxidants from Asia and its consequences", *Environmental Pollution*, vol. 150, No. 1 (November 2007), pp. 65–84; and J.-T. Lin, X.-Z. Liang and D. J. Wuebbles, "Effects of inter-continental transport on surface ozone over the United States: present and future assessment with a global model", *Geophysical Research Letters*, vol. 35 (2008).

[785] Several of these pollution threats to the Arctic environment have been identified, such as persistent organic pollutants and mercury, which originate mainly from sources outside the region. These pollutants end up in the Arctic from southern industrial regions of Europe and other continents *via* prevailing northerly winds and ocean circulation. See T. Koivurova, P. Kankaanpää and A. Stepien, "Innovative environmental protection: lessons from the Arctic", *Journal of Environmental Law*, vol. 27, No. 2 (July 2015), pp. 285–311, at p. 297.

[786] See R. A. Duce and others, "The atmospheric input of trace species to the world ocean", *Global Biogeochemical Cycles*, vol. 5, No. 3 (September 1991), pp. 193–259; and T. Jickells and C. M. Moore, "The importance of atmospheric deposition for ocean productivity", *Annual Review of Ecology, Evolution, and Systematics*, vol. 46 (2015), pp. 481–501.

and drought.[787] In its resolution 71/257 of 23 December 2016, the General Assembly confirmed the effect of climate change on oceans and stressed the importance of increasing the scientific understanding of the oceans-atmosphere interface.[788]

(5)   In 2015, the First Global Integrated Marine Assessment (first World Ocean Assessment) was completed as a comprehensive, in-depth study on the state of the marine environment, including a chapter addressing in part the substances polluting the oceans from land-based sources through the atmosphere.[789] The summary of the report was approved by the General Assembly at its seventieth session.[790]

(6)   Among the various human activities that have an impact on the oceans, greenhouse gas emissions from ships contribute to global warming and climate change. The 2009 study by the International Maritime Organization (IMO) on greenhouse gas emissions classified such emissions from ships into four categories, namely: emissions of exhaust gases, cargo emissions, emissions of refrigerants and other emissions.[791] Research indicates that excessive greenhouse gas emissions from ships change the composition of the atmosphere and climate, and cause a negative impact on the marine environment and human health.[792]

(7)   The General Assembly has continued to emphasize the urgency of addressing the effects of atmospheric degradation, such as increases in global temperatures, sea-level rise, ocean acidification and other climate change impacts that are seriously affecting coastal areas and low-lying coastal countries, including many least developed countries and small island developing States, and threatening the survival of many societies.[793]

(8)   The third preambular paragraph is also linked to paragraph 1 of draft guideline 9 in the sense that the physical linkage that exists between the atmosphere and the oceans forms the physical basis of the interrelationship between the rules on the protection of the atmosphere and the rules of the law of the sea.[794]

(9)   The fourth preambular paragraph pronounces, bearing in mind the importance of the problems relating to the atmosphere, as aforementioned, that the protection of the atmosphere from atmospheric pollution and atmospheric degradation is a "pressing concern of the international community as a whole". While a number of treaties and literature demonstrate some support for the concept of "common concern of humankind",[795] the Commission

---

[787] According to the Intergovernmental Panel on Climate Change, "Ocean warming dominates the increase in energy stored in the climate system, accounting for more than 90% of the energy accumulated between 1971 and 2010 (*high confidence*), with only about 1% stored in the atmosphere. On a global scale, the ocean warming is largest near the surface, and the upper 75 m warmed by 0.11 [0.09 to 0.13] °C per decade over the period 1971 to 2010. It is *virtually certain* that the upper ocean (0–700 m) warmed from 1971 to 2010, and it *likely* warmed between the 1870s and 1971" (IPCC, *Climate change 2014: Synthesis report—Contribution of Working Groups I, II and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change*, Geneva, 2014, p. 4; available from www.ipcc.ch/site/assets/uploads/2018/05/SYR_AR5_FINAL_full_wcover.pdf). Because of the rise in ocean temperatures, many scientific analyses suggest risk of severe and widespread drought in the twenty-first century over many land areas. See S. K. Min and others, "Human contribution to more-intense precipitation extremes", *Nature*, vol. 470 (2011), pp. 378–381; A. Dai, "Increasing drought under global warming in observations and models", *Nature Climate Change*, vol. 3 (2013), pp. 52–58; and J. Sheffield, E. F. Wood and M. L. Roderick, "Little change in global drought over the past 60 years", *Nature*, vol. 491 (2012), pp. 435–438. See also Ø. Hov, "Overview: oceans and the atmosphere" and T. Jickells, "Linkages between the oceans and the atmosphere", in "Summary of the informal meeting of the International Law Commission: dialogue with atmospheric scientists (third session), 4 May 2017", paras. 4–12 and 21–30, respectively. Available from https://legal.un.org/ilc/sessions/69/pdfs/english/informal_dialogue_4may2017.pdf.

[788] General Assembly resolution 71/257 of 23 December 2016 on oceans and the law of the sea, paras. 185–196 and 279.

[789] Division for Ocean Affairs and the Law of the Sea, "First Global Integrated Marine Assessment (first World Ocean Assessment)". Available from www.un.org/depts/los/global_reporting/WOA_RegProcess.htm (see, in particular, chapter 20 on "Coastal, riverine and atmospheric inputs from land").

[790] General Assembly resolution 70/235 of 23 December 2015.

[791] Ø. Buhaug and others, *Second IMO GHG Study 2009*, London, IMO, 2009, p. 23. See also T. W .P. Smith and others, *Third IMO GHG Study 2014*, London, IMO, 2015, executive summary, table 1; and M. Righi, J. Hendricks and R. Sausen, "The global impact of the transport sectors on atmospheric aerosol in 2030—Part 1: land transport and shipping", *Atmospheric Chemistry and Physics*, vol. 15 (2015), pp. 633–651.

[792] Most of the greenhouse gas emissions from ships are emitted in or transported to the marine boundary layer where they affect atmospheric composition. See, e.g., V. Eyring and others, "Transport impacts on atmosphere and climate: shipping", *Atmospheric Environment*, vol. 44 (2010), pp. 4735–4771, at pp. 4735, 4744–4745 and 4752–4753. See also D. E. J. Currie and K. Wook, "Climate change and $CO_2$ in the oceans and global oceans governance", *Carbon and Climate Law Review*, vol. 3, No. 4 (2009), pp. 387–404, at pp. 387 and 389; C. Schofield, "Shifting limits? Sea level rise and options to secure maritime jurisdictional claims", *ibid.*, pp. 405–416; and S. R. Cooley and J. T. Mathis, "Addressing ocean acidification as part of sustainable ocean development", *Ocean Yearbook*, vol. 27 (2013), pp. 29–47.

[793] General Assembly resolution 70/1 of 25 September 2015, Transforming our world: the 2030 Agenda for Sustainable Development, para. 14 ("Climate change is one of the greatest challenges of our time and its adverse impacts undermine the ability of all countries to achieve sustainable development. Increases in global temperature, sea level rise, ocean acidification and other climate change impacts are seriously affecting coastal areas and low-lying coastal countries, including many least developed countries and small island developing States. The survival of many societies, and of the biological support systems of the planet, is at risk."). See also "Oceans and the law of the sea: report of the Secretary-General" (A/71/74/Add.1), chap. VIII ("Oceans and climate change and ocean acidification"), paras. 115–122.

[794] See para. (6) of the commentary to draft guideline 9 below.

[795] The first paragraph of the preamble to the 1992 United Nations Framework Convention on Climate Change acknowledges that "change in the Earth's climate and its adverse effects are a common concern of humankind". Likewise, the preamble to the 1992 Convention on Biological Diversity shows parties to be "[c]onscious … of the importance of biological diversity for evolution and for maintaining life sustaining systems of the biosphere" (second paragraph) and affirms that "the conservation of biological diversity is a common concern of humankind" (third paragraph). The 1994 Convention to Combat Desertification in Those Countries Experiencing Drought and/or Desertification, Particularly in Africa, adopted phrases similar to "common concern" in its preamble, including "the centre of concerns", "the urgent concern of the international community" and "problems of global dimension" for combating desertification and drought. Other instruments such as the Minamata Convention on Mercury, the Stockholm Convention on Persistent Organic Pollutants and the Gothenburg Protocol to the 1979 Convention on Long-range Transboundary Air Pollution to Abate Acidification, Eutrophication and Ground-level Ozone employ concepts similar to "common concern". See A. E. Boyle, "International law and the protection of the global atmosphere: concepts, categories and principles", in R. Churchill and D. Freestone (eds.), *International Law and Global Climate Change*, Leiden, Kluwer Academic, 1991, pp. 7–19, at pp. 11–12; D. French, "Common concern, common heritage and other global(-ising) concepts: rhetorical devices, legal principles or a fundamental challenge?", in M. Bowman, P. Davies and E. Goodwin (eds.), *Research Handbook on Biodiversity and Law*, Cheltenham/

decided not to adopt this language for the characterization of the problem, as the legal consequences of the concept of common concern of humankind remain unclear at the present stage of development of international law relating to the atmosphere. It was considered appropriate to express the concern of the international community as a factual statement, and not as a normative statement, as such, of the gravity of the atmospheric problems. In this context, therefore, the expression "a pressing concern of the international community as a whole" has been employed. This is an expression that the Commission has frequently employed as one of the criteria for the selection of new topics for inclusion in its long-term programme of work.[796]

(10)  The fifth preambular paragraph, having regard to considerations of equity, concerns the special situation and needs of developing countries. One of the first attempts to incorporate such a principle was the Washington Conference of the International Labour Organization in 1919, at which delegations from Asia and Africa succeeded in ensuring the adoption of differential labour standards.[797] Another example is the Generalized System of Preferences elaborated under the United Nations Conference on Trade and Development in the 1970s, as reflected in draft article 23 of the Commission's 1978 draft articles on most-favoured-nation clauses.[798]

(11)  The need for special consideration for developing countries in the context of environmental protection has been endorsed by a number of international instruments, such as the 1972 Stockholm Declaration,[799] the 1992 Rio Declaration on Environment and Development (Rio Declaration)[800] and the 2002 Johannesburg Declaration on Sustainable Development.[801] Principle 12 of the Stockholm Declaration attaches importance to "taking into account the circumstances and particular requirements of developing countries". Principle 6 of the Rio Declaration highlights "[t]he special situation and needs of developing countries, particularly the least developed and those most environmentally vulnerable". The Johannesburg Declaration expresses resolve to pay attention to "the developmental needs of small island developing States and the least developed countries".[802] The principle is similarly reflected in article 3 of the 1992 United Nations Framework Convention on Climate Change and article 2 of the 2015 Paris Agreement adopted under the United Nations Framework Convention on Climate Change (Paris Agreement).

(12)  The formulation of the fifth preambular paragraph is based on the seventh paragraph of the preamble of the 1997 Convention on the Law of the Non-navigational Uses of International Watercourses.[803]

(13)  The sixth preambular paragraph addresses one of the most profound impacts of atmospheric degradation for all States, that is, the sea-level rise caused by global warming. It draws particular attention to the special situation of low-lying coastal areas and small island developing States due to sea-level rise. The Fifth Assessment Report of the Intergovernmental Panel on Climate Change estimates that the global mean sea-level rise is likely to be between 26 cm and 98 cm by the year 2100.[804] While exact figures and rates of change still remain uncertain, the report states that it is "virtually certain" that sea levels will continue to rise during the twenty-first century, and for centuries beyond—even if the concentrations of greenhouse gas emissions are stabilized. Moreover, sea-level rise is likely to exhibit "a strong regional pattern, with some places experiencing significant deviations of local and regional sea level change from the global mean change".[805] That degree of change in sea levels may pose a potentially serious, maybe even disastrous, threat to many coastal areas, especially those with large, heavily

Northampton, Edward Elgar, 2016, pp. 334–360, at p. 347; A. Kiss, "The common concern of mankind", Environmental Policy and Law, vol. 27 (1997), pp. 244–247, at p. 246; A. A. Cançado Trindade and D. J. Attard, "The implications of the 'common concern of mankind' concept on global environmental issues", in T. Iwama (ed.), Policies and Laws on Global Warming: International and Comparative Analysis, Tokyo, Environmental Research Center, 1991, pp. 7–13; and J. Brunnée, "Common areas, common heritage, and common concern", in D. Bodansky, J. Brunnée and E. Hey (eds.), The Oxford Handbook of International Environmental Law, Oxford, Oxford University Press, 2007, pp. 550–573, at pp. 565–566. See also C. Kreuter-Kirchhof, "Atmosphere, international protection", Max Planck Encyclopedia of Public International Law, vol. I, Oxford, Oxford University Press, 2012, pp. 737–744, at p. 739, paras. 8–9 (the atmosphere as a "common concern of mankind") (online edition: https://opil.ouplaw.com/home/MPIL).

[796] Yearbook ... 1997, vol. II (Part Two), para. 238; Yearbook ... 1998, vol. II (Part Two), para. 553. See also Yearbook ... 2014, vol. II (Part Two) and corrigendum, para. 269. The Commission has agreed that it should not restrict itself to traditional topics, but could also consider those that reflect new developments in international law and pressing concerns of the international community as a whole.

[797] On the basis of the third paragraph of article 405 of the 1919 Treaty of Peace between the Allied and Associated Powers and Germany (Treaty of Versailles), which became article 19, paragraph 3, of the International Labour Organization Constitution (labour conventions "shall have due regard" to the special circumstances of countries where local industrial conditions are "substantially different"). The same principle also appeared in some of the conventions approved by the International Labour Organization in 1919 and in several conventions adopted afterwards. See I. F. Ayusawa, International Labor Legislation, New York, Columbia University, 1920, chap. VI, pp. 149 et seq.

[798] See article 23 (The most-favoured-nation clause in relation to treatment under a generalized system of preferences) and article 30 (New rules of international law in favour of developing countries) of the draft articles on most-favoured-nation clauses adopted by the Commission at its thirtieth session in 1978, Yearbook ... 1978, vol. II (Part Two), para. 74; see also paragraphs 47–72. See also S. Murase, Economic Basis of International Law, Tokyo, Yuhikaku, 2001, pp. 109–179 (in Japanese). And see the earlier exceptions for developing countries specified in article XVIII of the 1947 General Agreement on Tariffs and Trade.

[799] See footnote 781 above. See also L. B. Sohn, "The Stockholm Declaration on the Human Environment", Harvard International Law Journal, vol. 14 (1973), pp. 423–515, at pp. 485–493.

[800] Adopted at Rio de Janeiro on 14 June 1992; see Report of the United Nations Conference on Environment and Development, Rio de Janeiro, 3–14 June 1992, vol. I: Resolutions adopted by the Conference (A/CONF.151/26/Rev.1 (Vol. I) and Corr.1, United Nations publication, Sales No. E.93.I.8 and corrigenda), resolution 1, annex I, p. 3.

[801] Report of the World Summit on Sustainable Development, Johannesburg, South Africa, 26 August–4 September 2002 (A/CONF.199/20, United Nations publication, Sales No. E.03.II.A.1 and corrigendum), chap. I, resolution 1, annex.

[802] Johannesburg Declaration, para. 24. See also outcome document of the United Nations Conference on Sustainable Development, "The future we want", contained in General Assembly resolution 66/288 of 27 July 2012, annex.

[803] Adopted by the General Assembly in resolution 51/229 (annex) on 21 May 1997. The Convention entered into force on 17 August 2014.

[804] IPCC, Climate Change 2013: The Physical Science Basis, Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change, Cambridge, Cambridge University Press, 2013, p. 1180. Available from www.ipcc.ch/report/ar5/wg1/.

[805] Ibid., p. 1140.

populated and low-lying coastal areas, as well as to small island developing States.[806]

(14)  The sixth preambular paragraph is linked to the interrelationship between the rules of international law relating to the protection of the atmosphere and the rules of the law of the sea addressed in paragraph 1 of draft guideline 9.[807] This preambular paragraph is also linked to the special consideration to be given to persons and groups in vulnerable situations, which are referred to in paragraph 3 of draft guideline 9.[808] The words "in particular" are intended to acknowledge specific areas without necessarily limiting the list of potentially affected areas.

(15)  The seventh preambular paragraph emphasizes the interests of future generations, including with a view to human rights protection. The goal is to ensure that the planet remains habitable for future generations. In taking measures to protect the atmosphere today, it is important to take into account the long-term conservation of the quality of the atmosphere. The 2015 Paris Agreement, in its preamble, after acknowledging that climate change is a common concern of humankind, provides that parties should, when taking action to address climate change, respect, promote and consider, among other things, their respective obligations on human rights, as well as intergenerational equity. The importance of "intergenerational" considerations was already expressed in principle 1 of the 1972 Stockholm Declaration.[809] It also underpins the concept of sustainable development, as formulated in the 1987 Brundtland report, "Our Common Future",[810] and informs the 2030 Agenda for Sustainable Development.[811] It is also reflected in the preamble of the Convention on Biological Diversity of 1992,[812] and in other treaties.[813] Article 3, paragraph 1, of the United Nations Framework Convention on Climate Change of 1992 provides that "[p]arties should protect the climate system for the benefit of present and future generations of humankind". The International

Court of Justice has noted, in its 1996 advisory opinion in the *Legality of the Threat or Use of Nuclear Weapons* case with respect to such weapons, the imperative to take into account "in particular their … ability to cause damage to generations to come".[814]

(16)  The Commission opted for the term "interests" rather than "benefit" under the seventh preambular paragraph. A similar formulation is used in draft guideline 6, which refers to the interests of future generations in the context of "equitable and reasonable utilization of the atmosphere".[815]

(17)  The eighth preambular paragraph reproduces the 2013 understanding of the Commission on the inclusion of the topic in its programme of work at its sixty-fifth session.[816]

---

[806] See A. H. A. Soons, "The effects of a rising sea level on maritime limits and boundaries", *Netherlands International Law Review*, vol. 37, No. 2 (1990), pp. 207–232; and M. Hayashi, "Sea-level rise and the law of the sea: future options", in D. Vidas and P. J. Schei (eds.), *The World Ocean in Globalisation: Climate Change, Sustainable Fisheries, Biodiversity, Shipping, Regional Issues*, Leiden/Boston, Brill/Martinus Nijhoff, 2011, pp. 187–206. See also International Law Association, *Report of the Seventy-fifth Conference held in Sofia, August 2012*, pp. 385–428, and International Law and Sea Level Rise, *Johannesburg Conference (2016): International Law and Sea Level Rise* (interim report), pp. 13–18.

[807] See para. (6) of the commentary to draft guideline 9 below.

[808] See para. (16) of the commentary to draft guideline 9 below.

[809] Principle 1 of the Stockholm Declaration refers to the "solemn responsibility to protect and improve the environment for present and future generations".

[810] Report of the World Commission on Environment and Development: *Our Common Future*, Oxford, Oxford University Press, 1987. It emphasized the importance of "development that meets the needs of the present without compromising the ability of future generations to meet their own needs" (p. 43). See also A/42/427, p. 24.

[811] General Assembly resolution 70/1, which emphasizes the need to protect the planet from degradation so that it can "support the needs of the present and future generations".

[812] The preamble of the Convention provides for the "benefit of present and future generations" in the conservation and sustainable use of biological diversity.

[813] Article 4 (vi) of the 1997 Joint Convention on the Safety of Spent Fuel Management and on the Safety of Radioactive Waste Management provides that parties shall "strive to avoid actions that impose reasonably predictable impacts on future generations greater than those permitted for the current generation".

[814] *Legality of the Threat or Use of Nuclear Weapons*, Advisory Opinion, *I.C.J. Reports 1996*, p. 226, at p. 244, para. 36.

[815] Though there are as yet no decisions by international tribunals concerning customary intergenerational rights, there have been many national court decisions, which may constitute practice for the purposes of customary international law, recognizing intergenerational equity; see Z. Redgwell, "Principles and emerging norms in international law: intra- and inter-generational equity", in C. P. Carlarne, K. R. Gray and R. G. Tarasofsky (eds.), *The Oxford Handbook of International Climate Change Law*, Oxford, Oxford University Press, 2016, pp. 185–201, at p. 198. See also Australia: *Gray v. Minister for Planning*, [2006] NSWLEC 720; India: *Vellore Citizens' Welfare Forum and State of Tamil Nadu (joining) v. Union of India and others*, original public interest writ petition, 1996 5 SCR 241, ILDC 443 (IN 1996); Kenya: *Waweru, Mwangi (joining) and others (joining) v. Kenya*, miscellaneous civil application, Case No. 118 of 2004, application No. 118/04, ILDC 880 (KE 2006); South Africa: *Fuel Retailers Association of Southern Africa v. Director-General, Environmental Management, Department of Agriculture, Conservation and Environment, Mpumalanga Province, and others*, [2007] ZACC 13, 10 BCLR 1059; and Pakistan: *Rabab Ali v. Federation of Pakistan*, petition filed 6 April 2016 (summary available from www.ourchildrenstrust.org/pakistan). For commentary, see E. Brown Weiss, *In Fairness to Future Generations: International Law, Common Patrimony, and Intergenerational Equity*, Tokyo, United Nations University Press, 1989, p. 96; M. Bruce, "Institutional aspects of a charter of the rights of future generations", in S. Busuttil and others (eds.), *Our Responsibilities Towards Future Generations*, Valletta, UNESCO and Foundation for International Studies, University of Malta, 1990, pp. 127–131; T. Allen, "The Philippine children's case: recognizing legal standing for future generations", *Georgetown International Environmental Law Review*, vol. 6, No. 3 (1994), pp. 713–741 (referring to the judgment of the Philippine Supreme Court in *Minors Oposa et al. v. Factoran* (30 July 1993), ILM, vol. 33 (1994), p. 173). Standing to sue in some proceedings was granted on the basis of the "public trust doctrine", which holds governments accountable as trustees for the management of common environmental resources. See M. C. Wood and C. W. Woodward IV, "Atmospheric trust litigation and the constitutional right to a healthy climate system: judicial recognition at last", *Washington Journal of Environmental Law and Policy*, vol. 6 (2016), pp. 634–684; C. Redgwell, *Intergenerational Trusts and Environmental Protection*, Manchester, Manchester University Press, 1999; K. Coghill, C. Sampford and T. Smith (eds.), *Fiduciary Duty and the Atmospheric Trust*, London, Routledge, 2012; M. C. Blumm and M. C. Wood, *The Public Trust Doctrine in Environmental and Natural Resources Law*, 2nd ed., Durham, North Carolina, Carolina Academic Press, 2015; and K. Bosselmann, *Earth Governance: Trusteeship of the Global Commons*, Cheltenham, Edward Elgar Publishing, 2015. In a judgment on 13 December 1996, the Indian Supreme Court declared the public trust doctrine "the law of the land" (*M.C. Mehta v. Kamal Nath and Others* (1997), 1 Supreme Court Cases 388, reprinted in *Compendium of Judicial Decisions in Matters Related to Environment: National Decisions*, vol. I, Nairobi, United Nations Environment Programme (UNEP)/ United Nations Development Programme (UNDP), 1998, p. 260). See J. Razzaque, "Application of public trust doctrine in Indian environmental cases", *Journal of Environmental Law*, vol. 13, No. 2 (2001), pp. 221–234.

[816] It was agreed that the terminology and location of this paragraph would be revisited at a later stage in the Commission's work on this topic. See also *Yearbook … 2013*, vol. II (Part Two), para. 168.

### Guideline 1.  Use of terms

**For the purposes of the present draft guidelines:**

(a)  **"atmosphere" means the envelope of gases surrounding the Earth;**

(b)  **"atmospheric pollution" means the introduction or release by humans, directly or indirectly, into the atmosphere of substances contributing to deleterious effects extending beyond the State of origin of such a nature as to endanger human life and health and the Earth's natural environment;**

(c)  **"atmospheric degradation" means the alteration by humans, directly or indirectly, of atmospheric conditions having significant deleterious effects of such a nature as to endanger human life and health and the Earth's natural environment.**

### Commentary

(1)  The Commission has considered it desirable, as a matter of practical necessity, to provide a draft guideline on the "Use of terms" in order to have a common understanding of what is covered by the present draft guidelines. The terms used are provided only "for the purposes of the present draft guidelines", and are not intended in any way to affect any existing or future definitions of any such terms in international law.

(2)  No definition has been given to the term "atmosphere" in the relevant international instruments. The Commission, however, considered it necessary to provide a working definition for the present draft guidelines, and the definition given in paragraph (a) is inspired by the definition given by a working group of the Intergovernmental Panel on Climate Change.[817]

(3)  The Commission considered it necessary that its legal definition be consistent with the approach of scientists. According to scientists, the atmosphere exists in what is called the atmospheric shell.[818] Physically, it extends upward from the Earth's surface, which is the bottom boundary of the dry atmosphere. The average composition of the atmosphere up to an altitude of 25 km is as follows: nitrogen (78.08%), oxygen (20.95%), together with trace gases, such as argon (0.93%), helium and radiatively active greenhouse gases, such as carbon dioxide (0.035%) and ozone, as well as greenhouse water vapour in highly variable amounts.[819] The atmosphere

also contains clouds and aerosols.[820] The atmosphere is divided vertically into five spheres on the basis of temperature characteristics. From the lower to upper layers, these spheres are: troposphere, stratosphere, mesosphere, thermosphere and exosphere. Approximately 80 per cent of air mass exists in the troposphere and 20 per cent in the stratosphere. The thin, white, hazy belt (with a thickness of less than 1 per cent of the radius of the globe) that one sees when looking at the Earth from a distance is the atmosphere. Scientifically these spheres are grouped together as the "lower atmosphere", which extends to an average altitude of 50 km, and can be distinguished from the "upper atmosphere".[821] The temperature of the atmosphere changes with altitude. In the troposphere (up to the tropopause, at a height of about 12 km), the temperature decreases as altitude increases because of the absorption and radiation of solar energy by the surface of the planet.[822] In contrast, in the stratosphere (up to the stratopause, at a height of nearly 50 km), temperature gradually increases with height[823] because of the absorption of ultraviolet radiation by ozone. In the mesosphere (up to the mesopause, at a height of above 80 km), temperatures again decrease with altitude. In the thermosphere, temperatures once more rise rapidly because of X-ray and ultraviolet radiation from the sun. The atmosphere "has no well-defined upper limit".[824]

(4)  The definition, in paragraph (a), of the "atmosphere" as the envelope of gases surrounding the Earth represents a "physical" description of the atmosphere. There is also a "functional" aspect, which involves the large-scale movement of air. The atmospheric movement has a dynamic and fluctuating feature. The air moves and circulates around the Earth in a complicated formation called "atmospheric circulation". The Commission has decided, as noted earlier in the commentary to the preamble, to refer to this functional aspect of the atmosphere in the second paragraph of the preamble.[825]

(5)  It is particularly important to recognize the function of the atmosphere as a medium within which there is constant movement as it is within that context that the "transport and dispersion" of polluting and degrading

---

[817] Fifth Assessment Report, Working Group III, annex I (IPCC, *Climate Change 2014: Mitigation of Climate Change. Contribution of Working Group III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change*, O. Edenhofer and others (eds.), Cambridge, Cambridge University Press, 2014, p. 1252). Available from www.ipcc.ch/report/ar5/wg3/.

[818] The American Meteorological Society defines the "atmospheric shell" (also called atmospheric layer or atmospheric region) as "any one of a number of strata or 'layers' of the earth's atmosphere" (available from http://glossary.ametsoc.org/wiki/Atmospheric_shell).

[819] Physically, water vapour, which accounts for roughly 0.25 per cent of the mass of the atmosphere, is a highly variable constituent. In atmospheric science, "because of the large variability of water vapor concentrations in air, it is customary to list the percentages of the various constituents in relation to dry air". Ozone concentrations

[820] are also highly variable. Over 0.1 ppmv (parts per million by volume) of ozone concentration in the atmosphere is considered hazardous to human beings. See J. M. Wallace and P. V. Hobbs, *Atmospheric Science: An Introductory Survey*, 2nd ed., Boston, Elsevier Academic Press, 2006, p. 8.

[820] *Ibid.*

[821] The American Meteorological Society defines the "lower atmosphere" as "generally and quite loosely, that part of the atmosphere in which most weather phenomena occur (i.e., the troposphere and lower stratosphere); hence used in contrast to the common meaning for the upper atmosphere" (available from http://glossary.ametsoc.org/wiki/Lower_atmosphere). The "upper atmosphere" is defined as residual, that is "the general term applied to the atmosphere above the troposphere" (available from http://glossary.ametsoc.org/wiki/Upper_atmosphere).

[822] The thickness of the troposphere is not the same everywhere; it depends on the latitude and the season. The top of the troposphere lies at an altitude of about 17 km at the equator, although it is lower at the poles. On average, the height of the outer boundary of the troposphere is about 12 km. See E. J. Tarbuck, F. K. Lutgens and D. Tasa, *Earth Science*, 13th ed., Upper Saddle River, New Jersey, Pearson, 2011, p. 466.

[823] Strictly, the temperature of the stratosphere remains constant to a height of about 20–35 km and then begins a gradual increase.

[824] Tarbuck, Lutgens and Tasa, *Earth Science* (see footnote 822 above), p. 467.

[825] See para. (3) of the commentary to the preamble, above.

substances occurs. Indeed, the long-range transboundary movement of polluting substances is one of the major problems for the atmospheric environment. In addition to transboundary pollution, other concerns relate to the depletion of the ozone layer and to climate change.

(6) Paragraph (*b*) defines "atmospheric pollution" and addresses transboundary air pollution, whereas paragraph (*c*) defines "atmospheric degradation" and refers to global atmospheric problems. By stating "by humans", both paragraphs (*b*) and (*c*) make it clear that the draft guidelines concern "anthropogenic" atmospheric pollution and atmospheric degradation. The Commission is aware that the focus on human activity, whether direct or indirect, is a deliberate one, as the present guidelines seek to provide guidance to States and the international community.

(7) The term "atmospheric pollution" (or air pollution) is sometimes used broadly to include global deterioration of atmospheric conditions such as ozone depletion and climate change,[826] but the term is used in the present draft guidelines in a narrow sense, in line with existing treaty practice. It thus excludes the global issues from the definition of atmospheric pollution.

(8) In defining "atmospheric pollution", paragraph (*b*) uses language that is essentially based on article 1 (*a*) of the 1979 Convention on Long-range Transboundary Air Pollution,[827] which provides that:

"[a]ir pollution" means the introduction by man, directly or indirectly, of substances or energy into the air resulting in deleterious effects of such a nature as to endanger human health, harm living resources and ecosystems and material property and impair or interfere with amenities and other legitimate uses of the environment, and "air pollutants" shall be construed accordingly.

It may also be noted that article 1, paragraph 1 (4), of the United Nations Convention on the Law of the Sea defines the term "pollution" for the purposes of the marine environment as meaning "the introduction by man, directly or indirectly, of substances or energy into the marine

environment, including estuaries, which results or is likely to result in such deleterious effects as harm to living resources and marine life, hazards to human health".[828] The deleterious effects arising from an introduction or release have to be of such a nature as to endanger human life and health and the Earth's natural environment, including by contributing to endangering them.

(9) While article 1 (*a*) of the Convention on Long-range Transboundary Air Pollution and article 1, paragraph 1 (4), of the United Nations Convention on the Law of the Sea provide for "introduction of energy" (as well as substances) as part of the "pollution", the Commission has decided not to make an explicit reference to the term "energy" in the text of paragraph (*b*) of the draft guideline. It is the understanding of the Commission that, for the purposes of the draft guidelines, the word "substances" includes "energy". "Energy" is understood to include heat, light, noise and radioactivity introduced and released into the atmosphere through human activities.[829]

(10) The expression "effects extending beyond the State of origin" in paragraph (*b*) clarifies that the draft guidelines address the transboundary effects in the sense

---

[826] For instance, article 1, paragraph 1, of the Cairo resolution (1987) of the Institute of International Law (*Institut de droit international*) on "Transboundary air pollution" provides that "[f]or the purposes of this Resolution, 'transboundary air pollution' means any physical, chemical or biological *alteration in the composition*\* or quality of the atmosphere which results directly or indirectly from human acts or omissions, and produces injurious or deleterious effects in the environment of other States or of areas beyond the limits of national jurisdiction" (*Yearbook of the Institute of International Law*, vol. 62-II, pp. 296 and 298; available from the Institute's website at www.idi-iil.org, *Resolutions*).

[827] The formulation of article 1 (*a*) of the Convention on Long-range Transboundary Air Pollution goes back to the definition of pollution by the Council of the Organisation for Economic Co-operation and Development (OECD) in its recommendation C(74)224 on "Principles concerning transfrontier pollution", of 14 November 1974, which reads as follows: "For the purpose of these principles, pollution means the introduction by man, directly or indirectly, of substances or energy into the environment resulting in deleterious effects of such a nature as to endanger human health, harm living resources and ecosystems, and impair or interfere with amenities and other legitimate uses of the environment" (ILM, vol. 14 (1975), p. 243; or OECD, *Legal Aspects of Transfrontier Pollution*, Paris, 1977, p. 13). See also P. Birnie, A. Boyle and C. Redgwell, *International Law and the Environment*, 3rd ed., Oxford, Oxford University Press, 2009, pp. 188–189; and A. Kiss and D. Shelton, *International Environmental Law*, London, Graham & Trotman, 1991, p. 117 (definition of pollution: "also forms of energy such as noise, vibrations, heat, radiation are included").

[828] Article 212 of the United Nations Convention on the Law of the Sea provides for an obligation to prevent airborne pollution of the sea, and to that extent, the definition of "pollution" in this Convention is relevant to atmospheric pollution.

[829] With regard to heat, see World Meteorological Organization/International Global Atmospheric Chemistry, *Impacts of Megacities on Air Pollution and Climate*, Global Atmosphere Watch Report No. 205, Geneva, 2012; D. Simon and H. Leck (eds.), "Urban adaptation to climate/environmental change: governance, policy and planning", Special Issue, *Urban Climate*, vol. 7 (March 2014) pp. 1–134; A. J. Arnfield, "Two decades of urban climate research: a review of turbulence, exchanges of energy and water, and the urban heat island", *International Journal of Climatology*, vol. 23 (2003), pp. 1–26; and L. Gartland, *Heat Islands: Understanding and Mitigating Heat in Urban Areas*, London, Earthscan, 2008; see, in general, B. Stone, *The City and the Coming Climate: Climate Change in the Places We Live*, Cambridge, Cambridge University Press, 2012. Regarding light pollution, see C. Rich and T. Longcore (eds.), *Ecological Consequences of Artificial Night Lighting*, Washington, D.C., Island Press, 2006; P. Cinzano and F. Falchi, "The propagation of light pollution in the atmosphere", *Monthly Notices of the Royal Astronomical Society*, vol. 427, No. 4 (December 2012), pp. 3337–3357; and F. Bashiri and C. Rosmani Che Hassan, "Light pollution and its effect on the environment", *International Journal of Fundamental Physical Sciences*, vol. 4, No. 1 (March 2014), pp. 8–12. Regarding acoustic/noise pollution, see e.g. annex 16 (Environmental Protection: Aircraft Noise) of the 1944 Convention on International Civil Aviation; see also P. Davies and J. Goh, "Air transport and the environment: regulating aircraft noise", *Air and Space Law*, vol. 18 (1993), pp. 123–135. Concerning radioactive emissions, see D. Rauschning, "Legal problems of continuous and instantaneous long-distance air pollution: interim report", in International Law Association, *Report of the Sixty-second Conference held at Seoul, August 24th to August 30th, 1986*, pp. 198–223, at p. 219; and International Atomic Energy Agency (IAEA), *Environmental Consequences of the Chernobyl Accident and their Remediation: Twenty Years of Experience—Report of the Chernobyl Forum Expert Group 'Environment'*, Radiological Assessment Report Series, 2006 (STI/PUB/1239). See also United Nations Scientific Committee on the Effects of Atomic Radiation, 2013 report to the General Assembly, *Scientific Annex A: Levels and effects of radiation exposure due to the nuclear accident after the 2011 great east-Japan earthquake and tsunami* (United Nations publication, Sales No. E.14.IX.1), available from www.unscear.org/unscear/uploads/documents/unscear-reports/UNSCEAR_2013_Report_Vol.I.pdf. This is without prejudice to the peaceful uses of nuclear energy in relation to climate change in particular (see IAEA, *Climate Change and Nuclear Power 2014*, Vienna, 2014, p. 7).

provided in article 1 (*b*) of the 1979 Convention on Long-range Transboundary Air Pollution that:

"[l]ong-range transboundary air pollution" means air pollution whose physical origin is situated wholly or in part within the area under the national jurisdiction of one State and which has adverse effects in the area under the jurisdiction of another State at such a distance that it is not generally possible to distinguish the contribution of individual emission sources or groups of sources.

(11)   Since "atmospheric pollution" is defined narrowly in paragraph (*b*), it is necessary, for the purposes of the draft guidelines, to address issues other than atmospheric pollution by means of a different definition. For this purpose, paragraph (*c*) provides the definition of "atmospheric degradation". This definition is intended to include problems of ozone depletion and climate change. It covers the alteration of the global atmospheric conditions caused by humans, whether directly or indirectly. These may be changes to the physical environment or biota or alterations to the composition of the global atmosphere. The 1985 Vienna Convention for the Protection of the Ozone Layer provides the definition of "adverse effects" in article 1, paragraph 2, as meaning "changes in the physical environment or biota, including changes in climate, which have significant deleterious effects on human health or on the composition, resilience and productivity of natural and managed ecosystems, or on materials useful to mankind". Article 1, paragraph 2, of the United Nations Framework Convention on Climate Change defines "climate change" as "a change of climate which is attributed directly or indirectly to human activity that alters the composition of the global atmosphere and which is in addition to natural climate variability observed over comparable time periods".

(12)   The term "significant deleterious effects" is intended to qualify the range of human activities to be covered by the draft guidelines. The Commission has frequently employed the term "significant" in its previous work.[830] The Commission has stated that "*'significant' is something more than 'detectable' but need not be at the level of 'serious' or 'substantial'*. The harm must lead to a real detrimental effect [and]… [s]uch detrimental effects must be susceptible of being measured by factual and objective standards".[831] Moreover, "[t]he term 'significant', while determined by factual and objective criteria, also involves a value determination which depends on the

circumstances of a particular case and the period in which such determination is made. For instance, a particular deprivation at a particular time might not be considered 'significant' because at that specific time scientific knowledge or human appreciation for a particular resource had not reached a point at which much value was ascribed to that particular resource." The question of what constitutes "significant" is more of a factual assessment.[832]

(13)   While with respect to "atmospheric pollution" the introduction or release of substances has to contribute only to "deleterious" effects, in the case of "atmospheric degradation" the alteration of atmospheric conditions must have "significant deleterious effects". As is evident from draft guideline 2, on the scope of the guidelines, the present guidelines are concerned with the protection of the atmosphere from both atmospheric pollution and atmospheric degradation. As noted in paragraph (11) above, "adverse effects" in the Vienna Convention for the Protection of the Ozone Layer (art. 1, para. 2) refers to changes which have significant deleterious effects. The word "deleterious" refers to something harmful, often in a subtle or unexpected way.

### Guideline 2.   Scope of the guidelines

**1.   The present draft guidelines concern the protection of the atmosphere from atmospheric pollution and atmospheric degradation.**

**2.   The present draft guidelines do not deal with, but are without prejudice to, questions concerning the polluter-pays principle, the precautionary principle, common but differentiated responsibilities, the liability of States and their nationals, and the transfer of funds and technology to developing countries, including intellectual property rights.**

**3.   The present draft guidelines do not deal with specific substances, such as black carbon, tropospheric ozone and other dual-impact substances, which are the subject of negotiations among States.**

**4.   Nothing in the present draft guidelines affects the status of airspace under international law nor questions related to outer space, including its delimitation.**

### Commentary

(1)   Draft guideline 2 sets out the scope of the draft guidelines in relation to the protection of the atmosphere. Paragraph 1 describes the scope in a positive manner, indicating what the guidelines are concerned with, namely the protection of the atmosphere from atmospheric pollution and atmospheric degradation, while paragraphs 2 and 3 are formulated in a negative way, specifying what is not covered by the present draft guidelines. Paragraph 4 contains a saving clause on airspace and outer space.

---

[830] See, for example, article 7 of the 1997 Convention on the Law of the Non-navigational Uses of International Watercourses (General Assembly resolution 51/229 of 21 May 1997, annex; the text of the draft articles adopted by the Commission at its forty-sixth session is reproduced in *Yearbook … 1994*, vol. II (Part Two), para. 222); article 1 of the 2001 articles on prevention of transboundary harm from hazardous activities (General Assembly resolution 62/68, annex; the text of the draft articles adopted by the Commission at its fifty-third session is reproduced in *Yearbook … 2001*, vol. II (Part Two) and corrigendum, para. 97); principle 2 of the 2006 principles on the allocation of loss in the case of transboundary harm arising out of hazardous activities (General Assembly resolution 61/36, annex; the text of the draft principles adopted by the Commission at its fifty-eighth session is reproduced in *Yearbook … 2006*, vol. II (Part Two), para. 66); and article 6 of the 2008 articles on the law of transboundary aquifers (General Assembly resolution 63/124, annex; the text of the draft articles adopted by the Commission at its sixtieth session is reproduced in *Yearbook … 2008*, vol. II (Part Two), para. 53).

[831] Para. (4) of the commentary to article 2 of the 2001 draft articles on prevention of transboundary harm from hazardous activities, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 152.

[832] See the commentary to the draft articles on prevention of transboundary harm from hazardous activities (paras. (4) and (7) of the commentary to draft article 2), *ibid.*, pp. 152 and 153. See also the commentary to the draft principles on the allocation of loss in the case of transboundary harm arising out of hazardous activities (paras. (1)–(3) of the commentary to draft principle 2), *Yearbook … 2006*, vol. II (Part Two), pp. 64–65.

(2) Paragraph 1 deals with questions of the protection of the atmosphere in two areas, atmospheric pollution and atmospheric degradation. The draft guidelines are concerned only with anthropogenic causes and not with those of natural origin such as volcanic eruptions and meteorite collisions. The focus on transboundary pollution and global atmospheric degradation caused by human activity reflects the current realities, which are supported by the science.[833] According to the Intergovernmental Panel on Climate Change, the science indicates with 95 per cent certainty that human activity has been the dominant cause of observed warming since the mid-twentieth century. The Panel has noted that human influence on the climate system is clear. Such influence has been detected in warming of the atmosphere and the ocean, in changes in the global water cycle, in reductions in snow and ice, in global mean sea-level rise, and in changes in some climate extremes.[834] The Panel has further noted that it is extremely likely that more than half of the observed increase in global average surface temperature from 1951 to 2010 was caused by the anthropogenic increase in greenhouse gas concentrations and other anthropogenic "forcings" together.[835]

(3) The guidelines will also not deal with domestic or local pollution. It may be noted however that whatever happens locally may sometimes have a bearing on the transboundary and global context insofar as the protection of the atmosphere is concerned. Ameliorative human action, taken individually or collectively, may need to take into account the totality of the atmosphere, hydrosphere, biosphere and geosphere and their interactions.

(4) Sulphur dioxide and nitrogen oxides are the main sources of transboundary atmospheric pollution,[836] while climate change and depletion of the ozone layer are the two principal concerns leading to atmospheric degradation.[837] Certain ozone-depleting substances also contribute to global warming.[838]

(5) Paragraphs 2 and 3, as well as the fourth preambular paragraph, reflect the understanding of the Commission reached when the topic was included in the programme of work of the Commission at its sixty-fifth session, in 2013.[839] It should be emphasized that the decision of the Commission not to address the questions in paragraph 2 in no way indicates a view as to the legal status of these

questions. Moreover, the view was expressed that the Commission ought to have addressed these questions.

(6) Paragraph 4 is a saving clause stating that the draft guidelines do not affect the status of airspace under international law. The atmosphere and airspace are two entirely different concepts, which should be distinguished. Airspace is a static and spatial-based institution over which the State, within its territory, has "complete and exclusive sovereignty". For instance, article 1 of the Convention on International Civil Aviation provides that "every State has complete and exclusive sovereignty over the airspace above its territory".[840] In turn, article 2 of the same Convention deems the territory of a State to be "the land areas and territorial waters adjacent thereto under the sovereignty, suzerainty, protection or mandate of such State". The airspace beyond the boundaries of territorial waters is regarded as being outside the sovereignty of any State and is open for use by all States, like the high seas. On the other hand, the atmosphere, as an envelope of gases surrounding the Earth, is dynamic and fluctuating, with gases that constantly move without regard to territorial boundaries.[841] The atmosphere is invisible, intangible and non-separable.

(7) Moreover, while the atmosphere is spatially divided into spheres on the basis of temperature characteristics, there is no sharp scientific boundary between the atmosphere and outer space. Beyond 100 km, traces of the atmosphere gradually merge with the emptiness of space.[842] The Treaty on Principles Governing the Activities of States in the Exploration and Use of Outer Space, Including the Moon and Other Celestial Bodies, is silent on the definition of "outer space".[843] Since 1959 the matter has been under discussion within the context of the Legal Subcommittee of the Committee on the Peaceful Uses of Outer Space, which has looked at both spatial and functional approaches to the questions of delimitation.[844]

(8) Accordingly, the Commission elected, in paragraph 4, to indicate that the draft guidelines do not affect the legal status of airspace nor address questions related to outer space. Moreover, the reference to outer space reflects the 2013 understanding of the Commission.

### Guideline 3.    Obligation to protect the atmosphere

States have the obligation to protect the atmosphere by exercising due diligence in taking appropriate measures, in accordance with applicable rules of international law, to prevent, reduce or control atmospheric pollution and atmospheric degradation.

---

[833] See generally IPCC, Summary for Policymakers, in *Climate Change 2013: The Physical Science Basis. Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change*, T. F. Stocker and others (eds.), 2013. Available from https://www.ipcc.ch/report/ar5/wg1/.

[834] *Ibid.*

[835] *Ibid.*

[836] Birnie, Boyle and Redgwell, *International Law and the Environment* (see footnote 827 above), p. 342.

[837] *Ibid.*, p. 336. The linkages between climate change and ozone depletion are addressed in the preamble as well as in article 4 of the United Nations Framework Convention on Climate Change. The linkage between transboundary atmospheric pollution and climate change is addressed in the preamble and article 2 of the Protocol to the 1979 Convention on Long-range Transboundary Air Pollution to Abate Acidification, Eutrophication and Ground-level Ozone, amended in 2012.

[838] Birnie, Boyle and Redgwell, *International Law and the Environment* (see footnote 827 above), p. 336.

[839] *Yearbook ... 2013*, vol. II (Part Two), para. 168.

[840] See also article 2, paragraph 2, of the United Nations Convention on the Law of the Sea, which provides that "sovereignty extends to the air space over the territorial sea as well as to its bed and subsoil".

[841] See generally Birnie, Boyle and Redgwell, *International Law and the Environment* (footnote 827 above), chap. 6.

[842] Tarbuck, Lutgens and Tasa, *Earth Science* (see footnote 822 above), pp. 465 and 466.

[843] Moscow, London and Washington, D.C., 27 January 1967, United Nations, *Treaty Series*, vol. 610, No. 8843, p. 205.

[844] See, generally, B. Jasani (ed.), *Peaceful and Non-Peaceful Uses of Space: Problems of Definition for the Prevention of an Arms Race*, United Nations Institute for Disarmament Research, New York, Taylor and Francis, 1991, especially chaps. 2–3.

*Commentary*

(1)    Draft guideline 3 is central to the present draft guidelines. In particular, draft guidelines 4, 5 and 6 flow from this guideline; these three draft guidelines seek to apply various principles of international environmental law to the specific situation of the protection of the atmosphere.

(2)    The draft guideline refers to both the transboundary and global contexts. It will be recalled that draft guideline 1 contains a "transboundary" element in defining "atmospheric pollution" (as the introduction or release by humans, directly or indirectly, into the atmosphere of substances contributing to deleterious effects "extending beyond the State of origin", of such a nature as to endanger human life and health and the Earth's natural environment), and a "global" dimension in defining "atmospheric degradation" (as the alteration by humans, directly or indirectly, of atmospheric conditions having significant deleterious effects of such a nature as to endanger human life and health and the Earth's natural environment). Draft guideline 3 delimits the obligation to protect the atmosphere to preventing, reducing and controlling atmospheric pollution and atmospheric degradation, thus differentiating the kinds of obligations pertaining to each. The formulation of the present draft guideline finds its genesis in principle 21 of the Stockholm Declaration, which reflected the finding in the *Trail Smelter* arbitration.[845] This is further reflected in principle 2 of the 1992 Rio Declaration.

(3)    The reference to "States" for the purposes of the draft guideline denotes the possibility of States acting "individually" or "jointly", as appropriate.

(4)    As presently formulated, the draft guideline is without prejudice to whether or not the obligation to protect the atmosphere is an *erga omnes* obligation in the sense of article 48 of the articles on responsibility of States for internationally wrongful acts,[846] a matter on which there are different views. While there is support for recognizing that the obligations pertaining to the protection of the atmosphere from transboundary atmospheric pollution of global significance and global atmospheric degradation are obligations *erga omnes*, there is also support for the view that the legal consequences of such a recognition are not yet fully clear in the context of the present topic.

(5)    Significant adverse effects on the atmosphere are caused, in large part, by the activities of individuals and private industries, which are not normally attributable to a State. In this respect, due diligence requires States to "ensure" that such activities within their jurisdiction or control do not cause significant adverse effects. This does not mean, however, that due diligence applies solely to private activities, since a State's own activities are also subject to the due diligence rule.[847] It is an obligation which entails not only the adoption of appropriate rules and measures, but also a certain level of vigilance in their enforcement and the exercise of administrative control applicable to public and private operators, such as the monitoring of activities undertaken by such operators, to safeguard the rights of the other party. It also requires taking into account the context and evolving standards of both regulation and technology. Therefore, even where significant adverse effects materialize, that does not automatically constitute a failure of due diligence. Such failure is limited to the State's negligence to meet its obligation to take all appropriate measures to prevent, reduce or control human activities where these activities have or are likely to have significant adverse effects. The State's obligation "to ensure" does not require the achievement of a certain result (obligation of result) but only requires the best available efforts not to cause significant adverse effects (obligation of conduct).

(6)    The reference to "prevent, reduce or control" denotes a variety of measures to be taken by States, whether individually or jointly, in accordance with applicable rules as may be relevant to atmospheric pollution on the one hand and atmospheric degradation on the other. The phrase "prevent, reduce or control" draws upon formulations contained in the United Nations Convention on the Law of the Sea[848] and the United Nations Framework Convention on Climate Change.[849]

(7)    Even though the appropriate measures to "prevent, reduce or control" apply to both atmospheric pollution and atmospheric degradation, the reference to "applicable rules of international law" signals a distinction between measures taken, bearing in mind the transboundary nature of atmospheric pollution and global nature of atmospheric degradation and the different rules that are applicable in relation thereto. In the context of transboundary atmospheric pollution, the obligation of States to prevent significant adverse effects is firmly established as customary international law, as confirmed, for example, by the Commission's articles on prevention of transboundary harm

---

[845] *Trail Smelter*, UNRIAA, vol. III (Sales No. 1949.V.2), pp. 1905–1982 (Award of 11 March 1941), at p. 1965 *et seq.*; see also the first report of the Special Rapporteur (A/CN.4/667) (footnote 776 above), para. 43. See also A. K. Kuhn, "The Trail Smelter arbitration, United States and Canada", *American Journal of International Law*, vol. 32 (1938), pp. 785–788; *ibid.*, vol. 35 (1941), pp. 665–666; and J. E. Read, "The Trail Smelter dispute", *Canadian Yearbook of International Law*, vol. 1 (1963), pp. 213–229.

[846] Article 48 (Invocation of responsibility by a State other than an injured State) provides that: "1. Any State other than an injured State is entitled to invoke the responsibility of another State in accordance with paragraph 2 if … (*b*) the obligation breached is owed to the international community as a whole" (General Assembly resolution 56/83 of 12 December 2001, annex. For the draft articles adopted by the Commission and the commentaries thereto, see *Yearbook … 2001*, vol. II (Part Two) and corrigendum, paras. 76–77).

[847] See *Pulp Mills on the River Uruguay (Argentina v. Uruguay)*, Judgment [of 20 April 2010], *I.C.J. Reports 2010*, p. 14, at pp. 55 and 79, paras. 101 and 197; *Certain Activities Carried Out by Nicaragua in the Border Area (Costa Rica v. Nicaragua)* and *Construction of a Road in Costa Rica along the San Juan River (Nicaragua v. Costa Rica)*, Judgment, *I.C.J. Reports 2015*, p. 665, at pp. 706, 720, 724 and 740, paras. 104, 153, 168 and 228; International Tribunal for the Law of the Sea, *Responsibilities and obligations of States with respect to activities in the Area*, Advisory Opinion, 1 February 2011, *ITLOS Reports 2011*, p. 10, at p. 46, para. 131; draft articles on prevention of transboundary harm from hazardous activities, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, pp. 154–155 (commentary to draft article 3, paras. (7)–(18)); first and second reports of the International Law Association Study Group on Due Diligence in International Law, 7 March 2014 and July 2016, respectively; and J. Kulesza, *Due Diligence in International Law*, Leiden, Brill, 2016.

[848] United Nations Convention on the Law of the Sea, art. 194.

[849] Article 3, paragraph 3, has a similar provision than "[t]he Parties should take precautionary measures to anticipate, prevent or minimize the causes of climate change and mitigate its adverse effects".

from hazardous activities[850] and by the jurisprudence of international courts and tribunals.[851] However, the existence of this obligation is still somewhat unsettled for global atmospheric degradation. The International Court of Justice has stated that "the existence of the general obligation of States to ensure that activities within their jurisdiction and control respect the environment … of areas beyond national control is now part of the corpus of international law",[852] and has attached great significance to respect for the environment "not only for States but also for the whole of mankind".[853] The Tribunal in the *Iron Rhine Railway* case stated that the "duty to prevent, or at least mitigate [significant harm to the environment] … has now become a principle of general international law".[854] At the same time, the views of members diverged as to whether these pronouncements may be deemed as fully supporting the recognition that the obligation to prevent, reduce or control global atmospheric degradation exists under customary international law. Nonetheless, such an obligation is found in relevant conventions.[855] In this context, it should be noted that the preamble of the Paris Agreement, "acknowledging" that "climate change is a common

concern of humankind", states "the importance of ensuring the integrity of all ecosystems, including oceans, and the protection of biodiversity".

### Guideline 4.    Environmental impact assessment

**States have the obligation to ensure that an environmental impact assessment is undertaken of proposed activities under their jurisdiction or control which are likely to cause significant adverse impact on the atmosphere in terms of atmospheric pollution or atmospheric degradation.**

#### Commentary

(1)    Draft guideline 4 deals with environmental impact assessment. This is the first of three draft guidelines that flow from the overarching draft guideline 3. In the *Construction of a Road in Costa Rica along the San Juan River* case, the International Court of Justice affirmed that "a State's obligation to exercise due diligence in preventing significant transboundary harm requires that State to ascertain whether there is a risk of significant transboundary harm prior to undertaking an activity having the potential adversely to affect the environment of another State. If that is the case, the State concerned must conduct an environmental impact assessment."[856] In the above-mentioned case, the Court concluded that the State in question "ha[d] not complied with its obligation under general international law to perform an environmental impact assessment prior to the construction of the road".[857] In a separate opinion, Judge Owada noted that "an environmental impact assessment plays an important and even crucial role in ensuring that the State in question is acting with due diligence under general international environmental law".[858] In 2010, in the *Pulp Mills on the River Uruguay* case, the Court stated that "the obligation to protect and preserve, under Article 41 (*a*) of the Statute [of the River Uruguay], has to be interpreted in accordance with a practice, which in recent years has gained so much acceptance among States that it may now be considered *a requirement under general international law to undertake an environmental impact assessment*".[859] Moreover, in 2011, the Seabed Disputes Chamber of the International Tribunal for the Law of the Sea, in its advisory opinion on the *Responsibilities and obligations of States regarding activities in the Area*, held that the duty to conduct an environmental impact assessment not only arises under the United Nations Convention on the Law of the Sea, but is also a "general obligation under customary international law".[860] Similarly, the International Court of Justice, in the *Gabčíkovo-Nagymaros Project* case, alluded to the importance of environmental impact assessment.[861]

---

[850] Article 3 (Prevention) provides that: "The State of origin shall take all appropriate measures to prevent significant transboundary harm or at any event to minimize the risk thereof" (General Assembly resolution 62/68 of 6 December 2007, annex. For the draft articles adopted by the Commission and the commentaries thereto, see *Yearbook … 2001*, vol. II (Part Two) and corrigendum, paras. 97–98). The Commission has also dealt with the obligation of prevention in its articles on responsibility of States for internationally wrongful acts (General Assembly resolution 56/83, annex. For the draft articles adopted by the Commission and the commentaries thereto, see *Yearbook … 2001*, vol. II (Part Two) and corrigendum, paras. 76–77). Article 14, paragraph 3, provides that: "The breach of an international obligation requiring a State to prevent a given event occurs when the event occurs and extends over the entire period during which the event continues". According to the commentary to this article: "Obligations of prevention are usually construed as best efforts obligations, requiring States to take all reasonable or necessary measures to prevent a given event from occurring, but without warranting that the event will not occur" (*Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 62, para. (14)). The commentary cited "the obligation to prevent transboundary damage by air pollution, dealt with in the *Trail Smelter* arbitration" as one of the examples of the obligation of prevention (*ibid.*).

[851] The International Court of Justice has emphasized prevention as well. In the *Gabčíkovo-Nagymaros Project* case, the Court stated that it "is mindful that, in the field of environmental protection, vigilance and prevention are required on account of the often irreversible character of damage to the environment and of the limitations inherent in the very mechanism of reparation of this type of damage" (*Gabčíkovo-Nagymaros Project (Hungary/Slovakia)*, Judgment, *I.C.J. Reports 1997*, p. 7, at p. 78, para. 140). In the *Iron Rhine Railway* case, the Arbitral Tribunal also stated that "[t]oday, in international environmental law, a growing emphasis is being put on the duty of prevention" (*Arbitration regarding the Iron Rhine ("Ijzeren Rijn") Railway between the Kingdom of Belgium and the Kingdom of the Netherlands*, decision of 24 May 2005, UNRIAA, vol. XXVII (Sales No. E/F.06.V.8), pp. 35–125, at p. 116, para. 222).

[852] *Legality of the Threat or Use of Nuclear Weapons* (see footnote 814 above), pp. 241–242, para. 29.

[853] *Gabčíkovo-Nagymaros Project* (see footnote 851 above), p. 41, para. 53; the Court cited the same paragraph in *Pulp Mills on the River Uruguay*, Judgment of 20 April 2010 (see footnote 847 above), p. 78, para. 193.

[854] *Iron Rhine Railway* (see footnote 851 above), pp. 66–67, para. 59.

[855] See, for example, United Nations Convention on the Law of the Sea; Vienna Convention for the Protection of the Ozone Layer; United Nations Framework Convention on Climate Change; Convention on Biological Diversity; United Nations Convention to Combat Desertification in Those Countries Experiencing Serious Drought and/or Desertification, Particularly in Africa; Stockholm Convention on Persistent Organic Pollutants; and Minamata Convention on Mercury.

[856] *Certain Activities Carried Out by Nicaragua in the Border Area (Costa Rica v. Nicaragua)* and *Construction of a Road in Costa Rica along the San Juan River (Nicaragua v. Costa Rica)* (see footnote 847 above), p. 720, para. 153.

[857] *Ibid.*, p. 724, para. 168.

[858] *Ibid.*, separate opinion of Judge Owada, para. 18.

[859] *Pulp Mills on the River Uruguay*, Judgment of 20 April 2010 (see footnote 847 above), p. 83, para. 204. For the Statute of the River Uruguay, signed at Salto, Uruguay, on 26 February 1975, see United Nations, *Treaty Series*, vol. 1295, No. 21425, p. 331.

[860] *Responsibilities and obligations of States with respect to activities in the Area* (see footnote 847 above), p. 50, para. 145.

[861] *Gabčíkovo-Nagymaros Project* (see footnote 851 above).

(2) The draft guideline is formulated in the passive tense—"States have the obligation to ensure that an environmental impact assessment is undertaken" as opposed to "States have an obligation to undertake an appropriate environmental impact assessment"—in order to signal that this is an obligation of conduct and that, given the broad nature of economic actors, the obligation does not necessarily attach to the State itself to perform the assessment. What is required is that the State put in place the necessary legislative, regulatory and other measures for an environmental impact assessment to be conducted with respect to proposed activities. Notification and consultations are key to such an assessment.

(3) The phrase "of proposed activities under their jurisdiction or control" is intended to indicate that the obligation of States to ensure that an environmental impact assessment is undertaken is in respect of activities under their jurisdiction or control. Since environmental threats have no respect for borders, it is not precluded that States, as part of their global environmental responsibility, take decisions jointly regarding environmental impact assessments.

(4) A threshold was considered necessary for triggering the environmental impact assessment. The phrase "which are likely to cause significant adverse impact" has accordingly been inserted. It is drawn from the language of principle 17 of the Rio Declaration.[862] Moreover, there are other instruments, such as the Convention on Environmental Impact Assessment in a Transboundary Context, that use a similar threshold. In the *Pulp Mills on the River Uruguay* case, the Court indicated that an environmental impact assessment had to be undertaken where there was a risk that the proposed industrial activity may have a "significant adverse impact in a transboundary context, in particular, on a shared resource".[863]

(5) By having a threshold of "likely to cause significant adverse impact", the draft guideline excludes an environmental impact assessment for an activity whose impact is likely to be minor. The impact of the potential harm must be "significant" for both "atmospheric pollution" and "atmospheric degradation". What constitutes "significant" requires a factual, not a legal, determination.[864]

(6) The phrase "in terms of atmospheric pollution or atmospheric degradation" was considered important as it relates the draft guideline to the two main issues of concern to the present draft guidelines as regards protection of the atmosphere, namely transboundary atmospheric pollution and atmospheric degradation. While the relevant precedents for the requirement of an environmental impact

assessment primarily address transboundary contexts, it is considered that there is a similar requirement for projects that are likely to have significant adverse effects on the global atmosphere, such as those activities involving intentional large-scale modification of the atmosphere.[865] As regards the protection of the atmosphere, such activities may carry a more extensive risk of severe damage than even those causing transboundary harm, and therefore the same considerations should be applied *a fortiori* to those activities potentially causing global atmospheric degradation. Thus, the Protocol on Strategic Environmental Assessment to the Convention on Environmental Impact Assessment in a Transboundary Context encourages "strategic environmental assessment" of the likely environmental, including health, effects, which means any effect on the environment, including human health, flora, fauna, biodiversity, soil, climate, air, water, landscape, natural sites, material assets, cultural heritage and the interaction among these factors.[866]

(7) While it is acknowledged that transparency and public participation are important components in ensuring access to information and representation, it was considered that the procedural aspects of an environmental impact assessment should not be dealt with in the draft guideline itself. Principle 10 of the 1992 Rio Declaration[867] provides that environmental issues are best handled with the participation of all concerned citizens, at the relevant level. This includes access to information, the opportunity to participate in decision-making processes, and effective access to judicial and administrative proceedings. The Convention on Access to Information, Public Participation in Decision-Making and Access to Justice in Environmental Matters also addresses these issues. The Protocol on Strategic Environmental Assessment to the Convention on Environmental Impact Assessment in a Transboundary Context encourages the carrying out of public participation and consultations, and the taking into account of the results of the public participation and consultations in a plan or programme.[868]

## Guideline 5. Sustainable utilization of the atmosphere

**1. Given that the atmosphere is a natural resource with a limited assimilation capacity, its utilization should be undertaken in a sustainable manner.**

**2. Sustainable utilization of the atmosphere includes the need to reconcile economic development with protection of the atmosphere.**

### Commentary

(1) The atmosphere is a natural resource with limited assimilation capacity.[869] It is often not conceived of as exploitable in the same sense as, for example, mineral

[862] *Report of the United Nations Conference on Environment and Development* ... (see footnote 800 above), p. 6.

[863] *Pulp Mills on the River Uruguay*, Judgment of 20 April 2010 (see footnote 847 above), p. 83, para. 204.

[864] The Commission has frequently employed the term "significant" in its work, including in the articles on prevention of transboundary harm from hazardous activities (2001). In that case, the Commission chose not to define the term, recognizing that the question of "significance" requires a factual determination rather than a legal one (see para. (4) of the general commentary to the draft articles and paras. (4)–(7) of the commentary to article 2, *Yearbook ... 2001*, vol. II (Part Two) and corrigendum, pp. 148 and 152–153). See also the commentary to the draft principles on the allocation of loss in the case of transboundary harm arising out of hazardous activities (commentary to draft principle 2, paras. (1)–(3), *Yearbook ... 2006*, vol. II (Part Two), pp. 64–65).

[865] See draft gnideline 7.

[866] Protocol on Strategic Environmental Assessment to the Convention on Environmental Impact Assessment in a Transboundary Context, art. 2, paras. 6–7.

[867] *Report of the United Nations Conference on Environment and Development* ... (see footnote 800 above), p. 5.

[868] Protocol on Strategic Environmental Assessment to the Convention on Environmental Impact Assessment in a Transboundary Context, art. 2, paras. 6–7.

[869] See para. (2) of the commentary to the preamble, above.

or oil and gas resources are explored and exploited. In truth, however, the atmosphere, in its physical and functional components, is exploitable and exploited. The polluter exploits the atmosphere by reducing its quality and its capacity to assimilate pollutants. The draft guideline draws analogies from the concept of "shared resource", while also recognizing that the unity of the global atmosphere requires recognition of the commonality of interests. Accordingly, this draft guideline proceeds on the premise that the atmosphere is a resource with limited assimilation capacity, the ability of which to sustain life on Earth is impacted by anthropogenic activities. In order to secure its protection, it is important to see it as a resource that is subject to exploitation, thereby subjecting the atmosphere to the principles of conservation and sustainable use. Some members expressed doubts as to whether the atmosphere could be treated analogously to transboundary watercourses or aquifers.

(2) It is acknowledged in paragraph 1 that the atmosphere is a "natural resource with a limited assimilation capacity". The second part of paragraph 1 seeks to integrate conservation and development so as to ensure that modifications to the planet continue to enable the survival and well-being of organisms on Earth. It does so by reference to the proposition that the utilization of the atmosphere should be undertaken in a sustainable manner. This is inspired by the Commission's formulations in the 1994 draft articles on the law of the non-navigational uses of international watercourses[870] and in the 2008 draft articles on the law of transboundary aquifers.[871]

(3) The term "utilization" is used broadly and in general terms evoking notions beyond actual exploitation. The atmosphere has been utilized in several ways. Likely, most of those activities that have been carried out so far are those conducted without a clear or concrete intention to affect atmospheric conditions. However, there have been certain activities the very purpose of which is to alter atmospheric conditions, such as weather modification. Some of the proposed technologies for intentional, large-scale modification of the atmosphere[872] are examples of the utilization of the atmosphere.

(4) The formulation "its utilization should be undertaken in a sustainable manner" in the present draft guideline is simple and not overly legalistic, which well reflects a paradigm shift towards viewing the atmosphere as a natural resource that ought to be utilized in a sustainable manner. It is presented more as a statement of international policy and regulation than an operational code to determine rights and obligations among States.

(5) Paragraph 2 builds upon the language of the International Court of Justice in its judgment in the *Gabčíkovo-Nagymaros Project* case, in which it referred to the "need to reconcile economic development with protection of

the environment".[873] There are other relevant precedents.[874] The reference to "protection of the atmosphere" as opposed to "environmental protection" seeks to focus the paragraph on the subject matter of the present topic, which is the protection of the atmosphere.

## Guideline 6.  Equitable and reasonable utilization of the atmosphere

**The atmosphere should be utilized in an equitable and reasonable manner, taking into account the interests of present and future generations.**

### Commentary

(1) Although equitable and reasonable utilization of the atmosphere is an important element of sustainability, as reflected in draft guideline 5, it is considered important to state it as an autonomous principle. Like draft guideline 5, the present guideline is formulated at a broad level of abstraction and generality.

---

[870] *Yearbook … 1994*, vol. II (Part Two), para. 222; see, in particular, draft articles 5 and 6, *ibid.*, pp. 96 and 101.

[871] *Yearbook … 2008*, vol. II (Part Two), paras. 53–54; see, in particular, draft articles 4 and 5, *ibid.*, pp. 27–29. The articles on the law of transboundary aquifers adopted by the Commission at its sixtieth session are reproduced in the annex to General Assembly resolution 63/124 of 11 December 2008.

[872] See draft guideline 7.

[873] *Gabčíkovo-Nagymaros Project* (see footnote 851 above), p. 78, para. 140.

[874] In its 2006 order in the *Pulp Mills on the River Uruguay* case, the International Court of Justice highlighted "the importance of the need to ensure environmental protection of shared natural resources while allowing for sustainable economic development" (*Pulp Mills on the River Uruguay (Argentina v. Uruguay)*, Provisional Measures, Order of 13 July 2006, *I.C.J. Reports 2006*, p. 113, at p. 133, para. 80); the 1998 WTO Appellate Body decision on *United States—Import Prohibition of Certain Shrimp and Shrimp Products* stated that, "recalling the explicit recognition by WTO Members of the objective of sustainable development in the preamble of the [Marrakesh Agreement Establishing the World Trade Organization], we believe it is too late in the day to suppose that Article XX (g) of the [General Agreement on Tariffs and Trade 1994] may be read as referring only to the conservation of exhaustible mineral or other non-living natural resources" (Appellate Body Report, *United States—Import Prohibition of Certain Shrimp and Shrimp Products (United States—Shrimp)*, WT/DS58/AB/R, adopted 6 November 1998, para. 131; see also paras. 129 and 153); in the 2005 arbitral case of the *Iron Rhine Railway*, the Tribunal held as follows: "There is considerable debate as to what, within the field of environmental law, constitutes 'rules' or 'principles'; what is 'soft law'; and which environmental treaty law or principles have contributed to the development of customary international law. … The emerging principles, whatever their current status, make reference to … sustainable development. … Importantly, these emerging principles now integrate environmental protection into the development process. Environmental law and the law on development stand not as alternatives but as mutually reinforcing, integral concepts, which require that where development may cause significant harm to the environment there is a duty to prevent, or at least mitigate, such harm. … This duty, in the opinion of the Tribunal, has now become a principle of general international law" (*Iron Rhine Railway* (see footnote 851 above), paras. 58–59); the 2013 Partial Award in the *Indus Waters Kishenganga Arbitration* states: "There is no doubt that States are required under contemporary customary international law to take environmental protection into consideration when planning and developing projects that may cause injury to a bordering State. Since the time of *Trail Smelter*, a series of international … arbitral decisions have addressed the need to manage natural resources in a sustainable manner. In particular, the International Court of Justice expounded upon the principle of 'sustainable development' in *Gabčíkovo-Nagymaros*, referring to the 'need to reconcile economic development with protection of the environment'" (*Indus Waters Kishenganga Arbitration (Islamic Republic of Pakistan v. Republic of India)*, Partial Award of 18 February 2013, para. 449, Permanent Court of Arbitration, *Award Series, The Indus Waters Kishenganga Arbitration (Pakistan v. India): Record of Proceedings (2010–2013)*; or ILR, vol. 154, p. 1, at p. 172). This was confirmed by the Final Award of 20 December 2013, para. 111 (Permanent Court of Arbitration, *Award Series …* ; or ILR, vol. 157, p. 362, at p. 412).

(2)   The draft guideline is formulated in general terms so as to apply the principle of equity[875] to the protection of the atmosphere as a natural resource that is to be shared by all. The first part of the sentence deals with "equitable and reasonable" utilization. The formulation that the "atmosphere should be utilized in an equitable and reasonable manner" draws, in part, upon article 5 of the Convention on the Law of the Non-navigational Uses of International Watercourses and article 4 of the draft articles on the law of transboundary aquifers. It requires a balancing of interests and consideration of all relevant factors that may be unique to either atmospheric pollution or atmospheric degradation.

(3)   The second part of the formulation addresses questions of intra- and intergenerational equity.[876] In order to draw out the link between the two aspects of equity, the Commission elected to use the phrase "taking into account the interests of" instead of "and for the benefit of present and future generations of humankind". The words "the interests of", and not "the benefit of", have been used to signal the integrated nature of the atmosphere, the "exploitation" of which needs to take into account a balancing of interests to ensure sustenance for the Earth's living organisms.

### Guideline 7.   Intentional large-scale modification of the atmosphere

**Activities aimed at intentional large-scale modification of the atmosphere should be conducted with prudence and caution, subject to any applicable rules of international law.**

#### Commentary

(1)   Draft guideline 7 deals with activities the very purpose of which is to alter atmospheric conditions. As the title of the draft guideline signals, it addresses only intentional modification on a large scale.

(2)   The term "activities aimed at intentional large-scale modification of the atmosphere" is taken in part from the definition of "environmental modification techniques" that appears in the Convention on the Prohibition of Military or Any Other Hostile Use of Environmental Modification Techniques, which refers to techniques for changing—through the deliberate manipulation of natural processes—the dynamics, composition or structure of the Earth, including its biota, lithosphere, hydrosphere and atmosphere, or of outer space.

(3)   These activities include what is commonly understood as "geoengineering", the methods and technologies of which encompass carbon dioxide removal and solar radiation management. Activities related to the former involve the ocean, land and technical systems and seek to remove carbon dioxide from the atmosphere through natural sinks or through chemical engineering. Proposed techniques for carbon dioxide removal include soil carbon sequestration, carbon capture and sequestration, ambient air capture, ocean fertilization, ocean alkalinity enhancement, and enhanced weathering. Indeed, afforestation has traditionally been employed to reduce carbon dioxide.

(4)   According to scientific experts, solar radiation management is designed to mitigate the negative impacts of climate change by intentionally lowering the surface temperatures of the Earth. Proposed activities here include "albedo enhancement", a method that involves increasing the reflectiveness of clouds or the surface of the Earth, so that more of the heat of the sun is reflected back into space; stratospheric aerosols, a technique that involves the introduction of small reflective particles into the upper atmosphere to reflect sunlight before it reaches the surface of the Earth; and space reflectors, which entail blocking a small proportion of sunlight before it reaches the Earth.

(5)   As noted above, the term "activities" is broadly understood. However, there are certain other activities that are prohibited by international law, which are not covered by the present draft guideline, such as those prohibited by the Convention on the Prohibition of Military or Any Other Hostile Use of Environmental Modification Techniques[877] and Additional Protocol I to the Geneva Conventions of 1949.[878] Accordingly, the present draft guideline applies only to "non-military" activities. Military activities involving deliberate modifications of the atmosphere are outside the scope of the present guideline.

(6)   Likewise, other activities will continue to be governed by various regimes. For example, afforestation has been incorporated in the Kyoto Protocol to the United Nations Framework Convention on Climate Change regime and in the Paris Agreement (art. 5, para. 2). Under some international legal instruments, measures have been adopted for regulating carbon capture and storage. The 1996 Protocol to the 1972 Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter now includes an amended provision and annex, as well as new guidelines for controlling the dumping of wastes and other matter. To the extent that "ocean iron fertilization" and "ocean alkalinity enhancement" relate to questions of ocean dumping, the 1972 Convention and the 1996 Protocol thereto are relevant.

(7)   Activities aimed at intentional large-scale modification of the atmosphere have a significant potential for preventing, diverting, moderating or ameliorating

---

[875] See, for example, J. Kokott, "Equity in international law", in F. L. Tóth (ed.), *Fair Weather? Equity Concerns in Climate Change*, London, Earthscan, 1999, pp. 173–192; see also *Frontier Dispute (Burkina Faso/Republic of Mali)*, Judgment, *I.C.J Reports 1986*, p. 554. See, in general, P. Weil, "L'équité dans la jurisprudence de la Cour internationale de Justice: Un mystère en voie de dissipation?", in V. Lowe and M. Fitzmaurice (eds.), *Fifty years of the International Court of Justice: Essays in Honour of Sir Robert Jennings*, Cambridge, Cambridge University Press, 1996, pp. 121–144; and F. Francioni, "Equity in international law", *Max Planck Encyclopedia of Public International Law*, vol. III, Oxford, Oxford University Press, 2013, pp. 632–642 (online edition: https://opil.ouplaw.com/home/MPIL.).

[876] See C. Redgwell, "Principles and emerging norms in international law …" (footnote 815 above), pp. 185–201; and D. Shelton, "Equity", in Bodansky, Brunnée and Hey (eds.), *The Oxford Handbook of International Environmental Law* (footnote 795 above), pp. 639–662.

[877] Convention on the Prohibition of Military or Any Other Hostile Use of Environmental Modification Techniques, art. 1.

[878] Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts (Protocol I), art. 35, para. 3, and art. 55; see also Rome Statute of the International Criminal Court, art. 8, para. 2 (*b*) (iv).

the adverse effects of disasters and hazards, including drought, hurricanes and tornadoes, and for enhancing crop production and the availability of water. At the same time, it is also recognized that they may have long-range and unexpected effects on existing climatic patterns that are not confined by national boundaries. As noted by the World Meteorological Organization with respect to weather modification: "[T]he complexity of the atmospheric processes is such that a change in the weather induced artificially in one part of the world will necessarily have repercussions elsewhere. … Before undertaking an experiment on large-scale weather modification, the possible and desirable consequences must be carefully evaluated, and satisfactory international arrangements must be reached."[879]

(8)    It is also not the intention of the present draft guideline to stifle innovation and scientific advancement. Principles 7 and 9 of the Rio Declaration[880] acknowledge the importance of new and innovative technologies and co-operation in these areas. At the same time, this does not mean that those activities always have positive effects.

(9)    Accordingly, the draft guideline does not seek either to authorize or to prohibit such activities unless there is agreement among States to take such a course of action. It simply sets out the principle that such activities, if undertaken, should be conducted with prudence and caution. The reference to "prudence and caution" is inspired by the language of the International Tribunal for the Law of the Sea in the *Southern Bluefin Tuna* cases,[881] the *MOX Plant* case,[882] and the *Land Reclamation* case.[883] The Tribunal stated in the last case: "*Considering* that, given the possible implications of land reclamation on the marine environment, prudence and caution require that Malaysia and Singapore establish mechanisms for exchanging information and assessing the risks or effects of land reclamation works and devising ways to deal with them in the areas concerned".[884] The draft guideline is cast in hortatory language, aimed at encouraging the development of rules to govern such activities, within the regimes competent in the various fields relevant to atmospheric pollution and atmospheric degradation.

(10)    The last part of the guideline refers to "subject to any applicable rules of international law". It is understood that international law would continue to operate in the field of application of the draft guideline.

(11)    It is widely acknowledged that such an activity should be conducted in a fully disclosed and transparent manner, and that an environmental impact assessment provided for in draft guideline 4 may be required for such an activity. It is considered that a project involving intentional large-scale modification of the atmosphere may well carry an extensive risk of severe damage, and therefore that *a fortiori* an assessment is necessary for such an activity.

(12)    A number of members remained unpersuaded that there was a need for a draft guideline on this matter, which essentially remains controversial, and the discussion on it is evolving, and is based on scant practice. Other members were of the view that the draft guideline could be enhanced during the second reading.

### Guideline 8.    International cooperation

**1.    States have the obligation to cooperate, as appropriate, with each other and with relevant international organizations for the protection of the atmosphere from atmospheric pollution and atmospheric degradation.**

**2.    States should cooperate in further enhancing scientific knowledge relating to the causes and impacts of atmospheric pollution and atmospheric degradation. Cooperation could include exchange of information and joint monitoring.**

### Commentary

(1)    International cooperation is at the core of the whole set of the present draft guidelines. The concept of international cooperation has undergone a significant change in international law,[885] and today is to a large extent built on the notion of common interests of the international community as a whole.[886] The fourth paragraph of the preamble to the present draft guidelines recognizes this in stating that the protection of the atmosphere from atmospheric pollution and degradation is "a pressing concern of the international community as a whole".

(2)    In this context, paragraph 1 of the present draft guideline provides for the obligation of States to cooperate, as

[879] See *Second Report on the Advancement of Atmospheric Sciences and Their Application in the Light of Developments in Outer Space*, Geneva, World Meteorological Organization, 1963, p. 19; see also Decision 8/7 (Earthwatch: assessment of outer limits) of the Governing Council of UNEP, Part A (Provisions for co-operation between States in weather modification) of 29 April 1980 (A/35/25, annex I).

[880] *Report of the United Nations Conference on Environment and Development …* (see footnote 800 above), p. 3.

[881] *Southern Bluefin Tuna (New Zealand v. Japan; Australia v. Japan)*, Provisional Measures, Order of 27 August 1999, *ITLOS Reports 1999*, p. 280, at p. 296, para. 77. The Tribunal stated that "*[c]onsidering* that, in the view of the Tribunal, the parties should in the circumstances act with prudence and caution to ensure that effective conservation measures are taken to prevent serious harm to the stock of southern bluefin tuna".

[882] *MOX Plant (Ireland v. United Kingdom)*, Provisional Measures, Order of 3 December 2001, *ITLOS Reports 2001*, p. 95, at p. 110, para. 84 ("*[c]onsidering* that, in the view of the Tribunal, prudence and caution require that Ireland and the United Kingdom cooperate in exchanging information concerning risks or effects of the operation of the MOX plant and in devising ways to deal with them, as appropriate").

[883] *Land Reclamation in and around the Straits of Johor (Malaysia v. Singapore)*, Provisional Measures, Order of 8 October 2003, *ITLOS Reports 2003*, p. 10.

[884] *Ibid.*, p. 26, para. 99.

[885] See W. Friedmann, *The Changing Structure of International Law*, London, Stevens & Sons, 1964, pp. 60–71; and C. Leben, "The changing structure of international law revisited by way of introduction", *The European Journal of International Law*, vol. 8, No. 3 (1997), pp. 399–408. See also J. Delbrück, "The international obligation to cooperate—An empty shell or a hard law principle of international law?—A critical look at a much debated paradigm of modern international law", in H. P. Hestermeyer and others (eds.), *Coexistence, Cooperation and Solidarity, Liber Amicorum Rüdiger Wolfrum*, vol. I, Leiden/Boston, Martinus Nijhoff, 2012, pp. 3–16.

[886] See B. Simma, "From bilateralism to community interests in international law", *Collected Courses of the Hague Academy of International Law, 1994-VI*, vol. 250, pp. 217–384; and N. Okuwaki, "On compliance with the obligation to cooperate: new developments of 'international law for cooperation'", in Jun'ichi Eto (ed.), *Aspects of International Law Studies* (Festschrift for Shinya Murase), Tokyo, Shinzansha, 2015, pp. 5–46, at pp. 16–17 (in Japanese).

appropriate. In concrete terms, such cooperation is with other States and with relevant international organizations. The phrase "as appropriate" denotes a certain flexibility for States in carrying out the obligation to cooperate depending on the nature and subject matter required for cooperation. The forms in which such cooperation may occur may also vary depending on the situation and allow for the exercise of a certain margin of appreciation of States. It may be at the bilateral, regional or multilateral levels. States may also individually take appropriate action.

(3) In the *Pulp Mills on the River Uruguay* case, the International Court of Justice emphasized linkages attendant to the obligation to inform, cooperation between the parties and the obligation of prevention. The Court noted that "it is by cooperating that the States concerned can jointly manage the risks of damage to the environment … so as to prevent the damage in question".[887]

(4) International cooperation is found in several multilateral instruments relevant to the protection of the environment. Both the Stockholm Declaration and the Rio Declaration, in principle 24 and principle 27, respectively, stress the importance of cooperation, entailing good faith and a spirit of partnership.[888] In addition, among some of the existing treaties, the Vienna Convention for the Protection of the Ozone Layer (1985) provides, in its preamble, that the parties to this Convention are "[a]ware that measures to protect the ozone layer from modifications due to human activities require international co-operation and action". Furthermore, the preamble of the United Nations Framework Convention on Climate Change (1992) acknowledges that "the global nature of climate change calls for the widest possible cooperation by all countries and their participation in an effective and appropriate international response", while reaffirming "the principle of sovereignty of States in international cooperation to address climate change".[889]

---

[887] *Pulp Mills on the River Uruguay*, Judgment of 20 April 2010 (footnote 847 above), p. 49, para. 77.

[888] Principle 24 of the Stockholm Declaration states:

"International matters concerning the protection and improvement of the environment should be handled in a co-operative spirit by all countries, big and small, on an equal footing. Co-operation through multilateral or bilateral arrangements or other appropriate means is essential to effectively control, prevent, reduce and eliminate adverse environmental effects resulting from activities conducted in all spheres, in such a way that due account is taken of the sovereignty and interests of all States."

*Report of the United Nations Conference on the Human Environment …* (see footnote 781 above), p. 5.

Principle 27 of the Rio Declaration states:

"States and people shall cooperate in good faith and in a spirit of partnership in the fulfilment of the principles embodied in this Declaration and in the further development of international law in the field of sustainable development."

*Report of the United Nations Conference on Environment and Development …* (see footnote 800 above), p. 8.

[889] See also section 2 of part XII of the United Nations Convention on the Law of the Sea, which provides for "Global and regional cooperation", setting out "Cooperation on a global or regional basis" (art. 197), "Notification of imminent or actual damage" (art. 198), "Contingency plans against pollution" (art. 199), "Studies, research programmes and exchange of information and data" (art. 200) and "Scientific criteria for regulations" (art. 201). Section 2 of part XIII of the Convention provides for "International cooperation", setting out "Promotion of international cooperation" (art. 242), "Creation of favourable conditions" (art. 243) and "Publication and dissemination of information and knowledge" (art. 244).

(5) Paragraph 1 of article 8 of the Convention on the Law of the Non-navigational Uses of International Watercourses, on the general obligation to cooperate, provides that:

Watercourse States shall cooperate on the basis of sovereign equality, territorial integrity, mutual benefit and good faith in order to attain optimal utilization and adequate protection of an international watercourse.

(6) In its work, the Commission has also recognized the importance of the obligation to cooperate. The articles on prevention of transboundary harm from hazardous activities (2001) provide in draft article 4, on cooperation, that:

States concerned shall cooperate in good faith and, as necessary, seek the assistance of one or more competent international organizations in preventing significant transboundary harm or at any event in minimizing the risk thereof.[890]

Further, the articles on the law of transboundary aquifers (2008) provide in draft article 7, "General obligation to cooperate", that:

1. Aquifer States shall cooperate on the basis of sovereign equality, territorial integrity, sustainable development, mutual benefit and good faith in order to attain equitable and reasonable utilization and appropriate protection of their transboundary aquifers or aquifer systems.

2. For the purpose of paragraph 1, aquifer States should establish joint mechanisms of cooperation.[891]

(7) Finally, the draft articles on the protection of persons in the event of disasters (2016) provide, in draft article 7, for a duty to cooperate.[892]

(8) Cooperation could take a variety of forms. Paragraph 2 of the draft guideline stresses, in particular, the importance of cooperation in enhancing scientific knowledge relating to the causes and impacts of atmospheric pollution and atmospheric degradation. Paragraph 2 also highlights the exchange of information and joint monitoring.

(9) The Vienna Convention for the Protection of the Ozone Layer provides, in its preamble, that international cooperation and action should be "based on relevant scientific and technical considerations", and in article 4, paragraph (1), on cooperation in the legal, scientific and technical fields, there is provision that:

---

[890] *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 146. The articles on prevention of transboundary harm from hazardous activities adopted by the Commission at its fifty-third session are reproduced in the annex to General Assembly resolution 62/68 of 6 December 2007.

[891] *Yearbook … 2008*, vol. II (Part Two), p. 20. The articles on the law of transboundary aquifers adopted by the Commission at its sixtieth session are reproduced in the annex to General Assembly resolution 63/124 of 11 December 2008.

[892] Draft article 7 provides that:

"In the application of the present draft articles, States shall, as appropriate, cooperate among themselves, with the United Nations, with the components of the International Red Cross and Red Crescent Movement, and with other assisting actors."

The draft articles were adopted by the Commission at its sixty-eighth session, in 2016, and submitted to the General Assembly as a part of the Commission's report covering the work of that session, *Yearbook … 2016*, vol. II (Part Two), para. 48. In its resolution 71/141 of 13 December 2016, the General Assembly took note of the draft articles and invited Governments to submit comments concerning the recommendation by the Commission to elaborate a convention on the basis of the articles.

The Parties shall facilitate and encourage the exchange of scientific, technical, socio-economic, commercial and legal information relevant to this Convention as further elaborated in annex II. Such information shall be supplied to bodies agreed upon by the Parties.

Annex II to the Convention gives a detailed set of items for information exchange. Article 4, paragraph 2, provides for cooperation in the technical fields, taking into account the needs of developing countries.

(10) Article 4, paragraph 1, of the United Nations Framework Convention on Climate Change, regarding commitments, provides that:

All Parties ... shall: ... (e) Cooperate in preparing for adaptation to the impacts of climate change; ... (g) Promote and cooperate in scientific, technological, technical, socio-economic and other research, systematic observation and development of data archives related to the climate system and intended to further the understanding and to reduce or eliminate the remaining uncertainties regarding the causes, effects, magnitude and timing of climate change and the economic and social consequences of various response strategies; (h) Promote and cooperate in the full, open and prompt exchange of relevant scientific, technological, technical, socio-economic and legal information related to the climate system and climate change, and to the economic and social consequences of various response strategies; (i) Promote and cooperate in education, training and public awareness related to climate change and encourage the widest participation in this process, including that of non-governmental organizations.

(11) The obligation to cooperate also includes, *inter alia*, the exchange of information. In this respect, it may also be noted that article 9 of the Convention on the Law of the Non-navigational Uses of International Watercourses has a detailed set of provisions on exchange of data and information. Moreover, the Convention on Long-range Transboundary Air Pollution provides in article 4 that the contracting parties "shall exchange information on and review their policies, scientific activities and technical measures aimed at combating, as far as possible, the discharge of air pollutants which may have adverse effects, thereby contributing to the reduction of air pollution including long-range transboundary air pollution". The Convention also has detailed provisions on cooperation in the fields of research and development (art. 7); exchange of information (art. 8); and implementation and further development of the cooperative programme for the monitoring and evaluation of the long-range transmission of air pollutants in Europe (art. 9). Similarly, the Eastern Africa Regional Framework Agreement on Air Pollution (Nairobi Agreement, 2008) and the West and Central Africa Regional Framework Agreement on Air Pollution (Abidjan Agreement, 2009) have identical provisions on international cooperation. The parties agree to:

1.2 Consider the synergies and co-benefits of taking joint measures against the emission of air pollutants and greenhouse gases; ... 1.4 Promote the exchange of educational and research information on air quality management; 1.5 Promote regional cooperation to strengthen the regulatory institutions.

(12) The second sentence of draft article 17, paragraph 4, of the articles on the law of transboundary aquifers provides that: "Cooperation may include coordination of international emergency actions and communications, making available emergency response personnel, emergency response equipment and supplies, scientific and technical expertise and humanitarian assistance".[893]

In turn, the draft articles on the protection of persons in the event of disasters provides, in draft article 8 (Forms of cooperation in the response to disasters), that "[c]o-operation in the response to disasters includes humanitarian assistance, coordination of international relief actions and communications, and making available relief personnel, equipment and goods, and scientific, medical and technical resources".[894]

(13) In the context of protecting the atmosphere, enhancing scientific knowledge relating to the causes and impacts of atmospheric pollution and atmospheric degradation is considered key by the Commission.

## Guideline 9.    Interrelationship among relevant rules

1.    **The rules of international law relating to the protection of the atmosphere and other relevant rules of international law, including, *inter alia*, the rules of international trade and investment law, of the law of the sea and of international human rights law, should, to the extent possible, be identified, interpreted and applied in order to give rise to a single set of compatible obligations, in line with the principles of harmonization and systemic integration, and with a view to avoiding conflicts. This should be done in accordance with the relevant rules set forth in the Vienna Convention on the Law of Treaties of 1969, including articles 30 and 31, paragraph 3 (c), and the principles and rules of customary international law.**

2.    **States should, to the extent possible, when developing new rules of international law relating to the protection of the atmosphere and other relevant rules of international law, endeavour to do so in a harmonious manner.**

3.    **When applying paragraphs 1 and 2, special consideration should be given to persons and groups particularly vulnerable to atmospheric pollution and atmospheric degradation. Such groups may include, *inter alia*, indigenous peoples, people of the least developed countries and people of low-lying coastal areas and small island developing States affected by sea-level rise.**

### Commentary

(1) Draft guideline 9 addresses "interrelationship among relevant rules"[895] and seeks to reflect the relationship between rules of international law relating to the protection of the atmosphere and other relevant rules of international law. Paragraphs 1 and 2 are general in nature, while paragraph 3 places emphasis on the protection of groups that are particularly vulnerable to atmospheric pollution and atmospheric degradation. Atmospheric pollution and atmospheric degradation are defined in draft guideline 1 on the use of terms. Those

---

[893] *Yearbook ... 2008*, vol. II (Part Two), p. 22.

[894] *Yearbook ... 2016*, vol. II (Part Two), p. 25.

[895] See draft article 10 (on interrelationship) of International Law Association resolution 2/2014 on the declaration of legal principles relating to climate change, *Report of the Seventy-sixth Conference held in Washington D.C., August 2014*, p. 26.

terms focus on pollution and degradation caused "by humans". That necessarily means that human activities governed by other fields of law have a bearing on the atmosphere and its protection. It is therefore important that conflicts and tensions between rules relating to the protection of the atmosphere and rules relating to other fields of international law be avoided to the extent possible. Accordingly, draft guideline 9 highlights the various techniques in international law for addressing tensions between legal rules and principles, whether they relate to a matter of interpretation or a matter of conflict. The formulation of draft guideline 9 draws upon the conclusions reached by the Commission's Study Group on fragmentation of international law: difficulties arising from the diversification and expansion of international law.[896]

(2)   Paragraph 1 addresses three kinds of legal processes, namely the identification of the relevant rules, their interpretation and their application. The phrase "and with a view to avoiding conflicts" at the end of the first sentence of the paragraph signals that "avoiding conflicts" is one of the principal purposes of the paragraph. It is, however, not the exclusive purpose of the draft guideline. The paragraph is formulated in the passive form, in recognition of the fact that the process of identification, interpretation and application involves not only States but also international organizations, as appropriate.

(3)   The phrase "should, to the extent possible, be identified, interpreted and applied in order to give rise to a single set of compatible obligations" draws upon the Commission's Study Group conclusions on fragmentation of international law. The term "identified" is particularly relevant in relation to rules arising from treaty obligations and other sources of international law. In coordinating norms, certain preliminary steps need to be taken that pertain to identification, for example, a determination of whether two norms address "the same subject matter", and which norm should be considered *lex generalis* or *lex specialis* and *lex anterior* or *lex posterior*, and whether the *pacta tertiis* rule applies. Moreover, when resorting to rules of customary international law for the purposes of interpretation, caution is required in identifying customary international law.

(4)   The first sentence also makes specific reference to the principles of "harmonization and systemic integration", which were accorded particular attention in the conclusions of the work of the Study Group. As noted in conclusion (4) on harmonization, when several norms bear on a single issue they should, to the extent possible, be interpreted so as to give rise to "a single set of compatible obligations". Moreover, under conclusion (17), systemic integration denotes that "whatever their subject matter, treaties are a creation of the international legal system". They should thus be interpreted against the background of other international rules and principles.

(5)   The second sentence of paragraph 1 seeks to locate the paragraph within the relevant rules set forth in the Vienna Convention on the Law of Treaties ("1969 Vienna Convention"), including articles 30 and 31, paragraph 3 (*c*), and the principles and rules of customary international law. Article 31, paragraph 3 (*c*), is intended to guarantee a "systemic interpretation", requiring "any relevant rules of international law applicable in the relations between the parties" to be taken into account.[897] In other words, article 31, paragraph 3 (*c*), of the 1969 Vienna Convention emphasizes both the "unity of international law" and "the sense in which rules should not be considered in isolation of general international law".[898] Article 30 of the 1969 Vienna Convention provides rules to resolve a conflict, if the above principle of systemic integration does not work effectively in a given circumstance. Article 30 provides for conflict rules of *lex specialis* (para. 2), of *lex posterior* (para. 3) and of *pacta tertiis* (para. 4).[899] The phrase "principles and rules of customary international law" in the second sentence of paragraph 1 covers such principles and rules of customary international law as are relevant to the identification, interpretation and application of relevant rules.[900]

(6)   The reference to "including, *inter alia*, the rules of international trade and investment law, of the law of the sea and of international human rights law" highlights the practical importance of these three areas in their relation to the protection of the atmosphere. The specified areas have a close connection with the rules of international law relating to the protection of the atmosphere in terms of treaty practice, jurisprudence and doctrine.[901] Other fields of law, which might be equally relevant, have not been overlooked and the list of relevant fields of law is not intended to be exhaustive. Furthermore, nothing in draft guideline 9 should be interpreted as subordinating rules of international law in the listed fields to rules relating to the protection of the atmosphere and vice versa.

[896] *Yearbook ... 2006*, vol. II (Part Two), para. 251 (see conclusion (2) on "relationships of interpretation" and "relationships of conflict"). See also the analytical study in the report of the Study Group of the Commission finalized by Martti Koskenniemi on fragmentation of international law: difficulties arising from the diversification and expansion of international law, *Yearbook ... 2006*, vol. II (Part One) (addendum 2), document A/CN.4/L.682 and Add.1.

[897] See, e.g., WTO, Appellate Body Report, *United States—Shrimp* (footnote 874 above), para. 158. See also *Al-Adsani v. the United Kingdom* [GC], no. 35763/97, ECHR 2001-XI, para. 55.

[898] P. Sands, "Treaty, custom and the cross-fertilization of international law", *Yale Human Rights and Development Law Journal*, vol. 1 (1998), p. 95, para. 25; see also C. McLachlan, "The principle of systemic integration and article 31 (3) (*c*) of the Vienna Convention", *International and Comparative Law Quarterly*, vol. 54 (2005), pp. 279–319; and J.-M. Sorel and V. Boré Eveno, "1969 Vienna Convention. Article 31: General rule of interpretation", in O. Corten and P. Klein (eds.), *The Vienna Conventions on the Law of Treaties: A Commentary*, vol. I, Oxford, Oxford University Press, 2011, pp. 804–837, at pp. 828–829.

[899] See A. Orakhelashvili, "1969 Vienna Convention. Article 30: Application of successive treaties relating to the same subject matter", in O. Corten and P. Klein (eds.) (footnote 898 above), pp. 764–800, at pp. 791–798.

[900] It may be noted that the WTO Understanding on Rules and Procedures Governing the Settlement of Disputes (Marrakesh Agreement Establishing the World Trade Organization, annex 2) provides in article 3, paragraph 2, that "[t]he dispute settlement system of the WTO ... serves ... to clarify the existing provisions of those [covered] agreements in accordance with *customary*\* rules of interpretation of public international law".

[901] See International Law Association, *Report of the Seventy-sixth Conference ...* (footnote 895 above); and A. Boyle, "Relationship between international environmental law and other branches of international law", in Bodansky, Brunnée and Hey (eds.), *The Oxford Handbook of International Environmental Law* (footnote 795 above), pp. 125–146.

(7)  With respect to international trade law, the concept of mutual supportiveness has emerged to help reconcile that law and international environmental law, which relates in part to protection of the atmosphere. The 1994 Marrakesh Agreement Establishing the World Trade Organization provides, in its preamble, that its aim is to reconcile trade and development goals with environmental needs "in accordance with the objective of sustainable development". The WTO Committee on Trade and Environment began pursuing its activities "with the aim of making international trade and environmental policies mutually supportive",[902] and in its 1996 report to the Singapore Ministerial Conference, the Committee reiterated its position that the WTO system and environmental protection are "two areas of policy-making [that] are both important and … should be mutually supportive in order to promote sustainable development".[903] As the concept of "mutual supportiveness" has become gradually regarded as "a legal standard *internal* to the WTO",[904] the 2001 Doha Ministerial Declaration expresses the conviction of States that "acting for the protection of the environment and the promotion of sustainable development can and must be mutually supportive".[905] Mutual supportiveness is considered in international trade law as part of the principle of harmonization in interpreting conflicting rules of different treaties. Among a number of relevant WTO dispute settlement cases, the *United States—Standards for Reformulated and Conventional Gasoline* case in 1996 is most notable in that the Appellate Body refused to separate the rules of the General Agreement on Tariffs and Trade from other rules of interpretation in public international law, by stating that "the *General Agreement* is not to be read *in clinical isolation from public international law\**",[906] strongly supporting the interpretative principle of harmonization and systemic integration.

(8)  Similar trends and approaches appear in international investment law. Free trade agreements, which

contain a number of investment clauses, such as the North American Free Trade Agreement,[907] and numerous bilateral investment treaties[908] also contain standards relating to the environment, which have been confirmed by the jurisprudence of the relevant dispute settlement bodies. Some investment tribunals have emphasized that investment treaties "cannot be read and interpreted in isolation from public international law".[909]

(9)  The same is the case with the law of the sea. The protection of the atmosphere is intrinsically linked to the oceans and the law of the sea owing to the close physical interaction between the atmosphere and the oceans. The Paris Agreement notes in its preamble "the importance of ensuring the integrity of all ecosystems, including oceans". This link is also borne out by the United Nations Convention on the Law of the Sea of 1982,[910] which defines the "pollution of the marine environment", in article 1, paragraph 1 (4), in such a way as to include all airborne sources of marine pollution, including atmospheric pollution from land-based sources and vessels.[911] It offers detailed provisions on the protection and preservation of the marine environment through part XII, in particular articles 192, 194, 207, 211 and 212. There are a number of regional conventions regulating marine pollution from land-based sources.[912] IMO has sought to regulate vessel-source

---

[902] Trade Negotiations Committee, decision on trade and environment of 14 April 1994.

[903] WTO, Committee on Trade and Environment, Report (1996), WT/CTE/1 (12 November 1996), para. 167.

[904] See J. Pauwelyn, *Conflict of Norms in Public International Law: How WTO Law Relates to Other Rules of International Law*, Cambridge, Cambridge University Press, 2003; and R. Pavoni, "Mutual supportiveness as a principle of interpretation and law-making: a watershed for the 'WTO-and-competing regimes' debate?", *The European Journal of International Law*, vol. 21, No. 3 (2010), pp. 649–679, at pp. 651–652. See also S. Murase, "Perspectives from international economic law on transnational environmental issues", *Collected Courses of the Hague Academy of International Law, 1995*, vol. 253, pp. 283–431, reproduced in S. Murase, *International Law: An Integrative Perspective on Transboundary Issues*, Tokyo, Sophia University Press, 2011, pp. 1–127; and S. Murase, "Conflict of international regimes: trade and the environment", *ibid.*, pp. 130–166.

[905] Adopted in Doha on 14 November 2001 at the fourth session of the WTO Ministerial Conference, WT/MIN(01)/DEC/1, para. 6. The Hong Kong Ministerial Declaration of 2005 reaffirmed "the mandate in paragraph 31 of the Doha Ministerial Declaration aimed at enhancing the mutual supportiveness of trade and environment" (adopted in Hong Kong, China, on 18 December 2005 at the sixth session of the Ministerial Conference, WT/MIN(05)/DEC, para. 30).

[906] WTO, Appellate Body Report, *United States—Gasoline* (see footnote 783 above), p. 17. See also S. Murase, "Unilateral measures and the WTO dispute settlement" (discussing the *United States—Gasoline* case), in S. S. C. Tay and D. C. Esty (eds.), *Asian Dragons and Green Trade: Environment, Economics and International Law*, Singapore, Times Academic Press, 1996, pp. 137–144.

[907] North American Free Trade Agreement between the Government of Canada, the Government of the United Mexican States, and the Government of the United States of America. Note, in particular, articles 104, paragraph 1, and 1114.

[908] There are various model bilateral investment treaties, such as: Canada Model Bilateral Investment Treaty of 2004, available from www.italaw.com/documents/Canadian2004-FIPA-model-en.pdf; Colombia Model Bilateral Investment Treaty of 2007, available from www.italaw.com/documents/inv_model_bit_colombia.pdf; United States Model Bilateral Investment Treaty of 2012, available from www.italaw.com/sites/default/files/archive/ita1028.pdf; and International Institute for Sustainable Development (IISD) Model International Agreement on Investment for Sustainable Development of 2005, H. Mann and others, *IISD Model International Agreement on Investment for Sustainable Development*, 2nd ed., Winnipeg, IISD, 2005, art. 34, available from www.iisd.org/pdf/2005/investment_model_int_agreement.pdf. See also United Nations Conference on Trade and Development, *Investment Policy Framework for Sustainable Development* (2015), pp. 91–121, available from https://unctad.org/en/PublicationsLibrary/diaepcb2015d5_en.pdf; and P. Muchlinski, "Negotiating new generation international investment agreements: new sustainable development-oriented initiatives", in S. Hindelang and M. Krajewski (eds.), *Shifting Paradigms in International Investment Law: More Balanced, Less Isolated, Increasingly Diversified*, Oxford, Oxford University Press, 2016, pp. 41–64.

[909] *Phoenix Action Ltd. v. the Czech Republic*, International Centre for Settlement of Investment Disputes (ICSID) Case No. ARB/06/5, Award, 15 April 2009, para. 78.

[910] Prior to the Convention, the only international instrument of significance was the 1963 Treaty Banning Nuclear Weapon Tests in the Atmosphere, in Outer Space and Under Water.

[911] See M. H. Nordquist and others (eds.), *United Nations Convention on the Law of the Sea 1982: A Commentary*, vol. II, Dordrecht, Martinus Nijhoff, 1991, pp. 41–42.

[912] For example, the Convention for the Protection of the Marine Environment of the North-East Atlantic, art. 1 (*e*); the Convention on the Protection of the Marine Environment of the Baltic Sea Area, art. 2, para. 2; the Protocol for the Protection of the Mediterranean Sea against Pollution from Land-based Sources, art. 4, para. 1 (*b*); the Protocol for the Protection of the South-East Pacific against Pollution from Land-based Sources, art. II (*c*); and the Protocol for the Protection of the Marine Environment against Pollution from Land-based Sources to the Kuwait Regional Convention for Cooperation on the Protection of the Marine Environment from Pollution, art. III.

pollution in its efforts to supplement the provisions of the United Nations Convention on the Law of the Sea[913] and to combat climate change.[914] The effective implementation of the applicable rules of the law of the sea could help to protect the atmosphere. Similarly, the effective implementation of the rules on the protection of the environment could protect the oceans.

(10)   As for international human rights law, environmental degradation, including air pollution, climate change and ozone layer depletion, "has the potential to affect the realization of human rights".[915] The link between human rights and the environment, including the atmosphere, is acknowledged in practice. The Stockholm Declaration recognizes, in its principle 1, that everyone "has the fundamental right to freedom, equality and adequate conditions of life, in an environment of a quality that permits a life of dignity and well-being".[916] The Rio Declaration of 1992 outlines, in its principle 1, that "[h]uman beings are at the centre of concerns for sustainable development", and that "[t]hey are entitled to a healthy and productive life in harmony with nature".[917] In the context of atmospheric pollution, the 1979 Convention on Long-range Transboundary Air Pollution recognizes that air pollution has "deleterious effects of such a nature as to endanger human health" and provides that the parties are determined "to protect man and his environment against air pollution" of a certain

magnitude.[918] Likewise, for atmospheric degradation, the 1985 Vienna Convention for the Protection of the Ozone Layer contains a provision whereby the parties are required to take appropriate measures "to protect human health" in accordance with the Convention and Protocols to which they are a party.[919] Similarly, the 1992 United Nations Framework Convention on Climate Change deals with the adverse effects of climate change, including significant deleterious effects "on human health and welfare".[920]

(11)   In this regard, relevant human rights are "the right to life",[921] "the right to private and family life"[922] and "the right to property".[923] Where a specific right to environment exists in human rights conventions, the relevant courts and treaty bodies apply it, including the right to health. In order for international human rights law to contribute to the protection of the atmosphere, however, certain core requirements must be fulfilled.[924] First, as international human rights law remains "a personal-injury-based legal system",[925] a direct link between atmospheric pollution or degradation that impairs the protected right and an impairment of a protected right must be established. Second, the adverse effects of atmospheric pollution or degradation must attain a certain threshold if they are to fall within the scope of international human rights law. The assessment of such minimum standards is relative and depends on the content of the right to be invoked and all the relevant circumstances of the case, such as the intensity and duration of the nuisance and its physical or mental effects. Third, and most importantly, it is necessary to establish the causal link between an action or omission of a State, on the one hand, and atmospheric pollution or degradation, on the other hand.

(12)   One of the difficulties in the interrelationship between the rules of international law relating to the atmosphere and human rights law is the "disconnect" in their application. While the rules of international law relating to the atmosphere apply not only to the States of victims but also to the States of origin of the harm, the scope of application of human rights treaties is limited to the

---

[913] For example, at the fifty-eighth session of the Marine Environment Protection Committee in 2008, IMO adopted annex VI, as amended, to the International Convention for the Prevention of Pollution from Ships, which regulates, *inter alia*, emissions of $SO_x$ and $NO_x$. The Convention now has six annexes, namely, annex I on regulations for the prevention of pollution by oil (entry into force on 2 October 1983); annex II on regulations for the control of pollution by noxious liquid substances in bulk (entry into force on 6 April 1987); annex III on regulations for the prevention of pollution by harmful substances carried by sea in packaged form (entry into force on 1 July 1992); annex IV on regulations for the prevention of pollution by sewage from ships (entry into force on 27 September 2003); annex V on regulations for the prevention of pollution by garbage from ships (entry into force on 31 December 1988); and annex VI on regulations for the prevention of air pollution from ships (entry into force on 19 May 2005).

[914] See S. Karim, *Prevention of Pollution of the Marine Environment from Vessels: The Potential and Limits of the International Maritime Organization*, Dordrecht, Springer, 2015, pp. 107–126; S. Karim and S. Alam, "Climate change and reduction of emissions of greenhouse gases from ships: an appraisal", *Asian Journal of International Law*, vol. 1, No. 1 (2011), pp. 131–148; Y. Shi, "Are greenhouse gas emissions from international shipping a type of marine pollution?", *Marine Pollution Bulletin*, vol. 113, Nos. 1–2 (2016), pp. 187–192; and J. Harrison, "Recent developments and continuing challenges in the regulation of greenhouse gas emissions from international shipping" (2012), Edinburgh School of Law, Research Paper No. 2012/12, p. 20. Available from https://ssrn.com/abstract=2037038.

[915] Analytical study on the relationship between human rights and the environment: report of the United Nations High Commissioner for Human Rights (A/HRC/19/34), para. 15. See also Human Rights Council resolution 19/10 of 22 March 2012 on human rights and the environment, *Official Records of the General Assembly, Sixty-seventh Session, Supplement No. 53* (A/67/53), pp. 34–37.

[916] *Report of the United Nations Conference on the Human Environment …* (see footnote 781 above), p. 4; see also L. B. Sohn, "The Stockholm Declaration on the Human Environment" (footnote 799 above), pp. 451–455.

[917] *Report of the United Nations Conference on Environment and Development …* (see footnote 800 above), p. 3; see also F. Francioni, "Principle 1: human beings and the environment", in J. E. Viñuales (ed.), *The Rio Declaration on Environment and Development: A Commentary*, Oxford, Oxford University Press, 2015, pp. 93–106, at pp. 97–98.

[918] Convention on Long-range Transboundary Air Pollution, arts. 1 and 2.

[919] Vienna Convention for the Protection of the Ozone Layer, art. 2.

[920] United Nations Framework Convention on Climate Change, art. 1, para. 1.

[921] Article 6 of the International Covenant on Civil and Political Rights of 1966; article 6 of the Convention on the Rights of the Child of 1989; article 10 of the Convention on the Rights of Persons with Disabilities of 2006; article 2 of the Convention for the Protection of Human Rights and Fundamental Freedoms of 1950 (European Convention on Human Rights); article 4 of the American Convention on Human Rights of 1969; and article 4 of the African Charter on Human and Peoples' Rights of 1981.

[922] Article 17 of the International Covenant on Civil and Political Rights; article 8 of the European Convention on Human Rights; and article 11, paragraph 2, of the American Convention on Human Rights.

[923] Article 1 of the Protocol to the European Convention on Human Rights (Protocol No. 1); article 21 of the American Convention on Human Rights; and article 14 of the African Charter on Human and Peoples' Rights. See D. Shelton, "Human rights and the environment: substantive rights", in M. Fitzmaurice, D. M. Ong and P. Merkouris (eds.), *Research Handbook on International Environmental Law*, Cheltenham, Edward Elgar, 2010, pp. 265–283, at pp. 267 and 269–278.

[924] See P.-M. Dupuy and J. E. Viñuales, *International Environmental Law*, Cambridge, Cambridge University Press, 2015, pp. 320–329.

[925] *Ibid.*, pp. 308–309.

persons subject to a State's jurisdiction.[926] Thus, where an environmentally harmful activity in one State affects persons in another State, the question of the interpretation of "jurisdiction" in the context of human rights obligations arises. In interpreting and applying the notion, regard may be had to the object and purpose of human rights treaties. In its advisory opinion on the *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, the International Court of Justice pronounced, when addressing the issue of extraterritorial jurisdiction, "while the jurisdiction of States is primarily territorial, it may sometimes be exercised outside the national territory. Considering the object and purpose of the International Covenant on Civil and Political Rights, it would seem natural that, even when such is the case, States parties to the Covenant should be bound to comply with its provisions".[927]

(13)   One possible consideration is the relevance of the principle of non-discrimination. Some authors maintain that it may be considered unreasonable that international human rights law would have no application to atmospheric pollution or global degradation and that the law can extend protection only to the victims of intra-boundary pollution. They maintain that the non-discrimination principle requires the responsible State to treat transboundary atmospheric pollution or global atmospheric degradation no differently from domestic pollution.[928] Furthermore, if and insofar as the relevant human rights norms are today recognized as either established or emergent rules of customary international law,[929] they may be considered as overlapping with environmental norms for the protection of the atmosphere, such as due diligence (draft guideline 3), environmental impact assessment (draft guideline 4), sustainable utilization (draft guideline 5), equitable and reasonable utilization (draft guideline 6) and international cooperation (draft guideline 8), among others, which would enable interpretation and application of both norms in a harmonious manner.

(14)   In contrast to paragraph 1, which addresses identification, interpretation and application, paragraph 2 deals with the situation in which States wish to develop new rules. The paragraph signals a general desire to encourage States, when engaged in negotiations involving the creation of new rules, to take into account the systemic relationships that exist between rules of international law relating to the atmosphere and rules in other legal fields.

(15)   Paragraph 3 highlights the plight of those in vulnerable situations because of atmospheric pollution and atmospheric degradation. It has been formulated to make a direct reference to atmospheric pollution and atmospheric degradation. The reference to paragraphs 1 and 2 captures both the aspects of "identification, interpretation and application", on the one hand, and "development", on the other hand. The phrase "special consideration should be given to persons and groups particularly vulnerable to atmospheric pollution and atmospheric degradation" underlines the broad scope of the consideration to be given to the situation of vulnerable groups, covering both aspects of the present topic, namely "atmospheric pollution" and "atmospheric degradation". It was not considered useful to refer in the text to "human rights", or even to "rights" or "legally protected interests".

(16)   The second sentence of paragraph 3 gives examples of groups that may be found in vulnerable situations in the context of atmospheric pollution and atmospheric degradation. The World Health Organization (WHO) has noted that "[a]ll populations will be affected by a changing climate, but the initial health risks vary greatly, depending on where and how people live. People living in small island developing States and other coastal regions, megacities, and mountainous and polar regions are all particularly vulnerable in different ways."[930] In the Sustainable Development Goals adopted by the General Assembly in its 2030 Agenda for Sustainable Development, atmospheric pollution is addressed in Goals 3.9 and 11.6, which call, in particular, for a substantial reduction in the number of deaths and illnesses from air pollution, and for special attention to ambient air quality in cities.[931]

(17)   The phrase in the second sentence of paragraph 3 "may include, *inter alia*" denotes that the examples given are not necessarily exhaustive. Indigenous peoples are, as was declared in the report of the Indigenous Peoples' Global Summit on Climate Change, "the most vulnerable to the impacts of climate change because they live in the areas most affected by climate change and are usually the most socio-economically disadvantaged".[932] People

---

[926] Article 2 of the International Covenant on Civil and Political Rights; article 1 of the European Convention on Human Rights; and article 1 of the American Convention on Human Rights. See A. Boyle, "Human rights and the environment: where next?", *The European Journal of International Law*, vol. 23, No. 3 (2012), pp. 613–642, at pp. 633–641.

[927] *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, Advisory Opinion, *I.C.J. Reports 2004*, p. 136, at p. 179, para. 109.

[928] See Boyle, "Human rights and the environment …" (footnote 926 above), pp. 639–640.

[929] See B. Simma and A. Alston, "The sources of human rights law: custom, *jus cogens*, and general principles", *Australian Year Book of International Law*, vol. 12 (1989), pp. 82–108; V. Dimitrijevic, "Customary law as an instrument for the protection of human rights", Working Paper No. 7, Milan, Istituto per gli Studi di Politica Internazionale (ISPI), 2006, pp. 3–30; B. Simma, "Human rights in the International Court of Justice: are we witnessing a sea change?", in D. Alland and others (eds.), *Unity and Diversity of International Law: Essays in Honour of Professor Pierre-Marie Dupuy*, Leiden, Martinus Nijhoff, 2014, pp. 711–737; and H. Thirlway, "International law and practice: human rights in customary law: an attempt to define some of the issues", *Leiden Journal of International Law*, vol. 28 (2015), pp. 495–506.

[930] WHO, *Protecting Health from Climate Change: Connecting Science, Policy and People*, Geneva, 2009, p. 2.

[931] General Assembly resolution 70/1; see B. Lode, P. Schönberger and P. Toussaint, "Clean air for all by 2030? Air quality in the 2030 Agenda and in international law", *Review of European, Comparative and International Environmental Law*, vol. 25, No. 1 (2016), pp. 27–38. See also the indicators for these targets specified in 2016 (3.9.1: mortality rate attributed to household and ambient air pollution; and 11.6.2: annual mean levels of fine particulate matter in cities).

[932] Report of the Indigenous Peoples' Global Summit on Climate Change, 20–24 April 2009, Anchorage, Alaska, p. 12; available from www.un.org/ga/president/63/letters/globalsummitonccc.pdf#search=%27. See R. L. Barsh, "Indigenous peoples", in Bodansky, Brunnée and Hey (eds.), *The Oxford Handbook of International Environmental Law* (footnote 795 above), pp. 829–852; B. Kingsbury, "Indigenous peoples", *Max Planck Encyclopedia of Public International Law*, vol. V, Oxford, Oxford University Press, 2012, pp. 116–133; and H. A. Strydom, "Environment and indigenous peoples", *ibid.*, vol. III, Oxford, Oxford University Press, 2012, pp. 455–461 (online edition: https://opil.ouplaw.com/home/MPIL).

of the least developed countries are also placed in a particularly vulnerable situation as they often live in extreme poverty, without access to basic infrastructure services and to adequate medical and social protection.[933] People of low-lying coastal areas and small island developing States affected by sea-level rise are subject to the potential loss of land, leading to displacement and, in some cases, forced migration. As noted in the preamble of the Paris Agreement, in addition to the groups specifically indicated in paragraph 3 of draft guideline 9, other groups of potentially particularly vulnerable people include local communities, migrants, women, children, persons with disabilities and also the elderly, who are often seriously affected by atmospheric pollution and atmospheric degradation.[934]

### Guideline 10.    Implementation

**1.    National implementation of obligations under international law relating to the protection of the atmosphere from atmospheric pollution and atmospheric degradation, including those referred to in the present draft guidelines, may take the form of legislative, administrative, judicial and other actions.**

**2.    States should endeavour to give effect to the recommendations contained in the present draft guidelines.**

### Commentary

(1)    Draft guideline 10 deals with national implementation of obligations under international law relating to the protection of the atmosphere from atmospheric pollution and atmospheric degradation. Compliance at the international level is the subject of draft guideline 11. The term "implementation" is used in the present draft guideline to refer to measures that States may take to make treaty provisions effective at the national level, including implementation in their national laws.[935]

(2)    Draft guideline 10 consists of two paragraphs, which address, on the one hand, existing obligations under

international law, and on the other hand, recommendations contained in the draft guidelines.

(3)    The draft guidelines refer to relevant obligations of States under international law relating to the protection of the atmosphere from atmospheric pollution and atmospheric degradation, namely, the obligation to protect the atmosphere (draft guideline 3), the obligation to ensure that an environmental impact assessment is carried out (draft guideline 4) and the obligation to cooperate (draft guideline 8).[936] Given that States have these obligations, it is clear that they need to be faithfully implemented.

(4)    The term "[n]ational implementation" denotes the measures that parties may take to make international agreements operative at the national level, pursuant to the national constitution and legal system of each State.[937] National implementation may take many forms, including "legislative, administrative, judicial and other actions". The word "may" reflects the discretionary nature of the provision. The reference to "administrative" actions is used, rather than "executive" actions, as it is more encompassing. It covers possible implementation at lower levels of governmental administration. The term "other actions" is a residual category covering all other forms of national implementation. The term "national implementation" also applies to obligations of regional organizations such as the European Union.[938]

(5)    The use of the term "obligations" in paragraph 1 does not refer to new obligations for States, but rather refers to existing obligations that States already have under international law. Thus, the phrase "including those [obligations] referred to in the present draft guidelines" was chosen, and the expression "referred to" highlights the fact that the draft guidelines do not as such create new obligations and are not dealing comprehensively with the various issues related to the topic.

(6)    The reference to "the recommendations contained in the present draft guidelines" in paragraph 2 is intended to distinguish such recommendations from "obligations" as referred to in paragraph 1. The expression "recommendations" was considered appropriate as it would be consistent with the draft guidelines, which use the term "should".[939] This is without prejudice to any normative content that the draft guidelines have under international law. Paragraph 2 provides that States should endeavour to give effect to the recommendations contained in the draft guidelines.

(7)    The Commission decided not to include a paragraph in the draft guideline on the responsibility of States for internationally wrongful acts as originally proposed by the

---

[933] World Bank Group Climate Change Action Plan, 7 April 2016, para. 104; available from http://pubdocs.worldbank.org /en/677331460056382875/WBG-Climate-Change-Action-Plan-public-version.pdf.

[934] The Committee on the Elimination of Discrimination against Women has an agenda on "gender-related dimensions of disaster risk reduction and climate change"; see www.ohchr.org/EN/HRBodies/CEDAW /Pages/ClimateChange.aspx. Along with women and children, the elderly and persons with disabilities are usually mentioned as vulnerable people. See WHO, *Protecting Health from Climate Change ...* (footnote 930 above), and the World Bank Group Climate Change Action Plan (footnote 933 above). The Inter-American Convention on Protecting the Human Rights of Older Persons of 2015 provides, in article 25 (Right to a healthy environment), that "[o]lder persons have the right to live in a healthy environment with access to basic public services. To that end, States Parties shall adopt appropriate measures to safeguard and promote the exercise of this right, *inter alia*: a. To foster the development of older persons to their full potential in harmony with nature; b. To ensure access for older persons, on an equal basis with others, to basic public drinking water and sanitation services, among others."

[935] See generally P. Sands and J. Peel, *Principles of International Environmental Law*, 3rd ed., Cambridge, Cambridge University Press, 2012, pp. 135–183. See also E. Brown Weiss and H. K. Jacobson (eds.), *Engaging Countries: Strengthening Compliance with International Environmental Accords*, Cambridge, Massachusetts, MIT Press, 1998, pp. 1–18, at p. 4.

[936] Even the obligation to cooperate sometimes requires national implementation. According to draft guideline 8, paragraph 2, "[c]ooperation could include exchange of information and joint monitoring", which normally require national implementing legislation.

[937] See C. Redgwell, "National implementation", in Bodansky, Brunnée and Hey (eds.), *The Oxford Handbook of International Environmental Law* (footnote 795 above), pp. 922–946, at p. 925.

[938] See L. Krämer, "Regional economic integration organizations: the European Union as an example", in Bodansky, Brunnée and Hey (eds.), *The Oxford Handbook of International Environmental Law* (footnote 795 above), pp. 853–876 (on implementation, pp. 868–870).

[939] See, for example, draft guidelines 5, 6, 7, 9 and 12, para. 2.

Special Rapporteur.[940] In the main, it was considered that the secondary rules of responsibility were a subject that the Commission had already dealt with, adopting in 2001 the articles on responsibility of States for internationally wrongful acts.[941] Those articles are equally applicable in relation to environmental obligations, including protection of the atmosphere from atmospheric pollution and atmospheric degradation.

(8)   Moreover, even though States sometimes resort to extraterritorial application of national law to the extent permissible under international law,[942] the Commission did not consider it necessary to address the matter for the purposes of the present draft guidelines.[943] The Commission considered that the matter of extraterritorial application of national law by a State raised a host of complex questions with far-reaching implications for other States and for their relations with each other.

### Guideline 11.   Compliance

1.    **States are required to abide with their obligations under international law relating to the protection of the atmosphere from atmospheric pollution and atmospheric degradation in good faith, including through compliance with the rules and procedures in the relevant agreements to which they are parties.**

2.    **To achieve compliance, facilitative or enforcement procedures may be used, as appropriate, in accordance with the relevant agreements:**

(*a*)   **facilitative procedures may include providing assistance to States, in cases of non-compliance, in a transparent, non-adversarial and non-punitive manner to ensure that the States concerned comply with their obligations under international law, taking into account their capabilities and special conditions;**

(*b*)   **enforcement procedures may include issuing a caution of non-compliance, termination of rights and privileges under the relevant agreements, and other forms of enforcement measures.**

### Commentary

(1)   Draft guideline 11, which complements draft guideline 10 on national implementation, refers to compliance at the level of international law. The use of the term "compliance" is not necessarily uniform in agreements, or in literature. The term "compliance" is used in the present draft guideline to refer to mechanisms or procedures *at the level of international law* that verify whether States in fact adhere to the obligations of an agreement or other rules of international law. Paragraph 1 reflects, in particular, the principle *pacta sunt servanda*. The purpose of the formulation "obligations under international law" relating to the protection of the atmosphere is to harmonize the language used in paragraph 1 with the language used throughout the draft guidelines. The broad nature of the formulation "obligations under international law" was considered to also better account for the fact that treaty rules constituting obligations may, in some cases, be binding only on the parties to the relevant agreements, while others may reflect or lead to the crystallization of rules of customary international law with consequent legal effects for non-parties. The phrase "relevant agreements" to which the States are parties has been used to avoid narrowing the scope of the provision only to multilateral environmental agreements, when such obligations can exist in other agreements.[944] The general character of paragraph 1 also appropriately serves as an introduction to paragraph 2.

(2)   Paragraph 2 deals with the facilitative or enforcement mechanisms that may be used by compliance mechanisms.[945] The opening phrase of the chapeau, "[t]o achieve compliance", provides a purposive positive approach, with its wording aligned with formulations in existing agreements addressing compliance mechanisms.

---

[940] See the fifth report of the Special Rapporteur (A/CN.4/711), para. 31.

[941] For the articles adopted by the Commission and the commentaries thereto, see *Yearbook … 2001*, vol. II (Part Two) and corrigendum, paras. 76–77. The articles on responsibility of States for internationally wrongful acts adopted by the Commission at its fifty-third session are reproduced in the annex to General Assembly resolution 56/83.

[942] The relevant precedents of extraterritorial application of national law include: (*a*) *Tuna* cases under the General Agreement on Tariffs and Trade (the "extrajurisdictional application" of the United States Marine Mammal Protection Act not being consistent with article XX of the Agreement, Panel Report, *United States—Restrictions on Imports of Tuna*, DS21/R-39S/155, 3 September 1991 (*Tuna I*, not adopted), paras. 5.27–5.29; General Agreement on Tariffs and Trade, Panel Report, *United States—Restrictions on Imports of Tuna*, DS29/R, 16 June 1994 (*Tuna II*, not adopted), para. 5.32); (*b*) *United States—Gasoline* case (on the extraterritorial application of the United States Clean Air Act, WTO, Appellate Body Report, *United States—Gasoline* (see footnote 783 above); (*c*) *Air Transport Association of America and Others v. Secretary of State for Energy and Climate*, European Court of Justice (Grand Chamber) Judgment of 21 December 2011, Case No. C-366/10, *European Court Reports 2011* (on the extraterritorial application of Directive 2008/101/EC of the European Parliament and of the Council of 19 November 2008 on aviation); and (*d*) Singapore Transboundary Haze Pollution Act of 2014, providing for extraterritorial jurisdiction based on the "objective territorial principle" (Parliament of Singapore, *Official Report*, No. 12, Session 2, 4 August 2014, paras. 5–6). See Murase, "Perspectives from international economic law on transnational environmental issues" (footnote 904 above), pp. 349–372.

[943] See the Special Rapporteur's fifth report (A/CN.4/711), para. 31.

[944] This reflection of State practice would include multilateral or regional or other trade agreements, for example, that may also contemplate environmental protection provisions including exceptions such as those under article XX of the General Agreement on Tariffs and Trade or even so-called environmental "side agreements", such as the North American Agreement on Environmental Cooperation.

[945] Non-compliance procedures have been widely adopted in multilateral environmental agreements relating to the protection of the atmosphere, including the following: (*a*) Convention on Long-range Transboundary Air Pollution and its subsequent Protocols: see E. Milano, "Procedures and mechanisms for review of compliance under the 1979 Long-range Transboundary Air Pollution Convention and its Protocols", in T. Treves and others (eds.), *Non-Compliance Procedures and Mechanisms and the Effectiveness of International Environmental Agreements*, The Hague, T.M.C. Asser Press, 2009, pp. 169–180; (*b*) Montreal Protocol on Substances that Deplete the Ozone Layer: see F. Lesniewska, "Filling the holes: the Montreal Protocol's non-compliance mechanisms", in Fitzmaurice, Ong and Merkouris (eds.), *Research Handbook on International Environmental Law* (footnote 923 above), pp. 471–489; (*c*) Convention on Environmental Impact Assessment in a Transboundary Context; (*d*) Kyoto Protocol to the United Nations Framework Convention on Climate Change, and decision 24/CP.7 (FCCC/CP/2001/13/Add.3): J. Brunnée, "Climate change and compliance and enforcement processes", in R. Rayfuse and S. V. Scott (eds.), *International Law in the Era of Climate Change*, Cheltenham, Edward Elgar, 2012, pp. 290–320; and (*e*) the Paris Agreement adopted under the United Nations Framework Convention on Climate Change: D. Bodansky, "The Paris Climate Change Agreement: a new hope?", *American Journal of International Law*, vol. 110 (2016), pp. 288–319.

The phrase "may be used, as appropriate" emphasizes the differing circumstances and contexts in which facilitative or enforcement procedures could be deployed to help foster compliance. The disjunctive word "or" indicates that facilitative or enforcement procedures are to be considered as alternatives by the competent organ established under the agreement concerned. The phrase "in accordance with the relevant agreements" is used at the end of the chapeau, so as to emphasize that facilitative or enforcement procedures are those provided for under existing agreements to which States are parties, and that these procedures will operate in accordance with such existing agreements.

(3) Besides the chapeau, paragraph 2 comprises two subparagraphs, (a) and (b). In both subparagraphs, the word "may" has been used before "include" to provide States and the competent organ established under the agreement concerned with flexibility to use existing facilitative or enforcement procedures.

(4) Subparagraph (a) employs the phrase "in cases of non-compliance"[946] and refers to "the States concerned", avoiding the expression "non-complying States". Facilitative procedures may include providing "assistance" to States, since some States may be willing to comply but unable to do so for lack of capacity. Thus, facilitative measures are provided in a transparent, non-adversarial and non-punitive manner to ensure that the States concerned are assisted to comply with their obligations under international law.[947] The last part of that sentence, which references "taking into account their capabilities and special conditions", was considered necessary, in recognition of the specific challenges that developing and least developed countries often face in the discharge of obligations relating to environmental protection. This is due to, most notably, a general lack of capacity, which can sometimes be mitigated through the receipt of external support enabling capacity-building to facilitate compliance with their obligations under international law.

which may include issuing a caution of non-compliance, termination of rights and privileges under the relevant agreements, and other forms of enforcement measures.[948] Enforcement procedures, in contrast to facilitative procedures, aim to achieve compliance by imposing a penalty on the State concerned in case of non-compliance. At the end of the sentence, the term "enforcement measures" was employed rather than the term "sanctions" in order to avoid any confusion with the possibly negative connotation associated with the term "sanctions". The enforcement procedures referred to in subparagraph (b) should be distinguished from any invocation of international responsibility of States; hence these procedures should be adopted only for the purpose of leading the States concerned to return to compliance in accordance with the relevant agreements to which they are parties, as referred to in the chapeau.[949]

### Guideline 12.  Dispute settlement

**1.  Disputes between States relating to the protection of the atmosphere from atmospheric pollution and atmospheric degradation are to be settled by peaceful means.**

**2.  Given that such disputes may be of a fact-intensive and science-dependent character, due consideration should be given to the use of technical and scientific experts.**

### Commentary

(1) Draft guideline 12 concerns dispute settlement. Paragraph 1 describes the general obligation of States to settle their disputes by peaceful means. The expression "between States" clarifies that the disputes being referred to in the paragraph are inter-State in nature. The paragraph does not refer to Article 33, paragraph 1, of the Charter of the United Nations, but the intent is not to downplay the significance of the various pacific means of settlement mentioned in that provision, such as negotiation, enquiry, mediation, conciliation, arbitration, judicial settlement or resort to other peaceful means that may be preferred by the States concerned, nor the principle of choice of means.[950] Paragraph 1 is not intended to interfere with or displace existing dispute settlement provisions in treaty regimes, which will continue to operate in their own terms. The main purpose of the present paragraph is to reaffirm the principle of peaceful settlement of disputes[951] and to serve as a basis for paragraph 2.

(2) The first part of the sentence of paragraph 2 recognizes that disputes relating to the protection of the atmosphere from atmospheric pollution and atmospheric degradation would be "fact-intensive" and "science-dependent". As scientific input has been emphasized in the process of progressive development of international law

---

[946] This is based on the Montreal Protocol on Substances that Deplete the Ozone Layer, which in article 8 uses the phrase "Parties found to be in non-compliance".

[947] See M. Koskenniemi, "Breach of treaty or non-compliance? Reflections on the enforcement of the Montreal Protocol", *Yearbook of International Environmental Law*, vol. 3 (1992), pp. 123–162; D. G. Victor, "The operation and effectiveness of the Montreal Protocol's non-compliance procedure", in D. G. Victor, K. Raustiala and E. B. Skolnikoff (eds.), *The Implementation and Effectiveness of International Environmental Commitments: Theory and Practice*, Cambridge, Massachusetts, MIT Press, 1998, pp. 137–176; O. Yoshida, *The International Legal Régime for the Protection of the Stratospheric Ozone Layer*, The Hague, Kluwer Law International, 2001, pp. 178–179; and Dupuy and Viñuales, *International Environmental Law* (footnote 924 above), pp. 285 et seq.

[948] See G. Ulfstein and J. Werksman, "The Kyoto compliance system: towards hard enforcement", in O. S. Stokke, J. Hovi and G. Ulfstein (eds.), *Implementing the Climate Regime: International Compliance*, London, Earthscan, 2005, pp. 39–62; S. Urbinati, "Procedures and mechanisms relating to compliance under the 1997 Kyoto Protocol to the 1992 United Nations Framework Convention on Climate Change", in Treves and others (eds.), *Non-Compliance Procedures and Mechanisms ...* (footnote 945 above), pp. 63–84; and Murase, *International Law: An Integrative Perspective on Transboundary Issues* (footnote 904 above), pp. 167–180, at pp. 173–174.

[949] See G. Loibl, "Compliance procedures and mechanisms", in Fitzmaurice, Ong and Merkouris (eds.), *Research Handbook on International Environmental Law* (footnote 923 above), pp. 426–449, at pp. 437–439.

[950] See C. Tomuschat, "Article 33", in B. Simma (ed.), *The Charter of the United Nations: A Commentary*, 2nd ed., vol. I, Munich, Verlag C. H. Beck, 2002, pp. 583–594.

[951] See N. Klein, "Settlement of international environmental law disputes", in Fitzmaurice, Ong and Merkouris (eds.), *Research Handbook on International Environmental Law* (footnote 923 above), pp. 379–400; and C. P. R. Romano, "International dispute settlement", in Bodansky, Brunnée and Hey (eds.), *The Oxford Handbook of International Environmental Law* (footnote 795 above), pp. 1036–1056, at pp. 1039–1042.

relating to the protection of the atmosphere,[952] likewise, more complicated scientific and technical issues have been raised in the process of international dispute settlement in recent years. Thus, the cases brought before international courts and tribunals have increasingly focused on highly technical and scientific evidence.[953] Thus, those elements, evident from the experience with inter-State environment disputes, typically require specialized expertise to contextualize or fully grasp the issues in dispute.

(3)   There has been a noticeable change in the attitude of States and the International Court of Justice in recent cases involving the science-dependent issues of international environmental law, which reflect, directly or indirectly, specific features of the settlement of disputes relating to the protection of the atmosphere.[954] For this reason, it

would be necessary that, as underlined in paragraph 2, "due consideration" be given to the use of technical and scientific experts.[955] The essential aspect in this paragraph is to emphasize the use of technical and scientific experts in the settlement of inter-State disputes, whether by judicial or other means.[956]

(4)   In the context of judicial or arbitral processes of settling disputes relating to the protection of the atmosphere, the principles of *jura novit curia* (the court knows the law) and *non ultra petita* (not beyond the parties' request) may be relevant, since the relationship between law and fact is a pertinent issue relating to scientific evidence.[957] The Commission, however, decided to maintain a simple formulation, and not to address these issues in the draft guideline.

[952] See S. Murase, "Scientific knowledge and the progressive development of international law: with reference to the ILC topic on the protection of the atmosphere", in J. Crawford and others (eds.), *The International Legal Order: Current Needs and Possible Responses. Essays in Honour of Djamchid Momtaz*, Leiden, Brill Nijhoff, 2017, pp. 41–52.

[953] See the statement by the President of the International Court of Justice, Ronny Abraham, before the Sixth Committee on 28 October 2016 (on international environmental law cases before the International Court of Justice) (available from www.icj-cij.org/files/press -releases/0/19280.pdf); and the statement made on 27 September 2013 by the then President of the International Court of Justice, Peter Tomka, on the occasion of the centenary of the Peace Palace, "The ICJ in the service of peace and justice—words of welcome by President Tomka" (available from www.icj-cij.org/files/press-releases/8/17538.pdf). See also E. Valencia-Ospina, "Evidence before the International Court of Justice", *International Law FORUM du droit international*, vol. 1, No. 4 (November 1999), pp. 202–207; A. Riddell, "Scientific evidence in the International Court of Justice—problems and possibilities", *Finnish Yearbook of International Law*, vol. 20 (2009), pp. 229–258; B. Simma, "The International Court of Justice and scientific expertise", *American Society of International Law, Proceedings of the 106th Annual Meeting*, vol. 106 (2012), pp. 230–233; and A. Riddell and B. Plant, *Evidence before the International Court of Justice*, London, British Institute of International and Comparative Law, 2009, pp. 329–358.

[954] In the *Gabčíkovo-Nagymaros Project* case of 1997 (see footnote 851 above) and the *Pulp Mills on the River Uruguay* case, Judgment of 20 April 2010 (see footnote 847 above), the parties followed the traditional method of presenting the evidence, that is, by expert counsel, though they were scientists and not lawyers. Their scientific findings were treated as the parties' assertions, but this met some criticisms by the Bench, as well as by commentators. Thus, in the *Aerial Herbicide Spraying* case (withdrawn in 2013) (*Aerial Herbicide Spraying (Ecuador v. Colombia)*, Order of 13 September 2013, *I.C.J. Reports 2013*, p. 278), the 2014 *Whaling in the Antarctic* case (*Whaling in the Antarctic (Australia v. Japan: New Zealand intervening)*, Judgment, *I.C.J. Reports 2014*, p. 226) and the 2015 *Construction of a Road* case (*Construction of a Road in Costa Rica along the San Juan River (Nicaragua v. Costa Rica)*) (see footnote 847 above), the parties appointed independent experts, who were, in the latter two cases, cross-examined and whose statements were treated with more weight than the statements of expert counsel. In all of these cases, the Court did not appoint its own experts in accordance with Article 50 of its Statute, but it did so finally in the *Maritime Delimitation in the Caribbean Sea and the Pacific Ocean* case (2018), although the latter was not *per se* an environmental law dispute (*Maritime Delimitation in the Caribbean Sea and the Pacific Ocean (Costa Rica v. Nicaragua)* and *Land Boundary in the Northern Part of Isla Portillos (Costa Rica v. Nicaragua)*, Judgment, *I.C.J. Reports 2018*, p. 139).

[955] See D. Peat, "The use of court-appointed experts by the International Court of Justice", *British Year Book of International Law 2014*, vol. 84, pp. 271–303; J. G. Devaney, *Fact-finding before the International Court of Justice*, Cambridge, Cambridge University Press, 2016; C. E. Foster, *Science and the Precautionary Principle in International Courts and Tribunals: Expert Evidence, Burden of Proof and Finality*, Cambridge, Cambridge University Press, 2011, pp. 77–135; *Journal of International Dispute Settlement*, vol. 3, No. 3 (November 2012), special edition on courts and tribunals and the treatment of scientific issues; C. J. Tams, "Article 50" and "Article 51", in A. Zimmermann and others (eds.), *The Statute of the International Court of Justice: A Commentary*, 2nd ed., Oxford, Oxford University Press, 2012, pp. 1287–1311; C. E. Foster, "New clothes for the Emperor? Consultation of experts by the International Court of Justice", *Journal of International Dispute Settlement*, vol. 5 (2014), pp. 139–173; J. E. Viñuales, "Legal techniques for dealing with scientific uncertainty in environmental law", *Vanderbilt Journal of Transnational Law*, vol. 43 (2010), pp. 437–503, at pp. 476–480; and G. Gaja, "Assessing expert evidence in the ICJ", *The Law and Practice of International Courts and Tribunals*, vol. 15 (2016), pp. 409–418.

[956] It should be recalled that there are close interactions between non-judicial and judicial means of settling disputes. In the context of disputes relating to the environment and to the protection of the atmosphere, in particular, even at the stage of initial negotiations, States are often required to be well equipped with scientific evidence on which their claims are based, and accordingly the distance between negotiation and judicial settlement may not be very great.

[957] The line between "fact" and "law" is often obscured (see M. Kazazi, *Burden of Proof and Related Issues: A Study on Evidence before International Tribunals*, The Hague, Kluwer Law International, 1996, pp. 42–50). Scientific issues are described by commentators as "mixed questions of fact and law" (e.g., C. F. Amerasinghe, *Evidence in International Litigation*, Leiden, Martinus Nijhoff, 2005, p. 58), which cannot be easily categorized into either matters of law or fact. Judge A. Yusuf stated in his declaration in the *Pulp Mills on the River Uruguay* case that the experts' role was to elucidate facts and to clarify the scientific validity of the methods used to establish facts or to collect data, whereas it is for the Court to weigh the probative value of the facts (*Pulp Mills on the River Uruguay*, Judgment of 20 April 2010 (see footnote 847 above), p. 219, declaration of Judge Yusuf, para. 10). See also Foster, *Science and the Precautionary Principle in International Courts and Tribunals ...* (footnote 955 above), pp. 145–147. Based on *jura novit curia*, the Court can in principle apply any law to any fact, and in theory can evaluate evidence and draw conclusions as it sees appropriate (as long as the Court complies with the *non ultra petita* rule); these are all legal matters. Given its judicial function and under *jura novit curia*, the Court needs to sufficiently understand the meaning of each related technical fact in the case at hand. See the Special Rapporteur's fifth report (A/CN.4/711), para. 104.

# Chapter VII

# PROVISIONAL APPLICATION OF TREATIES

## A. Introduction

79. At its sixty-fourth session (2012), the Commission decided to include the topic "Provisional application of treaties" in its programme of work and appointed Mr. Juan Manuel Gómez Robledo as Special Rapporteur for the topic.[958] In its resolution 67/92 of 14 December 2012, the General Assembly subsequently noted with appreciation the decision of the Commission to include the topic in its programme of work.

80. The Special Rapporteur submitted four reports from 2013 to 2016,[959] which the Commission considered at its sixty-fifth to sixty-eighth sessions (2013–2016), respectively. The Commission also had before it three memoranda by the Secretariat, which were submitted at the sixty-fifth (2013), sixty-seventh (2015) and sixth-ninth (2017) sessions, respectively.[960]

81. On the basis of the draft guidelines proposed by the Special Rapporteur in the third and fourth reports, the Commission, at its sixty-eighth session (2016), took note of draft guidelines 1 to 4 and 6 to 9, as provisionally adopted by the Drafting Committee. Owing to a lack of time, it was decided to consider draft guidelines 5 and 10 at the next session.

82. At its sixty-ninth session (2017), the Commission referred draft guidelines 1 to 4 and 6 to 9, provisionally adopted by the Drafting Committee in 2016, back to the Committee, with a view to finalizing a consolidated set of draft guidelines. The Commission subsequently provisionally adopted draft guidelines 1 to 11, as presented by the Drafting Committee at the same session, with commentaries thereto.

## B. Consideration of the topic at the present session

83. At the present session, the Commission had before it the fifth report of the Special Rapporteur (A/CN.4/718 and Add.1), with a bibliography on the topic. In his fifth report, the Special Rapporteur analysed the comments made by States and international organizations on the 11 draft guidelines provisionally adopted by the Commission at its sixty-ninth session, provided additional information on the practice of international organizations, and submitted

two new draft guidelines, 5 bis and 8 bis, concerning reservations and termination or suspension, respectively, as well as eight draft model clauses.[961] The Commission also had before it the third memorandum by the Secretariat,[962] reviewing State practice in respect of treaties (bilateral and multilateral), deposited or registered in the last 20 years with the Secretary-General, that provide for provisional application, including treaty actions related thereto.

84. At its 3402nd to 3406th and 3409th meetings, from 14 to 18 and on 22 May 2018, the Commission considered the fifth report of the Special Rapporteur and the third memorandum by the Secretariat. At its 3409th meeting, on 22 May 2018, the Commission decided to refer draft guidelines 5 bis and 8 bis and the eight draft model clauses to the Drafting Committee, and instructed it to complete the first reading of the entire set of draft guidelines, including those adopted provisionally at the sixty-ninth session (2017), taking into account the comments and observations of Governments and the plenary debate on the Special Rapporteur's report.

85. The Commission considered the report of the Drafting Committee (A/CN.4/L.910) at its 3415th meeting, held on 31 May 2018, and adopted draft guidelines 6 [7], 7 [5 bis], 9, 10, 11 and 12. The Commission then proceeded to adopt the entire set of draft guidelines on provisional application of treaties, as the draft Guide to Provisional Application of Treaties, on first reading (see section C.1 below). The Commission further took note of the recommendation of the Drafting Committee that a reference be made in the commentaries to the possibility of including, during the second reading, a set of draft model clauses,[963] based on a revised proposal that the Special Rapporteur would make at an appropriate time, taking

---

[958] Yearbook ... 2012, vol. II (Part Two), para. 267.

[959] Yearbook ... 2013, vol. II (Part One), document A/CN.4/664 (first report); Yearbook ... 2014, vol. II (Part One), document A/CN.4/675 (second report); Yearbook ... 2015, vol. II (Part One), document A/CN.4/687 (third report); and Yearbook ... 2016, vol. II (Part One), document A/CN.4/699 and Add.1 (fourth report).

[960] Yearbook ... 2013, vol. II (Part One), document A/CN.4/658; Yearbook ... 2015, vol. II (Part One), document A/CN.4/676; and Yearbook ... 2017, vol. II (Part One), document A/CN.4/707. The consideration of document A/CN.4/707 was postponed to the present session.

[961] For the text of the draft model clauses proposed by the Special Rapporteur in his fifth report (A/CN.4/718 and Add.1), see footnote 963 below.

[962] Yearbook ... 2017, vol. II (Part One), document A/CN.4/707. At its sixty-ninth session (2017) the Commission decided to postpone the consideration of the memorandum by the Secretariat to the present session.

[963] The text of the draft model clauses proposed by the Special Rapporteur in his fifth report (A/CN.4/718 and Add.1), excluding footnotes, reads as follows:

"A. Time frame for the provisional application of a treaty

"1. Commencement

"Draft model clause 1

"The negotiating [contracting] States [international organizations] agree to apply this Treaty provisionally from the date of signature (or any subsequent date agreed upon).

"Draft model clause 2

"The negotiating [contracting] States [international organizations] agree to apply this Treaty provisionally from ... [a specified date].

(Continued on next page.)

into account the comments and suggestions made both during the plenary debate and in the Drafting Committee.

86.   At its 3435th, 3437th, 3440th and 3441st meetings, on 24, 27 and 31 July and 2 August 2018, the Commission adopted the commentaries to the aforementioned draft guidelines (see section C.2 below).

87.   At its 3441st meeting, on 2 August 2018, the Commission further expressed its deep appreciation for the outstanding contribution of the Special Rapporteur, Mr. Juan Manuel Gómez Robledo, which had enabled the Commission to bring to a successful conclusion its first reading of the draft Guide to Provisional Application of Treaties.

88.   Also at its 3441st meeting, the Commission decided, in accordance with articles 16 to 21 of its statute, to transmit the draft guidelines (see section C below), through the Secretary-General, to Governments and international organizations for comments and observations, with the request that such comments and observations be submitted to the Secretary-General by 15 December 2019.

### C.   Text of the draft Guide to Provisional Application of Treaties, adopted by the Commission on first reading

#### 1.   TEXT OF THE DRAFT GUIDE TO PROVISIONAL APPLICATION OF TREATIES

89.   The text of the draft Guide to Provisional Application of Treaties adopted by the Commission on first reading is reproduced below.

---

(*Footnote 963 continued.*)

"*Draft model clause 3*

"The negotiating [contracting] States [international organizations] agree that the Treaty [articles … of the Treaty] shall be applied provisionally, except by any State [international organization] that notifies the Depositary in writing at the time of signature that it does not consent to such provisional application.

"*Draft model clause 4*

"This Treaty shall be applied provisionally from the date on which a State [an international organization] so notifies the other States [international organizations] concerned or deposits a declaration to that effect with the Depositary.

"2.   Termination

"*Draft model clause 5*

"The provisional application of this Treaty shall terminate upon its entry into force for a State [an international organization] that is applying it provisionally.

"*Draft model clause 6*

"The provisional application of this Treaty with respect to a State [an international organization] shall be terminated if that State [international organization] notifies the other States [international organizations] (or the Depositary) of its intention not to become a party to the Treaty.

"B.   Scope of provisional application

"1.   Treaty as a whole

"*Draft model clause 7*

"A State [An international organization] that has notified the other States [international organizations] (or the Depositary) that it will provisionally apply this Treaty shall be bound to observe all the provisions thereof as agreed with the States [international organizations] concerned.

"2.   Only a part of a treaty

"*Draft model clause 8*

"A State [An international organization] that has notified the other States [international organizations] (or the Depositary) that it will provisionally apply articles […] of this Treaty shall be bound to observe the provisions thereof as agreed with the States [international organizations] concerned."

---

### GUIDE TO PROVISIONAL APPLICATION OF TREATIES

#### *Guideline 1.   Scope*

**The present draft guidelines concern the provisional application of treaties.**

#### *Guideline 2.   Purpose*

**The purpose of the present draft guidelines is to provide guidance regarding the law and practice on the provisional application of treaties, on the basis of article 25 of the Vienna Convention on the Law of Treaties and other rules of international law.**

#### *Guideline 3.   General rule*

**A treaty or a part of a treaty may be provisionally applied, pending its entry into force between the States or international organizations concerned, if the treaty itself so provides, or if in some other manner it has been so agreed.**

#### *Guideline 4.   Form of agreement*

**In addition to the case where the treaty so provides, the provisional application of a treaty or a part of a treaty may be agreed through:**

**(*a*)   a separate treaty; or**

**(*b*)   any other means or arrangements, including a resolution adopted by an international organization or at an intergovernmental conference, or a declaration by a State or an international organization that is accepted by the other States or international organizations concerned.**

#### *Guideline 5.   Commencement of provisional application*

**The provisional application of a treaty or a part of a treaty, pending its entry into force between the States or international organizations concerned, takes effect on such date, and in accordance with such conditions and procedures, as the treaty provides or as are otherwise agreed.**

#### *Guideline 6.   Legal effect of provisional application*

**The provisional application of a treaty or a part of a treaty produces a legally binding obligation to apply the treaty or a part thereof as if the treaty were in force between the States or international organizations concerned, unless the treaty provides otherwise or it is otherwise agreed.**

#### *Guideline 7.   Reservations*

**1.   In accordance with the relevant rules of the Vienna Convention on the Law of Treaties, applied *mutatis mutandis*, a State may, when agreeing to the provisional application of a treaty or a part of a treaty, formulate a reservation purporting to exclude or modify the legal effect produced by the provisional application of certain provisions of that treaty.**

**2.   In accordance with the relevant rules of international law, an international organization may, when agreeing to the provisional application of a treaty or a part of a treaty, formulate a reservation purporting to exclude or modify the legal effect produced by the provisional application of certain provisions of that treaty.**

#### *Guideline 8.   Responsibility for breach*

**The breach of an obligation arising under a treaty or a part of a treaty that is provisionally applied entails international responsibility in accordance with the applicable rules of international law.**

#### *Guideline 9.   Termination and suspension of provisional application*

**1.   The provisional application of a treaty or a part of a treaty terminates with the entry into force of that treaty in the relations between the States or international organizations concerned.**

2. Unless the treaty otherwise provides or it is otherwise agreed, the provisional application of a treaty or a part of a treaty with respect to a State or international organization is terminated if that State or international organization notifies the other States or international organizations between which the treaty or a part of a treaty is being applied provisionally of its intention not to become a party to the treaty.

3. The present draft guideline is without prejudice to the application, *mutatis mutandis*, of relevant rules set forth in part V, section 3, of the Vienna Convention on the Law of Treaties or other relevant rules of international law concerning termination and suspension.

*Guideline 10.    Internal law of States and rules of international organizations, and the observance of provisionally applied treaties*

1. A State that has agreed to the provisional application of a treaty or a part of a treaty may not invoke the provisions of its internal law as justification for its failure to perform an obligation arising under such provisional application.

2. An international organization that has agreed to the provisional application of a treaty or a part of a treaty may not invoke the rules of the organization as justification for its failure to perform an obligation arising under such provisional application.

*Guideline 11.    Provisions of internal law of States and rules of international organizations regarding competence to agree on the provisional application of treaties*

1. A State may not invoke the fact that its consent to the provisional application of a treaty or a part of a treaty has been expressed in violation of a provision of its internal law regarding competence to agree to the provisional application of treaties as invalidating its consent unless that violation was manifest and concerned a rule of its internal law of fundamental importance.

2. An international organization may not invoke the fact that its consent to the provisional application of a treaty or a part of a treaty has been expressed in violation of the rules of the organization regarding competence to agree to the provisional application of treaties as invalidating its consent unless that violation was manifest and concerned a rule of fundamental importance.

*Guideline 12.    Agreement to provisional application with limitations deriving from internal law of States and rules of international organizations*

The present draft guidelines are without prejudice to the right of a State or an international organization to agree in the treaty itself or otherwise to the provisional application of the treaty or a part of the treaty with limitations deriving from the internal law of the State or from the rules of the organization.

2. TEXT OF THE DRAFT GUIDE TO PROVISIONAL APPLICATION OF TREATIES AND COMMENTARIES THERETO

90. The text of the draft Guide to Provisional Application of Treaties, together with commentaries thereto, adopted by the Commission on first reading is reproduced below.

## GUIDE TO PROVISIONAL APPLICATION OF TREATIES

*General commentary*

(1) As is always the case with the Commission's output, the draft guidelines are to be read together with the commentaries.

(2) The purpose of the Guide to Provisional Application of Treaties is to provide assistance to States, international organizations and other users concerning the law and practice on the provisional application of treaties. States, international organizations and other users may encounter difficulties concerning, *inter alia*, the form of the agreement to provisionally apply a treaty or a part of a treaty, the commencement and termination of such provisional application, and its legal effect. The objective of the Guide is to direct States, international organizations and other users to answers that are consistent with existing rules and most appropriate for contemporary practice.

(3) Provisional application is a mechanism available to States and international organizations to give immediate effect to all or some of the provisions of a treaty prior to the completion of all internal and international requirements for its entry into force.[964] Provisional application serves a practical purpose, and thus a useful one, for example, when the subject matter entails a certain degree of urgency or when the negotiating States or international organizations want to build trust in advance of entry into force,[965] among other objectives.[966] More generally, provisional application serves the overall purpose of preparing for or facilitating the entry into force of the treaty. It must, however, be stressed that provisional application constitutes a voluntary mechanism which States and international organizations are free to resort to or not, and which may be subject to limitations deriving from the internal law of States and rules of international organizations.

(4) Although the draft guidelines are not legally binding as such, they elaborate upon existing rules of international law in the light of contemporary practice. The draft guidelines are mainly based on article 25 of both the Vienna Convention on the Law of Treaties of 1969 (1969 Vienna Convention)[967] and the Vienna Convention on the Law of Treaties between States and International Organizations or between International Organizations

---

[964] See D. Mathy, "1969 Vienna Convention. Article 25: Provisional application", in O. Corten and P. Klein (eds.), *The Vienna Conventions on the Law of Treaties: A Commentary*, vol. I, Oxford, Oxford University Press, 2011, pp. 639–654, at p. 640; and A. Quast Mertsch, *Provisionally Applied Treaties: Their Binding Force and Legal Nature*, Leiden, Brill, 2012. The concept has been defined by writers as "the application of and binding adherence to a treaty's terms before its entry into force" (R. Lefeber, "Treaties, provisional application", *Max Planck Encyclopedia of Public International Law*, vol. X, Oxford, Oxford University Press, 2012, p. 1) (online edition: https://opil.ouplaw.com /home/MPIL) or as "a simplified form of obtaining the application of the entire treaty, or of certain provisions, for a limited period of time" (M. E. Villiger, *Commentary on the 1969 Vienna Convention on the Law of Treaties*, Leiden, Martinus Nijhoff, 2009, p. 354).

[965] See H. Krieger, "Article 25. Provisional application", in O. Dörr and K. Schmalenbach (eds.), *Vienna Convention on the Law of Treaties: A Commentary*, Berlin and Heidelberg, Springer, 2012, pp. 407–421, at p. 408.

[966] See the first report of the Special Rapporteur, *Yearbook ... 2013*, vol. II (Part One), document A/CN.4/664, paras. 25–35.

[967] Article 25 of the 1969 Vienna Convention reads as follows:

"Provisional application

"1. A treaty or a part of a treaty is applied provisionally pending its entry into force if:

"(*a*) [t]he treaty itself so provides; or

"(*b*) [t]he negotiating States have in some other manner so agreed.

"2. Unless the treaty otherwise provides or the negotiating States have otherwise agreed, the provisional application of a treaty or a part of a treaty with respect to a State shall be terminated if that State notifies the other States between which the treaty is being applied provisionally of its intention not to become a party to the treaty."

of 1986 (1986 Vienna Convention),[968] which they try to clarify and explain, and on the practice of States and international organizations on the matter, without prejudice to other rules of international law.

(5)  It is of course impossible to address all the questions that may arise in practice and to cover the myriad of situations that may be faced by States and international organizations. Yet, a general approach is consistent with one of the main aims of the present draft guidelines, which is to acknowledge the flexible nature of the provisional application of treaties[969] and to avoid any temptation to be overly prescriptive. In line with the essentially voluntary nature of provisional application, which always remains optional, the Guide recognizes that States and international organizations may set aside, by mutual agreement, the solutions identified in the draft guidelines if they so decide.

(6)  The Guide should also help to promote the consistent use of terms and therefore avoid confusion. The extensive use of certain terms, such as "provisional entry into force" as opposed to *definitive* entry into force, has led to confusion regarding the scope and the legal effect of the concept of the provisional application of treaties.[970] In the same vein, quite frequently, treaties do not use the adjective "provisional", but speak instead of "temporary" or "interim" application.[971] Consequently, the framework

[968] Article 25 of the 1986 Vienna Convention reads as follows:

"Provisional application

"1.  A treaty or a part of a treaty is applied provisionally pending its entry into force if:

"(a)  the treaty itself so provides; or

"(b)  the negotiating States and negotiating organizations or, as the case may be, the negotiating organizations have in some other manner so agreed.

"2.  Unless the treaty otherwise provides or the negotiating States and negotiating organizations or, as the case may be, the negotiating organizations have otherwise agreed, the provisional application of a treaty or a part of a treaty with respect to a State or an international organization shall be terminated if that State or that organization notifies the States and organizations with regard to which the treaty is being applied provisionally of its intention not to become a party to the treaty."

[969] See the first report of the Special Rapporteur, *Yearbook ... 2013*, vol. II (Part One), document A/CN.4/664, paras. 28–30.

[970] In this regard, reference can be made to the analysis contained in *The Treaty, Protocols, Conventions and Supplementary Acts of the Economic Community of West African States (ECOWAS), 1975–2010*, Abuja, Ministry of Foreign Affairs of Nigeria, 2011, which is a collection of a total of 59 treaties concluded under the auspices of the Community. There it can be observed that of those 59 treaties, only 11 did not provide for provisional application (see the fourth report of the Special Rapporteur, *Yearbook ... 2016*, vol. II (Part One), document A/CN.4/699 and Add.1, paras. 168–174).

[971] See paragraph 33 of the letter from the Federal Republic of Yugoslavia in the Exchange of Letters Constituting an Agreement between the United Nations and the Federal Republic of Yugoslavia on the Status of the Office of the United Nations High Commissioner for Human Rights in the Federal Republic of Yugoslavia (Geneva, 6 and 9 November 1998), United Nations, *Treaty Series*, vol. 2042, No. 35283, p. 23, and *United Nations Juridical Yearbook 1998* (United Nations publication, Sales No. E.03.V.5), p. 103, at p. 109; article 15 of the Agreement between the Government of the Republic of Belarus and the Government of Ireland on the Conditions of Recuperation of Minor Citizens from the Republic of Belarus in Ireland (Minsk, 23 February 2009), United Nations, *Treaty Series*, vol. 2679, No. 47597, p. 65, at p. 79; and article 16 of the Agreement between the Government of Malaysia and the United Nations Development Programme [UNDP] concerning the Establishment of the UNDP Global Shared Service Centre (Kuala

of article 25 of the 1969 and 1986 Vienna Conventions, while it constitutes the legal basis of the matter,[972] has been criticized as difficult to understand[973] and lacking legal precision.[974] The intention of the present draft guidelines is to provide greater clarity in that regard.

(7)  To provide assistance to States and international organizations in their practice on provisional application, it is anticipated that this Guide will also include draft model clauses, which are to be reproduced in an annex.[975] Those draft model clauses would reflect best practice with regard to the provisional application of both bilateral and multilateral treaties. They are in no way intended to limit the flexible and voluntary nature of provisional application of treaties, and they do not pretend to address the whole range of situations that may arise.

### Guideline 1.    Scope

**The present draft guidelines concern the provisional application of treaties.**

#### Commentary

(1)  Draft guideline 1 is concerned with the scope of application of the draft guidelines. The provision should be read together with draft guideline 2, which sets out the purpose of the draft guidelines.

(2)  The word "concern" was considered more suitable for a text aimed at providing guidance to States and international organizations than other formulations, such as "apply to", which is more frequently found in texts laying down rules applicable to States and other subjects of international law.

(3)  The Commission decided not to include a further qualification limiting the scope *ratione personae* of the draft guidelines to States. Instead, the draft guidelines also pertain to international organizations, as is evident from the references to both States and international organizations in draft guidelines 5 to 7 and 9 to 12.[976] That

Lumpur, 24 October 2011), *ibid.*, vol. 2794, No. 49154, p. 67, at p. 76. See also the memorandums by the Secretariat on the origins of article 25 of the 1969 and 1986 Vienna Conventions (*Yearbook ... 2013*, vol. II (Part One), document A/CN.4/658; and *Yearbook ... 2015*, vol. II (Part One), document A/CN.4/676), and the memorandum by the Secretariat on the practice of States and international organizations in respect of treaties that provide for provisional application (*Yearbook ... 2017*, vol. II (Part One), document A/CN.4/707).

[972] See Quast Mertsch, *Provisionally Applied Treaties ...* (footnote 964 above), p. 22.

[973] See A. Geslin, *La mise en application provisoire des traités*, Paris, Pedone, 2005, p. 111.

[974] See M. A. Rogoff and B. E. Gauditz, "The provisional application of international agreements", *Maine Law Review*, vol. 39, No. 1 (1987), pp. 29–81, at p. 41.

[975] For the text of the draft model clauses as proposed by the Special Rapporteur in his fifth report (A/CN.4/718 and Add.1), see footnote 963 above. The Commission was not able to conclude its consideration of the draft model clauses because of a lack of time. It therefore intends to resume such consideration at its seventy-first session, to allow States and international organizations to assess the annex containing such draft model clauses before the second reading of the draft Guide takes place during its seventy-second session.

[976] The question of the potential role to be played by an international organization or an international conference in an agreement to provisionally apply a treaty or a part of a treaty is addressed in draft guideline 4.

accords with the fact that the provisional application of treaties is envisaged in article 25 of both the 1969 and the 1986 Vienna Conventions.

### Guideline 2.   Purpose

**The purpose of the present draft guidelines is to provide guidance regarding the law and practice on the provisional application of treaties, on the basis of article 25 of the Vienna Convention on the Law of Treaties and other rules of international law.**

### Commentary

(1)   Draft guideline 2 concerns the purpose of the draft guidelines and follows the practice of the Commission of including such a provision in its texts with a view to clarifying the purpose of the text in question. In the present case, the purpose of the draft guidelines is to provide guidance to States and international organizations regarding the law and practice on the provisional application of treaties.

(2)   Draft guideline 2 is intended to underline that the guidelines are based on the 1969 Vienna Convention and other rules of international law, including the 1986 Vienna Convention. The reference to "other rules of international law" is primarily intended to extend the scope of the provision to the provisional application of treaties by international organizations. It acknowledges that the 1986 Vienna Convention has not yet entered into force, and accordingly should not be referred to in the same manner as its 1969 counterpart.

(3)   Draft guideline 2 serves to confirm the basic approach taken throughout the draft guidelines, namely that article 25 of the 1969 and the 1986 Vienna Conventions does not necessarily reflect all aspects of contemporary practice on the provisional application of treaties. That is suggested by the decision to include a reference to both "the law and practice" on the provisional application of treaties. Such an approach is also alluded to in the reference to "other rules of international law", which reflects the understanding within the Commission that other rules of international law, including those of a customary nature, may also be applicable to the provisional application of treaties.

(4)   At the same time, notwithstanding the possibility of the existence of other rules and practice relating to the provisional application of treaties, the draft guidelines recognize the central importance of article 25 of the 1969 and the 1986 Vienna Conventions. The words "on the basis of", and the express reference to article 25, are intended to indicate that this article serves as the basic point of departure of the draft guidelines, even if it is to be supplemented by other rules of international law in order to obtain a full appreciation of the law applicable to the provisional application of treaties.

### Guideline 3.   General rule

**A treaty or a part of a treaty may be provisionally applied, pending its entry into force between the States or international organizations concerned, if the treaty itself so provides, or if in some other manner it has been so agreed.**

### Commentary

(1)   Draft guideline 3 states the general rule on the provisional application of treaties. In so doing, the Commission deliberately sought to follow the formulation of article 25 of the 1969 Vienna Convention, so as to underscore that the starting point for the draft guidelines is article 25. That is subject to the general understanding referred to in paragraph (3) of the commentary to draft guideline 2, namely that the 1969 and the 1986 Vienna Conventions do not necessarily reflect all aspects of contemporary practice on the provisional application of treaties.

(2)   The opening phrase confirms the general possibility that a treaty, or a part of a treaty, may be provisionally applied. The formulation follows that found in the chapeau to paragraph 1 of article 25 of the 1969 and the 1986 Vienna Conventions, while it uses the word "may" to underline the optional character of provisional application.

(3)   The Commission also considered how best to capture in the text the States or international organizations that could provisionally apply a treaty, and the States or international organizations whose agreement is required in order for such provisional application to take place, and therefore retained a more general formulation. Unlike in article 25, which alludes, in paragraph 1 (*b*), to an agreement to provisionally apply a treaty or a part of a treaty among "negotiating States" or "negotiating States and negotiating organizations", no reference is made in draft guideline 3 to which States or international organizations may provisionally apply a treaty. In the process of considering whether to align the present formulation with that found in article 25, by qualifying the applicability of the general rule to a particular group of States or international organizations, the Commission acknowledged the possibility, arising from contemporary practice, that provisional application may be undertaken by States or international organizations that are not negotiating States or negotiating organizations of the treaty in question. The question as to whether the term "negotiating States" in article 25, paragraph 1 (*b*), would prevent non-negotiating States or non-negotiating international organizations from entering into an agreement on provisional application could not be clearly answered based on the multilateral treaties taken into consideration.[977] Furthermore, the need to distinguish between different groups of States or international organizations, in terms of their connection with the treaty, was considered less apposite in the context of bilateral treaties, which constitute the vast majority of treaties that historically have been provisionally applied. However, relevant practice was identified by examining certain commodity agreements that had never entered into force but whose provisional application was extended beyond their termination date.[978] In such cases, such an

---

[977] See the memorandum by the Secretariat, *Yearbook … 2017*, vol. II (Part One), document A/CN.4/707, para. 37.

[978] See, for example, the International Tropical Timber Agreement, 1994, which was extended several times on the basis of article 46 of the Agreement, during which time some States (Guatemala, Mexico, Nigeria and Poland) acceded to it. See also the case of Montenegro regarding Protocol No. 14 to the Convention for the Protection of Human Rights and Fundamental Freedoms, amending the Control System of the Convention (United Nations, *Treaty Series*, vol. 2677, p. 34). Montenegro,

*(Continued on next page.)*

extension was also understood as applying to States that had acceded to the commodity agreement, thus demonstrating the belief that those States had also been provisionally applying the agreement.

(4)  The distinction between provisional application of the entire treaty, as opposed to a "part" thereof, originates in article 25. The Commission, in its work on the law of treaties, specifically envisaged the possibility of what became referred to as provisional application of only a part of a treaty. In draft article 22, paragraph 2, of the 1966 draft articles on the law of treaties, the Commission confirmed that the "same rule" on what it then termed "provisional entry into force" applied to "part of a treaty".[979] In the corresponding commentary, it was explained that "[n]o less frequent to-day is the practice of bringing into force provisionally only a certain part of a treaty in order to meet the immediate needs of the situation".[980] The possibility of provisional application of only a part of a treaty also helps overcome the problems arising from certain types of provisions, such as operational clauses establishing treaty monitoring mechanisms, that may be less amenable to provisional application. The provisional application of a part of a treaty is accordingly reflected in the formula "provisional application of a treaty or a part of a treaty", which is used throughout the draft guidelines.[981]

(5)  The second phrase, namely "pending its entry into force between the States or international organizations concerned", is based on the chapeau of article 25. The

Commission considered the possible ambiguity in the reference to "entry into force". While the expression could be referring, on the one hand, to the entry into force of a treaty itself,[982] examples exist of provisional application continuing for some States or international organizations after the entry into force of a treaty itself, when the treaty had not yet entered into force for those States and international organizations, as is the case for multilateral treaties.[983] The reference to "entry into force" in draft guideline 3 is therefore to be understood in accordance with article 24 of the 1969 and 1986 Vienna Conventions on the same subject. It deals with both the entry into force of the treaty itself and the entry into force for each State or international organization concerned. The reference at the outset to "pending its entry into force" is also meant to underscore the role played by provisional application in preparing for or facilitating such entry into force, even if it may pursue other objectives.

(6)  The third and fourth phrases ("if the treaty itself so provides, or if in some other manner it has been so agreed") reflect the two possible bases for provisional application recognized in paragraph 1 (*a*) and (*b*) of article 25. The possibility of provisional application on the basis of a provision in the treaty in question is well established,[984] and hence the formulation follows that found in the 1969 and 1986 Vienna Conventions.

(7)  A modified, more general formulation was adopted for the alternative scenario of provisional application on the basis of a separate agreement. Unlike in the 1969 and

---

(Footnote 978 continued)

which became independent in 2006 and was therefore not a negotiating State, succeeded to the aforementioned treaty and had the option of provisionally applying certain provisions in accordance with the Agreement on the Provisional Application of Certain Provisions of Protocol No. 14 Pending its Entry into Force (Agreement of Madrid). For the declarations of provisional application made by Albania, Belgium, Estonia, Germany, Liechtenstein, Luxembourg, the Netherlands, Spain, Switzerland and the United Kingdom of Great Britain and Northern Ireland, see, *ibid.*, pp. 30–37.

[979] *Yearbook … 1966*, vol. II, document A/6309/Rev.1 (Part II), p. 210.

[980] Para. (3) of the commentary to draft article 22, *ibid.*

[981] An example of the practice regarding the provisional application of a part of a treaty in bilateral treaties can be found in the Agreement between the Kingdom of the Netherlands and the Principality of Monaco on the Payment of Dutch Social Insurance Benefits in Monaco (Monaco, 29 November 2001), United Nations, *Treaty Series*, vol. 2205, No. 39160, p. 541, at p. 550, art. 13, para. 2; and examples of bilateral treaties expressly excluding a part of a treaty from provisional application can be found in the Agreement between the Austrian Federal Government and the Government of the Federal Republic of Germany on the Cooperation of the Police Authorities and the Customs Administrations in the Border Areas (Vienna, 16 December 1997), *ibid.*, vol. 2170, No. 38115, p. 573, at p. 586, art. 18; and the Agreement between the Government of the Federal Republic of Germany and the Government of the Republic of Croatia regarding Technical Cooperation (Zagreb, 15 January 1999), *ibid.*, vol. 2306, No. 41129, p. 439. With respect to multilateral treaties, practice can be found in the Convention on the Prohibition of the Use, Stockpiling, Production and Transfer of Anti-Personnel Mines and on Their Destruction, art. 18; the Convention on Cluster Munitions, art. 18; the Arms Trade Treaty, art. 23; and the Document agreed among the States Parties to the Treaty on Conventional Armed Forces in Europe, sect. VI, para. 1. Similarly, the Protocol on the Provisional Application of the Revised Treaty of Chaguaramas Establishing the Caribbean Community including the CARICOM Single Market and Economy makes explicit which provisions of the Revised Treaty are not to be provisionally applied, while the Trans-Pacific Strategic Economic Partnership Agreement is an example of provisional application of a part of the treaty that applies only in respect of one party to the Agreement.

[982] As in the case of the Agreement relating to the Implementation of Part XI of the United Nations Convention on the Law of the Sea of 10 December 1982 and the Agreement on the Provisional Application of Certain Provisions of Protocol No. 14 to the Convention for the Protection of Human Rights and Fundamental Freedoms Pending its Entry into Force.

[983] For example, the Arms Trade Treaty.

[984] Examples in the bilateral sphere include: Agreement between the European Community and the Republic of Paraguay on Certain Aspects of Air Services (Brussels, 22 February 2007), *Official Journal of the European Union* L 122, 11 May 2007, art. 9; Agreement between the Argentine Republic and the Republic of Suriname on Visa Waiver for Holders of Ordinary Passports (San Salvador, 6 June 2011), United Nations, *Treaty Series*, vol. 2957, No. 51407), p. 213, at p. 218, art. 8; Treaty between the Swiss Confederation and the Principality of Liechtenstein relating to Environmental Taxes in the Principality of Liechtenstein (Bern, 29 January 2010), *ibid.*, vol. 2761, No. 48680, p. 23, at p. 29, art. 5; Agreement between the Kingdom of Spain and the Principality of Andorra on the Transfer and Management of Waste (Madrid, 17 October 2006), *ibid.*, vol. 2881, No. 50313, p. 165, at p. 187, art. 13; Agreement between the Government of the Kingdom of Spain and the Government of the Slovak Republic on Cooperation to Combat Organized Crime (Bratislava, 3 March 1999), *ibid.*, vol. 2098, No. 36475, p. 341, at p. 357, art. 14, para. 2; and Treaty on the Formation of an Association between the Russian Federation and the Republic of Belarus (Moscow, 2 April 1996), *ibid.*, vol. 2120, No. 36926, p. 595, at p. 616, art. 19. Examples in the multilateral sphere include: Agreement relating to the Implementation of Part XI of the United Nations Convention on the Law of the Sea of 10 December 1982, art. 7; Agreement on the Amendments to the Framework Agreement on the Sava River Basin and the Protocol on the Navigation Regime to the Framework Agreement on the Sava River Basin, art. 3, para. 5; Framework Agreement on a Multilateral Nuclear Environmental Programme in the Russian Federation, art. 18, para. 7, and its corresponding Protocol on Claims, Legal Proceedings and Indemnification, art. 4, para. 8; Statutes of the Community of Portuguese-speaking Countries, art. 21; and Agreement Establishing the "Karanta" Foundation for Support of Non-Formal Education Policies and Including in Annex the Statutes of the Foundation, arts. 8 and 49, respectively.

1986 Vienna Conventions, no specific mention is made of a particular group of States or international organizations, acknowledging the contemporary practice that has included cases of provisional application being agreed to either by only some negotiating States or by non-negotiating States that subsequently signed or acceded to the treaty. Furthermore, the draft guideline envisages the possibility of a third State or international organization, completely unconnected to the treaty, provisionally applying it after having agreed in some other manner with one or more States or international organizations concerned. That explains the more neutral drafting of draft guideline 3, in the passive form, which simply restates the basic rule.

(8)   Draft guideline 3 should be read together with draft guideline 4, which provides further elaboration on provisional application by means of a separate agreement, thereby explaining the meaning of agreement "in some other manner".

### Guideline 4.   Form of agreement

In addition to the case where the treaty so provides, the provisional application of a treaty or a part of a treaty may be agreed through:

(a)   a separate treaty; or

(b)   any other means or arrangements, including a resolution adopted by an international organization or at an intergovernmental conference, or a declaration by a State or an international organization that is accepted by the other States or international organizations concerned.

### Commentary

(1)   Draft guideline 4 deals with forms of agreement on the basis of which a treaty, or a part of a treaty, may be provisionally applied, in addition to when the treaty itself so provides. The structure of the provision follows the sequence of article 25 of the 1969 and 1986 Vienna Conventions, which first envisages the possibility that the treaty in question might expressly permit provisional application and, second, provides for the possibility of an alternative basis for provisional application, when the States or the international organizations "in some other manner" so agreed, which typically occurs when the treaty is silent on the point.

(2)   As previously indicated, draft guideline 4 explains the reference to "in some other manner it has been so agreed" at the end of draft guideline 3, which is envisaged in article 25, paragraph 1 (b). That is confirmed by the opening phrase "[i]n addition to the case where the treaty so provides", which is a direct reference to the phrase "if the treaty itself so provides" in draft guideline 3. That follows the language of article 25. Two categories of additional methods for agreeing the provisional application are identified in the subparagraphs.

(3)   Subparagraph (a) envisages the possibility of provisional application by means of a separate treaty, which

should be distinguished from the treaty that is provisionally applied.[985]

(4)   Subparagraph (b) acknowledges the possibility that, in addition to a separate treaty, provisional application may also be agreed through "other means or arrangements", which broadens the range of possibilities for reaching agreement on provisional application. The Commission viewed such an additional reference as confirmation of the inherently flexible nature of provisional application.[986] By way of providing further guidance, reference is made to two examples of such "means or arrangements", namely provisional application agreed by means of a resolution adopted by an international organization or at an intergovernmental conference, or a declaration by a State or an international organization that is accepted by the other States or international organizations concerned.[987]

[985] Examples of bilateral treaties on provisional application that are separate from the treaty that is provisionally applied include: Agreement on the Taxation of Savings Income and the Provisional Application Thereof between the Netherlands (in respect of Aruba) and Germany (Brussels, 26 May 2004, and The Hague, 9 November 2004), United Nations, *Treaty Series*, vol. 2821, No. 49430), p. 3, and Amendment to the Agreement on Air Services between the Kingdom of the Netherlands and the State of Qatar (The Hague, 11 September 1998, and London, 30 October 2000), *ibid.*, vol. 2265, No. 40360, p. 507, at p. 511. The Netherlands has concluded a number of similar treaties. Examples of multilateral treaties on provisional application that are separate from the treaty that is provisionally applied include: Protocol on the Provisional Application of the Agreement Establishing the Caribbean Community Climate Change Centre; Protocol on the Provisional Application of the Revised Treaty of Chaguaramas; and Agreement on the Provisional Application of Certain Provisions of Protocol No. 14 to the Convention for the Protection of Human Rights and Fundamental Freedoms Pending its Entry into Force.

[986] In practice, some treaties were registered with the United Nations as having been provisionally applied, but with no indication as to which other means or arrangements had been employed to agree upon provisional application. The following are examples of such treaties: Agreement between the Kingdom of the Netherlands and the United States of America on the Status of United States Personnel in the Caribbean Part of the Kingdom (Washington, D.C., 19 October 2012), United Nations, *Treaty Series*, vol. 2967, No. 51578, p. 79; Agreement between the Government of the Republic of Latvia and the Government of the Republic of Azerbaijan on Cooperation in Combating Terrorism, Illicit Trafficking in Narcotic Drugs, Psychotropic Substances and Precursors and Organized Crime (Baku, 3 October 2005), *ibid.*, vol. 2461, No. 44230, p. 205; and Agreement between the United Nations and the Government of the Republic of Kazakhstan relating to the Establishment of the Subregional Office for North and Central Asia of the United Nations Economic and Social Commission for Asia and the Pacific (Astana, 4 May 2011), *ibid.*, vol. 2761, No. 48688, p. 339. See R. Lefeber, "The provisional application of treaties", in J. Klabbers and R. Lefeber (eds.), *Essays on the Law of Treaties: A Collection of Essays in Honour of Bert Vierdag*, The Hague, Martinus Nijhoff, 1998, p. 81.

[987] These are not agreements in which the international organization is a party to the treaty as such. Rather, these are agreements between States reached in meetings or conferences under the auspices of that international organization. Several such instances can be given. First, the amendments to the Convention on the International Maritime Satellite Organization (INMARSAT) and its Operating Agreement. See D. Sagar, "Provisional application in an international organization", *Journal of Space Law*, vol. 27, No. 2 (1999), pp. 99–116. Second, there are a number of precedents in which the competent organs of international organizations provisionally applied amendments, without explicit power being provided for in their constitutions, namely the Congress of the Universal Postal Union, the Committee of Ministers of the Council of Europe, and the practice of the International Telecommunication Union (see Sagar, "Provisional application in an international organization", pp. 104–106). Third, the amendment adopted in 2012 by the Conference of the Parties serving as the Meeting of the Parties to the Kyoto Protocol to the United Nations Framework Convention on Climate Change (Doha Amendment), in which the Ad Hoc

(Continued on next page.)

(5)   While the practice is still quite exceptional,[988] the Commission was of the view that it was useful to include a reference to the possibility that a State or an international organization could make a declaration to the effect of provisionally applying a treaty or a part of a treaty, in cases where the treaty remains silent or when it is not otherwise agreed. However, the declaration must be verifiably

_____

*(Footnote 987 continued)*

Working Group on Further Commitments for Annex I Parties under the Kyoto Protocol, in considering the gap in the operation of the clean development mechanism that might arise in relation to the entry into force of amendments to the Kyoto Protocol, recommended that those amendments could be provisionally applied. See "Legal considerations relating to a possible gap between the first and subsequent commitment periods" (FCCC/KP/AWG/2010/10), para. 18. Fourth, the amendment to article 14 of the Statutes of the World Tourism Organization. Other examples, where Governments are given the possibility to bring the agreement provisionally into force by virtue of a collective decision, include: (*a*) International Agreement on Olive Oil and Table Olives, 2005; (*b*) International Tropical Timber Agreement, 1994; (*c*) International Cocoa Agreement, 1993; and (*d*) International Cocoa Agreement, 2010. Lastly, a case that two academic sources qualify as one of provisional application refers to the establishment of the Preparatory Commission for the Comprehensive Nuclear-Test-Ban Treaty Organization, which was done through the adoption of a resolution by the Meeting of States Signatories (CTBT/MSS/RES/1) on 19 November 1996. Although in the negotiations that led to the Comprehensive Nuclear-Test-Ban Treaty a proposal for provisional application was rejected, although the Comprehensive Nuclear-Test-Ban Treaty makes no explicit provision for provisional application, and although no separate treaty has been concluded to that effect, these scholars argue that because the decisions of the Preparatory Commission are intended to implement core provisions of the Treaty before its entry into force, the resolution of the Meeting of States Signatories can be interpreted as evidence of an agreement "in some other manner", or of an "implied provisional application" on the basis of article 25, paragraph 1 (*b*), of the 1969 Vienna Convention. See A. Michie, "The provisional application of arms control treaties", *Journal of Conflict and Security Law*, vol. 10, No. 3 (2005), pp. 345–377, at pp. 369–370. See also Y. Fukui, "CTBT: Legal questions arising from its non-entry into force revisited", *Journal of Conflict and Security Law*, vol. 22, No. 2 (2017), pp. 183–200, at pp. 197–199. By contrast, another source, published under the auspices of the United Nations Institute for Disarmament Research and containing a preface by the Executive Secretary of the Preparatory Commission, maintains that the Comprehensive Nuclear-Test-Ban Treaty is not currently being provisionally applied (see R. Johnson, *Unfinished Business: The Negotiation of the CTBT and the End of Nuclear Testing* (UNIDIR/2009/2, United Nations publication, Sales No. GV.E.09.0.4), pp. 227–231).

[988] There are cases in which the treaty does not require the negotiating or signatory States to apply it provisionally, but leaves open the possibility for each State to decide whether to apply the treaty or a part of the treaty, at any point in the process from the adoption of the text until or even after its entry into force. In these circumstances, the expression of intention that creates the obligation arising from provisional application may take the form of a unilateral declaration by the State. An example of this is the provisional application by the Syrian Arab Republic of the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction. When the Syrian Arab Republic unilaterally declared that it would provisionally apply the Convention, the Director-General of the Organisation for the Prohibition of Chemical Weapons (OPCW) replied neutrally, informing the Syrian Arab Republic that its "request" to provisionally apply the Convention would be forwarded to the States parties through the Depositary. Although the Convention does not provide for provisional application of the Convention and such a possibility was not discussed during its negotiation, neither the States parties nor OPCW objected to the provisional application by the Syrian Arab Republic of the Convention, as expressed in its unilateral declaration (see the second report of the Special Rapporteur (*Yearbook ... 2014*, vol. II (Part One), document A/CN.4/675, para. 35 (*c*)), and the third report of the Special Rapporteur (*Yearbook ... 2015*, vol. II (Part One), document A/CN.4/687, para. 120)). Another example of consent to be bound by the provisional application of a part of a treaty by means of a unilateral declaration, but which is expressly provided for in a parallel agreement to the treaty, is contained in the Protocol to the Agreement on a Unified Patent Court on Provisional Application.

accepted by the other States or international organizations concerned, as opposed to mere non-objection. Most of the existing practice reflects the acceptance of provisional application in written form. The draft guideline retains a certain degree of flexibility to allow for other modes of acceptance on the condition that it is expressed. The Commission avoided the use of the word "unilateral" before "declaration" in order not to confuse the rules governing the provisional application of treaties with the legal regime of the unilateral acts of States.

### Guideline 5.   Commencement of provisional application

**The provisional application of a treaty or a part of a treaty, pending its entry into force between the States or international organizations concerned, takes effect on such date, and in accordance with such conditions and procedures, as the treaty provides or as are otherwise agreed.**

#### Commentary

(1)   Draft guideline 5 deals with the commencement of provisional application. The draft guideline is modelled on article 24, paragraph 1, of the 1969 and 1986 Vienna Conventions, on entry into force.

(2)   The first clause reflects the approach taken in the draft guidelines of referring to the provisional application of the entire treaty or a part of a treaty.

(3)   The second clause has two components. The reference to "pending its entry into force" follows the formulation found in draft guideline 3, whereby "entry into force" refers to the entry into force between the States or international organizations concerned. As indicated in the commentary to draft guideline 3, such considerations are pertinent primarily in the context of the provisional application of multilateral treaties. The Commission decided to retain the general reference to "entry into force", as already indicated in the commentary to draft guideline 3.[989]

(4)   The second component is the inclusion of the reference to both States and international organizations. That reflects the position taken by the Commission, referred to in paragraph (3) of the commentary to draft guideline 1, whereby the scope of the draft guidelines should include treaties between States and international organizations or between international organizations. The reference to entry into force "between" the States or international organizations was rendered in general terms in order to cover the variety of possible scenarios, for example, provisional application between a State or international organization for which the treaty has entered into force and another State or international organization for which the treaty has not yet entered into force.

(5)   The phrase "takes effect on such date, and in accordance with such conditions and procedures" defines the commencement of provisional application. The text is based on that adopted in article 68 of the 1969 Vienna Convention, which refers to "takes effect". The phrase confirms that what is being referred to is the legal effect

_____

[989] See para. (5) of the commentary to draft guideline 3 above.

in relation to the State or international organization electing to apply the treaty provisionally. The Commission decided not to refer expressly to the various modes of expressing consent to be bound by a treaty, in order to retain a more streamlined provision.

(6)   The concluding phrase "as the treaty provides or as are otherwise agreed" confirms that the agreement to provisionally apply a treaty or a part of a treaty is based on a provision set forth in the treaty that is provisionally applied, on a separate treaty, whatever its particular designation, or on other means or arrangements that establish an agreement for provisional application, and is subject to the conditions and procedures established in such instruments.

### Guideline 6.   Legal effect of provisional application

**The provisional application of a treaty or a part of a treaty produces a legally binding obligation to apply the treaty or a part thereof as if the treaty were in force between the States or international organizations concerned, unless the treaty provides otherwise or it is otherwise agreed.**

#### Commentary

(1)   Draft guideline 6 deals with the legal effect of provisional application. Two types of "legal effect" might be envisaged: the legal effect of the agreement to provisionally apply the treaty or a part of it, and the legal effect of the treaty or a part of it that is being provisionally applied.

(2)   The draft guideline begins by stating that the legal effect of provisional application of a treaty or a part of a treaty is to produce a legally binding obligation to apply the treaty or a part thereof as if the treaty were in force between the States or international organizations concerned. In other words, a treaty or a part of a treaty that is provisionally applied is considered as binding on the parties provisionally applying it from the time at which the provisional application commenced. Such legal effect is derived from the agreement to provisionally apply the treaty by the States or the international organizations concerned, which may be expressed in the forms identified in draft guideline 4. In cases in which that agreement is silent on the legal effect of provisional application, which is common, the draft guideline provides that the provisional application produces a legally binding obligation to apply the treaty or a part thereof as if the treaty were in force.[990]

(3)   The general position is qualified by the concluding phrase "unless the treaty provides otherwise or it is otherwise agreed", which confirms that the basic rule is subject to the treaty or another agreement, which may provide an alternative legal outcome. Such an understanding, namely a presumption in favour of the creation of a legally binding obligation to apply the treaty as if it were in force, subject to the possibility that the parties may agree otherwise, is reflected in existing State practice.[991]

(4)   The opening phrase "[t]he provisional application of a treaty or a part of a treaty" follows draft guideline 5. The phrase "a legally binding obligation to apply the treaty or a part thereof as if the treaty were in force", which is central to the draft guideline, refers to the effect that the treaty would produce were it in force for the State or the international organization concerned and to the conduct that is expected from States or international organizations that decide to resort to provisional application. The reference to "between the States or international organizations concerned" was inserted in order to align the draft guideline with draft guideline 5. The concluding clause, "unless the treaty provides otherwise or it is otherwise agreed", indicates the condition on which the general rule is based, namely that the treaty does not provide otherwise.

(5)   Nonetheless, an important distinction must be made. As a matter of principle, provisional application is not intended to give rise to the whole range of rights and obligations that derive from the consent by a State or an international organization to be bound by a treaty or a part of a treaty. Provisional application of treaties remains different from their entry into force, insofar as it is not subject to all rules of the law of treaties. Therefore, the formulation that provisional application "produces a legally binding obligation to apply the treaty or a part thereof as if the treaty were in force" does not imply that provisional application has the same legal effect as entry into force. The reference to "a legally binding obligation" is intended to add more precision in the depiction of the legal effect of provisional application.

(6)   The Commission considered the possibility of introducing an express safeguard so that the provisional application of a treaty could not result in the modification of the content of the treaty. However, the formulation adopted for draft guideline 6 was considered to be sufficiently comprehensive to deal with the point, since provisional application is limited to producing a legally binding obligation to apply the treaty or a part thereof as if the treaty were in force. Implicit in the draft guideline, therefore, is the understanding that the act of provisionally applying the treaty does not affect the rights and obligations of other States or international organizations.[992] Furthermore, draft guideline 6 should not be understood as limiting the freedom of States or international organizations to amend or modify the treaty that is provisionally applied, in accordance with part IV of the 1969 and the 1986 Vienna Conventions.

---

the number of both bilateral and multilateral treaties provisionally applied is higher than the number available in the United Nations *Treaty Series*. See also the examples contained in the reports submitted by the Special Rapporteur: *Yearbook ... 2013*, vol. II (Part One), document A/CN.4/664 (first report); *Yearbook ... 2014*, vol. II (Part One), document A/CN.4/675 (second report); *Yearbook ... 2015*, vol. II (Part One), document A/CN.4/687 (third report); and *Yearbook ... 2016*, vol. II (Part One), document A/CN.4/699 and Add.1 (fourth report). The fourth report contains an annex with examples of recent European Union practice on provisional application of agreements with third States. See also the examples of the practice of the European Free Trade Association (EFTA) referred to in the fifth report of the Special Rapporteur (A/CN.4/718 and Add.1).

[992] However, the subsequent practice of one or more parties to a treaty may provide a means of interpretation of the treaty under articles 31 or 32 of the 1969 Vienna Convention. See chapter IV above on subsequent agreements and subsequent practice in relation to the interpretation of treaties.

---

[990] See Mathy, "1969 Vienna Convention. Article 25 ..." (footnote 964 above), p. 651.

[991] The memorandum by the Secretariat (*Yearbook ... 2017*, vol. II (Part One), document A/CN.4/707) contains an analysis of more than 400 bilateral and 40 multilateral treaties and recognizes that in reality

### Guideline 7.  Reservations

**1.  In accordance with the relevant rules of the Vienna Convention on the Law of Treaties, applied *mutatis mutandis*, a State may, when agreeing to the provisional application of a treaty or a part of a treaty, formulate a reservation purporting to exclude or modify the legal effect produced by the provisional application of certain provisions of that treaty.**

**2.  In accordance with the relevant rules of international law, an international organization may, when agreeing to the provisional application of a treaty or a part of a treaty, formulate a reservation purporting to exclude or modify the legal effect produced by the provisional application of certain provisions of that treaty.**

#### Commentary

(1)  Draft guideline 7 deals with the formulation of reservations, by a State or an international organization, purporting to exclude or modify the legal effect produced by the provisional application of certain provisions of a treaty.

(2)  Owing to the relative lack of practice on the matter and the fact that reservations in the case of provisional application were not addressed in the 2011 Guide to Practice on Reservations to Treaties,[993] the Commission is only at the initial stage of considering the question of reservations in relation to the provisional application of treaties. Different and quite divergent views were expressed in the Commission as to whether it was appropriate or necessary to include a provision on reservations in the context of provisional application of a treaty or a part thereof in the Guide, although it was generally believed that, as a matter of principle, nothing prohibits the possibility of formulating reservations related to provisional application.

(3)  Although States have made interpretative declarations in conjunction with agreeing to provisional application, such declarations must be distinguished from reservations.[994] Nor do declarations to opt out of provisional application constitute reservations in the sense of the law of treaties.[995]

(4)  Paragraph 1 begins with the phrase "[i]n accordance with the relevant rules of the Vienna Convention on the Law of Treaties, applied *mutatis mutandis*". This phrase is meant to indicate the application of some, but not necessarily all, of the rules of the 1969 Vienna Convention applicable to reservations in case of provisional application. The phrase was placed at the beginning of the paragraph to clearly indicate that the relevant rules of the 1969

Vienna Convention being referred to are those that qualify the formulation of reservations, and not those that relate to the provisional application of certain provisions of the respective treaty.

(5)  The phrase "a State may, when agreeing to the provisional application of a treaty or a part of a treaty, formulate a reservation purporting to exclude or modify the legal effect produced by the provisional application of certain provisions of that treaty" is based on articles 2, paragraph 1 (*d*), and 19 of the 1969 Vienna Convention. The reference to the legal effect "produced by the provisional application" underlines the intrinsic link between draft guideline 6 and draft guideline 7. The formulation is considered to be neutral on the question as to whether reservations exclude or modify the legal effect arising from the provisional application of the treaty, or that of the agreement between the parties to provisionally apply the treaty as such.

(6)  Paragraph 2 provides for the formulation of reservations by international organizations to parallel the situation of States envisaged in paragraph 1. Paragraph 2 replicates paragraph 1, with the necessary modifications. The opening phrase "[i]n accordance with the relevant rules of international law" is to be understood broadly to include primarily the rules of the law of treaties, but also those pertaining to the rules of international organizations.

### Guideline 8.  Responsibility for breach

**The breach of an obligation arising under a treaty or a part of a treaty that is provisionally applied entails international responsibility in accordance with the applicable rules of international law.**

#### Commentary

(1)  Draft guideline 8 deals with the question of responsibility for breach of an obligation arising under a treaty or a part of a treaty that is being provisionally applied. It reflects the legal implication of draft guideline 6. Since the treaty or a part of a treaty being provisionally applied produces a legally binding obligation, then a breach of an obligation arising under the treaty or a part of a treaty being provisionally applied necessarily constitutes a wrongful act giving rise to international responsibility. The Commission considered whether it was necessary to have a provision on responsibility at all. The inclusion of the present draft guideline was deemed necessary since it deals with a key legal consequence of the provisional application of a treaty or a part of a treaty. Article 73 of the 1969 Vienna Convention states that its provisions shall not prejudge any question that may arise in regard to a treaty from the international responsibility of a State and article 74 of the 1986 Vienna Convention provides similarly. The scope of the draft guidelines is not limited to that of the two Vienna Conventions, as stated in draft guideline 2.

(2)  The Commission decided to retain the reference to "a part" of a treaty in order to specify that when a part of a treaty is being provisionally applied, it is only a breach of that part of the treaty that is susceptible of giving rise to international responsibility.

---

[993] *Yearbook … 2011*, vol. II (Part Two), chap. IV, para. 75, and *ibid.*, vol. II (Part Three) and Corr.1–2; the text of the guidelines constituting the Guide to Practice are reproduced in the annex to General Assembly resolution 68/111 of 16 December 2013.

[994] See, in particular, guideline 1.3 of the Guide to Practice on Reservations to Treaties (*ibid.*).

[995] See e.g. article 45, paragraph 2 (*a*), of the Energy Charter Treaty and article 7, paragraph 1 (*a*), of the Agreement relating to the Implementation of Part XI of the United Nations Convention on the Law of the Sea of 10 December 1982.

(3)   The draft guideline was aligned with the articles on responsibility of States for internationally wrongful acts of 2001[996] and with the articles on the responsibility of international organizations of 2011,[997] to the extent that they reflect customary international law. Accordingly, the reference to "an obligation arising under" and the word "entails" were consciously drawn from those draft articles. Likewise, the concluding phrase "in accordance with the applicable rules of international law" is intended as a reference, *inter alia*, to those draft articles.

### Guideline 9.   Termination and suspension of provisional application

**1.   The provisional application of a treaty or a part of a treaty terminates with the entry into force of that treaty in the relations between the States or international organizations concerned.**

**2.   Unless the treaty otherwise provides or it is otherwise agreed, the provisional application of a treaty or a part of a treaty with respect to a State or international organization is terminated if that State or international organization notifies the other States or international organizations between which the treaty or a part of a treaty is being applied provisionally of its intention not to become a party to the treaty.**

**3.   The present draft guideline is without prejudice to the application, *mutatis mutandis*, of relevant rules set forth in part V, section 3, of the Vienna Convention on the Law of Treaties or other relevant rules of international law concerning termination and suspension.**

#### Commentary

(1)   Draft guideline 9 concerns the termination and suspension of provisional application. The provisional application of a treaty or a part of a treaty by a State or an international organization typically ceases in one of two instances: first, when the treaty enters into force for the State or international organization concerned or, second, when the intention not to become a party to the treaty is communicated by the State or international organization provisionally applying the treaty or a part of a treaty to the other States or international organizations between which the treaty or a part of a treaty is being provisionally applied. The possibility of other, less common, means of terminating provisional application is not excluded.

(2)   Paragraph 1 addresses termination of provisional application upon entry into force. Entry into force is the most frequent way in which provisional application is terminated.[998] That the provisional application of a treaty or a part of a treaty can be terminated by means of the entry into force of the treaty itself is implicit in the reference in draft guidelines 3 and 5 to "pending its entry into force",

which is based on article 25 of the 1969 and 1986 Vienna Conventions.[999] In accordance with draft guideline 5, provisional application continues until the treaty enters into force for the State or international organization provisionally applying the treaty or a part of a treaty in relation to the other States or international organizations provisionally applying it or a part of it as well.[1000]

(3)   The phrase "in the relations between the States or international organizations concerned" was included to distinguish the entry into force of the treaty from the provisional application by one or more parties to the treaty. This was viewed as being particularly relevant in the relations between parties to a multilateral treaty, where the treaty might enter into force for a number of the parties but continue to be applied only provisionally by others. This phrase is thus intended to capture all the possible legal situations that may exist in that regard.

(4)   Paragraph 2 reflects the second instance mentioned in paragraph (1) of the commentary to the present draft guideline, namely the case in which the State or international organization gives notice of its intention not to become a party to a treaty. It follows closely the formulation of paragraph 2 of article 25 of the 1969 and 1986 Vienna Conventions.

(5)   The opening phrase of paragraph 2, "[u]nless the treaty otherwise provides or it is otherwise agreed", omits the reference to such an alternative agreement only being concluded between the "negotiating" States and international organizations, which can be found in the 1969 and 1986 Vienna Conventions. The formulation "or it is otherwise agreed" continues to refer to the States or international organizations that had negotiated the treaty, but it may also include States and international organizations that were not involved in the negotiation of the treaty. Given the complexity of concluding modern multilateral treaties, contemporary practice supports a broad reading of the language of the Vienna Conventions, in terms of treating all negotiating States or international organizations as being on the same legal footing in relation to

---

[996] *Yearbook … 2001*, vol. II (Part Two) and corrigendum, para. 76, subsequently annexed to General Assembly resolution 56/83 of 12 December 2001.

[997] *Yearbook … 2011*, vol. II (Part Two), para. 87, subsequently annexed to General Assembly resolution 66/100 of 9 December 2011.

[998] See the memorandum by the Secretariat, *Yearbook … 2017*, vol. II (Part One), document A/CN.4/707, para. 88.

[999] Most bilateral treaties state that the treaty shall be provisionally applied "pending its entry into force", "pending its ratification", "pending the fulfilment of the formal requirements for its entry into force", "pending the completion of these internal procedures and the entry into force of this Convention", "pending the Government[s] … informing each other in writing that the formalities constitutionally required in their respective countries have been complied with", "until the fulfilment of all the procedures mentioned in paragraph 1 of this article" or "until its entry into force" (*ibid.*, para. 90). That is also the case for multilateral treaties, such as the Agreement on the Provisional Application of Certain Provisions of Protocol No. 14 to the Convention for the Protection of Human Rights and Fundamental Freedoms Pending its Entry into Force, which provides in paragraph (*d*) that "[s]uch a declaration [of provisional application] will cease to be effective upon the entry into force of Protocol No. 14 *bis* to the Convention in respect of the High Contracting Party concerned."

[1000] See, e.g., the Agreement between the Government of the Federal Republic of Germany and the Government of the Republic of Slovenia concerning the Inclusion in the Reserves of the Slovenian Office for Minimum Reserves of Petroleum and Petroleum Products of Supplies of Petroleum and Petroleum Products Stored in Germany on its Behalf (Laibach, 18 December 2000), United Nations, *Treaty Series*, vol. 2169, No. 38039, p. 287, at p. 302 (art. 8); and the Exchange of Notes Constituting an Agreement between the Government of Spain and the Government of Colombia on Free Visas (Bogota, 21 and 27 December 2001), *ibid.*, vol. 2253, No. 20662, p. 328, at p. 333.

provisional application, out of recognition of the existence of other groups of States or international organizations whose agreement on matters related to the termination of provisional application might also be sought.[1001]

(6)  The Commission was also concerned with identifying which States or international organizations should be notified of another's intention to terminate the provisional application of a treaty or a part of a treaty. The final phrase in the draft guideline, "notifies the other States or international organizations between which the treaty or a part of a treaty is being applied provisionally", clarifies that point.[1002]

(7)  The Commission decided not to introduce a safeguard in relation to unilateral termination of provisional application by, for example, applying *mutatis mutandis* the rule found in paragraph 2 of article 56 of the 1969 and 1986 Vienna Conventions, which establishes a notice period for denunciation of or withdrawal from a treaty containing no provision regarding termination, denunciation or withdrawal. The Commission declined to do so out of concern for the flexibility inherent in article 25 and in view of insufficient practice in that regard.

(8)  Paragraph 3 confirms that draft guideline 9 is without prejudice to the application, *mutatis mutandis*, of relevant rules set forth in part V, section 3, of the 1969 Vienna Convention or other relevant rules of international law concerning termination and suspension. Despite an apparent lack of relevant practice and notwithstanding the fact that article 25, paragraph 2, of the Convention provides a flexible way to terminate provisional application, the Commission considered it useful to include a provision

relating to termination and suspension in the Guide to address a number of possible scenarios not covered by paragraphs 1 and 2. For example, a State or international organization may only wish to terminate provisional application, but still intend to become a party to the treaty. Another conceivable scenario is that in situations of material breach, a State or international organization may only seek to terminate or suspend provisional application *vis-à-vis* the State or international organization that has committed the material breach, while still continuing to provisionally apply the treaty in relation to other parties. The State or international organization affected by the material breach may also wish to resume the suspended provisional application of the treaty after the material breach has been adequately remedied.

(9)  The formulation of paragraph 3 as a "without prejudice" clause is intended to preserve the possibility that provisions pertaining to termination and suspension in the 1969 Vienna Convention may be applicable to a provisionally applied treaty. However, the provision does not aspire to definitively determine which grounds in section 3 might serve as an additional basis for the termination of provisional application, or in which scenarios and to what extent those grounds would be applied. Instead, the rules of the Convention are to be "applied *mutatis mutandis*" depending on the circumstances.

(10)  The reference to "or other relevant rules of international law" is primarily intended to extend the scope of the provision to the provisional application of treaties by international organizations, but the reference also makes clear that the provision is without prejudice to other methods of terminating provisional application more generally.[1003]

(11)  The scope of the provision is limited to section 3 of part V of the 1969 Vienna Convention to avoid any legal uncertainty that might have resulted from a general reference to part V. Similarly, the specific reference to section 3 serves to exclude the applicability of section 2 of part V of the Convention, on invalidity. The Guide addresses invalidity in draft guideline 11.

### Guideline 10.  Internal law of States and rules of international organizations, and the observance of provisionally applied treaties

1.  A State that has agreed to the provisional application of a treaty or a part of a treaty may not invoke the provisions of its internal law as justification for its failure to perform an obligation arising under such provisional application.

2.  An international organization that has agreed to the provisional application of a treaty or a part of a treaty may not invoke the rules of the organization as justification for its failure to perform an obligation arising under such provisional application.

---

[1001] Such an approach accords with that taken with regard to the position of negotiating States in draft guideline 3. See paras. (2) and (5) of the commentary to draft guideline 3 above.

[1002] A small number of bilateral treaties contain explicit clauses on termination of provisional application and in some cases provide also for its notification. An example could be the Agreement between the Government of the United States of America and the Government of the Republic of the Marshall Islands concerning Cooperation to Suppress the Proliferation of Weapons of Mass Destruction, their Delivery Systems, and Related Materials by Sea (Honolulu, 13 August 2004), United Nations, *Treaty Series*, vol. 2962, No. 51490, p. 339, art. 17. Other examples include: Treaty between the Federal Republic of Germany and the Kingdom of the Netherlands concerning the Implementation of Air Traffic Controls by the Federal Republic of Germany above Dutch Territory and concerning the Impact of the Civil Operations of Niederrhein Airport on the Territory of the Kingdom of the Netherlands (Berlin, 29 April 2003), *ibid.*, vol. 2389, No. 43165, p. 117, at p. 173 (art. 16); Agreement between Spain and the International Oil Pollution Compensation Fund (London, 2 June 2000), *ibid.*, vol. 2161, No. 37756, p. 45, at p. 50; and Treaty between the Kingdom of Spain and the North Atlantic Treaty Organization Represented by the Supreme Headquarters Allied Powers Europe on the Special Conditions Applicable to the Establishment and Operation on Spanish Territory of International Military Headquarters (Madrid, 28 February 2000), *ibid.*, vol. 2156, No. 37662, p. 139, at p. 155 (art. 25). As for the termination of multilateral treaties, the 1995 Agreement for the Implementation of the Provisions of the United Nations Convention on the Law of the Sea of 10 December 1982 relating to the Conservation and Management of Straddling Fish Stocks and Highly Migratory Fish Stocks includes a clause (art. 41) allowing for termination by notification reflecting the wording of article 25, paragraph 2, of the 1969 Vienna Convention. Furthermore, the practice with regard to commodity agreements illustrates that provisional application may be agreed to be terminated by withdrawal from the agreement, as is the case with the International Agreement on Olive Oil and Table Olives.

[1003] See, for example, article 29 of the 1978 Vienna Convention on Succession of States in respect of Treaties, which envisages additional means of terminating provisional application of multilateral treaties that are in force with respect to the territory to which the succession of States relates.

*Commentary*

(1)   Draft guideline 10 deals with the observance of provisionally applied treaties and their relation with the internal law of States and the rules of international organizations. Specifically, it deals with the question of the invocation of internal law of States, or in the case of international organizations the rules of the organization, as justification for failure to perform an obligation arising under the provisional application of a treaty or a part of a treaty. The first paragraph concerns the rule applicable to States and the second the rule applicable to international organizations.

(2)   The provision follows closely the formulation contained in article 27 of both the 1969[1004] and 1986[1005] Vienna Conventions. Therefore, it should be considered together with those articles and other applicable rules of international law.

(3)   The provisional application of a treaty or a part of a treaty is governed by international law. Like article 27,[1006] draft guideline 10 states, as a general rule, that a State or an international organization may not invoke the provisions of its internal law or rules as a justification for its failure to perform an obligation arising under such provisional application. Likewise, such internal law or rules cannot be invoked so as to avoid the responsibility that may be incurred for the breach of such obligations.[1007] However, as indicated in draft guideline 12, the States and international organizations concerned may agree to limitations deriving from such internal law or rules as a part of their agreement on provisional application.

(4)   While it is true that each State or international organization may decide, under its internal law or rules, whether to agree to the provisional application of a treaty or a part of a treaty,[1008] once a treaty or a part of a treaty is provisionally applied, an inconsistency with the internal law of a State or the rules of an international organization cannot justify a failure to provisionally apply such a treaty

or a part thereof. Consequently, the invocation of those internal provisions in an attempt to justify a failure to provisionally apply a treaty or a part thereof would not be in accordance with international law.

(5)   A failure to comply with the obligations arising from the provisional application of a treaty or a part of a treaty with a justification based on the internal law of a State or rules of an international organization will engage the international responsibility of that State or international organization.[1009] Any other view would be contrary to the law on State responsibility, according to which the characterization of an act of a State or an international organization as internationally wrongful is governed by international law and such characterization is not affected by its characterization as lawful by internal law.[1010]

(6)   The reference in the draft guideline to the "internal law of States and rules of international organizations" stands for any provision of this nature, and not only the internal law or rules specifically concerning the provisional application of treaties.

(7)   The phrase "obligation arising under such provisional application", in both paragraphs of the draft guideline, is broad enough to encompass situations where the obligation flows from the treaty itself or from a separate agreement to provisionally apply the treaty or a part of a treaty. This is in accordance with the general rule of draft guideline 6, which states that the provisional application of a treaty or a part of a treaty produces a legally binding obligation to apply the treaty or a part thereof as if the treaty were in force between the States or international organizations concerned.

**Guideline 11.   Provisions of internal law of States and rules of international organizations regarding competence to agree on the provisional application of treaties**

**1.   A State may not invoke the fact that its consent to the provisional application of a treaty or a part of a treaty has been expressed in violation of a provision of its internal law regarding competence to agree to the provisional application of treaties as invalidating its consent unless that violation was manifest and concerned a rule of its internal law of fundamental importance.**

**2.   An international organization may not invoke the fact that its consent to the provisional application of a treaty or a part of a treaty has been expressed in violation of the rules of the organization regarding competence to agree to the provisional application of treaties as invalidating its consent unless that violation was manifest and concerned a rule of fundamental importance.**

[1004] Article 27 of the 1969 Vienna Convention provides as follows:

    "*Internal law and observance of treaties*

    "A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty. This rule is without prejudice to article 46."

[1005] Article 27 of the 1986 Vienna Convention provides as follows:

    "*Internal law of States, rules of international organizations and observance of treaties*

    "1.   A State party to a treaty may not invoke the provisions of its internal law as justification for its failure to perform the treaty.

    "2.   An international organization party to a treaty may not invoke the rules of the organization as justification for its failure to perform the treaty.

    "3.   The rules contained in the preceding paragraphs are without prejudice to article 46."

[1006] See A. Schaus, "1969 Vienna Convention, Article 27: Internal law and observance of treaties", in Corten and Klein (eds.), *The Vienna Conventions on the Law of Treaties* ... (footnote 964 above), pp. 688–701, at p. 689.

[1007] See article 7 (Obligatory character of treaties: the principle of the supremacy of international law over domestic law) in the fourth report on the law of treaties by Sir Gerald Fitzmaurice, Special Rapporteur (*Yearbook ... 1959*, vol. II, document A/CN.4/120, p. 43).

[1008] See Quast Mertsch, *Provisionally Applied Treaties* ... (footnote 964 above), p. 64.

[1009] See Mathy, "1969 Vienna Convention, Article 25 ..." (footnote 964 above), p. 646.

[1010] See article 3 of the draft articles on responsibility of States for internationally wrongful acts of 2001 (*Yearbook ... 2001*, vol. II (Part Two) and corrigendum, para. 76, subsequently annexed to General Assembly resolution 56/83); and draft article 5 of the draft articles on the responsibility of international organizations of 2011 (*Yearbook ... 2011*, vol. II (Part Two), para. 87, subsequently annexed to General Assembly resolution 66/100).

*Commentary*

(1)   Draft guideline 11 deals with the effects of the provisions of the internal law of States and the rules of international organizations on their competence to agree to the provisional application of treaties. The first paragraph concerns the internal law of States and the second the rules of international organizations.

(2)   Draft guideline 11 follows closely the formulation of article 46 of both the 1969 and 1986 Vienna Conventions. Specifically, the first paragraph of the draft guideline follows paragraph 1 of article 46 of the 1969 Vienna Convention,[1011] and the second, paragraph 2 of article 46 of the 1986 Vienna Convention.[1012] Therefore, the draft guideline should be considered together with those articles and other applicable rules of international law.

(3)   Draft guideline 11 provides that any claim that the consent to provisional application is invalid must be based on a manifest violation of the internal law of the State or the rules of the organization regarding their competence to agree to such provisional application and, additionally, must concern a rule of fundamental importance.

(4)   A violation of that type is "manifest" if it would be objectively evident to any State or any international organization conducting itself in the matter in accordance with the normal practice of States or, as the case may be, of international organizations and in good faith.[1013]

### Guideline 12.   Agreement to provisional application with limitations deriving from internal law of States and rules of international organizations

**The present draft guidelines are without prejudice to the right of a State or an international organization to agree in the treaty itself or otherwise to the provisional application of the treaty or a part of the treaty with limitations deriving from the internal law of the State or from the rules of the organization.**

*Commentary*

(1)   Draft guideline 12 relates to the limitations of States and international organizations that could derive from their internal law and rules when agreeing to the provisional application of a treaty or a part of a treaty. It acknowledges that such limitations may exist and, consequently, recognizes the right of States and international organizations to agree to provisional application subject to limitations that derive from internal law or rules of the organizations, and reflecting them in their consent to provisionally apply a treaty or a part of a treaty.

(2)   Notwithstanding the fact that the provisional application of a treaty or a part of a treaty may be subject to limitations, the present draft guideline recognizes the flexibility of a State or an international organization to agree to the provisional application of a treaty or a part of a treaty in such a manner as to guarantee that such an agreement conforms with the limitations deriving from their respective internal provisions. For example, the present draft guideline provides for the possibility that the treaty may expressly refer to the internal law of the State or the rules of the international organization and make such provisional application conditional on the non-violation of the internal law of the State or the rules of the organization.[1014]

(3)   The word "agreement" in the title of the draft guideline reflects the consensual basis of the provisional application of treaties, as well as the fact that provisional application might not be possible at all under the internal law of States or the rules of international organizations.[1015]

(4)   The draft guideline should not be interpreted as implying the need for a separate agreement on the applicability of limitations deriving from the internal law of the State or the rules of the international organization concerned. The existence of any such limitations deriving from internal law needs only to be sufficiently clear in the treaty itself, in the separate treaty or in any other form of agreement to provisionally apply a treaty or a part of a treaty.

---

[1011] Article 46 of the 1969 Vienna Convention provides as follows:

"*Provisions of internal law regarding competence to conclude treaties*

"1.   A State may not invoke the fact that its consent to be bound by a treaty has been expressed in violation of a provision of its internal law regarding competence to conclude treaties as invalidating its consent unless that violation was manifest and concerned a rule of its internal law of fundamental importance.

"2.   A violation is manifest if it would be objectively evident to any State conducting itself in the matter in accordance with normal practice and in good faith."

[1012] Article 46 of the 1986 Vienna Convention provides as follows:

"*Provisions of internal law of a State and rules of an international organization regarding competence to conclude treaties*

"1.   A State may not invoke the fact that its consent to be bound by a treaty has been expressed in violation of a provision of its internal law regarding competence to conclude treaties as invalidating its consent unless that violation was manifest and concerned a rule of its internal law of fundamental importance.

"2.   An international organization may not invoke the fact that its consent to be bound by a treaty has been expressed in violation of the rules of the organization regarding competence to conclude treaties as invalidating its consent unless that violation was manifest and concerned a rule of fundamental importance.

"3.   A violation is manifest if it would be objectively evident to any State or any international organization conducting itself in the matter in accordance with the normal practice of States and, where appropriate, of international organizations and in good faith."

[1013] According to article 46, paragraph 2, of the 1969 Vienna Convention and article 46, paragraph 3, of the 1986 Vienna Convention.

[1014] See, for example, article 45 of the Energy Charter Treaty.

[1015] See also the several examples of free trade agreements between the EFTA States and numerous other States (i.e. Albania, Bosnia and Herzegovina, Canada, Chile, Egypt, Georgia, Lebanon, Mexico, Montenegro, Peru, Philippines, Republic of Korea, Serbia, Singapore, the former Yugoslav Republic of Macedonia, Tunisia and the Central American States, the Gulf Cooperation Council member States and the Southern African Customs Union (SACU) States), where different clauses are used in this regard, such as: "if its constitutional requirements permit", "if its respective legal requirements permit" or "if their domestic requirements permit" (www.efta.int/free-trade/free-trade-agreements). For instance, article 43, paragraph 2, of the Free Trade Agreement between the EFTA States and the SACU States reads as follows:

"Article 43. *Entry into force*

" [...]

"2.   If constitutional requirements permit, any EFTA State or SACU State may apply this Agreement provisionally. Provisional application of this Agreement under this paragraph shall be notified to the Depositary."

# Chapter VIII

# PEREMPTORY NORMS OF GENERAL INTERNATIONAL LAW (*JUS COGENS*)

## A. Introduction

91. At its sixty-seventh session (2015), the Commission decided to include the topic "*Jus cogens*" in its programme of work and appointed Mr. Dire Tladi as Special Rapporteur for the topic.[1016] The General Assembly subsequently, in its resolution 70/236 of 23 December 2015, took note of the decision of the Commission to include the topic in its programme of work.

92. At its sixty-eighth session (2016) and sixty-ninth session (2017), the Commission considered the first and second reports of the Special Rapporteur,[1017] respectively. Following the debates on those reports, the Commission decided to refer the draft conclusions contained in those reports to the Drafting Committee. The Commission heard interim reports from the Chairs of the Drafting Committee on peremptory norms of general international law (*jus cogens*) containing the draft conclusions provisionally adopted by the Drafting Committee at the sixty-eighth and the sixty-ninth sessions, respectively.

93. At its sixty-ninth session, following a proposal by the Special Rapporteur in his second report,[1018] the Commission decided to change the title of the topic from "*Jus cogens*" to "Peremptory norms of general international law (*jus cogens*)".[1019]

## B. Consideration of the topic at the present session

94. At the present session, the Commission had before it the third report of the Special Rapporteur (A/CN.4/714), which considered the consequences and legal effects of peremptory norms of general international law (*jus cogens*). On the basis of his analysis, the Special Rapporteur proposed 13 draft conclusions.[1020]

[1016] At its 3257th meeting, on 27 May 2015 (*Yearbook ... 2015*, vol. II (Part Two), para. 286). The topic had been included in the long-term programme of work of the Commission during its sixty-sixth session (2014), on the basis of the proposal contained in the annex to the report of the Commission on the work of that session (*Yearbook ... 2014*, vol. II (Part Two) and corrigendum, para. 266 and pp. 170–178).

[1017] *Yearbook ... 2016*, vol. II (Part One), document A/CN.4/693; and *Yearbook ... 2017*, vol. II (Part One), document A/CN.4/706.

[1018] *Yearbook ... 2017*, vol. II (Part One), document A/CN.4/706, para. 90.

[1019] *Ibid.*, vol. II (Part Two), para. 146.

[1020] The text of draft conclusions 10 to 23, as proposed by the Special Rapporteur in his third report, reads as follows:

"*Draft conclusion 10. Invalidity of a treaty in conflict with a peremptory norm of general international law* (jus cogens)

"1. A treaty is void if, at the time of its conclusion, it conflicts with a peremptory norm of general international law (*jus cogens*). Such a treaty does not create any rights or obligations.

"2. An existing treaty becomes void and terminates if it conflicts with a new peremptory norm of general international law (*jus cogens*) that emerges subsequent to the conclusion of the treaty. Parties to such a treaty are released from any further obligation to perform in terms of the treaty.

95. The Commission considered the third report at its 3414th to 3421st and 3425th meetings, on 30 May and 1 June 2018, and from 2 to 4 and on 9 July 2018.

"3. To avoid conflict with a peremptory norm of general international law, a provision in a treaty should, as far as possible, be interpreted in a way that renders it consistent with a peremptory norm of general international law (*jus cogens*).

"*Draft conclusion 11. Severability of treaty provisions in conflict with peremptory norm of general international law* (jus cogens)

"1. A treaty which, at its conclusion, is in conflict with a peremptory norm of general international law (*jus cogens*) is invalid in whole, and no part of the treaty may be severed or separated.

"2. A treaty which becomes invalid due to the emergence of a new peremptory norm of general international law (*jus cogens*) terminates in whole, unless:

" (*a*) the provisions that are in conflict with a peremptory norm of general international law (*jus cogens*) are separable from the remainder of the treaty with regards to their application;

" (*b*) the provisions that are in conflict with a peremptory norm of general international law (*jus cogens*) do not constitute an essential basis of the consent to the treaty; and

" (*c*) continued performance of the remainder of the treaty would not be unjust.

"*Draft conclusion 12. Elimination of consequences of acts performed in reliance of invalid treaty*

"1. Parties to a treaty which is invalid as a result of being in conflict with a peremptory norm of general international law (*jus cogens*) at the time of the treaty's conclusion have a legal obligation to eliminate the consequences of any act performed in reliance of the provision of the treaty which is in conflict with a peremptory norm of general international law (*jus cogens*).

"2. The termination of a treaty on account of the emergence of a new peremptory norm of general international law (*jus cogens*) does not affect any right, obligation or legal situation created through the execution of the treaty prior to the termination of the treaty unless such a right, obligation or legal situation is itself in conflict with a peremptory norm of general international law (*jus cogens*).

"*Draft conclusion 13. Effects of peremptory norms of general international law* (jus cogens) *on reservations to treaties*

"1. A reservation to a treaty provision which reflects a peremptory norm of general international law (*jus cogens*) does not affect the binding nature of that norm, which shall continue to apply.

"2. A reservation cannot exclude or modify the legal effect of a treaty in a manner contrary to a peremptory norm of general international law (*jus cogens*).

"*Draft conclusion 14. Recommended procedure regarding settlement of disputes involving conflict between a treaty and a peremptory norm of general international law* (jus cogens)

"1. Subject to the jurisdictional rules of the International Court of Justice, any dispute concerning whether a treaty conflicts with a peremptory norm of general international law (*jus cogens*) should be submitted to the International Court of Justice for a decision, unless the parties to the dispute agree to submit the dispute to arbitration.

"2. Notwithstanding paragraph 1, the fact that a dispute involves a peremptory norm of general international law (*jus cogens*) is not sufficient to establish the jurisdiction of the Court without the necessary consent to jurisdiction in accordance with international law.

"*Draft conclusion 15. Consequences of peremptory norms of general international law* (jus cogens) *for customary international law*

"1. A customary international law rule does not arise if it conflicts with a peremptory norm of general international law (*jus cogens*).

(*Continued on next page.*)

96.    At its 3425th meeting, on 9 July 2018, the Commission referred draft conclusions 10 to 23,[1021] as contained

(Footnote 1020 continued)

    "2.    A customary international law rule not of *jus cogens* character ceases to exist if a new conflicting peremptory norm of general international law (*jus cogens*) arises.

    "3.    Since peremptory norms of general international law (*jus cogens*) bind all subjects of international law, the persistent objector rule is not applicable.

    "*Draft conclusion 16.    Consequences of peremptory norms of general international law* (jus cogens) *on unilateral acts*

    "A unilateral act that is in conflict with a peremptory norm of general international law (*jus cogens*) is invalid.

    "*Draft conclusion 17.    Consequences of peremptory norms of general international law* (jus cogens) *for binding resolutions of international organizations*

    "1.    Binding resolutions of international organizations, including those of the Security Council of the United Nations, do not establish binding obligations if they conflict with a peremptory norm of general international law (*jus cogens*).

    "2.    To the extent possible, resolutions of international organizations, including those of the Security Council of the United Nations, must be interpreted in a manner consistent with peremptory norms of general international law (*jus cogens*).

    "*Draft conclusion 18.    The relationship between peremptory norms of general international law* (jus cogens) *and obligations* erga omnes

    "Peremptory norms of general international law (*jus cogens*) establish obligations *erga omnes*, the breach of which concerns all States.

    "*Draft conclusion 19.    Effects of peremptory norms of general international law* (jus cogens) *on circumstances precluding wrongfulness*

    1.    No circumstance may be advanced to preclude the wrongfulness of an act which is not in conformity with an obligation arising under a peremptory norm of general international law (*jus cogens*).

    2.    Paragraph 1 does not apply where a peremptory norm of general international law (*jus cogens*) emerges subsequent to the commission of an act.

    "*Draft conclusion 20.    Duty to cooperate*

    "1.    States shall cooperate to bring to an end through lawful means any serious breach of a peremptory norm of general international law (*jus cogens*).

    "2.    A serious breach of a peremptory norm of general international law (*jus cogens*) refers to a breach that is either gross or systematic.

    "3.    The cooperation envisioned in this draft conclusion can be carried out through institutionalized cooperation mechanisms or through *ad hoc* cooperative arrangements.

    "*Draft conclusion 21.    Duty not to recognize or render assistance*

    "1.    States have a duty not to recognize as lawful a situation created by a breach of a peremptory norm of general international law (*jus cogens*).

    "2.    States shall not render aid or assistance in the maintenance of a situation created by a breach of a peremptory norm of general international law (*jus cogens*).

    "*Draft conclusion 22.    Duty to exercise domestic jurisdiction over crimes prohibited by peremptory norms of general international law* (jus cogens)

    "1.    States have a duty to exercise jurisdiction over offences prohibited by peremptory norms of international law (*jus cogens*), where the offences are committed by the nationals of that State or on the territory under its jurisdiction.

    "2.    Paragraph 1 does not preclude the establishment of jurisdiction on any other ground as permitted under its national law.

    "*Draft conclusion 23.    Irrelevance of official position and non-applicability of immunity* ratione materiae

    "1.    The fact that an offence prohibited by a peremptory norm of general international law (*jus cogens*) was committed by a person holding an official position shall not constitute a ground excluding criminal responsibility.

    "2.    Immunity *ratione materiae* shall not apply to any offence prohibited by a peremptory norm of general international law (*jus cogens*)."

    [1021] *Idem.*

in the Special Rapporteur's third report, to the Drafting Committee on the understanding that draft conclusions 22 and 23 would be dealt with by means of a "without prejudice" clause.

97.    At its 3402nd meeting, on 14 May 2018, the Chair of the Drafting Committee presented an interim report of the Drafting Committee on "Peremptory norms of general international law (*jus cogens*)", concerning draft conclusions 8 and 9 that it had provisionally adopted at the seventieth session. At its 3436th meeting, on 26 July 2018, the Chair of the Drafting Committee presented a further interim report of the Drafting Committee, concerning draft conclusions 10 to 14 that it had provisionally adopted at the seventieth session. Both reports were presented for information only, and are available from the website of the Commission.[1022]

### 1.    INTRODUCTION BY THE SPECIAL RAPPORTEUR OF THE THIRD REPORT

98.    In providing a review of the debate in the Sixth Committee, the Special Rapporteur recalled that, while States had generally agreed with the criteria for the identification of norms of *jus cogens* provisionally adopted by the Drafting Committee, a few had recommended the inclusion of additional elements, such as non-derogation, fundamental values of the international community, and practice. He noted the call for greater clarity concerning the concept of "acceptance and recognition". Many States had agreed that there should be "a very large majority" of States accepting and recognizing the peremptory character of a norm. Some States preferred a more stringent qualifier that would not be seen just from the perspective of numbers but also from the representative character of the group of States. He also recalled the divergence in views concerning the sources of law that could form the basis of a peremptory norm, but noted that there was near-universal agreement that customary international law was the most common basis for *jus cogens* norms.

99.    The Special Rapporteur then introduced his proposed draft conclusions contained in paragraph 160 of the third report. He noted that draft conclusions 10, 11 and 12 were based on provisions of the Vienna Convention on the Law of Treaties of 1969 (1969 Vienna Convention), with the exception of paragraph 3 of draft conclusion 10, which provides that a treaty be interpreted in a manner consistent with peremptory norms. The Special Rapporteur considered this to be a necessary consequence of article 31, paragraph 3 (*c*), of the 1969 Vienna Convention requiring the relevant rules of international law to be taken into account in the interpretation of treaties. Moreover, he noted that there was a significant amount of practice in support of the content of paragraph 3 of draft conclusion 10.

100.    Draft conclusion 13 concerning the effects of peremptory norms of general international law (*jus cogens*) on reservations to treaties was based principally on

[1022] See the Analytical Guide to the Work of the International Law Commission: https://legal.un.org/ilc/guide/1_14.shtml.

guideline 4.4.3 of the Guide to Practice on Reservations to Treaties,[1023] adopted by the Commission in 2011.

101.    Draft conclusion 14 contained a recommended procedure regarding settlement of disputes involving conflict between a treaty and a norm of *jus cogens*. The Special Rapporteur recalled the fundamental importance of article 66 of the 1969 Vienna Convention for the application of articles 53 and 64 thereof. Nonetheless, in his view it was difficult to incorporate the procedure therein into a set of non-binding draft conclusions. Instead, he considered that his proposal for draft conclusion 14 would, for cases in which article 66 of the 1969 Vienna Convention did not apply (e.g., because the States concerned were not parties to the Convention), serve as encouragement for parties to submit their disputes to judicial settlement, including by the International Court of Justice.

102.    As regards draft conclusion 15, the Special Rapporteur noted that paragraph 1 was based on a number of decisions of national courts in which *jus cogens* norms were held to prevail over the rules of customary international law. In his view, such findings necessarily implied that existing norms of *jus cogens* would invalidate customary international law rules or prevent them from coming into being. The second paragraph of draft conclusion 15, concerning the conflict of a customary international law rule with a new *jus cogens* norm, was inspired by article 64 of the 1969 Vienna Convention, and had been supported by States and by judgments of the European Court of Justice. The Special Rapporteur further noted that paragraph 3, concerning the non-application of the persistent objector rule to *jus cogens* norms, was consistent with the universal nature of *jus cogens* and had been accepted in State practice, including in the decisions of national and regional courts.

103.    With regard to draft conclusion 16, on the invalidity of a unilateral act in conflict with a norm of *jus cogens*, the Special Rapporteur noted that the use of the phrase "is invalid" tracked guiding principle 8 of the Guiding Principles applicable to unilateral declarations of States capable of creating legal obligations,[1024] adopted by the Commission in 2006.

104.    Draft conclusion 17 concerned the binding resolutions of international organizations. The Special Rapporteur noted that the proposition, contained in the first paragraph, that binding resolutions of international organizations did not establish binding obligations if they conflicted with a norm of *jus cogens* was supported by a significant amount of literature and public statements by States maintaining that Security Council resolutions were subject to norms of *jus cogens*, as well as by decisions of domestic, regional and international courts. He also noted that, similar to paragraph 3 of draft conclusion 10, paragraph 2 of draft conclusion 17 contained an interpretative presumption indicating that, to the extent possible, resolutions of international organizations were to be interpreted in a manner consistent with norms of *jus cogens*. Such an

assertion found support in statements by States in various contexts and in the judgments of the European Court of Justice.

105.    As regards draft conclusion 18, the Special Rapporteur maintained that it was virtually universally accepted that *jus cogens* norms established *erga omnes* obligations.

106.    Draft conclusions 19, 20 and 21 concerned aspects of international responsibility. Draft conclusion 19, drawn from draft article 26 of the articles on responsibility of States for internationally wrongful acts,[1025] adopted in 2001, confirmed in paragraph 1 that the circumstances precluding wrongfulness under general international law did not apply to breaches of obligations arising from *jus cogens* norms. The second paragraph sought to prevent responsibility from arising retroactively where a norm of *jus cogens* emerged subsequent to the commission of an act in breach of that norm.

107.    Draft conclusion 20 concerned the duty to co-operate to bring to an end through lawful means any serious breach of a *jus cogens* norm. The first paragraph was based on paragraph 1 of draft article 41 of the articles on responsibility of States for internationally wrongful acts. The duty to cooperate was a well-established principle of international law. It had been codified by the Commission in the draft articles on the protection of persons in the event of disasters,[1026] adopted in 2016, and had found support in the *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* advisory opinion of the International Court of Justice[1027] and the *La Cantuta* case[1028] in the Inter-American Court of Human Rights.

108.    Draft conclusion 21, providing for a duty not to recognize as lawful a situation created by a breach of a *jus cogens* norm and not to give aid or assistance in the maintenance of such a situation, was based on paragraph 2 of draft article 41 of the articles on responsibility of States for internationally wrongful acts. The Commission, in 2001, had recognized that the duty enjoyed a customary international law status, as confirmed by the International Court of Justice in the *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)*[1029] and *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* advisory opinions, as well as in resolutions of

[1023] *Yearbook … 2011*, vol. II (Part Two), chap. IV, para. 75, and *ibid.*, vol. II (Part Three) and Corr. 1–2; the text of the guidelines constituting the Guide to Practice is reproduced in the annex to General Assembly resolution 68/111 of 16 December 2013.

[1024] *Yearbook … 2006*, vol. II (Part Two), para. 176.

[1025] *Yearbook … 2001*, vol. II (Part Two) and corrigendum, para. 76. The articles on responsibility of States for internationally wrongful acts adopted by the Commission at its fifty-third session are reproduced in the annex to General Assembly resolution 56/83 of 12 December 2001.

[1026] *Yearbook … 2016*, vol. II (Part Two), para. 48.

[1027] *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, Advisory Opinion, *I.C.J. Reports 2004*, p. 136, at p. 200, para. 159.

[1028] *La Cantuta v. Peru*, Judgment (Merits, Reparations and Costs) of 29 November 2006, Inter-American Court of Human Rights, Series C, No. 162, para. 160: "[a]s pointed out repeatedly, the acts involved in the instant case have violated peremptory norms of international law (*jus cogens*) … In view of the nature and seriousness of the events … the need to eradicate impunity reveals itself to the international community as a duty of cooperation among [S]tates".

[1029] *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)*, Advisory Opinion, *I.C.J. Reports 1971*, p. 16, at p. 54, para. 119.

the Security Council and the General Assembly. He also pointed out that, differing from draft conclusion 20, draft conclusion 21 was not limited to "serious" breaches, since the duty of non-recognition or non-assistance was based on the peremptoriness of the norm and not the seriousness of its breach. He noted, in that regard, that neither the *Namibia* nor the *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* advisory opinion had specified the seriousness as a threshold in the case of the duty not to recognize or give assistance. Moreover, since that duty, unlike the duty to cooperate, did not require positive conduct, and was thus less onerous, the lowered threshold was justified.

109.   Draft conclusion 22, on the establishment of jurisdiction over crimes prohibited by norms of *jus cogens*, was based on draft article 7 of the draft articles on crimes against humanity,[1030] adopted by the Commission on first reading in 2017, albeit in a more simplified formulation. Paragraph 2 adopted the same approach to the question of universal jurisdiction as had been done in paragraph 3 of draft article 7, as the practice in this area was less settled.

110.   Draft conclusion 23 concerned the irrelevance of official position and the non-applicability of immunity *ratione materiae*. Paragraph 1, providing that a person's official capacity did not constitute a ground excluding responsibility, was inspired by draft article 6, paragraph 3, of the draft articles on crimes against humanity adopted on first reading in 2017, and was generally accepted as being part of customary international law. Paragraph 2, providing for the non-applicability of immunity *ratione materiae* in the case of offences prohibited by *jus cogens* norms, was based principally on draft article 7 of the draft articles on immunity of State officials from foreign criminal jurisdiction,[1031] adopted provisionally by the Commission in 2017. Despite the criticism that draft provision had received, including that there existed State practice contradicting the exception, the Special Rapporteur pointed out that such contradictory practice was typically based on cases concerning civil proceedings and proceedings against States, which were not meant to serve as precedent for immunities in a criminal context, as suggested by several judicial decisions, including that of the International Court of Justice in the *Jurisdictional Immunities of the State (Germany v. Italy: Greece intervening)* case.[1032]

### 2.   Summary of the debate

#### (a)   General comments

111.   Members generally welcomed the third report on peremptory norms of general international law (*jus cogens*). Several members commended the Special Rapporteur for attempting to address all the possible consequences of *jus cogens*, beyond the law of treaties and that of State responsibility, the two main areas in which the Commission had previously made extensive codification efforts. Some members noted that the consequences

of *jus cogens*, for example, for international criminal law, customary international law and Security Council resolutions, presented important practical problems and generated debate in the academic literature, and that the divergent views in case law should not prevent the Commission from dealing with those issues.

112.   Several members supported the Special Rapporteur's practical approach to the examination of the topic, as opposed to taking a doctrinal or excessively theoretical approach. The challenge posed by the lack of practice and the relative complexity of the political and moral elements involved was further pointed to. It was emphasized that the Commission should take a cautious approach and examine all aspects of the consequences of *jus cogens* in a balanced manner and on the basis of the existing law and established practice. It was suggested that the characteristics of *jus cogens* were intertwined with the consequences of their breach and the two should be considered together. The concern was expressed that the Special Rapporteur was attaching legal significance to what were essentially descriptive elements, such as non-derogability, which was a criterion for identification of *jus cogens* norms, not a legal consequence thereof. It was suggested that a study of the negotiating history of articles 53, 64 and 66 (*a*) and other relevant provisions of the 1969 Vienna Convention and the 1986 Vienna Convention on the Law of Treaties between States and International Organizations or between International Organizations be undertaken.

113.   Satisfaction was expressed with the fact that most of the draft conclusions proposed by the Special Rapporteur were based on relevant provisions of the 1969 Vienna Convention, and other instruments adopted by the Commission. The lack of a parallel structure in the draft conclusions dealing with the consequences of conflict with *jus cogens* for various sources of international law was, however, questioned. Some members would prefer that the same structure as that in articles 53 and 64 of the 1969 Vienna Convention be applied to the consequences of *jus cogens* for sources of international law other than treaties. They further stressed the need to set out procedures for ascertaining the invalidity of a particular rule of international law owing to conflict with *jus cogens*.

114.   Several members agreed that the draft conclusions could be grouped into different parts according to their context and be organized in a coherent, concise and effective manner, closely following the structure of the existing instruments. The view was expressed that the Commission should reconsider the appropriateness of having draft "conclusions" as the outcome of its consideration of the topic.

115.   It was noted that the Special Rapporteur had not proposed a draft conclusion relating to general principles of law, which implied that a general principle of law in conflict with a *jus cogens* norm may nevertheless be valid. Some members supported such non-inclusion on the ground that no conflict could possibly be conceived of in the case of general principles of law. The view was also expressed that the Commission should strive to bring new elements to the topic, beyond those of its previous work.

---

[1030] *Yearbook … 2017*, vol. II (Part Two), para. 45.

[1031] *Ibid.*, para. 140.

[1032] *Jurisdictional Immunities of the State (Germany v. Italy: Greece intervening)*, Judgment, *I.C.J. Reports 2012*, p. 99, at p. 130, para. 70 (national legislation), and pp. 141–142, para. 96 (case law).

116.   The view was expressed that, throughout the draft conclusions, the use of terms such as "consequences", "legal effects", "void", "invalid" and others should be consistent with the usage in existing instruments. It was suggested that the notion of "conflict" used in the draft conclusions should be clarified to provide guidance or criteria to States when deciding whether a treaty or act was, as a matter of law, in conflict with a norm of *jus cogens*.

### (b)   Specific comments on the draft conclusions

#### (i)   Draft conclusion 10

117.   Some members noted that the first sentence of paragraph 1 replicated article 53 of the 1969 Vienna Convention, and suggested that the second sentence, providing that treaties in conflict with *jus cogens* did not create any rights or obligations, be further clarified in the commentary. It was also suggested that the second sentence more closely track the formulation of article 71, paragraph 2 (*a*), of the Convention. It was also suggested that the second sentence was superfluous.

118.   Recognizing that direct conflict of treaties with *jus cogens* was extremely rare, some members supported the inclusion of paragraph 3, providing that treaties should be interpreted in a manner consistent with *jus cogens* norms, as interpretative guidance for States. It was suggested that the commentary clarify that the provision should not override the rules of interpretation in the 1969 Vienna Convention and customary international law. The view was expressed that the issue of interpretation would presumably be pertinent to all sources of international law and was better addressed in a separate draft conclusion. Several drafting suggestions aimed at improving the clarity of the provision were made.

#### (ii)   Draft conclusion 11

119.   Some members welcomed paragraph 1, which confirmed that no part of a treaty which, at the time of its conclusion, was in conflict with a *jus cogens* norm could be separated. A preference was expressed for a structure whereby the separability approach contained in paragraph 2 would be presented as the general rule, with non-severability (currently in paragraph 1) presented as a special rule applicable to the case of article 53 of the 1969 Vienna Convention. A more detailed consideration of the justification for applying different legal consequences to such situations was called for. The view was expressed that the draft conclusion could also cover acts of international organizations that create obligations for States. It was further suggested that paragraph 1 be redrafted to be consistent with paragraph 1 of draft conclusion 10, and that it should highlight the absoluteness of non-separability of treaty provisions in conflict with existing *jus cogens* norms.

#### (iii)   Draft conclusion 12

120.   The view was expressed that the phrase "any act performed in reliance of the provision of the treaty", at the end of paragraph 1 of draft conclusion 12, was too broad to describe the relationship between the treaty and

the act and could be replaced by "any act performed as a result of the implementation of the treaty". It was also suggested that the qualifier "as far as possible", which appeared in article 71 of the 1969 Vienna Convention, be included in paragraph 1 to ensure the practicability of the provision, or that an explanation be included in the commentaries as to why the formulation of the provision differed slightly from article 71. It was further suggested that a new paragraph be inserted between paragraphs 1 and 2 tracking paragraph 1 (*b*) of article 71, to the effect that States must also bring their mutual relations into conformity with *jus cogens*. A further suggestion was to align the formulation of paragraph 2 with that of article 71, paragraph 2 (*b*), in particular by including a reference to the "maintenance" of rights, obligations or situations. The view was expressed that the draft conclusion should also have included the provisions of articles 69 and 70 of the 1969 Vienna Convention, dealing with invalidity or termination of treaties in all situations, including on account of conflict with *jus cogens*.

121.   Since draft conclusion 12 dealt with the consequences of invalidity or termination of a treaty, it was also suggested that the provision was better placed after draft conclusion 14.

#### (iv)   Draft conclusion 13

122.   The view was expressed that paragraph 2 of draft conclusion 13 was of relevance to the field of human rights treaties, and reference was made to the general comment of the Human Rights Committee on reservations to the International Covenant on Civil and Political Rights, to the effect that reservations contrary to peremptory norms in such a human rights treaty would not be compatible with its object and purpose.[1033] The view was expressed that the very existence of norms of *jus cogens* in a treaty did not mean that any reservation to the treaty, for example a reservation to a compromissory clause, was invalid. It was also suggested that the provision be located elsewhere in order to avoid any misunderstanding that disputes over reservations to a treaty were also subject to the recommended judicial settlement procedure contained in draft conclusion 14.

#### (v)   Draft conclusion 14

123.   Support was expressed for the proposed "recommended dispute settlement procedure", which was aimed at facilitating a final decision on the invalidity of a treaty based on conflict with *jus cogens*. While some members were of the view that the disputes to be submitted to the International Court of Justice under the provisions should be limited to disputes concerning the invalidity of a treaty on account of conflict with norms of *jus cogens*, other members supported the extension of the procedure to disputes concerning the existence of a conflict between a treaty and a norm of *jus cogens*, as well as the consequences of invalidity. It was recalled that, while the

[1033] Human Rights Committee, general comment No. 24 (1994) on issues relating to reservations made upon ratification or accession to the Covenant or the Optional Protocols thereto, or in relation to declarations under article 41 of the Covenant, *Official Records of the General Assembly, Fiftieth Session, Supplement No. 40*, vol. I (A/50/40 (vol. I)), annex V, para. 8.

Commission's 1966 draft articles on the law of treaties[1034] had only included a reference to all means of dispute settlement, the States participating in the United Nations Conference on the Law of Treaties (the Vienna Conference) had deliberately included a special mechanism with respect to disputes concerning *jus cogens*, namely what became article 66, subparagraph (*a*), of the 1969 Vienna Convention. At the same time, some members questioned how the strong reluctance by States to accept judicial settlement in such circumstances, as evidenced by the significant number of reservations to article 66 of the Convention, could be overcome. The concern was also expressed that the resort to arbitration entailed a higher risk of inconsistency, which could run counter to the aim of consolidating the international legal system and achieving legal certainty. It was also queried whether the decision of the International Court of Justice, or of an arbitral tribunal, would lead to the invalidation or termination of the treaty, or whether it would be merely declaratory.

124.    Some members considered that the characterization of the procedure as being "recommended" had the effect of diluting the legally binding obligation on States parties to the 1969 Vienna Convention to submit their disputes concerning the invalidity of a treaty owing to conflict with norms of *jus cogens* to the International Court of Justice. Such an outcome could risk leaving no definitive process for determining the invalidity of a treaty conflicting with *jus cogens*, and would create precisely the problem that States had sought to avoid when they included article 66 in the 1969 Vienna Convention. It was suggested, instead, that a unilateral assertion by a State as to the invalidity of a treaty due to its conflict with *jus cogens* could be the subject of another procedure, such as that contained in article 65 of the 1969 Vienna Convention, even if a national or regional court had already declared that a treaty violated a norm of *jus cogens*. In this connection, it was pointed out that the International Court of Justice had noted that articles 65 to 67 of the 1969 Vienna Convention "if not codifying customary law, at least generally reflect customary international law and contain certain procedural principles which are based on an obligation to act in good faith".[1035] It was also suggested that State consent to the jurisdiction of the Court was not necessary when it came to a dispute regarding *jus cogens*. In terms of another proposal, a new paragraph could be added providing for the resort to the advisory jurisdiction of the Court or to other amicable procedures for dispute settlement.

125.    Other members questioned the necessity of including the draft conclusion in its entirety, since it was ultimately for States to choose the appropriate procedure for the resolution of disputes, and there was no hierarchy *per se* between the different methods listed in Article 33 of the Charter of the United Nations. The view was also expressed that the provision did not correspond with the approach of the Commission when developing draft conclusions, namely to reflect existing international law, since the Special Rapporteur had himself acknowledged that the provision did not reflect existing international law and had been included only as a recommended procedure.

(vi)    *Draft conclusion 15*

126.    Support was expressed for the first two paragraphs concerning the consequences of *jus cogens* for customary international law, which followed the same approach as that applied to treaty law. At the same time, the view was expressed that the Commission should not circumvent the question of what made *jus cogens* norms different from rules of customary international law, since State consent was not the exclusive basis for *jus cogens*.

127.    In terms of proposals for modifications, it was recalled that draft conclusions 3 and 5, as provisionally adopted by the Drafting Committee, had confirmed that a norm of *jus cogens* could be modified by a subsequent norm having the same character, and that customary international law was the most common basis for a norm of *jus cogens*, respectively. Accordingly, it was suggested that draft conclusion 15 could indicate the possibility that a rule of customary international law in conflict with a norm of *jus cogens* may still arise, so long as that new customary rule was accepted and recognized as a norm from which no derogation was permitted. Another suggestion was to include the words "not of a *jus cogens* character" in paragraph 1, as had been done in paragraph 2, in order to maintain the possibility of a replacement of one norm of *jus cogens* by another. It was suggested that the first paragraph be amended to indicate that practice and *opinio juris* cannot give rise to a norm of customary law if they conflict with *jus cogens*, instead of assuming that the rule of customary law already exists at the time of the conflict.

128.    Several members expressed their satisfaction with paragraph 3, which excluded the applicability of the persistent objector rule with regard to norms of *jus cogens*, which, in their view, accorded with the "without prejudice" clause inserted in the draft conclusions on identification of customary international law, adopted by the Commission on second reading at the present session.[1036] It was pointed out that a norm of *jus cogens* implied acceptance and recognition by a very large majority of States representing all regions and all legal systems.

129.    Nonetheless, some members were of the view that the proposed paragraph 3 did not fully reflect the complexity of the issue, which concerned the relationship between the superior status of *jus cogens* norms and the principle of State consent. The question was raised as to whether the status of a persistent objection recognized at the stage of the formation of a rule of customary international law should be denied if the customary rule subsequently attained the status of *jus cogens*. It was also suggested that there be further consideration given to the distinction between objections to an existing norm of *jus cogens* and objections raised during the formation of a norm of *jus cogens*. Another suggestion was that the question of persistent objection could be dealt with in the commentaries.

(vii)    *Draft conclusion 16*

130.    Several members emphasized the need to clarify the meaning of the term "unilateral act", as presented in the draft conclusion, for example by instead using the term "unilateral commitments", in order to emphasize that

---

[1034] *Yearbook ... 1966*, vol. II, document A/6309/Rev.1 (Part II), p. 177.

[1035] *Gabčíkovo-Nagymaros Project (Hungary/Slovakia)*, Judgment, *I.C.J. Reports 1997*, p. 7, at p. 66, para. 109.

the draft conclusion related only to formal unilateral acts that created legal obligations. A suggestion was made to classify unilateral acts into three categories. It was queried whether the draft conclusion should also apply to international organizations. It was also suggested that the commentaries could clarify the distinction between unilateral acts and reservations.

### (viii) Draft conclusion 17

131. Several members concurred with the position taken in draft conclusion 17 that binding obligations derived from resolutions of international organizations, including Security Council resolutions, should be invalid if they run counter to *jus cogens* norms. The view was expressed that the draft conclusions should address all resolutions of international organizations, including General Assembly resolutions concerning the maintenance of peace and security adopted in cases where the Security Council was unable to take a decision. It was also noted that other acts of international organizations, such as the regulations, directives and decisions taken by the European Union or acts by an intergovernmental conference, may also create legal obligations and should be addressed in the draft conclusions. Notwithstanding the remoteness of the possibility of a direct conflict between a Security Council resolution and a *jus cogens* norm, some members still considered it important to specify Security Council resolutions. They felt this to be necessary, given the unique status of such resolutions and their legal consequences for States in diverse fields of international law under Chapter VII of the Charter of the United Nations and the application of Article 103 of the Charter of the United Nations.

132. Other members did not consider that a specific reference to the resolutions of the Security Council would be appropriate in the present project, which was aimed at formulating general rules. Concern was expressed as to its potential negative impact on the effectiveness of Security Council resolutions and the collective security system established by the Charter of the United Nations. It was suggested that the draft conclusion could instead focus on the role of *jus cogens* norms as a reference for States when adopting resolutions within international organizations.

133. It was suggested that the provision should indicate that not only would the resolutions in violation of *jus cogens* no longer be binding, but they would also be invalid. Other suggestions included making it clear that the consequences for international organizations should also include the duty of non-recognition and all other legal consequences arising from the conflict with a *jus cogens* norm, and that the possibility of separability be considered in relation to the invalidity of resolutions of international organizations, as in the case of the invalidity of treaties.

### (ix) Draft conclusion 18

134. While supporting the proposition that *jus cogens* norms established obligations *erga omnes*, some members suggested that the commentaries should clarify the point that not all obligations *erga omnes* arose from *jus cogens* norms. A doubt was expressed as to whether it was correct to say that *jus cogens* norms "establish" obligations *erga omnes*. Some members suggested rephrasing the provision to better reflect the relationship between *jus cogens* norms and obligations *erga omnes*, as well as the consequences arising from them. It was also suggested that the formulation follow that of article 48, paragraph 1, of the articles on responsibility of States for internationally wrongful acts. Another view expressed was that the draft conclusion should be limited to serious breaches of obligations arising under *jus cogens* norms, in line with articles 40 and 41 of the articles on State responsibility. The view was also expressed that the relationship between *jus cogens* and obligations *erga omnes* was complex and deserved more thorough and in-depth consideration, in order to present a broader perspective on the issue and to reflect recent developments, such as the discussion as to whether obligations *erga omnes* could arise from rules relating to environmental protection.

### (x) Draft conclusion 19

135. General agreement was expressed in relation to draft conclusion 19, which was based on article 26 of the articles on responsibility of States for internationally wrongful acts. At the same time, it was suggested that the provision follow the formulation of article 26 more closely. It was also proposed that the draft conclusions cover circumstances precluding wrongfulness in the context of the responsibility of international organizations. The view was further expressed that the draft conclusions could also cover countermeasures.

### (xi) Draft conclusion 20

136. It was suggested that draft conclusion 20, paragraph 1, more closely follow the text of the *Namibia* advisory opinion of the International Court of Justice by indicating that States were "under obligation"[1037] to cooperate to bring to an end any serious breach of *jus cogens*. The view was also expressed that it was not clear whether a duty to cooperate reflected existing law, nor what precise obligations would flow from such duty.

137. It was suggested that paragraph 2 be aligned with paragraph 2 of article 40 of the articles on responsibility of States for internationally wrongful acts, so as to read: "[a] breach of such an obligation is serious if it involves a gross or systematic failure by the responsible State to fulfil the obligation".

138. Some members questioned the necessity of paragraph 3, regarding forms of cooperation, not least because the provision made no reference to the collective security mechanism of the United Nations, including the Security Council. Another view expressed was that paragraph 3 was an effort to progressively develop the operationalization of the obligation to cooperate through institutions or in an *ad hoc* manner, which was welcome and to be supported.

### (xii) Draft conclusion 21

139. While draft conclusion 21 was generally supported, several members questioned the omission of the qualifier "serious" before "breach", as contained in article 41,

---

[1037] See *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)* (footnote 1029 above), p. 54, paras. 117–119.

paragraph 2, of the articles on responsibility of States for internationally wrongful acts, since it expanded the principle beyond what was provided for in those articles. In particular, it was observed that the reasons advanced by the Special Rapporteur for the omission of the word "serious" could apply equally to the duty to cooperate. Another view was that, while there was a strong legal and policy basis for confining the duty to cooperate to serious breaches of *jus cogens* (as per draft conclusion 20), the same was not true with regard to the duties not to recognize and not to render assistance to a breach. In that regard, it was observed that the Commission should engage in progressive development in that area.

140.   It was proposed that a further paragraph be added indicating that the non-recognition should not disadvantage the affected population and that relevant acts, such as the registration of births, deaths and marriages, ought to be recognized.

(xiii)   *Draft conclusions 22 and 23*

141.   Different views were expressed as to the propriety of dealing with the questions of individual criminal responsibility and immunity *ratione materiae* (draft conclusion 23) within the draft conclusions being developed. Several members expressed support for addressing both issues in the context of a study on the consequences of the breach of *jus cogens*, and thus supported their inclusion in the draft conclusions. Several other members were of the view that draft conclusions 22 and 23 addressed primary rules of international criminal law regarding criminal prosecution under national jurisdiction and the effects of a specific subset of rules of *jus cogens*, namely those prohibiting international crimes. Such approach, it was maintained, deviated from the scope of the topic, which was to be limited to secondary rules of international law, and focusing on the general effect of all rules of *jus cogens*.

142.   As regards paragraph 1 of draft conclusion 22, several members noted that the third report provided ample evidence in both treaty and case law to support the existence of a legal duty for States to establish jurisdiction over crimes prohibited by *jus cogens*, which derived from the prohibition of international offences and the obligation of States to cooperate in order to put an end to the serious violation of *jus cogens*. Some members regretted that the provision excluded the principle of passive nationality, and suggested addressing the issue of conflict of jurisdiction in the commentaries.

143.   Other members were of the view that the third report did not sufficiently demonstrate that State practice supported the existence under international law of a duty for every State to exercise national criminal jurisdiction over all offences prohibited by *jus cogens* when committed on its territory or by its nationals. On the contrary, the fact that half or even the majority of States had no statute on crimes prohibited by *jus cogens*, such as crimes against humanity, the crime of apartheid and the crime of aggression, evinced the lack of general belief that such a duty existed under international law. It was further maintained that the examples provided in the third report of States exercising national criminal jurisdiction in implementing a treaty did not necessarily substantiate the claim being made in paragraph 1.

144.   Several members supported retaining paragraph 2 in the form of a "without prejudice" clause, so as to allow for the potential expansion of the exercise of domestic jurisdiction on the basis of universal jurisdiction. It was suggested that the phrase "in accordance with international law" be inserted to acknowledge the current ambiguous state of international law as regards universal jurisdiction.

145.   As regards paragraph 1 of draft conclusion 23, the view was expressed that the rule of the irrelevance of official position was well established.

146.   With regard to paragraph 2, several members were of the view that the Special Rapporteur had approached the issue in a comprehensive manner by examining practice, both in support and in opposition, of the non-applicability of immunity *ratione materiae* to *jus cogens* crimes, and correctly concluded that the balance of authorities was in favour of the non-applicability of immunity *ratione materiae* to an offence committed in contravention of a *jus cogens* norm. Support was also expressed for drawing a distinction between criminal and civil jurisdiction when addressing the issue of exceptions to immunity *ratione materiae*. It was suggested that it be clarified, in the draft conclusions or the commentaries, to which crimes such exceptions would apply.

147.   Other members were of the view that the practice cited by the Special Rapporteur in his third report did not support the draft conclusions he proposed. It was noted that draft conclusion 23, as proposed, was potentially even broader than draft article 7 of the draft articles on immunity of State officials from foreign criminal jurisdiction, adopted at the sixty-ninth session in 2017.[1038] The concern expressed was that draft conclusion 23 could make it more difficult for the Commission to reach agreement on the draft articles on immunity of State officials from foreign criminal jurisdiction, and for the draft articles on crimes against humanity[1039] to succeed as a convention.

148.   Another view was that both positions in the Commission could be accommodated by narrowing the scope of the draft conclusion, including by developing a list of applicable crimes, and stressing the exceptional nature of the non-applicability of immunity *ratione materiae* in the commentary. Still others proposed leaving the provision in abeyance until the conclusion of the work on immunity of State officials from foreign criminal jurisdiction and crimes against humanity.

(xiv)   *Future work*

149.   Some members expressed regret about the procedure being followed, whereby draft conclusions were left pending in the Drafting Committee, without being considered by the plenary on an annual basis with accompanying commentaries, until the conclusion of the first reading of the entire set of draft conclusions, and without giving States the opportunity to comment on a considered position of the Commission. Another view expressed was that the procedure being followed was not a real impediment, since States were able to react in the Sixth Committee to

---

[1038] *Yearbook ... 2017*, vol. II (Part Two), para. 140.

[1039] *Ibid.*, para. 45.

the reports of the Special Rapporteur and his proposed draft conclusions, as well as the oral interim reports of the respective Chairs of the Drafting Committee.

150.   Support was expressed for the development of an illustrative list of *jus cogens* norms. It was suggested that the list could draw from *jus cogens* norms identified in the previous work of the Commission. It was stressed that it was important to take as much account as possible of the comments received from States on what norms should be included in such a list. Others expressed caution, since the Commission might take a long time to agree on even an illustrative list.

151.   It was noted that the possibility of regional *jus cogens* had attracted some support from States in the Sixth Committee, and it was suggested that the existence and relationship of regional *jus cogens* norms to universally applicable *jus cogens* norms be studied. Others doubted the existence of regional *jus cogens* and warned that any discussion on regional *jus cogens* might undermine the integrity of, and be contrary to, the notion of *jus cogens* as being norms "accepted and recognized by the international community of States as a whole".

152.   While support was expressed for the Special Rapporteur's intention to conclude the first reading of the draft conclusions at the next session of the Commission, a view was expressed that the Commission should not unduly rush to conclude its work on the topic.

### 3.   Concluding remarks of the Special Rapporteur

153.   The Special Rapporteur noted that the Commission had been generally supportive of the approach taken in his third report, and of the proposed draft conclusions. He shared the views of members as to the importance of a proper exposition of the consequences of *jus cogens* norms for the stability of the international legal system. He agreed with the concerns expressed as to the potential risk of not including appropriate and responsible safeguards. He reiterated the purpose of the topic, which was not to develop new rules but to make existing rules more accessible and understandable. He admitted that the relative dearth of State practice presented a challenge, but maintained that it was not an insurmountable obstacle, nor should it justify a conservative approach to the topic. Rather, he emphasized that the Commission's role should be to faithfully assess the practice, together with other sources on which the Commission normally relied, in order to come to the most accurate description of existing international law. He pointed out that many of his proposed draft conclusions contained formulations drawn from the 1969 Vienna Convention. At the same time, it was worth recalling that the structure of the Convention was not designed with only *jus cogens* norms in mind.

154.   Turning to the proposed draft conclusions, the Special Rapporteur thanked members for their various comments and proposals for amendments, which could be discussed in the Drafting Committee or be reflected in the commentary. Members had generally agreed with draft conclusions 10 to 13. The first two paragraphs of draft conclusion 10, read together, provided the principal consequence arising from treaties conflicting with *jus cogens* norms, namely that such a treaty would either be void at the time of conclusion or would become void owing to the later emergence of the *jus cogens* norm. Both paragraphs were drawn from the 1969 Vienna Convention. He concurred with the proposal to formulate a single draft conclusion containing a general rule regarding interpretation, based on his proposal for draft conclusion 10, paragraph 3, which would be applicable to all sources of international law. The corresponding commentary would clarify that such rule should conform with the rules of interpretation in the Convention. He also agreed that good faith was the central basis for such interpretative rule, which was captured by the qualification "as far as possible" and could be further explained in the commentaries. The principle of *pacta sunt servanda* was a significant reason for the coherent and integrationist approach to treaty interpretation, and, where it was possible to be consistent with *jus cogens*, such approach would always be preferable to the invalidation of the treaty.

155.   The Special Rapporteur shared the concerns raised by some members about the absoluteness of the non-severability rule in cases of a treaty conflicting with an existing norm of *jus cogens*, as reflected in draft conclusion 11, paragraph 1, but found it difficult to depart from the provisions of the 1969 Vienna Convention without a coherent legal basis drawn from State practice. He did not support the suggestion that reference be made in draft conclusion 12 to articles 69 and 70 of the Convention, since they were not concerned with specific consequences of *jus cogens*.

156.   On draft conclusion 14, concerning a recommended dispute settlement procedure, the Special Rapporteur was not opposed to inserting a new paragraph drawing from article 65 of the 1969 Vienna Convention if it was generally agreed by members. He, however, doubted the appropriateness of subjecting the consequences of breaches of *jus cogens* norms to agreements concluded through negotiations by two or more States. He reiterated that draft conclusion 14 did not seek to impose anything on any State, or to address jurisdictional issues or standing. Nor did it downplay the legally binding obligations of States parties to the Convention. He agreed to expand the range of options for settlement of disputes and to reformulate the second paragraph into a "without prejudice" clause. He further explained that the placement of draft conclusion 14 at the end of the first cluster of draft conclusions did not minimize the importance of a procedure for the settlement of disputes, but rather was intended to illustrate that such procedure was linked to the draft conclusions concerning the conflict between treaties and *jus cogens* norms.

157.   To address the concern of some members as to the logic underlying draft conclusion 15, paragraph 1, the Special Rapporteur suggested reformulating the paragraph to read: "A customary international law rule does not arise if the practice on which it is based conflicts with a peremptory norm of general international law (*jus cogens*)." He further agreed that the Drafting Committee could insert the phrase "not of a *jus cogens* character" in paragraph 1 to resolve the issue concerning the modification of a peremptory norm by a subsequent peremptory norm. As regards paragraph 3, he did not have any objection to

drawing a link between the effect of persistent objection during the formation of customary international law and the non-applicability of persistent objection once a norm had acquired the status of *jus cogens*.

158.   The Special Rapporteur agreed with those members who had maintained that it was appropriate to specifically single out Security Council resolutions in draft conclusion 17, because the discussion on the effects of *jus cogens* norms on acts of international organizations often took place in the context of Security Council decisions, given the unique power of the Council as well as Article 103 of the Charter of the United Nations.

159.   The Special Rapporteur opposed inserting the qualifier "serious" in draft conclusion 18, which, according to him, found no support in the articles on responsibility of States for internationally wrongful acts and did not appropriately capture the relationship between norms of *jus cogens* and obligations *erga omnes*. At the same time, he had no objection to considering, in the Drafting Committee, aligning the text of draft conclusion 18 with the relevant passage in the *Barcelona Traction* judgment.[1040] He further sought to explain the omission of the same qualifier in draft conclusion 21, by noting that it would be wrong to suggest that it was lawful for States to recognize or even assist in breaches of *jus cogens* that "were not serious".

160.   The Special Rapporteur also agreed that draft conclusions 18 to 21 should apply not only to States but also to international organizations.

161.   The Special Rapporteur conceded that draft conclusions 22 and 23 were different from other draft conclusions in that they concerned primary rules while the rest of the draft conclusions addressed methodological issues. He stated that this might provide a cogent reason for not including these draft conclusions. However, he pointed out that the issue of the effect of *jus cogens* norms on immunities had been explicitly referred to in paragraph 17 of the syllabus to the topic prepared at the time of the decision to include the topic in the long-term programme of work of the Commission.[1041] The issue had not drawn any objection at the time of its consideration by the Commission, nor had the exclusion of immunities from the topic been suggested by States or members of the Commission

at the time. He noted, as also indicated by some members, that there was abundant practice in support of both draft conclusions, and that the Commission had previously adopted important draft conclusions based on more scant practice. He was not convinced by the argument that the inclusion of the two draft conclusions would result in no agreement being reached on other topics being considered by the Commission. He, similarly, did not accept that there was insufficient practice to support draft conclusion 23. He recalled that cases concerning civil proceedings, such as *Jurisdictional Immunities of the State*, that were often advanced to justify the view that there were no exceptions to immunity for international crimes of a *jus cogens* nature declared that they were not an authority for exceptions in cases related to criminal proceedings. While noting that these two draft conclusions enjoyed broad support from the Commission, he noted that, with a view to finding a way forward, both from a substantive point of view and from the perspective of attaining consensus in the Commission, the Commission might wish to address the issues mentioned by means of a "without prejudice" clause. In that context, he proposed that the Drafting Committee replace the two draft conclusions with a single "without prejudice" clause, which would read: "The present draft conclusions are without prejudice to the consequences of specific/individual/particular peremptory norms of general international law (*jus cogens*)." The corresponding commentary would indicate that immunity *ratione materiae* was one such issue implicated by the provision and would be drafted in a non-prejudicial manner.

162.   As regards the comments on the working method of keeping texts within the Drafting Committee, without the preparation of commentaries, the Special Rapporteur noted that such a working method had been previously agreed to by the Commission, as a compromise. He recalled further that the topic had, each year, been considered during the second half of the session with insufficient time for the preparation and adoption of commentaries. Nonetheless, he undertook to produce a full set of commentaries for consideration by the Commission, on the understanding that the topic would be considered during the first half of the 2019 session.

163.   Finally, the Special Rapporteur assured members that he would consider carefully all their comments regarding future work when preparing his fourth report. He agreed with various suggestions in that regard, such as the inclusion of a bibliography and the need for consistency on the use of terms, as well as that general principles should also be covered in the project.

---

[1040] *Barcelona Traction, Light and Power Company, Limited*, Judgment, *I.C.J. Reports 1970*, p. 3, at p. 32, para. 33.

[1041] *Yearbook … 2014*, vol. II (Part Two) and corrigendum, annex, p. 174.

# Chapter IX

# PROTECTION OF THE ENVIRONMENT IN RELATION TO ARMED CONFLICTS

## A. Introduction

164. At its sixty-fifth session (2013), the Commission decided to include the topic "Protection of the environment in relation to armed conflicts" in its programme of work, and appointed Ms. Marie G. Jacobsson as Special Rapporteur for the topic.[1042]

165. The Commission received and considered three reports from its sixty-sixth session (2014) to its sixty-eighth session (2016).[1043] At its sixty-sixth session (2014), the Commission considered the preliminary report of the Special Rapporteur.[1044] At its sixty-seventh session (2015), the Commission considered the second report of the Special Rapporteur[1045] and took note of the draft introductory provisions and draft principles provisionally adopted by the Drafting Committee, which were subsequently renumbered and revised for technical reasons by the Drafting Committee at the sixty-eighth session.[1046] Accordingly, the Commission provisionally adopted draft principles 1, 2, 5 and 9 to 13, and commentaries thereto, at that session.[1047] At the same session, the Commission also considered the third report of the Special Rapporteur,[1048] and took note of draft principles 4, 6 to 8, and 14 to 18 provisionally adopted by the Drafting Committee,[1049] without provisionally adopting any commentaries.

166. At its sixty-ninth session (2017), the Commission established a Working Group to consider the way forward in relation to the topic, as Ms. Jacobsson was no longer with the Commission.[1050] The Working Group, chaired by Mr. Vázquez-Bermúdez, had before it the draft commentaries prepared by the Special Rapporteur, even though she was no longer with the Commission, on draft principles 4, 6 to 8, and 14 to 18 provisionally adopted by the Drafting Committee at the sixty-eighth session, and taken note of by the Commission at the same session. The Working

Group recommended to the Commission the appointment of a new Special Rapporteur for the topic to assist with the successful completion of its work on the topic.[1051] Following an oral report by the Chair of the Working Group, the Commission decided to appoint Ms. Marja Lehto as Special Rapporteur.[1052]

## B. Consideration of the topic at the present session

167. At the present session, the Commission established, at its 3390th meeting, on 30 April 2018, a Working Group, chaired by Mr. Vázquez-Bermúdez, to assist the Special Rapporteur in the preparation of the draft commentaries to draft principles 4, 6 to 8, and 14 to 18. The Working Group held two meetings, on 3 and 4 May 2018.

168. At its 3426th meeting, on 10 July 2018, the Commission provisionally adopted draft principles 4, 6 to 8, and 14 to 18, which had been provisionally adopted by the Drafting Committee at the sixty-eighth session (see section C.1 below).

169. At the same meeting, the Commission began its consideration of the first report of Special Rapporteur Ms. Marja Lehto (A/CN.4/720). The Commission continued its consideration of the first report at its 3427th to 3431st meetings, from 11 to 17 July 2018.

170. In her first report, the Special Rapporteur addressed the protection of the environment in situations of occupation. The report offered a general introduction to the protection of the environment under the law of occupation and addressed the complementarity between the law of occupation, international human rights law and international environmental law. The Special Rapporteur proposed three draft principles relating to the protection of the environment in situations of occupation, to be included in a separate part (Part Four). She also made some suggestions for the future programme of work on the topic.

171. At its 3431st meeting, on 17 July 2018, the Commission referred draft principles 19 to 21, as contained in the first report of the Special Rapporteur, to the Drafting Committee.[1053]

---

[1042] The decision was made at the 3171st meeting of the Commission, on 28 May 2013 (see *Yearbook ... 2013*, vol. II (Part Two), para. 167). For the syllabus of the topic, see *Yearbook ... 2011*, vol. II (Part Two), annex V.

[1043] *Yearbook ... 2014*, vol. II (Part One), document A/CN.4/674 (preliminary report); *Yearbook ... 2015*, vol. II (Part One), document A/CN.4/685 (second report); and *Yearbook ... 2016*, vol. II (Part One), document A/CN.4/700 (third report).

[1044] *Yearbook ... 2014*, vol. II (Part Two) and corrigendum, paras. 187–222.

[1045] *Yearbook ... 2015*, vol. II (Part Two), paras. 132–170.

[1046] A/CN.4/L.870 and Rev.1 (available from the Commission's website, documents of the sixty-seventh and sixty-eighth sessions).

[1047] *Yearbook ... 2016*, vol. II (Part Two), para. 189.

[1048] *Ibid.*, paras. 141–189.

[1049] A/CN.4/L.876 (available from the Commission's website, documents of the sixty-eighth session).

[1050] *Yearbook ... 2017*, vol. II (Part Two), para. 255.

[1051] *Ibid.*, para. 260.

[1052] *Ibid.*, para. 262.

[1053] The draft principles proposed by the Special Rapporteur in her first report read as follows:

"Part Four

"*Draft principle 19*

"1. Environmental considerations shall be taken into account by the occupying State in the administration of the occupied territory, including in any adjacent maritime areas over which the territorial State is entitled to exercise sovereign rights.

*(Continued on next page.)*

172.   At its 3436th meeting, on 26 July 2018, the Chair of the Drafting Committee presented the report of the Drafting Committee on protection of the environment in relation to armed conflicts, containing draft principles 19, 20 and 21 provisionally adopted by the Drafting Committee at the seventieth session (A/CN.4/L.911),[1054] which can be found on the website of the Commission.[1055] The Commission took note of the draft principles as presented by the Drafting Committee. It is anticipated that the Commission will take action on the draft principles and commentaries thereto at the next session.

173.   At its 3451st meeting, on 9 August 2018, the Commission adopted the commentaries to the draft principles provisionally adopted at the present session (see section C.2 below).

### 1.   Introduction by the Special Rapporteur of her first report

174.   The Special Rapporteur recalled the background of the topic, noting that it had been under active consideration by the Commission based on three reports submitted by her predecessor. She also emphasized the continued interest of States in the topic as well as the importance

---

(Footnote 1053 continued)

"2.   An occupying State shall, unless absolutely prevented, respect the legislation of the occupied territory pertaining to the protection of the environment.

"*Draft principle 20*

"An occupying State shall administer natural resources in an occupied territory in a way that ensures their sustainable use and minimizes environmental harm.

"*Draft principle 21*

"An occupying State shall use all the means at its disposal to ensure that activities in the occupied territory do not cause significant damage to the environment of another State or to areas beyond national jurisdiction."

[1054] The text provisionally adopted by the Drafting Committee reads as follows:

"Part Four

"Principles applicable in situations of occupation

"*Draft principle 19.   General obligations of an Occupying Power*

"1.   An Occupying Power shall respect and protect the environment of the occupied territory in accordance with applicable international law and take environmental considerations into account in the administration of such territory.

"2.   An Occupying Power shall take appropriate measures to prevent significant harm to the environment of the occupied territory that is likely to prejudice the health and well-being of the population of the occupied territory.

"3.   An Occupying Power shall respect the law and institutions of the occupied territory concerning the protection of the environment and may only introduce changes within the limits provided by the law of armed conflict.

"*Draft principle 20.   Sustainable use of natural resources*

"To the extent that an Occupying Power is permitted to administer and use the natural resources in an occupied territory, for the benefit of the population of the occupied territory and for other lawful purposes under the law of armed conflict, it shall do so in a way that ensures their sustainable use and minimizes environmental harm.

"*Draft principle 21.   Due diligence*

"An Occupying Power shall exercise due diligence to ensure that activities in the occupied territory do not cause significant harm to the environment of areas beyond the occupied territory."

[1055] The report and the corresponding statement of the Chair of the Drafting Committee are available in the Analytical Guide to the Work of the International Law Commission: https://legal.un.org/ilc/guide/8_7.shtml.

---

of consultations with the United Nations Environment Programme (UNEP) and the International Committee of the Red Cross (ICRC). Her first report, which built on previous reports, did not set forth a new methodology and sought to ensure coherence with the work completed thus far. The report proposed three new draft principles on an issue that the Commission had identified for further consideration, namely the protection of the environment in situations of occupation. The Special Rapporteur reiterated the temporal scope of the topic, which covered the whole conflict cycle and allowed the review of the law of armed conflict, international human rights law and international environmental law.

175.   The law of occupation constituted a distinct legal regime, primarily based on the 1907 Regulations respecting the Laws and Customs of War on Land (Hague Regulations) and the 1949 Geneva Convention relative to the Protection of Civilian Persons in Time of War (Fourth Geneva Convention). While these instruments provided only indirect protection to the environment, relevant concepts such as the notions of "civil life" and "usufruct" lend themselves to evolutive interpretation. Furthermore, the law of occupation had to be interpreted in the light of circumstances of the occupation, in particular its stability and duration. The Special Rapporteur recalled that, generally, an occupied territory is expected to be administered for the benefit of the occupied population, not the occupying State.

176.   The report addressed the relationship between international human rights law, international environmental law and the law of occupation as *lex specialis*. International jurisprudence confirmed that human rights law applied alongside the law of occupation, while the exact content of the obligations depended on the nature and duration of the occupation. The report focused on the right to health as an example of how human rights law may contribute to environmental protection in the case of occupation. Customary and conventional environmental law also played a role in situations of occupation, particularly in relation to transboundary or global issues. The Special Rapporteur emphasized that such environmental obligations protected a collective interest and were owed to a wider group of States than those involved in an armed conflict or occupation.

177.   The report contained proposals for three new draft principles. The Special Rapporteur proposed to place those in a new Part Four, as they could be relevant to armed conflicts as well as the post-conflict phase, depending on the nature of the occupation.

178.   Draft principle 19 embedded the obligation of the occupying State to protect the environment in the general obligation to take care of the welfare of the occupied territories. The text of paragraph 1, for which the Special Rapporteur had proposed a reformulation during her introduction, found support in international human rights law and in the jurisprudence of international courts and tribunals. The relevant obligations covered land territory as well as adjacent maritime areas and superjacent airspace. Paragraph 2 reiterated the obligation of the occupying State to respect, unless absolutely prevented, the legislation of the occupied territory pertaining to the protection of the environment.

179.  Draft principle 20 was based on the principle of usufruct as found in article 55 of the 1907 Hague Regulations while it also drew on the principle of sustainable use as its modern equivalent. It provided that the occupying State should exercise caution in the exploitation of non-renewable resources and exploit renewable resources in a way that ensured their long-term use and capacity for regeneration. The practical application of the principle would depend on the nature and duration of the occupation. The wording of draft principle 20 was based on article 54, paragraph 1, of the Berlin Rules on Water Resources as adopted by the International Law Association.[1056]

180.  Draft principle 21 incorporated the principle not to cause harm to the environment of another State. A central principle in international environmental law, the "no harm" principle applied to situations of occupation, as confirmed in international jurisprudence and Commission's earlier work. The wording was derived from the judgment of the International Court of Justice in *Pulp Mills on the River Uruguay*.[1057] The words "at its disposal" notably allow for flexibility depending on the prevailing circumstances.

181.  The Special Rapporteur further explained that the principles in Part One and Part Two applied to situations of occupation, and proposed to clarify in the commentary to draft principles 15 to 18, contained in Part Three, that they were also relevant to situations of occupation.

182.  As to future work, the Special Rapporteur expressed the intention to address in her next report certain questions relating to the protection of the environment in non-international armed conflicts, questions relating to responsibility and liability for environmental harm in relation to armed conflicts, and issues related to the consolidation of a complete set of draft principles.

2.  Summary of the debate

(a)  *General comments*

183.  Members supported the continuation of the methodology adopted by the previous Special Rapporteur, in particular the temporal approach to the topic. At the same time, it was reiterated that a strict temporal division might not always be feasible. A number of members agreed with the Special Rapporteur that the Commission should not seek to change international humanitarian law relating to occupation, but rather to fill gaps relating to environmental protection.

184.  Some members supported the addition of a separate Part Four, dealing specifically with occupation. Some others insisted that occupation fell exclusively within the armed conflict phase (Part Two), while yet others maintained it related to the post-armed-conflict phase (Part Three). Several members supported the proposal of the Special Rapporteur to extend the application of certain draft principles already provisionally adopted by the Commission to the situation of occupation and noted that this should be

indicated in the commentaries. It was proposed by some members to indicate in a separate draft principle that the draft principles in Parts One, Two and Three applied *mutatis mutandis* to situations of occupation.

185.  Some members held that the report presented little State practice to bolster its findings, while others called for the inclusion of State practice from a wider variety of regions. Some members called for a definition of the concept of occupation, either in the commentary or in the text of the draft principles. Others maintained that providing a definition would not be necessary, while recognizing that situations of occupation may vary in nature and duration. It was also suggested by some members to take into consideration the legality or illegality of the occupation and to exclude the applicability of occupation law to situations resulting from unlawful use of force.

186.  Several members suggested addressing the issue of the applicability of the law of occupation to international organizations in the draft principles or in the commentaries. While some members suggested that international organizations could exercise functions similar to those of an Occupying Power, other members questioned this proposition. It was noted by some members that the international administration of a territory by an international organization was very different in nature from a belligerent occupation.

187.  Several members suggested replacing the term "occupying State" with a more general reference to "Occupying Power", which was the term used in the relevant treaties.

188.  Several members noted that, while the law of armed conflict predated international environmental law, the former had to be interpreted so as to incorporate elements of the latter. Others did not favour an evolutionary interpretation of the law of armed conflict.

189.  Members noted that the law of occupation was a subset of the law of armed conflict, which only offered "indirect" protection to the environment. Members generally agreed that international human rights law and international environmental law continued to apply in situations of occupation, while the specificities of the law of armed conflict were to be taken into account. According to some members, international humanitarian law, as *lex specialis*, could set aside those bodies of law if the situation of occupation so required. Other members maintained that, in situations of occupation, military necessity did not override—but had to be balanced against—international human rights law and international environmental law obligations.

190.  Several members emphasized that the application of international human rights law and international environmental law depended on the type of occupation, its nature and its duration. In this regard, some members proposed drawing a distinction between different forms of occupation, such as "belligerent" or "military" occupation and "pacific" or "prolonged" occupation, or "colonial" occupation. Other members pointed out that the focus of the report was on belligerent occupation and that such a distinction was therefore not necessary in this context.

---

[1056] International Law Association, *Report of the Seventy-first Conference held in Berlin, 16–21 August 2004*, pp. 334 *et seq.*, at p. 397.

[1057] *Pulp Mills on the River Uruguay (Argentina v. Uruguay)*, Judgment, *I.C.J. Reports 2010*, p. 14.

191.   Some members questioned the link drawn by the Special Rapporteur between the protection of property rights in situations of occupation and the protection of the environment. It was pointed out that harm to public or private property could not necessarily be equated to damage to the environment. Others maintained that the protection of the environment had become a core task of the modern State, and that the concept of "usufruct" could be interpreted in the current legal context to accommodate environmental considerations.

192.   A number of members also noted that, while a significant part of the report dealt with international human rights law, the Special Rapporteur had not proposed a draft principle on that basis. Several members suggested the addition of a new draft principle, or a new paragraph, addressing the relevance of international human rights law, while some members were doubtful about the proposal and saw it as beyond the scope of the topic.

193.   While agreeing that the right to health was relevant to the protection of the environment, several members encouraged the Special Rapporteur to extend her analysis to include other human rights, such as the right to life, the right to water and the right to food. A suggestion was made to focus on particularly vulnerable populations.

### (b)   Comments on draft principle 19

194.   Members generally expressed support for the oral revision of paragraph 1 of draft principle 19 made by the Special Rapporteur during her introduction of the report, while some members asked for further clarification of the proposed formulation. In particular, several members called for clarification of certain terms, including "general obligation", "environmental considerations" and "administration", or for reconsideration of the use of the words "territorial State" and "sovereign rights".

195.   Some members questioned the reference to the maritime areas and airspace of the occupied territory. Other members maintained that the authority was limited to the areas over which the occupying State had established its authority and exercised effective control.

196.   With regard to paragraph 2, members supported the position of the Special Rapporteur that an occupying State had a general obligation to respect the legislation of the occupied territory with regard to environmental protection. A number of members suggested that the Occupying Power enjoyed greater latitude to alter environmental legislation than the wording of paragraph 2 permitted, particularly to enhance the protection of the population. The view was expressed that in such cases the local population had to be consulted.

197.   It was suggested that, apart from domestic legislation, occupying States should respect the international obligations pertaining to the protection of the environment that were incumbent on the occupied territory. It was also suggested that an occupying State was bound by its own obligations under international law.

198.   Several drafting suggestions were made with regard to draft principle 19, including the addition of a further paragraph to the draft principle to reflect the role of international human rights law.

### (c)   Comments on draft principle 20

199.   With regard to draft principle 20, some members supported the term "sustainable use", while a view was expressed that the term should be clarified. Other members expressed the view that the principle of sustainable use constituted a policy objective, rather than a legal obligation, and questioned its application to situations of occupation. Some members also questioned the link with the concept of usufruct, and how this concept applied to different categories of property, including private property, public goods and natural resources. Other members stressed that occupying States ought to consider sustainability in the administration and exploitation of natural resources.

200.   In this regard, a number of members emphasized the importance of the principles of permanent sovereignty over natural resources and of the self-determination of peoples for the draft principles, while other members questioned the relevance of these principles.

201.   Members emphasized that the Occupying Power should act for the benefit of the people under occupation, not for its own benefit. A suggestion was made to broaden the principle to apply to economic and social development of the occupied State more generally.

202.   Some members also questioned the term "minimize" environmental harm, while a view was expressed that "prevent" would be more appropriate. The view was expressed that in situations of occupation, the focus was on eliminating and repairing environmental damage, in light of the draft principles contained in Part Three, rather than on the administration of natural resources.

203.   Several drafting proposals were made with regard to draft principle 20.

### (d)   Comments on draft principle 21

204.   Members generally expressed support for the inclusion of the no-harm or due diligence principle in draft principle 21, although a view was expressed that the principle had no place in the project. A suggestion was made to include therein the obligation to cooperate to prevent, reduce and control transboundary environmental pollution.

205.   Certain drafting suggestions or clarifications were proposed, including with regard to the phrases "all the means at its disposal", "significant damage" and "areas beyond national jurisdiction". It was also suggested that the no-harm principle be extended to situations of armed conflict beyond occupation.

### (e)   Future work

206.   Support was expressed for the proposals by the Special Rapporteur regarding future work on the topic. It was suggested that, in her next report, the Special Rapporteur address the extent to which the draft principles apply to non-international armed conflicts; enforcement

measures; compensation for environmental damage; and questions of responsibility and liability. The Special Rapporteur was also encouraged to clarify the role and obligations of non-State actors. A suggestion was made to elaborate on the relevance of the precautionary and "polluter pays" principles with regard to the topic, although opposition to this proposal was expressed.

207.    Support was also expressed for completing the first reading on the topic in 2019, although it was noted that this was an ambitious goal.

3.    CONCLUDING REMARKS OF THE SPECIAL RAPPORTEUR

208.    Regarding the applicability of the law of occupation to international organizations, the Special Rapporteur noted that such law may have relevance to the administration of a territory, in particular to United Nations missions, provided that they entail the exercise of functions and powers over a territory that are comparable to those of an occupying State under the law of armed conflict. The Special Rapporteur pointed out that, even considering that the law of occupation could complement the mandate laid down in the relevant Security Council resolutions, there was very little actual practice of having recourse to the law of occupation for such purpose. This remained a theoretical possibility, and the issue was not mature enough to be addressed in the draft principles. The Special Rapporteur proposed to replace the term "occupying State" in the draft principles with the expression "Occupying Power", which could leave the door open for further developments in this regard.

209.    The Special Rapporteur stressed that the distinction between belligerent occupation and pacific occupation had lost much significance, and that the presence of armed forces based on an agreement was already largely covered by draft principles 7 and 8. She reiterated that the focus of the report and of the draft principles was on belligerent—or military—occupation. In addition, the Special Rapporteur considered that no distinction between different forms of occupation was needed, since the law of armed conflict did not distinguish between different types of occupation. At the same time, the Special Rapporteur pointed out that the obligations of the occupying State under the law of occupation were to a certain extent dependent on the prevailing situation, and that a certain flexibility was thus recognized in its implementation.

210.    With respect to the interplay of different areas of international law, the Special Rapporteur indicated that the requirements of the law of occupation as *lex specialis*, as well as the concrete realities of the situation, affected the extent to which other areas of international law, such as international human rights law and international environmental law, may complement the law of armed conflict. This did not mean that humanitarian principles, human rights and environmental considerations could be ignored, as the jurisprudence of the International Court of Justice made clear. The question therefore was not whether certain peacetime rules applied in situations of armed conflict or occupation, but how they applied.

211.    On the general issue of the legality or illegality of occupation, the Special Rapporteur noted that the law of armed conflict applied whenever the criteria of

armed conflict were fulfilled, regardless of the reasons for the conflict. She stressed that occupation law, from the perspective of international humanitarian law, applied equally to all occupations, whether or not they were the result of force used lawfully within the *jus ad bellum*.

212.    The Special Rapporteur indicated that, although the first report focused on the right to health, other human rights were relevant from the point of view of environmental protection. She concluded that such rights could usefully be addressed in the commentary. The Special Rapporteur suggested that the relationship between the draft principles proposed in the first report and the draft principles already adopted by the Commission be clarified in the commentary.

213.    The Special Rapporteur noted that the reformulation proposed in her introduction was generally supported. She added that the term "general obligation" was used in reference to article 43 of the Hague Regulations, which set forth the obligation of the occupying State to restore and maintain public order and civil life. Such an obligation must be interpreted in light of current circumstances, including the importance of environmental concerns as an essential interest of all States and taking into account the development of international human rights law. She also indicated that the term "environmental considerations" was context-dependent and evolving, as indicated in the commentary to draft principle 11. The Special Rapporteur also indicated that the latter part of paragraph 1, concerning the territorial scope of draft principle 19, could be addressed in the commentary. Regarding the second paragraph of draft principle 19, the Special Rapporteur acknowledged the usefulness of making reference to the international obligations of the occupied State, in addition to its legislation. Finally, the Special Rapporteur expressed her agreement with the proposal made by several members to include a provision related to the human rights obligations of the occupying State.

214.    As regards draft principle 20, the Special Rapporteur noted that the first issue concerned the limits of the Occupying Power's right to administer and use the resources of the occupied territory. In that respect, she indicated that the proposal to add wording, in either the draft principle or the commentary, along the lines of the Institute of International Law's Bruges Declaration on the Use of Force,[1058] could be useful. She added that the principle of permanent sovereignty over natural resources was also to be taken into account. Regarding the mention of "minimizing environmental harm", the Special Rapporteur stressed that the purpose of the draft principles, as indicated in draft principle 2, was to enhance "the protection of the environment in relation to armed conflict, including through preventive measures for minimizing damage to the environment during armed conflict". Further, the Special Rapporteur recalled that draft principle 20 was grounded on article 55 of the Hague Regulations, which is binding as customary international law and should be interpreted to involve environmental aspects. In addition, the concept of sustainability, in particular in the context of sustainable use of natural resources, was well

---

[1058] *Yearbook of the Institute of International Law*, vol. 70-II (Session of Bruges, Belgium, 2003), pp. 285 *et seq.*; available from the Institute's website at www.idi-iil.org, *Declarations*.

established, as reflected in the adoption by the General Assembly of the 2030 Agenda for Sustainable Development and the 17 Sustainable Development Goals.[1059]

215.  The Special Rapporteur indicated that draft principle 21 had met with broad agreement. In addition to the current language, two alternatives were supported deriving either from the advisory opinion of the International Court of Justice concerning the *Legality of the Threat or Use of Nuclear Weapons*[1060] or from the Commission's articles on prevention of transboundary harm from hazardous activities.[1061]

216.  Regarding future work on the topic, the Special Rapporteur clarified that her intention was to address non-international armed conflicts, as well as the questions of responsibility and liability, in the context of the topic and not to give a comprehensive presentation of these two areas. She noted that it would not be advisable to expressly limit the draft principles to one type of armed conflict given that the development of customary international law had a tendency to progressively reduce the importance of the distinction between international and non-international armed conflicts. This was also in line with the approach taken by the Commission on the topic so far.

## C. Text of the draft principles on protection of the environment in relation to armed conflicts provisionally adopted so far by the Commission

### 1.  TEXT OF THE DRAFT PRINCIPLES

217.  The text of the draft principles provisionally adopted so far by the Commission is reproduced below.

### PROTECTION OF THE ENVIRONMENT IN RELATION TO ARMED CONFLICTS

*Principle 1.    Scope*

The present draft principles apply to the protection of the environment* before, during or after an armed conflict.

*Principle 2.    Purpose*

The present draft principles are aimed at enhancing the protection of the environment in relation to armed conflict, including through preventive measures for minimizing damage to the environment during armed conflict and through remedial measures.

[...]

### PART ONE

### GENERAL PRINCIPLES

*Principle 4.    Measures to enhance the protection of the environment*

1.  States shall, pursuant to their obligations under international law, take effective legislative, administrative, judicial and other measures to enhance the protection of the environment in relation to armed conflict.

---

2.  In addition, States should take further measures, as appropriate, to enhance the protection of the environment in relation to armed conflict.

*Principle 5 [I-(x)].**    Designation of protected zones*

States should designate, by agreement or otherwise, areas of major environmental and cultural importance as protected zones.

*Principle 6.    Protection of the environment of indigenous peoples*

1.  States should take appropriate measures, in the event of an armed conflict, to protect the environment of the territories that indigenous peoples inhabit.

2.  After an armed conflict that has adversely affected the environment of the territories that indigenous peoples inhabit, States should undertake effective consultations and cooperation with the indigenous peoples concerned, through appropriate procedures and in particular through their own representative institutions, for the purpose of taking remedial measures.

*Principle 7.    Agreements concerning the presence of military forces in relation to armed conflict*

States and international organizations should, as appropriate, include provisions on environmental protection in agreements concerning the presence of military forces in relation to armed conflict. Such provisions may include preventive measures, impact assessments, restoration and clean-up measures.

*Principle 8.    Peace operations*

States and international organizations involved in peace operations in relation to armed conflict shall consider the impact of such operations on the environment and take appropriate measures to prevent, mitigate and remediate the negative environmental consequences thereof.

### PART TWO

### PRINCIPLES APPLICABLE DURING ARMED CONFLICT

*Principle 9 [II-1].    General protection of the natural environment during armed conflict*

1.  The natural environment shall be respected and protected in accordance with applicable international law and, in particular, the law of armed conflict.

2.  Care shall be taken to protect the natural environment against widespread, long-term and severe damage.

3.  No part of the natural environment may be attacked, unless it has become a military objective.

*Principle 10 [II-2].    Application of the law of armed conflict to the natural environment*

The law of armed conflict, including the principles and rules on distinction, proportionality, military necessity and precautions in attack, shall be applied to the natural environment, with a view to its protection.

*Principle 11 [II-3].    Environmental considerations*

Environmental considerations shall be taken into account when applying the principle of proportionality and the rules on military necessity.

*Principle 12 [II-4].    Prohibition of reprisals*

Attacks against the natural environment by way of reprisals are prohibited.

*Principle 13 [II-5].    Protected zones*

An area of major environmental and cultural importance designated by agreement as a protected zone shall be protected against any attack, as long as it does not contain a military objective.

---

* Whether the term "environment" or "natural environment" is preferable for all or some of these draft principles will be revisited at a later stage.

[1059] General Assembly resolution 70/1 of 25 September 2015.

[1060] *Legality of the Threat or Use of Nuclear Weapons*, Advisory Opinion, *I.C.J. Reports 1996*, p. 226.

[1061] *Yearbook ... 2001*, vol. II (Part Two) and corrigendum, pp. 146 *et seq.* The articles on prevention of transboundary harm from hazardous activities adopted by the Commission at its fifty-third session are reproduced in the annex to General Assembly resolution 62/68 of 6 December 2007.

** The draft principles provisionally adopted by the Drafting Committee at the sixty-seventh session, and which the Commission took note of at that session, are in brackets.

PART THREE

PRINCIPLES APPLICABLE AFTER AN ARMED CONFLICT

### Principle 14.    Peace processes

1.    Parties to an armed conflict should, as part of the peace process, including where appropriate in peace agreements, address matters relating to the restoration and protection of the environment damaged by the conflict.

2.    Relevant international organizations should, where appropriate, play a facilitating role in this regard.

### Principle 15.    Post-armed conflict environmental assessments and remedial measures

Cooperation among relevant actors, including international organizations, is encouraged with respect to post-armed conflict environmental assessments and remedial measures.

### Principle 16.    Remnants of war

1.    After an armed conflict, parties to the conflict shall seek to remove or render harmless toxic and hazardous remnants of war under their jurisdiction or control that are causing or risk causing damage to the environment. Such measures shall be taken subject to the applicable rules of international law.

2.    The parties shall also endeavour to reach agreement, among themselves and, where appropriate, with other States and with international organizations, on technical and material assistance, including, in appropriate circumstances, the undertaking of joint operations to remove or render harmless such toxic and hazardous remnants of war.

3.    Paragraphs 1 and 2 are without prejudice to any rights or obligations under international law to clear, remove, destroy or maintain minefields, mined areas, mines, booby-traps, explosive ordnance and other devices.

### Principle 17.    Remnants of war at sea

States and relevant international organizations should cooperate to ensure that remnants of war at sea do not constitute a danger to the environment.

### Principle 18.    Sharing and granting access to information

1.    To facilitate remedial measures after an armed conflict, States and relevant international organizations shall share and grant access to relevant information in accordance with their obligations under international law.

2.    Nothing in the present draft principle obliges a State or international organization to share or grant access to information vital to its national defence or security. Nevertheless, that State or international organization shall cooperate in good faith with a view to providing as much information as possible under the circumstances.

2.    TEXT OF THE DRAFT PRINCIPLES AND COMMENTARIES THERETO PROVISIONALLY ADOPTED BY THE COMMISSION AT ITS SEVENTIETH SESSION

218.    The text of the draft principles and commentaries thereto provisionally adopted by the Commission at its seventieth session is reproduced below.

## PROTECTION OF THE ENVIRONMENT IN RELATION TO ARMED CONFLICTS

### Principle 4.    Measures to enhance the protection of the environment

1.    States shall, pursuant to their obligations under international law, take effective legislative, administrative, judicial and other measures to enhance the protection of the environment in relation to armed conflict.

2.    In addition, States should take further measures, as appropriate, to enhance the protection of the environment in relation to armed conflict.

### Commentary

(1)    Draft principle 4 recognizes that States are required to take effective measures to enhance the protection of the environment in relation to armed conflict. Paragraph 1 recalls obligations under international law and paragraph 2 encourages States voluntarily to take further measures. The phrase "to enhance the protection of the environment", included in both paragraphs, corresponds to the purpose of the set of draft principles. Similarly, the phrase "in relation to armed conflict", also inserted in both paragraphs, is intended to underline the connection of environmental protection to armed conflict.

(2)    Paragraph 1 reflects the fact that States have obligations under international law to enhance the protection of the environment in relation to armed conflict and addresses the measures that States are obliged to take to this end. The obligation is denoted by the word "shall". The requirement is qualified by the expression "pursuant to their obligations under international law", indicating that the provision does not require States to take measures that go beyond their existing obligations. The specific obligations of a State under this provision will differ according to the relevant obligations under international law by which it is bound.

(3)    Consequently, paragraph 1 is formulated broadly in order to cover a wide range of measures. The provision includes examples of the types of measures that can be taken by States, namely "legislative, administrative, judicial and other measures". The examples are not exhaustive, as indicated by the open category "other measures". Instead, the examples aim to highlight the most relevant types of measures to be taken by States.

(4)    The law of armed conflict imposes several obligations on States that directly or indirectly contribute to the aim of enhancing the protection of the environment in relation to armed conflict. The notion "under international law" is nevertheless broader and covers also other relevant treaty-based or customary obligations related to the protection of the environment before, during or after an armed conflict, whether derived from international environmental law, human rights law or other areas of law.

(5)    As far as the law of armed conflict is concerned, the obligation to disseminate the law of armed conflict to armed forces and, to the extent possible, also to the civilian population contributes to the protection of the environment.[1062] A relevant provision to this end is article 83

---

[1062] Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field (First Geneva Convention), art. 47; Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea (Second Geneva Convention), art. 48; Geneva Convention relative to the Treatment of Prisoners of War (Third Geneva Convention), art. 127; Geneva Convention relative to the Protection of Civilian Persons in Time of War (Fourth Geneva Convention), art. 144; Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts (Protocol I), art. 83; Protocol Additional to the Geneva

(Continued on next page.)

of Protocol I, which provides that the High Contracting Parties are under the obligation to disseminate information on, among other provisions, articles 35 and 55[1063] to their forces. This obligation can also be linked to common article 1 of the Geneva Conventions of 1949, in which States parties undertake to respect and to ensure respect for the Conventions in all circumstances.[1064] Such dissemination can take place for instance through the inclusion of relevant information in military manuals,[1065] as encouraged by the ICRC Guidelines for Military Manuals and Instructions on the Protection of the Environment in Times of Armed Conflict.[1066]

(6)    Common article 1 is also interpreted to require that States, when they are in a position to do so, exert their influence to prevent and stop violations of the Geneva Conventions by parties to an armed conflict.[1067] As far as

*(Continued on next page.)*

Conventions of 12 August 1949, and relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), art. 19; Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Adoption of an Additional Distinctive Emblem (Protocol III), art. 7; and Convention on Prohibitions or Restrictions on the Use of Certain Conventional Weapons Which May Be Deemed to Be Excessively Injurious or to Have Indiscriminate Effects, art. 6. See also J.-M. Henckaerts and L. Doswald-Beck, *Customary International Humanitarian Law, Volume 1: Rules*, Cambridge, ICRC and Cambridge University Press, 2005, pp. 505–508, rule 143.

[1063] Article 35 of Protocol I reads:

"1.    In any armed conflict, the right of the Parties to the conflict to choose methods or means of warfare is not unlimited.

"2.    It is prohibited to employ weapons, projectiles and material and methods of warfare of a nature to cause superfluous injury or unnecessary suffering.

"3.    It is prohibited to employ methods or means of warfare which are intended, or may be expected, to cause widespread, long-term and severe damage to the natural environment."

Article 55 reads:

"1.    Care shall be taken in warfare to protect the natural environment against widespread, long-term and severe damage. This protection includes a prohibition of the use of methods or means of warfare which are intended or may be expected to cause such damage to the natural environment and thereby to prejudice the health or survival of the population.

"2.    Attacks against the natural environment by way of reprisals are prohibited."

[1064] First Geneva Convention, art. 1; Second Geneva Convention, art. 1; Third Geneva Convention, art. 1; Fourth Geneva Convention, art. 1.

[1065] Examples of States that have introduced such provisions in their military manuals include Argentina, Australia, Belgium, Benin, Burundi, Canada, the Central African Republic, Chad, Colombia, Côte d'Ivoire, France, Germany, Italy, Kenya, the Netherlands, New Zealand, Peru, the Russian Federation, South Africa, Spain, Sweden, Switzerland, Togo, Ukraine, the United Kingdom of Great Britain and Northern Ireland and the United States of America. Information available from https://ihl-databases.icrc.org/customary-ihl/eng/docs/v2_rul_rule45.

[1066] The Guidelines for Military Manuals and Instructions on the Protection of the Environment in Times of Armed Conflict (A/49/323, annex) states, in guideline 17, that: "States shall disseminate these rules and make them known as widely as possible in their respective countries and include them in their programmes of military and civil instruction."

[1067] See the 2016 ICRC commentary on article 1 of the First Geneva Convention (ICRC, *Commentary on the First Geneva Convention*, 2016, p. 35; available from https://ihl-databases.icrc.org/ihl/full/GCI-commentary). The ICRC study on customary international law provides a broader interpretation, according to which the obligation to respect and to ensure respect is not limited to the Geneva Conventions of 1949 but refers to the entire body of international humanitarian law binding upon a particular State (Henckaerts and Doswald-Beck, *Customary International Humanitarian Law, Volume 1: Rules* (see footnote 1062 above), p. 495, rule 139.

the protection of the environment is concerned, this could entail, for instance, sharing of scientific expertise as to the nature of the damage caused to the natural environment by certain types of weapons, or making available technical advice as to how to protect areas of particular ecological importance or fragility.

(7)    A further obligation to conduct a "weapons review" is found in article 36 of Protocol I. According to this provision, a High Contracting Party is under an obligation to determine whether the employment of a new weapon would, in some or all circumstances, be prohibited by Protocol I or by any other applicable rule of international law. It is notable that the obligation covers the study, development, acquisition or adoption of all means or methods of warfare: both weapons and the way in which they can be used.[1068] According to the ICRC commentary on the Additional Protocols, article 36 "implies the obligation to establish internal procedures for the purpose of elucidating the issue of legality".[1069] A number of States, including States not party to Protocol I, are known to have established such procedures.[1070]

(8)    The obligation to institute a "weapons review" binds all High Contracting Parties to Protocol I. The reference to "any other rule of international law" makes it clear that the obligation goes beyond merely studying whether the employment of a certain weapon would be contrary to the law of armed conflict. This means, first, an examination of whether the employment of a new weapon, means or method of warfare would, in some or all circumstances, be prohibited by Protocol I, including articles 35 and 55, which are of direct relevance to the protection of the environment. Second, there is a need to go beyond Protocol I and analyse whether any other rules of the law of armed conflict, treaty or customary, or any other areas of international law might prohibit the employment of a new weapon, means or method of warfare. Such examination will include taking into account any applicable international environmental law and human rights obligations.[1071]

(9)    While Protocol I applies only to international armed conflict, the weapons review provided for in article 36 also

[1068] J. de Preux, "Article 35: Basic rules", in Y. Sandoz, C. Swinarski and B. Zimmermann (eds.), *Commentary on the Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 August 1949*, Geneva, ICRC and Martinus Nijhoff, 1987, p. 390, at p. 398, para. 1402. The commentary on article 36, "New weapons", refers to this section for an explanation of means and methods on page 425, paragraph 1472.

[1069] *Ibid.*, p. 424, para. 1470.

[1070] States that are known to have in place national mechanisms to review the legality of weapons and that have made the instruments setting up these mechanisms available to ICRC include Australia, Belgium, Canada, Denmark, Germany, the Netherlands, Norway, Sweden, the United Kingdom and the United States. Other States have indicated to ICRC that they carry out reviews pursuant to Ministry of Defence instructions, but these have not been made available. Information received from ICRC on 31 December 2017.

[1071] Some States, such as Sweden, Switzerland and the United Kingdom, see a value in considering international human rights law in the review of military weapons because military personnel may in some situations (e.g. peacekeeping missions) use the weapon to conduct law enforcement missions. For further commentary, see S. Casey-Maslen, N. Corney and A. Dymond-Bass, "The review of weapons under international humanitarian law and human rights law", in S. Casey-Maslen (ed.), *Weapons under International Human Rights Law*, Cambridge, Cambridge University Press, 2014, pp. 411–447.

promotes respect for the law in non-international armed conflicts. Furthermore, the use of weapons that are inherently indiscriminate and the use of means or methods of warfare that are of a nature to cause superfluous injury or unnecessary suffering are prohibited under customary international law.[1072] These rules are not limited to international armed conflict.[1073] It follows that new weapons as well as methods of warfare are to be reviewed against all applicable international law, including the law governing non-international armed conflicts, in particular as far as the protection of civilians and the principle of distinction are concerned. The obligation not to use inherently indiscriminate weapons, means or methods of warfare has the indirect effect of protecting the environment in a non-international armed conflict. Furthermore, the special treaty-based prohibitions of certain weapons (such as biological and chemical weapons) that may cause serious environmental harm must be observed.

(10)    States also have the obligation to effectively exercise jurisdiction and prosecute persons suspected of certain war crimes that have a bearing on the protection of the environment in relation to armed conflict, to the extent that such crimes fall within the category of grave breaches of the Geneva Conventions of 1949.[1074] Examples of grave breaches, the suppression of which provides indirect protection to certain components of the natural environment, include wilfully causing great suffering or serious injury to body or health and extensive destruction and appropriation of property, not justified by military necessity and carried out wantonly and unlawfully.

(11)    Yet another treaty-based obligation is for States to record the laying of mines in order to facilitate future clearing of landmines.[1075]

(12)    Paragraph 2 of the draft principle addresses voluntary measures that would further enhance the protection of the environment in relation to armed conflict. This paragraph is therefore less prescriptive than paragraph 1 and the word "should" is used to reflect this difference. The phrases "[i]n addition" and "further measures" both serve to indicate that this provision goes beyond the measures that States shall take pursuant to their obligations under international law, which are addressed in paragraph 1. Like the measures referred to in paragraph 1, the measures taken by States may be of a legislative, judicial, administrative or other nature. Furthermore, they could include

special agreements providing additional protection to the natural environment in situations of armed conflict.[1076]

(13)    In addition to encouraging States to take voluntary measures to enhance the protection of the environment in relation to armed conflict beyond their current obligations under international law, the paragraph captures the recent developments in the practice of States to this end.[1077] One example of how States can continue this development is through providing more explicit guidelines on environmental protection in their military manuals.[1078] Such guidelines may, for instance, aim to ensure training of military personnel involved in peace operations on the environmental aspects of the operation, as well as the conduct of environmental assessments.[1079] Other measures that should be taken by States can aim at enhancing cooperation, as appropriate, with other States, as well as with relevant international organizations.

(14)    The overall development that paragraph 2 aims to capture and encourage has its basis also in the practice of international organizations. One example of such practice is the United Nations initiative "Greening the Blue Helmets", which aims to function as a sustainable environmental management programme.[1080] A further example of this development is the joint environmental policy developed by the United Nations Department of Peacekeeping Operations and Department of Field Support. The policy includes obligations to develop environmental baseline studies and adhere to a number of multilateral environmental agreements. References are made to treaties and instruments, including the Declaration of the United Nations Conference on the Human Environment (Stockholm Declaration),[1081] the World Charter for Nature,[1082] the Convention on International Trade in Endangered Species of Wild Fauna and Flora, the Convention on Biological Diversity and the Convention on Wetlands of International Importance especially as Waterfowl Habitat, as standards

---

[1072] Henckaerts and Doswald-Beck, *Customary International Humanitarian Law, Volume 1: Rules* (see footnote 1062 above), rules 70 and 71, pp. 237–250.

[1073] By virtue of the customary rule that civilians must not be made the object of attack, weapons that are by nature indiscriminate are also prohibited in non-international armed conflicts. The prohibition of weapons that are by nature indiscriminate is also set forth in several military manuals applicable in non-international armed conflicts, for instance those of Australia, Colombia, Ecuador, Germany, Nigeria and the Republic of Korea. Information available from https://ihl-databases .icrc.org/customary-ihl/eng/docs/v1_rul_rule71#Fn_1_19.

[1074] First Geneva Convention, art. 49; Second Geneva Convention, art. 50; Third Geneva Convention, art. 129; Fourth Geneva Convention, art. 146.

[1075] See, for example, the Protocol on Prohibitions or Restrictions on the Use of Mines, Booby-Traps and Other Devices as amended on 3 May 1996 (Protocol II as amended on 3 May 1996) annexed to the Convention on Prohibitions or Restrictions on the Use of Certain Conventional Weapons Which May Be Deemed to Be Excessively Injurious or to Have Indiscriminate Effects.

[1076] For special agreements, see First Geneva Convention, art. 6; Second Geneva Convention, art 6; Third Geneva Convention, art. 6; and Fourth Geneva Convention, art. 7. See also common article 3 of the Geneva Conventions of 1949.

[1077] See, e.g., Slovenia, Rules of Service in the Slovenian Armed Forces, item 210; Paraguay, National Defence Council, *Política de Defensa Nacional 1999–2020* [National Defence Policy 1999–2020], para. I (A); and Netherlands, note verbale dated 20 April 2016 from the Permanent Mission of the Netherlands to the United Nations addressed to the Secretariat, para. 5. See also contributions in the Sixth Committee from Croatia (A/C.6/70/SR.24, para. 89), Cuba (*ibid.*, para. 10), the Czech Republic (*ibid.*, para. 45), New Zealand (A/C.6/70/SR.25, para. 102) and Palau (*ibid.*, para. 27).

[1078] Examples of States that have done so include Australia, Burundi, Cameroon, Côte d'Ivoire, the Netherlands, the Republic of Korea, Switzerland, Ukraine, the United Kingdom and the United States. Information available from https://ihl-databases.icrc.org/customary-ihl /eng/docs/v2_rul_rule44. For further examples, see the second and third reports of the previous Special Rapporteur, *Yearbook … 2015*, vol. II (Part One), document A/CN.4/685, paras. 69–76, and *Yearbook … 2016*, vol. II (Part One), document A/CN.4/700, para. 52, respectively.

[1079] See the information on the UNEP website regarding post-crisis environmental recovery, available from www.unep.org/explore-topics /disasters-conflicts/what-we-do/response-and-recovery.

[1080] UNEP, *Greening the Blue Helmets: Environment, Natural Resources and UN Peacekeeping Operations*, Nairobi, 2012.

[1081] *Report of the United Nations Conference on the Human Environment, Stockholm, 5–16 June 1972* (United Nations publication, Sales No. E.73.II.A.14 (A/CONF.48/14/Rev.1)), part one, chap. I.

[1082] General Assembly resolution 37/7 of 28 October 1982, annex.

to be considered when a mission establishes its environmental objectives and procedures.[1083]

### Principle 6.    Protection of the environment of indigenous peoples

**1.    States should take appropriate measures, in the event of an armed conflict, to protect the environment of the territories that indigenous peoples inhabit.**

**2.    After an armed conflict that has adversely affected the environment of the territories that indigenous peoples inhabit, States should undertake effective consultations and cooperation with the indigenous peoples concerned, through appropriate procedures and in particular through their own representative institutions, for the purpose of taking remedial measures.**

### Commentary

(1)    Draft principle 6 recognizes that States should, due to the special relationship between indigenous peoples and their environment, take appropriate measures to protect such an environment in relation to an armed conflict. It further recognizes that where armed conflict has adversely affected the environment of indigenous peoples' territories, States should attempt to undertake remedial measures. In light of the special relationship between indigenous peoples and their environment, these steps should be taken in consultation and cooperation with such peoples, respecting their relationship and through their own leadership and representative structures.

(2)    The special relationship between indigenous peoples and their environment has been recognized, protected and upheld by international instruments such as the International Labour Organization (ILO) Convention (No. 169) concerning Indigenous and Tribal Peoples in Independent Countries and the United Nations Declaration on the Rights of Indigenous Peoples,[1084] as well as in the practice of States and in the jurisprudence of international courts and tribunals. To this end, the land of indigenous peoples has been recognized as having a "fundamental importance for their collective physical and cultural survival as peoples".[1085]

(3)    Paragraph 1 is based, in particular, on article 29, paragraph 1, of the United Nations Declaration on the Rights of Indigenous Peoples, which expresses the right of indigenous peoples to "the conservation and protection of the environment and the productive capacity of their lands or territories and resources",[1086] and article 7, paragraph 4, of the ILO Convention (No. 169) concerning Indigenous and Tribal Peoples in Independent Countries, which recognizes that "Governments shall take measures, in co-operation with the peoples concerned, to protect and preserve the environment of the territories they inhabit".

(4)    The specific rights of indigenous peoples over certain lands or territories may be the subject of different legal regimes in different States. Further, in international instruments concerning the rights of indigenous peoples, various formulations are used to refer to the lands or territories connected to indigenous peoples, and over which they have various rights and protective status.[1087]

(5)    Armed conflict may have the effect of increasing existing vulnerabilities to environmental harm or creating new types of environmental harm on the territories concerned and thereby affecting the survival and well-being of the peoples connected to them. Under paragraph 1, in the event of an armed conflict, States should take appropriate measures to promote the continuation of the relationship that indigenous peoples have with their ancestral lands. The appropriate protective measures referred to in paragraph 1 may be taken, in particular, before or during an armed conflict. The wording of the paragraph is broad enough to allow for the measures to be adjusted according to the circumstances.

(6)    For example, the concerned State should take steps to ensure that military activities do not take place in the lands or territories of indigenous peoples unless justified by a relevant public interest or otherwise freely agreed with or requested by the indigenous peoples concerned.[1088]

---

relationship with their traditional lands and natural resources, not only because these are their main means of subsistence, but also because they constitute an integral component of their cosmovision, religious beliefs and, consequently, their cultural identity" (*Rio Negro Massacres v. Guatemala*, Judgment (Preliminary Objection, Merits, Reparations and Costs), 4 September 2012, Inter-American Court of Human Rights, Series C, No. 250, para. 177, footnote 266, which cites the judgment in *Yakye Axa Indigenous Community v. Paraguay*, Judgment (Merits, Reparations and Costs), 17 June 2005, Series C, No. 125, para. 135); see also *Chitay Nech et al. v. Guatemala*, Judgment (Preliminary Objections, Merits, Reparations and Costs), 25 May 2010, Series C, No. 212, para. 147, footnote 160.

[1086] United Nations Declaration on the Rights of Indigenous Peoples (see footnote 1084 above). See also American Declaration on the Rights of Indigenous Peoples, adopted on 15 June 2016, Organization of American States (OAS), General Assembly, forty-sixth regular session, Santo Domingo, 13–15 June 2016, *Proceedings*, vol. I, OEA/Ser.P/XLVI-O.2, resolution AG/RES. 2888 (XLVI-O/16), art. XIX, para. 4.

[1087] See, for example, the phrase "lands or territories, or both as applicable, which they occupy or otherwise use" in article 13, paragraph 1, of the ILO Convention (No. 169) concerning Indigenous and Tribal Peoples in Independent Countries, or the expression "lands, territories and resources" in the preamble of the United Nations Declaration on the Rights of Indigenous Peoples.

[1088] See United Nations Declaration on the Rights of Indigenous Peoples, art. 30:

"1.    Military activities shall not take place in the lands or territories of indigenous peoples, unless justified by a relevant public interest or otherwise freely agreed with or requested by the indigenous peoples concerned.

---

[1083] United Nations, Department of Peacekeeping Operations and Department of Field Support, "Environmental Guidelines for UN Field Missions", 24 July 2009. See also the Department of Field Support website, available from https://fieldsupport.un.org/en/environment.

[1084] ILO Convention (No. 169) concerning Indigenous and Tribal Peoples in Independent Countries, 1989, which revised the ILO Convention (No. 107) concerning the Protection and Integration of Indigenous and Other Tribal and Semi-Tribal Populations in Independent Countries, 1957; United Nations Declaration on the Rights of Indigenous Peoples, General Assembly resolution 61/295 of 13 September 2007, annex, art. 26. The reports of the Special Rapporteur on the rights of indigenous peoples and the Special Rapporteur on human rights and the environment provide an overview of the application of the rights of indigenous peoples in connection with the environment and natural resources (see, for example, A/HRC/15/37 and A/HRC/4/32, respectively).

[1085] Report of the Working Group of Experts on Indigenous Populations/Communities of the African Commission on Human and Peoples' Rights, adopted by the African Commission on Human and Peoples' Rights at its 28th ordinary session, p. 93. See also, for example, *Rio Negro Massacres v. Guatemala*, in which the Inter-American Court of Human Rights recognized that "the culture of the members of the indigenous communities corresponds to a specific way of being, seeing and acting in the world, constituted on the basis of their close

This could be achieved through avoiding placing military installations in indigenous peoples' lands or territories, and by designating their territories as protected areas, as set out in draft principle 5. In general, the concerned State should consult effectively with the indigenous peoples concerned prior to using their lands or territories for military activities.[1089] During an armed conflict, the rights, lands and territories of indigenous peoples also enjoy the protections provided by the law of armed conflict and applicable human rights law.[1090]

(7)    Paragraph 2 focuses on the phase after an armed conflict has ended. The purpose of this provision is to facilitate the taking of remedial measures in the event that an armed conflict has adversely affected the environment of the territories that indigenous peoples inhabit.[1091] In doing so, it seeks to ensure the participatory rights of indigenous peoples in issues relating to their territories in a post-conflict context, while focusing on States as the subjects of the paragraph.

(8)    In such instance, the concerned States should undertake effective consultations and cooperation with the indigenous peoples concerned, through appropriate procedures and, in particular, through their own representative institutions. In doing so, States should consider the special nature of the relationship between indigenous peoples and their territories—in its social, political, spiritual, cultural and other aspects. Further, States should consider that this relationship is often of a "collective" nature.[1092]

_____

"2.    States shall undertake effective consultations with the indigenous peoples concerned, through appropriate procedures and in particular through their representative institutions, prior to using their lands or territories for military activities."

[1089] Ibid.

[1090] See the American Declaration on the Rights of Indigenous Peoples (footnote 1086 above), art. XXX, paras. 3 and 4, which read:

"3.    Indigenous peoples have the right to protection and security in situations or periods of internal or international armed conflict, in accordance with international humanitarian law.

"4.    States, in compliance with international agreements to which they are party, in particular those of international humanitarian law and international human rights law, including the Geneva Convention relative to the Protection of Civilian Persons in Time of War and Protocol II thereof relating to the protection of victims of non-international armed conflicts, shall, in the event of armed conflicts, take adequate measures to protect the human rights, institutions, lands, territories, and resources of indigenous peoples and their communities …".

[1091] According to the United Nations Declaration on the Rights of Indigenous Peoples, "[i]ndigenous peoples have the right to redress, by means that can include restitution or, when this is not possible, just, fair and equitable compensation, for the lands, territories and resources which they have traditionally owned or otherwise occupied or used, and which have been confiscated, taken, occupied, used or damaged without their free, prior and informed consent" (art. 28, para. 1). Similarly, the American Declaration on the Rights of Indigenous Peoples states: "Indigenous peoples and individuals have the right to effective and suitable remedies, including prompt judicial remedies, for the reparation of any violation of their collective and individual rights. States, with the full and effective participation of indigenous peoples, shall provide the necessary mechanisms for the exercise of this right" (art. XXXIII).

[1092] For example, see article 13, paragraph 1, of the ILO Convention (No. 169) concerning Indigenous and Tribal Peoples in Independent Countries, which states that: "In applying the provisions of this Part of the Convention governments shall respect the special importance for the cultures and spiritual values of the peoples concerned of their relationship with the lands or territories, or both as applicable, which they occupy or otherwise use, and in particular the collective aspects of this relationship." Though specific to that Convention's application, it explicitly notes the collective aspects of the relationship that indigenous peoples have with their lands or territories.

(9)    The need to proceed through appropriate procedures and representative institutions of indigenous peoples has been included to acknowledge the diversity of the existing procedures within different States that allow for effective consultation and cooperation with indigenous peoples, and the diversity of their modes of representation, in order to obtain their free, prior and informed consent before adopting measures that may affect them.[1093]

### Principle 7.    Agreements concerning the presence of military forces in relation to armed conflict

**States and international organizations should, as appropriate, include provisions on environmental protection in agreements concerning the presence of military forces in relation to armed conflict. Such provisions may include preventive measures, impact assessments, restoration and clean-up measures.**

### Commentary

(1)    Draft principle 7 addresses agreements concluded by States among themselves and between States and international organizations, concerning the presence of military forces in relation to armed conflict. The phrase "in relation to armed conflict" underlines the purpose of the draft principles: to enhance the protection of the environment in relation to armed conflict. Consequently, the provision does not refer to situations in which military forces are being deployed without any relation to an armed conflict, since such situations are outside the scope of the topic.

(2)    The draft principle is cast in general terms to refer to "agreements concerning the presence of military forces in relation to armed conflict". The specific designation and purpose of such agreements can vary, and may, depending on the particular circumstances, include status of forces and status of mission agreements. The purpose of the draft principle is to reflect recent developments whereby States and international organizations have begun addressing matters relating to environmental protection in agreements concerning the presence of military forces concluded with host States.[1094] The word "should" indicates that this provision is not mandatory in nature, but rather aims at acknowledging and encouraging this development.

(3)    Examples of environmental provisions in agreements concerning the presence of military forces in relation to armed conflict include the United States–Iraq agreement on the withdrawal of the United States from Iraq, which contains an explicit provision on the protection of the

_____

[1093] See for instance, United Nations Declaration on the Rights of Indigenous Peoples, art. 19. The Inter-American Court of Human Rights has established safeguards requiring States to obtain the "free, prior, and informed consent [of indigenous peoples], according to their customs and traditions" (Saramaka People v. Suriname, Judgment (Preliminary Objections, Merits, Reparations and Costs), 28 November 2007, Series C, No. 172, para. 134).

[1094] The Agreement between the European Union and the former Yugoslav Republic of Macedonia on the status of the European Union-led forces in the former Yugoslav Republic of Macedonia of 21 March 2003 (Official Journal of the European Union, L 82, 29 March 2003, pp. 46–51, annex, article 9, provided for a duty to respect international norms regarding, inter alia, the sustainable use of natural resources.

environment.[1095] Another example is the status of forces agreement between the North Atlantic Treaty Organization (NATO) and Afghanistan, in which the parties agree to pursue a preventative approach to environmental protection.[1096] The status of mission agreement under the European Security and Defence Policy also makes several references to environmental obligations.[1097] Relevant treaty practice includes also the agreement between Germany and other NATO States, which states that potential environmental effects shall be identified, analysed and evaluated, in order to avoid environmental burdens.[1098] Moreover, the memorandum of special understandings between the United States and the Republic of Korea contains several provisions on environmental protection.[1099] Reference can further be made to arrangements applicable to the short-term presence of foreign armed forces in a country for the purpose of exercises, transit by land or training.[1100]

(4)   Reference can also be made to other agreements, including those concerning the presence of military forces with a less clear relation to armed conflict, such as the status of forces agreement between the United States and Australia, which contains a relevant provision on damage claims,[1101] and the Enhanced Defence Cooperation Agreement between the United States and the Philippines, which contains provisions seeking to prevent environmental damage and provides for a review process.[1102]

(5)   The draft principle also provides a non-exhaustive list of provisions on environmental protection that may be included in agreements concerning the presence of military forces in relation to armed conflict. Thus the second sentence of the draft principle mentions "preventive measures, impact assessments, restoration and clean-up measures" as examples of what provisions on environmental protection may address. The presence of military forces may risk having an adverse impact on the environment.[1103] In order to avoid such adverse impact to the extent possible, measures of a preventive nature are of great importance. Impact assessments are necessary to determine the kind of restoration and clean-up measures that may be needed at the conclusion of the presence of military forces.

(6)   The measures referred to in the draft principle may address a variety of relevant aspects. Some precise examples that deserve specific mention as reflected in treaty practice are: the recognition of the importance of environmental protection, including the prevention of pollution in facilities and areas granted to the deploying State;[1104] an understanding that the agreement will be implemented in a manner consistent with protecting the environment;[1105] cooperation and sharing of information between the host State and the sending State regarding issues that could affect the health and environment of citizens;[1106] measures to prevent environmental damage;[1107] periodic environmental performance assessments;[1108] review processes;[1109] application of the environmental laws of the host State[1110] or, similarly, a commitment by the deploying State to respect the host State's environmental laws, regulations and standards;[1111] a duty to respect international norms regarding the sustainable use of natural resources;[1112] the taking of restorative measures where detrimental effects are unavoidable;[1113] and the regulation of environmental damage claims.[1114]

---

[1095] Agreement between the United States of America and the Republic of Iraq on the Withdrawal of United States Forces from Iraq and the Organization of Their Activities during their Temporary Presence in Iraq (Baghdad, 17 November 2008), art. 8 (hereinafter, "United States–Iraq Agreement").

[1096] Agreement between the North Atlantic Treaty Organization and the Islamic Republic of Afghanistan on the Status of NATO Forces and NATO Personnel Conducting Mutually Agreed NATO-led Activities in Afghanistan (Kabul, 30 September 2014), ILM, vol. 54, No. 2 (2015), pp. 272–305, art. 5, para. 6, art. 6, para. 1, and art. 7, para. 2.

[1097] Agreement between the Member States of the European Union concerning the status of military and civilian staff seconded to the institutions of the European Union, of the headquarters and forces which may be made available to the European Union in the context of the preparation and execution of the tasks referred to in Article 17(2) of the Treaty on European Union, including exercises, and of the military and civilian staff of the Member States put at the disposal of the European Union to act in this context (EU SOFA) (Brussels, 17 November 2003).

[1098] Agreement to Supplement the Agreement between the Parties to the North Atlantic Treaty regarding the Status of their Forces with respect to Foreign Forces stationed in the Federal Republic of Germany (Bonn, 3 August 1959), amended by the Agreements of 21 October 1971 and 18 March 1993 (hereinafter, "NATO–Germany Agreement"), art. 54A. See also Agreement between the Parties to the North Atlantic Treaty regarding the Status of their Forces of 19 June 1951, art. XV.

[1099] Memorandum of Special Understandings on Environmental Protection, concluded between the United States and the Republic of Korea (Seoul, 18 January 2001) (hereinafter, "United States–Republic of Korea Memorandum"). Available from www.usfk.mil/Portals/105/Documents/SOFA/A12_MOSU.Environmental.Protection.pdf.

[1100] See, e.g., Memorandum of Understanding between Finland and NATO regarding the provision of host nation support for the execution of NATO operations/exercises/similar military activity (4 September 2014), available from www.defmin.fi/files/2898/HNS_MOU_FINLAND.pdf. According to article 5.3 (g), sending nations must follow host nation environmental regulations as well as any host nation regulations for the storage, movement, or disposal of hazardous materials.

[1101] Agreement concerning the Status of United States Forces in Australia (Canberra, 9 May 1963), United Nations, *Treaty Series*, vol. 469, No. 6784, p. 55 (hereinafter, "United States–Australia Agreement"), art. 12, para. 7 (e) (i).

[1102] Agreement between the Government of the Republic of the Philippines and the Government of the United States of America on enhanced defense cooperation (Quezon City, 28 April 2014) (hereinafter, "United

States–Philippines Agreement"). Available from www.officialgazette.gov.ph/downloads/2014/04apr/20140428-EDCA.pdf.

[1103] See e.g. D. Shelton and I. Cutting, "If you break it, do you own it?", *Journal of International Humanitarian Legal Studies*, vol. 6 (2015), pp. 201–246, at pp. 210–211; and J. Taylor, "Environment and security conflicts: the U.S. military in Okinawa", *The Geographical Bulletin*, vol. 48 (2007), pp. 3–13, at pp. 6–7.

[1104] See United States–Republic of Korea Memorandum (footnote 1099 above).

[1105] See United States–Iraq Agreement (footnote 1095 above), art. 8.

[1106] See United States–Republic of Korea Memorandum (footnote 1099 above).

[1107] See United States–Philippines Agreement (footnote 1102 above), art. IX, para. 3, and NATO–Germany Agreement, art. 54A.

[1108] These assessments could identify and evaluate the environmental aspects of the operation and can be accompanied by a commitment to plan, programme and budget for these requirements accordingly, as in the United States–Republic of Korea Memorandum (footnote 1099 above).

[1109] See United States–Philippines Agreement (footnote 1102 above), art. IX, para. 2.

[1110] See NATO–Germany Agreement, art. 54A, and United States–Australia Agreement (footnote 1101 above), art. 12, para. 7 (e) (i).

[1111] See United States–Iraq Agreement (footnote 1095 above), art. 8.

[1112] As is done in article 9 of the Agreement between the European Union and the former Yugoslav Republic of Macedonia on the status of the European Union-led forces in the former Yugoslav Republic of Macedonia (see footnote 1094 above).

[1113] See NATO–Germany Agreement, art. 54A.

[1114] *Ibid.*, art. 41, and United States–Australia Agreement (footnote 1101 above), art. 12, para. 7 (e) (i).

(7) The phrase "as appropriate" signals two different considerations. First, agreements on the presence of military forces in relation to armed conflict are sometimes concluded under urgent circumstances in which it may not be possible to address issues of environmental protection. Second, sometimes it may be especially important that the agreement contain provisions on environmental protection. One such example is provided by a protected zone at risk of being affected by the presence of military forces. The phrase "as appropriate" therefore provides nuance to this provision and allows it to capture different situations.

### Principle 8.  Peace operations

**States and international organizations involved in peace operations in relation to armed conflict shall consider the impact of such operations on the environment and take appropriate measures to prevent, mitigate and remediate the negative environmental consequences thereof.**

### Commentary

(1) Peace operations can relate to armed conflict in multiple ways. Previously, many peace operations were deployed following the end of hostilities and the signing of a peace agreement.[1115] As the High-level Independent Panel on Peace Operations noted, today many missions operate in environments where no such political agreements exist, or where efforts to establish one have failed.[1116] Moreover, modern United Nations peacekeeping missions are multi-dimensional and address a range of peacebuilding activities, from providing secure environments to monitoring human rights, or rebuilding the capacity of a State.[1117] Mandates also include the protection of civilians.[1118] Draft principle 8 is intended to cover all such peace operations that may relate to multifarious parts or aspects of an armed conflict, and may vary in temporal nature.

(2) The words "in relation to armed conflict" delineate the scope of the draft principle. They make clear the connection to armed conflict so as to ensure that the obligations are not to be interpreted too broadly (i.e. as potentially applying to every action of an international organization related to the promotion of peace). While the term is to be understood from a broad perspective in the

context of the draft principle, it is recognized that not all such operations have a direct link to armed conflict.

(3) The present draft principle covers operations where States and international organizations are involved in peace operations related to armed conflict and where groups of multiple actors may be present. All these actors will have some effect on the environment. For example, the Department of Peacekeeping Operations and the Department of Field Support recognize the potential damage by peacekeeping operations to the local environment.[1119]

(4) The environmental impact of a peace operation may stretch from the planning phase through its operational part, to the post-operation phase. The desired goal is that peace operations should undertake their activities in such a manner that the impact of their activities on the environment is minimized. The draft principle thus focuses on activities to be undertaken in situations where the environment would be negatively affected by a peace operation. At the same time, it is understood that "appropriate" measures to be taken may differ in relation to the context of the operation. The relevant considerations may include, in particular, whether such measures relate to the pre-, in-, or post-armed conflict phase, and what measures are feasible under the circumstances.

(5) The draft principle reflects the growing recognition on the part of States and international organizations such as the United Nations, the European Union[1120] and NATO[1121] of the need to consider the environmental impact of peace operations and to take necessary measures to prevent, mitigate and remediate negative impacts. For example, some United Nations field missions have dedicated environmental units to develop and implement mission-specific environmental policies and oversee environmental compliance.[1122]

(6) There is no clear or definitive definition for "peace operation" or "peacekeeping" in existing international law, and the current draft principle is intended to cover broadly all such peace operations that relate to armed conflict. The Agenda for Peace highlighted that "peacemaking" was action to bring hostile parties to agreement, especially through peaceful means;[1123] "peacekeeping"

---

[1115] Report of the High-level Independent Panel on Peace Operations on uniting our strengths for peace: politics, partnership and people (A/70/95–S/2015/446), para. 23.

[1116] Ibid.

[1117] V. Holt and G. Taylor, Protecting Civilians in the Context of UN Peacekeeping Operations: Successes, Setbacks and Remaining Challenges, independent study jointly commissioned by the Department of Peacekeeping Operations and the Office for the Coordination of Humanitarian Affairs (United Nations publication, Sales No. E.10. III.M.1), pp. 2–3.

[1118] See, for example, the following mandates of United Nations-led missions found in Security Council resolutions: United Nations Mission in Sierra Leone (UNAMSIL) (1289 (2000)); United Nations Observer Mission in the Democratic Republic of the Congo (MONUC) (1291 (2000)); United Nations Mission in Liberia (UNMIL) (1509 (2003) and 2215 (2015)); United Nations Operation in Burundi (ONUB) (1545 (2004)); United Nations Stabilization Mission in Haiti (MINUSTAH) (1542 (2004)); United Nations Operation in Côte d'Ivoire (UNOCI) (1528 (2004) and 2226 (2015)); United Nations Mission in the Sudan (UNMIS) (1590 (2005)); African Union–United Nations Hybrid Operation in Darfur (UNAMID) (1769 (2007)); and United Nations Mission in the Central African Republic and Chad (MINURCAT) (1861 (2009)).

[1119] See United Nations, Department of Peacekeeping Operations and Department of Field Support, "DFS Environment Strategy" (2017). Available from https://peacekeeping.un.org/sites/default/files/171116 _dfs_exec_summary_environment_0.pdf. The strategy is complemented by an environmental policy and environmental guidelines for United Nations field missions (see footnote 1083 above).

[1120] See, e.g., European Union, "Military Concept on Environmental Protection and Energy Efficiency for EU-led military operations", 14 September 2012, European External Action Service document EEAS 01574/12.

[1121] See, e.g., NATO, "Joint NATO doctrine for environmental protection during NATO-led military activities", 8 March 2018, document NSO(Joint)0335(2018)EP/7141.

[1122] "The future of United Nations peace operations: implementation of the recommendations of the High-level Independent Panel on Peace Operations", report of the Secretary-General (A/70/357–S/2015/682), para. 129.

[1123] "An Agenda for Peace: Preventive diplomacy, peacemaking and peace-keeping", report of the Secretary-General (A/47/277–S/24111), para. 20. See also the supplement thereto, a position paper of the Secretary-General on the occasion of the fiftieth anniversary of the United Nations (A/50/60–S/1995/1).

was the deployment of a United Nations presence in the field, involving military and/or police personnel, and frequently civilians as well;[1124] while "peacebuilding" was to take the form of cooperative projects in a mutually beneficial undertaking to enhance the confidence fundamental to peace.[1125] The report of the High-level Independent Panel on Peace Operations includes, for its purposes, "a broad suite of tools … from special envoys and mediators; political missions, including peacebuilding missions; regional preventive diplomacy offices; observation missions, including both ceasefire and electoral missions; to small, technical-specialist missions such as electoral support missions; multidisciplinary operations …".[1126] The term "peace operations" is thus aimed to cover all these types of operations, and operations broader than United Nations peacekeeping operations, including peace enforcement operations and operations by regional organizations. There is no reference in the text to "multilateral" peace operations, as it was considered unnecessary to address this expressly in the draft principle. The general understanding of the term "peace operations" is nevertheless that it concerns multilateral operations.

(7)  "Prevent" has been used in acknowledgement of the fact that peace operations are not isolated in nature, and that in planning their actions, actors should plan or aim to minimize negative environmental consequences. While the prevention obligation requires action to be taken at an early stage, the notion of "mitigation" refers to reduction of harm that has already occurred. The notion of "remediation", in turn, has been used in the same sense as "remedial measures" in draft principle 2, encompassing any measure that may be taken to restore the environment.

(8)  Draft principle 8 is distinctly separate in character from draft principle 7 and entails different obligations from those contained in the latter. Peace operations, unlike agreements concerning the presence of military forces in relation to armed conflict, do not necessarily involve armed forces or military personnel. Other types of actors such as civilian personnel and various types of specialists may also be present and covered by such operations. Draft principle 8 is also intended to be broader and more general in scope, and to direct focus on the activities of such peace operations.

(9)  It is understood that the draft principle also encompasses reviews of concluded operations that would identify, analyse and evaluate any detrimental effects of those operations on the environment. This would be a "lessons learned" type of exercise to seek to avoid or minimize the negative effects of future peace operations on the environment and ensure that mistakes are not repeated.

### Principle 14.    Peace processes

**1.  Parties to an armed conflict should, as part of the peace process, including where appropriate in peace agreements, address matters relating to the restoration and protection of the environment damaged by the conflict.**

### 2.  Relevant international organizations should, where appropriate, play a facilitating role in this regard.

#### Commentary

(1)  Draft principle 14 aims to reflect the fact that environmental considerations are, to a greater extent than before, being taken into consideration in the context of contemporary peace processes, including through the regulation of environmental matters in peace agreements.

(2)  Including the term "peace process" in the draft principle is intended to broaden its scope to cover the entire peace process, as well as any formal peace agreements concluded.[1127] Modern armed conflicts have a variety of outcomes that do not necessarily take the form of formal agreements. For example, at the end of an armed conflict, a ceasefire agreement, an armistice or a situation of *de facto* peace with no agreement could be reached. A peace process may also begin well before the actual end of an armed conflict. The conclusion of a peace agreement thus represents only one aspect, which, if at all, may take place several years after the cessation of hostilities. For this reason, and also to avoid any temporal *lacuna*, the words "as part of the peace process" have been employed. The outcome of a peace process often involves different steps and the adoption of a variety of instruments.

(3)  The phrase "[p]arties to an armed conflict" is used in paragraph 1 to indicate that the provision covers both international and non-international armed conflicts. This is in line with the general understanding that the draft principles apply to international as well as non-international armed conflicts.

(4)  The word "should" is used to reflect the normative value of the obligation, while also recognizing that it does not correspond to any existing legal obligation.

(5)  The draft principle is cast in general terms to accommodate the wide variety of situations that may exist after an armed conflict. The condition of the environment after an armed conflict can vary greatly depending on a number of factors.[1128] In some instances, the environment may have suffered serious and severe damage which is immediately apparent and which may need to be addressed as a matter of urgency, whereas in others, the damage the environment has suffered may not be so significant as to warrant urgent restoration.[1129] Some environmental

---

[1124] A/47/277–S/24111, para. 20.

[1125] *Ibid.*, para. 56.

[1126] A/70/95–S/2015/446 (see footnote 1115 above), para. 18.

---

[1127] The United Nations peace agreements database, a "reference tool providing peacemaking professionals with close to 800 documents that can be understood broadly as peace agreements and related material", contains a huge variety of documents, such as "formal peace agreements and sub-agreements, as well as more informal agreements and documents such as declarations, communiqués, joint public statements resulting from informal talks, agreed accounts of meetings between parties, exchanges of letters and key outcome documents of some international or regional conferences … The database also contains selected legislation, acts and decrees that constitute an agreement between parties and/or were the outcome of peace negotiations". Selected resolutions of the Security Council are also included. The database is available from https://peacemaker.un.org/document-search.

[1128] For example, the intensity and duration of the conflict as well as the weapons used can all influence how much environmental damage is caused in a particular armed conflict.

[1129] Well-known examples of environmental damage caused in armed conflict include the damage caused by the United States Armed Forces'

damage may only become apparent months or even years after the armed conflict has ended.

(6)   The draft principle aims to cover all formal peace agreements, as well as other instruments or agreements concluded or adopted at any point during the peace process, whether concluded between two or more States, between State(s) and non-State armed group(s), or between two or more non-State armed groups. Such agreements and instruments may take different forms, such as sub-agreements to formal peace agreements, informal agreements, declarations, communiqués, joint public statements resulting from informal talks and agreed accounts of meetings between parties, as well as relevant legislation, acts and decrees that constitute an agreement between parties and/or were the outcome of peace negotiations.[1130]

(7)   Some modern peace agreements contain environmental provisions.[1131] The types of environmental matters that have been addressed in the instruments concluded during peace processes or in peace agreements include, for example, obligations for or encouragement to parties to cooperate regarding environmental issues, and provisions that set out in detail the authority that will be responsible for matters relating to the environment, such as preventing environmental crimes and enforcing national laws and regulations on natural resources and the sharing of communal resources.[1132] The present draft principle aims to encourage parties to consider including such provisions in the agreements.

(8)   Paragraph 2 aims to encourage relevant international organizations to take environmental considerations into account when they act as facilitators in peace processes. The wording of the paragraph is intended to be broad enough to cover situations where resolutions of the United Nations Security Council under Chapter VII of the Charter of the United Nations have been passed, as well as situations where relevant international organizations play a facilitating role with the consent of the relevant State or parties to the armed conflict in question.

(9)   Paragraph 2 refers to "relevant international organizations" to signal that not all organizations are suited to address this particular issue. The organizations that are envisioned as being relevant in the context of this draft principle include those that have been recognized as playing an important role in the peace processes of various armed conflicts in the past, *inter alia*, the United Nations and its organs in particular, as well as the African Union, the European Union and the Organization of American States.[1133] The draft principle also includes the words

use of Agent Orange in the Viet Nam War and the burning of Kuwaiti oil wells by Iraqi troops in the Gulf War, which are well documented. Instances of environmental damage, which vary in severity, have also been documented in relation to other armed conflicts, such as the conflicts in Colombia, the Democratic Republic of the Congo, Iraq and the Syrian Arab Republic. See UNEP, "UN Environment will support environmental recovery and peacebuilding for post-conflict development in Colombia", available from www.unenvironment.org/news-and-stories/story/un-environment-will-support-environmental-recovery-and-peace-building-post; UNEP, *The Democratic Republic of the Congo: Post-Conflict Environmental Assessment—Synthesis for Policy Makers*, 2011, available from https://wedocs.unep.org/20.500.11822/22069; UNEP, *UNEP in Iraq: Post-Conflict Assessment, Clean-up and Reconstruction*, 2007, available from https://wedocs.unep.org/20.500.11822/17462 and "Lebanon Environmental Assessment of the Syrian Conflict and Priority Interventions" (MOE/EU/UNDP, 2014) (Lebanon, supported by UNDP and the European Union), available from www.undp.org/lebanon/publications/lebanon-environmental-assessment-syrian-conflict. See also International Law and Policy Institute, "Protection of the natural environment in armed conflict: an empirical study", Oslo, 2014, pp. 34–40.

[1130] See C. Bell, "Women and peace processes, negotiations, and agreements: operational opportunities and challenges", Norwegian Peacebuilding Resource Centre, Policy Brief, March 2013, p. 1; available from http://noref.no, *Publications*.

[1131] Such instruments are predominantly concluded in non-international armed conflicts, between a State and a non-State actor, and include the following: Peace Agreement between the Government of El Salvador and the Frente Farabundo Martí para la Liberación Nacional (Chapultepec Agreement) (Mexico City, 16 January 1992), A/46/864–S/23501, annex, chap. II; Interim Agreement for Peace and Self-Government in Kosovo (Rambouillet Accords) (Paris, 18 March 1999), S/1999/648, annex; Arusha Peace and Reconciliation Agreement for Burundi (Arusha, 28 August 2000), available from http://peacemaker.un.org/node/1207, Protocol III, art. 12, para. 3 (*e*), and Protocol IV, art. 8 (*h*); Final Act of the Inter-Congolese Political Negotiations (Sun City, 2 April 2003), available from http://peacemaker.un.org/drc-suncity-agreement2003, resolution No. DIC/CEF/03 and resolution No. DIC/CHSC/03; Comprehensive Peace Agreement between the Government of the Republic of the Sudan and the Sudan People's Liberation Movement/Sudan People's Liberation Army, available from http://peacemaker.un.org/node/1369, chap. V and chap. III, which set out as guiding principles that "the best known practices in the sustainable utilization and control of natural resources shall be followed" (para. 1.10)—further regulations on oil resources are found in paras. 3.1.1 and 4; Darfur Peace Agreement (Abuja, 5 May 2006), available from http://peacemaker.un.org/node/535, chap. 2, art. 17, para. 107 (*g*) and (*h*), and art. 20; Agreement on Comprehensive Solutions between Uganda and Lord's Resistance Army/Movement (Juba, 2 May 2007), available from https://peacemaker.un.org/sites/peacemaker.un.org/files/UG_070502_AgreementComprehensiveSolutions.pdf, para. 14.6; and Peace Agreement between the Government of Sierra Leone and the Revolutionary United Front of Sierra Leone (Lomé, 7 July 1999), S/1999/777, annex, art. VII.

[1132] Chapultepec Agreement, chap. II. Further regulations are found in article 13 contained in annex II to the Agreement; they prescribe that it is the role of the Environment Division of the National Civil Police to "be responsible for preventing and combating crimes and misdemeanours against the environment". The Arusha Peace and Reconciliation Agreement for Burundi, Protocol III, art. 12, para. 3 (*e*), and Protocol IV, art. 8 (*h*), contains several references to the protection of the environment, one of which prescribes that one of the missions of the intelligence services is "[t]o detect as early as possible any threat to the country's ecological environment". Furthermore, it states that "[t]he policy of distribution or allocation of new lands shall take account of the need for environmental protection and management of the country's water system through protection of forests".

[1133] The United Nations has acted as a facilitator in numerous armed conflicts, *inter alia* the armed conflicts in Angola, the Democratic Republic of the Congo, Libya and Mozambique. Regional organizations have also played a facilitating role in peace processes across the world. For example, the African Union has been involved in aspects of the peace processes in, *inter alia*, the Comoros, Côte d'Ivoire, Guinea-Bissau, Liberia and Somalia. See Chatham House, Africa Programme, "The African Union's role in promoting peace, security and stability: from reaction to prevention?", meeting summary (15 October 2014), p. 3, available from www.chathamhouse.org/sites/default/files/field/field_document/20141015AfricanUnion.pdf. OAS was involved in the peace processes in, *inter alia*, the Plurinational State of Bolivia and Colombia. See P. J. Meyer, "Organization of American States: background and issues for Congress" (Congressional Research Service, 2014), p. 8, available from https://fas.org/sgp/crs/row/R42639.pdf. See also T. Whitfield, "External actors in mediation", in African Union and Centre for Humanitarian Dialogue, *Managing Peace Processes: A Handbook for AU Practitioners*, vol. 3: *Towards More Inclusive Processes*, 2013, pp. 95–111, at p. 106. The European Union has been involved in the peace processes in armed conflicts in, *inter alia*, the Middle East and Northern Ireland. See also Switzerland, Federal Department of International Affairs, "Mediation and facilitation in today's peace processes: centrality of commitment, coordination and context", presentation by Thomas Greminger at a retreat of the International Organization of la Francophonie, 15–17 February 2007, available from www.swisspeace.ch, *Publications*.

"where appropriate" to reflect the fact that the involvement of international organizations for this purpose is not always required, or wanted by the parties.

### Principle 15.    Post-armed conflict environmental assessments and remedial measures

**Cooperation among relevant actors, including international organizations, is encouraged with respect to post-armed conflict environmental assessments and remedial measures.**

#### Commentary

(1)   The purpose of draft principle 15 is to encourage relevant actors to cooperate in order to ensure that environmental assessments and remedial measures can be carried out in post-conflict situations. The draft principle is closely linked to draft principle 8.

(2)   The reference to "relevant actors" includes both State and non-State actors. Not only States, but also a wide range of actors, including international organizations and non-State actors, have a role to play in relation to environmental assessments and remedial measures. The phrase "is encouraged" is hortatory in nature and is to be seen as an acknowledgement of the scarcity of practice in this field.

(3)   The term "environmental assessment" is distinct from an "environmental impact assessment", which is typically undertaken *ex ante* as a preventive measure.[1134] Such assessments play an important role in the preparation and adoption of plans, programmes, and policies and legislation, as appropriate. This may involve the evaluation of the likely environmental, including health, effects of a plan or programme.[1135]

(4)   It is in this context that a post-conflict environmental assessment has emerged as a tool to mainstream environmental considerations in the development plans in the post-conflict phase. Such assessments are typically intended to identify major environmental risks to health, livelihoods and security and to provide recommendations to national authorities on how to address them.[1136] A post-conflict environmental assessment is intended to meet various needs and policy processes, which, depending on the requirements, are distinct in scope, objective and approach.[1137] Such post-conflict environmental assessment, undertaken at the request of a State, may take the form of: (*a*) a needs assessment;[1138] (*b*) a quantitative risk

assessment;[1139] (*c*) a strategic assessment;[1140] or (*d*) a comprehensive assessment.[1141] The comprehensive assessment of Rwanda, for example, involved a scientific expert evaluation and assessment, covering a range of activities, including scoping, desk study, fieldwork, environmental sampling, geographic information system modelling, analysis and reporting and national consultations. It is readily acknowledged that "conflicts often have environmental impacts, direct or indirect, that affect human health and livelihoods as well as ecosystem services".[1142]

(5)   Such assessments are encouraged because, if the environmental impacts of armed conflict are left unattended, there is strong likelihood that they may lead to "further population displacement and socio-economic instability", thereby "undermining recovery and reconstruction in post-conflict" zones and "triggering a vicious cycle".[1143]

(6)   In order to align the text with other draft principles, in particular draft principle 2, the term "remedial" is used in the present principle even though "recovery" has a more prominent usage in the practice. Once an assessment is completed, the challenge is to ensure that environmental recovery programmes are in place that aim at strengthening the national and local environmental authorities, rehabilitate ecosystems, mitigate risks and ensure sustainable utilization of resources in the context of the concerned State's development plans.[1144] The term "remedial measures" has a more limited remit than "recovery".

### Principle 16.    Remnants of war

**1.   After an armed conflict, parties to the conflict shall seek to remove or render harmless toxic and hazardous remnants of war under their jurisdiction or control that are causing or risk causing damage to the environment. Such measures shall be taken subject to the applicable rules of international law.**

---

[1134] See, for instance, Convention on Environmental Impact Assessment in a Transboundary Context.

[1135] See Protocol on Strategic Environmental Assessment to the Convention on Environmental Impact Assessment in a Transboundary Context.

[1136] See UNEP, "Post-crisis environmental assessment", available from www.unep.org/explore-topics/disasters-conflicts/what-we-do/preparedness-and-response/post-crisis-environmental.

[1137] D. Jensen, "Evaluating the impact of UNEP's post-conflict environmental assessments", in D. Jensen and S. Lonergan (eds.), *Assessing and Restoring Natural Resources in Post-Conflict Peacebuilding*, London, Earthscan, 2012, p. 18; available from https://environmental peacebuilding.org/assets/Documents/LibraryItem_000_Doc_061.pdf.

[1138] A needs assessment and desk study can be done during or after a conflict, based on a collection of pre-existing secondary information

on environmental trends and natural resource management challenges from international and national sources. Such information, with limited verification field visits, is then compiled into a desk study report that attempts to identify and prioritize environmental needs; *ibid.*, pp. 18–19.

[1139] A quantitative risk assessment, involving field visits, laboratory analysis and satellite imagery, focuses on the direct environmental impact of conflicts caused by bombing and destruction of buildings, industrial sites, and public infrastructure; *ibid.*, pp. 19–20.

[1140] A strategic assessment evaluates the indirect impact of the survival and coping strategies of local people and the institutional problems caused by the breakdown of governance and capacity. These tend to be longer in duration; *ibid.*, p. 20.

[1141] A comprehensive assessment seeks to provide a detailed picture of each natural resource sector and the environmental trends, governance challenges, and capacity needs. Based on national consultations with stakeholders, comprehensive assessments attempt to identify priorities and cost the required interventions over the short, medium and long terms; *ibid.*, p. 20.

[1142] DAC Network on Environment and Development Co-operation (ENVIRONET) of the Development Assistance Committee of the Organisation for Economic Co-operation and Development, "Strategic environmental assessment and post-conflict development—SEA toolkit" (2010), p. 4, available from http://content-ext.undp.org/aplaws_publications/2078176/Strategic%20Environment%20Assessment%20and%20Post%20Conflict%20Development%20full%20version.pdf.

[1143] *Ibid.*

[1144] See UNEP, "Disasters and Conflicts"; available from www.unep.org/explore-topics/disasters-conflicts.

**2. The parties shall also endeavour to reach agreement, among themselves and, where appropriate, with other States and with international organizations, on technical and material assistance, including, in appropriate circumstances, the undertaking of joint operations to remove or render harmless such toxic and hazardous remnants of war.**

**3. Paragraphs 1 and 2 are without prejudice to any rights or obligations under international law to clear, remove, destroy or maintain minefields, mined areas, mines, booby-traps, explosive ordnance and other devices.**

### Commentary

(1) Draft principle 16 aims to strengthen the protection of the environment in a post-conflict situation. It seeks to ensure that toxic and hazardous remnants of war that are causing or that may cause damage to the environment are removed or rendered harmless after an armed conflict. This draft principle covers toxic and hazardous remnants of war on land, as well as those which have been placed or dumped at sea, as long as they fall under the jurisdiction or control of a former party to the armed conflict. The measures taken shall be subject to the applicable rules of international law.

(2) Paragraph 1 is cast in general terms. Remnants of war take various forms. They consist of not only explosive remnants of war but also other hazardous material and objects. Some remnants of war are not dangerous to the environment at all or may be less dangerous if they remain where they are after the conflict is over.[1145] In other words, removing the remnants of war may in some situations pose a higher environmental risk than leaving them where they are. It is for this reason that the draft principle contains the words "or render harmless", to illustrate that in some circumstances it may be appropriate to do nothing, or to take measures other than removal.

(3) The obligation to "seek to" is one of conduct and relates to "toxic and hazardous remnants of war" that "are causing or risk causing damage to the environment". The terms "toxic" and "hazardous" are often used when referring to remnants of war which pose a danger to humans or the environment, and it was considered appropriate to use the terms here.[1146] The term "hazardous" is somewhat wider than the term "toxic", in

that all remnants of war that pose a threat to humans or the environment may be considered hazardous, but not all are toxic. The term "toxic remnants of war" does not have a definition under international law, but has been used to describe "any toxic or radiological substance resulting from military activities that forms a hazard to humans and ecosystems".[1147]

(4) The reference to "jurisdiction or control" is intended to cover areas within *de jure* and *de facto* control even beyond that established by a territorial link. The term "jurisdiction" is intended to cover, in addition to the territory of a State, activities over which, under international law, a State is authorized to exercise its competence and authority extraterritorially.[1148] The term "control" is intended to cover situations in which a State (or party to an armed conflict) is exercising *de facto* control, even though it may lack *de jure* jurisdiction.[1149] It therefore "refers to the factual capacity of effective control over activities outside the jurisdiction of a State".[1150]

(5) The present draft principle is intended to apply to international as well as non-international armed conflicts. For this reason, paragraph 1 addresses "parties to the conflict". The phrase "party to a conflict" has been used in various provisions of law of armed conflict treaties in the context of remnants of war.[1151] It was considered appropriate to use the term in the present draft principle as it is foreseeable that there may be situations where there are toxic or hazardous remnants of war in an area where a State does not have full control. For example, a non-State actor may have control over territory where toxic and hazardous remnants of war are present.

---

[1145] For example, this is often the case with chemical weapons that have been dumped at sea. See T. A. Mensah, "Environmental damages under the Law of the Sea Convention", in J. E. Austin and C. E. Bruch (eds.), *The Environmental Consequences of War: Legal, Economic, and Scientific Perspectives*, Cambridge, Cambridge University Press, 2000, pp. 226–249. The Chemical Munitions Search and Assessment (CHEMSEA) project is an example of cooperation among the Baltic States, which is partly financed by the European Union. Information on the CHEMSEA project can be found at https://ec.europa.eu/regional_policy/en/projects/finland/chemsea-tackles-problem-of-chemical-munitions-in-the-baltic-sea. See also the Baltic Marine Environment Protection Commission (Helsinki Commission) website at https://helcom.fi/baltic-sea-trends/hazardous-subtances/sea-dumped-chemical-munitions.

[1146] See, for more information, ICRC, "Strengthening legal protection for victims of armed conflicts", report prepared for the thirty-first International Conference of the Red Cross and Red Crescent in 2011 (31IC/11/5.1.1), chap. 3, p. 18.

[1147] See M. Ghalaieny, "Toxic harm: humanitarian and environmental concerns from military-origin contamination", discussion paper (Toxic Remnants of War project, 2013), p. 2. Available from https://paxforpeace.nl/media/download/987_icbuw-toxicharmtrwproject.pdf. For more information on toxic remnants of war, see also Geneva Academy, *Weapons Law Encyclopedia*, available from www.weaponslaw.org, *Glossary*, which cites the ICRC report "Strengthening legal protection for victims of armed conflicts" (see footnote 1146 above), p. 18. See the statements delivered by Austria, Costa Rica, Ireland and South Africa to the First Committee of the General Assembly at its sixty-eighth session, which are available from www.un.org/disarmament/meetings/firstcommittee-68.

[1148] See para. (9) of the commentary to draft article 1 of the draft articles on prevention of transboundary harm from hazardous activities, *Yearbook … 2001*, vol. II (Part Two) and corrigendum, p. 151.

[1149] Para. (12) of the commentary to draft article 1, *ibid.*

[1150] Third report on the protection of the atmosphere, prepared by Mr. Shinya Murase, Special Rapporteur, *Yearbook … 2016*, vol. II (Part One), document A/CN.4/692, para. 33. Concerning the concept of "control", see also *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970)*, Advisory Opinion, *I.C.J. Reports 1971*, p. 16, at p. 54, para. 118, where it states that: "The fact that South Africa no longer has any title to administer the Territory does not release it from its obligations and responsibilities under international law towards other States in respect of the exercise of its powers in relation to this Territory. Physical control of a territory, and not sovereignty or legitimacy of title, is the basis of State liability for acts affecting other States."

[1151] See, for example, amended Protocol II to the Convention on Certain Conventional Weapons, as well as the Protocol on Explosive Remnants of War, annexed to the Convention on Prohibitions or Restrictions on the Use of Certain Conventional Weapons Which May Be Deemed to Be Excessively Injurious or to Have Indiscriminate Effects (Protocol V) (Protocol V to the Convention on Certain Conventional Weapons).

(6) Paragraph 2 should be read together with paragraph 1. It aims to encourage cooperation and technical assistance among parties to render harmless the remnants of war referred to in paragraph 1. It should be noted that paragraph 2 does not aim to place any new international law obligations on parties to cooperate. However, it is foreseeable that there may be situations where an armed conflict has taken place and a party is not in a position to ensure that toxic and hazardous remnants of war are rendered harmless. It was thus considered valuable to encourage parties to cooperate in this regard.

(7) Paragraph 3 contains a "without prejudice" clause that aims to ensure that there would be no uncertainty that existing treaty or customary international law obligations prevail. There are various law of armed conflict treaties that regulate remnants of war, and different States thus have varying obligations relating to remnants of war.[1152]

(8) The words "clear, remove, destroy or maintain", as well as the specific remnants of war listed, namely "minefields, mined areas, mines, booby-traps, explosive ordnance and other devices", were specifically chosen and are derived from existing law of armed conflict treaties to ensure that the paragraph is based on the law of armed conflict as it exists at present.[1153]

(9) It should be noted that the draft principle does not directly deal with the issue of responsibility or reparation for victims on purpose. This is because responsibility to clear, remove, destroy or maintain remnants of war is already regulated to some extent under the existing law of armed conflict, at least in the sense that certain treaties identify who should take action.[1154] The draft principle is without prejudice to the allocation of responsibility and questions of compensation.

---

[1152] See, for example, amended Protocol II to the Convention on Certain Conventional Weapons; Protocol V to the Convention on Certain Conventional Weapons; Convention on the Prohibition of the Use, Stockpiling, Production and Transfer of Anti-Personnel Mines and on Their Destruction; Convention on Cluster Munitions; and Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction.

[1153] See the wording of amended Protocol II to the Convention on Certain Conventional Weapons; Convention on the Prohibition of the Use, Stockpiling, Production and Transfer of Anti-Personnel Mines and on Their Destruction; and Convention on Cluster Munitions.

[1154] See, e.g., article 3, paragraph 2, of amended Protocol II to the Convention on Certain Conventional Weapons: "Each High Contracting Party or party to a conflict is, in accordance with the provisions of this Protocol, responsible for all mines, booby-traps, and other devices employed by it and undertakes to clear, remove, destroy or maintain them as specified in Article 10 of this Protocol." Article 10, paragraph 2, in turn, provides that: "High Contracting Parties and parties to a conflict bear such responsibility with respect to minefields, mined areas, mines, booby-traps and other devices in areas under their control." In addition, article 3, paragraph 2, of Protocol V to the Convention on Certain Conventional Weapons provides that: "After the cessation of active hostilities and as soon as feasible, each High Contracting Party and party to an armed conflict shall mark and clear, remove or destroy explosive remnants of war in affected territories under its control." See also Convention on Cluster Munitions, art. 4, para. 1: "Each State Party undertakes to clear and destroy, or ensure the clearance and destruction of, cluster munition remnants located in cluster munition contaminated areas under its jurisdiction or control"; and Convention on the Prohibition of the Use, Stockpiling, Production and Transfer of Anti-Personnel Mines and on Their Destruction, art. 5, para. 1: "Each State Party undertakes to destroy or ensure the destruction of all anti-personnel mines in mined areas under its jurisdiction or control".

## Principle 17.   Remnants of war at sea

**States and relevant international organizations should cooperate to ensure that remnants of war at sea do not constitute a danger to the environment.**

### Commentary

(1) Unlike the broader draft principle 16, which deals with remnants of war more generally, draft principle 17 deals with the specific situation of remnants of war at sea, including the long-lasting effects on the marine environment. Draft principle 17 has added value, as draft principle 16 only covers remnants of war under the jurisdiction or control of a former party to an armed conflict, which means that it is not wide enough to cover all remnants of war at sea. This draft principle expressly encourages international cooperation to ensure that remnants of war at sea do not constitute a danger to the environment.[1155]

(2) Owing to the multifaceted nature of the law of the sea, a particular State could have sovereignty, jurisdiction, both sovereignty and jurisdiction, or neither sovereignty nor jurisdiction, depending on where the remnants are located.[1156] It is therefore not surprising that remnants of war at sea pose significant legal challenges.[1157] For example, the parties to the armed conflict may have ceased to exist, the coastal State may not have the resources to ensure that the remnants of war at sea do not constitute a danger to the environment, or the coastal State may not have been a party to the conflict, but the cooperation of that State may still be needed in efforts to get rid of remnants. Another foreseeable challenge is that the party that left the remnants may not have been in violation of its international law obligations at the time when that happened, but these remnants now pose environmental risks.

(3) Accordingly, draft principle 17 addresses States generally, not only those which have been involved in an armed conflict. It aims to encourage all States, as well as relevant international organizations,[1158] to cooperate to ensure that

---

[1155] The need to take cooperative measures to assess and increase awareness of environmental effects related to waste originating from chemical munitions dumped at sea has been explicitly recognized by the General Assembly since 2010, including in General Assembly resolution 71/220 of 21 December 2016. The resolution reaffirms the 2030 Agenda for Sustainable Development and recalls a number of relevant international and regional instruments. It furthermore notes the importance of raising awareness of the environmental effects related to waste originating from chemical munitions dumped at sea and invites the Secretary-General to seek the views of Member States and relevant regional and international organizations on the cooperative measures envisaged in the resolution with a view to identifying the appropriate intergovernmental bodies within the United Nations for further consideration and implementation, as appropriate, of those measures.

[1156] See United Nations Convention on the Law of the Sea. The remnants of war could be located in the territorial waters, the continental shelf, the exclusive economic zone or on the high seas, and this will have an impact on the rights and obligations of States.

[1157] See A. Lott, "Pollution of the marine environment by dumping: legal framework applicable to dumped chemical weapons and nuclear waste in the Arctic Ocean", *Nordic Environmental Law Journal* (2015:1), pp. 57–69; and W. F. Searle and D. H. Moody, "Explosive remnants of war at sea: technical aspects of disposal", in A. H. Westing (ed.), *Explosive Remnants of War: Mitigating the Environmental Effects*, London and Philadelphia, Taylor and Francis, 1985, pp. 61–69.

[1158] For example, the CHEMSEA project, which was initiated in 2011 as a project of cooperation among the Baltic States and partly financed by the European Union (see footnote 1145 above).

remnants of war at sea do not constitute a danger to the environment. The reference to "international organizations" is qualified with the word "relevant", in the light of the fact that the issues involved tend to be specialized.

(4)    The words "should cooperate" rather than the more prescriptive "shall cooperate" were considered appropriate, given that this is an area where practice is still developing. Cooperation is an important element concerning remnants of war at sea, as the coastal States negatively affected by remnants of war at sea may not have the resources and thus not be capable of ensuring that remnants of war at sea do not pose environmental risks.

(5)    There are various ways in which States and relevant international organizations can cooperate to ensure that remnants of war at sea do not pose environmental risks. For example, they could survey maritime areas and make the information freely available to the affected States, they could provide maps with markers, and they could provide technological and scientific information and information concerning whether the remnants pose risks or may pose risks in the future.

(6)    There is increasing awareness concerning the environmental effects of remnants of war at sea.[1159] Dangers posed to the environment by remnants of war at sea could entail significant collateral damage to human health and safety, especially of seafarers and fishermen.[1160] The clear link between danger to the environment and public health and safety has been recognized in several international law instruments, and it was thus considered particularly important to encourage cooperation among States and international organizations to ensure that remnants of war at sea do not pose a danger.[1161]

(7)    Draft principle 17 intentionally does not deal with any issues concerning the allocation of responsibility or compensation for damage regarding remnants of war at sea. Determining which party has the primary obligation to ensure that remnants of war at sea do not pose

environmental risks is a very complex and delicate issue to define, especially considering the varied legal nature of the law of the sea, ranging from internal waters to the high seas.

### Principle 18.    Sharing and granting access to information

**1.    To facilitate remedial measures after an armed conflict, States and relevant international organizations shall share and grant access to relevant information in accordance with their obligations under international law.**

**2.    Nothing in the present draft principle obliges a State or international organization to share or grant access to information vital to its national defence or security. Nevertheless, that State or international organization shall cooperate in good faith with a view to providing as much information as possible under the circumstances.**

#### Commentary

(1)    Draft principle 18 refers generally to "States", as this term is broader than "parties to an armed conflict". States not parties to an armed conflict may be affected as third States, and may have relevant information useful for the taking of remedial measures that could usefully be provided to other States or international organizations. This obligation applies to States, even though non-State actors are addressed in other draft principles, and the set of draft principles covers both international and non-international armed conflicts.

(2)    While States are typically the most relevant subjects, the draft principle also refers to international organizations, with the addition of the qualifier "relevant". The specific term "national defence" applies only to States. For some international organizations, confidentiality requirements may also affect the extent of information that they can share or grant access to in good faith.[1162]

(3)    Draft principle 18 consists of two paragraphs. Paragraph 1 refers to the obligations States and international organizations may have under international law to share and grant access to information with a view to facilitating remedial measures after an armed conflict. Paragraph 2 refers to security considerations to which such access may be subject.

(4)    The expression "in accordance with their obligations under international law" reflects the fact that treaties contain obligations relevant in the context of the protection of the environment in relation to armed conflicts, which may be instrumental for the purpose of the taking of remedial measures after an armed conflict,[1163] such as, for instance, keeping a record of the placement of landmines.

---

[1159] See General Assembly resolutions 65/149 of 20 December 2010 and 68/208 of 20 December 2013, and the report of the Secretary-General on cooperative measures to assess and increase awareness of environmental effects related to waste originating from chemical munitions dumped at sea (A/68/258). See also Mensah, "Environmental damages under the Law of the Sea Convention" (footnote 1145 above), p. 233.

[1160] The Baltic Marine Environment Protection Commission (Helsinki Commission), governing body of the Convention on the Protection of the Marine Environment of the Baltic Sea Area, issued guidelines for fishermen that encounter sea-dumped chemical munitions at an early stage. For an easily accessible overview, see the work done by the James Martin Center for Nonproliferation Studies at www.nonproliferation.org/chemical-weapon-munitions-dumped-at-sea/.

[1161] There is a clear link between danger to the environment and public health and safety. See, for example, article 55, paragraph 1, of Protocol I Additional to the Geneva Conventions of 12 August 1949, which provides for the protection of the natural environment in international armed conflicts and prohibits the use of means and methods of warfare which are intended or may be expected to cause environmental damage and thereby prejudice the health of the population; article 1, paragraph 2, of the Convention on the Protection and Use of Transboundary Watercourses and International Lakes stipulates that adverse effects on the environment include "effects on human health and safety, flora, fauna, soil, air, water, climate, landscape and historical monuments or other physical structures or the interaction among these factors; they also include effects on the cultural heritage or socioeconomic conditions resulting from alterations to those factors".

[1162] Cf. e.g. Office of the United Nations High Commissioner for Refugees (UNHCR), Policy on the Protection of Personal Data of Persons of Concern to UNHCR (2015), available from www.refworld.org/pdfid/55643c1d4.pdf.

[1163] Protocol I, art. 33; First Geneva Convention, art. 16; Second Geneva Convention, arts. 19 and 42; Third Geneva Convention, art. 23; and Fourth Geneva Convention, art. 137.

Obligations to grant access to and/or share information which provide protection for the environment in relation to armed conflicts have been listed above. Also relevant is paragraph 2 of article 9 on "Recording and use of information on minefields, mined areas, mines, booby-traps and other devices" of amended Protocol II to the Convention on Certain Conventional Weapons, as well as paragraph 2 of article 4 on "Recording, retaining and transmission of information" of Protocol V to the Convention on Certain Conventional Weapons.

(5) Furthermore, this expression reflects the fact that the obligations to grant access to and/or share information as contained in the relevant treaties are commonly accompanied by exceptions or limitations regarding grounds on which the disclosure of information may be refused. Such grounds relate, *inter alia*, to "national defence or public security" or situations in which the disclosure would make it more likely that the environment to which such information related would be damaged.[1164]

(6) While the term "share" refers to information provided by States and international organizations in their mutual relations and as a means of cooperation, the term "granting access" refers primarily to allowing access to individuals, for example, to such information, and thus signifies a more unilateral relationship.

(7) The obligation to share and grant access to information pertaining to the environment can be found in numerous sources of international law, at both the global and regional levels.

(8) The origins of the right of access to information in modern international human rights law can be found in article 19 of the Universal Declaration of Human Rights,[1165] as well as in article 19 of the International Covenant on Civil and Political Rights. General comment No. 34 on article 19 of the International Covenant on Civil and Political Rights provides that article 19, paragraph 2, should be read as including a right of access to information held by public bodies.[1166]

(9) A right to environmental information has also developed within the context of the European Convention on Human Rights, as exemplified in the case of *Guerra and Others v. Italy*,[1167] in which the European Court of Human Rights decided that the applicants had a right to environmental information on the basis of article 8 of the Convention (the right to family life and privacy). Reference can also be made to the European Union directive on public access to environmental information and to a related

judgment of the European Court of Justice of 2011.[1168] In addition to the right to privacy, a right to environmental information has also been based on the right to freedom of expression (as in e.g. *Claude-Reyes et al. v. Chile* before the Inter-American Court of Human Rights).[1169]

(10) Principle 10 of the 1992 Rio Declaration on Environment and Development[1170] also provides that individuals shall have appropriate access to information, including on hazardous materials. The recently adopted Sustainable Development Goal 16 on peaceful and inclusive societies calls upon States to ensure public access to information and protect fundamental freedoms, in accordance with national legislation and international agreements.[1171]

(11) Article 2 of the Convention on Access to Information, Public Participation in Decision-Making and Access to Justice in Environmental Matters defines "environmental information" as any information pertaining to the state of elements of the environment, factors affecting or likely to affect elements of the environment, and the state of human health and safety insofar as they may be affected by these elements. Article 4 of the Convention stipulates that States parties must "make such [environmental] information available to the public, within the framework of national legislation". Such a right necessarily entails a duty for States to collect such environmental information for the purposes of making it available to the public if and when requested to do so.

(12) The United Nations Framework Convention on Climate Change addresses access to information in its article 6, noting that the parties shall "[p]romote and facilitate at the national and, as appropriate, subregional and regional levels, and in accordance with national laws and regulations, and within their respective capacities: … public access to information on climate change and its effects". In addition, the Cartagena Protocol on Biosafety to the Convention on Biological Diversity stipulates that parties shall promote and facilitate access to information on living modified organisms.[1172] Both the Rotterdam Convention on the Prior Informed Consent Procedure for Certain Hazardous Chemicals and Pesticides in International Trade[1173] and the Stockholm Convention on Persistent Organic Pollutants[1174] contain provisions on access to information. Similarly, article 18 of the 2013 Minamata Convention on Mercury stipulates that parties

---

[1164] See Convention on Access to Information, Public Participation in Decision-Making and Access to Justice in Environmental Matters, art. 4, para. 4 (*b*); and Convention for the Protection of the Marine Environment of the North-East Atlantic, art. 9, para. 3 (*g*). See also the Regional Agreement on Access to Information, Public Participation and Justice in Environmental Matters in Latin America and the Caribbean, art. 5, para. 6 (*b*).

[1165] General Assembly resolution 217 A (III) of 10 December 1948.

[1166] Human Rights Committee, general comment No. 34 (2011) on article 19 (freedoms of opinion and expression), *Official Records of the General Assembly, Sixty-sixth Session, Supplement No. 40* (A/66/40), vol. I, annex V, para. 18.

[1167] *Guerra and Others v. Italy*, 19 February 1998, *Reports of Judgments and Decisions* 1998-I.

[1168] Directive 2003/4/EC of the European Parliament and of the Council of 28 January 2003 on public access to environmental information, *Official Journal of the European Union*, L 41, 14 February 2003, p. 26; *Office of Communications v. Information Commissioner*, case C-71/10, judgment of 28 July 2011, *ibid.*, C 298, 8 October 2011, p. 6.

[1169] *Claude-Reyes et al. v. Chile*, Judgment (Merits, Reparations and Costs) of 19 September 2006, Inter-American Court of Human Rights, Series C, No. 151.

[1170] Adopted at Rio de Janeiro on 14 June 1992; see *Report of the United Nations Conference on Environment and Development, Rio de Janeiro, 3–14 June 1992*, vol. I: *Resolutions adopted by the Conference* (A/CONF.151/26/Rev.1 (Vol. I) and Corr.1, United Nations publication, Sales No. E.93.I.8 and corrigenda), resolution 1, annex I, p. 3.

[1171] General Assembly resolution 70/1.

[1172] Cartagena Protocol on Biosafety to the Convention on Biological Diversity, art. 23.

[1173] Rotterdam Convention on the Prior Informed Consent Procedure for Certain Hazardous Chemicals and Pesticides in International Trade, art. 15.

[1174] Stockholm Convention on Persistent Organic Pollutants, art. 10.

shall "promote and facilitate" access to such information. The recently concluded Paris Agreement adopted under the United Nations Framework Convention on Climate Change similarly addresses access to information in numerous paragraphs and articles, e.g. as part of the responsibility of States to provide intended nationally determined contributions, referred to in article 4, paragraph 8, of the Paris Agreement, and more generally regarding climate change education and public access to information, referred to in article 12.

(13)  In accordance with the United Nations Convention to Combat Desertification in Those Countries Experiencing Serious Drought and/or Desertification, Particularly in Africa, parties thereto shall make information on desertification "fully, openly and promptly available".[1175] Similarly, the Bali Guidelines provide that "affordable, effective and timely access to environmental information held by public authorities upon request" should be ensured.[1176]

(14)  Within the particular regime of humanitarian demining and remnants of war, a number of instruments contain requirements on providing environmental information. For instance, a request to extend the deadline for completing the clearance and destruction of cluster munition remnants under the Convention on Cluster Munitions must outline any potential environmental and humanitarian impacts of such an extension.[1177] Similarly, in connection with the destruction of cluster munitions, the "location of all destruction sites and the applicable safety and environmental standards" must be outlined.[1178] Similar obligations are contained in the Convention on the Prohibition of the Use, Stockpiling, Production and Transfer of Anti-Personnel Mines and on Their Destruction.[1179] Reference can also be made to International Mine Action Standard 10.70, which states, inter alia, that national mine action authorities should "promulgate information about significant environmental incidents to other demining organisations within the programme".[1180]

(15)  Regarding the practice of international organizations, the Environmental Policy for United Nations Field Missions of 2009 stipulates that peacekeeping missions shall assign an Environmental Officer with the duty to "[p]rovide environmental information relevant to the operations of the mission and take actions to promote awareness on environmental issues".[1181] The policy also contains a requirement to disseminate and study information on the environment, which would presuppose access to information that can in fact be disseminated and that thus is not classified.

(16)  Moreover, the ICRC Guidelines for Military Manuals and Instructions on the Protection of the Environment in Times of Armed Conflict contain a provision on protection of organizations,[1182] which could include environmental organizations gathering environmental data as a means of "contributing to prevent or repair damage to the environment".[1183]

(17)  In connection with post-armed conflict environmental assessments, it is worth recalling that the UNEP guidelines on integrating environment in post-conflict assessments include a reference to the importance of public participation and access to information, as "natural resource allocation and management is done in an ad-hoc, decentralized, or informal manner" in post-conflict contexts.[1184]

(18)  The obligation to *share information* and to cooperate in this context is reflected in the Convention on the Law of the Non-navigational Uses of International Watercourses.[1185] Moreover, the Convention on Biological Diversity contains a provision on exchange of information in its article 14, requiring that each Contracting Party shall, as far as possible and as appropriate, promote "notification, exchange of information and consultation on activities under their jurisdiction or control which are likely to significantly affect adversely the biological diversity of other States or areas beyond the limits of national jurisdiction, by encouraging the conclusion of bilateral, regional or multilateral arrangements, as appropriate".[1186] In addition, article 17 of the Convention calls upon the Parties to facilitate the exchange of information relevant to the conservation and sustainable use of biological diversity.

(19)  Previous work of the Commission of relevance to this aspect of the draft principle includes the articles on nationality of natural persons in relation to the succession of States (1999),[1187] articles on prevention of transboundary harm from hazardous activities (2001),[1188] principles on the allocation of loss in the case of transboundary harm

---

[1175] United Nations Convention to Combat Desertification in Those Countries Experiencing Serious Drought and/or Desertification, Particularly in Africa, art. 16 (f), and also art. 19.

[1176] UNEP, Guidelines for the development of national legislation on access to information, public participation and access to justice in environmental matters, adopted by the Governing Council of UNEP in decision SS.XI/5 A, annex, of 26 February 2010, guideline 1 (A/65/25, annex I). Available from www.unep.org, Resources.

[1177] Convention on Cluster Munitions, art. 4, para. 6 (h).

[1178] Ibid., art. 7 (Transparency measures), para. 1 (e).

[1179] Article 5.

[1180] IMAS 10.70, 1 September 2007, "Safety and occupational health—Protection of the environment", para. 12.1 (f), available from www.mineactionstandards.org.

[1181] United Nations, Department of Peacekeeping Operations and Department of Field Support, "Environmental Policy for UN Field Missions", 2009, para. 23.5.

[1182] Guidelines for Military Manuals and Instructions on the Protection of the Environment in Times of Armed Conflict (see footnote 1066 above), guideline 19, referring to the Fourth Geneva Convention, art. 63, para. 2, and Protocol I, arts. 61–67.

[1183] It should be noted that guideline 19 refers to special agreements between the parties or permission granted by one of them.

[1184] UNEP, Guidance Note, Integrating Environment in Post-Conflict Needs Assessments, Geneva, 2009, p. 7; available from www.unep.org/resources/report/integrating-environment-post-conflict-needs-assessments-unep-guidance-note (as referenced in paragraph 144 and footnote 264 of the third report of the previous Special Rapporteur, Yearbook … 2016, vol. II (Part One), document A/CN.4/700).

[1185] Convention on the Law of the Non-navigational Uses of International Watercourses, arts. 9, 11, 12, 14–16, 19, 30, 31 and 33, para. 7.

[1186] Article 14, para. 1 (c).

[1187] General Assembly resolution 55/153 of 12 December 2000, annex, art. 18. The draft articles and the commentaries thereto are reproduced in Yearbook … 1999, vol. II (Part Two), paras. 47–48.

[1188] General Assembly resolution 62/68 of 6 December 2007, annex, arts. 8, 12–14 and 17. The draft articles adopted by the Commission and the commentaries thereto are reproduced in Yearbook … 2001, vol. II (Part Two) and corrigendum, paras. 97–98.

arising out of hazardous activities (2006)[1189] and articles on the law of transboundary aquifers (2008).[1190]

(20)    Paragraph 2 serves a similar purpose in the context of draft principle 18. The exception to the obligation set out under paragraph 1 concerns information vital to the national defence of a State or the security of a State or an international organization. This exception is not absolute. The second sentence of the paragraph provides that States and international organizations shall provide as much information as possible under

the circumstances, through cooperation in good faith. Paragraph 2 is based on provisions contained in the Convention on the Law of the Non-navigational Uses of International Watercourses. Article 31 of the Convention provides that a watercourse State is not obliged to provide data or information vital to its national defence or security, while noting that the obligation to cooperate in good faith is still applicable. The articles on prevention of transboundary harm from hazardous activities[1191] and the articles on the law of transboundary aquifers[1192] contain a similar exception.

(21)    Draft principle 18 is closely linked to the duty to cooperate, as well as draft principle 15 on post-armed conflict environmental assessments and remedial measures.

---

[1189] General Assembly resolution 61/36 of 4 December 2006, annex, principle 5. The draft principles and the commentaries thereto are reproduced in *Yearbook … 2006*, vol. II (Part Two), paras. 66–67.

[1190] General Assembly resolution 63/124 of 11 December 2008, annex, arts. 8, 13, 15, 17 and 19. The draft articles adopted by the Commission and the commentaries thereto are reproduced in *Yearbook … 2008*, vol. II (Part Two), paras. 53–54.

[1191] Article 14.

[1192] Article 19.

# Chapter X

# SUCCESSION OF STATES IN RESPECT OF STATE RESPONSIBILITY

## A.  Introduction

219.  At its sixty-ninth session (2017), the Commission decided to include the topic "Succession of States in respect of State responsibility" in its programme of work and appointed Mr. Pavel Šturma as Special Rapporteur.[1193] The General Assembly subsequently, in its resolution 72/116 of 7 December 2017, took note of the decision of the Commission to include the topic in its programme of work.

220.  At the same session, the Commission considered the first report of the Special Rapporteur,[1194] which sought to set out the Special Rapporteur's approach to the scope and outcome of the topic, as well as to provide an overview of general provisions relating to the topic. Following the plenary debate, the Commission decided to refer draft articles 1 to 4, as contained in the first report of the Special Rapporteur, to the Drafting Committee. The Commission subsequently took note of the interim report of the Chair of the Drafting Committee regarding draft articles 1 and 2, provisionally adopted by the Committee, which was presented to the Commission for information only.[1195]

## B.  Consideration of the topic at the present session

221.  At the present session, the Commission had before it the second report of the Special Rapporteur (A/CN.4/719), which was considered at its 3431st to 3435th meetings, from 17 to 24 July 2018.

222.  In his second report, which was composed of four parts, the Special Rapporteur first addressed certain introductory issues, including the legality of succession (Part One). He then discussed the general rules on succession of States in respect of State responsibility, particularly in relation to attribution and in relation to the difference between continuing and completed breaches (Part Two). Thereafter, the Special Rapporteur considered certain special categories of State succession to the obligations arising from responsibility (Part Three). The future programme of work on the topic was then addressed (Part Four). The Special Rapporteur proposed seven draft articles corresponding to the issues considered in Part One (draft article 5), Part Two (draft article 6), and Part Three (draft articles 7 to 11) of his second report.[1196]

[1193] At its 3354th meeting, on 9 May 2017. The topic had been included in the long-term programme of work of the Commission during its sixty-eighth session (2016), on the basis of the proposal contained in annex II to the report of the Commission on the work of that session (*Yearbook … 2016*, vol. II (Part Two), para. 36 and pp. 242–250).

[1194] *Yearbook … 2017*, vol. II (Part One), document A/CN.4/708.

[1195] The interim report of the Chair of the Drafting Committee is available in the Analytical Guide to the Work of the International Law Commission: https://legal.un.org/ilc/guide/gfra.shtml.

[1196] The text of draft articles 5 to 11, as proposed by the Special Rapporteur in his second report, reads as follows:

"*Draft article 5.  Cases of succession of States covered by the present draft articles*

"The present draft articles apply only to the effects of a succession of States occurring in conformity with international law and, in particular, the principles of international law embodied in the Charter of the United Nations.

"*Draft article 6.  General rule*

"1.  Succession of States has no impact on the attribution of the internationally wrongful act committed before the date of succession of States.

"2.  If the predecessor State continues to exist, the injured State or subject may, even after the date of succession, invoke the responsibility of the predecessor State and claim from it a reparation for the damage caused by such internationally wrongful act.

"3.  This rule is without prejudice to the possible attribution of the internationally wrongful act to the successor State on the basis of the breach of an international obligation by an act having a continuing character if it is bound by the obligation.

"4.  Notwithstanding the provisions of paragraphs 1 and 2, the injured State or subject may claim reparation for the damage caused by an internationally wrongful act of the predecessor State also or solely from the successor State or States, as provided in the following draft articles.

"*Draft article 7.  Separation of parts of a State (secession)*

"1.  Subject to the exceptions referred to in paragraphs 2 and 3, the obligations arising from an internationally wrongful act of the predecessor State do not pass to the successor State in case of secession of a part or parts of the territory of a State to form one or more States, if the predecessor State continues to exist.

"2.  If particular circumstances so require, the obligations arising from an internationally wrongful act of the predecessor State will transfer to the successor State when the act was carried out by an organ of a territorial unit of the predecessor that has later become an organ of the successor State.

"3.  If particular circumstances so require, the obligations arising from an internationally wrongful act of the predecessor State, where there is a direct link between the act or its consequences and the territory of the successor State or States, are assumed by the predecessor and the successor State or States.

"4.  The conduct of a movement, insurrectional or other, which succeeds in establishing a new State in part of the territory of a predecessor State or in a territory under its administration shall be considered an act of the new State under international law.

"*Draft article 8.  Newly independent States*

"1.  Subject to the exceptions referred to in paragraph 2, the obligations arising from an internationally wrongful act of the predecessor State do not pass to the successor State in case of establishment of a newly independent State.

"2.  If the newly independent State agrees, the obligations arising from an internationally wrongful act of the predecessor State may transfer to the successor State. The particular circumstances may be taken into consideration where there is a direct link between the act or its consequences and the territory of the successor State and where the former dependent territory had substantive autonomy.

"3.  The conduct of a national liberation or other movement which succeeds in establishing a newly independent State shall be considered an act of the new State under international law.

(*Continued on next page.*)

223.   At its 3435th meeting, on 24 July 2018, the Commission decided to refer draft articles 5 to 11, as contained in the Special Rapporteur's second report, to the Drafting Committee, taking into account the views expressed in the plenary debate.

224.   At its 3443rd meeting, on 3 August 2018, the Chair of the Drafting Committee presented an interim oral report on draft article 1, paragraph 2, and draft articles 5 and 6, provisionally adopted by the Drafting Committee. The report was presented for information only and is available from the website of the Commission.[1197]

225.   At its 3451st meeting, on 9 August 2018, the Commission decided to request from the Secretariat a memorandum providing information on treaties which may be of relevance to its future work on the topic.

### 1. INTRODUCTION BY THE SPECIAL RAPPORTEUR OF THE SECOND REPORT

226.   The Special Rapporteur indicated that his second report took into account the comments from members of the Commission and from delegations in the Sixth Committee. In relation to the general rule underlying the topic of succession to responsibility, the Special Rapporteur considered that a general theory of non-succession should not be replaced by another similar theory in favour of succession: a more flexible and realistic approach was

needed. While consistency with the previous work of the Commission was important, especially in relation to terminology, it was unnecessary to adopt the same structure as the Vienna Convention on Succession of States in respect of Treaties of 1978 and the Vienna Convention on Succession of States in respect of State Property, Archives and Debts of 1983. The previous work of the Commission on responsibility of States for internationally wrongful acts was equally essential.

227.   In that regard, the Special Rapporteur remarked that the complex legal regime of State responsibility had already been codified by the Commission in its articles on responsibility of States for internationally wrongful acts,[1198] which largely reflected customary international law. The general principles and rules arising therefrom should thus be applied or developed, if necessary, to serve as guidance for States facing problems of responsibility in cases of succession. The question of succession had to be considered not with respect to "responsibility" *in abstracto* but rather with respect to the principles and rules of a secondary character governing, in particular: the establishment of an internationally wrongful act and its attribution to a given State; the content and forms of responsibility; and the invocation of such responsibility. Any general rules identified would then be subject to exceptions and modifications, taking into account various factors, such as whether the breach was completed or continuing, whether damage was localized, and whether the predecessor State continued to exist or not. This last issue was especially significant, in the view of the Special Rapporteur.

228.   Seven new draft articles had been proposed by the Special Rapporteur in his second report. In addition to addressing certain general rules (draft articles 5 and 6), the draft articles focused on the transfer of obligations arising from the internationally wrongful act of the predecessor State (draft articles 7 to 11). Draft article 5 dealt with the issue of legality of succession, providing that the draft articles applied only to the effects of a succession of States occurring in conformity with international law and, in particular, the principles of international law embodied in the Charter of the United Nations. The Special Rapporteur had initially been hesitant to address such a potentially controversial issue, given that, in addition to clear cases of illegal succession, there were also cases which belonged to a "grey" or "neutral" zone which was possibly not governed by international law. Draft article 5 was therefore a modest provision modelled on article 6 of the Vienna Convention on Succession of States in respect of Treaties of 1978, and consistent with other provisions previously adopted by the Commission, as well as with the work undertaken by the Institute of International Law.

229.   The second general provision was draft article 6, which set out the general rule applicable to the succession of States in respect of State responsibility, namely the principle of non-succession when it comes to the

---

*(Footnote 1196 continued)*

"*Draft article 9.   Transfer of part of the territory of a State*

"1.   Subject to the exceptions referred to in paragraphs 2 and 3, the obligations arising from an internationally wrongful act of the predecessor State do not pass to the successor State when part of the territory of the predecessor State becomes part of the territory of the successor State.

"2.   If particular circumstances so require, the obligations arising from an internationally wrongful act of the predecessor State will transfer to the successor State when the act was carried out by an organ of a territorial unit of the predecessor that has later become an organ of the successor State.

"3.   If particular circumstances so require, the obligations arising from an internationally wrongful act of the predecessor State, where there is a direct link between the act or its consequences and the territory of the successor State or States, are assumed by the predecessor and the successor State.

"*Draft article 10.   Uniting of States*

"1.   When two or more States unite and form a new successor State, the obligations arising from an internationally wrongful act of any predecessor State pass to the successor State.

"2.   When a State is incorporated into another existing State and ceased to exist, the obligations arising from an internationally wrongful act of the predecessor State pass to the successor State.

"3.   Paragraphs 1 and 2 apply unless the States concerned, including an injured State, otherwise agree.

"*Draft article 11.   Dissolution of State*

"1.   When a State dissolves and ceases to exist and the parts of its territory form two or more successor States, the obligations arising from the commission of an internationally wrongful act of the predecessor State pass, subject to an agreement, to one, several or all the successor States.

"2.   Successor States should negotiate in good faith with the injured State and among themselves in order to settle the consequences of the internationally wrongful act of the predecessor State. They should take into consideration a territorial link, an equitable proportion and other relevant factors."

[1197] The report is available in the Analytical Guide to the Work of the International Law Commission: https://legal.un.org/ilc/guide/gfra .shtml.

[1198] General Assembly resolution 56/83 of 12 December 2001, annex. The draft articles adopted by the Commission and the commentaries thereto are reproduced in *Yearbook … 2001*, vol. II (Part Two) and corrigendum, paras. 76–77.

establishment of an internationally wrongful act. The draft article provided that succession of States had no impact on the attribution of an internationally wrongful act committed before the date of succession of States. It then addressed the possible impact on succession to responsibility of the distinction between instantaneous and continuing breaches, as well the issue of composite acts.

230. The five draft articles that followed draft article 6 developed and modified the general rule expressed therein. They considered individual categories of succession and specified the circumstances where the obligations arising from an internationally wrongful act rested with the predecessor State and those where they passed to the successor State. The five draft articles were divided into two groups. Draft articles 7, 8 and 9 dealt with cases of succession where the predecessor State continued to exist, while draft articles 10 and 11 dealt with situations where the predecessor State had ceased to exist.

231. Draft articles 7, 8 and 9 addressed respectively the separation of parts of a State, the establishment of a newly independent State, and the transfer of part of the territory of a State. They were similarly structured. First, they expressed the general rule that obligations arising from an internationally wrongful act of the predecessor State did not pass to the successor State; then, they identified exceptions that applied in particular circumstances, such as a direct link between the act or its consequences and the territory of the successor State or States. Draft articles 7 and 9 also addressed the possibility of an act carried out by an organ of a territorial unit of the predecessor State that had later become an organ of the successor State.

232. Draft article 10 dealt with the two situations of merger of States and incorporation of a State into another existing State, while draft article 11 addressed the dissolution of State. The latter draft article underlined the role of agreements that should be negotiated in good faith by successor States.

233. The Special Rapporteur indicated that the final wording and placement of draft articles 3 and 4, as proposed in the first report and referred to the Drafting Committee, may be left for discussion at a later stage. In relation to the future programme of work, the Special Rapporteur reiterated his intention of following the programme outlined in his first report[1199] with the necessary flexibility. The issue of forms and invocation of reparation might require further analysis in the future, and some additional definitions might be included in draft article 2 on the use of terms. In principle, the third report (2019) would focus on the transfer of the rights or claims of an injured predecessor State to the successor State. The fourth report (2020) would then address procedural and miscellaneous issues, including the plurality of successor States and the issue of shared responsibility, as well as issues concerning injured international organizations and injured individuals. The Special Rapporteur envisaged that the entire set of draft articles might be adopted on first reading in 2020 or 2021, depending on the progress of the debate.

2. Summary of the debate

(a) General comments

234. Members of the Commission generally welcomed the second report of the Special Rapporteur and commended its structure. Several members remarked that the scarcity of State practice on succession of States in respect of State responsibility presented significant challenges to the work of the Commission on the topic. Some members agreed with the Special Rapporteur that the available State practice was diverse, context-specific and often politically sensitive, and observed that not many relevant decisions by domestic and international courts and tribunals were available. According to a number of members, such difficulties confirmed the initial misgivings expressed by some members as to the suitability of the topic for codification or progressive development. Several members expressed caution at the heavy reliance of the report of the Special Rapporteur on academic writings and on the work of the Institute of International Law. In addition, it was noted that the practice considered in the report, although generally more diverse than in his first report, had still predominantly focused on European sources and examples.

235. Several members agreed with the Special Rapporteur that it was possible to identify an underlying general rule applicable to the succession of States in respect of State responsibility, according to which State responsibility did not automatically transfer to the successor State, except in certain circumstances. It was underlined that a realistic and flexible approach was needed in that regard, as the Special Rapporteur had remarked. Other members of the Commission expressed the view that identifying several rules would be more practical than attempting to confirm the existence of a single underlying general rule, which could be impossible to determine.

236. The scope of possible exceptions to the underlying general rule of non-succession was the object of considerable debate. Several members cautioned against replacing a general theory of non-succession to State responsibility with a similarly general presumption of succession. It was noted that some of the draft articles proposed by the Special Rapporteur in fact espoused such a presumption of succession, especially in relation to cases where the predecessor State no longer existed. In the view of several members, such proposals were based on policy grounds rather than State practice, and were more in the nature of progressive development, or *de lege ferenda*, rather than codification of existing international law. In that respect, it was highlighted that it was important to clarify the extent to which each of the draft articles would constitute progressive development or codification of international law.

237. In relation to the methodology adopted by the Special Rapporteur, some members expressed doubts as to the separation of the issues of succession to obligations arising from an internationally wrongful act of a predecessor State (considered in the second report) from the issues concerning the rights and claims arising from an internationally wrongful act injuring a predecessor State (to be considered in the third report). In

---

[1199] A/CN.4/708 (see footnote 1194 above), para. 133.

their view, that might lead to unnecessary duplication of work. In relation to the categories of succession to be analysed, a number of members agreed with the basic distinction proposed by the Special Rapporteur between cases where the predecessor State continued to exist and cases where it did not. Other members, however, suggested that such a distinction was not necessarily borne out by State practice, but was rather the result of policy considerations. Members also generally agreed that it was important to maintain consistency with the previous work of the Commission, in matters of both terminology and substance, especially in relation to the articles on responsibility of States for internationally wrongful acts.

238.   In relation to the subsidiary nature of the proposed rules, a number of members proposed that a draft article be added stating that the draft articles would only apply in the absence of any agreement between the parties, including the State injured by an internationally wrongful act. In that regard, the fundamental role of treaties, other agreements, and unilateral undertakings by successor States was underlined by some members. The view was also expressed that caution was required in inferring general rules from existing agreements, which were often narrow in scope and only bound the parties thereto. According to one view, the Commission should focus its work solely on responsibility of States for internationally wrongful acts whose injured parties were also States.

239.   Some members proposed changing the title of the topic to "State responsibility problems in cases of succession of States". Suggestions were also made as to the possible structuring of the draft articles in several parts.

(b)   *Specific comments*

(i)   *Draft article 5—Cases of succession of States covered by the present draft articles*

240.   Members generally expressed their support for draft article 5, the wording of which was consistent with the previous work of the Commission. It was noted that the draft article was also consistent with the fundamental principle *ex injuria jus non oritur* and with General Assembly resolution 2625 (XXV) of 24 October 1970 (Declaration on Principles of International Law concerning Friendly Relations and Cooperation among States in accordance with the Charter of the United Nations). In relation to the legality of succession, some members remarked that no third category existed beyond lawful and unlawful cases of succession. Other members considered that the question of legality of succession should be considered separately from the possible consequences, in terms of responsibility, of unlawful succession, including in relation to any unlawful territorial changes occurring before it. The view was also expressed that draft article 5 might not accomplish its intended purpose, because the exclusion of unlawful succession from the scope of application of the draft articles might lead to a paradoxical advantage for unlawful successor States, insofar as any identified exceptions to the general rule of non-succession to State responsibility may not be understood as applying to them.

(ii)   *Draft article 6—General rule*

241.   While members generally expressed agreement with the rule of non-succession to State responsibility enshrined in draft article 6, several members remarked that the formulation of that draft article was unclear. A number of drafting suggestions were made in that regard, which *inter alia* aimed at clarifying that the responsibility for wrongful acts in cases of succession of States only arose for the State that had committed the wrongful act, except when the draft articles otherwise provided.

242.   In relation to the legal basis of the general rule of non-succession, some members expressed support for the view of the Special Rapporteur that such a rule derived from the rules on attribution of conduct enshrined in the articles on responsibility of States for internationally wrongful acts, and in particular that the non-succession rule was a corollary to the definition of State responsibility contained in article 1 thereof. Other members, however, considered that the question of attribution of conduct was distinct from the question of succession to responsibility, and that employing the language of attribution of conduct might generate confusion, because issues of succession in respect of State responsibility only arose in relation to internationally wrongful acts that had already been attributed to the predecessor State under article 2 of the articles on responsibility of States for internationally wrongful acts; in the absence of such attribution, there would be no responsibility to transfer. The view was also expressed that the general rules on attribution of conduct and other rules on State responsibility may in fact be affected by rules on State succession.

243.   In relation to paragraph 4 of draft article 6, some members considered that its reference to "reparation" would limit the scope of the draft articles only to certain aspects of State responsibility; it was therefore necessary to clarify the extent of the obligations arising from an internationally wrongful act that would be transferred in cases of succession in respect of responsibility. Other members considered that paragraph 4 undermined the general rule of non-succession enshrined in the first part of draft article 6, and that it conflicted with the general principle of law that only the wrongdoer should be held responsible for a wrongful act.

(iii)   *Draft article 7—Separation of parts of a State*

244.   The suggestion was made by several members of the Commission to omit from draft article 7 and its title any reference to "secession", because the term might be interpreted as including unlawful succession. Some members considered that the limited State practice did not support the exceptions to the non-succession rule included in draft article 7. In addition, the expressions "[i]f particular circumstances so require" (paras. 2 and 3), "an organ of a territorial unit" (para. 2), "direct link", and "are assumed" (para. 3) were deemed unclear by a number of members. In relation to paragraph 2, the view was expressed that when an act of a continuing character was carried out by an organ of the predecessor State that became an organ of the successor State, no transfer of responsibility would occur, but two separate internationally wrongful acts could be established, each attributable to

either the predecessor or the successor State. The view was also expressed that some criteria for the apportionment of rights and obligations after succession should be added to this and other draft articles, and that the concept of unjust enrichment might provide additional clarity in that regard. Other members considered that the rules applicable to unjust enrichment might not be pertinent in this context.

245. Several members expressed their support in relation to paragraph 4 of draft article 7, and a number of drafting proposals were made to clarify further the link between the attribution of conduct of an insurrectional or other movement and the consequent transfer of responsibility at the date of succession. Drafting suggestions were also made with a view to combining this draft article with draft article 8 and/or draft article 9.

(iv)  *Draft article 8—Newly independent States*

246. A number of drafting suggestions were made in relation to draft article 8. The article received the support of several members of the Commission. Other members questioned whether it would still be necessary for the Commission to adopt a draft article devoted to "newly independent States", as the concept now seemed anachronistic. Other members, however, remarked that the General Assembly maintained a list of Non-Self-Governing Territories, and that cases of succession based on the principle of self-determination raised certain legal specificities that should not be overlooked. Several members proposed that the definition of "newly independent States" be included among those in draft article 2.

247. The view was expressed that, among the criteria to be considered under paragraph 2 of draft article 8, reference should be made to the possible direct link between an internationally wrongful act and the population, rather than just the territory, of the successor State. In relation to paragraph 3, some members considered that the concept of "insurrectional or other movement" would comprise "national liberation" movements, and it was thus possible to adopt the same language employed in paragraph 4 of draft article 7.

(v)  *Draft article 9—Transfer of part of the territory of a State*

248. In relation to draft article 9, several members remarked that their views concerning draft article 7 applied *mutatis mutandis*, including those concerning the limited State practice in support of the exceptions to the general rule of non-succession and the need to clarify the meaning of some of the terms employed. A number of drafting suggestions were made.

(vi)  *Draft article 10—Uniting of States*

249. Several members of the Commission remarked that draft articles 10 and 11, which concerned the situation where the predecessor State no longer existed, espoused a general presumption of succession to responsibility that was inconsistent with the general rule of non-succession in respect of State responsibility identified in draft article 6. In their view, there was not sufficient State practice in

support of such a presumption of succession, which found support only in some academic writings and in the work of the Institute of International Law. The examples provided by the Special Rapporteur often concerned expropriation, which was not an internationally wrongful act *per se*. Some members underlined that, in the absence of consent, it was simply not possible to deduce any assumption of obligations by the successor State. Some members considered that the policy rationale underlying such a reversal of the general rule of non-succession may in fact lead to inequitable or unjust results. In addition, it was remarked that attaching legal consequences to the predecessor State's remaining in existence, or otherwise, may lead to discriminatory results. Other members expressed support for draft articles 10 and 11, as they established the certainty of legal consequences for all internationally wrongful acts, and thus preserved the rights of injured parties.

250. A number of drafting suggestions were made in relation to draft article 10, some of which aimed at removing any reference to the distinction between types of unification of States, given that the legal consequences in terms of succession to responsibility were deemed to be identical.

(vii)  *Draft article 11—Dissolution of State*

251. In addition to the observations that applied to both draft article 10 and draft article 11 mentioned above, a number of members of the Commission remarked that draft article 11 posed specific challenges and would require careful consideration in the light of the highly context-specific nature of dissolution of States.

252. Several members of the Commission considered that paragraph 1 of draft article 11 was unclear, especially in relation to the expression "subject to an agreement"; it was important to specify which parties would be involved in such an agreement, and whether the scope of the agreement would be the apportionment of responsibility among successors or the transfer of responsibility itself. In relation to paragraph 2, a number of members considered that the introduction of a duty to negotiate would not be appropriate, and that it was therefore important that the wording remained hortatory in nature. A number of drafting suggestions were made.

(c)  *Final form*

253. In terms of the final form that the project should take, a number of members noted that some States had expressed their preference for a form other than draft articles, such as draft guidelines or conclusions, although other States had supported the form of draft articles. The view was expressed that the final form could be decided upon at a later stage. Some members remarked that it could be useful to consider the possibility of drafting model clauses to be used as a basis for negotiation of agreements on succession.

(d)  *Future programme of work*

254. Members of the Commission generally agreed with the proposals by the Special Rapporteur concerning the

future programme of work. The view was also expressed that the Special Rapporteur should consider further topics, such as the role of international organizations and the effect of non-recognition policies on issues of succession to responsibility.

### 3. CONCLUDING REMARKS OF THE SPECIAL RAPPORTEUR

255.    In response to the debate, the Special Rapporteur expressed his gratitude for the many comments received and welcomed the prevailing sense of the debate, which had focused on how to best approach the topic in a balanced manner. In relation to the doubts that had been expressed as to the feasibility and suitability of the topic for codification, the Special Rapporteur reiterated his view that the topic was suitable for codification and progressive development, as it aimed to shed more light on the gaps left by the previous codification work of the Commission in the two fields of State responsibility and succession of States. The topic was intended to explain the possible impact of succession of States on general rules of State responsibility, not to create new rules on the succession of States. In his view, the fact that such issues had been deliberately left unaddressed during the Commission's work on State responsibility was an invitation rather than a hindrance to further consideration by the Commission. In the Special Rapporteur's view, nothing in the articles on responsibility of States for internationally wrongful acts suggested that the legal consequences of an internationally wrongful act simply disappeared because of State succession. The Special Rapporteur also indicated that he agreed that the Commission should consider changing the title of the topic to "State responsibility problems in cases of succession of States".

256.    Concerning issues of methodology, and in particular comments made by members as to available practice, the Special Rapporteur underlined his intention to combine the progressive development of international law and its codification, an approach consistent with the mandate of the Commission. He indicated that there was little distinction between *lex ferenda* and policy considerations, and that State practice, including bilateral and multilateral treaties, was also influenced by policy considerations.

257.    The Special Rapporteur also noted that a slow but growing trend of case law was emerging concerning succession to State responsibility, especially among regional human rights courts. He agreed that, in his report, he had greatly relied on academic writings, but considered that this was consistent with the role of writings as subsidiary means for the identification of rules of law. In addition, the Special Rapporteur stressed that the existence of early drafts on the topic by private codification bodies, and in particular the Institute of International Law, confirmed the relevance of the topic. He added that the Commission was, however, not bound by previous work undertaken by such bodies.

258.    In relation to the question of the identification of a general rule underlying the topic of State succession in relation to State responsibility, the Special Rapporteur agreed that such a general rule, or rules, was needed, together with exceptions applicable to individual categories of succession. For the purpose of creation of responsibility

of a State (based on its own internationally wrongful act), non-succession was an absolute rule: both the act and the international obligation breached must refer only to the predecessor State. The legal consequences of a wrongful act, including circumstances precluding wrongfulness, the obligation of cessation, and possible countermeasures, would all in principle remain applicable to the predecessor State. The successor State would not become responsible on the basis of a wrongful act that it did not commit. Rather, it may be responsible for its own wrongful acts, in cases such as continuing breaches or attribution of conduct of insurrectional or other movements. In addition, some exceptions to the rule of non-succession existed in relation to certain consequences of an internationally wrongful act that did not disappear if the predecessor State no longer existed. These consequences continued to exist in a similar manner as territory, population, property or debts continued to exist in cases of succession. The exceptional grounds on which this was the case were certainly open to debate. Nonetheless, such circumstances did not determine a situation in which the successor State would become responsible, or be blamed, for acts that it did not commit; it would rather have to be commended for not leaving the injured States or injured persons without any reparation.

259.    The Special Rapporteur pointed out that the basic distinction between cases where the predecessor State continued to exist and cases where it no longer existed was based on the description of real differences and was consistent with the recognized categories of succession, regardless of possible policy considerations. The specific rules and exceptions to be drafted in that regard had to be worded in such a way as to prevent unjust and inequitable results. With reference to the separation of the issues of succession to obligations arising from an internationally wrongful act of a predecessor State (considered in the second report) from the issues concerning the rights and claims arising from an internationally wrongful act injuring a predecessor State (to be considered in the third report), the Special Rapporteur noted that duplication could be avoided by eventually merging draft articles, as needed.

260.    The Special Rapporteur also expressed his agreement with several other comments and proposals, including the need to consider the link between an internationally wrongful act and the population of a successor State; the relevance of the consent of the injured State or person to any undertaking of responsibility by the successor State; the importance of agreements and unilateral declarations in matters of succession; and the need to include a provision expressly indicating the subsidiary character of the draft articles. He also agreed that a number of definitions would need to be added to draft article 2, and considered that a number of the drafting proposals concerning the structure and content of the draft articles should be upheld.

261.    In the Special Rapporteur's view, the draft articles should also address subjects other than States as possible injured subjects. Such an approach was consistent with the first part of the articles on responsibility of States for internationally wrongful acts, which also applied to breaches of international obligations of States owed to other actors.

262.  In relation to draft article 5, the Special Rapporteur reiterated that this proposal was consistent with the Vienna Convention on Succession of States in respect of Treaties of 1978 and the Vienna Convention on Succession of States in respect of State Property, Archives and Debts of 1983. He noted that it remained unclear whether modern international law fully regulated certain facts in relation to the creation of States. Draft article 5 aimed at positively delineating the material scope of the draft articles in a manner consistent with the previous work of the Commission on succession. The draft article in no way sought to grant any privileges to unlawful successor States by exempting them from responsibility; rather, it concerned both the possible transfer of obligations and the transfer of rights arising from responsibility.

263.  As to draft article 6, the Special Rapporteur was open to several of the suggestions received to improve its clarity. Concerning paragraph 4, the Special Rapporteur indicated that the reference to reparation did not exclude the relevance of other rules of State responsibility, which remained applicable to the predecessor State.

264.  In relation to draft article 7, the Special Rapporteur agreed with a number of drafting suggestions, including omitting any reference to "secession" therefrom; in addition, the expression "[i]f particular circumstances so require" needed further clarification or removal. As to draft article 8, the Special Rapporteur indicated that, in his view, all categories of succession previously considered by the Commission should be maintained, including the category of newly independent States. Regarding both draft article 7 and draft article 9, the Special Rapporteur indicated that the term "an organ of a territorial unit" referred to situations where such organs had a substantive degree of autonomy, such as in the case of federal States. Furthermore, he agreed with a number of drafting proposals, including those aimed at combining draft articles 7, 8 and 9 in a single provision. The Special Rapporteur also clarified that it was not the purpose of draft articles 7, 8 and 9 to create obligations entailing the automatic transfer of obligations to the successor State.

265.  Regarding draft articles 10 and 11, the Special Rapporteur agreed with many of the comments made during the plenary debate. He underlined, however, that draft article 10 created a rebuttable presumption rather than a rule of automatic succession replacing that of non-succession in all circumstances. Furthermore, in his view, cases concerning unlawful expropriation could not be discounted as irrelevant. As to draft article 11, the Special Rapporteur underlined that it was a general, introductory provision that would later be complemented by another draft article on the criteria and rules for the apportionment of obligations arising from the internationally wrongful act of a predecessor State that had ceased to exist.

266.  In relation to the future programme of work, the Special Rapporteur took note of the agreement of some members with his proposed programme of work and agreed that the focus of the third report, on transfer of rights or claims of an injured predecessor, might need careful consideration to avoid duplication of work and that the role of international organizations could also be considered at a later stage, together with other issues.

# Chapter XI

# IMMUNITY OF STATE OFFICIALS FROM FOREIGN CRIMINAL JURISDICTION

## A. Introduction

267. The Commission, at its fifty-ninth session (2007), decided to include the topic "Immunity of State officials from foreign criminal jurisdiction" in its programme of work and appointed Mr. Roman A. Kolodkin as Special Rapporteur.[1200] At the same session, the Commission requested the Secretariat to prepare a background study on the topic, which was made available to the Commission at its sixtieth session (2008).[1201]

268. The Special Rapporteur submitted three reports. The Commission received and considered the preliminary report at its sixtieth session (2008) and the second and third reports at its sixty-third session (2011).[1202] The Commission was unable to consider the topic at its sixty-first (2009) and sixty-second (2010) sessions.[1203]

269. The Commission, at its sixty-fourth session (2012), appointed Ms. Concepción Escobar Hernández as Special Rapporteur to replace Mr. Kolodkin, who was no longer a member of the Commission.[1204] The Commission received and considered the preliminary report of the Special Rapporteur at the same session (2012), her second report during the sixty-fifth session (2013), her third report during the sixty-sixth session (2014), her fourth report during the sixty-seventh session (2015) and her fifth report during the sixty-eighth (2016) and sixty-ninth (2017) sessions.[1205] On the basis of the draft articles proposed by the Special Rapporteur in her second, third, fourth and fifth reports, the Commission has thus far provisionally adopted seven draft articles

and commentaries thereto. Draft article 2, on the use of terms, is still being developed.[1206]

## B. Consideration of the topic at the present session

270. The Commission had before it the sixth report of the Special Rapporteur (A/CN.4/722), in which she summarized the debates in the Commission and the Sixth Committee on draft article 7, dealing with crimes under international law in respect of which immunity *ratione materiae* should not apply, and which was provisionally adopted by the Commission at its sixty-ninth session. She then started to address the procedural aspects of immunity from foreign criminal jurisdiction in chapters II and III. In particular, she initiated the consideration, expected to be completed the following year, of the procedural aspects of immunity by first analysing the way in which procedural aspects had been dealt with previously in the work of the Commission, how such procedural aspects comported with the overall boundaries of the present topic and the approach that the Special Rapporteur intended to follow when analysing procedural aspects; and, second, providing an analysis of three components of procedural aspects related to the concept of jurisdiction, namely: (*a*) timing; (*b*) the kinds of acts affected; and (*c*) the determination of immunity. The report did not include new draft articles.

271. It was anticipated that the seventh report, to be submitted in 2019, would constitute the final component of the analysis of procedural aspects. The seventh report would consider such issues as the invocation of immunity and the waiver of immunity, as well as addressing aspects concerning procedural safeguards related to both the State of the official and the foreign official concerned, including safeguards and rights that must be recognized in relation to such an official; communication between the forum State and the State of the official; transmission

---

[1200] At its 2940th meeting, on 20 July 2007 (see *Yearbook ... 2007*, vol. II (Part Two), para. 376). The General Assembly, in paragraph 7 of its resolution 62/66 of 6 December 2007, took note of the decision of the Commission to include the topic in its programme of work. The topic had been included in the long-term programme of work of the Commission during its fifty-eighth session (2006), on the basis of the proposal contained in annex I of the report of the Commission (*Yearbook ... 2006*, vol. II (Part Two), para. 257 and pp. 191–200).

[1201] *Yearbook ... 2007*, vol. II (Part Two), para. 386. For the memorandum by the Secretariat, see A/CN.4/596 and Corr.1 (available from the Commission's website, documents of the sixtieth session).

[1202] *Yearbook ... 2008*, vol. II (Part One), document A/CN.4/601 (preliminary report); *Yearbook ... 2010*, vol. II (Part One), document A/CN.4/631 (second report); and *Yearbook ... 2011*, vol. II (Part One), document A/CN.4/646 (third report).

[1203] See *Yearbook ... 2009*, vol. II (Part Two), para. 207; and *Yearbook ... 2010*, vol. II (Part Two), para. 343.

[1204] *Yearbook ... 2012*, vol. II (Part Two), para. 266.

[1205] *Ibid.*, vol. II (Part One), document A/CN.4/654 (preliminary report); *Yearbook ... 2013*, vol. II (Part One), document A/CN.4/661 (second report); *Yearbook ... 2014*, vol. II (Part One), document A/CN.4/673 (third report); *Yearbook ... 2015*, vol. II (Part One), document A/CN.4/686 (fourth report); and *Yearbook ... 2016*, vol. II (Part One), document A/CN.4/701 (fifth report).

[1206] At its 3174th meeting, on 7 June 2013, the Commission received the report of the Drafting Committee and provisionally adopted draft articles 1, 3 and 4 and, at its 3193rd to 3196th meetings, on 6 and 7 August 2013, it adopted the commentaries thereto (see *Yearbook ... 2013*, vol. II (Part Two), paras. 48–49). At its 3231st meeting, on 25 July 2014, the Commission received the report of the Drafting Committee and provisionally adopted draft articles 2 (*e*) and 5 and, at its 3240th to 3242nd meetings, on 6 and 7 August 2014, it adopted the commentaries thereto (see *Yearbook ... 2014*, vol. II (Part Two), paras. 131–132). At its 3329th meeting, on 27 July 2016, the Commission provisionally adopted draft articles 2 (*f*) and 6, provisionally adopted by the Drafting Committee and taken note of by the Commission at its sixty-seventh session and, at its 3345th and 3346th meetings, on 11 August 2016, the Commission adopted the commentaries thereto (see *Yearbook ... 2016*, vol. II (Part Two), paras. 194–195 and 249–250). At its 3378th meeting, on 20 July 2017, the Commission provisionally adopted draft article 7 by a recorded vote and, at its 3387th to 3389th meetings, on 3 and 4 August 2017, it adopted the commentaries thereto (*Yearbook ... 2017*, vol. II (Part Two), paras. 74, 76 and 140–141).

of information by the State of the official; and cooperation and international legal assistance between the State of the official and the forum State. In addition, the report would analyse matters related to cooperation between States and international criminal courts and the possible impact of such cooperation on immunity from foreign criminal jurisdiction. Furthermore, it would contain proposals for draft articles on the issues addressed in the sixth report and the analysis contained in the seventh report. It was hoped that the Commission would complete the first reading of the draft articles under the topic the following year.

272.    The Commission considered the sixth report at its 3438th to 3440th meetings, on 30 and 31 July 2018. The debate on the report would be continued and completed at the seventy-first session, in 2019.

### 1.    INTRODUCTION BY THE SPECIAL RAPPORTEUR OF THE SIXTH REPORT

273.    The Special Rapporteur prefaced her introduction by stating that the sixth report, unlike previous reports, contained in the introduction a detailed summary, for information purposes, of the debate in the Commission and the Sixth Committee on draft article 7, which had been provisionally adopted by the Commission at its sixty-ninth session. Such an approach was justified given the intensity of the debate on limitations and exceptions to immunity and the related draft article 7, also bearing in mind the sensitivity of the subject and the divergence of the views expressed. Moreover, in the debate on draft article 7, attention had been drawn to the importance of considering procedural aspects that would also focus on procedural safeguards, the consideration of which, for some, was a condition for the adoption of draft article 7.

274.    Highlighting the importance of addressing procedural aspects under the present topic, she recalled that aspects thereof were addressed in the memorandum by the Secretariat[1207] and the third report of the former Special Rapporteur,[1208] as well as by the Special Rapporteur herself in previous reports,[1209] including in the informal concept paper on procedural provisions and safeguards discussed in informal consultations at the Commission's session in 2017, and during the interactive dialogue with the Sixth Committee in 2017. The Special Rapporteur observed that, in its prior work, the Commission had focused on the timing of any consideration of immunity, the invocation and the waiver of immunity, acts affected by immunity, and the determination of immunity. Moreover, it had considered the related analysis of the concept of jurisdiction, as well as the relationship between limitations and exceptions to immunity and procedural safeguards. Indeed, the Commission had proceeded on the assumption that it would at some stage address the procedural provisions and safeguards applicable to the draft articles. She also recalled that the Sixth Committee had considered the procedural aspects, particularly at the sixty-sixth session of the General Assembly.

275.    The Special Rapporteur, however, noted that in subsequent years, the focus with regard to the procedural aspects of immunity in the Commission had shifted somewhat from the classical aspects related to procedure, such as timing, invocation and waiver, towards the need to establish procedural safeguards to avoid the politicization and abuse of the exercise of criminal jurisdiction in respect of foreign officials. Such a shift had been replicated in discussions in the Sixth Committee, where the interest in the procedural aspects was closely linked to the safeguarding and strengthening of the immunity regime and the principle of the sovereign equality of States, as well as the assurance of guarantees of due process. While the Special Rapporteur stressed that the need to analyse and establish procedural safeguards to prevent politically motivated proceedings and the abuse of jurisdiction was not a new subject, as the concern had been raised in earlier discussions, the debate on the issue was more pronounced in 2016 and 2017 in the context of the debate on draft article 7.

276.    The Special Rapporteur stressed the significance of the consideration of the procedural aspects of immunity, bearing in mind that immunity was claimed in a foreign criminal jurisdiction. She stated that, in considering procedural aspects, the Commission could offer proposals for respecting the sovereign equality of States, as well as the other legal principles and values of the international community as a whole (including the fight against impunity). She also noted that, by considering the procedural aspects, it was possible to ensure that a State official who might be affected by the exercise of foreign criminal jurisdiction enjoyed all of the procedural safeguards recognized under international law, in particular international human rights law. In the view of the Special Rapporteur, a proper consideration of the procedural aspects, by introducing a neutral element into the treatment of immunity, would provide certainty to both the forum State and the State of the official. Furthermore, it would reduce the impact of political factors and avoid unnecessary claims of abusive prosecution of an official of a foreign State for political reasons or other ends, and would also help build trust between the States concerned.

277.    As regards the scope of the potential issues to be discussed, the Special Rapporteur stressed that an appreciation of the procedural aspects required consideration of a range of granular issues, including: (*a*) what was meant by criminal "jurisdiction"; (*b*) what kinds of acts of the forum State were affected by immunity from foreign criminal jurisdiction; (*c*) who determined the applicability of immunity, and what effect such a determination had on immunity; (*d*) when immunity from foreign criminal jurisdiction began to apply; (*e*) whether invocation of immunity was necessary, and who could invoke such immunity; (*f*) how the waiver of immunity was effected, and by whom; (*g*) what effect the waiver of immunity had on the exercise of jurisdiction; (*h*) how the communication between the forum State and the State of the official would be ensured, and what mechanisms could be used for such communication; (*i*) what mechanisms, if any, enabled the State of the official to have its legal positions made known and taken into consideration by the courts of the forum State when determining whether immunity applied in a specific case;

---

[1207] A/CN.4/596 and Corr.1 (see footnote 1201 above).

[1208] A/CN.4/646 (see footnote 1202 above).

[1209] A/CN.4/654 (preliminary report), A/CN.4/661 (second report) and A/CN.4/701 (fifth report) (see footnote 1205 above).

(*j*) how international judicial cooperation and assistance between the forum State and the State of the official would be facilitated; (*k*) to what extent, and through which procedures, the obligation to cooperate with an international criminal court would be taken into consideration; and (*l*) how proceedings begun in the forum State would be transferred to the State of the official or an international criminal court, as necessary.

278.  To address such a variety of issues, the Special Rapporteur suggested that it was necessary to take into account a set of criteria consisting of the following: (*a*) the presence in the jurisdiction of the forum State of a foreign element identified as the "State official", and whose acts, at least with respect to immunity *ratione materiae*, were performed in an official capacity; (*b*) the need to establish a balance between the right of the forum State to exercise jurisdiction and the right of the State of the official to ensure that the immunity of its officials was respected; (*c*) the need to establish a balance between respecting the functional and representative character of State officials and safeguarding the fight against impunity for the commission of serious crimes under international law; and (*d*) the need to ensure that State officials would benefit from the procedural rights and guarantees recognized by international human rights law.

279.  In that connection, the Special Rapporteur thought it important to pursue a broad and comprehensive approach, which would take into account four distinct but complementary dimensions:

(*a*)  The procedural implications for immunity arising from the concept of jurisdiction, in particular with respect to timing, the identification of the acts of the forum State that may be affected by immunity and issues related to the determination of immunity;

(*b*)  The procedural elements of autonomous procedural significance with links to the application or non-application of immunity in a given case, which served as a first-level safeguard for the State of the official, in particular questions concerning the invocation and waiver of immunity;

(*c*)  The procedural safeguards for the State of the official, in particular mechanisms to facilitate communication and consultation between it and the forum State and to transmit information between the judicial authorities concerned, as well as instruments of international legal cooperation and mutual assistance between the States concerned;

(*d*)  The procedural safeguards inherent in the concept of a fair trial, including respect for international human rights law.

280.  The Special Rapporteur also thought it necessary that the Commission consider the effect that the obligation to cooperate with an international criminal court could have on the immunity of foreign State officials.

281.  The Special Rapporteur emphasized that the consideration of the various procedural issues required information from States on their practices. She expressed her appreciation for the comments that had been received from States and renewed her request for new contributions.

282.  Turning to the content of the sixth report, the Special Rapporteur noted that, even though the various procedural aspects of immunity were interrelated and required holistic treatment, the report focused on the implications of the concept of jurisdiction for the procedural aspects of immunity. She recalled the proposal for a definition of "jurisdiction" included in her second report, which was still pending in the Drafting Committee. Although the sixth report was not intended to reopen a general discussion on the concept of jurisdiction, the Special Rapporteur stressed the significance that jurisdiction had for some procedural aspects. Accordingly, the sixth report focused on the "when", the "what" and the "who", by examining: (*a*) the timing of the consideration of immunity; (*b*) the acts of the authorities of the forum State that may be affected by immunity; and (*c*) the identification of the organ competent to decide whether immunity applies.

283.  As regards the timing of the consideration of immunity, the Special Rapporteur noted that the competent organs of the State should consider whether immunity existed at an early stage in the process, since otherwise immunity would lose its usefulness and *raison d'être*. However, she stressed that it was not easy to define what was meant by "an early stage", in particular because of the great variety of practices and procedures related to the criminal process in the various national legal systems. Thus, in the view of the Special Rapporteur, the timing of the consideration of immunity must be identified by combining two elements: (*a*) the stage of criminal procedures (investigation, prosecution and trial); and (*b*) the binding and coercive nature of any measure to be adopted and its effect on the foreign State official.

284.  By applying such criteria, the Special Rapporteur concluded as follows:

(*a*)  Immunity must be considered by the courts of the forum State, at the earliest possible opportunity, when they began to exercise their jurisdiction and before adopting any decision on the merits; and, in any event, when they had to take any measures expressly directed at the official imposing obligations on him or her that, in the event of non-compliance, could lead to coercive measures and that could possibly impede the proper performance of his or her State functions. Accordingly, the immunity of a State official had to be considered by the courts: (i) before commencing the prosecution of a foreign official; (ii) before bringing charges against the official or committing him or her for trial; or (iii) before commencing the hearing.

(*b*)  Whether immunity applied at the inquiry or investigation stage was more doubtful, but it must be considered at the stage before taking any measures expressly directed at the official imposing obligations on him or her that, in the event of non-compliance, could lead to coercive measures and that could possibly impede the proper performance of his or her State functions, in particular an arrest warrant, an indictment or certain provisional measures.

(c)  It appeared impossible to conclude that immunity from jurisdiction must be considered automatically from the start of an investigation, in particular because acts of a merely investigative nature, as a rule, neither had binding force nor directly affected a State official or the performance of his or her functions.

285.  As a final remark, she stressed the importance of maintaining the distinction between immunity *ratione personae* and immunity *ratione materiae* regarding the timing of the consideration of immunity, in particular taking into account the different requirements for identifying a Head of State, a Head of Government or a Minister for Foreign Affairs, on the one hand, and any other State official, on the other.

286.  Regarding the kinds of acts affected by immunity, the Special Rapporteur noted that measures that were directly affected by immunity included the bringing of a criminal charge, a summons to appear before a court as a person under investigation or to attend a confirmation of charges hearing, a decision on the confirmation of charges, committal for trial, a summons to appear as the accused in a criminal trial, a court detention order or an application to extradite or surrender a foreign official. All those acts were jurisdictional in nature, directly affected a State official and could have an influence on or would interfere with the performance of his or her State functions.

287.  The Special Rapporteur also identified other kinds of acts of an authority of the forum State that could have an impact on the foreign official and his or her immunity from foreign criminal jurisdiction. Those included: (a) acts that were essentially executive in nature, including, for example, the detention of a foreign official as part of a police operation in the territory of the forum State or in accordance with an international arrest warrant, or the registration of a search or arrest warrant in international police cooperation systems; (b) acts that, despite being qualified as judicial in nature, ordinarily had the purpose of exercising criminal jurisdiction over a third person rather than over a foreign official, including, for example, a summons to appear as a witness, or an order to provide a court of the forum State with information in the possession of the official; and (c) precautionary measures that could be ordered by a court in the forum State in the exercise of its jurisdiction over a foreign official, but that did not in themselves have the purpose of determining his or her criminal responsibility, including, for example, interim measures aimed at attaching assets of that foreign official.

288.  In the view of the Special Rapporteur, whether such acts were affected by immunity from foreign criminal jurisdiction depended on various factors, including, while bearing in mind the distinction between immunity *ratione personae* and immunity *ratione materiae*: (a) the distinction between immunity from jurisdiction and inviolability; (b) the separation between the person of the official and the assets the seizure of which was sought; and (c) the binding and coercive nature of the measure and its impact on the exercise by the foreign official of his or her functions. Thus, whether such acts were affected by immunity must be considered case by case.

289.  Concerning the determination of immunity, in particular the identification of the organ in the forum State that was competent to consider and decide on the applicability of immunity, the Special Rapporteur observed that the courts of the forum State would be competent to give a definitive view on the matter, although it would also be possible for organs other than judicial bodies (such as public prosecutors) to decide, when tasked with the investigation or preliminary proceedings, and a question arose as to immunity in relation to any of the acts affected by immunity.

290.  The Special Rapporteur stressed that asserting that a foreign court was competent to give a definitive view on determining immunity did not necessarily imply that other State organs or authorities could not express their views on the matter, acting together with the courts to settle the question of immunity. In any case, the possibility for other organs or State authorities to express their views depended on national law. She expressed a similar view regarding the information provided by the State of the official, which could have considerable importance for the court's determination of immunity. The Special Rapporteur stated that that matter would be the subject of analysis in the seventh report as a cooperation issue.

291.  In the view of the Special Rapporteur, the determination of immunity by the courts of the forum State must take into account various elements, depending on whether it was a matter of determining immunity *ratione personae* or immunity *ratione materiae*. Regarding the former, it was enough for the court to consider whether the State official possessed the status of Head of State, Head of Government or Minister for Foreign Affairs, and whether he or she was serving in that capacity at the time when the immunity had to be considered. Regarding immunity *ratione materiae*, the court had to assess: (a) whether the individual was a State official; (b) whether the acts in question were performed in an official capacity; (c) whether the acts were performed by the official during his or her term of office; and (d) whether the acts in question fell within any of the categories of crimes under international law to which immunity *ratione materiae* did not apply.

292.  The Special Rapporteur also addressed the future programme of work as outlined in paragraph 271 above.

### 2.  Summary of the debate

293.  Given the limited time available for the consideration of this report at the present session, the debate on the sixth report would be continued at the seventy-first session. Thus, the members who made statements stressed the preliminary character of their interventions while reserving the right to comment further on the report the following year.

#### (a)  *General comments*

294.  Members commended the Special Rapporteur for her excellent and solid report, even though some members regretted its late issuance, as well as the fact that the relevant draft articles on the issues analysed in the report would only be submitted the following year. It was noted

that the report did not address all the procedural aspects or deal with the relationship between the procedural and substantive aspects of the topic. Some other members observed that, even though draft articles were not proposed in the sixth report, the analysis therein provided a crucial advance in the understanding of procedural issues. Several members expressed the hope that the seventh report would be submitted for consideration in a timely manner the following year.

295.    Members stressed the continuing importance of the topic for States. In that connection, some members mentioned the interest of the African Union in having a request included in the agenda of the General Assembly for an advisory opinion of the International Court of Justice on the question of immunities and the relationship between articles 27 and 98 of the Rome Statute of the International Criminal Court for States parties under international law. It was reiterated that the topic was politically sensitive and legally complex, with a potential impact not only on international relations, but also on the practice of courts at the national level, thereby affording an opportunity to assist States to harmonize their procedures regarding immunity of State officials. It was also underlined that the consideration of the topic required deliberation and careful treatment of and attention to State practice. In that connection, some members regretted the absence of practice from certain regions or practice with respect to particular aspects of immunity *ratione materiae*. The paucity of practice and doctrine in matters concerning procedural aspects and safeguards was acknowledged by other members.

296.    Attention was also drawn by some members to the relationship between the topic and other topics on the current programme of work of the Commission, including crimes against humanity and peremptory norms of international law (*jus cogens*), as well as universal criminal jurisdiction, included in the long-term programme of the Commission at the current session. That had implications for the Commission as it required the pursuit of a common approach to ensure consistency and guard against fragmentation of international law. Some members recalled the need to treat the elaboration of the present topic consistently with other relevant regimes, in particular article 27, paragraph 1, of the Rome Statute of the International Criminal Court.

297.    It was considered that the discussion on procedural issues was important to ensure that immunities, where applicable, were respected in order to safeguard the stability of international relations and ensure respect for the sovereign equality of States. It was equally vital to take into account the jurisdiction of the forum State, the importance of the fight against impunity and the rights of the State official concerned. For some members, it was therefore necessary to ponder carefully the types of procedures that were to be elaborated. Such procedures, it was suggested, should aim to achieve a delicate balance between all the various interests, including respect for immunity and ensuring the stability of international relations, and consideration of the limitations to immunity in the fight against impunity.

298.    Several members expressed their support for the suggested approach of the Special Rapporteur to deal with procedural aspects broadly and comprehensively. Moreover, members alluded to the importance of addressing the dual components of procedural aspects: the traditional considerations concerning such issues as timing, invocation and waiver, as well as, more importantly, a full range of considerations concerning safeguards in the light particularly, though not exclusively, of the adoption of draft article 7.

(b)    *Comments on the summary of the debate on draft article 7*

299.    Members who made statements expressed their appreciation for the summary, in the sixth report, of the debate on draft article 7, the circumstances surrounding the adoption of which were recalled, with members drawing attention to various components of the debate that they considered essential. Some members reiterated their dissatisfaction with the manner in which draft article 7 had been adopted and the impact that would have on the working methods of the Commission. Some other members recalled the importance for Member States to have a clear indication by the Commission of whether draft article 7 reflected existing customary international law or progressive development. In view of the anticipated completion of the topic on first reading the following year, it was envisaged by some members that the Commission could afford itself a further opportunity to address the content of draft article 7, not only in order to address the question of whether it reflected customary international law or was an exercise in progressive development, but also to ameliorate the manner in which the draft article was adopted. Nevertheless, some other members recalled that the consideration of limitations and exceptions constituted the essence of the topic. In that connection, it was considered that the discussion on procedural aspects would ensure the fair and effective operation of draft article 7. It was at the same time noted that procedural provisions and safeguards were relevant to the whole set of draft articles, not only with respect to draft article 7. Several members looked forward to consideration of those aspects in the seventh report the following year. According to another view, the feasibility of curing, through procedural safeguards, what were considered to be substantive fundamental flaws in draft article 7 was doubtful.

(c)    *Comments on the procedural aspects dealt with in the sixth report*

300.    Regarding the concept of jurisdiction, some members, while acknowledging the proposals of the Special Rapporteur on draft article 2 that were before the Drafting Committee, noted that it was not entirely necessary to define criminal "jurisdiction" for the purposes of the draft articles on the topic. A functional approach would be sufficient to sketch out the parameters of jurisdiction in respect of the procedural aspects. It was suggested, as a general matter of methodology, that a distinction be made between the general concept of jurisdiction, including the general bases of jurisdiction of the State, and the question of the bodies that were competent to exercise the criminal jurisdiction of a particular State. For some other members, such a definition was necessary as it would bring certainty to the scope of criminal jurisdiction affected by the rules on immunity.

301.  Methodologically, it was considered useful to maintain the distinction between immunity *ratione personae* and immunity *ratione materiae* in addressing the procedural provisions as well as, subsequently, the safeguards, even though some members noted that the distinction should not be exaggerated.

302.  Members in general looked forward to the draft articles that would be presented by the Special Rapporteur, in the seventh report, on the procedural aspects considered in the sixth report.

(i)  *Timing*

303.  Regarding the question of timing, it was generally considered that that was an area that could be considered by the Commission and on which it could offer valuable guidance on the basis of existing case law and practice.

304.  In any event, members stressed the importance of addressing immunity issues at an early stage of the proceedings so as to avoid confusion at a later stage. Based on case law, it was confirmed that questions of immunity were preliminary in nature and had to be resolved expeditiously and decided *in limine litis*. It was recalled that in the advisory opinion on the *Difference Relating to Immunity from Legal Process of a Special Rapporteur of the Commission on Human Rights*, the International Court of Justice had stated that that principle was "a generally recognized principle of procedural law" intended to avoid "nullifying the essence of the immunity rule".[1210]

305.  It was nevertheless considered important by some members to address, as suggested by the Special Rapporteur, some practical aspects, such as what was meant by "an early stage" or "at the earliest opportunity", as the terms were imprecise and fraught with ambiguity. It was confirmed that, at least with respect to immunity *ratione personae*, the 2001 resolution of the Institute of International Law on immunities from jurisdiction and execution of Heads of State and of Government in international law indicated that immunity and inviolability to which a foreign Head of State was entitled should be afforded to him or her as soon as that status was known.[1211] Accordingly, it was observed that immunity must be considered without delay and in any event at the initiation of the procedure and before binding measures were taken against the State official that constituted an obstacle to the exercise of his or her functions. Moreover, it was suggested that the *Avena* case[1212] could provide some guidance on addressing aspects of a practical nature concerning the immediacy of acting "without delay"; in that particular case, the International Court of Justice interpreted the expression as not necessarily meaning "immediately upon arrest and before interrogation".[1213]

306.  Some members who made statements recognized the difficulty of determining the application of immunity rules during the investigative stages, given the diversity of national law and practice in investigation and prosecution. It was still necessary for the Commission to study the matter and provide practical guidance for States.

307.  It was suggested that immunity considerations should cover, in principle, the whole criminal procedure, starting from investigation, arrest, detention, extradition, transfer, prosecution, prosecutorial review, pretrial stage and provisional measures of protection, as well as formal court proceedings and judgments and their execution.

308.  Some members doubted that it was necessarily conclusive that immunity had no immediate application during the investigative stages, as much depended on the circumstances of each case and the law and practice of the particular States concerned. Such a matter required further study.

(ii)  *Acts affected*

309.  Concerning the acts of the forum States to which immunity applied, members generally agreed with the three categories canvassed by the Special Rapporteur in her sixth report—namely, detention, appearance as a witness and precautionary measures—as requiring examination. Some members noted that it was necessary to clarify what was meant by "acts affected by immunity". According to some, it was useful to distinguish between the criminal investigation of a situation and the criminal investigation of a particular case for purposes of immunity. It would be on the latter context that particular attention should be focused. In that connection, stress was placed on the binding acts that imposed coercive measures on the State official. Accordingly, it was observed that immunity must be considered before binding measures were taken against the State official that constituted an obstacle to the exercise of his or her functions.

310.  In the estimation of some members, measures would include the arrest warrant, the criminal indictment, a summons to appear before a court as an investigated person or to attend confirmation of charges hearings, and a request for extradition or surrender. It was also noted that not all acts performed during criminal proceedings involved subjecting an official to constraining coercive measures. It was noted, for instance, that a criminal complaint *per se* did not have a direct influence on the exercise of functions by an official.

311.  Members stressed the importance of the coercive nature of the constraint measures and the consequent impediment to the exercise of functions by an official. It was recalled that in the *Arrest Warrant of 11 April 2000* case, the Court referred to protecting the individual concerned against any act of authority of another State that would hinder him or her in the performance of his or her duties,[1214] while in the case concerning *Certain Questions of Mutual Assistance in Criminal Matters*,

---

[1210] *Difference Relating to Immunity from Legal Process of a Special Rapporteur of the Commission on Human Rights*, Advisory Opinion, *I.C.J. Reports 1999*, p. 62, at p. 88, para. 63.

[1211] *Yearbook of the Institute of International Law*, vol. 69 (Session of Vancouver, 2001), p. 743, at p. 747, art. 6; available from the Institute's website at www.idi-iil.org, *Resolutions*.

[1212] *Avena and Other Mexican Nationals (Mexico v. United States of America)*, Judgment, *I.C.J. Reports 2004*, p. 12.

[1213] *Ibid.*, p. 48, para. 85.

[1214] *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v. Belgium)*, Judgment, *I.C.J. Reports 2002*, p. 3, at p. 22, para. 54.

it stressed that "the determining factor in assessing whether or not there has been an attack on the immunity of the Head of State lies in the subjection … to a constraining act of authority".[1215]

312.   Suggestions were made by some members to address further the impact of inviolability on immunity, particularly on immunity *ratione materiae*, instead of overly relying on a deductive methodology or drawing certain inferences from the practice relevant to immunity *ratione personae*. It was also suggested that the role of the International Criminal Police Organization and its practice with respect, in particular, to its system of "red notices" required further in-depth analysis.

313.   It was viewed as necessary by some members to study further questions related to appearing as a witness, particularly with respect to immunity *ratione materiae*, including in the production of evidentiary material and documents.

314.   Some members also considered that the question of precautionary measures required further consideration.

(iii)   *Determination of immunity*

315.   Some members agreed with the Special Rapporteur that it was for the courts of the forum State to determine whether immunity existed and, if so, whether there were exceptions to such immunity. Nevertheless, it was suggested that the Commission consider the procedural requirement that any exercise of jurisdiction over an official should be subject to a decision of a higher court and not the lowest magistrate court.

316.   Some members echoed the importance of not discounting the role to be played by the executive. In that regard, attention was drawn to the role played nationally by the ministries responsible for foreign affairs.

317.   Some other members stressed the importance of addressing, within the scope of the present topic and with a view to elaborating possible limitations, questions concerning prosecutorial discretion. That was necessary in order to avoid abusive or politically motivated prosecutions. It was noted that the establishment of guidelines for prosecutors would have the advantage of ameliorating the arbitrary or aggressive exercise of prosecutorial discretion against the troika and other State officials. Conversely, such guidelines would provide a mechanism to safeguard against the negative exercise of prosecutorial discretion in cases in which a State official who had committed a serious crime under international law was not prosecuted.

318.   Some members stressed the importance of ensuring certainty in the rules concerning the applicable procedure for law enforcement. In case of doubt or ambiguity, it was suggested that there should be a State organ designated to provide appropriate instructions to the law enforcement agencies, recognizing in that regard the role played by the ministries responsible for foreign affairs.

319.   It was also suggested that the question of the settlement of disputes related to questions of immunity by international courts and tribunals could be examined. It would also be necessary to examine the possible role of the Security Council in matters concerning compliance with arrest warrants or compliance with orders for the delivery of documentation.

320.   Some members advocated exploring further the possible use of the waiver of immunity as an option for the State of the official.

(d)   *Comments on procedural safeguards and guarantees*

321.   The consideration of procedural safeguards and guarantees was viewed by members to be crucial to the successful completion of work on the topic. It was noted that a distinction had to be drawn between safeguards ensuring individual due process and other guarantees under international human rights law, and safeguards that aimed at protecting the stability of international relations and preventing political and abusive prosecutions. Both aspects required treatment and it was suggested that, for safeguards to be meaningful, they should address the consequences of the denial of immunity of the State official in the forum State not only generally, but also in the specific context of draft article 7.

322.   For procedural safeguards affecting the foreign official concerned, attention was drawn, for instance, to the International Covenant on Civil and Political Rights, especially its provisions safeguarding minimum international standards in criminal proceedings, such as arrest and detention (art. 9), fair treatment of suspects and the accused (art. 10) and the right to a fair trial (art. 14).

323.   Concerning safeguards with a potential impact on the stability of international relations, and the related draft article 7, the point was made that it was crucial for the Commission to make an effort to reach some common ground. In that connection, the suggestion was made that specific safeguards be developed to address questions arising from draft article 7. Such safeguards would entail that an exercise of criminal jurisdiction based upon draft article 7 was permissible only if: (a) the foreign official was present in the forum State; (b) the evidence that the official committed the alleged offence, given its exceptional gravity, was "fully conclusive";[1216] (c) the decision by the forum State to pursue criminal proceedings against the foreign official was taken at the highest level of government or prosecutorial authority; and (d) the forum State was required to cooperate with the State of the official.

324.   It was further elaborated that the duty to cooperate in that regard meant that the forum State must notify the State of the official if it intended to pursue criminal proceedings and inquire whether the State of the official wished to waive the immunity of its official; and if the State of the official was able and willing to submit the

---

[1215] *Certain Questions of Mutual Assistance in Criminal Matters (Djibouti v. France)*, Judgment, *I.C.J. Reports 2008*, p. 177, at p. 237, para. 170.

[1216] *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v. Serbia and Montenegro)*, Judgment, *I.C.J. Reports 2007*, p. 43, at p. 129, para. 209.