# EXHIBIT 51

| | |
|---|---|
| Reference works: | yes |
| BGHZ (*Federal Court of Justice, Civil Matters*): | no |
| <u>BGHR (*decided cases from the Federal Court of Justice*):</u> | <u>yes</u> |

Section 1025 (1) and (2), and section 1032 (2) of the German Code of Civil Procedure (*Zivilprozessordnung,* ZPO); Article 26 of the Energy Charter Treaty (ECT); Article 25, Article 26, sentence 1, Article 41 (1), Articles 53 and 54 of the Convention of 18 March 1965 on the Settlement of Investment Disputes between States and Nationals of Other States (ICSID Convention)

a) Applying section 1025 (2) German Code of Civil Procedure by analogy in arbitration proceedings without a place of arbitration under the ICSID Convention, it follows that German courts have international jurisdiction for an application pursuant to section 1032 (2) German Code of Civil Procedure.

b) The *Kompetenz-Kompetenz* of the arbitral tribunal pursuant to Article 41 (1) ICSID Convention generally precludes the general admissibility of proceedings pursuant to section 1032 (2) German Code of Civil Procedure, at least as soon as any such ICSID arbitration proceedings have been initiated.

c) Intra-EU investor-State arbitration proceedings under the ICSID Convention on the basis of Article 26 ECT are a special scenario, where, exceptionally, the blocking effect of Article 41 (1) ICSID Convention does not prevent an application pursuant to section 1032 (2) German Code of Civil Procedure from being admissible, because of the primacy of EU law - also vis-à-vis international law - taking into account the principle of effectiveness.

d) According to the case law of the Court of Justice of the European Union for intra-EU investor state arbitration proceedings, the arbitration clause in Article 26 (2) (c) ECT violates EU law, which means that it is not possible to conclude an effective arbitration agreement pursuant to Article 26 ECT in intra-EU investor state arbitration proceedings. Due to the incompatibility in particular with Articles 267, 344 TFEU, there is no effective consent and thus no offer by the host state to conclude an arbitration agreement.

Federal Court of Justice, Order of 27 July 2023 - I ZB 43/22 − Berlin Higher Regional Court (*Kammergericht*)



# FEDERAL COURT OF JUSTICE

## ORDER

I ZB 43/22

Handed down on:
27 July 2023
Hemminger
Clerk of the Court as
clerk of the court
registry

in the proceedings
for a declaration of the inadmissibility of the arbitration proceedings

Federal Republic of Germany, (…) Berlin,

applicant and appellant,

- represented by: (…)  -

v

1.    Mainstream (…),

2.    International Mainstream (…),

3.    Mainstream Renewable Power (…),

ECLI:DE:BGH:2023:270723BIZB43.22.0

4. Horizont (…),

5. Horizont (…),

6. Horizont (…),

defendants and
defendants to the appeal,

- represented by: *(…)* -

Following the hearing on 17 May 2023, the First Civil Senate of the Federal Court of Justice (*Bundesgerichtshof*), with the Presiding Judge Prof Dr Koch, Judges Feddersen, Pohl, Dr Schmaltz and Odörfer,

held as follows:

On the applicant's appeal, the order of the Berlin Higher Regional Court - 12th Civil Senate - of 28 April 2022 is set aside.

It is declared that the arbitration proceedings instituted by the defendants against the applicant before the International Centre for Settlement of Investment Disputes under file number ICSID ARB/21/26 are inadmissible.

The defendants are ordered to pay the costs of the proceedings.

The value of the subject matter of the appeal is set at € 30 million.

Grounds:

1        A. The applicant is the Federal Republic of Germany (hereinafter also "Germany"). The 1st defendant and its two subsidiaries, the 2nd and 3rd defendants, have their registered offices in Ireland. The 2nd defendant holds 100% of the shares in each of the 4th, 5th and 6th defendants, all of which have their registered offices in Germany.

2        The defendants are investors in the field of wind and solar energy. They contended that a change in the legislation in Germany had harmed their planned investments, and on 30 April 2021 they filed a request for arbitration against the applicant with the International Centre for Settlement of Investment Disputes (hereinafter "ICSID" or "the Centre") on the basis of the Energy Charter Treaty. Those proceedings were registered on 13 May 2021 under file no. ICSID ARB/21/26. The defendants quantify their claims at (…).

3       The arbitral tribunal was constituted on 14 September 2021. On 18 January 2022, in an interim decision, it rejected the application of the applicant here to dismiss the arbitration claim as manifestly unfounded.

4       The Energy Charter Treaty is a multilateral agreement on cooperation in the energy sector that has been ratified by 49 States as well as the European Union (EU) and the European Atomic Energy Community (Euratom) and entered into force on 16 April 1998. Since that day the Energy Charter Treaty has also been in force in Germany (Federal Law Gazette II 1998 p. 3009; hereinafter referred to as "ECT"), having been approved by way of an Act dated 20 December 1996 (Federal Law Gazette II 1997 p. 4). In Ireland, the Treaty entered into force on 14 July 1999.

5       In Article 10 ECT, the contracting parties affirm that they will promote and protect investments by creating stable, equitable, favourable and transparent conditions for investors of other contracting States. Article 13 ECT grants protection against expropriation without compensation, among other things. Both provisions can be found in Part III of the Energy Charter Treaty. Article 26 ECT enables an investor from a contracting State to bring a claim against another contracting state for possible violations of the Energy Charter Treaty

by way of arbitration proceedings. This Article states the following (excerpts):

(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

(2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

    a) to the courts or administrative tribunals of the Contracting Party party to the dispute;

    b) in accordance with any applicable, previously agreed dispute settlement procedure; or

    c) in accordance with the following paragraphs of this Article.

(3) a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

(4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:

    a) (i) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention; or

(5) (a) The consent given in paragraph (3) together with the written consent of the Investor given pursuant to paragraph (4) shall be considered to satisfy the requirement for:

    i) written consent of the parties to a dispute for purposes of Chapter II of the ICSID Convention and for purposes of the Additional Facility Rules; ...

(6) A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law...

6          The Convention of 18 March 1965 on the Settlement of Investment Disputes between States and Nationals of Other States (hereinafter "ICSID Convention") established an International Centre for the Settlement of Investment Disputes, the purpose of which is to provide conciliation and arbitration facilities for the settlement of investment disputes between contracting states and nationals of other contracting states in accordance with the provisions of the Convention (Article 1 ICSID Convention). The German Parliament (*Bundestag*) approved the ISCID Convention by passing the Act of 25 February 1969 (Federal Law Gazette II p. 369; hereinafter "InvStreitBeilG"); the Convention entered into force on 18 May 1969 (Federal Law Gazette II p. 1191). Ireland ratified the ICSID Convention in April 1981. It entered into force on 7 May 1981.

7          In its application, filed with the Berlin Higher Regional Court on 17 August 2021, the applicant sought a declaration of inadmissibility of the arbitration proceedings initiated with file number ICSID ARB/21/26. The Berlin Higher Regional Court dismissed the application (IPRax 2023, 77). The applicant is appealing this decision and the defendants have requested that that appeal be dismissed.

8          B. The Berlin Higher Regional Court gave the following reasons for dismissing the application as inadmissible:

9          It held that recourse to the ordinary courts was available; moreover, it held that the Berlin Higher Regional Court also had local jurisdiction. However, although the application for a declaration of the inadmissibility of the arbitration proceedings under section 1032 (2) German Code of Civil Procedure was submitted in time, it was not admissible. It stated that the ICSID Convention had a closed legal system with its own procedural rules. This, it argued, meant that no other legal remedies were admissible. It stated that an arbitral tribunal seized under the ICSID Convention conclusively decides on its own jurisdiction and whether an arbitration agreement is valid.

10          Nor was this changed by the case-law of the Court of Justice of the European Union on intra-EU investment disputes. The CJEU's case-law, it found, did not relate to the procedural rules of the German Code of Civil Procedure and their applicability to ICSID arbitration proceedings. It held that it was for the

arbitral tribunal to decide whether the applicant's consent pursuant to Article 26 ECT was also valid in an intra-EU investment dispute and, in doing so, to also consider the case-law of the Court of Justice of the European Union.

11  It held, that it was not a violation of EU law not to apply section 1032 (2) German Code of Civil Procedure to ICSID arbitration proceedings. It is a domestic procedural provision. That constellation, it found, was neither comparable to a subsequent application for setting aside nor to arbitration proceedings under the UNCITRAL Arbitration Rules, which did not contain any exclusive procedural rules comparable to the ICSID Convention.

12  C. The appeal on points of law is admissible (section 574 (1) sentence 1 no. 1 German Code of Civil Procedure in conjunction with section 1065 (1) sentence 1, section 1062 (1) no. 2 case 1, section 1032 (2) German Code of Civil Procedure) and also admissible in other respects (section 574 (2) German Code of Civil Procedure). It is also well-founded. Contrary to the view of the Berlin Higher Regional Court, the application for a declaration of inadmissibility of the arbitration proceedings is admissible (see C I). It is also well-founded (see C II). A referral to the Court of Justice of the European Union is not necessary (see C III).

13  I. The application pursuant to section 1032 (2) German Code of Civil Procedure is admissible. The question of whether recourse to the ordinary courts is open is not subject to review by the appellate court (see C I 1). The German courts have international jurisdiction to decide on the application (see C 12). The application was filed in time (see C I 3) and is also permissible (see C 14). There is also a need for the protection of a legal interest (*Rechtsschutzbedürfnis*) for the application (see C 15).

14  1. Contrary to the view argued in the response to the appeal, pursuant to section 17a (5) German Court Constitution Act (*Gerichtsverfahrensgesetz* - GVG), the question of whether, for such a request, recourse to the ordinary courts is available, pursuant to section 13 German Court Constitution Act and section 40 (2) sentence 1 of the Code of Administrative Court Procedure (*Verwaltungsgerichtsordnung* - VwGO), is not subject to review by the appellate court.

15        a) The Berlin Higher Regional Court assumed that recourse to the ordinary courts was open pursuant to section 13 German Court Constitution Act and section 40 (2) sentence 1 VwGO. It held that the claims asserted were essentially claims for compensation arising from the violation of public-law obligations, for which legal recourse to the ordinary courts was available under Article 14 (3) sentence 4 of the German Constitution (*Grundgesetz* - GG). A preliminary ruling pursuant to section 17a (3) sentence 2 German Court Constitution Act was not necessary because the defendants had only raised the admissibility of the legal recourse taken as an alternative point. Moreover, it stated, that an appeal against a preliminary ruling pursuant to section 17a (4) sentence 4 German Court Constitution Act would not be admissible anyway, because no reasons for admitting the appeal were apparent.

16        b) Pursuant to section 17a (5) German Court Constitution Act, the court that decides on an appeal against a decision on the merits of the matter does not review whether the legal recourse taken is admissible. A decision on the merits includes decisions to dismiss a claim or a request as inadmissible, due to some other conditions for the proceedings not being met, after legal recourse to the civil courts has been affirmed (see Federal Court of Justice, Order of 23 September 1992 - I ZB 3/92, BGHZ 119, 246 [juris, para. 14] - *Rechtswegprüfung*). The provision also applies to orders that are capable of formal res judicata (see MünchKomm. ZPO/Pabst, 6th ed., section 17a German Court Constitution Act para. 25). This is the situation in the current case. In its order, the Berlin Higher Regional Court expressly affirmed that recourse to the civil courts was admissible, but considered the application under section 1032 (2) German Code of Civil Procedure to be non-permissible and therefore inadmissible.

17        c) The admissibility of the legal recourse taken is also not subject to review by the Senate, even exceptionally. If, contrary to section 17a (3) sentence 2 German Court Constitution Act, the court does not decide by way of a preliminary order on the admissibility of the legal recourse taken following an objection, but only decides on that objection when deciding on the merits, then section 17a (5) German Court Constitution Act is not applicable (see BGHZ 119, 246 [juris, para. 15] - *Rechtswegprüfung*; Federal Court of Justice, Order of 3 November 2021 - XII ZB 289/21, NJW-RR 2022, 217 [juris, para. 9], with further references).

However, due to the fact that there was no objection regarding the legal recourse chosen (*Rechtswegrüge*), no such preliminary decision was required from the Berlin Higher Regional Court.

18      aa) If the parties did not make an objection challenging the admissibility of the legal recourse taken and, therefore, the court of first instance could refrain from making a preliminary ruling pursuant to section 17a (3) German Court Constitution Act, then the appellate court is bound by this affirmation of jurisdiction, even if it is only tacit, and even in doubtful cases (see Federal Court of Justice, Order of 18 September 2008 - V ZB 40/08, NJW 2008, 3572 [juris para. 13 et seq, 16 et seq.]; Jacobs in Stein/Jonas, ZPO, 23rd ed., section 17a German Court Constitution Act para. 24).

19      bb) The defendants only raised an objection to the admissibility of the legal recourse taken as an alternative point before the Berlin Higher Regional Court. An objection pursuant to section 17a (3) German Court Constitution Act is a procedural act which can generally be subjected to conditions within the proceedings − as in this case (see Anders in Anders/Gehle, ZPO, 81st ed., preliminary remarks on section 128 para. 62; Zöller/Greger, ZPO, 34th ed., preliminary remarks on section 128 para. 20, with further references). That condition did not arise in the current dispute, because the defendants had already succeeded with their prioritised objection to the admissibility of the application under section 1032 (2) German Code of Civil Procedure.

20      2. Pursuant to section 1025 (2) German Code of Civil Procedure, the German courts have international jurisdiction for the application pursuant to section 1032 (2) German Code of Civil Procedure.

21      a) The international jurisdiction of the German courts must be reviewed ex officio in appeal proceedings. Such a review is not precluded by section 576 (2) German Code of Civil Procedure; the same rules apply to proceedings regarding a complaint on a point of law    (*Rechtsbeschwerdeverfahren*) as apply to proceedings for an appeal on a point of law (*Revisionsverfahren*), in respect of which section 545 (2) German Code of Civil Procedure does not preclude a review of the international jurisdiction (see Federal Court of Justice, Order of 13 August 2009 - I ZB 43/08, WRP 2009, 1559 [juris para. 10]; Order of 22

September 2016 - V ZB 125/15, RIW 2017, 138 [juris para. 8]; on section 545 (2) German Code of Civil Procedure, see Federal Court of Justice, Judgment of 14 July 2022 - I ZR 121/21, GRUR 2022, 1675 [juris para. 29] = WRP 2022, 1519 - *Google-Drittauskunft*, with further references).

22        b) In the current case, the international jurisdiction for the application pursuant to section 1032 (2) German Code of Civil Procedure arises from the application of section 1025 (2) German Code of Civil Procedure by analogy.

23        aa) Pursuant to section 1032 (2) German Code of Civil Procedure, an application for a declaration regarding the admissibility or inadmissibility of arbitration proceedings may be filed with the court until such time as the arbitral tribunal has been constituted. Pursuant to section 1025 (2) German Code of Civil Procedure, the provisions of sections 1032, 1033 and 1050 German Code of Civil Procedure are also applicable in cases where the place of arbitration is abroad or has not yet been determined.

24        bb) Section 1025 (2) German Code of Civil Procedure thus governs the international jurisdiction of the German courts for − inter alia − the proceedings pursuant to section 1032 (2) German Code of Civil Procedure (see Geimer, IZPR, 8th ed, paras. 1258 et seq.; MünchKomm.ZPO/ Münch loc. cit. section 1025 para. 18; Schlosser in Stein/Jonas loc. cit. section 1062 para. 4, section 1025 para. 6; Voit in Musielak/Voit, ZPO, 20th ed., section 1062 para. 1, section 1025 para. 5; different opinion in Kröll, IHR 2005, 142, 144). Insofar as the defendants argue that including section 1032 (2) German Code of Civil Procedure in section 1025 (2) German Code of Civil Procedure is a legislative oversight, this argument fails. It is true that the explanatory memorandum to the Act only makes reference to an application for a stay of arbitration proceedings in legal proceedings before the ordinary courts pursuant to section 1032 (1) German Code of Civil Procedure (see Government Draft of an Act on the Novation of Arbitration Law of 12 July 1996, Bundestag printed paper 13/5274, p. 31). However, if there was an intention to exclude section 1032 (2) and (3) German Code of Civil Procedure when applying section 1025 (2) German Code of Civil Procedure, then this was not expressed in the act. However, when construing a statutory provision, the objectified intention of the legislature expressed therein is decisive, as it results from the wording of the statutory provision and the context in which it is placed.

That interpretation, which must be based primarily on the objective spirit and purpose of the law, cannot be bound by motives that were set out in the legislative process, but which have not been expressed in the wording of the law (see Federal Court of Justice, Judgment of 6 June 2019 - I ZR 67/18, GRUR 2019, 970 [juris, para. 66] = WRP 2019, 1304 - *Erfolgshonorar für Versicherungsberater*, with further references).

25        cc) The wording of section 1025 (2) German Code of Civil Procedure does not in itself give rise to the international jurisdiction of German courts. The arbitration proceedings initiated by the defendants neither take place "abroad" within the meaning of this provision (case 1) nor is the place of the arbitration proceedings "not yet determined" (case 2).

26        (1) The arbitration proceedings were initiated by the defendants before the Centre. Pursuant to Article 2 sentence 1 ICSID Convention, the seat of the Centre is where the International Bank for Reconstruction and Development has its seat, i.e. in Washington D.C., United States of America (USA). Pursuant to Articles 62 et seq. in Chapter VII of the ICSID Convention, the arbitration proceedings take place at the seat of the Centre, which must be distinguished from the arbitral tribunal (see Schöbener/Markert, ZVgIRWiss 2006, 65, 73), unless something different has been agreed between the parties.

27        (2) Contrary to what is argued in the appeal, it does not follow from this that the place of arbitration relevant for the purposes of section 1025 (2) German Code of Civil Procedure is in the United States and thus abroad.

28        Contrary to what the title of Chapter VII of the ICSID Convention – "Place of Proceedings" − might suggest, Articles 62 et seq. ICSID Convention only stipulate that the place of the hearing is that place where the arbitral tribunal actually holds its hearings. This venue can not to be equated with the place of arbitration as the legal domicile of the arbitration proceedings, which serves to anchor the arbitration proceedings to a particular jurisdiction (see Bundestag printed paper 13/5274, p. 47; BeckOK.ZPO/ Wilske/Markert, 48th ed. [as of 1 March 2023], section 1043 para. 1; Münch-Komm.ZPO/Münch loc. cit. section 1043 paras. 3 and 5; Zöller/Geimer loc. cit. section 1043 paras. 1 and 4).

29          This corresponds with the overwhelming view taken in domestic and international literature on the ICSID Convention. According to this, investor-State arbitration proceedings under this Convention take place in a delocalised manner (see Kern, *Schiedsgericht und Generalklausel*, 2017, pp. 62, 78; Bertolini, *Die Durchsetzung von ISDS-Entscheidungen in Deutschland*, 2019, p. 92; Köster, *Investitionsschutz in Europa*, 2022, p. 16 et seq.; Schütze/Thümmel, *Schiedsgericht und Schiedsverfahren*, 7th ed., section 25 para. 6; Happ in Schütze, *Institutionelle Schiedsgerichtsbarkeit*, 3rd ed., XV Chapter, Section II para. 13, Section IV Rule 13 ICSID Arbitration Rules para. 5; Sasson in Fouret/Gerbay/Alvarez, The ICSID Convention, Regulations and Rules, A Practical Commentary, Art. 62 paras. 7.03 et seq.; Schütze in Wieczorek/Schütze, ZPO, 5th ed., section 1025 para. 56b; Gaillard, ICSID Review - Foreign Investment Law Journal 1988, 136, 138 et seq.; Berger, SchiedsVZ 2017, 282, 289; von Marschall, RIW 2021, 785, 787; Nikolov, EuR 2022, 496, 501; Seelmann-Eggebert, SchiedsVZ 2023, 32, 35 et seq.; different opinion in Semler, SchiedsVZ 2003, 97, 101).

30          The arbitral awards rendered by ICSID arbitral tribunals are therefore neither domestic nor foreign arbitral awards within the meaning of sections 1060 et seq. German Code of Civil Procedure, but rather arbitral awards sui generis (see Semler, SchiedsVZ 2003, 97, 99; von Marschall, RIW 2021, 785, 787). Contrary to the principle applicable in commercial arbitration that there are no private arbitration proceedings detached from any national legal system (see Geimer loc. cit. para. 3718, with further references; MünchKomm.ZPO/Münch loc. cit. section 1025 para. 11; Schütze in Wieczorek/Schütze loc. cit. section 1043 paras. 6 et seq.), an investment dispute before the Centre exceptionally results in a non-national arbitration (Köster loc. cit. p. 16 et seq.).

31          (3) There is also no case where the "place of arbitration has not yet been determined" (section 1025 (2) 2nd case German Code of Civil Procedure). The wording "not yet determined" suggests that this refers only to a temporary situation. Pursuant to section 1043 (1), sentence 1 German Code of Civil Procedure, the parties are free to agree on the place of arbitration. In the absence of such an agreement, the place of arbitration is determined by the arbitral tribunal (section 1043 (1) sentence 2 German Code of Civil Procedure). Until such a

determination is made, there is a state of limbo, without the possibility of a territorial connection. In cases of such a state of limbo, the provision in section 1025 (2) case 2 German Code of Civil Procedure applies (see MünchKomm.ZPO/Münch loc. cit. section 1025 para. 24).

32        Such a − temporary − state of limbo is not given in the current dispute. In an ICSID arbitration, no place of arbitration is determined, but only a venue. This means that any later determination of the place of arbitration by the arbitral tribunal is therefore precluded from the outset.

33        dd) However, at least where it refers to section 1032 German Code of Civil Procedure, the provisions set out in section 1025 (2) German Code of Civil Procedure must be applied accordingly, if there is no domestic place of arbitration (for a similar opinion see BeckOK.ZPO/Wolf/Eslami, 48th ed. [as of 1 September 2022], section 1032 para. 39; different opinion in BeckOK.ZPO/Wilske/Markert loc. cit. section 1062 para. 2.4, with further references).

34        (1) In order to apply a provision by analogy, there needs to be an unintended regulatory gap in the law and comparable circumstances of interest (longstanding jurisprudence; see for example the German Federal Court of Justice's Judgment of 7 November 2019 - I ZR 42/19, GRUR 2020, 429 [juris para. 32] = WRP 2020, 452 - *Sportwetten in Gaststätten*, with further references). These conditions are satisfied.

35        (2) Insofar as the delocalised and thus non-national ICSID investment arbitration proceedings are not covered by the wording of the law, this constitutes an unintended regulatory gap in the law. There is no indication that the legislator intended to exclude this special constellation from the 10th Book of the German Code of Civil Procedure.

36        (a) Pursuant to section 1025 (1) German Code of Civil Procedure, the provisions of the 10th Book of the German Code of Civil Procedure are applicable if the place of arbitration within the meaning of section 1043 (1) German Code of Civil Procedure is in Germany. Moreover, as already shown, section 1025 (2) German Code of Civil Procedure also opens up a scope of application beyond this for some provisions of the 10th Book of the German Code of Civil Procedure, such as the existence of an arbitration agreement pursuant to section 1032 (1)

German Code of Civil Procedure as well as the declaratory proceedings under section 1032 (2) German Code of Civil Procedure, which are relevant here, if the place of arbitration is abroad or has not yet been determined (see Schlosser in Stein/Jonas loc. cit. section 1062 para. 4, section 1025 para. 6; Voit in Musielak/Voit loc. cit. section 1025 paras. 5 to 7).

37          (b) As far as commercial arbitration within the meaning of the UNCITRAL Model Law, which serves as basis for the reform of arbitration proceedings (see Bundestag printed paper 13/5274, p. 24; for the scope of application of the Model Law, see Melis in Kronke/Melis/Kuhn, *Handbuch Internationales Wirtschaftsrecht*, 2. ed., part P para. 230), was concerned, the three types of cases resulting from section 1025 (1) and (2) German Code of Civil Procedure – "place of arbitration in Germany", "place of arbitration abroad" and "place of arbitration not yet determined" − covered all conceivable constellations.

38          (c) The German legislator deliberately chose to extend the 10th Book of the German Code of Civil Procedure beyond the scope of the UNCITRAL Model Law to all arbitration proceedings (see Bundestag printed paper 13/5274, p. 25 and 31). This covers all domestic and international private law arbitration proceedings − and not just the commercial law ones (see Kulick/Scheu in Fouret, Enforcement of Investment Treaty Arbitration Awards, 2. ed., p. 385, 389; Lachmann, *Handbuch für die Schiedsgerichtspraxis*, 3rd ed., para. 190; MünchKomm.ZPO/Münch loc. cit. preliminary remarks on section 1025 paras. 23 et seq., section 1029 para. 93). Although closely related to international law, international investment arbitration between private investors and States also belongs here as a special form (on arbitration proceedings based on a bilateral investment protection treaty, see Federal Court of Justice, Order of 3 March 2016 - I ZB 2/15, SchiedsVZ 2016, 328 [juris para. 15]; Order of 31 October 2018 - I ZB 2/15, SchiedsVZ 2019, 46 [juris para. 16]; Order of 17 November 2021 - I ZB 16/21, IWRZ 2022, 129 [juris paras. 8, 34]; Raeschke-Kessler in Prütting/Gehrlein, ZPO, 14th ed., section 1061 para. 11; Köster loc. cit. p. 30; Schwab/Walter, *Schiedsgerichtsbarkeit*, 7th ed., Chapter 41 para. 22, with further references; see also BeckOK.ZPO/Wolf/Eslami loc. cit. section 1025 para. 9a, with further references; MünchKomm.ZPO/Münch loc. cit. preliminary remarks on section 1025 paras. 18 to 22), which also includes ICSID investment arbitration

proceedings (see Herdegen, *Internationales Wirtschaftsrecht*, 13th ed., section 23 para. 97; Kern loc. cit. p. 66 to 88; Schöbener/Markert, ZVgIRWiss 2006, 65, 68 to 70, with further references; undecided Schwab/Walter loc. cit. chapter 41 para. 5, fn. 42; different opinion in Raeschke-Kessler in *Festschrift Schlick*, 2015, p. 57 et seq., 75; overall in this respect see Pirrung, *Die Schiedsgerichtsbarkeit nach dem Weltbankübereinkommen für Investitionsstreitigkeiten*, 1972, p. 183 to 192, with further references).

39        (d) Insofar as the response to the appeal argues that the legislator intended to make a conclusive provision for ICSID proceedings by amending Article 2 (2) of the Act ratifying the ICSD (InvStreitBeilG) in the course of reforming the law on arbitration by way of the Act of 22 December 1997 (Federal Law Gazette I p. 3224), that argument fails.

40        If, prior to the reform of arbitration law, the legal provisions regarding the process for filing a request for a declaration of the admissibility of enforcement of an ICSID arbitral award provided that the legal provisions governing the enforceability of domestic arbitral awards (which, pursuant to section 1044 (1) sentence 1 German Code of Civil Procedure, old version, also applied by analogy to foreign arbitral awards) were applicable, the provisions regarding the process for the declaration of enforceability of foreign arbitral awards must now be applied accordingly (section 1025 (4), sections 1061 to 1065 German Code of Civil Procedure).

41        This amendment is merely one of many necessary consequential amendments of existing provisions to correspond to the new provisions of the 10th Book of the German Code of Civil Procedure (see Bundestag printed paper 13/5274, p. 68) It does not change the fact that Article 2 InvStreitBeilG still only regulates the post-arbitral phase after an award has been made and that the corresponding application of provisions of the 10th Book of the German Code of Civil Procedure only concerns the enforcement of ICSID awards. It is not possible to infer from this any statement regarding the (non-)applicability of section 1025 (2) German Code of Civil Procedure (and section 1032 (2) German Code of Civil Procedure) in ICSID arbitration proceedings, especially considering the deliberate extension of the material scope of application of the 10th Book of the

German Code of Civil Procedure beyond the UNCITRAL Model Law to all arbitration proceedings (see Bundestag printed paper13/5274, p. 25 and 31).

42    (e) At least for the declaratory proceedings pursuant to section 1032 (2) German Code of Civil Procedure, which are at issue here, the existing regulatory gap in section 1025 (2) German Code of Civil Procedure also becomes apparent when looking at the provisions governing local jurisdiction in section 1062 (1) and (2) German Code of Civil Procedure, which essentially open up a global scope of application, only by distinguishing a domestic place of arbitration.

43    Section 1062 (1) no. 2 case 1 German Code of Civil Procedure provides for the jurisdiction of the Higher Regional Court designated in the arbitration agreement or, where no such designation has been made, that Higher Regional Court in whose district the place of arbitration is located, for decisions on applications to declare the admissibility or inadmissibility of arbitration proceedings (section 1032 German Code of Civil Procedure). If there is no German place of arbitration in this case, then the Higher Regional Court in whose district the defendant has its seat or habitual residence or in whose district the assets of the defendants or any other object claimed or affected by the arbitration proceedings are located, shall have jurisdiction for the decisions, alternatively the Berlin Higher Regional Court (section 1062 (2) German Code of Civil Procedure).

44    Taking into account the legal concept of the dual function of local jurisdiction, this provision suggests that − like section 1062 (2) German Code of Civil Procedure for local jurisdiction − section 1025 (2) German Code of Civil Procedure for international jurisdiction is always applicable (accordingly) in cases where there is no German place of arbitration, despite the positive wording ("abroad", "not yet determined").

45    If there are no specific rules on jurisdiction, then international jurisdiction is indirectly derived from the provisions on local jurisdiction (so-called "dual function"; on section 32 German Code of Civil Procedure see Federal Court of Justice, Judgment of 28 June 2007 - I ZR 49/04, BGHZ 173, 57 [juris, para. 23] - Cambridge Institute, with further references; generally Roth in Stein/Jonas loc. cit. preliminary remarks on section 12 paras. 32, 32b; Zöller/Schultzky loc. cit. section 1 para. 8). Where a German court has local jurisdiction according to these

provisions, then, according to German law, it also has international jurisdiction (see MünchKomm.ZPO/Patzina loc. cit. section 12 para. 90).

46          It is true that section 1025 (2) German Code of Civil Procedure contains a special provision regarding international jurisdiction. However, that provision must be interpreted in accordance with section 1062 (2) German Code of Civil Procedure. If section 1062 (2) German Code of Civil Procedure O generally provides that as an alternative the Berlin Higher Regional Court has jurisdiction for the declaratory proceedings pursuant to section 1032 (2) German Code of Civil Procedure in cases where − as in this case − there is "no German place of arbitration", then a lack of international jurisdiction in this case reveals an unintended regulatory gap.

47          (3) The test of comparable circumstances of interest requires the assumption that the legislator, weighing the interests according to the principles that guided it when enacting the laws referred to, would have reached the same conclusion (Federal Court of Justice, GRUR 2020, 429 [juris, para. 34] - *Sportwetten in Gaststätten*). This is the situation in the current case.

48          The legislator's intention, as expressed in the wording of the law, is that it should also be possible to seize the German courts in the cases listed in section 1025 (2) German Code of Civil Procedure even where the arbitration proceedings take place abroad (see Bundestag printed paper 13/5274, p. 31). The intention expressed therein, that the German courts should have a global jurisdiction in the cases mentioned, applies equally in delocalised arbitration proceedings under the ICSID Convention and in arbitration proceedings where the place of arbitration is abroad. This is particularly evident in section 1032 (1) German Code of Civil Procedure stipulating an objection of an existing arbitration agreement which may be raised in legal proceedings before the ordinary courts, which is explicitly referred to in the explanatory memorandum to the Act. Such an objection, with the possible consequence of the claim being found to be inadmissible, is also only made possible in the case of ICSID arbitration proceedings if section 1025 (2) German Code of Civil Procedure applies by analogy. If it was not possible for the objection of an (ICSID) arbitration agreement to lead to the inadmissibility of the claim before the ordinary courts due to section 1032 (1) German Code of Civil Procedure (via section 1025 (2) German Code of Civil Procedure) not being

applicable, then this would contradict the spirit and purpose of arbitration agreements, including those within the scope of application of the ICSID Convention.

49        3. The application pursuant to section 1032 (2) German Code of Civil Procedure was lodged with the Berlin Higher Regional Court in good time.

50        a) The relevant date for deciding whether an application pursuant to section 1032 (2) German Code of Civil Procedure has been submitted in time, which can be submitted up until the time that the arbitral tribunal is constituted, is the date on which the application is received by the court, not the date of service of the application on the other party (see Federal Court of Justice, Order of 30 June 2011 - III ZB 59/10, GRUR 2012, 95 [juris para. 10], with further references; MünchKomm.ZPO/Münch loc. cit. section 1032 para. 30; Voit in Musielak/Voit loc. cit. section 1032 para. 10). A non-permanent arbitral tribunal within the meaning of section 1032 (2) German Code of Civil Procedure is constituted when all arbitrators have been appointed and the arbitrators have not only been nominated but have also accepted their appointment (see Federal Court of Justice, Order of 9 February 2023 - I ZB 62/22, NJOZ 2023, 497 [juris, para. 15], with further references).

51        b) This means that the time limitation has been complied with. The application was received by the Berlin Higher Regional Court on 17 August 2021 and thus before the arbitral tribunal was constituted on 14 September 2021.

52        4. The application pursuant to section 1032 (2) German Code of Civil Procedure is also admissible. In the context of such application, the ordinary court will review whether an effective arbitration agreement exists, whether it is practicable, and whether the subject matter of the arbitration proceedings falls within the scope of the arbitration agreement (Federal Court of Justice, Order of 19 September 2019 - I ZB 4/19, SchiedsVZ 2020, 50 [juris, para. 11], with further references). In the present context, the court may carry out this review, also with a view to the ICSID arbitration proceedings already initiated beforehand, which, pursuant to Article 41 (1) ICSID Convention, provides for a genuine *Kompetenz-Kompetenz* of the arbitral tribunal. The blocking effect of the ICSID arbitration proceedings with respect to proceedings before the ordinary courts (see C I 4 b)

exceptionally does not apply here, due to the primacy of EU law (see C I 4 c and d).

53        a) The Berlin Higher Regional Court took the view that section 1032 (2) German Code of Civil Procedure did not apply with respect to ICSID arbitration proceedings. It held that the procedural rules of the ICSID Convention were a closed legal system which does not allow for any other procedural rules to be applicable. Pursuant to Article 41 (1) ICSID Convention, it was up to the seized arbitral tribunal to conclusively decide on its own competence and the effectiveness of any arbitration clause. It stated that by way of the Investment Disputes Settlement Convention Act (InvStreitBeilG), Germany had recognised this regime and confirmed in Article 2 (2) thereof, that it only referred to a corresponding application of the German Code of Civil Procedure for a request for a declaration of the admissibility of enforcement action.

This did not allow for either a review of the procedure nor a review on the basis of public policy within the meaning of section 1059 (2) German Code of Civil Procedure. Nor was section 1032 (2) German Code of Civil Procedure applicable (by analogy) to ICSID arbitration proceedings. Nor was this changed by the case-law of the Court of Justice of the European Union on intra-EU investment disputes. This case-law did not relate to the procedural rules of the German Code of Civil Procedure and their applicability to ICSID arbitration proceedings. The arbitration had been duly initiated in accordance with the provisions of Article 26 ECT. The applicant's consent to be a party of the Energy Charter Treaty pursuant to Article 26 (3) (a) ECT had been given by being a contracting party to the treaty and had been given without reservation. The defendants had given their consent to the arbitration agreement by submitting the request for arbitration to the Centre. Pursuant to Article 41 (1) ICSID Convention, the question of whether the consents were also effective in an intra-EU investment dispute was a matter for the arbitral tribunal to decide, taking into account the case-law of the Court of Justice of the European Union. It held, that it was not a violation of EU law not to apply section 1032 (2) German Code of Civil Procedure to ICSID arbitration proceedings. It was a domestic procedural provision. The dispute, it found, was neither comparable to a subsequent application for annulment nor to arbitration proceedings under the UNCITRAL Arbitration Rules, which did not contain any exclusive procedural

rules comparable to the ICSID Convention. This does not stand up to legal scrutiny.

54    b) However, as a rule, proceedings before the ordinary courts are precluded, at least from the point in time that ICSID arbitration proceedings have been initiated, due to the *Kompetenz-Kompetenz* of the arbitral tribunal pursuant to Article 41 (1) ICSID Convention, as this provision is more specific and therefore has priority.

55    aa) The international ICSID Convention ranks like a simple federal law in the German legal order due to the fact that it was ratified by the 1969 Act pursuant to Article 59 (2) sentence 1 German Constitution. The provisions of the treaty are given domestic effect by an order giving effect to an international treaty at the national level (*Rechtsanwendungsbefehl*) within the meaning of Article 59 (2) sentence 1 German Constitution (see BVerfGE 141, 1 [juris, paras. 45 et seq.]; von Arnauld, *Völkerrecht*, 5th ed. para. 509; BeckOK.GG/Pieper, 55th ed. [as at 15 May 2023], Art. 59 para. 41, with further references; Nettesheim in Dürig/Herzog/Scholz, GG, 90th supplementary edition, February 2020, Art. 59 paras. 177 et seq.; on the ICSID Convention see Seelmann-Eggebert, SchiedsVZ 2023, 32, 36). Where domestic laws have the same status, if there is a conflict between them, the principles of lex posterior and lex specialis apply. The principle of the German Constitution's openness to international law requires that domestic laws should, where possible, be interpreted in such a manner, that they do not cause any conflict with the Federal Republic of Germany's obligations under international law. Therefore, if the relevant methodological principles of interpretation allow for a statute to be interpreted in several possible ways, then the interpretation that is open to international law is generally to be preferred (BVerfGE 141, 1 [juris para. 71], with further references; von Arnauld loc. cit. paras. 517, 525 et seq.; BeckOK.GG/Pieper loc. cit. Art. 59 paras. 38, 44). However, this does not result in a constitutional obligation to comply with every provision of international law without limitation (BVerfGE 141, 1 [juris, para. 69]).

56    bb) The Berlin Higher Regional Court correctly pointed out that the ICSID Convention has a closed legal system with its own procedural rules. Whereas under domestic arbitration law and the UNCITRAL Model Law, both in the pre-arbitral phase up to the formation of the arbitral tribunal, the arbitral phase during

the arbitration proceedings and the post-arbitral phase after the award has been made, the ordinary courts can be called upon to review and support the arbitration proceedings (see for example section 1032 (2), section 1033, section 1040 (3) sentence 2 and sections 1059 to 1061 German Code of Civil Procedure) and have the final decision-making competence (see Federal Court of Justice, GRUR 2012, 95 [juris para. 11]; Schütze in Wieczorek/Schütze loc. cit. section 1032 para. 17, with further references), the ICSID Convention deliberately deviates from involving the ordinary courts in that manner.

57          cc) In order to resolve the question of the jurisdiction of the Centre within the meaning of Article 25 ICSID Convention and, consequently, the question of the jurisdiction of the arbitral tribunal, it is the arbitral tribunal alone that is the competent forum pursuant to Article 41 (1) ICSID Convention, at any rate as from the date of the registration of an ICSID arbitration − in this case on 13 May 2021.

58          (1) Pursuant to Art. 25 (1) sentence 1 ICSID Convention, the jurisdiction of the Centre extends to all disputes between a contracting state, and a national of another contracting state, which are directly related to an investment, provided that the parties have agreed in writing to submit the disputes to the Centre.

59          Pursuant to Article 36 (3) sentence 1 ICSID Convention, the Secretary-General of the Centre is responsible, from the time the request for arbitration is submitted (Article 36 (1) ICSID Convention) until the time it is registered, for the preliminary examination on whether the dispute obviously does not fall within the competence of the Centre pursuant to Article 25 ICSID Convention (so-called "screening power"; see Escher, RIW 2001, 20, 23 et seq.; Escobar in Fouret/Gerbay/Alvarez loc. cit. Article 36 paras. 4.23, 4.35; Kern loc. cit. p. 60, with further references; Schöbener/Markert, ZVglRWiss 2006, 65, 76 et seq.). The Secretary General's power to refuse registration is defined so narrowly that it does not interfere with the *Kompetenz-Kompetenz* of the arbitral tribunal (see von Wobeser in Fouret/Gerbay/Alvarez loc. cit. Article 41 para. 4.184).

60          This *Kompetenz-Kompetenz* of the arbitral tribunal is justified by Article 41 (1) ICSID Convention, according to which the arbitral tribunal itself decides on whether it is competent. Irrespective of a positive preliminary finding by the Secretary General, it can still come to the conclusion that the Centre is not

competent (see Pirrung loc. cit. p. 94 et seq., 97; Schöbener/Markert, ZVgIRWiss 2006, 65, 77, with further references; von Wobeser in Fouret/Gerbay/Alvarez loc. cit. Article 41 para. 4.184). In such a case, the arbitral tribunal has nevertheless been formed validly, even if the validity of the parties' consent to ICSID arbitration is in dispute and should prove to be invalid (see Kriebaum in Schreuer's Commentary on the ICSID Convention, 3rd ed., Article 41 paras. 7 et seq.). Therefore, pursuant to Article 41 (1) ICSID Convention, the decision as to whether the jurisdictional requirements of Article 25 ICSID Convention have been met, fundamentally rests solely with the arbitral tribunal (see Kern loc. cit. p. 60; von Wobeser in Fouret/Gerbay/Alvarez loc. cit. Article 41 paras. 4.182, 4.184).

61        (2) Accordingly, Article 41 (1) ICSID Convention already applies in any event from the point in time that the arbitration proceedings are initiated (see Kriebaum in Schreuer's Commentary on the ICSID Convention loc. cit. Article 41 para. 25 and paras. 83 to 85; Kryvoi, International Centre for Settlement of Investment Disputes (ICSID), 4th ed., para. 208, with further references; Pirrung loc. cit. p. 97; von Wobeser in Fouret/Gerbay/Alvarez loc. cit. Article 41 para. 4.179; (presumably) different opinion in Steinbrück/Krahé, IPRax 2023, 36, 38 et seq.), which deviates from section 1040 German Code of Civil Procedure, which, in conjunction with section 1032 (2) German Code of Civil Procedure, provides for the (provisional) *Kompetenz-Kompetenz* of the arbitral tribunal only from the time of the arbitral tribunal having been formed (see BeckOK.ZPO/Wolf/Eslami loc. cit. section 1032 para. 2; Schütze in Wieczorek/ Schütze loc. cit. section 1032 para. 8). Pursuant to No. 6 (2) of the Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings, an ICSID arbitration is deemed to have been initiated as soon as it is registered. Due to the fact that the proceedings have already been registered, no decision is required in this case on whether Article 41 (1) ICSID Convention was already applicable in the period from the request for arbitration being made until the proceedings being registered.

62        (3) From a systematic point of view, the idea that the arbitral tribunal has jurisdiction, at least from the point in time when proceedings have been initiated by registration, is certainly supported by the fact that this ensures a seamless continuation from the preliminary assessment by the Secretary General of the Centre. Pursuant to Article 36 (3) sentence 1 ICSID Convention. This covers the

period from the request first being made until it is registered, following which the preliminary assessment is concluded. Therefore, the relevant point in time for the Centre and the arbitral court examining whether the conditions of Article 25 ICSID Convention are satisfied is the time of registration; later changes are irrelevant (see Banifatemi/Edson in Fouret/Gerbay/Alvarez loc. cit. Article 25 para. 2.09, with further references; Kriebaum in Schreuer's Commentary on the ICSID Convention loc. cit. Article 41, paras. 83 to 85.)

63          The spirit and the purpose of the Convention, which is designed to decouple domestic law and ordinary courts as much as possible (see Pearsall in Fouret loc. cit. p. 117, 118; Sasson in Fouret/Gerbay/Alvarez loc. cit. Article 62, para. 7.04; Happ in Schütze loc. cit. chapter XV, part II para. 13; Kern loc. cit. p. 65; Kröll, NJW 2023, 819, 820), also suggests a comprehensive decision-making power within the ICSID system from the point of a request being submitted or, in any event, from the time proceedings are initiated.

64          In contrast to commercial arbitration, where section 1040 (3) sentence 2 German Code of Civil Procedure provides for a mandatory review by the courts in cases of an objection (see Federal Court of Justice, Order of 24 July 2014 - III ZB 83/13, BGHZ 202, 168 [juris para. 10], with further references; Schroeter, SchiedsVZ 2004, 288, 290; for the corresponding provision in Article 16 (3) sentence 2 UNCITRAL Model Law see Melis in Kronke/Melis/Kuhn loc. cit. part P para. 279), in ICSID arbitration proceedings there generally is no subsequent review of the decision on jurisdiction by the ordinary courts and thus no final decision-making competence for the ordinary courts. Examining the jurisdictional competence must be carried out exclusively within the framework of the arbitration proceedings themselves according to the provisions of the ICSID Convention, which are more specific and therefore generally have priority (see Pirrung loc. cit. p. 116; Schöbener/Markert, ZVgIRViss 2006, 65, 74; Berger, SchiedsVZ 2017, 282, 290; Raeschke-Kessler, SchiedsVZ 2018, 1, 6; Kröll, NJW 2023, 819, 820 et seq.; Seelmann-Eggebert, SchiedsVZ 2023, 32, 36; Steinbrück/Krahé, IPRax 2023, 36, 38). This also satisfies the priority to be accorded to international treaties, which the legislator considered self-evident when reforming the arbitral procedure (see Bundestag printed paper 13/5274, p. 31).

65          dd) Accordingly, if looking at the provisions of the ICSID Convention in isolation, the *Kompetenz-Kompetenz* of the arbitral, pursuant to Article 41 (1) ICSID Convention, would therefore preclude proceedings pursuant to section 1032 (2) German Code of Civil Procedure due to the fact that arbitration proceedings had already been initiated. According to the database available on the ICSID website (icsid.world-bank.org), the arbitration proceedings were registered with the file number ICSID ARB/21/26 on 13 May 2021 and thus commenced, whereas the application pursuant to section 1032 (2) German Code of Civil Procedure was only received by the Berlin Higher Regional Court in August 2021.

66          ee) Due to the fact that the arbitration proceedings have already been initiated, it is not of decisive importance what the precise meaning of the provision of Article 26 sentence 1 ICSID Convention is, which stipulates that the consent of the parties to arbitration under the Convention is also deemed to be a waiver of any other remedy, unless a declaration to the contrary is made. This provision only applies directly up until such time as a request has been submitted to the Centre (see Alexandrov in Schreuer's Commentary on the ICSID Convention loc. cit. Article 26 para. 6; Haridi in Fouret/Gerbay/Alvarez loc. cit. Article 26 paras. 2.258 et seq.).

67          c) Intra-EU investor-State arbitration proceedings under the ICSID Convention on the basis of Article 26 ECT are a special scenario, where, exceptionally, the blocking effect of Article 41 (1) ICSID Convention does not prevent an application under section 1032 (2) German Code of Civil Procedure from being admissible, because of the primacy of EU law − also vis-à-vis public international law.

68          aa) According to the settled case-law of the Court of Justice of the European Union, EU law originates from an autonomous source, namely the Treaties, and takes precedence over the law of the Member States. The autonomy of EU law exists both vis-à-vis the law of the Member States and vis-à-vis international law (see CJEU, Opinion of 30 April 2019 - Gut 1/17, EuGRZ 2019, 191 [juris para. 109] - CETA Agreement EU-Canada, with further references; on primacy over public international law, see also CJEU, Judgment of 3 September 2008 - C-402/05, C-415/05, [2008] 1-6351 = EuGRZ 2008, 480

[juris paras. 281 to 285] - Kadi and Al Barakaat Foundation v Council and Commission). The supremacy of EU law requires that the domestic courts, which have to apply the provisions of EU law within their jurisdiction, ensure the full effect of these provisions. To that end, they must exercise their own decision-making power to disapply any conflicting domestic provision, if necessary, without first requesting or awaiting a change in the national law by the legislator or some other constitutional process to eliminate such a conflicting provision (see CJEU, Judgment of 4 December 2018 - C-378/17, NZA 2019, 27 [juris para. 35] - Minister for Justice and Equality and Commissioner of An Garda Síochána, with further references; Judgment of 2 September 2021 - C-741/19, SchiedsVZ 2022, 34 [juris para. 43] - Komstroy; see also BVerfGE 126, 286 [juris para. 53]; Nettesheim in Grabitz/Hilf/Nettesheim, *Das Recht der EU*, 48th Supplementary Edition, August 2012, Article 288 TFEU paras. 47 to 53).

69        bb) Also according to settled case-law of the Court of Justice of the European Union, Articles 267 and 355 TFEU must be construed in such a way that they preclude the application of a provision in an international agreement entered into between two Member States, pursuant to which an investor from one of these Member States may initiate arbitration proceedings against the other Member State where there is a dispute about investment in that other Member State, and to initiate such proceedings before an arbitral court whose jurisdiction that Member State accepts (see CJEU, Judgment of 6 March 2018 - C-284/16, SchiedsVZ 2018, 186 [juris paras. 32, 60] - Achmea; CJEU, SchiedsVZ 2022, 34 [juris paras. 42 to 46] - Komstroy; CJEU, Judgment of 26 October 2021 - C-109/20, EuZW 2021, 1097 [juris para. 44] - PL Holdings; Judgment of 25 January 2022 - C-638/19, RIW 2022, 219 [juris para. 138] - European Food; Opinion of 16 June 2022 - C-1/20, juris para. 47 with para. 20 - Modernised contract for the Energy Charter; Order of 21 September 2022 - C-333/19, BeckRS 2022, 26460 para. 33 - Romatsa).

70        An ICSID award must be considered incompatible with EU law, in particular with Articles 267 and 344 TFEU, if the arbitration clause underlying the arbitration proceedings calls into question the respect for the specific nature of EU law guaranteed by the preliminary ruling procedure, in breach of the principles of loyal cooperation and the autonomy of EU law (see CJEU, RIW 2022, 219 [juris

para. 142] - European Food; BeckRS 2022, 26460 paras. 41 et seq. - Romatsa).
An arbitral award that is incompatible with EU law in this way cannot have any
effect and thus cannot be enforced. A court of a Member State involved in the
compulsory enforcement of such an ICSID award is under an obligation not to
apply the award and consequently must not enforce it under any circumstances
(see CJEU, BeckRS 2022, 26460, paras. 43 et seq. - Romatsa [in French]; for
the translation of the operative part, see OJ C 24 of 2023, p. 14).

71          cc) According to these principles, in the intra-EU context, a review of an
ICSID award by an ordinary court is absolutely required in the subsequent
enforceability proceedings for reasons of EU law and contrary to the system of
the ICSID Convention (see [1]). In such a case, however, the principle of
effectiveness ("effet utile") requires that, when deciding on the admissibility of an
upstream remedy such as section 1032 (2) German Code of Civil Procedure,
Article 41 (1) ICSID Convention, which is contrary to this in this respect − and
which ranks like a simple federal law in the German legal order due to the fact
that it was ratified by the Act of approval − be left unapplied in order to ensure the
full effect of EU law as early as possible (see [2]).

72          (1) According to the case law of the Court of Justice of the European
Union, judicial review of an ICSID award in an intra-EU investor-State
constellation, such as here, is mandatory in the downstream proceedings
regarding a declaration of the admissibility of enforcement action.

73          (a) The decisions in "European Food" and "Romatsa" make it clear that the
Court of Justice of the European Union considers its jurisdiction under Articles
267, 344 TFEU for the subsequent enforcement of an arbitral award to be
unaffected by the ICSID Convention. Notwithstanding the complete exclusion of
a review of an ICSID award by the domestic courts, as provided for in Articles 53,
54 ICSID Convention, the domestic courts must disapply an arbitral award that is
incompatible with EU law and, consequently, must not enforce it under any
circumstances (see CJEU, BeckRS 2022, 26460 paras. 43 et seq. - Romatsa;
see also CJEU, RIW 2022, 219 [juris para. 142] - European Food; on the
annulment of an intra-EU ICSID award see Cour de Cassation du Grand-Duché
de Luxembourg, Judgment of 14 July 2022 - CAS-2021-00061 paras. 26 to 40

and 43, www.italaw.com/sitesidefault/files/case-documents/italaw170526.pdf - last accessed on 3 June 2023).

74        (b) Such a downstream review of ICSID awards in the intra-EU context, which is required by EU law, is not precluded by the provision of Article 2 (4) InvStreitBeiIG, according to which the request to declare the admissibility of enforcement action may only be rejected if the award has been set aside in proceedings pursuant to Article 51 or Article 52 ICSID Convention. The primacy of EU law (para. 68 above) requires that, in the intra-EU context, this domestic provision is not applied as it is a conflicting domestic provision.

75        (2) As a subsequent revision of ICSID arbitral awards by the German courts is therefore mandatory for reasons of EU law, notwithstanding Articles 53, 54 ICSID Convention and Article 2 (4) InvStreitBeiIG, the principle of effectiveness ("effet utile") requires that the primacy of EU law must also be extended to the preceding declaratory proceedings under section 1032 (2) German Code of Civil Procedure and, thus, its admissibility must be affirmed.

76        (a) According to the settled case-law of the Court of Justice of the European Union, the principle of effectiveness requires that the applicable national legislation is not such as to render practically impossible or excessively difficult the exercise of the rights conferred by EU law. This must be assessed in the light of the position of the legislation in the proceedings as a whole, the course of the proceedings and the specific features of the proceedings before the various national bodies (CJEU, Judgment of 11 November 2015 - C-505/14, EuZW 2016, 57 [juris paras. 40 et seq.] - Klausner Holz; Judgment of 5 March 2019 - C-349/17, EuZW 2019, 379 [juris paras. 137 et seq.] - Eesti Pagar; Judgment of 7 April 2022 - C-116/20, juris paras. 100 et seq. - Avio Lucos, all with further references). Where a provision of domestic law precludes the application of a domestic remedy, then it must be disapplied if the domestic remedy would otherwise be capable of giving full effect to EU law (see CJEU, Judgment of 19 June 1990 - C-213/89, [1990] 1-2433 = NJW 1991, 2271 [juris para. 23] - Factortame and others; Judgment of 13 July 2006 - C-295/04 to C-298/04, [2006]1-6619 = EuZW 2006, 529 [juris para. 62] - Manfredi and others; see also Hess, *Europäisches Zivilprozessrecht*, 2nd ed., section 11 para. 11.9).

77        (b) For procedural and economic reasons, with section 1032 (2) German Code of Civil Procedure, the domestic legislator has deliberately provided for a special remedy which (at least initially) precedes the arbitration proceedings. These proceedings are a German peculiarity and have no counterpart in the UNCITRAL Model Law (see Bundestag printed paper 13/5274, p. 38; Saenger/Saenger, ZPO, 9th ed., section 1032 para. 13; on the advantages and disadvantages, see Steinbrück, *Die Unterstützung ausländischer Schiedsverfahren durch staatliche Gerichte*, 2009, pp. 347 to 350). A final decision on an application pursuant to section 1032 (2) German Code of Civil Procedure is binding on the (domestic) ordinary courts in subsequent court proceedings, in particular in proceedings for annulment or a declaration of enforceability under sections 1059 to 1061 German Code of Civil Procedure and in other legal proceedings, where the objection of arbitration proceedings may be raised under section 1032 (1) German Code of Civil Procedure (see German Federal Court, Order of 6 May 2021 - I ZB 71/20, juris para. 16; BeckOK.ZPO/Wolf/Eslami loc. cit. section 1032 para. 42; Voit in Musielak/Voit loc. cit. section 1032 paras. 13 et seq.; Zöller/Geimer loc. cit. section 1032 para. 24, section 1040 para. 4 and section 1059 para. 39). For the parties, the remedy of section 1032 (2) German Code of Civil Procedure provides an option to save time and costs, if, for example, the arbitration proceedings are not initiated at all or not pursued further upon determination of the inadmissibility, where the arbitral tribunal is persuaded of the inadmissibility or, in any event, where the subsequent court proceedings are simplified and accelerated by the determined result.

78        c) Article 41 (1) ICSID Convention, which precludes the application of section 1032 (2) German Code of Civil Procedure with these effects, must not be applied in intra-EU investor-State arbitration proceedings (see Steinbrück/Krahé, IPRax 2023, 36, 41; critical opinion in Wilske/Markert/Ebert, SchiedsVZ 2022, 111, 130), in order to allow EU law to take full effect at an early stage.

79        In the intra-EU context, the ex-ante control provided for by the German legislator in section 1032 (2) German Code of Civil Procedure can bindingly anticipate the ex-post control required in the context of ICSID arbitration proceedings (see CJEU, BeckRS 2022, 26460, paras. 43 et seq. - Romatsa; paras. 72 to 74 above). A finding that the arbitration proceedings are inadmissible

pursuant to section 1032 (2) German Code of Civil Procedure prevents any (later) declaration of enforceability of an ICSID award in Germany due to the binding effect of this decision.

80        Applying section 1032 (2) German Code of Civil Procedure also takes into account the case-law of the Court of Justice of the European Union, according to which the Member States, as soon as a dispute is brought before an arbitration tribunal on the basis of an obligation violating EU law, are obliged to object to the validity of the arbitration clause or any ad-hoc arbitration agreement on the basis of which that body was seized, either before that arbitration tribunal or before the competent court (see CJEU, EuZW 2021, 1097 [juris para. 52] - PL-Holdings).

81        To the extent that the response to the appeal in this context complains that the case-law of the Court of Justice of the European Union does not give rise to an obligation under EU law to create a sui generis domestic remedy for a declaration of inadmissibility of the arbitration proceedings, it overlooks the fact that such a remedy is already provided for in national law in section 1032 (2) German Code of Civil Procedure, which is also applicable via section 1025 (2) German Code of Civil Procedure.

82        (d) The primacy of EU law is not achieved by an impermissible interpretation of domestic law contra legem (on this limit, see CJEU, EuZW 2016, 57 [juris para. 32] - Klausner Holz; CJEU, Judgment of 11 February 2021 - C-760/18, NZA 2021, 333 [juris para. 67] - M. V. and others, with further references; Federal Court of Justice, Order of 29 July 2021 - I ZR 135/20, GRUR 2021, 1320 [juris para. 36] = WRP 2021, 1290 - Flaschenpfand III, with further references). The admissibility of the application under section 1032 (2) German Code of Civil Procedure results from the wording of the provision of section 1032 (2) German Code of Civil Procedure, given the inapplicability of Article 41 (1) ICSID Convention as required by EU law (on the primacy of EU law see supra para. 68). The provisions in Articles 2 et seq. InvStreitBeilG apply only to the phase after the ICSID arbitral award has been issued; statements on the preceding phase and the applicability of section 1032 (2) German Code of Civil Procedure cannot be inferred from these provisions.

83          d) There are no exceptional circumstances, thus the primacy of EU law over Article 41 ICSID Convention is not excluded pursuant to Article 351 (1) TFEU.

84          aa) Article 1 (1) TFEU provides that the rights and obligations arising from agreements concluded prior to 1 January 1958 or, for States that acceded thereafter, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties. The purpose of the provision is to protect the Member States from breaches of international law vis-à-vis third countries, which would be caused by the primacy of EU law, and thus takes into account the maxim "pacta sunt servanda" (see Schmalenbach in Calliess/Ruffert, EUV/AEUV, 6th ed., Article 351 TFEU para. 1; Streinz/Kokott, EUV/AEUV, 3rd ed., Article 351 TFEU para. 1).

85          bb) According to its wording, Article 351 (1) TFEU is not directly applicable in the case at issue. For the applicant, as a founding member of the European Economic Community, the relevant date is 1 January 1958. For the defendants, the relevant date is the accession date of Ireland, the State of domicile of defendants 1 to 3, to the European Community in 1973. The ICSID Convention entered into force for the applicant in 1969 and for Ireland in 1981, the Energy Charter Treaty in 1998 for both parties.

86          cc) According to the case-law of the Court of Justice of the European Union, Article 351 (1) TFEU cannot be applied by analogy to cases in which rights and obligations are concerned that have arisen from agreements which − as in the current case − were concluded after the relevant dates specified in the provision, but which concern a subject matter for which the EU only became competent at a later date as a result of an increase in its competence (see CJEU, Judgment of 28 October 2022 - C-435/22, NJW 2023, 349, paras. 115 to 127 - PPU). Contrary to a widespread opinion in the literature (see Lorenzmeier in Grabitz/Hilf/Nettesheim loc. cit. Article 351 TFEU paras. 24 to 28; Schmalenbach in Calliess/Ruffert loc. cit. Article 351 TFEU paras. 6 to 9; on the Energy Charter Treaty, see Köster loc. cit. p. 176 et seq.), the provision of Article 351 (1) TFEU, which, if its requirements are met, permits derogations from EU law, including primary law, must be interpreted narrowly as an exceptional provision. It only

covers agreements concluded before 1 January 1958 or, in the case of States that acceded thereafter, agreements concluded before the date of their accession (see CJEU, NJW 2023, 349 paras. 119 et seq. and 126 - PPU). The current wording of the provision was adopted in the Treaty of Amsterdam and was not changed since in the Treaties of Nice and Lisbon, even though shifts of competence were known in each case through the developments of the EU's competences. Nevertheless, a transfer of competence to the EU was not determined as another relevant date in time (see CJEU, NJW 2023, 349, paras. 123 to 125 - PPU).

87      5. The requirement under section 1032 (2) German Code of Civil Procedure of a need for the protection of a legal interest is met.

88      a) Like any procedural remedy, the application pursuant to section 1032 (2) German Code of Civil Procedure requires a need for the protection of a legal interest. In general, this need already arises from a potential party status in the arbitration proceedings (see Federal Court of Justice, Order of 8 November 2018 - I ZB 21/18, NJW 2019, 857 [juris para. 15]). The (subsequent) formation of the arbitral tribunal does not mean that the need for the protection of a legal interest for the applicant under section 1032 (2) German Code of Civil Procedure has ceased to exist. In section 1032 (2) and (3) German Code of Civil Procedure, the law assumes a subsequent coexistence of the state court and arbitration proceedings in the case of an admissible application filed before the formation of the arbitral tribunal (see Federal Court of Justice, GRUR 2012, 95 [juris para. 11], with further references; on the continuing interest for legal protection in case an arbitral award is issued in the meantime, see Federal Court of Justice, Order of 11 May 2017 - I ZB 75/16, NJW 2017, 3723 [juris paras. 10, 14]).

89      However, the need for the protection of a legal interest is missing if the claimant or applicant can achieve their objective by simpler or less expensive means or not at all by the remedy applied for (regarding the application for a court decision see Federal Court of Justice, Order of 10 February 2016 - IV AR (VZ) 8/15, NJW-RR 2016, 445 [juris para. 10], with further references; for an application for an injunction under trade mark law see Federal Court of Justice, Judgment of 15 October 2020 - I ZR 210/18 - GRUR 2020, 1311 [juris para. 27] = WRP 2021, 42 - Vorwerk, with further references; on enforcement law, see

Federal Court of Justice, Order of 13 October 2022 - I ZB 69/21, GRUR 2023, 105 [juris para. 13] with further references.

90        b) Accordingly, there is a need for the protection of a legal interest in the current case. The application relates to concrete arbitration proceedings in which the applicant is the respondent. The declaratory proceedings for a declaration pursuant to section 1032 (2) German Code of Civil Procedure are not objectively pointless; above all, they are not merely limited to expressing a legal opinion, but will have legal and factual effects. In particular, a finding of inadmissibility of the arbitration proceedings pursuant to section 1032 (2) German Code of Civil Procedure prevents a subsequent declaration of the admissibility of enforcement action of an ICSID award in Germany (see above para. 79).

91        Furthermore, a preceding declaratory decision by one of Germany's highest courts can have a strong signalling effect for other ordinary courts bound by EU law in proceedings for the recognition or declaration of enforceability of arbitration awards (see Scheu/Nikolov, Arbitration International 2020, 253, 267 to 269). Such a decision in proceedings for a declaration of enforceability can have persuasive force through the "doctrine of comity" in third countries, despite the binding effect of an ICSID award provided for in Articles 53, 54 ICSID Convention (also "mutual sovereign respect", see in this regard Gibbons/Myers/Dolzer, RIW 2004, 899; Späth, IPrax 2006, 184 and 185 et seq.) (see US District Court for the District of Columbia, Order of 29 June 2021 - Civil Action No. 20-817 - Infrared Environmental Infrastructure GP Ltd. v. Spain, https://casetext.com/case/infrared-envtl-infrastructure-gp-ltd-v-kingdom-of-spain - last accessed on 3 June 2023, where "considerations of comity" are explicitly addressed; on the (inconsistent) case law of the US District Court for the District of Columbia, see Hindelang/Naßl/Jena, Achmea goes to Washington, VerfBlog, 2023/4/19; see also Scheu/Nikolov, Arbitration International 2020, 253, 271 et seq.; Steinbrück/Krahé, EuZW 2022, 357, 364 et seq.; van der Beck, *Schiedsgerichtlicher Investitionsschutz innerhalb der Europäischen Union*, 2022, p. 255 et seq.; on the dangers of possible enforcement proceedings in third countries such as the USA under Article 54 ICSID Convention, see COM [2022] 523 final of 5 October 2022, p. 1).

92          Moreover, an at least factual-indirect effect on ICSID arbitration proceedings that already have been initiated cannot be excluded (see Steinbrück/Krahé, IPRax 2023, 36, 38; van der Beck loc. cit. p. 259). An arbitral tribunal is obliged to work towards an effective award (see Federal Court of Justice, Judgment of 5 May 1986 - III ZR 233/84, BGHZ 98, 32 [juris para. 15]; Schroeter, SchiedsVZ 2004, 288, 296; Spohnheimer in *Festschrift Käfer*, 2009, p. 357, 371, 373 et seq.). The non-observance of a prior final court decision on the inadmissibility of the arbitration proceedings pursuant to section 1032 (2) German Code of Civil Procedure leads − in the case of a domestic arbitral award − to nullity (see Federal Court of Justice, Order of 11 October 2018 - I ZB 9/18, SchiedsVZ 2019, 150 [juris para. 6]; Saenger/Saenger loc. cit. section 1032 para. 17; Voit in Musielak/Voit loc. cit. section 1032 paras. 14 et seq.) or at least to a setting aside (see MünchKomm.ZPO/Münch loc. cit. section 1032 para. 40; Schroeter, SchiedsVZ 2004, 288, 295 et seq.). It is true, that this does not apply to an (a-national) ICSID award. In such a case, however, a binding declaration must be made to the effect that the award is not enforceable in Germany.

93          Moreover, the arbitral tribunal has to take into account that the European Commission has practical means to implement the case-law of the Court of Justice of the European Union against arbitral awards in intra-EU investor-State arbitration proceedings. As the decision in the "European Food" case (CJEU, RIW 2022, 219) shows, compliance with an arbitral award that is contrary to EU law may constitute impermissible state aid within the meaning of Articles 107 et seq. TFEU, which in turn may lead to infringement proceedings against the Respondent Member State under Article 108 (2), second subparagraph, TFEU in conjunction with Articles 258 et seq. TFEU (see von Marschall, RIW 2022, 228, 230; van der Beck loc. cit. p. 262 et seq., 266; see also Rösch, *Intraeuropäisches Investitionsrecht*, 2017, p. 162 et seq.).

94          It cannot be argued that there could not be a de facto, indirect impact on intra-EU-investor-State-arbitration because arbitral tribunals were per se opposed to finding invalidity of arbitration agreements based on EU law. In the arbitration Green Power Partners vs. Spain a tribunal constituted under the arbitration rules of the arbitration institute of the Stockholm Chamber of Commerce (SCC) unanimously considered the consent of a Member State to the

arbitration agreement under Art. 26 ECT in an intra-EU-dispute as invalid because of the violation of EU law and, therefore, denied its jurisdiction (see Award of 16 June 2022 - SCC Case No. V. [2016/135] paras. 170, 411 et seq., 468 et seq., 476 to 478; in this regard Lavranos/Lath/Varma, SchiedsVZ 2023, 38, 41 et seq.; see also US District Court for the District of Columbia, Order of 29 March 2023 - Civil Case No. 21-3249, Blasket Renewable Investments v. Spain, https://jusmundi.com/en/document/pdf/decision/en-aes-solar-and-others-pv-investors-v-the-kingdom-of-spain-memorandum-opinion-of-the-united-states-district-court-for-the-district-of-columbia-wednesday-29th-march-2023    -    last retrieved on 3 June 2023, according to which an [UNCITRAL] arbitral tribunal in an intra-EU investor-State arbitration is bound by the interpretation of EU law by the Court of Justice of the European Union on the basis of Article 26 ECT).

95        II. The application pursuant to section 1032 (2) German Code of Civil Procedure is also well-founded. The arbitral proceedings are inadmissible due to the lack of an effective arbitration agreement. According to the case-law of the Court of Justice of the European Union, the arbitration clause contained in Article 26 (2) (c) ECT is not applicable to intra-EU investor-State arbitration, precluding the conclusion of a valid arbitration agreement (see C II 2 and 3). Nor can an arbitration agreement be based on Article 25 ICSID Convention (see C II 4).

96        1. The law applicable to an arbitration agreement is decisive to assess the validity of such an arbitration agreement (see Steinbrück, loc. cit. p. 379). The law applicable to the arbitration agreement is determined by applying Article V (1) (a) NYC by analogy (see Federal Court of Justice, Judgment of 26 November 2020 - I ZR 245/19, SchiedsVZ 2021, 97 [juris paras. 48, 51]). Pursuant to this provision, the law chosen by the parties prevails. The validity of the arbitration agreement on arbitration proceedings initiated on the basis of the Energy Charter Treaty is therefore determined according to the parties' intentions, in particular according to Article 26 (2) to (4) ECT (see Rösch loc. cit. p. 176).

97        2. According to the now settled case-law of the Court of Justice of the European Union, Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement between Member States under which an investor of one of those Member States may, in the event of a dispute concerning investments in the other Member State, institute proceedings against

this Member State before an arbitral tribunal to whose jurisdiction that Member State has agreed to, if a such an arbitration provision may result in such investment disputes not being resolved in a manner which guarantees the full effectiveness of EU law (see CJEU, EuZW 2021, 1097 [juris paras. 44 et seq.] - PL Holdings; RIW 2022, 219 [juris paras. 138 et seq.] - European Food; BeckRS 2022, 26460 paras. 33 et seq. - Romatsa; see also Federal Court of Justice, IWRZ 2022, 129 [juris paras. 10, 20 et seq.]).

98        a) The Court of Justice of the European Union has based its case-law on the principle that an international agreement must not affect the system of competence laid down by the Treaties and, consequently, the autonomy of the EU's legal system, which the Court of Justice safeguards. This principle is enshrined in particular in Article 344 TFEU, according to which the Member States undertake not to settle disputes concerning the interpretation or application of the Treaties otherwise than as provided therein. On the basis of mutual trust, and in accordance with the principle of sincere cooperation laid down in the first subparagraph of Article 4 (3) TEU, it is the responsibility of the Member States to ensure that EU law is applied and observed in their respective territories and, to that end, to take all appropriate measures, whether general or particular, to ensure fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the EU. The Treaties have established a judicial system under which, in accordance with Article 19 TEU, it is for the domestic courts and the Court of Justice to ensure the full application of EU law in all Member States and the protection of the rights which individuals derive from it. The key element of the court system thus designed is the preliminary ruling procedure provided for in Article 267 TFEU, which is intended to ensure the uniform interpretation of EU law by establishing a court-to-court dialogue between the Court of Justice and the courts of the Member States (see CJEU, SchiedsVZ 2018, 186 [juris paras. 32 to 37] - Achmea; EuGRZ 2019, 191 [juris paras. 109 to 111] - CETA Agreement EU-Canada; SchiedsVZ 2022, 34 [juris paras. 42 to 46] - Komstroy; see also Federal Court of Justice, IWRZ 2022, 129 [juris para. 10]).

99        b) This case-law must be taken into account in the current dispute. This is not contradicted by the fact that the provisions in Article 26 (2) to (4) ECT (also) constitute provisions of international law. According to the case-law of the Court

of Justice of the European Union, the Energy Charter Treaty has a dual nature as an agreement under international law and as a legal act of the EU because the EU itself is a party to the agreement (see CJEU, SchiedsVZ 2022, 34 [juris, paras. 23, 49 et seq.] - Komstroy; in this regard Köster loc. cit. p. 131 to 135).

100    3. According to these principles, in intra-EU investor-State-arbitration such as the present matter, the dispute resolution mechanism in Art. 26 para. 2 lit. c ECT violates EU law. Due to its incompatibility in particular with Articles 267 and 344 TFEU, there is a lack of effective consent, and thus of an offer by the applicant EU Member States to conclude an arbitration agreement (see Federal Court of Justice, SchiedsVZ 2019, 46 [juris para. 28]; Lithuanian Supreme Court, EuZW 2022, 567 para. 79).

101    a) According to the case-law of the Court of Justice of the European Union, the answer to the question whether the possibility for an investor to bring an action before an arbitral tribunal opened up by an investment protection agreement between Member States is compatible with EU law depends, first, on whether the disputes on which the arbitral tribunal has to rule possibly relate to the interpretation or application of EU law. If the answer is in the affirmative, it depends secondly on whether the arbitral tribunal can be regarded as a court or tribunal entitled to request a preliminary ruling within the meaning of Article 267 TFEU or, thirdly, whether the award is subject to review by a court or tribunal of a Member State, which ensures that the questions of EU law which the arbitral tribunal might have to deal with could possibly be referred to the Court of Justice of the European Union by way of preliminary ruling proceedings (see CJEU, SchiedsVZ 2018, 186 [juris paras. 39, 43 and 50] - Achmea; RIW 2021, 661 [juris paras. 48, 51 and 54] - Komstroy; Federal Court of Justice, IWRZ 2022, 129 [juris para. 11], with further references; Scheu/Nikolov, Arbitration International 2020, 253, 256 et seq.).

102    This case-law also applies to intra-EU investor-State arbitration proceedings under the ICSID Convention. The Court of Justice of the European Union does not differentiate between the individual arbitration rules which Article 26 (2) (c) in conjunction with (4) (a) to (c) ECT offers and which also include ICSID arbitration (see CJEU, Opinion of 16 June 2022 - C-1/20, juris para. 47 with paras. 20, 25 - Modernised Energy Charter Treaty; same opinion taken in

Steinbrück/Krahé, IPRax 2023, 36, 40 et seq.; likewise van der Beck loc. cit. p. 270 et seq., 393). It is also clear from the decisions in "European Food" and "Romatsa" that the case-law refers precisely to ICSID arbitration proceedings (see CJEU, RIW 2022, 219 [juris paras. 137 to 145] - European Food; BeckRS 2022, 26460 paras. 33 to 43 - Romatsa). Insofar as it was stated in these decisions that the consent of the state was "now irrelevant" (see CJEU, RIW 2022, 219 [juris para. 145] - European Food; BeckRS 2022, 26460 para. 40 - Romatsa), this is solely due to the special nature of the case constellation in these cases, namely the later accession of Romania to the European Union; it does not follow from this that there is a restriction of the case-law with regard to arbitration proceedings under the ICSID Convention.

103    b) According to these standards, the dispute resolution mechanism pursuant to Article 26 (2) (c) ECT violates EU law in the case at issue.

104    aa) In the underlying investment dispute, the ICSID Arbitral Tribunal must (also) interpret and apply EU law to the merits.

105    Pursuant to Article 42 (1) sentence 1 ICSID Convention (a conflict of laws rule, see Lörcher, SchiedsVZ 2005, 11, 17), the ICSID Arbitral Tribunal will decide on the merits of the case primarily in accordance with the legal rules agreed upon by the parties. If the state party has declared its consent to the Centre's jurisdiction in a bilateral or multilateral investment protection treaty, the arbitral tribunal will primarily have to take into account the legal norms laid down therein (see Escher, RIW 2001, 20, 24; Schöbener/Markert, ZVglRWiss 2006, 65, 101 et seq.). According to the findings of the Berlin Higher Regional Court, the defendants based their request for arbitration on breaches of contract under Articles 10 and 13 ECT. According to Article 26 (6) ECT, an arbitral tribunal established under Article 26 (4) ECT decides on the disputed issues applying the provisions in the Energy Charter Treaty and the applicable rules and principles of international law.

106    According to the case-law of the Court of Justice of the European Union, the Energy Charter Treaty has a dual nature as an agreement under international law and as a legal act of the EU, because the EU itself is a party to the agreement. Accordingly, the decision of the arbitral tribunal on the merits is rendered not only

according to international law but also according to EU law (see CJEU, SchiedsVZ 2022, 34 [juris paras. 23, 49 et seq.] - Komstroy; also Köster loc. cit. p. 131 to 135).

107        bb) According to the case-law of the Court of Justice of the European Union, an ICSID arbitral tribunal does not belong to the court system of the EU because it is not a court entitled to request a preliminary ruling (see CJEU, RIW 2022, 219 [juris paras. 141 et seq.] - European Food; BeckRS 2022, 26460 paras. 36 et seq. - Romatsa; on an UNCITRAL arbitral tribunal under the Energy Charter Treaty see CJEU, SchiedsVZ 2022, 34 [juris paras. 51 to 53] - Komstroy; also Nikolov, EuR 2022, 496, 497).

108        cc) According to the case-law of the Court of Justice of the European Union, in view of Articles 53, 54 ICSID Convention, an ICSID award is not subject to a sufficient review by a court of a Member State with regard to its compatibility with EU law (see CJEU, RIW 2022, 219 [juris, paras. 142 to 144] - European Food; BeckRS 2022, 26460 paras. 37 to 39 - Romatsa).

109        The (limited) review in the proceedings for the declaration of the enforceability, which according to the CJEU's case-law exceptionally also is required for ICSID arbitral awards (see above paras. 72 to 74), does not lead to a different conclusion. This merely achieves consistency with investment arbitral awards under other arbitration rules, for which such a limited review, however, is also not sufficient (on UNCITRAL proceedings under the Energy Charter Treaty, see CJEU, SchiedsVZ 2022, 34 [juris paras. 54 to 59] - Komstroy; in this regard Nikolov, EuR 2022, 496, 497).

110        4. The arbitration agreement cannot be based on Article 25 (1) sentence 1 ICSID Convention. The ICSID Convention itself does not constitute an arbitration agreement of its own and does not contain the required consent (see Banifatemi/Edson in Fouret/Gerbay/Alvarez loc. cit. Article 25 para. 2.76; Escher, RIW 2001, 20, 23; Kryvoi loc. cit. para. 38; Pirrung loc. cit. p. 74). In paragraph 7 of the preamble to the ICSID Convention, the contracting states declared that the mere ratification, acceptance or approval of the Convention by a contracting state does not imply its obligation to submit a particular dispute to conciliation or arbitration without its consent. Accordingly, Article 25 (1) sentence 1 ICSID

Convention also requires written consent for the competence of the Centre (see also Article 25 (4) sentence 3 ICSID Convention, according to which the notification provided for in this Article does not constitute the consent required under (1); Escher, RIW 2001, 20, 23). Accordingly, Article 26 (5) (a) case 1 ECT contains the declaratory statement that the consent of the host state under Article 26 (3) ECT and the consent of the investor under Article 26 (4) ECT shall be deemed to satisfy the requirement of written consent of the parties to the dispute within the meaning of Chapter II (Articles 25 to 27) of the ICSID Convention.

111      III. There is no need to make a request for a preliminary ruling to the Court of Justice of the European Union pursuant to Article 267 (3) TFEU (see CJEU, Judgment of 6 October 1982 - 283/81, [1982] 3415 [juris para. 21] = NJW 1983, 1257 - Cilfit and others; Judgment of 1 October 2015 - C-452/14, GRUR Int. 2015, 1152 [juris para. 43] - Doc Generici; Judgment of 6 October 2021 - C-561/19, NJW 2021, 3303 [juris paras. 32 f.] - Consorzio Italian Management and Catania Multiservizi).

112    1. In the case in dispute, there is no question relevant to the interpretation of EU law which has not already been clarified by the case-law of the Court or which cannot be answered beyond doubt. In particular, the question that an intra-EU investor-State ICSID arbitration is also incompatible with EU law on the basis of Article 26 (2) (c), (3) (a) and (4) (a) ECT has been resolved (see CJEU, RIW 2022, 219 [juris paras. 137 to 145] - European Food; BeckRS 2022, 26460 paras. 33 to 43 - Romatsa; see also Steinbrück/Krahé, IPRax 2023, 36, 41; different opinion in Wackernagel, EuZW 2022, 574, 576).

113      There is also no doubt that the principle of the effectiveness of EU law, which has been sufficiently clarified in the case-law of the Court of Justice of the European Union, as well as the obligation of the Member States under Article 19 (1), second subparagraph TEU require a review of the admissibility of intra-EU investor-State arbitration proceedings on the basis of the Energy Charter Treaty to be carried out as early as possible. The related question of whether the Respondent State in a dispute may have the inadmissibility of the ICSID arbitration proceedings determined in the special German proceedings under section 1032 (2) German Code of Civil Procedure before the arbitral tribunal is

constituted, on the other hand, concerns national procedural law and is not subject to interpretation by the Court of Justice.

114    2. There are no grounds for a request for a preliminary ruling to the Court of Justice of the European Union on the basis that the Senate thought that the conditions for an ultra vires act had been satisfied (on the necessity of a referral in such a case, see German Constitutional Court, NJW 2023, 425 [juris para. 139]; E. Klein in Benda/Klein, *Verfassungsprozessrecht*, 4th ed., para. 95; O. Klein, DVBl. 2023, p. 779, 780). The Court of Justice of the European Union did not act ultra vires when deciding on the invalidity of arbitration agreements in bilateral and multilateral investment protection treaties.

115    a) In any event, an ultra vires review can only be considered if a violation of competence by the European institutions is sufficiently qualified (see BVerfGE 126, 286 [juris, para. 61]; 154, 17 [juris, para. 110], with further references.). The jurisdictional mandate of the Court of Justice of the European Union, which is linked to the allocation of functions under Article 19 (1) sentence 2 TEU, ends where an interpretation of the Treaties is no longer verifiable and therefore objectively arbitrary (BVerfGE 154, 17 [juris, para. 112]; on the present constellation, see Steinbrück/Krahé, EuZW 2022, 357, 360 et seq.). In the allocation of competences, the principle of proportionality must be taken into account as a corrective to protect the competences of the Member States (see in this regard BVerfGE 154, 17 [juris paras. 119, 123]).

116    b) The Senate already rejected an ultra vires act of the Court of Justice of the European Union in the "Achmea" case (see Federal Court of Justice, SchiedsVZ 2019, 46 [juris paras. 60 to 71]). The decisions of the Court of Justice following the "Achmea" decision were not based on an objectively arbitrary interpretation of the Treaties, either.

117    aa) The allegation that the Court of Justice of the European Union, in its decision in the "Komstroy" case, ruled on a legal dispute that was completely external to the EU and declared an international agreement that was binding on the Member States and the EU − namely the Energy Charter Treaty − to be "inapplicable", although its competences pursuant to Article 267 (1) TFEU are

limited to the "validity" and the "interpretation" of EU law (opinion in Karpenstein/Sangi, NJW 2021, 3228 para. 7), fails.

118        The Court of Justice of the European Union was duly seized in the proceedings by the Cour d'Appel de Paris with a request for a preliminary ruling pursuant to Article 267 TFEU regarding the Energy Charter Treaty. The statement made in an obiter dictum on the non-applicability of Article 26 (2) (c) ECT in an intra-EU context can also not be seen as exceeding its competences (see CJEU, SchiedsVZ 2022, 34 [juris paras. 64 to 66] - Komstroy). The Court of Justice of the European Union has the authority to interpret international agreements concluded by the EU (see CJEU, Judgment of 27 February 2018 - C-266/16, juris paras. 45 et seq. - Western Sahara Campaign UK, with further references). It has limited itself to interpret Article 26 ECT solely in the intra-EU context and has not ruled on unlimited inapplicability or amended or repealed provisions of the agreement contrary to the mechanism provided for in Articles 34, 36 ECT.

119        bb) The objection that under Article 267 TFEU the Court of Justice of the European Union was not competent to make the statements made only as obiter dictum due to the lack of a request for a preliminary ruling is also unsuccessful (see in this regard Wilske/Markert/Ebert, SchiedsVZ 2022, 111, 128 et seq.; critical opinion in Schwalb/Weiler, SchiedsVZ 2022, 38 et seq.; for the ultra vires act, Lavranos/Lath/Varma, SchiedsVZ 2023, 38, 42 et seq.). In accordance with the questions referred for a preliminary ruling, the operative part of the decision in the "Komstroy" case only covers the interpretation of the term "investment" in Article 1 number 6 and Article 26 (1) TFEU; the binding effect only extends to this interpretation (see Wegener in Calliess/Ruffert, loc. cit., Article 267 TFEU, para. 50). Thus, the Court of Justice of the European Union was not prevented from making further statements in an obiter dictum.

120        Moreover, the Court of Justice of the European Union subsequently referred repeatedly to its statements in the "Komstroy" decision and thus confirmed them irrespective of the specific facts of the "Komstroy" case. In particular, in its Opinion 1/20 on Article 26 ECT, it referred in general terms to the decision in the "Komstroy" case, irrespective of any specific arbitration rules (Opinion of 16 June 2022 - C-1/20, juris para. 47 with para. 20 - Modernised Energy Charter Treaty).

121         cc) Neither did the Court of Justice of the European Union disregard Article 351 (1) TFEU and the legal rationale expressed therein that the Member States and not the Court of Justice must remedy incompatibilities between international agreements and EU law. The Court of Justice has understandably rejected an application of Article 351 (1) TFEU by analogy in view of the fact that the exception must be narrowly interpreted (see CJEU, NJW 2023, 349, paras. 115 to 127 - PPU; above paras. 83 to 86).

122         dd) The decisions of the Court of Justice of the European Union also do not violate general rules of international law (Article 25 German Constitution) or the Vienna Convention on the Law of Treaties of 23 May 1969 (Federal Law Gazette II 1985 p. 926; hereinafter "Vienna Convention"), in particular Article 27 Vienna Convention. According to this provision, a contracting party cannot invoke its domestic law to justify non-performance of a treaty.

123         According to Article 3 (b) Vienna Convention, the provisions of the Vienna Convention, which are an expression of general customary international law, are also applicable to non-parties − such as the European Union (see CJEU, Judgment of 25 February 2010 - C-386/08 [2010] 1-1289 = EuZW 2010, 264 [juris paras. 40 bis 42] - Brita, with further references; Judgment of 27 February 2018 - C-266/16, juris para. 58 - Western Sahara Campaign UK; Judgment of 20 October 2022 - C-111/21, NJW 2022, 3701 [juris para. 22] - Laudamotion). Articles 26 et seq. Vienna Convention are also part of customary international law. However, by acceding to the EU, the Member States have limited their power of disposition under international law and have, among themselves, waived the exercise of rights under international treaties that conflict with EU law. Accordingly, customary international law conflicting with EU law cannot exist between Member States (see Federal Court of Justice, Order of 24 January 2019 - I ZB 2/15, juris para. 7; see also Federal Court of Justice, SchiedsVZ 2019, 46 [juris paras. 40 et seq.], with further references; Cour d'Appel de Paris, Judgment of 19 April 2022 - No. 48/2022, RG-NR 20/13085 para. 90) and the citizens of the participating member states cannot rely on older obligations of the member states under international law that are in conflict with EU law (see Federal Court of Justice, SchiedsVZ 2019, 46 [juris para. 41]).

124      ee) An accusation of arbitrariness cannot be based on the fact that the Court treats investment arbitration differently from commercial arbitration, which is commonly permissible under EU law. This unequal treatment is objectively justified because the obligation of the host state to engage in investment arbitration is based on its standing offer resulting from its prior consent to other contracting states in an international treaty and not − as in commercial arbitration − on the exercise of party autonomy in the individual case vis-à-vis the respective investor (see CJEU, SchiedsVZ 2018, 186 [juris para. 55] - Achmea; SchiedsVZ 2022, 34 [juris para. 59] – Komstroy).

125      This is not contradicted by the decision in the "PL Holdings" case. The ad-hoc arbitration agreement challenged there was in fact aimed at circumventing the obligations arising for the Member State from Article 4 (3) TEU and Articles 267, 344 TFEU as interpreted in the "Achmea" decision (see CJEU, EuZW 2021, 1097 [juris paras. 47, 56] - PL Holdings).

126      ff) Insofar as it is alleged that there was an encroachment on concluded matters without transitional rules, this is the recognised consequence of the ex-tunc interpretation of EU law by the Court of Justice of the European Union (see CJEU, EuZW 2021, 1097 [juris paras. 58 to 61] - PL Holdings, with further references; see also BVerfGE 126, 286 [juris paras. 83], with further references).

127      gg) The objection that the decisions on investment arbitration lack a proportionality test also fails to substantiate the allegation that there was an ultra vires act.

128      (1) The objection does not concern the principle of proportionality as a corrective to protect the Member States' competences, which must also be observed in the allocation of competences of the EU pursuant to Article 5 (1) sentence 2 and (4) TEU (BVerfGE 154, 17 [juris, paras. 119, 123]). The decisions of the Court of Justice on intra-EU investment arbitration proceedings concern the delimitation of the competences of ordinary courts on the one hand, and arbitral tribunals on the other, in their interpretation and application of EU law.

129      (2) Irrespective of this, there is no indication that the decisions of the Court of Justice of the European Union, in reviewing acts of the institutions of the EU, do not satisfy the principle of proportionality, which is recognised as an unwritten

element of EU law (in this regard, BVerfGE 154, 17 [juris, paras. 124 to 126], with further references), in order to achieve the legitimate objective of ensuring the coherence, full validity and autonomy of EU law.

130   (a) In particular, the fact that the interpretation of the Energy Charter Treaty is only binding on the Member States, and thus on some of the contracting parties, does not stand in the way of its appropriateness. The binding interpretation by the Court of Justice of the European Union can and must refer solely to the context within the EU (see Article 19 (1), first subparagraph, sentence 2, (3) TEU). In this area, however, its interpretation is binding on all and in this way can achieve its objective of ensuring the coherence and uniformity of EU law (see in this regard CJEU, EuGRZ 2019, 191 [juris para. 111] - CETA Agreement EU-Canada).

131   (b) As far as the finding of the Court of Justice of the European Union is concerned that arbitral tribunals are not to be classified as courts within the meaning of Article 267 TFEU (see CJEU, SchiedsVZ 2018, 186 [juris paras. 37, 43, 46] Achmea), this does not result in a lack of necessity because gaps can also occur in the submissions of questions for interpretation by the ordinary courts. In this respect, there are possibilities for redress in individual cases. Under EU law, an infringement procedure under Articles 258 et seq. TFEU may be considered (see CJEU, Judgment of 4 October 2018 - C-416/17, EuZW 2018, 1038 [juris operative part 2 and paras. 105 to 114] - Commission v. France; Wegener in Calliess/Ruffert loc. cit. 35 et seq., with further references) and, domestically, a constitutional court review based on Article 101 (1) sentence 2 German Constitution (see BVerfG, EuGRZ 2022, 350 [juris paras. 41 to 47], with further references; Wegener in Calliess/Ruffert loc. cit. Article 267 TFEU para. 36, with further references). However, it would not be possible to have a comparable review in the case of arbitral tribunals entitled to file requests for a preliminary ruling.

132   (c) The decisions of the Court of Justice are also not inappropriate because of colliding economic and foreign policy concerns. Article 26 (2) (a) ECT expressly provides for the possibility of recourse to domestic courts. The Senate has already explained that the investors are not denied effective legal protection (Article 2 (1) in conjunction with Article 20 (3) German Constitution; Article 47 EU

Charter of Fundamental Rights) (see Federal Court of Justice, SchiedsVZ 2019, 46 [juris, para. 72]), but rather, with a view to the principle of mutual trust, are granted effective legal protection before the courts of the Member States (see CJEU, EuZW 2021, 1097 [juris para. 68] - PL Holdings; Cour d'Appel de Paris, Judgment of 19 April 2022 - No. 48/2022, RG-NR 20/13085 paras. 92 to 95; see also Federal Court of Justice, IWRZ 2022, 129 [juris para. 41]; Langenfeld, EuR 2022, 399, 404; van der Beck loc. cit. p. 370, 373, with further references). On the international level, there is also the possibility of appealing to the European Court of Human Rights (see Lavranos/Lath/Varma, SchiedsVZ 2023, 38, 46).

133    D. Accordingly, the appealed order must be set aside and, as requested, a declaration of inadmissibility must be given pursuant to section 1032 (2) German Code of Civil Procedure. The Senate can itself decide on the merits of the case because the decision is set aside only as a result of a violation of the law when applying the law to the determined facts, and, thus, the case is ready for final adjudication (section 577 (5) sentence 1 German Code of Civil Procedure).

134    The decision on costs is based on section 91 (1) German Code of Civil Procedure.

135    E. The value of the subject matter of the appeal is set at € 30 million.

136    The value of the subject matter of the appeal in proceedings pursuant to section 1032 (2) German Code of Civil Procedure must be set at one fifth of the value of the main matter according to the established practice of the Senate (see Federal Court of Justice, SchiedsVZ 2020, 50 [juris, para. 26], with further references; NJOZ 2023, 497 [juris, para. 22]). Based on the value asserted in the request for arbitration in the amount of € (…) million, therefore, a sum of € (…) million would be set. Pursuant to section 39 (2) German Court Cost Act, however, the maximum amount may not exceed € 30 million, unless a lower maximum value is determined.

Koch                    Feddersen                    Pohl

Schmaltz                    Odörfer


Lower court:

Berlin Higher Regional Court, decision of 28 April 2022 - 12 SchH 6/21 -