# EXHIBIT 52



# BUNDESGERICHTSHOF

## BESCHLUSS

I ZB 75/22

Verkündet am:
27. Juli 2023
Hemminger
Justizangestellte
als Urkundsbeamtin
der Geschäftsstelle

in dem Verfahren
auf Feststellung der Unzulässigkeit des Schiedsverfahrens

ECLI:DE:BGH:2023:270723BIZB75.22.0

- 2 -

Der I. Zivilsenat des Bundesgerichtshofs hat auf die mündliche Verhand-
lung vom 17. Mai 2023 durch den Vorsitzenden Richter Prof. Dr. Koch, den Rich-
ter Feddersen, die Richterinnen Pohl und Dr. Schmaltz sowie den Richter Odörfer

beschlossen:

> Auf die Rechtsbeschwerde der Antragsgegnerin wird unter Zurück-
> weisung des weitergehenden Rechtsmittels der Beschluss des
> 19. Zivilsenats des Oberlandesgerichts Köln vom 1. September
> 2022 im Kostenpunkt und insoweit aufgehoben, als hinsichtlich des
> Antrags zu 2 zum Nachteil der Antragsgegnerin erkannt worden ist.

> Im Umfang der Aufhebung wird der Antrag zu 2 auf Feststellung,
> dass jegliches schiedsrichterliche Verfahren zwischen dem Antrag-
> steller und der Antragsgegnerin auf der Grundlage von Art. 26
> Abs. 3 und 4 ECV unzulässig ist, als unzulässig verworfen.

> Die Kosten des Verfahrens tragen der Antragsteller zu $^1/_3$ und die
> Antragsgegnerin zu $^2/_3$.

> Der Wert des Beschwerdegegenstands wird auf 30 Mio. € festge-
> setzt.

Gründe:

1    A. Der Antragsteller ist das Königreich der Niederlande (nachfolgend "Nie-
derlande"). Die Antragsgegnerin hat ihren satzungsmäßigen Sitz in der Bundes-
republik Deutschland (nachfolgend "Deutschland"). Sie investiert unter anderem
in die konventionelle Stromerzeugung aus Kohle.

2    Die Antragsgegnerin sieht ihre Investitionen in das im Staatsgebiet des
Antragstellers bei G.     im Hafen von E.     gelegene Kohlekraftwerk

- 3 -

aufgrund der regulatorischen Entscheidung des Antragstellers, bis 2030 aus der Kohleverstromung auszusteigen, geschädigt. Sie reichte daher am 20. Januar 2021 mit einer weiteren Schiedsklägerin einen Antrag auf Einleitung eines Schiedsverfahrens gegen den Antragsteller auf Grundlage des Energiecharta-Vertrags beim Internationalen Zentrum zur Beilegung von Investitionsstreitigkeiten (International Centre for Settlement of Investment Disputes; nachfolgend "ICSID" bzw. "Zentrum") ein. Das Verfahren wurde am 2. Februar 2021 zum Aktenzeichen ICSID ARB/21/4 registriert; das Schiedsgericht konstituierte sich am 2. Juni 2021. Die Schiedsklägerinnen bezifferten ihre Ansprüche auf 1,4 Mrd. €.

3          Der Energiecharta-Vertrag ist ein multilaterales Abkommen zur Kooperation im Energiesektor, das von 49 Staaten sowie der Europäischen Union (EU) und der Europäischen Atomgemeinschaft (Euratom) ratifiziert wurde und am 16. April 1998 in Kraft trat. Seit diesem Tag ist der Energiecharta-Vertrag nach Zustimmung durch Gesetz vom 20. Dezember 1996 (BGBl. II 1997 S. 4) auch in Deutschland (BGBl. II 1998 S. 3009; nachfolgend "ECV") und, nach Ratifikation am 11. Dezember 1997, in den Niederlanden in Kraft.

4          In Art. 10 ECV sichern sich die Vertragsparteien die Förderung und den Schutz von Investitionen durch die Schaffung stabiler, gerechter, günstiger und transparenter Bedingungen für Investoren anderer Vertragsstaaten zu. In Art. 13 ECV wird unter anderem Schutz vor entschädigungslosen Enteignungen gewährt. Beide Regelungen finden sich in Teil III des Energiecharta-Vertrags. Nach Art. 26 ECV besteht für den Investor aus einem Vertragsstaat die Möglichkeit, einen anderen Vertragsstaat wegen möglicher Verletzungen des Energiecharta-Vertrags im Wege eines Schiedsverfahrens in Anspruch zu nehmen. Die Vorschrift lautet auszugsweise:

(1)    Streitigkeiten zwischen einer Vertragspartei und einem Investor einer anderen Vertragspartei über eine Investition des letzteren im Gebiet der ersteren, die sich auf einen behaupteten Verstoß der ersteren Vertragspartei gegen eine Verpflichtung aus Teil III beziehen, sind nach Möglichkeit gütlich beizulegen.

(2)    Können solche Streitigkeiten nicht innerhalb von drei Monaten nach dem Zeitpunkt, zu dem eine der Streitparteien um eine gütliche Beilegung ersucht hat,

- 4 -

nach Absatz 1 beigelegt werden, so kann der Investor als Streitpartei die Strei-
tigkeit auf folgende Weise beilegen lassen:

a) durch die Zivil- oder Verwaltungsgerichte der an der Streitigkeit beteilig-
ten Vertragspartei;

b) im Einklang mit einem anwendbaren, zuvor vereinbarten Streitbeile-
gungsverfahren oder

c) im Einklang mit den folgenden Absätzen.

(3) a) Vorbehaltlich nur der Buchstaben b und c erteilt jede Vertragspartei hier-
mit ihre uneingeschränkte Zustimmung, eine Streitigkeit einem interna-
tionalen Schieds- oder Vergleichsverfahren in Übereinstimmung mit die-
sem Artikel zu unterwerfen. …

(4) Beabsichtigt ein Investor, die Streitigkeit einer Beilegung nach Absatz 2
Buchstabe c zu unterwerfen, so hat er ferner schriftlich seine Zustimmung zu
erteilen, damit die Streitigkeit folgenden Stellen vorgelegt werden kann:

a) i) dem Internationalen Zentrum zur Beilegung von Investitionsstreitigkeiten,
das im Rahmen des am 18. März 1965 in Washington zur Unterzeich-
nung aufgelegten Übereinkommens zur Beilegung von Investitionsstrei-
tigkeiten zwischen Staaten und Angehörigen anderer Staaten (im folgen-
den als "ICSID-Übereinkommen" bezeichnet) errichtet wurde, falls so-
wohl die Vertragspartei des Investors als auch die an der Streitigkeit be-
teiligte Vertragspartei Vertragsparteien des ICSID-Übereinkommens
sind, …

(5) a) Die Zustimmung nach Absatz 3 zusammen mit der schriftlichen Zustim-
mung des Investors nach Absatz 4 wird so angesehen, als erfülle sie das
Erfordernis

i) der schriftlichen Zustimmung der Streitparteien im Sinne des Kapitels II
des ICSID-Übereinkommens und im Sinne der Regeln für die Zusatzein-
richtung, …

(6) Ein nach Absatz 4 gebildetes Schiedsgericht entscheidet über die strittigen
Fragen in Übereinstimmung mit diesem Vertrag und den geltenden Regeln
und Grundsätzen des Völkerrechts. …

5      Mit dem Übereinkommen vom 18. März 1965 zur Beilegung von Investiti-
onsstreitigkeiten zwischen Staaten und Angehörigen anderer Staaten (nachfol-
gend "ICSID-Übereinkommen") wurde ein Internationales Zentrum zur Beilegung
von Investitionsstreitigkeiten errichtet, dessen Zweck es ist, nach Maßgabe des
Übereinkommens Vergleichs- und Schiedseinrichtungen zur Beilegung von In-
vestitionsstreitigkeiten zwischen Vertragsstaaten und Angehörigen anderer Ver-
tragsstaaten zur Verfügung zu stellen (Art. 1 ICSID-Übereinkommen). Der Deut-
sche Bundestag stimmte dem ICSID-Übereinkommen mit Gesetz vom

- 5 -

25. Februar 1969 zu (BGBl. II S. 369; nachfolgend "InvStreitBeilG"); das Über-
einkommen trat am 18. Mai 1969 in Kraft (BGBl. II S. 1191). Die Niederlande un-
terzeichneten das ICSID-Übereinkommen am 25. Mai 1966; es trat dort am
14. Oktober 1966 in Kraft.

6        Der Antragsteller hat mit seinen am 10. Mai 2021 beim Oberlandesgericht
eingegangenen Anträgen die Feststellung der Unzulässigkeit des zum Aktenzei-
chen ICSID ARB/21/4 eingeleiteten Schiedsverfahrens (Antrag zu 1) sowie jegli-
chen schiedsrichterlichen Verfahrens nach Art. 26 Abs. 3 und 4 ECV (Antrag
zu 2) beantragt. Das Oberlandesgericht hat den Anträgen stattgegeben (OLG
Köln, Beschluss vom 1. September 2022 - 19 SchH 15/21, juris). Dagegen richtet
sich die Rechtsbeschwerde der Antragsgegnerin, deren Zurückweisung der An-
tragsteller beantragt.

7        B. Das Oberlandesgericht hat zur Begründung seiner Entscheidung im
Wesentlichen ausgeführt:

8        Der Rechtsweg zu den ordentlichen Gerichten sei für den Antrag nach
§ 1032 Abs. 2 ZPO gemäß § 13 GVG in Verbindung mit § 40 Abs. 2 Satz 1 Halb-
satz 1 VwGO eröffnet. Die sachliche, örtliche und internationale Zuständigkeit
folge aus § 1062 Abs. 1 Nr. 2, Abs. 2 ZPO. Mangels inländischen Schiedsorts sei
der Sitz der Antragsgegnerin maßgeblich, was die Zuständigkeit des Senats be-
gründe.

9        Der Antrag zu 1 sei rechtzeitig vor Konstituierung des Schiedsgerichts ein-
gereicht worden. Seiner Statthaftigkeit stehe das geschlossene Rechtssystem
des ICSID-Übereinkommens nicht entgegen. Hier sei nicht über die Schiedsklage
nach dem ICSID-Übereinkommen zu entscheiden, sondern ob eine wirksame
Schiedsvereinbarung durch die auch unionsrechtliche Vorschrift des Art. 26 ECV
als Grundlage des Schiedsverfahrens vorliege. Es sei Sache der nationalen Ge-
richte, dem Unionsrecht zur vollen Wirksamkeit zu verhelfen. Eine frühzeitige
Feststellung der unionsrechtlichen Unwirksamkeit der Schiedsabrede sei nach

der der Verfahrensökonomie dienenden Vorschrift des § 1032 Abs. 2 ZPO mög-
lich und müsse auch für ICSID-Verfahren statthaft sein.

10          Der Antrag zu 1 sei auch begründet. Es fehle an einer wirksamen Schieds-
vereinbarung. Die Schiedsklausel in Art. 26 Abs. 2 Buchst. c, Abs. 3 und 4 ECV
sei in Intra-EU-Streitigkeiten nach der Rechtsprechung des Gerichtshofs der Eu-
ropäischen Union mit dem Unionsrecht unvereinbar. Zwar unterlägen Schieds-
verfahren nach dem ICSID-Übereinkommen grundsätzlich nicht der Kontrolle na-
tionaler Gerichte. Einer letztverbindlichen Auslegung und Anwendung des Uni-
onsrechts durch das Schiedsgericht stehe aber das Rechtsprechungsmonopol
des Gerichtshofs der Europäischen Union entgegen. Dies gelte auch für Schieds-
verfahren mit Sitz außerhalb der Europäischen Union und für ICSID-Schiedsver-
fahren. Für die Effektivität des Unionsrechts müsse es auch möglich sein, die
Vorfrage der Unzulässigkeit des Schiedsverfahrens wegen Verstoßes gegen das
Unionsrecht vorab geltend zu machen.

11          Der Antrag zu 2 sei ebenfalls zulässig und begründet. Für den Antrag nach
§ 1032 Abs. 2 ZPO müsse noch kein konkreter Streitfall vorliegen. Das allein er-
forderliche allgemeine Rechtsschutzbedürfnis sei gegeben.

12          C. Die Rechtsbeschwerde ist statthaft (§ 574 Abs. 1 Satz 1 Nr. 1 ZPO in
Verbindung mit § 1065 Abs. 1 Satz 1, § 1062 Abs. 1 Nr. 2 Fall 1, § 1032 Abs. 2
ZPO) und auch sonst zulässig (§ 574 Abs. 2 ZPO). Sie erweist sich als teilweise
begründet. Das Oberlandesgericht hat den Antrag zu 1 auf Feststellung der Un-
zulässigkeit des Schiedsverfahrens zu Recht für zulässig (dazu C I) und begrün-
det (dazu C II) gehalten. Eine Vorlage an den Gerichtshof der Europäischen
Union ist nicht veranlasst (dazu C III). Der Antrag zu 2 auf Feststellung der Un-
zulässigkeit jeglichen schiedsrichterlichen Verfahrens zwischen den Parteien ist
dagegen entgegen der Ansicht des Oberlandesgerichts unzulässig (dazu C IV).

13          I. Der Antrag zu 1 gemäß § 1032 Abs. 2 ZPO ist zulässig. Die Frage, ob
der Rechtsweg zu den ordentlichen Gerichten eröffnet ist, unterliegt nicht der

Kontrolle durch das Rechtsbeschwerdegericht (dazu C I 1). Die deutschen Gerichte sind für die Entscheidung über den Antrag international zuständig (dazu C I 2). Der Antrag ist rechtzeitig gestellt worden (dazu C I 3) und auch statthaft (dazu C I 4). Ein Rechtsschutzbedürfnis für den Antrag liegt ebenfalls vor (dazu C I 5).

14        1. Die Frage, ob der Rechtsweg zu den ordentlichen Gerichten nach § 13 GVG, § 40 Abs. 2 Satz 1 VwGO eröffnet ist, unterliegt im Streitfall gemäß § 17a Abs. 5 GVG nicht der Kontrolle durch das Rechtsbeschwerdegericht.

15        a) Das Oberlandesgericht hat angenommen, der Rechtsweg zu den ordentlichen Gerichten sei gemäß § 13 GVG eröffnet. Es gehe um Sekundäransprüche eines privaten Investors gegen eine Partei eines völkerrechtlichen Vertrags, für die gemäß der abdrängenden Sonderzuweisung in § 40 Abs. 2 Satz 1 Halbsatz 1 VwGO der ordentliche Rechtsweg gegeben sei.

16        b) Nach § 17a Abs. 5 GVG prüft das Gericht, das über ein Rechtsmittel gegen eine Entscheidung in der Hauptsache entscheidet, nicht, ob der beschrittene Rechtsweg zulässig ist. Die Vorschrift gilt ebenso für Beschlüsse, die der formellen Rechtskraft fähig sind (vgl. MünchKomm.ZPO/Pabst, 6. Aufl., § 17a GVG Rn. 25). So liegt es hier. Das Oberlandesgericht hat in seinem Beschluss den Zivilrechtsweg ausdrücklich bejaht und den Antrag nach § 1032 Abs. 2 ZPO auch im Übrigen als zulässig und begründet erachtet.

17        c) Die Zulässigkeit des Rechtswegs ist vom Senat auch nicht ausnahmsweise zu überprüfen. Hat das Gericht erster Instanz entgegen § 17a Abs. 3 Satz 2 GVG nach Rüge über die Zulässigkeit des Rechtswegs hierüber nicht vorab durch Beschluss, sondern erst in der Entscheidung in der Hauptsache entschieden, ist § 17a Abs. 5 GVG zwar nicht anwendbar (vgl. BGH, Beschluss vom 23. September 1992 - I ZB 3/92, BGHZ 119, 246 [juris Rn. 15] - Rechtswegprüfung; Beschluss vom 3. November 2021 - XII ZB 289/21, NZFam 2022, 63 [juris Rn. 9] mwN). Einer solchen Vorabentscheidung bedurfte es hier aber nicht. Die Rechtsbeschwerdeerwiderung weist zutreffend darauf hin, dass es an einem

ausdrücklichen Bestreiten des Zivilrechtswegs durch die Antragsgegnerin im erstinstanzlichen Verfahren und damit an der für eine Verpflichtung zur Vorabentscheidung nötigen Rüge nach § 17a Abs. 3 Satz 2 GVG fehlt.

18        aa) Haben die Parteien die Zulässigkeit des beschrittenen Rechtswegs nicht gerügt und durfte das erstinstanzliche Gericht deshalb von einer Vorabentscheidung nach § 17a Abs. 3 GVG absehen, ist das Rechtsmittelgericht an die auch nur stillschweigend bejahte Rechtswegzuständigkeit selbst in zweifelhaften Fällen gebunden (vgl. BGH, Beschluss vom 18. September 2008 - V ZB 40/08, NJW 2008, 3572 [juris Rn. 13 f., 16 f.]; Jacobs in Stein/Jonas, ZPO, 23. Aufl., § 17a GVG Rn. 24). Die Rüge muss ausdrücklich und innerhalb der Frist des § 282 Abs. 3 ZPO erhoben werden (vgl. Wittschier in Musielak/Voit, ZPO, 20. Aufl., § 17a GVG Rn. 12 mwN; zur Geltung von § 282 Abs. 3 ZPO vgl. BGH, Urteil vom 25. Februar 1993 - III ZR 9/92, BGHZ 121, 367 [juris Rn. 15]; Urteil vom 18. November 1998 - VIII ZR 269/97, NJW 1999, 651 [juris Rn. 7]; Zöller/ Lückemann, ZPO, 34. Aufl., § 17a GVG Rn. 6). Die Rechtswegrüge muss zwar nicht ausdrücklich als solche bezeichnet werden. Erforderlich ist aber ein Vorbringen, das die Zulässigkeit des Rechtswegs eindeutig bestreitet (VGH Baden-Württemberg, WissR 2020, 209 [juris Rn. 3]; Kissel/Mayer, GVG, 10. Aufl., § 17 Rn. 27, jeweils mwN). Daran fehlt es hier.

19        bb) Die Antragsgegnerin hat binnen der gesetzten Frist in ihrer Antragserwiderung vom 9. Juli 2021 und damit innerhalb der Frist des § 282 Abs. 3 Satz 2 ZPO die Zulässigkeit des Rechtswegs zu den ordentlichen Gerichten nicht ausdrücklich und eindeutig im Sinne des § 17a Abs. 3 Satz 2 GVG gerügt. Die Auslegung ihres von der Rechtsbeschwerde in Bezug genommenen Vorbringens ergibt, dass nicht die Zulässigkeit des Rechtswegs zum Oberlandesgericht und damit die Konkurrenz staatlicher Gerichte untereinander gerügt worden ist. Das Vorbringen hat vielmehr die Frage betroffen, ob ein Vorgehen nach § 1032 Abs. 2 ZPO vor den staatlichen Gerichten überhaupt möglich ist. Die Antragsgegnerin hat zwar § 13 GVG erwähnt, wonach vor die ordentlichen Gerichte - unter anderem - die bürgerlichen Rechtsstreitigkeiten gehören, für die nicht entweder die

- 9 -

Zuständigkeit von Verwaltungsbehörden oder Verwaltungsgerichten begründet ist oder auf Grund von Vorschriften des Bundesrechts besondere Gerichte bestellt oder zugelassen sind. Sie hat aber sodann unter der Überschrift "Die Vorschriften der §§ 1025 ff. sind auf ICSID-Schiedsverfahren nicht anwendbar" zum Verhältnis von bürgerlich-rechtlichen Streitigkeiten vor den ordentlichen Gerichten zu völkerrechtlichen Streitigkeiten vor einem internationalen Schiedsgericht vorgetragen. In einem späteren Schriftsatz hat die Antragsgegnerin bestätigt, dass es ihr generell um einen "Ausschluss der staatlichen Gerichtsbarkeit bei ICSID-Schiedsverfahren" gehe. Damit hat sie in der Gesamtschau auf die fehlende Statthaftigkeit des Antrags nach § 1032 Abs. 2 ZPO vor einem staatlichen Gericht abgezielt, der ihren allein gestellten Antrag auf Zurückweisung der Anträge - vorrangig als unzulässig - hat tragen sollen. Es ist ihr gerade nicht um eine - deshalb von ihr auch nicht hilfsweise beantragte - Verweisung des Rechtsstreits an ein anderes staatliches Gericht wegen der Unzulässigkeit des beschrittenen Rechtswegs gegangen.

20        2. Die deutschen Gerichte sind gemäß § 1025 Abs. 2 ZPO für den Antrag nach § 1032 Abs. 2 ZPO international zuständig.

21        a) Die internationale Zuständigkeit der deutschen Gerichte ist im Rechtsbeschwerdeverfahren von Amts wegen zu prüfen. Die Prüfung ist nicht durch § 576 Abs. 2 ZPO ausgeschlossen; für das Rechtsbeschwerdeverfahren gilt nichts anderes als für das Revisionsverfahren, in dem § 545 Abs. 2 ZPO der Prüfung der internationalen Zuständigkeit nicht entgegensteht (vgl. BGH, Beschluss vom 13. August 2009 - I ZB 43/08, WRP 2009, 1559 [juris Rn. 10]; Beschluss vom 22. September 2016 - V ZB 125/15, RIW 2017, 138 [juris Rn. 8]; zu § 545 Abs. 2 ZPO vgl. nur BGH, Urteil vom 14. Juli 2022 - I ZR 121/21, GRUR 2022, 1675 [juris Rn. 29] = WRP 2022, 1519 - Google-Drittauskunft, mwN).

22        b) Die internationale Zuständigkeit für den Antrag nach § 1032 Abs. 2 ZPO ergibt sich im Streitfall aus der analogen Anwendung des § 1025 Abs. 2 ZPO.

23        aa) Nach § 1032 Abs. 2 ZPO kann bei Gericht bis zur Bildung des Schiedsgerichts Antrag auf Feststellung der Zulässigkeit oder Unzulässigkeit eines schiedsrichterlichen Verfahrens gestellt werden. Nach § 1025 Abs. 2 ZPO sind die Bestimmungen der §§ 1032, 1033 und 1050 ZPO auch dann anzuwenden, wenn der Ort des schiedsrichterlichen Verfahrens im Ausland liegt oder noch nicht bestimmt ist.

24        bb) Die Vorschrift des § 1025 Abs. 2 ZPO regelt damit die internationale Zuständigkeit der deutschen Gerichte für - unter anderem - das Verfahren nach § 1032 Abs. 2 ZPO (vgl. Geimer, IZPR, 8. Aufl., Rn. 1258 f.; MünchKomm.ZPO/ Münch aaO § 1025 Rn. 18; Schlosser in Stein/Jonas aaO § 1062 Rn. 4, § 1025 Rn. 6; Voit in Musielak/Voit aaO § 1062 Rn. 1, § 1025 Rn. 5; aA Kröll, IHR 2005, 142, 144). Soweit die Antragsgegnerin geltend macht, bei der Einbeziehung von § 1032 Abs. 2 ZPO in § 1025 Abs. 2 ZPO handle es sich um ein gesetzgeberisches Versehen, dringt sie damit nicht durch. Zwar wird in der Gesetzesbegründung nur auf die Schiedseinrede in Klageverfahren vor den staatlichen Gerichten gemäß § 1032 Abs. 1 ZPO Bezug genommen (vgl. Regierungsentwurf eines Gesetzes zur Neuregelung des Schiedsverfahrensrechts vom 12. Juli 1996, BT-Drucks. 13/5274, S. 31). Ein damit möglicherweise intendierter Ausschluss von § 1032 Abs. 2 und 3 ZPO bei der Anwendung von § 1025 Abs. 2 ZPO hat im Gesetz aber keinen Niederschlag gefunden. Für die Auslegung einer Gesetzesvorschrift ist jedoch der in dieser zum Ausdruck kommende objektivierte Wille des Gesetzgebers maßgeblich, so wie er sich aus dem Wortlaut der Gesetzesbestimmung und dem Sinnzusammenhang ergibt, in den diese hineingestellt ist. Die vorrangig am objektiven Sinn und Zweck des Gesetzes zu orientierende Auslegung kann durch Motive, die im Gesetzgebungsverfahren dargelegt wurden, im Gesetzeswortlaut aber keinen Ausdruck gefunden haben, nicht gebunden werden (vgl. BGH, Urteil vom 6. Juni 2019 - I ZR 67/18, GRUR 2019, 970 [juris Rn. 66] = WRP 2019, 1304 - Erfolgshonorar für Versicherungsberater, mwN).

25          cc) Die internationale Zuständigkeit deutscher Gerichte folgt nicht bereits aus dem Wortlaut des § 1025 Abs. 2 ZPO. Das von der Antragsgegnerin eingeleitete Schiedsverfahren findet weder im Sinne dieser Vorschrift "im Ausland" statt (Fall 1) noch ist der Ort des schiedsrichterlichen Verfahrens "noch nicht bestimmt" (Fall 2).

26          (1) Das Schiedsverfahren wurde von der Antragsgegnerin vor dem Zentrum eingeleitet. Der Sitz des Zentrums ist gemäß Art. 2 Satz 1 ICSID-Übereinkommen am Sitz der Internationalen Bank für Wiederaufbau und Entwicklung und damit in Washington D.C., Vereinigte Staaten von Amerika (USA). Gemäß Art. 62 f. in Kapitel VII des ICSID-Übereinkommens finden vorbehaltlich anderweitiger Parteivereinbarungen am Sitz des Zentrums, das vom Schiedsgericht zu unterscheiden ist (vgl. Schöbener/Markert, ZVglRWiss 2006, 65, 73), die Schiedsverfahren statt.

27          (2) Daraus folgt indes nicht, dass der für § 1025 Abs. 2 ZPO maßgebliche Ort des schiedsrichterlichen Verfahrens in den USA und damit im Ausland liegt.

28          Anders als die Bezeichnung von Kapitel VII des ICSID-Übereinkommens - "Ort des Verfahrens" ("Place of Proceedings") - nahelegen könnte, wird in Art. 62 f. ICSID-Übereinkommen nur der Tagungsort als derjenige Ort geregelt, an dem das Schiedsgericht seine Verhandlungen faktisch abhält. Dieser Tagungsort ist nicht gleichzusetzen mit dem Schiedsort als dem Legaldomizil des Schiedsverfahrens, das der Verankerung des Schiedsverfahrens in einer bestimmten Rechtsordnung dient (vgl. BT-Drucks. 13/5274, S. 47; BeckOK.ZPO/Wilske/Markert, 48. Edition [Stand 1. März 2023], § 1043 Rn. 1; MünchKomm.ZPO/Münch aaO § 1043 Rn. 3 und 5; Zöller/Geimer aaO § 1043 Rn. 1 und 4).

29        Das entspricht der ganz überwiegenden Ansicht in der nationalen sowie internationalen Literatur zum ICSID-Übereinkommen. Danach finden Investor-Staat-Schiedsverfahren nach diesem Übereinkommen delokalisiert statt (vgl. Kern, Schiedsgericht und Generalklausel, 2017, S. 62, 78; Bertolini, Die Durchsetzung von ISDS-Entscheidungen in Deutschland, 2019, S. 92; Köster, Investitionsschutz in Europa, 2022, S. 16 f.; Schütze/Thümmel, Schiedsgericht und Schiedsverfahren, 7. Aufl., § 25 Rn. 6; Happ in Schütze, Institutionelle Schiedsgerichtsbarkeit, 3. Aufl., XV. Kapitel, Abschnitt II Rn. 13, Abschnitt IV Rule 13 ICSID Arbitration Rules Rn. 5; Sasson in Fouret/Gerbay/Alvarez, The ICSID Convention, Regulations and Rules, A Practical Commentary, Art. 62 Rn. 7.03 f.; Schütze in Wieczorek/Schütze, ZPO, 5. Aufl., § 1025 Rn. 56b; Gaillard, ICSID Review - Foreign Investment Law Journal 1988, 136, 138 f.; Berger, SchiedsVZ 2017, 282, 289; von Marschall, RIW 2021, 785, 787; Nikolov, EuR 2022, 496, 501; Seelmann-Eggebert, SchiedsVZ 2023, 32, 35 f.; aA Semler, SchiedsVZ 2003, 97, 101).

30        Bei den von ICSID-Schiedsgerichten erlassenen Schiedssprüchen handelt es sich daher weder um inländische noch um ausländische Schiedssprüche im Sinne der §§ 1060 f. ZPO, sondern um Schiedssprüche sui generis (vgl. Semler, SchiedsVZ 2003, 97, 99; von Marschall, RIW 2021, 785, 787). Entgegen dem in der Handelsschiedsgerichtsbarkeit geltenden Grundsatz, dass es keine von jeder nationalen Rechtsordnung losgelösten privaten Schiedsverfahren gibt (vgl. Geimer aaO Rn. 3718 mwN; MünchKomm.ZPO/Münch aaO § 1025 Rn. 11; Schütze in Wieczorek/Schütze aaO § 1043 Rn. 6 f.), kommt es in einer Investitionsstreitigkeit vor dem Zentrum ausnahmsweise zu einem anationalen Schiedsverfahren (Köster aaO S. 16 f.).

31        (3) Es liegt auch kein Fall eines "noch nicht bestimmten" Schiedsorts vor (§ 1025 Abs. 2 Fall 2 ZPO). Die Formulierung "noch nicht bestimmt" spricht für einen nur vorübergehenden Zustand. Nach § 1043 Abs. 1 Satz 1 ZPO können die Parteien eine Vereinbarung über den Ort des schiedsrichterlichen Verfahrens treffen. Fehlt eine solche Vereinbarung, so wird der Ort des schiedsrichterlichen

Verfahrens vom Schiedsgericht bestimmt (§ 1043 Abs. 1 Satz 2 ZPO). Bis zu einer solchen Bestimmung besteht ein Schwebezustand ohne die Möglichkeit einer territorialen Anknüpfung. Für diesen Schwebezustand gilt die Regelung in § 1025 Abs. 2 Fall 2 ZPO (vgl. MünchKomm.ZPO/Münch aaO § 1025 Rn. 24).

32        Ein solcher - vorübergehender - Schwebezustand liegt im Streitfall nicht vor. Bei einem ICSID-Schiedsverfahren wird kein Schiedsort, sondern allein ein Tagungsort bestimmt. Eine spätere Bestimmung des Schiedsorts durch das Schiedsgericht scheidet damit von vornherein aus.

33        dd) Die Regelung des § 1025 Abs. 2 ZPO ist aber, jedenfalls soweit sie auf die Bestimmung des § 1032 ZPO verweist, entsprechend anzuwenden, wenn es keinen inländischen Schiedsort gibt (ähnlich BeckOK.ZPO/Wolf/Eslami, 48. Edition [Stand 1. September 2022], § 1032 Rn. 39; ablehnend BeckOK.ZPO/Wilske/Markert aaO § 1062 Rn. 2.4 mwN).

34        (1) Die analoge Anwendung einer Vorschrift setzt eine planwidrige Regelungslücke und eine vergleichbare Interessenlage voraus (st. Rspr.; vgl. nur BGH, Urteil vom 7. November 2019 - I ZR 42/19, GRUR 2020, 429 [juris Rn. 32] = WRP 2020, 452 - Sportwetten in Gaststätten, mwN). Diese Voraussetzungen sind erfüllt.

35        (2) Soweit die delokalisierten und damit anationalen ICSID-Investitionsschiedsverfahren vom Gesetzeswortlaut nicht erfasst werden, ergibt sich eine planwidrige Regelungslücke. Es gibt keinen Anhaltspunkt dafür, dass der Gesetzgeber diese besondere Konstellation aus dem 10. Buch der Zivilprozessordnung ausgrenzen wollte.

36        (a) Nach § 1025 Abs. 1 ZPO sind die Vorschriften des 10. Buchs der Zivilprozessordnung anzuwenden, wenn der Ort des schiedsrichterlichen Verfahrens im Sinne des § 1043 Abs. 1 ZPO in Deutschland liegt. Für einige Vorschriften des 10. Buchs der Zivilprozessordnung, unter anderem die Schiedseinrede nach § 1032 Abs. 1 ZPO sowie das hier maßgebliche Feststellungsverfahren nach

- 14 -

§ 1032 Abs. 2 ZPO, eröffnet die Vorschrift des § 1025 Abs. 2 ZPO - wie bereits dargestellt - einen darüber hinausgehenden Anwendungsbereich, wenn der Ort des schiedsrichterlichen Verfahrens im Ausland liegt oder noch nicht bestimmt ist (vgl. Schlosser in Stein/Jonas aaO § 1062 Rn. 4, § 1025 Rn. 6; Voit in Musielak/Voit aaO § 1025 Rn. 5 bis 7).

37        (b) Mit den sich danach aus § 1025 Abs. 1 und 2 ZPO ergebenden drei Fallgruppen - "Schiedsort in Deutschland", "Schiedsort im Ausland" und "Schiedsort noch nicht bestimmt" - waren für die internationale Handelsschiedsgerichtsbarkeit im Sinne des als Grundlage für die Schiedsverfahrensreform dienenden UNCITRAL-Modellgesetzes (vgl. BT-Drucks. 13/5274, S. 24; zum Anwendungsbereich des Modellgesetzes vgl. Melis in Kronke/Melis/Kuhn, Handbuch Internationales Wirtschaftsrecht, 2. Aufl., Teil P Rn. 230) alle denkbaren Konstellationen erfasst.

38        (c) Der deutsche Gesetzgeber hat sich bewusst dafür entschieden, das 10. Buch der Zivilprozessordnung über den Anwendungsbereich des UNCITRAL-Modellgesetzes hinaus auf alle Schiedsverfahren auszudehnen (vgl. BT-Drucks. 13/5274, S. 25 und 31). Damit sind alle nationalen und internationalen privatrechtlichen - und nicht nur die handelsrechtlichen - Schiedsverfahren erfasst (vgl. Kulick/Scheu in Fouret, Enforcement of Investment Treaty Arbitration Awards, 2. Aufl., S. 385, 389; Lachmann, Handbuch für die Schiedsgerichtspraxis, 3. Aufl., Rn. 190; MünchKomm.ZPO/Münch aaO Vorb. zu § 1025 Rn. 23 f., § 1029 Rn. 93). Trotz ihres engen Bezugs zum Völkerrecht gehört hierher als Sonderform auch die internationale Investitionsschiedsgerichtsbarkeit zwischen privaten Investoren und Staaten (zu Schiedsverfahren aufgrund eines bilateralen Investitionsschutzabkommens vgl. BGH, Beschluss vom 3. März 2016 - I ZB 2/15, SchiedsVZ 2016, 328 [juris Rn. 15]; Beschluss vom 31. Oktober 2018 - I ZB 2/15, SchiedsVZ 2019, 46 [juris Rn. 16]; Beschluss vom 17. November 2021 - I ZB 16/21, IWRZ 2022, 129 [juris Rn. 8, 34]; Raeschke-Kessler in Prütting/Gehrlein, ZPO, 14. Aufl., § 1061 Rn. 11; Köster aaO S. 30; Schwab/Walter, Schiedsgerichtsbarkeit, 7. Aufl., Kapitel 41 Rn. 22 mwN; vgl. auch BeckOK.ZPO/

- 15 -

Wolf/Eslami aaO § 1025 Rn. 9a mwN; MünchKomm.ZPO/Münch aaO Vorb. zu § 1025 Rn. 18 bis 22), zu der auch die ICSID-Investitionsschiedsverfahren zählen (vgl. Herdegen, Internationales Wirtschaftsrecht, 13. Aufl., § 23 Rn. 97; Kern aaO S. 66 bis 88; Schöbener/Markert, ZVglRWiss 2006, 65, 68 bis 70 mwN; offen Schwab/Walter aaO Kapitel 41 Rn. 5, Fn. 42; aA Raeschke-Kessler in Festschrift Schlick, 2015, S. 57 f., 75; insgesamt dazu Pirrung, Die Schiedsgerichtsbarkeit nach dem Weltbankübereinkommen für Investitionsstreitigkeiten, 1972, S. 183 bis 192 mwN).

39          (d) Soweit die Rechtsbeschwerde die Auffassung vertritt, der Gesetzgeber habe mit der Änderung von Art. 2 Abs. 2 InvStreitBeiIG im Zuge der Neuregelung des Schiedsverfahrensrechts durch Gesetz vom 22. Dezember 1997 (BGBl. I S. 3224) eine abschließende Regelung für ICSID-Verfahren treffen wollen, greift dies nicht durch.

40          Erklärte die Vorschrift vor der Reform des Schiedsverfahrensrechts für das Verfahren über den Antrag, die Zulässigkeit der Zwangsvollstreckung aus einem ICSID-Schiedsspruch festzustellen, die Vorschriften über das Verfahren bei der Vollstreckbarerklärung inländischer Schiedssprüche, die gemäß § 1044 Abs. 1 Satz 1 ZPO aF auch für ausländische Schiedssprüche galten, für entsprechend anwendbar, sind auf das Verfahren nunmehr ausdrücklich die Vorschriften über das Verfahren der Vollstreckbarerklärung ausländischer Schiedssprüche (§ 1025 Abs. 4, §§ 1061 bis 1065 ZPO) entsprechend anzuwenden.

41          Diese Änderung stellt lediglich eine von vielen notwendigen Folgeanpassungen von bereits bestehenden Regelungen an die Neuregelung des 10. Buchs der Zivilprozessordnung dar (vgl. BT-Drucks. 13/5274, S. 68). Sie ändert nichts daran, dass Art. 2 InvStreitBeiIG nach wie vor allein die postarbitrale Phase nach Erlass des Schiedsspruchs regelt und die insoweit angeordnete entsprechende Anwendung von Vorschriften des 10. Buchs der Zivilprozessordnung nur die Vollstreckung von ICSID-Schiedssprüchen betrifft. Aussagen zur (Nicht-)Anwendbar-

- 16 -

keit von § 1025 Abs. 2 ZPO (und § 1032 Abs. 2 ZPO) bei ICSID-Schiedsverfah-
ren lassen sich dem, zumal unter Berücksichtigung der bewussten Ausweitung
des sachlichen Anwendungsbereichs des 10. Buchs der Zivilprozessordnung
über das UNCITRAL-Modellgesetz hinaus auf alle Schiedsverfahren (vgl.
BT-Drucks. 13/5274, S. 25 und 31), nicht entnehmen.

42          (e) Jedenfalls für das hier zur Entscheidung stehende Feststellungsver-
fahren nach § 1032 Abs. 2 ZPO zeigt sich die insoweit vorhandene Regelungs-
lücke des § 1025 Abs. 2 ZPO auch bei einem Blick auf die Regelungen der örtli-
chen Zuständigkeit in § 1062 Abs. 1 und 2 ZPO, die mit der Abgrenzung allein
vom inländischen Schiedsort einen im Grundsatz globalen Anwendungsbereich
eröffnen.

43          Die Vorschrift des § 1062 Abs. 1 Nr. 2 Fall 1 ZPO regelt die Zuständigkeit
des Oberlandesgerichts, das in der Schiedsvereinbarung bezeichnet ist oder,
wenn eine solche Bezeichnung fehlt, in dessen Bezirk der Ort des schiedsrich-
terlichen Verfahrens liegt, für Entscheidungen über Anträge betreffend die Fest-
stellung der Zulässigkeit oder Unzulässigkeit eines schiedsrichterlichen Verfah-
rens (§ 1032 ZPO). Besteht in diesem Fall kein deutscher Schiedsort, so ist für
die Entscheidungen das Oberlandesgericht zuständig, in dessen Bezirk der An-
tragsgegner seinen Sitz oder gewöhnlichen Aufenthalt hat oder sich Vermögen
des Antragsgegners oder der mit der Schiedsklage in Anspruch genommene
oder von der Maßnahme betroffene Gegenstand befindet, hilfsweise das Kam-
mergericht (§ 1062 Abs. 2 ZPO).

44          Diese Regelung spricht unter Berücksichtigung des Rechtsgedankens der
Doppelfunktionalität der örtlichen Zuständigkeit dafür, dass § 1025 Abs. 2 ZPO
für die internationale Zuständigkeit - wie § 1062 Abs. 2 ZPO für die örtliche Zu-
ständigkeit - trotz des positiv anknüpfenden Wortlauts ("im Ausland", "noch nicht
bestimmt") immer dann (entsprechend) anwendbar ist, wenn "kein deutscher
Schiedsort" besteht.

45        Die internationale Zuständigkeit ergibt sich im Zweifel, wenn besondere Zuständigkeitsregeln fehlen, mittelbar aus den Vorschriften über die örtliche Zuständigkeit (so genannte "Doppelfunktionalität"; zu § 32 ZPO vgl. BGH, Urteil vom 28. Juni 2007 - I ZR 49/04, BGHZ 173, 57 [juris Rn. 23] - Cambridge Institute, mwN; allgemein Roth in Stein/Jonas aaO Vor § 12 Rn. 32, 32b; Zöller/Schultzky aaO § 1 Rn. 8). Soweit nach diesen Vorschriften ein deutsches Gericht örtlich zuständig ist, ist es nach deutschem Recht auch international zuständig (vgl. MünchKomm.ZPO/Patzina aaO § 12 Rn. 90).

46        § 1025 Abs. 2 ZPO enthält zwar eine besondere Vorschrift für die internationale Zuständigkeit. Die Regelung ist aber im Einklang mit § 1062 Abs. 2 ZPO auszulegen. Sieht § 1062 Abs. 2 ZPO in Fällen, in denen - wie hier - "kein deutscher Schiedsort" besteht, für das Feststellungsverfahren des § 1032 Abs. 2 ZPO grundsätzlich hilfsweise eine örtliche Zuständigkeit des Kammergerichts vor, offenbart eine für diesen Fall fehlende internationale Zuständigkeit eine planwidrige Regelungslücke.

47        (3) Das Merkmal der vergleichbaren Interessenlage erfordert die Annahme, dass der Gesetzgeber bei einer Interessenabwägung nach den Grundsätzen, von denen er sich bei Erlass der herangezogenen Normen hat leiten lassen, zum gleichen Abwägungsergebnis gekommen wäre (BGH, GRUR 2020, 429 [juris Rn. 34] - Sportwetten in Gaststätten). So liegt es hier.

48        Nach dem Willen des Gesetzgebers, der sich im Gesetzeswortlaut manifestiert hat, sollten die deutschen Gerichte in den in § 1025 Abs. 2 ZPO aufgeführten Fällen auch dann angerufen werden können, wenn das Schiedsverfahren im Ausland stattfindet (vgl. BT-Drucks. 13/5274, S. 31). Das darin zum Ausdruck kommende Interesse an einer globalen Zuständigkeit der deutschen Gerichte in den genannten Fällen ist bei delokalisierten Schiedsverfahren nach dem ICSID-Übereinkommen ebenso gegeben wie bei Schiedsverfahren mit Schiedsort im Ausland. Das zeigt sich insbesondere an der in der Gesetzesbegründung aus-

- 18 -

drücklich in Bezug genommenen Regelung des § 1032 Abs. 1 ZPO zur Schieds-
einrede in Klageverfahren vor dem staatlichen Gericht. Diese Einrede mit der
möglichen Folge der Unzulässigkeit der Klage wird im Fall von ICSID-Schieds-
verfahren ebenfalls erst über eine entsprechende Geltung des § 1025 Abs. 2
ZPO eröffnet. Könnte die Einrede der (ICSID-)Schiedsvereinbarung vor dem
staatlichen Gericht mangels Anwendbarkeit des § 1032 Abs. 1 ZPO (über § 1025
Abs. 2 ZPO) nicht zur Unzulässigkeit der Klage führen, widerspräche das dem
Sinn und Zweck von Schiedsvereinbarungen auch im Anwendungsbereich des
ICSID-Übereinkommens.

49          3. Der Antrag nach § 1032 Abs. 2 ZPO ist rechtzeitig beim Oberlandesge-
richt gestellt worden.

50          a) Entscheidend für die Rechtzeitigkeit des Antrags nach § 1032 Abs. 2
ZPO, der bis zur Bildung des Schiedsgerichts gestellt werden kann, ist der Ein-
gang bei Gericht, nicht die Zustellung des Antrags an die Gegenseite (vgl. BGH,
Beschluss vom 30. Juni 2011 - III ZB 59/10, GRUR 2012, 95 [juris Rn. 10] mwN;
MünchKomm.ZPO/Münch aaO § 1032 Rn. 30; Voit in Musielak/Voit aaO § 1032
Rn. 10). Ein nicht-ständiges Schiedsgericht ist im Sinne von § 1032 Abs. 2 ZPO
gebildet, wenn alle Schiedsrichter bestellt und die Schiedsrichter nicht nur be-
nannt sind, sondern ihr Amt auch angenommen haben (vgl. BGH, Beschluss vom
9. Februar 2023 - I ZB 62/22, NJOZ 2023, 497 [juris Rn. 15] mwN).

51          b) Danach ist die zeitliche Grenze hier gewahrt. Der Antrag ist am 10. Mai
2021 und damit vor Bildung des Schiedsgerichts am 2. Juni 2021 beim Oberlan-
desgericht eingegangen.

52          4. Der Antrag nach § 1032 Abs. 2 ZPO ist auch statthaft. Im Rahmen eines
solchen Antrags prüft das staatliche Gericht, ob eine wirksame Schiedsvereinba-
rung besteht, diese durchführbar ist und der Gegenstand des Schiedsverfahrens
der Schiedsvereinbarung unterfällt (BGH, Beschluss vom 19. September 2019
- I ZB 4/19, SchiedsVZ 2020, 50 [juris Rn. 11] mwN). Diese Prüfung kann das
staatliche Gericht im vorliegenden Kontext auch mit Blick auf das bereits zuvor

- 19 -

eingeleitete ICSID-Schiedsverfahren, das nach Art. 41 Abs. 1 ICSID-Überein-
kommen eine echte Kompetenz-Kompetenz des Schiedsgerichts zur Entschei-
dung über seine Zuständigkeit vorsieht, vornehmen. Die Sperrwirkung des
ICSID-Schiedsverfahrens betreffend ein Verfahren vor den staatlichen Gerichten
(dazu C I 4 b) greift hier ausnahmsweise wegen des Anwendungsvorrangs des
Unionsrechts nicht durch (dazu C I 4 c und d).

53          a) Das Oberlandesgericht hat angenommen, der Statthaftigkeit des An-
trags stehe nicht entgegen, dass die Verfahrensregeln des ICSID-Übereinkom-
mens in Verbindung mit dem Gesetz zum Übereinkommen zur Beilegung von
Investitionsstreitigkeiten eine Überprüfung gemäß § 1032 Abs. 2 ZPO nicht vor-
sähen. Die Schiedsverfahren nach dem ICSID-Übereinkommen unterlägen zwar
grundsätzlich nicht der Kontrolle nationaler Gerichte. Dies berühre die Statthaf-
tigkeit des Antrags nach § 1032 Abs. 2 ZPO jedoch nicht, weil der Senat nicht
über die Zulässigkeit und Begründetheit der Schiedsklage entscheide, sondern
über die Frage, ob eine wirksame Schiedsvereinbarung - hier durch die auch uni-
onsrechtliche Vorschrift des Art. 26 ECV - als Grundlage des Schiedsverfahrens
vorliege.

54          Dass Grundlage des Verfahrens die Regelung des Internationalen Wirt-
schaftsrechts im Bereich des Investitionsschutzes auf Basis eines völkerrechtli-
chen Vertrags sei, stehe der Befassung mit dem Anliegen des Antragstellers auf-
grund des Vorrangs des Unionsrechts nicht entgegen. Einer Entscheidung nach
§ 1032 Abs. 2 ZPO stehe auch nicht entgegen, dass der Gerichtshof der Euro-
päischen Union keine Ausführungen zu den nationalen Verfahrensvorschriften
und deren Anwendbarkeit im Falle eines ICSID-Schiedsverfahrens gemacht
habe. Es sei Sache des nationalen Gerichts, dem Unionsrecht durch entspre-
chende Auslegung seiner Rechtsnormen zur vollen Wirksamkeit zu verhelfen.
Gerade da § 1032 Abs. 2 ZPO eine der Verfahrensökonomie dienende Vorschrift
darstelle, sei die frühzeitige Feststellung der hier gegebenen unionsrechtlichen
Unwirksamkeit der Schiedsabrede in diesem Verfahren zu treffen. Das hält der
rechtlichen Nachprüfung im Ergebnis stand.

55        b) Ein Verfahren vor den staatlichen Gerichten ist allerdings grundsätzlich jedenfalls ab Einleitung eines ICSID-Schiedsverfahrens durch die Kompetenz-Kompetenz des Schiedsgerichts nach dem insoweit vorrangigen, weil spezielleren Art. 41 Abs. 1 ICSID-Übereinkommen gesperrt.

56        aa) Das völkerrechtliche ICSID-Übereinkommen nimmt in der deutschen Rechtsordnung aufgrund des Zustimmungsgesetzes von 1969 nach Art. 59 Abs. 2 Satz 1 GG den Rang eines einfachen Bundesgesetzes ein. Den Vertragsbestimmungen wird durch den Rechtsanwendungsbefehl im Sinne von Art. 59 Abs. 2 Satz 1 GG innerstaatliche Geltung verliehen (vgl. BVerfGE 141, 1 [juris Rn. 45 f.]; von Arnauld, Völkerrecht, 5. Aufl., Rn. 509; BeckOK.GG/Pieper, 55. Edition [Stand 15. Mai 2023], Art. 59 Rn. 41 mwN; Nettesheim in Dürig/Herzog/Scholz, GG, 90. Ergänzungslieferung Februar 2020, Art. 59 Rn. 177 f.; zum ICSID-Übereinkommen vgl. Seelmann-Eggebert, SchiedsVZ 2023, 32, 36). Für ranggleiches innerstaatliches Recht gelten im Fall der Kollision der lex-posterior- sowie der lex-specialis-Grundsatz (vgl. BVerfGE 141, 1 [juris Rn. 49 f.]). Der Grundsatz der Völkerrechtsfreundlichkeit des Grundgesetzes gebietet, die nationalen Gesetze nach Möglichkeit so auszulegen, dass ein Konflikt mit völkerrechtlichen Verpflichtungen der Bundesrepublik Deutschland nicht entsteht. Im Rahmen geltender methodischer Grundsätze ist daher von mehreren möglichen Auslegungen eines Gesetzes grundsätzlich eine völkerrechtsfreundliche zu wählen (BVerfGE 141, 1 [juris Rn. 71] mwN; von Arnauld aaO Rn. 517, 525 f.; BeckOK.GG/Pieper aaO Art. 59 Rn. 38, 44). Hieraus folgt indes keine verfassungsrechtliche Pflicht zur uneingeschränkten Befolgung jeder Bestimmung des Völkerrechts (BVerfGE 141, 1 [juris Rn. 69]).

57        bb) Das ICSID-Übereinkommen weist ein geschlossenes Rechtssystem mit eigenen Verfahrensregelungen auf. Während nach dem nationalen Schiedsverfahrensrecht und dem UNCITRAL-Modellgesetz sowohl in der präarbitralen Phase bis zur Bildung des Schiedsgerichts, der arbitralen Phase während des Schiedsverfahrens als auch der postarbitralen Phase nach Erlass des Schiedsspruchs die staatlichen Gerichte zur Kontrolle und zur Unterstützung des

- 21 -

Schiedsverfahrens angerufen werden können (vgl. zum Beispiel § 1032 Abs. 2, § 1033, § 1040 Abs. 3 Satz 2 und §§ 1059 bis 1061 ZPO) und die Letztentscheidungskompetenz haben (vgl. BGH, GRUR 2012, 95 [juris Rn. 11]; Schütze in Wieczorek/Schütze aaO § 1032 Rn. 17 mwN), weicht das ICSID-Übereinkommen von einer solchen Einbindung der staatlichen Gerichte bewusst ab.

58          cc) Zur Klärung der Frage der Zuständigkeit des Zentrums im Sinne von Art. 25 ICSID-Übereinkommen und dem folgend der Frage der Zuständigkeit des Schiedsgerichts ist jedenfalls ab der Registrierung eines ICSID-Schiedsverfahrens - hier am 2. Februar 2021 - gemäß Art. 41 Abs. 1 ICSID-Übereinkommen allein das Schiedsgericht das kompetente Forum.

59          (1) Nach Art. 25 Abs. 1 Satz 1 ICSID-Übereinkommen erstreckt sich die Zuständigkeit des Zentrums auf alle unmittelbar mit einer Investition zusammenhängenden Rechtsstreitigkeiten zwischen einem Vertragsstaat einerseits und einem Angehörigen eines anderen Vertragsstaats andererseits, wenn die Parteien schriftlich eingewilligt haben, die Streitigkeiten dem Zentrum zu unterbreiten.

60          Ab Einreichung des Schiedsantrags (Art. 36 Abs. 1 ICSID-Übereinkommen) bis zu dessen Registrierung obliegt dem Generalsekretär des Zentrums nach Art. 36 Abs. 3 Satz 1 ICSID-Übereinkommen die Vorprüfung, ob die Streitigkeit offensichtlich nicht in die Zuständigkeit des Zentrums nach Art. 25 ICSID-Übereinkommen fällt (so genannte "screening power"; vgl. Escher, RIW 2001, 20, 23 f.; Escobar in Fouret/Gerbay/Alvarez aaO Art. 36 Rn. 4.23, 4.35; Kern aaO S. 60 mwN; Schöbener/Markert, ZVglRWiss 2006, 65, 76 f.). Die Befugnis des Generalsekretärs, die Registrierung zu verweigern, ist dabei so eng definiert, dass sie nicht in die Kompetenz-Kompetenz des Schiedsgerichts eingreift (vgl. von Wobeser in Fouret/Gerbay/Alvarez aaO Art. 41 Rn. 4.184).

61          Diese Kompetenz-Kompetenz des Schiedsgerichts wird durch Art. 41 Abs. 1 ICSID-Übereinkommen begründet, wonach das Schiedsgericht selbst über seine Zuständigkeit entscheidet. Es kann dabei ungeachtet einer positiven

Vorprüfung des Generalsekretärs die Zuständigkeit des Zentrums noch vernei-nen (vgl. Pirrung aaO S. 94 f., 97; Schöbener/Markert, ZVglRWiss 2006, 65, 77 mwN; von Wobeser in Fouret/Gerbay/Alvarez aaO Art. 41 Rn. 4.184). In einem solchen Fall bleibt es bei der wirksamen Bildung des Schiedsgerichts, auch wenn die Wirksamkeit der Einwilligung der Parteien zum ICSID-Schiedsverfahren in Streit steht und sie sich als unwirksam herausstellen sollte (vgl. Kriebaum in Schreuer's Commentary on the ICSID Convention, 3rd ed., Art. 41 Rn. 7 f.). Die Entscheidung, ob die Zuständigkeitsvoraussetzungen des Art. 25 ICSID-Über-einkommen erfüllt sind, liegt mithin nach Art. 41 Abs. 1 ICSID-Übereinkommen im Grundsatz allein beim Schiedsgericht (vgl. Kern aaO S. 60; von Wobeser in Fouret/Gerbay/Alvarez aaO Art. 41 Rn. 4.182, 4.184).

62    (2) Art. 41 Abs. 1 ICSID-Übereinkommen greift danach abweichend von § 1040 ZPO, der die (vorläufige) Kompetenz-Kompetenz des Schiedsgerichts im Zusammenspiel mit § 1032 Abs. 2 ZPO erst ab Bildung des Schiedsgerichts vor-sieht (vgl. BeckOK.ZPO/Wolf/Eslami aaO § 1032 Rn. 2; Schütze in Wieczorek/Schütze aaO § 1032 Rn. 8), jedenfalls bereits ab dem Moment der Einleitung des Schiedsverfahrens (vgl. Kriebaum in Schreuer's Commentary on the ICSID Con-vention aaO Art. 41 Rn. 25 und Rn. 83 bis 85; Kryvoi, International Centre for Settlement of Investment Disputes (ICSID), 4. Aufl., Rn. 208 mwN; Pirrung aaO S. 97; von Wobeser in Fouret/Gerbay/Alvarez aaO Art. 41 Rn. 4.179; aA wohl Steinbrück/Krahé, IPRax 2023, 36, 38 f.). Nach Nr. 6 Abs. 2 Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings gilt ein ICSID-Schiedsverfahren als eingeleitet, sobald es registriert wird. Ob Art. 41 Abs. 1 ICSID-Übereinkommen schon in dem Zeitraum von der Stellung des Schiedsan-trags bis zu dessen Registrierung Anwendung findet, bedarf im Streitfall wegen der bereits erfolgten Registrierung keiner Entscheidung.

63    (3) Für eine Zuständigkeit des Schiedsgerichts jedenfalls ab der Einleitung des Verfahrens durch dessen Registrierung spricht aus systematischer Sicht die dadurch gewährleistete nahtlose Anknüpfung an die Vorprüfung des General-

sekretärs des Zentrums. Diese reicht nach Art. 36 Abs. 3 Satz 1 ICSID-Übereinkommen von der Antragstellung bis zur Registrierung und findet darin ihren Abschluss. Maßgeblicher Prüfzeitpunkt für das Vorliegen der Voraussetzungen des Art. 25 ICSID-Übereinkommen durch das Zentrum und das Schiedsgericht ist daher die Registrierung; spätere Änderungen sind unbeachtlich (vgl. Banifatemi/Edson in Fouret/Gerbay/Alvarez aaO Art. 25 Rn. 2.09 mwN; Kriebaum in Schreuer's Commentary on the ICSID Convention aaO Art. 41 Rn. 83 bis 85).

64        Auch Sinn und Zweck des Übereinkommens, das auf eine möglichst weitreichende Entkoppelung von dem nationalen Recht und den staatlichen Gerichten angelegt ist (vgl. Pearsall in Fouret aaO S. 117, 118; Sasson in Fouret/Gerbay/Alvarez aaO Art. 62 Rn. 7.04; Happ in Schütze aaO XV. Kapitel, Abschnitt II Rn. 13; Kern aaO S. 65; Kröll, NJW 2023, 819, 820), spricht für eine lückenlose Entscheidungsbefugnis innerhalb des ICSID-Systems ab Antragstellung oder jedenfalls ab Verfahrenseinleitung.

65        Anders als für die Handelsschiedsgerichtsbarkeit in § 1040 Abs. 3 Satz 2 ZPO zwingend vorgesehen (vgl. BGH, Beschluss vom 24. Juli 2014 - III ZB 83/13, BGHZ 202, 168 [juris Rn. 10] mwN; Schroeter, SchiedsVZ 2004, 288, 290; zur entsprechenden Regelung in Art. 16 Abs. 3 Satz 2 UNCITRAL-Modellgesetz vgl. Melis in Kronke/Melis/Kuhn aaO Teil P Rn. 279), gibt es bei ICSID-Schiedsverfahren grundsätzlich keine nachträgliche Kontrolle der Zuständigkeitsentscheidung durch staatliche Gerichte und damit keine staatsgerichtliche Letztentscheidungskompetenz. Die Zuständigkeitsprüfung ist nach den spezielleren und daher grundsätzlich vorrangigen Regelungen des ICSID-Übereinkommens ausschließlich im Rahmen des Schiedsverfahrens selbst vorzunehmen (vgl. Pirrung aaO S. 116; Schöbener/Markert, ZVglRWiss 2006, 65, 74; Berger, SchiedsVZ 2017, 282, 290; Raeschke-Kessler, SchiedsVZ 2018, 1, 6; Kröll, NJW 2023, 819, 820 f.; Seelmann-Eggebert, SchiedsVZ 2023, 32, 36; Steinbrück/Krahé, IPRax 2023, 36, 38). Damit ist auch dem vom Gesetzgeber bei der Schiedsverfahrensreform als selbstverständlich erachteten Vorrang völkerrechtlicher Verträge (vgl. BT-Drucks. 13/5274, S. 31) Genüge getan.

- 24 -

66          dd) Die Kompetenz-Kompetenz des Schiedsgerichts gemäß Art. 41 Abs. 1 ICSID-Übereinkommen steht danach bei einer isolierten Betrachtung der Bestimmungen des ICSID-Übereinkommens dem Verfahren nach § 1032 Abs. 2 ZPO aufgrund des bereits eingeleiteten Schiedsverfahrens entgegen. Das Schiedsverfahren ist ausweislich der auf der Webseite des ICSID (icsid.worldbank.org) verfügbaren Datenbank am 2. Februar 2021 mit dem Aktenzeichen ICSID ARB/21/4 registriert und damit eingeleitet worden, während der Antrag nach § 1032 Abs. 2 ZPO erst im Mai 2021 beim Oberlandesgericht eingegangen ist.

67          ee) Da das Schiedsverfahren bereits eingeleitet ist, kommt es nicht entscheidend auf die Bedeutung der Regelung des Art. 26 Satz 1 ICSID-Übereinkommen an, wonach die Zustimmung der Parteien zum Schiedsverfahren im Rahmen des Übereinkommens zugleich als Verzicht auf jeden anderen Rechtsbehelf gilt, sofern nicht etwas anderes erklärt wird. Diese Vorschrift gilt unmittelbar nur für die Zeit bis zur Einreichung des Antrags beim Zentrum (vgl. Alexandrov in Schreuer's Commentary on the ICSID Convention aaO Art. 26 Rn. 6; Haridi in Fouret/Gerbay/Alvarez aaO Art. 26 Rn. 2.258 f.).

68          c) Die Sperrwirkung des Art. 41 Abs. 1 ICSID-Übereinkommen steht der Statthaftigkeit eines Antrags nach § 1032 Abs. 2 ZPO in der besonderen Konstellation des Streitfalls eines Intra-EU-Investor-Staat-Schiedsverfahrens nach dem ICSID-Übereinkommen auf der Grundlage von Art. 26 ECV jedoch wegen des Anwendungsvorrangs des Unionsrechts - auch gegenüber dem Völkerrecht - ausnahmsweise nicht entgegen.

69          aa) Nach ständiger Rechtsprechung des Gerichtshofs der Europäischen Union entspringt das Unionsrecht einer autonomen Quelle, den Verträgen, und hat Vorrang vor dem Recht der Mitgliedstaaten. Die Autonomie der Unionsrechtsordnung besteht sowohl gegenüber dem Recht der Mitgliedstaaten als auch gegenüber dem Völkerrecht (vgl. EuGH, Gutachten vom 30. April 2019 - Gut 1/17, EuGRZ 2019, 191 [juris Rn. 109] - CETA-Abkommen EU-Kanada, mwN; zum Vorrang gegenüber dem Völkerrecht vgl. auch EuGH, Urteil vom 3. September

- 25 -

2008 - C-402/05, C-415/05, Slg. 2008, I-6351 = EuGRZ 2008, 480 [juris Rn. 281 bis 285] - Kadi und Al Barakaat Foundation/Rat und Kommission). Der Vorrang des Unionsrechts gebietet es, dass die nationalen Gerichte, die im Rahmen ihrer Zuständigkeit die Bestimmungen des Unionsrechts anzuwenden haben, für die volle Wirksamkeit dieser Bestimmungen Sorge tragen. Hierzu haben sie erforderlichenfalls jede entgegenstehende nationale Bestimmung aus eigener Entscheidungsbefugnis unangewendet zu lassen, ohne die vorherige Beseitigung dieser Bestimmung auf gesetzgeberischem Weg oder durch irgendein anderes verfassungsrechtliches Verfahren zu beantragen oder abzuwarten (vgl. EuGH, Urteil vom 4. Dezember 2018 - C-378/17, NZA 2019, 27 [juris Rn. 35] - Minister for Justice and Equality und Commissioner of An Garda Síochána, mwN; Urteil vom 2. September 2021 - C-741/19, SchiedsVZ 2022, 34 [juris Rn. 43] - Komstroy; vgl. auch BVerfGE 126, 286 [juris Rn. 53]; Nettesheim in Grabitz/Hilf/Nettesheim, Das Recht der EU, 48. Ergänzungslieferung August 2012, Art. 288 AEUV Rn. 47 bis 53).

70          bb) Nach ebenfalls ständiger Rechtsprechung des Gerichtshofs der Europäischen Union sind die Art. 267 und 344 AEUV dahin auszulegen, dass sie einer Bestimmung in einem zwischen zwei Mitgliedstaaten geschlossenen internationalen Abkommen entgegenstehen, nach der ein Investor eines dieser Mitgliedstaaten im Fall einer Streitigkeit über Investitionen in dem anderen Mitgliedstaat gegen diesen ein Verfahren vor einem Schiedsgericht, dessen Gerichtsbarkeit sich dieser Mitgliedstaat unterworfen hat, einleiten darf (vgl. EuGH, Urteil vom 6. März 2018 - C-284/16, SchiedsVZ 2018, 186 [juris Rn. 32, 60] - Achmea; EuGH, SchiedsVZ 2022, 34 [juris Rn. 42 bis 46] - Komstroy; EuGH, Urteil vom 26. Oktober 2021 - C-109/20, EuZW 2021, 1097 [juris Rn. 44] - PL Holdings; Urteil vom 25. Januar 2022 - C-638/19, RIW 2022, 219 [juris Rn. 138] - European Food; Gutachten vom 16. Juni 2022 - C-1/20, juris Rn. 47 mit Rn. 20 - Modernisierter Vertrag über die Energiecharta; Beschluss vom 21. September 2022 - C-333/19, BeckRS 2022, 26460 Rn. 33 - Romatsa).

71        Ein ICSID-Schiedsspruch ist als mit dem Unionsrecht, insbesondere mit Art. 267 und 344 AEUV, unvereinbar anzusehen, wenn die dem Schiedsverfahren zugrundeliegende Schiedsklausel die durch das Vorabentscheidungsverfahren gewährleistete Wahrung der Eigenart des Unionsrechts unter Verstoß gegen die Grundsätze der loyalen Zusammenarbeit und der Autonomie des Unionsrechts in Frage stellt (vgl. EuGH, RIW 2022, 219 [juris Rn. 142] - European Food; BeckRS 2022, 26460 Rn. 41 f. - Romatsa). Ein derart mit dem Unionsrecht unvereinbarer Schiedsspruch kann keine Wirkung entfalten und somit nicht vollstreckt werden. Ein Gericht eines Mitgliedstaats, das mit der Zwangsvollstreckung eines solchen ICSID-Schiedsspruchs befasst ist, ist verpflichtet, diesen Schiedsspruch unangewendet zu lassen, und darf ihn folglich keinesfalls vollstrecken (vgl. EuGH, BeckRS 2022, 26460 Rn. 43 f. - Romatsa [in französischer Sprache]; zur Übersetzung des Tenors vgl. ABl. C 24 vom 23. Januar 2023, S. 14).

72        cc) Nach diesen Grundsätzen ist im Intra-EU-Kontext eine staatsgerichtliche Kontrolle eines ICSID-Schiedsspruchs im nachgelagerten Vollstreckbarerklärungsverfahren aus unionsrechtlichen Gründen - entgegen der Regelungssystematik des ICSID-Übereinkommens - zwingend geboten (dazu C I 4 c c [1]). Dann jedoch gebietet es der Effektivitätsgrundsatz ("effet utile"), bei der Entscheidung über die Statthaftigkeit eines vorgelagerten Rechtsbehelfs wie § 1032 Abs. 2 ZPO die insoweit entgegenstehende Vorschrift des Art. 41 Abs. 1 ICSID-Übereinkommen - die über das Zustimmungsgesetz einfaches Bundesrecht darstellt - unangewendet zu lassen, um so dem Unionsrecht frühestmöglich zur Wirksamkeit zu verhelfen (dazu C I 4 c c [2]).

73        (1) Nach der Rechtsprechung des Gerichtshofs der Europäischen Union ist eine gerichtliche Kontrolle eines ICSID-Schiedsspruchs in einer Intra-EU-Investor-Staat-Konstellation wie hier im nachgelagerten Vollstreckbarerklärungsverfahren zwingend erforderlich.

74        (a) Die Entscheidungen "European Food" und "Romatsa" verdeutlichen, dass der Gerichtshof der Europäischen Union seine Rechtsprechungskompetenz nach Art. 267, 344 AEUV für die nachgelagerte Phase der Durchsetzung eines Schiedsspruchs als durch das ICSID-Übereinkommen unberührt sieht. Ungeachtet des nach Art. 53, 54 ICSID-Übereinkommen vorgesehenen vollständigen Ausschlusses einer Kontrolle eines ICSID-Schiedsspruchs durch die nationalen Gerichte seien diese verpflichtet, einen mit dem Unionsrecht unvereinbaren Schiedsspruch unangewendet zu lassen, und dürften ihn folglich keinesfalls vollstrecken (vgl. EuGH, BeckRS 2022, 26460 Rn. 43 f. - Romatsa; vgl. auch EuGH, RIW 2022, 219 [juris Rn. 142] - European Food; zur Aufhebung eines Intra-EU-ICSID-Schiedsspruchs vgl. Cour de Cassation du Grand-Duché de Luxembourg, Urteil vom 14. Juli 2022 - CAS-2021-00061 Rn. 26 bis 40 und 43, www.italaw.com/sites/default/files/case-documents/italaw170526.pdf    - zuletzt abgerufen am 3. Juni 2023).

75        (b) Einer solchen unionsrechtlich gebotenen nachgelagerten Kontrolle von ICSID-Schiedssprüchen im Intra-EU-Kontext steht die Regelung des Art. 2 Abs. 4 InvStreitBeilG nicht entgegen, wonach der Antrag, die Zulässigkeit der Zwangsvollstreckung festzustellen, nur abgelehnt werden kann, wenn der Schiedsspruch in einem Verfahren nach Art. 51 oder Art. 52 ICSID-Übereinkommen aufgehoben worden ist. Der Anwendungsvorrang des Unionsrechts (oben Rn. 69) gebietet es, diese nationale Vorschrift im Intra-EU-Kontext als entgegenstehende nationale Bestimmung unangewendet zu lassen.

76        (2) Ist eine nachgelagerte Kontrolle von ICSID-Schiedssprüchen durch die deutschen Gerichte mithin aus unionsrechtlichen Gründen ungeachtet der Art. 53, 54 ICSID-Übereinkommen und des Art. 2 Abs. 4 InvStreitBeilG zwingend geboten, ist der Anwendungsvorrang des Unionsrechts nach dem Effektivitätsgrundsatz ("effet utile") auch auf das vorgelagerte Feststellungsverfahren nach § 1032 Abs. 2 ZPO zu erstrecken und dessen Statthaftigkeit zu bejahen.

77         (a) Der Grundsatz der Effektivität fordert nach ständiger Rechtsprechung des Gerichtshofs der Europäischen Union, dass die anwendbaren nationalen Rechtsvorschriften nicht so ausgestaltet sind, dass sie die Ausübung der durch die Unionsrechtsordnung eingeräumten Rechte praktisch unmöglich machen oder übermäßig erschweren. Dies ist unter Berücksichtigung der Stellung der Vorschrift im gesamten Verfahren, des Verfahrensablaufs und der Besonderheiten des Verfahrens vor den verschiedenen nationalen Stellen zu prüfen (EuGH, Urteil vom 11. November 2015 - C-505/14, EuZW 2016, 57 [juris Rn. 40 f.] - Klausner Holz; Urteil vom 5. März 2019 - C-349/17, EuZW 2019, 379 [juris Rn. 137 f.] - Eesti Pagar; Urteil vom 7. April 2022 - C-116/20, juris Rn. 100 f. - Avio Lucos, jeweils mwN). Steht eine Bestimmung des nationalen Rechts der Anwendung eines nationalen Rechtsbehelfs entgegen, ist sie unangewendet zu lassen, wenn der nationale Rechtsbehelf ansonsten geeignet ist, dem Unionsrecht zur vollen Wirksamkeit zu verhelfen (vgl. EuGH, Urteil vom 19. Juni 1990 - C-213/89, Slg. 1990, I-2433 = NJW 1991, 2271 [juris Rn. 23] - Factortame u.a.; Urteil vom 13. Juli 2006 - C-295/04 bis C-298/04, Slg. 2006, I-6619 = EuZW 2006, 529 [juris Rn. 62] - Manfredi u.a.; vgl. auch Hess, Europäisches Zivilprozessrecht, 2. Aufl., § 11 Rn. 11.9).

78         (b) Der nationale Gesetzgeber hat mit § 1032 Abs. 2 ZPO aus verfahrensökonomischen Gründen bewusst einen besonderen, dem Schiedsverfahren (jedenfalls zunächst) vorgelagerten Rechtsbehelf geschaffen. Das Verfahren ist eine deutsche Besonderheit und findet kein Gegenstück im UNCITRAL-Modellgesetz (vgl. BT-Drucks. 13/5274, S. 38; Saenger/Saenger, ZPO, 9. Aufl., § 1032 Rn. 13 mwN; zu den Vor- und Nachteilen vgl. Steinbrück, Die Unterstützung ausländischer Schiedsverfahren durch staatliche Gerichte, 2009, S. 347 bis 350). Eine rechtskräftige Entscheidung über einen Antrag nach § 1032 Abs. 2 ZPO entfaltet für die (nationalen) staatlichen Gerichte Bindungswirkung in nachfolgenden gerichtlichen Verfahren, insbesondere im Verfahren der Aufhebung bzw. Vollstreckbarerklärung nach §§ 1059 bis 1061 ZPO und in Klageverfahren mit Blick auf die Schiedseinrede nach § 1032 Abs. 1 ZPO (vgl. BGH, Beschluss vom

6. Mai 2021 - I ZB 71/20, juris Rn. 16; BeckOK.ZPO/Wolf/Eslami aaO § 1032 Rn. 42; Voit in Musielak/Voit aaO § 1032 Rn. 13 f.; Zöller/Geimer aaO § 1032 Rn. 24, § 1040 Rn. 4 und § 1059 Rn. 39). Den Parteien eröffnet der Rechtsbehelf des § 1032 Abs. 2 ZPO eine Möglichkeit, Zeit und Kosten zu sparen, wenn beispielsweise das Schiedsverfahren bei Feststellung der Unzulässigkeit gar nicht eingeleitet oder nicht weiterbetrieben, das Schiedsgericht von der Unzulässigkeit überzeugt oder jedenfalls das spätere gerichtliche Verfahren durch das feststehende Ergebnis vereinfacht und beschleunigt wird.

79        (c) Der einer Anwendung des § 1032 Abs. 2 ZPO mit diesen Wirkungen entgegenstehende Art. 41 Abs. 1 ICSID-Übereinkommen muss in einem Intra-EU-Investor-Staat-Schiedsverfahren unangewendet bleiben (vgl. Steinbrück/Krahé, IPRax 2023, 36, 41; kritisch Wilske/Markert/Ebert, SchiedsVZ 2022, 111, 130), um so dem Unionsrecht zu einem frühen Zeitpunkt zur vollen Wirksamkeit zu verhelfen.

80        Die vom deutschen Gesetzgeber mit § 1032 Abs. 2 ZPO beabsichtigte vorgezogene Kontrolle kann im Intra-EU-Kontext die aus unionsrechtlichen Gründen auch im Rahmen eines ICSID-Schiedsverfahrens erforderliche nachgelagerte Kontrolle (vgl. EuGH, BeckRS 2022, 26460 Rn. 43 f. - Romatsa; oben Rn. 73 bis 75) bindend vorwegnehmen. Eine Feststellung der Unzulässigkeit des Schiedsverfahrens nach § 1032 Abs. 2 ZPO verhindert aufgrund der Bindungswirkung dieser Entscheidung die (spätere) Vollstreckbarerklärung eines ICSID-Schiedsspruchs in Deutschland.

81        Eine Anwendung des § 1032 Abs. 2 ZPO trägt darüber hinaus der Rechtsprechung des Gerichtshofs der Europäischen Union Rechnung, nach der die Mitgliedstaaten verpflichtet sind, sobald eine Streitigkeit aufgrund einer unionsrechtswidrigen Verpflichtung bei einer Schiedsstelle anhängig gemacht wird, vor dieser Schiedsstelle oder vor dem zuständigen Gericht die Gültigkeit der

Schiedsklausel oder der ad hoc abgeschlossenen Schiedsvereinbarung zu rü-
gen, aufgrund deren diese Stelle angerufen wurde (vgl. EuGH, EuZW 2021, 1097
[juris Rn. 52] - PL-Holdings).

82      Soweit die Rechtsbeschwerde in diesem Zusammenhang rügt, aus der
Rechtsprechung des Gerichtshofs der Europäischen Union ergebe sich keine
unionsrechtliche Pflicht, einen innerstaatlichen Rechtsbehelf sui generis auf Un-
zulässigkeitserklärung des Schiedsverfahrens zu schaffen, übersieht sie, dass im
nationalen Recht mit § 1032 Abs. 2 ZPO ein solcher Rechtsbehelf bereits vorge-
sehen ist, der über § 1025 Abs. 2 ZPO auch anwendbar ist.

83      (d) Der Anwendungsvorrang des Unionsrechts wird nicht durch eine unzu-
lässige Auslegung des nationalen Rechts contra legem erreicht (zu dieser
Grenze vgl. EuGH, EuZW 2016, 57 [juris Rn. 32] - Klausner Holz; EuGH, Urteil
vom 11. Februar 2021 - C-760/18, NZA 2021, 333 [juris Rn. 67] - M. V. u.a., mwN;
BGH, Beschluss vom 29. Juli 2021 - I ZR 135/20, GRUR 2021, 1320 [juris Rn. 36]
= WRP 2021, 1290 - Flaschenpfand III, mwN). Die Statthaftigkeit des Antrags
nach § 1032 Abs. 2 ZPO ergibt sich bei der unionsrechtlich gebotenen Unan-
wendbarkeit des Art. 41 Abs. 1 ICSID-Übereinkommen (zum Anwendungsvor-
rang des Unionsrecht siehe oben Rn. 69) aus dem Wortlaut der Vorschrift des
§ 1032 Abs. 2 ZPO. Die Regelungen in Art. 2 f. InvStreitBeilG erfassen insofern
allein die nachgelagerte Phase nach Erlass des ICSID-Schiedsspruchs; Aussa-
gen zu der vorgelagerten Phase und der Anwendbarkeit von § 1032 Abs. 2 ZPO
lassen sich diesen Vorschriften nicht entnehmen.

84      d) Der Vorrang des Unionsrechts vor Art. 41 ICSID-Übereinkommen ist
nicht ausnahmsweise nach Art. 351 Abs. 1 AEUV ausgeschlossen.

85      aa) Nach Art. 351 Abs. 1 AEUV werden die Rechte und Pflichten aus
Übereinkünften, die vor dem 1. Januar 1958 oder, im Falle später beigetretener
Staaten, vor dem Zeitpunkt ihres Beitritts zwischen einem oder mehreren Mit-
gliedstaaten einerseits und einem oder mehreren dritten Ländern andererseits
geschlossen wurden, durch die Verträge nicht berührt. Die Norm bezweckt, die

Mitgliedstaaten vor Völkerrechtsbrüchen gegenüber Drittstaaten zu schützen, die durch den Vorrang des Unionsrechts bewirkt würden, und trägt damit der Maxime "pacta sunt servanda" Rechnung (vgl. Schmalenbach in Calliess/Ruffert, EUV/AEUV, 6. Aufl., Art. 351 AEUV Rn. 1; Streinz/Kokott, EUV/AEUV, 3. Aufl., Art. 351 AEUV Rn. 1).

86          bb) Die Vorschrift des Art. 351 Abs. 1 AEUV ist nach ihrem Wortlaut im Streitfall nicht direkt anwendbar. Für den Antragsteller ist als Gründungsmitglied der Europäischen Wirtschaftsgemeinschaft der 1. Januar 1958 maßgeblich. Dasselbe gilt für die Antragsgegnerin mit Sitz in Deutschland, einem weiteren Gründungsmitglied der Europäischen Wirtschaftsgemeinschaft. Das ICSID-Übereinkommen ist für den Antragsteller im Jahr 1966 und für Deutschland im Jahr 1969 in Kraft getreten, der Energiecharta-Vertrag jeweils im Jahr 1998.

87          cc) Eine analoge Anwendung von Art. 351 Abs. 1 AEUV auf Fallgestaltungen, in denen Rechte und Pflichten aus Übereinkünften betroffen sind, die zwar - wie hier - nach den in der Vorschrift genannten maßgeblichen Zeitpunkten geschlossen wurden, aber einen Sachbereich betreffen, für den die Union erst später durch Kompetenzzuwachs zuständig geworden ist, scheidet nach der Rechtsprechung des Gerichtshofs der Europäischen Union aus (vgl. EuGH, Urteil vom 28. Oktober 2022 - C-435/22, NJW 2023, 349 Rn. 115 bis 127 - PPU). Entgegen einer verbreiteten Auffassung in der Literatur (vgl. Lorenzmeier in Grabitz/Hilf/ Nettesheim aaO Art. 351 AEUV Rn. 24 bis 28; Schmalenbach in Calliess/Ruffert aaO Art. 351 AEUV Rn. 6 bis 9; zum Energiecharta-Vertrag vgl. Köster aaO S. 176 f.) ist die Vorschrift des Art. 351 Abs. 1 AEUV, die, wenn ihr Tatbestand erfüllt ist, Abweichungen vom Unionsrecht einschließlich des Primärrechts zulassen kann, als Ausnahmevorschrift eng auszulegen. Sie erfasst nur Übereinkünfte, die vor dem 1. Januar 1958 oder, im Fall später beigetretener Staaten, vor dem Zeitpunkt ihres Beitritts geschlossen wurden (vgl. EuGH, NJW 2023, 349 Rn. 119 f. und 126 - PPU). Der heutige Wortlaut der Bestimmung wurde im Vertrag von Amsterdam beschlossen und nachfolgend in den Verträgen von Nizza und Lissabon nicht mehr verändert, obwohl Kompetenzverlagerungen durch die

Entwicklungen der Zuständigkeiten der Union jeweils bekannt waren. Dennoch wurde eine Kompetenzverlagerung auf die Union nicht als weiterer möglicher Anknüpfungszeitpunkt normiert (vgl. EuGH, NJW 2023, 349 Rn. 123 bis 125 - PPU).

88          5. Das Rechtsschutzbedürfnis für den Antrag nach § 1032 Abs. 2 ZPO ist gegeben.

89          a) Das Oberlandesgericht hat angenommen, das für den Antrag erforderliche Rechtsschutzbedürfnis des Antragstellers ergebe sich bereits aus seiner Parteistellung in dem von der Antragsgegnerin eingeleiteten schiedsrichterlichen Verfahren. Diese Beurteilung ist von Rechts wegen nicht zu beanstanden.

90          b) Der Antrag nach § 1032 Abs. 2 ZPO setzt wie jeder prozessuale Rechtsbehelf ein Rechtsschutzbedürfnis voraus. Dieses ergibt sich regelmäßig bereits aus der möglichen Parteistellung in dem schiedsrichterlichen Verfahren (vgl. BGH, Beschluss vom 8. November 2018 - I ZB 21/18, NJW 2019, 857 [juris Rn. 15]). Die (nachfolgende) Bildung des Schiedsgerichts lässt das Rechtsschutzbedürfnis für den Antrag nach § 1032 Abs. 2 ZPO nicht entfallen. Das Gesetz geht in § 1032 Abs. 2 und 3 ZPO bei einem zulässig vor Bildung des Schiedsgerichts gestellten Antrag von einem anschließenden Nebeneinander des staatlichen und des schiedsrichterlichen Verfahrens aus (vgl. BGH, GRUR 2012, 95 [juris Rn. 11] mwN; zum fortbestehenden Rechtsschutzbedürfnis bei zwischenzeitlichem Erlass eines Schiedsspruchs vgl. BGH, Beschluss vom 11. Mai 2017 - I ZB 75/16, NJW 2017, 3723 [juris Rn. 10, 14]).

91          Ein Rechtsschutzbedürfnis fehlt allerdings, wenn der Kläger oder Antragsteller sein Ziel auch auf einfacherem oder kostengünstigerem Weg oder durch die beantragte Maßnahme gar nicht erreichen kann (zu einem Antrag auf gerichtliche Entscheidung vgl. BGH, Beschluss vom 10. Februar 2016 - IV AR (VZ) 8/15, NJW-RR 2016, 445 [juris Rn. 10] mwN; zu einem markenrechtlichen Unterlassungsantrag vgl. BGH, Urteil vom 15. Oktober 2020 - I ZR 210/18, GRUR 2020,

1311 [juris Rn. 27] = WRP 2021, 42 - Vorwerk, mwN; zum Zwangsvollstreckungs-recht vgl. BGH, Beschluss vom 13. Oktober 2022 - I ZB 69/21, GRUR 2023, 105 [juris Rn. 13] mwN).

92          c) Danach ist das Rechtsschutzbedürfnis im Streitfall gegeben. Der Antrag zu 1 bezieht sich auf ein konkretes schiedsrichterliches Verfahren, in dem der Antragsteller Schiedsbeklagter ist. Das Feststellungsverfahren nach § 1032 Abs. 2 ZPO ist auch nicht objektiv sinnlos; es erschöpft sich vor allem nicht in der Erstattung eines Rechtsgutachtens, sondern entfaltet rechtliche und faktische Wirkungen. Insbesondere verhindert eine Feststellung der Unzulässigkeit des Schiedsverfahrens nach § 1032 Abs. 2 ZPO die spätere Vollstreckbarerklärung eines ICSID-Schiedsspruchs in Deutschland (siehe oben Rn. 80).

93          Von einer vorgelagerten Feststellungsentscheidung eines deutschen obersten Gerichts kann darüber hinaus eine starke Signalwirkung für andere an Unionsrecht gebundene staatliche Gerichte in Anerkennungs- oder Vollstreckba-rerklärungsverfahren ausgehen (vgl. Scheu/Nikolov, Arbitration International 2020, 253, 267 bis 269). Auch in Drittländern kann eine solche Entscheidung in Vollstreckbarerklärungsverfahren trotz der in Art. 53, 54 ICSID-Übereinkommen vorgesehenen Bindungswirkung eines ICSID-Schiedsspruchs über die "doctrine of comity" (auch "gegenseitiger hoheitlicher Respekt", vgl. dazu Gibbons/Myers/ Dolzer, RIW 2004, 899; Späth, IPrax 2006, 184 und 185 f.) Überzeugungskraft entfalten (vgl. US District Court for the District of Columbia, Beschluss vom 29. Juni 2021 - Civil Action No. 20-817 - Infrared Environmental Infrastructure GP Ltd. vs. Spain, https://casetext.com/case/infrared-envtl-infrastructure-gp-ltd-v-kingdom-of-spain - zuletzt abgerufen am 3. Juni 2023, wo ausdrücklich "conside-rations of comity" angesprochen werden; zur insoweit allerdings uneinheitlichen Rechtsprechung des US District Court for the District of Columbia vgl. Hindelang/ Naßl/Jena, Achmea goes to Washington, VerfBlog, 2023/4/19; vgl. auch Scheu/Nikolov, Arbitration International 2020, 253, 271 f.; Steinbrück/Krahé, EuZW 2022, 357, 364 f.; van der Beck, Schiedsgerichtlicher Investitionsschutz innerhalb der Europäischen Union, 2022, S. 255 f.; zu den Gefahren möglicher

Vollstreckungsverfahren in Drittländern wie den USA nach Art. 54 ICSID-Übereinkommen vgl. COM [2022] 523 final vom 5. Oktober 2022, S. 1).

94         Auch eine jedenfalls faktisch-mittelbare Auswirkung auf ein bereits eingeleitetes ICSID-Schiedsverfahren ist nicht ausgeschlossen (vgl. Steinbrück/Krahé, IPRax 2023, 36, 38; van der Beck aaO S. 259). Ein Schiedsgericht ist verpflichtet, auf einen wirksamen Schiedsspruch hinzuwirken (vgl. BGH, Urteil vom 5. Mai 1986 - III ZR 233/84, BGHZ 98, 32 [juris Rn. 15]; Schroeter, SchiedsVZ 2004, 288, 296; Spohnheimer in Festschrift Käfer, 2009, S. 357, 371, 373 f.). Die Nichtbeachtung einer vorherigen rechtskräftigen gerichtlichen Entscheidung über die Unzulässigkeit des schiedsrichterlichen Verfahrens gemäß § 1032 Abs. 2 ZPO führt - bei einem inländischen Schiedsspruch - zur Nichtigkeit (vgl. BGH, Beschluss vom 11. Oktober 2018 - I ZB 9/18, SchiedsVZ 2019, 150 [juris Rn. 6]; Saenger/Saenger aaO § 1032 Rn. 17; Voit in Musielak/Voit aaO § 1032 Rn. 14 f.), zumindest zur Aufhebbarkeit (vgl. MünchKomm.ZPO/Münch aaO § 1032 Rn. 40; Schroeter, SchiedsVZ 2004, 288, 295 f.). Dies gilt zwar nicht für einen (anationalen) ICSID-Schiedsspruch. Dieser ist in einem solchen Fall im Inland jedoch bindend nicht für vollstreckbar zu erklären.

95         Zudem hat das Schiedsgericht zu berücksichtigen, dass die Europäische Kommission über Mittel verfügt, um die Rechtsprechung des Gerichtshofs der Europäischen Union gegen Schiedssprüche in Intra-EU-Investor-Staat-Schiedsverfahren praktisch durchzusetzen. Wie die Entscheidung in der Rechtssache "European Food" (EuGH, RIW 2022, 219) zeigt, kann die Befolgung eines unionsrechtswidrigen Schiedsspruchs eine unzulässige staatliche Beihilfe im Sinne von Art. 107 f. AEUV darstellen, was wiederum zu einem Vertragsverletzungsverfahren gegen den beklagten Mitgliedstaat nach Art. 108 Abs. 2 Unterabsatz 2 AEUV in Verbindung mit Art. 258 f. AEUV führen kann (vgl. von Marschall, RIW 2022, 228, 230; van der Beck aaO S. 262 f., 266; vgl. auch Rösch, Intraeuropäisches Investitionsrecht, 2017, S. 162 f.).

96        Gegen eine jedenfalls faktisch-mittelbare Auswirkung auf Intra-EU-Investor-Staat-Schiedsverfahren lässt sich auch nicht einwenden, Schiedsgerichte seien einer unionsrechtlich begründeten Unwirksamkeit der Schiedsvereinbarung per se unzugänglich. Im Schiedsverfahren Green Power Partners vs. Spanien hat ein nach den Schiedsregeln des Instituts für Schiedsverfahren der Stockholmer Handelskammer (SCC) gebildetes Schiedsgericht einstimmig die Zustimmung eines Mitgliedstaats zur Schiedsvereinbarung nach Art. 26 ECV in einem Intra-EU-Streit wegen Verstoßes gegen das Unionsrecht für unwirksam erachtet und dementsprechend seine Zuständigkeit verneint (vgl. Schiedsspruch vom 16. Juni 2022 - SCC Case No. V. [2016/135] Rn. 170, 411 f., 468 f., 476 bis 478; dazu Lavranos/Lath/Varma, SchiedsVZ 2023, 38, 41 f.; vgl. auch US District Court for the District of Columbia, Beschluss vom 29. März 2023 - Civil Case No. 21-3249, Blasket Renewable Investments v. Spain, https://jusmundi.com/en/document/pdf/decision/en-aes-solar-and-others-pv-investors-v-the-kingdom-of-spain-memorandum-opinion-of-the-united-states-district-court-for-the-district-of-columbia-wednesday-29th-march-2023 - zuletzt abgerufen am 3. Juni 2023, wonach ein [UNCITRAL-]Schiedsgericht in einem Intra-EU-Investor-Staat-Schiedsverfahren auf der Basis von Art. 26 ECV an die Auslegung des Unionsrecht durch den Gerichtshof der Europäischen Union gebunden ist).

97        II. Der Antrag zu 1 nach § 1032 Abs. 2 ZPO ist auch begründet. Das Schiedsverfahren ist mangels wirksamer Schiedsvereinbarung unzulässig. Dem Abschluss einer wirksamen Schiedsvereinbarung zwischen den Parteien steht entgegen, dass die Schiedsklausel in Art. 26 Abs. 2 Buchst. c ECV nach der Rechtsprechung des Gerichtshofs der Europäischen Union auf Investitionsstreitigkeiten im Intra-EU-Kontext nicht anwendbar ist (dazu C II 3 und 4). Die Schiedsvereinbarung kann auch nicht auf Art. 25 ICSID-Übereinkommen gestützt werden (dazu C II 5).

98        1. Das Oberlandesgericht hat angenommen, der Antrag zu 1 sei begründet, weil es an einer wirksamen Schiedsklausel fehle. Die Schiedsklausel in Art. 26 Abs. 2 Buchst. c, Abs. 3 und 4 ECV sei in Intra-EU-Streitigkeiten nach der

- 36 -

Rechtsprechung des Gerichtshofs der Europäischen Union mit dem Unionsrecht unvereinbar. Schiedsverfahren nach dem ICSID-Übereinkommen unterlägen allerdings grundsätzlich nicht der Kontrolle durch die nationalen Gerichte. Über eine etwaige fehlende Zustimmung des Antragstellers aufgrund der Unionsrechtswidrigkeit hätte gemäß Art. 26 und 41 ICSID-Übereinkommen ausschließlich das Schiedsgericht im Wege der Kompetenz-Kompetenz zu entscheiden. Dadurch würde aber das Schiedsgericht letztverbindlich über die Auslegung und Anwendung des Unionsrechts entscheiden, was dem Rechtsprechungsmonopol des Gerichtshofs entgegenstehe.

99        Dies gelte auch für Schiedsverfahren mit Schiedsort außerhalb der Europäischen Union und für ICSID-Schiedsverfahren. Nach der Rechtsprechung des Gerichtshofs der Europäischen Union sei der Energiecharta-Vertrag selbst ein Rechtsakt der Union. Das Schiedsgericht habe daher - unabhängig von den konkret vereinbarten Schiedsregeln und damit auch nach dem ICSID-Übereinkommen - das Unionsrecht auszulegen und anzuwenden, obwohl es nicht zum Gerichtssystem der Europäischen Union gehöre. Dadurch sei die volle Wirksamkeit des Unionsrechts nicht mehr gewährleistet. Für dessen Effektivität müsse es möglich sein, die Vorfrage der Unzulässigkeit des Schiedsverfahrens wegen Verstoßes gegen das Unionsrecht vorab geltend zu machen. Angesichts der ähnlichen Sachverhalte sei es unerheblich, dass der Energiecharta-Vertrag ein multilaterales Abkommen und kein bilaterales Investitionsschutzabkommen wie in der Entscheidung in der Rechtssache "Achmea" sei.

100       Die Beteiligung des Gerichtshofs sei durch ein mögliches Aufhebungsverfahren nach § 1059 ZPO nicht ausreichend gesichert. Die Norm finde hier mangels inländischen Schiedsspruchs aber ohnehin keine Anwendung. Bei der danach nur möglichen Verweigerung der Anerkennung und Vollstreckbarerklärung im Inland bleibe der möglicherweise unionsrechtswidrige Schiedsspruch existent und eine wirksame Grundlage für eine Vollstreckung im Ausland. Das hält der rechtlichen Nachprüfung stand.

101        2. Für die Prüfung der Wirksamkeit der Schiedsvereinbarung ist das auf die Schiedsvereinbarung anwendbare Recht maßgeblich (vgl. Steinbrück aaO S. 379). Das selbständig anzuknüpfende Schiedsvereinbarungsstatut bestimmt sich in (analoger) Anwendung von Art. V Abs. 1 Buchst. a UNÜ (vgl. BGH, Urteil vom 26. November 2020 - I ZR 245/19, SchiedsVZ 2021, 97 [juris Rn. 48, 51]). Danach greift vorrangig das von den Parteien gewählte Recht. Die Wirksamkeit der Schiedsvereinbarung zu einem auf Grundlage des Energiecharta-Vertrags eingeleiteten Schiedsverfahren bestimmt sich daher nach dem Parteiwillen insbesondere nach Art. 26 Abs. 2 bis 4 ECV (vgl. Rösch aaO S. 176).

102        3. Nach der nunmehr ständigen Rechtsprechung des Gerichtshofs der Europäischen Union sind die Art. 267 und 344 AEUV dahin auszulegen, dass sie einer Bestimmung in einer internationalen Übereinkunft zwischen den Mitgliedstaaten entgegenstehen, nach der ein Investor eines dieser Mitgliedstaaten im Fall einer Streitigkeit über Investitionen in dem anderen Mitgliedstaat gegen diesen ein Verfahren vor einem Schiedsgericht einleiten darf, dessen Gerichtsbarkeit sich dieser Mitgliedstaat unterworfen hat, wenn eine entsprechende Schiedsregelung dazu führen kann, dass solche Investitionsstreitigkeiten nicht in einer Weise entschieden werden, die die volle Wirksamkeit des Unionsrechts gewährleistet (vgl. EuGH, EuZW 2021, 1097 [juris Rn. 44 f.] - PL Holdings; RIW 2022, 219 [juris Rn. 138 f.] - European Food; BeckRS 2022, 26460 Rn. 33 f. - Romatsa; vgl. auch BGH, IWRZ 2022, 129 [juris Rn. 10, 20 f.]).

103        a) Der Gerichtshof der Europäischen Union hat seine Rechtsprechung damit begründet, dass eine internationale Übereinkunft die in den Verträgen festgelegte Zuständigkeitsordnung und damit die Autonomie des Rechtssystems der Union, deren Wahrung der Gerichtshof sichert, nicht beeinträchtigen darf. Dieser Grundsatz ist insbesondere in Art. 344 AEUV verankert, nach dem sich die Mitgliedstaaten verpflichten, Streitigkeiten über die Auslegung oder Anwendung der Verträge nicht anders als hierin vorgesehen zu regeln. Auf der Basis gegenseitigen Vertrauens obliegt es den Mitgliedstaaten nach dem in Art. 4 Abs. 3 Unterabsatz 1 EUV niedergelegten Grundsatz der loyalen Zusammenarbeit, in ihrem

- 38 -

jeweiligen Hoheitsgebiet insbesondere für die Anwendung und Wahrung des Unionsrechts zu sorgen und zu diesem Zweck alle geeigneten Maßnahmen allgemeiner oder besonderer Art zur Erfüllung der Verpflichtungen, die sich aus den Verträgen oder den Handlungen der Unionsorgane ergeben, zu ergreifen. Die Verträge haben ein Gerichtssystem geschaffen, in dessen Rahmen es gemäß Art. 19 EUV Sache der nationalen Gerichte und des Gerichtshofs ist, die volle Anwendung des Unionsrechts in allen Mitgliedstaaten und den Schutz der Rechte zu gewährleisten, die den Einzelnen aus ihm erwachsen. Das Schlüsselelement des so gestalteten Gerichtssystems besteht in dem in Art. 267 AEUV vorgesehenen Vorabentscheidungsverfahren, das durch die Einführung eines Dialogs von Gericht zu Gericht gerade zwischen dem Gerichtshof und den Gerichten der Mitgliedstaaten die einheitliche Auslegung des Unionsrechts gewährleisten soll (vgl. EuGH, SchiedsVZ 2018, 186 [juris Rn. 32 bis 37] - Achmea; EuGRZ 2019, 191 [juris Rn. 109 bis 111] - CETA-Abkommen EU-Kanada; SchiedsVZ 2022, 34 [juris Rn. 42 bis 46] - Komstroy; vgl. auch BGH, IWRZ 2022, 129 [juris Rn. 10]).

104        b) Diese Rechtsprechung ist im Streitfall zu berücksichtigen. Dem steht nicht entgegen, dass die Regelungen in Art. 26 Abs. 2 bis 4 ECV (auch) Bestimmungen des Völkerrechts darstellen. Der Energiecharta-Vertrag weist nach der Rechtsprechung des Gerichtshofs der Europäischen Union eine Doppelnatur als völkerrechtliches Abkommen sowie als Rechtsakt der Union auf, weil die Union selbst Vertragspartei des Abkommens ist (vgl. EuGH, SchiedsVZ 2022, 34 [juris Rn. 23, 49 f.] - Komstroy; dazu Köster aaO S. 131 bis 135).

105        4. Der Streitbeilegungsmechanismus in Art. 26 Abs. 2 Buchst. c ECV verstößt nach diesen Grundsätzen für Intra-EU-Investor-Staat-Schiedsverfahren wie im Streitfall gegen das Unionsrecht. Wegen der Unvereinbarkeit insbesondere mit Art. 267, 344 AEUV fehlt es an einer wirksamen Einwilligung und damit an einem Angebot des Antragstellers zum Abschluss einer Schiedsvereinbarung (vgl. BGH, SchiedsVZ 2019, 46 [juris Rn. 28]; Oberster Gerichtshof von Litauen, EuZW 2022, 567 Rn. 79).

106    a) Dem stehen keine anderslautenden tatbestandlichen Feststellungen entgegen. Soweit das Oberlandesgericht ausgeführt hat, dass beide Parteien der ICSID-Streitbeilegung zugestimmt hätten und der Antragsteller ein sogenanntes stehendes Angebot nach Art. 26 Abs. 3 ECV abgegeben habe, wird damit allein die tatsächliche Sachlage referiert, aber nicht die streitige Frage der Wirksamkeit des Angebots gemäß Art. 26 Abs. 3 ECV berührt. Letzteres stellt vielmehr eine Rechtsfrage dar.

107    b) Ob die einem Investor in einem Investitionsschutzabkommen zwischen Mitgliedstaaten eröffnete Möglichkeit zur Anrufung eines Schiedsgerichts mit dem Unionsrecht vereinbar ist, hängt nach der Rechtsprechung des Gerichtshofs der Europäischen Union erstens davon ab, ob sich die Streitigkeiten, über die das Schiedsgericht zu erkennen hat, auf die Auslegung oder Anwendung des Unionsrechts beziehen können. Bejahendenfalls kommt es zweitens darauf an, ob das Schiedsgericht als ein vorlageberechtigtes Gericht im Sinne von Art. 267 AEUV angesehen werden kann, oder ob drittens der Schiedsspruch der Kontrolle durch ein Gericht eines Mitgliedstaats unterliegt, die gewährleistet, dass die unionsrechtlichen Fragen, die das Schiedsgericht zu behandeln haben könnte, eventuell im Wege eines Vorabentscheidungsverfahrens dem Gerichtshof der Europäischen Union vorgelegt werden könnten (vgl. EuGH, SchiedsVZ 2018, 186 [juris Rn. 39, 43 und 50] - Achmea; RIW 2021, 661 [juris Rn. 48, 51 und 54] - Komstroy; BGH, IWRZ 2022, 129 [juris Rn. 11] mwN; Scheu/Nikolov, Arbitration International 2020, 253, 256 f.).

108    Diese Rechtsprechung findet auch auf Intra-EU-Investor-Staat-Schiedsverfahren nach dem ICSID-Übereinkommen Anwendung. Der Gerichtshof der Europäischen Union differenziert nicht zwischen den einzelnen Schiedsregeln, die Art. 26 Abs. 2 Buchst. c in Verbindung mit Abs. 4 Buchst. a bis c ECV zur Auswahl stellt und die auch ein ICSID-Schiedsverfahren umfassen (vgl. EuGH, Gutachten vom 16. Juni 2022 - C-1/20, juris Rn. 47 mit Rn. 20, 25 - Modernisierter Vertrag über die Energiecharta; so auch Steinbrück/Krahé, IPRax 2023, 36, 40 f.; ebenso schon van der Beck aaO S. 270 f., 393). Aus den Entscheidungen

in den Rechtssachen "European Food" und "Romatsa" ergibt sich zudem eindeu-
tig, dass sich die Rechtsprechung gerade auch auf ICSID-Schiedsverfahren be-
zieht (vgl. EuGH, RIW 2022, 219 [juris Rn. 137 bis 145] - European Food;
BeckRS 2022, 26460 Rn. 33 bis 43 - Romatsa). Soweit in diesen Entscheidungen
formuliert worden ist, die Zustimmung des Staats sei "nunmehr gegenstandslos"
(vgl. EuGH, RIW 2022, 219 [juris Rn. 145] - European Food; BeckRS 2022,
26460 Rn. 40 - Romatsa), ist dies allein der Besonderheit der dortigen Fallkons-
tellation geschuldet, namentlich des späteren Beitritts Rumäniens zur Europäi-
schen Union; daraus folgt keine Beschränkung der Rechtsprechung mit Blick auf
Schiedsverfahren nach dem ICSID-Übereinkommen.

109          c) Nach diesen Maßstäben ist der Streitbeilegungsmechanismus gemäß
Art. 26 Abs. 2 Buchst. c ECV im Streitfall unionsrechtswidrig.

110          aa) Das ICSID-Schiedsgericht hat im zugrundeliegenden Investitionsstreit
in der Sache (auch) Unionsrecht auszulegen und anzuwenden.

111          Das ICSID-Schiedsgericht entscheidet gemäß Art. 42 Abs. 1 Satz 1
ICSID-Übereinkommen (einer Kollisionsnorm, vgl. Lörcher, SchiedsVZ 2005,
11, 17) in der Sache vorrangig nach den von den Parteien vereinbarten Rechts-
vorschriften. Hat die staatliche Streitpartei ihre Einwilligung in die Zuständigkeit
des Zentrums in einem bi- oder multilateralen Investitionsschutzabkommen er-
klärt, wird das Schiedsgericht in erster Linie die hierin niedergelegten Rechtsnor-
men zu berücksichtigen haben (vgl. Escher, RIW 2001, 20, 24; Schöbener/
Markert, ZVglRWiss 2006, 65, 101 f.). Die Antragsgegnerin hat ihre Schiedsklage
nach den Feststellungen des Oberlandesgerichts auf Verletzungen von Verpflich-
tungen gemäß Teil III des Energiecharta-Vertrags gestützt. Nach Art. 26 Abs. 6
ECV entscheidet ein nach Art. 26 Abs. 4 ECV gebildetes Schiedsgericht über die
strittigen Fragen in Übereinstimmung mit dem Energiecharta-Vertrag und den
geltenden Regeln und Grundsätzen des Völkerrechts.

112          Der Energiecharta-Vertrag weist nach der Rechtsprechung des Gerichts-
hofs der Europäischen Union eine Doppelnatur als völkerrechtliches Abkommen

sowie als Rechtsakt der Union auf, weil die Union selbst Vertragspartei des Ab-kommens ist. Die Entscheidung des Schiedsgerichts ergeht danach in der Sache jedenfalls auch nach unionsrechtlichen und nicht allein nach völkerrechtlichen Vorschriften (vgl. EuGH, SchiedsVZ 2022, 34 [juris Rn. 23, 49 f.] - Komstroy; dazu Köster aaO S. 131 bis 135).

113     bb) Ein ICSID-Schiedsgericht gehört nach der Rechtsprechung des Ge-richtshofs der Europäischen Union nicht zum Gerichtssystem der Union, weil es kein vorlageberechtigtes Gericht ist (vgl. EuGH, RIW 2022, 219 [juris Rn. 141 f.] - European Food; BeckRS 2022, 26460 Rn. 36 f. - Romatsa; zu einem UNCITRAL-Schiedsgericht nach dem Energiecharta-Vertrag vgl. EuGH, SchiedsVZ 2022, 34 [juris Rn. 51 bis 53] - Komstroy; dazu Nikolov, EuR 2022, 496, 497).

114     cc) Ein ICSID-Schiedsspruch unterliegt nach der Rechtsprechung des Ge-richtshofs der Europäischen Union mit Blick auf Art. 53, 54 ICSID-Übereinkom-men keiner ausreichenden Kontrolle durch ein Gericht eines Mitgliedstaats hin-sichtlich seiner Vereinbarkeit mit dem Unionsrecht (vgl. EuGH, RIW 2022, 219 [juris Rn. 142 bis 144] - European Food; BeckRS 2022, 26460 Rn. 37 bis 39 - Romatsa).

115     Die nach der Rechtsprechung des Gerichtshofs der Europäischen Union ausnahmsweise auch bei ICSID-Schiedssprüchen erforderliche (eingeschränkte) Kontrolle im Vollstreckbarerklärungsverfahren (vgl. oben Rn. 73 bis 75) führt zu keiner anderen Beurteilung. Dadurch wird lediglich ein Gleichklang mit Investiti-onsschiedssprüchen nach anderen Schiedsregeln erreicht, bei denen eine sol-che eingeschränkte Kontrolle jedoch ebenfalls nicht genügt (zu einem UNCITRAL-Verfahren nach dem Energiecharta-Vertrag vgl. EuGH, SchiedsVZ 2022, 34 [juris Rn. 54 bis 59] - Komstroy; dazu Nikolov, EuR 2022, 496, 497).

116     5. Die Schiedsvereinbarung kann nicht auf Art. 25 Abs. 1 Satz 1 ICSID-Übereinkommen gestützt werden. Das ICSID-Übereinkommen selbst begründet

keine eigene Schiedsvereinbarung und enthält auch nicht die nötige Zustimmung (vgl. Banifatemi/Edson in Fouret/Gerbay/Alvarez aaO Art. 25 Rn. 2.76; Escher, RIW 2001, 20, 23; Kryvoi aaO Rn. 38; Pirrung aaO S. 74). In Absatz 7 der Präambel des ICSID-Übereinkommens haben die Vertragsstaaten erklärt, dass allein die Ratifizierung, Annahme oder Genehmigung des Übereinkommens durch einen Vertragsstaat nicht dessen Verpflichtung bedeutet, eine bestimmte Streitigkeit ohne seine Zustimmung einem Vergleichs- oder Schiedsverfahren zu unterwerfen. Danach setzt auch Art. 25 Abs. 1 Satz 1 ICSID-Übereinkommen zur Zuständigkeit des Zentrums eine schriftliche Einwilligung voraus (vgl. auch Art. 25 Abs. 4 Satz 3 ICSID-Übereinkommen, wonach die in diesem Artikel vorgesehene Notifikation nicht die nach Absatz 1 erforderliche Zustimmung darstellt; Escher, RIW 2001, 20, 23). Dementsprechend enthält Art. 26 Abs. 5 Buchst. a Fall 1 ECV die deklaratorische Feststellung, dass die Zustimmung des Gaststaats nach Art. 26 Abs. 3 ECV und die Zustimmung des Investors nach Art. 26 Abs. 4 ECV so angesehen werden, als erfüllten sie das Erfordernis der schriftlichen Zustimmung der Streitparteien im Sinne des Kapitels II (Art. 25 bis 27) des ICSID-Übereinkommens.

117        III. Eine Vorlage an den Gerichtshof der Europäischen Union nach Art. 267 Abs. 3 AEUV ist nicht veranlasst (vgl. EuGH, Urteil vom 6. Oktober 1982 - 283/81, Slg. 1982, 3415 [juris Rn. 21] = NJW 1983, 1257 - Cilfit u.a.; Urteil vom 1. Oktober 2015 - C-452/14, GRUR Int. 2015, 1152 [juris Rn. 43] - Doc Generici; Urteil vom 6. Oktober 2021 - C-561/19, NJW 2021, 3303 [juris Rn. 32 f.] - Consorzio Italian Management und Catania Multiservizi).

118        1. Im Streitfall stellt sich keine entscheidungserhebliche Frage zur Auslegung des Unionsrechts, die nicht bereits durch die Rechtsprechung des Gerichtshofs geklärt oder nicht zweifelsfrei zu beantworten ist. Insbesondere ist die Frage geklärt, dass auch ein Intra-EU-Investor-Staat-ICSID-Schiedsverfahren auf der Grundlage des Art. 26 Abs. 2 Buchst. c, Abs. 3 Buchst. a, Abs. 4 Buchst. a ECV mit dem Unionsrecht unvereinbar ist (vgl. EuGH, RIW 2022, 219 [juris Rn. 137 bis 145] - European Food; BeckRS 2022, 26460 Rn. 33 bis 43 - Romatsa; vgl.

auch Steinbrück/Krahé, IPRax 2023, 36, 41; aA Wackernagel, EuZW 2022, 574, 576).

119        Dass der in der Rechtsprechung des Gerichtshofs der Europäischen Union hinreichend geklärte Grundsatz der Effektivität des Unionsrechts sowie die Verpflichtung der Mitgliedstaaten aus Art. 19 Abs. 1 Unterabsatz 2 EUV eine möglichst frühe Prüfung der Zulässigkeit von Intra-EU-Investor-Staat-Schieds-verfahren auf der Grundlage des Energiecharta-Vertrags gebieten, ist ebenso zweifelsfrei zu beantworten. Die damit in Zusammenhang stehende Frage, ob der beklagte Staat im Streitfall vor der Konstituierung des Schiedsgerichts in dem besonderen deutschen Verfahren nach § 1032 Abs. 2 ZPO die Unzulässigkeit des ICSID-Schiedsverfahrens feststellen lassen kann, betrifft hingegen das nationale Verfahrensrecht und obliegt nicht der Auslegung durch den Gerichtshof.

120        2. Eine Vorlage an den Gerichtshof der Europäischen Union ist auch nicht deswegen veranlasst, weil der Senat die Voraussetzungen eines Ultra-vires-Ak-tes für gegeben hielte (zur Erforderlichkeit einer Vorlage in einem solchen Fall vgl. BVerfG, NJW 2023, 425 [juris Rn. 139]; E. Klein in Benda/Klein, Verfassungs-prozessrecht, 4. Aufl., Rn. 95; O. Klein, DVBl. 2023, S. 779, 780). Der Gerichtshof der Europäischen Union hat mit seinen Entscheidungen zur Unwirksamkeit von Schiedsvereinbarungen in bi- und multilateralen Investitionsschutzabkommen nicht ultra vires gehandelt.

121        a) Eine Ultra-vires-Kontrolle kommt ohnehin nur in Betracht, wenn ein Kompetenzverstoß der europäischen Organe hinreichend qualifiziert ist (vgl. BVerfGE 126, 286 [juris Rn. 61]; 154, 17 [juris Rn. 110] mwN). Der mit der Funk-tionszuweisung des Art. 19 Abs. 1 Satz 2 EUV verbundene Rechtsprechungsauf-trag des Gerichtshofs der Europäischen Union endet dort, wo eine Auslegung der Verträge nicht mehr nachvollziehbar und daher objektiv willkürlich ist (BVerfGE 154, 17 [juris Rn. 112]; zur vorliegenden Konstellation vgl. Steinbrück/ Krahé, EuZW 2022, 357, 360 f.). Bei der Kompetenzverteilung ist auch der

- 44 -

Grundsatz der Verhältnismäßigkeit als Korrektiv zum Schutz mitgliedstaatlicher Zuständigkeiten zu beachten (vgl. dazu BVerfGE 154, 17 [juris Rn. 119, 123]).

122     b) Der Senat hat bereits in der Rechtssache "Achmea" einen Ultra-vires-Akt des Gerichtshofs der Europäischen Union abgelehnt (vgl. BGH, SchiedsVZ 2019, 46 [juris Rn. 60 bis 71]). Auch den in Fortschreibung der "Achmea"-Ent-scheidung ergangenen Entscheidungen des Gerichtshofs liegt keine objektiv will-kürliche Auslegung der Verträge zugrunde.

123     aa) Der Vorwurf, der Gerichtshof der Europäischen Union habe in seiner Entscheidung in der Rechtssache "Komstroy" einen vollständig unionsexternen Rechtsstreit entschieden sowie ein die Mitgliedstaaten und die Union bindendes internationales Abkommen - den Energiecharta-Vertrag - für "nicht anwendbar" erklärt, obwohl seine Kompetenzen gemäß Art. 267 Abs. 1 AEUV auf die "Gültig-keit" und die "Auslegung" des Unionsrechts beschränkt seien (so Karpenstein/Sangi, NJW 2021, 3228 Rn. 7), greift nicht durch.

124     Der Gerichtshof der Europäischen Union wurde in dem Verfahren ord-nungsgemäß von der Cour d'Appel de Paris mit einem Vorabentscheidungsersu-chen gemäß Art. 267 AEUV zum Energiecharta-Vertrag befasst. Eine Kompe-tenzüberschreitung ist auch nicht mit der in einem obiter dictum erfolgten Aus-sage zur Nichtanwendbarkeit von Art. 26 Abs. 2 Buchst. c ECV im Intra-EU-Kon-text (vgl. EuGH, SchiedsVZ 2022, 34 [juris Rn. 64 bis 66] - Komstroy) verbunden. Der Gerichtshof der Europäischen Union ist zur Auslegung von durch die Union geschlossenen internationalen Übereinkünften befugt (vgl. EuGH, Urteil vom 27. Februar 2018 - C-266/16, juris Rn. 45 f. - Western Sahara Campaign UK, mwN). Er hat sich auf eine Auslegung des Art. 26 ECV allein im Intra-EU-Kontext beschränkt und gerade keine uneingeschränkte Unanwendbarkeit statuiert oder entgegen dem in Art. 34, 36 ECV vorgesehenen Mechanismus Regelungen des Abkommens geändert oder außer Kraft gesetzt.

125     bb) Ebenfalls ohne Erfolg bleibt der Einwand, der Gerichtshof der Euro-päischen Union sei für die nur als obiter dictum geäußerten Aussagen mangels

Vorlagefrage nicht nach Art. 267 AEUV zuständig gewesen (vgl. dazu Wilske/ Markert/Ebert, SchiedsVZ 2022, 111, 128 f.; kritisch Schwalb/Weiler, SchiedsVZ 2022, 38 f.; für Ultra-vires-Akt Lavranos/Lath/Varma, SchiedsVZ 2023, 38, 42 f.). Der Tenor der Entscheidung in der Rechtssache "Komstroy" umfasst entsprechend den Vorlagefragen allein die Auslegung des Begriffs der Investition in Art. 1 Nr. 6 und Art. 26 Abs. 1 ECV; nur hierauf erstreckt sich auch die Bindungswirkung (vgl. Wegener in Calliess/Ruffert aaO Art. 267 AEUV Rn. 50). Damit sind dem Gerichtshof der Europäischen Union weitere Ausführungen im Rahmen eines obiter dictums indes nicht versagt gewesen.

126         Außerdem hat der Gerichtshof der Europäischen Union nachfolgend wiederholt auf seine Ausführungen in der Rechtssache "Komstroy" Bezug genommen und diese dadurch unabhängig vom konkreten Sachverhalt des damaligen Vorlageverfahrens bestätigt. Insbesondere hat er in seinem Gutachten 1/20 zu Art. 26 ECV unabhängig von einer konkreten Schiedsordnung pauschal auf die Entscheidung in der Rechtssache "Komstroy" verwiesen (Gutachten vom 16. Juni 2022 - C-1/20, juris Rn. 47 mit Rn. 20 - Modernisierter Vertrag über die Energiecharta).

127         cc) Der Gerichtshof der Europäischen Union hat sich auch nicht über Art. 351 Abs. 1 AEUV und den darin zum Ausdruck kommenden Rechtsgedanken hinweggesetzt, dass die Mitgliedstaaten und nicht der Gerichtshof Unvereinbarkeiten zwischen internationalen Übereinkünften und dem Unionsrecht beheben müssen. Eine analoge Anwendung von Art. 351 Abs. 1 AEUV hat der Gerichtshof mit Blick auf die erforderliche enge Auslegung der Ausnahmevorschrift nachvollziehbar abgelehnt (vgl. EuGH, NJW 2023, 349 Rn. 115 bis 127 - PPU; oben Rn. 84 bis 87).

128         dd) Die Entscheidungen des Gerichtshofs der Europäischen Union verstoßen auch nicht gegen allgemeine Regeln des Völkerrechts (Art. 25 GG) oder das Wiener Übereinkommen vom 23. Mai 1969 über das Recht der Verträge (BGBl. II 1985 S. 926; nachfolgend "WVK"), insbesondere Art. 27 WVK. Danach kann sich

eine Vertragspartei nicht auf ihr innerstaatliches Recht berufen, um die Nichterfüllung eines völkerrechtlichen Vertrags zu rechtfertigen.

129        Nach Art. 3 Buchst. b WVK sind die Bestimmungen des Wiener Übereinkommens, die eine Ausprägung des allgemeinen Völkergewohnheitsrechts darstellen, zwar auch auf Nichtparteien - wie die Europäische Union - anwendbar (vgl. EuGH, Urteil vom 25. Februar 2010 - C-386/08, Slg 2010, I-1289 = EuZW 2010, 264 [juris Rn. 40 bis 42] - Brita, mwN; Urteil vom 27. Februar 2018 - C-266/16, juris Rn. 58 - Western Sahara Campaign UK; Urteil vom 20. Oktober 2022 - C-111/21, NJW 2022, 3701 [juris Rn. 22] - Laudamotion). Die Art. 26 f. WVK sind auch Teil des Völkergewohnheitsrechts. Die Mitgliedstaaten haben aber durch den Beitritt zur Union ihre völkerrechtliche Dispositionsbefugnis beschränkt und untereinander auf die Ausübung mit dem Unionsrecht kollidierender völkervertraglicher Rechte verzichtet. Dementsprechend kann dem Unionsrecht widersprechendes Völkergewohnheitsrecht zwischen Mitgliedstaaten nicht bestehen (vgl. BGH, Beschluss vom 24. Januar 2019 - I ZB 2/15, juris Rn. 7; vgl. auch BGH, SchiedsVZ 2019, 46 [juris Rn. 40 f.] mwN; Cour d'Appel de Paris, Urteil vom 19. April 2022 - Nr. 48/2022, RG-NR 20/13085 Rn. 90) und die Angehörigen der beteiligten Mitgliedstaaten können sich nicht auf ältere völkerrechtliche Verpflichtungen der Mitgliedstaaten berufen, die im Widerspruch zum Unionsrecht stehen (vgl. BGH, SchiedsVZ 2019, 46 [juris Rn. 41]).

130        ee) Ein Willkürvorwurf lässt sich nicht damit begründen, dass der Gerichtshof die Investitionsschiedsgerichtsbarkeit anders behandelt als die regelmäßig auch unionsrechtlich zulässige Handelsschiedsgerichtsbarkeit. Diese Ungleichbehandlung ist sachlich gerechtfertigt, weil die Schiedsbindung des Gaststaats in einem Investitionsschiedsverfahren auf seinem stehenden Angebot aus seiner vorab gegenüber anderen Vertragsstaaten erteilten Zustimmung in einem völkerrechtlichen Vertrag beruht und nicht - wie bei der Handelsschiedsgerichtsbarkeit - auf der Ausübung der Parteiautonomie im Einzelfall gegenüber dem jeweiligen Investor (vgl. EuGH, SchiedsVZ 2018, 186 [juris Rn. 55] - Achmea; SchiedsVZ 2022, 34 [juris Rn. 59] - Komstroy).

131        Dem steht die Entscheidung in der Rechtssache "PL-Holdings" nicht ent-
gegen. Die dort beanstandete ad-hoc-Schiedsvereinbarung zielte in Wirklichkeit
auf die Umgehung der Verpflichtungen, die sich für den Mitgliedstaat aus Art. 4
Abs. 3 EUV sowie Art. 267, 344 AEUV gemäß ihrer Auslegung in der Entschei-
dung in der Rechtssache "Achmea" ergaben (vgl. EuGH, EuZW 2021, 1097 [juris
Rn. 47, 56] - PL Holdings).

132        ff) Soweit ein Eingriff in abgeschlossene Sachverhalte ohne Übergangsre-
gelungen gerügt wird, ist dies die anerkannte Folge der ex-tunc-Auslegung des
Unionsrechts durch den Gerichtshof der Europäischen Union (vgl. EuGH,
EuZW 2021, 1097 [juris Rn. 58 bis 61] - PL Holdings, mwN; vgl. auch BVerfGE
126, 286 [juris Rn. 83] mwN).

133        gg) Mit dem Einwand, es mangele den Entscheidungen zur Investitions-
schiedsgerichtsbarkeit an einer Verhältnismäßigkeitsprüfung, kann ebenfalls kein
Ultra-vires-Akt begründet werden.

134        (1) Der Einwand betrifft nicht den nach Art. 5 Abs. 1 Satz 2 und Abs. 4
EUV auch bei der Kompetenzverteilung der Union zu beachtenden Grundsatz
der Verhältnismäßigkeit als Korrektiv zum Schutz mitgliedstaatlicher Zuständig-
keiten (dazu BVerfGE 154, 17 [juris Rn. 119, 123]). Die Entscheidungen des Ge-
richtshofs zu Intra-EU-Investitionsschiedsverfahren betreffen die Abgrenzung der
Zuständigkeiten von einerseits Staats- und andererseits Schiedsgerichten bei der
Auslegung und Anwendung des Unionsrechts.

135        (2) Unabhängig davon gibt es keine Anhaltspunkte dafür, dass die Ent-
scheidungen des Gerichtshofs der Europäischen Union in der Sache nicht dem
auch als ungeschriebenem Bestandteil des Unionsrechts anerkannten Grundsatz
der Verhältnismäßigkeit bei der Überprüfung von Handlungen der Organe der
Union (dazu BVerfGE 154, 17 [juris Rn. 124 bis 126] mwN) genügen, um das
legitime Ziel der Sicherstellung der Kohärenz, der vollen Geltung und Autonomie
des Unionsrechts zu erreichen.

- 48 -

136       (a) Der Geeignetheit steht insbesondere nicht entgegen, dass die Auslegung des Energiecharta-Vertrags nur für die Mitgliedstaaten und damit einen Teil der Vertragsparteien verbindlich ist. Die verbindliche Auslegung durch den Gerichtshof der Europäischen Union kann und darf sich allein auf den unionsinternen Kontext beziehen (vgl. Art. 19 Abs. 1 Unterabsatz 1 Satz 2, Abs. 3 EUV). In diesem Bereich ist seine Auslegung aber für alle verbindlich und kann so ihr Ziel erreichen, die Kohärenz und Einheitlichkeit des Unionsrechts zu sichern (vgl. dazu EuGH, EuGRZ 2019, 191 [juris Rn. 111] - CETA-Abkommen EU-Kanada).

137       (b) Mit Blick auf die Auffassung des Gerichtshofs der Europäischen Union, Schiedsgerichte seien nicht als Gerichte im Sinne von Art. 267 AEUV einzustufen (vgl. EuGH, SchiedsVZ 2018, 186 [juris Rn. 37, 43, 46] - Achmea), fehlt es nicht deshalb an der Erforderlichkeit, weil es auch bei der staatsgerichtlichen Vorlage von Auslegungsfragen zu Lücken kommen kann. Insoweit gibt es im Einzelfall Möglichkeiten der Abhilfe. Unionsrechtlich kommt ein Vertragsverletzungsverfahren nach Art. 258 f. AEUV in Betracht (vgl. EuGH, Urteil vom 4. Oktober 2018 - C-416/17, EuZW 2018, 1038 [juris Tenor 2 und Rn. 105 bis 114] - Kommission/Frankreich; Wegener in Calliess/Ruffert aaO Art. 267 AEUV Rn. 35 mwN) und innerstaatlich eine verfassungsgerichtliche Kontrolle am Maßstab des Art. 101 Abs. 1 Satz 2 GG (vgl. BVerfG, EuGRZ 2022, 350 [juris Rn. 41 bis 47] mwN; Wegener in Calliess/Ruffert aaO Art. 267 AEUV Rn. 36 mwN). Eine vergleichbare Kontrolle im Fall von vorlageberechtigten Schiedsgerichten wäre dagegen nicht möglich.

138       (c) Die Entscheidungen des Gerichtshofs sind auch nicht wegen kollidierender wirtschafts- und außenpolitischer Belange unangemessen. Art. 26 Abs. 2 Buchst. a ECV sieht die Möglichkeit der Anrufung nationaler Gerichte ausdrücklich vor. Der Senat hat bereits ausgeführt, dass den Investoren effektiver Rechtsschutz (Art. 2 Abs. 1 in Verbindung mit Art. 20 Abs. 3 GG; Art. 47 EU-Grundrechtecharta) nicht verwehrt wird (vgl. BGH, SchiedsVZ 2019, 46 [juris Rn. 72]), sondern mit Blick auf den Grundsatz des gegenseitigen Vertrauens vielmehr vor den mitgliedstaatlichen Gerichten gewährt wird (vgl. EuGH, EuZW 2021, 1097

- 49 -

[juris Rn. 68] - PL Holdings; Cour d'Appel de Paris, Urteil vom 19. April 2022 - Nr. 48/2022, RG-NR 20/13085 Rn. 92 bis 95; vgl. auch BGH, IWRZ 2022, 129 [juris Rn. 41]; Langenfeld, EuR 2022, 399, 404; van der Beck aaO S. 370, 373 mwN). Auf internationaler Ebene besteht außerdem die Möglichkeit, den Europäischen Gerichtshof für Menschenrechte anzurufen (vgl. Lavranos/Lath/Varma, SchiedsVZ 2023, 38, 46).

139        IV. Der Antrag zu 2 ist entgegen der Auffassung des Oberlandesgerichts unzulässig.

140        1. Das Oberlandesgericht hat angenommen, es sei unerheblich, dass bislang nur das Schiedsverfahren ICSID ARB/21/4 vorliege, das durch Annahme des Angebots gemäß Art. 26 Abs. 3 ECV eingeleitet worden sei. Es sei auch unerheblich, dass eine Schiedsvereinbarung erst zustande komme, wenn die Antragsgegnerin dieses "stehende Angebot" annehme, was diese in Bezug auf weitere Streitigkeiten in Abrede stelle. Aufgrund der derzeit noch geltenden Regelung des "stehenden" Schiedsverfahrensangebots des Antragstellers im Energiecharta-Vertrag könne die Antragsgegnerin jederzeit die Annahme erklären und dadurch ein Schiedsverfahren auf unionsrechtlich unwirksamer Basis in Gang setzen. Das hält der rechtlichen Nachprüfung nicht stand.

141        2. Im Rahmen eines Antrags nach § 1032 Abs. 2 ZPO prüft das staatliche Gericht, ob eine wirksame Schiedsvereinbarung besteht, diese durchführbar ist und der Gegenstand des Schiedsverfahrens der Schiedsvereinbarung unterfällt (BGH, SchiedsVZ 2020, 50 [juris Rn. 11]). Aus diesem Prüfungsumfang folgt, dass als Mindestvoraussetzung für einen zulässigen Antrag nach § 1032 Abs. 2 ZPO eine Schiedsvereinbarung zwischen den Parteien vorgetragen werden muss (vgl. Anders in Anders/Gehle, ZPO, 81. Aufl., § 1032 Rn. 3; BeckOK.ZPO/Wolf/Eslami aaO § 1032 Rn. 2; Schlosser in Stein/Jonas aaO § 1032 Rn. 38). Eine nur potenzielle oder zukünftige Schiedsvereinbarung zwischen den Parteien genügt nicht.

142        Streitig ist, wie weit im Vorfeld eines konkreten Schiedsverfahrens der An-
trag statthaft ist, insbesondere, ob sich ein gegenständlich abgrenzbares indivi-
dualisierbares Schiedsverfahren abzeichnen muss (so OLG München, Beschluss
vom 26. August 2015 - 34 SchH 2/14, juris Rn. 20, 22; Saenger/Saenger aaO
§ 1032 Rn. 14; Hilger, NZG 2003, 575, 576; vgl. auch Schlosser in Stein/Jonas
aaO § 1032 Rn. 38, 40; Spohnheimer aaO S. 357, 366), oder ob eine abstrakte
Überprüfung der Gültigkeit vertraglicher Schiedsklauseln möglich ist (so KG,
SchiedsVZ 2012, 337, 338; OLG Frankfurt, SchiedsVZ 2015, 47 [juris Rn. 21 f.];
BeckOK.ZPO/Wolf/Eslami aaO § 1032 Rn. 6, 26 bis 32; MünchKomm.ZPO/
Münch aaO § 1032 Rn. 33; Voit in Musielak/Voit aaO § 1032 Rn. 12; Seiler in
Thomas/Putzo, ZPO, 44. Aufl. § 1032 Rn. 5).

143        3. Diese Streitfrage bedarf hier keiner Entscheidung. Der Antrag zu 2 ist
unzulässig, weil es schon an einer vom Antragsteller behaupteten (und möglich-
erweise unwirksamen) Schiedsvereinbarung zwischen den Parteien fehlt.

144        Im Streitfall liegt allein das so genannte "stehende Angebot" gemäß Art. 26
Abs. 3 ECV des Antragstellers vor. Die Annahme dieses Angebots durch die An-
tragsgegnerin mit der Einreichung des Schiedsantrags im Verfahren ICSID
ARB/21/4 hat nicht eine jegliche Streitigkeit aus dem Energiecharta-Vertrag er-
fassende Schiedsvereinbarung begründet.

145        Soweit der Antragsteller vorbeugend geklärt wissen möchte, dass die An-
tragsgegnerin durch eine mögliche zukünftige Annahme des "stehenden Ange-
bots" - hinsichtlich eines anderen Streitgegenstands - keine wirksame Schieds-
vereinbarung herbeiführen kann, betrifft diese Fragestellung keine konkrete
Schiedsvereinbarung mit einem potenziell daraus erwachsenden Schiedsverfah-
ren, sondern lediglich eine potenzielle Schiedsvereinbarung und ist mithin nicht
vom Prüfungsumfang eines Antrags nach § 1032 Abs. 2 ZPO umfasst.

146        4. Von der Mindestvoraussetzung einer jedenfalls behaupteten Schieds-
vereinbarung kann nicht mit Blick auf die Besonderheiten von Intra-EU-Investor-
Staat-Schiedsverfahrens abgesehen werden. Der Grundsatz der Effektivität des

Unionsrechts (vgl. oben Rn. 77) gebietet zwar eine möglichst frühe Prüfung der Zulässigkeit von Intra-EU-Investor-Staat-Schiedsverfahren auf der Grundlage des Energiecharta-Vertrags. Diese wird aber bereits dadurch gewährleistet, dass der Rechtsbehelf des § 1032 Abs. 2 ZPO eröffnet ist, sobald eine Schiedsvereinbarung vorliegt.

147        D. Die Rechtsbeschwerde ist danach hinsichtlich des Antrags zu 1 als unbegründet zurückzuweisen. Hinsichtlich des Antrags zu 2 ist der angefochtene Beschluss auf die Rechtsbeschwerde aufzuheben und der Feststellungsantrag als unzulässig zu verwerfen. Der Senat kann insoweit in der Sache selbst entscheiden, weil die Aufhebung der Entscheidung nur wegen einer Rechtsverletzung bei Anwendung des Rechts auf das festgestellte Sachverhältnis erfolgt und nach letzterem die Sache zur Endentscheidung reif ist (§ 577 Abs. 5 Satz 1 ZPO).

148        Die Kostenentscheidung beruht auf § 92 Abs. 1 Satz 1, § 97 Abs. 1 ZPO.

149        E. Der Wert des Beschwerdegegenstands ist auf 30 Mio. € festzusetzen.

150        Der Wert des Beschwerdegegenstands eines Verfahrens nach § 1032 Abs. 2 ZPO ist nach ständiger Praxis des Senats auf ein Fünftel des Hauptsachewerts festzusetzen (vgl. BGH, SchiedsVZ 2020, 50 [juris Rn. 26] mwN; NJOZ 2023, 497 [juris Rn. 22]).

151        Ausgehend von dem in der Schiedsklage geltend gemachten Entschädigungsbetrag für die zwei Schiedsklägerinnen in Höhe von 1,4 Mrd. € hält der Senat bei Annahme einer paritätischen Beteiligung der Schiedsklägerinnen für den Antrag zu 1 einen Gegenstandswert von 140 Mio. € für angemessen (ein Fünftel von 700 Mio. € für die hiesige Antragsgegnerin als eine der beiden Schiedsklägerinnen). Für den Antrag zu 2 sind gemäß § 48 Abs. 1 Satz 1 GKG, § 3 ZPO nach freiem Ermessen die Hälfte des Werts des Antrags zu 1, mithin weitere 70 Mio. €, anzusetzen und für den Gegenstandswert nach § 39 Abs. 1 GKG hinzuzurechnen. Nach § 39 Abs. 2 GKG beträgt der Streitwert allerdings höchstens 30 Mio. €, soweit kein niedrigerer Höchstwert bestimmt ist. Erreicht bereits einer

- 52 -

von mehreren Streitgegenständen den Höchstwert, führt die Zusammenrech-
nung nach § 39 Abs. 1 GKG zu keiner Erhöhung (vgl. BGH, Beschluss vom
6. April 2010 - II ZR 130/08, juris Rn. 1).


Koch                          Feddersen                          Pohl

        Schmaltz                          Odörfer


Vorinstanz:

OLG Köln, Entscheidung vom 01.09.2022 - 19 SchH 15/21 -