# EXHIBIT 54

ORDONNANCE DE LA COUR (dixième chambre)

21 septembre 2022 (*)

« Renvoi préjudiciel – Article 99 du règlement de procédure de la Cour – Aides d'État – Articles 107 et 108 TFUE – Traité bilatéral d'investissement – Clause d'arbitrage – Roumanie – Sentence arbitrale accordant le versement de dommages et intérêts – Décision de la Commission européenne déclarant que ce versement constitue une aide d'État incompatible avec le marché intérieur et ordonnant sa récupération – Exécution forcée de la sentence arbitrale devant une juridiction d'un État membre autre que l'État membre destinataire de la décision – Violation du droit de l'Union – Article 19 TUE – Articles 267 et 344 TFUE – Autonomie du droit de l'Union »

Dans l'affaire C-333/19,

ayant pour objet une demande de décision préjudicielle au titre de l'article 267 TFUE, introduite par la cour d'appel de Bruxelles (Belgique), par décision du 12 mars 2019, parvenue à la Cour le 24 avril 2019, dans les procédures

**DA**

contre

**Romanian Air Traffic Services Administration (Romatsa),**

**Roumanie,**

**Commission européenne,**

**Organisation européenne pour la sécurité de la navigation aérienne (Eurocontrol),**

**FC,**

**European Food SA,**

**Starmill SRL,**

**Multipack SRL,**

et

**FC,**

**European Food SA,**

**Starmill SRL,**

**Multipack SRL**

contre

**Romanian Air Traffic Services Administration (Romatsa),**

**Roumanie,**

**DA,**

**Commission européenne,**

**Organisation européenne pour la sécurité de la navigation aérienne (Eurocontrol),**

LA COUR (dixième chambre),

composée de M. I. Jarukaitis, président de chambre, M. E. Regan, président de la cinquième chambre (rapporteur), et M. Ilešič, juge,

avocat général : M. M. Szpunar,

greffier : M. A. Calot Escobar,

vu la décision prise, l'avocat général entendu, de statuer par voie d'ordonnance motivée, conformément à l'article 99 du règlement de procédure de la Cour,

rend la présente

**Ordonnance**

1   La demande de décision préjudicielle porte sur l'interprétation de la décision (UE) 2015/1470 de la Commission, du 30 mars 2015, concernant l'aide d'État SA.38517 (2014/C) (ex 2014/NN) mise en œuvre par la Roumanie – Sentence arbitrale dans l'affaire Micula/Roumanie du 11 décembre 2013 (JO 2015, L 232, p. 43), ainsi que les principes généraux du droit de l'Union, notamment ceux de coopération loyale et de l'autorité de la chose jugée.

2   Cette demande a été présentée dans le cadre de litiges opposant DA et FC, des ressortissants suédois résidant en Roumanie, ainsi que European Food SA, Starmill SRL et Multipack SRL, des sociétés contrôlées par ceux-ci, à Romanian Air Traffic Services Administration (Romatsa), la Roumanie, la Commission européenne et l'Organisation européenne pour la sécurité de la navigation aérienne (Eurocontrol) au sujet d'une saisie-arrêt exécution que DA a fait pratiquer en Belgique entre les mains d'Eurocontrol, à la charge de la Roumanie, sur la base d'une sentence arbitrale.

**Le cadre juridique**

*Le droit international*

*La convention CIRDI*

3   La convention pour le règlement des différends relatifs aux investissements entre États et ressortissants d'autres États, conclue à Washington le 18 mars 1965 (ci–après la « convention CIRDI »), entrée en vigueur à l'égard de la Roumanie le 12 octobre 1975, dispose, à son article 53, paragraphe 1 :

« La sentence est obligatoire à l'égard des parties et ne peut être l'objet d'aucun appel ou autre recours, à l'exception de ceux prévus à la présente Convention. Chaque partie doit donner effet à la sentence conformément à ses termes [...] »

4   L'article 54, paragraphe 1, de la convention CIRDI prévoit :

« Chaque État contractant reconnaît toute sentence rendue dans le cadre de la présente Convention comme obligatoire et assure l'exécution sur son territoire des obligations pécuniaires que la sentence impose comme s'il s'agissait d'un jugement définitif d'un tribunal fonctionnant sur le territoire dudit État. [...] »

*Le TBI*

5   Le traité bilatéral d'investissement, conclu le 29 mai 2002, entre le gouvernement du Royaume de Suède et le gouvernement roumain pour la promotion et la protection réciproque des investissements

(ci-après le « TBI »), entré en vigueur le 1$^{er}$ juillet 2003, dispose, à son article 2, paragraphe 3 :

« Chaque partie contractante assure à tout moment un traitement juste et équitable aux investissements des investisseurs de l'autre partie contractante et n'entrave pas, par des mesures arbitraires ou discriminatoires, l'administration, la gestion, le maintien, l'utilisation, la jouissance ou la cession desdits investissements par lesdits investisseurs ».

6   L'article 7 du TBI prévoit que les différends entre les investisseurs et les pays signataires sont réglés, notamment, par un tribunal arbitral qui applique la convention CIRDI.

   *Le droit de l'Union*

7   La décision 2015/1470, adoptée par la Commission sur le fondement, notamment, de l'article 108, paragraphe 2, TFUE, énonce :

   « *Article premier*

Le versement des dommages et intérêts accordés par le tribunal arbitral, [...] par la sentence arbitrale rendue le 11 décembre 2013 dans l'affaire no ARB/05/20 Micula e.a./Roumanie, à l'unité économique unique composée par [DA], [FC], [...] European Food [...], [...] Starmill [...], [...] Multipack, European Drinks SA, Rieni Drinks SA, Scandic Distilleries SA, Transilvania General Import-Export SRL et West Leasing International SRL constitue une aide d'État au sens de l'article 107, paragraphe 1, [TFUE], qui est incompatible avec le marché intérieur.

   *Article 2*

1.   La Roumanie ne verse aucune aide incompatible visée à l'article 1$^{er}$ et récupère toutes les aides incompatibles visées à l'article 1$^{er}$ qui ont déjà été versées aux entités, quelles qu'elles soient, qui composent l'unité économique unique qui a bénéficié de cette aide à la suite de la mise en œuvre ou à l'exécution partielle de la sentence arbitrale du 11 décembre 2013, ainsi que toute aide versée aux entités, quelles qu'elles soient, qui composent l'unité économique unique qui a bénéficié de cette aide à la suite d'une mise en œuvre ultérieure de la sentence arbitrale du 11 décembre 2013 qui n'a pas été notifiée à la Commission ou toute aide versée après la date de l'adoption de la présente décision.

2.   [DA], [FC], [...] European Food [...], [...] Starmill [...], [...] Multipack, European Drinks [...], Rieni Drinks [...], Scandic Distilleries [...], Transilvania General Import-Export [...] et West Leasing International [...] sont solidairement responsables du remboursement de l'aide d'État qu'ils ont reçue.

   [...]

7.   La Roumanie veille à ce qu'aucun autre versement de l'aide visée à l'article 1$^{er}$ ne soit effectué à partir de la date d'adoption de la présente décision.

   *Article 3*

1.   La récupération de l'aide visée à l'article 1$^{er}$ est immédiate et effective.

2.   La Roumanie veille à ce que la présente décision soit exécutée dans un délai de quatre mois à compter de sa notification.

   [...]

   *Article 5*

La Roumanie est destinataire de la présente décision. »

   **Le litige au principal et les questions préjudicielles**

8    Par la sentence arbitrale du 11 décembre 2013, un tribunal arbitral, constitué dans le cadre de la convention CIRDI conformément à la clause d'arbitrage prévue à l'article 7 du TBI, a accordé à DA et à FC ainsi qu'aux sociétés European Food, Starmill et Multipack, au motif de la violation par la Roumanie de l'article 2, paragraphe 3, du TBI, des dommages et intérêts à charge de cet État pour un montant s'élevant en principal à 376 433 229 lei roumains (RON) (environ 78 millions d'euros), à majorer d'intérêts jusqu'à la date de pleine exécution de cette sentence par la Roumanie. Par conséquent, le montant total dû par la Roumanie le 11 décembre 2013 s'élevait à 791 882 452 RON (environ 164 000 000 euros).

9    Le 18 avril 2014, la Roumanie a introduit un recours devant un comité ad hoc du Centre international pour le règlement des différends relatifs aux investissements (CIRDI) tendant à l'annulation de ladite sentence arbitrale.

10    Le 30 mars 2015, la Commission a adopté la décision 2015/1470.

11    Le 2 juillet 2015, la sentence arbitrale du 11 décembre 2013 a été revêtue de la formule exécutoire, conformément à la législation belge portant approbation de la convention CIRDI.

12    Le 19 août 2015, DA a fait signifier cette sentence à la Roumanie.

13    Le 9 septembre 2015, DA a fait pratiquer une saisie-arrêt exécution entre les mains d'Eurocontrol, dont le siège est établi à Bruxelles (Belgique), sur les créances que cette dernière a ou aura à l'égard de la Roumanie, notamment représentée par l'intermédiaire de Romatsa, aux fins d'obtenir le paiement d'un montant de 85 066 428,42 euros.

14    Par citations en opposition à saisie-arrêt exécution, respectivement, des 23 et 24 septembre 2015, Romatsa et la Roumanie ont introduit une action devant la chambre des saisies du tribunal de première instance francophone de Bruxelles (Belgique) afin d'obtenir la mainlevée de la saisie pratiquée par DA. La Commission, Eurocontrol, FC, European Food, Starmill et Multipack ont introduit une demande en intervention volontaire dans ces procédures.

15    Par requêtes déposées au greffe du Tribunal de l'Union européenne, respectivement, les 6, 30 et 28 novembre 2015, European Food, Starmill, Multipack et Scandic Distilleries, une autre société contrôlée par DA et FC, dans l'affaire T-624/15, DA, dans l'affaire T-694/15, et FC ainsi que European Drinks, Rieni Drinks, Transilvania General Import-Export et West Leasing International, toutes des sociétés également contrôlées par DA et FC, dans l'affaire T-704/15, ont chacun introduit un recours au titre de l'article 263 TFUE tendant à l'annulation de la décision 2015/1470.

16    Par jugement du 25 janvier 2016, le tribunal de première instance francophone de Bruxelles (Belgique), faisant droit aux demandes de Romatsa et de la Roumanie, a ordonné la mainlevée de la saisie en cause. L'intervention volontaire de FC, European Food, Starmill et Multipack a été rejetée comme étant irrecevable.

17    Par décision du 26 février 2016, le comité ad hoc du CIRDI a rejeté le recours en annulation introduit par la Roumanie contre la sentence du 11 décembre 2013, de sorte que cette dernière est devenue définitive.

18    Le 29 février 2016, DA a interjeté appel du jugement du 25 janvier 2016 auprès de la cour d'appel de Bruxelles (Belgique), la juridiction de renvoi. Le même jour, FC, European Food, Starmill et Multipack ont interjeté appel de la partie du jugement rejetant leur intervention volontaire comme étant irrecevable. Par ailleurs, ils ont demandé à intervenir volontairement dans la procédure d'appel engagée par DA. La juridiction de renvoi a joint les deux affaires pour cause de connexité.

19    Dans sa décision de renvoi, la cour d'appel de Bruxelles, après avoir confirmé le rejet de l'intervention volontaire de FC, European Food, Starmill et Multipack devant le premier juge, mais déclaré recevable l'intervention volontaire de ceux-ci dans la procédure d'appel, expose, s'agissant de l'examen du bien-fondé de la saisie-arrêt exécution du 9 septembre 2015, que la sentence arbitrale du 11 décembre 2013, laquelle fait suite à une procédure d'arbitrage à laquelle la Commission a participé comme amicus curiae et qui est entre-temps devenue définitive, constitue un titre exécutoire régulier en soi. Cette

saisie-arrêt exécution aurait, de ce fait, été pratiquée sur la base d'une sentence arbitrale revêtue de la formule exécutoire, dont l'article 54 de la convention CIRDI imposerait la reconnaissance et l'exécution à chaque État contractant, dont le Royaume de Belgique.

20    Toutefois, la juridiction de renvoi fait observer que le fait du prince constitue une cause étrangère libératoire pouvant justifier qu'un débiteur ne paie pas un créancier muni d'un titre exécutoire régulier. Or, en l'espèce, la décision 2015/1470 serait présentée comme un obstacle majeur à l'exécution de la sentence arbitrale du 11 décembre 2013. En effet, cette décision, adoptée postérieurement à cette dernière, interdirait à la Roumanie de procéder à l'exécution de cette sentence, dès lors que ladite décision considère que le versement des dommages et intérêts accordés par ladite sentence constitue une « aide d'État », au sens de l'article 107, paragraphe 1, TFUE, incompatible avec le marché intérieur, et enjoint à la Roumanie de récupérer les montants d'aide déjà versés. Il existerait donc un risque réel de conflit entre, d'une part, la décision d'une juridiction nationale confirmant, en vertu des articles 53 et 54 de la convention CIRDI, une saisie-arrêt exécution de la sentence du 11 décembre 2013 et, d'autre part, la décision 2015/1470, qui fait l'objet d'un recours pendant devant le juge de l'Union.

21    La juridiction de renvoi relève cependant que, selon DA, la décision 2015/1470 n'interdit pas, en tant que telle, une exécution forcée de la sentence arbitrale du 11 décembre 2013 en Belgique. En effet, conformément à la jurisprudence de la Cour, telle qu'elle ressort, notamment, de l'arrêt du 16 mai 2002, France/Commission (C-482/99, EU:C:2002:294, point 24), l'exécution de cette sentence ne constituerait une « aide d'État », au sens de l'article 107, paragraphe 1, TFUE, que si cette exécution est imputable à l'État roumain. Or, tel ne serait le cas, selon cette décision, que lorsque cet État exécute volontairement ladite sentence, les décisions rendues par les juridictions roumaines et les huissiers de justice désignés par celles-ci devant, quant à elles, être regardées comme étant imputables à l'État roumain. En revanche, si la Roumanie est contrainte par une juridiction d'un autre État membre de procéder à l'exécution de la sentence arbitrale en cause, cette exécution ne constituerait pas une « aide d'État », au sens de l'article 107, paragraphe 1, TFUE. Une telle exécution ne pourrait être considérée comme étant imputable à la Roumanie, et, partant, ne violerait pas cette décision. En vertu des articles 53 et 54 de la convention CIRDI, cet État membre ne disposerait d'ailleurs d'aucune autonomie quant à l'exécution de la sentence arbitrale du 11 décembre 2013.

22    Dans ces conditions, la cour d'appel de Bruxelles a décidé de surseoir à statuer et de poser à la Cour les questions préjudicielles suivantes :

« 1)    Est-ce que la décision 2015/1470 doit être comprise comme visant les paiements dus par la Roumanie même dans le cas où les paiements seront recouvrés [auprès d'elle] à la suite d'une procédure d'exécution forcée de la sentence arbitrale [...] du 11 décembre 2013, entamée devant les juridictions d'un État membre autre que la Roumanie ?

2)    Est-ce que le droit de l'Union exige en soi et d'office qu'une juridiction d'un État membre (autre que la Roumanie), saisie d'un recours [contre] une procédure d'exécution forcée d'une sentence arbitrale [...] qui a force de chose jugée selon les règles de procédure nationales propres à cet État membre, écarte cette sentence, au seul motif qu'une décision non définitive de la Commission adoptée postérieurement à la sentence considère que cette exécution forcée de la sentence est contraire au régime [de l'Union] des aides d'État ?

3)    Est-ce que le droit de l'Union, notamment le principe de coopération loyale ou le principe d'autorité de la chose jugée, permet qu'une juridiction nationale d'un État membre (autre que la Roumanie) ne respecte pas ses obligations internationales découlant de la convention CIRDI dans l'hypothèse où la Commission a adopté une décision postérieurement à la sentence, qui considère que l'exécution forcée de la sentence serait contraire au régime [de l'Union] des aides d'État et ce même si la Commission a participé à la procédure d'arbitrage (en ce compris le recours en annulation [contre] la sentence) et a fait valoir ses moyens relatifs au régime [de l'Union] des aides d'État ? »

**Les développements postérieurs à la demande de décision préjudicielle**

23　　　Par arrêt du 18 juin 2019, European Food e.a./Commission (T-624/15, T-694/15 et T-704/15, EU:T:2019:423), le Tribunal a annulé la décision 2015/1470 au motif, en substance, que la Commission n'était pas compétente ratione temporis pour adopter celle-ci au titre de l'article 108 TFUE.

24　　　Le 27 août 2019, la Commission a saisi la Cour d'un pourvoi visant à l'annulation de cet arrêt.

25　　　Par décision du 5 septembre 2019, le président de la Cour a suspendu la procédure dans la présente affaire jusqu'au prononcé de l'arrêt statuant sur ce pourvoi.

26　　　Par arrêt du 25 janvier 2022, Commission/European Food e.a. (C-638/19 P, EU:C:2022:50), la Cour a annulé l'arrêt du 18 juin 2019, European Food e.a./Commission (T-624/15, T-694/15 et T-704/15, EU:T:2019:423), et renvoyé l'affaire devant le Tribunal pour qu'il statue sur les moyens et les arguments soulevés devant lui sur lesquels la Cour ne s'est pas prononcée.

27　　　Le 28 janvier 2022, l'arrêt du 25 janvier 2022, Commission/European Food e.a. (C-638/19 P, EU:C:2022:50), a été notifié à la cour d'appel de Bruxelles en lui demandant si, au vu de celui-ci, et en particulier de ses points 137 à 145, elle souhaitait maintenir sa demande de décision préjudicielle.

28　　　Par lettre datée du 14 juin 2022, parvenue à la Cour le 15 juin 2022, cette juridiction a indiqué que, dans l'intérêt d'une bonne administration de la justice, elle maintenait cette demande.

29　　　Par décision du président de la Cour du 22 juin 2022, il a été décidé, M. le juge rapporteur et M. l'avocat général entendus, de ne pas notifier le présent renvoi préjudiciel aux intéressés visés à l'article 23 du statut de la Cour de justice de l'Union européenne.

**Sur les questions préjudicielles**

30　　　En vertu de l'article 99 de son règlement de procédure, la Cour peut, notamment lorsqu'une réponse à une question posée à titre préjudiciel peut être clairement déduite de la jurisprudence ou lorsque la réponse à la question posée ne laisse place à aucun doute raisonnable, décider, à tout moment, sur proposition du juge rapporteur, l'avocat général entendu, de statuer par voie d'ordonnance motivée.

31　　　Il y a lieu de faire application de cette disposition dans la présente affaire.

32　　　Par ses deuxième et troisième questions, qu'il convient d'examiner ensemble et en premier lieu, la juridiction de renvoi demande, en substance, si le droit de l'Union doit être interprété en ce sens qu'une juridiction d'un État membre saisie de l'exécution forcée de la sentence arbitrale ayant fait l'objet de la décision 2015/1470 est tenue d'écarter cette sentence.

33　　　À cet égard, il convient de rappeler que, selon la jurisprudence de la Cour, les articles 267 et 344 TFUE s'opposent à une disposition contenue dans un accord international conclu entre deux États membres aux termes de laquelle un investisseur de l'un de ces États membres peut, en cas de litige concernant des investissements dans l'autre État membre, introduire une procédure contre ce dernier État membre devant un tribunal arbitral, dont cet État membre s'est obligé à accepter la compétence (arrêts du 6 mars 2018, Achmea, C-284/16, EU:C:2018:158, point 60, ainsi que du 25 janvier 2022, Commission/European Food e.a., C-638/19 P, EU:C:2022:50, point 138).

34　　　En effet, par la conclusion d'un tel accord, les États membres parties à celui-ci consentent à soustraire à la compétence de leurs propres juridictions et, partant, au système de voies de recours juridictionnel que l'article 19, paragraphe 1, second alinéa, TUE leur impose d'établir dans les domaines couverts par le droit de l'Union des litiges pouvant porter sur l'application ou l'interprétation de ce droit. Un tel accord est donc susceptible d'aboutir à une situation dans laquelle ces litiges ne seraient pas tranchés d'une manière garantissant la pleine efficacité dudit droit (arrêts du 26 octobre 2021, PL Holdings, C-109/20, EU:C:2021:875, point 45, ainsi que du 25 janvier 2022, Commission/European Food e.a., C-638/19 P, EU:C:2022:50, point 139).

Case 1:19-cv-01618-TSC   Document 109-54   Filed 02/14/25   Page 8 of 9

35      En l'occurrence, à compter du 1er janvier 2007, date d'adhésion de la Roumanie à l'Union, le droit de l'Union, notamment les articles 107 et 108 TFUE, était applicable à cet État membre. Il est, par ailleurs, constant que l'indemnisation sollicitée par les requérants en arbitrage ayant donné lieu à la sentence arbitrale du 11 décembre 2013, qui fait l'objet de la décision 2015/1470, ne portait pas exclusivement sur les dommages prétendument subis avant cette date d'adhésion. Par conséquent, le différend porté devant le tribunal arbitral ne saurait être regardé comme cantonné en tous ses éléments à une période au cours de laquelle la Roumanie, n'ayant pas encore adhéré à l'Union, n'était pas encore liée par les règles et les principes rappelés aux points 33 et 34 de la présente ordonnance (voir, en ce sens, arrêt du 25 janvier 2022, Commission/European Food e.a., C-638/19 P, EU:C:2022:50, point 140).

36      Or, ainsi que la Cour l'a déjà relevé, le tribunal arbitral auquel a été soumis ce litige n'appartient pas au système juridictionnel de l'Union que l'article 19, paragraphe 1, second alinéa, TUE impose aux États membres d'établir dans les domaines couverts par le droit de l'Union, lequel système juridictionnel, à compter de l'adhésion de la Roumanie à l'Union, s'est substitué au mécanisme de résolution de litiges susceptibles de concerner l'interprétation ou l'application du droit de l'Union (arrêt du 25 janvier 2022, Commission/European Food e.a., C-638/19 P, EU:C:2022:50, point 141).

37      En effet, d'une part, ce tribunal arbitral ne constitue pas une « juridiction d'un des États membres », au sens de l'article 267 TFUE, et, d'autre part, la sentence arbitrale prononcée par ce dernier n'est soumise, conformément aux articles 53 et 54 de la convention CIRDI, à aucun contrôle par une juridiction d'un État membre quant à sa conformité au droit de l'Union (arrêt du 25 janvier 2022, Commission/European Food e.a., C-638/19 P, EU:C:2022:50, point 142).

38      Cette constatation n'est pas susceptible d'être remise en cause par le fait que la Roumanie avait consenti à la possibilité qu'un litige soit porté contre elle dans le cadre de la procédure d'arbitrage prévue par le TBI (arrêt du 25 janvier 2022, Commission/European Food e.a., C-638/19 P, EU:C:2022:50, point 143).

39      En effet, un tel consentement, à la différence de celui qui aurait été donné dans le cadre d'une procédure d'arbitrage commercial, ne trouve pas son origine dans un accord spécifique reflétant l'autonomie de la volonté des parties en cause, mais résulte d'un traité conclu entre deux États, dans le cadre duquel ceux-ci ont, de manière générale et par avance, consenti à soustraire à la compétence de leurs propres juridictions des litiges pouvant porter sur l'interprétation ou l'application du droit de l'Union au profit de la procédure d'arbitrage (arrêt du 25 janvier 2022, Commission/European Food e.a., C-638/19 P, EU:C:2022:50, point 144 ainsi que jurisprudence citée).

40      Dans ces conditions, dès lors que, à compter de l'adhésion de la Roumanie à l'Union, le système des voies de recours juridictionnel prévu par les traités UE et FUE s'est substitué à cette procédure d'arbitrage, le consentement à cet effet donné par cet État est désormais dépourvu de tout objet (arrêt du 25 janvier 2022, Commission/European Food e.a., C-638/19 P, EU:C:2022:50, point 145).

41      Il s'ensuit que la clause d'arbitrage prévue par le TBI, en tant qu'elle a constitué le fondement de la sentence arbitrale qui fait l'objet de la décision 2015/1470, a remis en cause la préservation du caractère propre du droit de l'Union assurée par la procédure du renvoi préjudiciel, en violation des principes de coopération loyale et de l'autonomie du droit de l'Union (voir, en ce sens, arrêts du 6 mars 2018, Achmea, C-284/16, EU:C:2018:158, points 58 et 59, ainsi que du 26 octobre 2021, PL Holdings, C-109/20, EU:C:2021:875, point 46).

42      En conséquence, cette sentence arbitrale doit être considérée comme étant incompatible avec le droit de l'Union, en particulier, avec ses articles 267 et 344 TFUE.

43      Une telle sentence ne saurait donc produire aucun effet et ne peut ainsi être exécutée en vue de procéder au versement de l'indemnisation accordée par celle-ci.

44      Il convient, dès lors, de répondre aux deuxième et troisième questions posées que le droit de l'Union, en particulier ses articles 267 et 344 TFUE, doit être interprété en ce sens qu'une juridiction d'un État membre saisie de l'exécution forcée de la sentence arbitrale ayant fait l'objet de la décision 2015/1470

est tenue d'écarter cette sentence et, partant, ne peut en aucun cas procéder à l'exécution de celle-ci afin de permettre à ses bénéficiaires d'obtenir le versement des dommages et intérêts qu'elle leur accorde.

45     Compte tenu de cette réponse, il n'y a plus lieu de répondre à la première question.

### Sur les dépens

46     La procédure revêtant, à l'égard des parties au principal, le caractère d'un incident soulevé devant la juridiction de renvoi, il appartient à celle-ci de statuer sur les dépens.

Par ces motifs, la Cour (dixième chambre) ordonne :

**Le droit de l'Union, en particulier ses articles 267 et 344 TFUE, doit être interprété en ce sens qu'une juridiction d'un État membre saisie de l'exécution forcée de la sentence arbitrale ayant fait l'objet de la décision (UE) 2015/1470 de la Commission, du 30 mars 2015, concernant l'aide d'État SA.38517 (2014/C) (ex 2014/NN) mise en œuvre par la Roumanie – Sentence arbitrale dans l'affaire Micula/Roumanie du 11 décembre 2013, est tenue d'écarter cette sentence et, partant, ne peut en aucun cas procéder à l'exécution de celle-ci afin de permettre à ses bénéficiaires d'obtenir le versement des dommages et intérêts qu'elle leur accorde.**

Fait à Luxembourg, le 21 septembre 2022.

Le greffier                                                                                                          Le président de la X[ème] chambre

A. Calot Escobar                                                                                                                    I. Jarukaitis

---

\*     Langue de procédure : le français.