# EXHIBIT 63

**N° 116 /2022**
**du 14.07.2022**
**Numéro CAS-2021-00061 du registre**

**Audience publique de la Cour de cassation du Grand-Duché de Luxembourg du jeudi, quatorze juillet deux mille vingt-deux.**

**Composition:**

Roger LINDEN, président de la Cour,
Christiane JUNCK, conseiller à la Cour de cassation,
Jean ENGELS, premier conseiller à la Cour d'appel,
Michèle HORNICK, conseiller à la Cour d'appel,
Joëlle DIEDERICH, conseiller à la Cour d'appel,
Serge WAGNER, premier avocat général,
Daniel SCHROEDER, greffier à la Cour.


**Entre:**

**l'ETAT DE ROUMANIE,** représenté par l'organe représentatif en justice, avec pour adresse RO-050741 Bucarest, 17, rue Apolodor, secteur 5,

**demandeur en cassation,**

**comparant par Maître Donald VENKATAPEN,** avocat à la Cour, en l'étude duquel domicile est élu, assisté de Maître Shiva MIR MOTAHARI, avocat à la Cour,


**et:**


**1) M),**

**défendeur en cassation,**

**comparant par la société en commandite simple BONN STEICHEN & PARTNERS,** inscrite à la liste V du tableau de l'Ordre des avocats du barreau de Luxembourg, en l'étude de laquelle domicile est élu, représentée aux fins de la présente procédure par Maître Fabio TREVISAN, avocat à la Cour,

**2) la COMMISSION EUROPEENNE,** établie et ayant son siège à B-1049 Bruxelles, 200, rue de la Loi, représentée par les agents Paul-John Loewenthal et Tim Maxian Rusche, intervenante volontaire conformément à l'article 483 du Nouveau Code de procédure civile, combiné avec l'article 29, paragraphe 2, du Règlement (UE) 2015/1589 du Conseil du 13 juillet 2015, portant modalités d'application de l'article 108 du Traité sur le fonctionnement de l'Union européenne,

**défenderesse en cassation,**

**comparant par Maître Michel SCHWARTZ,** avocat à la Cour, en l'étude duquel domicile est élu.

_____

Vu l'arrêt attaqué, numéro 15/21-VIII-Exequatur, rendu le 11 février 2021 sous le numéro 43054 du rôle par la Cour d'appel du Grand-Duché de Luxembourg, huitième chambre, siégeant en matière civile et d'exequatur ;

Vu le mémoire en cassation signifié le 9 juin 2021 par l'ETAT DE ROUMANIE à M) et à la COMMISSION EUROPEENNE, déposé le 11 juin 2021 au greffe de la Cour supérieure de justice ;

Vu le mémoire en réponse signifié le 3 août 2021 par M) à l'ETAT DE ROUMANIE et à la COMMISSION EUROPEENNE, déposé le 6 août 2021 au greffe de la Cour ;

Vu le mémoire en réponse signifié le 5 août 2021 par la COMMISSION EUROPEENNE à M) et à l'ETAT DE ROUMANIE, déposé le 6 août 2021 au greffe de la Cour ;

Sur les conclusions du Procureur général d'Etat adjoint John PETRY déposées le 8 février 2022 au greffe de la Cour ;

Vu les notes de plaidoiries de l'ETAT DE ROUMANIE et de M) déposées les 22 et 23 mars 2022 au greffe de la Cour.

### Sur les faits

Par ordonnance du 8 mai 2015 rectifiée le 22 mai 2015, la présidente du tribunal d'arrondissement de Luxembourg avait déclaré exécutoire au Grand-Duché de Luxembourg la sentence arbitrale n°ARB/05/20 du 11 décembre 2013 rendue par le Centre International pour le Règlement des Différends relatifs aux Investissements (ci-après *« le CIRDI »*). La Cour d'appel a confirmé cette ordonnance.

### Sur le premier moyen de cassation

### Enoncé du moyen

*« Tiré de la violation de la loi, in specie de la violation des dispositions du Nouveau Code de Procédure Civile relatives à l'exequatur, plus spécifiquement de la violation des articles 1244 et suivants,1250 et 1251 du Nouveau Code de Procédure Civile ;*

2

*En ce que la Cour d'Appel a rejeté l'appel de la Roumanie visant à obtenir l'annulation, sinon la révocation, sinon la réformation de l'ordonnance d'exequatur 45/2015 du 8 mai 2015 et de l'ordonnance de rectification 51/2015 du 22 mai 2015 en ayant déclaré, qu': << Il s'ensuit que certains développements de l'ETAT de ROUMANIE,…, qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur, notamment les questions :*

*- (…) de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, - de la contrariété entre le TBI et le droit de l'Union européenne, - du conflit de normes entre le droit de l'Union européenne et la convention de Washington, - (…), - de l'argument tiré de ce que le droit de l'Union européenne prévoit un système de règlement des différends en matière d'investissements basé sur l'article 19 du Traité sur l'Union européenne et les articles 267 et 344 du TFUE, - de la contrariété entre une décision de la Commission européenne et un jugement national définitif, notamment le conflit entre un jugement définitif national (une sentence CIRDI étant à assimiler à un tel jugement) et une obligation découlant d'une décision de la Commission en matière d'aides d'Etat, - de la circonstance que le Luxembourg a adhéré à l'Union européenne avant d'adhérer à la Convention de Washington en 1970, - du devoir de coopération loyale des autorités nationales avec l'Union européenne, - du principe d'effectivité du droit de l'Union européenne, - de l'effet de la décision du Tribunal de l'Union européenne du 18 juin 2019 sur les décisions de la Commission du 26 mai 2014 et du 1er octobre 2014, - de la primauté du droit de l'Union face à des faits intervenus avant l'adhésion de la Roumanie, - du moyen subsidiaire de la Commission européenne, consistant à dire qu'en cas d'application de la Convention de Washington, la Sentence est à traiter comme un jugement de l'ordre juridique national qui doit céder le pas face au droit communautaire contraire, - de l'arrêt de la Cour d'appel du 21 mars 2018, siégeant en matière d'appel de référé, qui a ordonné la mainlevée des saisies-arrêts pratiquées les 28 et 29 juillet 2015 par M) sur base de la contrariété de la Sentence à l'ordre public communautaire et donc luxembourgeois, des renvois préjudiciels sollicités par la Commission européenne, notamment celui formulé dans les conclusions notifiées le 18 juin 2020, qui ne sont pas pertinents.>>,*

*déclarant ainsi l'appel non fondé, et condamnant l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur, ce alors qu'en reportant l'analyse des moyens soulevés par la partie appelante, actuelle demanderesse en cassation, tenant à l'appréciation des illégalités entachant la Sentence, et par voie de conséquence les Ordonnances d'exequatur de celle-ci, notamment les illégalités procédant de la violation du principe de la primauté du droit de l'Union Européenne, dans le cadre de la procédure d'exequatur de ladite Sentence, à un stade ultérieur, plus précisément au moment de l'examen de la validité des actes individuels d'exécution qui viendraient à être posés sur base des Ordonnances d'exequatur, en somme, en se déclarant incompétente ratione tempori, pour apprécier l'existence et la nature des illégalités entachant la Sentence et par là même, les Ordonnances d'exequatur, la Cour d'Appel a violé les dispositions légales précitées du Nouveau Code de Procédure Civile ;*

*Alors que si l'exécution est illégale, l'apposition de la formule exécutoire par le juge luxembourgeois, l'est a fortiori, et qu'en ne procédant à l'analyse des*

*illégalités entachant la Sentence et les Ordonnances d'exequatur, que tardivement, au moment où les actes d'exécution seront posés, la Cour d'Appel se méprend sur les règles procédurales gouvernant l'exequatur, alors qu'en effet, le Luxembourg ne saurait prêter son concours à l'exécution d'une sentence illégale - en l'occurrence rendue en méconnaissance du droit de l'Union Européenne, bien que, in fine, la nature de l'illégalité important peu, eu égard au moment auquel il convient d'analyser ladite illégalité - le trouble résultant précisément de l'octroi de la force exécutoire sur le territoire du grand-Duché de Luxembourg, à un acte dont l'exécution serait entachée d'illégalité, en somme à un acte rendu en violation du droit de l'Union Européenne, qu'aux pages 11 et 12 de l'acte d'appel, la partie appelante, actuelle demanderesse en cassation, a invoqué l'illégalité entachant la Sentence et les Ordonnances d'exequatur, au stade de l'exequatur même de la Sentence et devant le juge de l'exequatur, lui demandant de procéder à l'analyse de ladite illégalité, avant d'attribuer reconnaissance et force exécutoire à la Sentence sur le territoire du Grand-Duché, dans les termes suivants : << L'article 2 de la décision de la Commission Européenne (UE) 2015/1470 dispose qu'une exécution de la sentence arbitrale constituerait une violation évidente du droit de l'Union par la Roumanie. A ce titre, il faut noter que d'après la jurisprudence de la Cour de Justice de l'Union Européenne (ci-après "CJUE"), l'ordre public d'un Etat membre comprend aussi le ius cogens issu du droit de l'Union. Ainsi, la CJUE a confirmé que les règles du droit de la concurrence, qui comprennent les règles en matière d'aide d'Etat, et du droit de la protection des consommateurs font partie de l'ordre public national en vertu des principes généraux de droit de l'Union d'effectivité et d'équivalence. >>, que cet exposé des motifs constituait le support nécessaire du dispositif de l'acte d'appel, tendant à l'annulation, sinon la révocation, sinon la réformation des Ordonnances d'exequatur, que la partie demanderesse en cassation rappelant ledit principe aux pages 18 et 20 à 23 des conclusions récapitulatives du 15 novembre 2019, notamment comme suit : << (...) Il ressort donc clairement de ce qui précède que c'est donc la primauté du droit de l'Union Européenne ainsi que la modification du droit applicable par l'adhésion d'un Etat à l'Union Européenne et l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur qu'il convient de considérer en l'espèce. Ainsi, la convention de Washington, mise en avant par Monsieur M) pour voir confirmer, de façon automatique, sa demande d'exequatur, doit en fait s'effacer devant la primauté du droit de l'Union Européenne et devant l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur. C'est donc à tort que Monsieur M) plaide qu'un traité international prévaudrait sur le Droit de l'Union Européenne. (...). Cet arrêt présente une motivation particulièrement intéressante alors qu'il affirme également la primauté du droit de l'Union Européenne. (....) Or, permettre qu'un titre fasse l'objet d'un exequatur et soit revêtu de la formule exécutoire est précisément contraire à la Décision du 30 mars 2015 et reviendrait à remettre en cause la primauté du Droit de l'Union Européenne. (...) la décision arbitrale se base sur un traité bilatéral de la Suède et de la Roumanie daté du 29 mai 2002, convention citée de manière erronée dans le dispositif de l'ordonnance d'exéquatur. Or, ce traité bilatéral a été implicitement abrogé lors de l'adhésion de la Roumanie à l'Union Européenne et ne saurait servir de fondement à la reconnaissance d'une sentence arbitrale...>>, de sorte que, quant à la question de savoir si, la Cour d'Appel aurait dû procéder à l'analyse de l'existence et de la nature des illégalités soulevées par la partie appelante, actuelle demanderesse en cassation, au stade même de la procédure d'exequatur et préalablement à l'attribution de toute reconnaissance et force*

*exécutoire à la Sentence, prononçant l'annulation, sinon la révocation, sinon la réformation des Ordonnances d'exequatur, pour être contraires à l'ordre public des Etats membres, c'est-à-dire à l'ordre public européen, en raison de leur violation du principe de la primauté du droit de l'Union Européenne, la réponse est positive, de sorte que la Cour d'Appel aurait dû se reconnaître compétente, ratione tempori, pour connaître de l'existence et de la nature des illégalités entachant la Sentence et les Ordonnances d'exequatur.*

### Réponse de la Cour

Il ressort de la discussion du moyen que le demandeur en cassation invoque la violation de l'article 1251 du Nouveau Code de procédure civile qui dispose *« Sous réserve des dispositions de conventions internationales, le juge refuse l'exequatur : ... 2° si la sentence ou son exécution est contraire à l'ordre public ou si le litige n'était pas susceptible d'être réglé par la voie d'arbitrage ».*

Les juges d'appel ont retenu que l'article 1251 du Nouveau Code de procédure civile ne s'applique que sous la réserve des dispositions de conventions internationales, que la Convention de Washington (ci-après *« la Convention »*) constitue une telle convention, qu'elle ne prévoit, hormis la condition tirée de l'existence d'une sentence arbitrale, aucune cause de refus de reconnaissance, qui n'est susceptible d'être invoquée, sur base de l'article 54, paragraphe 3, de la Convention, qu'au stade de l'exécution de la sentence arbitrale, qui est à distinguer de celui, applicable en l'espèce, de l'exequatur de la sentence.

Le refus des juges d'appel d'examiner la conformité au droit de l'Union européenne de la sentence arbitrale se fonde partant sur l'article 54, paragraphe 3, de la Convention, et non sur l'article 1251 du Nouveau Code de procédure civile qui ne fait que renvoyer aux dispositions de conventions internationales.

Le grief est dès lors étranger aux articles visés au moyen.

Il s'ensuit que le moyen est irrecevable.

### Sur les deuxième, troisième, quatrième, cinquième et sixième moyens de cassation réunis

### Enoncé des moyens

**le deuxième,** *« Tiré de la violation de la loi, in specie de la violation du principe général de droit constitutionnel tenant à la primauté du droit de l'Union Européenne ;*

*En ce que la Cour d'Appel a rejeté l'appel de la Roumanie visant à obtenir l'annulation, sinon la révocation, sinon la réformation de l'ordonnance d'exequatur 45/2015 du 8 mai 2015 et de l'ordonnance de rectification 51/2015 du 22 mai 2015 en ayant déclaré qu': << Il s'ensuit que certains développements de l'ETAT de ROUMANIE,..., qui pourraient, le cas échéant, présenter un intérêt au niveau du*

*caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur, notamment les questions :*

*- (...) de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, - de la contrariété entre le TBI et le droit de l'Union européenne, - du conflit de normes entre le droit de l'Union européenne et la convention de Washington, - (...), - de l'argument tiré de ce que le droit de l'Union européenne prévoit un système de règlement des différends en matière d'investissements basé sur l'article 19 du Traité sur l'Union européenne et sur les articles 267 et 344 du TFUE, - de la contrariété entre une décision de la Commission européenne et un jugement national définitif, notamment le conflit entre un jugement définitif national (une sentence CIRDI étant à assimiler à un tel jugement) et une obligation découlant d'une décision de la Commission en matière d'aides d'Etat, - de la circonstance que le Luxembourg a adhéré à l'Union européenne avant d'adhérer à la Convention de Washington en 1970, - du devoir de coopération loyale des autorités nationales avec l'Union européenne, - du principe d'effectivité du droit de l'Union européenne, - de l'effet de la décision du Tribunal de l'Union européenne du 18 juin 2019 sur les décisions de la Commission du 26 mai 2014 et du 1er octobre 2014, - de la primauté du droit de l'Union face à des faits intervenus avant l'adhésion de la Roumanie, - du moyen subsidiaire de la Commission européenne, consistant à dire qu'en cas d'application de la Convention de Washington, la Sentence est à traiter comme un jugement de l'ordre juridique national qui doit céder le pas face au droit communautaire contraire, - de l'arrêt de la Cour d'appel du 21 mars 2018, siégeant en matière d'appel de référé, qui a ordonné la mainlevée des saisies-arrêts pratiquées les 28 et 29 juillet 2015 par M) sur base de la contrariété de la Sentence à l'ordre public communautaire et donc luxembourgeois, des renvois préjudiciels sollicités par la Commission européenne, notamment celui formulé dans les conclusions notifiées le 18 juin 2020, qui ne sont pas pertinents. >>, ce alors qu'en reconnaissant la Sentence et en lui accordant le caractère exécutoire, en méconnaissance du principe inviolable de la primauté du droit de l'Union Européenne, notamment en matière d'<< aide d'Etat déclarée incompatible par la Commission Européenne >>, déclarant ainsi l'appel non fondé, et condamnant l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur, les juges d'appel ne se sont pas prononcés sur les moyens soulevés à maintes reprises par la partie appelante, actuelle demanderesse en cassation, tenant à la prééminence du droit de l'Union Européenne, reportant l'analyse desdits moyens à un stade ultérieur, au moment de l'examen de la validité des actes individuels d'exécution qui viendront à être posés sur base des Ordonnances d'exequatur ;*

*Alors que l'article 49 bis de la Constitution dispose que : << L'exercice d'attributions réservées par la Constitution aux pouvoirs législatif, exécutif et judiciaire peut être temporairement dévolu par traité à des institutions de droit international. >>, consacrant le principe de la prééminence du droit de l'Union Européenne, dans l'ordre juridique national, principe réaffirmé par la jurisprudence dans les termes suivants : << ...les traités qui ont institué le droit communautaire ont institué un nouvel ordre juridique au profit duquel les Etats membres ont limité l'exercice de leurs pouvoirs souverains dans les domaines que ces traités déterminent. Cette règle s'impose plus particulièrement lorsque le conflit existe entre une norme de droit interne et une norme communautaire puisque les traités qui ont*

*créé le droit communautaire ont institué un nouvel ordre juridique au profit duquel les Etats membres ont limité l'exercice de leurs pouvoirs souverains dans les domaines que ces traités déterminent. >>, ainsi que par la doctrine, qui a consacré ce principe, en le qualifiant d'<< un principe non écrit de droit constitutionnel >>, qu'aux pages 11 et 12 de l'acte d'appel, la partie appelante, actuelle demanderesse en cassation, a invoqué ce principe dans les termes suivants : << L'article 2 de la décision de la Commission Européenne (UE) 2015/1470 dispose qu'une exécution de la sentence arbitrale constituerait une violation évidente du droit de l'Union par la Roumanie. A ce titre, il faut noter que d'après la jurisprudence de la Cour de Justice de l'Union Européenne (ci-après "CJUE"), l'ordre public d'un Etat membre comprend aussi le ius cogens issu du droit de l'Union. Ainsi, la CJUE a confirmé que les règles du droit de la concurrence, qui comprennent les règles en matière d'aide d'Etat, et du droit de la protection des consommateurs font partie de l'ordre public national en vertu des principes généraux de droit de l'Union d'effectivité et d'équivalence. >>, que cet exposé des motifs constituait le support nécessaire du dispositif de l'acte d'appel, tendant à l'annulation, sinon la révocation, sinon la réformation des Ordonnances d'exequatur, que la partie demanderesse en cassation rappelant ledit principe aux pages 18 et 20 à 23 des conclusions récapitulatives du 15 novembre 2019, notamment comme suit : << (...) Il ressort donc clairement de ce qui précède que c'est donc la primauté du droit de l'Union Européenne ainsi que la modification du droit applicable par l'adhésion d'un Etat à l'Union Européenne et l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur qu'il convient de considérer en l'espèce. Ainsi, la convention de Washington, mise en avant par Monsieur M) pour voir confirmer, de façon automatique, sa demande d'exequatur, doit en fait s'effacer devant la primauté du droit de l'Union Européenne et devant l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur. C'est donc à tort que Monsieur M) plaide qu'un traité international prévaudrait sur le Droit de l'Union Européenne. (...). Cet arrêt présente une motivation particulièrement intéressante alors qu'il affirme également la primauté du droit de l'Union Européenne. (....) Or, permettre qu'un titre fasse l'objet d'un exequatur et soit revêtu de la formule exécutoire est précisément contraire à la Décision du 30 mars 2015 et reviendrait à remettre en cause la primauté du Droit de l'Union Européenne. (...) la décision arbitrale se base sur un traité bilatéral de la Suède et de la Roumanie daté du 29 mai 2002, convention citée de manière erronée dans le dispositif de l'ordonnance d'exéquatur. Or, ce traité bilatéral a été implicitement abrogé lors de l'adhésion de la Roumanie à l'Union Européenne et ne saurait servir de fondement à la reconnaissance d'une sentence arbitrale...>>, de sorte que, quant à la question de savoir si les Ordonnances d'exequatur auraient dû être annulées, sinon révoquées, sinon réformées, pour être contraires à l'ordre public des Etats membres, c'est-à-dire à l'ordre public européen, en raison de leur violation du principe de la primauté du droit de l'Union Européenne, les juges d'appel auraient dû répondre par la positive, alors que même à supposer que la Sentence serait à considérer comme exécutoire au regard de la Convention de Washington, force est de constater qu'en reportant l'examen des illégalités des Ordonnances d'exequatur à un stade ultérieur, à savoir au moment où chaque acte individuel d'exécution sera posé (<< au niveau du caractère exécutable de la Sentence >>), la Cour d'Appel contrevient au principe de la primauté du droit de l'Union Européenne, et prive d'effectivité ledit principe, et qu'en refusant de répondre, au stade de la procédure d'exequatur de la Sentence, aux moyens de la partie demanderesse en cassation, soulevés aussi bien aux pages 11 et 12 de son acte*

*d'appel, qu'aux pages 11, 18 et 20 à 23 de ses conclusions récapitulatives, tenant à la primauté du droit de l'Union Européenne, les juges d'appel n'ont pas appliqué le principe général de droit constitutionnel relatif à la primauté du droit de l'Union Européenne, entachant ainsi l'arrêt a quo du vice de fond que constitue la violation de la règle de droit. »,*

**le troisième,** *« Tiré de la violation de la loi, in specie de la violation des dispositions de l'article 351 du Traité sur le Fonctionnement de l'Union Européenne (ci-après << TFUE >>), consacrant le principe de la primauté du droit de l'Union Européenne ;*

*En ce que la Cour d'appel a rejeté l'appel de la Roumanie visant à obtenir l'annulation, sinon la révocation, sinon la réformation de l'ordonnance d'exequatur 45/2015 du 8 mai 2015 et de l'ordonnance de rectification 51/2015 du 22 mai 2015 en ce qu'ayant déclaré, qu': << Il s'ensuit que certains développements de l'ETAT de ROUMANIE,…, qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur, notamment les questions :*

*- (…) de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, - de la contrariété entre le TBI et le droit de l'Union européenne, - du conflit de normes entre le droit de l'Union européenne et la convention de Washington, - (…), - de l'argument tiré de ce que le droit de l'Union européenne prévoit un système de règlement des différends en matière d'investissements basé sur l'article 19 du Traité sur l'Union européenne et sur les articles 267 et 344 du TFUE, - de la contrariété entre une décision de la Commission européenne et un jugement national définitif, notamment le conflit entre un jugement définitif national (une sentence CIRDI étant à assimiler à un tel jugement) et une obligation découlant d'une décision de la Commission en matière d'aides d'Etat, - de la circonstance que le Luxembourg a adhéré à l'Union européenne avant d'adhérer à la Convention de Washington en 1970, - du devoir de coopération loyale des autorités nationales avec l'Union européenne, - du principe d'effectivité du droit de l'Union européenne, - de l'effet de la décision du Tribunal de l'Union européenne du 18 juin 2019 sur les décisions de la Commission du 26 mai 2014 et du 1er octobre 2014, - de la primauté du droit de l'Union face à des faits intervenus avant l'adhésion de la Roumanie, - du moyen subsidiaire de la Commission européenne, consistant à dire qu'en cas d'application de la Convention de Washington, la Sentence est à traiter comme un jugement de l'ordre juridique national qui doit céder le pas face au droit communautaire contraire, - de l'arrêt de la Cour d'appel du 21 mars 2018, siégeant en matière d'appel de réfère, qui a ordonné la mainlevée des saisies-arrêts pratiquées les 28 et 29 juillet 2015 par M) sur base de la contrariété de la Sentence à l'ordre public communautaire et donc luxembourgeois, des renvois préjudiciels sollicités par la Commission européenne, notamment celui formulé dans les conclusions notifiées le 18 juin 2020, qui ne sont pas pertinents. >>, ce alors qu'en reconnaissant la Sentence et en lui accordant le caractère exécutoire, en méconnaissance du principe inviolable de la primauté du droit de l'Union européenne, notamment en matière d'<< aide d'Etat déclarée incompatible par la Commission Européenne >>, déclarant ainsi l'appel non fondé, et condamnant l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur, les juges d'appel ne se sont pas prononcés sur les moyens*

*soulevés à maintes reprises par la partie appelante, actuelle demanderesse en cassation, tenant à la prééminence du droit de l'Union Européenne, reportant l'analyse desdits moyens à un stade ultérieur, au moment de l'examen de la validité des actes individuels d'exécution qui viendront à être posés sur base des Ordonnances d'exequatur ;*

*Alors que l'article 351 TFUE dispose que : << les droits et obligations résultant de conventions conclues antérieurement au 1er janvier 1958 ou, pour les États adhérents, antérieurement à la date de leur adhésion, entre un ou plusieurs États membres, d'une part, et un ou plusieurs États tiers, d'autre part, ne sont pas affectés par les dispositions des traités >>, qu'aux pages 16 à 18 des conclusions récapitulatives du 15 novembre 2019, la partie appelante, actuelle demanderesse en cassation, a invoqué ce principe dans les termes suivants : << 1. Quant à l'article 351 TFUE : La partie M) se réfère au recours contre la Décision 2015/1470 et à la relation entre le droit de l'Union Européenne, le TIB et la Convention de Washington. La partie M) cite ensuite le texte de conclusions déposées dans le cadre d'un litige entre la Slovaquie et la Commission Européenne (C-264/09) et estime qu'il s'agirait d'une jurisprudence, alors qu'il ne s'agit que des seules conclusions dans cette affaire et non du jugement définitif. Elle en déduit erronément que toutes conventions conclues antérieurement avant l'adhésion à l'Union Européenne primeraient. Ainsi selon le paragraphe 44 de l'arrêt qui est issu des conclusions, citées par la partie M) : "Or, il y a lieu de rappeler que, dans l'affaire ayant donné lieu à l'arrêt du 4 juillet 2000, Commission/Portugal (C-62/98, Rec. p. I-5171, point 49), la Cour a précisé que, si, dans le cadre de l'article 307 CE, les États membres ont le choix quant aux mesures à adopter afin d'éliminer les incompatibilités existant entre une convention précommunautaire et le traité CE, lorsqu'un État membre rencontre des difficultés rendant la modification d'un accord impossible, il ne saurait être exclu qu'il lui incombe de dénoncer cet accord.". La partie M) se réfère à l'article 351 TFUE, selon lequel les droits et obligations résultant de conventions antérieures à l'adhésion de l'Etat de Roumanie resteraient acquis, sans pour autant en expliquer le contexte international. Il résulte clairement du libellé de l'article 351 TFUE que le TBI n'est pas applicable en l'espèce, étant donné que le TBI est un traité conclu entre deux États membres de l'Union Européenne, à savoir la Suède et la Roumanie, et non un traité "entre un ou plusieurs États membres, d'une part, et un ou plusieurs États tiers, d'autre part". Il en va de même pour la Convention de Washington qui dans un litige intracommunautaire ne sera plus applicable. En effet, selon la Décision 2015/1470, points 130 à 132…, Partant il y a lieu de constater que l'article 351 TFUE ne s'applique pas au cas d'espèce et que la partie M) devra se conformer au droit européen qui affecte également les relations entre l'Etat de Roumanie et la Suède. La partie concluante se rallie à la position de l'Union Européenne selon laquelle - Il n'importe pas de savoir si la Roumanie était membre de l'Union Européenne au moment de la ratification du TBI ; - Il y a primauté du droit de l'Union dès lors que l'Etat adhère l'Union Européenne, autant pour le TBI que la Convention de Washington ; - Le droit applicable est susceptible d'être modifié par l'adhésion d'un Etat à l'Union européenne et il n'existe donc pas de droit acquis sur la base d'une convention ou d'un traité antérieur, Le tribunal arbitral a outrepassé ses pouvoirs et compétences… >>, que cet exposé des motifs constituait le support nécessaire du dispositif de l'acte d'appel, tendant à l'annulation, sinon la révocation, sinon la réformation des Ordonnances d'exequatur, que la partie demanderesse en cassation rappelant ledit principe aux*

*pages 11, 18 et 20 à 23 des conclusions récapitulatives du 15 novembre 2019, notamment comme suit : << La partie M) omet ainsi - volontairement - d'expliquer quel est l'impact de l'Union Européenne sur la Convention. En effet, on ne peut passer à côté de l'article 344 du Traité sur le Fonctionnement de l'Union Européenne (ci-après le "TFUE") (...) Il ressort donc clairement de ce qui précède que c'est donc la primauté du droit de l'Union Européenne ainsi que la modification du droit applicable par l'adhésion d'un Etat à l'Union Européenne et l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur qu'il convient de considérer en l'espèce. Ainsi, la convention de Washington, mise en avant par Monsieur M) pour voir confirmer, de façon automatique, sa demande d'exequatur, doit en fait s'effacer devant la primauté du droit de l'Union Européenne et devant l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur. C'est donc à tort que Monsieur M) plaide qu'un traité international prévaudrait sur le Droit de l'Union Européenne. (...). Cet arrêt présente une motivation particulièrement intéressante alors qu'il affirme également la primauté du droit de l'Union Européenne. (....) Or, permettre qu'un titre fasse l'objet d'un exequatur et soit revêtu de la formule exécutoire est précisément contraire à la Décision du 30 mars 2015 et reviendrait à remettre en cause la primauté du Droit de l'Union Européenne. (...) la décision arbitrale se base sur un traité bilatéral de la Suède et de la Roumanie daté du 29 mai 2002, convention citée de manière erronée dans le dispositif de l'ordonnance d'exéquatur. Or, ce traité bilatéral a été implicitement abrogé lors de l'adhésion de la Roumanie à l'Union Européenne et ne saurait servir de fondement à la reconnaissance d'une sentence arbitrale...>>, de sorte que, quant à la question de savoir si les Ordonnances d'exequatur auraient dû être annulées, sinon révoquées, sinon réformées, pour être contraires à l'ordre public des Etats membres, c'est-à-dire à l'ordre public européen, en raison de leur violation du principe de la primauté du droit de l'Union Européenne, les juges d'appel auraient dû répondre par la positive, alors que même à supposer que la Sentence serait à considérer comme exécutoire au regard de la Convention de Washington, force est de constater qu'en reportant l'examen des illégalités des Ordonnances d'exequatur à un stade ultérieur, à savoir au moment où chaque acte individuel d'exécution sera posé (<< au niveau du caractère exécutable de la Sentence >>), la Cour d'Appel contrevient aux dispositions de l'article 351 TFUE, consacrant le principe de la primauté du droit de l'Union Européenne, et prive d'effectivité ledit principe, alors que la règle de conflits énoncée à l'article 351 TFUE instaure le principe de primauté du droit de l'Union, qui ne cède devant un autre accord bilatéral (ou multilatéral) ayant été conclu par un Etat membre que dans les hypothèses et aux conditions cumulatives préconisées par la même disposition légale, à savoir lorsque les deux conditions cumulatives suivantes sont remplies : la convention bilatérale (ou multilatérale) conclue par l'Etat membre doit avoir été conclue antérieurement à son adhésion, d'une part, et la convention bilatérale (ou multilatérale) doit avoir été conclue entre l'Etat membre et un Etat tiers, d'autre part, que cette règle de conflit de normes fait donc en l'espèce prévaloir le droit de l'Union sur la Convention de Washington, de sorte qu'en faisant primer l'applicabilité des articles 53 et 54 de la Convention de Washington, sur celle du droit de l'Union Européenne, la Cour d'Appel a violé l'article 351 TFUE, entachant ainsi l'arrêt a quo du vice de fond que constitue la violation de la règle de droit. »,*

le quatrième, *« Tiré de la violation de la loi, in specie de la violation des dispositions de l'article 288 du Traité sur le Fonctionnement de l'Union*

*Européenne,(ci-après << TFUE >>), consacrant le principe de la primauté du droit de l'Union Européenne ;*

*En ce que la Cour d'Appel a rejeté l'appel de la Roumanie visant à obtenir l'annulation, sinon la révocation, sinon la réformation de l'ordonnance d'exequatur 45/2015 du 8 mai 2015 et de l'ordonnance de rectification 51/2015 du 22 mai 2015 en ce qu'ayant déclaré, qu': << Il s'ensuit que certains développements de l'ETAT de ROUMANIE,..., qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur, notamment les questions :*

*- (...) de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, - de la contrariété entre le TBI et le droit de l'Union européenne, - du conflit de normes entre le droit de l'Union européenne et la convention de Washington, - (...), - de l'argument tiré de ce que le droit de l'Union européenne prévoit un système de règlement des différends en matière d'investissements basé sur l'article 19 du Traité sur l'Union européenne et sur les articles 267 et 344 du TFUE, - de la contrariété entre une décision de la Commission européenne et un jugement national définitif, notamment le conflit entre un jugement définitif national (une sentence CIRDI étant à assimiler à un tel jugement) et une obligation découlant d'une décision de la Commission en matière d'aides d'Etat, - de la circonstance que le Luxembourg a adhéré à l'Union européenne avant d'adhérer à la Convention de Washington en 1970, - du devoir de coopération loyale des autorités nationales avec l'Union européenne, - du principe d'effectivité du droit de l'Union européenne, - de l'effet de la décision du Tribunal de l'Union européenne du 18 juin 2019 sur les décisions de la Commission du 26 mai 2014 et du 1er octobre 2014, - de la primauté du droit de l'Union face à des faits intervenus avant l'adhésion de la Roumanie. - du moyen subsidiaire de la Commission européenne, consistant à dire qu'en cas d'application de la Convention de Washington, la Sentence est à traiter comme un jugement de l'ordre juridique national qui doit céder le pas face au droit communautaire contraire, - de l'arrêt de la Cour d'appel du 21 mars 2018, siégeant en matière d'appel de référé, qui a ordonné la mainlevée des saisies-arrêts pratiquées les 28 et 29 juillet 2015 par M) sur base de la contrariété de la Sentence à l'ordre public communautaire et donc luxembourgeois, des renvois préjudiciels sollicités par la Commission européenne, notamment celui formulé dans les conclusions notifiées le 18 juin 2020, qui ne sont pas pertinents. >>, ce alors qu'en reconnaissant la Sentence et en lui accordant le caractère exécutoire, en méconnaissance du principe inviolable de la primauté du droit de l'Union européenne, notamment en matière d'<< aide d'Etat déclarée incompatible par la Commission Européenne >>, déclarant ainsi l'appel non fondé, et condamnant l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur, les juges d'appel ne se sont pas prononcés sur les moyens soulevés à maintes reprises par la partie appelante, actuelle demanderesse en cassation, tenant à la prééminence du droit de l'Union Européenne, reportant l'analyse desdits moyens à un stade ultérieur, au moment de l'examen de la validité des actes individuels d'exécution qui viendront à être posés sur base des Ordonnances d'exequatur ;*

*Alors que l'article 288 TFUE dispose que : << Pour exercer les compétences de l'Union, les institutions adoptent des règlements, des directives, des décisions, des*

11

*recommandations et des avis. (…) La décision est dans tous ses éléments. Lorsqu'elle désigne des destinataires, elle n'est obligatoire que pour ceux-ci. (...) >>, qu'aux pages 11 et 12 de l'acte d'appel, la partie appelante, actuelle demanderesse en cassation, a invoqué ce principe dans les termes suivants : << L'article 2 de la décision de la Commission Européenne (UE) 2015/1470 dispose qu'une exécution de la sentence arbitrale constituerait une violation évidente du droit de l'Union par la Roumanie. A ce titre, il faut noter que d'après la jurisprudence de la Cour de Justice de l'Union Européenne (ci-après "CJUE"), l'ordre public d'un Etat membre comprend aussi le ius cogens issu du droit de l'Union. Ainsi, la CJUE a confirmé que les règles du droit de la concurrence, qui comprennent les règles en matière d'aide d'Etat, et du droit de la protection des consommateurs font partie de l'ordre public national en vertu des principes généraux de droit de l'Union d'effectivité et d'équivalence. >>, que cet exposé des motifs constituait le support nécessaire du dispositif de l'acte d'appel, tendant à l'annulation, sinon la révocation, sinon la réformation des Ordonnances d'exequatur, que la partie demanderesse en cassation rappelant ledit principe aux pages 11, 18 et 20 à 23 des conclusions récapitulatives du 15 novembre 2019, notamment comme suit : << La partie M) omet ainsi - volontairement - d'expliquer quel est l'impact de l'Union Européenne sur la Convention. En effet, on ne peut passer à côté de l'article 344 du Traité sur le Fonctionnement de l'Union Européenne (ci-après le "TFUE") (...) Il ressort donc clairement de ce qui précède que c'est donc la primauté du droit de l'Union Européenne ainsi que la modification du droit applicable par l'adhésion d'un Etat à l'Union Européenne et l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur qu'il convient de considérer en l'espèce. Ainsi, la convention de Washington, mise en avant par Monsieur M) pour voir confirmer, de façon automatique, sa demande d'exequatur, doit en fait s'effacer devant la primauté du droit de l'Union Européenne et devant l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur. C'est donc à tort que Monsieur M) plaide qu'un traité international prévaudrait sur le Droit de l'Union Européenne. (…). Cet arrêt présente une motivation particulièrement intéressante alors qu'il affirme également la primauté du droit de l'Union Européenne. (….) Or, permettre qu'un titre fasse l'objet d'un exequatur et soit revêtu de la formule exécutoire est précisément contraire à la Décision du 30 mars 2015 et reviendrait à remettre en cause la primauté du Droit de l'Union Européenne. (...) la décision arbitrale se base sur un traité bilatéral de la Suède et de la Roumanie daté du 29 mai 2002, convention citée de manière erronée dans le dispositif de l'ordonnance d'exéquatur. Or, ce traité bilatéral a été implicitement abrogé lors de l'adhésion de la Roumanie à l'Union Européenne et ne saurait servir de fondement à la reconnaissance d'une sentence arbitrale…>>, que ledit principe a encore été rappelé, par la partie appelante, actuelle demanderesse en cassation, dans ses conclusions n° 3 du 10 mai 2017 ( à la page 3), dans les termes suivants : << L'article 288 du TFUE rend toute décision de la Commission obligatoire… >>, respectivement dans ses conclusions n° 4 du 18 octobre 2017 ( à la page 4), comme suit : << Il est rappelé que la Décision du 30 mars 2015 a force obligatoire et exécutoire par application des articles 288 du TFUE et 299 du TFUE et que ceci a pour effet de lui conférer un caractère contraignant. >> et dans ses conclusions n° 6 du 14 août 2018 ( à la page 6), dans les termes suivants : << que la Décision du 30 mars 2015 est obligatoire dans tous ces éléments et dans tous les Etats membres en vertu de l'article 288 du TFUE, et ce indépendamment du recours dont elle fait l'objet, qui n'est pas suspensif >>, de sorte que, quant à la question de savoir si les Ordonnances d'exequatur auraient dû*

*être annulées, sinon révoquées, sinon réformées, pour être contraires à l'ordre public des Etats membres, c'est-à-dire à l'ordre public européen, en raison de leur violation du principe de la primauté du droit de l'Union Européenne, les juges d'appel auraient dû répondre par la positive, alors que même à supposer que la Sentence serait à considérer comme exécutoire au regard de la Convention de Washington, force est de constater qu'en reportant l'examen des illégalités des Ordonnances d'exequatur à un stade ultérieur, à savoir au moment où chaque acte individuel d'exécution sera posé (<< au niveau du caractère exécutable de la Sentence >>), la Cour d'Appel contrevient aux dispositions de l'article 288 TFUE, consacrant le principe de la primauté du droit de l'Union Européenne, et prive d'effectivité ledit principe, alors qu'en présence de la Décision de la Commission du 30 mars 2015 (n°2015/1470), interdisant à la Roumanie de procéder à toute exécution de la Sentence arbitrale, au motif qu'une telle exécution de la Sentence arbitrale constituerait une violation du droit de l'Union par la Roumanie, la Cour d'Appel aurait dû se prononcer sur les prédits moyens de la partie demanderesse en cassation, tenant à la primauté du droit de l'Union Européenne, et qu'en refusant de répondre, au stade de la procédure d'exequatur de la Sentence, aux moyens de la partie demanderesse en cassation, soulevés aussi bien aux pages 11 et 12 de son acte d'appel, qu'aux pages 11, 18 et 20 à 23 de ses conclusions récapitulatives, et à la page 3 de ses conclusions n° 3, respectivement à la page 4 de ses conclusions n°4 et à la page 6 de ses conclusions n° 6, tenant à la primauté du droit de l'Union Européenne, la Cour d'Appel n'a pas appliqué le principe d'ordre public européen énoncé tenant à la primauté du droit de l'Union Européenne, énoncé à l'article 288 du Traité sur le Fonctionnement de l'Union Européenne, entachant ainsi l'arrêt a quo du vice de fond que constitue la violation de la règle de droit. »,*

**le cinquième,** *« Tiré de la violation de la loi, in specie de la violation des dispositions de l'article 344 du Traité sur le Fonctionnement de l'Union Européenne, consacrant le principe de la primauté du droit de l'Union Européenne ;*

*En ce que la Cour d'Appel a rejeté l'appel de la Roumanie visant à obtenir l'annulation, sinon la révocation, sinon la réformation de l'ordonnance d'exequatur 45/2015 du 8 mai 2015 et de l'ordonnance de rectification 51/2015 du 22 mai 2015 en ce qu'ayant déclaré, qu': << Il s'ensuit que certains développements de l'ETAT de ROUMANIE,…, qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur, notamment les questions :*

*- (…) de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, - de la contrariété entre le TBI et le droit de l'Union européenne, - du conflit de normes entre le droit de l'Union européenne et la convention de Washington, - (…), - de l'argument tiré de ce que le droit de l'Union européenne prévoit un système de règlement des différends en matière d'investissements basé sur l'article 19 du Traité sur l'Union européenne et les articles 267 et 344 du TFUE, - de la contrariété entre une décision de la Commission européenne et un jugement national définitif, notamment le conflit entre un jugement définitif national (une sentence CIRDI étant à assimiler à un tel jugement) et une obligation découlant d'une décision de la Commission en matière d'aides d'Etat, - de la circonstance que le Luxembourg a adhéré à l'Union européenne avant d'adhérer à la Convention de Washington en 1970, - du devoir de coopération loyale des*

*autorités nationales avec l'Union européenne, - du principe d'effectivité du droit de l'Union européenne, - de l'effet de la décision du Tribunal de l'Union européenne du 18 juin 2019 sur les décisions de la Commission du 26 mai 2014 et du 1ᵉʳ octobre 2014, - de la primauté du droit de l'Union face à des faits intervenus avant l'adhésion de la Roumanie, - du moyen subsidiaire de la Commission européenne, consistant à dire qu'en cas d'application de la Convention de Washington, la Sentence est à traiter comme un jugement de l'ordre juridique national qui doit céder le pas face au droit communautaire contraire, - de l'arrêt de la Cour d'appel du 21 mars 2018, siégeant en matière d'appel de réfère, qui a ordonné la mainlevée des saisies-arrêts pratiquées les 28 et 29 juillet 2015 par ___ M) sur base de la contrariété de la Sentence à l'ordre public communautaire et donc luxembourgeois, des renvois préjudiciels sollicités par la Commission européenne, notamment celui formulé dans les conclusions notifiées le 18 juin 2020, qui ne sont pas pertinents. >>, ce alors qu'en reconnaissant la Sentence et en lui accordant le caractère exécutoire, en méconnaissance du principe inviolable de la primauté du droit de l'Union européenne, notamment en matière d'<< aide d'Etat déclarée incompatible par la Commission Européenne >>, déclarant ainsi l'appel non fondé, et condamnant l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur, les juges d'appel ne se sont pas prononcés sur les moyens soulevés à maintes reprises par la partie appelante, actuelle demanderesse en cassation, tenant à la prééminence du droit de l'Union Européenne, reportant l'analyse desdits moyens à un stade ultérieur, au moment de l'examen de la validité des actes individuels d'exécution qui viendront à être posés sur base des Ordonnances d'exequatur ;*

*Alors que suivant les dispositions de l'article 344 TFUE : << Les États membres s'engagent à ne pas soumettre un différend relatif à l'interprétation ou à l'application des traités à un mode de règlement autre que ceux prévus par ceux-ci. >>, que pour garantir l'autonomie du l'ordre juridique de l'Union, les traités européens ont instauré un système juridictionnel spécifique, composé des juridictions nationales d'une part, et de la Cour de Justice de l'Union Européenne, d'autre part, que partant un accord international ne saurait porter atteinte au monopole juridictionnel ainsi créé par les traités européens, ni à l'autonomie du système juridique de l'Union, consacré par l'article 344 du Traité de fonctionnement de l'Union européenne (TFUE) qui fait interdiction aux Etats membres de soumettre un différend relatif à l'interprétation et à l'application du droit de l'Union à un mode de règlement différent de celui prévu par les traités, qu'aux pages 11 et 12 de l'acte d'appel, la partie appelante, actuelle demanderesse en cassation, a invoqué ce principe dans les termes suivants : << L'article 2 de la décision de la Commission Européenne (UE) 2015/1470 dispose qu'une exécution de la sentence arbitrale constituerait une violation évidente du droit de l'Union par la Roumanie. A ce titre, il faut noter que d'après la jurisprudence de la Cour de Justice de l'Union Européenne (ci-après "CJUE"), l'ordre public d'un Etat membre comprend aussi le ius cogens issu du droit de l'Union. Ainsi, la CJUE a confirmé que les règles du droit de la concurrence, qui comprennent les règles en matière d'aide d'Etat, et du droit de la protection des consommateurs font partie de l'ordre public national en vertu des principes généraux de droit de l'Union d'effectivité et d'équivalence. >>, que cet exposé des motifs constituait le support nécessaire du dispositif de l'acte d'appel, tendant à l'annulation, sinon la révocation, sinon la réformation des Ordonnances d'exequatur, que la partie demanderesse en cassation rappelant ledit principe aux*

*pages 11, 18 et 20 à 23 des conclusions récapitulatives du 15 novembre 2019, notamment comme suit : << La partie M) omet ainsi - volontairement - d'expliquer quel est l'impact de l'Union Européenne sur la Convention. En effet, on ne peut passer à côté de l'article 344 du Traité sur le Fonctionnement de l'Union Européenne (ci-après le "TFUE") (...) Il ressort donc clairement de ce qui précède que c'est donc la primauté du droit de l'Union Européenne ainsi que la modification du droit applicable par l'adhésion d'un Etat à l'Union Européenne et l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur qu'il convient de considérer en l'espèce. Ainsi, la convention de Washington, mise en avant par Monsieur M) pour voir confirmer, de façon automatique, sa demande d'exequatur, doit en fait s'effacer devant la primauté du droit de l'Union Européenne et devant l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur. C'est donc à tort que Monsieur M) plaide qu'un traité international prévaudrait sur le Droit de l'Union Européenne. (...). Cet arrêt présente une motivation particulièrement intéressante alors qu'il affirme également la primauté du droit de l'Union Européenne. (....) Or, permettre qu'un titre fasse l'objet d'un exequatur et soit revêtu de la formule exécutoire est précisément contraire à la Décision du 30 mars 2015 et reviendrait à remettre en cause la primauté du Droit de l'Union Européenne. (...) la décision arbitrale se base sur un traité bilatéral de la Suède et de la Roumanie daté du 29 mai 2002, convention citée de manière erronée dans le dispositif de l'ordonnance d'exéquatur. Or, ce traité bilatéral a été implicitement abrogé lors de l'adhésion de la Roumanie à l'Union Européenne et ne saurait servir de fondement à la reconnaissance d'une sentence arbitrale...>>, de sorte que, quant à la question de savoir si les Ordonnances d'exequatur auraient dû être annulées, sinon révoquées, sinon réformées, pour être contraires à l'ordre public des Etats membres, c'est-à-dire à l'ordre public européen, en raison de leur violation du principe de la primauté du droit de l'Union Européenne, les juges d'appel auraient dû répondre par la positive, alors que même à supposer que la Sentence serait à considérer comme exécutoire au regard de la Convention de Washington, force est de constater qu'en reportant l'examen des illégalités des Ordonnances d'exequatur à un stade ultérieur, à savoir au moment où chaque acte individuel d'exécution sera posé (<< au niveau du caractère exécutable de la Sentence >>), la Cour d'Appel contrevient aux dispositions de l'article 344 TFUE consacrant le principe de la primauté du droit de l'Union Européenne, et prive d'effectivité ledit principe, alors qu'en vertu du principe de l'autonomie du système juridictionnel Européen, la Cour d'Appel aurait dû prononcer l'annulation, sinon la révocation, sinon la réformation des Ordonnances d'exequatur,  et qu'en refusant de répondre, au stade de la procédure d'exequatur de la Sentence, aux moyens de la partie demanderesse en cassation, soulevés aussi bien aux pages 11 et 12 de son acte d'appel, qu'aux pages 11, 18 et 20 à 23 de ses conclusions récapitulatives, tenant à la primauté du droit de l'Union Européenne, la Cour d'Appel n'a pas appliqué le principe d'ordre public européen tenant à la primauté du droit de l'Union Européenne, énoncé à l'article 344 du Traité sur le Fonctionnement de l'Union Européenne, entachant ainsi l'arrêt a quo du vice de fond que constitue la violation de la règle de droit. »*

et

**le sixième,** *« Tiré de la violation de la loi, in specie de la violation des dispositions de l'article 108 du Traité sur le Fonctionnement de l'Union Européenne*

*(ci-après << TFUE >>), consacrant le principe de la primauté du droit de l'Union Européenne ;*

*En ce que la Cour d'Appel a rejeté l'appel de la Roumanie visant à obtenir l'annulation, sinon la révocation, sinon la réformation de l'ordonnance d'exequatur 45/2015 du 8 mai 2015 et de l'ordonnance de rectification 51/2015 du 22 mai 2015 en ce qu'ayant déclaré, qu': << Il s'ensuit que certains développements de l'ETAT de ROUMANIE,..., qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur, notamment les questions :*

*- (...) de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, - de la contrariété entre le TBI et le droit de l'Union européenne, - du conflit de normes entre le droit de l'Union européenne et la convention de Washington, - (...), - de l'argument tiré de ce que le droit de l'Union européenne prévoit un système de règlement des différends en matière d'investissements basé sur l'article 19 du Traité sur l'Union européenne et sur les articles 267 et 344 du TFUE, - de la contrariété entre une décision de la Commission européenne et un jugement national définitif, notamment le conflit entre un jugement définitif national (une sentence CIRDI étant à assimiler à un tel jugement) et une obligation découlant d'une décision de la Commission en matière d'aides d'Etat, - de la circonstance que le Luxembourg a adhéré à l'Union européenne avant d'adhérer à la Convention de Washington en 1970, - du devoir de coopération loyale des autorités nationales avec l'Union européenne, - du principe d'effectivité du droit de l'Union européenne, - de l'effet de la décision du Tribunal de l'Union européenne du 18 juin 2019 sur les décisions de la Commission du 26 mai 2014 et du 1$^{er}$ octobre 2014, - de la primauté du droit de l'Union face à des faits intervenus avant l'adhésion de la Roumanie, - du moyen subsidiaire de la Commission européenne, consistant à dire qu'en cas d'application de la Convention de Washington, la Sentence est à traiter comme un jugement de l'ordre juridique national qui doit céder le pas face au droit communautaire contraire, - de l'arrêt de la Cour d'appel du 21 mars 2018, siégeant en matière d'appel de réfère, qui a ordonné la mainlevée des saisies-arrêts pratiquées les 28 et 29 juillet 2015 par M) sur base de la contrariété de la Sentence à l'ordre public communautaire et donc luxembourgeois, des renvois préjudiciels sollicités par la Commission européenne, notamment celui formulé dans les conclusions notifiées le 18 juin 2020, qui ne sont pas pertinents. >>, ce alors qu'en reconnaissant la Sentence et en lui accordant le caractère exécutoire, en méconnaissance du principe inviolable de la primauté du droit de l'Union européenne, notamment en matière d'<< aide d'Etat déclarée incompatible par la Commission Européenne >>, déclarant ainsi l'appel non fondé, et condamnant l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur, les juges d'appel ne se sont pas prononcés sur les moyens soulevés à maintes reprises par la partie appelante, actuelle demanderesse en cassation, tenant à la prééminence du droit de l'Union Européenne, reportant l'analyse desdits moyens à un stade ultérieur, au moment de l'examen de la validité des actes individuels d'exécution qui viendront à être posés sur base des Ordonnances d'exequatur ;*

*Alors qu'aux pages 11 et 12 de l'acte d'appel, la partie appelante, actuelle demanderesse en cassation, a invoqué ce principe dans les termes suivants :*

*<< L'article 2 de la décision de la Commission Européenne (UE) 2015/1470 dispose qu'une exécution de la sentence arbitrale constituerait une violation évidente du droit de l'Union par la Roumanie. A ce titre, il faut noter que d'après la jurisprudence de la Cour de Justice de l'Union Européenne (ci-après "CJUE"), l'ordre public d'un Etat membre comprend aussi le ius cogens issu du droit de l'Union. Ainsi, la CJUE a confirmé que les règles du droit de la concurrence, qui comprennent les règles en matière d'aide d'Etat, et du droit de la protection des consommateurs font partie de l'ordre public national en vertu des principes généraux de droit de l'Union d'effectivité et d'équivalence. >>, que cet exposé des motifs constituait le support nécessaire du dispositif de l'acte d'appel, tendant à l'annulation, sinon la révocation, sinon la réformation des Ordonnances d'exequatur, que la partie demanderesse en cassation rappelant ledit principe aux pages 22 à 26 des conclusions récapitulatives du 15 novembre 2019, notamment comme suit : << L'arrêt KLAUSNER du 11 novembre 2015 par lequel la CJUE qui a dit pour droit que le principe d'effectivité s'oppose à une règle nationale qui empêche le juge national de tirer toutes les conséquences de la violation de l'article 108 TFUE en raison de l'autorité de la chose jugée d'une décision juridictionnelle nationale rendue à propos d'un litige étranger au contrôle des aides d'Etat, ..., Or, permettre qu'un titre fasse l'objet d'un exequatur et soit revêtu de la formule exécutoire est précisément contraire à la Décision du 30 mars 2015 et reviendrait à remettre en cause la primauté du Droit de l'Union Européenne.... Il ne faut pas perdre de vue en effet que l'arrêt du 18 juin 2019 a annulé uniquement la Décision du 30 mars 2015, mais que subsistent tous les autres actes contraignants pris par la Commission. Il y a en particulier deux actes contraignants qui subsistent à l'heure actuelle, à savoir :1. L'injonction de suspension notifiée à la Roumanie en date du 26 mai 2014 (ci-après "l'Injonction de suspension")... Nonobstant l'annulation de la Décision du 30 mars 2015, cette injonction de suspension existe donc toujours et elle va demeurer jusqu'à ce que l'instruction de la procédure ouverte en vertu de l'article 108 (2) et (3) TFUE, dont la Décision du 30 mars 2015 devait constituer l'épilogue, débouche sur une décision définitive... La décision de la Commission, notifiée à la Roumanie en date du 1er octobre 2014, d'ouvrir, en application de l'article 108 (2) et (3) TFUE, une procédure visant à statuer sur la question de savoir si le paiement des dommages et intérêts auxquels la Sentence arbitrale avait condamné la Roumanie était ou non à assimiler à une aide d'Etat illicite prohibée par l'article 107 TFUE... La décision de la Commission, notifiée à la Roumanie en date du 1er octobre 2014 d'ouvrir, en application de l'article 108 (2) et (3) du TFUE, une procédure visant à statuer sur la question de savoir si le paiement des dommages et intérêts auxquels la Sentence arbitrale avait condamné la Roumanie était ou non à assimiler à une aide d'Etat illicite prohibée par l'article 107 TFUE. La Décision d'ouverture de la procédure d'examen a de manière analogue à l'injonction de suspension, automatiquement pour effet d'imposer la suspension de toute mesure qui aurait pour résultat de distribuer l'aide d'Etat incriminée tant que n'a pas été rendue de décision définitive de la Commission sur la légalité de la mesure suspectée de constituer une aide d'Etat prohibée. Cette suspension est expressément prévue par l'article 108 (3) TFUE. ... La CJUE a eu l'occasion de confirmer que l'ouverture par la Commission d'une procédure par application de l'article 108 (2) et (3) TFUE oblige non seulement l'Etat concerné, mais également les juridictions de tout autre Etat membre, à ne rien faire qui puisse avoir pour résultat de distribuer l'aide d'Etat considérée comme illégale par la Commission (ou du moins suspectée de l'être durant la phase d'instruction de la procédure)... l'effet utile de l'article 108, paragraphe 3, TFUE*

*serait mis en échec ... les juridictions nationales auraient méconnu leur obligation, imposée par les articles 108, paragraphe 3, TFUE... En attendant qu'intervienne cette décision définitive, tant l'article 108 (3) du TFUE que l'Injonction de suspension font obstacle à toute mise en exécution de la Sentence arbitrale. >>, de sorte que, quant à la question de savoir si les Ordonnances d'exequatur auraient dû être annulées, sinon révoquées, sinon réformées, pour être contraires à l'ordre public Européen, et par là même contraire à l'ordre public des Etats membres, en raison de leur violation du principe de la primauté du droit de l'Union Européenne, les juges d'appel auraient dû répondre par la positive, alors que même à supposer que la Sentence serait à considérer comme exécutoire au regard de la Convention de Washington, force est de constater qu'en reportant l'examen des illégalités des Ordonnances d'exequatur à un stade ultérieur, à savoir au moment où chaque acte individuel d'exécution sera posé (<< au niveau du caractère exécutable de la Sentence >>), la Cour d'Appel contreviennent aux dispositions de l'article 108 TFUE consacrant le principe de la primauté du droit de l'Union Européenne, et prive d'effectivité ledit principe, alors que, d'une part, en présence de la Décision de la Commission du 30 mars 2015 (n°2015/1470), interdisant à la Roumanie de procéder à toute exécution de la Sentence arbitrale, au motif qu'une telle exécution de la Sentence arbitrale constituerait une violation évidente du droit de l'Union par la Roumanie, que d'autre part, en présence de l'injonction de suspension notifiée à la Roumanie en date du 26 mai 2014 ainsi que de la Décision d'ouverture de la procédure d'examen, notifiée à la Roumanie en date du 1er octobre 2014 et visant à statuer sur la question de savoir si le paiement de dommages et intérêts auxquels la Sentence arbitrale avait condamné la Roumanie, constitue ou non une aide d'Etat illicite prohibée par l'article 107 TFUE, la Cour d'appel aurait dû se prononcer sur les prédits moyens de la partie demanderesse en cassation, tenant à la primauté du droit de l'Union Européenne, et qu'en refusant de répondre, au stade de la procédure d'exequatur de la Sentence, aux moyens de la partie demanderesse en cassation, soulevés aussi bien aux pages 11 et 12 de son acte d'appel, qu'aux pages 22 à 26 de ses conclusions récapitulatives, tenant à la primauté du droit de l'Union Européenne, la Cour d'appel n'a pas appliqué le principe d'ordre public européen tenant à la primauté du droit de l'Union Européenne, énoncé à l'article 108 du Traité sur le Fonctionnement de l'Union Européenne, entachant ainsi l'arrêt a quo du vice de fond que constitue la violation de la règle de droit. ».*

### Réponse de la Cour

Aux termes de l'article 10, alinéa 2, de la loi modifiée du 18 février 1885 sur les pourvois et la procédure en cassation, un moyen ou un élément de moyen ne doit, sous peine d'irrecevabilité, mettre en œuvre qu'un seul cas d'ouverture.

Le demandeur en cassation invoque dans chaque moyen, non subdivisé en branches, d'une part, le vice de fond tiré de la violation du principe de la primauté du droit de l'Union européenne, rattaché respectivement à l'article 49*bis* de la Constitution et aux articles 351, 288, 344 et 108 TFUE et, d'autre part, le vice de forme tiré du défaut de réponse à conclusions dans lesquelles il avait développé que la reconnaissance de la sentence arbitrale méconnaîtrait ce principe sur base desdites dispositions, partant deux cas d'ouverture distincts.

Il s'ensuit que les moyens sont irrecevables.

**Sur les septième et huitième moyens de cassation réunis**

**Enoncé des moyens**

**le septième**, *« Tiré de la violation de l'article 89 de la Constitution ;*

*En ce que la Cour d'Appel a rejeté l'appel de la Roumanie visant à obtenir l'annulation, sinon la révocation, sinon la réformation de l'ordonnance d'exequatur 45/2015 du 8 mai 2015 et de l'ordonnance de rectification 51/2015 du 22 mai 2015 en ce qu'ayant déclaré, qu'* <<* Il s'ensuit que certains développements de l'ETAT de ROUMANIE ... qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur, notamment les questions :*
*- (...) de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, - de la contrariété entre le TBI et le droit de l'Union européenne, - du conflit de normes entre le droit de l'Union européenne et la convention de Washington, - (...), - de l'argument tiré de ce que le droit de l'Union européenne prévoit un système de règlement des différends en matière d'investissements basé sur l'article 19 du Traité sur l'Union européenne et sur les articles 267 et 344 du TFUE, - de la contrariété entre une décision de la Commission européenne et un jugement national définitif, notamment le conflit entre un jugement définitif national (une sentence CIRDI étant à assimiler à un tel jugement) et une obligation découlant d'une décision de la Commission en matière d'aides d'Etat, - de la circonstance que le Luxembourg a adhéré à l'Union européenne avant d'adhérer à la Convention de Washington en 1970, - du devoir de coopération loyale des autorités nationales avec l'Union européenne, - du principe d'effectivité du droit de l'Union européenne, - de l'effet de la décision du Tribunal de l'Union européenne du 18 juin 2019 sur les décisions de la Commission du 26 mai 2014 et du 1er octobre 2014, - de la primauté du droit de l'Union face à des faits intervenus avant l'adhésion de la Roumanie, - du moyen subsidiaire de la Commission européenne, consistant à dire qu'en cas d'application de la Convention de Washington, la Sentence est à traiter comme un jugement de l'ordre juridique national qui doit céder le pas face au droit communautaire contraire, - de l'arrêt de la Cour d'appel du 21 mars 2018, siégeant en matière d'appel de réfère, qui a ordonné la mainlevée des saisies - arrêts pratiquées les 28 et 29 juillet 2015 par M) sur base de la contrariété de la Sentence à l'ordre public communautaire et donc luxembourgeois, des renvois préjudiciels sollicités par la Commission européenne, notamment celui formulé dans les conclusions notifiées le 18 juin 2020, qui ne sont pas pertinents.* >>*, ce alors qu'en reconnaissant la Sentence et en lui accordant le caractère exécutoire, en méconnaissance du principe inviolable de la primauté du droit de l'Union Européenne, notamment en matière d'« aide d'Etat déclarée incompatible par la Commission Européenne* >>* déclarant ainsi l'appel non fondé, et condamnant l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur, les juges d'appel ne se sont pas prononcés sur le moyen soulevé à maintes reprises par la partie appelante, actuelle demanderesse en cassation, tenant à la prééminence du droit de l'Union Européenne ;*

*Alors qu'aux termes de l'article 89 de la Constitution, << Tout jugement est motivé. Il est prononcé en audience publique. >>, que << les juges du fond sont tenus de s'expliquer sur tous les moyens qui leur sont proposés, quel qu'en soit le mérite >> et que l'article 49 bis de la Constitution dispose que : << L'exercice d'attributions réservées par la Constitution aux pouvoirs législatif, exécutif et judiciaire peut être temporairement dévolu par traité à des institutions de droit international. >>, consacrant le principe de la prééminence du droit de l'Union Européenne, dans l'ordre juridique national, qu'aux pages 11 et 12 de l'acte d'appel du dix novembre 2015, la partie appelante, actuelle demanderesse en cassation, a invoqué ce principe dans les termes suivants : << L'article 2 de la décision de la Commission Européenne (UE) 2015/1470 dispose qu'une exécution de la sentence arbitrale constituerait une violation évidente du droit de l'Union par la Roumanie. A ce titre, il faut noter que d'après la jurisprudence de la Cour de Justice de l'Union Européenne (ci-après "CJUE"), l'ordre public d'un Etat membre comprend aussi le ius cogens issu du droit de l'Union. Ainsi, la CJUE a confirmé que les règles du droit de la concurrence, qui comprennent les règles en matière d'aide d'Etat, et du droit de la protection des consommateurs font partie de l'ordre public national en vertu des principes généraux de droit de l'Union d'effectivité et d'équivalence. (...) la décision arbitrale se base sur un traité bilatéral de la Suède et de la Roumanie daté du 29 mai 2002, convention citée de manière erronée dans le dispositif de l'ordonnance d'exéquatur. Or, ce traité bilatéral a été implicitement abrogé lors de l'adhésion de la Roumanie à l'Union Européenne et ne saurait servir de fondement à la reconnaissance d'une sentence arbitrale...>>, que cet exposé constituait le support nécessaire du dispositif de l'acte d'appel, tendant à l'annulation, sinon la révocation, sinon la réformation des Ordonnances d'exequatur, que la partie demanderesse en cassation rappelant ledit principe aux pages 18 et 20 à 23 des conclusions récapitulatives du 15 novembre 2019, notamment comme suit : « (...) Il ressort donc clairement de ce qui précède que c'est donc la primauté du droit de l'Union Européenne ainsi que la modification du droit applicable par l'adhésion d'un Etat à l'Union Européenne et l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur qu'il convient de considérer en l'espèce. Ainsi, la convention de Washington, mise en avant par Monsieur M) pour voir confirmer, de façon automatique, sa demande d'exequatur, doit en fait s'effacer devant la primauté du droit de l'Union Européenne et devant l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur. C'est donc à tort que Monsieur M) plaide qu'un traité international prévaudrait sur le Droit de l'Union Européenne. (...) Cet arrêt présente une motivation particulièrement intéressante alors qu'il affirme également la primauté du droit de l'Union Européenne. (...) Or, permettre qu'un titre fasse l'objet d'un exequatur et soit revêtu de la formule exécutoire est précisément contraire à la Décision du 30 mars 2015 et reviendrait à remettre en cause la primauté du Droit de l'Union Européenne. >>, de sorte que, quant à la question de savoir si les Ordonnances d'exequatur de la Sentence auraient dû être annulées, sinon révoquées, sinon réformées, pour être contraires à l'ordre public, en raison de leur violation du principe de primauté du droit de l'Union Européenne, les juges d'appel auraient dû répondre par la positive, alors que << ...les traités qui ont institué le droit communautaire ont institué un nouvel ordre juridique au profit duquel les Etats membres ont limité l'exercice de leurs pouvoirs souverains dans les domaines que ces traités déterminent. Cette règle s'impose plus particulièrement lorsque le conflit existe entre une norme de droit interne et une norme communautaire puisque les traités qui ont créé le droit communautaire ont institué*

*un nouvel ordre juridique au profit duquel les Etats membres ont limité l'exercice de leurs pouvoirs souverains dans les domaines que ces traités déterminent. >>, et qu'en refusant de répondre au moyen de la partie demanderesse en cassation, tenant à la primauté du droit de l'Union Européenne, ils n'ont pas suffisamment motivé l'arrêt rapporté, violant ainsi l'article 89 de la Constitution. »*

et

**le huitième,** « *Tiré de la violation de l'article 89 de la Constitution ;*

*En ce que la Cour d'Appel a rejeté l'appel de la Roumanie visant à obtenir l'annulation, sinon la révocation, sinon la réformation de l'ordonnance d'exequatur 45/2015 du 8 mai 2015 et de l'ordonnance de rectification 51/2015 du 22 mai 2015 en ce qu'ayant déclaré, qu' : << Il s'ensuit que certains développements de l'ETAT de ROUMANIE ... qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur, notamment les questions :*

*- (...) de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne, - de la contrariété entre le TBI et le droit de l'Union européenne, - du conflit de normes entre le droit de l'Union européenne et la convention de Washington, - (...), - de l'argument tiré de ce que le droit de l'Union européenne prévoit un système de règlement des différends en matière d'investissements basé sur l'article 19 du Traité sur l'Union européenne et sur les articles 267 et 344 du TFUE, - de la contrariété entre une décision de la Commission européenne et un jugement national définitif, notamment le conflit entre un jugement définitif national (une sentence CIRDI étant à assimiler à un tel jugement) et une obligation découlant d'une décision de la Commission en matière d'aides d'Etat, - de la circonstance que le Luxembourg a adhéré à l'Union européenne avant d'adhérer à la Convention de Washington en 1970, - du devoir de coopération loyale des autorités nationales avec l'Union européenne, - du principe d'effectivité du droit de l'Union européenne, - de l'effet de la décision du Tribunal de l'Union européenne du 18 juin 2019 sur les décisions de la Commission du 26 mai 2014 et du 1$^{er}$ octobre 2014, - de la primauté du droit de l'Union face à des faits intervenus avant l'adhésion de la Roumanie, - du moyen subsidiaire de la Commission européenne, consistant à dire qu'en cas d'application de la Convention de Washington, la Sentence est à traiter comme un jugement de l'ordre juridique national qui doit céder le pas face au droit communautaire contraire, - de l'arrêt de la Cour d'appel du 21 mars 2018, siégeant en matière d'appel de réfère, qui a ordonné la mainlevée des saisies-arrêts pratiquées les 28 et 29 juillet 2015 par M) sur base de la contrariété de la Sentence à l'ordre public communautaire et donc luxembourgeois, des renvois préjudiciels sollicités par la Commission européenne, notamment celui formulé dans les conclusions notifiées le 18 juin 2020, qui ne sont pas pertinents. >>, ce alors qu'en reconnaissant la Sentence et en lui accordant le caractère exécutoire, en méconnaissance du principe inviolable de la primauté du droit de l'Union européenne, notamment en matière d'<< aide d'Etat déclarée incompatible par la Commission Européenne >>, déclarant ainsi l'appel non fondé, et condamnant l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur, les juges d'appel ne se sont pas prononcés sur le moyen*

*soulevé à maintes reprises par la partie appelante, actuelle demanderesse en cassation, tenant à la prééminence du droit de l'Union Européenne ;*

*Alors qu'aux termes de l'article 89 de la Constitution, << Tout jugement est motivé. Il est prononcé en audience publique. >>, que << les juges du fond sont tenus de s'expliquer sur tous les moyens qui leur sont proposés, quel qu'en soit le mérite >> et que l'article 49 bis de la Constitution dispose que : « L'exercice d'attributions réservées par la Constitution aux pouvoirs législatif, exécutif et judiciaire peut être temporairement dévolu par traité à des institutions de droit international. >>, consacrant le principe de la prééminence du droit de l'Union Européenne, dans l'ordre juridique national, qu'aux pages 11 et 12 de l'acte d'appel, la partie appelante, actuelle demanderesse en cassation, a invoqué ce principe dans les termes suivants : « L'article 2 de la décision de la Commission Européenne (UE) 2015/1470 dispose qu'une exécution de la sentence arbitrale constituerait une violation évidente du droit de l'Union par la Roumanie. A ce titre, il faut noter que d'après la jurisprudence de la Cour de Justice de l'Union Européenne (ci-après "CJUE"), l'ordre public d'un Etat membre comprend aussi le ius cogens issu du droit de l'Union. Ainsi, la CJUE a confirmé que les règles du droit de la concurrence, qui comprennent les règles en matière d'aide d'Etat, et du droit de la protection des consommateurs font partie de l'ordre public national en vertu des principes généraux de droit de l'Union d'effectivité et d'équivalence. >>, que cet exposé des motifs constituait le support nécessaire du dispositif de l'acte d'appel, tendant à l'annulation, sinon la révocation, sinon la réformation des Ordonnances d'exequatur, que la partie demanderesse en cassation rappelant ledit principe aux pages 18 et 20 à 23 des conclusions récapitulatives du 15 novembre 2019, notamment comme suit : « (…) Il ressort donc clairement de ce qui précède que c'est donc la primauté du droit de l'Union Européenne ainsi que la modification du droit applicable par l'adhésion d'un Etat à l'Union Européenne et l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur qu'il convient de considérer en l'espèce. Ainsi, la convention de Washington, mise en avant par Monsieur M) pour voir confirmer, de façon automatique, sa demande d'exequatur, doit en fait s'effacer devant la primauté du droit de l'Union Européenne et devant l'absence de droit acquis sur la base d'une convention ou d'un traité antérieur. C'est donc à tort que Monsieur M) plaide qu'un traité international prévaudrait sur le Droit de l'Union Européenne. (…) Cet arrêt présente une motivation particulièrement intéressante alors qu'il affirme également la primauté du droit de l'Union Européenne. (…) Or, permettre qu'un titre fasse l'objet d'un exequatur et soit revêtu de la formule exécutoire est précisément contraire à la Décision du 30 mars 2015 et reviendrait à remettre en cause la primauté du Droit de l'Union Européenne. (…) la décision arbitrale se base sur un traité bilatéral de la Suède et de la Roumanie daté du 29 mai 2002, convention citée de manière erronée dans le dispositif de l'ordonnance d'exéquatur. Or, ce traité bilatéral a été implicitement abrogé lors de l'adhésion de la Roumanie à l'Union Européenne et ne saurait servir de fondement à la reconnaissance d'une sentence arbitrale…>>, de sorte qu'en refusant d'examiner les moyens de la partie demanderesse en cassation, notamment le moyen tenant à la primauté du droit de l'Union Européenne, ayant pour conséquence juridique l'annulation, sinon la révocation sinon la réformation des Ordonnances d'exequatur de la Sentence, dont la reconnaissance et l'exécution entraînent la contrariété au droit de l'Union Européenne, partant à l'ordre public d'un Etat membre de l'Union Européenne, les juges d'appel n'ont pas répondu au*

*moyen soulevé par la partie demanderesse en cassation, aussi bien aux pages 11 et 12 de son acte d'appel, qu'aux pages 18 et 20 à 23 de ses conclusions récapitulatives, et qu'en refusant de répondre au moyen de la partie demanderesse en cassation, tenant à la primauté du droit de l'Union Européenne, les juges d'appel n'ont pas répondu aux conclusions de cette dernière, ce qui constitue le vice de forme du défaut de réponse à conclusions,* partant ils n'ont pas suffisamment motivé l'arrêt rapporté, *violant ainsi l'article 89 de la Constitution. ».*

### Réponse de la Cour

En tant que tiré de la violation de l'article 89 de la Constitution, le moyen vise le défaut de réponse à conclusions, qui est une forme du défaut de motifs, qui est un vice de forme.

Une décision est motivée dès lors qu'elle comporte une motivation, expresse ou implicite, sur le point considéré.

En retenant

*« Il résulte des articles 53 et 54 de la Convention de Washington que l'unique condition posée à l'obtention de l'exequatur d'une sentence arbitrale réside dans l'existence d'une sentence CIRDI, dont une copie certifiée conforme par le secrétaire général est à soumettre au juge de l'exequatur. Hormis cette condition, la Convention de Washington ne prévoit aucune cause de refus d'exequatur d'une sentence CIRDI.*

*Si l'ETAT de ROUMANIE soutient que l'article 54.-3) de la Convention de Washington (« L'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder ») renvoie au droit national luxembourgeois, ceci ne vaut que pour l'exécution des jugements. Or et tel qu'indiqué ci-dessus, l'exequatur ne constitue pas, en lui-même, un acte d'exécution.[…]*

*Il s'ensuit que certains développements de l'ETAT de ROUMANIE et de la Commission européenne, qui pourraient, le cas échéant, présenter un intérêt au niveau du caractère exécutable de la Sentence, ne seront pas examinés en raison de leur défaut de pertinence au niveau de la procédure d'exequatur, c'est-à-dire, notamment, les questions :[…]*

- *de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne,*
- *de la contrariété entre le TBI et le droit de l'Union européenne,*
- *du conflit de normes entre le droit de l'Union européenne et la convention de Washington […] »,*

les juges d'appel ont répondu aux conclusions du demandeur en cassation.

Il s'ensuit que les moyens ne sont pas fondés.

**Sur les neuvième et dixième moyens de cassation réunis**

**Enoncé des moyens**

**le neuvième,** «*Tiré de la violation de l'article 89 de la Constitution ;*

*En ce que la Cour d'Appel a rejeté l'appel de la Roumanie visant à obtenir l'annulation, sinon la révocation, sinon la réformation de l'ordonnance d'exequatur 45/2015 du 8 mai 2015 et de l'ordonnance de rectification 51/2015 du 22 mai 2015 en ce qu'ayant constaté, à la page 13, l'avant dernier paragraphe de l'arrêt rapporté, qu'<< En l'espèce, la Sentence a été rendue sous l'égide du CIRDI* (ci-après "*la Sentence"), en application de la Convention de Washington, à laquelle tant la Roumanie que le Luxembourg, Etat dans lequel l'exécution est poursuivie, sont parties. >>, constatations qui emportent nécessairement, une acception large de l'exequatur, en ce qu'il constitue non seulement un acte de reconnaissance, mais également une première étape de la procédure d'exécution, entraînant comme conséquences juridiques immédiates et logiques, que, conformément aux dispositions de l'article 54.-3) de la Convention de Washington, il y a applicabilité du droit national, notamment des articles 1244 et suivants, 1250 et 1251 du Nouveau Code de Procédure Civile, à la procédure d'exequatur de la Sentence, notamment quant à l'appréciation des motifs de refus de l'exequatur, les juges d'appel retiennent, quelques lignes plus haut puis quelques lignes plus bas, que << ...l'exequatur ne constitue pas, en lui-même, un acte d'exécution... >>, affirmant ainsi une chose et son contraire, pour en déduire que << ... Si l'Etat de Roumanie soutient que l'article 54.-3) de la Convention de Washington (...) renvoie au droit national luxembourgeois, ceci ne vaut que pour l'exécution des jugements. Or et tel qu'indiqué ci-dessus, l'exequatur ne constitue pas en lui-même un acte d'exécution. >>, rejetant le moyen de la partie appelante, actuelle partie demanderesse en cassation, tenant à l'applicabilité des dispositions de la législation luxembourgeoise à la procédure d'exequatur de la Sentence, notamment quant à l'appréciation des motifs de refus d'exequatur de la Sentence, conformément aux dispositions de l'article 54 (3) de la Convention de Washington, moyen exprimé à de maintes reprises, aussi bien dans son acte d'appel du 10 novembre 2015, aux pages 8, 9, 11et 12, dans les termes suivants : << L'article 1250 du NCPC, qui traite de l'exequatur d'une sentence arbitrale rendue à l'étranger, renvoie aux règles régissant l'exécution des jugements étrangers soumis à un traité ou à un acte communautaire (articles 679 du NCPC et suivants). En vertu de l'article 682 du NCPC, la partie contre laquelle l'exécution est demandée peut former un recours par-devant la Cour Supérieure de Justice, siégeant en matière d'appel. En l'espèce, la partie appelante interjette formellement appel contre la décision d'exequatur alors que ces ordonnances d'exequatur n'ont pas été rendues conformément aux articles 1250 du NCPC et suivants.(...) 1) violation de l'article 1251 (1) du NCPC : A supposer que les ordonnances a quo ne doivent pas d'ores et déjà être réformées pour non-respect du formalisme imposé par l'article 1250 NCPC, il est établi que le Juge de l'exequatur n'aurait pas dû accorder une telle reconnaissance de la sentence arbitrale étrangère. Tel qu'indiqué précédemment, l'article 1251 NCPC dispose que l'exequatur doit être refusée : 1° si la sentence peut encore être attaquée devant des arbitres et si les arbitres n'en ont pas ordonné l'exécution provisoire nonobstant appel. Or, la décision arbitrale a fait l'objet d'un recours en annulation en date du 9 avril 2014...De ce fait, la décision arbitrale n'a pas l'autorité de la chose jugée*

*permettant d'obtenir son exequatur alors que la sentence arbitrale est frappée d'un recours en annulation. (...) L'article 1251 NCPC dispose encore que l'exequatur doit être refusé : 2° si la sentence ou son exécution est contraire à l'ordre public ou si le litige n'était pas susceptible d'être réglé par la voie d'arbitrage; Si par impossible Votre Cour devait estimer que la décision n'est pas frappée d'un recours et/ou est exécutoire, il faut encore noter que la décision arbitrale est contraire à l'ordre public international. >>, que dans ses conclusions récapitulatives du 15 novembre 2019, notamment aux pages 8 et 13, dans les termes suivants : << Ensuite, l'article 54 (3) de la Convention de Washington renvoie pour le surplus à la législation nationale : 'L'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder. >>, et << l'article 54 (3) de la Convention de Washington renvoie clairement à la législation nationale : "L'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder." et les articles 1250 NCPC et suivants complètent ces règles, dont l'article 1251 du NCPC prévoyant des raisons de refus de l'exequatur. >>, refusant ainsi l'applicabilité du droit national, notamment des dispositions précitées du Nouveau Code de Procédure Civile, à la procédure d'exequatur de la Sentence, notamment quant aux motifs de refus de l'exequatur de la Sentence, laquelle applicabilité découle pourtant sans équivoque des dispositions de l'article 54.-3 de la Convention de Washington, pour ainsi rejeter la demande en annulation, sinon en réformation, sinon en révocation des Ordonnances d'exequatur, et déclarer l'appel non fondé, et condamner l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur ;*

*Alors qu'aux termes de l'article 89 de la Constitution, « Tout jugement est motivé. Il est prononcé en audience publique. >>, que « deux motifs contradictoires se détruisent et s'annihilent réciproquement, aucun d'entre eux ne pouvant alors être retenu comme fondement de la décision >>, de sorte que, quant à la question de savoir si, conformément aux dispositions de l'article 54.-3) de la Convention de Washington, il y a applicabilité du droit national luxembourgeois, à l'exequatur d'une sentence arbitrale étrangère, notamment des articles 1244 et suivants, 1250 et 1251 du Nouveau Code de Procédure Civile, la Cour d'Appel aurait dû répondre par la positive, ce alors que les juges d'appel ont retenu, dans le même arrêt, qu'en introduisant une procédure en exéquatur au Luxembourg, M) y a << poursuivi (e) >> en réalité << l'exécution >> de la Sentence, assimilant ainsi l'exéquatur à l'exécution, partant l'arrêt entrepris est à déclarer comme n'étant pas motivé, au sens des dispositions de l'article 89 de la Constitution , et partant est à annuler pour contravention aux dispositions constitutionnelles précitées. »*

et

**le dixième,**  *« Tiré de la violation de l'article 89 de la Constitution ;*

*En ce que la Cour d'Appel a rejeté l'appel de la Roumanie visant à obtenir l'annulation, sinon la révocation, sinon la réformation de l'ordonnance d'exequatur 45/2015 du 8 mai 2015 et de l'ordonnance de rectification 51/2015 du 22 mai 2015 en ce qu'ayant constaté, à la page 13, l'avant dernier paragraphe de l'arrêt rapporté, qu' << En l'espèce, la Sentence a été rendue sous l'égide du CIRDI (ci-après "la Sentence"), en application de la Convention de Washington, à laquelle tant*

*la Roumanie que le Luxembourg, Etat dans lequel l'exécution est poursuivie, sont parties. >>, constatations qui emportent nécessairement, une acception large de l'exequatur, en ce qu'il constitue non seulement un acte de reconnaissance, mais également une première étape de la procédure d'exécution, entraînant comme conséquences juridiques immédiates et logiques, que l'exequatur relève aussi bien du domaine de l'immunité de juridiction des Etats, que de celui de leur immunité d'exécution, les juges d'appel énoncent, quelques lignes plus haut puis quelques lignes plus bas, que << ...l'exequatur ne constitue pas, en lui-même, un acte d'exécution... >>, affirmant ainsi une chose et son contraire, pour en déduire que << ...l'exequatur...pas de nature à provoquer l'immunité d'exécution de l'Etat considéré... >>, pour déclarer le moyen tenant à la nullité sinon à la réformation sinon à la révocation des Ordonnances, pour contrariété à l'ordre public et contravention à l'immunité de juridiction et d'exécution de l'Etat de Roumanie, non fondé, rejetant le moyen de la partie appelante, actuelle partie demanderesse en cassation, soulevé d'une part dans son acte d'appel du 10 novembre 2015, sous le titre « II.C.2) immunité de juridiction >>, dans les termes suivants : << La Sentence Arbitrale est encore contraire à l'ordre public en ce que l'Etat de Roumanie bénéficie d'une immunité de juridiction et d'exécution, à moins que cet Etat n'y ait expressément renoncé. Or, en l'espèce, la Roumanie n'a jamais expressément renoncé à son immunité, de sorte que l'exécution de la Sentence violerait l'ordre public. >>, soulevé d'autre part à la page 20 de ses conclusions récapitulatives du 15 novembre 2019, dans les termes suivants : << Premièrement, le TBI a été implicitement écarté par l'adhésion de la Roumanie à l'Union Européenne. Deuxièmement et subsidiairement l'article 7 (5) cité par la partie M) soumet cette immunité à la condition qu'un consentement ait été fourni en application du paragraphe 2 du même article. Il appartient à la partie M) de fournir les éléments confirmant le respect des conditions de ce paragraphe 2. >>, déclarant ainsi l'appel non fondé, et condamnant l'Etat de Roumanie aux frais et dépens de l'instance d'appel, confirmant ainsi les Ordonnances d'exequatur ;*

*Alors qu'aux termes de l'article 89 de la Constitution, « Tout jugement est motivé. Il est prononcé en audience publique. >>, que << deux motifs contradictoires se détruisent et s'annihilent réciproquement, aucun d'entre eux ne pouvant alors être retenu comme fondement de la décision >> de sorte que, quant à la question de savoir si l'Etat de Roumanie pouvait valablement se prévaloir de son immunité d'exécution, pour soulever la nullité, sinon la réformation, sinon la révocation des Ordonnances, pour être contraires à l'ordre public, la Cour d'Appel aurait dû répondre par la positive, ce alors que les juges d'appel ont retenu, dans le même arrêt, qu'en introduisant une procédure en exéquatur au Luxembourg, M) y a << poursuivi (e) >> en réalité << l'exécution >> de la Sentence, assimilant ainsi l'exéquatur à l'exécution, partant l'arrêt entrepris est à déclarer comme n'étant pas motivé, au sens des dispositions de l'article 89 de la Constitution , et partant est à annuler pour contravention aux dispositions constitutionnelles précitées.».*

**Réponse de la Cour**

Le demandeur en cassation fait grief aux juges d'appel de s'être déterminés par des motifs contradictoires en ayant retenu, d'une part, que l'exequatur ne constitue pas un acte d'exécution et, d'autre part, que l'exécution de la sentence arbitrale était poursuivie au Luxembourg.

Le grief tiré de la contradiction de motifs, équivalant à un défaut de motifs, ne peut être retenu que si les motifs incriminés sont contradictoires à un point tel qu'ils se détruisent et s'annihilent réciproquement, aucun ne pouvant être retenu comme fondement de la décision.

Les juges d'appel ont d'abord écarté le moyen tiré de l'immunité d'exécution de l'ETAT DE ROUMANIE au motif que « *La procédure d'exequatur relève du domaine de l'immunité de juridiction et non du domaine de l'immunité d'exécution. En effet, l'exequatur ne constitue pas, en lui-même, un acte d'exécution de nature à provoquer l'immunité d'exécution de l'Etat considéré.* ».

Ils ont ensuite rejeté l'exception tirée de la violation de l'ordre public de l'Etat requis au motif qu'« *en cas d'application d'une convention internationale, comme en l'espèce la Convention de Washington, les dispositions de l'article 1251 ne s'appliquent pas et que le juge ne tient compte que des dispositions de la convention* ». Ils ont constaté que « *la Sentence a été rendue sous l'égide du CIRDI, en application de la Convention de Washington, à laquelle tant la Roumanie que le Luxembourg, Etat dans lequel l'exécution est poursuivie, sont parties. Ces deux pays n'ont jamais dénoncé cette Convention, qui est dès lors toujours en vigueur.* »

et retenu

« *qu'il résulte des articles 53 et 54 de la Convention de Washington que l'unique condition posée à l'obtention de l'exequatur d'une sentence arbitrale réside dans l'existence d'une sentence CIRDI, dont une copie certifiée conforme par le secrétaire général est à soumettre au juge de l'exequatur. Hormis cette condition, la Convention de Washington ne prévoit aucune cause de refus d'exequatur d'une sentence CIRDI.*

*Si l'ETAT de ROUMANIE soutient que l'article 54.-3) de la Convention de Washington (« L'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder ») renvoie au droit national luxembourgeois, ceci ne vaut que pour l'exécution des jugements. Or et tel qu'indiqué ci-dessus, l'exequatur ne constitue pas, en lui-même, un acte d'exécution.* ».

Les développements dans lesquels les juges d'appel ont retenu que la Convention de Washington lie « *tant la Roumanie que le Luxembourg, Etat dans lequel l'exécution est poursuivie...* » avaient pour seul objet de rechercher si cette convention continuait à lier les deux pays, de sorte que l'ajout litigieux selon lequel « *l'exécution est poursuivie au Luxembourg* », surabondant, ne constitue pas le soutien nécessaire à la décision des juges d'appel de rejeter la fin de non - recevoir tirée de l'immunité d'exécution invoquée par le demandeur en cassation, rejet basé sur le motif, rappelé après le passage critiqué, que « *l'exequatur ne constitue pas, en lui - même, un acte d'exécution de nature à provoquer l'immunité d'exécution de l'Etat considéré.* ».

Les juges d'appel ne se sont partant pas contredits.

Il s'ensuit que les moyens ne sont pas fondés.

**Sur le moyen d'office d'ordre public**

« tiré de la violation des articles 267 et 344 du Traité sur le fonctionnement de l'Union européenne (TFUE) et du principe de droit international public de l'immunité de juridiction des États étrangers, en ce que la Cour d'appel, saisie de l'appel contre une ordonnance ayant fait droit à une demande de reconnaissance, sur base de l'article 54 de la Convention pour le règlement des différends relatifs aux investissements entre États et ressortissants d'autres États, adoptée le 18 mars 1965 à Washington (la « Convention CIRDI »), de la sentence arbitrale n° ARB/05/20, rendue le 11 décembre 2013 par le Centre international pour le règlement des différends dans le cadre d'un litige entre, d'une part, différents investisseurs, dont M), et, d'autre part, la Roumanie, en exécution de la clause d'arbitrage prévue par l'article 7(5) du traité bilatéral d'investissement, conclu le 29 mai 2002, entre les Gouvernements de Suède et de Roumanie (« le TBI »), a écarté l'exception d'immunité de juridiction soulevée par la Roumanie aux motifs que « [a]u vu de la clause d'arbitrage, découlant de l'article 7(5) du TBI à laquelle l'ETAT de ROUMANIE a consenti, celui-ci est à considérer comme ayant expressément renoncé à son immunité de juridiction » , tout en ayant été saisie des questions « de la primauté du droit de l'Union sur le TBI depuis l'adhésion de la Roumanie à l'Union européenne » et « de la contrariété entre le TBI et le droit de l'Union européenne » , alors que, **première branche**, ainsi que la Cour de justice de l'Union européenne l'a dit pour droit dans son arrêt Achmea, du 6 mars 2018 (C-284/16, ECLI:EU:C:2018:158), les articles 267 et 344 TFUE s'opposent à une disposition contenue dans un accord international conclu entre les Etats membres aux termes de laquelle un investisseur de l'un de ces Etats membres peut, en cas de litige concernant des investissements dans l'autre Etat membre, introduire une procédure contre ce dernier Etat membre devant un tribunal arbitral, dont cet Etat membre s'est obligé à accepter la compétence et que, ainsi que la Cour de justice de l'Union européenne l'a constaté dans son arrêt Commission c/ European Food e.a., du 25 janvier 2022 (C-638/19 P, ECLI:EU:C:2022:50), le consentement que la Roumanie avait donné à la possibilité qu'un litige avec des investisseurs soit porté contre elle dans le cadre de la clause d'arbitrage prévue par l'article 7(5) du TBI est, à compter de l'adhésion de la Roumanie à l'Union européenne en date du 1er janvier 2007, « dépourvu de tout objet » (point 145 de l'arrêt précité) parce qu'il est contraire aux articles 267 et 344 TFUE, de sorte que ces articles s'opposent à déduire de l'article 7(5) du TBI une renonciation à l'immunité de juridiction et que, en procédant à cette déduction, la Cour d'appel a méconnu ces articles, et que, **seconde branche**, en déduisant la renonciation par la Roumanie à son immunité de juridiction du consentement donné par celle-ci à l'article 7(5) du TBI, tant bien même que, au regard des arrêts précités de la Cour de justice de l'Union européenne, ce consentement est contraire aux articles 267 et 344 TFUE et, à compter de l'adhésion de la Roumanie à l'Union européenne en date du 1er janvier 2007, « dépourvu de tout objet » (point 145 de l'arrêt précité Commission c/ European Food e.a., du 25 janvier 2022), la Cour d'appel a méconnu le principe de droit international public de l'immunité de juridiction des Etats étrangers. »

**Réponse de la Cour**

Vu les articles 267 et 344 du TFUE et le principe de l'immunité de juridiction des Etats étrangers.

Il résulte de l'arrêt attaqué que l'ETAT DE ROUMANIE avait invoqué devant les juges d'appel comme moyens de défense à la demande en reconnaissance de la sentence arbitrale tant son immunité de juridiction que la contrariété au droit de l'Union européenne de la clause d'arbitrage prévue à l'article 7(5) du traité bilatéral d'investissement (ci - après *« le TBI »*) liant le Royaume de Suède à l'Etat de Roumanie.

La contrariété aux articles 267 et 344 TFUE d'une clause d'arbitrage contenue dans un accord international liant deux Etats membres de l'Union européenne a été retenue par la CJUE dans l'arrêt *Slowakische Republik-Achmea* (ci-après *« Achmea »*) du 6 mars 2018 (C-284/16, ECLI:C:2018:158.), partant antérieurement au moment où les juges d'appel ont statué.

Dans l'arrêt *Achmea*, la CJUE a dit pour droit que *« les articles 267 et 344 TFUE doivent être interprétés en ce sens qu'ils s'opposent à une disposition contenue dans un accord international conclu entre les Etats membres* [de l'Union européenne] [...] *aux termes de laquelle un investisseur de l'un de ces Etats membres peut, en cas de litige concernant des investissements dans l'autre Etat membre, introduire une procédure contre ce dernier Etat membre devant un tribunal arbitral, dont cet Etat membre s'est obligé à accepter la compétence »*.

Dans l'arrêt *Commission c/ European Food, Victor M) e.a.* du 25 janvier 2022 (C-638/19 P, ECLI:EU:C:2022:50), la CJUE a dit pour droit que la solution retenue dans l'arrêt *Achmea* s'applique à la clause d'arbitrage prévue à l'article 7(5) du TBI précité (points 137 et 138).

Elle a rappelé que

*« par la conclusion d'un tel accord, les États membres parties à celui-ci consentent à soustraire à la compétence de leurs propres juridictions et, partant, au système de voies de recours juridictionnel que l'article 19, paragraphe 1, second alinéa, TUE leur impose d'établir dans les domaines couverts par le droit de l'Union, des litiges pouvant porter sur l'application ou l'interprétation de ce droit. Un tel accord est donc susceptible d'aboutir à une situation dans laquelle ces litiges ne seraient pas tranchés d'une manière garantissant la pleine efficacité dudit droit (arrêt du 26 octobre 2021, PL Holdings, C-109/20, EU:C:2021:875, point 45 et jurisprudence citée) »*,

aux motifs tirés *« d'une part,* [que] *ce tribunal arbitral ne constitue pas une << juridiction d'un des Etats membres >>, au sens de l'article 267 TFUE, et, d'autre part,* [que] *la sentence arbitrale prononcée par ce dernier n'est soumise, conformément aux articles 53 et 54 de la convention CIRDI, à aucun contrôle par une juridiction de l'Etat membre quant à sa conformité avec le droit de l'Union. »* (points 139 et 142).

La CJUE en a conclu que *« dès lors que, à compter de l'adhésion de la Roumanie à l'Union, le système des voies de recours juridictionnel prévu par les traités UE et FUE s'est substitué à cette procédure d'arbitrage, le consentement à cet effet donné par cet État est [...] dépourvu de tout objet. »* (point 145).

Les juges d'appel ont écarté la fin de non-recevoir tirée de l'immunité de juridiction de l'ETAT DE ROUMANIE opposée à la demande en reconnaissance de la sentence arbitrale au motif que le demandeur en cassation avait renoncé à invoquer l'immunité de juridiction en raison de son accord à voir toiser le différend en application de la clause d'arbitrage contenue à l'article 7(5) du TBI.

Dès lors cependant qu'à partir du 1er janvier 2007, date de l'adhésion de la Roumanie à l'Union européenne, le système des voies de recours juridictionnel propre à l'Union européenne s'est substitué à la procédure d'arbitrage du TBI liant le Royaume de Suède à l'Etat de Roumanie et que le consentement du demandeur en cassation à voir toiser le différend en application de la clause d'arbitrage y contenue est dépourvu de tout objet, les juges d'appel, en statuant comme ils l'ont fait, ont violé tant les articles 267 et 344 TFUE que le principe de droit international public de l'immunité de juridiction de l'ETAT DE ROUMANIE.

Il s'ensuit que l'arrêt encourt la cassation.

Il n'y a pas lieu à renvoi du litige devant la Cour d'appel, étant donné que l'immunité de juridiction de l'ETAT DE ROUMANIE paralyse l'exercice du pouvoir juridictionnel qui résulte de la compétence internationale des juridictions luxembourgeoises.

Le fait pour l'ETAT DE ROUMANIE de bénéficier de l'immunité de juridiction dans le cas d'espèce prive, certes, le défendeur en cassation M), tel qu'il le fait valoir dans sa note de plaidoiries, de la possibilité de voir reconnaître au Luxembourg la sentence arbitrale litigieuse.

L'article 6 de la Convention de sauvegarde des droits de l'homme et des libertés fondamentales ne s'oppose cependant pas à une limitation du droit d'accès à un tribunal, découlant de l'immunité des Etats étrangers, dès lors que cette limitation est consacrée par le droit international et ne va pas au-delà des règles de droit international généralement reconnues en matière d'immunité des Etats.

Il n'y a pas lieu, tel que le défendeur en cassation le fait encore valoir, de surseoir à statuer en attendant que la CJUE se soit prononcée sur le mérite d'une question préjudicielle dont elle a été saisie par la Cour d'appel de Bruxelles dans le cadre du litige opposant les mêmes parties, étant donné que la réponse à la question préjudicielle n'est pas susceptible d'influer sur la solution du présent litige.

**Sur les demandes en allocation d'une indemnité de procédure**

Au vu du sort réservé aux dépens, la demande de M) en allocation d'une indemnité de procédure est à rejeter.

Il n'est pas inéquitable de laisser à charge de la COMMISSION EUROPEENNE l'intégralité des frais exposés non compris dans les dépens de sorte que sa demande en allocation d'une indemnité de procédure est à rejeter.

**PAR CES MOTIFS,**

**la Cour de cassation :**

casse et annule, sans renvoi, l'arrêt numéro 15/21-VIII-Exequatur, rendu le 11 février 2021 sous le numéro 43054 du rôle par la Cour d'appel du Grand-Duché de Luxembourg, huitième chambre, siégeant en matière civile et d'exequatur ;

rejette les demandes en allocation d'une indemnité de procédure ;

condamne le défendeur en cassation M) aux dépens de l'instance en cassation ;

ordonne qu'à la diligence du procureur général d'Etat, le présent arrêt soit transcrit sur le registre de la Cour d'appel du Grand-Duché de Luxembourg et qu'une mention renvoyant à la transcription de l'arrêt soit consignée en marge de la minute l'arrêt annulé.

La lecture du présent arrêt a été faite en la susdite audience publique par le président Roger LINDEN en présence du premier avocat général Serge WAGNER et du greffier Daniel SCHROEDER.