# EXHIBIT 65



# Reports of Cases

## JUDGMENT OF THE COURT (Fifth Chamber)

### 14 March 2024*

(Failure of a Member State to fulfil obligations – Default procedure – Agreement on the withdrawal of the United Kingdom of Great Britain and Northern Ireland from the European Union and the European Atomic Energy Community – Article 127(1) – Transition period – Jurisdiction of the Court of Justice – Judgment of the Supreme Court of the United Kingdom – Enforcement of an arbitral award granting the payment of compensation – Decision of the European Commission declaring that that payment constitutes State aid which is incompatible with the internal market – Article 4(3) TEU – Sincere cooperation – Obligation to stay proceedings – First paragraph of Article 351 TFEU – International agreement between Member States and third countries concluded before the date of their accession to the European Union – Convention on the Settlement of Investment Disputes between States and Nationals of Other States (ICSID Convention) – Application of EU law – Article 267 TFEU – National court or tribunal adjudicating at last instance – Obligation to make a reference to the Court for a preliminary ruling – Article 108(3) TFEU – Suspension of implementation of the aid)

In Case C-516/22,

ACTION for failure to fulfil obligations under Article 258 TFEU, brought on 29 July 2022,

**European Commission**, represented by L. Armati, P.-J. Loewenthal and T. Maxian Rusche, acting as Agents,

applicant,

v

**United Kingdom of Great Britain and Northern Ireland**, represented by S. Fuller, acting as Agent,

defendant,

THE COURT (Fifth Chamber),

composed of E. Regan (Rapporteur), President of the Chamber, Z. Csehi, M. Ilešič, I. Jarukaitis and D. Gratsias, Judges,

Advocate General: N. Emiliou,

Registrar: A. Calot Escobar,

---

* Language of the case: English.



having regard to the written procedure,

after hearing the Opinion of the Advocate General at the sitting on 9 November 2023,

gives the following

## Judgment

1    By its application, the European Commission requests the Court to declare that, by the judgment of the Supreme Court of the United Kingdom of 19 February 2020 in *Micula* v *Romania* ('the judgment at issue'), the United Kingdom of Great Britain and Northern Ireland has failed to fulfil its obligations under Article 4(3) TEU, Article 108(3), the first and third paragraphs of Article 267 and the first paragraph of Article 351 TFEU, read in conjunction with Article 127(1) of the Agreement on the withdrawal of the United Kingdom of Great Britain and Northern Ireland from the European Union and the European Atomic Energy Community ('the Withdrawal Agreement'), adopted on 17 October 2019.

## Legal context

### *European Union law*

2    The Withdrawal Agreement, approved on behalf of the European Union and the European Atomic Energy Community (EAEC) by Council Decision (EU) 2020/135 of 30 January 2020 (OJ 2020 L 29, p. 1) entered into force on 1 February 2020, pursuant to Article 185 of that agreement.

3    Under Article 2(e) of the Withdrawal Agreement:

'For the purposes of this Agreement, the following definitions shall apply:

…

(e) "transition period" means the period provided in Article 126'.

4    Article 86 of that agreement, entitled 'Pending cases before the Court of Justice of the European Union', provides in paragraph 2 thereof:

'The Court of Justice of the European Union shall continue to have jurisdiction to give preliminary rulings on requests from courts and tribunals of the United Kingdom made before the end of the transition period.'

5    Article 87 of the Framework Agreement, entitled 'New cases before the Court of Justice', provides in paragraph 1 thereof:

'If the European Commission considers that the United Kingdom has failed to fulfil an obligation under the Treaties or under Part Four of this Agreement before the end of the transition period, the European Commission may, within 4 years after the end of the transition period, bring the matter before the Court of Justice of the European Union in accordance with the requirements laid down in

Article 258 TFEU or the second subparagraph of Article 108(2) TFEU, as the case may be. The Court of Justice of the European Union shall have jurisdiction over such cases.'

6    Article 126 of that agreement, entitled 'Transition period', provides:

'There shall be a transition or implementation period, which shall start on the date of entry into force of this Agreement and end on 31 December 2020.'

7    Article 127 of the Withdrawal Agreement, entitled 'Scope of the transition', is worded as follows:

'1.  Unless otherwise provided in this Agreement, Union law shall be applicable to and in the United Kingdom during the transition period.

…

3.  During the transition period, the Union law applicable pursuant to paragraph 1 shall produce in respect of and in the United Kingdom the same legal effects as those which it produces within the Union and its Member States, and shall be interpreted and applied in accordance with the same methods and general principles as those applicable within the Union.

…

6.  Unless otherwise provided in this Agreement, during the transition period, any reference to Member States in the Union law applicable pursuant to paragraph 1, including as implemented and applied by Member States, shall be understood as including the United Kingdom.'

### International law

#### The ICSID Convention

8    The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, concluded in Washington on 18 March 1965 ('the ICSID Convention'), which entered into force with regard to the United Kingdom on 18 January 1967 and with respect to Romania on 12 October 1975, provides in Article 53(1):

'The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award …'

9    Article 54(1) of that convention provides:

'Each Contracting State shall recognise an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State. …'

10   Article 64 of the ICSID Convention states:

'Any dispute arising between Contracting States concerning the interpretation or application of this Convention which is not settled by negotiation shall be referred to the International Court of Justice

by the application of any party to such dispute, unless the States concerned agree to another method of settlement.'

11    Article 69 of that convention is worded as follows:

'Each Contracting State shall take such legislative or other measures as may be necessary for making the provisions of this Convention effective in its territories.'

### The BIT

12    The Bilateral Investment Treaty, concluded on 29 May 2002, between the Government of the Kingdom of Sweden and Romania on the Promotion and Reciprocal Protection of Investments ('the BIT'), which entered into force on 1 April 2003, provides, in Article 2(3) thereof:

'Each Contracting Party shall at all times ensure fair and equitable treatment of the investments by investors of the other Contracting Party and shall not impair the management, maintenance, use, enjoyment or disposal thereof […] through unreasonable or discriminatory measures.'

13    Article 7 of the BIT states that any dispute between investors and the Contracting Parties is to be settled, inter alia, by an arbitral tribunal which applies the ICSID Convention.

## Background to the dispute

### The arbitration proceedings

14    On 22 February 2005, Romania repealed, with a view to its accession to the European Union, a regional aid scheme in the form of tax incentives ('the aid scheme at issue').

15    On 28 July 2005, Mr Ioan Micula and Mr Viorel Micula, Swedish citizens, and European Food SA, Starmill SRL and Multipack SRL ('the investors'), companies they controlled, requested, in accordance with Article 7 of the BIT, the establishment of an arbitral tribunal under the ICSID Convention, in order to obtain compensation for the damage they allegedly sustained from the repeal of the aid scheme at issue from which they had benefited prior to that repeal.

16    In its arbitral award of 11 December 2013 ('the arbitral award'), delivered after Romania's accession to the European Union on 1 January 2007, the arbitral tribunal found that, by repealing the aid scheme at issue, Romania had breached the legitimate expectations of the investors, who thought that the tax incentives at issue would be available until 31 March 2009, had failed to act transparently by failing to inform the investors in a timely manner and had failed to ensure fair and equitable treatment of their investments within the meaning of Article 2(3) of the BIT. Consequently, the arbitral tribunal ordered Romania to pay the investors, by way of compensation, the sum of Romanian lei (RON) 791 882 452 (approximately EUR 178 million), that sum being fixed by taking into account principally the loss allegedly suffered by the investors in the period from 22 February 2005 until 31 March 2009.

17    Since 2014, the investors have sought recognition and enforcement of the arbitral award in Belgium, France, Luxembourg, Sweden, the United Kingdom and the United States of America. The Commission has intervened in all of those proceedings to oppose recognition and enforcement.

***The procedure before the Commission***

18    On 26 May 2014, the Commission adopted Decision C(2014) 3192 final (State aid SA.38517 (2014/NN) – Romania – Arbitral award *Micula* v *Romania* of 11 December 2013 – Injunction to Suspend Aid) ('the suspension injunction'), obliging Romania immediately to suspend any action that might lead to the implementation or execution of the arbitral award, on the ground that such action appeared to constitute unlawful State aid granted in breach of Article 108(3) TFEU, until the Commission had taken a final decision on the compatibility of that measure with the internal market.

19    On 1 October 2014, the Commission adopted Decision 2014/C 393/03 (State aid – Romania – State aid SA.38517 (2014/C) (ex 2014/NN) – Implementation of Arbitral award *Micula* v *Romania* of 11 December 2013 – Invitation to submit comments pursuant to Article 108(2) TFEU (OJ 2014 C 393, p. 27)) ('the opening decision'), by which the Commission informed Romania of the initiation of the formal investigation procedure laid down in Article 108(2) TFEU in respect of the partial implementation of the arbitral award by Romania that took place in early 2014 as well as in respect of any further implementation or execution of that award.

20    On 30 March 2015, the Commission adopted Commission Decision (EU) 2015/1470 of 30 March 2015 on State aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania – Arbitral award *Micula* v *Romania* of 11 December 2013 (OJ 2015 L 232, p. 43) ('the final decision').

21    Under the heading 'The application of the State aid rules does not affect rights and obligations protected by Article 351 of the Treaty', recitals 126 to 129 of that decision, which correspond, in essence, to paragraphs 51 to 54 of the opening decision, are worded as follows:

'(126)    Article 351 [TFEU] provides that "[t]he rights and obligations arising from agreements concluded […] for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties". In the present case, the rights and obligations on which the [investors] rely are those arising from the BIT.

(127)    It is clear from the wording of Article 351 [TFEU] that it does not apply in the present case, since the BIT is a treaty concluded between two Member States of the Union, Sweden and Romania, and not a treaty "between one or more Member States on the one hand, and one or more third countries on the other". Accordingly, the application of State aid law in the present case does not affect rights and obligation protected under Article 351 [TFEU].

(128)    In this context, the Commission recalls that different rules apply under Union law to intra-EU BITs, on the one hand, and BITs concluded between a Member State of the Union and a third country, on the other. In the case of intra-EU BITs, the Commission takes the view that such agreements are contrary to Union law, incompatible with provisions of the Union Treaties and should therefore be considered invalid. …

(129)    Romania is also a party to the … ICSID Convention, to which it has acceded prior to its accession to the Union. However, because no third country Contracting Party to the ICSID Convention is party to the BIT involved in the present proceedings, Article 351 [TFEU] is not relevant for this case.'

22    As regards the operative part of the final decision, Article 1 thereof provides that the payment of the compensation awarded by the arbitral award to the single economic unit comprising the investors, European Drinks, Rieni Drinks, Scandic Distilleries, Transilvania General Import-Export and West Leasing International constitutes 'State aid' within the meaning of Article 107(1) TFEU which is incompatible with the internal market.

23    Pursuant to Article 2 of that decision, Romania is required not to pay out any incompatible aid referred to in Article 1 of the decision and to recover such aid which has already been paid out to the entities comprising that economic unit as well as any aid paid out to those entities which was not notified to the Commission pursuant to Article 108(3) TFEU, and any aid paid out after the date of that decision.

### Proceedings before the Courts of the European Union

24    By judgment of 18 June 2019, *European Food and Others* v *Commission* (T-624/15, T-694/15 and T-704/15, EU:T:2019:423), the General Court annulled the final decision in its entirety on the ground, in essence, that the Commission was not competent *ratione temporis* to adopt that decision under Article 108 TFEU ('the judgment of the General Court').

25    In particular, the General Court held, in paragraphs 91 and 92 of that judgment, that since the Commission had not made a distinction, as regards the amounts to be recovered, between those falling within the period prior to Romania's accession to the European Union and those falling within the period after that accession, it had exceeded its powers in the area of State aid review, by retroactively applying the powers which it holds under Article 108 TFEU to events predating Romania's accession; the Commission could not, therefore, classify the payment of compensation granted by the arbitral award as 'State aid' within the meaning of Article 107(1) TFEU.

26    In that regard the General Court held, in paragraphs 98 to 111 of that judgment that since EU law did not apply *ratione temporis* and the Commission lacked competence under Article 108 TFEU, the final decision, which failed to make any distinction between the amounts to be recovered according to whether they relate to the period prior to or after the accession in question, is unlawful in so far as it classifies the award of that compensation as an 'advantage' and 'State aid' within the meaning of Article 107(1) TFEU, at least in respect of the period predating the entry into force of EU law in Romania.

27    On 27 August 2019, the Commission lodged an appeal before the Court of Justice seeking to have the judgment of the General Court set aside.

### The proceedings before the United Kingdom courts

28    On 17 October 2014, the arbitral award was registered in the High Court of Justice (England & Wales) (United Kingdom) pursuant to the Arbitration (International Investment Disputes) Act 1966, which implements the ICSID Convention in the United Kingdom.

29    On 20 January 2017, that court dismissed Romania's application to set aside that registration. By contrast, it stayed enforcement of the arbitral award pending determination of the proceedings before the Courts of the European Union.

30    On 27 July 2018, the Court of Appeal (England & Wales) (United Kingdom) found that the United Kingdom courts were barred, on the basis of the principle of sincere cooperation laid down in Article 4(3) TEU, from ordering immediate enforcement of the arbitral award, so long as a Commission decision prohibited Romania from paying the compensation granted by the arbitral award. On that basis, the Court of Appeal (England & Wales) dismissed the appeal brought by the investors against the stay of enforcement of the arbitral award which the High Court of Justice (England & Wales) had ordered.

31    On 19 February 2020, the Supreme Court of the United Kingdom ordered, by the judgment at issue, enforcement of the arbitral award. The Commission participated in those proceedings as an intervener.

### The judgment at issue

32    By the judgment at issue, the Supreme Court of the United Kingdom first of all rejected, in paragraphs 41 to 57 thereof, the investors' plea that the judgment of the General Court meant that the United Kingdom courts were no longer required, by virtue of the obligation of sincere cooperation, to stay enforcement of the arbitral award. In that regard, the Supreme Court of the United Kingdom held, in paragraph 56 of its judgment, that it was concerned with potentially conflicting decisions on the same subject matter between the same parties, that it was not possible for it to conclude that there was scarcely any risk of conflict between those decisions, that if the conflict between different decisions materialised, the consequence thereof would be a substantial impediment to the operation of EU law, and that the existence of a pending appeal to the Court of Justice was, in principle, sufficient to trigger the obligation of sincere cooperation.

33    By contrast, in paragraphs 58 to 118 of the judgment at issue, the Supreme Court of the United Kingdom upheld the investors' plea that the first paragraph of Article 351 TFEU was applicable to the United Kingdom's obligations under the ICSID Convention, with the result that they are not subject to the mandatory effects of EU law. According to that court, in order to determine whether that provision applies in any particular case, it will be necessary to construe the prior international agreement at issue in order to ascertain whether it imposes on the Member State concerned obligations the performance of which may be required by third countries which are parties to it.

34    In the present case, it is, in its view, clear that the United Kingdom's obligation to enforce the arbitral award under Articles 54 and 69 of the ICSID Convention is owed not only to the Kingdom of Sweden, but also to all the other Contracting States to that convention, for the following reasons, which were set out in paragraphs 104 to 107 of the judgment at issue:

    –  first, the ICSID Convention's scheme is based upon mutual trust and confidence and depends on the participation and compliance of every Contracting State with regard to the rules laid down by that convention;

    –  secondly, it appears from Articles 53, 54 and 69 of the ICSID Convention that the obligations which it lays down are expressed in unqualified terms, without limit, and that the remedy provided for in Article 64 of that convention is open to each Contracting State;

    –  thirdly, the purpose of the ICSID Convention points to a network of mutual enforcement obligations from which a Contracting State cannot expressly derogate and which, if foregone, transfers the burden of enforcement to another Contracting State;

–   fourthly, it is apparent from the *travaux préparatoires* that if a Contracting State were to fail to fulfil its obligations under the ICSID Convention, the other Contracting States could take appropriate action.

35   In the view of the Supreme Court of the United Kingdom, as the obligation of sincere cooperation is not applicable in the present case, the United Kingdom courts are not obliged to decline to rule on the question of the effects of the ICSID Convention by staying the national proceedings pending the outcome of the proceedings pending before the Courts of the European Union, or by referring a question to the Court of Justice for a preliminary ruling, for the following reasons, set out in paragraphs 112 to 114 of the judgment at issue:

–   first, as a matter of EU law, questions as to the existence and extent of obligations stemming from prior agreements under the first paragraph of Article 351 TFEU are not reserved to the Courts of the European Union. Such questions are not governed by EU law and the Court of Justice was in no better position than a national court to answer them;

–   secondly, the Article 351 TFEU issue raised before the Supreme Court of the United Kingdom by the investors was not entirely the same as that raised before the Courts of the European Union. Before those courts, the investors claimed, inter alia, that Article 351 TFEU afforded primacy to Romania's pre-existing international obligations flowing from the BIT and from Article 53 of the ICSID Convention. By contrast, in the United Kingdom proceedings the relevant legal issue was the United Kingdom's obligations to implement the ICSID Convention and to recognise and enforce the arbitral award under Articles 54 and 69 of the ICSID Convention. The latter was an issue which, because it was specific to the proceedings in the United Kingdom, had not been raised before the Courts of the European Union;

–   thirdly, the prospect of one the Courts of the European Union addressing the applicability of Article 351 TFEU to Romania's pre-accession obligations under the ICSID Convention in relation to the arbitral award was remote. The General Court did not rule on the plea alleging infringement of the first paragraph of Article 351 TFEU and, as a consequence, the appeal pending before the Court of Justice was limited to other issues. Therefore, if the appeal were dismissed, the question of the application of the first paragraph of Article 351 TFEU would not be examined by the Courts of the European Union. If, on the other hand, the appeal were upheld, the case would be referred back to the General Court, with the result that that question, as regards Romania's obligations, could be examined by the Courts of the European Union.

**Pre-litigation procedure**

36   On 3 December 2020, the Commission sent the United Kingdom a letter of formal notice concerning the judgment at issue, in which it alleged that the United Kingdom had infringed, respectively, Article 4(3) TEU, Article 108(3), the first and third paragraphs of Article 267 and the first paragraph of Article 351 TFEU, read in conjunction with Article 127(1) of the Withdrawal Agreement.

37   By letter of 1 April 2021, the United Kingdom responded to that letter of formal notice, contesting all of the breaches set out by the Commission.

38    On 15 July 2021, taking the view that the arguments raised in that response were not sufficient to alter its analysis, the Commission sent its reasoned opinion to the United Kingdom, in which it concluded that, as a result of the judgment at issue, the United Kingdom had infringed the provisions referred to in its letter of formal notice.

39    By letter of 23 August 2021, the United Kingdom asked the Commission for an extension of the deadline for responding to the reasoned opinion, which was granted. However, the United Kingdom did not ultimately respond to the reasoned opinion.

**Developments subsequent to the reasoned opinion**

40    By judgment of 25 January 2022, *Commission* v *European Food and Others* (C-638/19 P, EU:C:2022:50), the Court of Justice set aside the judgment of the General Court, on the ground, apparent from paragraphs 115 to 136 of that judgment of the Court of Justice, that the General Court erred in law when it held that the Commission lacked competence *ratione temporis* to adopt the final decision under Article 108 TFEU, given that the entitlement to the State aid covered by that decision had been granted by the arbitral award after Romania's accession to the European Union. The Court of Justice added, in paragraphs 137 to 145 of that judgment, that, moreover, the General Court also erred in law when it held that the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158) is irrelevant for the present case, since the system of judicial remedies laid down by the EU and FEU Treaties had replaced the arbitration procedure at issue as from that accession. The Court of Justice referred the case back to the General Court for it to adjudicate on the pleas and arguments raised before it on which the Court of Justice had not given a ruling. That case, registered under numbers T-624/15 RENV, T-694/15 RENV and T-704/15 RENV, is pending before the General Court.

41    By order of 21 September 2022, *Romatsa and Others* (C-333/19, EU:C:2022:749), the Court of Justice held, in paragraphs 42 and 43 thereof, that it followed from the judgments of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158) and of 25 January 2022, *Commission* v *European Food and Others* (C-638/19 P, EU:C:2022:50), that the arbitral award was incompatible with Articles 267 and 344 TFEU, with the result that it could not produce any effect. Consequently, the Court of Justice ruled, in paragraph 44 of that order, that a court or tribunal of a Member State seised of the enforcement of that arbitral award is obliged to refrain from applying that award and, therefore, cannot in any event proceed with its enforcement in order to enable its beneficiaries to obtain payment of the compensation which it awarded to them.

42    By order of 24 November 2022, *European Food and Others* (C-333/19 REC, EU:C:2022:936), the Court also rejected the request for the order in that case to be withdrawn or rectified and for removal of Case C-333/19 from the register.

**The procedure before the Court**

43    On 29 July 2022, the Commission brought the present action.

44    Since the application lodged by the Commission for that purpose had been duly served on the United Kingdom, but the latter had not lodged a defence, within the meaning of Article 124(1) of the Rules of Procedure of the Court of Justice, by the expiry of the time limit prescribed for responding to the application, set at 14 October 2022, and since the United Kingdom had

informally confirmed to the Registry that it did not intend to participate in the proceedings at that stage, the Commission applied to the Court, in accordance with Article 152(1) of the Rules of Procedure of the Court, for judgment by default.

45  On 14 February 2023, the Court asked the Commission whether, in the light of the particular context of the present case, it was prepared to accept that the United Kingdom should be granted a new time limit for lodging its defence, the Court stating that it would apply Article 152 of the Rules of Procedure only in the absence of a response from the United Kingdom at the expiry of that new time limit.

46  By letter of 3 March 2023, the Commission informed the Court that, given the particular circumstances of this case, it would not oppose a new time limit being set for the United Kingdom to lodge a defence, adding that this should not in any way constitute a precedent for other cases.

47  By letter of 8 March 2023, the Court therefore stated to the United Kingdom that if it wished to avail itself of the opportunity, offered in agreement with the Commission, to lodge a defence notwithstanding the failure to lodge such a defence within the initial period, the Commission would not request the Court to give judgment in the present case by default, pursuant to Article 152 of the Rules of Procedure. Consequently, the Court informed the United Kingdom that it could lodge a defence within two months of service of that letter, extended on account of distance by 10 days provided for in Article 51 of those Rules of Procedure, while requesting the United Kingdom, should it decide not to avail itself of that opportunity, to inform it as soon as possible, in which case the written procedure would once again be closed and the default procedure would follow its normal course.

48  By letter of 20 April 2023, the United Kingdom stated to the Court that it confirmed that it did not intend to lodge a defence in the present case, despite the new time limit having been set.

49  It is, accordingly, for the Court to give judgment by default, pursuant to Article 41 of the Statute of the Court of Justice of the European Union and Article 152 of the Rules of Procedure. Since the admissibility of the action is beyond doubt, it is, therefore, for the Court, in accordance with Article 152(3) of those rules, to ascertain whether the Commission's claims appear well founded.

**The jurisdiction of the Court of Justice**

50  As a preliminary point, it should be recalled that, in accordance with Article 87(1) of the Withdrawal Agreement, the Court is to have jurisdiction in actions brought before it by the Commission under Article 258 TFEU within four years after the end of the transition period, which, under Article 2(e) of that agreement, read in conjunction with Articles 126 and 185 of that agreement, extended from 1 February 2020 to 31 December 2020 ('the transition period'), where the Commission considers that the United Kingdom has failed to fulfil an obligation under the Treaties before the end of that transition period.

51  Consequently, since the failure to fulfil obligations of which the United Kingdom is accused in the present action arises, as is apparent from paragraph 1 above, from the judgment at issue, delivered on 19 February 2020 during the transition period, and the present action was brought by the Commission on 29 July 2022, during the four-year period following the end of that transition period, the Court has jurisdiction over that action.

**Substance**

52  In support of its action, the Commission raises four complaints, alleging an infringement by the United Kingdom, first, of Article 4(3) TEU, secondly, of the first paragraph of Article 351 TFEU, thirdly, of the first and third paragraphs of Article 267 TFEU and, fourthly, of Article 108(3) TFEU, read in conjunction with Article 127(1) of the Withdrawal Agreement, with each of those infringements resulting, according to the Commission, from the judgment at issue.

53  For the purposes of examining those complaints, it should be noted at the outset that, in accordance with Article 127(6) of the Withdrawal Agreement, the United Kingdom – even if the failure to fulfil obligations of which it is accused is subsequent to its withdrawal from the European Union, as pointed out in paragraph 51 above, although prior to the expiry of the transition period – must be regarded for the purposes of examining the complaints raised by the Commission in support of its action as a 'Member State', and not as a third country, with Article 127(1) stating, moreover, that EU law was applicable to the United Kingdom during that transition period.

54  According to the Court's settled case-law, the obligation of the Member States to comply with the provisions of the FEU Treaty is binding on all their authorities, including, for matters within their jurisdiction, the courts. Thus, a Member State's failure to fulfil obligations may, in principle, be established under Article 258 TFEU whatever the agency of that State whose action or inaction is the cause of the failure to fulfil its obligations, even in the case of a constitutionally independent institution (judgment of 28 January 2020, *Commission* v *Italy (Directive combating late payment)*, C-122/18, EU:C:2020:41, paragraph 55 and the case-law cited).

55  It is appropriate to assess the merits of the complaints raised by the Commission in the light of those considerations, by examining, first, the second of those complaints.

***The second complaint, alleging an infringement of the first paragraph of Article 351 TFEU, read in conjunction with Article 127(1) of the Withdrawal Agreement***

*The applicant's arguments*

56  The Commission submits that the United Kingdom infringed the first paragraph of Article 351 TFEU, read in conjunction with Article 127(1) of the Withdrawal Agreement, in that, by misinterpreting and misapplying the concepts of 'the rights [of] one or more third countries' and 'affected by the provisions of the Treaties', the Supreme Court of the United Kingdom held, in the judgment at issue, that EU law did not apply to the United Kingdom's obligation to enforce the arbitral award pursuant to Article 54 of the ICSID Convention.

57  First, that obligation does not involve any right of one or more third countries, since the present case concerns only Member States and their nationals. Secondly, no obligation of the United Kingdom under the ICSID Convention was affected by the EU Treaties in so far as the relevant provisions of that convention could be interpreted in such a way as to ensure that there is no conflict with the relevant rules of EU law.

*Findings of the Court*

58    It must be borne in mind that, according to the first paragraph of Article 351 TFEU, the rights and obligations arising from international agreements before the date of accession to the European Union, concluded between one or more Member States on the one hand, and one or more third countries on the other, are not to be affected by the provisions of the Treaties.

59    According to the settled case-law of the Court, the purpose of the first paragraph of Article 351 TFEU is to make clear, in accordance with the principles of international law, that application of the EU Treaties does not affect the commitment of the Member State concerned to respect the rights of third countries under a prior international agreement and to comply with its corresponding obligations (see, in particular, judgments of 14 October 1980, *Burgoa*, 812/79, EU:C:1980:231, paragraph 8, and of 9 February 2012, *Luksan*, C-277/10, EU:C:2012:65, paragraph 61). That provision is of general scope, in that it applies to any international agreement, irrespective of subject matter, which is capable of affecting the EU Treaties (see, to that effect, judgment of 2 August 1993, *Levy*, C-158/91, EU:C:1993:332, paragraph 11).

60    The first paragraph of Article 351 TFEU has, therefore, the aim of protecting the rights of third countries (judgment of 13 July 1966, *Consten and Grundig* v *Commission*, 56/64 and 58/64, EU:C:1966:41, p. 346), by permitting the Member States concerned to perform their obligations under a prior international agreement (see, to that effect, judgment of 21 December 2011, *Air Transport Association of America and Others*, C-366/10, EU:C:2011:864, paragraph 61).

61    That provision does not, however, authorise the Member States to exercise rights under such agreements in their internal relations within the European Union (see, to that effect, judgments of 2 July 1996, *Commission* v *Luxembourg*, C-473/93, EU:C:1996:263, paragraph 40, and of 7 July 2005, *Commission* v *Austria*, C-147/03, EU:C:2005:427, paragraph 58).

62    It follows that, in the first paragraph of Article 351 TFEU, the terms 'rights and obligations' refer, as regards 'rights', to the rights of non-member countries and, as regards 'obligations', to the obligations of Member States (judgments of 27 February 1962, *Commission* v *Italy*, 10/61, EU:C:1962:2, p. 10, and of 2 August 1993, *Levy*, C-158/91, EU:C:1993:332, paragraph 12).

63    Consequently, in order to determine whether a rule of EU law may be deprived of effect by a prior international agreement pursuant to that provision, it is necessary to examine whether that agreement imposes on the Member State concerned obligations whose performance may still be required by non-member countries which are parties to it (see in particular, judgments of 2 August 1993, *Levy*, C-158/91, EU:C:1993:332, paragraph 13, and of 15 September 2011, *Commission* v *Slovakia*, C-264/09, EU:C:2011:580, paragraph 42).

64    Thus, for a rule of EU law to be deprived of effect as a result of an international agreement, pursuant to the first paragraph of Article 351 TFEU, two conditions must be fulfilled: the agreement must have been concluded before the entry into force of the EU Treaties in the Member State concerned and the third country concerned must derive from it rights which it can require the Member State concerned to respect (see, to that effect, judgment of 10 March 1998, *T. Port*, C-364/95 and C-365/95, EU:C:1998:95, paragraph 61).

65   That provision cannot, therefore, be relied on by the Member States where, in the particular case under consideration, the rights of non-member countries are not involved (see, to that effect, judgment of 22 September 1988, *Deserbais*, 286/86, EU:C:1988:434, paragraph 18, and of 6 April 1995, *RTE and ITP* v *Commission*, C-241/91 P and C-242/91 P, EU:C:1995:98, paragraph 84).

66   It is in the light of those principles that it is appropriate to examine the merits of the second complaint, by which the Commission submits that the United Kingdom infringed the first paragraph of Article 351 TFEU on the ground that, in the judgment at issue, the Supreme Court of the United Kingdom misinterpreted and misapplied that provision.

67   In that regard, it should be recalled that by that judgment that court held, in essence, that the first paragraph of Article 351 TFEU was applicable to the United Kingdom's obligation under the ICSID Convention, in particular Article 54 thereof, to enforce the arbitral award, with the result that, since it was inapplicable, EU law, in particular Articles 107 and 108 TFEU – which the Commission applied to that award in the suspension injunction, the opening decision and the final decision – could not preclude the national courts of the Member States from enforcing that award.

68   In order to assess whether, as the Commission maintains, such an interpretation and such an application of the first paragraph of Article 351 TFEU are erroneous, it should be noted, in the first place, that it is established that the ICSID Convention, to which the European Union is not a party and which therefore does not form part of EU law, is a multilateral treaty which was concluded by the United Kingdom, before its accession to the European Union, with both Member States and third countries and that, consequently, that international agreement is capable of falling within the scope of the first paragraph of Article 351 TFEU, which is a provision of EU law in respect of which the Court has exclusive jurisdiction to give a definitive interpretation (see, to that effect, judgment of 2 September 2021, *Republic of Moldova*, C-741/19, EU:C:2021:655, paragraph 45).

69   As is apparent from the case-law of the Court, recalled in paragraphs 59 to 65 above, the mere fact that a prior international agreement has been concluded by a Member State with third countries is not, however, sufficient to trigger the application of that provision, since such international agreements may be relied upon in relations between Member States only where those third countries derive, in the circumstances of the case, rights which they can require the Member State concerned to respect.

70   It is, therefore, appropriate to examine, in the second place, whether the ICSID Convention, as regards the enforcement of the arbitral award, imposes on the United Kingdom obligations which it is bound to fulfil towards third countries and which those countries are entitled to rely upon as against the United Kingdom, for the purposes of the first paragraph of Article 351 TFEU.

71   In that regard, it should be recalled that, by the arbitral award, an arbitral tribunal established under the ICSID Convention, pursuant to the arbitration clause provided for in the BIT concluded between the Kingdom of Sweden and Romania before Romania's accession to the European Union, ordered Romania to pay compensation to the investors – Swedish nationals and companies controlled by them – as reparation for the damage allegedly suffered by them as a result of the repeal by Romania, in alleged breach of that BIT, of a regional aid scheme, before Romania's accession to the European Union.

72    In accordance with the case-law of the Court, such a bilateral treaty must, since Romania's accession to the European Union, be regarded as a treaty concerning two Member States (see, by analogy, judgment of 8 September 2009, *Budějovický Budvar*, C-478/07, EU:C:2009:521, paragraphs 97 and 98).

73    It follows that, by the dispute which the investors submitted to the Supreme Court of the United Kingdom in the present case, it was sought to impose on one Member State, the United Kingdom, the obligation to enforce, pursuant to the ICSID Convention, an arbitral award in order to ensure compliance by another Member State, in this case Romania, with its obligations under the BIT vis-à-vis a final Member State, namely the Kingdom of Sweden.

74    It is, therefore, apparent that that dispute concerned the alleged obligation of the United Kingdom to comply with the provisions of the ICSID Convention, vis-à-vis the Kingdom of Sweden and its nationals and, accordingly, the alleged right of the latter to require the United Kingdom to comply with those provisions.

75    By contrast, a third country does not appear entitled to require the United Kingdom to enforce the arbitral award pursuant to the ICSID Convention. Indeed, for the reasons set out by the Advocate General in points 133 to 137 of his Opinion, and as the Commission has argued in support of the present complaint, that international agreement, despite its multilateral nature, is intended to govern bilateral relations between the contracting parties in an analogous way to a bilateral treaty (see, by analogy, judgment of 2 September 2021, *Republic of Moldova*, C-741/19, EU:C:2021:655, paragraph 64).

76    In that regard, it must, in particular, be observed that although the Supreme Court of the United Kingdom concluded, in paragraphs 104 to 108 of the judgment at issue, that there was such a right on which third countries could rely vis-à-vis the United Kingdom, the fact remains, as the Advocate General observed in points 147 to 149 of his Opinion, that that national court confines itself, in essence, to making clear that third countries that have concluded the ICSID Convention could have an interest in a Member State, such as the United Kingdom, complying with its obligations vis-à-vis another Member State by enforcing, in accordance with the provisions of that convention, an arbitral award falling within its scope. However, such a purely factual interest cannot be equated with a 'right', within the meaning of the first paragraph of Article 351 TFEU, capable of justifying the application of that provision.

77    By contrast, it must be held that, in the judgment at issue, the Supreme Court of the United Kingdom failed to examine the fundamental question of the extent to which a third country could, in particular, under Article 64 of the ICSID Convention, engage the international liability of the United Kingdom for failure to fulfil its obligations under that convention in the context of the enforcement of an arbitral award made at the conclusion of a dispute between Member States.

78    However, it is important to note that the first paragraph of Article 351 TFEU is a rule which may, where its conditions of application are met, allow derogations from the application of EU law, including primary law (judgment of 28 October 2022, *Generalstaatsanwaltschaft München (Extradition and* ne bis in idem), C-435/22 PPU, EU:C:2022:852, paragraph 119 and the case-law cited).

79    That provision is thus capable of having a considerable impact on the EU legal order, since it makes it possible, as the Advocate General stated in points 140 and 175 of his Opinion, to derogate from the principle of the primacy of EU law (see, to that effect, judgment of

28 March 1995, *Evans Medical and Macfarlan Smith*, C-324/93, EU:C:1995:84, paragraphs 26 to 28), that principle being one of the essential characteristics of that law (see, in particular, judgment of 2 September 2021, *Republic of Moldova*, C-741/19, EU:C:2021:655, paragraph 43 and the case-law cited).

80  In that context, it must be observed that were the judgment at issue followed, all the Member States which concluded the ICSID Convention before their accession to the European Union, which is the case for most of them, could, by relying on the first paragraph of Article 351 TFEU, be in a position to remove disputes concerning EU law from the judicial system of the European Union by entrusting them to the arbitral tribunals established under that convention. However, it follows from the Court's case-law, as enshrined in the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158), that the system of judicial remedies provided for by the EU and FEU Treaties replaced the arbitration procedures established between the Member States (judgment of 25 January 2022, *Commission* v *European Food and Others*, C-638/19 P, EU:C:2022:50, paragraph 145).

81  The first paragraph of Article 351 TFEU must therefore, in accordance with the Court's case-law, be interpreted strictly, so that the general rules laid down by the EU Treaties are not negated (see, to that effect, judgment of 28 October 2022, *Generalstaatsanwaltschaft München (Extradition and* ne bis in idem), C-435/22 PPU, EU:C:2022:852, paragraph 120).

82  In those circumstances, the Supreme Court of the United Kingdom was in any event required, before reaching the conclusion that EU law, by virtue of the first paragraph of Article 351 TFEU, is not applicable to the United Kingdom's obligation under the ICSID Convention to enforce the arbitral award, to examine in detail whether such an obligation, despite relating to an award declaring that a Member State has infringed a bilateral treaty concluded with another Member State, also entails rights which third countries might rely on as against those States.

83  Such a detailed examination, taking into account the principle that any exception to the primacy of EU law must be interpreted strictly, is, however, lacking in the judgment at issue, which cannot, therefore, call into question the considerations arising from paragraphs 73 to 75 above.

84  Accordingly, it must be held, without there being any need to examine the Commission's arguments concerning the scope of the expression 'affected by the provisions of the Treaties' in the first paragraph of Article 351 TFEU, that the Supreme Court of the United Kingdom, by the judgment at issue, misinterpreted and misapplied that provision by conferring on it a broad scope, in the sense that it was applicable to the United Kingdom's obligation, under the ICSID Convention, to enforce the arbitral award, so that since EU law was inapplicable, it could not preclude that enforcement.

85  However, it cannot be accepted that a national court or tribunal, still less so a court or tribunal against whose decisions there is no judicial remedy under national law, such as in the present case the Supreme Court of the United Kingdom, may adopt an erroneous interpretation of EU law, the object and effect of which is deliberately to exclude the application of EU law in its entirety.

86  Such an interpretation, which, as is already apparent from paragraphs 78 and 79 above, has the effect of setting aside the principle of the primacy of EU law, that principle being one of the essential characteristics of that law, is such as to call into question the consistency, full effect and

autonomy of EU law as well as, ultimately, the particular nature of the law established by the Treaties (see, to that effect, judgment of 2 September 2021, *Republic of Moldova*, C-741/19, EU:C:2021:655, paragraph 46 and the case-law cited).

87    It follows from this that, by the judgment at issue, the Supreme Court of the United Kingdom seriously compromised the EU legal order.

88    Consequently, the second complaint, alleging an infringement of the first paragraph of Article 351 TFEU, read in conjunction with Article 127(1) of the Withdrawal Agreement, must be upheld.

### The first complaint, alleging an infringement of Article 4(3)TEU, read in conjunction with Article 127(1) of the Withdrawal Agreement

#### The applicant's arguments

89    By its first complaint, the Commission submits that the United Kingdom infringed Article 4(3) TEU, read in conjunction with Article 127(1) of the Withdrawal Agreement, on the ground that the Supreme Court of the United Kingdom, by the judgment at issue, ruled on the interpretation of the first paragraph of Article 351 TFEU and the application of that provision to the implementation of the arbitral award, even though the matter relating to that interpretation had been decided in a Commission decision and was awaiting adjudication before the Courts of the European Union.

90    Where a national court is seised of a case that is already the subject matter of a Commission investigation or proceedings before the Courts of the European Union, the obligation of sincere cooperation requires that national court to stay the case before it, unless there is scarcely any risk of conflict between its future judgment and the future act of the Commission or the future judgment of the Courts of the European Union.

91    Through the enforcement proceedings brought, in the present case, by the investors in the United Kingdom, the Supreme Court of the United Kingdom was seised of an action requiring an interpretation of the same provision of EU law in relation to the same measure as that which the Commission had already decided upon and which the Courts of the European Union were called upon to resolve.

92    Although the Supreme Court of the United Kingdom accepted, initially, that the obligation of sincere cooperation continued to be engaged, in the light of the appeal brought against the judgment of the General Court, pending the final judgment of the Courts of the European Union, it ultimately concluded that that obligation is not applicable in the present case, on the basis of erroneous grounds, thus giving rise to a risk of conflict between its judgment and the decisions of the Commission and/or the Court of Justice on the same issue.

#### Findings of the Court

93    It should be recalled that, according to the second and third subparagraphs of Article 4(3) TEU, the Member States are, first, to take any appropriate measure, general or particular, to ensure fulfilment of the obligations arising out of the Treaties or resulting from the acts of the

institutions of the Union and, secondly, to facilitate the achievement of the European Union's tasks and refrain from any measure which could jeopardise the attainment of the European Union's objectives.

94    According to the case-law of the Court, it follows from the principle of sincere cooperation laid down in that provision that the Member States, and in particular the national courts, are obliged to take all the measures necessary to guarantee the application and effectiveness of EU law (see, in particular, judgment of 8 March 2022, *Commission* v *United Kingdom (Action to counter undervaluation fraud)*, C-213/19, EU:C:2022:167, paragraph 584).

95    In particular, the application of the rules of EU law on State aid laid down in Articles 107 and 108 TFEU is based on an obligation of sincere cooperation between, on the one hand, the national courts, and, on the other hand, the Commission and the Courts of the European Union, in the context of which each acts on the basis of the role assigned to it by the Treaty (judgment of 4 March 2020, *Buonotourist* v *Commission*, C-586/18 P, EU:C:2020:152, paragraph 89).

96    In that regard, it is apparent from settled case-law that proceedings may be brought before national courts in matters relating to State aid which require them to interpret and apply the concept of 'aid' referred to in Article 107(1) TFEU, in particular with a view to determining whether a State measure has been introduced in infringement of Article 108(3) TFEU. In contrast, national courts do not have jurisdiction to give a decision on whether State aid is compatible with the internal market. Indeed, the assessment of the compatibility of aid measures or an aid scheme with the internal market falls within the exclusive competence of the Commission, subject to review by the Courts of the European Union (judgment of 4 March 2020, *Buonotourist* v *Commission*, C-586/18 P, EU:C:2020:152, paragraph 90 and the case-law cited).

97    In the context of the necessary cooperation on which the application of those provisions is based, national courts must take all the necessary measures, whether general or specific, to ensure fulfilment of the obligations under EU law and refrain from taking those which may jeopardise the attainment of the objectives of the Treaty, as follows from Article 4(3) TEU (judgment of 12 January 2023, *DOBELES HES*, C-702/20 and C-17/21, EU:C:2023:1, paragraph 77). National courts must, in particular, refrain from taking decisions which conflict with a decision of the Commission, even if it is provisional (judgment of 21 November 2013, *Deutsche Lufthansa*, C-284/12, EU:C:2013:755, paragraph 41).

98    Consequently, where the outcome of the dispute before the national court depends on the validity of the Commission decision, it follows from the obligation of sincere cooperation that the national court should, in order to avoid reaching a decision that runs counter to the Commission decision, stay its proceedings pending final judgment in the action for annulment before the Courts of the European Union, unless it takes the view that, in the circumstances of the case, a reference to the Court of Justice for a preliminary ruling on the validity of the Commission decision is warranted (judgment of 25 July 2018, *Georgsmarienhütte and Others*, C-135/16, EU:C:2018:582, paragraph 24 and the case-law cited).

99    In that context, it should also be pointed out that acts of the EU institutions are in principle presumed to be lawful until such time as they are annulled or withdrawn (see, in particular, judgment of 2 April 2020, *Commission* v *Poland, Hungary and Czech Republic (Temporary mechanism for the relocation of applicants for international protection)*, C-715/17, C-718/17 and C-719/17, EU:C:2020:257, paragraph 139).

100 In the present case, it should be recalled that, by the final decision, adopted in the context of the procedure laid down in Article 108(2) TFEU following the suspension injunction and the opening decision, the Commission found that the payment of the compensation granted by the arbitral award constitutes State aid, within the meaning of Article 107(1) TFEU, which is incompatible with the internal market.

101 To that end, the Commission, both in recitals 51 to 54 of the opening decision and in recitals 126 to 129 of the final decision, found, as is apparent from paragraph 21 above, that the first paragraph of Article 351 TFEU did not preclude the application of Articles 107 and 108 TFEU to the enforcement of the arbitral award. In particular, the Commission found, in that regard, that the application of the rules of the FEU Treaty on State aid to the compensation granted by that award could not affect the rights and obligations laid down in the first paragraph of Article 351 TFEU, since, first, the BIT is a treaty concluded between two Member States and, secondly, no third country which has signed and ratified the ICSID Convention is a party to the BIT which is the subject of the proceedings at issue.

102 In support of their action for annulment of the final decision which they brought before the General Court under Article 263 TFEU, the investors, by their first pleas in law in Cases T‑624/15 and T‑694/15 and by their third plea in law in Case T‑704/15, argued that the Commission's reasoning is incorrect. However, the judgment of the General Court annulled that decision on another ground, namely that the Commission lacked competence *ratione temporis* under Article 108 TFEU, without ruling on those pleas.

103 It is in that context that the investors brought an action before the Supreme Court of the United Kingdom seeking enforcement, in the United Kingdom, of the arbitral award vis-à-vis Romania and, therefore, for payment of the compensation granted by that arbitral award, contending in support of that application that neither the proceedings pending before the EU institutions under Articles 107 and 108 TFEU nor the first paragraph of Article 351 TFEU constituted an obstacle to such enforcement.

104 It follows that, as the Advocate General observed in point 79 of his Opinion, the proceedings pending before the EU institutions and the Supreme Court of the United Kingdom concerned the same matter, namely, in essence, the enforcement of the arbitral award in the European Union, involved the interpretation of the same provisions, in particular Articles 107 and 108 TFEU and the first paragraph of Article 351 TFEU, and concerned the validity or effectiveness of the decisions adopted by the Commission under Articles 107 and 108 TFEU in order to prevent such enforcement.

105 Thus, the Supreme Court of the United Kingdom itself observes, in paragraph 51 of the judgment at issue, that the judgment of the General Court 'leaves in existence an extant Commission investigation into State aid', with the result that 'the effects of that initiating decision subsist', and that it 'may well be open' that the judgment of the General Court does not preclude the Commission from 'reconfigur[ing] the investigation in the present case so as to avoid the errors which resulted in the annulment of the [final] decision'.

106 In those circumstances, the Supreme Court of the United Kingdom states, in paragraph 56 of the judgment at issue, as has already been noted in paragraph 32 above, that it is 'concerned with potentially contradictory decisions on the same subject matter between the same parties', since 'it is not possible to conclude that there is scarcely any risk of conflict' and that, if that risk

materialised, that would amount to 'a substantial impediment to the operation of EU law', with the result that 'the existence of a pending appeal to the Court of Justice with a real prospect of success is, in itself, sufficient to trigger the duty of [sincere] cooperation'.

107    It is, therefore, apparent that the Supreme Court of the United Kingdom was fully aware of the fact that if it were to authorise the enforcement of the arbitral award in the United Kingdom, such a decision would have the effect of countering both the administrative proceedings brought before the Commission under Articles 107 and 108 TFEU and the judicial proceedings brought before the Courts of the European Union under Article 263 TFEU.

108    It is true that, at the time when the Supreme Court of the United Kingdom ruled in the judgment at issue, the final decision had been annulled by the judgment of the General Court.

109    However, such an annulment has no bearing on the obligation of sincere cooperation incumbent upon the Supreme Court of the United Kingdom pursuant to Article 4(3) TEU, read in conjunction with Article 127(1) of the Withdrawal Agreement.

110    First, as the Commission rightly notes, the annulment of the final decision did not have the effect of calling into question either the suspension injunction or the opening decision. According to the case-law of the Court, the annulment of an EU measure does not necessarily affect the preparatory acts, and the procedure for replacing such a measure may, in principle, be resumed at the very point at which the illegality occurred (judgment of 21 September 2017, *Riva Fire* v *Commission*, C-89/15 P, EU:C:2017:713, paragraph 34 and the case-law cited).

111    In the present case, although the judgment of the General Court did indeed annul the final decision on the ground that the Commission lacked competence *ratione temporis* under Article 108 TFEU, it was after noting, in paragraph 108 of that judgment, as has already been noted in paragraph 25 above, that the Commission had not made a distinction, as regards the amounts of compensation to be recovered, between those falling within the period prior to Romania's accession to the European Union and those falling within the period after that accession.

112    It follows that the judgment of the General Court did not preclude the Commission – as the Supreme Court of the United Kingdom, as already noted in paragraph 105 above, itself stated in paragraph 51 of the judgment at issue – from resuming the formal investigation procedure referred to in Article 108(2) TFEU, limiting itself to compensation relating to the post-accession period.

113    From that point of view, the opening decision, which rules out the relevance of the first paragraph of Article 351 TFEU, therefore continued to produce its effects, which the Supreme Court of the United Kingdom also accepted in paragraph 51 of the judgment at issue.

114    Secondly, since the Commission had lodged, before the judgment at issue was delivered, an appeal against the judgment of the General Court, and even though an appeal does not, under Article 278 TFEU, have suspensory effect, no definitive decision had yet been given by the Courts of the European Union on the validity of the final decision, at the time when the Supreme Court of the United Kingdom ruled in the judgment at issue.

115   Indeed, it could not be excluded that the Court of Justice might, in turn, set aside the judgment of the General Court and refer to that Court the examination of the other pleas for annulment of the final decision, including those alleging the infringement of the first paragraph of Article 351 TFEU. That is, moreover, the situation which arose following the judgment of 25 January 2022, *Commission* v *European Food and Others* (C-638/19 P, EU:C:2022:50), delivered after the judgment at issue and the reasoned opinion.

116   It follows from the foregoing that, as at the date on which the Supreme Court of the United Kingdom delivered the judgment at issue, the matter of the effect of the first paragraph of Article 351 TFEU on the application of EU law, in particular of Articles 107 and 108 TFEU, to the enforcement of the arbitral award was the subject of a provisional examination by the Commission in its opening decision, in the context of which, as noted in paragraph 101 above, the Commission had excluded the application of the first paragraph of Article 351 TFEU, and could still be assessed by the Courts of the European Union in the context of judicial proceedings under Article 263 TFEU seeking annulment of the final decision.

117   In those circumstances, it must be found that at the time the Supreme Court of the United Kingdom gave its ruling in the judgment at issue, there was a risk of conflicting decisions, which, moreover, materialised, since it was concluded in that judgment that the first paragraph of Article 351 TFEU applied and that there was the obligation, under the ICSID Convention, to proceed to enforcement of the arbitral award, whereas quite the opposite conclusion had been reached in the opening decision, as in the final decision, the legality of which was subject to an appeal as at the date on which that judgment was delivered.

118   That conclusion cannot be called into question by any of the grounds advanced by the Supreme Court of the United Kingdom, in order to disapply the obligation of sincere cooperation in the present case, and set out in paragraph 35 above.

119   In the first place, as regards the ground that questions as to the existence and extent of obligations stemming from prior international agreements to which the European Union is not a party, for the purposes of applying the first paragraph of Article 351 TFEU, are not reserved to the Courts of the European Union or even fall outside their jurisdiction, it must first of all be stated that the obligation of sincere cooperation incumbent on national courts under Article 4(3) TEU is in no way based on the premiss that certain questions fall within the exclusive jurisdiction of the Courts of the European Union or that of the national courts, but, on the contrary, presupposes that the same question may fall within the concurrent jurisdiction of each of them, with the result that there is a risk of conflicting decisions.

120   The matter which was referred, in the present case, both to the Supreme Court of the United Kingdom, on the one hand, and to the Commission and Courts of the European Union, on the other hand, concerned the scope of the first paragraph of Article 351 TFEU, which is a provision of EU law the definitive interpretation of which falls, as already stated in paragraph 68 above, within the exclusive jurisdiction of the Court of Justice, with a judgment delivered by the Court of Justice under Article 267 TFEU being binding on the national courts for the purposes of the decision to be given in the dispute before them (see, to that effect, judgment of 5 July 2016, *Ognyanov*, C-614/14, EU:C:2016:514, paragraph 33).

121   In particular, it should be pointed out in that regard that the first paragraph of Article 351 TFEU does not make any reference to the law of the Member States or to international law, with the result that the expressions in that provision must be regarded as autonomous concepts of EU law

that must be interpreted in a uniform manner throughout the territory of the European Union (see, to that effect, judgment of 22 June 2021, *Venezuela* v *Council (Whether a third State is affected)*, C-872/19 P, EU:C:2021:507, paragraph 42 and the case-law cited).

122 It follows that the Courts of the European Union have jurisdiction to determine whether a prior international agreement concluded by Member States with third countries, such as the ICSID Convention, imposes on the Member State concerned, in the present case the United Kingdom, obligations with which a third country is entitled to require compliance and whether those rights and obligations are affected by the EU Treaties, within the meaning of the first paragraph of Article 351 TFEU.

123 That is the case, as the Supreme Court of the United Kingdom accepts in paragraph 99 of the judgment at issue, in the context of an action for annulment under Article 263 TFEU or an action for failure to fulfil obligations under Article 258 TFEU. Indeed, if the principle of effective judicial protection is not to be undermined, the Courts of the European Union, in order to rule on the merits of an argument alleging an infringement by an EU institution or by a Member State, as the case may be, of the first paragraph of Article 351 TFEU in relation to a prior international agreement, must necessarily examine the scope of that agreement in order to decide the action before it (see, to that effect, judgments of 6 April 1995, *RTE and ITP* v *Commission*, C-241/91 P and C-242/91 P, EU:C:1995:98, paragraph 84, and of 15 September 2011, *Commission* v *Slovakia*, C-264/09, EU:C:2011:580, paragraphs 40 and 42).

124 The same is also true, contrary to what the Supreme Court of the United Kingdom suggests in paragraph 99 of the judgment at issue, where a reference is made to the Court in the context of the preliminary ruling procedure under Article 267 TFEU.

125 Admittedly, in such a context, the Court has held that it is for the national court to determine which obligations are imposed by a prior international agreement on the Member State concerned and to ascertain their ambit so as to be able to determine the extent to which they constitute an obstacle to the application of EU law (see, in particular, judgments of 2 August 1993, *Levy*, C-158/91, EU:C:1993:332, paragraph 21, and of 14 January 1997, *Centro-Com*, C-124/95, EU:C:1997:8, paragraph 58).

126 However, that case-law, which reflects the separate roles conferred, as a rule, on the Court of Justice and on the national courts in the context of the preliminary ruling procedure, cannot be understood as meaning that the Court would thereby be deprived of all jurisdiction to examine under Article 267 TFEU the scope of the provisions of an international agreement, such as the ICSID Convention, in order to determine whether the latter is capable of coming under the first paragraph of Article 351 TFEU.

127 This is all the less the case where, as in the circumstances here, the application of the latter provision to such an international agreement is likely to exert a decisive effect on the outcome of a parallel direct action brought before the Courts of the European Union under Article 263 TFEU, seeking the annulment of a Commission decision, such as the final decision, which, like the opening decision, concluded that the first paragraph of Article 351 TFEU was not applicable to the United Kingdom's obligation to enforce the arbitral award under the ICSID Convention.

128 Where, in an action for annulment, the Courts of the European Union are called upon to rule on the validity of an act of EU law, it is consistent with the division of roles between the national courts and the Courts of the European Union for the Court alone to have jurisdiction to interpret

the relevant prior international agreement in order to determine whether or not the first paragraph of Article 351 TFEU precludes the application of EU law by that act, the Court alone having jurisdiction, in accordance with settled case-law, to declare an EU act invalid (judgment of 22 February 2022, *RS (Effect of the decisions of a constitutional court)*, C-430/21, EU:C:2022:99, paragraph 71 and the case-law cited).

129   In the second place, as regards the ground that the issues raised in the present case before the national courts and the Courts of the European Union are incongruent as regards the relevant provisions of the ICSID Convention and the Member States involved, it should be noted that, on the one hand, both the procedure conducted by the Commission pursuant to Articles 107 and 108 TFEU and the proceedings brought before the Courts of the European Union and, on the other hand, the proceedings before the United Kingdom courts, concerned enforcement by a Member State, under that convention, of the arbitral award made in respect of another Member State, and raised the same question of the extent to which the first paragraph of Article 351 TFEU was capable, in such a context, of disapplying EU law, since all those Member States concluded that convention before their accession to the European Union.

130   In that regard, it is irrelevant that different provisions of the ICSID Convention, namely Article 53 or Article 54 thereof, were relied on before the national courts and the EU institutions or that a different Member State is involved, that is, as the case may be, the United Kingdom or Romania, which are Contracting States to the ICSID Convention, since those proceedings were capable of resulting in conflicting decisions.

131   In any event, the judgment at issue wrongly suggests that Article 54 of the ICSID Convention is not concerned before the Courts of the European Union. Indeed, it is apparent from recitals 31 and 32 of the final decision that the investors sought enforcement of the arbitral award in Romania on the basis of that article, with the result that not only Article 53 of that convention, but also Article 54 thereof, are invoked before the General Court, which, moreover, the Supreme Court of the United Kingdom itself notes in paragraph 113 of the judgment at issue.

132   In the third place, as regards the ground that the prospect of a Court of the European Union addressing the applicability of the first paragraph of Article 351 TFEU to pre-accession obligations under the ICSID Convention in relation to the arbitral award was remote, it is sufficient to note that, in the event of the appeal brought by the Commission against the judgment of the General Court being allowed, the Court of Justice could, pursuant to the first paragraph of Article 61 of the Statute of the Court of Justice, either itself give final judgment in the matter, or refer the case back to the General Court for judgment, which implies, in both cases, that the Courts of the European Union must examine the pleas put forward at first instance alleging infringement of the first paragraph of Article 351 TFEU. In the present case, since the Court of Justice set aside the judgment of the General Court and referred the case back to that court, those pleas are therefore pending before the General Court.

133   Conversely, had that appeal been dismissed, the Commission would have been required to resume the procedure concerning the application of Articles 107 and 108 TFEU to the payment of compensation fixed by the arbitral award and, in that context, to assess once again the question of the effect of the first paragraph of Article 351 TFEU and, therefore, of the ICSID Convention, on that procedure, without prejudice to the subsequent bringing of an action under Article 263 TFEU before the Courts of the European Union.

134   It follows from this that whatever the outcome of the appeal brought by the Commission against the judgment of the General Court, it could not be considered, as at the date on which the Supreme Court of the United Kingdom delivered the judgment at issue, that the prospect of a Court of the European Union addressing the applicability of the first paragraph of Article 351 TFEU to the enforcement of the arbitral award under the ICSID Convention was faint.

135   Consequently, the first complaint, alleging an infringement of Article 4(3) TEU, read in conjunction with Article 127(1) of the Withdrawal Agreement, must be upheld.

### The third complaint, alleging an infringement of the first and third paragraphs of Article 267 TFEU, read in conjunction with Article 127(1) of the Withdrawal Agreement

#### The applicant's arguments

136   The Commission complains that the United Kingdom infringed the first and third paragraphs of Article 267 TFEU, read in conjunction with Article 127(1) of the Withdrawal Agreement, in that the Supreme Court of the United Kingdom delivered the judgment at issue without first referring a question to the Court of Justice for a preliminary ruling concerning, first, the validity of the suspension injunction and the opening decision and, secondly, the interpretation of the first paragraph of Article 351 TFEU, which is neither *acte clair* nor *acte éclairé.*

137   As regards, in the first place, the failure to make a reference for a preliminary ruling on validity, the Commission submits that the judgment at issue had the effect of rendering inoperative both the suspension injunction and the opening decision. Indeed, by refusing to give effect to those decisions, which required, under the last sentence of Article 108(3) TFEU, the suspension of payment of the aid at issue, the Supreme Court of the United Kingdom acted as if those decisions were invalid. However, the Court of Justice alone has jurisdiction to invalidate acts of EU law.

138   As regards, in the second place, the failure to make a reference for a preliminary ruling on interpretation, the Commission submits that the Supreme Court of the United Kingdom was seised, as a national court of last instance, of two questions which ought to have led it to find that it was required to refer the matter to the Court of Justice, namely, first, the question of the interpretation of the first paragraph of Article 351 TFEU in the light of the obligations laid down by multilateral conventions to which both the Member States and third countries are contracting parties and, secondly, the question of the jurisdiction of the national courts and Courts of the European Union to interpret that provision.

#### Findings of the Court

139   It should be noted at the outset that, under Article 86 of the Withdrawal Agreement, the Court continued to have jurisdiction to give preliminary rulings on requests from courts and tribunals of the United Kingdom made before the end of the transition period. As has already been stated in paragraph 51 above, the judgment at issue was delivered during that period.

140   It must be borne in mind that, under the third paragraph of Article 267 TFEU, where a question of interpretation is raised in a case pending before a national court or tribunal against whose decisions there is no judicial remedy under national law, as is the case with the Supreme Court of the United Kingdom, that court or tribunal must bring the matter before the Court.

141 However, the authority of an interpretation already provided by the Court under Article 267 TFEU may deprive the obligation laid down in the third paragraph of Article 267 TFEU of its purpose and thus empty it of its substance, especially where the question raised is materially identical to a question that has already been the subject of a preliminary ruling in a similar case, or, *a fortiori*, in the same national proceedings, or where established case-law of the Court already resolves the point of law in question, irrespective of the nature of the proceedings which led to that case-law, even if the issues in dispute are not strictly identical (judgment of 6 October 2021, *Consorzio Italian Management and Catania Multiservizi*, C-561/19, EU:C:2021:799, paragraph 36).

142 In addition, according to the settled case-law of the Court, a national court or tribunal against whose decisions there is no judicial remedy under national law may refrain from referring to the Court a question concerning the interpretation of EU law and take upon itself the responsibility for resolving it where the correct interpretation of EU law is so obvious as to leave no scope for any reasonable doubt. Before concluding that such is the case, the national court or tribunal of last instance must be convinced that the matter would be equally obvious to the other courts or tribunals of last instance of the Member States and to the Court of Justice, taking into account the characteristic features of EU law, the particular difficulties to which the interpretation of the latter gives rise and the risk of divergences in judicial decisions within the European Union (see, to that effect, judgment of 6 October 2021, *Consorzio Italian Management and Catania Multiservizi*, C-561/19, EU:C:2021:799, paragraphs 39 to 41).

143 In particular, the Court has pointed out in that regard that where the national court or tribunal of last instance is made aware of the existence of diverging lines of case-law – among the courts of a Member State or between the courts of different Member States – concerning the interpretation of a provision of EU law applicable to the dispute, that court or tribunal must be particularly vigilant in its assessment of whether or not there is any reasonable doubt as to the correct interpretation of the provision of EU law at issue and have regard, inter alia, to the objective pursued by the preliminary ruling procedure which is to secure uniform interpretation of EU law (see judgment of 6 October 2021, *Consorzio Italian Management and Catania Multiservizi*, C-561/19, EU:C:2021:799, paragraph 49).

144 In the present case, it must be found, in the first place, that the question whether the enforcement by a Member State of an arbitral award made against another Member State under the provisions of the ICSID Convention – which was concluded by most of the Member States which are parties to that convention, before their accession to the European Union, and therefore constitutes for them a prior international agreement, for the purposes of the first paragraph of Article 351 TFEU – implies that those Member States are bound by 'obligations' vis-à-vis third countries that have concluded that convention, with the result that the latter derive from it correlative 'rights' which would be 'affected' by the provisions of the Treaties, within the meaning of the first paragraph of Article 351 TFEU, is a novel question in the case-law of the Court.

145 Although, as is apparent from paragraphs 58 to 65 above, the Court has already been called upon to clarify the scope of the first paragraph of Article 351 TFEU, the fact remains that the question whether, in the context of the regime established by the ICSID Convention, the enforcement of an arbitral award by a Contracting State to that convention may be required, not only by the Contracting States directly involved in the dispute concerned, but also by all the other Contracting States to that convention is a matter of some complexity which had not yet been addressed by the Court when the Supreme Court of the United Kingdom ruled in the judgment at issue.

146 Furthermore, it should be noted that the scope of the expression 'affected by the provisions of the Treaties', in the first paragraph of Article 351 TFEU, has not yet been clarified by the Court.

147 As has been pointed out in paragraphs 78 and 79 above, the first paragraph of Article 351 TFEU, inasmuch as it allows Member States to refrain from applying EU law, and therefore to derogate from the principle of the primacy of EU law, that principle being one of the essential characteristics of that law, is capable of having a considerable impact on the EU legal order by limiting the effectiveness of EU law.

148 In the second place, it should be recalled that, as is apparent from paragraphs 21 and 101 above, in the opening decision and in the final decision, the Commission adopted an interpretation of the first paragraph of Article 351 TFEU which conflicts with that adopted by the Supreme Court of the United Kingdom in the judgment at issue.

149 The Commission's interpretation is, moreover, called into question by the investors in support of their action before the General Court seeking the annulment of the final decision, although the judgment of the General Court did not, however, annul that decision on the ground that the first paragraph of Article 351 TFEU precluded the application of EU law, but on the ground that that decision infringed Article 108 TFEU. In the light of the appeal brought against that judgment before the Court of Justice, the question of the effect of the first paragraph of Article 351 TFEU on the enforcement of the arbitral award therefore remains pending before the Courts of the European Union.

150 In the third place, it should be noted that, as the Supreme Court of the United Kingdom observed in paragraphs 29, 32, 91 and 94 of the judgment at issue, both the High Court of Justice (England & Wales) and the Court of Appeal (England & Wales), before which the investors had previously brought an action, had refused, in the present case, to rule on the question of the applicability of the first paragraph of Article 351 TFEU on the ground that that question was pending before the Courts of the European Union and that there was, therefore, a risk of conflicting decisions.

151 In the fourth place, it should be noted that the Nacka tingsrätt (Nacka District Court, Sweden), by a judgment of 23 January 2019, relied on by the Commission in its written observations in the proceedings before the Supreme Court of the United Kingdom, held that the first paragraph of Article 351 TFEU did not apply to the enforcement of the arbitral award and, therefore, refused to enforce that award in Sweden, on the ground that, in the same way as it could not enforce a national judgment awarding damages to the investors, without infringing Article 108(3) TFEU and Article 4(3) TEU, nor could it enforce an arbitral award granting them such damages.

152 Moreover, the issue of the enforcement of the arbitral award, as is apparent from the order of 21 September 2022, *Romatsa and Others* (C-333/19, EU:C:2022:749), was pending before the Belgian courts at the time when the Supreme Court of the United Kingdom ruled, which the Commission had also pointed out in its written observations submitted to that court.

153 It follows from the foregoing that there was, in the present case, sufficient evidence to raise doubts as to the interpretation of the first paragraph of Article 351 TFEU, which, in view of the impact of that provision on one of the essential characteristics of EU law and the risk of conflicting decisions within the European Union, ought to have led the Supreme Court of the United Kingdom to consider that the interpretation of that provision is not so obvious as to leave no scope for any reasonable doubt.

154    In those circumstances, without there being any need to rule on the merits of the other arguments put forward by the Commission in support of the present complaint, it must be held that it was for the Supreme Court of the United Kingdom, as a national court or tribunal against whose decisions there is no judicial remedy under national law, to make a reference to the Court of Justice on the basis of Article 267 TFEU concerning the interpretation of the first paragraph of Article 351 TFEU, in order to avert the risk of an incorrect interpretation of EU law which, as is apparent from paragraphs 71 to 84 above, it did in fact reach in the judgment at issue (see, by analogy, judgment of 4 October 2018, *Commission* v *France (Advance payment)*, C-416/17, EU:C:2018:811, paragraph 113).

155    Consequently, on that ground alone, the third complaint, alleging an infringement of the first and third paragraphs of Article 267 TFEU, read in conjunction with Article 127(1) of the Withdrawal Agreement, must be upheld.

### *The fourth complaint, alleging an infringement of Article 108(3) TFEU, read in conjunction with Article 127(1) of the Withdrawal Agreement*

#### *The applicant's arguments*

156    The Commission complains that the judgment at issue infringed Article 108(3) TFEU, read in conjunction with Article 127(1) of the Withdrawal Agreement, by ordering Romania to breach its obligations under EU law flowing from the suspension injunction and the opening decision.

157    Indeed, in lifting the stay on enforcement of the arbitral award ordered by the United Kingdom courts that had ruled on the case in question at lower instances, that award becomes enforceable. The ruling of the Supreme Court of the United Kingdom had, thus, the effect of rendering the compensation set out in the award payable. That effect is in direct contradiction to the standstill obligation laid down in Article 108(3) TFEU, as enshrined in the suspension injunction and the opening decision.

158    The Supreme Court of the United Kingdom also disregarded the case-law of the Court of Justice, as set out in the judgment of 18 July 2007, *Lucchini* (C-119/05, EU:C:2007:434, paragraphs 62 and 63), according to which the prohibition on granting State aid that has not been duly authorised may be relied on in order to prevent the enforcement of final judgments of national courts that would infringe that prohibition.

#### *Findings of the Court*

159    According to the case-law of the Court, as recalled in paragraphs 95 and 97 above, since the application of the rules of EU law on State aid is based on an obligation of sincere cooperation between, on the one hand, the national courts, and, on the other hand, the Commission and the Courts of the European Union, those national courts must refrain from taking decisions which conflict with a decision of the Commission on State aid, even if that decision is provisional.

160 In that context, it should be recalled that Member States are under an obligation, first, to notify to the Commission each measure intended to grant new aid or alter aid for the purposes of Article 107(1) TFEU and, secondly, not to implement such a measure, in accordance with the last sentence of Article 108(3) TFEU, until the Commission has taken a final decision on the measure (judgment of 5 March 2019, *Eesti Pagar*, C-349/17, EU:C:2019:172, paragraph 56).

161 According to the case-law of the Court, an aid measure which is put into effect in infringement of the obligations arising from that provision is unlawful (judgment of 19 March 2015, *OTP Bank*, C-672/13, EU:C:2015:185, paragraph 66 and the case-law cited).

162 In that regard, the Court has stated that the prohibition on implementation of planned aid laid down in the last sentence of Article 108(3) TFEU has direct effect and that the immediate enforceability of the prohibition on implementation referred to in that provision extends to all aid which has been implemented without being notified (judgment of 5 March 2019, *Eesti Pagar*, C-349/17, EU:C:2019:172, paragraph 88).

163 Consequently, as is apparent from the case-law referred to in paragraph 96 above, it is for the national courts to draw the necessary conclusions with respect to the infringement of Article 108(3) TFEU, in accordance with their national law, with regard to both the validity of the acts giving effect to the aid and the recovery of financial support granted in disregard of that provision (judgment of 19 March 2015, *OTP Bank*, C-672/13, EU:C:2015:185, paragraph 69 and the case-law cited).

164 The national courts therefore have jurisdiction to order the recovery of unlawful aid from its recipients (see, to that effect, judgment of 5 March 2019, *Eesti Pagar*, C-349/17, EU:C:2019:172, paragraph 89 and the case-law cited).

165 Moreover, where the national courts are seised of a request seeking the payment of aid which is unlawful, they must, in principle, reject that request (see, to that effect, judgment of 12 January 2023, *DOBELES HES*, C-702/20 and C-17/21, EU:C:2023:1, paragraph 121).

166 In the present case, it must be recalled that, in the final decision, the Commission found that the payment of the compensation granted by the arbitral award of which it had not been notified constituted State aid that was unlawful and incompatible with the internal market. Although that decision was indeed annulled by the judgment of the General Court, the fact remains that an appeal against that judgment was pending before the Court of Justice at the time when the Supreme Court of the United Kingdom delivered the judgment at issue.

167 In addition, as has already been noted in paragraphs 110 to 113 above, the judgment of the General Court did not affect the legality of the suspension injunction and of the opening decision, by which the Commission had also found that the payment of the compensation granted by the arbitral award constituted unlawful State aid incompatible with the internal market and had ordered Romania not to implement that award before the adoption of its final decision.

168 It must be held that by ordering the enforcement of the arbitral award, the judgment at issue requires Romania to pay the compensation granted by that arbitral award in breach of the obligation laid down in the last sentence of Article 108(3) TFEU.

169 It follows that Romania is thus faced with conflicting decisions concerning the enforcement of that award. Therefore, far from ensuring compliance with that provision, in accordance with the case-law referred to in paragraphs 163 to 165 above, the judgment at issue fails to comply with that provision by ordering another Member State to infringe it.

170 It is irrelevant, in that regard, that the last sentence of Article 108(3) TFEU lays down an obligation on 'the Member State concerned', namely, in principle, the Member State that pays the aid, in this case Romania.

171 As the Commission rightly submits, the obligation of sincere cooperation enshrined in Article 4(3) TEU, which underpins the application of the rules of EU law on State aid, required the United Kingdom, and, in particular, its national courts, to facilitate Romania's compliance with its obligations under Article 108(3) TFEU, if that provision is not to be deprived of its effectiveness (see, to that effect, judgment of 27 September 1988, *Matteucci*, 235/87, EU:C:1988:460, paragraph 19).

172 That conclusion cannot be invalidated by the fact that the arbitral award has become final either. The rule that the Commission has exclusive competence to assess the compatibility of State aid with the internal market is necessary in the national legal order as a result of the principle of the primacy of EU law. EU law precludes the application of the principle of *res judicata* from preventing the national courts from drawing all the necessary conclusions with respect to the infringement of Article 108(3) TFEU (see, to that effect, judgments of 18 July 2007, *Lucchini*, C-119/05, EU:C:2007:434, paragraphs 62 and 63, and of 4 March 2020, *Buonotourist* v *Commission*, C-586/18 P, EU:C:2020:152, paragraphs 94 and 95).

173 Nor is the first paragraph of Article 351 TFEU capable of precluding the application of Article 108(3) TFEU, since, as is apparent from paragraphs 71 to 84 above, that first paragraph of Article 351 TFEU was not applicable to the dispute before the Supreme Court of the United Kingdom, with the result that the rules of EU law on State aid could not be set aside by virtue of the latter provision.

174 Consequently, the fourth complaint, alleging an infringement of Article 108(3) TFEU, read in conjunction with Article 127(1) of the Withdrawal Agreement, must be upheld.

175 In the light of all the foregoing considerations, it must be held that, by the judgment at issue, the United Kingdom has failed to fulfil its obligations under Article 4(3) TEU, Article 108(3), the first and third paragraphs of Article 267 and the first paragraph of Article 351 TFEU, read in conjunction with Article 127(1) of the Withdrawal Agreement.

**Costs**

176 Under Article 138(1) of the Rules of Procedure of the Court, the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings. Since the Commission has applied for costs and the United Kingdom has been unsuccessful, the United Kingdom must be ordered to pay the costs.

On those grounds, the Court (Fifth Chamber) hereby:

1. **Declares that, by the judgment of the Supreme Court of the United Kingdom of 19 February 2020 in *Micula* v *Romania*, the United Kingdom of Great Britain and Northern Ireland has failed to fulfil its obligations under Article 4(3) TEU, Article 108(3), the first and third paragraphs of Article 267 and the first paragraph of Article 351 TFEU, read in conjunction with Article 127(1) of the Agreement on the withdrawal of the United Kingdom of Great Britain and Northern Ireland from the European Union and the European Atomic Energy Community, adopted on 17 October 2019;**

2. **Orders the United Kingdom of Great Britain and Northern Ireland to pay the costs.**

Regan                                           Csehi                                           Ilešič

Jarukaitis                                                                                      Gratsias

Delivered in open court in Luxembourg on 14 March 2024.

A. Calot Escobar                                                                E. Regan
Registrar                                                        President of the Chamber