# EXHIBIT 66



# Reports of Cases

JUDGMENT OF THE GENERAL COURT (Second Chamber, Extended Composition)

2 October 2024*

(State aid – Articles 107 and 108 TFEU – Bilateral investment treaty – Arbitration clause – Romania – Accession to the European Union – Repeal of a tax incentives scheme prior to accession – Arbitral award granting payment of damages after accession – Decision declaring the aid incompatible with the internal market and ordering its recovery – First paragraph of Article 351 TFEU – Obligation to state reasons – Concept of 'State aid' – Advantage – Selective nature – Whether imputable to the State – Whether compatible with the internal market – Aid facilitating the economic development of disadvantaged regions – Recovery – Concept of 'economic unit' – Legitimate expectations – Right to be heard)

In Cases T-624/15 RENV, T-694/15 RENV and T-704/15 RENV,

**European Food SA**, established in Păntăşeşti (Romania),

**Starmill SRL**, established in Păntăşeşti,

**Multipack SRL**, established in Păntăşeşti,

**Scandic Distilleries SA**, established in Păntăşeşti,

represented by N. Forwood, Barrister-at-Law, and by G. Forwood and W. De Catelle, lawyers,

applicants in Case T-624/15 RENV,

**Ioan Micula**, residing in Oradea (Romania), represented by N. Forwood, G. Forwood and W. De Catelle,

applicant in Case T-694/15 RENV,

**Viorel Micula**, residing in Oradea,

**European Drinks SA**, established in Ştei (Romania),

**Rieni Drinks SA**, established in Rieni (Romania),

**Transilvania General Import-Export SRL**, established in Oradea,

**West Leasing SRL**, formerly West Leasing International SRL, established in Păntăşeşti,

---

* Language of the case: English.



represented by J. Derenne, D. Vallindas, A. Álvarez Vidal, R. Chiriță, and O. Chiriță, lawyers,

applicants in Case T-704/15 RENV,

v

**European Commission**, represented by T. Maxian Rusche and P.-J. Loewenthal, acting as Agents,

defendant,

supported by

**Federal Republic of Germany**, represented by R. Kanitz, J. Möller and N. Scheffel, acting as Agents,

by

**Kingdom of Spain**, represented by M.J. Ruiz Sánchez, acting as Agent,

by

**Republic of Latvia**, represented by K. Pommere, acting as Agent,

by

**Hungary**, represented by M. Fehér and G. Koós, acting as Agents,

and by

**Republic of Poland**, represented by D. Lutostańska, B. Majczyna and M. Rzotkiewicz, acting as Agents,

interveners,

THE GENERAL COURT (Second Chamber, Extended Composition),

composed of A. Marcoulli, President, V. Tomljenović, N. Półtorak, R. Norkus (Rapporteur) and W. Valasidis, Judges,

Registrar: A. Marghelis, Administrator,

having regard to the written part of the procedure,

having regard to the judgment of 25 January 2022, *Commission* v *European Food and Others* (C-638/19 P, EU:C:2022:50),

further to the hearing on 4 and 5 March 2024,

gives the following

## Judgment [1]

1   By their actions based on Article 263 TFEU, the applicants, European Food SA, Starmill SRL, Multipack SRL and Scandic Distilleries SA, in Case T-624/15, Mr Ioan Micula, in Case T-694/15, and Mr Viorel Micula, European Drinks SA, Rieni Drinks SA, Transilvania General Import-Export SRL and West Leasing SRL, in Case T-704/15, seek the annulment of Commission Decision (EU) 2015/1470 of 30 March 2015 on State aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania – Arbitral award Micula v Romania of 11 December 2013 (OJ 2015 L 232, p. 43; 'the contested decision').

## I.  Background to the dispute

2   The applicants were named in the contested decision as the beneficiaries of the compensation granted by an arbitral award on 11 December 2013 in Case ARB/05/20 *Micula and Others* v *Romania* ('the arbitral award') made by an arbitral tribunal ('the arbitral tribunal') established under the auspices of the International Centre for Settlement of Investment Disputes (ICSID).

3   Mr Ioan Micula and Mr Viorel Micula, Swedish citizens residing in Romania, are the majority shareholders of the European Food and Drinks Group (EFDG), whose activities include the production of food and drink in the region of Ştei-Nucet, Bihor County, in Romania. European Food, Starmill, Multipack, Scandic Distilleries, European Drinks, Rieni Drinks, Transilvania General Import-Export and West Leasing belong to the EFDG.

4   On 2 October 1998, the Romanian authorities adopted Emergency Government Ordinance No 24/1998 granting certain investors in disadvantaged regions who had obtained permanent investor certificates a series of tax incentives, including, inter alia, facilities such as exemption from customs duties and value added tax for machinery, reimbursement of customs duties for raw materials and exemption from the payment of profit tax; those applied for as long as the relevant area was designated as a 'disadvantaged region'.

5   By decision of 25 March 1999, the Romanian Government designated the mining area of Ştei-Nucet as a 'disadvantaged region' for 10 years, with effect from 1 April 1999.

6   On 1 July 2000, Emergency Government Ordinance No 75/2000 amended Emergency Government Ordinance No 24/1998 while maintaining the tax incentives at issue (together, 'the tax incentives scheme at issue').

7   On the basis of the permanent investor certificates, obtained on 1 June 2000 by European Food and on 17 May 2002 by Starmill and Multipack, those three companies made investments in the mining area of Ştei-Nucet.

8   In February 2000, the negotiations for the accession of Romania to the European Union started. In those negotiations, the European Union noted, in the common position of 21 November 2001, that in Romania there were a 'number of existing as well as new incompatible aid schemes which [had] not been brought into line with the *acquis*', including the 'facilities provided under [the tax incentives scheme at issue]'.

---

[1]   Only the paragraphs of the present judgment which the Court considers it appropriate to publish are reproduced here.

9    On 29 May 2002, a bilateral investment treaty was concluded between the Swedish Government and the Romanian Government on the Promotion and Reciprocal Protection of Investments ('the BIT'). That treaty entered into force on 1 July 2003 and granted investors of both countries (including for investments entered into prior to the entry into force of the BIT) certain protections when the investors of one country invested in the other country.

10   Article 2(3) of the BIT provides, inter alia, that 'each Contracting Party shall at all times ensure fair and equitable treatment of the investments by investors of the other Contracting Party and shall not impair, by means of arbitrary or discriminatory measures, the administration, management, maintenance, use, enjoyment or disposal thereof by those investors'. Furthermore, Article 7 of the BIT provides that any dispute between investors and the signatory countries is to be settled, inter alia, by an arbitral tribunal under the auspices of ICSID. In that regard, in accordance with Article 54(1) of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, concluded on 18 March 1965 ('the ICSID Convention'), each Contracting State is required to enforce the arbitral awards rendered pursuant to that convention, with the award being binding on the parties, who, in accordance with Article 53(1) of that convention, must abide by and comply with its terms.

11   On 26 August 2004, Romania repealed all the measures granted under the tax incentives scheme at issue, with the exception of the exemption from the payment of profit tax, stating that 'in order to meet the criteria in the Community rules on State aid, and also to complete the negotiations under Chapter No 6 – Competition Policy it [was] necessary to eliminate all forms of State aid in national legislation incompatible with the *acquis communautaire* in this area'. That repeal came into effect on 22 February 2005.

12   On 28 July 2005, Mr Ioan Micula, Mr Viorel Micula, European Food, Starmill and Multipack ('the arbitration applicants') requested the establishment of an arbitral tribunal pursuant to Article 7 of the BIT, in order to obtain compensation for the damage resulting from the repeal of the tax incentives scheme at issue.

13   On 1 January 2007, Romania acceded to the European Union.

14   By decision of 24 September 2008, the arbitral tribunal found that the arbitration applicants' claims were admissible.

15   In the arbitral award, the arbitral tribunal found that, by repealing the tax incentives scheme at issue prior to 1 April 2009, Romania had violated the legitimate expectations of the arbitration applicants, who thought that those incentives would be available, in substantially the same form, until 31 March 2009 inclusive, had failed to act transparently by failing to inform them in a timely manner and had failed to ensure fair and equitable treatment of those applicants' investments, within the meaning of Article 2(3) of the BIT. Consequently, it ordered Romania to pay them, by way of damages, the sum of 791 882 452 Romanian lei (RON) (approximately EUR 178 million), that sum being fixed by taking into account principally the loss allegedly suffered by those applicants in the period from 22 February 2005 until 31 March 2009.

...

19   On 1 October 2014, the Commission informed Romania that it had decided to initiate the formal investigation procedure laid down in Article 108(2) TFEU in respect of the partial execution of the arbitral award by Romania that took place in early 2014 as well as in respect of any further

implementation or execution of that award ('the opening decision'). In that decision, published in the *Official Journal of the European Union* on 7 November 2014, it invited interested parties to submit their comments.

...

25    On 30 March 2015, the Commission adopted the contested decision; Article 1 of that decision provides that the payment of the compensation granted by the arbitral tribunal in the arbitral award ('the sums at issue') to the single economic unit comprising Mr Ioan Micula, Mr Viorel Micula, European Food, Starmill, Multipack, European Drinks, Rieni Drinks, Scandic Distilleries, Transilvania General Import-Export and West Leasing constitutes 'State aid' within the meaning of Article 107(1) TFEU that is incompatible with the internal market. Pursuant to Article 2(1) of that decision, Romania is required not to pay out any incompatible aid referred to in Article 1 of that decision and to recover such aid which has already been paid out to the entities comprising that economic unit as well as any aid paid out to those entities that the Commission had not been made aware of pursuant to Article 108(3) TFEU or that is paid out after the date of that decision. Article 2(2) of that decision states that the applicants are jointly liable to repay the State aid received by any one of them. In accordance with Article 2(3) and Article 2(4) of the decision, the sums to be recovered are those resulting from the implementation or execution of that award and are to bear interest from the date on which they have been put at the disposal of the beneficiaries.

## II.  Earlier proceedings before the General Court and the Court of Justice

...

28    By judgment of 18 June 2019, *European Food and Others* v *Commission* (T-624/15, T-694/15 and T-704/15, EU:T:2019:423; 'the initial judgment'), the General Court annulled the contested decision. The General Court upheld the form of order sought by the applicants, by upholding the first part of the first plea in law raised in Case T-704/15 and the first part of the second plea raised in Cases T-624/15 and T-694/15, inasmuch as, by the arguments made in support of those pleas, the applicants had challenged the Commission's competence to adopt the contested decision. The General Court also upheld the second part of the second plea raised in Cases T-624/15 and T-694/15 and the first part of the second plea raised in Case T-704/15, alleging, in essence, that the legal classification of the arbitral award as an 'advantage' and 'aid' for the purposes of Article 107 TFEU was incorrect.

...

32    By judgment of 25 January 2022, *Commission* v *European Food and Others* (C-638/19 P, EU:C:2022:50; 'the judgment on appeal'), the Court of Justice set aside the initial judgment, declared that there was no need to adjudicate on the cross-appeal, referred the case back to the General Court for it to adjudicate on the pleas and arguments raised before it on which the Court of Justice had not given a ruling, and reserved the costs.

### III.  Forms of order sought by the parties after referral

33   The Federal Republic of Germany, the Republic of Latvia, Hungary and the Republic of Poland have not submitted written observations on the conclusions to be drawn from the judgment on appeal pursuant to Article 217 of the Rules of Procedure of the General Court.

34   The applicants in Cases T-624/15 RENV and T-694/15 RENV claim that the General Court should:

– annul the contested decision;

– in the alternative, annul that decision in so far as it:

– concerns each of the applicants in those two cases;

– prevents Romania from complying with the arbitral award;

– orders Romania to recover any incompatible aid;

– orders that the applicants are to be jointly liable to repay State aid received by any of the entities identified in Article 2(2) thereof;

– order the Commission to pay the costs relating, first, to the proceedings before the General Court, and second, to the appeal proceedings before the Court of Justice.

35   The applicants in Case T-704/15 RENV claim that the General Court should:

– annul the contested decision;

– in the alternative, annul that decision in so far as it:

– identifies Mr Viorel Micula as an 'undertaking' and therefore part of the economic unit constituting the beneficiary of the aid;

– identifies the beneficiary of the aid as a single economic unit comprising Mr Viorel Micula, Mr Ioan Micula, European Food, Starmill, Multipack, European Drinks, Rieni Drinks, Scandic Distilleries, Transilvania General Import-Export and West Leasing;

– orders, in Article 2(2), that Mr Viorel Micula, Mr Ioan Micula, European Food, Starmill, Multipack, European Drinks, Rieni Drinks, Scandic Distilleries, Transilvania General Import-Export and West Leasing are to be jointly liable to repay the State aid received by any one of them;

– order the Commission to pay the costs relating, first, to the proceedings before the General Court, and second, to the appeal proceedings before the Court of Justice.

36    In Cases T-624/15 RENV, T-694/15 RENV and T-704/15 RENV, the Commission contends that the General Court should:

– dismiss the actions;

– order the applicants to pay the costs of the proceedings, including those relating to the appeal proceedings before the Court of Justice.

37    In Cases T-624/15 RENV, T-694/15 RENV and T-704/15 RENV, the Kingdom of Spain contends that the General Court should:

– dismiss the actions;

– order the applicants to pay the costs.


## IV.  Law

...


## A.  The admissibility of the actions

42    The Commission, supported by the Kingdom of Spain, raises a plea of inadmissibility alleging that the applicants lack interest in bringing proceedings.

43    According to the Commission, the Court of Justice, relying on the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158), recognised, in the judgment on appeal, that the arbitral award giving rise to the compensation at issue was incompatible with EU law. Furthermore, the Commission states that, in accordance with the order of 21 September 2022, *Romatsa and Others* (C-333/19, not published, EU:C:2022:749), the EU courts are required to set aside that award and cannot, in any event, enforce it. In those circumstances and in essence, the applicants have no 'legitimate' interest in seeking the annulment of the contested decision.

44    When asked to clarify its argument at the hearing, the Commission claimed, in essence, that an interest in bringing proceedings is legitimate where it is not contrary to a fundamental public policy interest of the European Union.

45    In their supplementary observations on the conclusions to be drawn from the judgment on appeal, the applicants submit that the actions are admissible.

46    In that regard, it should be noted that an action for annulment brought by a natural or legal person is admissible only in so far as that person has an interest in having the contested act annulled. Such an interest requires that the annulment of that act must be capable, in itself, of having legal consequences and that the action may therefore, through its outcome, procure an advantage to the party which brought it (judgment of 27 February 2014, *Stichting Woonpunt and Others* v *Commission*, C-132/12 P, EU:C:2014:100, paragraph 67). The interest in bringing proceedings is an essential and fundamental prerequisite for any legal proceedings (judgment of 15 June 2023, *Shindler and Others* v *Council*, C-501/21 P, EU:C:2023:480, paragraph 63).

47    By contrast, there is no interest in bringing proceedings when the favourable outcome of an action could not, in any event, give the applicant satisfaction (see, to that effect, judgments of 9 June 2011, *Evropaïki Dynamiki* v *ECB*, C-401/09 P, EU:C:2011:370, paragraph 49, and of 23 November 2017, *Bionorica and Diapharm* v *Commission*, C-596/15 P and C-597/15 P, EU:C:2017:886, paragraph 85).

48    Moreover, an applicant's interest in bringing proceedings does not depend on the merits of his or her action (see, to that effect, judgment of 4 July 2017, *European Dynamics Luxembourg and Others* v *European Union Agency for Railways*, T-392/15, EU:T:2017:462, paragraph 41).

49    In the present case, it should be recalled that, by the contested decision, the Commission classified the payment of the sums at issue as State aid incompatible with the internal market and ordered Romania to recover the sums already paid from the applicants, namely the arbitration applicants and five other companies, on the ground that, together, they formed a single economic unit. That decision clearly adversely affects the applicants, since it requires Romania to recover from them the sums paid and the interest which those sums have accrued up to the date of their actual repayment. In that regard, it should be noted that, according to the Commission, as is apparent from recital 42 of that decision, the Romanian authorities fully implemented the arbitral award.

50    The fact that the Court of Justice held that the arbitral award was, since Romania's accession to the European Union, incompatible with EU law, in particular Articles 267 and 344 TFEU, and that it cannot therefore produce any effect (order of 21 September 2022, *Romatsa and Others*, C-333/19, not published, EU:C:2022:749, paragraphs 42 and 43), is not such as to deprive the applicants of their interest in bringing proceedings.

51    First, as the applicants submit, the fact that a court of a Member State cannot under any circumstances, in accordance with the order of 21 September 2022, *Romatsa and Others* (C-333/19, not published, EU:C:2022:749, paragraph 44), enforce the arbitral award is independent of the question whether the contested decision, adopted by the Commission, complies with EU law and, in particular, whether the measure referred to therein satisfies, from a substantive point of view, the conditions laid down in Article 107(1) TFEU in order to be classified as State aid within the meaning of that provision and, on that basis, be subject to a recovery obligation incumbent on Romania.

52    Second, the fact that the payment of the sums at issue led, according to the Commission, to 'enforcement of an award which [violated] fundamental principles of EU law' is not such as to deprive the applicants, irrespective of the merits of their actions, of their right to challenge the legality of an act adversely affecting them.

53    Furthermore, it must be observed that the Court of Justice, in finding, in paragraphs 154 and 155 of the judgment on appeal, that, as regards the arguments, parts and pleas concerning the merits of the contested decision, the state of the proceedings did not permit it to give final judgment, even though it was already in a position to assess the admissibility of those proceedings, and that the case therefore had to be referred back to the General Court for it to give judgment on them, implicitly but necessarily found that the present dispute was admissible.

54    In those circumstances, the plea of inadmissibility raised by the Commission alleging that the applicants lack interest in bringing proceedings must be rejected.

## B. The merits of the actions

...

### 1. The first plea in law, alleging a misuse of powers and an infringement of Article 351 TFEU and of general principles of law

...

### (b) The second part, alleging an infringement of Article 351 TFEU and of general principles of law

65    The applicants submit, in essence, that Romania was required to comply with the obligations that it had entered into, before its accession to the European Union, under the BIT and the ICSID Convention, in particular Articles 53 and 54 of that convention, which require it to execute the arbitral award, even in the event that the payment of the sums at issue would constitute State aid within the meaning of EU law.

66    According to the applicants, Romania's compliance with the ICSID Convention is required vis-à-vis all States signatory to that convention, with the result that that convention may be relied on by any third State, without that State having to invoke a specific interest in the outcome of the dispute.

67    In particular, the applicants refer to the judgment of the Supreme Court of the United Kingdom of 19 February 2020 in *Micula and Others* v *Romania*, which allowed enforcement of the arbitral award by recognising that 'the obligations of [ICSID] Contracting States [arising from] articles 53, 54 and 69 are expressed in unqualified terms, without limit as to the persons to whom they are owed'.

68    In those circumstances, according to the applicants, even if the BIT did not fall within the scope of Article 351 TFEU, that circumstance would have no bearing on Romania's obligation to execute the arbitral award pursuant to the ICSID Convention, even after its accession to the European Union. The consent given by Romania to the arbitration procedure thus continues to bind that country on the basis of Article 25(1) of that convention, which provides that, when a Contracting State has given its consent to arbitration, it cannot withdraw it unilaterally.

69    The applicants add in that regard, in Cases T-624/15 RENV and T-694/15 RENV, that if Romania were to fail to meet its obligations, any Contracting State, including any non-EU Contracting State, could bring an action against Romania before the International Court of Justice (ICJ) under Article 64 of the ICSID Convention.

70    The applicants state that, consequently, the contested decision, in ordering recovery in respect of the aid measure at issue, prevents Romania from complying with those obligations and is therefore contrary to the first paragraph of Article 351 TFEU, pursuant to which the rights and obligations arising from an agreement concluded between a Member State prior to its accession and third countries are not affected by the provisions of the Treaties.

71  According to the applicants, the contested decision is also contrary to the general principle of EU law, *pacta sunt servanda*, to which the first paragraph of Article 351 TFEU gives expression. Furthermore, the applicants submit that the decision disregards the principle of sincere cooperation between the European Union and the Member States, the mutuality of which is stressed in Article 4(3) TEU and of which Article 351 TFEU is 'reflective'.

72  The Commission, supported by the Kingdom of Spain, disputes the applicants' line of argument.

73  The first paragraph of Article 351 TFEU provides that 'the rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties'.

74  According to settled case-law, the purpose of the first paragraph of Article 351 TFEU is to make clear, in accordance with the principles of international law, as set out in, inter alia, Article 30(4)(b) of the Vienna Convention on the Law of Treaties of 23 May 1969 (*United Nations Treaty Series*, vol. 1155, p. 331), that the application of the FEU Treaty does not affect the duty of the Member State concerned to respect the rights of non-member countries under a prior agreement and to perform its obligations thereunder (see judgment of 15 September 2011, *Commission* v *Slovakia*, C-264/09, EU:C:2011:580, paragraph 41 and the case-law cited).

75  The first paragraph of Article 351 TFEU is of general scope, inasmuch as it applies to any international convention, irrespective of subject matter, which is capable of affecting the EU Treaties (see, to that effect, judgment of 2 August 1993, *Levy*, C-158/91, EU:C:1993:332, paragraph 11).

76  The first paragraph of Article 351 TFEU has, therefore, the aim of protecting the rights of third countries (judgment of 13 July 1966, *Consten and Grundig* v *Commission*, 56/64 and 58/64, EU:C:1966:41, p. 346), by permitting the Member States concerned to perform their obligations under a prior international agreement (see, to that effect, judgment of 21 December 2011, *Air Transport Association of America and Others*, C-366/10, EU:C:2011:864, paragraph 61).

77  On the other hand, the first paragraph of Article 351 TFEU does not authorise the Member States to exercise rights under such agreements in their internal relations within the European Union (see, to that effect, judgments of 2 July 1996, *Commission* v *Luxembourg*, C-473/93, EU:C:1996:263, paragraph 40, and of 7 July 2005, *Commission* v *Austria*, C-147/03, EU:C:2005:427, paragraph 58).

78  It follows that, in the first paragraph of Article 351 TFEU, the terms 'rights and obligations' refer, as regards 'rights', to the rights of non-member countries and, as regards 'obligations', to the obligations of Member States (judgment of 2 August 1993, *Levy*, C-158/91, EU:C:1993:332, paragraph 12).

79  Consequently, in order to determine whether a rule of EU law may be deprived of effect by an earlier international agreement, it is necessary to examine whether that agreement imposes on the Member State concerned obligations the performance of which may still be required by non-member countries which are parties to it (judgments of 2 August 1993, *Levy*, C-158/91, EU:C:1993:332, paragraph 13, and of 15 September 2011, *Commission* v *Slovakia*, C-264/09, EU:C:2011:580, paragraph 42).

80    Thus, for a rule of EU law to be deprived of effect as a result of an international agreement, pursuant to the first paragraph of Article 351 TFEU, two conditions must be fulfilled: the agreement must have been concluded before the entry into force of the EU Treaties in the Member State concerned and the third State concerned must derive from it rights which it can require that Member State to respect (see, to that effect, judgment of 10 March 1998, *T. Port*, C-364/95 and C-365/95, EU:C:1998:95, paragraph 61).

81    The first paragraph of Article 351 TFEU, in so far as it constitutes a rule capable of authorising derogations from the application of EU law, including primary law, must therefore be interpreted strictly, so that the general rules laid down by the EU Treaties are not negated (judgment of 14 March 2024, *Commission* v *United Kingdom (Judgment of the Supreme Court)*, C-516/22, EU:C:2024:231, paragraphs 78 and 81).

82    The ICSID Convention, which entered into force with respect to Romania on 12 October 1975, provides, in Article 25(1) thereof:

'The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally.'

83    Article 53(1) of the ICSID Convention is worded as follows:

'The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award …'

84    Article 54(1) of the ICSID Convention provides:

'Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State. …'

85    Article 64 of the ICSID Convention states that 'any dispute arising between Contracting States concerning the interpretation or application of this Convention which is not settled by negotiation shall be referred to the International Court of Justice by the application of any party to such dispute, unless the States concerned agree to another method of settlement'.

86    Article 7 of the BIT provides that any dispute between investors and the signatory countries is to be settled, inter alia, by an arbitral tribunal which applies the ICSID Convention.

87    In the present case, the Commission stated, in recitals 126 and 127 of the contested decision, that the rights and obligations relied on by the arbitration applicants resulted from the application of the BIT. After finding that that treaty had been concluded between two Member States, and not between one or more Member States and one or more third countries, the Commission found as a result that Article 351 TFEU was not applicable in the case at hand. It concluded from that that the application of State aid law did not, in the circumstances at hand, affect rights and obligations protected under Article 351 TFEU.

88    The Commission added, in recital 129 of the contested decision, that, since no third country that was a contracting party to the ICSID Convention was party to the BIT involved in the arbitration proceedings, Article 351 TFEU was not relevant in the case at hand.

89    Having regard to the applicants' line of argument and to the statement of reasons for the contested decision on that point, the analysis of the present part requires it to be ascertained, at the outset, whether, in the present case, the obligations entered into by Romania under, first, the BIT, and second, the ICSID Convention, fall within the scope of Article 351 TFEU.

*(1) The existence of obligations, within the meaning of Article 351 TFEU, entered into by Romania under the BIT*

90    Article 351 TFEU concerns, as noted in paragraphs 74 and 78 above, the rights of non-member countries and the corresponding obligations of the Member States. Romania's obligations, entered into prior to its accession, under the BIT, correspond to the rights of the Kingdom of Sweden acquired on that same basis.

91    On the date of the signature of the BIT, the Kingdom of Sweden was a Member State rather than a non-Member State of the European Union. Such a bilateral treaty must therefore, since Romania's accession to the European Union, be regarded as a treaty concerning two Member States (judgment of 14 March 2024, *Commission* v *United Kingdom (Judgment of the Supreme Court)*, C-516/22, EU:C:2024:231, paragraph 72).

92    Article 351 TFEU does not apply to a bilateral treaty concluded between two Member States, since no third country is party to it (see, to that effect, judgment of 8 September 2009, *Budějovický Budvar*, C-478/07, EU:C:2009:521, paragraph 99).

93    In those circumstances, on the date on which the aid was granted, which is decisive for assessing whether Article 351 TFEU is applicable – in the present case, the day of delivery of the arbitral award (see paragraph 62 above) – the BIT cannot be regarded as an agreement giving rise, within the meaning of that article, to rights in favour of third countries and obligations on the part of that Member State liable to be affected by the application, pursuant to the contested decision, of Articles 107 and 108 TFEU.

94    The fact that the event giving rise to the damage, namely the repeal, allegedly in breach of the BIT, of the tax incentives scheme at issue, for which compensation was granted by the arbitral award, occurred prior to Romania's accession to the European Union cannot call that interpretation into question.

95    The same is true of the circumstance that the facts giving rise to Romania's liability took place, at least in part, before its accession to the European Union, when that State was still a third country within the meaning of Article 351 TFEU.

96    As the Court of Justice pointed out in the judgment on appeal, it is true that it cannot be ruled out that, according to the principles deriving from national law on civil liability, a right to compensation arises on the date of the repeal of the tax incentives scheme at issue, recognised as the event giving rise to the damage (judgment on appeal, paragraphs 117 and 118). By contrast, that right to compensation differs from the right to receive the compensation granted by the arbitral award, with the result that the aid measure at issue was not granted on the date of that repeal (judgment on appeal, paragraphs 119 to 127).

97   In the light of the foregoing, it must be concluded that Romania's obligations entered into under the BIT and examined in the context of the present dispute did not fall within the scope of Article 351 TFEU.

98   The applicants cannot therefore maintain that, by the contested decision, the Commission infringed Article 351 TFEU by preventing Romania from complying with its obligations entered into under the BIT.

*(2)   The existence of obligations, within the meaning of Article 351 TFEU, entered into by Romania under the ICSID Convention*

99   In accordance with the judgment on appeal, the system of judicial remedies provided for by the EU and FEU Treaties replaced the arbitration procedure provided for by the BIT with effect from Romania's accession to the European Union, that is to say, from 1 January 2007 (judgment on appeal, paragraph 145).

100   It is common ground that the arbitral tribunal, which applies the ICSID Convention and before which the dispute between the arbitration applicants and Romania was brought, does not form part of the EU judicial system (judgment on appeal, paragraph 141).

101   The arbitral award, adopted by the arbitral tribunal on 11 December 2013, that is to say, after Romania's accession to the European Union, cannot therefore produce any effects and cannot thus be executed with a view to paying the compensation granted by that award (see, to that effect, order of 21 September 2022, *Romatsa and Others*, C-333/19, not published, EU:C:2022:749, paragraph 43).

102   Consequently, a court or tribunal of a Member State ruling on the enforcement of an arbitral award is required to set aside that award and, therefore, may not in any case proceed with its enforcement in order to enable its beneficiaries to obtain payment of damages which it awarded them (order of 21 September 2022, *Romatsa and Others*, C-333/19, not published, EU:C:2022:749, paragraph 44). That finding is binding on Romania, as a Member State.

103   There was therefore no obligation for Romania to execute the arbitral award or, a fortiori, to implement it, independently of any enforcement.

104   Therefore, it must be concluded that Article 53 of the ICSID Convention, under which each party bound by the award must abide by and comply with its terms, as recalled in paragraph 83 above, did not, in the present case, create obligations for Romania falling within the scope of Article 351 TFEU.

105   Consequently, it must be stated that Article 54 of the ICSID Convention, according to which 'each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories', as set out in paragraph 84 above, was not such as to create rights in favour of third counties corresponding to obligations on the part of Romania, such obligations, in the present case, being non-existent.

106   Furthermore, as the Court of Justice has held, the ICSID Convention, despite its multilateral nature, is intended to govern bilateral relations between the contracting parties in an analogous way to a bilateral treaty. Although the applicants claim, in essence, that the third States which have concluded the ICSID Convention could have an interest in Romania complying with its

obligations vis-à-vis another Member State by enforcing, in accordance with the provisions of that convention, an arbitral award falling within its scope, such a purely factual interest cannot be equated with a 'right', within the meaning of the first paragraph of Article 351 TFEU, capable of justifying the application of that provision (see, to that effect, judgment of 14 March 2024, *Commission* v *United Kingdom (Judgment of the Supreme Court)*, C-516/22, EU:C:2024:231, paragraphs 75 and 76).

107    Therefore, Articles 53 and 54 of the ICSID Convention cannot be interpreted as having created 'rights', within the meaning of the first paragraph of Article 351 TFEU, in favour of third States signatory to that convention that correspond to obligations on the part of Romania to execute the arbitral award.

108    In those circumstances, and without it being necessary to rule on the effect that the applicants allege Article 25(1) and Article 64 of the ICSID Convention have on Romania's obligation to execute the arbitral award pursuant to that convention, the contested decision, in ordering the recovery of the aid, was not such as to prevent a Member State from complying with obligations falling within the scope of Article 351 TFEU. Consequently, that decision did not infringe Article 351 TFEU, under which the rights and obligations arising from an agreement concluded between a Member State before its accession and third counties are not affected by the provisions of the Treaties.

109    The Commission could therefore find, without erring in law, that 'the application of the State aid rules [did] not affect rights and obligations protected by Article 351 TFEU'.

110    The complaint alleging an infringement of the first paragraph of Article 351 TFEU and, consequently, the complaint alleging a breach of the principle *pacta sunt servanda*, of which that article is said to be the expression, must be rejected.

111    The same applies to the complaint alleging a breach of the principle of sincere cooperation in so far as it is said to be implemented by the first paragraph of Article 351 TFEU.

112    In the light of all the foregoing, the present part must be rejected and, consequently, the first plea in law must be rejected in its entirety.

## 2.  *The second plea in law, alleging an infringement of Article 107(1) TFEU*

113    The applicants submit that the Commission has not shown that the conditions laid down by Article 107(1) TFEU have been satisfied in the present case. They divide their plea into three parts.

114    The Commission, supported by the Kingdom of Spain, disputes the applicants' arguments.

115    It must be borne in mind that, according to Article 107(1) TFEU, 'any aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods shall, in so far as it affects trade between Member States, be incompatible with the internal market'.

116    According to settled case-law, the classification as State aid within the meaning of Article 107(1) TFEU requires that all the conditions set out in that provision are fulfilled. Thus, for a measure to be classified as State aid, first, there must be an intervention by the State or through State resources; second, that intervention must be liable to affect trade between Member States; third,

it must confer an advantage on the recipient, and fourth, it must distort or threaten to distort competition (see judgment of 12 November 2013, *MOL* v *Commission*, T-499/10, EU:T:2013:592, paragraph 51 and the case-law cited).

### (a) First part, alleging that there is no economic advantage

117   The applicants submit that the aid measure at issue does not confer any economic advantage on them. They advance three main complaints.

118   In the first place, the applicants submit that, contrary to what the Commission claims, the arbitral award did not compensate the arbitration applicants for the consequences of the repeal of the tax incentives scheme at issue but awarded them damages as compensation for the damage resulting from Romania's failure to act fairly and equitably towards them, contrary to Article 2(3) of the BIT. At the very least, even if the Commission's interpretation of that award were correct, compensation for indirect consequences of that repeal, such as lost profit or lost opportunity to win new markets, cannot be classified as an advantage for the purposes of the rules on State aid.

119   In the second place, the applicants submit that, in accordance with the case-law arising from the judgment of 27 September 1988, *Asteris and Others* (106/87 to 120/87, EU:C:1988:457, paragraphs 23 and 24), the damages granted by the arbitral award did not constitute an advantage for the purposes of Article 107(1) TFEU.

120   In the third and last place, the applicants state that, assuming that the arbitral award could constitute an advantage, the contested decision incorrectly identifies the aid measure at issue as consisting in the payment of the sums at issue rather than in that award. That payment is part of the 'normal course' of the execution or implementation of that award, with the result that Romania paying compensation cannot amount to an advantage that is separate from that allegedly conferred by that award.

121   It must be borne in mind that measures which, whatever their form, are likely directly or indirectly to favour certain undertakings or are to be regarded as an economic advantage which the recipient undertaking would not have obtained under normal market conditions are considered to constitute State aid (see judgments of 15 May 2019, *Achema and Others*, C-706/17, EU:C:2019:407, paragraph 83 and the case-law cited, and of 17 September 2020, *Compagnie des pêches de Saint-Malo*, C-212/19, EU:C:2020:726, paragraph 39 and the case-law cited).

122   In that regard, in order to assess whether a Member State has conferred an advantage on a given undertaking, the financial situation of the undertaking following the measure should be compared with its financial situation if the measure had not been taken. In particular, interventions which, in various forms, mitigate the charges which are normally included in the budget of an undertaking are considered to constitute aid. There is therefore an advantage where, as a result of the measure and without that being justified by the nature or general scheme of the system concerned, the net financial situation of the beneficiary is improved (see, to that effect, judgment of 17 September 2020, *Compagnie des pêches de Saint-Malo*, C-212/19, EU:C:2020:726, paragraph 40).

123   The General Court considers it appropriate to examine, in the first place, the third complaint, alleging incorrect identification of the aid measure at issue, before analysing the first and second complaints, based on the premiss that that measure consists in the grant of damages under the arbitral award.

*(1)  The third complaint, alleging incorrect identification of the aid measure at issue*

124   The applicants submit, in essence, as noted in paragraph 120 above, that the aid measure at issue is not the payment of the sums at issue but the arbitral award. According to them, the Commission therefore vitiated the contested decision by an error of law, inasmuch as it erred in identifying the measure under examination, with the result that it could not, without making an error of assessment, classify that payment as an advantage for the purposes of Article 107(1) TFEU.

125   In the present case, the aid measure at issue is identified in recital 39 of the contested decision as follows: 'the measure under assessment is the payment of the [sums at issue] by virtue of the Award, whether by implementation or execution of that [arbitral] Award, plus the interest that has accrued since the Award was issued'.

126   It is clear from recital 39 of the contested decision, which concerns the 'Description of the measure' and comes under Part 3 of that decision, entitled 'Description of the measure and grounds for initiating the procedure', that the measure referred to by that decision is the payment of the sums at issue and not the arbitral award.

127   The identification by the Commission of the aid measure at issue as corresponding to the payment of the sums at issue is confirmed in recital 123 of the contested decision, in which it is stated that '[that payment] to the [arbitration applicants], whether by implementing or executing the Award, would improve their competitive position'.

128   That finding cannot be called into question by the applicants' argument based on paragraph 124 of the judgment on appeal, in which it is stated that 'the right to compensation for the loss which the arbitration applicants allege to have suffered as a result of the repeal, allegedly in breach of the BIT, of the tax incentives scheme at issue was granted only by the arbitration award'.

129   It must be pointed out that, by making that statement, the Court of Justice ruled only on the Commission's competence *ratione temporis* to adopt the contested decision under Article 108 TFEU. It thus made a ruling, in paragraph 124 of the judgment on appeal, solely concerning the date on which the right to compensation was granted to the applicants and not on the classification as State aid within the meaning of Article 107(1) TFEU of the payment of the sums at issue, as examined in that decision.

130   In that regard, the question whether, irrespective of the payments examined, the arbitral award constitutes in itself an advantage capable of being classified as State aid within the meaning of Article 107(1) TFEU has no bearing on the identification of the aid measure at issue as being the payment of the sums at issue.

131   The Court of Justice, furthermore, expressly stated, in paragraph 135 of the judgment on appeal, that, by the contested decision, the Commission had examined, in the light of the rules of the FEU Treaty on State aid, the payment of the sums at issue pursuant to the arbitral award.

132   Moreover, the Commission cannot ask the General Court to consider from now on, as is apparent it does in its supplementary statements of written observations and by the oral argument presented at the hearing, that the measure examined by it should be regarded as a single measure consisting in the arbitral award and its execution. It is settled case-law that, in the context of an

action for annulment, the General Court cannot substitute its own reasoning for that of the author of the contested act (see judgment of 26 October 2016, *PT Musim Mas* v *Council*, C-468/15 P, EU:C:2016:803, paragraph 64 and the case-law cited).

133 Although the applicants claim also that the payment of damages is merely the 'automatic consequence' of the arbitral award, they only state, by that assertion, that that award is the cause of the payment of the sums at issue by Romania and cannot, by that statement, effectively claim that that payment did not constitute an advantage that is separate from that award.

134 Article 107(1) TFEU does not distinguish between the causes of State aid but, as the Commission pointed out in recital 80 of the contested decision, defines them in relation to their effects (judgment of 4 March 2021, *Commission* v *Fútbol Club Barcelona*, C-362/19 P, EU:C:2021:169, paragraph 61, and judgment on appeal, paragraph 122).

135 Even supposing that the arbitral award could not be separated from its execution, the fact remains that the payment of the sums at issue, in execution or implementation of that award, was the measure assessed by the Commission in the contested decision.

136 In those circumstances, the Commission was fully entitled to define, contrary to what the applicants have claimed, the aid measure at issue as the payment of the sums at issue in order to ascertain, in its assessment of the existence of State aid, within the meaning of Article 107(1) TFEU, whether that payment represented an economic advantage from which the applicants would not have benefited under normal market conditions.

137 In the light of all the foregoing, the present complaint must be rejected.

*(2) The first complaint, alleging that the aid measure at issue cannot constitute an advantage paid as compensation for the consequences of the repeal of the tax incentives scheme at issue*

138 As is apparent from paragraph 118 above, the present complaint is based on two main arguments.

*(i) The first argument, alleging that the Commission erred in finding that the arbitral award compensated the arbitration applicants for the consequences of the repeal of the tax incentives scheme at issue*

139 It is apparent from paragraph 131 above that the Commission examined, in the light of the rules of the FEU Treaty on State aid, the payment of the sums at issue and not the tax incentives scheme at issue, which had been repealed before Romania's accession to the European Union and was, moreover, no longer in force at the time the contested decision was adopted (judgment on appeal, paragraph 135).

140 To that end, as is apparent from recital 93 of the contested decision, the Commission examined the basis on which the arbitral tribunal had assessed the aid that that tribunal had granted to the arbitration applicants and the description of the damage allegedly suffered.

141 It is apparent from recital 94 of the contested decision that the Commission considered, first of all, that the arbitral tribunal had compensated the damage resulting from the premature repeal of the tax incentives scheme at issue. The Commission found, next, that the implementation or execution of the arbitral award by Romania granted the arbitration applicants, as is apparent from

recital 95 of that decision, an amount corresponding to the advantages which they should have received under that scheme for the period between the moment it was repealed, on 22 February 2005, and its scheduled expiry, on 1 April 2009. Lastly, it found that the amount of the damage represented, in essence, first, repayment of the amount of customs duties charged on sugar and other raw materials which the arbitration applicants would have avoided if that repeal had not taken place, and second, the amount of lost profit from the sale of finished goods resulting from that repeal.

142   The Commission therefore classified, in recital 96 of the contested decision, the payment of the sums at issue as an economic advantage which the arbitration applicants would not have been able to obtain under normal market conditions, on the ground that that payment was intended to compensate them for the damage they had incurred as a result of the repeal of the tax incentives scheme at issue.

143   In order to challenge the Commission's interpretation of the arbitral award, the applicants submit that the arbitral tribunal awarded the arbitration applicants damages as compensation for the damage they allege to have suffered, as recalled in paragraph 118 above, as a result of Romania's failure to ensure fair and equitable treatment of their investments, in breach of Article 2(3) of the BIT. In that regard, they state that Romania infringed that article by, first, removing the principal benefits of the tax incentives scheme at issue while keeping in place the concomitant obligations, and second, failing to act transparently by failing to inform the arbitration applicants in a timely manner of the repeal of that scheme.

144   The applicants add that, although the arbitral tribunal referred to the tax incentives scheme at issue in order to quantify the damage suffered, that fact cannot in itself mean that the arbitral award reinstated that scheme.

145   In the present case, it is apparent from paragraph 872 of the arbitral award, as reproduced in paragraph 27 of the judgment on appeal and in recital 26 of the contested decision, that the arbitral tribunal found that, by repealing the tax incentives scheme at issue prior to 1 April 2009, Romania, first, violated the legitimate expectations of the arbitration applicants, who thought that those incentives would be available, in substantially the same form, until 31 March 2009 inclusive, second, failed to act transparently by failing to inform those applicants in a timely manner, and third, failed, consequently, to ensure fair and equitable treatment of the investments of those applicants, within the meaning of Article 2(3) of the BIT. Accordingly, that tribunal ordered Romania to pay those applicants damages, the amount of which was fixed by taking into account principally the loss allegedly suffered by them in the period from 22 February 2005 until 31 March 2009.

146   That said, it must be noted, in the first place, that the damage compensated by the arbitral award, as identified in the operative part of that award and summarised in recital 27 of the contested decision, corresponds to the following damage: the increase in the cost of sugar (for the import of which the arbitration applicants had to pay customs duties after the repeal of the raw materials facility), the increase in the cost of raw materials other than sugar and certain types of polyethylene terephthalate (PET, in respect of which the claim for damages had been rejected by the arbitral tribunal on the ground that the applicants had never benefited from the raw materials facility with respect to their import), the loss of the ability to stockpile sugar at lower prices (the amount of which was calculated on the basis of the customs duties charged on imported sugar which could have been avoided if the arbitration applicants had had the opportunity to stockpile sugar prior to 1 April 2009); and lost profits in respect of lost sales of finished goods

(corresponding to the loss of market shares over the 2004-2008 period in respect of soft drinks and other products containing sugar, the rising cost of which led to an increase in the price of those products, that increase in turn causing a drop in the sales of those products).

147    The sums paid as compensation for damage thus identified bore interest, calculated from 1 March 2007 in respect of the increased cost of sugar and other raw materials, from 1 November 2009 in respect of the loss of the ability to stockpile sugar, and from 1 May 2008 in respect of lost profits.

148    In the second place, it must be borne in mind that, as is apparent from the contested decision, the tax incentives scheme at issue granted certain investors in regions regarded by the Romanian Government as disadvantaged an exemption from customs duties for the raw materials necessary to the investment made in the disadvantaged region concerned, the exemption from duties having succeeded, after an amendment to that scheme, to the reimbursement of those duties initially provided for.

149    As has been pointed out in paragraph 7 above, from the early 2000s, the arbitration applicants enjoyed, in their capacity as investors in the mining region of Ștei-Nucet, considered to be disadvantaged, the exemptions from customs duties on raw materials provided for by the tax incentives scheme at issue, until its repeal on 22 February 2005.

150    In the third place, it must be added that, although the applicants dispute the conclusions liable to be drawn from the method of calculating the compensation used by the arbitral tribunal, they do not dispute, by contrast, that the amount of damages was fixed taking into account the tax incentives scheme at issue.

151    It is apparent from paragraphs 944 and 945 of the arbitral award that the method used by the arbitral tribunal to calculate the damage sustained was advanced by the arbitration applicants and consisted in quantifying the increased costs and lost profit suffered by the arbitration applicants as a result of not having been able to develop their business as they had planned, by implementing incremental investments and selling sugar-containing products.

152    In that regard, the arbitral tribunal stated, in paragraph 917 of the arbitral award, reproduced in recital 94 of the contested decision, that damages had to be awarded on the basis of the principle that 'the claimant must be placed back in the position it would have been "in all probability" but for the international wrong'. It also found, as is apparent from paragraph 928 of that award, that only losses that are causally linked to the act constituting the international wrong could be compensated by way of damages and that 'all of the violations of the BIT alleged by the [arbitration applicants] arise from the same fact[, namely] the premature revocation of the incentives [provided for by the tax incentives scheme at issue,] or [are] in direct connection with that premature revocation'.

153    In those circumstances, as the Commission noted in recital 94 of the contested decision, the arbitral tribunal took into account, when determining the amount of damages due to the applicants, whether losses had been incurred in reality and whether they were directly related to the repeal of the tax incentives scheme at issue, as is apparent, in particular, from paragraph 953 of the arbitral award, as regards the award of damages in respect of the increase in the price of sugar, from paragraph 971 of that award, as regards the award of damages in respect of the increase in the price of raw materials other than sugar and PET, from paragraphs 982 to 985 of

that award, as regards the award of damages in respect of the loss of the ability to stockpile sugar, and from paragraphs 1016 to 1020 of that award, as regards the award of damages for lost profit in respect of sales of finished goods.

154    In the fourth and last place, as the Court of Justice pointed out in paragraph 117 of the judgment on appeal, the compensation granted by the arbitral award, since it was intended to compensate for the damage which the arbitration applicants claimed to have suffered as a result of the repeal by Romania of the tax incentives scheme at issue, allegedly in breach of the BIT, has its origin in that repeal, which constitutes the event giving rise to the damage for which that compensation was granted by the arbitral tribunal.

155    It is apparent from paragraphs 146 to 154 above that the arbitral tribunal, in taking the view that Romania, as recalled in paragraph 145 above, had failed to ensure fair and equitable treatment of the investments of the arbitration applicants, within the meaning of Article 2(3) of the BIT, intended to compensate those applicants for the financial consequences of the repeal of the tax incentives scheme at issue.

156    As the Commission stated at the hearing, the arbitral tribunal, moreover, neither characterised nor quantified, first, the damage alleged to have resulted from the consequences of the obligations imposed on the beneficiaries of the tax incentives scheme at issue having been kept in place despite the removal of the advantages previously connected to them, and second, the damage alleged to have resulted from Romania's failure to act transparently, as a result of its failure properly to inform the investors that that scheme would be terminated prior to its stated date of expiry.

157    The applicants are therefore not justified in claiming that the arbitral award did not compensate the arbitration applicants for the consequences of the repeal of the tax incentives scheme at issue but awarded them damages as compensation for the damage suffered as a result of Romania's conduct consisting in, first, keeping in place, despite the repeal of the scheme, the obligations corresponding to the advantages established by that scheme, and second, failing to inform them in a timely manner of that repeal, in breach of its obligation to ensure fair and equitable treatment of investors' investments, in accordance with Article 2(3) of the BIT.

*(ii)  The second argument, alleging that compensation for indirect consequences of the repeal of the tax incentives scheme at issue cannot be classified as an advantage within the meaning of Article 107(1) TFEU*

158    The applicants add, as stated in paragraph 118 above, that, at the very least, should the General Court find that the arbitral award compensated the arbitration applicants for the consequences of the repeal of the tax incentives scheme at issue, compensation for indirect consequences of that repeal, such as lost profit or lost opportunity to win new markets, cannot be classified as an advantage for the purposes of the State aid rules.

159    In that regard, the applicants submit that the sums at issue do not correspond to the amounts which they would have received if the tax incentives scheme at issue had not been repealed. According to the applicants, the compensation granted by the arbitral tribunal pursuant to the arbitral award compensates for indirect consequences of the repeal of that scheme, namely the increase in costs due to the fact that it was impossible for them to stockpile sugar before the

scheduled date of expiry of that scheme and the drop in profits due to the loss of market shares as a result of the rising costs of imported raw materials, on account of the payment of customs duties.

160  In those circumstances, the applicants in Case T-704/15 RENV state that, even if the payment of the sums at issue had led to compensation for the withdrawal of unlawful or incompatible aid to which the tax incentives scheme at issue is alleged to amount, the sums granted by the arbitral tribunal as compensation for lost profit or lost opportunity following the repeal of that scheme cannot, in any event, constitute, in accordance with the relevant case-law, 'advantages' for the purposes of Article 107(1) TFEU.

161  According to the case-law relied on by the applicants, the recovery of unlawful aid with a view to re-establishing the status quo ante does not imply reconstructing past events differently on the basis of hypothetical elements and entails only the restitution of the advantage procured by the aid for the recipient, not the restitution of any economic benefit the recipient may have enjoyed as a result of exploiting the advantage (judgment of 21 December 2016, *Commission* v *Aer Lingus and Ryanair Designated Activity*, C-164/15 P and C-165/15 P, EU:C:2016:990, paragraphs 91 and 92).

162  It must be noted, first of all, that it is irrelevant for the classification of the compensation granted by the arbitral tribunal, pursuant to the arbitral award, whether or not that compensation corresponded to compensation for the withdrawal of unlawful or incompatible aid, the only relevant question in that regard being whether the compensation granted was capable of constituting State aid within the meaning of Article 107(1) TFEU. Furthermore, the fact that the recovery of unlawful aid entails only, in accordance with the case-law relied on by the applicants, the restitution of the advantage procured by that aid for the recipient is also irrelevant for the classification that the Commission must make of the compensation granted by that award in the light of that provision.

163  Next, it should be noted that the case-law cited in paragraph 161 above precludes the recovery of unlawful aid from involving the restitution of any economic benefit the recipient may have enjoyed as a result of exploiting the unlawful aid. In any event, the contested decision orders recovery in respect of the payment of the sums at issue and not the recovery of a hypothetical advantage resulting from the recipient exploiting those sums.

164  The advantage enjoyed by the applicants in the present case is the payment of the compensation granted pursuant to the arbitral award.

165  Moreover, an action for damages, such as that brought by the arbitration applicants before the arbitral tribunal, cannot lead to circumvention of the effective application of the rules on State aid (see, to that effect, judgment of 11 November 2015, *Klausner Holz Niedersachsen*, C-505/14, EU:C:2015:742, paragraphs 42 to 44). Damages paid as compensation for loss of market shares or as compensation for losses related to the stockpiling of raw materials, or, ultimately, for any loss resulting from the repeal of an aid scheme cannot therefore escape classification as State aid where those damages meet the definition of an economic advantage for the purposes of those rules.

166   In that regard, the Commission stated, in recital 96 of the contested decision, as follows:

'… Granting the [arbitration applicants] compensation for lost profits because they had to bear their own operating expenses themselves likewise constitutes an economic advantage not available under normal market conditions and in absence of the Award; under normal market conditions, the undertaking would have had to bear itself the costs inherent in its economic activity and would therefore not have generated these profits. Third, paying interest to the [arbitration applicants] on payments that were allegedly due in the past, but which themselves must be qualified as conferring an advantage, confers a separate and additional advantage.'

167   It must be stated that the applicants have not put forward any argument such as to call into question the Commission's findings, set out in recital 96 of the contested decision, that the compensation granted by the arbitral tribunal constituted an economic advantage for the purposes of Article 107(1) TFEU, following its analysis of the advantages alleged to have been granted to the applicants under the tax incentives scheme at issue for the period between its repeal and the scheduled date of its expiry.

168   In the light of all the foregoing, the applicants have not established that the Commission erred in finding that the aid measure at issue constituted an economic advantage for the purposes of Article 107(1) TFEU, provided to the arbitration applicants as compensation for the consequences of the repeal of the tax incentives scheme at issue.

169   Consequently, the present complaint must be rejected in its entirety.

*(3)  The second complaint, alleging failure to have regard to the judgment of 27 September 1988,* Asteris and Others *(106/87 to 120/87)*

170   The present complaint is based, as is apparent from paragraph 119 above, on the premiss that the arbitral award produced legal effects vis-à-vis the applicants, by awarding them damages to compensate for the loss suffered as a result of the alleged infringement of the BIT, which they claim is at the root of their right to compensation granted by that award. Therefore, the payment of damages under that award would not be classified as State aid pursuant to the judgment of 27 September 1988, *Asteris and Others* (106/87 to 120/87, EU:C:1988:457, paragraphs 23 and 24).

171   It must be borne in mind that State aid, which constitutes measures of the public authorities favouring certain undertakings or certain products, is fundamentally different in its legal nature from damages which the competent national authorities may be ordered to pay to individuals in compensation for the harm they have caused to those individuals. Therefore, damages do not constitute State aid within the meaning of EU law (see, to that effect, judgment of 27 September 1988, *Asteris and Others*, 106/87 to 120/87, EU:C:1988:457, paragraphs 23 and 24).

172   In accordance with settled case-law, a distinction must also be drawn between claims for compensation for damage resulting from unlawfulness and an action for the payment of amounts due under legislation (see, to that effect, judgment of 27 September 1988, *Asteris and Others*, 106/87 to 120/87, EU:C:1988:457, paragraphs 25 and 26 and the case-law cited).

173   Where sums claimed before the courts, even formally as compensation, correspond to the payment of an advantage which the applicant is seeking pursuant to legislation, the action does not seek compensation for harm distinct from that consisting of the complete non-payment of

the advantage to which the applicant considered he or she was entitled under that legislation (see, to that effect, judgment of 12 January 2023, *DOBELES HES*, C-702/20 and C-17/21, EU:C:2023:1, paragraphs 61 and 62).

174   Therefore, where national legislation has established 'State aid' within the meaning of Article 107(1) TFEU, the payment of a sum claimed before the courts in accordance with that legislation also constitutes such aid (judgment of 12 January 2023, *DOBELES HES*, C-702/20 and C-17/21, EU:C:2023:1, paragraph 65).

175   The recipient of aid cannot therefore, as noted in paragraph 165 above, circumvent the effective application of the rules on State aid by obtaining, without relying on EU law on State aid, a judgment granting compensation whose effect would enable it, definitively, to continue to implement the aid in question over a number of years (see, to that effect and by analogy, judgment of 11 November 2015, *Klausner Holz Niedersachsen*, C-505/14, EU:C:2015:742, paragraphs 42 to 44).

176   In the present case, as is apparent from paragraphs 99 to 101 above, the EU judicial system, of which the arbitral tribunal does not form part (judgment on appeal, paragraph 141), replaced the arbitration procedure provided for by the BIT as from Romania's accession to the European Union, that is to say, from 1 January 2007, with the result that the arbitral award, adopted by that tribunal after that accession, could not have produced effects vis-à-vis the applicants (order of 21 September 2022, *Romatsa and Others*, C-333/19, not published, EU:C:2022:749, paragraphs 40 to 43).

177   In those circumstances, and in any event, the classification adopted in the arbitral award is not decisive for the analysis of the question of the existence of State aid. The payment of the sums at issue pursuant to that award cannot therefore be classified, in law, as damages for the purposes of EU law on the sole ground that such a classification follows from that award.

178   In that regard, the Commission was therefore entitled to analyse, as it did in the contested decision, the existence of State aid irrespective of the legal classification adopted by the arbitral tribunal.

179   As is apparent from the analysis of the first complaint in the first part of the second plea in law, the Commission concluded, without the applicants having succeeded in calling that assessment into question, that the aid measure at issue constituted an economic advantage provided to the arbitration applicants as compensation for the consequences of the repeal of the tax incentives scheme at issue and not for the damage which they allegedly suffered as a result of Romania's conduct consisting in, first, keeping in place, despite the repeal of the scheme, the obligations corresponding to the advantages established by that scheme, and second, failing to inform them in a timely manner of that repeal.

180   Since it has not been established that the payment of the sums at issue had the effect of providing compensation for damage resulting from Romania's allegedly wrongful conduct, as described in paragraph 157 above, the applicants cannot effectively claim that the aid measure at issue cannot be classified as State aid pursuant to the judgment of 27 September 1988, *Asteris and Others* (106/87 to 120/87, EU:C:1988:457, paragraphs 23 and 24).

181 The applicants add, nevertheless, that the arbitral award could not have compensated them for the withdrawal of unlawful or incompatible aid allegedly constituted by the tax incentives scheme at issue. According to them, that is the case, in essence, because that scheme, which had been implemented prior to Romania's accession to the European Union, was never subject to EU rules on State aid or came within the competence of the Commission.

182 It must be recalled, as a preliminary point, that the case-law arising from the judgment of 27 September 1988, *Asteris and Others* (106/87 to 120/87, EU:C:1988:457, paragraphs 23 and 24), disregard of which is alleged by the applicants, concerns only the classification of State aid, since it provides only that State aid is fundamentally different in its legal nature from damages.

183 As is apparent from paragraphs 139 to 157 above, the Commission was entitled to conclude that the advantage obtained by the arbitration applicants did not constitute compensation for damage resulting from unlawfulness for the purposes of the judgment of 27 September 1988, *Asteris and Others* (106/87 to 120/87, EU:C:1988:457, paragraphs 23 and 24). Therefore, the applicants' arguments seeking to call into question the additional reasoning of the contested decision relating to the unlawfulness of the aid, provided by the Commission in order to rule out the application of the judgment of 27 September 1988, *Asteris and Others* (106/87 to 120/87, EU:C:1988:457), cannot call into question the correctness of that decision in that regard.

184 In any event, and for the sake of completeness, it may be recalled that, pursuant to Article 64(1)(iii) of the Europe Agreement establishing an association between the European Economic Communities and their Member States, of the one part, and Romania, of the other part, concluded and approved on behalf of the Community by Decision 94/907/EC, ECSC, Euratom of the Council and the Commission of 19 December 1994 (OJ 1994 L 357, p. 2; 'the Europe Agreement'), any public aid which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods is incompatible with the proper functioning of that agreement, in so far as it may affect trade between the European Communities and Romania. By virtue of Article 64(2) of that agreement, any practices contrary to that article are to be assessed 'on the basis of criteria arising from the application of the rules of Articles 85, 86 and 92 of the [EEC Treaty, now Articles 101, 102 and 107 TFEU]'.

185 In order to comply with its harmonisation obligation under the Europe Agreement, Romania adopted, in 1999, lege nr. 143/1999 privind ajutorul de stat (Law No 143/1999 on State aid), which included the same definition of State aid as that contained in Article 64 of that agreement and in EU law. That law designated the Consiliul Concurenței (Competition Council, Romania) and the Oficiul Concurenței (Competition Office, Romania) as national State aid surveillance authorities competent for assessing the compatibility of State aid granted by Romania to undertakings.

186 In the present case, the Commission stated that the dispute at hand did not fall within the scope of the case-law arising from the judgment of 27 September 1988, *Asteris and Others* (106/87 to 120/87, EU:C:1988:457, paragraphs 23 and 24), on the ground, as is apparent in essence from recital 103 of the contested decision, that, since the tax incentives scheme at issue had the effect of granting unlawful State aid, the compensation granted to the arbitration applicants, the amount of which corresponded to the tax incentives of which they had been deprived following the repeal of that scheme, itself constituted unlawful State aid.

187   In that regard, it is apparent from the case file that the Romanian Competition Council found, by decision of 15 May 2000, that 'exemption from customs duty on raw materials [had to be] deemed State aid for operating purposes', and that that decision was neither challenged nor annulled.

188   In those circumstances, the mere fact, relied on in support of their argument set out in paragraph 181 above, that the tax incentives scheme at issue was established before Romania's accession to the European Union does not mean that that scheme was not examined having regard to the State aid rules applicable in the European Union. The fact that the Commission is alleged not to have had competence to carry out such an assessment is irrelevant in that regard, since that assessment was carried out by an authority whose competence is not called into question in the present dispute.

189   The applicants cannot therefore, on that ground alone, effectively claim that the Commission erred in law in finding, as is apparent from recital 103 of the contested decision, that the compensation granted by the arbitral award had the effect of compensating the arbitration applicants for the withdrawal of unlawful or incompatible aid constituted by the tax incentives scheme at issue, in accordance with the case-law principles recalled in paragraphs 172 to 174 above.

190   In the light of all the foregoing, the present complaint must be rejected and, consequently, the present part must be rejected in its entirety.

...

### (c)   The third part, alleging that the aid measure at issue is not imputable to Romania

201   The applicants claim in essence that, in accordance with Articles 53 and 54 of the ICSID Convention, the implementation or execution of the arbitral award by Romania is an unintended and automatic consequence of its legal obligations vis-à-vis the other signatories of that convention. Since Romania is required to implement or execute the arbitral award, the payment of the sums at issue is therefore not a unilateral and autonomous decision of that Member State. Consequently, the alleged aid cannot be imputable to it so as to consider that it constitutes State aid within the meaning of Article 107(1) TFEU.

202   In support of their reasoning, the applicants rely on the case-law arising from the judgment of 5 April 2006, *Deutsche Bahn* v *Commission* (T-351/02, EU:T:2006:104, paragraphs 100 to 102), according to which the measures that the Member States are required to adopt under EU law and for which they have no discretion are not imputable to them. The applicants submit that the same should be true of measures imposed under international law.

203   Furthermore, according to the applicants, the arbitral award, in accordance with the ICSID Convention, is enforceable in all countries party to the convention, including outside the European Union. Since the arbitration applicants are therefore entitled to enforce it against assets owned by Romania abroad, its enforcement is not necessarily decided by a Romanian court, so that, also for that reason, the alleged aid cannot be imputable to Romania.

204  In their written observations on the conclusions to be drawn from the judgment on appeal, the applicants add that the arbitral award is not, in any event, itself imputable to Romania. That award was made by an independent tribunal, since Romania exercised no control over its decisions, which cannot be the subject of an action before the Romanian courts. For that reason, that award cannot be imputable to that Member State.

205  The Commission, supported by the Kingdom of Spain, disputes the applicants' line of argument.

206  It is apparent from the case-law that, for it to be possible to classify advantages as 'aid' within the meaning of Article 107(1) TFEU, they must be imputable to the State (see judgment of 13 September 2017, *ENEA*, C-329/15, EU:C:2017:671, paragraph 20 and the case-law cited). In that regard, it must be noted that, where an advantage is granted by a public authority, that advantage is, by definition, attributable to the State (see judgment of 15 December 2021, *Oltchim* v *Commission*, T-565/19, EU:T:2021:904, paragraph 160 and the case-law cited).

207  In the present case, the Commission recalled, in the fifth indent of recital 43 of the contested decision, that it considered, in the opening decision, that the decision to grant the advantage was imputable to Romania, regardless of whether it had executed the arbitral award voluntarily or on the order of a court.

208  In recitals 118 to 120 of the contested decision, the Commission stated, first of all, that Romania's voluntary agreement to enter into the BIT created the favourable conditions for the selective advantage.

209  The Commission stated, next, that the payment of a portion of the compensation awarded to the arbitration applicants under the arbitral award by the offsetting of tax debts owed to the Romanian authorities by one of the applicants and the payment of the remaining amount by those authorities were imputable to that Member State, because those actions had been carried out voluntarily in implementation of that award.

210  The Commission considered, moreover, that the payment of a portion of the compensation by Romania, following the actions taken, at the request of the arbitration applicants, by the national courts and court-appointed executors, is also imputable to that Member State, since those actions are imputable to the public authorities of the Romanian State.

211  Stating that Romania was not obliged by EU law to execute the arbitral award, the Commission concluded that 'any decision to implement or execute [that] Award, whether taken by the Romanian government or Romania's domestic courts, [was] thus imputable to the Romanian State'.

212  In order to challenge the Commission's assessment as regards whether the aid measure at issue is imputable to Romania, the applicants rely, essentially, on the premiss that Romania's implementation or execution of the arbitral award constituted an obligation on the part of that Member State vis-à-vis the other signatories of the ICSID Convention.

213  In that regard, it must be recalled that since Romania's accession to the European Union, the system of judicial remedies provided for by the EU and FEU Treaties has replaced the arbitration procedure provided for by the BIT (judgment on appeal, paragraph 145), with the result that the

arbitral award, made after that accession, has not produced any effects vis-à-vis Romania and cannot be executed (order of 21 September 2022, *Romatsa and Others*, C-333/19, not published, EU:C:2022:749, paragraph 43).

214 In those circumstances, Romania was required to set aside the arbitral award (see, to that effect, order of 21 September 2022, *Romatsa and Others*, C-333/19, not published, EU:C:2022:749, paragraph 44). Consequently and a fortiori, the applicants are not justified in claiming that Romania was under an obligation to implement or execute that award (see, to that effect, order of 21 September 2022, *Romatsa and Others*, C-333/19, not published, EU:C:2022:749, paragraph 43).

215 In any event, the ICSID Convention cannot, in the present case, as regards the enforcement of the arbitral award, impose on Romania obligations vis-à-vis third States that those States would be entitled to rely on against Romania. As stated in paragraph 106 above, a purely factual interest of a third State that has concluded the ICSID Convention in the enforcement of such an award cannot be equated with a 'right' on the part of that third State that creates an obligation for Romania to enforce that award (see, to that effect, judgment of 14 March 2024, *Commission* v *United Kingdom (Judgment of the Supreme Court)*, C-516/22, EU:C:2024:231, paragraph 76).

216 Since the premiss on which the applicants rely in support of the present part is incorrect, the arguments on which it is based have no bearing on the legality of the contested decision.

217 Moreover, by merely relying on case-law relating to EU law, the applicants have not adduced any evidence capable of establishing, as they claim, that a measure which stems from obligations outside a Member State's internal legal order cannot be regarded as a decision imputable to that State for the purposes of the application of Article 107(1) TFEU. As the Commission submits, to accept the applicants' reasoning would effectively allow all Member States to escape State aid scrutiny, as long as they enter into an international obligation to grant a certain State aid measure.

218 In addition, the fact that Romania attempted to oppose the execution of the arbitral award or that the Commission should not have based its assessment of the imputability of the measure on the voluntary nature of Romania's accession to the BIT, as the applicants maintain, cannot mean that the implementation or execution of that award was not imputable to Romania for the other reasons relied on by the Commission in the contested decision. It is common ground, as is apparent from recital 120 of that decision, set out in paragraph 210 above, that the public authorities of that Member State paid the compensation in fact, with the result that they were involved in its implementation or execution (see, to that effect, judgment of 15 May 2019, *Achema and Others*, C-706/17, EU:C:2019:407, paragraph 48 and the case-law cited).

219 Furthermore, as regards the fact relied on by the applicants that the enforcement of the arbitral award following a judicial decision delivered by the court or tribunal of a third State would result in seizure of Romania's assets abroad, it is sufficient to note that such enforcement had not taken place at the time of the adoption of the contested decision, with the result that that argument is irrelevant in the present dispute.

220 Lastly, the fact that the arbitral award was made by an independent tribunal has no bearing on the assessment of the imputability of the aid measure at issue. As is apparent from paragraphs 125 to 136 above, the measure which is the subject of the contested decision does not consist in that award but in the payment of the sums at issue in execution or implementation of that award.

221 In the light of all the foregoing, the present part must be rejected and, consequently, the second plea in law must be rejected in its entirety.

...

### 5. The fifth plea in law, alleging an error in the determination of the beneficiaries of the aid measure at issue and a failure to state reasons

284 The applicants submit that the Commission vitiated its assessment of the beneficiaries of the aid measure at issue by committing a manifest error and by failing to state reasons, by concluding that, first, Mr Ioan Micula and Mr Viorel Micula, as natural persons, formed a single economic unit with the other applicants, without demonstrating that they themselves engaged in an economic activity so as to be considered undertakings within the meaning of Article 107(1) TFEU, second, all of the applicants formed a single economic unit, and third, the applicant undertakings which were not parties to the arbitration proceedings were beneficiaries of the aid measure at issue.

285 The Commission disputes the applicants' line of argument.

286 In the interests of the sound administration of justice, it is appropriate to examine the second part of the present plea, relating to a failure to state reasons for the contested decision, before the first part of that plea, relating to the merits of that decision.

287 In view of the arguments raised in support of the present plea, it is also appropriate to assess each part of that plea, first, in so far as it concerns Mr Ioan Micula and Mr Viorel Micula, and second, in so far as it concerns the applicant undertakings which were not parties to the arbitration proceedings.

### (a) The second part, alleging a failure to state reasons

288 It must be borne in mind that the statement of reasons required by Article 296 TFEU, which provides that legal acts are to state the reasons on which they are based, is an essential procedural requirement (judgment of 18 June 2015, *Ipatau* v *Council*, C-535/14 P, EU:C:2015:407, paragraph 37), and must be appropriate to the act at issue and disclose in a clear and unequivocal fashion the reasoning followed by the institution which adopted that measure in such a way as to enable the persons concerned to ascertain the reasons for the measure and to enable the competent court to exercise its power of review. Thus, the requirements to be satisfied by the statement of reasons depend on the circumstances of each case, in particular the content of the measure in question, the nature of the reasons given and the interest which the addressees of the measure, or other parties concerned by it within the meaning of the fourth paragraph of Article 263 TFEU, may have in obtaining explanations. It is not necessary for the reasoning to go into all the relevant facts and points of law, since the question whether the statement of reasons meets the requirements laid down by Article 296 TFEU must be assessed with regard not only to its wording but also to its context and to all the legal rules governing the matter in question (judgments of 2 April 1998, *Commission* v *Sytraval and Brink's France*, C-367/95 P, EU:C:1998:154, paragraph 63, and of 15 April 2008, *Nuova Agricast*, C-390/06, EU:C:2008:224, paragraph 79).

289    In that regard, it must be noted, as a preliminary point, that, contrary to what the applicants claim, the Commission was entitled, without thereby amending the statement of reasons for the contested decision, to rely on matters derived from the arbitral award, which the applicants themselves have annexed to the application but which were not reproduced in the statement of reasons for that decision, in order to respond to the arguments which the applicants put forward in the context of the proceedings before the General Court.

290    As was pointed out in paragraph 288 above, the statement of reasons for an act must be assessed not only in the light of the content of the contested act itself, but also in the light of its context, that is to say, in the present case, the context consisting of the arbitration proceedings and the ensuing arbitral award.

291    Those matters were, moreover, known to the arbitration applicants, for whom the arbitral award was intended. In addition, it should be stated that the applicant undertakings which were not parties to the arbitration proceedings were in a position to ascertain those matters indirectly, through Mr Ioan Micula and Mr Viorel Micula, namely their majority shareholders (see, to that effect and by analogy, judgment of 12 September 2007, *Olympiaki Aeroporia Ypiresies* v *Commission*, T-68/03, EU:T:2007:253, paragraph 45).

292    In those circumstances, the applicants cannot effectively claim that the Commission, by responding to the arguments which they have put forward in the application and the reply, supplemented the statement of reasons for the contested decision by referring to the content of the arbitral award.

293    In the present case, the Commission concluded, as is apparent from recital 91 of the contested decision, as follows:

'The Micula brothers and the three corporate [arbitration applicants] together form a single economic unit that constitutes an undertaking for the purpose of applying Article 107(1) [TFEU]. The other EFDG companies for whose alleged losses the Micula brothers were awarded compensation by virtue of the Award (European Drinks SA, Rieni Drinks SA, Scandic Distilleries SA, Transilvania General Import-Export S.R.L., West Leasing S.R.L) likewise form part of this single economic unit. The final beneficiary of the aid measure is this single economic unit, made up of the five [arbitration applicants] and those EFDG companies.'

*(1)  The statement of reasons for the contested decision in so far as it designates Mr Ioan Micula and Mr Viorel Micula as beneficiaries of the aid measure at issue*

294    After having stated, in recital 85 of the contested decision, that the three arbitration applicant undertakings and Mr Ioan Micula and Mr Viorel Micula together constituted a single economic unit for the purposes of the application of the State aid rules, the Commission inferred therefrom that that single economic unit had to be regarded as the undertaking in question and set out, in recitals 85 to 89 of that decision, the reasons why it considered that the five arbitration applicants formed a single economic unit. In particular, it stated that Mr Ioan Micula and Mr Viorel Micula owned, directly or indirectly, almost the entirety of the capital of the applicant undertakings, so that, in accordance with their 'virtually exclusive' ownership, they had 'complete control' over those undertakings. In recital 88 of that decision, the Commission added that the arbitration applicant undertakings had asked for the sums at issue to be paid to Mr Ioan Micula and Mr Viorel Micula and concluded therefrom that that conduct showed the lack of autonomy of the arbitration applicant undertakings vis-à-vis those persons.

295    Lastly, in response to the applicants' arguments, the Commission has referred, in the present proceedings, to the arbitral award, setting out the applicants' own testimony, from which, according to the Commission, it is apparent that they formed one and the same undertaking with the arbitration applicant undertakings. The Commission has thus submitted that, during the arbitration proceedings, the arbitration applicants had described their business organisation as an 'integrated business model', 'a family run business that took decisions verbally and did not usually operate on the basis of written plans' and an 'integrated system of production companies'.

296    In those circumstances, the contested decision is sufficiently reasoned to enable Mr Ioan Micula and Mr Viorel Micula to ascertain the reasons why the Commission considered that they should be regarded as forming, together with the arbitration applicant undertakings, a single economic unit for the purposes of the application of the State aid rules, with the result that they are considered to be beneficiaries of the aid measure at issue. The statement of reasons for that decision was all the more sufficient since it was taken in a context with which they were familiar (see, to that effect, judgment of 13 December 2017, *Greece* v *Commission*, T-314/15, not published, EU:T:2017:903, paragraph 110 and the case-law cited).

297    The first complaint in the present part must therefore be rejected.

*(2) The statement of reasons for the contested decision in so far as it designates the applicant undertakings which were not parties to the arbitration proceedings as beneficiaries of the aid measure at issue*

298    As is apparent from the contested decision, the Commission, after having recalled, in recitals 81 and 82 of that decision, the definition of an undertaking within the meaning of the case-law and the conditions for considering that legal entities, whether natural or legal, could together form a single economic unit for the purposes of the application of State aid rules, set out the reasons why it considered that all of the applicants, including the applicant undertakings which were not parties to the arbitration proceedings, formed a single economic unit.

299    As regards the membership of the single economic unit of the applicant undertakings which were not parties to the arbitration proceedings, the Commission, after noting that they formed part of a larger group of undertakings, namely the EFDG, pointed out, in recital 87 of the contested decision, that the arbitration applicants had sought, in the course of the proceedings, damages in respect of the applicant undertakings which were not parties to the arbitration proceedings and had quantified the amount of compensation sought for losses allegedly suffered by that group as a whole. The Commission also stated, in that recital, that the arbitral tribunal had established that Mr Ioan Micula and Mr Viorel Micula owned at least 99.96% of the capital of the applicant undertakings which were not parties to the arbitration proceedings and stated that the arbitration applicants' conduct and that tribunal's assessments of the compensation demonstrated that 'the Micula brothers and the three [arbitration applicant undertakings], as well as the … companies forming part of EFDG [which were not parties to the arbitration proceedings], [formed] a single economic unit with a single economic interest'. The Commission stated in recital 89 of that decision that, by virtue of their ownership, Mr Ioan Micula and Mr Viorel Micula exercised in fact 'complete control' over the undertakings which were not parties to the arbitration proceedings. In those circumstances, as stated in paragraph 293 above, the Commission concluded that 'the final beneficiary of the aid measure [was that] single economic unit, made up of the five [arbitration applicants] and those EFDG companies'.

300    In response to the applicants' arguments in the present proceedings, the Commission, referring to the applicants' witness statements in the arbitration proceedings, claimed also that the development of the EFDG had followed a single, integrated business plan, 'the new companies and investments [having been] integrated into the existing companies and investments, so that all companies functioned cooperatively to create, manufacture, package, and distribute products efficiently'.

301    It is apparent from the statement of reasons for the contested decision, and from the context in which it was adopted, that the applicant undertakings which were not parties to the arbitration proceedings were in a position to understand the reasons why the Commission considered that they had also to be regarded as beneficiaries of the aid measure at issue.

302    In that regard, the applicants' argument that the contested decision does not put forward any reason why the undertakings which were not parties to the arbitration proceedings should be considered to 'actually benefit' from the aid measure at issue is, moreover, ineffective, since the Commission did not rely anywhere, in that decision, on the concept of 'actual benefit' in order to identify the beneficiaries of that measure.

303    In the light of all the foregoing, the second complaint in the present part must be rejected and, consequently, that part must be rejected in its entirety.

### (b)  The first part, alleging a manifest error of assessment

304    The applicants maintain that the Commission has not established, to the requisite legal standard and in essence, that Mr Ioan Micula and Mr Viorel Micula, on account of the fact that they hold shares in the undertakings of the EFDG and on account of their affiliation with those undertakings, were in a position, beyond the exercise of their rights as shareholders in those undertakings, to intervene in fact in the actual management of the undertakings in that group, so as to form a single economic unit with those undertakings.

305    The applicants claim, in particular, that the grounds of the contested decision, relating (i) to the existence of a controlling interest, which has, moreover, not been established, in the applicant undertakings which were not parties to the arbitration proceedings, (ii) to the fact that Mr Ioan Micula and Mr Viorel Micula were allowed during the arbitration proceedings to claim damages for losses that they had suffered through those undertakings, and (iii) to the fact that the arbitral tribunal 'collectively' compensated the five arbitration applicants, are not sufficient to demonstrate that Mr Ioan Micula and Mr Viorel Micula exercise control over the economic unit which they are alleged to form with the undertakings of the EFDG.

306    According to the applicants, since natural persons who are not themselves undertakings cannot be beneficiaries of State aid, the Commission thus vitiated the contested decision by a manifest error of assessment by designating Mr Ioan Micula and Mr Viorel Micula, who did not engage in any economic activity, as beneficiaries of the aid measure at issue.

307    The applicants add that, although Mr Ioan Micula and Mr Viorel Micula were compensated by the arbitral award for damage which they suffered only in their capacity as shareholders of the applicant undertakings which were not parties to the arbitration proceedings, those undertakings, which have not received any sums, cannot be regarded as beneficiaries of the aid measure at issue either.

308    Moreover, according to the applicants, the arbitral tribunal's analysis in the arbitral award concerns the period between 2000 and 2009, and not the period taken into account in the contested decision.

309    It must be recalled that EU competition law and, in particular, the prohibition laid down in Article 107(1) TFEU apply to the activities of undertakings (judgment of 25 July 2018, *Commission* v *Spain and Others*, C-128/16 P, EU:C:2018:591, paragraph 34).

310    According to settled case-law, in the field of competition law, the concept of 'undertaking' covers any entity engaged in an economic activity, regardless of its legal status and the way in which it is financed (see judgment of 10 January 2006, *Cassa di Risparmio di Firenze and Others*, C-222/04, EU:C:2006:8, paragraph 107 and the case-law cited).

311    Any activity consisting in offering goods or services on a given market is an economic activity (see judgment of 27 June 2017, *Congregación de Escuelas Pías Provincia Betania*, C-74/16, EU:C:2017:496, paragraph 45 and the case-law cited).

312    In so doing, EU competition law, by targeting the activities of undertakings, enshrines as the decisive criterion the existence of unity of conduct on the market, without allowing the formal separation between various companies that results from their separate legal personalities to preclude such unity for the purposes of the application of the competition rules (judgment of 27 June 2024, *Unichem Laboratories* v *Commission*, C-166/19 P, not published, EU:C:2024:548, paragraph 52).

313    Therefore, where legally distinct natural or legal persons constitute an economic unit, they should be treated as a single undertaking for the purposes of EU competition law. In the area of State aid, the question as to whether an economic unit exists arises where the beneficiary of the aid needs to be identified (see judgment of 19 May 2021, *Ryanair* v *Commission (KLM; COVID-19)*, T-643/20, EU:T:2021:286, paragraph 46 and the case-law cited).

314    Among the factors taken into account by the case-law in order to determine the presence or absence of an economic unit in the field of State aid are, inter alia, the company concerned being part of a group of companies which is directly or indirectly controlled by one of those companies, the pursuit of identical or parallel economic activities, the companies concerned having no economic autonomy, the formation of a single group controlled by a single entity, the possibility for an entity owning a controlling shareholding in another company to exercise functions relating to control, direction and financial support in relation to that company, and the existence of organic and functional links between those companies (see judgment of 19 May 2021, *Ryanair* v *Commission (KLM; COVID-19)*, T-643/20, EU:T:2021:286, paragraph 47 and the case-law cited).

315    Although, usually, the economic activity is carried on directly on the market, that may be the case both of an operator in direct contact with the market and, indirectly, of another entity controlling that operator as part of an economic unit which they together form (judgment of 10 January 2006, *Cassa di Risparmio di Firenze and Others*, C-222/04, EU:C:2006:8, paragraphs 109 and 110).

316    It must, however, be pointed out that the mere fact of holding shares, even controlling shareholdings, is insufficient to characterise as economic an activity of the entity holding those shares, when it gives rise only to the exercise of the rights attached to the status of shareholder or

member as well as, if appropriate, the receipt of dividends, which are merely the fruits of the ownership of an asset (judgment of 10 January 2006, *Cassa di Risparmio di Firenze and Others*, C-222/04, EU:C:2006:8, paragraph 111).

317    On the other hand, an entity which, owning controlling shareholdings in a company, actually exercises that control by involving itself directly or indirectly in the management thereof must be regarded as taking part in the economic activity carried on by the controlled undertaking and must therefore itself, in that respect, be regarded as an undertaking within the meaning of Article 107(1) TFEU (judgment of 10 January 2006, *Cassa di Risparmio di Firenze and Others*, C-222/04, EU:C:2006:8, paragraphs 112 and 113).

318    The Commission has a wide discretion in determining whether companies forming part of a group must be regarded as an economic unit or as legally and financially independent for the purposes of applying the State aid rules (judgment of 29 June 2000, *DSG* v *Commission*, T-234/95, EU:T:2000:174, paragraph 124).

319    The Courts of the European Union are confined to checking, other than that the rules of procedure and the statement of reasons have been complied with, that the facts are materially correct and that there has been no manifest error of assessment or misuse of powers. To that end, the EU Courts must, inter alia, establish not only whether the evidence relied on is factually accurate, reliable and consistent but also whether that evidence includes all the relevant information which must be taken into account in order to assess a complex situation and whether it is capable of substantiating the conclusions drawn from it (see judgment of 19 May 2021, *Ryanair* v *Commission (KLM; COVID-19)*, T-643/20, EU:T:2021:286, paragraphs 69 and 70 and the case-law cited).

320    In that regard, the lawfulness of a decision concerning State aid falls to be assessed by the EU judicature in the light of the information available to the Commission at the time when the decision was adopted, which includes that which seemed relevant to the assessment to be carried out and which could have been obtained, upon request by the Commission, during the administrative procedure (see, to that effect, judgment of 20 September 2017, *Commission* v *Frucona Košice*, C-300/16 P, EU:C:2017:706, paragraphs 70 and 71).

*(1) The first complaint, alleging a manifest error of assessment concerning the designation of Mr Ioan Micula and Mr Viorel Micula as beneficiaries of the aid measure at issue*

321    In the present case, it is common ground that all of the arbitration applicants received payment of the sums at issue. Mr Ioan Micula and Mr Viorel Micula expressly acknowledge that they were beneficiaries of that payment in their replies to the written questions which the General Court sent to them on 30 May 2023 by way of a measure of organisation of procedure adopted on the basis of Article 89 of the Rules of Procedure ('the measure of organisation of procedure of 30 May 2023').

322    The fact that a part of the sums was 'blocked' in an account opened in the name of the five arbitration applicants is not such as to call that finding into question. An actual transfer of State resources is not required where the right is conferred on the beneficiaries (see, to that effect, judgment of 19 December 2019, *Arriva Italia and Others*, C-385/18, EU:C:2019:1121, paragraph 36).

323 Mr Ioan Micula and Mr Viorel Micula submit, nevertheless, that the sums at issue can, in essence, have benefited them only as shareholders of the undertakings of the EFDG and not as entities engaging in an economic activity. According to them, that is apparent in particular from the reasoning set out by the arbitral tribunal in support of the arbitral award.

324 In the first place, without the applicants calling into question the findings of fact made by the arbitral tribunal and reproduced in support of the contested decision, it is apparent from the case file that, during the arbitration proceedings, as evidenced by the observations and witness statements produced by the arbitration applicants on 22 December 2009 and reproduced in support of the arbitral award, Mr Ioan Micula and Mr Viorel Micula, after the success of their initial investments, extended, as is apparent from paragraph 160 of that award, their beverage production business, building what would become an integrated system of production. In that regard, the arbitration applicants claimed, as is apparent from paragraph 161 of that award, that the expansion of their production business, through the creation of new undertakings, had been planned to coincide with the expiration of the tax incentives for older undertakings. New undertakings and new investments were thus integrated into the existing undertakings and investments, so that all undertakings functioned cooperatively 'to create, manufacture, package, and distribute products efficiently'. In particular, it is apparent from their reply of 22 December 2009, reproduced in paragraph 164 of that award, that the arbitration applicants relocated their distillery, which later became the company Scandic Distilleries, to Bihor County in order to benefit from the tax incentives scheme at issue.

325 Although Mr Ioan Micula and Mr Viorel Micula had initially planned to redirect their activities in the mining region of Ștei-Nucet, they decided, as stated in paragraph 554 of the arbitral award, to remain in Bihor County in order to benefit from the tax incentives scheme at issue. In that regard, they stated that the applicant undertakings European Food, Starmill and Multipack had been created, the first, to import the majority of raw materials, the second, to set up integrated in-house grain milling facilities, and the third, to establish the packaging and labelling for nearly all of the products of the companies in the group. They also stated, as is apparent from their witness statements produced on 22 December 2009, that their business strategy model was intended, through vertical integration of their facilities, to achieve long-term profitability by benefiting from that scheme. The arbitration applicants thus had to make an initial investment in order to take advantage of the incentives to develop an integrated, competitive and efficient long-term activity.

326 It is also apparent from the observations submitted by the arbitration applicants on 13 May 2011, as reproduced in paragraph 555 of the arbitral award, that they defined themselves as 'family businesses' and that Mr Ioan Micula and Mr Viorel Micula had carefully considered the impact of the tax incentives scheme at issue, how they could take advantage of it, and, before taking the decision to invest, how the advantages afforded by that scheme could be weighted against the disadvantages of investing in a disadvantaged region that lacked infrastructure and skilled workers.

327 The arbitration applicants also referred, during the arbitration proceedings, as is apparent from paragraph 1067 of the arbitral award, to their 'overall business model', which consisted of building out a sustainable 'manufacturing platform' on the expiry of the tax incentives scheme at issue.

328  It is apparent from the witness statement of one of their witnesses, referred to in paragraph 1072 of the arbitral award, and cited in the defence and reproduced in paragraph 1071 of that award, that he had included, in his first statement, diagrams showing 'the integration of the different facilities', which allowed it to be noted, in essence, that EFDG's initial planning for the sharing of that infrastructure had made it possible to save considerable amounts of money, which had been reinvested in 'the expansion and integration of the business'.

329  It is apparent from the witness statements and observations thus produced by the arbitration applicants during the arbitration proceedings that Mr Ioan Micula and Mr Viorel Micula were involved in the economic activities of the applicant undertakings which were parties to those proceedings, intervening directly or indirectly in their management.

330  In the second place, it must be added that the collective compensation granted by the arbitral award and the fact that the arbitration applicant undertakings asked, during the arbitration proceedings, for the sums at issue to be paid to Mr Ioan Micula and Mr Viorel Micula, which those brothers do not dispute, support the finding that there was no functional and organisational autonomy on the part of the arbitration applicant undertakings vis-à-vis those brothers.

331  In the third and last place, it is apparent from paragraph 1245 of the arbitral award, on which the Commission relied, that the arbitral tribunal would not 'enter into the discussion of whether shareholder damages are equivalent to the damages suffered by the underlying company' and added that it was satisfied that, 'given the size of [Mr Ioan Micula's and Mr Viorel Micula's] shareholding in the EFDG companies, [they] indirectly suffered at least a large part, if not virtually all, of the damage suffered directly by the Corporate [arbitration applicants]'. In those circumstances, the applicants cannot maintain that Mr Ioan Micula and Mr Viorel Micula were compensated solely in their capacity as shareholders of the undertakings in question.

332  Nor can the applicants' other arguments effectively support their claims.

333  The fact, first of all, that neither Mr Ioan Micula nor Mr Viorel Micula, on his own, has a majority stake in any of the undertakings in the EFDG has no bearing on the existence of a single economic unit consisting of them and those undertakings since they are, together, majority shareholders of those undertakings.

334  Next, the applicants claim that the matters derived from the arbitral award relate solely to the period between 2000 and 2009 and are therefore irrelevant for the purpose of assessing the existence of a single economic unit at the time of the adoption of the contested decision.

335  It must be noted in that regard that, in its replies to the written questions put to it in the context of the measure of organisation of procedure of 30 May 2023, the Commission stated that 'the Applicants [had] never claimed during the formal investigation procedure that [the controlling] links [of Mr Ioan Micula and Mr Viorel Micula over the companies of the EFDG for whose losses compensation was awarded] had changed subsequent to [the] period [covered by the compensation]'. The Commission added that, although the question of the existence of a single economic unit had been raised during the formal investigation procedure, 'the arbitration [applicants had] offered no facts or evidence to contradict the Commission's provisional finding that Messrs. Ioan and Viorel Micula controlled the companies for whose losses the arbitral tribunal awarded compensation, nor the reasons why [that] tribunal [had] also awarded that compensation to those natural persons'.

336   The applicants, who have not challenged those statements, have not established or even claimed that their capital structure or their internal operations changed between the end of the period in respect of which they were compensated and the adoption of the contested decision.

337   Lastly, although the Commission did not, as, moreover, it itself acknowledges, take the view, in the contested decision, that Mr Ioan Micula and Mr Viorel Micula should each be regarded, as natural persons, as an undertaking for the purposes of the application of the State aid rules, that fact has no bearing on the classification of the beneficiaries of the aid measure at issue, since the Commission found, in recital 85 of that decision, that they formed, together with all of the arbitration applicant undertakings, a single economic unit, which constituted the undertaking in question for the purpose of applying those rules.

338   Mr Ioan Micula and Mr Viorel Micula cannot therefore claim that they do not engage in any economic activity in order to challenge the finding that they were the beneficiaries of a State aid measure by way of payment of the sums at issue.

339   In the light of all the foregoing and having regard to the Commission's wide discretion, the first complaint in the present part must be rejected.

*(2) The second complaint, alleging a manifest error of assessment in the designation of the applicant undertakings that were not parties to the arbitration proceedings as beneficiaries of the aid measure at issue*

340   In the present case, in the first place, it is apparent from the diagram representing the structure of the EFDG, produced during the arbitration proceedings by one of the experts requested by the arbitration applicants, and reproduced in paragraph 937 of the arbitral award and cited by the Commission in its defence, that Mr Ioan Micula and Mr Viorel Micula hold 95% of the capital of the company Transilvania General Import-Export, which holds, first, 20% of the capital of European Drinks, the remaining 80% being held directly by the Micula brothers, and second, 58% of the capital of the company West Leasing, the remaining 42% also being held directly by those brothers.

341   In addition, the diagram of the capital structure of the undertakings of the EFDG shows that Mr Ioan Micula and Mr Viorel Micula hold 99% of the capital of the company Rieni Drinks and 96% of the capital of the company Scandic Distilleries.

342   During the arbitration proceedings, Mr Ioan Micula and Mr Viorel Micula expressly stated, as is apparent from paragraph 156 of the arbitral award, and without the applicants disputing the accuracy thereof, that they were the majority shareholders of the undertakings of the EFDG.

343   Mr Ioan Micula and Mr Viorel Micula, who have not established or even claimed that their shareholding in the undertakings of the EFDG has changed since the adoption of the arbitral award, as is apparent from paragraph 336 above, therefore hold, directly or indirectly, almost the entirety of the capital of the applicant undertakings which were not parties to the arbitration proceedings. Moreover, it is not disputed, first, that those applicants are undertakings inasmuch as they are actually engaged in an economic activity, and second, that those undertakings belong to that group, which engages, inter alia, in the industrial manufacturing of food products, milling products or plastic packaging.

344    In those circumstances, it must be considered that, having regard to their ownership rights in all the applicant undertakings which were not parties to the arbitration proceedings, Mr Ioan Micula and Mr Viorel Micula, by holding all or almost all of the capital of those undertakings, exercise functions relating to direction and financial support in relation to all of those undertakings, with the result that they are ensured sole or almost sole control of those undertakings.

345    Furthermore, since they pursue identical or parallel economic activities, the undertakings controlled by Mr Ioan Micula and Mr Viorel Micula form a coherent whole, from both a financial and industrial point of view, thus forming a single group controlled by them.

346    In the second place, it is apparent from the arbitration applicants' own witness statements, produced during the arbitration proceedings, that their business strategy model was aimed at vertical integration of their facilities, that those facilities were defined as a 'family run business' that took decisions verbally and did not usually operate on the basis of written plans, and, lastly, that their 'overall business model' consisted of building out a sustainable manufacturing platform on the expiry of the tax incentives scheme at issue, with Mr Ioan Micula and Mr Viorel Micula directly involving themselves in the decision to invest in new facilities, by examining the impact of that scheme as well as its advantages and disadvantages, as stated in paragraphs 325 to 327 above, respectively.

347    In particular, the arbitration applicants claimed that, in the context of the expansion of their production business, as stated in paragraph 324 above, new undertakings and investments were integrated into the existing undertakings and investments, so that all companies functioned cooperatively to 'create, manufacture, package, and distribute products efficiently'. In that regard, as set out in paragraph 328 above, EFDG's initial planning for the sharing of that infrastructure had made it possible to save considerable amounts of money, which had been reinvested in 'the expansion and integration of the business'.

348    It is thus apparent from the analysis of the first complaint in the present part that the evidence in the case file, as set out in paragraphs 324 to 328 above, confirms the existence of economic and organisational links between the applicants, including the applicant undertakings which were not parties to the arbitration proceedings, within the same market and the same integrated activity, with the aim of being competitive and efficient in the long term.

349    Although the applicants maintain that Mr Ioan Micula and Mr Viorel Micula were not involved in the direct management of the undertakings of the EFDG, they merely assert, in that regard, that those undertakings acted 'independently from each other', determining their own market behaviour, but they do not adduce a single item of concrete and documented evidence in support of that assertion.

350    In the third and last place, it may be observed that the lack of economic autonomy of the applicant undertakings which were not parties to the arbitration proceedings is borne out, contrary to what the applicants maintain, by the fact that, during those proceedings, the arbitration applicants requested that the assessment of their loss should take account of the damage suffered also by those undertakings.

351    In those circumstances and in accordance with the case-law principles referred to in paragraph 314 above, it must be concluded that Mr Ioan Micula and Mr Viorel Micula belong, together with the applicant undertakings which were not parties to the arbitration proceedings, to one and the same undertaking for the purposes of the application of the State aid rules.

352    The applicants add, nevertheless, that the applicant undertakings which were not parties to the arbitration proceedings cannot be regarded as the beneficiaries of the aid measure at issue since the arbitral tribunal did not grant them any compensation.

353    In that regard, it is sufficient in any event to note that the Commission did not consider that the undertakings which were not parties to the arbitration proceedings were beneficiaries of the aid measure at issue on the ground that they had actually benefited from the payment of the sums at issue. The Commission considered that those undertakings were beneficiaries solely on the ground that they formed, together with the other applicants, a single economic unit constituting the undertaking in question for the purposes of the application of the State aid rules, as is apparent from recitals 85 to 91 of the contested decision.

354    It follows from paragraphs 340 to 351 above that the Commission was entitled to consider that the undertakings which were not parties to the arbitration proceedings formed, together with the other applicants, one and the same undertaking for the purposes of the application of the State aid rules.

355    The sums paid to the arbitration applicants, in execution or implementation of the arbitral award, were therefore liable to benefit, directly or indirectly, the undertakings which were not parties to the arbitration proceedings. That is the case, in particular, since Mr Ioan Micula and Mr Viorel Micula, exercising functions related to control and financial support in relation to those undertakings, could consider it necessary, in order to pursue on a long-term basis the economic aim attributed to the undertakings of the EFDG, to invest all or part of those sums in the financial consolidation or economic development of those undertakings.

356    Therefore, the fact that the applicant undertakings which were not parties to the arbitration proceedings were not designated as beneficiaries of the compensation granted by the arbitral tribunal pursuant to the arbitral award has no bearing on the fact that they were designated as beneficiaries of the aid measure at issue.

357    In the light of all the foregoing, the second complaint in the present part and, consequently, that part must be rejected; as a result, the fifth plea in law must be rejected in its entirety.

### 6.    The sixth plea in law, alleging an error of law relating to the recovery of the aid

...

360    By the second part, the applicants claim that the sums at issue cannot be recovered from certain entities covered by the contested decision, namely, in Case T-704/15, Mr Viorel Micula, who cannot be regarded as an undertaking and, in the three joined cases, the applicant undertakings which were not parties to the arbitration proceedings, since they were not designated as beneficiaries by the arbitral award.

361    In that regard, the applicants add that the sums at issue can be recovered only from those of them who actually benefited from them, that is to say, some or all of the arbitration applicants only.

362    According to the applicants, the Commission should therefore not have concluded that all of them were jointly liable to repay the aid but should have established which of them had actually benefitted from it.

363 The Commission disputes the applicants' line of argument.

364 It should be recalled that, in accordance with EU law, where the Commission finds that aid is incompatible with the internal market, it may order the Member State to recover that aid from the recipient (judgment of 8 May 2003, *Italy and SIM 2 Multimedia* v *Commission*, C-328/99 and C-399/00, EU:C:2003:252, paragraph 65).

365 Abolishing unlawful aid by means of recovery is the logical consequence of a finding that the aid is unlawful and its purpose is to re-establish the previously existing situation. That objective is attained once the aid in question, together, where appropriate, with default interest, has been repaid by the recipient, or, in other words, by the undertakings which actually enjoyed the benefit of it (judgments of 21 December 2016, *Commission* v *Aer Lingus and Ryanair Designated Activity*, C-164/15 P and C-165/15 P, EU:C:2016:990, paragraphs 89 and 90, and of 13 December 2018, *Transavia Airlines* v *Commission*, T-591/15, EU:T:2018:946, paragraph 299). By repaying the aid, the recipient forfeits the advantage which it had enjoyed over its competitors on the market, and the situation prior to payment of the aid is restored (judgment of 1 October 2015, *Electrabel and Dunamenti Erőmű* v *Commission*, C-357/14 P, EU:C:2015:642, paragraph 110 and the case-law cited).

366 In that regard, it must be borne in mind that the existence of an economic unit enables the undertaking to be identified, even if in law that economic unit consists of several persons, natural or legal, in receipt of the aid at issue (see, to that effect, judgment of 17 March 2015, *Pollmeier Massivholz* v *Commission*, T-89/09, EU:T:2015:153, paragraphs 122 and 123 (not published)).

367 The recovery of the aid, for the purpose of restoring the previously existing situation, moreover, cannot in principle be regarded as disproportionate to the objectives of the provisions of the FEU Treaty relating to State aid (see judgments of 11 March 2010, *CELF and Ministre de la Culture et de la Communication*, C-1/09, EU:C:2010:136, paragraph 54 and the case-law cited, and of 21 December 2016, *Commission* v *Aer Lingus and Ryanair Designated Activity*, C-164/15 P and C-165/15 P, EU:C:2016:990, paragraph 116 and the case-law cited).

368 The General Court considers it appropriate to analyse, in the first place, the second part of the present plea, concerning the beneficiaries of the aid, and, in the second place, the first part of that plea, concerning the amount of the aid.

### (a) The second part, alleging that the contested decision is vitiated by an error of law inasmuch as it orders the recovery of the aid measure at issue from certain applicants

369 The Commission stated in recital 160 of the contested decision that 'any payment of the compensation awarded to the [applicants] by the Tribunal [had to] be recovered by Romania since that payment [constituted] unlawful and incompatible State aid' and found that, 'as the five [arbitration applicants], together with the other relevant EFDG companies [constituted] a single economic unit …, the five [arbitration applicants] and the other relevant EFDG companies [were] jointly liable to repay the State aid received by any one of them to the Romanian State'.

370 As a preliminary point, since it has been concluded as part of the analysis of the first complaint in the first part of the fifth plea in law that Mr Ioan Micula and Mr Viorel Micula formed part of a single economic unit, it is necessary to reject the argument that recovery could not take place in

respect of the aid measure at issue from Mr Viorel Micula, as the applicants have argued in Case T-704/15, on the ground that he could not be regarded as an undertaking for the purposes of the application of the State aid rules.

371    Furthermore, even though, where there is no EU legislation on the subject, the unlawful aid must be recovered in accordance with the rules for implementation laid down by the applicable national law (see, to that effect, judgment of 5 March 2019, *Eesti Pagar*, C-349/17, EU:C:2019:172, paragraph 108), the applicants in Cases T-624/15 RENV and T-694/15 RENV cannot effectively argue, in order to challenge the legality of the contested decision, that the recovery from Mr Ioan Micula of the 'debts [of the applicant undertakings] unlawfully [pierced] the corporate veil, and [breached] Romanian corporate legislation reflected in various directives on shareholder rights'.

372    That said, in order to challenge the Commission's assessment, the applicants submit, in essence, that the sums at issue could be recovered only from the undertakings which had the 'actual benefit' of them, namely only the arbitration applicants, which were designated as beneficiaries by the arbitral award. They submit that the fact, supposing it were well founded, that all the applicant undertakings belonged to a single economic unit is irrelevant.

373    The applicants base their arguments on the judgment of 11 May 2005, *Saxonia Edelmetalle and ZEMAG* v *Commission* (T-111/01 and T-133/01, EU:T:2005:166, paragraph 113), and on the judgment of 19 October 2005, *Freistaat Thüringen* v *Commission* (T-318/00, EU:T:2005:363, paragraph 324), which reflect the case-law of the Court of Justice, as set out in paragraph 365 above.

374    Nevertheless, contrary to what the applicants claim, the judgments cited in paragraph 373 above are not such as to prevent recovery in respect of an aid measure from all of the entities constituting a single economic unit.

375    First, the cases which gave rise to the judgments cited in paragraph 373 above do not concern, as the present case does, economic entities forming one and the same undertaking in the framework of a single economic unit.

376    Second, as has been recalled in paragraph 312 above, EU competition law, in so far as it targets the activities of undertakings, enshrines as the decisive criterion the existence of unity of conduct on the market, without allowing the formal separation between various companies that results from their separate legal personalities to preclude such unity for the purposes of the application of the competition rules.

377    In the present case, as is apparent from the analysis of the fifth plea in law and, in particular, from paragraphs 344 and 355 above, Mr Ioan Micula and Mr Viorel Micula, in exercising functions relating to control and financial support in relation to all of the undertakings of the EFDG, may confer on those undertakings the benefit of the aid measure at issue, directly or indirectly, in the absence of any autonomous decision-making on the part of those undertakings. By the recovery in respect of the aid measure at issue, the single economic unit that the applicants form together thus forfeits the advantage which it had enjoyed over its competitors on the market, and the situation prior to payment of the aid is restored.

378    In the light of all the foregoing, the present part must be rejected.

        ...

On those grounds,

THE GENERAL COURT (Second Chamber, Extended Composition)

hereby:

1. **Joins Cases T-624/15 RENV, T-694/15 RENV and T-704/15 RENV for the purposes of the judgment;**

2. **Dismisses the actions;**

3. **Orders European Food SA, Starmill SRL, Multipack SRL, Scandic Distilleries SA, Mr Ioan Micula, Mr Viorel Micula, European Drinks SA, Rieni Drinks SA, Transilvania General Import-Export SRL and West Leasing SRL, formerly West Leasing International SRL, to bear their own costs and to pay those incurred by the European Commission in Cases T-624/15, T-694/15, T-704/15, T-624/15 RENV, T-694/15 RENV, T-704/15 RENV and C-638/19 P;**

4. **Declares that the Federal Republic of Germany is to bear its own costs in Cases T-624/15 RENV, T-694/15 RENV, T-704/15 RENV and C-638/19 P;**

5. **Declares that the Kingdom of Spain is to bear its own costs in Cases T-624/15, T-694/15, T-704/15, T-624/15 RENV, T-694/15 RENV, T-704/15 RENV and C-638/19 P;**

6. **Declares that the Republic of Latvia is to bear its own costs in Cases T-624/15 RENV, T-694/15 RENV, T-704/15 RENV and C-638/19 P;**

7. **Declares that Hungary is to bear its own costs in Cases T-624/15, T-694/15, T-704/15, T-624/15 RENV, T-694/15 RENV, T-704/15 RENV and C-638/19 P;**

8. **Declares that the Republic of Poland is to bear its own costs in Cases T-624/15 RENV, T-694/15 RENV, T-704/15 RENV and C-638/19 P.**

Marcoulli                          Tomljenović                          Półtorak

Norkus                                                                 Valasidis

Delivered in open court in Luxembourg on 2 October 2024.

[Signatures]