# EXHIBIT 67

## Article 41
*Agreements to modify multilateral treaties between certain of the parties only*

1. **Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:**

   (a) the possibility of such a modification is provided for by the treaty; or
   (b) the modification in question is not prohibited by the treaty and:

       (i) does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;
       (ii) does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.

2. **Unless in a case falling under paragraph 1 (a) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.**

### Contents

A. Purpose and Function ................................................................. 1
B. Historical Background and Negotiating History ........................................ 6
C. Elements of Article 41 ............................................................... 9
   I. Modification Provided for by the Treaty (para 1 lit a) ........................... 11
   II. Modification Not Prohibited by the Treaty (para 1 lit b) ......................... 13
   III. Notification (para 2) ............................................................ 19
D. Treaties of International Organizations (VCLT II) ..................................... 23

### A. Purpose and Function

Due to the conflicting interests prevailing at an international level, amendments of multilateral treaties (→ Art 40), especially amendments of treaties with a large number of parties, prove to be an extremely difficult and cumbersome process; sometimes, an amendment even seems impossible. It may thus happen that some of the **States Parties wish to modify the treaty as between themselves alone**. The reasons for such a step may be manifold[1]: States may share common interests or want to reinforce their mutual relationship. Another reason might be that States aim at ensuring higher standards of treaty obligations and decide to lead the way in this respect.    **1**

---

[1] See *Villiger* (2009), Art 41 MN 1, 3.

© Springer-Verlag GmbH Germany 2018      777
O. Dörr, K. Schmalenbach (eds.), *Vienna Convention on the Law of Treaties*,
DOI 10.1007/978-3-662-55160-8_44

2   Such a 'contracting-out',[2] however, creates a special regime under the same treaty and collides with the principle of consensus as well as with the integrity of the treaty.[3] Furthermore, it increases the already existing fragmentation caused by the large number of multilateral rights and obligations (→ Art 40 MN 1). Finally, an agreement between certain States Parties only is more likely to be incompatible with the object and purpose of a treaty.[4] Therefore, the ILC deemed it necessary to specify whether and under what circumstances such an *inter se* agreement is admissible. Consequently, Art 41 specifies the **conditions under which modifications may be regarded as permissible**.[5]

3   Art 41 is closely connected with **Art 39** and **Art 40** VCLT.[6] In theory, their respective scope is clearly defined. In practice, however, an overlapping of the cases covered by Art 40 and Art 41 is possible, since the differentiation between those two provisions only refers to the intention of the States but not to the outcome of their actions (→ Art 39 MN 1). Contrary to Art 40, Art 41 does not contain any procedural rules, apart from the obligation to notify in para 2. Its rules are substantive, not procedural in nature. The use of the term "agreement", however, corresponds to the terminology of Art 39 and thus lays down the rule that the modification agreement does not need to be in writing (→ Art 39 MN 10 *et seq*).

4   Of a more complicated nature is the relationship between Art 40 and **Art 30 para 4**.[7] At first glance, the conclusion of a modification agreement between some States Parties only and the application of successive treaties relating to the same subject matter, where the parties to the later treaty do not comprise all the parties to the earlier one, appear to be the same. There are, however, two main differences,[8] the first of which concerns the States Parties. In Art 41, the States Parties to the later treaty are necessarily a sub-group of the States Parties to the earlier treaty. Art 30 para 4, in contrast, has a larger scope. It also includes cases where the States Parties to conflicting treaties are not completely identical (→ Art 30 MN 24). The second difference refers to the date of conclusion of the treaty with the smaller number of States Parties. Since in Art 41 the States Parties to the later treaty are a sub-group of the States Parties to the earlier treaty, its provisions only apply to cases with a decreasing membership.[9] Art 30 para 4, however, lays down rules for both decreasing and increasing membership of the later treaty (→ Art 30 MN 25, 26). Therefore, not all cases falling under Art 30 para 4 are also covered by Art 41. All cases falling

---

[2] Final Draft, Commentary to Art 37, 235, para 2.
[3] *Dahm et al* (2002), p. 668.
[4] Final Draft, Commentary to Art 37, 235, para 1.
[5] Final Draft, Commentary to Art 37, 235, para 1.
[6] *Villiger* (2009), Art 41 MN 14 *et seq*.
[7] Surprisingly, the ILC did not consider this close relationship. Only a few delegations pointed out the problem, see *Reuter* [1966-I/2] YbILC 97, para 30; *Tunkin* [1966-I/2] YbILC 126, para 65; Waldock VI 76, para 4.
[8] *Rigaux et al* (2011), Art 41 MN 2 *et seq*.
[9] *Zuleeg* (1977), p. 261.

under Art 41, however, theoretically fall within the scope of Art 30 para 4. The question as to which of the two provisions has to be applied is answered by Art 30 para 5: Art 30 para 4 is without prejudice to Art 41, *ie* Art 41 prevails.[10] In other words: The legitimacy of the modification agreement depends on the criteria set out in Art 41. If a modification agreement meets the criteria, Art 30 para 4 is of no relevance.[11] The modification agreement is valid for the States Parties to it, and no international responsibility follows.[12] If the modification agreement does not meet the criteria set out in Art 41 and is thus illegitimate, the customary principles embodied in Art 30 para 4 on the *lex posterior* rule or the *pacta tertiis* rule (→ Art 30 MN 9) apply.[13] In such a case, the illegitimate, but valid[14] modification agreement has priority (Art 30 para 4 lit a) but the States Parties to it are internationally responsible towards the States Parties to the original treaty.[15]

There exists a certain parallelism between Art 41, **Art 58** and **Art 25**.[16] All three provisions regulate cases where a new legal situation evolves between certain States Parties only. Art 41 deals with the modification, Art 58 with the suspension of a treaty and Art 25 with its provisional application. Art 41 and Art 58 both use almost the same wording when referring to an agreement between certain States Parties only. Art 25 does not explicitly mention such a constellation, but it does not preclude that a multilateral treaty may be provisionally applied between certain States Parties only (→ Art 25).    5

## B. Historical Background and Negotiating History

At the Vienna Conference, the modification of multilateral treaties was regarded as a situation "not uncommon in practice".[17] Examples of treaty clauses providing for the possibility of modifications date back to the nineteenth century.[18] There were,    6

---

[10] Final Draft, Commentary to Art 26, 217, para 11; *Villiger* (2009), Art 41 MN 14; *Rigaux et al* (2011), Art 41 MN 6.

[11] *Mus* (1998), p. 226; *Aust* (2013), p. 242.

[12] *Mus* (1998), p. 225.

[13] *Mus* (1998), p. 226; *Rigaux et al* (2011), Art 41 MN 7.

[14] PCIJ *Oscar Chinn* PCIJ Ser A/B No 63, 65, 80 (1934); *Matz-Lück* (2010), MN 25; *Heintschel von Heinegg* (2014), p. 430; *Dahm et al* (2002), p. 668; *Mus* (1998), p. 225; *Capotorti* (1971), p. 509.

[15] Final Draft, Commentary to Art 37, 235, para 1; *Mus* (1998), p. 226 *et seq*; *Heintschel von Heinegg* (2014), p. 430; *Dahm et al* (2002), p. 668; *Rigaux et al* (2011), Art 41 MN 7; *Capotorti* (1971), p. 509.

[16] *Villiger* (2009), Art 41 MN 15.

[17] See the statement by the representative of Uruguay UNCLOT I 206.

[18] *Klabbers* (2006), MN 11. See *eg* Art 19 of the 1883 Paris Convention for the Protection of Industrial Property 828 UNTS 305: "It is understood that the countries of the Union reserve the right to make separately between themselves special agreements for the protection of industrial property, in so far as these agreements do not contravene the provisions of this Convention."

however, no common rules and almost no jurisprudence on the subject.[19] Due to the scarcity of examples and the diversity of cases, the issue of treaty modification was considered an "extremely complex problem".[20] Thus, Art 41 did **not codify an already existing rule of customary law**.[21] Particularly the detailed conditions under which a modification is to be regarded as permissible have to be regarded as innovative at the time.[22]

7   When SR *Waldock* presented the first draft of articles dealing with the amendment of multilateral treaties in 1964[23] (→ Art 39 MN 4), he did not include a provision on modification. Later, he presented a new draft which contained an article (Draft Art 69) regulating the modification of multilateral treaties.[24] This original provision underwent **some minor changes** during the negotiation process, the most important of which concerned the moment of notification. According to the original draft, the other States Parties had to be notified of the conclusion of a modification agreement. Many delegations, however, considered a notification at that stage as being too late.[25] Their doubts were taken into account in the revised draft of 1966.[26] Draft Art 67 established that States Parties seeking to modify a treaty had to notify the other parties of their intention to conclude such an agreement. This version became Draft Art 37 of the Final Draft[27] and was almost identical with today's Art 41. It did not give rise to many comments at the Vienna Conference.[28] Only the proposal according to which the content of para 1 lit b cl iii should be integrated into the wording of para 1 lit b[29] was accepted. The slightly amended version of Draft Art 37 was adopted by 91 votes to none[30] and became today's Art 41.

8   According to one scholar, the content of Art 41 may nowadays be considered as having come to reflect customary law.[31] The argument provided is that the provision has not been called into question by States since the conclusion of the VCLT. However, even though *inter se* agreements in order to modify a treaty are likely to become much more common owing to the increasing number of multilateral treaties, it is difficult to determine whether Art 41 in its entirety has become part

---

[19] *Rigaux et al* (2011), Art 41 MN 10.
[20] See the statement by the representative of Czechoslovakia UNCLOT I 205.
[21] *Sinclair* (1984), p. 14.
[22] *Villiger* (2009), Art 41 MN 18.
[23] *Waldock* III 47 *et seq.*
[24] *Waldock* [1964-I] YbILC 189.
[25] *Waldock* VI 86 *et seq* (comments of Finland, Israel and the Netherlands), statement of *Waldock* 87, paras 1 and 3.
[26] Revised Draft Articles [1966-II] YbILC 112, 119.
[27] Final Draft 182.
[28] UNCLOT I 205 *et seq.*
[29] UNCLOT I 205 MN 33 *et seq.* The proposal was introduced by Bulgaria, Romania and Syria.
[30] UNCLOT II 72.
[31] *Villiger* (2009), Art 41 MN 18.

of customary law. The cases where multilateral treaties have been modified even though this was not provided for in the treaty remain exceptional.[32] It is more likely that the **principle embodied in Art 41 reflects customary law**: unless a multilateral treaty so provides or unless the modification does not violate the main content of the treaty, there is a possibility but not a general right to change its provisions between certain States Parties only.[33]

## C. Elements of Article 41

Art 41 regulates two different issues. All in all, however, **three situations** have to be distinguished: If the treaty provides for its modification, such an *inter se* agreement is possible (para 1 lit a). If the treaty does not prohibit its modification, the treaty may be modified if certain conditions are met (para 1 lit b). If the treaty prohibits its modification, the States Parties are not allowed to 'contract out', and Art 41 does not apply (third implicit situation).   9

The rules laid down in Art 41 are of a **residual character**.[34] This is of special importance for Art 41 para 1 lit b which sets out the conditions which have to be met if the treaty provides no specification concerning the permissibility of a modification. The conditions refer to the content of the original treaty and aim at preserving its functioning. The only procedural requirement, *ie* notification, is laid down in para 2.   10

### I. Modification Provided for by the Treaty (para 1 lit a)

Art 41 para 1 lit a recognizes the obvious possibility to modify a treaty if the treaty itself so provides. There are many examples to be found in State practice.[35] The **most common type** of such modification clauses consists of treaty provisions allowing modifications that enhance the duties laid down in the treaty.[36]   11

> One example for such a treaty provision is Art 73 para 2 of the 1963 Vienna Convention on Consular Relations[37] according to which "[n]othing in the present Convention shall preclude States from concluding international agreements confirming or supplementing or extending or amplifying the provisions thereof". Another example is Art 28 para 2 of the 1957 European Convention on Extradition[38]: "The Contracting Parties may conclude between themselves bilateral or multilateral agreements only in order to supplement the

---

[32] *Klabbers* (2006), MN 11; *Brunnée* (2012), p. 364.

[33] Similarly *Dahm et al* (2002), p. 668.

[34] *Aust* (2013), p. 241; *Klabbers* (2006), MN 2; *Villiger* (2009), Art 41 MN 3.

[35] Examples are provided by the *United Nations* (2003), p. 107 *et seq*; *Rigaux et al* (2011), Art 41 MN 20 *et seq*.

[36] *Rigaux et al* (2011), Art 41 MN 25.

[37] 1963 Vienna Convention on Consular Relations 596 UNTS 261.

[38] 1957 European Convention on Extradition ETS 24.

provisions of this Convention or to facilitate the application of the principles contained therein." The TEU also allows for modifications. The instrument used is the so-called 'enhanced cooperation' laid down in Arts 20 *et seq* TEU and Arts 326 *et seq* TFEU.

12  The examples mentioned raise the question of whether **modifications not covered by the respective treaty provision** (in these cases: all modifications reducing the obligations laid down in the treaty) fall under the scope of para 1 lit b. Such a result, however, would not only contradict the treaty in question but also the wording of Art 41. If the treaty in question explicitly allows certain kinds of modifications only, all other modifications shall be deemed to be prohibited; Art 41 does not apply. The wording of Art 41 confirms this result: The term "or" at the end of para 1 lit a and the introductory words of para 2 show that para 1 lit b does not supplement para 1 lit a, but that both paragraphs preclude each other.[39] Either a modification is covered by para 1 lit a or it falls under the scope of para 1 lit b.

### II. Modification Not Prohibited by the Treaty (para 1 lit b)

13  Compared to the possibilities of modification provided for by many treaties (→ MN 11), the rules laid down in para 1 lit b remain quite general and provide further possibilities to modify a multilateral treaty.[40] They apply if the modification is not prohibited by the treaty. In some cases, the prohibition to modify a treaty may be explicit. Implicit prohibitions, however, *ie* cases in which a treaty allows certain modifications only and, therefore, implicitly prohibits all other modifications (→ MN 12), are possible as well. Therefore, para 1 lit b is only applicable if the treaty in question **remains silent** on the question of modification.[41]

14  In such a case, a modification is permissible if the two[42] substantive conditions specified in the two paragraphs are met: (i) the modification does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations; and (ii) the modification does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole. The **two conditions apply cumulatively**[43] and may overlap.

---

[39] *Villiger* (2009), Art 41 MN 6 n 22.

[40] *Rigaux et al* (2011), Art 41 MN 29.

[41] *Rigaux et al* (2011), Art 41 MN 21.

[42] Sometimes, it is indicated that three requirements are to be met (Final Draft, Commentary to Art 37, 235, para 2; *Sinclair* 1984, p. 108 *et seq*). The fact that the modification is not prohibited by the treaty is regarded as one of the three conditions. This view might be due to the fact that Art 37 para 1 lit b Final Draft, which became today's Art 41, contained three subparagraphs. At the Vienna Conference, however, para 1 lit b cl iii was integrated into the introductory words of para 1 lit b (→ MN 7).

[43] *Villiger* (2009), Art 41 MN 7; *Rigaux et al* (2011), Art 41 MN 30; *Dahm et al* (2002), p. 668; *Aust* (2013), p. 242.

According to the ILC, the **first condition (para 1 lit b cl i)** is met if the modification does not prejudice the rights of the other States Parties and does not add to their obligations.[44] The condition is an application of the principle laid down in Art 34[45]: The modifying treaty does not create either obligations or rights for the other States Parties. The modification thus remains *res inter alios acta* for the others.[46]   15

The **second condition (para 1 lit b cl ii)** focuses on the object and purpose of the respective treaty. If they can no longer be executed effectively, the modification is not allowed. This restriction resembles the requirements established for the formulation of reservations[47]: according to Art 19 lit c reservations are prohibited if they are incompatible with the object and purpose of the treaty.   16

> In the *Genocide* case of 1951, the ICJ argued quite similarly to the provision found today in Art 41 para 1 lit b cl ii. It stated that it is "a generally recognized principle that a multilateral convention is the result of an agreement freely concluded upon its clauses and that consequently none of the contracting parties is entitled to frustrate or impair, by means of unilateral decisions or particular agreements, the purpose and *raison d'être* of the convention."[48]

The ILC referred to the example of disarmament or a treaty of neutralization. If its main provisions were altered for certain States Parties, its object and purpose could no longer be fulfilled.[49] Modifications of environmental treaties aiming at enforcing higher standards than those required by the original treaty, on the contrary, are usually compatible with the object and purpose of the treaty.[50] It needs to be emphasized, however, that para 1 lit b cl ii explicitly refers to the object and purpose of the treaty "as a whole". Therefore, modifications relating to single and less important aspects of the object and purpose of the treaty are to be considered as permissible.[51]   17

In order to assess whether a modification meets the two conditions set out in para 1 lit b, it might be helpful to rely on the **distinction between treaties imposing obligations of a reciprocal, an interdependent or an integral nature**.[52] While modifications of interdependent treaties (like disarmament conventions) and of integral treaties (like human rights conventions) most likely affect the rights and obligations of other States Parties and/or are incompatible with the object and   18

---

[44] Final Draft, Commentary to Art 37, 235, para 2.

[45] *Rigaux et al* (2011), Art 41 MN 31.

[46] *Villiger* (2009), Art 41 MN 5.

[47] *Fitzmaurice and Merkouris* (2012), p 24.

[48] ICJ *Genocide Convention Opinion* [1951] ICJ Rep 15, 21.

[49] Final Draft, Commentary to Art 37, 235, para 2. See also *Fitzmaurice and Merkouris* (2012), p. 25.

[50] *Aust* (2013), p. 242.

[51] *Rigaux et al* (2011), Art 41 MN 32.

[52] *Pauwelyn* (2001), p. 549 with reference to *Fitzmaurice* III 27 *et seq*, 41 *et seq*. Similarly *Capotorti* (1971), p. 509.

purpose of the treaty, modifications of reciprocal treaties (like the 1961 Vienna Convention on Diplomatic Relations or the 1994 WTO Agreement) often comply with the conditions set out in para 1 lit b.[53]

### III. Notification (para 2)

19   The obligation to notify the other States Parties exists in **all cases of modifications**. If the treaty remains silent about the possibility of modifying it (para 1 lit b), the application of para 2 is obvious. If the possibility of modification is provided for by the treaty (para 1 lit a), the intention to conclude an *inter se* agreement has to be notified as well,[54] unless the treaty itself dispenses with such a duty.[55]

20   The formal procedure of notification is regulated by Arts 77 and 78. The States to be notified are the **other States Parties**, *ie* those States that have signed and ratified the original treaty. The obligation of notification laid down in Art 41 para 2 thus has a more limited scope than the similar duty set out by Art 40 para 2. In the case of an amendment, all contracting States, *ie* not only the States Parties but also those States that have signed but not yet ratified the original treaty, have to be notified (→ Art 40 MN 13).

21   The notification has to be made at **the moment** when the negotiation process of the *inter se* agreement has "reached a mature stage",[56] *ie* when the States Parties concerned have reached a consensus on the content of the modification, and no relevant obstacles to the conclusion of the agreement remain.[57] The notification of a modification proposal, at a time when the negotiations are still at an exploratory stage, was considered as "unnecessary and even inadvisable" by the ILC.[58] The notification of the effective conclusion of the modification agreement, on the contrary, was considered as being too late by the delegations at the Vienna Conference (→ MN 7). Hence, the aim of the notification becomes visible: the other States Parties shall be given the opportunity to verify whether the modification is in conformity with the original treaty and shall be protected against a *fait accompli* that might affect their rights.[59]

22   Consequently, the **content of the notification** covers two aspects, namely the intention as such to conclude an *inter se* agreement, and the content of the intended modification. Hence, the other States Parties are given the opportunity to verify if

---

[53] *Pauwelyn* (2001), p. 535; *Pauwelyn* (2002), p. 26 *et seq.*
[54] See *Rigaux et al* (2011), Art 41 MN 40 with reference to former versions of today's Art 41 para 2 and the history of negotiations.
[55] Final Draft, Commentary to Art 37, 235, para 3.
[56] Final Draft, Commentary to Art 37, 235, para 3.
[57] *Rigaux et al* (2011), Art 41 MN 41.
[58] Final Draft, Commentary to Art 37, 235, para 3.
[59] *Villiger* (2009), Art 41 MN 10; *Rigaux et al* (2011), Art 41 MN 41; *Bastid* (1985), p. 179.

the modification does not violate the basic rights, obligations, or object and purpose of the treaty. It is not necessary, however, to submit the text of the modification agreement.[60] The principle of giving all other States Parties the opportunity to examine the modification corresponds to the principle of notifying and consulting all contracting States when amending a treaty (→ Art 40 MN 12 *et seq*). This general principle of involving all States concerned was considered by the ILC as flowing directly from the obligation to perform a treaty in good faith.[61] Unlike in the case of an amendment, the other States Parties do not have the right to participate in the process of modification. The right to become a party to the modifying agreement depends on the *inter se* agreement.[62]

## D.  Treaties of International Organizations (VCLT II)[63]

The wording of Art 41 VCLT II is **identical** to the one of Art 41 VCLT I. Unlike Art 40 where the terms "every/any State" had to be supplemented by the terms "or international organization" in order to make the article applicable to international organizations (→ Art 40 MN 24), Art 41 could be left unchanged. The term "parties" encompasses both States and international organizations.[64] Therefore, the rules for modifying multilateral treaties between certain of the parties only are the same for treaties concluded between States, and for treaties concluded between States and international organizations or between international organizations. The ILC saw no need for making a commentary on Art 41 VCLT II.[65]    23

### References

Aust A (2013) Modern Treaty Law and Practice, 3rd edn. CUP, Cambridge
Bastid S (1985) Les traités dans la vie internationale. Economica, Paris
Brunnée J (2012) Treaty Amendments. In: *Hollis DB* (ed) The Oxford Guide to Treaties. OUP, Oxford, pp 347–366
Capotorti F (1971) L'extinction et la suspension des traités. RdC 134:417–588
Dahm G, Delbrück J, Wolfrum R (2002) Völkerrecht Band I/3, 2nd edn. De Gruyter, Berlin
Fitzmaurice M, Merkouris P (2012) Amendment and Modification of Non-Proliferation Treaties. In: *Joyner DH*, *Roscini M* (eds) Non-Proliferation Law as a Special Regime. A Contribution to Fragmentation Theory in International Law. CUP, Cambridge, pp 17–54

---

[60] *Villiger* (2009), Art 41 MN 11. For a different view, see *Reuter* (1995), MN 209, according to whom the notification of the modification agreement is also necessary.

[61] Final Draft, Commentary to Art 36, 233, para 9.

[62] *Villiger* (2009), Art 41 MN 12.

[63] For the treaty text see p. 1486 *et seq*.

[64] *Spanoudis and Weemaels* (2011), Art 41 VCLT II MN 1. During the negotiation process, however, two different drafts were presented. For more details see *Spanoudis and Weemaels* (2011), Art 41 VCLT II MN 2 *et seq*.

[65] Final Draft VCLT II, General comment to part IV.

*Heintschel von Heinegg W* (2014) Die völkerrechtlichen Verträge als Hauptrechtsquelle des Völkerrechts. In: *Ipsen K* (ed) Völkerrecht, 6th edn. C.H. Beck, Munich, pp 390–470

*Klabbers J* (2006) Treaties, Amendment and Revision. In: *Wolfrum R* (ed) The Max Planck encyclopedia of public international law. OUP, Oxford. http://opil.ouplaw.com/view/10.1093/law:epil/9780199231690/law-9780199231690-e1483. Accessed 29 November 2017

*Matz-Lück N* (2010) Treaties, Conflicts between. In: *Wolfrum R* (ed) The Max Planck encyclopedia of public international law. OUP, Oxford. http://opil.ouplaw.com/view/10.1093/law:epil/9780199231690/law-9780199231690-e1485. Accessed 29 November 2017

*Mus JB* (1998) Conflicts between Treaties in International Law. NILR 45:208–232

*Pauwelyn J* (2001) The Role of Public International Law in the WTO: How Far Can We Go? AJIL 95:535–578

*Pauwelyn J* (2002) The Nature of WTO Obligations, Jean Monnet Working Paper 1/02

*Reuter P* (1995) Introduction to the Law of Treaties, 2nd edn. Kegan Paul International, London

*Rigaux A*, *Simon D*, *Spanoudis J*, *Weemaels E* (2011) Article 41. In: *Corten O*, *Klein P* (eds) The Vienna Conventions on the Law of Treaties. OUP, Oxford, pp 986–1008

*Sinclair I* (1984) The Vienna Convention on the Law of Treaties, 2nd edn. University Press, Manchester

*Spanoudis J*, *Weemaels E* (2011) Article 41 VCLT II. In: *Corten O*, *Klein P* (eds) The Vienna Conventions on the Law of Treaties. OUP, Oxford, pp 1009–1011

*United Nations* (2003) Final Clauses of Multilateral Treaties: Handbook. United Nations Publication, Sales No. E.04.V.3

*Villiger M* (2009) Commentary on the 1969 Vienna Convention on the Law of Treaties. Nijhoff, Leiden

*Zuleeg M* (1977) Vertragskonkurrenz im Völkerrecht, Teil I: Verträge zwischen souveränen Staaten. GYIL 20:246–276