# EXHIBIT 68

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 28, 2024                Decided August 16, 2024

No. 23-7031

NextEra Energy Global Holdings B.V. and NextEra
Energy Spain Holdings B.V.,
Appellees

v.

Kingdom of Spain,
Appellant

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-01618)

———

*Sarah M. Harris* argued the cause for appellant. With her on the briefs were *Matthew J. Weldon*, *Lisa S. Blatt*, *Jonathan M. Landy*, *Benjamin W. Graham*, *Aaron Z. Roper*, and *Noah C. McCullough*.

*Sally L. Pei* argued the cause for *amicus curiae* the European Commission in support of appellant. With her on the brief was *R. Stanton Jones*.

2

*Donald I. Baker*, *W. Todd Miller*, and *Erin Glavich* were on the brief for *amicus curiae* the Government for the Kingdom of the Netherlands in support of appellant.

*Sharon Swingle*, Attorney, U.S. Department of Justice, argued the cause for *amicus curiae* United States of America in support of appellant. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Thomas Pulham*, Attorney.

*Shay Dvoretzky* argued the cause for appellees. With him on the briefs were *Timothy G. Nelson*, *Bradley A. Klein*, *Parker Rider-Longmaid*, *Sylvia O. Tsakos*, *David Herlihy*, *Ashley C. Parrish*, *Reginald R. Smith*, and *Thomas C. Childs.*

*Peter B. Rutledge* was on the brief for *amicus curiae* the Chamber of Commerce for the United States of America in support of appellees.

*Paul M. Levine*, *James J. East, Jr.*, and *Carlos Ramos-Mrosovsky* were on the brief for *amicus curiae* International Scholars in support of appellees.

*Steven A. Engel* and *Michael H. McGinley* were on the brief for *amicus curiae* MOL Hungarian Oil and Gas PLC in support of appellees.

*Matthew D. McGill*, *Matthew S. Rozen*, *Jeffrey Liu*, and *Lavi M. Ben Dor* were on the brief for *amicus curiae* Blasket Renewable Investments LLC in support of appellees.

3

No. 23-7032

9REN HOLDING S.A.R.L.,
APPELLEE

v.

KINGDOM OF SPAIN,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-01871)

*Sarah M. Harris* argued the cause for appellant. With her on the briefs were *Matthew J. Weldon*, *Lisa S. Blatt*, *Jonathan M. Landy*, *Benjamin W. Graham*, *Aaron Z. Roper*, and *Noah C. McCullough.*

*Sally L. Pei* argued the cause for *amicus curiae* the European Commission in support of appellant. With her on the brief was *R. Stanton Jones*.

*Sharon Swingle*, Attorney, U.S. Department of Justice, argued the cause for *amicus curiae* United States of America in support of appellant. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Thomas Pulham*, Attorney.

4

*Shay Dvoretzky* argued the cause for appellees. With him on the briefs were *Timothy G. Nelson*, *Bradley A. Klein*, *Parker Rider-Longmaid*, *Sylvia O. Tsakos*, *David Herlihy*, *Ashley C. Parrish*, *Reginald R. Smith*, and *Thomas C. Childs.*

*Peter B. Rutledge* was on the brief for *amicus curiae* the Chamber of Commerce for the United States of America in support of appellees.

*Paul M. Levine*, *James J. East, Jr.*, and *Carlos Ramos-Mrosovsky* were on the brief for *amicus curiae* International Scholars in support of appellees.

*Steven A. Engel* and *Michael H. McGinley* were on the brief for *amicus curiae* MOL Hungarian Oil and Gas PLC in support of appellees.

*Matthew D. McGill*, *Matthew S. Rozen*, *Jeffrey Liu*, and *Lavi M. Ben Dor* were on the brief for *amicus curiae* Blasket Renewable Investments LLC in support of appellees.

———

No. 23-7038

BLASKET RENEWABLE INVESTMENTS LLC,
APPELLANT

v.

KINGDOM OF SPAIN,
APPELLEE

———

5

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-03249)

———

*Matthew D. McGill* argued the cause for appellant.  With him on the briefs were *Matthew S. Rozen*, *Jeffrey Liu*, and *Lavi M. Ben Dor*.

*Sarah M. Harris* argued the cause for appellee.  With her on the brief were *Lisa S. Blatt*, *Jonathan M. Landy*, *Benjamin W. Graham*, *Aaron Z. Roper*, and *Noah C. McCullough*.

*Sally L. Pei* argued the cause for *amicus curiae* the European Commission in support of appellant.  With her on the brief was *R. Stanton Jones*.

*John A. Burlingame*, *Stephen P. Anway*, and *Dimitar P. Georgiev-Remmel* were on the brief for *amicus curiae* the Republic of Croatia in support of appellee.

*Sharon Swingle*, Attorney, U.S. Department of Justice, argued the cause for *amicus curiae* United States of America in support of appellant.  With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Thomas Pulham*, Attorney.

Before: PILLARD and PAN, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Opinion dissenting in part filed by *Circuit Judge* PAN.

6

PILLARD, *Circuit Judge*:  A collection of Dutch and Luxembourgish energy companies made investments in the Kingdom of Spain in reliance on promised economic subsidies. Several years later, in the wake of 2008 financial crisis, Spain withdrew those subsidies to control costs.  The companies challenged Spain's action.  Instead of going to court, they invoked an arbitration clause in the Energy Charter Treaty, a multilateral investment treaty whose signatories include most countries within the European Union, among them Spain, the Netherlands, and Luxembourg, along with some countries outside of Europe.  The companies prevailed in their respective arbitrations and secured multi-million-euro awards.  The European Union, however, has taken the position that the Energy Charter Treaty's arbitration provision does not apply to disputes between a national of one EU Member State and another EU Member State, and so the resulting arbitral awards are invalid as a matter of EU law.  If the companies sought to enforce the awards in an EU national court, they would lose.

So, the companies came to the United States.  Although the United States is not a signatory to the Energy Charter Treaty, it is a signatory to other treaties—namely, the ICSID Convention and the New York Convention—that obligate it to enforce certain foreign arbitral awards.  Invoking those treaties, the companies filed enforcement petitions in the United States District Court for the District of Columbia.

Spain defended itself in two ways relevant here.  It moved to dismiss the petitions on the ground that it enjoys sovereign immunity under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et. seq*.  And Spain filed its own lawsuits in Dutch and Luxembourgish courts seeking, among other things, an anti-suit injunction to prevent the companies from proceeding with their petitions to enforce their arbitral awards in United States courts.  In response, the companies argued that

7

the district courts had jurisdiction under the FSIA's waiver and arbitration exceptions and asked the district courts for their own *anti*-anti-suit injunction to enjoin Spain from seeking in foreign courts to enjoin the United States court proceedings.

The district courts resolved those motions in opposing ways. The court presiding over *NextEra Energy Global Holdings B.V. v. Kingdom of Spain*, 656 F. Supp. 3d 201 (D.D.C. 2023), and *9REN Holding S.A.R.L. v. Kingdom of Spain*, No. 19-cv-1871, 2023 WL 2016933 (D.D.C. Feb. 15, 2023), held that it had jurisdiction under the FSIA's arbitration exception and denied Spain's motion to dismiss in *NextEra*. (A motion to dismiss was not at issue in *9REN*.) Exercising that jurisdiction, the court granted both companies' requested injunctions to prevent Spain from seeking anti-suit relief in foreign courts.

By contrast, in *Blasket Renewable Investments, LLC v. Kingdom of Spain*, 665 F. Supp. 3d 1 (D.D.C. 2023), the district court deemed Spain immune under the FSIA and denied as moot the companies' requested injunction. Spain appeals the adverse decisions in *NextEra* and *9REN*, while a successor to some of the companies appeals the adverse decision in *Blasket*. Because the cases raise similar issues, we heard argument on the same day and now resolve them in a single opinion.

For the reasons that follow, we hold that the district courts have jurisdiction under the FSIA's arbitration exception to confirm these arbitration awards against Spain, but that the court in *NextEra* and *9REN* abused its discretion by enjoining Spain from pursuing anti-suit relief in Dutch and Luxembourgish courts. We therefore affirm in part and reverse in part in *NextEra*; reverse in *9REN* and *Blasket*; and remand for further proceedings.

8

**I.**

**A.**

These cases concern the relationship between three sets of multilateral international treaties: (1) the Treaty on the Functioning of the European Union (TFEU) and the Treaty on European Union (TEU) (collectively, the EU Treaties), which created and now govern the European Union; (2) the Energy Charter Treaty (ECT), an investment treaty adopted to promote international cooperation in the energy sector; and (3) the ICSID Convention (also known as the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States) and the New York Convention (also known as the Convention on the Recognition and Enforcement of Foreign Arbitral Awards), two treaties designed to facilitate the enforcement of international arbitration awards.

The Energy Charter Treaty was signed in 1994 among 53 nations and regional organizations to promote international cooperation in the energy sector.  *See* Energy Charter Treaty art. 2, Dec. 17, 1994, 2080 U.N.T.S. 95.  Its initial signatories (also known as contracting parties) included the EU, most EU Member States, including Spain, the Netherlands, and Luxembourg, and 26 nations outside the EU.  The United States is not a signatory.  See *Int'l Energy Charter*, Contracting Parties and Signatories of the Energy Charter Treaty, https://perma.cc/XA3F-L2R2.

While these cases were pending, the EU, Spain, and Luxembourg each announced its intention to withdraw from the ECT.  *See NextEra* 28(j) Letter dated May 20, 2024; *NextEra* 28(j) Letter dated July 9, 2024.  Under Article 47 of the ECT, these withdrawals "shall take effect" one year after their announcement.  ECT art. 47(2).  Because the withdrawals

9

post-date the events in question, we refer to the EU, Spain, and Luxembourg throughout this opinion as signatories to the ECT.

The ECT protects investments in the territory of a "Contracting Party" by "Investors" located or incorporated in "other Contracting Parties." *Id.* art. 10; *see also id.* arts. 1(7), 26. In particular, Article 10(1) mandates that contracting parties give "fair and equitable treatment" to the investments of other contracting parties' investors. *Id.* art. 10(1). To effectuate that protection, Article 26 provides that a foreign investor "may choose to submit" to international arbitration any "[d]ispute[]" between a Contracting Party and an Investor of another Contracting Party relating to" a covered investment. *Id.* art. 26(1), (2). By joining the ECT, a state "unconditional[ly] consent[s]" to "international arbitration" of investment disputes at the investor's election. *Id.*, art. 26(3).

Investors can choose among several arbitral tribunals, including the International Centre for Settlement of Investment Disputes (ICSID) or an hoc arbitration tribunal under the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL). *Id.* art. 26(4)(a), (b). Regardless of arbitral forum, the ECT provides that tribunals "shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law." *Id.* art. 26(6). ICSID awards may be enforced under the ICSID Convention, while UNCITRAL awards may be enforced under the New York Convention. *See* ICSID Convention art. 54(1), *opened for signature* Mar. 18, 1965, 17 U.S.T. 1270; New York Convention art. III, June 10, 1958, 21 U.S.T. 2517.

10

**B.**

**1.**

NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. (collectively, NextEra) are Dutch companies, as are AES Solar Energy Coöperatief U.A. and Ampere Equity Fund B.V. (collectively, AES). 9REN Holding S.À.R.L. (9REN) is a Luxembourgish company. Between 2007 and 2012, the companies made investments in solar power projects in Spain in reliance on that country's promise that they could charge subsidized electricity rates, ensuring profitable returns. NextEra and 9REN invested approximately €750 million and €211 million, respectively; AES did not detail the magnitude of its investment, but it was part of a broader group of investors that cumulatively invested approximately €2 billion.

In the wake of the 2008 financial crisis, Spain withdrew those subsidies in an effort to control costs. In response, the companies commenced arbitration under Article 26 of the ECT. Because Spain, the Netherlands, and Luxembourg are signatories to the ICSID Convention, NextEra and 9REN decided to arbitrate before ICSID tribunals in Washington D.C. AES opted to proceed before an ad hoc UNCITRAL tribunal seated in Geneva, Switzerland. The companies argued that Spain failed to give their investments "fair and equitable treatment" in violation of Article 10(1) of the ECT.

While those arbitral proceedings were ongoing, the Court of Justice of the European Union—the EU's court of last resort—issued two landmark decisions that called into question the validity of the underlying arbitration agreements. In *Slovak Republic v. Achmea BV*, ECLI:EU:C:2018:158, ¶ 60 (Mar. 6, 2018), a Dutch company called Achmea prevailed in arbitration against the Slovak Republic under the terms of a

11

bilateral investment treaty. *Achmea* ¶¶ 7, 12. The Slovak Republic had unsuccessfully objected in the arbitration to the arbitral tribunal's jurisdiction, arguing that "as a result of [the Slovak Republic's] accession to the European Union, [Achmea's] recourse to an arbitral tribunal provided for in [the bilateral investment treaty] was incompatible with EU law." *Id.* ¶ 11. Making the same argument in a German national court, the Slovak Republic sought to set aside the arbitral award, and that court referred the matter to the Court of Justice of the European Union. *Id.* ¶ 12.

The Court of Justice honored the Slovak Republic's objection. The court observed that Member States may not "submit a dispute concerning the interpretation or application of the [EU] Treaties to any method of settlement other than those provided for in the Treaties." *Id.* ¶ 32 (citing TFEU art. 344). And one such requirement, the court explained, is that a tribunal "called on to interpret or . . . apply EU law," *id.* ¶ 42, must have the authority to "make a reference to the [Court of Justice] for a preliminary ruling," with the "object of securing uniform interpretation of EU law, thereby serving to ensure its consistency," *id.* ¶¶ 37, 49 (citing TFEU art. 267). The court reasoned that an arbitral tribunal considering an intra-EU dispute under an investment treaty "may be called on to interpret or indeed to apply EU law," *id.* ¶ 42, but, unlike national courts, would lack the authority to refer questions of EU law to the Court of Justice, *id.* ¶ 49. As a result, the court concluded, a binding commitment to submit intra-EU disputes to arbitration could prevent open legal questions "from being resolved in a manner that ensures the full effectiveness of EU law." *Id.* ¶ 56.

The Court of Justice therefore held that the EU Treaties "must be interpreted as precluding a provision in an international agreement concluded between [EU] Member

12

States, . . . under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept." *Id.* ¶ 60. As a result, the Court of Justice prohibited EU national courts from enforcing Achmea's arbitration award. *Id.* ¶ 60.

In *Republic of Moldova v. Komstroy LLC*, ECLI:EU:C:2021:655 (Sept. 2, 2021), the Court of Justice applied the logic of *Achmea* to the Energy Charter Treaty's arbitration provision. The Court of Justice first determined that, because the European Union is a signatory to the ECT, "the ECT itself is an act of EU law." *Komstroy* ¶ 49. A tribunal constituted under the ECT, therefore, will necessarily be "required to interpret, and even apply, EU law." *Id.* ¶ 50. And because such a tribunal cannot refer such questions to the Court of Justice, the Treaty's arbitration provision could run afoul of the EU Treaties in just the same way as the provision at issue in *Achmea*. Apparently embracing a form of interpretation akin to our doctrine of constitutional avoidance, the Court of Justice concluded that Article 26 of the ECT "must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State." *Id.* ¶ 66.

Separately, the European Commission (EC)—the EU's executive branch—identified a different problem with the awards. Article 107 of the TFEU prohibits Member States from granting "aid" that "distorts or threatens to distort competition," absent the EC's prior approval. TFEU arts. 107, 108. The EC determined that Spain's energy subsidies were unapproved "[s]tate aid." *See* Euro. Comm'n Decision on State Aid, SA.40348, ¶ 88 (Nov. 10, 2017). That meant, according to the EC, that any arbitral award successfully challenging

13

Spain's revocation of the subsidies "would constitute in and of itself State aid." *Id.* ¶ 165. So, even if the companies prevailed in this appeal, EU law would prohibit Spain from paying the awards unless and until the EC granted approval to do so. *Id.* The EC is currently considering whether to grant such approval, but it has made no decision to date. *See NextEra* Eur. Comm'n Amicus Br. 30.

Both arbitration regimes—ICSID and UNCITRAL—delegate to the arbitral tribunal the power to decide threshold issues of arbitrability. *See* ICSID Convention art. 41(1) ("The Tribunal shall be the judge of its own competence."); UNCITRAL Rules, art. 23(1) ("The arbitral tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement."). Relying on *Achmea* and *Komstroy*, Spain argued to the arbitral tribunals that they lacked jurisdiction over the disputes because, as a matter of EU law, Spain could not lawfully enter into arbitration agreements with the companies. Spain made two primary arguments: (1) that Article 26(4) of the ECT (the arbitration provision) does not cover disputes between an investor in one EU Member State and another EU Member State; and (2) that, even if it did, Article 26(6) of the ECT (the choice-of-law provision) requires the tribunal to apply *Achmea* and *Komstroy* to prevent such intra-EU arbitration.

The tribunals rejected Spain's jurisdictional objection. The *9REN* tribunal's analysis is illustrative. First, the tribunal concluded that "the plain language of the ECT['s arbitration provision]" does not exclude "intra-EU disputes from the scope of ECT." *9REN* J.A. 86. Quoting another tribunal, the *9REN* tribunal observed that "[i]t would have been a simple matter to draft the ECT so that Article 26 does not apply to disputes between an Investor of one EU Member State and another EU

14

Member State as respondent." *9REN* J.A. 86 n.102. But "[t]hat was not done," and the tribunal found no other "indication in the language of the ECT that any such exclusion was intended." *9REN* J.A. 86 n.102.

Second, the *9REN* tribunal determined that the ECT, so construed, does not violate the EU Treaties because the tribunal's "jurisdiction and its exercise in the present case rests upon the ECT (with international law as the applicable law) and not EU law." *9REN* J.A. at 95-96. And, looking to the ECT's choice-of-law provision, the tribunal reasoned that, "[a]s a matter of international law, the notion that EU law may be considered only by EU judges is misconceived." *9REN* J.A. at 94. After all, "[i]nternational courts and tribunals are frequently required to consider the laws of domestic or regional jurisdictions," but their conclusions "are not binding on the courts or tribunals of the home jurisdiction." *9REN* J.A. at 94. Likewise, "[t]he award of an ECT [arbitral] tribunal does not in any way represent a threat or challenge to the autonomy or authority of the . . . the EU and the [Court of Justice]." *9REN* J.A. at 94.

On the merits, the tribunals found that Spain violated the Energy Charter Treaty and awarded damages in the amount of €290 million to NextEra, €41 million to 9REN, and €26.5 million to AES. These awards are not anomalous. Amici point out that "Spain now leads the world in noncompliance with investor-state awards," owing "more than $1.3 billion for 16 unpaid investor-state awards." *NextEra* Int'l Scholars Amicus Br. 30 & n.23.

Spain continued to fight these awards through the processes laid out in the ICSID and New York Conventions. Spain requested review of NextEra's and 9REN's awards under the ICSID annulment process, arguing that the tribunals

15

"manifestly exceed[ed] [their] powers"—one of the five recognized grounds for annulment under Article 52 of the ICSID Convention. And Spain appealed AES's award (at issue in *Blasket*) to the Federal Supreme Court of Switzerland, as contemplated by Article V(1)(e) of the New York Convention and Swiss law. Those challenges were unsuccessful.

**2.**

Armed with multi-million-euro arbitration awards, the companies sought to confirm them in the United States. "Confirmation is the process by which an arbitration award is converted to a legal judgment." *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 875 (D.C. Cir. 2021). It is only once an award is confirmed that the prevailing party may seek to execute on the resulting judgment "by, for example, attaching [the sovereign's] commercial assets in the United States." *Id.*

As a signatory to the ICSID Convention, the United States instructs its federal courts to "enforce[]"—*i.e.*, confirm—ICSID awards and give them "the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." 22 U.S.C. § 1650a(a). Likewise, as a signatory to the New York Convention, the United States instructs its federal courts to confirm UNCITRAL awards governed by the Convention "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the . . . Convention." 9 U.S.C. § 207.

Spain defended itself in two ways. First, it moved to dismiss the petitions filed in district court by NextEra and AES in part on the ground that it enjoyed sovereign immunity under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602 *et seq*. (Spain initially moved the district court to dismiss 9REN's petition, but that motion was denied without

16

prejudice when the case was held in abeyance pending the outcome of the ICSID annulment proceedings, and Spain did not renew its motion to dismiss once the case resumed.) Second, Spain filed its own lawsuits in the courts of the Netherlands and Luxembourg seeking, among other things, to enjoin the companies under EU law from proceeding with their petitions in the United States (a so-called anti-suit injunction).

The companies responded in kind. They argued that the district courts had jurisdiction under the FSIA's waiver and arbitration exceptions, and they asked the district courts for their own injunctions—*anti*-anti-suit injunctions—to stop Spain from seeking anti-suit injunctions in foreign courts to enjoin the U.S. court proceedings. And, in an effort to escape the jurisdictional reach of the Dutch courts, AES transferred its rights in the award to a Delaware company called Blasket Renewable Investments LLC (Blasket). Blasket, not AES, is an appellant here.

The district courts resolved these motions in early 2023. The district court presiding over *NextEra* and *9REN* held that, under our binding precedent, Spain's assertion that it "could not have entered into the ECT's arbitration provisions because EU law . . . does not permit EU members to assign questions of EU law to arbitration in non-EU tribunals" was a merits defense to enforcement, not a jurisdictional question under the FSIA. *NextEra Energy Global Holdings B.V. v. Kingdom of Spain*, 656 F. Supp. 3d 201, 213 (D.D.C. 2023) (citing *Stileks*, 985 F.3d at 878-79; *Chevron Corp. v. Ecuador*, 795 F.3d 200, 205 & n.3 (D.C. Cir. 2015)); *see also 9REN Holding S.À.R.L. v. Kingdom of Spain*, No. 19-cv-1871, 2023 WL 2016933, at *4-6 (D.D.C. Feb. 15, 2023). The court thus held it had jurisdiction under the FSIA's arbitration exception, denied Spain's motion to dismiss in *NextEra*, and granted the companies' requested injunctions to prevent Spain from

17

seeking anti-suit relief in foreign courts. *See NextEra*, 656 F. Supp. 3d at 215-21; *9REN*, 2023 WL 2016933, at *7-13.

In *Blasket*, by contrast, the district court granted Spain's motion to dismiss, reasoning that, "[b]ecause Spain's standing offer to arbitrate was void as to the Companies under the [EU] law to which both Spain and the Companies are subject and which applied to the dispute by the terms of the Energy Charter Treaty itself, no valid agreement to arbitrate exists." *Blasket Renewable Inv., LLC v. Kingdom of Spain*, 665 F. Supp. 3d. 1, 4 (D.D.C. 2023); *see id.* at 12-13. The *Blasket* court thus deemed Spain immune under the FSIA and denied as moot the companies' requested injunction. *Id.* at 14 & n.9.

Spain appeals the adverse decisions in *NextEra* and *9REN*; Blasket appeals the adverse decision in *Blasket*.

## II.

These appeals raise two primary questions. The first question is whether the FSIA gives the district courts jurisdiction to enforce (or decline to enforce) the arbitration awards against Spain. The *NextEra* and *9REN* district court answered in the affirmative and denied Spain's motion to dismiss *NextEra* on sovereign immunity grounds; the *Blasket* district court said no and granted Spain's motion to dismiss. We have jurisdiction to review dismissals for and denials of sovereign immunity under 28 U.S.C. § 1291, and we do so *de novo*. *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126-27 (D.C. Cir. 2004). The second question is whether, assuming it had jurisdiction, the district court in *NextEra* and *9REN* abused its discretion by enjoining Spain from seeking anti-suit relief under foreign law in foreign courts. We have jurisdiction to review the grant of a preliminary injunction under 28 U.S.C. § 1292(a)(1); our review is for abuse of discretion. *Laker Airways Ltd. v.*

18

*Sabena, Belgian World Airlines*, 731 F.2d 909, 921 (D.C. Cir. 1984); *see Elec. Privacy Info. Ctr. v. U.S. Dep't of Commerce*, 928 F.3d 95, 100 (D.C. Cir. 2019).

## A.

We begin with jurisdiction.  NextEra and 9REN seek to enforce their arbitration awards against the Kingdom of Spain under 22 U.S.C. § 1650a (implementing the ICSID Convention), while Blasket seeks to do so under 9 U.S.C. § 203 (implementing the New York Convention).  Invoking the FSIA, Spain insists that it is immune from the companies' enforcement suits, so the district courts lack jurisdiction over them.

The "FSIA codifies a baseline principle of immunity for foreign states and their instrumentalities."  *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 272 (2023) (citing 28 U.S.C. § 1604).  It then sets out a handful of narrow exceptions to that principle.  *See, e.g.*, 28 U.S.C. § 1605(a). The companies contend that two of the FSIA exceptions apply in these cases: the waiver exception and the arbitration exception.  28 U.S.C. § 1605(a)(1), (6).

## 1.

The waiver exception provides in relevant part that a foreign state "shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the foreign state has waived its immunity either explicitly or by implication."  *Id.* § 1605(a)(1).  The companies contend that Spain implicitly waived its immunity by ratifying the ICSID and New York Conventions, since those conventions provide for enforcement of arbitration awards against contracting foreign sovereigns in domestic courts of any convention signatory.  By mutually agreeing with other

19

sovereigns to enforce arbitral awards rendered in disputes to which any signatory is a party, the logic goes, Spain waived its immunity defense against such an enforcement action in U.S. court.

Embracing that logic, the Second Circuit has held that, by ratifying either convention, a country implicitly waives its sovereign immunity from suits seeking to enforce awards under that convention. *See Blue Ridge Invs., LLC v. Republic of Argentina*, 735 F.3d 72, 84 (2d Cir. 2013) (ICSID Convention); *Seetransport Wiking Trader v. Navimpex Centrala*, 989 F.2d 572, 578-79 (2d Cir. 1993) (New York Convention). The High Court of Australia recently came to a similar conclusion. *See Kingdom of Spain v. Infrastructure Servs. Luxembourg S.à.r.l.* [2023] HCA 11 ¶ 79 (holding that Spain consented to the jurisdiction of Australian courts "because the relevant agreement arose from Spain's entry into the ICSID Convention, which included its agreement as to the consequences of an award rendered pursuant to the ICSID Convention").

The waiver issue remains "unsettled" in our Circuit. *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria* (*P&ID*), 27 F.4th 771, 774 (D.C. Cir. 2022). To be sure, we have twice approvingly cited the Second Circuit's decision in *Seetransport*. In *Creighton Ltd. v. Government of State of Qatar*, 181 F.3d 118 (D.C. Cir. 1999), we opined in dicta that *Seetransport* "correctly" held that a foreign sovereign waives sovereign immunity when it joins the New York Convention. *Id.* at 123. Then, in *Taftneft v. Ukraine*, 771 F. App'x 9 (D.C. Cir. 2019), we held in an unpublished judgment that "a sovereign, by signing the New York Convention, waives its immunity from arbitration-enforcement actions in other signatory states." *Id.* at 10. More recently, however, we emphasized that "[a]lthough we have favorably cited

20

*Seetransport* and its reasoning in dicta and in an unpublished opinion, we have not formally adopted it." *P&ID*, 27 F.4th at 774. And the United States urges against doing so in this case. *See NextEra* U.S. Amicus Br. 19-25.

We leave clarification of the waiver question for another day because we conclude that the district courts have jurisdiction under the FSIA's arbitration exception, to which we now turn.

**2.**

As relevant here, the FSIA arbitration exception withdraws sovereign immunity:

> in any case . . . in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if . . . the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards.

28 U.S.C. § 1605(a)(6).

To proceed under this clause of the FSIA's arbitration exception, we have explained, a district court must find three "jurisdictional facts": (1) an arbitration agreement, (2) an arbitration award, and (3) a treaty potentially governing award

21

enforcement.  *Chevron Corp.*, 795 F.3d at 204 & n.2; *see also Stileks*, 985 F.3d at 877.  In assessing these jurisdictional facts, we apply a burden-shifting framework.  The plaintiff must initially satisfy a burden of production as to these facts, which when met requires the foreign sovereign to "establish the absence of the factual basis by a preponderance of the evidence."  *Chevron*, 795 F.3d at 204 (citation omitted).  The United States objects to *Chevron*'s burden-shifting framework. In its view, the plaintiff, as the party invoking the federal court's jurisdiction, must satisfy both the burden of production and persuasion.  *See NextEra* U.S. Amicus Br. 9-10 n.2.  We are bound by *Chevron*, however, and would have no occasion in any event to revisit the issue because the plaintiff companies satisfy the burden of persuasion in these cases.

Spain does not dispute that the companies have demonstrated arbitration awards and a treaty governing the enforcement of the awards in the United States.  The only jurisdictional fact in dispute here is "the existence of an arbitration agreement."  *Chevron*, 795 F.3d at 204.  The word "existence" in this context is significant.  It is well established in this Circuit that disputes about the scope of an arbitration agreement, such as whether a binding arbitration agreement covers a particular dispute, are not jurisdictional questions under the FSIA.  *See Stileks*, 985 F.3d at 878.  Scope questions instead go to the award's enforceability on the merits.  To make the issue jurisdictional, the sovereign must attack the existence or validity of the arbitration agreement.

The first step in the analysis, then, is to identify the relevant arbitration agreement.  As mentioned, the FSIA requires "an agreement made by the foreign state"—*either* "with" *or* "for the benefit" of a private party—to submit certain disputes to arbitration.  28 U.S.C. § 1605(a)(6).

22

The most straightforward case is when a sovereign enters into an arbitration agreement directly "with" a private investor. Consider, for example, *Belize Social Development Limited v. Government of Belize*, 794 F.3d 99 (D.C. Cir. 2015). In that case, a private company entered into a business agreement containing an arbitration clause with the prime minster of Belize, who purported to sign on behalf of the country. *Id.* at 100-01. A newly elected prime minster later renounced the agreement, claiming that the previous prime minister lacked the authority to enter into the agreement. *Id.* at 101. The company nonetheless commenced arbitration, prevailed, and, invoking the FSIA's arbitration exception, sought to enforce the resultant award in the United States. *Id.* Belize resisted enforcement on the ground that it did not enter into a valid arbitration agreement with the company. *Id.* at 102. We treated Belize's argument as a jurisdictional one—it was attacking the validity of the arbitration agreement it signed "with" the private company—but we rejected the argument because the country failed to substantiate its claim that the previous prime minister "lacked authority to enter the agreement to arbitrate." *Id.* at 103 (emphasis omitted).

An arbitration provision in an investment treaty works differently. In itself, an investment treaty "cannot constitute an agreement to arbitrate *with* an investor. How could it? No investor is a party to that Treaty." *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 50 (2014) (Roberts, C.J., dissenting) (emphasis added). The investment treaty is instead "a contract . . . between nations." *Id.* at 37 (majority op.). As such, an arbitration provision in an investment treaty can both (1) constitute an agreement "for the benefit" of a private party; and (2) give rise to a separate agreement "with" a private party. 28 U.S.C. § 1605(a)(6). Under the plain terms of the FSIA's arbitration exception, either type of agreement may support the exercise of jurisdiction over a foreign sovereign.

23

The two agreements are related. First, the arbitration provision in an investment treaty may itself be "part of a completed agreement between" the signatory countries to arbitrate certain disputes with investors of the other's country. *BG Grp.*, 572 U.S. at 53 (Roberts, C.J., dissenting) (emphasis omitted). Such a provision is an agreement made "for the benefit" of a private party. But it is not a complete agreement made "with" a private party. "Something else must happen to create an agreement where there was none before." *Id.* at 50 (emphasis omitted). To that end, an investment treaty's arbitration provision operates as "a unilateral offer to arbitrate" by each sovereign to investors of the other signatory countries. *Id.* (emphasis omitted). A foreign investor seeking to take advantage of the investment treaty's arbitration agreement may accept the offer by "filing . . . a notice of arbitration," *id.* at 42 (majority op.), and thereby create a second arbitration agreement—this one made by the sovereign "with" a private party.

In so holding, we recognize that "a sovereign's consent to arbitration is important." *Id.* at 43. That is especially so where, as here, the agreement to arbitrate is the basis of a federal court's authority to exercise jurisdiction over the sovereign. An investment treaty may reflect the requisite consent for purposes of the FSIA's arbitration exception. When a sovereign makes "an agreement . . . to submit to arbitration" by entering an investment treaty with other sovereigns "for the benefit of" a class of private investors, it is the treaty that manifests the sovereign's consent to arbitrate. 28 U.S.C. § 1605(a)(6). We therefore may look to the investment treaty itself to identify the scope of the sovereign's consent and the relevant agreement for purposes of the FSIA's arbitration exception.

24

The investment treaty offers powerful reasons to conclude that the standing offer to arbitrate contained in the ECT's arbitration provision extends to EU nationals. The clear terms of the ECT's arbitration provision cover "[d]isputes between a Contracting Party and an Investor of another Contracting Party." ECT art. 26(1). Spain is undeniably a "Contracting Party," *id.* art. 1(2), and the companies are undeniably "Investor[s] of another Contracting Party," *id.* art. 26(1), because the companies are "organized in accordance with the law applicable in" the Netherlands or Luxembourg, *id.* art. 1(7). And if the ECT's drafters nonetheless intended to exempt intra-EU disputes, they could have done so through a "disconnection clause"—a provision stating that the treaty does not govern the relationships between EU Member States. Indeed, as another ICSID tribunal explained, "during negotiation of the ECT, the EU had proposed the insertion of a disconnection clause. However, that clause was ultimately dropped from the draft treaty." *Vattenfall AB v. Fed. Republic of Germany*, ICSID Case No. Arb/12/12, Decision on the *Achmea* Issue, ¶¶ 204-05 (Aug. 31, 2018).

For its part, Spain insists that it did not enter into an arbitration agreement "with" the companies. It contends that the standing offer to arbitrate contained in Article 26 of the ECT did not and could not "extend" to the companies because, under the Court of Justice's *Komstroy* opinion, "the Energy Charter Treaty does not permit intra-EU arbitration." *NextEra* Appellant Br. 43. Therefore, the country concludes, it "could not form any arbitration agreement" with the companies as a matter of EU law. *Id.* 31.

But we need not and do not resolve whether Spain entered into separate arbitration agreements "with" private parties because we conclude that it entered into an arbitration agreement—the Energy Charter Treaty itself—that is arguably

25

"for the[ir] benefit." 28 U.S.C. § 1605(a)(6). Spain does not dispute that it is a signatory to the Energy Charter Treaty. And it is common ground that, in ratifying the ECT, Spain provided "unconditional consent" to arbitrate investment disputes with the investors of at least some of the other signatory nations. ECT art. 26(3)(a). Thus, as a leading scholar has explained, the treaty itself "contain[s] the *consent* of the contracting parties to submit disputes involving foreign investment to direct investor-state arbitration." Christopher Dugan et al., *Investor-State Arbitration* 241 (2008). That agreement is "for the benefit" of the signatory's investors, and therefore satisfies the FSIA's arbitration exception.

Spain agrees that the ECT was made "for the benefit" of some investors—just not those within the European Union. 28 U.S.C. § 1605(a)(6). Spain's view, again, is that the standing offer to arbitrate contained in Article 26 of the ECT does not extend to EU nationals like the companies; it extends only to the nationals of ECT signatories outside the European Union, like Japan. *NextEra* Appellant Br. 31, 42-44. That, however, is an argument regarding the *scope* of the Energy Charter Treaty, not its *existence*. It goes to whether the ECT's arbitration provision applies to these disputes. And our binding precedent holds that the question "[w]hether the ECT applies to [a] dispute" is not "a jurisdictional question under the FSIA." *Stileks*, 985 F.3d at 878-79 (emphasis omitted) (citing *Chevron*, 795 F.3d at 205-06).

In *Chevron* and *Stileks*, the sovereigns argued that they never agreed to arbitrate because the scope of the relevant investment treaties' arbitration provisions did not extend to the disputes that the companies sought to arbitrate. In each case, we held that the sovereign's argument went to the enforceability of the arbitral award on the merits, rather than

26

the district court's jurisdiction to enforce the award under the FSIA.

*Chevron* concerned a contractual dispute between Chevron, an American company, and the Republic of Ecuador. 795 F.3d at 202. After Chevron's lawsuits against Ecuador languished in Ecuador's courts, Chevron commenced arbitration and prevailed under an arbitration provision contained in a bilateral investment treaty between the United States and Ecuador. *Id.* at 202-03. Under that treaty, "Ecuador made a standing offer to American investors to arbitrate disputes involving investments that existed on or after the treaty's effective date." *Id.* at 202. Invoking the FSIA's arbitration exception, Chevron petitioned to enforce the award in the United States under the New York Convention. *Id.* at 203. Ecuador argued the arbitration exception did not apply because its "offer to arbitrate in the [investment treaty] [did not] encompass[] Chevron's breach of contract claims." *Id.* at 205. "According to Ecuador, if Chevron's claims [were] not covered by the [investment treaty], then Ecuador never agreed to arbitrate with Chevron, and the District Court consequently lacked jurisdiction." *Id.* The panel rejected that argument, holding that "[t]he dispute over whether the lawsuits were 'investments' for purposes of the treaty" is not a jurisdictional question under the FSIA; rather it "is properly considered as part of review under the New York Convention." *Id.* at 206.

*Stileks* applied the reasoning of *Chevron* to the Energy Charter Treaty's arbitration provision. A Ukrainian company called Energoalliance contracted to sell electricity to the Republic of Moldova. 985 F.3d at 874-75. But Energoalliance did not sell directly to Moldova; instead, it sold the electricity to a British Virgin Islands entity called Derimen Properties, which in turn provided the electricity to Moldova. *Id.* at 875. When Moldova fell behind on payments, "Derimen assigned

27

the debt to Energoalliance," which commenced arbitration under Article 26 of the Energy Charter Treaty. *Id.* Energoalliance secured an arbitral award and sought to enforce the award in the United States under the New York Convention. *Id.*

Like Chevron, Energoalliance invoked the FSIA's arbitration exception. *Id.* at 877. And, like Ecuador, Moldova argued that the arbitration exception did not apply. It reasoned that "Derimen's claim against [Moldova] was not an investment within the meaning of the ECT because Derimen, a [British Virgin Islands] entity, was not a qualifying investor." *Id.* at 878. So, "[a]lthough the ECT may establish that Moldova agreed to arbitrate certain disputes, it does not prove that it agreed to arbitrate this *particular* dispute." *Id.* Following *Chevron*, the panel in *Stileks* held "that the arbitrability of a dispute is not a jurisdictional question under the FSIA," and it "construe[d] Moldova's arbitrability argument as a defense under [the New York] Convention." *Id.*

What was true in *Stileks* is true here. Like Moldova, Spain argues that the ECT's arbitration provision does not cover the companies' claims. Moldova said that was because Energoalliance's claims were not covered investments under the ECT; Spain argues it is because the EU companies are not covered investors under the ECT. Both claims go to the scope of the ECT's arbitration provision—in the former case, which disputes are covered; in the latter, which investors are covered. In *Stileks*, we squarely held that the question "[w]hether the ECT applies to the dispute" is not "a jurisdictional question under the FSIA." 985 F.3d at 878-79. It does not matter *why* the ECT may not apply to the dispute. For jurisdictional purposes, the FSIA's arbitration exception requires that the arbitral tribunal "purported to make an award pursuant to the ECT, not that it in fact did so." *Id.* at 878. Therefore, the

28

companies showed Spain's agreement to arbitrate, for purposes of the FSIA, by "produc[ing] copies of the ECT." *Id.* at 877.

Two limits of our holding bear emphasis. First, not every arbitration provision in an investment treaty represents a completed agreement "for the benefit" of a private party. 28 U.S.C. § 1605(a)(6). That is because not all investment treaties "supply the requisite state consent to arbitration." Dugan, *Investor-State Arbitration* at 241. Some investment treaties contain "a mere agreement to agree"; they provide, for example, that a dispute "shall upon the agreement by both parties be submitted for arbitration." *Id.* at 237 (quoting Agreement Between the Government of Sweden and the Government of Malaysia Concerning the Mutual Protection of Investments art. 6, Mar. 3, 1979, 1254 U.N.T.S. 315). Unlike the ECT's arbitration provision, such a provision does not itself "constitute consent to arbitration by the States concerned." *Id.* (internal quotation omitted).

Second, we hold only that the district courts have jurisdiction to enforce these arbitration awards. That does not mean they must or should do so. By basing jurisdiction on the Energy Charter Treaty as an agreement "for the benefit" of foreign investors, we do not address the merits question whether that Treaty's arbitration provision extends to EU nationals and thus whether Spain ultimately entered into legally valid agreements with the companies.

Our holding that the FSIA's arbitration exception authorizes enforcement of these arbitral awards makes it unnecessary for us to reach another issue that Blasket raised in an amicus brief it filed in *NextEra* and *9REN*. The FSIA grants sovereign immunity to foreign states, but that grant is explicitly "[s]ubject to existing international agreements to which the United States [was] a party" before FSIA's enactment in 1976.

29

28 U.S.C. § 1604. Because the United States ratified the ICSID Convention in 1966, the FSIA's carve-out for "existing international agreements," *id.*, may include that convention, depending on whether it "expressly conflict[s] with the [FSIA's] immunity provisions." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 442 (1989) (formatting modified). Since we hold that district courts have jurisdiction to enforce these awards under the FSIA's arbitration exception, we see no express conflict between the FSIA's immunity provisions and the ICSID Convention. *See Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venez.*, 863 F.3d 96, 113-14 (2d Cir. 2017).

In sum, we take no position on the ultimate enforceability of these awards. We hold only that district courts have jurisdiction to enforce them under the FSIA's arbitration exception.

Finally, Spain contends that, even if the district courts had jurisdiction under the FSIA, they should have alternatively dismissed the petitions based on the doctrine of *forum non conveniens*. As Spain acknowledges, however, binding circuit precedent dictates that "*forum non conveniens* is not available in proceedings to confirm a foreign arbitral award because only U.S. courts can attach foreign commercial assets found within the United States." *See Stileks*, 985 F.3d at 876 n.1 (citing *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 303-04 (D.C. Cir. 2005)). We therefore reject that challenge.

**B.**

We now consider the propriety of the district court's anti-suit injunctions in *NextEra* and *9REN*. After asserting jurisdiction over the disputes, the district court preliminarily enjoined Spain from pursuing relief in the Netherlands or

30

Luxembourg that would interfere with the district court's jurisdiction.

On appeal, Spain contends that the injunctions were an abuse of discretion. Spain's primary argument is that the injunctions violate the principle of international comity—*i.e.*, "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Usoyan v. Republic of Turkey*, 6 F.4th 31, 48 (D.C. Cir. 2021) (quoting *Hilton v. Guyot*, 159 U.S. 113, 164 (1895)). In an amicus brief, the Netherlands stresses the same theme. *See NextEra* Netherlands Amicus Br. 15-17. As does the United States, which submitted an amicus brief and participated in oral argument at our invitation. *See NextEra* U.S. Amicus Br. 25-30.

We agree that the injunctions were an abuse of discretion.

We start with some context. There are two types of anti-suit injunctions: offensive (seeking to defeat another court's jurisdiction) and defensive (seeking to protect the ordering court's own jurisdiction). Some examples are useful to understand the difference. Suppose X sues Y in Country A. If Y turns to courts in Country B to obtain an injunction against the proceeding in Country A, that's an offensive anti-suit injunction: "Its only purpose is to destroy [Country A's] jurisdiction." *Laker Airways Ltd.*, 731 F.2d at 933 n.81. If X responds by seeking in Country A an injunction to put a stop to the Country B proceeding, that's a defensive anti-suit injunction: It is "designed to protect [Country A's] jurisdiction to proceed with the case." *Id.*

We affirmed a defensive anti-suit injunction in *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909 (D.C. Cir. 1984). There, British company Laker Airways sued other British, American, and foreign companies in U.S. district

31

court for anticompetitive behavior. *See id.* at 917-18. The British and some of the foreign defendant airlines went to British court and obtained an offensive anti-suit injunction, prohibiting Laker from proceeding in the U.S. court. *Id.* at 918. Laker responded by preemptively seeking in U.S. court defensive anti-suit injunctions against the U.S. airlines and the two foreign airlines that had not yet sought anti-suit relief in British court. *Id.*

The *Laker* district court granted the defensive anti-suit injunctions against those airlines, preventing them from "taking any action before a foreign court or governmental authority that would interfere with the district court's jurisdiction over the matters alleged in the complaint." *Id.* at 919. Those foreign airlines—one Dutch, the other Belgian— appealed. *Id.* at 919, 954 n.175. They did not "dispute the power of the United States District Court to issue the injunction." *Id.* at 934. Rather, they argued that the district court abused its discretion because the injunction "violate[d] their right to take part in the 'parallel' actions commenced in the English courts," in contravention of "international principles of comity." *Id.* at 921. They also argued that the injunction "ignored Britain's 'paramount right' to apply British law to Laker, which is a British subject." *Id.*

A divided panel affirmed the injunction. *Id.* at 916. The majority emphasized that an anti-suit injunction should issue only after a case-specific evaluation of the equities makes clear that it is necessary "to prevent an irreparable miscarriage of justice." *Id.* at 927. Anything less than "the most compelling circumstances" is not enough. *Id.*

The *Laker* panel approved the injunction because "the sole purpose of the English proceeding [was] to *terminate* the American action." *Id.* at 930 (emphasis in original). It ruled

32

that the "injunctions of the United Kingdom courts [were] not entitled to comity" because the "action before the United Kingdom courts [was] specifically intended to interfere with and terminate Laker's United States antitrust suit." *Id.* at 938. In other words, the "district court's anti-suit injunction was purely *defensive*," whereas the "English injunction [was] purely *offensive*." *Id.* The majority also reasoned that the district court exhibited comity by offering to narrow the scope of the injunction to permit the foreign airlines "to proceed in Great Britain without leaving them free to secure orders which would interfere with the district court's pending litigation." *Id.* at 942. The dissenting opinion would have held the injunction too broad but would have approved an injunction that authorized the foreign airlines to seek declaratory relief. *Id.* at 958 (Starr, J., dissenting).

Here, the district court took *Laker* as its starting point. *NextEra*, 656 F. Supp. 3d at 215. (Because the district court's analysis is substantially the same in *NextEra* and *9REN*, we cite only to the published opinion in *NextEra*.) The district court concluded that anti-suit injunctions were warranted because, like the injunction in *Laker*, the injunctions requested here were defensive anti-suit injunctions. The court found that Spain's "express and primary purpose" for initiating the Dutch and Luxemburgish suits was to terminate the ongoing district court actions. *Id.* at 215-16. And the district court permitted Spain to continue to seek declaratory relief to "vindicat[e] its interpretation of EU law." *Id.* at 217; *cf. Laker Airways*, 731 F.2d at 958 (Starr, J., dissenting). After considering the equitable factors *Laker* identifies as bearing on the propriety of anti-suit injunctions, the district court applied the traditional four-factor test for preliminary injunctions. *See NextEra*, 656 F. Supp. 3d at 214-21. It then issued the anti-suit injunctions, prohibiting Spain from pursuing relief in the Netherlands or

33

Luxembourg that would interfere with the district court's jurisdiction.  *See NextEra* J.A. 833-34.

Despite the district court's careful analysis, we conclude that it abused its discretion in issuing the anti-suit injunctions. A district court abuses its discretion when it "fail[s] to consider a relevant factor" or "relie[s] on an improper factor."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1053 (D.C. Cir. 2021) (quotation marks omitted); *see also Weyerhaeuser v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 25 (2018) (explaining that, on abuse-of-discretion review, a court must ensure that the decisionmaker "appropriately consider[s] all of the relevant factors").  A district court also abuses its discretion if, "upon a weighing of the relevant factors," it commits "a clear error of judgment."  *Truckers United for Safety v. Mead*, 329 F.3d 891, 894 (D.C. Cir. 2003) (quotation marks omitted).  And, of course, a district court abuses its discretion when it commits a "material error of law."  *Musgrave v. Warner*, 104 F.4th 355, 365 (D.C. Cir. 2024) (quotation marks omitted).

Before issuing an anti-suit injunction, a court "should focus on (1) whether an action in the foreign jurisdiction prevents United States jurisdiction or threatens a vital United States policy, and (2) whether the domestic interests outweigh concerns of international comity."  *Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft*, 491 F.3d 355, 361 & n.4 (8th Cir. 2007) (citing *Laker*, 731 F.2d at 909-59).  The district court made two errors in its evaluation of these factors.[1]

---

[1]    As mentioned, in addition to evaluating these specific anti-suit injunction factors, the district court also considered the four traditional injunction factors.  Other circuits appear to be

34

*First*, the district court did not address the fact that the anti-suit injunctions run against a foreign sovereign. "[A] district court's power to sanction or exercise other forms of judicial control over a foreign sovereign is not coterminous with its power to regulate or punish other litigants." *Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 72-73 (3d Cir. 1994). In general, anti-suit injunctions strain the "crucial principles of comity that regulate and moderate the social and economic intercourse between independent nations." *Laker*, 731 F.2d at 937. An anti-suit injunction against a foreign sovereign puts these comity concerns "near their peak." *BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def. Acquisition Program Admin.*, 884 F.3d 463, 480 (4th Cir. 2018).

The district court reasoned that anti-suit injunctions were justified by the need to protect its jurisdiction to enforce NextEra's and 9REN's awards. While such a concern could support an injunction against private parties, *see, e.g.*, *Laker*, 731 F.2d at 927-31, it alone does not account for all of the

---

divided on whether those factors apply to anti-suit injunctions. *Compare In re Millenium Seacarriers, Inc.*, 458 F.3d 92, 97-98 (2d Cir. 2006) (per curiam) (evaluating traditional injunction factors in addition to equitable factors specific to the propriety of an anti-suit injunction)*, with, e.g.*, *Goss*, 491 F.3d at 361 n.4. (holding anti-suit injunction factors displace traditional injunction factors). Because we conclude that the district court erred in its evaluation of the anti-suit injunction factors, we need not reach the question whether, in addition to those factors, a district court considering whether to issue an anti-suit injunction must also consider the four traditional injunction factors.

35

implicated interests when relief is sought against a foreign sovereign.

The injunctions here would "impinge on the sovereignty" of both the Spanish government to litigate and the Dutch and Luxembourgish courts to decide an issue that Spain and the European Union view as an important question of European Union law. *BAE*, 884 F.3d at 480; *see NextEra* Eur. Comm'n Amicus Br. 11-12.

These are not abstract concerns. "Actions against foreign sovereigns in our courts raise sensitive issues concerning the foreign relations of the United States," *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983), and can have serious "diplomatic implications," *Republic of Sudan v. Harrison*, 587 U.S. 1, 19 (2019). Indeed, the United States warns that the injunctions here "ha[ve] the potential to cause significant harm to the United States." *NextEra* U.S. Amicus Br. 29. That is because "there is a real risk that issuance of an antisuit injunction in cases like this could prompt reciprocal injunctions against the United States." *Id.* at 30.

It is thus no surprise that an anti-suit injunction against a foreign sovereign is virtually unprecedented. The injunction in *Laker* ran against private companies, and we emphasized there were "[n]o facts . . . presented . . . suggesting that the antitrust suit adversely affects the operations of foreign governments." *Laker*, 731 F.2d at 942. And, in sustaining anti-suit injunctions against private entities, other courts also stress the fact that foreign sovereigns are not involved in the lawsuit. *See, e.g.*, *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 994 (9th Cir. 2006) ("There is no indication that the government of Ecuador is involved in the litigation."). Indeed, the only case that we could find in which an appellate court was presented with a similar injunction deemed the injunction an abuse of

36

discretion because the district court "failed to recognize [its] extraordinarily intrusive nature." *See Westinghouse Elec. Co.*, 43 F.3d at 80-81 (vacating injunction against foreign sovereign prohibiting the sovereign from harassing witnesses who had testified against it in a suit it had brought in federal court in the United States).

The district court thus erred in issuing the injunctions without considering Spain's sovereign status.

Our partially dissenting colleague does not dispute that Spain's status as a foreign sovereign is an important part of the problem. She concludes, however, that the district court did reckon with "Spain's status as a sovereign nation." Partial Dissent 11. For support, she points to the district court's statement that general "[c]onsiderations of comity" weigh against the anti-suit injunctions. *Id.* (quoting *NextEra*, 656 F. Supp. 3d at 216-17). But that is true of all foreign anti-suit injunctions, regardless of whether they target private entities or foreign sovereigns.

Our dissenting colleague also suggests that we cannot consider the views of the United States because they were "not before the district court when the anti-suit injunctions were litigated." *Id.* at 14-15. She contends that, at most, we "should remand for the district court to consider the[] [United States' views] in the first instance." *Id.* at 15. We disagree.

For one thing, the views of the United States *were* before the district court when the anti-suit injunctions were litigated. In opposing the injunctions before the district court, Spain pointed to the United States' amicus brief in *BAE System Technology Solution & Services*, 884 F.3d 463, a 2018 case in which the Fourth Circuit affirmed a district court's denial of an anti-suit injunction against the Republic of Korea. *See NextEra* ECF No. 81 at 15. In a portion of the amicus brief that Spain

37

quoted to the district court, the United States stressed—in language it echoes in its brief in this case—that "an antisuit injunction, barring a foreign sovereign from invoking the jurisdiction of its own courts, would be a truly extraordinary remedy with significant consequences for international comity, and its issuance could have significant negative consequences for the U.S. government." *See* Brief for the United States as Amicus Curiae, *BAE Sys. Tech. Sol. & Servs.*, 884 F.3d 463 (4th Cir. 2018) (No. 17-1070), 2018 WL 551803, at *2; *cf. NextEra* U.S. Amicus Br. 25 ("Enjoining a foreign sovereign from bringing suit in a foreign court is an extraordinary remedy that would rarely (and possibly never) be justified."). So, the district court was aware of the United States' position on the propriety of anti-suit injunctions against foreign sovereigns, at least as of 2018.

If the interests of the United States were not clear to the district court, it could have invited the United States to file an amicus brief to clarify its position. Indeed, no party expressed surprise at, or objected to, our invitation to the United States to participate as amicus curiae; all undoubtedly recognize that U.S. courts addressing matters touching foreign affairs give substantial respect to the views of the United States government. Restatement (Third) of Foreign Relations Law § 112, cmt. c (Am. L. Inst. 2024). And, although they took the opportunity to respond to the views of the United States, the companies did not request that, if we were unable to sustain the injunctions, we should remand them to the district court.

In any event, our holding does not turn on the views of the United States. Those views are important, to be sure. But, even without them, we would conclude that an anti-suit injunction against a foreign sovereign presents more serious comity concerns than one against a private entity. The district court's failure to recognize that difference was an error. So, we would

38

vacate and remand the injunctions even if the United States had not filed an amicus brief in this case asking us to do so.

*Second*, with comity concerns near their peak, the district court failed to identify domestic interests strong enough to warrant the anti-suit injunctions.

In approving the injunction in *Laker*, we emphasized that the injunction served substantial interests of the United States. 731 F.2d at 922-26.  Although the enjoined party there was a foreign corporation, it was in liquidation and its "principal creditors [were] Americans."  *Id.* at 924.  In addition, the case implicated the enforcement of American antitrust laws, which would have "directly benefit[ed] American consumers," since the anticompetitive behavior was alleged to "raise fares for United States passengers."  *Id.*

The only domestic interest the district court identified here is a public interest in encouraging arbitration.  *NextEra*, 656 F. Supp. 3d at 221.  That important interest is codified at 22 U.S.C. § 1650a(a), the federal statute implementing the ICSID Convention.  Under that Convention, the United States must open the doors of its courthouses to foreign investors seeking to enforce such awards.  But neither the treaty nor the statute requires the United States to remove obstacles in other countries that might make it harder for foreign investors to find their way to our courts.

These cases are a far cry from *Laker*.  The United States has no direct interest in the underlying disputes between the Dutch and Luxembourgish companies and Spain.  There is no suggestion that U.S. law governs that underlying dispute.  Nor does the United States have a direct interest in the interpretation of the Energy Charter Treaty, a treaty to which it does not belong.  The European Union asserts that "the question of Article 26's intra-EU application is a matter internal to the EU

39

and does not implicate the rights of third countries that are also contracting parties to the Energy Charter Treaty." *NextEra* Eur. Comm'n Amicus Br. 17; *see NextEra* U.S. Amicus Br. 28 (noting with approval that "[t]he submission of the EU explains that these questions are of extraordinary importance to that body because they 'implicat[e] the structure of the EU legal order, the role and jurisdiction of EU courts, the interpretation of EU law by non-EU adjudicatory bodies, and the future of the Energy Charter Treaty and investor-State arbitration within the EU.'" (quoting *NextEra* Eur. Comm'n Amicus Br. 26)).

Our partially dissenting colleague suggests that we "give insufficient weight to the United States' obligation to uphold the ICSID Convention and its strong interests in doing so." Partial Dissent 17. But the United States itself tells us those interests "are far outweighed by the interests in allowing the foreign litigation to proceed." *NextEra* U.S. Amicus Br. 25.

In any event, we disagree that Spain's tactics threaten to "undermine[] the whole process envisioned by the ICSID Convention." Partial Dissent 17. After all, the ICSID Convention explicitly offers recourse to signatory countries objecting that another signatory country is improperly interfering with ICSID enforcement proceedings. Under Article 64, a signatory country may refer a dispute "concerning the interpretation or application of this Convention" to the International Court of Justice. ICSID Convention art. 64. If the Netherlands or Luxembourg concluded that Spain's treatment of their nationals was in violation of the ICSID Convention, they could refer the dispute to the International Court of Justice. Our colleague suggests the ICSID Convention's remedy is too "cumbersome," but that is neither here nor there: It is the remedy "envisioned by the ICSID Convention." Partial Dissent 17-18. Not only has the

40

Netherlands declined to pursue that remedy, it urges us to vacate the injunctions. *See* Netherlands Amicus Br. 17.

That last point bears emphasis. The companies argue that Spain is breaching the commitments it made to the Netherlands and Luxembourg in the Energy Charter Treaty and the ICSID Convention to arbitrate disputes with their nationals before an ICSID tribunal. If the Netherlands or Luxembourg agreed with the companies, they might try to put a stop to Spain's tactics. They could refer the issue to the International Court of Justice. Or their courts could simply deny Spain's requests for anti-suit relief. The countries have not taken these steps, likely because they agree with Spain that the Energy Charter Treaty "cannot and never could serve as a legal basis for intra-EU arbitration proceedings." *NextEra* 28(j) Letter dated July 9, 2024. In other words, those countries do not understand the agreement they made with Spain to obligate Spain to arbitrate with their nationals. One reason the companies may struggle to enforce their arbitration awards is that the awards are based on an interpretation of an international treaty that the treaty signers reject.

One final note about what is—and is not—at stake with these anti-suit injunctions. Our dissenting colleague laments that, without the injunctions, "[o]ur affirmance of the district court's jurisdictional rulings is a hollow victory for the [companies]" because they "will be enjoined by foreign courts from ever confirming their hard-won awards." Partial Dissent 21. But the injunctions are one small piece of a complex international puzzle. The injunctions might help the companies confirm their awards, but—as the district court made clear—they would not stop Spain from continuing to seek declaratory and monetary relief in foreign courts that could ultimately prevent the companies from securing the money they seek. *See NextEra*, 656 F. Supp. 3d at 217.

41

For example, in addition to seeking an injunction, Spain asked the Dutch court for a monetary award of "[€]300 million or an amount equivalent to the amount obtained by NextEra . . . through the execution, whichever is lower." *NextEra* J.A. 800. Even if we sustained the injunctions, Spain would be free to pursue an order from the Dutch courts requiring the companies to return whatever money NextEra obtained through this enforcement action. Indeed, *Laker* itself recognized that foreign courts "can sanction their citizens for resorting to United States . . . remedies." 731 F.2d at 936. One way or another, then, the companies will have to reckon with their national courts and EU law. The injunctions might help the companies *confirm* their arbitral awards, but they would not help them *keep* the awards. At the very least, all agree that is a matter of EU law.

In sum, the district court's careful analysis overlooked the fact that anti-suit relief was sought against a foreign sovereign and the nature of the United States' ICSID obligations. In so holding, we do not categorically foreclose anti-suit injunctions against foreign sovereigns. In this context and on this record, however, we must vacate the anti-suit injunctions.

## III.

We hold that the district courts have jurisdiction to confirm these arbitration awards under the FSIA's arbitration exception, and that the preliminary injunctions in *NextEra* and *9REN* are an abuse of discretion. We therefore affirm in part and reverse in part in *NextEra*; reverse in *9REN* and *Blasket*; and remand for further proceedings.

*So ordered.*

PAN, *Circuit Judge*, dissenting in part:

I concur with the court's holding that the district court has jurisdiction under the Foreign Sovereign Immunities Act to hear the instant cases and to confirm the arbitration awards at issue. But I believe that the majority errs in vacating the anti-suit injunctions imposed by the district court. I disagree with the majority's approach to applying the abuse-of-discretion standard of review: The majority appears to perform its own balancing of interests and to substitute its own judgments for those of the district court. In so doing, the majority opinion gives insufficient weight to the United States' interest in upholding the ICSID Convention, overlooks Spain's lack of comity and apparent bad faith, and ignores the district court's finding that the injunctions were necessary to prevent irreparable harm to NextEra and 9REN. Because reasonable minds evidently differ on how to weigh the competing factors, the majority's conclusions are, at best, only arguably correct. Thus, the applicable standard of review requires us to uphold the district court's discretionary calls, which were within its "range of choice" and were "not influenced by any mistake of law." *Morrissey v. Mayorkas*, 17 F.4th 1150, 1156 (D.C. Cir. 2021). I therefore respectfully dissent as to Part II.B of the court's opinion.

## I.

### A.

The Energy Charter Treaty ("ECT") is a multilateral treaty that facilitates foreign investments in the energy sectors of participating nations. *See* Maj. Op. 8–9. A key feature of the ECT is its guarantee to foreign investors that the participating nations will agree to resolve disputes arising from the foreign investments in a neutral arbitral forum. *See id*. at 9. Specifically, the ECT provides that each nation "gives its unconditional consent to the submission of [a] dispute to

2

international arbitration." *See* Energy Charter Treaty 16 art. 26(3), Dec. 17, 1994, 2080 U.N.T.S. 95. An investor who elects to arbitrate can proceed before the International Centre for Settlement of Investment Disputes ("ICSID"). *Id*. at art. 26(3)–(5). The ICSID Convention is a multilateral treaty that authorizes ICSID "to convene arbitration, mediation, and fact-finding panels to address disputes between international investors and Contracting States." *Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela*, 87 F.4th 510, 514 (D.C. Cir. 2023). Signatory nations are obligated to enforce any arbitration award conferred by an ICSID tribunal as if the award "were a final judgment of a court in that [signatory nation]." *See* ICSID Convention, art. 54; *see also* Maj. Op. 15; 22 U.S.C. § 1650a(a).

The ECT's arbitration provision, which includes the promise of recourse under the ICSID framework, plays an important role in encouraging foreign investments: It ameliorates the risk to private companies of doing business with a sovereign nation by ensuring that there will be a fair procedure for resolving any disputes arising from the companies' investments. Spain is a signatory of the ICSID Convention, and at the relevant time was a signatory of the ECT. The United States is a signatory of the ICSID Convention.

NextEra and 9REN (the "Investors") are energy companies from the Netherlands and Luxembourg, respectively. *See* Maj. Op. 10. They both invested in the Spanish energy sector with the understanding that they could avail themselves of the arbitration provisions in the ECT and the ICSID Convention if necessary. Spain accepted the capital investments made by NextEra and 9REN, but nevertheless broke its promise to provide energy subsidies that would have benefited the Investors. *See id*.

3

In response to Spain's breach of its commitments, NextEra and 9REN followed the procedures outlined in the ECT and the ICSID Convention. *See* Maj. Op. 10. They participated in lengthy arbitration proceedings with Spain, in which all of Spain's arguments were fully aired. The Investors each secured significant monetary awards that were upheld pursuant to ICSID's internal appeal process. *See id.* at 14–15. They then sought to confirm their arbitral awards in a United States district court, as permitted by the ICSID Convention. *See id.* at 15. The district court ruled that it had jurisdiction to confirm the arbitral awards. *See NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 656 F. Supp. 3d 201, 214 (D.D.C. 2023); *9REN Holding S.À.R.L. v. Kingdom of Spain*, Civ. No. 19-01871, 2023 WL 2016933, at *3 (D.D.C. Feb. 15, 2023). We unanimously affirm the district court's jurisdictional rulings and remand for further proceedings so that the Investors may litigate the confirmation of their awards. But all the Investors' efforts to date may have been for naught because the majority opinion vacates the district court's anti-suit injunctions, which protected the Investors' ability to enforce their arbitral awards under the ICSID framework.

**B.**

Spain has argued in this case and elsewhere that it is not obligated to arbitrate with EU nationals — such as NextEra and 9REN — because the EU's highest court has prohibited EU-member nations from making treaty commitments to arbitrate intra-EU disputes. *See* Maj. Op. 24 (citing *Republic of Moldova v. Komstroy LLC*, ECLI:EU:C:2021:655 (Sept. 2, 2021)). Based on the EU court's ruling, Spain claims that it could not have lawfully entered into arbitration agreements with the Investors, even though Spain became a signatory to the ECT and the ICSID Convention long before that ruling was made. *See id.* at 10, 13, 25. Spain advanced those arguments

4

to oppose jurisdiction in this forum, even though dozens of arbitral tribunals and non-EU courts have ruled against Spain when presented with similar claims. *See* Int'l Scholars Amicus Br. 13 n.7 (collecting examples); *Infrastructure Servs. Luxembourg S.À.R.L v. Kingdom of Spain*, [2023] EWHC 1226 (Comm) ¶ 67 (decision by the English High Court of Justice holding that "[t]he EU treaties do not trump [Spain's obligations under the ICSID Convention and the ECT], nor do they override the relevant domestic law mechanism in the United Kingdom"). Notably, Spain currently owes more than $1.3 billion for sixteen unpaid arbitral awards won by investors. *See* Int'l Scholars Amicus Br. 30 n.23 (citing Nikos Lavranos, *Updated Report concerning Spain's Compliance with Investment Treaty Arbitration Awards 2023*, Int'l L. Compliance (June 2023)).

In these cases, faced with the prospect of losing on the merits yet again, Spain resorted to a procedural gambit to block the Investors from using the ICSID framework to enforce their arbitral awards: Spain sued NextEra and 9REN in their home countries to enjoin the Investors from confirming their awards in the United States. In the Dutch action, Spain sought an order requiring NextEra to "take all actions necessary to suspend the proceedings currently pending before the United States District Court . . . under penalty of a daily payment of EUR 30,000 for each day." *NextEra* J.A. 798. Spain also requested an injunction prohibiting NextEra from trying to enforce its award anywhere in the world. *Id.* at 798–99. Likewise, Spain asked the Luxembourgish court to order 9REN to "cease any enforcement of the Arbitral Award" or be subject to a penalty of EUR 100,000 per day. *9REN* J.A. 411.

The extreme remedies requested by Spain in the foreign actions were designed to deter the Investors from exercising their rights under the ECT and the ICSID Convention — even

5

though Spain signed those treaties and thereby consented to the procedures followed by the Investors. To escape its obligations under the governing treaties and arbitrations, Spain would like to re-litigate the issues already resolved by the ICSID arbitral panels in friendlier forums in the EU: Spain apparently believes that because the Netherlands and Luxembourg are EU countries, their courts will be more receptive to Spain's arguments, which are based on a ruling of the EU Court of Justice. In short, Spain is forum-shopping.

In a pair of well-reasoned opinions, the district court granted the Investors' requests to enjoin Spain from pursuing anti-suit injunctions in the Netherlands and Luxembourg that would interfere with the district court's jurisdiction to provide relief to the Investors. *See NextEra*, 656 F. Supp. 3d at 214; *9REN*, 2023 WL 2016933, at *7.[1] The district court emphasized that the express purpose of Spain's foreign lawsuits was "to *terminate* [the U.S.] action[s]" by "ordering [the Investors] to withdraw [their] suit[s], imposing penalties upon failure to do so, and issuing [] worldwide injunction[s] preventing [the Investors] from taking any action to confirm the Award[s]." *NextEra*, 656 F. Supp. 3d at 216 (emphasis in original). Moreover, Spain did not provide "any prior notice" that it was seeking the injunctions, "apparently planning to simply later advise the court of the '*fait accompli* . . . which would have virtually eliminated the court's effective jurisdiction over [the Investors'] facially valid claim[s].'" *Id.* (first and second alteration in original) (quoting *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 930–31 (D.C. Cir. 1984)). Noting that U.S. courts have a "duty to protect their legitimately conferred jurisdiction to the extent

---

[1]     The district court's opinions in *NextEra* and *9REN* are substantially identical in their analysis of the issues, and I therefore cite only to the published *NextEra* opinion.

6

necessary to provide full justice to litigants," the court determined that these "most compelling circumstances" required it to "meet the force of Spain's attempt to deprive this court of jurisdiction." *Id.* at 215–17 (first and second quoting *Laker Airways*, 731 F.2d at 927).

In reaching that conclusion, the district court considered Spain's "strenuous[]" arguments that "principles of comity" precluded the issuance of the injunctions, while acknowledging its duty to take Spain's claims "seriously." *NextEra*, 656 F. Supp. 3d at 216 (quoting *Laker Airways*, 731 F.2d at 937). But the district court refused to "countenance [Spain's] hypocrisy," observing that Spain's "claims of comity . . . come burdened with the failure of Spain to recognize comity," and that "[t]he comity concerns that Spain laments are of its own making." *Id.* at 217 (cleaned up). And further, the court held that "relief against Spain is warranted in the form of a preliminary injunction" because "there is a public interest in encouraging arbitration and the enforcement of international arbitration law as an efficient means of settling disputes," as well as "an expectation on the part of Congress that actions to enforce ICSID awards would not be protracted, much less permanently halted by collateral attacks in foreign courts." *Id.* at 217, 221 (cleaned up). Finally, the district court found that the Investors would be irreparably harmed if it did not issue the injunctions because the Investors would likely be permanently enjoined from enforcing their awards. *Id.* at 220. The district court therefore held that the balance of equities "strongly" favored the Investors. *Id.* But the court tailored its relief to preserve Spain's ability to seek a declaration from the Dutch and Luxembourgish courts "vindicating its interpretation of EU law." *Id.* at 217.

7

## II.

It is undisputed that the district court had the authority to issue the anti-suit injunctions at issue in these cases. "It is well settled that . . . American courts have power to control the conduct of persons subject to their jurisdiction to the extent of forbidding them from suing in foreign jurisdictions." *Laker Airways*, 731 F.2d at 926; *see also BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def. Acquisition Program Admin.*, 884 F.3d 463, 479 (4th Cir. 2018). That power may be exercised with respect to a foreign sovereign, and there is precedent for issuing an anti-suit injunction against a foreign sovereign. *See BAE*, 884 F.3d at 479 (noting that the district court "lifted a preliminary injunction it had previously imposed" against South Korea). "There are no precise rules governing the appropriateness of antisuit injunctions." *Laker Airways*, 731 F.2d at 927. Rather, we must "carefully examine[]" the "equitable circumstances surrounding each request for an injunction" and determine whether the injunction is necessary "to prevent an irreparable miscarriage of justice." *Id.* We have explained that "[i]njunctions are most often necessary to protect the jurisdiction of the enjoining court, or to prevent the litigant's evasion of the important public policies of the forum." *Id.* An anti-suit injunction is extraordinary relief that should be granted only under compelling circumstances. *Id.*; *BAE*, 884 F.3d at 480.

We review the district court's issuance of the anti-suit injunctions for abuse of discretion. *See Laker Airways*, 731 F.2d at 916, 921. "The abuse of discretion standard means that the district court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." *Morrissey*, 17 F.4th at 1156 (cleaned up). In other words, we ask whether the district court's decision was "at least within the zone of

8

reasonableness, even if we might disagree with the decision[.]" *Morley v. CIA*, 894 F.3d 389, 391 (D.C. Cir. 2018). If we merely disagree, "[w]e may not substitute our judgment for that of the trial court," especially when our review involves a multi-factor balancing of interests. *Morrissey*, 17 F.4th at 1156, 1159–60. Indeed, "it will be the rare case when we can reverse a district court's balancing of [] factors." *Morley*, 894 F.3d at 391. Our review must be guided by "appellate restraint, a principle faithful to the reality that appellate tribunals cannot hope to have the entire range of considerations as readily at hand as the court charged with the case in the first instance." *Founding Church of Scientology, Inc. v. Webster*, 802 F.2d 1448, 1457 (D.C. Cir. 1986); *see id*. ("The abuse-of-discretion standard calls on the appellate department, in a spirit of humility occasioned by not having participated in what has gone before, not just to scrutinize the conclusion but to examine with care and respect the process that led up to it.").

### III.

In my view, the district court did not abuse its discretion in granting the Investors' requests for anti-suit injunctions against Spain under the "equitable circumstances" presented. *Laker Airways*, 731 F.2d at 927. The district court's decisions (1) properly applied our precedent in *Laker Airways*, a case in which we upheld an anti-suit injunction in a similar posture; (2) considered the United States' interests in protecting the jurisdiction of its courts and upholding the ICSID framework; (3) assessed Spain's actions and prerogatives in a detailed discussion of "comity" concerns; and (4) gave appropriate weight to the irreparable harm that would be done to the Investors if the requested injunctions were denied.

9

## A.

In *Laker Airways*, we considered dueling requests for injunctions, much like the ones at issue here. There, some defendants in an antitrust case in the United States successfully halted the proceedings against them by securing an anti-suit injunction in the United Kingdom. In response, the plaintiff obtained an "anti-anti-suit injunction" from the district court to prevent the remaining defendants from joining the U.K. litigation to secure similar injunctions that would have impeded the U.S. antitrust case. *See Laker Airways*, 731 F.2d at 918; Maj. Op. 30–32. We upheld the anti-anti-suit injunction, reasoning that "where the foreign proceeding is not following a parallel track but attempts to carve out exclusive jurisdiction over concurrent actions, an injunction may be necessary to avoid the possibility of losing validly invoked jurisdiction" and to protect "the court's ability to render a just and final judgment." *Laker Airways*, 731 F.2d at 930. In reaching that conclusion, we considered the defendants' "strenuous[]" argument "that the district court's injunction violates the crucial principles of comity that regulate and moderate the social and economic intercourse between independent nations." *Id.* at 937. But we held that "the obligation of comity expires when the strong public policies of the forum are vitiated by the foreign act." *Id.*

We considered three factors important in upholding the district court's anti-suit injunction: (1) the foreign lawsuit was brought with "the sole purpose . . . [of] *terminat[ing]* the American action," *Laker Airways*, 731 F.2d at 930 (emphasis in original); (2) defendants sought to "evade culpability under statutes of admitted [] importance to the United States which [were] specifically applicable . . . and upon which [the plaintiff] may have legitimately relied," *id*. at 932; and (3) any

10

comity concerns were a product of defendants' own efforts "to generate interference with the American courts," *id*. at 939–40.

Here, the district court appropriately weighed the factors that we identified in *Laker Airways*. First, it considered the type of foreign suit to be enjoined: Spain's requested relief in the Dutch and Luxembourgish courts was specifically targeted to interfere with the enforcement of the arbitral awards by the district court. The district court recognized that Spain filed its foreign lawsuits with the sole intention of depriving a U.S. court of jurisdiction to provide justice to parties that were properly before it. *See NextEra*, 656 F. Supp. 3d at 215–16. The nature of the competing foreign action weighed strongly in favor of issuing an anti-suit injunction under *Laker Airways*.

Second, the district court considered other interests of the United States, specifically "encouraging arbitration and the enforcement of international arbitration law as an efficient means of settling disputes." *NextEra*, 656 F. Supp. 3d at 221 (internal quotations omitted). Although *Laker Airways* gave weight to the district court's obligation to enforce U.S. antitrust laws — and such purely domestic laws are not at issue here — there is a strong analogous U.S. interest in enforcing the ICSID Convention, an international arbitration treaty that the United States ratified, and that Congress enacted into federal law. *See Laker Airways*, 731 F.2d at 932 (upholding the anti-suit injunction that "properly prevented appellants from attempting to escape application of [governing] laws"). We have a statutory obligation to enforce ICSID awards with "the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." 22 U.S.C. § 1650a(a). Moreover, the United States benefits from its membership in ICSID because American companies also enforce arbitral awards issued pursuant to the ICSID Convention. In fact, there have been at least 150 ICSID

11

arbitrations brought by American investors.  *See* Int'l Scholars Amicus Br. 19 n.14.

Third, the district court recognized the importance of comity:  It understood that Spain's status as a sovereign nation weighed in favor of restraint.  *See NextEra*, 656 F. Supp. 3d at 216–17 (recognizing that "[c]onsiderations of comity" are "deserving [of] substantial respect," but rejecting the argument that "'comity compels us to recognize a decision by a *foreign* government that *this court* shall not apply its own laws'" (quoting *Laker Airways*, 731 F.2d at 939) (emphasis in original)).  Here, Spain's claim to comity is greatly diminished by its own disregard for the comity due to the U.S. district court, which properly exercised its jurisdiction to hear the Investors' facially valid claims.  *See id.* at 217.  It was Spain that filed the first requests for anti-suit injunctions in the Netherlands and Luxembourg, in a bold attempt to interfere with the Investors' cases before the district court.  In short, Spain is in a weak position to demand comity when it declines to practice what it preaches.

Fourth, the district court properly weighed the prospect of irreparable harm to the Investors.   The district court emphasized that "[i]f Spain receives the relief it seeks in the [foreign] action[s], [the Investors] will be permanently enjoined from enforcing the Award[s], both in this court and around the world."  *NextEra*, 656 F. Supp. 3d at 220.  The court found that this was "precisely the kind of irreparable harm identified by the district court, and affirmed by the D.C. Circuit, in *Laker Airways*[.]"  *Id.*  It was well within the district court's discretion to consider the harm to the Investors caused by Spain's actions, and to find that the balance of equities "strongly" favored the Investors.  *Id.*

12

**B.**

Despite the district court's careful application of *Laker Airways*, and the equities that strongly favor granting relief to the Investors, the majority opinion holds that the district court abused its discretion in issuing anti-suit injunctions that "run against a foreign sovereign," rather than a private litigant. Maj. Op. 34. The majority opinion states that "comity concerns [are] near their peak," *id.* at 38, and the "only domestic interest the district court identified here is a public interest in encouraging arbitration," which does not involve the enforcement of American laws or affect the interests of American creditors or consumers, *see id.* Moreover, the majority opinion asserts that the district court "did not address the fact that the anti-suit injunctions run against a foreign sovereign," and "failed to identify domestic interests strong enough to warrant the anti-suit injunctions." *Id.* at 34, 38. Thus, the majority opinion emphasizes the factors that it believes are most important, performs its own weighing of interests, and reaches a different conclusion from that of the district court. I disagree with the majority's approach to reviewing the district court's exercise of discretion.

The majority opinion's independent balancing of factors understandably gives great weight to respecting the sovereignty of other nations. Its analysis, however, overlooks the narrow scope of the anti-suit injunctions issued by the district court. The majority opinion states that the injunctions "impinge on the sovereignty of both the Spanish government to litigate and the Dutch and Luxembourgish courts to decide an issue that Spain and the European Union view as an important question of European Union law." Maj. Op. 35 (cleaned up). But the district court tailored its injunctions to allow Spain to obtain a ruling on that issue of EU law from the foreign courts: The district court enjoined Spain only from

13

seeking *relief* from the foreign courts that would require the Investors to "suspend, hold in abeyance, or withdraw" their actions before the district court — *i.e.*, Spain could still litigate its claims in the Netherlands and Luxembourg to seek declaratory relief. *NextEra*, 656 F. Supp. 3d at 217, 222 (preserving Spain's ability to seek a declaration from Dutch and Luxembourgish courts "vindicating its interpretation of EU law"). In effect, the district court's injunctions impinged only on Spain's efforts to block the district court from hearing the Investors' claims. As a result, the injunctions at issue here are far less intrusive than the ones described in other cases cited by the majority opinion. *See Republic of Philippines v. Westinghouse Elec. Co*., 43 F.3d 65, 73 (3d Cir. 1994) (vacating injunction that "purport[ed] to supervise and control the law enforcement activities of a foreign sovereign nation against its own citizens on its own soil"); *BAE*, 884 F.3d at 480 (upholding denial of permanent injunction against South Korea in part because "comity concerns are far greater where an injunction would bar a foreign sovereign . . . from litigating a dispute in its own courts"). Indeed, it is questionable whether Spain's interference with a lawsuit in the United States can even be considered a "sovereign" prerogative.

The majority faults the district court for not paying enough attention to the two factors that the majority finds most compelling. But the district court properly considered both Spain's status as a foreign sovereign and the interests of the United States, which are not limited to purely "domestic" concerns. First, the district court recognized that only "sufficiently unusual circumstances" would warrant "a preliminary, anti-suit injunction against a *foreign sovereign*," *NextEra*, 656 F. Supp. 3d at 214 (emphasis added): The district court plainly was aware that Spain is a sovereign nation and that Spain's sovereignty raised serious comity concerns. Second, the district court understood that the facts before it

14

implicated both domestic and international interests of the United States — it expressly noted the importance of international arbitration, as well as the fact that Congress has passed a statute codifying key terms of the ICSID Convention, which assures prompt confirmation of arbitral awards. *See id*. at 217, 221 (recognizing the "public interest in encouraging arbitration and the enforcement of international arbitration law as an efficient means of settling disputes," as well as "an expectation on the part of Congress that actions to enforce ICSID awards [will] not be protracted, much less permanently halted by collateral attacks in foreign courts" (cleaned up)). In sum, the district court did not "fail[] to consider" either of the factors singled out by the majority opinion — the majority simply disagrees with the weight that the district court assigned to them. Maj. Op. 33 (district court abuses its discretion when it "*fails to consider* a relevant factor" (emphasis added) (cleaned up)). Nor did the district court make a "clear error of judgment" when it performed the requisite balancing — the evident disagreement among members of this panel demonstrates that if there was error, it was not "clear." *Id.* (district court abuses its discretion when it "commits a *clear* error of judgment" (emphasis added) (cleaned up)).

The majority opinion relies most heavily on "international comity" and is influenced by amicus briefs filed in this court by the United States and the Netherlands. *See* Maj. Op. 30, 35–37.[2] But the positions expressed by those amici were not before

---

[2]     The majority opinion notes that (1) the Netherlands and the United States "stress[]" the theme of international comity, Maj. Op. 30 (citing amicus briefs of the Netherlands and the United States); (2) the United States "warns that the injunctions here 'have the potential to cause significant harm to the United States,'" *id.* at 35 (quoting amicus brief of the United States) (cleaned up); (3) the views of the United States "are important, to be sure," *id.* at 37; (4)

15

the district court when the anti-suit injunctions were litigated and therefore should not be considered here. When applying an abuse-of-discretion standard of review, it is a "commonsense notion" that we should "only examine those parts of the record that were properly before the decisionmaker at the time the question was considered." *See Sanderlin v. United States*, 794 F.2d 727, 734 (D.C. Cir. 1986). Thus, if the views of the United States and the Netherlands are important to the analysis at hand, we should remand for the district court to consider them in the first instance. Indeed, the cited amicus briefs provide us with the official positions of the United States and the Netherlands, and the interests of those nations are directly relevant to the weighing of international comity. That those amici feel strongly about how this case should be resolved is a fact that might have swayed the district court, just as it has swayed the majority. On appeal, our task is to determine "whether, *in light of the particular factual circumstances*, the trial court erred in applying or weighing the factors limiting its discretion." Edwards & Elliott, Federal Standards of Review: Review of District Court Decisions and Agency Actions 72 (3d ed., 2023 Update) (emphasis added). Because the positions of the United States and the Netherlands were never put before the district court and thus could play no role in that court's exercise of discretion, I believe that the

---

the United States "tells us th[e] interests [in upholding the ICSID Convention] 'are far outweighed by the interests in allowing the foreign litigation to proceed,'" *id.* at 39 (quoting amicus brief of the United States); (5) the Netherlands has not only declined to refer Spain to the International Court of Justice, but it "urges us to vacate the injunctions," *id.* at 39–40 (citing amicus brief of the Netherlands); and (6) it "bears emphasis" that the Netherlands and Luxembourg likely "agree with Spain" in the underlying legal dispute, *id*. at 40.

16

majority opinion errs in relying on those amicus briefs — the information they provide simply is not in the record on review.

The majority opinion insists that the views of the United States "*were* before the district court" because Spain, in its briefing below, quoted an amicus brief filed in 2018 by the United States in an unrelated and factually distinguishable case.  Maj. Op. 36–37 (emphasis in original) (relying on Spain's citation and quotation of Brief for the United States as Amicus Curiae, *BAE*, 884 F.3d 463 (No. 17-1070) 2018 WL 551803, at *2).[3]  Of course, Spain had no authority to speak for the United States and certainly could not do so by citing a brief from a different case that is on Westlaw.  Only the United States itself could state its position regarding the unique circumstances presented here.  Moreover, the majority states that "[i]f the interests of the United States were not clear to the district court, it could have invited the United States to file an amicus brief to clarify its position."  Maj. Op. 37.  That statement expresses how the majority would have liked to see the district court handle this case but does not identify any

---

3    The dispute in *BAE* had nothing to do with arbitration, ICSID, or an anti-suit injunction instigated by a foreign sovereign to deprive a U.S. court of its statutorily conferred jurisdiction.  Thus, the United States took no position on any of those interests in the amicus brief it filed in that case.  *BAE* involved a contract dispute between a defense contractor and the Republic of Korea, where the defense contractor sought an anti-suit injunction barring Korea from pursuing a parallel contract suit in Korean courts.  *See BAE*, 884 F.3d at 467.  Indeed, the language that the majority opinion quotes from the United States' amicus brief in *BAE* demonstrates how that case is inapposite:  It characterizes as "extraordinary" "an antisuit injunction barring a foreign sovereign from invoking the jurisdiction of *its own* courts."  Maj. Op. 37 (emphasis added) (quoting Brief for the United States as Amicus Curiae, *BAE*, 884 F.3d 463 (No. 17-1070) 2018 WL 551803, at *2).  Here, the anti-suit injunctions do not interfere with Spain's invocation of the jurisdiction of *its own* (Spanish) courts.

17

abuse of discretion:  The district court was not *required* to invite the United States to file an amicus brief and therefore acted within its range of choices when it did not do so.  The district court was allowed to consider the United States' interests without that formal input.

In my view, the majority opinion errs by focusing only on the factors that it deems most important while failing to address or glossing over several important considerations relied upon by the district court.  The majority opinion overlooks important aspects of the district court's ruling and cites no authority to support its incomplete review of the district court's reasoning.

First, the majority opinion seems to give insufficient weight to the United States' obligation to uphold the ICSID Convention and its strong interests in doing so.  *See supra* at 10–11.  Importantly, Spain's strategy of interfering with the Investors' ability to confirm their awards undermines the whole process envisioned by the ICSID Convention and the ECT. Both of those treaties facilitate foreign investments by guaranteeing investors a neutral arbiter in disputes with sovereign nations.  Spain turns the framework on its head by forcing the Investors to litigate in forums of the *sovereign's* choice.  Moreover, if Spain succeeds in blocking enforcement actions under the ICSID Convention by obtaining anti-suit injunctions in foreign jurisdictions that are friendly to it, other signatory states can follow the same playbook, thereby threatening the viability of the entire ICSID framework.

Today's majority opinion makes the United States an inhospitable forum for enforcing ICSID awards:  It permits a foreign sovereign with assets in the United States who does not wish to honor an ICSID award to stymie any U.S. enforcement proceeding by filing for an anti-suit injunction in another nation.  In this case, Spain chose to litigate in the Investors'

18

home countries, but nothing stops a foreign sovereign from requesting an anti-suit injunction from one of its own national courts — exactly the type of situation that the ECT and the ICSID Convention guard against. The majority opinion appears to greenlight such tactics. *See* Maj. Op. 38 (stating that the United States is not required to "remove obstacles in other countries that might make it harder for foreign investors to find their way to our courts"). The majority's suggestion that the Investors could instead rely on the Netherlands and Luxembourg to refer "Spain's treatment of their nationals" to the International Court of Justice, *see id.* at 39, misses the point: The Investors should not have to seek such a cumbersome remedy that affords them no immediate monetary compensation when the ICSID Convention and U.S. law give them a streamlined way to enforce their multi-million-euro arbitral awards in the United States.

Next, the majority opinion overlooks Spain's own lack of comity: As the district court pointed out, it is Spain that precipitated a clash of international interests by "seeking to frustrate the operation of U.S. law." *NextEra*, 656 F. Supp. 3d at 217; *supra* at 11. Indeed, a strong case can be made that Spain has acted in bad faith and that the district court made a finding to that effect. Spain attempts to bully the Investors into withdrawing their legitimate lawsuits in the United States by requesting fines against them of EUR 30,000 or 100,000 per day; and it seeks foreign injunctions that plainly are intended to disrupt and hamper the cases before the district court. *See Chambers v. NASCO, Inc*., 501 U.S. 32, 46 (1991) ("[A] party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order." (cleaned up)). Although the district court did not use the words "bad faith," it criticized Spain's conduct and emphasized Spain's attempt to "virtually eliminate[] the court's effective jurisdiction" without "any prior notice." *See NextEra*, 656 F. Supp. 3d at 216

19

(quoting *Laker Airways*, 731 F.2d at 930–31); *see also id*. at 217, 221 (noting Spain's "hypocrisy" and that Spain's representations "verge on disingenuous"). Thus, the facts in the record speak for themselves and the district court both referred to and relied on Spain's arguably bad-faith actions. *See LaPrade v. Kidder Peabody & Co.*, 146 F.3d 899, 906 (D.C. Cir. 1998) (It is "an empty formalism to find an abuse of discretion simply because the district court failed to invoke the magic words 'bad faith.'"). Spain's lack of comity and arguable bad faith support the anti-suit injunctions issued by the district court but are not addressed by the majority opinion.

Furthermore, the majority opinion does not mention the district court's finding that the anti-suit injunctions were necessary to prevent irreparable harm to the Investors. *See supra* at 11. The lawsuits that Spain brought in the Netherlands and Luxembourg seek to block the Investors from enforcing their arbitral awards in *any* forum in *the world*. And to be clear, NextEra and 9REN are the injured parties here. They invested in Spain's energy sector after Spain promised to provide energy subsidies and that the Investors would be guaranteed a neutral arbitral forum if any disputes with Spain arose. When Spain breached its commitments, the Investors dutifully followed the procedures prescribed by the ECT and the ICSID Convention. Spain has fought them every step of the way. Thus, the Investors have expended substantial time and resources to participate in lengthy arbitration proceedings and to defend their sizeable arbitral awards in ICSID's internal appeal process. They now seek only to confirm and enforce the awards in U.S. courts, as they are entitled to do under the ICSID Convention and U.S. law. Allowing Spain to extinguish the Investors' rights and claims by obtaining foreign injunctions that forbid the Investors from ever confirming their awards is manifestly unfair. But the majority appears to conclude that

20

the district court's finding of irreparable harm to the Investors is irrelevant.[4]

I also believe that the majority opinion goes astray by focusing on the parties' "underlying disputes" and on matters related to the interpretation or implementation of European law. *See*, *e.g.*, Maj. Op. 38–39. Although the "underlying disputes" between Spain and the Investors do involve EU law, those disputes already have been resolved by ICSID arbitral panels. As a result, all that remains in the cases before us is the straightforward confirmation of the ICSID arbitral awards. In such cases, the district court's scope of review is "below even the 'extremely limited' review available under the [Federal Arbitration Act]," and the district court may not consider the merits of the parties' positions before the arbitral tribunal. *See Valores*, 87 F.4th at 520; *see id.* at 515 ("Contracting states' courts are [] not permitted to examine an ICSID award's merits,

---

[4]    In each of the two cases before us, the district court issued an injunction that relied on *both* the *Laker Airways* discussion of anti-suit injunctions *and* traditional preliminary-injunction factors. *See NextEra*, 656 F. Supp. 3d at 214–21. In other words, the district court applied two sets of factors in issuing a single injunction. Thus, both parts of the district court's analysis are relevant to our evaluation of how the district court exercised its discretion to issue each injunction. Indeed, the district court undoubtedly relied on its findings of irreparable harm when it issued the injunctions at issue. *See id.* at 220. But the majority opinion appears to limit its review to the anti-suit injunction factors discussed in *Laker Airways*, leaving its analysis incomplete. The majority opinion apparently takes this approach because the majority believes that it need not decide in this case whether a district court is *required* to consider the "four traditional injunction factors" in this context. Maj. Op. 33 n.1. Yet, even if we need not address *whether* the preliminary-injunction factors *must* be analyzed under the circumstances presented, we still are obligated to review what the district court actually did in this case.

21

its compliance with international law, or the ICSID tribunal's jurisdiction to render the award." (cleaned up)). "Under the [ICSID] Convention's terms, [the district court] may do no more than examine the judgment's authenticity and enforce the obligations imposed by the award." *Id*. Thus, we need not dwell on the "complex international puzzle" described by the majority opinion. *See* Maj. Op. 40. Rather, we should keep our eye on the ball and simply uphold the treaty obligation and the U.S. statute that require the district court to enforce any ICSID arbitration award as if the award "were a final judgment of a court in [the United States]." *See* ICSID Convention, art. 54; 22 U.S.C. § 1650a(a) (ICSID awards are entitled to "the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States.").

Unlike the majority, I am unable to reconcile our obligation to give full faith and credit to ICSID awards and to enforce them like final judgments with a ruling that allows Spain to block access to U.S. courts in a gambit to *prevent* the confirmation and enforcement of those very same awards. *See* Maj. Op. 38 ("[T]he United States must open the doors of its courthouses to foreign investors seeking to enforce such awards. But neither the treaty nor the statute requires the United States to remove obstacles in other countries that might make it harder for foreign investors to find their way to our courts."). Our affirmance of the district court's jurisdictional rulings is a hollow victory for the Investors if they nevertheless will be enjoined by foreign courts from ever confirming their hard-won awards.

For the foregoing reasons, I cannot agree with the majority's approach or analysis in vacating the anti-suit injunctions. But whether my arguments are persuasive or not, the conflicting views expressed by members of this panel demonstrate that there is no objectively correct answer to the

22

question of whether those injunctions should have been granted. Because there is more than one reasonable way to resolve these cases, the abuse-of-discretion standard requires us to affirm the choices made by the district court. *See Morrissey*, 17 F.4th at 1156 ("The abuse of discretion standard means that the district court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." (cleaned up)); *Morley*, 894 F.3d at 391 ("[I]t will be the rare case when we can reverse a district court's balancing of [] factors.").

\*   \*   \*

Even though the district court did not take the path preferred by the majority, it acted well within its discretion when it evaluated the equities in the way that it did. The majority opinion does not identify any relevant factor that the district court failed to consider or any mistake of law that it made. Instead, the majority disagrees with the district court's weighing of interests and substitutes its own judgments for those of the district court. Because the majority opinion misapplies the required standard of review, I respectfully dissent as to Part II.B of the court's opinion.