# EXHIBIT 69

# Article 53

**(1) The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention.**

**(2) For the purposes of this Section, "award" shall include any decision interpreting, revising or annulling such award pursuant to Articles 50, 51 or 52.**

## OUTLINE

|  |  | *Paragraphs* |
|---|---|---|
| I. | INTRODUCTION | 1–11 |
|  | A. **General** | 1–4 |
|  | B. **The Additional Facility** | 5–11 |
| II. | INTERPRETATION | 12–82 |
|  | A. **'(1) The award shall be binding on the parties . . .'** | 12–24 |
|  | 1. The Binding Nature of the Award | 12–13 |
|  | 2. The Binding Force between the Parties | 14–20 |
|  | a) General | 14–17 |
|  | b) Constituent Subdivision or Agency | 18–20 |
|  | 3. Authority for Subsequent Decisions | 21–24 |
|  | B. **'. . . and shall not be subject to any appeal or to any other remedy except those provided for in this Convention.'** | 25–41 |
|  | 1. Exhaustive Nature of the Convention's Review System | 25–39 |
|  | a) National Courts | 27–30 |
|  | b) The International Court of Justice | 31–35 |
|  | c) Proposals for Appeals Mechanisms | 36–39 |
|  | 2. Exclusion of Another Remedy | 40–41 |
|  | C. **'Each party shall abide by and comply with the terms of the award . . .'** | 42–57 |
|  | 1. Obligation to Comply | 42–49 |
|  | 2. Means to Secure Compliance | 50–57 |
|  | D. **'. . . except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention.'** | 58–75 |
|  | 1. Suspension of the Obligation to Comply | 58–61 |
|  | 2. No Presumption in Favor of Granting a Stay of Enforcement | 62–64 |
|  | 3. Timing | 65–75 |
|  | E. **'(2) For the purposes of this Section, "award" shall include any decision interpreting, revising or annulling such award pursuant to Articles 50, 51 or 52.'** | 76–82 |

https://doi.org/10.1017/9781316516584.059 Published online by Cambridge University Press

# BIBLIOGRAPHY

Alexandrov, Stanimir A, 'Enforcement of ICSID Awards: Articles 53 and 54 of the ICSID Convention' in Christina Binder and others (eds), *International Investment Law of the 21st Century: Essays in Honour of Christoph Schreuer* (OUP 2009) 322

Baldwin, Edward, Kantor, Mark and Nolan, Michael, 'Limits to Enforcement of ICSID Awards' (2006) 23(1) Journal of International Arbitration 1

Broches, Aron, 'Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution' (1987) 2 ICSID Review 287

Hirsch, Moshe, 'Explaining Compliance and Non-Compliance with ICSID Awards: The Argentine Case Study and a Multiple Theoretical Approach' (2016) 19 Journal of International Economic Law 681

Hunter, J Martin and García Olmedo, Javier, '"Enforcement/Execution" of ICSID Awards against Reluctant States' (2011) 12 The Journal of World Investment & Trade 307

Reinisch, August, 'Enforcement of Investment Treaty Awards' in Katia Yannaca-Small (ed), *Arbitration under International Investment Agreements: A Guide to the Key Issues* (2nd edn, OUP 2018) 797

Shubin, Vasily, 'The Enforcement of ICSID Arbitral Awards, Practice and Problems' (2012) 11–12 Korea University Law Review 11

Tawil, Guido Santiago, 'Binding Force and Enforcement of ICSID Awards: Untying Articles 53 and 54 of the ICSID Convention' in Albert Jan van den Berg (ed), *50 Years of the New York Convention: ICCA International Arbitration Conference* (Kluwer 2009) 327

Wang, Dong, 'Binding Force and Enforcement' in UNCTAD (ed), *Dispute Settlement: International Centre for Settlement of Investment Disputes* (United Nations 2003)

Williams, David, 'International Commercial Arbitration and Globalization, Review and Recourse against Awards Rendered under Investment Treaties' (2003) 4 The Journal of World Investment & Trade 251

# I. INTRODUCTION

## A. General

**1**    Art. 53 is the first of three Articles of Section 6 of Chapter IV of the Convention. Section 6 is entitled 'Recognition and Enforcement of the Award.' Art. 54 deals more specifically with recognition and enforcement. Art. 55 concerns the immunity of a foreign State from execution.

**2**    Art. 53 addresses the effects of a final award on the parties to an ICSID arbitration. It deals with three issues. One is the finality of an ICSID award: once an ICSID award has been rendered, the parties may not seek a remedy concerning the same dispute in another forum. The second issue is the absence of any external review of an ICSID award: ICSID's review system, as established by Arts. 49(2), 50, 51, and 52, is exhaustive and self-contained. The third issue is the binding force of an award: non-compliance with an award by a party would be a breach of a legal obligation.

**3**    Other instruments governing international adjudication contain similar provisions concerning the binding force and finality of judgments and awards. Examples are the Statute of the International Court of Justice (ICJ Statute) (Arts. 59,

60),[1] the 1958 International Law Commission Model Rules on Arbitral Procedure (Arts. 30, 32),[2] the 2013 UNCITRAL Arbitration Rules (Art. 34(2)), the 1985 UNCITRAL Model Law on International Commercial Arbitration (amended in 2006) (Art. 35(1)), the 2021 ICC Arbitration Rules (Art. 35(6)), the 1996 Commercial Arbitration and Mediation Center for the Americas Arbitration Rules (Art. 29(1)),[3] the 2020 LCIA Arbitration Rules (Art. 26.8), and the 2017 SCC Arbitration Rules (Art. 46).

During the Convention's drafting, there was little discussion on the substance of what **4** ultimately became Art. 53.[4] All drafts embodied the principles of finality and binding force (see paras. 13, 50 *infra*). The later drafts also contained an explicit exclusion of any external appeal (History, Vol. I, pp. 242, 244) (see paras. 25, 32 *infra*). The discussions primarily concerned the exact date at which an award would have to be complied with (see paras. 58, 59 *infra*).

## B. The Additional Facility

The ICSID Convention, including Art. 53, does not apply to arbitration under the **5** Additional Facility Rules (see Art. 25, paras. 12–19). This means that, unlike ICSID arbitration, arbitration under the Additional Facility is not insulated from national law. Review, recognition, and enforcement of awards made under the Additional Facility are governed by the national law of the place of arbitration and any applicable treaties.[5]

Art. 52 of the Arbitration (Additional Facility) Rules provides in part: '(4) The award **6** shall be final and binding on the parties.' While the Arbitration (Additional Facility) Rules thus embody the principles of finality and binding force, they do not contain a rule excluding external review (see para. 2 *supra*). Awards rendered under the Additional Facility are not subject to system-internal review procedures comparable to Arts. 51 and 52. However, as addressed below, they are subject to any review or appeal provided for by the law in place at the seat of the arbitration (see paras. 9, 10 *infra*).

The Arbitration (Additional Facility) Rules contain the following provisions on the **7** place of arbitration:

### Article 19

*Limitation on Choice of Forum*

Arbitration proceedings shall be held only in States that are parties to the 1958 UN Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

---

1 Statute of the International Court of Justice (adopted 26 June 1945, entered into force 24 October 1945) USTS 993.

2 [1958] 2 YBILC 83, 85–86.

3 (1996) 35 ILM 1541, 1557.

4 For a detailed analysis of the drafting history of Art. 53, see Aron Broches, 'Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution' (1987) 2 ICSID Rev 287, 290 ff.

5 See David Williams, 'International Commercial Arbitration and Globalization, Review and Recourse against Awards Rendered under Investment Treaties' (2003) 4 JWIT 251.

https://doi.org/10.1017/9781316516584.059 Published online by Cambridge University Press

### Article 20
*Determination of Place of Arbitration*
(1) Subject to Article 19 of these Rules the place of arbitration shall be determined by the Arbitral Tribunal after consultation with the parties and the Secretariat.

. . .

(3) The award shall be made at the place of arbitration.

**8**    Under Art. 1 of the Arbitration (Additional Facility) Rules, peremptory provisions of the law applicable to the arbitration will continue to govern.

**9**    The Additional Facility Rules do not contain a recognition and enforcement mechanism. This means that an award rendered under the Additional Facility is subject to any review or appeal provided by the law in place at the seat of the arbitration.[6] The requirement that Additional Facility proceedings be held only in States parties to the 1958 United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York Convention)[7] is designed to facilitate the recognition and enforcement of resulting awards in States parties to the New York Convention.[8] However, even under the New York Convention, the recognition or enforcement of an award may be refused pursuant to Art. V (see also Art. 54, paras. 12–23).

**10**    The partial setting aside of the Award in *Metalclad v Mexico*[9] by a Canadian court illustrates that Additional Facility arbitration under Chapter 11 of the North American Free Trade Agreement (NAFTA) is not an exhaustive and self-contained system. The Supreme Court of British Columbia held – on the basis of the International Commercial Arbitration Act of British Columbia – that it had jurisdiction to review an award rendered in Vancouver. On the merits, the Canadian court found that the Additional Facility Tribunal had partially exceeded its competence in finding that the breach of the fair and equitable treatment standard had resulted from a lack of transparency.[10]

---

6    *United Mexican States v Metalclad*, Canada, Supreme Court of British Columbia (2 May 2001) [2001] BCSC 664, 1529, (2002) 5 ICSID Reports 236, (2004) 6 ICSID Reports 52; *United Mexican States v Feldman Karpa*, Ontario Superior Court of Justice (3 December 2003) (2005) 8 ICSID Reports 500, and Ontario Court of Appeal (11 January 2005) (2006) 9 ICSID Reports 508; *Loewen v United States*, US District Court, District of Columbia (31 October 2005) (2006) 10 ICSID Reports 448; *Bayview v Mexico*, Case No 07-CV-340139-PD2, Ontario Superior Court of Justice (5 May 2008); *Canada v Mobil and others*, Ontario Superior Court of Justice (16 February 2016) (2016) 3 Ontario Reports 506; *Venezuela v Gold Reserve*, Case No RG 14/21103, joint with Case No RG 15/00496, Paris Court of Appeal (7 February 2017); *Rusoro v Venezuela*, Case No RG 16/20822-N°Portalis 35L7-V-B7A-BZ2EA, Paris Court of Appeal (29 January 2019); *Ryan and others v Poland*, Case No RG 16/24358-N°Portalis 35L7-V-B7A-B2ESP, Paris Court of Appeal (2 April 2019).

7    United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (signed 10 June 1958, entered into force 7 June 1959) 330 UNTS 38 (New York Convention).

8    See also Aron Broches, 'The "Additional Facility" of the International Centre for Settlement of Investment Disputes (ICSID)' (1979) 4 YB Comm Arb 373, 379; Pierluigi Toriello, 'The Additional Facility of the International Centre for Settlement of Investment Disputes' (1978/1979) 4 Italian YBIL 59, 70, 82–83.

9    *Metalclad v Mexico* (AF), Award (30 August 2000).

10    *United Mexican States v Metalclad*, Canada, Supreme Court of British Columbia (2 May 2001) [2001] BCSC 664, 1529, (2002) 5 ICSID Reports 236, (2004) 6 ICSID Reports 52. See also William S Dodge, 'Metalclad Corporation v Mexico, ICSID Case No ARB(AF)/97/1' (2001) 95 AJIL 910; Henri C Alvarez, 'Setting Aside Additional Facility Awards: The *Metalclad* Case' in Emmanuel Gaillard and Yas Banifatemi (eds), *Annulment of ICSID Awards* (Juris Pub 2004) 267.

https://doi.org/10.1017/9781316516584.059 Published online by Cambridge University Press

Similarly, the Canadian court that endorsed the recognition and enforcement of the Additional Facility award in *Crystallex v Venezuela*[11] also engaged in a review, albeit not of the merits, based on the International Commercial Arbitration Act of Ontario.[12]

While the ICSID Secretariat plays no formal role in the recognition and enforcement of awards made under the Additional Facility Rules, if a party informs the Secretariat of the other party's non-compliance with an award, it is the Secretariat's practice to contact the non-complying party to request information on the steps that party has taken, or will take, to comply with the award.[13]        **11**

## II. INTERPRETATION

### A. '(1) The award shall be binding on the parties . . .'

#### 1. The Binding Nature of the Award

The binding nature of the award is inherent in the concept of arbitration. It is often deemed to render the issue decided upon a *res judicata*. Since arbitration is based on an agreement between the parties and this agreement includes a promise to abide by the resulting award, the award's binding force can also be based on the maxim *pacta sunt servanda*.[14] The principle of the binding force of arbitral awards is included in most instruments governing arbitration (see para. 3 *supra*), and is frequently restated in arbitration agreements.[15]        **12**

The principle of the binding force of an award found expression in all drafts leading to the Convention (History, Vol. I, pp. 242, 244) and was never cast into doubt in the debates on these drafts. Rather, the award's binding force was emphasized on numerous occasions (History, Vol. II, pp. 54–55, 57, 58, 74, 80, 110, 161, 304, 344, 347, 424, 428, 430, 502, 505, 521, 574, 763, 819, 916, 989).[16] The Report of the Executive Directors underscores the binding force of an arbitral award in terms of the difference between conciliation and arbitration:        **13**

> 37. . . . The differences between the two sets of provisions reflect the basic distinction between the process of conciliation which seeks to bring the parties to agreement and that of arbitration which aims at a binding determination of the dispute by the Tribunal.[17]

#### 2. The Binding Force between the Parties

##### a) General

Art. 53 only addresses the award's effect on the parties to the arbitration proceeding. This is not to say that the legal consequences of an award are limited to the parties. For        **14**

---

11  *Crystallex v Venezuela*, Award (4 April 2016).
12  *Crystallex v Venezuela*, Case No CV-16-11340-00CL (Canada, Superior Court of Justice of Ontario, 20 July 2016).
13  See ICSID, 'Recognition and Enforcement – Additional Facility Arbitration' <http://icsid.worldbank.org/> accessed 10 January 2021.
14  See also Broches (n 8) 289.
15  Georges R Delaume, 'Reflections on the Effectiveness of International Arbitral Awards' (1995) 12 J Int'l Arb 5.
16  See also Broches (n 4) 291 ff.          17  (1993) 1 ICSID Reports 23, 31.

instance, Art. 54 provides for an obligation of each Contracting State of the Convention to cooperate in the award's recognition and enforcement. But this obligation is different from the primary obligation of the parties to the ICSID arbitration to comply with the terms of the award.[18]

**15**     The legal basis for the award's binding force is not entirely symmetrical. ICSID proceedings, by necessity, involve a State party and a non-State party. Both are parties to the agreement to arbitrate (see para. 12 *supra*). But during the Convention's drafting, it was pointed out repeatedly that the State party additionally has an obligation to abide by the award under the ICSID Convention to which it is a party (History, Vol. II, pp. 57, 344, 521, 574). This obligation, arising directly under the ICSID Convention, exists vis-à-vis other parties to the Convention. Its violation may lead to State responsibility (see also para. 57 *infra*).[19]

**16**     The binding force of ICSID awards rendered on the basis of bilateral investment treaties (BITs) concluded between Member States of the European Union (EU) and the Energy Charter Treaty (ECT) has been questioned due to a potential conflict between EU law and these investment agreements. In particular, following the 6 March 2018 judgment of the Court of Justice of the European Union (CJEU) in *Slovak Republic v Achmea BV*,[20] in which the Court held that the investor–State dispute settlement provisions in the BIT between the Czech Republic and the Netherlands were contrary to EU law, respondent States have argued that arbitral tribunals had no jurisdiction to entertain intra-EU disputes, either under intra-EU BITs or under the ECT, and that compliance with ICSID awards resulting from such arbitrations would be contrary to EU law.[21] However, investment tribunals have emphasized that the *Achmea* judgment is silent on the relationship between EU law and the ICSID Convention.[22] Any potential conflicts between the Convention, or investment treaties, and EU law need to be assessed according to the Vienna Convention on the Law of Treaties (VCLT), and if a conflict between these regimes exists, EU law would need to prevail for tribunals to

---

18  See *Total v Argentina*, Decision on Stay of Enforcement (4 December 2014) para 99 ('[T]he obligation to enforce the award contained in Article 54 is an obligation imposed on all Contracting States and thus, different in scope from the obligation of Article 53. While the latter imposes on the party to the arbitration the obligation to comply with the award, the former obliges all Contracting States, whether or not a party to the given arbitration, to enforce the pecuniary obligations of the award as it were a final decision of their own courts. Steps to secure recognition and enforcement of an award is only required when the award has not been voluntarily complied with and not as a requisite for payment').

19  See generally Guido Santiago Tawil, 'Binding Force and Enforcement of ICSID Awards: Untying Articles 53 and 54 of the ICSID Convention' in Albert Jan van den Berg (ed), *50 Years of the New York Convention: ICCA International Arbitration Conference* (Kluwer 2009) 327–337.

20  CJEU, Case C-284/16 *Slovak Republic v Achmea BV* (Judgment, 6 March 2018) ECLI:EU:C:2018:158.

21  See eg *Masdar v Spain*, Award (16 May 2018) paras 48–59; *Vattenfall v Germany*, Decision on the *Achmea* Issue (31 August 2018) paras 48–59; *Adamakopoulos and others v Cyprus*, Decision on Jurisdiction (7 February 2020) paras 50–63; *Addiko v Croatia*, Decision on Jurisdiction (12 June 2020) paras 62–65, 125–131, 136–143. See also Declaration of 22 EU Member States of 15 January 2019 on the Legal Consequences of the Achmea Judgment and on Investment Protection (and Declaration of 5 EU Member States on 16 January 2019, as well as the separate Declaration of Hungary on 16 January 2019) <https://ec.europa.eu/info/publications/190117-bilateral-investment-treaties_en> accessed 10 January 2021.

22  See eg *UP and CD Holding v Hungary*, Award (9 October 2018) paras 258; *Landesbank Baden-Württemberg and others v Spain*, Decision on Intra-EU Objection (25 February 2019) para 150; *United Utilities v Estonia*, Award (21 June 2019) para 540; *CMC v Mozambique*, Award (24 October 2019) para 335(b).

lack jurisdiction. Tribunals have rejected both the existence of a conflict between the Convention (as well as investment treaties) and EU law[23] and, if a conflict existed, the supremacy of EU law over the Convention and investment treaties.[24] Thus, the Convention remains binding upon the States parties as long as the State party has not denounced the Convention, or terminated the BIT providing for access to ICSID arbitration (see Art. 25, para. 498; Art. 72, paras. 4–8).[25]

Some tribunals have emphasized particularly that Arts. 53 and 54 of the Convention    **17** demanded compliance with ICSID awards. Placing reliance on, inter alia, Art. 53 of the Convention, the Tribunal in *OperaFund v Spain* held that Spain, being a Contracting State to the ICSID Convention, was bound by the Tribunal's Award, had no option of appeal outside the ICSID system, and was obliged to recognize the Award as binding.[26] In the Tribunal's view, Spain was thus obliged by Art. 53 of the Convention to enforce the pecuniary obligations imposed by the Award within its territory as if it were a final judgment of a court in Spain. The Tribunal rejected the argument that, since the *Achmea* decision, Spain was not bound by the ICSID Convention or by ICSID awards.[27] Other tribunals have also pointed out that ICSID awards remained binding and could not be reviewed for compliance with EU law by national courts, but rather needed to be recognized as binding pursuant to Art. 53 of the Convention.[28] Similarly, the *ad hoc* Committee in *NextEra v Spain* stressed that, while it was aware that penalties might be imposed on Spain for paying out the Award under EU law, 'the Committee is equally conscious that the award creditor's right to be paid are final and binding under the ICSID Convention.'[29] In response to the argument that EU law prevailed over the BIT and the ICSID Convention, the Tribunal in *Marfin and others v Cyprus* also referred to Art. 53 of the Convention, stating that:

> This standing offer to arbitrate [in the BIT] implies not only Cyprus' willingness to take part in arbitral proceedings under the auspices of the ICSID Convention, but also its commitment to give effect to any ensuing award as if it were a final judgment of its national courts, as per Articles 53(1) and 54(1) of the Convention.[30]

### b)  Constituent Subdivision or Agency

In accordance with Art. 25(1), the party on the host State's side may be a constituent    **18** subdivision or agency designated to the Centre by that State (see Art. 25, paras.

---

23  See eg *EURAM v Slovakia*, Award on Jurisdiction (22 October 2012) paras 184–185; *Magyar Farming v Hungary*, Award (13 November 2019) paras 238–239; *Adamakopoulos and others v Cyprus*, Decision on Jurisdiction (7 February 2020) paras 163–186.

24  See eg *RREEF v Spain*, Decision on Jurisdiction (6 June 2016) paras 75, 87; *Eskosol v Italy*, Decision on Termination Request and Intra-EU Objection (7 May 2019) paras 76, 182. See, however, *Electrabel v Hungary*, Decision on Jurisdiction, Applicable Law and Liability (30 November 2012) para 4.189.

25  See eg *UP and CD Holding v Hungary*, Award (9 October 2018) paras 259–260. On 5 May 2020, twenty-three member states of the EU signed a plurilateral treaty to consensually terminate their intra-EU BITs; see Agreement for the Termination of Bilateral Investment Treaties between the Member States of the European Union [2020] L 169/1.

26  *OperaFund v Spain*, Award (6 September 2019) para 387.

27  ibid paras 387–388.

28  See also *UP and CD Holding v Hungary*, Award (9 October 2018) paras 256–257.

29  *NextEra v Spain*, Decision on Stay of Enforcement (6 April 2020) para 90.

30  *Marfin and others v Cyprus*, Award (26 July 2018) para 593.

523–571). An entity thus designated has a separate *locus standi* in ICSID proceedings. Its consent to ICSID jurisdiction is subject to approval by the host State (see Art. 25, paras. 1446–1471). Consent by a constituent subdivision or agency does not amount to consent by the host State itself (see Art. 25, paras. 635–642). Since it is the constituent subdivision or agency that is the party to the proceeding under these circumstances, the effect of the award's binding force under Art. 53 would be upon that entity. The host State, not being a party to the proceeding, would not be subject to the obligation of Art. 53. Conversely, a constituent subdivision or agency would not be bound by an award rendered against its parent State.[31]

**19**    On the other hand, the *travaux préparatoires* to the Convention contain some indication that a host State would be responsible for the compliance with an award rendered against one of its constituent subdivisions or agencies (History, Vol. II, pp. 858, 859, 990). Mr. Broches, after a careful analysis of the Convention's history on this point,[32] reaches the following conclusion:

> If a constituent subdivision or an agency of a Contracting State meets the requirements of the Convention as regards designation and approval and has consented to submit or has submitted a dispute with a national of another Contracting State to arbitration under the Convention, the former Contracting State is responsible for compliance with a resulting award, whether or not the subdivision or agency is acting for or on behalf of that Contracting State.[33]

**20**    This responsibility for compliance would not rest on any role of the host State as party to the proceeding or as award debtor. Rather, it would arise from its role as designating and approving authority under Art. 25(1) and (3), from the obligation under Art. 54 to recognize and enforce awards, and generally from the principle of good faith. Additionally, in the event of non-compliance with an ICSID award by the subdivision or agency of the host State, the home State may take up its national's claim in the exercise of diplomatic protection and commence State-to-State dispute settlement.[34] This is permissible under Art. 27 of the ICSID Convention, which recognizes that the host State might be susceptible to proceedings before the International Court of Justice (ICJ) if it has 'failed to abide by and comply with' an ICSID award (see paras. 31, 52–55 *infra*; Art. 27, paras. 23–31, 47–55).

### 3. Authority for Subsequent Decisions

**21**    The first part of Art. 53(1) may also be read as excluding the applicability of the principle of binding precedent to successive ICSID cases.[35] Nothing in the Convention's *travaux préparatoires* suggests that a doctrine of *stare decisis* should

---

31    Cf *Benvenuti & Bonfant v Banque Commerciale Congolaise*, France, Cour de cassation (21 July 1987) (1993) 1 ICSID Reports 373. In this case an attempt to enforce an ICSID award against a Congolese bank failed. But the bank was not a constituent subdivision or agency.

32    Broches (n 4) 294 ff.                        33    ibid 298.

34    UNCTAD, *Module 2.2: Selecting the Appropriate Forum* (Course on Dispute Settlement, 2003) 29, 33.

35    Art. 59 of the ICJ Statute (n 1) is more specific on this point by saying: 'The decision of the Court has no binding force except between the parties and in respect of that particular case.'

be applied to ICSID arbitration. Tribunals and *ad hoc* committees routinely refer to, and rely on, previous decisions. But they have also pointed out on several occasions that they were not bound by these decisions[36] (see also Art. 42, paras. 251–256).

The lack of a system of *stare decisis* implies a certain risk of inconsistent awards. In fact, some ICSID tribunals have come to divergent conclusions, such as the two *SGS* tribunals concerning the meaning of umbrella clauses,[37] or the *CMS* and the *LG&E* tribunals with regard to the availability of a necessity defense.[38] The Tribunal in *SGS v Philippines* openly addressed the question whether ICSID tribunals should defer to previous ICSID decisions and came to a nuanced conclusion:

**22**

> The ICSID Convention provides only that awards rendered under it are 'binding on the parties' (Article 53(1)), a provision which might be regarded as directed to the *res judicata* effect of awards rather than their impact as precedents in later cases. In the Tribunal's view, although different tribunals constituted under the ICSID system should in general seek to act consistently with each other, in the end it must be for each tribunal to exercise its competence in accordance with the applicable law, which will by definition be different for each BIT and each Respondent State. Moreover there is no doctrine of precedent in international law, if by precedent is meant a rule of the binding effect of a single decision. There is no hierarchy of international tribunals, and even if there were, there is no good reason for allowing the first tribunal in time to resolve

---

36  *Amco v Indonesia*, Decision on Jurisdiction (25 September 1983) para 14, Decision on Annulment (16 May 1986) para 44; *LETCO v Liberia*, Award (31 March 1986) (1994) 2 ICSID Reports 346, 352; *Feldman v Mexico* (AF), Award (16 December 2002) para 107; *Enron v Argentina*, Decision on Jurisdiction (14 January 2004) para 40, Decision on Jurisdiction (Ancillary Claim) (2 August 2004) para 25; *AES v Argentina*, Decision on Jurisdiction (26 April 2005) paras 17–33; *Gas Natural v Argentina*, Decision on Jurisdiction (17 June 2005) paras 36–51; *Bayindir v Pakistan*, Decision on Jurisdiction (14 November 2005) para 76; *Vivendi v Argentina*, Resubmitted Case: Decision on Jurisdiction (14 November 2005) para 94; *El Paso v Argentina*, Decision on Jurisdiction (27 April 2006) para 39; *Suez and others v Argentina*, Decision on Jurisdiction (16 May 2006) paras 26, 31, 60–65; *Jan de Nul v Egypt*, Decision on Jurisdiction (16 June 2006) paras 63, 64; *Azurix v Argentina*, Award (14 July 2006) para 391; *Pan American v Argentina*, Decision on Preliminary Objections (27 July 2006) para 42; *ADC v Hungary*, Award (2 October 2006) para 293; *World Duty Free v Kenya*, Award (4 October 2006) para 16; *Saipem v Bangladesh*, Award (30 June 2009) para 90; *SGS v Paraguay*, Decision on Jurisdiction (12 February 2010) para 41; *Caratube v Kazakhstan*, Award (5 June 2012) paras 234–235; *Ambiente Ufficio and others v Argentina*, Decision on Jurisdiction (8 February 2013) para 12; *Impregilo v Argentina*, Decision on Annulment (24 January 2014) para 190; *Muhammet Çap v Turkmenistan*, Decision on Jurisdiction (13 February 2015) para 275; *Mamidoil v Albania*, Award (30 March 2015) para 565; *Poštová banka v Greece*, Decision on Annulment (29 September 2016) para 126; *Krederi v Ukraine*, Award (2 July 2018) para 299; *UP and CD Holding v Hungary*, Award (9 October 2018) paras 288–290; *Landesbank Baden-Württemberg and others v Spain*, Decision on Intra-EU Objection (25 February 2019) para 106; *Mobil v Argentina*, Decision on Annulment (8 May 2019) para 83; *BayWa v Spain*, Decision on Jurisdiction, Liability and Directions on Quantum (2 December 2019) para 317; *Masdar v Spain*, Procedural Order No 3 (30 May 2020) para 65. See also Gabrielle Kaufmann-Kohler, 'Arbitral Precedent: Dream, Necessity or Excuse? The 2006 Freshfields Lecture' (2007) 23 Arb Int'l 357; Christoph Schreuer and Matthew Weiniger, 'A Doctrine of Precedent?' in Peter Muchlinski, Federico Ortino and Christoph Schreuer (eds), *The Oxford Handbook of International Investment Law* (OUP 2008) 1188; Jan Paulsson, 'Role of Precedent in Investment Treaty Arbitration' in Katia Yannaca-Small (ed), *Arbitration under International Investment Agreements. A Guide to the Key Issues* (2nd edn, OUP 2018) 81; Patrick M Norton, 'The Role of Precedent in the Development of International Investment Law' (2018) 33 ICSID Rev 280.

37  *SGS v Pakistan*, Decision on Jurisdiction (6 August 2003) paras 163–173; *SGS v Philippines*, Decision on Jurisdiction (29 January 2004) paras 113–129.

38  *CMS v Argentina*, Award (12 May 2005) paras 304–394; *LG&E v Argentina*, Decision on Liability (3 October 2006) paras 201–266.

issues for all later tribunals. It must be initially for the control mechanisms provided for under the BIT and the ICSID Convention, and in the longer term for the development of a common legal opinion or *jurisprudence constante*, to resolve the difficult legal questions discussed by the *SGS v. Pakistan* Tribunal and also in the present decision.[39]

**23**    Similarly, the Tribunal in *UP and CD Holding v Hungary* emphasized that

> the decisions of other tribunals are not binding on the Tribunal … This does not preclude the Tribunal from considering arbitral decisions and the arguments of the Parties based upon them, to the extent that it may find that they shed any useful light on the issues that arise for the decision in the present case.[40]

**24**    Despite the absence of a system of *stare decisis*, some arbitral tribunals have in fact stressed the need to ensure consistency in arbitral case law, arguing that tribunals have 'a duty to contribute to the harmonious development of investment law.'[41]

### B. '. . . and shall not be subject to any appeal or to any other remedy except those provided for in this Convention.'

#### 1. Exhaustive Nature of the Convention's Review System

**25**    The Convention provides for its own self-contained system of review of awards. The idea that this review system should be exclusive was expressed repeatedly in the course of the Convention's drafting (History, Vol. II, pp. 161, 408, 426, 427, 519, 889, 901, 902, 908). But it was not clearly reflected in the text before the Revised Draft (History, Vol. I, p. 244). The relationship of Art. 53 to the Convention's system of review is summarized in the Report of the Executive Directors in the following terms:

> 41. Article 53 declares that the parties are bound by the award and that it shall not be subject to appeal or to any other remedy except those provided for in the Convention. The remedies provided for are revision (Article 51) and annulment (Article 52). In addition, a party may ask a Tribunal which had omitted to decide any question submitted to it, to supplement its award (Article 49(2)) and may request interpretation of the award (Article 50).[42]

**26**    The exclusive nature of the remedies provided by the Convention against awards is related to the Convention's general exclusive remedy rule in Art. 26. But the rule as reflected in Art. 26 applies only 'unless otherwise stated' by the parties (see Art. 26,

---

39  *SGS v Philippines*, Decision on Jurisdiction (29 January 2004) para 97 (footnotes omitted; the Tribunal referred to this section of the First Edition of this Commentary).

40  *UP and CD Holding v Hungary*, Award (9 October 2018) paras 288–289; see also *Liman Caspian Oil v Kazakhstan*, Award (22 June 2010) paras 172–173.

41  *Saipem v Bangladesh*, Decision on Jurisdiction and Provisional Measures (21 March 2007) para 67; *Cargill v Poland* (UNCITRAL), Final Award (29 February 2008) para 224; *Noble Energy v Ecuador*, Decision on Jurisdiction (5 March 2008) para 50; *Duke Energy v Ecuador*, Award (18 August 2008) para 117; *Saipem v Bangladesh*, Award (30 June 2009) para 90; *Metal-Tech v Uzbekistan*, Award (4 October 2013) para 116; *KT Asia v Kazakhstan*, Award (17 October 2013) para 83; *Churchill and Planet Mining v Indonesia*, Decision on Jurisdiction (24 February 2014) para 85; *Vestey v Venezuela*, Award (15 April 2016) para 113; *Lighthouse Corp v Timor-Leste*, Award (22 December 2017) para 111; *Burlington v Ecuador*, Decision on Reconsideration and Award (7 February 2017) para 46.

42  (1993) 1 ICSID Reports 23, 31–32; see also UNCTAD, *Module 2.9: Binding Force and Enforcement* (Course on Dispute Settlement, 2003) 7.

https://doi.org/10.1017/9781316516584.059 Published online by Cambridge University Press

paras. 23–167). By contrast, Art. 53 is not open to modification by the parties (see also Art. 48, para. 3). Therefore, it can be argued that the parties may not agree on appeals procedures for final ICSID awards beyond those provided by the Convention.[43] However, some treaty texts, such as the European Union–Canada Comprehensive Economic and Trade Agreement (CETA)[44] and the European Union–Viet Nam Investment Protection Agreement,[45] provide for the use of ICSID arbitration to settle investor–State disputes under the agreements and contain provisions for appeals against resulting awards. To the extent that the underlying awards may be viewed as 'provisional,' and only become 'final' after the appeal, such an arrangement could be seen as permissible under the Convention.[46] It remains to be seen, however, whether such arrangements will be accepted in State practice in the light of Art. 53 of the Convention and Art. 41 of the VCLT (see paras. 37–39 *infra*). Irrespective of this, an appeal mechanism may be permissible for decisions other than final awards. The term 'award,' as used in Art. 53, does not cover decisions on provisional measures or decisions on jurisdiction (see para. 82 *infra*). Arguably, it also does not cover 'provisional' awards as envisaged in some of the recent EU investment agreements.[47] Thus, the language of Art. 53 does not bar any right to appeal their 'provisional' findings.[48]

### a) National Courts

The self-contained and exhaustive nature of review procedures under the ICSID Convention is one of the Convention's distinctive features.[49] It serves the interest of the finality of awards and provides a clear advantage over other arbitration mechanisms. Awards stemming from other arbitration systems, such as the International Chamber of Commerce (ICC), the American Arbitration Association (AAA), or UNCITRAL, are subject to potentially protracted and costly review procedures by the courts of the arbitration forum.[50]    **27**

The *ad hoc* Committee in *MINE v Guinea* expressed this effect of Art. 53 in the following terms:    **28**

---

43  CF Amerasinghe, 'Submissions to the Jurisdiction of the International Centre for Settlement of Investment Disputes' (1973/1974) 5 J Mar L & Comm 211, 244–245; Jansen Calamita, 'The (In)Compatibility of Appellate Mechanisms with Existing Instruments of the Investment Treaty Regime' (2017) 18 JWIT 585, 618.

44  European Union–Canada Comprehensive Economic and Trade Agreement (CETA) (signed 30 October 2016, in parts provisionally applied since 21 September 2017) [2017] OJ L 11/23, Art. 8.28.

45  European Union–Viet Nam Investment Protection Agreement (signed 30 June 2019, not yet in force) COM(2018)683 final, Art. 3.54.

46  For a discussion of the relationship between appeals mechanisms and the ICSID Convention, see Albert Jan van den Berg, 'Appeal Mechanism for ISDS Awards: Interaction with the New York and ICSID Conventions' (2019) 34 ICSID Rev 156, 162–165. On the possibility of including an appeals system in the ICSID Convention, see ICSID Secretariat, 'Possible Improvements of the Framework for ICSID Arbitration' (22 October 2004) 14, Annex, paras 1, 2.

47  CETA (n 44) Art. 8.28.9; European Union–Singapore Investment Protection Agreement (signed 19 October 2018, not yet in force) COM(2018)194 final, Art. 3.19; European Union–Viet Nam Investment Protection Agreement (n 45) Art. 3.55.

48  See paras 32–35, 40–41 *infra*.

49  August Reinisch, 'Enforcement of Investment Treaty Awards' in Yannaca-Small (n 36) 797, 816–817; Vasily Shubin, 'The Enforcement of ICSID Arbitral Awards, Practice and Problems' (2012) 11–12 Korea Univ LR 11, 17.

50  Klaus Peter Berger, 'The Modern Trend Towards Exclusion of Recourse against Transnational Arbitral Awards: A European Perspective' (1989) 12 Fordham ILJ 605; Delaume (n 15).

Article 53 of the Convention provides that the award shall be binding on the parties 'and shall not be subject to any appeal or to any other remedy except those provided for in this Convention'. The post-award procedures (remedies) provided for in the Convention, namely, addition to, and correction of, the award (Art. 49), and interpretation (Art. 50), revision (Art. 51) and annulment (Art. 52) of the award are to be exercised within the framework of the Convention and in accordance with its provisions. It appears from these provisions that the Convention excludes any attack on the award in national courts. The award is final in that sense. It is also final in the sense that even within the framework of the Convention it is not subject to review on the merits. It is not final, on the other hand, in the sense that it is open to being completed or corrected, interpreted, 'revised' or annulled.[51]

29      The independence of ICSID arbitration from national procedures for review of arbitral awards means that the place of arbitration in ICSID proceedings is irrelevant for the award's validity and enforcement.[52] ICSID arbitration is delocalized and independent of judicial control in the country where the proceedings take place and the award is rendered (see Art. 44, paras. 44, 24, 61). Consequently, a party to ICSID proceedings may not initiate actions before a domestic court to seek annulment or another form of review of an ICSID award. A court of a State that is a party to the ICSID Convention would be under an obligation to dismiss such an action.

30      The impossibility to review ICSID awards by domestic courts is also a recurring issue in connection with awards rendered on the basis of intra-EU BITs (see para. 16 *supra*). In that regard, ICSID tribunals have emphasized that there exists 'no option of appeal outside the ICSID system.'[53] Rather, ICSID awards need to be recognized as binding pursuant to Art. 53 of the Convention.[54] Accordingly, domestic courts addressing the interaction between EU law and the Convention in *Micula v Romania* indicated that the domestic courts of EU Member States lack the authority to review the awards of ICSID tribunals (see also Art. 54, paras. 99–109).[55]

### b) The International Court of Justice

31      The exclusion of any appeal against an ICSID award extends to a possible review of ICSID awards by the ICJ. Art. 64 provides that a dispute between Contracting Parties concerning the interpretation or application of the Convention may be referred to the ICJ. This is a fairly standard clause for the settlement of disputes between States parties to a treaty.

32      The role of the ICJ with regard to ICSID awards was discussed during the Convention's drafting. Mr. Broches noted that on no account should the provision of what later became Art. 64 be used as a procedure for appeal against awards, and that any

---

51  *MINE v Guinea*, Decision on Annulment (22 December 1989) para 4.02. Cf also ibid paras 4.04, 5.08; see also Edward Baldwin, Mark Kantor and Michael Nolan, 'Limits to Enforcement of ICSID Awards' (2006) 23 J Int'l Arb 1, 3–5.

52  *Noble Energy v Ecuador*, Decision on Jurisdiction (5 March 2008) para 228.

53  *UP and CD Holding v Hungary*, Award (9 October 2018) para 257; *OperaFund v Spain*, Award (6 September 2019) para 387.

54  ibid.

55  *Micula and others v Romania III*, 404 F Supp 3d 265 (DC Cir, 11 September 2019) paras 4, 57. See also *Micula v Romania,* Brussels Court of First Instance, Judgment (25 January 2016) paras 36–38; *Micula v Romania*, UK Supreme Court, Judgment (9 February 2020) paras 68–69.

https://doi.org/10.1017/9781316516584.059 Published online by Cambridge University Press

decision of the ICJ would in no way affect the award of the arbitral tribunal (History, Vol. II, pp. 274, 438, 440).

Art. 64 does not confer jurisdiction on the ICJ to review the decision of an arbitral tribunal (see Art. 64, paras. 12 and 13). The Report of the Executive Directors says so specifically with respect to the tribunal's competence (see Art. 41, para. 31). It continues by saying: **33**

> Nor does it empower a State to institute proceedings before the Court in respect of a dispute which one of its nationals and another Contracting State have consented to submit or have submitted to arbitration, since such proceedings would contravene the provisions of Article 27, unless the other Contracting State had failed to abide by and comply with the award rendered in that dispute.[56]

The obligation of the investor's State of nationality under Art. 27 not to give diplomatic protection extends to the post-award phase, unless the host State has failed to comply with the award (see paras. 53–55 *infra*). A claim, or part of a claim, that has been rejected in the award, may not be brought before the ICJ in the exercise of diplomatic protection (see Art. 27, para. 55). **34**

A host State is enjoined by Art. 53 from challenging an award before the ICJ in proceedings against the investor's home State or against a third State in which the award is to be recognized and enforced. The same principle will apply if a third State that is a party to the ICSID Convention seeks to have an ICSID award reviewed by the ICJ in the course of enforcement proceedings or otherwise. This means, in particular, that a Contracting State may not evade its obligation under Art. 54 to recognize and enforce an award by arguing the award's nullity before the ICJ. **35**

*c) Proposals for Appeals Mechanisms*

The United States Model BIT of 2004 in its Annex D envisaged the possibility of a bilateral appellate mechanism to review awards, including ICSID awards. While the US Model BIT of 2012 does not contain such a model clause, the provision of the 2004 US Model BIT found its way into some actual treaties of the United States;[57] it also seems to have inspired similar provisions in a few free trade agreements concluded by other States.[58] In 2005, ICSID proposed the establishment of a central Appeals Facility,[59] but meanwhile has shelved these plans as premature.[60] Still, these ideas and proposals have triggered a lively debate about the introduction of an appeals system in investment arbitration.[61] The principal arguments in favor of an appeals mechanism are coherence **36**

---

56  (1993) 1 ICSID Reports 23, 33.
57  See eg Chile–United States FTA (signed 6 June 2003, entered into force 1 January 2004) Annex 10-H; United States–Uruguay BIT (signed 4 November 2005, entered into force 31 October 2006) Annex E.
58  See eg Australia–China FTA (signed 17 June 2015, entered into force 20 December 2015) Art. 9.23; Australia–Korea FTA (signed 8 April 2014, entered into force 12 December 2014) Annex 11-E; Canada–Korea FTA (signed 22 September 2014, entered into force 1 January 2015) Annex 8-E; see also van den Berg (n 46) 159–162.
59  ICSID Secretariat, 'Possible Improvements of the Framework for ICSID Arbitration' (22 October 2004) paras 20–23 and Annex.
60  ICSID Secretariat, 'Suggested Changes to the ICSID Rules and Regulations' (12 May 2005) paras 2, 4.
61  See Federico Ortino, Audley Sheppard and Hugo Warner (eds), *Investment Treaty Law: Current Issues* vol I (BIICL 2006); Christian J Tams, 'Is There a Need for an ICSID Appellate Structure?' in Rainer

and consistency in the practice of tribunals and the possibility to correct 'erroneous' decisions.[62] Currently, the issue of an appeals mechanism for investor–State dispute settlement is generally discussed in the framework of UNCITRAL[63] and pursued by the EU in recent investment agreements.[64]

**37**     An appeals mechanism would be incompatible with Art. 53 in its present form. The wording, excluding any appeal, or other remedy except those provided for in the Convention, is unequivocal. Other provisions of the Convention are open to variation by the parties by including the formula 'except as the parties otherwise agree' or similar wording. Examples are Arts. 26, 33, 35, 43, 44, 46, 47, 60, 61, and 63. Significantly, the general exclusive remedy rule of Art. 26 applies only 'unless otherwise stated' (see Art. 26, paras. 23–167). By contrast, Art. 53 does not contain such a formula. Therefore, the parties to the arbitration may not derogate from it. An amendment of the Convention under Art. 66 to open the way for an appeals mechanism, while not impossible, would be extremely difficult and generally inadvisable. Nevertheless, the appeals mechanism against 'provisional' awards envisaged in some recent EU investment agreements may be compatible with the ICSID Convention's concept of the finality of awards (see para. 26 *supra*).

**38**     An agreement on an *inter se* modification of the Convention between certain of its parties to allow for an appeals mechanism also would not be without difficulties. If Art. 41 of the VCLT is to be followed,[65] it would have to be established that the modification is not prohibited by the ICSID Convention, that it does not affect the rights of other, non-modifying treaty parties, and is not incompatible with the effective execution of its object and purpose as a whole. If only some ICSID parties were to grant the right to appeal ICSID awards to investors from the modifying ICSID parties, this would not diminish the right of the nationals of non-modifying ICSID States to use the existing ICSID system also against modifying ICSID parties. Hence, such an appeals mechanism would probably not constitute a modification that would affect the rights of the other treaty parties.

**39**     As for the required compatibility with the object and purpose of the treaty as a whole pursuant to Art. 41(1)(b)(ii) of the VCLT, Art. 1(2) of the ICSID Convention stipulates

    Hofmann and Christian Tams (eds), *The International Convention on the Settlement of Investment Disputes (ICSID): Taking Stock after 40 Years* (Nomos 2007) 223; Asif H Qureshi, 'An Appellate System in International Investment Arbitration?' in Peter Muchlinski and others (eds), *The Oxford Handbook of International Investment Law* (OUP 2008) 1154; Karl P Sauvant (ed), *Appeals Mechanism in International Investment Disputes* (OUP 2008).

62   See generally Brian McGarry and Josef Ostřanský, 'Modifying the ICSID Convention under the Law of Treaties' (*EJIL: Talk!*, 11 May 2017).

63   UNCITRAL Working Group III, 'Possible Reform of Investor–State Dispute Settlement (ISDS): Appellate and Multilateral Court Mechanisms' A/CN.9/WG.III/WP.185 (29 November 2019); UNCITRAL Working Group III, 'Report of Working Group III (Investor–State Dispute Settlement Reform) on the Work of Its Resumed Thirty-Eighth Session' A/CN.9/1004/Add.1 (28 January 2020). See also Marc Bungenberg and August Reinisch, *From Bilateral Arbitral Tribunals and Investment Courts to a Multilateral Investment Court: Options Regarding the Institutionalization of Investor–State Dispute Settlement* (2nd edn, Springer 2020).

64   CETA (n 44) Art. 8.28; European Union–Singapore Investment Protection Agreement (n 47) Art. 3.10; European Union–Viet Nam Investment Protection Agreement (n 45) Art. 3.39.

65   Technically, the Vienna Convention on the Law of Treaties (adopted 23 May 1969, entered into force 27 January 1980) 1155 UNTS 331 (VCLT) is not applicable to the ICSID Convention, since, under its Art. 4, it applies only to treaties concluded after its entry into force.

that the purpose of the Convention is 'to provide facilities for conciliation and arbitration of investment disputes between Contracting States and nationals of other Contracting States in accordance with the provisions of this Convention.' If investor–State dispute settlement 'in accordance with the provisions of this Convention' was to be narrowly defined, any *inter se* modification to the ICSID Convention would be impermissible. Yet, 'in accordance with the provisions of this Convention' could be interpreted broadly as referring to the ICSID Convention's aim to serve its object and purpose of providing investor–State dispute settlement to its Contracting Parties and their nationals. The establishment of an appeals system ought to be permissible under Art. 41(1)(b) of the VCLT, as its drafting history and commentaries confirm that Art. 41(1)(b) is concerned only with express prohibitions against treaty modification. Ultimately, the permissibility of an *inter se* modification of the ICSID Convention to accommodate an appeals mechanism would depend on its specific design.[66]

### 2. Exclusion of Another Remedy

The exclusion of another remedy means that a party to ICSID proceedings that is   **40** dissatisfied with the award may not turn to another forum to seek relief for the same claim. Once an ICSID tribunal has rendered its award and the review procedures under the Convention have been exhausted, the case is *res judicata*.[67] The principle *ne bis in idem* precludes resort to any national or international judicial remedy. Therefore, an ICSID award may be used as a defense against an action in the same matter before another judicial forum (History, Vol. II, pp. 344, 519). This would apply even if a court or tribunal would otherwise have jurisdiction over the matter. For instance, a dispute settlement clause referring alternatively to national courts, ICSID arbitration, and UNCITRAL arbitration (see Art. 26, paras. 23–167) is no longer of any avail, once an ICSID award has been rendered.

This principle applies only if the ICSID award has yielded a decision on the merits of   **41** the dispute. This would include awards under Arbitration Rule 43(2) which authorizes the tribunal to embody an agreed settlement of the parties in its award (see Art. 48, paras. 89–100). The principle of *ne bis in idem* does not apply to the substance of a

---

66 For a more thorough discussion of an *inter se* modification of the ICSID Convention to include an appeals mechanism, see August Reinisch, 'Will the EU's Proposal Concerning an Investment Court System for CETA and TTIP Lead to Enforceable Awards? – The Limits of Modifying the ICSID Convention and the Nature of Investment Arbitration' (2016) 19 JIEL 761, 771 ff; N Jansen Calamita, 'The (In)Compatibility of Appellate Mechanisms with Existing Instruments of the Investment Treaty Regime' (2017) 18 JWIT 585; McGarry and Ostřanský (n 62). See also Antonio R Parra, 'The Limits of Party Autonomy in Arbitration Proceedings under the ICSID Convention' (1999) 10(1) ICC Bulletin; van den Berg (n 46) 169–171.

67 See eg *Churchill and Planet Mining v Indonesia*, Decision on Stay of Enforcement (27 June 2017) para 34 (stating that '. . . Article 53(1) of the Convention makes particularly clear that awards have *res judicata* effect'). While the principle of *res judicata* applies to awards, there is no consensus among ICSID tribunals whether it also applies to preliminary decisions on jurisdiction. See eg *Standard Chartered Bank v TANESCO*, Award (12 September 2016) paras 313–314, 318, Decision on Annulment (22 August 2018) paras 150–151, 319, 322–324, 330 (rejecting *res judicata*). See, however, *ConocoPhillips v Venezuela*, Decision on Reconsideration (10 March 2014) paras 19–23; *Perenco v Ecuador*, Decision on Reconsideration (10 April 2015) paras 42–43 (accepting the application of *res judicata*). For a detailed overview, see Catharine Titi, '*Res Iudicata* and Interlocutory Decisions under the ICSID Convention: Antinomies over the Power of Tribunals to Review' (2018) 33 ICSID Rev 358. See also Art. 41, paras 40–45; Art. 44, paras 80–88; Art. 51, para 6.

dispute if the ICSID tribunal has given an award in which it finds that the dispute is not within the jurisdiction of the Centre or not within its own competence, in accordance with Arbitration Rule 41(6) (see Art. 41, para. 125). In other words, if an ICSID tribunal declines jurisdiction over a dispute, it renders a final award to that effect, and a party may take that dispute to another forum for a decision on the merits, but cannot bring the same claims before an ICSID tribunal again.[68] However, if the tribunal's decision to decline jurisdiction is annulled by an *ad hoc* committee, the principle of the exclusion of another remedy revives in favor of a tribunal constituted in accordance with Art. 52(6).

## C. 'Each party shall abide by and comply with the terms of the award . . .'

### 1. Obligation to Comply

**42**     The obligation to abide by, and comply with, the terms of the award is a logical consequence of its binding nature. The principle was contained in all drafts leading to the Convention (History, Vol. I, pp. 242, 244) and was never cast into doubt during the deliberations. It is expressed in the Report of the Executive Directors in the following terms:

> 42. Subject to any stay of enforcement in connection with any of the above proceedings in accordance with the provisions of the Convention, the parties are obliged to abide by and comply with the award.[69]

**43**     The obligation to comply applies equally to both parties. There is no difference between a host State and a foreign investor in this respect. This obligation rests on the Convention itself, and on the consent to jurisdiction, which is an agreement between the parties (see Art. 25, paras. 759–763). But the consequences of non-compliance may differ for the two parties (see para. 15 *supra*, paras. 52–57 *infra*).

**44**     The obligation to comply is independent of any enforcement proceedings.[70] In particular, an award debtor may not insist on the initiation of enforcement proceedings to delay compliance.[71] If the award debtor refuses to pay the award, and instead requires

---

68   Cf *Pac Rim v El Salvador*, Award (14 October 2016) para 5.36 (stating that '[i]n an ICSID arbitration, there can only be one award. Article 51 on revision and Article 53(1) on annulment of the ICSID Convention therefore do not apply to preliminary decisions affirming jurisdiction until their incorporation in the later award. This is only different when an ICSID tribunal denies all jurisdiction, since such a decision does bring the arbitration to an end and must therefore take the form of an award in accordance with ICSID Arbitration Rule 41(6)'). See, however, *Iberdrola v Guatemala* (UNCITRAL), Final Award (24 August 2020) paras 262, 266, 267, 348 (holding that in principle an ICSID award declining jurisdiction can have *res judicata* effect for any subsequent arbitral proceedings, if the first tribunal 'held that the arbitration agreement was invalid or did not cover the subject matter of the dispute' – quote at ibid, para 266).

69   (1993) 1 ICSID Reports 23, 32.

70   *Enron v Argentina*, Decision on Stay of Enforcement (7 October 2008) paras 65–69; *Sempra v Argentina*, Decision on Stay of Enforcement (5 March 2009) paras 37–39, 44–46, 52, 59; *Total v Argentina*, Decision on Stay of Enforcement (4 December 2014) para 85; see also Tawil (n 19) 329; Inna Uchkunova and Oleg Temnikov, 'Enforcement of Awards under the ICSID Convention – What Solutions to the Problem of State Immunity?' (2014) 29 ICSID Rev 187, 196–197.

71   Stanimir A Alexandrov, 'Enforcement of ICSID Awards: Articles 53 and 54 of the ICSID Convention' in Christina Binder and others (eds), *International Investment Law of the 21st Century: Essays in Honour of Christoph Schreuer* (OUP 2009) 322, 324–325.

the award creditor to seek enforcement through domestic enforcement mechanisms pursuant to Art. 54, the award debtor will be in breach of Art. 53.[72]

Accordingly, in response to Argentina's arguments that the Claimant was obliged to seek enforcement of the ICSID Award before Argentine courts, the *ad hoc* Committee in *Enron v Argentina* held that                                              **45**

> it would be inconsistent with the purpose of the ICSID Convention if an award creditor had to bring proceedings pursuant to national law enforcement mechanisms established under Article 54(1) as a prerequisite for compliance with the award by the award debtor. The ICSID dispute settlement mechanism was intended to be an international method of settlement, and it would run counter to this intention for compliance with a final award to be subject, ultimately, to the provisions and mechanisms of national law. The Committee considers that it would inherently undermine confidence in the ICSID system if a State against which an award has been given could make its own compliance with the award subject to the award creditor availing itself of the mechanisms under that State's national law for enforcement of final judgments of courts.[73]

To the same effect, the *ad hoc* Committee in *Sempra v Argentina* emphasized that     **46**

> Article 53(1), second sentence, of the ICSID Convention imposes an unconditional obligation to comply, subject only to the *proviso* that a stay ordered in accordance with the provisions of the ICSID Convention will temporarily release a party from that obligation. The terms of this provision are clear and contain nothing to support the proposition that an award creditor must first seek enforcement pursuant to Article 54 in order to have the award complied with.[74]

Procedural obstacles that may arise in the course of enforcement in no way affect the obligation to comply with the award. Art. 54 refers to the law of the State in which recognition and enforcement are sought. But any difficulties that may arise under that law in no way affect the obligation of a party to comply with the award. Therefore, a party that successfully resists enforcement of an award before a court, or another authority of a State in which enforcement is sought, is still in violation of its obligation to abide by, and comply with, the award under Art. 53 (see Art. 54, para. 155; Art. 55, para. 8).     **47**

In particular, the obligation to comply exists also where a State party finds that it can rely on State immunity in accordance with Art. 55. State immunity may be used to thwart enforcement against certain types of property of the award debtor.[75] But it does not affect the obligation to comply with the award.[76] The *ad hoc* Committee in *MINE v Guinea* expressed this principle in the following terms:     **48**

> It should be clearly understood . . . that State immunity may well afford a legal defense to forcible execution, but it provides neither argument nor excuse for failing to comply with an award. In fact, the issue of State immunity from forcible execution of an award

---

72  *Enron v Argentina*, Decision on Stay of Enforcement (7 October 2008) paras 83–85.
73  ibid para 68.
74  *Sempra v Argentina*, Decision on Stay of Enforcement (5 March 2009) para 37.
75  Uchkunova and Temnikov (n 70) 199.
76  Andrea K Bjorklund, 'State Immunity and the Enforcement of Investor–State Arbitral Awards' in Binder and others (n 71) 302, 306.

https://doi.org/10.1017/9781316516584.059 Published online by Cambridge University Press

will typically arise if the State party refuses to comply with its treaty obligations. Non-compliance by a State constitutes a violation by that State of its international obligations and will attract its own sanctions. The Committee refers in this connection among other things to Articles 27 and 64 of the Convention, and to the consequences which such a violation would have for such a State's reputation with private and public sources of international finance.[77]

**49**    The existence of the obligation to abide by and comply with the award, regardless of the availability of an immunity defense, was equally affirmed by the *ad hoc* Committee in *Mitchell v DR Congo*. It followed the reasoning of the *ad hoc* Committee in *MINE v Guinea* and stated:

> The immunity of a State from execution (Article 55 of the Convention) does not exempt it from enforcing the award, given its formal commitment in this respect following signature of the Convention. If it does not enforce the award, its behaviour is subject to various indirect sanctions. Precisely, reference is made to Articles 27 and 64 of the Convention. The investor's State has the right, according to Article 27, to exercise diplomatic protection against the State which does not respect its obligation to enforce an arbitral award of the Centre; but also, according to Article 64, to have recourse to the International Court of Justice. Moreover, a State's refusal to enforce an ICSID award may have a negative effect on this State's position in the international community with respect to the continuation of international financing or the inflow of other investments.[78]

### 2. Means to Secure Compliance

**50**    The Convention establishes an autonomous enforcement mechanism and obliges the competent authorities of national jurisdictions to execute pecuniary obligations imposed by awards.[79] During the Convention's drafting, there was a general expectation that compliance by the host State with ICSID awards would not be a practical problem and that voluntary compliance would be a natural consequence of the treaty obligation expressed in Art. 53. Any other course of conduct was likely to lead to adverse reactions by other States, and would affect the standing of the State concerned with the international business community (History, Vol. II, pp. 273, 425, 428, 430). This view is supported by a cost–benefit analysis of non-compliance,[80] and by most of the practice following ICSID awards.[81]

---

77  *MINE v Guinea*, Decision on Stay of Enforcement (12 August 1988) para 25.

78  *Mitchell v DR Congo*, Decision on Stay of Enforcement (30 November 2004) para 41. The *ad hoc* Committee's terminology is infelicitous: when using the term 'enforce,' the Committee evidently meant 'comply with.'

79  Tawil (n 19) 328.

80  See Delaume (n 15); Jan Paulsson, 'Third World Participation in International Investment Arbitration' (1987) 2 ICSID Rev 19, 54–55; Ibrahim FI Shihata, 'Towards a Greater Depoliticization of Investment Disputes: The Roles of ICSID and MIGA' (1986) 1 ICSID Rev 1, 9; David A Soley, 'ICSID Implementation: An Effective Alternative to International Conflict' (1985) 19 Int'l Lawyer 521, 543.

81  See eg 'Disputes before the Centre' (1984) 1(1) News from ICSID 2, concerning compliance with the award in *Benvenuti & Bonfant v Congo*. But see also the attempts to enforce the Awards in *Benvenuti & Bonfant v Congo* and *SOABI v Senegal* in the French courts: (1993) 1 ICSID Reports 368–375, (1994) 2 ICSID Reports 337–342; and the attempts to enforce the Award in *LETCO v Liberia* in US courts: (1994) 2 ICSID Reports 383–396. Until 2013, Argentina resisted compliance with awards by insisting on 'enforcement' in the Argentine federal courts. Starting with a settlement with four ICSID award creditors,

During the Convention's preparation reference was made to the connection of the International Centre for Settlement of Investment Disputes to the International Bank for Reconstruction and Development (History, Vol. II, pp. 471, 654). But it is by no means clear whether it was expected that the World Bank's strong position with many host States would serve as an incentive to comply with awards. It remains an untested assumption that ICSID's affiliation with the World Bank implies an 'institutional gravitas that creates an incentive for sovereigns to comply with ICSID awards, lest they have difficulty securing future World Bank financing.'[82] In practice, it seems that the blocking of World Bank loans by the United States and other Member States was instrumental in moving Argentina towards compliance with ICSID awards rendered in the wake of Argentina's response to the economic and financial crisis of 2001/2002.[83]    **51**

There are essentially two types of legal action that are available to secure compliance with an award. One is recognition and enforcement in accordance with Art. 54. Recognition and enforcement action may be taken against either the host State or the investor. It is discussed in the Commentary on Art. 54. The other is legal action by a State party to the Convention in accordance with Arts. 27 and 64. The latter remedy is only available against a host State that has failed to comply with the award.[84]    **52**

During the Convention's drafting, Mr. Broches confirmed that diplomatic protection by the investor's home State would remain available to secure compliance with an award by the host State (History, Vol. II, pp. 344, 425, 763). Art. 27 excludes diplomatic protection once consent to arbitration has been given. But Art. 27 specifically provides that the right to diplomatic protection revives, if the host State fails to comply with the award (see Art. 27, paras. 47–55).    **53**

Diplomatic protection for the purpose of securing compliance with the award may be exercised by the State of nationality of the aggrieved natural or juridical person (see Art. 27, paras. 35–37). Diplomatic protection may be exercised through negotiations, the institution of judicial proceedings between the two States, or by any other means of dispute settlement that may be available. In the course of diplomatic protection, the protecting State may threaten to take, or may actually take, countermeasures, such as withholding payments due to the recalcitrant award debtor, offsetting the claim arising from the award against claims that the award debtor may have against the protecting State, or the freezing of assets that belong to the award debtor.    **54**

Referral of the dispute between the two countries to the ICJ would be one of the means for dispute settlement available in such a situation of diplomatic protection. Art. 64 provides the jurisdictional basis required by Art. 36(1) of the ICJ Statute. A dispute over non-compliance with an award clearly falls under the concept of a 'dispute ... concerning the interpretation or application of this Convention' as required    **55**

---

this policy changed thereafter. See Moshe Hirsch, 'Explaining Compliance and Non-Compliance with ICSID Awards: The Argentine Case Study and a Multiple Theoretical Approach' (2016) 19 JIEL 681.

82  Susan D Franck, 'Foreign Direct Investment, Investment Treaty Arbitration, and the Rule of Law' (2007) 19 Pac McGeorge Global Bus & Dev LJ 337, 372.

83  See Hirsch (n 81) 681; Charles B Rosenberg, 'The Intersection of International Trade and International Arbitration: The Use of Trade Benefits to Secure Compliance with Arbitral Awards' (2013) 44 Geo JIL 503, 517.

84  J Martin Hunter and Javier García Olmedo, '"Enforcement/Execution" of ICSID Awards against Reluctant States' (2011) 12 JWIT 307, 317–319.

https://doi.org/10.1017/9781316516584.059 Published online by Cambridge University Press

by Art. 64 of the Convention. The result would be a judgment of the ICJ in which the host State may be found to be in violation of Art. 53 of the Convention.[85]

**56**     Art. 1136(5) of the NAFTA (see Art. 25, paras. 864–867) provides for a specific procedure in case of non-compliance with an award. It leads to the establishment of a panel that may determine that the failure to abide by, and comply with, the award is inconsistent with the obligations under the NAFTA and may recommend that the party concerned abide by and comply with the award.[86]

**57**     States parties to the ICSID Convention, other than the investor's State of nationality, have no right of diplomatic protection. But they may show a general interest in the effectiveness of the arbitration process under the Convention, and in the compliance with awards. Every State party to the Convention may demand that other States parties meet their obligations under the Convention including compliance with awards in accordance with Art. 53. To the extent that a third State is able to show a legal interest in the compliance with an award, it may also rely on Art. 64 to bring the resulting dispute before the ICJ (see Art. 27, paras. 27, 36, 47, 50).[87]

**D. '. . . except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention.'**

*1. Suspension of the Obligation to Comply*

**58**     During the Convention's drafting, there was considerable debate on the exact time at which the parties would have to comply with the award.[88] The Working Paper provided that parties would have to 'comply with the award immediately, unless the Arbitral Tribunal shall have allowed a time limit for the carrying out of the award or any part thereof' (History, Vol. I, p. 242). The Preliminary Draft retained this formula, but added a reference to a stay of enforcement in connection with procedures for the award's interpretation, revision, and annulment (History, Vol. I, p. 242; Vol. II, pp. 161–162). This led to a debate as to whether a general period of grace, or time limit for compliance with an award, should be introduced (History, Vol. II, pp. 271, 340–341, 342–343, 428). On the suggestion of Mr. Broches, the First Draft omitted the reference to immediate compliance and replaced the tribunal's power to allow a time limit with an obligation to comply with the award 'in accordance with its terms' (History, Vol. I,

---

85   See also Amerasinghe (n 43) 813–814; Broches (n 4) 294.

86   North American Free Trade Agreement (NAFTA) (signed 17 December 1992, entered into force 1 January 2014, terminated 1 July 2020) (1993) 32 ILM 605, 646. See also United States–Mexico–Canada Agreement (USMCA) (signed 30 November 2018, entered into force 1 July 2020), Art. 14.D.13(11). Similarly, see eg Dominican Republic–Central America Free Trade Agreement (DR–CAFTA) (signed 5 August 2004, in force 1 January 2009) Art. 10.26(8); Morocco–United States FTA (signed 15 June 2004, entered into force 1 October 2006) Art. 10.25(8); United States–Uruguay BIT (n 57) Art. 34(6); Korea–United States FTA (signed 30 June 2007, entered into force 15 March 2012) Art. 11.26 (9); Rwanda–United States BIT (signed 19 February 2008, entered into force 1 January 2012) Art. 34(8); Comprehensive and Progressive Agreement for Trans-Pacific Partnership (CPTPP) (signed 8 March 2018, entered into force 30 December 2018) Art. 9.29(11).

87   See also Aron Broches, 'The Convention on the Settlement of Investment Disputes between States and Nationals of Other States' (1972–II) 136 RdC 331, 379–380.

88   For a summary of the drafting history on this point, see Broches (n 4) 291 ff.

p. 244; Vol. II, p. 519). The 'except' clause referring to a stay of enforcement was apparently overlooked in the First Draft.[89]

The coordination of proceedings for the interpretation, revision, and annulment of awards with the obligation to comply continued to trouble the delegates (History, Vol. II, pp. 845, 847, 885, 887–888, 890). Mr. Broches pointed out that there should be a complete parallelism between the obligation to comply with the award, and the possibility of seeking enforcement (ibid., p. 900). The introduction of a provisional stay of enforcement upon the request of a party applying for revision or annulment (see Art. 51, para. 40; Art. 52, para. 713) was adopted to bridge the period until the tribunal or *ad hoc* committee can decide on a stay of enforcement (History, Vol. II, pp. 900, 902, 950). This is also why the Convention does not refer to a stay of enforcement by the tribunal or *ad hoc* committee, but rather states that 'enforcement shall have been stayed pursuant to relevant provisions of this Convention.' The Report of the Executive Directors merely paraphrases the Convention's provision by saying that the parties' obligation to abide by, and comply with, the award is subject to a stay of enforcement in accordance with the provisions of the Convention (see para. 42 *supra*). **59**

A stay of enforcement affects the finality of the award since the award cannot be relied upon as a final decision for the duration and extent of the stay.[90] The *ad hoc* Committee in *MINE v Guinea* has described this effect in the following terms: **60**

> Article 53(1) provides that the award is binding on the parties and that each party 'shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention'. Article 52(4) is one of those relevant provisions. Thus, if an *ad hoc* Committee grants a stay of enforcement, the obligation of the party against whom the Award was rendered to abide and comply with the terms of the Award is *pro tanto* suspended.[91]

However, a stay of enforcement does not dispose of the binding force of an award. Accordingly, the *ad hoc* Committee in *Pey Casado v Chile* noted that it **61**

> follows from [Art 53(1)] that, while a stay of enforcement suspends a party's obligation to abide by and comply with the award (that is to say, to implement it), the stay of the enforcement does not suspend the binding force of the award. It also follows from the provision's terms that all that can be stayed is the enforcement of the award.[92]

### 2. No Presumption in Favor of Granting a Stay of Enforcement

Additionally, it has been argued that Art. 53 militates against a presumption in favor of granting a stay of enforcement. The *ad hoc* Committee in *Antin v Spain* stated that 'a presumption in favour of granting a stay [runs] counter to the principle that ICSID awards are final and binding . . . [which] is enshrined in Article 53(1) of the **62**

---

89  Broches (n 4) 292.                    90  ibid 294.

91  *MINE v Guinea*, Decision on Stay of Enforcement (12 August 1988) para 9.

92  *Pey Casado v Chile*, Resubmitted Case: Decision on Stay of Enforcement (15 March 2018) para 52; see also ibid para 57 (stating that '[t]he provision does not revoke the binding character of the award but allows an order to inhibit the other party from enforcing the rights that the award has granted, despite its ongoing binding character. The stay of enforcement does not stay the effect of the award').

ICSID Convention . . .'[93] Thus, the *ad hoc* Committee concluded that 'the need to respect the finality of the award calls for greater restraint in deciding whether a stay of enforcement should be granted.'[94] The *ad hoc* Committee placed reliance on the following observations in *SGS v Paraguay*:

> [T]he binding nature of the award is the rule, whereas its annulment is the exception. The ICSID system is built on the premise that the awards rendered by ICSID tribunals settle in a definite manner the issues submitted to their consideration, and that only under exceptional and highly limited circumstances may their annulment be declared.[95]

**63**    However, most *ad hoc* committees have ruled that the Convention provides neither for a presumption in favor nor against a stay of enforcement (see Art. 52, paras. 52, 733).[96] To that effect, the *ad hoc* Committee in *Perenco v Ecuador* held that

> the provisions of the Convention exclude a presumption in favour or against a continued stay of enforcement. Rather, committees have to exercise their discretion to determine each time whether the stay is warranted in light of the given circumstances.[97]

**64**    Similarly, the Tribunal in the revision proceedings in *Dan Cake v Hungary* emphasized that

> Article 51(4) of the ICSID Convention cannot be interpreted as including a presumption in favour of staying enforcement, as argued by Hungary, since that provision makes a stay expressly conditional upon the Tribunal's assessment of the circumstances. Similarly, Article 53(1) of the ICSID Convention expressly subjects the enforceability of an award to the possibility of a stay of enforcement and does not contain a preference for enforcement over the right of the award debtor to access remedies under the ICSID Convention against an award.[98]

### 3. Timing

**65**    The solution adopted in the Convention to link the suspension of the obligation to comply with the award to a stay of enforcement does not resolve all problems. Under the terms of the Convention, the obligation to comply with the award arises when the award is rendered, that is, on the date on which the certified copies are dispatched (see Art. 49(1) of the Convention; see also Art. 49, paras. 21–23). This means that the parties

---

93  *Antin v Spain*, Decision on Stay of Enforcement (21 October 2019) para 65.

94  ibid para 66.

95  *SGS v Paraguay*, Decision on Stay of Enforcement (22 March 2013) paras 84–85. See also *Pey Casado v Chile*, Decision on Stay of Enforcement (16 March 2013) para 40 ('Above all, the Committee notes the binding nature of awards set forth in Article 53 of the Convention. Annulment and other post-award remedies are the exception . . . When a revision or annulment proceeding is instituted, the presumption is that the award must be enforced. The stay of enforcement of the award is the exception granted only when specific circumstances so require'); *Tenaris v Venezuela I*, Decision on Stay of Enforcement (24 March 2017) para 73, referring to the 'exceptional nature' of the stay of enforcement in light of Art. 53(1).

96  For an overview of divergent approaches to the stay of enforcement, see Brian Kotick and Joel Dahlquist Cullborg, 'A (Counter) Balancing Act: The Express Power to Order a Security on a Stay of Enforcement Pending Annulment' (2018) 33 ICSID Rev 260, 264–270.

97  *Perenco v Ecuador*, Decision on Stay of Enforcement (21 February 2020) para 64. See also *NextEra v Spain*, Decision on Stay of Enforcement (6 April 2020) para 79; *Masdar v Spain*, Decision on the Continuation of the Stay of Enforcement (20 May 2020) paras 63–68.

98  *Dan Cake v Hungary*, Decision on Stay of Enforcement (25 December 2018) para 47.

must take all steps to give effect to it promptly. But these steps may take some time. For instance, payments by the State party may require budgetary appropriations. The parties may agree in advance that a certain period of grace is allowed for compliance with the award[99] (see also para. 70 *infra*).

Stays of enforcement are provided for by the Convention in connection with the interpretation, revision, and annulment of awards (see Arts. 50, 51, 52). A stay of enforcement is not possible in connection with a request for supplementation or rectification in accordance with Art. 49(2).[100] Therefore, even if the omission or the clerical, arithmetical, or similar error concerned affects the performance of the award, the obligation to comply with the award in its original form remains unchanged, until the tribunal has given its decision which then becomes part of the award (see Art. 49, paras. 96–98; para. 81 *infra*).    **66**

A request for the interpretation of an award in accordance with Art. 50 is not subject to a time limit (see Art. 50, paras. 28–30). A mere request for interpretation does not lead to a stay of enforcement. But under Art. 50(2), the tribunal may grant a stay of enforcement upon a party's request pending its decision (see Art. 50, paras. 51–55). It follows that the period of time between the date of the award and a possible stay of enforcement in the course of proceedings for its interpretation is entirely indeterminate. The obligation to comply with the award may have existed for a considerable period of time before it is suspended by a decision of the tribunal. A stay of enforcement terminates automatically on the date on which the decision on interpretation is given (see Art. 50, para. 54).    **67**

A request for revision of an award in accordance with Art. 51 is subject to a time limit of 90 days after discovery of the relevant fact, and to an absolute time limit of three years from the date of the award (see Art. 51, paras. 33–37). If the party requesting revision also requests a stay of enforcement, a provisional stay of enforcement is granted automatically upon the application's registration (see Art. 51, para. 43). The tribunal may grant a stay of enforcement upon a party's request pending its decision (see Art. 51, para. 45). It follows that the period of time between the date of the award and a stay of enforcement in the course of proceedings for revision may last over three years. A stay of enforcement terminates automatically on the date on which the decision on revision is given (see Art. 51, paras. 42, 45).    **68**

A request for annulment of an award in accordance with Art. 52 is subject to a time limit of 120 days from the date on which the award was rendered. If the request for annulment is based on the ground of corruption, the time limit is more flexible (see Art. 52, paras. 568–570). If the party requesting annulment also requests a stay of enforcement, a provisional stay of enforcement is granted automatically upon the application's registration (see Art. 52, paras. 720–723). The *ad hoc* committee may grant a stay of enforcement pending its decision (see Art. 52, paras. 724–797). It follows    **69**

---

99   Georges R Delaume, *Transnational Contracts: Applicable Law and Settlement of Disputes* (Oceana 1990) ch XV, 72.

100   *Masdar v Spain*, Decision on Stay of Enforcement (24 August 2018) paras 20, 23, 24; *Watkins Holdings v Spain*, Decision on Rectification (13 July 2020) paras 73–74.

that the time period between the date of the award and the stay of enforcement in the course of annulment proceedings should not, except in the unlikely case of alleged corruption, last much longer than 120 days (but see para. 75 *infra*).

**70**    The NAFTA (see Art. 25, paras. 864–867) contains a specific clause providing for a stay of enforcement of ICSID awards. Art. 1136(3) provides:

> A disputing party may not seek enforcement of a final award until:
>> (a) in the case of a final award made under the ICSID Convention
>>> (i)  120 days have elapsed from the date the award was rendered and no disputing party has requested revision or annulment of the award, or
>>> (ii)  revision or annulment proceedings have been completed; . . .[101]

**71**    The period of 120 days is designed to stay enforcement during the time limit available for an application for annulment. However, the period of 120 days will not necessarily suffice to exclude that a revision of the award is requested pursuant to Art. 51 of the Convention (see para. 68 *supra*).

**72**    In any event, the stay of enforcement under Art. 1136(3) of the NAFTA is more far-reaching in that it is automatic and does not depend on any request by a party or a decision of the tribunal or *ad hoc* committee.[102] It will last until the completion of the revision or annulment proceedings. The suspension of the obligation to comply under Art. 53 is contingent upon a stay of enforcement pursuant to the relevant provisions of the ICSID Convention. But it would be illogical to separate the obligation to comply from a stay of enforcement just because that stay of enforcement is not based on the Convention, but on an agreement between the parties.[103] Therefore, in the case of ICSID arbitration under the NAFTA, the obligation to abide by, and comply with, an award would not take effect until 120 days after the award has been rendered or until revision or annulment proceedings have been completed.[104]

**73**    Under the Convention, once annulment proceedings are completed, a stay of enforcement will lapse, in principle (see Art. 52, para. 728), and its suspensive effect on the obligation to comply will come to an end. If annulment is rejected, the obligation to comply revives. If the award is annulled, there is no obligation to comply (see Art. 52, para. 791). If there is a partial annulment, the *ad hoc* committee may grant a temporary stay of enforcement of the award's unannulled portion, until a new tribunal constituted under Art. 52(6) can grant a stay of enforcement. This stay of enforcement remains in effect until the new award is rendered (see Art. 52, paras. 52, 794). The obligation to comply with the original award under Art. 53 would be suspended accordingly.

---

101  NAFTA (n 86) Art. 1136(3); see also USMCA (n 86) Art. 14.D.13(9)(a). See Antonio R Parra, 'Provisions on the Settlement of Investment Disputes in Modern Investment Laws, Bilateral Investment Treaties and Multilateral Instruments in Investment' (1997) 12 ICSID Rev 287, 348.

102  Provisions on an automatic stay of enforcement are also included in other treaties. See eg DR–CAFTA (n 86) Art. 10.26(6); United States–Uruguay BIT (n 57) Art. 34(6); Korea–United States FTA (n 86) Art. 11.26(7); Rwanda–United States BIT (n 86) Art. 34(6); Australia–China FTA (n 58) Art. 9.22(7); CPTPP (n 86) Art. 9.29(9); CETA (n 44) Art. 8.41(3).

103  By taking up the offer to arbitrate contained in the NAFTA, the investor accepts the modalities of the offer including the provision on stay of enforcement.

104  On the identical provision in the DR–CAFTA, see *TECO v Guatemala*, Decision on Stay of Enforcement (10 February 2015) para 33 (stating that '[i]n addition, Article 10.26.6 of the CAFTA–DR does not allow the disputing Parties to seek enforcement of the challenged Award before annulment proceedings are finalized').

The link of the obligation to comply with the existence or non-existence of a formal **74** stay of enforcement means that the obligation of compliance depends on whether the questions addressed in proceedings for the interpretation, revision, and annulment of awards require a stay of enforcement. An award may give rise to an obligation to comply for a certain period of time. This obligation may then be suspended through a stay of enforcement or may even disappear altogether as a consequence of annulment. Even a realistic expectation of a forthcoming stay of enforcement is not a valid justification for non-compliance with the award until the stay of enforcement is in effect.

The problem of a temporary obligation to comply is compounded by the varying time **75** limits governing the different procedures. Annulment proceedings, the most likely basis for a stay of enforcement, are normally subject to a 120-day time limit from the day of the award (see para. 69 *supra*). Revision may be requested up to three years after the date of the award (see para. 68 *supra*). Interpretation is not subject to any time limit (see para. 67 *supra*). The situation may become even more complicated as a consequence of the operation of Art. 49(2). Proceedings for supplementation and rectification do not lead to a stay of enforcement (see para. 66 *supra*), but they postpone the time limits for revision and annulment (see Art. 49, paras. 99–104). Therefore, the period of time until a stay of enforcement takes effect, and the obligation to comply is suspended, may be further extended.

## E. '(2) For the purposes of this Section, "award" shall include any decision interpreting, revising or annulling such award pursuant to Articles 50, 51 or 52.'

Art. 53(2) was not reflected in the earlier drafts to the Convention, and was only **76** inserted into the Revised Draft at the initiative of the Secretariat (History, Vol. I, p. 244).[105] Under its own terms, Art. 53(2) applies not just to Art. 53 but to 'this Section,' that is, also to Art. 54, dealing with recognition and enforcement, and to Art. 55, dealing with immunity from execution.

Art. 53(2) clarifies that the obligation to abide by, and comply with, the award relates **77** to the award as interpreted or revised (see also Art. 50, paras. 50, 37; Art. 51, para. 32). From the date of the decision on interpretation or revision, the obligation to comply applies only to its modified version. This is independent of any prior suspension of the obligation to comply as a consequence of a stay of enforcement (see paras. 58–75 *supra*).

Once the award has been annulled, the obligation to comply with the award disap- **78** pears. But even a total annulment does not remove the effects of Art. 53(1) entirely. The exhaustive nature of the Convention's review system (see paras. 25–39 *supra*) continues to apply in the sense that a party has no other means of appeal. The *ad hoc* committee's decision to annul is not subject to any review either inside or outside the Convention's system. The exclusion of another remedy (see paras. 40, 41 *supra*) also continues to apply in favor of a new tribunal constituted under Art. 52(6) (see Art. 52, para. 805). Therefore, one party may not, after annulment, turn to another remedy not

---

105   Broches (n 4) 294.

provided for by the Convention, such as arbitration of the same dispute under different arbitration rules.[106] Of course, it is always open to both parties to settle the case by agreement or to agree to submit it to another court or tribunal (see Art. 54, para. 36).

79      In the case of partial annulment (see Art. 52, paras. 616–636), the obligation to comply with the award would apply, in principle, to the unannulled portion of the award. But in the case of a partial annulment, a stay of enforcement and a consequent suspension of the obligation to comply is likely (see para. 73 *supra*).

80      Curiously, Art. 53(2) does not refer to Art. 49(2) dealing with the award's supplementation and rectification. But Art. 49(2) itself says that the decision on supplementation or rectification shall become part of the award (see Art. 49, paras. 49, 96–98). It follows that 'award' for purposes of Arts. 53, 54, and 55 includes also any decision supplementing or rectifying the award pursuant to Art. 49(2). This means that the obligation to comply applies to the award as supplemented or rectified.

81      The possibility of the award's modification through supplementation, rectification, interpretation, revision, and annulment means that the substance of the parties' obligation to comply may be subject to change. This is particularly so in view of the varying periods of time during which the award is to be performed in its original form before any stay of enforcement may become effective (see paras. 65, 66 *supra*). A party may have started to give effect to an award in its original form, but may later be informed that its obligation differs from what it had assumed. At that point any performance will have to be adjusted retroactively to conform to the award as modified. Underpayments will have to be made up. Overpayments will have to be refunded or credited. Any performance made in good faith in accordance with the award's original version will be lawful, until the award is modified. Post-award interest will not be due for underpayment in accord with an award before its modification.

82      The term 'award,' as used in Art. 53, only refers to final decisions of the tribunal (see Art. 48, paras. 24–32, 89–99). It does not include preliminary decisions on jurisdiction, although these will be reflected in the award (see Art. 41, para. 121).[107] It also does not include decisions on provisional measures (see Art. 47, para. 4). Nor does it refer to procedural orders which the tribunal makes in the course of the proceedings (see Art. 44, paras. 62–64). This interpretation of the term 'award' is also confirmed by the practice of the Secretary-General, who has refused to register applications for

---

106  Cf also *Pey Casado v Chile*, Resubmitted Case: Decision on Stay of Enforcement (15 March 2018) paras 77–81 (confirming that the UNCITRAL proceedings in *President Allende Foundation v Chile* did not concern the same violations of the applicable BIT, but alleged breaches after the ICSID proceedings had ended).

107  *RFCC v Morocco*, Decision on Annulment (18 January 2006) para 227; *Standard Chartered Bank v TANESCO*, Award (12 September 2016) paras 312, 314; *Burlington v Ecuador*, Decision on Reconsideration and Award (7 February 2017) para 82. See also *Pac Rim v El Salvador*, Award (14 October 2016) para 5.36 (stating that 'an award must deal with every question submitted to the Tribunal. Since decisions affirming jurisdiction are limited to the settlement of jurisdictional questions prior to issues as to the merits, they do not have the status of an award under the ICSID Convention until their incorporation into the award that addresses all questions and thus decides the parties' dispute. In an ICSID arbitration, there can only be one award. Article 51 on revision and Article 53(1) on annulment of the ICSID Convention therefore do not apply to preliminary decisions affirming jurisdiction until their incorporation in the later award. This is only different when an ICSID tribunal denies all jurisdiction, since such a decision does bring the arbitration to an end and must therefore take form of an award in accordance with ICSID Arbitration Rule 41(6)' – footnotes omitted).

annulment of procedural orders and preliminary decisions on jurisdiction because they did not constitute 'awards' (see Art. 52, paras. 52, 73). Conversely, decisions by the Secretary-General refusing the registration of applications, such as for annulment, or for the disqualification of a tribunal, do not qualify as awards (see Art. 41, paras. 17–24; Art. 48, para. 90, 105). Nor does the term 'award' include a decision by co-arbitrators, or of the Chairman of the Administrative Council, on a challenge to an arbitrator or arbitrators.[108]

---

108  *Azurix v Argentina*, Decision on Annulment (1 September 2009) para 284; *RSM v St Lucia*, Decision on Annulment (29 April 2019) para 159.

https://doi.org/10.1017/9781316516584.059 Published online by Cambridge University Press