# EXHIBIT 70

SFEI AND OTHERS

## JUDGMENT OF THE COURT
### 11 July 1996 *

In Case C-39/94,

REFERENCE to the Court under Article 177 of the EC Treaty by the Tribunal de Commerce, Paris, for a preliminary ruling in the proceedings pending before that court between

**Syndicat Français de l'Express International (SFEI) and Others**

and

**La Poste and Others**

on the interpretation of Articles 92 and 93 of the EC Treaty,

THE COURT,

composed of: G. C. Rodríguez Iglesias, President, C. N. Kakouris, J.-P. Puissochet and G. Hirsch (Presidents of Chambers), G. F. Mancini, C. Gulmann (Rapporteur), J. L. Murray, P. Jann and H. Ragnemalm, Judges,

Advocate General: F. G. Jacobs,
Registrar: D. Loutermann-Hubeau, Principal Administrator,

* Language of the case: French.

after considering the written observations submitted on behalf of:

— Syndicat Français de l'Express International and Others, by Eric Morgan de Rivery, of the Paris Bar,

— TAT SA, by Valérie Bouaziz Torron and Dominique Berlin, of the Paris Bar,

— the French Government, by Jean-Marc Belorgey, Head of Mission in the Legal Affairs Directorate of the Ministry of Foreign Affairs, and Catherine de Salins, Deputy Director in the same Directorate, acting as Agents,

— the German Government, by Ernst Röder, Ministerialrat in the Federal Ministry of Finance, and Bernd Kloke, Regierungsrat in the same Ministry, acting as Agents,

— the Spanish Government, by Alberto José Navarro González, Director General of Community Legal and Institutional Coordination, and Gloria Calvo Díaz, Abogado del Estado, of the State Legal Service, acting as Agents,

— the Commission of the European Communities, by Michel Nolin and Ben Smulders, of its Legal Service, acting as Agents,

having regard to the Report for the Hearing,

after hearing the oral observations of Syndicat Français de l'Express International and Others, represented by Eric Morgan de Rivery and Jacques Derenne, of the Paris Bar, Société Française de Messagerie Internationale, represented by Manuel Bosque, of the Seine-Saint-Denis Bar, the French Government, represented by Catherine de Salins, the Spanish Government, represented by Gloria Calvo Díaz, and the Commission, represented by Michel Nolin and Ben Smulders, at the hearing on 24 October 1995,

after hearing the Opinion of the Advocate General at the sitting on 14 December 1995,

SFEI AND OTHERS

gives the following

# Judgment

1  By judgment of 5 January 1994, received at the Court on 31 January 1995, the Tribunal de Commerce (Commercial Court), Paris, referred to the Court for a preliminary ruling under Article 177 of the EC Treaty a number of questions on the interpretation of Articles 92 and 93 of the Treaty.

2  Those questions were raised in proceedings between Syndicat Français de l'Express International (hereinafter 'SFEI') and five of its member undertakings, DHL International, Service Crie-LFAL, May Courier International, Federal Express and Express Transports Communications, on the one hand, and Société Française de Messagerie Internationale (hereinafter 'SFMI'), Chronopost, the French Post Office, Holding des Filiales de la Poste, Sofipost, Société de Transport Aérien Transrégional (hereinafter 'TAT') and TAT Express, on the other hand. That dispute concerned logistical and commercial assistance afforded by the Post Office to SFMI and Chronopost in their express delivery activities.

3  Express delivery is a personalized service for the rapid dispatch of documents and parcels. It answers the needs of business customers for whom it is essential that such documents reach the addressee within a guaranteed period. In France this sector is open to unrestricted competition, unlike the ordinary postal service which is subject to the monopoly of the Post Office.

4  In order to improve its position on the express delivery market, the French Post Office modernized its service in that sector, Postadex, which it renamed EMS Chronopost. At the end of 1985 the management and development of Chronopost were entrusted to SFMI, a company governed by private law set up for that

purpose. 66% of the capital in SFMI was then held by Sofipost, itself a 100% subsidiary of the Post Office. The remaining 34% was subscribed by TAT.

5    In the early months of 1986 the Post Office invited the customers of the Postadex service to use EMS Chronopost. Next, instructions from the Ministry of Posts and Telecommunications of 19 August 1986 (*Bulletin officiel des PTT*, 1986, p. 311 et seq.) set out the detailed conditions for the operation and marketing of the EMS Chronopost service. It was to be run principally by SFMI, thanks to the Post Office's resources, supplemented by those of TAT Express, an express transport company and subsidiary of TAT. The Post Office provided SFMI with assistance in the form, on the one hand, of making its post offices and some of its staff available for the collection, sorting, transport and distribution of letters and parcels to customers ('logistical assistance') and, on the other, of advertising, canvassing and advising customers ('commercial assistance').

6    SFMI was quick to take off and grow. Its turnover rose from FF 200 000 000 for its first financial year, 1986, to FF 720 000 000 in 1988, FF 1 030 000 000 in 1989 and FF 1 340 000 000 in 1991.

7    On 1 January 1991 the Post Office, which until then had been part of the State administration, became an autonomous corporation governed by public law. Law No 90-568 of 2 July 1990 on the organization of the public post and telecommunications service expressly authorized it to develop, alongside its public service functions, its operations in areas open to private initiative.

8    In 1992 the structure of the express delivery business changed, following the creation by the French Post Office and the German, Netherlands, Canadian and Swedish Post Offices, on the one hand, and the Australian delivery service TNT, on the other, of a common international express delivery operator, GNEW (the concentration was authorized by the Commission on 2 December 1991, OJ 1991 C 322, p. 19). Domestic business was assigned to a new company, Chronopost, in which Sofipost had a 66% holding and TAT a 34% holding. International operations were left to SFMI which came under the control of GNEW France, the

French subsidiary of the common operator. In this new structure Chronopost acts as agent for SFMI in collecting and distributing international dispatches entrusted to GNEW. Until 1 January 1995 the French Post Office guaranteed GNEW-SFMI exclusive access to its network and Chronopost could not compete with SFMI.

9   SFEI considered that the conditions for the logistical and commercial assistance afforded SFMI by the Post Office constituted State aid incompatible with the common market and rendered competition unequal, and therefore lodged a complaint on 21 December 1990 with the Commission of the European Communities and the Conseil Français de la Concurrence (French Competition Board). It alleged in particular that the assistance given by the postal authorities enabled SFMI to charge rates considerably lower than those charged by its competitors.

10  On 10 March 1992 the Commission rejected SFEI's complaint under Article 92 of the Treaty. SFEI and three of its member undertakings then brought an action before the Court on 16 May 1992 for annulment of that decision (Case C-222/92). Since the Commission withdrew that decision in order, 'having regard to certain aspects of the application (...) to add further evidence to the file', the Court removed the case from the register by order of 18 November 1992.

11  Since then the Commission has been pursuing its examination of the matter; in particular it has twice requested information from the French authorities. However, it has neither given a final decision nor even adopted a position on whether the measures at issue constitute State aid within the meaning of Article 92 of the Treaty.

12  Those were the circumstances in which SFEI and the five abovementioned companies brought an action before the Tribunal de Commerce, Paris, on 16 June 1993 against SFMI, Chronopost, the Post Office, Sofipost, TAT and TAT Express. They sought a declaration that the logistical and commercial assistance afforded by

JUDGMENT OF 11. 7. 1996 — CASE C-39/94

the Post Office to SFMI and Chronopost constituted State aid and had been implemented without prior notification to the Commission, in breach of the last sentence of Article 93(3) of the Treaty. Accordingly, they sought, first, an order that the Post Office should forthwith refrain from granting those State aids and, second, an order that SFMI and Chronopost should repay the Post Office all unlawful State aid received since they were set up, amounting to FF 2 139 million for the period from 1986 to 1991. The plaintiffs in the main proceedings also claimed damages of FF 216 million from the defendants.

13    It is apparent from SFEI's submissions before the national court that the alleged logistical assistance consists in making available to SFMI the use of the postal infrastructure comprising 300 000 members of staff, 73 000 daily postal rounds, 16 835 buildings, 50 000 vehicles, 300 railway carriages and 22 aeroplanes, in return for payment of an abnormally low consideration, and in granting privileged customs clearance procedure and unusually favourable terms of payment with regard to the Post Office. It is also alleged that the Post Office gives commercial assistance to SFMI and Chronopost. On the one hand, the latter have access to the Post Office's customers. On the other, they benefit from the Post Office's promotional and advertising campaigns. According to SFEI, the aid consists of the difference between the consideration paid for and the market price of that assistance.

14    The defendants in the main proceedings objected in particular that the matter fell within the competence of the Commission or of the French Conseil d'État. The plaintiffs replied that they were not seeking the annulment of administrative acts but merely complained that a public operator had contributed to the development of commercial companies in breach of the competition rules to which those companies are subject.

I - 3582

15    In the light of those factual and legal circumstances, the Tribunal de Commerce, Paris, decided by interlocutory judgment to stay proceedings and refer the following eight questions on the interpretation of Articles 92 and 93 of the Treaty to the Court for a preliminary ruling:

'1.    Must measures taken by a Member State consisting *inter alia* in the grant, through the Ministry of Economic Affairs and the Ministry of Posts and Telecommunications of that Member State, of subsidies to an express courier company by giving it logistical and commercial assistance and refraining from asking for the normal payment in return for its technical, commercial or financial services, be regarded as State aids which distort or threaten to distort competition and affect trade between Member States within the meaning of Article 92 of the Treaty?

2.    If Question 1 is answered in the affirmative, does the recovery of the financial support already paid in breach of the prohibition laid down by the last sentence of Article 93(3) not constitute, in addition to the immediate suspension of provision of the aid in question, the only means of guaranteeing the effectiveness of that prohibition?

3.    If Question 1 is answered in the affirmative, is an undertaking to which such aids are granted under an obligation, by virtue of Community law and in particular the principle of the primacy of Community law, to show diligence by verifying, in particular, the propriety of the procedure under which the aid is granted, in the light of Article 93(3) of the Treaty, before receiving the aid in question?

4.    If Question 3 is answered in the affirmative, must the damage suffered by the undertakings competing with the undertaking that receives the aid as a result of the latter's lack of due diligence also be compensated for in accordance with the rules of national law in order to remedy the breach of the provisions of Community law at issue?

5.  Under the applicable provisions of Community law, is a national court hearing an application intended to secure, under civil law and in accordance with its national law, the appropriate reaction to a State measure put into force without fulfilment of the prior examination procedure under the last sentence of Article 93(3) of the Treaty, under an obligation to declare that it lacks jurisdiction if a complaint has been submitted to the Commission in order to obtain a finding that the contested measure is incompatible with the common market, even though the Commission has not given its final decision and has not even ruled whether or not the contested measures constitute State aids?

6.  Alternatively, and in the same situation, is a national court that has declared that it has jurisdiction nevertheless obliged to stay the proceedings pending a decision from the Commission as to whether the contested measures are State aids?

7.  Is the situation described in 5 and 6 affected by the fact that the Commission has not yet given a ruling even though the matter was referred to it more than two years ago and that the plaintiff has satisfied the national court of the urgent need to bring to an end the harmful consequences for it of the infringement of the last sentence of Article 93(3)?

8.  Conversely, can it not be inferred, in circumstances such as those mentioned in paragraphs 5 to 7 above, from the terms of the judgment of the Court of 21 November 1991 in Case C-354/90 (particularly paragraph 14) that the national court, by declaring that it has jurisdiction and giving the ruling asked of it on the basis of the last sentence of Article 93(3), is merely fulfilling its duty of safeguarding, until the Commission gives its final decision, the rights of individuals against the failure by the State authorities to observe the prohibition laid down in the last sentence of Article 93(3) of the Treaty?'

16   On 4 February 1994, the Post Office and Sofipost summoned SFEI before the first President of the Court of Appeal, Paris, sitting in relief proceedings, seeking leave to appeal against the interlocutory judgment of 5 January 1994. That application was dismissed by order of 24 March 1994.

I - 3584

## The admissibility of the questions referred

17   TAT and SFMI maintain that the questions are inadmissible by reason of the national court's lack of jurisdiction, the lack of any description of the factual and legal context of the case in the judgment making the reference, infringement of the right to a fair hearing and abuse of procedure.

18   First, they contend that the essential point in the dispute in the main proceedings is whether the French Republic infringed Article 93(3) of the Treaty by failing to notify to the Commission the measures in favour of SFMI and Chronopost and, if so, what consequences ensue. In France, only the administrative courts are competent to review the legality of administrative acts relating to the grant of aid. Nor do civil courts have the power to order repayment of aid or to award damages against the State. Since the Tribunal de Commerce manifestly lacks competence, the questions submitted are not necessary for the determination of the dispute.

19   Second, the referring court does not, according to TAT and SFMI, specify the nature of the logistical and commercial assistance provided by the Post Office to SFMI and Chronopost. Moreover, the abnormally low level of the consideration for such assistance is merely postulated and not demonstrated. That being so, parties wishing to submit observations to the Court find it almost impossible to do so to any good purpose and the Court cannot usefully give a reply to the questions referred to it.

20   Third, they claim that, whereas the national court heard argument only on questions of competence, it took certain matters of fact to be settled. Consequently, if the Court of Justice were to rule on the question referred to it, it would do so on the basis of false allegations and in breach of the defendants' right to a fair hearing.

21  Fourth, they claim that the preliminary ruling procedure is being abused in order to overcome the obstacle for the plaintiffs in the main proceedings caused by the Commission's slowness in adopting a decision. By its first question, the national court asks not only whether the measures in question constitute State aid within the meaning of Article 93(3) of the Treaty but also whether they are incompatible with the Treaty, a matter which falls exclusively within the Commission's competence. They consider that it is for the plaintiffs to institute proceedings against the Commission either for failure to act or for annulment of the decision refusing to initiate the consultation procedure under Article 93(2) of the Treaty.

22  The French Government merely challenges the admissibility of the first question. As formulated, that question gives the impression, it maintains, that the national court has already reached the conclusion that SFMI and Chronopost have received advantages in return for an abnormally low consideration and have therefore received State aid. However, the judgment making the reference does not set out the factual or legal considerations which have led the Tribunal de Commerce, Paris, to such a conclusion. According to the French Government, the inadmissibility of the question is particularly clear given the extremely complex factual issues raised.

23  Those pleas and arguments cannot be accepted.

24  As regards the national court's alleged lack of jurisdiction, it should be recalled that it is not for the Court to determine whether the decision whereby a matter is brought before it was taken in accordance with the rules of national law governing the organization of the courts and their procedure. The Court must therefore abide by the decision from a court of a Member State requesting a preliminary ruling in so far as it has not been overturned in any appeal procedures provided for by national law (see Case C-10/92 *Balocchi* v *Ministero delle Finanze* [1993] ECR I-5105, paragraphs 16 and 17, and Case 65/81 *Reina* v *Landeskreditbank Baden-Württemberg* [1982] ECR 33, paragraphs 7 and 8).

25    As regards the arguments alleging lack of any description in the judgment making the reference of the factual and legal context of the dispute, infringement of the right to a fair hearing and abuse of procedure, it should be noted, as a preliminary point, that these arguments are of relevance only to the first question.

26    The judgment making the reference sets out in detail the measures sought by the plaintiffs should the national court find that there has been an infringement of the last sentence of Article 93(3), and also the views of the parties concerning the national court's jurisdiction, having regard to the fact that the matter has also been referred to the Commission. On the one hand, Questions 2 to 4 are concerned specifically with the conclusions which a national court may draw from the lack of prior notification of State aid. On the other hand, Questions 5 to 8 concern the jurisdiction of the national court where the matter has also been referred to the Commission.

27    Although the description in the national court's judgment of the factual and legal background to the first question is highly succinct, that fact is not, in the present case, sufficient to render the question inadmissible. That succinct presentation enables the first question to be understood as being limited to asking the Court whether the provision of logistical and commercial assistance, without the payment in return of any normal consideration, by a public undertaking to its subsidiaries, which are governed by private law and carry on an activity open to free competition, is capable of constituting State aid within the meaning of Article 92 of the Treaty.

28    Furthermore, it follows from the foregoing considerations that the argument based on an alleged abuse of procedure must also be rejected. In its first question the national court is not asking the Court to encroach on the Commission's exclusive competence by ruling on the compatibility of the measures in question with the common market. It confines itself to seeking clarification on the applicability of Article 92(1) of the Treaty to measures such as those at issue in order to be able to draw the appropriate conclusions from any breach of the prohibition, laid down in the last sentence of Article 93(3) of the Treaty, on prior implementation of planned aid.

29    Accordingly the questions referred must be considered.


30    Since Questions 5 to 8 concern the issue of the national court's jurisdiction and
      whether it may proceed with the case notwithstanding the fact that the matter in
      point is concurrently before the Commission, they should be dealt with before
      Questions 1 to 4, which concern the concept of State aid and the remedies to be
      granted in the event of an infringement of the last sentence of Article 93(3).



**Questions 5 to 8**


31    By Questions 5 to 8 the national court asks essentially what position it should
      adopt when seised of a request that it should draw the appropriate conclusions
      from an infringement of Article 93(3) of the Treaty, when the Commission is con-
      currently seised of the matter and has not yet given a decision on the question
      whether or not the State measures in question constitute State aid. More specifi-
      cally, the national court asks whether it must declare that it has no jurisdiction
      (Question 5) or, at least, stay proceedings until the Commission has adopted a pos-
      ition on how the measures in question are to be categorized (Question 6) or, on
      the contrary, whether it must declare itself to have jurisdiction and safeguard the
      rights of individuals where there is an infringement by the State of Article 93(3) of
      the Treaty by giving the ruling asked of it (Question 8). Finally, the national court
      asks whether the fact that the matter has been before the Commission for more
      than two years and that the plaintiffs have demonstrated the urgency of the
      situation has any bearing on the answer to be given to the previous question
      (Question 7).


32    According to TAT, where the Commission has been seised of the matter but has
      yet to decide whether the measures in question constitute State aid, the national
      court should declare that it has no jurisdiction since its decision might otherwise
      conflict with that of the Commission. If the Commission subsequently decides
      that the measures do not constitute State aid, the national proceedings for recovery
      of the aid based on Article 93(3) would be deprived of any legal basis. TAT argues

in the alternative that the national court is required to stay proceedings pending the Commission's decision on the question whether the measures constitute aid. Finally it states that, if the measures do constitute aid, they should be regarded as existing aid owing to the abnormally long time taken by the Commission to reach a decision, with the result that it could no longer be required to be repaid but only to be abolished or altered for the future.

33    Those arguments cannot be accepted.

34    It is important to bear in mind the system reviewing State aids which has been established by the Treaty and the respective roles of the Commission and the national courts in putting that system into effect.

35    Article 92(1) of the Treaty provides that '[S] ave as otherwise provided in this Treaty, any aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods shall, in so far as it affects trade between Member States, be incompatible with the common market'.

36    That prohibition, as a matter of principle, of State aids is neither absolute nor unconditional since paragraph (3) in particular of Article 92 confers on the Commission a wide discretion to allow aid by way of derogation from the general prohibition laid down in paragraph (1) of that article. The determination in such cases of the question whether a State aid is or is not compatible with the common market raises problems which presuppose the examination and appraisal of economic facts and conditions which may be both complex and liable to change rapidly (Case C-301/87 *France* v *Commission* [1990] ECR I-307, the 'Boussac' case, paragraph 15).

JUDGMENT OF 11. 7. 1996 — CASE C-39/94

37    That was the reason for which the Treaty provided in Article 93 for a special procedure under which the Commission would monitor aid schemes and keep them under constant review. With regard to new aid which Member States might be intending to grant, a preliminary procedure was established; if this procedure was not followed, the aid could not be regarded as having been properly granted. By virtue of the first sentence of Article 93(3) of the Treaty, the Commission is to be notified of plans to grant or alter aid before they are put into effect.

38    The Commission then conducts an initial review of the planned aid. If at the end of that review it considers a plan to be incompatible with the common market, it must without delay initiate the consultative examination procedure under Article 93(2). It follows from the last sentence of Article 93(3) that throughout the preliminary period the Member State concerned may not put the planned aid into effect. Where the consultative examination procedure is initiated, that prohibition continues until the Commission reaches a decision on the compatibility of the planned aid with the common market (see Case C-47/91 *Italy* v *Commission* [1992] ECR I-4145, paragraph 24). However, if the Commission has not responded within two months of notification, the Member State concerned may implement the plan after informing the Commission (Case 120/73 *Lorenz* v *Germany* [1973] ECR 1471, paragraph 4).

39    The involvement of national courts is the result of the direct effect which the prohibition on implementation of planned aid laid down in the last sentence of Article 93(3) has been held to have. In this respect, the Court has stated that the immediate applicability of the prohibition on implementation referred to in that article extends to all aid which has been implemented without being notified and, in the event of notification, operates during the preliminary period and if the Commission sets in motion the consultative examination procedure, until the final decision (Case 120/73 *Lorenz*, cited above, paragraph 8, and Case C-354/90 *Fédération Nationale du Commerce Extérieur des Produits Alimentaires and Syndicat National des Négociants et Transformateurs de Saumon* [1991] ECR I-5505, hereinafter '*FNCE*', paragraph 11).

40    National courts must offer to individuals the certain prospect that all the appropriate conclusions will be drawn from an infringement of the last sentence of

Article 93(3) of the Treaty, in accordance with their national law, as regards the validity of measures giving effect to the aid, the recovery of financial support granted in disregard of that provision and possible interim measures (Case C-354/90 *FNCE*, cited above, paragraph 12).

41    As regards the supervision of Member States' compliance with their obligations under Articles 92 and 93 of the Treaty, the national courts and the Commission fulfil complementary and separate roles.

42    In drawing the appropriate conclusions from an infringement of the last sentence of Article 93(3), national courts cannot rule on the compatibility of the aid with the common market, that determination being a matter for the Commission, subject to review by the Court of Justice (see Case C-354/90 *FNCE*, cited above, paragraph 14).

43    Unlike the national courts, the Commission cannot order State aid to be repaid solely on the ground that it has not been notified in accordance with Article 93(3) of the Treaty (see 'Boussac', cited above, paragraphs 19 to 22, Case C-142/87 *Belgium* v *Commission* [1990] ECR I-959, paragraphs 15 to 20 and Case C-354/90 *FNCE*, cited above, paragraph 13). First it must, after giving the Member State in question an opportunity to submit its comments on the matter, issue an interim decision requiring it to suspend immediately the payment of aid pending the outcome of the examination of the aid and to provide the Commission, within such period as it may specify, with all such documentation, information and data as are necessary in order that it may examine the compatibility of the aid with the common market. It is only if the Member State, notwithstanding the Commission's order, fails to provide the information requested that the Commission is empowered to terminate the procedure and make its decision, on the basis of the information available to it, on the question whether or not the aid is compatible with the common market and, if appropriate, call for the recovery of the amount of aid which has already been paid ('Boussac', cited above, paragraphs 19 and 21).

I - 3591

44 In those circumstances, the initiation by the Commission of a preliminary examination procedure under Article 93(3) or the consultative examination procedure under Article 93(2) cannot release national courts from their duty to safeguard the rights of individuals in the event of a breach of the requirement to give prior notification.

45 Any other interpretation would have the effect of encouraging the Member States to disregard the prohibition on implementation of planned aid. Since the Commission can do no more than order further payments to be suspended so long as it has not adopted its final decision on the substance of the matter, the effectiveness of Article 93(3) would be weakened if the fact that the Commission was seised of the matter were to prevent the national courts from drawing all the appropriate conclusions from the infringement of that provision.

46 Similarly, it cannot be accepted that the Commission's delay in completing its preliminary examination may result in the transformation of new aid granted in breach of the last sentence of Article 93(3) of the Treaty into existing aid which can be abolished only with respect to the future.

47 The Court has, admittedly, held that where a Member State notifies planned measures to the Commission, the latter must decide within two months whether or not to initiate the procedure under Article 93(2). If the Commission does not adopt a decision within that period, the Member State may implement the plan after giving notice to the Commission. The aid is then deemed to be existing aid subject to the review provided for under Article 93(1) and (2) (Case 120/73 *Lorenz* v *Germany*, cited above, paragraphs 4 and 5).

48 This case-law is, however, based on the need to take account of the legitimate interest of the Member State in being rapidly informed of the legal position. That

element is missing where the Member State has implemented planned aid without having notified the Commission beforehand.

49  Finally, a national court may have cause to interpret the concept of aid contained in Article 92 of the Treaty in order to determine whether a State measure introduced without observance of the preliminary examination procedure provided for in Article 93(3) ought to have been subject to that procedure (Case 78/76 *Steinike und Weinlig* v *Germany* [1977] ECR 595, paragraph 14, and Case C-189/91 *Kirsammer-Hack* v *Sidal* [1993] ECR I-6185, paragraph 14).

50  Where the national court entertains doubts as to whether the measures at issue should be categorized as State aid, it may seek clarification from the Commission on that point. In its notice on cooperation between national courts and the Commission in the State aid field (OJ 1995 C 312, p. 8), the Commission expressly encouraged national courts to make contact with it when they encounter difficulties in the application of Article 93(3) of the Treaty and explained what kind of information it was able to supply. It should be noted, in that regard, that as a consequence of the duty of sincere cooperation between the Community institutions and the Member States resulting from Article 5 of the Treaty (Case C-2/88 Imm. *Zwartveld and Others* [1990] I-3365, paragraphs 17 and 18), the Commission must respond as quickly as possible to requests from national courts.

51  Moreover, in accordance with the second and third paragraphs of Article 177 of the Treaty, the national court may or must request the Court for a preliminary ruling on the interpretation of Article 92 of the Treaty.

52  Where it is likely that some time will elapse before it gives its final judgment, it is for the national court to decide whether it is necessary to order interim relief such as the suspension of the measures at issue in order to safeguard the interests of the parties.

53    The answer to Questions 5 to 8 must therefore be that a national court, seised of a request that it should draw the appropriate conclusions from an infringement of the last sentence of Article 93(3) of the Treaty, where the matter has also been referred to the Commission, which has not yet given a final decision as to whether the State measures constitute State aid, is not required to declare that it lacks jurisdiction or to stay proceedings until such time as the Commission has adopted a position on how the measures in question are to be categorized. With a view to determining whether those measures should have been notified to the Commission, a national court may have cause to interpret and apply the concept of aid. In case of doubt, it may ask the Commission for clarification. Furthermore, it may or must, in accordance with the second and third paragraphs of Article 177 of the Treaty, refer a question to the Court of Justice for a preliminary ruling. Where it consults the Commission or refers a question to the Court, it must decide whether it is necessary to order interim measures in order to safeguard the interests of the parties pending final judgment.

**The first question**

54    By its first question the national court seeks in essence to ascertain whether the provision of logistical and commercial assistance by a public undertaking to its subsidiaries, which are governed by private law and carry on an activity open to free competition, without normal consideration in return is capable of constituting State aid within the meaning of Article 92 of the Treaty.

55    As a preliminary point it should be observed that the measures in question have never been notified to the Commission, since the French Government did not regard them as constituting State aids, and, furthermore, that although a complaint was made to it in 1990 the Commission is still unable, following the withdrawal of a first decision rejecting that complaint in 1992, to give a decision on how the logistical and commercial assistance afforded by the Post Office to SFMI and Chronopost is to be categorized.

SFEI AND OTHERS

56  Furthermore, the French Government and the Commission are at one in considering that the first question, as formulated, calls for an affirmative answer. They both also point out that the determination of what constitutes normal consideration calls for a detailed and complex economic analysis of the costs connected with the services in question and that the judgment making the reference does not contain sufficient information in that respect.

57  The view that the provision of logistical and commercial assistance by a public undertaking to its subsidiaries, which are governed by private law and carry on an activity open to free competition, without normal consideration in return is capable of constituting State aid within the meaning of Article 92 of the Treaty must be upheld.

58  The aim of Article 92 of the Treaty is to prevent trade between Member States from being affected by advantages granted by public authorities which, in various forms, distort or threaten to distort competition by favouring certain undertakings or certain products (see Case C-387/92 *Banco Exterior de España* v *Ayuntamiento de Valencia* [1994] ECR I-877, paragraph 12, and Case 173/73 *Italy* v *Commission* [1974] ECR 709, paragraph 26). The concept of aid thus encompasses not only positive benefits, such as subsidies, but also interventions which, in various forms, mitigate the charges which are normally included in the budget of an undertaking and which, without therefore being subsidies in the strict sense of the word, are of the same character and have the same effect (see Case C-387/92 *Banco Exterior de España*, cited above, paragraph 13).

59  It follows from the foregoing considerations that the supply of goods or services on preferential terms is capable of constituting State aid (see Joined Cases 67/85, 68/85 and 70/85 *Van der Kooy and Others* v *Commission* [1988] ECR 219, paragraph 28, and Case C-56/93 *Belgium* v *Commission* [1996] ECR I-723, paragraph 10).

60    Accordingly, in order to determine whether a State measure constitutes aid, it is necessary to establish whether the recipient undertaking receives an economic advantage which it would not have obtained under normal market conditions.

61    In examining that question, it is for the national court to determine what is normal remuneration for the services in question. Such a determination presupposes an economic analysis taking into account all the factors which an undertaking acting under normal market conditions should have taken into consideration when fixing the remuneration for the services provided.

62    In the light of the foregoing considerations, the answer to the first question must be that the provision of logistical and commercial assistance by a public undertaking to its subsidiaries, which are governed by private law and carry on an activity open to free competition, is capable of constituting State aid within the meaning of Article 92 of the Treaty if the remuneration received in return is less than that which would have been demanded under normal market conditions.

**The second question**

63    By its second question, the Tribunal de Commerce, Paris, asks in essence whether a national court requested to order the repayment of aid must grant that application if it finds that the aid was not notified to the Commission.

64    According to the Spanish Government, breach of the obligation to notify laid down in Article 93(3) may give rise only to interim measures, the most severe of which is suspension of payment of the aid. Repayment of the aid may not be

ordered until it is found that a measure constitutes aid incompatible with the common market. If they were to order repayment, national courts would be prejudging the outcome of the substantive issues.

65    TAT and the Spanish, French and German Governments also claim that national courts are never required to order repayment. It would be paradoxical, they maintain, if a breach of the procedural obligation laid down in Article 93(3) were necessarily to entail repayment of the aid, whereas the Commission is not constrained to order repayment when it finds the aid to be incompatible with the common market.

66    Those views cannot be accepted.

67    First, the role of a national court seised of an application based on the last sentence of Article 93(3) goes beyond that of a judge ruling on an application for interim relief. The national court is under a duty to provide protection in the final judgment it gives in such a case against the consequences of unlawful implementation of aid. Moreover, its decision cannot be challenged by the Commission. The latter's final decision does not have the effect of regularizing *ex post facto* the measures unlawfully implementing aid (see *FNCE*, cited above, paragraph 16).

68    It follows from paragraph 12 of the *FNCE* judgment that a finding that aid has been granted in breach of the last sentence of Article 93(3) must in principle lead to its repayment in accordance with the procedural rules of domestic law.

69    Any other interpretation would encourage the Member States to disregard the prohibition laid down in Article ·93(3). Thus, if national courts could only order

suspension of any new payment, aid already granted would subsist until the Commission's final decision finding the aid incompatible with the common market and ordering its repayment.

70    Having regard to the importance for the proper functioning of the common market of compliance with the procedure for prior review of planned State aid, national courts must in principle allow an application for repayment of aid paid in breach of Article 93(3) of the Treaty. However, as the Advocate General has pointed out in paragraphs 73 to 77 of his Opinion, there may be exceptional circumstances in which it would be inappropriate to order repayment of the aid.

71    The answer to the second question must therefore be that a national court requested to order the repayment of aid must grant that application if it finds that the aid was not notified to the Commission, unless by reason of exceptional circumstances repayment is inappropriate.

**The third and fourth questions**

72    By its third and fourth questions, the national court asks in essence whether the recipient of aid who does not verify that the aid has been notified to the Commission in accordance with Article 93(3) of the Treaty may incur liability on the basis of Community law.

73    The machinery for reviewing and examining State aids established by Article 93 of the Treaty does not impose any specific obligation on the recipient of aid. First,

SFEI AND OTHERS

the notification requirement and the prior prohibition on implementing planned aid laid down in Article 93(3) are directed to the Member State. Second, the Member State is also the addressee of the decision by which the Commission finds that aid is incompatible with the common market and requests the Member State to abolish the aid within the period determined by the Commission.

74    That being so, Community law does not provide a sufficient basis for the recipient to incur liability where he has failed to verify that the aid received was duly notified to the Commission.

75    That does not, however, prejudice the possible application of national law concerning non-contractual liability. If, according to national law, the acceptance by an economic operator of unlawful assistance of a nature such as to occasion damage to other economic operators may in certain circumstances cause him to incur liability, the principle of non-discrimination may lead the national court to find the recipient of aid paid in breach of Article 93(3) of the Treaty liable.

76    In the light of the foregoing considerations, the answer to the third and fourth questions must be that a recipient of aid who does not verify that the aid has been notified to the Commission in accordance with Article 93(3) of the Treaty cannot incur liability solely on the basis of Community law.

Costs

77    The costs incurred by the French, German and Spanish Governments and the Commission of the European Communities, which have submitted observations to the Court, are not recoverable. Since these proceedings are, for the parties to the

I - 3599

main proceedings, a step in the proceedings pending before the national court, the decision on costs is a matter for that court.

On those grounds,

THE COURT

in answer to the questions referred to it by the Tribunal de Commerce, Paris, by judgment of 5 January 1994, hereby rules:

1. A national court, seised of a request that it should draw the appropriate conclusions from an infringement of the last sentence of Article 93(3) of the Treaty, where the matter has also been referred to the Commission, which has not yet given a final decision on the question whether the State measures constitute State aid, is not required to declare that it lacks jurisdiction or to stay proceedings until such time as the Commission has adopted a position on how the measures in question are to be categorized. With a view to determining whether those measures should have been notified to the Commission, a national court may have cause to interpret and apply the concept of aid. In case of doubt, it may ask the Commission for clarification. Furthermore, it may or must, in accordance with the second and third paragraphs of Article 177 of the EC Treaty, refer a question to the Court of Justice for a preliminary ruling. Where it consults the Commission or refers a question to the Court, it must decide whether it is necessary to order interim measures in order to safeguard the interests of the parties pending final judgment.

2. The provision of logistical and commercial assistance by a public undertaking to its subsidiaries, which are governed by private law and carry on an activity open to free competition, is capable of constituting State aid within the meaning of Article 92 of the EC Treaty if the remuneration received in return is less than that which would have been demanded under normal market conditions.

3. A national court requested to order the repayment of aid must grant that application if it finds that the aid was not notified to the Commission, unless by reason of exceptional circumstances repayment is inappropriate.

4. A recipient of aid who does not verify that the aid has been notified to the Commission in accordance with Article 93(3) of the Treaty cannot incur liability solely on the basis of Community law.

Rodríguez Iglesias            Kakouris                    Puissochet

Hirsch                Mancini                Gulmann

Murray                    Jann                        Ragnemalm

Delivered in open court in Luxembourg on 11 July 1996.

R. Grass                                            G. C. Rodríguez Iglesias

Registrar                                                        President