# EXHIBIT 74

ORDONNANCE DE LA COUR (septième chambre)

22 octobre 2014 (*)

«Renvoi préjudiciel – Aides d'État – Notion d''intervention de l'État ou au moyen de ressources de l'État' – Sociétés titulaires d'installations de production d'énergie électrique – Financements extraordinaires»

Dans l'affaire C‑275/13,

ayant pour objet une demande de décision préjudicielle au titre de l'article 267 TFUE, introduite par le Tribunal Supremo (Espagne), par décision du 22 avril 2013, parvenue à la Cour le 21 mai 2013, dans la procédure

**Elcogás SA**

contre

**Administración del Estado,**

**Iberdrola SA,**

LA COUR (septième chambre),

composée de M. J.-C. Bonichot, président de chambre, MM. A. Arabadjiev et J. L. da Cruz Vilaça (rapporteur), juges,

avocat général: M. N. Jääskinen,

greffier: M. A. Calot Escobar,

considérant les observations présentées:

–    pour Elcogás SA, par M$^e$ M. Magide Herrero, abogado,

–    pour le gouvernement espagnol, par M$^{me}$ S. Centeno Huerta, en qualité d'agent,

–    pour la Commission européenne, par M$^{me}$ P. Němečková et M. É. Gippini Fournier, en qualité d'agents,

vu la décision prise, l'avocat général entendu, de statuer par voie d'ordonnance motivée, conformément à l'article 99 du règlement de procédure de la Cour,

rend la présente

## Ordonnance

1    La demande de décision préjudicielle porte sur l'interprétation de l'article 107, paragraphe 1, TFUE.

2    Cette demande a été présentée dans le cadre d'un litige opposant Elcogás SA (ci-après «Elcogás») à l'Administración del Estado et à Iberdrola SA à propos des mesures de financement dont Elcogás a

bénéficié.

## Le cadre juridique

3   La vingtième disposition additionnelle, paragraphe 1, de la loi 54/1997, sur le secteur de l'électricité (Ley 54/1997, del Sector eléctrico), du 27 novembre 1997 (BOE n° 285, du 28 novembre 1997, p. 35097, ci-après la «loi 54/1997»), dispose:

«Le gouvernement, sur rapport de la Commission déléguée aux affaires économiques, peut, à titre exceptionnel, approuver des plans de viabilité extraordinaires pour les sociétés propriétaires d'installations de production d'énergie électrique qui démontrent l'existence de difficultés financières particulières, d'une importance telle qu'elles mettent en péril le déroulement normal des activités de l'entreprise. Ces plans de viabilité extraordinaires seront considérés comme des coûts permanents de fonctionnement du système aux fins de l'article 16, paragraphe 5, de la [loi 54/1997] et seront, à ce titre, inclus dans le calcul du tarif électrique moyen ou de référence fixé dans le décret royal 1432/2002, du 27 décembre 2002.»

4   En vertu de l'article 16, paragraphe 5, de la loi 54/1997, sont considérés comme des coûts permanents de fonctionnement du système:

–   les coûts qui, au titre de l'exercice d'activités de fourniture d'énergie électrique dans des territoires insulaires et extra péninsulaires, peuvent être intégrés dans le système, conformément à l'article 12, paragraphe 3;

–   les coûts reconnus de l'opérateur du système, et

–   les coûts de fonctionnement de la Comisión Nacional de Energía (Commission nationale de l'énergie, ci-après la «CNE»).

5   L'article 17, paragraphes 1 à 3, de la loi 54/1997 prévoit:

«1.   Le ministre de l'Industrie, du Tourisme et du Commerce, sur rapport de la Commission du gouvernement déléguée aux affaires économiques, prend les dispositions nécessaires pour la mise en place des péages d'accès aux réseaux, qui sont fixés sur la base des coûts des activités réglementées correspondantes du système, y compris les coûts permanents et les coûts de la diversification et de la sécurité de l'approvisionnement.

Les péages ainsi calculés sont uniques sur tout le territoire national et ne comprennent aucune sorte d'impôt.

2.   [...]

Les péages à verser par les producteurs du régime commun et du régime spécial sont réglementés par voie réglementaire, compte tenu de l'énergie qu'ils injectent dans les réseaux.

3.   Le gouvernement établit la méthode de calcul des péages.»

6   En vertu du décret royal 2017/1997, du 26 décembre 1997 (BOE n° 310, du 27 décembre 1997, p. 38037, ci-après le «décret royal 2017/1997»), il incombe à la CNE de procéder à la liquidation des obligations de paiement et des droits à paiement au titre de la rémunération des activités de transport, de distribution et de commercialisation suivant un tarif ainsi qu'au titre des coûts permanents du système, de la diversification et de la sécurité de l'approvisionnement.

7   Les annexes du décret royal 2017/1997 définissent, les sujets de la procédure de liquidation, les formules mathématiques applicables, le système de paiement et d'acompte ainsi que la procédure de

liquidation elle-même, conformément à des paramètres objectifs prédéterminés.

8    Le gouvernement a la faculté d'approuver ou non un plan de viabilité extraordinaire. S'il approuve un tel plan, les fonds ou les apports nécessaires pour son financement sont considérés comme des coûts permanents du système aux fins du décret royal 2017/1997.

### Le litige au principal et la question préjudicielle

9    Elcogás est propriétaire d'une centrale de production thermique d'énergie électrique fonctionnant grâce à la gazéification du charbon et d'autres combustibles alternatifs.

10    La technologie utilisée engendrant des surcoûts économiques importants que les prix normaux du marché de l'électricité ne permettent pas de couvrir intégralement, Elcogás a bénéficié, au cours des années antérieures à l'année 2011, d'un mécanisme de compensation de ces surcoûts.

11    Après avoir validé le plan de viabilité présenté par Elcogás, le Conseil des ministres a autorisé cette dernière, par décision du 16 mars 2007, à recevoir, durant une période de dix ans, des apports annuels à fonds perdus intégrés au tarif de l'électricité à partir du 1$^{er}$ juillet 2006.

12    Ce plan de viabilité a été notifié à la Commission européenne le 1$^{er}$ août 2007. Le gouvernement espagnol a retiré cette notification le 21 février 2008 avant de procéder à une nouvelle notification le 21 septembre 2009 en faisant valoir que ledit plan n'entraînait pas de transfert de fonds publics. Il semblerait que cette dernière notification ait également été retirée.

13    Par l'arrêté ITC/3353/2010, fixant les péages d'accès à partir du 1$^{er}$ octobre 2011 ainsi que les tarifs et les primes des installations du régime spécial (Orden ITC/3353/2010, por la que se establecen los peajes de acceso a partir de 1 de enero 2011 y las tarifas y primas de las instalaciones del régimen especial), du 28 décembre 2010, Elcogás a perdu le bénéfice de l'apport financier qu'elle devait percevoir au titre de l'année 2011. Celle-ci a alors formé un recours en annulation devant le Tribunal Supremo.

14    Cette juridiction relève que si la mesure en cause au principal était qualifiée d'«aide d'État», au sens de l'article 107 TFUE, elle pourrait être considérée comme n'ayant pas été notifiée à la Commission. Elle estime que le mécanisme de compensation des surcoûts dont a bénéficié Elcogás constitue un avantage sélectif susceptible d'induire une distorsion de concurrence au sens de l'article 107 TFUE. Le Tribunal Supremo émet cependant des doutes quant à l'origine étatique des apports perçus par Elcogás, nés notamment du fait que le mécanisme de financement en cause ne relève pas, au sens strict, de la catégorie de l'impôt, du prélèvement fiscal et de la taxe parafiscale, mais s'apparente à un coût supplémentaire du système électrique.

15    Il est précisé que le tarif final appliqué aux consommateurs d'électricité et aux utilisateurs des réseaux de transport et de distribution comporte un poste qui est affecté au paiement aux entreprises électriques créancières tant de l'énergie fournie et de l'utilisation des réseaux que des autres «coûts permanents du système» parmi lesquels figure l'apport dont bénéficie Elcogás.

16    Le «fond commun» financé par les consommateurs d'électricité et des utilisateurs des réseaux sont distribués, par la suite, au moyen d'un mécanisme de liquidation des paiements. Pour ce faire, la CNE, organe de nature étatique, perçoit ces fonds, calcule et liquide, conformément aux règles en vigueur, les montants revenant à chacun des bénéficiaires, notamment à Elcogás. Le Tribunal Supremo précise que la CNE ne dispose, à cet égard, d'aucun pouvoir discrétionnaire pour distribuer lesdits fonds.

17    Dans ces conditions, le Tribunal Supremo a décidé de surseoir à statuer et de poser à la Cour la question préjudicielle suivante:

«L'interprétation de l'article 107, paragraphe 1, [TFUE] ainsi que la jurisprudence de la Cour de justice de l'Union européenne relative à cette disposition [notamment les arrêts (PreussenElektra, C-379/98, EU:C:2001:160, ainsi que Essent Netwerk Noord e.a., C-206/06, EU:C:2008:413)] permettent-elles de considérer que constituent une 'aide accordée par les États ou au moyen de ressources d'État' les montants annuels alloués à [Elcogás], en tant que propriétaire d'une installation particulière de production d'électricité, en vertu des plans de viabilité extraordinaires adoptés en faveur [d'Elcogás] par le Conseil des ministres, dans des conditions où la perception de ces sommes s'inscrit dans la catégorie générale des 'coûts permanents du système électrique', qui sont payés par l'ensemble des utilisateurs et transférés aux entreprises du secteur électrique grâce à des liquidations successives que la [CNE] effectue conformément aux critères légaux prédéterminés et sans aucun pouvoir discrétionnaire?»

### Sur la question préjudicielle

18    En vertu de l'article 99 de son règlement de procédure, lorsque la réponse à une question posée à titre préjudiciel peut être clairement déduite de la jurisprudence, la Cour peut à tout moment, sur proposition du juge rapporteur, l'avocat général entendu, décider de statuer par voie d'ordonnance motivée.

19    Il y a lieu de faire application de ladite disposition procédurale dans la présente affaire.

20    Par sa question, la juridiction de renvoi demande, en substance, si l'article 107, paragraphe 1, TFUE doit être interprété en ce sens que constituent une intervention de l'État ou au moyen de ressources d'État les montants alloués à une entreprise privée productrice d'électricité qui sont financés par l'ensemble des utilisateurs finaux d'électricité situés sur le territoire national et qui sont distribués aux entreprises du secteur électrique par un organisme public conformément à des critères légaux prédéterminés.

21    Pour que des avantages puissent être qualifiés d'aides au sens de l'article 107, paragraphe 1, TFUE, ils doivent, d'une part, être accordés directement ou indirectement au moyen de ressources d'État et, d'autre part, être imputables à l'État (voir arrêt Association Vent De Colère! e.a., C-262/12, EU:C:2013:851, point 16 ainsi que jurisprudence citée).

22    S'agissant, en premier lieu, de la condition tenant à l'imputabilité de la mesure, il convient d'examiner si les autorités publiques doivent être considérées comme ayant été impliquées dans l'adoption de cette mesure (voir arrêt Association Vent De Colère! e.a., EU:C:2013:851, point 17 ainsi que jurisprudence citée).

23    À cet égard, le mécanisme en cause au principal ayant été institué et étant régi par la loi 54/1997 et le décret royal 2017/1997, il doit être considéré comme imputable à l'État.

24    Concernant, en second lieu, la condition tenant à ce que l'avantage soit accordé directement ou indirectement au moyen de ressources d'État, il y a lieu de rappeler que des mesures ne comportant pas un transfert de ressources d'État peuvent néanmoins relever de la notion d'aide (voir arrêt Association Vent De Colère! e.a., EU:C:2013:851, point 19 ainsi que jurisprudence citée).

25    En effet, la notion d'intervention au moyen de ressources d'État vise à inclure, outre les avantages accordés directement par l'État, ceux accordés par l'intermédiaire d'un organisme public ou privé, désigné ou institué par cet État en vue de gérer l'aide (voir arrêt Association Vent De Colère! e.a., EU:C:2013:851, point 20 ainsi que jurisprudence citée).

26    Il convient également de relever que l'article 107, paragraphe 1, TFUE englobe tous les moyens pécuniaires que les autorités publiques peuvent effectivement utiliser pour soutenir des entreprises, sans qu'il soit pertinent que ces moyens appartiennent ou non de manière permanente au patrimoine de l'État. En conséquence, même si les sommes correspondant à la mesure en cause ne sont pas de

façon permanente en possession du Trésor public, le fait qu'elles restent constamment sous contrôle public et, donc à la disposition des autorités nationales compétentes, suffit pour qu'elles soient qualifiées de ressources d'État (voir arrêt Association Vent De Colère! e.a., EU:C:2013:851, point 21).

27   Il ressort des éléments transmis à la Cour que, dans l'affaire au principal, un arrêté ministériel fixe annuellement les péages d'accès aux réseaux de manière à ce que le paiement de ces péages couvre, notamment, des «coûts permanents de fonctionnement du système» parmi lesquels figurent ceux afférents au plan de viabilité d'Elcogás.

28   Le mécanisme de compensation des surcoûts dont bénéficie Elcogás est ainsi financé intégralement au moyen du tarif final d'électricité appliqué à l'ensemble des consommateurs espagnols et aux utilisateurs des réseaux de transport et de distribution sur le territoire national.

29   Les sommes perçues en appliquant ce tarif sont par la suite réparties et distribuées par la CNE, organe de nature étatique, conformément au décret royal 2017/1997, sans que celle-ci dispose d'un quelconque pouvoir discrétionnaire à cet égard.

30   Or, la Cour a déjà jugé qu'un mécanisme de compensation des surcoûts, dont le financement est supporté par tous les consommateurs finals d'électricité situés sur le territoire national et dont les sommes ainsi collectées sont réparties et distribuées aux entreprises bénéficiaires, conformément à la législation de l'État membre, par une entité publique doit être considéré comme une intervention de l'État ou au moyen de ressources d'État au sens de l'article 107, paragraphe 1, TFUE (voir, en ce sens, arrêt Association Vent De Colère! e.a., EU:C:2013:851, points 28 et 37).

31   À cet égard, il est sans incidence, d'une part, que les sommes destinées à compenser les surcoûts ne proviennent pas d'un supplément spécifique au tarif de l'électricité et, d'autre part, que le mécanisme de financement en cause ne relève pas, au sens strict, de la catégorie de l'impôt, du prélèvement fiscal et de la taxe parafiscale en droit national.

32   Il convient, par ailleurs, de rappeler que, contrairement à l'affaire au principal, dans l'affaire ayant donné lieu à l'arrêt PreussenElektra (EU:C:2001:160), en premier lieu, les entreprises privées étaient uniquement tenues à une obligation d'achat au moyen de leur ressources financières propres (voir, en ce sens, arrêt Essent Netwerk Noord e.a., EU:C:2008:413, point 74). En second lieu, les fonds en cause ne pouvaient être considérés comme une ressource d'État puisqu'ils n'étaient à aucun moment sous contrôle public et qu'il n'existait aucun mécanisme, instauré et réglementé par l'État membre, de compensation des surcoûts pesant sur des entreprises privées, par lequel cet État garantissait à ces entreprises la couverture de ces surcoûts (voir, en ce sens, arrêt Association Vent De Colère! e.a., EU:C:2013:851, point 36).

33   Il résulte des considérations qui précèdent qu'il y a lieu de répondre à la question préjudicielle que l'article 107, paragraphe 1, TFUE doit être interprété en ce sens que constituent une intervention de l'État ou au moyen de ressources d'État les montants alloués à une entreprise privée productrice d'électricité qui sont financés par l'ensemble des utilisateurs finaux d'électricité situés sur le territoire national et qui sont distribués aux entreprises du secteur électrique par un organisme public conformément à des critères légaux prédéterminés.

### Sur les dépens

34   La procédure revêtant, à l'égard des parties au principal, le caractère d'un incident soulevé devant la juridiction de renvoi, il appartient à celle-ci de statuer sur les dépens. Les frais exposés pour soumettre des observations à la Cour, autres que ceux desdites parties, ne peuvent faire l'objet d'un remboursement.

Par ces motifs, la Cour (septième chambre) dit pour droit:

**L'article 107, paragraphe 1, TFUE doit être interprété en ce sens que constituent une intervention de l'État ou au moyen de ressources d'État les montants alloués à une entreprise privée productrice d'électricité qui sont financés par l'ensemble des utilisateurs finaux d'électricité situés sur le territoire national et qui sont distribués aux entreprises du secteur électrique par un organisme public conformément à des critères légaux prédéterminés.**

Signatures

---

[*](#) Langue de procédure: l'espagnol.