# EXHIBIT 81

23.7.2019    EN     Official Journal of the European Union     C 247/1

II

*(Information)*

# INFORMATION FROM EUROPEAN UNION INSTITUTIONS, BODIES, OFFICES AND AGENCIES

# EUROPEAN COMMISSION

**COMMUNICATION FROM THE COMMISSION**

**Commission Notice on the recovery of unlawful and incompatible State aid**

(2019/C 247/01)

Table of contents

|  |  | Page |
|---|---|---|
| 1. | INTRODUCTION | 2 |
| 2. | GENERAL PRINCIPLES | 3 |
| 2.1. | The purpose and scope of recovery | 4 |
| 2.2. | The principle of sincere cooperation | 4 |
| 2.2.1. | The general principle | 4 |
| 2.2.2. | The principle applied to the sharing of information | 4 |
| 2.3. | The obligation to recover | 5 |
| 2.4. | Limits to the obligation to recover | 5 |
| 2.4.1. | General principles of European Union law | 5 |
| 2.4.2. | Limitation period | 9 |
| 2.5. | The application of national law and the immediate and effective execution of the Commission's recovery decisions | 10 |
| 3. | THE RESPECTIVE ROLES OF THE COMMISSION AND THE MEMBER STATE CONCERNED | 10 |
| 3.1. | The role of the Commission | 11 |
| 3.2. | The role of the Member State | 11 |
| 4. | IMPLEMENTING THE RECOVERY DECISION | 12 |
| 4.1. | Request for an extension of the deadline to execute the decision | 12 |
| 4.2. | Kick-off meeting | 13 |
| 4.3. | Identification of the beneficiaries from whom the aid must be recovered | 13 |
| 4.3.1. | Identification of the aid beneficiary belonging to a group of undertakings | 13 |
| 4.3.2. | Extension of the recovery order; economic continuity | 13 |
| 4.3.3. | The aid beneficiaries of tax measures | 15 |
| 4.4. | Quantification of the amount to be recovered | 15 |
| 4.4.1. | Tax measures | 16 |
| 4.4.2. | Calculation of recovery interest | 16 |
| 4.5. | The service of recovery orders | 17 |
| 4.6. | Provisional implementation of recovery | 17 |
| 4.7. | Alternative means of recovery | 18 |
| 4.8. | Insolvency proceedings | 19 |

4.9.    Provisional and definitive closure of recovery procedures ……………………………………………………… 20

5.    LITIGATION BEFORE NATIONAL COURTS ……………………………………………………………… 20

6.    CONSEQUENCES OF A FAILURE TO IMPLEMENT A COMMISSION RECOVERY DECISION ……………… 21

6.1.    Infringement proceedings …………………………………………………………………………………… 21

6.1.1.    Action pursuant to Article 108(2) TFEU ……………………………………………………………………… 21

6.1.2.    Actions on the basis of Article 260(2) TFEU ………………………………………………………………… 22

6.2.    The *Deggendorf* case law ……………………………………………………………………………………… 23

7.    FINAL PROVISIONS ………………………………………………………………………………………… 23

## 1. INTRODUCTION

1. Since 2012, the European Commission ('Commission') has implemented the State Aid Modernisation Agenda ('SAM') (¹). Under the SAM, the Commission has streamlined and consolidated a number of guidelines. A package of legislation has also strengthened the Member States' responsibility and increased cooperation between the Commission and Member States in the field of State aid enforcement. As a result, Member States grant more aid without prior control by the Commission. The Juncker Commission has put particular focus on this matter and since 2015, more than 96 % of new aid measures for which expenditure was reported for the first time was covered by the General Block Exemption Regulation ('GBER') (²) — an absolute increase of about 28 percentage points compared to 2013 (³). The Commission, for its part, has enhanced the downstream monitoring to ensure that Member States remove distortions to competition by recovering the aid which is paid in breach of the State aid rules. This is an important part of the Commission's overall enforcement agenda.

2. The purpose of this Notice is to explain the European Union rules and procedures governing the recovery of State aid, and how the Commission works with Member States to ensure compliance with their obligations under European Union law. It is addressed to the authorities of the Member States in charge of implementing a decision by which the Commission has ordered the recovery of State aid (a 'recovery decision').

3. In 1973, the Court of Justice of the European Union (the 'Court of Justice') established for the first time that the Commission has the power to decide that a Member State must alter or abolish a State aid found incompatible with the internal market and to require repayment of that aid (⁴). In 1983 (⁵) the Commission informed the Member States that it had decided to use all measures at its disposal to ensure that Member States fulfil their obligations under current Article 108(3) of the Treaty on the Functioning of the European Union ('TFEU') (⁶), including the requirement to recover aid granted in breach of European Union State aid rules.

4. In the second half of the 1980s and in the 1990s, the Commission started ordering more systematically that Member States recover incompatible aid. In 1999, Council Regulation (EC) No 659/1999 (⁷), now replaced by Council Regulation (EU) 2015/1589 (⁸) (the 'Procedural Regulation'), introduced basic rules on recovery. More detailed implementing provisions were laid down in Commission Regulation (EC) No 794/2004 (⁹) (the 'Implementing Regulation').

5. In 2007, the Commission explained its policy and practice in the Notice 'Towards an effective implementation of Commission decisions ordering Member States to recover unlawful and incompatible State aid' (the '2007 Recovery Notice') (¹⁰).

(¹) Communication from the Commission to the European Parliament, the Council, the European Economic and Social Committee and the Committee of the Regions – EU State Aid Modernisation (SAM), COM/2012/0209 final.

(²) Commission Regulation (EU) No 651/2014 of 17 June 2014 declaring certain categories of aid compatible with the internal market in application of Articles 107 and 108 of the Treaty (OJ L 187, 26.6.2014, p. 1).

(³) See http://ec.europa.eu/competition/state_aid/scoreboard/index_en.html

(⁴) See Judgment of the Court of Justice of 12 July 1973, *Commission v Germany ('Kohlegesetz')*, C-70/72, ECLI:EU:C:1973:87, paragraph 13.

(⁵) Commission communication (OJ C 318, 24.11.1983, p. 3).

(⁶) OJ C 202, 7.6.2016, p. 47.

(⁷) Council Regulation (EC) No 659/1999 of 22 March 1999 laying down detailed rules for the application of Article 93 of the EC Treaty (OJ L 83, 27.3.1999, p. 1).

(⁸) Council Regulation (EU) 2015/1589 of 13 July 2015 laying down detailed rules for the application of Article 108 of the Treaty on the Functioning of the European Union (codification) (OJ L 248, 24.9.2015, p. 9).

(⁹) Commission Regulation (EC) No 794/2004 of 21 April 2004 implementing Council Regulation (EC) No 659/1999 laying down detailed rules for the application of Article 93 of the EC Treaty (OJ L 140, 30.4.2004, p. 1).

(¹⁰) OJ C 272, 15.11.2007, p. 4.

6. Since then, the Commission's practice and the case law of the General Court and the Court of Justice (together, the 'Union Courts') has evolved. This Notice explains those developments and replaces the 2007 Recovery Notice.

7. This Notice forms part of the modernised State aid control framework introduced by the SAM, by assisting Member States in their responsibilities for ensuring the correct enforcement of State aid rules, promoting better cooperation between the Commission and Member States, and increasing further the predictability of the Commission's actions.

8. Furthermore, this Notice aims to contribute to a robust enforcement of competition policy, in line with the Commission's priority to remedy distortions of competition that undermine the level playing field in the internal market. On the one hand, the enforcement of recovery policy spurs efficiency and growth in the internal market. On the other hand, enhanced cooperation between the Commission and Member States may reduce the recourse to infringement proceedings.

9. This Notice does not create or alter any right or obligation as compared to those laid down in the Treaty on the Functioning of the European Union, the Procedural Regulation and the Implementing Regulation as interpreted by the Union Courts.

## 2. GENERAL PRINCIPLES

10. The TFEU prevents Member States from giving financial advantages to undertakings in a way which could distort competition in the internal market. Under Article 107(1) TFEU, State aid is incompatible with the internal market, unless it falls within the categories of exceptions laid down in paragraphs (2) and (3) of that same Article. Articles 42, 93, 106(2), 108(2) and 108(4) TFEU also provide for conditions under which State aid is or may be considered compatible with the internal market.

11. Under Article 108(2) TFEU, the Commission has exclusive competence to assess the compatibility of an aid measure with the internal market [11]. The assessment of the Commission is subject to review by the General Court and the Court of Justice [12].

12. Article 108(3) TFEU provides that each Member State must notify in advance to the Commission any plans to grant or alter aid. It prohibits Member States from putting into effect the proposed aid measure before the Commission has adopted a final decision on its compatibility with the internal market (the so-called 'standstill obligation').

13. New aid [13] implemented without notification to the Commission or before its approval is unlawful [14]. As the standstill obligation has direct effect [15], national courts must draw all consequences from the unlawfulness of the aid. In particular, the Member State concerned must in principle put an end to its implementation and, when already implemented, order its recovery in the absence of exceptional circumstances [16]. The Commission, for its part, has also to establish the incompatibility of the unlawful aid with the internal market before ordering its recovery [17].

---

[11] See Judgment of the Court of Justice of 21 November 1991, *Fédération nationale du commerce extérieur des produits alimentaires and Others v France ('Saumon')*, C-354/90, ECLI:EU:C:1991:440, paragraph 14; Judgment of the Court of Justice of 15 December 2005, *Unicredito Italiano*, C-148/04, ECLI:EU:C:2005:774, paragraph 42.

[12] See Judgment of the Court of Justice of 8 December 2011, *Residex Capital IV*, C-275/10, ECLI:EU:C:2011:814, paragraph 27.

[13] See Article 1(c) of Council Regulation (EU) 2015/1589 of 13 July 2015 laying down detailed rules for the application of Article 108 of the Treaty on the Functioning of the European Union (codification) (OJ L 248, 24.9.2015, p. 9).

[14] Under Articles 109 and 108(4) TFEU, some categories of State aid may be exempted from the obligation to notify it to the Commission, under the so-called 'exemption Regulations'. Any aid granted pursuant to an exemption Regulation without meeting the conditions for exemption from notification established therein is also unlawful. See Judgment of the Court of Justice of 5 March 2019, *Eesti Pagar*, C-349/17, ECLI:EU:C:2019:172, paragraphs 84-87. Article 108(2) TFEU also provides for the exceptional and specific case in which the Council may decide that aid is compatible with the internal market. See Judgment of the Court of Justice of 4 December 2013, *Commission v Council*, C-117/10, ECLI:EU:C:2013:786, paragraph 51.

[15] See Judgment of the Court of Justice of 21 November 1991, *Fédération nationale du commerce extérieur des produits alimentaires and Others v France ('Saumon')*, C-354/90, ECLI:EU:C:1991:440, paragraph 11; Judgment of the Court of Justice of 21 November 2013, *Deutsche Lufthansa*, C-284/12, ECLI:EU:C:2013:755, paragraph 29.

[16] To that effect, see Judgment of the Court of Justice of 11 July 1996, *SFEI and Others*, C-39/94, ECLI:EU:C:1996:285, paragraphs 68-71. See also Judgment of the Court of Justice of 5 March 2019, *Eesti Pagar*, C-349/17, ECLI:EU:C:2019:172, paragraphs 92-94. For additional information on the role of national courts in the enforcement of State aid rules, see the Commission Notice on the enforcement of State aid law by national courts (OJ C 85, 9.4.2009, p. 1), or any legal act amending or replacing it.

[17] The Court has clarified that the Commission cannot request recovery of unlawful aid without first examining the compatibility of the aid with the internal market under the procedure provided for by Article 108(2) TFEU. To that effect, see Judgment of the Court of Justice of 14 February 1990, *France v Commission ('Boussac')*, C-301/87, ECLI:EU:C:1990:67, paragraphs 9, 10-22. This does not preclude the possibility for the Commission to issue a recovery injunction in specific cases, see paragraph 27.

14. While the TFEU does not contain any explicit provision on the recovery of unlawful State aid, the Court of Justice has ruled that recovery is the necessary corollary of the general prohibition of State aid established by Article 107(1) TFEU and protects the effectiveness of the standstill obligation enshrined in Article 108(3) TFEU (¹⁸).

15. The Union Courts have subsequently provided further guidance on the scope of the recovery obligation and on how to meet it. The rules and procedures in the Procedural Regulation and the Implementing Regulation are based on that case law.

## 2.1. The purpose and scope of recovery

16. The purpose of recovery is to restore the situation which existed in the internal market before the aid was paid (¹⁹). By paying back the unlawful aid, in fact, its recipient forfeits the advantage which it has enjoyed over its competitors (²⁰). To eliminate any advantages incidental to the unlawful aid, interest on the aid amount unlawfully granted (the 'recovery interest') is also to be recovered. By paying the recovery interest the aid beneficiary forfeits the financial advantage arising from the availability of the aid in question, free of charge, from the date it was put at the disposal of the beneficiary until it is paid back (²¹).

17. Article 16(1) of the Procedural Regulation requires the Commission to order recovery of unlawful and incompatible aid unless that would be contrary to a general principle of European Union law. The Commission orders a Member State to recover the aid through a recovery decision.

18. Article 16(2) of the Procedural Regulation establishes that the aid must be recovered together with the interest accrued until the date of its effective recovery; the Implementing Regulation sets out the method for calculating the recovery interest (see section 4.4.2).

19. Lastly, Article 16(3) of the Procedural Regulation states that 'recovery shall be effected without delay and in accordance with the procedures under the national law of the Member State concerned, provided that they allow for the immediate and effective execution of the Commission decision'.

## 2.2. The principle of sincere cooperation

### 2.2.1. The general principle

20. Article 4(3) of the Treaty on European Union (²²) ('TEU') requires Member States to facilitate the achievement of the European Union's tasks. Pursuant to the principle of sincere cooperation, the European Union and Member States must assist each other in carrying out those tasks, with a view to attaining the objectives of the European Union.

21. This principle, which is applicable in all relations between the Commission and the Member States, is particularly important for the State aid recovery policy (²³).

22. The Commission and the Member States must cooperate in good faith in all phases of State aid proceedings, especially during an investigation pursuant to Article 108(2) TFEU. Good cooperation already during the investigation may allow for easier and faster execution of a recovery decision.

### 2.2.2. The principle applied to the sharing of information

23. The Member State concerned by a recovery decision must report to the Commission regularly about its implementation. That cooperation allows the Commission to assess the correct execution of a recovery decision and to better identify any need for assistance.

24. In particular, the Commission may share examples of spreadsheets for the Member State to provide information on aid beneficiaries and aid amounts. The Commission may also share mock calculations of aid to be recovered, based on the formulae or methodologies established in the relevant recovery decision.

(¹⁸) See Judgment of the Court of Justice of 11 December 1973, *Lorenz GmbH v Bundesrepublik Deutschland and Others*, C-120/73, ECLI:EU:C:1973:152, paragraphs 3 and 4.
(¹⁹) See Judgment of the Court of Justice of 11 December 2012, *Commission v Spain ('Magefesa II')*, C-610/10, ECLI:EU:C:2012:781, paragraph 105.
(²⁰) See Judgment of the Court of Justice of 4 April 1995, *Commission v Italy ('ALFA Romeo')*, C-348/93, ECLI:EU:C:1995:95, paragraph 27.
(²¹) See Judgment of the Court of First Instance of 8 June 1995, *Siemens v Commission*, T-459/93, ECLI:EU:T:1995:100, paragraphs 97-101.
(²²) OJ C 202, 7.6.2016, p. 13.
(²³) See Judgment of the Court of Justice of 11 September 2014, *Commission v Germany ('Biria Gruppe')*, C-527/12, ECLI:EU:C:2014:2193, paragraph 51 and 56.

25. In that context, the Commission, in line with the recovery decision, may assist the Member State concerned by elaborating on the standard of proof and the type of evidence required to determine, among other things, the identity of the aid beneficiaries, the amount of aid subject to recovery and the amounts finally recovered. The Commission may also share examples of escrow agreements (see paragraph 118).

## 2.3. The obligation to recover

26. Recovery of State aid is not a penalty [24] but rather the logical consequence of the finding that it is unlawful [25], and it cannot depend on the form in which the aid was granted [26]. Recovery can therefore neither be regarded as disproportionate to the objectives of the TFEU with regard to State aid [27], nor as entailing unjust enrichment for the Member State concerned, since it merely provides for the restitution of an amount that should not have been paid to the beneficiary [28].

27. Pursuant to Article 13(2) of the Procedural Regulation, the Commission can use its discretion and adopt a recovery injunction already during its investigation of the aid measures concerned — i.e. before adopting a final decision on the compatibility of the aid measures with the internal market — provided a series of cumulative criteria are fulfilled.

28. On the contrary, where adopting a decision finding that aid is incompatible with the internal market ('negative decision'), the Commission has no discretion and must order the recovery of the aid [29] unless that would be contrary to a general principle of European Union law. For this reason, once the Commission has established that an aid measure is unlawful and incompatible with the internal market, it is not required to state additional reasons to order its recovery [30].

29. Irrespective of the source of the recovery obligation, be that a recovery injunction or a recovery decision, the Member State concerned must implement recovery effectively and immediately, in accordance with Article 16(2) and Article 16(3) of the Procedural Regulation. The measures taken by the Member State cannot only aim at an immediate and effective execution of the recovery decision, but must actually attain it [31].

## 2.4. Limits to the obligation to recover

### 2.4.1. General principles of European Union law

30. Under Article 288 TFEU, decisions are binding in their entirety upon those to whom they are addressed. In the case of State aid, the Commission addresses its decision to the Member State concerned, which is obliged to execute it [32] by making use of all the measures necessary to ensure its implementation, including interim measures [33]. Commission decisions are presumed to be lawful and remain binding in all respects also while proceedings before the Union Courts are pending [34].

31. In line with the Union Courts' case law and Article 16(1) of the Procedural Regulation, the Commission does not require recovery of State aid if this would be contrary to a general principle of European Union law.

[24] See Judgment of the Court of Justice of 17 June 1999, *Belgium v Commission ('Maribel bis/ter scheme')*, C-75/97, ECLI:EU:C:1999:311, paragraph 65.

[25] See Judgment of the Court of Justice of 21 December 2016, *Commission v Aer Lingus*, C-164/15 P and C-165/15 P, ECLI:EU:C:2016:990, paragraphs 114 and 116.

[26] See Judgment of the Court of Justice of 17 September 2015, *Commission v Italy ('Venice and Chioggia II')*, C-367/14, ECLI:EU:C:2015:611, paragraph 41.

[27] See Judgment of the Court of Justice of 21 March 1990, *Belgium v Commission ('Tubemeuse')*, C-142/87, ECLI:EU:C:1990:125, paragraph 66.

[28] See Judgment of the General Court of 1 March 2017, *SNCM v Commission*, T-454/13, ECLI:EU:T:2017:134, paragraph 269.

[29] See Judgment of the Court of Justice of 7 March 2002, *Italy v Commission ('Employment Measures I')*, C-310/99, ECLI:EU:C:2002:143, paragraph 99.

[30] See Judgment of the General Court of 20 September 2011, *Regione autonoma della Sardegna and Others v Commission*, T-394/08, T-408/08, T-453/08 and T-454/08, ECLI:EU:T:2011:493, paragraph 152.

[31] See Judgment of the Court of Justice of 29 March 2012, *Commission v Italy ('Hotel industry in Sardinia')*, C-243/10, ECLI:EU:C:2012:182, paragraph 35.

[32] See Article 31(2) of the Procedural Regulation, stating that negative decisions shall be addressed to the Member State concerned.

[33] See Judgment of the Court of Justice of 14 November 2018, *Commission v Greece ('Hellenic Shipyards II')*, C-93/17, ECLI:EU:C:2018:903, paragraph 69.

[34] See Judgment of the Court of Justice of 9 July 2015, *Commission v France ('Lignes maritimes Marseille-Corse')*, C-63/14, ECLI:EU:C:2015:458, paragraph 44.

32. Neither the TEU nor the TFEU identify or list the general principles of European Union law; instead, the Union Courts have derived them from the general principles common to the laws of the Member States. The following paragraphs deal with the general principles of European Union law most frequently invoked in the context of the implementation of the recovery obligation.

33. While these principles inspire the whole European Union legal framework, in the context of State aid recovery policy they are subject to a restrictive interpretation ($^{35}$). Therefore, generic claims about an alleged infringement of a general principle of European Union law cannot be accepted.

### 2.4.1.1. The principle of legal certainty

34. The principle of legal certainty requires that legal rules be clear, precise and predictable in their effect, so that interested parties can ascertain their position in situations and legal relationships governed by European Union law ($^{36}$). Therefore, Member States and aid beneficiaries are afforded protection against a recovery order in case of a breach of legal certainty.

35. The Union Courts have given a restrictive interpretation of the principle of legal certainty and have accepted that recovery be limited only in exceptional circumstances, to be assessed on a case-by-case basis.

36. Where State aid has been granted in breach of the standstill obligation, a delay by the Commission in exercising its supervisory powers and ordering recovery of the aid is not a sufficient legal ground to limit or exclude recovery ($^{37}$).

37. In addition, the principles of the primacy and effectiveness of European Union law mean that Member States and aid beneficiaries cannot rely on the principle of legal certainty to limit recovery in case of an alleged conflict between national and European Union law. European Union law prevails and national rules must be left unapplied or interpreted in a way that preserves the effectiveness of European Union law ($^{38}$).

38. Under the law of certain Member States, the national legal basis of an aid measure becomes null and void from the date of its entry into force as a consequence of the adoption of a Commission recovery decision. In light of the principle of effectiveness, any such provision under national law cannot affect the lawfulness of the Commission decision and the obligation to recover. Recovery cannot depend on the consequences under national law of the failure to comply with the standstill obligation ($^{39}$).

### 2.4.1.2. The principle of the protection of legitimate expectations

39. The principle of the protection of legitimate expectations ($^{40}$) is a corollary of the principle of legal certainty and the Union Courts have applied them in conjunction. It concerns any person who can entertain expectations which are justified and well founded, having received precise, unconditional and consistent assurances from the competent institutions of the European Union. Those assurances must be given in accordance with the applicable rules ($^{41}$). Thus, this principle protects justified expectations of Member States and aid beneficiaries that the Commission will not order the recovery of aid.

($^{35}$) See Judgment of the General Court of 20 September 2011, *Regione autonoma della Sardegna and Others v Commission*, T-394/08, T-408/08, T-453/08 and T-454/08, ECLI:EU:T:2011:493, paragraph 283.

($^{36}$) See Judgment of the Court of Justice of 15 February 1996, *Duff and Others*, C-63/93, ECLI:EU:C:1996:51, paragraph 20.

($^{37}$) The principle of legal certainty has the effect of preventing the Commission from indefinitely delaying the exercise of its powers. However, the Court of Justice established that 'a delay by the Commission in exercising its supervisory powers and ordering recovery of the aid does not render that recovery decision unlawful, except in exceptional cases which show that the Commission manifestly failed to act and clearly breached its duty of diligence': see Judgment of the Court of Justice of 22 April 2008, *Commission v Salzgitter*, C-408/04 P, ECLI:EU:C:2008:236, paragraph 106. In the *GIE Fiscaux* case, the Commission decided that due to the specific combination of exceptional circumstances in that case, recovery had to be limited to the aid granted after the date of the Commission decision to initiate the formal investigation pursuant to Article 6 of the Procedural Regulation, in order to protect the principle of legal certainty. See Commission Decision of 20 December 2006 on the aid scheme implemented by France under Article 39 CA of the General Tax Code — State aid C 46/2004 (ex NN 65/2004) (OJ L 112, 30.4.2007, p. 41).

($^{38}$) See Judgment of the Court of Justice of 5 October 2006, *Commission v France ('Scott')*, C-232/05, ECLI:EU:C:2006:651, paragraphs 50-53.

($^{39}$) See Judgment of the General Court of 7 October 2010, *DHL Aviation and DHL Hub Leipzig v Commission*, T-452/08, ECLI:EU:T:2010:427, paragraphs 34 and 41.

($^{40}$) On the principle of the protection of legitimate expectations, see Judgment of the Court of Justice of 20 September 1990, *Commission v Germany*, C-5/89, ECLI:EU:C:1990:320, paragraphs 13 and 14.

($^{41}$) See Judgment of the Court of Justice of 24 March 2011, *ISD Polska and Others v Commission*, C-369/09 P, ECLI:EU:C:2011:175, paragraph 123; Judgment of the Court of Justice of 16 December 2010, *Kahla Thüringen Porzellan v Commission*, C-537/08 P, ECLI:EU:C:2010:769, paragraph 63; Judgment of the Court of Justice of 16 December 2008, *Masdar (UK) v Commission*, C-47/07 P, ECLI:EU:C:2008:726, paragraphs 34 and 81.

23.7.2019     EN     Official Journal of the European Union     C 247/7

40. In view of the mandatory nature of Article 108(3) TFEU, a Member State whose authorities have granted aid in breach of the standstill obligation may not plead that that infringement creates a legitimate expectation for a beneficiary that the aid would not be recovered. Otherwise, Article 107 and Article 108 TFEU would be deprived of any effect (⁴²).

41. Similarly, in case of breach of the standstill obligation, the aid beneficiary cannot claim to entertain legitimate expectations that the grant of the aid was lawful, unless exceptional circumstances apply (⁴³). A diligent business operator should be able to determine whether the aid was duly approved by the Commission (⁴⁴). This principle also applies to small undertakings (⁴⁵).

42. The Union Courts have identified a series of situations which do not give rise to legitimate expectations and which, therefore, cannot limit or preclude recovery of the aid concerned. In particular, the following situations do not create legitimate expectations:

— the silence of the Commission on an aid measure notified to it (⁴⁶);

— any apparent failure of the Commission to react to an aid measure which was not notified (⁴⁷);

— the adoption of a decision opening a formal investigation pursuant to Article 6 of the Procedural Regulation, in which the Commission merely carries out a provisional assessment of the aid measures at issue, since an aid beneficiary cannot base legitimate expectations on a provisional decision (⁴⁸);

— absence of action by the Commission for a relatively long period (⁴⁹);

— an earlier decision from the Commission (⁵⁰);

— the adoption of several successive Commission decisions authorising the grant of aid, subsequently annulled by the Union Courts (⁵¹);

(⁴²) See Judgment of the Court of Justice of 9 June 2011, *Diputación Foral de Vizcaya and Others v Commission*, C-465/09 P to C-470/09 P, ECLI:EU:C:2011:372, paragraph 150.

(⁴³) See Judgment of the General Court of 15 November 2018, *Deutsche Telekom v Commission*, T-207/10, ECLI:EU:T:2018:786, paragraph 42. The Court of Justice has recognised the existence of legitimate expectations of an aid beneficiary only once, in the *RSV* judgment. See Judgment of the Court of Justice of 24 November 1987, *RSV v Commission*, C-223/85, ECLI:EU:C:1987:502. However, the Union Courts have underlined the exceptional circumstances of that case, by refusing to extend the protection of legitimate expectations beyond the exceptional situation identified in *RSV*; for instance, see Judgment of the Court of First Instance of 14 January 2004, *Fleuren Compost v Commission*, T-109/01, ECLI:EU:T:2004:4, paragraphs 145-148 and Judgment of the Court of Justice of 29 April 2004, *Italy v Commission*, C-298/00 P, ECLI:EU:C:2004:240, paragraph 90.

(⁴⁴) See Judgment of the Court of Justice of 20 March 1997, *Land Rheinland-Pfalz v Alcan Deutschland*, C-24/95, ECLI:EU:C:1997:163, paragraph 25.

(⁴⁵) See Judgment of the Court of Justice of 29 April 2004, *Italy v Commission*, C-298/00 P, ECLI:EU:C:2004:240, paragraph 88.

(⁴⁶) See Judgment of the Court of First Instance of 30 November 2009, *France v Commission*, T-427/04 and T-17/05, ECLI:EU:T:2009:474, paragraph 261.

(⁴⁷) See Judgment of the Court of Justice of 8 December 2011, *France Télécom v Commission*, C-81/10 P, ECLI:EU:C:2011:811, paragraphs 58-60.

(⁴⁸) See Judgment of the General Court of 27 February 2013, *Nitrogénművek Vegyipari v Commission*, T-387/11, ECLI:EU:T:2013:98, paragraph 121; Judgment of the Court of First Instance of 25 March 2009, *Alcoa Trasformazioni v Commission*, T-332/06, ECLI:EU:T:2009:79, paragraph 61.

(⁴⁹) See Judgment of the Court of Justice of 28 July 2011, *Diputación Foral de Vizcaya and Others v Commission*, C-471/09 P to C-473/09 P, ECLI:EU:C:2011:521, paragraphs 64-65, 68, 75-77.

(⁵⁰) A previous decision finding that a certain measure does not constitute State aid or declaring a certain State aid measure compatible with the internal market must be read as strictly applicable to the particular facts and circumstances of that specific case. Each case must be assessed on its own merits. Thus, for instance, the Court of Justice held that an earlier decision declaring a measure as not constituting State aid for a limited duration and based on the circumstances prevailing at a given time cannot give rise to legitimate expectations as to the future assessment of the State aid nature of a similar measure. See Judgment of the Court of Justice of 21 July 2011, *Alcoa Trasformazioni v Commission*, C-194/09 P, ECLI:EU:C:2011:497, paragraphs 72-75. A different situation occurs if the Commission alters its appraisal of a measure on the basis only of a more rigorous application of the Treaty rules on State aid. In this circumstance, the Court concluded that the aid beneficiaries were entitled to expect that a Commission decision reversing its previous approach would give them the time necessary to address that change and therefore they benefit from the protection of legitimate expectations. To that effect, see Judgment of the Court of Justice of 22 June 2006, *Belgium v Commission ('Forum 187')*, C-182/03 and C-217/03, ECLI:EU:C:2006:416, paragraph 71.

(⁵¹) In the *CELF II* judgment, the Court of Justice held that the unusual succession of annulments reflects, in principle, the difficulty of the case and, far from giving rise to legitimate expectations, would rather appear likely to increase the aid beneficiary's doubts as to the compatibility of the disputed aid. See Judgment of the Court of Justice of 11 March 2010, *CELF and ministre de la Culture et de la Communication ('CELF II')*, C-1/09, ECLI:EU:C:2010:136, paragraphs 51-52 and 55.

C 247/8          EN          Official Journal of the European Union          23.7.2019

— a proposal for a decision from the Commission submitted to the Council ([52]).

### 2.4.1.3. The principle of res judicata

43. The principle of *res judicata* establishes that 'judicial decisions which have become definitive after all rights of appeal have been exhausted or after expiry of the time limits provided to exercise those rights can no longer be called into question' ([53]).

44. The Court of Justice recognised the importance of this principle in both the legal order of the European Union and the legal systems of the Member States ([54]). However, since its application cannot undermine the primacy and effectiveness of European Union law, the principle of *res judicata* cannot be used to justify an infringement of European Union law and to preclude the recovery of State aid ([55]).

45. Under the principle of primacy of European Union law, European Union State aid rules prevail over conflicting national laws, which must be left unapplied. This holds true also for national rules and judicial rulings whose effect is that the application of the principle of *res judicata* breaches European Union State aid rules.

46. With specific regard to unlawful aid, while the rules implementing the principle of res judicata are a matter for the legal system of each Member State in accordance with the principle of procedural autonomy, they cannot render any final decision by a national court an obstacle, nor can they have the consequence of making it impossible for the national courts or authorities to drawing the necessary consequences from the breach of the standstill obligation ([56]).

### 2.4.1.4. Absolute impossibility to recover

47. The principle that 'no one is obliged to do the impossible' is among the general principles of European Union law ([57]). The existence of exceptional circumstances which make it absolutely impossible for a Member State to implement the recovery decision is the only situation recognised by the Court of Justice as justifying the Member State's failure to implement that decision ([58]).

48. Absolute impossibility has been construed by the Union Courts in a restrictive manner. A Member State must demonstrate that it attempted, in good faith, to recover the aid and it must cooperate with the Commission in accordance with Article 4(3) TEU, with a view to overcoming the difficulties encountered ([59]).

49. The burden of proof is on the Member State to demonstrate the existence of reasons justifying the absence of recovery ([60]) or only partial recovery of the incompatible aid. The type of evidence necessary to prove absolute impossibility to recover depends on the specific features of each case.

50. The Member State concerned cannot demonstrate the absolute impossibility of implementing a recovery decision by merely informing the Commission of legal, political, practical or internal difficulties ([61]).

---

([52]) See Judgment of the Court of Justice of 24 March 2011, *ISD Polska and Others v Commission*, C-369/09 P, ECLI:EU:C:2011:175, paragraph 124.

([53]) See Judgment of the Court of Justice of 22 December 2010, *Commission v Slovakia ('Frucona Košice')*, C-507/08, ECLI:EU:C:2010:802, paragraph 59.

([54]) See Judgment of the Court of Justice of 24 January 2013, *Commission v Spain ('Magefesa')*, C-529/09, ECLI:EU:C:2013:31, paragraph 64.

([55]) See Judgment of the Court of Justice of 18 July 2007, *Lucchini*, C-119/05, ECLI:EU:C:2007:434, paragraphs 61-63; Judgment of the Court of Justice of 11 November 2015, *Klausner Holz Niedersachsen*, C-505/14, ECLI:EU:C:2015:742, paragraph 45.

([56]) See Judgment of the Court of Justice of 11 November 2015, *Klausner Holz Niedersachsen*, C-505/14, ECLI:EU:C:2015:742, paragraph 40; see also Judgment of the Court of Justice of 5 March 2019, *Eesti Pagar*, C-349/17, ECLI:EU:C:2019:172, paragraph 138 and 139.

([57]) Judgment of the Court of Justice of 6 November 2018, *Scuola Elementare Maria Montessori v Commission*, C-622/16 P to C-624/16 P, ECLI:EU:C:2018:873, paragraph 79.

([58]) See Judgment of the Court of Justice of 9 November 2017, *Commission v Greece ('Larco')*, C-481/16, ECLI:EU:C:2017:845, paragraph 28.

([59]) See Judgment of the Court of Justice of 12 February 2015, *Commission v France ('Plans de Campagne')*, C-37/14, ECLI:EU:C:2015:90, paragraph 67.

([60]) See, to that effect, Judgment of the Court of Justice of 9 July 2015, *Commission v France ('Lignes maritimes Marseille-Corse')*, C-63/14, ECLI:EU:C:2015:458, paragraphs 52 and 53.

([61]) See Judgment of the Court of Justice of 9 November 2017, *Commission v Greece ('Larco')*, C-481/16, ECLI:EU:C:2017:845, paragraph 29; see also Judgment of the Court of Justice of 6 November 2018, *Scuola Elementare Maria Montessori v Commission*, C-622/16 P to C-624/16 P, ECLI:EU:C:2018:873, paragraphs 91 and 95.

23.7.2019 | EN | Official Journal of the European Union | C 247/9

51. Thus, the Member State concerned, in order to justify its failure to comply with a recovery decision, cannot plead the existence of absolute impossibility based on requirements of national law, such as national limitation periods ([62]), the absence of a right under national law to impose recovery ([63]) or a legal vacuum ([64]). Equally, a Member State cannot plead provisions, practices or situations prevailing in its domestic legal order, including concerns of social unrest ([65]), to justify its failure to observe obligations arising from European Union law ([66]). Only in very specific cases may the basis for an absolute impossibility be a legal one, provided that it complies with European Union law ([67]).

52. The Member State must identify and adopt the necessary measures without delay ([68]). To attain that result, the Member State concerned may have to adopt new legal acts, including legislation, or to set aside provisions of national law which do not allow for a swift removal of the difficulties encountered. Lastly, the attempts to recover must be exhaustive and duly substantiated with evidence ([69]).

53. Nor is the obligation to recover the aid affected by the economic situation of the beneficiary. The fact that an undertaking is in financial difficulties or even insolvent does not constitute proof that recovery is impossible ([70]), unless it has been liquidated and no assets are recoverable ([71]) (see section 4.8). In addition, the aid is impossible to recover where the beneficiary has already ceased to exist, without any legal and economic successor (see paragraph 135).

54. The aim of recovery is not to maximise the Member States' return but to restore the situation that existed in the internal market before the aid was granted. Consequently, possible losses for a Member State in its capacity as a shareholder or creditor do not justify its failure to fulfil the recovery obligation.

55. While the absolute impossibility to recover is typically an issue which arises during the execution of a recovery decision, the absolute impossibility to recover may already be established during the Commission's formal investigation pursuant to Article 6 of the Procedural Regulation ([72]).

### 2.4.2. Limitation period

56. Article 17(1) of the Procedural Regulation establishes that the powers of the Commission to order the recovery of aid are subject to a limitation period of 10 years (the 'limitation period').

57. Pursuant to Article 17(2) of the Procedural Regulation, the limitation period begins on the day on which the unlawful aid is awarded to the beneficiary ([73]), either as individual aid or as aid under an aid scheme ([74]). In the case of an aid scheme, the limitation period does not run from the date of adoption of its legal basis but from the moment the individual aid is granted under that scheme ([75]).

---

([62]) See Judgment of the Court of Justice of 20 March 1997, *Land Rheinland-Pfalz v Alcan Deutschland*, C-24/95, ECLI:EU:C:1997:163, paragraphs 34-37.

([63]) See Judgment of the Court of Justice of 21 March 1991, *Italy v Commission ('Lanerossi')*, C-303/88, ECLI:EU:C:1991:136, paragraphs 52 and 60.

([64]) See Judgment of the Court of Justice of 17 October 2013, *Commission v Greece ('Ellinikos Xrysos')*, C-263/12, ECLI:EU:C:2013:673, paragraph 36.

([65]) To that effect, the Court has clarified that 'as regards the possible outbreak of social unrest which might jeopardise public order, the Court has consistently held, as the Advocate General noted in paragraph 86 of his Opinion, that where such unrest is threatened, it is for the Member State to adopt all appropriate measures to guarantee the full scope and effect of European Union law so as to ensure its proper implementation in the interests of all economic operators, concerned unless it can show that action on its part would have consequences for public order with which it could not cope by using the means at its disposal'. See Judgment of the Court of Justice of 9 July 2015, *Commission v France ('Lignes maritimes Marseille-Corse')*, C-63/14, ECLI:EU:C:2015:458, paragraph 52.

([66]) See Judgment of the Court of Justice of 17 September 2015, *Commission v Italy ('Venice and Chioggia II')*, C-367/14, ECLI:EU:C:2015:611, paragraph 51.

([67]) See Judgment of the Court of Justice of 11 September 2014, *Commission v Germany ('Biria Gruppe')*, C-527/12, ECLI:EU:C:2014:2193, paragraph 49.

([68]) See Judgment of the Court of Justice of 9 July 2015, *Commission v France ('Lignes maritimes Marseille-Corse')*, C-63/14, ECLI:EU:C:2015:458, paragraph 49.

([69]) See Judgment of the Court of Justice of 9 July 2015, *Commission v France ('Lignes maritimes Marseille-Corse')*, C-63/14, ECLI:EU:C:2015:458, paragraph 57.

([70]) See Judgment of the Court of Justice of 15 January 1986, *Commission v Belgium*, C-52/84, ECLI:EU:C:1986:3, paragraph 14.

([71]) See Judgment of the Court of Justice of 2 July 2002, *Commission v Spain*, C-499/99, ECLI:EU:C:2002:408, paragraph 37.

([72]) See Judgment of the Court of Justice of 6 November 2018, *Scuola Elementare Maria Montessori v Commission*, C-622/16 P to C-624/16 P, ECLI:EU:C:2018:873, paragraphs 82 and 84.

([73]) Judgment of the General Court of 25 January 2018, *BSCA v Commission*, T-818/14, ECLI:EU:T:2018:33, paragraph 72.

([74]) The notions of 'aid scheme' and 'individual aid' are defined, respectively, in Article 1(d) and (e) of the Procedural Regulation.

([75]) See Judgment of the Court of Justice of 8 December 2011, *France Télécom v Commission*, C-81/10 P, ECLI:EU:C:2011:811, paragraph 80.

58. The date on which aid was granted depends on the nature of the aid in question. For a multiannual scheme entailing payments or other financial advantages granted on a periodic basis, the date of adoption of the legal basis of the aid scheme and the date on which the undertakings concerned will actually be granted the aid may be a considerable period of time apart. In this case, for the purpose of calculating the limitation period the aid must be regarded as not having been awarded to the beneficiary until the date on which it was actually received by the beneficiary ([76]).

59. The principle referred to in paragraph 58 also applies to an aid scheme entailing fiscal measures granted on a periodic basis (for instance, tax reliefs on every annual or biannual tax declaration, etc.), for which the limitation period starts running for each fiscal exercise on the date on which the tax is due.

60. To enforce a recovery decision, the Member State concerned may have to perform controls, for example tax audits of certain fiscal years, even when that would be time-barred under national law. In that case, national prescription rules cannot justify a failure to fulfil the recovery obligation and must be left unapplied, if need be ([77]).

61. Since the investigation of an aid measure is a bilateral procedure between the Member State and the Commission, after the limitation period has started running it can be interrupted by any action undertaken by the Commission or by the Member State at the Commission's request ([78]). This is the case irrespective of whether the action has been notified to the aid beneficiary ([79]) or has come to its knowledge. If a decision of the Commission is subject to proceedings before the Union Courts, the limitation period remains suspended until the end of the proceedings.

62. Article 17(3) of the Procedural Regulation provides that 'any aid with regard to which the limitation period has expired shall be deemed to be existing aid'. The limitation period provided for by the Procedural Regulation 'merely precludes recovery of aid awarded more than 10 years before the Commission first intervened' ([80]).

### 2.5. The application of national law and the immediate and effective execution of the Commission's recovery decisions

63. Article 16(3) of the Procedural Regulation codified the requirements of the principle of effectiveness ([81]). The recovery obligation is met only when the Member State concerned has effectively recovered the amount of incompatible aid, including the recovery interest ([82]) (the 'full recovery amount').

64. The Member State concerned can choose the means to meet its obligation to recover aid, provided that they comply with the principle of effectiveness ([83]) and the principle of equivalence ([84]). The question whether the Member State concerned has given immediate and effective execution of the recovery obligation in accordance with those principles can be assessed only on a case-by-case basis ([85]).

### 3. THE RESPECTIVE ROLES OF THE COMMISSION AND THE MEMBER STATE CONCERNED

65. Both the Commission and the Member States have an essential role to play in implementing recovery decisions and must contribute to the effective enforcement of recovery policy. A robust enforcement of recovery policy, coupled with close and proactive cooperation, effectively remedies distortions of competition in the internal market and promotes its full potential.

---

([76]) See Judgment of the Court of Justice of 8 December 2011, *France Télécom v Commission*, C-81/10 P, ECLI:EU:C:2011:811, paragraph 82.

([77]) See Judgment of the Court of Justice of 20 March 1997, *Land Rheinland-Pfalz v Alcan Deutschland*, C-24/95, ECLI:EU:C:1997:163, paragraphs 34-37.

([78]) For example, a request for information from the Commission to the Member State concerned interrupts the limitation period and starts time running afresh. See Judgment of the Court of Justice of 26 April 2018, *ANGED*, C-233/16, ECLI:EU:C:2018:280, paragraphs 84 and 85.

([79]) See Judgment of the Court of Justice of 6 October 2005, *Scott v Commission*, C-276/03 P, ECLI:EU:C:2005:590, paragraphs 27 and 36.

([80]) Judgment of the Court of Justice of 23 January 2019, *Fallimento Traghetti del Mediterraneo*, C-387/17, ECLI:EU:C:2019:51, paragraph 52; Judgment of the Court of First Instance of 30 April 2002, *Gibraltar v Commission*, T-195/01 and T-207/01, ECLI:EU:T:2002:111, paragraph 130.

([81]) See Judgment of the Court of Justice of 11 September 2014, *Commission v Germany ('Biria Gruppe')*, C-527/12, ECLI:EU:C:2014:2193, paragraphs 39 and 41.

([82]) To that effect, see Judgment of the Court of Justice of 6 October 2011, *Commission v Italy (Venice and Chioggia I')*, C-302/09, ECLI:EU:C:2011:634, paragraphs 38 and 39.

([83]) See Judgment of the Court of Justice of 5 October 2006, *Commission v France ('Scott')*, C-232/05, ECLI:EU:C:2006:651, paragraph 49.

([84]) Pursuant to the principle of equivalence, national law must be applied in a non-discriminatory manner as compared to similar cases which are governed solely by national legislation. See Judgment of the Court of Justice of 13 June 2002, *Netherlands v Commission*, C-382/99, ECLI:EU:C:2002:363, paragraph 90.

([85]) See Judgment of the Court of Justice of 11 September 2014, *Commission v Germany ('Biria Gruppe')*, C-527/12, ECLI:EU:C:2014:2193, paragraph 43.

### 3.1.    The role of the Commission

66.    The Commission endeavours in its recovery decisions to identify the beneficiaries of the incompatible aid and quantify the aid to be recovered ([86]). This allows recovery decisions to be implemented more swiftly and facilitates the fulfilment of the recovery obligation. If that is not possible, the Commission describes in the recovery decision the methodology by which the Member State has to identify the beneficiaries and determine the aid amount to be recovered ([87]).

67.    Pursuant to the principle of sincere cooperation, the Commission assists the Member State concerned in implementing the recovery decision, among other things, by:

—    sharing examples of spreadsheets for the Member State concerned to provide information on aid beneficiaries and aid amounts (see paragraphs 24 and 25);

—    assessing requests to extend the deadline to execute a recovery decision (see section 4.1);

—    organising a kick-off meeting (see section 4.2);

—    providing a tool to calculate recovery interest (see paragraph 111);

—    sharing examples of escrow agreements suitable for the provisional recovery of aid (see paragraph 118);

—    informing the Member State concerned about the provisional or definitive closure of a recovery procedure (see section 4.9).

### 3.2.    The role of the Member State

68.    Member States play a crucial role in rendering recovery policy effective. In particular, by providing accurate and complete information in the course of the formal investigation pursuant to Article 6 of the Procedural Regulation, Member States can contribute to the adoption of recovery decisions that are more easily enforceable and prevent or reduce the risk that recovery is not immediate and effective. In particular, a Member State may submit specific circumstances that, in its view, should be taken into account by the Commission when establishing the deadline to implement the recovery obligation (see paragraphs 71 and 72).

69.    Pursuant to Article 16(1) of the Procedural Regulation, the Member State concerned is required to take all necessary measures to recover the aid from the beneficiary. Based on the legal system of the Member State concerned, several authorities, either at local, regional or national level, may be concerned by the recovery process. A Commission decision addressed to a Member State is binding on all the organs of that State, including its courts ([88]).

70.    In the absence of pertinent provisions of European Union law, it is for each Member State to implement a recovery decision by applying the rules and procedures laid down by national law ([89]). Whilst each Member State designates the actual entity responsible for the implementation of the recovery decision, some Member States have entrusted a single body with the task of coordinating and overseeing the national recovery process. In the experience of the Commission, a single coordinating body contributes to the immediate and effective execution of recovery decisions, by collecting and disseminating knowledge at national level and by creating a stable channel of communication with the Commission's services.

---

([86])    Whilst it is generally not complex to identify the beneficiary of individual aid, the Commission is generally not in the position to identify each and all of the beneficiaries of an incompatible aid scheme, let alone the exact amount of aid received.

([87])    The Commission is not legally required to spell out in its recovery decision the exact amount to be recovered. It is sufficient for the Commission to include in it information enabling the Member State to quantify that amount without overmuch difficulty. See Judgment of the Court of Justice of 28 July 2011, *Mediaset v Commission*, C-403/10 P, ECLI:EU:C:2011: 533, paragraph 126.

([88])    See Judgment of the Court of Justice of 21 May 1987, *Albako v BALM*, C-249/85, ECLI:EU:C:1987:245, paragraph 17. See also Judgment of the Court of Justice of 5 March 2019, *Eesti Pagar*, C-349/17, ECLI:EU:C:2019:172, paragraph 90.

([89])    See Judgment of the Court of Justice of 13 June 2002, *Netherlands v Commission ('Service stations')*, C-382/99, ECLI:EU:C:2002:363, paragraph 90.

C 247/12          [EN]                    Official Journal of the European Union                    23.7.2019

## 4. IMPLEMENTING THE RECOVERY DECISION

71. Where the Commission concludes that aid already granted is incompatible with the internal market and orders its recovery, the Member State concerned must abolish the aid ([90]) and recover it, where relevant ([91]), within the dead-line set by the Commission (the 'recovery deadline'). Recovery after the recovery deadline cannot satisfy the requirements of European Union law and represents a failure to execute the recovery decision ([92]). In any event, the Member State concerned remains under an obligation to enforce the recovery of the unlawful aid and to put an end to the infringement of European Union law as close as possible after the expiry of the recovery deadline.

72. In its recovery decision, the Commission sets two deadlines for the Member State concerned to (i) submit precise information on the measures it has planned and already undertaken to execute the recovery decision (generally within 2 months of its service); and (ii) fulfil the recovery obligation (generally within 4 months of its service ([93])). In particular, within the first deadline the Member State is generally required to provide complete information on the identity of the beneficiaries, if not already identified in the recovery decision, the amount to be recovered and the national procedure applicable to fulfil the recovery obligation.

73. The Member State concerned is free to choose the national procedure to implement a recovery decision, provided that it allows for the immediate and effective execution of the recovery decision ([94]). In the experience of the Commission, fast-track, specialised administrative procedures can be very effective and allow Member States to duly comply with their obligations. Irrespective of the national procedure chosen to implement a recovery decision, the competent authority or court is under a duty to give full effect to European Union law ([95])

### 4.1. Request for an extension of the deadline to execute the decision

74. If a Member State encounters difficulties in executing the recovery decision within the recovery deadline, it is under a duty to submit those difficulties for consideration to the Commission, in sufficient time to enable the latter to assess the situation, together with proposals for suitable solutions ([96]). This may include a proposal to extend the recovery deadline.

75. In these cases, the Commission and the Member State concerned must work together in good faith to overcome the difficulties while fully complying with European Union law ([97]). In the same way, the Member State concerned must provide the Commission with all the information enabling it to establish that the means chosen will lead to the correct implementation of the recovery decision ([98]).

76. The Commission's practice is to grant an extension of the deadline to execute its decision only in exceptional circumstances if the Member State demonstrates with conclusive evidence that all other possible measures that could lead to timely implementation of the Commission decision would not be effective.

77. Requests for extension of the recovery deadline are not granted where the delay in recovery is due to the ways and means chosen by the Member State, where faster options were available.

78. Requests to extend the recovery deadline once it has elapsed cannot be granted retroactively ([99]) (see paragraph 71).

---

([90]) This implies that a Member State must take all the measures necessary to restore the situation which existed before the aid was granted, including, for instance, by cancelling a contract. See Judgment of the Court of Justice of 8 December 2011, *Residex Capital IV*, C-275/10, ECLI:EU:C:2011:814, paragraphs 45-47.

([91]) See Judgment of the Court of Justice of 20 March 1997, *Land Rheinland-Pfalz v Alcan Deutschland*, C-24/95, ECLI:EU:C:1997:163, paragraph 34.

([92]) To that effect, see Judgment of the Court of Justice of 22 December 2010, *Commission v Italy ('Newly listed companies')*, C-304/09, ECLI:EU:C:2010:812, paragraph 32.

([93]) The Commission may set a different recovery deadline, based on the specific circumstances of the case. See paragraph 68.

([94]) See Judgment of the Court of Justice of 11 September 2014, *Commission v Germany ('Biria Gruppe')*, C-527/12, ECLI:EU:C:2014:2193, paragraph 41.

([95]) See Judgment of the Court of Justice of 5 March 2019, *Eesti Pagar*, C-349/17, ECLI:EU:C:2019:172, paragraph 91.

([96]) See Judgment of the Court of Justice of 9 November 2017, *Commission v Greece ('Larco')*, C-481/16, ECLI:EU:C:2017:845, paragraph 29.

([97]) See Judgment of the Court of Justice of 20 March 2014, *Rousse Industry v Commission*, C-271/13 P, ECLI:EU:C:2014:175, paragraph 78.

([98]) For an illustration of proposals for implementation, see Judgment of the Court of Justice of 12 December 2002, *Commission v Germany*, C-209/00, ECLI:EU:C:2002:747, paragraphs 40-44.

([99]) In that sense, see Judgment of the Court of Justice of 9 July 2015, *Commission v France ('Lignes maritimes Marseille-Corse')*, C-63/14, ECLI:EU:C:2015:458, paragraph 45.

### 4.2.    Kick-off meeting

79.    The Commission customarily offers a kick-off meeting to the authorities of the Member States concerned shortly after the service of a recovery decision. This is preferably held within one month and in any case before the expiry of the first deadline to provide information, as referred to in paragraph 72.

80.    The kick-off meeting aims to facilitate and accelerate the recovery process by establishing a collaborative and transparent relationship between the Commission and the authorities of the Member State concerned. The Commission also explains the tools that it can offer the Member State to facilitate the recovery.

81.    The Commission endeavours to give, during the kick-off meeting, initial feedback about the recovery strategy and the implementing measures that the Member State concerned has planned to ensure compliance with the recovery decision.

82.    While participating in a kick-off meeting is not compulsory, the Commission strongly encourages Member States to avail themselves of this possibility to receive guidance on the main aspects of recovery and to anticipate any request for clarifications they may need.

### 4.3.    Identification of the beneficiaries from whom the aid must be recovered

83.    Unlawful aid found to be incompatible with the internal market must be recovered from the beneficiaries that actually benefitted from it [100]. When the aid beneficiaries are not identified in the recovery decision, the Member State concerned must look at the individual situation of each undertaking concerned [101].

84.    Pursuant to Article 345 TFEU, private and public undertakings are subject to the same State aid rules; therefore there is no difference between them when it comes to recovering unlawful aid.

#### 4.3.1.    *Identification of the aid beneficiary belonging to a group of undertakings*

85.    Generally, the identification of the aid beneficiary is not complex. In some cases, however, the Commission may have to assess which undertaking within a group of undertakings forming an economic unit benefitted from the aid.

86.    Where certain transactions occurred within a group of undertakings, the Commission may still limit the scope of recovery to only one aid beneficiary within the group. However, the Commission may conclude in its recovery decision that undertakings belonging to a group, even if they are qualified under national law as separate legal entities, form an economic unit for the purposes of competition law [102] and have benefitted from the aid. The Commission may also conclude that other undertakings of such group have benefitted from the aid.

87.    In the case referred to in paragraph 86, the recovery decision may order the Member State concerned to recover the aid not only from the undertaking which directly benefitted from it but also from the whole group of undertakings forming an economic unit or from some of the legal entities belonging to it [103] that also benefitted from the aid.

88.    In implementing such a recovery decision, the Member State concerned must prove to the Commission that it has correctly recovered the aid either from its direct beneficiary or from the other undertakings subject to the recovery obligation.

#### 4.3.2.    *Extension of the recovery order; economic continuity*

89.    If, at the implementation stage of a recovery decision, the aid cannot be recovered from the original beneficiary and it was transferred to another undertaking, the Member State should extend recovery to the undertaking that effectively enjoys the advantage following the transfer of activities and ensure that the recovery obligation is not circumvented [104].

---

[100]  See Judgment of the Court of Justice of 29 April 2004, *Germany v Commission ('SMI')*, C-277/00, ECLI:EU:C:2004:238, paragraph 75.
[101]  See Judgment of the Court of Justice of 13 February 2014, *Mediaset*, C-69/13, ECLI:EU:C:2014:71, paragraph 22.
[102]  According to the case law of the Court of Justice, where legally distinct natural or legal persons constitute an economic unit, they must be treated as a single undertaking for the purposes of European Union competition law. See Judgment of the Court of Justice of 12 July 1984, *Hydrotherm*, C-170/83, ECLI:EU:C:1984:271, paragraph 11. The Commission has a broad discretion to determine whether undertakings of a group should be considered as an economic unit or separate entities for the purpose of State aid law. See Judgment of the General Court of 29 June 2000, *DSG v Commission*, T-234/95, ECLI:EU:T:2000:174, paragraph 124.
[103]  See Judgment of the Court of First Instance of 29 June 2000, *DSG v Commission*, T-234/95, ECLI:EU:T:2000:174, paragraph 124.
[104]  See Judgment of the General Court of 13 September 2010, *Greece v Commission*, T-415/05, T-416/05 and T-423/05, ECLI:EU:T:2010:386, paragraphs 143-146.

90. The Court of Justice has drawn a distinction between two means to transfer the activities of an undertaking. These are (i) the sale of all or part of its assets, following which the activity is no longer carried out by the same legal entity ('asset deal'); and (ii) the sale of its shares, following which the undertaking which has benefitted from the aid retains its legal personality and continues to carry out its activities ('share deal') [105].

### 4.3.2.1. Asset deal

91. Where the beneficiary of incompatible aid creates a new company or transfers its assets to another undertaking to continue some or all of its activities, the continuation of those activities may prolong the distortion of competition brought about by the aid. Accordingly, the newly created company or the buyer of the assets may, if it retains that advantage, be required to pay back the aid in question.

92. In an asset deal scenario, the Commission assesses the existence of economic continuity between undertakings on a case-by-case basis, using an open set of non-cumulative criteria. In particular, the Commission may take into account the following criteria [106]: (i) the scope of the transfer (assets [107] and liabilities, maintenance of the workforce and/or management); (ii) the price of the transfer [108]; (iii) the identity of the shareholders or the owners of the seller and of the buyer; (iv) the time at which the transfer takes place (during the preliminary investigation pursuant to Article 4 of the Procedural Regulation or the formal investigation pursuant to Article 6 of the that Regulation, or after adoption of the recovery decision); (v) the economic logic of the operation [109].

### 4.3.2.2. Share deal

93. The sale to a third party of shares in a beneficiary of incompatible aid does not affect the obligation of the beneficiary to reimburse such aid [110].

94. Where the shares of the undertaking to which unlawful State aid was granted are sold, but the undertaking retains its legal personality and continues to carry out the activities subsidised by the State aid, the Member State must recover the aid from it [111]. In fact, it is that undertaking which maintains an advantage over its competitors.

---

[105] See Judgment of the Court of Justice of 29 April 2004, *Germany v Commission ('SMI')*, C-277/00, ECLI:EU:C:2004:238, paragraphs 78 and 84.

[106] The Commission is not required to take into account all of the criteria. To that effect, see Judgment of the General Court of 28 March 2012, *Ryanair v Commission*, T-123/09, ECLI:EU:T:2012:164, paragraphs 155 and 156.

[107] As regards the scope of the transaction, in principle the assets sold have to be only a part of those owned by the aid beneficiary. The larger the share of the original business that is transferred to a new entity, the higher the likelihood that the economic activity related to the assets sold continues to benefit from the incompatible aid. See Commission Decision (EU) 2015/1826 of 15 October 2014 on the State aid SA.33797 — (2013/C) (ex 2013/NN) (ex 2011/CP) implemented by Slovakia for NCHZ (OJ L 269, 15.10.2015, p. 71). As regards economic continuity, see Commission Decision of 17 September 2008, State aid N 321/08, N 322/08 and N 323/08 — Greece — *Vente de certains actifs d'Olympic Airlines/Olympic Airways Services*; Commission decision of 12 November 2008 State aid N 510/2008 — Italy — Sale of assets of Alitalia; Commission decision of 4 April 2012 SA.34547 — France — *Reprise des actifs du groupe SERNAM dans le cadre de son redressement judiciaire.*

[108] Where the assets are sold through an open, transparent, non-discriminatory and non-conditional tender to the highest bidder, the price paid is generally presumed to be the market price. This principle was followed by the Commission in Commission Decision of 1.10.2014 on the State aid SA.31550 (2012/C) (ex 2012/NN) implemented by Germany for Nürburgring; Commission Decision of 27.3.2014 on the State aid SA.34572 (13/C) (ex 13/NN) implemented by Greece for Larco General Mining & Metallurgical Company S.A.; Commission Decision of 7.5.2015 on the State aid SA.35546 (2013/C) (ex 2012/NN) implemented by Portugal for Estaleiros Navais de Viana do Castelo S.A.

[109] The Commission found economic continuity in cases where there would be no change in the way the business was run, in the scope of the activity or in production. For instance, see Commission Decision (EU) 2015/1826 of 15 October 2014 on the State aid SA.33797 — (2013/C) (ex 2013/NN) (ex 2011/CP) implemented by Slovakia for NCHZ (OJ L 269, 15.10.2015, p. 71). Conversely, in cases where significant changes in the activity or the business strategy were demonstrated, the Commission took the view that there was no economic continuity. See Commission Decision (EU) 2016/151 of 1 October 2014 on the State aid SA.31550 (2012/C) (ex 2012/NN) implemented by Germany for Nürburgring (OJ L 34, 10.2.2016, p. 1); Commission Decision (EU) 2016/152 of 1 October 2014 on State aid SA 27339 (12/C) (ex 11/NN) implemented by Germany for Zweibrücken airport and airlines using the airport (OJ L 34, 10.2.2016, p. 68). In any event, economic logic alone has not been considered a conclusive element when looking for economic continuity between two undertakings.

[110] See Judgment of the Court of Justice of 29 April 2004, *Germany v Commission ('SMI')*, C-277/00, ECLI:EU:C:2004:238, paragraph 81.

[111] See Judgment of the Court of Justice of 1 October 2015, *Electrabel and Dunamenti Erőmű v Commission*, C-357/14 P, ECLI:EU:C:2015:642, paragraph 113.

### 4.3.2.3. Mergers and other business reorganisations

95. Besides asset and share deals, a Member State may be called upon to determine from which undertaking the aid must be recovered following a merger or another form of business reorganisation. In these cases, the Member State concerned must identify the legal successor of the original aid beneficiary and recover the aid from the surviving entity ([112]).

### 4.3.3. The aid beneficiaries of tax measures

96. As regards the specific case of schemes granting tax reliefs, the Member State concerned must identify the undertakings that have benefitted from the advantage granted through the scheme and recover the aid from them.

97. For the purpose of identifying a beneficiary it is not relevant whether the aid measure has been applied correctly by the relevant undertaking in its tax declaration or, instead, in breach of the applicable national rules ([113]). The relevant question is whether an undertaking has enjoyed the tax relief found to constitute State aid incompatible with the internal market. National procedures to address the misapplication or abuse of national tax rules cannot jeopardise the immediate and effective recovery of State aid.

### 4.4.    Quantification of the amount to be recovered

98. Where the Commission decision already quantifies the aid amount, a Member State is bound to implement the decision as adopted by the Commission. If the Member State disputes the quantification of the aid amount, the issue has to be brought before the Union Courts. It follows that the Member State must recover the aid amount as established in the recovery decision, unless and until it has been suspended or annulled by the General Court or the Court of Justice.

99. If the Commission has not quantified the precise amount of aid to be recovered in the recovery decision, the Member State concerned must quantify the aid to be recovered from each of the beneficiaries, based on the methodology set out in the recovery decision ([114]).

100. In principle, the Commission requires the Member State to recover all aid, unless at the time it was granted the aid met the applicable requirements established by (i) a regulation declaring certain categories of aid compatible with the internal market in application of Article 107 and Article 108 TFEU (a 'Block Exemption Regulation'); (ii) a regulation establishing that some public support does not meet all the criteria of Article 107(1) TFEU and is therefore exempted from the notification provided for in Article 108(3) TFEU ('de minimis Regulation'); (iii) a different, previous decision of the Commission ([115]).

101. The Commission can accept the retrospective application of the de minimis rule to an aid beneficiary, under the following conditions:

— the entire amount of aid must be below the de minimis ceiling ([116]); in this regard, the use of average amounts per beneficiary is not acceptable, since it does not ensure that no undertaking benefitted from a total amount that exceeded that ceiling ([117]);

— when verifying retrospectively the amount of de minimis aid granted over any period of 3 fiscal years, a Member State must consider each 3 fiscal year period which includes the date on which the aid which should purportedly be excluded from recovery was granted ([118]); and

---

([112]) To that effect, see Judgment of the Court of Justice of 7 March 2018, *SNCF Mobilités v Commission*, C-127/16 P, ECLI:EU:C:2018:165.

([113]) See Judgment of the Court of Justice of 14 July 2011, *Commission v Italy ('Tremonti bis')*, C-303/09, ECLI:EU:C:2011:483, paragraph 43.

([114]) See Judgment of the Court of Justice of 13 February 2014, *Mediaset*, C-69/13, ECLI:EU:C:2014:71, paragraph 21. See also paragraph 66 above.

([115]) For instance, see Commission Decision of 11 July 2001 on the State aid scheme applied by Spain to certain newly established firms in Álava (OJ L 314, 18.11.2002, p. 1), Recital 90.

([116]) See Judgment of the General Court of 20 September 2011, *Regione autonoma della Sardegna and Others v Commission*, T-394/08, T-408/08, T-453/08 and T-454/08, ECLI:EU:T:2011:493, paragraphs 310-312, as upheld by Judgment of the Court of Justice of 13 June 2013, *HGA and Others v Commission*, C-630/11 P to C-633/11 P, ECLI:EU:C:2013:387.

([117]) See Judgment of the Court of Justice of 13 September 2017, *Commission v Belgium*, C-591/14, ECLI:EU:C:2017:670, paragraph 46.

([118]) For instance, if a Member State is claiming in 2018 that an advantage granted on 31 December 2014 could be retrospectively considered as de minimis aid, that Member State must prove that also when including that new de minimis aid, the relevant ceiling is not exceeded in any of the following three-year periods: 2012-2014, 2013-2015 and 2014-2016. It follows that the Commission can allow the retrospective inclusion of that alleged de minimis aid only on the condition that the relevant de minimis ceiling is never exceeded.

EN

— all the conditions laid down in the applicable Regulation, which can be applied retrospectively must be met [119].

102. To calculate the amount to be recovered, a Member State can also take into account whether the beneficiary has paid taxes on the aid received. If that is the case, (i.e. the gross aid does not equal the net aid), the Member State may, in accordance with its national tax rules, take account of the earlier payment of taxes by recovering only the net amount received by the aid beneficiary.

103. By contrast, where a beneficiary of unlawful and incompatible aid has not paid taxes on the aid received (i.e. the gross aid equals the net aid), the beneficiary must pay back the gross amount of aid received.

104. In any case, the Member State concerned must ensure that the aid beneficiary will not be able to enjoy a further tax relief by claiming that the reimbursement has reduced his taxable income.

### 4.4.1. Tax measures

105. In the context of a State aid granted through tax relief, 're-establishing the *status quo ante* means returning, as far as possible, to the situation which would have prevailed if the operations at issue had been carried out without the tax reduction' [120].

106. Therefore, the Member State concerned must calculate the correct tax amount that an undertaking should have paid without the unlawful aid measure. This quantification can only be based on the choices actually made in the past, without taking into account alternative, hypothetical choices which would have been available [121]. Only automatically applicable deductions provided for by national and international law, if applicable, or by the recovery decision can be taken into account.

107. For instance, if a Member State implements a recovery decision by increasing the tax base of the aid beneficiary, other tax reliefs which were already available at the time the initial tax was due could in principle still be applied [122].

108. Based on the obligation of professional secrecy established by Article 339 TFEU and Article 30 of the Procedural Regulation, the confidentiality of tax documents is not a valid justification for not providing the requested evidence in this context.

109. Pursuant to national law, in order to collect tax amounts (including State aid granted in the form of tax reliefs), the tax authorities of the Member State concerned might have to carry out internal tax audits prior to the actual recovery. Such tax audits are acceptable provided that (i) they lead to recovery within the recovery deadline; and (ii) the methodology set out in the decision for quantifying the aid to be recovered is followed.

### 4.4.2. Calculation of recovery interest

110. Under Article 16(2) of the Procedural Regulation, the aid to be recovered pursuant to a recovery decision includes interest from the date when the aid was made available to the beneficiary until its recovery [123]. Pursuant to the Implementing Regulation interest must be applied on a compound basis [124].

---

[119] As also established by Commission Regulation (EU) No 1407/2013 of 18 December 2013 on the application of Articles 107 and 108 of the Treaty on the Functioning of the European Union to *de minimis* aid (OJ L 352, 24.12.2013, p. 1).

[120] See Judgment of the Court of Justice of 15 December 2005, *Unicredito Italiano*, C-148/04, ECLI:EU:C:2005:774, paragraph 117.

[121] See Judgment of the Court of Justice of 15 December 2005, *Unicredito Italiano*, C-148/04, ECLI:EU:C:2005:774, paragraphs 118-119.

[122] In that instance, the following conditions relating to the other tax reliefs must be fulfilled: (i) they shall not lead to any (new) State aid; (ii) they should concern all taxpayers in the same way; (iii) they shall apply by way of a rule that existed at the time the incompatible aid was granted; and (iv) the undertakings eligible to the reliefs must benefit from them automatically (i.e. the application of the relief does not require prior authorisation from the Member State nor the activation of an option in due time by the taxpayer).

[123] In the case of recovery decisions subject to court proceedings, the recovery interest shall be calculated also for the periods during which the decision was suspended by a court order or annulled by a first instance judgment then overturned by the Court of Justice. To that effect, see Judgment of the Court of Justice of 12 February 2008, *CELF and ministre de la Culture et de la Communication ('CELF I')*, C-199/06, ECLI:EU:C:2008:79, paragraphs 56-58 and 69.

[124] Reference and discount rates (in %) since 1 August 1997 are published on the website of the Directorate-General for Competition of the Commission.

23.7.2019    EN    Official Journal of the European Union    C 247/17

111. It is the task of the Member State concerned to quantify the exact amount of interest to be recovered. To facilitate that task, the Commission has made available to Member States a tool to calculate interest according to the rules established by the Implementing Regulation ([125]).

### 4.5. The service of recovery orders

112. The Member State to which a recovery decision is addressed must order the beneficiary to pay back the aid incompatible with the internal market within the time period prescribed in the decision. An immediate service of the recovery order, imposing the repayment of the State aid within the recovery deadline, is crucial to guarantee that the requirements established by Article 16(3) of the Procedural Regulation are met (see paragraph 19).

113. The nature and features of a recovery order may vary depending on, among other things, the granting authority, the way the incompatible aid was granted, its amount. Without prejudice to the peculiarities of the relevant national legal system, in the experience of the Commission standardised forms and procedures for the service of recovery orders may contribute to a timely and effective execution of recovery decisions.

114. The reference to national law also implies that in principle all rules and procedures in the legal order of the Member State concerned shall apply, irrespective of their source. Therefore, for aid beneficiaries not having their seat or a permanent establishment in the territory of the Member State concerned, the service of recovery orders may be governed by the rules and procedures established in international agreements or private international law applicable in that Member State.

115. In accordance with the principle of sincere cooperation, Member States must warn the Commission at the earliest opportunity if they expect difficulties in serving a recovery order.

### 4.6. Provisional implementation of recovery

116. Where a recovery decision is still subject to legal challenges, a Member State may accept provisional repayment of the aid to be recovered.

117. The Member State concerned may consider provisional recovery insofar as it is adequate to ensure the full, albeit provisional, removal of the distortion of competition brought about by the incompatible aid. To that end, the Member State concerned must ensure that the advantage linked to the unlawful and incompatible aid leaves the beneficiary. The Member State concerned should justify to the Commission the need for provisional measures and submit an exhaustive description of the provisional measures envisaged.

118. Provisional implementation of the recovery decision can be achieved, for instance, by way of a payment by the beneficiary of the full recovery amount into an escrow account ([126]). The Commission is ready to share examples of suitable escrow agreements. A Member State may also submit to the Commission a specific escrow account agreement complying with the conditions cited in paragraph 117.

119. Conversely, the provision of guarantees for the future payment of the recovery amount is not an adequate provisional measure since the aid is meanwhile left at the disposal of the beneficiary.

120. Alternatively, if provided for by national law, a beneficiary can choose to pay back the aid amount and the recovery interest to the Member State under a special clause by which the aid returns to the beneficiary if the final outcome of the ongoing litigation is favourable to the latter.

---

([125]) Access to the tool is granted following a registration process at both national and European Union level. This registration ensures that only the authorised officials of the authorities of the Member State concerned and of the Commission's services can access the tool.

([126]) The payment of the total amount of aid including recovery interest on an escrow account may be governed by a specific agreement, signed by the Member State, a bank or a trustee and the aid beneficiary, by which the parties agree that the amount paid in escrow will be released in favour of one or other party, depending on the final outcome of the litigation. Should the final ruling of the Union Courts only partially uphold the recovery decision in a way that it entails the reduction of the recovery amount, the funds held in escrow, including any potential gain or loss, must be transferred to the Member State concerned and the aid beneficiary pro quota.

C 247/18          EN          Official Journal of the European Union          23.7.2019

121. Other means of provisional implementation may also be used in exceptional cases, as long as the principles described above are respected. In the absence of immediate final recovery, Member States should make use of any existing provision in their legal order allowing their authorities to order an interim payment of the aid ([127]), even when that provision is not designed for the specific purpose of recovering State aid ([128]).

### 4.7.  **Alternative means of recovery**

122. Where a Member State recovers aid by means other than a cash payment, it must provide the Commission with the information enabling it to establish that the means chosen constitute an appropriate means to implement the decision ([129]). The Commission accepts alternative means of recovery only if: (i) they are a suitable instrument for re-establishing the market conditions that have been distorted by the unlawful aid measure; (ii) they are capable of being identified as such by the Commission and other interested parties ([130]); and (iii) the Member State proves that they have an equivalent effect to a cash payment.

123. The Commission regularly receives requests to accept recovery implemented through alternative means, such as recovery in kind or offsetting of State aid claims against the existing credits held by the aid beneficiary against the Member State concerned.

124. The Commission can accept recovery in kind only in exceptional cases, if the conditions cited in paragraph 122 are met and if the Member State concerned acts in compliance with the following basic principles.

— The value of the assets must be established in an objective manner in order to allow the Commission to conclude that the value is equivalent to the recovery amount, including the appropriate recovery interest.

— Recovery in kind must be allowed under national law. The Member State must inform the Commission of the relevant legal provisions at national level which provide for recovery in kind.

— It must be avoided that economic activities are carried out using the beneficiary's assets for a certain period of time after the decision (for instance at least until full depreciation of those assets according to standard accounting rules). On this point, reference is made to the criteria for evaluating the existence of economic continuity set out in paragraph 92.

125. The Commission can accept offsetting of claims only in exceptional cases, if the Member State concerned acts in compliance with the following basic principles.

— The possibility of offsetting claims is provided for by national law ([131]);

— The claims offset are certain, of a fixed amount and due; and

— The measures taken are fully transparent in order to enable the Commission to satisfy itself that they are suitable for the purpose of eliminating the distortion to competition caused by the aid.

126. Deferrals of recovery or payments in instalments beyond the recovery deadline would imply that the recovery obligation is not implemented without delay, and are therefore not allowed, even if they would maximise the return of the Member State concerned (see paragraph 54).

---

([127]) For instance, French law provides for national courts to order the provisional payment of the aid (i.e. pending the outcome of the proceedings on the merits of the case) if the obligation to pay back the aid cannot be seriously called into question. This interim request for payment (called '*référé-provision*') can be granted for a recovery order issued following a Commission decision.

([128]) For instance, some Member States do not have provisions allowing their authorities responsible for recovery to order provisional payments under tax law, but do have similar provisions under civil law. In those cases, a Member State should make use of the rules allowing the provisional implementation of the decision, irrespective of the procedure chosen to execute it.

([129]) See Judgment of the Court of Justice of 7 July 2009, *Commission v Greece* ('*Olympic Airways II*'), C-369/07, ECLI:EU:C:2009:428, paragraph 79.

([130]) See Judgment of the Court of Justice of 12 December 2002, *Commission v Germany*, C-209/00, ECLI:EU:C:2002:747, paragraphs 57-58.

([131]) See Judgment of the Court of Justice of 7 July 2009, *Commission v Greece* ('*Olympic Airways II*'), C-369/07, ECLI:EU:C:2009:428, paragraph 68.

### 4.8.    Insolvency proceedings

127. An aid beneficiary which is not able to pay back the aid and the recovery interest due is in principle surviving in the market only because of the aid it received. Therefore, to restore the situation in the internal market retrospectively through the removal of the aid, that aid beneficiary must exit the internal market. If the aid beneficiary exits the market but a portion or all of the advantage is transferred to a legal and economic successor, the recovery obligation should be extended to the latter (see section 4.3.2).

128. In order to recover the aid from an insolvent beneficiary, the Member State can only proceed to seize the assets of the aid beneficiary and to cause its liquidation if the latter is unable to pay back the aid or to take any other measure enabling the aid to be recovered, as provided for under its national law ([132]). In this regard, recovering the aid by means of proceedings aimed at winding up the beneficiary cannot in principle be regarded as disproportionate to the objectives of the TFEU ([133]). Therefore, the Member State concerned must bring those proceedings in its capacity as a creditor or shareholder, where it has this latter position ([134]).

129. From the moment the aid beneficiary is undergoing insolvency proceedings, restoration of the previous situation and elimination of the distortion of competition resulting from the aid can be achieved through registration of the claim relating to the aid to be recovered in the schedule of liabilities ([135]) within the recovery deadline. In that case, the registration of the claim must be followed by (i) recovery of the full recovery amount, or, if that can not achieved, (ii) the winding-up of the undertaking and the definitive cessation of its activities ([136]).

130. As regards the first condition cited in paragraph 129, the Member State concerned must register the amount to be recovered, i.e. the incompatible aid, together with recovery interest accrued until full repayment or until an earlier date if under national law interest stops accruing for all creditors on that earlier date (for instance, the date of opening of the insolvency proceedings). As recovery interest forfeits the financial advantage arising from the availability of the aid (see paragraph 16) and, as such, its recovery serves the same purpose of the recovery of the aid principal, Member States must register the aid principal amount and recovery interest with the same ranking.

131. As regards the second condition cited in paragraph 129, certain Member States provide for proceedings aimed at the restructuring or temporary continuation of some or all of the activities of insolvent undertakings. However, such proceedings must be left unapplied insofar as, in absence of timely recovery of the full recovery amount, they prevent the winding up and cessation of activities of the aid beneficiary ([137]).

132. Thus, where a plan providing for the continuation of the activity of the aid beneficiary is proposed to the creditors' committee, the authorities of the Member State concerned can support that plan only if it ensures recovery of the full recovery amount within the recovery deadline. A Member State cannot waive part of its recovery claim if the aid beneficiary continues its activity after the recovery deadline.

133. There might be cases where the shareholders of an aid beneficiary decide to voluntarily liquidate it, outside a procedure administered by or under the surveillance of a court. Irrespective of the procedure chosen, the same principles outlined in this section apply.

([132]) See Judgment of the Court of Justice of 17 January 2018, *Commission v Greece ('United Textiles')*, C-363/16, ECLI:EU:C:2018:12, paragraph 36.

([133]) See Judgment of the Court of Justice of 21 March 1990, *Belgium v Commission ('Tubemeuse')*, C-142/87, ECLI:EU:C:1990:125, paragraphs 65-66.

([134]) See Judgment of the Court of Justice of 17 January 2018, *Commission v Greece ('United Textiles')*, C-363/16, ECLI:EU:C:2018:12, paragraph 38.

([135]) As recovery is effected in accordance with the procedures under the national law of the Member State concerned, national law governs the ranking of the State aid claim in the schedule of liabilities, provided the ranking complies with the principle of effectiveness and the principle of equivalence. See paragraph 64. In any event, the State aid claim cannot be ranked lower than ordinary unsecured claims.

([136]) See Judgment of the Court of Justice of 11 December 2012, *Commission v Spain ('Magefesa II')*, C-610/10, ECLI:EU:C:2012:781, paragraphs 72 and 104.

([137]) To that effect, see Judgment of the General Court of 21 October 2014, *Italy v Commission*, T-268/13, ECLI:EU:T:2014:900, paragraphs 62-64.

C 247/20    EN    Official Journal of the European Union    23.7.2019

134. All the organs of the Member State concerned, including its courts, must leave unapplied all provisions under the national insolvency proceedings or the national rules governing voluntary liquidation which, by keeping the aid to be recovered at the disposal of the beneficiary, do not ensure immediate and effective execution of a Commission recovery decision. In the same way, the Commission considers that the Member State must challenge any decision adopted by its national courts in breach of European Union law ([138]).

135. For the purpose of the fulfilment of the recovery obligation, an aid beneficiary is liquidated when its activities cease and its assets and interests are sold under market conditions ([139]). While national rules apply, the sale must be carried out through an open, transparent and non-discriminatory procedure ([140]). The evaluation of the assets should be carried out by an independent expert. Based on the Commission's experience, these requirements are generally met in the case of bankruptcy proceedings under the surveillance of a court. To prevent the buyer of the assets from being liable to pay back the aid, the Member State must ensure that there is no economic continuity (see section 4.3.2).

### 4.9.    Provisional and definitive closure of recovery procedures

136. Over recent years, the Commission has developed the internal practice of 'provisional closure' of recovery procedures. This applies to situations where a recovery decision has been provisionally implemented by a Member State but cannot be considered as definitively executed due to: (i) pending litigation at European Union or national level; (ii) ongoing national administrative procedures that may still affect the fulfilment of the recovery obligation; or (iii) still pending insolvency proceedings in which the State aid claims have been properly registered at the appropriate rank.

137. Pursuant to the principle of sincere cooperation, the Commission endeavours to communicate to the Member State concerned when it provisionally closes a recovery procedure.

138. Following the provisional closure of a recovery procedure, the Member State concerned must keep the Commission updated and continue providing information and evidence on request and at least once per year until the Commission concludes that the Member State concerned has definitively executed the recovery decision.

139. The Commission also continues to inform the Member State concerned about its assessment of the state of the procedure. By letter from its services, it also informs the Member State when the recovery procedure is definitively closed. At that stage, the recovery procedure is also removed from the list of State aid cases with pending recovery procedures published on the website of the Commission's Directorate-General for Competition ([141]).

140. Neither the provisional nor the definitive closure of a recovery procedure precludes the Commission from resuming closer scrutiny of the matter or reopening the procedure. That would be the case if new facts change the situation that had led the Commission to the closure.

## 5.    LITIGATION BEFORE NATIONAL COURTS

141. The implementation of recovery decisions can give rise to litigation before national courts ([142]). In the experience of the Commission, proceedings before administrative courts, where available, tend to guarantee a faster enforcement of recovery orders than proceedings before civil courts.

142. Two main categories of recovery-related litigation can be distinguished: (i) actions brought by the recovering authority seeking a court order to force an unwilling beneficiary to pay back the aid; and (ii) actions brought by beneficiaries contesting the recovery order, including individual measures to ensure recovery.

143. There is a risk of the execution of a recovery decision being delayed where the national measures taken to implement it are challenged in court ([143]).

---

([138])  To that effect, see Judgment of the Court of Justice of 17 November 2011, *Commission v Italy ('Employment Measures II')*, C-496/09, ECLI:EU:C:2011:740, paragraph 74.

([139])  See Judgment of the Court of Justice of 29 April 2004, *Germany v Commission ('SMI')*, C-277/00, ECLI:EU:C:2004:238, paragraph 86.

([140])  In that sense, see the Commission Notice on the notion of State aid as referred to in Article 107(1) of the Treaty on the Functioning of the European Union (OJ C 262, 19.7.2016, p. 1), paragraphs 89-96.

([141])  See http://ec.europa.eu/competition/state_aid/studies_reports/recovery.html

([142])  For additional information on the role of national courts in the enforcement of State aid rules, see the Commission Notice on the enforcement of State aid law by national courts (OJ C 85, 9.4.2009, p. 1), or any legal act amending or replacing it.

([143])  The national court concerned may cooperate with the Commission by using the cooperation tools provided for by Article 29(1) of the Procedural Regulation.

144. If the aid beneficiary requests interim relief against the national measures adopted to implement the recovery decision because of an alleged illegality of that decision, the national court has to assess whether the case at hand fulfils the conditions established by the Court of Justice in the cases *Zuckerfabrik* ([144]) and *Atlanta* ([145]). Under that case law, interim relief can be granted by a national court only if the following cumulative conditions are met ([146]):

(i) that court entertains serious doubts as to the validity of the European Union act and, if the validity of the contested act is not already in issue before the Court of Justice, the national court itself refers the question to the Court of Justice ([147]);

(ii) there is urgency, in that the interim relief is necessary to avoid serious and irreparable damage being caused to the party seeking the relief;

(iii) the national court takes due account of the interest of the European Union; and

(iv) in its assessment of all those conditions, it respects any decisions of the Court of Justice or the General Court ruling on the lawfulness of the European Union act or on an application for interim measures seeking similar interim relief at European level.

145. Where the conditions set out in paragraph 144 are not met, the Member State concerned cannot rely on interim measures granted by national courts to justify its failure to implement the decision ([148]). In that context, it is for the Member State to prove that all the conditions are satisfied ([149]).

## 6. CONSEQUENCES OF A FAILURE TO IMPLEMENT A COMMISSION RECOVERY DECISION

146. Where the Member State concerned has not complied with a recovery decision, and has not been able to demonstrate the existence of absolute impossibility, the Commission may initiate infringement proceedings. In addition, it may make the payment of new compatible aid to the beneficiary or beneficiaries concerned conditional to the recovery of the previous aid found unlawful and incompatible.

### 6.1. Infringement proceedings

147. Infringements of provisions of the TFEU concerning State aid affect trade and directly harm the interests of other players in the markets concerned, who do not benefit from the same type of support.

#### 6.1.1. *Action pursuant to Article 108(2) TFEU*

148. Due to the importance of State aid rules for protecting competition and for the effective functioning of the internal market, Article 108(2) TFEU provides that if the Member State concerned does not comply with the recovery decision within the recovery deadline, the Commission may directly refer the matter to the Court of Justice. In fact, in contrast to Article 258 TFEU, Article 108(2) TFEU does not provide for a pre-litigation phase ([150]).

149. In order to refer a matter under Article 108(2) TFEU to the Court of Justice, the Commission must first establish which obligation imposed on the Member State by the recovery decision was not fulfilled. Generally, the recovery decision includes two different types of obligations: (i) to inform the Commission of the measures taken or to be taken to implement the decision and keep it informed about the state of play of the case following the recovery deadline; and (ii) to execute the obligation to recover the State aid within the recovery deadline.

---

([144]) See Judgment of the Court of Justice of 21 February 1991, *Zuckerfabrik Süderdithmarschen and Zuckerfabrik Soest v Hauptzollamt Itzehoe and Hauptzollamt Paderborn*, C-143/88 and C-92/89, ECLI:EU:C:1991:65, paragraphs 23 and following.

([145]) See Judgment of the Court of Justice of 9 November 1995, *Atlanta Fruchthandelsgesellschaft and Others (I) v Bundesamt für Ernährung und Forstwirtschaft*, C-465/93, ECLI:EU:C:1995:369, paragraph 51.

([146]) See Judgment of the Court of Justice of 29 March 2012, *Commission v Italy ('Hotel industry in Sardinia')*, C-243/10, ECLI:EU:C:2012:182, paragraph 48.

([147]) See Judgment of the Court of Justice of 14 July 2011, *Commission v Italy ('Tremonti bis')*, C-303/09, ECLI:EU:C:2011:483, paragraph 46.

([148]) See Judgment of the Court of Justice of 6 October 2011, *Commission v Italy ('Venice and Chioggia I')*, C-302/09, ECLI:EU:C:2011:634, paragraph 50.

([149]) See Judgment of the Court of Justice of 17 September 2015, *Commission v Italy ('Venice and Chioggia II')*, C-367/14, ECLI:EU:C:2015:611, paragraph 50.

([150]) See Judgment of the Court of Justice of 3 July 2001, *Commission v Belgium*, C-378/98, ECLI:EU:C:2001:370, paragraph 26.

150. Consequently, the infringement of either of these obligations, as well as of any other obligation established in the recovery decision, may lead to an action pursuant to Article 108(2) TFEU. While the infringement is established if the relevant obligation was not fulfilled by the recovery deadline, Member States also remain under an obligation to enforce the recovery of the unlawful aid after its expiry.

151. The recovery obligation is an obligation of results. To remove the distortion of competition caused by the aid, Member States must succeed in actually recovering the full recovery amount ([151]).

152. The Commission systematically considers launching a court action if recovery is not achieved, irrespective of the reasons for that failure ([152]) and of the national administration or organ which internally bears responsibility for the failure to comply with the recovery obligation ([153]).

153. The decision to launch a court action is at the discretion of the Commission. It is taken on a case-by-case basis in light of objective grounds, the commitment of the Member State and of the actions already taken to implement the decision ([154]).The Commission may also take into account whether the aid has been partially recovered and, if so, what percentage.

### 6.1.2.  *Actions on the basis of Article 260(2) TFEU*

154. Article 260(2) TFEU provides that, if the Commission considers that the Member State has failed to fulfil the obligations established in a judgment pursuant to Article 108(2) TFEU, the Commission may bring the matter to the Court of Justice, after giving that State the opportunity to submit its observations.

155. The reference date for assessing the existence of an infringement for the purposes of Article 260(2) TFEU is the deadline set in the letter of formal notice issued in accordance with the first subparagraph of Article 260(2) TFEU ([155]).

156. The procedure laid down in Article 260(2) TFEU aims to induce a defaulting Member State to comply with a previous judgment establishing a failure to fulfil obligations, thereby ensuring that European Union law is in fact applied. Both sanctions provided for by that provision, namely a lump sum and a penalty payment, are intended to achieve this objective.

---

([151])  See Judgment of the Court of Justice of 17 January 2018, *Commission v Greece ('United Textiles')*, C-363/16, ECLI:EU:C:2018:12, paragraph 34; Judgment of the Court of Justice of 24 January 2013, *Commission v Spain ('Magefesa')*, C-529/09, ECLI:EU:C:2013:31, paragraph 91. Clearly, that is without prejudice to the limits to the obligation to recover: see Section 2.4.

([152])  This is without prejudice to a demonstrated absolute impossibility to recover the aid.

([153])  See Judgment of the Court of Justice of 30 September 2003, *Köbler*, C-224/01, ECLI:EU:C:2003:513, paragraphs 31-33.

([154])  Since the adoption of the 2007 Recovery Notice, the Court of Justice has decided on several matters referred to it by the Commission under Article 108(2) TFEU. See Judgment of the Court of Justice of 17 January 2018, *Commission v Greece ('United Textiles')*, C-363/16, ECLI:EU:C:2018:12; Judgment of the Court of Justice of 9 November 2017, *Commission v Greece ('Larco')*, C-481/16, ECLI:EU:C:2017:845; Judgment of the Court of Justice of 9 July 2015, *Commission v France ('Lignes maritimes Marseille-Corse')*, C-63/14, ECLI:EU:C:2015:458; Judgment of the Court of Justice of 6 May 2015, *Commission v Germany ('Deutsche Post')*, C-674/13, ECLI:EU:C:2015:302; Judgment of the Court of Justice of 11 September 2014, *Commission v Germany ('Biria Gruppe')*, C-527/12, ECLI:EU:C:2014:2193; Judgment of the Court of Justice of 5 June 2014, *Commission v Italy ('Exemption from excise duty')*, C-547/11, ECLI:EU:C:2014:1319; Judgment of the Court of Justice of 12 December 2013, *Commission v Italy ('Preferential electrical tariff')*, C-411/12, ECLI:EU:C:2013:832; Judgment of the Court of Justice of 17 October 2013, *Commission v Italy ('Alcoa')*, C-344/12, ECLI:EU:C:2013:667; Judgment of the Court of Justice of 17 October 2013, *Commission v Greece ('Ellinikos Xrysos')*, C-263/12, ECLI:EU:C:2013:673; Judgment of the Court of Justice of 10 October 2013, *Commission v Italy ('Ixfin')*, C-353/12, ECLI:EU:C:2013:651; Judgment of the Court of Justice of 21 March 2013, *Commission v Italy ('Sardinia Ferries')*, C-613/11, ECLI:EU:C:2013:192; Judgment of the Court of Justice of 28 June 2012, *Commission v Greece ('Hellenic Shipyards I')*, C-485/10, ECLI:EU:C:2012:395; Judgment of the Court of Justice of 29 March 2012, *Commission v Italy ('Hotel industry in Sardinia')*, C-243/10, ECLI:EU:C:2012:182; Judgment of the Court of Justice of 1 March 2012, *Commission v Greece ('Tax-exempt reserve fund')*, C-354/10, ECLI:EU:C:2012:109; Judgment of the Court of Justice of 13 October 2011, *Commission v France ('New Interline')*, C-454/09, ECLI:EU:C:2011:650; Judgment of the Court of Justice of 6 October 2011, *Commission v Italy ('Venice and Chioggia I')*, C-302/09, ECLI:EU:C:2011:634; Judgment of the Court of Justice of 14 July 2011, *Commission v Italy ('Tremonti bis')*, C-303/09, ECLI:EU:C:2011:483; Judgment of the Court of Justice of 5 May 2011, *Commission v Italy ('Trade fairs')*, C-305/09, ECLI:EU:C:2011:274; Judgment of the Court of Justice of 14 April 2011, *Commission v Poland ('Technologie Buczek')*, C-331/09, ECLI:EU:C:2011:250; Judgment of the Court of Justice of 22 December 2010, *Commission v Slovakia ('Frucona Košice')*, C-507/08, ECLI:EU:C:2010:802; Judgment of the Court of Justice of 22 December 2010, *Commission v Italy ('Newly listed companies')*, C-304/09, ECLI:EU:C:2010:812; Judgment of the Court of Justice of 13 November 2008, *Commission v France ('Article 44-septies CGI')*, C-214/07, ECLI:EU:C:2008:619; Judgment of the Court of Justice of 19 June 2008, *Commission v Germany ('Kahla/Thüringen')*, C-39/06, ECLI:EU:C:2008:349; Judgment of the Court of Justice of 14 February 2008, *Commission v Greece ('Olympic Airways I')*, C-419/06, ECLI:EU:C:2008:89; Judgment of the Court of Justice of 6 December 2007, *Commission v Italy ('Mesures urgentes en faveur de l'emploi')*, C-280/05, ECLI:EU:C:2007:753.

([155])  See Judgment of the Court of Justice of 17 September 2015, *Commission v Italy ('Venice and Chioggia II')*, C-367/14, ECLI:EU:C:2015:611, paragraph 35.

157. The sanctions are decided by the Court of Justice on the basis of a proposal from the Commission (which is not binding on the Court of Justice). This proposal of sanctions under an Article 260(2) TFEU action follows the criteria set out in a Communication from the Commission ([156]) which is regularly updated. According to that Communication, when imposing a financial sanction on a Member State, three fundamental criteria must be taken into account: (i) the seriousness of the infringement; (ii) its duration; and (iii) the need to ensure that the sanction itself acts as a deterrent to further infringements. The Commission considers that the infringement of the recovery obligation is always a serious infringement ([157]).

158. The Commission systematically considers referring to the Court of Justice, pursuant to Article 260(2) TFEU, cases where the Member State concerned has failed to comply with a judgment pursuant to Article 108(2) TFEU ([158]).

## 6.2.    The *Deggendorf* case law

159. In its judgment in the *Deggendorf* case, the Court of Justice held that the Commission may declare aid to an undertaking compatible with the internal market on condition that the undertaking pays back previous unlawful aid, given the cumulative effect of the aids in question ([159]).

160. Where legally distinct natural or legal persons constitute an economic unit, they are to be treated as a single undertaking for the purposes of European Union competition law. In such cases, for the purpose of assessing the cumulative effect of previous and planned new aids, the Commission must consider the group of which the aid beneficiary forms part ([160]).

## 7.    FINAL PROVISIONS

161. This Notice replaces the 2007 Recovery Notice.

162. The Commission may review this Notice on the basis of future important developments in its practice on the recovery of State aid or relevant modifications of the applicable European Union rules or case law.

163. The authorities of the Member States may contact the Commission's single contact point for queries about the recovery of State aid: comp-recovery-state-aid@ec.europa.eu

---

([156]) Communication from the Commission on the Application of Article 228 of the EC Treaty, SEC(2005) 1658 (OJ C 126, 7.6.2007, p. 15), as amended and updated by the communications published on the website of the Commission.

([157]) See Judgment of the Court of Justice of 13 May 2014, *Commission v Spain ('Basque fiscal aid')*, C-184/11, ECLI:EU:C:2014:316, paragraph 69.

([158]) Since the adoption of the 2007 Recovery Notice, the Court of Justice has decided on several matters referred to it by the Commission under Article 260(2) TFEU. See Judgment of the Court of Justice of 14 November 2018, *Commission v Greece ('Hellenic Shipyards II')*, C-93/17, ECLI:EU:C:2018:903; Judgment of the Court of Justice of 17 September 2015, *Commission v Italy ('Venice and Chioggia II')*, C-367/14, ECLI:EU:C:2015:611; Judgment of the Court of Justice of 17 November 2011, *Commission v Italy ('Employment Measures II')*, C-496/09, ECLI:EU:C:2011:740; Judgment of the Court of Justice of 13 May 2014, *Commission v Spain ('Basque fiscal aid')*, C-184/11, ECLI:EU:C:2014:316; Judgment of the Court of Justice of 7 July 2009, *Commission v Greece ('Olympic Airways II')*, C-369/07, ECLI:EU:C:2009:428; Judgment of the Court of Justice of 11 December 2012, *Commission v Spain ('Magefesa II')*, C-610/10, ECLI:EU:C:2012:781. In all these judgments, except the *Basque fiscal aid*, the Court of Justice imposed both a lump sum and a penalty payment. In particular, in *Hellenic Shipyards*, the Court imposed a penalty payment of EUR 7 294 000 for every 6 months of delay in implementing the necessary measures to comply with the judgment of the Court and a lump sum of EUR 10 million; in *Venice and Chioggia II*, the Court imposed a penalty payment of EUR 12 million for every 6 months of delay in implementing the necessary measures to comply with the judgment of the Court and a lump sum of EUR 30 million; in *Employment Measures II* the Court imposed a penalty payment of an amount calculated by multiplying the basic amount of EUR 30 million by the percentage of the unlawful aid that has not yet been recovered, or not shown to have been recovered, at the end of the period concerned, compared to the total amount not yet recovered on the date of delivery of that judgment, for every 6 months of delay in implementing the necessary measures to comply with the judgment of the Court under Article 108 TFEU (paragraph 68), plus a lump sum of EUR 30 million (paragraph 97); in *Basque fiscal aid*, the Court imposed a lump sum of EUR 30 million (paragraph 84); in *Olympic Airways II* the Court imposed a penalty payment of EUR 16 000 for each day of delay in adopting the measures necessary to comply with the judgment of the Court (paragraph 127) and a lump sum of EUR 2 million (paragraph 150); in *Magefesa II* the Court imposed a penalty payment of EUR 50 000 for each day of delay in adopting the measures necessary to comply with the judgment of the Court (paragraph 136) and a lump sum of EUR 20 million (paragraph 148).

([159]) See Judgment of the Court of Justice of 15 May 1997, *TWD v Commission*, C-355/95 P, ECLI:EU:C:1997:241, paragraphs 25 and 26.

([160]) See Judgment of the Court of First Instance of 8 September 2009, *AceaElectrabel v Commission*, T-303/05, ECLI:EU:T:2009:312, paragraph 163, as upheld by Judgment of the Court of Justice of 16 December 2010, *AceaElectrabel v Commission*, C-480/09 P, ECLI:EU:C:2010:787.