# EXHIBIT 84

# FEDERAL COURT OF JUSTICE

## ORDER

I ZB 2/15

of

31 October 2018

in the proceedings

for setting aside a domestic arbitral award

Slovak Republic, represented by the Ministry of Finance of the Slovak Republic, which is represented by the Minister of Finance Ing. Peter Kažimír, Stefanovicova 5, Bratislava, Slovak Republic,

Applicant and Appelant,

– Authorised representatives: RA Dr. v. Plehwe and RA Schäfer –

Against

Achmea B.V., represented by the Director Wilhem A.J. van Ouin, Handelsweg 2, Zeist, The Netherlands,

Respondent and Appellee,

– Authorised representative: RA Prof. Raeschke-Kessler –

The First Civil Senate of the Federal Court of Justice on 31 October 2018, with Presiding Justice Prof. Dr. Koch and Justices Prof. Dr. Schaffert, Prof. Dr. Kirchhoff, Feddersen and Dr. Schmaltz

held:

In the proceedings for appeal on points of law brought by the Applicant, the Order of the Frankfurt am Main Higher Regional Court – 26th Civil Senate – of 18 December 2014 is reversed.

The arbitral award (final award) in the arbitration proceedings PCA Case No. 2008/-13 of 7 December 2012 is set aside.

The costs of the proceedings are borne by the Respondent.

Amount in dispute: EUR 22,100,000

Reasons:

A. The Applicant, the Slovak Republic, is the legal successor of the Czech and Slovak Republic (hereinafter: Czechoslovakia). The Respondent is a Dutch insurance group. 1

In 1991, Czechoslovakia and the Kingdom of the Netherlands (hereinafter: the Netherlands), concluded an Agreement – effective 1 October 1992 – on Encouragement and Reciprocal Protection of Investments ("Bilateral Investment Treaty", hereinafter BIT). In Article 3(1) BIT, the parties undertook to ensure fair and equitable treatment to the investments of investors of the other contracting party and not to impair, by unreasonable or discriminatory measures, the operation, management, maintenance, use, enjoyment or disposal thereof by those investors. According to Article 4 BIT, each contracting party must guarantee the free transfer of payments related to an investment, in particular profits, interests and dividends, in freely convertible currency and without undue restriction or delay. 2

Art. 8 BIT contains the following provision: 3

1. All disputes between one Contracting Party and an investor of the other Contracting Party concerning an investment of the latter shall if possible, be settled amicably.

2. Each Contracting Party hereby consents to submit a dispute referred to in paragraph (1) of this Article, to an arbitral tribunal, if the dispute has not been settled amicably within a period of six months from the date either party to the dispute requested amicable settlement.

3. The arbitral tribunal referred to in paragraph (2) of this Article will be constituted for each individual case in the following way: each party to the dispute appoints one member of the tribunal and the two members thus appointed shall select a national of a third State as Chairman of the tribunal. ...

…

5. The arbitration tribunal shall determine its own procedure applying the arbitration rules of the United Nations Commission for International Trade Law (UNCITRAL).

6. The arbitral tribunal shall decide on the basis of the law, taking into account in particular though not exclusively:

- the law in force of the Contracting Party concerned;
- the provisions of this Agreement, and other relevant Agreements between the Contracting Parties;
- the provisions of special agreements relating to the investment;
- the general principles of international law.

…

The Applicant became the legal successor to Czechoslovakia on 1 January 1993, taking on its rights and obligations under the BIT. Effective 1 May 2004, the Applicant became a Member of the European Union. 4

In the context of a health care reform, the Applicant opened the Slovak market to domestic and foreign providers of private health insurance in 2004. Thereupon, the Respondent was registered as a health insurer in Slovakia. The Respondent founded Union Insurance a.s. there and, according to its submissions, invested the equivalent of approx. EUR 72 million in cash contributions into it over the course of 2006 and, through it, offered private health insurance. Following a change of government in 2006, the Applicant partially reversed the liberalisation of the health insurance market. The law of 12 December 2006 prohibited the use of insurance brokers, the law of 25 October 2007 prohibited the distribution of profits from health insurance operations and the law of 28 April 2009 prohibited the sale of insurance portfolios. In its ruling of 26 January 2011, the Slovak Constitutional Court held the prohibition of profit distributions to be unconstitutional. In the new statutory health insurance provisions that came into force on 1 August 2011, the Applicant again permitted profit distributions. 5

The Respondent asserts that it suffered losses in the range of tens of millions due to the Applicant's statutory regulatory measures. In October 2008, the Respondent initiated arbitration proceedings against the Applicant, in 6

| | |
|---|---|
| which it claimed damages for violation of its rights under the BIT. In the arbitration proceedings, Frankfurt am Main was determined as the place of the proceedings in agreement with the parties. | |
| In the arbitration proceedings, the Applicant objected to the lack of jurisdiction of the arbitral tribunal. It argued that, with its accession to the European Union, the offer to conclude an arbitration agreement contained in Art. 8(2) BIT had become invalid because it was incompatible with EU law and thus inapplicable. In an interim ruling, dated 26 October 2010, the arbitral tribunal affirmed its jurisdiction. By Order of 10 May 2012, the Higher Regional Court rejected the Applicant's request for a declaration that the arbitral tribunal did not have jurisdiction. The Applicant's appeal against the order was unsuccessful, because the Federal Court of Justice (BGH) rejected the application against the interim ruling on the grounds of inadmissibility, given that an arbitral award had been made in the main proceedings (BGH, Order of 30 April 2014 - III ZB 37/12, *Zeitschrift für Schiedsverfahren* (hereinafter: SchiedsVZ) 2014, 200). | 7 |
| In its arbitral award of 7 December 2012, the arbitral tribunal ordered the Applicant to pay EUR 22.1 million plus interest. The Applicant applied to the Higher Regional Court for the award to be set aside. The Higher Regional Court rejected the application (OLG Frankfurt am Main, Order of 18 December 2014 - 26 Sch 3/13, juris). In the appeal at hand against that decision, the Applicant continues to seek the setting aside of the arbitral award. The Respondent has requested that the appeal be dismissed. | 8 |
| By Order of 3 March 2016, this Senate [of the Federal Court of Justice] referred the following questions to the Court of Justice of the European Union (CJEU) for a preliminary ruling (BGH, SchiedsVZ 2016, 328): | 9 |

1. Does Article 344 TFEU preclude the application of a provision in a bilateral investment protection agreement between Member States of the European Union (a so-called intra-EU BIT) under which an investor of a Contracting State, in the event of a dispute concerning investments in the other Contracting State, may bring proceedings against the latter State before an arbitral tribunal where the investment protection agreement was concluded before one of the Contracting States acceded to the European Union but the arbitral proceedings are not to be brought until after that date?

If Question 1 is to be answered in the negative:

2. Does Article 267 TFEU preclude the application of such legislation?

If Questions 1 and 2 are to be answered in the negative:

3. Does the first paragraph of Article 18 TFEU preclude the application of such a provision under the circumstances described in Question 1?

| | |
|---|---|
| The Court of Justice of the European Union ruled on these questions in its Judgment of 6 March 2018 - C-284/16 as follows (CJEU, SchiedsVZ 2018, 186 -Achmea): | 10 |

Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.

| | |
|---|---|
| B. The Higher Regional Court did not find any reason to set aside the award. In reaching this conclusion, it notes: | 11 |
| The arbitration clause in Article 8(2) BIT is valid because it is compatible with EU law. It is not contrary to the exclusive nature of the EU dispute settlement mechanisms provided for in Article 344 TFEU, because the EU treaties do not provide for specific judicial proceedings with regard to disputes between a private investor and a Member State. Article 344 TFEU does not constitute a general "competence safeguarding rule" in respect of the Court of Justice of the European Union. The arbitration clause is also compatible with Article 267 TFEU. It is true that the arbitral tribunal is not entitled to refer to the Court of Justice of the European Union questions of relevance for its decision relating to the interpretation or application of EU law. According to the CJEU's case-law, however, the review of an arbitral award by the national courts – with a standard of review limited in national law to setting aside an award or refusing to recognise it – is sufficient to ensure the uniform interpretation and application of EU law in the Member States. If necessary, a reference for a preliminary ruling from the national courts to the CJEU could be made. | 12 |

The award is also not to be set aside on the basis of an infringement of the *ordre public* EU law provisions. 13

C. The appeal is admissible (§ 574(1) sentence 1 no. 1 German Code of Civil Procedure (hereinafter: ZPO) in conjunction with § 1065(1) sentence 1, § 1062(1) no. 4 case 1 ZPO) and otherwise receivable (§ 574(2) no. 1 ZPO). It is also well-founded. In accordance with the decision of the Court of Justice of the European Union, issued as the result of a request for a preliminary ruling by the Senate [this Court], there is no arbitration agreement between the parties. The award must therefore be set aside (§ 1059(2) no. 1 letter a ZPO). 14

1. Pursuant to § 1059(2) no. 1 letter a ZPO, an award may be set aside if the Applicant reasonably submits that the arbitration agreement is invalid under the law which the parties have agreed will govern it or, if the parties have not made any such provision, under German law. The absence of an arbitration agreement is equivalent to its invalidity (cf. Schwab/Walter, Schiedsgerichtsbarkeit, 7th ed., chap. 24, para. 7; Lachmann, Handbuch für die Schiedsgerichtpraxis, 3rd ed., para. 2184). 15

1. The provision in § 1059 ZPO is applicable to the case at hand. The decision of the arbitral tribunal of 7 December 2012 is a domestic arbitral award. Pursuant to § 1025(1) ZPO, the provisions of §§ 1025 to 1066 ZPO shall apply if the place of arbitration is, within the meaning of § 1043(1) ZPO, in Germany. In accordance with § 1043(1) sentence 1 ZPO, the parties established Frankfurt am Main as the place of arbitration. 16

2. In the case at hand, the arbitration agreement could only have been concluded on the basis of the Respondent's application for the initiation of arbitration proceedings of 1 October 2008 in conjunction with Article 8(2) BIT. The provision of Article 8(2) BIT constitutes an agreement in favour of the investors of the contracting states and provides them with the possibility of choosing whether to initiate arbitration proceedings or proceedings before a national court in an investment dispute against the other contracting state (cf. Düsseldorf Higher Regional Court, SchiedsVZ 2006, 331, 333 [juris para. 28]; Frankfurt am Main Higher Regional Court, SchiedsVZ 2013, 119, 122 [juris para. 17]). Article 8(2) BIT thus contains an offer by the contracting states to conclude arbitration agreements with the investors of the other contracting state which the respective investor may accept expressly or by implication (cf. Düsseldorf Higher Regional Court, SchiedsVZ 2006, 331, 333 et seq. [juris para. 28]; Happ, IStR 2006, 649, 650; Markert, Streitschlichtungsklauseln in Investitionsschutzabkommen, 2010, p. 120). As the Higher Regional Court correctly recognised in its ruling of 10 May 2012, the Respondent accepted this offer by initiating arbitration proceedings (cf. Frankfurt am Main Higher Regional Court, SchiedsVZ 2013, 119, 122 [juris para. 73]). 17

3. Given that the arbitral tribunal was constituted only after the Applicant's accession to the European Union, pursuant to Art. 8(6) BIT, the law applicable to the Applicant for arbitral proceedings is, in particular, the EU law which enjoys primacy in its territory. This also applies in respect of the question of whether the jurisdiction of the arbitral tribunal was effectively established by the arbitration agreement or whether the arbitration agreement is invalid on the basis of conflict with EU law. 18

II. The appeal successfully claims that the Applicant's option of having an arbitral tribunal settle an investment dispute with the Respondent pursuant to Article 8(2) of the BIT is incompatible with the system of legal protection in the European Union enshrined in Articles 344 and 267 TFEU. 19

1. After the Applicant's accession to the European Union on 1 May 2004, the BIT constitutes an intra-EU agreement between Member States. According to the case-law of the Court of Justice of the European Union, in the areas governed by EU law, the provisions of EU law take precedence over provisions agreed in other agreements between the Member States prior to their entry into force in the event of a conflict of laws (see ECJ, Judgment of 27 September 1988 - 235/87, ECR 1988, 5589, para. 22 - Matteucci, with further references). An agreement concluded by one Member State with another State cannot apply in the relations between those States after the accession of the second State to the European Union, to the extent that it is contrary to EU law (cf. ECJ, Judgment of 10 November 1992 - C-3/91, ECR 1992, I-5529 = GRUR Int. 1993, 76, para. 8 - Exportur; Judgment of 8 September 2009 - C-478/07, ECR 2009, I-7721 = GRUR 2010, 143 para. 98 - American Bud II; Judgment of 21 January 2010 - C-546/07, ECR 2010, I-439 = EuZW 2010, 217, para. 44 - Commission v Germany). 20

2. With regard to the questions referred to it by the Senate [this Court], the Court of Justice of the European Union notes: 21

As is apparent, in particular, from Article 344 TFEU, an international agreement should not impair the autonomy of the EU legal order. In order to ensure that the specific characteristics and the autonomy of the EU legal order are preserved, the Treaties established a judicial system intended to ensure the consistency and uniformity in the interpretation of EU law. The keystone of that judicial system is the preliminary ruling procedure provided for in Article 267 TFEU, which secures the uniform interpretation of EU law (CJEU, SchiedsVZ 2018, 186, paras. 32, 35, 37 - Achmea). 22

As part of the law of the Applicant, the arbitral tribunal may, in accordance with Article 8(6) BIT, be called upon to interpret or indeed to apply EU law, particularly the provisions on freedom of establishment and free movement of capital (CJEU, SchiedsVZ 2018, 186, paras. 39 to 42 - Achmea), but it is not a court entitled to make a reference to the CJEU under Article 267 TFEU (CJEU, SchiedsVZ 2018, 186 paras. 43 to 49 - Achmea). The arbitral award made by such a tribunal is also not subject to any review by a court of a Member State, ensuring that the questions of EU law which the tribunal may have to address can be submitted to the CJEU by means of a reference for a preliminary ruling. Pursuant to Article 8(5) of the BIT, the arbitral tribunal shall itself choose its seat and consequently the law applicable to the procedure governing judicial review of the validity of the award. In addition, judicial review of the award can only be exercised by a court of a Member State to the extent permitted by national law. § 1059(2) ZPO, however, provides only for limited review, concerning in particular the validity of the arbitration agreement under applicable law and the consistency with public policy of the recognition or enforcement of the award (CJEU, SchiedsVZ 2018, 186 paras. 50-53 - Achmea). 23

It is true that, in relation to commercial arbitration, the CJEU has held that the requirements of efficient arbitration proceedings justify the fact that the review of arbitration awards by the courts of the Member States is limited in scope, provided that the fundamental provisions of EU law can be examined in the course of that review and, if necessary, be the subject of a reference to the CJEU for a preliminary ruling. However, the arbitration proceedings in Article 8 BIT are different from commercial arbitration proceedings because they do not originate in the freely expressed wishes of the parties but rather derive from a treaty by which Member States agree to remove from the jurisdiction of their own courts, disputes which may concern the application or interpretation of EU law. Thus, the considerations justifying a limited review of commercial arbitration awards by national courts cannot be applied to arbitration proceedings under Article 8 BIT (CJEU, SchiedsVZ 2018, 186, paras. 54 et seq. - Achmea). Unlike in the cases of the EEA Agreement, the Agreement establishing a unified patent litigation system and the accession of the EU to the ECHR, the submition of disputes to an arbitral tribunal referred to in Article 8 BIT is provided for by an agreement which was concluded not by the EU, but by Member States. Article 8 BIT is such as to call into question not only the principle of mutual trust between Member States but also the preservation of the particular nature of the law established by the Treaties as guaranteed by Article 267 TFEU, and is therefore not compatible with the EU law principle of sincere cooperation between the Member States (CJEU, SchiedsVZ 2018, 186 paras. 57 and 58 - Achmea). 24

3. Thus, if Art. 8(2) BIT contradicts Art. 267 and Art. 344 TFEU, the provision is inapplicable (see ECJ, ECR 1988, 5589, para. 22 - Matteucci; GRUR Int. 1993, 76 para 8 - Exportur; GRUR 2010, 143, para. 98 - American Bud II; EuZW 2010, 217, para. 44 - Commission v Germany) and no valid arbitration agreement has been concluded between the parties. 25

(a) It is true that, given its bilateral nature, Article 8(2) BIT is only inapplicable since the accession of the Applicant to the EU in the relationship between the Slovak Republic and the Netherlands. However, this means that neither Contracting Party to Art. 8(2) BIT could effectively undertake towards the other Contracting Party to consent to submit a dispute referred to in Art. 8(1) BIT to an arbitral tribunal. There thus was never an offer by the Applicant to conclude an arbitration agreement with the investors from the Netherlands which the Respondent could have accepted. 26

(b) Consequently, contrary to the opinion of the Higher Regional Court in the Order of 10 May 2012, an arbitration agreement between the parties could not be concluded by the Respondent's initiating arbitration proceedings and appointing an arbitrator. If the requisite consent of the Applicant to the arbitration proceedings is lacking, the arbitral award made in the present proceedings pursuant to § 1059(2) no. 1 letter a ZPO must be set aside because no arbitration agreement exists between the parties. 27

c) The Respondent correctly submits that the decision of the Court of Justice of the European Union concerns only the content of the BIT between the Applicant and the Netherlands and not the question of whether the parties have concluded a valid arbitration agreement. In the present case, however, the BIT is inextricably linked to the arbitration agreement. The only thing which can be considered an offer by the Applicant to conclude an 28

| | |
|---|---|
| arbitration agreement with the Respondent is the declaration to the Netherlands pursuant to Art. 8(2) BIT. However, in accordance with the decision of the Court of Justice of the European Union, that declaration cannot have any effect. Thus, there can be no finding of an offer to conclude an arbitration agreement with the Respondent. | |
| 4. The objections raised by the Respondent following the decision of the Court of Justice of the European Union against the setting aside of the award are unsuccessful. | 29 |
| a) The Respondent asserts, without success, that since the Court of Justice of the European Union held the provision on the law applicable by the arbitral tribunal pursuant to Article 8(6) BIT to be objectionable, the validity of the arbitration agreement under Article 8(2) BIT is unaffected. | 30 |
| The CJEU found that what constituted a breach of EU law was that an investor from one of the contracting parties may, in the event of a dispute concerning investments in the territory of the other contracting party, bring proceedings against the latter party before an arbitral tribunal (CJEU, SchiedsVZ 2018, 186, para. 60 - Achmea). This statement clearly refers to the consent in Art. 8(2) BIT to submit disputes to an arbitral tribunal. By contrast, the Court's decision only addresses Article 8(6) BIT only to the extent that the fact that the arbitral tribunal must apply EU law, where appropriate, arises from its obligation to take into account EU law as the law of the contracting party concerned. | 31 |
| b) Contrary to the Respondent's view, it is immaterial whether or not, in the dispute at issue, the arbitral tribunal in fact applied EU law or was required to apply it. With regard to the question whether an arbitration agreement exists between the parties, the only relevant issue is whether the Applicant was capable, in Art. 8(2) BIT, to make a valid offer to the Respondent to conclude an arbitration agreement. According to the decision of the Court of Justice of the European Union, this was not the case, irrespective of whether or not the arbitral tribunal had to apply EU law in the given dispute. | 32 |
| c) The decision of the Court of Justice of the European Union is not based on a misunderstanding of German arbitration law. | 33 |
| aa) It can remain undecided here whether the Senate [this Court] correctly assumed in para. 52 of its order for reference (SchiedsVZ 2016, 328) that the mention of UNCITRAL in Article 8(5) BIT precludes an arbitral tribunal from requesting, pursuant to § 1050 sentence 1 ZPO, that a German court submit to the CJEU a question on the interpretation of EU law considered to be material in the arbitration proceedings. The Respondent submits that a distinction must be made between the UNCITRAL Arbitration Rules and the UNCITRAL Model Law. Whereas, under Art. 27 of the UNCITRAL Model Law, an arbitral tribunal may only request assistance from a state court for the taking of evidence, the UNCITRAL Arbitration Rules do not contain any provisions to that effect, so that the Code of Civil Procedure (ZPO) applies with the possibility of referral under § 1050 ZPO. This is of no relevance because this consideration is of no significance for the CJEU's decision. | 34 |
| bb) The Court of Justice of the European Union begins by noting the significance of the fact that the arbitral tribunal in the dispute at hand is not part of the existing judicial system in the Netherlands or in Slovakia and cannot be classified as a court "of a Member State" within the meaning of Art. 267 TFEU (CJEU, SchiedsVZ 2018, 186 paras. 45 f., 49 - Achmea). The CJEU then examines whether the award is subject to review by a court of a Member State which ensures the opportunity to clarify questions of EU law by way of the preliminary ruling procedure provided for in Article 267 TFEU. The CJEU notes that only the choice of Frankfurt am Main as the place of arbitration allowed the Applicant to apply to a German court to review the arbitral award. Judicial review can be exercised only to the extent permitted by national law; § 1059(2) ZPO provides only for a limited review (CJEU, SchiedsVZ 2018, 186 paras. 50-53 - Achmea). To the extent that the CJEU considered a limited reviewability of arbitral awards to be sufficient in the area of commercial arbitration, these considerations cannot be applied to arbitration proceedings such as those under Article 8 BIT (CJEU, SchiedsVZ 2018, 186 para. 54 f. - Achmea). | 35 |
| The question whether the arbitral tribunal constituted under Art. 8 BIT is empowered in a specific case to make a referral to the Court of Justice of the European Union for a preliminary ruling via a national court is not mentioned in the grounds of the CJEU's judgment. Rather, the CJEU does not consider it sufficient that judicial review can only be exercised to the extent that national law permits it in the specific case. Accordingly, it is irrelevant whether the arbitral tribunal, in accordance with the German law applicable in the present case by reason of the choice of Frankfurt am Main as the place of arbitration, could have referred to the CJEU, via a | 36 |

German court, a question on the interpretation of EU law considered to be material in the arbitration proceedings.

d) Contrary to the Respondent's view, in the dispute at hand it is not important whether Article 267 and Article 344 TFEU are prohibition laws within the meaning of § 134 BGB (German Civil Code). The invalidity of a contract concluded by two parties is not at issue, but rather the question of whether one party has even made any offer at all to conclude an arbitration agreement. The Applicant was prevented from doing so by reason of EU law. Thus, already there is no legal transaction here which could be void pursuant to § 134 BGB.    37

e) Contrary to the Respondent's assertion, it is irrelevant that the arbitration agreement alleged by the Respondent would be of a private legal nature. It is also irrelevant whether the arbitral tribunal conducted commercial arbitration proceedings.    38

The Court of Justice of the European Union did not look to the characteristics of the procedure followed by the arbitral tribunal after its constitution, but rather looked to the fact that, in a commercial arbitration, the arbitration agreement leading to the constitution of the arbitral tribunal is based on party autonomy, whereas in the case of the BIT, two Member States, as contracting parties, agreed to withdraw from the jurisdiction of their courts certain disputes that could affect the application and interpretation of EU law. The principles recognised by the Court with regard to a valid agreement on commercial arbitration can thus not be applied to arbitration proceedings under Art. 8 BIT (CJEU, SchiedsVZ 2018, 186 para. 55 - Achmea).    39

f) The Respondent argues to no avail that the decision of the Court of Justice of the European Union does not alter the effectiveness, under international law, of the BIT with regard to the relationship between the Respondent and the Netherlands, so that, in the absence of any termination of the BIT, the arbitration clause between the parties also remains effective.    40

As the Senate [this Court] already stated in its order for reference (BGH, SchiedsVZ 2016, 328, para. 85), by acceding to the EU, the Member States have limited their discretionary powers under international law and have mutually agreed to renounce the exercise of any international treaty rights which conflict with EU law (cf. ECJ, Judgment of 12 February 2009 - C-45/07, ECR 2009, I-701, para. 17 - Commission v Greece). In view of this, the primacy of the provisions of EU law has the consequence that a rule in an intra-EU agreement between Member States which is incompatible with EU law is also inapplicable as a rule in an international treaty (cf. Tietje, KSzW 2011, 128, 130 f.; Lavranos in von der Groeben/Schwarzen/Hatje, Europäisches Unionsrecht, 7th ed., Art. 351 TFEU para. 7; Schmalenbach in Calliess/Ruffert, EUV/ AEUV, 5th ed., Art. 351 TFEU para. 9; differing view, Lock, Das Verhältnis zwischen dem EuGH und internationalen Gerichten, 2010, p. 205 f.). The nationals of the Member States concerned cannot rely on the Member States' prior international law obligations that are contrary to EU law (see ECJ, Judgment of 8 December 1981 - 180/80 and 266/80, ECR 1981, 2997 para. 20 - Crujeiras Tome and Yurrita).    41

III. Good faith (*Treu und Glauben* (§ 242 BGB)) does not prevent the Applicant from invoking the invalidity of the arbitration agreement. Even so, it can be assumed in favour of the Respondent that – as regards the objection in the present case that there was no arbitration agreement – § 242 BGB would apply as part of the procedural *ordre public*.    42

1. Having said that, under German law, a party may be in violation of the principle of good faith by emphatically and unrestrictedly invoking an allegedly concluded arbitration agreement prior to the proceedings, thereby prompting its contractual partner to bring an arbitration action, but then asserting in the arbitration proceedings and in the judicial proceedings for a declaration of enforceability of an arbitral award to its detriment that a valid arbitration agreement had not been concluded (BGH, Judgment of 2 April 1987 - III ZR 76/86, NJW-RR 1987, 1194, 1195, [juris para. 13]; Order of 16 March 2017 - 1 ZB 49/16, SchiedsVZ 2018, 37 para. 32 f.). Yet the dispute at issue neither corresponds to this example nor is it comparable in terms of valuation. It can therefore be left unanswered whether the Respondent's claim based on good faith should be refused already because recognising it would be incompatible with the obligation of Member States to apply EU law effectively, since assigning disputes to an arbitral tribunal in a BIT, in contravention of EU law, would then prove to be *de facto* effective, at least to a large extent, to the benefit of the investors.    43

2. The Applicant did not create a legitimate expectation (*Vertrauenstatbestand*) upon which the Respondent could rely in good faith.    44

| | |
|---|---|
| a) The BIT between the Applicant and the Netherlands entered into force on 1 October 1992. The validity of the arbitration clause in Art. 8(2) BIT could only be called into question as of 1 May 2004, following the Applicant's accession to the European Union. The Respondent's investments did not occur until after accession. As the Senate [this Court] already held in para. 76 of its order for reference (BGH, SchiedsVZ 2016, 328), the Respondent had to take into consideration the fact that EU law, which from then on took precedence in the relationship of the contracting parties, could have an effect on the provisions of the BIT. | 45 |
| b) The Respondent also fails to show that, after its accession to the EU, the Applicant indicated vis-à-vis the Respondent that it would protect investors generally or specifically in accordance with the arbitration clause of the BIT. | 46 |
| The fact that the Commission did not object to existing BITs at the time of the accession of the new Member States (cf. Opinion of Advocate General Wathelet in CJEU - C-284/16, paras. 40-43 - Achmea) could not create a legitimate expectation for the Respondent, attributable to the Applicant. | 47 |
| Such a legitimate expectation also does not arise from the fact that the Applicant, after joining the EU, did not express any doubts as to the validity of the BIT. | 48 |
| Furthermore, the creation of an investment-friendly environment following the accession to the EU does not allow any conclusion to be drawn as to the explicit recognition of the arbitration clause by the Applicant. In particular, a policy encouraging investment could easily be the result of accession of the EU, which a new Member State will regularly expect to provide economic stimulus. | 49 |
| The inclusion of the BIT in the list of the Applicant's existing contracts, even after accession to the EU, is also not a basis from which the Respondent can derive legitimate expectations in view of the recognition of the arbitration clause by the Applicant. Inclusion in this list is not tied to a specific message on the validity of the arbitration clause, and all the less so, given that the BIT is not necessarily or obviously rendered invalid as a whole if the arbitration clause is void. | 50 |
| The fact that the BIT has not yet been terminated by the Applicant does not give rise to any legitimate expectations for the Respondent with regard to the arbitration clause. The Applicant was not and is not prevented from taking the legal view that the BIT remains valid with the exception of the arbitration clause. | 51 |
| Contrary to the Respondent's submission, the letter of 14 April 2008 from the Applicant's then Minister of Finance does not contain any express recognition of the arbitration proceedings with regard to the present dispute. The letter merely expresses the wish of the then Minister of Finance to seek amicable settlement of the dispute within the meaning of Art. 8(1) BIT, but does not contain any recognition of the jurisdiction of the arbitral tribunal or the permissibility of arbitration proceedings pursuant to Art. 8(2) BIT. | 52 |
| Finally, the fact that the claimant entered into negotiations with the Respondent for the amicable settlement of the dispute could not create legitimate expectations for the Respondent with regard to the recognition of the arbitration clause by the Applicant. The Applicant was already obliged to negotiate an amicable settlement of the dispute with the investor pursuant to Art. 8(1) BIT. The validity of this provision is not called into question if the provisions following Art. 8(1) BIT, particularly Art. 8(2) BIT, are inapplicable by reason of EU law. | 53 |
| 3. The Respondent has also failed to substantiate any contradictory conduct which would prevent the Applicant in good faith from invoking the absence of an arbitration agreement. | 54 |
| a) Contradictory conduct by a party is, in principle, permissible. It only becomes an abuse of rights if a legitimate expectation has been created vis-à-vis the other party or if other special circumstances make the exercise of the right appear to be contrary to good faith. An exercise of rights may be impermissible if the overall picture objectively shows contradictory conduct, on the grounds that the earlier conduct is factually incompatible with the later conduct and that the interests of the opposing party appear to be more worthy of protection (BGH, Judgment of 15 November 2012 - IXZR 103/11, NJW-RR 2013, 757 para. 12). It should be noted that this is a narrow exception (BGH, NJW-RR 2013, 757 para. 13). | 55 |
| b) In the dispute at hand, no legitimate expectation for the Respondent was created (cf. paras. 44 to 53). There are also no special circumstances which made the exercise of the right appear to be contrary to good faith. | 56 |

| | |
|---|---|
| aa) To the extent that, in disputes with other investors, the Applicant has not invoked the inapplicability of the arbitration clause on the grounds of a contravention of EU law, this shall not have the effect of constituting contradictory conduct in bad faith vis-à-vis the Respondent. A party is, in principle, free to pursue different strategies in disputes with different opposing parties. In the cases cited by both parties, Austrian Airlines and HICEE, the arbitral tribunals also declared themselves to have no jurisdiction because the content of the claims at issue there was not covered by the arbitration clause of the BIT. There was thus no reason to assert the invalidity of the arbitration clauses under EU law. | 57 |
| bb) In the present arbitration proceedings, upon filing the arbitration claim in October 2008, the claimant immediately objected to the arbitral tribunal's lack of jurisdiction on the grounds that Art. 8(2) BIT had become invalid upon the Applicant's accession to the EU. The Applicant has maintained this view unchanged since then. As outlined above (cf. paras. 48 to 53), at no time in the time between the Applicant's accession to the EU and the filing of the arbitration claim in the present proceedings, which is the only relevant period in this respect, did the conduct of the Applicant justify a legitimate expectation on the part of the Respondent to the effect that it would recognise the arbitration agreement as valid. | 58 |
| 4. The Respondent asserts, without success, that the Applicant acquired its legal position through an abuse of rights (*rechtsmissbräuchlich*). The possibility for the Applicant to successfully rely on the absence of an arbitration agreement results from the interpretation of EU law which the Court of Justice of the European Union considers to be correct in the present proceedings. That does not constitute an abuse of rights. | 59 |
| IV. Contrary to the Respondent's proposal in the written statements of 14 September and 29 October 2018, the Senate [this Court] will not consider referring the decision of the Court of Justice of the European Union of 6 March 2018 - C-284/16 to the Federal Constitutional Court (*Bundesverfassungsgericht*) pursuant to Art. 100(1) or (2) of the Basic Law (*Grundgesetz*) in order to have it declared it inapplicable. | 60 |
| 1. A direct application of Article 100(1) of the Basic Law to decisions of the Court of Justice of the European Union is precluded by the wording of the provision. It states that only a statute may be submitted. Whether and under what conditions an analogous application of Article 100(1) of the Basic Law might be considered for an *ultra vires* review in very exceptional cases (cf. *Entscheidungen des Bundesverfassungsgerichts* (hereinafter: BVerfGE) 123, 267, 354 f. [juris para. 241]) does not need to be decided in the present case. | 61 |
| 2. In its decision, the CJEU did not act *ultra vires*, but rather answered the questions referred by the Federal Court of Justice to the extent that it deemed this necessary, in accordance with the division of jurisdiction between it and the national courts pursuant to Article 267 TFEU. | 62 |
| (a) The *ultra vires* review examines whether legal acts of the European institutions and bodies respect the EU law principle of subsidiarity (Art. 5(1) sentence 2 and (3) TEU) within the limits of the sovereign rights granted to them by way of conferral. Beyond that, the identity review serves to examine whether the inviolable core content of the Basic Law's constitutional identity in Article 23(1) sentence 3 in conjunction with Article 79(3) of the Basic Law is maintained (cf. BVerfGE 123, 267, 353 f. [juris para. 240]; 142, 123, 203 para. 153). | 63 |
| The ultra vires review as well as identity review only come into play with regard to "sufficiently qualified" infringements. For this to be the case, the challenged act must result from an obvious exceeding of competences and must carry considerable weight in the structure of competences between the Member States and the EU as regards the principle of conferral and the rule of law (cf. BVerfGE 126, 286, 304 [juris para. 61]; 142, 123, 200 para. 147). In relation to the Court of Justice of the European Union, this would only be the case if a decision exceeded the boundaries of arbitrariness in the interpretation of the Treaties (cf. BVerfGE 126, 286, 307 [juris, para. 66]; 142, 123, 200 f., para. 149 f.). | 64 |
| b) According to these principles, there is no basis in the case at hand for an ultra vires review by the Federal Constitutional Court. In any case, the decision of the Court of Justice of the European Union is not based on an arbitrary interpretation of Articles 267 and 344 TFEU. It was issued in the context of a preliminary ruling procedure under Article 267 TFEU and is thus within the scope of the powers conferred to the Court of Justice of the European Union under Article 23(1) second sentence of the Basic Law. | 65 |
| 3. It is not apparent that in its assessment the Court of Justice of the European Union disregarded the arguments put forward by the Senate [this Court] and Advocate General Wathelet. It simply did not agree with them. Moreover, the CJEU's jurisdiction would remain unaffected, even if it were to have disregarded arguments. If the Senate were of the view that its arguments had not been heard by the CJEU, a new reference for a | 66 |

preliminary ruling would have to be considered. The CJEU's acting ultra vires, however, would be out of the question. The Senate sees no grounds for a new reference for a preliminary ruling in the case at hand.

4. Contrary to the Respondent's view, the Judgment of the Court of Justice of the European Union of 6 March 2018 (SchiedsVZ 2018, 186 - Achmea) does not constitute a general rule of international law, which is integrated into federal law pursuant to Art. 100(2) of the Basic Law and could thus be the subject of a reference to the Federal Constitutional Court.   67

a) The constitutional law term "general rules of international law" encompasses the norms of universal customary international law – that is to say those norms of international law which, on the basis of general practice and a corresponding general legal conviction, are binding on the vast majority of states – as well as the general principles of law supplementing customary international law (cf. BVerfGE 15, 25, 32 f. [juris para. 37]). Stringent requirements must be placed on the establishment of a general rule of international law on account of the fundamental obligation of all states expressed therein (BVerfGE 118, 124, 137 [juris paras. 30 et seq.]; Heintschel von Heinegg in BeckOKGG, 38th ed., Art. 25 GG para. 19). This universal character does not lend itself to a decision of the Court of Justice of the European Union already because its territorial effect is limited to the territory of the EU. Instead, the judgments of the Court of Justice of the European Union interpret EU law, which, on the territory limited to the Community, has created an autonomous legal order in relation to national law.   68

b) The Respondent's submission regarding the decision of the ICSID arbitral tribunal in the case ARS 12/12 - Vattenfall et al. / Federal Republic of Germany of 29 August 2018 and the statements of the Federal Republic of Germany and the European Commission reproduced therein do not lead to a different conclusion. In its submission reproduced under para. 84 of that decision, the Commission explains that the significance of the CJEU's decision in Case C-284/16 (SchiedsVZ 2018, 186 - Achmea) as regards the Vattenfall proceedings lies in the autonomy of the legal system of the EU. The German Federal Government, in paragraph 10 of the "Vattenfall" proceedings, stated that the ICSID Arbitral Tribunal would decide the dispute in accordance with the Energy Charter Treaty and the applicable rules and principles of international law, including EU law and the decision of the Court of Justice of the European Union in Case C-284/16 (SchiedsVZ 2018, 186 - Achmea). The ICSID arbitral tribunal joined this view in para. 150 of the decision.   69

It does not follow from this that judgments of the Court of Justice of the European Union are suitable subjects for referral [to the Federal Constitutional Court] under Art. 100(2) of the Basic Law. According to the system of the Basic Law and the decision-making practice of the Federal Constitutional Court, Art. 100(2) of the Basic Law only permits a referral if there are serious doubts as to the meaning or scope of a general rule of international law (BVerfG [Kammer], EuGRZ 2016, 54, 60 para. 53; NJW 2012, 293, 295 [juris para. 27], each with further references). The explicit reference to Art. 25 of the Basic Law in Art. 100(2) of the Basic Law makes it clear that only questions on the general rules of international law which are integrated into federal law can be the object of a referral (cf. Dederer in Maunz/Dürig, GG, version: April 2018, Art. 100, para. 292). Independent interpretations of EU law by the Court of Justice of the European Union do not constitute general rules of international law on account of their character as decisions taken in respect of individual cases.   70

c) Extending the possibility of referral under Article 100(2) of the Basic Law to questions concerning the meaning or scope of decisions of the Court of Justice of the European Union would also entail a very far-reaching extension of the power of the Federal Constitutional Court to examine acts of the institutions of the European Union, which is incompatible with the primacy of EU law, and which is currently limited to the observance of the fundamental constitutional principles of the Federal Republic of Germany (cf. BVerfGE 142, 123 para. 115 et seq.).   71

V. Lastly, the decision of the Court of Justice of the European Union of 6 March 2018 does not deprive the Respondent of effective legal protection. The judgment of the CJEU is based on the premiss that, in light of the principle of mutual trust between the Member States regarding the recognition of the common values of the Union (Article 2 TEU) and respect for EU law (cf. ECJ, SchiedsVZ 2018, 186 para. 34 - Achmea), the Respondent, as an investor, could obtain effective legal protection before the courts of Slovakia. The decision of the CJEU and the subsequent setting aside of the arbitral award in the case at issue is in no way tied to the deprivation of material claims of the Respondent. Also, no proprietary interest will be taken from the Respondent as a result of the setting aside of the arbitral award in the dispute at hand.   72

D. The Senate's decision is rendered without an oral hearing. While § 128(4) ZPO does in principle provide for the possibility of oral proceedings in the case of legal appeals pursuant to § 1065(1), § 577(6) first sentence ZPO, following the preliminary ruling of the Court of Justice of the European Union, there was no need for such a hearing. 73

E. The decision on costs is based on § 91 (1) ZPO. 74

Koch   Feddersen   Schaffert   Schmaltz   Kirchhoff

Previous instance:

Frankfurt am Main Higher Regional Court, Decision of 18.12.2014 - 26 Sch 3/13 -