# EXHIBIT 86

# VOGIIIS

**AMSTERDAM COURT**

Civil law

zaaknuiuiner / rolnuininer: C/13/728512 / HA ZA 23-64

**Judgment of 5 February 2025**

in the case of

the legal person under foreign law KINGDOM OF
SPAIN,
based in Madrid, Spain;
plaintiff,
Advocate Mr P.L. Tjiam of Amsterdam,

at

1.        The cooperative with excluded liability AES
SOLAR ENERGY **COÖPERATIEF U.A.,**
based in Amsterdam,
2        The private limited liability company AMPERE
**EQUITY FUND** B.V.,
based at Schiphol Airport,
defendants,
Advocate Mr D. Knottenbelt of Rotterdam.

The parties will hereinafter be referred to as Spain, AES and

AEF. The zaah in brief

Spain has been ordered in an arbitral award to pay damages to AES and AEF. The
arbitration was initiated on the basis of the Energy  Treaty. The court that that order
against Spain constitutes a form of state aid if enforcement action is taken against Spain.
In that , AES and AEF will be ordered to repay what Spain has paid.

1.        The **procedure**

1.1.        The course of the proceedings in the main case appears tiit:
- writs of summons dated 22 December 2022, with exhibits,
- the reinstatement summons against AES,
- the deed of amendment of claim and production of exhibits, taken on the roll of 1 6
   August 2023,
- AES and AEF's deed letting out claim amendment dated 1 6 August 2023,

_____

- a written document dated 23 December 2023, the European Commission (further: the
  Commission) exercised its power' to submit comments on the case in an ongoing
  procedure in which state aid is (being) raised.
- Spain's act amending requirement of 1 May 2024,
- the reply act claim modification
- the judgment in incident dated 29 May 2024[2], and the correspondence and
  documents referred to therein in the incidental phase of these proceedings, in which
  the court assumed jurisdiction in this case,
- the statement of reply, with exhibits,
- 's additional written comments dated 17 October 2024,
- the 4 November 2024 post-objection email from AES and AEF, in which the court
  informed the parties and the that the Commission's written submissions would be
  allowed,
- the minutes of 13 November 2024 of the oral hearing in the main proceedings
  held that day and the procedural documents and procedural acts contained
  therein, the Commission having been represented by its legal service during the
  oral .
- the letter dated 17 December 2024 from AES and AEF with additions and comments to
  the minutes.

1.2.      Finally, judgment was .

1.3.      The Commission submitted its written observations in the main case and was
invited to the oral  of the main case. The parties responded orally to the 's final written
submissions.

**2.       Reading guide**

2.1.      ln Chapter 3 the relevant facts are presented, Chapter 4 Spain's claims, a summary
of the parties' positions and the Commission's comments. Chapter 5 contains explanations
of the Union law rules on State aid and the ECT Treaty'. Chapter 6 assesses whether the
subject matter of dispute in these proceedings is governed by the Union law rules on State
aid, or by the provisions of the ECT. Chapter 7 assesses Spain's claims under the rules
deemed applicable.

3.       The facts

3.1.      By arbitral award dated 28 February 2020 of the ad hoc arbitral tribunal of the
Permanent Court of Arbitration (PHA), Spain was ordered to pay 15.4 million

_____

' Article 29(2) of the Council Regulation (EU) 2015/1589 laying detailed rules for the application of
Article 108 of the Treaty on the Functioning of the European (Codification); OJ L 248, 24 2019, p. 9
(further: the Procedural Regulation).
[2] Amsterdam District Court, 29 May 2024, ECLI:NL:RBAMS:2024:3156.
' Energy Charter Treaty, Lisbon, 1994-12- 17, Trb. 1995, 108 (and also OJ 1994,
L 380, p. 24); the name of the treaty in its original language (English) is The Energy Charter Treaty
(ECT).

euro to AES and €11.1 million to AEF, plus costs and interest. The PHA arbitral tribunal chose Switzerland as the place of arbitration.

3.2.    In that arbitration between AES and AEF (and other companies) on the one hand and Spain, on the other hand, focused on the following facts:

3.2.1.    In 2007, Spain introduced a scheme to incentivise the production of electricity from solar energy, implementing European Union Directive 2001/77/EC[4] on renewable energy.

3.2.2.    In 2008, the 2007 scheme was re-adopted for installations that the deadline for applying for the 2007 scheme. The content of the scheme was not changed.

3.2.3.    Spain's 2007 scheme provided favourable financial conditions for investors in solar energy installations in Spain. AES and AEF invested in such installations in Spain from 2007 onwards and invoked the 2007 scheme. Spain deemed the 2007 scheme applicable to AES and AEF's investments.

3.2.4.    This created a legal relationship between Spain, on the one hand, and AES and AEF, on the other. That legal relationship is governed by the provisions of the ECT because Spain and the Netherlands are Contracting Parties to that international agreement. One such provision is an arbitration clause (other provisions of the ECT are in more detail in The ):

> Article 26 Settlement of disputes between an investor and a **Contracting Party**
> 1.    Disputes between a Contracting Party and an investor of another Contracting Party concerning an investment of the latter in the territory of the former, which relate to the alleged non-fulfilment of an obligation of the former Party arising under Part III of this Treaty, shall be settled, if possible, by amicable agreement.
> 2.    If such disputes are not in accordance with the provisions of subsection 1 can be settled within a period of three months from the date when either party to the dispute has requested an amicable settlement, the dispute shall be submitted at the request of the investor concerned:
>     a.    to the courts or administrative authorities of the Contracting Party that is party to the dispute, or
>     b.    in accordance with an applicable, previously agreed dispute settlement procedure, or
>     c.    in accordance with the following paragraphs of this .
> 3.    a. Subject only to the provisions of subparagraphs (b) and (c), each Contracting Party gives its unconditional consent to the settlement of a dispute

[4] Replaced on 23 April 2009 by Directive 2009/28/EC of the European Parliament and of the Council and on 11 December 2018 by Directive (EU) 2018/2001, OJ L 328.

submit to international arbitration pf mediation in accordance with the provisions of this article.

8.  Arbitral awards, which may the award of interest, shall be final and binding on the parties to the . (...) Each Contracting Party shall promptly comply with any such award and ensure the effective enforcement of such awards within its territory.

3.2.5.    Spain amended the 2007 scheme in 2010, as a result of which investors in solar energy installations in Spain receive lower subsidies and, for certain installations, for a shorter period than provided in the 2007 scheme. Spain did not notify the  scheme and the 2010 amendments to that scheme to the Commission as State aid (within the meaning of Article 107(1) TFEU').

3.2.6.    AES and AEF - and other investors in solar installations in Spain - have been of opinion that they suffer damages as a result of the amendments to the 2007 regime because their investments in solar installations in Spain have become worth less due to the amendments. No agreement on possible compensation was reached between Spain and those investors at the time (2010/2011) (as per Article 26(1) ECT). Then, in 2011, a group of investors (including AES and AEF) took Spain to arbitration before the PHA arbitral tribunal.

3.2.7.    In 2013 and 2014, Spain repealed the 2007 scheme and replaced it with six new laws for investments in solar energy installations with different financial conditions. In December 2014, Spain notified these changes (further: the 2014 scheme) to the Commission as state aid.

3.3.    In its decision of 10 November 2017 (the Approval Decision), the Commission considered the compensation that Spain will pay to private companies on the basis of the 2014 scheme to be compatible with the internal market. This includes payments to investors based on previous regulations in Spain (the 2007 scheme and its amendments in 2010).

3.4.    AES and AEF requested on 10 December 2020 that the District Court for the District of Columbia in the United States of America (US) (i) enter an order recognising and affirming the arbitral award of the PHA Arbitral Tribunal in the United States of America (US) or (ii) enter an award in favour of AES and AEF in the amount of damages awarded by the PHA Arbitral Tribunal.

3.5.    Spain brought an appeal to the Swiss Supreme Court to set aside the 28 February 2020 arbitral award. The Swiss Supreme Court, in its ruling of 23 February 2021, dismissed the action to set aside the arbitral award.

Treaty on the Functioning of the European , Trb. 2013, 109.
[6] Commission decision on *"State Aid SA.40348 (2015'NN) - Spain"*.

3.6.     On 6 July 2021, Spain notified the PHA arbitral tribunal ruling as aid to the
, which acknowledged receipt of the notification on 14 September 2021 and
registered it under number SA.64761.

3.7.     By deeds of assignment dated 13 and 17 January 2023, AES and AEF assigned
their title from the arbitral award to Blasket Renewable Investments LLC (hereinafter
referred to as Blasket), based in Wilmington, Delaware, United States of America.

3.8.     AES and AEF sold their renewable energy investments in Spain to another
investor in 2015.

## 4.     The dispute

4.1.     Spain claims, after claim amendments (last of 1 May 2024), by judgment - as
far as possible provisionally enforceable:

| | |
|---|---|
| I. | rule that the 2007 scheme constitutes aid within the meaning of Article 107(1) TFEU; |
| 11. | Rule that the 2007 scheme was not notified to the European in accordance with Article 108(3) TFEU and constitutes unlawful State aid; |
| III. | that the compensation awarded by the PHA Arbitral Award of 28 February 2020 constitutes aid within the meaning of Article 107(1) TFEU, and results in unlawful aid as long as the European Commission has not declared the Arbitral Award compatible with the internal market under Article 107(3) TFEU; |
| IV. | rule that the recovery of damages awarded by the PHA Arbitral Tribunal by Arbitral Award of 28 February 2020 is contrary to Union law, so long as the European Commission has not declared that arbitral award compatible with the internal market; |
| v. | rule that there was no legitimate expectation on the part of the defendants or any other undertaking connected with them within the meaning of Article 3(3) of Annex I to Regulation (EU) No 651/2014 that they were entitled that aid measure contained in the 2007 Scheme; |
| VI. | that any payment made by Spain to Blasket or any other party in respect of the damages awarded to AES and AEF  the PHA Arbitral Award of 28 February 2020 constitutes unlawful State aid in favour of AES and AEF for as long as the European Commission finds the Arbitral Award incompatible with the internal <br> market declared under Article 107(3) TFEU; |
| VII. | *Primarily,* order AES to pay to Spain EUR 15.4 million, plus interest at the rate of the Spanish 10-year bond interest rate from 30 June 2014 until the Spain paid that amount to Blasket or any  party pursuant to the Arbitral Award, *in the alternative,* if Blasket or any other party obtains leave to enforce the Arbitral Award, the amount to be paid to Blasket or any  party, *in the further alternative,* if Spain, whether or not by enforcing |

the Arbitral Award makes a payment to Blasket or any other party, the amount paid by Spain, all so long as the European has not declared the Arbitral Award compatible with the internal market Article 107(3) TFEU;

VIII.   *Primarily,* order *AEF* to pay to Spain EUR 1 l, 1 million, plus interest at the rate of the Spanish 10-year bond interest rate from 30 June 2014 to the Spain that amount to Blasket or any other party pursuant to the Arbitral Award, *in the alternative,* if Blasket or any other party obtains leave to enforce the Arbitral Award, the amount to be paid to Blasket or any  party, *in the further alternative,* if Spain, whether or not by enforcing
the Arbitral Award makes a payment to Blasket or any other party, the amount paid by Spain, all so long as the European has not declared the Arbitral Award compatible the internal market Article 107(3) TFEU;

IX.     Order AES to pay statutory interest on EUR 15.4 million, plus interest at the rate of the Spanish 10-year bond interest rate from 30 June 2014 starting from 10 December 2021, *alternatively* 13 January 2023, *in the further alternative* from the day of payment of the said amount or any other amount to Blasket or any other party executing the Arbitral until the day of payment in full;

X.      Order AEF to pay statutory interest on EUR 11.1 million, plus interest at the rate of the Spanish 10-year bond rate from 30 June 2014 starting from 10 December 2021, *in the alternative* from 17 January 2023, *in the further alternative* from the day of payment of the said amount or any other amount to Blasket or any other party executing the Arbitral until the  of payment in full;

XI.     order AES and AEF to pay the costs incurred by Spain in the proceedings, including the follow-up costs, the court fees due and the lawyer's fees estimated up to this judgment.

4.2.    To this end, Spain argues - in brief - that it follows from settled case-law of the Court of Justice of the EU (hereinafter: CJEU) that Spain's payment obligation from the arbitral award is state aid.

Whether there is State aid does not depend on an actual payment by Spain, what matters whether an entrepreneur has obtained an advantage that must be paid by Spain or  from Spain's exchequer. This is the case because the arbitral award requires Spain to pay damages to AES and AEF.

In addition, the amount of compensation was budgeted on the basis of the 2014 scheme. This scheme is an aid measure that the Commission declared compatible with the internal market in 2017. This also declared payments under the 2007 scheme compatible with the internal market. In that Approval Decision, the also included that the arbitral award (then yet to be ) constituted state aid.

Under its obligations to other EU member states, Spain had to notify the payment obligation from the arbitral award as state aid to the Commission for examination of the internal market compatibility of that payment. Until the Commission ruled on the compatibility with the internal market of the

---

payment obligation from the arbitral award, Spain may not make any payment under that arbitral award (the standstill obligation under Article 108(3) TFEU).

The enforcement of the arbitral award in the US may result in payment to Blasket from the State Treasury of Spain under the arbitral award notified as State aid. Claims VII and VIII are therefore conditional recoveries of state aid. Their payment is unlawful until the Commission has decided on the compatibility of that State aid with the internal market. Spain is bring such claims under EU law.

The arbitral award was notified to the shortly after it became final (due to the rejection of the claim for annulment of the arbitral award by the Swiss Supreme Court). Thus, there is no legal estoppel concerning Spain's legal claims. It also follows from the case-law of the CJEU that the notification of an aid measure cannot be a misuse of law. It is not Spain's fault that the Commission has not yet ruled on the compatibility of the arbitral with the internal market, according to increasingly Spain.

4.3.    AES and AEF argue - in outline - that the arbitral award is an obligation under the ECT and that it is not subject to Union law regulations on state aid.

In addition, no (unlawful) state aid has yet occurred because Spain has not yet fulfilled the payment obligation from the arbitral award. The arbitral award has also not yet been enforced. Spain wrongly notified the payment obligation from the arbitral award to the Commission as aid. There is also no need to maintain the standstill obligation. This in itself is sufficient reason to reject Spain's claims against AES and AEF.

Moreover, Spain has no interest in the claims against AES and AEF. The 2007 Scheme is not at issue in these proceedings, so Spain  no interest in the claims thereon (Section 3:303 of the Civil Code). The other declarations of law claimed should be claimed against those directly involved. This is no longer the case because AES and AEF have sold their title from the arbitral award to Blasket. That is an additional reason why the payment claims cannot be awarded against AES and AEF, according to increasingly AES and AEF.

4.4.    The Commission notes - in summary - that it considered in the November 2017 Approval Decision that an award in the then pending arbitration between AES and AEF, on the one hand, and Spain, on the other, constituted state aid.

A treaty of which the EU has become a member cannot affect primary Union law. Union law rules on state aid therefore do apply to the compensation Spain must pay to AES and AEF under the arbitral award.

In that judgment, an advantage was granted to AES and AEF that should be met with state resources from Spain. That is when the State aid arises and from  on Spain is obliged by the principle of loyalty (Article 4(3) TEU') towards other EU Member States to follow Union law rules on State aid. The payment obligation from the arbitral award must notified as State aid to the Commission and Spain must  every effort to prevent AES and AEF from

---

[7] Treaty on European , Trb. 2008, 11 and Trb. 2010, 43.

effectively of the advantage awarded to them until the Commission has decided that Spain's payment obligation from the arbitral award is compatible with the internal market. That prevention of AES and AEF being able to dispose of the advantage awarded to them is at in these proceedings. The attempt to enforce the arbitral award in the US, and the subsequent assignment of the title from the arbitral award by AES and AEF to Blasket, should not be grounds for Spain's claims against AES and AEF. If so, Union law on state aid could easily be circumvented. This is not desirable, especially when an EU member state and companies from another EU member state are involved, it keeps saying.

4.5.     The parties' and the Commission's contentions are discussed in more detail below, where relevant.

## 5.     The assessment: legal framework

5.1.     At the centre of these proceedings is the arbitral award ordering Spain to pay damages to AES and AEF. Spain argued, supported by the Commission, that that payment obligation from that arbitral constituted State aid (within the meaning of Article 107 TFEU) and notified it to the as such. AES and AEF contested the of State aid. AES and AEF'most far-reaching defence is that arbitral is governed by the ECT and not the EU law rules on state aid.

5.2.     This chapter sets out the European state aid regulations and the provisions in the ECT.

*About slaalssleun*

5.3.     State aid regulation is entirely governed by Union law as stipulated in Articles 107 to 109 TFEU and further explained and clarified in the Procedural Regulation,' the 's notices on judicial enforcement of competition law' and case law of the CJEU. The need for these Union law rules lies in the internal market created by the Union. (Article 3(2) TEU).

5.4.     Article 107(l) TFEU state aid:

> Save as otherwise provided in the Treaties, any aid granted by a Member State or through State resources in  form whatsoever which distorts or threatens distort competition by favouring certain undertakings or the production of certain goods shall, in so far as it affects trade between Member States, be incompatible with the internal market.

see note 1.
  The Commission Notice on the enforcement of State aid law by national , OJEU 2021 C 305/01, 30 July 2021 (further: Notice 2021/C 305), and
Commission notice on the recovery of unlawful and incompatible State aid, OJ 2019 C 247/01, 23 July 2019 (further: 2019/C 247 notice).

5.4.1.    Often, an aid measure will follow from a policy or laws of an EU Member State, such as in this the 2007 scheme and the 2014 scheme by Spain. It follows from established case-law of the CJEU, as well as the Notices, that a judgment ordering an EU member state to pay damages to a private company established in an EU member state can also be considered state aid under specific conditions.

5.4.2.    According to that settled case-law of the CJEU, the classification as State aid within the meaning of Article 107(1) TFEU requires that all the conditions set out in Article 107(1) TFEU are met. Thus, for a measure to as State aid, it must first be a measure taken by the State or through State resources. Second, the measure must be liable to affect trade between Member States. Third, it must confer an advantage on the beneficiary, and fourth, it must distort or threaten to distort competition[10]. In this, the source of the state aid - a financial policy put in place by the EU Member State (as here the 2007 scheme and the 2014 scheme) or a conviction of the EU Member State as described above - is irrelevant according to the settled case-law of the CJEU and the aforementioned Communications on State Aid.

5.4.3.    The further interpretation of the concept of State aid (as follows from settled case law of the CJEU and the 's communications) is discussed in more detail in the following chapters - to the extent that Union law is applicable in these proceedings, which will be decided first in the next .

5.5.    Article 107(2) TFEU lists a number of types of aid that are with the internal market.

5.6.    Article 107(3) TFEU lists a number of aid measures that *'may be considered to be compatible with the internal market'.* Other articles of the TFEU also set out the conditions under which State aid is or may be compatible with the internal [11]. These articles are not at issue in these proceedings.

5.7.    Article 108(3) TFEU requires a Member State to notify any plans to introduce or alter aid measures to the . Other regulatory documents' have expressly repeated that changes existing state aid must also be notified.

5.8.    Article 108(3) TFEU is the so-called standstill obligation. Member States are prohibited from implementing the proposed aid measure before the Commission has adopted a final decision on compatibility with the internal market."

---

[10] General Court of the EU 2 October 2024, *(European Food SA, Micula and others v European Commission),* Cases T-624/15 RENV and T-694/15 RENV, ECLI:EU:T:2024:659, paragraph 116 and the case law contained therein, and CJEU, 25 January 2022, *(European Food SA, Micula and others v European Commission),* Case C-638/19 P, ECLI:EU:2022:50, paragraph 121.
[11] Articles 42, 93, 106(2), and 108(4) TFEU.
[12] E.g. Communication 2021/C 305, paragraph 12; as also Article 1(c) Procedural Regulation. ' Communication 2019 C 247, paragraph 12.

C/13/728512 / HA ZA 23-64                                                        10
5 February 2025

---

5.8.1.    Unlawfully paid state aid exists if the Member State makes a payment to a
private company under a new aid measure that has not notified to the Commission or for
which the  not yet decided that the aid measure is compatible with the internal market. In
that case, the Member State has the obligation to recover the illegally paid state aid in
proceedings before a national court'[4].

5.8.2.    In addition, the  may order the EU Member State to recover the unlawful state
aid paid (a recovery decision') before the competent national . This procedure does not
involve recovery decision, but Spain wants to avoid having to pay before the decision
on compatibility or non-compliance is .

5.8.3.    If the state aid is an order by the EU member state to pay a private , the judgment
may have res judicata (or irrevocable) under the law under which it was made. A judgment
with res judicata may not be challenged again. The principle of primacy of Union law
entails that national courts must ensure the full effect of the provisions of Union law, , if
necessary of their own motion, any conflicting national provision. This also applies to
national rules laying down the principle of res judicata. The finality of a judgment
therefore does not the possible granting of a recovery of any unlawfully paid State aid."

5.8.4.    further interpretation of the standstill obligation - and in particular as to when State
aid arises: by payment or by an entitlement to payment - as it follows from settled case law
of the CJEU and the Commission' communications, will be in more detail in the following
chapters (if Union law applies in these proceedings, which will be decided first in Chapter
6).

5.9.      The requested national court organisation must assess recoveries of unlawfully
paid state aid on the basis of national law" and take the  measures so that the beneficiary
(AES and AEF in this case) cannot freely dispose of the aid - or the advantage enjoyed -
until the Commission has ruled on its compatibility with the internal market". All this also
applies to claims that concern the enforcement of the EU Member State's standstill
obligation.

5.10.     It follows from the above that if the Union law rules on state aid apply in
these proceedings, Spain's legal claims should be

'[4] Communication 2019/C 247, para 13.
" Article 16(1) Procedural Regulation.
'^ Communication 2021/C 305 paragraphs 30 to 33 and the case law cited therein.
[1] Communication 2021/C 305, paragraph 11. See also: CJEU 5 March 2019, *(Easti Pagar),* Case C-349/17,
ECLI:EU:C:20 19:172, paragraphs 88 and 89 and CJEU 3 March 2020, *(Vodafone Magyaroszàg),* case C-
75/18, ECLI:EU:C:2020:139, paragraphs 22 and 23.
" CJEU 21 November 2013, *(Deutsche Lufthansa),* Case C-284/12, ECLI:EU:C:20 13:755.

C/13/728512 / HA ZA 23-64                                                                                    11
5 February 2025

assessed under Dutch law. Spain must then have an interest in the legal actions brought (articles 3:302 and 3:303 Civil Code (BW)) and, furthermore, the legal actions must be based on a statutory provision in Dutch law.

5.11.    In the case of a State aid claim, the national court has jurisdiction to rule on whether the statutory scheme (or under which a payment has been made by an EU Member State to a private company) constitutes State aid within the meaning of Article 107(1) TFEU" and on the enforcement of the standstill obligation[20]. The national court may not express an opinion on whether that statutory scheme is compatible with the internal market. That is an exclusive competence of the Commission".

5.12.    Furthermore, the notification of state aid and the subsequent course of action after such notification are governed by the Procedural Regulation. The Procedural Regulation sets out deadlines for the to examine the compatibility of notified State aid with the internal market. However, the deadlines set out therein do not apply to formal investigations of unlawful aid, which is as new aid put into in contravention of Article 108(3) TFEU, see Article l(f) and Article 15(2) Procedural Regulation.

*About the ECT*

5.13.    In 1991, Spain and the Netherlands concluded the ECT. The EU joined this treaty in 1994. Since then, all EU-I id States have been Contracting Parties to the ECT. Besides the EU member states, other countries (including countries from the European Economic Area and from outside Europe) have also joined the ECT.

5.14.    The provisions in the ECT apply between the Contracting Parties, and also apply to legal relations between a Contracting Party (in this case Spain) and an undertaking (investor) from another Contracting Party (in this case AES and AEF).

5.15.    The Preamble to the ECT states:

> **Preamble**
>
> Guided by the desire to establish the structural framework required to put into practice the principles set out in the European Energy Charter;
> Guided by a desire to give concrete expression to the rationale of the European Energy Charter,  that it should act as a catalyst for economic growth by taking measures to liberalise investment and trade in energy;

'* Communication 2021/C 305 paragraphs 56 to 58; CJEU 11 November 2015, *(Klausner* leo/s)*, Case C-505/14, ECLI:EU:C:2015:742, paragraphs 18 to 26.
°' Communication 2021/C 305 paragraphs 61 to 63.
" Communication 2021/C 305 para 34 and the CJEU case-law cited therein.

Affirming that the Contracting Parties attach the utmost importance to the effective application of the principle of full national treatment and most-favoured-nation treatment, and that these obligations will apply *to the* making of investments under a Supplementary Treaty;

Considering competition rules on mergers, monopolies, anti-competitive behaviour and abuse of dominant position;

5.16.    Part I (Definitions and purpose) :

**Article l Definitions**

2  "Contracting Party" means a State or regional  integration organisation that has consented to be bound by the Convention and for which the is in force;

3  "Regional Economic Integration Organisation" means an organisation constituted by States to which its Member States have transferred competence over a number of matters, some of which governed by this Convention, including the authority to make decisions binding on its Member States in respect of those matters;

6. "investment" means any form of asset that an investor owns or , directly or indirectly, (...);

(9) "returns" means derived from or in connection with an investment, regardless of the form in which they are paid, including profits, dividends, interest, capital gains, royalty payments, management or technical support fees or other forms of remuneration and payments in kind;

**Artihel** 2 **Purpose of** the **Treaty**
The  of this Treaty is provide a legal framework for the promotion long-term cooperation in the field of energy on the basis of mutual benefit and complementarity and in accordance with the objectives and principles of the .

5.17.    Part III ECT provisions on investment promotion, protection and treatment, which - as far as relevant in these proceedings - read:

**Artihel 10 Investment promotion, protection and treatment**
1.    Each Contracting Party shall, in accordance with the of this Treaty, promote and create stable, equitable, favourable and transparent conditions for the making of investments in its territory by investors of other Contracting Parties. Such conditions include a commitment to always treat investments of investors of other Contracting fairly and equitably. Such investments shall further enjoy durable protection and security and the Contracting Parties shall not, by unreasonable or discriminatory measures

prejudice their management, conservation, use, enjoyment and disposal. In no case shall such investments  treated less favourably than by international law, including treaty obligations. Each Contracting Party must honour obligations it has assumed towards investors or in respect of investments made by investors of another Contracting Party.

Article l6 Relationship to other agreements
Where two or more Contracting Parties have already entered into, or subsequently enter into, an international agreement, the provisions of which relate to the subject matter of Part III or Part V of this Convention,
1.   no provision of Part III or Part V of this Convention shall be so as to from any provision of that , or any right to settle disputes thereunder; and
2.   no provision of that agreement may be interpreted in such a way as to affect any provision of Part III or Part V of this Treaty or any right to settle disputes relating thereto under this Treaty,
when that provision is more favourable to the investor or the investment.

5.18.    Part V a Dispute Settlement Scheme, including the arbitration clause as set out under3.2.4.

5.19.    Part lV  various provisions on taxes (Article 21) and exemptions (Article 24). The dispute between Spain on the one hand and AES and AEF on the other does not concern these two articles of the ECT. Therefore, they are not subject to further substantive discussion. AES and AEF have referred to these articles in support of their defence that the ECT rules apply to the arbitral award and not the Union law rules on State aid. Articles 21 and 24 ECT concern matters that are also regulated in the TFEU, AES and AEF argued.

**6.    The assessment: ECT or Union law on state aid applicable**

6.1.    The most far-reaching defence of AES and AEF is that Spain is wrong to invoke Union law rules on state aid. The relationship between the parties is  by the rules of the ECT, according to AES and AEF. Sections 6.1.1 to 6.1.7 the views of AES and AEF on this . These will be addressed from 6.2 to 6.13.

*Views of AES and AEF on non-applicability to arbitral award of Union law*

6.1.1.    AES and AEF argue that the found the payments under the relevant Spanish aid measures (the 2007 scheme, 2010 amendment and the 2014 scheme) to be compatible with the internal market. This ends the role of EU law state aid rules.

6.1.2.    Between Spain, on the one hand, and AES and AEF, on the other, the ECT applies. The ECT has several obligations with which the contracting parties must comply. Under Article 10 ECT, contracting parties are obliged to provide *"stable, fair,*

*favourable and transparent conditions".* They are required to *"treat* investors *fairly and equitably"* and further provide *"effective means"* for the *"enforcement of rights concerning investments".*

6.1.3.    Furthermore, the ECT has a dispute resolution scheme, gives the investor the right submit a dispute to an arbitral tribunal. That is what AES and AEF (and many other investors) have done. The outcome of that arbitration (the arbitral award) flows from the ECT and is therefore in itself also an obligation under the ECT. The performance of the obligations under the arbitral award is governed by the regulations of the ECT, in particular the provisions of Article 10.

6.1.4.    Spain was ordered in the arbitral award to pay sums of money to AES and AEF because Spain had acted in breach of Article 10 ECT. During the arbitration, Union law rules on state aid were not raised by Spain.

6.1.5.    Spain evades its obligations under the ECT to comply with the arbitral award by invoking the standstill obligation under Article 108(3) TFEU. Spain thus invokes its own internal (substantive) rules to fail to comply with its obligations under the ECT. This is not allowed (see Article 27 TFEU[.1]). This also applies to the EU as a Contracting Party the ECT. EU law is to be  as national and substantive law of the EU, also of Spain. In Article 46 ECT provides that a contracting state may not subsequently invoke the invalidity of that concluded treaty on the basis of conflict with a provision of national law. This  the case in this instance because the EU has declared Article 26 ECT inapplicable, seeking to render the PHA Arbitral Tribunal incompetent to decide the dispute between AES and AEF on the one hand and Spain on the other.

6.1.6.    Article 16 ECT stipulates that other existing or future international treaties should not affect the investor protection as provided in the ECT (e.g. in Article 10 ECT).

6.1.7.    The ECT does not provide that Union law rules on state aid also apply to an obligation under that treaty. If the EU (or its Member States) had wanted to achieve this, it should have had it included in the ECT that those obligations under the ECT are also  to Union law rules on state aid. This has been , for example, for national security (Article 24 ECT) and taxation (Article 19 ECT). Therefore, the Union law rules on state aid also do not apply to the arbitral award, AES and AEF keep saying.

*Assessment of the above defence by AES and AEF*

6.2.    The relationship between the ECT and Union law is at the heart of *Komstrofi' judgment.* That judgment deals, inter alia, with the competence of the CJEU to  cognisance of preliminary questions on the term *'investment'* from Article 1(6) ECT

[22] The Vienna Convention: Vienna Convention on the Law of Treaties, Trb. 1972, 51 and Trb. 1985, 79.
[2'] CJEU 2 September 2021, *(Komstroy),* Case C-741/19, ECLI:EU:C:2021:655, para 66; the Opinion of the Advocate General ECLI:EU:C:2021:164.

by the civil court in Paris, France, proceedings to set aside an ICSID arbitration award (rendered in Paris, France), between Komstroy
- an apparently Ukraine-based company - and the Republic of Moldova.

6.2.1.    The contention in those proceedings is that the CJEU has no jurisdiction  the question referred for a preliminary ruling (on Article 1(6) ECT), as European Union law does not apply to the dispute at in the main proceedings because the parties to that dispute have nothing to do with the European Union'[4].

6.2.2.    The CJEU considers that the ECT  an international agreement to which the EU is party by an act of the Council[25]. It follows from settled case-law that the provisions of an international agreement concluded by an EU institution, form part of the legal order of the Union and that the CJEU has jurisdiction to rule on the interpretation of that agreements [6].

6.3.    The above certainly applies in these proceedings between an EU Member State and investors from another EU Member State[2'].

6.4.    It therefore follows from the settled case-law of the CJEU that the provisions of the ECT are part of Union law. Spain therefore has an obligation to  with the arbitral award in accordance with the provisions of Article 10 ECT and, at the same time, Spain has obligations under Articles 107 and 108 TFEU.

6.5.    This explanation also fits with the way Contracting Parties and investors implement the ECT.

6.5.1.    AES and AEF also consider that a modification of the aid measure that allowed them to claim favourable financial terms for their investments in Spain should be notified to the Commission. This for examination of the compatibility with the internal market of the payments to the private company under that (proposed) amendment to the aid measure.

6.5.2.    Furthermore, it is not in dispute between the parties that those amended financial terms can only be claimed after the has declared the amended aid measure compatible with the internal market.

6.6.    It is obvious that the above would then also apply to the payment obligation of the EU member state from a judgment rendered in a dispute between an investor (or investors) from another Contracting Party and that EU member state. AES and AEF have not made it clear that within the ECT's regulations an EU I 's payment obligation from a judgment should be considered differently
than a payment obligation of that EU member state from a proposed modification of an aid measure declared compatible with the internal market such as the 2007 scheme.

[2'] *Komstroy,* ECLI:EU:C:2021:164, para 21.
[2'] Article 16 Treaty on European Union (TEU): 'The Council, together with the European Parliament, shall legislative and budgetary functions'.
[2'] *Komstroy,* ECLI:EU:C:2021:164, para 23 and the judgments cited therein.
[2'] Komstroy, ECLI:EU:C:2021:164, para 29 and the case law cited therein.

6.7.      Indeed, the payment obligation of the EU member state from a judgment may involve an additional advantage to those investor(s) with whom the EU member state has a dispute over the aid measure and may be considered as modification of that aid measure in favour of those investor(s). Such favouring of that investor(s) may then distort or threaten to distort competition (Article 107(1) TFEU). It follows that an order by an EU Member State to pay a private company can also constitute aid. Therefore within the system in which EU Member States loyally cooperate in the fulfilment of the duties arising from the TEU and the TFEU (Article 4(3) TEU), the notification of such a judgment as aid to the Commission is consistent with international law in general, EU rules and the ECT.

6.8.      In this respect, it is irrelevant whether the award was made by a national court or an arbitral tribunal, as AES and AEF argued at the hearing. Indeed, it is the payment obligation of the EU Member State that must be examined for compatibility with the internal market, regardless of the source of that payment obligation.

6.9.      Further, it is therefore immaterial that, in the dispute between AES and AEF, on the one hand, and Spain, on the other, the PHA arbitral tribunal considered in the arbitral award that the compensation awarded to AES and AEF was compatible with the internal market (or correct because it was assessed in accordance with the 2014 compatible scheme).

6.9.1.    That the arbitral tribunal considers that its decision is fully in  with the Approval Decision is also to these proceedings. After all, the Commission has exclusive competence to assess whether state aid is compatible with the internal market.

6.9.2.    Therefore, what positions Spain took on possible state aid in that arbitration is also irrelevant in these proceedings.

6.10.     AES and AEF's reliance on Article 16 ECT does not . That article deals with the ranking of similar provisions in an international agreement other than the ECT in the event that both international agreements apply to the legal relationship between those parties. That is not the case in this . Indeed, Parts III and V of the ECT do not contain any provisions on State aid.

6.11.     AES and AEF argued that the EU, or the EU Member States, should have had it included in the ECT that EU law rules on state aid also apply to an (arbitral) award made under Article 26 ECT. This argument does not succeed. There is no provision in the ECT that amendments to aid measures (which regulates favourable financial conditions for investors) are subject to EU law state aid rules. Nevertheless, all parties involved in the ECT and those involved a legal relationship to which the ECT applies adhere to those Union law State aid rules when amending the (previously declared compatible with the internal ) aid measure. Why there specifically an arbitral award the ECT should have a provision to make it subject to Union law state aid rules has not been made by AES and AEF (see also 6.6 and 6.7). Moreover, it is unusual for an international agreement to include provisions

assume that a national statutory provision of the State in which the characteristic performance of that contract is performed is applicable to the legal relationship between those contracting parties. After all, that speaks for - even under international law rules. This also applies to this case in which the EU is the Contracting Party.

6.12.     Under the above circumstances, AES and AEF's reference to Articles 21 and 24 ECT cannot help them.

6.13.     The court comes to the interlocutory conclusion that, in addition to the ECT provisions, Union law rules on state aid also apply to Spain's payment obligation from the arbitral award. It must be examined whether that payment obligation constitutes state aid within the meaning of Articles 107 and 108 TFEU.

6.14.     Introductory considerations for that question of law will be  first. From 7.8 onwards, the parties' views, and the 's comments, on them will be discussed.

## 7.        The substantive assessment of legal claims

*Introduction to consideration of the parties' substantive submissions*

7.1.     As already considered in section 5.1 above, the central issue in these proceedings is the arbitral award, ordered Spain to pay damages to AES and AEF. Spain has argued that the payment obligation from the arbitral award constitutes aid within the meaning of Article 107(1) TFEU. AES and AEF have disputed this at length.

7.2.     In considering the parties' substantive positions, the following circumstances are relevant:

7.2.1.     The dispute between AES and AEF, on the one hand, and Spain, on the other, which  to the arbitral award is entirely on the 2007 scheme, its amendments in 2010 and the 2014 scheme. There is no between the parties that these schemes constitute aid within the meaning of Article 107(1) TFEU.

7.2.2.     In its 2017 Approval Decision, the Commission declared the compensation for renewable energy installations in Spain on the basis the 2014 scheme, and the payments made by Spain on the basis of the previous schemes (in that : *"premium economic scheme "*), compatible with the internal market.

7.2.3.     Furthermore, it is not in dispute between the parties that in the period from 2007 to 2015 (when AES and AEF sold their investments in the plants in Spain), Spain always paid AES and AEF in accordance with the aid measures (compatible with the internal market).

7.2.4.    It also follows from the above that the *"proceeds"* as defined in Article 1(9) ECT obtained by AES and AEF in the period 2007 to 2015 constituted an aid payment compatible with the internal market.

*Judgments in Micula case applicable f'n this proceeding?*

7.3.    It follows from Chapter 6 of this judgment that Union law rules on State aid apply in these proceedings. These Union law rules are further interpreted in judgments of the CJEU (both the Court of Justice and the General Court of the EU, which has jurisdiction to hear appeals against Commission decisions[2']). In these proceedingsSpain and the Commission referred, inter alia, to the rulings in the Micula case'. AES and AEF have argued that the Micula case is substantially different from these proceedings. Therefore, the court will first address the Micula case.

7.4.    The Micula case centres on an arbitral decision of 11 December 2013 in which Romania (which joined the EU in 2007) was ordered to pay damages to a private economic unit of several individuals and companies (including European Food) following the abolition in 2005 of a 1998 tax incentive rule (as a result of Romania's accession negotiations). That arbitral award was notified to the Commission as state aid.

7.4.1.    In its decision of 30 March 2015, the Commission declared the payment of compensation under the arbitration award incompatible with the internal market and ordered Romania to recover the payments made.

7.4.2.    Against that decision, European Food c.s. appealed to the General Court of the EU, annulled the Commission's decision by of 18 June 2019 on the grounds that - very briefly - in the General Court's view, it assumed an incorrect point in time at which European Food c.s.'s entitlement to payment (so that the Commission  jurisdiction to decide on the payment obligation from the arbitral award) and further that the Commission wrongly considered that payment obligation  be *"advantage"* and *"aid"* within the meaning of Article 107(1) TFEU.

7.4.3.    From that judgment, the Commission appealed to the CJEU. At 25 January 2022, the CJEU (Case C-638/19 P, ECLI:EU:C:2022:50, further cited as *"Micula 2022 "*) overturned the earlier judgment of the General Court. The case was then referred back to the General Court, which delivered another judgment on 2 October 2024 and upheld the Commission's decision. This judgment was published under ECLI:EU:T:2024:659 (further cited as *"hlicula 2024"*). AES and AEF and the Commission incorporated the latter ruling in their submissions.

---

[2'] Article 256 TFEU.
[2'] General Court of the EU 2 October 2024, *(European Food SA, Micula and others, European Commission),* cases T-624/15 RENV and T-694/15 RENV, ECLI:EU:T:2024:659, and CJEU, 25 January 2022, *{European Food SA, Miciila and others European Commission),* Case C-638/19 P, ECLI:EU:C:2022:50.

7.4.4.    The Micula case thus centres on the legal questions of whether an award in an arbitral award can constitute State aid and, if so, when that aid . That is also the central issue in these proceedings, also in light of AES and AEF's defence that either Spain's payment obligation from the arbitral award  not State aid or that Spain is wrong to invoke the standstill obligation.

7.5.    AES and AEF correctly argued that the Micula case - unlike the present proceedings - involved an enforcement of the arbitral award and that Romania made payments to European Food (and related natural and persons) under that enforcement. Further, the Micula case involves a Commission decision to recover sums of money paid by Romania. Indeed, none of this is at issue in these proceedings. However, these differences argued by AES and AEF with these proceedings are not relevant for the purpose of answering of the questions of law issue in these proceedings. In fact, the judgments in the Micula case lend themselves to answering the questions of law in these proceedings.

7.6.    The substantive considerations from the rulings in the Micula case, and other judgements of the CJEU and the General Court of the EU, will be discussed in more detail in the further review.

*Receivables I, II and V*

7.7.    Claims I, II and V concern declarations of law on the 2007 scheme. That aid scheme is not at in these proceedings, as AES and AEF  rightly argued. In these proceedings, Spain has not put forward any facts and circumstances from which an interest as referred to in Article 3:303 of the Civil Code can be  in granting claims I, lI and V. That these claims are a prelude to the other claims (which do concern the arbitral award) is insufficient. Claims I, II and V are therefore dismissed.

*Substantive defence by AES and AEF on alleged aid measure*

7.8.    AES and AEF have disputed that Spain's payment obligation from the arbitral award is a new independent aid measure - in any case, there is no unlawful State aid. To this end, AES and AEF argue that, to date, Spain has not made any payment under the arbitral and that the arbitral award has not yet been enforced.

7.9.    This defence focuses on the characterisation of Spain's payment obligation from the arbitral award as aid (within the meaning of Article 107(1) TFEU). This will be addressed first.

*Is Spain's payment obligation from the arbitral award state aid?*

7.10.    As a preliminary remark, during the Commission's investigation[30] into the amended aid measure notified by Spain (the 2014 scheme), the arbitration between

---

[30] referred to in Chapter II *'Procedure regarding notified aid',* Articles 6 to 11 Procedural Regulation

investors and Spain was ongoing. In its Approval Decision, the included on this:

> "(165) The Commission recalls that any compensation which an Arbitration Tribunal were to grant to an investor on the basis that Spain has modified the premium economic scheme[3'] by the notified scheme'[2] would constitute in and of itself State aid. However, the Arbitration Tribunals are not competent to authorise the granting of State aid. That is an exclusive competence of the Commission. If they award compensation, such as in Claimant v Spain, or were to do so in the future, this compensation would be notifiable State aid pursuant to Article 108(3) TFEU and be subject to the standstill obligation."

7.11.    It follows that in these proceedings the considers that a payment obligation of Spain from the arbitral award between AES and AEF on the one hand and Spain on the other hand constitutes State aid. It follows from the 's further observations that it is of the opinion that that payment obligation from the arbitral award constitutes aid within the meaning of Article 1(c) of the Procedural Regulation and should therefore be notified as State aid as required by Article 108(3) TFEU. This opinion of the Commission - which incidentally is not part of the conclusion of the Approval Decision - is a weighty circumstance in answering the legal question whether Spain's payment obligation from the arbitral award is State aid (as referred to in Article 107(1) TFEU).

7.12.    AES and AEF also argued on this defence that the PHA arbitral tribunal found that the decision in the arbitral award was fully in line with the Approval Decision. Thus, there is no new independent aid measure, AES and AEF said.

7.13.    In this context, too, the arbitral tribunal's opinion on the compatibility of its decision with the internal market is , as already considered in section 6.9 and onwards. Moreover, this submission by AES and AEF does not challenge the contention that Spain's payment obligation from the arbitral award constitutes State aid that must be notified to the Commission under Article 108(3) TFEU

7.14.    In making this argument, AES and AEF referred to the CJEU's *Dobeles HET'* and *Mytilinaios/DEF*[3] judgments without giving any concrete explanation as to why those judgments are relevant in the legal question of whether Spain's payment obligation under the arbitral award is a new independent aid measure.

7.14.1.    In the court's , these judgments do not support AES and AEF's argument.

7.14.2.    The *Mytilinaios/DEI* judgment concerns a dispute between the producer of electricity ( by the Greek state) and its main customer (an aluminium producer). In an arbitration award between them, a

---

" Defined in paragraph 4 of the Approval Decision as: the 2007 Scheme and the 2008 Scheme. '[2] The 2014 Scheme whose specific laws are set out in paragraph 6 of the Approval Decision
°' CJEU 12 January 2023, *(Dobeles HES),* Case C-702/20, ECLI:EU:C:2023: l.
" CJEU 22 February 2024, *[Mytilinaios,'DEl),* Case C-701/21, ECLI:EU:C:2024:146.

granted a substantial discount on the market tariff to the buyer of electricity. That it first had to pay the market rate to the generator was not a case of state aid. In the proceedings before the Commission and subsequently before the General Court of the EU and then the CJEU, the central issue is whether the lower rate determined in the arbitral award constitutes grant of state aid. In that, this ruling differs from these proceedings to such an extent that the *Mytilinaios/DEI* judgment cannot be relevant to the legal question of whether Spain's payment obligation from the arbitral award is an independent state aid.

7.14.3.    Although the underlying dispute in *Dobeles Hes*[3'] judgment is also different from that in these proceedings, that judgment provides a number of general considerations on State aid that are independent of the underlying dispute. In *Dobeles HES*, it was held that where national scheme has an aid measure within the meaning of Article 107(1) TFEU (as Spain did here with the 2007 scheme and its amendments in the 2014 scheme), the payment of an amount claimed under that scheme in court also constitutes such an aid measuref[6]. This consideration was reiterated in the  General Court's follow-up judgment in the Micula case *(Micula 2024)."*

7.14.4.    AES and AEF argued at the hearing that two possibilities follow from *Dobeles HES*: the underlying subsidy scheme constitutes the aid measure, or the payment in the context of the enforcement of the arbitral award constitutes the aid measure. The court considers this argument an incorrect reading (or interpretation) of the interpretation on Article 107(1) TFEU in this judgment.

7.15.    It follows from the *Dobeles HES* and *Micula 2024* judgments that a payment obligation of an EU member state from an arbitral award can state aid. The General Court of the EU also considered in *Micula 2024* that a distinction must be made between claims for compensation for damage arising an unlawful act and a claim for payment of sums due under a scheme."

7.15.1.    It is not in dispute between the parties that the arbitration between AES and AEF, on the one hand, and Spain, on the other, concerned the investors(i.e. including AES and AEF) claim that Spain had acted in breach of Article 10(1) ECT by amending the 2007 regime, as a result of which the would receive less return on their investments (or lower *"returns* ") than originally thought. Accordingly, the investors' claim for damages was for additional compensation for their investments, over and above what they received from the amended 2007 regime, finally fixed in the 2014

---

*"* In Dobeles Hes, the underlying dispute is between producers of electricity that sold to a company affiliated to Latvia (EU member state) at a tariff set by that company. This tariff was lower than agreed in a support measure. The arbitral tribunal ordered the company (i.e. Latvia) to apply the tariff provided for in the support measure. The question in this judgment is whether that order constitutes a new independent aid measure. In other words, the damaging event is a faulty implementation of the aid measure by the EU member state and not a modification of an aid measure.

[6] Dobeles HES, ECLI:EU:C:2023:1, para 65.

" Micula 2024: ECLI:EU:T:2024:659 para 174.

[o'] Micula 2024: ECLI:EU:T:2024:659, para 172 (quoting CJEU, 27 September 1988,
*{Asteris and Others),* Cases C-106'87 and C-120/87, EU:C: 1988:457, paragraphs 25 and 26 and case-law cited there).

scheme, would obtain. Thus, the claims of AES and AEF (and the other investors) did not concern the payment of amounts owed by Spain under the aid measures (see also section 7.2.3). This is also consistent with Spain's argument that the arbitral award goes far beyond the subsidy scheme(s) that the Commission found compatible with the internal market.

7.15.2.    The arbitral award ruled that Spain had violated the provisions of Article 10 ECT by the amendments to the 2007 regime and that Spain was therefore liable to pay damages to (among ) AES and AEF. Spain was subsequently ordered to pay damages to AES and AEF.

7.15.3.    Those damages increase the *"proceeds"* as defined in Article 1(9) ECT of the investments of AES and AEF. Those proceeds are based on an aid measure introduced by Spain by national regulation (see also
under 7.2.4) that was declared compatible with the internal market by the Commission (see under 7.2.2). The arbitral award thus ordered Spain to pay an amount of damages claimed on the basis of an aid measure.

7.15.4.    This makes Spain's payment obligation from the arbitral award a compensation for damages resulting from an illegality. In that case, the payment obligation may qualify as State aid[31]. AES and AEF have not alleged any facts and circumstances that give rise to different interlocutory conclusion on this point.

7.16.    AES and AEF have argued that Spain's payment obligation from the arbitral award is not a new independent aid measure. That payment obligation of Spain should therefore be tested against the conditions for qualification as State aid (as described in 5.4.2).

7.17.    The arbitral award higher proceeds to - as far as relevant in these proceedings - AES and AEF. This higher yield does not accrue to other investors participating in the Spanish market of renewable  production. These investors from other EU member states. Spain's payment obligation from the arbitral award may therefore affect trade between member states. All this may distort or disrupt competition. Finally, if the  award is successfully enforced, Spain will have to cover the payment obligation from state resources.

7.18.    Spain's payment obligation from the arbitral award thus meets the four conditions for qualification as state aid as  out above.

7.19.    AES and AEF's reliance on a judgment of the Essen Regional Court does not help them. After all, that case sought a declaratory judgment to the effect that enforcement of the arbitral award at issue in those proceedings was unlawful. That is not (no longer) at issue in these proceedings following Spain's claim amendments.

---

[31] Micula 2024: ECLI:EU:T:2024:659, inter alia at paragraphs 172, 173 and 175.

7.20.    It follows from the above that Spain's payment obligation from the arbitral award is compensation for an illegality of Spain, that this is a payment of an amount claimed on the basis of an aid measure in law and that the payment obligation meets the of state aid. Spain's payment obligation from the award is therefore an aid measure within the meaning of Article 107(1) TFEU.

*Œerious defences AES and AEF*
*I: standstill obligation not compromised*

7.21.    AES and AEF argue in the arbitral award should be characterised as state aid, that Spain is  to invoke the standstill obligation in order to avoid having to meet the payment obligation from the arbitral and that the standstill obligation is not in jeopardy because Spain has not made any payment under the arbitral award. There is also no enforcement of the arbitral award yet, according to steeds AES and AEF.

7.22.    The court considers that Spain is obliged to notify a new aid measure to the (Article 108(3) TFEU, the Notices and Procedures Regulation based on it (see also at 5.7 5.12 above) and the settled case law of the General Court of the EU and the CJEU on this matter). Moreover, in its Approval Decision, the Commission also instructed Spain to notify as aid a payment obligation imposed in an arbitral award see paragraph 165 of this decision quoted at 7.10 above). Due to the justified notification of the payment obligation from the arbitral award, the standstillvCr obligation rests with Spain.

*Is enforcement of the standstill obligation required?*

7.23.    It follows from settled case-law[40] of the CJEU that payment under a statutory State aid entitlement is not a requirement for that statutory scheme to be classified as State aid. In the Micula case, the CJEU reiterated":

> 115 According to settled case-law of the Hot, to which the General Court refers in paragraph 69 of the judgment under appeal, State aid is to be deemed to be 'granted' within the meaning of Article 107(1) TFEU on the  on which the beneficiary acquires a legal right to State aid under the applicable national scheme (...).

7.23.1.    It also follows from the Micula case that in this , the condemnation from the arbitral award is equivalent to a statutory entitlement to aid. In this sense, it is also understood that Spain's conviction from the arbitral award is to be equated with the term 'grant of aid[42]'. The above jurisprudence of the CJEU in this case is then

---

[40] CJEU 31 March 2013, (Magdeburger Mühlenwerke), Case C-129'12, ECU:EU:C:2013:200, paragraph 40 and CJEU 19 December 2019, (Arriva ltalia and others), Case C-385/18, ECU:EU:C:20 19:1121, paragraph 36. " Micula 2022: ECU:EU:C:2022:50, paragraph 115 - with reference to the earlier judgments.
[*2] As in the *Easti Pagar* case (ECU:EU:C:2019:172) and in CJEU 11 November 2015, *(Klausner Holz),* ECU:EU:C:2015:742, paragraphs 18 to 26.

also translated to: the time when the conviction of Spain can be claimed by AES and AEF.

7.23.2.   The arbitral award was governed by Swiss law (the country in which the PHA arbitral tribunal  domiciled). Spain sought the annulment of the arbitral award in Switzerland. That claim was rejected by the Swiss Supreme Court in its ruling of 23 February 2021. At that time, the arbitral award became final. It is inferred that under Switzerland's domestic regime, at that point in time, the condemnation of Spain can be claimed by AES and AEF, and at that point in time, their firm claim for support arose.

7.23.3.   From then on, Spain's obligations thus rest on
Article 108(3) TFEU: the notification to the Commission the payment obligation as aid, the standstill obligation (including the taking measures that no actual payment is under that notified aid') and, if payment is enforced in any , to claim reimbursement thereof. AES and AEF have not put forward any facts and circumstances from which it can be inferred that the *Easti Pagar* judgment on this cannot be applied in these proceedings - even though *Easti Pagar* deals with schemes under Regulation 800/2008[4'] (block exemptions of aid measures, not applicable in these proceedings).

7.23.4.   It also follows from this case law that the standstill obligation does not depend on the fact that Spain  not made an actual payment under the arbitral award, or that the arbitral award has not yet been .

7.24.     This means that even at this stage - without any payment having been made pursuant to the arbitral award and without actual enforcement of that arbitral award - Spain has a legitimate interest (within the meaning of Section 3:303 of the Civil Code) in seeking measures to enforce the standstill obligation.

*II. reliance on estoppel*

7.25.     AES and AEF argued that Spain had, through estoppel, exhausted its
legal claims in respect of the argument that it was here in relation to the

---

[4'] ***Easti** Pagar,* ECLI:EU:C:20 19:172, paragraphs 94 and 95 referring to the powers of the national court in state aid proceedings as considered in *Deutsche Lufthansa,* ECLI:EU:C:2013:755, paragraphs 15 to 32 and *Klausner Holz* ECLI:EU:C:20 15:164.
" Commission Regulation EC) No 800/2008 of 6 August 2008 declaring certain categories of aid compatible with the common market in application of Articles [107 and 108 TFEU] (General block exemption Regulation), OJ 2008 L 214, p. 3, replaced in 2014 by Regulation EU 651/2014 (2014 OJ L 187, p. 1), now consolidated in Commission Regulation (EU) 2023/1315 of 23 June 2023, amending Regulation (EU) 651/2014 declaring certain categories of aid compatible with the internal market in application of Articles 107 and 108 of the Treaty, and Regulation (EU) 2022/2473
declaring certain categories of aid to undertakings active in the production, processing and marketing of fishery and aquaculture products compatible with the internal market in application of Articles 107 and 108 of the Treaty (Text with EEA relevance) OJ 2023 L 167, p. 1-90.

subsidiary claim in the arbitration concerning state aid lost. Spain should have raised those arguments in the arbitration. They also argue that Spain notified the arbitral award (dated February 2020) to the Commission at an unreasonable deadline (July 2021).

7.26.    Spain rightly argued that it had to notify the arbitral award to the Commission only after the arbitral award had become irrevocable (under Swiss law), as also follows from what has been considered under 7.23.2 and 7.23.3 above. The arbitrators are not competent to decide whether or not State aid or compatibility with the internal market of an award made by Spain is a matter for the Commission alone. Thus, no legal estoppel can follow from the failure to the State aid argument against the subsidiary claim either. The period between the decision of the Swiss Supreme Court (28 February 2021) and the notification (apparently it was 6 July 2021) is not unreasonable and, in any case, not so long that AES and AEF can infer that Spain would no longer wish to raise this argument, nor has it been shown that their interests have been prejudiced as a result.

7.27.    To the extent that AES and AEF have that an unreasonably long period elapsed between the notification (6 July 2021) of Spain's payment obligation to the Commission and the writ of summons (22 December 2022), this does not succeed either. Indeed, that period was 1 /z years in which the CJEU handed  the *Komstroy* judgment (2 September 2021) and followed shortly afterwards the CJEU's judgment in the Micula case (on 22 January 2022). Both judgments appear to be relevant to Spain's claims in these proceedings. It follows that Spain did not take an unreasonably long time to bring the claims against AES and AEF in these proceedings based on those judgments.

7.28.    AES and AEF's plea of estoppel fails.

*III: Spain misuses law*

7.29.    AES and AEF argued that Spain had misused law by notifying that payment obligation as aid to the .

7.30.    AES' and AEF's views to this effect do not convince the court.

7.30.1.   That Spain has breached Union law in the past is immaterial. Spain apparently learned from those mistakes and complied with the Commission's instruction in paragraph 165 of the Approval Decision. Spain's past mistakes are not circumstances from which it can be inferred that following a Commission instruction and complying with obligations under Article 108(3) TFEU could constitute an abuse of rights.

7.30.2.   With regard to the deadline by which Spain notified the payment obligation from the arbitral award, it has already been considered above at 7.25 and 7.26 that AES and AEF assume an incorrect time when Spain should have notified the payment obligations from the arbitral award to the Commission as aid.

7.30.3.   That AES and AEF consider that the arbitral award and any settlement based on it between Blasket and Spain would be compatible with EU law is irrelevant (as only the Commission may and can decide that) and

does not show that Spain abused its rights by notifying the Commission of the payment
obligation from the arbitral award and rejecting an offer of negotiation from Blasket.

7.30.4.    It has not been shown that Spain notified the payment obligation from the arbitral
award only to avoid having to comply with that obligation and that it would thereby
commit an abuse of rights. Indeed, as explained above, Spain was obliged to make that
notification. Reliance on the standstill obligation does not constitute an abuse of rights
either, as Spain was obliged to comply with it.

*IV. unreasonable time limit for Commission investigation*

7.31.    AES and AEF further argued that a decision on compatibility of the arbitral
with the internal market was long overdue. Meanwhile, the reasonable period of 2
months (Article 4(5) Procedural Regulation) has passed, AES and AEF said.

7.32.    According to Spain and the Commission, the latter confirmed the notification
of the arbitral award with a communication dated 14 September 2021.

7.33.    It follows from the case file that after that notification of the arbitral award, the
Commission not conduct an investigation into its compatibility with the internal market.
Spain and the Commission have argued that the investigation into the notified arbitral
award was not initiated, or was paused, until a final decision was taken in a similar case
(the Antin case[45]).

7.34.    In this regard, AES and AEF have argued that the is acting unreasonably because
the arbitral tribunal's award in the Antin case is not comparable to the arbitral award at the
heart of these proceedings and further that Spain is delaying the investigation in the Antin
case. Spain and the do not clarify whether the arbitral award is compatible with the internal
market. As a result, the interests of AES and AEF in a speedy, timely and diligent hearing
(as follows from Article 6 ECHR'[6] and Article 47 Charter EU') are not being respected, AES
and AEF increasingly say.

7.35.    It noted that any compensation awarded by an arbitral tribunal in these cases -
regardless of the amount - should be notified as state aid and that this is not affected by the
arbitral tribunal's reasoning on the amount of the

[5] The investor Antin (consisting of two companies Antin Energia Infrastructure Services
Luxembourg S.ä.r.l. and Antin Energia Termosolar B.V.) initiated an ICSID arbitration against Spain
in November 2013 on the amendments to the 2007 regime. Antin was awarded damages in that
arbitral tribunal's award of 15 June 2018, which was reduced at Spain request in a new award of 29
January 2019. Spain notified this ICSID arbitrators' award to the Commission as State aid on 17 April
2019. After further investigation, the Commission on 19 July 2021 to a formal investigation
procedure and provisionally found that the award between Spain and Antin does not appear to be
compatible with the internal market.
[46] Convention for the Protection of Human Rights and Fundamental Freedoms, Trb. 1951,
154.
[7] Charter of Fundamental Rights of the European Union (2007/C 303), Pb. C 303 of 14/12/2007.

C/13/728512 / HA ZA 23-64                                                                              27
5 February 2025

---

compensation and why it is awarded. Thus, the manner in which the compensation awarded
was budgeted (according to AES and AEF, it was budgeted differently in the Antin case
than in the arbitral award at the centre of these proceedings) is not relevant to the
Commission's investigation in the Antin case, nor will it be relevant in any forthcoming
investigation into the compatibility with the internal market of Spain's payment obligation
from the arbitral award at the centre of these proceedings. Whether this is a correct starting
point of the will have to be seen in any proceedings to be brought against a  decision before
the EU court with exclusive jurisdiction for that purpose, the General Court of the EU[4']. It
is not for this court to assess the above comments of the Commission.

7.36.     It follows from the above that the difference argued by AES and AEF between the,
Antin case and their case is irrelevant for assessment of the legal claims in these
proceedings. It is on that basis that AES and AEF's contention that it is unreasonable to
them that the compatibility with the internal should be decided first in the Antin case
before continuing the examination of the notified arbitral award.

7.37.     Furthermore, there is no information on how the Antin case is being investigated.
There is nothing to show that this investigation is being delayed or otherwise interfered with
by Spain. It would have  to AES and AEF to give to this argument. They have  to do so, so
their defence cannot benefit them in these . It also follows that it cannot be established that
Spain is to  for the fact that the has not ruled on the investigation into the notified arbitral
award.

7.38.     AES and AEF drew attention to the provisions of Article 2, Article 4(5) and (6) and
Article 15 of the Procedural Regulation. These that the shall without delay carry out an
initial examination of the notified aid (Article 2), that the shall report on it within two
months (Article 4(5)) and that the shall be deemed to have been authorised if the
Commission has not taken a decision within that period (Article 4(6)). Contrary to what
AES and AEF have argued, it does not follow from this that Spain is obliged to effect to the
arbitral award after the two-month period has elapsed. Indeed, this requires first that Spain
notifies the Commission, after which the can take a decision within 15 working days of that
notification (the final sentence of Article 4(6) Procedural Regulation). In these proceedings,
it is unknown what was  in the 's decision of 14 September 2021 and how Spain and the
Commission acted further. However, whether or not all this is transparent and possibly
negligent on the part of the towards AES and AEF is not for this court to assess in the
context of these proceedings. For that purpose, only the General Court of the EU is
competent[4']. It follows from the text of Article 265 TFEU that AES and AEF also have an
objection

---

" Article 263 in conjunction with Article 256 TFEU.
[4'] Article 265 in conjunction with Article 256 TFEU. Article 265 TFEU states: 'In case (..) the
Commission, (...) fails to take a decision, the Member States and the other institutions of the Union
may apply to the Court  Justice of the European Union for a declaration of such breach. This Article
shall , under the same conditions, to bodies, offices and agencies of the Union which fail to act.

may file an appeal with the EU General Court over the Commission's failure to decide on the compatibility with the internal market of Spain's payment obligations from the arbitral awards at the centre of the Antin case and in these proceedings, the Commission at the hearing.

7.39.    Article 15 Procedural Regulation applies where a formal investigation into the possible unlawfulness of the aid measure has been initiated by the Commission. This is also clear from the title of Chapter III *"Procedure regarding unlawful aid"*. AES and AEF have not argued, nor  this evident from the case file, that the Commission has opened such an investigation into the illegality of the aid notified by Spain (the payment obligation from the arbitral award). Therefore, the time limits mentioned in that article do not here.

7.40.    Accordingly, AES and AEF's argument that the deadline for a Commission decision on the notified arbitral award violates the reasonable time for justice as provided for in Article 6 ECHR and Article 47 EU Charter does not benefit them in these  under the above circumstances.

7.41.    Any defences by AES and AEF aimed at any unreasonable time taken by the Commission to investigate cannot lead to the rejection of Spain's claims in these proceedings.

*Interim conclusion*

7.42.    The interim conclusion is that Spain's contentions that the arbitral award constitutes State aid stand and that AES and AEF's defences concerning the notification of that arbitral award do not succeed. What all this means for the remaining claims (III, IV, VI, VII, VIII, IX and X) is below, which will also address the defences of AES and AEF specifically directed at those claims.

*Claims III, IV and VI: declarations for justice*

7.43.    The claims under III, IV and VI concern declarations as to the arbitral award. Against this, AES and AEF argued that such claims should be brought against those directly involved and that AES and AEF are not because they have assigned their title from the arbitral award to Blasket. Spain therefore has no interest within the meaning of Section 3:302 of the Civil Code, AES and AEF argued.

7.44.    This defence cannot lead to the dismissal of claims III, IV and VI. This is because Spain's payment obligation from the arbitral award was imposed against AES and AEF. Therefore, it is AES and AEF that obtained an advantage from the arbitral award. That is the determining criterion according to the case law cited above.

Any (...) legal person may (...) complain to the Court that one of the institutions, bodies, offices or agencies of the Union has failed to take any action in relation to it other than issuing a recommendation or an opinion.

7.45.    The fact that AES and AEF sold their advantage (the title of the arbitral award) to Blasket does not make it clear that AES and AEF  not obtain an advantage within the meaning state aid case-law.

7.45.1.    AES and AEF have argued, there is a link between the advantage granted to them and the reduction of Spain's assets: in the event that the arbitral award is successfully enforced by Blasket (or its legal successor), Spain will have to make a payment from its state resources. Thereby, the possible reduction of Spain's assets is , as also under 7.17.

7.45.2.    A recovery against Blasket will not succeed because no advantage (as referred to in State aid case-law) has been provided to Blasket. Blasket is in no way an adversary of Spain in  state aid recovery. In that case, Spain's obligation towards all other EU Member States under Article 108(3) TFEU, an obligation arising from the principle of loyal cooperation between EU Member States (Article 4(3) TEU), could not be fulfilled, as the Commission noted. This therefore implies that companies from an aid measure could escape Union law by their benefit to a party outside the EU. This is not desirable, as convincingly noted by the Commission.

7.45.3.    It is also significant that the must decide on the compatibility with the internal market of the arbitral award as : in it, AES and AEF are parties.

7.46.    It follows from the above that AES and AEF are directly involved in the declarations claimed under III, IV and VI. The defence to claims III, IV and VI is therefore rejected. These claims are therefore allowable.

7.47.    The claimed addition *"pursuant to Article 107(3) TFEU"* is not included because the Commission may consider Spain's payment obligation from the arbitral award compatible with the internal market on another ground. Furthermore, it is also possible that Spain's payment obligation may be deemed compatible with the internal market on other grounds (as defined in Article 108(2) TFEU) (see below 5.6). Even then, a payment  from the enforcement of the arbitral award does not constitute unlawful State aid.

*Progress lot lerugbelaling of slaalssleun*

7.48.    Claims VII and VIII are the same, that claim VII is against AES and claim VIII is against AEF.

*Party positions*

7.48.1.    Spain back in the deed of change of claim taken on the roll of 16 August 2023 the bases for these claims. The court understands that Spain rely on these bases. Spain primarily asserted Union law as the basis for claims VII and VIII, pointing to what was considered in

*Easti Pagar* . In the alternative, Spain argued that AES and AEF were unjustly enriched by the arbitral award, or at least Spain's payment obligation therefrom (Section 6:212 of the Civil Code).

7.48.2.    AES and AEF have argued that EU law does not provide bases for claims VII and VIII and further that there is no impoverishment of Spain because nothing has yet been paid under the arbitral award. Claims VII and VIII are also non-existent at present and whether they will ever exist in the future is uncertain at present because it depends on the 's decision on the compatibility with the internal market of Spain's payment obligation from the arbitral award. The claims made in the alternative and further in the alternative also depend on successful enforcement of the arbitral award. It is highly uncertain whether enforcement is possible, and then what will ultimately have to be paid by Spain. Under these circumstances, there is no basis for the grant of claims VH and VIII, AES and AEF increasingly said.

*Review*

7.49.    Spain's reliance on *Easti Pagar* as a basis for its claims is incorrect. ln that judgment it was held that the EU Member State has a duty to apply to national courts to compliance with the standstill obligation. It does not follow from that a basis for that EU Member State's claims for repayment of state aid. On that point, the Procedural Regulation and Notices 2019/C 247 and 2021/C 305 explicitly provide that the national court must apply national law, and thus recovery must be  on a basis in national law. Spain's primary contention therefore does not hold water, as AES and AEF rightly argued.

7.50.    Spain argued in the alternative that AES and AEF had been unjustly enriched. Therefore, it must first be examined whether the requirements set out in Section 6:212 of the Civil Code have been met.

7.50.1.    A payment of aid by an EU Member State during the standstill obligation is unlawful (Article 108(3) TFEU, see also section 5.7 ).

7.50.2.    AES and AEF were enriched by the arbitral award. Indeed, they obtained an advantage from the arbitral award over and above what they were entitled to under the aid measures (the 2007 scheme and the 2014 scheme).

7.50.3.    If Spain has to make a payment to Blasket (or his successor in title, if any) in the event of a future successful enforcement of the arbitral award (anywhere in the ), will be impoverished.

7.50.4.    All the requirements of Article 6:212 of the Civil Code are thus met, with the unlawful nature of a future payment, and therefore *"unjustified",* only applying for as long as the has not yet ruled on the compatibility with internal

---

" *Easti Pagar,* ECLI:EU:C:2019:172, paragraphs 94 and 95.

market of the arbitral award, or ruled that the arbitral award  incompatible with the internal market.

7.51.    It also follows from EU law that Spain's claims VII and VIII do exist now. The rules on the standstill obligation are clear and not to any other interpretation: at the moment when a claim can be made for State aid (in this : payment under the arbitral award), the EU Member State (here Spain) must notify that payment obligation as aid (Article 108(3) YWEU) and then take and adopt all measures to any payment from that State aid until the Commission has decided on the compatibility of that payment obligation with the internal market. That may include bringing actions before national courts to prevent the beneficiary from benefiting from the advantage granted in the event of any payment from that notified aid." In this case, Spain conditionally brought such a claim without there being an actual payment from aid (which follows from the arbitral award) as addressed in the above-cited settled case-law of the CJEU and the General Court of the EU. It is likely that that interpretation of EU law in that cited settled case-law of the CJEU also  in the circumstances of this case. Nor have AES and AEF put forward any arguments from which it can be inferred that that settled case-law does not apply to the claims in these proceedings.

7.52.    Claims VII and VIII in these proceedings are therefore claims based on Spain's obligations under Union law (including the principle of loyalty under Article 4(3) TEU), even if there is no actual impoverishment of Spain at present. All of AES and AEF's defences about non-existent claims are therefore rejected.

7.53.    All other defences of AES and AEF cannot lead to the dismissal of claims VII and VIII. The currently unknown size of the is no reason to dismiss claims VII and VIII. That AES and AEF allegedly received a lower amount from Blasket as the purchase price for the title from the arbitral award than the amounts to which Spain was ordered to pay irrelevant in the legal relationship between Spain, on the one hand, and AES and AEF, on the other. Furthermore, the claims were also brought on the condition that the  had not yet ruled on the compatibility of the arbitral award with the internal market. AES and AEF have correctly argued that the Commission may also decide that the arbitral award is partly compatible with the internal market and partly therefore incompatible. On the basis of that (future) decision, the maximum amount to be can be estimated by AES and AEF. This does not, at stage, preclude the granting of Spain's claims, as AES and AEF have argued. However, these are relevant factors in deciding which claim (primary, subsidiary or more subsidiary) to grant and under what conditions.

7.54.    The submissions of AES and AEF on the unclear scope of the amount claimed give reason to subsidiary claims VII and VIII (i.e. payment of the amount to be paid by Spain to Blasket or its successor in title in the event of successful enforcement in the US or anywhere else in the world), while  an additional (not claimed) condition in the event that the  does not grant the

---

[5] *Easti Pagar,* ECLI: EU:C:2019: 172, para 92.

considers Spain's payment obligation from the arbitral award partially compatible with the internal market.

7.54.1.    Spain's primary claims VII and VIII are not admissible because they  the amount set out in the arbitral award. At this stage, Spain has not yet advanced that . Spain is not willing to  voluntarily in  of the award. Impoverishment of will therefore only take place if Blasket (or its possible successor in title) enforces the arbitral award in the US (or anywhere in the world), to the extent that assets are thereby extracted at 's expense. In this award, payment by Spain' should therefore be understood below to mean the situation in which an enforcement measure  to the recovery of assets of Spain to the detriment of Spain.

7.55.    The award of claims VII and VIII will include the condition *"as long as the* **Commission** *has not declared Spain's payment obligation under the arbitral award compatible in whole or in part".* Such a condition can be attached to awarding orders in a Dutch judgment and fulfils the requirement that national courts must take all measures for the purpose of enforcing the standstill obligation.

7.56.    Furthermore, a condition will be added that the amount to be paid by AES and AEF to Spain cannot exceed the amount of Spain's payment obligation from the arbitral award that is finally declared incompatible with the internal market by the . These may the entire amounts from the arbitral award, but it can also not be ruled that the Commission considers part of those amounts in the arbitral award to be compatible with the internal market, as AES and AEF have rightly argued. Indeed, if so, Spain  then receive more from AES and AEF than was unlawfully in aid. The EU law rules on recovery of unlawfully granted aid do not give rise to such a situation.

7.57.    Here also applies what has been considered under 7.47 regarding the phrase *"under Article 107(3) TFEU"* in Claims VII and VIII. Regardless of the ground on which the arbitral award is declared **compatible** with the internal market, its compatibility does not involve unlawful State aid and Spain has no right to recover any payments made under the arbitral award. That phrase is therefore not included when claims VII and VIII are granted.

*Interest on the amount to be repaid to Spain (claims IX and X)*

7.58.    Claims lX and X concern the addition of interest on the total that Spain may have to pay through the enforcement the arbitral award (currently to Blasket who wishes to the arbitral award in the US), as  above on claims VII and VIII. Such a claim is allowable. The question is which interest rate should be .

7.59.    In the claim amendment of 16 August 2023, Spain argued that statutory interest could be awarded thereon and referred in support to *"OJ 2015, L 248/9".* The Procedural Regulation was published under that number. Spain has

however, did not amend the claims on interest even though it thus argued that Dutch statutory interest . AES and AEF did not raise any substantive defence as to which interest rate should be .

7.60.    Contrary to what Spain has argued, the Procedural Regulation does not apply in this . Article 16 of that regulation applies in the case of a recovery of unlawfully paid state aid after the Commission has adopted a recovery decision. That is not at issue in this .

7.61.    Claims VII and VIII on AES and AEF are a conditional recovery of state aid without a recovery decision by the Commission. For these cases, Communication 2021/C 305 applies. That Communication states that the principal sum awarded should be increased by so-called illegality interest[2]. In this way, the advantage granted is cancelled out, according to the Communication 2021/C 305.

7.62.    The national court must award illegality interest according to the applicable rules of national law, provided that
1)   those rules respect the principles of equivalence and effectiveness (as defined in section 2.2 of Communication 202 l/C 305), and
2)   illegality interest must be calculated at a rate at least equal to that which would have been applied if the beneficiary had had to borrow the amount of such aid on the market during that period[3].

7.63.    The Dutch statutory interest rate referred to in Article 6:119 of the Civil Code meets the conditions  for the illegality interest rate mentioned above.

7.63.1.    Such interest applies to all legal obligations to pay sums of money and is not less favourable than what applies to Dutch situations. Nor does the application of statutory interest make the exercise of Union law impossible or excessively difficult[4]. Accordingly, the statutory interest provided for in Article 6:119 of the Civil Code the principles of equivalence and effectiveness set out in paragraph 81 of Notice 2021/C 305.

7.63.2.    The statutory interest rate is the interest rate at which the creditor should have taken replacement money elsewhere." This can also be  in this case to the benefit granted to AES and AEF in the arbitral award: after all, they would have had to pay the market interest rate if they had had to borrow the amounts awarded to them in the arbitral award.

7.63.3.    The statutory interest rate is  using a reference interest rate. Since 2002, that has been the European Central 's refinancing margin mentioned in Article 6:120(2) of the Civil Code, plus 2'/' process point[6]. In 2024, that interest rate is set at 7% and

[2] Communication 2021'C 305, para 77.
" Notice 2021/C 305, para 81.
[4] Communication 2021/C 305, para 20.
[5] MoA II, Parl. Gesch. Civil Code Book 6 1981, p. 473
" NvT, Decree 3 July 2003, Stb. 2003, 280.

by 1 January 2025 at 6%". This is a higher interest rate than is currently common in the money market. Thus, the statutory interest rate meets the second condition from para 81 Notices 2021/C 305: at least equal to the interest rate. As Spain did not state anything about the level of the interest rate of the 10-year Spanish government bond 2014 claimed by it, so that it cannot be whether it meets the aforementioned conditions, statutory interest will be awarded instead.

7.64.    Interest on the amount of the principal sum awarded can only take effect when Spain actually makes a payment to the party that can actually the arbitral award, anywhere in the (currently Blasket in the ), in respect of the title that AES and AEF obtained with the arbitral award. AES and AEF will be given a reasonable period five days from Spain's written demand for the amounts before interest will become due.

*Costs of these proceedings*

7.65.    AES and AEF were largely so they are ordered to pay Spain's legal costs. The claims awarded are declarations in law and otherwise pecuniary claims that are conditionally. In these circumstances, for the purposes of the order for costs in this case, the costs on Spains side are assessed using the indeterminate value rates. For the liquidation rate, 3 (three) items are estimated: the summons, the amendments to the claim and the oral . The costs on Spain's side eligible for reimbursement by AES and AEF are estimated at:

| | | | |
|---|---|---|---|
| - writ costs | £ | 206,66 | (two exploits) |
| - court fee | | 676,00 | |
| - salary lawyer | | 1.842,00 | (three points) |
| - after expenses | | 178.00 | plus increase as mentioned in the decision) |
| Total | £ | 2.902,66 | |

7.66.    The Commission is not a litigant and is involved in these proceedings on its own initiative. There is nothing to show that the Commission's costs should be borne by any of the parties to proceedings. In these circumstances, the Commission should bear its own legal costs.

*Enforceable by stock*

7.67.    AES and AEF requested that an award in this judgment not be declared provisionally enforceable. They fear that Spain will not comply with any refund decision on . That is a restitution risk. The declaration of enforceability sought should therefore be rejected or be made conditional on the provision of security in the event of a restitution claim arising, AES and AEF said.

7.68.    Under section 233(l) Rv, the court may, if so requested, declare a judgment provisionally enforceable. The plaintiff need not - in the absence of a

" Stb 2023, 484 and Stb 2024, 395.

defence on this point - do not have to give separate reasons. If such a defence is put forward, interests of the parties must be weighed in the light of the circumstances of the case. It must be verified whether based on those circumstances, for instance connection with the urgency of complying with the order, the interest of the party obtaining the order outweighs the interest of the other party in maintaining the existing situation until a decision will be made on a (possible) appeal.

7.69.     The declaration of enforceability sought can only be rejected under special circumstances - which AES and AEF must establish. Such a circumstance is the restitution risk of (in  case) Spain. AES and AEF have argued that this risk of restitution is present because Spain does not appear to comply with orders to pay - at least as far as the dispute concerns the amendments to the 2007 scheme that are laid down as aid measures in the 2014 scheme.

7.70.     It does not follow from this contention of AES and AEF that Spain is, or will be, unable to repay to AES and AEF the amounts paid to it under this judgment in the event of a contrary judgment on appeal. Essentially, AES and AEF' argument is that they may have difficulty  claims against Spain (for repayment of what AES and AEF have paid this judgment). As this does not yet represent a concrete risk of restitution, the court sees no reason follow AES and AEF's defence and not declare the judgment provisionally enforceable or attach conditions to it."

7.71.     Furthermore, Spain has a compelling interest in  this judgment declared provisionally enforceable. After all, Spain must give effect to the obligations under Article 108(3) TFEU and the national court is obliged take all measures appropriate to ensure compliance with Union law[5]. This is not possible if this award is not provisionally enforceable and the arbitral award can be successfully enforced in a non-EU state.

7.72.     It is also relevant here that the claims for payment of a sum of money are granted subject to two conditions: that the enforcement of the arbitral award results in a payment by Spain and that the has not yet decided on the compatibility with the internal market of Spain's obligation to pay from the arbitral award. It is not foreseeable that these conditions will be met in the short term, so that during any appeal this by AES and AEF, there will not yet be any fulfilment of those conditions.

7.73.     The awarded orders of AES and AEF are therefore declared provisionally enforceable.

" Compare Supreme , 17 June 1994, ECLI:NL:HR:1994:ZC 1400 and Supreme , 2 May 2003, ECLI:NL:HR:2003:AF5892.
" Communication 2021/C 305, paragraph 18 and CJEU judgments of 21 March 1991, Italy v Commission *[Lanerossi]*, Case C-303*88, ECLI:EU:C: 1991: 136, paragraphs 52 and 60; CJEU 17 October 2013, Commission'Greece *(Ellinikos Xrysos)*, Case C-263/12, ECLI:EU:C:2013:673, paragraph 36.

---

## 8.    The **decision**

The court

8.1.    Declares that the compensation awarded by the PHA arbitral tribunal by an arbitral award of 28 February 2020 constitutes aid within the meaning of Article 107(1) TFEU, and results in unlawful aid as long as the Commission has not declared that arbitral award compatible with the internal market in whole or in part,

8.2.    Declares that the recovery of damages awarded by the PHA Arbitral Tribunal by arbitral award of 28 February 2020 is contrary Union law, so long as the Commission  not declared that arbitral award compatible with the internal market in whole or in part,

8.3.    Declares that any payment made by Spain to Blasket or any other party respect of the damages awarded to AES and AEF by the PHA arbitral award of 28 February 2020 constitutes unlawful State aid in  of AES and AEF until such time as the Commission that arbitral award compatible with the internal market in whole or in part,

8.4.    orders AES to pay to Spain the amount which Spain must pay to Blasket or its successor in title in the event of an enforcement of the arbitral award of 28 February 2020 in respect of AES, so long as the has not declared the compensation awarded to AES in that arbitral award to be compatible with the internal market in whole or in part,

8.5.    orders AEF to pay to Spain the amount which Spain must pay to Blasket or its legal successor in the event of enforcement of the arbitral award of 28 February 2020 in respect of AEF, so long as the has not declared the compensation awarded to AEF in that arbitral award to be compatible in whole or in part with the internal market,

8.6.    determines that if the Commission has decided on the compatibility with the internal market of the damages awarded to AES and AEF in the arbitral award of 28 February 2020, the amount to  paid by AES and AEF to Spain will be limited to that part of the damages awarded to AES and to AEF in the arbitral award of 28 February 2020 that the Commission considers incompatible with the internal market,

8.7.    orders AES to pay the statutory interest referred  in Section 6:119 of the Civil Code on the amount awarded pursuant to 8.4 and 8.6 from 5 (five) days after Spain wrote to AES requesting payment, until the day of payment,

8.8.    orders AEF to pay the statutory interest referred to in Article 6:119 of the Civil Code on the amount awarded pursuant to 8.5 and 8.6 from 5 (five) days after Spain wrote to AES requesting payment until the date of payment,

8.9.    order AES and AEF to pay the costs of the proceedings, assessed to date at£ 2,902.66, to be increased by the sum of£ 92.00 for lawyers' fees, and

C, 1 3/7285l2 / HA ZA 23-64                                        37
5 February 2025

court costs in the event that AES and AEF fail to comply with this judgment within 14 days of notification of this judgment and the judgment must be served,

8.10.    orders the Commission to bear its own costs,

8.11.    declares that what has been decided under 8.4 to 8.9 is enforceable,

8.12.    the more or otherwise claimed.

This judgment has been delivered by C.M.E. de , R.H.C. Jongeneel and M.Z.B. Sterk, judge, assisted by R.E.R. Verloo, registrar, and pronounced in public on 5 February 2025.

BEFORE     RIFT CONFORM
The .iof the Rechtb
sterdam