## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ | ) |
| NEXTERA ENERGY GLOBAL HOLDINGS B.V. and NEXTERA ENERGY SPAIN HOLDINGS B.V., | ) ) ) ) |
|  | ) |
| Petitioners, | ) |
|  | ) Civil Action No. 1:19-cv-1618-TSC |
| v. | ) |
|  | ) |
| KINGDOM OF SPAIN, | ) |
|  | ) |
| Respondent. | ) |
| _____ | ) |

### SUPPLEMENTAL AMICUS BRIEF FOR THE EUROPEAN COMMISSION ON BEHALF OF THE EUROPEAN UNION AS *AMICUS CURIAE* IN SUPPORT OF THE KINGDOM OF SPAIN

Sally L. Pei (D.C. Bar No. 1030194)
R. Stanton Jones (D.C. Bar No. 987088)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
T: (202) 942-5000
sally.pei@arnoldporter.com
stanton.jones@arnoldporter.com

*Counsel for Amicus Curiae*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

INTEREST OF AMICUS CURIAE ..................................................................................... 1

ARGUMENT ......................................................................................................................... 1

     A.     EU law precluded the formation of an arbitration agreement between Spain and Petitioners ........................................................................................................ 2

     B.     The Court should defer to the decisions of the Court of Justice ............................ 5

     C.     Properly interpreted according to customary international law rules of treaty interpretation, Spain's offer to arbitrate contained in Article 26 of the Energy Charter Treaty does not extend to EU investors ...................................................... 6

CONCLUSION .................................................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*,
  585 U.S. 33 (2018)....................................................................................................5

*BG Grp., PLC v. Republic of Argentina*,
  572 U.S. 25 (2014)..................................................................................................10

*Georges v. United Nations*,
  834 F.3d 88 (2d Cir. 2016)........................................................................................7

*Hilton v. Guyot*,
  159 U.S. 113 (1895)...................................................................................................6

*Kreimerman v. Casa Veerkamp, S.A. de C.V.*,
  22 F.3d 634 (5th Cir. 1994) .......................................................................................7

*Medellín v. Texas*,
  552 U.S. 491 (2008).................................................................................................10

*Mora v. New York*,
  524 F.3d 183 (2d Cir. 2008).......................................................................................6

*NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*,
  112 F.4th 1088 (D.C. Cir. 2024).................................................................. 1, 5, 8, 10

*Pliego v. Hayes*,
  843 F.3d 226 (6th Cir. 2016) .....................................................................................7

*Sumitomo Shoji Am., Inc. v. Avagliano*,
  457 U.S. 176 (1982)................................................................................................10

**Statutes**

28 U.S.C. § 1605(a)(6).....................................................................................................1

**Treaties and International Agreements**

Concluding Document of the Hague Convention on the European Energy Charter,
  *adopted* Dec. 17, 1991 ..............................................................................................9

Energy Charter Treaty and its Protocol on Energy Efficiency and Related Environmental
  Aspects, *adopted* Dec. 17, 1994, *entered into force* April 16, 1998,
  2080 U.N.T.S 95 (1995) ..............................................................................1, 2, 7, 8, 9

Declaration on the legal consequences of the judgment of the Court of Justice in
  *Komstroy* and common understanding on the non-applicability of Article 26 of the
  Energy Charter Treaty as a basis for intra-EU arbitration,
  26 June 2024, O.J. (L 2024/2121) .................................................................................3, 10

Treaty on European Union, Oct. 26, 2012,
  2012 O.J. (C 326) 13 ....................................................................................................1

Treaty on the Functioning of the European Union, Oct. 26 2012,
  2012 O.J. (C 326) 47....................................................................................................5

Vienna Convention on the Law of Treaties,
  *opened for signature* May 23, 1969, 1155 U.N.T.S. 331 ................................................6, 7, 10

**European Union Authorities**

*Commission v. Ireland* ("*Mox Plant*"),
  30 May 2006, EU:C:2006:345 .......................................................................................4, 5

*DA v. Romatsa*,
  21 Sept. 2022, EU:C:202:749 ........................................................................................2

*Republic of Moldova v. Komstroy*,
  2 Sept. 2021, EU:C:2021:655 .......................................................................................2, 4

*Republiken Polen v. PL Holdings Sàrl*,
  26 Oct. 2021, EU:C:2021:875 ........................................................................................2

*Slovak Republic v. Achmea BV*,
  6 March 2018, EU:C:2018:158.......................................................................................2, 3, 4

**Other Authorities**

*Bundesgerichtshof* Decision*, Federal Republic of Germany v. Mainstream Renewable
  Power et al.* (July 27, 2023), I ZB 43/22 ....................................................................3

*Bundesgerichtshof* Decision, *Netherlands v. RWE* (July 27, 2023), I ZB 75/22 ............................3

*Eastern Sugar B.V. (Netherlands) v. The Czech Republic*,
  SCC Case No. 088/2004, Partial Award (Mar. 27, 2007)...........................................................4

*Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, |
  Decision on Jurisdiction, Applicable Law and Liability (Nov. 30, 2012)..................................4

*Italian Republic v. CEF Energia*,
  T 436-19, Svea Court of Appeal (May 27, 2024)....................................................................3

Pieter J. Kuijper, *The Conclusion and Implementation of the Uruguay Round Results by the
  European Community*, 6 Eur. J. Int'l L. 222 (1995)................................................................9

iv

Notice of Annulment of the Award and Joint Motion for Leave To File Supplemental Briefing, *Mercuria Energy Group Ltd. v. Republic of Poland*, Case No. 1:23-cv-3572 (D.D.C. Jan. 20, 2025).........................................................................3

United Nations, *Handbook: Final Clauses of Multilateral Treaties* (2003)....................................8

Sir Humphrey Waldock (Special Rapporteur on the Law of Treaties), *Sixth Report on the Law of Treaties*, UN Doc. A/CN.4/186 and Add.1-7, [1966] 2 Y.B. Int'l L. Comm'n...........................................................................................................7

## INTEREST OF AMICUS CURIAE

The European Commission is an institution of the European Union (the "EU" or "Union"), a treaty-based international organization composed of 27 Member States.[1] The Commission is an independent institution and acts in the interests of the Union as a whole, rather than individual EU Member States. Under Article 17(1) of the Treaty on European Union, Oct. 26, 2012, 2012 O.J. (C 326) 13, the Commission "shall ensure the Union's external representation"—*i.e.*, it is responsible for, inter alia, representing the Union in proceedings outside the EU. The Commission submits this amicus brief in this function on behalf of the European Union.

The EU has a substantial interest in this case and in ensuring that this Court proceeds based on a correct understanding of the principles and questions of EU law that it raises.

## ARGUMENT

Petitioners, companies headquartered in the Netherlands, and hence EU nationals— brought this suit to enforce an award rendered in their favor against Spain by a private investment arbitration tribunal under the Energy Charter Treaty ("ECT").[2] The D.C. Circuit recently held that this Court has jurisdiction over this matter under the Foreign Sovereign Immunities Act's arbitration exception, 28 U.S.C. § 1605(a)(6). *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1105 (D.C. Cir. 2024). But the D.C. Circuit expressly declined to address the enforceability of the award, leaving for this Court the question "whether the [ECT]'s arbitration provision extends to EU nationals and thus whether Spain ultimately entered into legally valid agreements with the companies." *Id.* at 1104.

---

[1] These Member States are Austria, Belgium, Bulgaria, Croatia, Cyprus, the Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, the Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, and Sweden.

[2] Energy Charter Treaty and its Protocol on Energy Efficiency and Related Environmental Aspects, *adopted* Dec. 17, 1994, *entered into force* April 16, 1998, 2080 U.N.T.S 95 (1995).

Foundational EU law principles, confirmed by an accretion of jurisprudence from the Court of Justice of the EU (the EU's highest court), make clear that the answer is no. The Commission explained these principles in detail in its prior amicus brief in support of Spain's motion to dismiss. ECF No. 67, at 5-8, 11-19. The Commission also explained that enforcement of the award in this Court would interfere with the EU State aid framework. *Id.* at 24-25. In the interest of economy, the Commission will not repeat a detailed discussion here, but will highlight and elaborate on a few key points.

### A.    EU law precluded the formation of an arbitration agreement between Spain and Petitioners

Article 26 of the ECT contains a standing offer from the EU and its Member States to arbitrate disputes with "an Investor of another Contracting State." It is undisputed that, by virtue of EU law, that offer does not extend to investors of EU Member States. The Court of Justice has explained—most notably in its decisions in *Slovak Republic v. Achmea BV*, 6 March 2018, EU:C:2018:158, and *Republic of Moldova v. Komstroy*, 2 Sept. 2021, EU:C:2021:655—that this conclusion is a necessary consequence of fundamental EU law principles. *See also* ECF No. 67, at 6-8 (discussing the principles of primacy of EU law and the autonomy of the EU legal order).

The Court of Justice has reiterated this reasoning in numerous subsequent cases. It has held that EU law requires Member States to resist intra-EU arbitration and the recognition and enforcement of intra-EU arbitral awards. *See Republiken Polen v. PL Holdings Sàrl*, 26 Oct. 2021, EU:C:2021:875, ¶ 52. It has also confirmed that EU courts must set aside and decline to enforce intra-EU arbitral awards. *DA v. Romatsa*, 21 Sept. 2022, EU:C:202:749.[3]

EU Member States are complying with these obligations. The Commission reported in its

---

[3] A copy of the order, along with a courtesy translation, is attached as Exhibit A.

previous amicus brief that courts in France had already set aside intra-EU awards against Spain and Poland. ECF No. 46, at 23 & n. 14. Since then, the Federal Supreme Court in Germany has confirmed that EU law precludes arbitration claims under the ECT,[4] and EU courts have continued to set aside and decline to enforce intra-EU ECT awards. *See, e.g.*, *Italian Republic v. CEF Energia*, T 436-19, Svea Court of Appeal (May 27, 2024) (setting aside intra-EU ECT award rendered against Italy);[5] *see also* Notice of Annulment of the Award and Joint Motion for Leave To File Supplemental Briefing, *Mercuria Energy Group Ltd. v. Republic of Poland*, Case No. 1:23-cv-3572 (D.D.C. Jan. 20, 2025) (reporting annulment of intra-EU ECT award against Poland).

Notwithstanding the clarity of the Court of Justice's pronouncements, private arbitral tribunals—which appear to consider themselves not bound by EU law, even when the instrument they are purportedly acting under is itself a piece of EU law—continue to entertain disputes brought by EU investors against EU Member States under the ECT. Thus, on June 26, 2024, the EU and 26 Member States (including Spain and the Netherlands) formally and expressly reaffirmed their "common understanding" that "Article 26 [of the ECT] cannot and never could serve as a legal basis for intra-EU arbitration proceedings." Declaration on the legal consequences of the judgment of the Court of Justice in *Komstroy* and common understanding on the non-applicability of Article 26 of the Energy Charter Treaty as a basis for intra-EU arbitration, § 1, 26 June 2024, O.J. (L 2024/2121) ("Declaration"). No non-EU signatory to the ECT is affected by this interpretation, which concerns only the bilateral relations between parties belonging to the EU. In any event, none has disputed this interpretation.

---

[4] *See Bundesgerichtshof* Decision, *Federal Republic of Germany v. Mainstream Renewable Power et al.* (July 27, 2023), I ZB 43/22 (ECF No. 109-51); *Bundesgerichtshof* Decision, *Netherlands v. RWE* (July 27, 2023), I ZB 75/22 (ECF No. 109-52).

[5] *See* Supplemental Status Report, Ex. A, *CEF Energia v. Italian Republic*, Case No. 1:19-cv-3443-CKK (D.D.C. June 21, 2024).

Importantly, the incompatibility of intra-EU arbitration with EU law is not a new rule announced for the first time in *Achmea* and *Komstroy*. Intra-EU *investor-State* arbitration itself is a relatively recent phenomenon. The first such cases were brought in the early 2000s, particularly as Central and Eastern European states (which had concluded bilateral investment treaties with EU Member States) acceded to the EU, and treaties between those states and EU Member States became treaties between two EU Member States. The first known intra-EU investor-State arbitration—*Eastern Sugar B.V. (Netherlands) v. The Czech Republic*, under the bilateral investment treaty between the Netherlands and the Czech Republic—was filed in 2004. SCC Case No. 088/2004, Partial Award (Mar. 27, 2007), ¶ 15. Even at that early stage, the Commission expressed doubt about the compatibility of intra-EU arbitration with EU law. *See id.* ¶¶ 119, 126.

While it was natural for intra-EU cases under bilateral investment treaties to arise only after former third States became EU Member States through accession, the same is not true for the ECT, which had 15 EU Member State signatories from the outset. Yet for nearly the first decade of the treaty's existence, intra-EU claims were entirely unknown. The first such case—*Electrabel S.A. v. Republic of Hungary*—came in 2007, nine years after the treaty's entry into force. ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability (Nov. 30, 2012), ¶ 1.8. The Commission filed an amicus brief in that case, objecting to the tribunal's jurisdiction over intra-EU claims that implicated EU law. *Id.* ¶¶ 5.9-5.20.

During this same time frame, in *Commission v. Ireland ("Mox Plant")*, the Court of Justice held that Ireland had breached its obligations under the EU Treaties by instituting arbitration proceedings against the United Kingdom under the U.N. Convention on the Law of the Sea, in connection with issues that fell within the ambit of EU law. 30 May 2006, EU:C:2006:345 ¶ 184. In so holding, the Court invoked the same principles of primacy of EU law and autonomy of the

EU legal order that are enshrined in the EU Treaties and that the Court would invoke more than a decade later in *Achmea* and *Komstroy*. *See id.* ¶¶ 120-128, 130-133.

In short, the notion that EU law precludes intra-EU arbitration was clearly established long before Petitioners initiated their arbitration against Spain in 2014. *See* ECF No. 1-4, PDF p. 31, ¶ 6. Settled EU law has always precluded the formation of an arbitration agreement between Spain and Petitioners. Spain did not offer to arbitrate with EU investors, and hence no agreement to arbitrate this dispute with Petitioners could ever have been formed.

### B.    The Court should defer to the decisions of the Court of Justice

As Spain has argued, in determining whether to accord full faith and credit to the Award, "[i]t is the Court's role to determine whether the arbitral tribunal had jurisdiction based on a valid agreement to arbitrate." ECF No. 108, at 16. Moreover, whether an arbitration agreement between Petitioners (EU companies) and Spain (an EU Member State) was ever formed is a question of EU law. ECF No. 108, at 18-19. And on questions of EU law, the decisions of the Court of Justice— the EU's highest court—are conclusive. *See Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 43-44 (2018) (analogizing to the rule that "[i]f the relevant state law is established by a decision of 'the State's highest court,' that decision is 'binding on the federal courts'"). That is so even though the purported offer of arbitration appears in an international treaty. The ECT's interpretation (as it applies in bilateral relations between EU Member States) is a question of EU law, and the EU Member States have charged the Court of Justice with issuing authoritative interpretations of the treaty—at least insofar as it applies in intra-EU relations. *See* Treaty on the Functioning of the European Union, art. 344, Oct. 26 2012, 2012 O.J. (C 326) 47; *cf. Mox Plant*, ¶¶ 121-133 (similar analysis regarding the U.N. Convention on the Law of the Sea).

Deference to the decisions of the Court of Justice is especially warranted here given the

immense importance of the issue to the EU. Whether EU Member States like Spain could have "entered into legally valid [arbitration] agreements" with EU investors, *NextEra*, 112 F.4th at 1104, is a question that implicates fundamental principles of EU law and the structure of the EU legal order. ECF No. 67, at 22-23. It has engendered years of litigation in EU courts and prompted action at the highest diplomatic and political levels of the EU and its Member States.

By contrast, as the D.C. Circuit recognized, "[t]he United States has no direct interest in the underlying disputes" between Petitioners and Spain. 112 F.4th at 1109. "Nor does the United States have a direct interest in the interpretation of the Energy Charter Treaty, a treaty to which it does not belong." *Id*. For a U.S. court nonetheless to second-guess the Court of Justice on a question of such magnitude for the EU legal order would contradict the principles of comity and mutual respect that govern U.S. courts' approach to legal issues that affect the interests of foreign governments. *See, e.g. Hilton v. Guyot*, 159 U.S. 113, 163-64, 202-03 (1895).

### C.    Properly interpreted according to customary international law rules of treaty interpretation, Spain's offer to arbitrate contained in Article 26 of the Energy Charter Treaty does not extend to EU investors

Even if the Court were to decline to defer to the Court of Justice's decisions on the interpretation of the ECT as it applies between EU Member States and interpreted Article 26 for itself, basic principles of treaty interpretation would compel the same conclusion: Spain's standing offer to arbitrate in Article 26 does not extend to EU investors.

Treaty interpretation is governed by the Vienna Convention on the Law of Treaties ("VCLT"), *opened for signature* May 23, 1969, 1155 U.N.T.S. 331. While the United States is not a party to the VCLT, the Department of State "considers [it] an authoritative guide to current treaty law and practice." *Mora v. New York*, 524 F.3d 183, 196 n.19 (2d Cir. 2008). Federal courts of appeals "have applied [the VCLT] as an articulation of the customary international law of treaty

interpretation." *Pliego v. Hayes*, 843 F.3d 226, 232 (6th Cir. 2016). *See also, e.g.*, *Georges v. United Nations*, 834 F.3d 88, 96 n.41 (2d Cir. 2016); *Kreimerman v. Casa Veerkamp, S.A. de C.V.*, 22 F.3d 634, 638-39 (5th Cir. 1994).

Under the VCLT, treaty provisions must be "interpreted in good faith, in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose." VCLT art. 31(1). Key here, the interpreter "shall" also "take[]into account" (among other things) "any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions," *id.* art. 31(3)(a), and "any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation," *id.* art. 31(3)(b).[6] The interpreter may also have recourse to "supplementary means of interpretation," including, "the preparatory work of the treaty and the circumstances of its conclusion." *Id.* art. 32. Treaty interpretation is a "single combined operation" without any hierarchy between interpretative elements. Sir Humphrey Waldock (Special Rapporteur on the Law of Treaties), *Sixth Report on the Law of Treaties*, UN Doc. A/CN.4/186 and Add.1-7, [1966] 2 Y.B. Int'l L. Comm'n, 95 & 219-20.

Multiple factors demonstrate that the standing offer to arbitrate by Contracting Parties that are EU Member States contained in Article 26 of the ECT does not apply to EU investors.

***Ordinary meaning of treaty terms in their context.*** Article 26 governs the resolution of "[d]isputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former … ." ECT Art. 26(1). Article 26 thus contains a "diversity" requirement: it covers only disputes between one Contracting Party and an investor

---

[6] The interpreter must also take into account and "any relevant rules of international law applicable in the relations between the parties." VCLT art. 31(3)(c).

of "another" i.e., a different—"Contracting Party," relating to an investment made by the investor in that other Contracting Party's "Area."

The terms "Contracting Party" and "Area" are defined terms. Article 1(2) defines "Contracting Party" to include either a state or a "Regional Economic Integration Organization which has consented to be bound by [the ECT]." The term "Regional Economic Integration Organization" ("REIO") is defined in Article 1(3) as "an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters." The EU—which is a party to the ECT—is the paradigmatic REIO United Nations, *Handbook: Final Clauses of Multilateral Treaties* 22 (2003), https://bit.ly/2sw2HSl. Finally, Article 1(10) defines the term "Area." Specifically, "with respect to a Regional Economic Integration Organization, Area means the Areas of the member states of such Organization … ." That is, where the Contracting Party is the REIO, the relevant "Area" includes the areas of all its member states.

Taking these terms together, under the ECT, in an intra-EU situation, the relevant "Contracting Party" is the REIO, *i.e.*, the EU itself. The diversity between the investor and the respondent Contracting Party that is necessary to invoke Article 26 is therefore lacking.

The fact that the ECT does not specifically provide that Article 26 is inapplicable to intra-EU disputes (by means of a so-called "disconnection clause") is irrelevant. *Cf. NextEra*, 112 F.4th at 1102 (stating in dicta that the ECT's drafters could have exempted intra-EU disputes through a disconnection clause). Disconnection clauses inform non-EU contracting parties that EU law will apply as between EU Member States that are parties to the same treaty. But non-EU Contracting Parties to the ECT were already on notice of this fact, for at least two reasons. First, as mentioned above, Article 1(3) of the ECT recognizes the EU's ability to bind EU Member States and the

relevance of that fact to the Regional Economic Integration Organization as a Contracting Party. Second, it is well-recognized that when the EU and its Member States join an international treaty together, they do not assume new treaty obligations as between themselves; their relations remain governed by EU law. The WTO Agreement (to which the EU and its Member States are contracting parties) illustrates the point. That treaty also does not contain a disconnection clause, but it is widely understood and accepted that the EU's internal market rules, and not the WTO Agreement itself, govern intra-EU trade. *See* Pieter J. Kuijper, *The Conclusion and Implementation of the Uruguay Round Results by the European Community*, 6 Eur. J. Int'l L. 222, 228 (1995). Where, as with the ECT, the EU itself is not just a contracting party but rather was the driving force behind the treaty, *see infra*, that EU law continues to govern relations between EU Member States is even more clear. A disconnection clause would have been superfluous.

   ***Object and purpose.*** The ECT's object and purpose bolster this interpretation. As the Commission has previously explained, the EU was the driving force behind the ECT. ECF No. 67, at 9-10. A key purpose of the ECT—which implements the policy objectives set out in its predecessor instrument, the European Energy Charter, *see* ECT, pmbl.—was to create a framework for energy cooperation between the EU on the one hand, and the former communist countries of Central and Eastern Europe on the other, as those countries transitioned to market economies and prepared for eventual accession to the European Union. *See* ECF No. 67, at 9-10. The EU saw the ECT as governing its *external* energy policy, not altering the relationships between EU Member States. *See id.*; *see also* Concluding Document of the Hague Convention on the European Energy Charter, *adopted* Dec. 17, 1991, pmbl., https://bit.ly/3CGBhx0 ("Assured of support from the European Community, through completion of *its internal energy market* … ." (emphasis added)); *id.* ("Aware of the obligations under major relevant international agreements [i.e., including the

EU Treaties] … ."). Put simply, the objective was never to create new treaty obligations under the ECT that EU investors could enforce against other EU Member States.

**Subsequent practice and agreement.** Finally, the subsequent practice of the EU Member States, *see supra* pp. 2-3, indicates that those States agree that, as between EU Member States, the offer to arbitrate in Article 26 does not extend to EU investors. *See* VCLT Art. 31(1)(b); *NextEra*, 112 F.4th at 1110 (noting that other EU Member States "do not understand the agreement they made with Spain to obligate Spain to arbitrate with their nationals"). Moreover, as also discussed above, the EU and 26 EU Member States (including Spain and the Netherlands) have formally declared their "common understanding" that "Article 26 … cannot and could never serve as a legal basis for intra-EU arbitration proceeding." Declaration § 1(i). This declaration is a "subsequent agreement between the parties regarding the interpretation of [the ECT] or the application of its provisions" for purposes of Article 31(3)(a) of the VCLT and should be given significant, if not controlling, weight. Consistent with Article 31(3), the Supreme Court recognizes "'the postratification understanding' of signatory nations" as an "aid[]" to the interpretation of a treaty. *Medellín v. Texas*, 552 U.S. 491, 507 (2008). At bottom, a court's role in interpreting an international treaty is to "giv[e] effect to the intent of the Treaty parties." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982); *see also BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014). The intent and agreement of the relevant treaty parties here as to the meaning of Article 26 is beyond dispute, and there is no basis for the Court to second-guess it.

## CONCLUSION

For the foregoing reasons and those set forth in previous submissions by Spain and the Commission, the Court should deny Petitioners' motion for summary judgment, enter judgment for Spain, and dismiss the Petition with prejudice.

Dated: February 26, 2025                     Respectfully submitted,

                                             *s/ Sally L. Pei*

                                             Sally L. Pei (D.C. Bar No. 1030194)
                                             R. Stanton Jones (D.C. Bar No. 987088)
                                             ARNOLD & PORTER
                                               KAYE SCHOLER LLP
                                             601 Massachusetts Ave., NW
                                             Washington, DC  20001-3743
                                             T: (202) 942-5000
                                             sally.pei@arnoldporter.com
                                             stanton.jones@arnoldporter.com

                                             *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.


_s/ Sally L. Pei_
Sally L. Pei