# Exhibit A



Ref. Ares(2022)6734265 - 29/09/2022

Date de réception     :     29/09/2022

СЪД НА ЕВРОПЕЙСКИЯ СЪЮЗ
TRIBUNAL DE JUSTICIA DE LA UNIÓN EUROPEA
SOUDNÍ DVŮR EVROPSKÉ UNIE
DEN EUROPÆISKE UNIONS DOMSTOL
GERICHTSHOF DER EUROPÄISCHEN UNION
EUROOPA LIIDU KOHUS
ΔΙΚΑΣΤΗΡΙΟ ΤΗΣ ΕΥΡΩΠΑΪΚΗΣ ΕΝΩΣΗΣ
COURT OF JUSTICE OF THE EUROPEAN UNION
COUR DE JUSTICE DE L'UNION EUROPÉENNE
CÚIRT BHREITHIÚNAIS AN AONTAIS EORPAIGH
SUD EUROPSKE UNIJE
CORTE DI GIUSTIZIA DELL'UNIONE EUROPEA

EIROPAS SAVIENĪBAS TIESA
EUROPOS SĄJUNGOS TEISINGUMO TEISMAS
AZ EURÓPAI UNIÓ BÍRÓSÁGA
IL-QORTI TAL-ĠUSTIZZJA TAL-UNJONI EWROPEA
HOF VAN JUSTITIE VAN DE EUROPESE UNIE
TRYBUNAŁ SPRAWIEDLIWOŚCI UNII EUROPEJSKIEJ
TRIBUNAL DE JUSTIÇA DA UNIÃO EUROPEIA
CURTEA DE JUSTIŢIE A UNIUNII EUROPENE
SÚDNY DVOR EURÓPSKEJ ÚNIE
SODIŠČE EVROPSKE UNIJE
EUROOPAN UNIONIN TUOMIOISTUIN
EUROPEISKA UNIONENS DOMSTOL



LUXEMBOURG

## ORDONNANCE DE LA COUR (dixième chambre)

### 21 septembre 2022 *

— 1235419 —

« Renvoi préjudiciel – Article 99 du règlement de procédure de la Cour – Aides d'État – Articles 107 et 108 TFUE – Traité bilatéral d'investissement – Clause d'arbitrage – Roumanie – Sentence arbitrale accordant le versement de dommages et intérêts – Décision de la Commission européenne déclarant que ce versement constitue une aide d'État incompatible avec le marché intérieur et ordonnant sa récupération – Exécution forcée de la sentence arbitrale devant une juridiction d'un État membre autre que l'État membre destinataire de la décision – Violation du droit de l'Union – Article 19 TUE – Articles 267 et 344 TFUE – Autonomie du droit de l'Union »

Dans l'affaire C-333/19,

ayant pour objet une demande de décision préjudicielle au titre de l'article 267 TFUE, introduite par la cour d'appel de Bruxelles (Belgique), par décision du 12 mars 2019, parvenue à la Cour le 24 avril 2019, dans les procédures

**DA**

contre

**Romanian Air Traffic Services Administration (Romatsa),**

**Roumanie,**

**Commission européenne,**

**Organisation européenne pour la sécurité de la navigation aérienne (Eurocontrol),**

**FC,**

**European Food SA,**

* Langue de procédure : le français.

FR

**Starmill SRL,**

**Multipack SRL,**

et

**FC,**

**European Food SA,**

**Starmill SRL,**

**Multipack SRL**

contre

**Romanian Air Traffic Services Administration (Romatsa),**

**Roumanie,**

**DA,**

**Commission européenne,**

**Organisation européenne pour la sécurité de la navigation aérienne (Eurocontrol),**

LA COUR (dixième chambre),

composée de M. I. Jarukaitis, président de chambre, M. E. Regan, président de la cinquième chambre (rapporteur), et M. Ilešič, juge,

avocat général : M. M. Szpunar,

greffier : M. A. Calot Escobar,

vu la décision prise, l'avocat général entendu, de statuer par voie d'ordonnance motivée, conformément à l'article 99 du règlement de procédure de la Cour,

rend la présente

**Ordonnance**

1   La demande de décision préjudicielle porte sur l'interprétation de la décision (UE) 2015/1470 de la Commission, du 30 mars 2015, concernant l'aide d'État SA.38517 (2014/C) (ex 2014/NN) mise en œuvre par la Roumanie – Sentence arbitrale dans l'affaire Micula/Roumanie du 11 décembre 2013 (JO 2015, L 232, p. 43), ainsi que

les principes généraux du droit de l'Union, notamment ceux de coopération loyale et de l'autorité de la chose jugée.

2    Cette demande a été présentée dans le cadre de litiges opposant DA et FC, des ressortissants suédois résidant en Roumanie, ainsi que European Food SA, Starmill SRL et Multipack SRL, des sociétés contrôlées par ceux-ci, à Romanian Air Traffic Services Administration (Romatsa), la Roumanie, la Commission européenne et l'Organisation européenne pour la sécurité de la navigation aérienne (Eurocontrol) au sujet d'une saisie-arrêt exécution que DA a fait pratiquer en Belgique entre les mains d'Eurocontrol, à la charge de la Roumanie, sur la base d'une sentence arbitrale.

**Le cadre juridique**

***Le droit international***

*La convention CIRDI*

3    La convention pour le règlement des différends relatifs aux investissements entre États et ressortissants d'autres États, conclue à Washington le 18 mars 1965 (ci–après la « convention CIRDI »), entrée en vigueur à l'égard de la Roumanie le 12 octobre 1975, dispose, à son article 53, paragraphe 1 :

« La sentence est obligatoire à l'égard des parties et ne peut être l'objet d'aucun appel ou autre recours, à l'exception de ceux prévus à la présente Convention. Chaque partie doit donner effet à la sentence conformément à ses termes [...] »

4    L'article 54, paragraphe 1, de la convention CIRDI prévoit :

« Chaque État contractant reconnaît toute sentence rendue dans le cadre de la présente Convention comme obligatoire et assure l'exécution sur son territoire des obligations pécuniaires que la sentence impose comme s'il s'agissait d'un jugement définitif d'un tribunal fonctionnant sur le territoire dudit État. [...] »

*Le TBI*

5    Le traité bilatéral d'investissement, conclu le 29 mai 2002, entre le gouvernement du Royaume de Suède et le gouvernement roumain pour la promotion et la protection réciproque des investissements (ci-après le « TBI »), entré en vigueur le 1er juillet 2003, dispose, à son article 2, paragraphe 3 :

« Chaque partie contractante assure à tout moment un traitement juste et équitable aux investissements des investisseurs de l'autre partie contractante et n'entrave pas, par des mesures arbitraires ou discriminatoires, l'administration, la gestion, le maintien, l'utilisation, la jouissance ou la cession desdits investissements par lesdits investisseurs ».

3

6    L'article 7 du TBI prévoit que les différends entre les investisseurs et les pays signataires sont réglés, notamment, par un tribunal arbitral qui applique la convention CIRDI.

**Le droit de l'Union**

7    La décision 2015/1470, adoptée par la Commission sur le fondement, notamment, de l'article 108, paragraphe 2, TFUE, énonce :

*« Article premier*

Le versement des dommages et intérêts accordés par le tribunal arbitral, [...] par la sentence arbitrale rendue le 11 décembre 2013 dans l'affaire no ARB/05/20 Micula e.a./Roumanie, à l'unité économique unique composée par [DA], [FC], [...] European Food [...], [...] Starmill [...], [...] Multipack, European Drinks SA, Rieni Drinks SA, Scandic Distilleries SA, Transilvania General Import-Export SRL et West Leasing International SRL constitue une aide d'État au sens de l'article 107, paragraphe 1, [TFUE], qui est incompatible avec le marché intérieur.

*Article 2*

1.    La Roumanie ne verse aucune aide incompatible visée à l'article 1er et récupère toutes les aides incompatibles visées à l'article 1er qui ont déjà été versées aux entités, quelles qu'elles soient, qui composent l'unité économique unique qui a bénéficié de cette aide à la suite de la mise en œuvre ou à l'exécution partielle de la sentence arbitrale du 11 décembre 2013, ainsi que toute aide versée aux entités, quelles qu'elles soient, qui composent l'unité économique unique qui a bénéficié de cette aide à la suite d'une mise en œuvre ultérieure de la sentence arbitrale du 11 décembre 2013 qui n'a pas été notifiée à la Commission ou toute aide versée après la date de l'adoption de la présente décision.

2.    [DA], [FC], [...] European Food [...], [...] Starmill [...], [...] Multipack, European Drinks [...], Rieni Drinks [...], Scandic Distilleries [...], Transilvania General Import-Export [...] et West Leasing International [...] sont solidairement responsables du remboursement de l'aide d'État qu'ils ont reçue.

[...]

7.    La Roumanie veille à ce qu'aucun autre versement de l'aide visée à l'article 1er ne soit effectué à partir de la date d'adoption de la présente décision.

*Article 3*

1.    La récupération de l'aide visée à l'article 1er est immédiate et effective.

2.    La Roumanie veille à ce que la présente décision soit exécutée dans un délai de quatre mois à compter de sa notification.

4

ROMATSA E.A.

[...]

*Article 5*

La Roumanie est destinataire de la présente décision. »

**Le litige au principal et les questions préjudicielles**

8    Par la sentence arbitrale du 11 décembre 2013, un tribunal arbitral, constitué dans le cadre de la convention CIRDI conformément à la clause d'arbitrage prévue à l'article 7 du TBI, a accordé à DA et à FC ainsi qu'aux sociétés European Food, Starmill et Multipack, au motif de la violation par la Roumanie de l'article 2, paragraphe 3, du TBI, des dommages et intérêts à charge de cet État pour un montant s'élevant en principal à 376 433 229 lei roumains (RON) (environ 78 millions d'euros), à majorer d'intérêts jusqu'à la date de pleine exécution de cette sentence par la Roumanie. Par conséquent, le montant total dû par la Roumanie le 11 décembre 2013 s'élevait à 791 882 452 RON (environ 164 000 000 euros).

9    Le 18 avril 2014, la Roumanie a introduit un recours devant un comité ad hoc du Centre international pour le règlement des différends relatifs aux investissements (CIRDI) tendant à l'annulation de ladite sentence arbitrale.

10   Le 30 mars 2015, la Commission a adopté la décision 2015/1470.

11   Le 2 juillet 2015, la sentence arbitrale du 11 décembre 2013 a été revêtue de la formule exécutoire, conformément à la législation belge portant approbation de la convention CIRDI.

12   Le 19 août 2015, DA a fait signifier cette sentence à la Roumanie.

13   Le 9 septembre 2015, DA a fait pratiquer une saisie-arrêt exécution entre les mains d'Eurocontrol, dont le siège est établi à Bruxelles (Belgique), sur les créances que cette dernière a ou aura à l'égard de la Roumanie, notamment représentée par l'intermédiaire de Romatsa, aux fins d'obtenir le paiement d'un montant de 85 066 428,42 euros.

14   Par citations en opposition à saisie-arrêt exécution, respectivement, des 23 et 24 septembre 2015, Romatsa et la Roumanie ont introduit une action devant la chambre des saisies du tribunal de première instance francophone de Bruxelles (Belgique) afin d'obtenir la mainlevée de la saisie pratiquée par DA. La Commission, Eurocontrol, FC, European Food, Starmill et Multipack ont introduit une demande en intervention volontaire dans ces procédures.

15   Par requêtes déposées au greffe du Tribunal de l'Union européenne, respectivement, les 6, 30 et 28 novembre 2015, European Food, Starmill, Multipack et Scandic Distilleries, une autre société contrôlée par DA et FC, dans

l'affaire T-624/15, DA, dans l'affaire T-694/15, et FC ainsi que European Drinks, Rieni Drinks, Transilvania General Import-Export et West Leasing International, toutes des sociétés également contrôlées par DA et FC, dans l'affaire T-704/15, ont chacun introduit un recours au titre de l'article 263 TFUE tendant à l'annulation de la décision 2015/1470.

16    Par jugement du 25 janvier 2016, le tribunal de première instance francophone de Bruxelles (Belgique), faisant droit aux demandes de Romatsa et de la Roumanie, a ordonné la mainlevée de la saisie en cause. L'intervention volontaire de FC, European Food, Starmill et Multipack a été rejetée comme étant irrecevable.

17    Par décision du 26 février 2016, le comité ad hoc du CIRDI a rejeté le recours en annulation introduit par la Roumanie contre la sentence du 11 décembre 2013, de sorte que cette dernière est devenue définitive.

18    Le 29 février 2016, DA a interjeté appel du jugement du 25 janvier 2016 auprès de la cour d'appel de Bruxelles (Belgique), la juridiction de renvoi. Le même jour, FC, European Food, Starmill et Multipack ont interjeté appel de la partie du jugement rejetant leur intervention volontaire comme étant irrecevable. Par ailleurs, ils ont demandé à intervenir volontairement dans la procédure d'appel engagée par DA. La juridiction de renvoi a joint les deux affaires pour cause de connexité.

19    Dans sa décision de renvoi, la cour d'appel de Bruxelles, après avoir confirmé le rejet de l'intervention volontaire de FC, European Food, Starmill et Multipack devant le premier juge, mais déclaré recevable l'intervention volontaire de ceux-ci dans la procédure d'appel, expose, s'agissant de l'examen du bien-fondé de la saisie-arrêt exécution du 9 septembre 2015, que la sentence arbitrale du 11 décembre 2013, laquelle fait suite à une procédure d'arbitrage à laquelle la Commission a participé comme amicus curiae et qui est entre-temps devenue définitive, constitue un titre exécutoire régulier en soi. Cette saisie-arrêt exécution aurait, de ce fait, été pratiquée sur la base d'une sentence arbitrale revêtue de la formule exécutoire, dont l'article 54 de la convention CIRDI imposerait la reconnaissance et l'exécution à chaque État contractant, dont le Royaume de Belgique.

20    Toutefois, la juridiction de renvoi fait observer que le fait du prince constitue une cause étrangère libératoire pouvant justifier qu'un débiteur ne paie pas un créancier muni d'un titre exécutoire régulier. Or, en l'espèce, la décision 2015/1470 serait présentée comme un obstacle majeur à l'exécution de la sentence arbitrale du 11 décembre 2013. En effet, cette décision, adoptée postérieurement à cette dernière, interdirait à la Roumanie de procéder à l'exécution de cette sentence, dès lors que ladite décision considère que le versement des dommages et intérêts accordés par ladite sentence constitue une « aide d'État », au sens de l'article 107, paragraphe 1, TFUE, incompatible avec le marché intérieur, et enjoint à la Roumanie de récupérer les montants d'aide déjà versés. Il existerait donc un risque réel de conflit entre, d'une part, la décision d'une juridiction nationale confirmant, en vertu des articles 53 et 54 de la convention CIRDI, une saisie-arrêt exécution de

la sentence du 11 décembre 2013 et, d'autre part, la décision 2015/1470, qui fait l'objet d'un recours pendant devant le juge de l'Union.

21  La juridiction de renvoi relève cependant que, selon DA, la décision 2015/1470 n'interdit pas, en tant que telle, une exécution forcée de la sentence arbitrale du 11 décembre 2013 en Belgique. En effet, conformément à la jurisprudence de la Cour, telle qu'elle ressort, notamment, de l'arrêt du 16 mai 2002, France/Commission (C-482/99, EU:C:2002:294, point 24), l'exécution de cette sentence ne constituerait une « aide d'État », au sens de l'article 107, paragraphe 1, TFUE, que si cette exécution est imputable à l'État roumain. Or, tel ne serait le cas, selon cette décision, que lorsque cet État exécute volontairement ladite sentence, les décisions rendues par les juridictions roumaines et les huissiers de justice désignés par celles-ci devant, quant à elles, être regardées comme étant imputables à l'État roumain. En revanche, si la Roumanie est contrainte par une juridiction d'un autre État membre de procéder à l'exécution de la sentence arbitrale en cause, cette exécution ne constituerait pas une « aide d'État », au sens de l'article 107, paragraphe 1, TFUE. Une telle exécution ne pourrait être considérée comme étant imputable à la Roumanie, et, partant, ne violerait pas cette décision. En vertu des articles 53 et 54 de la convention CIRDI, cet État membre ne disposerait d'ailleurs d'aucune autonomie quant à l'exécution de la sentence arbitrale du 11 décembre 2013.

22  Dans ces conditions, la cour d'appel de Bruxelles a décidé de surseoir à statuer et de poser à la Cour les questions préjudicielles suivantes :

« 1)  Est-ce que la décision 2015/1470 doit être comprise comme visant les paiements dus par la Roumanie même dans le cas où les paiements seront recouvrés [auprès d'elle] à la suite d'une procédure d'exécution forcée de la sentence arbitrale [...] du 11 décembre 2013, entamée devant les juridictions d'un État membre autre que la Roumanie ?

2)  Est-ce que le droit de l'Union exige en soi et d'office qu'une juridiction d'un État membre (autre que la Roumanie), saisie d'un recours [contre] une procédure d'exécution forcée d'une sentence arbitrale [...] qui a force de chose jugée selon les règles de procédure nationales propres à cet État membre, écarte cette sentence, au seul motif qu'une décision non définitive de la Commission adoptée postérieurement à la sentence considère que cette exécution forcée de la sentence est contraire au régime [de l'Union] des aides d'État ?

3)  Est-ce que le droit de l'Union, notamment le principe de coopération loyale ou le principe d'autorité de la chose jugée, permet qu'une juridiction nationale d'un État membre (autre que la Roumanie) ne respecte pas ses obligations internationales découlant de la convention CIRDI dans l'hypothèse où la Commission a adopté une décision postérieurement à la sentence, qui considère que l'exécution forcée de la sentence serait contraire au régime [de l'Union] des aides d'État et ce même si la Commission a

7

participé à la procédure d'arbitrage (en ce compris le recours en annulation [contre] la sentence) et a fait valoir ses moyens relatifs au régime [de l'Union] des aides d'État ? »

**Les développements postérieurs à la demande de décision préjudicielle**

23    Par arrêt du 18 juin 2019, European Food e.a./Commission (T-624/15, T-694/15 et T-704/15, EU:T:2019:423), le Tribunal a annulé la décision 2015/1470 au motif, en substance, que la Commission n'était pas compétente ratione temporis pour adopter celle-ci au titre de l'article 108 TFUE.

24    Le 27 août 2019, la Commission a saisi la Cour d'un pourvoi visant à l'annulation de cet arrêt.

25    Par décision du 5 septembre 2019, le président de la Cour a suspendu la procédure dans la présente affaire jusqu'au prononcé de l'arrêt statuant sur ce pourvoi.

26    Par arrêt du 25 janvier 2022, Commission/European Food e.a. (C-638/19 P, EU:C:2022:50), la Cour a annulé l'arrêt du 18 juin 2019, European Food e.a./Commission (T-624/15, T-694/15 et T-704/15, EU:T:2019:423), et renvoyé l'affaire devant le Tribunal pour qu'il statue sur les moyens et les arguments soulevés devant lui sur lesquels la Cour ne s'est pas prononcée.

27    Le 28 janvier 2022, l'arrêt du 25 janvier 2022, Commission/European Food e.a. (C-638/19 P, EU:C:2022:50), a été notifié à la cour d'appel de Bruxelles en lui demandant si, au vu de celui-ci, et en particulier de ses points 137 à 145, elle souhaitait maintenir sa demande de décision préjudicielle.

28    Par lettre datée du 14 juin 2022, parvenue à la Cour le 15 juin 2022, cette juridiction a indiqué que, dans l'intérêt d'une bonne administration de la justice, elle maintenait cette demande.

29    Par décision du président de la Cour du 22 juin 2022, il a été décidé, M. le juge rapporteur et M. l'avocat général entendus, de ne pas notifier le présent renvoi préjudiciel aux intéressés visés à l'article 23 du statut de la Cour de justice de l'Union européenne.

**Sur les questions préjudicielles**

30    En vertu de l'article 99 de son règlement de procédure, la Cour peut, notamment lorsqu'une réponse à une question posée à titre préjudiciel peut être clairement déduite de la jurisprudence ou lorsque la réponse à la question posée ne laisse place à aucun doute raisonnable, décider, à tout moment, sur proposition du juge rapporteur, l'avocat général entendu, de statuer par voie d'ordonnance motivée.

31    Il y a lieu de faire application de cette disposition dans la présente affaire.

32    Par ses deuxième et troisième questions, qu'il convient d'examiner ensemble et en premier lieu, la juridiction de renvoi demande, en substance, si le droit de l'Union doit être interprété en ce sens qu'une juridiction d'un État membre saisie de l'exécution forcée de la sentence arbitrale ayant fait l'objet de la décision 2015/1470 est tenue d'écarter cette sentence.

33    À cet égard, il convient de rappeler que, selon la jurisprudence de la Cour, les articles 267 et 344 TFUE s'opposent à une disposition contenue dans un accord international conclu entre deux États membres aux termes de laquelle un investisseur de l'un de ces États membres peut, en cas de litige concernant des investissements dans l'autre État membre, introduire une procédure contre ce dernier État membre devant un tribunal arbitral, dont cet État membre s'est obligé à accepter la compétence (arrêts du 6 mars 2018, Achmea, C-284/16, EU:C:2018:158, point 60, ainsi que du 25 janvier 2022, Commission/European Food e.a., C-638/19 P, EU:C:2022:50, point 138).

34    En effet, par la conclusion d'un tel accord, les États membres parties à celui-ci consentent à soustraire à la compétence de leurs propres juridictions et, partant, au système de voies de recours juridictionnel que l'article 19, paragraphe 1, second alinéa, TUE leur impose d'établir dans les domaines couverts par le droit de l'Union des litiges pouvant porter sur l'application ou l'interprétation de ce droit. Un tel accord est donc susceptible d'aboutir à une situation dans laquelle ces litiges ne seraient pas tranchés d'une manière garantissant la pleine efficacité dudit droit (arrêts du 26 octobre 2021, PL Holdings, C-109/20, EU:C:2021:875, point 45, ainsi que du 25 janvier 2022, Commission/European Food e.a., C-638/19 P, EU:C:2022:50, point 139).

35    En l'occurrence, à compter du 1er janvier 2007, date d'adhésion de la Roumanie à l'Union, le droit de l'Union, notamment les articles 107 et 108 TFUE, était applicable à cet État membre. Il est, par ailleurs, constant que l'indemnisation sollicitée par les requérants en arbitrage ayant donné lieu à la sentence arbitrale du 11 décembre 2013, qui fait l'objet de la décision 2015/1470, ne portait pas exclusivement sur les dommages prétendument subis avant cette date d'adhésion. Par conséquent, le différend porté devant le tribunal arbitral ne saurait être regardé comme cantonné en tous ses éléments à une période au cours de laquelle la Roumanie, n'ayant pas encore adhéré à l'Union, n'était pas encore liée par les règles et les principes rappelés aux points 33 et 34 de la présente ordonnance (voir, en ce sens, arrêt du 25 janvier 2022, Commission/European Food e.a., C-638/19 P, EU:C:2022:50, point 140).

36    Or, ainsi que la Cour l'a déjà relevé, le tribunal arbitral auquel a été soumis ce litige n'appartient pas au système juridictionnel de l'Union que l'article 19, paragraphe 1, second alinéa, TUE impose aux États membres d'établir dans les domaines couverts par le droit de l'Union, lequel système juridictionnel, à compter de l'adhésion de la Roumanie à l'Union, s'est substitué au mécanisme de résolution de litiges susceptibles de concerner l'interprétation ou l'application du droit de

9

ORDONNANCE DU 21. 9. 2022 – AFFAIRE C-333/19

l'Union (arrêt du 25 janvier 2022, Commission/European Food e.a., C-638/19 P, EU:C:2022:50, point 141).

37 En effet, d'une part, ce tribunal arbitral ne constitue pas une « juridiction d'un des États membres », au sens de l'article 267 TFUE, et, d'autre part, la sentence arbitrale prononcée par ce dernier n'est soumise, conformément aux articles 53 et 54 de la convention CIRDI, à aucun contrôle par une juridiction d'un État membre quant à sa conformité au droit de l'Union (arrêt du 25 janvier 2022, Commission/European Food e.a., C-638/19 P, EU:C:2022:50, point 142).

38 Cette constatation n'est pas susceptible d'être remise en cause par le fait que la Roumanie avait consenti à la possibilité qu'un litige soit porté contre elle dans le cadre de la procédure d'arbitrage prévue par le TBI (arrêt du 25 janvier 2022, Commission/European Food e.a., C-638/19 P, EU:C:2022:50, point 143).

39 En effet, un tel consentement, à la différence de celui qui aurait été donné dans le cadre d'une procédure d'arbitrage commercial, ne trouve pas son origine dans un accord spécifique reflétant l'autonomie de la volonté des parties en cause, mais résulte d'un traité conclu entre deux États, dans le cadre duquel ceux-ci ont, de manière générale et par avance, consenti à soustraire à la compétence de leurs propres juridictions des litiges pouvant porter sur l'interprétation ou l'application du droit de l'Union au profit de la procédure d'arbitrage (arrêt du 25 janvier 2022, Commission/European Food e.a., C-638/19 P, EU:C:2022:50, point 144 ainsi que jurisprudence citée).

40 Dans ces conditions, dès lors que, à compter de l'adhésion de la Roumanie à l'Union, le système des voies de recours juridictionnel prévu par les traités UE et FUE s'est substitué à cette procédure d'arbitrage, le consentement à cet effet donné par cet État est désormais dépourvu de tout objet (arrêt du 25 janvier 2022, Commission/European Food e.a., C-638/19 P, EU:C:2022:50, point 145).

41 Il s'ensuit que la clause d'arbitrage prévue par le TBI, en tant qu'elle a constitué le fondement de la sentence arbitrale qui fait l'objet de la décision 2015/1470, a remis en cause la préservation du caractère propre du droit de l'Union assurée par la procédure du renvoi préjudiciel, en violation des principes de coopération loyale et de l'autonomie du droit de l'Union (voir, en ce sens, arrêts du 6 mars 2018, Achmea, C-284/16, EU:C:2018:158, points 58 et 59, ainsi que du 26 octobre 2021, PL Holdings, C-109/20, EU:C:2021:875, point 46).

42 En conséquence, cette sentence arbitrale doit être considérée comme étant incompatible avec le droit de l'Union, en particulier, avec ses articles 267 et 344 TFUE.

43 Une telle sentence ne saurait donc produire aucun effet et ne peut ainsi être exécutée en vue de procéder au versement de l'indemnisation accordée par celle-ci.

44 Il convient, dès lors, de répondre aux deuxième et troisième questions posées que le droit de l'Union, en particulier ses articles 267 et 344 TFUE, doit être interprété en

10

ROMATSA E.A.

ce sens qu'une juridiction d'un État membre saisie de l'exécution forcée de la sentence arbitrale ayant fait l'objet de la décision 2015/1470 est tenue d'écarter cette sentence et, partant, ne peut en aucun cas procéder à l'exécution de celle-ci afin de permettre à ses bénéficiaires d'obtenir le versement des dommages et intérêts qu'elle leur accorde.

45    Compte tenu de cette réponse, il n'y a plus lieu de répondre à la première question.

**Sur les dépens**

46    La procédure revêtant, à l'égard des parties au principal, le caractère d'un incident soulevé devant la juridiction de renvoi, il appartient à celle-ci de statuer sur les dépens.

Par ces motifs, la Cour (dixième chambre) ordonne :

**Le droit de l'Union, en particulier ses articles 267 et 344 TFUE, doit être interprété en ce sens qu'une juridiction d'un État membre saisie de l'exécution forcée de la sentence arbitrale ayant fait l'objet de la décision (UE) 2015/1470 de la Commission, du 30 mars 2015, concernant l'aide d'État SA.38517 (2014/C) (ex 2014/NN) mise en œuvre par la Roumanie – Sentence arbitrale dans l'affaire Micula/Roumanie du 11 décembre 2013, est tenue d'écarter cette sentence et, partant, ne peut en aucun cas procéder à l'exécution de celle-ci afin de permettre à ses bénéficiaires d'obtenir le versement des dommages et intérêts qu'elle leur accorde.**

Fait à Luxembourg, le 21 septembre 2022.

Le greffier                                          Le président de la X$^{\text{ème}}$ chambre

A. Calot Escobar                                    I. Jarukaitis

Pour copie conforme,

Luxembourg, le  2 9. 09. 2022

Le Greffier,
par ordre
Maria Krausenboeck
Administratrice

11

# English Translation

[COURT INSIGNIA]

Order of the COURT (Tenth Chamber)

~ 1235419 ~

21 September 2022 *

(Reference for a preliminary ruling – Article 99 of the Rules of Procedure of the Court of Justice –State aid – Articles 107 and 108 TFEU– Bilateral investment treaty–Arbitration clause– Romania – Arbitration award awarding damages – Decision of the European Commission declaring that that payment constitutes State aid incompatible with the internal market and ordering its recovery – Enforcement of the arbitral award before a court of a Member State other than1 – Member State to which the decision is addressed – Infringement of EU law – Article 19 TEU – Articles 267 and 344 TFEU – Autonomy of EU law)

In Case C-333/19,

request for a preliminary ruling under Article 267 TFEU from the cour d'appel de Bruxelles (Court of Appeal, Brussels, Belgium), made by decision of 12 March 2019, received at the Court on 24 April 2019, in the proceedings

**DA**

against

**Romanian Air Traffic Services Administration (Romatsa), Romania,**

**European Commission.**

**European Organisation for the Safety of Air Navigation (Eurocontrol),**

**FC,**

**European Food SA,**

• Language of the case: French.

**Starmill SRL,**

**Multipack SRL,**

and

**FC,**

**European Food SA,**

**Starmill SRL,**

**Multipack SRL**

**Romanian Air Traffic Services Administration (Romatsa),**

**Romania,**

**DA,**

**European Commission;**

**European Organisation for the Safety of Air Navigation (Eurocontrol),**

The Court (Tenth Chamber),

composed of I. Jarukaitis, President of the Chamber, E. Regan, President of the Fifth Chamber (Rapporteur), and M. Ilesic, Judge,

Advocate General: M. Szpunar,

Registrar: A. Calot Escobar,

having decided, after hearing the Advocate General, to give a decision by reasoned order, in accordance with Article 99 of the Rules of Procedure of the Court,

makes the following

## Order

1   The request for a preliminary ruling concerns the interpretation of Commission Decision (EU) 2015/1470 of 30 March 2015 on State aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania – Arbitration award in Micula v Romania of 11 December 2013 (OJ 2015 L 232, p. 43) and the general principles of EU law,

2

in particular those of sincere cooperation and res judicata.

2    This request has been made in proceedings between DA and FC, Swedish nationals residing in Romania, as well as European Food SA, Starmill SRL and Multipack SRL, companies controlled by them, and Romanian Air Traffic Services Administration (Romatsa), Romania, the European Commission and the European Organisation for the Safety of Air Navigation (Eurocontrol) concerning an attachment order that DA served on Eurocontrol, for the responsibility of Romania, in Belgium on the basis of an arbitration award.

**The legal framework**

***International law***

*ICSID Convention*

3    The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, concluded in Washington on 18 March 1965 ('the ICSID Convention'), which entered into force with respect to Romania on 12 October 1975, provides in Article 53(1):

'The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award …'

4    Article 54(1) of the ICSID Convention provides:

'Each Contracting State shall recognise an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State …'
*The BIT*

5    The Bilateral Investment Treaty concluded on 29 May 2002 between the Swedish Government and the Romanian Government on the Promotion and Reciprocal Protection of Investments ('the BIT'), which entered into force on 1 July 2003, provides, in Article 2(3):

'Each Contracting Party shall at all times ensure fair and equitable treatment of the investments by investors of the other Contracting Party and shall not impair, by means of arbitrary or discriminatory measures, the administration, management, maintenance, use, enjoyment or disposal thereof by those investors'.

3

6    Article 7 of the BIT provides that any dispute between investors and the Contracting Parties is to be settled, inter alia, by an arbitral tribunal which applies the ICSID Convention.

**Union law**

7    Decision 2015/1470, adopted by the Commission on the basis of, inter alia, Article 108(2) TFEU, states:

'*Article 1*

The payment of the compensation awarded by the arbitral tribunal […] by award of 11 December 2013 in Case No ARB/05/20 Micula a.o. v Romania to the single economic unit comprising, [DA], [FC], […] European Food […], […] Starmill […], […] Multipack, European Drinks SA, Rieni Drinks SA, Scandic Distilleries SA, Transilvania General Import-Export SRL and West Leasing International SRL constitutes State aid within the meaning of Article 107(1) [TFEU] which is incompatible with the internal market.

*Article 2*

1. Romania shall not pay out any incompatible aid referred to in Article 1 and shall recover any incompatible aid referred to in Article 1 which has already been paid out to any one of the entities constituting the single economic unit benefiting from that aid in partial implementation or execution of the arbitral award of 11 December 2013, as well as any aid paid out to any one of the entities constituting the single economic unit benefiting from that aid in further implementation of the arbitral award of 11 December 2013 that the Commission has not been made aware of or that is paid out after the date of this Decision.

2. [DA], [DC], […] European Food […], […] Starmill […], […] Multipack, European Drinks […], Rieni Drinks […], Scandic Distilleries […], Transilvania General Import-Export […] and West Leasing […] shall be jointly liable to repay the State aid received by any one of them.

[…]

7. Romania shall ensure that no further payments of the aid referred to in Article 1 shall be effected with effect from the date of adoption of this Decision.

*Article 3*

1. Recovery of the aid referred to in Article 1 shall be immediate and effective.

2. Romania shall ensure that this Decision is implemented within four months following the date of notification of this Decision.

4

[…]

*Article 5*

This Decision is addressed to Romania.'

**The dispute in the main proceedings and the preliminary questions**

8    By the arbitral award of 11 December 2013, an arbitral tribunal, constituted in the context of the ICSID Convention in accordance with the arbitration clause provided for in Article 7 of the BIT, awarded DA and FC as well as European Food, Starmill and Multipack, on the ground of Romania's infringement of Article 2(3) of the BIT, damages and interests against that State in the principal sum of 376 433 229 Romanian lei ( RON) (approximately EUR 78 million), increased with interest up to the date of full implementation of that award by Romania. Consequently, the total amount owed by Romania on 11 December 2013 was RON 791 882 452 (approximately EUR 164 000 000).

9    On 18 April 2014, Romania brought an action before an ad hoc committee of the International Centre for Settlement of Investment Disputes (ICSID) seeking the annulment of that arbitral award.

10    On 30 March 2015, the Commission adopted Decision 2015/1470.

11    On 2 July 2015, the arbitral award of 11 December 2013 was given executory effect, in accordance with the Belgian legislation approving the ICSID Convention.

12    On 19 August 2015, DA served that award on Romania.

13    On 9 September 2015, DA served an attachment order on Eurocontrol, whose registered office is in Brussels (Belgium), in respect of claims which the latter has or will have against Romania, represented in particular through Romatsa, in order to obtain payment of EUR 85 066 428,42.

14    By summons opposing an attachment order of 23 and 24 September 2015 respectively, Romatsa and Romania brought an action before the Chamber for Applications of the Tribunal de première instance francophone de Bruxelles [French-speaking Court of First Instance of Brussels] (Belgium) seeking the lifting of the seizure carried out by DA. The Commission, Eurocontrol, FC, European Food, Starmill and Multipack applied for voluntary intervention in these procedures.

15    By applications lodged at the Registry of the General Court of the European Union on 6, 30 and 28 November 2015 respectively, European Food, Starmill, Multipack and Scandic Distilleries, another company controlled by DA and FC, in

ROMATSAE.A.

Case T-624/15, DA, in Case T-694/15, and FC and European Drinks, Rieni Drinks, Transilvania General Import-Export and West Leasing International, all companies also controlled by DA and FC, in Case T-704/15, each brought an action under Article 263 TFEU for annulment of Decision 2015/1470.

16    By judgment of 25 January 2016, the tribunal de première instance francophone de Bruxelles [French-speaking Court of First Instance of Brussels] (Belgium), upholding the applications of Romatsa and Romania, ordered that the attachment at issue be lifted. The voluntary intervention of FC, European Food, Starmill and Multipack was rejected as inadmissible.

17    By decision of 26 February 2016, the ICSID Ad Hoc Committee dismissed Romania's action for annulment of the Award of 11 December 2013, with the result that the Award became final.

18    On 29 February 2016, DA appealed the judgment of 25 January 2016 to the cour d'appel de Bruxelles [Brussels Court of Appeal] (Belgium), the referring court. On the same day, FC, European Food, Starmill and Multipack appealed against the part of the judgment dismissing their voluntary intervention as inadmissible. Furthermore, they applied to intervene voluntarily in the appeal proceedings brought by DA. The referring court joined the two cases on account of the connection between them.

19    In its order for reference, the cour d'appel de Bruxelles [Brussels Court of Appeal], after upholding the rejection of the voluntary intervention of FC, European Food, Starmill and Multipack before the first court, but declaring admissible their voluntary intervention in the appeal proceedings, states, as regards the examination of the merits of the attachment order of 9 September 2015, that the arbitral award of 11 December 2013, which follows arbitration proceedings in which the Commission participated as amicus curiae and which has since become final, constitutes a legally enforceable title in itself. That attachment order was therefore made on the basis of an arbitral award endorsed with an enforcement order, which Article 54 of the ICSID Convention requires each Contracting State, including the Kingdom of Belgium, to recognise and enforce.

20    However, the referring court observes that a *fait du prince* constitutes an external cause which acts as a discharge capable of justifying the failure of a debtor to pay a creditor with a valid enforcement order. In the present case, however, Decision 2015/1470 is presented as a major obstacle to the enforcement of the arbitral award of 11 December 2013. That decision, adopted after the latter, prohibits Romania from implementing that award, since that decision considers that the payment of the damages awarded by that award constitutes 'State aid', within the meaning of Article 107 (I) TFEU, incompatible with the internal market, and requires Romania to recover the amounts of aid already paid. There is therefore a real risk of conflict between, on one hand, the decision of a national court confirming, pursuant to Articles 53 and 54 of the ICSID Convention, an attachment order implementing the award of

6

11 December 2013 and, on the other hand, Decision 2015/1470, which is the subject of an action pending before the Courts of the European Union.

21    The referring court notes, however, that, according to DA, Decision 2015/1470 does not, as such, prohibit enforcement of the arbitral award of 11 December 2013 in Belgium. Indeed, in accordance with the case-law of the Court of Justice, as follows, in particular, from the judgment of 16 May 2002, France v. Commission (C-482/99, EU:C:2002:294, paragraph 24), the execution of that award would constitute 'State aid' within the meaning of Article 107(1) TFEU only if that execution is imputable to the Romanian State. However, according to that decision, that is the case only where that State voluntarily implements that award, decisions delivered by the Romanian courts and the bailiffs designated by them must be, for their part, regarded as imputable to the Romanian State. In contrast, if Romania is compelled by a court of another Member State to enforce the arbitration award at issue, that enforcement would not constitute 'State aid' within the meaning of Article 107(1) TFEU. Such enforcement cannot be regarded as imputable to Romania and, therefore, does not infringe that decision. Under Articles 53 and 54 of the ICSID Convention, that Member State does not, moreover, have any autonomy as regards the enforcement of the arbitral award of 11 December 2013.

22    In those circumstances, the Cour d'appel de Bruxelles decided to stay proceedings and refer the following questions to the Court for a preliminary ruling:

"1)    Is Decision (EU) 2015/1470 of the European Commission of 30 March 2015 on State aid SA.38517 (2014/C) (ex 2014/NN) to be understood as referring to payments due from Romania even in a case where payments are recovered against Romania as a result of proceedings to enforce the ICSID arbitral award of 11 December 2013 brought before the courts of a Member State other than Romania?

2)    Does EU law itself automatically require a court of a Member State (other than Romania), before which an action is brought to oppose proceedings for the enforcement of an ICSID arbitral award which has the force of res judicata according to the national procedural rules of that Member State, to reject that award, for the sole reason that a non-definitive decision of the European Commission adopted after the date of the award considers enforcement of that award to be contrary to the EU State aid regime?

3)    Does EU law, in particular the principle of cooperation in good faith and the principle of res judicata, allow the national court of a Member State (other than Romania) not to comply with its international obligations under the ICSID Convention in a situation where the European Commission has adopted a decision after the date of that award, under which enforcement of the award is regarded as contrary to the EU State aid regime, even when the European

Commission participated in the arbitration proceedings (including the action for annulment of the award) and put forward its case in relation to the EU State aid regime?

**Developments subsequent to the request for a preliminary ruling**

23    By judgment of 18 June 2019, European Food and Others v Commission (T-624/15, T-694/15 and T-704/15, EU:T:2019:423), the General Court annulled Decision 2015/1470 on the ground that, in essence, the Commission lacked competence ratione temporis to adopt that decision under Article 108 TFEU.

24    On 27 August 2019, the Commission brought an appeal before the Court of Justice seeking to have that judgment set aside.

25    By decision of 5 September 2019, the President of the Court of Justice stayed the proceedings in the present case pending delivery of the judgment on that appeal.

26    By judgment of 25 January 2022, Commission v European Food and Others (C-638/19 P, EU:C:2022:50), the Court of Justice set aside the judgment of 18 June 2019, European Food and Others v Commission (T-624/15, T-694/15 and T-704/15, EU:T:2019:423), and referred the case back to the General Court for judgment on the pleas in law and arguments raised before it on which the Court of Justice did not rule.

27    On 28 January 2022, the judgment of 25 January 2022, Commission v European Food and Others (C-638/19 P, EU:C:2022:50), was notified to the cour d'appel de Bruxelles [Brussels Court of Appeal], asking it whether, in the light of that judgment, and in particular paragraphs 137 to 145 thereof, it wished to maintain its request for a preliminary ruling.

28    By letter dated 14 June 2022, received at the Court on 15 June 2022, that court stated that, in the interests of the proper administration of justice, it was maintaining that request.

29    By decision of the President of the Court of 22 June 2022, it was decided, after hearing the Reporting Judge and the Advocate General, not to notify the present reference for a preliminary ruling to the interested parties referred to in Article 23 of the Statute of the Court of Justice of the European Union.

**The questions referred**

30    Under Article 99 of its Rules of Procedure, the Court may, in particular where an answer to a question referred for a preliminary ruling may be clearly deduced from existing case-law or where the answer to the question referred leaves no reasonable doubt, decide at any time, on a proposal from the Reporting Judge and after hearing the Advocate General, to give a decision by reasoned order.

31    That provision must be applied in the present case.

32    By its second and third questions, which it is appropriate to examine together and in the first place, the referring court asks, in essence, whether EU law must be interpreted as meaning that a court of a Member State seised of the forced enforcement of the arbitral award which was the subject of Decision 2015/1470 is required to set aside that award.

33    In that regard, it should be borne in mind that, according to the case-law of the Court, Articles 267 and 344 TFEU preclude a provision contained in an international agreement concluded between two Member States under which an investor of one of those Member States may, in the event of a dispute concerning investments in another Member State, bring proceedings against the latter Member State before an arbitral tribunal, whose jurisdiction that Member State has obliged to accept (judgments of 6 March 2018, Achmea, C-284/16, EU:C:2018:158, paragraph 60, and of 25 January 2022, Commission v European Food and Others, C-638/19 P, EU:C:2022:50, paragraph 138).

34    By concluding such an agreement, the Member States which are parties to it agree to remove from the jurisdiction of their own courts and, therefore, from the system of judicial remedies which the second subparagraph of Article 19(1) TEU requires them to establish in the fields covered by EU law, disputes which may concern the application or interpretation of EU law. Such an agreement is therefore liable to result in a situation in which those disputes are not settled in a way that ensures the full effectiveness of that law (judgments of 26 October 2021, PL Holdings, C-109/20, EU:C:2021:875, paragraph 45, and of 25 January 2022, Commission v European Food and Others, C-638/19 P, EU:C:2022:50, paragraph 139).

35    In the present case, as from 1 January 2007, the date of Romania's accession to the European Union, EU law, in particular Articles 107 and 108 TFEU, was applicable to that Member State. It is, moreover, common ground that the compensation sought by the arbitration applicants which gave rise to the arbitration award of 11 December 2013, which is the subject of Decision 2015/1470, did not relate exclusively to the damage allegedly suffered before that date of accession. Consequently, the dispute before the arbitral tribunal cannot be regarded as being confined in its entirety to a period during which Romania, which had not yet acceded to the European Union, was not yet bound by the rules and principles referred to in paragraphs 33 and 34 of the present order (see, to that effect, judgment of 25 January 2022, Commission v European Food and Others, C-638/19 P, EU:C:2022:50, paragraph 140).

36    As the Court has already held, the arbitral tribunal to which that dispute was brought does not belong to the judicial system of the European Union which the second subparagraph of Article 19(1) TEU requires Member States to establish in the fields covered by European Union law, which, as from Romania's accession to the European Union, has replaced the mechanism for resolving disputes which may concern the interpretation or application of EU law (judgment of 25 January 2022,

Commission v European Food and Others, C‑638/19 P, EU:C:2022:50, paragraph 141).

37    On one hand, that arbitral tribunal does not constitute a 'court or tribunal of one of the Member States' within the meaning of Article 267 TFEU and, on the other, the arbitral award made by that tribunal is not subject, in accordance with Articles 53 and 54 of the ICSID Convention, to any review by a court of a Member State as to its compliance with EU law (judgment of 25 January 2022, Commission v European Food and Others, C‑638/19 P, EU:C:2022:50, paragraph 142).

38    That finding is not capable of being called into question by the fact that Romania had consented to the possibility that a dispute might be brought against it under the arbitration procedure provided for by the BIT (judgment of 25 January 2022, Commission v European Food and Others, C‑638/19 P, EU:C:2022:50, paragraph 143).

39    Such consent, unlike that which would have been given in the context of commercial arbitration proceedings, does not have its origin in a specific agreement reflecting the autonomy of the parties in question, but is the result of a treaty concluded between two States, in the context of which they have, generally and in advance, consented to exclude from the jurisdiction of their own courts disputes which may concern the interpretation or application of EU law in favour of arbitration proceedings (judgment of 25 January 2022, Commission v European Food and Others, C‑638/19 P, EU:C:2022:50, paragraph 144 and the case-law cited).

40    In those circumstances, since, as from Romania's accession to the European Union, the system of judicial remedies provided for in the EU and FEU Treaties replaced that arbitration procedure, the consent given by that State to that effect is now devoid of any purpose (judgment of 25 January 2022, Commission v European Food and Others, C‑638/19 P, EU:C:2022:50, paragraph 145).

41    It follows that the arbitration clause provided by the BIT, in so far as it formed the basis of the arbitration award which is the subject of Decision 2015/1470, called into question the preservation of the specific nature of EU law ensured by the preliminary ruling procedure, in breach of the principles of sincere cooperation and the autonomy of EU law (see, to that effect, judgments of 6 March 2018, Achmea, C‑284/16, EU:C:2018:158, paragraphs 58 and 59, and of 26 October 2021, PL Holdings, C‑109/20, EU:C:2021:875, paragraph 46).

42    Consequently, that arbitral award must be regarded as incompatible with EU law, in particular Articles 267 and 344 TFEU.

43    Such an award cannot therefore produce any effect and thus cannot be enforced in order to pay the compensation awarded by it.

44    The answer to the second and third questions referred must therefore be that EU law, in particular Articles 267 and 344 TFEU, must be interpreted as meaning that a court of a

Member State seised of the enforcement of the arbitral award which was the subject of Decision 2015/1470 is required to set aside that award and, therefore, may not, in any event, enforce that award in order to enable its beneficiaries to obtain payment of the damages which it awards them.

45    In the light of that answer, there is no longer any need to answer the first question.

**Costs**

46    Since these proceedings are, for the parties to the main proceedings, a step in the action pending before the national court, the decision on costs is a matter for that court.

On those grounds, the Court (Tenth Chamber) hereby:

**EU law, in particular Articles 267 and 344 TFEU, must be interpreted as meaning that a court of a Member State seised of the enforcement of the arbitral award which was the subject of Commission Decision (EU) 2015/1470 of 30 March 2015 on State aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania – Arbitral award in Micula v Romania of 11 December 2013, is required to set aside that award and, therefore, may not, in any event, enforce it in order to enable its beneficiaries to obtain payment of the damages which it awards them.**

Luxembourg, 21 September 2022.

The Registrar                                    President of the Xth Chamber

A. Calot Escobar                                              I. Jarukaitis

[STAMP OF THE COURT]

11

11