# EXHIBIT 1

[stamp:] COPY

# judgment

**DISTRICT COURT OF AMSTERDAM**

Civil law

case number / docket number: C/13/728512 / HA ZA 23-64

**Judgment dated February 5, 2025**

In the case of

the legal entity under foreign law
**KINGDOM OF SPAIN,**
based in Madrid, Spain,
plaintiff,
attorney mr. P.L. Tjiam in Amsterdam,

versus

1.        the cooperative with excluded liability
**AES SOLAR ENERGY COÖPERATIEF U.A.,**
with its registered office in Amsterdam,
2.        the private limited company
**AMPERE EQUITY FUND B.V.,**
with its registered office at Schiphol,
defendants,
attorney mr. D. Knottenbelt in Rotterdam.

Parties will hereafter be referred to as Spain, AES and AEF.

**Summary description of the case**

In an arbitration award, Spain was ordered to pay damages to AES and AEF. The arbitration was initiated on the basis of the Energy Charter Treaty. According to the court, that order against Spain constitutes a form of state aid if enforcement measures are taken against Spain. In that case, AES and AEF are ordered to repay what Spain paid.

**1.        The proceedings**

1.1.        The course of the proceedings in the main action is evidenced by:
-        Writs of summons dated December 22, 2022, with exhibits;
-        Amended writ against AES;
-        Brief of amendment of claim and submission of exhibits, included on the docket of August 16, 2023;
-        Brief commenting on the amendment of claim of AES and AEF, dated August 16, 2023;

- Written document dated December 23, 2023, in which the European Commission (hereafter: the Commission) exercised its authority[1] to submit comments on the case in an ongoing procedure in which state aid is (allegedly) at issue;
- Brief of amendment of claim dated May 1, 2024 from Spain;
- Defense brief amendment of claim;
- Judgment in the interim proceedings of May 29, 2024[2], and the correspondence and documents mentioned therein in the interim phase of these proceedings, in which the court declared itself competent in this case;
- Statement of defense, with exhibits;
- Additional written comments from the Commission, dated October 17, 2024;
- Email dated November 4, 2024 following the objection from AES and AEF, in which the court informs the parties and the Commission that the written comments of the Commission are allowed;
- the official report dated November 13, 2024, of the hearings in the main case held that day and the procedural documents and actions included therein, in which the Commission was represented by its legal department during the hearings;
- Letter dated December 17, 2024 from AES and AEF with additions and comments to the official report.

1.2.    Finally, a judgment was rendered.

1.3.    The Commission has submitted its written comments on the main proceedings and has been invited to the hearings in the main proceedings. The parties have responded orally to the Commission's latest written comments.

**2.    Summary**

2.1.    Chapter 3 contains the relevant facts, Chapter 4 contains Spain's claims, a summary of the views of the parties and the Commission's comments. Chapter 5 contains an explanation of the rules on state aid under EU law on state aid and the Energy Charter Treaty (ECT)[3]. Chapter 6 assesses whether the subject of dispute in these proceedings is subject to the rules on state aid under EU law or to the provisions of the ECT. In Chapter 7, Spain's claims are assessed under the rules deemed applicable.

**3.    Facts**

3.1.    In an arbitration award dated February 28, 2020, the ad hoc arbitration tribunal of the Permanent Court of Arbitration (PCA) ordered Spain to pay 15.4 million euros to AES and 11.1 million euros to AEF, plus costs and interest. The Permanent Court of Arbitration (PCA) selected Switzerland as the arbitration location.

---

[1] Article 29(2) of Council Regulation (EU) 2015/1589 laying down detailed rules for the application of Article 108 of the Treaty on the Functioning of the European Union (codification); OJEU L 248, September 24, 2019, p. 9 (hereafter: the Procedural Regulation).
[2] District Court of Amsterdam, May 29, 2024, ECLI:NL:RBAMS:2024:3156.
[3] Energy Charter Treaty, Lisbon, December 17, 1994, Official Gazette 1995, 108 (and also OJ 1994, L 380, p. 24); in its original language (English) the treaty is called the Energy Charter Treaty (ECT).

3.2.      In that arbitration between, on the one hand, AES and AEF (and other companies) and, on the other hand, Spain, the following facts were central:

3.2.1.    In 2007, Spain introduced a scheme to stimulate the production of electricity from solar energy, implementing European Union Directive 2001/77/EC on renewable energy[4].

3.2.2.    In 2008, the 2007 scheme was approved once again for installations that missed the sign-up deadline for the 2007 scheme. The content of the 2007 scheme has not been changed.

3.2.3.    Spain's 2007 scheme provided favorable financial conditions for investors in solar installations in Spain. AES and AEF have invested in such installations in Spain since 2007 and have applied for the 2007 scheme. Spain has deemed the 2007 scheme applicable to AES' and AEF's investments.

3.2.4.    This has resulted in a legal relationship between Spain on the one hand and AES and AEF on the other. The provisions of the ECT apply to this legal relationship because Spain and the Netherlands are Contracting Parties to this international agreement. One of these provisions is an arbitration clause (other provisions from the ECT will be discussed in more detail in The Assessment):

> "(...)
> **Article 26 Settlement of disputes between an investor and a Contracting Party**
> 1.   Disputes between a Contracting Party and an investor of another Contracting Party relating to an investment of the latter in the territory of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.
> 2.   If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the dispute may be submitted on upon request of the respective investor:
>      a.   to the courts or administrative tribunals of the Contracting Party who is party to the dispute; or
>      b.   in accordance with any applicable, previously agreed dispute settlement procedure; or
>      c.   in accordance with the following paragraphs of this article.
> 3.   a. Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or mediation in accordance with the provisions of this article.

---

[4] Replaced on April 23, 2009 by Directive 2009/28/EC of the European Parliament and of the Council and on December 11, 2018 by Directive (EU) 2018/2001, OJ L 328.

(…)

8.  Arbitral awards, which may include an award of interest, shall be final and
    binding upon the parties to the dispute. (...) Each Contracting Party shall
    immediately carry out such award and shall make provision for the effective
    enforcement in its territory of such awards.

(...)"

3.2.5.  In 2010, Spain amended the 2007 scheme, by which investors in solar energy
installations in Spain receive lower subsidies and for certain installations for a shorter period
than stipulated in the 2007 scheme. Spain did not notify the Commission of the 2007 scheme
and the 2010 amendments to that scheme as state aid (as referred to in Article 107(1) TFEU[5]).

3.2.6.  AES and AEF - and other investors in solar energy installations in Spain - have argued
that they have suffered damages as a result of the amendments to the 2007 scheme because the
amendments have reduced the value of their investments in solar energy installations in Spain.
No agreement was reached at the time (2010/2011) between Spain and those investors regarding
possible compensation (as referred to in Article 26(1) ECT). Subsequently, a group of investors
(including AES and AEF) filed a case against Spain in 2011 for arbitration proceedings at the
Permanent Court of Arbitration (PCA).

3.2.7.  In 2013 and 2014, Spain repealed the 2007 scheme and replaced it with six new laws
for investments in solar power installations with different financial conditions. In December
2014, Spain informed the Commission that these changes (hereafter: the 2014 scheme)
constituted state aid.

3.3.  In its decision of November 10, 2017 (the Approval Decision[6]), the Commission
deemed the compensation that Spain will pay to private companies based on the 2014 scheme to
be compatible with the internal market. This also applies to payments to investors based on
previous regulations in Spain (the 2007 scheme and its amendments in 2010).

3.4.  On December 10, 2020, AES and AEF petitioned the District Court for the District of
Columbia in the United States of America (USA) to (i) issue an order recognizing and affirming
the PCA's arbitration award in the USA; or (ii) to rule in favor of AES and AEF in the amount
of the damages awarded by the PCA.

3.5.  Spain has filed an appeal with the Swiss Supreme Court to annul the arbitration award
of February 28, 2020. In its judgment of February 23, 2021, the Swiss Supreme Court dismissed
the appeal to overturn the arbitration award.

---

[5] Treaty on the Functioning of the European Union, Official Gazette. 2013, 109.
[6] Commission Decision on "*State Aid SA.40348 (2015/NN) - Spain*".

3.6.    On July 6, 2021, Spain notified the Commission about the PCA's aid measure ruling. The Commission confirmed receipt of the notification on September 14, 2021, and registered it under number SA.64761.

3.7.    In deeds of assignment dated January 13 and 17, 2023, AES and AEF assigned their title from the arbitration award to Blasket Renewable Investments LLC (hereafter: Blasket), located in Wilmington, Delaware, USA.

3.8.    AES and AEF sold their investments in renewable energy in Spain to another investor in 2015.


**4.        Dispute**

4.1.    Spain asks, after amendments of the claim (most recently on May 1, 2024), for a judgment - insofar as possible provisionally enforceable - to:

I.      Rule that the 2007 scheme constitutes state aid within the meaning of Article 107(1) TFEU;

II.     Rule that the 2007 scheme was not notified to the European Commission in accordance with Article 108(3) TFEU and constitutes unlawful state aid;

III.    Rule that the compensation awarded by the PCA in the arbitration award of February 28, 2020, constitutes state aid within the meaning of Article 107(1) TFEU, and leads to unlawful support as long as the European Commission has not declared the Arbitration Ruling compatible with the internal market pursuant to Article 107(3) TFEU;

IV.     Rule that the collection of the damages awarded by the PCA in the arbitration award of February 28, 2020 is in violation of European EU law, as long as the European Commission has not declared that arbitration award compatible with the internal market;

V.      Rule that there is no legitimate expectation of parties or any other company affiliated with them within the meaning of Article 3(3) of Annex I to the Regulation (EU) No. 651/2014 that based on the 2007 scheme they could lay claim to the aid measure laid down in said 2007 scheme.

VI.     Rule that a payment made by Spain to Blasket or any other party by virtue of the damages awarded to AES and AEF by the PCA in the arbitration award of February 28, 2020, constitutes an unlawful state aid measure in favor of AES and AEF as long as the European Commission has not declared the arbitration award compatible with the internal market pursuant to Article 107(3) TFEU;

VII.    _Primarily_, to order AES to pay Spain EUR 15.4 million, plus interest at the Spanish 10-year bond rate from June 30, 2014 until the day that Spain pays that amount to Blasket or any other party pursuant to the arbitration award, _alternatively_, if Blasket or any other party obtains permission to enforce the arbitration award, the amount to be paid to Blasket or any other party, or, as a _further alternative_, if Spain makes a payment to Blasket or any other party as a result of the enforcement of the arbitration award, the amount paid by Spain, all as long as the European Commission has not declared the arbitration award compatible with the internal market pursuant to Article 107(3) TFEU;

VIII.   Primarily, to order AEF to pay Spain EUR 11.1 million, plus interest at the Spanish 10-year bond rate from June 30, 2014 until the day that Spain pays that amount to Blasket or any other party pursuant to the arbitration award, *alternatively*, if Blasket or any other party obtains permission to enforce the arbitration award, the amount to be paid to Blasket or any other party, or, as a *further alternative*, if Spain makes a payment to Blasket or any other party as a result of the enforcement of the arbitration award, the amount paid by Spain, all as long as the European Commission has not declared the arbitration award compatible with the internal market pursuant to Article 107(3) TFEU;

IX.   Order AES to pay the statutory interest on EUR 15.4 million, plus interest at the Spanish 10-year bond rate from June 30, 2014, to be calculated from December 10, 2021, *alternatively* January 13, 2023, or in the *further alternative*, from the day of payment of the stated amount or any other amount to Blasket or any other party executing the arbitration award until the day of full payment;

X.   Order AEF to pay the statutory interest on EUR 11.1 million, plus interest at the Spanish 10-year bond rate from June 30, 2014, to be calculated from December 10, 2021, *alternatively* January 17, 2023, or in the further alternative, from the day of payment of the stated amount or any other amount to Blasket or any other party executing the arbitration award until the day of full payment;

XI.   Order AES and AEF to pay the legal costs incurred by Spain, including the additional costs, the court fees owed and the amount budgeted for the lawyer's fees up to the time of this judgment.

4.2.   To this end, Spain argues - in summary- that it follows from longstanding case law of the Court of Justice of the EU (hereafter: CJEU) that Spain's payment obligation from the arbitration award is state aid.

Whether there is state aid does not depend on Spain making an actual payment; what matters is whether an entrepreneur has obtained a benefit that must be paid by Spain, or paid out of Spain's treasury. This is the case because the arbitration award ordered Spain to pay damages to AES and AEF.

In addition, the compensation amount was estimated based on the 2014 scheme. This scheme is an aid measure the Commission declared compatible with the internal market in 2017. In the process, payments under the 2007 scheme were also declared compatible with the internal market. In that Approval Decision, the Commission also included that the arbitration award (still pending at that time) constituted state aid.

Spain, by virtue of its obligations to other EU Member States, was required to notify the payment obligation from the arbitration award as state aid to the Commission in order to investigate the compatibility of that payment with the internal market. Pending the Commission's decision on the compatibility with the internal market of the payment obligation from the arbitration award, Spain may not make any payment under that arbitration award (the standstill obligation under Article 108(3) TFEU).

Enforcement of the arbitration award in the US could result in a payment from the Spanish treasury to Blasket under the arbitration award, which has been declared state aid. Claims VII and VIII are therefore conditional recoveries of state aid. Its payment is unlawful until the Commission has ruled on the compatibility of this state aid with the internal market. Spain is obliged under EU law to bring such claims.
The arbitration award was reported to the Commission shortly after it became irrevocable (due to the dismissal of the claim for annulment of the arbitration award by the Swiss Supreme Court). Consequently, there is no question of Spain's legal claims being forfeited. It also follows from the case law of the CJEU that notifying a support measure cannot be an abuse of rights. Spain maintains that it is not the country's fault that the Commission has not yet made a decision on the compatibility of the arbitration ruling with the internal market.

4.3.    AES and AEF argue - as outlined above - that the arbitration award is an obligation under the ECT and that the rules on state aid under EU law do not apply.
In addition, there is so far no question of (unlawful) state aid because Spain has not yet fulfilled the payment obligation from the arbitration award, nor has the arbitration award been implemented. Spain unduly notified the Commission of the payment obligation arising from the arbitration award as an aid measure, nor is there any need to maintain the standstill obligation. This alone is sufficient reason to dismiss Spain's claims against AES and AEF.
Moreover, Spain has no interest in the claims against AES and AEF. The 2007 scheme is not at issue in these proceedings, and therefore Spain has no interest in the related claims (Article 3:303 DCC [Dutch Civil Code]). The other requested rulings must be claimed against those directly involved. This is no longer the case because AES and AEF sold their title from the arbitration award to Blasket. That is an additional reason why the payment claims cannot be assigned to AES and AEF, as AES and AEF have repeatedly stated.

4.4.    The Commission notes - in summary - that in the Approval Decision of November 2017, it considered that a ruling in the then pending arbitration between AES and AEF on the one hand, and Spain on the other, is considered state aid.
A treaty of which the EU has become a member cannot affect primary EU law. The rules on state aid under EU law therefore do indeed apply to the compensation that Spain must pay to AES and AEF pursuant to the arbitration award.
That award granted a benefit to AES and AEF that must be paid out of Spanish government funds. That is the moment when state aid is created and from that moment on, Spain is obliged to follow the rules on state aid under EU law towards other EU Member States on the basis of the principle of loyalty (Article 4(3) TEU[7]). The payment obligation from the arbitration award must be reported to the Commission as state aid, and Spain must make every effort to prevent AES and AEF from actually receiving the awarded benefit until the Commission has decided that Spain's payment obligation from the arbitration award is compatible with the internal market. Preventing AES and AEF from enjoying the benefit they were granted is the object of these proceedings. The attempt to enforce the arbitration award in the US and the subsequent assignment of the title from the arbitration award by AES and AEF to Blasket should not be grounds for dismissing Spain's claims against AES and AEF. If this were the case, EU law on state aid could easily be circumvented. This is not a desirable situation, especially when it involves an EU Member State and companies from another EU Member State, as the Commission has reiterated.

[7] Treaty on the European Union, Treaty, Official Gazette 2008, 11 and Official Gazette 2010, 43.

4.5.      The arguments of the parties and the Commission are discussed in more detail below, insofar as relevant.

**5.        Assessment: legal framework**

5.1.      These proceedings focus on the arbitration award in which Spain was ordered to pay damages to AES and AEF. Spain has argued, supported by the Commission, that this payment obligation is state aid (within the meaning of Article 107 TFEU) and has notified the Commission accordingly. AES and AEF contested that this is state aid. The most far-reaching defense of AES and AEF is that the ECT applies to the arbitration award and not the rules on state aid under EU law.

5.2.      This chapter outlines European regulations on state aid and the provisions in the ECT.

*About state aid*

5.3.      The regulations on state aid are entirely governed by EU law as stipulated in Articles 107 to 109 TFEU and further explained and interpreted in the Procedural Regulation,[8] the Notices of the Commission on legal enforcement of competition law[9] and case law of the CJEU. The necessity for the rules on state aid under EU law is rooted in the internal market established by the Union (Article 3(2) TEU).

5.4.      Article 107(1) TFEU defines state aid as follows:

> Save as otherwise provided in the Treaties, any aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favoring certain undertakings or the production of certain goods shall, in so far as it affects trade between Member States, be incompatible with the internal market.

---

[8] See note 1.
[9] The Commission Communication on the enforcement of state aid rules by national courts, OJEU 2021 C 305/01, July 30, 2021 (hereafter: Communication 2021/C 305), and the The Commission Communication on the recovery of unlawful and incompatible state aid, OJEU 2019 C 247/01, July 23, 2019 (hereafter: Communication 2019/C 247).

5.4.1.    In many cases, an aid measure will follow from a policy or laws of an EU Member State, e.g. in this case the 2007 scheme and the 2014 scheme established by Spain. It follows from established case law of the CJEU, as well as the aforementioned Notices, that a judgment in which an EU Member State is ordered to pay damages to a private company established in an EU Member State can also be considered state aid under specific conditions.

5.4.2.    According to the established case law of the CJEU, qualifying as state aid within the meaning of Article 107(1) TFEU requires that all the conditions set out in Article 107(1) TFEU are met. Therefore, in order for a measure to be considered state aid, it must first be a state measure or be funded by the state. Secondly, this measure must have the potential to negatively affect trade between Member States. Thirdly, it must give the beneficiary a benefit, and fourthly, it must distort or threaten to distort competition[10]. In all this, the source of the state aid - a financial policy instituted by the EU Member State (e.g. the 2007 and 2014 schemes in this case) or a judgment against the EU Member State as described above - is not relevant, according to the established case law of the CJEU and the aforementioned Notices on state aid.

5.4.3.    The further explanation of the concept of state aid (as follows from established case law of the CJEU and the Notices of the Commission) is discussed in more detail in the next chapters - insofar as EU law is applicable in these proceedings, which will be decided first in the next chapter.

5.5.    Article 107(2) TFEU lays down a number of types of aid measures that are compatible with the internal market.

5.6.    Article 107(3) TFEU provides for a number of aid measures that "*can be considered compatible with the internal market'*. Other articles of the TFEU also specify the conditions under which state aid is or may be considered compatible with the internal market[11]. These Articles are not relevant to this procedure.

5.7.    Article 108(3) TFEU stipulates that a Member State must notify the Commission of its intention to introduce or amend aid measures. Other regulatory documents[12] have explicitly reiterated that changes to existing state support must also be reported.

5.8.    Article 108(3) TFEU is the so-called standstill obligation. Member States are prohibited from implementing the proposed aid measure before the Commission has adopted a final decision on its compatibility with the internal market[13].

---

[10] General Court of the EU October 2, 2024, (*European Food SA, Micula et al. v European Commission*), Cases T-624/15 RENV and T-694/15 R.ENV, ECLI:EU:T:2024:659, paragraph 116 and the case law included therein, and CJEU, January 25, 2022, {*European Food SA, Micula et al. / European Commission),* Case C-638/19 P, ECLI:EU:2022:50, paragraph 121.
[11] Articles 42, 93, 106(2), 108(2), and 108(4) TFEU.
[12] For example, Communication 2021/C 305, paragraph 12; as well as Article 1(c) of the Rules of Procedure.
[13] Communication 2019/C 247, paragraph 12.

5.8.1.    Unlawful state aid is where the Member State makes a payment to a private undertaking under a new aid measure which has not been notified to the Commission or which the Commission has not yet decided is compatible with the internal market. In that case, the Member State shall be obliged to recover the unlawfully paid state aid in proceedings before a national court[14].

5.8.2.    In addition, the Commission may instruct the EU Member State to recover the unlawful state aid paid (a recovery decision[15]) from the competent national court. This procedure does not involve a recovery decision, but Spain wants to avoid having to pay before the decision on compatibility has been made.

5.8.3.    If the state support constitutes a judgment in which the EU Member State is ordered to pay a private company, the judgment can be final and binding (or irrevocable) according to the law under which it was issued. A judgment with authority of res judicata may not be challenged again. The principle of primacy of EU law means that the national judge must ensure the full effect of the provisions of EU law and, if necessary, must set aside, ex officio, any conflicting national provision. This also applies to national rules laying down the principle of res judicata. The definitive nature of a verdict therefore does not stand in the way of the possible awarding of a recovery of any unlawfully paid state aid[16].

5.8.4.    The further explanation of the standstill obligation - and in particular the moment at which state aid arises: by payment or by having a claim to payment - as follows from established case law of the CJEU and the communications of the Commission, will be discussed in more detail in the following chapters (if EU law applies in these proceedings, which will first be decided in Chapter 6).

5.9.    The requested national judicial organization should assess the recovery of unlawfully paid state aid on the basis of national legislation[17] and should take the necessary measures to ensure that the beneficiary (AES and AEF in this case) cannot freely dispose of the aid - or the benefit enjoyed - until the Commission has ruled on the compatibility of that aid with the internal market[18]. This also applies to claims concerning the enforcement of the standstill obligation of the EU Member State.

5.10.    From the above it follows that if the rules on state aid under EU law apply in these proceedings, the legal claims of Spain must be assessed under Dutch law. Spain must then have an interest in the legal actions instituted (Articles 3:302 and 3:303 DCC) and furthermore, a legal provision in Dutch law must be applied to the merits of the legal actions.

---

[14] Communication 2019/C 247, paragraph 13.
[15] Article 16(1) Procedural Regulation.
[16] Communication 2021/C 305 paragraphs 30 to 33 and the case law cited therein.
[17] Communication 2021/C 305, paragraph 11. See also: CJEU 5 March 2019, (*Easti Pagar*), Case C-349/17, ECLI:EU:C:2019:172, paragraphs 88 and 89 and CJEU 3 March 2020, (*Vodafone Magyarország*), Case C-75/18, ECLI:EU:C:2020:139, paragraphs 22 and 23.
[18] CJEU 21 November 2013, (*Deutsche Lufthansa*), Case C-284/12, ECL1:EU:C:2013:755.

5.11.    In the case of a state aid claim, the national court shall be competent to decide whether the legislation claimed (or under which a payment was made by an EU Member State to a private undertaking) is[19] state aid as referred to in Article 107(1) TFEU and on the enforcement of the standstill obligation[20]. The national court may not express an opinion on whether this statutory regulation is compatible with the internal market. This is an exclusive competence of the Commission[21].

5.12.    Furthermore, the Procedure Regulation applies to the notification of state aid and the course of events following that notification. The Procedural Regulation includes deadlines within which the Commission must investigate the compatibility of notified state aid with the internal market. However, the specified deadlines do not apply to official investigations into unlawful aid, which is defined as follows: New aid implemented in violation of Article 108(3) TFEU, see Article 1(f) and Article 15(2) of the Procedural Regulation.

*About the ECT*

5.13.    Spain and the Netherlands concluded the ECT in 1991. The EU acceded to this Treaty in 1994. Since then, all EU Member States have been Contracting Parties to the ECT. In addition to the EU Member States, other countries (including countries from the European Economic Area and from outside Europe) have also joined the ECT.

5.14.    The ECT provisions apply between the Contracting Parties and also apply to legal relationships between a Contracting Party (in this case Spain) and a company (investor) from another Contracting Party (in this case AES and AEF).

5.15.    The Preamble of the ECT includes:

> "(...)
> **Preamble**
> (…)
> Desiring also to establish the structural framework required to implement the principles enunciated in the European Energy Charter;
> Wishing to implement the basic concept of the European Energy Charter initiative which is to catalyze economic growth by means of measures to liberalize investment and trade in energy;

---

[19] Communication 2021/C 305 paragraphs 56 up to an including 58; CJEU November 11, 2015, (*Klausner Holz*), Case C-505/14, ECLI:EU:C:2015:742, paragraphs 18 to 26.
[20] Communication 2021/C 305 paragraphs 61 to 63.
[21] Communication 2021/C 305 paragraph 34 and the case law of the CJEU mentioned therein.

Affirming that Contracting Parties attach the utmost importance to the effective
implementation of full national treatment and most favored nation treatment, and that
these commitments will be applied to the Making of Investments pursuant to a
supplementary treaty;
(...)
Given the competition rules concerning mergers, monopolies, anti-competitive
practices and abuse of dominant position;
(…)"

5.16.    Part I (Definitions and purpose) includes:

"(...)"
**Article 1 Definitions**
(...)
2. "Contracting Party" means a state or Regional Economic Integration Organization
which has consented to be bound by this Treaty and for which the Treaty is in force.
3. "Regional Economic Integration Organization" means an organization constituted
by states to which they have transferred competence over certain matters a number of
which are governed by this Treaty, including the authority to take decisions binding on
them in respect of those matters.
(…)
6. "Investment" means every kind of asset, owned or controlled directly or indirectly
by an investor (...);
(...)
9. "Returns" means the amounts derived from or associated with an investment,
irrespective of the form in which they are paid, including profits, dividends, interest,
capital gains, royalty payments, management, technical assistance or other fees and
payments in kind.
(...)
**Article 2 Purpose of the Treaty**
This Treaty establishes a legal framework in order to promote long-term cooperation
in the energy field, based on complementarities and mutual benefits, in accordance
with the objectives and principles of the Charter.
(...)"

5.17.    Part III ECT contains provisions on the promotion, protection and treatment of
investments, which - insofar as relevant in these proceedings - state:

"(...)
**Article 10 Promotion, Protection and Treatment of investments**
1.   Each Contracting Party shall, in accordance with the provisions of this Treaty,
     encourage and create stable, equitable, favorable and transparent conditions for
     Investors of other Contracting Parties to make Investments in its Area. Those
     conditions shall include a commitment to accord at all times to Investments of
     Investors of other Contracting Parties fair and equitable treatment. Such
     Investments shall also enjoy the most constant protection and security and no
     Contracting Party shall in any way impair by unreasonable or discriminatory
     measures their management, maintenance, use, enjoyment or disposal. In no case
     shall these investments be treated less favorable than required by international
     law, including treaty obligations. Each Contracting Party shall observe any

obligations it has entered into with an investor or an investment of an investor of any other Contracting Party.

(...)

**Article 16 Relation to other agreements**

Where two or more Contracting Parties have entered into a prior international agreement, or enter into an international agreement afterwards, which terms in either case concern the object of Part III or V of this Treaty,

1.  nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and

2.  nothing in such terms of that agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty, where any such provision is more favorable to the investor or investment.

(…)"

5.18.    Part V contains a Settlement of Disputes, including the arbitration clause as included under 3.2.4.

5.19.    Part IV contains various provisions on taxes (Article 21) and exceptions (Article 24). The dispute between Spain on the one hand and AES and AEF on the other does not concern these two Articles from the ECT. These are broader in scope and therefore not at issue. AES and AEF have referred to these Articles to support their defense that the ECT rules apply to the arbitration award, and not the rules on state aid under EU law. Articles 21 and 24 ECT concern topics that are also regulated by the TFEU, according to AES and AEF.

## 6.    Assessment: ECT or EU Law Applicable to State Aid

6.1.    The most far-reaching defense of AES and AEF is that Spain is wrongly invoking the rules on state aid under EU law. The rules of the ECT apply to the relationship between parties, according to AES and AEF. The views of AES and AEF on this subject are summarized under 6.1.1 to 6.1.7. This will be addressed from 6.2 to 6.13.

*Positions of the AES and AEF on the non-applicability of EU law to arbitration awards*

6.1.1.    AES and AEF argue that the Commission considered the payments under the relevant Spanish aid measures (the 2007 scheme, the 2010 amendment and the 2014 scheme) compatible with the internal market. As a result, the role of the rules on state aid under EU law ceases.

6.1.2.    The ECT applies between Spain on the one hand and AES and AEF on the other. The ECT has various obligations with which the contracting parties must comply.
Based on Article 10, Contracting Parties are obliged to apply *"stable, fair, favorable and transparent conditions".* They must provide investors *with "fair and equitable treatment"* and *"effective means"* for *"enforcement of investment rights".*

6.1.3.    Furthermore, the ECT has a dispute settlement scheme that gives the investor the right to submit a dispute to an arbitration tribunal. AES and AEF (and many other investors) have done that. The outcome of that arbitration (the arbitration award) arises from the ECT and is in itself also an obligation from the ECT. Compliance with the obligations arising from the arbitration award is subject to ECT regulations, in particular the provisions of Article 10.

6.1.4.    Spain was ordered in the arbitration award to pay sums of money to AES and AEF because Spain acted in violation of Article 10 of the ECT. During the arbitration, Spain did not raise the issue of the rules on state aid under EU law.

6.1.5.    Spain evades the obligations from the ECT to comply with the arbitration award by invoking the standstill obligation from Article 108(3) TFEU. In other words, Spain is invoking its own internal (substantive) rules to avoid fulfilling its obligations under the ECT. This is not permitted (see Article 27 Vienna Convention[22]). This also applies to the EU as Contracting Party to the ECT. EU law should be considered as national and substantive law of the EU, as well as of Spain. Article 46 Vienna Convention stipulates that a contracting state may not invoke the invalidity of the concluded treaty on the basis of conflict with a provision of national law. This is the case here because the EU has declared Article 26 ECT inapplicable, thereby attempting to deny the Permanent Court of Arbitration (PCA) the authority to decide on the dispute between AES and AEF on the one hand and Spain on the other.

6.1.6.    Article 16 ECT stipulates that other existing or future international treaties may not detract from the protection to which the investor is entitled as stipulated in the ECT (e.g. in Article 10 ECT).

6.1.7.    The ECT does not include that the rules on state aid under EU law also apply to an obligation under that Convention. If the EU (or its Member States) would have wanted to achieve this, it should have included in the ECT that those obligations under the ECT are also subject to the rules on state aid under EU law. This has in fact been done for national security (Article 24 ECT) and taxation (Article 19 ECT). The rules on state aid under EU law therefore do not apply to the arbitration award, according to AES and AEF.

*Assessment of the above defense of AES and AEF*

6.2.    The relationship between ECT and EU law is central to the *Komstroy judgment*[23]. This judgment discusses, among other things, the CJEU's jurisdiction to hear the preliminary questions about the term '*investment*' from Article 1(6) ECT that the civil court in Paris, France, has raised in proceedings to overturn an ICSID arbitration award (handed down in Paris, France) between Komstroy - a company apparently based in Ukraine - and the Republic of Moldova.

---

[22] Vienna Convention on the Law of Treaties: Vienna Convention on the Law of Treaties, Official Gazette 1972, 51 and Official Gazette 1985, 79.
[23] CJEU September 2, 2021, (*Komstroy*), Case C-741/19, ECLI:EU:C:2021:655, paragraph 66; the conclusion of Advocate-General ECLI:EU:C:2021:164.

6.2.1.    The argument in those proceedings is that the CJEU has no jurisdiction to answer the question referred for a preliminary ruling (concerning Article 1(6) ECT), since EU law does not apply to the dispute at hand in the main proceedings because the parties to this dispute have nothing to do with the European Union[24].

6.2.2.    The CJEU considers that the ECT is an international agreement to which the EU is party by an act of the Council[25]. It follows from settled case law that the provisions of an international agreement concluded by an EU institution are part of the legal order of the Union and that the CJEU has jurisdiction to rule on the interpretation of that agreement[26].

6.3.    The above certainly applies in this procedure between an EU Member State and investors from another EU Member State[27].

6.4.    It therefore follows from the settled case law of the CJEU that the provisions from the ECT are part of EU law. Spain is therefore obliged to comply with the arbitration award in accordance with Article 10 of the ECT and at the same time Spain is obliged to comply with the obligations arising from Articles 107 and 108 TFEU.

6.5.    This explanation is also consistent with the way Contracting Parties and investors implement the ECT.

6.5.1.    AES and AEF also argue that a change to the aid measure that entitled them to favorable financial conditions for their investments in Spain must be reported to the Commission. This is to investigate the compatibility with the internal market of the payments to the private company under that (intended) change to the aid measure.

6.5.2.    Furthermore, it is not disputed between the parties that these amended financial conditions can only be claimed after the Commission has declared the amended aid measure compatible with the internal market.

6.6.    It is obvious that the above therefore applies to the payment obligation of the EU Member State under a judgment rendered in a dispute between an investor (or investors) from a different Contracting Party and that EU Member State. AES and AEF have not clarified that within the ECT regulations a payment obligation of an EU Member State arising from a judgment must be considered in a different way than a payment obligation of that EU Member State arising from a proposed change to an aid measure declared compatible with the internal market, such as the 2007 scheme.

---

[24] *Komstroy,* ECLI:EU:C:2021:164, paragraph 21.
[25] Article 16 Treaty on European Union (TEU): The Council exercises the legislative and budgetary tasks together with the European Parliament.
[26] *Komstroy,* ECLI:EU:C:2021:164, paragraph 23 and the judgments cited therein.
[27] Komstroy, ECLI: EU:C:2021:164, paragraph 29 and the case law cited therein.

6.7.    After all, the payment obligation of the EU Member State arising from a judgment may constitute an additional benefit for the investor(s) with whom the EU Member State has a dispute over the aid measure, and may be considered a change to that aid measure that favors those investor(s). Such a beneficiary of those investor(s) may then distort or threaten to distort competition (Article 107(1) TFEU). It follows from all of this that an order for an EU Member State to pay a private company can also constitute an aid measure. Within the EU system in which EU Member States cooperate loyally in fulfilling the tasks arising from the TEU and the TFEU (Article 4(3) TEU), the notification of such a judgment to the Commission as support is therefore in accordance with international law in general, EU rules and the ECT.

6.8.    This is regardless of whether the verdict was handed down by a national court or an arbitration tribunal, as AES and AEF have argued at the hearing. After all, it concerns the payment obligation of the EU Member State, which must be examined for compatibility with the internal market, regardless of the source of that payment obligation.

6.9.    In addition, it is therefore not important that the Permanent Court of Arbitration (PCA), in the dispute between AES and AEF on the one hand and Spain on the other, considered in the arbitration award that the damages awarded to AES and AEF are compatible with the internal market (or are correct because they were estimated in accordance with the 2014 scheme, which is compatible with the internal market).

6.9.1.    The fact that the arbitration tribunal believes its decision is completely in line with the Approval Decree is also not relevant in these proceedings. After all, the Commission has exclusive jurisdiction to assess whether state aid is compatible with the internal market.

6.9.2.    Therefore, in these proceedings it is also irrelevant what positions Spain has taken on possible state aid in that arbitration.

6.10.    AES and AEF's claim based on Article 16 of the ECT is unfounded. This article concerns the ranking of comparable provisions in an international agreement other than the ECT in case both international agreements apply to the legal relationship between those parties. That is not the case here. After all, parts III and V of the ECT do not contain provisions on state aid.

6.11.    AES and AEF have argued that the EU, or the EU Member States, should have included in the ECT that the rules on state aid under EU law also apply to an (arbitration) award rendered pursuant to Article 26 ECT. This argument is not convincing. The ECT does not include any provision that changes to aid measures (regulating favorable financial conditions for investors) are subject to rules on state aid under EU law. Nevertheless, all parties involved with the ECT and the parties involved in a legal relationship to which the ECT applies will adhere to those rules on stated aid under EU law in the event of a change to the (previously declared compatible with the internal market) aid measure. AES and AEF have not made clear why an arbitration award based on the ECT specifically requires the inclusion of a provision to declare that the rules on state aid under EU law apply (see also 6.6 and 6.7). Moreover, it is unusual to include provisions in an international agreement that a national legal provision of the State in which the characteristic performance of that agreement is performed is applicable to the legal relationship between those contracting parties. That goes without saying, also under international legal rules. This also applies to this case in which the EU is the Contracting Party.

6.12.    Given the circumstances described above, the AES and AEF's reference to Articles 21 and 24 ECT is of no avail to them.

6.13.    The Court comes to the interim conclusion that in addition to the ECT provisions, the rules on state aid under EU law also apply to Spain's obligation to pay from the arbitration award. It should therefore be examined whether that payment obligation constitutes state aid as referred to in Articles 107 and 108 TFEU.

6.14.    First, we will discuss introductory considerations to answer that legal question. From 7.8, the views of the parties and the comments of the Commission will be addressed.

**7.       The substantive assessment of the legal claims**

*Introduction to the discussion of the parties' substantive positions*

7.1.     As already considered under 5.1, these proceedings focus on the arbitration award, in which Spain was ordered to pay damages to AES and AEF. Spain has stated that the payment obligation from the arbitration award is aid as referred to in Article 107(1) TFEU. AES and AEF have disputed this in detail.

7.2.     The following circumstances are important when considering the substantive positions of the parties:

7.2.1.    The dispute between AES and AEF on the one hand and Spain on the other, which led to the arbitration award, is based entirely on the 2007 scheme, the amendments made to it in 2010 and the 2014 scheme. It is not disputed between the parties that these schemes are aid measures as referred to in Article 107(1) TFEU.

7.2.2.    In its 2017 Approval Decision, the Commission declared the compensation for renewable energy installations in Spain on the basis of the 2014 scheme, and the payments made by Spain on the basis of the previous schemes (in that Decision: *'premium economy scheme'*) compatible with the internal market.

7.2.3.    Furthermore, it is not disputed between the parties that Spain in the period 2007 to 2015 (when AES and AEF sold their investments in the installations in Spain) has always paid AES and AEF in accordance with the aid measures (compatible with the internal market).

7.2.4.    It also follows from the above that the *"returns"* as defined in Article 1(9) of the ECT obtained by AES and AEF in the period from 2007 to 2015 constituted aid payments compatible with the internal market.

*Judgments in the Micula case applicable in this procedure?*

7.3.    It follows from Chapter 6 of this judgment that in these proceedings the rules on state aid under EU law apply. These rules under EU law are explained in more detail in judgments of the CJEU (both the Court and the General Court of the EU, which has jurisdiction to hear objections to Commission decisions[28]). In these proceedings, Spain and the Commission have referred to the judgments in the Micula case, among other things[29]. AES and AEF claimed that the Micula case is substantially different from these proceedings. The court will therefore first discuss the Micula case.

7.4.    The Micula case centers on an arbitration award of December 11, 2013, in which Romania (having joined the EU in 2007) was ordered to pay damages to a private economic entity consisting of various natural persons and companies (including European Food) as a result of the abolition in 2005 of a fiscal incentive rule from 1998 (as a result of the negotiations between Romania and the EU about joining the EU). That arbitration award has been notified to the Commission as state aid.

7.4.1.    The Commission, in its decision of March 30, 2015, declared the payment of the compensation under the arbitration award incompatible with the internal market and instructed Romania to recover the payments made.

7.4.2.    European Food et al. appealed this decision before the General Court of the EU, which overturned the Commission's decision in a judgment of June 18, 2019 because, in short, according to the Court, it was based on an incorrect moment at which European Food et al.'s claim to payment arose (and that the Commission was therefore not authorized to rule on the payment obligation arising from the arbitration award), and furthermore that the Commission wrongly considered this payment obligation to be an "*benefit*" and "*aid*" within the meaning of Article 107(1) TFEU.

7.4.3.    The Commission has appealed the ruling to the CJEU. On January 25, 2022, the CJEU (Case C-638/19 P, ECLI:EU:C:2022:50, hereafter referred to as *"Micula 2022"*) annulled the earlier judgment of the General Court. The case was then referred back to the EU General Court, which delivered another judgment on October 2, 2024, upholding the Commission's decision. This judgment is published under ECLI:EU:T:2024:659 (hereafter referred to as *"Micula 2024")*. AES and AEF and the Commission have included the latter ruling in their arguments.

---

[28] Article 256 TFEU.
[29] General Court of the EU of October 2, 2024, (*European Food SA, Micula et al. v European Commission*), Cases T-624/15 RENV and T-694/15 RENV, ECLI:EU:T:2024:659, and CJEU, January 25, 2022, (*European Food SA, Micula et al. v European Commission*), Case C-638/19 P, ECLI:EU:C:2022:50.

7.4.4.    The Micula case, therefore, centers on the legal questions whether a conviction in an arbitration award can constitute state aid and, if so, when that aid arose. This is also the central point in these proceedings, also given the defense of AES and AEF that Spain's payment obligation from the arbitration award is not state aid, or that Spain wrongly invokes the standstill obligation.

7.5.    AES and AEF correctly argued that the Micula case - unlike these proceedings - involved an enforcement of the arbitration award and that Romania made payments to European Food (and related natural and legal persons) under that enforcement. Furthermore, the Micula case concerns a Commission decision to recover sums of money paid by Romania. Clearly, none of this is relevant to these proceedings. The differences between this procedure and those argued for by AES and AEF are not relevant to answering the legal questions that are at issue in this procedure. To answer the legal questions in this case, the judgments in the Micula case are particularly appropriate.

7.6.    The substantive considerations from the judgments in the Micula case, as well as other rulings of the CJEU and the General Court of the EU, will be addressed in more detail in the further assessment.

*Claims I, II and V*

7.7.    Claims I, II and V concern rulings about the 2007 scheme. That aid measure is not at issue in these proceedings, as AES and AEF rightly argued. In these proceedings, Spain did not establish any facts and circumstances from which an interest as referred to in Article 3:303 DCC can be inferred in the granting of claims I, II and V. Simply stating that these claims are a stepping stone to the other claims (those concerning the arbitration award) is too limited. Claims I, II and V are therefore dismissed.

*Substantive defense of AES and AEF on alleged aid measure*

7.8.    AES and AEF disputed that Spain's obligation to pay under the arbitration award is a new stand-alone aid measure - in any case, there is no unlawful state aid. To this end, AES and AEF argue that, to date, Spain has not made any payment under the arbitration award and that the arbitration award has not yet been enforced.

7.9.    This defense focuses on the qualification of Spain's payment obligation from the arbitration award as aid (as referred to in Article 107(1) TFEU). This will be addressed first.

*Does Spain's payment obligation from the arbitration award constitute state aid?*

7.10.    Primarily, it is stated that during the Commission's investigation[30] into the amended support measure (the 2014 scheme) as notified by Spain, arbitration between the investors and Spain was ongoing. In its Approval Decision, the Commission included in this regard:

---

[30] As referred to in Chapter II *'Procedure concerning notified aid',* Articles 6 to 11 of the Procedural Regulation

"(165) The Commission recalls that any compensation which an Arbitration Tribunal were to grant to an investor on the basis that Spain has modified the premium economic scheme[31] by the notified scheme[32] would constitute in and of itself State aid. However, the Arbitration Tribunals are not competent to authorize the granting of State aid. That is an exclusive competence of the Commission. If they award compensation, such as in Eiser v Spain, or were to do so in the future, this compensation would be notifiable State aid pursuant to Article 108(3) TFEU and be subject to the standstill obligation."

7.11.    It follows that in these proceedings the Commission is of the opinion that a payment obligation of Spain arising from the arbitration award between AES and AEF on the one hand and Spain on the other hand constitutes state aid. It follows from the Commission's further comments that it is of the opinion that this payment obligation from the arbitration award is aid as referred to in Article 1(c) of the Procedures Regulation and therefore must be reported as state aid as prescribed by Article 108(3) TFEU. This opinion of the Commission - which is not part of the conclusion of the Approval Decision - is a compelling circumstance in answering the legal question of whether Spain's payment obligation under the arbitration award constitutes state aid (as referred to in Article 107(1) TFEU).

7.12.    AES and AEF have also argued with regard to this defense that the Permanent Court of Arbitration (PCA) has ruled that the decision in the arbitration award is entirely in line with the Approval Decision. Thus, there is no new stand-alone aid measure, according to AES and AEF.

7.13.    In this context too, the opinion of the arbitration tribunal on the compatibility of its judgment with the internal market is not relevant, as already considered in 6.9 et seq. Moreover, this argument of AES and AEF does not dispute the argument that Spain's payment obligation from the arbitration award is state aid that must be notified to the Commission pursuant to Article 108(3) TFEU

7.14.    In making this argument, AES and AEF referred to the CJEU's *Dobeles HES*[33] and *Mytilinaios/DEI*[34] judgments without providing any concrete explanation as to why those judgments are relevant in answering the legal question of whether Spain's payment obligation under the arbitration award is a new independent aid measure.

7.14.1.    In the opinion of the Court, these judgments do not support the argument of AES and AEF.

7.14.2.    The *Mytilinaios/DEI* judgment concerns a dispute between the producer of electricity (controlled by the Greek state) and its main customer (an aluminum producer). In an arbitration award between them, a significant discount on the market rate was granted to the purchaser of electricity. The fact that it first had to pay the market rate to the producer was not a case of state aid. In the proceedings before the Commission and subsequently before the General Court of the EU and subsequently with the CJEU, the main question is whether the lower rate determined in the arbitration award entails granting state aid. In this respect, this judgment diverges from these proceedings in the sense that the *Mytilinaios/DEI* judgment cannot be relevant to the legal

---

[31] In paragraph 4 of the Approval Decision defined as: the 2007 scheme and the 2008 scheme.
[32] The 2014 scheme whose specific laws are included in paragraph 6 of the Approval Decision
[33] CJEU January 12, 2023, (*Dobeles HES*), Case C-702/20, ECLI:EU:C:2023:1.
[34] CJEU February 22, 2024, (*Mytilinaios/DEI*), Case C-701/21, ECLI:EU:C:2024:146.

question of whether Spain's payment obligation from the arbitration award is an independent aid measure.

7.14.3.    Although the underlying dispute in the *Dobeles Hes*[35] judgment is also different than in these proceedings, this judgment gives a number of general considerations about state aid that are independent of the underlying dispute. The *Dobeles HES* judgment held that where a national scheme establishes an aid measure within the meaning of Article 107(1) TFEU (as Spain did here with the 2007 scheme and its amendments in the 2014 scheme), the payment of an amount claimed on the basis of that scheme in legal proceedings also constitutes such an aid measure[36]. This consideration was repeated in the subsequent judgment of the General Court of the EU in the Micula case *(Micula 2024*[37]*)*.

7.14.4.    AES and AEF argued at the hearing that two possibilities ensue from *Dobeles HES*: the underlying subsidy scheme constitutes the aid measure, or the payment made in enforcement of the arbitration award constitutes the aid measure. The court considers this argument an incorrect reading (or understanding) of the interpretation about Article 107(1) TFEU in this judgment.

7.15.    It follows from the *Dobeles HES* and *Micula 2024* judgments that an EU Member State's payment obligation following an arbitration award may be state aid. In *Micula 2024*, the EU General Court also considered that a distinction should be made between claims for compensation of damages resulting from unlawfulness and a claim for payment of amounts due under a scheme[38].

7.15.1.    It is not disputed between the parties that the arbitration between AES and AEF on the one hand and Spain on the other hand pertained to the argument of the investors (thus also AES and AEF) that Spain acted in violation of Article 10(1) ECT by amending the 2007 scheme, as a result of which the investors would receive less return on their investments (or lower *"returns"*) than initially thought. Therefore, the investors' claim for damages was aimed at an additional compensation for their investments, in addition to what they would obtain from the amended 2007 scheme, ultimately established in the 2014 scheme. Therefore, the claims of AES and AEF (and the other investors) did not concern the payment of amounts due from Spain under the aid measures (see also under 7.2.3). This is also in line with Spain's argument that the arbitration award goes far beyond the subsidy scheme(s) considered compatible by the Commission with the internal market.

---

[35] In Dobeles Hes, the underlying dispute is between producers of electricity that was sold to a company affiliated with Latvia (EU Member State) at a rate set by that company. This rate was lower than agreed in an aid measure. The arbitral tribunal ordered the company (i.e. Latvia) to apply the rate included in the aid measure. The question in this judgment is whether that ruling constitutes new independent aid. In other words, the damaging event is an incorrect implementation of the aid measure by the EU Member State and not an amendment of an aid measure.
[36] Dobeles HES, ECLI:EU:C:2023:1, paragraph 65.
[37] Micula 2024: ECLI:EU:T:2024:659 paragraph 174.
[38] Micula 2024: ECLI:EU:T:2024:659, paragraph 172 (with reference to CJEU, September 27, 1988, (*Asteris et al.*), cases C-106/87 and C-120/87, EU:C: 1988:457, paragraphs 25 and 26 and case law cited therein).

7.15.2.    The arbitration award ruled that Spain violated the provisions of Article 10 ECT as a result of the amendments to the 2007 scheme and that Spain is therefore liable for damages against (among other things) AES and AEF. Spain was then ordered to pay damages to AES and AEF.

7.15.3.    Those damages shall increase the *"returns"* as defined in Article 1(9) ECT of the investments of AES and AEF. That revenue is based on an aid measure introduced by Spain by national scheme (see also under 7.2.4) declared compatible by the Commission with the internal market (see under 7.2.2). Therefore, in the arbitration award Spain was ordered to pay a damage amount claimed on the basis of an aid measure.

7.15.4.    This means that Spain's obligation to pay from the arbitration award is compensation for damage resulting from an unlawfulness. In that case, the payment obligation may be qualified as state aid[39]. AES and AEF have not stated any facts and circumstances that give rise to another interim conclusion regarding this point.

7.16.    AES and AEF claimed that Spain's obligation to pay under the arbitration award is not a new stand-alone aid measure. That payment obligation of Spain should therefore be assessed against the conditions for qualification as state aid (as defined under 5.4.2).

7.17.    In the arbitration award, a higher return was granted to - insofar as relevant in these proceedings - AES and AEF. This higher return does not accrue to other investors who participate in the Spanish market for the sustainable production of electricity. This includes investors from other EU Member States. Spain's obligation to pay under the arbitration award may therefore negatively affect trade between Member States. All this may cause distortion or disruption of competition. Finally, if the arbitration award is successfully enforced, Spain will have to cover the payment obligation from state resources.

7.18.    Spain's payment obligation from the arbitration award therefore meets the four conditions to qualify as state aid, as set out above.

7.19.    The invocation by AES and AEF of a judgment by the Landesgericht Essen (Essen Regional Court) does not benefit them. After all, that case sought a ruling to the effect that enforcement of the arbitration award at issue in those proceedings was unlawful. That is not (no longer) an issue in these proceedings following Spain's claim amendments.

[39] Micula 2024: ECLI:EU:T:2024:659, including in paragraphs 172, 173 and 175.

7.20.     It follows from the above that Spain's payment obligation from the arbitration award is compensation for an illegality of Spain, that this is a payment of an amount claimed on the basis of an aid measure in legal proceedings, and that the payment obligation meets the requirements of state aid. The payment obligation of Spain from the arbitration award is therefore an aid measure as referred to in Article 107(1) TFEU.

*Other defenses AES and AEF*
*I: Standstill obligation not compromised*

7.21.     AES and AEF argue in case the arbitration award qualifies as state aid, that Spain is inappropriately invoking the standstill obligation to avoid having to meet the payment obligation from the arbitration award and that the standstill obligation is not compromised because Spain did not make any payment under the arbitration award. There is also no enforcement of the arbitration award yet, according to AES and AEF.

7.22.     The court held that Spain is obliged to notify a new aid measure to the Commission (Article 108(3) TFEU, the Notices and Procedures Regulation based thereon (see also sections 5.7 to 5.12) and the settled case law of the General Court of the EU and the CJEU on this matter). Moreover, in its Approval Decision, the Commission also instructed Spain to notify as aid a payment obligation imposed in an arbitration award (see paragraph 165 of this Decision cited under 7.10). As a result of the proper notification of the payment obligation from the arbitration award, Spain has the standstill obligation.

*Is enforcement of the standstill obligation required?*

7.23.     It follows from established case law[40] of the CJEU that payment under a legal claim to state aid is not a requirement for the qualification of that legal regulation as state aid. In the Micula case, the CJEU reiterated[41]:

> "(...)
> 115 According to settled case law of the Court, to which the General Court refers in paragraph 69 of the contested judgment, state aid must be deemed to have been 'granted' within the meaning of Article 107(1) TFEU on the date on which the beneficiary acquires a legal claim to state aid under the applicable national rules (...).
> (...)"

7.23.1.   It also follows from the Micula case that in this case the sentencing from the arbitration award is equal to a legal claim to aid. In that sense, it is also understood that Spain's sentencing from the arbitration award must be equated with the term 'granting aid[42]'. The above case law of the CJEU is therefore translated in this case into: the moment at which the conviction of Spain can be demanded by AES and AEF.

---

[40] CJEU March 31, 2013, (Magdeburger Mühlenwerke), Case C-129/12, ECLI:EU:C:2013:200, paragraph 40 and CJEU December 19, 2019, (Arriva Italia et al.), Case C-385/18, ECLI:EU:C:2019:1 121, paragraph 36.
[41] Micula 2022: ECLI:EU:C:2022:50, paragraph 115 - with reference to the earlier judgments.
[42] As in the *Easti Pagar* case (ECLI:EU:C:2019:172) and in CJEU November 11, 2015, *(Klausner Holz)*, ECLI:EU:C:2015:742, paragraphs 18 to 26.

7.23.2.    The arbitration award is subject to Swiss law (the country in which the Permanent Court of Arbitration (PCA) has elected domicile). Spain has requested the annulment of the arbitration award in Switzerland. That claim was dismissed by the Swiss Supreme Court in its decision of February 23, 2021. At that time, the arbitration award became irrevocable. From this, it is then inferred that according to Switzerland's domestic rules, the sentencing of Spain can be claimed by AES and AEF at that time, and that at that time their firm claim to aid arose.

7.23.3.    From that moment on, Spain is therefore under the obligations of Spain under Article 108(3) TFEU: reporting to the Commission the payment obligation as aid, the standstill obligation (including taking measures that no actual payment is made under that notified aid[43]) and if payment is forced to claim reimbursement of it in any way. AES and AEF have not presented any facts and circumstances from which it can be inferred that the Easti Pagar judgment on this point cannot be applied in these proceedings - even though Easti Pagar deals with schemes under Regulation 800/2008[44] (block exemptions of aid measures, not applicable in these proceedings).

7.23.4.    From this case law it also follows that for the standstill obligation it is not important that Spain has not made an actual payment based on the arbitration award, or that the arbitration award has not yet been enforced.

7.24.    This means that Spain also currently - without a payment being made under the arbitration award and without actual enforcement of that arbitration award - has a legitimate interest (as referred to in Article 3:303 DCC) to claim measures for the enforcement of the standstill obligation.

*II: Appeal to forfeiture of rights*

7.25.    AES and AEF have argued that Spain by virtue of forfeiture of rights has lost its legal claims with respect to the argument that this is state aid in the arbitration with respect to the subsidiary claim. Spain should have put these arguments forward in the arbitration. They also argue that Spain notified the arbitration award (of February 2020) to the Commission at an unreasonable time (July 2021).

---

[43] *Easti Pagar,* ECLI:EU:C:2019:172, paragraphs 94 and 95 referring to the powers of the national court in state aid proceedings as envisaged in *Deutsche Lufthansa,* ECLI:EU:C:2013:755, paragraphs 15 to 32 and *Klausner Holz* ECLI:EU:C:2015:164.

[44] Commission Regulation (EC) No 800/2008 of August 6, 2008 declaring certain categories of aid compatible with the common market in application of Articles [107 and 108 TFEU] (General Block Exemption Regulation), OJ 2008 L 214, p. 3, replaced in 2014 by Regulation EU 651/2014 (2014 OJ L 187, p. 1), now consolidated in Commission Regulation (EU) 2023/1315 of June 23, 2023, amending Regulation (EU) No [107 and 108 TFEU], OJ 2008 L 214, p. 3, replaced in 2014 by Regulation EU 651/2014 (2014 OJ L 187, p. 1), now consolidated in Commission Regulation (EU) 2023/1315 of June 23, 2023, amending Regulation (EU) No. 651/2014  declaring certain categories of aid compatible with the internal market in application of Articles 107 and 108 of the Treaty, and Regulation (EU) 2022/2473 declaring certain categories of aid for undertakings active in the production, processing and marketing of fishery and aquaculture products compatible with the internal market in application of Articles 107 and 108 of the Treaty (Text with EEA relevance) OJ 2023 L 167, p. 1-90.

7.26.    Spain rightly argued that it had to notify the arbitration award to the Commission only after the arbitration award had become irrevocable (under Swiss law), as also follows from what was considered under 7.23.2 and 7.23.3. The arbitrators have no jurisdiction to decide whether or not a conviction of Spain is state aid or compatible with the internal market, that is for the Commission to decide. Therefore, the failure to provide the state aid argument against the subsidiary claim cannot lead to limitation. The period between the Swiss Supreme Court's decision (February 28, 2021) and the notification (apparently this was July 6, 2021) is not unreasonable and, in any case, not so long that AES and AEF can infer that Spain would no longer wish to make this argument, nor has it been shown that their interests have been harmed as a result.

7.27.    To the extent that AES and AEF have implied that an unreasonably long period of time elapsed between the notification (July 6, 2021) of Spain's payment obligation to the Commission and the summons (December 22, 2022), this is not successful either. After all, that period was a year and a half during which the CJEU handed down the Komstroy judgment (September 2, 2021) and shortly thereafter followed the CJEU's judgment in the Micula case (on January 22, 2022). Both judgments appear to be important for Spain's claims in these proceedings. From all this, it follows that Spain did not take an unreasonably long time to bring the claims against AES and AEF in these proceedings based on those judgments.

7.28.    AES and AEF's appeal to limitation is unsuccessful.

*III: Spain commits an abuse of rights*

7.29.    AES and AEF have argued that Spain has committed an abuse of rights by notifying that payment obligation to the Commission as aid.

7.30.    AES and AEF's positions to that effect do not convince the court.

7.30.1.    The fact that Spain has violated EU law in the past is irrelevant. Spain apparently learned from those mistakes and followed the Commission's mandate in paragraph 165 of the Approval Decision. Past errors of Spain are not circumstances from which it can be inferred that by following a Commission order and complying with obligations under Article 108(3) TFEU, abuse of rights may be possible.

7.30.2.    Regarding the timing of Spain's notification of the payment obligation from the arbitration award, it has already been considered above in sections 7.25 and 7.26 that AES and AEF assume an incorrect time at which Spain should have notified the payment obligations from the arbitration award to the Commission as aid.

7.30.3.    The fact that AES and AEF argue that the arbitration award and any settlement based on it between Blasket and Spain would be compatible with EU law is irrelevant (since only the Commission may and can decide that) and does not prove that Spain is committing an abuse of rights by notifying the Commission of the payment obligation from the arbitration award and rejecting Blasket's offer to negotiate.

7.30.4.    There is no evidence that Spain notified the payment obligation from the arbitration award only to avoid having to fulfill that obligation and that it would thereby commit an abuse of rights. After all, as explained above, Spain was obliged to submit this notification. An appeal to the standstill obligation also does not constitute an abuse of rights, because Spain was obliged to observe it.

*IV: Unreasonable time frame for investigation by the Commission*

7.31.    AES and AEF have further argued that a Commission decision on the compatibility of the arbitration award with the internal market is very long overdue. The reasonable period of 2 months (Article 4(5) Procedural Regulation) has now passed, according to AES and AEF.

7.32.    According to Spain and the Commission, the latter confirmed the notification of the arbitration award with a notice of September 14, 2021.

7.33.    It follows from the procedural file that the Commission did not carry out an investigation into compatibility with the internal market after that notification of the arbitration award. Spain and the Commission have argued that the investigation into the notified arbitration award has not commenced or has been paused until a final decision has been taken in a comparable case (the Antin case[45]).

7.34.    AES and AEF have argued that the Commission acts unreasonably because the arbitration award of the arbitration tribunal in the Antin case is not comparable to the arbitration award at the heart of these proceedings and that Spain is also delaying the investigation in the Antin case. Spain and the Commission do not provide any clarity as to whether the arbitration award is compatible with the internal market. As a result, the interests of AES and AEF are not respected in a successful, timely and careful treatment (as follows from Article 6 ECHR[46] and Article 47 EU Charter[47]), according to AES and AEF.

7.35.    The Commission noted that any compensation granted by an arbitration tribunal in these cases - regardless of the amount - should be notified as state aid and that this does not affect the reasoning of the arbitration tribunal as to the amount of the compensation and why it is granted. As a result, how the compensation awarded was quantified (according to AES and AEF, it was quantified differently in the Antin case than in the arbitration award that is at the center of these proceedings) is not relevant to the Commission's investigation into the Antin case, nor will it be relevant in any forthcoming investigation into compatibility with the internal market of Spain's payment obligation from the arbitration award that is at the center of these proceedings. Whether this is a correct starting point of the Commission will have to be demonstrated through possible proceedings against a Commission decision in the EU's

---

[45] In November 2013, the investor Antin (consisting of two companies Antin Energia Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.) initiated an ICSID arbitration against Spain on the amendments to the 2007 scheme. In the judgment of that arbitration tribunal of June 15, 2018, Antin was granted damages, which were reduced at the request of Spain in a new judgment of January 29, 2019. Spain notified this judgment of the ICSID arbitrators to the Commission as state aid on April 17, 2019. The Commission, after further investigation on July 19, 2021, decided to open a formal investigation procedure and provisionally ruled that the judgment between Spain and Antin appears to be incompatible with the internal market.
[46] Convention for the Protection of Human Rights and Fundamental Freedoms, Official Gazette 1951, 154.
[47] Charter of Fundamental Rights of the European Union (2007/C 303), Pb. C 303 of 12/14/2007.

exclusively competent court, the EU General Court[48]. It is not up to this court to assess the above comments of the Commission.

7.36.    It follows from the above that the difference argued by AES and AEF between the Antin case and their case is irrelevant to assessment of the legal claims in these proceedings. This is where AES and AEF's argument fails about it being unfair to them that making a decision on compatibility with the internal market before continuing the investigation of the notified arbitration award in the Antin case is unreasonable.

7.37.    Furthermore, any information about the how the Antin case is investigated is missing. Nothing suggests that this investigation is being delayed or otherwise interfered with by Spain. It would have been up to AES and AEF to give substance to this argument. They failed to do so, so their defense cannot benefit them in these proceedings. Likewise, it is also impossible to establish that Spain is to blame for the Commission's pending investigation of the notified arbitration award.

7.38.    AES and AEF pointed out the provisions of Article 2, Article 4(5) and (6) and Article 15 of the Procedural Regulation. These stipulate that the Commission must conduct an initial investigation of the notified aid without delay (Article 2), that the Commission must report on it within two months (Article 4(5)), and that the aid is deemed approved if the Commission has not decided within that time (Article 4(6)). Contrary to what AES and AEF have argued, it does not follow from this that Spain is obliged to give effect to the arbitration award after the two-month period has expired. In fact, the first requirement for this would be for Spain to notify the Commission, after which the Commission could take a decision no later than 15 working days after that notification (the final sentence of Article 4(6) Procedural Regulation). In these proceedings, it is unknown what was included in the Commission's September 14, 2021 decision and how Spain and the Commission proceeded. However, whether or not all of this is transparent and may be careless towards AES and AEF by the Commission is not at the discretion of this court in the context of these proceedings. To that end, only the General Court of the EU is competent[49]. It follows from the text of Article 265 TFEU that AES and AEF may also lodge an objection with the EU General Court about the absence of a Commission decision on compatibility with the internal market of Spain's payment obligations from the arbitration awards at the heart of the Antin case and in these proceedings, as noted at the hearing by the Commission.

---

[48] Article 263 in conjunction with Article 256 TFEU.
[49] Article 265 in conjunction with Article 256 TFEU. Article 265 TFEU provides: Should (...) the Commission (...), fail to act, the Member States and the other institutions of the Union may bring an action before the Court of Justice of the European Union to have the infringement established. This Article shall apply under the same conditions to EU bodies and agencies that fail to take a decision. (...)

7.39.    Article 15 Procedural Regulation shall apply in the event that a formal investigation into the possible unlawfulness of the aid measure has been initiated by the Commission. This is also apparent from the title of Chapter III *"Procedure concerning unlawful aid"*. AES and AEF did not argue, nor does the case file show, that the Commission initiated such an investigation into the unlawfulness of the aid notified by Spain (the payment obligation under the arbitration award). Therefore, the time limits set out in that Article do not apply here.

7.40.    Accordingly, AES and AEF's argument that the time limit for the Commission's decision on the notified arbitration award violates the reasonable time for justice as stipulated in Article 6 ECHR and Article 47 Charter EU does not benefit them in these proceedings under the above circumstances.

7.41.    All defenses by AES and AEF aimed at any unreasonable time limit upheld by the Commission for the investigation cannot lead to the dismissal of Spain's claims in these proceedings.

*Interim conclusion*

7.42.    The interim conclusion is that Spain's contentions that the arbitration award is state aid are upheld and that AES and AEF's defenses regarding the notification of that arbitration award are without merit. What this all means for the other claims (III, IV, VI, VII, VIII, IX and X) is considered below, which will also include a response to AES and AEF's defenses specifically focused on those claims.

*Claims III, IV and VI: Rulings*

7.43.    The claims under III, IV and VI concern rulings about the arbitration award. In opposition, AES and AEF argued that such claims should be brought against those directly involved, which AES and AEF are not because they assigned their title from the arbitration award to Blasket. Spain therefore has no interest as referred to in Article 3:302 DCC, according to AES and AEF.

7.44.    This defense cannot lead to the dismissal of claims III, IV and VI. After all, Spain's payment obligation from the arbitration award was imposed vis-a-vis AES and AEF. Therefore, AES and AEF obtained a benefit through the arbitration award. This is the determining criterion, according to the case law cited above.

Any (...) legal person may (...) present to the Court its objections to the failure of any of the institutions, bodies, organs or agencies of the Union to take any action with respect to it other than the issuance of a recommendation or opinion.

7.45.    The fact that AES and AEF sold their benefit (the title of the arbitration award) to Blasket does not mean that AES and AEF did not receive any benefit as referred to in the case law on state aid.

7.45.1.    Contrary to what AES and AEF have argued, there is indeed a link between the benefit to them and the reduction of Spain's assets: in the event that the arbitration award is successfully enforced by Blasket (or its legal successor), Spain will have to make a payment from its state resources. This determines the possible reduction in the capital of Spain, as also considered under 7.17.

7.45.2.    A recovery against Blasket will not succeed because no benefit (as referred to in state aid case law) was provided to Blasket. Blasket is in no way an opposing party to Spain in any recovery of state aid. In that case, Spain's obligation to all other EU Member States under Article 108(3) TFEU, an obligation arising from the principle of loyal cooperation between EU Member States (Article 4(3) TEU), could not be fulfilled, as the Commission noted. This therefore implies that companies benefiting from an aid measure could escape EU law by selling their benefit to a party outside the EU. This is not desirable, as convincingly noted by the Commission.

7.45.3.    Furthermore, it is also important that the Commission must decide on the compatibility with the internal market of the arbitration award as it was rendered: in it, AES and AEF are parties.

7.46.    It follows from the above that AES and AEF are directly involved in the requested rulings under III, IV and VI. The defense against claims III, IV and VI is therefore dismissed. These claims are therefore assignable.

7.47.    The requested addition *"pursuant to Article 107(3) TFEU"* is not included because the Commission may consider Spain's payment obligation from the arbitration award compatible with the internal market on another ground. Furthermore, it is also possible that Spain's payment obligation is considered compatible with the internal market by other means (as defined in Article 108(2) TFEU) (see under 5.6). Even then, a payment as a result of the enforcement of the arbitration award is not unlawful state aid.

*State aid repayment claims*

7.48.    Claims VII and VIII are the same, except that claim VII is against AES and claim VIII is against AEF.

*Positions of the parties*

7.48.1.    Spain included the bases for these claims in the deed amendment of claim taken on the docket of August 16, 2023. It is the court's understanding that Spain still invokes these principles. Spain primarily based EU law on claims VII and VIII, with Spain pointing out what was considered in *Easti Pagar*[50]. In the alternative, Spain has argued that AES and AEF were unjustified enriched by the arbitration award, at least Spain's payment obligation from it (Article 6:212 DCC).

---

[50] *Easti Pagar,* ECLI:EU:C:2019:172, paragraphs 94 and 95.

7.48.2.    AES and AEF claimed that EU law does not provide any basis for claims VII and VIII, as well as that there is no impoverishment of Spain because nothing has yet been paid under the arbitration award. Claims VII and VIII are also currently non-existent and whether they will ever exist in the future is currently uncertain because this depends on the Commission's decision on the compatibility with the internal market of Spain's payment obligation from the arbitration award. Moreover, the claims filed alternatively and further alternatively are dependent on a successful enforcement of the arbitration award. It is very uncertain whether implementation is possible, and what will eventually have to be paid by Spain. Under these circumstances, there is no basis for granting claims VII and VIII, according to AES and AEF.

*Assessment*

7.49.    Spain's appeal to *Easti Pagar* as the basis for its claims is incorrect. That judgment held that the EU Member State has a duty to apply to national courts to ensure compliance with the standstill obligation. This does not provide a basis for the claims of that EU Member State for reimbursement of state aid. On this matter, the Procedural Regulation and Notices 2019/C 247 and 2021/C 305 explicitly state that the national court must apply national law, and therefore the recovery must be based on a basis in national law. Therefore, Spain's primary position cannot be upheld, as AES and AEF rightly argued.

7.50.    Spain alternatively claimed that AES and AEF were unjustifiably enriched. Therefore, it must first be investigated whether the requirements of the provisions of Article 6:212 DCC have been met.

7.50.1.    A payment of support by an EU Member State during the standstill obligation is unlawful (Article 108(3) TFEU, see also under 5.7 et seq.).

7.50.2.    AES and AEF were enriched by the arbitration award. After all, they obtained a benefit from the arbitration award in addition to what they were entitled to based on the aid measures (the 2007 scheme and the 2014 scheme).

7.50.3.    If Spain has to make a payment to Blasket (or its possible legal successor) in the future successful execution of the arbitration award (anywhere in the world), it is considered impoverishment of Spain.

7.50.4.    All requirements of Article 6:212 DCC have therefore been met, whereby the unlawful nature of a future payment, and thus *"unjustified",* only applies as long as the Commission has not yet decided on the compatibility with the internal market of the arbitration award, or has decided that the arbitration award is incompatible with the internal market.

7.51.    It also follows from EU law that claims VII and VIII of Spain indeed already exist. The regulations on the standstill obligation are clear and not open to any other interpretation: once a claim to state aid (in this case: payment under the arbitration award) can be made, the EU Member State (here Spain) must notify that payment obligation as aid (Article 108(3) TFEU) and then take and adopt all measures to prevent any payment from that state aid until the Commission has decided on the compatibility of that payment obligation with the internal market. This may include filing claims in national courts to prevent the beneficiary from disposing of the benefit granted in any payment from that notified aid[51]. In this case, Spain has provisionally filed such a claim without there being an actual payment from aid (which follows from the arbitration award as discussed in the aforementioned settled case law of the CJEU and the General Court of the EU. It is plausible that this interpretation of EU law in that cited settled case law of the CJEU also applies under the circumstances of this case. AES and AEF also did not provide any arguments from which it can be inferred that this settled case law does not apply to the claims in these proceedings.

7.52.    Therefore, claims VII and VIII in these proceedings are claims based on Spain's obligations under EU law (including the principle of loyalty under Article 4(3) TEU), even though there is currently no actual impoverishment of Spain. All defenses of AES and AEF about non-existing claims are therefore dismissed.

7.53.    All other defenses of AES and AEF cannot lead to the dismissal of claims VII and VIII. The amount currently unknown is not a reason to dismiss claims VII and VIII. The fact that AES and AEF would have received a lower amount from Blasket as purchase price for the title from the arbitration award than the amounts to which Spain was ordered, is irrelevant in the legal relationship between on the one hand Spain, and on the other hand AES and AEF. Furthermore, the claims were also filed under the condition that the Commission has not yet decided on the compatibility with the internal market of the arbitration award. AES and AEF rightly argued that the Commission may also decide that the arbitration award is partly compatible with the internal market and therefore partly incompatible. Based on that (future) decision, the maximum amount to be reimbursed can be estimated by AES and AEF. This does not currently prevent the granting of Spain's claims, as AES and AEF have argued. These are relevant factors in the decision which claim (primary, alternatively or more alternatively) is assigned and under which conditions.

7.54.    AES and AEF's argument about the unclear size of the amount claimed gives reason to grant subsidiary claims VII and VIII (i.e., payment of the amount that Spain must pay to Blasket or its successor in title in the event of successful enforcement in the U.S. or anywhere else in the world), while including an additional (not claimed) condition in case the Commission finds Spain's payment obligation from the arbitration award partially compatible with the internal market.

---

[51] *Eesti Pagar,* ECLI:EU:C:2019:172, paragraph 92.

7.54.1.    Spain's primary claims VII and VIII cannot be granted because they claim the amount included in the arbitration award. Spain is not yet impoverished by that amount. Spain is not willing to pay the arbitration award voluntarily. Therefore, impoverishment of Spain will only take place if Blasket (or its possible legal successor) successfully enforces the arbitration award in the US (or anywhere in the world), insofar as assets are recovered at the expense of Spain. In this judgment, hereafter "payment by Spain" should therefore be understood to mean the situation that leads to an enforcement measure against Spain to extract assets of Spain.

7.55.    The granting of claims VII and VIII will include the condition *'as long as the Commission has not declared Spain's payment obligation under the arbitration award fully or partially compatible with the internal market'.* Such a condition can be attached to granting sentences in a Dutch judgment and satisfies the requirement that national courts must take all measures for the purpose of enforcing the standstill obligation.

7.56.    Furthermore, a condition will be added that the amount to be paid by AES and AEF to Spain cannot exceed the amount of Spain's payment obligation from the arbitration award that is in the end declared incompatible by the Commission. These may be the entire amounts set out in the arbitration award, but it also cannot be ruled out that the Commission considers some of those amounts in the arbitration award to be compatible with the internal market, as AES and AEF have rightly argued. In that case, after all, Spain would then receive more from AES and AEF than was unlawfully paid in aid. The EU law on recovery of unlawfully granted aid does not provide such a reason.

7.57.    Here it also applies what was considered in 7.47 about the phrase *"based on Article 107(3) TFEU"* in claims VII and VIII. Regardless of the basis on which the arbitration award is declared compatible with the internal market, its compatibility does not constitute unlawful state aid and Spain does not have a right of recovery of any payments under the arbitration award. This phrase is therefore not included in the granting of claims VII and VIII.

*Interest on the amount to be repaid to Spain (Claims IX and X)*

7.58.    Claims IX and X concern the increase with interest on the total amount that Spain may have to pay by the enforcement of the arbitration award (currently to Blasket who wishes to enforce the arbitration award in the US), as was previously decided on claims VII and VIII. Such a claim can be granted. The question is which interest rate should be applied.

7.59.    Spain stated in the change of claim of August 16, 2023 that the statutory interest can be granted on this and referred to *"OJEU 2015, L 248/9"* in support. The Procedural Regulation was published under that number. However, Spain has not changed the claims on the interest even though it states that the Dutch statutory interest applies. AES and AEF did not conduct a substantive defense about what interest should be applied.

7.60.    Contrary to what Spain has argued, the Procedural Regulation does not apply in this case. Article 16 of that Regulation shall apply in the event of a recovery of unlawfully disbursed state aid once the Commission has taken a recovery decision. This is an issue in this case.

7.61.    Claims VII and VIII against AES and AEF are a conditional recovery of state aid without a Commission recovery decision. For these cases, the Communication 2021/C 305 applies. This Notice states that the granted principal amount must be increased with the so-called unlawful interest[52]. In this way, the benefit granted is undone, according to Communication 2021/C 305.

7.62.    The national court must grant an unlawful interest rate in accordance with the applicable requirements of national law, provided that
    1)    those rules respect the principle of equivalence and the principle of effectiveness (as defined in Section 2.2 of the 2021/C 305 Notice); and
    2)    the unlawful interest should be calculated at an interest rate at least equal to that which would have been applied if the beneficiary had had to borrow the amount of that aid on the market during that period[53].

7.63.    The Dutch statutory interest as referred to in Article 6:119 DCC meets the conditions that have been imposed on the aforementioned unlawful interest.

7.63.1.    This interest applies to all legal obligations to pay sums of money and is not less favorable than what applies to Dutch situations. Nor does the application of the statutory interest make the exercise of EU law impossible or extremely difficult[54]. The statutory interest from Article 6:119 DCC therefore complies with the principle of equivalence and effectiveness as referred to in paragraph 81 of Communication 2021/C 305.

7.63.2.    The legal interest rate is the rate at which the creditor should have taken replacement money elsewhere[55]. This can also be applied in this case to the benefit granted to AES and AEF in the arbitration award: after all, they should have paid the interest in force on the market if they should have borrowed the amounts granted to them in the arbitration award.

7.63.3.    The statutory interest is determined on the basis of a reference interest rate. Since 2002, this has been the European Central Bank's refinancing room mentioned in Article 6:120(2) DCC, increased by 2 1⁄4 process points[56]. In 2024, this interest rate was set at 7% and as of January 1, 2025 at 6%[57]. This is a higher interest rate than is currently customary in the money market. With this, the statutory interest meets the second condition from paragraph 81, Communication 2021/C 305: at least equal to the interest on the market. Since Spain has not provided any details on the amount of interest on the 10-year Spanish government bond 2014 it has claimed - and therefore it cannot be determined whether it fulfills the aforementioned conditions - legal interest will be granted instead.

---

[52] Communication 2021/C 305, paragraph 77.
[53] Communication 2021/C 305, paragraph 81.
[54] Communication 2021/C 305, paragraph 20.
[55] Statement of Defense II, Parl. Hist. DCC Book 6 1981, p. 473
[56] Additional Explanatory Note, Decision July 3, 2003, Official Gazette 2003, 280.
[57] Official Gazette 2023, 484 and Official Gazette 2024, 395.

7.64.    Interest on the principal sum awarded can take effect only when Spain actually makes a payment to the party that can actually enforce the arbitration award, anywhere in the world (currently Blasket in the U.S.), in respect of the title obtained by AES and AEF with the arbitration award. AES and AEF shall be given a reasonable period of five days after a written claim from Spain on the amounts before the interest will become due.

*Costs of these proceedings*

7.65.    AES and AEF were largely unsuccessful so they were ordered to pay Spain's legal costs. The granted claims are rulings and otherwise monetary claims granted with conditions. Under these circumstances, for the purposes of the order for costs in this case, the costs on Spain's side are estimated using the indeterminate value rates. For the liquidation rate, 3 (three) points are budgeted: the summons, the claim amendments and the oral hearing. The costs on the part of Spain eligible for reimbursement by AES and AEF are estimated at:

| | | | |
|---|---|---|---|
| - writ costs | € | 206.66 | (two writs) |
| - court clerk fee | | 676.00 | |
| - attorney's salary | | 1,842.00 | (three points) |
| - additional costs | | 178.00 | (plus increase as stated in the decision) |
| Total | € | 2,902.66 | |

7.66.    The Commission is not a litigant and is involved in these proceedings on its own initiative. Nothing indicates that the Commission's costs should be reimbursed by any of the litigants in a proceeding. Under these circumstances, the Commission should bear its own legal costs.

*Enforceable notwithstanding any remedy*

7.67.    AES and AEF requested that an award in this judgment not be declared provisionally enforceable. They are worried that Spain will not comply with any refund decision on appeal. This is a refund risk. The requested enforceable order should therefore be rejected or be made conditional on the provision of security in the event a refund claim were to arise, AES and AEF said.

7.68.    Under Article 233(1) Dutch Code of Civil Procedure, the court may, if so requested, declare a judgment to be provisionally enforceable. The plaintiff - in the absence of a defense on this point - does not have to substantiate this separately. If a defense is raised on this, the interests of the parties must be weighed in light of the circumstances of the case. It must be verified whether, based on those circumstances, for example in connection with the urgency of complying with the judgment, the interest of the person obtaining the judgment outweighs the interest of the opposing party in maintaining the existing situation until a decision will be made on an appeal (if any).

7.69.    The requested declaration of enforceability can be rejected only under special circumstances - which AES and AEF must state. Such a circumstance is the refund risk of (in this case) Spain. AES and AEF have argued that this refund risk is present because Spain does not appear to be complying with rulings to pay - at least as far as the dispute over the changes to the 2007 scheme that are set out as aid measures in the 2014 scheme is concerned.

7.70.    It does not follow from this argument by AES and AEF that Spain is, or will be, unable to repay AES and AEF the amounts paid to it pursuant to this judgment in the event of a contrary judgment on appeal. Essentially, AES and AEF's argument is that they may have difficulty recovering claims against Spain (to repay what AES and AEF have paid under this judgment). Because this does not yet involve a concrete refund risk, the court sees no reason to follow the defense of AES and AEF and not to declare the judgment provisionally enforceable or to attach conditions to this[58].

7.71.    Furthermore, Spain has a compelling interest in having this judgment declared provisionally enforceable. Spain should, after all, implement the obligations laid down in Article 108(3) TFEU and the national court is obliged to take all measures appropriate to ensure compliance with EU law[59]. This is not possible if this judgment is not provisionally enforceable and the arbitration award can be successfully enforced in a state that is not a member of the EU.

7.72.    Also relevant here is that the claims for payment of a sum of money are granted under two conditions, i.e. that the enforcement of the arbitration award results in a payment by Spain and that the Commission has not yet decided on the compatibility with the internal market of Spain's payment obligation from the arbitration award. It is not foreseeable that these conditions will be met in the near future, so that during any appeal of this judgment by AES and AEF that may be filed, there will not yet be any fulfillment of those conditions.

7.73.    The granted judgments of AES and AEF are therefore declared provisionally enforceable.

---

[58] Compare Supreme Court, June 17, 1994, ECLI:NL:HR:1994:ZC1400 and Supreme Court, May 2, 2003, ECLI:NL:HR:2003:AF5892.
[59] Communication 2021/C 305, paragraph 18 and CJEU judgments of March 21, 1991, Italy v Commission (*Lanerossi*), Case C-303/88, ECLI:EU:C:1991:136, paragraphs 52 and 60; CJEU October 17, 2013, Commission v Greece (*Ellinikos Xrysos*), Case C-263/12, ECLI:EU:C:2013:673, paragraph 36.

## 8.    Ruling

The Court

8.1.    Rules that the compensation awarded by the PCA in the arbitration award of February 28, 2020, constitutes state aid within the meaning of Article 107(1) TFEU, and leads to unlawful support as long as the European Commission has not declared the Arbitration Ruling compatible with the internal market;

8.2.    Rules that the collection of the damages awarded by the PCA in the arbitration award of February 28, 2020 is in violation of European EU law, as long as the European Commission has not declared that arbitration award compatible with the internal market;

8.3.    Rules that a payment made by Spain to Blasket or any other party by virtue of the damages awarded to AES and AEF by the PCA in the arbitration award of February 28, 2020, constitutes an unlawful state aid measure in favor of AES and AEF as long as the European Commission has not declared the arbitration award compatible with the internal market;

8.4.    Orders AES to pay to Spain the amount that Spain must pay to Blasket or its successor in title in the event of an enforcement of the February 28, 2020 arbitration award with respect to AES, so long as the Commission has not declared the damages awarded to AES in that arbitration award to be compatible in whole or in part;

8.5.    Orders AEF to pay to Spain the amount that Spain must pay to Blasket or its successor in title in the event of an enforcement of the February 28, 2020 arbitration award with respect to AEF, so long as the Commission has not declared the damages awarded to AEF in that arbitration award to be compatible in whole or in part;

8.6.    Stipulates that if the Commission has decided on the compatibility with the internal market of the damages awarded to AES and AEF in the February 28, 2020 arbitration award, the amount to be paid by AES and AEF to Spain will be limited to that part of the damages awarded to AES and to AEF in the February 28, 2020 arbitration award that the Commission considers incompatible with the internal market;

8.7.    Orders AES to pay the statutory interest referred to in Article 6:119 DCC on the amount awarded pursuant to 8.4 and 8.6 from 5 (five) days after Spain wrote to AES requesting payment, until the day of payment;

8.8.    Orders AEF to pay the statutory interest referred to in Article 6:119 DCC on the amount awarded pursuant to sections 8.5 and 8.6 from 5 (five) days after Spain wrote to AEF requesting payment, until the day of payment;

8.9.    Orders AES and AEF to pay the costs of the proceedings, estimated to date at €2,902.66 on the part of Spain, to be increased by the sum of €92.00 for attorney's fees and the costs of the writ of summons should AES and AEF fail to comply with this judgment within 14 days of notification of this judgment and should the judgment be served,

8.10.    Stipulates that the Commission shall bear its own costs,

8.11.    Declares what has been ruled in sections 8.4 to 8.9 provisionally enforceable;

8.12.    Dismisses more claims or claims made otherwise.

This judgment was rendered by mr. C.M.E. de Koning, mr. R.H.C. Jongeneel and mr. M.Z.B. Sterk, judge, assisted by mr. R.E.R. Verloo, Registrar, and pronounced in public on February 5, 2025.


[signature]                                              [signature]




[stamp:] FOR COPY IN ACCORDANCE WITH The Registrar of the District Court of Amsterdam [signature]



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**vonnis HA ZA 23-64**" is, to the best of my knowledge and belief, a true and accurate translation from Dutch into English.

_____
Jacqueline Yorke

Sworn to before me this
February 20, 2025

_____
Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20_27_

_____
Stamp, Notary Public