# EXHIBIT 6

1            UNITED STATES COURT OF APPEALS
           FOR THE DISTRICT OF COLUMBIA CIRCUIT
2

3   NEXTERA ENERGY GLOBAL
    HOLDINGS B.V. AND NEXTERA
4   ENERGY SPAIN HOLDINGS V.B.,

5        Appellant,
                                No. 23-7031
6
    V.
7
    KINGDOM OF SPAIN,
8
         Appellee,
9
    And
10
    9REN HOLDING S.A.R.L.,
11
         Appellant,           No. 23-7032
12
    v.
13
    KINGDOM OF SPAIN,
14
         Appellant.
15  _____
                                Wednesday, February 28, 2024
16                              Washington, D.C.

17       The above-entitled matters came on for oral argument
    pursuant to notice.
18
         BEFORE:
19
             CIRCUIT JUDGES PILLARD AND PAN, AND SENIOR CIRCUIT
20           JUDGE ROGERS

21       APPEARANCES:

22           ON BEHALF OF THE APPELLANT:
             Sarah M. Harris, Esq.
23
             ON BEHALF OF THE APPELLEE:
24           Shay Dvoretzky, Esq.

25



2

1          <u>ON BEHALF OF THE EUROPEAN COMMISSION</u>:
           Sally L. Pei, Esq.
2
           <u>ON BEHALF OF THE UNITED STATES OF AMERICA</u>:
3          Sharon Swingle, DOJ

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            C O N T E N T S

2    ORAL ARGUMENT OF:                              PAGE

3    SARAH M. HARRIS, ESQ.                          4, 105
     On behalf of the Appellant
4
     SALLY L. PEI, ESQ.                             41
5    On behalf of the European Commission

6    SHARON SWINGLE, ESQ.                           55
     On behalf of the United States of America
7
     SHAY DVORETZKY, ESQ.                           73
8    On behalf of the Appellees

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

escribers

www.escribers.net | 800-257-0885

4

<u>P R O C E E D I N G S</u>

1

2      THE CLERK:  Case number 23-7031, NextEra Energy Global

3 Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom

4 of Spain, Appellant, and case number 23-7032, 9REN Holding

5 S.A.R.L. v. Kingdom of Spain, Appellants.  Ms. Harris for the

6 appellant, Kingdom of Spain; Ms. Pei, amicus curiae for the

7 European Commission; Ms. Swingle, amicus curiae for the United

8 States of America; Mr. Dvoretzky for the appellees, NextEra

9 Energy Global Holdings, et al. and 9REN Holding S.A.R.L.

10      JUDGE PILLARD:  Good morning, Ms. Harris.

11           ORAL ARGUMENT OF SARAH M. HARRIS, ESQ.

12              ON BEHALF OF THE APPELLANT

13      MS. HARRIS:  Good morning.  Thank you, and may it

14 please the court.  Sarah Harris for the Kingdom of Spain.  The

15 Foreign Sovereign Immunities Act bars jurisdiction over Spain.

16 First, the arbitration exception doesn't apply.  That exception

17 requires federal courts to confirm for themselves that an

18 arbitration agreement exists.  None exist here.

19      EU law is paramount international law for EU members,

20 like Spain, and EU nationals, like the investors.  EU law has

21 always deprived EU members of any power to agree to resolve

22 intra-EU disputes outside the EU system, including through

23 arbitration.

24      Second, the waiver exception doesn't apply.  Foreign

25 sovereigns don't implicitly waive their immunity just by



1  ratifying arbitration treaties.  Foreign sovereigns must also

2  agree to arbitrate with particular parties.

3          And third, the investor's position will offend settled

4  international law and make the U.S. a haven for suits that an

5  investor's home countries forbid.  The settled rule is that

6  when the EU itself ratifies a treaty, as here, the EU controls

7  intra-EU relations and the treaty doesn't supplant EU law.

8          JUDGE PILLARD:  Ms. Harris, you mentioned that the EU

9  and the member states ratified the treaty, and under the

10  Foreign Sovereign Immunities Act, we look not only to whether

11  the nation state has -- under the arbitration exception,

12  whether the nation state has agreed with the counterparty, but

13  whether it's entered an agreement for the benefit of other

14  parties.  And here, I take it you don't dispute that the EU in

15  Spain entered into an agreement for the benefit of the

16  investors.

17          MS. HARRIS:  We dispute that the relevant agreement, I

18  guess, is the Energy Charter Treaty, so we think that the

19  agreement here is a very specific one, to the extent one exists

20  at all.  It would be between Spain and the individual investors

21  and --

22          JUDGE PILLARD:  But what do we make of -- I mean,

23  we're interpreting the Foreign Sovereignty Act, and for

24  purposes of this question, the arbitration exception, is your

25  position that the parties then who have to submit their dispute



1    to arbitration have to be the same parties who entered the

2    agreement for the benefit of others?

3          MS. HARRIS:  Our position is there's only one

4    arbitration agreement here because the Energy Charter Treaty

5    itself seems to recognize that.  And --

6          JUDGE PILLARD:  Well, the court in the BG Group and

7    the chief justices as well, talk about, just sort of the

8    relationship between two agreements.  An agreement to settle

9    disputes by arbitration, that could be the treaty, and the

10   agreement creating a standing offer for investors.

11         MS. HARRIS:  That's true, but I think the relevant

12   precedence here would be the later Supreme Court decision in ZF

13   Automotive, which discusses the type of investment treaty we

14   have here, as well as the Olin decision from the Second

15   Circuit, which is serving this, and looking at the Energy

16   Charter Treaty itself.  So if you look at Article 26(5) in

17   particular, I don't think you can construe sort of whatever

18   background is going on with members states or not as the

19   relevant arbitration agreement because Article 26(5) recognizes

20   that to have the type of arbitration agreement required under

21   both ICSID and the New York Convention, you need both consent

22   given by the sovereign, together with the written consent of

23   the investor.  And those two things together are what would

24   satisfy the requirements under ICSID and the New York

25   Convention.



1          JUDGE PILLARD:  So why does the ECT not satisfy that

2    test?

3          MS. HARRIS:  These -- well, here we don't think that

4    there is any -- Spain does not have the power to agree to

5    arbitrate with these investors from European countries, and so

6    the missing ingredient here is the consent given by Spain, and

7    the words of the European Court of Justice --

8          JUDGE PILLARD:  But the ECT contains an unconditional

9    agreement to arbitrate, and Spain signed that, and we have held

10   in, at least two cases, Chevron and Stileks, that this type of

11   agreement in a treaty, married with a request for the

12   arbitration, consistent with what the treaty requires, is

13   sufficient to confer jurisdiction, at least on a prima facie

14   level.

15         MS. HARRIS:  So two issues with that.  First of all,

16   the -- I think there's a preliminary question, which is what

17   law governs whether Spain actually consented in the Energy

18   Charter Treaty or not.  And given that this is a dispute

19   between an EU member and EU parties, the primary law governing

20   their relationship is and always has been EU law.

21         JUDGE PILLARD:  I guess the question is, why is not

22   your position just a question of arbitrability as opposed to a

23   question about jurisdictional facts?  Because it seems that if

24   we're just looking at jurisdictional facts, we have precedence

25   addressing the ECT, specifically in Stileks, and a similar



8

1    agreement in Chevron, which said that while you need to show is

2    a treaty like this, and a request to arbitrate from the

3    investor, and an arbitral award, we have that here, and if you

4    have other arguments as to why this doesn't apply, why isn't

5    that just a question of arbitrability, which is not about

6    jurisdiction?

7         MS. HARRIS:  Two reasons.  And first of all, is this

8    court's other precedence, which seemed to clearly establish

9    that whether a party has the power to agree to arbitrate is a

10   question of whether an agreement formed, which is always for

11   this courts to decide de novo under the Foreign Sovereignty

12   Immunities Act.  And --

13        JUDGE PAN:  Can I -- which precedence are you

14   principally relying?

15        MS. HARRIS:  Both --

16        JUDGE PAN:  The FAIA precedence?

17        MS. HARRIS:  No, I'm particularly relying in the

18   Foreign Sovereign Immunities context on Belize and Micula, but

19   I also can talk about FAIA cases because those also confirm the

20   point.

21        And just to walk through the Belize decision.  If it

22   were true that all you had to do was take a quick look at

23   whether there is an investment treaty, whether there is a

24   purported agreement, that case would be inexplicable because

25   this court said, no, there has to be a further look at whether



1    Belize's prime minister actually had the authority to agree to

2    arbitrate.  This court --

3           JUDGE PILLARD:  Can I ask you a question.  It seems to

4    me that you've conceded that the language in the ECT, the ECT

5    itself, does create an agreement to arbitrate with non-EU

6    signatories to the ECT; is that correct?

7           MS. HARRIS:  That is correct.  And that is no

8    different -- but we don't think that that means it's

9    necessarily a question of arbitrability.

10          JUDGE PILLARD:  No.  Well, I guess my question is,

11   it's the exact same language that creates an agreement to

12   arbitrate with non-EU countries, and there's no carve out in

13   the ECT for intra-EU disputes.  So it's the exact same

14   language.  It does create an agreement for non-EU countries but

15   it does not for inter-EU countries?  It's the same language.

16          MS. HARRIS:  So two points on that.  I just -- first

17   of all, if you're looking at the ETC itself, we disagree with

18   that reading because -- and I would first point you to Article

19   1(3) of the ECT, which expressly recognizes that economic

20   integration organizations like the EU have primacy and control

21   relations between EU members, and that provision says that --

22          JUDGE PILLARD:  I'm sorry, what was the number of that

23   again?

24          MS. HARRIS:  1(3).  Article 1(3).  And it says that an

25   organization constituted by states to it is -- to which they



```
 1    have transferred competence, i.e. sovereignty, over certain

 2    matters, a number of which are governed by this treaty,

 3    including the authority to take decisions binding on them with

 4    respect to those matters.  So even if --

 5              JUDGE PILLARD:  Is your position any different from

 6    what it would be had all the current members of the EU been

 7    members in the EU only on its own behalf had joined the ECT?

 8              MS. HARRIS:  I don't think so.  The reason why the EU

 9    joins alongside members is usually there are issues of sort of

10    shared competence in a treaty, and this one, again, is an

11    expressed recognition that the EU is going to have primacy in

12    certain regards.  So it's not --

13              JUDGE PILLARD:  So your answer to my question was that

14    your position is the same as it would be if the individual

15    members states had not joined but only the ECT had joined?

16    That --

17              MS. HARRIS:  Only the EU.

18              JUDGE PILLARD:  I'm sorry --

19              MS. HARRIS:  Sure.

20              JUDGE PILLARD:  -- only the EU.  Thank you.

21              MS. HARRIS:  Yes.  And the reason is, when the EU

22    joins a treaty, it sort of market -- it's demarcating with

23    respect to individual members that there are matters within the

24    exclusive competence of the European Union between the members.

25    That is how 28 signatories unanimously understand the Energy
```

1    Charter Treaty.  That is how signatories across the world

2    understand other treaties, like the World Trade Agreement in

3    1995.

4            JUDGE PILLARD:  You mentioned the Belize case, but

5    Belize case doesn't really get you out of the questions, I

6    think, that Judge Pan and I were asking where you have a

7    background treaty that under which the parties have agreed to

8    arbitrate with respect to third parties.  That was just a

9    bilateral situation.  You're talking about the competence of

10   the chain.

11           MS. HARRIS:  Sure.  And two responses on that.

12   Micula, I think, is very squarely on all fours, albeit, an

13   unpublished decision.  This court is saying in Micula that it

14   is a jurisdictional question whether the bar on intra-EU

15   arbitration precluded Romania from entering into an agreement.

16           And just more broadly, the idea that there is a

17   distinction between bilateral treaties and an international

18   agreement respectfully puts the cart before the horse.  The

19   question in the first instance is did Spain, could Spain

20   consent to take certain types of disputes outside the EU

21   system?  Did the parties to the Energy Charter Treaty

22   understand that Spain and any other EU members were doing this?

23   And any way you look at it, and under any sort of choice of law

24   principle, either because you -- like, you agree that when EU

25   members and nationals are doing anything, the primary law

1    governing their relationship is EU law.  Or because under the

2    Energy Charter Treaty itself, the EU joining, Article 1(3), the

3    other principles in Article 26(6) recognized that EU law has a

4    significant role to play and cannot allow --

5         JUDGE PILLARD:  So shouldn't the EU and Spain just

6    withdraw from the ECT if that's the case?  Because they have

7    signed an agreement that unconditionally agrees to arbitrate

8    and now they're saying we can't sign that agreement.  The EU

9    and Spain are still benefiting from the ECT, their nationals

10   can arbitrate against non-EU countries and have all of these

11   benefits and -- but you're saying that they don't have to sort

12   of pay the price.  And it seems to me that if they have a

13   problem and there's a conflict between the ECT and EU law, then

14   they need to resolve it themselves, not through coming to court

15   like this, but just withdrawing from the ECT, which in no

16   uncertain terms says, there's an unconditional agreement to

17   arbitrate.

18        MS. HARRIS:  But respectfully, that would contravene

19   the way every signatory to the ECT that has ever weighed in on

20   this issue understands the treaty.  So it will be really

21   strange to force signatories just to withdraw --

22        JUDGE PILLARD:  I'm sorry, what do you mean?  What do

23   you think everybody's agreeing to?  Because I think there's a

24   dispute here as to whether you can arbitrate or not.

25        MS. HARRIS:  There is certainly a dispute with the



1    investors, but among signatories to the Energy Charter Treaty,

2    28 of them -- and no one has said otherwise, everyone

3    interprets that treaty to mean that Spain and other EU members

4    never agreed to arbitrate in the EU system.  And that's not a

5    surprise given the backdrop of the treaty.  The idea of even

6    having intra-EU arbitration was unheard of until the mid-2000s.

7    And whenever it cropped up -- it started cropping up then,

8    European Court of Justice immediately made clear in the Ireland

9    decision --

10           JUDGE PILLARD:  I want to go back to what you said

11   before because we have an amicus brief from International

12   Scholars, and they note that when the ECT was being negotiated

13   and drafted, there was a suggestion that we have a

14   disconnection clause, which is something that would carve out

15   intra-EU disputes, and they chose not to do that.  It was

16   actually considered and not done.  But the EU did carve out

17   this Svalbard Treaty concerning an archipelago in the Arctic,

18   but you never carved intra-EU disputes.  And the plain language

19   of the ECT says that you're unconditionally agreeing to

20   arbitrate these disputes even among the European countries.

21   And what you pointed to me before, Article 1(3), is just a

22   definition section.  It's not a disconnection clause.

23           MS. HARRIS:  So a few responses.  First of all, the EU

24   offered the disconnection clause only if necessary, and it is

25   superfluous because when the EU itself joins a treaty, the EU



1    is making the treaty part of EU law.  Now, Article 1(3), of

2    course, is a definitional section, but it's still highly

3    significant that the definition of the EU is as an organization

4    to which state (indiscernible) competence and that the EU can

5    take binding decisions with respect to matters within the

6    treaty.  So it is defining what the EU does but it's saying

7    that matters governed by the treaty -- matters governed by the

8    treaty are subject to the EU's competence, including the power

9    to take those decisions.  Svalbard --

10            JUDGE PILLARD:  You're reading a lot into this

11    definition.

12            MS. HARRIS:  Well, I don't --

13            JUDGE PILLARD:  It does not say that.  I'm looking at

14    it right now.

15            MS. HARRIS:  Respectfully, I don't have to just rely

16    on Article 1(3).  I am also relying on the significance of the

17    EU joining a treaty.  This is no different from the WTO

18    agreement from 1995.  There also was a disconnection clause

19    proposed for that treaty.  No one has understood the idea that

20    you, you know, propose a disconnection clause only if relevant,

21    to mean that the EU somehow lacks the authority to make EU law

22    on this.  And on the Svalbard issue --

23            JUDGE PILLARD:  I'm sorry.  So are you saying that at

24    the time that they drafted the ECT, everybody understood that

25    it would not apply to intra-EU disputes?



1          MS. HARRIS:  Yes.  I am absolutely saying that.  And

2    not only am I saying that, that is evident from the

3    signatories' understanding of this treaty --

4          JUDGE PILLARD:  But Achmea and Komstroy had not been

5    decided yet.

6          MS. HARRIS:  Yes, but Achmea and Komstroy are applying

7    settled principles that date to 1957 in the EU system.  And so

8    it is not just the case that these were principles that were

9    only discovered in 2018 or later, they are principles that have

10   undergutted the entire EU system since its formation.  Article

11   344, the treaty on the function of the EU sets out in very

12   plain language that member states who join the EU no longer can

13   refer to disputes outside the European system if they're intra-

14   EU disputes.  It is not allowed to do so.  By --

15         JUDGE PAN:  What if Switzerland and the United States

16   had a treaty that predated the ECT and that incorporated sort

17   of -- First Options v. Kaplan, your idea about verifying the

18   existence in advance of -- of the -- the validity of the

19   arbitration agreement in advance, and then they claimed that

20   the ECT, even though they're signatories and ICSID, even though

21   they're signatories, are subject to a different jurisdictional

22   inquiry than the inquiry that one would ordinarily make in an

23   ICSID case, applying the ECT.  That's also international law;

24   is it not?

25         MS. HARRIS:  So that would be international law.  I



1    think the question is -- we're all in the same world, I think,

2    of deciding which conflict principles apply.  And we have three

3    options that have been on the table from both sides, under both

4    of which under which we win.  The first of which is that

5    European law is the primary law governing relations between EU

6    members.  That's what everyone expects, investors, nationals,

7    members alike.  Second of all is the general principle that the

8    specific governs the general.  The EU treaties are themselves

9    international law and are the most specific rules governing the

10   capacity or power of EU members.

11           JUDGE PILLARD:  You're saying that general law is more

12   specific than the ECT that contains an explicit agreement and

13   consent to arbitrate?  How is --

14           MS. HARRIS:  Yes.

15           JUDGE PILLARD:  -- that more specific than the ECT?

16           MS. HARRIS:  Because the ECT is silent with respect to

17   power to agree to things.  And not only is the -- again, ECT

18   itself is internally conflicting, but does not have a rule

19   saying, you know, this is the rule for capacity or power to --

20           JUDGE PAN:  So does your position boil down to Spain

21   signed the ECT, believing it could agree to this unconditional

22   arbitration agreement, but they were wrong?  They weren't able

23   to sign that?

24           MS. HARRIS:  Absolutely not.  What we are saying is

25   Spain and everyone else, again, all 28 signatories

1    unanimously -- who have weighed in unanimously saying this;

2    that when an EU member, such as Spain or anyone else, signs the

3    ECT, especially when you have the EU joining, what it is

4    agreeing to is arbitrating with non-EU members.  And so that is

5    what it's agreeing to.  It is not --

6         JUDGE PILLARD:  Why wouldn't you just say that in the

7    treaty then?  Because it says the complete opposite in the

8    plain words of the treaty.

9         MS. HARRIS:  Respectfully --

10         JUDGE PILLARD:  Because every signatory -- or every

11    contracting party is agreeing to an unconditional arbitration.

12         MS. HARRIS:  And you could say the same thing for the

13    UN Convention on the lawlessly in the WTO agreements.  And the

14    understanding at the time is that when the EU itself joins a

15    treaty alongside members, there is no power to sort of say, oh

16    you know, we thought that this meant to supersede primary EU

17    law that governs these relationships.  It is clear to everyone,

18    and again, I can't emphasize enough, how unusual it would be

19    for a court to sort of say that all signatories who have

20    weighed in just got this totally wrong.  They have been

21    operating under this understanding --

22         JUDGE PAN:  But your position relies on this sort of

23    fiction that at the time, they assumed they knew what Komstroy

24    and Achmea were going to decide.

25         MS. HARRIS:  So respectfully, not it doesn't rely on



1    that fiction.  It relies on the understanding that when the EU

2    members formed the European Union in 1957, and agreed to a

3    provision that put off limits, any sort of dispute resolution

4    that did not let the European Court of Justice have primary

5    decision-making responsibility, that was not allowed.  They

6    gave up that power.  And --

7              JUDGE ROGERS:  Let me ask you a question --

8              JUDGE PILLARD:  Let's -- yeah, let's --

9              JUDGE ROGERS:  -- then about arbitration because

10   that's what we're focusing on here.  When the EU signed the ETC

11   (sic), it knew that arbitration was different than litigation,

12   so that parties could agree to arbitrate a matter where they

13   would reach an agreement through the arbitration process that

14   would not be appealable, would be bound by it, but they had a

15   choice of going that route or litigating.  So why do we read

16   this treaty in a manner that assumes that the EU did not know

17   what commercial arbitration was?

18             MS. HARRIS:  Respectfully, I don't think it's a matter

19   of reading the treaty as if the EU doesn't understand

20   arbitration.

21             JUDGE ROGERS:  Well, what did it mean by arbitration?

22   Commercial arbitration then?  In the understanding that one of

23   the reasons post-World War II arbitration was so desirable,

24   what you could avoid the costs and delay of litigation.  And

25   surely the EU and its leaders were sophisticated enough to



1    realize that.  All I'm getting at is, if it joins a treaty

2    where it embraces the understanding of a term in a commercial

3    field, how can it come back years later and say, oh that's not

4    what we meant.  I'm just trying to understand where your

5    argument goes --

6              MS. HARRIS:  Yes.  And our argument is --

7              JUDGE ROGERS:  -- (indiscernible) discuss that

8    arbitration, commercial arbitration at least, among parties was

9    not a matter that --

10             MS. HARRIS:  Yes, it --

11             JUDGE ROGERS:  -- came through the court system or the

12   legislative system on an individual basis.

13             MS. HARRIS:  And what the EU agreed to and what the

14   member states agreed to is arbitration vis-a-vis non-EU

15   members.  It sort of begs the question, what -- who are they

16   agreeing with.  It's sort of as if states --

17             JUDGE ROGERS:  Well, they are sophisticated party.

18   They knew who they're agreeing with.  They know they're

19   agreeing with sovereigns who are part of the EU.  Not only an

20   agreement as to countries that are not part of the EU.  I mean,

21   you're asking us to assume, and you may be correct but I just

22   want to be clear about it, that there was either a bit of

23   naivety or ignorance on the part of the EU when it agreed by

24   signing a treaty that enabled independent commercial

25   arbitration.



1              MS. HARRIS:  So respectfully, I think this is like the

2    UN Convention on the Law of the Sea, where it is not naivety or

3    lack of sophistication going on, it is the understanding that

4    when the EU itself joins a treaty, it is taking intra-EU

5    matters off the table.  So the agreement is absolutely between

6    the EU members and people outside the EU.  But there is no

7    agreement to arbitrate things within EU members.

8              JUDGE PILLARD:  I have one question --

9              JUDGE ROGERS:  So when Judge Pillard asked you what

10   authorities you were relying on, you gave her two cases from

11   our court, and you dismissed the Supreme Court <u>BG</u> authority,

12   and of course we can go through those cases and point out how

13   they're factually different.  That's why I thought Judge Pan's

14   question about trying to understand what's going on, when the

15   EU signs a treaty that calls for commercial arbitration as an

16   option.

17             MS. HARRIS:  Yes.  And what goes on -- and again, this

18   is the way that treaties have been understood.  Similar

19   treaties too.  And so it would really upend the way these

20   treaties have been read by all the signatories to say suddenly

21   this is not the case.  But when the EU signs a treaty, is

22   fencing off intra-EU relations.  And that's not just sort of me

23   saying it, it's also the European Court of Justice repeatedly

24   saying this, including --

25             JUDGE PILLARD:  But why did -- why did all the



1    individual members of the EU separately sign the treaty?  If

2    you had -- if only the EU had signed it, your position would

3    make a lot more sense.

4        MS. HARRIS:  The reason is, and I think, again,

5    Article 1(3) recognizes, that some of the matters in the treaty

6    are exclusive competence of the European Union.  Others at the

7    time were not.  And so that is the practice of the European

8    Union.  If they are sort of shared matters, the EU signs and

9    also the individual members.  But the key thing is the EU

10   signing and recognizing that with respect to external matters,

11   that is what happened.  And that --

12       JUDGE PAN:  You talk about throughout your briefing

13   and your argument that the implications of Komstroy and Achmea

14   are that Spain lacks the capacity, but that is not how those

15   decisions read.  Komstroy talks about as a matter of EU law,

16   the ECT's arbitration provision has to be interpreted as not

17   being applicable to disputes between a member state and an

18   investor of another member state.  It goes more to whether

19   Spain did enter an agreement as opposed to whether it could.

20   And so is there anything you can point me to in those

21   decisions, the EU Court of Justice decisions, that point to

22   this capacity argument?

23       MS. HARRIS:  Yes.  First of all, when Komstroy says

24   that the ECT arbitration provision cannot apply to intra-EU

25   arbitration, it is saying that that lacks force between EU



1    members.  It's not just sort of -- it doesn't (indiscernible)

2    it doesn't exist.  And I think the European Food's decision

3    from the European Court of Justice makes this super clear.

4    It's going over those cases and saying that the consent, quote,

5    lacks force, which is sort of the typical language you would

6    expect if it was a lack of power, lack of authority argument of

7    the type that this court has --

8            JUDGE PILLARD:  Or it can be that it's invalid, which

9    is -- you know, and I understand and appreciate why you're

10   using the capacity arguments.  I think that's your strongest

11   footing in a very tough hurdle against ICSID, and we haven't

12   even talked about the full faith and credit aspect of ICSID,

13   but -- so the logic underlying -- the position is that an

14   international tribunal or an arbitral tribunal can't interpret

15   EU law because it's not part of the EU judicial system, but

16   fundamentally, I don't understand what the threat is to the EU

17   judicial system and the EU courts primacy, in a kind of Marbury

18   v. Madison sense, as interpreters of EU law because arbitration

19   awards are not precedential.  So you end up with -- I mean, the

20   easier position that parties -- private parties can't settle

21   energy disputes within the EU, or private and state parties

22   can't settle disputes based on a misapprehension of EU law?

23           MS. HARRIS:  Our position is what the European Court

24   of Justice said in Komstroy and in previous cases and why this

25   is part of one of the foundational treaties on the EU, which is



1    that the EU members and their nationals really are getting

2    together and so that the European Court of Justice can actually

3    develop this body of law, dispute resolution mechanisms that

4    are outside of that that do not respect the primacy of EU law,

5    undermine the system that is being built in the EU.  They

6    leave -- even when it's an arbitral decision where you sort of

7    say it's just an award, you can decide whether or not to

8    enforce it.  Those are extremely important interpretive

9    questions of treaties that the members of the EU agreed, at

10   least in matters among them, would be subject to the European

11   Court of Justice, and that's --

12           JUDGE PILLARD:  What about settlement?

13           MS. HARRIS:  Settlement with respect -- you have to, I

14   suppose, have a dispute brought --

15           JUDGE PILLARD:  Spain --

16           MS. HARRIS:  -- somewhere in the outset.

17           JUDGE PILLARD:  -- Spain and 9REN and NextEra decide

18   to settle this case and they have ideas in their own minds

19   about EU law and what it means, and they just settle and they

20   don't publish anything.  They talk among themselves.  They are

21   interpreting EU law, they're not -- it sounds like your

22   position is requiring everybody to litigate, which is, as Judge

23   Rogers was asking, like, there is some benefit to having some

24   disputes arbitrated.  So you're saying, no, they cannot be

25   arbitrated, period?



1            MS. HARRIS:  And I'm saying within EU members.  It's

2    not just me saying that; that is the European Court of

3    Justice's position -- longstanding position from 2006, when it

4    said the UN Convention on the Law of the Sea -- which is also a

5    multilateral treaty, you have two EU members who tried to

6    invoke the arbitration provision there -- the Court of Justice

7    says, no, that is taking disputes outside the system.  It is a

8    fundamental affront --

9            JUDGE PAN:  So does this mean that nobody can

10   arbitrate within the EU?  Because what about private parties?

11           MS. HARRIS:  There is -- so Komstroy, at paragraph 65,

12   says that the limits of this risk are respect to EU member and

13   EU nationals.  It's not speaking to private arbitration.

14           JUDGE PAN:  That's the same principle.  The whole idea

15   about arbitration is, parties are agreeing to it, consenting to

16   let this arbitrator just decide this case.  And it saves time,

17   I guess Judge Rogers said, when we're not in litigation.  And

18   we're just going to abide by this.  It's an agreement among the

19   parties.  And it has no precedential value.  It has no

20   precedential affect.  So it doesn't affect the primacy of EU

21   law.  It doesn't affect the EU's interest in making sure the

22   law is consistent.  And if it does, then why is that different

23   from private arbitration --

24           MS. HARRIS:  So --

25           JUDGE PAN:  -- that interprets EU law?



1          MS. HARRIS:  Respectfully, the European Court of

2    Justice truly has said in many, many opinions that even

3    arbitration, if it involves an EU member and an investor or

4    another EU member, really does offend the system because --

5          JUDGE PAN:  I understand.  My question is why?

6          MS. HARRIS:  Yes.  And the why is because as part of

7    forming the EU to develop a coherent body of law and to ensure

8    the EU --

9          JUDGE PAN:  It's nonprecedential, so how is this part

10   of --

11         MS. HARRIS:  Because it's --

12         JUDGE PAN:  -- developing a coherent body of law?

13         MS. HARRIS:  It's taking a dispute that should be

14   developed by the European Court of Justice to of the European

15   Court of Justice --

16         JUDGE PAN:  So you're saying they have to litigate?

17         MS. HARRIS:  We are saying between EU members, that is

18   what people agreed to.  And it does not -- the Komstroy

19   decision, the European Court of Justice has not --

20         JUDGE PAN:  So that means any EU member cannot

21   arbitrate?

22         MS. HARRIS:  And -- between each other, that is --

23         JUDGE PAN:  Never?

24         MS. HARRIS:  So yes, that is -- you cannot do that

25   because it's not an -- unless the arbitral tribunal were



1     allowed to have de novo review by the European Court of

2     Justice, this is what that court held.

3               JUDGE PAN:  So you also say that -- you say that no

4     tribunal outside the EU can decide an issue of EU law.  But

5     you're also asking us to apply EU law, right?  So under your

6     reading of Achmea, it violates EU law for us to decide this

7     case in your favor.  I'm not really following how that --

8     doesn't run afoul of the very principle on which your case

9     rests.

10              MS. HARRIS:  No, our -- our argument is that because

11    EU law governs, you should apply what the European Court of

12    Justice has said and respect that it has -- that it has

13    interpreted EU law as governing and it's interpreted EU law

14    clearly.  We obviously understand --

15              JUDGE PAN:  But you just said you want us to apply EU

16    law.

17              MS. HARRIS:  Yes.  And so the argument is not courts

18    can never, like, resolve a dispute involving EU law in any

19    context.  The alternative would be, what, Spain could -- is

20    supposed to argue, like, EU law never applies.  Where Spain is

21    arguing there's no jurisdiction over Spain under the Foreign

22    Sovereign Immunities Act in the first instance.  In order to --

23              JUDGE PAN:  In order to so hold, we would have to

24    apply EU law, and I -- Achmea is saying -- our international

25    arbitration tribunal can't even apply, let alone interpret EU



1  law, but you're asking us to apply it.

2          MS. HARRIS:  So what we're saying is, there are

3  context in which obviously EU law has to be applied.  This --

4  one of them.  And that in order to avoid the issues with

5  letting parties circumvent their obligations here, there's no

6  other choice.  I mean, Spain can't really get up here and say,

7  what, like no EU applies.

8          JUDGE PAN:  The other choice is full faith and credit.

9  I mean, the -- there's no -- there's no question that Spain is

10  a member of the ICSID and that this case was arbitrated under

11  ICSID, and that we, as a U.S. court, are bound to give that

12  award full faith and credit.  And so that award has done its

13  job in deciding that you claim as a threshold jurisdictional

14  question that would otherwise be for us.  So we decide that;

15  we're bound separately by the ICSID treaty, ICSID Convention to

16  give full faith and credit.  So why is our job not done?

17          MS. HARRIS:  Because that -- respectfully, that would

18  both create a circuit split and do violence to the Foreign

19  Sovereignty Immunities Act, which is the only source of subject

20  matter jurisdiction.  1650(a), which is the full faith and

21  credit provision for ICSID, is not a source of subject matter

22  jurisdiction.  The Foreign Sovereign Immunities Act requires

23  federal courts to assure themselves that they have

24  jurisdiction.  And just sort of outsourcing the jurisdictional

25  determination to arbitrators does not do that job and would be

1    flatly contrary to the weight this court has actually done an

2    inquiry into whether questions are arbitrability or existence

3    of the arbitration agreement.  Not only --

4            JUDGE PILLARD:  What's your circuit split?

5            MS. HARRIS:  The circuit split is with the Second

6    Circuit.  The Mobil Cerro decision very clearly holds that you

7    can't just use the New York Convention or ICSID as if they're

8    sort of separate bodies of law.  And Amerada Hess, from the

9    Supreme Court, also says the only source of jurisdiction over

10   foreign sovereigns is the Foreign Sovereign Immunities Act.

11   You can't just look to the ICSID -- you --

12           JUDGE PAN:  But we could be applying the --

13           MS. HARRIS:  -- can't look at something else.

14           JUDGE PAN:  -- the Foreign Sovereign Immunities Act--

15           MS. HARRIS:  But what --

16           JUDGE PAN:  -- in conjunction with the ECT --

17           JUDGE PILLARD:  And Mobil Cerro was under the --

18           JUDGE PAN:  I understand the Circuit split --

19           JUDGE PILLARD:  -- waiver exception, not the

20   arbitration.

21           MS. HARRIS:  But the principles it's applying are the

22   starting point for the inquiry is that the Foreign Sovereign

23   Immunities Act does not sort of allow you to look to other

24   treaty implementing divisions as if they supply subject matter

25   jurisdiction.  This court still must --



1          JUDGE PAN:  But we look to facts and decisions.  I

2    mean, we look to the existence of an agreement to arbitrate.

3    We look to whether there's an award.  I mean, those are facts

4    of the world that we have to honor and credit in order to make

5    our own immunity decision under the FSIA, don't we?

6          MS. HARRIS:  I think it would be contrary to also this

7    court's decision on Belize, and even Chevron and Stileks, to

8    sort of say, you're no longer going to take a look at whether

9    the question is one of formation or arbitrability, and if it is

10   one of formation, you're no longer going to look for yourselves

11   whether -- in Belize case, for instance, the prime minister had

12   the power to agree to arbitrate.  Those cases don't make any

13   sense under the other side's view that you're just sort of

14   checking boxes and looking if there's an agreement to arbitrate

15   because all of those cases also involve delegation clauses.

16         JUDGE PILLARD:  Weren't those cases New York

17   Convention cases, not ICSID cases?  I mean, we're in a very

18   different situation, I think, under ICSID because of the full

19   faith and credit.  Really, it's a extremely powerful treaty in

20   terms of the credit we have to give to the arbitration.

21         MS. HARRIS:  Well, two responses.  First of all, the

22   Micula decision, obviously not precedential, but it did involve

23   ICSID, and this court, and Judge Mehta in the district court

24   did a very fulsome analysis.  It would be flatly incompatible

25   with the idea that the ICSID Convention meant you sort of drop

1    pencils and say that the issue is delegated.  There's an award.

2    You're all done.

3            And with respect to ICSID, again, relying on the idea

4    that you give an award full faith or credit still puts the cart

5    before the horse because that is what happens if there actually

6    is jurisdiction under the Foreign Sovereign Immunities Act to

7    begin with, but otherwise, you'd have circumstances --

8    potential circumstances in which you're not actually

9    ascertaining for yourselves whether an arbitration agreement

10   exists.  You're sort of rubberstamping whatever an arbitral

11   tribunal might or might not have said on this.  And again, that

12   is contrary to both bedrock principles of -- really bedrock

13   principles of arbitration everywhere.

14           I would point you to the China Minmetals decision that

15   we cited from the Third Circuit because that decision canvases

16   both Foreign Sovereign Immunities act, international practice,

17   domestic, our foreign, our federal arbitration act practice,

18   and I think just refutes the idea that ICSID is somehow a sort

19   of super powered convention that does -- that allows you to

20   bypass the jurisdictional inquiry that applied.  If that's what

21   the --

22           JUDGE PAN:  I'd like to ask a question about the

23   injunction, if I may.  There's a lot of talk about comity with

24   respect to this injunction, and isn't it Spain who acted with a

25   lack of comity by bringing a suit in another country just to



1    stop the proceedings in the U.S. courts?

2              MS. HARRIS:  Absolutely not.  Spain's only choice in

3    order to enforce its obligations under EU law and to seize

4    circumvention of those obligations was to try to bring suits in

5    the investor's home country, which is where you would expect

6    litigation to be brought.  In comity interests, that this court

7    talked about in Laker Airways, are about the singular afront

8    that would happen from subjecting a foreign sovereign to --

9              JUDGE PAN:  Well, I think comity is a little bit

10   broader.  It's about respecting proceedings in foreign courts.

11   I think there is definitely a very strong interest when there's

12   sovereign involved.  I accept that.  But it just seems to me

13   that that's -- the entire goal and purpose of the suit brought

14   by Spain, and I guess the Netherlands and Luxembourg was to

15   stop the U.S. proceedings.  That seems to be a lack of comity

16   on Spain's part.

17             MS. HARRIS:  Spain is respecting -- I mean, again, I'm

18   not sure what Spain was supposed to do in order to enforce its

19   EU law obligations in order to say that there is --

20             JUDGE PILLARD:  Well, I guess what Spain could have

21   done is allow this proceeding to go forth while trying to

22   confirm whether or not they have to pay under -- in the EU

23   courts, and then ask for a stay of these proceedings while

24   that's being decided.  Just seems that -- trying to just stop

25   these proceedings -- it's very much like Laker Airways, except

1    I do understand that the parties are sovereign and not a

2    private company.  But the whole purpose of it was to stop the

3    U.S. suit for confirmation of the award.

4            MS. HARRIS:  And I think if you bought that view,

5    anti-suit injunctions against foreign sovereigns would suddenly

6    become commonplace in U.S. courts because you would be

7    saying -- I guess would be asking only is there some attempt by

8    a foreign sovereign to stop litigation in the United States.

9    And if that were the test, again, it would not be the case that

10   across the world foreign sovereigns would virtually -- it would

11   be unheard of to enjoin the foreign sovereigns.

12           JUDGE PILLARD:  Well, it seems to me that there are

13   cases not like this one where they're just parallel proceedings

14   going on in foreign courts and U.S. courts, and then it's kind

15   of trying to get to the end and who's going to get there first,

16   and then start res judicata or whatever.  But this is a

17   different kind of case, which is -- it's more like Lake Airways

18   where the whole purpose of a litigation in Luxembourg and the

19   Netherlands was to stop this litigation.  And it seems to me

20   that if all people subject -- all sovereigns to ICSID could go

21   and just try to stop investors from trying to apply ICSID,

22   ICSID would just collapse.  If they can sue in these national

23   courts to stop ICSID proceedings, ICSID would collapse.  And

24   the whole purpose of ICSID is to prevent investors from having

25   to go to these national courts to seek justice because the idea

1    of it is they should be entitled to a neutral arbiter through

2    this international arbitration system and not be subject to

3    any -- any court's -- national courts.

4            MS. HARRIS:  And I respectfully disagree on two

5    fronts.  First of all, that Laker Airways is in any way

6    resembling this case.  In that case, the whole point was to

7    deprive of any form for, like, any antitrust claims.  Again,

8    the whole point of Spain's litigation is that these claims only

9    properly belong in the investor's home states or within the

10   European Union.  So that is the --

11           JUDGE PILLARD:  Finish your question. I want to --

12           MS. HARRIS:  Sorry.  That is the point of

13   (indiscernible) was doing.  And second of all, the idea that

14   ICSID is going to collapse if investors cannot bring these

15   suits or there's some sort of -- there's some sort of

16   undermining, seems defied by practice in which, again, the

17   European Court of Justice is holding that there is no

18   arbitration among intra-EU members under ICSID in the European

19   Food decision and the collateral consequences of requiring EU

20   members to say and to object to such arbitrations and to claw

21   back such awards.  ICSID is not collapsing because people

22   understand, and the signatories understand, that this is just

23   not something that EU members agreed to.

24           JUDGE PAN:  Why then didn't Spain go into the Dutch --

25   or the Luxembourgish court to stop the arbitration before it



1    concluded?  It seems to me you'd be in a better position.

2         MS. HARRIS:  Spain at that point was resistant --

3    attempting to, you know, resist the arbitration everywhere.  I

4    don't know the details of when it would have been -- whether it

5    would have been jurisdictionally premature to do so, but it's

6    sort of -- just the question of what Spain should have done as

7    a litigant, I think, underscores why an anti-suit injunction is

8    so strange.  You're sort of second-guessing what a foreign

9    sovereign can or cannot do in litigation context.  As the

10   United States points out, there's a very strong reciprocal

11   interest in not having foreign sovereigns also second-guess

12   what the United States is doing in foreign courts, and again,

13   that is why no circuit court ever has greenlit this kind of

14   injunction and why it would be so extraordinary here.

15        JUDGE PAN:  And even under the injunction that Judge

16   Chutkan put in place, it doesn't prevent Spain from seeking

17   monetary relief from -- through the Dutch and Luxembourgish

18   courts to effectively claw back to recoup whatever these

19   investors managed to win in the United States.  So why doesn't

20   that really lower the temperature or lower the stakes on these

21   proceedings?  Because the EU, you know, as unified, as you

22   describe it, will in the end come to Spain's rescue.

23        MS. HARRIS:  Well, respectfully, the idea that Spain's

24   litigation choices are supposed to be sort of dictated by

25   others, especially in other countries' courts, is sort of like



1   doubling the offense.  It's sort of saying --

2          JUDGE PAN:  No, I mean, Spain did join some treaties.

3   That's why its choices are being dictated.

4          MS. HARRIS:  And again, we -- you know, we can go

5   through this.  Again, Spain's position is that the treaties it

6   agreed to did not involve this type of consent, and Spain's

7   position is consistent with the idea that EU law is primary is

8   imposing obligations on Spain to resist this sort of

9   circumvention of the EU system, and that if courts --

10          JUDGE PILLARD:  So isn't Spain just trying to get out

11   of its commitments?  I mean, it owes more than $1.3 billion for

12   16 unpaid investor state awards.  It just doesn't want to pay.

13          MS. HARRIS:  Respectfully --

14          JUDGE PILLARD:  It got the benefits of all this

15   investment, and now they don't want to hold up their end of the

16   bargain by going to arbitration, which they agreed to in the

17   ECT.

18          MS. HARRIS:  So two responses.  One, no, Spain is not

19   trying to get out of something it agreed to.  Spain's position

20   throughout has been it didn't agree to this.  And second of

21   all, I don't think it's just a sort of opportunistic view of

22   the Energy Charter --

23          JUDGE PILLARD:  Let's take a step back.  Do you think

24   these investors would have necessarily invested all this money

25   in Spain without the assurance that if something like this were

1    to happen, and Spain wanted to get out of it, they wouldn't

2    have a neutral arbiter to decide this dispute?

3    MS. HARRIS:  I'm glad you raised what the investors

4    should have understood at the time they invested and at the

5    time they purported to form these agreements in 2011 and 2014

6    and '15, because I think the first and foremost thing that

7    European investors and the EU member states understand is that

8    EU law is going to be the paramount law governing the

9    relationship.  And the second thing they would understand at

10   the time of these things is that intra-EU arbitration at the

11   time was absolutely unheard of.

12   JUDGE PILLARD:  So they can't rely on the words of the

13   ECT?

14   MS. HARRIS:  Well, I think what they can rely on is

15   the text of the ECT, and going back to it, that the EU joined

16   it, which at the time --

17   JUDGE PILLARD:  Correct.  And the text of the ECT says

18   there's an unconditional agreement and consent to arbitrate

19   with an investor that asks for it.

20   MS. HARRIS:  And what --

21   JUDGE PILLARD:  Under ICSID or under UNCITRAL.

22   MS. HARRIS:  And again, what people would understand

23   from -- certainly from 2006, onward, from the Ireland decision,

24   is that when you have such an international agreement, the EU

25   joins it.  Even if you have an arbitration provision, that is



1    exactly like the ECT, you do not have consent --

2            JUDGE PILLARD:  I understand.

3            MS. HARRIS:  -- to enter EU arbitration.  Just one

4    other thing with respect to what --

5            JUDGE ROGERS:  Well, but I need to clarify your

6    position.  Your position then is that there is no arbitration

7    in EU in the sense that neither its highest judicial authority

8    could so find, nor its highest legislative body could so

9    provide?

10            MS. HARRIS:  There's no intra-EU arbitration in the

11    sense between an EU member and another EU member, or an EU

12    member or nationals.  And that is, again, based on what the

13    European Court of Justice has said.  That there is just no

14    power to agree to that sort of thing.  And it said --

15            JUDGE ROGERS:  And --

16            MS. HARRIS:  -- (indiscernible) offered --

17            JUDGE ROGERS:  -- and that neither its highest

18    judicial authority, nor its highest legislative authority could

19    provide for such arbitration?  In other words, the EU is a

20    closed -- I don't even know what to call it -- a closed

21    governmental entity?

22            MS. HARRIS:  So the only way it could be provided for

23    would be if you had arbitration and then it was reviewable de

24    novo by the European Court of Justice.

25            JUDGE ROGERS:  Well, that's not --

1           MS. HARRIS:  So --

2           JUDGE ROGERS:  -- arbitration.  I mean, we've

3   discussed -- what is arbitration and why parties have sought

4   arbitration, the commercial parties.  So your position is that

5   there can be no arbitration among commercial parties who are

6   members of the EU, period.  That the EU's highest court and the

7   EU's highest legislature, neither could provide that power to a

8   member of the EU?

9           MS. HARRIS:  So I think my position just thinking

10  about where it comes from is Article 344 of the Treaty --

11          JUDGE ROGERS:  No, but where does it go?  That's what

12  I'm trying to understand, all right.  And what I heard you

13  saying is there is none and there can be none, and I want to be

14  clear if you have some qualifications on that.

15          MS. HARRIS:  So the --

16          JUDGE ROGERS:  I haven't heard any so far.

17          MS. HARRIS:  The qualifications, I think, are best

18  expressed in paragraph 65 of the Komstroy decision.  The

19  limitations are between EU member, so country, country, and

20  country, EU member, and EU national.  That is the full limits

21  of what the European Court of Justice has said on this.  And

22  the reason is again --

23          JUDGE ROGERS:  That's not my question, Counsel, and

24  you're sharp enough to know it.

25          MS. HARRIS:  With respect, Judge Rogers, that is the



1    limit that we know.  And the other limit is that to the extent

2    there is an attempt to -- if you say arbitration is allowed and

3    in the home countries you're domesticated and the European

4    Court of Justice can review that, that would also satisfy the

5    limitation.  But the limitation just is what it is, and always

6    has been since 1957, which is --

7         JUDGE ROGERS:  And it never changed, is your argument

8    to us today.

9         MS. HARRIS:  You could change it through treaty

10   amendment, but that is not what has happened with the treaties

11   on the function of the European Union since --

12        JUDGE ROGERS:  How would that treaty be amended?

13        MS. HARRIS:  The members of the European Union would

14   get together, which they have done with the treaty on the

15   functioning of the EU --

16        JUDGE ROGERS:  What would the treaty say?

17        MS. HARRIS:  The treaty would say that we no longer --

18   you know, you no longer have to turn to the European Court of

19   Justice as the -- it no longer has primacy.  That's one way of

20   doing it.

21        JUDGE ROGERS:  Who has authority to do that under your

22   argument?

23        MS. HARRIS:  Well, it's a treaty, so you would have to

24   have the treaty signatories do it.  Because the understanding

25   of --



1          JUDGE ROGERS:  But the EU couldn't sign that treaty.

2          MS. HARRIS:  The EU -- it would be a matter about what

3  they EU can or cannot do, so the EU members would be making the

4  treaty, which is what they do --

5          JUDGE ROGERS:  Well, let me say.  Your argument, so

6  far as I can see it, cuts off members of the EU in a way that

7  you say everybody understood, but I certainly never understood

8  the EU's position to be what you're saying today.  And the

9  cases that have been cited to us, as well as our own

10  authorities, haven't said that in those terms.  And as you

11  know, courts are very good, as are lawyers, of distinguishing

12  cases.  But I think it's an astounding argument we're hearing

13  today.  And maybe the European Commission will confirm it.  But

14  in any event --

15          MS. HARRIS:  I mean, respectfully, the European Union

16  is an innovation where sovereigns seek -- where sovereigns gave

17  the European Union certain powers.  And that decision has

18  consequences and has always had consequences.  And that is why

19  the signatories to the Energy Charter Treaty --

20          JUDGE ROGERS:  That's what we're trying to distinguish

21  here.  Anyway, I won't belabor this.  Thank you, Counsel.

22          JUDGE PILLARD:  Did you reserve time for rebuttal?

23          MS. HARRIS:  Yes, Judge Pillard.  I reserved three

24  minutes.

25          JUDGE PILLARD:  As you know, our practice is to give



1    you a time limit, and then we promptly seem to disregard it

2    with our active questioning.  So you will have an opportunity

3    for --

4              MS. HARRIS:  Thank you, Judge Pillard.

5              JUDGE PILLARD:   -- a rebuttal.

6              And we will next hear from the European Commission.

7    And that's -- is it Ms. Pei?

8                    ORAL ARGUMENT OF SALLY L. PEI, ESQ.

9                  ON BEHALF OF THE EUROPEAN COMMISSION

10             MS. PEI:  Yes, Ms. Pei.  Thank you.

11             Good morning.  May it please the court.  Sally Pei for

12   the European Commission.  I'm also pleased to introduce Lorna

13   Armati, Petra Nemeckova, and Paul John Lowenthal from the

14   Commission's Legal Service, who have traveled from Brussels to

15   observe argument today.

16             The investor's position is extraordinary on every

17   level.  It ignores the EU treaties, which are the foundational

18   instruments of the EU legal order.  It disregards the decisions

19   of the EU's highest court about an issue that's of fundamental

20   importance to the EU structure.  And it seeks to restrain an EU

21   member state from pursuing litigation in EU courts on questions

22   of EU law.  This is --

23             JUDGE PAN:  Can you explain -- kind of following up on

24   Judge Pillard's question to Ms. Harris.  We're trying to

25   understand the EU's interest here, because there is this

1    declaration in your brief that this case implicates the EU's

2    authority and primacy and all these things.  But given that

3    arbitral awards are nonprecedential, how is that a threat to, I

4    guess, the supremacy of the EU courts?

5            MS. PEI:  So I think, as Ms. Harris was discussing

6    toward the end of the argument, the question really goes back

7    to two key provisions of the EU treaties, which are Articles

8    344 and Article 267.  Under Article 344, the EU member states

9    agreed that they would never submit questions of EU law for

10   resolution outside the EU judicial system.  And Article 267 is

11   the other side of that same coin.  It provides that questions

12   of EU law must be ventilated through the EU system and -- so

13   that they can be referred --

14           JUDGE PAN:  Even if it's nonprecedential?  Because if

15   it's nonprecedential, it doesn't affect your case law.  It

16   doesn't affect anything.  It's just two parties agreeing on

17   something.  That's what arbitration is, and it's just more

18   efficient.

19           MS. PEI:  So with respect to questions of the Energy

20   Charter Treaty, the Energy Charter Treaty is EU law as between

21   (indiscernible) states, so whenever --

22           JUDGE PAN:  I guess my question is more basic than

23   that, which is, I don't understand why the EU has an interest

24   in not letting people arbitrate.

25           MS. PEI:  So the (indiscernible) really is in ensuring



1    that questions of EU law are developed and ventilated within

2    the -- within the European --

3              JUDGE PAN:  But there's no developing or ventilating

4    happening if it's nonprecedential, is there?

5              MS. PEI:  Well, it is to the extent that EU members

6    and EU nationals should not be submitting questions outside the

7    EU system.  For them to be able to go outside the EU system to

8    resolve disputes that really are internal to the EU and should

9    have been governed by EU law in the first place, it's quite

10   detrimental --

11             JUDGE PAN:  So what about arbitrations between EU and

12   non-EU signatories to the ECT that involve EU law.  You say

13   that an arbitral panel can decide those.

14             MS. PEI:  So in such a case, the questions being

15   presented in that kind of arbitration would not necessarily

16   raise questions of EU law in the same way as a -- as a dispute

17   between an EU member of state and an EU national --

18             JUDGE PILLARD:  Why not?  What if they're

19   interpreting --

20             MS. PEI:  -- (indiscernible) --

21             JUDGE PAN:  -- EU law?

22             MS. PEI:  So I think there could be situations

23   conceivably where -- if the arbitral tribunal were being asked

24   actually to resolve a legal question of EU law, it's

25   conceivable that the same questions of primacy would arise.  I



1    would note that the Court of Justice has not reached this

2    particular question.  It's left open.  Komstroy seems to

3    suggest that there is a distinction here where there's -- if

4    there were a case involving a third country investor --

5         JUDGE PAN:  But sort of putting the law aside though.

6    I'm just trying to understand where would you draw this line?

7    You have decided this principle that, you know, EU courts

8    should decide EU law, and we have private parties settling

9    based on their understanding of EU law.  We have private

10    parties arbitrating based on an arbitrator's interpretation of

11    EU law.  We have EU members arbitrating with non-EU people

12    deciding questions of EU law.  All of these things are

13    happening and that doesn't seem to be disrupting the primacy of

14    EU law because it's nonprecedential.

15         MS. PEI:  So with respect to the different scenarios

16    in which that you've referred to.  With respect to purely

17    profit disputes that might involve questions of EU law as a

18    matter of fact, for example, the Court of Justice, I think, has

19    recognized that those do not raise the same kinds of concerns

20    as you would have in Achmea and Komstroy.  And that's partly

21    because those arbitrations are not based on an agreement by a

22    member state -- a (indiscernible) agreement to take these

23    disputes outside the EU system.  So I think there's something

24    fundamentally different between two commercial parties

25    agreeing --



1          JUDGE PAN:  So are you saying it's not about the

2    actual substance of the EU law that's being interpreted, it's

3    about the act of agreeing by the members?

4          MS. PEI:  At least with respect to -- that's at least

5    a line that the -- that the Court of Justice has drawn so far.

6    It has carved out commercial arbitration.  And the reason

7    why --

8          JUDGE PAN:  But the members have signed ICSID and

9    UNCITRAL and private parties benefit from that.  I'm not sure

10   that I'm seeing your distinction.  You say the -- it's -- that

11   purely private settlements are arbitrations, (indiscernible),

12   because they're not based on a treaty agreement by EU members

13   to take the cases outside, but ICSID is a treaty agreement to

14   take the cases outside the EU court system.

15         MS. PEI:  So if I might just back up a little bit and

16   finish the answer that I was --

17         JUDGE PAN:  I'm so sorry.

18         MS. PEI:  -- I was -- I'm sorry about that.

19         JUDGE PAN:  Yes.

20         MS. PEI:  So first of all, the question about

21   commercial -- the idea is that there are two private parties

22   that have agreed between themselves.  The Court of Justice has

23   said that that is not -- that does not raise the same issues

24   and for the reason that it's not through a treaty agreement

25   between EU member states.  In addition, those kinds of disputes

1    are subject to review in EU courts, to the extent that there

2    may be set aside proceedings at the end of the arbitration.

3    Those questions of EU law can still be ventilated within the EU

4    system.

5          Now, turning to the question about ICSID and

6    arbitration agreements that member states have signed.  As Ms.

7    Harris was explaining, here Spain did not have the capacity to

8    enter into an agreement to arbitrate disputes between itself

9    and members of another EU member state.

10         JUDGE PAN:  But it has signed ICSID, so a Spanish

11   private entity and a Dutch private entity could -- Spain could

12   enter an agreement that allows those private parties to take

13   their dispute outside, and that's this action by Spain?

14         MS. PEI:  So if it were -- if it were (indiscernible)

15   as a dispute between a Spanish private party and a Dutch

16   private party, you would not need an investment treaty to do

17   that.  That would be a purely -- that would be an agreement

18   just between its parties.

19         JUDGE PAN:  But the parties want to -- ICSID's only

20   with governments?

21         MS. PEI:  Correct.

22         JUDGE PAN:  How about UNCITRAL, same?

23         MS. PEI:  UNCITRAL, I think that would govern -- so

24   UNCITRAL governs commercial arbitrations as well.  So you could

25   have a private arbitration agreement between two parties.  But

1    UNCITRAL is -- yeah, again, that would be --

2              JUDGE PAN:  Governments are --

3              MS. PEI:  -- (indiscernible) rules --

4              JUDGE PAN:  -- the governments are signatories.

5              MS. PEI:  Correct.

6              JUDGE PAN:  I thought you were -- I thought you were

7    making a point that the governments couldn't even purport to be

8    signatories to something that affords arbitration to bilateral

9    private party disputes.  So that wasn't your point?

10             MS. PEI:  So I think my point was that the -- there

11   would be no need for a sovereign state to enter into such an

12   agreement to -- that would govern purely commercial

13   arbitrations between private parties.

14             JUDGE PAN:  But they have.  No?

15             MS. PEI:  So the -- with respect to the -- so

16   conventions like the ICSID Convention, and the New York

17   Convention, those are -- those are not in themselves

18   arbitration agreements.  They are in the enforceability and

19   the -- it's a framework for arbitration, but the substantive

20   agreement to arbitrate, even if you're talking about the

21   context of investor state arbitration, that's why you need

22   recourse to something like the Energy Charter Treaty or a

23   bilateral investment agreement.  You don't -- you cannot,

24   unfortunately, simply look to the ICSID Convention and say that

25   that is endorsing arbitration or --



1          JUDGE PAN:  Or --

2          MS. HARRIS:  -- UNCITRAL.

3          JUDGE PILLARD:  So I understand your position --

4          JUDGE ROGERS:  I'm not clear if I understand your

5    point about there's no need for a sovereign state, which is a

6    member of the EU to enter an agreement with a private

7    commercial corporation located in another sovereign state.  But

8    wasn't what happened here an example of why it was necessary?

9    I mean, in order to attract investors, the sovereign state was

10   offering tax benefits.

11         MS. PEI:  So with respect to --

12         JUDGE ROGERS:  Private parties can't do that.  And

13   private parties may not be willing to enter a contract that's

14   financially beneficial.

15         MS. PEI:  So I agree with your point, Judge Rogers,

16   that in many cases, investment treaties serve as an important

17   reason for investors to invest in foreign countries.  The point

18   with respect to the Energy Charter Treaty and intra-EU

19   investment agreements is that these kinds of agreements never

20   were designed to provide benefits that would apply with the EU.

21   Investment protection within the EU is governed by EU law and

22   EU regulations, and those are the remedies that EU investors

23   should have availed themselves of if they believed --

24         JUDGE PAN:  So I understand that that's your position,

25   and that could be a question of arbitrability versus whether or



1    not there was an agreement, but I want to put that aside for a

2    moment and just say that the EU did sign the ECT, which has

3    language that says there's unconditional consent to arbitrate.

4    Spain signed it too.  And there's no disconnection clause that

5    carves out anything for intra-EU disputes.  So why can't the EU

6    and Spain just be held to what they signed and the ECT -- and

7    if you want to litigate these other issues, it's a question of

8    arbitrability.  They've got to litigate these issues before the

9    ICSID tribunal.

10           MS. PEI:  So first of all with respect to the

11    disconnection clause.  A disconnection clause would have been

12    superfluous here.  Member states are already under obligations

13    to accord primacy to EU law.  So the purpose of a disconnect

14    clause in any treaty would be only to inform non-EU parties of

15    the existence of the EU and the existence of EU obligations

16    that govern member states that are signing on to this --

17           JUDGE PAN:  I'm looking at the plain language of the

18    ECT, and that seems to be contrary to what you're saying.  I

19    know that that's your legal position, which can be litigated,

20    but the -- the EU and Spain signed the ECT, which has very

21    plain language about arbitration.  I know your position.  The

22    question is, who do you get to argue that before if the

23    question of arbitrability is before the arbitral panel?  And I

24    believe you intervened and did argue this position before the

25    arbitral panel and it was rejected.  But in any event, I don't

1    see why the ECT language doesn't control here, and if there's a

2    problem with it, the EU and Spain should withdraw from the ECT.

3              MS. PEI:  So respectfully, Your Honor, I will first

4    address the point about whether this court can look at this.

5    And it's not a question of arbitrability, it's a question of

6    the formation of the agreement.  And the court absolutely has

7    the ability and obligation to review this question de novo.

8              On the question of the language of the Energy Charter

9    Treaty, I suppose you're referring to the paragraph -- Article

10   26, paragraph 3(a), which contains the language about

11   unconditional consent.

12             JUDGE PAN:  Yes.

13             MS. PEI:  I would also point you to Article 26(1),

14   which delineates the kinds of disputes that are being

15   contemplated for submission to arbitration.  It says, "Disputes

16   between a contracting party and an investor of another

17   contracting party relating to an investment of the latter in

18   the area of the former, which concern an alleged breach, will

19   be settled amicably."  And then that's the kind of dispute that

20   would be submitted for resolution.

21             Now, I would note that contracting party here is a

22   defined term, so you go back to the definition section.

23   Article 1(2) provides that a contracting party may include a

24   Regional Economic Integrational Organisation.  And it's

25   understood that the Regional Economic Integration Organisation,



1    the paradigm example of that is the EU.  And then you look to

2    Article 1(3) -- which I understand this is quite a

3    complicated --

4              JUDGE PAN:  It is.

5              MS. PEI:  Yes.

6              JUDGE PAN:  It's very convoluted and --

7              MS. PEI:  Right.  But --

8              JUDGE PAN:  -- Section 3 is very straightforward.

9              MS. PEI:  Yes.

10             JUDGE PAN:  Unconditional consent.  And what about

11   Section 5 --

12             JUDGE PILLARD:  Wait, wait, but continue.  I want to

13   hear the rest of the example.  You say then you go Article

14   1(3) --

15             MS. PEI:  1(3) is about the Regional Economic

16   Integration Organisation.  And this is the provision that Ms.

17   Harris was discussing with you earlier, which explains that a

18   Regional Economic Integration Organisation is an entity

19   constituted by states and to -- over which -- to which they

20   have transferred competence over certain matters, a number of

21   which are governed by this treaty.  Including the authority to

22   take -- decisions binding on them in respect to those matters.

23             And so in an intra-EU situation, the relevant

24   contracting party for purposes of Article 26(1) is the European

25   Union.  And so there's no -- you don't have the requisite

1    veracity between the investor of a contracting party and the

2    investor of another contracting party in an intra-EU situation.

3    So that's the textual argument for why this particular --

4        JUDGE PAN:  Can you address subsection 5, which says,

5    "The consent given in paragraph [3] together with the written

6    consent of the Investor given pursuant to paragraph [4] shall

7    be considered to satisfy the requirement for:  written consent

8    of the parties to a dispute and for an agreement in writing for

9    purposes of Article 2 of the New York Convention."  There's

10   also a provision that says this is an agreement to arbitrate.

11       MS. PEI:  So paragraph 5 is the paragraph that

12   provides that you need both consent in paragraph 3 and written

13   consent by the investor to create an arbitration agreement for

14   purposes of these -- for purposes of the UN Convention and the

15   UNCITRAL rules and the ICSID Convention.  The reference to the

16   consent in paragraph 3 then refers you back to dispute, which

17   is governed by 26(1).  That defines the universe of disputes

18   that is -- that are being contemplated could be submitted to

19   arbitration.  And again, you need diversity between the

20   contracting party and the investor of the other contracting

21   party.

22       In an intra-EU situation, there is no diversity

23   because the contracting party is the EU, as recognized by the

24   inclusion of the Regional Economic Integration Organisation

25   clause.



1          JUDGE PAN:  You mention in your brief that the

2     European Commission is considering whether to permit Spain to

3     pay these ICSID awards.  I wonder if you have any update on any

4     progress in that?

5          MS. PEI:  So that's correct.  The Commission's

6     deliberations on this are still ongoing.  Spain has notified

7     all of these awards to the Commission, and until -- unless and

8     until the Commission renders its decision, Spain is not

9     permitted to pay them under EU law.

10          JUDGE PAN:  And I had also asked Ms. Harris this, but

11     what's your position on whether this court is prohibited by

12     Achmea and Komstroy from applying EU law or why we're not in

13     our FSIA determination?

14          MS. PEI:  So with regard to your FSIA determination,

15     the question, of course, is whether an arbitration agreement

16     exists.  And the Court of Justice has spoken clearly on this.

17     You are not being asked to do anything other than to take

18     notice of what the Court of Justice has said and to apply that

19     as a question of fact in determining your -- whether the

20     agreement exists as a question of jurisdictional fact for

21     purposes of the (indiscernible).

22          JUDGE PAN:  Although, for example, the EU has not

23     characterized its ruling in terms of the capacity of Spain.  We

24     would have to be doing something interpretive, not just

25     accepting some kind of legal fact and applying it.  But that's



1   not -- that's not in violation of those (indiscernible)

2   decisions?

3           MS. PEI:  No, I think -- Your Honor, I think that to

4   understand why this is a question of capacity, I think the

5   reason why the Court of Justice did not refer to it in those

6   particular instances is because this really is a question that

7   is sort of, you know, inherent to how the Court of Justice

8   conceives of the EU treaties.  It's useful to remember that

9   when EU member states joined the Union, they are transferring

10  certain parts to their sovereignty to the Union.  Member states

11  assume obligation that -- and they agree that the EU treaties

12  will have primacy over their national law and other

13  international agreements.  And that brings you back to Articles

14  344 and 267.  Those are very much deeply engrained.

15          And as a matter of the way that the EU is structured,

16  when EU member states join the union, they essentially give up

17  their ability to agree to anything that would be contrary to

18  the EU treaty.  So it is very much a question of power and

19  capacity, even though the Court of Justice did not, you know,

20  use that particular term of art.

21          JUDGE PAN:  Judge Rogers, did you have any other

22  questions for Ms. Pei?

23          JUDGE ROGERS:  Thank you, no.

24          JUDGE PAN:  Thank you very much.

25          MS. PEI:  All right, thank you.



1          JUDGE PILLARD:  And now we'll hear for the United

2    States as amicus Sharon Swingle from the Department of Justice.

3              ORAL ARGUMENT OF SHARON SWINGLE, ESQ.

4              ON BEHALF OF THE UNITED STATES OF AMERICA

5          MS. SWINGLE:  Thank you, Your Honors.  And thank you

6    for the courts' invitation to be heard on the issues presented.

7          I'd like to make just three basic points.  First is

8    that in determining whether a court has jurisdiction over a

9    foreign state under the -- FSIA's arbitration exception, the

10   court must make an independent determination regarding the

11   existence of an arbitration agreement.  I think that is a legal

12   principle that is clear from this court's cases, which treat

13   the existence of the -- existence of the arbitration agreement

14   is a jurisdictional fact that must be established.

15         In Belize, for example, the court evaluated whether

16   the prime minister lacked authority to enter into the

17   arbitration agreement.  In Ecuador, the court held that a

18   district court erred when it failed to make that determination

19   as part of its jurisdictional analysis.  And in Micula, the

20   court reviewed whether Armenia's ascension to the European

21   Union nullified its agreement to arbitrate.

22         Your Honor (sic) asked Judge Pillard about whether any

23   of those rules applied.  ICSID rules, and Micula, of course,

24   that was ICSID arbitration.  But I would note that Belize also

25   involved arbitration under rules that gave the arbitral



1    tribunal authority to conclusively decide its own jurisdiction

2    and to conclusively decide the existence and validity of the

3    arbitration agreement, and yet this court, nevertheless,

4    independently reviewed that.

5         JUDGE PAN:  But you do acknowledge there's a

6    difference between deciding if there's an agreement and whether

7    it's a question of arbitrability, because that seems to be --

8         MS. SWINGLE:  We do, Your Honor.

9         JUDGE PAN:  -- (indiscernible).

10        MS. SWINGLE:  And we understand that to be the

11   distinction the court drew in Stileks.  And I think that same

12   distinction flows form the arbitration cases that the court

13   looks to.  In District Number 1, for example, the court

14   recognized that the question of formation was one that could

15   not be delegated to the arbitrator to decide and was

16   necessarily for the court.

17        JUDGE PAN:  So it doesn't seem like your position

18   would be inconsistent with the view that there is an agreement

19   based on the ECT and the -- I guess, what we said in Chevron

20   and Stileks, we have this treaty.  We have an award.  You know,

21   we have an agreement by the investor under the terms of the

22   treaty to arbitrate.  Your position is not inconsistent with

23   that.  The agreement is the ECT --

24        MS. SWINGLE:  We do --

25        JUDGE PAN:  -- et cetera.



1          MS. SWINGLE:  -- take a position on whether in fact

2    there is a valid agreement here.  I do want to take issue

3    with --

4          JUDGE PAN:  Under the ECT?

5          MS. SWINGLE:  Yes, but I do want to take issue with

6    one point.  In our understanding, ECT is not itself an

7    agreement to arbitrate.  And I think just an example will

8    establish why that's so.  For example, I do not think a foreign

9    state that is a party to an ECT -- to the ECT could invoke

10   arbitration against the wishes of an investor.  We understand

11   the ECT to be a --

12         JUDGE PAN:  Yes.

13         MS. SWINGLE:  -- standing offer to arbitrate.

14         JUDGE PAN:  Correct.  It would be in combination

15   with --

16         MS. SWINGLE:  Right.

17         JUDGE PAN:  -- the acceptance by the investor.  And

18   then --

19         MS. SWINGLE:  That's correct.

20         JUDGE PAN:  -- the arbitral award under our case law.

21         JUDGE PILLARD:  And do you have a position on whether

22   the ECT is an agreement for the benefit -- an agreement to

23   resolve issues by arbitration for the benefit of others?

24         MS. SWINGLE:  So again, we don't understand the ECT

25   itself to be an agreement to arbitrate.  And I --



1              JUDGE PILLARD:  I'm asking the specific question,

2       though of, the FSIA has its own language?

3              MS. SWINGLE:  Yes, and I want to look to that.  It's,

4       again, that is -- that description which may arise -- to

5       enforce an agreement made by the foreign state with or -- for

6       the benefit of a private party to arbitrate.  And again, I

7       think that is envisioning an arbitration agreement.  I think

8       that is the jurisdictional fact.

9              JUDGE PILLARD:  But why is it an agreement among the

10      contracting parties to arbitrate --

11             MS. SWINGLE:  Because I think --

12             JUDGE PILLARD:  -- the benefit --

13             MS. SWINGLE:  -- in some instances, you can have third

14      party enforcement of an arbitration agreement.  A third party

15      beneficiary of the arbitration agreement might --

16             JUDGE PILLARD:  And why isn't that what we have here?

17             MS. SWINGLE:  So again, we're not taking a position on

18      the bottom line of whether there is in fact an agreement to

19      arbitrate here.

20             JUDGE ROGERS:  So could I just clarify one thing in my

21      own mind.  When the United States -- its first point -- that at

22      least as to the FSIA, on the district court faced with an

23      enforcement petition must make an independent determination

24      that there is an arbitration agreement.  By that I assume that

25      the United States is saying it's not enough for the district



1    court to defer to an EU arbitrator's conclusion?

2            MS. SWINGLE:  That is absolutely correct, Your Honor.

3    We think the court needs to make its own independent

4    determination.

5            JUDGE ROGERS:  Does that mean in the nature of a

6    summary judgment proceeding, potentially, or maybe a trial?

7            MS. SWINGLE:  If there are disputed jurisdictional

8    facts, potentially, yes.  You know, I think generally it would

9    be our view that this would likely be legal issues to be

10   decided --

11           JUDGE ROGERS:  Yes, I understand, but I just want to

12   understand where we're going here, potentially.  Depending on

13   the evidence, it may not be possible to resolve this matter

14   simply on a procedural Rule 56 proceeding.

15           MS. SWINGLE:  And that's possible, Your Honor.  As is

16   typically the case in FSIA cases, if there are disputed

17   questions of fact, that are necessary to be resolved to address

18   the question of whether a particular exception to foreign

19   sovereign immunity applies.

20           JUDGE ROGERS:  So do you know, and there's no reason

21   you should necessarily, whether or not throughout the world

22   when a party has an award and seeks its enforcement, there are

23   independent determinations as to whether or not that party is

24   properly before the court and there is no deference as to

25   whether or not the agreement of which it is seeking exists?

1              MS. SWINGLE:  So I do not know, Your Honor, but I

2       think that is unsurprising.  And I would just -- to return to

3       the ICSID Convention, I think it's clear that -- the ICSID

4       Convention sets out a framework for arbitration, but it is not

5       an agreement among states to waive their sovereign immunity.

6       That's clear from the convention itself, which references

7       sovereign immunity only to make explicit that it is not

8       abrogated by the convention.

9              And it's clear from Article 54, which provides that a

10      state party -- a state party with a federal constitutional

11      structure, like ours, agrees to enforce an arbitration

12      agreement as if it were a final judgment of the courts of a

13      constituent state.  So under U.S. law, that requires that there

14      be a basis for subject matter jurisdiction under the FSIA.

15             And I would note that the convention was implemented

16      domestically through 22 U.S.C. 1605(a), which doesn't itself

17      abrogate sovereign immunity and doesn't provide an independent

18      basis for jurisdiction over a foreign state.  That's governed

19      solely by the FSIA.

20             JUDGE PILLARD:  But there's an argument.  If that's

21      the -- immunities not abrogated with respect to execution and

22      the investor's counsel points out that the limits of that

23      abrogation imply that immunity may well be abrogated in their

24      view is abrogated with respect to, you know, recognition and

25      enforcement.



1          MS. SWINGLE:  So I think both textually that's a

2    dramatic overreading of the convention to take by negative

3    implication that the parties meant to waive sovereign immunity.

4    I --

5          JUDGE PILLARD:  Well, it certainly doesn't expressly

6    preserve it except with respect to execution.

7          MS. SWINGLE:  Well, I don't think it's consistent with

8    Article 54 either because the obligation to enforce an

9    arbitration award as if it were a final judgment of the courts

10   of constituent state envision enforcement under domestic law,

11   which, in this case, incorporates, you know, whatever you need

12   to do to show that sovereign immunity doesn't apply.

13         And I would also just point to the legislative history

14   of 1605(a), which was the implementing legislation.  Obviously,

15   the legislative history strongly suggests that it was

16   understood that the convention was not waiving sovereign

17   immunity.  If you take a look at the Second Circuit's decision

18   in Mobil Cerro Negro, it outlines that legislative history.

19   But I also think it's not the kind of clear statement we would

20   expect to constitute a waiver of sovereign immunity from suit.

21   Certainly that would not be sufficient to waive U.S. sovereign

22   immunity.

23         JUDGE PILLARD:  Going back to the arbitration

24   exception.  What about ICSID and the full faith and credit

25   clause.  You say in your brief that dismissing for lack of



1    jurisdiction would not run afoul of the ICSID full faith and

2    credit obligation, but is that -- I mean, doesn't the full

3    faith and credit encompass or effectuate issue preclusion,

4    (indiscernible) preclusion, if there's a jurisdictional issue

5    that was decided by --

6            MS. SWINGLE:  So --

7            JUDGE PILLARD:  -- the ICSID panel --

8            MS. SWINGLE:  I think the court needs to have

9    jurisdiction in order to exercise any power over a foreign

10   state, right.  The subject matter jurisdiction inquiry under

11   the FSIA is a threshold question of this court's authority.

12   And again, under ICSID Article 54, you know, our obligation is

13   to enforce the arbitral award in the same way that we would

14   enforce a judgment of a constituent state.  And that too under

15   federal law would require finding a plenary basis for

16   jurisdiction under the FSIA at the threshold.

17           Now, on the merits, certainly the court would not be

18   reconsidering -- assuming it had jurisdiction to enforce, would

19   not be reconsidering the merits of the arbitral award, but that

20   is a different inquiry, I think, from the subject matter

21   jurisdiction inquiry.

22           JUDGE PILLARD:  So if an investor in Switzerland

23   decided we are going to enter into an arbitration agreement and

24   we are going to give the arbitrators the authority to decide

25   whether we have agreed -- whether we have an arbitration



1    agreement, and then to decide under it, and the arbitrators,

2    yes, we have an agreement, and yes, we've decided under it, we

3    as a U.S. court enforcing that against Switzerland could not

4    credit the conclusion in that award as to the existence of an

5    agreement?

6            MS. SWINGLE:  On the merits, certainly --

7            JUDGE PILLARD:  But not as --

8            MS. SWINGLE:  -- but as --

9            JUDGE PILLARD:  -- (indiscernible) --

10           MS. SWINGLE:  -- conferring subject matter

11   jurisdiction on this court, no.  And I think that follows

12   necessarily from this court's prior decisions.  In Belize

13   itself, as I mentioned, arbitration took place under rules that

14   gave the jurisdictional -- gave the arbitral partner the

15   authority to decide conclusively disputes about the existence

16   and validity of the agreement.

17           JUDGE PILLARD:  And what about Chevron and Stileks?

18           MS. SWINGLE:  Well, I think -- there's this basic

19   distinction that we've drawn between the existence of the

20   agreement and questions about arbitrability.  We understand

21   Chevron and Stileks to be based on that distinction.

22           JUDGE PILLARD:  And finding the existence of agreement

23   based on what?

24           MS. SWINGLE:  Well, I think independently examining --

25   for example, in Belize, you know, the court looked to whether

1    the governmental official in fact had authority to enter into a

2    binding agreement to arbitrate.

3          JUDGE PILLARD:  That's Belize, but Chevron, Stileks, I

4    mean, they're viewing -- they're -- where do you see them

5    determining that there is an agreement to arbitrate?

6          MS. SWINGLE:  So in Chevron, the court held that the

7    district court had in fact determined that there was an

8    agreement to arbitrate, right.  And --

9          JUDGE PAN:  Based on the treaty --

10         MS. SWINGLE:  Right.

11         JUDGE PAN:  -- that offered arbitration --

12         MS. SWINGLE:  Correct.

13         JUDGE PAN:  -- acceptance by the --

14         MS. SWINGLE:  The court --

15         JUDGE PAN:  -- (indiscernible) --

16         MS. SWINGLE:  The district court had not understood

17   itself to be making that determination as part of the

18   jurisdictional inquiry, but it had in fact determined that

19   there was a valid agreement.  And in Stileks, the court simply

20   decided that it was a question of the scope of the arbitration

21   agreement.  It wasn't a dispute about the existence of the

22   arbitration agreement itself.

23         JUDGE PAN:  Can you address the injunction, please.

24         MS. SWINGLE:  I'd like to, Your Honor.  I will say in

25   the view of the United States, this is an extraordinary set of



1    injunctions that Judge Chutkan entered.  We are aware of no

2    other instance in which a court has enjoined a foreign

3    sovereign from pursuing litigation in a foreign court.

4         I want to turn, if I can, Judge Pan, to your earlier

5    question about why this wasn't just like Laker Airways.

6    Because in the United States' view, what's relevant here is

7    kind of the -- the circumstances presented and the real balance

8    seen of interests here that make clear what an extraordinary

9    affront international comity this is.  You know, in Laker

10   Airways, it was an injunction against a private entity, and I

11   think that's extremely significant.  Obviously, the affront to

12   sovereign dignity is greatly heightened when you're talking

13   about enjoining a foreign state itself.  But in addition, the

14   court in that case was applying -- being asked to apply

15   domestic substantive rules of decision to govern the conduct of

16   entities operating in this country whose operations were

17   alleged to be in violation of domestic law to the serious

18   detriment of both the -- for functioning of United States

19   markets and U.S. consumers.

20        Here, this is a far cry from that.  The underlying

21   arbitration here involves arbitration between a foreign state,

22   a foreign national from EU member country, addressing questions

23   of EU law.  United States here is acting solely as an

24   enforcement arm of an arbitral tribunal.

25        And I would just add.  You know, obviously, we have



1    grave concerns about the propriety of coercive measures, like

2    injunctions against foreign states.  The law of many foreign

3    countries do not allow for such orders to be entered.

4    Countries rightly think that it is a violation of their

5    sovereignty.  And you know, obviously, we have concerns about

6    the reciprocal treatment of the United States.

7              JUDGE PAN:  Is it your position, though, that there's

8    never a situation which the United States would sanction or

9    approve of an anti-suit injunction against a foreign sovereign?

10             MS. SWINGLE:  We have not --

11             JUDGE PAN:  Where do we draw that line?

12             MS. SWINGLE:  We have not taken the position that it

13   would never be appropriate.  I think the question has not been

14   squarely presented, but certainly both in this case and in the

15   BAE case we cite, it was the government's view that injunctive

16   relief would not have been appropriate.  We don't think it was

17   appropriate here.

18             JUDGE PILLARD:  So if I could give you a hypothetical.

19   We do have an amicus brief from a party called MOL Hungarian

20   Oil.  I don't know if you've read it.  But it's supposed to

21   illustrate the importance of the ICSID framework for ensuring

22   that justice is done to investors when a nation decides they

23   want to get out of a deal.  And assume this nation is doing it

24   in bad faith, because in this amicus brief, it recounts how

25   Croatia took steps to get out of an investment agreement with

1    MOL Hungarian Oil, which included relying on false information;

2    criminally prosecuting and imprisoning one of the officers of

3    the investor corporation.  And in spite of all that, however,

4    MOL Hungarian Oil was able to get an arbitration award from the

5    ICSID framework, and mutual arbitrators found that Croatia was

6    acting in bad faith, that these were false, these were lies,

7    and awarded an arbitral award to MOL Hungarian Oil.  And this

8    is supposed to illustrate why ICSID is so important.

9           So what if Croatia had sued MOL Hungarian Oil in

10   Hungary to prevent that company from availing itself of the

11   benefits of ICSID, would comity say we can't grant an anti-suit

12   injunction under such a circumstance?

13          MS. SWINGLE:  So again, we're not taking any hard and

14   fast position that it would never be appropriate, and of

15   course, I can't speak to the veracity or propriety of the facts

16   in that hypothetical --

17          JUDGE PILLARD:  Let's assume --

18          MS. SWINGLE:  -- (indiscernible) --

19          JUDGE PILLARD:  -- that they're true.  I'm just

20   wondering if there is room for an anti-suit injunction under

21   narrow circumstances where there's apparent bad faith or

22   something --

23          MS. SWINGLE:  I would --

24          JUDGE PILLARD:  -- that indicates there would be an

25   injustice.



1          MS. SWINGLE:  I would say -- I think the circumstances

2    presented here are a far cry from circumstances that would

3    demonstrate bad faith --

4          JUDGE PILLARD:  Are you fighting my hypothetical?

5          MS. SWINGLE:  Well, and I -- I want to just point out

6    something that I think is important.  Even in BAE, you know,

7    there you had the Korean government going into Korean courts

8    seeking relief under their own law.  You know, where you had

9    every reason to think that that was a particularly favorable

10   forum for the home country to be litigating in.  Here --

11         JUDGE PILLARD:  I see that as a different kind of

12   case, because those are sort of parallel proceedings.  This is

13   a suit to stop the U.S. proceedings.

14         MS. SWINGLE:  Well --

15         JUDGE PILLARD:  And also in BAE, it looks like there

16   was an injunction, which was lifted.  I was reading that case

17   this morning, and it says there was an injunction entered which

18   was lifted.

19         MS. SWINGLE:  The district court -- ultimately when it

20   came before this court, there was an injunction in place.

21         JUDGE PILLARD:  Correct.  But --

22         MS. SWINGLE:  Right.

23         JUDGE PILLARD:  -- earlier in that -- the proceedings

24   of that case -- you said there never has been, but it --

25         MS. SWINGLE:  Well --



1          JUDGE PILLARD:  -- looks like there was one in that

2     case.

3          MS. SWINGLE:  I misspoke, Your Honor.  I think --

4     there's every reason to think that the EU courts, where these

5     proceedings are taking place, would have no reason to be unduly

6     favorable to Spain, right.  Spain has gone into the home court

7     of the investor to try and get that court, which is under the

8     EU rubric and framework, to decide questions of EU law.

9          JUDGE PILLARD:  I don't want to opine on what the

10    motivations of the EU courts are or anything like that, but I

11    thought that the whole reason for ICSID was to ensure that

12    there would be a neutral arbiter that investors don't have to

13    go before national courts.  They get to go before international

14    arbiters.

15         And the United States is a signatory to ICSID and has

16    150 cases out there with American investors availing themselves

17    of ICSID and does the United States have an interest in making

18    sure that ICSID framework doesn't collapse?  Because if nation

19    states can file suits to enjoin people from using ICSID, that's

20    a threat to ICSID, and the United States is a member of ICSID

21    and has an interest in making sure that doesn't happen.

22         MS. SWINGLE:  So again, Your Honor, it is true that

23    the United States is a member of ICSID.  I think that the

24    United States' interest in acting purely as an enforcement

25    court for an ICSID arbitral award is not the same kind of

1    interest that this court had before it in <u>Laker Airways</u>.  Where

2    even there where the injunction ran purely against a private

3    entity, the court recognized that it was extraordinary

4    circumstance.  But that in that case in particular, the

5    domestic forum's interest in adjudicating questions of U.S. law

6    to apply to regulate conduct of companies joined business in

7    this country and availing themselves of the legal protections

8    in this country, I think that's --

9            JUDGE PILLARD:  But I guess my question is whether

10   United States' interest in upholding the ICSID framework is

11   something similar or akin to, you know, this interest in U.S.

12   law.

13           MS. SWINGLE:  I don't -- we do not see the interest as

14   the same.  And I would point out that, you know, this is not

15   merely a hypothetical circumstance in which an injunction

16   against litigation could harm our foreign relations, but we

17   have no reason to think that is manifest.  What we have here

18   are statements --

19           JUDGE ROGERS:  (Indiscernible) to think it's what?

20           MS. SWINGLE:  It's not purely hypothetical that the

21   injunctions here are harming our foreign relations and our

22   relations with our international partners.  You know, we have

23   statements from the EU here about the interference with the

24   resolution of complex questions of EU law that the injunctions

25   pose.  We have the European Union and relevant foreign



1    sovereigns have raised diplomatic concerns directly with the

2    state department.  I think they all just reflect the

3    significant affront foreign relations that those injunctions

4    have caused.

5            JUDGE PAN:  Is there room for a very narrow path to

6    upholding an injunction like this?  Because these are very

7    specific circumstances where the foreign case is one which is

8    directly contributed at stopping jurisdiction in a U.S. court.

9    It's not just like a parallel proceeding based on the same

10   facts.  The purpose of these suits brought by Spain is to stop

11   the -- this ongoing legal proceeding in the United States.  And

12   it's under circumstances where these investors won't get to, I

13   guess, have the benefits of ICSID or probably have their awards

14   at all because we know how the EU feels about these awards.  It

15   just seems that it leaves the investors in a difficult place.

16           It seems to me that in Laker Airways, we said that the

17   test is we have to examine the equitable circumstances to

18   determine if the anti-suit injunction is required to prevent in

19   irreparable miscarriage of justice.  And I don't know how this

20   all balances out because I do understand that this is different

21   from Laker Airways because we're talking about a sovereign, and

22   I just don't know, you know, how that all weighs.  It just

23   seems that there are also other circumstances here that aren't

24   considered in Laker Airways.

25           MS. SWINGLE:  So I think it's not just that it's a



1   foreign sovereign here that makes this case different from

2   Laker Airways.  I do think the nature of the domestic court's

3   interest is reduced here.

4          And I would just, if I can, Judge Pan, it is true that

5   the European proceedings are intended to stop the domestic

6   litigation, but it is routinely the case that at least the

7   practical effect that a foreign litigant who is litigating both

8   in domestic courts and in some foreign proceeding is going to

9   be to nullify the effect of the domestic judgment.  That was

10  true in B.A. Airways where Korea was looking for a Korean court

11  adjudication that it would be able to recoup whatever payment.

12         JUDGE PAN:  But those were just parallel proceedings,

13  which is a little different --

14         MS. SWINGLE:  But I think --

15         JUDGE PAN:  -- in my eyes where somebody is trying to

16  stop something from happening here.

17         MS. SWINGLE:  I think -- it is correct that the fact

18  that a foreign proceeding is for the purpose of short-

19  circuiting or stopping the domestic litigation in U.S. court is

20  a relevant factor, but I don't --

21         JUDGE PAN:  And wasn't -- didn't Spain behave with a

22  lack of comity by doing this?

23         MS. SWINGLE:  I don't think it's a dispositive factor,

24  Your Honor.  And I -- you know, I don't want to speak for

25  Spain, but I would assume that Spain's view is that it has been

1    forced into arbitration that it cannot validly agree to, and

2    then put that risk of facing awards that it can't comply with

3    consistent with the EU law.  But again --

4        JUDGE PILLARD:  So your view is its interest -- you

5    know, it may be using this tool, but its interest is closer to

6    the heart of at least what it perceives to be a sovereign

7    prerogatives than the U.S.'s interest as an ICSID signatory in

8    being a form for enforcement.

9        MS. SWINGLE:  Correct.  Particularly when the

10   underlying questions are one --

11       JUDGE PILLARD:  Is not U.S. law, not U.S. parties --

12       MS. SWINGLE:  A treaty --

13       JUDGE PILLARD:  -- not U.S. consumers --

14       MS. SWINGLE:  -- to which we are not, yeah.

15       JUDGE PILLARD:  -- not --

16       MS. SWINGLE:  If the Court has no further questions.

17       JUDGE PILLARD:  Thank you very much.  And we

18   appreciate your submitting a brief and appearing today at our

19   invitation.

20       And now we will hear from Mr. Dvoretzky for NextEra

21   and 9REN.  Good morning.

22           ORAL ARGUMENT OF SHAY DVORETZKY, ESQ.

23                ON BEHALF OF THE APPELLEES

24       MR. DVORETZKY:  Good morning.  May it please the

25   Court.  I'd like to start with the ICSID issue --



1          JUDGE PILLARD:  I was hoping that you were going to

2    pronounce your name so that I could see that I pronounced it --

3          MR. DVORETZKY:  No, you got it correctly.

4          I'd like to start, if I could, with the ICSID waiver

5    issue, but in my time, also, of course, address the arbitration

6    exception as well.  ICSID is an extraordinarily broad

7    convention.  Spain's position in this case would effectively

8    tear down the ICSID regime without regard for the U.S.'s own

9    obligations under ICSID, which the United States recognized,

10   for example, in its filing in the Second Circuit in the Mobil

11   Cerro case.  There's jurisdiction here under the waiver

12   exception because by ratifying the ICSID Convention, Spain

13   waived immunity to ICSID award enforcement actions in member

14   states' courts.  It would create a circuit split with the

15   Second Circuit in Blue Ridge to hold otherwise.  It would also

16   be at odds with the Australian High Court's decision, which

17   followed Blue Ridge to hold otherwise.

18          The ICSID Convention is a unique treaty that governs

19   disputes with the foreign states and waives by its terms

20   immunity to award enforcement in courts of member states.  We

21   get that first from the text, if you walk through the text of

22   ICSID.  Article 25(1) of ICSID talks about how the jurisdiction

23   of the Centre shall extend to any legal dispute arising

24   directly out of an investment between a Contracting State and a

25   national of another Contracting State.  So from the outset,

1    ICSID is contemplating disputes against or involving

2    contracting states.

3         Article 41(1), again, a very broad provision, talks

4    about how the Tribunal shall be the judge of its own

5    competence.  And Article 41(2), that includes that any

6    objection by a party to the dispute that the dispute is not

7    within the jurisdiction of the Centre, shall also be considered

8    by the Tribunal.  So the Tribunal decides its own jurisdiction.

9    That's delegated to the Tribunal.

10         Under Article 53 --

11         JUDGE ROGERS:  So help us respond, if you would,

12   Counsel, to the arguments that we heard this morning, because

13   certainly through Judge Pan's question you got the notion that

14   the Court has been reading the plain language, but we're told

15   that there were a lot of understandings, there were a lot of

16   assumptions, everybody knew, and of course now we have this

17   more recent statement by, what, 26 sovereigns in the EU.  What

18   is going on here?  Can you help us understand.

19         MR. DVORETZKY:  Judge Rogers, I don't think that any

20   of those arguments go to an understanding about ICSID.  I don't

21   think there is any argument that the terms of ICSID mean

22   anything other than what they say, including that the award's

23   going to be binding on the parties, and that every contracting

24   state has to recognize an award and treat it as if it were a

25   final judgment of a court in that state.



1           JUDGE ROGERS:  Correct.

2           MR. DVORETZKY:  I think the argument --

3           JUDGE ROGERS:  But you heard counsel take us through

4    articles saying that there is language here that limits that

5    understanding; that not only was commercial arbitration not at

6    that point, at that time, but the economic aspect of what's

7    going on has changed dramatically since that period immediately

8    after World War I.  So your position is that those limiting

9    articles need to be read how?

10          MR. DVORETZKY:  So Judge Rogers, I think that those

11   arguments go to the language of the ECT, rather than to the

12   language of ICSID.  If the court would --

13          JUDGE PAN:  You need an agreement to go into ICSID,

14   and I think that's really where the action is.  And it feels

15   like the parties are sort of ships passing in the night on

16   that.

17          MR. DVORETZKY:  So I don't think we're ships passing

18   because I think there are two distinct grounds on which the

19   district court had jurisdiction.  The waiver exception doesn't

20   require you to look at the ECT because the waiver is by

21   entering the ICSID Convention.  And the reason that I was

22   marching through the text of the ICSID Convention is that I

23   don't think there can be any dispute that that text waives

24   immunity as to enforcement of ICSID awards, including -- in the

25   courts of any member state, which, under 1650(a) includes

1    courts of the United States.  That --

2                 JUDGE PILLARD:  Arbitration exception.

3                 MR. DVORETZKY:  Then there's the arbitration

4    exception.  Under the arbitration exception, a few points on

5    this.  First, this court's cases in Chevron and Stileks set

6    forth the framework -- and not just the framework, but in

7    Stileks, dealing with the ECT specifically, for how to

8    determine whether there is jurisdiction under the arbitration

9    exception.  Stileks tells us that producing copies of the ECT,

10   the notices of arbitration, and the tribunal's decision show

11   that the arbitration exception applies, and that's exactly what

12   happened here.  Stileks treated the ECT as the arbitration

13   agreement because, tying this to the language of the FSIA, it

14   is an agreement made by the foreign state, contracting parties

15   to the ECT, with or for the benefit of private parties, which

16   is again what we have here.

17               The -- a key quote from Stileks is that, "The

18   Tribunal's jurisdictional grant derived from Moldova's

19   signature on the treaty itself", that's treating the treaty

20   itself as the relevant agreement, "and under our law, it is up

21   to the Tribunal to determine what the treaty means."  Spain's

22   arguments, Judge Rogers, about what the ECT means under that

23   language in Stileks are for the Tribunal.

24               If you don't view the ECT as the relevant agreement, a

25   sovereign could always frame very challenge as one of



1    existence, saying, well, because the right kind of investor or

2    investment wasn't involved, there was never an offer, there was

3    never acceptance, there was never agreement.  Stileks and

4    Chevron reject that.  In those cases too, in Chevron, Ecuador

5    said there was no agreement because the treaty's arbitration

6    clause didn't apply to the investments.  The court rejected

7    that because that's an issue that was decided against Ecuador

8    by the arbitrators.

9         JUDGE PAN:  Within the scope, but -- so back to

10    Stileks.  You're reading -- so you're reading the FSIA -- I

11    just think that I should put the language right in front of

12    me -- the parties to the relevant agreement to arbitrate and

13    being different from the parties to the dispute that's being

14    arbitrated, if you just track that the FSIA's language, that

15    does not bother you?  Or how should we --

16         MR. DVORETZKY:  I think that is the FSIA's language.

17    The FSIA's language was contemplating investment treaties.

18    Investment treaties are different in kind from ordinary

19    commercial arbitration agreements, where you have party A and

20    party B signing an agreement and then -- usually you're going

21    to have party A and party B, the ones in arbitration, but even

22    then you can have a third party that can sometimes force an

23    arbitration agreement.  Here in A(6) of the FSIA, congress is

24    specifically contemplating this kind of agreement where you

25    have an investment treaty among states for the benefit of

1    private parties.  When congress added A(6) to the statute, it

2    was trying to expand the scope of enforceability of arbitral

3    awards, and this is exactly the kind of agreement that it was

4    contemplating.  And again, Stileks and Chevron, following B.G.

5    Group, treat the ECT, the investment treaty, as the relevant

6    agreement.  As to --

7              JUDGE PILLARD:  So you have an agreement -- to enforce

8    an agreement made by the foreign state, Spain, for the benefit

9    of a private party, investors, such as your clients, to submit

10   to arbitration all or any differences which have arisen or

11   which may arise between the parties.  So there the parties are

12   not the parties to the agreement made by the foreign state

13   because the parties to that are the other signatories of the

14   ECT.  But that doesn't bother you, that between the parties

15   suddenly becomes the nation state and the third party

16   beneficiary?

17             MR. DVORETZKY:  No, because I don't think that private

18   party, at the beginning of that sentence, is referring to the

19   same parties as the ones who will be in the arbitration --

20   necessarily will be in the arbitration.

21             JUDGE PILLARD:  Oh I think -- I thought that was your

22   position --

23             MR. DVORETZKY:  No --

24             JUDGE PILLARD:  -- that the private -- the benefit of

25   a private --



1          MR. DVORETZKY:  No --

2          JUDGE PILLARD:  -- is the investor --

3          MR. DVORETZKY:  Well, I'm sorry --

4          JUDGE PILLARD:  -- and then it's a dispute that arises

5    between the parties, and that is no longer the parties to the

6    agreement --

7          MR. DVORETZKY:  That's right.

8          JUDGE PILLARD:  -- made by the foreign state.

9          MR. DVORETZKY:  Correct.

10          JUDGE PILLARD:  It is now the parties to the

11    differences which arise.

12          MR. DVORETZKY:  Correct.  Which can be --

13          JUDGE PILLARD:  So it's the same party plus --

14          MR. DVORETZKY:  Plus the foreign state.

15          JUDGE PILLARD:  -- the foreign state.

16          MR. DVORETZKY:  Right.  And --

17          JUDGE PILLARD:  (Indiscernible), that shift.

18          MR. DVORETZKY:  I think it just reflects in this

19    court's decisions in Chevron, and Stileks do as well, the

20    nature of an investment treaty where states are getting

21    together to reach an agreement in order to ensure that the

22    contracting party -- that the parties within those states have

23    right -- have access to an arbitral forum.  And this --

24          JUDGE PAN:  So it seems to me -- it seems to me that

25    there are really two ways to look at whether there's an

1    agreement to arbitrate.  One is the way that Judge Pillard was

2    just asking you about, which is just to look at the ECT and see

3    that as an agreement among the contracting states to agree to

4    unconditional arbitration for the benefit of private parties,

5    such as your client.  And then the second way, to look at it

6    the way we did in Chevron, which is to say there is an offer --

7    there is an offer to arbitrate with any investors out there by

8    Spain, because they signed this treaty and it says, I'm

9    unconditionally agreeing to arbitrate, and then it's accepted

10   when an investor files its notice of arbitration, and then get

11   an award, and those are the three jurisdictional facts we need

12   under the FSIA.  Those seem to be two different ways to say

13   that there is an agreement to arbitrate, and I'm just wondering

14   if one is better than the other, or if there's a preference as

15   to which is more persuasive.

16        MR. DVORETZKY:  So I think that there are two -- there

17   are two agreements to arbitrate that could be at issue, which I

18   think is what Your Honor's question is getting at.  There is

19   the ECT, which is an agreement to arbitrate for the benefit of

20   a private party, then there's the agreement that is formed when

21   the notice is submitted, and then that's a further agreement

22   between the private party and the state.  What this court said

23   in Chevron and Stileks is that consistent with the FSIA's plain

24   language, that first agreement qualifies under the FSIA for

25   purposes of establishing jurisdiction.  And -- so that would be

1    the relevant agreement to look at.  And if that were not the

2    relevant --

3              JUDGE PAN:  The one among the states that --

4              MS. SWINGLE:  The one among the states --

5              JUDGE PAN:  The states?

6              MR. DVORETZKY:  Once you have -- once you have the

7    ECT, it's indisputable that the ECT exists, Spain signed on to

8    it.

9              JUDGE PAN:  Yeah.

10             MR. DVORETZKY:  That is the agreement that satisfies

11   A(6) and that establishes subject matter jurisdiction -- and

12   that establishes -- the way sovereign immunity establishes --

13             JUDGE PAN:  It seems like either could satisfy A(6).

14   Either of the two ways of looking at it.

15             JUDGE PILLARD:  I was just going to say -- you can

16   answer that because I have --

17             JUDGE PAN:  No, I'm interested. --

18             JUDGE PILLARD:  -- follow-on question.

19             MR. DVORETZKY:  Well, I think the -- the reason that

20   the better way to look at is that the ECT satisfies that

21   agreement is that -- the ECT satisfies the requirement -- is

22   that otherwise, if you look at a case like Chevron or Stileks,

23   where you have a state coming in and saying, yes, we agreed to

24   arbitrate, but we didn't agree to arbitrate about this issue.

25   The way that -- under Spain's argument, that is always going to

1    become a question for the court rather than a scope question,

2    because Spain's view of the world is -- Spain's view of the

3    world is because we didn't agree to arbitrate about X, we never

4    made an offer to arbitrate about X, and no agreement was ever

5    formed.  That --

6            JUDGE PAN:  But under Chevron, didn't we decide that

7    that's just a question of arbitrability?

8            MR. DVORETZKY:  Yes.

9            JUDGE PAN:  (Indiscernible).

10           MR. DVORETZKY:  Precisely.  That is a question of

11    arbitrability.  It's a question of scope for the arbitrator.

12           JUDGE PAN:  Yes.

13           MR. DVORETZKY:  And that's precise -- and it -- the

14    Court did that in Chevron because it viewed the ECT as the

15    relevant agreement.

16           JUDGE PILLARD:  But -- I'm sorry, finish your

17    sentence.

18           MR. DVORETZKY:  No, no, please.

19           JUDGE PILLARD:  I don't want to interrupt.

20           MR. DVORETZKY:  That's okay.

21           JUDGE PILLARD:  But don't you have the same problem if

22    you go back, you know, one step earlier, as you were doing, and

23    saying the ECT is itself an agreement to resolve disputes by

24    arbitration.  You disavow that it's an agreement between Spain

25    and your clients because your clients weren't parties to it.

1    It's more -- it's -- but it is an agreement to resolve disputes

2    by arbitration, but Spain would come back and say, yes, but

3    it's only an agreement by EU member states to resolve disputes

4    by arbitration with investors from outside the EU.  So the very

5    same problem of -- well, what's the scope of, you know,

6    Ecuador's offer to arbitrate arises with respect to the

7    interpretation of the meaning of the ECT.  And their view is,

8    that has to be decided by us.  It's our jurisdiction, how do we

9    resolve that.

10           MR. DVORETZKY:  But Judge Pillard, it is the same sort

11   of question about scope as the one that Ecuador raised, and

12   this court in Chevron and in Stileks decided that that was a

13   question about scope for the arbitrator.

14           JUDGE PILLARD:  I find --

15           MR. DVORETZKY:  That's --

16           JUDGE PILLARD:  -- that undertheorized and I would

17   love your help to bolster what we are bound by on that point,

18   because if the nature of the treaty itself is, yes, Spain's a

19   signatory, but Spain is a signatory to a treaty that -- with

20   respect to Spain, only allows non-EU investors to accept its

21   offer to arbitrate.  That's our understanding and that's

22   actually the dominant European Court understanding.  How does

23   it get you an agreement to arbitrate -- how does it transform a

24   formation question into a scope question through the magic of

25   adding ICSID and stirring?



1          MR. DVORETZKY:  So I think there's no question that

2     the ECT is an offer to arbitrate.  If you had a Japanese

3     investor come in, there's no question that they could accept

4     the offer to arbitrate.  The only argument that Spain is making

5     is, we need to construe the terms of this indisputable existing

6     agreement.  The meaning of this indisputably existing

7     agreement, that takes us back to the quote that I had -- that I

8     read earlier from Stileks.  The meaning of the treaty, once we

9     agree that the treaty exists and that Spain has signed on to

10    it, which is indisputable, the meaning of the treaty is a scope

11    question.  That's the logic of Stileks.

12          That's equally true whether we're talking about the

13    kind of investment or whether we're talking about within the

14    language of the ECT, what it means to be a contracting state.

15    And the language of the ECT as to what it means to be a

16    contracting state is clear and unambiguous.  It -- I mean,

17    it -- there's no limitation on the offer to arbitrate with

18    entities that are organized in accordance with the law

19    applicable to contracting parties.  To go --

20          JUDGE PAN:  Except in Spain's view, the limit that is

21    the instinct and the entire nature of the capacity of EU and EU

22    states to join such a treaty, which is, well, of course,

23    primacy of EU law, of course this doesn't speak to our in-house

24    internecine, inter/intra-EU --

25          JUDGE PILLARD:  But isn't that foreclosed by Stileks?



1          MR. DVORETZKY:  Well, I think it's foreclosed by

2    Stileks.  I also think it's at odds with Vienna Convention and

3    how international law fundamentally works.  Under Article 6 of

4    the Vienna Convention, there's no question that Spain has the

5    capacity to enter into -- to enter into a treaty.  Article --

6    I'm sorry, there's no -- under Article 6, there's no question

7    that Spain has the capacity to enter into a treaty.  What Spain

8    is doing is it's claiming to discover decades later that as a

9    result of internal EU law, there was actually some prohibition

10   on doing that.  Under Article 46 of the Vienna Convention, a

11   state can't use internal law in order to escape its

12   international obligations unless the limitation was manifest

13   and goes to a question of fundamental importance of that

14   state's law.

15          JUDGE PAN:  What's the source for that?

16          MR. DVORETZKY:  That's the Vienna Convention Article

17   46.

18          JUDGE PILLARD:  And that is their view.  I mean,

19   they -- Ms. Harris, I think, quite clearly is saying, oh yeah,

20   it manifests and of fundamental importance, the whole time.

21   You may have overlooked it, but in their -- that has to, I

22   think, be their view.  And I guess one question is, can that

23   change?  Could that now be the case going forward?

24          MR. DVORETZKY:  I don't know --

25          JUDGE PILLARD:  I know it wouldn't affect your client.



1          MR. DVORETZKY:  I don't think it can because the

2    Vienna Convention talks in the past tense about what was

3    manifest.  And I --

4          JUDGE PILLARD:  But let's say you're a new investor

5    today, would you be on notice, given the much more vocal in

6    manifest?

7          MR. DVORETZKY:  No, I -- I still don't think you would

8    because what Spain is effectively doing is trying to get out of

9    the ECT or to amend the ECT without going through the

10   procedures that the treaty itself provides for doing it.  You

11   simply can't do that as a matter of internal law.  To get --

12         JUDGE PILLARD:  Well, you're characterizing it as akin

13   to domestic law.  They're characterizing it as akin to, you

14   know, international law in the plain language of the Vienna

15   Convention itself.  Is it somewhere in between, and if we

16   can -- if we can synthesize the EU law and the Vienna

17   Convention and the ECT, to what -- in the Vienna Convention

18   does -- what is not respected by reading the EU law as a

19   species of international law, and is having the effect on the

20   ECT that --

21         MR. DVORETZKY:  So to --

22         JUDGE PILLARD:  -- that Spain says.  But who else does

23   it affect?  This is Europe's however benighted way of running

24   its own affairs.

25         MR. DVORETZKY:  So there's a lot packed into that.



1              JUDGE PILLARD:  I know.

2              MR. DVORETZKY:  That's okay.  Let me try to make three

3    points.  One, under the Vienna Convention Article 31(1),

4    treaties are contracts.  They're construed in accordance with

5    their ordinary meaning.  When you look at the ordinary meaning

6    of Article 26(3), it talks about how each contracting party --

7    Spain is a contracting party -- each contracting party hereby

8    gives its unconditional consent to the submission of a dispute

9    and so forth.  There simply is no other way to read that

10   language other than as Spain consented.  That -- Spain's

11   argument that decades later this limitation was discovered

12   doesn't come close to manifestly showing that that language

13   means something other than what it says.

14             JUDGE PILLARD:  What law -- what law are we applying

15   to decide the contract question in your view?  Choice of law

16   question.

17             MR. DVORETZKY:  Well, I think in terms of reading the

18   contract, I don't know that there is a -- I think you're just

19   reading the contract according to its ordinary terms.  I don't

20   know that there's a -- I don't know that EU law can read each

21   contracting party to mean something other than each contracting

22   party.  Vienna Convention 31(1) says you just interpret

23   language -- you interpret contracts according to their --

24   interpret treaties as according to their ordinary meaning.

25             With respect to the role that EU law plays in the



1   context to international law, there are numerous arbitration

2   decisions by respected arbitrators and scholars that have all

3   but uniformly rejected Spain's argument about the role of EU

4   law relative to the ECT.  I would point the Court to Professor

5   George Bermann's declaration in our record -- in the NextEra

6   record, which quotes a number of these arbitral decisions, and

7   explains within the system of international law, EU law doesn't

8   have supremacy.  It doesn't have hierarchal priority over the

9   laws of nonmember states or over rules of international law.

10          The EC itself, in its amicus brief, describes EU law

11  as being akin to federal law that preempts state law within the

12  United States.  EU law doesn't dictate the meaning of the ECT

13  as to non-EU members.  So this plain language of the ECT, when

14  we're talking about how each contracting party consents, that

15  doesn't mean one thing when Japan looks at the ECT and another

16  thinks when Spain or an EU member looks at the ECT.  The EU law

17  doesn't dictate the meaning of this agreement for non-EU

18  members.  It is a kind of international law in the sense that

19  it governs relations among sovereign states within Europe, but

20  it is not international law on the same plane as the general

21  international law that governs the interpretation of the ECT

22  for all signatories to the Energy Charter Treaty.

23          JUDGE PILLARD:  I'm not sure I'm entirely convinced

24  that it has to mean the exact same thing for EU investors as

25  for the Japanese investor, given that the two can coexist.



1     Nobody's going to be subject to confusing or conflicting

2     obligations in that --

3                MR. DVORETZKY:  But I think that --

4                JUDGE PILLARD:  -- (indiscernible).

5                MR. DVORETZKY:  But I think the problem is that with

6     these multilateral treaties, whether we're talking about the

7     ECT or whether we're talking about ICSID, every signatory state

8     has an interest in ensuring that other signatory states uphold

9     their obligations as to everybody.  That's why for ICSID

10    Congress consisted with the United States' obligations under

11    that convention, passed 1650(a) so that federal district courts

12    have an obligation to enforce ICSID awards.  And that's true

13    whether the ICSID award is held by a U.S. investor or by a

14    foreign investor.  All countries that are signatories to these

15    treaties have an interest in ensuring that other countries

16    honor them.  And so yes, Japan does have an interest in

17    ensuring that the ECT means the same thing for a Japanese

18    investor as for a Dutch investor.

19                JUDGE PILLARD:  Does it -- if all the -- if all the

20    investors in Europe said, oh we can't take advantage of that,

21    we'll just (indiscernible) without it and Japan is, like, well

22    we're going to take advantage of it, and like, the world would

23    go on.  There's nothing --

24                MR. DVORETZKY:  Well, if the investors in Europe don't

25    want to take advantage of it, they don't have to accept the

1    offer and arbitrate.  They can go to court if they choose to,

2    and sure, Japan --

3              JUDGE PILLARD:  Right.

4              MR. DVORETZKY:  -- Japan --

5              JUDGE PILLARD:  And if they're told, like EU law,

6    we're going to fine you if you do it or we're going to shun you

7    if you do it, or whatever, that doesn't work through the ECT.

8    I'm just not sure that -- that I see the uniforming point.  But

9    I take it and I don't want to -- I don't want to dwell on that.

10             Can you address the full faith and credit obligation.

11   You don't mention it when you're analyzing the arbitration

12   exception.  Is that the instrument by which the jurisdictional

13   determination of the ICSID tribunal comes into our case and

14   binds this court?

15             MR. DVORETZKY:  So I think that's what this court

16   recently said in Valores.  That 22 U.S.C. 1650(a) requires a

17   U.S. court to give full faith and credit, quote, even as to

18   questions of jurisdiction.  And that's exactly what we have

19   here.  Spain pressed the very same arguments about intra-EU law

20   to the tribunals and to the annulment committees in both of our

21   cases, and the -- under the ICSID Convention, those arguments

22   were considered and rejected.  The whole point of the ICSID

23   Convention is that when that happens, the role of a member

24   state's court is just to ensure the authenticity of the award

25   and then to enforce the award.  Again, that was this court's

1    decision in Valores.

2          JUDGE PILLARD:  So there's a waiver as to enforcement

3    in ICSID.  There's not as to -- I'm now switching back to

4    waiver.

5          MR. DVORETZKY:  Sure.

6          JUDGE PILLARD:  But there's not as to execution.  So

7    what's -- what happens next if we were to affirm the district

8    court?

9          MR. DVORETZKY:  So as to execution, the FSIA's rules

10   about execution in 28 U.S.C. 1609 and 1610 would apply.  So

11   it's true.  ICSID does not waive -- the ICSID Convention does

12   not waive sovereign immunity as to execution.  Instead, it says

13   that the country in which the award is enforced, its rules

14   about execution will apply.  And that is supplied, again, by

15   1609 and 1610 of the FSIA.  And there are various exceptions to

16   sovereign immunity that we would be able to satisfy under the

17   FSIA as to execution.

18         JUDGE PILLARD:  And --

19         MR. DVORETZKY:  The --

20         JUDGE PILLARD:  -- I just wanted to give you an

21   opportunity to talk about the injunction, and I wonder what you

22   think is the U.S. national interest that's promoted here by

23   the -- enjoining the proceedings in Europe.

24         MR. DVORETZKY:  Sure.  So it's two interests.  One is

25   the district court's interest in protecting its own



 1    jurisdiction.  Congress enacted 1650(a).  That requires

 2    district courts to enforce ICSID awards.  Spain's tactic here

 3    was to try to defeat the district court's jurisdiction by

 4    bringing suit in the Dutch and Luxembourgish courts.  And so

 5    the -- one interest is, in protecting federal district court

 6    jurisdiction, the other is -- the injunctions were necessary to

 7    uphold the United States' obligations under the ICSID

 8    Convention and under 1650(a).

 9         Article 54(1) of the ICSID Convention says that a

10    court must recognize an ICSID award as binding, as if it were a

11    final judgment of a court in that state.  1650(a) implements

12    that in the U.S. as a statutory matter.  Again, every signatory

13    nation that signed on to the ICSID Convention took on a

14    obligation to ensure that those awards are enforceable, because

15    that's really essential for the system to function --

16         JUDGE PILLARD:  But then we would be --

17         MR. DVORETZKY:  -- is that you could --

18         JUDGE PILLARD:  I mean, Judge Chutkan enforced if

19    there were no injunctions, she would still have enforced.  She

20    would have done her duty under ICSID, and the rest is beyond

21    what -- I mean, ICSID doesn't have a requirement of enjoining

22    other countries, other signatories, courts.  The jurisdiction

23    in this case would be -- have been exercised.

24         MR. DVORETZKY:  Well, but Judge Chutkan, I think,

25    needed to enter that injunction because Spain initiated these

1    actions in the Netherlands at the Luxembourg in order to

2    terminate the district court proceedings and prevent Judge

3    Chutkan from enforcing.  They're seeking extraordinarily high

4    monetary penalties against NextEra and against 9REN for every

5    day that they don't comply with the European Court injunction

6    to dismiss the U.S. action.  So the whole point of these

7    European actions was actually to prevent Judge Chutkan from

8    ever getting to the point where she could enforce.

9           JUDGE PAN:  So if the anti-suit cases went forward in

10   the Netherlands and Luxembourg, anything still pending here

11   would be suspended and stopped if they prevailed?  Including an

12   appeal, including any attempt to, I guess, execute a judgment?

13          MR. DVORETZKY:  Correct, because their relief sought

14   there.  And again, Judge Chutkan did not enjoin the entire

15   proceedings in the European courts.  She allowed some aspect of

16   those to proceed, and that was showing comity to Spain and to

17   the European Courts.  But she narrowly entered an injunction

18   that prevented that relief in the European Courts that would

19   have interfered with U.S. jurisdiction and prevented the suits

20   from going forward.

21          JUDGE PAN:  So what's allowed to proceed under her --

22          MR. DVORETZKY:  Declaratory relief, a determination

23   about the state aid issue.  She didn't enjoin those things from

24   proceeding because those were not directly stopping the U.S.

25   action.  But as this court recognized in Laker Airways -- and I



1    know the <u>Laker Airways</u> didn't involve a foreign sovereign -- it

2    involved a private party -- but it talked about the importance

3    of comity.  And it said that comity gives weight when a foreign

4    lawsuit "is specifically intended to interfere with and

5    terminate a U.S. lawsuit".  That's precisely what we have here.

6    Spain --

7              JUDGE PILLARD:  Under ICSID, you know, because I think

8    you're right that the -- you know, the -- we do have an

9    obligation under ICSID, but why isn't it correct to understand

10   our obligation under ICSID, to have our courthouse doors open

11   to foreign investors seeking to enforce ICSID awards?  What in

12   ICSID requires us to read it as -- that our courts must remove

13   overseas obstacles to make it easier for foreign investors to

14   find their way into and effectively use our courts?

15             MR. DVORETZKY:  It's not about making it easier, but

16   Article 54(1) of ICSID says, "Each contracting state shall

17   recognize an award and enforce the pecuniary obligations

18   imposed by that award within its territories as if it were a

19   final judgment of a court in that state."  It's not just about

20   making the U.S. courts open, it's that if the U.S. courts are

21   asked to enforce, each contracting state shall do that, shall

22   enforce.

23             JUDGE PILLARD:  All right.  But it's a little like

24   challenging.  I mean -- and this is always the case with

25   international transactions and litigation.  If the government



```
 1    of some country said, its investors come and try to enforce an
 2    ICSID award in the United States, and the dictator of that
 3    country says to the investor, if you keep doing that case,
 4    we're going to, you know, start killing your nieces and nephews
 5    and we'll come for you next, does the U.S. court have to get
 6    involved in ensuring that that doesn't happen?
 7             MR. DVORETZKY:  Well, I don't know that the --
 8    unfortunately, I don't know that there's much that a U.S. court
 9    could do in that --
10             JUDGE PILLARD:  Exactly.
11             MR. DVORETZKY:  -- situation to --
12             JUDGE PILLARD:  Exactly.
13             JUDGE PAN:  Exactly.
14             MR. DVORETZKY:  -- prevent the killings, but it --
15             JUDGE PILLARD:  But it's just it's someone else's
16    lawlessness on their own territory with respect to their own
17    national businesses.  I'm not sure that I see that as running
18    afoul of our ICSID obligations.
19             MR. DVORETZKY:  I think it -- I think it is a
20    different situation when we are talking about enjoining
21    litigation as opposed to trying to stop a killing spree.
22             JUDGE PILLARD:  Well, to threaten people because
23    they're doing litigation.  I'm sorry if I wasn't clear.  That
24    the idea is unless you draw out of that litigation, we are
25    going to threaten you or take away your business license or --
```

1    all kinds of other activities, and I'm just -- what I'm doing

2    is trying prudently to test how much responsibility to protect

3    our open courthouse doors we have that would involve reaching

4    overseas into sovereign territory and sovereign function or

5    dysfunction of other countries.

6         MR. DVORETZKY:  So I think the limits of the U.S.'s

7    responsibility would probably be tied to the inherent authority

8    of a court.  A court doesn't have inherent authority to prevent

9    the dictator in some other country from engaging in the tactics

10   that you're suggesting.  I suppose you could enter an

11   injunction.  It would be completely meaningless.

12        A court does have the inherent authority to enjoin

13   litigation in this way.  That's what Laker Airways ran against.

14   And so then the only question is, is it any different in this

15   case that instead of enjoining a private party, we're enjoining

16   a sovereign.  And --

17        JUDGE PAN:  Doesn't Laker Airways also talk about a

18   miscarriage of justice?  Like, is that a standard -- an

19   irreparable miscarriage of justice.  And I don't know that this

20   necessarily falls within -- the situation before us might not

21   necessarily fall within a miscarriage of justice, such as a

22   dictator killing people's children, but it just seems that if

23   you play this out, it seems that the result of the EU cases

24   seems likely to be that because I guess EU countries have

25   adopted the Achmea and Komstroy reasoning, that they would

1    grant an anti-suit injunction to Spain and the investors would

2    just not be able to collect on these awards that they have won

3    going through this arbitral process before experts in

4    international law -- because my understanding is that the

5    arbitrators through ICSID are experts, and they're also people

6    who are placed in the pool by the member countries, including

7    Spain --

8             MR. DVORETZKY:  Right.

9             JUDGE PAN:  -- and it just seems that it would be

10   unjust -- I don't know if it's the kind of, you know, injustice

11   that we -- that outweighs comity, but it just seems that if --

12   if we believed that the investors had the correct reading of

13   ICSID and -- you know, they just wouldn't be able to proceed,

14   and it would be an injustice.  I just don't know if that

15   outweighs comity interest.

16            MR. DVORETZKY:  So I think it does outweigh comity

17   interest for two reasons.  One is the reason that the Laker

18   Airways court itself gave, which is that comity gives way when

19   you're talking about a foreign proceeding that's specifically

20   interfering with U.S. litigation.  The other -- just to step

21   back a minute.  We have Spain coming in here talking about

22   comity.  Laker Airways describes comity as the mortar that

23   holds together the bricks of the international system.  What's

24   corrosive to the international system is to have Spain come in

25   and say that it doesn't need to honor its obligations under the

1    ICSID convention and under the ECT.  And then Spain's

2    arguing --

3              JUDGE ROGERS:  But you heard -- you heard the

4    Department of Justice on behalf of the United States basically

5    say to us when a sovereign is involved -- we're talking about

6    an international treaty -- this a political question.  And it's

7    the United States' position is this is going to harm the United

8    States' interest, and that's not something for the courts to

9    inquire into.  Where it's best that commercial operation, as

10   Lakers Airways, you know, it's only money.  It's a different

11   calculus.  And I'm concerned, how would you respond?

12             I mean, counsel had the opportunity this morning to

13   talk about political question, and she didn't, but it seems to

14   me that's the thrust of what happens when you have a sovereign

15   international treaty and the United States is concerned about

16   its own interest being adversely affected were the court to

17   issue an injunction.

18             MR. DVORETZKY:  Judge Rogers, I don't think that it's

19   a political question.  I think it's a question that is governed

20   by Section 1606 of the FSIA.  Under Section 1606 of the FSIA,

21   foreign states that aren't immune -- and if we're talking about

22   the injunctions -- we're talking about that because we've

23   already concluded that Spain is not immune under either the

24   arbitration exception or the waiver exception.  Foreign states

25   that aren't immune shall be treated in the same manner as a

1     private individual under like circumstances.  A district court

2     could have enjoined a private party in like circumstances.

3     It's precisely the Laker Airways case.  Section 1606 --

4           JUDGE ROGERS:  From a private party.  I mean, all I'm

5     trying to get is somebody to recognize that -- you know, we can

6     talk about injustice, et cetera, and who's really right in this

7     litigation, but I just wonder if once you get the United States

8     and you get foreign governments complaining to our government,

9     doesn't the whole nature of the controversy -- if it doesn't

10    change, it certainly is different.

11          MR. DVORETZKY:  I understand why it feels different.

12    I don't think that it is different.

13          JUDGE ROGERS:  Okay.

14          MR. DVORETZKY:  Because under 1606 --

15          JUDGE ROGERS:  Right.

16          MR. DVORETZKY:  -- once there's no immunity, Spain is

17    treated like a private party.  And I understand, of course,

18    that Spain and other members of the European Union are here

19    arguing that they shouldn't be bound by the language that they

20    agreed to in ICSID and the ECT.  The Australian High Court was

21    not moved by that when it followed Blue Ridge and recognized

22    that the ICSID Convention was a waiver.  And actually, under

23    that court's law, it had to be an expressed waiver, and the

24    Australian High Court found that joining the ICSID Convention

25    satisfied that standard.  And so I understand why it feels

1     different, but I don't think that it is different as a legal

2     matter, Judge Rogers.

3             JUDGE ROGERS:  All right.  Thank you.  And the other

4     question I have is -- and this goes beyond any obligations you

5     have in terms of a client that you're representing now, but I

6     just wonder from your practice, why has the High Court for the

7     European Union not been, in my view, clear about this in terms

8     of the position it's now presenting to this court in terms of

9     what the ETC -- what the EU intended when it joined the ETC --

10    ECT and why that makes a difference here?  In other words,

11    there was a sentence thrown out to the effect that, well,

12    until, you know, 2000, et cetera, this type of commercial

13    litigation wasn't very active in Europe.  Is that right?

14            MR. DVORETZKY:  So I don't know as a factual matter

15    because my practice is as an appellate lawyer, not an

16    international arbitration lawyer.

17            JUDGE ROGERS:  I understand that.  Experts and briefs.

18            MR. DVORETZKY:  So I don't know the answer to that

19    as --

20            JUDGE ROGERS:  Yeah.

21            MR. DVORETZKY:  -- a factual matter.  But what I can

22    tell you, again, just going back to the Vienna Convention

23    Article 46, is that these sorts of late discovered -- late --

24    too late discovered understandings of plain language of

25    treaties, that may create an issue for Spain within the EU.  It



1    does not absolve Spain of its responsibilities under the

2    treaty.  Any more than -- to give an example.  The United

3    States has been a member of NATO for 75 years.  We're obligated

4    to defend foreign countries if they're attacked.  If a court in

5    the U.S. discovered 75 years later, actually, maybe there's a

6    constitutional problem spending U.S. taxpayer dollars to defend

7    foreign states, no one would think that gets you out of NATO.

8    That's a internal problem for the U.S.

9           The EU decades later has come up with an objection

10   that they say prevents them from arbitrating under the plain

11   terms that they agreed to, and as a matter -- there's no comity

12   obstacle or other obstacle holding them to those terms.

13           JUDGE PILLARD:  I have just a few more questions about

14   the injunction situation.  I take it -- I mean, you haven't

15   cited any other cases from the Federal Court of Appeals

16   affirming an anti-suit injunction against a foreign sovereign.

17   There just -- there aren't any.

18           MR. DVORETZKY:  There -- no, there are other cases

19   where courts, including this court, have upheld injunctions

20   against foreign sovereigns in other context, but not this kind

21   of anti-antisuit injunction.  But that's also because we're not

22   aware of any case where a foreign sovereign has tried this

23   tactic.

24           JUDGE PAN:  Right.

25           MR. DVORETZKY:  And --



1          JUDGE PILLARD:  Understood.

2          MR. DVORETZKY:  -- this would become a common tactic

3    if the injunction --

4          JUDGE PILLARD:  Understood.

5          MR. DVORETZKY:  -- is not availed.

6          JUDGE PILLARD:  Practically speaking, I mean this is a

7    lot of money at stake in the award that you have -- your

8    clients have won.  What effect would a foreign court injunction

9    have?  Wouldn't your clients just proceed and have to pay a

10   certain amount of penalties, hoping that the district court

11   would work quickly?

12         MR. DVORETZKY:  The penalties are quite steep.

13         JUDGE PILLARD:  Relative to the amount of money that

14   your award stands for?

15         MR. DVORETZKY:  Well, so first of all, I can't speak

16   to how long it would actually take to go back to the district

17   court, conclude proceedings, and ultimately enforce these

18   awards, during which time these penalties would be mounting.

19   But regardless, the penalties provide, at the very least, a

20   strong incentive for our clients not to pursue the U.S.

21   actions, which, again, is an interference under Laker Airways

22   with U.S. court's jurisdiction, which, as we discussed, have

23   the obligation to enforce ICSID.

24         JUDGE PILLARD:  And if you -- I mean, one way or the

25   other, assume that the Dutch courts are planning -- or might,

1    at least think they have the capacity to seek to claw back

2    whatever you've gained here.  I mean, in the end of the day,

3    there's going to have to be some kind of resolution of those

4    cases.

5          MR. DVORETZKY:  After the award is paid, if there were

6    some sort of a proceeding later to try to claw it back, that's

7    something we would have to deal with at that time.  But that is

8    separate from -- that would be playing out the internal EU law

9    issue as a matter of -- a matter of EU law.  But that's a

10   separate question from the U.S.'s obligation --

11         JUDGE PILLARD:  Absolutely.

12         MR. DVORETZKY:  -- to enforce the ICSID award.

13         JUDGE PILLARD:  And my only other question is that

14   ICSID itself has this Article 64, which empowers a contracting

15   party, including the United States, to refer another

16   contracting party to the ICJ.  So if the executive branch here

17   is concerned that Spain or Luxembourg is violating the ICSID

18   Convention -- or Dutch courts, you know violating the

19   convention by trying to stop the enforcement of your client's

20   award, then couldn't the executive seek resolution in the ICJ?

21         MR. DVORETZKY:  I think the problem is that the U.S.

22   could be referred to the ICJ by another signatory state because

23   it's not meeting its obligations.  And again, the whole nature

24   of this convention is that all 160 or so signatories have an

25   interest in other signatory states, recognizing and not second-



1  guessing and enforcing ICSID awards.  And I think this court in

2  Valores recognized that.

3          JUDGE PAN:  Anymore questions, Judge Rogers?

4          JUDGE ROGERS:  No, thank you.

5          JUDGE PAN:  All right.

6          MR. DVORETZKY:  Thank you.

7          JUDGE PAN:  Thank you very much.

8          Ms. Harris has reserved rebuttal time.

9               REBUTTAL ARGUMENT OF SARAH M. HARIS, ESQ.

10                  ON BEHALF OF THE APPELLANT

11          MS. HARRIS:  Thank you.  I would just like to go over

12  the decision points because the position the investors would

13  like to adopt would truly be a (indiscernible) change in all of

14  those scores.  First of all, with respect to the position,

15  under the Foreign Sovereign Immunities Act, you can just

16  rubberstamp what the arbitrators have already said or treat

17  Spain's argument that it lacks the power to arbitrate as a

18  question for arbitrability that courts don't decide.  That will

19  be flatly contrary to the way this court reasoned in Belize,

20  talking about the nature of challenges to the power of a

21  foreign sovereign of its representative to actually agree.  But

22  also run afoul of Stileks, a case that did not involve two --

23  or any EU parties and was just hueing to this court's line

24  saying, questions with respect to someone had the power to

25  agree to arbitrate formation always records regardless of a

1  delegation clause.

2          Your questioning whether an agreement that exists

3  covers a subject matter, which is what happened in Stileks,

4  because the question was whether it's a qualifying investment,

5  that always goes to arbitrability.  To adapt the investor's

6  position would be to obliterate the clarity of the line and

7  really throw under the wayside the court's decisions in Belize

8  and in Micula.

9          And again, this argument that Spain has been making

10 really does clearly go to formation.  It is, again, the idea

11 that Spain could not and did not ever agree under the Energy

12 Charter Treaty.

13         And second of all, were this court to say that the

14 Energy Charter Treaty actually embodied this consent, a whole

15 host of problems ensue.  They point to not one case of a treaty

16 in which a court has said the text is somehow clear, yet in

17 contravention of what all the signatories on the record have

18 ever said about it.  Especially strange for a treaty the U.S.

19 did not sign and it would be a real upheaval for the way the

20 actual parties to this treaty are actually operating.

21         And then, on the waiver exception.  We agree with --

22         JUDGE PAN:  You said one -- that's one decision point?

23         MS. HARRIS:  Those were the two decision points I

24 wanted to cover.  And then the waiver point, we agree with the

25 United States, is perfective with respect to, again, an



www.escribers.net | 800-257-0885

1    upheaval, both with respect to the nature of how the

2    arbitration exception works, and the understanding of the

3    treaties as not in and of themselves waivers.  They're

4    frameworks for considering arbitration that require consent.

5              JUDGE PAN:  Thank you very much.

6              (Whereupon, the proceedings were concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3    I, TreLinda Wilson, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7

8    _____

9    /s/ TRELINDA WILSON, CDLT-148

10

11   eScribers

12   7227 N. 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  March 10, 2024

16

17

18

19

20

21

22

23

24

25