**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                      :

NEXTERA ENERGY GLOBAL HOLDINGS   :
B.V. and NEXTERA ENERGY SPAIN      :
HOLDINGS B.V.,                       :
                                       :

                   Petitioners,   :
                                       :    Civil Action No. 19-cv-01618-TSC
                     v.              :
                                         :

KINGDOM OF SPAIN,                 :
                                         :

                 Respondent.   :
                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**EXPERT DECLARATION OF PROFESSOR GEORGE A. BERMANN**
**IN SUPPORT OF PETITIONERS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to 28 U.S.C. § 1746, I, GEORGE A. BERMANN, declare as follows:

## I.    INTRODUCTION

1.     I submit this Expert Declaration at the request of counsel for NextEra Energy

Global Holdings B.V. and NextEra Energy Spain Holdings B.V. (together, "NextEra"), the two

Petitioners in this action, in support of their motion for summary judgment in this proceeding to

enforce an arbitral award (the "Award"). I previously submitted three expert reports in this

proceeding,[1] all in connection with Spain's motion to dismiss this proceeding. I understand that

Spain's motion has since been denied (and that an appeal from that denial was rejected).

---

[1]    My previous declarations were dated December 19, 2019 (ECF No. 22), June 7, 2022 (ECF
No. 68-1) (the "Bermann 2022 Decl.") and July 12, 2022 (ECF No. 75-2) (the "Bermann 2022
Supp. Decl.").

2.     This declaration responds to: (i) the declaration of Professor Dr. Steffen Hindelang, LLM filed February 14, 2025 (the "Hindelang 2025 Decl.") (ECF No. 109);[2] (ii) certain related submissions by the Kingdom of Spain ("Spain") in its Memorandum of Law in Opposition to petitioners' summary judgment motion (the "Spain SJ Opp.") (ECF No. 108); and (iii) certain related submissions by the European Commission (the "EC") in its amicus brief (ECF No. 67) and supplemental amicus brief (ECF No. 111-1).[3]

3.     As a threshold matter, I note that there is significant (and in some respects total) overlap between the points being made by Professor Hindelang in his 2025 Declaration and those in his previous declarations.  I have addressed these matters fully in my prior declarations and adhere to my prior testimony in this regard.  Similar observations apply to Spain's and the EC's latest submissions.  Thus, I will attempt to deal principally with the new points being made by Professor Hindelang, Spain and/or the EC that appear pertinent to the current motion, rather than revisit matters that were already addressed and refuted in my prior declarations.

4.     In his latest declaration, Professor Hindelang reiterates his earlier-stated position that this Court should subordinate its and the United States' obligations under the International Convention on the Settlement of Investment Disputes between States and Nationals of Other States[4] (the "ICSID Convention") and the corresponding U.S. implementing legislation[5] to the law and policies of the European Union (the "EU").

---

[2]     Professor Hindelang has made several prior declarations in this case, dated October 11, 2019 (ECF No. 15-6), February 7, 2020 (ECF No. 25) and May 2, 2022 (ECF No. 62-1).

[3]     As I understand it, the supplemental EC amicus brief incorporates its prior amicus submissions by reference.

[4]     Nov. 18, 1965, 575 U.N.T.S. 159 (ECF No. 1-5).

[5]     22 U.S.C. § 1650a.

5.     Professor Hindelang bases his conclusion on a series of propositions, none of which has merit.  In Part II of this Declaration, I set out these propositions as clearly and distinctly as I possibly can.  For the reasons elaborated in Part III, I conclude that each of these propositions is fallacious and that this Court should not be misled by them.

6.     I present my overall conclusions in Part IV.

## II.    THE FLAWED PROPOSITIONS UPON WHICH PROFESSOR HINDELANG'S LATEST DECLARATION IS BASED

7.     Professor Hindelang advances several propositions as the basis for his contention that this Court should deny enforcement of the Award in disregard of its obligations under the ICSID Convention and its U.S. implementing legislation.  Those propositions are:

(a)     Because EU law is the product of a treaty, it constitutes a body of international law which trumps all other international law, including the obligations of Contracting States under the ICSID Convention, and the obligations of Contracting Parties under the Energy Charter Treaty[6] (the "ECT").

(b)     Certain quasi-constitutional principles of the EU are binding on U.S. courts and bar this Court from performing its obligations under an international treaty by which this Court and the United States are bound.

(c)     This Court should deny enforcement of the Award in this case due to certain "developments" that have taken place in or by the EU and its Member States since Professor Hindelang's 2022 Declaration.

(d)     This Court cannot enforce the Award in this case because payment of the Award by Spain would constitute illegal State aid under EU law.

(e)     The decision of the U.S. Court of Appeals for the District of Columbia (the "D.C. Circuit") in this case stands for the proposition that the interests of the United States are not implicated by the enforcement action before this Court.

---

[6]     Dec. 17, 1994, 2080 U.N.T.S. 95 (ECF No. 1-6).

8.    For the reasons set out in the following Part III, none of these propositions withstands scrutiny.[7]

## III.    THE FALLACIES IN PROFESSOR HINDELANG'S CONTENTIONS

### A.    EU Law Does Not Supersede or Trump the ICSID Convention

9.    Professor Hindelang argues that because the Award in this case arises out of a dispute between Spain and a Dutch investor, its enforceability presents an issue of EU law. According to Professor Hindelang, the Award should be denied enforcement by this Court on the basis of administrative rulings by the EC and/or decisions of the Court of Justice of the European Union (the "CJEU").  Such rulings/decisions, he suggests, indicate that agreements between EU nationals and EU Member States to arbitrate disputes under the ECT are contrary to EU law.

10.    Of course, as both the D.C. Circuit and this Court have ruled, enforcement of the Award in this action is governed by the U.S. legislation implementing the ICSID Convention.[8] Professor Hindelang does not explain how EU law could alter this.  He does, however, posit that EU law constitutes international law, in that it is a product of an international treaty among the EU Member States.  Upon this premise, he appears to contend that EU law trumps international law in all its other forms, including the ICSID Convention, the ECT and any other international

---

[7]    As in my prior declarations in this case, the opinions expressed in this Declaration are limited to address issues of international law, including the law of treaties, and to deal with certain matters of EU law where relevant.  I accordingly do not respond to Professor Hindelang's proposition (e) except to note that, in my view, his interpretation is decidedly not what the D.C. Circuit held.  The fact is that the United States *does* have an important interest in the case— compliance with its international treaty obligations—which fact was not lost on the D.C. Circuit panel in this case, whose decision referred specifically to the "public interest in encouraging arbitration . . . [as] codified [in] the federal statute implementing the ICSID Convention."  *See NextEra Energy Global Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1109 (D.C. Cir. 2024).

[8]    Mem. Op. at 21-23, Feb. 15, 2023 (ECF No. 84); *NextEra*, 112 F.4th at 1098.

agreement.[9]  In other words, in Professor Hindelang's telling, EU law sits atop the hierarchy of international law.  As a matter of international law, this argument is, in my view, misplaced.  The mere existence of the EU treaties (and the EU law flowing from them) does not make these treaties general international law paramount and superior to other international obligations.[10]  This is all the more so with respect to the United States, which is not bound by EU law to begin with.

11.    Although this should be obvious, I set out here three distinct reasons why this Court should not accept Professor Hindelang's contention that it must bow to EU law as interpreted by the CJEU or national courts in EU Member States in determining whether to enforce the Award in this case.

12.    *First*, the ICSID Convention creates obligations that are binding on each of its Contracting States, including the United States, Spain and other EU Member States.  It is well-established that State parties are not entitled to avoid such international treaty obligations by reference to their internal law.  Article 27 of the Vienna Convention on the Law of Treaties (the "VCLT") specifically provides that "[a] party may not invoke the provisions of its internal law as justification for its failure to perform a treaty."[11]

13.    If every party to a treaty could escape its obligations thereunder by invoking its own internal law, the efficacy of treaties would be at the mercy of every one of their signatory States.  Treaty-based international law cannot survive under such circumstances.  Similarly at serious risk is any multilateral treaty—such as the ECT or the ICSID Convention—if a subset of its signatory States can avoid their treaty obligations simply by entering into a separate treaty

---

[9]    Hindelang 2025 Decl. ¶ 16 (ECF No. 109).

[10]    It is also hard to fathom how EU law could supplant the explicit terms of 22 U.S. Code § 1650a,

[11]    May 23, 1969, 1155 U.N.T.S. 331 (ECF No. 68-7).

among themselves—like the EU treaties among EU Member States—that they claim requires them to breach the multilateral treaty.

14.    As much as the EU may prefer for the EU treaties and all of EU law to be branded as paramount international law, the fact remains that both these treaties and this law are unquestionably *internal* to both the EU and Spain within the meaning of the VCLT.[12]   They certainly do not apply to the United States and other countries that are not EU Member States.

15.    *Second*, all States entering a treaty among themselves do so on an equal footing. This is true for the Contracting States to the ICSID Convention as well as the Contracting Parties to the ECT—each State party to these treaties is bound by their terms to the same extent as all others.  It cannot plausibly be suggested that some parties to these treaties can avoid their treaty obligations on the basis of their internal law simply by calling it "international law."

16.    *Third*, it is essential to distinguish sharply between (on the one hand) treaty obligations such as those arising under the ICSID Convention, and (on the other hand) EU law. The former is international law that is shared by all parties to the international regime of which that treaty is the foundation, and ICSID awards are rendered under the explicit terms of the ICSID Convention.  The latter is "international" only because it is the product of an agreement among States forming a regional grouping.  Of course, once a tribunal is formed under the ICSID Convention, it has the power to take into account the context in which the dispute arose—such as the impact (for both the investor and the host State) of local law, including EU law.  I understand that the ICSID tribunal in this case did indeed examine Spain's objections and arguments based upon EU law, and that it also took into account the EC's position.  But once the ICSID tribunal rendered its Award, its status as a final and binding award was mandated by Articles 53 and 54 of

---

[12]   *See* Bermann 2022 Decl. ¶¶ 87-93 (ECF No. 68-1).

the ICSID Convention.  Spain is bound by this mandate under the principle of *pacta sunt servanda*, a fundamental principle of international law providing that "[e]very treaty in force is binding upon the parties to it and must be performed by them in good faith,"[13] regardless of any other (even possibly competing) obligations it may be subject to.  Spain is seeking to violate this principle in these proceedings, and is urging this Court to violate it as well.

**B.    The CJEU's Rulings Do Not Modify the ICSID Convention or ECT**

17.    For similar reasons, Professor Hindelang's invocation of two quasi-constitutional principles of EU law, namely the principles of "primacy" and "autonomy,"[14] do not alter the ICSID Convention or ECT.

18.    As I have explained before, the principle of "primacy" fundamentally addresses the legal relationship between the EU and its Member States.[15]  It posits, quite simply, that in case of a conflict between Member State law and EU law, the latter must prevail.[16]  To quote the CJEU in the *Costa* case:

> The law stemming from the Treaty, an independent source of law, could not, because of its special and original nature, be overridden by domestic legal provisions, however framed, without being deprived of its character as Community law and without the legal basis of the Community itself being called into question.[17]

---

[13]    VCLT, art. 26 (ECF No. 68-7).

[14]    Hindelang 2025 Decl. ¶¶ 15-20 (ECF No. 109).

[15]    *See* Bermann 2022 Decl. ¶¶ 92-93 (ECF No. 68-1).

[16]    *Id.*; *see also, e.g.*, *Costa v. E.N.E.L.*, Case No. 6-64, ECLI:EU:C:1964:66, at 585 (July 15,1964) (ECF No. 62-17); *Amministrazione delle Finanze dello Stato v. Simmenthal SpA*, Case No. 106/77, ECLI:EU:C:1978:49, ¶ 21 (Mar. 9, 1978) ("*Simmenthal II*") (ECF No. 62-18).

[17]    *Costa* at 594 (ECF No. 62-17).

19.    The reference here to "Community law" means, in modern parlance, EU law (the European Economic Community having been renamed the "European Union").  But unmistakably, the CJEU here is recognizing that EU law is a unique body of law.

20.    Primacy thus operates effectively as a federalism principle within the EU, not unlike the Supremacy Clause in the U.S. Constitution.  It has no application to a country outside the EU called upon to comply with its own treaty obligations.[18]

21.    The principle of "autonomy" is less straightforward.  Under this principle, the integrity of EU law depends on its uniformity and consistency.  In the CJEU's view, this autonomy is fatally impaired if a court or tribunal anywhere in the world is permitted to interpret and apply EU law without making a so-called "preliminary reference" to the CJEU for an authoritative interpretation of a matter of EU law in the case before it.  Under the EU treaties, the only bodies entitled to make preliminary references to the CJEU are courts of the EU Member States.

22.    In its *Achmea* judgment,[19] the CJEU ruled that the investor-state arbitration clauses in bilateral investment treaties between EU Member States, i.e., "intra-EU" investment treaties, were incompatible with EU law precisely because EU law issues are apt to arise in intra-EU cases heard by investment tribunals that cannot make preliminary references to the CJEU.[20]

23.    In *Achmea*, the CJEU stated:

Also, according to settled case-law of the Court, the autonomy of EU law with respect both to the law of the Member States and to international law is justified by

---

[18]    *See* Bermann 2022 Decl. ¶¶ 92-93 (ECF No. 68-1).

[19]    *Slovak Republic v. Achmea BV*, Case No. C-284/16, ECLI:EU:C:2018:158, ¶¶ 49-60 (Mar. 6, 2018) (ECF No. 109-5).

[20]    *See* Bermann 2022 Decl. ¶¶ 58-61 (ECF No. 68-1).

the essential characteristics of the EU and its law, relating in particular to the constitutional structure of the EU and the very nature of that law.[21]

24.     In the later *Komstroy* case,[22] the CJEU held that the same principle applies to intra-EU disputes under multilateral treaties, and to the ECT in particular.[23]  The Award in the present case of course grew precisely out of an intra-EU ECT dispute, one between Spain and investors incorporated in the Netherlands and ultimately owned by a U.S. investor.

25.     I have already discussed at length the reasons why the *Achmea* and *Komstroy* decisions do not (and cannot) alter either the validity of an arbitration agreement made under the ECT, or the obligations of an ICSID Contracting State to enforce an award rendered in accordance with the ICSID Convention and ECT.[24]  It is also worth noting that, even aside from these matters, the *Achmea* and *Komstroy* rulings are extraordinary.  No other jurisdiction on Earth has ever asserted that foreign courts and international tribunals cannot apply its law because its supreme court does not have an opportunity to provide them with an authoritative interpretation of that law. The EU is absolutely unique in this respect.

26.     Professor Hindelang has highlighted the further holdings of the CJEU (in *Achmea* and other decisions) that EU Member State courts must annul intra-EU awards as invalid, and are forbidden under EU law to enforce any intra-EU award rendered in the territory of another Member State.[25]  These too are extraordinary rulings, without any comparable precedent in jurisdictions

---

[21]   *Id*. ¶¶ 33-34.

[22]   *Republic of Moldova v. Komstroy LLC*, Case No. C-741/19, ECLI:EU:C:2021:655 (Sept. 16, 2021) (ECF No. 109-9).

[23]   *See* Bermann 2022 Decl. ¶ 39 (ECF No. 68-1).

[24]   *See id.* ¶¶ 62-102.

[25]   Hindelang 2025 Decl. ¶¶ 38-40 (ECF No. 109).

outside of the EU.  Yet, Professor Hindelang urges that these rulings (and the principle of the autonomy of EU law) mean that a court outside of the EU, such as this Court, cannot enforce intra-EU awards.  He even goes so far as to assert that "Spain does not bear any obligation to comply with the Award rendered in [this case]."[26]

27.    Extrapolating further, Professor Hindelang claims that the courts of ICSID Contracting States outside of the EU must also refrain from enforcing intra-EU awards:

> Any Contracting State to the ICSID Convention, here the United States, is under no international law obligation to recognize or enforce an intra-EU investment award that was rendered in violation of the EU Treaties, such as the Award in [this case].[27]
>
> . . .
>
> [I]f there is no obligation [of Spain to comply with an ICSID award] in the first place, none of the Contracting States to the ICSID Convention are under any obligation to recognize or enforce such award [under] the ICSID Convention.[28]

28.    The notion that the autonomy of EU law bars enforcement of intra-EU awards by U.S. courts is altogether untenable.  *First*, and most obviously, neither the United States nor its courts are subject to EU law, even quasi-constitutional EU law, much less the decisions of the CJEU or national courts within the EU.  EU law may be considered binding within the territory of its 27 Member States, but not elsewhere.  This Court is simply not subject to the principle of EU autonomy.[29]

---

[26]    *Id.* ¶ 42.

[27]    *Id.* ¶ 41.

[28]    *Id.* ¶ 45.

[29]    *See* Bermann 2022 Decl. ¶¶ 92-93 (ECF No. 68-1).

29.     *Second*, and worse yet, for this Court to bow to EU law in this context would require it to deny enforcement of an award that the United States and its courts are treaty-bound to enforce under the ICSID Convention.  This Court simply cannot be expected, out of deference to the EU and its notions of autonomy, to breach the obligations that the United States has undertaken by ratifying the ICSID Convention, as enshrined in U.S. statute.

30.     I find it remarkable for Spain, or Professor Hindelang in support of Spain, to instruct this Court not to enforce an award in compliance with its *own* treaty and statutory obligations because doing so would offend the EU's self-serving notion of autonomy.  Neither the primacy nor the autonomy of EU law, as asserted by the CJEU, is controlling upon *either* an arbitral tribunal empaneled under an international treaty to which the parties to the underlying dispute are subject *or* upon the court of a foreign State that is bound by its own treaty obligations to give effect to the resulting arbitral award.

## C.     The Impact of Events Since 2022

31.     Professor Hindelang seeks to draw support from various "developments" that have occurred since his 2022 Declaration.[30]

32.     The recent developments identified by Professor Hindelang are:

- The withdrawal of certain EU Member States from the ECT in the period from 2022 to 2024;[31]

---

[30]     *See* Hindelang 2025 Decl. ¶ 24 (ECF No. 109).  Professor Hindelang also repeats his reliance upon an arbitral award rendered earlier in 2022 in Stockholm, entitled *Green Power v. Spain*, which I addressed in my July 13, 2022 declaration.  As explained therein, *Green Power v. Spain* (a non-ICSID Convention award) merely reflected that, within the EU legal system, *Achmea* has precedential effect.  In any event, *Green Power* also has zero impact on the enforceability of ICSID Convention awards in the United States.  Bermann 2022 Supp. Decl. ¶¶ 4-20 (ECF No. 75-2).

[31]     Hindelang 2025 Decl. ¶ 25 (ECF No. 109).

- The issuance in mid-2024 of a "Declaration by the Member States on the Legal Consequences of the *Achmea* Judgment and on Investment Protection in the European Union";[32]

- The annulment and denial of enforcement of intra-EU awards by Member State courts and issuance of anti-suit injunctions against arbitral tribunals empaneled to hear and decide intra-EU disputes;[33]

- Certain recent judgments of the CJEU;[34] and

- The issuance of certain arbitral awards (and an arbitrator's dissenting opinion) favoring Spain's "*Achmea*" objection.[35]

33. None of these supposed developments actually alter the analysis.

     1.   <u>Withdrawal of EU Member States from the ECT</u>

34. As Professor Hindelang notes, numerous EU Member States withdrew from the ECT in the period from 2022 to 2024.[36]  In each case, they appear to have sent notices of withdrawal to the depositary, in accordance with Article 47(1) of the ECT.[37]  Under the ECT, the withdrawal takes effect one year following the depositary's receipt of such notice.[38]

35. Although Professor Hindelang does not point this out, one motivation for EU Member States withdrawing from the ECT may have been to prospectively avoid the imposition of liabilities for future breaches after the withdrawal takes effect.  In all events, the ECT makes

---

[32]  *Id.* ¶¶ 26-34.

[33]  *Id.* ¶¶ 35-37.

[34]  *Id.* ¶¶ 38-43.

[35]  *Id.* ¶ 25 n.30.

[36]  *Id.* ¶ 25.

[37]  *E.g.*, *Notification of the Republic of Poland to the Government of the Portuguese Republic, in its capacity as Depository of the Energy Charter Treaty* (Dec. 28, 2022) (ECF No. 109-33).

[38]  ECT art. 47(2) (ECF No. 1-6).

clear (in Article 47) that withdrawal will not affect the validity of claims or awards that predate withdrawal.[39]

36.    All of this underscores that, while the ECT remains in effect, its terms impose binding obligations, along with an ongoing risk of liability (including in intra-EU disputes).  To close off this risk as regards future events, the EU Member States needed to withdraw—it was not enough simply to invoke EU legal principles.

### 2.    The EU Member States' Purported "Declaration"

37.    Although Professor Hindelang emphasizes a June 26, 2024 "Declaration" by EU Member States concerning the impact of *Komstroy*,[40] this adds nothing to the analysis.  I previously analyzed the effect of a similar "Declaration" issued in 2019 by EU Member States concerning *Achmea*, and concluded that it was not capable of altering the legal effect of the ECT (or the ICSID Convention).[41]  Indeed, the EU Member State declarations in 2019 and 2024 did nothing more than subscribe to what the CJEU had already announced in the *Achmea* and *Komstroy* judgments.

38.    I note that virtually all ICSID Convention and non-ICSID tribunals to consider the Member State's declaration in 2019 agree with my conclusion that it did not affect the validity of their obligations under the ECT (neither substantive investor protections nor the obligation to arbitrate).  For example, the *Renergy* Award (which I quoted in my 2022 Declaration)[42] states:

> With a view to the arguments of amendment, suspension, or regarding the alleged effects of the EU Member States Declarations, the Tribunal further adds and recalls

---

[39]   *See id.* art. 47(3).

[40]   Hindelang 2025 Decl. ¶¶ 26-34 (ECF No. 109); *Declaration by the Member States on the Legal Consequences of the Achmea Judgment and on Investment Protection in the European Union* (Aug. 6, 2024) (ECF No. 109-27).

[41]   Bermann 2022 Decl. ¶¶ 97-99 (ECF No. 68-1).

[42]   *See id.* ¶¶ 82 n.124 (ECF No. 68-1).

that even if suspension or amendment was the argued effect of either the EU Member States Declarations or the *Achmea* and *Komstroy* Judgments, any such effect would come too late in this case to affect or invalidate the consent perfected by the Parties at the relevant time, i.e. the date of the Request.[43]

39.      As with the 2019 Declaration, the 2024 Declaration simply does not alter the treaty obligations at issue in the present dispute.  The Declaration is not legally binding within the EU—it was not even signed by all EU Member States party to the ECT—and it certainly does not bind courts outside of the EU.  It is essentially a statement of EU policy.

40.      Notably also, there was little consensus in reality among EU Member States when it came to *Achmea* and *Komstroy*.  Several western European Member States had vocally disagreed with the EC in its condemnation of intra-EU treaties.[44]  In 2019, six Member States refused to join the majority's declaration and instead issued separate declarations setting out their competing views on the legal consequences of *Achmea*.[45]  And before *Achmea*, Member States did not consistently adhere to the EC's view.  For example, in 2010, the Netherlands took the position in the *Eureko v. Slovak Republic* case that:

> the BIT in question in this dispute [The Netherlands–Slovak Republic BIT] continues to be fully in force.  Consequently, there is also no reason to doubt the jurisdiction of the Arbitral Tribunal in this dispute.  Accordingly, Article 8 of the BIT, which prescribes international arbitration as a dispute settlement tool for disputes between an investor and a Contracting Party, is fully applicable.  In the

---

[43]   *Renergy S.à.r.l. v. Kingdom of Spain*, No. ARB/14/18, Award ¶ 348 (ICSID 2022) ("*Renergy* Award") (ECF No. 68-33).

[44]   *See* Cecilia Olivet, *Intra-EU Bilateral Investment Treaties: A Test for European Solidarity*, Transnational Institute (Feb. 1, 2013) (Ex. 32 hereto).

[45]   *Declaration of the Representative of the Government of Hungary on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union* (Jan. 16, 2019) (ECF No. 62-55); *Declaration of the Representatives of the Governments of the Member States on the Enforcement of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union* (Jan. 16, 2019) (ECF No. 62-54) (signed by Finland, Luxembourg, Malta, Slovenia and Sweden).

view of The Netherlands, European Union law aspects cannot and do not affect in a way the existing jurisdiction of this Arbitral Tribunal.[46]

41.     Moreover, when the EC eventually ordered all Member States to terminate their intra-EU BITs,[47] a number of Member States—including, but not only, Austria, Finland and Sweden—failed to do so, and the EC instituted infringement actions against them.  (The EC also initiated infringement proceedings against the UK even though the UK had already exited the EU.)  The 2024 Declaration was essentially dictated by the EC in order to smooth over these matters.

3.     Actions of EU Member State Courts

42.     Professor Hindelang then turns to the cases in which, following the *Achmea* and *Komstroy* judgments, EU Member State courts at the seat of arbitration have annulled intra-EU awards,[48] and Member State courts outside the seat have denied enforcement of those awards.[49]

---

[46]  *Eureko B.V. v. Slovak Republic*, PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension ¶ 161 (UNICTRAL Oct. 26, 2010) (Ex. 1 hereto).

[47]  These orders take the form of Letters of Formal Notice, which are the first stage of infringement procedures under Article 258 of the Treaty on the Functioning of the European Union, March 25, 1957, 2012 O.J. (C 326) 47 (the "TFEU") (ECF No. 62-9).

[48]  Hindelang 2025 Decl. ¶¶ 35-36 (ECF No. 109); *Slovak Republic v. Achmea, B.V*, Case No. I ZB 2/15 (Ger. BGH Oct. 31, 2018) (ECF No. 109-84).  Professor Hindelang also cites the annulment of awards by French and Swedish courts in particular, *Poland v. Slot Group et al.*, Case No. RG 20/14581 – No. Portalis 35L7-V-B7ECCPBD (Paris Ct. App. Apr. 19, 2022) (ECF No. 109-55); *Poland v. Mercuria Energy Grp.*, Case No. T 2613-23 (Svea Ct. App. Dec. 23, 2024) (not published); *Spain v. Foresight Lux.  Solar 1 S.à.r.l. et al.*, Case No. T 1626-19 (Svea Ct. App. June 28, 2024) (ECF No. 109-57); *Republic of Italy v. Athena Inv. A/S et al.*, Case No. T-3229-19 (Svea Ct. App. June 17, 2024) (ECF No. 109-58); *Italy v. CEF Energia B.V.*, Case No. T 4236-19 (Svea Ct. App. May 27, 2024) (ECF No. 109-59); *Spain v. Triodos SICAV II*, Case No. T 15200-22 (Svea Ct. App. Mar. 27, 2024) (ECF No. 109-60); *Festorino Inv. Ltd. et al. v. Poland*, Case No. T 12646-21 (Svea Ct. App. Dec. 20, 2023) (ECF No. 109-61); *Poland v. PL Holdings S.á.r.l., Poland v. PL Holdings S.á.r.l.*, Case No. T 1569-19 (Swed. Sup. Ct. Dec. 14, 2022) (ECF No. 109-8); *Spain v. Novenergia II*, Case No. T 4658-18 (Svea Ct. App. Dec. 13, 2022) (ECF No. 109-62).

[49]  Hindelang 2025 Decl. ¶ 36 (ECF No. 109); *e.g.*, Case No. CAS-2021-00061 (Lux. Sup. Ct. July 14, 2022) (ECF No. 109-63).

He also reports that, in one case (not dealing with the ICSID Convention), a Member State court ordered investors to pay back to the award debtor Member State any amount that the State pays to the award creditor if the EC has not granted approval for payment under EU State aid rules.

43.     The *RWE* decision starkly illustrates the basis on which EU Member State courts are acting.[50]  In this decision, the Bundesgerichtof (the German Supreme Court), after taking note of the provisions of the ICSID Convention, states that it is required to give effect to "the primacy of application of European Union law—***even over international law.***"[51]  It then states that, under CJEU case law, "European Union law originates from an autonomous source, the Treaties, and takes precedence over the law of the Member States. ***The autonomy of the European Union's legal system exists both vis-à-vis the law of the Member States and vis-à-vis international law***."[52] The Court goes on to say:

> 72         cc) According to these principles, in the intra-EU context, a national court review of an ICSID arbitral award following a declaration of enforceability proceedings ***is mandatory for reasons of European Union law—contrary to the regulatory system of the ICSID Convention*** (cf. C I 4 c c [1]).  In this case, however, the principle of effectiveness ("effet utile") requires that, when deciding on the admissibility of an upstream remedy such as Section 1032 (2), ZPO, Article 41 (1) of the ICSID Convention—which simple federal German law provides via the implementing law—Is not applied to give effect to European Union law as soon as possible (cf. C I 4 c c [2]).
>
> 73         (1) According to the case law of the Court of Justice of the European Union, judicial ***review of an ICSID award in an intra-EU investor-***

---

[50]   *The Netherlands v. RWE*, Case No. I ZB 75/22 (Ger. BGH July 27, 2023).  The translated version that Spain that submitted to the D.C. Circuit in connection with its prior appeal in this case is attached hereto as Ex. 33.

[51]   *Id.* ¶ 68 (ECF No. 109-52) (emphasis added).

[52]   *Id.* ¶ 69 (emphasis added).

> *state constellation, such as here, is mandatory in the downstream declaration of enforceability proceedings.*[53]

44.     Thus, although the German Supreme Court fully acknowledged that the ICSID Convention represented international law (and that the course it was taking was "contrary" to the ICSID Convention), it considered itself bound, as a matter of EU law, to give effect to CJEU decisions holding that EU law has primacy over international law.

45.     These Member State rulings thus are merely a byproduct of the judicial hierarchy in the EU, wherein rulings of the CJEU have precedential and binding effect. But again, this has no effect whatsoever on the binding force of the ICSID Convention and its implementing federal statute.

46.     Indeed, for courts not bound by this hierarchy, the intra-EU objection continues to be ineffective. For example, courts in Australia and the UK have continued to confirm ICSID Convention awards notwithstanding the intra-EU objection.[54]

47.     As regards arbitral tribunals constituted under non-ICSID rules, courts outside of the EU also have generally rejected intra-EU objections. For example, in *EDF Energies Nouvelles v. Spain*, a Geneva-based tribunal issued an award of damages against Spain for breaches of the ECT.[55] Although the award was challenged by Spain in the Swiss courts (reportedly based on

---

[53]   *Id.* ¶¶ 72-73 (emphasis added).

[54]   *Kingdom of Spain v Infrastructure Servs. Luxembourg S.à.r.l.*, [2023] HCA 11 ¶¶ 7-9, 67-80 (Apr. 12, 2023) (Ex. 2 hereto); *Infrastructure Services Luxembourg S.À.R.L. v Kingdom of Spain*, [2023] EWHC 1226 ¶¶ 93-95 (Comm) (Fraser, J.) (May 24, 2023) (Ex. 3 hereto).

[55]   Erik Brouwer, *UNCITRAL tribunal reportedly awards almost 30 million EUR to French government-controlled energy giant EDF in dispute under Energy Charter Treaty*, IAReporter (July 3, 2023) (Ex. 4 hereto).

intra-EU objections), Switzerland's highest court rejected Spain's challenge in April 2024.[56]  The Swiss court made a similar decision in June 2024, in a case involving intra-EU treaty claims against Czechia.[57]

48.    For these reasons, Professor Hindelang's reference to court decisions within the EU is not, from an international law perspective, relevant or useful in analyzing the status of the Award in the present case, or the United States' obligations under the ICSID Convention.

### 4.    Recent Judgments of the CJEU

49.    Professor Hindelang observes how the CJEU has reiterated its opposition to intra-EU arbitration in numerous post-*Achmea* and post-*Komstroy* cases.[58]  For example, in the case of *Commission v. European Food and Others II*, the CJEU ruled that the *Micula* Award (an ICSID Convention award in an intra-EU case) "cannot . . . produce any effects and cannot thus be executed with a view to paying the compensation granted by that award."[59]  But these cases rely entirely on *Achmea* and *Komstroy* and add nothing new.

---

[56]    Damien Charlotin, *Swiss Federal Tribunal upholds intra-EU ECT award against Spain, finding that CJEU's rulings should be given "no particular value"*, IAReporter (May 3, 2024) (Ex. 5 hereto).

[57]    Lisa Bohmer, *Swiss Federal Tribunal upholds intra-EU renewable energy award against Czech Republic*, IAReporter (Jul. 17, 2024) (Ex. 6 hereto).

[58]    *See, e.g.*, *Romatsa and Others*, Case No. C-333/19, ECLI:EU:C:2022:749 (Sept. 21, 2022) (ECF No. 109-54); *Commission v. United Kingdom*, Case No. C-516/22, ECLI:EU:C:2024:231 (Mar. 14, 2024) (ECF No. 109-65).  The General Court, which is the lower EU court, has ruled in accordance with the views expressed by the CJEU.  *See, e.g.*, *European Food et al. II*, Case Nos. T-624/15, T-694/15 & T-704/15, ECLI:EU:T:2024:659 (EU Gen. Ct. Oct. 2, 2024) ("*European Food II*") (ECF No. 109-66).

[59]    *European Food II* ¶ 101 (ECF No. 109-66).

50.     I further note that the *Micula* Award remains confirmed as a judgment in this District, and that the D.C. Circuit recently rejected an appeal from a district court decision that had sought to reopen the judgment on *Achmea/Komstroy* grounds.[60]

5.     Recent Arbitration Awards

51.     In my 2022 Declaration, I observed that the "[v]ast [m]ajority" of arbitral tribunals dealing with treaty claims had, as of that date (June 7, 2022) rejected intra-EU objections by Spain or other EU member state respondents.[61]  I identified a large number of ICSID Convention awards and annulment committee decisions that evidenced this.[62]  My 2022 Supplemental Declaration (as of July 12, 2022) likewise observed that the "overwhelming majority" of arbitral awards dealing with investment treaties had rejected Spain's intra-EU arguments.[63]

52.     Professor Hindelang's latest Declaration does not engage with these observations. Rather, Professor Hindelang now cites two awards post-dating 2022 in which an *Achmea* objection has been upheld in an arbitration,[64] seemingly to imply that arbitral tribunals are now accepting Spain's intra-EU objection.  Far from it.

53.     First, the awards (in *Sapec v. Kingdom of Spain* and *European Solar Farms* ("*ESF*") *v. Kingdom of Spain*) were in cases that were decided simultaneously, by tribunals that, while

---

[60]     *Micula v. Gov't of Romania*, 101 F.4th 47, 53 (D.C. Cir. 2024).

[61]     Bermann 2022 Decl. § III(G) (ECF No. 68-1).

[62]     *Id.* ¶ 115 n.87.

[63]     Bermann 2022 Supp. Decl. ¶ 17 (ECF No. 75-2).

[64]     Hindelang 2025 Decl. ¶ 25 n.30 (ECF No. 109).

separate, were both chaired by the same presiding arbitrator.[65]  Second, each of them were subject to a dissenting opinion that appears to have rejected Spain's jurisdictional objections outright.[66]

54.    Third, neither of these awards (or dissenting opinions) are public, and the tribunal majorities' reasoning is not fully known.  But what is known is that both tribunal majorities rejected the primacy of EU law over the ECT, finding that EU law was neither directly applicable to the ECT as "international law" under Article 26(6) of the ECT nor capable on its own of precluding Spain's ability to validly consent to arbitration under the ECT.[67]  Instead, the tribunal majorities in these cases appear to have reached a different conclusion in light of the ECT's object and purpose and historical development.  While I think their conclusions are wrong, these decisions obviously have no impact on the Award at issue in this case, which has survived an annulment application by Spain.

55.    In any event, my observation that the vast majority of tribunals had rejected Spain's position remains true today.  What Professor Hindelang fails to mention is that, since the date of my 2022 Supplemental Declaration, there have been numerous ICSID Convention awards involving treaty claims in which the arbitral tribunal has rejected intra-EU objections by Spain.  In

---

[65]  *See* Lisa Bohmer, *Breaking: ICSID tribunal majorities uphold intra-EU objection in duo of ECT arbitrations against Spain*, IAReporter (Oct. 12, 2024) (Ex. 7 hereto).

[66]  In the *Sapec* case, Arbitrator James Spigelman (former Chief Justice of New South Wales, Australia) dissented.  In *ESF*, Arbitrator Thomas Johnson (a current U.S. judge at the Iran-U.S. Claims Tribunal) dissented.  *See id.*

[67]  According to this report, the tribunal majorities: (i) "rejected Spain's contention that the state could not have validly consented to the arbitrations solely based on the principle of primacy of EU law"; (ii) "dismissed Spain's argument that Article 26(6) of the ECT (on the applicable law) implied that EU law directly applied to the tribunals' jurisdictions"; (iii) "rejected the idea that an interpretation of Article 26 of the ECT was solely a matter for the two contracting states concerned by the dispute"; and (iv) "considered that the Komstroy Judgment . . . was not directly relevant, since the arbitrations were governed by the ECT and the ICSID Convention, and the CJEU was not the ultimate arbiter under this framework."  *Id.*

some cases, this has led to an award of damages under the relevant treaty,[68] and in some cases the

tribunal has determined, on the merits, that the investor's claim has not been established (i.e.,

Spain's intra-EU objections were rejected, but the investor lost on the merits).[69]  In other cases, the

intra-EU objections were rejected in an interim opinion,[70] with the merits being dealt with (or to

be dealt with) in a separate phase.

---

[68]  *See Strabag SE v. Germany*, No. ARB/19/29, Award (ICSID Dec. 18, 2024) (decision not
public; tribunal reportedly rejected intra-EU objections and award damages to investors,
subject to a partial dissenting opinion, *see* Lisa Bohmer, *[Updated] Austrian Investors Are
Awarded Damages in ICSID/ECT Offshore Wind Dispute with Germany*, IAReporter (Dec. 19,
2024) (Ex. 8 hereto)); *LSG Bldg. Solutions GmbH v. Romania*, No. ARB/18/19, Award ¶¶ 2,
243 (ICSID July 11, 2022) (Ex. 10 hereto) (awarding damages after rejecting intra-EU
objections in July 2022); *E.ON SE, E.ON Finanzanlagen GmbH v. Spain,* No. ARB/15/35,
Award (ICSID Jan. 18, 2024) (decision not public; tribunal reportedly awarded damages after
having previously rejected intra-EU objections, *see* Lisa Bohmer, *Spain Is Hit With One of the
Biggest Renewable Energy Awards Yet Against the State*, IAReporter (Jan. 19, 2024) (Ex. 11
hereto); *ACF Renewable Energy Ltd. v. Bulgaria*, No. ARB/18/1, Award ¶¶ 449-58, 1512-15
(ICSID Jan. 5, 2024) (Ex. 12 hereto); *Kruck v. Spain*, No. ARB/15/23, Award ¶¶ 2-9 (ICSID
Oct. 6, 2023) (Ex. 13 hereto) (awarding damages after rejecting intra-EU objections in April
2021, reconsideration request in September 2022, and second reconsideration request in June
2022); *Sevilla Beheer B.V. v. Spain*, No. ARB/16/27, Award ¶¶ 7, 14-16, 21-23, 219 (ICSID
Mar. 6, 2023) (Ex. 14 hereto) (awarding damages after rejecting intra-EU jurisdictional
objections in February 2022, reconsideration in August 2022, and a second reconsideration
request in January 2023); *Rockhopper Italia S.p.A. v. Italy*, No. ARB/17/14, Award ¶¶ 170-73
(ICSID Aug. 23, 2022) (Ex. 16 hereto) (awarding damages after rejecting intra-EU objections
in June 2019 and reconsideration request in September 2021); *MOL Hungarian Oil & Gas Co.
plc v. Croatia*, No. ARB/13/32, Award ¶¶ 454-89 (ICSID July 5, 2022) (Ex. 17 hereto).  I note
that many, if not most, of these awards are subject to pending annulment applications by the
respondent State involved.

[69]  *See Encavis AG v. Italy*, No. ARB/20/39, Award ¶¶ 308-495 (ICSID Mar. 11, 2024) (Ex. 18
hereto); *Gabriel Resources Ltd. v. Romania*, No. ARB/15/31 Award ¶¶ 618-35 (ICSID Mar.
8, 2024) (Ex. 19 hereto); *Elitech B.V. v. Croatia*, No. ARB/17/32, Award (ICSID May 23,
2023) (decision not public; tribunal reportedly rejected intra-EU objections and upheld
jurisdiction, but dismissed investors' claims on the merits, *see* Hristina Todorovic, *ICSID
Tribunal Dismisses BIT Claim Against Croatia in Golf Course Dispute*, IAReporter (May 24,
2023) (Ex. 20 hereto)).

[70]  *See Canepa Green Energy Opportunities I, S.á r.l. v. Spain,* No. ARB/19/4, Decision on
jurisdiction, admissibility, liability, and general directions with respect to *quantum* (ICSID
May 31, 2024) (decision not public; tribunal majority reportedly rejected intra-EU objections,
subject to a dissenting opinion, *see* Lisa Bohmer, *Spain Is Held Liable for ECT Breach in Wind*

56.     Furthermore, since the date of my 2022 Supplemental Declaration, several ICSID Convention annulment committees have rejected Spain's efforts to overturn awards; in most such cases, Spain's principal asserted basis for annulment was its intra-EU objection.[71]

57.     Once again, the ICSID Convention arbitrators and annulment committee members involved in these recent decision came from a wide variety of legal traditions (American, Argentine, Australian, Austrian, Bahamian, British, Canadian Chilean, Colombian, Costa Rican, Dutch, Ecuadorian, Finnish, French, Guatemalan, Irish, Latvian, New Zealand, Nigerian, Paraguyan, Portuguese, Singaporean, Swiss), and include former senior judges[72] and international law experts.

---

*Farm Dispute*, IAReporter (Nov. 3, 2023) (Ex. 9 hereto)); *Adria Group B.V. v. Croatia,* No. ARB/20/6, Decision on Jurisdiction ¶¶ 156-78 (ICSID Oct. 31, 2023) (Ex. 21 hereto); *Cavalum SGPS, S.A. v. Spain*, ARB/15/34, Procedural Order No. 6 on the Kingdom of Spain's Request for Reconsideration of the Tribunal's Decisions on Jurisdiction of 31 August 2020 and 10 January 2022 ¶¶ 41-58 (ICSID Sept. 7, 2022) (Ex. 15 hereto); *LSG Bldg. Solutions GmbH v. Romania*, No. ARB/18/19, Decisions on Principles of Liability and Jurisdiction ¶¶ 492-94, 596-776 (ICSID July 11, 2022) (Ex. 23 hereto).

[71]   *STEAG GmbH v. Spain*, No. ARB/15/4, Decision on Annulment (ICSID Sept. 30, 2024) (decision not public; committee reportedly denied annulment, *see* Lisa Bohmer, *ICSID Ad Hoc Committee Reportedly Dismisses Spain's Request for Annulment of Solar Energy Award*, IAReporter (Oct. 1, 2024 (Ex. 24 hereto); *RENERGY S.à r.l. v. Spain*, No. ARB/14/18, Decision on Annulment ¶¶ 127-75 (ICSID Aug. 14, 2024) (Ex. 25 hereto); *BayWa r.e. Renewable Energy GmbH v. Spain*, No. ARB/15/16, Decision on Annulment ¶¶ 152-95 (ICSID May 8, 2023) (Ex. 26 hereto)*; Hydro Energy 1 S.à r.l. v Spain*, No. ARB/15/42, Decision on Annulment ¶¶ 243-306 (ICSID Mar. 20, 2023) (Ex. 27 hereto); *ESPF Beteiligungs GmbH v. Italy*, ARB/16/5, Decision on Annulment ¶¶ 219-65 (ICSID July 31, 2023) (Ex. 28 hereto); *OperaFund Eco-Invest SICAV PLC & Schwab Holding AG v. Spain,* No. ARB/15/36, Decision on Annulment ¶¶ 255-78 (ICSID Mar. 2, 2023) (Ex. 29 hereto); *RREEF Infrastructure (G.P.) Ltd. v. Spain*, No. ARB/13/30, Decision on Annulment ¶¶ 54-100 (ICSID June 20, 2022) (Ex. 30 hereto) *InfraRed Env't Infrastructure GP Ltd. v. Spain,* No. ARB/14/12, Decision on Annulment ¶¶ 443-554, 606-645 (ICSID June 10, 2022) (Ex. 31 hereto) (this case pre-dates my 2022 Declaration, but only seems to have been made public afterwards).

[72]   *E.g.*, Lord Lawrence Collins (president of the *Cavalum* tribunal) is a former judge of the UK Supreme Court. Sit Christopher Greenwood (president of the *Adria* tribunal) is a former judge of the International Court of Justice.

58.     In virtually all of these cases, the EC was granted permission to make submissions too.

\*          \*          \*

59.     In sum, the recent developments that Professor Hindelang depicts as strengthening his position fail to do so.  Apart from reiterations by the CJEU of its own policy and case law, most of these developments consist of pronouncements and actions by Member States made and taken purely in compliance with what the EC and the CJEU have told them to say and do.  And none of them are binding on U.S. courts, nor can they override the express requirements of the ECT, much less U.S. treaties and statutes under ICSID.

**D.     Professor Hindelang's Contentions Concerning "State Aid"**

60.     Finally, Professor Hindelang contends that this Court cannot enforce the Award in Petitioner's favor because doing so would effectively confer on the investor State aid that Spain itself is forbidden by EU law to confer.

61.     It is true that under EU law Member States are barred from issuing State aid without the EC's prior consent.  EU law provides for the withdrawal of such aids found to be incompatible with EU law and recovery of all sums already paid to the recipients.  Purportedly based upon this, the EC now maintains that if a Member State is found to have breached its investment treaty obligations by withdrawing illegal State aid, the State is positively forbidden to pay the resulting award.

62.     In my opinion, payment of an arbitral award cannot plausibly be viewed as constituting a State aid to an investor.  A state aid is defined as the conferral of a gratuitous benefit on a private party.  But an investor's recovery of damages in arbitration is not gratuitous; it means the investor has been found by a tribunal to have suffered damages.  Nor does the investor receive a benefit; it is simply made whole for the damage suffered as a result of a Member State's breach

23

of an investment treaty.  Furthermore, the current application is for recognition and enforcement of an ICSID Convention award against Spain, over Spain's objections.  Enforcement is not the same as payment for EU State aid law purposes, not least because one criterion for State aid is that the measure must be a voluntary act attributable to the State.  Moreover, the enforcing court is conferring nothing; it is simply issuing a judgment pursuant to its treaty obligations.

63.    I note that Spain and the EC raised the same "State aid" argument during the subject arbitration, and it was rejected by the Tribunal.[73]

64.    In sum, the EC cannot properly turn investment tribunals into State aid police.

IV.    **CONCLUSION**

65.    Professor Hindelang calls upon this Court to subordinate its obligations under the ICSID Convention, an international treaty binding on the United States, and its implementing U.S. federal statute, to commands imposed by the EC and the CJEU on EU Member States, such as Spain.  Professor Hindelang's admonition is predicated on a series of propositions on the relationship between international investment arbitration and the EU, not one of which has merit.

66.    Even were EU law viewed as a type of international law on the mere basis that it flows from treaties concluded among the EU Member States, it is still binding only on the parties to those treaties, i.e., the EU Member States themselves.  Regardless of whether the EC and its Member States view EU law as superior to treaties such as the ICSID Convention and ECT, this does not represent a valid international law viewpoint.  Certainly, the United States is not bound by this viewpoint.  Tribunals constituted under the ICSID Convention are likewise not bound by this viewpoint.

---

[73]    *See* Award, Annex A ¶¶ 510-17, 539 (ECF No. 1-4); *see also id.* Annex A ¶¶ 390, 582-601 (rejecting Spain's State aid argument).

67.     Whatever else they may be, the EU notions of primacy and autonomy are the *internal* law of the EU and its Member States.  Under Article 27 of the VCLT, no party to an international treaty may escape its obligations by reference to its internal law.  Every feature of EU law upon which Professor Hindelang relies in his 2025 Declaration—whether the European Union treaties or the principles of primacy and autonomy, or any other instrument or policy of the EU—is *internal* EU law.  None of them is a valid excuse under international law for an EU Member State to violate its obligations under the ECT and the ICSID Convention.  But, more importantly, none of them can possibly justify expecting a State outside the EU, such as the United States, to disregard its own treaty obligations on such basis.

68.     Contrary to Professor Hindelang's contentions, the "developments" that have taken place since he submitted his earlier Declarations do not in the least strengthen his current opinion.  The vast majority of ICSID Convention arbitration awards and annulment committee decisions continue to reject the intra-EU position.  And as for the EU Member State's 2024 pronouncements and other actions that Professor Hindelang recounts, these do not and cannot alter the enforceability of arbitration awards rendered under the ICSID Convention and ECT.

69.     Finally, the State aid argument advanced by Professor Hindelang remains untenable.  It is one thing for the EC to condemn and sanction an EU Member State for actually conferring a State aid on a private actor without EC approval.  But it is quite another to also treat payment by an EU Member State to an investor of an award rendered against it by an ICSID Convention tribunal in compliance with its treaty obligations as a "constructive" State aid.  That payment is neither gratuitous nor a benefit, two key features of a State aid.  Even less so can enforcement against the State (the issue now before this Court) be a form of State aid.

70.     It is still more extraordinary to demand, as Professor Hindelang does, that a U.S. court refuse, strictly on the basis of the EU's State aid policy, to enforce an otherwise enforceable ICSID Convention award pursuant to U.S. treaty obligations.  The recovery that the investor may enjoy once an award in its favor is enforced is nothing other than compensation for past harm ordered by an arbitral tribunal due to a host State's own breach of its investment treaty obligations.

*     *     *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of March 2025,
in Princeton, New Jersey, USA

_____

George A. Bermann