# Exhibit 1

**PCA Case No. 2008-13**

**IN THE MATTER OF AN ARBITRATION
BEFORE A TRIBUNAL CONSTITUTED IN ACCORDANCE WITH THE
AGREEMENT ON ENCOURAGEMENT AND RECIPROCAL PROTECTION OF
INVESTMENTS BETWEEN THE KINGDOM OF THE NETHERLANDS AND
THE CZECH AND SLOVAK FEDERAL REPUBLIC, SIGNED ON 29 APRIL 1991,
ENTERED INTO FORCE ON 1 OCTOBER 1992 ("TREATY")**

**-and-**

**THE UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW
ARBITRATION RULES ("UNCITRAL ARBITRATION RULES")**

**-between-**

**EUREKO B.V.**

**("Claimant")**

**-and-**

**THE SLOVAK REPUBLIC**

**("Respondent," and together with Claimant, the "Parties")**

_____

**AWARD ON JURISDICTION, ARBITRABILITY AND SUSPENSION**
_____

**26 October 2010**

*Tribunal*

Professor Vaughan Lowe QC
Professor Albert Jan van den Berg
Mr. V.V. Veeder QC

*Secretary to Tribunal*

Judith Levine, Permanent Court of Arbitration

# TABLE OF CONTENTS

I.    **INTRODUCTION** ..................................................................................... 1

    A. The Claimant ................................................................................................ 1

    B. The Respondent ........................................................................................... 1

    C. The Dispute .................................................................................................. 2

II.   **PROCEDURAL HISTORY** .................................................................... 3

    A. Commencement of the Arbitration ............................................................ 3

    B. Constitution of the Tribunal ...................................................................... 4

    C. Written Proceedings ................................................................................... 5

    D. Hearing on the Intra-EU Jurisdictional Objection .................................... 7

    E. Post-Hearing Proceedings .......................................................................... 8

III.  **HISTORICAL AND FACTUAL BACKGROUND** ................................... 10

    A. The Slovak Republic's Entry into the European Union ............................. 10

    B. Liberalisation of Slovak Heath Insurance Sector in 2004 and Eureko's Entry to
       Market ........................................................................................................ 12

    C. Reforms in the Slovak Republic Health Insurance Sector in 2006 – 2009 ............. 13

    D. Dispute Between Eureko and Slovak Republic and Complaint to the EU ................ 13

IV.  **ARGUMENTS ON THE "INTRA-EU JURISDICTIONAL OBJECTION"** ......... 14

    A. Termination of the BIT under Article 59 of the Vienna Convention ......................... 16

       1.   Do the BIT and the EC Treaty relate to the same subject matter? ...................... 17

           *Respondent's Position* .................................................................................. 17

           *Claimant's Position* ..................................................................................... 22

       2.   Did the Parties intend the EC Treaty to replace the BIT? ................................... 25

           *Respondent's Position* .................................................................................. 25

           *Claimant's Position* ..................................................................................... 28

       3.   Are the provisions of the EC Treaty and BIT so far incompatible that the
           treaties are not capable of being applied at the same time? ................................. 32

           *Respondent's Position* .................................................................................. 32

           *Claimant's Position* ..................................................................................... 35

    B. Inapplicability of the BIT's Arbitration Clause BIT under Article 30
       of the Vienna Convention .......................................................................... 37

           *Respondent's Position* .................................................................................. 37

           *Claimant's Position* ..................................................................................... 37

    C. Inapplicability of the BIT and Incompetence of the Tribunal
       as a Matter of EU Law ............................................................................... 38

           *Respondent's Position* .................................................................................. 38

           *Claimant's Position* ..................................................................................... 40

    D. Non-Arbitrability as a Matter of German Law .......................................... 41

           *Respondent's Position* .................................................................................. 41

           *Claimant's Position* ..................................................................................... 42

E. Request to Submit the Dispute to ECJ or Stay the Arbitration Pending
  ECJ Decision ...................................................................................................43
    *Respondent's Position*.......................................................................................*43*
    *Claimant's Position* .........................................................................................*43*
F. Request that the European Commission be Invited to Participate
  in the Arbitration ...........................................................................................43
    *Respondent's Position*.......................................................................................*43*
    *Claimant's Position* .........................................................................................*44*

**V.    OBSERVATIONS FROM THE NETHERLANDS GOVERNMENT AND THE
       EUROPEAN COMMISSION .................................................................44**

A. Written Observations of the Netherlands Government ..............................45
  1.  Netherlands Government Letter of 10 June 2010................................45
  2.  Netherlands Government Letter of 23 June 2010 appending Note Verbale
      from the Slovak Republic ................................................................47
  3.  Parties' comments on Netherlands Government observations and Slovak
      Republic Note Verbale.....................................................................48
    *Respondent's Position*.......................................................................................*48*
    *Claimant's Position* .........................................................................................*48*
B. Written Observations of the European Commission .................................49
  1.  Distinction between extra-EU BITs and intra-EU BITs.....................49
  2.  Discrimination issues with intra-EU BITs........................................51
  3.  Competing judicial and arbitral mechanisms....................................52
  4.  Termination of the Dutch-Slovak BIT is desirable but has not happened
      automatically under VCLT Article 59...............................................53
  5.  Some BIT provisions are inapplicable under VCLT Article 30(3) ....53
  6.  Suspension of proceedings until doubts resolved by ECJ .................54
  7.  Parties' comments on the European Commission's observations ......55
    *Respondent's Comments* ...................................................................................*55*
    *Claimant's Comments*.......................................................................................*57*

**VI.   RELIEF REQUESTED BY THE PARTIES ...............................................59**
    *Respondent's Request for Relief* ......................................................................*59*
    *Claimant's Request for Relief*...........................................................................*59*

**VII. ANALYSIS BY THE TRIBUNAL...............................................................60**
A. Termination of the BIT under Article 59 of the Vienna Convention ........63
B. Inapplicability of the BIT under VCLT Article 30....................................72
C. Inapplicability of the BIT under EU Law.................................................74
D. Non-Arbitrability of the Dispute under German Law ...............................75
E. Relationship between the Tribunal and EU Institutions............................76

**VIII. DECISION ...............................................................................................77**

## LIST OF DEFINED TERMS

| Term | Definition |
|---|---|
| 5 April 2004 E-mail | Respondent's Exhibit R-46, an e-mail dated 5 April 2004 from the Slovak Ministry of Finance to the economic and commercial counsellors at diplomatic missions of several EU Member States in Bratislava |
| 226-Reply | The Slovak Republic's Reply of 22 January 2010 to the European Commission's formal notice pursuant to Article-226 of the EC Treaty issued in relation to Complaint No. 2008/4268 and received by the Slovak Republic on 23 November 2009. |
| Accession Treaty | Treaty between the [original Member States of the EU, including the Netherlands] and the Czech Republic, the Republic of Estonia, the Republic of Cyprus, the Republic of Latvia, the Republic of Lithuania, the Republic of Hungary, the Republic of Malta, the Republic of Poland, the Republic of Slovenia, the Slovak Republic, concerning the accession of the [above listed countries], signed on 16 April 2003, entered into force on 1 May 2004 |
| Association Agreement | Agreement Establishing an Association between the European Communities and their Member States and the Slovak Republic on 4 October 1993, entered into force on 1 February 1995 |
| *Austrian Airlines* | *Austrian Airlines v. Slovak Republic*, UNCITRAL, (Austria/Slovak BIT), (redacted) Final Award of 9 October 2009 |
| BIT (or Treaty) | Agreement on Encouragement and Reciprocal Protection of Investments between the Kingdom of the Netherlands and the Czech and Slovak Federal Republic, signed on 29 April 1991, entered into force on 1 October 1992 |
| Claimant (or Eureko) | Eureko B.V., a Dutch private company with limited liability with its statutory seat in Amsterdam and its head office at Handelsweg 2, 3707NH Zeist, The Netherlands, Company Reg. No.: 33235189 |
| CSFR | The Czech and Slovak Federative Republic (from 1990) |
| CSFR Association Agreement | European Agreement Establishing an Association between the European Community on the one hand, and the CSFR, Hungary and Poland on the other, signed 16 December 1991 |

| Term | Definition |
|------|-----------|
| *Eastern Sugar* | *Eastern Sugar B.V. (Netherlands)* v. *Czech Republic* (ad hoc arbitration under UNCITRAL Rules, administered by the Stockholm Chamber of Commerce, SCC No. 088/2004), Partial Award of 27 March 2007. |
| ECHR | European Convention for the Protection of Human Rights and Fundamental Freedoms, signed on 21 February 1991, entered into force on 18 March 1992 |
| EC Treaty | Treaty Establishing the European Community, adopted 25 March 1957, entered into force on 1 January 1958 |
| ECJ | Court of Justice of the European Union |
| European Commission Observations | Written observations of the European Commission submitted to the PCA regarding the Intra-EU Jurisdictional Objection, dated 7 July 2010 |
| EFC | Economic and Financial Committee of the Council of the European Union |
| EU | The European Union |
| Eureko (or Claimant) | Eureko B.V., a Dutch private company with limited liability with its statutory seat in Amsterdam and its head office at Handelsweg 2, 3707NH Zeist, The Netherlands, Company Reg. No.: 33235189 |
| Extra-EU BIT Cases | ECJ decisions in cases brought against Austria, Sweden and Finland, relating to breaches of their obligations as EU Member States arising from the investment treaties that they had concluded with third (*i.e.*, non-EU) countries: Case C-205/06, *Commission v. Republic of Austria*, Judgment of 3 March 2009, [2009] ECR I-01303; Case C-249/06, *Commission v. Kingdom of Sweden*, Judgment of 3 March 2009, and Case C-118/07, *Commission v. Republic of Finland*, Judgment of 19 November 2009 |
| *Francovich* | Joined Cases C-6/90 and C-9/90, *Francovich and Others v. Italian Republic*, Judgment of 19 November 1991, [1991] ECR I-5357. |
| ILC | International Law Commission |

| Term | Definition |
|---|---|
| Intra-EU Jurisdictional Objection | Respondent's jurisdictional objection based on the Slovak Republic's membership of the EU, comprising the arguments that, as a matter of international law, EU law, Slovak law and German law, the accession of the Slovak Republic to the EU in May 2004 terminated the BIT or rendered its arbitration clause inapplicable, and accordingly that this Tribunal lacks jurisdiction |
| Jurisdiction Counter-Memorial | Claimant's Counter-Memorial on the Intra-EU Jurisdictional Objection, dated 26 February 2010 |
| Jurisdiction Memorial | Respondent's Memorial on the Intra-EU Jurisdictional Objection, dated 29 January 2010 |
| Jurisdiction Rejoinder | Claimant's Rejoinder on the Intra-EU Jurisdictional Objection, dated 16 April 2010 |
| Jurisdiction Reply | Respondent's Reply on the Intra-EU Jurisdictional Objection, dated 23 March 2010 |
| Lisbon Treaty (or TFEU) | Treaty on the Functioning of the European Union, done in Lisbon 13 December 2007, entered into force 1 December 2009 |
| Ministry of Health | Ministry of Health of the Slovak Republic (Ministerstvo zdravotníctva Slovenskej republiky) |
| *MOX Plant* | Case C-459/03, *Commission v. Ireland*, Judgment of 30 May 2006, [2006] ECR I-4635 |
| Notice of Arbitration | Claimant's Notice of Arbitration, dated 1 October 2008 |
| PCA | Permanent Court of Arbitration, serving as registry in this arbitration |
| Post-Hearing Submissions | Submissions filed by each Party, dated 19 July 2010, containing comments on the observations provided by the Netherlands Ministry of Economic Affairs and the European Commission, the *Austrian Airlines* award, and the 226-Reply |
| Respondent (or Slovak Republic) | The Slovak Republic, represented by the Ministry of Finance |
| Slovak Republic (or Respondent) | The Slovak Republic, represented by the Ministry of Finance |
| Statement of Claim | Claimant's Statement of Claim, dated 16 June 2009 |
| Statement of Defence | Respondent's Statement of Defence, dated 30 October 2009 |

| Term | Definition |
|---|---|
| TFEU (or Lisbon Treaty) | Treaty on the Functioning of the European Union, signed in Lisbon on 13 December 2007, entered into force on 1 December 2009 |
| Transcript | Transcript of the hearing on the Intra-EU Jurisdictional Objection held on 24 April 2010 |
| Treaty (or BIT) | Agreement on Encouragement and Reciprocal Protection of Investments between the Kingdom of the Netherlands and the Czech and Slovak Federal Republic, signed on 29 April 1991, entered into force on 1 October 1992 |
| Tribunal | Arbitration tribunal established pursuant to Article 8 of the BIT in the case *Eureko B.V. v. Slovak Republic* |
| UNCITRAL Arbitration Rules | The United Nations Commission on International Trade Law Arbitration Rules (1976) |
| Union Healthcare | Union zdravotná poisťovňa, a.s., registered seat: Bajkalská 29/A, Bratislava 821 08, The Slovak Republic, Company Reg. No.: 36 284 831, a wholly owned subsidiary of Eureko |
| Union Insurance | Union poisťovňa a.s. (joint-stock company), registered seat: Bajkalská 29/A, 813 60 Bratislava, The Slovak Republic, Company Reg. No.: 31 322 051 |
| VCLT (or Vienna Convention) | Vienna Convention on the Law of Treaties, signed on 23 May 1969, entered into force on 27 January 1980 |
| Vienna Convention (or VCLT) | Vienna Convention on the Law of Treaties, signed on 23 May 1969, entered into force on 27 January 1980 |
| ZPO | The German Code of Civil Procedure (Zivilprozessordnung), Book 10 of which contains the German Arbitration Act |

# I.    INTRODUCTION

## A.  The Claimant

1.    Eureko B.V. ("**Eureko**" or "**Claimant**") is a Dutch private company with limited liability, having its statutory seat in Amsterdam and its head offices in Zeist, The Netherlands.

2.    The group of companies headed by Eureko is a financial services group that offers a range of insurance products internationally, including health insurance, life and non-life insurance, pension products, asset management and banking.  Eureko operates in the Slovak Republic through two companies:    (i)  Union poisťovňa a.s. ("**Union Insurance**"), incorporated in 1991 by the Government of the Slovak Republic and privatised in 1992, in which Eureko acquired shares in 1997; and (ii) Union zdravotná poisťovňa, a.s ("**Union Healthcare**"), a wholly owned subsidiary of Eureko incorporated in 2006 and funded by Eureko.[1]   This arbitration primarily concerns Eureko's investment in Union Healthcare.

3.    Eureko is represented in this arbitration by Marnix Leijten, Rogier Schellaars, Albert Marsman, and Patrick Ploeger of De Brauw Blackstone Westbroek N.V., Claude Debussylaan 80, 1082 MD Amsterdam, The Netherlands; and by René Visser and Nynke Hupkens of Eureko B.V.

## B.  The Respondent

4.    The Slovak Republic ("**Slovak Republic**" or "**Respondent**") is a sovereign State, formerly a part of the Czech and Slovak Federal Republic.  It gained independence on 1 January 1993 and joined the European Union ("**EU**") on 1 May 2004.  The Slovak Republic is a multiparty parliamentary democracy, with executive power lying with the government headed by a Prime Minister.[2]

5.    Respondent is represented in this arbitration by Andrej Solár and Andrea Holíková of the Slovak Republic Ministry of Finance, Štefanovicova 5, 817 82 Bratislava, the Slovak Republic; Martin Maisner, Miloš Olík, Pavel Černohorský and David Fyrbach of Rowan Legal, s.r.o., Námestie Slobody 11, 811 06 Bratislava, Slovak Republic;

---

[1]    Statement of Claim, ¶¶ II.2, 4-12.
[2]    Statement of Claim, ¶¶ II.16-22.

Lukáš Trojan, Jan Štovíček and Martin Doleček of KSD Štovíček advokátska kancelária, s.r.o., Michalská 7, 811 01 Bratislava, Slovak Republic; and Jay Alexander and Alejandro Escobar, Baker Botts LLP, The Warner, 1299 Pennsylvania Ave. NW, Washington, DC 20004-2400, United States of America.

### C.  The Dispute

6.    Claimant initiated this arbitration on the basis of claims that the Slovak Republic has violated the 1992 Agreement on Encouragement and Reciprocal Protection of Investments between the Kingdom of the Netherlands and the Czech and Slovak Federal Republic ("**Treaty**" or "**BIT**").[3]

7.    Claimant complains that various legislative measures introduced by Respondent after a change in government in July 2006 constituted a systematic reversal of the 2004 liberalisation of the Slovak health insurance market that had prompted Eureko to invest in the Slovak Republic's health insurance sector.  According to Claimant, these actions destroyed the value of Eureko's investment.  Claimant characterises the measures as constituting an unlawful indirect expropriation of its investment in Union Healthcare, in breach of **Article 5** of the BIT.  Claimant further alleges that Respondent's conduct amounts to a violation of the BIT's standards of protection contained in its provisions on (i) fair and equitable treatment including as to non-discrimination (**Article 3(1)** of the BIT), (ii) full protection and security (**Article 3(2)** of the BIT), and (iii) free transfer of profits and dividends (**Article 4** of the BIT).[4] Claimant seeks, *inter alia*, compensation in an amount exceeding €100 million for damages suffered as a result of the Slovak Republic's alleged breaches of the Treaty, as well as costs, interest and a declaration to the effect that the Slovak Republic has breached and continues to breach its obligations under the Treaty.[5]

8.    The Slovak Republic challenged the Tribunal's jurisdiction over the dispute under the principles of *ratione personae* and *ratione materiae* and raised a further jurisdictional objection based on the Slovak Republic's membership of the EU.  It denies that it has expropriated or otherwise violated any obligation—international or otherwise—purportedly owed to Eureko, that any of Eureko's claims are viable as a matter of fact

---

[3]   Signed on 29 April 1991, entered into force on 1 October 1992 (Exhibit C-10).
[4]   Statement of Claim, ¶ IV.
[5]   Notice of Arbitration, ¶ 10.  Claimant will present a detailed damages claim in a subsequent phase of the arbitration as appropriate (Statement of Claim, ¶ V.28; Procedural Order No. 1, ¶¶ 5.6).

and law, and that Eureko has suffered any cognizable damages or injury.  Respondent asserts that it has complied fully with all applicable international legal requirements.[6]

9.    In accordance with the procedure agreed with the Parties, this Award on Jurisdiction, Arbitrability and Suspension deals exclusively with Respondent's jurisdictional objection based on the Slovak Republic's membership of the EU.  In essence, Respondent argues that, as a matter of international law, EU law, Slovak law and German law, the accession of the Slovak Republic to the EU in May 2004 terminated the BIT or rendered its arbitration clause inapplicable, and accordingly this Tribunal lacks jurisdiction to hear the dispute (the "**Intra-EU Jurisdictional Objection**").  Claimant denies this.

## II.    PROCEDURAL HISTORY

### A.  Commencement of the Arbitration

10.    Pursuant to Article 8 of the Treaty and Article 3 of the UNCITRAL Arbitration Rules, Eureko sent a Notice of Arbitration to Respondent on 1 October 2008, which Respondent received on 3 October 2008.

11.    Article 8 of the Treaty provides in the relevant parts as follows:

(1)    All disputes between one Contracting Party and an investor of the other Contracting Party concerning an investment of the latter shall if possible, be settled amicably.

(2)    Each Contracting Party hereby consents to submit a dispute referred to in paragraph (1) of this Article, to an arbitral tribunal, if the dispute has not been settled amicably within a period of six months from the date either party to the dispute requested amicable settlement.
…

(5)    The arbitration tribunal shall determine its own procedure applying the arbitration rules of the United Nations Commission for International Trade Law (UNCITRAL).

(6)    The arbitral tribunal shall decide on the basis of the law, taking into account in particular though not exclusively:

- the law in force of the Contracting Party concerned;

- the provisions of this Agreement, and other relevant Agreements between the Contracting Parties;

- the provisions of special agreements relating to the investment;

- the general principles of international law.
…

---

[6]    Statement of Defence, ¶¶ 1, 2, 128.

### B.  Constitution of the Tribunal

12.  By letter dated 17 October 2008, Claimant appointed Professor Albert Jan van den Berg as the first arbitrator.

13.  On 26 November 2008, Respondent appointed His Excellency Judge Peter Tomka as the second arbitrator.

14.  On 20 December 2008, the co-arbitrators jointly appointed Professor Vaughan Lowe QC as the presiding arbitrator.

15.  The Tribunal and the Parties signed Terms of Appointment on 5 March 2009, confirming the constitution of the Tribunal and designating the International Bureau of the Permanent Court of Arbitration ("**PCA**") to act as registry in the arbitration.  It was agreed that the language of the proceedings would be English.[7]

16.  The Tribunal held a procedural hearing with the Parties on 19 March 2009 at the Peace Palace in The Hague.  On that date, the Tribunal issued **Procedural Order No. 1**, taking into account the agreements reached at the hearing.  In Procedural Order No. 1, the Tribunal determined Frankfurt, Germany to be the place (seat) of the arbitration, while reserving the Tribunal's right to conduct hearings and meetings at any location considered appropriate.[8]  Procedural Order No. 1 also provided, *inter alia,* for a preliminary schedule for the Parties' submissions, for the use of teleconference as a means of communication between the Tribunal and the Parties, for the methods of production of evidence and for confidentiality undertakings.

17.  By letter dated 7 April 2009, Judge Tomka notified his co-arbitrators and the Parties of his decision to resign as arbitrator in the present case, with effect from 30 April 2009.  On 6 May 2009, Respondent notified the appointment of Mr. Van Vechten Veeder QC as substitute arbitrator, who formally accepted the appointment on 18 May 2009.  The PCA drew the Parties' attention to the fact that both Mr. Veeder and Professor Lowe are members of Essex Court Chambers.  By e-mails from Respondent dated 27 May 2009 and from Claimant dated 5 June 2009, both Parties confirmed in writing that they had no objection to Mr. Veeder's appointment.

---

[7]  Terms of Appointment, ¶¶ 3, 5 and 11.
[8]  Procedural Order No. 1, ¶ 1.

### C. Written Proceedings

18.     In accordance with Procedural Order No. 1, Claimant filed its **Statement of Claim**, with accompanying exhibits, on 16 June 2009.

19.     Respondent filed its **Statement of Defence**, with accompanying exhibits, on 30 October 2009.  In addition to rejecting Claimant's claims, Respondent asserted that Eureko had not presented sufficient facts to establish either jurisdiction *ratione personae* or *ratione materiae*.[9]  Respondent also introduced the Intra-EU Jurisdictional Objection, arguing that the Slovak Republic's membership in the EU deprives the Tribunal of jurisdiction because, *inter alia*:  (i) the European Community treaty ("**EC Treaty**")[10] governs the same subject matter as the BIT and therefore the BIT should be considered terminated and/or inapplicable pursuant to Articles 59 and 30 of the Vienna Convention on the Law of Treaties ("**VCLT**" or "**Vienna Convention**"),[11] (ii) the arbitration clause in the BIT cannot apply because it is incompatible with the EC Treaty, as the ECJ has exclusive jurisdiction over Eureko's claims, and (iii) clauses such as Article 4 of the BIT relating to free transfer of capital have been held by the European Court of Justice ("**ECJ**") to be incompatible with EU law, which is supreme.[12]

20.     On 3 December 2009, having considered the matters raised during a teleconference held with the Parties the previous day, the Tribunal issued **Procedural Order No. 2**.  In Procedural Order No. 2, the Tribunal decided to hold a preliminary jurisdictional phase dedicated to Respondent's Intra-EU Jurisdictional Objection, and set a schedule for the Parties' submissions, for requests for document disclosure and for a hearing on the Intra-EU Jurisdictional Objection.  The Tribunal noted from the teleconference that there had been no agreement between the Parties on any form of consolidation of hearings on the Intra-EU Jurisdictional Objection in this case with those in other pending cases against the Slovak Republic in which similar issues might also arise.  With respect to the *ratione personae* jurisdictional objection, the Tribunal requested Claimant to produce evidence of the extent of its shareholding and written assurances as to its continued ownership of the claim, after which Respondent would be given an

---

[9]   Statement of Defence, ¶¶ 125-126.
[10]  Treaty Establishing the European Community 25 March 1957 (entered into force on 1 January 1958) now Consolidated Version of the Treaty on the Functioning of the European Union 5 September 2008, 2008 O.J. (C 115) 47 (hereafter "**TFEU**").
[11]  Vienna Convention on the Law of Treaties, UN Doc. A/Conf.39/27; 1155 UNTS 331; 8 ILM 679 (1969); 23 May 1969 (entered into force 27 January 1980) (hereafter "**VCLT**").  The Netherlands acceded to the VCLT on 9 April 1985 and the Slovak Republic succeeded to the VCLT on 28 May 1993.
[12]  Statement of Defence, ¶¶ 119-124.

opportunity to particularise any outstanding concerns.  With respect to the *ratione materiae* jurisdictional objection, the Tribunal ordered the Parties to proceed by way of concurrent requests for document production in the form of "Redfern Schedules." The Tribunal reserved any decision on how and when to resolve the *ratione materiae* issues until after it had reviewed the Parties' positions.

21.     Pursuant to Procedural Order No. 2, the Parties exchanged requests for disclosure of documents related to the Intra-EU Jurisdictional Objection on 4 December 2009, and replies and responses on disclosure on 11 and 17 December 2009.  On 21 December 2009, the Tribunal issued **Procedural Order No. 3**, deciding the outstanding issues of document production.

22.     On 29 January 2010, in accordance with Procedural Order No. 2, Claimant provided evidence of the extent of its shareholding in Union Healthcare at all relevant times and written assurances as to its continuous ownership of the claims that it has brought against Respondent in this arbitration.  By letter dated 22 February 2010, Respondent stated that it raised no questions regarding the Claimant's jurisdiction *ratione personae*.  By letter dated 25 February 2010, the PCA informed the Parties that the Tribunal, after review of the Parties' positions, decided that no action needed to be taken on the question of jurisdiction *ratione personae*.

23.     In accordance with Procedural Order No. 2, Respondent submitted its Memorial on the Intra-EU Jurisdictional Objection with accompanying exhibits on 29 January 2010 ("**Jurisdiction Memorial**") and Claimant submitted its Counter-Memorial on the Intra-EU Jurisdictional Objection with accompanying exhibits on 26 February 2010 ("**Jurisdiction Counter-Memorial**").  The Parties' jurisdictional arguments are set out in more detail in Part IV below.

24.     On 5 February 2010, in accordance with Procedural Order No. 2, Respondent filed a request for disclosure of documents with respect to the so-called *ratione materiae* concerns (relating, *inter alia*, to the objective criteria of an "investment" and Claimant's compliance with Slovak law), and Claimant sent a letter stating it was not in a position to submit such a request in the absence of specific allegations by Respondent.  On 5 March 2010, Claimant filed objections to Respondent's document requests relating to the so-called *ratione materiae* concerns, to which Respondent replied on 12 March 2010.  Further correspondence amongst the Parties ensued and

the Tribunal held a teleconference on 8 April 2010.  Following the teleconference, on 8 April 2010, the Tribunal informed the Parties in writing that:

    i.   The Tribunal has decided not to order any disclosure at this time.

    ii.  The Partial Award on Jurisdiction [*i.e.*, the present Award] will decide only the "Intra EU" challenge.

    iii. The Tribunal is not minded to arrange a second jurisdictional stage devoted to the *ratione materiae* challenge if it rejects the "Intra EU" challenge.

    iv.  Points (ii) and (iii) above are without prejudice to the right of the Respondent to raise arguments based on 'illegality' and / or 'business risk' in relation to questions of liability and / or quantum, if the case proceeds that far.

    v.   Similarly, both Parties will be able to make fresh requests for disclosure in relation to questions of merits and / or quantum, if the case proceeds that far.

25.  In accordance with Procedural Order No. 2, Respondent submitted its Reply on the Intra-EU Jurisdictional Objection with accompanying exhibits on 23 March 2010 ("**Jurisdiction Reply**") and Claimant submitted its Rejoinder on the Intra-EU Jurisdictional Objection with accompanying exhibits on 16 April 2010 ("**Jurisdiction Rejoinder**").

26.  On 14 April 2010, Respondent submitted a document entitled "Respondent's Position on Amicus Curiae Brief of the European Commission" in which Respondent proposed that the European Commission be invited to participate in the Intra-EU Jurisdictional phase of the arbitration proceedings as *amicus curiae*.

27.  On 15 April 2010, the Parties jointly filed a "List of agreed uniform terminology for key entities in the arbitration," the contents of which are incorporated in the List of Defined Terms at the front of this Award.

28.  On 21 April 2010, each Party sent the Tribunal a short summary list of headings under which it would be making its oral submissions at the hearing on the Intra-EU Jurisdictional Objection.

### D.  Hearing on the Intra-EU Jurisdictional Objection

29.  On Saturday, 24 April 2010, a hearing on the Intra-EU Jurisdictional Objection was held at the International Dispute Resolution Centre in London.  Present at the hearing were:

        Tribunal:      Professor Vaughan Lowe QC
                       Professor Albert Jan van den Berg
                       Mr. V. V. Veeder QC

| Claimant: | Mr. Marnix Leijten, De Brauw Blackstone Westbroek NV |
|---|---|
| | Mr. Rogier Schellars, De Brauw Blackstone Westbroek NV |
| | Mr. Albert Marsman, De Brauw Blackstone Westbroek NV |
| | Mr. Rene Visser, Eureko B.V. |
| | Mrs. Nynke Hupkens, Eureko B.V. |
| Respondent: | Mr. Martin Maisner, Rowan Legal |
| | Mr. Jiri Feichtinger, Rowan Legal |
| | Mr. David Fyrbach, Rowan Legal |
| | Mr. Miloš Olík, Rowan Legal |
| | Ms. Andrea Holíková, Ministry of Finance, Slovak Republic |
| | Mr. Radovan Hronsky, Ministry of Finance, Slovak Republic |
| | Mr. Matej Sapak, Ministry of Finance, Slovak Republic |
| Registry: | Ms. Judith Levine, Permanent Court of Arbitration |
| | Ms. Trina Ng, Permanent Court of Arbitration |

30.    Each Party presented arguments on the Intra-EU Jurisdictional Objection and answered questions from the Tribunal.  The Tribunal discussed with the Parties the possibility of approaching the European Commission and the Netherlands Government to provide comments to the Tribunal.

### E.  Post-Hearing Proceedings

31.    After the hearing on the Intra-EU Jurisdictional Objection and following consultations with the Parties, on 10 May 2010, the Tribunal wrote to the Director General of the Legal Service of the European Commission providing information about the present arbitration, referring to observations that the European Commission had made in the *Eastern Sugar BV (Netherlands)* v. *Czech Republic* arbitration ("***Eastern Sugar***") concerning the effect upon the Tribunal's jurisdiction of the fact that both the Respondent and the national State of the Claimant are Member States of the EU,[13] and inviting the European Commission to submit any further observations on that jurisdictional question that it might wish to communicate to the Tribunal.

32.    Also on 10 May 2010, following consultations with the Parties, the Tribunal wrote to the Netherlands Ministry of Economic Affairs noting that the Netherlands Government had already provided a letter to the Claimant for purposes of the present

---

[13]    *Eastern Sugar B.V. v. Czech Republic*, UNCITRAL Rules, SCC Case No. 088/2004, Partial Award, 27 March 2007 (hereafter "***Eastern Sugar***").  Available at:  http://ita.law.uvic.ca/documents/EasternSugar.pdf.

arbitration,[14] and inviting the Netherlands Government to provide to the Tribunal any further observations that it might have on the jurisdictional question.

33.    By e-mail dated 28 May 2010, the European Commission requested copies of Eureko's claims.  After consultation with the Parties, the Tribunal provided the Notice of Arbitration and Statement of Claim to the European Commission on 17 June 2010.

34.    On 10 June 2010, the Netherlands Ministry of Economic Affairs responded to the Tribunal's invitation on behalf of the Netherlands Government with a letter setting out its position on the jurisdictional question, as is described in more detail at paragraphs 155 to 163.

35.    By e-mail dated 11 June 2010, Claimant drew the Tribunal's attention to an award dated 9 October 2009 (made public, in redacted form, on 2 June 2010) in the matter of *Austrian Airlines v. Slovak Republic*, an arbitration brought pursuant to the Austrian-Slovak BIT under the UNCITRAL Arbitration Rules.  Claimant pointed out that in that case the Slovak Republic had raised no objection to jurisdiction based on the fact that the BIT in question was between two EU Member States.

36.    By letter dated 23 June 2010, the Netherlands Government sent a further letter to the Arbitral Tribunal attaching a formal written statement in the form of a "Note Verbale" from the Slovak Republic dated 16 June 2010 that had been sent in response to a request from the Netherlands Government of 4 May 2010.   This document is described in more detail below at paragraphs 164 to 166.

37.    On 7 July 2010, the European Commission responded to the Tribunal's invitation setting out its observations on the Intra-EU Jurisdictional Objection, as is described in more detail below at paragraphs 175 to 196.

38.    On 12 July 2010, the Tribunal issued **Procedural Order No. 4**, in which the Tribunal:  (i) re-affirmed its order to Claimant to produce documents covered by paragraph 2.4 of Procedural Order No. 3 by Monday, 2 August 2010; (ii) ordered Respondent to produce the Slovak Republic's Reply to the European Commission's "Article 226" letter by 13 July 2010 (the "**226-Reply**"); and (iii), recalling both Parties' desire for the expeditious and efficient resolution of the dispute, and Claimant's willingness to proceed to prepare immediately for the merits "at its own risk" without waiting for the Award on Jurisdiction to be rendered, set 2 August 2010

---

[14]  See below, ¶ 101.

as the date by which Claimant should submit its Memorial on the Merits (which Claimant proceeded to do).

39.     On 13 July 2010, Respondent complained to the Tribunal that, as revealed in the European Commission's Observations, Claimant had sent the European Commission an "*ex parte* communication" on 11 June 2010.  Claimant provided a copy of the communication in question to Respondent and to the Tribunal on 13 July 2010.  Also on 13 July 2010, Respondent produced to Claimant and to the Tribunal a copy of its 226-Reply.

40.     On 19 July 2010, the Tribunal declined a request by Respondent to allow disclosure of the European Commission's observations in this arbitration to an arbitral tribunal constituted in another arbitration involving the Slovak Republic under the same BIT.

41.     On 19 July 2010, each Party submitted comments on the observations provided by the Netherlands Ministry of Economic Affairs and the European Commission, as well as on the (redacted) *Austrian Airlines v. Slovak Republic* award and the 226-Reply ("**Post Hearing Submissions**").

42.     Further comments relating to the Intra-EU Jurisdictional Objection were received from the Parties on 22 July, 29 July, 4 August, 6 August and 10 August 2010.  On 16 August 2010, the Tribunal confirmed to the Parties that it considered that it had all the material it needed for its deliberations on the Intra-EU Jurisdictional Objection.

## III.     HISTORICAL AND FACTUAL BACKGROUND

43.     The summary below is drawn from the Parties' pleadings and is presented to give context to the timing of the investment and alleged BIT violations against the background of the Slovak Republic's entry into the EU.  It in no way presents factual determinations by the Tribunal that would be binding or could affect any assessment at any later stage of this case.

### A.  The Slovak Republic's Entry into the European Union

44.     Starting in 1989 with the collapse of the Soviet Eastern Bloc, Czechoslovakia (from 1990 the Czech and Slovak Federative Republic ("**CSFR**")) underwent a transformation from a system of central economic planning to a market economy.  According to the Slovak Republic, this transformation necessitated the creation of a

"sufficient legal framework, which would safeguard the functioning of the new system and protection of the participating subjects." Integration into the European Community and Council of Europe was a priority in fostering the economic and political stability desired, while ensuring the protection of foreign entities entering a then-emerging market.[15]

45.    In 1989 Czechoslovakia initiated contact with the European Community. Negotiations resulted in the conclusion on 16 December 1991 of the European Agreement Establishing an Association between the European Community on the one hand, and the CSFR, Hungary and Poland on the other ("**CSFR Association Agreement**").[16] That Agreement was subject to ratification.

46.    During the same period, the CSFR concluded the Interim Agreement on Trade and Trade-related Matters by and between the CSFR, European Economic Community and the European Coal and Steel Community, which entered into force from 1 March 1992. The CSFR also concluded bilateral agreements on the promotion and protection of investments, including the BIT with The Netherlands, which was signed on 29 April 1991 and came into force from 1 October 1992.[17]

47.    The CSFR became a member of the Council of Europe and a signatory to the European Convention for the Protection of Human Rights and Fundamental Freedoms ("**ECHR**") on 21 February 1991. The ECHR has been in force for the CSFR since 18 March 1992.

48.    The Slovak Republic separated from the CSFR and became an independent State on 1 January 1993. It succeeded to the CSFR-Netherlands BIT, as well as to the ECHR, as of the day of its independence. Because of the split of the CSFR, the CSFR Association Agreement was never ratified. The Slovak Republic had to renegotiate its relationship with the European Community by concluding the Agreement Establishing an Association between the European Communities and their Member States [including The Netherlands] and the Slovak Republic on 4 October 1993

---

[15]  Jurisdiction Memorial, ¶¶ 7-8.
[16]  Jurisdiction Memorial, ¶¶ 7-9.
[17]  Jurisdiction Memorial, ¶¶ 9-10. The Netherlands has been a member of the EU since it became party to the Treaty of Rome Establishing the European Economic Community on 25 March 1957. The Netherlands had become a party to the European Convention for the Protection of Human Rights and Fundamental Freedoms on 31 August 1954.

("**Association Agreement**").  The Association Agreement has been in force since 1 February 1995.[18]

49.  On 16 April 2003, the Slovak Republic signed the **Accession Treaty**,[19] and its membership of the EU became effective when the Accession Treaty entered into force on 1 May 2004.

50.  On 1 December 2009, the Lisbon Treaty entered into force for all EU Member States, including the Slovak Republic and the Netherlands.

### B.  Liberalisation of Slovak Heath Insurance Sector in 2004 and Eureko's Entry to Market

51.  The Slovak Republic established a mandatory and universal public health insurance system in 1993.[20]  This system, administered by a single state-owned Health Insurer, was modified in 1994 to permit the creation of other state-owned and private entities to perform public healthcare functions.[21]

52.  By 2004, the public health insurance system had accumulated a substantial deficit. The Slovak Republic addressed this deficit by an infusion of funds from the state budget and a series of reforms to liberalise the legal framework of the health insurance market.  The 2004 reforms aimed at achieving a mix of public and private investment.[22]  Among other things, the reforms (i) eliminated administrative expenses caps and enabled insurance companies to compete for clients, (ii) reduced the scope of the mandatory health-care package by providing for supplementary health insurance through voluntary additional out-of-pocket co-payments by the beneficiaries, (iii) gave health insurers leverage in setting prices for services, as well as the ability to make and use profits from the provision of such services, (iv) enabled privatisation of

---

[18]  Jurisdiction Memorial, ¶¶ 12-13.

[19]  Treaty between the Kingdom of Belgium, the Kingdom of Denmark, the Federal Republic of Germany, the Hellenic Republic, the Kingdom of Spain, the French Republic, Ireland, the Italian Republic, the Grand Duchy of Luxembourg, the Kingdom of the Netherlands, the Republic of Austria, the Portuguese Republic, the Republic of Finland, the Kingdom of Sweden, the United Kingdom of Great Britain and Northern Ireland (Member States of the European Union) and the Czech Republic, the Republic of Estonia, the Republic of Cyprus, the Republic of Latvia, the Republic of Lithuania, the Republic of Hungary, the Republic of Malta, the Republic of Poland, the Republic of Slovenia, the Slovak Republic, concerning the accession of the Czech Republic, the Republic of Estonia, the Republic of Cyprus, the Republic of Latvia, the Republic of Lithuania, the Republic of Hungary, the Republic of Malta, the Republic of Poland, the Republic of Slovenia, the Slovak Republic concerning the Accession of The Czech Republic, the Republic of Estonia, the Republic of Cyprus, the Republic of Latvia, the Republic of Lithuania, the Republic of Hungary, the Republic of Malta, the Republic of Poland, the Republic of Slovenia and the Slovak Republic to the European Union, signed on 23 September 2003, entered into force on 1 May 2004, (2003) O.J. L 236 of 23 September 2003.  Available at: http://eur-lex.europa.eu/JOHtml.do?uri=OJ:L:2003:236:SOM:en:HTML.

[20]  Statement of Defence, ¶ 6.  Act No. 9/1993 Coll. (Exhibit R-2).

[21]  Statement of Defence, ¶ 10.  Act No. 273/1994 Coll. (Exhibit R-4).  See also Statement of Claim, ¶¶ III.1-11.

[22]  Statement of Claim, ¶¶ III.12-14, Acts No. 580/2004 Coll. and No. 581/2004 Coll. (Exhibits C-20 and C-21).

state-owned health care providers by providing for conversion of existing health insurance companies into joint-stock companies, (v) envisaged the use of surplus funds by joint-stock companies, and (vi) established an independent Health Care Regulator to supervise and control the health insurance market.[23]

53.    According to Claimant, the 2004 liberalisation was "instrumental in making investment in the Slovak health insurance sector attractive to Eureko."    Eureko resolved to invest in the Slovak health insurance market through the incorporation of Union Healthcare on 9 March 2006.[24]    By 1 January 2007, Union Healthcare had obtained a share of around 8.5 percent in the Slovak health insurance market and received top rankings and awards within the industry.[25]

### C.  Reforms in the Slovak Republic Health Insurance Sector in 2006 – 2009

54.    On 17 June 2006 parliamentary elections in the Slovak Republic resulted in the victory of the SMER Social Democracy party.    The new Slovak Government introduced measures amending the 2004 reforms.  Claimant bases its claim on nine of these measures:[26]  (i) the cap on operating expenses, (ii) the ban on brokers, (iii) the repositioning of the Healthcare Regulator and the entire management board, (iv) the amended network requirements obliging health insurance companies to contract with specific state hospitals, (v) the ban on the distribution of profits to shareholders, (vi) the changes to the redistribution system, (vii) the scrutiny of the budgets of health insurance companies, (viii) the newly-introduced solvency requirements, and (ix) the ban on the transfer of insurance portfolios.

### D.  Dispute Between Eureko and Slovak Republic and Complaint to the EU

55.    On 28 February 2008, Eureko filed a complaint with the European Commission. According to Eureko, this filing was made in order to impress upon the Slovak Government Eureko's view that its policies are not in line with basic EU law principles that had been a cornerstone of Eureko's confidence in investing in the Slovak Republic.  The complaint led to the opening of an infringement procedure by

---

[23]  Statement of Defence, ¶ 17; Statement of Claim, ¶¶ III.16-20.
[24]  Statement of Defence, ¶ 26; Statement of Claim, ¶¶ III.15, III.24.  Eureko already had a presence in the Slovak Republic through its shareholding in Union Insurance, which provided a further motivation to launch Union Healthcare.
[25]  Statement of Claim, ¶¶ II.15, III. 25; Exhibit C-22.
[26]  For detailed descriptions of the various legislative reforms and their alleged impact on Claimant, see Statement of Claim, ¶¶ III.78-III.154; Exhibits C-40, C-41, C-43, C-49, C-54, C-55, C-61, C-62, C-63, C-64.

the European Commission against the Slovak Republic under Article 226 of the EC Treaty.[27]    The infringement procedure, including the European Commission's administrative investigation into the Slovak health care legislation, is currently ongoing.[28]

56.    Noting that Eureko's influence on the progress and direction of this complaint procedure is "limited," that "ancillary proceedings in the European Court of Justice can by their very nature not result in a damages award," and that Eureko's damages "cannot be redressed through other EU-channels," Claimant explained that it was forced to turn to arbitration to seek redress.[29]    On 4 March 2008, Eureko sent the Prime Minister of the Slovak Republic a "trigger letter" setting out its grievances with respect to the reforms to the health insurance sector and formally notifying its intention to commence arbitration proceedings under the BIT.    After attempts at amicable settlement failed, Eureko formally commenced an arbitration by a Notice of Arbitration dated 1 October 2008.[30]

## IV.    ARGUMENTS ON THE "INTRA-EU JURISDICTIONAL OBJECTION"

57.    The "Intra-EU Jurisdictional Objection" was first raised in Respondent's Statement of Defence dated 30 October 2009, in accordance with Article 21(3) of the UNCITRAL Arbitration Rules.    Respondent further articulated the grounds for its Intra-EU Jurisdictional Objection in its Jurisdiction Memorial, Jurisdiction Reply, oral argument during the hearing on 24 April 2010, and Post-Hearing Submission.

58.    According to Respondent, as of the date of the Accession Treaty (1 May 2004), the EC Treaty has governed the relationship between the Slovak Republic and the Netherlands.[31]    By acceding to the EU, the Slovak Republic became a part of a specific system of law which creates a much more complex, wide-reaching and elaborate framework of investment protection and human rights than that provided by

---

[27]    Article 226 provides that:  "If the Commission considers that a Member State has failed to fulfil an obligation under the Treaties, it shall deliver a reasoned opinion on the matter after giving the State concerned the opportunity to submit its observations.  If the State concerned does not comply with the opinion within the period laid down by the Commission, the latter may bring the matter before the Court of Justice of the European Union."  That provision is Article 258 of the TFEU.  The Complaint procedure was registered under reference number 2008/4268.  See Observations of the European Commission dated 7 July 2010 (hereafter "**European Commission Observations**"), ¶ 7.

[28]    For reference to the current status of the Complaint proceedings, see Claimant's Post-Hearing Submission, ¶¶ 29-34, and European Commission Observations, ¶ 7.

[29]    Statement of Claim, ¶¶ 1.17; Exhibit R-45.

[30]    Notice of Arbitration, Annex 1; Statement of Claim, ¶¶ 1.8-14.

[31]    Jurisdiction Memorial, ¶ 14.

the BIT.[32]  Respondent points out that Claimant has simultaneously complained of breaches of the BIT and breaches of the EC Treaty and ECHR and also commenced a complaint procedure with the European Commission.[33]  Respondent contends that these treaties cannot be applied simultaneously or in parallel and that the application of the BIT is therefore excluded.[34]

59.    Essentially, Respondent's arguments underlying the Intra-EU Jurisdictional Objection can be summarised as follows:

- As a matter of public international law, pursuant to Article 59 ("Termination or suspension of the operation of a treaty implied by conclusion of a later treaty") of the Vienna Convention, the BIT was terminated upon the Slovak Republic's accession to the EC Treaty.

- As a matter of public international law, pursuant to Article 30 ("Application of successive treaties relating to the same subject-matter") of the Vienna Convention, since the Slovak Republic's accession to the EC Treaty the arbitration clause in the BIT can no longer be considered applicable.

- As a matter of EU law, which forms part of the law of the Slovak Republic (applicable by this Tribunal pursuant to Article 8(6) of the BIT), the Tribunal lacks jurisdiction because the arbitration clause is incompatible with the EC Treaty, the principle of autonomy of EU law, and the principle of supremacy of EU law.

- As a matter of German law (the law of the place of the arbitration) the Tribunal lacks jurisdiction because the dispute is not arbitrable.

60.    These arguments are each detailed further below, along with Claimant's response to such arguments, as articulated in Claimant's Jurisdiction Counter-Memorial, Jurisdiction Rejoinder, oral argument during the hearing on 24 April 2010, and Post-Hearing Submission.

61.    Claimant describes the Intra-EU Jurisdictional Objection as boiling down to "an outright denial, by the Slovak Republic, of rights offered to a party that has invested

---

[32]  Jurisdiction Memorial, ¶¶ 15-17.
[33]  Statement of Defence, ¶ 120; Jurisdiction Memorial, ¶¶ 19, 44, 149; Jurisdiction Reply, ¶¶ 116, 148; Respondent's Post-Hearing Submission, ¶ 83.
[34]  Jurisdiction Memorial, ¶¶ 19-23.

in its economy to seek redress from an arbitral tribunal under the BIT because the Slovak Republic has chosen to enter the European Union."[35]  Claimant notes also that the objection first came to light over a year after the arbitration commenced, had never been mentioned in prior discussions and is undermined by multiple statements in which the Slovak Republic has held out the BIT as valid and binding.[36]

62.     Both Parties stressed the importance of the issues at stake.  For example, at the hearing, Respondent stated that the Tribunal's decision "may affect entire jurisprudence in this matter and numerous disputes in the future," noting that "the uncertain fate of the old Intra-EU BITs provokes an ever growing debate in the whole of Europe without unfortunately clear outcome at the moment."[37]  Claimant, for its part, asserted that Respondent's logic would "mark the end of arbitration" in the EU, because every tribunal that touched upon a question of EU law, considered by a respondent to be difficult, would be forced to say it has no jurisdiction.[38]

### A.  Termination of the BIT under Article 59 of the Vienna Convention

63.     The Parties presented detailed arguments based on the VCLT.  According to Respondent, the BIT was effectively terminated upon the Slovak Republic's accession to the EC Treaty by virtue of Article 59 of the VCLT, which provides as follows:

> *Termination or Suspension of the Operation of a Treaty Implied by Conclusion of a Later Treaty*
>
> (1)   A treaty shall be considered as terminated if all the parties to it conclude a later treaty relating to the same subject matter and:
>
>    (a)  it appears from the later treaty or is otherwise established that the parties intended that the matter should be governed by that treaty; or
>
>    (b)  the provisions of the later treaty are so far incompatible with those of the earlier one that the two treaties are not capable of being applied at the same time.

64.     Claimant asserts that the following requirements must be satisfied in order to fulfil the conditions for termination under Article 59:  (i) the two treaties must relate to the same subject matter; (ii) the two States must have intended Eureko's investment to be governed by the EC Treaty instead of the BIT; and (iii) the provisions of the BIT must

---

[35]  Jurisdiction Counter-Memorial, ¶ 2.
[36]  Jurisdiction Counter-Memorial, ¶¶ 20-23; Exhibits C-81, C-82, C-64, C-70, C-81, C-82.
[37]  Transcript, p. 7.
[38]  Transcript, pp. 45-46.

be so far incompatible with the provisions of the EC Treaty that the two treaties are not capable of being applied at the same time.[39] Claimant denies that these conditions are met.

### 1.    Do the BIT and the EC Treaty relate to the same subject matter?

*Respondent's Position*

65.    Respondent argues that the BIT and the EC Treaty relate to the same subject matter because they cover the same types of investors and investments, serve the same purposes, offer the same standards of protection, and provide for equivalent remedies.

66.    With respect to *investors*, the definition in BIT Article 1(b) includes investors that are natural persons citizen of contracting parties or legal entities established in accordance with the law of the contracting parties.  The EC Treaty, Article 48(1), protects all citizens of EU Member States including natural persons and legal entities.

67.    With respect to covered *investments*, Article 1(a) of the BIT defines investments as "every kind of asset invested either directly or through an investor of a third State" and lists examples.  Under EU law, the protection of investments is provided for by the freedoms of the internal market, such as the freedom of establishment, the free movement of goods, persons, services and capital.[40]  Although the EC Treaty does not define "capital," an explanatory note to a Council Directive and decisions of the ECJ have, according to Respondent, confirmed that the term "investments" in the Council Directive covers the same type of investments as those covered by the BIT.[41]

68.    Respondent argues that the BIT and EC Treaty serve identical *purposes*, which are fundamentally to broaden and strengthen mutual economic relationships and to promote the flow of capital and economic development of the contracting parties, while at the same time guaranteeing fair and equitable treatment.  Respondent points to the preamble of the BIT and to Articles 2, 3 and 12 of the EC Treaty.

---

[39]  Jurisdiction Memorial, ¶¶ 30-33.
[40]  Jurisdiction Memorial, ¶¶ 45-47, referencing EC Treaty Title III (now TFEU Title III), and EC Treaty, art. 43 (now TFEU, art. 49).
[41]  Jurisdiction Memorial, n. 18-19, citing Council Directive 88/361/EEC of 24 June 1988, O.J. L 178, 08/07/1988 p. 005-0018, for the implementation of Article 67 of the Treaty; Joined Cases C-282/04 to C-283/04, *Commission v. Kingdom of the Netherlands*, Judgment of 28 September 2006, [2006] ECR I-9141; Case C-174/04, *Commission v. Italian Republic*, Judgment of 2 June 2005, [2005] ECR 1-4933.

69.    According to Respondent, the *standards of protection* offered by the two treaties are the same.  For example:

- With respect to the *establishment of investments*, Respondent compares the undertaking in Article 2 of the BIT to promote the investments between the two countries to Articles 2 and 3 of the EC Treaty, in which the Slovak Republic undertook to eliminate any restrictions preventing foreign investors' access to the market in the territory of another Member State.  Article 56 of the EC Treaty further prohibits any restrictions on the free movement of capital and payments.[42]

- With respect to *equal treatment and non-discrimination*, Respondent notes the similarities between the promise in Article 3(1) of the BIT "not to impair, by unreasonable or discriminatory measures, the operation, management, maintenance, use, enjoyment or disposal" of an investment, and the principles of non-discrimination and equality of treatment fundamentally protected by EU law through Articles 12 and 43 of the EC Treaty and under the Charter on Fundamental Rights of the European Union.[43]   Respondent acknowledges that Article 3(3) of the BIT makes some exceptions to equal treatment in certain circumstances.  Respondent points out that Claimant itself invoked EU law to support its argument that the Slovak Republic failed to provide fair and equitable treatment of Eureko's investment as required by the BIT.[44]

- In relation to *free movement of payments*, Respondent points to the "identical" protections offered by Article 4 of the BIT (guaranteeing that payments related to an investment may be transferred) and Article 56 of the EC Treaty (prohibiting "all restrictions on the movement of capital" and "all restrictions on payments" between Member States…").  Respondent additionally invokes recent decisions of the ECJ in cases brought against Austria, Sweden and Finland, relating to breaches of their obligations as EU Member States arising from the investment treaties that they had concluded with third (*i.e.*, non-EU) countries (hereafter the "**Extra-EU BIT Cases**").[45]

---

[42]  Jurisdiction Memorial, ¶¶ 62-64.  EC Treaty art. 56 (now TFEU art. 63).
[43]  EC Treaty, arts. 12 and 43 (now TFEU arts. 18 and 49).
[44]  Statement of Claim, ¶¶ IV.79-90; Jurisdiction Memorial, ¶ 72.
[45]  Case C-205/06, *Commission v. Republic of Austria*, Judgment of 3 March 2009, [2009] ECR I-01303; Case C-249/06, *Commission v. Kingdom of Sweden*, Judgment of 3 March 2009; Case C-118/07, *Commission v. Republic of Finland*, Judgment of 19 November 2009.

- Respondent argues that the standard of "*full protection and security*" under Article 3(2) is similarly guaranteed under the EC Treaty, by virtue of the rules of the internal market. The ECJ has held such internal market rules to include protection of investment from physical interventions, impairment or neutralisation measures which might discourage investors from other Member States.[46] Respondent acknowledges that the EC Treaty in some respects goes beyond the guarantees offered by the BIT but contends that the EC Treaty "exhaustively covers the standard of full protection and security of investments."

- Respondent argues that the *protection of proprietary rights* is one of the fundamental rights guaranteed by both the BIT (through Article 5 on expropriation) and EU law, especially within the scope of the freedom of movement, freedom of establishment, free movement of capital and Article 17(1) of the ECHR.[47]

70.    At the hearing on 24 April 2010, Respondent submitted a "Comparative Table" illustrating that all the rules in the BIT allegedly breached by Respondent are covered by the EC Treaty, as summarised below:

| BIT | EC Treaty |
| --- | --- |
| Free Transfer of Capital (Art. 4) | Free Movement of Capital (Art. 56) |
| Fair and Equitable Treatment (Art. 3(1)) | Prohibition of Discrimination (Art. 12) |
| Full Security and Protection (Art. 3(2)) | Freedom of Establishment (Art. 43) |
| Indirect Expropriation (Art. 5) | Freedom of Establishment (Art. 43) |

71.    Finally Respondent argues that both the BIT and EU law provide the same system of *remedies* where investments have been impaired as a result of state action. Under EU law, investors pursue their claims before national courts with involvement of the ECJ via a preliminary ruling procedure; and under the BIT investors can have their dispute heard before an arbitral tribunal. Both mechanisms aim at the same objective, namely the protection of investments. Under both mechanisms, investors may seek compensation for damages from States for unlawful conduct (a right confirmed by the ECJ in 1991 in the case of *Francovich v. Italian Republic* ("**Francovich**").[48]

---

[46] See, for example, Case C-531-06, *Commission v. Italian Republic*, Judgment of 19 May 2009, ¶ 46.
[47] Jurisdiction Memorial, ¶¶ 86-90.
[48] Under EU law, this duty was established in the Joined Cases C-690 to C-9190, *Francovich and Others v. Italian Republic*, Judgment of 19 November 1991 [1991] ECR I-5357 (hereafter "**Francovich**").

72.    Respondent characterises Claimant's approach to what constitutes the "same subject matter" for the purposes of the VCLT as too narrow.  According to Respondent, the VCLT requires that both treaties "relate to" the same subject matter: not that they cover or regulate *exactly* the same subject matter.  If particular conduct is such as to attract the application of both treaties, then the treaties relate to the same subject matter.  This broader interpretation is, according to Respondent, consistent with the position taken by the ILC and in *Oppenheim's International Law*.[49]

73.    Respondent disagrees with Claimant's assertion that the EC Treaty merely covers the *promotion* of investments, pointing out that the EC Treaty also covers all aspects of investment *protection* in a manner comparable to the standards guaranteed by the BIT, including fair and equitable treatment, full security and protection and even the possibility of dispute resolution against the State.[50]

74.    Respondent dismisses the two "precedents" – the *Binder* and *Eastern Sugar* cases – relied upon by Claimant.[51]  Respondent questions their binding value as there is no formal rule of precedent in international arbitration.  Respondent states that the Tribunal should in any event not follow *Eastern Sugar* because:  (i) the violations complained of by the claimant in *Eastern Sugar* occurred before the Czech Republic's accession to the EU, and the principle of supremacy did not therefore come into play; (ii) the important Extra-EU BIT Cases were decided by the ECJ after the award in *Eastern Sugar*; (iii) when assessing the "same subject-matter" argument, the *Eastern Sugar* tribunal only took into account the EU regulation of free movement of capital and not other rules of EU law that overlap with the BIT; (iv) the *Eastern Sugar* tribunal failed properly to address the opinions of EU institutions; and (v) the *Eastern Sugar* tribunal incorrectly concluded that the EU "does not provide for possibility for an investor to sue a host state directly," despite the possibility of investors claiming damages through a national court under the interpretative supervision of the ECJ.[52]

---

[49]  Jurisdiction Reply,¶¶ 54-58; citing A Ramanujan, *Conflicts over Conflict: Preventing Fragmentation of International Law*, Trade, Law and Development, Vol. 1, No. 1, 2009 (Exhibit R-51) and UN International Law Commission (hereafter "**ILC**"), Study Group of the ILC, *Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law*, U.N. Doc. A/CN.4/L.682, 13 April 2006, pp. 129-131 ("the test of whether two treaties deal with the 'same subject matter' is resolved through the assessment of whether the fulfilment of the obligation under one treaty affects the fulfilment of the obligation of another.") (Exhibit R-52).

[50]  Jurisdiction Reply, ¶ 60-63.

[51]  See discussion below at ¶¶ 80-82.  Respondent refused to address the *Binder* case because it is not publicly available and no source was given that provided information about the conclusions of the tribunal in that case.  See Jurisdiction Reply, ¶¶ 127-8.

[52]  Jurisdiction Reply, ¶¶ 119-126.

75. Respondent also maintains that a further award cited by Claimant, *Austrian Airlines v. Slovak Republic*, should have no impact on the current proceedings.[53] Respondent explains that in the *Austrian Airlines* case the Slovak Republic had raised other strong jurisdictional objections and did not have any reason to complicate the proceedings by raising in addition the Intra-EU Jurisdictional Objection, which would have required inviting the European Commission to share its views. This approach was vindicated as Respondent was ultimately successful on its other jurisdictional objections. The *Austrian Airlines* case was, moreover, a factually distinct proceeding from the present arbitration. The fact that a party does not develop a certain argument in one case does not estop that party from subsequently developing and advancing such a line of argumentation in different proceedings. Nor does it impact on the validity of the Intra-EU Jurisdictional Objection itself, the seriousness and significance of which is demonstrated by the level of interest amongst European institutions, Member States (including the Czech Republic, the other original party to the BIT), academics and practitioners.[54]

76. Respondent notes Claimant's failure to address the Extra-EU BIT Cases, which are relevant because (i) they address the legal overlap between the EC Treaty and Extra-EU BITs regarding the protection of investments,[55] and (ii) they are concerned with situations in which there is a conflict between treaties, arising from the impossibility of applying restrictions on the free movement of payments and capital adopted by the Council under the EC Treaty where at the same time the Extra-EU BITs forbid such restrictions.[56] Respondent argues *a fortiori* that the principle established in the Extra-EU BIT Cases also applies to intra-EU BITs because both kinds of BITs relate to the same subject-matter. Intra-EU BITs may also compromise the effectiveness of EU law which the Member States are obliged to ensure pursuant to Article 10 of the EC Treaty.[57]

77. At the hearing, Respondent argued that the subject matter of the EC Treaty not only relates to the same aspects of investment protection as the BIT but in many aspects,

---

[53] *Austrian Airlines v. Slovak Republic*, UNCITRAL, (Austria/Slovak BIT), Final Award of 9 October 2009, (hereafter "***Austrian Airlines***"). Available at: http://ita.law.uvic.ca/documents/AustrianAirlinesv.Slovakia.pdf. See Respondent's letter dated 2 July 2010 responding to Claimant's arguments about the significance of the Award, discussed below at ¶ 83. See also Respondent's Post-Hearing Submission, ¶ 11.
[54] Respondent's letter of 2 July 2010.
[55] See Case C-205/06, *Commission v. Austria*, Judgment of 3 March 2009, [2009] ECR p. I-01301, ¶¶ 24-25, cited in Jurisdiction Reply, ¶ 43.
[56] See *Ibid*, ¶ 37.
[57] Jurisdiction Reply, ¶¶ 44-50.

especially with regard to the area of full security and protection and indirect expropriation, the protection granted by EU law under freedom of establishment is substantially *more* extensive.[58]  Moreover, the fact that there has never been a BIT concluded between two EU Member States confirms there is overlapping subject-matter.[59]

*Claimant's Position*

78.  Claimant rejects the proposition that the BIT and EC Treaty relate to the same subject matter.  This is because the EC Treaty deals with *initiation* of investments, while the BIT primarily aims to protect investments once made.  The EC Treaty is primarily concerned with the integration of the economies of the Member States and removal of restrictions on trade and investments and thus establishes the freedom to make investments.[60]  While the EC Treaty provides for free movement of capital and freedom to establish undertakings, it does not require Member States to afford investments "fair and equitable treatment," "full security and protection" or dispute resolution through arbitration.

79.  The expression "relating to the same subject-matter" must, according to Claimant, be interpreted strictly and narrowly.  It should not apply when a later *general* treaty impinges indirectly on *specific* provisions of an earlier treaty.[61]  The EC Treaty is a general wide ranging treaty regulating agriculture, fisheries, public health, culture, consumer protection, citizenship and development cooperation.  While the EC Treaty contains some provisions on the free flow of capital and payments and freedom of establishment, the BIT has more detailed and particularised provisions on the *protection* to be afforded to investments.  Thus, even if the EC Treaty offers *some* protections of investments, this does not mean the BIT and the EC Treaty relate to the same subject matter.

80.  In support of its position, Claimant refers to arbitral "precedents" in two similar disputes involving EU investors against the Czech Republic.  Claimant distinguishes these cases from the Extra-EU BIT Cases, which it says are entirely different from cases involving *intra-EU BITs* and therefore irrelevant to the present proceedings.

---

[58]  Transcript, pp. 13-14.
[59]  Transcript, p. 15.
[60]  As seen in freedom to establish branches, subsidiaries and undertakings, per EC Treaty, art. 43 (now TFEU, art. 49), free movement of capital and payments in EC Treaty, art. 56 (now TFEU, art. 63).
[61]  Jurisdiction Counter-Memorial, ¶ 73, citing Sir Humphrey Waldock, Special Rapporteur, Sixth Report on the Law of Treaties, *Yearbook of the ILC*, 1966.

81.     The first case is the March 2007 partial award in *Eastern Sugar*, involving a claim by a Dutch investor against the Czech Republic under the Czech-Netherlands BIT, which is identical to the BIT in the present case.  The Czech Republic had argued that Article 59 of the VCLT resulted in the BIT no longer being effective, that the BIT could be considered terminated following the accession of the Czech Republic to the EU, that the intra-EU investment regime as at the date of accession superseded the obligations in the BIT and that the BIT would breach the non-discrimination principle in Article 12 of the EC Treaty.  The tribunal in *Eastern Sugar* rejected the Czech Republic's argument under Article 59 of the VCLT.  The *Eastern Sugar* tribunal did not accept that the EC Treaty and the BIT in question covered the same subject matter.[62]

82.     The second case relied on by Claimant is a June 2007 award on jurisdiction in *Binder v. Czech Republic*, between a German investor and the Czech Republic under the German-Czech BIT.[63]  According to Claimant's sources, the Czech Republic argued that the BIT was no longer applicable in view of the Czech Republic's accession to the EU and investment protection offered by EC law, that intra-EU BITs are inconsistent with the "mutual trust principle" under EC law and the exclusive jurisdiction of the ECJ, that there is discrimination against investors from EU Member States where investors have no similar rights to those under the BIT and that Article 59 of the VCLT causes termination of the BIT.  The Czech Republic sought a stay of proceedings pending a statement by the competent EU authorities or a preliminary ruling from the ECJ.  The tribunal dismissed the Czech Republic's arguments in their entirety, holding that the intra-EU BIT and EC law were compatible and still in force.[64]

83.     Additionally, Claimant draws attention to the award in *Austrian Airlines v. Slovak Republic*, an arbitration brought pursuant to the Austrian-Slovak BIT.[65]  Claimant points out that in that case the Slovak Republic raised seven jurisdictional objections but none related to the termination or inapplicability of the Austrian-Slovak BIT on the basis that both Austria and the Slovak Republic are members of the EU.  In fact,

---

[62] *Eastern Sugar*, ¶¶ 159-166.
[63] Unreported.  Tribunal: Justice Hans Danelius, Prof. Jurgen Creutzig and Professor Emmanuel Gaillard.
[64] Jurisdiction Counter-Memorial, ¶¶ 133.  The *Binder* case was subject to a pending challenge before the Czech courts.  The Czech Republic has reportedly taken steps to terminate some of its intra-EU BITs, which according to Claimant shows that the Czech Republic no longer considers intra-EU BITs to have been implicitly terminated.
[65] See *Austrian Airlines*, ¶¶ 65-72.  See also Claimant's e-mail to the Tribunal, 11 June 2010.

the objections concerned the interpretation of the Austrian-Slovak BIT, thus presuming its continued validity and applicability.[66]   According to Claimant, this shows that the Slovak Republic has no genuine concern about the Intra-EU Jurisdictional Objection but rather considers it an "argument of last resort" to be used to cause substantial delay.[67]   Claimant notes that the *Eastern Sugar* tribunal considered as relevant the position that the respondent State had taken towards intra-EU BITs in other arbitral proceedings.[68]

84.   At the hearing, Claimant was asked about the possible impact of the Lisbon Treaty. Claimant stated that even if Article 307 could possibly be relevant to intra-EU BITs (which it is not), or if the EU competence in respect of "foreign direct investment" covered everything that BITs covered (which it does not), at most the only possible ruling could be that a Member State breaches its obligation under EU law by having treaties in place that fall within the exclusive competence of the Community, and that would entail only the obligation to terminate them.  There is no support, according to Claimant, for the proposition that, as a result of the Lisbon Treaty, all EU BITs would be *automatically* terminated as a matter of law.  That would leave an "enormous gap" in the protection of investors.[69]

85.   Addressing the Extra-EU BIT Cases, Claimant notes that the ECJ determined that the member states had not complied with their obligation to bring the relevant BITs in line with EU law but until such amendments are made, the BITs remain fully in force. Even under the Lisbon Treaty, the BITs remain in force and do not lapse or automatically expire under public international law.   At any rate, according to Claimant, expropriation issues remain with the individual member states under the Lisbon Treaty.[70]

---

[66]   Claimant, in its Post-Hearing Submission of 19 July 2010 noted that although the Slovak Republic was ultimately successful in having the case dismissed for lack of jurisdiction, the objections were not so strong as to have justified omitting the Intra-EU Jurisdictional Objection, as shown by the fact that the award was not unanimous.
[67]   See Claimant's e-mail to the Tribunal, 11 June 2010, and Claimant's Post Hearing Submission, 19 July 2010.
[68]   *Eastern Sugar*, ¶ 155.
[69]   Transcript, pp. 66-67.
[70]   Jurisdiction Rejoinder, ¶¶ 9-12.

## 2.    Did the Parties intend the EC Treaty to replace the BIT?

*Respondent's Position*

86.    Respondent argues that by concluding the Accession Treaty, "the intention of the contracting parties was to replace the former treaty with the later one."[71]  Against the backdrop of the Slovak Republic's efforts to join the EU, the ultimate objective of the BIT was to help the Slovak Republic accede to the EU and create a trading platform on which basis the nationals of Member States could invest in the Slovak Republic without fears of uncertainty or lack of a legal framework for foreign investments. However, when the Slovak Republic acceded to the EU on 1 May 2004, that trading platform "became obsolete."[72]

87.    According to Respondent, the BIT was merely an accessory to the Association Agreements and since those were terminated by the accession of the new Member States, so was the applicability of the BIT.[73]  The Accession Treaty itself proves that the intention of the Slovak Republic and the Netherlands was that their mutual relations, including those relating to the subject matter of the BIT, should be governed by EU law.  Any other methods of interpreting the intention of the States, such as the statements and communications cited by Claimant, are redundant and irrelevant to the present case since the termination of the BIT is implied by the conclusion of the Accession Treaty.

88.    This conclusion is not impeded by Article 3(5) of the BIT (which envisages more favourable treatment under later agreements) because Article 3(5) does not prohibit changing or replacing the BIT itself.[74]  Further, Article 3(5) is incompatible with the principles of direct effect and supremacy.  In any event, Article 3(5) is also deemed to have been terminated along with the rest of the BIT pursuant to Article 59 of the VCLT.

89.    Respondent rejects Claimant's argument that the BIT and EC Treaty were already operating in parallel before the Accession Treaty, under Articles 12 and 56 of the EC Treaty.  These provisions could only have applied to Respondent's nationals under the

---

[71]  Jurisdiction Memorial, ¶ 100.
[72]  Jurisdiction Memorial, ¶¶ 105-106.
[73]  Jurisdiction Reply, ¶ 70.
[74]  Article 3(5) of the BIT provides:  "If the provisions of law of either Contracting Party or obligations under international law existing at present or established hereafter between the Contracting Parties in addition to the present Agreement contain rules, whether general or specific, entitling investments by investors of the other Contracting Party to a treatment more favourable than is provided for by the present Agreement, such rules shall to the extent that they are more favourable prevail over the present Agreement."

principle of personal applicability, and did not impose obligations on Respondent itself under EU law. Respondent also considers Claimant's argument on Article 6(12) of the Act on Accession attached to the Accession Treaty as irrelevant to this dispute because that provision concerns "external agreements or conventions" and not intra-EU BITs.

90.    As evidence that Respondent was of the opinion that its post-Accession BITs would be considered inapplicable, it submitted with its Jurisdiction Memorial Exhibit R-46, an e-mail dated 5 April 2004 from the Slovak Ministry of Finance to the economic and commercial counsellors at diplomatic missions of several EU Member States in Bratislava (the "**5 April 2004 E-mail**"). The 5 April 2004 E-mail stated as follows:

> One of the priorities of Accession of the Slovak Republic in the European Union is accomplish obligations concerning harmonisation of international trade agreements – Agreement for protection and reciprocal promotion of investment contains Articles which are not compatible with the *acquis communautaire*.
>
> The officials of the Slovak Republic have already made initial contact with the European Commission concerning this issues, and as a reply we have received this opinion from Mr. Jörn Sack – expert of the Legal Service of the European Commission in Brussels:
>
> > *'For the second point (BITs among MS) we have agreed in a coordination meeting at the Commission that these become obsolete under Article 59 of the Vienna Convention, but that the parties should notify each other that they agree on that'.*
>
> On the basis of the above-mentioned, as well unofficial information from the European Commission, we would like to initiate the reception common procedure concerning to harmonization BIT's with Member States and Accession Countries.
>
> We would like to know your unofficial opinion to our proposal as soon as possible.

91.    At the hearing, Respondent was asked whether any of the States who were recipients of the 5 April 2004 E-mail had replied to the request for "unofficial opinion[s] to our proposal."[75]    Respondent obtained information about five such responses. One was from Poland which opined that "from the day of accession articles which are not compatible with the EU *acquis communautaire* according to the Article 59 in connection with Article 30 par. 3 of Vienna Convention are terminated (*lex posteriori derogate lex priori*). Therefore there is no need to initiate any procedure." One

---

[75]    Transcript, p. 26; Exhibit R-46.

response was from a German counsellor, who "without having the occasion to consult with the competent ministries in Berlin" gave his "rather personal – *i.e.*, totally unofficial – opinion" that the "whole complex of Foreign Trade will be harmonized and coordinated by the EU.  Therefore the BIT would become obsolete.  About this fact the parties concerned should give notice to each other."   According to Respondent, a response from Greece opined that the BITs are still valid parallel to EU law; and responses from Latvia and France reserved their right to make their opinions later, which they never did.  Respondent remarked that these responses showed "how different the interpretation of this issue is." [76]

92.    Respondent maintains that irrespective of any notification procedures, the Slovak Republic's accession to the EU had the legal consequence of terminating the BIT.  The Netherlands and Slovak Republic "definitely intended to govern their relationships with the nationals of their respective counterparty under EU law."  This is a necessary consequence of the fundamental characteristics of EU law, including supremacy, direct applicability and direct effect.  According to Respondent, so long as the intention of the Parties is to terminate the earlier treaty, an *explicit* intention to terminate the former treaty is not required for purposes of Article 59 of the VCLT.[77]

93.    In other words, termination of the BIT occurs *ex lege* without notification to the other party.  The Intra-EU Jurisdictional Objection concerns a legal question that cannot be affected by unilateral statements made by the parties to the BIT, as confirmed by VCLT Articles 31(2) and (3).  Thus, the position of the Dutch Government, as set out in a letter provided to Eureko (described below in Section V.A), can have no effect on the legal consequences relating to the conclusion of the Accession Treaty seven years earlier.  Similarly, statements made by Slovak authorities referring to the possibility of investors commencing arbitration have no import because they fail to address the validity, termination or applicability of the BIT, and in any event were made after Eureko established Union Healthcare and could not have been relied on by Eureko at the time of establishing its investment.[78]

94.    At the hearing, Respondent was asked by a member of the Tribunal whether it had followed Article 65 of the VCLT, which establishes "a procedure to be followed with respect to invalidity, termination, withdrawal from or suspension of the operation of a

---

[76]  Transcript, pp. 95-98.
[77]  Jurisdiction Memorial, ¶ 112.
[78]  Jurisdiction Reply, ¶ 24.

27

treaty," requiring a state to notify its counterparty of its claim and the reasons therefor.  Respondent had two answers.  First, the 5 April 2004 E-mail was an explicit communication relating to termination of the Treaty.  Second, notification is not in any event a requirement for termination when the termination occurs automatically by virtue of Article 59 of the VCLT.[79]

95.     Respondent was also asked about the statement of the European Commission included in the *Eastern Sugar* award.  Respondent acknowledged the European Commission's position, at least at the time of *Eastern Sugar*, to be that there was no automatic termination of intra-EU BITs, but stressed that it was important for the Commission to be invited to present its views in the present arbitration.[80]

96.     In response to a question about the termination provisions in Article 13(3) of the BIT, Respondent stated that first, Claimant's investment took place only after the Slovak Republic entered the EU, and thus the termination occurred before the investment was made.  Second, Article 13(3) should apply only to termination by an act of a Contracting Party, and not to the termination *ex lege* under the VCLT.[81]

*Claimant's Position*

97.     Claimant argues that the requirement in Article 59(1)(a) of an intention to terminate the BIT has not been met.  Rather, the EC Treaty and the BIT were intended to function alongside each other.  According to Claimant, numerous indicators show the absence of any intent to terminate the BIT.

98.     First, when concluding the BIT, the two States had in mind that future treaties between them would complement the parties' rights and obligations, and not that such provisions would replace provisions in the BIT.[82]  For example, Article 8(6) of the BIT explicitly acknowledges the permissibility of other treaties relating to investment protection by referring to "other relevant Agreements between the Contracting Parties" as a possible source on which a tribunal may rely to decide an arbitration.  Similarly, Article 3(5) of the BIT refers to the possibility of more favourable provisions in "obligations under international law existing at present or established hereafter between the Contracting Parties in addition to the present Agreement."  Claimant notes that even prior to the Slovak Republic's accession to the EC Treaty,

---

[79]  Transcript, pp. 16-20.
[80]  Transcript, p. 23.
[81]  Transcript, pp. 24-25.
[82]  Jurisdiction Counter-Memorial, ¶¶ 78-80.

the BIT and EC Treaty already functioned alongside each other to the extent that Slovak investors were eligible to invoke some aspects of the EC Treaty as external investors.[83]

99.    Second, Claimant says that the Accession Treaty itself evidences that the Netherlands and the Slovak Republic did not intend to replace or terminate the BIT, because Article 6(12) of the Act attached to the Accession Treaty provides that:

> The new Member States shall take appropriate measures, where necessary, to adjust their position in relation to […] those international agreements to […] which other Member States are also parties, to the rights and obligations arising from their accession to the Union.

If the intent had been implicitly to terminate these treaties, there would be no need to require "measures" in order for agreements to be "adjusted" to the rights and obligations arising under the EC Treaty.

100.    Third, neither State manifests on its website or in its official treaty records any intention to terminate the BIT and have the subject matter governed solely by the EC Treaty.  The BIT is listed as a treaty in force on the official websites of the Slovak Ministry of Finance and the Slovak Ministry of Foreign Affairs.[84]  Claimant recalls that the *Eastern Sugar* tribunal held that implicit termination could not be found in circumstances where both contracting parties to the BIT still list the BIT as an international treaty to which they are party.  The *Eastern Sugar* tribunal found that it was not the common intent of the Netherlands and the Czech Republic for the EC Treaty to supersede the BIT.

101.    The Netherlands also publicly affirms the BIT to be valid, as is reflected in its official record of treaties and on the Netherlands Ministry of Foreign Affairs website.[85]  The Netherlands Government also confirmed explicitly, in a letter of 10 February 2010, responding to questions from Eureko, that it considers the BIT to be "in force."[86]  The Netherlands Government stated that the "Slovak Republic has never indicated to the Kingdom of the Netherlands in any way that the [BIT] is no longer in force or that its applicability could be in doubt"; nor had the Slovak Republic "indicated any wish to negotiate termination of the [BIT]."

---

[83]   Citing EC Treaty, art. 56 (now TFEU, art. 63), on free movement of capital and payments; and the prohibition to discriminate on grounds of nationality (EC Treaty, art. 12, now TFEU, art. 18).
[84]   Exhibits C-83 and C-84.
[85]   Exhibits C-85 and C-86.
[86]   Exhibits C-87 and C-88.

102.   Claimant further observes that the Slovak Republic has taken no steps to invoke the termination provisions in the BIT.  The sole evidence submitted by Respondent to suggest otherwise was the informal 5 April 2004 E-mail, which does not appear to have been effectively sent to or received by the Dutch Embassy (there were flaws in the e-mail address used) and in any event is "blatantly insufficient to terminate a BIT."[87]  Further the 5 April 2004 E-mail refers to "harmonization of BIT's," which would not be necessary and would not have been proposed had the intra-EU BITs been automatically terminated.[88]  Claimant does not consider the German or Polish responses to the 5 April 2004 E-mail (produced at the hearing) to be supportive of Respondent's position.[89]

103.   Claimant proffers a number of statements by the Slovak Republic, made in the context of the 2007 Reforms, holding out the BIT to be valid and binding.  For example, two communications from the Slovak Ministry of Finance to other government departments warned of likely arbitrations "for breach of bilateral investment treaties due to indirect expropriation of shares."[90]  Similarly, the Government's Legislative Board raised the prospect of investors having "the option to revert to arbitration to claim … compensation of damages from the Slovak Republic" pursuant to the BIT.[91]  Finally, in 2008, the Ministry of Finance stated that if certain measures were taken, then "[f]rom an international perspective, such step of the State might be interpreted as an unreasonable intervention with the rights of foreign investors guaranteed by the State under agreements on support and mutual protection of investments … and their violation may give rise to international arbitrations."[92]  All these statements were made some three to five years *after* the Slovak Republic's accession to the EU.

104.   The Slovak Republic also made statements directly to Eureko that are "wholly incompatible with the Slovak Republic's argument that the BIT has terminated upon its accession to the EU."  For example, in a January 2007 letter, a Minister Valentovič assured Eureko that the proposed Ministry of Health procedures would be "in accordance with EU regulations and bilateral treaties between the Slovak Republic

---

[87]   Jurisdiction Counter-Memorial, ¶ 54.  See also Transcript, p. 48.
[88]   Jurisdiction Counter-Memorial, ¶ 30-32.
[89]   Transcript, pp. 98-99.  Claimant observes that "[t]he Polish e-mail simply makes an obvious statement that articles which are not compatible with the EU Acquis according to the VCLT are terminated under the VCLT, but does not state that the BIT itself or any particular article therein was terminated.  The German e-mail is mysterious but does not make Respondent's point."
[90]   Jurisdiction Counter-Memorial, ¶¶ 20-23; Exhibits C-81, C-82.
[91]   Jurisdiction Counter-Memorial, ¶¶ 20-23; Exhibit C-64.
[92]   Exhibit C-70.

and the Netherlands."[93]  In subsequent communications there was no mention that the BIT was considered invalid.[94]  When the prospect of arbitration was raised, the Minister of Finance referenced the possibility of reaching an "amicable settlement" within the meaning of the BIT.

105.  According to Claimant, the above-described statements of the Contracting Parties to the BIT are "highly relevant" to the analysis under VCLT Article 59 because they reveal whether or not there was the requisite implicit intent on the part of the BIT Contracting Parties to terminate the treaty.  Such intent is an essential element of the Article 59 test, and it is therefore wrong for Respondent to dismiss the statements as irrelevant to the resolution of "purely legal" issues under the VCLT.

106.  At the hearing, Claimant was questioned about the European Commission's letter quoted in the *Eastern Sugar* partial award.  Claimant highlighted that the European Commission had stated as follows:[95]

> the EU Acquis does not entail at the same time the automatic termination of the concerned BITs or necessarily the non-application of all their provisions. Without prejudice to the primacy of Community law, to terminate these agreements Member States would have to strictly follow the relevant procedure provided for this in the agreements themselves.  Such termination cannot have a retroactive effect.

107.  Claimant reiterated that there was nothing on the record to indicate that the European Commission considered that the treaties had been rendered inapplicable, as a matter of law and in their entirety, at the moment of accession.[96]

108.  A member of the Tribunal pointed out that the European Commission's letter cited in *Eastern Sugar* appeared to reflect a distinction between situations in which the facts that had occurred before accession, and situations such as those where the alleged violations occurred after the Slovak Republic's accession to the EU.  Claimant nevertheless considered that this should not make a difference to the legal proposition that a BIT is not automatically terminated but requires strict procedures to be followed in order to effect termination.[97]

---

[93]  Exhibits C-27.
[94]  Exhibits C-2, C-4, C-5.
[95]  Transcript, pp. 55-56; *Eastern Sugar*, p. 25.
[96]  Transcript, pp. 64-65.
[97]  Transcript, pp. 56-57.

**3.    Are the provisions of the EC Treaty and BIT so far incompatible that the treaties are not capable of being applied at the same time?**

*Respondent's Position*

109.    As an alternative to a finding that the BIT was terminated by virtue of Article 59(1)(a) of the VCLT, Respondent argues that Article 59(1)(b) is, in any event, satisfied.  That is, the provisions of the EC Treaty are so far incompatible with those of the BIT that the two treaties are not capable of being applied at the same time.   Under Article 59(1)(b), a conflict occurs when the performance of one treaty necessarily causes a breach of the other treaty:  in other words, the obligations arising out of the BIT and the EC Treaty cannot both be fulfilled at the same time.[98]

110.    Respondent posits that the provisions on the *free movement of payments* and the *protection and security of investments* guaranteed under the BIT are incompatible with the EC Treaty because Article 58 of the EC Treaty permits exceptions to the free movement of capital relating to taxation and financial supervision or public policy and security.  Thus a State may be in breach of the BIT but be in compliance with the EC Treaty.[99]

111.    Respondent further argues that the *expropriation clause* in Article 5 of the BIT is incompatible with the regulation of expropriation and damages under EU law, which is derived largely from the ECHR.[100]   This is because EU law enables possible restrictions on proprietary rights "necessary for the general interest" which could cause a breach of Article 5 of the BIT.  Respondent argues that Article 5 of the BIT would also breach Article 10 of the EC Treaty, dealing with loyal cooperation.

112.    Respondent criticises Claimant's failure to address the Extra-EU BIT Cases, even though those cases precisely define what should be considered an incompatibility between EU law and international law instruments.

113.    According to Respondent the *arbitration clause* in Article 8 of the BIT is also incompatible with the EC Treaty for two reasons:  (i) the arbitration clause violates the exclusive competence of the ECJ to interpret EU law; and (ii) the EC Treaty does

---

[98]  Jurisdiction Memorial, ¶¶ 119-120.
[99]  Jurisdiction Memorial, ¶¶ 130-133.  A discussion ensued about Article 10 of the BIT, which deals with arbitration of disputes between the two Contracting Parties to the BIT.  There appeared to be the suggestion in the European Commission's letter cited in *Eastern Sugar* that such disputes should be dealt with as a matter of Community Law and therefore Article 10 might not be valid.
[100]  Jurisdiction Memorial, ¶¶ 134-138.

not provide for arbitration proceedings between investors and Member States leading to a discrimination problem.[101]

114.     As to the first, arbitral tribunals, unlike national courts, are not entitled to raise preliminary questions of EU law to the ECJ, pursuant to Article 234 of the EC Treaty. Were an arbitral tribunal to resolve questions of EU law in the absence of a referral to the ECJ, this would seriously jeopardise the uniform application of EU law.

115.     Respondent disagrees with Claimant's statement that the ECJ has held that arbitral tribunals are under an obligation to apply fundamental EU law.[102]  Although it is common ground that this Tribunal should apply EU law, according to Respondent, this Tribunal is prevented from doing so because it is not able to ensure the uniform application and interpretation of EU law, which is the role of the ECJ under Article 220 of the EC Treaty.  Even if this Tribunal could request a national court to assist, the national court could not do so because it does not ultimately decide the case on its merits.[103]

116.     Respondent explains that the uniform application of EU law may not be sufficiently safeguarded by the possibility of annulment or enforcement proceedings in national courts because:  (i) such proceedings are not obligatory; (ii) such remedies are limited by specific prerequisites and not every misinterpretation of the law results in the annulment of an award or refusal of its recognition and enforcement; and (iii) if such proceedings are commenced outside the EU, then the national courts will neither be obliged nor entitled to request a preliminary ruling from the ECJ.

117.     On discrimination, Respondent argues that the arbitration clause is incompatible because it fundamentally violates the principle of equality as stipulated in Article 12 of the EC Treaty.  Article 12 prohibits discrimination on the grounds of nationality. Investors from Member States which have not concluded BITs with the Slovak Republic would be discriminated against as a result of the Arbitration Clause.  Thus the fact that only certain EU nationals may seek compensation for damages caused by a breach of EU law before an international arbitral tribunal is discriminatory and in violation of Article 12 of the EC Treaty.  In this connection, Respondent dismisses the reasoning of the arbitral tribunal in the *Eastern Sugar* arbitration as based on an

---

[101] Jurisdiction Memorial, ¶¶ 52, 65-72, 106, 140, 153, 155, 156.
[102] Jurisdiction Reply, ¶ 91.
[103] Jurisdiction Reply, ¶¶ 96-98.

"unconvincing" and "cursory analysis."[104]    Because the BIT leads to unequal treatment of EU nationals, the *Eastern Sugar* tribunal ought to have found that compliance with one treaty (the BIT) causes breach of the other treaty (the EC Treaty) and there thus exists an incompatibility for purposes of Article 59(1)(b) of the VCLT.

118.    Respondent rejects Claimant's suggestion that the discriminatory effects of the BIT could be removed by offering the same rights granted under the BIT to investors from other Member States.  This is because the EU has exclusive power to govern and amend the rights relating to the free movement of goods, persons, services and capital. As a result, the Member States do not have competence to enter BITs.  Even if they did have such competence, this would not remove the discriminatory effect of the BIT retrospectively, as the Vienna Convention's concept of "incompatible" provisions includes any provision in a treaty which requires a party to act in a way which necessarily causes a breach of a later treaty.  The arbitration clause in the BIT is such a provision because its invocation by Claimant necessarily causes discrimination against citizens from other Member States by the Slovak Republic and the Netherlands.  Hence, the BIT must be deemed to have been terminated or inapplicable because of its incompatibility with the EC Treaty.

119.    In response to a question from a member of the Tribunal at the hearing, Respondent confirmed its view that any complaint that could be made under the fair and equitable treatment provision in the BIT (and not only those complaints specifically raised in the present arbitration) could also be made under the provisions on equality and the prohibition of discrimination in the EC Treaty.  In response to a question concerning the example of a flat corporate tax, to be applied in a non-discriminatory manner but which could be said to be unfair and inequitable, Respondent said that this could be an example of a measure incompatible with the BIT but permitted by EU law, and therefore a clear example of incompatibility between the two Treaties.  The question was posed whether "incompatibility" describes a situation where something that is forbidden under the BIT is *permitted* by EU law, or only where something that is forbidden under the BIT is *mandated* by EU law.  According to Respondent, incompatibility occurs when an act is permissible under one treaty, but not permissible under the other.[105]

---

[104] Jurisdiction Memorial, ¶ 158.
[105] Transcript, pp. 27-31.

*Claimant's Position*

120.  Claimant argues that the BIT and EC Treaty are not "so far incompatible … that the two are not capable of being applied at the same time."  Article 59(1)(b) requires, according to Claimant, a "gross incompatibility," to such an extent that the parties must be considered to have intended to abrogate the earlier treaty.  As Claimant argued with respect to Article 59(1)(a), such intent is absent.

121.  Further, according to Claimant, the weight of opinion in the literature supports the view that Article 59(1)(b) requires an incompatibility of "regimes" of both treaties *as a whole*, and not merely an incompatibility between *some* provisions of the treaties. The incompatibility must be such that the two treaties are "not capable of being applied at the same time" and therefore that it is "not at all possible" for them to be simultaneously applied.  Claimant points to the fact that various tribunals in intra-EU BIT disputes have rendered awards, showing that such treaties are perfectly capable of being applied at the same time.[106]

122.  Claimant observes that the dispute resolution mechanism in Article 8 of the BIT is not incompatible with the EC Treaty, as is shown by the fact that the ECJ has repeatedly held that arbitral tribunals are under an obligation to apply fundamental EU law, despite the fact that arbitral tribunals in and by themselves are not empowered to raise preliminary questions.[107]  Ultimately, the uniform application of EU law is safeguarded by national courts in exercise of their competence to set aside or refuse to enforce arbitral awards or in their capacity to submit preliminary questions to the ECJ.[108]

123.  Claimant disputes Respondent's contention that Article 8 of the BIT is incompatible with Article 12 of the EC Treaty (prohibiting discrimination on grounds of nationality).  According to Claimant, Article 8 of the BIT merely grants Dutch investors a right to be heard by an arbitral tribunal, and if the Slovak Republic considers the exercise of this right to be discriminatory *vis-à-vis* non-Dutch investors it should grant those non-Dutch investors the same right.  Discriminatory behaviour

---

[106] Jurisdiction Counter-Memorial, ¶ 100.
[107] Jurisdiction Counter-Memorial, ¶ 101.  Citing cases in the context of competition law (Case C-126/97, *Eco Swiss China Time Ltd. v. Benetton International NV*, Judgment of 1 June 1999, [1999] ECR I-03055, hereafter "*Eco Swiss*") and consumer rights (Case C-168/05, *Elisa María Mostaza Claro v. Centro Móvil Milenium SL*, Judgment of 26 October 2006, [2006] ECR I-10421, hereafter "*Claro*").
[108] Jurisdiction Counter-Memorial, ¶¶ 101-103.

should be remedied by granting others a similarly favourable position, not by placing all parties in a similarly unfavourable position.[109]

124.    According to Claimant, the *Eastern Sugar* tribunal rejected arguments based on discrimination and also observed that the European Commission had not commenced infringement proceedings against either the Netherlands or the Czech Republic, which would have been expected if the Czech Republic were correct about incompatibility. Similarly, according to sources relied upon by Claimant, the *Binder* tribunal dismissed the Czech Republic's arguments in their entirety, holding that the intra-EU BIT and EC law are compatible and still in force. The *Binder* tribunal found no discrimination and no conflict between the substantive protections offered by the BIT and the terms of the EC Treaty, and thus no need to debate the primacy of EC law.[110]

125.    At the hearing, Claimant responded to questions about discrimination. Claimant argued that where Investor A may bring a State to arbitration, but Investor B cannot bring that same State to arbitration, the State cannot renege on its promise to Investor A by invoking its own discriminatory act. The proper remedy would be for Investor B to seek a right to arbitration. It was discussed whether this in any event presented a problem of compatibility in terms of Article 30 or Article 59 of the VCLT.[111]   In this context, the Extra-EU BIT cases were recalled, and Claimant pointed out that the ECJ did not refer to discrimination in those cases.

126.    Claimant also points to statements by organs of the EU itself which it says confirm the validity of the intra-EU BITs – in particular, the 2007 annual report of the EU's Economic and Financial Committee ("**EFC**") in which the EFC argued for the eventual termination of "remaining" intra-EU BITs and invited Member States to address their concerns. In the subsequent annual report, the EFC noted that there are over 190 intra-EU BITs and that the Commission had informed Member States of the need to address the issue "through bilateral actions." The 2008 EFC annual report noted that "most Member States did not share the Commission's concern in respect of

---

[109] Jurisdiction Counter-Memorial, ¶ 104.
[110] Jurisdiction Counter-Memorial, ¶¶ 116-136.  Claimant noted that the *Binder* case was subject to a pending challenge before the Czech courts and that the Czech Republic had reportedly taken steps to terminate some of its intra-EU BITs, evidencing that the Czech Republic no longer holds the view that intra-EU BITs have been implicitly terminated.
[111] Transcript, pp. 76-81.

arbitration risks and discriminatory treatment of investors and a clear majority of Member States preferred to maintain the existing agreements."[112]

### B. Inapplicability of the BIT's Arbitration Clause BIT under Article 30 of the Vienna Convention

*Respondent's Position*

127.    Respondent argues that even if Article 59 of the VCLT does not operate to terminate the BIT, the Tribunal has no jurisdiction to decide this case because the arbitration clause in the BIT is not "compatible" with the EC Treaty within the meaning of Article 30 of the VCLT, which provides:

> *Successive Treaties Relating To The Same Subject Matter*
>
> …
> 3.   When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty

128.    Unlike Article 59, Article 30 requires no proof of the parties' intentions and does not relate to the incompatibility of the treaties as a whole, but rather to the incompatibility of individual provisions.   In this arbitration, Claimant asserts the Slovak Republic violated Articles 3(1), 3(2), 4 and 5 of the BIT, all of which, according to Respondent, were supplanted by EU law.   Therefore, the dispute has to be solved under EU law. However, the Tribunal lacks the competence to apply and interpret EU law. According to Respondent, Article 30(3) of the VCLT therefore renders the arbitration clause inapplicable, and the Tribunal lacks jurisdiction to decide the case.

*Claimant's Position*

129.    Claimant argues against an application of Article 30(3) of the VCLT on the grounds that the BIT and EC Treaty do not "relate to the same subject matter" (as previously discussed) and that Article 8 is not incompatible with provisions of the EC Treaty (as discussed in the context of Article 59(1)(b)).[113]

---

[112] Exhibits C-89, C-90.   With respect to the statements of the EFC in its Annual Reports of 2006-2008, Respondent submitted in its Jurisdiction Reply that these do not represent the opinions of the Commission, and when read in context they clearly imply, *inter alia*, that at least some of the provisions of the BIT have been superseded by EU law and the Commission's belief that the application of the BITs causes discrimination.
[113] Jurisdiction Counter-Memorial, ¶ 105.

130.  Claimant points out that the *Eastern Sugar* tribunal rejected the VCLT Article 30(3) argument with respect to the arbitration clause.  That tribunal found that "the fact that [the EC Treaty] does not provide for a possibility for an investor to sue a host state directly, and that in international BIT arbitration this is an essential feature of most bilateral investment treaties, is in itself sufficient to reject the Czech Republic's equivalence argument."[114]

131.  Claimant's responses to the European Commission's observations on the applicability of VCLT Article 30(3) in the present arbitration are discussed below at paragraphs 205 to 207.

### C.  Inapplicability of the BIT and Incompetence of the Tribunal as a Matter of EU Law

*Respondent's Position*

132.  In the alternative to a finding of inapplicability under the VCLT, Respondent argues that the Tribunal lacks jurisdiction as a matter of EU law, which the Tribunal is bound to apply in accordance with Article 8(6) of the BIT.  Article 8(6) provides as follows:

> The arbitral tribunal shall decide on the basis of the law, taking into account in particular though not exclusively:
> - the law in force of the Contracting Party concerned;
> - the provisions of this Agreement, and other relevant Agreements between the Contracting Parties;
> - the provisions of special agreements relating to the investment;
> - the general principles of international law.

133.  According to Respondent, this provision obliges the Tribunal to take into account EU law as part of the "law in force of the Contracting Party concerned."  By the accession of the Slovak Republic to the EU, the *acquis communautaire* has become part of the Slovak legal order with supremacy over other legal rules.  The notion of supremacy stems from both ECJ jurisprudence and the Constitution of the Slovak Republic.[115]

---

[114] Jurisdiction Counter-Memorial, ¶ 122, citing *Eastern Sugar* partial award, ¶ 180.  In its Jurisdiction Reply, Respondent points out that *Eastern Sugar* is the only published decision dealing with the relationship between an intra-EU BIT and EU law; but the tribunal in that case only did so through the prism of Article 59 of the VCLT, and not through Article 30(3) or through principles of arbitrability according to the *lex loci arbitri*.

[115] Jurisdiction Memorial, ¶¶ 176-180.  Article 7(2) of the Slovak Constitution states that "Legally binding acts of the European Communities and of the European Union shall have precedence over laws of the Slovak Republic."  Respondent also cites:  Case C-6/64, *Flaminio Costa v. E.N.E.L.*, Judgment of 15 July 1964, [1964]; Case 106/77, *Amministrazione delle Finanze dello Stato v. Simmenthal SpA*, Judgment of 9 March 1978, [1978] ECR 00629; Case C-425/06, *Ministerio*

134.    Respondent complained that Claimant had not complied with an order from the Tribunal that it produce exchanged correspondence with the European Commission, from a certain date range, relating to the alleged breach of EU law by the Slovak Republic.    As a result, Respondent requested the Tribunal to draw the following adverse inference from Claimant's failure to produce such correspondence: "the Tribunal should consider it to be proved that the legal subject matter of the Dispute is governed by EU law."[116]    However, because the ECJ has an "interpretive monopoly" with regard to EU law under Articles 220 and 234 of the EC Treaty, and the Tribunal lacks the competence to refer to the ECJ for a preliminary ruling, the Tribunal has no jurisdiction to decide a dispute governed by EU law.[117]

135.    Several of Claimant's BIT complaints correspond to complaints under EU law.    For example, unlawful expropriation contrary to Article 5 of the BIT is also governed by Article 6(2) of the EC Treaty and the ECHR, as well as by Articles 43 and 56 of the EC Treaty on indirect expropriation.    Parallel application of both EU law and the BIT is not possible, according to Respondent, because of the supremacy and direct effect of EU law.    Respondent argues that as a matter of national law the supremacy of EU law enables EU law to supersede the legal systems of its Member States, including bilateral treaties concluded between Member States, as confirmed by the ECJ.[118]    In support of this argument, Respondent points out that no intra-EU BITs have ever been concluded between Member States after their accession to the EC/EU.

136.    According to Respondent, the ECJ considers EU law to prevail over bilateral treaties concluded between Member States as it does over rules of national law.[119]    Thus, EU law should be applicable and take priority over the provisions of the BIT.[120]    Respondent concludes that "due to the fact that the subject matter regulated by the BIT is comprehensively covered by EU law, the provisions of the BIT are no longer applicable … and thus the Tribunal's jurisdiction to decide on the breach of the EC Treaty is not given."[121]

---

dell'Economia e delle Finanze v. Part Service Srl, Judgment of 21 February 2008, [2008] ECR I-00897; Case 26-62, NV Algemene Transport en Expeditie Onderneming van Gend & Loos v. Netherlands Inland Revenue Administration, Judgment of 5 February 1963.
[116] Jurisdiction Memorial, ¶¶ 5-6.
[117] Jurisdiction Reply, ¶¶ 133-5.
[118] Jurisdiction Memorial, ¶ 114, citing Case C-478/07, Budějovicky Budvar, narodni podnik v. Rudolf Ammersin GmbH, Judgment of 8 September 2009, [2009] ECR I-07721.
[119] Ibid, ¶ 26.
[120] Jurisdiction Memorial, ¶ 182.
[121] Jurisdiction Memorial, ¶¶ 183-185.

137.    Respondent argues that, under the principles of direct applicability and supremacy of EU law, intra-EU BITs are contrary to EU law.  The unity of the *acquis communautaire* does not allow for any difference in the position of EU law within the legislation of individual Member States.  Uniform application of EU law can only occur when all member states accord priority to EU law over any other rule of law, including the intra-EU BITs (supremacy of EU law), and provide for the direct and immediate application of EU law (direct effect).  Application of a rule of law belonging to a legal system outside that of the EU would undermine the creation of the internal market and result in the resolution of matters of EU law being removed from the ambit of the ECJ.[122]

138.    At the hearing, Respondent acknowledged that with Frankfurt as the place of arbitration and therefore with German law as the *lex loci arbitri*, the doctrine of separability of the arbitration clause would apply in this case, but Respondent did not consider this to be problematic.[123]  Respondent also acknowledged that all over Europe there are arbitration tribunals, particularly in commercial arbitration, that apply EU law on a regular basis.  According to Respondent, such tribunals are wrong to do so, as such questions of EU law should be sent to the ECJ for a preliminary interpretation and arbitral tribunals have no competence to do so.[124]  It was put to Respondent that although a tribunal cannot make a reference to the ECJ, an arbitration matter may end up before a national court and that national court may itself make a reference to the ECJ.  Respondent acknowledged this to be possible, but pointed out that if the parties had agreed to a seat of arbitration outside of the ECJ, such as Switzerland, there could be no referral to the ECJ.[125]

*Claimant's Position*

139.    In answer to Respondent's argument referring to the applicable law under Article 8(6) of the BIT, Claimant contends that the argument is (i) untimely and thus inadmissible, (ii) incomprehensible, and (iii) in any event based on a misreading of Article 8(6) of the BIT, which expressly *permits* the Tribunal to apply both the provisions of "this

---

[122] Jurisdiction Reply, ¶¶ 27-43.
[123] Transcript, p. 37.  The doctrine of separability appears in Book 10 of the German Code of Civil Procedure (Zivilprozessordnung, or "**ZPO**"), § 1040.  See also UNCITRAL Rules, art. 21(2).
[124] Transcript, pp. 39-41.
[125] Transcript, p. 41-42.

Agreement and other relevant Agreements" as well as "the law in force of the Contracting Party concerned." [126]

140.   Claimant addresses Respondent's request that the Tribunal draw from Eureko's non-production of certain correspondence with the European Commission the adverse inference that "the legal subject matter of the dispute is governed by EU law." Claimant submits that the procedural history shows Respondent to have changed its motive for requesting the documents, and that the requested inference is incapable of being drawn from the documents in question.[127]

141.   Claimant considers Respondent's exposé about the principles of "supremacy" of EU law over national law to be irrelevant.  Claimant points out that the BIT is not a national law but an instrument of public international law.  EU law is not superior to and does not take precedence over international law.  A rule of international law is not automatically rendered inapplicable if it contravenes a rule of EU law, and at most an EU Member State may be obliged to amend or terminate such an international law obligation.  However such an international law obligation remains fully in force as long as the Member State does not actually procure its amendment or termination.

142.   Claimant explained at the hearing that under Respondent's logic, every tribunal that would touch upon an issue of EU law that a respondent considered to be controversial would be forced to declare that it had no jurisdiction because the tribunal could not itself make a referral of the controversial question to the ECJ.[128]   Claimant also pointed out that lower national courts apply EU law every day, and that while lower national courts *may* refer preliminary questions of EU law to the ECT, they are not bound to do so.

### D.  Non-Arbitrability as a Matter of German Law

*Respondent's Position*

143.   Respondent argues that arbitrability under the *lex loci arbitri* (German law), provides an alternative basis for finding that the Tribunal lacks jurisdiction to hear the dispute.[129]

---

[126] Jurisdiction Counter-Memorial, ¶¶ 140-144.
[127] Jurisdiction Counter-Memorial, ¶¶ 150-56.
[128] Transcript, pp.45-46.
[129] Jurisdiction Memorial, ¶¶ 186-93.

144.   Under German law, an arbitral award issued in a non-arbitrable dispute may be set aside by a German court under Section 1059(2)(2)(a) of the ZPO.[130]   Under Section 1030 of the ZPO, disputes involving an economic interest can be the subject of an arbitration agreement unless any other German legal regulation stipulates that national courts have exclusive jurisdiction.

145.   According to Respondent, EU law constitutes an integral part of the legal order applicable in Germany as an EU Member State.   Thus, any and all statutory provisions of EU law governing the protection of investments constitute an integral part of the German legal order.   In this case, Claimant asserts a breach of both EU law and the BIT.   As the whole area covered by the BIT overlaps with legal regulations arising under EU law, the Tribunal would inevitably be deciding on a breach of EU law.   EU law does not allow the conferral on an arbitral tribunal of jurisdiction over the area covered by the BIT and therefore, Respondent argues, the dispute would be non-arbitrable under Section 1030(3) of the ZPO.

*Claimant's Position*

146.   Claimant considers that Respondent's argument based on arbitrability must fail because Article 8(6) obliges the Tribunal to apply EU law as one of the sources of law.   This is consistent with ECJ jurisprudence on the obligation upon arbitral tribunals to apply EU law, subject to limited review by state courts subsequent to the conclusion of arbitral proceedings.[131]

147.   Claimant argues that if the ECJ were exclusively competent to interpret EU law, the European Commission would not have invited Eureko "to seek redress … through arbitration and conciliation procedures available."[132]   The fact that an arbitral tribunal is not competent to raise preliminary questions before the ECJ does not render an arbitration agreement invalid.   Claimant observed that the *Eastern Sugar* tribunal rejected a similar argument based on arbitrability brought by the Czech Republic.

---

[130] Jurisdiction Memorial, ¶ 188 ("An arbitral award may be set aside only if […] the court finds that the subject-matter of the dispute is not capable of settlement by arbitration under German law").
[131] Jurisdiction Counter-Memorial, ¶ 156, citing *Eco Swiss* and *Claro*.
[132] Exhibit R-47.

### E.  Request to Submit the Dispute to ECJ or Stay the Arbitration Pending ECJ Decision

*Respondent's Position*

148.    As an alternative to a finding that the Tribunal lacks jurisdiction, Respondent requests that, in the event the Tribunal finds itself competent to submit the request for a preliminary ruling of the ECJ, the Tribunal (i) submit such a request to the ECJ after consulting the Parties; and (ii) stay the arbitration pending the ECJ's decision.[133]  As discussed below at paragraphs 197 to 203, Respondent is supportive of a similar proposal put by the European Commission.

*Claimant's Position*

149.    Claimant's primary objective in having filed a complaint with the European Commission was to remain active as a health insurer in the Slovak Republic and thus help persuade the Slovak government to change its approach.  Having filed the complaint, proceedings between the European Commission and an EU Member State are out of the control of the complainant.  The complaint proceedings must be seen as complementary to the BIT arbitration, instigated under two different treaties and two sets of procedural and substantive norms.[134]

150.    Claimant opposes Respondent's suggestions that the arbitral proceedings be stayed and that the Tribunal submit a request to the ECJ, because the Tribunal is not competent to do so.  As discussed below at paragraphs 204 to 211, Claimant similarly rejects a proposal by the European Commission that the Tribunal suspend the arbitration.

### F.  Request that the European Commission be Invited to Participate in the Arbitration

*Respondent's Position*

151.    In its Jurisdiction Memorial, Respondent requested the Tribunal to invite the EU, represented by the European Commission, to participate in the jurisdictional phase of

---

[133] Jurisdiction Memorial, ¶ 195.  Respondent noted that a similar approach was taken in *Ireland v. United Kingdom*, arbitration proceedings initiated pursuant to Annex VII of the 1982 United Nations Convention on the Law of the Sea (hereafter "***MOX Plant***"), Procedural Order No. 6 (Termination of Proceedings), 6 June 2008.  Available at: http:///www.pca-cpa.org/showpage.asp?pag _id=1148.
[134] Jurisdiction Counter-Memorial, ¶¶ 10-11.

the proceedings as an *amicus curiae* to express the EU's view on the application of the BIT.[135]

*Claimant's Position*

152.    In its written submissions, Claimant opposes the suggestion that the European Commission be invited to submit an *amicus* brief, on the basis that this would result in additional delay and costs and could not in any event be relevant or decisive with respect to the Tribunal's consideration of its jurisdiction on the basis of Article 8 of the BIT.[136]

153.    At the hearing, Claimant compared the relevance of what the European Commission thinks about the validity of the BIT with what the two contracting parties to the BIT think about the validity of the BIT.   As with Eureko's views, the European Commission's views on the validity of the BIT are not relevant to the application of Article 59 of the VCLT.   That is why Claimant considered the correspondence between Eureko and the Commission to be irrelevant in the document production phase.   It is also why Claimant considered it unnecessary (not to mention a possible source of delay) for the European Commission to be invited to participate as an *amicus curiae* in the arbitration.   By contrast, the views of the Slovak Republic and Netherlands, being contracting parties to the BIT, directly weigh on the question of "intention" for purposes of Article 59 of the VCLT.   That is why Claimant argues that the Slovak Republic's statements to the public, to Eureko and to the European Commission are all relevant (and, in the latter category, explain why the production of Respondent's 226-Reply had been sought).[137]

V.    **OBSERVATIONS FROM THE NETHERLANDS GOVERNMENT AND THE EUROPEAN COMMISSION**

154.    At the conclusion of the 24 April 2010 hearing, the Tribunal consulted with the Parties about the possibility of approaching the Government of the Netherlands and the European Commission for written observations.   It was agreed that such

---

[135] Jurisdiction Memorial, ¶ 196.  See also "Respondent's Position on Amicus Curiae Brief of the European Commission," submitted to the Tribunal by letter dated 14 April 2010.
[136] Jurisdiction Counter-Memorial, ¶ 162.
[137] Transcript, pp. 51-53.

invitations could be extended, so long as relatively tight deadlines for the responses were requested in order to keep the proceedings as efficient as possible.[138]

## A.    Written Observations of the Netherlands Government

### 1.    Netherlands Government Letter of 10 June 2010

155.    On 10 June 2010, the Netherlands Government, by letter from the Ministry of Economic Affairs, responded to the Tribunal's invitation to provide observations with regard to the question whether or not the BIT is still legally valid and subsequently whether or not the Tribunal has jurisdiction to adjudicate this claim.

156.    The Netherlands Government noted that the BIT was in force long before the Slovak Republic's accession to the European Union.  The Government concurred with the following statements made by the European Commission quoted in the *Eastern Sugar* partial award:

> However the effective prevalence of the EU acquis does not entail, at the same time, the automatic termination of the concerned BITs or, necessarily, the non-application of all their provisions.  Without prejudice to the primacy of Community law, to terminate these agreements, Member States would have to strictly follow the relevant procedure provided for this in regard in the agreements themselves.  Such termination cannot have a retroactive effect.

157.    The Netherlands Government noted that according to ECJ jurisprudence, the EU must respect international law in the exercise of its powers, in particular with respect to the termination and suspension of international treaties.[139]

158.    The Netherlands Government emphasised that the legal validity of the BIT is:

> solely governed by Article 13(2) of the BIT, and where necessary by the Vienna Convention on the Law of Treaties and general public international law.  Thus, this BIT can only be terminated by informing – at least 6 months before – the other Contracting Party about its intention to terminate the BIT.  The Netherlands so far has never received any indication from the Slovak Government that it has the intention to terminate the BIT.  Similarly, the Slovak Government so far has also not expressed towards the Netherlands Government its wish to renegotiate the BIT.  Nor did The Netherlands express any intention in this direction towards the Slovak Republic.

159.    The Netherlands Government referred to the letter it had provided to Claimant's counsel in response to a request in January 2010.  After receipt of that letter, the

---

[138] Transcript, pp. 106-107.
[139] Case C-162/96, *Racke GmbH & Co. v. Hauptzollannt Mainz*, Judgment of 16 June 1998, [1988] ECR I-03655, ¶¶ 45-46, Case C-286/90, *Anklagemyndigheden v. Peter Michael Poulsen and Diva Navigation Corp.*, Judgment of 24 November 1992, [1992] ECR I-06019, ¶ 9.

Netherlands approached the Slovak Republic officially in order to confirm that the BIT remains fully in force, and in order to receive a confirmation to that effect by the Slovak Republic.  As at 10 June 2010, the Slovak Republic had provided oral and informal assurances of the BIT's validity.

160.    The Netherlands Government stated that the conditions in Article 54 of the VCLT for the termination of a treaty, namely termination in conformity with the provisions of the Treaty or by consent of all parties after consultation with the other contracting States, had not been met here.[140]

161.    The Netherlands Government concluded that:

> The Netherlands affirms again that the BIT in question in this dispute continues to be fully in force.  Consequently, there is also no reason to doubt the jurisdiction of the Arbitral Tribunal in this dispute.  Accordingly, Article 8 of the BIT, which prescribes international arbitration as a dispute settlement tool for disputes between an investor and a Contracting Party, is fully applicable.  In the view of The Netherlands, European Union law aspects cannot and do not affect in a way the existing jurisdiction of this Arbitral Tribunal.  Thus, this Arbitral Tribunal should fully exercise its jurisdiction and adjudicate this dispute.

162.    On a more general level, the Netherlands Government stated that it was aware of recent developments regarding BITs and EU law.  First, the Extra-EU BIT Cases were not directly relevant for the present dispute; but in order to accommodate these judgments, all Member States and the European Commission were in close discussions with each other "to adopt a common attitude."  Second, with the entry into force of the Lisbon Treaty on 1 December 2009, a transfer of competence from the Member States to the EU has taken place regarding foreign direct investments and the protection of investments as laid down in Article 207 of the TFEU.  According to the Netherlands Government, the way the EU will exercise this new power still needs to be determined.

163.    Finally, the Netherlands Government observed that:

> Currently, the European Union Member States are awaiting proposals from the European Commission regarding the future policy towards the new competence pursuant to article 207 TFEU, which will also touch upon the matter of existing BITs of the Member States.  The Netherlands is actively involved in working towards a practical solution that takes into account the concerns of the European

---

[140] VCLT, art. 54 provides:  "The termination of a treaty or the withdrawal of a party may take place: (a) in conformity with the provisions of the treaty; or (b) at any time by consent of all the parties after consultation with the other contracting States."

Commission, while at the same time secures the interests of the Member States and the protection of investors in the European Union.

Considering this ongoing process between the Member States and the European Commission, The Netherlands deems it inappropriate to anticipate or even predetermine the question of the status of intra-EU BITs in the present dispute before an international ad hoc Arbitral Tribunal. Legal certainty for all Contracting Parties to BITs and for investors and their investments is of the utmost importance to the Netherlands. Therefore, casting any doubt on the legal validity of existing intra-EU BITs would be unnecessarily harmful and undermine the rights and legitimate expectations of investors relying on existing BITs.

### 2.  Netherlands Government Letter of 23 June 2010 appending Note Verbale from the Slovak Republic

164.    On 23 June 2010, the Netherlands Government sent a further letter to the Arbitral Tribunal attaching a Note Verbale received by the Netherlands Government from the Slovak Ministry of Foreign Affairs in response to a request from the Netherlands Government on 4 May 2010.

165.    The Slovak Note Verbale included the following statement:

According to competent authority of the Slovak Republic, the Ministry of the Finance of the Slovak Republic, the validity of the BIT has not been terminated in accordance with article 13 of the BIT.

However, according to competent authority of the Slovak Republic, the Ministry of the Finance of the Slovak Republic it is nonetheless important to analyze the issue as to whether the BIT is valid and applicable, since the validity and applicability of the BITs concluded between EU Member States have been repeatedly challenged in investment disputes and also in debates between International Law experts and European Law experts, as well as among EU Member States.

166.    In light of those observations, the Slovak Republic invited the Netherlands "to commence discussions regarding the validity and applicability of the BIT," while inviting other EU Member States and the European Commission to join these discussions:

Only within the scope of this broad discussion it is possible find a common solution and eliminate the current legal uncertainty.

The Ministry of Finance of the Slovak Republic deems this issue to be of the utmost importance for the future of investment protection in Europe.

### 3.    Parties' comments on Netherlands Government observations and Slovak Republic Note Verbale

*Respondent's Position*

167.    Respondent notes that the observations of the Netherlands Government do not exhaustively consider the legal status of intra-EU BITs.  Indeed, the observations should have "no substantial impact on the jurisdiction of the Tribunal," because "the Netherlands Government failed to substantiate its assertions … omitted to present its observations with respect to the inapplicability of the BIT as a result of its incompatibility with the EC Treaty," and relied on only one portion of the European Commission's views as cited in the controversial *Eastern Sugar* award.[141]

168.    In relation to the Netherlands Government's reference to Article 54 of the Vienna Convention, Respondent notes that Article 54 does not purport to contain an exhaustive list of means to terminate a treaty.[142]

169.    According to Respondent, the Netherlands Government misinterprets the alleged confirmation by the Slovak Republic of the validity of the BIT.  By its Note Verbale, the Slovak Republic merely confirmed that the BIT had not been terminated by means of the procedure under Article 13 of the BIT (a fact never contested by Respondent.) The Note Verbale actually reiterates the importance of considering the validity and applicability of the BIT.  In this context, the Slovak Republic invited the Netherlands and other Member States to participate in discussions that might lead to a common solution to the legal uncertainty.[143]

170.    Respondent thus concludes that the observations from the Netherlands Government are not persuasive with respect to the Intra-EU Jurisdictional Objection.

*Claimant's Position*

171.    Claimant emphasises that the observations of the Netherlands leave no doubt whatsoever that the Netherlands considers the "the BIT … is still fully in force."

172.    According to Claimant, the Slovak Republic "has also in effect admitted that the BIT has not terminated," though according to the Note Verbale the Slovak Republic confirmed only that the BIT has not "terminated under its own provisions." Comparing the strongly-argued position taken by Respondent in this arbitration with

---

[141] Respondent's Post-Hearing Submission, ¶¶ 18-19.
[142] Respondent's Post-Hearing Submission, ¶ 24.
[143] Respondent's Post-Hearing Submission, ¶¶ 21, 22, 25-26.

the ambiguous language in the Note Verbale that it is "important" to "analyse" validity of the BIT, Claimant considers that the Slovak Republic's position is inconsistent and disingenuous.  Claimant thus states:

> If the Slovak Republic had truly believed that the BIT had terminated as of its EU accession, it could have simply communicated so to its treaty partner (and to Eureko upon notification of a claim under the BIT).  Its failure to give that simple confirmation evidences that the Slovak Republic is not truly convinced that the BIT has terminated…

173.    Claimant concludes that there can be no doubt the BIT is a treaty in force that has not terminated under Article 59 of the VCLT.

174.    With respect to incompatibility, Claimant notes that the Netherlands considers that "European Union law aspects cannot and do not affect in a way the existing jurisdiction of this Arbitral Tribunal."   Claimant also notes the absence of any argument in the Slovak Republic's Note Verbale that the arbitration clause is not applicable.[144]

### B.    Written Observations of the European Commission

175.    On 7 July 2010, the European Commission submitted detailed observations in response to the Tribunal's invitation to update and elaborate upon the observations that had been submitted in 2006 to the tribunal in *Eastern Sugar.*

### 1.    Distinction between extra-EU BITs and intra-EU BITs

176.    At the outset of its observations, the Commission distinguishes between extra-EU BITs (of which there are over 1000) and intra-EU BITs (of which there are approximately 190).[145]   The Commission's concerns about extra-EU BITs relate to questions of treaty making competence and incompatibility with mandatory EC law relating to investment, other capital movements and payments.  With the entry into force of the Lisbon Treaty, the EU has exclusive competence in respect of foreign direct investment as part of the common commercial policy (TFEU, Art. 207(1), Art. 3(1)(e)).   The Commission refers to a new proposal for an EU Regulation establishing the terms and procedures under which Member States are authorised to maintain in force, amend or conclude extra-EU BITs.  That proposal expressly does *not* encompass intra-EU BITs.  According to the Commission, "unlike intra-EU BITs,

---

[144] Claimant's Post-Hearing Submission, ¶¶ 2, 4-6, 9.
[145] European Commission Observations, ¶¶ 10-19.

it is important to clarify that the European Commission does not take issue with third party arbitration mechanisms set out in these BITs entered into with non-EU countries."

177.   The Commission's concerns with intra-EU BITs are of "a different order" and relate to the compatibility of such BITs with mandatory provisions of EU law and with the EU's judicial system.[146]  Intra-EU BITs amount to an "anomaly within the EU internal market."  There is at the very least a partial overlap between intra-EU BITs and the internal market provisions of the EU, and this calls into question the permissibility of the continued existence of intra-EU BITs.

178.   In the EU judicial system, the Luxembourg courts have exclusive jurisdiction (i) to determine, in infringement proceedings, whether EU Member States have fulfilled their EU law obligations, and (ii) to give preliminary rulings on questions of EU law as requested by EU domestic courts and tribunals.  EU Member States are prevented from submitting their disputes to "any other method of dispute settlement" under the principle established in the "*MOX Plant*" case between the UK and Ireland, in which the ECJ found that it had exclusive jurisdiction in resolving a dispute between two EU Member States that was at least partially covered by EU law.[147]  As a consequence, EU Member States that resort to an *inter-State* arbitration mechanism provided for under an intra-EU BIT for matters partially covered by EU law, are in breach of Article 344 of the TFEU.

179.   For investor-State arbitration, under a BIT, an international tribunal independent from the host State may be seized with the matter; but under the EU judicial system, investors must either address a national court (which may or must refer questions of interpretation to the ECJ) or alternatively call on the Commission to initiate infringement proceedings.  According to the Commission, "the arguments in favour of maintaining an investor-State arbitration mechanism for intra-EU BITs are not persuasive from an internal EU law perspective."[148]

180.   The Commission asserts that where there is a conflict with EU law, the rule of *pacta sunt servanda* does *not* apply to agreements between EU Member States, because of the jurisprudence establishing that "EU law takes supremacy not only over the

---

[146] European Commission Observations, ¶¶ 20-38.
[147] European Commission Observations, ¶ 25, citing Case C-459/03, *Commission v. Ireland*, Judgment of 30 May 2006, [2006] ECR I-4635 (hereafter "*MOX Plant*").
[148] European Commission Observations, ¶ 29.

national legal systems, but also over bilateral agreements concluded between Member States."  This applies to pre-accession bilateral treaties between Member States.  The ECJ has consistently held that in cases of conflict between bilateral agreements between Member States and EU law, the latter prevails.[149]  The Commission explains:

> [A]s a result of the supremacy of EU law vis-à-vis pre-accession treaties between Member States, conflicts between BIT provisions and EU law cannot be resolved by interpreting and applying the relevant EU law provisions in the light of the BIT.  Only the inverse approach is possible, namely interpretation of the BIT norms in the light of EU law.  The foregoing has implications as regards the ability of private parties (investors) to rely on provisions of an intra-EU BIT that are in conflict with EU law.  Under EU law, <u>a private party cannot rely on provisions in an international agreement to justify a possible breach of EU law</u>.  This includes resort to judicial settlement mechanisms that conflict with the EU judicial system.  Furthermore, in the EU legal system, national legislation of an EU Member State that is incompatible with EU law does not become 'invalid'; it merely cannot be applied where it conflicts with EU law.  The same applies in the Commission's view, to existing intra-EU BITs that contain provisions that are incompatible with EU law:  neither the BIT as such nor the conflicting provisions become 'invalid'; but they cannot be applied where they conflict with EU law. [*emphasis in original*]

181.   Even when general principles of law, including the Vienna Convention, are followed, "the conclusion cannot be any different:  for all states that accede to the EU, the EU treaties are to be regarded as a 'later treaty', *lex posterior*."  The *pacta sunt servanda* rule only applies to extra-EU BITs.[150]  This results from an unambiguous conflict rule that forms part of the *acquis communautaire* that Member States sign up to when they join the EU.

182.   The Commission notes that its continued concerns regarding the compatibility of intra-EU BITs with EU law are well known to all Member States, and claims that:[151]

> Eventually, all intra-EU BITs will have to be terminated.  Commission services intend to contact all Member States again, urging them to take concrete steps soon.  Furthermore, while the Commission is in favour of consensual solutions with EU Member States, as guardian of the EU treaties it cannot exclude eventually having to resort to infringement proceedings against certain Member States.

### 2.    Discrimination issues with intra-EU BITs

183.   The Commission considers there is serious potential for discrimination between EU investors from different Member States, which is incompatible with EU law.  That

---

[149] European Commission Observations, ¶ 30, citing Case C-235/87, *Matteucci v. Communauté française of Belgium et. al*, Judgment of 27 September 1988, [1988] ECR 05589, ¶ 22; Case 3/91, *Exportur SA v. Lor SA and Confiserie du Tech SA*, Judgment of 10 November 1992, [1992] ECR I-5529, ¶ 8; Case 10/61, *Commission v. Italy*, Judgment of 27 February 1962.
[150] European Commission Observations, ¶¶ 30-32.
[151] European Commission Observations, ¶ 38.

is because some investors are covered by a BIT and granted the opportunity to resort to investor-State arbitration while others are not. Arbitration is seen by some as more attractive, though the Commission does not accept that arbitration is more efficient than redress through national courts or through a complaint to the Commission. In any event, the availability of a *choice* of dispute resolution procedures gives some investors an advantage over investors from other Member States, and thus constitutes forbidden discrimination against those other EU nationals.[152]

184.    The Commission rejects the suggestion that discrimination be resolved positively, not by eliminating the investor-State arbitration mechanism but by extending the preferential treatment to all investors from other EU countries. Such a suggestion is unacceptable from an institutional EU law perspective and misunderstands the EU judicial system, which is "firmly opposed to the 'outsourcing' of disputes involving EU law" to tribunals outside the EU courts, for the reasons set out by the ECJ in the *MOX Plant* case.[153]

### 3.    Competing judicial and arbitral mechanisms

185.    The Commission considers that granting the opportunity for arbitration to all investors would "inevitably promote competing judicial and arbitral mechanisms, increase 'forum shopping' by litigants and contribute to the risk of further fragmentation of international law." The Commission explains:

> Continued resort to outside dispute settlement mechanisms by EU subjects based on intra-EU BITs also reveals mistrust in the courts of EU Member States. This has no place in the current post-enlargement context, which is rooted in mutual trust between Member States and founded on the development of a common favourable investment environment. Mutual trust in the administration of justice in the European Union is one of the principles regarded as necessary by the European Court of Justice for the sound operation of the internal market.

186.    The Commission also contests Eureko's assertion that a damages award would be unavailable to it under the EU legal system, and recalls the well-settled and "inherent" principle established by the ECJ in *Francovich* that a victim has a right to compensation for damage caused as a result of breaches of EU law.[154]

---

[152] European Commission Observations, ¶ 31.
[153] European Commission Observations, ¶ 32.
[154] European Commission Observations, ¶ 36.

### 4.    Termination of the Dutch-Slovak BIT is desirable but has not happened automatically under VCLT Article 59

187.    With respect to the BIT in this arbitration, the Commission states that "both EU Member States should terminate this type of bilateral agreement."  However, the Commission acknowledges that neither party appears to have taken any decisive step formally to terminate this BIT.  The Commission does not discern in the 2003 Act of Accession any intention of the parties to abrogate earlier intra-EU BITs.  The Commission thus agrees that "the entire Dutch-Slovak BIT has not been implicitly terminated or suspended by virtue of Article 59(1) of the Vienna Convention." However, the Commission argues that "EU law prevails, which means that private parties are not entitled to rely on EU-inconsistent provisions of this agreement." [155]

### 5.    Some BIT provisions are inapplicable under VCLT Article 30(3)

188.    According to the Commission, even where it appears the BIT is not rendered invalid or terminated *as a whole*, those provisions of a BIT that are inconsistent with EU law cannot be applied.  The Commission observes that Eureko has invoked EU law as well as breaches of the BIT to support its contention that the Slovak Republic failed to offer fair and equitable treatment and restricted the freedom of capital movement with respect to its investment.  The Commission recalls that Eureko lodged a complaint with the Commission based in part on the same grievances as the arbitration claim, and that this led to infringement proceedings being opened against the Slovak Republic.  The Commission states that the investigation is currently ongoing, but is "unable at this stage to disclose the scope of its investigation into the Slovak legislation and administrative practice."[156]

189.    The Commission asserts that the Tribunal is bound to take EU law into account by virtue of Article 8(6) of the BIT.  Both as a matter of the internal EU conflict rules of supremacy, and as a matter of public international law, the Tribunal cannot apply provisions of the BIT that are incompatible with EU law.

190.    The Commission argues that Article 30(3) of the VCLT applies where two treaties cover the "same subject matter" and provisions of the earlier treaty are "incompatible" with those of the later treaty, and that both of these conditions are satisfied here.

---

[155] European Commission Observations, ¶¶ 73-74.
[156] European Commission Observations, ¶ 45.

191.   On the "same subject matter" element, the Commission argues that the *Eastern Sugar* tribunal was mistaken in holding that the BIT and EC Treaty do not cover the same subject matter because it "it did not inquire correctly into the standards of 'sameness' under Article 30 of the Vienna Convention.  Rather it simply assumed that the two treaties would have to relate to 'the same precise subject matter.'"  The Commission argues that the better approach, and that of the ILC, is that the two treaties need only be of a "similar or comparable degree of generality" so that their parallel operation could lead to incompatible results.  In the instant case, both the BIT and the TFEU "would have a normative claim to rule on the legality of Slovakian Health Care legislation.  It follows that the two treaties relate to 'the same subject matter' within the meaning of Article 30 of the Vienna Convention."  There can be no doubt that the treaties pursue similar objectives.  Comparing various provisions in the two treaties in both the establishment and post-establishment phase of an investment, the Commission concludes that the BIT and the TFEU relate to "the same subject matter" within the meaning of Article 30 of the Vienna Convention.

192.   On the "incompatibility" element, while the Commission believes there is no "incompatibility" within the meaning of Article 59(1)(b) of the Vienna Convention between the BIT in its *entirety* and the TFEU, there is "incompatibility" of *certain provisions*, within the meaning of Article 30(3) of the Vienna Convention.

193.   The Commission takes the view that:[157]

> There are some provisions of the Dutch-Slovak BIT "that raise fundamental questions regarding compatibility with EU law.  Most prominent among these are the provisions of the BIT providing for an investor-State arbitral mechanism (set out in Art. 8), and the provisions of the BIT providing for an inter-State arbitral mechanism (set out in Art. 10).  These provisions conflict with EU law on the exclusive competence of EU courts for claims which involve EU law, even for claims where EU law would only partially be affected.  The European Commission must therefore … express its reservation with respect to the Arbitral Tribunal's competence to arbitrate the claim brought before it by *Eureko B.V.*

**6.     Suspension of proceedings until doubts resolved by ECJ**

194.   The Commission believes that were this Tribunal to proceed now, there would be a real risk that it might come to a different view than the Commission (which is dealing with the pending infringement case) or eventually, the ECJ.  Thus, the Commission states:

---

[157] European Commission Observations, ¶ 80.

> The prospect of two conflicting decisions involving EU law is most unwelcome. In addition, there is a related risk that the Arbitral Tribunal might render an award that is not compatible with EU law. An arbitral award that has been rendered in violation of EU law may not be executed and enforced in an EU Member State. A Member State that would do so nonetheless, risks infringement proceedings.

195. Accordingly, the Commission proposes a similar course of action to that in the *MOX Plant* case, where the arbitral tribunal concluded that:

> In the circumstances, and bearing in mind considerations of mutual respect and comity which should prevail between judicial institutions both of which may be called upon to determine rights and obligations as between two States, the Tribunal considers that it would be inappropriate for it to proceed further with hearing the Parties on the merits of the dispute in the absence of a resolution of the problems referred to. Moreover, a procedure that might result in two conflicting decisions on the same issue would not be helpful to the resolution of the dispute between the Parties.

196. The Commission suggests that this Tribunal suspend the present arbitration because: (i) EU law forms part of the law that this Tribunal must apply by virtue of Article 8(6) of the BIT and the fact that Eureko itself invokes EU law; (ii) the EU law to be applied includes the principle of exclusive competence of the EU courts in respect of disputes between EU law subjects that involve EU law; (iii) the Commission has already opened an infringement case against the Slovak Republic in connection with Eureko's complaints; and (iv) the "considerations of mutual respect and comity" form part of the general principles of law that the Tribunal must apply by virtue of Article 8(6) of the BIT.

### 7.     Parties' comments on the European Commission's observations

*Respondent's Comments*

197. Respondent considers that the Commission's observations are "of the utmost importance" to the Tribunal's jurisdictional decision. The observations confirm the significance of the Intra-EU Jurisdictional Objection and thus undermine Claimant's accusations that Respondent has brought a frivolous challenge.[158] In this respect, Respondent draws the Tribunal's attention to an e-mail from the Commission of 19 July 2010 inviting Member States to meet to discuss their views and concerns regarding intra-EU BITs.[159]

---

[158] Respondent's Post-Hearing Submission, ¶¶ 15, 29-30.
[159] Respondent's Post-Hearing Submission, ¶ 31; Exhibit R-59.

198.    Respondent draws support from the Commission's position that the BIT and EC Treaty relate to the "same subject matter" in light of the purposes of both treaties, the content of the basic freedoms, the procedural protections offered (including the right to damages) and the significance of the Extra-EU BIT Cases.  Claimant's preference for a narrow interpretation of "same subject matter," by contrast, is rejected by the Commission.[160]

199.    Respondent acknowledges that the Commission found no *explicit* statement of the Contracting Parties that the BIT should be terminated, but points out that the Commission did not focus on evidence of the Contracting Parties' intention that as of the date of accession EU law should govern investment protection as contained in the BIT.[161]

200.    Respondent notes that the Commission did not examine in depth the question of incompatibility of the BIT and EU law.  Nevertheless, Respondent concludes from the Commission's observations that "in every case whereby an investor claiming the breach of the BIT is simultaneously entitled to claim a breach of the EC Treaty (TFEU), the parallel operation of both treaties is precluded.  Due to the principle of supremacy, the exclusive jurisdiction of the EU courts and finally as consequence of the discriminatory effects of the BIT, the invocation of such an Arbitration Clause would therefore breach EU law."[162]

201.    According to Respondent, the Commission "unambiguously expresses that from the perspective of EU law, the European legal norms automatically supersede any other national norms, including intra-EU international treaties, from the moment they conflict, with every intersection between intra-EU BITs and EU law having thus to be resolved in favour of EU law."  The principle of supremacy also applies "from the perspective of international law."[163]

202.    Respondent notes the Commission rejects Claimant's stance on discrimination and on the principle of the uniform application and interpretation of EU law.[164]

203.    Finally, Respondent is convinced that "the Tribunal in the present case is facing the same circumstances and therefore should follow the example of the *MOX Plant*

---

[160] Respondent's Post-Hearing Submission, ¶¶ 53-61.
[161] Respondent's Post-Hearing Submission, ¶¶ 62-64.
[162] Respondent's Post-Hearing Submission, ¶¶ 65-77.
[163] Respondent's Post-Hearing Submission, ¶ 93.
[164] Respondent's Post-Hearing Submission, ¶¶ 94-101.

Tribunal and suspend the proceedings, if it does not find that it lacks jurisdiction to decide on the merits."[165]

*Claimant's Comments*

204.    Claimant highlights that the Commission unequivocally confirms that the BIT has "not been implicitly terminated or suspended by virtue of Article 59(1) of the Vienna Convention" and that this is consistent with the view already been expressed in *Eastern Sugar.*[166]

205.    With respect to inapplicability of the arbitration clause under Article 30 of the VCLT, Claimant considers the Commission's observations run contrary to ECJ jurisprudence and are internally inconsistent.  Claimant suggests that the Commission's positions are "induced by political doctrine rather than legal reasoning," citing as examples of opinionated statements the Commission's remarks that (i) intra-EU BITs are "an anomaly within the EU internal market," and (ii) intra-EU BIT arbitrations conducted to date "reveal mistrust in the courts of the EU Member States" which has "no place in the current post-enlargement context."[167]

206.    Claimant argues that questions of supremacy of EU law are only relevant *after* it is established that an incompatibility exists.

207.    Claimant describes the Commission's analysis with respect to discrimination as a basis of incompatibility as "inconsistent" and "irreconcilable."  On the one hand, the Commission notes that some investors will have the opportunity to resort to arbitration while others do not.  On the other hand, the Commission states that the systems of enforcement of investor rights under the BIT and TFEU offer "at least equivalent protection," and the Commission denies that arbitration is "more efficient" than redress before national courts.  In any event, Claimant maintains that it is not the offer of arbitration that is discriminatory, but the refusal to grant a similar benefit to other EU investors.[168]  Claimant points out that the ECJ did not find discrimination in the Extra-EU BIT Cases.  Claimant also notes as "telling" the fact that the Commission has never brought an infringement case against a Member State with an intra-EU BIT in place.

---

[165] Respondent's Post-Hearing Submission, ¶ 117.
[166] Claimant's Post-Hearing Submission, ¶¶ 3, 35.
[167] Claimant's Post-Hearing Submission, ¶ 10.
[168] Claimant's Post-Hearing Submission, ¶¶ 15-17, citing ECJ jurisprudence on double taxation treaties and *Matteucci* case.

208.    Claimant also criticises the Commission's position on the competence of an arbitral tribunal to resolve EU law disputes as being "devoid of reality."  Claimant notes that numerous arbitral tribunals all over the EU render awards on a daily basis that involve the application of EU law, and such practice is fully accepted, even *mandated*, by the ECJ since the *Nordsee* case.[169]  According to Claimant, this long-standing ECJ case law is ignored by the Commission and runs contrary to the Commission's assertion of the "exclusive competence of EU courts for claims which involve EU law."

209.    Claimant distinguishes the *MOX Plant* case from the present case.  *MOX Plant* was based on UNCLOS, a treaty that explicitly provides that dispute resolution procedures in regional treaties shall have precedence over those contained in UNCLOS.  Further, the *MOX Plant* case was between two EU Member States, thus falling under TFEU Article 344, whereas the present case between a Member State and a private party falls under no such EU law provision.  For these two reasons, *MOX Plant* should not be applied to suspend the proceedings in this arbitration.  A suspension would in any event "bring nothing but unacceptable delay."[170]

210.    Claimant also observes that:  (i) the Commission itself had advised Eureko to turn to arbitration;[171] (ii) the Commission has advocated the use of investor-state arbitration in the context of extra-EU BITs and described it as an "established feature" of investment agreements essential to attracting investors;[172] and (iii) the Commission's position would reduce intra-EU BITs to meaningless agreements between states that provide only unenforceable protections to private parties.[173]

211.    Finally, Claimant complains that the Commission has neglected to fully inform the Tribunal of its views and status of the infringement proceedings.  According to Claimant, the Commission's initial conclusion, expressed in a November formal notice, was that "the Slovak Republic has failed to fulfil its obligations under the EC Treaty."[174]  In April 2010, the Commission completely reversed its position and informed Eureko that it intended to close the complaint procedure on the basis that EU law does *not apply* to Eureko's investment in the first place (because the freedom

---

[169] Claimant's Post-Hearing Submission, ¶¶ 20-22.
[170] Claimant's Post-Hearing Submission, ¶ 38.
[171] Claimant's Post-Hearing Submission, ¶ 26.
[172] Claimant's Post-Hearing Submission, ¶ 27.
[173] Claimant's Post-Hearing Submission, ¶ 28.
[174] Claimant's Post-Hearing Submission, ¶ 30.

of establishment and freedom of movement of capital do not apply).[175]  According to its 7 July 2010 observations, however, the Commission is apparently now looking further into the facts of the infringement case and states that "EU law is incontestably relevant to the dispute before the Arbitral Tribunal."  Claimant considers these changes in position to be "disconcerting" and sufficient reason to reject the Commission's appeal to "considerations of mutual respect and comity … between judicial institutions."  Claimant is anxious that it will be left without a forum to recover damages if it is denied arbitration and at the same time is confronted by assertions from both the Commission and the Slovak Republic (in its 226-Reply) that its dispute is not covered by the EU legal system.[176]

## VI.    RELIEF REQUESTED BY THE PARTIES

*Respondent's Request for Relief*

212.    Respondent requests that the Tribunal find that it lacks jurisdiction over the dispute.

213.    Should the Tribunal come to the conclusion that it has jurisdiction over the dispute or that it is not possible to properly assess its jurisdiction at this moment, the Tribunal should, according to Respondent, follow the European Commission's suggestion and suspend the proceedings until the European Commission and/or the ECJ have come to a decision on the EU law aspects of the infringement proceedings.[177]

214.    Respondent further requests the Tribunal to dismiss Claimant's request for an interim costs award because Respondent has a legitimate right to file jurisdictional objections, and the Tribunal's decision on the Intra-EU Jurisdictional Objection is of substantial importance.[178]

*Claimant's Request for Relief*

215.    Claimant requests that the Tribunal reject the Slovak Republic's jurisdictional arguments and also requests an interim award on costs in favour of Eureko.[179]

216.    Claimant seeks an interim costs award because the Intra-EU Jurisdictional Objection was raised belatedly, is irreconcilable with earlier statements by the Slovak Republic,

---

[175] Claimant's Post-Hearing Submission, ¶ 31; Exhibit C-105.
[176] Claimant's Post-Hearing Submission, ¶¶ 34; Exhibit C-106.
[177] Respondent's Post-Hearing Submission, ¶¶ 118-19.
[178] Jurisdiction Reply, ¶ 150.
[179] Jurisdiction Counter-Memorial, ¶ 163; Jurisdiction Rejoinder, ¶ 20; Claimant's Post-Hearing Submission, ¶ 39.

is inconsistent with accessible case law and literature, and can only be explained as a strategy to delay proceedings.[180]

## VII.    ANALYSIS BY THE TRIBUNAL

217.    The Tribunal has considered carefully the submissions made by the Parties, as well as the observations of the Government of the Netherlands and of the European Commission, all of which were helpful and for all of which the Tribunal thanks their respective authors.  All of the points made in those submissions have been taken into account by the Tribunal, even though it is not here necessary to address and decide in turn each and every one of these submissions and observations.

218.    In particular, the Tribunal wishes to emphasise that its decisions are here limited both by the requirements of this particular case and by the scope of the arguments presented by the Parties.  This award is thus necessarily confined to the specific circumstances of the present case; and the Tribunal does not here intend to decide any general principles for other cases, however ostensibly analogous to this case they might be.  For example, this case arises from a BIT concluded in 1991 before the CSFR Association Agreement, the Association Agreement and the Accession Treaty; it does not arise from a multi-lateral treaty or a treaty to which the EU is a party or signatory; and, moreover, these arbitration proceedings were instituted in 2008 before the Lisbon Treaty came into force, amending the EU Treaty and the EC Treaty (now the TFEU).

219.    As a preliminary matter, the Tribunal must satisfy itself of the existence and extent of its jurisdiction.  It considers that its jurisdiction is fixed by laws (as explained further below), and that such jurisdiction cannot here be created, continued or extended by arguments based on the possible operation of doctrines of acquiescence, waiver or estoppel in respect of acts or omissions of Respondent (or Claimant).  In any event, the Tribunal has not found it necessary to rest any part of its decision upon the ostensible attitude of either Party to these arbitration proceedings – still less upon that of the Government of the Netherlands or of the European Commission – to the question of the status of the BIT or the existence, continuation or extent of the jurisdiction of the Tribunal.

---

[180] Jurisdiction Counter-Memorial, ¶¶ 12-16.

220.    It is important to bear in mind, as a paramount factor relating to jurisdiction, that the Tribunal is established by, and derives its powers (if any) from, the consent of the Parties.  That consent operates at two successive stages.

221.    The first stage originates from the agreement between the Netherlands and the Slovak Republic in Article 8 of the BIT dated 29 April 1991 that investors of one Contracting Party[181] have a right to submit disputes with the other Contracting Party before an arbitration tribunal.  Article 8 (1) and (2) read as follows:

> Article 8
>
> (1)    All disputes between one Contracting Party and an investor of the other Contracting Party concerning an investment of the latter shall if possible, be settled amicably.
>
> (2)    Each Contracting Party hereby consents to submit a dispute referred to in paragraph (1) of this Article, to an arbitral tribunal, if the dispute has not been settled amicably within a period of six months from the date either party to the dispute requested amicable settlement.

222.    As a matter of international law, those provisions constitute an offer which can be accepted by an investor.  At this first stage, the Tribunal is concerned with the consent of the Netherlands and the Slovak Republic as expressed in Article 8 of the BIT, to be interpreted in accordance with international law and, in particular, the VCLT.

223.    The second stage originates from the offer's acceptance by Claimant, as an investor and national of the Netherlands, here effected through the initiation of arbitral proceedings under Article 8 of the BIT.  Upon such acceptance there is consent between the investor and the Contracting Party to submit to the jurisdiction of the tribunal constituted in accordance with the BIT, in respect of the dispute referred to it. Providing that all other conditions stipulated in the BIT, including those relating to such matters as the nationality of the investor, the six-month delay and the investment, have been met, the tribunal established in accordance with the BIT has at least *prima facie* jurisdiction over the dispute.[182]

224.    This second stage operates both under international law and, here, also under German law as the *lex loci arbitri* applying to UNCITRAL arbitration proceedings where the agreed place of arbitration is Frankfurt in the Federal Republic of Germany (within

---

[181] As defined in Article 1(b) of the BIT: viz., "the term 'investors' shall comprise: i.e. natural persons having the nationality of one of the Contracting Parties in accordance with its law; ii. legal persons constituted under the law of one of the Contracting Parties."

[182] Unlike some BITs (such as the 1997 Germany-Philippines BIT, Article 9) the Netherlands-Slovak Republic BIT does not explicitly confine the right to initiate arbitration to the investor; but it is not necessary for the Tribunal to take a position on the effect of this and it does not do so.  It is sufficient to determine that the investor has the right to initiate arbitration.

the meaning of Article 16 of the UNCITRAL Arbitration Rules and § 1043 of the German Arbitration Law, the Tenth Book of the German Code of Civil Procedure). As a result, this is a German arbitration; and this Tribunal is an *ad hoc* German arbitration tribunal subject to German law and not an international tribunal (such as an ICSID tribunal under the 1965 Washington Convention). Germany is a founding member of the EU; and German law includes, of course, EU law.

225.    The Tribunal cannot derive any part of its jurisdiction or authority from EU law as such: its jurisdiction is derived from the consent of the Parties to the dispute, in accordance with the BIT and German law. Although EU law, as between the EU and member States of the EU (including Respondent and the Netherlands, but not Claimant), operates at the level of international law, EU law operates, as between the Parties, as part of German law as the *lex loci arbitri*.

226.    It is, however, possible that the Parties' consent and the jurisdiction flowing from such consent might be circumscribed not only by the terms of the BIT itself but also both by international law applicable to the BIT and by provisions of German law incorporating EU law. Indeed, as explained above, the consent of the Parties can be or become qualified by the operation of legal provisions that lie outside the text of the BIT, whether at the first stage or second stage (or both).

227.    In the present case, Respondent argues, in effect, that EU law operates in this way. EU law has, in Respondent's submission, displaced or rendered inapplicable the provisions of the BIT. Respondent also argues that the arbitration cannot proceed because the dispute is non-justiciable under German law as the *lex loci arbitri*. As further explained below, this latter argument depends upon the non-arbitrability of the dispute under EU law, as part of German law.[183]

228.    In the view of the Tribunal, the proper framework for its analysis of these arguments is, in the first place, the framework applicable to the legal instrument from which the Tribunal derives its *prima facie* jurisdiction. Just as the Court of Justice of the European Communities has held that its own perspective is dictated by the treaties that established it,[184] so the perspective of this Tribunal must begin with the instrument by which and the legal order within which consent originated, *i.e.*, the first

---

[183] See above, ¶¶ 143-145.
[184] See Cases C-402/05 P to C-415/05 P, *Yassin Abdullah Kadi and Al Barakaat International Foundation*, Judgment of 3 September 2008, ¶¶ 280-291.

stage described above.  That framework is the BIT and international law, including applicable EU law.

229.    Whatever legal consequences may result from the application of EU law, those consequences must be applied by this Tribunal within the framework of the rules of international law and not in disregard of those rules.  Those consequences may operate in a number of distinct ways.  For example, EU law may affect the capacity of a State to consent to an international treaty, or may affect the performance of obligations under the treaty, or may be part of the law applicable to determine the scope of obligations under the treaty, or may affect the manner in which disputes arising under the treaty must be settled and the jurisdiction of tribunals established outside the EU legal order.  These distinctions are important in the present case.

230.    Respondent puts forward its objections to jurisdiction under four broad headings:

> A.    Termination of the BIT under Article 59 of the Vienna Convention on the Law of Treaties ('VCLT')
>
> B.    Inapplicability of the BIT under VCLT Article 30
>
> C.    Inapplicability of the BIT under EU law
>
> D.    Non-arbitrability of the dispute under German law

In addition, Respondent has made submissions concerning the proper relationship between this Tribunal and the institutions of the EU.  These arguments and submissions are considered in turn in the following paragraphs.

### A.  Termination of the BIT under Article 59 of the Vienna Convention

231.    Respondent has been a State Party to the VCLT since 28 May 1993; and the Netherlands since 9 April 1985.[185]  While the VCLT does not apply retrospectively, it is widely regarded as reflecting customary international law.  Respondent has argued on the basis of the provisions of the VCLT, and neither Party has suggested that the rules set out in the provisions which it discusses are not applicable to the BIT.

232.    VCLT Article 59 provides for the termination of treaties.  It is convenient to set it out in full at this point:

---

[185] See above, note 11.

*Article 59. Termination or suspension of the operation
of a treaty implied by conclusion of a later treaty*

1.  A treaty shall be considered as terminated if all the parties to it conclude a later treaty relating to the same subject matter and:

    (a) it appears from the later treaty or is otherwise established that the parties intended that the matter should be governed by that treaty; or

    (b) the provisions of the later treaty are so far incompatible with those of the earlier one that the two treaties are not capable of being applied at the same time.

2.  The earlier treaty shall be considered as only suspended in operation if it appears from the later treaty or is otherwise established that such was the intention of the parties.

233.  The Tribunal rejects the submission that the BIT has been terminated in accordance with the rules set out in VCLT Article 59.  There are three main reasons for this decision.

234.  The first main reason is that the operation of VCLT Article 59 is subject to the provisions of VCLT Article 65 ("Procedure to be followed with respect to invalidity, termination, withdrawal from or suspension of the operation of a treaty").  VCLT Article 65(1) – (3) read as follows:

*Article 65. Procedure to be followed with respect to
invalidity, termination, withdrawal from or
suspension of the operation of a treaty*

1.  A party which, under the provisions of the present Convention, invokes either a defect in its consent to be bound by a treaty or a ground for impeaching the validity of a treaty, terminating it, withdrawing from it or suspending its operation, must notify the other parties of its claim. The notification shall indicate the measure proposed to be taken with respect to the treaty and the reasons therefor.

2.  If, after the expiry of a period which, except in cases of special urgency, shall not be less than three months after the receipt of the notification, no party has raised any objection, the party making the notification may carry out in the manner provided in article 67 the measure which it has proposed.

3.  If, however, objection has been raised by any other party, the parties shall seek a solution through the means indicated in article 33 of the Charter of the United Nations.

235.  In the view of the Tribunal, it is therefore clear from the text of the VCLT that the invalidity or termination of a treaty must be invoked, according to the Article 65

procedure. The VCLT[186] does not provide for the automatic termination of treaties by operation of law (with the exception of treaties that conflict with rules of *jus cogens*).[187]

236.    The Tribunal does not regard Respondent's e-mail dated 5 April 2004[188] as a notification for the purposes of VCLT Article 65. That e-mail was phrased as a request to be told the "unofficial position" of the addressees on Respondent's proposal to initiate a common procedure to "harmonize" BITs. It was not a notification to the Netherlands that Respondent regarded the BIT as terminated. Moreover, the e-mail appears not to have been followed up by Respondent.

237.    VCLT Article 65(5) provides that:

> 5.    Without prejudice to article 45,[189] the fact that a State has not previously made the notification prescribed in paragraph 1 shall not prevent it from making such notification in answer to another party claiming performance of the treaty or alleging its violation.

238.    In the present case it is not "another party" to the treaty that is alleging its violation. Claimant is not a party to the BIT, which was concluded by the Netherlands and (via the initial ratification by Czechoslovakia) the Slovak Republic, now Respondent. It is, however, not necessary for the Tribunal to decide whether VCLT Article 65(5) would permit Respondent to give a notification of invalidity in answer to a request for arbitration made by an investor under the BIT, because the Tribunal considers that in any event the other conditions for the application (and hence the invocation under Article 65) of VCLT Article 59 are not met.

239.    The second main reason for dismissing this objection to jurisdiction is that the application of VCLT Article 59 is expressly limited to situations where there are successive treaties "relating to the same subject-matter." (see Article 59(1) cited above). The same phrase appears in VCLT Article 30 in a different context; but while the notion of "sameness" may be common to those two instances, the manner in

---

[186] The Tribunal observes that this interpretation of the clear meaning of the text is supported by the terms of the ILC Commentary on the draft of VCLT article 65 (then numbered article 62): see: http://untreaty.un.org/ilc/texts/instruments/english/commentaries/1_1_1966.pdf at pp. 261-3.

[187] See VCLT, arts. 53, 64. Neither party has suggested that questions of *jus cogens* are engaged in this case.

[188] Exhibit R-46. See above, ¶¶ 90, 94.

[189] VCLT, art. 45 reads as follows: "*Article 45. Loss of a right to invoke a ground for invalidating, terminating, withdrawing from or suspending the operation of a treaty*. A State may no longer invoke a ground for invalidating, terminating, withdrawing from or suspending the operation of a treaty under articles 46 to 50 or articles 60 and 62 if, after becoming aware of the facts: (a) it shall have expressly agreed that the treaty is valid or remains in force or continues in operation, as the case may be; or (b) it must by reason of its conduct be considered as having acquiesced in the validity of the treaty or in its maintenance in force or in operation, as the case may be." Article 45 is not applicable in the present case.

which the overlap between the treaties is approached is manifestly not common.  This is evident from the roles accorded by the VCLT to Articles 30 and 59.

240.    Article 59 is concerned only with the termination of *the entire treaty*.  Article 30, in contrast, is concerned with the priority between *particular provisions* of earlier and later treaties relating to the same subject-matter.[190]  While Article 30 is, therefore, focused on particular provisions, the question under Article 59 is whether the entire treaty should be terminated by reason of the adoption of a later treaty relating to the same subject-matter.  The very fact that these situations are treated separately in the VCLT points to the need under Article 59 for a broader overlap between the earlier and later treaties than would be needed to trigger the application of Article 30.

241.    This conclusion is borne out by a comparison of the terms of Article 30 and Article 59.  Under Article 30 the test is whether the two successive treaty provisions are "compatible."  Under Article 59 the test is whether the provisions of the later treaty are "so far incompatible with those of the earlier one that the two treaties are not capable of being applied at the same time."  Article 30 may be triggered by the slightest incompatibility between the provisions of the earlier and later treaties.  Article 59 clearly requires a broader incompatibility between the two treaties.

242.    Nothing in Article 59 requires that the two treaties should be in all respects co-extensive; but the later treaty must have more than a minor or incidental overlap with the earlier treaty.  In any event, it is also necessary, as Article 59 expressly stipulates, that either (a) it appears from the later treaty or is otherwise established that the parties intended the later treaty to govern the subject-matter or (b) the provisions of the treaties that relate to the subject-matter are so far incompatible as to preclude the concurrent application of the two treaties.  One or other limb of that test must be satisfied if VCLT Article 59 is to operate.

243.    The Tribunal observes that while test (b) requires incompatibility between treaty provisions, test (a) does not.  Test (a) would apply even in circumstances where successive treaties contain identical provisions.  The result would be that it is the provisions in the later treaty that govern.  That may be significant for questions of jurisdiction that turn upon the date of the governing instrument, for example.

---

[190] This point was explained by the ILC in its Commentary on the draft of article 59 (then numbered article 56): see http://untreaty.un.org/ilc/texts/instruments/english/commentaries/1_1_1966.pdf, at pp. 252–3 (paragraph 4).

244. In the present case, the Tribunal does not consider that either of the two tests is met. As far as an intention that the later treaty should "govern the matter" is concerned, it is plainly established that the Parties to the BIT – Respondent and the Netherlands – subsequently intended that EU law should apply in full between them. There is, however, no evidence of any intention that the provisions of EU law should result in the termination of the entire BIT. Nothing in the text of the EU treaties produces that result; and the necessary intention is not established by extraneous evidence. Indeed, such evidence as there is indicates that there was no or, at least, no clear intention that the BIT should be terminated by any of the CSFR Association Agreement, the Association Agreement, the Accession Treaty or the Lisbon Treaty.

245. Moreover, the BIT establishes extensive legal rights and duties that are neither duplicated in EU law nor incompatible with EU law. The protections afforded to investors by the BIT are, at least potentially, broader than those available under EU law (or, indeed, under the laws of any EU Member State). Those rights and duties are central to the purpose of the BIT. This, too, indicates that no intention that EU law should entirely displace the BIT can be inferred.

246. The claims in this case are made under Articles 3(1) (fair and equitable treatment; non-discrimination), Article 3(2) (full protection and security; non-discrimination), Article 4 (free transfer of profits and dividends), and Article 5 (expropriation), pursuant to Article 8 (investor-state arbitration) of the BIT.[191]

247. The Tribunal recalls that Respondent provided the following summary of its submissions on the equivalence between the provisions of the BIT and the provisions of the EC Treaty:[192]

| BIT | EC LAW |
|---|---|
| Free transfer of capital (Art 4) | Free movement of capital (Art 56, 58) |
| Fair and equitable treatment (Art 3-1) | Prohibition of discrimination (Art 12) |
| Full security and protection (Art 3-2) | Freedom of establishment (Art 43, 56) |
| Indirect expropriation (Art 5) | Freedom of establishment (Art 43, 56) |
| Arbitration Clause (Art 8) | Damage claim against the state before national courts |

---

[191] Statement of Claim, ¶ IV.
[192] Respondent's e-mail dated 21 April 2010.

248.    The question of the relationship between free transfer of capital under a BIT and free movement of capital under EU law arose in the *Extra-EU BIT* cases.  The European Court of Justice held in those cases that the BIT "free transfer" provisions might be a bar to limitations on free movement of capital imposed under EU law, which EU Member States would be obliged to implement, and that the compatibility of the BIT with EU law could not be ensured.  The Court considered that there was no adequate mechanism under international law that would allow an EU Member State to derogate from its BIT obligations in respect of the free movement of capital in order to fulfil its obligations under EU law.

249.    The situation in the present case is different.  The situation would not be one in which the EU State sought to invoke its internal law (including EU law) against an investor from a non-EU State in order to derogate from its BIT obligations.[193]  In the present case, both the EU State and the investor from another EU State would be subject to the same provisions of EU law.  It is, accordingly, at least arguable that there is no incompatibility between the BIT and EU law on this point.  The Tribunal does, however, accept that it is at least arguable that there is a duplication of rights to free movement of capital, which exist both under the BIT and under EU law.  Nonetheless, that fact cannot determine the question of jurisdiction here because the Tribunal considers that the other material BIT provisions are not duplicated in EU law, quite apart from Article 8 of the BIT.

250.    The Tribunal does not accept the submission that the protection afforded by the BIT provision on fair and equitable treatment is entirely covered by a prohibition on discrimination.  Respondent does not allege that there is any principle of EU law that specifically forbids treatment that is not fair and equitable.  The Tribunal does not consider that any such principle, independent of concepts of non-discrimination, proportionality, legitimate expectation and of procedural fairness, is yet established in EU law.[194]

251.    Treatment might be unfair and inequitable even if it is imposed on everyone regardless of nationality or, indeed, of any other distinguishing characteristic.[195]

---

[193] The Tribunal takes no position on the question whether such a plea should succeed.

[194] Cf. The Tridimas, *The General Principles of EU Law*, (2nd ed. 2006).

[195] See, e.g., *S D Myers v. Canada*, UNCITRAL, Partial Award on Jurisdiction of 13 November 2000, ¶ 259, available at: http://www.naftalaw.org/Disputes/Canada/SDMyers/SDMyersMeritsAward.pdf ("The 'minimum standard' is a floor below which treatment of foreign investors must not fall, even if a government were not acting in a discriminatory manner."). Cf., *LG&E Energy Corp. v Argentine Republic*, ICSID Case No. ARB/02/1 (USA-Argentina BIT), Decision on Liability of

A flat-rate corporation tax might be an example.[196]  Respondent accepted that such a measure might be prohibited by the BIT but permitted by EU law.[197]  That possibility precludes an *a priori* determination that every claim of a violation of the fair and equitable treatment standard must fall within the scope of a prohibition on discrimination.  Similar hypothetical examples can readily be imagined that relate to other principles of EU law.

252.    It cannot, therefore, be assumed (as the first test in VCLT Article 59 requires) that EU law is so comprehensive and legally certain as to have been impliedly intended to govern this question.  It cannot be assumed that the Parties intended that a right so central to the purpose of the BIT would be displaced by the narrower and more loosely defined rights accorded by EU law.

253.    Respondent argues that this hypothetical situation, where an action that would violate the BIT is permitted by EU law, is a clear example of incompatibility between the BIT and EU law.  Incompatibility is a matter to be considered under test (b) in VCLT Article 59. Respondent said that incompatibility occurs when one act is permissible under one law, but not permissible under the other.  The Tribunal does not share that view.

254.    Article 59 is concerned with situations where "provisions of the later treaty are so far incompatible with those of the earlier one that the two treaties are not capable of being applied at the same time."  That could only arise in the hypothetical situation if the Member State had either a legally-protected right under EU law or a legal duty under EU law to impose the flat-rate tax.  It would not arise where, because no law forbade it, the State simply had the freedom to impose such a tax if it so chose.  True, the BIT obligation would prevent the State from enjoying its freedom under EU law to impose a flat-rate tax:  but all treaty obligations consist in the fettering of a State's freedom to act.

255.    Accordingly, in the view of the Tribunal the fair and equitable treatment provision in the BIT does not fall under either limb of the test set out in VCLT Article 59.

256.    The Tribunal has focused on the scope of the protections afforded by the BIT and by EU law, rather than on the question whether on the facts of this particular case the

---

3  October  2006,  ¶ 162,  available  at:    http://ita.law.uvic.ca/documents/ARB021_LGE-Decision-on-Liability-en.pdf ("characterizing the measures as not arbitrary does not mean that such measures are characterized as fair and equitable.").
[196] See above, ¶ 119.
[197] See above, ¶ 119.

claim based on the fair and equitable treatment provision could be raised under EU law. There are several reasons for this focus.

257. As discussed further below, the question here is one of jurisdiction; and the extent to which either the BIT or EU law covers the claim cannot be answered until the merits of the case have been considered.

258. The Tribunal also considers that the question of overlap and incompatibility must, under VCLT Article 59, relate to the same legal relationship. Thus, a treaty provision guaranteeing non-discrimination does not have, even indirectly, the "same subject-matter" as a treaty provision guaranteeing fair and equitable treatment, even if on the facts of a particular case a claim might be raised under either provision and the claimant might be able to recover compensation for the entire loss under either provision. In this respect the notion of the same "subject-matter" has certain common features with the notions of "identity" that operate in the context of the doctrine of *res judicata*.

259. The Tribunal's decision in relation to the fair and equitable treatment provision in the BIT alone is sufficient to dismiss Respondent's submission that all BIT claims are covered by provisions of EU law. It is enough that one such claim made by the Claimant does not necessarily lie within the scope of the protections afforded by EU law to conclude that the BIT offers protections wider than those afforded by EU law. The fair and equitable treatment claim, however, is not the only claim that is not wholly covered by EU law.

260. In the view of the Tribunal the BIT right to "full protection and security" is not exhausted by the rights flowing from the freedom of establishment under EU law. The right to full protection and security subsists for as long as the investment remains in place, no matter how long after it has been established and no matter whether or not the treatment complained of is discriminatory. While the freedom of establishment under EU law entails various ancillary rights, the Tribunal does not consider that those rights cover the entire ground that the right to full protection and security might be said to cover.[198]

---

[198] Cf. Case C-186/87, *Ian William Cowan v, Trésor Public* 2 February 1989, [1989] ECR 00195 §17 and see generally European Commission, *Guide to the Case Law of the European Court of Justice on Articles 43 et seq. EC Treaty: Freedom of Establishment* (2001).

261.    Similarly, the protection in Article 5 of the BIT against expropriation is by no means covered by the EU freedom of establishment.  While it certainly overlaps with the right to property secured by Article 17 of the EU Charter of Fundamental Rights (and the First Protocol to the ECHR, as applied under EU law), the BIT provision on expropriation is not obviously co-extensive with it.  Both the considerable body of jurisprudence on indirect takings that has emerged in the context of BITs, and also the fact that the BIT protects "assets" and "investments" rather than the arguably narrower concepts of "possessions" and "property" protected by the EU Charter on Fundamental Rights, give rise to the possibility of wider protection under the BIT than is enjoyed under EU law.

262.    Thus, EU law does not provide substantive rights for investors that extend as far as those provided by the BIT.  There are rights that may be asserted under the BIT that are not secured by EU law.  Consequently, it cannot be said that it is implicit in the text of the EC Treaties that Respondent and the Netherlands intended that it should supplant the BIT.

263.    Nor can it be said that the provisions of the BIT are incompatible with EU law.  The rights to fair and equitable treatment, to full protection and security, and to protection against expropriation at least, extend beyond the protections afforded by EU law; and there is no reason why those rights should not be fulfilled and upheld in addition to the rights protected by EU law.

264.    The third main reason for rejecting the jurisdictional challenge based on VCLT Article 59 may be stated simply.  An essential characteristic of an investor's rights under the BIT is the right to initiate UNCITRAL arbitration proceedings against a State party (as the host State) under Article 8 of the BIT.  Such a consensual arbitration under well-established arbitration rules adopted by the United Nations, in a neutral place and with a neutral appointing authority, cannot be equated simply with the legal right to bring legal proceedings before the national courts of the host state; and, moreover, the *locus standi* of an investor under the BIT, with its broad definition of "indirect" investments under Article 1, is unlikely to be replicated under the court procedures of an EU Member State.

265.    Accordingly, the Tribunal dismisses Respondent's submission that the BIT provisions have been displaced by EU law as a result of the principle set out in Article 59 of the Vienna Convention on the Law of Treaties.

266.    The consequence is that in any particular case investors protected by the BIT may have wider rights than those given under the substantive provisions of EU law to investors of (other) EU Member States.  Affording such wider protection to those investors while not affording it to investors of other EU States may violate EU law prohibitions on discrimination.  But that is not a reason for cancelling Claimant's wider rights under the BIT.  More significantly, it is still less a reason for treating the Parties' consent to these arbitration proceedings as invalid or otherwise ineffective, particularly where the first stage of such consent pre-dated the relevant EU Treaties, the second stage pre-dated the Lisbon Treaty, and Claimant is an EU investor.

267.    There is moreover no reason, legal or practical, why an EU Member State should not accord to investors of all other EU Member States rights equivalent to those which the State has bound itself to accord to investors of its EU bilateral investment treaty partners – or, indeed, to investors from States that are not members of the EU. Certainly, it is not for an arbitral tribunal to cancel rights created by a valid treaty in order to safeguard a State party against the possibility that it might one day decide to apply the treaty in a way that could violate its obligations under one or more other later treaties.

### B.  Inapplicability of the BIT under VCLT Article 30

268.    Respondent's argument that the provisions of the BIT are inapplicable because of the operation of the rules set out in VCLT Article 30 can be dealt with briefly.

269.    VCLT Article 30 is concerned with situations of incompatibility between particular provisions in successive treaties.  In so far as it is relevant, it reads as follows:

> *Article 30.  Application of successive treaties*
> *relating to the same subject-matter*
>
> 1.    Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs.
>
> 2.    When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.

> 3. When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the latter treaty."

270. Article 30(1) refers to the provision of Article 103 of the UN Charter which gives obligations arising under the Charter priority over other treaty obligations. It is not relevant in this case. Article 30(2) deals with situations where there is an express provision governing relations between successive treaties. There is no such provision in this case. Article 30(3) is the material provision for the present case.

271. It has already been explained that in the view of the Tribunal there is no incompatibility in circumstances where an obligation under the BIT can be fulfilled by Respondent without violating EU law. That conclusion is not affected by the principles of supremacy, direct effect or direct application of EU law.

272. More importantly, it is difficult to see how Article 30 could deprive the Tribunal of jurisdiction based upon the Parties' consent derived from Article 8 of the BIT (whether operating the first stage, second stage or both), even if there may be circumstances in which a true incompatibility between the BIT and EU law arises. Any such incompatibility would be a question of the effect of EU law as part of the applicable law and, as such, a matter for the merits and not jurisdiction.

273. The one exception would be if Article 8 of the BIT, which provides for arbitration between the investor and the State, were by itself incompatible with EU law. It could not be incompatible when the BIT was made; but it might be argued that it is incompatible with the CSFR Association Agreement, the Association Agreement, the Accession Treaty or the Lisbon Treaty. If that were so, that would, at least arguably, deprive the Tribunal of jurisdiction.

274. There is, however, no rule of EU law that prohibits investor-State arbitration. Far from it: transnational arbitration is a commonplace throughout the EU, including arbitrations between legal persons and States; and the European Court of Justice has given several indications of how questions of EU law should be handled in the course of arbitrations, including important questions of public policy.[199] It cannot be asserted that all arbitrations that involve any question of EU law are conducted in violation of EU law. The argument that the availability of arbitration for some but not all EU

---

[199] For example, *Eco Swiss*.

investors would amount to discrimination in violation of EU law[200] was addressed above, where it was decided that the answer is to extend rights and not to cancel them.

275.    The fact that there might be remedies available to the Claimant in national courts through *Francovich* procedures does not alter the position.   One of the central purposes of arbitration is to provide the disputing parties, by their consent, with an alternative to proceedings in national courts.   Moreover, an arbitration clause in a BIT is specifically included to address the substantive protections afforded to investors under the BIT.

276.    Reference was made to the ruling of the ECJ in the *MOX Plant* case, that by virtue of Article 344 TFEU (ex Article 292 TEC) and the principle of loyalty the ECJ had exclusive jurisdiction over disputes between two Member States.   Whatever the implications of that ruling might be for Article 10 of the BIT, which is concerned with disputes between the BIT Contracting Parties, the ruling is not applicable to disputes under Article 8, which are not disputes between Contracting Parties but investor-State disputes.   There is no suggestion here that every dispute that arises between a Member State and an individual must be put before the ECJ; nor would the ECJ have the jurisdiction (let alone the capacity) to decide all such cases.

277.    The argument that Article 8 of the BIT is incompatible with EU law is therefore unsustainable.   Accordingly, the Tribunal dismisses Respondent's submission that the Tribunal lacks jurisdiction because the BIT provisions have been disapplied by EU law as a result of the principle set out in Article 30 of the Vienna Convention on the Law of Treaties.

### C.  Inapplicability of the BIT under EU Law

278.    Respondent's third line of argument is that the Tribunal lacks jurisdiction because, as a matter of EU law, EU law has direct effect and prevails over both national law and international treaties, and because only the European Court of Justice can interpret EU law.

279.    The Tribunal does not accept this argument. EU law may have a bearing upon the scope of rights and obligations under the BIT in the present case, by virtue of its role as part of the applicable law under BIT Article 8(6) and German law as the *lex loci*

---

[200] See above, note 109.

*arbitri*.  But that is a question for the merits stage, not a question that goes to jurisdiction.

280.  The only basis – beyond the arguments already discussed in relation to VCLT Articles 30 and 59 – on which the Tribunal might arguably be deprived of jurisdiction on the basis of the status of EU law is that the Tribunal needs to consider and apply EU law in order to decide the present case and yet is entirely precluded from considering and applying any such EU law by the Parties' consent derived from Article 8 of the BIT or German law.

281.  Even assuming, for the sake of argument, that the questions that the Tribunal will need to address might be identified accurately prior to the merits stage, and that they include questions of EU law, that proposition is unsustainable.  Indeed, the Tribunal considers it the opposite of the truth.  Far from being precluded from considering and applying EU law the Tribunal is bound to apply it to the extent that it is part of the applicable law(s), whether under BIT Article 8, German law or otherwise.

282.  The argument that the ECJ has an "interpretative monopoly" and that the Tribunal therefore cannot consider and apply EU law, is incorrect.  The ECJ has no such monopoly.  Courts and arbitration tribunals throughout the EU interpret and apply EU law daily.  What the ECJ has is a monopoly on the final and authoritative interpretation of EU law:  but that is quite different.  Moreover, even final courts are not obliged to refer questions of the interpretation of EU law to the ECJ in all cases.  The *acte clair* doctrine is well-established in EU law.[201]

283.  The fact that, at the merits stage, the Tribunal might have to consider and apply provisions of EU law does not deprive the Tribunal of jurisdiction.  The Tribunal can consider and apply EU law, if required, both as a matter of international law and as a matter of German law.  This jurisdictional objection therefore is rejected.

### D.  Non-Arbitrability of the Dispute under German Law

284.  Respondent's argument, based upon the alleged non-arbitrability of the dispute under German law, turns upon the proposition that the dispute is outside the jurisdiction of the Tribunal by virtue of EU law and that German law as the *lex loci arbitri* must therefore treat the dispute as non-arbitrable.

---

[201] See Case C-283/81, *Srl CILFIT and Lanificio di Gavardo SpA v. Ministry of Health,* Judgment of 6 October 1982, [1982] ECR I-03415.

285.    The Tribunal has found that EU law does not deprive it of jurisdiction; and accordingly, as already indicated above, the jurisdictional objection based on German law must also fail *in limine*.

### E.  Relationship between the Tribunal and EU Institutions

286.    Submissions were made on the question of the proper relationship between this Tribunal and EU institutions.  The Tribunal understands that there is a relationship between them and that, like all courts and tribunals in the EU, it must take proper account of that relationship.

287.    The Tribunal is bound by Article 8(6) of the BIT, which stipulates that:

> The arbitral tribunal shall decide on the basis of the law, taking into account in particular though not exclusively:
>
> - the law in force of the Contracting Party concerned;
> - the provisions of this Agreement, and other relevant Agreements between the Contracting Parties;
> - the provisions of special agreements relating to the investment;
> - the general principles of international law.

288.    The question of the content of EU law and its role in the present case is one for the merits stage, as decided above.

289.    Without prejudice to arguments that might be raised at that stage, the Tribunal considers that in principle EU law appears to fall within the scope of the first two and the last of these bullet points ("the law in force of the Contracting Party concerned"; "other relevant Agreements between the Contracting Parties" and as part of "the general principles of international law").  Accordingly, the Tribunal considers that in principle the EU legal doctrines, including those of supremacy, precedence, direct effect, direct applicability, are part of the body of EU law that might fall to be applied by the Tribunal in this case under Article 8(6) of the BIT.

290.    On the other hand, the Tribunal notes that its jurisdiction is confined to ruling upon alleged breaches of the BIT.  The Tribunal does not have jurisdiction to rule on alleged breaches of EU law as such.  The manner and extent to which that clear and fixed limitation on the jurisdiction of the Tribunal may impact upon the cases presented by the Parties will become clear at the merits stage and will be addressed at that stage.

291.   The Tribunal's findings, set out above, leave it in no doubt that it has jurisdiction in this case and that it can and, by virtue of its mandate, should exercise it in this case.

292.   The Tribunal has considered whether it would be appropriate to suspend these arbitration proceedings until the EU Commission and/or the ECJ have come to a decision on the EU law aspects of the infringement case.  While the Tribunal wishes to organise its proceedings with full regard for considerations of mutual respect and comity as regards other courts and institutions, it does not consider that the questions in issue in the infringement case are so far coextensive with the claims in the present case that it is appropriate to suspend its proceedings now.  Should it become evident at a later stage that the relationship between the two sets of proceedings is so close as to be a cause of procedural unfairness or serious inefficiency, the Tribunal will reconsider the question of suspension.

## VIII.   DECISION

293.   For the reasons stated above, the Tribunal:

    (a)   DISMISSES the "Intra-EU Jurisdictional Objection" advanced by Respondent and decides that it has jurisdiction over the dispute;

    (b)   REJECTS Respondent's request to suspend the proceedings until the European Commission and/or the ECJ have come to a decision on the EU law aspects of the infringement proceedings;

    (c)   RESERVES all questions concerning the merits, costs, fees and expenses, including the Parties' costs of legal representation, for subsequent determination; and

    (d)   INVITES the Parties to confer regarding the procedural calendar for the merits phase of the arbitration, and to report to the Tribunal in this respect within 14 days of receipt of this Award.

*Place y Arbitration:*

~~So decided in~~ Frankfurt, Germany

Dated this _26th_ day of October, 2010

_____
**Professor Albert Jan van den Berg**
**Co-Arbitrator**

_____
**Mr. V.V. Veeder QC**
**Co-Arbitrator**

_____
**Professor Vaughan Lowe QC**
**Presiding Arbitrator**