# Exhibit 3

# HIGH COURT OF AUSTRALIA

KIEFEL CJ,
GAGELER, GORDON, EDELMAN, STEWARD, GLEESON AND JAGOT JJ

KINGDOM OF SPAIN                                    APPELLANT

AND

INFRASTRUCTURE SERVICES LUXEMBOURG
S.À.R.L. & ANOR                                  RESPONDENTS

*Kingdom of Spain v Infrastructure Services Luxembourg S.à.r.l.*
[2023] HCA 11
*Date of Hearing: 9 & 10 November 2022*
*Date of Judgment: 12 April 2023*
S43/2022

## ORDER

*Appeal dismissed with costs.*

On appeal from the Federal Court of Australia

**Representation**

C S Ward SC with P F Santucci for the appellant (instructed by K&L Gates)

B W Walker SC and J A Hogan-Doran SC with C W Brown for the respondents (instructed by Norton Rose Fulbright)

Notice:  This copy of the Court's Reasons for Judgment is subject to formal revision prior to publication in the Commonwealth Law Reports.

**CATCHWORDS**

**Kingdom of Spain v Infrastructure Services Luxembourg S.à.r.l.**

Public international law – Foreign State immunity – Immunity from jurisdiction – Proceedings for recognition and enforcement of arbitral award – Where respondents obtained arbitral award under Convention on the Settlement of Investment Disputes between States and Nationals of Other States (1965) ("ICSID Convention") – Where respondents sought to enforce award in Australia under s 35(4) of *International Arbitration Act 1974* (Cth) – Where s 9 of *Foreign States Immunities Act 1985* (Cth) ("Act") provides that a foreign State is immune from jurisdiction of Australian courts – Where appellant asserted foreign State immunity from jurisdiction – Whether appellant waived foreign State immunity from jurisdiction under s 10 of Act by submitting to jurisdiction by agreement – Whether entry into ICSID Convention and agreement to Arts 53, 54 and 55 constituted waiver of immunity from jurisdiction – Whether "recognition", "enforcement" and "execution" in Arts 53, 54 and 55 of ICSID Convention have separate and different meanings – Whether inconsistency arises between English, French and Spanish texts of ICSID Convention.

Words and phrases – "arbitral award", "enforcement", "execution", "*exequatur*", "explicature", "express", "foreign State immunity", "immunity from jurisdiction", "implicature", "implied", "inference", "international law principles", "recognition", "treaty interpretation", "waiver of immunity".

*Foreign States Immunities Act 1985* (Cth), ss 9, 10.
*International Arbitration Act 1974* (Cth), ss 2D, 31, 32, 33, 34, 35, Sch 3.
Convention on the Settlement of Investment Disputes between States and Nationals of Other States (1965), Arts 53, 54, 55.

KIEFEL CJ, GAGELER, GORDON, EDELMAN, STEWARD, GLEESON AND JAGOT JJ.

**Introduction**

1    The respondents, relying on provisions of the Energy Charter Treaty (1994)[1], commenced arbitration against the Kingdom of Spain ("Spain") under the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (1965) ("the ICSID Convention")[2], to which Spain is a party. Chapter IV of the ICSID Convention, entitled "Arbitration", provides in Section 1 for an arbitral tribunal to hear and determine disputes between State parties and nationals of other State parties upon request[3].

2    The respondents obtained an arbitral award of €101 million. They brought proceedings in the Federal Court of Australia seeking "to enforce [that] award under section 35(4) of the *International Arbitration Act 1974* [(Cth)]" and seeking orders including that Spain pay them €101 million together with interest on that sum. Section 35(4) of that Act provides that, with leave, the Federal Court can enforce an award "as if the award were a judgment or order of that court".

3    The *Foreign States Immunities Act 1985* (Cth) provides that a foreign State is immune from the jurisdiction of the courts of Australia, except as provided by that Act[4]. One circumstance where this immunity does not apply is where the foreign State has submitted to the jurisdiction, including by agreement[5]. An "agreement" is defined to include a treaty[6]. The relevant treaty in this case is the ICSID Convention.

---

**1**    2080 UNTS 95, Art 26.

**2**    575 UNTS 159.

**3**    ICSID Convention, Art 36.

**4**    *Foreign States Immunities Act 1985* (Cth), s 9.

**5**    *Foreign States Immunities Act 1985* (Cth), ss 10(1), 10(2).

**6**    *Foreign States Immunities Act 1985* (Cth), s 3.

| | |
|---|---|
| *Kiefel* | *CJ* |
| *Gageler* | *J* |
| *Gordon* | *J* |
| *Edelman* | *J* |
| *Steward* | *J* |
| *Gleeson* | *J* |
| *Jagot* | *J* |

2.

4    As a party to the ICSID Convention, Spain agreed to the provisions in Ch IV which include, in Section 6, three articles concerning "Recognition and Enforcement of the Award": Arts 53, 54 and 55. Article 53 relevantly provides for the binding nature of the award. Article 54 relevantly provides for recognition of the award by a Contracting State as binding, enforcement of the award within a Contracting State as if it were a final judgment of a court in that State, and execution of the award which is to be governed by the laws of the State concerning execution. And Art 55 relevantly provides that nothing in Art 54 shall be construed as derogating from the law in force in a Contracting State relating to immunity of a foreign State from execution.

5    The primary judge in the Federal Court (Stewart J) held that Spain's agreement to these articles constituted a waiver of its immunity from recognition and enforcement, but not from execution, of the award by the Court[7]. His Honour made orders against Spain including an order that Spain "pay the applicants €101 [million]".

6    On appeal, the Full Court of the Federal Court of Australia (Allsop CJ, Perram and Moshinsky JJ) held that immunity from a proceeding for recognition had been waived by Spain's entry into the ICSID Convention (and concomitant agreement to Arts 54 and 55), although immunity from court processes of execution, and perhaps also from enforcement, had not[8]. The Full Court concluded that the orders of the primary judge went too far by "requiring Spain to do something"[9]. The Full Court made new orders including, in broad terms, an order recognising the award as binding on Spain, as well as that "judgment be entered" against Spain for €101 million, but providing that nothing in that order "shall be

---

7    *Eiser Infrastructure Ltd v Kingdom of Spain* (2020) 142 ACSR 616 at 648 [175], 649 [179]-[181].

8    *Kingdom of Spain v Infrastructure Services Luxembourg Sarl* (2021) 284 FCR 319 at 322 [1], 323 [6], 324 [9], 327-328 [22], [25], 345 [118].

9    *Kingdom of Spain v Infrastructure Services Luxembourg Sarl* (2021) 284 FCR 319 at 336 [65]. See also at 322 [1], 324 [10], 345 [118].

| | |
|---|---|
| *Kiefel* | *CJ* |
| *Gageler* | *J* |
| *Gordon* | *J* |
| *Edelman* | *J* |
| *Steward* | *J* |
| *Gleeson* | *J* |
| *Jagot* | *J* |

3.

construed as derogating from the effect of any law relating to immunity of [Spain] from execution"[10].

7      The two issues raised on this appeal by Spain are: (i) whether Spain's agreement to Arts 53-55 of the ICSID Convention involved any waiver of foreign State immunity from the jurisdiction of the courts of Australia (Spain being the subject of a binding ICSID arbitral award); and (ii) if so, whether Spain's amenability to jurisdiction is limited to "bare recognition" of the award, or to "recognition" and "enforcement" of the award, and whether the orders made by the Full Court amounted to enforcement.

8      For the reasons below, given that Spain was the subject of a binding ICSID arbitral award, the effect of Spain's agreement to Arts 53-55 amounted to a waiver of foreign State immunity from the jurisdiction of the courts of Australia to recognise and enforce, but not to execute, the award. The orders made by each of the primary judge and the Full Court are properly characterised as orders for recognition and enforcement. Spain's challenge to the orders of the Full Court should not be accepted. The orders of the Full Court should not be disturbed.

9      This conclusion leaves unaffected any foreign State immunity enjoyed by Spain in relation to execution. Spain's agreement to Arts 53-55 did not amount to a waiver of its immunity from court processes concerning execution. No issue arises in this proceeding concerning the scope of that immunity, including any exceptions to that immunity, such as where the execution relates to commercial property[11].

10      The issues raised on this appeal are addressed below as follows. The starting point is to explain the operation in the *Foreign States Immunities Act* of the concept of foreign State immunity from jurisdiction and the manner in which that immunity can be waived. Then it is necessary to explain the extent to which Spain, as the subject of a binding ICSID arbitral award, waived its foreign State immunity under the *Foreign States Immunities Act* by entry into the ICSID Convention. The primary issues concerning the extent of Spain's waiver of foreign State immunity are: (i) the background, purpose, and general operation of the ICSID Convention;

---

10    *Kingdom of Spain v Infrastructure Services Luxembourg Sàrl. [No 3]* (2021) 392 ALR 443 at 450-451.

11    *Foreign States Immunities Act 1985* (Cth), s 32. See also s 33.

*Kiefel*      *CJ*
*Gageler*     *J*
*Gordon*      *J*
*Edelman*     *J*
*Steward*     *J*
*Gleeson*     *J*
*Jagot*       *J*

4.

(ii) the meaning of each of the concepts of recognition, enforcement, and execution in Arts 53-55; and (iii) the extent to which the words of Arts 53-55 of the ICSID Convention constitute "express" agreement by a foreign State party to waive its immunity from the jurisdiction of the courts of Australia.

**Foreign State immunity from jurisdiction**

11    The Explanatory Memorandum to the Bill which became the *Foreign States Immunities Act* explains that the proposed legislation was "based upon a report and recommendations of the Law Reform Commission ... which involved a thorough review of developments in other countries and at the international level, including the work of the International Law Commission"[12]. As will be seen, the Australian Law Reform Commission drew from international legal rules and principles governing the existence of foreign State immunity from jurisdiction and the waiver of that immunity.

12    Part II of the *Foreign States Immunities Act* provides for a general regime of immunity of foreign States from jurisdiction. Section 9 provides that, subject to the Act, "a foreign State is immune from the jurisdiction of the courts of Australia in a proceeding". The term "jurisdiction" is used in this context to describe "the amenability of a defendant to the process of Australian courts" so that Australian courts "will not by their process make the foreign State against its will a party to a legal proceeding"[13].

13    The *Foreign States Immunities Act* contains a further, particular, regime in Pt IV concerning immunity from any process or order of an Australian court in respect of execution over property. This relevantly includes, in s 30, a process or order "for the satisfaction or enforcement of a judgment, order or arbitration award". In the Federal Court, the processes of court relating to execution include

---

**12**    Australia, House of Representatives, *Foreign States Immunities Bill 1985*, Explanatory Memorandum at 2, citing Australian Law Reform Commission, *Foreign State Immunity*, Report No 24 (1984). See also Australia, House of Representatives, *Parliamentary Debates* (Hansard), 21 August 1985 at 141.

**13**    *PT Garuda Indonesia Ltd v Australian Competition and Consumer Commission* (2012) 247 CLR 240 at 247 [17]. See also *Firebird Global Master Fund II Ltd v Republic of Nauru* (2015) 258 CLR 31 at 47-48 [35].

Kiefel    CJ
*Gageler*    *J*
*Gordon*    *J*
*Edelman*    *J*
*Steward*    *J*
*Gleeson*    *J*
*Jagot*    *J*

5.

the issue of any writ or warrant of execution for which the Sheriff of the Court is responsible[14].

## Waiver of foreign State immunity from jurisdiction

### (i) Waiver of general and specific immunities from jurisdiction

14    The general and specific foreign State immunities from jurisdiction do not apply when those immunities have been waived. The provisions for waiver in relation to the general and specific immunities respectively are contained in ss 10(2) and 31(1) of the *Foreign States Immunities Act*. Section 10(2) provides:

> "A foreign State may submit to the jurisdiction at any time, whether by agreement or otherwise, but a foreign State shall not be taken to have so submitted by reason only that it is a party to an agreement the proper law of which is the law of Australia."

Section 31(1) provides:

> "A foreign State may at any time by agreement waive the application of section 30 in relation to property, but it shall not be taken to have done so by reason only that it has submitted to the jurisdiction."

15    This appeal concerns whether, pursuant to s 10 of the *Foreign States Immunities Act*, Spain's entry into the ICSID Convention, and concomitant agreement to Arts 53-55 of that Convention, constituted a waiver of its immunity from Australian court processes concerning recognition and enforcement of a binding ICSID arbitral award (necessarily consequent upon agreement to arbitrate).

### (ii) Interpreting s 10(2) consistently with international law

16    A "long standing" principle of interpretation is that statutory provisions should be interpreted, so far as possible, to be consistent with international law[15].

---

14    *Federal Court of Australia Act 1976* (Cth), s 18P(1).

15    *Al-Kateb v Godwin* (2004) 219 CLR 562 at 589 [63]. See also *Jumbunna Coal Mine, No Liability v Victorian Coal Miners' Association* (1908) 6 CLR 309 at 363; *Polites*

*Kiefel*       *CJ*
*Gageler*      *J*
*Gordon*       *J*
*Edelman*      *J*
*Steward*      *J*
*Gleeson*      *J*
*Jagot*        *J*

6.

This is particularly so where a provision, like s 10 of the *Foreign States Immunities Act*, seeks to give effect to matters of international law[16].

17    In reliance upon international law, Spain submitted that s 10 of the *Foreign States Immunities Act* only permits an Australian court to recognise a waiver of foreign State immunity from jurisdiction in a treaty if the words of that treaty contain an "express", and not an "implied", waiver. It was said that this requirement reflected a principle of international law that waiver of immunity by treaty must always be express, and that this was recognised by the Report of the Australian Law Reform Commission which was the foundation for the *Foreign States Immunities Act*. In that report, the Australian Law Reform Commission said that in a treaty[17]:

> "[t]he need for clarity and certainty entails that a waiver be express, rather than being ... inferred from such things as the fact that Australian law was chosen, or determined to be, the proper law of the contract".

18    The extent to which this statement should be understood to reject the possibility of any implication of waiver of foreign State immunity from jurisdiction in a treaty is doubtful. Earlier in the same report, the Australian Law Reform Commission seemingly acknowledged the possibility of an implied waiver of immunity, referring to circumstances "in which parties either explicitly or (arguably) impliedly waive foreign state immunity"[18]. It is necessary, therefore, to consider more closely the international law principle – that waiver of immunity in

---

*v The Commonwealth* (1945) 70 CLR 60 at 68-69, 77, 80-81; *Minister for Immigration and Ethnic Affairs v Teoh* (1995) 183 CLR 273 at 287; *Kartinyeri v The Commonwealth* (1998) 195 CLR 337 at 384 [97].

**16**    *Firebird Global Master Fund II Ltd v Republic of Nauru* (2015) 258 CLR 31 at 50 [44].

**17**    Australian Law Reform Commission, *Foreign State Immunity*, Report No 24 (1984) at 44 [79].

**18**    Australian Law Reform Commission, *Foreign State Immunity*, Report No 24 (1984) at 44 [79].

| Kiefel | CJ |
| Gageler | J |
| Gordon | J |
| Edelman | J |
| Steward | J |
| Gleeson | J |
| Jagot | J |

7.

an international agreement must be "express" – against which s 10(2) falls to be interpreted.

*(iii) An international law principle that waiver of immunity in an international agreement must be express*

19      As Spain submitted, it has been said that "[t]he rule that waiver of immunity by treaty must always be express is well established in international law"[19]. That "rule" was enunciated by the International Court of Justice in the *Case Concerning Armed Activities on the Territory of the Congo (Democratic Republic of the Congo v Uganda)*[20]. In that case, the International Court of Justice said that "waivers or renunciations of claims or rights must either be [(i)] express or [(ii)] unequivocally implied from the conduct of the State alleged to have waived or renounced its right".

20      There is no doubt concerning the second category to which the International Court of Justice referred. An example is the "universally recognised rule that commencement of proceedings by a foreign state constitutes a waiver of immunity with respect to those proceedings"[21]. As to the first category, namely where the waiver is constituted by words of a treaty rather than by conduct, the point made by the International Court of Justice is that those words must "express" waiver.

21      A similar requirement for a waiver of immunity in a treaty to be "express" can be seen in numerous treaties of widespread operation. Article 32(2) of the Vienna Convention on Diplomatic Relations (1961)[22] provides that a waiver of immunity from jurisdiction of diplomatic agents "must always be express".

---

**19**   McLachlan, "*Pinochet* Revisited" (2002) 51 *International and Comparative Law Quarterly* 959 at 961, fn 20.

**20**   [2005] ICJ Rep 168 at 266 [293].

**21**   Australian Law Reform Commission, *Foreign State Immunity,* Report No 24 (1984) at 45 [81]. See also *Rothschild v Queen of Portugal* (1839) 3 Y & C Ex 594 [160 ER 838]; United Nations Convention on Jurisdictional Immunities of States and Their Property (2004), Art 8(1) (not yet entered into force).

**22**   500 UNTS 95.

*Kiefel*      *CJ*
*Gageler*     *J*
*Gordon*      *J*
*Edelman*     *J*
*Steward*     *J*
*Gleeson*     *J*
*Jagot*       *J*

8.

Article 2 of the European Convention on State Immunity (1972)[23] relevantly provides that a Contracting State cannot claim immunity from the jurisdiction of a court of another Contracting State if it has undertaken to submit to the jurisdiction of that court by "international agreement" or "an express term contained in a contract in writing". In the Explanatory Report to the latter Convention[24], the drafters observe that Art 2, as a whole, "concerns cases in which a Contracting State has expressly undertaken to submit to the jurisdiction of a foreign court".

22        This principle of international law was reflected in Lord Millett's and Lord Goff of Chieveley's judgments in *R v Bow Street Magistrate; Ex parte Pinochet [No 3]*[25]. In that case, their Lordships considered a provision concerning waiver of immunity by agreement, similarly worded to s 10(2) of the *Foreign States Immunities Act*[26]. Lord Goff accepted that a waiver of immunity could occur by implication from conduct outside the terms of a treaty, such as by taking steps in proceedings concerning the merits of the case[27]. However, Lord Goff said that in the interpretation of a treaty, "consent by a state party to the exercise of jurisdiction against it must ... be express"[28]. One source relied upon by Lord Goff for this reasoning was the 1991 Report of the International Law Commission which said that customary international law and international usage required waiver of immunity to be "expressed ... in no uncertain terms"[29]. Similarly, Lord Millett said

---

**23**    1495 UNTS 181.

**24**    Council of Europe, *Explanatory Report to the European Convention on State Immunity* (1972) at 5 [21].

**25**    [2000] 1 AC 147.

**26**    *State Immunity Act 1978* (UK), s 2(2).

**27**    [2000] 1 AC 147 at 215, citing *Oppenheim's International Law*, 9th ed (1992), vol 1 at 351-355. Consistently with this, see Crawford, *Brownlie's Principles of Public International Law*, 9th ed (2019) at 486.

**28**    [2000] 1 AC 147 at 216.

**29**    United Nations General Assembly, *Report of the International Law Commission on the work of its forty-third session* (1991) at 53.

*Kiefel*  CJ
*Gageler*  J
*Gordon*  J
*Edelman*  J
*Steward*  J
*Gleeson*  J
*Jagot*  J

9.

that it was not in dispute that "where [State immunity] is waived by treaty or convention the waiver must be express"[30].

*(iv) The meaning of the international law principle that waiver of immunity in a treaty be express*

23      There is some ambiguity about what these numerous statements mean by their insistence that a waiver of immunity in a treaty be "express". Part of the difficulty is a lack of clarity in legal discourse generally about what is meant by "express" meaning[31]. Properly understood, express meaning can include implications, which constitute the unexpressed content of a statement or term and which are identified by inference[32].

24      An express term of an agreement involves words that are "openly uttered" either orally or in writing[33]. The meaning of an express term is derived primarily from the content of the words expressed. It contrasts with an implied term, the meaning of which is derived primarily by inference from the conduct of the parties to the agreement and the circumstances in light of the express terms. There can sometimes be difficulty in distinguishing between the two types of terms, because often the imprecision of language means that inferences are required to understand an express term[34]. Even the words of the most carefully drafted international instrument are built upon a foundation of presuppositions and necessary implicatures and explicatures. The international authorities that insist upon express waiver of immunity in a treaty should not be understood as denying the ordinary

---

30    [2000] 1 AC 147 at 268.

31    See Wilmot-Smith, "Express and Implied Terms" (2023) 43 *Oxford Journal of Legal Studies* 54.

32    *Macquarie Dictionary*, 7th ed (2017), vol 1 at 762, "implication", sense 1, 2 and especially 3.

33    See Blackstone, *Commentaries on the Laws of England* (1766), bk 2, ch 30 at 443.

34    Wilmot-Smith, "Express and Implied Terms" (2023) 43 *Oxford Journal of Legal Studies* 54 at 58-59. See also Wilson and Sperber, *Meaning and Relevance* (2012) at 149-168.

*Kiefel*      *CJ*
*Gageler*     *J*
*Gordon*      *J*
*Edelman*     *J*
*Steward*     *J*
*Gleeson*     *J*
*Jagot*       *J*

10.

and natural role of implications in elucidating the meaning of the express words of the treaty.

25          The insistence that the waiver be "express" should be understood as requiring only that the expression of waiver be *derived* from the express words of the international agreement, whether as an express term or as a term implied for reasons including necessity. For instance, Lord Goff's statement in *Pinochet [No 3]* that consent must be "express" was based on his acceptance of the submissions of Dr Collins[35], including that "[a] term can only be [recognised as] implied [in] a treaty for necessity, not to give the treaty maximum effect"[36]. In *Li v Zhou*[37], this point was made in the context of rejecting a claim of waiver by a foreign State of immunity from proceedings, where the claim was based on alleged agreement by the foreign State in a treaty[38] to waive the immunity. Basten JA (with whom Bathurst CJ and Beazley P agreed) said that even if the express terms of the treaty did not manifest submission to jurisdiction, it is possible that "language and context may give rise to a necessary implication to similar effect" if that implication is "readily derived from the [express] terms"[39].

26          In this sense, the insistence by international authority that a waiver of immunity in an international agreement must be "express" is an insistence that any inference of a waiver of immunity must be drawn with great care when interpreting the express words of that agreement in context. It does not deny that implications are almost invariably contained in any (expressed) words of a treaty. As senior counsel for Spain rightly put the point in oral submissions: "[T]here must be implications that surround every textual passage. The question is: what are those implications, and what level of clarity about the implication is required?" Accordingly, if an international agreement does not expressly use the word "waiver", the inference that an express term involves a waiver of immunity will

---

**35**    Later, Lord Collins of Mapesbury.

**36**    [2000] 1 AC 147 at 176, 216.

**37**    (2014) 87 NSWLR 20.

**38**    Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (1984) 1465 UNTS 85.

**39**    (2014) 87 NSWLR 20 at 31 [38].

| | |
|---|---|
| *Kiefel* | *CJ* |
| *Gageler* | *J* |
| *Gordon* | *J* |
| *Edelman* | *J* |
| *Steward* | *J* |
| *Gleeson* | *J* |
| *Jagot* | *J* |

11.

only be drawn if the implication is clear from the words used and the context. In words quoted by Lord Goff in *Pinochet [No 3]* from the International Law Commission's commentary upon (what were then) the draft articles on jurisdictional immunities of States and their property, there is "no room" to recognise an implication of "consent of an unwilling state which has not expressed its consent in a clear and recognisable manner"[40]. And as Rehnquist CJ said, delivering the opinion of the Supreme Court of the United States in *Argentine Republic v Amerada Hess Shipping Corp*[41], a foreign State will not waive its immunity merely "by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States". This reflects the "political principle that those who are independent and autonomous cannot, except by consent, exercise authority over, or establish an external source of authority over, others of independent and autonomous status"[42].

*(v) The proper approach to waiver in s 10(2) of the* Foreign States Immunities Act

27     Against this background of international law, there is no basis to interpret s 10(2) of the *Foreign States Immunities Act* as requiring a novel approach to interpretation that would exclude the possibility of a waiver of immunity being evidenced by implications inferred from the express words of a treaty in their context and in light of their purpose.

28     A high level of clarity and necessity are required before inferring that a foreign State has waived its immunity in a treaty because it is so unusual[43], and the consequence is so significant. Hence, s 10(2) makes clear that the mere fact that a

---

40    [2000] 1 AC 147 at 215, quoting United Nations General Assembly, *Report of the International Law Commission on the work of its forty-third session* (1991) at 49 [8].

41    (1989) 488 US 428 at 442-443.

42    *Li v Zhou* (2014) 87 NSWLR 20 at 30 [37], referring to Charlesworth and Chinkin, *The Boundaries of International Law: A Feminist Analysis* (2000) at 124, 145.

43    Australian Law Reform Commission, *Foreign State Immunity*, Report No 24 (1984) at 44 [79]: "The Commission is not aware of any existing bilateral treaties which contain a waiver of immunity from jurisdiction of Australian courts."

| | |
|---|---|
| *Kiefel* | *CJ* |
| *Gageler* | *J* |
| *Gordon* | *J* |
| *Edelman* | *J* |
| *Steward* | *J* |
| *Gleeson* | *J* |
| *Jagot* | *J* |

12.

State "is a party to an agreement the proper law of which is the law of Australia" is not sufficient to waive immunity from jurisdiction. But s 10(2) expressly refers to submission (and thus waiver) "by agreement".

29        For these reasons, and contrary to Spain's submissions, s 10(2) of the *Foreign States Immunities Act* aligns with the approach taken to waiver of immunity in the United States, where the general immunity of a foreign State from jurisdiction[44] does not apply if the foreign State "waived its immunity either explicitly or by implication"[45], and where it has been accepted that words said to evidence waiver by implication must be "construed narrowly"[46], as well as that waiver "is rarely accomplished by implication"[47] and only arises where "the waiver was unmistakeable"[48]. The waiver in s 10(2) is unmistakable.

## The background, purpose, and operation of the ICSID Convention

30        In 1960, in a paper entitled "The Promotion of the International Flow of Private Capital", the Secretary-General of the United Nations called for the establishment of "special international arbitration machinery for foreign investments"[49]. The ICSID Convention was the response to that call. It arose from

---

44  *Foreign Sovereign Immunities Act of 1976* (28 USC §1604).

45  *Foreign Sovereign Immunities Act of 1976* (28 USC §1605(a)(1)).

46  *Blue Ridge Investments LLC v Republic of Argentina* (2013) 735 F 3d 72 at 84, quoting *Cabiri v Government of the Republic of Ghana* (1999) 165 F 3d 193 at 201. See also *In re Tamimi* (1999) 176 F 3d 274 at 278, citing *Frolova v Union of Soviet Socialist Republics* (1985) 761 F 2d 370 at 377, *Joseph v Office of the Consulate General of Nigeria* (1987) 830 F 2d 1018 at 1022, and *Foremost-McKesson Inc v The Islamic Republic of Iran* (1990) 905 F 2d 438 at 444.

47  *In re Tamimi* (1999) 176 F 3d 274 at 278.

48  *Cabiri v Government of the Republic of Ghana* (1999) 165 F 3d 193 at 201, quoting *Shapiro v The Republic of Bolivia* (1991) 930 F 2d 1013 at 1017.

49  See International Centre for Settlement of Investment Disputes, *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals*

Kiefel    *CJ*
*Gageler*    *J*
*Gordon*    *J*
*Edelman*    *J*
*Steward*    *J*
*Gleeson*    *J*
*Jagot*    *J*

13.

the work of the World Bank, and in particular from the remarkable efforts of Mr Aron Broches, General Counsel of the Bank from 1959 to 1979[50]. Mr Broches was rightly described by the primary judge as "the principal architect" of the ICSID Convention[51], which was developed in the spirit of the Bretton Woods Conference of 1944.

31      In the *History of the ICSID Convention*[52], it is explained how it had become "increasingly clear" during the 1960s that the growth plans of developing countries would need to rely upon international private investment as well as external government sources:

"To encourage such investments, the competent international organizations considered several schemes designed to remove some of the uncertainties and obstacles that faced investors in any foreign country and in particular in many of the States that had only recently attained independence and self-government and whose need for outside capital was greatest."

32      Following Mr Broches' preparation of the Preliminary Draft of the ICSID Convention, a series of consultative meetings were held in Addis Ababa (December 1963), Santiago de Chile (February 1964), Geneva (February 1964) and Bangkok (April-May 1964), with representatives from a large number of

---

*of Other States* (1970), vol 1 at 2, fn 3, referring to Secretary-General of the United Nations, *The Promotion of the International Flow of Private Capital* (1960) at [170]-[171], [200], [203].

50    Broches, "Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution" (1987) 2 *ICSID Review – Foreign Investment Law Journal* 287 at 287.

51    *Eiser Infrastructure Ltd v Kingdom of Spain* (2020) 142 ACSR 616 at 639 [122], citing Schreuer, *The ICSID Convention: A Commentary*, 2nd ed (2009) at 2 [2]. See also *Schreuer's Commentary on the ICSID Convention*, 3rd ed (2022), vol 1 at 2 [2].

52    International Centre for Settlement of Investment Disputes, *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1970), vol 1 at 2.

Kiefel      *CJ*
Gageler     *J*
Gordon      *J*
Edelman     *J*
Steward     *J*
Gleeson     *J*
Jagot       *J*

14.

countries (usually lawyers)[53]. The summary record of proceedings of the first consultative meeting at Addis Ababa records Mr Broches as repeating the concern of developing countries that one of the most serious impediments to the flow of private capital was "the fear of investors that their investment would be exposed to political risks such as outright expropriation, government interference and non-observance by the host government of contractual undertakings on the basis of which the investment had been made"[54].

33      The consultative meetings gave rise to a Revised Draft which was then the subject of intensive deliberation by a special legal committee convened in Washington (from November to December 1964). The ICSID Convention was concluded in March 1965 and entered into force in 1966. It now has 165 State parties.

34      The primary purpose of the ICSID Convention was, and remains, to promote the flow of private capital to sovereign nations, especially developing countries, by the mitigation of sovereign risk[55]. The ICSID Convention mitigates risk by giving private investors, upon default by a country, an arbitral remedy which is intended to provide certainty. As was observed in the 1965 Report of the Executive Directors of the International Bank for Reconstruction and Development on the ICSID Convention[56], the ICSID Convention serves the cause

---

53   International Centre for Settlement of Investment Disputes, *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1968), vol 2-1 at 557.

54   International Centre for Settlement of Investment Disputes, *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1968), vol 2-1 at 240.

55   International Bank for Reconstruction and Development, *Report of the Executive Directors on the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1965) at 40-41 [9], [12]-[13].

56   International Bank for Reconstruction and Development, *Report of the Executive Directors on the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1965) at 40 [9].

| | |
|---|---|
| Kiefel | CJ |
| Gageler | J |
| Gordon | J |
| Edelman | J |
| Steward | J |
| Gleeson | J |
| Jagot | J |

15.

of economic development by its "creation of an institution designed to facilitate the settlement of disputes between States and foreign investors" in order to promote "an atmosphere of mutual confidence and thus stimulat[e] a larger flow of private international capital into those countries which wish to attract it".

35        The preamble to the ICSID Convention begins by referring to "the need for international cooperation for economic development, and the role of private international investment therein" and refers to "the possibility that from time to time disputes may arise in connection with such investment between Contracting States and nationals of other Contracting States"[57]. In Ch I, the ICSID Convention establishes the International Centre for Settlement of Investment Disputes. In Ch II, the ICSID Convention establishes the jurisdiction of the Centre, which broadly extends to any legal dispute arising directly out of an investment between a Contracting State and a national of another Contracting State. Chapter III deals with conciliation.

36        Chapter IV of the ICSID Convention is concerned with arbitration. It provides for the constitution, powers, and functions of an arbitral tribunal. It also provides a process by which any Contracting State or any national of a Contracting State may institute arbitration proceedings following a request in writing. This was the procedure followed by the respondents in initiating their arbitration against Spain. Section 6 of Ch IV is concerned with "Recognition and Enforcement of the Award". It contains three Articles – Arts 53, 54 and 55 – the meaning of which is the central issue on this appeal.

37        In Australia, the *International Arbitration Act* gives effect to the ICSID Convention[58]. Section 32 gives the force of law in Australia to relevant provisions in the ICSID Convention, including Arts 53-55, with the words and expressions in Pt IV of the *International Arbitration Act* having the same meaning as they do in the ICSID Convention[59]. Section 33 provides that an award under the ICSID Convention is binding on a party to the investment dispute to which the award relates. Section 34 provides that other laws relating to the recognition and enforcement of arbitral awards, including Pts II and III of the *International*

---

[57]    See also *International Arbitration Act 1974* (Cth), Sch 3.

[58]    *International Arbitration Act 1974* (Cth), s 2D(f), Sch 3.

[59]    *International Arbitration Act 1974* (Cth), s 31(2).

*Kiefel      CJ*
*Gageler     J*
*Gordon      J*
*Edelman     J*
*Steward     J*
*Gleeson     J*
*Jagot       J*

16.

*Arbitration Act*, do not apply. As will be discussed below, s 35 provides that the Federal Court is designated as "the competent court" for the purposes of Art 54 of the ICSID Convention[60], and that awards may be "enforced in the Federal Court of Australia with the leave of that court as if the award were a judgment or order of that court"[61].

**The meaning of recognition, enforcement, and execution in the ICSID Convention, Arts 53-55**

*(i) Principles of treaty interpretation*

38          The text of an international agreement or treaty is not interpreted according to particular domestic rules of interpretation, which might have slight variations from country to country[62]. Rather, as is reflected by the approach taken in Australia, a treaty should have the same meaning for all of the States which are party to it[63]. The general principles of treaty interpretation are contained in the Vienna Convention on the Law of Treaties (1969)[64]. Although the Vienna Convention on the Law of Treaties post-dates the ICSID Convention, it is widely

---

**60**    *International Arbitration Act 1974* (Cth), s 35(3).

**61**    *International Arbitration Act 1974* (Cth), s 35(4).

**62**    *Povey v Qantas Airways Ltd* (2005) 223 CLR 189 at 211 [60].

**63**    *Shipping Corporation of India Ltd v Gamlen Chemical Co A/Asia Pty Ltd* (1980) 147 CLR 142 at 159; *Great China Metal Industries Co Ltd v Malaysian International Shipping Corporation, Berhad* (1998) 196 CLR 161 at 186 [71], 213 [137]; *Siemens Ltd v Schenker International (Australia) Pty Ltd* (2004) 216 CLR 418 at 466-467 [153]-[154]; *Povey v Qantas Airways Ltd* (2005) 223 CLR 189 at 202 [25]; *Basfar v Wong* [2023] AC 33 at 55 [16].

**64**    1155 UNTS 331. See *The Commonwealth v Tasmania (The Tasmanian Dam Case)* (1983) 158 CLR 1 at 93, 222; *Thiel v Federal Commissioner of Taxation* (1990) 171 CLR 338 at 356; *Applicant A v Minister for Immigration and Ethnic Affairs* (1997) 190 CLR 225 at 240, 251-252; *Povey v Qantas Airways Ltd* (2005) 223 CLR 189 at 202 [24], 211 [60]; *Maloney v The Queen* (2013) 252 CLR 168 at 180-181 [14], 255-256 [235]; *Macoun v Federal Commissioner of Taxation* (2015) 257 CLR 519 at 539 [69].

*Kiefel*      *CJ*
*Gageler*     *J*
*Gordon*      *J*
*Edelman*     *J*
*Steward*     *J*
*Gleeson*     *J*
*Jagot*       *J*

17.

accepted that, in the respects relevant to this appeal, the Vienna Convention was declaratory of customary international law[65].

39        Article 31(1) of the Vienna Convention on the Law of Treaties provides that a treaty must be interpreted "in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose". Article 32 provides that extrinsic sources, including the *travaux préparatoires*, may be used to confirm the meaning or to determine the meaning when it is ambiguous or obscure or leads to a manifestly absurd or unreasonable result. Article 33(1) provides that if a treaty has been authenticated in two or more languages, then the text is equally authoritative in each language unless the treaty provides, or the parties agree, otherwise. However, under Art 33(4), if an apparent difference in meaning arises between the equally authoritative authentic texts, then the meaning that should be adopted is that which best reconciles the texts, having regard to the object and purpose of the treaty.

*(ii) The terms of Arts 53-55*

40        Articles 53-55 of the ICSID Convention, which have the force of law in Australia[66], are a central plank in giving effect to the primary object of the ICSID Convention: to encourage private international investment including by mitigating sovereign risk and providing an investor with the "legal security required for an investment decision"[67].

---

65    See *Territorial Dispute (Libyan Arab Jamahiriya v Chad)* [1994] ICJ Rep 6 at 21-22 [41]. See also *The Tasmanian Dam Case* (1983) 158 CLR 1 at 93-94, 222-223; *Thiel v Federal Commissioner of Taxation* (1990) 171 CLR 338 at 356; *Golder Case* (1975) 57 ILR 200 at 213-214.

66    *International Arbitration Act 1974* (Cth), ss 31 (definition of "Investment Convention"), 32.

67    See, eg, *Schreuer's Commentary on the ICSID Convention*, 3rd ed (2022), vol 1 at 7. See also International Bank for Reconstruction and Development, *Report of the Executive Directors on the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1965) at 40-41 [9]-[13].

*Kiefel*      *CJ*
*Gageler*     *J*
*Gordon*      *J*
*Edelman*     *J*
*Steward*     *J*
*Gleeson*     *J*
*Jagot*       *J*

18.

41    Articles 53-55 provide as follows:

"Recognition and Enforcement of the Award

*Article 53*

(1) The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention.

(2) For the purposes of this Section, 'award' shall include any decision interpreting, revising or annulling such award pursuant to Articles 50, 51 or 52.

*Article 54*

(1) Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State. A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.

(2) A party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General. Each Contracting State shall notify the Secretary-General of the designation of the competent court or other authority for this purpose and of any subsequent change in such designation.

(3) Execution of the award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such execution is sought.

Kiefel    *CJ*
Gageler    *J*
Gordon    *J*
Edelman    *J*
Steward    *J*
Gleeson    *J*
Jagot    *J*

19.

*Article 55*

Nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution."

*(iii) The textual meaning of recognition, enforcement, and execution*

42    In some contexts pertaining to international arbitration, the English words "recognition", "enforcement", and "execution" have been used in vague, overlapping and even interchangeable senses. In the Convention on the Execution of Foreign Arbitral Awards (1927)[68], for example, the word "execution" appeared in the title as a broad description of the subject matter of substantive obligations framed in terms of "recognition" and "enforcement". The Convention on the Recognition and Enforcement of Foreign Arbitral Awards (1958)[69], as a further example, does not define either term and makes no reference to "execution", although the French title uses the word "*exécution*" in place of the English "enforcement". In common parlance, as leading arbitration practitioners and arbitrators have observed, "enforcement" is sometimes used "loosely" to extend to "execution"[70]. For instance, F A Mann used the term "enforcement" not merely to mean "turning the award into a judgment or a title equivalent to a judgment by providing it with an *exequatur* or some similar judicial certificate" but also to extend to "execution in the accepted sense of the term"[71].

---

[68]    92 LNTS 301.

[69]    330 UNTS 3.

[70]    See Reed, Paulsson and Blackaby, *Guide to ICSID Arbitration*, 2nd ed (2011) at 179-180; Juratowitch, "Waiver of State Immunity and Enforcement of Arbitral Awards" (2016) 6 *Asian Journal of International Law* 199 at 218. See also Broches, "Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution" (1987) 2 *ICSID Review – Foreign Investment Law Journal* 287 at 318.

[71]    Mann, "State Contracts and International Arbitration" (1967) 42 *British Yearbook of International Law* 1 at 18.

*Kiefel*      CJ
*Gageler*    J
*Gordon*     J
*Edelman*    J
*Steward*    J
*Gleeson*    J
*Jagot*      J

20.

43        Within the structure of Arts 53-55 of the ICSID Convention, in contrast, the words "recognition", "enforcement", and "execution" can be seen to be used separately and with different meanings. The distinction between "recognition" and "enforcement" is apparent in the two distinct obligations that are imposed on a Contracting State by the first sentence of Art 54(1). The subject matter of each obligation is different and the extent of each obligation is identified separately with precision. The obligation to "recognize" is expressed to apply to the entirety of "an award rendered pursuant to this Convention" and to be no more than an obligation to recognise the award "as binding". The obligation to "enforce" is expressed to apply only to "the pecuniary obligations imposed by [the] award" and to go no further than to oblige the Contracting State to enforce those pecuniary obligations within its territories "as if [the award] were a final judgment of a court in that State". The disjunctive "or" in Art 54(2) makes plain that those two obligations imposed by Art 54(1) are severable, in that a party to an arbitral award might seek "recognition" by a competent court of a Contracting State without necessarily also seeking "enforcement" of the pecuniary obligations imposed by that award.

44        The further distinction between "recognition" and "enforcement", on the one hand, and "execution", on the other hand, is then drawn out in Arts 53-54 and Art 55. This is seen in the provision by Art 54(3) that execution is a matter to be governed by the domestic law of the Contracting State, and by Art 55 that none of the international obligations imposed by Art 54 extend so far as to derogate from the domestic law of the Contracting State concerning State immunity or foreign State immunity from execution. In particular, Art 55 spells out that the obligation to "enforce" the pecuniary obligations imposed by an award as if the award were a final judgment of a court in the Contracting State stops short of an obligation to ensure their execution. Whether or not enforcement against a State party to an award can lead to execution is left entirely to be determined under the domestic law of the Contracting State concerning State immunity or foreign State immunity from execution.

45        That usage of the words "recognition", "enforcement", and "execution" in the context of Arts 53-55 of the ICSID Convention aligns with the precise definitions adopted in the recently approved version of the proposed *Restatement of the Law: The US Law of International Commercial and Investor-State Arbitration*, which described "terminological confusion" that may result when these "analytically distinct" concepts are not distinguished and "recognition" is

| | |
|---|---|
| *Kiefel* | *CJ* |
| *Gageler* | *J* |
| *Gordon* | *J* |
| *Edelman* | *J* |
| *Steward* | *J* |
| *Gleeson* | *J* |
| *Jagot* | *J* |

21.

used to mean "enforcement" or "enforcement" is used to mean "execution"[72]. Consistently with the usage in the context of Arts 53-55, the proposed *Restatement* defines "recognition" as the court's "determination ... that an international arbitral award is entitled to be treated as binding"[73], involving the court's "acceptance of the award's binding character and its preclusive effects"[74]. It describes "enforcement" as "the legal process by which an international award is reduced to a judgment of a court that enjoys the same status as any judgment of that court"[75]. It defines "execution" as "the means by which a judgment enforcing an international arbitral award is given effect"[76] and explains that "[t]he execution process commonly involves measures taken against the property of the judgment debtor by a law-enforcement official … acting pursuant to a writ of execution"[77].

46            The distinction so drawn between "recognition" and "enforcement" accords with reasoning of Lord Rodger (with whom Lords Bingham, Hope, Walker and

---

72    American Law Institute, *Restatement of the Law: The US Law of International Commercial and Investor-State Arbitration*, Proposed Final Draft (2019) §1.1, Note n. See also §1.1, Note nn.

73    American Law Institute, *Restatement of the Law: The US Law of International Commercial and Investor-State Arbitration*, Proposed Final Draft (2019) §1.1(nn).

74    American Law Institute, *Restatement of the Law: The US Law of International Commercial and Investor-State Arbitration*, Proposed Final Draft (2019) §1.1, Note nn.

75    American Law Institute, *Restatement of the Law: The US Law of International Commercial and Investor-State Arbitration*, Proposed Final Draft (2019) §1.1, Note m, §1.1(m). See also Collins (ed), *Dicey, Morris and Collins on the Conflict of Laws*, 15th ed (2012), vol 1 at 678 [14-028].

76    American Law Institute, *Restatement of the Law: The US Law of International Commercial and Investor-State Arbitration*, Proposed Final Draft (2019) §1.1(n).

77    American Law Institute, *Restatement of the Law: The US Law of International Commercial and Investor-State Arbitration*, Proposed Final Draft (2019) §1.1, Comment n. See also Juratowitch, "Waiver of State Immunity and Enforcement of Arbitral Awards" (2016) 6 *Asian Journal of International Law* 199 at 218.

Kiefel      CJ
Gageler     J
Gordon      J
Edelman     J
Steward     J
Gleeson     J
Jagot       J

22.

Neuberger agreed) in *Clarke v Fennoscandia Ltd*[78] relating to the recognition of a foreign judgment. The distinction also accords with the reasoning of French CJ and Gageler J in *TCL Air Conditioner (Zhongshan) Co Ltd v Judges of the Federal Court of Australia*[79] in the context of examining Art 35 of the UNCITRAL Model Law on International Commercial Arbitration[80], which relevantly provides that an arbitral award "shall be recognized as binding and, upon application in writing to the competent court, shall be enforced". Their Honours there observed that an appropriate order for the Federal Court to make on an application for "enforcement" of an arbitral award "would be an order that the arbitral award be enforced as if [it] were a judgment or order of the Federal Court"[81]. It has been noted elsewhere in relation to Art 35(1) of the UNCITRAL Model Law that "the possibility of ordering actual enforcement measures [ie execution] [i]s not a prerequisite for such a declaration of enforceability"[82].

47        Moreover, the drawing of a distinction between "enforcement" and "execution" accords with the construction of Arts 53-55 of the ICSID Convention proffered by Mr Broches writing academically some years after it had entered into force[83]. Mr Broches noted that "enforce" standing alone in Art 54(1) "might be considered as including execution" but he said that Art 54(3) "which deals separately with execution makes clear that that is not the intention". He

---

**78**   2008 SC (HL) 122 at 126 [18], 127 [21]-[22]. See also Briggs, *The Conflict of Laws*, 4th ed (2019) at 129.

**79**   (2013) 251 CLR 533 at 551-552 [19]-[23].

**80**   Adopted by UNCITRAL on 21 June 1985 and amended by UNCITRAL on 7 July 2006.

**81**   *TCL Air Conditioner (Zhongshan) Co Ltd v Judges of the Federal Court of Australia* (2013) 251 CLR 533 at 552 [24].

**82**   United Nations Commission on International Trade Law, *UNCITRAL 2012 Digest of Case Law on the Model Law on International Commercial Arbitration* (2012) at 170, citing Bayerisches Oberstes Landesgericht, Germany, 4 Z Sch 31/99, 27 June 1999.

**83**   See Broches, "Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution" (1987) 2 *ICSID Review – Foreign Investment Law Journal* 287 at 318.

Kiefel      CJ
Gageler      J
Gordon      J
Edelman      J
Steward      J
Gleeson      J
Jagot      J

23.

nevertheless acknowledged that "a slight awkwardness remains" and that Art 54(1) might have been clearer had it been drafted to state that an award "shall be recognized as binding by each Contracting State, and the pecuniary obligations imposed by the award shall be enforceable within the territories of each such State, as if it were a final judgment of one of its courts". Importantly, he explained the substantive distinction being drawn through the making of the linguistic distinction between "enforcement" and "execution" within the structure of Arts 53-55 as "the distinction between enforceability which is governed and decreed by the Convention and its implementation by execution which is governed by domestic law".

48        Both the linguistic distinction between "enforcement" and "execution" and the substantively intended effect of the linguistic distinction as identified by Mr Broches are borne out by the *travaux préparatoires* to the ICSID Convention.

*(iv) Confirmation of these meanings in the* travaux préparatoires

49        Following the preparation of a working paper on the ICSID Convention by Mr Broches and his team, a meeting was held on 20 September 1963 to receive comments from the Executive Directors[84]. The minutes of the meeting record Mr Broches' explanation that it was "desirable to have a very clear provision ... which required that each Contracting State recognize an award of a tribunal as binding and enforce it within its territories as if that award were a final judgment of the courts of that State"[85]. Mr Broches saw clarity, and "quite a step forward", in: (i) requiring recognition, namely that "each Contracting State recognize an award of a tribunal as binding"; (ii) requiring enforcement, namely that each Contracting State "enforce [an award] within its territories as if that award were a final judgment of the courts in that State"; (iii) recognising that "[i]n general"

---

[84]    International Centre for Settlement of Investment Disputes, *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1968), vol 2-1 at 174.

[85]    International Centre for Settlement of Investment Disputes, *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1968), vol 2-1 at 177 [12].

*Kiefel*      *CJ*
*Gageler*     *J*
*Gordon*      *J*
*Edelman*     *J*
*Steward*     *J*
*Gleeson*     *J*
*Jagot*       *J*

24.

forced execution "would not be possible"[86] where the term "execution" was used to describe "seizing [the foreign State's] property and selling it in forced execution".

50      The provision as framed to give effect to the approach Mr Broches outlined ultimately became Art 54 of the ICSID Convention. As it appeared in the Preliminary Draft, which was the subject of the consultative meetings in Addis Ababa, Santiago, Geneva and Bangkok, the precursor to Art 54 simply provided that "[e]ach Contracting State shall recognize an award ... as binding and enforce it within its territories as if it were a final judgment of the courts of that State"[87].

51      Referring to the provision as then appearing in the Preliminary Draft, in introductory remarks at the commencement of each consultative meeting, Mr Broches said that he "wished to make it clear that where, as in most countries, the law of State [i]mmunity from execution would prevent enforcement against a State as opposed to execution against a private party, the Convention would leave that law unaffected" and that "[a]ll the Convention would do would be to place an arbitral award rendered pursuant to it on the same footing as a final judgment of the national [c]ourts". He spelt out the result: "[i]f such judgment could be enforced under the domestic law in question, so could the award; if that judgment could not be so enforced, neither could the award"[88].

---

[86]   International Centre for Settlement of Investment Disputes, *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1968), vol 2-1 at 177 [12].

[87]   International Centre for Settlement of Investment Disputes, *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1968), vol 2-1 at 218.

[88]   International Centre for Settlement of Investment Disputes, *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1968), vol 2-1 at 242, 372, 464-465. See also 304.

Kiefel     CJ
Gageler     J
Gordon     J
Edelman     J
Steward     J
Gleeson     J
Jagot     J

25.

52     In a discussion at the Santiago meeting on the impact of the provision as appearing in the Preliminary Draft on State immunity, Mr Broches volunteered that the insertion of a further provision might be warranted to make the position "completely clear"[89] and noted that it had "been suggested that it might be useful to distinguish between recognition of awards as binding and their execution"[90]. Picking up on that language at the Geneva meeting, and referring back to the Santiago meeting, Mr Broches noted that the view had been expressed that the provision as appearing in the Preliminary Draft "would force a modification in State practice and law on the question of a State's immunity from execution". He said that he thought that view was "unfounded", but added that "an express proviso removing any doubt as to the intent of the section might be inserted"[91].

53     When subsequently explaining the language of the provision as then appearing in the Preliminary Draft at the Bangkok meeting, Mr Broches spoke with more precision[92]. He said that it "dealt with two problems". He said that the first was the obligation of each Contracting State "to recognize an award ... as binding". He added that "the intent of the provision" in that first respect might have been better reflected if the word "accept" had been used in place of "recognize" given that "[w]hat was contemplated in [that] part of the sentence was the force of

---

89    International Centre for Settlement of Investment Disputes, *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1968), vol 2-1 at 343.

90    International Centre for Settlement of Investment Disputes, *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1968), vol 2-1 at 347.

91    International Centre for Settlement of Investment Disputes, *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1968), vol 2-1 at 428.

92    International Centre for Settlement of Investment Disputes, *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1968), vol 2-1 at 519.

*Kiefel*        *CJ*
*Gageler*       *J*
*Gordon*        *J*
*Edelman*       *J*
*Steward*       *J*
*Gleeson*       *J*
*Jagot*         *J*

26.

the award as [a] res judicata ... defence in resisting an action ... in the ordinary courts of a State, on a matter already determined in arbitral proceedings" under the ICSID Convention. He said that the second part was the obligation of each Contracting State "to enforce the award within [its] territories". He added that "the intent of the provision" in that second respect "might be better expressed if the words 'recognize ... and enforce it' were substituted by 'recognize as enforceable'".

54          In a report summarising the issues which had been raised in relation to the Preliminary Draft during the consultative meetings, Mr Broches referred to issues having been raised about the effect of the provision on State immunity[93]. He explained that "[b]y providing that the award could be enforced as if it were a final judgment of a local court", the provision "implicitly imported the limitation on enforcement which in most countries existed with respect to enforcement of court decisions against Sovereigns". "However", he added, "this point might be made explicit in order to allay the fears expressed by several delegations".

55          The fears concerning State immunity to which Mr Broches referred were allayed by the insertion into the Revised Draft of the provision which was soon to become Art 55 of the ICSID Convention[94]. Picking up on the suggestion concerning terminology which had been noted at the Geneva meeting, the provision expressed the intended preservation of State immunity in terms of "immunity ... from execution".

56          In the subsequent deliberation of the legal committee in Washington, the principle of enforcement which was to be embodied in Art 54 of the ICSID Convention – requiring an award to be equated with a final decision – "survived

---

[93]    International Centre for Settlement of Investment Disputes, *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1968), vol 2-1 at 575.

[94]    International Centre for Settlement of Investment Disputes, *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1968), vol 2-1 at 637.

*Kiefel CJ*
*Gageler J*
*Gordon J*
*Edelman J*
*Steward J*
*Gleeson J*
*Jagot J*

27.

[an] onslaught" of opposition[95]. The draft of Art 54 underwent a measure of refinement, including by the limitation of the obligation of enforcement in Art 54(1) to the enforcement of pecuniary obligations and by the insertion of what would become Art 54(3), which also picked up on the language of "execution". Article 55, which Mr Broches described at a meeting of the legal committee in December 1964 as a mere "clarification"[96], emerged substantially unaltered.

57          Mr Broches provided a succinct summary of the result in a memorandum to the Executive Directors on 19 January 1965. He wrote[97]:

> "Article 54 requires Contracting States to equate an award rendered pursuant to the Convention with a final judgment of its own courts. It does not require them to go beyond that and to undertake forcible execution of awards rendered pursuant to the Convention in cases in which final judgments could not be executed. In order to leave no doubt on this point Article 55 provides that nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution."

**95**    Broches, "Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution" (1987) 2 *ICSID Review – Foreign Investment Law Journal* 287 at 316.

**96**    International Centre for Settlement of Investment Disputes, *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1968), vol 2-2 at 905.

**97**    International Centre for Settlement of Investment Disputes, *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1968), vol 2-2 at 963 [44].

*Kiefel*      CJ
*Gageler*      J
*Gordon*      J
*Edelman*      J
*Steward*      J
*Gleeson*      J
*Jagot*      J

28.

58        Those remarks were reproduced in the accompanying Report of the Executive Directors on the ICSID Convention when it was published on 18 March 1965 and submitted to governments by the World Bank[98].

*(v) French and Spanish texts of Arts 53-55*

59        Despite the English text of Arts 53-55 embodying, clearly enough, a distinction between recognition, enforcement, and execution, with those concepts used in the senses described above, account must be taken of the fact that the ICSID Convention was done in French and Spanish, as well as English, and all three texts are equally authentic and authoritative[99]. As Perram J observed in the Full Court, referring to a point made by Professor Schreuer[100], a difficulty that arises in interpreting Arts 53-55 is that the French and Spanish texts, respectively, use the words *exécution* and *ejecución*, and similar forms, wherever the words "enforce", "enforcement", *or* "execution" are used in the English text[101]. By contrast, in the French and Spanish texts, respectively, *reconnaissance* and *reconocimiento*, and similar forms, are used where the English text uses "recognition" and "recognize".

60        A purely literal comparison of the French and Spanish texts with the English text might suggest that the French and Spanish texts are treating enforcement as

---

98    International Bank for Reconstruction and Development, *Report of the Executive Directors on the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1965) at [43]. See also International Centre for Settlement of Investment Disputes, *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (1968), vol 2-2 at 1041, 1083.

99    See ICSID Convention, testimonium. See also Vienna Convention on the Law of Treaties (1969), Art 33(1).

100   Schreuer, *The ICSID Convention: A Commentary*, 2nd ed (2009) at 1134-1135. See also *Schreuer's Commentary on the ICSID Convention*, 3rd ed (2022), vol 2 at 1493-1494.

101   *Kingdom of Spain v Infrastructure Services Luxembourg Sarl* (2021) 284 FCR 319 at 338 [79], 339-340 [88].

| | |
|---|---|
| *Kiefel* | *CJ* |
| *Gageler* | *J* |
| *Gordon* | *J* |
| *Edelman* | *J* |
| *Steward* | *J* |
| *Gleeson* | *J* |
| *Jagot* | *J* |

29.

synonymous with execution. If that were correct, then there would be a conflict between the French and Spanish texts (where enforcement and execution would have the same meaning) and the English text (where enforcement and execution have different meanings).

61          If such conflict existed, it would be resolved by applying the rule that if an apparent difference in meaning arises, then the meaning that should be adopted is that which best reconciles the texts, having regard to the object and purpose of the treaty. In taking this approach, Professor Schreuer[102] reasoned that since there was no explanation for the inconsistency in the drafting history of the ICSID Convention, the interpretation that best reconciled the three texts was to treat "enforcement" and "execution" as having the same meaning in the English text. This would mean that the preservation of immunity from court processes relating to execution in Art 55 would extend also to enforcement. But once enforcement in Art 54 is understood to be the process of granting an award the status of a judgment of a domestic court, the reasoning of Professor Schreuer is not consonant with the purpose of the ICSID Convention, particularly Arts 53-55. The object and purpose of the ICSID Convention, which includes mitigating sovereign risk, would not favour a reconciliation of any differences in the texts by extending the application of laws concerning foreign State immunity beyond execution to enforcement (as that concept, in English, is used in Art 54).

62          The better approach is to proceed on the basis that there is no difference in meaning between the texts that requires reconciliation. The French and Spanish texts are, of course, to be understood against the background of the civilian process of *exequatur*, which encompasses both recognition and the step by which a court grants an arbitral award the force of (that is, the same status as) a judgment of the domestic court[103]. The function of the *exequatur* is thus both to recognise the

---

**102**   *Schreuer's Commentary on the ICSID Convention*, 3rd ed (2022), vol 2 at 1493.

**103**   Juratowitch, "Waiver of State Immunity and Enforcement of Arbitral Awards" (2016) 6 *Asian Journal of International Law* 199 at 217-218. See also Reed, Paulsson and Blackaby, *Guide to ICSID Arbitration*, 2nd ed (2011) at 179-180.

*Kiefel*      *CJ*
*Gageler*     *J*
*Gordon*      *J*
*Edelman*     *J*
*Steward*     *J*
*Gleeson*     *J*
*Jagot*       *J*

30.

arbitral award and to render the award enforceable in the territory of the issuing State[104].

63      The literal conflation in the French and Spanish texts of "enforcement" and "execution" reflects what Allsop CJ described as "a penumbra or range of meaning in the words *exécution* and *ejecu[ción]* to encompass a non-execution procedure of enforcement"[105]. In other words, *exécution* and *ejecución* slide between the meanings of enforcement and execution, in the loose sense described above, so that they are used in Art 54 to refer to the process of *exequatur* or enforcement (granting an award the force of a judgment of the court), but are used in Art 55 in the different sense of execution (subsequent effectuation of the judgment).

64      The real distinction within the French and Spanish texts of Arts 54 and 55 is therefore between, on the one hand, recognition and enforcement by *exequatur* in Art 54 and, on the other hand, "enforcement" as execution in Art 55. This is consistent with the description by the Special Rapporteur in the Second Report on Jurisdictional Immunities of States and their Property[106] to the International Law Commission of "the practice of the French courts in which a strict distinction was drawn between recognition of arbitral awards and actual execution of the awards". The report then quotes a decision of the Tribunal de grand instance of Paris from 1970 which treated recognition as including enforcement, namely all steps "up to and including the procedure for granting an *exequatur* which was necessary for the award to acquire full force"[107].

65      The same approach, treating recognition and enforcement as loosely interchangeable but separate from the immunity from execution, was taken by the

---

104   See *Jurisdictional Immunities of the State (Germany v Italy: Greece Intervening)* [2012] ICJ Rep 99 at 150 [125], 151 [128], referred to in *Firebird Global Master Fund II Ltd v Republic of Nauru* (2015) 258 CLR 31 at 50-51 [47]-[48].

105   *Kingdom of Spain v Infrastructure Services Luxembourg Sarl* (2021) 284 FCR 319 at 324 [9].

106   United Nations General Assembly, *Second Report on Jurisdictional Immunities of States and their Property* (1989) at 12 [15].

107   *Socialist Federal Republic of Yugoslavia v Société Européenne d'Études et d'Entreprises* (1970) 65 ILR 46.

*Kiefel*      *CJ*
*Gageler*      *J*
*Gordon*      *J*
*Edelman*      *J*
*Steward*      *J*
*Gleeson*      *J*
*Jagot*      *J*

31.

Court of Cassation, in *SOABI (Seutin) v Senegal*[108]. There, the Court quashed a decision of the Court of Appeal of Paris which had held that SOABI failed to demonstrate that "enforcement" against Senegal would not conflict with the State's immunity from execution. In the English translation of the report, *exequatur* was described by the Court of Cassation as "recognition", which the Court held "does not constitute a measure of execution". Again, the process of *exequatur* – which combines recognition and enforcement, as the preliminary measures to be taken before execution – can be seen in the English translation of the decision in *Benvenuti et Bonfant Sarl v Government of the People's Republic of the Congo*[109]. In that decision, the Court of Appeal of Paris described Art 54 as "lay[ing] down a simplified procedure for obtaining an *exequatur*" and, after quoting Art 55, said that "[t]he order granting an *exequatur* for an arbitral award does not, however, constitute a measure of execution but simply a preliminary measure prior to measures of execution".

66        For these reasons, there is no real difference between the English text of Arts 53-55, and the French and Spanish texts (at least not in respect of the important distinction between recognition and enforcement, on the one hand, and execution, on the other).

**Waiver of immunity from court processes concerning recognition or enforcement in Art 54**

*(i) The text and purpose of Art 54*

67        Spain's primary submission on this appeal was that Art 54 is not concerned with awards sought to be enforced against a State in a foreign court. Spain argued that the express words of Art 54 are not sufficiently clear to amount to a waiver of immunity from court processes concerning recognition or enforcement.

68        Spain's primary submission concerning the interpretation of Art 54(1) was that, in its application in Australia, it contemplated recognition and enforcement in three circumstances: (i) if a State had an award against an investor and sought recognition and enforcement in an Australian court; (ii) if an investor had an award against Australia (which is not entitled to foreign State immunity in Australia) and

---

**108**   (1991) 30 ILM 1167.

**109**   (1981) 65 ILR 88 at 91.

*Kiefel*      *CJ*
*Gageler*     *J*
*Gordon*      *J*
*Edelman*     *J*
*Steward*     *J*
*Gleeson*     *J*
*Jagot*       *J*

32.

sought recognition and enforcement against Australia in an Australian court; and (iii) if an investor had an award against a foreign State and sought recognition and enforcement against the foreign State in an Australian court and the foreign State chose to waive immunity over the proceeding. Spain argued that since Art 54(1) said nothing "expressly" about a waiver of immunity from jurisdiction by a foreign State, there should be no inference drawn that a foreign State had waived that immunity by agreement to Art 54(1).

69          Spain's submission requires the text of Arts 53-55 to be read in a contorted manner. In light of the effect of the provision in Art 53 that awards shall be "binding" on Contracting States, together with the preservation in Art 55 of immunity from execution only (subject to the laws of Contracting States), it would distort the terms of Art 54(1) to require separate conduct that amounted to a waiver of immunity before an award could be recognised and enforced against a foreign State. On Spain's interpretation, Art 55 would also be inaccurate, because Art 54(1) would then preserve to a Contracting State a much greater immunity than merely immunity from execution subject to the laws of the Contracting State.

70          Spain submitted that since Arts 53 and 54(2) make no reference to execution, and since Art 54(3) leaves execution (and any immunity from execution) to be governed by the laws of the jurisdiction in which execution is sought, Art 55 would be redundant or surplus on the interpretation we prefer. This possible surplusage of Art 55 is, however, a consequence of the plain meaning of "execution" in Art 55 which, as explained above, must be adopted as a matter of text, principle, context, and purpose. The view that Art 55 has no independent work to do, other than reinforcement of the limits in Arts 53 and 54, is also supported by the *travaux préparatoires* to the ICSID Convention, to which reference has already been made.

71          The textual difficulties with Spain's primary submission are compounded when the ordinary meaning of Art 54(1) is understood, as the Vienna Convention on the Law of Treaties requires, in light of its object and purpose, which includes mitigating sovereign risk. Although Spain correctly submitted that the main reason for the inclusion of Art 54 was to ensure that Contracting States were able to obtain effective remedies against private investors[110], this was to ensure parity with the

---

110   See the discussion at the consultative meeting in Geneva: International Centre for Settlement of Investment Disputes, *History of the ICSID Convention: Documents*

Kiefel     CJ
Gageler     J
Gordon     J
Edelman     J
Steward     J
Gleeson     J
Jagot     J

33.

obligations of the Contracting States because it was otherwise assumed that participating nation states would abide by arbitral outcomes. This assumption is most explicit in the provision in Art 53(1), restating customary international law[111] that each party, that is each Contracting State, "shall abide by and comply with the terms of the award", except to the extent to which the terms are stayed. In that sense, Art 53 is the "primary provision"[112].

72        The assumption of parity was also recorded in the summary record of proceedings of the consultative meeting held at Santiago, where Mr Broches observed that the provision that became Art 54 "was intended to protect the interests of the host States which while they were themselves internationally bound to comply with the award, might want an effective assurance that the private party would be compelled to do the same"[113]. Again, following the last consultative meeting in Bangkok, a Chairman's Report prepared by Mr Broches referred to Art 54 as "establishing equality not only of rights, but also of obligations, between State[s] and investors"[114]. All of the drafts leading to the ICSID Convention thus referred "to recognition and enforcement against the parties in equal terms, without

_Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States_ (1968), vol 2-1 at 424.

111  Broches, "Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution" (1987) 2 _ICSID Review – Foreign Investment Law Journal_ 287 at 289.

112  Broches, "Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution" (1987) 2 _ICSID Review – Foreign Investment Law Journal_ 287 at 302.

113  International Centre for Settlement of Investment Disputes, _History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States_ (1968), vol 2-1 at 347.

114  International Centre for Settlement of Investment Disputes, _History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States_ (1968), vol 2-1 at 574.

*Kiefel*      *CJ*
*Gageler*     *J*
*Gordon*      *J*
*Edelman*     *J*
*Steward*     *J*
*Gleeson*     *J*
*Jagot*       *J*

34.

distinguishing between investors and host States". Giving effect to that purpose, the terms of Art 54 do "not distinguish between the recognition and enforcement of awards against investors, on the one side, and against host States, on the other"[115].

73      In light of the object and purpose of the ICSID Convention, Professor van den Berg has observed that a curiosity of the ICSID Convention is not that it requires recognition and enforcement of awards against foreign States, but that a foreign State which has agreed to arbitration is not deemed to also accept the consequence of execution. He explains the result – that Contracting States waive their immunity from jurisdiction in relation to recognition and enforcement but not any immunity that they have from execution – on the basis of political and economic considerations[116]:

> "Execution is commonly felt to be a 'more intensive interference with the rights of a State.' From the eco[n]omic point of view, restrictive immunity principles applied to execution could result in foreign States refraining from investment in countries in which they know their property could be subject to execution." (footnote omitted)

*(ii) International authority*

74      As explained above, there is no real distinction between the United States provision permitting a waiver of immunity to be identified "either explicitly or by implication" and s 10(2) of the *Foreign States Immunities Act* permitting a waiver of immunity "by agreement". And, consistently with the caution that is required before drawing inferences of a waiver of immunity, United States courts have

---

115  *Schreuer's Commentary on the ICSID Convention*, 3rd ed (2022), vol 2 at 1474.

116  Van den Berg, "Recent Enforcement Problems under the New York and ICSID Conventions" (1989) 5 *Arbitration International* 2 at 13.

Kiefel      CJ
Gageler       J
Gordon        J
Edelman       J
Steward       J
Gleeson       J
Jagot         J

35.

concluded, sometimes saying that they had little or no doubt[117], that entry into the ICSID Convention involves a waiver of immunity from jurisdiction[118].

75      The conclusion that the express terms of Art 54(1) involve a waiver of immunity from jurisdiction in relation to recognition and enforcement is also supported by the 1991 Report of the International Law Commission which, as explained above, was relied upon by Lord Goff in *Pinochet [No 3]*[119] for his Lordship's cautious approach to inferences supporting a waiver of immunity. That report referred to a rule of customary international law that a waiver of immunity be "expressed ... in no uncertain terms"[120]. The International Law Commission gave examples of State practice where a State "has previously expressed its consent to such jurisdiction in the provision of a treaty or an international agreement"[121]. One of those examples was the ICSID Convention.

**Spain's alternative submission: waiver limited to bare recognition**

76      Alternatively, Spain argued that Art 54 contemplates only a waiver of immunity from court processes relating to recognition, and not enforcement, relying heavily on the French and Spanish texts which use execution and enforcement interchangeably. In this respect, Spain submitted that the orders of the Full Court went beyond bare recognition.

---

117  *Liberian Eastern Timber Corporation v The Government of the Republic of Liberia* (1986) 650 F Supp 73 at 76; *Continental Casualty Company v The Argentine Republic* (2012) 893 F Supp 2d 747 at 751.

118  *Blue Ridge Investments LLC v Republic of Argentina* (2013) 735 F 3d 72 at 84-85; *Mobil Cerro Negro Ltd v Bolivarian Republic of Venezuela* (2017) 863 F 3d 96 at 113; *Micula v Government of Romania* (2019) 404 F Supp 3d 265 at 277.

119  [2000] 1 AC 147 at 216.

120  United Nations General Assembly, *Report of the International Law Commission on the work of its forty-third session* (1991) at 53.

121  United Nations General Assembly, *Report of the International Law Commission on the work of its forty-third session* (1991) at 52, fn 89, referring to United Nations, *Materials on Jurisdictional Immunities of States and their Property* (1982) at 150-178.

*Kiefel*      CJ
*Gageler*     J
*Gordon*      J
*Edelman*     J
*Steward*     J
*Gleeson*     J
*Jagot*       J

36.

77      The only matter supporting Spain's alternative submission, that any waiver of immunity from jurisdiction should be confined to recognition, is the different linguistic phrasing used in the French and Spanish texts of Arts 53-55. But, for the reasons explained above, the materials before this Court strongly militate against any conclusion that the French and Spanish texts of Arts 53-55 were intended to mean, or have been interpreted to mean, anything different from the English text. No basis has been shown to conclude that those texts bear a different meaning from the English text, preserving, subject to the laws of a Contracting State, the immunity from court processes relating to enforcement and not merely immunity from court processes relating to execution.

### Decision of the Court of Justice of the European Union in *Republic of Moldova v Komstroy LLC*

78      A final, although not fully developed, submission by Spain concerned the effect of the decision of the Court of Justice of the European Union in *Republic of Moldova v Komstroy LLC*[122]. In that case, the European Court of Justice applied the earlier decision of *Slovak Republic v Achmea BV*[123] and decided that the agreement to arbitrate in the Energy Charter Treaty must be interpreted as not being applicable to disputes between a member state of the European Union and an investor of another member state where the dispute concerned an investment by the investor in the first member state[124].

79      Spain's contention was that this Court would "take cognisance" of *Komstroy* in identifying whether Spain had agreed to submit to the jurisdiction of the Australian courts for the purposes of the *Foreign States Immunities Act*. That contention must fail because the relevant agreement arose from Spain's entry into the ICSID Convention, which included its agreement as to the consequences of an award rendered pursuant to the ICSID Convention.

---

**122**   [2021] 4 WLR 132.

**123**   [2018] 4 WLR 87.

**124**   [2021] 4 WLR 132 at [66].

*Kiefel*    *CJ*
*Gageler*    *J*
*Gordon*    *J*
*Edelman*    *J*
*Steward*    *J*
*Gleeson*    *J*
*Jagot*    *J*

37.

**Conclusion**

80          The appeal should be dismissed with costs. It is unnecessary to consider any further the grounds in the notice of contention, which were raised by the respondents only in the event that they were unsuccessful on their primary submissions. No notice of any application for costs was given to the European Commission so there should be no order as to costs against the European Commission in relation to its unsuccessful application for leave to appear as amicus curiae.