# Exhibit 3

**This judgment is to be handed down by the judge remotely by circulation to the parties' advisers by email and release to the National Archive. The date for hand-down is deemed to be 24 May 2023.**

Case No: CL-2021-000362

**Neutral Citation Number:** [2023] EWHC 1226 (Comm)

**IN THE MATTER OF THE ARBITRATION (INTERNATIONAL INVESTMENT DISPUTES) ACT 1966**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**COMMERCIAL COURT (KBD)**

Rolls Building
Fetter Lane
London, EC4A 1NL

Date: 24 May 2023

Before :

**THE HONOURABLE MR JUSTICE FRASER**
- - - - - - - - - - - - - - - - - - - -
**Between :**

**(1) INFRASTRUCTURE SERVICES LUXEMBOURG S.À.R.L.**
*(formerly Antin Infrastructure Services Luxembourg S.À.R.L.)*
**(2) ENERGIA TERMOSOLAR B.V.**
*(formerly Antin Energia Termosolar B.V.)*
**Claimants**

**- and –**

**KINGDOM OF SPAIN**
**Defendant**

**JUDGMENT**

**Patrick Green KC, Nicholas Cherryman and Richard Clarke**
(Instructed by Kobre & Kim (UK) LLP) for the Claimants
**Tariq Baloch and Cameron Miles**
(Instructed by Simmons & Simmons LLP)
for the Defendant

Hearing Dates: 29, 30, 31 March and 3 April 2023
Draft judgment distributed to parties on 17 May 2023

**Mr Justice Fraser:**

1.     This judgment is in the following parts:

A. Introduction and Overview

B. Background to the Award and Order

C. The Issues on the Application

D. Issue 1: Jurisdiction

E. Discussion on Jurisdiction

F. Issue 2: Non-Disclosure

G. Discussion on Non-Disclosure

H. Conclusions

*A.     Introduction and overview*

2.     This is a judgment upon an application by the defendant, the Kingdom of Spain ("Spain"), to set aside an Order of Cockerill J made on 29 June 2021 ("the Order") which registered an arbitration award ("the Award") which the two claimants had obtained following an arbitration against Spain. That arbitration was one conducted under the Convention which established the International Centre for Settlement of Investment Disputes ("the ICSID Convention"). This means, therefore, that the application to the Commercial Court by the claimants for registration, and the Order, were made under the Arbitration (International Investment Disputes) Act 1966 ("the 1966 Act"). Ordinarily, arbitration awards more routinely encountered are sought to be registered and enforced under the New York Convention, and therefore the Arbitration Act 1996 ("the 1996 Act") would usually apply. That is not the case here, and this case is therefore somewhat different. The underlying dispute between the claimants and Spain which was referred to arbitration arose under the Energy Charter Treaty, and the Award is in the sum of approximately €120 million in the claimants' favour.

3.     The application to Cockerill J to register the Award, which is what led to her making the Order, was made *ex parte* by the claimants under CPR Part 62.21(2)(b) and CPR 74.3(2)(b). The Order expressly granted Spain liberty to apply to have it set aside, which is the usual term included in any order that is made without notice to any party. Spain did so apply, seeking to have the Order set aside. Initially Spain sought to set aside the Order on the grounds of alleged defective service. That attempt to set aside the Order was dismissed in a consent order made by Moulder J on 7 March 2022, and in that order she extended time for Spain to seek to set aside the Order on the other grounds now advanced. That order by Moulder J also states in the recitals "upon the Parties having agreed that the date of service of the Order was 21 October 2021". There is therefore no doubt as to the date of service as a result of this.

4.     There are two grounds upon which Spain seeks to set aside the Order. In outline terms only, the first is sovereign immunity; the second is non-disclosure by the claimants in the application for registration that was made to the Commercial Court. The claim for sovereign immunity is broadly based upon lack of jurisdiction both on the part of the arbitral panel that made the Award, and also the court to register it. The foundations

of these arguments are decisions of the Court of Justice of the European Union which are said by Spain to be authority, both in the law of the European Union ("the EU") and international law, to found the absence of jurisdiction. This case therefore raises questions of sovereign immunity, recognition by the High Court of ICSID Convention awards, and the effect and operation of the 1966 Act, including potentially issues of international law. I shall explain the non-disclosure issues in Section F of this judgment below at [126.] and following.

5.    That brief summary is sufficient to set the scene for the somewhat more complicated arguments advanced by the parties. The other point that requires some explanation is that the Order was made in the summer of 2021, and this application was heard by me in late March and early April 2023. That long duration was caused by a variety of different issues and steps. That period also included the European Commission applying to the court for permission to appear as an intervener. That application was refused, following a hearing, by Cockerill J and her judgment is at [2023] EWHC 234 (Comm). The application to intervene did not impact the period of the delay, which totals approximately 21 months, and is explained by other procedural steps that took months, rather than weeks, for a wide variety of reasons. Another factor was that the parties asked for a four-day hearing, and the dates when such hearings can be accommodated depend upon judicial availability. I refer to this overall period because those in charge of the component parts of the Business and Property Courts take pride in the efficient dispatch of disputes, including international disputes. The short point is that it is not because of the court that it has taken so long for this application to be heard.

6.    The claimants were originally represented by Gibson, Dunn & Crutcher UK LLP, and the initial witness statement which supported the application to register the Award was made by a partner of that firm. The claimants are now represented by Kobre & Kim (UK) LLP, but nothing turns on that change, and I recite it for completeness. The evidence on the application was in the form of a number of different witness statements from Douglas Watson, Erika Saluzzo and Kunhee Cho for the claimants; and Stuart Dutson for Spain.

7.    Finally by way of introduction, the parties between them cited in the hearing before me almost 200 different authorities, primary domestic legislation, international treaties and declarations, practitioner texts, law journals, extracts from Hansard, Law Reform Commission materials and also numerous press articles. Of the authorities, there were domestic cases including decisions of the Supreme Court, international ones from the International Court of Justice, international arbitral decisions, EU cases, and decisions of foreign courts including but not limited to those from the US, Australia, France, Luxembourg, British Virgin Islands, Lithuania, Netherlands, and Germany. There were also European Commission and Council Decisions on the Energy Charter Treaty itself. Extensive oral submissions were made on many of them.

8.    Given that breadth of material, accommodating the hearing within only four days was a challenge, and all counsel are to be commended for the way that this was achieved. There were some very interesting issues of international law debated in the hearing, and the ultimate decision in this case may attract a degree of academic interest, if not interest also within other Member States of the EU who are also parties to the ICSID Convention. However, I will not be specifically addressing all of this extensive material in this judgment, although it has all been considered. This is for two reasons. Firstly, to do so would lead to this judgment evolving into something approaching a

doctoral thesis, rather than a decision on registration of an arbitral award under the ICSID Convention and the 1966 Act. Secondly, preparing a comprehensive judgment of such length that deals with the entirety of the material cited to the court would take many months. The over-riding objective in CPR Part 1 means that the interests of other court users have to be taken into account, and to produce a judgment dealing with every single point raised would take so much time that this would be to the detriment of other users of the court. I will therefore only specifically refer to authorities or sources necessary to dispose of the issues.

9.    There were also post-hearing submissions received by the court following judgment which was handed down by the Federal Court in Washington DC in the US on Friday 31 March 2023, the penultimate hearing day of the application. This had not come to the attention of either counsel before the hearing had finished on Monday 3 April, and so the claimants' counsel submitted a copy promptly afterwards and, at the request of the solicitors acting for Spain, I permitted further written submissions from both parties on both the cases that were provided, although I imposed a short page limit. This is because there was a risk that otherwise there would be endless further rounds of lengthy submissions, which after the full ventilation of matters during the hearing itself, would be counter-productive. The parties agreed between themselves that they would lodge these supplemental post-hearing submissions sequentially, and did so.

10.    Also, Mr Baloch, who appeared as one of the two counsel instructed for Spain along with his junior Mr Miles, did not seek to make any oral submissions on the second of the two areas of challenge to the Order, namely non-disclosure by the claimants. This had been extensively addressed in the skeleton argument submitted by both him and Mr Miles. That second issue still remained a live issue and was not abandoned by Spain; rather Spain decided that Mr Baloch would use all of his time during the hearing for oral submissions to focus on the more complicated of the two grounds, namely jurisdiction.

### B.    Background to the Award and Order

11.    ICSID itself is an international institution that was established in 1966 under the Convention from which it took its name. The full title of the latter is the International Convention on the Settlement of Investment Disputes between States and nationals of other States. It had three original language texts, English, French and Spanish, and the treaty was opened for signature on 18 March 1965. It was registered by the International Bank for Reconstruction and Development on 17 October 1966. The preamble sets out its purpose, which I will only summarise. It established an agreement between states which took account of the need for international cooperation for economic development, and the role that private investment had in that activity. Disputes would potentially arise between individuals or companies who or which had privately invested in other states, and although those disputes would sometimes be subject to national processes, an international settlement of disputes between such parties would sometimes be appropriate. Therefore, facilities for this were established under the auspices of the International Bank for Reconstruction and Development ("the IBRD"). That is an international institution that is part of the World Bank. Both the IBRD and ICSID are headquartered in Washington, DC in the United States. IBRD is the seat of ICSID (which is called in the Convention "the Centre") and this is made clear in Article 2 of the Convention.

12.    Section 2 of the ICSID Convention established the Administrative Council and Section 3 established the Secretariat. Jurisdiction of the Centre (which is given

international status and immunities by reason of Section 6) is dealt with in Chapter II of the Convention. At Article 25, the Convention states:

"(1) The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally."

13.    "Recognition and Enforcement of the Award" is set out in Section 6 of the ICSID Convention and Articles 53, 54 and 55 state:

"Article 53
(1) The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention.
(2) For the purposes of this Section, "award" shall include any decision interpreting, revising or annulling such award pursuant to Articles 50, 51 or 52.

Article 54
(1) Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State. A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.
(2) A party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General. Each Contracting State shall notify the Secretary-General of the designation of the competent court or other authority for this purpose and of any subsequent change in such designation.
(3) Execution of the award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such execution is sought.

Article 55
Nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution."

14.    The wording of these articles occupied extensive attention during the hearing by both parties.

15.    Both the United Kingdom and Spain are signatories to the ICSID Convention. This clearly imposes certain treaty obligations upon all those Contracting States. These are obligations that are contained in the Convention itself, and so far as dispute resolution is concerned, they are clearly set out in the articles that I have recited above. In accordance with its own treaty obligations, the United Kingdom passed the 1966 Act. The full title of that legislation is the Arbitration (International Investment Disputes)

Act 1966 (which in this judgment I refer to as "the 1966 Act"). The preamble states that it is "An Act to implement an international Convention on the settlement of investment disputes between States and nationals of other States". It was specifically passed in order that the United Kingdom would comply with the treaty obligations upon it which it had assumed as a result of the specific act of becoming a Contracting State under the ICSID Convention.

16.    The wording of the 1966 Act is clear and there is no need to consult Hansard in order to discern its purpose or clarify ambiguities. The well-known dicta in ***Pepper (Inspector of Taxes) v Hart*** [1993] AC 593 makes it clear that the rule excluding reference to Parliamentary material as an aid to statutory construction is to be relaxed so as to permit such reference where (a) the legislation was ambiguous, obscure or led to absurdity, (b) the material relied upon was or were statements by Ministers or others promoting the bill (together with the other material necessary to understand those statements and their effect) and (c) the statements relied upon were clear. Accordingly, the statements in Hansard are not necessary, and are not admissible, to construe the 1966 Act because condition (a) in that list of three is not satisfied. The statute can be construed perfectly sensibly by the normal canons of statutory construction, including the meaning of the words themselves in the Act, and there is no ambiguity, obscurity or absurdity.

17.    However, the debate in the House of Lords of 10 November 1966 on the second reading of the Bill that became the 1966 Act was referred to by both parties before me. To be fair to Mr Green KC for the claimants, he did not seek to deploy it and clearly relied upon ***Pepper v Hart*** to exclude it, but in the alternative he took me to the debate too, as Mr Baloch for Spain had done. I do not take the Hansard passages of that debate into account in discerning the meaning of the Act. However, I will quote from one passage from the debate merely as a useful way of explaining the background to the 1966 Act. The passage also, in so doing, makes it crystal clear that the purpose of the 1966 Act fully aligns with the last sentence of [15.] of this judgment above. Lord Walston, the Parliamentary Under-Secretary of State for Foreign Affairs, introduced the Bill and said:

"There are actually three main aspects of the Convention which require United Kingdom legislation. First of all, we must provide for the enforcement in this country of any arbitral awards made under the Convention. It was not possible to apply the Arbitration Act 1950 to proceedings under the Convention, because that Act subjects the conduct of arbitration proceedings in England and Wales to certain legal rules and to the control of English courts in some respects. Proceedings under the Convention, on the other hand, will be governed by the provisions of the Convention itself and the rules made under it. It would be inconsistent with the Convention to make the 1950 Act apply. The procedure of registration of awards in the High Courts has therefore been adopted; they will then have the same force and effect for the purpose of execution as judgments of the High Court. Secondly, we must give effect to the provisions of Articles 18 to 24 of the Convention (the text of which is set out in the Schedule to the Bill) concerning the status, immunities and privileges of the Centre, of members of its Administrative Council and its secretariat and of persons taking part in conciliation or arbitration proceedings under the Convention.

…..

May I go briefly through the clauses of the Bill? Clauses 1 and 2 deal with the enforcement of awards given under the Convention. An arbitral award may be

registered in the High Court in so far as pecuniary obligations under the award have not already been satisfied, and subject to compliance with rules of court; the award then has the same force and effect for purposes of execution as a judgment of the High Court. There is, however, a provision for the making of rules for the stay of execution of an award in some circumstances in accordance with the Convention. Clause 3 will enable the Lord Chancellor to make the relevant provisions of the Arbitration Act 1950 and the Foreign Tribunals Evidence Act 1856 apply for the securing of evidence for the purpose of conciliation or arbitration proceedings under the Convention."

18.    This is a useful explanation of what the 1966 Act therefore does; that is why I have quoted the passages. In simple and summary terms, by becoming a party to the ICSID Convention, the United Kingdom acquired treaty obligations as set out in the Convention itself, as (only partially) quoted above in this judgment. These obligations expressly included bringing into domestic law a procedure for awards under the ICSID Convention to be recognised in law as binding, and enforceable, as though such awards were judgments of a competent court within the Contracting State. That obligation upon the United Kingdom to align the domestic law with the state's international obligations under the Convention was complied with by Parliament enacting the legislation in the 1966 Act, as can be seen by the sections of the 1966 Act. The relevant terms of the 1966 Act are:

*"Section 1 Registration of Convention Awards*
(1) This section has effect as respects awards rendered pursuant to the Convention on the settlement of investment disputes between States and nationals of other States which was opened for signature in Washington on 18th March 1965.
That Convention is in this Act called "the Convention", and its text is set out in the Schedule to this Act.
(2) A person seeking recognition or enforcement of such an award shall be entitled to have the award registered in the High Court subject to proof of the prescribed matters and to the other provisions of this Act.
(3) [this was repealed by the Administration of Justice Act 1977 and is not relevant]
(4) In addition to the pecuniary obligations imposed by the award, the award shall be registered for the reasonable costs of and incidental to registration.
(5) If at the date of the application for registration the pecuniary obligations imposed by the award have been partly satisfied, the award shall be registered only in respect of the balance, and accordingly if those obligations have then been wholly satisfied, the award shall not be registered.
(6) The power to make rules of court under [the relevant statutes are identified] shall include power—
(a) to prescribe the procedure for applying for registration under this section, and to require an applicant to give prior notice of his intention to other parties,
(b) to prescribe the matters to be proved on the application and the manner of proof, and in particular to require the applicant to furnish a copy of the award certified pursuant to the Convention,
(c) to provide for the service of notice of registration of the award by the applicant on other parties,
and in this and the next following section "prescribed" means prescribed by rules of court.
(7) For the purposes of this and the next following section—

(a) "award" shall include any decision interpreting, revising or annulling an award, being a decision pursuant to the Convention, and any decision as to costs which under the Convention is to form part of the award,

(b) an award shall be deemed to have been rendered pursuant to the Convention on the date on which certified copies of the award were pursuant to the Convention dispatched to the parties.

(8) This and the next following section shall bind the Crown (but not so as to make an award enforceable against the Crown in a manner in which a judgment would not be enforceable against the Crown).

### Section 2 Effect of Registration

(1) Subject to the provisions of this Act, an award registered under section 1 above shall, as respects the pecuniary obligations which it imposes, be of the same force and effect for the purposes of execution as if it had been a judgment of the High Court given when the award was rendered pursuant to the Convention and entered on the date of registration under this Act, and, so far as relates to such pecuniary obligations —

(a) proceedings may be taken on the award,

(b) the sum for which the award is registered shall carry interest,

(c) the High Court shall have the same control over the execution of the award,

as if the award had been such a judgment of the High Court.

(2) Rules of court [the statutes under which such rules are made are specified] may contain provisions requiring the court on proof of the prescribed matters to stay execution of any award registered under this Act so as to take account of cases where enforcement of the award has been stayed (whether provisionally or otherwise) pursuant to the Convention, and may provide for the provisional stay of execution of the award where an application is made pursuant to the Convention which, if granted, might result in a stay of enforcement of the award."

19.   The 1966 Act therefore leaves certain detail to be included in subsequent rules of court. That is what the Civil Procedure Rules are. The two relevant ones here are CPR Part 62.21 and Part 74. It is not necessary to set out their full text, but it should be noted that under CPR Part 62.21(3) the Part 8 procedure must be used on an application to register an award under the 1966 Act, and under CPR Part 62.21(4) the written evidence required by CPR Part 74.4 must also exhibit the award itself and say whether "enforcement of the award has been stayed (provisionally or otherwise) under the Convention". That requirement was complied with in this case.

20.   There are a great number of other treaties that have been entered into since 1966 that, by reference, incorporate the terms of the ICSID Convention within them as a dispute-resolution mechanism. Many of them are what is called Bilateral Investment Treaties ("BITs"). As a result of the ICSID Convention, the international investment world has a free-standing arbitration process in existence, which is administered by ICSID from its headquarters in the US and this will, according to its rules, operate or administer both arbitral panels and also conciliation panels (which do not arise here) to assist or accomplish the resolution of international disputes between private parties (private individuals or, more usually, companies) and Contracting States. The benefits of this are obvious, and do not require recitation here. If a private investing party is successful following the reference to ICSID of a dispute it has with a Contracting State, the arbitration will result in an award in that party's favour. The first step to that

party in enforcement is to have the award recognised – as though it were a judgment – in the High Court. This requires the court to have adjudicative jurisdiction.

21. The New York Convention, and the Arbitration Act 1996, do not arise in this case as I explained in the introduction. The Award is an ICSID award and the Order was made under the 1966 Act. However, some of the authorities cited to me were decisions on the New York Convention, which may be potentially persuasive but are certainly not directly on point. Also, some of the authorities concern disputes arising under BITs; where these concern ICSID, they would be relevant, but almost all of them are decisions in other jurisdictions. There are only isolated authorities in England and Wales on the issues that arise here, but as will be seen, there are some.

22. The next step in the process of explanation of what led to the Award is the Energy Charter Treaty ("the ECT"). A European Energy Charter Conference was held and its final plenary session was held in Lisbon on 16 and 17 December 1994. Spain had joined the European Community ("the EC") in 1986, the EC being the predecessor to the EU (the former becoming the latter after the Maastricht treaty was agreed in 1993). The final act of the European Energy Charter Conference in 1994 was to agree the terms of the ECT, which was also approved (in its provisional form) on 15 December 1994, and whose terms are annexed at Annex 1 to the EC Council Decision of the same date (this is at 94/998/EC). The final plenary session at Lisbon, and the signatories of the ECT, are numerous, and include a great many countries including many that were *not* members of the EC, including countries that one could confidently predict never will be, such as the United States and the Russian Federation. Both Spain, and the EC itself, signed the ECT, and their accession to the treaty entered into force on 16 April 1998.

23. The ECT expressly incorporated the ICSID Convention. The states that entered into the ECT are referred to within it as "Contracting Parties". It is necessary only to set out limited parts of the ECT.

"Article 2 - Purpose of the Treaty
This Treaty establishes a legal framework in order to promote long-term co-operation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter.

PART II – COMMERCE

Article 3 - International Markets
The Contracting Parties shall work to promote access to international markets on commercial terms, and generally to develop an open and competitive market, for Energy Materials and Products.
…

Article 16 - Relation to other Agreements
Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,
(1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and

(2) nothing in <u>such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty, where any such provision is more favourable to the Investor or Investment</u>.

…

## PART V - DISPUTE SETTLEMENT

Article 26 - Settlement of Disputes between an Investor and a Contracting Party

(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

(2) If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, <u>the Investor party to the dispute may choose to submit it for resolution:</u>

(a) to the courts or administrative tribunals of the Contracting Party party to the dispute;

(b) in accordance with any applicable, previously agreed dispute settlement procedure;

or

(c) <u>in accordance with the following paragraphs of this Article</u>.

(3)(a) Subject only to subparagraphs (b) and (c), <u>each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article</u>.

(b)(i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).

(ii) For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.

(c) A Contracting Party listed in Annex IA does not give such unconditional consent with respect to a dispute arising under the last sentence of Article 10(1).

(4) <u>In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:</u>

(a)(i) <u>The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention</u>; or

(ii) <u>The International Centre for Settlement of Investment Disputes, established pursuant to the Convention referred to in subparagraph (a)(i), under the rules governing the Additional Facility for the Administration of Proceedings by the Secretariat of the Centre (hereinafter referred to as the "Additional Facility Rules"), if</u>

the Contracting Party of the Investor or the Contracting Party party to the dispute, but not both, is a party to the ICSID Convention;

(b) a sole arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (hereinafter referred to as "UNCITRAL"); or

(c) an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce.

(5)(a) The consent given in paragraph (3) together with the written consent of the Investor given pursuant to paragraph (4) shall be considered to satisfy the requirement for:

(i) written consent of the parties to a dispute for purposes of Chapter II of the ICSID Convention and for purposes of the Additional Facility Rules;

(ii) an "agreement in writing" for purposes of article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, 10 June 1958 (hereinafter referred to as the "New York Convention"); and

(iii) "the parties to a contract [to] have agreed in writing" for the purposes of article 1 of the UNCITRAL Arbitration Rules.

(b) Any arbitration under this Article shall at the request of any party to the dispute be held in a state that is a party to the New York Convention. Claims submitted to arbitration hereunder shall be considered to arise out of a commercial relationship or transaction for the purposes of article I of that Convention.

(6) A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.

(7) An Investor other than a natural person which has the nationality of a Contracting Party party to the dispute on the date of the consent in writing referred to in paragraph (4) and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting Party, shall for the purpose of article 25(2)(b) of the ICSID Convention be treated as a "national of another Contracting State" and shall for the purpose of article 1(6) of the Additional Facility Rules be treated as a "national of another State".

(8) The awards of arbitration, which may include an award of interest, shall be final and binding upon the parties to the dispute. An award of arbitration concerning a measure of a sub-national government or authority of the disputing Contracting Party shall provide that the Contracting Party may pay monetary damages in lieu of any other remedy granted. Each Contracting Party shall carry out without delay any such award and shall make provision for the effective enforcement in its Area of such awards."

(emphasis added)

24.    Article 26(3) states, as clearly set out and emphasised in the paragraph above, that the parties to the ECT, the Contracting Parties, thereby gave their unconditional consent to disputes being referred to international arbitration. Some Contracting Parties which were listed in Annex IA did not give such unconditional consent for some disputes, but that does not arise here in respect of Spain, and that exception does not apply in this case. The international arbitration choices for an investor seeking to refer a dispute are ICSID (under Article 26(4)(a)(i) and (ii)); an arbitrator or ad hoc arbitration tribunal under UNCITRAL (under Article 26(4)(b)); or an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce (under Article 26(4)(c)).

25.     Article 26(4)(a)(i) and (ii) therefore both clearly refer to, and thereby incorporate, arbitration under the ICSID Convention as the dispute resolution mechanism (or one of them) that can be invoked by an investor who finds themselves in a dispute with a Contracting State under the ECT. The only difference between them is whether (under (a)(i)) both the State of the investor and the Contracting State are parties to the ICSID Convention; or (under (a)(ii)) only one of those is.

26.     That therefore sets out the international treaty framework within which the factual circumstances of the dispute between the parties, the arbitration, the Award and therefore the Order, arise.

27.     Thereafter the claimants in the arbitration that resulted in the Award became investors in certain energy infrastructure projects in Spain. The investments were entered into in 2011 and concerned solar power installations in Spain. There were certain tariff advantages at the time for such renewable power, but that is background only to this application, as the nature of the precise dispute between the claimants and Spain, its scope and the merits on each side, are not relevant to the issues before me.

28.     However, what happened in wider European terms must be explained, as it forms the basis of Spain's arguments under Issue I below. The Treaty of Lisbon, which was signed in December 2007 and came into force after ratification on 1 December 2009, amended (also renamed) the two treaties which form the constitutional basis of the European Union. These two treaties have since then been called the Treaty on European Union ("TEU"), and the Treaty on the Functioning of the European Union ("TFEU"). This step created much greater integration within the European Union, which had been created some years earlier by the Treaty of Maastricht (which was the former name of the Treaty on European Union). All members of the European Community became members of the EU, which was a wider and more complete integration of certain relations between Member States. As the preamble to the Treaty of Lisbon explains, it followed the resolve within the Member States to mark a new stage in the process of European integration that was undertaken with the establishment of the European Communities. One of the declarations that was annexed to the Final Act of the Intergovernmental Conference which adopted the Treaty of Lisbon made clear at Declaration 17 that the Treaties of the EU, and the law adopted by the EU on the basis of the treaties, have primacy over the domestic law of individual Member States. The exact terms of Declaration 17 are:

"The Conference recalls that, in accordance with well settled case law of the Court of Justice of the European Union, the Treaties and the law adopted by the Union on the basis of the Treaties have primacy over the law of Member States, under the conditions laid down by the said case law".

29.     EU law therefore clearly has primacy within the Member States of the EU, over the different domestic laws of Member States. For historical interest only, the Treaty of Lisbon also included certain provisions which have become increasingly topical over recent years. Article 50 included a provision whereby a Member State could leave the EU; that has only so far been utilised once, namely by the United Kingdom after the referendum held in 2016 leading to what is now widely known as Brexit. Another creation of the EU was the single market, with free movement of goods, labour and capital within the EU and between Member States, which also included a gradual harmonisation of many tariffs.

30.   The Treaty of Lisbon set out the EU's institutions in Article 13, which included – for example - the European Commission (also called simply the Commission) and the European Central Bank, but also the Court of Justice of the European Union, or CJEU hereafter. Article 19 of the Treaty explained its function. It has its seat in Luxembourg, and constitutes the judicial authority of the EU. It has supremacy and the EU Treaties make it clear that it is the sole (and highest) authority for resolving matters of EU law.

31.   It is convenient here to identify some provisions of the TFEU, namely Articles 267, 344 and 351. These state:

"Article 267
The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:
(a) the interpretation of the Treaties;
(b) the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union;
Where such a question is raised before any court or tribunal of a Member State, that court or tribunal may, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court to give a ruling thereon.
Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court.
If such a question is raised in a case pending before a court or tribunal of a Member State with regard to a person in custody, the Court of Justice of the European Union shall act with the minimum of delay.

Article 344
Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.

Article 351
The rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties.
To the extent that such agreements are not compatible with the Treaties, the Member State or States concerned shall take all appropriate steps to eliminate the incompatibilities established. Member States shall, where necessary, assist each other to this end and shall, where appropriate, adopt a common attitude.
In applying the agreements referred to in the first paragraph, Member States shall take into account the fact that the advantages accorded under the Treaties by each Member State form an integral part of the establishment of the Union and are thereby inseparably linked with the creation of common institutions, the conferring of powers upon them and the granting of the same advantages by all the other Member States."

32.   Then what happened is as follows. Over a period of time, Spain firstly reduced, and then removed, the tariff advantages that had been available for solar energy (and therefore had been to the benefit of investors in such renewables). This was done as part of the move by Member States within the EU towards the integration of tariffs and other tax treatments as part of establishing what is called the single market. The

claimants found themselves in dispute with Spain as a result. The basis of the dispute was that the claimants alleged that Spain had breached its obligations under the ECT of fair and equal treatment.

33.    That dispute could not be settled amicably and on 22 November 2013 the claimants commenced international arbitration by referring this dispute to ICSID. That is the date that the ICSID Secretary-General registered the Request for Arbitration by the claimants. The claimants had different names at that point but nothing turns on that. The first claimant is a private limited liability company incorporated under the laws of the Grand Duchy of Luxembourg. The second claimant is a private limited liability company incorporated under the laws of the Netherlands, and is wholly owned by the first claimant. Luxembourg and the Netherlands are, of course, both Member States of the EU. The President of the arbitral tribunal was Dr Eduardo Zuleta; the claimants' appointee was Professor Francisco Orrego Vicuña; and Spain's appointee was Mr J. Christopher Thomas QC ("the Tribunal"). The arbitration was conducted under the auspices of ICSID and given designation ICSID Case No. ARB/13/31. A hearing was conducted in Paris in October 2016.

34.    Spain challenged jurisdiction before the arbitral panel, but this challenge was dismissed unanimously by the Tribunal and was therefore not successful. The claimants were also successful in their substantive claim, the unanimous award of the Tribunal being dated 15 June 2018. A rectification process then followed, which was requested by Spain, and is in accordance with Article 49(2) of the ICSID Convention, which requires the tribunal to rectify "any clerical, arithmetical or similar error in the award. Its decision shall become part of the award and shall be notified to the parties in the same manner as the award". Spain sought to have the amount of compensatory damages awarded to the claimants reduced, contending that there was an error in computation, with the amount of costs being correspondingly reduced. Sadly, during the process of rectification, Professor Vicuña died, and he was replaced by Mr Klaus Reichert SC who took his place on the tribunal. The Award was rectified by a decision on rectification which was issued on 29 January 2019. That decision did reduce the amount of compensatory damages by €11 million approximately. It is the amount of the rectified Award that the claimants applied to the court to register under Article 49(2).

35.    The sum awarded comprised damages, interest and costs. The Commission had applied to intervene in the arbitration as a non-disputing party (also sometimes referred to as an *amicus curiae*) on Spain's jurisdictional objections, and the Tribunal granted authority for this, subject to an undertaking from the Commission that, as a non-party, it would comply with any costs order. This the Commission was not prepared to do, and so it did not participate.

36.    Spain then applied to challenge the Award under the annulment procedure, which is contained within the ICSID Convention itself. The ICSID Committee that heard this application was appointed by the Chairman of the ICSID Administrative Council and was Mr Cavinder Bull as President, together with Mr José Antonio Moreno Rodríguez and Dr Nayla Comair-Obeid. The broad basis of the annulment application was that Spain alleged that the Tribunal had exceeded its powers by exercising jurisdiction over the arbitration in breach of EU law. The grounds for the alleged breach of EU law are explained below in more detail and arise under what I have called "the EU law question", but essentially the argument is that any intra-EU arbitration under the ECT is precluded by EU law (as would be any international arbitration to which a

Member State is a party). There were other limbs to the application, including objections to the calculations of damages and objections to procedure (including imposing the costs undertaking upon the Commission as a condition of the Commission intervening), but for present purposes these other points do not matter. This is because all of the matters raised were considered by the ICSID Committee appointed for that purpose, who conducted a hearing and heard arguments. A stay had been imposed upon the Award by the ICSID Committee when Spain applied to annul the Award, but that was lifted on 21 October 2019. The claimants applied to the Federal Court in Australia for recognition of the Award. The application by Spain for annulment failed and the ICSID Committee issued its decision on this dated 30 July 2021.

37.    For completeness, I should also note that Spain announced its intention to withdraw from the ECT on 13 October 2022. However, that does not affect the Award itself, nor does it of itself affect recognition of the Award under the 1966 Act, and I do not understand Spain to contend that it does. The dispute, the Award, and the application that led to the Order all occurred before Spain did this. Again, I include that purely for completeness.

38.    Following the lifting of the stay by the ICSID Committee, the claimants applied for recognition of the Award in Australia. Amongst the many decisions cited to me were the Australian Federal Court decisions on that application, and also those of the US District Court for the District of Columbia in Washington, DC. Recognition in those different foreign jurisdictions was also challenged in each of them by Spain on, more or less, the same grounds as on this application (but not non-disclosure). Obviously, the domestic law regimes that apply to such challenges are different to the law here. Although the judgments in those other cases in those foreign jurisdictions are potentially at least persuasive, they are neither determinative nor are they binding upon the High Court of England and Wales, nor do they involve the interpretation and application of the 1966 Act. In so far as those other foreign decisions deal with international legal principles, again they do not bind the High Court. The High Court is bound to apply the law as it is set down in domestic primary legislation – and in this case that plainly includes the 1966 Act – and as supplemented and interpreted by legal precedent and the doctrine of *stare decisis*. I shall return to this matter later after explaining the issues.

### C.    *The Issues on the Application*

39.    These can firstly be identified at a high level, then sub-divided as necessary. They are:

I. Jurisdiction; and

II. Non-disclosure.

40.    Issue I has a number of different strands to it. Essentially Spain advances before this court similar arguments that have already been extensively canvassed and deployed before the ICSID arbitral tribunal initially, and then also the ICSID Committee when Spain applied to annul the Award. However, there are other elements to this challenge before this court, including one based upon the terms and operation of the State Immunity Act 1978, that are specific to the legislative regime in this jurisdiction. Spain challenges the Order in particular on the grounds of state immunity; lack of a written agreement on Spain's part to arbitrate disputes under the ECT; and the validity of the Award itself.

41.    Issue II requires consideration both of the extent of disclosure by the claimants upon the application that was considered by Cockerill J, which led to the Order, and whether there was material non-disclosure by the claimants.

42.    I shall deal with each of these two areas separately. If Spain were to succeed on either of them, then Spain would be entitled to have the Order set aside.

**Issue I. Jurisdiction**

43.    Spain maintains that the Order was made without jurisdiction. Paragraph 3 of Spain's skeleton states that it seeks "to have the Recognition Order set aside on the basis that the Court lacked jurisdiction to grant it under s 1(1) SIA", by which it refers to the State Immunity Act 1978.

44.    This issue requires consideration both of state immunity, the State Immunity Act 1978, the existence or otherwise of a written agreement to arbitrate, and whether the Award is valid. In respect of a written agreement to arbitrate between the parties, Spain alleges that there is none. In order to answer this issue or these sub-issues, Spain deploys arguments which arise under what I have decided to term "the EU law question".

45.    The background to the EU law question is summarised in paragraphs 72 to 74 of Spain's skeleton argument. The EU law question was refined during the hearing and Spain, at the request of the court, produced a further document sub-dividing the issue into a number of different sub-issues or questions. I invited Mr Baloch to submit these in writing, following his oral exposition of them during his submissions. They are as follows. The case referred to within them as *Achmea* is explained further below at [57].

***The EU law question and its sub-issues:***

1.    *Achmea* arose out of the BIT between the Slovak Republic and Netherlands. Does *Achmea*'s reasoning also apply to the ECT?

2.    Do TFEU Articles 267 and 344, as interpreted by the CJEU, have primacy over Article 26 of the ECT as a matter of international law? This in turn gives rise to a series of questions:

   a.    *Achmea* and the subsequent CJEU decisions have identified a conflict or incompatibility between TFEU Articles 267 and 344 on the one hand, and ECT Article 26 on the other. What gives the CJEU the power to articulate such a conflict, and is it binding as a matter of international law?

   b.    What rules of conflict as a matter of international law apply to allow TFEU Articles 267 and 344, as interpreted by CJEU, to disapply ECT Article 26 of the ECT in the Intra-EU context?

   c.    At what point did the conflict arise? Is it retroactive or prospective from the date the conflict is declared?

   d.    Can this reasoning apply to a multilateral treaty such as the ECT? Can it be said that the TFEU has primacy over intra-EU disputes under the ECT but not those involving non-EU Member States?

   e.    In such a situation, how does the conflict with TFEU Articles 267 and 344 affect ECT Article 26 as it applies in the intra-EU context? What does disapplication of ECT Article 26 in this context mean?

46.    On one interpretation of the EU law question, none of the sub-issues at 2(a) to (e) above arise. This is because it is not necessary to address these sub-issues in order to

consider and answer the first part of question 2, namely "Do TFEU Articles 267 and 344, as interpreted by the CJEU, have primacy over Article 26 of the ECT as a matter of international law?" The claimants argue that the proper construction of the ECT and in particular the disapplication of Article 26 for which Spain contends has no foundation in the ECT or the applicable principles of international law. The claimants also contend that such an argument is in any event incompatible with the good faith interpretation of the ECT which is required by Article 31 of the Vienna Convention. I consider the Vienna Convention in outline terms at [81.] below.

**D.    *Issue I: Jurisdiction***

47.    Spain challenges the jurisdiction of the court to make the recognition order. This is on a number of different grounds.

48.    At this point, it is convenient to reproduce three short passages from the written skeleton argument served by Spain for the application before me.

**"The EU's longstanding concerns on investment treaty arbitration**
72. Investment treaties like the ECT have a long history in Europe [footnote omitted]. They were originally concluded after the end of the Cold War in 1989, prior to the Central and Eastern European states joining the EU from 2004 onwards. These intra-EU investment treaties protected Western European investment in Central and Eastern Europe, as the domestic standard of investment protection was then inadequate.

73. The ECT is a multilateral investment treaty designed to facilitate and protect investment in the energy sector – primarily between Western Europe and Central and Eastern Europe, but also including certain former Soviet states. Concluded in 1994, the ECT has over its lifetime seen several states parties join the EU. Like intra-EU BITs, the ECT contains substantive standards of protection for investments and, in Article 26, an investment arbitration clause.

74. The EU has watched these developments with concern. Investment in EU Member States is comprehensively regulated by the EU Treaties and the legal order based upon them. An essential element of this legal order is the CJEU, which is the final arbiter of all questions relating to the interpretation and application of the EU legal order. But an investment treaty creates an arbitral tribunal that is outside the CJEU's jurisdiction. If that tribunal is required to apply or interpret EU law, its conclusions will be unreviewable, undermining the autonomy of EU law."

49.    These passages are, in a sense, all well and good when looked at from the internal perspective of the EU, or from the perspective of Spain as a Member State. But in my judgment they are notable for two reasons. Spain considers that the "standards of protections for investments" in the ECT are "substandard"; and also submits that the EU is "concerned" with the way in which international arbitration operates under investment treaties, including – or even particularly – the ICSID Convention. But that is nothing to the point, in my judgment. However, the sentence "But an investment treaty creates an arbitral tribunal that is outside the CJEU's jurisdiction" goes to the heart of the matter. That is rather the whole point. Indeed, it is central to international arbitration that the tribunal that determines whichever dispute is referred to it is outside the jurisdiction of a domestic court (other than for supervision or enforcement), and also – in this case - outside the jurisdiction of the CJEU (which did not even exist in its current form in 1966 when the ICSID Convention was agreed internationally). In principle, by entering into an arbitration agreement, the parties

agree that the arbitral tribunal will resolve their disputes, and not domestic courts. The attractions of that are varied, whether international or domestic arbitration. I would go somewhat further and observe that this is the main purpose of the ICSID Convention itself, which was expressly incorporated into the ECT by the signatories to that later treaty, including Spain. The fact that the EU and/or Spain is concerned that international arbitration works in this way, and/or dilutes or undermines the CJEU's role in affairs, is not relevant.

50.    There are likely to be all kinds of wider policy considerations of an international nature for countries when it comes to their treaty obligations. There are also going to be a number of different pros and cons within the EU when the CJEU interprets EU law, or makes rulings on matters that affect Member States. None of those, with respect to the way that Spain has argued its case on this application, have primacy on the issues before this court on this application to set aside the Order.

### E.     Discussion on jurisdiction

51.    The challenge by Spain to jurisdiction can be considered in two ways. One is a shorter point on arbitral awards, and statutory interpretation of the 1966 Act. The other is a longer analysis applying international law principles to the treaty obligations of a sovereign state. I intend to address both routes.

52.    The correct place to start when a sovereign state such as Spain asserts lack of jurisdiction on the part of a court to immunity is primary legislation. The 1966 Act has already been referred to. The relevant sections are set out at [18.] above.

53.    The State Immunity Act 1978 is relied upon by Spain in this respect, in particular section 1(1). Immunity must in any event be addressed because of the terms of section 1(2) of the Act. This is consistent with the approach of the court under the New York Convention too. Sections 1 and 2 of the State Immunity Act 1978 state as follows:

"*1 General Immunity from jurisdiction*
(1) A State is immune from the jurisdiction of the courts of the United Kingdom except as provided in the following provisions of this Part of this Act.
(2) A court shall give effect to the immunity conferred by this section even though the State does not appear in the proceedings in question.

*2 Submission to jurisdiction*
(1) A State is not immune as respects proceedings in respect of which it has submitted to the jurisdiction of the courts of the United Kingdom.
(2) A State may submit after the dispute giving rise to the proceedings has arisen or by a prior written agreement; but a provision in any agreement that it is to be governed by the law of the United Kingdom is not to be regarded as a submission.
(3) A State is deemed to have submitted—
(a) if it has instituted the proceedings; or
(b) subject to subsections (4) and (5) below, if it has intervened or taken any step in the proceedings.
(4) Subsection (3)(b) above does not apply to intervention or any step taken for the purpose only of—
(a) claiming immunity; or
(b) asserting an interest in property in circumstances such that the State would have been entitled to immunity if the proceedings had been brought against it.
(5) Subsection (3)(b) above does not apply to any step taken by the State in ignorance of facts entitling it to immunity if those facts could not reasonably have been ascertained and immunity is claimed as soon as reasonably practicable.....
..."

54.    These sections are then followed by a number of others, dealing with specific situations such as commercial transactions (section 3), contracts of employment (section 4) and so on. At section 9, the following is stated in the Act:

"*9 Arbitrations*
(1) Where a State has agreed in writing to submit a dispute which has arisen, or may arise, to arbitration, the State is not immune as respects proceedings in the courts of the United Kingdom which relate to the arbitration.

(2) This section has effect subject to any contrary provision in the arbitration agreement and does not apply to any arbitration agreement between States."

55.    These provisions and their impact upon Spain's claim to immunity are considered further at [91.] below.

56.    However, there is an important distinction in terms of jurisdiction, and this is one that was clearly appreciated both by Spain and the claimants on this application. This distinction is between adjudicative jurisdiction and enforcement jurisdiction. Recognition of an ICSID Award falls into the former; this application does not entail consideration of any execution upon Spain.

57.    In order fully to follow the EU law question, one has to consider in detail the case of the ***Slovak Republic v Achmea BV*** Case C-284/16; ECLI:EU:C:2018:158 (Judgment, Grand Chamber) which is central to the arguments advanced by Spain (*"Achmea"*). That case concerned a bilateral international treaty, or BIT, which had been concluded in 1991 between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic. The reason this is referred to as a bilateral treaty is the Slovak Republic became an independent nation in recent times on 1 January 1993, the treaty originally being concluded between the Netherlands and its predecessor state, Czechoslovakia (which then became two separate states, the Czech Republic or Czechia; and the Slovak Republic). Article 8 of the BIT provided for arbitration of disputes between one Contracting Party and an investor of the other Contracting Party. The arbitral body was to be appointed by the President of the Arbitration Institute of the Chamber of Commerce of Stockholm, and was to apply the arbitration rules of UNCITRAL, rather than ICSID, but that does not matter for present purposes.

58.    The background to the dispute was the distribution of profits from the commercial operation of the private medical insurance market (explained further at [7] to [9] of the judgment) and in an ensuing arbitration under the treaty provisions in the BIT the Slovak Republic raised an objection of lack of jurisdiction on the part of the arbitral tribunal. It submitted that as a result of its accession to the EU, recourse to an arbitral tribunal as provided for in article 8(2) of the BIT was incompatible with the law of the EU. German law applied to the arbitration proceedings because the seat of the arbitration was Frankfurt am Main in Germany, the well-known international finance centre. This jurisdictional argument was dismissed by the arbitral tribunal and an award of damages was made against the Slovak Republic. In the course of the proceedings undertaken by the Slovak Republic seeking to have that award set aside, the Bundesgerichtshof (the Federal Court of Justice, Germany) requested a preliminary ruling from the CJEU concerning the interpretation of Articles 18, 267 and 344 of the TFEU.

59.    In short form, the CJEU decided that Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States of the EU, such as Article 8 of the BIT in that case. This is because, as demonstrated by the reasoning in that judgment, Article 8 of the BIT was held to have an adverse effect upon the autonomy of EU law (as summarised in [59] of the judgment).

60.    This reasoning is explained in a number of places in the judgment, but for convenience I shall quote only two passages. These are lengthy, but in my judgment ought to be reproduced *in extenso* as the reasoning underpins so much of the argument advanced by Spain before me:

"31. By its first and second questions, which should be taken together, the referring court essentially asks whether Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.

32.    In order to answer those questions, it should be recalled that, according to settled case-law of the Court, an international agreement cannot affect the allocation of powers fixed by the Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the Court. That principle is enshrined in particular in Article 344 TFEU, under which the Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the Treaties (Opinion 2/13 (Accession of the EU to the ECHR) of 18 December 2014, EU:C:2014:2454, paragraph 201 and the case-law cited).

33.    Also according to settled case-law of the Court, the autonomy of EU law with respect both to the law of the Member States and to international law is justified by the essential characteristics of the EU and its law, relating in particular to the constitutional structure of the EU and the very nature of that law. EU law is characterised by the fact that it stems from an independent source of law, the Treaties, by its primacy over the laws of the Member States, and by the direct effect of a whole series of provisions which are applicable to their nationals and to the Member States themselves. Those characteristics have given rise to a structured network of principles, rules and mutually interdependent legal relations binding the EU and its Member States reciprocally and binding its Member States to each other (see, to that effect, Opinion 2/13 (Accession of the EU to the ECHR) of 18 December 2014, EU:C:2014:2454, paragraphs 165 to 167 and the case-law cited).

34.    EU law is thus based on the fundamental premiss that each Member State shares with all the other Member States, and recognises that they share with it, a set of common values on which the EU is founded, as stated in Article 2 TEU. That premiss implies and justifies the existence of mutual trust between the Member States that those values will be recognised, and therefore that the law of the EU that implements them will be respected. It is precisely in that context that the Member States are obliged, by reason inter alia of the principle of sincere cooperation set out in the first subparagraph of Article 4(3) TEU, to ensure in their respective territories the application of and respect for EU law, and to take for those purposes any appropriate measure, whether general or particular, to ensure fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the EU (Opinion 2/13 (Accession of the EU to the ECHR) of 18 December 2014, EU:C:2014:2454, paragraphs 168 and 173 and the case-law cited).

35.    In order to ensure that the specific characteristics and the autonomy of the EU legal order are preserved, the Treaties have established a judicial system intended to ensure consistency and uniformity in the interpretation of EU law (Opinion 2/13 (Accession of the EU to the ECHR) of 18 December 2014, EU:C:2014:2454, paragraph 174)…..

49.    <u>It follows that a tribunal such as that referred to in Article 8 of the BIT cannot be regarded as a 'court or tribunal of a Member State' within the meaning of Article 267 TFEU, and is not therefore entitled to make a reference to the Court for a preliminary ruling</u>."

(emphasis added)

61.    The second series of passages states:

"54.    It is true that, in relation to commercial arbitration, the Court has held that the requirements of efficient arbitration proceedings justify the review of arbitral awards by the courts of the Member States being limited in scope, provided that the fundamental provisions of EU law can be examined in the course of that review and, if necessary, be the subject of a reference to the Court for a preliminary ruling (see, to that effect, judgments of 1 June 1999, *Eco Swiss*, C-126/97, <u>EU:C:1999:269</u>, paragraphs 35, 36 and 40, and of 26 October 2006, *Mostaza Claro*, C-168/05, <u>EU:C:2006:675</u>, paragraphs 34 to 39).

55.    However, arbitration proceedings such as those referred to in Article 8 of the BIT are different from commercial arbitration proceedings. While the latter originate in the freely expressed wishes of the parties, the former derive from a treaty by which Member States agree to remove from the jurisdiction of their own courts, and hence from the system of judicial remedies which the second subparagraph of Article 19(1) TEU requires them to establish in the fields covered by EU law (see, to that effect, judgment of 27 February 2018, *Associação Sindical dos Juízes Portugueses*, C-64/16, <u>EU:C:2018:117</u>, paragraph 34), disputes which may concern the application or interpretation of EU law. In those circumstances, the considerations set out in the preceding paragraph relating to commercial arbitration cannot be applied to arbitration proceedings such as those referred to in Article 8 of the BIT.

56.    Consequently, having regard to all the characteristics of the arbitral tribunal mentioned in Article 8 of the BIT and set out in paragraphs 39 to 55 above, it must be considered that, by concluding the BIT, the Member States parties to it established a mechanism for settling disputes between an investor and a Member State which could prevent those disputes from being resolved in a manner that ensures the full effectiveness of EU law, even though they might concern the interpretation or application of that law.

57.    It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law. The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the EU and its legal order is respected (see, to that effect, Opinion 1/91 (EEA Agreement -I) of 14 December 1991, EU:C:1991:490, paragraphs 40 and 70; Opinion 1/09 (Agreement creating a unified patent litigation system) of 8 March 2011, EU:C:2011:123, paragraphs 74 and 76; and Opinion 2/13 (Accession of the EU to the ECHR) of 18 December 2014, <u>EU:C:2014:2454</u>, paragraphs 182 and 183).

58.    In the present case, however, apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the BIT may relate to the interpretation both of that agreement and of EU law, the possibility of submitting those disputes to a body which is not part of the judicial system of the EU is provided for by an agreement which was concluded not by the EU but by Member States. Article 8 of the BIT is such as to call into question not only the principle of mutual trust between the Member States, but also the preservation of the particular nature of the law established by the Treaties, ensured by the preliminary ruling procedure provided for in Article 267 TFEU, and is not therefore compatible with the principle of sincere cooperation referred to in paragraph 34 above.

59.    <u>In those circumstances, Article 8 of the BIT has an adverse effect on the autonomy of EU law.</u>

60.    Consequently, the answer to Questions 1 and 2 is that Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept."

(emphasis added)

62.    Therefore, the CJEU made two fundamental points (amongst other important points). The first was to draw a distinction between commercial arbitration, and arbitration under an international treaty provision. The second was to find that an arbitral tribunal such as the one in that case would, or could, be called upon to consider or rule on the applicability of EU law, yet was not competent to do that under the EU Treaties or the law of the EU, because it had no jurisdiction to do that. Such a tribunal could not be regarded as a court or tribunal of a Member State, nor could it make a reference to the CJEU for a preliminary ruling (a point made clear at [49] of the judgment in that case). This meant that treaty provisions permitting or establishing international arbitration for disputes involving Member States was contrary to the EU Treaties, and the CJEU therefore held that these were effectively invalid.

63.    The case of *Achmea* did, however, involve a BIT, and both of the Contracting Parties were members of the EU, although not at the time that the BIT was concluded. However, even if these were potential points of arguable distinction then, in terms of the law of EU at least, they became of lesser (or no) importance given a subsequent decision of the CJEU on the ECT itself, namely the case of ***Republic of Moldova v Komstroy LLC (successor in law to Energoalians)*** Case C-741/19; EU:C:2021:655 (Judgment, Grand Chamber); [2021] 4 WLR 132. Spain heavily relies upon this case too.

64.    That case specifically concerned the ECT itself. It was a reference by the cour d'appel de Paris (the Court of Appeal, Paris) and the substantive underlying claim which arose from a contract for the sale and supply of electricity to the Republic of Moldova which was assigned to the defendant's predecessor, a Ukrainian company. That company referred a dispute concerning the sale and re-sale of electricity to arbitration under Article 26 of the ECT. This was an ad hoc arbitration which was established in France, and the tribunal made an award in favour of the company against Moldova.

This was challenged by Moldova, and the Court of Appeal in Paris referred a question to the CJEU for a preliminary ruling on the meaning of "investment" within the ECT. The Commission, and several intervening states, raised an associated question concerning whether an arbitral tribunal under the ECT could rule on an intra-EU dispute between an investor of one Member State and another Member State.

65.     The CJEU ruled that it had jurisdiction itself to give preliminary rulings on questions concerning the interpretation of the ECT, because the EU and many of its individual Member States were parties to it. This included the interpretation of what constituted an "investment" under the ECT. The court also held that the EU had exclusive competence in relation to foreign direct investment and shared competence in relation to indirect investment. It also held that it was in the interests of the EU that, in order to forestall future differences of interpretation, "investment" should be uniformly interpreted. It also found of note that the parties to the dispute had chosen to submit the dispute to arbitration in a Member State in which the ECT was applicable as a matter of EU law. It then applied its reasoning on the issue of whether the underlying dispute constituted an "investment" for the purposes of the treaty, and found that it did not.

66.     It also found, applying the same reasoning as in *Achmea* and applying that case specifically, that since the EU was a contracting party to the ECT, that treaty itself was an act of EU law and an ad hoc tribunal could be required to interpret and apply EU law when deciding a dispute under Article 26 of the ECT. Yet, because (for the same reasons as set out in [49] of *Achmea* and explained above) such an arbitral tribunal was not entitled to make a reference to the court for a preliminary ruling, the arbitration provisions under Article 26 of the ECT could not and did not apply intra-EU. Strictly speaking in English law terms, given the conclusions set out concerning the interpretation of the term "investment", this part of the judgment could be considered *obiter*. However, that concept does not strictly speaking apply to decisions of the CJEU in any event, because this was part of the conclusion to a question that had specifically been referred to it by the French court. This is made clear at [64] to [66] of the judgment, which makes this point following on from the reasoning of *Achmea*, and appears in the judgment under the overall heading "Consideration of the questions referred" and the specific heading "The first question". The law report in the Weekly Law Reports supports this and states this to be *per curiam*. But whether it is *obiter* or not, the reasoning within the judgment entirely aligns with that of *Achmea*, and there is no reason to doubt that the CJEU would answer any similar question, or even an identical one, in anything other than exactly the same way, even were that to be the only question referred to it for a ruling. It is therefore, within the sphere of EU law, undoubtedly the case that the CJEU has ruled that the provisions of Article 26 of the ECT are in conflict with Member States' obligations arising under the EU Treaties. The case of *Komstroy* makes it crystal clear that the CJEU considers that the provisions of Article 26 in the ECT, and the mechanism for referring a dispute between an investor and a Member State to arbitration, cannot apply within the EU as such an arbitration provision is incompatible with the supremacy of the CJEU as the ultimate arbiter of matters of EU law under the EU Treaties. The decision does. However. somewhat gloss over the difficulties that such an interpretation would cause in terms of Member States' existing international treaty obligations under both the ECT and the ICSID Convention.

67.     Spain argued before me the questions of EU law set out above in a manner that elevated the status of these decisions of the CJEU, almost as though they were

decisions of an over-arching international court that must bind all nations. For example, Spain referred to what it called "the international law aspects of the EU legal order" and also stated in its supporting documents for the application that "EU law is an inextricable part of international law." There is no doubt that the law of the EU is correctly described as being international law, as self-evidently it governs relations between Member States which have collectively entered into international treaty obligations under the EU Treaties including the TFEU. Those treaty obligations have international effect and the institutions of the EU have primacy over domestic organs in certain important respects. However, as the claimants point out, this argument ignores the other aspects of international law that requires observance of existing express treaty obligations, and it also ignores the effect of Spain having pre-existing treaty obligations under other treaties such as the ICSID Convention and the ECT. The EU treaties do not trump these, nor do they override the relevant domestic law mechanism in the United Kingdom.

68.    There is, however, direct and binding Supreme Court authority on the operation both of the ICSID Convention and the 1966 Act, which includes the subject of recognition of an ICSID award in the United Kingdom and how conflicts with the internal law of the EU impact upon the former. This is the case of ***Micula & Ors v Romania (European Commission intervening)*** [2020] UKSC 5. It is of considerable interest, and its reasoning is, in my judgment, directly relevant. It is also binding upon this court.

69.    Romania acceded to the EU on 1 January 2007. Before that, in April 1999, Romania had adopted an investment incentive scheme for certain regions (the details of which are not directly relevant, but which was called "EGO 24"). On 30 June 1999, Romania incorporated EU state aid rules into domestic law, as a result of which EGO 24 was modified. During the early 2000s, the claimants invested in a large, highly integrated food production operation in the relevant region in reliance on EGO 24. In 2002, Romania and Sweden entered into a BIT providing reciprocal protection of investments and investor-State arbitration under the ICSID Convention. During the accession negotiations between Romania and the EU before Romania's accession on 1 January 2007, the EU informed Romania that certain schemes, including EGO 24, were contrary to EU state aid rules. As a result, Romania repealed the majority of the incentives under EGO 24 and this led to a claim by the claimants, as a result of which the claimants in July 2005 filed a request for ICSID arbitration under the BIT.

70.    An arbitration under ICSID took place and on 11 December 2013, the tribunal issued its award, deciding that Romania had breached the BIT and awarding compensation of approximately £70m plus interest to the claimants. Romania unsuccessfully applied to annul the award and also attempted to implement the award by setting off tax debts owed by one of the claimants. This led to the Commission issuing an injunction against Romania in May 2014 ordering it to suspend any action that might lead to execution of the award, until the Commission had taken a final decision on its compatibility with state aid rules. The Commission thereupon formally opened a state aid investigation which led to a decision by the Commission in March 2015 which concluded that the payment of the award by Romania constituted unlawful state aid. The claimants sought annulment of the Commission Decision before the CJEU in 2015. On 18 June 2019, the General Court (the "("GCEU") ") annulled the Commission Decision on the ground that the Commission had purported to apply its

powers retroactively to events pre-dating Romania's accession to the EU. The Commission applied to appeal this decision.

71.    Proceedings were started in England in 2014 by the claimants applying for registration of the award under the 1966 Act, and this was granted. In 2015, Romania applied for a stay of enforcement and the claimants sought an order for security. In 2017, the High Court granted Romania's application to stay enforcement pending the GCEU proceedings and refused the claimants' application for security. The claimants appealed, and in 2018, the Court of Appeal continued the stay but ordered that Romania provide security. Romania appealed the order for security and the claimants cross-appealed the grant of a stay, both of these appeals being set down before the Supreme Court. On the morning the hearing was to have taken place in June 2019, the GCEU handed down its judgment, and this caused the stay to lapse, and the hearing to be adjourned in any event until October 2019. After the hearing later took place, the Supreme Court allowed the claimants' cross-appeal and lifted the stay. It did not therefore need to consider Romania's appeal in relation to security. The claimants had appealed against the stay on five grounds. These were: (1) the effect of the GCEU's judgment was that the duty of sincere co-operation (which arises under the EU Treaties) no longer required the English courts to stay enforcement; (2) there was no power to order a stay under the ICSID Convention and the 1966 Act; (3) the stay was incompatible with the ICSID Convention; (4) the European Communities Act 1972 did not require the United Kingdom to breach pre-accession obligations under the ICSID Convention; and (5) Article 351 of TFEU applied, with the result that the obligations of the United Kingdom under the pre-accession ICSID Convention were not subject to the overriding effect of EU law.

72.    Each of the grounds numbered (2) to (5) set out at [71.] above are directly applicable to the instant case. The unanimous judgment of the Supreme Court was given by Lord Lloyd-Jones JSC and Lord Sales JSC, and the following extract will make it clear to any reader of this judgment what the approach of the High Court should be, when considering challenges of the type mounted by Spain in this case. This is a lengthy quotation but because it incorporates, and indeed anticipates, so much of the argument mounted in this case by Spain, I have concluded that it is best to reproduce it in full.

"[68].  The provisions of the 1966 Act must be interpreted in the context of the ICSID Convention and it should be presumed that Parliament, in enacting that legislation, intended that it should conform with the United Kingdom's treaty obligations. It is a notable feature of the scheme of the ICSID Convention that once the authenticity of an award is established, a domestic court before which recognition is sought may not re-examine the award on its merits. Similarly, a domestic court may not refuse to enforce an authenticated ICSID award on grounds of national or international public policy. In this respect, the ICSID Convention differs significantly from the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards 1958. The position is stated in this way by Professor Schreuer in his commentary on article 54(1):

"The system of review under the Convention is self-contained and does not permit any external review. This principle also extends to the stage of recognition and enforcement of ICSID awards. A domestic court or authority before which recognition and enforcement is sought is restricted to ascertaining the award's authenticity. It may not re-examine the ICSID tribunal's jurisdiction. It may not re-

examine the award on the merits. Nor may it examine the fairness and propriety of the proceedings before the ICSID tribunal. This is in contrast to non-ICSID awards, including Additional Facility awards, which may be reviewed under domestic law and applicable treaties. In particular, the New York Convention gives a detailed list of grounds on which recognition and enforcement may be refused …" (Christoph H Schreuer, *The ICSID Convention: A Commentary*, 2nd ed (2009), p 1139, para 81)

"The Convention's drafting history shows that domestic authorities charged with recognition and enforcement have no discretion to review the award once its authenticity has been established. Not even the *ordre public* (public policy) of the forum may furnish a ground for refusal. The finality of awards would also exclude any examination of their compliance with international public policy or international law in general. The observance of international law is the task of the arbitral tribunal in application of article 42 of the Convention subject to a possible control by an ad hoc committee … Nor would there be any room for the application of the Act of State doctrine in connection with the recognition and enforcement of an ICSID award …" (Schreuer, pp 1140-1141, para 85)

[69].    Contracting States may not refuse recognition or enforcement of an award on grounds covered by the challenge provisions in the Convention itself (articles 50-52). Nor may they do so on grounds based on any general doctrine of *ordre public*, since in the drafting process the decision was taken not to follow the model of the New York Convention. However, although it is recognised that this is the general position under the Convention, it is arguable that article 54(1), by framing the relevant obligation as to enforcement as an obligation to treat an award under the Convention as if it were a final judgment of a local court, allows certain other defences to enforcement which are available in local law in relation to such a final judgment to be raised.

[70].    The principle that arbitration awards under the ICSID Convention should be enforceable in the courts of all Contracting States and with the same status as a final judgment of the local courts in those States, as eventually set out in article 54(1), was a feature from an early stage in the drafting of the Convention. Mr Aron Broches, General Counsel of the World Bank at the time who chaired the regional consultative meetings ("the Regional Consultative Meetings") that occurred as part of the Convention's drafting, explained to delegates that by virtue of this formula Contracting States would be entitled to apply their local law of sovereign or state immunity with regard to the enforcement of awards, and thereby avoid or minimise possible embarrassment at having to enforce awards against other friendly Contracting States. Accordingly, it was made clear that article 54(1) had the substantive effect of introducing to some degree a principle of equivalence between a Convention award and a local final judgment as regards the possibility of applying defences in respect of enforcement……

[71].    In his report on the Regional Consultative Meetings, Mr Broches referred to certain comments that had dealt with the effect of what was then draft section 15 (which became article 54(1)) on existing law with respect to sovereign immunity. Mr Broches "explained that the drafters had no intention to change that law. By providing that the award could be enforced as if it were a final judgment of a local court, section 15 implicitly imported the limitation on enforcement which in most countries existed with respect to enforcement of court decisions against Sovereigns. However, this point might be made explicit in order to allay the fears expressed by several

delegations"….. Mr Broches again indicated that this was the intended effect of what became article 54(1), but that it could be made completely clear to allay concerns).

[72].      Accordingly, the provision which eventually became article 55 was included in what was designated as the First Draft of the Convention and was retained in the final version of the Convention (*History*, vol I, 254; vol II-1, Doc 43 (11 September 1964) "Draft Convention: Working Paper for the Legal Committee", p 636). The official Report of the Executive Directors on the Convention confirmed that this provision was introduced for the avoidance of doubt (as its text indicates)…. The law of State immunity varies from State to State, and the Convention made no attempt to harmonise it. As Professor Schreuer points out in his commentary on article 54, persons seeking to enforce arbitration awards made pursuant to the Convention will tend to choose to do so in those jurisdictions which have the least generous rules of State immunity for the protection of the assets of other Contracting States (Schreuer, p 1124, para 27).

[73].      The fact that the specific qualification of the obligation to enforce an award like a final court judgment relating to state immunity was expressly dealt with in article 55 for the avoidance of doubt indicates that article 54(1) was itself understood to have the effect of allowing the possibility of certain other defences to enforcement if national law recognised them in respect of final judgments of local courts.

[74].      The *travaux préparatoires* also indicate that it was accepted that further defences available in national law in relation to enforcement of court judgments could be available in exceptional circumstances by virtue of the formulation of the obligation in article 54(1)…."

(emphasis added)

73.    The published works of both Professor Schreuer and Mr Broches were cited to me on this application. The former is a highly distinguished international law jurist, and the latter was General Counsel of the World Bank at the time the ICSID Convention was signed. Both were cited to, and approved by, the Supreme Court and their writings were expressly referred to by Lord Lloyd-Jones JSC and Lord Sales JSC, as can be seen by the extracts above. They are therefore directly considered in the decision in **Micula**. Their Lordships continued:

"[77] Articles 50(2), 51(4) and 52(5) make specific provision for staying enforcement of an award in certain specific situations, none of which applies here. Section 2(2) of the 1966 Act and CPR 62.21(5) make corresponding provision in domestic law for the grant of a stay in such situations. These stays pursuant to the Convention are available only in the context of interpretation, revision and annulment of awards addressed by those articles. In the present case, Romania has already exercised and exhausted its right under article 52 of ICSID to seek annulment of the Award. The ICSID *ad hoc* Committee upheld the Award on 26 February 2016.

[78]      However, in light of the wording of articles 54(1) and 55 and the *travaux préparatoires* reviewed above, it is arguable that there is scope for some additional defences against enforcement, <u>in certain exceptional or extraordinary circumstances which are not defined, if national law recognises them in respect of final judgments of national courts and they do not directly overlap with those grounds of challenge to an</u>

award which are specifically allocated to Convention organs under articles 50 to 52 of the Convention."

(emphasis added)

74.    When considering the argument mounted by Romania that EU law both conflicted with, and effectively overrode the obligations in the ICSID Convention, their Lordships stated the following:

"[84]   The grant of a stay [by the Court of Appeal, per Arden and Leggatt LJJ, Hamblen LJ dissenting (as they all then were)] in these circumstances was not consistent with the ICSID Convention, on their interpretation of it, under which the United Kingdom and its courts had a duty to recognise and enforce the Award. This was not a limited stay of execution on procedural grounds, but a prohibition on enforcement of the Award on substantive grounds until the GCEU had ruled on the apparent conflict between the ICSID Convention and the EU Treaties. Effect was given to the Commission Decision until such time as the GCEU might pronounce upon it. The logic of the position adopted by Arden and Leggatt LJJ was that if the GCEU upheld the Commission Decision, the stay would continue indefinitely (and the same would be true if the CJEU allows the Commission's appeal against the decision of the GCEU). But the grounds of objection raised by the Commission, even if upheld before the EU courts, were not valid grounds of objection to the Award or its enforcement under the ICSID Convention, as interpreted by Arden and Leggatt LJJ. The principle laid down in article 53(1) that awards are binding on the parties and are not subject to any appeal or other remedy except those provided under the Convention and reflected in article 54 (on their interpretation of it) was disregarded. In substance, the Court of Appeal made use of powers to stay execution granted by domestic law in order to thwart enforcement of an award which had become enforceable under the ICSID Convention.

[85].        On the other hand, if article 54(1) incorporates the principle of equivalence, in line with Hamblen LJ's interpretation, it remains the case that Romania's submission in answer to the Claimants' cross-appeal cannot succeed. This is because article 351 TFEU has the effect that any obligation on the UK courts to give effect to a decision such as the Commission Decision pursuant to the duty of sincere co-operation which might arise under the Treaties in other circumstances does not arise in this case. The discussion below of Original Ground 4 of the cross-appeal, explains that the United Kingdom owes relevant obligations to non-EU member states under the ICSID Convention, a treaty to which the United Kingdom was party before it became a member state. By virtue of article 351 TFEU this means that the obligations on the United Kingdom arising from the ICSID Convention are "not … affected by the provisions of the Treaties".

[86].        Leaving aside the Treaties, in the circumstances of the present case the English courts are obliged under article 54(1) of the ICSID Convention to give effect to the Award in favour of the Claimants and this is not a case in which any of the exceptional possible types of defence to enforcement contemplated by Mr Broches and Professor Schreuer arise. Leaving the Treaties out of the analysis, if the Award were a final judgment of an English court it would be enforced without question. Similarly, on Hamblen LJ's interpretation of article 54(1) involving the principle of equivalence, it must follow that the Award would be enforced in the same way. Article 351 TFEU means that this obligation cannot be affected by anything in the

Treaties, which are the foundation for the legal effect of Commission rulings and for the obligation of sincere co-operation on which Romania seeks to rely. Romania's attempt to pray in aid the obligation of sincere co-operation is an attempt to pull itself up by its own bootstraps. It cannot make out the necessary foundation for its argument, since it cannot show that the obligation of sincere co-operation has any application at all.

[87].        Finally, in this regard, we should refer to the submission on behalf of Romania that to the extent that there is any uncertainty as to the meaning of the relevant provisions of the ICSID Convention and the 1966 Act, this court is bound by EU law to interpret them so far as possible in accordance with EU law in order to comply with the EU principle of effectiveness (seeking to gain support from *van Munster v Rijksdienst voor Pensioenen* (Case C-165/91) [1994] ECR I-4661, para 34; *Budějovický Budvar národní podnik v Rudolf Ammersin GmbH* (Case C-216/01) [2003] ECR I-13617, paras 168-169). This is another bootstraps argument on behalf of Romania. The first step in the analysis should be to ask whether the United Kingdom has relevant obligations arising from the ICSID Convention which, by operation of article 351 TFEU, preclude the application of the Treaties. As explained below in relation to Cross-Appeal Original Ground 3 (paras 101-108), on a proper interpretation of the ICSID Convention, the United Kingdom clearly does have such obligations. Therefore, the Treaties do not have any relevant effect and this court is not bound by EU law to interpret the Convention in the manner for which Romania contends. In any event, the proper interpretation of the Convention is given by principles of international law applicable to all Contracting States and it cannot be affected by EU law."

(emphasis added)

75.    This analysis was then reinforced in the underlined passage below, with the surrounding (and explanatory) passages included to put it in context:

"[88].        On behalf of the First Claimant, Viorel Micula, Mr Patrick Green QC advances this ground of appeal, which the other Claimants adopt, on the basis that a conflict might be said to arise between the United Kingdom's obligations under the ICSID Convention and EU law. Mr Green submits that the UK Parliament, in enacting section 2(1) of the European Communities Act 1972, could not have intended to empower the EU to put the United Kingdom in breach of pre-accession international obligations, with only EU institutions as arbiters of the lawfulness of doing so. He says this is so for two reasons. First, it undermines the scheme of the Convention and the express terms and purpose of the 1966 Act. Secondly, at the time Parliament enacted the 1972 Act there was before it a treaty which provided, in what has become article 351 TFEU, that it would not affect the pre-accession international obligations of member states…..

[89].        The constitutional principles which underlie this submission are clearly correct. Under the UK constitution Parliament is sovereign and EU law has effect within the United Kingdom only to the extent that it has been given such effect by section 2(1) of the European Communities Act 1972 (*R (Buckinghamshire County Council) v Secretary of State for Transport* (*"HS2"*) [2014] UKSC 3; [2014] 1 WLR 324, para 79; *Pham v Secretary of State for the Home Department* [2015] 1 WLR 1591, paras 80, 90; *R (Miller) v Secretary of State for Exiting the European Union* [2017] UKSC 5; [2018] AC 61, paras 60, 61). It is for the UK courts to decide on the scope and effect of section 2(1) and, as Lord Reed observed in *HS2* at para 79, if there

is a conflict between a constitutional principle and EU law, that conflict has to be resolved by our courts as an issue arising under the constitutional law of the United Kingdom. However, by contrast with *HS2*, which concerned article 9 of the Bill of Rights, the present case concerns obligations arising under the ICSID Convention which are given effect by the 1966 Act, which is not a statute of fundamental constitutional importance. In these circumstances, there is no sound basis for concluding that the effect of section 2(1) of the European Communities Act 1972 was impliedly excluded so far as the 1966 Act is concerned. In any event, successive treaties which have been given effect in the domestic law of the United Kingdom by section 2(1) of the 1972 Act have included a provision equivalent to the current article 351 TFEU. As a result, the 1972 Act has already made provision for the effect of accession on pre-accession treaties and, accordingly, this ground of appeal collapses into Original Ground 4 to which we now turn….”

76.     After the decision of the Supreme Court in *Micula*, the question of the scope of potential defences available to a state was referred to at first instance in *Unión Fenosa Gas SA v Arab Republic of Egypt* [2020] EWHC 1723 (Comm), a decision of Jacobs J. In that case, the investor had obtained an award in an arbitration conducted pursuant to the ICSID Convention against the state of Egypt. The investor applied without notice under CPR Part 62.21 for registration of it, and CPR Part 62.21(3) provided that such an application for an ICSID Convention award had to be made “in accordance with the Part 8 procedure”. Males J (as he then was) made an order granting permission to register the award, but a dispute arose as to whether, in addition to serving the order of Males J, the investor ought also to have served the Part 8 claim form on Egypt. On a without notice application by the investor, Teare J granted a declaration that service of the claim form was not required; Egypt applied to set aside that order, on the grounds that Part 8 applied to the application to register the ICSID Convention award and that the claim form ought to have been, and was required to be, served on the foreign state.

77.     Jacobs J held that it did not, and refused the application. He did so for three reasons. Firstly, it was not required on a proper construction of CPR Part 62.21. Secondly, requiring service of a Part 8 claim form would be inconsistent with the regime for registration incorporated in CPR Part 62.21 and CPR Part 74.6, which required service only of the order made on registration. Thirdly, he observed that it would be surprising if this were required, as it was not required under New York Convention awards unless the court so ordered, and the defences against enforcement under the New York Convention were far wider in scope than for ICSID Convention awards. He also found that CPR Part 8, for these purposes, had to be read consistently with CPR Part 62.21, and this latter rule modified or disapplied elements of Part 8 as they applied to applications to have an ICSID award registered, such that such an application could be made without notice.

78.     In deciding the application, which is one of the few reported cases on enforcing awards under the ICSID Convention, the judge considered the Supreme Court decision in *Micula*. He stated, having considered Articles 53 and 54 of the ICSID Convention:

“[66] The effect of these provisions, as stated in *Dicey, Morris & Collins: The Conflict of Laws* 15th edition paragraph 16-189, is to take ICSID awards outside the normal regime for the enforcement of arbitral awards, including the New York Convention regime, which enables recognition to be refused by national courts on

specified grounds. <u>Instead, the ICSID Convention has its own internal procedure for interpretation, revision and annulment of awards. Requests for annulment are dealt with by an ad hoc committee, and the grounds for annulment are limited.</u> However, as Dicey states:

"Unless an ICSID award is annulled pursuant to this procedure, the courts of Contract States are bound to recognise and enforce it in accordance with Art.54 (1), to which effect is given in England by ss.1 and 2 of the 1966 Act".

[67]. The recent decision of the Supreme Court in *Micula* confirms that the ICSID Convention differs significantly from the New York Convention: see paragraph [68]. The Supreme Court considered it arguable, however, that there is:

"scope for some additional defences against enforcement, in certain exceptional or extraordinary circumstances which are not defined, if national law recognises them in respect of final judgments of national courts and they do not directly overlap with those grounds of challenge to an award which are specifically allocated to Convention organs under articles 50 to 52 of the Convention. (paragraph [78])."

[68]. It clearly remains the case, however, that such a defence, even if it exists at all (a point which is arguable but has not yet been finally determined), is far narrower in scope than the possible defences under the New York Convention. The important point for present purposes is that it would be surprising if a more cumbersome procedure had to be followed for the registration of ICSID awards under the 1966 Act, when compared to the procedure for New York Convention awards, in circumstances where the arguments available to the state (if they exist at all) are significantly more limited. Apart from the possibility of 'exceptional or extraordinary circumstances', the only available argument to the state is that the enforcement of the award has been or might be stayed. CPR r. 62.18(4) and (5) expressly cater for this possibility, by requiring (amongst other things) the award creditor to state whether a stay has been granted or an application made for a stay."

79.    I entirely agree with those observations. The availability of defences to a foreign state faced with an application to register an arbitral award under the ICSID Convention is far narrower than those that would be available if an award were being enforced under the New York Convention. ICSID is a separate and stand-alone international convention, with signatories far more numerous than the Member States of the EU. The 1966 Act is separate legislation dealing with such awards. *Micula* makes it clear that for an additional defence to be available to a state, it must "not directly overlap with those grounds of challenge to an award which are specifically allocated to Convention organs under articles 50 to 52 of the Convention." Jurisdiction of the tribunal, and matters covered in the annulment application, are plainly within such areas allocated to such organs. They are exclusively allocated under the ICSID Convention to ICSID itself. Therefore Spain has no ability to deploy such defences in this application. This is an – undoubtedly more lengthy than ideal – explanation of the first route to the answer on this issue on this application.

80.    The United Kingdom undoubtedly had existing treaty obligations which pre-date its accession to the European Community, which then became the European Union. These include its own international obligations under the ICSID Convention, which are owed to all the other signatories in what is plainly a multilateral treaty. One can

well understand that Spain finds itself on the horns of a juridical dilemma, with its obligations under the ECT for dispute resolution (which treaty plainly incorporates the ICSID Convention) now found by the CJEU to conflict with the law of the EU as set out in the EU Treaties. The ultimate court under those EU Treaties, the CJEU, has found that international arbitration of the type established under the ICSID Convention (and incorporated into the ECT) is not compatible with EU law for the reasons it has explained both in the *Achmea* and *Komstroy* cases. However, with the greatest of respect to the CJEU, it is not the ultimate arbiter under the ICSID Convention, nor under the ECT, and the difficulties in which Spain finds itself does not assist it here, given the United Kingdom's own treaty obligations under the ICSID Convention, which are owed to all signatories of the ICSID Convention. The domestic mechanism established under the 1966 Act was enacted specifically in order to comply with these.

81.    However, even if I am wrong in that analysis, and the ECT itself (or the EU Treaties) was (or were) directly in conflict with Spain's (or other Member States') obligations to the ICSID Convention, applying conventional analysis to conflicting treaty obligations, one would turn to the Vienna Convention. That too is a multilateral treaty, and its full title is the Vienna Convention on the Law of Treaties ("VCLT"), and it was concluded at Vienna on 23 May 1969 and opened for signature on that date. Its authentic texts are English, French, Chinese, Russian and Spanish. Article 5 states that the Convention applies to any treaty which is the constituent instrument of an international organisation and to any treaty adopted within an international organisation without prejudice to any relevant rules of the organisation.

82.    Articles 26 to 30 are as follows. The headings are included in the text of the treaty:

"Article 26. "PACTA SUNT SERVANDA"
Every treaty in force is binding upon the parties to it and must be performed by them in good faith.

Article 27. INTERNAL LAW AND OBSERVANCE OF TREATIES
A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty. This rule is without prejudice to article 46.

Article 28. NON-RETROACTIVITY OF TREATIES
Unless a different intention appears from the treaty or is otherwise established, its provisions do not bind a party in relation to any act or fact which took place or any situation which ceased to exist before the date of the entry into force of the treaty with respect to that party.

Article 29. TERRITORIAL SCOPE OF TREATIES
Unless a different intention appears from the treaty or is otherwise established, a treaty is binding upon each party in respect of its entire territory.

Article 30. APPLICATION OF SUCCESSIVE TREATIES RELATING TO THE SAME SUBJECT-MATTER
1. Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs.
2. When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.

3. When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.

4. When the parties to the later treaty do not include all the parties to the earlier one:

(a) As between States parties to both treaties the same rule applies as in paragraph 3;

(b) As between a State party to both treaties and a State party to only one of the treaties, the treaty to which both States are parties governs their mutual rights and obligations.

5. Paragraph 4 is without prejudice to article 41, or to any question of the termination or suspension of the operation of a treaty under article 60 or to any question of responsibility which may arise for a State from the conclusion or application of a treaty the provisions of which are incompatible with its obligations towards another State under another treaty."

83.    Finally, Articles 40 and 41 state:

"Article 40. AMENDMENT OF MULTILATERAL TREATIES

1. Unless the treaty otherwise provides, the amendment of multilateral treaties shall be governed by the following paragraphs.

2. Any proposal to amend a multilateral treaty as between all the parties must be notified to all the contracting States, each one of which shall have the right to take part in:

(a) The decision as to the action to be taken in regard to such proposal;

(b) The negotiation and conclusion of any agreement for the amendment of the treaty.

3. Every State entitled to become a party to the treaty shall also be entitled to become a party to the treaty as amended.

4. The amending agreement does not bind any State already a party to the treaty which does not become a party to the amending agreement; article 30, paragraph 4(b), applies in relation to such State.

5. Any State which becomes a party to the treaty after the entry into force of the amending agreement shall, failing an expression of a different intention by that State:

(a)  be  considered  as  a  party  to  the  treaty  as  amended;  and

(b) be considered as a party to the unamended treaty in relation to any party to the treaty not bound by the amending agreement.

Article 41 AGREEMENTS TO MODIFY MULTILATERAL TREATIES BETWEEN CERTAIN OF THE PARTIES ONLY

1. Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:

(a) The possibility of such a modification is provided for by the treaty; or

(b) The modification in question is not prohibited by the treaty and:

(i) Does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;

(ii) Does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.

2. Unless in a case falling under paragraph 1(a) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides."

84.     Both the ICSID Convention and the ECT are plainly multilateral treaties. Mr Baloch drew attention to the bilateral nature of the dispute resolution procedures in the ECT, which only involve only two parties. He submitted that such a procedure is a bilateral process. That may be, but I do not consider that the fact that only two parties would be in dispute means that the treaties should be construed as though they were bilateral, as they plainly are multilateral. The mechanism within the ECT for resolving disputes does not make it a bilateral treaty, nor does it mean that any part of it should be considered as though it were. Further, there has been no amendment of the ICSID Convention pursuant to Article 40 of the VCLT, nor has there been a modification under Article 41 either.

85.     It is common ground between the parties that the ICSID Convention should be interpreted in accordance with Article 31 VCLT, and that the starting point is that any text "*shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*" Article 32 allows recourse to supplementary means of interpretation, including the preparatory work of the treaty in order "*to confirm the meaning resulting from the application of article 31, or to determine the meaning*" when the determination when the article 31 exercise leaves the meaning ambiguous, obscure or leads to an absurd result. This latter part has some similarities with the approach under ***Pepper v Hart***, but in any event permits reference to what, in international law, is usually called by the French term *travaux préparatoires*. Section 3 deals with termination and suspension. Article 54 allows termination or withdrawal from a treaty in accordance with its terms. Article 58 permits two or more parties to a multilateral treaty to conclude an agreement to suspend the operation of the treaty, temporarily and between themselves alone as long as such suspension is permitted by the treaty and not prohibited. Neither of those had been initiated by Spain either alone, or together with (say) the Member States where the claimants are situated (for temporary suspension under Article 58) before the dispute which led to the ICSID Award, for either ICSID or the ECT.

86.     In terms of any conflict, this is governed by Article 30. Here, Article 30(4) would apply, because the ICSID Convention has nation parties to it who are not Member States. Therefore, the ICSID Convention, for as long as Spain is a party to it, should govern the way in which valid ICSID awards against Spain are dealt with in other domestic courts. This includes enforcing those awards, which includes recognition orders. Spain would probably argue that this is a circular argument, because of the need for a "valid ICSID award" and if Spain were right, such an award could not be valid because there is no valid arbitration agreement. But the answer to that is that such reasoning is, itself, entirely circular. If one considers the matter in a chronological and linear fashion, starting with the ICSID Convention itself, Spain acceded to that freely and so did the United Kingdom. Spain – or any other Member State in my judgment – cannot rely upon the ***Achmea*** and/or the ***Komstroy*** cases to dilute the United Kingdom's own multilateral international treaty obligations. It certainly cannot rely upon those cases to interpret the 1966 Act differently to what its clear terms require.

87.     I consider that there is a clear conflict between the EU Treaties, as their application to international arbitration involving Member States has been decided by the CJEU and explained by Mr Baloch, and each (or more accurately both) of the ECT or the ICSID

Convention. If intra-EU arbitration is contrary to EU law principles governing either primacy of the CJEU or EU principles generally, then this must (and can only) arise from the EU Treaties themselves. I cannot see how it can arise in any other way. Therefore, if that is the case, there must be a conflict. That conflict does not mean that the latter EU law principles as enunciated by the CJEU remove Spain from the ambit and scope of the ECT, or from the ICSID Convention. Spain's arguments, as either amplified or further explained in submissions (including a letter to the court after distribution of the draft judgment) was that there was a conflict between articles 267 and 344 of the TFEU on the one hand, and article 26 of the ECT on the other. In those circumstances, Spain maintained that this conflict should be resolved in favour of the articles of the TFEU by what it called "the treaty conflict rule of EU primacy". However, in my judgment that is simply a different way of Spain maintaining that both the ECT and the ICSID Convention – both of which clearly have signatories who are not Member States of the EU – should be interpreted by ignoring their clear terms regarding dispute resolution, in preference to granting the decisions of the CJEU complete primacy over those pre-existing treaty obligations of all states. I do not accept that is the correct approach, and I do not consider that such a result can be achieved by applying international law principles to conflicting treaty provisions.

88. The answers to the EU law sub-issues which I set out at [45.] above are therefore as follows:

Question 1. *Achmea* arose out of the BIT between the Slovak Republic and Netherlands. Does *Achmea*'s reasoning also apply to the ECT?

Answer: The reasoning in *Achmea* probably does also apply to the ECT, in terms of the applicability of EU law, as considered by the CJEU. This means that the CJEU would be most likely to reach the same conclusion on any EU law question referred to it under the ECT as it did under the BIT in the *Achmea* case. However, these are matters of EU law only. The conclusion does not "apply to the ECT" in the sense contended for by Spain. That conclusion is a purely EU law issue.

Question 2. Do TFEU Articles 267 and 344, as interpreted by the CJEU, have primacy over Article 26 of the ECT as a matter of international law?

Answer: No, they do not. Even if they did, this would go to the jurisdiction of the ICSID arbitral tribunal, and the ICSID Convention makes clear that this is a matter that is reserved to, and can only be resolved by, the procedure set down in the Convention, and not domestic law. This is helpfully stated in the commentary by Professor Schreuer on Article 54 which stated that "A domestic court or authority before which recognition and enforcement is sought is restricted to ascertaining the award's authenticity. It may not re-examine the ICSID tribunal's jurisdiction. It may not re-examine the award on the merits. Nor may it examine the fairness and propriety of the proceedings before the ICSID tribunal." This passage was expressly approved by the Supreme Court in *Micula* at [68] which definitively states the approach under English law to this issue.

The answers to the series of questions that followed at sub-issues 2(a) to (e) are therefore of academic interest only and need not be addressed on this application.

89. Having therefore considered what I consider to be the over-arching submissions of Spain on the impact of EU law upon its other, pre-existing treaty obligations under the ICSID Convention and the ECT, I can turn to consider the specifics of the challenges to jurisdiction on this application. One therefore turns to consider whether the grounds

deployed by Spain here fall into the category of what the Supreme Court described as "scope for some additional defences against enforcement, in certain exceptional or extraordinary circumstances which are not defined, if national law recognises them in respect of final judgments of national courts" (to quote from the Supreme Court in *Micula*). They must also not "directly overlap with those grounds of challenge to an award" specifically allocated to Convention organs.

90.     The only defence that I consider could potentially fall into that category, even arguably, would be one based upon the State Immunity Act 1978, if such a defence were available. Lack of a written agreement to arbitrate, and validity of the award, are both within the grounds of challenge allocated to Convention organs. The Supreme Court could not possibly be referring to defences being "additional", as well as having to arise in both "exceptional or extraordinary circumstances", if they had as their subject matter challenges to jurisdiction raised before and considered (and rejected) by the ICSID arbitral tribunal and the ICSID Committee. In case I am wrong about that, I will address those briefly in any event.

*State Immunity*

91.     I have already referred to parts of the State Immunity Act 1978 ("the 1978 Act") set out at [53.] above. The 1978 Act expressly has exceptions to state immunity included within it, with section 2(2) being where there is a "prior written agreement" and section 9(1) being where a state has agreed in writing to submit a dispute which may arise to arbitration. There is a specific exception for states which have submitted to the jurisdiction, and the provision within section 9 can either be seen as a specific sub-set of the more general submission to the jurisdiction by way of a written agreement, or as a free-standing exception relating to arbitration. It does not much matter which analysis is adopted, because under section 9 (and to use its exact wording) no state is "immune as respects proceedings in the courts of the United Kingdom which relate to the arbitration".

92.     The claimants rely upon both section 2(2) of the 1978 Act (concerning the state's prior agreement to submit to this jurisdiction) and section 9(1) of the 1978 Act (whereby the state's agreement to arbitrate means submitting to proceedings in this jurisdiction for recognition of any resulting award). Spain argues that neither of these apply. Spain cited a number of authorities that are of limited relevance, including those such as *R v Bow Street Metropolitan Stipendiary Magistrate & Ors; ex parte Pinochet Ugarte (No 3)* [1999] UKHL 17; [2000] 1 AC 147, as well as other far earlier authorities that pre-date the 1978 Act and deal with submission to the jurisdiction in (what used to be called) the face of the court. The *Pinochet* case post-dates the 1978 Act, and concerned attempts by Spain to extradite General Pinochet from the United Kingdom for human rights abuses including torture whilst he was the head of state of Chile, having seized power in 1973 in a military coup. He was arrested in London in the late 1990s, having travelled here for medical treatment. None of these authorities assists Spain on this application in its assertion that the High Court has no adjudicative jurisdiction to make an order for recognition of an ICSID award under the 1966 Act.

93.     Under section 2(2) of the 1978 Act, a state loses its adjudicative immunity if by prior agreement it has submitted to the jurisdiction of the English courts. Spain denies that the claimants are correct when they rely upon Article 54 of the ICSID Convention as constituting this agreement. Spain challenges that Article 54 of the ICSID Convention

satisfies the requirements of prior agreement to submit to the jurisdiction of the courts under section 2(2) of the 1978 Act. Spain maintains that (and here I quote again from its skeleton argument): "(a) it is well established both as a matter of English and international law that only an express submission (or, as it is sometimes called, waiver) by the state itself to the jurisdiction will qualify as a submission within the meaning of s 2(2) SIA; and (b) Article 54 of the ICSID Convention does not come close to meeting that requirement (among others), not least because it is not framed as a waiver or submission by Spain to the jurisdiction of any domestic court bar its own, and indeed does not even refer to a state's adjudicative immunity."

94.    Spain also maintains that "as a matter of historical record, Article 54 of the ICSID Convention was never understood as containing a waiver by states of their adjudicative immunity in this jurisdiction. Had it been, it would have been discussed by Parliament in those terms when the ICSID Convention was being ratified, together with the legislative changes necessary to give it effect." Spain maintains that this was not done, and therefore this is the "strongest possible indication that the UK did not consider such a waiver to exist in the ICSID Convention, as giving effect to it would have required a seismic change to the common law, given waiver by prior agreement was impossible in the UK at that time."

95.    This argument is misplaced, and entirely ignores, in my judgment, both the content and effect of the 1966 Act, the terms of the 1966 Act and also the ratio of *Micula*. The terms of the 1966 Act are clear, and the ICSID Convention itself is a schedule to the Act. It is not necessary to consider what was, and what was not, discussed in Parliament or in what terms. Further, if Spain were correct, it would mean that section 1(1) of the 1966 Act could only apply to awards in which the United Kingdom was a party. That is not a sensible interpretation of the statute, and would – if correct – be categorised as an absurd result. It is plainly not correct. In my judgment, Article 54 of the ICSID Convention falls within "prior written agreement" for the purposes of the 1978 Act, as does the relevant article, article 26, of the ECT which incorporates the ICSID Convention.

96.    The claimants also rely upon the second exception, namely the one under section 9(1) of the 1978 Act. Under this exception, a state's adjudicative immunity is removed with respect to proceedings related to an arbitration in which it has agreed to arbitrate, including proceedings for the recognition of any resulting award. Spain originally submitted before me that there were two reasons why the section 9(1) exception did not apply in this case to remove its adjudicative immunity. It was initially submitted by Spain that the exception did not "encompass arbitrations involving sovereign acts, which includes the Award. Customary international law, against which the SIA must be interpreted, only recognises an exception for adjudicative immunity for recognition proceedings where the dispute on which the award is premised involves a commercial transaction." However, that submission was expressly, and in my judgment sensibly, withdrawn in reply. In order to assist, should the argument be contemplated in other proceedings in the future, the distinction is a flawed one and Mr Baloch was right to withdraw it. There are at least two fundamental problems with any attempt to make a distinction between commercial transactions and sovereign acts in this way. The first is that section 9(1) does not restrict itself only to commercial arbitration. The wording is where the agreement is "to submit a dispute which has arisen, or may arise, to arbitration"; note the use of the indefinite article, and the absence of a restrictive

adjective with the word "arbitration". There is no basis for reading into the section a word that is not there, namely "commercial", to restrict the type of arbitration to which the section applies.

97.    Any doubts about the extent of the exception to matters of enforcement of international arbitration awards should in any event be considered to be well settled, and the judgment of the Court of Appeal in ***Svenska Petroleum Exploration AB v Government of the Republic of Lithuania & Anor (No 2)*** [2006] EWCA Civ 1529, [2007] QB 886 is directly relevant. In that case the arbitration was conducted in Denmark under the auspices of the International Chamber of Commerce or ICC. That case concerned an award and the New York Convention, not ICSID, but what the court had to say concerning *international* arbitration is equally applicable to an ICSID Convention award. At [111] to [120] Moore-Bick LJ considered Hansard and various amendments to the 1978 Act. At [121] he concluded:

"Like the judge, we are not persuaded that section 9(1) is ambiguous or obscure in either respect when read in the context of the rest of the Act, but we also agree that, if it is, the two statements of the Lord Chancellor to which we have referred put the matter beyond any doubt. It is quite clear that it was the intention of Parliament in formulating section 9 of the Act in unrestricted terms that applications for leave to enforce arbitration awards should not attract sovereign immunity, whether the award was domestic or foreign." (emphasis added)

98.    Exactly the same reasoning applies to whether the award relates to "commercial" arbitration or some other type of arbitration that is not commercial. There is no basis for such a distinction and it does not appear in the 1978 Act.

99.    The second fundamental problem with the submission is that it invites consideration of the substantive, underlying dispute, in respect of which the Award has been made, as part of the court's consideration of whether it should be recognised. Spain argued originally that the dispute concerned "sovereign acts" since it concerns the way that Spain modified its energy regulations. But, with the greatest respect to Spain, that is neither here nor there, and in my judgment would be a wholly irrelevant point. Such an argument *might* have assisted it before the ICSID arbitral tribunal (although it did not here, and I doubt it ever would, because arbitrations under the ICSID Convention almost always involve a state as a party). But whether it could have assisted Spain before the tribunal leading to the making of the Award or not, once such an award is made, that is the end of the matter so far as the substantive dispute is concerned.

100.    Unless Spain were able to demonstrate that it has some "*additional defences against enforcement, in certain exceptional or extraordinary circumstances*" (to use the terminology from [78] in ***Micula***) then the proper approach to an application to recognise an award made by an arbitral tribunal under the ICSID Convention is to recognise it in accordance with the 1966 Act which are in accordance with the treaty obligations of the United Kingdom under the ICSID Convention, which is a schedule to the Act. Here, none of the defences deployed by Spain are, in my judgment, "exceptional or extraordinary".

101.    Finally, Spain contended that its "offer of arbitration in the ECT did not extend to [the claimants], depriving the Tribunal of jurisdiction". The authorities that are said to justify this analysis that the arbitration provisions in the treaty itself are in some way

partial, applying only to some investors and not others, are the two cases of the CJEU that I have already considered under the EU law question, namely ***Achmea*** and ***Komstroy***. However, not only have I answered those issues above already (and in favour of the claimants), but there is no justification for interpreting their effect as, in some way, creating within the ECT itself, only a partial offer of arbitration to some investors, but not others, depending upon whether those investors were resident within Member States or elsewhere. Spain cannot rely upon any particular wording within the treaty itself that could accomplish such an extraordinary result. There is no such wording.

102.    In my judgment, and this is consistent with the cases including ***Micula***, the ICSID Convention – a schedule to the 1966 Act - satisfies the requirements of section 9(1) of the 1978 Act and is an agreement in writing by all the Contracting States to submit disputes with investors from other states to international arbitration. The same applies to the ECT for that matter, which expressly incorporates ICSID in article 26.  The 1966 Act concerns only awards under the ICSID Convention, and therefore the claimants' application to register the Award qualifies as "proceedings in the courts of the United Kingdom which relate to the arbitration" under section 9(1) of the 1978 Act.

103.    Spain therefore cannot rely upon immunity; this is the consequence of the express terms of the 1966 Act and the 1978 Act. Its arguments in this respect are not made out and I reject them.

### *Lack of a written agreement to arbitrate and the validity of the Award itself*

104.    These two lines of argument can usefully be considered together. In a sense they can be seen as two sides of the same coin. Spain maintains that there was no written agreement, and also that the Award was not valid. The way this is summarised in the skeleton argument is as follows: "This is because the Award was rendered pursuant to an offer by Spain to arbitrate in ECT Article 26 that did not extend to claims against nationals of other EU Member States, including by the [claimants] *vis-à-vis* Spain. That prohibition on what is known as 'intra-EU claims' in the ECT sounds in international law."

105.    This argument implicitly requires an elevation of the case law of the CJEU, namely the ***Achmea*** and ***Komstroy*** cases, which I have addressed above when considering the EU law question, to a prohibition in international law, and to grant them a precedence higher than the wording of the ICSID Convention and the ECT themselves. I have already explained above why I do not consider that to be the correct analysis.

106.    The Award was issued by a validly constituted ICSID tribunal, and challenges to the decisions of that tribunal were brought by Spain under the ICSID Convention and the validity of the award was confirmed by the ICSID Committee. These very points have been considered and adjudicated upon by both the tribunal and the Committee, and the ICSID Convention gives these organs the exclusive jurisdiction to determine such matters. It is therefore a valid and authentic award, and Spain has no basis for contending otherwise.

107.    I therefore remind myself of what Professor Schreuer said in his writings, approved by the Supreme Court in ***Micula*** at [68], and together with this, one can put the dicta from [69] and [78] in that case together to establish a summary of the principles, which I have synthesised into the following. This is not an exact and direct quotation

from either the writings of Professor Schreuer or from the judgment of Lord Lloyd Jones JSC and Lord Sales JSC in the Supreme Court, but takes some of their phraseology, and is my analysis of what they state the law to be. The underlining is my emphasis:

Where an application is made to the High Court for recognition of an award made by a tribunal under the ICSID Convention, the court is restricted to ascertaining the award's authenticity. It may not re-examine the ICSID tribunal's jurisdiction. It may not re-examine the award on the merits. Nor may it examine the fairness and propriety of the proceedings before the ICSID tribunal. The High Court may not refuse recognition or enforcement of an award on grounds covered by the challenge provisions in the ICSID Convention itself. Nor may it do so on grounds based on any general doctrine of *ordre public.* There is a provision in the 1966 Act for a stay to be imposed in certain situations, that correspond with those available under the Convention in Articles 50, 51 and 52. However, these stays pursuant to the Convention are available only in the context of interpretation, revision and annulment of awards addressed by those articles. If a respondent state has already exercised and exhausted its right under article 52 of the ICSID Convention to seek annulment of the Award, and has failed (such that the award is question has been upheld by the ICSID *ad hoc* Committee), then the High Court will not grant a stay.

108.    Finally, although it is arguable that there is scope for some additional defences against enforcement, in certain exceptional or extraordinary circumstances which are not yet defined, such defences must, in my judgment, (as a minimum) comply with two conditions. Firstly, the law of this jurisdiction must recognise them in respect of final judgments of the English courts; and secondly, they must not overlap with those grounds of challenge to an award which are specifically allocated to Convention organs under articles 50 to 52 of the ICSID Convention.

109.    Here, there are no such exceptional or extraordinary circumstances. The EU law question does not qualify as such; and in any event, the primacy of the law of this jurisdiction and the adherence of the United Kingdom to its own international treaty obligations under the ICSID Convention (as set out in the 1966 Act) would in any event be given priority by the High Court as stated by the Supreme Court in *Micula*.

110.    Nor, in my judgment, does this result mean that the United Kingdom's treatment of such issues make it some sort of outlier in the field of recognition of ICSID awards, or in its interpretation of international legal principle. Similar outcomes have resulted elsewhere on the same, or very similar, international law issues.

111.    The claimants rely upon decisions on ICSID award enforcement against Spain and attempts to have these recognised in both Australia and in the United States. Although the domestic law of each of those jurisdictions is different from that of the United Kingdom, there are distinct similarities, and both of them are signatories to the ICSID Convention. The approach of both of those jurisdictions merits attention, and I shall refer to each in turn.

112.    In Australia the r case of *Kingdom of Spain v Infrastructure Services Luxembourg S.à.r.l* [2021] FCAFC 3 concerned enforcement attempts by the claimants against Spain in respect of the same Award. In Australia the statute that is the broad equivalent of the State Immunities Act 1978 here, is the Foreign State Immunities Act 1985 (referred to in that judgment as "the Immunities Act"). At first instance, Spain

sought to claim foreign state immunity when opposing an application that Spain pay the amount of the award. The judge at first instance, Stewart J (referred to in the judgments of the Federal Court of Appeal as "the primary judge") had rejected the claim of foreign state immunity and on appeal, the principal issue was whether Spain's accession to the ICSID Convention constituted a submission to the jurisdiction of the Federal Court (per [15] in the judgment of Perram J). Spain had also submitted "that Article 26 of the ECT was unlawful under European law", an argument described by Perram J as "an orphan submission".

113.    The Federal Court of Appeal unanimously found that the ICSID Convention was an agreement within the meaning of section 10(2) of the Immunities Act, and thereby constituted a submission to the jurisdiction. It found that there was a distinction between recognition and execution, and this was reflected in the proper construction of Article 54(2) of the ICSID Convention. The judgment of Perram J held at [29] that both Articles 54(1) and (2) showed that a party with an ICSID award may seek recognition without enforcement (by which it plainly means without at that stage execution) and that execution could not be construed as including recognition in Article 55. I agree with that analysis. Allsop CJ, who at the time as Chief Justice of the Federal Court of Australia was the most senior judge of that court, agreed with Perram J but also gave additional reasons and stated at [4] that Article 54 included enforcement because it was principally considered that this was to give recourse against a defaulting investor and "it was considered highly unlikely that the State party to the Convention would not carry out its treaty obligations" (quoting Professor Schreuer). The orders at first instance made by the primary judge had gone beyond those rights available to the claimants, but the claimants were entitled to recognition of the Award and that was the outcome of the appeal.

114.    In my judgment, that analysis in terms of state immunity and recognition holds good in the United Kingdom, for the same reasons but applying the logic to the relevant domestic legislation. Spain has no immunity to these proceedings under the 1966 Act because it has already submitted to the jurisdiction of the court by reason of its accession to the ICSID Convention, which is a written agreement to arbitrate and hence within the exceptions of the State Immunities Act 1978. Spain made a special application for leave to appeal to the High Court of Australia from the judgment of the Federal Court, and judgment was handed down after the hearing before me on 12 April 2023, and is at [2023] HCA 11. The claimants drew this to my attention during the period after the hearing and whilst this judgment was being prepared, and I gave both parties permission to lodge short further supplemental submissions on that matter, and they both did so.

115.    In summary, the High Court of Australia dismissed Spain's appeal and found that Spain was the subject of a binding ICSID arbitral award, the effect of Spain's agreement to Articles 53 to 55 of the ICSID Convention amounted to a waiver of foreign State immunity from the jurisdiction of the courts of Australia to recognise and enforce, but not to execute, the award. The court held that "the orders made by each of the primary judge and the Full Court are properly characterised as orders for recognition and enforcement. Spain's challenge to the orders of the Full Court should not be accepted. The orders of the Full Court should not be disturbed."

116.    In its supplemental submissions Spain contended that this decision "carries little or no weight as an authority on the questions before this court". I disagree with that characterisation, as I find such an authority persuasive; I do of course accept that one

must obviously take account of the slightly different domestic statutes involved. However, even without deploying that decision as an authority of weight, the claimants are entitled to rely upon what is its conventional analysis of legal principle, including international treaty obligations such as Spain being a state that is party both to the ECT and the ICSID Convention, to support its case. Regardless of that, the outcome of that appeal does not, in my judgment, affect or impinge upon the analysis of the correct approach to be applied by this court on the law in this jurisdiction on the application by Spain to set aside the Order. I would characterise it as separate free-standing support, in the highest appellate court of another common law jurisdiction, for the analysis which I have undertaken. Both my analysis and that in Australia are consistent, and reach the same conclusions.

117.   Turning to the United States, a number of decisions were cited to me, including *NextEra Energy Global Holdings B.V. v Kingdom of Spain* No.1:19-cv-1618 (TSC) (DDC 2023) which was handed down on 15 February 2023 and *9Ren Holding S.À.R.L. v Kingdom of Spain* No.1:19-cv-1871 (TSC) (DDC 2023). These were part of what appears to be a battle on a wide international front between these parties, and these two were anti-anti-suit injunctions by which parties to such awards were seeking to overcome Spain's continuing opposition to enforcement by bringing motions to dismiss, with the corresponding petitions to enforce the award. It is unnecessary to analyse these in any great detail, because in any event the statute which the court had to apply was that which applies in the United States, namely the Foreign Sovereign Immunities Act. For what it is worth, however, and perhaps unsurprisingly, the US courts granted the relief sought, in order to protect their own lawful jurisdiction (explained at Section B [4] of the judgment of US District Judge Kutyan) which prevented Spain from continuing with certain acts in Luxembourg that were, in the view of that judge, plainly aimed at usurping the jurisdiction of the US court (explained at Section B [3] of the judgment in the *9Ren* case). These cases support the claimants' approach.

118.   Remaining in the United States, on 29 March 2023 (therefore the first day of the hearing before me) the US District Court for the District of Columbia (usually referred to as "DC") handed down its opinion in the case of *Blasket Renewable Investments LLC v The Kingdom of Spain* Civil Case No. 21-3249 (RJL) (DDC 2023). In that case, the claimant Blasket had inherited (by way of substitution or otherwise) the claims of two Dutch companies which had the benefit of an arbitration award from a tribunal which had been seated in Switzerland. The judge found that there was no valid agreement to arbitrate as a result of the law of the EU and Spain's motion for Blasket's petition to be dismissed was granted. That case did not however concern an ICSID award, but rather was one convened under UNCITRAL. That is a very important difference. In particular, it does not assist Spain before me. This is because, as explained on page 10, and as the judge stated, "the presumption [as to lack of an agreement to arbitrate] can be overcome in cases where there is clear and unmistakeable evidence that the parties delegated authority to the arbitrator to resolve challenges to the existence of an arbitration agreement; *First Options of Chicago Inc v Kaplan* 514 US 938, 944 (1995). As relevant here, one way in which parties may show such clear and unmistakeable evidence is to agree to arbitrate under rules that expressly delegate such authority to the arbitrator." That passage correctly states that authority to resolve jurisdiction issues can be delegated to the arbitrator or the arbitral tribunal. In my judgment, that is what the ICSID Convention clearly does.

119.    I explained above at [38.] that the claimants had sought recognition of the Award in
        other jurisdictions, including Australia. That jurisdiction is a signatory to the ICSID
        Convention and it is a matter of the domestic law in other jurisdictions, wherever
        recognition is sought, whether the claimants are entitled to recognition in those other
        jurisdictions. The ratio and decisions in other countries are potentially persuasive and
        of interest, but as I noted, plainly they do not bind this court. It is however heartening,
        in terms of the integrity of international treaties, and the purpose and applicability of
        the ICSID Convention and international arbitration under it, that both in Australia and
        also the District of Columbia, those jurisdictions have adopted broadly the same
        analysis as I have. The near-identical conclusion of the highest court in Australia, and
        its findings of the lack of state immunity there, due to the existence of a binding
        arbitration agreement, demonstrate in my judgment that my conclusion is correct.

120.    There is a decision relied upon by Spain which is listed in a footnote in its skeleton,
        and was amplified orally at the hearing. This is a decision of the Commercial Court in
        the British Virgin Islands ("the BVI"), namely *Tethyan Copper Company Pty Ltd v
        Islamic Republic of Pakistan and others* BVIHC (Com) 2020/0196. In that case, the
        claimant ("TCC") had sought provisional charging orders and interim relief, together
        with an application for recognition of an ICSID award in the amount of US$6.2
        billion which it had obtained following a dispute with Pakistan. In the course of
        deciding that TCC were not entitled to this in the BVI, Wallbank J considered at [50]
        the submission made by the TCC that by virtue of Pakistan being a party to the ICSID
        Convention, it was not immune from the jurisdiction of the courts of the BVI under its
        State Immunity Act (called "the SIA" in the judgment at [27]), because of a similar
        provision to the 1978 statute in the UK concerning an arbitration agreement. The
        judge dismissed that argument in a five-line paragraph in his judgment that included
        the following: "However, the ICSID Convention is a treaty that can have no effect
        under domestic law in and of itself. That includes, for present purposes, the United
        Kingdom position on state immunity, which is set out in the SIA."

121.    I respectfully do not agree with that statement, in so far as it is advanced as authority
        for stating the position of the law of England and Wales where a claimant seeks
        recognition of an ICSID award in the High Court. Firstly, the point does not appear to
        have been fully argued before the judge, and was very much a secondary element to
        the ratio of the judgment on wider and different issues. Secondly, the decision is one
        of the courts of the BVI. Thirdly, it does not pay any attention to the terms of the 1966
        Act; whether there is a similar act governing that territory or not, that statute is a
        crucial step in enshrining the United Kingdom's international treaty obligations in
        domestic law and will be applied here by the High Court. Therefore, the statement
        that a treaty can have no effect under domestic law is, as a general proposition,
        broadly correct in terms of the lack of direct effect available to private individuals of
        international obligations generally contained in treaties, but cannot stand unqualified
        when one considers the terms of the 1966 Act. Additionally, that there are some
        differences between the law of England and Wales and the law of the BVI is clear
        from, for example, the passages at [56] to [64] discussing the procedural differences
        under the two different CPRs in force in each jurisdiction. But regardless of the
        position under the law of the BVI – and this is not the place for a comparative
        analysis of the two jurisdictions - I am satisfied that the position of the law to be
        applied in this jurisdiction is as I have explained it.

122.    What Spain's main EU law argument amounts to is this, at its heart. Spain accepts
        that it is a party to the ICSID Convention; it accepts that it is a party to the ECT. It

freely acceded to both of those treaties. There is no doubt that the ECT expressly incorporates the ICSID arbitration provisions within it, adopting international arbitration to resolve disputes between Contracting Parties (which includes Spain) and private international investors, who are resident or domiciled in other countries. Yet Spain relies upon its membership of the EU, the EU Treaties that created that union, and the strictures imposed on those Member States by the CJEU's rulings on the EU Treaties. These rulings have determined – again, outlined here only in summary - that there can be no valid arbitration provision adopted by Member States which grants jurisdiction to any arbitral tribunal that may touch upon matters of EU law. This is due to the primacy of the CJEU to determine all such EU law matters. Therefore Spain argues that there can be no jurisdiction, even for a properly constituted ICSID arbitral tribunal, to determine any dispute under the ECT between Spain and an investor from any other state. This is the case regardless of whether that investor is within, or without, another Member State, although it runs both lines of argument in the alternative. It also argues that any ICSID award, such as the Award in this case, must therefore have been reached without jurisdiction and so cannot be a valid award; and/or that it has immunity from recognition in the courts of the United Kingdom for what may broadly be described as the same, or similar, reasons.

123.    The logical consequence (or extension) of this argument for it to be correct is that these decisions of the CJEU must be taken as binding all the parties to the ECT and to the ICSID Convention – whether Member States of the EU or otherwise - and take priority over all other treaty obligations entered into by any other state, even those obligations assumed by treaty prior to the creation of the EU. What this would mean, were Spain to be correct (and I am confident that it is not correct) is that by reason of the terms of the EU Treaties, and by reason of the rulings of the CJEU and its supremacy over EU law matters, the EU and the CJEU would have unilaterally changed – if not removed - all the existing treaty obligations of all the Contracting Parties to the ICSID Convention. I know of no framework of international law in which such a position could be correct. I would go further and observe that it simply cannot be correct. It would mean that the existing treaty obligations of any Contracting Party to the ICSID Convention would have been changed, without any intention or involvement on the part of that Contracting Party, a sovereign nation, as a result of rulings by the CJEU. That is not a conventional analysis of how international obligations work, and I reject Spain's arguments. This completes my consideration of what I consider is the longer route.

124.    It can therefore be seen that whichever route is navigated – the first based on domestic law analysis, and the second considering international legal principles - one arrives at the same destination. The United Kingdom enacted the 1966 Act in order to comply with its own treaty obligations under the ICSID Convention. The Award in this case is a valid one which is authentic and one that was clearly reached with jurisdiction. Jurisdiction was considered and determined by the ICSID Tribunal, and this was confirmed by the ICSID Annulment Committee. The operation of the 1966 Act means that the Award was properly recognised as set out in the Order, in accordance with the CPR rules that govern such matters. There is no basis for setting aside that Order under Issue I, jurisdiction, as this is a matter that is reserved to the Convention organs. But even if there were, Spain's challenges to jurisdiction are misplaced. The claimants' arguments are to be preferred on this ground.

125.    Were Spain's arguments to be accepted by this court this would mean, in my judgment, that the High Court would be giving effect to EU law and finding invalid

the express ICSID arbitration provision which is undoubtedly included in the ECT. This would thereby override both the United Kingdom's own domestic statutes precisely on the same point – both the 1966 Act and the State Immunity Act 1978 – but would also be ignoring its own separate international treaty obligations contained in the ICSID Convention itself. There is no reason to do this: indeed, there is every reason not to do so. It would, in my judgment, be wrong in law to allow this argument by Spain based on EU law, as explained in ***Achmea*** and ***Komstroy*** by the CJEU, to trump the existing treaty obligations of the ICSID Convention, as enacted into domestic law here by the 1966 Act.

**F.    *Issue II: Non-Disclosure***

126.    This is a separate and free-standing ground upon which Spain seeks to set aside the Order, but obviously it only arises in the event that Spain's challenge to jurisdiction fails. It is said by Spain that the claimants failed to comply with their duties of full and frank disclosure and fair presentation in obtaining the Order.

127.    This is explained in the skeleton argument lodged for Spain in this way: "there is a significant amount of information that [the claimants] failed to convey to it when the Recognition Order was made, and failed to update the Court on thereafter." There are therefore two aspects to it. Firstly, disclosure (or as alleged, non-disclosure) when obtaining the Order; secondly, similar failures after the Order was made.

128.    Mr Green KC for the claimants, at one stage, invited clarification from the court in terms of direction as to what precisely, in a situation such as this one, ought to be disclosed by an applicant in the position of these claimants. He pointed out that the claimants had lodged over 2,000 pages of evidence and exhibits in their application for recognition that led to the Order. He pointed out the logistical difficulties on the part of any such applicant, and the difficulty of knowing how much was sufficient in terms of satisfying the duty of disclosure. He also, later in the hearing, argued that there was no obligation for any disclosure on the part of a claimant seeking recognition of an ICSID award by the High Court, although he rowed back from that when, upon discussion with the court, it appeared that he came to consider this position potentially extreme.

129.    There are two limbs to what used to be called the rules of "natural justice", and now sometimes described as the duty to act fairly. They both have Latin tags. One is the rule against bias, which can be either actual or apparent bias, which used to be called *nemo iudex in sua causa*, or – loosely translated - no man can act as a judge in his own cause. In modern parlance, this means every litigant is entitled to have their case judged by an impartial tribunal. The other limb used to be called *audi alteram partem*, or hear the other side. This equates to a party knowing the case they have to meet, and being given a fair opportunity to meet that case. What that distils down to, in any case where an *ex parte* order is involved, is this. On applying for the order, the applicant must disclose to the court any matters adverse to him or herself which are material, even if they are adverse to the applicant. This is because making an order against a party without giving them the opportunity to be heard is a narrow exception to the second limb as explained above. Additionally, because the duty of disclosure upon such an applicant is a high one (and it is also, incidentally, an exception in an adversarial system such as ours) the court can demonstrate its disapproval of the failure to comply with the duty by discharging the order even if, otherwise, the applicant on the *inter partes* hearing would be entitled to the same relief.

130.   The seminal statement on the scope of the duty is per Bingham LJ (as he then was) in
       **Siporex Trade SA v Comdel Commodities Ltd** [1986] 2 Lloyd's Rep 428, 437 where
       he stated that an applicant for *ex parte* relief must:

> "[I]dentify the crucial points for and against the application, and
> not rely on general statements, and the mere exhibiting of
> numerous documents […] He must disclose all facts which
> reasonably could or would be taken into account by the judge in
> deciding whether to grant the application. It is no excuse for an
> applicant to say that he was not aware of the importance of matters
> he has omitted to state. If the duty of full and fair disclosure is not
> observed the court may discharge the injunction even if after full
> inquiry the view is taken that the order made was just and
> convenient and would probably have been made even if there had
> been full disclosure."

131.   That duty remains upon the applicant until the first hearing on notice; per Saville J (as
       he then was) in **Commercial Bank of the Near East plc v A and others** [1989] 2
       Lloyd's Rep 319, 323. There was some disagreement between the parties before me
       regarding the point at which that duty is lifted, and whether service of the Order is the
       point at which it no longer applies. To support its contention that the duty subsists
       past the date of service, Spain cited a recent decision of Bacon J, namely **Valbonne
       Estates Limited v Cityvalue Estates Limited** [2021] EWHC 544 (Ch) at [31], who
       stated that "the duty of full and frank disclosure is not temporally limited to the
       hearing of the without notice application, but continues while the proceedings remain
       on that basis".

132.   Here, the consent order of Moulder J to which I have referred at [3.] is directly
       relevant because it demonstrates that the Order was agreed by the parties to have been
       served on 21 October 2021, and Spain made its first application to set the Order aside
       by way of an application dated 4 November 2021. The date advanced by Spain at
       [124] of its skeleton argument as the date of 8 November 2021 being the one prior to
       which breaches of the disclosure obligation are relevant is therefore slightly wrong.
       However, nothing of note occurred, or did not occur, between 21 October 2021 and
       either 4 November or 8 November 2021, and so nothing turns on that minor
       difference in dates for reasons that will become clear.

133.   It is trite law that where the court determines that there has been a substantial breach
       of the duty, "the court strongly inclines to setting its order aside and not renewing it,
       so as to deprive the defaulting party of any advantage that the order may have given
       him. This is particularly so in the case of freezing and seizure orders"; per Christopher
       Clarke J (as he then was) at [104] in **Re OJSC Ank Yugraneft v Sibir Energy Plc**
       [2008] EWHC 2614 (Ch), [2010] BCC 475. That there is a particularly high duty in
       such cases is well known, because, self-evidently, orders of those kinds particularly
       interfere with, and are invasive of, the respondent's rights. Such orders have in a
       number of other cases been described as "draconian in nature". In the **Yugraneft** case,
       a provisional liquidator had been appointed. One of the respondents was Mr Roman
       Abramovich, a well-known international figure who for many years owned Chelsea
       FC, an association football club. The non-disclosure was highly material, and just to
       select here one small element, the court had not been told that Sibir had alleged in

other proceedings in the BVI that he was resident in England (which partially founded the jurisdiction to make the order) that he had denied this on oath in other proceedings, and both the Court of Appeal and the court at first instance in those BVI proceedings had accepted that Russia was the country of habitual residence and centre of operations of Sibir and of all of the defendants, including Mr Abramovich. This was not disclosed to the court at all on the *ex parte* application.

134.   That judgment continued to explain that whether to continue such an order in those circumstances was always a matter of discretion in any particular case:

"[106] As with all discretionary considerations, much depends on the facts. The more serious or culpable the non-disclosure, the more likely the Court is to set its order aside and not renew it, however prejudicial the consequences. The stronger the case for the order sought and the less serious or culpable the non-disclosure, the more likely it is that the Court may be persuaded to continue or re-grant the order originally obtained. In complicated cases it may be just to allow some margin of error. It is often easier to spot what should have been disclosed in retrospect, and after argument from those alleging non-disclosure, than it was at the time when the question of disclosure first arose."

135.   Materiality therefore depends in every case upon the nature of the application and the matters relevant to be known by the judge when hearing it; Jacobs J in *Union Fenosa* at [109], quoting Toulson J (as he then was) in *MRG (Japan) Ltd v Engelhard Metals Japan Ltd* [2003] EWHC 3418 (Comm) at [25].

136.   The duty of full and frank disclosure also applies in respect of immunity. Spain argues that section 1(2) of the State Immunity Act itself "charges the Court with ensuring the state's right to immunity is upheld even where it does not appear. But more importantly, the SIA purports to reflect the UK's obligations towards other states under customary international law. A state may breach public international law due to the actions of its courts."

137.   I accept that state immunity is a highly important feature, and potential arguments in that respect ought to be brought to the attention of the court on an *ex parte* application. I also accept that the court has to consider this of its own motion given the terms of the 1978 Act. I also concur with the description of such immunity as a matter of "the greatest importance", the terms used by Lawrence Collins LJ in *ETI Euro Telecom International NV v Republic of Bolivia & Anor* [2008] EWCA Civ 880, [2009] 1 WLR 665 at [110]. In that case, Bolivia had nationalised certain assets and as a result the claimant commenced arbitration under the provisions in a BIT between Bolivia and the Netherlands, the claimant being a Dutch company. That BIT contained ICSID Convention arbitration provisions and this resulted in an arbitration claim being submitted to ICSID. The claimant also sought a freezing injunction against Bolivian assets in London. This was discharged on the grounds, inter alia, of state immunity. This case makes clear that "the court must give effect to immunity even if the state does not appear", and therefore I accept that this point must be considered by the court at the point of considering an application. This is consistent with what is stated in that case, because Stanley Burnton LJ stated at [128] (with whom Tuckey LJ agreed at [129]) that "any claimant who wishes to bring proceedings against a state must be in a position to address the issue as to the

jurisdiction of the court when he seeks to invoke the jurisdiction of the court". He also added (after observations in respect of seeking an injunction against a state, which do not apply here) that "in a case such as the present, the court must consider and decide the question of state immunity at as early a stage of the proceedings as practicable."

138.    The court here could not finally decide the question of state immunity without full argument from Spain. The issues are complex and a decision of this nature is not apt to be made, even (or especially) at first instance, without giving a sovereign state the ability properly to advance its own arguments by its own counsel, properly instructed. However, there is no doubt that the issue of lack of jurisdiction – however it might be arrived at, whether by reason of lack of jurisdiction on the part of the tribunal, state immunity under the State Immunity Act, or otherwise - was or would be a central feature of whether the Award should be recognised.

139.    In *Gold Reserve Inc v Bolivarian Republic of Venezuela* [2016] EWHC 153 (Comm), [2016] 1 WLR 2829 [67]–[91] Teare J considered similar issues in respect of enforcement of an arbitral award following resolution of a dispute between an investor and Venezuela concerning mining rights and concessions there, which were held by a Canadian company. There was a dispute resolution procedure in place under a BIT between Venezuela and Canada, and because Venezuela was not a signatory to the ICSID Convention the arbitration was conducted under the Additional Facility mechanism. Venezuela had been a party to the ICSID Convention but had denunciated it in accordance with Article 71 in July 2012.

140.    In that case, the applicant had drawn the court's attention to Venezuela's immunity, but was held to have breached the obligation of full and frank disclosure by failing to draw the court's attention to the arguments that Venezuela would be likely to rely upon in order to maintain that immunity. Teare J said at [71] the following, in a passage upon which Spain relies:

> "When a judge is faced with an application for permission to enforce an award against a state as if it were a judgment the judge will have to decide whether it is likely that the state will claim state immunity. If that is likely then he would probably not give permission to enforce the award but would instead specify […] that the claim form be served on the state and consider whether it was a proper case for granting permission to serve out of the jurisdiction. He would envisage that there would be an *inter partes* hearing to consider the question of state immunity. For that reason any applicant for permission must draw the court's attention to those matters which would suggest that the state was likely to claim state immunity. Indeed, since the court is required by section 1(2) of the State Immunity Act to give effect to state immunity even though the state does not appear, it is important that the court be informed of the available arguments with regard to state immunity. […] [W]here, as here, it was known that Venezuela was continuing to rely upon those arguments and therefore was likely to rely upon state immunity it was incumbent upon the applicant to summarise those arguments for the benefit of the judge. That was the more necessary where the application was on documents alone and the

> judge might well be considering the application after a busy day in
> court dealing with other matters."

141. Spain relies upon this passage in two ways. Firstly, it is said to provide guidance for
the court when dealing with state immunity that this subject is sufficiently important
to be drawn to the court's attention in its own right. Spain submitted in its skeleton
"Put simply, where it appears likely that a state will rely on its immunity before the
Court, the Court should make no *ex parte* order, but instead 'envisage that there
would be an *inter partes* hearing to consider the question of state immunity'."

142. The nature of the non-disclosure in that case is clear from [68] of the judgment:

> "[68] With regard to state immunity Mr. Dunning submitted that Mr. Miller, who
> made the witness statement in support of the application without notice, did not refer
> to the fact that the arbitration agreement had been disputed in the arbitration or to the
> fact that the arbitration agreement was still being disputed by Venezuela in
> proceedings in Paris and Luxembourg. In the result it was said that the court was not
> alerted to the fact that there was a substantial and continuing dispute concerning the
> agreement to arbitrate."

### G.    Discussion on Non-Disclosure

143. Dealing with the substance of the complaints raised by Spain in this respect, the
following points must be made. This is a very different set of facts to those in **Gold
Reserve**.

144. There is nothing of substance in the complaint that the Order was made *ex parte*
without the judge convening an *inter partes* hearing to consider and determine Spain's
challenges to jurisdiction and/or claim of state immunity. This is because CPR Part
62.21 contains a specific regime for registration of ICSID awards. This is headed
"Registration of awards under the Arbitration (International Investment Disputes) Act
1966". Teare J was considering the procedure under CPR 62.18 as made clear at [54]
in his judgment where he sets this out. That is a different rule.

145. The Practice Direction to CPR Part 62 does not deal specifically with whether an
order recognising an award under the ICSID Convention should, or should not, be
determined without a hearing in the first instance, but it does state in the commentary
in the White Book on PD62(1) that:
*"It is not necessary for a party seeking to enforce an award against a state under this
provision to issue a claim form; it suffices to issue a without notice application, and
the state is then able to apply to set aside any order made against it."*

146. That entry in the commentary supports the approach adopted by the claimants in this
case. As observed by Jacobs J in **Unión Fenosa v Egypt** (which has already been
referred to at [76.] above), there have been very few reported cases on recognition of
ICSID awards. At [59] he stated:

> "Indeed, even though the procedure for registering awards under the 1966 Act has
> now been in place for over 50 years, there is no reported example of an application for
> registration coming before the court initially on an ordinary *inter partes* application
> under Part 8 or its equivalent under the rules of the Supreme Court. If there is to be a

contested application, then it would be expected to arise on an application to set aside the without notice order."

147.    The Commercial Court Guide states in its 11th edition that such an order "may be made without a hearing" in section O.11. Further, this supports not only the approach in the commentary, but also that suggested by Jacobs J in the **Fenosa** case.

148.    Spain therefore, as a matter that amounts to alleging a breach of procedural fairness, maintains that the judge ought not to have made the Order in the way that she did, and ought instead to have set the matter down for a fully contested hearing. The implication is also that had she been aware of the full nature of the objections and arguments which Spain would advance, she would have done so. I disagree with both of those propositions for reasons which will become clear.

149.    Further, and in any event, even if the judge was wrong to have made the Order, and even if I am wrong in agreeing that she adopted the correct procedural way forward (and even if my reasons for so agreeing do not withstand scrutiny) this does not matter for two reasons. Firstly, Spain has been given the opportunity to address all of the many arguments that it wished to advance on this subject in any event, under its liberty to apply to have the *ex parte* Order set aside. Secondly, given this was an Order recognising the Award, Spain has suffered no prejudice whatsoever in any event. And thirdly, departing from the consideration of the principles to be applied, and finally – perhaps conclusively - these points raised by Spain have no basis in fact in this case. This is because the claimants expressly *did* draw the jurisdiction issues to the attention of the court in their first witness statement and the extensive evidence lodged in support of the application for recognition. Unlike the **Gold Reserve** case, where these matters were not referred to, the claimants explained in considerable detail the arguments that Spain had deployed to challenge jurisdiction, and the EU law basis of them.

150.    Three examples will suffice from the witness statement of Mr Watson:

1. In section "B Background" at (iv) under the heading "The European Commission's Applications for Leave to Intervene in the ICSID Arbitration" he sought to explain this, which included reference to the US and Australian enforcement proceedings, which he explained later in his statement;

2. In the same section at (v) under the heading "The ICSID Annulment Proceedings" he summarised the arguments advanced by Spain, including at 41.1 that it had been contended by Spain that the ICSID tribunal had manifestly exceeded its powers by exercising jurisdiction over the Arbitration in beach of EU law. This included the following passages "On Spain's case, because the dispute is "intra-EU" in nature, it is contrary to EU law, including the "principle of primacy", for the Tribunal to have accepted jurisdiction. Spain also argues that the **Achmea** judgment – which was not analysed by the Tribunal as it was not on the Arbitration record – should have been applied and that the effect of **Achmea** is to preclude intra-EU arbitration under the ECT…..";

3. At 43.3, in a section dealing with Spain's contentions that the Tribunal failed to state reasons, these included "in relation to its determination of….the applicability of EU law. Spain claims that the Tribunal failed to state reasons because it did not explain why EU law could not deprive the Tribunal of its jurisdiction under the ECT."

The statement also explained that Spain had submitted three separate and new expert reports "in support of its EU law arguments….who opined on two main issues of EU law: the application of the ECT to intra-EU disputes; and EU state aid issues." He also set out the counter-arguments being advanced by the claimants to meet these points. In my judgment, more than enough was provided to explain to the court that Spain was contending that the correct application of EU law meant the arbitral tribunal had no jurisdiction. These issues were perfectly properly and sufficiently brought to the attention of the court by the claimants before the Order was made.

151. Mr Watson also dealt with the application by the Commission to intervene in the Annulment proceedings, as well as the steps taken by the claimants in Australia and the United States to enforce the award, including reference to the decisions of the courts in those two jurisdictions in so far as those were then available. He referred to the assertion by Spain in Australia before Justice Stewart of foreign state immunity under the Foreign State Immunities Act 1985. In a separate section of his statement, headed "E. Full and frank disclosure", he set out in 17 separate paragraphs Spain's "anticipated arguments" and also some other points to put those in context.

152. There are four matters listed in Spain's skeleton argument which it is argued before me were not disclosed. Firstly, it is said that the claimants failed to update the court when the judgment of the CJEU in the **Komstroy** case was handed down on 2 September 2021.  Secondly, the claimants failed to inform the court of "various developments which followed the CJEU's judgment in **Achmea**……including, most egregiously, the fact of Intra-EU Declaration 1 and the UK's signature of the same". It is said that these were, or were likely to be, relevant to Spain's defences. Thirdly, that the claimants "failed to update the court on developments at the European Commission, in the courts of EU Member States and elsewhere, which are clearly relevant to Spain's argument that section 9(1) [of the State Immunity Act 1978] cannot apply to displace its immunity, and which have transpired since the Recognition Order." Finally and fourthly, although the judgment in the **Gold Reserve** case *was* expressly brought to the attention of the court by the claimants on the *ex parte* application, Spain contends that they failed to draw the attention of the court specifically to the "guidance" in [71] of that judgment, which I have quoted at [140.] above, to the effect that an *inter partes* hearing would (or on Spain's case, should) be held.

153. Intra-EU Declaration 1 arises as follows. The full title of this is Declaration of the Representatives of the Governments of the Member States of 15 January 2019 on the Legal Consequences of the Judgment of the Court of Justice in **Achmea** and on Investment Protection in the European Union. On 15 January 2019, the EU Member States of the EU, including at that time the UK (as it had not at that stage left the EU) signed a declaration ("Intra–EU Declaration 1") which stated the following:

"International agreements concluded by the [EU], including the [ECT], are an integral part of the EU legal order and must therefore be compatible with the [EU] Treaties. Arbitral tribunals have interpreted the [ECT] as also containing an investor-State arbitration clause applicable between Member States. Interpreted in such a manner, the clause would be incompatible with the Treaties and thus would have to be disapplied."

154. However, Intra-EU Declaration 1 does not bind this court, it did not bind the judge who made the Order, and it certainly does not apply in priority above the 1966 Act, or in preference to the ratio of the Supreme Court as set down in **Micula**. In my

judgment, it is not relevant to the issues on the application, which can be taken from the *Achmea* case. The sentence "and thus would have to be disapplied" from the Intra-EU Declaration also, as observed above at [81.], directly contradicts Article 5 of the Vienna Convention specifically dealing with conflicting treaty obligations. It does not therefore need to be considered further, and I do not consider it to have been material non-disclosure for the claimants not to have drawn the attention of the judge to this on the *ex parte* application pursuant to which she made the Order.

155.   The judgment in **Komstroy** was handed down on 2 September 2021, which falls in the period after the Order was made on 29 June 2021, and before the first set-aside application was made by Spain on 4 November 2021, following the Order having been served on 21 October 2021 (the agreed date in the consent order made by Moulder J). There is no doubt therefore that it became known directly in the period covered by the duty of full and frank disclosure upon the claimants. The claimants' response to that complaint is three-fold. They observe that the decision of the CJEU affirmed the Opinion of AG Szpunar, which had been brought to the attention of the court in Mr Watson's witness statement in any event; that as of 2 September 2021, they had by that date "already sought to have the order served via diplomatic channels on Spain"; and finally they proffer an apology if they had misjudged matters in this respect.

156.   I do not consider the failure to provide the court with a copy of the judgment in **Komstroy** in September 2021 to be of any particular import, or to constitute non-disclosure. It was handed down about 2½ months after the Order had been made, and after the claimants had initiated the process (which is done via the Foreign, Commonwealth and Development Office) for service of the Order. Its reasoning and conclusion was no surprise, and the judgment is entirely consistent (as is to be expected) with the view of the CJEU as set out in **Achmea**, and also as expounded by the Opinion of AG Szpunar (which was brought to her attention in Mr Watson's statement). The case is entirely aligned with the ratio of **Achmea**. All that the decision in **Komstroy** did was add to the weight of material supporting Spain's arguments on what I have called the EU law question; it did not raise a new argument. Out of an abundance of caution, the claimants' advisers could have provided the court with a copy (as they have done of later international decisions even when the *ex parte* duty clearly no longer applied), but one has to be realistic about this. The court was not likely to be assisted by a steady notification of material relevant to the development of the law in this area within the EU, nor is that required, for months after the Order had been made. The issue was put fairly and squarely by the claimants in the material already lodged with the court supporting the application that led to the Order, and the court had already been put on notice that these were arguments which Spain would be likely to mount. In my judgment that was sufficient.

157.   So far as the failure to cite [71] specifically of **Gold Reserve** to the court is concerned, one has to be realistic too, about what that case actually states, its standing and the effect of the contents of that paragraph. Whether to hold an *inter partes* hearing or not prior to recognition is effectively, in the instant or any similar case for recognition of an ICSID award, a matter of procedure. It is true that Teare J was the Judge in Charge of the Commercial Court at the time of his judgment in **Gold Reserve**, and his views on such matters hold weight. However, it is equally true to observe that Cockerill J occupied exactly the same post at the time she made the Order, as she was the Judge in Charge by then. One can safely assume that she would not have needed the dicta of her predecessor citing to her, in order to be aware that the powers of the court include

ordering an *inter partes* to be held. The case itself in any event had been specifically drawn to her attention. Further and in any event, an *inter partes* hearing is not the procedure generally adopted for recognition of arbitral awards, ICSID or otherwise, and this is supported by the commentary in the White Book. As the Judge in Charge, she followed the procedure for recognition and considered the matter *ex parte*. This approach is not only correct procedurally, but is supported by the decision in *Unión Fenosa* that the order is what must be served on a foreign state, not the claim form. If the construction of CPR Part 62.21 by Jacobs J is correct, and I consider that it is, then an order would ordinarily be obtained *ex parte* in the first instance in almost all, if not all, cases. This is also consistent with section 1(6)(c) of the 1966 Act itself. Here, the Order expressly included liberty to Spain to apply to set it aside, as all such orders will. I do not consider the failure to identify [71] of **Gold Reserve** to be a non-disclosure issue at all.

158.    The over-riding objective requires the court to consider the full list of matters at CPR Part 1 in everything that it does, including saving expense, acting proportionately, dealing with court business expeditiously and fairly, and allotting to any case appropriate resources, including considering resources necessary for other court users. Although Spain had previously deployed certain arguments extensively, both before the arbitral tribunal, the ICSID Annulment Committee and in the courts of Australia and the United States, there was no guarantee that this would necessarily continue, and the making of the Order in the way adopted here (and in other cases) gives any respondent a chance to consider, take advice specific to this jurisdiction, and then reflect upon whether it will challenge the order, and if so, on what grounds. If *inter partes* hearings were to be required as a matter of routine (or irregular routine, given how seldom ICSID awards are brought before the courts), the utility of having an arbitral award recognised by the courts will be undermined, and the efficient dispatch of court business would be damaged. In my judgment (and putting to one side the existing procedural rules), declining to have made the Order on the usual *ex parte* basis and instead listing the matter for an *inter partes* hearing – which as experience of this case shows, would have required four court days, according to the parties, inevitably some way in the future - would not have been in accordance with the overriding objective, still less in accordance with both the terms and ethos of the 1966 Act and the ICSID Convention itself.

159.    Taking these matters about which Spain complains, and considering them both separately and also collectively, I do not accept that there was any material non-disclosure in this case. Spain's challenge on this issue also therefore fails, and there are no grounds to set aside the Order on the basis of non-disclosure.

**H.    Conclusion**

160.    Spain argued in its skeleton argument regarding ICSID arbitrations that "the approach of these tribunals (and [the claimants]) in second guessing the sovereign prerogative of the treaty parties circumvents the essentially consent-based character of international jurisdiction, and forces those treaty parties to have recourse to the bluntest tool available – treaty termination – to regain control. From the point of view of an orthodox international lawyer, this is bizarre." I understand this submission to mean that Spain considers that it ought not to have to terminate (or withdraw from) earlier treaties in order to "regain control", by which I take it to mean, not to have to submit to arbitration under the ICSID Convention. But this submission is, with respect, to misunderstand the effect of treaty obligations in international law. Any

state that becomes a party to any treaty, by definition, becomes subject to the obligations contained in that treaty. That is what acceding to a treaty accomplishes. Those treaty obligations subsist, in broad terms, for as long as that state is a party to the treaty in question. If it wishes to "regain control" over the matters that are the subject of the treaty obligations, then it may do so (depending upon the terms of the treaty) by making reservations (if the treaty permits this) or terminating, or withdrawing from it. This is not the "bluntest tool" as Spain describes it; but even if it were, it is preferable to a particular state insisting that its own international treaty obligations be interpreted differently for itself, rather than for the other treaty nations, or for those who have rights under the ICSID Convention.

161.   The law of England and Wales, as set out in the 1966 Act, clearly requires the High Court to recognise the Award, which was the result of the valid ICSID arbitration process between the claimants and Spain concerning their dispute under the ECT. It was this valid procedure which led to the Award, which is a valid and authentic one. Recognition was achieved by the making of the Order, which was done *ex parte* as required by the Civil Procedure Rules. Spain was not heard on that application, and this too is as required by the rules, although Spain was entitled to apply to set that Order aside.

162.   However, there are no proper grounds for setting aside the Order or refusing to recognise the Award, and on all the different arguments raised by Spain on its application – those based on lack of jurisdiction or immunity, no arbitration agreement, an invalid award and so on - and also non-disclosure to the judge who made the Award, Spain has failed. I would add only this. I have produced this judgment in order to explain the analysis that I consider both underpins the domestic enforcement regime for ICSID awards under the 1966 Act, and to address Spain's carefully advanced and argued multiple grounds of opposition to the Order. This should not be taken as encouragement by any state in a similar position to Spain that there is a lengthy and costly legal argument, based on wide-ranging arguments under international law, to be had on all or any attempts to obtain recognition of an ICSID award by an investor under the 1966 Act. There is not.

163.   I explained at [38.] above that the High Court will apply the law as it is set down in primary legislation together with judicial precedent applied by the doctrine of *stare decisis*. To do so in this case would lead to a very short judgment, and that is what parties must expect on applications of this type, on these types of jurisdictional grounds, in the future. The entire purpose of the ICSID Convention and the 1966 Act would be undermined if lengthy and complex arguments of the type advanced by Spain in this case were routinely advanced. Given the relative lack of authority on enforcement of ICSID awards under the 1966 Act, I hope that I might be forgiven for producing a judgment of this length on an application to which there is such a short answer available. In cases such as this one in the future, if the ICSID Committee have considered and dismissed objections under the Convention procedure and the award is a valid and authentic one, I wish to make it clear that there are no grounds for repetition or rehearing of those in the Commercial Court. Unless a case is truly exceptional, it is difficult to foresee how a hearing of the length required in this case, and a judgment of this length, would occur again. To do so would be contrary to the ICSID Convention and the 1966 Act, and is exactly what international arbitration is designed to avoid.

164.    It therefore follows that this application by Spain to set-aside the Order fails.