# Exhibit 5

# Swiss Federal Tribunal upholds intra-EU ECT award against Spain, finding that CJEU's rulings should be given "no particular value"

*Published: May 03, 2024 | By: Damien Charlotin*

The Swiss Federal Tribunal has dismissed the state's request for set-aside of an award issued in EDF Energies Nouvelles v. Spain, rejecting the Spain's intra-EU arguments.

As we reported, in the underlying April 11, 2023 award (which remains unpublished), the French claimant, which is indirectly owned by the French state, was awarded nearly 30 million EUR on account of Spain's breaches of the Energy Charter Treaty ("ECT"). The tribunal was composed of Alejandro Escobar (chair), Stanimir A. Alexandrov (claimant's appointee) and Raul E. Vinuesa (respondent's appointee).

In its April 3, 2024 Judgment [click to download],* the Swiss Federal Tribunal has now revealed that this decision was taken by majority (with Mr. Vinuesa dissenting), and confirmed that the French firm's claims were only partly successful.

The court further dismissed all of the state's grounds for set-aside of the award under Article 190(2) of the Swiss Law on Private International Law ("PILA"). In particular, the Swiss judges saw no evidence supporting Spain's allegation that the tribunal majority had failed to deliberate on a particular issue.

The brunt of the Judgment is dedicated to an analysis of Spain's argument that the ECT could not provide the tribunal with jurisdiction over disputes of an intra-EU nature. After finding that they would give "no particular value" to the views of the Court of Justice of the European Union ("CJEU") on this issue, the Swiss judges carried out their own analysis of the ECT and its Article 26, on investor-state dispute-settlement – concluding that nothing in the treaty's text prevented intra-EU arbitrations. The court was further unmoved by the state's attempt to rely on subsequent instruments to vary that interpretation, and it dismissed allegations that the ECT had been modified by an *inter se* agreement of the EU member states.

The court further found inadmissible Spain's argument that the dispute had been non-arbitrable, or that the tribunal's chair had lacked independence and impartiality.

The court was composed of Monique Jametti (chair), Fabienne Hohl, Christina Kiss, Yves Rüedi, and Marie-Chantal May Canellas.

**Tribunal majority carried out deliberations on contested issue**

In a first ground to set the award aside, Spain contended that the tribunal had erred by allegedly failing to deliberate on the impact on the case of the award in Green Power v. Spain, which – as we reported – was the first known ECT tribunal to decline jurisdiction in line with the state's intra-EU arguments. As recounted in the judgment, an unspecified majority of the tribunal granted Spain leave to add this decision to the record, but denied the parties leave to supplement their submissions. In his dissenting opinion, which is partly quoted in the Judgment, Mr. Vinuesa alleged that the majority had dismissed the relevance of this decision without any deliberation.

For the court, deliberations in an arbitration are not only a right for the parties – as part of their right to be heard – but also a duty incumbent on the arbitrators, though there is no particular requirement as to the *form* such deliberations may take. In its jurisprudence, the court had reviewed allegations of a failure to deliberate as an

improper constitution of the tribunal (under Article 190(2)(a) of the PILA), a breach of due process (Article 190(2)(d)), or a violation of public policy (Article 190(2)(e)).

(The *ad hoc* committee in [ESPF v. Italy](#) opined that the existence of deliberations qualified as a fundamental rule of procedure.)

In the case at hand, the judges saw no need to pick between these three bases to review Spain's allegations, since they considered them to be unfounded. Indeed, while Spain protested that the tribunal had ignored the award in Green Power, the court noted that this authority had been expressly addressed in the award – but found irrelevant and unpersuasive.

The judges added that all three arbitrators had signed the final award, indicating that they had all considered the deliberations to be concluded. In view of the explicit discussion of the Green Power decision in the award, the fact that the dissenting arbitrator had criticised the majority's views on this point changed nothing: "a dissent remains an independent opinion, distinct from the award, whose reasons and conclusions it leaves unaffected", the court held.

At most, what the dissent indicated, for the court, was that the dissenting arbitrator would have preferred the tribunal to discuss at greater length the relevance of the Green Power decision. Yet, the judges added that this would have changed nothing, since Mr. Vinuesa had ultimately agreed with his co-arbitrators that Spain's intra-EU objection should be dismissed.

Accordingly, any possible flaw in the deliberations by the tribunal would have had no impact on the case's final outcome – rendering Spain's challenge (and the state's associated request to produce evidence of deliberations on this issue, if that request were admissible) moot.

**Court finds it unsurprising that two tribunals chaired by the same individual land on the same outcome regarding Spain's intra-EU objection**

Spain further protested that, in a context where the award was rendered nearly five years after the hearing, the chair of the tribunal – Mr. Escobar – had merely copied and pasted language used in the October 2022 award in [Triodos v. Spain](#), also chaired by Mr. Escobar, to discount the relevant of the Green Power decision. For the state, this evidenced that Mr. Escobar had not approached the issue with an open mind, warranting setting the award aside under Article 190(2)(a) of the PILA.

The court recalled that the Swiss *lex arbitri* requires arbitrators to be impartial and independent, and sanctions the appearance of a lack of independence and impartiality – as long as that appearance proceeds from an objective analysis, in context, and not solely from the subjective view of a party. The judges added that a party alleging a lack of independence or impartiality should, in line with its duty of good faith, raise the issue as soon as possible.

Against that background, the court found that Spain's challenge to Mr. Escobar's independence and impartiality was belated. If Spain's concerns stemmed from his attitude towards the intra-EU issue, which the state had invoked both in the underlying case and in Triodos v. Spain, then it should have known of that attitude as soon as the award in the latter case had been rendered.

The state's counter-argument that it could not have expected Mr. Escobar to adopt the same position was not credible, the judges held, stressing that the awards in these two cases had been rendered within six months of each other, by tribunals chaired by the same individual. Accordingly, the court ruled that Spain should have aired its doubts as to Mr. Escobar's impartiality at an earlier point.

(The court did not address the potential issue of the reasoning being *identical* between the two awards. In [Suez v. Argentina (1)](#), an *ad hoc* committee looked dimly on such copy-and-paste between two awards, but ultimately

found that this did not amount to a serious breach of a fundamental rule of procedure or a failure to state reasons.)

**CJEU's ruling on articulation between EU law and ECT should be given "no particular value", as the EU court fell into temptation of asserting primacy of its own law**

Spain's third ground to challenge the award was that the tribunal had lacked jurisdiction over this intra-EU dispute, in a context where Article 26 of the ECT was inapplicable in an intra-EU context, as found by the Court of Justice of the European Union in [Komstroy](#).

After recounting the findings of the tribunal on the intra-EU issue and the arguments of the parties at the set-aside stage, the court recalled that it was empowered, under Article 190(2)(b) of the PILA, to review all questions of law underpinning a tribunal's jurisdiction. When these questions of law included issues of foreign law, the court noted that it would typically follow the majority opinion on the relevant issue. As for the interpretation of international investment treaties, the judges pointed out that they were not bound by the opinion of investment tribunals, but could draw inspiration from them.

The court next recalled that international treaties should be interpreted in line with Articles 31 and 32 of the Vienna Convention on the Law of Treaties ("VCLT"). And while the court found that there is no hierarchy between the various elements to take into account for this interpretation, the starting point should be the ordinary meaning of the text of the treaty. In the case at hand, the issue was whether Article 26 of the ECT could serve as a valid basis for an arbitration agreement involving two European parties, the court held.

In this context, the court acknowledged that this question was not isolated, and that, "for several years, the EU organs have led a crusade against" intra-EU investment arbitrations. The judges also noted that the CJEU's ruling in Komstroy had been made as an *obiter dictum*, "while taking no account of international law or of the rules of treaty interpretation" – which explained why this outcome had been fiercely challenged in doctrinal writings. The Swiss judges added that they were not bound by the jurisprudence of the CJEU, and, just like arbitral tribunals, could not seek the CJEU's guidance on issues of EU law by way of a preliminary reference.

Repeating that, in theory, Swiss courts should interpret foreign law in line with the majority opinion of the supreme court of the relevant polity, the Federal Tribunal added that this stance was less relevant in a context where the main issue was the articulation between various legal regimes – a context in which a supreme court "might be tempted, as in Komstroy, to assert the primacy of its law over that derived from another international agreement, thereby giving its decision the character of a *pro domo* plea."

As such, the court ruled that it would give "no particular value" to the CJEU's opinion, and would instead reach its own conclusions as to the interpretation of Article 26 of the ECT.

**Swiss court sees nothing in ECT that would disapply investor-state arbitration in an intra-EU context**

Turning to Article 26 of the ECT, the court stressed that its interpretation should be informed by the *effet utile* principle, and could not land on a meaning that would contradict the letter or the spirit of the text at hand.

The court next pointed out that Article 26 provided that all states parties to the ECT had provided their "unconditional consent" to the arbitration of "any dispute" with an investor – with the same article providing only for an exhaustive list of exceptions, none of which was applicable in the case at hand. The judges thus concluded that nothing in this provision supported Spain's contention that it did not apply in an intra-EU context.

The state has also relied on other parts of the treaty, and in particular the ECT's provisions bearing on Regional Economic Integration Organisations ("REIO"), such as the EU. According to Spain, these provisions indicated

that the law governing such REIOs prevailed over obligations under the ECT.

This failed to convince the Swiss court, which stressed that states, even when they enter a REIO and transfer some of their powers to such an organisation, remain bound by international obligations they undertook under prior treaties, especially with respect to states that are not parties to that REIO. The judges also saw nothing in either the treaty's definition of a REIO, or in the provision as to the "area" covered by the latter, that supported Spain's argument. Likewise, Article 25 ECT (which provides that states members of an economic integration agreement, such as the EU, are not obliged to extend the resulting benefits to third states) could not result in disapplying Article 26 in an intra-EU context, the court resolved.

At this juncture, the court further observed, citing [Vattenfall v. Germany](#) and [Eskosol v. Italy](#), that EU member states could have avoided the application of Article 26 of the ECT in an intra-EU context by providing for it explicitly in the treaty, yet they had failed to do so. The court stressed that the EU had not included a disconnection clause in the ECT that would have had this result, by contrast with other, prior international agreements.

The court also found that the ECT's object and purpose to foster international investment in the energy sector was better served by an interpretation that maintained the availability of intra-EU investor-state arbitration, while a contrary interpretation would be "counter-productive" in this context.

**January 2019 Declaration does not amount to a subsequent practice of agreement, and cannot retroactively deprive tribunal of jurisdiction**

Spain had further sought to rely on additional instruments to interpret the ECT as prohibiting intra-EU arbitrations, but the court saw no merit in these arguments.

The state had notably invoked a [1997 statement](#) made to the ECT Secretariat by the EU, which provided that the EU and its member states would decide between themselves who should serve as respondent in an arbitral proceeding lodged under the treaty. For the court, however, this document was of no assistance to Spain, as it related mostly to the EU (then known as the European Communities), and did not make a distinction between intra-EU and extra-EU proceedings – yet still contemplated the possibility for investors to lodge arbitral proceedings.

In the same vein, the Swiss judges were unconvinced that their reading of the treaty should vary on the basis of the [January 2019 Declaration](#) by 22 EU member states that had confirmed the invalidity, under EU law, of intra-EU arbitration under investment treaties. In particular, the court disagreed with Spain's contention that this Declaration amounted to a subsequent agreement or practice for the purposes of Article 31(3)(a) and (b) of the VLCT, given that it had not been joined by all parties to the ECT – not to mention the EU, as six EU member states had declined to sign that declaration.

Besides, the court considered that the Declaration only embodied a political statement by states interested in disapplying the ECT in future disputes. As such, the impact of this Declaration, if any, would only be prospective, and would not result in tribunals being deprived of their jurisdiction in a retroactive fashion – with the court pointing out that the jurisdiction of a tribunal should be assessed at the time when the proceedings were lodged.

Having concluded that the meaning of Article 26 of the ECT was clear and non-ambiguous, the court saw no need to review supplementary means of interpretation under Article 32 VCLT, though it briefly noted from the *travaux préparatoires* that the EU had tried, yet failed, to include a disconnection clause in the treaty – a fact that undermined Spain's argument. The court further observed that the parties to the ECT, when they had renegotiated the treaty in 2022, had agreed to explicitly provide for the interpretation favoured by the EU parties.

**Federal Tribunal sees no conflict on the international level between ECT and EU law**

Finally, the Federal Tribunal was not persuaded that the ECT's investor-state dispute settlement regime should be disapplied because of a conflict with EU law, which should allegedly prevail.

Spain had relied on Article 31(3)(c) of the VCLT, which states that the interpretation should take into account other rules of international law applicable between the parties. The state had also, in later submissions, relied on Articles 30 and 41 of the VCLT (on subsequent treaties and amendments of multilateral treaties, respectively), but the court found that these arguments were belated.

Be that as it may, the court in any event saw no merit in Spain's position. The judges noted that the state's contention of a conflict between Article 26 of the ECT and EU law found support mostly in the CJEU's ruling in Komstroy, which they considered to be unpersuasive, because the EU court had "taken no account of international law nor of the rules of treaty interpretation". By contrast, the court saw no such conflict: the fact that, with the treaty of Lisbon, the EU had been given competence over matters of international investment did not mean that all preexisting treaties had become in breach of EU law.

Besides, the Swiss court disagreed with Spain and the EU court's reading of Article 267 of the Treaty on the Functioning of the European Union ("TFEU"), which, though it gave competence to the CJEU for the interpretation of EU law and acts taken by the EU (including the ECT), did not specify that this competence was exclusive. Even the CJEU, in Komstroy, had acknowledged that its jurisprudence could leave room for the EU to establish an international court whose interpretation of an international agreement would be binding on it.

As for Article 344 of the TFEU, which prevents member states from submitting disputes over the interpretation of the "treaties" to other modes of dispute-resolution than EU courts, the Federal Tribunal noted that this provision only applied to EU member states, and not to private parties hailing from them. Besides, the term "treaties" in this provision was known to refer to the TFEU and other EU treaties – and would thus not cover an investment dispute under the ECT.

**EU law would not prevail over ECT in case of conflict, Swiss judges rule**

Even if a conflict existed between the ECT and the EU treaties, the court continued, it was doubtful that EU law would prevail.

While Article 31(3)(c) of the VCLT required the court to interpret the treaty in line with the "relevant rules of international law applicable in the relations between the parties", the judges observed that it was not clear whether EU law qualified as such rules, since they bound only EU member states – and not all ECT parties. In any event, this provision did not mean that these other rules should prevail over the treaty being interpreted, especially since multilateral treaties should, in principle, be interpreted in a similar way for all their parties – regardless of whether they form part of the EU or not.

As for Article 30 of the VCLT, on subsequent agreements, the court found that Spain could not rely on it either to argued that EU law prevailed over the ECT. The judges reasoned that this article presupposed that the two agreements had the same subject matter, which was not the case. Furthermore, the rules invoked by Spain as conflicting with – and prevailing over – the ECT, Article 267 and 344 of the TFEU, actually preceded the ECT, since they existed under prior EU treaties. And while Article 30(2) provided that treaties could be subordinated to each other, this required them to be explicit on this subject – in a context where the TFEU did not mention the ECT.

By contrast, the court stressed, the ECT was clear that it would not be subordinated to other agreements, since it included a provision dealing with conflict of norms in its Article 16 – providing that investors would be guaranteed the norms most favourable to them.

The court also saw no merit in Spain's allegation that EU member states had amended the ECT *inter se* through the later EU treaties. The judges noted that Article 41(1)(a) of the VCLT required the original treaty to provide for a modification process, but the ECT contains no such provision. As for Article 41(1)(b), it allowed for such amendments only when the treaty did not prohibit it – a dead-end in view of Article 16. The court noted, in this context, that the ECT Secretariat had sent a letter to the EU Parliament in February 2023 that supported this reading of Article 16. (As we noted, the Secretariat's letter was a plea for the EU to ratify the modernised version of the treaty, which would have deleted Article 16.)

**Allegations of lack of arbitrability are inadmissible, as Spain failed to plead them correctly**

As a final argument, Spain had contended that the award violated Swiss international public policy (under Article 190(2)(e) of the PILA), because the underlying dispute had not been arbitrable in view of the CJEU's exclusive jurisdiction over matters of EU law. For the state, Switzerland could not sanction an interpretation of the ECT that had been rejected by the CJEU without interfering with EU law.

However, the court noted that Spain's argument should have been made under the vista of Article 190(2)(b) of the PILA, since arbitrability is a requirement for the validity of the arbitration agreement. The court stressed that, in set-aside proceedings, the applicable rules limited the court's review to the grounds invoked and pleaded by the parties, a limit that Spain could not side-step by decrying the court's "excessive formalism"

Accordingly, the court considered that Spain's last argument was inadmissible.

The set-aside bid was consequently rejected, and the state was ordered to bear the costs of the proceedings (75,000 CHF) and bear some of EDF Energies Nouvelles's costs (85,000 CHF).

* The Judgment is only available in French. All translations were made by *IAReporter*.