# Exhibit 12

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**ACF RENEWABLE ENERGY LIMITED**

Claimant

and

**REPUBLIC OF BULGARIA**

Respondent

**ICSID Case No. ARB/18/1**

---

# AWARD

---

***Members of the Tribunal***
Judge Bruno Simma, President
Mr. Oscar M. Garibaldi
Prof. Pierre Mayer

***Assistant to the Tribunal***
Mr. Jan U. Ortgies

***Secretary of the Tribunal***
Mr. Oladimeji Ojo

*Date of dispatch to the Parties: 5 January 2024*

## REPRESENTATION OF THE PARTIES

*Representing ACF Renewable Energy Limited*:

Mr. Kenneth R. Fleuriet
King & Spalding LLP
1700 Pennsylvania Avenue NW
Suite 200
Washington, D.C. 20006
United States of America

and

Ms. Amy Roebuck Frey
Ms. Héloïse Hervé
King & Spalding International LLP
12, cours Albert Ier
75008 Paris
France

and

Mr. Reginald R. Smith
Mr. Kevin D. Mohr
King & Spalding LLP
1100 Louisiana Street
Suite 4000
Houston, Texas 77002
United States of America

and

Mr. Kostadin Sirleshtov
Mr. Deyan Draguiev
CMS Cameron McKenna Nabarro
Olswang LLP
Bulgaria branch/Duncan Weston
Landmark Centre
14 Tzar Osvoboditel Boulevard
Floor 1
1000 Sofia
Republic of Bulgaria

*Representing the Republic of Bulgaria*:

Mr. Ivan Kondov
Head of Litigation Department
Ministry of Finance
102 Rakovski Street
Sofia 1040
Republic of Bulgaria

and

Ms. Abby Cohen Smutny
Mr. Petr Polášek
White & Case LLP
701 Thirteenth Street NW
Washington, D.C. 20005
United States of America

and

Mr. Lazar Tomov
Ms. Sylvia Steeva
Tomov & Tomov
4 Svetoslav Terter Street
Sofia 1124
Republic of Bulgaria

1

TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 22

II. PROCEDURAL HISTORY ............................................................................... 23

   A. Events following the *Achmea* Decision ........................................... 24

   B. Parties' Written Submissions on Jurisdiction, Merits, and Quantum ............. 24

   C. Hearing on Jurisdiction, Merits, and Quantum ................................ 30

III. PARTIES' POSITIONS .................................................................................... 37

   A. The Claimant ................................................................................... 37

      1. Introduction ................................................................................. 37

      2. The details of the Investment ..................................................... 38

      3. Factual background PV energy and incentive schemes ................ 41

      4. The composition of a perfect incentive scheme ......................... 42

      5. The Respondent intended quickly to increase the production of PV energy in Bulgaria ................................................................. 45

      6. The defining elements of the ERSA Regime ............................. 46

      *a. Reasonable return was not a defining element of the ERSA Regime* ... 50

      *b. The ERSA Regime was not introduced to curtail investment into production of energy from RES* .............................................. 52

      *c. Not only the FiT was stabilised* ............................................. 53

      *d. Article 9 No 3 RAESBA* ....................................................... 55

      7. How the ERSA Regime induced confidence in general ............. 56

      *a. Stability and predictability of the ERSA Regime* ................... 56

      *b. Monitoring capabilities* .......................................................... 57

      *c. The Respondent actively publicized and promoted the features of its scheme to induce foreign investment in its renewable energy sector* .. 58

      8. How the ERSA Regime and the Respondent induced confidence in the Claimant in particular ........................................................... 59

      *a. The Claimant's due diligence* ................................................. 59

         (1) The alleged April 2012 meeting(s) .......................... 60

         (2) Expectations of the Shareholders become expectations of the Claimant ................................................................. 62

         (3) Response to further counterarguments of the Respondent ....... 62

      *b. The knowledge of the Respondent of the Claimant's project* ............... 64

      9. The Respondent gave a guarantee and created legitimate expectations ................................................................................. 67

      *a. The Respondent gave a guarantee* .......................................... 67

      *b. The Respondent created legitimate expectations* ................... 68

         (1) Sources of legitimate expectations ........................... 69

c.  *Response to counterarguments of the Respondent* ............................... *71*

    (1)  Existing plants, "overcompensation", and plants being put "on notice" ................................................................................. 71

    (2)  Consequences of the risk of a spike in electricity prices .......... 72

    (3)  EU State aid law and legitimate expectations ......................... 73

    (4)  Allegedly relevant renewable energy booms in other Contracting Parties ................................................................. 74

10.  The Respondent entered into a number of legislative and regulatory obligations with regard to the Claimant and its Investment ................ 76

11.  The Claimant invested in reliance on the Respondent's guarantee and its legitimate expectations .................................................................... 78

12.  How the Respondent "changed the game" ........................................... 80

a.  *Temporary Grid Access Fee* ............................................................... *81*

b.  *Permanent Grid Access Fee* ............................................................... *83*

c.  *Annual Production Cap* ....................................................................... *85*

    (1)  Counterarguments ................................................................... 88

    (a)  *The role of the reference plant and overcompensation versus risk reward in an ex ante incentive scheme* ............................. *88*

    (b)  *Production caps in other Contracting Parties* ......................... *91*

    (c)  *Article 31(5) ERSA* ................................................................ *92*

    (d)  *Further counterarguments* ...................................................... *93*

d.  *20% Levy* ............................................................................................ *93*

e.  *Balancing Cost Exposure* ................................................................... *95*

f.  *5% ESSF Contribution* ........................................................................ *99*

g.  *Transition from FiT to FiP* .................................................................. *101*

13.  The consequences of the amendments to the ERSA Regime ............. 103

14.  Arguments regarding the alleged necessity to amend the ERSA Regime .......................................................................................................... 106

a.  *The alleged boom* ................................................................................ *106*

b.  *Plants were not able to profit from the alleged drop in costs of PV panels* ................................................................................................. *108*

c.  *The financial burden of the ERSA Regime on the Public Provider, the public debt, and the citizens of the Respondent was not too high* ...... *109*

15.  EU State aid law .................................................................................. 110

16.  Applicable Law ................................................................................... 113

17.  Evidentiary case of the Respondent .................................................... 115

18.  Objections to Jurisdiction ................................................................... 116

a.  *Article 17(1) Objection* ...................................................................... *116*

    (1)  The scope of Article 17(1) ECT ............................................ 116

|   | (a) | Impact of an invocation of Article 17(1) ECT on the consent to arbitration ................................................................. 116 |
|---|---|---|
|   | (b) | Interpretation of Article 17(1) ECT and timing, manner, and effect of invoking Article 17(1) ECT ...................................... 117 |
|   | (c) | The alleged prospective effect of the Respondent's invocation of Article 17(1) after 6 August 2018........................................... 120 |
|   | (d) | Interpretation of Article 17(1) ECT and what constitutes "substantial business activities" ........................................... 121 |
|   | (e) | Littop v. Ukraine ..................................................................... 123 |
|   | (2) | The conditions of Article 17(1) ECT ..................................... 123 |
|   | (a) | First condition – invocation in a timely manner .................... 124 |
|   | (b) | Second condition – control or ownership by citizens or nationals of a State that is not a Contracting Party .............. 126 |
|   | (c) | Third condition – substantial business activities in Malta..... 126 |
|   | (3) | The Claimant's conclusion on Article 17(1) ECT ................. 127 |
| b. | | Article 21 Objection ............................................................... 127 |
|   | (1) | Bulgarian law ......................................................................... 128 |
|   | (a) | The relevance of domestic law for the determination of whether a measure constitutes a Taxation Measure ........................... 128 |
|   | (b) | The domestic law analysis...................................................... 131 |
|   | (2) | International law...................................................................... 137 |
|   | (a) | The 5% ESSF Contribution .................................................... 139 |
|   | (b) | The 20% Levy .......................................................................... 139 |
| c. | | Komstroy Objection................................................................. 139 |
| 19. | | Principles to govern the Tribunal's analysis and scope of the allegedly violated obligations and standards .................................................... 142 |
| a. | | FET............................................................................................ 143 |
|   | (1) | Violating the Claimant's legitimate expectations regarding the FiT, offtake, and time period................................................ 145 |
|   | (a) | The protection of legitimate expectations as part of the FET Obligation.............................................................................. 145 |
|   | (b) | The applicable test ................................................................. 146 |
|   | (c) | Sources and consequences of inducement and legitimate expectations............................................................................ 146 |
|   | (d) | Specific commitments/undertakings/assurances and/or stabilization clauses ............................................................... 149 |
|   | (e) | Findings of legitimate expectations in cases against other Contracting Parties ............................................................... 151 |
|   | (f) | An incentive regime as an "open" and "unilateral" "offer" 152 |
|   | (g) | Legitimate expectation of a "reasonable return" ................. 153 |

(h)     *Legitimate expectations and State aid law and expectations of the shareholders of an SPV* ................................................. *154*

(2)     Fundamentally altering the investment framework ............... 155

(3)     Inconsistent and non-transparent treatment ........................... 157

b.      *Unreasonable Impairment* ................................................................ *159*

c.      *The Umbrella Clause* ........................................................................ *162*

20.     The Respondent's alleged violations of the ECT and applicable rules and principles of international law .................................................... 166

a.      *FET* ..................................................................................................... *167*

(1)     Violating the Claimant's legitimate expectations regarding FiT, offtake, and time period ...................................................... 167

(2)     Fundamentally altering the investment framework ............... 167

(3)     Inconsistent and non-transparent treatment ........................... 168

(4)     Reneging on an internationally protected obligation entered into ............................................................................................... 169

b.      *Unreasonable impairment* ................................................................ *170*

c.      *Umbrella Clause* ............................................................................... *172*

d.      *Alleged violations of the ECT and applicable rules and principles of international law specific to a measure* ............................................ *172*

(1)     All measures with the exception of the APC ......................... 172

(2)     Temporary Grid Access Fee and Permanent Grid Access Fee ............................................................................................... 173

(a)     *Temporary Grid Access Fee* ................................................. *174*

(3)     Annual Production Cap ......................................................... 174

(4)     20% Levy/Fee in 2014 .......................................................... 176

(5)     Balancing Cost Exposure ...................................................... 176

(6)     5% ESSF Contribution ........................................................... 176

e.      *Exculpatory arguments of the Respondent* ........................................ *177*

21.     Quantum ................................................................................... 177

a.      *Compensation standard* .................................................................... *177*

b.      *Quantum of compensation owed* ...................................................... *179*

(1)     Method of calculating quantum ............................................. 179

(a)     *Comments on the Respondent's quantum case* ...................... *180*

(2)     Calculation of quantum ......................................................... 185

(a)     *Equivalent FiT reduction* ..................................................... *188*

c.      *Pre- and post-award interest* ............................................................ *189*

22.     Petitum ..................................................................................... 190

B.      The Respondent ................................................................................. 192

1.      Introduction ............................................................................. 192

| | | | |
|---|---|---|---|
| 2. | | Objections to Jurisdiction | 192 |
| a. | | *Article 17(1) Objection* | *192* |
| | (1) | The scope of Article 17(1) ECT | 193 |
| | (a) | *Impact of an invocation of Article 17(1) ECT on the consent to arbitration* | *193* |
| | (b) | *Interpretation of Article 17(1) ECT and timing, manner, and effect of invoking Article 17(1) ECT* | *193* |
| | (c) | *Littop v. Ukraine* | *197* |
| | (d) | *The alleged prospective effect of the Respondent's invocation of Article 17(1) after 6 August 2018* | *197* |
| | (e) | *Interpretation of Article 17(1) ECT and what constitutes "substantial business activities"* | *198* |
| | (2) | The conditions of Article 17(1) ECT are met | 199 |
| | (a) | *First condition – control or ownership by citizens or nationals of a State that is not a Contracting Party* | *200* |
| | (b) | *Second condition – substantial business activities in Malta* | *200* |
| | (c) | *Timeliness of the denial* | *203* |
| | (d) | *Conclusion on fulfilment of conditions* | *204* |
| b. | | *Article 21 ECT* | *204* |
| | (1) | Bulgarian Law | 205 |
| | (a) | *The 5% ESSF Contribution* | *206* |
| | (b) | *The 20% Levy* | *208* |
| | (2) | International Law | 209 |
| | (a) | *The 5% ESSF Contribution* | *212* |
| | (b) | *The 20% Levy* | *213* |
| | (3) | Conclusion on Article 21 ECT | 214 |
| c. | | *Komstroy Objection* | *214* |
| 3. | | The Respondent's desire to increase production of energy from RES | 216 |
| 4. | | The situation before the introduction of ERSA | 216 |
| 5. | | The defining elements of the ERSA Regime | 217 |
| a. | | *The method of calculating the FiT* | *219* |
| b. | | *Only the FiT was stabilised* | *221* |
| c. | | *Article 9 No 3 RAESBA* | *221* |
| 6. | | EU State aid law | 221 |
| 7. | | Why the Respondent had to amend the ERSA Regime | 224 |
| a. | | *The alleged price drop of PV panels* | *225* |
| b. | | *The alleged boom* | *226* |
| c. | | *The impact of the boom* | *227* |

d.      *Analysis of the World Bank and the European Commission regarding the necessity to act*.................................................................. 228

e.      *The Respondent's swift reaction* .................................................. 229

f.      *Admissions and acknowledgements of the Respondent*..................... 229

      (1)     ERSA sought to remedy the overcapacity problem of the RAESBA Regime................................................................. 229

      (2)     Monitoring capabilities and knowledge of the Respondent ... 230

      (3)     The April 2012 Amendment ................................................. 231

      (4)     Shortcomings of the chosen LCOE methodology................. 232

      (5)     Bulgaria was unable to stop the boom ................................. 232

g.      *Counterarguments of the Claimant*.................................................. 232

8.      The Seven Measures........................................................................ 233

a.      *Temporary Grid Access Fee* .......................................................... 234

      (1)     Access Fee Settlement Agreement......................................... 234

      (2)     Merits of the claim ............................................................... 235

b.      *Permanent Grid Access Fee* .......................................................... 236

c.      *Annual Production Cap*.................................................................. 238

      (1)     60.4/50 Ratio and the "licensed capacity" ............................ 240

d.      *20% Levy* ...................................................................................... 241

e.      *Balancing Cost Exposure* .............................................................. 243

      (1)     There is evidence that the Claimant and its Shareholders expected to be exposed to balancing costs and what informed their expectations.................................................................. 245

      (2)     Lack of consideration of balancing costs in the FiT Decision is irrelevant................................................................................ 247

      (3)     Counterarguments of the Claimant ....................................... 247

f.      *5% ESSF Contribution* .................................................................. 248

g.      *Transition from FiT to FiP*............................................................ 250

      (1)     Alleged additional risks as a consequence of the Transition from FiT to FiP .......................................................................... 252

9.      The Respondent did not actively promote guarantees allegedly provided for in the ERSA Regime ...................................................... 254

10.     The Respondent never gave any guarantees........................................ 256

a.      *The ERSA*...................................................................................... 257

      (1)     Article 31(4) ERSA .............................................................. 257

      (2)     Article 31(5) ERSA .............................................................. 259

      (3)     Articles 31(1) and (2) ERSA ................................................ 259

b.      *The Karad PPA and the License* .................................................... 260

      (1)     The Karad PPA...................................................................... 260

|  | (2) | The License ............................................................. 261 |

(2) The License .............................................................. 261

(3) The Karad PPA and the License ............................. 261

c. *The FiT Decision and the FiT* ............................................ 262

11. The Respondent did not raise any reasonable legitimate expectations ................................................................................................ 263

a. *The ERSA Regime violated applicable Bulgarian and EU law and adjustments thus had to be expected* ................................. 264

b. *No expectations can be held regarding an unnotified incentive scheme* ................................................................................ 265

c. *Investors were put "on notice"* ......................................... 266

d. *The ERSA Regime did not seek to incentivize designs such as the 60.4/50 Ratio* ................................................................... 266

e. *Bulgaria's monitoring capabilities could not have assured investors under the FiT* ...................................................... 267

f. *The April 2012 Amendment* ............................................... 268

g. *Conclusion on the raising of legitimate expectations* ....... 268

12. The Claimant could not reasonably and legitimately have held the expectations it claims to have held .................................... 268

a. *The boom* ......................................................................... 268

b. *Knowledge of the Claimant* .............................................. 269

c. *Similar booms and the reaction thereto in other Contracting Parties would have warned the Claimant* ............................ 270

13. The Claimant failed to prove that it held any legitimate expectations 271

14. The Shareholders' due diligence reports and internal documents expressly anticipated the possibility of modifications to the scheme 273

a. *Documents of the Shareholders cannot speak as to the expectations of the Claimant* .......................................................... 273

b. *The due diligence reports are too old to be relevant* ........ 274

c. *The due diligence reports and internal documents of the Shareholders either do not support or even contradict the Claimant's case* .......... 274

(1) The Common Terms Agreement ............................ 277

(2) The alleged April 2012 meeting(s) ....................... 277

d. *The due diligence reports leave out matters of EU law and State aid* 279

e. *Conclusion on the Shareholders' due diligence and internal documents* .......................................................................... 279

15. The Respondent's knowledge of the Karad Project and the 60.4/50 Ratio ................................................................................. 280

a. *The Respondent's knowledge of the Karad Project and the licensing process* .............................................................................. 280

b. *The 60.4/50 Ratio and the License* .................................. 281

16. The Claimant did not suffer any damages ............................ 282

a.      *The Claimant claims windfall profits, a top-up it could not have expected to receive* ............................................................... 283

b.      *The Claimant made a profit* ........................................................ 283

c.      *The IRR at the level of the Karad Plant is the suitable method to assess performance* ................................................................. 284

d.      *The Claimant shifted profits to NOMAC* ................................... 284

e.      *The Karad Plant's developer overpaid for the PV panels* .............. 285

f.      *The Karad Plant earned a reasonable return* .............................. 285

g.      *Equivalent reduction of the FiT* ................................................ 286

h.      *Conclusion on lack of damages* ................................................ 287

17.     Applicable law ........................................................................... 287

18.     Principles to govern the Tribunal's analysis and scope of the allegedly violated obligations and standards ................................................ 288

a.      *FET* ......................................................................................... 289

        (1)     Violating the Claimant's legitimate expectations ................. 291

        (a)     *The applicable test and relevant factors and sources* ........... 291

        (b)     *Specific commitments/undertakings/assurances and/or stabilization clauses* ............................................................ 293

        (c)     *Cases against Spain* ............................................................ 296

        (d)     *Cases against Italy* ............................................................. 298

        (e)     *Cases against the Czech Republic* ........................................ 298

        (f)     *Legitimate expectations of a "reasonable return"* ............... 299

        (2)     Fundamentally altering the investment framework .............. 300

        (3)     Inconsistent and non-transparent treatment ..................... 302

        (a)     *Lack of transparency* .......................................................... 303

        (b)     *Lack of consistency* ............................................................ 304

b.      *Unreasonable Impairment* ......................................................... 304

        (1)     Unreasonable measures ....................................................... 305

        (2)     Discriminatory measures ..................................................... 306

        (3)     Degree of impairment ......................................................... 306

c.      *The Umbrella Clause* ............................................................... 307

19.     The Respondent's alleged violations of the ECT and applicable rules and principles of international law ................................................ 311

a.      *FET* ......................................................................................... 311

        (1)     Violating the Claimant's legitimate expectation ................. 311

        (2)     Fundamentally altering the investment framework .............. 313

        (3)     Inconsistent and non-transparent treatment ..................... 314

b.      *Unreasonable Impairment* ......................................................... 315

        (1)     Unreasonable measures ....................................................... 315

(2)     Discriminatory measures ....................................................... 316

(3)     Degree of impairment ........................................................... 317

(4)     Conclusion ........................................................................... 317

c.     *The Umbrella Clause* ................................................................. *317*

d.     *Alleged violations of the ECT and applicable rules and principles of international law specific to a measure* ............................................. *320*

(1)     Temporary Grid Access Fee ................................................ 320

(2)     Permanent Grid Access Fee ................................................ 320

(3)     APC ...................................................................................... 321

(4)     20% Levy .............................................................................. 322

(5)     Balancing Cost Exposure .................................................... 324

(6)     5% ESSF Contribution ......................................................... 324

(7)     Transition from FiT to FiP ................................................... 325

20.     Quantum ................................................................................ 326

a.     *Compensation Standard* ........................................................... *326*

b.     *Quantum of Compensation Owed* .............................................. *328*

(1)     Method of Calculating Quantum .......................................... 328

(a)     *Flaws in the Claimant's quantum calculations* ..................... *328*

(b)     *Reaction to the critique of the Respondent's IRR analysis* .... *329*

(2)     Calculation of Quantum ...................................................... 331

c.     *Pre- and Post-Award Interest* .................................................... *332*

21.     Petitum ................................................................................ 333

IV.     FACTS ....................................................................................... 334

A.     The Parties, the Contracting Parties, the Investment, and the Investment's structure and chronology ............................................ 334

1.     The Claimant ......................................................................... 334

2.     The Investment ...................................................................... 334

3.     The Respondent ..................................................................... 337

4.     The seat of the Claimant: Malta .......................................... 337

5.     Other relevant Bulgarian entities........................................ 337

B.     The ERSA Regime, legitimate expectations, and the knowledge of the Respondent and the Claimant .............................................. 338

1.     Primary and secondary laws, Directive 2009/28/EC, and the Karad PPA ......................................................................... 339

a.     *2007 Renewable and Alternative Energy Sources and Biofuels Act ("RAESBA")*........................................................ *339*

b.     *DIRECTIVE 2009/28/EC* ........................................................ *339*

c.     *The ERSA White Paper* ............................................................ *340*

d.    The ERSA .................................................................................. 341

e.    The Energy Act ........................................................................ 351

f.    The 2010 Electricity Trading Rules ..................................... 356

g.    The Karad PPA .......................................................................... 359

2.    The FiT Decision, the License, Act 16, and the process leading to those decisions ............................................................................ 363

a.    Minutes of Meeting EWRC ACWA Bulgaria 17 April 2012 .............. 363

b.    The FiT Decision ...................................................................... 365

c.    The Application for the License ......................................... 368

d.    Statement of Findings of the State Acceptance Commission (Act 16) 369

e.    The License Decision ............................................................. 369

f.    The License ................................................................................ 373

g.    The Permit .................................................................................. 374

3.    Policy documents .................................................................... 375

a.    The NREAP ................................................................................ 375

b.    The 2011 Energy Strategy ..................................................... 382

c.    Second National Report on Bulgaria's Progress in the Promotion and Use of Energy from Renewable Sources of December 2013 ............. 384

4.    Comments by officials / public statements ....................... 384

a.    Evidential value of statements in parliament ..................... 384

b.    16 February 2011 session of the Committee on Economic Policy, Energy, and Tourism of the Bulgarian Parliament ........................... 385

c.    17 February 2011 session of the Commission on Environment and Water of the Bulgarian Parliament ..................................................... 386

d.    23 February 2011 session of the Committee on European Affairs and Oversight of European Funds of the Bulgarian Parliament ............. 387

e.    3 May 2011 interview with the Vice Chair of the CEET ................. 388

f.    25 January 2012 debate on the April 2012 Amendment ................. 391

g.    19 April 2012 interview with the Chair of the EWRC ..................... 392

h.    28 June 2012 interview with the Chair of the EWRC ...................... 393

i.    26 September 2013 Letter from BEH to MEET ................................ 393

j.    28 April 2015 letter from EWRC to BEH and NEK .......................... 395

5.    Further background information ............................................ 396

a.    FT 5 October 2010 "Renewable energy: Cloudy forecast for solar power" ....................................................................................................... 396

b.    4 August 2015 Letter from Bulgaria to the European Commission ... 397

c.    EC Decision on State Aid ....................................................... 397

6.    Direct evidence of the Claimant's expectations: the Shareholders' and the Lender's due diligence and other documents ............................... 398

11

   *a.* *ACWA Power Board Investment Committee Presentation*.................. 398

   *b.* *Karadzhalovo Solar Power Plant Market Study* ................................ 399

   *c.* *The Common Terms Agreement* ......................................... 402

   *d.* *ACWA Bulgaria's "Long-term Business Plan" "2013-2032"* .......... 402

   *e.* *The due diligence report for the Shareholders*.................................. 404

   *f.* *E-Mail CMS to Shareholders* ......................................... 406

   *g.* *Crescent Capital Final Investment Memorandum* ............................ 406

   *h.* *The April meeting(s)* ......................................... 407

   *i.* *The SPA* ......................................... 409

   *j.* *The 18 September 2012 Letter* ......................................... 411

   *k.* *Summary on due diligence* ................................. 412

  C. The Seven Measures................................................................. 413

   *a.* *Temporary Grid Access Fee*.................................................. 413

   *b.* *Permanent Grid Access Fee* .................................................. 417

   *c.* *Annual Production Cap*.................................................. 419

   *d.* *20% Levy* .................................................. 424

   *a.* *Balancing Cost Exposure* .................................................. 429

   *b.* *5% ESSF Contribution* .................................................. 431

   *c.* *Transition from FiT to FiP and the termination of the Karad PPA*... 436

  D. Facts relating to the Article 17(1) Objection.................................. 445

  E. Summary of Facts................................................................. 448

   *a.* *The ERSA Regime*.................................................. 448

   *b.* *The target IRR of 9-10%* ................................................. 449

   *c.* *EU State aid law*.................................................. 450

   *d.* *The alleged boom* .................................................. 450

   *e.* *The 60.4/50 Ratio* .................................................. 452

   *f.* *Network costs* .................................................. 452

    (1) Temporary Grid Access Fee.................................. 453

    (2) Permanent Grid Access Fee ................................. 453

   *g.* *The 20% Levy* .................................................. 453

   *h.* *Balancing Cost Exposure* .................................................. 454

   *i.* *The 5% ESSF Contribution* .................................................. 454

   *j.* *Transition from FiT to FiP*.................................................. 455

V. ANALYSIS ................................................................. 455

  A. Applicable Law ................................................................. 455

  B. Jurisdiction ................................................................. 456

   1. Requirements under ECT and ICSID.................................. 456

2. Article 17 (1) Objection ...................................................... 457

a. *The Article 17(1) Objection*................................................ 457

b. *The effect of the invocation of Article 17(1) ECT after 6 August 2018* .................................................................................... 460

c. *Further aspects of the Article 17(1) Objection* ................... 462

3. Article 21 Objection ......................................................... 462

a. *What constitutes a Taxation Measure under the ECT*........................ 463

b. *The 20% Levy* ................................................................. 465

c. *The 5% ESSF Contribution* ................................................ 466

4. The *Komstroy* Objection ................................................. 468

C. Merits ...................................................................................... 469

1. FET.......................................................................................... 471

a. *Legitimate expectations*...................................................... 472

   (1) The Tribunal's analysis ......................................... 472

   (a) *Risks and expectations inherent to an ex ante incentive regime* .................................................................... 475

   (b) *Allegedly limited scope of the stabilisation clause*................ 479

   (c) *Expectation of lawful behaviour is protected despite fears of worst-case scenarios or expectations of possibly unlawful behaviour* ....................................................................... 480

   (d) *Sources of the legitimate expectations of stability* ................ 482

   (2) General counterarguments of the Respondent ...................... 482

   (a) *Relationship between Shareholder expectations and expectations of the Claimant and between public statements and expectations*............................................................ 483

   (b) *9% target rate*........................................................... 484

   (c) *The alleged boom* ...................................................... 488

   (d) *EU State aid* ............................................................ 499

   (3) Conclusion on legitimate expectations................................... 500

   (4) Application to Seven Measures............................................. 501

   (a) *Temporary Grid Access Fee*.......................................... 501

   (b) *APC* ...................................................................... 502

   (c) *20% Levy* ................................................................ 508

   (d) *Balancing Cost Exposure* .......................................... 509

   (e) *Transition from FiT to FiP*......................................... 511

b. *Fundamentally altering the investment framework, non-transparent and inconsistent treatment* ................................................. 512

   (1) The Tribunal's analysis ......................................... 512

   (2) Application to Seven Measures............................................. 515

13

|  |  | (a) | Temporary Grid Access Fee | 515 |
|  |  | (b) | Balancing Cost Exposure | 516 |
|  | c. | | Permanent Grid Access Fee | 517 |
|  | 2. | | Unreasonable Impairment | 519 |
|  | a. | | The Tribunal's analysis | 519 |
|  | b. | | Application to the Seven Measures | 523 |
|  |  | (1) | Temporary Grid Access Fee | 523 |
|  |  | (2) | Balancing Cost Exposure | 523 |
|  | 3. | | Umbrella Clause | 523 |
|  | 4. | | Alleged breach of the ECT by the Seven Measures taken as a whole | 525 |
| D. | | | Quantum | 525 |
|  | 1. | | The Tribunal's analysis regarding quantum | 525 |
|  | a. | | The standard of compensation, the method of calculating quantum, and the Claimant's quantum case | 525 |
|  | b. | | The Respondent's alternative quantum case | 526 |
|  | c. | | Equivalent FiT reduction | 528 |
|  | d. | | The Claimant's quantum case stands unopposed | 529 |
|  | 2. | | Quantum of compensation owed | 529 |
|  | 3. | | Pre- and post-Award Interest | 530 |
| VI. | COSTS | | | 531 |
| A. | | | The Claimant | 531 |
|  | 1. | | The Claimant's costs | 531 |
|  | 2. | | The Claimant's position on costs | 532 |
| B. | | | The Respondent | 533 |
|  | 1. | | The Respondent's costs | 533 |
|  | 2. | | The Respondent's position on costs | 533 |
| C. | | | The Tribunal | 536 |
|  | 1. | | The Tribunal's and ICSID's costs | 536 |
|  | 2. | | The Tribunal's decision on costs | 536 |
| VII. | AWARD | | | 538 |

TABLE OF ABBREVIATIONS

| 16% Target | EU mandated 16% target share of energy from RES in the gross end-consumption |
|---|---|
| 168 Hours Interview Angel Smerdzhiev | 168 Hours, Interview with Angel Semerdzhiev, The amount for green energy in the electricity price will grow, 19 April 2011 (**C-181**) |
| 18 September 2012 Letter | Letter from ACWA Power, Crescent Capital, First Reserve and SunEdison to Minister Dobrev, Prime Minister Borisov *et al*., 18 September 2012 (**C-110**) |
| 20% Levy | Fee for Production of Electricity from Wind and Solar Energy calculated as 20% of FiT revenue imposed by Bulgaria on 1 January 2014 |
| 2010 ETR | Electricity Trading Rules of 17 August 2010 (**C-49**) |
| 2011 Energy Strategy | Energy Strategy of the Republic of Bulgaria until 2020 dated June 2011 (**C-28**) |
| 2013 ETR | Electricity Market Rules, published SG 66 /26.07.2013, amended and supplemented SG 39/9.05.2014, in force as of 26 July 2013 (**C-159**) |
| 2014 ERSA | ERSA as amended by the ERSA Amendment (**C-152**) |
| 2015 Energy Act | Energy Act, SG No. 107 dated 9 December 2003, as amended SG No. 56, 24 July 2015 (**R-082**) |
| 2015 ERSA | ERSA as amended and supplemented, SG No. 56/24.07.2015, effective 24.07.2015 and exhibited by the Claimant as Exhibit (**C-163**) |
| 2018 Energy Act | Energy Act as amended and supplemented by SG No. 38/8.05.2018, effective 8 May 2018 (**C-164**) |
| 5% ESSF Contribution | Monthly contribution to the ESSF by energy producers consisting of 5% of their revenue per kwh, introduced by the 2015 Energy Act. |
| 60.4/50 Ratio | The installation of a higher capacity of solar modules (60.4 MW of peak capacity) than the capacity of the inverters of the plant (at 50 MW nominal capacity) at the Karad Plant |
| *9REN* | *9REN Holding S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019 (**CL-62**) |
| April 2012 Amendment | Amendment and Supplement to the ERSA, promulgated SG No. 29/10.04.2012, effective 10.04.2012 pushing back the date when renewable energy plants would obtain the FiT to "Act 16" with the objective that the pipeline of projects would come online after a new, lower FiT would have been set in July 2012. |
| April 2012 ERSA | The ERSA as amended by the April 2012 Amendment (**R-294**) |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings in force as of 10 April 2006 |
| Article 17(1) Objection | The Respondent's objection to the Tribunal's jurisdiction based on the submission that the advantages of Part III of the ECT were validly denied to the Claimant pursuant to Article 17(1) ECT |
| Balance/balancing costs | The costs of balancing out the effect that a higher or lower than expected production from a source of electricity has on the overall electricity grid by requiring the decrease or increase of the input of other sources of electricity at a cost |
| BEH | Bulgarian Energy Holding |

| | |
|---|---|
| *Belenergia* | *Belenergia S.A. v. The Italian Republic*, ICSID Case No. ARB/15/40, Award, 6 August 2019 (**RL-252**) |
| *BG Group* | *BG Group Plc. v. Argentine Republic*, UNCITRAL, Final Award, 24 December 2007 (**CL-109**) |
| Bulgaria or Respondent | Republic of Bulgaria |
| C-[#] | Claimant's Exhibit |
| *Cavalum* | *Cavalum SGPS, S.A. v. Kingdom of Spain*, ICSID Case No. ARB/15/34, Decision on Jurisdiction, Liability and Directions on Quantum, 31 August 2020 (**RL-265**) |
| CC *Komstroy* | Claimant's Comments on *Komstroy* of 15 November 2021 |
| CCS | Claimant's Costs Submission of 28 January 2022 |
| *CEF* | *CEF Energia B.V. v. Italic Republic*, SCC Arb. No. 2015/158, Award, 16 January 2019 (**CL-60**) |
| CfP | Contract for Premium |
| CJEU or EUCJ | Court of Justice of the European Union |
| CL-[#] | Claimant's Legal Authority |
| CMOM | Claimant's Memorial on the Merits of 17 April 2020 |
| CMS Due Diligence Report | CMS Cameron McKenna LLP, Legal Due Diligence Report Karadzhalovo Solar PV Project, 18 April 2012 (**C-75**) |
| CMS Regulatory Report | CMS Cameron Mckenna LLP, Regulatory Report, Overview of the Bulgarian Legislation for Support of PV Plants, 18 April 2012 (**C-80**) |
| Common Terms Agreement | Common Terms Agreement between ACWA Bulgaria (then ZBE Partners) and the Senior Lenders (as defined therein), dated 9 March 2012 (**C-84**) |
| Compass I | Expert Report of Fabien Roques, Compass Lexecon, 17 April 2020 |
| Compass II | Second Expert Regulatory Report of Fabien Roques, Compass Lexecon, 5 February 2021 |
| *Constitutional Court Decision No. 13* | Constitutional Court of Bulgaria, Decision No. 13, Constitutional Case No. 1/2014, 31 July 2014 (**C-155**) |
| COS | Slides of Claimant's Opening Presentation of 7 June 2021 |
| CPHB | Claimant's Post-Hearing Brief of 8 October 2021 |
| CR *Komstroy* | Claimant's Rejoinder on *Komstroy* of 22 December 2021 |
| CROMCMOJ | Claimant's Reply Memorial on the Merits and Counter-Memorial on Jurisdiction of 5 February 2021 |
| CROJ | Claimant's Rejoinder on Jurisdiction of 24 May 2021 |
| *Cube* | *Cube Infrastructure Fund SICAV and Others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 (**CL-148**) |
| Decision SP-1 | EWRC Decision SP-1, 24 July 2015 (**FR-81b (corrected)**) |
| EC Decision on State Aid | European Commission Decision on State Aid SA.44840 (2016/NN) of 4 August 2016 (**FR-78**) |
| ECA Report | Economic Consulting Associates, Infraproject Consult, Karadzhalovo Solar Power Plant Market Study, Final Report, March 2012 (**C-100**) |
| ECT | Energy Charter Treaty of 17 December 1994 (**CL-1**) |
| *Eiser* | *Eiser Infra. Ltd. And Energia Solar Lux. S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017 (**CL-21**) |

| El Paso | *El Paso Energy International Company. v. Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011 (**CL-79**) |
|---|---|
| *Electrabel* | *Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law, and Liability, 30 November 2012 (**RL-050**) |
| Energy Act | Bulgarian Energy Act, supplemented, SG No. 47/21.06.2011, effective 21.06.2011 (**R-247**). |
| Enery | Enery Development GmbH Vienna |
| ERSA | Bulgarian Energy from Renewable Sources Act of 2011, SG No. 35/3.05.2011, effective 3.05.2011 (**C-41**) |
| ERSA Amendment | The amendment of the ERSA, SG No. 109/20.12.2013, valid as of 1 January 2014 that first introduced the APC and the 20% Levy |
| ERSA Regime | The Respondent's incentive scheme for PV plants, as mostly set out in the ERSA |
| ESO | Electricity System Operator |
| *ESPF* | *ESPF Beteiligungs GmbH et al. v. Italian Republic*, ICSID Case No. ARB/16/5, Award, 14 September 2020 (**RL-266**) |
| ESSF | Security of Electrical Power System Fund |
| EU | European Union |
| European Commission Guidance | European Commission, Commission Staff Working Document, Guidance for Design of Renewables Support Schemes, SWD (2013) 419 final, 5 November 2013 (**FR-41**) |
| EWRC | (State) Energy and Water Regulatory Commission |
| FET | Fair and Equitable Treatment as required by Article 10(1) of the ECT |
| FET Obligation | Obligation to accord FET |
| FiP | Feed-in Premium |
| FiT | A FiT is a feed-in tariff whereas the FiT is the feed-in tariff set by the FiT Decision |
| FiT Decision | EWRC Decision C-18/2012 of 20 June 2011 (**C-48**) (**R-365**) which set the feed-in tariff for all investments in the production of renewable energy in the period from July 2011 to and including June 2012 |
| FTI I | Expert Report of Richard Edwards, FTI Consulting LLP, 17 April 2020 |
| FTI II | Second Report of Richard Edwards, FTI Consulting LLP, 5 February 2021 |
| FTI III | Supplemental Report of Fabien Roques and Richard Edwards of 9 July 2021 |
| *Greentech* | *Greentech Energy Systems A/S et al. v. Italy*, SCC Arb. No. 2015/095, Award, 23 December 2018 (**CL-48**) |
| HT | Hearing Transcript |
| *Hydro* | *Hydro Energy 1 S.à R.L. and Hydroxana Sweden AB v. The Kingdom of Spain*, ICSID Case No. ARB/15/42, Decision on Jurisdiction, Liability and Directions on Quantum, 9 March 2020 (**RL-261**) |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International ICSID Centre for Settlement of Investment Disputes |
| Investment | ACWA Bulgaria, the Karad Plant and Project, and, inasmuch as relevant and where applicable, all claims to money and performance and all returns associated with them together. |

| Imbalance-/imbalancing costs | Balance-/balancing costs |
|---|---|
| Impairment Clause | Article 10(1) ECT, sentence 3 |
| IRR | Internal rate of return |
| *Isolux* | *Isolux Infra. Netherlands B.V. v. Kingdom of Spain*, SCC 2013/153, Award, 12 July 2016 (**RL-229**) |
| Karad Plant | PV plant at land plot No 000434, situated in the land belonging to Karadzhalovo village, Parvomay Municipality, Plovdiv region, Merata area, with an area of 995,117 decares |
| Karad PPA | Agreement for Purchase of Electricity Produced by Photovoltaic Power Plant No. 12ИЕ3327013/13.06.2012 between ACWA Bulgaria (then ZBE Partners) and NEK, 13 June 2012 (**C-106**). The agreement by which ACWA Bulgaria sold the electricity which the Karad Plant produced to NEK. |
| Karad Project | Planning, building, and operation of the Karad Plant |
| *Khan Resources* | *Khan Resources Inc., Khan Resources B.V. and Cauc Holding Company Ltd. V. Government of Mongolia and Monatom LLC*, PCA Case No. 2011-09, Award on the Merits, 2 March 2015 (**CL-118**) |
| *Komstroy* Judgment | *Republic of Moldova v. Komstroy LLC, Case C-741/19*, Judgment (CJEU, Grand Chamber), 2 September 2021, RL-332. |
| *Komstroy* Objection | The Respondent's request that, in light of the *Komstroy* Judgment, the Tribunal should revisit its *Achmea* Decision and reconsider the *Achmea* Objection to dismiss the Claimant's claims for lack of jurisdiction |
| LCOE | Levelized cost of electricity |
| Lender(s) | The International Finance Corporation, the Overseas Private Investment Corporation, and UniCredit Bank Austria AG |
| *LG&E* | *LG&E Energy Corp., LG&E Capital Corp., and LG&E International, Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006 (**CL-94**) |
| License | EWRC license for generation of electric power No. L-383-01, issued to ACWA Bulgaria, dated 26 April 2012 (**C-158**). License may also refer to the combination of the License Decision and the License. |
| License Application | Application for the issuance of licenses from ACWA Bulgaria (then ZBE Partners) to EWRC, 12 January 2012 (**C-166**) |
| License Decision | EWRC Decision No. L-383, dated 26 April 2012 (**C-103**) |
| *Liman* | *Liman Caspian Oil B.V. and NCL Dutch Inv. B.V. v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Award, 22 June 2010 (**CL-27**) |
| *Littop* | *Littop Enterprises Limited, Bridgemont Ventures Limited, Borda Management Limited v. Ukraine*, SCC Arbitration No. V 2015/092, Final Award, 4 February 2021 (**RL-331**) |
| *Masdar* | *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 Mai 2018 (**CL-39**) |
| MEET | Republic of Bulgaria, Ministry of Economy, Energy and Tourism |
| Member State | A State that is a member of the EU. Also referred to as Member State of the EU or EU Member State |
| *Micula* | *Ioan Micula et al. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2012 (**CL-10**) |

| | |
|---|---|
| *Murphy* | *Murphy Exploration & Prod. Co. – Int'l v. Republic of Ecuador*, UNCITRAL, Partial Final Award, 6 May 2016 (**CL-156**) |
| National Assembly | National Assembly of Bulgaria / the Bulgarian Parliament |
| NA 25 January Transcript | National Assembly, Transcript of the plenary meeting of 25 January 2012 (**FR-104**) |
| NA 4 April Transcript | National Assembly, Transcript of the plenary meeting of 4 April 2018 (**R-232**) |
| NEK | Natsionalna Elektricheska Kompania EAD |
| Novenergia | *Novenergia II – Energy & Env't (SCA) (Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain*, SCC Arb. No. 2015/063, Final Award, 15 February 2018 (**CL-23**) |
| NREAP | Republic of Bulgaria, MEET, National Renewable Energy Action Plan, 20 April 2011 (**C-29**) |
| *Occidental* | *Occidental Petroleum Corp., Occidental Exploration and Prod. Co. v. Republic of Ecuador*, ICSID Case No. ARB/06/11, Award, 5 October 2012 (**CL-158**) |
| Oxera I | Expert Report of Jostein Kristensen, Oxera Consulting LLP, 28 October 2020 |
| Oxera II | Second Expert Report of Jostein Kristensen, Oxera Consulting LLP, 14 May 2021 |
| Oxera III | Supplemental Expert Report of Jostein Kristensen, Oxera Consulting LLP, 9 July 2021 |
| Oxera IV | Fourth Expert Report of Jostein Kristensen, Oxera Consulting LLP, 20 August 2021 |
| *Parkerings* | *Parkerings-Compagniet AS v. Republic of Lithuania*, ICSID Case No. ARB/05/08, Award, 11 September 2007 (**CL-91**) |
| Permanent Grid Access Fee | A fee set by the Permanent Grid Access Fee Decision allowing ESO and the other electricity transmission network operators operating in Bulgaria to charge producers of solar and wind energy a set price for access to their respective electricity transmission network. |
| Permanent Grid Access Fee Decision | EWRC Decision C-6/13/03/2014 of 13 March 2014, which set the Permanent Grid Access Fee (**FR-84b**) |
| Permit | EWRC Decision P-168 of 11 June 2012 (**C-105**) |
| *Plama* | *Plama Consortium Ltd. v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Decision on Jurisdiction, 8 February 2005 (**CL-24**) |
| PPA | Power purchasing agreement |
| Public Provider | NEK |
| PV | Photovoltaic |
| R-[#] | Respondent's Exhibit |
| RAESBA | Renewable and Alternative Energy Sources and Biofuels Act, Promulgated SG No. 49, 19 June 2007 (**R-006**) |
| RAESBA Regime | The Respondent's incentive scheme under the RAESBA |
| RC *Komstroy* | Respondent's Comments on the *Komstroy* Judgment of 15 October 2021 |
| RCMOMOJ | Respondent's Counter-Memorial on the Merits and Objections to Jurisdiction of 23 October 2020, Corrected 28 October 2020 |
| Regulator | EWRC |
| Remainder | Share of Temporary Grid Access Fee payments already paid by ACWA Bulgaria but not subject to reimbursement under the Access Fee Settlement Agreement equaling BGN 315,253.80 |

| | |
|---|---|
| Request for Bifurcation | Respondent's request to bifurcate the proceedings into a separate preliminary objections phase and a merits phase, dated 6 August 2018. |
| RES | Renewable energy source(s) |
| RfA | Request for Arbitration of 7 February 2018 |
| RL-[#] | Respondent's Legal Authority |
| ROP or RPO | Slides of Respondent's Opening of 7 June 2021, Volumes I-IV |
| RPHB | Respondent's Post-Hearing Brief of 8 October 2021 |
| *RREEF* | *RREEF Infra. (G.P.) Ltd. and RREEF Pan-European Infra. Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (**CL-59**) |
| RROMROJ | Respondent's Rejoinder on the Merits and Reply on Jurisdiction of 14 May 2021 |
| RR *Komstroy* | Respondent's Reply on the *Komstroy* Judgment |
| RSC | Respondent's Submission on Costs of 28 January 2022 |
| *RWE* | *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability, and Certain Issues of Quantum, 30 December 2019 (**RL-257**) |
| *Saluka* | *Saluka Investments BV v. Czech Republic*, UNCITRAL-PCA, Partial Award, 17 March 2006 (**CL-81**) |
| SERC | EWRC |
| SEWRC | EWRC |
| SG | State Gazette of the Republic of Bulgaria |
| Shareholders | ACWA Power International, Crescent, and First Reserve, *i.e.* ACF's shareholders |
| *SilverRidge* | *Silver Ridge Power BC v. Italy*, ICSID Case No. ARB/15/37, Award, 26 February 2021 (**RL-287**) |
| SPA | Share Purchase Agreement between SunEdison BV and ACF, dated 28 June 2012, by which ACF bought 100% of the shares in ACWA Bulgaria (then ZBE Partners) together with debt owed by ACWA Bulgaria to SunEdison BV for the price of EUR 32,458,659 (**C-107**) |
| SPV | Special Purpose Vehicle |
| *Stadtwerke* | *Stadtwerke München GmbH, RWE Innogy GmbH, and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (**RL-256**) |
| SunEdison BV | SunE Solar B.V. |
| SunEdison Italia | SunEdison Italia S.r.l. |
| SunEdison SLU | SunEdison Spain Construction S.L.U. |
| *SunReserve* | *SunReserve Luxco Holdings S.à.r.l and others v. Italian Republic*, SCC Case No. 132/2016, Final Award, 25 March 2020 (**RL-262**) |
| *Tecmed* | *Técnicas Medioambientales Tecmed S.A. v. México*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003 (**CL-82**) |
| Temporary Grid Access Fee | A fee set by EWRC Decision C-33/14.09.2012 of 14 September 2012 (**C-109**) allowing ESO and the other electricity transmission network operators operating in Bulgaria to charge producers of energy from RES a set price for access to their respective electricity transmission network |

| | |
|---|---|
| TEU | The Treaty on European Union, originally signed at Maastricht on 7 February 1992 |
| TFEU | The Treaty on the Functioning of the European Union, originally signed at Rome on 23 March 1957 |
| *Total* | *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010 (**CL-76**) |
| Transition from FiT to FiP | The replacement of the FiT with a FiP to be received from the ESSF rather than NEK, the obligation for previous recipients of a FiT with a capacity higher than 4 MW to sell their energy on the wholesale market, and the abrogation of the respective PPAs. |
| Tribunal | The Arbitral Tribunal in this case as constituted on 1 June 2018 |
| TVPEE | A 7% tax/levy on energy producers introduced in Spain |
| Umbrella Clause | Article 10(1) ECT, last sentence |
| Valuation Date | 31 December 2019 |
| VCLT | Vienna Convention on the Law of Treaties signed at Vienna on 23 May 1969 (**RL-24**) |
| *Voltaic Network* | *Voltaic Network GMBH v. The Government of the Czech Republic*, PCA Case No. 2014-20, Award, 15 May 2019 (**RL-248**) |
| World Bank Report | World Bank, Bulgaria Power Sector: Making the Transition to Financial Recovery and Market Liberalization, Summary Report, November 2016 (**R-096**) |
| WS | Witness Statement |
| WS [Name] I | First Witness Statement of [Name] |
| WS [Name] II | Second Witness Statement of [Name] |
| *Yukos* | *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, UNCITRAL, PCA Case No. 2005-04/AA227, Final Award, 18 July 2014 (**CL-129**) ("**Yukos**"). |
| ZBE Partners | ZBE Partners EAD, previous name of ACWA Bulgaria |

## I.    INTRODUCTION

1.    The Tribunal recalls that these proceedings concern a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Energy Charter Treaty of 17 December 1994, which entered into force for the Republic of Bulgaria on 16 April 1998 and for the Republic of Malta on 28 August 2001 (the "**ECT**"),[1] and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**"). The ICSID Convention Arbitration Rules of 10 April 2006 (the "**Arbitration Rules**") apply to these proceedings.

2.    The Claimant is ACF Renewable Energy Limited ("**ACF**" or the "**Claimant**"), a company incorporated under the laws of the Republic of Malta.[2]

3.    The Respondent is the Republic of Bulgaria ("**Bulgaria**" or the "**Respondent**").[3]

4.    The Claimant and the Respondent are collectively referred to in this Decision as the "**Parties**", and the term "**Party**" is used to refer to either the Claimant or the Respondent. The Parties' representatives and their addresses are listed above on page (i).

5.    The dispute relates to the Respondent's alleged failure to fulfil legislative and regulatory commitments it made relative to a photovoltaic facility of the Claimant, which in the view of the Claimant constitutes breaches of Article 10 ECT.

6.    By Procedural Order of 11 October 2018, the proceedings concerning the dispute were bifurcated into:

   a.    a preliminary phase dealing with the Respondent's objection to the Tribunal's jurisdiction and to the admissibility of the Claimant's claims based on its submission that the Tribunal would lack jurisdiction as a consequence of the application to this case of the judgment of 6 March 2018 of the Court of Justice of the European Union (the "**CJEU**") in *Slovak Republic v. Achmea B.V.* Case

---

[1]    RfA, paras. 51, 55.

[2]    For more details see below under IV.A.1.

[3]    For more details see below under IV.A.3.

C-284/16 (hereinafter the "*Achmea* **Judgment**", and the objection to jurisdiction based thereon the "*Achmea* **Objection**"); and

b.  a merits phase dealing with the remaining jurisdictional objection(s), liability, and quantum.

7.  The result of the first phase of the bifurcated proceedings was the Tribunal's Decision of 20 December 2019 on the *Achmea* Objection (the "*Achmea* **Decision**"), in which the Tribunal established its jurisdiction subject to its decision on the non-bifurcated objection to jurisdiction and consequently denied the *Achmea* Objection.

8.  The present Award constitutes the conclusion and resolution of the second phase of the proceedings, *i.e.* the merits phase.

9.  To that end, the present Award will first set out the procedural history following the *Achmea* Decision followed by a summary of the Parties' positions. It will then present the established facts relevant for its decision and an analysis of the remaining possible hurdles to the Tribunal's jurisdiction. The Award will then deal with the merits of the present case followed, finally, by an analysis of the compensation owed and the Tribunal's decision of the dispute.

10. The Parties are reminded that the Tribunal will take a straightforward approach to the resolution of this case. The Tribunal will, in principle, not discuss arguments of the Parties, or case law, which it did not find applicable or relevant. It may be assumed that the Tribunal has considered all arguments submitted to it, but that those with which it has not engaged have been rejected or deemed irrelevant.

11. Defined terms used in this Award have the same meaning as in earlier Orders and the *Achmea* Decision unless otherwise defined herein.


## II.    PROCEDURAL HISTORY

12. This procedural history is limited to the events following this Tribunal's *Achmea* Decision. The procedural history from before the date of that Decision is set out in paragraphs 11-53 of that Decision.

A.      **Events following the *Achmea* Decision**

13.     On 20 December 2019, together with the issuing of the *Achmea* Decision, the Parties were invited to confirm whether they consented to the publication of the Decision on the ICSID website, in reference to Section 24.1 of Procedural Order No. 1.

14.     On 3 January 2020, the Respondent informed the Secretary of the Tribunal that it did not consent to the publication of the Tribunal's Decision on *Achmea*.

15.     On 10 January 2020, the Claimant informed the Secretary of the Tribunal that it did not consent to the publication of the Tribunal's Decision on *Achmea*.

16.     On 19 February 2020, the Secretary-General of ICSID notified the Tribunal and the Parties that the case had been transferred to Ms. Veronica Lavista, ICSID Legal Counsel, to serve as Secretary of the Tribunal.

17.     On 26 February 2020, the Tribunal requested that the Parties inform it of the status of their efforts to "confer and seek agreement on the further procedural calendar", as requested in the *Achmea* Decision. In order to facilitate the process, the Tribunal informed the Parties that it would be available from 31 May to 11 June 2021 to hold two consecutive weeks of hearings.

18.     By communications of 17 March 2020, the Parties submitted to the Tribunal a proposed procedural schedule, which laid out the future deadlines for written submissions and hearings.

19.     On 23 March 2020, the Tribunal sent the Parties the final version of the procedural schedule. The Tribunal informed the Parties that the upcoming hearing would be held in Paris, France.

B.      **Parties' Written Submissions on Jurisdiction, Merits, and Quantum**

20.     On 17 April 2020, the Claimant submitted its Memorial on the Merits ("**Claimant's Memorial on the Merits**" or "**CMOM**"), together with Exhibits C-015 to C-192, Legal Authorities CL-072 to CL-151, as well as the following documentation: *(i)* Consolidated Index of Claimant's Exhibits (C-001 to C-192); *(ii)* Consolidated Index of Claimant's Legal Authorities (CL-001 to CL-151); *(iii)* Witness Statement of Mr. Abid Hussain Malik dated 17 April 2020; *(iv)* Witness Statement of Mr. Adi Blum dated 17 April

24

2020; *(v)* Witness Statement of Mr. Aygen Yayıkoğlu dated 17 April 2020; *(vi)* Witness Statement of Mr. Richard Roberts dated 17 April 2020; *(vii)* Expert Report of Dr. Fabien Roques (Compass Lexecon) dated 17 April 2020, accompanied by Exhibits FR-1 to FR-101 ("**Compass I**"); and *(viii)* Expert Report of Mr. Richard Edwards (FTI Consulting) dated 17 April 2020, accompanied by Appendices 1 to 6 and Exhibits RE-1 to RE-183 ("**FTI I**").

21.   On 30 April 2020, the Respondent informed the Tribunal that it had not agreed to conduct future hearings in Paris. Accordingly, pursuant to the ICSID Convention and ICSID Arbitration Rules, the Respondent requested that the hearing be held at the seat of the Centre in Washington, D.C.

22.   On 6 May 2020, the Tribunal informed the Parties that this matter was decided in paragraph 68 of Procedural Order No. 2 of 11 October 2018 which had established that "[t]*he Tribunal invites the Parties to cooperate and prepare an agreed procedural calendar taking into account the decision on bifurcation and the available dates that the Tribunal has indicated to the Parties in section 21.3 of its Procedural Order No. 1. In relation to section 11.1 of Procedural Order No. 1, the hearing on the Achmea Objection will be held at the ICSID facilities in Washington, D.C. and the hearing on the Denial of Benefits Objection and merits will be held at the World Bank Facilities in Paris, France.*"

23.   On 18 September 2020, the Claimant informed the Tribunal that on 10 September 2020, ACF closed the sale of its interest in ACWA Power CF Karad PV Park EAD ("**ACWA Bulgaria**") to Enery Power BG Holding GmbH. As a result of this transaction, the Company ceased to be an affiliate of ACF. Under Clause 12.22 of the Share Purchase Agreement, however, ACF expressly retained all of its interests in the claims at issue in the arbitration.

24.   On 13 October 2020, the Tribunal notified the Parties that, for urgent reasons, the Tribunal would need to move the date for the decision on the Parties' requests for document production to 18 December 2020. The Tribunal requested that the Parties confer and inform it whether this would necessitate any adjustments to the submissions timetable by 20 October 2020.

25.     On 14 October 2020, the Respondent requested that the Tribunal extend the deadline for the submission of the Respondent's Counter-Memorial on the Merits by one week from 16 October 2020 until 23 October 2020, in light of the Tribunal's decision to rule on the Parties' document production requests on 18 December 2020.

26.     On 15 October 2020, the Tribunal invited the Claimant to submit any comments it might have on the Respondent's request for extension.

27.     By communications of 15 October 2020, the Parties submitted to the Tribunal a revised procedural schedule. The Parties further informed the Tribunal that the Parties would prefer to reschedule the hearing to several months after the hearing dates of 7-11 June 2021 which had been reserved and to adjust the procedural schedule accordingly. The Parties requested that the Tribunal inform the Parties as soon as possible of any alternative dates for rescheduling the hearing.

28.     On 15 October 2020, the Tribunal sent the Parties the final version of the revised procedural schedule. The Tribunal informed the Parties that it would consider possible alternative hearing dates.

29.     On 16 October 2020, the Tribunal informed the Parties that, during the first half of 2022, it would only be available during the two weeks of 17-21 and 24-28 January 2022.

30.     On 24 October 2020, the Respondent submitted its Counter-Memorial on the Merits and Objections to Jurisdiction ("**Respondent's Counter-Memorial on the Merits**" or "**RCMOMOJ**"), together with Exhibits R-001 to R-282, Legal Authorities RL-152 to RL-278, as well as the following documentation: *(i)* Consolidated Index of Respondent's Exhibits (R-001 to R-282); *(ii)* Consolidated Index of Respondent's Legal Authorities (RL-001 to RL-278); and *(iii)* Expert Report of Mr. Jostein Kristensen (Oxera Consulting LLP) dated 23 October 2020 ("**Oxera I**").

31.     On 26 October 2020, the Tribunal requested that Parties inform it by 13 November 2020 if they intended to change the hearing dates to January 2022.

32.     By communications of 6 November 2020, the Parties informed the Tribunal that the January 2022 hearing dates proposed by the Tribunal were unfeasible, and that therefore the current procedural calendar should be maintained.

33.    On 24 November 2020, the Respondent notified the Claimant and the Tribunal that it had inadvertently omitted to include as exhibits to its Counter-Memorial submission several sources used as the basis for calculating Figure 6.3 on page 63 of the Expert Report of Mr. Jostein Kristensen of Oxera dated 23 October 2020. The Respondent therefore submitted into the record Exhibits R-283 to R-286. The Respondent also submitted a corrected version of the Oxera Report identifying the sources to Figure 6.3 on page 63, along with a redline showing this change.

34.    On 4 December 2020, each Party submitted its request for document production, together with the response of the other Party and its own reply, in the form of a Redfern Schedule (as prescribed in section 16.4 of Procedural Order No. 1, and in accordance with the schedule approved by the Tribunal on 15 October 2020).

35.    On 8 December 2020, the Secretary-General of ICSID notified the Tribunal and the Parties that the case had been transferred to Mr Francisco Abriani, ICSID Legal Counsel, to serve as acting Secretary of the Tribunal.

36.    On 18 December 2020, the Tribunal issued Procedural Order No. 5, regarding the Tribunal's Decision on the Parties' Document Production Requests. Further to the Tribunal's letter of 15 October 2020, the Parties were ordered to comply with the Tribunal's decisions in the schedule by 15 January 2021.

37.    On 27 January 2021, the Claimant submitted a request for an extension of its deadline to submit its Reply Memorial by one week, from 29 January 2021 to 5 February 2021.

38.    On 27 January 2021, the Respondent requested leave to submit brief comments on the Claimant's request seeking an extension of the Reply deadline.

39.    On 28 January 2021, the Tribunal granted the Respondent's request for leave. On the same date, the Respondent requested that the Tribunal either *(i)* grant a three-day extension to the Claimant, which the Respondent suggested was a compromise between the Parties or *(ii)* establish a new procedural schedule in coordination with the Parties, to include a later hearing date.

40.    On 29 January 2021, the Tribunal informed the Parties that it decided to grant the Claimant's request of 27 January 2021.

41.    On 5 February 2021, the Claimant submitted its Reply Memorial on the Merits and Counter-Memorial on Jurisdiction ("**Claimant's Reply**" or "**CROMCMOJ**"), together with Exhibits C-193 to C-253, Legal Authorities CL-152 to CL-185, as well as the following documentation: *(i)* Consolidated Index of Claimant's Exhibits (C-001 to C-253); *(ii)* Consolidated Index of Claimant's Legal Authorities (CL-001 to CL-185); *(iii)* Second Witness Statement of Mr. Abid Hussain Malik dated 5 February 2021; *(iv)* Second Witness Statement of Mr. Adi Blum dated 5 February 2021; *(v)* Second Witness Statement of Mr. Richard Roberts dated 5 February 2021; *(vi)* Second Expert Regulatory Report of Dr. Fabien Roques (Compass Lexecon) dated 5 February 2021, together with Exhibits FR-102a to FR-136 ("**Compass II**"); and *(vii)* Second Report of Richard Edwards (FTI Consulting) dated 5 February 2021, together with Appendix 2 (Spreadsheet calculation of the Claimant's losses) and Exhibits RE-184 to RE-186 ("**FTI II**").

42.    On 18 March 2021 the Respondent filed a letter including: *(i)* a supplemental document request (the "**Supplemental Document Request**"), and *(ii)* a request for further direction from the Tribunal to the Claimant in relation to some of the Tribunal's orders regarding the production of documents as contained in Procedural Order No. 5.

43.    On 20 March 2021, the Tribunal invited the Claimant to respond to the Respondent's letter of 18 March 2021 by 1 April 2021.

44.    On 1 April 2021 the Claimant filed a reply to the Respondent's letter of 18 March 2021.

45.    On 5 April 2021, the Tribunal informed the Parties that, if the Respondent deemed a second round of submissions necessary on the Supplemental Document Request, the Tribunal expected the Respondent's comments by 9 April and any further comments by the Claimant by 16 April.

46.    By communication of 6 April 2021, the Respondent confirmed that it considered a second round of submissions to be necessary and would submit a letter by 9 April as requested by the Tribunal.

47.    By letter of 9 April 2021, the Respondent replied to the letter of the Claimant and maintained its Supplemental Document Request. The Respondent requested that the Tribunal order the Claimant: *(i)* to produce certain documents that the Claimant allegedly should have, and could have, produced, or otherwise *(ii)* to submit affidavits

28

by certain representatives of the Claimant or its shareholders as to why it is not producing, or cannot produce, the requested documents.

48. On 16 April 2021, the Claimant replied to the letter of 9 April, objecting to the Supplemental Document Request.

49. On 23 April 2021, the Tribunal issued Procedural Order No. 6 which denied the Supplemental Document Request.

50. On 15 May 2021, the Respondent submitted its Rejoinder on the Merits and Reply on Jurisdiction ("**Respondent's Rejoinder**" or "**RROMROJ**"), together with Exhibits R-025 Resubmitted, R-287 to R-430, Legal Authorities RL-190 Resubmitted, RL-229 Resubmitted, RL-279 to RL-330, as well as the following documentation: *(i)* Consolidated Index of Respondent's Exhibits (R-001 to R-430); *(ii)* Consolidated Index of Respondent's Legal Authorities (RL-001 to RL-330); and *(iii)* Second Expert Report of Mr. Jostein Kristensen (Oxera Consulting LLP) dated 14 May 2021 ("**Oxera II**").

51. On 17 May 2021, the Secretary-General of ICSID notified the Tribunal and the Parties that the case had been transferred to Ms. Patricia Rodriguez, ICSID Legal Counsel, to serve as Secretary of the Tribunal.

52. On 19 May 2021, the Respondent submitted a corrected version of its Rejoinder on the Merits to correct a number of inadvertent errors related to the exhibit numbers, as well as clerical errors, together with a redline reflecting the changes from the Rejoinder as submitted on 14 May 2021.

53. On 20 May 2021, the Claimant informed the Tribunal that the Respondent had agreed to a short extension allowing that the Claimant's submission of its Rejoinder on Jurisdiction, be submitted on 24 May 2021, instead of 21 May. The Respondent confirmed the Parties' agreement by e-mail of the same date.

54. On 24 May 2021, the Claimant submitted its Rejoinder on Jurisdiction ("**Claimant's Rejoinder on Jurisdiction**" or "**CROJ**"), together with Exhibits C-254 to C-260 and Legal Authorities CL-186 to CL-201, as well as the following documentation: *(i)* Consolidated Index of Claimants' Exhibits (C-01 to C-260); and *(ii)* Consolidated Index of Claimant's Legal Authorities (CL-01 to CL-201).

55.    By communication of 3 June 2021, the Respondent submitted the award issued in *Littop Enterprises Limited, Bridgemont Ventures Limited, Borda Management Limited v. Ukraine* ("***Littop***") as Respondent's Legal Authority RL-331.[4]

56.    On 6 June 2021, the Respondent informed the Tribunal that the Respondent's expert, Mr. Kristensen, had made corrections to his reports dated 23 October 2020 and 14 May 2021. The Respondent resubmitted revised clean copies and redlines of Mr. Kristensen's reports reflecting those corrections. The Respondent also submitted a complete copy of Exhibit R-025 with complete translations of each Excel tab which had been inadvertently omitted before.

## C.    Hearing on Jurisdiction, Merits, and Quantum

57.    By letter of 31 March 2021, the Tribunal invited the Parties to share their views on the possibility of organizing a remote hearing by 9 April 2021.

58.    On 5 April 2021, the Tribunal informed the Parties that it considered it more beneficial to hold the pre-hearing organizational meeting earlier than previously scheduled and suggested that it take place on 25 May 2021. The Parties were invited to confirm their availability on this date and time by 10 May 2021.

59.    On 9 April 2021, the Claimant responded to the Tribunal's letter of 31 March 2021. The Claimant agreed that the upcoming hearing should be conducted in a remote manner in light of trajectory of the COVID-19 pandemic and resulting travel restrictions as well as the different locations of all of the hearing participants.

60.    On the same date, the Respondent notified the Tribunal that it did not object to holding the hearing remotely. The Respondent asked that the Tribunal indicate whether it would be prepared to extend the hearing to include Saturday and Sunday, 12-13 June 2021.

61.    On 14 April 2021, the Tribunal invited the Claimant to indicate whether it agreed with the Respondent's proposal to extend the hearing over the weekend on 12 and 13 June 2021.

---

[4]    *Littop Enterprises Limited, Bridgemont Ventures Limited, Borda Management Limited v. Ukraine*, SCC Arbitration No. V 2015/092, Final Award, 4 February 2021 (**RL-331**) ("***Littop***").

62.     By communication of 22 April 2021, the Claimant indicated that it did not believe it to be necessary to extend the hearing past 11 June 2021. However, the Claimant proposed to hold 12 June 2021 (Saturday) in reserve in case the hearing would not be completed within the originally contemplated five-day period. Subsequently, the Tribunal confirmed that it would hold 12 June 2021 (Saturday) in reserve.

63.     By communications of 7 and 10 May 2021, the Parties confirmed their availability to participate in the pre-hearing organizational meeting on 25 May 2021.

64.     On 17 May 2021, the Tribunal informed the Parties that in order to accommodate the Parties' availability, the Tribunal had decided that the President would participate in the meeting on behalf of the whole Tribunal. In preparation for the meeting, the Parties were invited to confer on the draft hearing protocol and to submit by 24 May 2021 a joint proposal advising the Tribunal of any agreements they were able to reach on the draft or of their respective positions where they were unable to reach an agreement. The Parties were also asked to inform the Tribunal of any item they wished to address during the meeting.

65.     On 19 May 2021, the Tribunal sent the Parties a list of questions for the Parties to answer and further elaborate on during the course of the Hearing.

66.     By communications of 21 May 2021, the Parties informed the Tribunal of the names of witnesses and experts the Parties wished to call for examination.

67.     On 24 May 2021, the Parties sent the Tribunal their joint observations on the draft hearing protocol, noting that the Parties had been unable to agree on certain provisions.

68.     On 25 May 2021, the President of the Tribunal and the Parties held a pre-hearing conference meeting, pursuant to Section 20.1 of Procedural Order No. 1. During the pre-hearing conference, the President of the Tribunal decided the outstanding points of disagreement between the Parties in relation to the organization of the hearing.

69.     On 27 May 2021, the Tribunal sent the Parties a list of additional questions for the Parties to answer and elaborate on during the course of the hearing.

70.     On 1 June 2021, the Tribunal issued Procedural Order No. 7, on the organization of the hearing.

71.    The hearing on jurisdiction, merits, and quantum was held virtually via Zoom and hosted by FTI Trial Services on 7 to 12 June 2021 (the "**Hearing**"). The following persons were present at the Hearing:

*Tribunal*:
  Judge Bruno Simma                      President
  Mr. Oscar M. Garibaldi                 Arbitrator
  Professor Pierre Mayer                 Arbitrator

*Assistant to the Tribunal*:
  Mr. Jan Ortgies                        Assistant to the Tribunal

*ICSID Secretariat*:
  Ms. Patricia Rodriguez Martin          Secretary of the Tribunal

*For the Claimant*:
  **Counsel:**
  Mr. Reginald R. Smith                  King & Spalding
  Mr. Kenneth R. Fleuriet                King & Spalding
  Mr. Kevin D. Mohr                      King & Spalding
  Ms. Amy Roebuck Frey                   King & Spalding
  Ms. Héloise Hervé                      King & Spalding
  Ms. Emma Iannini                       King & Spalding
  Ms. Violeta Valicenti                  King & Spalding
  Mr. Kostadin Sirleshtov                CMS
  Ms. Borislava Piperkova                CMS

  **Party Representatives:**
  Mr. Aygen Yayikoglu                    Crescent Capital
  Mr. Jerome Martin                      ACWA Power

  **Witnesses:**
  Mr. Adi Blum                           Blackrock
  Mr. Abid Malik                         ACWA Power
  Mr. Richard Roberts                    Crescent Capital

  **Experts:**
  Dr. Fabien Roques                      Compass Lexecon
  Ms. Anastasia Tseomashko               Compass Lexecon
  Ms. Catherine Doulache                 Compass Lexecon
  Mr. Richard Edwards                    FTI
  Mr. Samuel Davey                       FTI
  Mr. Sean Horan                         FTI
  Ms. Alexandra Ziółkowska               FTI

  **Technical Support Staff:**
  Mr. Ovidiu Pitic                       King & Spalding

*For the Respondent*:
**Counsel:**

| | |
|---|---|
| Ms. Abby Cohen Smutny | White & Case LLP |
| Mr. Petr Polášek | White & Case LLP |
| Ms. Jennifer Glasser | White & Case LLP |
| Mr. Brody Greenwald | White & Case LLP |
| Mr. Francisco Jijón | White & Case LLP |
| Mr. Sven Volkmer | White & Case LLP |
| Mr. Chad Farrell | White & Case LLP |
| Ms. Raquel Martinez Sloan | White & Case LLP |
| Ms. Gabriela Lopez Stahl | White & Case LLP |
| Ms. Céline Aka | White & Case LLP |
| Mr. Francis Levesque | White & Case LLP |
| Ms. Dara Brown | White & Case LLP |
| Ms. Lauri Kai | White & Case LLP |
| Mr. Alec Albright | White & Case LLP |
| Mr. Taylor Gillespie | White & Case LLP |
| Mr. Efat Elsherif | White & Case LLP |
| Mr. Lazar Tomov | Tomov & Tomov |
| Ms. Sylvia Steeva | Tomov & Tomov |
| Ms. Yoana Yovnova | Tomov & Tomov |

**Party Representative:**

| | |
|---|---|
| Mr. Ivan Kondov | Ministry of Finance, Republic of Bulgaria |

**Experts:**

| | |
|---|---|
| Mr. Jostein Kristensen | Oxera Consulting LLP |
| Mr. Ilyes Kamoun | Oxera Consulting LLP |
| Mr. Mohammed Khalil | Oxera Consulting LLP |
| Mr. Mateusz Slomka | Oxera Consulting LLP |
| Mr. Hugo Talbot | Oxera Consulting LLP |

**Technical Support Staff:**

| | |
|---|---|
| Mr. Daniel Shults | White & Case LLP |
| Mr. Antonio Nittoli | White & Case LLP |

*Court Reporters*:

Ms. Diana Burden
Ms. Ann Lloyd

*Technical Support*:

| | |
|---|---|
| Mr. Steve Schwartz | FTI Trial Services |
| Mr. Jamey Johnson | FTI Trial Services |

Mr. Andrew Skim                          FTI Trial Services

72.    During the Hearing, the following persons were examined:

*On behalf of the Claimant*:
Mr. Adi Blum                             Witness
Mr. Abid Malik                           Witness
Mr. Richard Roberts                      Witness
Dr. Fabien Roques                        Expert
Mr. Richard Edwards                      Expert

*On behalf of the Respondent*:
Mr. Jostein Kristensen                   Expert

73.    During the Hearing, the Parties submitted the following demonstrative exhibits:

**From Claimant**

- Claimant's Opening Presentation (142 pages);

- Presentation of Dr. Fabien Roques (Compass Lexecon) (54 pages);[5] and

- Presentation of Mr. Richard Edwards (FTI) (16 pages).[6]

From Respondent

- Respondent's Opening Presentation (submitted in four volumes);

- Presentation of Mr. Jostein Kristensen (Regulatory Framework) (Oxera Consulting LLP) (18 pages); and

- Presentation of Mr. Jostein Kristensen (IRR & Quantum) (Oxera Consulting LLP) (12 pages).

74.    In accordance with the Tribunal's instructions, on 9 July 2021, the Claimant filed the Supplemental Report of Fabien Roques and Richard Edwards ("**FTI III**") and the

---

[5]    Dr. Roque's presentation was resubmitted by the Claimant on 9 June 2021, following the Tribunal's instruction to delete certain slides.

[6]    Mr. Edward's presentation was resubmitted by the Claimant on 11 June 2021, following the Tribunal's instruction to delete one slide.

Respondent filed the Supplemental Expert Report of Jostein Kristensen, Oxera Consulting LLP ("**Oxera III**").

75.    On 20 July 2021, the Parties informed the Tribunal that they had reached an agreement to allow the Respondent to submit a further report by Oxera, responding to Claimant's new calculations concerning the Spalma Incentivi measures taken by Italy. On 29 July 2021, the Tribunal informed the Parties that it approved of the Parties procedure for the filing of the additional expert report.

76.    On 21 July 2021, the Tribunal sent the Parties a list of questions for the Parties to answer and further elaborate on in their Post-Hearing Briefs.

77.    On 20 August 2021, the Respondent filed the Fourth Expert Report of Jostein Kristensen, Oxera Consulting LLP together with appendices 1 to 4 ("**Oxera IV**").

78.    On 13 September 2021 the Respondent requested leave from the Tribunal to submit into the record the judgment of the CJEU in *Republic of Moldova v. Komstroy LLC* (the "***Komstroy* Judgment**"),[7] and suggested that, on 15 October 2021, the Parties should file simultaneous submissions of no more than 10 pages addressing the implications of the *Komstroy* Judgment for the Tribunal's jurisdiction.

79.    On 22 September 2021, the Claimant filed its observations on the Respondent's request of 13 September 2021. It opposed the introduction of the *Komstroy* Judgment into the record of this arbitration.

80.    On 23 September 2021, the Tribunal informed the Parties that it would grant the Respondent's request to include the *Komstroy* Judgment in the record of the case as a new authority and invited the Parties to attempt to agree on the details (timing, length and effect on the Post-Hearing Briefs) for a new round of submissions on this new legal authority.

81.    On 1 October 2021, the Parties sent a joint communication to the Tribunal informing it of the Parties' agreement to move the deadline for the filing of the Post-Hearing Briefs to 8 October 2021 and to address the *Komstroy* Judgment in two rounds of submissions (with a page limit of 10 page each). The Parties also agreed on the dates on which the

---

[7]    *Republic of Moldova v. Komstroy LLC, Case C-741/19*, Judgment (CJEU, Grand Chamber), 2 September 2021 (**RL-332**) (the "***Komstroy* Judgment**").

submissions should be made and that each submission may be accompanied by additional exhibits and legal authorities.

82.  On 4 October 2021 the Tribunal informed the Parties that it had decided to adopt the Parties' agreement with respect to the deadline for the filing of the Post-Hearing Briefs and the sequence and format of their submissions on the *Komstroy* Judgment.

83.  On 8 October 2021, the Parties filed their respective Post-Hearing Briefs ("**CPHB**" and "**RPHB**").

84.  On 15 October 2021, the Respondent submitted its comments on the implications for the Tribunal's jurisdiction of the *Komstroy* Judgment, together with Legal Authorities RL-139 (resubmitted) and RL-332 to RL-364, and a consolidated index of Legal Authorities.

85.  On 22 October 2021, the Parties informed the Tribunal of their agreement to move the deadline for their cost submissions to 28 January 2022.

86.  On 3 December 2021, the Respondent submitted its Reply on the *Komstroy* Judgment, together with Legal Authorities RL-365 and RL-366 and a consolidated index of Legal Authorities.

87.   On 22 December 2021, the Claimant submitted its Rejoinder on the *Komstroy* Judgment, together with Exhibits C-261 to C-264; Legal Authorities C-213 to CL-215; and an Index of Exhibits; and of Legal Authorities.

88.  On 15 November 2021, the Claimant submitted its comments on the *Komstroy* Judgment, together with Legal Authorities CL-202 to CL-212 and an updated index of Legal Authorities.

89.  On 7 January 2022, the Parties informed the Tribunal through a joint communication that they had agreed on a 10-page limit for each Party's submission on costs, excluding cost schedules detailing each Party's costs for the case. By e-mail of 10 January 2022, the Tribunal approved of the Parties' agreement.

90.  On 28 January 2022, the Parties filed their respective submissions on costs.

91.     As of 19 January 2023, Mr. Oladimeji Ayobobola Ojo, ICSID Legal Counsel was appointed to serve as Secretary of the Tribunal.

92.     The proceeding was closed on [insert date], 2023.

## III.    PARTIES' POSITIONS

86.     Below the Tribunal sets out the positions of the Parties.

87.     Before doing so, the Tribunal recalls that more than 3,500 pages of submissions, presentations, expert reports, and witness statements were presented to it and that a six-day hearing took place. Therefore, in the summary that follows the Tribunal will not be able to give full credit to every idea, fact, or argument submitted to it and represented in those documents. The Tribunal further recalls that by its very nature, a summary of arguments contains subjective choices and decisions on the importance of some aspects or arguments over others and that an argument is eventually what the reader thereof, *i.e.* the Tribunal, understands it to be, not what the writer intended it to be.

88.     That being said, the Tribunal is mindful that a claim extending over three (or rather five) kinds of different breaches of the ECT in relation to seven different measures can necessarily not be presented, or even summarised, without some degree of repetition and thus inevitably the "summary" of arguments set forth below will at times include a measure of repetition.

### A.    The Claimant

#### 1.    Introduction

89.     The Claimant's main position is that, in 2011-2012, the Respondent set up an incentive scheme for investors in photovoltaic ("**PV**") energy by means of various legislative, regulatory, and contractual guarantees and commitments. Once the scheme had proven successful, however, the Respondent "changed the rules of the game". The Respondent reneged on its guarantees and commitments, to the substantial detriment of the Claimant and, in doing so, the Respondent violated the ECT and related rules of international law

protecting the Claimant's investment. Therefore, the Respondent is liable to the Claimant for the damages it has suffered as a result of those breaches.[8]

### 2.    The details of the Investment

90.    The Claimant avers that it is a Maltese company, founded by its three shareholders ACWA Power International, Crescent, and First Reserve (the "**Shareholders**").[9] "[A]t all times relevant to this dispute and at the commencement of this arbitration",[10] the Claimant owned 100% of the Bulgarian operating company ACWA Bulgaria, previously named ZBE Partners EAD ("**ZBE Partners**").[11] ACWA Bulgaria at the relevant times owned 100% of the PV plant at land plot No 000434, situated in the land belonging to Karadzhalovo village, Parvomay Municipality, Plovdiv region, Merata area, with an area of 995,117 decares (the "**Karad Plant**" and the planning, building, and operation thereof being the "**Karad Project**"; ACWA Bulgaria, the Karad Plant and Project, and, inasmuch as relevant and where applicable, all claims to money and performance and all returns associated with them together being the "**Investment**").[12]

91.    In 2010, First Reserve had entered into a joint venture framework agreement with SunE Solar B.V. ("**SunEdison BV**"), the "market leader",[13] under which SunEdison BV would develop renewable energy plants and propose them to First Reserve for inclusion in its investment funds.[14] (The Tribunal notes that, although the Claimant refers only to SunEdison, at least three entities from what appears to be a "SunEdison" group were involved in parts of the Karad Project: SunE Solar B.V., SunEdison Italia S.r.l. ("**SunEdison Italia**"), and SunEdison Spain Construction S.L.U. ("**SunEdison SLU**"). For the sake of clarity, in presenting the Claimant's argument, the Tribunal will make informed guesses, helped also by the submissions of the Respondent,[15] as to which SunEdison group entity is meant in each case.)

---

[8]    CMOM, para. 2.

[9]    CMOM, para. 32.

[10]   CMOM, para. 33.

[11]   CMOM, paras. 33, 156.

[12]   CMOM, para. 33.

[13]   CMOM, para. 166.

[14]   CMOM, para. 155.

[15]   See *e.g.* at RCMOMOJ, para. 99.

92.   SunEdison Italia acquired ACWA Bulgaria (then ZBE Partners) in September 2011. SunEdison SLU then sold its engineering, procurement, and construction services regarding the Karad Plant to ACWA Bulgaria for a total price of EUR 134.4 million and entered into an operation and maintenance agreement with ACWA Bulgaria under which SunEdison SLU was to operate the Karad Plant in exchange for an annual fee.[16]

93.   Construction of the Karad Plant started on 10 September 2011 and was completed by March 2012.[17]

94.   In reliance on the guarantee of full offtake of renewable energy production as included in the Energy from Renewable Sources Act of 2011 (the "**ERSA**") (see below), SunEdison SLU had maximised the efficiency of the plant by installing a higher capacity of solar modules (60.4 MW of peak capacity) than the capacity of the inverters of the plant (at 50 MW nominal capacity) (the "**60.4/50 Ratio**"). The design allows a PV plant to produce electricity at the maximum capacity of the inverters for a longer period each day, and to make up for losses that are suffered in the process of producing energy at a PV plant.[18]

95.   As the Claimant sets out: "[i]ncreasing the peak capacity of the panels above the capacity of the auxiliary systems mitigates this inefficiency [of the plant's peak capacity only being used at the sun's peak] by shifting the entire bell curve upward so that the plant is using all of the auxiliary systems at their maximum capacity for more of the day."[19] The design entails additional costs but SunEdison BV concluded at the time that the value of the additional production under the applicable FiT would exceed those costs.[20]

---

[16]   CMOM, para. 156; CMS Cameron McKenna LLP, Legal Due Diligence Report Karadzhalovo Solar PV Project, 18 April 2012 (**C-75**) ("**CMS Due Diligence Report**"), pp. 2, 6, 8, 22; Engineering, Procurement and Construction Agreement between SunEdison SLU and ACWA Bulgaria (then ZBE Partners), as amended and restated, 9 March 2012 (**C-70**); Operation and Maintenance Agreement between SunEdison SLU and ACWA Bulgaria (then ZBE Partners), as amended and restated, 9 March 2012 (**C-71**); EWRC Decision No. L-383, 26 April 2012 (**C-103**) (the "**License Decision**").

[17]   HT, D5, 11 June 2021, pp. 921-924; CPHB, para. 59; SunEdison/MEMC, Karadzhavolo Bulgaria 60.4 MWp, November 2011 (**C-63**), p. 9.

[18]   CMOM, paras. 159, 225; CROMCMOJ, paras. 16, 215; COS, p. 35; HT, D1, 7 June 2021, pp. 51-53.

[19]   CPHB, para. 16, fn. 21; CMOM, para. 225.

[20]   CMOM, paras. 159, 226, 227, 313.

96.    The design was in conformity with the applicable regulatory framework at the time.[21] A plant with 50 MW of total installed capacity, such as the Karad Plant, can have 60.4 MWp of installed PV panels, but would never deliver more than 50 MW to the grid at any given time.[22] A measure such as the 60.4/50 Ratio is comparable to installing "trackers" that make the panels follow the sun during the day, or installing higher quality components that have a higher degree of efficiency and as such increase the times during which a plant can produce at maximum level.[23]

97.    The Claimant bought ACWA Bulgaria from SunEdison BV on 28 June 2012. The deal was done by means of a share purchase agreement by which the Claimant bought 100% of the shares in ACWA Bulgaria (then ZBE Partners) together with debt owed by ACWA Bulgaria to SunEdison BV for the price of EUR 32,458,659 (the "**SPA**").[24]

98.    At the time of the SPA, the Karad Plant was complete and operational, had received all necessary licenses from Bulgarian authorities (in particular, the Energy and Water Regulatory Commission (the "**EWRC**" – alternatively the State Energy Regulatory Commission (the "**SERC**" or the "**SEWRC**"), or the "**Regulator**"), including Decision No. L-383 of 26 April 2012 (the "**License Decision**")[25] issuing the license for generation of electric power No. L-383-01 of the same date (the "**License**"),[26] and EWRC Decision P-168 of 11 June 2012 (the "**Permit**").[27] In addition, ACWA Bulgaria had entered into a power-purchasing agreement with Natsionalna Elektricheska Kompania EAD ("**NEK**", the "**Public Provider**"), dated 13 June 2012, (a power-purchasing agreement being a "**PPA**" and this PPA being the "**Karad PPA**")[28] to sell

---

[21]    CMOM, para. 159.

[22]    CROMCMOJ, para. 252.

[23]    COS, p. 135; CPHB, para. 16, fn 21.

[24]    CMOM, para. 191; Share Purchase Agreement between SunEdison BV and ACF, 28 June 2012 (**C-107**) (the "**SPA**"), clauses 1.1, 2, 3; SunEdison Italia had, in the meantime, transferred the shares in ACWA Bulgaria to SunEdison BV, *cf*. CMS Due Diligence Report (**C-75**), pp. 2, 6, 8, 22.

[25]    CMOM, para. 182; License Decision (**C-103**).

[26]    License for generation of electric power No. L-383-01, 26 April 2012 (**C-158**) (the "**License**"). The Parties often use the defined term License for either of the two documents, *i.e.* the License Decision or the License or for both documents together. While somewhat unfortunate, the Tribunal will also adhere to that practice, meaning that when the Tribunal refers to the License it will usually refer to both documents together, unless otherwise specified.

[27]    CMOM, para. 183; EWRC Decision No. P-168, 11 June 2012 (**C-105**) (the "**Permit**").

[28]    CMOM, paras. 184-188; Agreement for Purchase of Electricity Produced by Photovoltaic Power Plant No. 12ИЕ3327013/13.06.2012 between ACWA Bulgaria (then ZBE Partners EAD) and NEK EAD, 13 June 2012 (**C-106**) (the "**Karad PPA**").

100% of its electricity production to NEK at the fixed FiT rate guaranteed by law. That rate was BGN 485.60/MWh as determined by Decision C-18/2012 of the EWRC which set the feed-in tariff for all investments in the period from July 2011 to and including June 2012 (the "**FiT Decision**"; a "**FiT**" being a feed-in tariff and the "**FiT**" being the FiT set by the FiT Decision).[29] The Karad Plant being complete, operational, fully authorised, and qualifying for the FiT was one of the Claimant's preconditions for entering into the transaction.[30]

99.    In order not to "have its capital tied up in a non-performing asset", the Claimant sold the Karad Plant to Enery Development GmbH from Vienna ("**Enery**") effective on 31 December 2019 for EUR 28.6 million, with the total valuation under that deal being nearly 40% less than the acquisition value in 2012.[31] The deal closed on 10 September 2020 and the entity that eventually made the purchase was Enery Power BG Holding GmbH.[32]

### 3.    Factual background PV energy and incentive schemes

100.   The Claimant submits that in the 2011/2012 period, it was significantly more expensive to produce renewable energy than to produce conventional power, to an extent that PV energy production could not recover its costs at the regulated prices set for conventional electricity in Bulgaria at the time.[33]

101.   PV installations are capital-intensive, and around 86% of their total lifetime costs are incurred upfront for building the plant, after which only comparatively low operating costs arise.[34] Accordingly, as the Respondent's expert Mr Kristensen confirmed in cross-examination, the levelized cost of electricity ("**LCOE**") for a specific, existing plant does not decrease significantly over time.[35]

---

[29]    CMOM, paras. 19, 140, 189; EWRC Decision No. C-18/2011, 20 June 2011 (**C-48**) (the "**FiT Decision**").

[30]    CMOM, paras. 19, 168, 189, 273, 306.

[31]    CMOM, para. 263; HT, D5, 11 June 2021, p. 1006.

[32]    Letter from the Claimant to the Tribunal of 18 September 2020. The Tribunal observes that most arguments regarding "Enery" as set out below either refer to Enery rather than to Enery Power BG Holding GmbH or are unaware of that distinction. In any case, the Enery-related arguments do not appear to depend on the identification of the precise entity.

[33]    CMOM, paras. 3-4, 73, 75.

[34]    CMOM, paras. 5, 76, 81; Compass I, para. 4.53.

[35]    HT, D5, 11 June 2021, pp. 910-912.

102.    An increase in production capacity and advancements in the design and installation technique of PV plants caused the cost of PV plants to decline rapidly.[36] "[B]ecause the capital cost of a particular renewable plant is fixed at the time of construction", cost reductions do not benefit existing plants.[37] Based on the previous two points, PV plants are "doubly sunk" assets because (i) almost all their lifetime costs are sunk up front and (ii) once the costs are sunk, a plant cannot profit from the declining costs of PV panels any more.[38]

103.    Energy production through PV, being dependent on the sun, and not being able to regulate or economically store its output, is also more volatile and less manageable than conventional energy production. As such, it is more exposed to market volatility since a PV plant may be producing, and consequently it may be in need of selling, a lot of energy at a time that the market price is low, and may not produce energy at a time that the market price is high.[39] For the same reason, *i.e.* the production being less predictable and less manageable, energy production through PV also increases imbalance costs for the grid operator (**(im-)balance costs** or **(im-)balancing costs** are the costs of balancing out the effect that a higher or lower than expected production from a source of electricity has on the overall electricity grid by requiring the decrease or increase of the input of other sources of electricity at a cost).[40]

104.    Finally, an increase in renewable energy production and consumption brings with it environmental and energy security benefits that, while beneficial to society as a whole, an unregulated energy market of individual consumers is unable to price and compensate.[41]

### 4.    The composition of a perfect incentive scheme

105.    Based on the above factors, the Claimant is of the opinion that an incentive scheme that seeks to increase PV energy production must (i) allow PV energy producers to recover

---

[36]    CMOM, para. 6.

[37]    CMOM, paras. 78-80.

[38]    COS, p. 15; HT, D1, 7 June 2021, pp. 24-26.

[39]    CMOM, paras. 7, 77.

[40]    CMOM, paras. 12, 77, 142.

[41]    CMOM, paras. 82-83.

their costs and make a profit when selling their energy,[42] (ii) facilitate, either through direct subsidies or through long-term minimum price stability, that potential investors be able to come up with the high amount of capital needed at the beginning of an investment in a PV plant,[43] (iii) maintain guaranteed offtake prices over a long period, in order not to incentivize potential investors to wait with their investments until the costs of PV plants have further decreased,[44] and in order not to deter investors by adding a price risk to the investment,[45] (iv) insulate PV plants from market volatility, *e.g.* through guaranteeing a full offtake at a set price, and not charging imbalance costs,[46] and (v) not reduce renumeration for existing plants in acknowledgment of the fact that almost all costs of a PV plant are sunk at the time of commissioning.[47]

106.    A FiT is an effective incentive tool in that regard because it addresses the above-mentioned characteristics that make (or made at the time) renewable energy non-competitive in the market while efficiently allocating risks between the government and investors.[48]

107.    The "best practice" in the design of a FiT programme is (i) to allocate risks to investors that the investors are in the best position to manage and (ii) to allocate risks which the investors cannot effectively manage to the regulator and, ultimately, to the consumer.[49] As a benefit from reducing an investor's risk, the investor will be happy to accept a lower return on its then more stable investment, reducing the support needed.[50] The reduction of risks makes it easier for investors to obtain third-party debt, and thus increases possible project sizes and investor appetites.[51]

---

[42]    CMOM, para. 4.

[43]    CMOM, paras. 5, 10, 81, 85.

[44]    CMOM, paras. 6, 80, 95; COS, p. 15.

[45]    CMOM, para. 90.

[46]    CMOM, paras. 7ff, 12, 129, 142.

[47]    HT, D1, 7 June 2021, p. 26.

[48]    CMOM, paras. 84-85; Compass I, para. 4.64.

[49]    CMOM, para. 88; HT, D1, 7 June 2021, p. 46; CPHB, paras. 1, 52.

[50]    CMOM, para. 92.

[51]    CMOM, para. 93 (together with other tax and accounting benefits); HT, D1, 7 June 2021, pp. 147-148; CPHB, paras. 1, 52.

108.   In a perfect scheme, decisions regarding the level of output of a site, such as site selection, the selection of the equipment, and the project design, as well as the management of the costs of a project (the operational risk) should fall to the investor.[52] In such a scheme, a guarantee of a full offtake of all production encourages producers to maximise their output and efficiency, and to innovate on ways to do so, which is a good way for a State to obtain a higher overall production of the desired renewable energy and to reduce costs for successive generations of plants.[53]

109.   The risk of the inability to forecast daily electricity production, and the effects thereof on the electricity grid should better be borne by the regulator and the consumer.[54] The "regulatory risk", under which the Claimant "primarily" subsumes the risk that, measured against its desired effect, the scheme turns out to be too generous, or not generous enough, should equally fall to the system and, in doing so, to the consumer.[55]

110.   The "defining characteristic" of a FiT programme is that it fixes the price and quantity terms "*ex ante*", not allowing for any fine-tuning afterwards, in order to give investors the confidence and predictability needed to decide to invest the high upfront investment necessary for an investment in PV energy.[56] The level of a FiT should be prospectively set, leaving the investor room to manage the cost in light of that standard, and imbalance costs should fall to the system, either directly, or indirectly by allowing the producer greater leeway regarding the accuracy of its forecasts.[57]

111.   What matters to an investor in its decision to invest in a renewable plant is the "net rate of financial support", being "the headline tariff rate less any costs imposed by the regulator on the normal operation of the plant". Transparency and stability regarding all contributing factors to the net rate of financial support are thus key to any (prospective) investor, including, in particular, stability regarding the net rate of the FiT level, the annual offtake percentage, and the duration of the guaranteed offtake at the guaranteed price. Stability of these factors, when paired with monitoring of an incentive

---

[52]   CMOM, para. 88; HT, D1, 7 June 2021, p. 46; CPHB, paras. 1, 52.

[53]   CMOM, paras. 128, 227; referring to Compass I, para. 4.42; CROMCMOJ, paras. 16, 262, 268; Compass II, para. 3.50.

[54]   CMOM, paras. 88, 142.

[55]   CMOM, para. 90, CROMCMOJ, para. 378; COS, p. 31; HT, D1, 7 June 2021, pp. 46-48.

[56]   CROMCMOJ, para. 149; Compass II, Section 3, para. 3.2.

[57]   CMOM, para. 88.

programme, also allows the State in question exactly to forecast, and control, the size and costs of a programme.[58]

### 5.    The Respondent intended quickly to increase the production of PV energy in Bulgaria

112.    The Claimant submits that, in 2011/2012, the Respondent, much as other EU Member States, had set a target quickly to increase the share of renewable energy in its electricity consumption until 2020 (from around 11% in 2010 to around 21% in 2020).[59] The Respondent's plan was to increase installed PV capacity by 2,500% by 2015 and 3,500% by 2020 as opposed to the 2010 values.[60] The Respondent intended to "front-load" the increase into the first half of the decennium in order to minimise the risk of missing the target.[61] According to the Claimant, it is undisputed that the increase had to take place mostly through an increase of wind and PV energy, given that the available technical potential of hydro-power, which in 2005 covered 9% of electricity consumption in Bulgaria, was already exploited to a large extent, and thus could not contribute much more.[62] However, Bulgaria's policy objectives were, in any case, "based on meeting electricity demand with clean energy generation, not simply [on] achieving an arbitrary target of installed RES capacity."[63]

113.    Setting the target and adopting the policy was the succession of a policy trend in Bulgaria that had commenced in anticipation of the accession of the Respondent to the EU and the EU's renewable energy requirements and quotas,[64] and also as a result of a desire to achieve greater energy security and independence.[65]

---

[58]    CMOM, paras. 89, 91-92.

[59]    CMOM, paras. 3, 6, 117, 118; COS, p. 7; HT, D1, 7 June 2021, pp. 16-17; Compass I, para. 3.37; National Renewable Energy Action Plan, 30 June 2010 (**FR-32**), p. 26.

[60]    CMOM, para. 121; Compass I, Table 3.

[61]    COS, p. 9; HT, D1, 7 June 2021, pp. 18-19.

[62]    CMOM, paras. 3, 6, 117, 121; CROMCMOJ, para. 131 C-33, 194; COS, p. 8, 9; HT, D1, 7 June 2021, pp. 17-18; CPHB, para. 6.

[63]    CROMCMOJ, para. 16.

[64]    CMOM, paras. 70-71, 105-106.

[65]    CMOM, paras. 58, 82.

114.    Environmental benefits of renewable energy compared to the coal and nuclear energy production prevalent in Bulgaria, also played a role in the Respondent's decision to opt for a higher share of renewable energy.[66]

115.    Given that, as outlined above, PV energy production could not recover its costs at the regulated prices set for conventional electricity in Bulgaria at the time,[67] and as a consequence of the particular requirements for, and obstacles to, attractive and profitable investment in renewable energy projects in Bulgaria in 2012, investment in the renewable energy sector in Bulgaria would not have occurred without government support.[68]

116.    Finally, the problem that government support was needed to attract investment in renewable energy production was further aggravated by the increase in the overall consumption of electricity in Bulgaria, as a consequence of which even more renewable energy was needed to reach the 21% consumption target for 2020.[69]

### 6.    The defining elements of the ERSA Regime

117.    According to the Claimant, the defining elements of the Respondent's incentive scheme for PV plants, as mostly set out in the ERSA (hereinafter referred to as the "**ERSA Regime**"), were as follows.

   a.    The ERSA Regime is an *ex ante* "at risk" remuneration model, placing development and operational risks on investors and market and regulatory risks on the host State, and shielding investors from volume and price risks.[70]

   b.    A mandatory "price, demand, and term ... were the fundamental pillars of the Bulgarian regime" and represent the bargain between the government and its investors, including the Claimant.[71] The Respondent guaranteed and stabilised

---

[66]    CMOM, paras. 82, 58.

[67]    CMOM, paras. 3-4, 73, 75.

[68]    CMOM, paras. 81, 83.

[69]    CMOM, paras. 119-120; COS, p. 8; HT, D1, 7 June 2021, p. 18. The 21% target appears to be the target for the share of electricity from RES in the consumption of electricity as opposed to the overall energy consumption target of 16% (see below).

[70]    CROMCMOJ, paras. 265-267; CPHB, paras. 1, 52, 67.

[71]    HT, D1, 7 June 2021, p. 39.

a fixed FiT for a fixed period of time of 20 years (Article 31(1) and (2) ERSA) and for the offtake of all of the electricity produced by a plant (Article 31(5) ERSA) to all renewable energy plants that met the necessary criteria and were commissioned by a certain date.[72] The specific FiT was set annually depending on factors such as size, location, and date of completion of a plant.[73] The FiT was set at levels high enough to "enable a typical plant to achieve an attractive return on investment – estimated at the time to be around 9% (pre-tax) for a standard plant".[74]

c.  The ERSA Regime allowed for annual reductions in the FiT rate applicable to new plants, but guaranteed that the FiT assigned to a particular completed plant would not change during the 20-year duration of the programme (Article 31(4) and (2) ERSA).[75] For existing plants, "all price insecurity was removed through an express stabilisation guarantee in the [ERSA] itself",[76] and "Bulgaria deliberately chose to relinquish its power to 'fine tune' the FiT".[77] Under cross-examination, Mr Kristensen confirmed that the ERSA Regime incentivises investors and their plants to become more efficient, although Mr Kristensen qualified this confirmation with an "up to a point" and a "by and large".[78]

d.  The guarantees of the Respondent were included in a power-purchase agreement between the plant operator and Bulgaria's state-owned public supplier NEK (Article 31(2) ERSA).[79]

e.  The ERSA Regime shielded producers of renewable energy from the majority of imbalance costs to the grid, by placing them into a "special balancing group"

---

[72]  CMOM, paras. 9, 127, 129; Nikolay Kiskinov, Renewable Energy Sources, 2012 (**C-47**), p. 195; CROMCMOJ, paras. 13, 155, 404; COS, p. 83; HT, D1, 7 June 2021, pp. 12, 14, 31-32; CPHB, paras. 1, 10, 80.

[73]  CMOM, para. 9; CROMCMOJ, para. 13; HT, D1, 7 June 2021, p. 32.

[74]  CMOM, paras. 9, 139; CROMCMOJ, paras. 168, 561.

[75]  CMOM, paras. 10, 96, 128; referring to Republic of Bulgaria, MEET, National Renewable Energy Action Plan, 20 April 2011 (**C-29**) (the "**NREAP**"), p. 158.

[76]  HT, D1, 7 June 2021, p. 32.

[77]  CPHB, paras. 1, 52.

[78]  HT, D4, 10 June 2021, pp. 783-784, 807; CPHB, para. 67; *cf.* also Oxera II, para. 6.19, fn 225.

[79]  CMOM, paras. 11, 127.

and limiting their financial responsibility to, in short, half of the costs of deviations from production forecasts greater than 20%.[80]

    f.  The ERSA Regime monitored sustainability and affordability of the increase in production for Bulgarian consumers. As opposed to the previously applicable scheme under the 2007 Renewable and Alternative Energy Sources and Biofuels Act ("**RAESBA**" and the incentive scheme governed by RAESBA being the "**RAESBA Regime**"), the ERSA Regime made the application process for new projects more demanding and cost-intensive. It terminated merely speculative projects by requiring up-front financial contributions for projects to move forward, and further by requiring detailed business plans, feasibility studies, and financial models prior to receiving final licensure into the Regime. In doing so, the ERSA Regime decreased the number of speculative project applications and increased the speed of the administrative process and the Respondent's view on the projects in the pipeline and their impact on the system.[81] The ERSA Regime was purposefully designed to allow Bulgaria to control the added capacity from renewable energy sources ("**RES**") and to control and prevent any potential boom.[82]

118.    The ERSA Regime deliberately sought to mitigate certain perceived flaws of the previously applicable schemes, mainly the RAESBA Regime, because the terms of the RAESBA "were not sufficiently attractive to incentivize completion of the amount of new capacity from RES that Bulgaria needed, particularly in solar PV projects",[83] and as such the previously applicable schemes were hindering the development of the Respondent's renewable energy sector and its ability to meet binding EU targets.[84]

119.    The ERSA Regime, in particular, removed the possibility for the Regulator to vary, *i.e.* also to decrease, the FiT for existing projects by up to 5% a year which had existed till

---

[80]    CMOM, paras. 12, 124, 141, 239; CROMCMOJ, para. 460; *cf.* ACWA Bulgaria, Annual Management Report and Financial Statements, 31 December 2013 (**RE-2**), p. 21.

[81]    CMOM, paras. 16-17, 116; CROMCMOJ, paras. 6, 12, 131, 138; COS, p. 60; CPHB, para. 8.

[82]    CROMCMOJ, para. 480; COS, pp. 59-61; HT, D1, 7 June 2021, pp. 80-81.

[83]    CROMCMOJ, para. 130.

[84]    CMOM, paras. 98ff, 123ff; CROMCMOJ, paras. 12, 131ff; COS, p. 18ff; HT, D1, 7 June 2021, p. 29.

then and entailed a significant potential downward risk for investors. It did so by fixing a FiT for the entire term of a power-purchasing agreement.[85]

120. At the same time, the ERSA Regime reduced the time during which a FiT could be "locked-in" for plants that had not been commissioned yet from three years to one year, thereby ensuring that FiT rates could be kept in line with technology costs, and eliminating the problem, already very minimal, of investors locking-in a high FiT rate and waiting with construction until the price of PV panels had further decreased, to benefit from what the Respondent had dubbed "overcompensation".[86] The ERSA further reduced the term over which a FiT was offered from 25 years to 20 years.[87]

121. Two key changes introduced by the ERSA Regime in respect of its predecessor the RAESBA Regime were thus (i) removing the possibility of decreasing the FiT for existing plants annually by 5% and thus making a FiT permanent for the whole term of a power purchasing agreement, and (ii) increasing the possibilities for keeping the FiT rate at which new plants could be commissioned in line with technology costs.

122. These changes made the ERSA Regime a full *ex ante* FiT scheme, *i.e.* one at which the incentives and conditions to obtain them are set in advance after which they cannot be changed anymore. Bulgaria choosing to adopt these amendments reflects that Bulgaria intentionally moved away from the "hybrid" *ex ante* model in RAESBA, which had allowed for *ex post* revisions to the FiT rate for existing plants, to a full *ex ante* model.[88]

123. The ERSA Regime "improved predictability and reliability for renewables producers",[89] and was "deliberately designed to be highly appealing to investors",[90] and to "enhance investor confidence".[91] Its aim was to create stability, taking away

---

[85]    CMOM, paras. 112, 113, 115, 123; MEET, White Paper on the draft of the Law for the Energy from Renewable Energy Sources, undated (**C-40**) (the "**ERSA White Paper**"); CROMCMOJ, paras. 12, 142; CPHB, para. 8.

[86]    CROMCMOJ, paras. 141-146, 148, 167; COS, p. 63.

[87]    CROMCMOJ, para. 150.

[88]    CROMCMOJ, paras. 149-150.

[89]    CMOM, para. 153.

[90]    CMOM, para. 124.

[91]    CROMCMOJ, para. 6.

Bulgaria's possibility to amend the FiT for existing plants annually in exchange for a shorter period over which the FiT was due (see above).[92]

124. The ERSA Regime was a success, increasing the Bulgarian PV capacity from almost zero to approximately 1,000 MW by mid-2012, "well on its way to meeting its 2020 EU target."[93]

>    a.    *Reasonable return was not a defining element of the ERSA Regime*

125. The Claimant submits that one of the pillars of the Respondent's defence, namely that the ERSA Regime was always subject to an overriding notion of offering support only at the minimum amount necessary, enabling only economically justified or reasonable returns, is false.[94]

126. The concept of economically justified returns was a vague notion informing the Respondent's *ex ante* design of the ERSA Regime, a "floor-level limitation" on the EWRC in setting prices generally, so to speak.[95] The concept appears only once in Article 31 of the Bulgarian Energy Act effective on 21.06.2011 (the "**Energy Act**"). Unlike in Spain, in Bulgaria the concept does not form a "cornerstone principle" sanctioned by the Supreme Court of Bulgaria and actively disclosed to investors. Neither does it provide the Respondent with a blank check to modify and override the ERSA Regime *ex post* for investments that were made in reliance on the conditions set at the time of the investment.[96]

127. Rather, the ERSA Regime was based on a target return which was not intended to be a cap – as Mr Kristensen agreed under cross-examination.[97] The notion of a reasonable

---

[92]    CROMCMOJ, para. 150.

[93]    CMOM, paras. 18, 124; CROMCMOJ, para. 151

[94]    CROMCMOJ, paras. 4, 5, 314; COS, p. 59; HT, D1, 7 June 2021, pp. 93-98; CPHB, para. 63.

[95]    CROMCMOJ, paras. 5, 435, 438; COS, p. 71.

[96]    CROMCMOJ, paras. 5, 435, 438; HT, D1, 7 June 2021, p. 96. Bulgarian Energy Act, supplemented, SG No. 47/21.06.2011, effective 21.06.2011 (**R-247**) (the "**Energy Act**").

[97]    CROMCMOJ, paras. 501, 557-558; HT, D1, 7 June 2021, p. 82; HT, D5, 11 June 2021, p. 1070; CPHB, paras. 4, 98; Letter from Bulgaria, Minister of MEET, to European Commission, SA.39126 (2014/CP), RES supporting scheme in Bulgaria / Renewable Energy Sources Act (RESA), 4 August 2015 (**C-240**), p. 4.

return does not stand in the way of outperforming the set target when earning a certain reasonable return is just a target in the first place.[98]

128.    The notion of reasonable return, in the Energy Act or elsewhere, if it were to represent an "overriding principle" or a "cap", would also be in contradiction to the precise detail and procedure offered by the ERSA, as adopted and advertised by Bulgaria before the Investment was made. It would thus be in contradiction with a law which, according to its Article 1(2), takes precedence over the Energy Act.[99]

129.    Within the system of the ERSA, Article 32(2) indeed mentions "the rate of return" as one of the guidelines in setting a FiT. Nevertheless, the ERSA, in the following Article 32(3), much as in Article 31(4), makes it very clear (*e.g.* to prospective, reasonable investors) that a price once set shall be applicable, *i.e.* fixed, for the "whole term" of a PPA. Therefore, within the ERSA, any consideration of return would have been an *ex ante* consideration, before setting the price, not during the term of a price.[100]

130.    The notion of reasonable return boils down to an argument that investors should not have relied on the exact terms of the ERSA and accompanying regulations and representations in public and parliament, and should not have calculated their investments on the basis that the State would act as it had announced and set out in law, but rather on the basis of changing economics subject only to a notion of "reasonable return". The argument presents a theory fabricated to justify misconduct in hindsight.[101]

131.    The Respondent's reasonable return argument also contradicts the logic behind an *ex ante* incentive scheme for investments in renewable energies and the drive to efficiency built into such a scheme (based on the incentive to earn more of the same fixed price with a more efficient plant). If suddenly applied in the middle of a term of a PPA, it would furthermore penalise investors who built or acquired efficient plants.[102]

---

[98]    CPHB, paras. 4, 98.

[99]    CROMCMOJ, paras. 10, 436-437, 549; COS, p. 72; HT, D1, 7 June 2021, pp. 93-98; CPHB, paras. 63-64.

[100]    *Ibid.*

[101]    CROMCMOJ, paras. 10, 436-437.

[102]    CROMCMOJ, para. 442; in cross-examination, the Claimant had Mr Kristensen confirm that the ERSA Regime incentivises investors and their plants to become more efficient although Mr Kristensen qualified this confirmation with an "up to a point" and a "by and large"; HT, D4, 10 June 2021, pp. 783-784, 807; CPHB, para. 67.

Logically, a "reasonable return" approach would also entail that less efficient plants should be entitled to damages if they failed to achieve a reasonable return.[103]

132. Finally, the contemporaneously expressed views of Bulgaria regarding the ERSA Regime underline that (i) the internal rate of return ("**IRR**") targeted was 9-10%, (ii) it was fully understood that individual plants could earn higher or lower returns, and (iii) only returns of more than 20%, as at times achieved under the RAESBA Regime, were deemed excessive. Nevertheless, in order not to undermine the legitimate expectations of the few investors achieving such excessive results at the time, such results were left intact when the ERSA was introduced.[104]

### b. The ERSA Regime was not introduced to curtail investment into production of energy from RES

133. The Claimant submits that another pillar of the Respondent's defence, *i.e.* the argument that the ERSA Regime set out to <u>limit</u> investment in production of energy from RES in Bulgaria is false, too,[105] and also belied by the actual effect of the ERSA Regime on investment in Bulgaria.[106]

134. An earlier draft of the ERSA had envisioned caps on the installed capacities (600 "MWp" for PV capacity) which would have automatically prevented any further PV plants from connecting to the grid once a cap was reached. Those provisions, as a deliberate choice, did not make it into the final version of the law. They were abandoned in favour of a scheme that would allow the Respondent to monitor the installation of new capacity closely and to react to developments of the market.[107] This indicates that Bulgaria did not want to limit capacity of any particular technology.[108] In addition, as early as July 2011, the Respondent knew that 2,850 MW of "serious" new capacity from RES was in the pipeline to be commissioned and that its renewable energy share target

---

[103]    CROMCMOJ, para. 442.

[104]    CROMCMOJ, paras. 168, 261; CPHB, para. 98.

[105]    CROMCMOJ, paras. 6, 98.

[106]    CROMCMOJ, para. 8.

[107]    CROMCMOJ, para. 185; CMS Cameron McKenna LLP, Draft of the New Renewable Energy Law of Bulgaria Provided for Consultations to the Bulgarian PV Association, 2010 (**C-246**), para. 2.2; COS, p. 63; HT, D4, 10 June 2021, pp. 866-867, 872-873; CPHB, para. 57.

[108]    CROMCMOJ, paras. 155, 185; COS, p. 63.

for 2020, as mandated by the EU, would be met by that capacity.[109] The fact that Bulgaria did not shut down the programme at that time indicates that meeting the EU target was not the only objective it sought to achieve with the ERSA Regime.[110]

135.    Finally, the Respondent cannot claim now that its Regime actually sought to curtail investment in energy production from RES but then, to its surprise, accidentally attracted investment. In particular, the Respondent cannot argue that the ERSA sought to curtail a boom in investment in renewable energy, but that subsequently that boom it sought to curtail, came unexpectedly (see below).[111]

<p style="text-align:center"><em>c.    Not only the FiT was stabilised</em></p>

136.    While the Respondent admits that the ERSA expressly states that the applicable FiT "shall not be changed" for a period of twenty years, and thus makes a specific commitment to stabilise the FiT, the Respondent also argues that the FiT would be the only part of the ERSA Regime that was stabilised. The Claimant submits that this is too narrow a reading of the ERSA.[112]

137.    What was stabilised in the ERSA is a question of statutory construction as to what Bulgaria intended when it stabilised the FiT for the full offtake at the full term and what a reader of the law would have understood. For that construction a statute must be read as a whole.[113]

138.    An explicit reference that a price "shall not be changed" in one part of an Article of the ERSA (Article 31(4)) does not mean that all other provisions in the same Article, or all other elements provided for therein, would be subject to change, or that only "radical changes" would be subject to legal scrutiny.[114] Even absent a stand-alone stabilisation clause enumerating specifically all elements stabilised, there can be no doubt that the ERSA, the FiT Decisions, as well as the approval process for, and the License of, the

---

[109]    CROMCMOJ, para. 186; CPHB, para. 58.

[110]    CROMCMOJ, para. 186.

[111]    CROMCMOJ, paras. 6, 8.

[112]    CROMCMOJ, paras. 9, 152; COS, pp. 20ff; CPHB, paras. 1-3.

[113]    COS, p. 23; HT, D1, 7 June 2021, p. 37; CPHB, paras. 2, 80.

[114]    CROMCMOJ, paras. 154-157; COS, p. 23; HT, D1, 7 June 2021, pp. 37-38; CPHB, para. 12.

Karad Plant stabilised the price term and the quantity term, which stabilisation took place for the specific purpose of inducing investment.[115]

139.    The Respondent's argument also lacks force because the stabilisation commitment regarding the FiT, which the Respondent admits to exist, would not only stabilise the FiT against direct frustration but also against frustration by indirect means such as the seven measures in dispute here (the "**Seven Measures**").[116]

140.    It would also be inconsistent with the economic-policy logic underlying the design of any FiT programme to stabilise only the price, but not also the volume and the duration of offtake.[117] This would also not be representative of the programme the Respondent had intended to introduce, as can be seen from government statements contemporaneous to the introduction of the ERSA.[118] In addition, any stabilisation in law of only the price in a FiT regime would be meaningless if the host State were free to amend an obligation regarding volume or duration of a purchase, or strike the whole obligation.[119]

141.    Because price and quantity go hand in hand, especially for a renewable power plant whose entire revenue stream is derived from the sale of a single commodity, if the Bulgarian government had actually believed that it had only stabilised the price and could have amended the offtake quantity at all times, including for existing plants, this would have amounted to a "fraudulent" bait and switch, "a trap for unwary investors", and a violation of the obligation to act in a transparent way, as opposed to an "opportunistic" bait and switch which in the Claimant's view actually occurred.[120]

142.    What is more, the Respondent has pointed to no statement of its government, or of a market actor, and has presented no fact witness that shared the view now taken that in the ERSA Regime only the price was stabilised. Therefore, the Claimant's

---

[115]    CPHB, paras. 2, 80.

[116]    COS, p. 24; HT, D1, 7 June 2021, p. 38.

[117]    CROMCMOJ, paras. 152-153, 158, 248; CPHB, para. 11.

[118]    CROMCMOJ, paras. 152-153, 158-159, 248; CPHB, para. 3; 168 Hours, Interview with Angel Semerdzhiev, The amount for green energy in the electricity price will grow, 19 April 2011 (**C-181**) ("**168 Hours Interview Angel Smerdzhiev**"); Capital, Interview with Angel Semerdzhiev, 23 June 2012 (**C-45**); AtomInfo.bg, Minister Dobrev –for the prices in the energy sector, 25 June 2012 (**C-182**); Letter from BEH to Chair National Assembly, Chair CEET, Minister MEET, 26 September 2013 (**C-46**); Letter from EWRC to BEH and NEK, 28 April 2015 (**C-165**).

[119]    CROMCMOJ, paras. 159, 248; HT, D1, 7 June 2021, p. 36; CPHB, paras. 3, 12.

[120]    CROMCMOJ, para. 248; COS, p. 23; CPHB, para. 12.

"overwhelming evidence" as to the intention of Bulgaria to stabilise its whole support regime, and as to the fact that this was so communicated to the public at large, and to the Claimant in particular, stands unrebutted.[121]

143.  Admitting to the stabilisation of one element of the Regime is also inconsistent with the Respondent's argument that Bulgaria would be allowed any direct or indirect changes to the ERSA Regime as long as it continues to provide a reasonable return.[122]

144.  Finally, the admission by Bulgaria "that the [ERSA] provided an express price stabilisation guarantee", in any case, differentiates this dispute from other ECT disputes between investors and Spain and Italy, where governments have consistently argued that there was no price stability guarantee.[123]

145.  By admitting to the stabilisation of the FiT, the Respondent also limits the question before the Tribunal not to the broader question of whether a stabilisation commitment was made, but to the narrower question of whether the stabilisation commitment that was made only includes the price term or includes the quantity and the price term.[124]

d.    *Article 9 No 3 RAESBA*

146.  The Claimant submits that omitting from ERSA an equivalent of Article 9 No 3. of RAESBA, which mandated the continuation of preferential treatment with "at least an equivalent effect" in case of an "alteration of the mechanisms for promoting" the production of renewable energy is, contrary to what the Respondent submits, not a sign of a deliberate decision of the Bulgarian legislator not to stabilise the ERSA Regime, but rather has two other explanations:

147.  First, the RAESBA, in Article 3(2) of its Transitional and Final Provisions, included a requirement that the Bulgarian government change the preferential treatment system into a market-based system by the end of 2011. This upcoming transformation, already anticipated at the time of the adoption of the RAESBA, and its effect on existing plants,

---

[121]    CROMCMOJ, para. 160; CPHB, paras. 3-4, 12.

[122]    CROMCMOJ, para. 9.

[123]    HT, D1, 7 June 2021, pp. 33-34, 103.

[124]    CPHB, paras. 11-12.

made it necessary to contemplate how to deal with existing pricing terms once that transformation would occur.

148. Secondly, under the RAESBA, amendments to the preferential pricing terms would also affect existing plants. The ERSA, however, abandoned the goal of moving toward a market-based support regime and did not allow for amendments to the pricing terms to affect existing plants, therefore making Article 9 No 3 of the RAESBA obsolete.[125]

### 7.    How the ERSA Regime induced confidence in general

149. The Claimant presents several arguments and examples as to how the ERSA Regime induced confidence of investors in the production of energy from RES in general.

### a.    *Stability and predictability of the ERSA Regime*

150. According to the Claimant, the ERSA Regime was even more stable and predictable than the incentive schemes of other EU Member States. It was so "rock-solid" that it "removed nearly any material degree of doubt about what Bulgaria could and could not do to alter the economics of PV investments once they had been made."[126]

151. The Respondent "effectively took off the table" legislative and regulatory policy tools such as the imposition of windfall profit taxes, or fees to the government, by "virtue of the transparency, certainty, and policy logic of the FiT scheme it created".[127] The ERSA Regime "sought to provide investors with total certainty regarding the revenues a plant could expect to receive by fixing the FiT for a plant's entire electricity production for the full duration of the PPA".[128] It "gave the investment community the assurances it needed to know that Bulgaria's system was reliable and that revenues and returns that could be generated under it were predictable for specific plants."[129]

---

[125]    CROMCMOJ, paras. 161-163; Article 3(2) of the Transitional and Final Provisions to the Renewable and Alternative Energy Sources and Biofuels Act, Promulgated SG No. 49, 19 June 2007 ("**RAESBA**"), however, appears to exclude plants with an existing PPA from the application of the market mechanism to be developed, which would undermine the premise of the argument made here; RAESBA (**R-006**).

[126]    CMOM, paras. 13-15.

[127]    CMOM, para. 15.

[128]    CMOM, paras. 124, 128, 131; CROMCMOJ, para. 98.

[129]    CROMCMOJ, paras. 147-148.

b.     *Monitoring capabilities*

152.   The Claimant submits that the Respondent's monitoring and monitoring capabilities added yet further confidence in the minds of investors, because the mechanisms used to that end could be used to control and prevent an unsustainable renewable energy bubble or boom as experienced in other EU Member States such as Spain.[130] The Respondent carefully monitored the capacity and types of plants entering into its FiT programme, and given that the tariff rates, eligible production, and duration of the guaranteed offtake were fixed, the Respondent (i) could know at all times how much its FiT programme would cost, and (ii) could close the programme to new entrants when it feared that the total costs its system and consumers should bear was met.[131] The authorisation structure of the ERSA Regime "allowed Bulgaria to know with absolute certainty the number and capacity of RES plants enrolling into Bulgaria's FiT program", and "gave Bulgaria an unprecedented level of detail regarding specific plants, including in terms of technology, design, and cost, as well as in terms of expected production, financing, and return projections."[132] It gave the Respondent "complete visibility into the pipeline of serious projects coming online under the program."[133] It "ensure[d] that Bulgaria could effectively manage the on-boarding of new projects and that only serious investors were in the pipeline…"[134]

153.   In that regard, the Claimant does not dispute Bulgaria's submission that the monitoring mechanism of Article 22(5) ERSA could be applied in 2012 for the first time.[135] Neither does the Claimant dispute that even if Article 22(5) ERSA could have been used earlier, the Karad Plant would not have been affected by any capacity limitation under the ERSA because it had obtained its final connection agreement prior to the ERSA entering into force and therefore had a right to be connected under the connection procedure in

---

[130]   CMOM, para. 17, 92; CROMCMOJ, paras. 140, 148, 480; COS, pp. 59-61; HT, D1, 7 June 2021, pp. 80-81.

[131]   CMOM, para. 92; CROMCMOJ, para. 6.

[132]   CMOM, paras. 17, 92; CROMCMOJ, para. 497.

[133]   CROMCMOJ, paras. 12, 132.

[134]   CROMCMOJ, para. 148.

[135]   CROMCMOJ, para. 199; EWRC Decision EM-01, 29 June 2012 (**R-044**); RCOMOJ, paras. 95-96. The mechanism allows the EWRC to approve the estimated amount of electricity capacity from RES that can be connected to the electricity grid in the following year by 30 June of each year. It was immediately used that year to limit the additional capacity to zero, *i.e.* to declare that no further capacity can be connected.

RAESBA.[136] According to the Claimant, such arguments miss the point: the existence of the mechanism, together with other mechanisms under the ERSA, gave investors, including the Claimant, the confidence that the unrealistic pipeline of projects under RAESBA was taken care of and that booms, like the one in the Czech Republic, would be registered on time and could and would be sufficiently addressed and managed with the means provided for in the ERSA, in contrast with other European countries with similar systems.[137]

> c.    *The Respondent actively publicized and promoted the features of its scheme to induce foreign investment in its renewable energy sector*

154.    The Claimant submits that the Respondent "actively publicized and promoted", and "reinforced" its commitment that it would provide (i) a fixed FiT and (ii) full offtake for (iii) the entire duration of a power-purchase agreement, and that the Respondent "touted the stability and security of the regime at every opportunity",[138] to induce foreign investment in its renewable energy sector.[139] To underline its point, the Claimant quotes several government reports, parliamentary debates, and newspaper interviews in which it is mentioned that a FiT would be set for the entire duration of a PPA and that all energy produced would be covered by the FiT.[140] According to the Claimant, the statements by officials were repeated and explicit, "express", statements and representations, intended to generate, and successfully generating, expectations among investors such as the Claimant.[141] The publicity and statements were also directed at the international financial community and European and international banks in order to advertise investment in renewable energy production in Bulgaria as reliable and

---

[136]    CROMCMOJ, para. 200; RCOMOJ, paras. 97-98.

[137]    CROMCMOJ, paras. 199-200, 235, 480.

[138]    CMOM, para. 292; CROMCMOJ, para. 398; CPHB, para. 82.

[139]    CMOM, paras. 125, 292-293; CROMCMOJ, paras. 2, 398; CPHB, para. 82.

[140]    CMOM, para. 292; CPHB, para. 82; *e.g.* National Assembly, Committee on Regional Policy and Local Government, Minutes, Meeting of 17 February 2011 (**C-176**); National Assembly, Committee on European Affairs and Oversight of the European Funds, Minutes, Meeting of 23 February 2011 (**C-177**); Dnevnik, Interview with Delyan Dobrev (GERB), Vice President of CEET, The Price of The Green Power Was Artificially Held High So Far, 3 May 2011 (**C-133**) (*cf.* also the Respondent's translation of the interview at (**R-197**)); 168 Hours Interview Angel Smerdzhiev (**C-181**); AtomInfo.bg, Minister Dobrev –for the prices in the energy sector, 25 June 2012 (**C-182**).

[141]    CMOM, para. 293-294, 296-297; CPHB, para. 82.

"bankable", in the knowledge that external debt would allow investors to leverage their investment to attractive returns at a reduced tariff level.[142]

155. "State representatives were clear that the goal of the ERSA was to better monitor the on-boarding of new projects while ensuring predictability for and safe-guarding the interests of investors."[143]

### 8.    How the ERSA Regime and the Respondent induced confidence in the Claimant in particular

#### a.    The Claimant's due diligence

156. The Claimant argues that the decision of the Shareholders to invest was a result of "thorough technical, financial, and legal analysis of the Bulgarian regulatory environment" and the specific project, conducted by "leading international consultants".[144]

157. The Shareholders jointly engaged CMS to review and analyse the applicable legal and regulatory regime. The resulting report confirmed the Shareholders' expectations regarding the ERSA Regime. It confirmed that all regulatory approvals were given and that the FiT was set at BGN 485.6/MWh. It furthermore raised none of the upcoming changes as a possible risk.[145] Contrary to an allegation of the Respondent, CMS also provided a regulatory report, as schedule 2 to its report, independently submitted as Exhibit C-80. Said report did not raise any red flags and indeed confirmed the analysis of CMS that "relevant grid operators" were obliged to offtake "all electricity" produced from the renewable source at the fixed FiT over the entire term of the Karad PPA.[146]

158. The Claimant's Shareholders' due diligence was only one in a series of due diligence efforts of all companies and institutions involved, including of SunEdison, which hired

---

[142]    CMOM, paras. 292, 294; HT, D1, 7 June 2021, p. 147; CPHB, para. 82; Darik News, Preferential prices for electricity produced from renewable energy sources will be fixed for the entire duration of the PPA, 24 April 2011 (**C-178**).

[143]    CROMCMOJ, para. 404, 480.

[144]    CMOM, paras. 19; 165; ACWA Power, Bulgaria, Country/Sector Analysis, 26 February 2012 (**C-65**); ACWA Power, Board Investment Committee Presentation, 26 February 2012 (**C-66**).

[145]    CMOM, paras. 175-176; CPHB, para. 28.

[146]    CROMCMOJ, para. 228; CMS Cameron Mckenna LLP, Regulatory Report, Overview of the Bulgarian Legislation for Support of PV Plants, 18 April 2012 (**C-80**) "**CMS Regulatory Report**"), pp. 16-17; CPHB, paras. 28, 35.

Wolf Theiss to confirm that the Karad Project had obtained the relevant titles, rights, permits, and assessments,[147] and of the International Finance Corporation, the Overseas Private Investment Corporation and UniCredit Bank Austria AG (the "**Lenders**"), which hired Allen & Overy, Spasov & Bratanov, Economic Consulting Associates, and Fichtner. Allen & Overy, Spasov & Bratanov, and Fichtner issued several reports on various aspects and concluded, among other things, that under the standard form power purchasing agreement at the time, NEK was to purchase and pay the applicable FiT of BGN 485.60/MWh (applicable to all plants commissioned until 30 June 2012) for all electricity generated by the project, and that the expected average yield of the project was to be 1,357 kWh/kWp per year, signifying 1,357 annual operating hours, and a production of 81,995 MWh per year.[148]

159.    The institutions that financed the Karad Project "were so confident in the security of Bulgaria's incentive framework" that they financed the project on a non-recourse basis, relying solely on the Karad Plant's revenues.[149] The banks' assessment of the situation in turn gave the Claimant confidence that its assessment of the situation in Bulgaria was correct.[150]

(1)     The alleged April 2012 meeting(s)

160.    The Claimant submits that, in April 2012, "at an in-person meeting prior to" its Investment, "State representatives", including the Deputy Minister of the Ministry of Economy, Energy and Tourism ("**MEET**"), Mr Valentin Nikolov, and representatives of the EWRC, the Bulgarian Energy Holding ("**BEH**") and NEK,

---

[147]    CMOM, para. 173; Wolf Theiss, Red Flag Due Diligence Report – Project Karadjalovo, 11 November 2011 (**C-73**).

[148]    CMOM, paras. 178-181; COS, pp, 50-51; HT, D1, 7 June 2021, p. 67; CPHB, para. 33; referring to Allen & Overy, Outline Bankability Review of Standard Form Renewables Power Purchase Agreement With National Electricity Company EAD (NEK) as Offtaker (the PPA), 27 January 2012 (**C-98**); Spasov & Bratanov, SunEdison Karadjalovo – Solar PV Project – Legal Red Flag Report, 27 February 2012 (**C-99**); Economic Consulting Associates, Infraproject Consult, Karadzhalovo Solar Power Plant Market Study, Final Report, March 2012 (**C-100**) ("**ECA Report**"); Fichtner, Yield Analysis Report, 13 February 2012 (**C-101**); Fichtner, Technical Due Diligence Report, 17 February 2012 (**C-102**).

[149]    CMOM, para. 295; CPHB, para. 34; WS Malik I, para. 9; WS Yayikoglu, paras. 12-13.

[150]    CMOM, para. 295, WS Malik I, para. 9; CROMCMOJ, para. 225; CPHB, paras. 33-34.

    a.  gave "direct assurances" in response to a specific question that Bulgaria would not impose "unexpected fees or costs" or a production cap such as the ones in Spain,

    b.  did not qualify their assurances in any way, *e.g.* by tying it to a notion of "reasonable return" or return above capital cost, and

    c.  explained to Messrs Blum, Roberts and Yayikoglu that

        i.  Bulgaria had enacted the ERSA in order to avoid an unsustainable wave of capacity, an overcapacity in the system that had happened in other countries in Europe,

        ii.  Bulgaria was in control of the connections into the system, and

        iii.  Bulgaria, in contrast with Spain, did not have a tariff deficit; it even had adopted a cost-recovery mechanism to avoid any such deficit.[151]

161.  Elsewhere the Claimant submits that "key members of ACF's management, including Messrs. Blum, Roberts, and Yayikoglu attended in-person meetings with the Deputy Minister of [MEET] as well as senior representatives of NEK, all of whom confirmed that the FiT rate would be paid on the entire electricity output."[152] The witnesses for the Claimant further testify that representatives of NEK also confirmed that the FiT was not going to cause significant financial hardship for NEK.[153]

162.  Regarding the April 2012 meeting, the Claimant points out that the Respondent satisfies itself with suggesting that the meeting did not take place or that the Claimant's witnesses would misrepresent the commitments made during it, or that the commitments were not made in writing, but that the Respondent has not made any official available to contest the Claimant's account of the meeting, leaving the testimony unrebutted. Therefore, "[t]here can be no doubt that the meeting took place as Claimant described it."[154]

---

[151]  CROMCMOJ, paras. 15, 229, 258; CMOM, para. 314; HT, D2, 8 June 2021, pp. 316, 478-480; CPHB, paras. 30-31, 81; WS Blum I, para. 11, WS Yayikoglu, para. 15; WS Roberts II, para. 6.

[152]  CROMCMOJ, para. 364.

[153]  HT, D2, 8 June 2021, p. 480.

[154]  CPHB, paras. 32, 81.

163.    The Claimant further submits that the meeting with the Deputy Minister is another unique aspect of the present case not found in renewable cases against Spain or Italy. The meeting makes the case a legitimate-expectations case based on an in-person meeting with a government minister who confirms the expectations so that the investor goes ahead with its Investment.[155]

(2)    Expectations of the Shareholders become expectations of the Claimant

164.    In response to an argument of the Respondent about the due diligence of the Shareholders not being the Claimant's due diligence, the Claimant submits that investment expectations, plans, and due diligence efforts of the Shareholders become those of the Claimant "through the mechanism of the shareholders' control over the [Claimant's] board of directors" once the joint venture moves forward, and that ACF's directors once appointed held the same expectations they had in their role within the Shareholders.[156] The Claimant was established and created with the knowledge and the expectations of the Shareholders that founded it.[157] Given that the Claimant is a special purpose vehicle ("**SPV**"), it would have been wasteful to incorporate it before its Shareholders had decided to move forward with the Investment.[158]

165.    With a view to Mr Blum and Mr Roberts in particular, the Claimant had conferred a power of attorney on them in June 2012, in order to sign the SPA. Therefore, they can speak in that capacity as to the expectations of the Claimant for the Karad Plant.[159]

(3)    Response to further counterarguments of the Respondent

166.    In response to an argument of the Respondent concerning the date of due diligence reports of other entities allegedly relied upon by ACF, the Claimant submits that due diligence reports dating from January through April 2012 are sufficiently close in time to the date of the Investment to be relevant. Indeed they are so relevant that a reasonable

---

[155]    HT, D1, 7 June 2021, p. 69; CPHB, paras. 32, 81.

[156]    CROMCMOJ, paras. 220, 363; CPHB, para. 37.

[157]    CROMCMOJ, para. 363.

[158]    CROMCMOJ, para. 229; CPHB, para. 37.

[159]    HT, D2, 8 June 2021, p. 319; HT, D3, 9 June 2021, pp. 562-563; ACF Renewable Energy Limited Power of Attorney, 20 June 2012 (**C-232**).

investor not only could have taken, but had to take such reports into account, even more so as the legislative and regulatory framework did not change between January 2012 and the time of the Investment in June 2012.[160]

167.  The Claimant further counters Bulgaria's criticism of the due diligence efforts made at the time, and the Respondent's argument pertaining thereto, as inaccurate.[161]

   a.  The Respondent, for example, misquotes and misrepresents the Crescent Capital Investment Memorandum of 7 June 2012 and the Allen & Overy draft bankability review of 27 January 2012 and the mandate behind Allen & Overy's report,[162] and takes commonplace disclaimers out of context.[163]

   b.  While the Common Terms Agreement between ACWA Bulgaria (then ZBE Partners) and the Senior Lenders (as defined therein), dated 9 March 2012 (the "**Common Terms Agreement**") does indeed provide that ZBE Partners "is required to prepay the loan in the form of a cash sweep if there is a change in law resulting in a lower FiT after ZBE locked in the FiT",[164] this is of no relevance since contracting parties in financing arrangements attempt to allocate responsibility for a multitude of events without expecting them actually to occur. The Common Terms Agreement, for example, also allocates responsibility in the event of the expropriation or nationalisation of the project without this meaning that the Claimant expected such a thing to happen.[165]

   c.  Contrary to what the Respondent insinuates, a sensitivity analysis in internal presentations of investors, even when concerning a 5% or 20% reduction of the FiT, also does not mean that investors conducting such an analysis actually expect the calculated scenario to materialise. In any case, none of the

---

[160]    CROMCMOJ, para. 221.

[161]    CROMCMOJ, para. 222.

[162]    CROMCMOJ, paras. 223-224, 234-235; Crescent Capital, Clean Energy Transition Fund, Final Investment Memo, 7 June 2012 (**C-62**) ("**Crescent Investment Memorandum**"); Allen & Overy, Outline Bankability Review of Standard Form Renewables Power Purchase Agreement With "National Electricity Company" EAD (NEK) as Offtaker (the PPA), 27 January 2012 (**C-98**).

[163]    CPHB, para. 36.

[164]    CROMCMOJ, para. 227; Common Terms Agreement between ACWA Bulgaria (then ZBE Partners) and the Senior Lenders (as defined therein), 9 March 2012 (**C-84**) (the "**Common Terms Agreement**").

[165]    CROMCMOJ, para. 227.

Shareholders modelled any scenario that would have expected or predicted any of the Seven Measures, for example, the APC (as defined below). In addition, a sensitivity analysis does not imply that the person running the analysis would believe that the changes considered for the calculation of the analysis, *e.g.* a reduction of the FiT, would be lawful.[166] Placing importance on a sensitivity analysis of a reduction of the FiT is also inconsistent with Bulgaria's argument that it never reduced the FiT.[167]

168.    Notwithstanding the Respondent's criticism of the Shareholders' or the Lenders', or the Project developer's due diligence efforts, the fact remains that none of these reports ever raised any red flags that amendments as they did happen in the form of the Seven Measures could or would happen directly or indirectly.[168]

### b.    The knowledge of the Respondent of the Claimant's project

169.    The Claimant argues that, in addition to the general and detailed monitoring of its energy market as a whole, the Respondent was also fully aware of the Karad Plant's design and financial expectations in particular.[169] The Karad Plant, as the second-largest and most innovative PV plant of Bulgaria at the time,[170] and the Karad Project were "well known to government officials at the highest levels, including the Minister of Economy and Energy".[171] "Bulgaria knew virtually everything there was to know about this Project".[172]

170.    The Respondent vetted every aspect of the Karad Project.[173] By the time the Karad Project was ready for commissioning, it had already received 17 official "acts" of approval, all of which had followed the study of application materials, including

---

[166]    CROMCMOJ, para. 236.

[167]    CROMCMOJ, para. 365.

[168]    CPHB, para. 36.

[169]    CMOM, paras. 169-170; CROMCMOJ, para. 7.

[170]    CROMCMOJ, para. 16.

[171]    CROMCMOJ, para. 7.

[172]    HT, D1, 7 June 2021, p. 54.

[173]    CMOM, paras. 170, 172, 290; Application for the issuance of licenses from ACWA Bulgaria (then ZBE Partners) to EWRC, 12 January 2012 (**C-166**) (the "License Application"); Letter from ACWA Bulgaria (then ZBE Partners) to EWRC, 13 March 2012 (**C-167**), Letter from ACWA Bulgaria (then ZBE Partners) to EWRC, 21 March 2012 (**C-168**), Letter from ACWA Bulgaria (then ZBE Partners) to EWRC, 23 March 2012 (**C-169**); CROMCMOJ, paras. 7, 203; COS, pp. 36ff, 59; HT, D1, 7 June 2021, pp. 53ff.

documents indicating the total capacity of the Plant, its projected production, its projected revenue, its projected rates of return, and including investment analysis and a financial model that was based on a fixed FiT on all the projected electricity production over a period of 20 years.[174]

171. The EWRC approved the financial model and the License only after a thorough review of the application over several sessions, which included a hearing of the investors at an open session, and only after "the unique aspects of the Karad Project were communicated [] and fully understood",[175] and the EWRC had "closely scrutinized the submitted documents".[176] At all times during the process, the EWRC had the opportunity to raise questions or seek further information regarding the financial models if any aspect of the application or documents had given rise to concerns. The EWRC was furthermore kept fully appraised of the changes in the business plan and the financing structure.[177]

172. The application materials for the License, including the business plan and the production estimate, much like minutes of an open session with the EWRC regarding the License, and the License itself, evidence that EWRC knew and took note of the expected output, the financing structure of the Karad Project, including its high profitability, and the 60.4/50 Ratio. The License specifically acknowledges a "total installed module capacity" of 60,434.64 kWp and an "estimated average annual quantity of produced electricity" of 78,632 MWh. Such an ouput would have been impossible to achieve for a PV plant at that location with only 50 MWp of installed PV panels, as all entities and persons involved would have known at the time.[178] For the Respondent now to argue that its regulators did not understand the meaning of the 60.4/50 Ratio when issuing the License, or that it had never licensed the Karad Plant's actual design, is "non-serious"

---

[174]    CMOM, paras. 170, 172, 290; referring to License Application (**C-166**), Letter from ACWA Bulgaria (then ZBE Partners) to EWRC, 13 March 2012 (**C-167**), Letter from ACWA Bulgaria (then ZBE Partners) to EWRC, 21 March 2012 (**C-168**), Letter from ACWA Bulgaria (then ZBE Partners) to EWRC, 23 March 2012 (**C-169**); CROMCMOJ, paras. 7, 203; COS, pp. 36ff, 38, 59; CPHB, para. 18, where the Claimant only speaks of "15" approvals; HT, D1, 7 June 2021, pp. 53ff.

[175]    CMOM, paras. 171, 182, 290; License Decision (**C-103**); CROMCMOJ, para. 16.

[176]    CROMCMOJ, para. 211.

[177]    CROMCMOJ, paras. 206, 211.

[178]    CMOM, paras. 182, 290, 313; License Decision (**C-103**), p. 3; CROMCMOJ, paras. 7, 216-217, 251-252; COS, pp. 39-49, 59; HT, D1, 7 June 2021, pp. 59-66; HT, D3, 9 June 2021, pp. 559-560; CPHB, paras. 19-24; WS II Roberts, para. 34; License Application (**C-166**), pp. 1-2, para. 2; Long-Term Business Plan of Photovoltaic Park 50 MW Karadzhalovo 2013-2032 of ZBE Partners EAD (**C-171**).

and "embarrassing", unsubstantiated by evidence, and casts into doubt the credibility of Bulgaria's entire case.[179]

173. It is, however, not the position of the Claimant that every single one of the 17 official approvals the Karad Plant received in itself serves as a stability assurance regarding the ERSA Regime.[180]

174. The Claimant further disputes as contradicted by the facts and law of the case that the developers of the Karad Plant built the plant on a "fast-track" timeline without the required regulatory approval.[181] Contrary to the submission of the Respondent, Bulgarian law does not require that a license from the EWRC be granted before the construction of a PV plant begins. Rather it provides that if such a license is granted before construction, the license shall include conditions for the further construction and timing of the completion of a plant necessary in order to keep the license valid and accurate.[182] *In casu*, the License was granted after completion of the construction of the Karad Plant.[183] In addition, in July 2015, the Public Financial Inspection Agency of Bulgaria audited ACWA Bulgaria for 34 days and found no aspect of the Karad Plant, not its design and not the 60.4/50 Ratio, to be in violation of the License and its underlying conditions.[184]

175. In any case, even if the Karad Plant had been in violation of its License, this would not provide a justification of, or stand in any connection to, the APC (as defined below) or any of the Seven Measures, or the expectations regarding the ERSA, since, at most, it could have and would have led to direct regulatory action against the Karad Plant itself.[185]

176. It is furthermore false for Bulgaria to argue that returns in excess of the figures that the applicants for the License assumed at the time of application would be unauthorised

---

[179]    CROMCMOJ, para. 252; CPHB, paras. 5, 23.

[180]    CROMCMOJ, paras. 202-203; COS, pp. 59, 68; HT, D1, 7 June 2021, pp. 81, 90-92.

[181]    *Ibid*.

[182]    CROMCMOJ, paras. 207-208; COS, p. 68; HT, D1, 7 June 2021, pp. 90-92.

[183]    CROMCMOJ, para. 209; COS, pp. 68-69.

[184]    CROMCMOJ, para. 213; COS, pp. 55, 68-69, 135; HT, D1, 7 June 2021, pp. 70-71; CPHB, para. 25; Public Financial Inspection Agency, Ministry of Finance, Report for Performed Inspection of ACWA Bulgaria, 10 July 2015 (**C-204**).

[185]    CPHB, para. 26.

returns under the License. That argument is also of less relevance given that the actual performance of the Karad Plant only "slightly" exceeded the projections in the application by around 6% (average production of 81,353 MWh from 2014-2019 as opposed to projection of 78,632 MWh for 2013).[186]

177.   Finally, the detailed vetting process and the detailed knowledge of Bulgaria of the Karad Project sets the Project apart also from projects that were the subject of cases against Spain or Italy.[187]

### 9.   The Respondent gave a guarantee and created legitimate expectations

#### a.   *The Respondent gave a guarantee*

178.   Based on the above, the Claimant concludes that "[s]eeking to induce significant investment in its renewable energy sector, Bulgaria guaranteed that Claimant's Karad Project would receive an incentive tariff at a fixed amount of BGN 485.60/MWh, for a fixed period of twenty years, on 100% of the electricity that the Karad Project delivered into the grid",[188] or that the Respondent gave a "firm commitment" that the Karad Plant would receive the FiT "on all of the electricity that it delivered".[189]

179.   The stabilisation guarantee was included in the ERSA and reinforced by the FiT Decision, the License, and the Karad PPA as well as repeatedly confirmed by statements of Bulgarian State officials in public as well as directly to the Shareholders.[190] More in particular, "all price insecurity was removed through an express stabilisation guarantee in the [ERSA]".[191]

---

[186]   CPHB, para. 27, fn 52. The difference between those two values, however, appears to be closer to 3.5% rather than 6%.

[187]   HT, D1, 7 June 2021, p. 54; CPHB, para. 18.

[188]   CMOM, para. 273; HT, D1, 7 June 2021, p. 14; CPHB, paras. 1, 80.

[189]   CROMCMOJ, para. 2.

[190]   CROMCMOJ, para. 499; HT, D1, 7 June 2021, pp. 12, 14; CPHB, paras. 1, 78, 80, 82.

[191]   HT, D1, 7 June 2021, p. 32.

180.    Implicit in such a guarantee is the commitment that future changes to the legislative or regulatory framework would not apply to the Karad Plant in a way that would alter or undermine the provisions that stabilised the revenues of the Karad Plant.[192]

181.    The Claimant invested in reliance on that commitment of the Respondent (see below).[193] The very success of the ERSA Regime in attracting investment, as seen also in contrast to the "lukewarm reception" of the RAESBA Regime, indeed proves that by means of the specific guarantees of the ERSA Regime, the Respondent induced investors to invest.[194]

*b.    The Respondent created legitimate expectations*

182.    The Claimant argues that the Respondent also created the legitimate expectation that all the electricity produced from the Karad Plant would receive a fixed FiT of BGN 485.60 MWh over twenty years.[195]

183.    Because of the ERSA Regime, the Shareholders expected that a fixed purchase price, a fixed volume, and a fixed duration was guaranteed by law,[196] and the Claimant, naturally, based its calculations that led to the purchase price for ACWA Bulgaria on that expectation.[197]

184.    Much like other investors and their lenders, the Claimant and the Lenders expected the economic benefit of the ERSA Regime to remain exactly what the Claimant was "promised" in the beginning, and they could not rationally expect the Respondent to amend the Regime in the way it did.[198]

---

[192]    CMOM, para. 286; CROMCMOJ, para. 398; CPHB, para. 80.

[193]    CMOM, para. 273; CPHB, para. 83.

[194]    CROMCMOJ, para. 399.

[195]    CMOM, para. 286; CROMCMOJ, paras. 2, 15; HT, D2, 8 June 2021, p. 319; CPHB, para. 83.

[196]    CMOM, paras. 158, 165; WS Blum I, paras. 5, 8; WS Malik I, para. 5.

[197]    CMOM, para. 229.

[198]    CMOM, paras. 15, 194.

185.   The Shareholders did expect that the ERSA Regime would prevent an unsustainable boom in renewables and would make the network able to accommodate new producers.[199]

(1)    Sources of legitimate expectations

186.   The Claimant submits that the Respondent created legitimate expectations regarding the parameters of the ERSA Regime by confirming these parameters in writing and orally.[200]

187.   The Claimant's expectations were formed "first and foremost by the plain language of Bulgarian law and its surrounding context".[201]

188.   However, Bulgarian officials also gave "numerous" explicit representations regarding the essential elements of the ERSA Regime in public in order to induce investors like the Claimant to invest.[202] Minister Dobrev of MEET, for example, gave an interview where he stated that under the ERSA "[t]here is no unpredictability in the cases where the construction can be completed with this time frame [*i.e.* the one year during which a set FiT applies]".[203] "State representatives" also gave "direct assurances" in person to representatives of the Claimant that Bulgaria would not impose unexpected fees or costs.[204] Such statements by Bulgarian officials corroborated and confirmed the Claimant's expectations and their reasonableness.[205] Especially the significance of the meeting with the Deputy Minister of Energy "is difficult to overstate" as it bases the legitimate expectations of the Claimant on a direct, in-person meeting.[206]

189.   The FiT Decision provided "explicit transparency" for investors regarding the Respondent's assumptions and methodology when setting the applicable FiT rate and

---

[199]   CMOM, paras. 163, 165; CPHB, para. 29; ACWA Power, Board Investment Committee Presentation, 26 February 2012 (**C-66**); WS Roberts I, para. 10.

[200]   CMOM, para. 286; CROMCMOJ, paras. 2, 15.

[201]   CROMCMOJ, para. 364; HT, D1, 7 June 2021, pp. 12, 14; CPHB, para. 78.

[202]   CMOM, para. 286; CROMCMOJ, paras. 2, 15, 364, 398; HT, D1, 7 June 2021, p. 12; CPHB, para. 82.

[203]   COS, p. 62; HT, D1, 7 June 2021, pp. 84-85; Dnevnik, Interview with Delyan Dobrev (GERB), Vice President of CEET, The Price of The Green Power Was Artificially Held High So Far, 3 May 2011 (**R-197**) (*cf.* also the Claimant's translation of the interview at (**C-133**)).

[204]   CROMCMOJ, para. 15.

[205]   CROMCMOJ, paras. 364, 404; CPHB, para. 13.

[206]   CPHB, paras. 32, 81.

the Decision made it clear to the Claimant that, provided the Karad Plant was completed by June 2012, the Karad Plant would receive a fixed FiT as determined in the FiT Decision.[207]

190.   As outlined above, the Respondent signed off on and granted the individualised License of the Karad Plant only after a thorough and detailed review of the application. The License confirms the economic parameters that would govern it, and was only one of as many as 17 individual approvals of the Karad Plant. All those approvals were the result of a thorough study of the materials and, therefore, gave the Claimant the legitimate expectation that Bulgaria would not renege on its commitments after only just having entered into them following such a thorough process.[208]

191.   The approvals and the process leading to them also reinforced the Claimant's expectation that the Respondent understood the productive capacity of the Karad Plant including the 60.4/50 Ratio and the criticality of receiving the FiT on the entire production of the plant for the economics of the Investment, and that this understanding of the Karad Plant was also underlying the Respondent's repeated commitments not to make detrimental changes to the FiT regime for the Karad Plant over its twenty-year duration.[209] In short, the Claimant expected "that once the Plant had this License it was a reliable investment".[210]

192.   It is irrelevant in that regard that the License was issued to ACWA Bulgaria (then ZBE Partners) not to the Claimant. The License and the licensing process also create expectations of the Claimant directly. The Investment having received the License and having endured the licensing process creates trust of the Claimant (i) in the process and (ii) in the knowledge of the Respondent about the Karad Plant.[211]

193.   The Karad PPA further enhanced the expectation "that the incentive framework governing its investment was secure" because in the Karad PPA, NEK agreed to purchase all the power produced by the Karad Plant, at the fixed FiT for a period of 20

---

[207]   CMOM, paras. 137-140, 288; FiT Decision (**C-48**).

[208]   CMOM, paras. 286, 290; CROMCMOJ, para. 2.

[209]   CROMCMOJ, para. 364.

[210]   HT, D1, 7 June 2021, p. 66.

[211]   CROMCMOJ, para. 404.

years.[212] The Claimant submits, however, that its claim is not that the Karad PPA "itself created the expectations of the Claimant", but rather, (i) that the Karad PPA was the culmination of the process and the elements that created the expectations, such as the ERSA, the history of the ERSA, and the licensing process, and (ii) that it was the ERSA that created the expectations of the Claimant.[213] In that regard, the Claimant recalls, that the ERSA at the time of the Investment stated that a granted FiT would not be changed for the term of a PPA, being 20 years.[214]

194.    In any case, the "investment context" gave rise to the same expectations for the Claimant and other investors.[215] Indeed, the manner in which the ERSA Regime operated, working with, and offering long-term commitments (and clear-cut and public criteria to qualify for them; "designed and marketed to investors as a kind of 'open offer'" to be accepted by applying and qualifying) reinforced the impression of a commitment to stability and to the fulfilment of the bargain on the side of the Respondent.[216]

195.    More abstractly: it being clear to any reasonable investor that the ERSA Regime constituted an *ex ante* remuneration model, no investor would have reasonably expected *ex post* changes to its remuneration terms, which changes, by definition, go against the fundamental principles of *ex ante* regulation.[217]

      *c.*    *Response to counterarguments of the Respondent*

        (1)    Existing plants, "overcompensation", and plants being put "on notice"

196.    It is false and not supported by any evidence, for the Respondent to claim (i) that any investor would have known that Bulgaria would amend the ERSA Regime and cut the revenues of existing plants to reduce the costs of its incentive scheme and to address "overcompensation" and (ii) that investors were put "on notice" that such changes

---

[212]    CMOM, paras. 184-188.

[213]    HT, D1, 7 June 2021, pp. 58, 73.

[214]    CMOM, paras. 286, 298; CROMCMOJ, para. 15.

[215]    CMOM, paras. 286-288; CROMCMOJ, para. 15.

[216]    CMOM, para. 299; CROMCMOJ, paras. 375, 387, 536; HT, D1, 7 June 2021, p. 104; WS Blum II, para. 7.

[217]    CROMCMOJ, para. 269.

would occur.[218] The Respondent had explicitly confirmed that reductions to the guaranteed incentives would only be made prospectively to new plants, not to existing plants.[219]

197.    In the contemporaneous view of politicians in Bulgaria, the ERSA also already addressed any alleged "overcompensation" problem of the RAESBA Regime. In addition, even though politicians at the time criticised the overcompensation under the RAESBA Regime, the ERSA did not reduce the return rates for plants already commissioned under RAESBA. Both of those factors further support the reasonable expectation that (i) the ERSA had tackled any alleged problem with overcompensation and (ii) that reform of a programme would not affect the compensation for existing plants.[220] It can also not be argued that an investor would have had to expect that Bulgaria would reduce, and have the right to reduce, returns in excess of 9-10% when contemporaneously it was made clear that individual plants could earn higher or lower returns than that, and while, as highlighted above, return rates of 20% or more achieved under the RAESBA Regime were left untouched when the RAESBA Regime was reformed to become the ERSA Regime.[221]

198.    Finally, any argument of Bulgaria that legitimate expectations or assurances were not violated as long as the Karad Plant's IRR exceeded its cost of capital is also nonsensical.[222]

(2)    Consequences of the risk of a spike in electricity prices

199.    The Claimant acknowledges that the Shareholders flagged as regulatory risk that too many PV projects could cause a spike in electricity prices which could cause the government to take away promised benefits.[223]

200.    The Claimant, however, did not expect that risk to become a reality given that when its Shareholders highlighted that risk, they also highlighted the differences between the

---

[218]    CROMCMOJ, paras. 6, 165, 166, 175; HT, D1, 7 June 2021, p. 93; CPHB, paras. 56-57, 60.

[219]    CROMCMOJ, para. 398.

[220]    CROMCMOJ, paras. 167-168.

[221]    CROMCMOJ, paras. 168, 261.

[222]    CROMCMOJ, para. 231.

[223]    CMOM, para. 163, fn 202; CROMCMOJ, paras. 234-235; Crescent Investment Memorandum (**C-62**); WS Roberts I, para. 10.

situation in Bulgaria and the situation in Spain or the Czech Republic. Those differences are significant because (i) the Bulgarian Government had "limited the final grid connection agreements that have been issued with a goal not to exceed 600 MW in the medium term and not to create an uncontrolled rush to solar tariffs",[224] (ii) "Bulgaria had not accumulated any tariff deficit in its electricity system (compared with Spain, which had an accumulated tariff deficit in excess of €15 billion in 2010)",[225] and (iii) the ERSA Regime seemed more soundly prepared for handling and managing a great influx of new projects and project applications.[226]

### (3)    EU State aid law and legitimate expectations

201.    The Claimant finally also disputes the Respondent's argument that until a State aid scheme is notified to, and approved by, the European Commission, an investor cannot legitimately expect total certainty to receive all revenues promised under that unnotified and unapproved scheme. The argument is disingenuous because, (i) at the time of the Investment, which is the only relevant time for the assessment, neither Bulgaria nor the European Commission believed a scheme to promote renewable energy production funded by the end-consumer rather than the State to be EU State aid, and (ii) the EU and Bulgaria at the time urged investment in the renewable energy sector in the country. The argument would thus come down to the assertion that an investor was not entitled legitimately to rely on the laws of the host State and could not legitimately expect that the legal assessment of a situation of both the host State and the European Commission was correct.[227]

202.    The opposite is true. "Investors are entitled to assume that states act in compliance with their legal obligations, and the consequences of Bulgaria's failure to do so should not be foisted on Claimant."[228] In addition, even if EU law were relevant, *quod non*, then the Respondent has grossly simplified EU law regarding the notion that allegedly under

---

[224]    *Ibid*. This assumption was wrong. See below.

[225]    CROMCMOJ, para. 258.

[226]    CROMCMOJ, paras. 200, 235, 258.

[227]    CROMCMOJ, paras. 164, 405, 409-410, 419-423, 425-426, 429; COS, pp. 59, 74; HT, D1, 7 June 2021, pp. 81-82.

[228]    CPHB, para. 74.

EU law an investor cannot legitimately expect to rely on an aid program that has not been notified to the European Commission.[229]

(4)    Allegedly relevant renewable energy booms in other Contracting Parties

203.    The Claimant avers that the Respondent's claim that other countries, such as Spain, Italy, and the Czech Republic, have taken allegedly similar measures in allegedly similar situations, *i.e.* allegedly similar booms, is false and even if it was not, could not justify its measures.[230]

204.    To start with, the Claimant disputes the existence of an alleged boom (see below).

205.    In addition, to the degree that measures in Spain, Italy, and the Czech Republic can be called similar, if at all, Bulgaria overlooks that those measures have led to more than sixty investment arbitration cases under the ECT and many findings of unlawfulness there and in national courts.[231] In these circumstances, no investor can be required to expect that Bulgaria would act in an equally unlawful manner.[232] Indeed, at the time of the Investment, the Claimant had believed that, *e.g.*, the challenges against the production cap in Spain would be successful.[233]

206.    More in particular regarding Italy, allegedly similar measures by, *e.g.*, Italy, post-date the Investment and were the result of policy changes, not a boom in the sector, as any such boom was prevented by a pre-defined threshold at which the Italian incentive regime was capped in its volume.[234]

207.    More in particular regarding the Czech Republic, both the incentive regime there as well as what investors did in reaction to it was different from the situation in Bulgaria and how investors, and specifically the Claimant, reacted to it. First, in the Czech Republic an actual boom took place whereas in Bulgaria there was only fear of a boom. The

---

[229]    CROMCMOJ, paras. 410-418, 424, 429.

[230]    CROMCMOJ, para. 6.

[231]    CROMCMOJ, paras. 188, 233, 400.

[232]    CROMCMOJ, paras. 188, 190, 233.

[233]    CROMCMOJ, para. 258, WS Blum II, para. 16.

[234]    CROMCMOJ, para. 190, fn 217.

incentive regime in the Czech Republic, similarly to the previous RAESBA Regime in Bulgaria, only allowed for an annual decrease of the FiT rate by 5%, which led to a disconnection of technology costs from the applicable FiT rates and thus led to a solar "boom" with 2,200 PV plants having been installed in 2009 as opposed to 28 in 2007.[235]

208.   Secondly, investors in the Czech Republic invested in anticipation of a looming change of legislation. That is because some investors in the Czech Republic were fully aware of the discrepancy between the FiT rate and technology costs and that the government might resort to taxation measures to deal with the solar boom but nevertheless, as held by the tribunal in *Antaris GmbH and Dr Michael Göde v. the Czech Republic* ("***Antaris***"), rushed in "opportunistically" still to obtain the FiT.[236] By contrast, the Claimant and other investors in Bulgaria invested in the understanding that the newly adopted ERSA already represented changed legislation that would (i) fix flaws of the previous law, the RAESBA, and namely the restriction to adjust the FiT by more than 5% annually, and (ii) prevent a boom.[237]

209.   Thirdly, whereas investors in the Czech Republic invested without performing due diligence and then sued when the taxation measures were introduced, the Investment was based on thorough due diligence and took place in a market where the host State had created, by means of the ERSA, a system to monitor its incentive programme and pipeline, to vet, and to approve or deny applications of individual plants. This system gave Bulgaria much more control over the process and any alleged boom than had any of the other countries like Spain, the Czech Republic, or Italy.[238]

210.   Fourthly, the Czech inaction had to be anticipated to a degree because a caretaker government was in place at the time of the increase of PV plant connections and many of the investments, whereas in Bulgaria a regular government that had just introduced a reform in the form of ERSA was in place at the time of the Investment.[239]

---

[235]   CROMCMOJ, paras. 191, 194, 459.

[236]   CROMCMOJ, paras. 191-193; *Antaris GmbH and Dr. Michael Göde v. Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018 (**RL-236**) ("***Antaris***").

[237]   CROMCMOJ, paras. 195, 197, 468-469.

[238]   CROMCMOJ, paras. 191-193, 196-198, 480.

[239]   CROMCMOJ, paras. 468-469.

211.  Finally, in any case, if booms in the Czech Republic, Italy, and Spain were comparable to the situation in Bulgaria, the Respondent would have been aware of them at the relevant time, including when it enacted the ERSA.[240]

### 10.    The Respondent entered into a number of legislative and regulatory obligations with regard to the Claimant and its Investment

212.  The Claimant argues that the Respondent entered into a number of legislative and regulatory obligations with regard to the Claimant and its Investment, and that in particular the ERSA, the License, and the Karad PPA created explicit obligations regarding the tariffs that the Respondent undertook to pay to qualifying facilities, the term of the offtake, and the offtake amount.[241]

213.  More in particular, regarding the amount of the FiT, the Claimant contends:[242]

   a.  Article 31(1) ERSA determined that the public supplier must purchase electricity from RES at the preferential price set by EWRC.

   b.  The FiT Decision defined the FiT for the energy the Karad Plant produced.

   c.  Article 31(4) ERSA determined that the FiT may not be changed for the term of the purchase set in accordance with the ERSA.

   d.  The License for the Karad Plant explicitly mentions the FiT Decision as applicable to the Karad Plant and identifies the FiT of BGN 485.60 as the correct FiT.

   e.  Article 11 of the Karad PPA states that the electricity produced by the Karad Plant shall be purchased by NEK at the FiT set by EWRC pursuant to Article 31 ERSA.

   f.  Article 11(2) confirms that the FiT is BGN 485.60 as set by the FiT Decision.

214.  More in particular, regarding the term of the offtake, the Claimant argues:

---

[240]    HT, D4, 10 June 2021, pp. 873-874.

[241]    CMOM, para. 355; HT, D1, 7 June 2021, pp. 57-58; CPHB, paras. 78, 80, 97.

[242]    CMOM, para. 355; CROMCMOJ, para. 246.

a.  Article 31(2) ERSA determines that electricity produced by solar energy must be purchased based on long-term purchase contracts signed for a term of twenty years.

b.  The License states that the FiT remains unchanged "throughout the period in question".[243]

c.  The Karad PPA confirms that it is valid for a twenty-year term from 13 June 2012 to 12 June 2032.

215.  More in particular, regarding the offtake quantity, the Claimant contends:

a.  Article 31(5) ERSA determines that NEK must purchase the "whole amount" of electricity from renewable sources.

b.  The License confirms that the 60.4/50 Ratio was installed and includes an annual power generation estimate of 78,632 MWh.

c.  Article 1 Karad PPA covers the entire electric energy produced by the Karad Plant.

216.  In addition, the Respondent's incentive tariffs were not of a general nature. They were individually and specifically granted and became a specific commitment to the Karad Plant itself through individual licenses, the extensive licensing process that enrolled the Plant into the ERSA Regime, and the Karad PPA.[244] The incentives furthermore were "very specific as to the amount and duration of incentives that Claimant could expect".[245] Developers who intended to secure the ERSA benefits for their plants, but did not meet the eligibility requirements by the required date, failed to obtain the specific rights, to the granting of which the Respondent committed itself *vis-à-vis* investors properly qualified under the regime, in a kind of "open offer".[246]

---

[243]  CMOM, para. 355; referring to License Decision (**C-103**). This, however, does not appear to be an exact quote, and where the License Decision uses similar wording (p. 8), it rather appears to refer to an assumption contained in ACWA Bulgaria's business plan that the price will not change.

[244]  CMOM, para. 356; CROMCMOJ, para. 398; CPHB, para. 18.

[245]  CROMCMOJ, para. 398.

[246]  CMOM, para. 356; CROMCMOJ, para. 387; WS Blum II, para. 7.

217.    The Karad PPA was furthermore not a normal commercial contract, but a restatement of the Respondent's commitments as imposed on NEK and a product of a legal obligation in the ERSA. It was a vehicle through which the ERSA required NEK to purchase all the electricity injected into the grid by ACWA Bulgaria, as 100% subsidiary of the Claimant, at the FiT for twenty years and in respect of which the ERSA guaranteed that the price paid should not change over the term of the Karad PPA.[247]

218.    The Claimant, however, acknowledges that the Karad PPA is subordinate to the ERSA and subject to change as the law might change. The Claimant submits that for the first six of the Seven Measures, inasmuch as they required deviations from the Karad PPA, in particular the Annual Production Cap (as defined below), NEK performed the Karad PPA in congruence with the newly introduced measures. The Karad PPA was thus *de facto* modified by the first six measures without having been formally amended or terminated. The Claimant adds that the seventh measure, the Transition from FiT to FiP (as defined below), then led to the termination of the Karad PPA (see below).[248]

### 11.    The Claimant invested in reliance on the Respondent's guarantee and its legitimate expectations

219.    The Claimant submits that the decision of its Shareholders to invest in Bulgaria was "based on the transparent, stable, and legally certain FiT program that Bulgaria had enacted".[249] It was made "in specific reliance on the guaranteed fixed tariffs for twenty years for all the energy the plant would produce, which was ensured by the legal and regulatory regime Bulgaria had enacted and additionally backed by a license and PPA". These were "essential elements" which were "repeatedly" touted by the Respondent in order to induce investment.[250] The Claimant's decision was "likely based on the assurances that State officials gave them directly in an in-person meeting, along with the other diligence they carried out and other repeated statements government officials

---

[247]    CROMCMOJ, para. 404; HT, D1, 7 June 2021, pp. 57-58.

[248]    HT, D1, 7 June 2021, pp. 73, 75-76, 104.

[249]    CMOM, paras. 19, 192; CROMCMOJ, paras. 13, 398; HT, D1, 7 June 2021, pp. 104-105.

[250]    CMOM, paras. 192, 273, 302-306; CROMCMOJ, para. 398; COS, p. 85; HT, D1, 7 June 2021, pp. 104-105.

had made about the regime" which led to the conclusion that "the risk of a FiT reduction was remote".[251]

220.    The Shareholders expected that a fixed purchase price, a fixed volume, and a fixed duration was guaranteed by law.[252] The Respondent's specific guarantees regarding those factors were the "*sine qua non*" of the Investment decision.[253] The Claimant based its calculations that led to the purchase price for ACWA Bulgaria on its expectation regarding the stability of the three key factors.[254] To recall, the completion of all necessary steps that would qualify the Karad Plant for the FiT under the conditions of the ERSA then in effect, such as the License, the Karad PPA, the Permit, etc. were preconditions for entering into the transaction to purchase ACWA Bulgaria (then ZBE Partners).[255] In particular the License, which included as an integral part the conceptual design of the Plant, its technical and technological characteristics, and the business plan, and the FiT Decision, were "a necessary confirmation" before the Shareholders would invest.[256]

221.    The Claimant argues that its witnesses confirm that had they expected that Bulgaria might institute the changes it did, and had they considered that scenario to be a risk, and/or had the Respondent been transparent about what it apparently believed it could or would do, then they would have never invested in the Karad Project.[257]

222.    Regarding the notion of "reasonable return", the Claimant argues that, if indeed a cap at a certain rate of return (to be defined from the outset) had been part of the Respondent's regime, then the Claimant would have either not invested, or would have designed the Investment differently on the basis of the knowledge of such a capped

---

[251]    CROMCMOJ, para. 236; HT, D1, 7 June 2021, pp. 104-105.

[252]    CMOM, paras. 158, 165, 302-306; COS, pp. 84-85; HT, D1, 7 June 2021, pp. 104-105; CPHB, para. 83; WS Blum I, para. 8, WS Malik I, para. 5.

[253]    CMOM, para. 203; CROMCMOJ, paras. 2, 399; COS, pp. 84-85; HT, D1, 7 June 2021, pp. 104-105; CPHB, para. 83.

[254]    CMOM, para. 229; CROMCMOJ, paras. 2, 13.

[255]    CMOM, paras. 19, 168, 189, 273, 306; CPHB, para. 83.

[256]    HT, D1, 7 June 2021, p. 66.

[257]    CMOM, paras. 315-317; CROMCMOJ, paras. 237, 366, 476, 501; COS, p. 52; HT, D1, 7 June 2021, pp. 68-69, 104-105; HT, D2, 8 June 2021, p. 406; CPHB, paras. 36, 61, 83; WS Roberts II, paras. 15, 37; WS Blum I, para. 22; WS Blum II, para. 9; WS Malik II; para. 9.

return.[258] "Bulgaria's decision to correct the problem of speculative projects … was a large part of Claimant's decision to invest under [the ERSA]".[259]

223.    The decision of SunEdison SLU to install the 60.4/50 Ratio was made in reliance on the guarantee of a full offtake under the ERSA. First Reserve's decision to acquire ACWA Bulgaria was made because the 60.4/50 Ratio helped the Karad Project to fulfil First Reserve's financial criteria for projects.[260] The other two Shareholders equally found the Karad Project "interesting" and "particularly attractive" because of the design to maximise production "based on the ERSA's 'full offtake' guarantee".[261] The Claimant eventually agreed to spend more money to acquire a plant with the 60.4/50 Ratio because the ERSA did not limit the volume of electricity for which the FiT would be paid and because Bulgaria had signed off on the design and the production forecasts of the Karad Project, *e.g.* in the License.[262]

224.    In that regard, the Claimant disputes Bulgaria's argument that no reasonable investor would have interpreted the ERSA Regime as seeking to incentivise maximum productivity of costlier plants. As stated above, a perfect incentive scheme guarantees full offtake and thereby, logically, incentivises maximalisation of the output of a plant. That guarantee was included in the ERSA Regime, and as such, the Regime, by definition, incentivised output maximalisation.[263] Incidentally, Bulgaria's argument that as a poor country it could not have been interpreted to be interested in attracting highly productive PV plants is also incorrect because at a fixed FiT any additional MWh produced by the Karad Plant would have cost Bulgaria and its consumers exactly the same as a MWh produced by any other PV plant in the same size category.[264]

### 12.    How the Respondent "changed the game"

225.    According to the Claimant, the Respondent, starting "just weeks after Claimant completed its investment", "change[d] the rules of the game" in seven different ways,

---

[258]    CROMCMOJ, para. 501; HT, D2, 8 June 2021, p. 406; CPHB, para. 37.

[259]    CROMCMOJ, para. 140.

[260]    CMOM, paras. 159-160, 229; CROMCMOJ, para. 16; HT, D1, 7 June 2021, p. 105.

[261]    CMOM, para. 164; WS Roberts I, paras. 12-14, WS Yayikoglu, para. 8.

[262]    CMOM, para. 313; CROMCMOJ, paras. 364, 501; HT, D1, 7 June 2021, p. 105.

[263]    CROMCMOJ, para. 253.

[264]    CROMCMOJ, para. 254.

"upending the stability and legal certainty it had guaranteed to attract investment from Claimant and others."[265] The Respondent "almost immediately" "embarked on a course of action designed to claw back the value of the incentives it had guaranteed to Claimant and others to attract their investment",[266] and "backtracked" on its promises after "reaping the benefit" of its representations.[267]

226.    "The fact is that Bulgaria decided to change its priorities, shifting away from a policy that sought to attract RES investment and toward one that sought to minimize consumers electricity prices, leaving RES investors to bear the consequences of that policy shift."[268] The Respondent "fundamentally transformed the support regime from an *ex ante* to an *ex post* model".[269]

227.    According to the Claimant, Bulgaria's intention behind the Seven Measures was to reduce the cost of its support scheme".[270]

228.    The Claimant calls the Seven Measures "retroactive measures" even though none of them had an effect before their date of introduction, because the Seven Measures retroactively amend a bargain struck with an asset 85-90% of the cost of which are sunk at construction, and which cannot adapt to changes.[271]

229.    The Claimant observes that the Respondent has not denied having introduced the Seven Measures.[272]

            a.    *Temporary Grid Access Fee*

230.    The Claimant submits that a temporary grid access fee was the first measure of the Respondent that upended the guaranteed legal certainty.[273]

---

[265]    CMOM, paras. 20, 193, 197, 273, 307; CROMCMOJ, para. 2.

[266]    CMOM, paras. 194, 307-308; HT, D1, 7 June 2021, p. 13; CPHB, para. 38.

[267]    CMOM, para. 318; HT, D1, 7 June 2021, p. 13.

[268]    CROMCMOJ, para. 499.

[269]    CPHB, paras. 2, 51-52, 88.

[270]    CPHB, para. 50.

[271]    HT, D1, 7 June 2021, pp. 78-80.

[272]    CROMCMOJ, para. 4.

[273]    CMOM, paras. 20, 308.

231.  According to the Claimant, on 17 July 2012, the Respondent's legislature amended ERSA to impose a new "grid access fee" on producers of renewable energy. [*The Tribunal observes that it appears that the Energy Act, not the ERSA was amended.*] The fee was to be determined by the EWRC.[274] On 14 September 2012, by means of Decision C-33/14.09.2012, the EWRC then imposed said grid access fee, which according to the EWRC was "temporary" (the "**Temporary Grid Access Fee**").[275] The Temporary Grid Access Fee for the Karad Plant was set at BGN 189.38/MWh which amounts to 39% of the FiT for the Plant. There was no legal or factual justification for the fee and it was introduced in violation of due process.[276] The Respondent's Supreme Administrative Court invalidated the Temporary Grid Access Fee in June 2013, because "the purported justifications for it were not supported by evidence" and "it exceeded the regulator's authority".[277]

232.  The true purpose of the Temporary Grid Access Fee was not to cover actual costs but "to claw back a substantial share of the FiT that Bulgaria had guaranteed to attract RES investment in the first place". This is demonstrated by two facts: (i) after the Temporary Grid Access Fee was invalidated by the Supreme Administrative Court, it was not re-imposed with the support of the sort of evidence which the Court had found to be lacking; (ii) as discussed below, when the Permanent Grid Access Fee (as defined below) was introduced later, it was set at only a very small fraction of the amount set as Temporary Grid Access Fee.[278]

233.  Following the decision of the Supreme Administrative Court to invalidate the Temporary Grid Access Fee, the Claimant sought reimbursement of the charged fees, leading to a settlement agreement between ACWA Bulgaria and the Elektroenergien Sistemen Operator EAD, *i.e.* the Electricity System Operator (the "**ESO**") to whom the

---

[274]  CMOM, paras. 20, 197; Energy Act, amended and supplemented, SG No. 54/17.07.2012, effective 17.07.2012 (**C-108**) (This Exhibit is, apparently incorrectly, named "Act for amendment and supplement of the Energy from Renewable Sources Act, 17 July 2012" by the Claimant.

[275]  CMOM, paras. 20, 198; EWRC Decision No. C-33, 14 September 2012 (**C-109**) (**R-212**); CPHB, para. 39.

[276]  CMOM, paras. 20, 198-199; CPHB, para. 39.

[277]  CMOM, paras. 21, 204-206, 213; Supreme Administrative Court of Bulgaria, Decision No. 8937 on Administrative Case 6082/2013, 19 June 2013 (**C-116**); CPHB, para. 39.

[278]  CMOM, para. 213; CROMCMOJ, para. 283.

Temporary Grid Access Fee was due, dated 21 December 2015 (the "**Access Fee Settlement Agreement**").[279]

234. According to the Claimant, in the Access Fee Settlement Agreement, ESO "refused" to reimburse an amount of fees of BGN 315,253.80, which would equal the amount of fees due had the Permanent Grid Access Fee (as defined below) been applied instead of the Temporary Grid Access Fee (the withheld amount hereinafter being referred to as the "**Remainder**").[280] The Claimant seeks reimbursement of the Remainder in line with its argumentation on the Permanent Grid Access Fee (as defined below).[281]

235. The Claimant disputes that by means of the Access Fee Settlement Agreement it agreed to forego compensation for the portion of the Temporary Grid Access Fee already paid which ESO "refused" to reimburse, because (i) the Claimant is not a party to the Access Fee Settlement Agreement, ACWA Bulgaria is, and (ii) the fact that ACWA Bulgaria accepted less than full reimbursement was an act of mitigating damages which does not impact the Claimant's claim on the basis of the introduction of the Temporary and the Permanent Grid Access Fee (as defined below). The damages that arose from that introduction were only partially compensated in the Access Fee Settlement Agreement.[282]

### b. Permanent Grid Access Fee

236. The Claimant submits that, on 13 March 2014, the Respondent, through its agency the EWRC, and by means of the EWRC's Decision C-6/13/03/2014, imposed a new permanent grid access fee on the basis of the 2012 amendment to the Energy Act (the "**Permanent Grid Access Fee**" and the decision being referred to as the "**Permanent Grid Access Fee Decision**").[283] This was done, "purportedly to cover the high cost of system imbalances arising from RES production".[284] For 2014-2015, the Permanent

---

[279] CMOM, para. 211; CPHB, para. 41; Settlement Agreement between ESO and ACWA Bulgaria, 21 December 2015 (**C-147**) (the "**Access Fee Settlement Agreement**").

[280] CMOM, paras. 211-212; HT, D1, 7 June 2021, p. 71; CPHB, para. 40; Access Fee Settlement Agreement (**C-147**).

[281] CMOM, para. 212; HT, D1, 7 June 2021, p. 71; CPHB, para. 41, fn 87.

[282] CROMCMOJ, para. 286; CPHB, para. 41, fn 87.

[283] CMOM, paras. 21, 207; CPHB, para. 40; EWRC Decision No. C-6, 13 March 2014 (**FR-84b**) (the "**Permanent Grid Access Fee Decision**").

[284] CMOM, para. 21.

Grid Access Fee was set in the amount of BGN 2.45/MWh, for 2015-2016 in the amount of BGN 7.14/MWh, for 2016-2017 BGN 7.02/MWh, for 2017-2018 BGN 6.68/MWh, for 2018-2019 BGN 3.02/MWh, and for 2019-2020 in the amount of 5.14/MWh.[285]

237.    These fees are "material" and range from 0.5% to 1.4% of the FiT for the Karad Plant. In a financial model that is based on a fixed price over 20 years for delivery to one and the same customer, and that is calculated with high-leverage debt, any additional fee (i) cannot be passed on to a new customer, given that the price is fixed, and (ii) can have a "significant" impact on the value of an investment.[286]

238.    Bulgaria's assertions in that regard that the costs of grid access are independent of the FiT rate are illogical and wrong. The true reason that grid access fees were not included in the calculations underlying the FiT Decision is that at the time of the decision, all grid access fees were allocated to network users, *i.e.* energy consumers. When the Respondent then imposed grid access fees on producers, it reallocated the network costs from consumers to producers, converting the FiT from a "factory gate" price to a "delivered" price. The allocation of the pricing was thus completely changed in a way that no reasonable investor could have expected.[287]

239.    In addition, at the time of the FiT Decision, an increase in network costs was a foreseeable consequence of Bulgaria's policy decision to increase its renewable power capacity. However, despite that knowledge, the FiT Decision did not allocate any of those anticipated cost increases as costs of producers of renewable energy. It could have done so, but the inclusion thereof would have resulted in a higher FiT.[288]

240.    Contrary to arguments of the Respondent, the fact that the European Commission and the Respondent's expert noted that some EU Member States also allocate network costs to producers, or the fact that an increase in network costs was a foreseeable consequence of the ERSA Regime and that Bulgarian network operators warned about it, in no way undermines the argument that the allocation of such costs should not shift, and cannot

---

[285]    CMOM, paras. 207, 209; CPHB, para. 40; The Permanent Grid Access Fee Decision (**FR-84b**); EWRC Decision No. C-27/2015, 31 July 2015 (**C-117**); EWRC Decision No. C-19/2016, 30 June 2016 (**C-118**); EWRC Decision No. C-19/2017, 1 July 2017 (**C-119**); EWRC Decision No. C-11/2018, 1 July 2018 (**C120**); EWRC Decision No. C-19/2019, 1 July 2019 (**C-121**).

[286]    CMOM, para. 210; CPHB, para. 40.

[287]    CROMCMOJ, paras. 274, 276-278.

[288]    CROMCMOJ, para. 279; HT, D5, 11 June 2021, p. 960.

be expected to shift, once the FiT rate is set and the investment is made. Indeed, the EC document on which the Respondent's argument relies, observes that it is best practice to consider network-related costs in the calculation of the proper support level.[289]

241.    Decisions of the Supreme Administrative Court of Bulgaria which rejected domestic legal challenges against the Temporary and Permanent Grid Access Fee are irrelevant to a decision of this Tribunal on a violation of the ECT. Any such domestic decisions furthermore are incorrect where they misunderstand the connection between the FiT and network costs. That connection is that if a host State seeks to induce investment in renewable energy via a FiT scheme but seeks to burden a producer of renewable energy with network costs at the same time, it needs to increase the FiT accordingly in order to obtain the same effect as if no network costs were imposed. Domestic court decisions are further incorrect where they misunderstand that increased network costs are a necessary effect of the desired increase of the production of renewable energy.[290]

242.    Finally, the situation regarding the grid access fees (thus also regarding the Temporary Grid Access Fee dealt with above) in Bulgaria is not comparable to that in Spain and Italy, because in Spain and Italy there was no undertaking similar to the undertaking in Bulgaria that network costs would be allocated to consumers instead of producers and in those countries the grid access fees were not deliberately left out from the decision to set the price for the incentivised energy, as was the case in Bulgaria.[291]

    c.    *Annual Production Cap*

243.    According to the Claimant, in January 2014, the Respondent imposed a cap on the quantity of electricity produced by the Karad Plant which was eligible to receive the FiT set in the FiT Decision.[292]

244.    The Respondent did so by amending Article 31(5) ERSA not to cover "the whole amount of electricity from renewable sources" any more but to cover only "the quantities of electric energy up to the amount of the determined average annual duration

---

[289]    CROMCMOJ, para. 281; European Commission, Commission Staff Working Document, Guidance for Design of Renewables Support Schemes, SWD(2013) 419 final, 5 November 2013 (**FR-41**) ("**European Commission Guidance**"), p. 19.

[290]    CROMCMOJ, para. 282; the Claimant does not indicate to what part of RCMOMOJ it refers.

[291]    CROMCMOJ, para. 458.

[292]    CMOM, paras. 21, 220ff, 309.

of work" as per the decision of the EWRC to determine the price of a particular producer, such as the FiT Decision (the "**ERSA Amendment**" and the amended ERSA hereinafter referred to as the "**2014 ERSA**").[293]

245.    The Claimant submits (and the Respondent does not appear to dispute, see below) that starting from January 2014, after the ERSA Amendment, the Respondent, or more specifically, NEK, applied the FiT set for the Karad Plant only to 1,250 operating hours per year, coinciding with the 1,250 hours "average annual duration of operation" mentioned in the FiT Decision (1 operating hour for a nominal 50 MW plant equalling 50 MWh per year, and 1,250 hours thus equalling 62,500 MWh per year, roughly 24% less than the expected average output of the Karad Plant of roughly 82,000 MWh per year).[294] The Claimant does not explain how the ERSA Amendment could have applied to the Karad Plant, which by then had already entered into a PPA and had already been commissioned. The Claimant also does not submit any decision or correspondence including any such information.

246.    Again without a clear or detailed explanation as to the how thereof, the Claimant appears implicitly to submit that by EWRC Decision "SP-1" of 24 July 2015 ("**Decision SP-1**"), the Respondent further decreased the amount it had its Public Provider take off from the Karad Plant at the FiT to 1,188 operating hours per year. (As discussed below, the Respondent presents a different explanation as to how the reduction came about.) The amount of 1,188 operating hours equals 59,400 MWh per year for a nominal 50 MW plant, *i.e.* roughly 28% less than the expected average output of the Karad Plant of roughly 82,000 MWh per year (the 2014 and 2015 reduction together are referred to as the "**Annual Production Cap**" or the "**APC**").[295] According to the Claimant, this change was purported to have been made to account for the assumed self-consumption

---

[293]    CMOM, para. 222; ERSA (**C-41**); 2014 ERSA (**C-152**).

[294]    CMOM, paras. 222-224 and fn 289; HT, D1, 7 June 2021, p. 75; CPHB, para. 42.

[295]    CMOM, para. 230. The Claimant speaks of a "further 5% reduction", rather than of a reduction of roughly 28%; CPHB, para. 42. Decision SP-1 is not referred to in the footnotes of CMOM. However, it was submitted by the Claimant's expert as EWRC Decision SP-1, 24 July 2015 (**FR-81b (corrected)**) ("**Decision SP-1**") as referred to in RCMOMOJ, para. 146, fn 320; the explanation in the RfA, para. 39 appears to be a more accurate description of what happened.

of a plant in that category of PV plants.[296] ACWA Bulgaria appealed Decision SP-1 but later it withdrew its appeal.[297]

247.    The Karad Plant typically reaches the annual production threshold around August of a year.[298] The price that ACWA Bulgaria receives for the excess production (typically around 15% of the FiT) was not even sufficient to cover the variable costs of operating the plant, such as operation and maintenance costs, "much less" to recoup the capital investment and generate a profit.[299] The Claimant considered shutting down the plant every year after reaching the production cap. The Claimant, however, came to the conclusion that the logistics of shutting down operations and then ramping them up again were too difficult for the Claimant to accomplish and, in any event, shutting down operations would not have eliminated all operation and maintenance costs over that period.[300]

248.    In conclusion, the APC was "just another attempt to reduce the FiT in the guise of a production cap". The Annual Production Cap reduced the expected cash flows over the life of the Karad Plant by approximately 24% and the value of the Investment by 48.5%.[301] Under cross-examination, Mr Kristensen confirmed that "[t]he imposition of the annual production cap materially affected the plants who were affected by it".[302]

249.    Notably, as acknowledged by the expert for the Respondent, annual production caps in other countries such as Estonia, the Netherlands, and Hungary applied to new plants only, not to existing plants.[303]

250.    Finally, Bulgaria's policy objective in its Regime was not only to implement EU law or meet certain targets of installed capacity, but also to increase clean energy generation. Therefore, punishing the production-maximising design of the 60.4/50 Ratio was

---

[296]    CMOM, para. 230.

[297]    CMOM, para. 230, fn 297.

[298]    CMOM, para. 224; CPHB, para. 42.

[299]    CMOM, para. 231.

[300]    CMOM, para. 231.

[301]    CMOM, para. 233; CROMCMOJ, paras. 273, 456; CPHB, para. 43.

[302]    HT, D4, 10 June 2021, p. 633; CPHB, para. 43.

[303]    HT, D4, 10 June 2021, pp. 830-831; Oxera II, p. 76, para. 7.24, fn 353.

contrary to Bulgaria's own objectives.[304] When introducing the APC, Bulgaria should have taken into account that through its full offtake guarantee under the ERSA Regime, it had created an incentive to maximise production.[305] Against that background, the APC was disproportionately harmful to the most productive plants as it varied the quantity term rather than the FiT directly.[306]

(1)    Counterarguments

(a)    *The role of the reference plant and overcompensation versus risk reward in an* ex ante *incentive scheme*

251.    Bulgaria's argument that it had always intended only to reimburse the production of a hypothetical reference plant is implausible because it comes down to an argument that what had been introduced as an *ex ante* scheme in which the price per unit is fixed was actually intended to be an *ex post* scheme in which only a certain revenue is guaranteed.[307] As confirmed by Mr Kristensen in cross-examination, the ERSA did include an obligation for NEK to purchase all electricity from RES, and did not include an annual production cap, and nothing would have prevented the Respondent at the time of the introduction of the ERSA to establish an annual operating-hour cap as part of the ERSA Regime.[308]

252.    The FiT Decision had explicitly anticipated that "[u]pon the actual application of the FiT set by the Commission each investor has the opportunity to achieve different profitability, depending on the individual management of the investment project", an understanding of the ERSA Regime also reflected in other government documents.[309] Therefore, it is incorrect for the Respondent to argue that the APC, rather than a fundamental change to the ERSA Regime, was a necessary adjustment to bring

---

[304]    CROMCMOJ, para. 16; COS, p. 72.

[305]    CROMCMOJ, para. 253.

[306]    CPHB, paras. 43, 94.

[307]    CROMCMOJ, paras. 19, 264.

[308]    HT, D4, 10 June 2021, pp. 828-829, 835.

[309]    CROMCMOJ, para. 261; COS, pp. 28-29, 59, 73; HT, D1, 7 June 2021, pp. 42-43, 45-46, 97-98; CPHB, paras. 15, 65, 98; FiT Decision (**C-48**), p. 7; Letter from Mr. Vasil Shtonov, Minister of Economy and Energy, to Mr. Rumen Porozhanov, Minister of Finance, 17 October 2014 (**C-244**), pp. 5-6.

compensation back in line with the ERSA Regime as exemplified by the FiT Decision.[310]

253.    The *ex post* characterisation of successful achievement of such added profitability or efficiency as "overcompensation" rather than as a "risk reward" destroys the symmetry of risk in an *ex ante* "at risk" scheme. An *ex ante* at risk scheme places the risk of how an individual plant will fare against the reference plant with the management of an individual plant but, in turn, in the symmetry of risk of such a scheme, does not punish those that manage to be more efficient than the reference plant, just as it would not compensate or reimburse plants that would not achieve the assumed efficiency of the reference plant.[311] To eradicate risk rewards *ex post* as alleged overcompensation penalises investors that built or acquired very efficient plants.[312] Even the Respondent and its expert concede that "[t]he distribution of actual returns of investments in PV plants would normally be expected to be scattered around the target return in a FiT scheme." And that "[i]n principle, investors should retain the right to a share of the profits attributable to investor and management decisions (*e.g.* plant design, financing, operations) … over and above those achieved by a notionally efficient plant."[313]

254.    Further, Mr Kristensen does not define, and there is no evidence that the EWRC had ever defined, what would constitute windfall profits or overcompensation, *i.e.* in a system that necessarily expects deviations from a target, what deviation from a target return would constitute *e.g.* "overcompensation". Therefore, the Respondent has not and cannot demonstrate that the Karad Plant earned returns in excess of what the Respondent anticipated.[314]

255.    Furthermore, neither Mr Kristensen nor the Respondent proves or substantiates that renewable energy plants in Bulgaria as a whole systematically earned windfall or

---

[310]    CROMCMOJ, paras. 259-261.

[311]    CROMCMOJ, paras. 262-265, 442; HT, D3, 9 June 2021, p. 600; CPHB, para. 67.

[312]    CROMCMOJ, para. 442.

[313]    COS, p. 29; HT, D1, 7 June 2021, pp. 44-45, 81-82; HT, D4, 10 June 2021, pp. 769-770, 780, 783-784, 838; HT, D5, 11 June 2021, p. 992; HT, D6, 12 June 2021, pp. 1108-1109; CPHB, paras. 4, 15, 67, 98; Oxera II, para. 6.19, fn 225.

[314]    HT, D1, 7 June 2021, pp. 43-44; HT, D3, 9 June 2021, p. 717; HT, D4, 10 June 2021, pp. 765-789; CPHB, paras. 17, 66.

excessive profits.[315] The only evidence on which the Respondent appears to rely to that effect is a list of 15 out of 1,072 plants, all much smaller than the Karad Plant, and as such not representative.[316]

256.   It is in that regard important to remember, as confirmed by Mr Kristensen in cross-examination, that the ERSA Regime incentivises, as it should, efficient management and design of plants, including choice of location, usage of trackers, etc. As such, the ERSA Regime may have a built-in desire or expectation that investors, especially of such large "utility-scale" plants as the Karad Plant, beat the reference plant in terms of efficiency and output.[317]

257.   The Seven Measures were, in any case, no response, much less a rational, non-arbitrary, non-discriminatory response to alleged "systematic" overcompensation. The Respondent had mechanisms against overcompensation, such as the possible annual reduction of the FiT and could have improved its methods by, for example, increasing the frequency at which it could adjust FiT rates for future plants (increasing the risk for non-commissioned plants and making the scheme less attractive as a consequence). What it could not do was to attract investment with a more generous system only to take the incentives away for existing investors after they had sunk their costs.[318]

258.   Finally, as a result of the Respondent's acknowledgments on overcompensation as set out above, the Respondent cannot sustain the position that the Karad Plant was earning windfall profits. Therefore, the Respondent falls back on its argument that the 60.4/50 Ratio exceeded the License, which it did not (see above). This is thus a "specious" argument.[319]

---

[315]   HT, D1, 7 June 2021, pp. 43-44; HT, D3, 9 June 2021, p. 717; HT, D4, 10 June 2021, pp. 765-789; CPHB, paras. 62, 66.

[316]   HT, D1, 7 June 2021, pp. 43-44; HT, D3, 9 June 2021, p. 717; HT, D4, 10 June 2021, pp. 788-794; Complaint No. E-04-11-9 from EWRC to European Commission in Respect of Infringement of European Union Law, 20 June 2014 (**R-067**), pp. 5-6; CPHB, para. 66.

[317]   HT, D4, 10 June 2021, pp. 783-784, 806-807, 814; HT, D5, 11 June 2021, 992; CPHB, para. 16.

[318]   CPHB, paras. 62, 68.

[319]   CPHB, paras. 16, 94.

(b)    *Production caps in other Contracting Parties*

259.  Bulgaria's argument that the Claimant had to expect a production cap since Spain had responded to a similar boom in its PV sector with similar caps, or that the Annual Production Cap did not constitute a fundamental change to the ERSA Regime because a production cap in Spain would have been found not to constitute such a change is incorrect.[320]

260.  Spain in fact introduced two production caps, a permanent one which was set at such a high level that it had "little actual impact", and a temporary one.[321] The situation in Spain was also different from that in Bulgaria for several other reasons:

    a.  the Spanish caps came at a later stage of a significant increase of PV capacity,

    b.  the Spanish caps were less onerous than the APC because they were tailored, *e.g.* (i) by being only temporary and taking into account different PV plant technology, such as "trackers" which increase productivity of a plant, or (ii) by taking into account technology levels of a plant and the production capacity of plant location, thereby recognising the connection between technology of a plant and its output and minimising the effect of a cap on PV plants with higher productivity, and

    c.  Spain extended the full applicability of the FiT by five years in order to alleviate the impact of the caps.[322]

261.  Nevertheless, the Spanish caps were found to be in violation of the ECT and no ECT tribunal held that any investor in Spain should have expected Spain's measures "as a result of the over-capacity of PV plants Spain's program generated."[323] At the time of its Investment in Bulgaria, the Claimant believed that challenges against the Spanish

---

[320]    CROMCMOJ, paras. 189, 454.

[321]    CROMCMOJ, para. 255.

[322]    CROMCMOJ, paras. 189, 233, 256-257, 455-456; HT, D5, 11 June 2021, pp. 927-933.

[323]    CROMCMOJ, paras. 189, 233, 259, 454.

caps would prevail.[324] The Claimant also had received assurances of Bulgaria's government that no cap as the ones in Spain would be introduced.[325]

262. Finally, if the Claimant should have considered the Spanish caps as a warning, those caps would at least show that the Claimant had no reason to fear a one-size-fits-all cap that did not take into account individual production capacity and technology of individual plants.[326]

*(c)     Article 31(5) ERSA*

263. Bulgaria's argument that

   a. Article 31(5) ERSA did oblige Bulgaria to purchase "the whole amount of electricity" produced by a renewable energy plant that fell under the ERSA Regime, but did not include an obligation to purchase said amount of energy at the FiT, together with the submission that

   b. even after the introduction of the APC, Bulgaria still was under an obligation to purchase all of the energy produced at the Karad Plant, just not at the FiT,

   is tortured and belied by the plain text of the relevant legislation and many contemporaneous government statements, as well as by legal advice given to Claimant from its counsel at CMS.[327]

264. Articles 31(1), (2), (4), and (5) ERSA must be construed as a whole. Read together, no other construction is reasonable than one of an obligation of full offtake at the FiT for the full term of a PPA.[328] As stated above, price and quantity go hand in hand in a FiT scheme for renewable energy.[329]

---

[324]    CROMCMOJ, para. 258; WS Blum II, para. 16.

[325]    CROMCMOJ, para. 258.

[326]    CROMCMOJ, para. 258.

[327]    CROMCMOJ, paras. 246, 404, 481; COS, pp. 25-26; HT, D1, 7 June 2021, pp. 40-42.

[328]    CROMCMOJ, paras. 246-247, 404, 481; COS, p. 25; HT, D1, 7 June 2021, pp. 40-42.

[329]    CROMCMOJ, para. 248.

*(d)    Further counterarguments*

265.    Bulgaria's argument that the FiT Decision did not contain a guarantee of full offtake of the whole production of a plant is equally misguided. First, this is because the FiT Decision, setting the FiT, would not have been the place for any such guarantee. Secondly, it is because the FiT Decision in calculating the appropriate FiT actually assumes that all of the production of the reference plant would be sold at the FiT rate. In doing so, the FiT Decision shows that it was the EWRC's assumption at the time that full offtake was the government's obligation.[330]

266.    Similarly, the License shows how much ACWA Bulgaria expected to sell and that ACWA Bulgaria assumed that it would sell the whole production. Consequently, it also shows that Bulgaria's must have received and understood this information.[331]

267.    Bulgaria's argument that the APC ensured that PV plants with more than 200kW capacity would continue to achieve "the 9% return target" also misses the point. The argument is conditioned on such plants to "have costs in line with the Regulator's assumptions" which the more expensively designed Karad Plant, with its 60.4/50 Ratio, did not have – a fact of which Bulgaria was well aware.[332]

*d.    20% Levy*

268.    According to the Claimant, in January 2014, Bulgaria imposed a new electricity production fee on PV plants (and wind farms) calculated as 20% of FiT revenue (the "**20% Levy**").[333]

269.    The 20% Levy was introduced in the same ERSA Amendment as the Annual Production Cap and thus came about equally "unexpectedly" and "surreptitiously" as the Annual Production Cap.[334]

270.    By its very formula as set out in Article 35a of the 2014 ERSA, being FiT times quantity of production times 20%, the 20% Levy is clearly identifiable as a direct 20% cut to the

---

[330]    CROMCMOJ, para. 249.

[331]    CROMCMOJ, para. 250.

[332]    CROMCMOJ, paras. 271-272.

[333]    CMOM, paras. 21, 310.

[334]    CMOM, paras. 221-222, 234.

FiT in violation of the price guarantee of Article 31(4) ERSA.[335] Denying this fact, elevates form over substance to the extent that any reduction of the FiT as long as it happened "on the sly" would be possible.[336]

271. On 31 July 2014, on the application of the then President of the Respondent, who deemed the 20% Levy unconstitutional, Bulgaria's Constitutional Court invalidated the 20% Levy.[337] The Constitutional Court did so because the setting of the fee took place in a non-transparent manner, the necessity for the fee was not substantiated, and the fee only targeted wind and PV energy producers.[338]

272. The Claimant does not argue that the decision of the Court automatically makes the 20% Levy a measure in breach of the ECT. The 20% Levy violates the ECT independently of the Constitutional Court's decision.[339] Notably however, the Court observed that where the legislature encourages investment and economic activity, it must create a regime that protects legitimate investments which have already been made by Bulgarian and foreign natural and legal persons.[340] Contrary to Bulgaria's submissions, the grounds on which the Constitutional Court struck down the measure were also not limited to the measure having been introduced as a "fee" for which no services were offered in return.[341]

273. The Claimant paid approximately BGN 4.9 million pursuant to the 20% Levy until it was invalidated.[342] MEET, NEK, ESO, and the Ministry of Finance of the Respondent either refused to return any of the sums collected under the 20% Levy or did not respond to a request to do so.[343]

---

[335] CROMCMOJ, para. 294; CPHB, para. 47; 2014 ERSA (**C-152**).

[336] CROMCMOJ, para. 294.

[337] CMOM, para. 21; CPHB, para. 47. Constitutional Court of Bulgaria, Decision No. 13, Constitutional Case No. 1/2014, 31 July 2014 (**C-155**) ("***Constitutional Court Decision No. 13***").

[338] CMOM, para. 236; CPHB, para. 47; *Constitutional Court Decision No. 13* (**C-155**).

[339] CROMCMOJ, para. 299.

[340] CMOM, para. 236; *Constitutional Court Decision No. 13* (**C-155**).

[341] CROMCMOJ, para. 300.

[342] CMOM, para. 237.

[343] CMOM, paras. 21, 237; CPHB, para. 47; referring to Letter from ACWA Bulgaria to MEET, ESO and NEK, 19 August 2014 (**C-187**); Letter from NEK to ACWA Bulgaria, 29 August 2014 (**C-188**); Letter from ACWA Bulgaria to Minister of Finance, 10 August 2016 (**C-156**); Letter from Minister of Finance to ACWA Bulgaria, 30 September 2016 (**C-157**).

274.　When Bulgaria in that regard states that on the Claimant's own case the effect of the 20% Levy was just 2% of the counterfactual value of the Investment, it disregards that the 20% Levy was in effect for less than one year.[344]

275.　Incidentally, where the Respondent, when arguing that the 20% Levy was a risk which was accepted by the Claimant, relies on the existence of a Tariff Event in the Common Terms Agreement, which anticipates that the Karad Plant will receive an amount less than the "Expected Tariff Price", *i.e.* the FiT, as a consequence of a new law or a decision of the Regulator, the Respondent admits that the 20% Levy had such a direct effect on the "Expected Tariff Price", *i.e.* the FiT.[345] An allocation of risk such as the inclusion of the Tariff Event in the Common Terms Agreement is furthermore a common occurrence in a sophisticated transaction between professional parties. Such an allocation, however, does not mean that the parties anticipate that an event will actually occur, or that the inclusion of the event would have any influence on the lawfulness of the third party's actions that cause the occurrence of the event.[346]

276.　Finally, a comparison with the situation in the Czech Republic is inapposite because, in contrast with the Respondent, the Czech Republic experienced and failed to address an actual "solar boom" and because claimants against the Czech Republic sought to rely on an allegedly expected income-tax exemption, while the claims regarding the 20% Levy and the 5% ESSF Contribution (as defined below) concern the Claimant's reliance on the stability of a price, the stability of which was guaranteed in express language.[347]

　　　*e.*　　*Balancing Cost Exposure*

277.　According to the Claimant, in 2014, the Respondent implemented new electricity trading rules that exposed producers of renewable energy to imbalance costs by eliminating earlier special protections such as (i) the placing into a "special balancing group" designed only for renewable energy producers, (ii) a 20% deviation tolerance threshold for deviations from the production forecasts, and (iii) a 50% discount on any balancing costs to be paid, and (iv) not charging balancing costs when the overall group

---

[344]　CROMCMOJ, para. 295.

[345]　CROMCMOJ, paras. 296-297.

[346]　CROMCMOJ, para. 298; Common Terms Agreement (**C-84**) p. 43, Article I, Section 1.01.

[347]　CROMCMOJ, para. 459.

result of a balancing group did not cause an imbalance to the grid (charging producers of renewable energy for such (im-)balance costs without the aforementioned special protections and limitations hereinafter being referred to as the "**Balancing Cost Exposure**").[348]

278.    The Claimant submits that, as evidenced by "its" business plan approved by the EWRC in the process of approving the License of the Karad Plant, the Claimant "reasonably expected" that imbalance costs would be assessed in line with the Electricity Trading Rules of 17 August 2010 (the "**2010 ETR**").[349] The business plan contains no provisions for balancing fees, consistent with the Claimant's expectation that any balancing fees to be incurred by the plant would be nominal.[350] The Claimant, however, has not submitted said business plan.[351]

279.    The Claimant "does not argue that it never expected to be exposed to any balancing costs at all".[352] The Claimant acknowledges that the SPA of 28 June 2012, by which it acquired ACWA Bulgaria (Exhibit C-107, the "**SPA**"), contains a price adjustment clause that can reduce the purchase price in the event that, within two years after closing, Bulgaria implemented balancing rules which would require the Karad Plant to pay fees for deviation from its production forecasts. The price adjustment is capped at a maximum of EUR 750,000.[353]

280.    The adjustment clause was introduced to the SPA because at the time of the SPA it was not yet fully clear how the existing balancing rules from 2010 would be implemented

---

[348]    CMOM, paras. 21, 242, 311; CPHB, para. 44; Electricity Market Rules, published SG 66 /26.07.2013, amended and supplemented SG 39/9.05.2014, in force as of 26 July 2013 (**C-159**) (the "**2013 ETR**").

[349]    CMOM, para. 240, referring to License (**C-158**). The Tribunal notes that neither (**C-158_EN**) nor (**C-158_BG**) (English and Bulgarian version of the License), nor (**C-103_EN**) and (**C-103_BG**) (English and Bulgarian version of the License Decision) contain said business plan. In any case, the business plan would appear to be that of ACWA Bulgaria (then ZBE Partners), not that of the Claimant. It is unclear whether Exhibit (**C-171_EN**), the "Long-Term Business Plan of Photovoltaic Park 50 MW Karadzhalovo 2013-2032 of ZBE Partners EAD", only once referred to, namely in paragraph 216 of the Claimant's Reply where it is deliberately left unclear which business plan it is, would be the business plan referred to here. There are indications that it is not, given that the business plan at (**C-171_EN**) refers to a different period from the one referred to in the License (2013-2032 rather than 2012-2031) and that it uses a higher annual output expectation (79,266 MWh v. 78,632 MWh); Electricity Trading Rules of 17 August 2010 (**C-49**) ("**2010 ETR**").

[350]    CMOM, para. 240.

[351]    See fn 349.

[352]    CROMCMOJ, para. 289.

[353]    CMOM, para. 241; SPA (**C-107**), Article 4.4(c).

and would affect the Karad Plant.[354] The cap of EUR 750,000 over 20 years represents a reasonable estimate based on experience of what balancing costs in a mature market would consist and shows that the Claimant had a reasonable expectation that any changes to the balancing rules would not have a big financial impact.[355] Knowing that the 2010 ETR were subject to modification which might result in some balancing costs imposed on it does not mean that the Claimant had no legitimate expectations at all, or that the Respondent could impose any balancing rules without also adjusting the FiT which, *nota bene*, had been calculated at a time that no balancing costs applied.[356]

281.    The Balancing Cost Exposure, in contrast with the existing balancing cost regime until then, disregarded the difficulties that producers of renewable energy have with balancing and forecasting their output and the immaturity of the balancing market in Bulgaria.[357]

282.    By placing producers of renewable energy into different balancing groups, and ignoring compensation of imbalances between groups, balancing fees to be received were also artificially increased. As a consequence thereof, the balancing costs imposed are materially higher than the actual balancing costs incurred across the Respondent's electricity system.[358] Whereas the charged costs represent 4 to 6 % of the revenue of PV plants, the European Commission had recommended only EUR 0.5 per MWh as a charge for "cross-border" balancing of electricity, showing that the costs actually charged "far exceed" recommended values.[359]

283.    In addition, the Respondent implemented the Balancing Cost Exposure before it had developed a mature balancing market, precluding the Karad Plant from mitigating its balancing exposure in a mature market.[360]

---

[354]    CMOM, para. 241; CROMCMOJ, para. 289.

[355]    CMOM, para. 241; CPHB, para. 46.

[356]    CROMCMOJ, para. 289.

[357]    CMOM, paras. 21, 243, 311; CROMCMOJ, para. 290; CPHB, para. 44; Compass II, paras. 8.6, 8.14-8.17.

[358]    CMOM, para. 243; CPHB, para. 45.

[359]    CMOM, paras. 243-244, referring to Commission Regulation (EU) No. 838/2010 on laying down guidelines relating to the inter-transmission system operator compensation mechanism and a common regulatory approach to transmission charging, 23 September 2010 (**C-160**).

[360]    CPHB, para. 45.

284.    Finally, the introduction of the Balancing Cost Exposure undermines the argument, used at the time that the Balancing Cost Exposure was introduced, that the Permanent Grid Access Fee was introduced to cover imbalance costs.[361]

285.    In conclusion, the Balancing Cost Exposure qualifies as "a radical change", and "serves no purpose other than to erode the value of the FiT that Bulgaria had promised to induce Claimant's investment".[362] The Respondent destroyed an incentive regime specifically designed "to shield renewable energy projects of imbalance costs by limiting their financial responsibility to deviations from production forecasts greater than 20%".[363] The Claimant reasonably expected that Bulgaria would implement balancing rules "broadly consistent" with the risk allocation in the 2010 ETR and good international practice regarding allocation of balancing responsibility, and would in doing so "maintain" its regulatory framework. The Claimant did not expect "sweeping changes to the fundamental structure of the balancing rules".[364]

286.    The Balancing Cost Exposure has reduced the value of the Investment by approximately EUR 7.3 million, *i.e.* about 10 times the EUR 750,000 maximum purchase price adjustment to which the Claimant had agreed in the SPA.[365]

287.    The fact the FiT Decision did not consider balancing costs does not mean that these were irrelevant to the setting of the FiT, but rather means that it was not anticipated at the time of the FiT Decision that renewable energy plants would be exposed to material balancing costs.[366]

288.    The situation regarding balancing charges in Italy is not comparable to that in Bulgaria and does not make the charging of balancing costs in Bulgaria foreseeable. This is because in Italy the "legal or regulatory" framework did not take into consideration

---

[361]    CMOM, paras. 21, 245.

[362]    CMOM, para. 311; CPHB, para. 45.

[363]    CROMCMOJ, para. 460.

[364]    CROMCMOJ, paras. 289, 460.

[365]    CMOM, para. 246; CROMCMOJ, para. 293; CPHB, para. 46.

[366]    CROMCMOJ, para. 288.

balancing costs when setting the FiT, while in Bulgaria producers of renewable energy were specifically protected by the design of the balancing cost rules.[367]

    *f.*    *5% ESSF Contribution*

289.    According to the Claimant, in 2015, the Respondent introduced a monthly contribution to the Security of Electrical Power System Fund ("**ESSF**") for producers of renewable energy of 5% of their FiT revenue (the "**5% ESSF Contribution**").[368]

290.    The Claimant submits that the Respondent introduced the 5% ESSF Contribution by amending the ERSA another time. [*The Tribunal notes, however, that the 5% ESSF Contribution was introduced by an amendment to the Energy Act, see below.*][369]

291.    The Claimant submits that according to that law, the contribution was introduced "for the purpose of management of the financial resources for covering the expenses incurred by the public supplier", which the Claimant translates to mean that the purpose of the amendment "was to require RES producers to subsidize the costs of NEK, rather than passing those costs on to the consumers who use electricity".[370]

292.    The legislation required that electricity producers pay 5% of the "revenues" from the electricity sold per month, excluding VAT.[371] A 5% deduction from the revenue of an entity that receives a preferential and guaranteed price by the government, and that only sells one product to one customer at one price, constitutes, in fact, a 5% reduction of that guaranteed price, *i.e.* the FiT.[372] Mr Kristensen admitted during cross-examination

---

[367]    CROMCMOJ, para. 460.

[368]    CMOM, paras. 21, 247, 310; CPHB, para. 48.

[369]    CMOM, para. 247; repeated at CPHB, para. 48.

[370]    CMOM, para. 247. The first quotation allegedly stems from Article 36b of the ERSA as amended and supplemented, SG No. 56/24.07.2015, effective 24.07.2015 and exhibited by the Claimant as Exhibit (**C-163**) (the "**2015 ERSA**"). That ERSA version, however, does not contain an Article 36b or the quoted language at any place. The Energy Act in force as of 24 July 2015 Energy Act, SG No. 107 dated 9 December 2003, as amended SG No. 56, 24 July 2015 exhibited by the Respondent as Exhibit (**R-082**) (the "**2015 Energy Act**") does contain an Article 36b and almost identical language; CROMCMOJ, para. 301.

[371]    CMOM, para. 248, referring to an allegedly existing Article 36f of the incorrect law. Article 36f of the 2015 Energy Act in the translation submitted by the Respondent, (**R-082**), which is the only translation on file, speaks of "profit" rather than of "revenue". Exhibit (**C-164**) contains a later version of the Energy Act (2018 Energy Act, see below), in which the Article has already been amended, but in that translation "revenue" is used also in other parts of the article, which were not amended, and where the translation at Exhibit (**R-082**) uses "profit".

[372]    CMOM, paras. 248-249; CROMCMOJ, para. 301; CPHB, para. 48.

that "if … the feed-in tariff represented, let's say, all of the remuneration to all the generation that it had, then [the 5% ESSF Contribution] wouldn't be materially different from reducing the FiT by 5%."[373]

293.  The Respondent cannot dispute that the 5% ESSF Contribution targets FiT receivers just because it also applies to the revenue of conventional producers.[374] This is the case because a "tax" on revenue per MWh disproportionately affects producers that receive a FiT. Such a FiT increases the revenue per MWh of that producer, but such a FiT also reflects such a producer's higher costs per MWh. A regular producer of energy selling at a price of BGN 50 per MWh would pay BGN 2.5 in ESSF Contribution per MWh, whereas a producer of PV energy at the scale of the Karad Plant, receiving BGN 485.6 per MWh would pay BGN 24.28 per MWh, roughly ten times as much.[375] Such arbitrariness and discrimination could have been avoided by structuring the alleged "tax" in a way based on the market value of electricity, which is the same for renewable and conventional energy producers, or by basing it on the net profit, but such arbitrariness and discrimination deliberately was not avoided.[376]

294.  As stated before in relation to other measures, Bulgaria's reliance on the inclusion of a Tariff Event in the Common Terms Agreement in its argument regarding the 5% ESSF Contribution equals an admission by Bulgaria that the 5% ESSF Contribution reduced the FiT in violation of Article 31(4) ERSA.[377]

295.  In conclusion, the 5% ESSF Contribution serves no purpose but to reduce the incentives guaranteed to producers such as the Claimant.[378] The Contribution was shaped in the way it was "in bad faith, in order to disguise a *de facto* reduction of the FiT as a 'taxation measure' in order to shield it from domestic and international legal scrutiny".[379]

296.  A comparison with the situation in the Czech Republic is inapposite in that regard. This is because, contrary to the Respondent, the Czech Republic experienced and failed to

---

[373]    CPHB, para. 48; HT, D5, 11 June 2021, p. 956.

[374]    CROMCMOJ, paras. 303-305.

[375]    CROMCMOJ, paras. 303-304.

[376]    CROMCMOJ, paras. 305-306.

[377]    CROMCMOJ, para. 302.

[378]    CMOM, paras. 21.

[379]    CROMCMOJ, para. 306.

address an actual "solar boom" and because claimants against the Czech Republic sought to rely on an allegedly expected income tax exemption, while the claims regarding the 20% Levy and the 5% ESSF Contribution concern the Claimant's reliance on the stability of a price, the stability of which was guaranteed by express language.[380]

g.    *Transition from FiT to FiP*

297.    According to the Claimant, in 2018, the Respondent replaced the FiT element of the ERSA Regime with a "Contract for Premium" ("**CfP**") scheme, under which producers of renewable energy must sell their energy on the wholesale market and receive an additional premium (the Feed-in Premium, "**FiP**") of the difference between the estimated wholesale price and the original FiT.[381]

298.    The change was brought about by an amendment to the Energy Act and ERSA. The amendment required all energy producers having more than 4MW capacity to sell their electricity production on the wholesale market.[382]

299.    In order to receive the new FiP, which was set annually by the EWRC, producers of renewable energy with a capacity of more than 4 MW had to enter into "premium-compensation contracts" with the ESSF.[383] Without providing details, the Claimant submits that the legislation "abrogated" the Karad PPA (the thus-described transition referred to as the "**Transition from FiT to FiP**").[384]

300.    The Claimant acknowledges that the CfP scheme was introduced with the "apparent intent" of broadly replicating the same level of financial support as the original FiT scheme.[385] The Claimant further acknowledges that the background of the introduction of the FiP was the Respondent's effort to implement a wholesale market for electricity trading.[386] The Claimant also acknowledges that "the winds were blowing toward the

---

[380]    CROMCMOJ, para. 459.

[381]    CMOM, paras. 21, 312; CPHB, para. 49.

[382]    CMOM, para. 252.

[383]    CMOM, para. 253.

[384]    CMOM, para. 252; during the Hearing, the Claimant submitted that "the change to the feed-in tariff regime that Bulgaria imposed in July of 2018 officially terminated the PPA, so in the new law that was enacted in July of 2018, I believe it is Article 68(9) there is an express reference in that law that says PPAs are now terminated"; HT, D1, 7 June 2021, p. 75; CPHB, para. 49.

[385]    CMOM, paras. 21, 250, 254, 311; CPHB, para. 49.

[386]    CMOM, para. 251; CPHB, para. 49.

full liberalization of EU energy markets in 2011-2012".The Claimant argues, however, that it does not follow from that trend that the Claimant should have expected that the FiT scheme would be replaced with a FiP scheme, or that it was reasonable for Bulgaria to apply the change also to existing plants.[387]

301. The Claimant further disputes the Respondent's argument that it was obligated to replace the FiT with a FiP in order to comply with EU law as unsubstantiated, and adds that "numerous EU Member States" maintained "legacy FiT programs" for existing investments.[388] The very EU document on which the Respondent seeks to rely as evidence of an EU preference for FiP schemes only speaks of "phasing out" FiT schemes, not of replacing them mid-term. The document emphasizes that it is a best practice to enter into "long term legal commitments on the timing and phasing out of support" and so are "clear commitments to avoid changes that alter the return on investments already made and undermine investors' legitimate expectations."[389]

302. In any case, the FiP scheme was poorly designed and less favourable and less secure than the existing FiT scheme. It reduced the price below the original FiT level.[390] This was the case mainly because the premium was set prospectively every year based on an estimate of the wholesale price of electricity in the coming year. Such estimates can be wrong, leading to losses or windfalls for the producer of renewable energy.[391]

303. The EWRC also has a natural incentive "systematically" to overestimate the wholesale price in order to reduce the financial burden on the ESSF, or to claw back what it perceives as windfall profits if it had estimated the previous year's wholesale price as too low. The EWRC has no incentive on the other hand to adapt its estimate if it had been off to the detriment of the renewable energy producers. That creates an additional and asymmetric regulatory risk.[392]

304. The FiP scheme also creates a counterparty risk (i) in the form of the ESSF, given that its funding is more insular than that of NEK and that its potential bankruptcy would be

---

[387]    CROMCMOJ, paras. 308-309.

[388]    CROMCMOJ, para. 307; Compass II, Table 2.

[389]    CROMCMOJ, para. 309; European Commission Guidance (**FR-41**), p. 5.

[390]    CMOM, paras. 21, 250, 311; CROMCMOJ, para. 3.

[391]    CMOM, para. 255.

[392]    CMOM, para. 255; CROMCMOJ, para. 310.

less consequential for the Bulgarian market than that of NEK, and (ii) in the form of third-party off-takers that purchase electricity from a producer.[393]

305. In contrast with the previous scheme which relied on PPAs regulating the full offtake of the production of electricity of a plant, in a FiP model the risk of not achieving full offtake is moved to the producer, which creates a "market risk" and constitutes another disadvantage of the FiP to the Claimant.[394]

306. Finally, less harmful, or indeed non-harmful ways of transitioning to a FiP model would have been possible, *e.g.* through a "true-up", the remuneration of the difference between the FiT and the actual wholesale price achieved and through a NEK guarantee for the ESSF liabilities, which would assimilate the counterparty risk to its previous status.[395]

307. In conclusion, the Transition from FiT to FiP in the way it was executed violated the Respondent's obligations under the ECT as a violation of the Claimant's legitimate expectations and an unreasonable and unfair reallocation of risks. It injured the Investment and caused about EUR 700,000 in damages.[396]

### 13. The consequences of the amendments to the ERSA Regime

308. The Claimant submits that, overall, the Respondent's changes to the ERSA Regime slashed the Karad Plant's expected free cash flows by approximately 28%, and reduced the value of the Investment by over 73%.[397]

309. In doing so, the Respondent transformed a "relatively" low risk, "modestly" profitable investment into a much riskier investment with nearly zero profit.[398] As a result of the Seven Measures, the Claimant went on to operate the Karad Plant merely for the benefit of the financing banks.[399]

---

[393] CMOM, paras. 256, 311; CROMCMOJ, para. 310; CPHB, para. 49.

[394] CMOM, para. 257; Compass I, para. 6.62; CROMCMOJ, para. 310; CPHB, para. 49.

[395] CMOM, para. 259; CROMCMOJ, para. 310.

[396] CMOM, para. 250.

[397] CMOM, paras. 22, 195, 262; CROMCMOJ, para. 452; COS, p. 5; CPHB, para. 2.

[398] CMOM, para. 264.

[399] CROMCMOJ, para. 3.

310. The reduction of the free cash flows caused ACWA Bulgaria to breach its debt covenants and made a restructuring of the project debt necessary in order to "avoid default and forfeiture of the entire investment."[400]

311. Fighting the Seven Measures, unexpectedly having to collect receivables and to market electricity, and having to restructure the debt entailed additional legal and administrative costs, estimated to be more than 80% of ACWA Bulgaria's whole legal costs in the period of 2013-2019.[401]

312. The Claimant submits that when it sold ACWA Bulgaria to Enery it had "recouped only a portion of its initial investment", and had not earned a profit,[402] or nearly no profit,[403] or that "essentially [] all of the profitability of the project" was "eliminated".[404] According to the Claimant, at the time of the sale to Enery, the total valuation of the Karad Plant was nearly 40% less than the acquisition value in 2012. The Claimant had only once received a "small" distribution of EUR 5.9 million from its Investment (in 2017), and that distribution together with the purchase price in the sale to Enery "barely repaid the Claimant's equity investment".[405] Because the Karad Plant was financed with project debt with a priority claim to its cash flows, as would be standard for renewable power plants, the reductions in return due to the Seven Measures "effectively wiped out all of the profit that Claimant legitimately expected to receive on its equity investment."[406]

313. The Claimant initially posited that at the time of the sale the overall project IRR was less than 2%,[407] but later clarified that the 2% figure relates to the Claimant's return on its Investment, not the project IRR.[408] In any case, since the first witness statement of Mr Roberts, the "return on investment" had further dropped to 0.67%, against an

---

[400]    CMOM, para. 262.

[401]    CMOM, para. 262; WS Roberts I, para. 25.

[402]    CMOM, paras. 22, 263; CROMCMOJ, para. 452.

[403]    CMOM, para. 264.

[404]    CROMCMOJ, para. 3.

[405]    CMOM, para. 263.

[406]    CROMCMOJ, para. 273.

[407]    CMOM, para. 263; relying, however, on a statement by Mr Roberts regarding the "return on investment" of the Claimant, Roberts WS I, para. 27.

[408]    CROMCMOJ, para. 317.

expected return on investment of 15.375%.[409] The Seven Measures had reduced the return on investment to less than $1/20^{th}$ of the return the Claimant had reasonably expected when it decided to invest in Bulgaria.[410] Mr Kristensen did not contest the figure of 0.67%.[411]

314. The project IRR of the Karad Plant when calculated on the same basis as the 9% target in the FiT Decision was only 6.1% (6.8%-8.6% in the calculations of the Respondent's expert), 30% below Bulgaria's own definition of a reasonable return, and even further apart from the Claimant's expected project IRR of around 10% pre-tax.[412]

315. The return on investment – the equity return – is so much lower and so much more affected by the Seven Measures than the project IRR because of the debt financing of the Karad Project which gives the banks priority on the cash flows making the investor the one that suffers the marginal impact on profitability of the Project.[413]

316. The Respondent's changes increased the Claimant's risk by reducing the certainty of full offtake and increasing the counterparty risk of payment default of the FiT which it was due.[414]

317. The Seven Measures were disproportionately harmful to the Karad Plant compared to other Bulgarian PV plants because of the Plant's efficient design (the 60.4/50 Ratio).[415] They were far more harmful than measures adopted in, *e.g.* Spain and Italy.[416]

318. The Respondent does not dispute that the Karad Plant's cash flows were drastically reduced, which can also not come as a surprise given that a substantial impact on the Karad Plant's cash flow was necessary to achieve Bulgaria's policy aim of reducing the cost of electricity for consumers.[417] Nevertheless, instead of engaging with the

---

[409]    CROMCMOJ, para. 317; COS, pp. 5, 139; HT, D1, 7 June 2021, pp. 15-16; CPHB, para. 104.

[410]    CROMCMOJ, para. 3.

[411]    CPHB, para. 104.

[412]    CROMCMOJ, paras. 273, 315-317, 443, 480, 502, 543, 552, 569-570; COS, p. 5; HT, D1, 7 June 2021, pp. 16, 146; CPHB, paras. 99, 104; Oxera II, para. 8.63, Figure 8.4.

[413]    HT, D1, 7 June 2021, p. 147; CPHB, para. 104.

[414]    CMOM, para. 261.

[415]    CPHB, paras. 5, 53, 94.

[416]    CPHB, para. 5.

[417]    CROMCMOJ, para. 313; CPHB, para. 2.

Claimant's calculations and attempting to justify the impact of the Seven Measures, the Respondent rather "moves the goalpost" with its argument on "reasonable returns" and a lack of harm if costs were covered and some profit was made,[418] or with its argument that the FiT was only protected against direct changes.[419]

319. As outlined in more detail above, however, the ERSA Regime did guarantee a price, a volume, and a term, not a "reasonable return", and it did not cap returns at a certain level, and therefore, even if the Karad Plant had earned a "reasonable return" but not the return the Claimant had reasonably expected based on the Respondent's commitments, the Claimant still would have been harmed.[420] In addition, as outlined above, after the introduction of the Seven Measures, the Karad Project, even on the calculations of the Respondent's expert, never earned the targeted reasonable return of 9% IRR.[421]

### 14. Arguments regarding the alleged necessity to amend the ERSA Regime

#### a. The alleged boom

320. The Claimant submits that Bulgaria's argument is premised on a "solar boom" that "did not occur", or that the Respondent at least "grossly overstates" the purported boom in its renewable energy sector at the time and shortly after the Investment took place.[422]

321. The Claimant concedes that "it is certainly true" that the ERSA and the FiT Decision resulted in a "significant amount" of investment in PV energy production in Bulgaria, and that Bulgaria secured more PV capacity than it had expected as a result of ERSA. The Respondent, however, failed to achieve its goal of 5,189 MW for total capacity of energy from RES installed by the end of 2012 (by 300 MW), because it did not secure even half of the necessary increase in wind energy.[423] The Respondent thus needed the

---

[418] CROMCMOJ, paras. 313-314.

[419] CPHB, para. 2.

[420] CROMCMOJ, paras. 314, 551.

[421] CROMCMOJ, paras. 315-316, 481, 480, 502, 543, 552; COS, p. 5; HT, D1, 7 June 2021, p. 16; CPHB, para. 99; Oxera II, para. 8.63, Figure 8.4.

[422] CROMCMOJ, paras. 98, 176ff, 480; CPHB, para. 55.

[423] CROMCMOJ, paras. 182-183, 498; COS, p. 67; HT, D1, 7 June 2021, p. 83; CPHB, para. 56; Compass II, para. 5.7, Figure 6.

additional PV capacity to obtain its renewable energy goals,[424] and consequently there was no excess capacity or boom and certainly not at the level that Bulgaria claims.[425]

322.    The increase in capacity was a positive development because it was the very result Bulgaria sought to achieve and it helped Bulgaria to reach its EU-mandated and internal policy objectives.[426]

323.    The Respondent cannot, in any case, either in terms of facts or law, argue that it came as a surprise to the Respondent that the ERSA Regime caused a boom in PV capacity, but that both the alleged boom and its consequences should have been expected by investors.[427]

324.    In particular, in light of the unsurprising nature of the intended increase of investment in PV energy following an improvement of the Respondent's incentive regime, *i.e.* the alleged boom, the Respondent cannot claim that any investor would have known that Bulgaria would cut revenues of existing plants.[428]

325.    Even if there was an unexpected boom in Bulgaria, the Respondent cannot argue that while that boom came unexpected to the Respondent, it should have been expected by the Claimant.[429]

326.    Indeed, Bulgaria, rather than any investor, was in the position to anticipate, manage, and limit the capacity in the pipeline.[430] In fact, Bulgaria knew since July 2011 that there was a pipeline of projects of 4,000 MW, and, accordingly, could have decided to end the programme then.[431] Therefore, even if there had been a boom, it could not have been unanticipated by Bulgaria, because Bulgaria controlled the system.[432] It could also not

---

[424]    CROMCMOJ, para. 184; COS, p. 60; HT, D1, 7 June 2021, p. 83; CPHB, para. 56.

[425]    CROMCMOJ, para. 498; CPHB, para. 56.

[426]    CPHB, para. 56.

[427]    CROMCMOJ, para. 8.

[428]    CROMCMOJ, paras. 6, 187.

[429]    CROMCMOJ, para. 8; HT, D4, 10 June 2021, p. 859.

[430]    CROMCMOJ, paras. 187, 497.

[431]    CROMCOJ, para. 186, corrected by Presentation Dr Roques 9 June 2021, pp. 16-17; HT, D3, 9 June 2021, pp. 588-589. Elsewhere, the Claimant further submits that the Respondent "knew" that more than 600 MW of added PV capacity was possible and likely; COS, p. 60.

[432]    CROMCMOJ, paras. 6, 187, 497-498.

have been a justification for the Respondent to renege on its commitments, given that "Bulgaria assumed responsibility and risks of managing the capacity enrolled in the support regime".[433]

327. The Respondent could have limited additional renewable energy capacity by various means including by denying grid connection agreements. The Respondent, however, while fully informed about the pipeline of projects, did not see a need to do so at the time.[434] Furthermore, while under the Claimant's understanding of Bulgarian administrative law, the issuance of a preliminary or final license to a project that met the eligibility criteria was not discretionary, Bulgaria would nevertheless have had the practical ability, of uncertain lawfulness depending on the circumstances of a particular case, to delay the final license and other approvals until after June 2012.[435]

328. The Respondent's claim that it obtained new capacity more quickly than it desired is thus a "post-hoc rationalisation", which, even if true, could not have justified what Bulgaria then proceeded to do to existing investments.[436]

> ### b. Plants were not able to profit from the alleged drop in costs of PV panels

329. The Claimant further disputes the premise of the Respondent's argument that investors that wanted to lock-in the FiT were able to profit from an alleged 50% reduction in costs of PV panels between July 2011 and June 2012. The Claimant submits (i) that it takes more than one year to develop and enrol a large PV plant, (ii) that the purchase of PV panels would take at least three to four months and would typically be timed to coincide with the anticipated receipt of a construction permit, and (iii) that, not least in light of annually decreasing FiTs under the ERSA Regime, it was imperative to avoid delays as much as possible.

330. Therefore, investors seeking to obtain the 2011-2012 FiT for their plant would usually have ordered PV panels before they could have profited from the alleged reduction in costs between July 2011 and June 2012. The Karad Plant, for example, was operational

---

[433]   CPHB, paras. 4, 60.

[434]   COS, pp. 64-66; HT, D1, 7 June 2021, pp. 88-89; CPHB, para. 57.

[435]   CPHB, para. 21, fn 40.

[436]   CROMCMOJ, para. 6.

by March 2012 and thus necessarily would have had to order its PV panels many months earlier. Notably, no evidence to the contrary was submitted or exists on the record. What is more, with a particular view to the Karad Plant, these considerations are of no relevance since the Claimant bought the plant from SunEdison BV when it was already operational. Therefore, not the Claimant, but the developer would have profited from lower prices for PV panels (which it however would likely not have achieved in light of the timing constraints outlined above).[437]

331.    During cross-examination of Mr Kristensen, the Claimant further developed this argument and submitted that it is inaccurate to compare the Karad Plant's LCOE, or costs against any average of LCOEs in June 2012, but that rather a point of comparison for a PV plant with a start of construction in September 2011, would most likely lie in 2011 as panels would have had to be purchased at that time.[438] The Claimant submits that the Respondent "acknowledges" that the Karad Plant's development timeline was not representative of the average Bulgarian PV project.[439]

> c.    *The financial burden of the ERSA Regime on the Public Provider, the public debt, and the citizens of the Respondent was not too high*

332.    Contrary to the Respondent's submission, NEK, the Public Provider, could not have gone bankrupt as the prices it charges to the end consumer are set annually to enable NEK to earn a guaranteed return on its actual costs, which was even increased from 2.28% to 3.99% in 2013. Any deficit would have been only temporary, to be recovered in the next regulatory period.[440]

333.    In addition, the Respondent cannot complain that significant financial resources were expended on the increase of renewable energy, given that it had exactly been the plan to subsidize those energies to increase their share. This naturally means that rising

---

[437]    CROMCMOJ, paras. 178-181; COS, 59, 68; HT, D1, 7 June 2021, 80-81, 145-146; CPHB, para. 59.

[438]    HT, D5, 11 June 2021, 919-924; SunEdison/MEMC, Karadzhavolo – Bulgaria – 60.4 MWp, November 2011 (**C-63**), p. 9.

[439]    CPHB, para. 59; RROMROJ, para. 82.

[440]    CMOM, para. 215; HT, D3, 9 June 2021, pp. 606-607; EWRC Decision No. C-25/2013, 29 July 2013 (**C-149**); EWRC Decision No. C-17/2012, 28 June 2012 (**C-150**).

financial costs of said increase of the share were costs that were both planned and needed to achieve a stated goal of the Respondent.[441]

334.    The Claimant in that regard further refers to an interview with Mr Angel Semerdzhiev, of 19 April 2012, at the time the head of the EWRC. In that interview, Mr Semerdzhiev reports three factors for the losses of NEK and higher-than-expected costs: (i) the covering of preferential prices for cogeneration plants, (ii) the covering of the prices for the electricity from the coal power plant Maritsa-I, and (iii) the financing of the hydro power plant Tsankov kamak. Mr Semerdzhiev explains, however, that any loss of NEK in one year will be covered by higher prices the next year and vice versa, and that NEK's low liquidity ratio is not a problem and improving.[442]

### 15.    EU State aid law

335.    The Claimant submits that the Respondent's arguments on EU State aid law are a "complete red herring" and a "sideshow".[443]

336.    Measured against the applicable legal and policy background (i) the ERSA Regime did not constitute State aid, (ii) if it did, it constituted legal State aid, and, in any case, (iii) at the time of the Investment, which is the only relevant time, anyone reviewing the applicable EU Directives, guidelines, and European Commission decisions would have expected that the European Commission would approve of, and be in favour of state aid schemes supporting renewable energy, and that the Commission would grant EU Member States wide latitude in how to structure such schemes.[444]

337.    The Claimant submits *ad* (i), that EU State aid law did not apply to renewable incentive schemes at the time of the Investment, which is the relevant time to assess whether it did.[445] Prior to 2014, and namely the "*Vent de Colère!*" decision of the CJEU, incentive regimes funded by end consumers rather than the State itself, such as the ERSA Regime, were not qualified as State aid, because the cost of the program ultimately was paid by

---

[441]    CMOM, para. 217.

[442]    CROMCMOJ, paras. 171-174; 168 Hours Interview Angel Smerdzhiev (**C-181**).

[443]    CROMCMOJ, paras. 5, 14.

[444]    *E.g.* CROMCMOJ, paras. 98, 102, 115, 409-410; COS, pp. 59, 74; HT, D1, 7 June 2021, pp. 81-82; CPHB, para. 69.

[445]    CROMCMOJ, paras. 14, 98, 116, 121.

the end-consumers, and not by the State directly.[446] The Claimant submits, as an example, that the European Commission, following the *PreussenElektra* judgment of the CJEU, had explicitly found, at the time, that the German renewable energy regime, which was very similar to that of Bulgaria, did not qualify as State aid.[447] Prior to 2014, neither Bulgaria, nor the European Commission, while being fully aware of the programme and under a duty to investigate and review, had notified, presented, analysed, or recognised the ERSA Regime as State aid under EU law.[448]

338. In that regard, the Respondent cannot now claim that NEK is a state entity and as such its role in the ERSA Regime makes it a State aid scheme, and elsewhere claim that NEK's actions are not attributable to Bulgaria.[449]

339. The Claimant, however, acknowledges that after the *Vent de Colère!* decision, which it qualifies as "subsequent changes in EU law" that "brought Bulgaria's incentive scheme within the arguable scope of EU State aid law",[450] the European Commission amended its legal position and started to qualify support schemes for renewable energy production that were funded that way as State aid.[451] Nevertheless, the fact that the ERSA Regime was unnotified prior to 2014, contrary to what the Respondent requests, cannot lead the Tribunal to assume that an investor could not expect an unnotified State aid scheme to remain unchanged.[452]

340. The Claimant submits *ad* (ii) that there is no evidence on file that the regime under which the Claimant invested was unlawful State aid or was considered by anyone as such.[453] "[T]here is no dispute as to whether Bulgaria complied with" EU State aid laws.[454] Neither the Respondent nor the European Commission alleges that Bulgaria was ever in violation of its EU law obligations with respect to any of the incentives at issue in this case, or with notification requirements, and there was never a finding that

---

[446]    CROMCMOJ, paras. 5, 14, 104, 116-120, 406; HT, D1, 7 June 2021, p. 99; CPHB, para. 69.

[447]    CROMCMOJ, paras. 14, 117-119, 406; HT, D1, 7 June 2021, p. 99.

[448]    CROMCMOJ, paras. 100, 104, 121, 124, 127-128, 405-406, fn 120; CPHB, paras. 70-71.

[449]    HT, D1, 7 June 2021, p. 99.

[450]    CROMCMOJ, para. 129.

[451]    CROMCMOJ, para. 14.

[452]    CROMCMOJ, paras. 14, 124, 129, 164, 405.

[453]    CROMCMOJ, paras. 14, 129, 405-406; COS, p. 74; HT, D1, 7 June 2021, p. 98.

[454]    CROMCMOJ, para. 336.

Bulgaria violated EU State aid law.[455] The eventual European Commission decision on whether the Bulgarian programme constituted unlawful State aid, European Commission Decision on State Aid SA.44840 (2016/NN) of 4 August 2016 (the "**EC Decision on State Aid**") concluded that the ERSA Regime was compatible with EU law both before and after the Seven Measures had been introduced and the EC Decision on State Aid did not require that aid granted before 2014 had to be clawed back.[456]

341.    The Claimant argues *ad* (iii) that the European Commission at the time of the Investment had long encouraged, and viewed favourably, support schemes to incentivize investments in renewable energy plants. It had "routinely" determined such schemes either not to constitute State aid, or to be permissible State aid, and had allowed the EU Member States "tremendous freedom" to develop their programs.[457] In 2011, for example, the European Commission praised the ERSA Regime as "in perfect harmony" with Brussels.[458]

342.    In addition, however, an EU State aid law defence cannot work because Bulgaria did not, nor does it provide any evidence that it did, enact any of the Seven Measures (i) because EU State aid law would have required it to do so, or (ii) that it did so after consultation with the European Commission, in order to bring the ERSA Regime into compliance with EU law, or (iii) that it did so after a change in EU State aid law. Rather, Bulgaria introduced the Seven Measures for different reasons.[459] Therefore, the legality of any of the Seven Measures in dispute in the present case cannot depend on questions of EU State aid law, even if one deemed such law applicable and deemed the ERSA Regime to constitute State aid under EU law. Neither can the Seven Measures be

---

[455]    CROMCMOJ, paras. 100, 104, 121, 124, 127-129, 408 fn 120. Nevertheless, the Claimant submits that in its first (indirect) notification of State Aid, the EWRC alleged overcompensation in case of FiTs awarded to photovoltaic and wind installations, which would appear to constitute an allegation of a breach of State aid rules, CROMCMOJ, para. 126, fn 123; European Commission Decision on State Aid SA.44840 (2016/NN) of 4 August 2016 (**FR-78**) (the "**EC Decision on State Aid**"), para. 38.

[456]    CROMCMOJ, paras. 128, 408; HT, D5, 11 June 2021, pp. 943-946; CPHB, para. 73; initially the Claimant had agreed with the Respondent that the EC Decision on State Aid only dealt with the ERSA Regime after the Seven Measures had been introduced but it amended that position during the Hearing. EC Decision on State Aid (**FR-78**).

[457]    CROMCMOJ, paras. 14, 98; CPHB, para. 72.

[458]    CROMCMOJ, paras. 122-123, 407; COS, p. 74; HT, D1, 7 June 2021, p. 100; HT, D5, 11 June 2021, pp. 940-941; CPHB, para. 71; referring to Telegraph, EU Climate Commissioner: You are in harmony with Brussels, 14 May 2011 (**C-60**), where the translation, however, speaks of "complete" not "perfect" harmony, both words of course meaning the same.

[459]    CROMCMOJ, paras. 5, 14, 124-125, 336, 439; COS, p. 74.

qualified as measures to be expected on the basis of EU State aid law.[460] The Respondent's State aid arguments, even if they represented a correct reading of the law, cannot destabilise the commitments of price, quantity, and term made in the ERSA as long as EU State aid law has not made a modification of the commitments necessary, a condition which, even on Bulgaria's own case, was never met.[461]

343. Bulgaria's submissions on State aid also come down to an argument that investors like the Claimant should bear responsibility for Bulgaria's alleged shortcomings in obeying EU law obligations. The Claimant, however, was entitled to expect that Bulgaria complied with any State aid obligations it had when it enacted the ERSA, as Bulgaria in fact did.[462]

344. Finally, if the Tribunal did not follow the Claimant's arguments as to the compliance of the ERSA Regime with State aid law, it would be improper for this Tribunal to speculate whether the European Commission might have found the ERSA Regime under which the Claimant invested, *i.e.* the ERSA Regime before the Seven Measures were introduced, to constitute incompatible State aid.[463]

345. In any case, even if EU State aid law stood in the way of a finding that the Claimant developed legitimate expectations, EU State aid law can have no bearing on the Respondent's compliance with other components of the fair and equitable treatment standard of Article 10(1) ECT, *i.e.* the duty to act transparently and consistently (fair and equitable treatment as referred to in that Article hereinafter being referred to as "**FET**" and the obligation to accord FET being the "**FET Obligation**").[464]

### 16. Applicable Law

346. The Claimant submits that, according to Article 42(1) Convention, the Tribunal must decide the merits of the dispute based on the laws agreed between the Parties.[465] The

---

[460]    CROMCMOJ, paras. 5, 14, 124-125, 336, 130.

[461]    CPHB, para. 11.

[462]    CROMCMOJ, para. 14; COS, pp. 59, 74; HT, D1, 7 June 2021, p. 99.

[463]    CROMCMOJ, paras. 427, 429.

[464]    CROMCMOJ, paras. 428-429.

[465]    CMOM, para. 265.

applicable law to which the Parties agreed is identified in Article 26(6) ECT. Therefore the ECT itself and other international law form the applicable law to this dispute.[466]

347.  Principles found in the VCLT are applicable as between Bulgaria and Malta and thus can assist the Tribunal in interpreting or applying the ECT, independently of the applicability of the VCLT between the Parties.[467]

348.  Even if VCLT principles did not apply between the Parties, that would still not lead to an interpretation of the ECT in which EU law would be found to be part of the applicable rules and principles of international law that govern the present dispute as per Article 26(6) ECT.[468]

349.  The Parties furthermore "seem to agree that EU law does not apply to the merits of this dispute", and "no Party has asked this Tribunal to interpret or apply EU law when reaching its conclusions in this case".[469] Repeating arguments from the *Achmea* phase of this dispute, the Claimant "insists" that "EU law is not part of the governing law of disputes arising under the ECT", but acknowledges the Tribunal's finding in its *Achmea* Decision that "[a]s a matter of course, in an *intra*-EU case such applicable rules and principles may include EU law, given that EU law is applicable international law between the Member States of the EU and thus contains rules and principles of international law applicable between them."[470]

350.  Questions of the general applicability of EU law notwithstanding, the Respondent's argument also makes EU law on State aid determinative for the decision on whether the Claimant's expectations regarding its entitlement to receive the FiT were legitimate. The Claimant objects to giving any EU law such a role in this dispute.[471]

351.  The Claimant agrees that EU law may be relevant to the factual background of a dispute, and thus may inform how an investor should have considered the investment climate

---

[466]   CMOM, paras. 265-269; CROMCMOJ, para. 320.

[467]   CROMCMOJ, paras. 321-324.

[468]   CROMCMOJ, paras. 321, 325.

[469]   CROMCMOJ, paras. 320, 325, 336.

[470]   CROMCMOJ, paras, 326-337; *Achmea* Decision, paras. 185, 191.

[471]   CROMCMOJ, para. 320.

(but disagrees with Bulgaria's characterisation of EU law in the period leading up to the Investment).[472]

352.   The Claimant further submits that Bulgarian law is relevant to the dispute only as a matter of fact. It cannot influence the legal standards that the Tribunal applies to determine whether the Respondent violated the ECT and international law, and it was not agreed as governing law between the Parties. Violations of Bulgarian law can however, inform, and provide context to, determinations that an action also constituted a violation of international law. Compliance with Bulgarian law of certain actions, on the other hand, however, is irrelevant to the Tribunal's consideration of whether the Respondent breached the ECT and other international law. In that context, it is well-settled that a State cannot avoid liability under international law by relying upon its domestic law.[473]

### 17.   Evidentiary case of the Respondent

353.   The Claimant points out that Mr Kristensen is the only witness for the Respondent. The Tribunal was not presented with any testimony from Bulgarian officials, or anyone else from Bulgaria, as to the facts or the intentions behind the ERSA Regime, or how Bulgaria understood it, or as to Bulgaria's knowledge of the Karad Plant or the alleged boom. More specifically, the Tribunal did not receive any testimony from the Bulgarian side as to the meeting(s) of government officials with Shareholders and (future) representatives of the Claimant or regarding any representations made therein.[474]

354.   The Claimant further submits, and confirmed in cross-examination, that Mr Kristensen only worked on the basis of documents, that in his research on the situation in Bulgaria he had no communications with anyone from Bulgaria, and that, consequently, none of his opinions are based on any such communications.[475]

---

[472]   CROMCMOJ, paras. 99, 336.

[473]   CMOM, paras. 270-271.

[474]   HT, D4, 10 June 2021, pp. 753-759, 851, 861, 882; HT, D5, 11 June 2021, pp. 918-919.

[475]   CPHB, para. 3; HT, D4, 10 June 2021, pp. 753-759, 809-810, 851, 861, 882; HT, D5, 11 June 2021, pp. 918-919.

### 18.    Objections to Jurisdiction

355.    Regarding the Respondent's objections to jurisdiction, the Claimant submits the following.

### a.    *Article 17(1) Objection*

356.    The Respondent cannot be deemed to have successfully invoked Article 17(1) ECT against the Claimant because (i) Article 17(1) ECT cannot be invoked after a dispute has arisen and (ii) because not all of the other conditions of Article 17(1) ECT are met since the Claimant maintains substantial business activities in Malta.[476] Accordingly, the Tribunal should reject outright the Respondent's objection to the Tribunal's jurisdiction based on the submission that the advantages of Part III of the ECT were validly denied to the Claimant pursuant to Article 17(1) ECT (the "**Article 17(1) Objection**").[477]

(1)    The scope of Article 17(1) ECT

(a)    *Impact of an invocation of Article 17(1) ECT on the consent to arbitration*

357.    The Claimant submits that the Article 17(1) Objection is flawed from the beginning since Article 17(1) ECT can never operate to deprive a tribunal of jurisdiction at all. The clause only provides for the right to deny the advantages of Part III of the ECT and the arbitration clause, and thus the Respondent's consent to arbitration, is situated in Part V.[478]

---

[476]    CROMCMOJ, paras. 25, 29-30; CROJ, para. 65.

[477]    CROMCMOJ, para. 54; CROJ, paras. 2, 5, 65.

[478]    CROJ, paras. 3, 42, 44, 46; COS, p. 95; HT, D1, 7 June 2021, p. 113.

> (b)    Interpretation of Article 17(1) ECT and timing, manner, and
> effect of invoking Article 17(1) ECT

358.    The Claimant further submits that many States have attempted to use Article 17(1) ECT for an objection to jurisdiction, but all (but one) have failed, at least when the objection was raised after an arbitration was commenced.[479]

359.    It is clear from the drafting history of the ECT and from the decisions of all but one ECT tribunal that has ever dealt with Article 17(1) ECT that a State that wishes to invoke Article 17(1) ECT must do so "well in advance" of a dispute arising,[480] and in any case before an arbitration has been commenced.[481] Some tribunals even suggest that an invocation prior to the investment being made is necessary.[482]

360.    To the extent that there is a minor debate in the case law on Article 17(1) ECT, also alluded to in some of the cases on which the Respondent seeks to rely, such a debate relates to the precise cut-off after which Article 17(1) ECT cannot be invoked any more, *i.e.* before arbitration, before a dispute, or before the investment. It never relates to whether Article 17(1) ECT could be invoked after an arbitration was commenced.[483]

361.    The requirement that Article 17(1) ECT be invoked well in advance of a dispute stems from the need of investors to know whether their investments are protected or not.[484] It is also dictated by a good faith interpretation of the clause which cannot be read to allow a host State to lure investors to invest and then to deny benefits when a dispute arises.[485] Any interpretation not requiring advance notification before a dispute arises would be used opportunistically by States in order to benefit from investments while wiping out claims brought by litigants with upstream ownership in a third State. Any such interpretation can therefore not be a good faith interpretation.[486] The Claimant

---

[479]    CROMCMOJ, para. 23; CROJ, paras. 3-4; CPHB, para. 115.

[480]    CROMCMOJ, paras. 23, 25, 29, 38, 40-41, 52; CROJ, paras. 17, 19; COS, p. 96 CPHB, para. 115.

[481]    CROMCMOJ, para. 29; CROJ, paras. 3, 17, 19; COS, p. 96; HT, D1, 7 June 2021, pp. 112-113; CPHB, para. 115.

[482]    CROMCMOJ, para. 33; CROJ, para. 17.

[483]    CROJ, paras. 22, 26; COS, p. 95; HT, D1, 7 June 2021, p. 113; CPHB, para. 116.

[484]    CROMCMOJ, paras. 23, 29, 38, 40-41.

[485]    CROMCMOJ, para. 39.

[486]    CROMCMOJ, para. 31; COS, p. 95; CPHB, para. 116; *Khan Resources Inc. et al. v. Government of Mongolia*, PCA Case No. 2011-09, Decision on Jurisdiction, 25 July 2012 (**CL-26**), para. 429.

characterises as "bold" and unsupported the Respondent's assertion that all but one ECT tribunal thus far have been wrong on the point.[487]

362.   After all, one could and should even go as far as to argue that any notification would have to take place before the investment is made.[488]

363.   In any case, the near unanimous case law of ECT tribunals on Article 17(1) requires that a State wishing to invoke the right it has reserved under Article 17(1) ECT must also take some form of further action to invoke the right and notify the affected investor thereof.[489] If the ECT Contracting Parties had wished globally to exclude the investors mentioned in Article 17(1) ECT from the protections of the ECT, then, as pointed out by many ECT tribunals, they would not have drafted Article 17(1) ECT as a reservation of rights, which by definition requires additional affirmative action to activate said right, but as an express exclusion.[490]

364.   To support its interpretation, the Claimant quotes from the decision on jurisdiction in *Plama Consortium Limited v. Bulgaria* ("**Plama**"), *i.e.* an ECT case against Bulgaria, which came to the conclusion that:

> The exercise [of the State's right in Article 17(1) ECT] would necessarily be associated with publicity or other notice so as to become reasonably available to investors and their advisers. To this end, a general declaration in a Contracting State's official gazette could suffice; or a statutory provision in a Contracting State's investment or other laws; or even an exchange of letters with a particular investor or class of investors. Given that in practice an investor must distinguish between Contracting States with different state practices, it is not unreasonable or impractical to interpret Article 17(1) as requiring that a Contracting State must exercise its right before applying it to an investor and be seen to have done so. By itself, Article 17(1) ECT is at best only half a notice; without further reasonable notice of its exercise by the host state, its terms tell the investor little; and for all practical purposes, something more is needed.[491] [emphasis omitted]

---

[487]   CROMCMOJ, para. 31.

[488]   CROMCMOJ, paras. 33, 36, 44, 52.

[489]   CROMCMOJ, para. 32; COS, pp. 95-96; HT, D1, 7 June 2021, pp. 117-118.

[490]   CROMCMOJ, para. 42; CROJ, para. 41; COS, p. 95; HT, D1, 7 June 2021, pp. 111-112.

[491]   *Plama Consortium Ltd. v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Decision on Jurisdiction, 8 February 2005 (**CL-24**) ("**Plama**"), para. 157; CROMCMOJ, para. 32; COS, p. 99; HT, D1, 7 June 2021, pp. 116-117; CPHB, para. 115; concurring *Khan Resources Inc. et al. v. Government of Mongolia*, PCA Case No. 2011-09, Decision on Jurisdiction, 25 July 2012 (**CL-26**), para. 423.

365.   According to the Claimant, *Plama* is the seminal decision on Article 17(1) ECT and, in terms of the facts, it deals with a situation similar to the situation in the present case: Bulgaria in that case had sought to deny the claimant the advantages of the ECT three months after the commencement of the arbitration – an invocation which the tribunal in *Plama* found to be ineffectual.[492]

366.   Relying on case law, including the *Plama* case, the Claimant further submits that in its view an invocation of Article 17(1) ECT does not have retroactive effect.[493] The Claimant acknowledges in that regard that Article 17(1) ECT does not include an "explicit limitation … to the pre-investment phase", as had been proposed by Norway during the drafting of the ECT, but argues that that cannot mean "that the provision can be invoked to retroactively deny protections to investments that actually were made years, or decades, before", or that Article 17(1) ECT would be unlimited in its temporal scope.[494]

367.   In any case, the Tribunal's jurisdiction is to be determined as per the date this arbitration was filed. At that date, the Respondent had not denied the Claimant the benefits of Part III of the ECT (see below).[495]

368.   More in detail, countering arguments of the Respondent one-by-one, the Claimant disputes that (i) it is necessary to rely on the object and purpose of the ECT in the interpretation of Article 17(1) ECT, (ii) that said object and purpose would command a different interpretation of Article 17(1) ECT from that at which all but one ECT tribunal has arrived thus far, (iii) that the object and purpose of the ECT is to prevent "free loaders" from benefitting from the Treaty, (iv) that any investor controlled by third state nationals without substantial business activities in the Contracting Party in which it is seated is automatically a "free loader", (v) that the Claimant would be a "free loader",

---

[492]   COS, pp. 97, 101; HT, D1, 7 June 2021, pp. 114-115; CPHB, paras. 115-116.

[493]   CROMCMOJ, paras. 38, 40, 43; CROJ, para. 21; COS, pp. 95, 97, 101, 103-104; HT, D1, 7 June 2021, p. 114; CPHB, para. 116.

[494]   CROMCMOJ, para. 45; CROJ, paras. 21, 40.

[495]   CROJ, para. 47.

and (vi) that the *travaux préparatoires* would shed any new light on the ECT's object and purpose in that regard.[496]

369.    The Respondent relies on commentary to the effect that two actions are inconsistent with the purpose of the ECT: "treaty shopping" and "hidden nationalities". But neither of these two actions is present here. The Claimant's corporate structure was created before the dispute arose and the Claimant never hid its nationality or its role in the shareholding in the Karad Plant *vis-à-vis* the Respondent.[497]

370.    Finally, despite the fact that the seminal decision on the Article was issued against Bulgaria and required the above-mentioned types of further action to invoke Article 17(1) ECT, Bulgaria never drew any consequences from that decision and never reserved its rights either generally or specifically as envisioned in *Plama*.[498] According to the Claimant, "[i]f there is any State on the planet that should have known that it needed to exercise its Article 17(1) right much earlier in time, it is the State of Bulgaria".[499]

### (c)    The alleged prospective effect of the Respondent's invocation of Article 17(1) after 6 August 2018

371.    Regarding the alleged prospective effect of the Respondent's invocation of Article 17(1) ECT, Bulgaria is incorrect in asserting (i) that its invocation of Article 17(1) ECT would at least apply as of 6 August 2018, the date of the letter in which it invoked the Article and (ii) that consequently, a valuation date of 31 December 2019 would be set too late.[500]

372.    Because none of the Seven Measures were implemented after 6 August 2018, all Seven Measures would still fall, and the harm caused by them would still materialise, at a time when, even on the Respondent's alternative denial-of-benefits case, the advantages of Part III of the ECT had not been denied yet, and, therefore, the consequences of those

---

[496]    CROMCMOJ, paras. 42-43; CROJ, paras. 36, 38-39; COS, pp. 103-104; HT, D1, 7 June 2021, pp. 118-122.

[497]    CROJ, para. 37.

[498]    COS, p. 97; HT, D1, 7 June 2021, pp. 114-115.

[499]    HT, D1, 7 June 2021, p. 115.

[500]    CROMCMOJ, para. 51; CROJ, para. 48.

measures would have to be repaired anyhow.[501] The Respondent cannot point to any tribunal that ever interpreted Article 17(1) ECT in the manner now requested by the Respondent. The Respondent's references to the *travaux préparatoires* of the ECT in that respect are furthermore "oblique" and fail.[502]

373. The Respondent also conflates carrying out and completion of a harmful act with continuing effects of a harmful act, which are distinct legal concepts.[503] The invocation of Article 17(1) ECT on 6 August 2018 cannot repair the inherent defect that it was not made before the Investment was made, *i.e.* before June 2012,[504] or at least that it was not made before the Seven Measures were implemented or the dispute arose.[505]

374. In conclusion, the Respondent's invocation of Article 17(1) on 6 August 2018, could, at most, apply to future violations of Part III of the ECT by the Respondent. It cannot be invoked to avoid responsibility for the continuing effects of the Seven Measures.[506]

375. What is more, with respect to the quantum aspect of the present case, even a valid invocation of Article 17(1) ECT cannot influence the appropriate valuation date. The determination thereof is a question of quantum, not of jurisdiction, and the principles governing the finding of an appropriate valuation date do not stem from the part of the ECT the advantages of which can be denied, *i.e.* Part III.[507]

(d)    *Interpretation of Article 17(1) ECT and what constitutes "substantial business activities"*

376. Regarding what constitutes "substantial business activities", at first, Bulgaria did not even attempt to articulate a legal standard therefor.[508] Later, Bulgaria urged the Tribunal

---

[501]    CROJ, paras. 47-48, 51; CROMCMOJ, paras. 51-52; CPHB, paras. 123, 125.

[502]    CROJ, para. 48; CPHB, paras. 122, 124.

[503]    CROJ, para. 50; COS, p. 110; CPHB, para. 123; *William Ralph Clayton, William Richard Clayton, Douglas Clayton, Daniel Clayton and Bilcon of Delaware, Inc. v. Government of Canada*, PCA Case No. 2009-04, Award on Jurisdiction and Liability, 17 March 2015 (**RL-330**), paras. 268-269.

[504]    CROMCMOJ, para. 52.

[505]    CROMCMOJ, para. 53; CROJ, para. 49; CPHB, para. 123.

[506]    CROJ, paras. 49, 52.

[507]    CROMCMOJ, para. 53.

[508]    CROMCMOJ, para. 55.

to follow an "unreasonably high and arbitrary legal standard".[509] All the while, the actual standard to be applied is "relatively low".[510]

377.    The term "substantial business activities" is to be interpreted, in the words of the tribunal in *Limited Liability Company AMTO v. Ukraine* ("**Amto**"), in a way that it seeks to exclude "nationalities of convenience" and that it means being "of substance and not merely of form" with "materiality" not "magnitude" of the activity being decisive.[511]

378.    The Claimant highlights the finding of the tribunal in *9REN Holding S.à r.l. v. Spain* ("**9REN**") that the nature of a business is relevant for the determination of the substance of the business activity given that "bricks and mortar are not of the essence of a holding company, which is typically preoccupied with paperwork, board meetings, bank accounts and cheque books."[512]

379.    It is accepted case law that investors may organise their investments from the outset so as to enjoy treaty protection and that there is nothing wrong if that was the sole reason for an investment's particular ownership structure.[513]

380.    The Claimant disputes that in order for its business activities in Malta to qualify as substantive it would have had to carry out "investment-like" activities in Malta, rather than the activities of a properly registered and active Maltese business investing elsewhere.[514] It would also be arbitrary and absurd if a qualification as "substantial" business activities required that regular business decisions be made only when the members of a board are physically present in Malta.[515]

---

[509]    CROJ, para. 4; although later the Claimant submits that the Parties agree that the legal standard for establishing the existence of substantial business activities "is not high", CROJ, para. 55; COS, p. 111.

[510]    CROJ, para. 54.

[511]    CROMCMOJ, para. 56; CROJ, paras. 55, 60; *Ltd. Liab. Co. AMTO v. Ukraine*, SCC Case No. 080/2005, Final Award, 26 March 2008 (**CL-29**) ("**Amto**"), para. 69.

[512]    CROMCMOJ, para. 57; CROJ, para. 64; COS, 111; *9REN Holding S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019 (**CL-62**) ("**9REN**"), para. 182.

[513]    CROMCMOJ, paras. 42, 59; CROJ, para. 56; *Mobil Corp. Venezuela Holdings BV et al. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Decision on Jurisdiction, 10 June 2010 (**CL-153**); *Aguas del Tunari S.A. v. Bolivia*, ICSID Case No. ARB/02/3, Decision on Respondent's Objections to Jurisdiction, 21 October 2005 (**CL-154**).

[514]    CROMCOJ, para. 56.

[515]    CROJ, para. 61.

*(e)*      *Littop v. Ukraine*

381.   The Claimant argues that the one "lone outlier" ECT award in which a respondent successfully invoked Article 17(1) ECT, *i.e.* the award in *Littop*, is inapposite since the "extreme" circumstances of that case are very different from the present case and since something is "very off" about that award.[516]

382.   The Article 17(1) ECT analysis in *Littop* was superfluous as other objections to jurisdiction had already succeeded in the cases. What is more, while the Respondent was aware of ACF's upstream ownership as early as 2012, in *Littop* the respondent only became aware of it later. Ukraine had also requested that information just weeks after the notice of dispute and it was refused, while in the present case all information was provided to Bulgaria in 2012 already. In addition, the change of nationality in Littop took place after the dispute arose and was made in order to benefit from the ECT.[517]

383.   In any case, the Respondent also did not fulfil the "*Littop* standard" according to which Article 17(1) ECT must be invoked "within a reasonable time" according to the circumstances and facts of a case.[518]

(2)      The conditions of Article 17(1) ECT

384.   According to the Claimant, Article 17(1) ECT imposes three cumulative requirements for successfully denying an investor the advantages of Part III of the ECT.[519]

385.   First, as discussed above, the timing of denial must be correct, that is, its invocation must have taken place "in a timely manner" at least before an investment dispute arose.[520]

---

[516]   COS, p. 109; HT, D1, 7 June 2021, pp. 126-127; CPHB, para. 120; *Littop* (**RL-331**), paras. 592, 593, 602, 612.

[517]   COS, p. 109; HT, D1, 7 June 2021, pp. 127-129; CPHB, paras. 120-121; *Littop* (**RL-331**), paras. 592, 593, 602, 612.

[518]   CPHB, para. 121.

[519]   CROMCMOJ, para. 30; CROJ, para. 14.

[520]   *Ibid.*

386. Secondly, the investor concerned must be owned or controlled by citizens or nationals of a State that is not a Contracting Party.[521]

387. Thirdly, the investor concerned must not have "substantial business activities" in the Area of the Contracting Party in which it is organised.[522]

*(a)    First condition – invocation in a timely manner*

388. Regarding the first condition, the Claimant submits, as outlined above, that this condition is not met because the Article was invoked only after the dispute had already arisen and six months after the arbitration had already commenced.[523]

389. Bulgaria was fully aware of ACF's investment in the Karad Project since its inception,[524] and would have had many opportunities to invoke Article 17(1) ECT in a timely manner. It could, for example, have included such an invocation in the ERSA itself.[525]

390. While arguably not timely anymore, the Respondent could also have invoked Article 17(1) ECT after 18 September 2012, the date on which the Claimant's third-State Shareholders, ACWA Power International, First Reserve, and Crescent Capital wrote to the Minster of MEET, copying the Prime Minister and the Minister of Finance, to complain about the Temporary Grid Access Fee and to inform the Minister that in the preparation of their investment in Bulgaria they had relied on "the assurances received from the Government" "not to levy discriminatory taxes or other similar measures" and "the protections available to Investors under the relevant bilateral investment treaties and the Energy Charter Treaty" (the "**18 September 2012 Letter**").[526] At the latest after that Letter, Bulgaria must have known that the Shareholders came from a third State

---

[521]    CROMCMOJ, para. 30.

[522]    CROMCMOJ, para. 30; CROJ, para. 14.

[523]    CROMCMOJ, paras. 27, 29; CROJ, para. 17.

[524]    CROJ, paras. 15, 30; HT, D1, 7 June 2021, p. 122.

[525]    CROMCMOJ, para. 34; CROJ, para. 15

[526]    CROMCMOJ, paras. 34-35; CROJ, para. 15; COS, pp. 105, 108; Letter from ACWA Power, Crescent Capital, First Reserve and SunEdison to Minister Dobrev, Prime Minister Borisov *et al.*, 18 September 2012 (**C-110**) (the "**18 September 2012 Letter**"); CPHB, para. 118.

within the meaning of the ECT and that they intended to rely on the protections of Part III of the ECT.[527]

391.   At least for this particular project, *i.e.* the Karad Project, the 18 September 2012 Letter also defeats any argument that a State cannot always be aware of every foreign investment in its territory and cannot always know whether it could or would need to invoke a denial of benefits provision or to whom such an invocation should be addressed.[528]

392.   It is "farcical" for the Respondent to suggest that the 18 September 2012 Letter cannot be read as a notification of Bulgaria that the Claimant intended to claim the advantages of the ECT.[529] It is equally implausible that the Respondent did not know about the Shareholders not originating from a Contracting Party or about their link to the Claimant, ACWA Bulgaria, or the Karad Plant, at the latest after the 18 September 2012 Letter.

393.   In any event, the Respondent would also have had access to that information on the basis of the registration of ACWA Bulgaria in Bulgaria, official documents, or the meetings of the Shareholders with government officials of the Respondent.[530]

394.   Although it would have been too late, the Respondent did not even invoke Article 17(1) ECT after 30 August 2017, when the Claimant sent a notice letter informing the Respondent of the Claimant's intention to pursue ECT arbitration in the case of the unresolved dispute between them – six months before the Request for Arbitration.[531]

395.   In any case, as of the date this arbitration was filed, which is the date relevant for the determination of the Tribunal's jurisdiction, the Respondent had not denied the Claimant the benefits of Part III of the ECT. Therefore, in any case, the Respondent's

---

[527]   CROMCMOJ, paras. 35-37; HT, D1, 7 June 2021, pp. 123-124; CPHB, para. 118.

[528]   CROMCMOJ, para. 37.

[529]   CROJ, para. 28.

[530]   CROJ, paras. 29-32; COS, pp. 106-108; HT, D1, 7 June 2021, pp. 124-125; Certificate Commercial Registry ACWA Bulgaria, 28 January 2014 (**C-254**).

[531]   CROJ, para. 33; COS, p. 108; HT, D1, 7 June 2021, p. 126; Notice of Legal Dispute Arising Under the Energy Charter Treaty and Offer of Amicable Settlement to Bulgaria, from ACF to the Respondent, 30 August 2017 (**C-8**); CPHB, para. 117.

arguments must fail as an objection to jurisdiction, and the Tribunal must conclude that the Claimant's claims are admissible and properly raised.[532]

396.   Finally, the Respondent's invocation of Article 17(1) ECT can exclude the Respondent's liability only for future acts that, but for the invocation of Article 17(1) ECT, would violate Part III of the ECT, and not for the continuing effects of the Seven Measures (see above). Therefore, the Respondent's invocation of that provision cannot be regarded timely also in respect of the alleged effects of the invocation that do not concern the Tribunal's jurisdiction, *e.g.* on the quantification of damages.[533]

> *(b)    Second condition – control or ownership by citizens or nationals of a State that is not a Contracting Party*

397.   Regarding the second condition, the Claimant acknowledges that the condition is met.[534]

> *(c)    Third condition – substantial business activities in Malta*

398.   Regarding the third condition, the Claimant submits that it is not met. The Respondent failed to demonstrate that ACF never carried out substantial business activities in Malta.[535] The Claimant is also not just a "sham" or a "mailbox" and indeed "can and did conduct substantial business activities in Malta in accordance with Maltese law".[536]

399.   The Shareholders legitimately chose to establish ACF as a holding company to operate from Malta. The Claimant's board members, including Mr Blum and Mr Roberts, tended to the business of the company through executing board resolutions, attending corporate matters, and appointing auditors. While most board meetings were held virtually, such board meetings nevertheless reflect business activities "designed to ensure that ACF was compliant with local Maltese business law."[537]

400.   The Claimant always had a bank account in Malta. It was used to pay the Shareholders' interest, debt, "various service providers", including the Maltese auditors, and "at times

---

[532]    CROJ, para. 47.

[533]    CROJ, paras. 49, 52-53.

[534]    CROMCMOJ, para. 30.

[535]    CROJ, para. 4.

[536]    CROMCMOJ, paras. 30, 58; CROJ, paras. 4, 54, 56-57, 64-65; COS, p. 112.

[537]    CROMCMOJ, para. 59; CROJ, para. 58; COS, p. 112.

had a balance in excess of 3 million euros".[538] In any case, the balance of an operating account at any particular point in time is irrelevant to the question of whether substantial business activities were carried out. The Claimant disputes that it would be relevant that the EUR 3 million balance was on the account after the present arbitration commenced. At any rate, the money was on that account before the Respondent invoked Article 17(1) ECT.[539]

401.  The Claimant disputes that it is of relevance that no Maltese nationals are employed by it or that 90% of its activities took place outside of Malta, and adds that, the latter, in turn, would mean that "ten percent" took place inside Malta.[540]

(3)  The Claimant's conclusion on Article 17(1) ECT

402.  The Claimant concludes that the Tribunal should dismiss Bulgaria's Article 17(1) Objection because it fails the *Plama* standard for timeliness. The Tribunal should equally reject the application of Article 17(1) ECT as of that date because all Seven Measures preceded that date and because the request is unanchored to any rule or principle of law.[541]

b.  *Article 21 Objection*

403.  The Claimant disputes that the 5% ESSF Contribution and the 20% Levy would constitute Taxation Measures within the meaning of the ECT because, according to the Claimant, they do not qualify as taxes even under Bulgarian law, let alone international law.[542] Therefore, the objection based on Article 21 ECT which claims that those measures do qualify as Taxation Measures (the "**Article 21 Objection**") is without merit and should be dismissed.[543]

404.  As shown by their direct application to the revenue achieved through the FiT, the two measures, in their legal form and economic impact, were tools indirectly to reduce the

---

[538]  CROMCMOJ, para. 59; CROJ, paras. 62-63; COS, p. 112.

[539]  CROJ, para. 62.

[540]  CROJ, paras. 59-60.

[541]  CPHB, para. 114.

[542]  CROMCMOJ, para. 23; CROJ, para. 116; CPHB, para. 126.

[543]  CROJ, paras. 2, 10-11, 66, 116.

FiT, and in so doing, to circumvent the Respondent's obligations under the ECT. As such, these measures were FiT cuts in violation of the ECT, not *bona fide* measures of taxation. Consequently, they are not protected by Article 21 ECT.[544]

405.    Even if the two measures could be construed as taxes, they could also never be *bona fide* taxes because they were introduced as fees and up until this arbitration treated as fees by Bulgaria, the State that introduced them.[545] Their re-qualification now by the Respondent is a made-for-arbitration claim.[546]

406.    Nevertheless, to defeat the Article 21 Objection, the Claimant "is not required to show that [it] was a deliberate ruse by Bulgaria", an act of bad faith, to introduce the two measures to claw-back incentives and circumvent protections of the ECT by retrospectively labelling them a tax".[547]

    (1)    Bulgarian law

    (a)    *The relevance of domestic law for the determination of whether a measure constitutes a Taxation Measure*

407.    The Claimant disputes the Respondent's argument that qualification under domestic law is decisive for the determination of whether a measure is a Taxation Measure within the meaning of the ECT.[548] "[I]nvestment treaty case law" is clear that measures that are taxes under domestic law may nevertheless not amount to Taxation Measures within the meaning of Article 21 ECT, and thus even if an analysis concludes that a measure was a tax under national law that measure will also have to be analysed under international law.[549] The only time that the domestic legal qualification is determinative of its status as a tax under the ECT is when a measure cannot be considered to be a tax under domestic law.[550]

---

[544]    CROMCMOJ, paras. 23, 63-64, 84, 97; CROJ, paras. 9, 68, 117, 121.

[545]    CROMCMOJ, para. 63; CROJ, paras. 7-8, 68.

[546]    CROMCMOJ, paras. 63, 76; CROJ, para. 66.

[547]    CROMCMOJ, paras. 95, 97.

[548]    CROMCMOJ, paras. 65-66; CROJ, paras. 6, 67; COS, p. 114.

[549]    CROMCMOJ, paras. 65-66, 84; CROJ, paras. 67, 69, 85; COS, p. 114; HT, D1, 7 June 2021, p. 130; CPHB, para. 127.

[550]    CROJ, paras. 67, 69, 75, 91, 116; COS, pp. 114, 116; CPHB, paras. 126-127.

408.    The case which, according to Bulgaria, purportedly determines the definitive role of domestic law in the qualification as a Taxation Measure, *Voltaic Network GmbH v. Czech Republic* ("**Voltaic Network**"), comes to the conclusion that (i) "there are also international limits imposed by Article 21 on those measures which a Contracting State may define as tax measures as a matter of domestic law", and that (ii) both sets of criteria, *i.e.* the criteria set by domestic and by general public international law, need to be fulfilled in order for a measure to qualify as Taxation Measure – a conclusion that is also reached by all other cases against the Czech Republic, two tribunals against Italy, "most if not all" of the cases against Spain, and the tribunals in *Murphy Exploration & Prod. Co. International v. Ecuador* ("**Murphy**") and *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Ecuador* ("**Occidental**").[551]

409.    The tribunal in *SunReserve Luxco Holdings S.à r.l. and others v. Italy* ("**SunReserve**"), another case on which the Respondent relies, much like the *Voltaic Network* tribunal, also treats domestic law only as a "starting point" in its Taxation Measure analysis.[552] The *SunReserve* tribunal furthermore underlines its alignment with "the autonomous international law understanding of a 'taxation measure'" and its agreement, as ECT tribunal, with *Murphy* as decided on the basis of the United States-Ecuador BIT.[553]

410.    The analysis of two other tribunals, on which the Respondent relies, namely the tribunals in *Belenergia S.A. v. Italy* ("**Belenergia**") and *CEF Energia B.V. v. Italy* ("**CEF**"), "the only cases that offer any hope to Bulgaria's position",[554] is incorrect. Rather, the tribunals in *Greentech Energy Systems A/S and others v. Italy* ("**Greentech**") and *ESPF Beteiligungs GmbH and others v. Italy* ("**ESPF**")*,* adopted the correct

---

[551]    CROMCMOJ, paras. 67-68; CROJ, paras. 70-71, 75, 85, 86, 87, 88, 89, 123; CPHB, paras. 126-127; *Voltaic Network GMBH v. Czech Republic*, PCA Case No. 2014-20, Award, 15 May 2019 (**RL-248**) ("**Voltaic Network**"), para. 249; *Murphy Exploration & Prod. Co. – Int'l v. Republic of Ecuador*, UNCITRAL, Partial Final Award, 6 May 2016 (**CL-156**); *Occidental Petroleum Corp., Occidental Exploration and Prod. Co. v. Republic of Ecuador*, ICSID Case No. ARB/06/11, Award, 5 October 2012 (**CL-158**).

[552]    CROMCMOJ, para. 69; *SunReserve Luxco Holdings S.À.R.L. et al. v. Italian Republic*, SCC Case No. V 2016/32, Final Award, 25 March 2020 (**RL-262**) ("**SunReserve**"), para. 515.

[553]    CROJ, paras. 72, 73; *SunReserve* (**RL-262**), para. 521.

[554]    CROJ, para. 76; *Belenergia S.A. v. The Italian Republic*, ICSID Case No. ARB/15/40, Award, 6 August 2019 (**RL-252**) ("**Belenergia**"); *CEF Energia B.V. v. Italian Republic*, SCC Arb. No. 2015/158, Award, 16 January 2019 (**CL-60**) ("**CEF**").

approach.[555] Evidently, the "two-pronged" national and international law test applies regardless of whether circumstances are as "extreme" as those present in the case of *Yukos Universal Limited (Isle of Man) v. The Russian Federation* ("**Yukos**").[556]

411.    If domestic law were the determinative factor in the qualification of a measure as Taxation Measure, then this would allow host States a loophole through which they could circumvent ECT obligations by targeting investments and revoking incentives under the guise of taxation.[557] It is a "long-held view", ultimately stemming from the principles enshrined in Article 3 of the ILC Articles on State Responsibility, that the characterisation of an act of a State as internationally wrongful is governed by international law and not affected by the characterization of the same as lawful by internal law and that, as such, a State cannot merely label a measure as tax and thereby shield it from the scrutiny of international law.[558]

412.    As the tribunal in *EnCana Corp v. Ecuador* put it, a tribunal therefore must "look behind the label". It is of note in that regard that the tribunal in *Novenergia II Energy & Environment (SCA) SICAR v. Spain* ("**Novenergia**") found it necessary to review whether the objective of a domestic tax was truly taxation, *i.e.* whether it was enacted in good faith,[559] and that the tribunal in *Murphy* held that a measure that operated like a tax should nevertheless be interpreted as a unilateral change to the economic terms of a contract, since that was how it impacted the investments in question in that case.[560] The Claimant warns against the signal that would be sent to other host States, if Bulgaria were permitted to get away with circumventing the ECT in such a way.[561]

---

[555]    CROMCMOJ, para. 70; CROJ, paras. 76-84; *Greentech Energy Systems A/S et al. v. Italy*, SCC Arb. No. 2015/095, Award, 23 December 2018 (**CL-48**) ("**Greentech**"); *ESPF Beteiligungs GmbH et al. v. Italian Republic*, ICSID Case No. ARB/16/5, Award, 14 September 2020 (**RL-266**) ("**ESPF**").

[556]    CROJ, para. 123; *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, UNCITRAL, PCA Case No. 2005-04/AA227, Final Award, 18 July 2014 (**CL-129**) ("**Yukos**").

[557]    CROMCMOJ, paras. 70-71, 85, 94; CROJ, para. 89.

[558]    CROJ, paras. 70, 72, 89; fn 90; *Antaris* (**RL-236**), para. 245.

[559]    CROMCMOJ, paras. 72, 94; *EnCana Corp v. Republic of Ecuador*, LCIA Case No. UN3481, UNCITRAL, Award, 3 February 2006 (**RL-189**), para. 142; *Novenergia II – Energy & Env't (SCA) (Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain*, SCC Arb. No. 2015/063, Final Award (**CL-23**) ("**Novenergia**"), paras. 519-520.

[560]    CROMCMOJ, para. 73.

[561]    CROMCMOJ, para. 95.

413.    In any case, the discussion about what set of laws is decisive for the determination of a measure as Taxation Measure is largely academic, because the 5% ESSF Contribution and the 20% Levy do not qualify as taxes under Bulgarian law,[562] not least because when originally enacted, they were not considered to be taxes.[563]

*(b)    The domestic law analysis*

414.    As to the required domestic law analysis, the Claimant submits that, according to jurisprudence, a "cumulative review" of a measure of a host State must "convincingly" establish that such a measure is a tax under domestic law in order for it to qualify as a carved-out Taxation Measure under the ECT. Any "material ambiguity" over the alleged tax nature of a measure would preclude the host State from relying upon Article 21 ECT.[564]

415.    As specified in more detail during the Hearing, factors that tribunals and scholars consider in such a domestic law review are (i) the name of a measure, (ii) the nature of the implementing legislation, (iii) the administrative authorities executing a measure and collecting a fee/tax, (iv) how a measure is characterised internally, *e.g.* by domestic courts, and (v) how it is paid.[565]

416.    More generally, under Bulgarian law, fees are payments made in exchange for an administrative service while taxes are not made in exchange for an administrative service.[566] As such, it is relevant whether the payment levied on the basis of a measure is related to a service.[567]

417.    Further, in accordance with the decision in *Greentech*, which found the imposition of VAT on charged fees relevant, the Claimant argues that a State cannot impose a tax on

---

[562]    CROMCMOJ, paras. 65, 75; CROJ, paras. 68, 91, 116; HT, D1, 7 June 2021, 130; CPHB, para. 128.

[563]    CROMCMOJ, paras. 75-77; CROJ, paras. 7-8, 68, 91, 116; COS, p. 116; HT, D1, 7 June 2021, p. 131; CPHB, para. 128.

[564]    CROJ, para. 92.

[565]    CROJ, para. 97; COS, pp. 117-118; HT, D1, 7 June 2021, p. 131; CPHB, para. 130; Cornel Marian, *The State's Power to Tax in Investment Arbitration of Energy Disputes: Outer Limits and The Energy Charter Treaty* (Kluwer Law International, 2020) (**CL-195**), p. 142; *Antaris* (**RL-236**), paras. 229-232; *Hydro Energy 1 S.À R.L. and Hydroxana Sweden AB v. The Kingdom of Spain*, ICSID Case No. ARB/15/42, Decision on Jurisdiction, Liability and Directions on Quantum, 9 March 2020 (**RL-261**) ("***Hydro***"), para. 323.

[566]    CROMCMOJ, para. 77.

[567]    COS, p. 117; HT, D1, 7 June 2021, p. 131; CPHB, para. 130.

a tax, *e.g.* by charging VAT on a tax payment. Therefore, if VAT is levied on payments under a measure, such as is the case here for the 5% ESSF Contribution and the 20% Levy, then the measure cannot be a tax under domestic law.[568]

418.　Contrary to contentions of the Respondent, maintaining the financial stability of an electricity system is indeed a service, and it is relevant whether a fee is introduced on the basis of energy legislation such as is the case here, or on the basis of tax legislation.[569]

419.　The Respondent furthermore bears the burden of establishing that the 5% ESSF Contribution and the 20% Levy were created and treated as taxes, and that it was unambiguously clear to everyone that they were created and treated as such. The Respondent has not satisfied that burden, as it has failed to marshal any convincing evidence in support of the domestic tax status of the two measures.[570]

*(i)　The 5% ESSF Contribution*

420.　The Claimant submits [*incorrectly, the Tribunal notes*] that the 5% ESSF Contribution is regulated under Article 36(e) of the 2003 Energy Act.[571] The Claimant submits [*correctly, the Tribunal observes*] that the 5% ESSF Contribution was introduced in energy legislation, not in tax legislation.[572]

421.　The Claimant further submits [*correctly, the Tribunal notes*] that the provision that regulates the 5% ESSF Contribution, in its English translation, uses the term "contribution",[573] and [*incorrectly, the Tribunal observes*] that it is also called a fee in "legislation".[574]

---

[568]　CROJ, para. 102; COS, p. 118; CPHB, para. 130; *Greentech* (**CL-48**), para. 244; Bulgarian VAT Act, version of 26 February 2021 (**C-260**).

[569]　CROJ, paras. 114-115; CPHB, para. 130.

[570]　CROJ, paras. 91-92, 116.

[571]　CROMCMOJ, para. 78. It appears to have been introduced in the 2015 Energy Act, Article 36f. Exhibit (**R-082**) is the only version of the 2015 Energy Act available on file.

[572]　COS, p. 123; CPHB, para. 132.

[573]　CROMCMOJ, para. 78; CPHB, para. 132. The Claimant does not refer to an exhibit. However, the Respondent has exhibited the 2015 Energy Act as (**R-082**), and in that translation, the term "contribution" is used in its Article 36f (and 36e).

[574]　COS, p. 123; CPHB, para. 132, referring to articles in the 2015 ERSA which on their face appear unrelated to the 5% ESSF Contribution: 2015 ERSA (**C-163**), Articles 11.1.4, 18.4.3, 34.5.

422.  The Claimant argues that the Bulgarian word for "contribution", in terms of result, is the same as the word for "fee" because the contribution *in casu* "(i)[] is not made to the State or municipal budget as would be a tax; (ii) [] is deductible, as a fee, from taxes owed by RE producers; (iii) [] is made on a monthly basis, while taxes are paid on an annual basis; (iv) [] is not defined in Bulgaria's tax legislation, but only in its energy legislation, together with other fees; and (v) [] is collected in exchange for Bulgaria's 'service' of ensuring the financial stability of the Bulgarian electricity system."[575]

423.  Even if the word used in the Bulgarian original of the Energy Act meant "instalment" rather than "contribution", and were not synonymous with "fee", still that word would not mean "tax" or be synonymous with the word "tax".[576] Moreover, the "implementing legislation" to the Energy Act and the 5% ESSF Contribution, which in the Claimant's view is the ERSA (see above), specifically authorises the EWRC to collect fees for covering its expenses in managing the electricity grid, as would be confirmed by a whitepaper. Therefore, the 5% ESSF Contribution must be considered a fee.[577]

424.  Bulgaria itself described the 5% ESSF Contribution as a contribution in consideration of the service of NEK of administering the electricity grid and the ERSA Regime.[578] In addition, in contrast with many taxes imposed on corporations, such as VAT, which are "passed through", the 5% ESSF Contribution is not refundable.[579] No tax form was used, and invoices sent to renewable energy producers for the 5% ESSF Contribution specifically provided that the fees were services subject to VAT. No actual tax is invoiced in such a manner in Bulgaria.[580]

425.  The tax authorities are also not involved in the collection of the 5% ESSF Contribution.[581] Furthermore, because the 5% ESSF Contribution is paid into the ESSF

---

[575]  CROMCMOJ, para. 78; COS, p. 123-124; HT, D1, 7 June 2021, p.133; CPHB, para. 132.

[576]  CROJ, para. 107.

[577]  CROJ, para. 108. The Claimant refers to some Articles in ERSA that mention the word fee and refers to a whitepaper with an incorrect file number or reference.

[578]  CROJ, para. 109; CPHB, para. 132. The references and footnotes used in both paragraphs either refer to wrong exhibits or do not cover what the Claimant submits there.

[579]  CROMCMOJ, para. 79; CROJ, para. 101; HT, D1, 7 June 2021, p. 133; CPHB, para. 132.

[580]  CROJ, para. 113; COS, p. 124; HT, D1, 7 June 2021, p. 133; CPHB, para. 132. To the knowledge of the Tribunal, any such invoices were not exhibited by the Claimant.

[581]  COS, p. 124. However, Article 36f (5) of the 2015 Energy Act states that the 5% ESSF Contributions "are public state receivables, and the contributions which have not been paid in within the fixed time limit are

directly, and thus never touches State or municipal budgets and is never collected for the general revenue of Bulgaria, it cannot be a "tax" either.[582]

426.    The Claimant speculates that the Respondent "likely" structured the 5% ESSF Contribution as a fee, not a tax, because the "retroactive application" of the 5% ESSF Contribution would have violated the Bulgarian constitution if the Respondent had introduced the 5% ESSF Contribution as a tax.[583]

*(ii)    The 20% Levy*

427.    The Claimant submits [*incorrectly, the Tribunal notes*] that the 20% Levy was regulated under Section V of the ERSA of 2011.[584] The Claimant submits [*correctly, the Tribunal observes*] that the 20% Levy was introduced in energy legislation, not in tax legislation.[585]

428.    The Claimant submits [*correctly, the Tribunal notes*] that when the 20% Levy was introduced (in the 2014 ERSA), the section heading of the section about the 20% Levy and the text thereunder, in the undisputed translation provided by the Claimant, speak of a "fee", not a tax.[586] According to the Claimant, the Respondent admits as much.[587]

429.    The 20% Levy constituted payment for the "service" of the Regulator's administration of the FiT programme and the electricity grid and therefore was a fee under Bulgarian law.[588]

---

ascertained and collected under the procedure of the Tax Insurance Procedure Code by the National Revenue Agency bodies."

[582]    CROJ, paras. 108, 111.

[583]    CROMCMOJ, para. 83; CROJ, paras. 104-106. In doing so, the Claimant submits that the retroactive application of a tax is unconstitutional under Bulgarian law and that the 20% Levy and the 5% ESSF Contribution were applied retroactively.

[584]    CROMCMOJ, para. 77. The Claimant refers to the incorrect version of the ERSA in which the 20% Levy had not been introduced yet: ERSA (**C-41**). The Claimant further refers to two Articles in ERSA which, on their face, appear not to have anything to do with the 20% Levy. The 20% Levy (see below) appears to have been introduced by means of the 2014 ERSA, Articles 35a-35c, 2014 ERSA (**C-152**).

[585]    COS, p. 119.

[586]    CROMCMOJ, para. 77; COS, pp. 119, 121; CPHB, para. 131; Articles 35a-35c of 2014 ERSA (**C-152**) (CROMCMOJ, incorrectly, refers to Articles 11.4, 34.5, and 19 of ERSA (**C-41**)).

[587]    CROJ, para. 96.

[588]    COS, p. 119.

430.   The Claimant initially submitted that Article 35c (3) of the 2014 ERSA would signify that the 2014 ERSA would refer to the 20% Levy as a payment established by the Chairperson of the EWRC, *i.e.* collected by the EWRC, not the Bulgarian revenue authorities, being the sole authority to enforce taxes. In the view of the Claimant, the lack of a role of the Bulgarian tax authorities in implementing and collecting the 20% Levy is strong evidence of the 20% Levy not having been considered a "tax".[589] In its Post-Hearing Brief, however, the Claimant submits that NEK collected the 20% Levy, transferred it to the EWRC, which in turn transferred "this sum to the state budget."[590]

431.   In contrast with many taxes imposed on corporations, such as VAT, which are "passed through", the 20% Levy was not refundable (Article 35c (2) 2014 ERSA).[591] The 20% Levy does not have a defined tax base, it is collected monthly, not annually, and does not involve the use of any tax form.[592] The Claimant submits that invoices which producers of renewable energy received for the 20% Levy specifically provided that the fees were services subject to VAT. The Claimant submits that no actual tax is invoiced in such a manner in Bulgaria.[593]

432.   The Claimant speculates that the Respondent "likely" structured the 20% Levy as a fee, not a tax, because the "retroactive application" of the 20% Levy would have violated the Bulgarian constitution if the Respondent had introduced the 20% Levy as a tax.[594]

433.   The Claimant contests the Respondent's argument that, because the Constitutional Court of the Respondent found that the 20% Levy did not constitute a fee, as no service was provided in return for it, it would constitute a tax. The Constitutional Court only ever assessed the 20% Levy as a fee and, in doing so, found that it was not a lawful fee

---

[589]   CROJ, para. 95; COS, p. 119; HT, D1, 7 June 2021, pp. 131-132; CPHB, para. 131. However, Article 35c (3) 2014 ERSA reads as follows "Outstanding fees under Article 35a shall be subject to enforcement by a public collectors in accordance with the procedure of the Tax and Social Insurance Procedure Code. The instrument establishing the account receivable shall be issued by the Chairperson of the SEWRC", 2014 ERSA (**C-152**).

[590]   CPHB, para. 47.

[591]   CROMCMOJ, para. 79; CROJ, para. 101; COS, pp. 120-121; HT, D1, 7 June 2021, p. 132; CPHB, para. 131.

[592]   COS, p. 120; HT, D1, 7 June 2021, p. 132; CPHB, para. 131.

[593]   CROJ, para. 113; COS, p. 120; HT, D1, 7 June 2021, p. 132; CPHB, para. 131. To the knowledge of the Tribunal, any such invoices were not exhibited by the Claimant.

[594]   CROMCMOJ, para. 83; CROJ, paras. 104-106. In doing so, the Claimant submits that the retroactive application of a tax is unconstitutional under Bulgarian law and that the 20% Levy and the 5% ESSF Contribution were applied retroactively.

in accordance with Bulgarian law. This finding does not mean that the 20% Levy was a tax. It rather only means that the 20% Levy was not a lawful fee.[595]

434.    In a similar vein, contrary to the Respondent's submission, where the Supreme Administrative Court of the Respondent treats the 20% Levy as a fee without engaging in an analysis of whether it constitutes a fee or a tax under Bulgarian law, this indicates that the Court treated the 20% Levy as a fee rather than that there was any uncertainty about the proper classification of the 20% Levy in that regard.[596] Translations of other decisions of Bulgarian administrative courts, up to the Supreme Administrative Court, also refer to the 20% Levy as "fee", as the Respondent acknowledges.[597]

435.    Equally, comments of a Member of the Bulgarian Parliament, Ms Diana Yordanova, on which the Respondent relies, only called the 20% Levy a tax to highlight that the "fee", as she refers to it, was adopted in a way that likely would run afoul of the Bulgarian Constitution.[598]

436.    In addition, in contrast with the cases against Italy, on which the Respondent relies, in the present case the argument is not that reparation is due for damage caused by an unconstitutional Taxation Measure, but rather that the unconstitutional measure, *i.e.* the 20% Levy, was not a Taxation Measure to begin with. The Respondent's reliance on the awards in *CEF*, *Greentech*, and *ESPF* in that regard is thus misplaced.[599]

437.    In conclusion, based on the review of the above-mentioned three factors the 20% Levy is not a tax under Bulgarian law because (i) it was titled and referred to as a "fee" in the legislation that introduced it, (ii) it was implemented by the EWRC, ESO, and NEK, not by the Bulgarian tax authorities, and (iii) courts, including the Supreme Administrative

---

[595]    CROJ, paras. 93-94.

[596]    CROJ, para. 96.

[597]    CROMCMOJ, para. 77; CROJ, para. 96; COS, pp. 119, 122; CPHB, para. 131; Supreme Administrative Court of Bulgaria, Decision No. 5642 on Administrative Case No. 14716/2018, 15 May 2020 (**C-193**); Supreme Administrative Court, Decision No. 9218 on Administrative Case No. 969/2019, 18 June 2019 (**C-194**); Supreme Administrative Court of Bulgaria, Decision No. 9435 on Administrative Case No. 8690/2015, 2 August 2016 (**C-195**); Supreme Administrative Court of Bulgaria, Ruling No. 15608 on Administrative Case No. 13717/2014, 19 December 2014 (**C-196**). However, these decisions also speak of the payment of said fee "into the state budget".

[598]    CROJ, para. 100.

[599]    CROMCMOJ, paras. 81-82.

Court and the Constitutional Court of the Respondent, consistently characterised it as a fee, not as a tax.[600]

(2)    International law

438.    The Claimant submits that "the ECT's governing law provision [] confirms that disputes must be settled according to applicable rules and principles of international law" and thus "requires that a question of whether a disputed measure is a 'tax' or a 'Taxation Measure' include an international law analysis." There is nothing in the definition of a Taxation Measure in the ECT that limits its meaning only to taxes under a Contracting Party's domestic law.[601]

439.    Under international law only *bona fide* measures of taxation can qualify as Taxation Measure within the meaning of the ECT.[602] Under that law, a State may tax foreign investors only in a manner which is (i) non-discriminatory, (ii) "non-confiscatory" as in that it does not unlawfully expropriate, and (iii) not arbitrary or an abuse of power.[603]

440.    Tribunals have developed a test to identify *bona fide* taxation measures as only those that are (i) imposed by law, (ii) upon a class of persons, and (iii) concern the payment of money to the State for public purposes "without any benefit to the taxpayer".[604]

441.    The tribunal in *Yukos*, for example, held that *bona fide* taxation measures are "actions that are motivated by the purpose of raising general revenue for the State" and *mala fide* taxation measures are "actions that are taken only under the guise of taxation, but in reality aim to achieve an entirely unrelated purpose".[605]

442.    The Claimant quotes the tribunal in *ESPF* stating[606]

Finally, with respect to the administrative fees and imbalance costs, the Tribunal agrees with the Claimants that these charges were not taxes in the sense provided in Article 21 of the ECT: they were not imposed for the purpose of raising

---

[600]    CROJ, para. 97.

[601]    CROJ, para. 73.

[602]    CROMCMOJ, para. 84; COS, p. 116.

[603]    CROJ, para. 119.

[604]    CROMCMOJ, para. 86; COS, p. 116.

[605]    CROMCMOJ, para. 85; *Yukos* (**CL-129**), para. 1407.

[606]    CROJ, paras. 83, 112; *ESPF* (**RL-266**), para. 357.

137

general revenue for the state; Italy's tax authorities were not involved in enacting, imposing or collecting either charge; [word missing] are subject to corporate income tax; and they are not subject to double-taxation treaties under Italian law, which apply to both direct and indirect taxes. Accordingly, they do not fall within the definition of "Taxation Measure" in Article 21 of the ECT.

443. Bulgaria's references to cases against Ecuador regarding a 50% levy on extraordinary revenues are of no support to Bulgaria's argument in that regard because that levy was paid "through the same tax consortium" as the one liable for income taxes and, like all taxes, directly into the "*Cuenta Unica*" of the State of Ecuador at its Central Bank.[607]

444. In addition, while the 5% ESSF Contribution and the 20% Levy were imposed on a class of persons "in the most literal sense", they were nevertheless imposed in a discriminatory manner, only to reduce incentives rather than for the purpose of general taxation. As such, they were discriminatory.[608] The measures had a particularly disproportionate impact on PV plants such as the Karad Plant.[609] There is furthermore "no credible argument that the measures were not discriminatory".[610] The 5% ESSF Contribution and the 20% Levy were *mala fide* measures not enjoying the protection of Article 21 ECT.[611]

445. A comparison of the 5% ESSF Contribution and the 20% Levy with a 7% tax introduced in Spain (the "**TVPEE**") can also not help Bulgaria. Contrary to the situation in Bulgaria, in Spain "there was no real doubt that the TVPEE was enacted domestically as a 'tax'" and treated as such domestically by officials, regulators, and domestic courts (up to the Spanish Constitutional Court and the Spanish High Court) and internationally, by the EU.[612] The TVPEE had a defined taxable base, tax rate, and was to be paid on a tax form.[613]

446. In contrast with the discriminatory 20% Levy, the TVPEE in Spain (i) also applied to all electricity producers, not only wind and PV producers, (ii) no ECT tribunal

---

[607]    CROMCMOJ, para. 93.

[608]    CROMCMOJ, para. 87; CROJ, para. 121.

[609]    CROJ, para. 121.

[610]    CROJ, para. 122.

[611]    CROJ, paras. 117-118, 125.

[612]    CROJ, paras. 85, 88, 98-99; COS, p. 126-127; HT, D1, 7 June 2021, pp. 134-135.

[613]    CROJ, para. 99; COS, pp. 118, 127; HT, D1, 7 June 2021, pp. 134-135.

considered it as discriminatory towards investors in renewable energy production, and (iii) the Spanish Constitutional Court upheld the measure, rather than striking it down as the Bulgarian Constitutional Court did with the 20% Levy.[614]

### (a)     The 5% ESSF Contribution

447.    The Claimant submits that the moneys paid as the 5% ESSF Contribution were cycled directly back into the ESSF with the purpose of subsidising the costs of NEK. Therefore, these moneys are not paid for a public purpose and not paid into the public budget. They do not constitute the payment of a *bona fide* tax.[615]

### (b)     The 20% Levy

448.    The Claimant submits that it is indicative of the discriminatory nature of the 20% Levy that it was struck down by the Constitutional Court of the Respondent, in part, for the reason of being discriminatory.[616] The Constitutional Court of the Respondent regarded the 20% Levy as a measure that, in the words of the Respondent, "lacked transparency and committed a social harm". Some members of the National Assembly of Bulgaria (the "**National Assembly**") cautioned that the measure would "kill" the PV sector in Bulgaria.[617] As such, the 20% Levy cannot be regarded to have served a public purpose,[618] or as having been made in good faith.[619]

### c.     Komstroy Objection

449.    As set out in more detail below, the Respondent requests that in light of the *Komstroy* Judgment,[620] the Tribunal should revisit its *Achmea* Decision and reconsider the *Achmea* Objection to dismiss the Claimant's claims for lack of jurisdiction (the "***Komstroy* Objection**").

---

[614]    CROMCMOJ, paras. 88, 95; COS, p. 126.

[615]    CROMCMOJ, paras. 92-93, 96.

[616]    CROMCMOJ, para. 87; CROJ, para. 9.

[617]    CROMCMOJ, paras. 90, 91, 93; CROJ, para. 124.

[618]    CROMCMOJ, para. 91.

[619]    CROJ, para. 124.

[620]    *Komstroy* Judgment (**RL-332**).

450.   Regarding that Objection, the Claimant submits the following.

451.   As a preliminary matter, the Claimant points out that the Tribunal's analysis in the *Achmea* Decision explicitly proceeded on the assumption that the CJEU intended the *Achmea* Judgment (as defined in the *Achmea* Decision) to apply to the ECT and treated the *Achmea* Judgment as if the *Komstroy* Judgment had already been rendered.[621] The Tribunal nevertheless concluded (i) that Article 26 ECT and Article 25 ICSID Convention were valid and applicable provisions of international law, (ii) that all of the requirements for the Tribunal to exercise jurisdiction over the present arbitration were met and (iii) that, on the basis of Article 16 ECT, and other grounds, Article 26 ECT prevailed over any EU legal rule that would exclude intra-EU arbitration from the ambit of the ECT.[622] The Tribunal therefore has already concluded that a CJEU judgment such as the *Komstroy* Judgment would not have such consequences as the Respondent argues it to have now,[623] and has already explained how a conflict between the ECT and the EU Treaties, as it assumed it to exist in the *Achmea* Decision, would be resolved.[624]

452.   The Respondent has not provided any credible basis as to why the *Achmea* Decision should be revisited or departed from.[625] Indeed, the *Achmea* Decision should be treated as *res judicata* in relation to the *Komstroy* Judgment. This is especially the case because the Tribunal anticipated the way in which the *Komstroy* Judgment interpreted the *Achmea* Judgment and came to its conclusions anyway.[626] There is furthermore ample authority in the Convention, the Rules, and case law, that a decision on jurisdiction is final and binding on the Parties just like an award, and can only be revised on the ground of discovery of some fact, previously unknown to the Tribunal and the applicant, of such a nature as decisively to affect the decision.[627]

453.   In addition, since the date of the *Komstroy* Objection at least three intra-EU ECT tribunals "faced with an almost identical situation" have rejected requests to reconsider

---

[621]   CC *Komstroy*, para. 3.

[622]   CC *Komstroy*, paras. 2, 3, 4, 16-18, 54.

[623]   CC *Komstroy*, para. 3.

[624]   CC *Komstroy*, para. 5; CR *Komstroy*, para. 21.

[625]   CC *Komstroy*, paras. 4, 54.

[626]   CC *Komstroy*, paras. 4, 6-8, 15; Claimant's Letter to the Tribunal, 22 September 2021, pp. 4-5.

[627]   CC *Komstroy*, paras. 8-14.

the merits of what is known as the intra-EU jurisdictional objection, while at least the tribunal in *Mathias Kruck and others v. Spain* "for the sake of completeness" also considered the impact of the *Komstroy* Judgment on the merits of its previous decision on Spain's intra-EU jurisdictional objection and rejected that it could have any. The Claimant acknowledges that the *Kruck* tribunal considered that it would have the authority to reconsider its earlier decision on jurisdiction in exceptional circumstances, but notes that the tribunal doubted that the *Komstroy* Judgment was a sufficient basis to do so.[628]

454.    Regarding the merits of the *Komstroy* Objection, "the most that can be said of *Komstroy* is that there now is a conflict between the EU Treaties and the ECT". Exactly that conflict was assumed and resolved by the Tribunal in the *Achmea* Decision by means of the *lex specialis* that is Article 16 ECT.[629] The Respondent's argument regarding the significance of the absence of a mentioning of Article 16 ECT in the *Komstroy* Judgment is disingenuous in that regard because the absence of a reference to Article 16 ECT in a CJEU judgment on EU law cannot help or hurt any interpretation of Article 16 ECT under the ECT.[630]

455.    Contrary to what the Respondent now argues, the *Komstroy* Judgment does not constitute, and cannot make the EU Treaties the "successive, valid and binding, formal treaty" doing away with parts of the ECT of which the Tribunal said that it could not ignore such a treaty if it existed. This already becomes clear when quoting the *Achmea* Decision more fully than the Respondent did. In any case, given that the Tribunal found that the *Achmea* Judgment would not be, and could not make the EU Treaties, such a "successive, valid and binding, formal" treaty, and assumed that the *Achmea* Judgment would have the meaning that the *Komstroy* Judgment now affirms it to have had, the Tribunal has already decided that the *Komstroy* Judgment much like the *Achmea* Judgment cannot constitute said treaty.[631]

---

[628]    CR *Komstroy*, paras. 2-6, 12-14, 17-18, 21, *Mathias Kruck et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/23, Decision on the Respondent's Request for Reconsideration of the Tribunal's Decision on Jurisdiction, 19 April 2021 (**CL-213**).

[629]    CC *Komstroy*, paras. 19-22; CR *Komstroy*, paras. 11-12, 17-19.

[630]    CR *Komstroy*, para. 22.

[631]    CC *Komstroy*, para. 23.

456.    The Respondent's arguments regarding Article 351 TFEU also have already been analysed and dealt with by the Tribunal in the *Achmea* Decision and are of no relevance to an ECT tribunal.[632]

457.    The Claimant further repeats, and elaborates on, its counterarguments regarding the Respondent's submissions as to the EU Treaties as "master treaties", intra-EU abrogations of the ECT, and on the interpretative power of the CJEU and the *ab initio* effect of the *Achmea* Judgment originally made in the context of the *Achmea* Objection.[633]

458.    The Claimant concludes that the Tribunal should dismiss the *Komstroy* Objection, or, alternatively, conclude again what it held in the *Achmea* Decision.[634]

### 19.    Principles to govern the Tribunal's analysis and scope of the allegedly violated obligations and standards

459.    The Claimant argues that the main legal question facing the Tribunal is "Do the ECT and applicable rules and principles of international law permit Bulgaria to induce foreign investment by granting a fixed FiT on all electricity production from eligible PV plants for a fixed period of time under a specific legal and regulatory framework, and then fundamentally alter and abolish that framework once investments have been made in reliance upon it?" The Claimant suggests that the answer to the question is no.[635]

460.    With a view to the applicable rules and principles, the Claimant makes detailed submissions on the FET standard of Article 10(1) ECT, the Impairment Clause (as defined below), and the Umbrella Clause (as defined below).

461.    More generally on principles and standards to govern the Tribunal's analysis, not directly to be placed in any of those categories, the Claimant submits that "reasonable

---

[632]    CC *Komstroy*, paras. 25-27; CR *Komstroy*, paras. 19-20.

[633]    CC *Komstroy*, paras. 29-30, 31-38, 39-47; CR *Komstroy*, paras. 7-10, 15-16, 24-27.

[634]    CC *Komstroy*, para. 54; CR *Komstroy*, para. 28.

[635]    CMOM, para. 272; COS, pp. 2-3; HT, D1, 7 June 2021, pp. 11-13.

return" is not a legal standard under the ECT and as such not an appropriate legal standard under which to assess the legality of the Respondent's actions.[636]

462. The degree of harm caused by the Seven Measures, while substantial, is not relevant to liability but only to quantum. Liability should be assessed based on whether a measure was qualitatively inconsistent with the fundamental allocation of risks at the time of investment.[637]

463. The intention to reduce costs is furthermore not a valid justification under international law for breaching commitments made to investors and changing a bargain after an investment was sunk and could not adapt any more.[638]

464. Finally, there is no element of "intent" in any of the Respondent's obligations under the ECT and under international law, "it is only the act of a State that matters, independently of any intention."[639]

    *a.*    *FET*

465. The Claimant submits that Article 10(1) ECT would require the Respondent to accord FET to the Investment at all times.[640]

466. The VCLT requires an investment treaty tribunal to apply the FET standard contained in a treaty in accordance with the object and purpose of that treaty.[641]

467. The "fundamental aim" of the ECT is to "strengthen the rule of law on energy issues". Two of the overarching purposes of the ECT are to "catalyze economic growth" through

---

[636]    CROMCMOJ, paras. 314, 549; COS, p. 92; CPHB, para. 98.

[637]    CPHB, para. 86.

[638]    CPHB, para. 50.

[639]    CPHB, para. 50, referring to Draft articles on Responsibility of States for Internationally Wrongful Acts, with commentaries, June 9, 2001, Commentary 10 to Article 2, available at https://legal.un.org/ilc/texts/instruments/english/commentaries/9_6_2001.pdf, last accessed October 8, 2021.

[640]    CMOM, para. 275.

[641]    CMOM, para. 276.

investment and trade in energy and to establish a legal framework to promote long-term cooperation.[642]

468.   "Ultimately, a State's unfair and inequitable conduct – such as that present in the instant case – is more than sufficient to prove a violation of ECT Article 10(1)'s FET standard."[643]

469.   Bulgaria erroneously argues that the FET standard of the ECT would equal the minimum standard of treatment under customary international law. Any such position is unsupported by case law interpreting the ECT.[644]

470.   The dominant view in the jurisprudence is that where a specific treaty does not include a clear and express link to the international minimum standard, FET provisions like the one contained in the ECT are to be interpreted as consisting of an independent and self-contained treaty standard, which affords greater protection than the international minimum standard.[645]

471.   ECT tribunals, such as, *e.g.*, the one in *RREEF Infrastructure (G.P.) Ltd and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Spain* ("***RREEF***"), have "consistently" interpreted the FET standard under the ECT to go beyond the international minimum standard.[646] The Respondent has misleadingly quoted the award in *Liman Caspian Oil BV and NCDL Dutch Investment BV v. Kazakhstan* ("***Liman***") in that regard, which actually also supports the view exemplified by *RREEF*.[647]

472.   The FET standard in Article 1105(1) NAFTA has distinct features that differ from the features of the FET standard in the ECT and other treaties. Therefore, the Respondent

---

[642]   CMOM, para. 276, referring to Energy Charter Treaty of 17 December 1994 ("**ECT**") (**CL-1**), pp. 14, 25, 39.

[643]   CROMCMOJ, para. 361.

[644]   CROMCMOJ, paras. 339, 351.

[645]   CROMCMOJ, paras. 339, 361.

[646]   CROMCMOJ, paras. 349, 361; *RREEF Infra. (G.P.) Ltd. and RREEF Pan-European Infra. Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (**CL-59**) ("***RREEF***"), para. 263.

[647]   CROMCMOJ, para. 350; *Liman Caspian Oil B.V. and NCL Dutch Inv. B.V. v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Award, 22 June 2010 (**CL-27**) ("***Liman***"), para. 263.

cannot successfully rely on NAFTA case law to further its submissions on the minimum standard.[648]

473.    The Claimant disputes that the protections under the FET standard as contained in the ECT would be "very limited", or that "a very high threshold" must be overcome to prove a violation of the FET standard under the ECT.[649] The cases that the Respondent relies upon to support its argument regarding the alleged narrowness of the FET standard under the ECT, do not, in fact, support the argument. This is with the exception of *SunReserve* and *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Spain* ("***RWE***"), which were decided on the basis of an incorrect, too demanding, interpretation of the FET standard under the ECT, since they demand "manifest" unfairness and "radical" or "fundamental" changes. These latter decisions constitute minority opinions in the ECT case law.[650]

> (1)    Violating the Claimant's legitimate expectations regarding the FiT, offtake, and time period

> *(a)    The protection of legitimate expectations as part of the FET Obligation*

474.    According to the Claimant, a State's duty to ensure a stable legal and regulatory framework in the sense of the FET standard arises when the State has generated legitimate expectations of such stability on the part of an investor.[651]

475.    Relying on investment treaty tribunals and scholars, the Claimant submits that the protection of legitimate expectations is a major component, if not the dominant element of the FET standard.[652] Some tribunals even held that the concept of legitimate expectations forms part of customary international law.[653]

---

[648]    CROMCMOJ, paras. 340-348.

[649]    CROMCMOJ, paras. 352, 358.

[650]    CROMCMOJ, paras. 352-361.

[651]    CMOM, para. 278.

[652]    CMOM, para. 279; CPHB, para. 76.

[653]    CROMCMOJ, para. 358, fn 473, interpreting *Glamis Gold, Ltd. v. United States of America*, UNCITRAL, Award, 8 June 2009 (**CL-78**), para. 627 to mean this.

145

*(b)    The applicable test*

476. The Claimant is of the opinion that investment treaty jurisprudence establishes a three-step approach to determine whether a host State has breached the FET Obligation by frustrating an investor's legitimate expectations.[654] That three-step approach requires a tribunal to ascertain (i) whether a host State induced the investment by creating legitimate expectations on the part of the investor, (ii) whether the investor reasonably relied on the host State's representations when deciding to invest, and (iii) whether the host State subsequently failed to honour the expectations it created.[655] "The legitimacy of an investor's expectations is for the Tribunal to determine objectively in light of all relevant circumstances".[656] The Claimant agrees with the Respondent that "only expectations that an investor actually held and only those that are objectively reasonable are protected".[657] The Claimant argues (see below) that all requirements for a finding of a breach of the ECT's FET standard by the Respondent are satisfied in this case.[658]

*(c)    Sources and consequences of inducement and legitimate expectations*

477. The Claimant argues that according to clear case law, a State can create legitimate expectations of stability explicitly (*e.g.* through a stabilisation clause) and implicitly, by conduct and by statements.[659]

478. If a host State induced an investment, that State is bound to maintain the conditions that led to the inducement.[660] This is even more the case, if a State has specifically changed the legal framework, *e.g.* by means of a FiT scheme or other support mechanisms, in

---

[654]    CMOM, para. 280.

[655]    CMOM, paras. 280, 284; CROMCMOJ, para. 379.

[656]    CROMCMOJ, para. 356.

[657]    CROMCMOJ, para. 362.

[658]    CMOM, para. 280; CROMCMOJ, paras. 362-364.

[659]    CMOM, para. 281; CROMCMOJ, paras. 354, 367-368, 370, 372, 382-383; HT, D1, 7 June 2021, p. 102; CPHB, para. 76; *Parkerings-Compagniet AS v. Republic of Lithuania*, ICSID Case No. ARB/05/08, Award, 11 September 2007 (**CL-91**) ("***Parkerings***"), para. 331; *Ioan Micula et al. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013 (**CL-10**) ("*Micula*"), para. 669.

[660]    CMOM, para. 282; CROMCMOJ, paras. 368, 377.

order to induce said investments.[661] This position should not be conflated with "an extreme notion of a State being required to 'petrify' its laws". A distinction should be drawn, however, between laws that regulate day to day matters and a framework of laws specifically designed to entice foreign investors with the promise of a specific remunerative regime, and specifically tailored to the particular stability requirements and useful life periods of renewable energy and investments therein.[662]

479.  Contracting Parties to the ECT, which are generally free to fix policies and legislation as they deem fit, by means of the ECT have accepted limitations on their power to alter the legislative or regulatory framework governing an investment when their acts gave rise to legitimate expectations of stability, much as, for example, Bulgaria in setting a FiT in an *ex ante* model, relinquished the power to "fine-tune" that FiT *ex post*.[663] As confirmed by a "number" of tribunals, the "[r]ight to regulate is not a legal defence to a treaty violation".[664]

480.  An inducement to invest from which an investor may derive legitimate expectations can come in many forms, including a promise, a guarantee, a commitment, an assurance, and otherwise. It can stem from a variety of sources (and combinations thereof), such as statutory commitments, the legal framework, repeated statements by a State, the context of an investment, the conduct of a State, or a specific undertaking between the State and the investor.[665]

481.  Regarding the many sources from which legitimate expectations may be derived, it follows from the award in *Ioan Micula and others v. Romania* ("***Micula***"), in the words of that award, that "an interplay of the purpose behind the [incentives] regime, the legal norms, the PICs [administrative certificate granting the incentives to a specific investor], and Romania's conduct" could be interpreted as, and indeed was interpreted by that tribunal as, "a representation that created a legitimate expectation that the […] incentives would be available substantially in the same form as they were initially

---

[661]  CROMCMOJ, para. 377; Y. Selivanova, *Changes in Renewables Support Policy and Investment Protection under the Energy Charter Treaty: Analysis of Jurisprudence and Outlook for the Current Arbitration Cases*, ICSID Review 2018, Vol. 33, No. 2 (**CL-176**), p. 442.

[662]  CROMCMOJ, paras. 377-378.

[663]  CMOM, para. 278; HT, D1, 7 June 2021, pp. 13-14, 108; CPHB, para. 1.

[664]  HT, D1, 7 June 2021, p. 108.

[665]  CMOM, para. 284; CROMCMOJ, paras. 354, 373, 380, 383-385.

offered".[666] Further underlining its point, the Claimant quotes an UNCTAD report submitted by the Respondent stating that

Arbitral decisions suggest in this regard that an investor may derive legitimate expectations either from (a) specific commitments addressed to it personally, for example, in the form of a stabilization clause, or (b) rules that are not specifically addressed to a particular investor but which are put in place with a specific aim to induce foreign investments and on which the foreign investor relied in making his investment.[667]

482. The Claimant further submits, relying on Dolzer, that the local laws at the time of an investment nurture the legitimate expectations that are inherent to the FET standard,[668] and that "numerous" ECT tribunals held that legitimate expectations may arise from general legislation.[669]

483. The Claimant further quotes the *Micula* tribunal stating that it "must take account of the accepted principle that Romania is free to amend its laws and regulations absent an assurance to the contrary" but that it "finds that Romania's conduct had included an element of inducement that required Romania to stand by its statements and its conduct."[670] The Claimant also points to the *Micula* tribunal's observation that "[i]f Romania had spelled out that it retained the right to eliminate the incentives at its discretion, despite the stated duration term for the incentives, Romania likely would not have achieved its objective of attracting investment. Investors require legal certainty, and Romania knew this full well".[671]

484. Finally, the Claimant quotes the *Micula* tribunal stating that "[i]t is irrelevant whether the state in fact wished to commit itself; it is sufficient that it acted in a manner that would reasonably be understood to create such an appearance",[672] which, to the

---

[666] CMOM, para. 297; CROMCMOJ, para. 376; *Micula* (**CL-10**), para. 677.

[667] CROMCMOJ, para. 380; UNCTAD, Fair and Equitable Treatment: UNCTAD Series on Issues in International Investment Agreements II: A Sequel (2012) (**RL-215**), p. 69, footnote references omitted.

[668] CPHB, para. 78; Rudolf Dolzer & Christoph Schreuer, Principles of International Investment Law (2nd ed. 2012) (**CL-89**), p. 146.

[669] CPHB, para. 78, although the awards referred to in fn 172 do not appear to hold as much at the referenced parts: *Micula* (**CL-10**), para. 686; *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010 (**CL-76**) ("***Total***"), paras. 117-118.

[670] CROMCMOJ, para. 368; *Micula* (**CL-10**), para. 686.

[671] CROMCMOJ, para. 369; *Micula* (**CL-10**), para. 678.

[672] CMOM, para. 285, fn 380; CROMCMOJ, para. 371; *Micula* (**CL-10**), para. 669.

148

Claimant, shows that there is no requirement under international law that a State have the "intent" to create commitments on its part or expectations on the investor's part.[673]

(d)    *Specific commitments/undertakings/assurances and/or stabilization clauses*

485.  Regarding "specific undertakings", the Claimant submits that "ample awards", including the one in *Micula* which the Respondent relies on to argue the opposite, hold that specific commitments, or an express stabilisation clause, are not required for a finding that an investor held legitimate expectations.[674] This is only logical because, specifically for investments in renewable energy, inducement normally takes place through the general legal framework since it would be impractical for a government to negotiate individual investment agreements while seeking to induce investments in thousands of projects of all sizes at the same time.[675]

486.  In that regard, the Claimant quotes the finding of the tribunal in *Electrabel S.A. v. Hungary* ("***Electrabel***") that "while specific assurances given by the host State may reinforce the investor's expectations, such an assurance is not always indispensable",[676] the *Antaris* tribunal's finding that "there is no requirement that there be an express stabilisation provision … it is sufficient for the Claimants to establish an express or implied promise giving rise to a legitimate and reasonable expectation of stability",[677] and the *Micula* tribunal's finding that "[t]he crucial point is whether the state, through

---

[673]  CMOM, para. 318, fn 407; CROMCMOJ, para. 373.

[674]  CMOM, para. 284; CROMCMOJ, paras. 367-368, 370-372, 379, 381, 384; CPHB, para. 78; *Antaris* (**RL-236**); *Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law, and Liability, 30 November 2012 (**RL-050**) ("***Electrabel***") (the exhibit number which the Claimant actually uses, CL-52, is incorrect, the exhibit submitted under that exhibit number appears to match the Exhibit at CL-58); *Enron Corporation and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case. No. ARB/01/3, Award, 22 May 2007 (**CL-93**); *Saluka Investments BV v. Czech Republic*, UNCITRAL-PCA, Partial Award, 17 March 2006 (**CL-81**) ("***Saluka***"); *LG&E Energy Corp., LG&E Capital Corp., and LG&E International, Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006 (**CL-94**) ("***LG&E***"); *El Paso Energy International Company. v. Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011 (**CL-79**) ("***El Paso***").

[675]  CROMCMOJ, paras. 387, 397.

[676]  CMOM, para. 284, referring to *Electrabel* (**RL-050**), para. 7.78 (the exhibit number which the Claimant actually uses, CL-52, is incorrect, the exhibit submitted under that exhibit number appears to match the Exhibit at CL-58).

[677]  CPHB, para. 78; *Antaris* (**RL-236**), para. 399.

statements or conduct, has contributed to the creation of a reasonable expectation, in this case, a representation of regulatory stability."[678]

487.    While the Respondent relies on the award in *El Paso Energy International Company v. Argentina* ("*El Paso*") as an example that a "specific commitment" would be required to give rise to legitimate expectations, the Claimant argues that the tribunal in that award actually does not use "specific commitment" in a way that it would help the Respondent's argument. The tribunal in *El Paso* underlines that a commitment does not need to be legally binding to be specific, as a legally binding commitment would not require the FET standard for its enforcement and that a commitment can also be a specific commitment if it is specific as to its object and purpose rather than to its addressee, *e.g.* has the specific object and purpose to give an investor a guarantee.[679]

488.    The Claimant acknowledges that the tribunal in *9REN* found that a legitimate expectation in order to arise requires a clear and specific commitment. However, the tribunal in that case continued to find that "there is no reason in principle why such a commitment of the requisite clarity and specificity cannot be made in the regulation itself where (as here) such a commitment is made for the purpose of inducing investment, which succeeded in attracting the Claimant's investment and once made resulted in losses to the Claimant."[680] In that same vein, the Claimant quotes the finding of the tribunal in *SilverRidge Power BV v. Italy* ("*SilverRidge*") that

a State may make specific commitments to investors also by virtue of legislative or regulatory acts which are not addressed to particular individuals, provided that these acts are sufficiently specific regarding their content and their object and purpose. In this context, the Tribunal considers the creation of legitimate expectations more likely where a State has adopted legislative or regulatory acts "with a specific aim to induce [...] investments" [footnotes omitted][681]

---

[678]    CMOM, para. 285; CROMCMOJ, paras. 371-372; *Micula* (**CL-10**), para. 669.

[679]    CROMCMOJ, paras. 388-391; similar on *Total*, CROMCMOJ, paras. 393-395; *El Paso* (**CL-79**).

[680]    CPHB, para. 78, fn 175; *9REN* (**CL-62**), para. 295.

[681]    *SilverRidge Power BC v. Italy*, ICSID Case No. ARB/15/37, Award, 26 February 2021 (**RL-287**) ("*SilverRidge*"), para. 408; also *9REN* (**CL-62**), para. 295.

*(e) Findings of legitimate expectations in cases against other Contracting Parties*

489. According to the Claimant, legitimate expectations of stability are typically found to exist on much less than the context present in this case.[682] The ERSA Regime in particular "epitomizes" the "specificity required to give rise to legitimate expectations".[683]

490. The ERSA Regime was also far more robust, and the commitments given by the Respondent were far more specific than, for example, Spain's regime and the commitments given therein.[684] The April 2012 meeting with the Deputy Minister, in particular, is a unique aspect of the present case. It makes the Claimant's case a legitimate expectations case based on an in-person meeting with a government minister who confirms expectations so that the investor goes ahead with its investment.[685]

491. Last but not least, "the question of whether Bulgaria created an appearance of long-term stability for renewable energy projects accepted into the ERSA Regime" and "gave rise to legitimate expectations" must not be assessed in reference to other cases or other countries, but with respect to the Respondent's own statements, conduct, and actions.[686]

492. Nevertheless, many of the considerations made in investor-State cases involving Spain's renewable energy sector may be helpful when deciding the present case.[687]

493. To that end, the Claimant offers a great deal of quotes from cases against Spain and, for example, quotes the tribunal in *Antin Infrastructure Services Luxembourg S.à r.l. and Antin Energia Termosolar B.V. v. Spain* ("***Antin***") stating that:[688]

> … Over all, the Respondent emphasized the stability of the legal and economic regime established in RD 661/2007 in order to attract investment in the sector.

---

682 CPHB, para. 81.

683 CROMCMOJ, para. 399.

684 CMOM, para. 289.

685 HT, D1, 7 June 2021, p. 69; CPHB, paras. 32, 81.

686 CROMCMOJ, para. 404.

687 CMOM, para. 289.

688 CMOM, para. 289; CROMCMOJ, para. 401, referring to *Antin Infra. Servs. Lux. S.à.r.l. & Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 (**CL-40**) ("***Antin***"), paras. 540, 552.

…

Given the precision and detail exhibited in the royal decrees, particularly the contemplation that the treatment would be accorded for a defined period of time, the Tribunal has no difficulty in concluding that this falls squarely into the type of State conduct that was intended to, and did, give rise to legitimate expectations of the Claimants.

494.    The Respondent's thorough and extensive approval and licensure process, during which the Karad Plant went through 17 approvals which took note of detailed technical and financial information regarding the plant, and the Respondent's intensive contact with, and knowledge of, the Karad Plant, exhibits the precision and detail referred to by the *Antin* tribunal.[689]

495.    The Respondent only cites seven cases involving Spain, and only selectively cites them, while "largely" ignoring eleven ECT cases that held that Spain was "liable for failing to honor specific incentive guarantees".[690] The Respondent likely avoids those latter awards because each of those tribunals held "to one degree or another" that States can foster investor expectations through a general regulatory framework and through statements of government officials to an industry as a whole.[691] Only three out of a total of 21 awards against Spain held that Spain did not breach the ECT.[692]

(f)    An incentive regime as an "open" and "unilateral" "offer"

496.    With regard to Spain, and Romania, the Claimant also points out that the tribunals in *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain* ("*Masdar*") and *Micula* highlighted the manner in which the Spanish and Romanian regime operated, that is guaranteeing long-term stability for those that fulfilled a number of procedural and substantial conditions/requirements by a certain time. Indeed, the *Masdar* tribunal saw in that manner of operation a "specific unilateral offer from the State" that any investor could accept by fulfilling said conditions on time, while the *Micula* tribunal found that the Romanian regime "created a general scheme of incentives available to investors who fulfilled certain requirements" and "a generalized entitlement that could be claimed by qualifying investors … later crystallized with respect to qualifying investors through the

---

[689]    CMOM, paras. 290-291.

[690]    CROMCMOJ, para. 400 and fn 528.

[691]    CROMCMOJ, para. 400.

[692]    CROMCMOJ, paras. 402.

granting of the PICs [Permanent Investor Certificates]".[693] This conclusion can be equally applied to the ERSA Regime with the "PICs" equalling the license under the ERSA Regime.[694]

497.   "The confirmation of specific rights to defined tariffs for a defined duration" in the ERSA is in itself sufficient to conclude that enrolling a plant into the ERSA Regime gives rise to legitimate expectations based on the specific terms of that law.[695] That way, the ERSA Regime, like other FiT programmes all over Europe, was designed as "a kind of 'open offer'" to be accepted by investors that applied and met the qualification criteria.[696] In addition, primary implementing regulations of the Respondent, such as the FiT Decision, provided explicit transparency and predictability regarding what investors could expect when it came to the application of the FiT and the ERSA Regime by Bulgaria.[697]

> (g)    Legitimate expectation of a "reasonable return"

498.   Regarding the assertion of a legal standard that would limit legitimate expectations of stability under the ECT to the legitimate expectation of a "reasonable return", the Claimant argues as follows.[698] First, attaching any such importance to the notion of a "reasonable return" is a minority view, even within the cases against Spain, developed in "a handful" of ECT awards against Spain only.[699] The "reasonable return" cases furthermore do not correctly interpret the Spanish regulatory framework, misinterpret important evidence, and ignore evidence contradicting their conclusions.[700] They introduce a "vague and extremely subjective" concept.[701]

---

[693]   CMOM, paras. 299-300; CROMCMOJ, paras. 371, 374-375, 401; *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 Mai 2018 (**CL-39**) ("*Masdar*"), para. 512; *Micula* (**CL-10**), para. 674.

[694]   CMOM, para. 300; CROMCMOJ, paras. 371, 375-376.

[695]   CMOM, paras. 287.

[696]   CROMCMOJ, paras. 387, WS Blum II, paras. 7.

[697]   CMOM, paras. 288.

[698]   CROMCMOJ, paras. 430ff, 543.

[699]   CROMCMOJ, paras. 431, 440, 444; COS, p. 92; HT, D1, 7 June 2021, p. 110.

[700]   CROMCMOJ, para. 434, fn 592.

[701]   CROMCMOJ, para. 440.

499.    Secondly, those few tribunals that employed the concept reached their conclusion based on the specific facts of Spain's incentive framework the cornerstone and main specific commitment of which was, in contrast with the situation in Bulgaria, not the remuneration itself, but the reasonable return or profitability. A fact that had been communicated to investors.[702] Those few tribunals noted that Spain's law and regulations required the Spanish regulator to set premiums so as to achieve reasonable profitability, and required the regulator periodically to review the remuneration to that effect. Spain's regime further allowed for the setting of incentives by reference to the cost of money in capital markets and the claimants in those "reasonable return" cases had been aware of Spanish precedent that had approved of changes to existing incentive frameworks if a reasonable return was maintained and that had held that "reasonable return" was the only guarantee given under Spain's law.[703] At the same time, Spain's primary legislation did not know the guarantee of full offtake and of no changes to the FiT for the duration of a PPA as included in the ERSA.[704]

500.    In conclusion, "reasonable return" is not an appropriate legal standard under which to assess the legality of Bulgaria's actions.[705]

> (h)    *Legitimate expectations and State aid law and expectations of the shareholders of an SPV*

501.    The Claimant further engages with two counterarguments regarding the applicable standards with regard to legitimate expectations and the FET Obligation.

502.    Regarding arguments of legitimate expectations and State aid law, the Claimant submits that investors are entitled to assume that a State complies with its legal obligations.[706]

---

[702]    CROMCMOJ, paras. 431-434; HT, D1, 7 June 2021, p. 110.

[703]    CROMCMOJ, paras. 432-433; HT, D1, 7 June 2021, p. 110.

[704]    CROMCMOJ, para. 436.

[705]    CROMCMOJ, para. 549; COS, p. 92; CPHB, para. 98.

[706]    CPHB, para. 74; *Total* (**CL-76**); *Cube Infrastructure Fund SICAV and Others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 January 2019 (**CL-148**) ("***Cube***"); *Antin* (**CL-40**); *Novenergia* (**CL-23**).

503.    Regarding the "novel" argument that an SPV's investment expectations cannot include the expectations of the sponsors who formed the SPV, *i.e.* its shareholders, the Claimant submits that the Respondent cites no precedent therefor.[707]

(2)    Fundamentally altering the investment framework

504.    The Claimant submits that, as agreed by "several" ECT tribunals, the obligation to encourage and create stable, equitable, favourable, and transparent conditions for investors of the first sentence of Article 10(1) ECT is an independent obligation, independent of the enumeration later in the Article of what such conditions "include", *e.g.* the accordance of FET.[708]

505.    The obligation entails, in the words of the tribunal in *SilverRidge*, that even in the absence of a specific commitment giving rise to a legitimate expectation, investors are also protected from "fundamental or radical modifications to the legal framework in which their investment was made".[709]

506.    The tribunals in, among others, *Eiser Infrastructure Limited and Energia Solar Luxembourg S.à r.l. v. Spain* ("***Eiser***"), *Novenergia*, *Antin*, and *Cube Infrastructure Fund SICAV and others v. Spain* ("***Cube***") held that "regulatory regimes cannot be radically altered as applied to existing investments in ways that deprive investors who invested in reliance on those regimes of their investment's value" and found that Spain breached the FET Obligation by imposing a new regulatory regime that "drastically and abruptly" dismantled the original regime,[710] "entirely transformed and altered the legal and business environment under which" an investment was decided and made,[711]

---

[707]    CPHB, para. 37.

[708]    CROMCMOJ, paras. 445-450; HT, D1, 7 June 2021, pp. 105-111.

[709]    CPHB, para. 84; *SilverRidge* (**RL-287**), para. 402; it would appear though that the *SilverRidge* tribunal merely takes note of the agreement on that point between the parties before it and also more generally subsumes the point under the FET Obligation as a whole rather than under an additional, independent obligation.

[710]    CMOM, paras. 320-325; CPHB, para. 188; referring to *Eiser Infra. Ltd. and Energia Solar Lux. S.à.r.l. v. Kingdom of Spain,* ICSID Case No. ARB/13/36, Award, 4 May 2017 (**CL-21**) ("***Eiser***"), paras. 382, 387; *Novenergia* (**CL-23**); *Antin* (**CL-40**); *Cube* (**CL-148**).

[711]    CMOM, para. 321; referring to *Novenergia* (**CL-23**), para. 695, itself citing *CMS Gas Transmission Company v. The Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May 2005 (**CL-101**), para. 275.

"stripped" the regime of its "key features",[712] and "definitely abolished the fixed long-term FIT and [did] so retroactively".[713]

507.    The Claimant quotes as relevant the *Cube* tribunal's statement[714]

[T]he Tribunal considers that there was [a] move away from a regime based on what were at the time of the investments 'promised' tariffs and premiums, to a regime based on capped 'reasonable returns', and that this move represented a fundamental change in the economic basis of the relationship between the State and the Claimants. It agrees with the view that the regulatory changes of 2013-2014 constituted "what economists call 'a mid-stream switch in the regulatory paradigm.'

508.    The Claimant also alerts the Tribunal to the holding in *Eiser* that[715]

Because the new system provided for the reduced target rate of return based on a hypothetical "efficient" plant, facilities like Claimants', which incurred higher initial construction and financing costs in order to attain increased production later, necessarily had a lower return on their investment. …

Respondent then retroactively applied these "one size fits all" standards to existing facilities, like Claimants', that were previously designed, financed and constructed based on the very different regulatory regime of RD 661/2007. No account was taken of existing plants' specific financial and operating characteristics in establishing their remuneration. …

Respondent's new 2014 standards in effect retroactively prescribe design and investment choices that in regulators' view should have been incorporated in plants designed and built some years before. Such design choices – for example, to design higher cost plants capable of higher annual production and therefore of generating higher revenues under the RD 661/2007 regime – are retroactively condemned as inefficient and undeserving of subsidy.

509.    According to the Claimant, while these tribunals describe the situation in Spain their considerations and observations highlight that the situation in Bulgaria in this regard was the same as in Spain, because in Bulgaria, much like in Spain, fundamental, radical changes to the regulatory framework and incentive program took place.[716] The situation in Bulgaria might even have been more severe than, at least, in Italy.[717]

---

[712]    CMOM, para. 322; COS, p. 87; referring to *Antin* (**CL-40**), para. 532.

[713]    CMOM, para. 321; referring to *Novenergia* (**CL-23**), para. 697.

[714]    CMOM, para. 323; CPHB, para. 87; *Cube* (**CL-148**), para. 427.

[715]    CMOM, para. 324; *Eiser* (**CL-21**), paras. 393, 400, 414.

[716]    CMOM, paras. 320-325; CROMCMOJ, paras. 451-452.

[717]    HT, D1, 7 June 2021, pp. 107-108.

510. In addition, tribunals, even absent a stabilisation commitment, have held that changes have to be made "fairly, consistently, predictably and taking into account the circumstances of the investment."[718]

511. "[I]nvestment treaty case law" further confirms that the type of "fundamental change" in an investment framework, as took place here, violates the FET Obligation.[719]

512. It is in that regard an "overgeneralization" of the Respondent when it states that only drastic, radical, or otherwise seriously improper modifications to the applicable legal framework can be considered a violation of the FET Obligation.[720] In any case, the Respondent admitted that the Claimant was legitimately entitled to expect "that Bulgaria would not radically or fundamentally change the legal framework in place when Claimant invested."[721] Therefore, even if Bulgaria had retained some discretion to alter the commitments it made to induce the Investment, that discretion would have been limited to "finetuning".[722]

(3)     Inconsistent and non-transparent treatment

513. Quoting the tribunal *LG&E Energy Corp. v. Argentina* ("***LG&E***"), the Claimant submits that the FET standard also "consists of the host State's consistent and transparent behaviour, free of ambiguity that involves the obligation to grant and maintain a stable and predictable legal framework."[723] Much like a violation of an investor's legitimate expectations, failing to treat an investor or its investment "transparently or consistently" equally violates the FET Obligation, making a claim regarding transparency and consistency of a respondent's behaviour a stand-alone claim.[724]

514. The Parties agree that the FET Obligation contains a separate, independent obligation that Contracting States act in a transparent and consistent manner with respect to

---

[718]   HT, D1, 7 June 2021, p. 107.

[719]   CMOM, para. 319.

[720]   CROMCMOJ, para. 451.

[721]   CPHB, para. 84; HT, D1, 7 June 2021, p. 191, though qualifying it with an "at most".

[722]   CPHB, para. 84.

[723]   CMOM, para. 329; *LG&E* (**CL-94**), para. 131; CPHB, para. 89.

[724]   CMOM, para. 329.

investors and their investments. The Respondent, however, misrepresents the legal standard when it submits that "there is a high threshold to establish a breach of the ECT's obligation to accord fair and equitable treatment on the basis of lack of transparency."[725]

515.   Transparency requires that Investors be informed of decisions before they are imposed and that there be no ambiguity or opacity in the treatment of investments.[726] It further mandates that if any ambiguity was created by the host State itself, the State cannot use ambiguity as an excuse.[727] The obligation of transparency also requires that the legal framework that will apply to an investment be readily apparent.[728]

516.   As held for example in *Micula*, a State violates the standard of transparency if it fails to correct or clarify uncertainties that develop in a regime, or fails adequately to inform investors regarding possible changes to a legal regime.[729] In *Greentech*, a majority held that tariff reductions that could not reasonably have been foreseen at the time of the claimants' investments constituted a failure of the State to encourage and create transparent conditions for investors of other Contracting Parties within the meaning of the ECT.[730]

517.   The Claimant acknowledges that the tribunal in *AES Summit Generation Limited and AES-Tisza Erömü KFT v. Hungary* ("*AES*") (relying ultimately on wording of the ICJ in *Elettronica Sicula S.p.A. (ELSI) (United States of America v. Italy)*) noted that the standard for transparency is "not one of perfection" and found that a State breaches its obligations of transparency when its "acts or procedural omissions are, on the facts and in the context before the adjudicator, manifestly unfair or unreasonable (such as would

---

[725]   CROMCMOJ, paras. 462, 482; RCMOMOJ, para. 420; CPHB, para. 89.

[726]   CMOM, para. 330; CROMCMOJ, paras. 465-466; CPHB, para. 89.

[727]   CROMCMOJ, para. 478; Thomas W. Wälde, *Energy Charter Treaty-Based Investment Arbitration*, Transnational Dispute Management, Vol. 1, Issue 3, July 2004 (**CL-111**), p. 24.

[728]   CMOM, para. 330; CROMCMOJ, para. 467; CPHB, para. 89.

[729]   CMOM, para. 331; CROMCMOJ, para. 475-476; *Micula* (**CL-10**), paras. 869-870, finding it a breach in an unclear situation to not have informed PIC holders in a timely manner that the "EGO 24 regime" would be ended prior to its stated date of expiry.

[730]   CMOM, para. 333; referring to *Greentech* (**CL-48**), para. 458.

shock, or at least surprise a sense of juridical propriety)."[731] In the view of the Claimant, however (as set out below), the conduct of the Respondent meets that standard.[732]

518.     The standard for a violation of the obligation to act in a transparent manner as set by the tribunal in *Stadtwerke München GmbH and others v. Spain* ("***Stadtwerke***") is higher than appropriate and higher than the standard adopted by "most tribunals". In addition, in terms of the facts of the case, contrary to the conclusion of the tribunal in the *Stadtwerke* case, a continuing pattern of non-transparent conduct occurred in Spain as it did, and even clearer than in Spain, in Bulgaria.[733]

519.     Finally, consistency requires that a State act coherently and apply its policies and legal framework consistently, whereas a failure to do so constitutes a violation of the FET Obligation.[734] The duty to act consistently endures after a change of administration. A new government "cannot repudiate or alter the commitments or relationships entered into with investors by a previous government without violating its obligation to afford FET to investors."[735]

    *b.     Unreasonable Impairment*

520.     The Claimant submits that in Article 10(1) ECT, sentence 3 (the "**Impairment Clause**"), the ECT provides that conduct that is either unreasonable or discriminatory breaches the ECT if it "in any way impair[s]" a protected investment's "management, maintenance, use, enjoyment or disposal.".[736]

---

[731]     CROMCMOJ, para. 463; *AES Summit Generation Ltd. & AES-Tisza Erömü Kft. v. Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010 (**CL-47**) ("***AES***"), para. 9.3.40, using in turn the words of the tribunal in *Técnicas Medioambientales Tecmed S.A. v. México*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003 (**CL-82**) ("***Tecmed***"), using the words of the ICJ in *Elettronica Sicula S.p.A. (ELSI) (United States of America v. Italy)*, Judgment, ICJ Reports 1989, 20 July 1989, p. 15 (**RL-152**).

[732]     CROMCMOJ, para. 463.

[733]     CROMCMOJ, para. 464; *Stadtwerke München GmbH, RWE Innogy GmbH, and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (**RL-256**) ("***Stadtwerke***"), para. 311.

[734]     CMOM, para. 332, referring to *MTD Equity v. Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004 (**CL-96**), para. 165; CROMCMOJ, para. 477.

[735]     CMOM, para. 332.

[736]     CPHB, para. 90.

521.    The Impairment Clause sets forth a low threshold as to the impact on an investment required to constitute impairment.[737]

522.    It is independent of the FET Obligation.[738] Quoting the tribunal in *ESPF*, for example, the Claimant submits that while a breach of the FET Obligation will usually also breach the Impairment Clause, the converse is not necessarily true.[739] Accordingly, the Impairment Clause is broader than the FET Obligation.[740] It is the only place where considerations as to the reasonableness and non-discriminatory nature of a measure of a host State are relevant – a measure that is reasonable and non-discriminatory but breaches a legitimate expectation would still violate the FET Obligation, according to the Claimant.[741]

523.    Tribunals have held that the term impairment means any negative impact or effect, including acts and omissions,[742] and that the resulting impairment "need not meet a particular level of harm" or be significant.[743] The majority in *Greentech*, for example, found that in light of the addition of "in any way" in the impairment clause in Article 10(1) ECT, the required "impairment" must not be qualified as only referring to "significant" impairment.[744] The tribunal in *ESPF* held that "the ECT's clear language provides that any impairment will be sufficient to establish a breach of the ECT."[745]

524.    Awards on which the Respondent relies such as *SunReserve, Electrabel*, and *Voltaic Network*, to the extent that they create a legal standard that requires a certain threshold

---

[737]    CMOM, para. 339; CPHB, para. 90.

[738]    CROMCMOJ, paras. 483-485; CPHB, para. 90.

[739]    CROMCMOJ, paras. 485-486; *ESPF* (**RL-266**), para. 698. The Claimant however also quotes J. W. SALACUSE, *The Law of Investment Treaties* (2nd ed. 2015) (**CL-172**) making the point that a breach of either the Impairment Clause or the FET Obligation that does not breach the respective other clause is possible; COS, p. 91.

[740]    CROMCMOJ, para. 486.

[741]    HT, D1, 7 June 2021, p. 109.

[742]    CMOM, para. 339; referring to *Saluka* (**CL-81**); *CMS Gas Transmission Company v. The Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May 2005 (**CL-101**); *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006 (**CL-110**); *Fisheries Jurisdiction (Spain v. Canada)*, Jurisdiction of the Court, Judgment, 4 December 1998, ICJ Reports 1998, p. 432 (**CL-150**).

[743]    CROMCMOJ, paras. 488, 506.

[744]    CMOM, para. 339; CROMCMOJ, paras. 490-491; referring to *Greentech* (**CL-48**), para. 461; as the Respondent also observed, however, the tribunal majority actually held that the impairment was significant, and that a final position on the question therefore did not have to be taken; *cf*. RCMOMOJ, para. 447.

[745]    CROMCMOJ, paras. 492, 508; *ESPF* (**RL-266**), para. 698.

of impairment, inappropriately conflate issues of liability with issues of quantum, and, moreover, fail even to attempt to reconcile their finding of a threshold with the plain language of the Treaty, and, therefore, should not be followed.[746]

525. In addition, because of the use of the disjunctive "or" instead of the conjunctive "and" in Article 10(1) ECT, unreasonable measures and discriminatory measures both violate the Impairment Clause.[747]

526. A measure may be unreasonable if it is taken without due consideration of its potential negative effects on foreign investors and if it is not the product of a rational decision-making process consisting of weighing of interest and consideration of effects.[748]

527. The tribunal in *BG Group Plc v. Argentina* ("**BG Group**"), relying on the partial award in *CME Czech Republic B.V. v. Czech Republic*, for example, held that the withdrawal of assurances given in good faith in order to induce investments was by definition unreasonable.[749]

528. The majority in *Greentech* found that a 6-8% reduction in revenues was significant and a violation of the Impairment Clause. Such a reduction is considerably lower than the reduction of the revenues of the Karad Plant, which amounted to 28%, and as such, it represents, by and of itself, an objective measure of an impairment.[750]

529. The notion of a "reasonable return" should not be introduced into the analysis of what is reasonable within the meaning of the Impairment Clause because (i) as argued above, the determination of whether an impairment exists and whether a measure is reasonable is independent of the "level of harm" and (ii) the invocation of a reasonable return cap can only be deemed reasonable if that cap was communicated before an investment was made.[751]

---

[746] CROMCMOJ, para. 489.

[747] CMOM, para. 340; CROMCMOJ, para. 488.

[748] CMOM, para. 340.

[749] CMOM, para. 340, referring to *BG Group Plc. v. Argentine Republic*, UNCITRAL, Final Award, 24 December 2007 (**CL-109**) ("**BG Group**"), para. 343.

[750] CMOM, para. 347; CROMCMOJ, para. 490; COS, p. 139; At HT, D1, 7 June 2021, p. 108, the Claimant appears to conflate reduction in value with reduction in revenue.

[751] CROMCMOJ, paras. 501, 508; see also para. 549; CPHB, paras. 86 (more in general), 98.

530. Finally, "impairment clauses have become increasingly prominent in investment treaty jurisprudence" and tribunals in cases such as *BG Group*, *Azurix Corp v. Argentina*, *Saluka Investments BV v. Czech Republic* ("**Saluka**"), and *Greentech* found a violation of an impairment clause in their awards.[752]

531. In response to points of the Respondent, the Claimant further argues, first, unlike Bulgaria suggests, a measure is not just reasonable because it is related to a rational policy. Such a reading would devoid the Impairment Clause of its meaning, give States the possibility of *post-hoc* rationalisations, and undermine the purpose of the ECT of fostering investment by stability. It would allow harmful measures to existing investments as long as such measures are aligned with shifting policy priorities.[753]

532. Secondly "it may be true" that the ECT does not require a State to choose the best policy option available to accomplish a goal. However, the reasonableness of even an abstractly reasonable measure is to be measured against the harm that it causes concretely, and in the analysis of whether a measure is reasonable it is a factor whether a State had other options available that would have avoided causing the harm.[754]

       *c.*     *The Umbrella Clause*

533. The Claimant argues that Article 10(1) ECT, last sentence, being the "**Umbrella Clause**", brings "any" obligation, not just contractual obligations, of a host State regarding an investor or an investment under the protective umbrella of the Treaty.[755] The Claimant submits that the Umbrella Clause is "famously broad" and specifically intended to expand the reach of the Treaty to include obligations that might otherwise not be covered.[756]

534. As Professor Thomas Wälde observed, tribunals should read the Umbrella Clause in light of the extensive scope of protection which the ECT intends to convey on

---

[752] CMOM, para. 338; referring to *Greentech* (**CL-48**); *Saluka* (**CL-81**); *BG Group* (**CL-109**); *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006 (**CL-110**).

[753] CROMCMOJ, para. 494.

[754] CROMCMOJ, para. 500.

[755] CMOM, para. 349; CROMCMOJ, paras. 20, 510-511; CPHB, para. 96.

[756] CMOM, para. 349; CPHB, para. 96.

investments.[757] In that same vein, "[o]ther scholars" convincingly noted that given that States have the option to opt out of the Umbrella Clause, as, for example, Australia, Canada, Hungary, and Norway did, logically it must have been intended as a very broad clause, the breadth of which some Contracting Parties may not be comfortable with and from which they may want to opt out.[758] Bulgaria should not be afforded an opportunity retroactively to escape liability under the Umbrella Clause from which it could have opted out but did not.[759]

535. Had the Contracting Parties wanted the Umbrella Clause only to cover contractual obligations, they would have used a reference to "contractual obligations" instead of a reference to "any obligations" in it.[760] As confirmed, among others, by *Plama*, the Umbrella Clause therefore has a wide character and next to contractual obligations, also covers legislative or regulatory undertakings, *i.e.* obligations undertaken through law or regulation.[761] As Gary Born stated in his dissent in *Jürgen Wirtgen and others v. Czech Republic*: "it is both commonplace and essential for states to be able to provide undertakings to private parties by way of 'general' legislative or regulatory instruments" and "[i]t would seriously impede the task of governance and regulations, and contradict aspirations for the rule of law, to deny states the ability to make commitments to private parties, including foreign investors, in the form of legislative (or regulatory) guarantees."[762]

---

[757]  CMOM, para. 350, referring to Thomas W. Wälde, *Energy Charter Treaty-Based Investment Arbitration*, Transnational Dispute Management, Vol. 1, Issue 3, July 2004 (**CL-111**), p. 36

[758]  CMOM, para. 350, referring to Johan Billiet, *International Investment Arbitration: A Practical Handbook*, Maklu Publishers 2016 (**CL-112**), p. 128; CROMCMOJ, para. 531.

[759]  CROMCMOJ, para. 531.

[760]  CROMCMOJ, paras. 512-514.

[761]  CMOM, paras. 351-352; referring to, among others, *Plama Consortium Ltd. v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008 (**CL-113**), paras. 186-187; CROMCMOJ, paras. 20; 510-511, 524, 527-528. Nevertheless, the reference to *Plama* appears somewhat misleading since the full quote of paragraph 186 thereof reads:

The Arbitral Tribunal can limit itself to noting that the wording of this clause in Article 10(1) of the ECT is wide in scope since it refers to "*any obligation.*" An analysis of the ordinary meaning of the term suggests that it refers to any obligation regardless of its nature, i.e., whether it be contractual or statutory. However, the *ad hoc* Committee that decided the annulment in the case, *CMS v. Argentina*, commented that the use of the expression "*entered into*" should be interpreted as concerning only consensual obligations. In any case, these obligations must be assumed by the host State **with** an Investor. [Footnotes omitted; emphasis as in original]

[762]  CROMCMOJ, para. 386; *Wirtgen et al. v. Czech Republic*, PCA Case No. 2014-03, Dissenting Opinion of Gary Born, 11 October 2007 (**CL-179**), para. 15.

536.    The award in *Khan Resources Inc and others v. Mongolia* ("**Khan Resources**") is another relevant example. In that case the tribunal held that a breach by Mongolia of any provision of its Foreign Investment Law would constitute a breach of the Umbrella Clause.[763] The Respondent cannot blame the finding in *Khan Resources* on the respondent in that case not contesting the issue. Indeed, Mongolia's decision not to contest rather suggests that it recognised that the Umbrella Clause covered these obligations.[764]

537.    The Claimant disputes that umbrella clauses from other treaties that it referred to in its argument are narrower than the Umbrella Clause, and submits that the Umbrella Clause is "among the broadest – if not the broadest iterations of the provision in investment treaty practice", a view which it considers to be "supported by dozens of ECT tribunals sharing [this] interpretation and forming a consensus in the jurisprudence".[765]

538.    Relying on the Oxford English Dictionary and a scholarly article of one of its counsel's colleagues, the Claimant dismisses the Respondent's argument that the wording of "entered into" as used in the Umbrella Clause signifies that the obligations referred to must be contractual, bilateral obligations.[766] The cases that the Respondent relies on to make this point, *i.e. Stadtwerke*, *OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Spain*, and *RREEF*, are incorrectly decided in light of the wording of the Umbrella Clause and the object and purpose of the ECT.[767] Awards that do not read the Umbrella Clause as only referring to contractual obligations, but read it narrowly as requiring specific personal promises, are equally incorrect for the same reasons.[768] In any case, a domestic law analysis cannot be decisive as to whether an obligation of a host State exists or ceased to exist within the meaning of the Umbrella Clause.[769]

---

[763]    CMOM, para. 354, referring to *Khan Resources* (**CL-118**), para. 366 [more clearly: paras. 294 and 295]; CROMCMOJ, para. 528.

[764]    CROMCMOJ, para. 529.

[765]    CROMCMOJ, para. 530.

[766]    CROMCMOJ, para. 515; Lexico Dictionaries, Definition of "enter into", 19 July 2019 (**CL-183**); Craig S. Miles, *Where's My Umbrella? An "Ordinary Meaning" Approach to Answering Three Key Questions That Have Emerged from the "Umbrella Clause" Debate*, in Investment Treaty Arbitration and International Law, Vol. 1 (2009) (**CL-184**).

[767]    CROMCMOJ, paras. 516, 517.

[768]    CROMCMOJ, paras. 518, 519.

[769]    CROMCMOJ, paras. 520-522.

539.    Quoting the tribunal in *Amto*, the Claimant argues that the Umbrella Clause also covers obligations of the host State towards the investment of an investor, including subsidiary companies of the investor established in the host State.[770] Relying on the majorities in *Greentech* and *ESPF*, and countering an argument of the Respondent, the Claimant adds that obligations of the host State entered into with the investment are also protected, if at the time of the entering into the obligation, the investor did not yet own the investment.[771]

540.    The situation in the present case is also similar to that in the *LG&E* case, and to the situation in Italy. Italy promised fixed tariffs for PV plants connected to the grid by a certain date and confirmed that the fixed tariff would remain constant for twenty years. Italy spelled out its obligation to pay the tariffs at constant rates in various regulations called "*Conto Energia*", in letters to the producers whose plants qualified, and in contracts for the full offtake of all electricity produced entered with the state entity in charge called "GSE". Italy then "unilaterally reduced the tariff rates".[772]

541.    In light of that situation, the tribunal in *Greentech* held that it did not need to consider whether the regulation, the letter, or the contract were obligations covered by the Umbrella Clause, because there could be no question that, taken together, these official acts bound Italy to honour its obligation of paying fixed tariffs to eligible plants over twenty years.[773] Faced with the same situation, the majority in *ESPF* went even further, finding that Italy's legal framework alone was sufficiently specific to create a binding obligation, "akin to a contractual arrangement", *vis-à-vis* plants which were properly enrolled into it and which thus had met the criteria set forth in the relevant decree thereby accepting Italy's offer to pay the promised tariffs, unchanged, for 20 years.[774]

542.    Nevertheless, the Spanish, and even the Italian renewable energy regimes were more "general" and not as "specific" as the one in Bulgaria. For example, the Italian argument that its contracts issued to investors were "form agreements" issued automatically and

---

[770]    CMOM, para. 353, referring to *Amto* (**CL-29**), para. 110.

[771]    CROMCMOJ, paras. 539-541; *Greentech* (**CL-48**), para. 467; *ESPF* (**RL-266**), para. 757.

[772]    CMOM, paras. 356-357.

[773]    CMOM, para. 357; referring to *Greentech* (**CL-48**), para. 466.

[774]    CROMCMOJ, para. 535; *ESPF* (**RL-266**), para. 815.

evolving automatically is not available to Bulgaria because the License was more specific.[775]

543. Finally, it is irrelevant to the analysis whether the Umbrella Clause is breached whether the promised FiT was reduced directly or indirectly, as otherwise any Contracting Party could avoid triggering the Umbrella Clause by circumventing obligations indirectly rather than by breaching them head-on. Such an outcome and interpretation would be contrary to the object and purpose of the ECT to promote foreign investment and the broad language of the Umbrella Clause.[776]

### 20.    The Respondent's alleged violations of the ECT and applicable rules and principles of international law

544. The Claimant submits that the Seven Measures have violated the ECT and applicable rules and principles of international law that protect the Investment.[777]

545. More specifically, in violation of Article 10(1) ECT, the Respondent has breached (i) its obligation to accord FET to the Investment, (ii) unreasonably impaired Claimant's management, maintenance, use, and enjoyment of the Investment, (iii) failed to observe the obligations it entered into with the Investment, and (iv) overall, violated the "spirit and purpose of the ECT" (detailed arguments presented per the first three categories below).[778]

546. Therefore, the Claimant should be awarded full compensation for the losses it has suffered as a result of the Respondent's breaches.[779]

547. The Seven Measures violate the ECT for reasons independent of their impact on the return of the Karad Plant relative to any – inapplicable – "reasonable return" benchmark. As set out below, however, even against the Respondent's own benchmark, and even on the calculations of the Respondent's own expert, no reasonable return was earned.[780]

---

[775]    CROMCMOJ, paras. 532-535.

[776]    CROMCMOJ, para. 538.

[777]    CMOM, para. 23, CROMCMOJ, para. 319.

[778]    CMOM, paras. 23, 274; CROMCMOJ, para. 503.

[779]    CMOM, para. 23.

[780]    CROMCMOJ, paras. 273, 314-317, 443, 480, 502, 543, 551-552; CPHB, para. 98.

Therefore, even on the Respondent's own case of only being bound by a promise of a reasonable return, the Seven Measures have breached the ECT.[781]

> ### a.  FET

548.  The Claimant argues that the Respondent breached the FET Obligation, separately and cumulatively,[782] (1) by violating the Claimant's legitimate expectation of receiving a fixed tariff of BGN 485.60/MWh on all the electricity the Karad Plant delivered to the grid for a twenty year period, *i.e.* reneging on specific commitments that the Claimant legitimately expected to be honoured;[783] (2) by fundamentally altering the essential characteristics of the investment framework that formed the basis for the Claimant's decision to invest after the Investment was executed and the Claimant's costs were sunk;[784] and (3) by failing to treat the Claimant and its Investment transparently and consistently, and rather treating it in an arbitrary and discriminatory manner.[785]

> ### (1)  Violating the Claimant's legitimate expectations regarding FiT, offtake, and time period

549.  Regarding the legitimate-expectations element of the Claimant's FET claim, the Claimant argues that Bulgaria induced the Investment by creating legitimate expectations (of stability), ACF reasonably relied on that inducement, and Bulgaria subsequently failed to honour the expectations it had created, and in so doing, breached its FET Obligation.[786] The Claimant has demonstrated above that it held these expectations, that it held them reasonably, and that it invested in reliance on them.[787]

> ### (2)  Fundamentally altering the investment framework

550.  Regarding the alleged second breach of the FET standard, the Claimant argues that the Seven Measures had serious negative impacts on the Investment and represent a

---

[781]  CROMCMOJ, para. 570.

[782]  CMOM, para. 277.

[783]  CMOM, para. 277; CROMCMOJ, para. 338; HT, D1, 7 June 2021, pp. 101-105; CPHB, paras. 75, 76-83.

[784]  CMOM, paras. 277, 319ff; CROMCMOJ, paras. 338; COS, p. 86; HT, D1, 7 June 2021, pp. 105-109; CPHB, paras. 75, 84-88.

[785]  CMOM, para. 277; CROMCMOJ, paras. 338, 482; CPHB, paras. 75, 89.

[786]  CMOM, para. 280; CROMCMOJ, para. 461; CPHB, para. 77.

[787]  CROMCMOJ, paras. 363-364; CPHB, paras. 77, 81.

"fundamental change to the regulatory framework" on which the Shareholders relied.[788] In particular, changing *ex post* the risk allocation of an *ex ante* "at risk" scheme to cap returns of an investor achieved under the *ex ante* model is a fundamental change to, and a midstream switch of, the ERSA Regime and the logic thereof from *ex ante* to *ex post* – all in violation of regulatory best practices.[789] It cannot credibly be suggested that changes to a regulatory regime that have more than a 70% impact on the value of an investment and cause damages of at least EUR 77.6 million are not fundamental and radical.[790]

(3)    Inconsistent and non-transparent treatment

551.    Regarding the consistency and transparency of the Respondent's acts, the Claimant argues that by introducing an incentive regime in order to meet EU and internal policy goals, and by promoting the regime as a stable and transparent system, in control of the pipeline of new projects, and then, once Bulgaria's goals were met, retroactively modifying the regime and reducing investor's revenues, the Respondent acted unforeseeably and non-transparently. In doing so, the Respondent also acted inconsistently with its legal framework and prior actions and statements and, consequently, the Respondent breached the FET Obligation.[791]

552.    This is particularly the case because, despite the harm that Bulgaria caused the Claimant with the Seven Measures, Bulgaria itself remained unharmed as it retained the entire benefit of the Karad Plant's electricity production at all times. Therefore, Bulgaria's acts are shocking, or at the very least surprising, to a sense of juridical propriety.[792]

553.    The Seven Measures were furthermore designed to disguise Bulgaria's real intentions behind them, namely, to reduce the FiT. They also made the legal framework of the Respondent not readily apparent to investors. Both constitutes non-transparent behaviour in violation of the FET Obligation.[793]

---

[788]    CMOM, paras. 326-327.

[789]    CROMCMOJ, paras. 263-264, 269; HT, D3, 9 June 2021, p. 600; CPHB, paras. 51-52, 85, 87, 89; *Cube* (**CL-148**), para. 247.

[790]    CROMCMOJ, para. 457; COS, p. 139; CPHB, para. 86.

[791]    CMOM, paras. 334-336; CROMCMOJ, paras. 463, 476-477, 480.

[792]    CROMCMOJ, para. 463.

[793]    CMOM, paras. 335-336; CROMCMOJ, para. 467; CPHB, para. 89.

554. The inapplicable and high standard of *Stadtwerke* was also met by Bulgaria's behaviour: there was a continuing pattern of non-transparent conduct in Bulgaria's actions.[794]

555. If one were to believe the Respondent's defence that the ERSA Regime was based on, at most, a "reasonable return" or an "economically justified" return instead of on the detailed conditions and regulations set out in ERSA, and/or if one were to believe that the ERSA Regime, while being set out in the form of a law, and including a stabilisation of the FiT, was subject to constant change and amendments that would affect existing plants and their revenues, then Bulgaria was not transparent about that purported limitation in the original framework or elsewhere, or about the scope of any such "reasonable return". That would be in violation of the ECT. In such a scenario, Bulgaria would also be hiding behind an ambiguous notion it itself created.[795]

556. As a matter of fact, Bulgaria's State aid argument even constitutes an admission of a lack of transparency and consistency on its side. If Bulgaria had to notify the ERSA Regime to the European Commission, and did not, and if it knew that it might have retroactively to change the ERSA Regime to affect existing plants, but did not communicate that to investors, then Bulgaria was not transparent about those aspects of the ERSA Regime.[796] Equally, if the Respondent attracted investment based on a regime in violation of EU law, *i.e.* an illegal regime, it would violate its transparency and broader FET obligations.[797]

557. Finally, regarding the April 2012 meeting with the Deputy Minister of MEET, if it is the Respondent's argument that any comments made in that meeting were only to tell potential investors what they wanted to hear so that they would invest, that itself would also represent an admission of a violation of Bulgaria's duty to act transparently.[798]

(4) Reneging on an internationally protected obligation entered into

558. The Claimant further argues that, by offering long-term stability of the ERSA Regime to all that fulfilled certain procedural and substantial conditions by a certain date, the

---

[794]  CROMCMOJ, para. 464.

[795]  CROMCMOJ, paras. 18, 478, 480; HT, D1, 7 June 2021, p. 37; CPHB, para. 89.

[796]  CROMCMOJ, para. 428, *cf.* also CROMCMOJ, para. 475; COS, p. 74; HT, D1, 7 June 2021, p. 100.

[797]  CPHB, para. 74.

[798]  CPHB, para. 81.

Respondent entered into an internationally protected obligation once the Claimant accepted the offer by fulfilling those conditions by the set time.[799] The breach of that obligation is a violation of the ECT, and namely a violation of the Claimant's legitimate expectations of fulfilment of that obligation and a violation of the Respondent's duty not to undermine the stability as promised in that obligation (but also an obligation under the Umbrella Clause, see below).[800]

### b.    Unreasonable impairment

559.    The Claimant argues that the Respondent violated the Impairment Clause by introducing unreasonable and/or discriminatory measures.[801]

560.    The Seven Measures were unreasonable because they violated the commitments and guarantees of the ERSA and deviated from repeated assurances of the Respondent's officials – guarantees and assurances that had induced the Claimant to invest.[802] The Respondent induced the Investment only to remove the incentive retroactively after the costs were sunk while retaining the benefit of the increase in production of renewable and clean energy. This is a manner of acting unreasonably in the sense of the Impairment Clause.[803]

561.    It was furthermore unreasonable of the Respondent to bring about regulatory change when there was no sound economic or regulatory policy basis for the change.[804]

562.    Finally, the Seven Measures were unreasonable from an economic and regulatory perspective, because better options were available to address the alleged problems the Respondent cited to justify its measures.[805] Bulgaria could for example have reduced the energy costs of groups or industries which are particularly vulnerable to energy

---

[799]    CMOM, paras. 299-300; CROMCMOJ, paras. 375, 387, 536; CPHB, para. 51.

[800]    CMOM, paras. 299-300.

[801]    CMOM, para. 337; CROMCMOJ, para. 503.

[802]    CMOM, para. 341; CROMCMOJ, paras. 494, 499; CPHB, para. 91.

[803]    CROMCMOJ, para. 500.

[804]    CMOM, para. 341; CPHB, para. 91.

[805]    CMOM, para. 343; CROMCMOJ, paras. 20, 500; HT, D1, 7 June 2021, pp. 82-83; CPHB, paras. 57, 92.

costs.[806] Moreover, the reasonable course of action would have been to close the ERSA Regime to new entrants, but not to reduce the revenues of existing plants.[807]

563. The Claimant's expert on regulatory issues concludes that the Seven Measures targeted the wrong beneficiaries, introduced inefficiencies in the Bulgarian economy, increased regulatory uncertainty, negatively affected the cost of capital, increased the costs of achieving Bulgaria's targets for electricity from RES, and may even have led to further increases of the electricity price.[808] For these reasons, the Seven Measures were unreasonable measures that impaired the Investment.[809]

564. The 28% reduction of the revenues of the Karad Plant as a consequence of the Seven Measures is an objective measure of an impairment.[810] In addition, even if a "reasonable return" were relevant for the assessment of reasonableness of a measure, which it is not, it would not help the Respondent *in casu*, because the Karad Plant, even on the Respondent's expert's own calculations, and against the Respondent's own benchmark, did not earn a reasonable return after imposition of the Seven Measures.[811]

565. It is in that regard a further example of unreasonable behaviour and of a failure to consider the Claimant's position, that Bulgaria knew full well the harmful impact the Seven Measures would have on the Claimant, but imposed them anyway.[812]

566. Finally, the Seven Measures were also discriminatory. They were lobbied for by traditional energy producers and only targeted renewable energy producers, affording consumers, the conventional energy sector, and "others" more favourable treatment, while less discriminatory and harmful alternatives to address Bulgaria's policy goals were available.[813]

---

[806]    CMOM, para. 343; Compass I, para. 7.6.

[807]    CROMCMOJ, para. 496; CPHB, para. 57.

[808]    CMOM, para. 346; Compass I, para. 7.14; CPHB, para. 93.

[809]    CMOM, paras. 346-348.

[810]    CMOM, para. 347; COS, p. 139.

[811]    CROMCMOJ, paras. 502, 543, 552; CPHB, paras. 95, 99; Oxera II, para. 8.63, Figure 8.4.

[812]    CMOM, para. 344.

[813]    CMOM, para. 345; CROMCMOJ, paras. 504-506; CPHB, para. 93.

### c.    Umbrella Clause

567. According to the Claimant, similarly to the situation in Italy, the Respondent entered into the obligation of full offtake of electricity for BG 485.60 per MWh over 20 years by means of the ERSA, the FiT Decision, the License, the Karad PPA and other permits individually and together (see above and below).

568. The Claimant adds that, "while the ERSA itself might be considered too 'general'", at the latest the License and the Karad PPA made the obligation a "specific" obligation.

569. In violation of the Umbrella Clause, the Respondent then breached that obligation, when it retroactively amended and then abrogated the applicable legal framework and imposed measures that materially reduced the FiT and limited its application to a portion of the Karad Plant's production.[814]

570. The ERSA, again much as in Italy, was effectively an offer to investors, which investors accepted by properly enrolling a plant in the regime, at which point the Respondent had an obligation to provide the specific remuneration for the electricity the enrolled plant would produce. The Respondent subsequently breached that obligation by reducing the FiT by means of the Seven Measures.[815]

571. The Claimant submits, however, that its claim is not one of direct breaches of the Karad PPA by any of the Seven Measures and in particular the Annual Production Cap. The claim rather is that the imposition of the Seven Measures violated the ECT.[816]

### d.    Alleged violations of the ECT and applicable rules and principles of international law specific to a measure

#### (1)    All measures with the exception of the APC

572. According to the Claimant, "the other measures", *i.e.* the Measures not being the APC, undermine the Respondent's promise of a fixed FiT rate for twenty years. It is in that regard irrelevant that they do so indirectly, because they "serve no purpose other than to reduce the price that Bulgaria had promised to pay". Therefore, the introduction of

---

[814]    CMOM, paras. 356-359; CROMCMOJ, paras. 20, 524, 526, 533; CPHB, para. 97.

[815]    CMOM, paras. 299-300; CROMCMOJ, paras. 375, 387, 536.

[816]    HT, D1, 7 June 2021, pp. 76-77.

these measures breached the Respondent's commitments and Claimant's legitimate expectations.[817]

573.   In the logic of the ERSA Regime, which works with a fixed FiT over a long period, imposing new arbitrary costs without adjusting the FiT defies that logic and is "as direct an assault as reducing the FiT itself". In that regard, the Claimant recalls that the FiT is the only revenue of a PV plant like the Karad Plant, and any fee applied "only" to revenues is a fee applied directly to the FiT.[818]

574.   It was furthermore an unreasonable impairment to impose fees and levies on incentive revenue without deducting costs as if incentive revenue equalled profit. It was particularly unreasonable to impose all kinds of new costs on the Claimant's plant after the FiT was fixed based on wholly different and materially lower cost assumptions.[819]

(2)   Temporary Grid Access Fee and Permanent Grid Access Fee

575.   The Claimant submits that the guarantee not to impose grid access fees is "necessarily implicit" in Article 31(4) ERSA where the Respondent guarantees that the "price of electricity from renewable sources shall not be changed for the term of the purchase contract."[820]

576.   The imposition of grid access fees on producers of renewable energy fundamentally altered the essential elements of the Claimant's remuneration under the ERSA Regime.[821]

577.   What is more, when the Respondent imposed grid access fees on producers, it reallocated the network costs from consumers to producers, converting the FiT from a "factory gate" price to a "delivered" price and completely changing the allocation of the pricing in a way that no reasonable investor could have expected. The allocation of network costs between consumers and producers, however, is an integral step in setting a FiT. A guarantee not to change a FiT for 20 years thus implicitly includes a promise

---

[817]   CMOM, para. 314.

[818]   *Ibid.*

[819]   CMOM, para. 341; CPHB, para. 91.

[820]   CROMCMOJ, para. 274.

[821]   CROMCMOJ, para. 458.

not to change the FiT from a "factory gate" FiT to a "delivered" FiT. Being bound by such a promise is not a "sweeping limitation" on Bulgaria's right to regulate.[822]

### (a)    Temporary Grid Access Fee

578.    With a view to the Temporary Grid Access Fee in particular, the Claimant submits that it was "unreasonable" not to reimburse payments of fees that Bulgarian courts had struck down as unlawful.[823]

579.    The Claimant's claim with regard to the Temporary Grid Access Fee does not arise on the basis of the Access Fee Settlement Agreement, but its primary basis is Bulgaria's violation of its FET, Impairment Clause, and Umbrella Clause obligations by means of the introduction of the Temporary Grid Access Fee. As stated above, in that context the Access Fee Settlement Agreement is relevant only as an effort to mitigate damages.[824]

580.    The secondary basis of the Claimant's Temporary Grid Access Fee claim is Bulgaria's violation of its obligation to apply its laws transparently and consistently by failing to ensure that ESO reimburse the remaining funds to the Claimant, and by retroactively applying the Permanent Grid Access Fee.[825]

581.    The Access Fee Settlement Agreement is furthermore irrelevant to the jurisdiction of the Tribunal over the claim regarding the Temporary Grid Access Fee because the Claimant is not a party to that agreement and because the Respondent did not assert any fork-in-the-road, *res judicata*, or other jurisdictional objection based on the Access Fee Settlement Agreement.[826]

### (3)    Annual Production Cap

582.    The Claimant submits that the Annual Production Cap was introduced "in direct violation" of the Respondent's "explicit and widely touted guarantee that eligible plants could sell 100% of their production at the FiT.[827] The guarantee was enshrined in the

---

[822]    CROMCMOJ, paras. 277-278, 280.

[823]    CMOM, para. 341; CPHB, para. 91.

[824]    CPHB, para. 41, fn 87.

[825]    *Ibid*.

[826]    *Ibid*.

[827]    CMOM, paras. 21, 313.

ERSA itself and officials of the Respondent "repeatedly" confirmed the 100% offtake obligation to investors, including the Claimant.[828]

583.　The APC fundamentally changed the cost/benefit equation after the fact, changing the ERSA Regime from one that rewards maximum productivity to one that rewards low-cost plants with average productivity.[829]

584.　In addition, it was an unreasonable impairment to impose an operating hour limit on a plant that cannot avoid material costs by shutting down, because in the case of PV plants most of the costs involved are sunk at the time of construction.[830] It was furthermore "arbitrary and discriminatory by design" to cap production at the level of an average plant and thereby only to injure above-average plants. This was particularly so because the details of the Karad Plant were fully known to the government and because the Karad Plant had been built the way it was built in reliance on the promise of full offtake set out in law, and in reliance on the communicated interest of Bulgaria that production of clean energy be increased and maximised.[831]

585.　Neither can the Respondent dispute or defend that the Seven Measures and especially the APC had a disproportionate impact on the Karad Plant because of its high cost/high output design, *i.e.* the 60.4/50 Ratio, and, accordingly, the Respondent falls back on the false assertion that it never licensed the plant's design. This underscores that the APC was utterly unreasonable and discriminatory.[832]

586.　Finally, Bulgaria is incorrect when it argues that the imposition of the APC did not constitute a fundamental change to the ERSA Regime and when it relies on ECT cases against Spain to support that position. As outlined in more detail above, the Spanish annual production cap was more modest and less impactful, it was only temporary, and still it was found to be unlawful by at least one ECT tribunal.[833]

---

[828]　CMOM, para. 313; CROMCMOJ, para. 16.

[829]　CPHB, para. 85.

[830]　CMOM, para. 341; see also CROMCMOJ, paras. 259ff; CPHB, para. 91.

[831]　CROMCMOJ, paras. 18; 259ff; 270; CPHB, para. 91.

[832]　CPHB, para. 94.

[833]　CROMCMOJ, paras. 454-456; *9REN* (**CL-62**), paras. 412f, 414.

(4)    20% Levy/Fee in 2014

587.    In respect of the 20% Levy, the Claimant argues that the imposition of the levy was a *de facto* reduction of the FiT despite Bulgaria having guaranteed not to do so. This reduction is a violation of Bulgarian law and the ECT, and the Claimant's legitimate expectation that Bulgaria would not reduce the FiT.[834]

588.    The failure to refund the sums collected under an unconstitutional law is unfair, arbitrary, and inconsistent, which constitutes a second breach of the ECT.[835]

589.    It was finally also "unreasonable" not to reimburse payments of fees that Bulgarian courts had struck down as unlawful.[836]

(5)    Balancing Cost Exposure

590.    The Claimant argues that it was an unreasonable impairment to impose balancing costs on a plant that is unable to control or avoid causing imbalances. In "'the absence of a well working intraday and balancing market, renewable energy plants had no possibility to effectively manage their imbalance risk'" and therefore, absent a mature balancing market, "it was unreasonable to expose them to these costs."[837]

591.    In addition, it is also unreasonable to cite imbalance costs as the justification for the Temporary and Permanent Grid Access Fees and the Balancing Cost Exposure at the same time.[838]

(6)    5% ESSF Contribution

592.    As for the 5% ESSF Contribution, the Claimant argues that the imposition of the fee was a *de facto* reduction of the FiT that Bulgaria had guaranteed to the Claimant, which reduction is in violation the ECT, and, more in particular, the Claimant's legitimate expectations that Bulgaria would not reduce the FiT incentives.[839]

---

[834]    CMOM, para. 238; CROMCMOJ, para. 459.

[835]    CMOM, para. 238.

[836]    CMOM, para. 341; CPHB, para. 91.

[837]    CMOM, paras. 341-342; quoting Compass I, para. 7.6; CPHB, paras. 91-92.

[838]    CMOM, paras. 341-343.

[839]    CROMCMOJ, para. 459.

e.    *Exculpatory arguments of the Respondent*

593.    The Claimant submits that the Respondent's defence is, broadly, that the Respondent made errors in the setting of the FiT which it then needed to correct.

594.    It is, however, for the Respondent to bear the risk of any such errors made because the Respondent is the regulator that sets the FiT. Such a risk cannot fall to investors who invested in legitimate reliance on the stability of the incentives that they were being provided by the government in order to incentivise them to invest.[840] Bulgaria "assumed responsibility and risks of managing the capacity enrolled in the support regime, and thus cannot use its own failure to manage a known risk properly as a justification for reneging on its commitments."[841] It "accepted the risk of under or over achieving [its] RES target".[842]

595.    Liability in that regard should be assessed based on whether the Seven Measures were qualitatively inconsistent with the fundamental allocation of risks at the time of the Investment. In that allocation of risk, and the assessment thereof, it also weighs that the Respondent, in full knowledge of the pipeline of projects, had the ability to react earlier and to set caps and to amend its legal framework before plants were commissioned and any alleged boom could manifest itself.[843]

### 21.    Quantum

a.    *Compensation standard*

596.    The Claimant submits that, given that the ECT contains no *lex specialis* regarding the compensation standard for violations of Article 10 ECT, the principle of full compensation, as first established in the *Chorzów Factory Case*, and reaffirmed many times since then,[844] including in the ILC Articles on State Responsibility,[845] fills that void. This means that: "reparation must, as far as possible, wipe out all the consequences

---

[840]    HT, D1, 7 June 2021, p. 50.

[841]    CPHB, paras. 4, 60.

[842]    CPHB, para. 60, quoting Presentation Dr Roques 9 June 2021, p. 41.

[843]    HT, D4, 10 June 2021, pp. 864-866, 879; HT, D5, 11 June 2021, pp. 903-907; CPHB, para. 86.

[844]    CMOM, paras. 363-367.

[845]    CMOM, para. 368.

of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed."[846] According to the Claimant, the Respondent explicitly agrees with the applicability of this standard.[847]

597. The Claimant is entitled to such compensation as of the date of the Award or a reasonable proxy in the form of a "Date of Assessment".[848]

598. The Date of Assessment is a legal matter, for the determination of which there are two common approaches: an "*ex ante*" valuation, which values damages as of the date of the breach and ignores subsequent changes to the investments, market conditions, and the legal framework, and an "*ex post*" approach, which values damages as of the date of the Award or a reasonable proxy, taking into account all of the information available to the Tribunal that has a bearing on the quantum of loss.[849]

599. A tribunal enjoys a large margin of appreciation in deciding which valuation methodology it chooses as most appropriate. In recent years, numerous arbitral decisions and numerous commentators have endorsed the "*ex post*" approach.[850]

600. In the case at hand, an *ex post* valuation is particularly appropriate because the Seven Measures continue to evolve, their effect is continuing, and they consist of several different measures introduced at different times, which makes an *ex ante* valuation either more burdensome, or imprecise.[851]

601. Bulgaria's only argument on quantum is, in fact, an argument on liability, namely, that the Claimant suffered no damages because it received a "reasonable return" at all times.[852] As discussed above, however, "reasonable return" is not an appropriate legal standard under which to assess the legality of the Respondent's actions. The standard

---

[846] CMOM, paras. 361-362; referring to *Case Concerning Factory at Chorzów (Germany v. Poland)*, Judgment 13, PCIJ, 13 September 1928 (**CL-123**), p. 47.

[847] CROMCMOJ, para. 543.

[848] CMOM, para. 369.

[849] CMOM, para. 370.

[850] *Ibid*.

[851] CMOM, para. 371.

[852] CROMCMOJ, paras. 21, 549, 551; COS, p. 131; HT, D1, 7 June 2021, pp. 136-138.

should thus not be allowed to re-enter through the back door as an argument on quantum.[853]

602. Only if the Tribunal came to the conclusion that the Claimant's sole legitimate expectation was that to a reasonable return, it must assess whether the Karad Project earned such a reasonable return after the implementation of the Seven Measures.[854] Were the Tribunal ever to engage in such an assessment, it would see that the evidence is clear that even on Bulgaria's evidence and benchmark, and on the calculation of Bulgaria's own expert, the target reasonable return of 9% was not reached.[855]

603. Finally, there can be no doubt about the causal link between the Seven Measures and the reduction of cash flows of the Karad Plant or about whether the Claimant has discharged its burden of proof in that regard, since all Seven Measures directly reduced cash flows by costing money or reducing revenue.[856]

### b.    Quantum of compensation owed

#### (1)    Method of calculating quantum

604. The Claimant has retained FTI to calculate its losses by applying the discounted cash flow ("**DCF**") method to calculate the diminution of the fair market value of its Investment.[857]

605. FTI calculated the quantum of compensation to be due by comparing the counterfactual scenario of the Respondent not having introduced the Seven Measures with the actual scenario. The specific investments evaluated in that process are the Claimant's equity interest and shareholder loans in ACWA Bulgaria.[858]

606. The impact of the challenged measures is assessed as at 31 December 2019, the effective date of the Claimant's sale of ACWA Bulgaria to Enery.[859] The sale of ACWA Bulgaria

---

[853]    CROMCMOJ, paras. 549, 551.

[854]    CROMCMOJ, para. 551.

[855]    CPHB, para. 99; Oxera II, para. 8.63, Figure 8.4.

[856]    CROMCMOJ, para. 550.

[857]    CMOM, paras. 372-373.

[858]    CMOM, para. 374.

[859]    CMOM, para. 375.

to Enery is an arms-length third party transaction and therefore constitutes "very strong" evidence of the fair market value of the Investment at that time in the actual scenario.[860]

607.   It is harder to determine the fair market value in the counterfactual scenario because one cannot study comparable transactions since all PV plants in Bulgaria are affected by the same measures, and therefore all sales of PV plants either are affected by the measures or took place too long ago to be relevant. In addition, the value of a PV plant is very case-specific as it is very design- and location-specific.[861]

608.   Therefore, the DCF method is the appropriate method to determine the counterfactual value of the Investment. "[T]he DCF method values an investment based on the stream of future cash flows that the investment is expected to generate, 'discounted' to a present value to account for the time value of money and the riskiness of the forecast cash flows." The DCF method is also the appropriate method for this case because the performance of PV plants is relatively predictable when it comes to the production over a full year and the selling price and the costs are known in the counterfactual scenario. Finally, in the DCF method, specific characteristics of a plant, such as the 60.4/50 Ratio, can be taken into account appropriately.[862]

(a)    Comments on the Respondent's quantum case

609.   Bulgaria's quantum case is wrong on its premises and wrong in its method and, as stated above, is in fact not a quantum case.[863] Bulgaria's quantum case and calculations ignore that the ERSA Regime as it attracted the Investment was based on a fixed price per unit on a determined amount of output (full output), not a particular return.[864] Accordingly, the quantum of damages must be calculated based on the impact of the Seven Measures on the Karad Plant's guaranteed cash flows rather than on its rate of return.[865] The Respondent's quantum case also ignores that the Karad Plant has never earned a

---

[860]   CMOM, para. 376; HT, D5, 11 June 2021, pp.1006-1007.

[861]   CMOM, para. 377.

[862]   CMOM, para. 378; CROMCMOJ, para. 545.

[863]   CROMCMOJ, paras. 21-22, 543-545, 549; COS, p. 131; HT, D1, 7 June 2021, pp. 136-138.

[864]   CROMCMOJ, paras. 21, 314-315, 480, 543, 549, 551.

[865]   CPHB, paras. 98-99.

reasonable return, even on the basis of the calculations of the Respondent's own expert against the Respondent's own benchmark.[866]

610. Finally, the quantum case of the Respondent also further inflates the Karad Plant's actual return through "egregious errors" of fact and methodology.[867]

*(i)    Use of a variable return*

611. Among other things,[868] the Respondent's expert in his first report uses a "variable return" which at the time of the expert's calculations is around 300 basis points lower than the return Bulgaria had considered reasonable at the time of the Investment. In doing so, Mr Kristensen ignores that the FiT, after having been set taking into account then current interest rates, was never to vary during its term, and was designed to be independent of future market interest rates.[869] It is thus inappropriate to take actual varying interest rates into account *ex post*. Doing so is comparable to retroactively treating a bond with a fixed interest rate as a bond with variable interest rates once interest rates have declined, arguing that, based on the new prevailing interest rates, the investor in the bond would still earn a reasonable return.[870] Using a variable return also ignores that, for better or worse, under the ERSA Regime the Claimant assumed the risk of a change in interest rates.[871] The Respondent's expert has accepted this to be a mistake, the Claimant submits.[872]

*(ii)    Use of an individual WACC rather than the FiT Decision WACC*

612. As another example, when then the Respondent's expert in his second report compares the Karad Project's (alleged) returns against one consistent weighted average cost of capital ("**WACC**"), he uses a wrong WACC. He uses his estimate of the Karad Project's WACC in 2012, rather than the WACC relied on by the EWRC for the reference plant

---

[866]    CROMCMOJ, paras. 21, 314-315, 480, 543, 549, 551; CPHB, para. 99; Oxera II, para. 8.63, Figure 8.4.

[867]    CROMCMOJ, paras. 21, 543, 549, 552, 562.

[868]    CROMCMOJ, para. 568; full overview at FTI II, chapter 3.

[869]    CROMCMOJ, paras. 21, 315, 553ff; COS, p. 132; HT, D1, 7 June 2021, pp. 138-140.

[870]    CROMCMOJ, paras. 21, 315.

[871]    COS, p. 132.

[872]    HT, D1, 7 June 2021, pp. 138-139.

in the FiT Decision, against which a return would have to be measured, if "reasonable return" were a relevant notion.[873] Indeed, the FiT Decision explicitly states that "[t]he Commission considers it economically justified to set a uniform target value for the rate of return on capital, at same target capital structure of own and borrowed capital, in setting the preferential prices for compulsory purchase of electricity from renewable energy sources."[874] The fact that the FiT Decision used a WACC for the entire sector, rather than a separate WACC calculated for each plant is "the definition of a benchmark".[875]

<div align="center">

*(iii)    Period over which to calculate the IRR and the electricity price forecast*

</div>

613.    As a further example, Mr Kristensen calculates the IRR of the Karad Project over the entire expected operating life of the Project of 30 years instead of over the 20 year duration against which the 9% IRR target was set and calculated.[876] Mr Kristensen's electricity price forecast is furthermore too high as opposed to the Claimant's own, more reliable estimate based on a third-party source (Raiffeisen Bank International, the Claimant's investment advisor).[877]

<div align="center">

*(iv)    The inclusion of NOMAC*

</div>

614.    The Claimant also disputes that costs of the Karad Plant were inflated or that profits were shifted by contracting NOMAC Bulgaria EAD ("**NOMAC**") as the operation and maintenance provider of the Karad Plant.[878] This is an assumption of the Respondent that allows the Respondent to increase the results of its calculation of the actually realised IRR considerably (see below).

615.    NOMAC, at first, was indeed a 50% subsidiary of a subsidiary of ACWA Power International, and later, since 2017, a full subsidiary of a subsidiary of ACWA Power

---

[873]    COS, p.133; HT, D1, 7 June 2021, pp. 140-142; CPHB, para. 100.

[874]    HT, D6, 12 June 2021, p. 1107; FiT Decision (**R-365**), p. 8.

[875]    CPHB, para. 100.

[876]    CROMCMOJ, para. 563; COS, p. 136; HT, D1, 7 June 2021, pp. 144-145; HT, D5, 11 June 2021, pp. 1015-1018.

[877]    CROMCMOJ, para. 564.

[878]    CROMCMOJ, paras. 238ff; 565ff.

International.[879] This fact, however, does not make the Claimant and NOMAC an integrated economic unit. The two other Shareholders, holding together roughly 58% in ACF, would also have never allowed to shift profits from the Claimant to NOMAC.[880]

616.     It is also incorrect that NOMAC made excessive profits. Rather NOMAC charged about 25% under-market. This had actually led to concerns of the Shareholders when ACWA Bulgaria was purchased by the Claimant. It was feared that the under-charging for operation and maintenance, by a company that at that time was still 100% owned by a group company of the seller of the Karad Plant, might be a ruse to increase the apparent profitability of the Karad Plant in order to increase the sale price of the Plant. The fear that this was the case led to the execution of a side letter to the SPA that assured the provision of equivalent operation and maintenance services to the Karad Plant in case of a default or change by or in NOMAC.[881]

617.     Therefore, the inclusion of NOMAC cash flows into the calculation of the IRR of the Karad Plant is baseless. In addition, in cross-examination, Mr Kristensen agreed that assuming the price NOMAC charged per year was too high, *quod non*, it was at maximum EUR 1,000 per MWp above market price. This would reduce the total impact of the inclusion of NOMAC, even if it were relevant and appropriate, to at maximum EUR 600,000 in present-day value, *i.e.* a very low figure.[882]

*(v)     The licensed capacity scenario*

618.     The Respondent's licensed capacity scenario is also baseless and fatally flawed.[883] First and foremost, the scenario misunderstands that even with the 60.4/50 Ratio installed, the Karad Plant never can produce more and feed in more into the grid than the capacity for which it is licensed.[884] Furthermore, as Mr Kristensen agreed in cross-examination,

---

[879]     CROMCMOJ, para. 240; NOMAC Financial Statements, 31 December 2016 (**R-100**), p. 3.

[880]     CROMCMOJ, paras. 241-242, 565; COS, p. 137; HT, D1, 7 June 2021, p. 145; HT, D5, 11 June 2021, pp. 1018-1019.

[881]     CROMCMOJ, paras. 242-243, 566-567; COS, p. 137; HT, D1, 7 June 2021, p. 145; HT, D5, 11 June 2021, p. 1019.

[882]     HT, D6, 12 June 2021, pp. 1100-1102; COS, p. 137.

[883]     COS, p. 134; HT, D1, 7 June 2021, pp. 142-144; CPHB, para. 101.

[884]     COS, p. 134; HT, D1, 7 June 2021, pp. 142-144.

the licensed capacity scenario would be wholly irrelevant if the Tribunal were to agree with the Claimant that the 60.4/50 Ratio was not in violation of the License.[885]

619.    The licensed capacity scenario also artificially increases the Karad Plant's IRR by way of its method of calculation: it assumes a reduction of the production volume and costs of the Karad Plant by 17%, rather than a reduction of the revenue and the costs of the Karad Plant by the same percentage. That increases the Karad Plant's IRR because a reduction in volume in a world in which the APC applies, leads to a higher share of volume obtaining the FiT rather than the lower market price, whereas a reduction in revenue equal to a reduction in costs would leave the IRR of the Karad Project unchanged.[886]

620.    Witness testimony by Mr Roberts in that regard also makes it clear that a plant with the 60.4/50 Ratio, contrary to Mr Kristensen's assumption, would not have a 14.9% higher CAPEX and 17% higher OPEX as compared to a plant with a 1:1 ratio, but rather would have around 10% higher costs. This is because, although the plant with the 1:1 ratio would save on additional panels, other components such as inverters, buildings, and the grid connection would be required to the same degree as in a plant with the 60.4/50 Ratio.[887]

621.    With the licensed capacity scenario, the Respondent's expert thus "imagines a hypothetical world in which Claimant had acquired a lower cost/lower production plant tailored to the incentive structure of the APC rather than the higher cost/higher production plant tailored to the incentive structure of the original FiT".[888]

622.    The only thing the licensed capacity scenario therefore does at the end of the day is to underscore how harmful the APC was to the Karad Plant.[889]

---

[885]    HT, D5, 11 June 2021, p. 1072.

[886]    COS, p. 134; HT, D1, 7 June 2021, pp. 142-144; HT, D5, 11 June 2021, pp. 1072-1075; CPHB, para. 101.

[887]    HT, D5, 11 June 2021, pp. 1073-1079; CPHB, para. 101.

[888]    COS, p. 134; HT, D1, 7 June 2021, pp. 142-144.

[889]    CPHB, para. 101.

*(vi)    An IRR calculation without the Respondent's errors*

623.    When correcting the errors of the Respondent's quantum case, *e.g.* by not including profits of NOMAC into the calculation, even on Bulgaria's incorrect "reasonable return" premise, the Karad Project only earned a project IRR of 6.1% over a 20 year period (6.8% pre-tax over a 30 year period, according to the Respondent's expert). That means that even on Bulgaria's own case, the Karad Project has suffered damages resulting from Bulgaria's Seven Measures of EUR 53.1 million, *i.e.* the lump sum payment required retroactively to increase the Karad Plant's IRR to the target 9%.[890] The Claimant's expert adds that in his calculations even over a 30 year period and including NOMAC's profit, the Karad Plant's IRR would not have exceeded 6.7%.[891]

624.    Therefore, as outlined above, the Respondent, on its own case based on having promised a reasonable return only, has breached that promise and violated the ECT.[892]

625.    In that regard it is of note that the difference between the lump sum payment to which the Claimant would be entitled under the Respondent's IRR approach and the higher amount of damages the Claimant claims (EUR 78.1 million) does not represent a windfall profit. It represents a reward for making a good investment in an efficient plant bearing the risk of the investment. A "reasonable return" target for damages would allow the Respondent to appropriate for itself the additional gains that the Claimant reasonably expected to earn as a result of its good investment in an efficient plant.[893]

(2)    Calculation of quantum

626.    According to the Claimant, its expert created two forecast based models to determine the Claimant's losses.[894]

627.    One model is created for the actual scenario but is, nevertheless, based on forecasts regarding production, degradation, operating life, sales price, operating costs, the

---

[890]    CROMCMOJ, paras. 21, 316, 443, 502, 552, 569-570; COS, pp. 5, 142; HT, D1, 7 June 2021, p. 146; FTI II, paras. 3.38-3.42; elsewhere the Claimant points out that in Oxera II, the Respondent's expert calculated a range of pre-tax IRRs of 6.8% to 8.6%; CPHB, paras. 99-100, 102; Oxera II, para. 8.63, Figure 8.4.

[891]    HT, D5, 11 June 2021, p. 1020; Richards Presentation, 11 June 2021, p. 16.

[892]    CROMCMOJ, para. 570.

[893]    CROMCMOJ, paras. 443, 570; HT, D1, 7 June 2021, p. 146.

[894]    CMOM, para. 379.

various fees and contributions imposed, and taxes. The model is then reconciled with the actual sale price of the sale of ACWA Bulgaria. That reconciliation also leads the expert to derive a cost of capital set at 6.1%.[895]

628. The other model is created for the counterfactual scenario. It is based on the assumption of a steady FiT on 100% of the production and no fees except for a small balancing fee estimated on the basis of the 2010 ETR, and applies the same cost of capital of 6.1% as derived in the actual scenario model. It further takes into account some cash flow impacts of the absence of the Seven Measures in the but-for scenario, mainly being the absence of the payments for various fees, the absence of additional legal fees, the absence of uncollectible receivables for sales outside the FiT regime, and the absence of restructuring costs. It does so by incorporating additional hypothetical cash-flows as a reduction of the net debt in the counterfactual scenario, *i.e.* it assumes that ACWA Bulgaria would have used additional cash flows which would arise in a scenario in which the Seven Measures had not been introduced to reduce debt.[896]

629. A comparison of the two models leads to the result that the losses caused by the Seven Measures are EUR 78.1 million.[897]

630. According to the Claimant, relying on its expert, the losses are attributable to the different regulatory changes as per the following table:[898]

| Regulatory Change | EUR m | % impact on counterfactual value of the Investment |
|---|---|---|
| Temporary Grid Access Fee | 0.0 | 0.0% |
| Permanent Grid Access Fee | 3.6 | 3.3% |
| Balancing Cost Exposure | 7.3 | 6.8% |

---

[895] CMOM, paras. 379-380.

[896] CMOM, para. 383.

[897] CROMCMOJ, para. 548.

[898] CMOM, para. 384; FTI II, para. 2.11, Table 2-5; FTI I, para. 7.7, Table 7-2.

| 20% Levy | 2.2 | 2.1% |
|---|---|---|
| Annual Production Cap | 53.4 | 50.1% |
| 5% ESSF Contribution | 9.6 | 9.0% |
| Transition from FiT to FiP | 1.7 | 1.6% |
| **Sub-total** | **77.8** | **72.9%** |
| Legal fees and debt restructuring costs | 0.4 | 0.3% |
| **Total losses** | **78.1 [78.2]**[899] | **73.2%** |

631.    While the Claimant did not make its position very clear at the outset, and made it more confusing by comments and later clarifications,[900] it appears from Mr Edward's first report that the Claimant's actual position is not that the alleged damage caused by the Temporary Grid Access Fee is to be measured at EUR 0. Rather, the Claimant combines the damage allegedly caused by the Temporary Grid Access Fee, *i.e.* the damage from ACWA Bulgaria not having received back the Remainder, *i.e.* BGN 315,253.80, with the damage allegedly caused by the Permanent Grid Access Fee. This appears to have been done by treating the Permanent Grid Access Fee for the purposes of the calculation as if it had started to apply in September 2012. The logic thereof is in line with the reasons for not paying out the Remainder as they appear in the Access Fee Settlement Agreement: as it is reasoned there, the Remainder equals what ACWA Bulgaria would have had to pay in Permanent Grid Access Fee over that period if that Fee had already applied.[901]

632.    The Respondent has not engaged with, and has not disputed, the content of the Claimant's quantum case, and in particular the underlying calculations as advanced by

---

[899]    According to the calculations of the Tribunal, the sum of the above amounts adds up to EUR 78.2 million. The Tribunal understands that the difference likely stems from more detailed numbers in the underlying model represented in this table.

[900]    CMOM, para. 383; CPHB, para. 41, fn 87.

[901]    Edwards I, para. 7.8.

the Claimant's expert. The Claimant's quantum case and the calculations pertaining to it therefore stand unchallenged, and are the only quantum valuation on record, should the Tribunal find liability.[902]

633.  In the Respondent's alternative quantum case, however, Mr Kristensen made some assumptions regarding certain factors which are also required for the calculation of the DCF, *i.e.* the Claimant's quantum case. This concerns, for example, the annual degradation of PV panel performance or the discount rate, both of which Mr Kristensen assumes to be lower than Mr Edwards.[903]

634.  Applying Mr Kristensen's assumptions to the Claimant's DCF valuation, the valuation of the Claimant's damages would even increase to EUR 84.9 million. This comes as no surprise to the Claimant, because assuming a lower annual degradation of the panels or a lower discount rate increases the on-paper return of the Karad Plant, which, in turn is in the interest of the Respondent's reasonable return case. If anything, Mr Kristensen's assumptions therefore show that Mr Edward's assumptions are reliable and indeed conservative.[904]

*(a)    Equivalent FiT reduction*

635.  The Claimant submits that Mr Kristensen's "Equivalent FiT Reduction" calculation, first presented in the Respondent's Rejoinder, is misleading, not least because it assumes the legality of the APC and thus omits the most harmful of the Seven Measures from the scenario.[905]

636.  The Claimant assumes that in presenting the equivalent FiT reduction calculation, the Respondent intends to suggest a similarity of the situation in Bulgaria to the impact of the "Spalma Incentivi" in Italy that were subject of the *SilverRidge* case, and were found not to violate the ECT in part because of their relatively small magnitude impact on the feed-in premium (not feed-in tariff) applicable there.[906]

---

[902]    CROMCMOJ, paras. 22, 313, 544-545; COS, pp. 131, 141; HT, D1, 7 June 2021, pp. 136-138.

[903]    CROMCMOJ, paras. 546-547.

[904]    CROMCMOJ, para. 547.

[905]    COS, p. 140; HT, D1, 7 June 2021, pp. 148-150; CPHB, paras. 105-110; FTI III, paras. 3.11-3.17.

[906]    HT, D1, 7 June 2021, p. 149; HT, D5, 11 June 2021, pp. 969-973; CPHB, paras. 105-110.

637. Nevertheless, if Mr Kristensen's errors and omissions in his equivalent reduction analysis were corrected, the applicable figure for Bulgaria, comparable to the 8% figure in Italy, would not amount to Mr Kristensen's 7.4%, corrected after the Hearing to 9.8%, but to a comparable reduction of 35.7%.[907]

638. This is because, first, as stated above, Mr Kristensen's calculations leave out the APC, while Mr Edwards' calculations include them,[908] secondly, because the regime in Italy was based on a FiP topping up the market price and a reduction of a top-up has a smaller impact than the same percentage reduction applied to the whole FiT, *i.e.* the whole price that a plant receives,[909] and thirdly, because Mr Kristensen's calculation includes periods before the Seven Measures applied in the calculation of the total revenue reduction and thus periods during which the full revenue was earned.[910] The Claimant requests that if the Tribunal were inclined to place any weight on this calculation of Mr Kristensen, it give the Claimant's expert an opportunity to respond.[911]

   *c.    Pre- and post-award interest*

639. The Claimant requests pre- and post-award compound interest "at the highest lawful" "appropriate" rate based on international commercial rates, from the Date of Assessment until the date that the Respondent pays the Award in full.[912] It argues that interest is an "integral" part of the compensation for damages an entity suffered and should run from the date when the Respondent's international responsibility became engaged.[913]

640. As the Respondent has acknowledged,[914] international law recognises compound interest as the generally accepted standard in international investment arbitration.[915]

---

[907]    COS, p. 140; HT, D1, 7 June 2021, p. 150; CPHB, paras. 105-110; FTI III, para. 3.17; Oxera IV, para. 1.11.

[908]    COS, p. 140; HT, D1, 7 June 2021, pp. 148-150; FTI III, paras. 3.11-3.17; CPHB, para. 110.

[909]    CPHB, para. 107.

[910]    COS, p. 140; HT, D1, 7 June 2021, pp. 148-150; FTI III, paras. 3.11-3.17; CPHB, para. 107.

[911]    HT, D1, 7 June 2021, p. 150.

[912]    CMOM, paras. 385-386.

[913]    CMOM, para. 385; referring to *Asian Agricultural Products Ltd. v. Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Award, 27 June 1990 (**CL-125**), para. 114.

[914]    CROMCMOJ, para. 571, misleadingly referring to RCMOMOJ, para. 503.

[915]    CMOM, paras. 386-391.

641.    Compound interest makes a claimant whole, ensures full compensation, and prevents unjust enrichment of the State.[916] It is not a punitive sanction.[917]

642.    The Tribunal has a "great deal" of discretion in choosing the pre- and post-award interest rate. Both rates do not necessarily need to be identical.[918] The Tribunal should award a higher rate of post-award interest than it applies as pre-award interest in order to facilitate prompt payment.[919]

643.    In contrast with the Respondent, the Claimant would find it inappropriate to award a risk-free interest rate, as such a rate would not be commensurate with the level of risk associated with Bulgaria's payment obligations or the opportunity costs of the Claimant of not having access to the funds.[920]

644.    In light thereof, the Claimant suggests finding a rate relating to the reasonable cost of borrowing money in the commercial market appropriate to reflect the Claimant's opportunity costs, such as EURIBOR plus 2%, as adopted by the Claimant's expert.[921] The Respondent's cost of debt would also appropriately reflect the level of risk associated with Bulgaria's payment obligations, but not the Claimant's opportunity costs. For this reason, the Respondent's cost of debt would constitute an appropriate, but less appropriate interest rate.[922]

## 22.    Petitum

645.    The Claimant requests that the Tribunal determine that the Respondent has breached its obligations under the ECT and international law and order the Respondent to pay the Claimant full compensation for the losses it suffered as a result, plus costs and pre- and post-award interest.[923] The Claimant seeks that the damages be calculated as the amount by which the fair market value of the Investment was diminished by the Respondent's

---

[916]    *Ibid.*

[917]    CMOM, para. 388.

[918]    CMOM, para. 393.

[919]    CROMCMOJ, para. 575.

[920]    CROMCMOJ, para. 571.

[921]    CROMCMOJ, para. 572.

[922]    CROMCMOJ, paras. 573.

[923]    CMOM, paras. 27, 394.

violations of the ECT, calculated in accordance with the DCF method, and that interest be compounded.[924]

646.    Specifically, the Claimant requests that the Tribunal grant the following relief:[925]

    a.  a declaration that the Tribunal has jurisdiction over this dispute under the ICSID Convention and the Energy Charter Treaty;

    b.  a declaration that Bulgaria has violated the Energy Charter Treaty and international law with respect to Claimant's investments;

    c.  compensation to Claimant for all damages it has suffered, as set forth in Claimant's submissions and as may be further developed and quantified in the course of this proceeding;

    d.  all costs of this proceeding, including but not limited to Claimant's attorneys' fees and expenses, the fees and expenses of Claimant's experts, and the fees and expenses of the Tribunal and ICSID;

    e.  pre-award and post-award compound interest at the highest lawful rate from the Date of Assessment until Bulgaria's full and final satisfaction of the Award; and

    f.  any other relief the Tribunal deems just and proper.

647.    The Claimant reformulated its request for relief in its CROMCMOJ to request that the Tribunal[926]

    •   Reject and dismiss Respondent's jurisdictional objections in their entirety;

    •   Find that Respondent has breached the Energy Charter Treaty;

    •   Order Respondent to pay compensation for the harm its breaches have caused, as detailed and calculated in this submission [/as set forth by Mr Edwards];

    •   Order Respondent to pay all costs associated with this proceeding, including but not limited to Claimant's attorneys' fees, the Tribunal Members' fees and expenses, ICSID's administrative fees and expenses, and all costs associated with this proceeding;

    •   Order Respondent to pay pre- and post-award compound interest; and

    •   any additional relief the Tribunal deems just and proper.

---

[924]    *Ibid.*, paras. 372, 386.

[925]    *Ibid.*, para. 394.

[926]    CROMCMOJ, para. 578, repeated in CROJ, para. 126, and in CPHB, para. 135.

648.  The Claimant specified its request for costs in its CCS to request that the Tribunal order the Respondent[927]

to pay the entirety of costs, fees, and expenses incurred by Claimant in this arbitration, in the amounts of US$ 7,112,331.31 and € 331,042.37.

### B.    The Respondent

#### 1.    Introduction

649.  The Respondent's main position regarding this case is twofold. First, the Respondent contests the Tribunal's jurisdiction. The Respondent contends that the Tribunal lacks jurisdiction based on Article 17(1) ECT and, alternatively, on the *Komstroy* Judgment. In addition, the Tribunal may not hear the Claimant's claims relating to the 20% Levy and the 5% ESSF Contribution on the ground that the two measures constitute Taxation Measures falling under the exemption of Article 21 ECT.[928]

650.  Secondly, the Respondent submits that the Claimant's claims are without merit and must also therefore fail.[929]

#### 2.    Objections to Jurisdiction

##### a.    *Article 17(1) Objection*

651.  The first jurisdictional objection of the Respondent to be dealt with in the merits phase of the proceedings relies on Article 17(1) ECT.

652.  The Respondent submits that, by letter of 6 August 2018, "at the outset of this arbitration", "before the First Session with the Tribunal", it has successfully denied the Claimant the advantages of Part III of the ECT in accordance with Article 17(1) ECT.[930]

---

[927]    CCS, para. 11.

[928]    RCMOMOJ, para. 6; RROMROJ, para. 5; RC *Komstroy*; RR *Komstroy*.

[929]    RCMOMOJ, para. 7.

[930]    RCMOMOJ, paras. 277ff, 293; RROMROJ, para. 300.

(1)    The scope of Article 17(1) ECT

(a)    *Impact of an invocation of Article 17(1) ECT on the consent to arbitration*

653.    The Respondent acknowledges that an invocation of Article 17(1) ECT cannot affect the Respondent's consent to arbitration under Article 26(1) ECT.[931] Article 26(1) ECT, however, provides for jurisdiction only in case of a dispute which concerns an alleged breach of an obligation under Part III of the ECT.[932] Under Article 17(1) ECT, the Contracting Parties have reserved the right, in certain circumstances, to deny to a specified category of investors the advantages of Part III of the ECT.[933] Consequently, when the advantages of Part III of the ECT are denied to an investor, no obligation under Part III of the ECT can be breached by a Contracting Party. This means, in turn, that no dispute concerning an alleged breach of such an obligation can have arisen, which, finally, means that no jurisdiction under Article 26(1) ECT can exist,[934] or, in any case, that a claim in relation to such an alleged breach is inadmissible, or must fail on the merits since no breach can have occurred.[935]

(b)    *Interpretation of Article 17(1) ECT and timing, manner, and effect of invoking Article 17(1) ECT*

654.    The Respondent submits that the right to deny the advantages of Part III of the ECT arises in respect of legal entities from another Contracting Party, if citizens or nationals of a third State own or control the entity, and if the entity has no substantial business activities in the Area of the Contracting Party whence the legal entity originates.[936]

655.    Provided that a legal entity qualifies as a legal entity in the sense of Article 17(1), a Contracting Party's right to deny the advantages of Part III of the ECT, which each Contracting Party has "reserved" under Article 17(1) ECT, is neither conditioned nor

---

931    RCMOMOJ, para. 292; ROP I, p. 13.

932    RCMOMOJ, para. 277; ROP I, p. 13; HT, D1, 7 June 2021, p. 164.

933    RCMOMOJ, para. 277; RROMROJ, para. 275; ROP I, p. 13.

934    RCMOMOJ, paras. 277, 280, 292; RROMROJ, para. 275; ROP I, p. 13; HT, D1, 7 June 2021, p. 164.

935    RCMOMOJ, para. 292; RROMROJ, para. 275.

936    RCMOMOJ, para. 278.

limited in any way and, in particular, knows no temporal limitation, no requirement of prior notice, and no solely prospective application.[937]

656.    The right to deny the advantages of Part III cannot be limited in its timing, and in particular not to before an investment is made, because ownership of an entity can change over time and so can a State's policies.[938]

657.    This means that the right to deny the advantages of Part III of the ECT may be exercised at any time and that no further notice or affirmative action is required. Article 17(1) ECT itself is the notice to qualifying entities, not least because an investor knows or must be presumed to know the Article, knows its own ownership structure, and knows the degree of its business activities in a Contracting Party.[939]

658.    It is true that "a number" of arbitral decisions, including the one in *Plama*, decided that Article 17(1) ECT cannot apply without notice to the legal entities concerned prior to their investment.[940] However, the interpretation adopted in those cases is contrary to the ordinary meaning of the terms of Article 17(1) ECT and contrary to the object and purpose of the ECT, and it is the Tribunal's responsibility to look afresh at the Article in its entirety.[941]

659.    The ordinary meaning of "[e]ach Contracting Party reserves the right" in connection with the factual conditions of Article 17(1) ECT signifies that when the two conditions of Article 17(1) ECT are met, a State is not obligated to accord the advantages of Part III of the ECT to an investor that meets those conditions.[942] Other interpretations are untenable since they would mean that a Contracting Party would have the right to deny advantages and the obligation, rather than just the choice, to accord advantages at the same time.[943]

---

[937]    RCMOMOJ, para. 279; RROMROJ, paras. 275, 277; ROP I, pp. 5-8, 11; HT, D1, 7 June 2021, pp. 153-163.

[938]    ROP I, 11, 12 HT, D1, 7 June 2021, p. 162.

[939]    RROMROJ, para. 277; ROP I, pp. 5-7, 9, 11; HT, D1, 7 June 2021, pp. 153-163, 184; RPHB, para. 11.

[940]    RCMOMOJ, para. 282; *Plama* (**CL-24**).

[941]    RCMOMOJ, para. 282; *Plama* (**CL-24**); ROP I, p. 11; HT, D1, 7 June 2021, p. 154; RPHB, para. 10.

[942]    HT, D1, 7 June 2021, p. 169.

[943]    RPHB, paras. 10, 14.

660. The stated object and purpose of the ECT is to "promote long-term cooperation in the energy field, based on complementarities and mutual benefits" among the ECT Contracting Parties.[944] The purpose of Article 17(1) ECT is "to permit Contracting Parties to require reciprocity of benefits" and not to permit obtaining protections of the ECT merely by establishing a holding company.[945] It would run contrary to that object and purpose if the benefits of the ECT were extended to investors from non-Contracting Parties which run mailbox or shell companies in a Contracting Party, given that the actual countries of origin of those investors would not reciprocate the advantages of the ECT to the ECT Contracting Parties.[946]

661. At the end of the day, "[d]epending upon the circumstances prevailing, the contracting Party either is or is not obligated to accord the advantages of Part III". Therefore, the Respondent argues that when a denial is possible, it must apply retroactively and prospectively.[947]

662. However, while not provided for in the text of the Treaty, there may come a point in time at which it is known to the State that the two conditions of Article 17(1) ECT are met, but at which the State may have to be considered to have waived its right of denial, *e.g.*, in an extreme example, the right might be considered to have been waived if raised at the first time in post-hearing briefs.[948]

663. The interpretation that the right not to accord the advantages of Part III of the ECT arises immediately once the conditions of the Article are met is given more persuasive force because it equally works for Article 17(1) and 17(2) ECT. A proper interpretation of Article 17(1) ECT should also work for Article 17(2) ECT. Article 17(2) ECT shows that the right to deny cannot just arise in a pre-investment context, given that Article 17(2) ECT addresses conditions that would arise after an investment took place.[949]

---

[944]  RCMOMOJ, para. 283; RROMROJ, para. 287; ROP I, 5; HT, D1, 7 June 2021, p. 153; ECT (**CL-1**), Article 2.

[945]  ROP I, 4; HT, D1, 7 June 2021, p. 153.

[946]  RCMOMOJ, para. 283.

[947]  ROP I, p. 12.

[948]  HT, D1, 7 June 2021, pp. 167-170, 182-184; RPHB, paras. 22-23.

[949]  HT, D1, 7 June 2021, 183-187; RPHB, paras. 9-10.

Moreover, the Contracting Parties did not agree on an opt-out mechanism for Article 17(1) ECT while they did so, for example, for parts of Article 10 ECT.[950]

664.    The *travaux préparatoires* of the ECT further confirm this understanding of Article 17(1) ECT.[951] Article 17(1) ECT was introduced to the ECT by the United States, following which several attempts of Norway were defeated to amend the clause to, in scope, only allow for the denial of the investment itself and, in time, only allow for the denial to take place <u>before</u> an investment was made.[952]

665.    In addition, neither is the interpretation of Article 17(1) ECT in ECT jurisprudence as "uniform or unanimous" as the Claimant characterises it, nor is there as clear a trend as the Claimant posits.[953] Some majority and minority opinions indeed point to an interpretation that an invocation of Article 17(1) ECT would be possible if made after the rights of Part III of the ECT have been invoked.[954]

666.    What is more, none of the decisions of ECT tribunals on the matter thus far had addressed the *travaux préparatoires* of the ECT.[955] The ECT tribunals which decided that even a timely invocation of Article 17(1) after a claimant claims the advantages of Part III of the ECT would be too late, *i.e.* the tribunals in *Plama*, *Khan Resources* (Decision on Jurisdiction), and *Luxtona Ltd v. the Russian Federation*, also openly acknowledged that their conclusions were not based on the text of Article 17(1) ECT, and complained that no *travaux préparatoires*, or subsequent practice, had been presented to them.[956]

667.    In particular the *Plama* case is incorrect on the law with regards to Article 17(1) ECT and, in any case, it does not form a binding precedent. Contrary to what the tribunal found in *Plama*, the ECT does not contain any provision contemplating a public

---

[950]    ROP I, p. 9; HT, D1, 7 June 2021, pp. 158-161.

[951]    RCMOMOJ, para. 284.

[952]    RCMOMOJ, para. 284, fns 652, 653; RROMROJ, paras. 288-289; ROP I, p. 11.

[953]    RROMROJ, paras. 278-279.

[954]    RROMROJ, paras. 279-283; RPHB, para. 12.

[955]    RROMROJ, para. 278.

[956]    RROMROJ, paras. 284-287; ROP I, p. 39; HT, D1, 7 June 2021, pp. 180-181; RPHB, para. 12; *Plama* (**CL-24**), para. 160; *Khan Resources Inc. et al. v. Government of Mongolia*, PCA Case No. 2011-09, Decision on Jurisdiction, 25 July 2012 (**CL-26**), para. 425; *Luxtona Limited v. The Russian Federation*, UNCITRAL, PCA Case No. 2014-09, Interim Award on the Respondent's Objections to the Jurisdiction of the Tribunal, 22 March 2017 (**CL-152**), para. 256.

declaration by a Contracting Party in relation to an invocation of its rights under Article 17(1) ECT.[957]

(c)    *Littop v. Ukraine*

668.    The Respondent, in particular, relies on the award in *Littop*, submitted shortly before the Hearing. The Respondent underlines the holdings of that tribunal that (i) an investor should be as aware of the potential effect of Article 17(1) ECT if invoked as it should be of its rights and protections under the ECT, (ii) that it is clear to an investor what requirements must be satisfied in order to invoke Article 17(1) ECT in a valid and effective manner, (iii) that therefore no legal uncertainty or unreasonableness arises if a State invokes its right under Article 17(1) ECT within a reasonable time after the circumstances for exercising the right have come into existence, and (iv) that Article 17(1) ECT can be invoked retrospectively.[958]

669.    The Respondent disputes that something would be "off" about *Littop* or that the *Littop* tribunal's dealing with Article 17(1) ECT was superfluous and not on par with how it had addressed the other jurisdictional objections presented to it.[959]

(d)    *The alleged prospective effect of the Respondent's invocation of Article 17(1) after 6 August 2018*

670.    The Respondent adds that, if the Tribunal were to find, erroneously, that a denial of advantages could only operate prospectively, then, in any case, any alleged breach would automatically have stopped on 6 August 2018, the date of the communication by the Respondent to the Claimant that it denies the Claimant the advantages of Part III of the ECT.[960] In that scenario, no damages could have arisen after that date and the Claimant's valuation date of 31 December 2019 would have to be reconsidered.[961] The Claimant's position that Bulgaria had set the tariff at a level that breached the ECT for decades to come is a presumption of continued wrongful conduct and must at least be

---

[957]    ROP I, p. 38; HT, D1, 7 June 2021, pp. 179-180.

[958]    ROP I, p. 10; *Littop* (**RL- 331**), pp. 597, 602; RPHB, para. 21.

[959]    RPHB, para. 20.

[960]    RCMOMOJ, para. 291; RROMROJ, paras. 275, 305-306, 562; ROP I, p. 36; ROP IV, p. 22; HT, D1, 7 June 2021, p. 179; HT, D1, 7 June 2021, pp. 305-306.

[961]    RCMOMOJ, para. 292; RROMROJ, paras. 206, 305, 562; ROP I, p. 36; ROP IV, p. 22; HT, D1, 7 June 2021, pp. 305-306.

rejected as of the date as of which the advantages of Part III of the ECT were denied to the Claimant.[962]

(e)      Interpretation of Article 17(1) ECT and what constitutes "substantial business activities"

671.    Regarding what constitutes substantial business activities, the Respondent submits that ECT decisions on that aspect of Article 17(1) ECT conducted their analysis consistently with the decisions in *Amto* and *Gran Colombia Gold Corp v. Colombia* which, according to the Respondent, require that activities of substance, not only of form, take place, which are not merely a sham.[963] In conducting that analysis, such tribunals found that substantial business activities existed where a business conducted investment-related activities from the host State, actively participated as a shareholder, employed a small, permanent local staff, leased office space, paid taxes, had board members residing permanently in the host State, and held the important meetings in the host State.[964] It is not sufficient simply to exist as a company in good standing, and whether a company does so exist is not the inquiry to be made under Article 17(1) ECT.[965] As an example, in the *Littop* case, "[i]n circumstances most like the present case", the claimant's business activity being limited to being an investment holding was considered not to constitute substantial business activity within the meaning of Article 17(1) ECT.[966]

672.    The Claimant may in that regard be right that there is no one single factor alone, the absence or existence of which would determine that business activities are substantial or not. Nevertheless, that does not change the fact that all factors together must indicate that the business activities of an entity are substantial.[967]

673.    It is furthermore not a valid counterargument of the Claimant to argue that there is nothing wrong with being a holding company. The Respondent agrees to that. However, in Article 17(1) ECT the Contracting Parties have created the opportunity to deny the

---

[962]    RROMROJ, para. 307; ROP IV, p. 22; HT, D1, 7 June 2021, pp. 305-306.

[963]    RROMROJ, paras. 310-312; ROP I, pp. 29-30; *Amto* (**CL-29**); *Gran Colombia Gold Corp. v. Republic of Colombia*, ICSID Case No. ARB/18/23, Decision on the Bifurcated Jurisdictional Issue of 23 November 2020 (**RL-307**).

[964]    RROMROJ, paras. 313-315; ROP I, p. 31; *Amto* (**CL-29**); *Masdar* (**CL-39**); *9REN* (**CL-62**).

[965]    ROP I, p. 19; HT, D1, 7 June 2021, pp. 174-175.

[966]    RPHB, para. 7; *Littop* (**RL-331**), paras. 621-638.

[967]    HT, D1, 7 June 2021, p. 176.

advantages of Part III of the ECT to such mere holding structures when they have non-ECT ownership.[968] Had the Claimant and its Shareholders wanted to structure the Investment to enjoy ECT protection from Malta, they would have had to make sure that the Claimant was not only incorporated in a Contracting Party, but also deployed substantial business activity there.[969]

(2)　The conditions of Article 17(1) ECT are met

674.　The Respondent submits that the conditions for the application of Article 17(1) ECT have two "prongs".[970]

675.　The first prong of Article 17(1) ECT contains two conditions of which at least one has to be fulfilled:

a.　first, that citizens or nationals of a third state own; or,[971]

b.　secondly and alternatively, that citizens or nationals of a third state control,[972]

the entity to which a respondent wants to deny the advantages of Part III of the ECT.

676.　The second prong of Article 17(1) ECT contains one condition, *i.e.* that the entity in question has no substantial business activities in the Area of the Contracting Party in which it is organized.[973]

677.　The burden of proof at least in regard to establishing the nationality of those owning and/or in control of the Claimant lies with the Claimant. The Claimant had indeed announced that during the merits phase of these proceedings it would present evidence that the conditions of Article 17(1) ECT were not met, but failed to do so in its Memorial on the Merits.[974]

---

[968]　ROP I, p. 28; HT, D1, 7 June 2021, pp. 174-175.

[969]　RPHB, para. 8.

[970]　RCMOMOJ, paras. 298, 305, 313; ROP I, p. 17.

[971]　RCMOMOJ, para, 298; ROP I, p. 17.

[972]　RCMOMOJ, para. 305; ROP I, p. 17.

[973]　RCMOMOJ, para. 313.

[974]　RCMOMOJ, para. 293 and fn 668.

678.    As outlined above, it is not a condition of Article 17(1) ECT that a denial of benefits was made or communicated before a certain point in time.

679.    In any case, the available evidence confirms (i) that the Claimant at all times was owned and/or controlled by citizens or nationals of States which are not Contracting Parties to the ECT, (ii) that the Claimant never conducted substantial business activities in Malta,[975] and that (iii) Bulgaria timely denied the advantages of Part III of the ECT.[976]

   (a)    *First condition – control or ownership by citizens or nationals of a State that is not a Contracting Party*

680.    The Respondent observes *ad* (i) that the Claimant concedes that the first requirement of Article 17(1) ECT as to ownership/control of the Claimant is met.[977] Only a 25% stake in the Claimant is held by an entity incorporated in, and ultimately owned by an entity from, a Contracting Party, Karad PV Limited (incorporated in the Bailiwick of Guernsey and ultimately owned by a Turkish entity).[978] ACWA Power International of Saudi Arabia, not a Contracting Party, holds a controlling interest and exercises operational control over the Claimant.[979]

   (b)    *Second condition – substantial business activities in Malta*

681.    The Respondent submits the following *ad* (ii) (no substantial business activities):

   a.    The Claimant was established as a holding company for tax-planning purposes. Under Maltese law it is not required to have any employees in Malta or resident directors. The company is not a "trading" company which conducts business.[980]

---

[975]    RCMOMOJ, para. 294; RROMROJ, paras. 5, 275, 308; ROP I, pp. 20, 32; HT, D1, 7 June 2021, p. 177.

[976]    RROMROJ, paras. 300ff; ROP I, pp. 33ff.

[977]    RROMROJ, para. 309; ROP I, p. 18; RPHB, para. 4.

[978]    RCMOMOJ, paras. 295-296; Certificate from the Maltese Registry of Companies ACF, 29 November 2017 (**C-2**); Regarding the Bailiwick of Guernsey: Declaration of the United Kingdom dated 11 August 1998 (**RL-171**), p. 4.

[979]    RCMOMOJ, paras. 300-301.

[980]    RCMOMOJ, para. 307; RROMROJ, para. 316; ROP I, p. 21.

b. Maltese law requires a minimum share capital of EUR 1,164.49 and the Claimant was incorporated with a share capital of EUR 1,200, which is just above the minimum required under Maltese law.[981]

c. The Claimant has submitted to the Maltese Registrar of Companies that it "has business interests, to the extent of more than ninety percent outside Malta".[982] Malta's Office of Inland Revenue has confirmed to the Claimant that it "has the majority of its business interests outside Malta".[983]

d. Under the Claimant's Articles of Association, meetings of its board of directors were to take place in Dubai by default and there is no evidence on file that the Claimant's board ever held meetings in Malta or made decisions there.[984] There is no evidence that the Claimant ever had permanent employees in Malta, made payroll or lease payments, paid VAT or investment-related fees, made any other investment, or owned any other shares than the ones in ACWA Bulgaria.[985] The Claimant also does not dispute that it never had office space or a continuous physical presence in Malta.[986] The notice address in the SPA by which the Claimant sold ACWA Bulgaria to Enery is in Dubai, not Malta, and the power of attorney for the Claimant's counsel in these proceedings was executed in Dubai.[987]

e. The Claimant's financial statements for 2012 and 2013, according to the Respondent the only ones ever filed with the Malta Business Registry, indicate

---

[981]    RCMOMOJ, para. 295; RROMROJ, para. 316.

[982]    RCMOMOJ, para. 308; ROP I, p. 22; ACF, Notice of claim for extension of period allowed for laying accounts by company carrying on business or having interests outside Malta, 27 June 2012 (**R-173**).

[983]    RCMOMOJ, paras. 297, 304, 309; ROP I, p. 23; Letter from the International Tax Unit of the Maltese Office of Inland Revenue to ACF, 9 July 2012 (**R-152**).

[984]    RCMOMOJ, para. 310; RROMROJ, para. 316; ROP I, pp. 24, 27.

[985]    RCMOMOJ, para. 311; RROMROJ, paras. 316, 330; ROP I, p. 27.

[986]    ROP I, p. 27.

[987]    RCMOMOJ, para. 310, fn 698; Share Purchase Agreement between ACF and Enery, 14 December 2019 (**C-189**); ACF, Authorization and Power of Attorney to King & Spalding LLP and CMS Cameron McKenna Nabarro Olswang LLP, 4 February 2018 (**C-3**).

that the cash-on-hand in the bank account of the Claimant in Malta in those years was EUR 1,193 and EUR 1,162 respectively.[988]

682.   The Claimant does not deny any of these "facts". The Parties, in principle, agree that all that the Claimant did in Malta was to exist as a company in good standing.[989]

683.   In any case, even after confronted with these facts, the Claimant did not assert that any board meeting ever took place in Malta.[990] In light of the absence of minutes of board meetings on the record, indeed no board meetings might have ever taken place, at all.[991] In that regard, the Claimant's argument that it engaged in "activities to ensure compliance with local Maltese business law" is a euphemism for maintaining one's corporate shell in Malta.[992]

684.   The Respondent dismisses the Claimant's submission that the bank account of the Claimant in Malta "at times" had a balance in excess of three million euros because this happened only on one single day, after the arbitration had begun, and the funds were distributed to the Shareholders on the next day.[993] Therefore, in the words of the tribunal in *Amto*, the Claimant's bank statement "provides no evidence of payments in respect of day-to-day business activities, and the Tribunal has not been provided with evidence that any other bank account exists."[994] In that regard it is further of note that the interest payments and debt payments made from the Claimant's bank account in Malta are the ones made to its Shareholders within the investment structure set up for the Shareholders' investment in the Karad Plant.[995]

---

[988]   RCMOMOJ, para. 312; RROMROJ, para. 316; ACF, Annual Financial Statements for the year ended 31 December 2013, 1 July 2014 (**R-147**); ACF, Annual Financial Statements for the year ended 31 December 2012, 1 July 2014 (**R-148**).

[989]   RROMROJ, paras. 317, 320; ROP I, pp. 19, 32; HT, D1, 7 June 2021, p. 171; RPHB, para. 5.

[990]   RROMROJ, paras. 317, 320.

[991]   RROMROJ, para. 322.

[992]   RROMROJ, para. 323.

[993]   RROMROJ, paras. 324-327; ROP I, p. 25.

[994]   RROMROJ, para. 327; ROP I, p. 25; *Amto* (**CL-29**), para. 68, though the Tribunal goes on to find that Amto did have substantive business activities in Latvia.

[995]   RROMROJ, para. 328; ROP I, p. 25.

(c)     *Timeliness of the denial*

685.   *Ad* (iii) (timeliness of the denial), the Respondent submits that it is undisputed that the Respondent communicated its denial of advantages on 6 August 2018, before the First Session with the Tribunal.[996]

686.   Where the Claimant seeks to rely on the 18 September 2012 Letter, the Respondent accuses it of trying to "shoehorn" the facts of the present case into the facts of *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Spain* ("***NextEra***"), where, three years before Spain denied the advantages of Part III of the ECT in its memorial on jurisdiction, it had been confronted by a clear assertion that *NextEra's* Dutch investment company had rights under the ECT, and that *NextEra* planned to exercise such rights, which letter was met with further assurances leading to the completion of the Termosol Plants.[997]

687.   However, the Claimant's attempt to shoehorn fails because the 18 September 2012 Letter does not mention the Claimant, any investment vehicle between the Shareholders and the Karad Project, or any entity incorporated in Malta, and the Letter speaks of investors rather than one investor. The 18 September 2012 Letter did thus not put Bulgaria on notice that the Claimant intended to claim the advantages of the ECT, the Respondent avers.[998]

688.   The Claimant also was on notice that the Respondent might invoke Article 17(1) ECT since when it made the Investment, allegedly in reliance on the ECT, the ECT included Article 17(1) ECT and the rights contained therein.

689.   The *Plama* decision also must have indicated to the Claimant that Bulgaria had invoked Article 17(1) ECT before, while, simultaneously, the Claimant as investor focused on investment treaties must have known that there is no binding precedent in international investment law, *i.e.* that the *Plama* decision was no guarantee a next tribunal would decide in a similar way.[999]

---

[996]   RROMROJ, para. 300; HT, D1, 7 June 2021, p. 177.

[997]   RROMROJ, paras. 301-302.

[998]   RROMROJ, para. 303; ROP I, p. 34; HT, D1, 7 June 2021, p. 178; RPHB, para. 24.

[999]   ROP I, p. 35; HT, D1, 7 June 2021, p. 178; RPHB, para. 25.

203

690.  Finally, no circumstances are present *in casu* that would indicate that the Respondent had waived or would be estopped from exercising its right to deny the advantages of Part III of the ECT, given that the Respondent had invoked its right before the First Session and sought to bifurcate proceedings on the basis of its objection.[1000]

### (d)    Conclusion on fulfilment of conditions

691.  In conclusion, the conditions for the application of Article 17(1) ECT are met in this case given that (i) the Claimant is a legal entity that is more than 50% owned and 100% controlled by citizens or nationals of States which are not Contracting Parties to the ECT, (ii) the Claimant does not have substantial business activities in Malta,[1001] and (iii) neither the 18 September 2012 Letter nor any other event forms a basis for arguing that Bulgaria's denial of the advantages of Part III of the ECT was untimely.[1002] Therefore, the Claimant's claims are outside of the Tribunal's jurisdiction, and/or inadmissible, and/or must fail on their merits since Bulgaria cannot breach obligations the advantages of which it has successfully denied.[1003]

### b.    Article 21 ECT

692.  The second jurisdictional objection to be dealt with in the merits phase of the present proceedings relies on Article 21 ECT.

693.  The Respondent submits that the 5% ESSF Contribution and the 20% Levy constitute Taxation Measures within the meaning of Article 21(1) and, as such, claims in relation to them would fall outside of the Tribunal's jurisdiction.[1004]

694.  Article 21 ECT, which prevails over other Articles of the ECT, provides in its first paragraph that nothing in the ECT "shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties".[1005] According to Article 21(7)(a) ECT

---

[1000]    RPHB, paras. 22-24, 26.

[1001]    RCMOMOJ, para. 281, 298, 305, 313; RROMROJ, para. 275.

[1002]    RROMROJ, para. 304.

[1003]    RCMOMOJ, para. 314; RROMROJ, paras. 275, 331.

[1004]    RCMOMOJ, para. 315; RROMROJ, paras. 5, 332.

[1005]    RCMOMOJ, para. 315; ECT (**CL-1**), Article 21(1); ROP III, p. 15.

Taxation Measures include "any provision relating to taxes of the domestic law of the Contracting Party."[1006]

695. It therefore follows, and ECT tribunals also have recognised, that the question whether a provision of the domestic law of a State relates to taxes is to be resolved by reference to that State's law, *i.e.* that, in the words of the tribunal in *Voltaic Network*, "the relevant assessment must be made under the domestic law of the respondent State".[1007]

696. There is no merit to the Claimant's position that in certain circumstances a measure that qualifies as a tax under domestic law might not qualify as a Taxation Measure under Article 21 ECT, in particular if it is a discriminatory tax or not a *bona fide* tax.[1008]

697. The Claimant also overlooks the domestic-law centred approach of the tribunals in *Voltaic Network* and *SunReserve* in relation to the Article 21 ECT analysis and too quickly dismisses the decisions in *Belenergia* and *CEF* as incorrect and cursory.[1009] The cases of *Murphy* and *Occidental* are equally unhelpful (i) because they are not based on the ECT and (ii) because the tribunals in those cases either determine that the law in question, Law 42, did not constitute a tax under domestic law, or were faced with an admission of Ecuador that the law did not constitute a tax.[1010]

(1)    Bulgarian Law

698. According to the Respondent, under Bulgarian law, a tax is a mandatory payment established unilaterally by the State by an act of parliament. The difference between a tax and a fee under Bulgarian law is that a tax is paid without receiving a specific service in return whereas a fee is always paid in order to receive or pay for a service.[1011] The

---

[1006]    RCMOMOJ, para. 316; ECT (**CL-1**) Article 21(7)(a); ROP III, p. 15; RPHB, para. 28. Contrast the use of the term "defines" in RROMROJ, paras. 350, 360, 368 and HT, D1, 7 June 2021, p. 265.

[1007]    RCMOMOJ, para. 316; RROMROJ, paras. 350-351; *Voltaic Network* (**RL-248**), para. 248; ROP III, p. 15.

[1008]    RROMROJ, para. 351.

[1009]    RROMROJ, paras. 353-356.

[1010]    RROMROJ, para. 370.

[1011]    RCMOMOJ, para. 317; RROMROJ, para. 334; ROP III, p. 17; HT, D1, 7 June 2021, pp. 266-267; RPHB, para. 29; Constitutional Court of Bulgaria, Decision No. 3, Constitutional Case No. 2/96, 9 February 1996 (**R-175**); Supreme Administrative Court of Bulgaria, Decision No. 11594 on Administrative Case No. 124102016, 3 October 2017 (**R-176**).

necessary analysis is one of substance and thus the name of a measure is not dispositive under Bulgarian law.[1012]

699.  It follows that the 20% Levy and the 5% ESSF Contribution are taxes under Bulgarian law.[1013]

### (a)    The 5% ESSF Contribution

700.  The Respondent submits that the 5% ESSF Contribution was established by Article 36f of the Energy Act as amended and supplemented by "SG No. 56/2015" of 24 July 2015 (the "**2015 Energy Act**").[1014] As such, the 5% ESSF Contribution was established by an act of parliament.[1015] The 5% ESSF Contribution is defined as a "public state receivable" in the 2015 Energy Act.[1016] Payment of the 5% ESSF Contribution is mandatory and no services are provided in return for the payment of the 5% ESSF Contribution. It follows that under Bulgarian law the 5% ESSF Contribution is a tax and not a fee.[1017]

701.  Countering the arguments of the Claimant, the Respondent submits that the word used for the 5% ESSF Contribution in the 2015 Energy Act is "instalment" which is in any case not a synonym of "fee". The Respondent leaves open whether the word "contribution" would be a synonym of fee in the Bulgarian language.[1018] Later the Respondent submits, however, that the use of the word "contribution" in Article 36f (1) of the 2015 Energy Act is not inconsistent with the qualification of the 5% ESSF Contribution as a tax.[1019]

---

[1012]  RPHB, para. 29.

[1013]  *Ibid*.

[1014]  RCOMOMJ, para. 318; RROMROJ, para. 334; ROP III, p. 21; 2015 Energy Act (**R-082**).

[1015]  RCMOMOJ, para. 318; RROMROJ, paras. 334, 340.

[1016]  RCMOMOJ, para. 318; RROMROJ, para. 334; HT, D1, 7 June 2021, p. 270; RPHB, para. 33; Article 36f(5) 2015 Energy Act.

[1017]  RCMOMOJ, para. 318; RROMROJ, paras. 334, 340.

[1018]  RROMROJ, para. 340.

[1019]  ROP III, p. 23; HT, D1, 7 June 2021, p. 271.

702.    The Respondent acknowledges in any case that the 5% ESSF Contribution was not labelled with the word "tax" but maintains that the label for the measure is not dispositive as to the status of the measure as a tax under any test.[1020]

703.    The Respondent further acknowledges that under the 2015 Energy Act disbursements to the ESSF may only be used for the payment of public service obligations, *i.e.* purchase obligations of NEK as the Public Provider, and for maintenance of the ESSF.[1021]

704.    However, the Respondent argues that because the ESSF is a State fund established by law for a public purpose, a payment into it is comparable to a payment into the State or municipal budget.[1022] It is furthermore normal for taxes to be deductible from other taxes in Bulgaria and so is a monthly frequency of payments of taxes.[1023] In addition, the Claimant's assertions that payments of the 5% ESSF Contribution are subject to tax are unsupported and Articles 36f (1) and (3) 2015 Energy Act make it clear that no tax is imposed on payments of the 5% ESSF Contribution.[1024]

705.    The Respondent disputes that maintaining the financial stability of the electricity system is a service provided to electricity producers, and rather views it as a government function necessary for the viability of the electricity network *per se*.[1025]

706.    Finally, the Respondent submits that (i) under Bulgarian law it is not a distinguishing factor between fees and taxes that a fee would be non-refundable because many taxes are non-refundable as well, and that (ii) it is incorrect to argue that the 5% ESSF Contribution was introduced as a fee in order to avoid any constitutional prohibition on the retroactivity of taxes, not least because the prohibition referred to by the Claimant

---

[1020]    ROP III, p. 22.

[1021]    RCMOMOJ, para. 318, fn 710.

[1022]    RROMROJ, paras. 341-342.

[1023]    RROMROJ, paras. 341, 343-344; ROP III, p. 23; HT, D1, 7 June 2021, p. 272; RPHB, para. 33.

[1024]    ROP III, p. 23; RPHB, para. 33. Article 36f (1) 2015 Energy Act determines that the contributions are to be made "from their sold electricity profit without VAT" and Article 36f (3) 2015 Energy Act determines that they are "current operating expenditures" for tax purposes; 2015 Energy Act (**R-082**).

[1025]    RROMROJ, para. 345; RPHB, para. 31.

does not explicitly address taxes and because the 5% ESSF Contribution did not apply retroactively.[1026]

<p style="text-align:center">(b)    The 20% Levy</p>

707.    The Respondent submits that the 20% Levy was established by Article 35a of the 2014 ERSA.[1027] As such, the 20% Levy was established by an act of parliament.[1028] The 20% Levy is defined as a "public state receivable" in the 2015 Energy Act. Collection of the levy was made subject to the procedures set out in the Bulgarian Tax and Social Insurance Procedure Code.[1029] Payment of the 20% Levy was mandatory and no services were provided in return for the payment of the 20% Levy.[1030] The Claimant also never adduced any evidence that would show that VAT was paid on the 20% Levy.[1031] It follows that under Bulgarian law the 20% Levy is a tax and not a fee.[1032]

708.    The Respondent acknowledges that the 20% Levy was "labeled as a fee".[1033] More in particular, the Respondent acknowledges that Section V, Article 35a of the 2014 ERSA refers to the 20% Levy as a "fee",[1034] and that in Articles 35a-35c of the 2014 ERSA the 20% Levy is described as "a fee to be collected for the production of electricity from wind and PV energy".[1035] In the Respondent's view, however, this does not change the fact that the 20% Levy fits the definition of a tax under Bulgarian law.[1036]

---

[1026]    RROMROJ, paras. 347-348; ROP III, p. 23; RPHB, para. 33.

[1027]    RCMOMOJ, para. 318; RROMROJ, para. 334; 2014 ERSA (**C-152**).

[1028]    RCMOMOJ, para. 318; RROMROJ, para. 334.

[1029]    RCMOMOJ, para. 318; RROMROJ, para. 334; RPHB, paras. 30, 33; Article 35a 2014 ERSA determines that outstanding fees are subject to enforcement by the public collector in accordance with the procedure of the Tax and Social Insurance Procedure Code. In contrast with, Article 36f(5) of the 2015 Energy Act in relation to the 5% ESSF Contribution, Article 35a 2014 ERSA does not speak of a "public state receivable".

[1030]    RCMOMOJ, para. 318; RROMROJ, para. 334; HT, D1, 7 June 2021, p. 269.

[1031]    RPHB, para. 33.

[1032]    RCMOMOJ, para. 318; RROMROJ, para. 334.

[1033]    ROP III, p. 20; HT, D1, 7 June 2021, pp. 267-269.

[1034]    RROMROJ, para. 335.

[1035]    ROP III, p. 18; HT, D1, 7 June 2021, p. 267.

[1036]    ROP III, p. 20.

709.   In any case, the Respondent's Constitutional Court held that the 20% Levy was not a fee because, among other things, no service was provided in exchange for it.[1037] The Claimant's references to other articles of the 2014 ERSA that contain the word fee furthermore appear to be unrelated to the subject matter of the 20% Levy,[1038] and while the Respondent's Supreme Administrative Court did refer to the 20% Levy as a fee, it did so "simply because that term was used in the [2014 ERSA]".[1039]

710.   The Respondent further seeks to rely on the question of a Member of its Parliament, Diana Yordanova, posed during the parliamentary debate that discussed the introduction of the 20% Levy. Ms Yordanova asked her colleagues why they would be afraid to introduce the 20% Levy as a tax when it clearly was a tax and suspected political motives behind the branding of the 20% Levy as a fee.[1040]

711.   Finally, the Respondent submits that (i) under Bulgarian law it is not a distinguishing factor between fees and taxes that a payment is non-refundable because many taxes are non-refundable as well, and that (ii) it is incorrect to argue that the 20% Levy was introduced as a fee in order to avoid any constitutional prohibition on the retroactivity of taxes, not least because the prohibition referred to by the Claimant does not explicitly address taxes and because the 20% Levy did not apply retroactively.[1041]

(2)    International Law

712.   The Respondent submits that "a number of ECT tribunals" concluded that as a matter of general principles of law, a Taxation Measure under Article 21 ECT is a measure that (i) is established by law, (ii) imposes an obligation on a class of persons as opposed to an individual person or entity, and (iii) entails the mandatory payment of money to the State for public purposes as opposed to a specific service rendered.[1042] Tribunals

---

[1037]   RROMROJ, para. 335; ROP III, pp. 19-20; HT, D1, 7 June 2021, pp. 268-269; RPHB, para. 30.

[1038]   RROMROJ, para. 336.

[1039]   RROMROJ, para. 337.

[1040]   RROMROJ, para. 338; ROP III, p. 19; HT, D1, 7 June 2021, p. 268; RPHB, para. 30, fn 54.

[1041]   RROMROJ, paras. 347-348; RPHB, para. 33.

[1042]   RCMOMOJ, para. 319; ROP III, pp. 16-17; HT, D1, 7 June 2021, pp. 266-277; HT, D1, 7 June 2021, p. 269; RPHB, para. 32. In RROMROJ, para. 368, the Respondent appeared to try to create some distance between its position of what a tax is and the three element test here, arguing that the "definition" in Article 21(7) ECT would be more relevant and broader than those criteria. This was, however, not continued during the Hearing and in RPHB.

constituted under other investment treaties with tax exemption clauses have applied similar criteria.[1043] It is notable in that regard that, within those international law criteria and the tests that apply them, whether a measure is labelled as a tax itself, while relevant, is not seen as dispositive in regard to the qualification of that measure as a Taxation Measure.[1044]

713.  In any case, the international and national law criteria as to what constitutes a tax are not materially different.[1045]

714.  Article 21 ECT furthermore does not exclude "discriminatory" taxes or taxes that are introduced in bad faith from the definition of Taxation Measures for the purposes of the ECT.[1046] Neither does the text of the ECT set forth a test whether a Taxation Measure is *bona fide*.[1047]

715.  In particular, the detailed exception for allegedly discriminatory taxes included in Article 21(5) ECT, included in the exceptions from the exclusion from the protections of the ECT for Taxation Measures provided in Articles 21(2)-(5) ECT, does not include an exception for violations of Article 10(1) ECT, on which the Claimant relies for its claim. This means that discriminatory tax measures were not to be excluded from the exclusion of Article 21 ECT *vis-à-vis* Article 10(1) ECT and thus qualify as Taxation Measures in a case based on Article 10(1) ECT.[1048]

716.  The Respondent acknowledges that ECT tribunals have held that there can be an exception to the standard that domestic law controls whether a measure is a tax or not under Article 21(1) ECT. However, such tribunals held that this would only be possible in circumstances as extreme as the ones in the *Yukos* case, *i.e.* where a tax was imposed on a particular entity with the intention of destroying the entity for political purposes.[1049] The respective tribunals held that it would be difficult to overcome the presumption that a tax measure was enacted in good faith and that the purpose of reducing a tariff deficit

---

[1043]    RCMOMJ, para. 319.

[1044]    RPO III, pp. 16, 22; HT, D1, 7 June 2021, p. 266; RPHB, para. 33.

[1045]    HT, D1, 7 June 2021, pp. 265-277.

[1046]    RROMROJ, paras. 360, 363; HT, D1, 7 June 2021, pp. 272-273.

[1047]    RROMROJ, para. 364.

[1048]    RROMROJ, para. 361.

[1049]    RROMROJ, para. 364.

by reducing incentives previously guaranteed is not comparable to the entirely unrelated purpose of the tax dealt with in the *Yukos* case.[1050]

717.    The proper test to be applied therefore is whether a measure was an abuse of right and there are no facts that would support such a conclusion.[1051]

718.    Regarding the Spanish TVPEE, the Respondent submits that "at least nineteen" ECT tribunals have found that the TVPEE constituted a Taxation Measure under Article 21(1) ECT because (i) it was established by law, namely Spain's Law 15/2012 on Tax Measures for Energy Sustainability, (ii) imposed obligations on a class of people, namely all producers of electricity, and (iii) entailed payment of money to the State for public purposes, namely protection of the environment.[1052] Both the cases that led to these findings as well as the measure itself are highly comparable to the situation in the present case in light of the similar categories of people that the 5% ESSF Contribution and the 20% Levy target and in light of the arguments of the claimants in the Spanish cases that the TVPEE, a 7% levy, amounted to a "backdoor tariff cut" in violation of the ECT.[1053] In addition, tribunals constituted under other investment treaties came to similar conclusions when, for example, finding that an Ecuadorian law requiring oil companies to pay 50% of their extraordinary revenues gained due to unexpectedly high oil prices to the State, constituted a tax exempted under the United States-Ecuador bilateral investment treaty.[1054]

719.    Regarding cases against Italy, the Respondent adds that the tribunals in *Belenergia* and *CEF* held that substance prevails over form, wherefore the fact that a measure was not styled officially as tax was irrelevant.[1055] Those tribunals further held that a fee that was a consideration for a given service, the *Conto V*, lacked sufficient reciprocity between fee and service for the fee not to constitute a tax, and that the fact that measures were

---

[1050]    RROMROJ, paras. 364-366; Novenergia (**CL-23**), paras. 522, 524; *FREIF Eurowind Holdings Ltd. v. Kingdom of Spain*, SCC Case V 2017/060, Award, 8 March 2021 (**RL-293**), para. 378.

[1051]    ROP III, p. 25; HT, D1, 7 June 2021, p. 273.

[1052]    RCMOMOJ, para. 321; RROMROJ, paras. 352, 356; ROP III, p. 24; HT, D1, 7 June 2021, p. 272.

[1053]    RCMOMOJ, para. 321; ROP III, p. 24.

[1054]    RCMOMOJ, para. 322; *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction, 2 June 2010 (**RL-206**), paras. 164-167; ROP III, p. 24; *Perenco Ecuador Ltd. v. Republic of Ecuador*, ICSID Case No. ARB/08/6, Decision on Remaining Issues of Jurisdiction and Liability, 12 September 2014 (**CL-108**), para. 377.

[1055]    RROMROJ, para. 357; *Belenergia* (**RL-252**), para. 375.

found unlawful by national courts was irrelevant to their status as Taxation Measures under the ECT.[1056] Indeed, where ECT tribunals in cases against Italy concluded that an administrative fee of EUR 1.20 to 2.20 per kW payable to an Italian State-owned company which is responsible for managing Italian incentive tariffs was not a tax, they did so because of a direct reciprocity of payment for services. That is not the case for the 5% ESSF Contribution and the 20% Levy for the payment of which no service is received in return (see below).[1057]

<p align="center">*(a)    The 5% ESSF Contribution*</p>

720.   The Respondent submits that the 5% ESSF Contribution meets the criteria set out by ECT tribunals as outlined above.[1058]

721.   The 5% ESSF Contribution (i) was established by law, (ii) imposes an obligation on a class of persons namely all electricity producers, importers, and network operators, and (iii) consists of a mandatory payment of money to the State for public purposes, without any benefit to the payer of the tax.[1059]

722.   In any event, the 5% ESSF Contribution is a non-discriminatory and *bona fide* tax.[1060] It is payable by all electricity producers, and as such cannot be discriminatory under the Claimant's own description of the applicable case law.[1061]

723.   Finally, regarding the allegations of bad faith, it is of note that the 5% ESSF Contribution was not directly targeted at one particular entity with the intent of destroying it for political purposes, as happened in the *Yukos* case, nor was the measure deliberately designed to bring it within the scope of the exception provided for by Article 21 ECT.[1062]

---

[1056]    RROMROJ, para. 358; *CEF* (**CL-60**), paras. 199, 202.

[1057]    RCMOMOJ, para. 441; *Greentech* (**CL-48**), para. 244; *SunReserve* (**RL-262**); *ESPF* (**RL-266**).

[1058]    RCMOMOJ, para. 320.

[1059]    RCMOMOJ, para. 320; RROMROJ, para. 369.

[1060]    RROMROJ, para. 351.

[1061]    RROMROJ, para. 362.

[1062]    RROMROJ, para. 364.

(b)    *The 20% Levy*

724.    The Respondent submits that the 20% Levy also meets the criteria set out by ECT tribunals as outlined above.[1063]

725.    The 20% Levy (i) was established by law, (ii) imposes an obligation on a class of persons namely all wind and solar energy producers, and (iii) consists of a mandatory payment of money to the State for public purposes, without any benefit to the payer of the tax.[1064]

726.    In any event, the 20% Levy is a non-discriminatory and *bona fide* tax.[1065] The Claimant's submission in that regard that a tax is discriminatory when it is payable by all PV and wind producers is unsupported by any reference to authority. Indeed, taxes on a specific category of producers such as oil producers, or liquor producers are commonplace.[1066]

727.    However, the Respondent acknowledges that the 20% Levy was held unconstitutional by its Constitutional Court as inconsistent with the principle of equal treatment. That holding, nevertheless is of no relevance for the qualification of the 20% Levy as a tax.[1067]

728.    Finally, regarding the allegations of bad faith, it is of note that the 20% Levy was not directly targeted at one particular entity with the intent of destroying it for political purposes, as happened in the *Yukos* case, nor was the measure deliberately designed to bring it within the scope of the exception provided for by Article 21 ECT.[1068]

---

[1063]    RCMOMOJ, para. 320.

[1064]    RCMOMOJ, para. 320; RROMROJ, para. 369; ROP III, p. 20.

[1065]    RROMROJ, para. 351.

[1066]    RROMROJ, para. 362.

[1067]    ROP III, p. 19; HT, D1, 7 June 2021, pp. 268-270.

[1068]    RROMROJ, para. 364.

(3)    Conclusion on Article 21 ECT

729.    In conclusion, the 5% ESSF Contribution and the 20% Levy constitute Taxation Measures within the meaning of Article 21(1) ECT and as such claims in relation to these two measures fall outside of the Tribunal's jurisdiction.[1069]

c.    *Komstroy Objection*

730.    As a third jurisdictional objection, the Respondent has submitted the *Komstroy* Objection.

731.    In that Objection, the Respondent argues that the *Komstroy* Judgment decided questions of EU law relevant to the jurisdiction of the present Tribunal the answer to which was not known, covered, or anticipated in the *Achmea* Decision, and "constitutes a material new development that has not been addressed by the" *Achmea* Decision. Therefore, the Respondent believes that the *Achmea* Objection, as rejected by the *Achmea* Decision, becomes valid again.[1070]

732.    In any case, the *Achmea* Decision does not bar the Tribunal from reconsidering its conclusions in that Decision.[1071] The *Achmea* Decision can furthermore not be regarded as *res judicata* between the Parties.[1072] The principle of *res judicata*, as affirmed by case law on which the Claimant seeks to rely, in an ICSID arbitration, is not applicable to tribunal decisions before a final award is rendered.[1073]

733.    With a view to the merits of the *Komstroy* Objection, the *Komstroy* Judgment makes it clear that the EU Treaties indeed form "successive, valid and binding, explicit and clear, formal treaties" that do away with parts of the ECT of the kind of which the present Tribunal stated that if they existed it could not ignore their existence.[1074]

---

[1069]    RCMOMOJ, para. 323; RROMROJ, para. 371.

[1070]    RC *Komstroy*, para. 1; RR *Komstroy*, para. 1.

[1071]    RC Komstroy, para. 38.

[1072]    RR Komstroy, para. 1.

[1073]    RR *Komstroy*, para. 2.

[1074]    RC *Komstroy*, paras. 1-3.

734. The Respondent acknowledges that the *Komstroy* Judgment is based on similar considerations as the *Achmea* Judgment.[1075] However, the *Komstroy* Judgment clarifies that the considerations of the CJEU in the *Achmea* Judgment also apply to multilateral agreements in general, and the ECT in particular,[1076] and that the subject matter of the ECT falls within the competence of the EU and thus within the scope of EU law.[1077] Accordingly, an arbitral tribunal as referred to in Article 26(6) ECT is required to interpret, and even apply, EU law.[1078] The Tribunal's *Kompetenz-Kompetenz* also requires it to take into account the treaty framework upon which its jurisdiction is claimed to be based and that treaty framework includes Bulgaria's and Malta's international agreements.[1079]

735. In the *Komstroy* Judgment, the CJEU ruled and clarified once more that Article 26 ECT is incompatible with the EU Treaties and inapplicable in intra-EU disputes such as the present dispute.[1080] Therefore, there was no offer to arbitrate by Bulgaria "*ab initio*", which for Bulgaria means since Bulgaria's accession to the EU on 1 January 2007, and thus since long before the beginning of the present dispute. Consequently, there is no agreement between the Claimant and Bulgaria to arbitrate the present dispute.[1081]

736. The CJEU furthermore does not mention Article 16 ECT in its analysis. This is a sign that the CJEU did not find Article 16 ECT relevant to its analysis.[1082] At any rate, the *Komstroy* Judgment does not support the conclusion that Article 16 ECT preserves the availability of intra-EU ECT arbitration or that it would operate to "resurrect" Article 26 ECT.[1083]

737. The Tribunal was wrong in finding that the Respondent's submissions on supremacy were based on general arguments of supremacy rather than on one specific rule

---

[1075] RC *Komstroy*, para. 4.

[1076] RC *Komstroy*, para. 5; RR *Komstroy*, para. 1.

[1077] RC *Komstroy*, para. 6.

[1078] RC *Komstroy*, para. 6.

[1079] RC *Komstroy*, para. 26.

[1080] RC *Komstroy*, para. 8; RR *Komstroy*, paras. 10, 11, 16.

[1081] RC *Komstroy*, paras. 21-25; RR *Komstroy*, paras. 10, 17-22.

[1082] RC *Komstroy*, paras. 9, 37, fn 19, referring "generally" to the *Komstroy* Judgment.

[1083] RR *Komstroy*, Heading III, para. 15, fn 42.

comparable to Article 16 ECT.[1084] Furthermore, on the basis of settled case law, Article 351 TFEU, as the only exception to supremacy of the EU Treaties, does not allow for the application of the ECT between Malta and Bulgaria despite its exact wording.[1085]

738.  The Respondent repeats, and elaborates on, its arguments on the EU Treaties as "master treaties" made in the preliminary objection phase of the present proceedings, but acknowledges that "different treaty regimes may exist as separate, equal sub-systems of international law that may or may not be interpreted harmoniously."[1086]

739.  Concluding, the Respondent requests that the Tribunal dismiss the claims of the Claimant for lack of jurisdiction.[1087]

### 3.    The Respondent's desire to increase production of energy from RES

740.  According to the Respondent, EU directives required Bulgaria to support and increase the production of energy from RES. As a consequence thereof, Bulgaria introduced a scheme to promote production of energy from RES.[1088]

### 4.    The situation before the introduction of ERSA

741.  The Respondent submits that between 2007 and 2010 a surge in the amount of PV power took place in Bulgaria, with the installed capacity of PV plants increasing by 71,233%, leading to concerns within the Bulgarian government that too many solar farms would be installed and that the capacity of the Bulgarian energy system would be exceeded.[1089]

742.  As of early 2010 already, Bulgarian officials warned that the projected new renewable energy capacity "far exceeded" the available network capacity.[1090] Bulgarian officials

---

[1084]  RC Komstroy, para. 14.

[1085]  RC *Komstroy*, paras. 11-13 and underlying footnotes; RR *Komstroy*, paras. 13-14.

[1086]  RC *Komstroy*, paras. 27-36; RR *Komstroy*, paras. 4-9.

[1087]  RC *Komstroy*, para. 39; RR *Komstroy*, para. 23.

[1088]  RCMOMOJ, paras. 8, 32-33; HT, D1, 7 June 2021, p. 193.

[1089]  RCMOMOJ, paras. 58-59.

[1090]  RCMOMOJ, paras. 22, 63; *Bulgaria Plans Caps On New Green Energy Assets*, Reuters, 24 September 2010 (**R-019**).

also cautioned that Bulgarian consumers, who have the lowest wages in the EU, could not afford the expected rapid onset of new renewable energy capacity to the system.[1091]

743.    However, the costs of constructing a PV plant had not yet bottomed out in 2010 and thus a second group of investors waited in the wings until the further cost reductions due to technological advances were fully realised in the Bulgarian market. These investors took out options to construct PV plants, but did little to advance their projects while waiting for the cost reductions.[1092]

### 5.    The defining elements of the ERSA Regime

744.    According to the Respondent, it adopted a regulatory framework consisting of a preferential pricing regime in order to attract investment in renewable energies, *i.e.* the ERSA Regime.[1093]

745.    The ERSA Regime allowed generators of renewable energy to sell the electricity they produce at subsidized prices that compensate for the difference between the market price and the high cost of producing energy from RES, *e.g.* the costs of the construction and operation of a PV plant.[1094]

746.    Under the ERSA Regime, a FiT is set annually at a "minimum necessary", *i.e.* a level that allows the Respondent to achieve its environmental objective and that aims at allowing all PV plants constructed over the following twelve months (i) to recover over a period of twenty years their building costs/project development costs and operating costs, and (ii) to earn a pre-tax target IRR commensurate with their WACC – set at 9% for the 2011/12 period.[1095]

---

[1091]    RCMOMOJ, paras. 22, 63-64; RROMROJ, para. 63; *Bulgaria Plans Caps On New Green Energy Assets*, Reuters, 24 September 2010 (**R-019**).

[1092]    RCMOMOJ, para. 61.

[1093]    RCMOMOJ, paras. 8, 42; RROMROJ, para. 32; the Respondent further submits that "[i]t is common ground that Bulgaria aimed to attract investments in renewables electricity in order to reach its binding EU target" and that "[t]his objective is set out in the [ERSA]"; HT, D1, 7 June 2021, p. 193.

[1094]    RCMOMOJ, paras. 8, 42; RROMROJ, para. 32.

[1095]    RCMOMOJ, paras. 10, 83, 408; RROMROJ, paras. 12-13, 25, 32, 445; ROP II, p. 11; RPHB, para. 122.

747.    The FiT applicable to the Karad Plant was set to be BGN 485.60. It was set based on a productivity assumption of 1,250 hours minus 5% for the plant's own needs.[1096]

748.    The ERSA Regime does not seek to remunerate "network costs" since such costs are entirely separate from an investor's investment and operating cost.[1097]

749.    The ERSA Regime's stance on balancing costs at the time of the introduction of the ERSA was set out in the form of the 2010 ETR. However, those rules were never used, since the balancing market was not implemented until 2014 and, by that time, the 2010 ETR had been amended (see below).[1098]

750.    The ERSA was designed to strengthen the Respondent's ability to monitor and limit new renewable energy capacity and, in Article 18(2) ERSA, indeed included an automatic cap that would prevent renewable energy producers that applied after the country would reach its 2020 consumption from obtaining preferential prices and priority connections.[1099]

751.    The Respondent asserts that, contrary to the Claimant's submission, the ERSA was adopted to reduce incentives, "to remedy this overcapacity problem", and to "curtail the surge of RES development spurred by [RAESBA] and to ensure cost-reflective FiTs in accordance with applicable law."[1100] The Respondent highlights that already contemporaneously it had explained that the RAESBA had "involved unduly high public costs" and that that would change due to ERSA.[1101]

752.    Contrary to an argument of the Claimant, the Respondent submits that the reason for eliminating the annual FiT adjustments of a maximum of 5% for existing and new plants under the RAESBA Regime was not to make the FiT more cost-reflective and to attract

---

[1096]    RCMOMOJ, paras. 82-85. On the correctness of this statement, see below.

[1097]    RCMOMOJ, para. 384.

[1098]    *Cf.* RCMOMOJ, paras. 51, 190-191.

[1099]    RCMOMOJ, para. 66, referring to ERSA (**C-41**), Article 18(2).

[1100]    RCMOMOJ, paras. 56-57, 65, 387; RROMROJ, paras. 30, 62, 64, 98; HT, D1, 7 June 2021, p. 207.

[1101]    RROMROJ, para. 53; Energy Strategy for the Republic of Bulgaria till 2020, June 2011 (**C-28**) (the "**2011 Energy Strategy**"), p. 20.

investors, but only to make the FiT more cost-reflective.[1102] Tellingly, this elimination was also not necessarily seen as something positive by the Shareholders' advisors.[1103]

### a. The method of calculating the FiT

753. The Respondent submits that it determined the minimum necessary FiT per MWh using the "LCOE", the levelized cost of electricity per MWh of a reference plant with representative costs over the mandatory purchase period. A FiT was thus set for a group of plants so that it would equal the LCOE of the reference plant.[1104]

754. Working with several, technology- and size-specific reference plants (30 different ones) was a choice made for efficiency reasons. Such a choice, however, cannot be interpreted to mean that an incentive scheme abandons the objective to set FiTs based on likely costs of actual plants or that a scheme intends to allow for overcompensation, or profit maximation, like a one-size-fits-all reference plant system not distinguishing plants per size or technology might do.[1105]

755. The Respondent acknowledges that "[i]n principle, plants could earn higher returns based on efficiency",[1106] but underlines that a plant with materially lower costs or higher productivity than assumed in the FiT Decision would "risk[] overcompensation" contrary to the Regulator's objective.[1107]

756. The Regulator, however, did not authorize and could not have authorized windfall profits.[1108] Furthermore, even outperforming plants were only to receive a cost-reflective minimum level of support under the ERSA Regime, even more so where such "overcompensation" was not due to investors assuming risk and managing risk well, but "due to a fortuitous drop in procurement costs ([of] PV panel prices)" and increased panel efficiency.[1109]

---

[1102]    RROMROJ, paras. 36-40; HT, D1, 7 June 2021, p. 196.

[1103]    ROP II, p. 12; HT, D1, 7 June 2021, p. 197.

[1104]    RCMOMOJ, paras. 43, 82-85; ROP II, p. 11.

[1105]    RROMROJ, paras. 218- 220.

[1106]    RPHB, para. 74.

[1107]    RCMOMOJ, para. 85; RROMROJ, paras. 32, 445.

[1108]    ROP II, p. 13.

[1109]    RROMROJ, paras. 84, 222; RPHB, para. 74.

757.  According to the Respondent, its manner of setting FiTs in general and the FiT in particular, was "aligned" with the Energy Act, which is relevant and applicable legislation,[1110] and which, in its Article 31 in the form applicable at the time of the Investment, required that the EWRC, in exercising its price regulation powers, set prices that "cover the economically justified operating costs" of energy companies and ensure an "economically justified rate of capital return"[1111] Bulgarian law further requires that interests of energy producers with regard to prices be balanced with several other factors including interests of consumers and sustainability of the development of the sector.[1112]

758.  Indeed, the Claimant and its industry expert acknowledge that an incentive regime should only provide the minimum level of support necessary and that a target return should only be so high that it induces sufficient deployment at minimum cost.[1113]

759.  More in particular regarding the LCOE methodology, the Respondent submits that the LCOE methodology can achieve its intended purpose of setting the FiT at the minimum level necessary when costs are predictable. The Respondent, however, acknowledges that the methodology may result in overcompensation in the event of unpredictable, rapidly declining costs.[1114]

760.  Elsewhere though, the Respondent submits that the ERSA "optimized the FiT-setting mechanism to eliminate overcompensation".[1115] It did so, according to the Respondent, with the above-mentioned elimination of the Regulator's ability to adapt annual prices by only 5%, which had prevented the Respondent to keep pace with the speed of the cost reductions in renewable energy technology.[1116]

---

[1110]    RPHB, para. 44.

[1111]    RCMOMOJ, paras. 83, 408, fns 149, 874; RROMROJ, para. 445; ROP II, p. 8; RPHB, para. 43; Energy Act (**R-247**), Articles 31(2), (4).

[1112]    RCMOMOJ, paras. 22, 47, 135; RROMROJ, paras. 84, 436, 445; HT, D1, 7 June 2021, p. 192; RPHB, para. 43; Energy Act (**R-247**), Articles 23(1), 24(1)(3).

[1113]    RROMROJ, para. 33; ROP II, p. 51; Compass II, para. 3.26; CROMCMOJ, para. 146.

[1114]    RCMOMOJ, para. 45.

[1115]    RCMOMOJ, para. 67.

[1116]    RCMOMOJ, para. 67; RROMROJ, para. 36.

### b. Only the FiT was stabilised

761. The Respondent avers that, contrary to the Claimant's submissions, the ERSA did not aim to provide investors with total certainty, or stabilise its whole regime, but rather provided "that only a single element of the FiT mechanism shall not be changed" during the term of a PPA, *i.e.* the preferential price itself.[1117] The Respondent goes as far as to submit that the ERSA Regime only fixed the price, not the quantity, and as such does not even meet the Claimant's definition of an *ex ante* regime.[1118]

### c. Article 9 No 3 RAESBA

762. The Respondent furthermore submits that the RAESBA contained a provision that provided revenue certainty in case of an alteration of the mechanisms for promoting generation of electricity from renewable and alternative energy sources and that ERSA "eliminated" that provision.[1119] The Respondent disputes that this elimination was related to Bulgaria abandoning its intent to move incentives for energy from RES to a market-based mechanism when introducing ERSA, *i.e.* to alter the mechanism as that goal was still contemplated in Article 31(5) ERSA.[1120]

## 6. EU State aid law

763. The Respondent argues that the FiT constitutes State aid within the meaning of EU State aid law, given that it distorts market competition.[1121]

764. EU law on renewable energy applicable at the time of the Investment acknowledges that "State aid" may be needed to reach mandatory targets for the share of consumption of energy from RES set in said EU law. Said law on renewable energy, in acknowledging the need for State aid, underlines the applicability of EU State aid law, meaning that such schemes must be monitored and authorized by the European Commission pursuant

---

[1117]   RCMOMOJ, paras. 70-71; RROMROJ, paras. 8, 34, 45-46; ERSA (**C-41**), Article 31.

[1118]   RROMROJ, para. 41.

[1119]   RCMOMOJ, para. 71, fn 122; RROMROJ, para. 58; RPHB, para. 42.

[1120]   RROMROJ, paras. 59-61.

[1121]   RCMOMOJ, para. 9.

to the applicable rules and regulations of EU law, including Article 107 and 108 TFEU.[1122]

765. The EC Decision on State Aid confirms that the ERSA Regime constitutes State aid and did constitute State aid when it came into effect in May 2011.[1123] It is within the exclusive competence of the European Commission to assess whether an incentive scheme for renewable energy production constitutes State aid.[1124]

766. It is in that regard not true that because the ERSA Regime was financed by end consumers and not by the State, it was not State aid at the time of the Investment in June 2012.[1125] The difference between the ERSA Regime and the situation in the *PreussenElektra* case, the Respondent initially argued, is that in Germany the FiT scheme was paid for by end consumers and the funds were channelled through private electricity supply companies whereas in Bulgaria NEK, a State-controlled entity, purchased the electricity and thus allocated the funds as public provider.[1126] Later, however, in response to a question of the Tribunal, the Respondent amended its comparison between the ERSA Regime and the situation in *PreussenElektra*. The Tribunal asked whether the Respondent's State-aid argument necessarily presupposes that NEK is a State entity and its acts are attributable to the Respondent. The Respondent answered, without any mention of NEK, that the ERSA Regime constitutes State aid not because under that regime a State-controlled entity would purchase the electricity, but rather because the payment of the purchases was financed by price surcharges set annually by the EWRC and collected under direct State control.[1127]

767. The *PreussenElektra* ruling was furthermore neither amended nor undermined by the *Vent de Colère!* judgment in 2013. Rather, the latter judgment simply continued in alignment with the views of the European Commission that support schemes funded by

---

[1122]    RCMOMOJ, paras. 34-37.

[1123]    RCMOMOJ, para. 37, fn 39; RROMROJ, paras. 191-192, 196; ROP III, p. 10; HT, D1, 7 June 2021, p. 254.

[1124]    RROMROJ, para. 172.

[1125]    RROMROJ, para. 185; ROP III, p. 10.

[1126]    RROMROJ, paras. 186-187, 189, 426; ROP III, p. 10.

[1127]    ROP III, p. 11; HT, D1, 7 June 2021, pp. 258-259; RPHB, para. 93.

end consumers, but under which collected funds are entrusted to a public body, would constitute EU State aid.[1128]

768.　As the core of its argument on State aid, the Respondent submits that as State aid, in line with the applicable EU law, the FiT must be limited to, and if need be modified to be kept at, the minimum level necessary to incentivise investments. It may not provide more than a reasonable or "normal" or "fair" rate of return, "equivalent to the cost of capital".[1129] As such, contrary to the submission of the Claimant, EU Member States did not have wide discretion to implement renewable energy incentive schemes.[1130] Indeed, the necessity regularly to align a renewable energy incentive scheme to EU State aid law obligations shows that the ERSA Regime cannot be regarded as a "set it and forget it" mechanism.[1131]

769.　In that regard, the fact that the European Commission considered over 90 renewable energy-related State aid schemes and found none incompatible with EU law does not mean, contrary to the Claimant's submission, that the European Commission tolerated schemes providing more than a reasonable return. It rather means that before decisions were made, in cooperation between the Commission and the respective EU Member States, these schemes were modified until they were compatible.[1132] Where the Claimant points to other European incentive schemes for which the Commission approved returns higher than 9%, the Claimant furthermore overlooks that those higher returns were driven by higher cost of capital of PV projects at the time, or by specific risk factors not present in Bulgaria.[1133]

770.　The APC in particular was introduced to realign the ERSA Regime with the Respondent's EU State aid law obligations.[1134] The European Commission only approved of the ERSA Regime on the ground that the Regime was modified as it was to limit the State aid granted by the Regime to the difference between the LCOE,

---

[1128]　RROMROJ, paras. 188, 426; ROP III, p. 10.

[1129]　RCMOMOJ, paras. 9, 37, 397, 408, fns 31-32; RROMROJ, paras. 172, 179-180, 184; ROP III, p. 12; HT, D1, 7 June 2021, pp. 259-260; RPHB, paras. 45, 47, 92.

[1130]　RROMROJ, paras. 179-181.

[1131]　ROP III; para. 9; HT, D1, 7 June 2021, pp. 255-256.

[1132]　RROMROJ, para. 182.

[1133]　RROMROJ, para. 814.

[1134]　RROMROJ, paras. 15, 197; ROP III, p. 7; HT, D1, 7 June 2021, p. 253.

including a "normal" rate of return, and the market price. That limitation only was achieved after the introduction of the APC. This therefore implies that the European Commission would not have approved of the ERSA Regime before the APC had been introduced.[1135]

771.    Regarding said normal rate of return, however, the Respondent acknowledges that in the EC Decision on State Aid, the European Commission declared that the rate of return of 9% initially set by the ERSA Regime corresponds to "the level of the estimated weighted average cost of capital [WACC] for renewable investors" in Bulgaria.[1136]

772.    In any case, "the EU origins of Bulgaria's RES support regime" as well as the "State aid limitations" were well known to the market and investors in Bulgaria's renewable energy sector, particularly to those from another EU Member State such as, in this case, Malta.[1137]

### 7.    Why the Respondent had to amend the ERSA Regime

773.    The Respondent submits that in the months following the FiT Decision, as it happened in many European countries in the late 2000s, the cost of PV technology and of building a PV plant plummeted to significantly below the cost assumed for the Decision.[1138] The decrease of the prices happened at a faster rate than Bulgaria could adapt to with the then existing mechanisms of its laws.[1139]

774.    The development allowed newly constructed plants that managed to be commissioned by June 2012, such as the Karad Plant, to earn excessive returns, *i.e.* "overcompensation".[1140]

---

[1135]    RROMOJ, paras. 175, 196; ROP III, p. 7; HT, D1, 7 June 2021, p. 254-255; RPHB, paras. 96-98.

[1136]    RPO III, p. 13; RPHB, para. 96; EC Decision on State Aid (**FR-78**), p. 63.

[1137]    RCMOMOJ, paras. 9, 399.

[1138]    RCMOMOJ, paras. 11, 45, 86, 88, 140; RROMOJ, paras. 16, 67, 78, 214, 454; ROP III, p. 54; RPHB, paras. 71, 99.

[1139]    RCMOMOJ, paras. 45, 86.

[1140]    RCMOMOJ, paras. 11, 140; RROMOJ, paras. 16, 67, 78, 214, 454; ROP III, p. 54; RPHB, paras. 71, 99.

775. Such "overcompensation", in the case of the Karad Plant, reached a rate of almost two times its cost of capital and well above the EWRC's target return of 9%, which the EWRC had calculated on the basis of the WACC.[1141]

776. In light thereof, the FiT which the Respondent set for the 2011/2012 period turned out to be "overly generous",[1142] "systematically overcompensat[ing] solar PV plants by 2.3 to 6.6 percentage points above the reference plant's 9% target IRR."[1143]

777. In knowledge thereof, "in an effort to game the system", investors, among which the Claimant, raced and "piled in" to lock in the 2011/2012 FiT before it could be amended, creating a boom of plants profiting from overcompensation.[1144]

778. However, as outlined above and below, it is an "essential feature" of Bulgarian and EU law that subsidies granted to renewable energy producers may not lead to more than a reasonable return.[1145]

779. It is against that background that the Respondent acted and had to act.[1146]

    a.    The alleged price drop of PV panels

780. Adding detail, the Respondent submits that between mid-2011 to mid-2012 the prices of the type of PV panels used for the Karad Plant (crystalline silicone imported from China) dropped by 53%,[1147] or on average by 49%,[1148] and that between the time the FiT was set in June 2011, and the time the Karad Plant was commissioned, the LCOE for PV plants above 200kW, the category of the Karad Plant, roughly halved (from EUR

---

[1141]  *Ibid*.

[1142]  RCMOMOJ, paras. 12, 86.

[1143]  RPHB, para. 73; Oxera III, para. 4.20.

[1144]  RCMOMOJ, paras. 12, 86, 390; RROMROJ, para. 222.

[1145]  RCMOMOJ, paras. 17, 47, 139; RROMROJ, paras. 10, 78.

[1146]  *E.g.* RCMOMOJ, paras. 11ff, 17, 22, 92; RROMROJ, paras. 17, 54, 97, 442, 456, 487; ROP II, p. 50; ROP III, pp. 37, 48-49; HT, D1, 7 June 2021, p. 282; RPHB, para. 71.

[1147]  RCMOMOJ, para. 87; referring to Oxera I, para. 4.32, Figure 4.5.

[1148]  RROMROJ, paras. 16, 76; ROP II, p.34; HT, D1, 7 June 2021, p. 208; RPHB, paras. 60, 70.

248 to EUR 121 per MWh).[1149] The Respondent suggests that the actual LCOE for the Karad Plant "may have been even less".[1150]

781.   Notably in that regard, the timelines on which the Claimant relies for its argument that the Karad Plant could not have profited from dropping PV panel prices are unsupported by evidence. The Claimant's own evidence shows that 19 MW of PV panels for the Karad Plant were set to be delivered by 4 January 2012 and the remaining 41.5 MW on 31 January 2012.[1151]

782.   A financial model of 1 February 2012, used by Crescent Capital, furthermore shows a lower price per Wp in PV panels (EUR 0.857) than the Annex to the engineering, supply, and construction contract between SunEdison SLU and ACWA Bulgaria of 22 December 2011, which shows a price of EUR 1.08 per Wp. Therefore, it is shown that the Karad Plant's developer did benefit from the drop in PV panel prices.[1152] (Elsewhere, however, the Respondent submits that it was shown that the Karad Plant's panels indeed cost EUR 1.08 per Wp and argues that the developer of the Karad Plant actually overpaid for the PV Panels of the Karad Plant.)[1153]

783.   Finally, the Claimant admitted that PV panel costs dropped in 2011-2012. The Claimant also does not dispute that the FiT was set based on estimates from before that drop in prices.[1154]

   *b.     The alleged boom*

784.   The Respondent further points out that by June 2012 the installed capacity of PV plants, having reached 935 MW, had reached three times the amount expected to be reached in 2020 or, respectively, the Respondent's target for 2020 of 300 MW. It had, in fact, increased by 1,054% from June 2011 to July 2012.[1155] Consequently, "due in part" to

---

[1149]   RCMOMOJ, para. 88.

[1150]   RCMOMOJ, para. 88, fn 159.

[1151]   RROMROJ, paras. 82-83, fn 146.

[1152]   RROMROJ, para. 83.

[1153]   RCMOMOJ, paras. 272-273.

[1154]   RROMROJ, paras. 68, 71, 76; RPHB, para. 54; CROMCMOJ, para. 182.

[1155]   RCMOMOJ, para. 89; RROMROJ, paras. 17, 67, 69, 97; ROP II, p. 41; ROP III, p. 54; HT, D1, 7 June 2021, p. 211; RPHB, paras. 53, 99.

the boom, Bulgaria reached its EU mandated 16% target share of energy from RES in the gross end-consumption (the "**16% Target**") "by early 2013".[1156]

785.    According to the Respondent's data, actual operating hours of PV plants receiving the FiT were also 14.2% higher than the EWRC had assumed.[1157] This was because on top of the prices dropping mid-2011 to mid-2012 PV plants also became more efficient during that time, "likely due to technological developments in capacity factors."[1158] Actual plants commissioned under the FiT of 2011 thus required lower investment costs and achieved higher operating hours than expected for the reference plants.[1159]

786.    Finally, and notably, the Claimant admits that "Bulgaria secured more PV capacity than it expected as a result of [ERSA]".[1160] In conclusion, the Respondent thus has shown that it experienced a renewable energy boom between mid-2011 and mid-2012.[1161]

      *c.*      *The impact of the boom*

787.    The Respondent submits that the "rapid onset" of new renewable energy capacity exceeded the network capacity and led to high costs to consumers for the purchase of electricity, to high network costs associated with intermittent electricity supply by producers of renewable energy, and to additional balancing costs to the network operator.[1162]

788.    Bulgarian law required that electricity prices must be set so as to balance the interests of consumers with the interests of energy companies. By the time of the Investment, June 2012, that balance had tilted in favour of renewable energy producers as a consequence of the renewable energy boom.[1163] In July 2012 consumer electricity prices

---

[1156]    RCMOMOJ, para. 89 (stating that the target was reached in 2012); RROMROJ, paras. 70, 99 (stating that the target was reached "by early 2013). At RROMROJ, para. 70, fn 114, the Respondent discusses other sources that contributed to reaching the target in 2013 already.

[1157]    RROMROJ, paras. 16, 229; ROP II, p. 72; HT, D1, 7 June 2021, p. 227.

[1158]    RROMROJ, paras. 77, 214; RPHB, para. 70.

[1159]    RROMROJ, paras. 214, 454; ROP II, p. 67.

[1160]    RROMROJ, paras. 68, 71; RPHB, para. 54; CROMCMOJ, para. 182.

[1161]    RROMROJ, para. 67.

[1162]    RCMOMOJ, paras. 22, 140; RROMROJ, paras. 78, 234; ROP II, p. 42; ROP III, p. 54; RPHB, para. 53.

[1163]    RCMOMOJ, para. 22; RROMROJ, paras. 241, 436; RPHB, paras. 43, 53.

were then raised by 13% "in large part" due to the surge in electricity from RES.[1164] Bulgarian consumers, however, are "the second most vulnerable to electricity price increases", being "energy poor" as in spending more than 10% of the household resources to cover energy needs.[1165] Affordability was thus always a paramount concern of Bulgarian policy making.[1166]

789.    The increased share of renewable energy also necessitated the purchase of greater reserves and other measures to maintain balance between production and consumption of energy. The increase also put NEK in jeopardy. This was the case because NEK had to pay more than expected in preferential prices while only being able to recover such additional costs over the next annual period, having to cover the balance, and serving as a "temporary cushion", in the meantime.[1167]

790.    Finally, in that regard the Claimant is incorrect when it posits that NEK was accorded a guaranteed return of 3.99%. Rather, NEK was allowed *ex ante* to apply a return of 3.99% in its estimate-based calculation underlying the setting of the transmission network tariff for the upcoming year.[1168]

> d.    *Analysis of the World Bank and the European Commission regarding the necessity to act*

791.    The Respondent feels confirmed in its analysis of necessity by a World Bank presentation of 27 May 2013 of a "Power Sector Rapid Assessment" of Bulgaria which was prepared at the request of Bulgaria, and by a European Commission Staff Working Document regarding "guidance for the design of renewable support schemes.[1169]

---

[1164]    RCMOMOJ, para. 91; referring to Oxera I, para. 6.27 and The Sofia Globe, Bulgaria to increase electricity prices by 13% on July 1, 29 June 2012 (**R-208**) (The article quotes the head of EWRC who mentions the "generous feed-in tariff" as the main reason but, however [not properly visible in the Exhibit, appearing under the cookie prompt], also names two other reasons, including higher purchasing prices agreed for electricity generated at the Maritsa Iztok 1 and 3 coal plant, and clarifies that an increase of 10% was planned anyway, meaning that the additional increase is 3%, not 13%); RROMROJ, paras. 78, 92; ROP II, p. 42.

[1165]    RROMROJ, paras. 97, 436, 478, fn 183; ROP II, p. 63; RPHB, para. 98 (stating that Bulgaria itself was "energy-poor"); Oxera I, para. 6.33.

[1166]    RROMROJ, para. 478.

[1167]    RCMOMOJ, paras. 90, 180; RROMROJ, paras. 18, 92, 95; RPHB, para. 53.

[1168]    RCMOMOJ, para. 180.

[1169]    RCMOMOJ, para. 140; ROP II, pp. 60-63; HT, D1, 7 June 2021, pp. 224-225; RPHB, paras. 100-101; World Bank, Republic of Bulgaria: Power Sector Rapid Assessment, 27 May 2013 (**R-054**).

792. According to the Respondent, the assessment of the World Bank flags the rapid build-up of renewable energy and a growing deficit of NEK, recommending to eliminate incentives that lead to inefficient investments and rent-seeking behaviour.[1170] The guidance of the European Commission declares that reform is needed and that support schemes should adjust to the falling costs of renewables, also in order to comply with State aid rules and in order to minimise costs to consumers.[1171]

> e.    The Respondent's swift reaction

793. The Respondent submits that it "acted swiftly" in response to the challenges presented by the renewable energy boom, by cutting the 2012/2013 FiT in half and by setting a moratorium, dated 29 June 2012, not allowing further connections for electricity from RES to the network starting 1 July 2012.[1172] However, that was not enough. As confirmed by Mr Kristensen, "because most of the intermittent RES-E capacity had been added within a short time frame (*i.e.* between 2011 and 2012), any meaningful management of RES-E costs following the rapid build-up of RES-E capacity also needed to apply to existing investments rather than future investments."[1173]

> f.    Admissions and acknowledgements of the Respondent

> (1)    ERSA sought to remedy the overcapacity problem of the RAESBA Regime

794. The Respondent admits that with the ERSA it sought to remedy the existing overcapacity problem of the RAESBA Regime, *e.g.* by terminating connection rights and requiring more permits and cash advances or guarantees. It submits that in doing so it reduced the pipeline of projects from 12,000 to 15,000 MW to approximately 4,000 MW. However, that pipeline of 4,000 MW, the Respondent submits, was still nearly

---

[1170] RCMOMOJ, para. 140; ROP II, pp. 60-63; ROP III, p. 54; HT, D1, 7 June 2021, pp. 224-225; RPHB, paras. 100-101; *cf.* World Bank, Republic of Bulgaria: Power Sector Rapid Assessment, 27 May 2013 (**R-054**), pp. 3, 20-24; the World Bank assessment appears to be more focused on abuse of preferential prices for cogeneration, poor regulation, and reductions of future tariffs, *cf.* pp. 3, 13, 15, 36.

[1171] RCMOMOJ, para. 141, referring to European Commission Guidance (**FR-41**), pp. 3-4, 15, 20, 32; however, it appears that the document's (presupposed) understanding is that any reform and amendments would only apply to "new installations"; ROP II, p. 7.

[1172] RCMOMOJ, para. 92; EWRC Decision EM-01, 29 June 2012 (**R-044**) the character of the alleged "moratorium" appears to be more aptly described at RCMOMOJ, paras. 95-96, fn 180; RROMROJ, para. 505; ROP II, p. 49.

[1173] RCMOMOJ, para. 92, quoting Oxera I, para. 2.14; RROMROJ, para. 505.

four times of what Bulgaria needed to reach its 2020 target for the share of renewable energy.[1174]

795.   The Respondent further seeks to specify that "the curtailment measures" of the ERSA "were not designed to counteract the RES boom that unfolded beginning in July 2011 … because Bulgaria did not and could not predict the massive drop in PV panel prices over that period", and that the ERSA "did not prevent the RES boom that occurred between mid-2011 and mid-2012" of which "a reasonable investor in June 2012 would have been aware",[1175] but which was not foreseeable in May 2011 at the time the ERSA was adopted.[1176] The Respondent disputes that there would be any evidence that it knew of that pipeline in July 2011 already.[1177]

(2)   Monitoring capabilities and knowledge of the Respondent

796.   The Respondent acknowledges that the monitoring procedures of ERSA aimed "to strengthen Bulgaria's ability to monitor and curtail new connections" but that they "were unable to ward off the unexpected RES boom that occurred between mid-2011 and mid-2012". The Respondent also blames "distribution companies" (such as *e.g.* EON Bulgaria EAD) for allegedly failing to provide it with accurate projections due to the unexpected growth of new connections. The Respondent argues that this is, however, irrelevant to the present case as market players had warned about that failure in the six months preceding the Investment and as, by June 2012, any reasonable investor "would have understood that the monitoring mechanisms had not worked".[1178]

797.   The Respondent disputes that it was best positioned to determine if its program risked causing a financial strain on its or its citizen's finances, not least, for example, because as far as the Claimant's argument would be that the Respondent had a view on its pipeline through the licensing process, that process did not even apply to new wind or

---

[1174]   RROMROJ, paras. 54, 64-65, 87.

[1175]   RROMROJ, para. 98.

[1176]   RPHB, para. 59.

[1177]   RPHB, para. 61.

[1178]   RROMROJ, para. 506 and fn 1160; ROP II, p. 32; EWRC, Minutes of public discussion of the draft of methodology on compensation of costs of the public provider and the end suppliers, incurred due to imposed obligations to society for purchasing of electricity at preferential prices from renewable energy sources and from highly effective combined production of heat and electric energy, 26 June 2011 (**R-308**), p. 3.

PV plants with a capacity of 5 MW or below, which constituted 65.8% of the commissioned capacity between 1 July 2011 and 30 June 2012. Therefore, as far as it had "some ability to monitor onboarding RES capacity through its issuance of licenses" that ability could not have had "any real effect".[1179] Furthermore, generators typically are better equipped to react to fast-paced commercial developments and booms than governments.[1180] The Respondent also finds it of import in that regard that most of the new PV capacity was added in May and even more in June 2012, *i.e.* towards the end of the 2011-2012 period.[1181]

<div align="center">(3)    The April 2012 Amendment</div>

798.    The Respondent admits that in April 2012, "in an attempt to slow down the installation of RES plants", the Bulgarian Parliament adopted "several amendments" pushing back the date when renewable energy plants would obtain the FiT to "Act 16" with the objective that the pipeline of projects would come online after a new, lower FiT would have been set in July 2012 (the "**April 2012 Amendment**").[1182]

799.    The Respondent, however, submits in response to a question from the Tribunal that it could have neither denied the License nor the Permit, nor could it have prevented any PV plant that fulfils all administrative law requirements from connection to the grid permanently before July 2012. This is the case, the Respondent argues, because, as stated above, plants under 5 MW, making up a 65.8% share of the PV capacity connected between 1 July 2011 and 30 June 2012, did not even require a license and where thus outside the control of the Regulator in terms of their connection to the grid. PV plants exceeding 5 MW, including the Karad Plant, had to be issued both their preliminary and final license if the plant met the requirements of the Energy Act and the Licensing Ordinance and thus also fell out of the EWRC's control in that case. Grid operators equally were required to connect PV plants that fulfilled all necessary requirements.[1183]

---

[1179]    RROMROJ, para. 506, fn 1159 (where it says 61% instead of 65.8%); RPHB, paras. 62, 65.

[1180]    RROMROJ, para. 506, fn 1160.

[1181]    ROP II, p. 48; HT, D1, 7 June 2021, p. 216.

[1182]    RROMROJ, para. 88; HT, D1, 7 June 2021, p. 209; RPHB, para. 63.

[1183]    RPHB, paras. 65-66.

(4)    Shortcomings of the chosen LCOE methodology

800.    The Respondent acknowledges that the LCOE method which Bulgaria had chosen for calculating the FiT may result in overcompensation "in the event of unpredictable, rapidly declining costs that drop faster than a State's ability to adapt FiTs".[1184]

801.    However, elsewhere, the Respondent, leaning more heavily on an argument of unexpectedness and unforeseeability than on a known weakness of its chosen method of calculation, submits that "as a result of unforeseen circumstances that had not been taken into account in setting the FiT" it was remunerating plants well above the level of efficient costs and a reasonable return (see also above para. 765) .[1185]

(5)    Bulgaria was unable to stop the boom

802.    More generally, the Respondent acknowledges that "Bulgaria was ultimately unable to stop the boom". That, however, was not a sign of Bulgaria welcoming the boom as a fulfilment of the objective to attract investment of its ERSA,[1186] or of Bulgaria abandoning its goal to have a cost-effective programme. Rather, it was, "evidence of fast-moving market developments, particularly in the first half of 2012, which outpaced all expectations and led to an unprecedented surge in May and June of 2012".[1187]

g.    *Counterarguments of the Claimant*

803.    When the Claimant submits that in 2012 the total volume of renewable energy capacity of the Respondent had not yet exceeded Bulgaria's target for renewable energy capacity by the end of 2020, it disregards that installing the same amount of capacity over eight years rather than in a single year has different cost implications.[1188] The Respondent in that regard acknowledges that "some frontloading" was envisaged in the 10-year renewable energy targets, but disputes that frontloading was supposed to take place to the extent that it did take place.[1189] Rather, "Bulgaria sought to achieve its 2020 target

---

[1184]    RCMOMOJ, para. 45.

[1185]    RCMOMOJ, para. 73.

[1186]    ROP II, pp. 43-46; HT, D1, 7 June 2021, pp. 212-213; RPHB, paras. 57-58.

[1187]    HT, D1, 7 June 2021, p. 215.

[1188]    RROMROJ, para. 71.

[1189]    RROMROJ, para. 72; HT, D1, 7 June 2021, p. 212.

through incremental annual increases in RES electricity",[1190] more in line with declining costs of the development over time and in a more sustainable fashion for the necessary grid management.[1191] The boom was thus not aligned with the Respondent's "incremental" renewable energy targets, the Respondent suggests.[1192]

804. The Claimant also ignores the different cost implications of the two different electricity sources when it suggests that the added PV capacity was needed to make up for a slower-than-expected and -desired increase in wind energy capacity. The FiT for PV plants for the 2011-2012 season was more than three times as high as the FiT for wind plants. As Bulgaria's policy was driven by costs, not a desire to attract the maximum amount of energy, it is incorrect that the Respondent would have been indifferent whether it would achieve its targets with expensive PV energy or lower-cost wind energy. The Claimant's argument on the interchangeability of PV and wind energy thus fails.[1193]

## 8.    The Seven Measures

805. The Respondent argues that the Seven Measures were introduced to realign the return of renewable energy producers to a reasonable return as required under EU and Bulgarian law and to optimise the ERSA Regime.[1194]

806. The Respondent's modifications to the ERSA Regime were "reasonable, proportional, based on rational policy goals, and foreseeable".[1195]

807. The Seven Measures were introduced "to avoid putting an additional burden on Bulgarian electricity consumers" and to address affordability concerns,[1196] NEK's deficit, and investor overcompensation.[1197] The Seven Measures did not represent a "fundamental change", or a "radical change", or a "claw back". Rather, the Seven

---

[1190]  HT, D1, 7 June 2021, p. 193; RPHB, para. 58.

[1191]  RPHB, para. 58.

[1192]  RROMROJ, para. 72; RPHB, para. 58.

[1193]  RROMROJ, paras. 73-75, 504; ROP II, pp. 43-46; HT, D1, 7 June 2021, pp. 212-214; HT, D3, 9 June 2021, p. 666; RPHB, paras. 57-59.

[1194]  RCMOMOJ, para. 13.

[1195]  RCMOMOJ, para. 23; RROMROJ, paras. 386, 436-437, 439, 445, 463, 550; ROP III, p. 50; RPHB, paras. 105, 108.

[1196]  RROMROJ, paras. 436-437; ROP III, p. 54.

[1197]  RPHB, paras. 99ff.

Measures ensured the stability of the electricity system, served to balance the interests of energy companies and consumers,[1198] and preserved the key attributes of the ERSA Regime, including that PV plants such as the Karad Plant still could, and did,[1199] earn a reasonable return after their introduction, as required by Bulgarian and EU law.[1200]

808. The Respondent did not directly reduce the FiT and the Claimant concedes as much.[1201] The Seven Measures also only had an equivalent effect of reducing the FiT by 7.4%.[1202]

809. Furthermore, contrary to the characterisation of the Claimant, the Seven Measures were not retroactive because, unlike in Spain, all of the Measures only applied prospectively, after their introduction.[1203]

810. The acquisition of ACWA Bulgaria by Enery shows that, contrary to statements of the Claimant's expert, the Seven Measures did not have a "chilling effect" on the investment climate in Bulgaria's PV sector. Indeed, the acquisition, together with comments made by Enery's CEO, show that Bulgaria is an attractive destination for investments in solar power on a market basis, *i.e.* without preferential prices, and despite the Seven Measures.[1204]

           *a.*     *Temporary Grid Access Fee*

           (1)     Access Fee Settlement Agreement

811. Regarding the Temporary Grid Access Fee in particular, as a preliminary point, the Respondent submits that the Claimant seeks damages that "it willingly agreed to forego" under the binding terms of the Access Fee Settlement Agreement with ESO.[1205] In addition, the Claimant's claim of having litigated "years" in Bulgarian courts to seek

---

[1198]    RROMROJ, para. 488; HT, D1, 7 June 2021, pp. 281-282.

[1199]    RCMOMOJ, para. 24; RROMROJ, para. 386; RPHB, para. 103.

[1200]    RCMOMOJ, paras. 23, 384; RROMROJ, paras. 436, 445, 448, 483, 488; ROP II, p. 30; ROP III, p. 54; HT, D1, 7 June 2021, pp. 281-282.

[1201]    RCMOMOJ, para. 384; RPHB, para. 108.

[1202]    RROMROJ, paras. 386, 449, 557; ROP II, p. 93; HT, D1, 7 June 2021, p. 246; RPHB, paras. 103, 129; Oxera II, para. 7.113, Table 7.1.

[1203]    RROMROJ, paras. 448, 485; ROP II, p. 71; RPHB, para. 104.

[1204]    RCMOMOJ, para. 275.

[1205]    RCMOMOJ, para. 156; RROMROJ, para. 234, fn 526.

reimbursement of the Temporary Grid Access Fee charges before the Access Fee Settlement Agreement was entered into, is unsupported.[1206]

812. To the extent that the Claimant has any complaint regarding the Access Fee Settlement Agreement, ACWA Bulgaria must pursue any such claim under its private law settlement contract with ESO, in the proper, domestic forum. This ICSID arbitration is not the proper channel to make any such claim.[1207] In any case, the amount allegedly withheld by ESO equals the amount that would have been due under the Permanent Grid Access Fee if it had been established at the time. It thus fits in the compensation scheme as envisioned by the Regulator.[1208]

(2)    Merits of the claim

813. On the merits of the claim and the adherence to due process in the adoption of the Temporary Grid Access Fee, "the record demonstrates" that the Regulator introduced the Temporary Grid Access Fee to cover costs relating to increased renewable energy production and acted reasonably and in good faith when setting it.[1209] As a provisional measure, the decision setting the Temporary Gird Access Fee was based on the existing, but "limited" data and, in any case, did include a mechanism for appropriate compensatory measures should the set fee turn out to be too high later.[1210] Said mechanism was eventually put in place concomitantly with the setting of the first Permanent Grid Access Fee in 2014 (see below).[1211]

814. The fact that the Permanent Grid Access Fee turned out to be so much lower than the Temporary Grid Access Fee is, in that regard, not an indicator that the Temporary Grid Access Fee was introduced to "claw back a substantial share of the FiT" as the Claimant had put it.[1212] Rather, the process leading to the Permanent Grid Access Fee

---

[1206]    RCMOMOJ, para. 175, fn 393.

[1207]    RCMOMOJ, para. 188; RROMROJ, para. 234, fn 526.

[1208]    RCMOMOJ, para. 189.

[1209]    RCMOMOJ, paras. 168, 174; ROP II, p. 75; HT, D1, 7 June 2021, pp. 233-234; RPHB, para. 102; referring to the decision itself at EWRC Decision No. C-33, 14 September 2012 (**R-212**) (**C-109**).

[1210]    RCMOMOJ, paras. 170, 174, 183-184; RROMROJ, paras. 234, 461, 463, fn 526; ROP II, p. 76; RPHB, para. 111.

[1211]    RCMOMOJ, paras. 183-184; RROMROJ, paras. 234, 463; ROP II, p. 76; RPHB, para. 111.

[1212]    RCMOMOJ, paras. 183-184, 187 referring to CMOM, para. 213.

demonstrates that the Regulator acted in good faith amending the fee when it had more data available.[1213]

815.  In light of the overgenerous FiT, it would not have been reasonable to saddle consumers with the increased network costs arising out of the renewable energy surge.[1214]

816.  Finally, the Temporary Grid Access Fee had a negligible impact on the Investment, constituting a reduction of the FiT of only 0.05%.[1215]

       *b.  Permanent Grid Access Fee*

817.  Regarding grid access fees in general, and the Permanent Grid Access Fee in particular, the Respondent argues as follows.

818.  The introduction of the Permanent Grid Access Fee on 13 March 2014 was made after a thorough research effort involving all network operators.[1216] The Permanent Grid Access Fee pursued the same reasonable objectives as the Temporary Grid Access Fee and was adopted in a transparent manner.[1217] It was set annually and payable by PV and wind producers.[1218]

819.  As confirmed by Mr Kristensen, the Permanent Grid Access Fee was set at a reasonable price reflective of the additional costs of ESO.[1219]

820.  Contrary to an argument of the Claimant, and as evidenced by the text of Article 32(2) ERSA itself, potential network costs were not, and did not have to be, considered when setting the adequate FiT.[1220] Grid access fees and the FiT also operate at different levels and are based on different laws (ERSA and the Energy Act). Being entitled to a FiT also in no way means that one does not have obligations arising from the nature of the

---

[1213]  RCMOMOJ, para. 185; RROMROJ, para. 234, fn 526.

[1214]  RCMOMOJ, para. 173; RROMROJ, para. 460.

[1215]  RROMROJ, para. 463; Oxera II, para. 7.113, Table 7.1, which however lists an impact of 0.05%.

[1216]  RCMOMOJ, paras. 183-184.

[1217]  RROMROJ, para. 461; ROP II, p. 77; RPHB, para. 102.

[1218]  RCOMOMOJ, paras. 183, 187; RROMROJ, para. 234.

[1219]  RCMOMOJ, paras. 186-187; RROMROJ, para. 463; HT, D1, 7 June 2021, pp. 234-235.

[1220]  RCMOMOJ, paras. 159-161; RROMROJ, paras. 238-239, 462; RPHB, para. 110.

electricity system and the achievement of balance in that system.[1221] It would have been unreasonable to interpret the absence of network costs in the FiT calculation as a guarantee that network costs would never be imposed.[1222]

821. As a consequence of the 2011-2012 renewable energy boom, network costs, and in particular the costs of ESO to purchase reserves, a cost increase of which ESO had explicitly warned, could not be borne anymore by the grid access charge payable to ESO by all network users, *i.e.* by the consumers. This is because a material increase in renewable energy capacity leads to a material increase in network costs.[1223] Having only consumers pay for the costs was especially impossible because PV energy producers profited from the cost drop of the panels and from efficiency gains.[1224]

822. Against that background, the EWRC made a reasonable and proportional decision not to burden the consumers with the additional network costs but to impose such additional costs on those who had caused them. It did so while the consumers continued to pay the network costs they were already paying and that had increased considerably over the preceding years.[1225]

823. Investors in PV plants in Bulgaria in 2012 could also reasonably foresee that grid users alone, *i.e.* consumers, would not be able to bear the costs of the large amounts of additional reserves needed at that time and that, as a result, producers of renewable energy might be required to assume some of the network costs they had caused.[1226]

824. In addition, given that grid access charges had also been introduced in other countries in similar situations, including "in the middle of a regulatory year after prices already had been set", the Claimant had no reason to believe that grid access charges in Bulgaria would remain frozen or were unreasonable.[1227]

---

[1221]  RCMOMOJ, paras. 161-162, quoting Supreme Administrative Court of Bulgaria, Decision No. 948 on Administrative Case No. 5263/2015, 23 January 2018 (**R-230**), p. 7.

[1222]  RROMROJ, para. 238.

[1223]  RCOMOJ, paras. 160-164; RROMROJ, paras. 234, 462; RPHB, para. 111; Ordinance on Regulation of Electricity Prices, Promulgated SG No. 35 dated 20 February 2004, effective 2 March 2004, as amended SG No. 62, 31 July 2007 (**R-008**) at Article 21a (1).

[1224]  RROMROJ, para. 241.

[1225]  RROMROJ, paras. 241-242; RPHB, para. 111.

[1226]  RCMOMOJ, para. 165.

[1227]  RCMOMOJ, para. 165; RROMROJ, paras. 243, 462.

825.    The Shareholders would also have been kept abreast about concerns about the network costs by its local corporate advisory "NECA", and, in any case, the Claimant, as purchaser of the largest PV plant of Bulgaria should also have known such things.[1228]

826.    The counterargument of the Claimant, that increased network costs were a foreseeable result of the Respondent's decision to increase its renewable energy capacity and could have been considered in setting the 2011 FiT is incorrect given that the boom occurred after June 2011, after the FiT had been set.[1229]

827.    Finally, the Permanent Grid Access Fee had a negligible impact on the Investment, constituting a reduction of the FiT of only 0.79%.[1230]

       *c.    Annual Production Cap*

828.    The Respondent submits that by an amendment to ERSA, as of 1 January 2014, the renewable energy production eligible for a FiT was capped to the average annual hours used by the EWRC in the applicable FiT setting decision, adjusted for a plant's own consumption. According to the Respondent, for the category of the Karad Plant, the FiT Decision had used 1,250 average annual hours minus 5% of own consumption, leading to a total of 1,188 hours of production eligible to receive the 2011/12 FiT.[1231]

829.    In deviation from the Claimant's explanation of the APC, the Respondent submits that the 5% adjustment for a plant's own consumption was not just added in a further 2015 amendment to ERSA, or in Decision SP-1, but was provided for in the 2014 ERSA already, only that NEK had failed to apply the adjustment to its 2014 purchase of energy from the Karad Plant.[1232]

830.    The Respondent does not explain, just as the Claimant failed to do, how the ERSA Amendment could be applied to PV plants already commissioned and to existing PPAs.

831.    The Respondent submits that "the Annual Production Cap was a transparently adopted, rational refinement designed to correct market distortions caused by the RES boom"

---

[1228]    RCMOMOJ, para. 166.

[1229]    RROMROJ, para. 240.

[1230]    RROMROJ, para. 463; Oxera II, para. 7.113, Table 7.1.

[1231]    RCMOMOJ, para. 126; ROP II, p. 65; RROMROJ, para. 214.

[1232]    RCMOMOJ, para. 146.

which had led to unlawful overcompensation. The APC was adopted "to realign the regulatory framework with its original purpose of remunerating economically justified investment costs and providing a reasonable return."[1233] It was also adopted to realign ERSA with "EU guidelines".[1234] The APC thus had a public purpose.[1235]

832.  Where Article 31 ERSA mentions that the Public Provider "shall purchase the whole amount of electricity from renewable sources", it does not mention the price at which such amounts would be sold. What is more, after the introduction of the APC, all energy produced was still being sold, just not all at the FiT.[1236]

833.  The APC was not a reversal but a rational extension of the ERSA Regime's original purpose and design of providing generators of renewable energy only with the minimum return necessary to incentivize investment made necessary because the FiT, in violation of applicable law, overcompensated plants with lower costs or higher operating hours than the reference plant.[1237]

834.  In that regard, it is false to claim that the APC, being a cap on the volume of electricity eligible for the FiT, or, for that matter, any other of the Seven Measures, would have turned the ERSA Regime from an *ex ante* into an *ex post* scheme given that (i) the APC did not retroactively amend the calculation underlying the FiT Decision, *i.e.* a reference plant with the reference cost would have still earned the 9% IRR and would not have been limited by the APC, (ii) it did not individually adjust the revenues of PV plants *ex post* to align them with a target return, and (iii) plants could still earn a reward by selling on the market electricity which they had efficiently produced above the cap limit, and plants would still be earning less if they operated for fewer hours than the cap or had inefficiently high costs.[1238] The *ex post* argument thus reflects "ivory tower economics" and is "divorced from the underlying facts" of the case.[1239]

---

[1233]  RCMOMOJ, paras. 128, 138-139, 142-143; RROMROJ, paras. 214, 454; ROP II, p. 66; HT, D1, 7 June 2021, pp. 226-227; RPHB, para. 102.

[1234]  RCMOMOJ, para. 143; RROMROJ, para. 214.

[1235]  RPHB, paras. 105-106.

[1236]  RCMOMOJ, paras. 130, 367 fn 284; ROP II, p. 69.

[1237]  RCMOMOJ, paras. 138-139, 142-143, 145, 148-149; RROMROJ, paras. 454-455; ROP II, p. 67.

[1238]  RROMROJ, paras. 22, 216-217, 223, 448, 455; ROP II, pp. 70-71; HT, D1, 7 June 2021, pp. 229-230; RPHB, para. 106.

[1239]  RROMROJ, para. 215.

835.    Finally, the Annual Production Cap did also not "devastate" the value of the Investment.[1240] According to the calculations of the Respondent, after introduction of the Annual Production Cap, the Karad Plant earned an IRR of 8%, one percent higher than the 7% WACC which ZBE Partners had relied on in 2012.[1241] Later the Respondent submits that the Karad Plant including NOMAC achieved a pre-tax IRR of 7.3% in line with its WACC of 7.0% to 8.0% in 2012.[1242] This, the Respondent submits, is a reasonable rate of return.[1243]

(1)     60.4/50 Ratio and the "licensed capacity"

836.    Any decreased profitability of the Karad Plant following the APC, and the allegedly arbitrary and discriminatory, disproportionate impact of the APC on the Karad Plant is also mainly caused by the 60.4/50 Ratio. The 60.4/50 Ratio however, represents a risk that first SunEdison SLU took in "upsizing" the Karad Plant "without approval" and at higher costs compared to the reference plant, and that then the Claimant assumed in paying the higher acquisition price for the Plant and its "speculative capacity.[1244]

837.    The decreased profitability is thus not caused by the Respondent.[1245] Rather, the APC cut short a gamble of the Claimant, as a commercial decision, to pay too high a price for an oversized plant.[1246] However, purchasing a plant with such a "speculative

---

[1240]    RCMOMOJ, para. 150; RROMROJ, para. 228.

[1241]    RCMOMOJ, para. 150.

[1242]    RROMROJ, para. 25.

[1243]    RCMOMOJ, para. 150; ROP II, p. 72.

[1244]    The Claimant "assumed a material risk" purchasing, as Mr Roberts put it, Bulgaria's "most productive plant at increased cost", the Respondent argues. RCMOMOJ, paras. 104, 137, 372 quoting WS Roberts I, para. 20; RROMROJ, paras. 23, 122, 224-225, 229-230, 457; ROP II, pp. 56, 72; HT, D1, 7 June 2021, pp. 222-224, 231; RPHB, paras. 82-83, 107. Elsewhere, though, the Respondent takes the position that the Claimant did not assume risks with respect to the development and construction of the Karad Plant and its operation and management, at all, because it acquired the Plant after it had been fully built and then outsourced the Karad Plant's operations and management to third parties for fixed fees; RROMROJ, para. 230. As an aside, the Respondent argues that the 60.4/50 Ratio was not so novel at the time since it had already been exploited in Spain and contributed to the boom there; RROMROJ, paras. 231, 457; ROP II, p. 72.

[1245]    RCMOMOJ, paras. 104, 372; RROMROJ, paras. 23, 224-225, 229, 457; ROP II, pp. 56, 72; HT, D1, 7 June 2021, p. 231; RPHB, paras. 82-83, 107. As an aside, the Respondent argues that the 60.4/50 Ratio was not so novel at the time since it had already been exploited in Spain and contributed to the boom there; RROMROJ, paras. 231, 457; ROP II, p. 72.

[1246]    RROMROJ, paras. 232, 457.

capacity" is not a risk that should be rewarded under the Claimant's own economic theory.[1247]

838.    It was also reasonable to calculate the APC as against a PV plant's legal capacity only and it does not render the APC arbitrary or discriminatory to disregard the specific details of the Karad Plant and what the APC meant for them.[1248] Indeed, the contrary would be true: by setting the cap at the operating hours of each different reference plant, the APC ensured that similarly situated plants were treated the same.[1249] In such a reference-plant-based model, the Regulator cannot take account of the specific price paid for the acquisition of one single plant.[1250] In addition, if it had made adjustments to the reference plant and the APC for individual plants based on their individual (investment) costs, *i.e.* if it had "discriminated" on the basis of individual plant specifics, that would have made the scheme an *ex post* scheme.[1251]

839.    In conclusion, had the Karad Plant been constructed in line with its License, then the APC would have only reduced the Karad Plant's output eligible for the FiT by 9% as opposed to 33%.[1252] This makes the APC a reasonably tailored, "if not slightly generous" measure.[1253]

    *d.    20% Levy*

840.    According to the Respondent, the 20% Levy was introduced by the ERSA Amendment as a "levy" on electricity from PV and wind producers, payable "into the State budget" no later than the 15th day of each first month of a quarter.[1254] The 20% Levy was to be deducted by NEK from the receivables of the affected generators of electricity.[1255] It was struck down by the Respondent's Constitutional Court on 31 July 2014.[1256]

---

[1247]    RROMROJ, para. 230; ROP II, p. 56.

[1248]    RROMROJ, paras. 23, 224-225, 512.

[1249]    RROMROJ, paras. 225, 512.

[1250]    RROMROJ, para. 226.

[1251]    RROMROJ, paras. 227, 512.

[1252]    RROMROJ, para. 229; ROP II, p. 72; RPHB, para. 107.

[1253]    HT, D1, 7 June 2021, p. 232.

[1254]    RCMOMOJ, para. 216; RROMROJ, para. 249.

[1255]    RCMOMOJ, para. 216.

[1256]    RCMOMOJ, paras. 217, 224; RROMROJ, para. 249.

841.    The Respondent submits that it is undisputed that the 20% Levy reduced the Karad Plant's revenues, not the FiT itself – and, as per the Claimant's own calculations, only reduced its revenues by 2%.[1257]

842.    The Respondent's Constitutional Court did also not strike down the 20% Levy because it would be a reduction of the allegedly guaranteed FiT, or violate legitimate expectations, or on grounds of a lack of transparency, but because it was adopted as a "fee", while not being levied in exchange for any services and because in its focus, it violated the Bulgarian constitutional requirement of equal conditions for economic activity by all citizens and legal persons.[1258]

843.    The addition of a Tariff Event prepayment term in the Common Terms Agreement between ACWA Bulgaria and the Lenders (see below), which contemplated "this exact scenario" of Bulgaria introducing a levy, furthermore shows that the Lenders thought that it was a sufficiently proximate and material risk to the ability to repay the loan that taxes or levies would be raised on the FiT.[1259] Contrary to the Claimant's assertions , "reasonable parties do not negotiate and include contractual protection for events that they believe have no reasonable prospect of occurring."[1260]

844.    Notably, in 2010, as a reaction to a boom similar to the boom in Bulgaria in 2011-2012, the Czech Republic introduced a 26% levy on the FiT paid to PV energy producers which was similar to the 20% Levy and widely published and discussed in trade publications. It thus had to be known to a PV investor in June 2012. It was, in any case, known by the Claimant's shareholder Crescent Capital.[1261]

845.    Finally, the Respondent's minister of finance reasonably denied ACWA Bulgaria's request for reimbursement of the 20% Levy as charged because under Bulgarian law the decisions of the Constitutional Court apply prospectively from the date of their entry

---

[1257]    RCMOMOJ, para. 220; RROMROJ, paras. 249-250, 472; the "2%" figure would however seem to relate to the Claimant's overall loss due to the measure and would appear to be "only" 2% because the 20% Levy was only applied in the first half of 2014.

[1258]    RCMOMOJ, para. 225; RROMROJ, paras. 249, 254.

[1259]    RCMOMOJ, paras. 221, 352, fn 496, referring to Common Terms Agreement (**C-84**); RROMROJ, paras. 252, 352, 471.

[1260]    RROMROJ, para. 252.

[1261]    RCMOMOJ, paras. 222, 440; RROMROJ, paras. 250, 471.

into force, in this case 10 August 2014.[1262] Fees collected until that point were thus lawfully collected.[1263] In 2018, a Bulgarian court of appeal, in a final decision, had furthermore reached the conclusion that the fees collected until the judgment of the Constitutional Court entered into force did not constitute unjust enrichment of the Respondent given that at the time of their collection there was a valid legal ground to collect them, which did not cease to exist after the judgment of the Constitutional Court.[1264] ACWA Bulgaria also had the right to bring a claim before the Bulgarian courts to seek restitution of the deducted fees, but did not do so.[1265]

846.    The Claimant, however, now "appears to have abandoned" its complaint regarding the action of the Minister of Finance with a view to the six months during which the 20% Levy was in force.[1266] It has, in any case, not submitted any evidence that Bulgaria's decision not to reimburse would not have been consistent with Bulgarian law.[1267]

           *e.*    *Balancing Cost Exposure*

847.    The Respondent submits that the 2010 ETR established a framework for the installation of a balancing market.[1268]

848.    Such a balancing market was necessitated by the variable nature of renewable energy generation and the proliferation of renewable energy plants in Bulgaria.[1269]

849.    Full exposure to the balancing market was also an evolving best practice communicated by the European Commission, and indeed a liberalization requirement under EU law. It followed an EU-wide trend already visible at the time of the Investment and consistent with the practice of at least ten other EU Member States as of 2013. The idea behind that was that exposure to the full network balancing costs would ensure the exposure to

---

[1262]    RCMOMOJ, paras. 227-228.

[1263]    RCMOMOJ, para. 227.

[1264]    *Ibid.*

[1265]    RCMOMOJ, para. 228; ROP III, p. 61.

[1266]    RROMROJ, para. 255.

[1267]    HT, D1, 7 June 2021, p. 240.

[1268]    RCMOMOJ, paras. 54, 191.

[1269]    RCMOMOJ, para. 54.

"adequate price signals from competitive power and balancing markets".[1270] A full exposure to the costs caused also incentivises generators of renewable energy to provide more accurate forecasts.[1271]

850.    Under the 2010 ETR, generators of electricity, including of renewable energy, would have been organised into balancing groups liable for the balancing costs of ESO in relation to deviations from the aggregated forecasts of their respective balancing group.[1272]

851.    It was clear on the face of the 2010 ETR that the 2010 ETR were temporary rules, to be applied on a test basis, for an initial experimental phase of the balancing market and that they were subject to amendment based on the results of their testing, which, *nota bene*, had not even begun in June 2012.[1273]

852.    The balancing market in Bulgaria was not implemented until June 2014 and the 2010 ETR were thus never applied.[1274] Before the opening of its balancing market, the EWRC then revised the 2010 ETR and introduced the Electricity Market Rules, published in SG 66/26.07.2013, amended and supplemented for the first time on 9 May 2014 (the "**2013 ETR**").[1275]

853.    In that revision, the EWRC preserved the "fundamental principle" of the 2010 ETR, namely that all electricity producers, and thus also renewable energy producers, should be exposed to balancing costs.[1276] Much like the 2010 ETR, the 2013 ETR made balancing groups liable for the balancing costs of ESO in relation to deviations from the aggregated forecasts of their respective balancing group.[1277]

---

[1270]    RCMOMOJ, paras. 54, 201, 209-210; referring, incorrectly, to European Commission Guidance (**FR-41**) at 1[5] and 16; it appears that the document's (presupposed) understanding is that any reform and amendments would only apply to "new installations"; RROMROJ, paras. 198, 244, 465-467; ROP II, pp. 80-81; RPHB, para. 102; HT, D1, 7 June 2021, pp. 237-238.

[1271]    RCMOMOJ, para. 208; RROMROJ, para. 468.

[1272]    RCMOMOJ, para. 190.

[1273]    RCMOMOJ, para. 196; RROMROJ, paras. 244, 466; ROP II, p. 79; HT, D1, 7 June 2021, pp. 236-237; 2010 ETR (**C-49**), Articles 6-8 of the transitional and concluding provisions.

[1274]    RCMOMOJ, paras. 54, 191, 195.

[1275]    RCMOMOJ, para. 191; 2013 ETR (**C-159**).

[1276]    RCMOMOJ, para. 191; RPHB, para. 110.

[1277]    RCMOMOJ, para. 204.

854.   The Respondent acknowledges that (i) Article 203 of the 2010 ETR shielded producers of renewable energy from a full exposure to balancing costs by, among others, only holding them liable for a maximum of 50% of the balancing costs arising from a deviation from their production forecast which exceeded 20%, and (ii) the Article was eliminated in the 2013 ETR. However, the Article gave renewable energy producers an "undue", "discriminatory" benefit which was not cost-reflective and which was subsidized by the consumers' payments for energy on the regulated market. The Respondent eliminated, and had to eliminate, the Article in order to comply with market liberalisation requirements of the EU which were behind the whole 2013 ETR.[1278]

855.   As confirmed by Mr Kristensen, the 2013 ETR introduced a balancing cost regime which is reflective of the costs of the imbalances that generators of renewable energy cause and exposes the generators to those costs in full.[1279]

856.   Given that the Balancing Cost Exposure applied to all electricity producers alike, it cannot be regarded as a reduction of the FiT which only producers of renewable energy received.[1280]

857.   Finally, the Balancing Cost Exposure had a "minor impact" on the Karad Plant, constituting the equivalent of only a 2.1% reduction of the FiT.[1281]

(1)   There is evidence that the Claimant and its Shareholders expected to be exposed to balancing costs and what informed their expectations

858.   A particular aspect of the claim regarding Balancing Cost Exposure furthermore stands out: the SPA included a price adjustment provision for the event of a "Balancing Costs Law" within two years of closing. The inclusion of that provision indicates that the Claimant expected changes to the balancing regulations within two years of the purchase.[1282]

---

[1278]   RCMOMOJ, paras. 205-207; RROMROJ, paras. 198, 465.

[1279]   RCMOMOJ, para. 207; RROMROJ, para. 465.

[1280]   RPHB, para. 110.

[1281]   RROMROJ, para. 468; Oxera II, para. 7.113, Table 7.1.

[1282]   RCMOMOJ, para. 197; RROMROJ, para. 466; SPA (**C-107**).

859.    In addition, in light of testimony from Mr Blum that the balancing cost expectations discounted into the SPA were informed by Italian balancing cost rules, the Claimant can also not plausibly assert that it or its Shareholders had formed any expectations that the 2010 ETR would constitute the basis for future balancing cost charges.[1283]

860.    Contemporaneous e-mail correspondence between the Shareholders, their legal advisors, and SunEdison BV equally confirms that the EUR 750,000 chosen as maximum price adjustment in case of the introduction of a Balancing Costs Law was a placeholder not based on any concrete expectation as to what kind of balancing cost regime the Respondent would introduce.[1284]

861.    Information that the Lenders received in their due diligence process in March 2012 equally indicates that investors at the time of the Investment did not expect that the 2010 ETR would form the basis for the new balancing rules in Bulgaria.[1285]

862.    The Claimant's assertion, made in the second round of submissions and thereafter, that it reasonably expected that renewable energy producers would only be exposed to balancing costs after a mature, liquid balancing market had been established which had not yet been the case at the time the Balancing Cost Exposure was introduced, is also unsupported by contemporaneous evidence. It was common practice at the time of the Investment and the introduction of the Balancing Cost Exposure to expose renewable energy producers to full balancing costs even in immature electricity markets with low levels of liquidity.[1286]

863.    In addition, if Italy was the example that informed the Shareholders expectations, which is, again, unsupported by contemporaneous evidence, then it would be a bad choice of example because the Italian model before 2013 worked via incentivising correct forecasts whereas the 2010 ETR and then later also the 2013 ETR worked with penalising wrong forecasts.[1287] The Claimant's assertion in that regard that its

---

[1283]    RCMOMOJ, para. 198, referring to WS I Blum, para. 18.

[1284]    RROMROJ, para. 248, fn 573.

[1285]    RCMOMOJ, para. 199, referring to ECA Report (**C-100**), p. 29.

[1286]    RROMROJ, paras. 246-247, 466-467.

[1287]    RROMROJ, para. 248, fn 572.

expectation was that any balancing costs to which it would have been exposed, would only have been nominal, is disputed.[1288]

864. Finally on the SPA, the fact that the balancing cost price adjustment provision addressed balancing costs to be imposed within the first two years of closing of the SPA demonstrates, contrary to what the Claimant now asserts, that the Claimant cannot have expected to be subject to balancing costs only once there was a fully mature balancing market.[1289]

(2)    Lack of consideration of balancing costs in the FiT Decision is irrelevant

865. The Respondent asserts that, as evidenced by the text of Article 32(2) ERSA itself, potential network costs were not, and did not have to be, considered when setting the adequate FiT. Therefore, also logically, not having considered balancing costs in a FiT decision cannot mean that balancing costs must be locked in at zero for all plants receiving that FiT.[1290] In addition, at the time of the 2011 FiT Decision, the EWRC must have known that balancing charges would be introduced in the near future and still, correctly so, did not include them in its calculations of the FiT. This demonstrates the unrelatedness of the FiT on the one hand with balancing costs and fees on the other.[1291]

866. Therefore, the absence of balancing costs in the calculation of the FiT cannot be interpreted as a guarantee that balancing costs would not have to be paid by the recipients of the FiT.[1292]

(3)    Counterarguments of the Claimant

867. More in particular regarding specific arguments of the Claimant, the Respondent adds:

868. Regarding the alleged increase of balancing costs through the creation of additional balancing groups in the 2013 ETR, the Claimant has failed to explain how additional, smaller balancing groups would impact, let alone inflate, balancing costs. The argument

---

[1288]    RROMROJ, para. 246.

[1289]    RROMROJ, para. 248, fn 572.

[1290]    RCMOMOJ, paras. 159-161, 200; RPHB, para. 110.

[1291]    RCMOMOJ, para. 200.

[1292]    RROMROJ, para. 245.

regarding the number of balancing groups furthermore fails because the 2010 ETR also already provided for more than one balancing group.[1293]

869.    The Claimant's claim that the 2013 ETR ignored intra-group compensation of balancing costs is unsupported. Intra-group allocation of imbalances occurred in accordance with the contractual terms agreed between the coordinator and participants of a balancing group.[1294]

870.    The Claimant's contention that the balancing costs imposed amounted to 4-6% of the revenues of PV plants is unfounded. The charge for "cross-border balancing of electricity" of EUR 0.5/MWh referred to by the Claimant and allegedly recommended by the European Commission furthermore refers to transmission charges for transmission abroad, not balancing costs, and thus consist of an inapposite comparison.[1295]

871.    Finally, contrary to the Claimant's allegation, the Permanent Grid Access Fee and the Balancing Cost Exposure do not cover the same ground twice. As both the Claimant's and the Respondent's experts confirm, the Permanent Grid Access Fee covers the ESO's costs to purchase reserves, while the Balancing Cost Exposure covers the costs to activate those reserves in the event of deviations from the generation and consumption forecasts.[1296]

*f.    5% ESSF Contribution*

872.    The Respondent submits that by amendment of the Energy Act (not the ERSA, as the Claimant had submitted), on 24 July 2015 the ESSF was created and consequently electricity producers were required to pay a monthly contribution to the ESSF equivalent to 5% of their "revenue from sold electricity".[1297]

---

[1293]    RCMOMOJ, para. 211.

[1294]    RCMOMOJ, para. 212. The Respondent's submission appears to ignore that the Claimant for its argument relies on, and addresses, the last part of Article 203 (4) 2010 ETR, which was not included in the 2013 ETR and deals with intra-group compensation.

[1295]    RCMOMOJ, para. 213.

[1296]    RCMOMOJ, para. 214; RROMROJ, para. 244, fn 556.

[1297]    RCMOMOJ, para. 229.

873. The ESSF and the contributions to it were introduced to "rebalance" the electricity system in order to alleviate the "system indebtedness" and in order fully to liberalize the market.[1298] This is a legitimate policy aim.[1299]

874. As to the "indebtedness": NEK had significant uncompensated receivables which it incurred due to its mandatory purchases, including that of "expensive" renewable energy at preferential prices, for which it served as a cushion until those costs were passed down to consumers later. The ESSF, funded by the 5% ESSF Contribution and other sources related to the energy market such as carbon emission allowances, statistical transfers of energy from RES, etc., was created exclusively to take over the payment of these mandatory purchase obligations of NEK.[1300]

875. The increase in consumer prices that would have taken place absent the 5% ESSF Contribution would have been significant. It has to be seen in the context of Bulgaria being the poorest country in the EU and the high share of utility prices in monthly household expenses of consumers. The impact of such an increase has to be evaluated against the fact (as outlined above) that affordability was always a paramount concern of Bulgarian policy making.[1301]

876. The introduction of the 5% ESSF Contribution did, however, not transfer the burden of paying for renewable energy electricity from the consumers to the producers of renewable energy, since in the Energy Act it was clearly determined that electricity from RES would have to be paid by consumers, and since consumers continued to pay a green energy surcharge and later a "public service obligation charge", paid into the ESSF, on the electricity they consume.[1302] The green energy surcharge did increase by 198% "in the aftermath" of the 2011-2012 renewable energy boom.[1303]

877. The Respondent acknowledges, however, that "[b]y providing for additional funding sources" for the cost of the so called "public service obligations", *i.e.* the purchase

---

[1298] RCMOMOJ, para. 232; RROMROJ, para. 476; ROP II, p. 85; RPHB, para. 102.

[1299] RROMROJ, para. 260.

[1300] RCMOMOJ, paras. 233-234; ROP II, p. 86.

[1301] RROMROJ, para. 478.

[1302] RCMOMOJ, para. 237.

[1303] RCMOMOJ, para. 237, relying on Oxera I, para. 6.27, where it is stated, however, that the green energy surcharge increased by 198% "from 2011 to 2012", not in the "aftermath", and that the surcharge increased by 424% "from 2009 to 2012"; RROMROJ, para. 241.

obligations of NEK then transferred to the ESSF, its Parliament "reduced" the burden on end consumers from mandatory purchases of electricity from RES.[1304] The 5% ESSF Contribution "spread[] the costs of the public service obligations across all market participants, including consumers".[1305]

878.   Notably, Portugal had created a similar system and fund in 2014,[1306] and also Spain and Greece have charged taxes on electricity revenues (not profits) to address tariff deficits of their public service providers.[1307]

879.   The Respondent's expert acknowledges that the 5% ESSF Contribution in economic terms has the same effect as a 5% reduction of the FiT,[1308] but the Respondent disputes that that would establish it as a bad faith measure to disguise a reduction of the FiT.[1309]

880.   Finally, given that the 5% ESSF Contribution was applied prospectively only to future generation and revenues it cannot be characterised as a "claw-back".[1310]

       *g.*     *Transition from FiT to FiP*

881.   According to the Respondent, in May 2018, Bulgaria amended the Energy Act to mandate that as of 1 January 2019 renewable energy plants of more than 4 MW capacity sell all of their output on the free and/or balancing markets.[1311] The amended Energy Act preserved the preferential pricing mechanism for renewable energy plants by implementing a FiP scheme for the duration of the original PPA term of a plant.[1312]

---

[1304]   RCMOMOJ, para. 238; RROMROJ, paras. 257, 476.

[1305]   RROMROJ, para. 475.

[1306]   RCMOMOJ, para. 236; HT, D1, 7 June 2021, pp. 241-242.

[1307]   RROMROJ, paras. 259, 477.

[1308]   HT, D5, 11 June 2021, p. 956.

[1309]   RROMROJ, para. 260.

[1310]   RCMOMOJ, para. 231.

[1311]   RCMOMOJ, para. 240; in the footnote to the statement, the Respondent quotes Article 68(8) of the transitional and concluding provisions of the Energy Act as amended and supplemented by SG No. 38/8.05.2018, effective 8 May 2018 (**C-164**) (the "**2018 Energy Act**"), in full, without further comment, presumably to indicate that that Article terminated all existing PPAs by 1 January 2019; ROP II, p. 90.

[1312]   RCMOMOJ, para. 240.

882. Under the FiP scheme, renewable energy plants enter into a CfP to receive a further premium, the FiP, in addition to the market price obtained.[1313] The FiP was set on an annual basis as the difference between the EWRC's estimate of the market price over the forthcoming year and the applicable FiT, and paid out monthly by the ESSF based on the monthly generation of a plant.[1314] In Bulgaria's FiP scheme, producers of renewable energy "continue to receive the same preferential price they have always received", that is "compensation commensurate with the FiT", until the end of their respective PPA,[1315] at no higher risk than under the previous FiT scheme.[1316]

883. As part of the Transition from FiT to FiP, by virtue of Article 68(8) Energy Act, the Karad PPA was terminated. That automatic termination was consistent with the terms of the Karad PPA, namely its Articles 48 and 51.[1317] Article 68(1) of the Energy Act provided plants that had active PPAs nearly nine months of advance notice and a "robust" transition period to facilitate the transition out of their PPAs.[1318] The Respondent has identified a letter from NEK to ACWA Bulgaria confirming the termination of the Karad PPA by operation of the law, which, however, is not on the record.[1319]

884. The Transition from FiT to FiP forms part of Bulgaria's ongoing liberalisation of its electricity market, which started as early as 2007 and incrementally intensified in the direction of full liberalisation, and which is executed in accordance with EU law and in implementation of EU and World Bank policy recommendations.[1320] It would have

---

[1313] RCMOMOJ, para. 240.

[1314] RCMOMOJ, para. 240; 2018 Energy Act (**C-164**), Article 36i (f), transitional and concluding provisions, Articles 67 and 68.

[1315] RCMOMOJ, paras. 249, 265; RROMROJ, paras. 261 (stating that the scheme was "designed" to do so), 482; RPHB, para. 110.

[1316] RROMROJ, para. 261; ROP II, p. 92.

[1317] ROP II, pp. 90-91; HT, D1, 7 June 2021, pp. 243-244.

[1318] HT, D1, 7 June 2021, p. 243.

[1319] HT, D1, 7 June 2021, p. 244.

[1320] RCMOMOJ, paras. 243-245, 250-256; RROMROJ, paras. 198, 261, 265, 267, 479-481; ROP II, pp. 88-90; HT, D1, 7 June 2021, p. 242; RPHB, para. 102; European Commission Guidance (**FR-41**); World Bank, Bulgaria Power Sector: Making the Transition to Financial Recovery and Market Liberalization, Summary Report, November 2016 (**R-096**) ("**World Bank Report**"), although the World Bank appears to have recommended that in a CfP scheme the reference price be set daily, rather than annually, and that it should be made sure that the original terms of the replaced PPA be exactly kept, *cf.* World Bank Report (**R-096**), p. 9; National Assembly, Transcript of the plenary meeting of 4 April 2018 (**R-232**) (the "**NA 4 April Transcript**").

undermined Bulgaria's efforts to transition to a market-based compensation mechanism if existing plants had been exempted from the FiP scheme.[1321]

885.   The Common Terms Agreement confirms that, already in March 2012, investors in the Bulgarian PV market did contemplate that the single buyer model, *i.e.* NEK buying all energy produced by a plant, might be abandoned. The Common Terms Agreement allows such a conclusion because it was agreed therein that it would not be an event of default if the Karad PPA were to be terminated but the Senior Lenders (as defined in the Common Terms Agreement) were satisfied that all of the electricity generated by the Karad Plant would nevertheless continue to be acquired by NEK or such other person acceptable to the Senior Lenders at a price per MWh (excluding VAT) not less than the FiT.[1322]

886.   The effects of the Transition from FiT to FiP were minimal for the Claimant as the Claimant itself acknowledges that it suffered only EUR 700,000 in damages.[1323] According to the Respondent's calculations, the Transition from FiT to FiP was equivalent to a FiT reduction of only 0.20%.[1324]

> (1)   Alleged additional risks as a consequence of the Transition from FiT to FiP

887.   The Respondent disputes that the Transition from FiT to FiP entailed additional risks for the Claimant or its Investment.

888.   The annual price setting under the FiP scheme follows a law- and rule-based transparent process, with stakeholder participation. This leads to a result which can be appealed before the Bulgarian courts and which, in case of material deviations, can be amended throughout the year. Contrary to the Claimant's accusations, the setting of the FiP must therefore be deemed to be free from incentives and market risks to the detriment of investors such as the Claimant.[1325] Any arguments to the contrary are pure

---

[1321]   RROMROJ, para. 480.

[1322]   RCMOMOJ, para. 246, fn 562; RROMROJ, para. 266.

[1323]   RCMOMOJ, para. 256.

[1324]   RROMROJ, para. 482; Oxera II, para. 7.113, Table 7.1.

[1325]   RCMOMOJ, paras. 257-261; ROP II, p. 92; HT, D1, 7 June 2021, pp. 244-245.

speculation.[1326] ACWA Bulgaria also did not appeal any pricing decision, even though it could have.[1327] Specifically with regard to allegations of a "volume" risk, it is of note that ACWA Bulgaria sold all its eligible production to its balancing partner and thereby shielded itself from the alleged risk.[1328]

889.  The Claimant's assertion that dealing with the ESSF would entail a greater counterparty risk to the Claimant than dealing with NEK is also unsubstantiated.[1329] As elaborated upon elsewhere, NEK was in financial trouble following the renewable energy boom.[1330] Indeed, the Claimant, in submitting that NEK was late with its payments in 2013, has acknowledged that dealing with NEK also posited a counterparty risk.[1331] The ESSF has significant contacts with MEET and therefore cannot be deemed to be an "insular" entity.[1332]

890.  In a presentation for potential purchasers of the Karad Plant in 2019, the Claimant had even advertised that the FiP scheme had provided "a highly predictable cash flow profile" and expressed itself positively about the solvency of the ESSF, thereby showing that the Claimant's arguments on risk in the present case do not reflect its actual perceptions of the risk situation.[1333]

891.  Finally, with the existence of additional risk not having been substantiated, the Claimant's arguments that FiP programmes that impose less risk on generators of renewable energy would have been possible are obsolete. The argument can also not have any legal consequences as there is no international law obligation to design the

---

[1326]    RCMOMOJ, para. 261; RROMROJ, para. 262.

[1327]    RCMOMOJ, para. 259.

[1328]    RCMOMOJ, para. 260.

[1329]    RCMOMOJ, paras. 262, 264.

[1330]    RCMOMOJ, para. 262.

[1331]    RCMOMOJ, para. 262, referring to CMOM, para. 214.

[1332]    RCMOMOJ, para. 263.

[1333]    RROMROJ, paras. 263, 482; ROP II, p. 92; HT, D1, 7 June 2021, p. 245; Raiffeisen Bank International/ACF, Project Thracia Information Memorandum ACWA Bulgaria, 24 July 2019 (**R-419**), p. 6, although that presentation on the same slide clarifies that the CfP mechanism only "aims to" achieve the original FiT.

Bulgarian FiP program, which has a reasonable relationship between its design and its policy objectives, in the particular way the Claimant would have preferred.[1334]

### 9.    The Respondent did not actively promote guarantees allegedly provided for in the ERSA Regime

892.    The Respondent disputes that its officials actively promoted the ERSA Regime or made remarks that could be interpreted as guarantees or as raising legitimate expectations.[1335]

893.    Rather, its officials were measured in their comments and pointed out that the ERSA decreased overcompensation of the RAESBA Regime and would aim only at a "normal return rate".[1336] Between January and June 2012, Bulgarian officials even "provided multiple warnings" and highlighted the unsustainable increase in renewable energy projects and that new regulatory measures would likely be necessary.[1337]

894.    The Respondent acknowledges that "several of the remarks" of its officials indicate "that the FiT would be fixed for the duration of the PPA and that NEK would purchase the renewable energy produced at the FiT". However, "none [of the remarks] indicate that Bulgaria promised that it would not impose additional regulations, fees or taxes that could affect the revenues of the Karad Plant."[1338]

895.    Regarding statements on the full offtake of electricity from renewable energy plants by officials in parliamentary hearings and interviews with "local press", the Respondent submits that all that such statements do is to describe that the FiT regime "then in effect" required full offtake of electricity.[1339]

896.    Descriptions of a law that is about to pass parliament made by ministers or members of parliament are, in any case, commonplace and cannot form evidence of guarantees or commitments to investors.[1340]

---

[1334]    RROMROJ, para. 268.

[1335]    RCMOMOJ, paras. 74, 79; RROMROJ, paras. 30, 56.

[1336]    RCMOMOJ, para. 75.

[1337]    RPHB, paras. 67-68, 118; RROMROJ, para. 506, fn 1160; ROP II, p. 32.

[1338]    RCMOMOJ, para. 378; RROMROJ, para. 56.

[1339]    RROMROJ, paras. 9, 56; ROP II, p. 18; HT, D1, 7 June 2021, pp. 201, 205; RPHB, para. 52.

[1340]    RCMOMOJ, para. 76; RROMROJ, para. 57.

897.  The statements of Bulgarian officials relied upon by the Claimant are furthermore either cited out of context or could not have generated legitimate expectations by a reasonable investor.[1341] They were, in any case, not addressed specifically to the Claimant or the PV sector, but were general statements made in the media to the general public.[1342]

898.  The press articles and statements the Claimant intends to rely on are also "replete with red flags" signalling concerns about affordability of the ERSA Regime, network management issues due to the renewable energy boom, and financial problems at NEK as a result of its compensation obligations. The articles explain that the ERSA Regime seeks to ensure a "normal return on investment" and "consumer protection", and "signal[] that a continued sector crisis could result in regulatory changes across the sector".[1343]

899.  Contrary to what the Claimant submits, publicly available comments by *e.g.* the EWRC, NEK, and ESO made before July 2012 also indicate that there were concerns about the impact of the new capacity on electricity network costs, consumer prices, the requirement to purchase additional reserves to balance the network, and the deficit at NEK.[1344]

900.  Many statements the Claimant seeks to rely on, including, for example, Mr Nikolay Kiskinov's book on RES, furthermore post-date the Investment in June 2012 and thus also therefore could not have informed the Claimant's expectations as to its Investment.[1345]

---

[1341]  RCMOMOJ, paras. 349, 376.

[1342]  RCMOMOJ, para. 377.

[1343]  RCMOMOJ, paras. 77, 379; RROMROJ, paras. 89, 93 Dnevnik, Interview with Delyan Dobrev (GERB), Vice President of CEET, The Price of The Green Power Was Artificially Held High So Far, 3 May 2011 (**R-197**) p. 3 (*cf.* also the Claimant's translation of the interview at (**C-133**)).

[1344]  RROMROJ, paras. 92-95, 462; ROP II, p. 39; EWRC, Minutes No. 80 (excerpt), 1 June 2012 (**R-206**) (an EWRC meeting which also deals with high profits of *e.g.* nuclear energy).

[1345]  RROMROJ, paras. 57, 391; Capital, Interview with Angel Semerdzhiev, 23 June 2012 (**C-45**); Letter from BEH to Chair National Assembly, Chair CEET, Minister MEET, 26 September 2013 (**C-46**); Nikolay Kiskinov, Renewable Energy Sources, 2012(**C-47**); Publics.bg, 'The book 'Renewable energy sources' – about the legislative innovations in the sector', 15 November 2012 (**R-297**).

### 10.    The Respondent never gave any guarantees

901.    The Respondent argues that Bulgaria never guaranteed, nor promised, any aspect of the ERSA Regime, nor guaranteed or promised that it would remain unchanged,[1346] and that it did thus not guarantee or promise (i) the FiT, (ii) any offtake, let alone full offtake, and (iii) the term for the application of the FiT.[1347] The Respondent never guaranteed that the revenues of a renewable energy plant would remain the same over time. This is evidenced by the fact that a clause to that effect in RAESBA was "removed" or "eliminated" from ERSA.[1348]

902.    In the course of the proceedings, however, the Respondent clarified that its position is that Bulgaria never guaranteed that the ERSA Regime as a whole would remain unchanged, but that, as allegedly acknowledged in its first submission already, one aspect of the ERSA Regime was "not to be changed", namely the FiT rate. This is because, unlike for the other aspects of the ERSA Regime, in respect of the FiT rate Bulgaria had indeed given up on its "inherent, sovereign right to make rationally-based changes to domestic legislation in the public interest".[1349] The Respondent repeats several times, however, that, as both Parties would agree, the FiT for the Karad Plant never was amended.[1350] The Respondent also maintains that its position is no admission that Article 31(4) ERSA would contain a stabilisation commitment, but the Respondent acknowledges that the Article "is certainly relevant to an assessment of a legitimate expectation claim".[1351]

903.    In the view of the Respondent, the Claimant also failed to demonstrate that any guarantee (of stability) existed.[1352] The Claimant did not submit documentary evidence showing that it obtained guarantees from Bulgarian officials or from any other source that the ERSA Regime would remain unchanged.[1353]

---

[1346]    RCMOMOJ, paras. 14, 128, 366; RROMROJ, paras. 7, 550.

[1347]    RCMOMJ, paras. 14, 128, 132, 367-368; RROMROJ, para. 202.

[1348]    RCMOMOJ, paras. 71, fn 122, 366; RROMROJ, para. 58; RPHB, para. 42.

[1349]    RROMROJ, paras. 7-8, 34, 45-46, 51; RCMOMOJ, paras. 70-71; ROP II, pp. 3ff.

[1350]    RROMROJ, paras. 7-8, 34, 45-46; RCMOMOJ, paras. 70-71; RPHB, para. 37.

[1351]    HT, D1, 7 June 2021, pp. 190-191.

[1352]    RCMOMOJ, para. 14; RROMROJ, para. 7; RPHB, para. 50.

[1353]    RROMROJ, para. 9.

904.    A stabilisation of an entire FiT regime would have been done expressly, not implicitly, and as such the absence of a stabilisation clause in the ERSA (except the commitment that the FiT "shall not be changed" in Article 31(4) ERSA), the License, and the Karad PPA, is a strong indicator that no guarantee of stability was made.[1354] Furthermore, "there would have been extensive debates before Parliament and related statements from politicians if the draft law being debated was to impede Bulgaria's right to regulate for 20 years, which there are none".[1355]

905.    States also do not guarantee that all design parameters of a RES-E support scheme will remain unchanged because they cannot. States have multiple objectives, including supply security, renewable energy targets, and costs and their allocation to consumers and investors, and therefore, necessarily, States and their regulators need a degree of flexibility to react to unforeseen issues and situations. It is telling that Mr Kristensen is "not aware of any FiT scheme that permanently fixes all parameters of the scheme".[1356]

    a.    *The ERSA*

906.    More in particular regarding the ERSA, the Respondent agrees with the Claimant that interpreting the ERSA is a question of statutory construction but the Respondent submits that,[1357] nevertheless, the ERSA did not guarantee investor's revenues,[1358] or the quantity of electricity that would be sold at the FiT,[1359] or that the ERSA Regime would not be adapted over 20 years.[1360]

    (1)    Article 31(4) ERSA

907.    Regarding the specific provision in Article 31(4) ERSA that the FiT rate "shall not be changed", the Respondent submits that it shows that the Bulgarian Parliament left open the possibility that the rest of the ERSA Regime could change because otherwise the Parliament would have used the same "shall not be changed" language also for the other

---

[1354]    RCMOMOJ, paras. 14-15, 106, 242; RROMROJ, paras. 7-8, 52; ROP II, p. 16; HT, D1, 7 June 2021, pp. 202-203; RPHB, paras. 41, 51.

[1355]    RROMROJ, para. 406; ROP II, pp. 17-18; HT, D1, 7 June 2021, p. 200; RPHB, para. 50.

[1356]    RROMROJ, para. 42; Oxera II, paras. 2.2, 3.6, 3.12, 3.14.

[1357]    HT, D1, 7 June 2021, p. 190.

[1358]    RROMROJ, paras. 30, 34.

[1359]    RROMROJ, para. 202; ROP II, p. 69.

[1360]    RCMOMOJ, para. 366; RROMROJ, paras. 30, 52, 202; ROP II, pp. 3ff.

aspects of the ERSA Regime, or would have inserted a stabilizing clause for the entire ERSA Regime.[1361]

908.   In that regard, the fact that "price and quantity go hand in hand", as the Claimant argues, and are important commercial factors, cannot be a reason to disregard the plain language of Article 31 ERSA which includes stabilising language regarding the price but not regarding the quantity, or duration for that matter. Indeed, because price, quantity, and duration are so important, a reasonable investor would have carefully studied Article 31 ERSA and would have noted that price, quantity, and duration were subject to different rules regarding stability.[1362]

909.   It is also not "necessarily implicit" in Article 31(4) ERSA that fees for network costs would never be imposed on renewable energy plants receiving the FiT. Article 31 ERSA is silent on taxes and network costs.[1363] More generally, the Respondent also disputes in that regard that a stabilisation guarantee as an extraordinary limitation of a State's legislative and regulatory power could in fact be made implicit rather than made in clear and express wording.[1364]

910.   It is furthermore not correct for the Claimant to contend that the Respondent's argument on Article 31(4) ERSA would "devoid" the Article of any meaning because it would mean that Bulgaria could lawfully reduce the volume obligation or the duration of the purchase to zero, or eliminate the purchase obligation in its entirety, without violating Article 31(4) ERSA as interpreted by the Respondent. That is because such "radical changes" would be subject to scrutiny by the Bulgarian courts and international tribunals. Such changes have, furthermore, nothing to do with the adjustments that took place *in casu* based on the Respondent's "inherent, sovereign right to make rationally-based changes to domestic legislation in the public interest".[1365]

---

[1361]   RROMROJ, paras. 8, 34, 45-47, 204; HT, D1, 7 June 2021, p. 188; RPHB, paras. 37, 41.

[1362]   RROMROJ, para. 208; HT, D1, 7 June 2021, p. 190.

[1363]   RROMROJJ, para. 235; RPHB, paras. 40, 109.

[1364]   RROMROJ, para. 235.

[1365]   RROMROJ, para. 51.

(2)    Article 31(5) ERSA

911.    Regarding the specific provision in Article 31(5) ERSA, stating that the Public Provider would purchase all electricity produced from RES, the Respondent is of the view that the provision does not guarantee that it would actually do so, or guarantee that the Respondent would not amend the Article. The Article does in any case not imply that the Respondent would purchase all electricity produced at the full FiT (see above).[1366] Tellingly, the Article, unlike Article 31(4) ERSA, does not include the words "shall not be changed".[1367]

912.    In addition, the reference in Article 31(5) ERSA to Chapter Nine, Section VII of the Energy Act concerning the possibility for all electricity producers to sell electricity at freely negotiated prices, and a reference to sales of electricity at the balancing market, have to be read as an anticipation in the ERSA that the offtake mechanism may evolve in line with EU liberalisation requirements.[1368]

913.    Finally, contemporaneous statements in Parliament do not sound as if the Deputy Minister of MEET had thought that anything in Article 31(5) ERSA, or its other parts, would prevent the Respondent from limiting the quantities purchased from a plant.[1369]

(3)    Articles 31(1) and (2) ERSA

914.    Regarding the specific provisions in Articles 31(1) and (2) ERSA, the Respondent submits that they provide the date at which the FiT is locked in and the duration of the PPAs to be entered into by NEK, but not a general rule on the price to be paid,[1370] or a rule on the volume of electricity from RES to be purchased by NEK.[1371] The "Claimant's arguments that the obligation to purchase RES electricity at the fixed FiT is clear based on 'the natural meaning' of Article 31(1)-(2) [ERSA] and that the

---

[1366]    RCMOMOJ, paras. 130, 367-368; RROMROJ, paras. 202, 204-205; ROP II, p. 69.

[1367]    RPHB, para. 38.

[1368]    RROMROJ, paras. 47, 205-206; RPHB, para. 38; *cf.* Chapter Nine, Section VII Energy Act (**R-247**).

[1369]    RROMROJ, para. 207; ROP II, pp. 32-33; HT, D1, 7 June 2021, p. 207; referring to National Assembly of Bulgaria, Transcript of the plenary meeting of 25 January 2012 (**FR-104**) (the "**NA 25 January Transcript**"), p. 7. It appears, though, that the quoted reference in its fuller context refers to potential problems with network capacity that might necessitate a stop of purchasing, rather than to a reduction of purchase obligations for the reason for which, according to the Respondent, the APC was introduced.

[1370]    RROMROJ, para. 49.

[1371]    RROMROJ, para. 50; RROMROJ, para. 202.

obligation to purchase all RES electricity is 'implicit' in Article 31(1)-(3) [ERSA] are admissions that none of these clauses contain any specific guarantees."[1372]

915. Consequently, also Article 31 ERSA "as a whole" does not guarantee that all electricity production would be sold at the FiT for the 20-year PPA term.[1373]

### b.   The Karad PPA and the License

### (1)   The Karad PPA

916. The Respondent acknowledges that the Karad PPA "states that NEK would purchase the electricity produced by the Karad Plant at the 2011 FiT".[1374] However, "nothing in the [Karad] PPA suggests that Bulgaria had committed to refrain from changing the [ERSA Regime]", or from "adopting fees and taxes impacting the Karad Plant's revenues.",[1375] and the Karad PPA does not contain guarantees with respect to the ERSA Regime.[1376] The Karad PPA was also never amended prior to its termination, and the Seven Measures, with the exception of the Transition from FiT to FiP, did not affect the terms of the Karad PPA and thus did not make amendments necessary.[1377] In any case, the interpretation of the Karad PPA as a Bulgarian law contract is a matter of Bulgarian law.[1378]

917. The Karad PPA was furthermore entered into with NEK and not the Respondent.[1379] NEK is not an organ of the State and it did not exercise delegated governmental authority in executing the Karad PPA nor was it controlled or directed by the State in that aspect. The reference to NEK as the "public provider" in the Respondent's laws does also not signify a public function and NEK's conduct or contracts are not attributable to the Bulgarian State. However, the Respondent admits that NEK is "ultimately State-owned" and, in its arguments on EU State aid, the Respondent initially

---

[1372]    RROMROJ, paras. 413.

[1373]    RROMROJ, paras. 203ff.

[1374]    ROP II, p. 25.

[1375]    RCMOMOJ, para. 373; RROMROJ, para. 27; ROP II, pp. 23-25.

[1376]    RROMROJ, para. 7; ROP II, pp. 23-25.

[1377]    HT, D1, 7 June 2021, p. 244.

[1378]    ROP III, p. 72.

[1379]    RCMOMOJ, paras. 15, 107, 374; ROP III, p. 73.

argued that because NEK is "a State-owned entity" acting as the public provider, the ERSA Regime constitutes State Aid.[1380]

918.    Bulgarian law also requires other entities, including private entities, namely the "end suppliers", to enter into PPAs, which shows that the PPAs are not concluded on behalf of the State.[1381] The Claimant also did not make, let alone substantiate, an argument of attribution of acts of NEK to the Respondent. In any case, if the Tribunal were inclined to follow that route nevertheless, due process would require that the Respondent be given an opportunity to submit evidence on the point.[1382]

919.    Finally, the Claimant has conceded during the Hearing that the Karad PPA was never breached in respect of any of the Seven Measures and the Claimant had clarified that it would not bring any claims on the basis of a breach of the Karad PPA and that it did not derive any expectations from it.[1383]

(2)    The License

920.    The Respondent submits that "nothing in the License suggests that Bulgaria had committed to refrain from changing the RES regulatory regime applicable to the Karad Plant", or from "adopting fees and taxes impacting the Karad Plant's revenues."[1384] In any case, the License did not include a promise or guarantee that the Karad Plant would sell its full output at the FiT without any limitation for 20 years.[1385]

(3)    The Karad PPA and the License

921.    The Respondent argues that both the Karad PPA and the License contain language that subjects them to Bulgarian law and future amendments thereto.[1386] The Karad PPA contains such language in its Articles 48 and 51, according to which the Karad PPA would automatically and unilaterally change in the event of a change in Bulgarian law

---

[1380]    RCMOMOJ, paras. 15, 107, 130, 374; RROMROJ, paras. 12, 28, 189; ROP III, pp. 11, 73, 75-79; HT, D1, 7 June 2021, pp. 204, 258-259.

[1381]    ROP III, pp. 73, 78.

[1382]    ROP III, p. 75; HT, D1, 7 June 2021, pp. 294-296.

[1383]    HT, D1, 7 June 2021, pp. 244, 293-294; RPHB, paras. 51, 115.

[1384]    RCMOMOJ, para. 370; RROMROJ, para. 27; ROP II, p. 22; HT, D1, 7 June 2021, p. 202.

[1385]    RCMOMOJ, para. 132; RROMROJ, para. 7; ROP II, p. 22.

[1386]    RCMOMOJ, paras. 15, 106, 130, 132, 242, 369, 373; RROMROJ, paras. 27, 52, 202; ROP II, 22, 24; ROP III, p. 71; HT, D1, 7 June 2021, pp. 202-204; RPHB, paras. 51, 115.

or applicable regulations.[1387] Regarding licenses, the Energy Act explicitly authorised the EWRC to modify licenses in the event of a change in the relevant legislation.[1388]

922.  What is more, the fact that the Karad PPA and the License were entered into with/issued to ACWA Bulgaria (then ZBE Partners) and not to the Claimant directly, is another reason why both documents cannot be said to constitute a guarantee *vis-à-vis* the Claimant.[1389]

923.  Finally, following the Respondent's Counter-Memorial, the Claimant has abandoned relying on the Karad PPA or the License as sources of guarantees.[1390]

### c.  The FiT Decision and the FiT

924.  The Respondent submits that setting a FiT in general, and the FiT Decision in particular, equally does not imply or include a guarantee.[1391] Indeed, all the FiT Decision does is to set the FiT. The EWRC, which issues the Decision, also has no authority to make guarantees to investors, including no authority to guarantee a particular FiT to a particular plant.[1392]

925.  The Respondent's decision to set the particular FiT, as included in the FiT Decision, does in any case not include an "implicit" commitment that Bulgaria would not make any changes to the regulatory framework which could affect the Karad Plant's revenues.[1393]

926.  In addition, also from an economic perspective, a fixed price does not signify a guaranteed revenue as revenue would still depend on many other factors,[1394] nor does it imply fixed costs or that all costs imposed by the government would be fixed.[1395]

---

[1387]  RCMOMOJ, paras. 15, 106, fn 218; RROMROJ, para. 138.

[1388]  RCMOMOJ, para. 370; Energy Act (**R-247**), Article 51(2)(2.).

[1389]  RCMOMOJ, paras. 15-16, 132, 369.

[1390]  RROMROJ, paras. 7, 29, 203.

[1391]  RCMOMOJ, paras. 80, 380-381.

[1392]  RCMOMOJ, para. 80.

[1393]  RCMOMOJ, paras. 380, 385.

[1394]  RCMOMOJ, para. 73.

[1395]  RROMROJ, para. 43; Compass II, para. 8.26.

927.    The Respondent denies that the FiT Decision assumed that all of the production of the reference plant would be sold at the FiT. The Respondent goes as far as to argue that the FiT Decision "effectively" includes a cap on electricity sales at the level of the annual operating hours, 1,188 hours.[1396]

928.    The Respondent acknowledges that the FiT Decision "specifically" states that when the FiT is actually applied, individual investors may earn a different profitability than that of the reference plant, depending on the individual management of the investment project. The Respondent further acknowledges that in a model based on reference plants, not on tariffs per individual plant, "some margin of deviation from the reference plant was inevitable",[1397] and that "[i]n principle, plants could earn higher returns based on efficiency".[1398] The Respondent, however, submits that any recognition of that fact by the EWRC in its FiT Decision cannot constitute a guarantee, for which to give the EWRC has no authority, nor can it constitute an affirmation that investors should expect to systematically earn windfall profits over decades.[1399]

929.    Finally, even if one were to conclude that Bulgaria made a commitment to the Claimant, by means of the FiT Decision, or more in general, that it would receive BGN 485.60 per MWh over 20 years, which the Respondent disputes, then this still could not be interpreted as to mean that other aspects of the ERSA Regime are stabilised.[1400]

### 11.    The Respondent did not raise any reasonable legitimate expectations

930.    The Respondent submits that neither ERSA, the Karad PPA, the License, nor the FiT Decision, alone or together, nor any other action or omission of the Respondent could have provided a basis for, or could be interpreted to contain undertakings or promises that would allow or give rise to a reasonable expectation that the ERSA Regime would not change or that (i) full offtake would take place (ii) at the FiT, (iii) over the term of 20 years.[1401]

---

[1396]    RROMROJ, para. 209.

[1397]    HT, D1, 7 June 2021, pp. 197-198; ROP II; p. 13; ROP IV, p. 9.

[1398]    RPHB, para. 74.

[1399]    HT, D1, 7 June 2021, pp. 197-198; ROP II, p. 13; ROP IV, p. 9.

[1400]    RCMOMOJ, para. 381.

[1401]    RCMOMOJ, paras. 368-370, 373-374, 380ff, 385; RROMROJ, para. 423.

>    a.    *The ERSA Regime violated applicable Bulgarian and EU law and*
>          *adjustments thus had to be expected*

931.  According to the Respondent, given that it is well known that Bulgarian and EU (State aid) law require that subsidies granted to producers of renewable energy may not lead to more than a reasonable return, and in the absence of a stabilisation clause, it would have been unreasonable for an investor such as the Claimant to expect that the ERSA Regime, which provided for unlawful overcompensation, would remain unchanged for twenty years and to expect that the Respondent would not adjust and re-align the ERSA Regime to bring the returns of PV plants within the permissible range of reasonable returns that it had intended to provide in the first place.[1402]

932.  Legitimate expectations concerning an investment in Bulgaria's renewable energy sector would have included the expectation that EU State aid law applies, that the scheme constituted EU State aid, and that the limits of EU State aid law apply to it.[1403]

933.  Furthermore, given that Bulgarian law required that interests of consumers and energy producers be balanced with regards to the electricity prices, an investor into the sector at the time that the Claimant invested reasonably would have expected that adjustments to the ERSA Regime were imminent.[1404]

934.  In addition, given that the RAESBA (as outlined above) included a provision that provided producers with revenue certainty and that the National Assembly had "removed" such a provision from the ERSA, "no reasonable investor would have concluded that the [ERSA] aimed to provide "total revenue certainty".[1405]

935.  Finally and in a similar vein, the fact that Bulgaria, when introducing the ERSA, had not corrected investor overcompensation for plants already commissioned under the RAESBA, which reached IRRs of more than 20%, does not provide an assurance that the Respondent would not do so in the future. That is especially the case given that

---

[1402]  RCMOMOJ, paras. 17, 131, 408; RROMROJ, paras. 10, 16, 78, 86, 173, 220, 271, 423, 439; ROP III, p. 37; ROP IV, p. 6; HT, D1, 7 June 2021, pp. 249-250; RPHB, paras. 48, 71, 121.

[1403]  RROMROJ, paras. 181, 190; RPHB, para. 48.

[1404]  RCMOMOJ, paras. 22, 47, 135; RROMROJ, paras. 13-14, 78, 85-86; RPHB, para. 43.

[1405]  RCMOMOJ, paras. 71, 366, fn 122; RROMROJ, paras. 34, 423.

overcompensation when the Claimant invested was at a higher level than when ERSA was introduced.[1406]

### b.    No expectations can be held regarding an unnotified incentive scheme

936.    Under the applicable and relevant EU law, the Claimant could furthermore not have had any reasonable expectations of stability and/or lawfulness of a subsidy scheme until the scheme had been notified and obtained its necessary approval by the European Commission – in this case not obtained until 2016 – even if the host State erroneously believed that the subsidy in question does not constitute State aid.[1407]

937.    Until such an approval, the Respondent argues, an investor had to expect that changes and amendments might be made to a scheme, which they were: the 2016 approval approved of the scheme in its then current form, *i.e.* with the APC and the other six of the Seven Measures in place already, and with producers of renewable energy only earning a reasonable return.[1408]

938.    Until notification and approval, an investor also accepts the risk associated with investing into an unnotified RES-E incentive scheme.[1409] Because the European Commission uses the WACC as a benchmark for a reasonable return, the Claimant would have had to expect reasonably that once the ERSA Regime was notified and would be assessed, that same measure of profitability, the WACC, based on a reference plant would be used in the EU assessment of the scheme.[1410]

---

[1406]    RROMROJ, para. 85.

[1407]    RCMOMOJ, paras. 18, 72, 398-400; RROMROJ, paras. 15, 172, 174, 190, 194-195, 424, 427, 430, 444; ROP II, pp. 4-6; ROP III, p. 42; HT, D1, 7 June 2021, pp. 251-252, 279; RPHB, paras. 49, 91-92; *Photovoltaik Knopf Betriebs GMBH (Germany) v. Czech Republic*, PCA Case No. 2014-21, Award, 15 May 2019 (**RL-247**); *Voltaic Network* (**RL-248**); *WA Investments-Europa Nova Limited (Cyprus) v. The Government of the Czech Republic*, PCA Case No, 2014-19, Award, 15 May 2019 (**RL-249**); *I.C.W. Europe Investments Limited (United Kingdom) v. The Government of the Czech Republic*, PCA Case No. 2014-22, Award, 15 May 2019 (**RL-246**); *Electrabel* (**RL-050**).

[1408]    RCMOMOJ, paras. 18, 72, 147, 398-399, 401-402; RROMROJ, paras. 15, 174-175; though, the EU Decision on State Aid appears to also have approved the ERSA Regime as it was before 2014 and the introduction of the APC, see below and EC Decision on State Aid (**FR-78**), paras. 59, 89; ROP II, pp. 4-6; HT, D1, 7 June 2021, pp. 251-253; RPHB, paras. 49, 91-92.

[1409]    ROP III, p. 4; RPHB, para. 92.

[1410]    RROMROJ, para. 444; ROP III, p. 49.

### c.    Investors were put "on notice"

939.  According to the Respondent, it put investors "on notice" in its "Energy Strategy of the Republic of Bulgaria till 2020" of June 2011 (the "**2011 Energy Strategy**") announcing that the energy sector is a dynamic environment and that performance of Bulgaria's targets and priorities will be monitored with a view to identifying any need for changes in laws and mechanisms.[1411]

940.  Before the Claimant invested, Bulgaria also made it clear publicly that the planned new renewable energy capacity far exceeded the available capacity,[1412] and that overcapacity could affect interests of generators of renewable energy and consumers and could lead to restrictions on the purchase of electricity.[1413]

941.  In light thereof, and contrary to the Claimant's assessment, Bulgaria's conduct and official policy did not indicate that Bulgaria was seeking to guarantee to investors in renewable energy production that the ERSA Regime would remain unchanged.[1414]

### d.    The ERSA Regime did not seek to incentivize designs such as the 60.4/50 Ratio

942.  With a view to the 60.4/50 Ratio in particular, the Respondent argues that no reasonable investor would have interpreted the ERSA Regime as seeking to incentivize maximum productivity of costlier plants. Bulgaria is the poorest country in the EU and it was always clear that the promotion of renewable energy production must be balanced with other objectives such as affordable electricity prices and security of supply. Indeed, the ERSA sought to limit renewable energy capacity in Bulgaria not to maximize it by incentivizing "maximum productivity" plants.[1415]

---

[1411]   RCMOMOJ, para. 73; RROMROJ, paras. 53-54, 436; ROP II, p. 20; RPHB, para. 50; quoting *2011 Energy Strategy* (**C-28**), p. 41.

[1412]   RCMOMOJ, para. 136; RROMROJ, para. 87.

[1413]   RROMROJ, paras. 18, 87.

[1414]   RCMOMOJ, para. 388; ROP II, p. 20.

[1415]   RCMOMOJ, paras. 135-136.

e.   *Bulgaria's monitoring capabilities could not have assured investors under the FiT*

943.   Countering an argument of the Claimant, the Respondent submits that the "main monitoring mechanism" under the ERSA, the one under Article 22 thereof, could not have given rise to the Claimant's and its Shareholders' confidence that, unlike in other countries, no boom would be allowed.[1416]

944.   This is because, first, the mechanism did not become effective before mid-2012, after the Investment was already made.[1417] The monitoring mechanism included the option of denying new connections to the grid based on forecasts of the first and second quarters of a year. The option was immediately used in its first cycle, denying any new connections for the period of July 2012 to June 2013.[1418]

945.   Secondly, any such denial of connection, even if it had come earlier, which the ERSA did not provide for, would, as the Claimant admits, not have affected the Karad Plant anyway, given that the Karad Plant was a legacy project (to be) connected to the grid pursuant to the procedure under RAESBA, not ERSA.[1419]

946.   In addition, a reasonable investor would have had to understand that if the capacity control mechanisms of the ERSA did come too late, Bulgaria might take "corrective actions" against existing plants.[1420]

947.   Finally, contrary to the Claimant's argument, the Respondent's monitoring mechanisms and capacity to set prices annually did not set it apart from Spain, Italy, and the Czech Republic, because a one-year period between price decisions was insufficient for the

---

[1416]   RCMOMOJ, paras. 95-96, 98; RROMROJ, paras. 99, 107, 505; HT, D3, 9 June 2021, p. 656; RPHB, paras. 55, 56.

[1417]   *Ibid*.

[1418]   RCMOMOJ, para. 96; RROMROJ, paras. 99, 505; RPHB, paras. 55-56, 63; EWRC Decision EM-01, 29 June 2012 (**R-044**).

[1419]   RCMOMOJ, para. 97, referring to CMOM, paras. 111, 173, fn 227. It is unclear whether this argument has a basis after the April 2012 Amendment to the ERSA, which affected the very articles of that law on which the Respondent's argument relies. Neither Party has taken a position on this issue. It appears, however, that by March 2012 the Karad Plant had obtained "Act 16" and therefore would not have been affected by the April 2012 Amendment (either), even if the Amendment were to apply to legacy projects. ERSA, amended and supplemented, SG No. 29/10.04.2012, effective 10.04.2012 (**R-294**) (the "**April 2012 ERSA**"); Statement of Findings to Determine the Fitness for Acceptance of the Construction Site, Form 16, 22 March 2012 (**R-201**) ("**Act No. 16**").

[1420]   RROMROJ, para. 88; RPHB, para. 56.

Respondent to keep pace with "commercial developments", *i.e.* the rapid technological and cost changes from mid-2011 to mid-2012.[1421]

### f.    The April 2012 Amendment

948.    The Respondent further submits, in respect of the April 2012 Amendment, *i.e.* an "attempt" of Bulgaria "to slow down the installation of RES plants", that reasonable investors would have had to understand that if the Amendment failed to obtain the desired effect, *i.e.* if the pipeline of prospective projects were not sufficiently slowed down, then Bulgaria might have to take "corrective actions" against existing plants.[1422]

949.    Reasonable investors would also have had to understand that if corrective measures had not been taken yet by June 2012, then they were likely still to come.[1423]

### g.    Conclusion on the raising of legitimate expectations

950.    The Respondent submits that, at the end of the day, the Claimant misunderstands the differences between setting up an incentive regime with certain parameters at that time, and setting up an incentive regime that includes a guarantee that it will be immunised from any future changes.[1424]

## 12.    The Claimant could not reasonably and legitimately have held the expectations it claims to have held

951.    The Respondent submits that the Claimant also on the basis of external circumstances and its knowledge thereof could not have held a reasonable and legitimate expectation that the ERSA Regime would not change.[1425]

### a.    The boom

952.    As outlined above in more detail, the Respondent submits that following the FiT Decision in 2011 the costs to construct a PV plant decreased significantly during the one-year period during which that decision was applicable, making the FiT no longer

---

[1421]    RROMROJ, para. 106.

[1422]    RROMROJ, para. 88; RPHB, para. 56.

[1423]    RROMROJ, para. 100.

[1424]    RROMROJ, para. 412.

[1425]    *E.g.*, RCMOMOJ, para. 368; RROMROJ, paras. 166, 212.

cost-reflective for the plants commissioned during that time,[1426] and, according to the Respondent, causing a surge in PV capacity.[1427]

953. In such a situation, a reasonable investor would have understood that the Respondent, the poorest country in the EU, would have to adapt to that new reality in the near term "in order to address the mounting network costs and electricity system deficit caused by the boom",[1428] and the "substantial cost implications" of the surge in PV capacity in excess of Bulgaria's policy goals.[1429]

954. Indeed, since the increase in PV capacity was so condensed into the short time frame of 2011 to 2012, it was entirely foreseeable in June 2012, at the time of the Investment, that such a mistake would have to be corrected and that corrections would have to affect existing plants, meaning that the corrective measures that Bulgaria took, were "entirely foreseeable" at the time of the Investment.[1430]

955. Nevertheless, in full knowledge of these circumstances, investors such as the Claimant raced to complete PV projects before the FiT would be reduced, in a speculative hope to "game the system".[1431]

b.    *Knowledge of the Claimant*

956. More generally, the Respondent submits that a "reasonable investor in June 2012" "would have followed the events" and "would have been aware" that the ERSA, while having reduced the pipeline of speculative renewable energy projects, did not prevent the mid-2011 to mid-2012 boom. A reasonable investor in June 2012 then would have been aware of the ensuing "possibility" or "heightened risk" of regulatory changes, including a production cap.[1432]

---

[1426]    RCMOMOJ, para. 86; RROMROJ, para. 16.

[1427]    RROMROJ, paras. 67-75.

[1428]    RCMOMOJ, paras. 86, 390; RROMROJ, paras. 16, 442, 487; HT, D1, 7 June 2021, pp. 217-218; RPHB, para. 53.

[1429]    RROMROJ, paras. 75, 487; RPHB, para. 53.

[1430]    RCMOMOJ, para. 92; RROMROJ, paras. 17, 54, 97, 442, 456, 487; ROP II, p. 50; ROP III, pp. 37, 48-49; HT, D1, 7 June 2021, p. 282; RPHB, para. 71.

[1431]    RCMOMOJ, para. 390; RROMROJ, para. 17; RPHB, para. 56.

[1432]    RROMROJ, paras. 155, 166, 212.

957.  It is of relevance in that regard that the Claimant and its witnesses did follow market developments and were, in their own words, kept up to date on the latest regulatory changes in Bulgaria by local corporate advisory consultant "NECA".[1433]

     *c.    Similar booms and the reaction thereto in other Contracting Parties would have warned the Claimant*

958.  According to the Respondent, the renewable energy boom in Bulgaria came after similar booms took place in other EU countries such as Spain, Italy, and the Czech Republic, and after those countries took measures to roll back their overly generous support schemes.[1434]

959.  A reasonable investor would have known about this, including, for example, about the Spanish production cap of 2010,[1435] and would have expected a similar reaction by the Respondent in case a renewable energy boom would take place in Bulgaria, too, as it did.[1436]

960.  This is particularly the case because at least one of the Shareholders, namely First Reserve, had invested in PV plants in Spain and Italy prior to its investment in Bulgaria, and therefore necessarily would have had direct experience of the boom and the roll-back in Spain and Italy.[1437]

961.  The Claimant's counterargument on the point, namely that measures adopted in Spain, Italy, and the Czech Republic were different from the ones taken in Bulgaria is irrelevant because (i) what would have raised the expectation of a regulatory response is not what exact measures were taken but that measures were taken, and because (ii) all States implemented some measures that also applied to existing plants.[1438]

962.  In any event, the measures adopted in these other countries, on the Claimant's own account of them, were indeed similar to the Seven Measures reacting to similar increases

---

[1433]  RROMROJ, paras. 96, 166.

[1434]  RCMOMOJ, paras. 21, 86, 93-94; RROMROJ, para. 19; ROP II, pp. 52ff; HT, D1, 7 June 2021, pp. 218-219; RPHB, paras. 69, 118.

[1435]  RCMOMOJ, para. 436; RROMROJ, paras. 101, 112, 213, 456.

[1436]  RCMOMOJ, paras. 21, 86, 93-94, 136, 353, 390; RROMROJ, paras. 19, 112, 441; ROP III, p. 37.

[1437]  RCMOMOJ, paras. 21, 94, 117, 136, 353, 390; RROMROJ, paras. 19, 398, 441; RPHB, para. 69, fn 164.

[1438]  RROMROJ, paras. 19, 105.

in PV capacity (an increase of 1,000% in Bulgaria over one year versus a "greatly exceeded" target in Spain over 16 months and a 7,700% increase over two years in the Czech Republic).[1439]

963.    The Claimant's other counterargument on the point, namely that many investment arbitrations were begun and won against Spain, Italy, and the Czech Republic also misses the point because (i) "many" of these cases were unsuccessful, (ii) the fact that cases were begun does not have any relevance to the argument that because measures were taken in one EU Member State, similar measures had to be expected in other EU Member States, and (iii) the Claimant did not identify any arbitral awards against measures in Italy, Spain, and the Czech Republic that were issued before June 2012, the time of the Investment. The earliest public reports of the two ECT cases pending against Spain at the time post-date the Investment.[1440] Furthermore, the Respondent disputes the Claimant's submission that Bulgaria did not encounter the same boom or problems as the Czech Republic or Spain.[1441]

964.    In any case, the Claimant does not dispute (i) that booms took place in those countries, (ii) that they were followed by corrective measures, and (iii) that the Shareholders were aware of these developments.[1442]

965.    Therefore, in conclusion, cases against any of these three countries could not have raised the legitimate expectations that certain measures would be illegal or that challenges against them would be successful.[1443]

### 13.    The Claimant failed to prove that it held any legitimate expectations

966.    The Respondent submits that the Claimant has not proven any of the expectations that are the basis for its claims and has not submitted any evidence as to its "own" expectations as opposed to the expectations of its Shareholders.[1444]

---

[1439]    RROMROJ, paras. 108-110, 456.

[1440]    RROMROJ, paras. 103-104, 212, 456; RPHB, para. 69, fn 164.

[1441]    RROMROJ, para. 487.

[1442]    ROP II, p. 52.

[1443]    RROMROJ, paras. 103-104, 212, 456; RPHB, para. 69, fn 164.

[1444]    RROMROJ, paras. 20, 130, 151, 390, 394, 403; ROP II, p. 53; ROP III; p. 29; HT, D1, 7 June 2021, pp. 274-276; RPHB, para. 75.

967.    As a starting point, the Claimant has failed to articulate precisely what its alleged expectations were at the time of its Investment.[1445]

968.    The Claimant also cannot "inherit" the expectations of its Shareholders.[1446] Arguing that a shareholder's expectation becomes a companies' expectation disregards the Claimant as a legal person and abuses the Claimant as a vehicle for claims of its shareholders over which the Tribunal would not have jurisdiction.[1447] The Shareholders are not parties to this arbitration and to the extent that they are not ECT-nationals can also not even hold protected expectations under the ECT.[1448]

969.    There is also no evidence on file, such as minutes of meetings, board resolutions, internal analyses or presentations, correspondence, etc., that speaks to any expectation of the Claimant that the ERSA Regime would remain unchanged let alone evidence that it resolved to invest in the Karad Plant based on that expectation.[1449] There is indeed no evidence that the Claimant actually held the expectations it invokes as the basis of its claim. It is of note in that regard that the Claimant was only incorporated two-and-a-half weeks before it acquired ACWA Bulgaria – a brief time to have formed the alleged expectations.[1450]

970.    The Claimant has also not presented witness testimony by anyone with decision-making authority at the Claimant at the time of its Investment. The four witnesses of the Claimant were not, and do not even claim to have been, employees of the Claimant or members of its board of directors at the time of the Investment. They all represent the Shareholders, not the Claimant itself. Consequently, their witness statements represent alleged expectations of the Shareholders rather than of the Claimant itself.[1451]

971.    In their witness statements, the witnesses also tellingly speak from the view of their respective company, being First Reserve, ACWA Power International, or Crescent, and

---

[1445]    RROMROJ, para. 131.

[1446]    RROMROJ, paras. 151, 396; ROP III, pp. 30-31; HT, D1, 7 June 2021, pp. 275-276; RPHB, para. 75.

[1447]    RROMROJ, paras. 20, 388-389, 396.

[1448]    RROMROJ, paras. 151, 396.

[1449]    RCMOMOJ, paras. 19, 108, 346; RROMROJ, para. 387; ROP III, p. 31; HT, D1, 7 June 2021, p. 276.

[1450]    RCMOMOJ, paras. 19, 108, 346, 354; RROMROJ, para. 387; ROP III, p. 29; HT, D1, 7 June 2021, p. 274.

[1451]    RCMOMOJ, para. 348; RROMROJ, para. 391; ROP III, p. 31.

discuss the Investment in terms of what it meant financially for their respective company, not in terms of what it meant for the Claimant or what the Claimant expected financially.[1452]

972. Finally, while the Claimant submits that statements by Bulgarian officials raised legitimate expectations, and the Respondent submits that none of the statements could have generated legitimate expectations, in any case none of the witnesses for the Claimant has referred to or relied upon any of the statements that the Claimant cites. Therefore, even if expectations of the Shareholders were relevant, and the statements in question were capable of raising legitimate expectations, then still those Shareholders do not testify, let alone prove that they relied on any purported statement of promotion of the ERSA Regime in their decision to invest.[1453]

### 14.    The Shareholders' due diligence reports and internal documents expressly anticipated the possibility of modifications to the scheme

973. The Respondent submits that the Shareholder's and Lender's due diligence efforts in particular cannot form the basis for, or evidence of, a reasonable expectation that the ERSA Regime would not change or that (i) full offtake would take place (ii) at the FiT, (iii) over the term of 20 years.[1454]

#### a.    *Documents of the Shareholders cannot speak as to the expectations of the Claimant*

974. To start with, the due diligence reports were prepared for the Shareholders and the Lenders, and thus cannot speak as to the expectations of the Claimant. What is more, the Claimant also did not adduce, and does not deny that it never adduced, evidence that it ever relied upon or even considered any item of information that its Shareholders allegedly considered.[1455]

---

[1452]    RCMOMOJ, para. 349, fn 762.

[1453]    RCMOMOJ, paras. 78, 349, 376; RROMROJ, paras. 404, 417; RPHB, para. 75.

[1454]    RCMOMOJ, para. 368; RROMROJ, para. 394; ROP III, p. 30.

[1455]    RROMROJ, paras. 21, 388, 402; RCMOMOJ, paras. 20, 118, 351; ROP III, 30; HT, D1, 7 June 2021, pp. 220-221; RPHB, paras. 75, 113.

### b. The due diligence reports are too old to be relevant

975. Since the cited due diligence reports date from January and February 2012, *i.e.* (i) from before the completion of construction, (ii) before the License was granted for, according to the Respondent, a capacity of 50MW only (see below), and (iii) before the peak period of the renewable energy boom in Bulgaria, the reports are also too old to be relevant for the investment decision for an investment made in June 2012. Any absence of a warning in any such document can thus not be of relevance to the Claimant's argument.[1456]

976. Elsewhere, however, the Respondent submits that "[i]t is clear from Claimant's witnesses that the shareholders' due diligence continued in the spring of 2012 as the RES boom reached a peak and the new PV capacity had climbed to unsustainable levels", but adds that the record is "devoid of any documents demonstrating an assessment of risk by Claimant or its shareholders from this critical pre-investment period."[1457] The Respondent accuses the Claimant of either withholding later risk assessments or having been negligent in updating its analyses based on the facts and circumstances in June 2012.[1458]

### c. The due diligence reports and internal documents of the Shareholders either do not support or even contradict the Claimant's case

977. The Respondent argues that the due diligence reports and documents only describe the ERSA Regime as it appeared in the law at the time. The reports furthermore expressly anticipate the possibility that the ERSA Regime would be modified. They do so, for example, when they project that the FiT would be reduced or where they determine that the introduction of taxes and levies applicable to generators of renewable energy would constitute a material adverse change for the Lenders (and thus anticipate that such an event might take place).[1459]

---

[1456] RCMOMOJ, paras. 109; RROMROJ, paras. 146-148, 212, 402; ROP II, p. 55; HT, D1, 7 June 2021, pp. 221-222.

[1457] RROMROJ, para. 164.

[1458] RROMROJ, para. 166.

[1459] RCMOMOJ, paras. 20, 118-119; RROMROJ, para. 394; ROP II, pp. 27-29.

978.   In making such anticipations, while not able to speak to the expectations of the Claimant, the due diligence reports still indicate what kind of amendments a reasonable investor would have expected potentially to occur.[1460] In addition, "none of the due diligence documents cited by Claimant state that Bulgaria guaranteed the FiT regime would remain frozen for 20 years", or argue that a stabilisation commitment existed,[1461] and "[e]ven the superficial analysis in these documents manifests the foreseeable risk that Claimant assumed in undertaking an investment during the RES boom and bust in Bulgaria."[1462]

979.   The due diligence documents and other internal documents submitted by the Claimant actually undermine the Claimant's case,[1463] not least, in respect of internal documents of the Shareholders, because so few of them were filed: one for First Reserve, two for ACWA Power International, and three for Crescent Capital. Especially as regards First Reserve and ACWA Power International, the absence from the record of any financial models, minutes or records of meetings approving or discussing the Investment is notable.[1464] What is more, only three of the documents submitted in that connection date from before the Investment was made.[1465] In light of those flaws and the small number of documents submitted, the Claimant has failed to prove the expectations allegedly held by its Shareholders.[1466]

980.   The internal documents also undermine the Claimant's case because they show, among other things, that the Claimant's shareholder Crescent Capital (i) deemed the price of the Karad Plant to be "high based on current equipment costs",[1467] (ii) observed that in light of "a steep drop" in panel prices in the end of 2011, "the economics for projects become compelling" and that "there is now a rush to complete projects" to receive the

---

[1460]   RCMOMOJ, paras. 20, 118, 351.

[1461]   RRMOMROJ, paras. 21, 130, 145; RRMOMROJ, paras. 394, 397; ROP II, p. 26ff; ROP III, p. 33; HT, D1, 7 June 2021, pp. 221, 277.

[1462]   RCMOMOJ, para. 118.

[1463]   RCMOMOJ, paras. 110, 118.

[1464]   RRMOMROJ, paras. 152-154; 167-170.

[1465]   RRMOMROJ, para. 397.

[1466]   RRMOMROJ, paras. 151, 171, 212.

[1467]   RCMOMOJ, para. 110, fn 230; referring to Crescent Investment Memorandum (**C-62**), p. 33, though quote could not be found there.

FiT,[1468] and (iii) "admitted" that the surge of electricity from RES could lead to a spike in prices and a subsequent change in the FiT mechanism.[1469]

981.    The Shareholders' internal documents also show that Crescent Capital and ACWA Power International calculated, and thus anticipated, retroactive FiT reductions of up to 20% in their sensitivity analysis.[1470] The Respondent acknowledges in that regard that modelling sensitivities does not imply an expectation that the modelled scenario will materialise, but maintains its position that modelling sensitivities shows an understanding that the modelled events could occur in some form.[1471] The Claimant, in any case, has not submitted evidence that its Shareholders did not model the Seven Measures.[1472]

982.    The Respondent criticises the Allen & Overy draft report, the Spasov & Bratanov Legal Red Flag Report, and the CMS report in detail, alleging that those reports include flaws and inaccuracies, are more limited in scope than represented, leave out regulatory risk, and overlook aspects of the PPA.[1473]

983.    That notwithstanding, it is of note that, in an e-mail to the Shareholders, CMS had stated that Bulgaria could take steps in the future to "limit the output" of renewable energy plants and to reduce their profitability, and had warned of regulation related to the

---

[1468]    RROMROJ, paras. 17, 81, 222; ROP II, 35; HT, D1, 7 June 2021, p. 209; Annex 1 (Bulgaria's Regulatory Environment) to Crescent Capital Initial Screening Memorandum, 4 February 2012 (**R-288**), p. 3.

[1469]    RCMOMOJ, para. 117; RROMROJ, paras. 21, 154; RPHB, para. 76; referring to Crescent Investment Memorandum (**C-62**), p. 25; however, see full quote below at para 1368.

[1470]    RCMOMOJ, paras. 117, 350; RROMROJ, paras. 153, 156-157, 159-160, 397; RPHB, para. 76; Crescent Investment memorandum (**C-62**); ACWA Power, Board Investment Committee Presentation, 26 February 2012 (**C-66**).

[1471]    RROMROJ, paras. 157, 443.

[1472]    RROMROJ, para. 158, fn 343.

[1473]    RCMOMOJ, paras. 97, 111-116, 351, 367, 375, fn 241; RROMROJ, paras. 21, 97, 136-138, 142; CMS Due Diligence Report (**C-75**); Allen & Overy, Outline Bankability Review of Standard Form Renewables Power Purchase Agreement With "National Electricity Company" EAD (NEK) as Offtaker (the PPA), 27 January 2012 (**C-98**); Spasov & Bratanov, SunEdison Karadjalovo – Solar PV Project – Legal Red Flag Report , 27 February 2012 (**C-99**). The allegations regarding these documents are not always covered by the actual text of the discussed reports. A detailed discussion of the documents and the criticism thereof would, however, take up too much space here.

predictability of the output of the plants, and of "changes to the rules for balancing electricity".[1474]

(1)    The Common Terms Agreement

984.    More in particular regarding the Common Terms Agreement, the Respondent argues that the Agreement foresaw that the law in Bulgaria might be modified or repealed in the future to an effect that the FiT would be reduced directly or by way of a tax imposed on the FiT, and the Common Terms Agreement demanded pre-payment in such a case.[1475] This demonstrates that the Lenders, on whose due diligence the Claimant seeks to rely, as any reasonable investor in the Bulgarian PV market in 2012, understood the risk of regulatory change leading to a direct or indirect FiT reduction.[1476]

985.    Contrary to the Claimant's position, and as stated above, it is implausible in that regard that parties would allocate responsibility for potential future events the occurrence of which they would not deem to constitute a risk, especially where a material adverse change provision is tailored, not boilerplate.[1477]

(2)    The alleged April 2012 meeting(s)

986.    Regarding the alleged meeting of the Shareholders with the deputy minister of MEET and representatives of NEK, in April 2012, the Respondent submits that the Claimant has only submitted one e-mail that speaks of a meeting with a minister and other than that relies exclusively on "self-serving" and "conflicting" statements of its witnesses,[1478] who did not even remember the name of the minister.[1479]

---

[1474]    RROMROJ, paras. 21, 136; RPHB, paras. 76, 118; E-mail from Kostadin Sirleshtov (CMS) to Adi Blum, Richard Roberts, Abid Malik, Aygen Yayikoğlu, *et al.*, 20 April 2012 (**R-305**). The e-mail does speak of limiting profitability (by increasing fees for guarantees of origin (which appear not to have been needed any more since the April 2012 Amendment), by further regulation related to the predictability of plant output, and by a fund for decommissioning of renewable energy plants). It does warn of balancing costs. It does, however, not speak of limiting or reducing the output of plants.

[1475]    RCMOMOJ, paras. 113, 221, 352, 368, fn 496; Common Terms Agreement (**C-84**).

[1476]    RCMOMOJ, paras. 112, 114, 352; RROMROJ, para. 144.

[1477]    RROMROJ, para. 144.

[1478]    RCMOMOJ, para. 219, fn 491, referring to WS I Blum, para. 11; RROMROJ, paras. 161, 395; E-mail from Miguel Muñoz to Adi Blum and Reda Chaar, 28 March 2012 (**C-211**).

[1479]    RROMROJ, para. 161; RPHB, para. 81.

987.   The Claimant has in particular not submitted any corroborating contemporaneous evidence of the alleged meeting or what was discussed there, such as minutes of the meeting or correspondence other than said one e-mail whereby the meeting was arranged.[1480] The Claimant has also not submitted records of alleged phone conversations where the meeting was discussed,[1481] and the meeting was not mentioned in Crescent's updated investment memorandum of June 2012.[1482] Such a lack of a paper trail and lack of documentation of important commitments is not credible.[1483]

988.   In addition, Mr Roberts testified that the Shareholders assumed that the Government would be unwilling to provide written assurances of the commitments given at the alleged meeting. The Shareholders thus understood that there was no legal basis for any such commitments.[1484]

989.   The stark increase of detail about the meeting between the first and second round of witness submissions, ten years after the meeting allegedly took place, is also suspicious.[1485] The testimony to that effect is further undermined because, in respect of the alleged comments on the absence of a tariff deficit, for example, contemporaneous public statements of NEK and the EWRC show that there was a tariff deficit at NEK of which these entities were aware.[1486]

990.   Nevertheless, in direct proximity to its arguments disputing the occurrence of the meeting(s), the Respondent uses references of the Claimant's witnesses to the meeting(s) or the April 10-12 "due diligence visit" as evidence that makes it "clear … that the Shareholders' due diligence continued in the spring of 2012",[1487] and during the Hearing, and the Post-Hearing Brief, the Respondent refers to the Shareholders' travel

---

[1480]   RCMOMOJ, para. 219, fn 491, referring to WS I Blum, para. 11; RROMROJ, paras. 161, 395; ROP III, p. 35; HT, D1, 7 June 2021, pp. 277-278; RPHB, para. 80.

[1481]   RROMROJ, para. 395.

[1482]   RROMROJ, para. 161.

[1483]   RROMROJ, paras. 162, 395.

[1484]   RPHB, para. 79; HT, D3, 9 June 2021, pp. 536-537. While Mr Roberts stated that "[t]here is no way they would have put anything in writing" and that "it was understood that that was not a possibility", he also stated that "[t]hey said it is in the law and we are going to abide by the law."

[1485]   RROMROJ, para. 163.

[1486]   RROMROJ, para. 163; HT, D1, 7 June 2021, pp. 209-210. The Respondent refers to no exhibit when making this submission.

[1487]   RROMROJ, para. 164, fn 358; HT, D1, 7 June 2021, pp. 209-210.

to Bulgaria from 10 to 12 April as evidence of their alertness to regulatory risk and concerns about overcapacity and affordability.[1488]

991.    In any case, the Respondent submits that if the meeting took place, it would have taken place before the Claimant was incorporated and no specific promises to the Claimant can thus have been made at the event,[1489] nor could due diligence of the Claimant have taken place at the meeting.[1490]

992.    Finally, inasmuch as a meeting did take place, and promises not to negatively affect plants enrolled in the ERSA Regime were made, *quod non*, in accordance with any such alleged promises the Karad Plant was not negatively affected, because it continued to earn a reasonable return as envisaged by the ERSA Regime.[1491]

          *d.      The due diligence reports leave out matters of EU law and State aid*

993.    The Respondent submits that it also appears from the due diligence documents submitted by the Claimant that neither the Claimant nor its Shareholders performed any due diligence as to matters of EU law and State aid, which would have been a basic element of due diligence.[1492]

          *e.      Conclusion on the Shareholders' due diligence and internal documents*

994.    In conclusion, even if the Shareholder's expectations were relevant, then the Claimant has failed to establish that its Shareholders actually held the expectations that the Claimant now claims that they held. Rather the Claimant (unwittingly) disclosed that its Shareholders' expectation was that modifications to the regulatory regime were a possibility.[1493] The Claimant thus knowingly invested despite the advice its Shareholders had received and in full knowledge that the ERSA Regime might change.[1494]

---

[1488]    ROP II, p. 37; RPHB, para. 77.

[1489]    RCMOMOJ, para. 219, fn 491, referring to WS I Blum, para. 11.

[1490]    RROMROJ, para. 395.

[1491]    RCMOMOJ, para. 219, fn 491, referring to WS I Blum, para. 11.

[1492]    RROMROJ, paras. 21, 149, 402; ROP III, p. 42; HT, D1, 7 June 2021, pp. 251, 279-280.

[1493]    RROMROJ, paras. 21, 399, 404.

[1494]    RROMROJ, paras. 21, 145.

### 15. The Respondent's knowledge of the Karad Project and the 60.4/50 Ratio

### a. The Respondent's knowledge of the Karad Project and the licensing process

995. The Respondent disputes that it had detailed knowledge of the Karad Plant.

996. While the Claimant seeks to place emphasis on the number of official approvals that the Karad Plant received, *i.e.* 17, the majority of these approvals only related to the construction process of the Karad Plant and had nothing to do with the ERSA Regime.[1495] "[S]everal" of these approvals were not even issued by the State but rather by project companies, designers, construction companies, and consultants.[1496]

997. Contrary to the Claimant's argument, the approving acts do not show that Bulgaria vetted every aspect of the Karad Project.[1497] The quality of the submitted application documents would also not have allowed for it, since the submitted documents were "limited in scope", inconsistent, incomplete, or not representative of the actual project design.[1498]

998. The financial model that the Regulator reviewed is also not as detailed as the Claimant claims and, in any case, less detailed than the financial model underlying the SPA by which the Claimant acquired ACWA Bulgaria, and which the Regulator did not review.[1499] The EWRC thus did not vet the Investment.[1500]

---

[1495]  RCMOMOJ, para. 100.

[1496]  RCMOMOJ, para. 100, fn 195, pointing, as an example, to Act No 15 at CMOM, para. 172, which can, however, not be directly identified. The Statement of Findings to Determine the Fitness for Acceptance of the Construction Site, Act No. 15, 1 March 2012 (**R-39**). Which the Respondent also refers to in that regard is, in any case, not immediately identifiable in the table at CMOM, para. 172.

[1497]  RCMOMOJ, para. 101; RROMROJ, para. 114.

[1498]  RCMOMOJ, paras. 101, 371.

[1499]  RCMOMOJ, para. 101, comparing Financial Model and Investment Analysis of the Karad Project, 26 April 2012 (**R-040**) with Financial Model used for ACF's acquisition of ACWA Bulgaria (**RE-146**).; RROMROJ, para. 114. The Respondent further submits that Exhibit (**R-040**) would constitute the "foregoing" financial model to Financial Model and Investment analysis of the Karad Project, 23 March 2012 (**C-172**). The Claimant submits that Exhibit (**C-172**) was attached to Letter from ACWA Bulgaria (then ZBE Partners) to EWRC, 23 March 2012 (**C-169**). See RCMOMOJ, para. 101, fn 196; CMOM, para. 200, fn 259.

[1500]  RROMROJ, para. 114.

999.   "[I]n reality", the EWRC "reviewed the plant's business plan and financial model solely for the limited purpose of ascertaining whether the licensee had the technical and financial capabilities, material and human resources and organizational structure required to meet the regulatory requirements for performance of the licensed activity."[1501]  Accordingly, the EWRC's review of ACWA Bulgaria's license application did not entail any endorsement of expectations, be it by the Claimant which did not yet exist at the time of the application, or anyone else.[1502]

### b.    The 60.4/50 Ratio and the License

1000.  The Respondent does not dispute that its authorities had knowledge of the total capacity of the Karad Plant, and hence the 60.4/50 Ratio, since at least March 2012, *i.e.* since at least before "Act 16".[1503]

1001.  The Respondent submits, however, that ACWA Bulgaria (then ZBE Partners) "fast-tracked" the construction of the Karad Plant without obtaining the necessary prior approval and thus did so "in violation of Bulgarian law". This means that the Claimant has no basis to claim that the Respondent signed off on the project, including the 60.4/50 Ratio.[1504]

1002.  Indeed, the License itself only authorises 50 MW "total installed capacity",[1505] and the Regulator eventually "declined to approve" a plant with "60.4 MW" of PV panels, *i.e.* the "speculative plant size".[1506] It is in that regard furthermore incorrect that "total installed capacity" in the License would refer to the Karad Plant's "nominal" capacity, *i.e.* the inverter capacity and not the capacity of the PV panels.[1507] The License actually only refers to a "total installed capacity" of 60,436.64 kWp and the projected electricity

---

1501    RCMOMOJ, paras. 133, 371, quoting Energy Act (**R-247**), Article 40(1).

1502    RCMOMOJ, para. 371.

1503    RCMOMOJ, para. 104, fn 210; RROMROJ, para. 401; RPHB, para. 85.

1504    RCMOMOJ, paras. 102-103, 133-134, 372; RROMROJ, paras. 115-120.

1505    RCMOMOJ, paras. 134, 372; RROMROJ, paras. 120, 122, 147; ROP II, p. 57.

1506    RROMROJ, paras. 122, 126; HT, D1, 7 June 2021, p. 223; RPHB, para. 85.

1507    RROMROJ, para. 124; RPHB, para. 84.

production of 78,632 MWh in "the factual summary of the license application materials presented by ZBE", and not in the "operative parts of the License Decision".[1508]

1003. Notably, Mr Blum and Mr Roberts internally had raised questions in early 2012 about how a 60.4 MW project would only have a grid connection of 50 MW.[1509]

1004. The License can therefore neither be regarded as a confirmation by the Regulator of the Claimant's expectations of the technical, economic, and financial parameters of the Karad Plant, nor as a basis for any expectation that the additional production achieved due to the 60.4/50 Ratio would be purchased at the FiT. Rather, it must have served as a warning to a reasonable investor that it would not. Ultimately, no reasonable investor would have expected to sell the full output of a capacity in violation of its license, and only authorisation by, not knowledge of, the EWRC could have raised protected reasonable expectations.[1510]

1005. Finally, the Respondent interprets comments in the Claimant's Reply to mean that the Claimant would no longer claim that the License approved the 60.4/50 Ratio, but rather would only claim that the License shows that the Respondent had knowledge of the 60.4/50 Ratio.[1511]

### 16.    The Claimant did not suffer any damages

1006. The Respondent argues that the Claimant did not suffer any damages given that even after the introduction of the Seven Measures it earned a reasonable return above its cost of capital, and indeed earned the return that it could have reasonably expected to earn in accordance with the law.[1512]

---

[1508]   RCMOMOJ, para. 134; RROMROJ, paras. 120, 127, fn 261; RPHB, para. 87.

[1509]   RROMROJ, paras. 129, 211; E-mail from Richard Roberts to Aygen Yayıkoğlu and Fabrizio Donini Ferretti, 2 January 2012 (**R-312**); E-mail from Adi Blum to Richard Roberts, 10 April 2012 (**R-311**).

[1510]   RROMROJ, para. 123.

[1511]   RROMROJ, para. 123.

[1512]   RCMOMOJ, paras. 24, 128, 267, 404-409; RROMROJ, paras. 269-271; ROP II, p. 72.

a. *The Claimant claims windfall profits, a top-up it could not have expected to receive*

1007. Awarding damages to the Claimant in this case would signify awarding excess profit to the Claimant. A windfall and an overcompensation that the Claimant, while speculatively hoping that it would not be addressed and corrected by Bulgaria, could not reasonably have expected to receive during the normal course of the Karad Project.[1513] Therefore, the Claimant's claim is a claim for "additional profit" or a "top-up" beyond the level of profit that the ERSA Regime was designed and intended to provide and that the Karad Plant in fact would have earned.[1514]

b. *The Claimant made a profit*

1008. The Respondent points out that contrary to statements of the Claimant that it sold the Investment at a loss, and that it earned no profit, the Claimant, according to its own witnesses, had recovered the entirety of its equity investment and earned a profit when selling ACWA Bulgaria to Enery.[1515] More specifically, in testifying that after the sale of ACWA Bulgaria, the return on investment of the Claimant will be less than 2%, Mr Roberts, a witness of the Claimant, admits that (i) the Claimant recovered the entirety of its original equity investment, and (ii) made a profit, confirming, contrary to submissions of the Claimant, that the Karad Project was profitable.[1516]

1009. Any such reference of Mr Roberts regarding a return on investment of "less than 2%" also appears to have excluded the additional profit due to the sale of NOMAC (see below), and that therefore Mr Robert's estimate would appear to be too low.[1517]

1010. The Investment was furthermore over-leveraged in light of the reasonably foreseeable risks the Investment would face. The financing structure was, however, the Claimant's choice, and therefore, even if it were true that the financing structure, *i.e.* the third-party debt and their priority claim to the cash flows, "wiped out" the profit of the Claimant, the financing structure is irrelevant to the legality of the Seven Measures, and cannot be

---

[1513]    RCMOMOJ, paras. 24, 267; RROMROJ, para. 222; ROP IV, p. 21.

[1514]    RCMOMOJ, paras. 25, 271; RROMROJ, para. 222.

[1515]    RCMOMOJ, paras. 25, 271.

[1516]    RCMOMOJ, paras. 270-271; WS I Roberts, para. 27.

[1517]    RCMOMOJ, para. 270.

a reason for granting damages.[1518] This is especially the case when an investor fails to take account of reasonably foreseeable business risks.[1519]

> c.    The IRR at the level of the Karad Plant is the suitable method to assess performance

1011.  The Respondent further disputes the relevance of the Claimant's profits and submits that, naturally, the only relevant profit is that at the project-level, *i.e.* at the level of the Karad Plant, given that the ERSA Regime aimed to compensate costs and a reasonable rate of return of the producer itself, not of an investor.[1520]

1012.  The reliable and commonly used method to then assess the Karad Plant's performance is the determination of its IRR compared to its WACC for the period of April 2012 to June 2042.[1521] As a further advantage, the IRR method also makes results comparable to the targets of the ERSA Regime, given that the plan of Bulgaria was to allow a certain IRR and in particular only to allow the recovery of efficient investment and operating costs as well as a reasonable return equal to the WACC.[1522]

> d.    The Claimant shifted profits to NOMAC

1013.  The Respondent further submits that the Claimant operated the Karad Plant through a "web of complex, opaque related party transactions", and kept silent about the fact that the operating company of the Karad Plant, NOMAC Bulgaria EAD ("**NOMAC**"), was 50% owned by one of its Shareholders: ACWA Power International. The Claimant further kept silent that ACWA Bulgaria and NOMAC formed a single, integrated economic unit, that NOMAC outsourced operation and management of the Karad Plant to a sub-contractor, and that, in doing so, the Karad Plant and NOMAC allegedly "shifted profits" from the Karad Plant to NOMAC, with NOMAC reaching a profit

---

[1518]    RROMROJ, paras. 226, 451, fn 500.

[1519]    RROMROJ, para. 451.

[1520]    RCMOMOJ, para. 271; RROMROJ, para. 273; RPHB, para. 129.

[1521]    RCMOMOJ, para. 268; ROP IV, p. 8.

[1522]    RCMOMOJ, para. 268.

margin of 39% in 2018. As a consequence, the Karad Plant's profitability appears lower than it was.[1523]

1014.   In any case, notwithstanding the Claimant's criticism of the allegations and arguments made in relation to NOMAC, the reality remains that NOMAC was a related party of ACWA Bulgaria, had high profit margins, and by charging the Karad Plant for its services together with a profit margin, it increased the costs and skimmed the profits of the Karad Plant.[1524] The costs incurred due to such overpaying are thus also inefficient costs for the compensation of which there is no legal basis.[1525]

### e.   The Karad Plant's developer overpaid for the PV panels

1015.   The Karad Plant also appears to have overpaid for its solar modules by at least EUR 0.286 per Wp or over EUR 17 million in total. Nevertheless, when an inefficient cost structure decreases a project's IRR, that is a problem of the investor, not of the remuneration scheme whose target it is to compensate only efficient costs. Such a decrease is not a basis for a claim under the ECT.[1526] Nevertheless, elsewhere, in connection with its argument on the sharp drop of prices (see above, para. 788), the Respondent argues that the Karad Plant and the Claimant had profited from the allegedly sharp drop in the prices of PV panels over the 2011-2012 FiT period.

### f.   The Karad Plant earned a reasonable return

1016.   The Respondent submits that the Karad Plant including NOMAC achieved a pre-tax IRR of 7.3% in line with its WACC of 7.0% to 8.0% in 2012. The Respondent further submits that had the Karad Plant been constructed in line with its License and thus without the 60.4/50 Ratio, its IRR would have been 8.6%, "well above its WACC".[1527]

1017.   The Respondent initially submitted that the pre-tax IRR of the Karad Plant was always higher than the WACC of the Karad Plant (at least if one includes the NOMAC cash-flows into the calculation), and higher "than the 7.0% discount rate included in ZBE's

---

[1523]   RCMOMOJ, paras. 120-125, 495-496; ROP IV, pp. 13-17; HT, D1, 7 June 2021, pp. 302-304; RPHB, para. 124.

[1524]   RROMROJ, para. 556; HT, D1, 7 June 2021, pp. 302-304.

[1525]   RPHB, para. 124.

[1526]   RCMOMOJ, paras. 272-273.

[1527]   RROMROJ, para. 25; ROP II, p. 72; ROP IV, p. 7.

financial model from April 2012",[1528] and a reasonable rate of return was thus earned.[1529] Later the Respondent clarified that an IRR higher than the WACC of 7-8% was only earned in its "licensed capacity scenario", *i.e.* the scenario that assumes legality of the APC and illegality of the 60.4/50 Ratio.[1530]

1018.    In any case, as confirmed by Mr Kristensen, if the Claimant were to be awarded the damages it seeks, the Karad Plant's IRR would increase to 11.4%, which would constitute a level in excess of its WACC and in violation of EU and Bulgarian law.[1531]

1019.    The Claimant's complaint that due to the Seven Measures the IRR of the Karad Plant fell below the 9% target return set in the FiT Decision (which the Respondent does not dispute) furthermore overlooks that, as the Claimant itself had argued, the ERSA Regime is an "at risk" model and that there were thus no guaranteed returns.[1532]

1020.    Finally, the target rate of return of 9% cannot be used as the benchmark for whether the Karad Plant earned a reasonable return because it is only a target, not a fixed return, making the actual WACC the appropriate benchmark. The WACC is also used by the European Commission to assess the compatibility of incentive regimes for renewable energy production with EU State aid law.[1533]

g.    *Equivalent reduction of the FiT*

1021.    As a further indicator of the low impact of the Seven Measures, the Respondent submits that the Measures only had the equivalent of a 7.4% reduction of the FiT against the reference plant (not including the effect of the Annual Production Cap), signifying a reduction that was even lower than the one in Italy found not to be in breach of the ECT

---

[1528]    RCMOMOJ, para. 497, referring to Oxera I, para. 8.40 where, however, this is not discussed. It is discussed at Oxera I, para. 8.38, and refers to Financial Model and Investment Analysis Karad Project, 26 April 2014 (**R-040**), Tab 3, Cell D24, where a 7% discount rate is included in the underlying formula to calculate the net present value (only visible in the downloaded Exhibit; the discount factor is, however, also referred to in the part of the License Decision (**C-103**) that quotes/paraphrases the underlying business plan of ZBE Partners). The same model, at Cell D26, arrives at an IRR for the Karad Plant of 9.1%; RROMROJ, para. 450.

[1529]    RCMOMOJ, paras. 269, 409, 497; RROMROJ, paras. 269, 553; RPHB, paras. 10, 121.

[1530]    ROP IV, p. 12; RPHB, para. 125.

[1531]    RCMOMOJ, paras. 271, 498.

[1532]    RROMROJ, para. 228; RPHB, para. 122.

[1533]    RROMROJ, para. 555; RPHB, para. 122.

in the *SilverRidge* case.[1534] After the Hearing, however, the Respondent's expert adjusted this equivalent effect calculation to 9.8%, and hence even on the Respondent's case, *i.e.* excluding the APC and disregarding the 60.4/50 Ratio, the adjustment reached a value above the allegedly relevant value referenced in *SilverRidge*.[1535]

1022. In contrast with the situation in Italy underlying the *SilverRidge* case, the Claimant was also at all times able to pay off its loans and provide a return to its Shareholders,[1536] a return of which elsewhere the Respondent argues that it is not a variable that should be of relevance as it would disregard the Claimant as a legal person.[1537]

### h.    Conclusion on lack of damages

1023. The Respondent concludes that the Karad Plant earned a reasonable rate of return and did not suffer damages.[1538] It was not harmed as compared to reasonable investor's expectations and the Claimant thus has no basis for its claims.[1539]

### 17.    Applicable law

1024. The Respondent submits that there is no dispute that, in accordance with Article 26(6) ECT, the Tribunal shall decide the issues in dispute in accordance with the ECT and applicable rules and principles of international law.[1540]

1025. The Respondent recalls, once more, that because Malta's accession to the VCLT post-dates Malta's conclusion of the ECT, and in light of Article 4 VCLT, the VCLT is not applicable between Bulgaria and Malta. The VCLT may be understood, however, to reflect the customary international law of treaties. There is furthermore agreement between the Parties, that, to the extent necessary, the general principles contained in the VCLT can assist the Tribunal.[1541]

---

[1534]    RROMROJ, para. 557; ROP II, p. 93; HT, D1, 7 June 2021, p, 246; RPHB, paras. 103, 129; Oxera II, para. 7.113, Table 7.1.

[1535]    Oxera IV, para. 1.11.

[1536]    RROMROJ, para. 558.

[1537]    RROMROJ, para. 273.

[1538]    RCMOMOJ, paras. 276, 404, 409; RROMROJ, paras. 269-270.

[1539]    RCMOMOJ, paras. 267, 276, 482; RROMROJ, para. 270.

[1540]    RCMOMOJ, para. 326; RROMROJ, para. 372.

[1541]    RCMOMOJ, para. 326, fn 728; RROMROJ, para. 373, fn 833.

1026.    The Respondent does not dispute that a State may not invoke the provisions of its internal law as justification for a failure to perform a treaty.[1542] Nevertheless, compliance with domestic law is not "altogether irrelevant to the Tribunal's consideration of Bulgaria's breaches of the ECT and international law" as the Claimant had put it.[1543] Compliance with domestic law has been viewed by a number of investment treaty tribunals as a relevant factor in determining whether a State observed its treaty undertakings.[1544]

1027.    "[T]here is authority", including the present Tribunal by means of its *Achmea* Decision, that applicable rules and principles of international law in an intra-EU case include EU law and that thus EU law applies as part of the law of decision.[1545] Bulgaria furthermore became a Member of the European Union before the date of the Investment.[1546]

1028.    The ERSA Regime was based upon, and subject to, EU law and in particular EU law concerning the energy sector, competition, and State aid and, therefore, an assessment of the Claimant's claims must encompass consideration of EU law. EU law also forms part of Bulgarian law, and within the system of Bulgarian law it prevails over conflicting legislation.[1547]

1029.    Even if the Tribunal were to determine that EU law is not directly applicable, then there can at least be no denying that EU law is "among the factual circumstances that the Tribunal must take into consideration in applying the provisions of the ECT".[1548]

### 18.    Principles to govern the Tribunal's analysis and scope of the allegedly violated obligations and standards

1030.    The Respondent submits that the Claimant bears the burden of proof that the alleged wrongful acts are in breach of the Respondent's obligations under Article 10(1)

---

[1542]    RCMOMOJ, para. 326.

[1543]    RCMOMOJ, para. 327, quoting CMOM, para. 271.

[1544]    RCMOMOJ, para. 327.

[1545]    RROMROJ, paras. 374, 427-428.

[1546]    RCMOMOJ, paras. 28-29; ROP III, p. 3.

[1547]    RCMOMOJ, paras. 28-29; RROMROJ, paras. 172, 374; ROP III, p. 3; HT, D1, 7 June 2021, pp. 248-249; RPHB, para. 46.

[1548]    RROMROJ, para. 429, quoting *Eurus Energy Holding Corporation v. Kingdom of Spain,* ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, Partial Dissent of Co-Arbitrator Garibaldi, 17 March 2021 (**RL-324**), para. 11.

ECT.[1549] The Claimant also has the burden of proving that it actually held the expectations that are the basis for its claims in this arbitration.[1550]

1031. An investment treaty tribunal is furthermore not an administrative review board tasked with assessing the appropriateness of policy as a matter of regulatory economics.[1551] "Whether Bulgaria could have elected a different approach is not a relevant inquiry for purposes of assessing liability under the ECT."[1552]

> a.    FET

1032. The Respondent submits that the "requirement" to accord FET of Article 10(1) ECT is tied to, and to be found by reference to, international law.[1553] A tribunal may not apply its own idiosyncratic standard in lieu of the objective standard laid down in the Treaty.[1554]

1033. In order to qualify as a failure to accord FET, the conduct in question must be "seriously improper" and, in the words of the tribunal in *AES* "shock, or at least surprise a sense of juridical propriety".[1555] Such conduct must have been, in the words of the tribunal in *SunReserve*, "manifestly or grossly unfair or unreasonable", "arbitrary or discriminatory", constituting "a denial of justice" or consisting of "a wilful neglect of duty or a wilful disregard of due process of law" or showing "an extreme insufficiency of action falling far below international standards".[1556] The Claimant accepts that

---

[1549]    RCMOMOJ, para. 326.

[1550]    RCMOMOJ, para. 108.

[1551]    RCMOMOJ, para. 173; RROMROJ, para. 452.

[1552]    RCMOMOJ, para. 173.

[1553]    RCMOMOJ, para. 329; RROMROJ, para. 375; *Mondev International v. United States*, ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002 (**RL-177**) ("***Mondev***"), paras. 119-120.

[1554]    RCMOMOJ, para. 329; RROMROJ, para. 375; *Mondev* (**RL-177**), paras. 119-120.

[1555]    RCMOMOJ, paras. 330, 332; RROMROJ, paras. 375, 384; *AES* (**CL-47**), para. 9.3.40, using in turn the words of the *Tecmed* tribunal, using the words of the ICJ in *Elettronica Sicula S.p.A. (ELSI) (United States of America v. Italy)*, Judgment, ICJ Reports 1989, 20 July 1989, p. 15 (**RL-152**).

[1556]    RCMOMOJ, para. 333; *SunReserve* (**RL-262**), para. 688. Using terms in which the tribunal in *Waste Management Inc v. México* ("*Waste Management*") summarised decisions of other investment tribunals in view of a possibly emerging general standard for the interpretation of Article 1105 NAFTA, the Respondent submits that the conduct must be "attributable to the State", "harmful to the claimant", and "arbitrary, grossly unfair, unjust or idiosyncratic", "discriminatory", exposing "the claimant to sectional or racial prejudice", or involving a "lack of due process leading to an outcome which offends judicial propriety", *e.g.* due to a "manifest failure of natural justice in judicial proceedings or a complete lack of transparency and candour in an administrative process." RCMOMOJ, para. 330; *Waste Management v.*

standard, albeit in the context of claims regarding non-transparent and inconsistent behaviour.[1557]

1034. The standard set out in Article 10(1) ECT forms a high threshold, independent of whether one views Article 10(1) ECT to be equivalent to, or autonomous of the international minimum standard of treatment required under customary international law.[1558] However, only a "minimum standard" is protected.[1559]

1035. Indeed, many tribunals have held that the actual content of the fair and equitable treatment standard in the respective treaty that such tribunals deal with, and the minimum standard of treatment under customary international law are not materially different.[1560] Contrary to the description of the Claimant, "numerous" investment treaty tribunals, including tribunals constituted under investment treaties where the fair and equitable treatment standard is not expressly tied to customary international law, endorsed the "*Waste Management* formulation".[1561]

1036. What is more, not every breach of an agreement or domestic law constitutes a violation of the ECT.[1562] Concepts like "legitimate expectations", "stability of the legal framework", and "transparency" may not be taken too literally or be viewed subjectively from the point of view of an investor.[1563]

---

[ ] *United Mexican States*, ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004 (**CL-87**), para. 98, the *Waste Management* tribunal does not seem to hold explicitly that this is the standard.

[1557] RROMROJ, para. 485.

[1558] RCMOMOJ, paras. 330-331, 333-335, fn 738; RROMROJ, paras. 375, 380-383; *Genin et al. v. Estonia*, ICSID Case No. ARB/99/2, Award of 25 June 2001 (**RL-175**) ("*Genin*"), para. 367; *Liman* (**CL-27**), para. 285 (The observations of the tribunal in *Liman* appear to be limited to the analysis of breaches of the FET Obligation by judicial acts.); *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability, and Certain Issues of Quantum, 30 December 2019 (**RL-257**) ("*RWE*"). The Respondent in that regard also cites the *SilverRidge* tribunal's reference to a "relatively high threshold" as described by the tribunal in *Blusun S.A. et al. v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016 (**CL-17**), *SilverRidge* (**RL-287**), para. 469.

[1559] RCMOMOJ, paras. 330-331, 333-334, fn 738; *Genin* (**RL-175**), para. 367; *Liman* (**CL-27**), para. 285 (The observations of the tribunal in *Liman* appear to be limited to the analysis of breaches of the FET Obligation by judicial acts.); *RWE* (**RL-257**).

[1560] RROMROJ, para. 377; *e.g. Biwater Gauff (Tanzania) Ltd. v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008 (**RL-198**), paras. 591-592.

[1561] RROMROJ, para. 378, for the standard see above note 1556.

[1562] RCMOMOJ, para. 335; *Parkerings* (**CL-91**), para. 315.

[1563] RCMOMOJ, para. 336; *Saluka* (**CL-81**), para. 304.

1037. In any case, an alleged breach of the FET Obligation can only be assessed in light of all of the facts and circumstances of a particular case and the record as a whole, not isolated events, determines whether a breach of international law took place.[1564]

1038. It is perfectly valid in that regard to rely on NAFTA-based decisions on the fair and equitable treatment standard and the minimum standard to further one's own argument. The Claimant also relies on NAFTA provisions and NAFTA based decisions in other parts of its argument.[1565]

1039. Finally, the Claimant's reference to the object and purpose of the ECT in its submissions on the interpretation of the FET Obligation cannot help the Claimant's case. That is because, in particular in light of Article 2 ECT and its reference to complementarities and mutual benefits, to the extent that the relevant provisions of the ECT require interpretation at all, the object and purpose of the ECT would require a "balanced approach" to the interpretation which keeps in mind (i) the State's right to regulate and (ii) that protection of foreign investments is not the sole aim of the Treaty.[1566]

(1)    Violating the Claimant's legitimate expectations

(a)    *The applicable test and relevant factors and sources*

1040. The Respondent largely agrees with the Claimant's proposed "three-prong test" for determining whether a claimant's legitimate expectations were frustrated in violation of the FET standard of Article 10(1) ECT. The Respondent agrees, in particular, that the test requires that it be established that (1) the host State created and the investor held the legitimate expectations, (2) the investor relied on the legitimate expectations, and (3) the host State subsequently failed to honour the expectations.[1567] The Respondent adds that it appears agreed that a finding is also necessary that holding and relying on any such expectation was "objectively reasonable",[1568] and that it is for the Claimant to

---

[1564]    RCMOMOJ, para. 337; *GAMI Investments v México*, UNCITRAL, Final Award, 15 November 2004 (**CL-97**), para. 97.

[1565]    RROMROJ, para. 379.

[1566]    RCMOMOJ, para. 334, fn 742; RROMROJ, para. 406.

[1567]    RCMOMOJ, para. 339; RROMROJ, para. 150; RPHB, para. 112.

[1568]    RCMOMOJ, para. 340; RROMROJ, paras. 150, 387, 423; RPHB, para. 112.

demonstrate that the elements of the test are met.[1569] Later, however, the Respondent summarises the "three-prong test" to mean that "an investor's expectation must be grounded in specific commitments made by the State at the time of the investment."[1570]

1041. An assessment of legitimate expectations must take "reasonable" account of the environment and circumstances in which an investor chooses to invest, including the political and socioeconomic conditions in the host State, such as, *e.g.*, a PV energy boom.[1571] "[A] claimant cannot have a reasonable expectation of regulatory stability when 'the market which the Claimants were entering was a bubble' and when the 'Government considered that the FiT regime was out of balance,'" which "'would have been obvious to anyone who participated in industry discussions, or paid attention to warnings by specialist professionals, or read the local press.'".[1572] "[T]he investment protection was never intended to promote and safeguard those who … 'pile in' to take advantage of laws which they must know may be in a state of flux caused essentially by investors of that type."[1573]

1042. A "speculative hope" is also not an internationally protected legitimate expectation,[1574] nor is an expectation against better knowledge or one formed even though the introduction of damaging measures was foreseeable as a whole.[1575] A reasonable investor furthermore has a certain duty to keep itself informed and make a risk assessment that takes into account the advantages and disadvantages of the dynamics of the market and that such dynamics may also call for policy adjustments.[1576]

1043. Only "real expectations" are protected, which means that even if an investor would have been entitled to expect, for instance, that a law would remain unchanged, but did, in

---

[1569]    RCMOMOJ, para. 343; RROMROJ, paras. 150, 387; ROP III, pp. 27-28; HT, D1, 7 June 2021, p. 274; RPHB, paras. 75, 112.

[1570]    RROMROJ, para. 385, referring to RCMOMOJ, paras. 339-340; RCMOMOJ, para. 355, referring to CMOM, para. 284.

[1571]    RCMOMOJ, para. 341; ROP III, p. 37.

[1572]    Quoting and paraphrasing the tribunal in *Antaris*. RCMOMOJ, para. 389; ROP III, p. 37; *Antaris* (**RL-236**), para. 434.

[1573]    Quoting the tribunal in *Antaris*. RCMOMOJ, para. 389; ROP III, p. 37; *Antaris* (**RL-236**), para. 435.

[1574]    RCMOMOJ, para. 341; RROMROJ, paras. 232, 450; *Antaris* (**RL-236**), para. 435.

[1575]    RROMROJ, para. 440; ROP III, p. 48.

[1576]    RROMROJ, para. 443; ROP III, p. 48; relying on *SilverRidge* (**RL-287**), para. 457; RPHB, para. 117.

fact, not believe that it would, the investor is not protected because it did not actually hold a protected expectation.[1577]

1044. In that same vein, it is of import, as put by the tribunal in *Stadtwerke*, that "[l]egitimate expectations must be grounded in the law and not based upon promotional literature about what the law says", meaning that statements of governmental officials cannot give rise to a legitimate expectation of fixed revenues when the law itself does not establish that it would.[1578]

1045. Moreover, the protected expectation must have been held by the claimant that invokes the breach, not by any other entity, such as its shareholders.[1579] As determined also in *Total S.A. v. Argentina* ("***Total***"), a license issued to an entity different from the Claimant (here ACWA Bulgaria), at a time that the Claimant was not even incorporated yet, cannot be said to form the basis of legitimate expectations of the Claimant.[1580]

1046. Finally, it is well established that the determination of the information an investor had, and the expectation it held, must be made as of the date of the investment. It is also well established that it is for the Claimant to establish that its legitimate expectations existed at that time and that the information it seeks to rely on to establish its legitimate-expectations claim existed and was known to it at that time, too.[1581] There is no concept of "constructive" or "deemed" expectations.[1582]

> (b)  *Specific commitments/undertakings/assurances and/or stabilization clauses*

1047. Regarding the requirement of specific commitments of stability of a host State or specific commitments to an investor, the Respondent submits that, "many investment treaty tribunals", including the tribunal in *SilverRidge*, have ruled that absent a stabilisation clause or a similar and specific undertaking by a host State, an investor does not have a legitimate expectation that a State will not exercise its sovereign

---

[1577]   RCMOMOJ, paras. 344-345.

[1578]   RROMROJ, para. 400; *Stadtwerke* (**RL-256**), para. 287.

[1579]   RCMOMOJ, paras. 345-346; RROMROJ, paras. 150ff; ROP III, p. 30; HT, D1, 7 June 2021, p. 275.

[1580]   RCMOMOJ, para. 369; *Total* (**CL-76**), paras, 41-42, 93, 145, 197; ROP III, p. 30.

[1581]   RROMROJ, paras. 391-393; ROP III, p. 32; HT, D1, 7 June 2021, pp. 276-277; RPHB, paras. 75, 113.

[1582]   ROP III, p. 30; HT, D1, 7 June 2021, p. 275.

prerogative to regulate, including its sovereign prerogative to alter the regulatory framework applicable, to adapt to the (evolving) needs of the market and to the public interest. This was the opinion of such tribunals even when an investor objectively believed to be able to rely on the stability of certain crucial factors of a regime.[1583]

1048. Quoting the tribunal in *Foresight Luxembourg Solar 1 S.à r.l. and others v. Spain*, the Respondent adds that where no stabilisation clause is in place "a host State has space to reasonably modify the legal or regulatory framework without breaching an investor's legitimate expectations of stability."[1584] "The only legitimate expectation that potentially may arise [in such a scenario] is that an incentives regime would not be fundamentally altered".[1585] This means that in the absence of a stabilisation clause, an investor bears the risk that an incentive scheme will be adjusted in case it overcompensates or overachieves its targets.[1586]

1049. As also determined by the tribunal in *RREEF*, relinquishing a State's right to regulate must be done explicitly and "cannot be assumed through an implicit declaration, diluted in general expressions."[1587] "The presumption that the State acts to preserve its right to regulate is strong and has been recognised by many investment tribunals".[1588] For a conclusion that a host State gave a legal guarantee "to maintain [an] incentive tariff, once awarded, in its full amount and duration, thus immunizing it against any following modifications … a stabilization or freezing clause" would be required as stated by the tribunal in *SilverRidge*.[1589]

---

[1583]    RCMOMOJ, paras. 355-357, 359, 412, fn 780; RROMROJ, paras. 385, 405, 422; ROP III, pp. 39, 43; HT, D1, 7 June 2021, p. 191; *Charanne B.V. & Constr. Invests. S.à.r.l. v. Kingdom of Spain*, SCC Arb. No. 062/2012, Award, 21 January 2016 (**CL-15**), paras. 499, 510; *Eiser* (**CL-21**), para. 362; *SilverRidge* (**RL-287**), paras. 415, 431, 436.

[1584]    RROMROJ, paras. 407, 410; ROP III, p. 39; *Foresight Lux. Solar 1 S.à.r.l. et al. v. Kingdom of Spain*, SCC Arb. No. 2015/150, Final Award, 14 November 2018 (**CL-43**), para. 356.

[1585]    RROMROJ, paras. 385, 410; HT, D1, 7 June 2021, p. 191.

[1586]    RPHB, para. 116.

[1587]    RROMROJ, paras. 406, 414, 529; ROP II, p. 5; ROP III, p. 40; RPHB, para. 41; *RREEF* (**CL-59**), para. 244.

[1588]    RROMROJ, para. 407; HT, D1, 7 June 2021, p. 279.

[1589]    RROMROJ, para. 412; ROP III, p. 41; HT, D1, 7 June 2021, p. 279; *SilverRidge* (**RL-287**), para. 435.

1050. In light of the above, and as held by the tribunal in *AES*, Article 10(1) ECT, and the reference to stable conditions therein, is also not a stabilisation clause.[1590] Any attempt to substitute the absence of a stabilisation clause by operation of the FET Obligation must thus fail.[1591] As put by the tribunal in *Blusun S.A. et al v. Italy,* "[i]nternational law does not make binding that which was not binding in the first place nor render perpetual what was temporary only".[1592]

1051. Interestingly, cases on which the Claimant relied in its submissions on the asserted lack of necessity of a specific commitment actually support the Respondent's views.[1593] The awards in *El Paso*, *Electrabel*, *Total*, and *Parkerings-Compagniet AS v. Lithuania* ("***Parkerings***"), for example, all require a specific commitment to, or agreement with, the investor, or a specific commitment of regulatory stability, in order for legitimate expectations of stability to arise.[1594] The tribunal in *Micula* treated the "Permanent Investor Certificates" at the heart of the case as a specific commitment that gave rise to legitimate expectations, and observed that holders of a PIC were promised compensation packages if a PIC were to be repealed.[1595]

1052. In any case, conduct and policy goals of a State or its government do not constitute a specific commitment that can serve as the basis for legitimate expectations.[1596] General laws do not give rise to implied promises of absolute stability either.[1597] "Oral statements made on promotional occasions are not sufficient" for proving that specific commitments are made.[1598]

---

[1590] RCMOMOJ, paras. 358-359, fn 780; *AES* (**CL-47**), paras. 9.3.29-9.3.30; Campbell Mclachlan *et al.*, *International Investment Arbitration: Substantive Principles* (2d ed. 2017) (**RL-230**), para. 7.162; Rudolf Dolzer, *Fair and Equitable Treatment: A Key Standard in Investment Treaties*, 39 INT'L LAW 87 (2005) (**RL-187**).

[1591] RROMROJ, para. 420.

[1592] RROMROJ, para. 407; *Blusun S.A. et al. v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016 (**CL-17**), para. 371.

[1593] RCMOMOJ, para. 360.

[1594] RCMOMOJ, paras. 360-362, 364; RROMROJ, paras. 418-419, 471; ROP III, p. 40; *El Paso* (**CL-79**); *Electrabel* (**RL-050**); *Total* (**CL-76**); *Parkerings* (**CL-91**).

[1595] RCMOMOJ, para. 363; RROMROJ, para. 409; *Micula* (**CL-10**).

[1596] RCMOMOJ, para. 386.

[1597] RROMROJ, para. 411.

[1598] RPO III, p. 36; *Eurus Energy Holding Corporation v. Kingdom of Spain,* ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, 17 March 2021 (**RL-286**), para. 322.

1053. "[A] number of investment treaty tribunals" have further confirmed that a specific commitment, or reasonable expectations regarding one aspect of a regulatory regime cannot be construed as to apply to all aspects of such a regime.[1599]

1054. The tribunal in *ESPF*, for example, held that Italy's undertakings regarding tariff rates for PV plants did not mean that Italy undertook not to impose administrative or balancing fees on those plants in the future.[1600] The tribunal in *Greentech* held that "repeated and precise assurances to specific investors … that [] tariffs would remain fixed for two decades" did not mean that several other measures which, according to the claimants in the case, amounted to an indirect tariff reduction, would violate the claimants' legitimate expectations.[1601] Finally, the *SunReserve* tribunal held that "[e]ven if one were to assume that Italy was under an obligation to maintain the incentive tariffs for a period of 20 years … this obligation cannot translate to a prohibition against imposition of any reasonable additional costs on the beneficiaries of the incentive tariffs."[1602]

1055. In addition, as put by the tribunal in *AES*, "any reasonably informed business person or investor knows that laws can evolve in accordance with the perceived political or policy dictates of the times."[1603] Indeed, an investor "must anticipate" that the legal environment could change and must structure its investment in order to be able to adapt to such changes.[1604]

### (c)    Cases against Spain

1056. As concerns the applicability of tribunal decisions against Spain about what can raise legitimate expectations, the Respondent disputes submissions of the Claimant that the ERSA Regime was far more robust than Spain's incentive regime and that therefore

---

[1599]    RCMOMOJ, para. 381.

[1600]    RCMOMOJ, para. 381; *ESPF* (**RL-266**), paras. 615-616.

[1601]    RCMOMOJ, para. 382; *Greentech* (**CL-48**), paras. 450, 536.

[1602]    RCMOMOJ, para. 383; *SunReserve* (**RL-262**), para. 880.

[1603]    RCMOMOJ, paras. 358, 411; *AES* (**CL-47**), para. 9.3.34; see also *Parkerings* (**CL-91**), para. 332.

[1604]    Quoting the tribunal in *Parkerings*. RCMOMOJ, paras. 364, 412; RROMROJ, para. 411; *Parkerings* (**CL-91**), para. 333.

tribunal decisions discussing Spain's renewable energy sector will be helpful for deciding the present dispute.[1605]

1057. This is because, for example, in Spain, FiTs were established by a Royal Decree and said decree provided expressly that the chosen FiT would not be changed by subsequent legislation, while in Bulgaria, the EWRC set the FiT and had no authority to give, and did not give, any guarantees of stability to investors.[1606]

1058. Spain's approval and licensure process for PV plants also was not less intense or interactive than the Bulgarian one (and, again, ACWA Bulgaria did not follow the requisite process anyhow (see above)).[1607]

1059. Finally, while Spain (i) departed from promises of stability expressly given in law, (ii) reversed its position for existing plants, (iii) materially reduced the price Spanish PV producers received for their electricity, and (iv) "clawed back" remuneration already received, Bulgaria maintained the FiT at the same level until it was replaced by a FiP that replicated the same level of remuneration and allowed the Karad Plant to be profitable at all times.[1608]

1060. In any event, "at least five" ECT tribunals concluded that the Spanish FiT regime did not create a legitimate expectation that Spain's regulatory framework regarding renewable energy would remain unchanged.[1609] As an example, the tribunal in *The PV Investors v. Spain* observed (regarding the Spanish commitment in the above-mentioned Royal Decree not to apply revisions to existing installations):[1610]

It is correct that Article 44.3 states that certain revisions that may occur in the future under that decree would not affect existing installations. However, that

---

[1605]   RCMOMOJ, para. 391.

[1606]   RCMOMOJ, paras. 391, 436; RROMROJ, para. 421.

[1607]   RCMOMOJ, para. 392.

[1608]   RCMOMOJ, para. 393; RROMROJ, para. 421.

[1609]   RCMOMOJ, para. 394; *RREEF* (**CL-59**); *BayWa r.e. Renewable Energie GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (**RL-255**); *PV Investors v. The Kingdom of Spain*, PCA Case No. 2012-14, Award of 28 February 2020 (**RL-260**); *Hydro* (**RL-261**); *Cavalum SGPS, S.A. v. Kingdom of Spain*, ICSID Case No. ARB/15/34, Decision on Jurisdiction, Liability and Directions on Quantum, 31 August 2020 (**RL-265**) ("*Cavalum*").

[1610]   RCMOMOJ, para. 394; *PV Investors. v. The Kingdom of Spain*, PCA Case No. 2012-14, Award of 28 February 2020 (**RL-260**), paras. 601-602 (text from the original source is cited more extensively than in Respondent's excerpt at para. 394 RCMOMOJ).

mere statement in and of itself does not make of Article 44.3 a stabilization commitment according to which the State guaranteed that future legislative or regulatory change would not affect the investment. Moreover, Article 44.3 cannot be read in isolation but must be viewed in the context of the entirety of the Spanish regulatory framework.

[A]s is evident from the changes which occurred since the inception of the Special Regime in 1997, the regulatory framework was subject to continuous changes aimed at adapting it to the constantly evolving technological and economic circumstances. This propensity for change should have been clear to any reasonable operator investing in this sector.

1061. Notable *in casu* then is that, similarly to what the *PV Investors* tribunal found relevant in the case of Spain, at the time of the Investment, Bulgaria had already adopted its second act concerning renewable energy, namely the ERSA, which had followed RAESBA.[1611]

### (d)    Cases against Italy

1062. As concerns cases against Italy, the Respondent submits that when ECT tribunals dealt with an administrative fee of EUR 1.20-2.20 per kW raised in Italy, they found that, in the view of the Respondent, much like the 5% ESSF Contribution and the 20% Levy,[1612] the Italian fee did not "impinge" upon investor's legitimate expectations because it was a foreseeable measure and not a direct reduction of the incentive tariff, and because no specific promises were made regarding the charges.[1613]

1063. In addition, regarding balancing charges levied in Italy which are similar to those adopted in Bulgaria, ECT tribunals held that such charges did not violate the FET Obligation because the measures were foreseeable and because "absent a specific promise to the contrary, the claimants could not have legitimately expected that additional reasonable charges would not be imposed" on them.[1614]

### (e)    Cases against the Czech Republic

1064. As concerns cases against the Czech Republic: where claims against a 26% levy on revenues generated by PV power plants were not dismissed on jurisdictional grounds as

---

[1611]    RCMOMOJ, para. 395.

[1612]    RCMOMOJ, para. 442.

[1613]    RCMOMOJ, para. 441; *Greentech* (**CL-48**); *ESPF* (**RL-266**).

[1614]    RCMOMOJ, para. 443; *Greentech* (**CL-48**), *SunReserve* (**RL-262**); *ESPF* (**RL-266**).

concerning a Taxation Measure, such claims were rejected on the merits because (i) the levy should have been expected,[1615] (ii) was "part of the exercise of the Respondent's sovereign right to regulate tariffs",[1616] and (iii) was an expression of the Czech Republic's "rational objective of reducing excessive profits and sheltering consumers from electricity price rises".[1617]

1065.   Regarding in particular the *Antaris* case, what the Claimant describes as differences between the situation in Bulgaria and the situation described in the *Antaris* case, are actually similarities: there were public warnings about cost increases caused by the boom before the date of the Investment and the Shareholders observed that investors were rushing in to take advantage of falling PV panel prices, and nevertheless the Claimant "piled in" into the bubble.[1618] Indeed, the Claimant's attempts to declare cases against the Czech Republic inapposite since in Bulgaria no solar boom like the Czech boom would have happened must fail because the boom in Bulgaria was highly comparable to the one in the Czech Republic.[1619]

<p style="text-align:center"><em>(f)     Legitimate expectations of a "reasonable return"</em></p>

1066.   The Respondent submits that "numerous tribunals and arbitrators in RES cases" came to the conclusion that in the absence of a stabilisation clause or a specific commitment that a regulatory regime would not change, the most an investor could expect is that its plant would be allowed to earn a reasonable rate of return.[1620]

1067.   According to the findings of the majority of the tribunal in *Cavalum SGPS S.A. v. Spain* and the tribunal in *RREEF*, the cornerstone of the Spanish incentive regime, and the only relevant and legitimate expectation an investor could have had, was the "reasonable rate of return" as calculated by the Spanish law as a "project IRR", not taking into account any premiums an investor might have paid.[1621] Similarly, the tribunal in *Total*

---

[1615]   RCMOMOJ, para. 440; *Antaris* (**RL-236**), para. 425.

[1616]   RCMOMOJ, para. 440; *Voltaic Network* (**RL-248**), para. 491.

[1617]   RCMOMOJ, para. 440; *Antaris* (**RL- 236**), para. 444.

[1618]   RROMROJ, para. 111.

[1619]   RROMROJ, para. 473.

[1620]   RCMOMOJ, paras. 405, 407; RROMROJ, para. 446; RPHB, para. 121.

[1621]   RCMOMOJ, para. 405; RROMROJ, para. 446; *Cavalum* (**RL-265**), para. 601; *RREEF* (**CL-59**), paras. 386, 545-546.

held that the fair and equitable standard was breached by setting prices that did not allow a reasonable profit to be made.[1622]

1068. In that regard, it is not a distinguishing factor between the cases against Spain and cases against Bulgaria that under the Spanish incentive regime it had been clearly communicated to investors that a reasonable return was the only guarantee on which investors could rely. Also in Bulgaria it was made clear at all times that, in line with EU law, the system was designed to permit a reasonable rate of return only.[1623]

1069. Finally, the Claimant's argument that any notion of reasonable return cannot override the specific commitments of the ERSA must fail. There are no stabilisation commitments in the ERSA, and, if there were, the obligation of limiting returns to the minimum necessary, as deriving from EU law obligations of Bulgaria, *i.e.* deriving from its treaty obligations under international law, would take precedence over such conflicting national legislation.[1624]

<div align="center">(2)    Fundamentally altering the investment framework</div>

1070. As a principal matter, the Respondent disputes that Article 10(1) ECT includes an autonomous obligation for a host State to avoid fundamental changes to an investment framework, or an autonomous obligation to promote and create stable and transparent conditions for making investments, to be analysed independently from the obligation to respect an investor's legitimate expectations.[1625]

1071. In any case, a high threshold is required for a showing that a measure introduced by Bulgaria would constitute a failure to provide a stable regulatory framework.[1626]

1072. Indeed, as also confirmed by the Spanish solar cases, where there is no stabilisation clause or another undertaking of legal stabilisation, the FET Obligation is observed "unless the modification to the applicable legal framework is drastic, radical, or

---

[1622]    RROMROJ, para. 419; *Total* (**CL-76**), para. 333.

[1623]    RROMROJ, para. 447.

[1624]    *Ibid*.

[1625]    RCMOMOJ, para. 411; RROMROJ, para. 431.

[1626]    RCMOMOJ, para. 418.

otherwise seriously improper", or fundamental, *e.g.*, paraphrasing the tribunal in *Antin*, by stripping a regime of its key features.[1627]

1073.   When applying said high standard, it is important to recall, as set out above already, that investors must expect that legislation will change and that States have a right to modify their regulatory regimes to adapt to changing circumstances,[1628] in any case in a fair, consistent, and predictable way.[1629] Notably, any measure that in re-balancing the system seeks to allow plants to earn a reasonable return, follows and will need to be considered to follow an overall legitimate public policy.[1630]

1074.   Against that background, whether a measure or set of measures represents a fundamental or radical alteration is determined by three factors, to be approached with high deference in light of a State's right to regulate: (i) whether the measures had a public purpose, (ii) whether the measures were foreseeable, and (iii) whether the measures were proportionate in the sense of not exceeding what was necessary.[1631]

1075.   "Provided that there is an appropriate correlation between the policy sought by the State and the measure, the decision by a State may be reasonable under the ECT's FET standard, even if others can disagree with that decision. A State can thus be mistaken without being unreasonable".[1632]

1076.   Similarly, as stated by the tribunal in *SilverRidge*: "it is not for the Tribunal to decide whether the host State made the right choice in selecting and prioritizing public policy objectives, but rather to determine whether the reasons relied upon by the host State in order to justify its conduct are, under the circumstances, plausible public policy objectives."[1633] In that regard, the intentions behind a measure are relevant in assessing

---

[1627]   RCMOMOJ, para. 412; RROMROJ, para. 432; ROP III, pp. 45ff; HT, D1, 7 June 2021, p. 280; RPHB, para. 114; *Antin* (**CL-40**), para. 532.

[1628]   RCMOMOJ, para. 412.

[1629]   RROMROJ, para. 432.

[1630]   RROMROJ, para. 436.

[1631]   RROMROJ, paras. 433-434; ROP III, pp. 43-45; HT, D1, 7 June 2021, pp. 280-281; RPHB, para. 105; relying on *SilverRidge* (**RL-287**), paras. 415, 419, 421, 446.

[1632]   RROMROJ, paras. 434, 461; ROP III, p. 44; quoting *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015 (**CL-12**), para. 179.

[1633]   RROMROJ, paras. 438, 452, 461; ROP III, p. 47; *SilverRidge* (**RL-287**), para. 450.

whether the measure drew on a public policy purpose, *i.e.* was reasonable.[1634] In any case, the ECT does not guarantee stability in the allocation of risks.[1635]

1077.   Finally, it is noticeable that the Claimant's argument regarding the fundamental alteration of the investment framework particularly concerns the introduction of the Annual Production Cap. However, the case law relied upon by the Claimant for that aspect of its case confirms that a production cap like the APC does not constitute a fundamental change to a renewable energy regulatory framework.[1636] The production cap introduced in Spain, referred to by the Claimant, for example, was part of an earlier round of legislative reforms in Spain which, according to the tribunals in *Cube*, *Eiser*, *Novenergia,* and *Charanne B.V. & Constr. Invests. S.à r.l. v. Spain*, unlike later legislative changes, did not yet amount to violations of Article 10 ECT.[1637] As, for example, described by the tribunal in *Cube*:

> [W]hile the cap introduced by RDL 14/2010 on the number of operating hours for which PV facilities were entitled to fixed tariffs undoubtedly affected their profitability, the Tribunal considers it to be a measure within the range of adjustments that a reasonable investor must be prepared to accept and accommodate. The Tribunal considers that it, too, was not a violation of Article 10 ECT.[1638]

(3)    Inconsistent and non-transparent treatment

1078.   The Respondent acknowledges that the requirement of transparency is incorporated into the FET Obligation,[1639] but appears to disagree with the Claimant as to whether a claim based on a lack of transparency or consistency of a measure is a stand-alone claim or can only be part of one and the same FET claim.[1640] In the view of the Respondent, the Claimant's transparency claim is, in any case, not distinct from its legitimate expectation claim.[1641]

---

[1634]    RPHB, para. 119.

[1635]    RROMROJ, paras. 223, 448.

[1636]    RCMOMOJ, paras. 414, 435-436; nor a violation of the Claimant's legitimate expectations, see paras. 346, 435.

[1637]    RCMOMOJ, paras. 414-416, 435-436; RROMROJ, para. 455.

[1638]    RCMOMOJ, para. 414; RROMROJ, para. 458; *Cube* (**CL-148**), para. 420.

[1639]    RCMOMOJ, para. 420; RROMROJ, para. 484.

[1640]    RROMROJ, para. 484.

[1641]    RROMROJ, para. 486.

*(a)    Lack of transparency*

1079. The Respondent is of the opinion that, as decisions of ECT tribunals would indicate, "there is a high threshold to establish a breach of the ECT's obligation to accord fair and equitable treatment on the basis of a lack of transparency."[1642] As put by the tribunal in *Stadtwerke*: "a finding of lack of transparency sufficient to constitute a violation of Article 10(1) of the ECT must be manifested in a continuing pattern of non-transparent actions by a government over time."[1643]

1080. Indeed, a number of tribunals have concluded that measures rolling back incentives for the PV sector adopted by other States did not cross the above-mentioned high threshold.[1644] The tribunal in *RWE*, for example, concluded that Spain was "*bona fide* adopting urgent measures" and the tribunal in *Voltaic Network* concluded that in light of "obvious and transparent need" for the Czech regime to be changed, and a "dramatic increase of PV plant grid connections", "the Czech Republic was as transparent as it could have been in the circumstances".[1645] The Respondent in that regard disputes, once more, the Claimant's submission that Bulgaria did not encounter the same boom and problems as the Czech Republic or Spain.[1646]

1081. Contrary to submissions of the Claimant, and as furthermore confirmed by comments of the tribunal in *RWE*,[1647] the transparency standard of Article 10(1) ECT also does not require the absence of any ambiguity or opacity in the treatment of investments.[1648]

---

[1642]    RCMOMOJ, para. 420.

[1643]    RCMOMOJ, para. 420, 425; *RWE* (**RL-257**), para. 661.

[1644]    RCMOMOJ, paras. 421ff.

[1645]    RCMOMOJ, paras. 421-422; RROMROJ, para. 487; *RWE* (**RL-257**), para. 661; *Voltaic Network* (**RL-248**), para. 543.

[1646]    RROMROJ, para. 487.

[1647]    RCMOMOJ, para. 423; *RWE* (**RL-257**), para. 660. The Respondent also incorrectly submits that *RWE* would have been the sole source that the Claimant relied on when making the statement. From para. 330 CMOM, it appears that the Claimant relied on Rudolf Dolzer & Christoph Schreuer, Principles of International Investment Law (2nd ed. 2012) (**CL-89**), which, in turn, quoted the exact words from the decision in *Tecmed*.

[1648]    RCMOMOJ, para. 423.

1082. It is also unfounded when the Claimant submits that the transparency standard of Article 10(1) ECT would require that investors be informed of decisions before they are imposed.[1649]

1083. Finally, the Claimant's references to *Frontier Petroleum Services Ltd v. Czech Republic*, *Electrabel*, and *Micula* are also inapposite for various reasons.[1650] Contrary to the Claimant's reliance on such concepts, it is irrelevant whether conditions of an investment were readily apparent, or capable of being readily known, if it is foreseeable that a measure will have to be introduced, as is the case here.[1651]

   *(b) Lack of consistency*

1084. Regarding an alleged requirement of consistency, the Respondent argues that, in any case, such a requirement does not mean that States are prohibited from changing existing policies or regulatory frameworks.[1652]

1085. The case law the Claimant refers to to bolster its consistency claim is furthermore of no help to it.[1653] The reference to *Greentech*, in particular, fails, because unlike Italy, Bulgaria did not enter into contractual undertakings with the Claimant or its Investment.[1654] The tribunal in *Greentech* also found no violation of consistency obligations regarding Italy's administrative fee and balancing charges, because those measures were foreseeable and did not breach any promises.[1655]

   *b. Unreasonable Impairment*

1086. Relying on case law, the Respondent submits that the obligation not to impair highly overlaps with the FET Obligation and that, in the words of the tribunal in *Isolux Infrastructure Netherlands B.V. v. Spain* ("**Isolux**") quoting the tribunal in *Saluka,* a violation of either obligation does not differ substantially from a violation of the other.

---

[1649] RCMOMOJ, para. 424.

[1650] RCMOMOJ, para. 426; RROMROJ, paras. 491-493.

[1651] RROMROJ, para. 489.

[1652] RCMOMOJ, para. 427; RROMROJ, para. 494.

[1653] RCMOMOJ, paras. 427-429; RROMROJ, para. 495.

[1654] RCMOMOJ, para. 429; RROMROJ, para. 495; *Greentech* (**CL-48**), para. 458 (although the *Greentech* majority does not specifically highlight the contractual undertakings there. It only mentions them together with the other sources of the conditions of the regime).

[1655] RROMROJ, para. 495.

"The non-impairment requirement merely identifies more specific effects of any such violation".[1656] As put by the tribunal in *SunReserve* "[t]he standard of 'reasonableness' has no different meaning in this context than in the context of the 'fair and equitable treatment' standard with which it is associated; and the same is true with regard to the standard of 'non-discrimination.'"[1657] Indeed, not one ECT tribunal found a breach of the Impairment Clause where a breach of the FET Obligation was not established.[1658]

1087. As per the applicable standard, the Respondent submits that, in line with what "numerous tribunals" have ruled, in order to violate the Impairment Clause, a measure in question must be (i) unreasonable, meaning "irrational, arbitrary, capricious, [or] based on prejudice", or (ii) discriminatory without rational justification, and (iii) the resulting impairment must be significant.[1659]

(1)    Unreasonable measures

1088. The threshold to establish unreasonableness is high and requires proof, the Respondent argues.[1660]

1089. It is notable as an illustration of the requirements that the tribunal in *LG&E*, for example, found no breach because the measures in dispute were the result of reasoned judgment and were introduced after a rational decision-making process took place.[1661] The tribunal in *Saluka* concluded that "[t]he standard of 'reasonableness' therefore requires, in this context as well, a showing that the State's conduct bears a reasonable relationship to some rational policy."[1662] What is more, the process leading to a measure counts in the evaluation of its reasonableness. It does, however, not count whether the measure

---

[1656]    RCMOMOJ, para. 445; RROMROJ, para. 497; ROP III, p. 52; *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, SCC Case No. V2013/153, Award, 12 July 2016 (**RL-229**) ("*Isolux*"), para. 822, quoting *Saluka* (**CL-81**), para. 461.

[1657]    RCMOMOJ, para. 445, fn 966; RROMROJ, para. 497; *SunReserve* (**RL-262**), para. 947, quoting *Saluka* (**CL-81**), para. 460.

[1658]    ROP II, p. 52; HT, D1, 7 June 2021, p. 283.

[1659]    RCMOMOJ, paras. 446, 451-452; RROMROJ, paras. 497, 503, 512; ROP III, pp. 53, 61; HT, D1, 7 June 2021, pp. 283-287; *SunReserve* (**RL-262**), paras. 947-948; *Plama Consortium Ltd. v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008 (**RL-102**), para. 184; *RWE* (**RL-257**), para. 647.

[1660]    RROMROJ, para. 503; ROP III, p. 53.

[1661]    RCMOMOJ, para. 449; *LG&E* (**CL-94**), paras. 158-163.

[1662]    RCMOMOJ, para. 452; RROMROJ, para. 503; ROP III, p. 53; *Saluka* (**CL-81**), para. 460.

ultimately chosen represents the best option available. The Impairment Clause does also not require that a State choose perfectly,[1663] or that a tribunal "second-guess the good faith exercise of a State's regulatory discretion".[1664]

1090.   Finally, as confirmed by the tribunal in *WA Investments-Europa Nova Limited v. Czech Republic*: where an investment has earned a reasonable return notwithstanding allegedly wrongful measures, that is a strong indicator that the measures in dispute were not unreasonable in the sense of Article 10(1) ECT.[1665]

(2)     Discriminatory measures

1091.   The Respondent submits that "[a] measure is discriminatory when similar entities are treated unequally without rational justification",[1666] and quotes the holding of the tribunals in *Saluka* and *SunReserve* that "the standard of 'non-discrimination' requires a rational justification of any differential treatment of a foreign investor."[1667]

1092.   In line therewith, a State "may treat different sectors or sub-sectors of the economy differently when there is a rational justification for doing so."[1668] As observed by the tribunal in *SunReserve*: the standard of non-discrimination under the Impairment Clause is not satisfied by "[t]reating photovoltaic energy differently from other renewable or traditional energy sources".[1669]

(3)     Degree of impairment

1093.   The Respondent submits that the cases on which the Claimant relies to show that the impairment need not be significant in order to establish a violation of the Impairment Clause, such as *Greentech* and *ESPF*, do not support its argument. The tribunals in those

---

[1663]   RCMOMOJ, para. 457.

[1664]   RROMROJ, para. 507.

[1665]   RCMOMOJ, para. 458; *WA Investments-Europa Nova Limited (Cyprus) v. The Government of the Czech Republic*, PCA Case No, 2014-19, Award, 15 May 2019 (**RL-249**), para. 687.

[1666]   RCMOMOJ, para. 459; RROMROJ, paras. 509, 512; ROP III, p. 55; HT, D1, 7 June 2021, p. 284.

[1667]   RCMOMOJ, para. 459, fn 995; RROMROJ, para. 509; ROP III, p. 55; *SunReserve* (**RL-262**), paras. 947, 955; *Saluka* (**CL-81**), para. 460.

[1668]   RCMOMOJ, para. 459; RROMROJ, paras. 509, 512-513; ROP III, pp. 57, 58; HT, D1, 7 June 2021, p. 284; RPHB, para. 120, fn 344.

[1669]   RCMOMOJ, para. 459; RROMROJ, para. 509; ROP III, pp. 57-60; *SunReserve* (**RL-262**), para. 955; HT, D1, 7 June 2021, pp. 285-286; RPHB, para. 120, fn 344.

cases either refrain from making a finding on the requirement of "significance", or expressly underline the high threshold to find a breach of the Impairment Clause.[1670]

1094. In any case, the decisions upon which the Claimant seeks to rely observe that a measure that is not unreasonable or discriminatory beyond the magnitude, or the mere fact, of its impact, cannot breach the ECT.[1671]

1095. The Claimant's submission that when finding whether the requisite impact on an investment is present, only a low threshold must be overcome, is thus incorrect.[1672]

### c.    The Umbrella Clause

1096. According to the Respondent, the Claimant is wrong when it argues that the Umbrella Clause encompasses legislative or regulatory undertakings and contractual obligations.[1673]

1097. A textual analysis of the Umbrella Clause, and specifically an interpretation of the term "entered into with", "*contracter*" in French, "*contraer*" in Spanish, must lead to the conclusion that only "contracted" obligations, *i.e.* obligations established by contract, are covered by the Umbrella Clause, and only obligations entered into with the investor or the investment, not obligations "with respect to" the investment.[1674] This is also the interpretation given to the clause by the Energy Charter Secretariat's "Reader's Guide" which states that Article 10(1) ECT covers "any contract" with the investor or its subsidiary.[1675]

1098. "Enter into with", by definition, does not include obligations stemming from laws and regulations since laws and regulations are not entered into with an investor or its investment.[1676] Even if laws could include obligations, a law or a regulation that is applicable to all investors or companies within a particular sector, foreign and national

---

[1670] RCMOMOJ, para. 447, fn 969; RROMROJ, paras. 498-501.

[1671] RROMROJ, paras. 499-500.

[1672] RCMOMOJ, para. 448.

[1673] RCMOMOJ, para. 464.

[1674] RCMOMOJ, paras. 464-465; RROMROJ, paras. 516, 519-520, 522-526; ROP III, pp. 63-64; HT, D1, 7 June 2021, pp. 287-288.

[1675] RROMROJ, para. 531; ROP III, p. 64; Energy Charter Treaty Secretariat 'The Energy Charter Treaty: a Reader's Guide', 2002 (**RL-326**), p. 26.

[1676] RMCOMOJ, para. 464; RROMROJ, para. 516.

investors alike, can, in any case, not be equated to an obligation Bulgaria specifically entered into with the Claimant and/or its Investment.[1677]

1099. The Claimant's reading of the Umbrella Clause furthermore disregards the word "with" and the text that follows that word in the Umbrella Clause. Such a reading is contrary to fundamental principles of interpretation requiring the Tribunal to give meaning to the entire treaty provision, not merely a part of it.[1678]

1100. The object and purpose of the ECT, which is to balance the sovereign rights over energy resources with the creation of a favourable investment climate, does also not stand in the way of this interpretation, nor could it, because where the wording of a clause is clear, the object and purpose of a treaty may not be taken into account in the interpretation thereof.[1679]

1101. Should the Tribunal nevertheless see any ambiguity in the Umbrella Clause, then the Tribunal should adhere to the principle of *in dubio mitius* and prefer the interpretation which is less onerous to the party assuming an obligation and which interferes less with the respective State's sovereignty.[1680]

1102. The Respondent's view is supported by many investment treaty tribunals, for example, the tribunal in *Novenergia* which stated:[1681]

> [T]he application of the umbrella clauses requires that the host State either concluded with the investor a specific contract or made to the investor a specific personal promise. On the contrary, in the instant case the Claimant made no contract with the Kingdom of Spain and the rights that the Claimant invoke are founded in general regulatory acts enacted by the Kingdom of Spain for a generality of investors in the field of renewable energy. They cannot therefore be equated with the kind of *ad personam* commitments that traditionally fall under the coverage of an umbrella clause.

---

[1677]    RCMOMOJ, paras. 472-473, 539; ROP III, p. 66; HT, D1, 7 June 2021, pp. 288-289.

[1678]    RROMROJ, paras. 518-520; ROP III, p. 63.

[1679]    RROMROJ, paras. 527-528; *cf.* RROMROJ, para. 406.

[1680]    RROMROJ, para. 530.

[1681]    RCMOMOJ, paras. 465-466, 472, 474, fn 1015; RROMROJ, para. 532; ROP III, p. 65; *Novenergia* (**CL-23**), para. 715 (Text from the original source is cited more extensively than in the Respondent's excerpt); *Foresight Lux. Solar 1 S.à.r.l. et al. v. Kingdom of Spain*, SCC Arb. No. 2015/150, Final Award, 14 November 2018 (**CL-43**), para. 58.

1103. The tribunal in *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Spain* stated:[1682]

> In the Tribunal's view, the umbrella clause in the last sentence of Article 10.1 of the ECT only applies to obligations specifically entered into by the host State with the investor or the investment. The paradigm case is an obligation under an investment contract duly entered into. By contrast the Tribunal does not accept that obligations arising under the general law, including legislation, of the host State, fall within the scope of the clause. When enacting legislation, the State establishes binding rules of conduct, but it does not make specific promises to each person entitled to claim under the law, nor does it enter into obligations to specific investors or their investments even when these entities are numbered among the beneficiaries of the law. A general law is not a promise.

1104. The Claimant, however, does not properly engage with the many decisions that follow the Respondent's interpretation, and as such the Claimant's reasons to dismiss these decisions as flawed are not persuasive.[1683]

1105. On the other hand, the case law on which the Claimant itself relies in its interpretation of the Umbrella Clause does not actually support the Claimant's position.[1684] The tribunal in *Mohammad Ammar Al-Bahloul v. Tajikistan*, mindful of the narrow view of the ICSID Ad Hoc Committee when annulling the decision in *CMS Gas Transmission Company v. Argentina*, actually concluded that the Umbrella Clause "does not refer to general obligations of the State arising as a matter of law."[1685] The tribunals in *Amto* and *Plama* did not reach the issue since the claim either was limited to contractual obligations or the obligations were alleged to have been undertaken by a separate legal entity.[1686] The award in *Khan Resources* is not relevant because the respondent in that case had failed to oppose the claimant's interpretation of the Umbrella Clause and the non-ECT cases relied upon by the Claimant are inapposite because they concern more broadly formulated umbrella clauses.[1687]

---

[1682] RCMOMOJ, para. 472; RROMROJ, para. 539; ROP III, p. 66; *BayWa r.e. Renewable Energie GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (**RL-255**), para. 442 (Text from the original source is cited more extensively than in the Respondent's excerpt).

[1683] RROMROJ, para. 533.

[1684] RCMOMOJ, paras. 467ff.

[1685] RCMOMOJ, para. 467, *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan*, SCC Case No. V (064/2008), Partial Award on Jurisdiction and Liability, 2 September 2009 (**CL-86**), para. 257.

[1686] RCMOMOJ, para. 468; RROMROJ, para. 535.

[1687] RCMOMOJ, para. 470; RROMROJ, paras. 535-536; ROP III, pp. 63-65.

1106.   The awards in *ESPF* and *Greentech*, and especially their approach of taking instruments together to determine whether together they form an obligation covered by the Umbrella Clause, are, in the words of the tribunal in *SilverRidge*, not in line with "the thrust of the existing arbitral decisions on the matter".[1688] At any rate, a "series of cases" against Italy found that certain GSE conventions did not give rise to autonomous obligations that could form the basis of a claim under the Umbrella Clause.[1689]

1107.   The situation in Bulgaria also differs from the circumstances in Italy that gave rise to the majority's finding in *Greentech* that the Umbrella Clause was breached by Italy.[1690] Italy directly reduced specific tariff rates that it had set for a fixed duration before, while Bulgaria never reduced the FiT.[1691]

1108.   In any case, the tribunal in *Greentech* denied a finding of a breach of the Umbrella Clause as to measures the imposition of which was not directly excluded, but could have only impliedly been excluded, in the obligations and undertakings relevant for the Umbrella Clause. That means that it denied a finding of a breach for measures that did not directly reduce the applicable FiT, *i.e.*, for example, administrative fees or balancing costs.[1692] This is relevant because the introduction of the Seven Measures was not expressly excluded in any of the documents that the Claimant relies on for its Umbrella Clause claim.[1693]

1109.   The fact that Article 26(3)(c) ECT provides for an opt-out of which a few Contracting Parties made use, contrary to what the Claimant submits, does not underline the broad scope of the Umbrella Clause. Indeed, if the Umbrella Clause were as broad as the Claimant contends, none of the Contracting Parties would have agreed to it.[1694]

1110.   Finally, questions as to (i) whether an obligation was entered into, (ii) by whom and with whom it was entered into, and (iii) the content of any such obligation must be answered by reference to the law applicable to the obligation – typically be the law of

---

[1688]   RROMROJ, paras. 535, 548; ROP III, p. 81; *SilverRidge* (**RL-287**), para. 383.

[1689]   RROMROJ, paras. 545-546.

[1690]   RCMOMOJ, para. 481.

[1691]   RCMOMOJ, para. 481; RROMROJ, para. 549.

[1692]   RCMOMOJ, para. 481; RROMROJ, paras. 549-550.

[1693]   RCMOMOJ, para. 481.

[1694]   RROMROJ, para. 537.

the host State.[1695] That primarily excludes a reference to the international legal rules on State responsibility, in particular when it comes to the question of attribution of an obligation to the State itself.[1696] Based thereon, with regards to the FiT Decision, the License, and the Karad PPA, *i.e.* instruments governed by Bulgarian law, the above-mentioned questions must be answered by reference to that law.[1697]

### 19.    The Respondent's alleged violations of the ECT and applicable rules and principles of international law

#### a.    FET

1111.   The Respondent submits that an assessment of the record of the case leads to the conclusion that the Respondent has not failed to accord FET to the Investment of the Claimant.[1698]

##### (1)    Violating the Claimant's legitimate expectation

1112.   The Claimant's claim that it held legitimate expectations, induced and then not honoured by the Respondent in violation of Article 10(1) ECT, must fail on the basis of the facts and the applicable (State aid) law as outlined above, in particular because (i) it was not reasonably possible to have held the alleged expectations, and (ii) because of the total lack of evidence regarding the expectations that the Claimant, and, if relevant, its Shareholders allegedly held and relied on before and in their decision to invest in the Karad Plant.[1699] The Claimant cannot have legitimately expected that the ERSA Regime would remain static for at least 20 years.[1700]

1113.   As outlined above, neither the ERSA, nor the Karad PPA, nor the License, nor the FiT Decision, nor any statements of Bulgarian government officials, alone or together, contained a specific commitment to the Claimant or a specific commitment to stabilise the ERSA Regime which could be interpreted as a guarantee, or a sufficient basis for

---

[1695]    RCMOMOJ, para. 476; RROMROJ, para. 541.

[1696]    RCMOMOJ, para. 476.

[1697]    RCMOMOJ, para. 477; RROMROJ, para. 541.

[1698]    RCMOMOJ, para. 338.

[1699]    RCMOMOJ, paras. 346-354, 386-390, 397-403; RROMROJ, paras. 151, 171, 387, 390, 404; ROP II, p. 53; ROP III, p. 29; HT, D1, 7 June 2021, pp. 220-221, 274-275; RPHB, paras. 75, 113.

[1700]    RCMOMOJ, para. 355.

the Claimant reasonably and legitimately to expect that the ERSA Regime would not change or that (i) full offtake would take place, above the licensed capacity, (ii) at the FiT, (iii) over the term of 20 years.[1701]

1114. It is established that in the absence of a stabilisation clause, the adoption of the Seven Measures was foreseeable for a reasonable investor.[1702]

1115. In addition, even if some aspects of the ERSA Regime were to be interpreted as a specific commitment to the Claimant that it would receive a FiT of BGN 485.60 over 20 years, then still this could not be interpreted as a guarantee regarding the other aspects of its scheme, *e.g.* that no fees or balancing charges would be imposed, or as a blanket guarantee of regulatory stability.[1703] In any case, Bulgaria never directly reduced the FiT and the Claimant conceded as much.[1704]

1116. The indirect equivalent effect of reduction of the Seven Measures on the FiT also did not exceed 7.4% (later corrected to 9.8%) well in line with what was found reasonable in, *e.g. SilverRidge*.[1705]

1117. In conclusion, in light of Bulgarian law and the ERSA Regime, and EU law, in the absence of a stabilisation clause or a specific commitment to the Claimant, the most that the Claimant could have reasonably expected at the time of its investment was that its plant would be allowed to earn a reasonable return on efficient project development and operating costs commensurate with the Karad Plant's cost of capital – which it did –[1706] and that the ERSA Regime would not be fundamentally or radically altered – which it was not, not least because the ERSA Regime continued to allow the Claimant to earn a reasonable return.[1707]

---

[1701]  RCMOMOJ, paras. 365-379; RROMROJ, para. 210.

[1702]  RROMROJ, para. 439; ROP III, pp. 48-49.

[1703]  RCMOMOJ, paras. 381, 385.

[1704]  RCMOMJ, para. 384; RPHB, para. 108.

[1705]  RROMROJ, paras. 386, 449, 557; ROP II, p. 93; HT, D1, 7 June 2021, p. 246; RPHB, paras. 103, 129; Oxera II, para. 7.113, Table 7.1; Oxera IV, para. 1.11.

[1706]  RCMOMOJ, para. 404-405; RROMROJ, paras. 10-14, 423, 483; ROP IV, pp. 6-7; HT, D1, 7 June 2021, p. 298; RPHB, para. 121.

[1707]  RROMROJ, paras. 385-386, 418, 429, 431; ROP III, pp. 45-46; HT, D1, 7 June 2021, p. 191.

1118.  In light thereof, the Claimant's legitimate-expectations claim must be rejected.[1708]

(2)    Fundamentally altering the investment framework

1119.  The Claimant's claim that Bulgaria eliminated essential characteristics of its investment framework and, in doing so, fundamentally altered said framework and failed to provide a stable regulatory framework in violation of Article 10(1) ECT, is baseless.[1709]

1120.  In contrast with the effects of the measures adopted by Spain on the Spanish incentive scheme, neither the Annual Production Cap, nor any other of the Seven Measures together, or individually, "stripped away the key features" of the ERSA Regime, or drastically and abruptly revised the ERSA Regime in a way that destroyed the value of the Investment, or in any other way crossed the high threshold required for a showing that Bulgaria's changes to the ERSA Regime constituted a failure to provide a stable regulatory framework.[1710] Rather, Bulgaria's measures were entirely foreseeable and proportionate, and, in the words of the tribunal in *Cube*, "within the range of adjustments that a reasonable investor must be prepared to accept and accommodate."[1711]

1121.  The ERSA Regime continued to allow the Claimant to earn a reasonable return after the Seven Measures were introduced and, therefore, it cannot be deemed to have been fundamentally changed or radically altered,[1712] and it must also be deemed to have followed overall legitimate public policy goals.[1713]

1122.  The APC, in particular, did not fundamentally or radically change the ERSA Regime and, while irrelevant for the determination of a breach of the ECT, the APC also did not fundamentally change the allocation of risk of the ERSA Regime from an *ex ante* to an *ex post* scheme.[1714]

---

[1708]    RROMROJ, para. 386.

[1709]    RCMOMOJ, para. 410.

[1710]    RCMOMOJ, paras. 413, 415, 418; RROMROJ, paras. 223, 435, 448.

[1711]    RCMOMOJ, para. 418; RROMROJ, paras. 22, 439, 445; ROP III, pp. 46, 48-49; *Cube* (**CL-148**), para. 420.

[1712]    RROMROJ, paras. 418, 450, 483, 488; ROP III, p. 46; HT, D1, 7 June 2021, p. 282.

[1713]    RROMROJ, para. 436; ROP III, pp. 46-47, 50; RPHB, para. 105.

[1714]    RROMROJ, paras. 223, 448, 453-454.

1123.  Finally, the Temporary Grid Access Fee, the Permanent Grid Access Fee, the 20% Levy, the Balancing Cost Exposure, the 5% ESSF Contribution, and the Transition from FiT to FiP, were equally reasonable and proportionate measures that did not fundamentally or radically change the ERSA Regime.[1715]

(3)    Inconsistent and non-transparent treatment

1124.  The Respondent submits that the Seven Measures were not designed to disguise a FiT reduction and that it has demonstrated that the Measures (i) were adopted in a transparent manner to address increased costs, consistent with the design of the original ERSA Regime, and (ii) were fully foreseeable.[1716] The Seven Measures balanced the interests of energy companies and consumers and ensured that a reasonable return continued to be earned, as required by Bulgarian and EU law.[1717] Once again, as acknowledged by the Claimant: the Respondent never amended the FiT, neither a few weeks after the Investment, nor later.[1718] In addition, since no stabilisation clause was in place, the Seven Measures also cannot have been inconsistent with any such stabilisation undertaking.[1719]

1125.  Therefore, the Seven Measures were fully transparent and consistent measures, traceable to the legal framework from which they originated.[1720]

1126.  Finally, the ERSA Regime was also not ambiguous and, on that basis, non-transparent. Any accusation to the contrary rests on the Claimant's lack of diligence regarding the existing legal framework at the time of its Investment, including EU law, and on its continued denial of the existence of a renewable energy boom in Bulgaria that needed to be addressed.[1721]

---

[1715]    RROMROJ, paras. 198, 261, 265, 267, 459, 463-464, 468-469, 472, 475-476, 478-480.

[1716]    RCMOMOJ, para. 432, RROMROJ, para. 486; ROP III, pp. 48-49.

[1717]    RROMROJ, para. 488; ROP III, pp. 48-49.

[1718]    RROMROJ, para. 486.

[1719]    RROMROJ, paras. 489, 495.

[1720]    RROMROJ, para. 488.

[1721]    RROMROJ, para. 496.

### b.    Unreasonable Impairment

1127.    The Respondent submits that, contrary to the Claimant's contention, it did not violate its obligation under Article 10(1) ECT not to impair in any way by unreasonable or discriminatory measures the management, maintenance, use, or enjoyment of the Investment.[1722]

1128.    "[I]n light of the convergence" of the Impairment Clause with the FET Obligation, and in light of the Respondent's submissions on its compliance with the FET Obligation, there is no basis to conclude that the Respondent violated its obligation not to impair,[1723] or that claims that failed as legitimate-expectations claims should succeed as claims of unreasonable impairment.[1724]

### (1)    Unreasonable measures

1129.    Nevertheless, the Seven Measures did not treat the Investment unreasonably, since they were implemented as part of a rational policy in the context of Bulgaria's and the EU's policy targets, the solar boom, and what the boom did to Bulgaria's energy system and its customers, as outlined more fully above.[1725]

1130.    Any argument that better options were available is furthermore irrelevant in that regard since the ECT does not require a State to choose the best option available.[1726] In any case, the Claimant does not substantiate that any alternative measures the Claimant describes as available would have been more efficient than the Seven Measures, especially when the interests of all relevant groups, including consumers, are taken into account.[1727]

---

[1722]    RCMOMOJ, para. 444; RPHB, para. 120.

[1723]    RCMOMOJ, para. 451; ROP III, p. 52.

[1724]    RROMROJ, para. 508.

[1725]    RCMOMOJ, paras. 453-454; RROMROJ, para. 502; ROP III, pp. 53-54.

[1726]    RCMOMOJ, para. 457; RROMROJ, para. 507; ROP III, p. 54; HT, D1, 7 June 2021, p. 226; HT, D3, 9 June 2021, p. 616.

[1727]    RROMROJ, para. 507; Oxera II, para. 6.61.

1131. Imposing new costs on PV plants after their FiT was fixed was in particular not unreasonable because no guarantee had been given that no additional costs would be imposed.[1728]

1132. Likewise, contrary to the submission of the Claimant, (i) producers of renewable energy were and are able to manage balancing risks,[1729] (ii) the Balancing Cost Exposure was necessary to align Bulgaria's balancing market with EU law, and, as such, (iii) the Balancing Cost Exposure cannot be deemed to have been unreasonable in the sense of the Impairment Clause.[1730]

1133. Once again: the fact the Karad Plant has earned a return above its cost of capital strongly supports the conclusion that the Seven Measures were not unreasonable.[1731]

(2)    Discriminatory measures

1134. The Respondent argues that, because the Claimant does not allege that it was discriminated against as a foreign investor but rather contends that measures of Bulgaria were discriminatory against renewable energy producers, its claim of non-impairment because of discrimination is meritless.[1732]

1135. Regarding specific measures, the Respondent submits that each of the Seven Measures had a specific design and background which the Claimant ignores for its argument.[1733]

   a.  The 5% ESSF Contribution, for example, cannot have been discriminatory since it also applied to all conventional electricity producers and traders, the Respondent argues (see above).[1734]

---

[1728]    RCMOMOJ, para. 454.

[1729]    The Respondent makes this statement for the first and apparently only time in paragraph 456 towards the end of its RROMROJ. In support thereof it refers back to paragraph 203-215 of the RCMOMOJ and paragraph 7.71 of Oxera I, where, however, that submission is not made or supported (paragraph 210 RCMOMOJ seems to be most closely related).

[1730]    RCMOMOJ, para. 456.

[1731]    RCMOMOJ, para. 458; RROMROJ, para. 514.

[1732]    RCMOMOJ, para. 460; RROMROJ, para. 509; ROP III, p. 56; HT, D1, 7 June 2021, p. 284.

[1733]    RROMROJ, para. 511.

[1734]    RROMROJ, para. 511; ROP III, p. 56.

b. The Permanent Grid Access Fee was reasonably tailored to apply to PV and wind generators, *i.e.* the producers that caused the additional costs from intermittent electricity production, the Respondent submits.[1735]

c. The APC was a rational, non-discriminatory measure that treated all plants in the same category of plants the same (see above).[1736]

d. All other measures applied to at least all producers of renewable energy.[1737]

### (3) Degree of impairment

1136. The Respondent avers that having earned a return above its cost of capital, the Investment cannot be regarded as having been impaired by the Seven Measures to a degree of significance as required by the Impairment Clause.[1738] The Claimant has, in any case, failed to establish impairment to the necessary degree of significance.[1739]

### (4) Conclusion

1137. In conclusion, a claim of discrimination by any of the Seven Measures cannot be considered as established.[1740]

### c. The Umbrella Clause

1138. According to the Respondent, it is agreed that Bulgaria has not entered into any contractual obligation with the Claimant or with its Investment, and, therefore, no obligation of the Respondent that could be breached in the sense of the Umbrella Clause has ever existed.[1741]

1139. It is also evident that the ERSA Regime arises from a general act of legislation, applying to every producer of renewable energy indistinguishably, foreign and national alike. This also removes the benefits provided under ERSA from the scope of the Umbrella

---

[1735] *Ibid.*

[1736] RROMROJ, para. 512; ROP III, p. 56.

[1737] ROP III, p. 56.

[1738] RCMOMOJ, paras. 461-462; RROMROJ, para. 514.

[1739] RROMROJ, paras. 497, 514.

[1740] RROMROJ, para. 513.

[1741] RCMOMOJ, paras. 463ff; RROMROJ, paras. 515, 550.

Clause.[1742] The fact that the benefits of the ERSA were conditional on satisfying certain defined criteria does not make them individualised benefits and individualised obligations in the sense of the Umbrella Clause.[1743]

1140.  The Claimant itself acknowledges that the ERSA in itself might be considered "too general" to amount to a specific obligation.[1744] However, in any case, even if the ERSA had included an obligation of the Respondent towards the Claimant or its Investment in the sense of the Umbrella Clause, then the obligation would have been not to change the FiT, which, as is agreed, it never did.[1745]

1141.  In addition, the FiT Decision, the License, and the Karad PPA, individually or together, do not constitute obligations covered by the Umbrella Clause.[1746]

1142.  Neither the FiT Decision nor the License are contracts under Bulgarian law, as acknowledged by the Claimant. The FiT Decision indeed is an administrative act applicable generally to all investors in the PV sector in the applicable period – an act, which, *nota bene*, was made at a time that neither the Karad Plant nor the Claimant existed.[1747] In addition, neither the FiT Decision nor the License sets forth an obligation of Bulgaria *vis-à-vis* the Claimant or its Investment that the FiT or the ERSA Regime would remain unchanged.[1748]

1143.  The License, a document issued at a time that the Claimant did not yet exist and which is subject to amendments of Bulgarian law, and "the other instruments", furthermore "merely reflect" or implement the terms of the ERSA and hence do not set out any autonomous undertakings of the Bulgarian State.[1749]

---

[1742]    RCMOMOJ, para. 475; RROMROJ, para. 539; ROP III, p. 66; HT, D1, 7 June 2021, p. 288.

[1743]    RCMOMOJ, para. 475.

[1744]    RROMROJ, para. 540; ROP III, p. 66; CROMCOJ, para. 533.

[1745]    ROP III, p. 67; HT, D1, 7 June 2021, p. 289.

[1746]    RCMOMOJ, para. 476; RROMROJ, paras. 541, 550.

[1747]    RCMOMOJ, paras. 478-479; RROMROJ, paras. 541, 548; ROP III, p. 70; HT, D1, 7 June 2021, pp. 290-291; CROMCMOJ, para. 521, fn 694.

[1748]    RCMOMOJ, para. 478; RROMROJ, paras. 543, 550; ROP III, p. 71.

[1749]    RROMROJ, paras. 544, 547; ROP III, pp. 68-71, 73; HT, D1, 7 June 2021, pp. 289-292; *SilverRidge* (**RL-287**), paras. 377-379.

1144. The price set by the FiT Decision was also never amended and hence any obligations from that decision were fully observed.[1750]

1145. Accordingly, the License and the FiT Decision do not fall under the Umbrella Clause, nor do they contain any obligations relevant to a finding regarding the Umbrella Clause.[1751]

1146. Regarding the Karad PPA, the Respondent reiterates its argument (i) that the agreement was not concluded by the Bulgarian State but by NEK, a separate entity whose contractual undertakings would, as a matter of Bulgarian law, not be attributable to the Respondent, and (ii) that the Karad PPA is subject to Bulgarian law and automatic amendment in the event of a change in law.[1752] As such, the Karad PPA does not constitute an obligation by Bulgaria in the sense of the Umbrella Clause.[1753] As the Karad PPA was subject to amendments of the law, it cannot have been breached by an amendment of the law.[1754] Finally, during the Hearing the Claimant also made it clear that it was not making its claim on the basis of a breach of the Karad PPA. What is more, earlier the Claimant had in any case already effectively withdrawn any Karad PPA related Umbrella Clause claim, by ceasing to mention the Karad PPA in the context of its Umbrella Clause claim.[1755]

1147. As developed in the dissenting opinion of Professor Sacerdoti in *Greentech*, the License and the Karad PPA were, in any case, not entered with an investment of the Claimant, because they were entered into with ACWA Bulgaria (then ZBE Partners) before the Claimant bought the entity.[1756]

1148. In conclusion, if no obligations existed, let alone were breached, in the individual instruments that the Claimant wants the tribunal to take and regard as a whole together,

---

[1750]    ROP III, p. 70; HT, D1, 7 June 2021, p. 291.

[1751]    RCMOMOJ, para. 478.

[1752]    RCMOMOJ, para. 480; RROMROJ, para. 541; ROP III, p. 73.

[1753]    RCMOMOJ, para. 480; ROP III, p. 73.

[1754]    ROP III, p. 74.

[1755]    RROMROJ, paras. 542; ROP III, p. 73; HT, D1, 7 June 2021, pp. 293-295; RPHB, paras. 51, 115.

[1756]    RCMOMOJ, para. 482, fn 1048; RROMROJ, para. 541; *Greentech* (**CL-48**), Dissenting Opinion Sacerdoti, paras. 66-68.

then no obligation or breach thereof can be the result of viewing the instruments together.[1757]

> d.    *Alleged violations of the ECT and applicable rules and principles of international law specific to a measure*

> (1)    Temporary Grid Access Fee

1149.  Regarding the Temporary Grid Access Fee claim in particular, the Respondent argues that there is no basis for the Claimant to seek compensation for reimbursements that the Karad Plant voluntarily gave up as part of the Access Fee Settlement Agreement.[1758]

1150.  The Temporary Grid Access Fee also did not surpass any threshold not already found not to be in violation of Article 10(1) ECT with a view to similar measures in cases against Spain.[1759]

1151.  Finally, the Temporary Grid Access Fee was proportionate in light of the situation in which it had to be adopted and it did not fundamentally or radically alter the ERSA Regime.[1760]

> (2)    Permanent Grid Access Fee

1152.  Regarding the Permanent Grid Access Fee, the Respondent argues that putting in place a preferential pricing regime for plants producing renewable energy cannot be interpreted as a twenty-year long abdication by the Bulgarian State of its "sovereign right" to regulate, *e.g.* by allocating network costs in an appropriate manner. No stabilisation clause, or any other commitment of the Respondent in any of the relevant documents points to such a "sweeping limitation" of its right to regulate, which can, furthermore, not be "implicit" in Article 31(4) ERSA.[1761]

---

[1757]    ROP III, p. 81.

[1758]    RCMOMOJ, paras. 156, 188.

[1759]    RCMOMOJ, para. 437.

[1760]    RROMROJ, paras. 459, 463.

[1761]    RCMOMOJ, para. 158; RROMROJ, para. 235.

1153. The introduction of a grid access charge such as the Permanent Grid Access Fee was also a foreseeable consequence of the 2011-2012 renewable energy boom.[1762]

1154. The Permanent Grid Access Fee also did not surpass any threshold not already found not to be in violation of Article 10(1) ECT with a view to similar measures in cases against Spain.[1763]

1155. Moreover, the Respondent made no guarantees to the Claimant that only consumers would have to bear the additional network costs, including the costs of additional reserves required to balance the added capacity of renewable energy.[1764] The Claimant could also not reasonably have expected that the Karad Plant would never bear any network costs,[1765] and, finally, the Permanent Grid Access Fee did not fundamentally or radically alter the Respondent's regulatory framework.[1766]

(3)    APC

1156. The Respondent submits that the APC is not inconsistent with the ERSA and the ERSA Regime as it existed before the APC was introduced. To begin with, the Respondent had not guaranteed any aspect of the ERSA Regime to the Claimant, and thus also not full-offtake of its production over twenty years, be it in the Karad PPA (of which it argues that it was not a party to it), the FiT Decision, the License, or the ERSA.[1767] The ERSA did also not guarantee that the FiT would apply to 100% of the electricity produced by a PV plant.[1768]

1157. A reasonable investor would also have anticipated that the Respondent would take corrective measures such as the APC in light of the "material" deviations of actual plants from the reference plant, and in light of such plants earning "excessive returns" or "windfall profits".[1769]

---

[1762]    RCMOMOJ, para. 164; RROMROJ, para. 234; RPHB, para. 111.

[1763]    RCMOMOJ, para. 437.

[1764]    RCMOMOJ, para. 167; RROMROJ, paras. 234, 462.

[1765]    RROMROJ, para. 463.

[1766]    RROMROJ, para. 459.

[1767]    RCMOMOJ, paras. 127-, 128, 130, 132; RROMROJ, paras. 22, 202ff; ROP II, p. 69.

[1768]    RCMOMOJ, para. 433.

[1769]    RROMROJ, paras. 214, 454, 456; ROP II, p. 67.

1158. The APC was also not a "fundamental change" of the ERSA Regime. It was reasonable, not unreasonable, and it was proportionately set, not "arbitrarily and perversely" in a manner that would impair the value of the Investment.[1770]

1159. The APC was designed to bring the ERSA Regime in line with its purpose of only remunerating a reasonable return.[1771] It was, in particular, also reasonable to set the APC by reference to the licensed capacity, not the total installed capacity of the Karad Plant.[1772]

1160. It is furthermore also evident from case law against Spain that the Respondent cannot have violated any legitimate expectations of the Claimant or cannot be deemed to have fundamentally altered the regulatory framework by introducing the APC. Investors in Bulgaria at the time of the Investment must have known about the Spanish production cap of 2010 and, what is more, unlike the Spanish regime, the ERSA Regime did not explicitly exclude future revisions to existing installations.[1773]

(4)    20% Levy

1161. The Respondent submits that it adopted the 20% Levy in good faith to maintain the viability of the Respondent's electricity system in response to the boom of renewable energy, to address the overcompensation of renewable energy producers in the ERSA Regime, and to mitigate the financial challenges the electricity system was facing at the time of the introduction of the 20% Levy, including NEK's growing deficit.[1774] In light of those circumstances, the 20% Levy was proportionate.[1775]

1162. Nowhere in the applicable law, rules, and decisions did the Respondent furthermore ever abdicate its "sovereign right" to impose taxes or levies in regulating the electricity sector in general, or specifically towards the Claimant.[1776] The Claimant also does not

---

[1770]    RCMOMOJ, paras. 127-128, 148-149; RROMROJ, paras. 22-23, 224, 454-455; ROP II, p. 70; RPHB, para. 105.

[1771]    RCMOMOJ, para. 432.

[1772]    RROMROJ, para. 23.

[1773]    RCMOMOJ, paras. 435-436.

[1774]    RROMROJ, para. 470; ROP II, p. 83; HT, D1, 7 June 2021, pp. 238-240; RPHB, para. 102.

[1775]    RROMROJ, para. 472.

[1776]    RCMOMOJ, paras. 219, 223; RPHB, para. 110.

and cannot claim that the Bulgarian State guaranteed it a fixed revenue over 20 years,[1777] or that PV plants would never be subject to additional taxes or levies that would affect the cash flows of a PV plant.[1778]

1163. A reasonable investor in June 2012 would have understood that Bulgaria might introduce a levy on generators of renewable energy in response to the surge of renewable energy capacity that year.[1779]

1164. The 20% Levy was furthermore only applicable for a very short time and had only a "*de minimis*" impact on the Investment. As such, it cannot constitute a basis for an investment treaty claim,[1780] or be considered disproportionate.[1781] As such, it can also not be considered to have reached the necessary threshold of significance or substance to constitute an unreasonable impairment.[1782]

1165. The fact that a national court invalidates a measure for violation of a domestic law does in any case not prove a violation of the ECT in general, or the Impairment Clause in particular.[1783] To the contrary, the judgment of the Respondent's Constitutional Court, and the emphasis of that Court on protecting legitimate investor's expectations shows that the Respondent's system works and takes seriously its commitment to protect foreign investors.[1784]

1166. In conclusion, the 20% Levy was a reasonable and proportionate measure that was neither a fundamental, nor a radical change of the regulatory framework of Bulgaria.[1785] The Claimant furthermore failed to demonstrate that the imposition of the 20% Levy was a breach of any provision of the ECT.[1786]

---

[1777]    RCMOMOJ, para. 220; RROMROJ, para. 474.

[1778]    RROMROJ, paras. 250-251, 473-474.

[1779]    RCMOMOJ, paras. 221, 223; RROMROJ, paras. 249, 471.

[1780]    RCMOMOJ, para. 220; ROP III, p. 61.

[1781]    RROMROJ, para. 472; ROP III, p. 61.

[1782]    ROP III, p. 61; HT, D1, 7 June 2021, pp. 286-287.

[1783]    RCMOMOJ, para. 224; ROP III, p. 61; HT, D1, 7 June 2021, pp. 286-287.

[1784]    RCMOMOJ, para. 224.

[1785]    RROMROJ, paras. 469, 472.

[1786]    RCMOMOJ, para. 228.

(5)    Balancing Cost Exposure

1167.    The Respondent submits that it gave no guarantee to the Claimant that it would never have to bear any balancing costs.[1787]

1168.    The Claimant in 2012 could also not reasonably have expected that the 2010 ETR would remain unchanged for the twenty-year term of the Karad PPA.[1788] The only reasonable expectation an investor could have had in June 2012 was that the balancing rules and costs would evolve after the upcoming implementation of the balancing market which was at that time still a future, and thus uncertain, event.[1789] This is not a basis legitimately to expect that the 2010 ETR would apply unchanged for twenty years.[1790]

1169.    The Balancing Cost Exposure was thus a reasonable measure and not a fundamental or radical change of the ERSA Regime.[1791] It was a proportionate measure because it was implemented to manage the implications of the boom of renewable energy and to ensure accurate forecasting.[1792]

(6)    5% ESSF Contribution

1170.    As with other measures, also regarding the introduction of the 5% ESSF Contribution, the Respondent reiterates its position taken elsewhere, that Bulgaria made no guarantees regarding the ERSA Regime,[1793] and no promises that renewable energy producers would be exempt from all new and reasonable taxes.[1794] The Respondent also again points to the Common Terms Agreement to underline its view that present or future taxes, withholding obligations, duties, and other charges were anticipated.[1795] The 5%

---

[1787]    RROMROJ, para. 244.

[1788]    RCMOMOJ, para. 194; RROMROJ, para. 244.

[1789]    RCMOMOJ, paras. 195, 202; RROMROJ, para. 244.

[1790]    RCMOMOJ, para. 196; RROMROJ, para. 244; ROP II, p. 76.

[1791]    RROMROJ, para. 464.

[1792]    RROMROJ, para. 468.

[1793]    RCMOMOJ, para. 230; RROMROJ, para. 477.

[1794]    RROMROJ, paras. 256, 477.

[1795]    RCMOMOJ, para. 230; RROMROJ, para. 477.

ESSF Contribution, the Respondent submits, was also not a fundamental or radical change to the ERSA Regime.[1796]

1171.  Given that the 5% ESSF Contribution was payable by all generators and traders of electricity, conventional and renewable alike, and later even by the ESO and gas network operators and storage facilities operators, the Contribution reduced revenues of all those entities and thus, by definition, cannot be regarded as a ruse for reducing the remuneration of renewable energy producers, or as discriminatory.[1797]

1172.  It is irrelevant in that regard that the 5% ESSF Contribution is to be paid on the revenue rather than on the net profit (revenue minus costs). While the Respondent acknowledges that renewable energy producers as a result of the FiT earn much higher revenues per MWh than conventional energy producers and thus, in absolute terms, pay significantly more Contribution per MWh than conventional energy producers, a focus thereon ignores that conventional and renewable energy producers are taxed at the same rate of 5% and that imposing taxes on the basis of total revenues is a common and sound regulatory practice perfectly aligned with the Respondent's right to design its tax regime at its discretion.[1798]

1173.  In conclusion, the 5% ESSF Contribution served to alleviate the tariff deficit and limited the burden on consumers of the RES-E costs, but still enabled the Karad Plant to continue to earn the required return. It was thus not an unreasonable, but rather a proportionate and reasonable measure.[1799]

(7)    Transition from FiT to FiP

1174.  The Respondent argues that Bulgaria did not make any guarantees with respect to the ERSA Regime and in particular that the Karad PPA did not include a stabilisation clause whereby Bulgaria would have guaranteed not to change the offtake mechanism agreed

---

[1796]    RROMROJ, para. 475.

[1797]    RCMOMOJ, para. 231; RROMROJ, paras. 258, 478, 511; HT, D1, 7 June 2021, pp. 240-241; RPHB, paras. 102, 110.

[1798]    RROMROJ, paras. 258-259, fn 602.

[1799]    RCMOMOJ, paras. 238-239; RROMROJ, paras. 256, 476, 478; Oxera I, para. 7.44.

therein. Indeed, the opposite is true: the Karad PPA makes it clear that it is subject to Bulgarian law including the Respondent's sovereign right to amend such a law.[1800]

1175. In addition, in June 2012 already, the transition from a single buyer to a market model such as a FiP scheme had to be regarded as a rational, proportional, and foreseeable measure, to be reasonably expected, also for existing plants.[1801]

1176. The Claimant's contention that the FiP scheme would be less favourable than the FiT scheme is furthermore baseless. Consequently, there is no basis for an ECT claim of the Claimant regarding the Transition from FiT to FiP.[1802]

### 20.    Quantum

#### a.    *Compensation Standard*

1177. The Respondent agrees with the Claimant that the standard of compensation is full reparation, *i.e.* reparation which "wipe[s] out all the consequences of the illegal act and re-establish[es] the situation which would, in all probability, have existed if that act had not been committed."[1803]

1178. A causal link between the internationally wrongful act and the injury is a necessary but not a sufficient condition for reparation in that regard. Any reparation must, in any case, be limited to the injury caused by the internationally wrongful act.[1804] Whether an injury can be ascribed to a wrongful act is furthermore a legal question, not a strictly factual

---

[1800]    RCMOMOJ, para. 242.

[1801]    RCMOMOJ, paras. 243-245, 250-256; RROMROJ, paras. 198, 261, 265, 267, 479, 480-481; ROP II, pp. 88-90; HT, D1, 7 June 2021, p. 242; RPHB, para. 102; European Commission Guidance (**FR-41**); World Bank Report (**R-096**), although the World Bank appears to have recommended that in a CfP scheme the reference price be set daily, rather than annually, and that it should be made sure that the original terms of the replaced PPA are exactly kept, *cf.* World Bank Report (**R-096**), p. 9; NA 4 April Transcript (**R-232**).

[1802]    RCMOMOJ, paras. 256, 265-266.

[1803]    RCMOMOJ, para. 484; RROMROJ, para. 551; ROP IV, p. 4; James Crawford, The International Law Commission's Articles on State Responsibility, Introduction, Text and Commentaries (Cambridge University Press 2002, 2005) (**RL-186**), p. 201.

[1804]    RCMOMOJ, para. 185.

question.[1805] Losses must be "attributable [to a wrongful act] as a proximate cause, and damage must not be "too indirect, remote, and uncertain to be appraised."[1806]

1179. The Claimant must prove the causal link between injury and act. It may not simply assume causation. The Claimant also bears the burden of proving the quantum of damages allegedly incurred.[1807]

1180. In addition, as stated above in more detail, in cases concerning incentive regimes for renewable energy generation, several ECT tribunals found that a claimant is only entitled to damages if the rate of return of its renewable energy plant lies below a reasonable rate of return (as measured against the WACC of a plant).[1808] Such tribunals have calculated damages on the basis of the difference between the actual return of the plan and the benchmark "reasonable" return.[1809]

1181. The Respondent interprets this to mean that a claimant in a renewable energy case against Bulgaria cannot be awarded a return on investment that it could not have legitimately expected to receive. Given that, in line with the Energy Act, EU State aid guidelines, and the FiT Decision, the maximum the Claimant could have expected to receive was a reasonable rate of return for, and at the level of, the Karad Plant, which the Karad Plant did receive, and given that, as outlined above, the Claimant and the Karad Plant did not suffer any damages *in casu*, the Claimant cannot be awarded any damages.[1810]

1182. In addition, because the Claimant accepts that Bulgaria had a right to modify the ERSA Regime, just not fundamentally, calculating damages using a DCF model, which uses a but-for scenario, is an incorrect approach. This is because the but-for DCF approach assumes a situation in which no alterations had happened whatsoever. That approach is

---

[1805]    RCMOMOJ, paras. 486-487.

[1806]    RCMOMOJ, para. 486; James Crawford, The International Law Commission's Articles on State Responsibility, Introduction, Text and Commentaries (Cambridge University Press 2002, 2005) (**RL-186**), p. 204.

[1807]    RCMOMOJ, para. 487.

[1808]    RCMOMOJ, paras. 488, 499; RROMROJ, para. 551; RPHB, paras. 121, 132; ROP IV, p. 5; *Hydro* (**RL-261**); *RWE* (**RL-257**); *Cavalum* (**RL-265**); *RREEF* (**CL-59**).

[1809]    RCMOMOJ, para. 488; RROMROJ, para. 551; RPHB, paras. 121, 132; *Hydro* (**RL-261**), para. 766; *RWE* (**RL-257**), paras. 732, 735, 742.

[1810]    RCMOMOJ, paras. 491-494; RROMROJ, para. 552; RPHB, para. 121.

thus based on an unproven counterfactual scenario and disregards (i) that other alterations might have happened and (ii) that the Claimant expected that some modifications might take place.[1811]

### b.   *Quantum of Compensation Owed*

#### (1)   Method of Calculating Quantum

1183.   In light of the above set out principles, the Respondent is of the opinion that the calculation of quantum in this case necessitates the calculation of the return of the Karad Plant.

1184.   The Respondent submits that the Karad Plant earns a reasonable return if it is profitable, and that the Karad Plant is profitable if its IRR is greater than its WACC.[1812] As such, the Respondent submits, the WACC is the appropriate benchmark for assessing reasonable return.[1813]

#### (a)   *Flaws in the Claimant's quantum calculations*

1185.   The Respondent notes that the Claimant's quantum expert does not provide any assessment of the Karad Plant's IRR, and does not take into account whether the Karad Plant earned a reasonable rate of return, but rather, and, in the Respondent's view incorrectly, compares a hypothetical counterfactual scenario, which assumes that none of the contested measures had taken place with the actual scenario.[1814]

1186.   The focus of the Claimant's quantum case on cash flows and the Claimant's own return on equity is baseless because the Bulgarian legal framework is not concerned with cash flows or the price an investor paid for an asset, but with a reasonable return commensurate with WACC on the level of the plant.[1815] A focus on lost cash flows would also lead to an award of damages that materially overcompensates the

---

[1811]     RROMROJ, paras. 408, 560; ROP IV, p. 21; RPHB, para. 132.

[1812]     RCMOMOJ, para. 494; ROP IV, p. 8.

[1813]     ROP IV, p. 8.

[1814]     RCMOMOJ, para. 498; Oxera I, para. 9.9.

[1815]     RROMROJ, para. 25.

Claimant.[1816] It would also disregard the Claimant's decision to have its plant exceed the capacity that was licensed.[1817]

1187. As outlined above, the valuation date chosen by the Claimant is also incorrect since it lies after 6 August 2018, the date on which the Respondent, at the latest, denied the Claimant the advantages of Part III of the ECT.[1818]

1188. The Claimant has furthermore failed to demonstrate the necessity of the debt restructuring of the Karad Project in 2017, and how the Seven Measures in general, or delays in payments by NEK between 2013 and 2015 in particular, would have made the restructuring necessary, *i.e.* "caused" it.[1819]

1189. It is finally the Claimant's industry expert's apparent view that as of 2016 it would have been reasonable to expose generators of renewable energy to full balancing costs. The Claimant's quantum expert should have taken this into consideration in his calculations, bud did not. This would reduce the damages of the Claimant by EUR 6.7 million in the actual capacity scenario.[1820]

*(b)      Reaction to the critique of the Respondent's IRR analysis*

1190. The Claimant's contentions that Mr Kristensen's analysis of the Karad Plant's IRR and WACC is flawed, overstates the return, and understates the benchmark, are furthermore unfounded.[1821]

*(i)      9% target rate*

1191. The target rate of return of 9% cannot be used as the benchmark for whether the Karad Plant earned a reasonable return because it is only a target, and an estimate, not a fixed return, making the actual WACC the appropriate benchmark. The actual WACC is also

---

[1816]    RROMROJ, para. 559; ROP IV, p. 21; RPHB, para. 131.

[1817]    ROP IV, p. 21.

[1818]    RCMOMOJ, paras. 499, 562; ROP IV, p. 22; HT, D1, 7 June 2021, pp. 305-306.

[1819]    RCMOMOJ, para. 274.

[1820]    RROMROJ, para. 561.

[1821]    RROMROJ, paras. 272, 554, 556; ROP IV, p. 231.

used by the European Commission to assess the compatibility of renewable energy incentive regimes with EU State aid law.[1822]

1192. It is relevant in that regard that the FiT Decision had announced that each investor had the opportunity to achieve "a different profitability depending on individual management of the investment project" and that thus the actual WACC and profitability should be the benchmark, not the target rate of the FiT Decision.[1823]

*(ii)    Licensed capacity scenario*

1193. The Respondent defends its licensed capacity scenario in response to the criticism that a 17% reduction of revenues would have accounted for the fact that the impact of a reduction in volume is lower than a reduction of revenue, because a reduction of volume principally affects volume above the cap of the APC that would be sold at the lower market price, whereas a reduction of revenue covers all revenues the same (see above).

1194. This criticism is baseless because, in the view of the Respondent, both in the speculative and in the licensed capacity scenario, the APC is legal and applies and the amount sold at the FiT is thus the same in both scenarios. Applying a reduction in revenue rather than volume would not cover that understanding of the APC's legality.[1824]

*(iii)    Various further points of criticism*

1195. The Claimant's criticism of Mr Kristensen using a variable WACC over time appears to be based on a misunderstanding of a graph of Oxera, the Respondent argues. The graph, which shows that, after the Investment, the WACC continued to decline relative to the Karad Plant's IRR, does so only for illustrative purposes to show that the Karad Plant in reality was always able to earn a reasonable return relative to its annual WACC. It is not an indication that a variable WACC would be the most relevant benchmark.[1825]

1196. Calculating over a 30-year operating life rather than over the 20-year duration of the FiT is furthermore correct for an IRR approach. The Claimant's criticism mixes up the

---

[1822]    RROMROJ, para. 555; ROP IV, pp. 9-10; HT, D1, 7 June 2021, pp. 300-301.

[1823]    ROP IV, p. 9.

[1824]    RPHB, para. 127.

[1825]    RROMROJ, para. 554; Oxera II, para. 8.16.

IRR approach with a DCF approach.[1826] This is because an IRR approach looks at what the Claimant earned over the actual 30-year time period that they had to earn a return.[1827] The Claimant's quantum expert did not dispute that in a WACC based IRR approach the 30-year time horizon is the appropriate one.[1828]

1197. Finally, Mr Kristensen's treatment of electricity forecasts in its first report was correct in light of the information then available, but was adjusted, without altering the ultimate conclusion, after the Claimant had disclosed additional information.[1829]

(2)    Calculation of Quantum

1198. As outlined above, the Respondent submits that the Karad Plant including NOMAC achieved a pre-tax IRR of 7.3% in line with its WACC of 7.0% to 8.0% in 2012.[1830]

1199. The Respondent further submits that had the Karad Plant been constructed in line with its License and thus, in the view of the Respondent, without the 60.4/50 Ratio, its IRR would have been 8.6%, "well above its WACC".[1831]

1200. Based thereon, the Respondent initially submitted that the pre-tax IRR of the Karad Plant was thus always higher than the WACC of the Karad Plant (at least if one includes the NOMAC cash-flows into the calculation) and a reasonable rate of return was thus earned.[1832]

1201. Later the Respondent clarified that an IRR higher than the WACC of 7-8% was only earned in its "licensed capacity scenario", *i.e.* the scenario that assumes legality of the APC and illegality of the 60.4/50 Ratio,[1833] and that an IRR lower than the WACC range

---

[1826]    RROMROJ, para. 556.

[1827]    HT, D1, 7 June 2021, p. 301; HT, D5, 11 June 2021, p. 1063.

[1828]    RPHB, para. 126.

[1829]    RROMROJ, para. 556.

[1830]    RROMROJ, para. 25; ROP II, p. 72.

[1831]    RROMROJ, para. 25; ROP II, p. 72; ROP IV, p. 7.

[1832]    RCMOMOJ, paras. 269, 409, 497; RROMROJ, para. 553; ROP II, p. 72; RPHB, paras. 103, 121.

[1833]    ROP IV, p. 12; RPHB, para. 125.

of 7-8%, namely 6.8%, was earned in the scenario that assumes legality of the 60.4/50 Ratio, illegality of the APC, and excludes NOMAC cash-flows.[1834]

1202. However, the Respondent argues that the "small difference" of 0.2% in that last scenario, which is equivalent to a loss of EUR 3.9 million, only represents a "shortfall" and (i) does not equal damages or imply that damages were suffered and (ii) cannot form the basis for an award of damages, for example also because the Claimant has not proven the efficiency of its cost or the influence of its business decisions on that result.[1835]

1203. From an equivalent effect perspective, the Respondent submits that the Seven Measures had the equivalent effect of a 7.4% reduction of the FiT when basing the equivalent effect calculations on the reference plant (*i.e.* not including the effect of the Annual Production Cap).[1836] However, as outlined above, after the Hearing, the Respondent's expert adjusted this equivalent effect calculation to reach 9.8%.[1837]

### c.    Pre- and Post-Award Interest

1204. The Respondent submits that in accordance with Article 38 ILC Articles on State Responsibility, interest is awarded as an element of compensation when necessary to ensure full reparation.[1838] An award of interest is, however, not always necessary.[1839]

1205. The determination of the appropriate amount of interest is fact-specific and must be based on evidence as to the nature of the alleged losses. It cannot be based merely on speculation. The Claimant bears the burden of demonstrating that the interest sought is reasonable and the burden of identifying the appropriate mode of calculation.[1840]

---

[1834]    ROP IV, p. 19; HT, D1, 7 June 2021, pp. 304-305.

[1835]    ROP IV, p. 19; HT, D1, 7 June 2021, pp. 304-305; RPHB, para. 130, fn 370.

[1836]    RROMROJ, para. 557; ROP II, p. 93; ROP IV, p. 20; HT, D1, 7 June 2021, p. 246; RPHB, paras. 103, 129; Oxera II, para. 7.113, Table 7.1.

[1837]    Oxera IV, para. 1.11.

[1838]    RCMOMOJ, para. 501; RROMROJ, para. 563.

[1839]    RROMROJ, para. 563; ROP IV, 24; James Crawford, The International Law Commission's Articles on State Responsibility, Introduction, Text and Commentaries (Cambridge University Press 2002, 2005) (**RL-186**), p. 235.

[1840]    RCMOMOJ, para. 501; RROMROJ, para. 564.

1206. Given that the Claimant only seeks pre- and post-award interest "at the highest lawful rate", and thus does not specify the applicable rate, how it is to be calculated, and why it is appropriate, the Claimant has failed to substantiate the interest rate requested.[1841] The Claimant has in particular not proven that any interest other than the risk-free rate would be appropriate.[1842]

1207. Investment treaty tribunals "routinely" award interest at non-speculative levels, *e.g.* at risk-free rates such as the rate of US Treasury bills. That approach would be appropriate in this case, too.[1843] This is because the Claimant's interest claim starts from the 2019 sale of the Karad Plant. However, to the extent that the Claimant was deprived of its Investment, it was also relieved of the risk associated with the Investment. The Claimant's proposed rates thus incorporate various risks that the Claimant would not actually face with an award of compensation.[1844]

1208. The applicable risk-free rate is the yield to maturity on ten-year German government bonds.[1845] Given that that risk-free interest rate was negative over the relevant period of time, the payment delay in the present case cannot have resulted in any damage to the Claimant that would require compensation by way of an award of interest. Therefore, an award of interest in this case would provide compensation in excess of the full reparation standard and thus should not be awarded.[1846]

## 21. Petitum

1209. The Respondent requests that the Claimant's claims be dismissed in their entirety and that the Claimant be ordered to bear all costs incurred by the Respondent in connection with this arbitration.[1847]

---

[1841] RCMOMOJ, para. 502.

[1842] ROP IV, p. 26.

[1843] RCMOMOJ, para. 503.

[1844] RROMROJ, paras. 565-566; ROP IV, pp. 25-26.

[1845] ROP IV, p. 26; Oxera II, paras. 9.15-9.17.

[1846] RROMROJ, para. 567.

[1847] RCMOMOJ, paras. 25, 507; RROMROJ, para. 570.

## IV.    FACTS

1210.    In this chapter, the Tribunal presents what it considers to be the relevant and established facts, after analysing, where necessary, relevant pieces of evidence and argument. At the end of the chapter, the Tribunal presents a summary of the facts as it deems them to be established and relevant for the legal analysis of the case, which is the subject of the then following chapter.

1211.    All highlighting in bold in the excerpts and quotes set out below is added by the Tribunal unless stated otherwise after a quote or excerpt.

### A.    The Parties, the Contracting Parties, the Investment, and the Investment's structure and chronology

#### 1.    The Claimant

1212.    The Claimant is ACF Renewable Energy Limited, a company incorporated on 11 June 2012 under the laws of the Republic of Malta having its registered office at Vincenti Buildings, 28/19 (Suite 1174) Strait Street, Valletta VLT 1432 and Registration Number C 56625.[1848]

1213.    It is not disputed that the ultimate beneficial shareholders of the Claimant are ACWA Power International (42%), Blackrock Inc. (33%) (after it acquired First Reserve in 2017), and Crescent (25%).[1849]

#### 2.    The Investment

1214.    The Investment consists of (i) the PV plant Karad Plant (as defined above) which is owned by ACWA Bulgaria, formerly ZBE Partners, (ii) ACWA Bulgaria, and, (iii) inasmuch as relevant and where applicable, all claims to money and performance and all Returns (as defined in Article 1(9) ECT) associated with the foregoing.

1215.    The Claimant bought ACWA Bulgaria on 28 June 2012 by means of the SPA whereby the Claimant bought 100% of the shares in ACWA Bulgaria (then ZBE Partners) from

---

[1848]    Certificate from the Maltese Registry of Companies ACF, 29 November 2017 (**C-2**).

[1849]    Though the record is not complete as to the ownership of the Claimant, see Certificate from the Maltese Registry of Companies ACF, 29 November 2017 (**C-2**); ACF, Notices of transfer or transmission of shares, 27 June 2012, 21 December 2012 (**R-177**).

SunEdison BV plus debt owed by ACWA Bulgaria to SunEdison BV for the price of EUR 32,458,659.[1850]

1216. On 14 December 2019, the Claimant sold its shares in ACWA Bulgaria to Enery for proceeds of ultimately EUR 30.9 million after closing.[1851] The deal closed on 10 September 2020 and the and the entity that eventually made the purchase was Enery Power BG Holding GmbH.[1852]

1217. Before the Claimant purchased ACWA Bulgaria (then ZBE Partners), SunEdison Italia had acquired the company in September 2011. During the time of SunEdison Italia's ownership, ACWA Bulgaria purchased its engineering, procurement, construction, and commissioning services regarding the Karad Plant from SunEdison SLU for a total price of EUR 134.4 million and entered into an operation and maintenance agreement with SunEdison SLU under which SunEdison SLU was to operate the Karad Plant in exchange for an annual fee.[1853]

1218. It is unclear when exactly construction of the Karad Plant began, allegedly in September 2011, but it is clear that construction was completed and all PV panels had been purchased and installed at the very latest by 10 March 2012, three days before the date of the protocol of a 72-hour trial of the Karad Plant. It appears, however, that already many tests of the Plant had been run and the fitness for acceptance of the construction had been tested and reported during February 2012. This makes it likely that the PV panels used had already been purchased and installed at that time.[1854]

---

[1850]  CMOM, para. 191; SPA (**C-107**), clauses 1.1, 2, 3; SunEdison Italia had, in the meantime, transferred the shares in ACWA Bulgaria to SunEdison BV; *cf*. CMS Due Diligence Report (**C-75**), pp. 2, 6, 8, 22.

[1851]  FTI II, paras. 2.5-2.6, fn 7; Share Purchase Agreement between ACF and Enery, 14 December 2019 (**C-189**).

[1852]  Letter from the Claimant to the Tribunal of 18 September 2020.

[1853]  CMOM, para. 156; CMS Due Diligence Report (**C-75**), p. 22; Engineering, Procurement and Construction Agreement between SunEdison SLU and ACWA Bulgaria (then ZBE Partners), as amended and restated, 9 March 2012 (**C-70**), Annex A; Operation and Maintenance Agreement between SunEdison SLU and ACWA Bulgaria (then ZBE Partners), as amended and restated, 9 March 2012 (**C-71**); License Decision (**C-103**).

[1854]  Act No. 16 (**R-201**), p. 55; License Decision (**C-103**), p. 4; CMOM, pp. 75-76; Ministry of Regional Development and Public Works, National Construction Supervision Directorate, Use Permit No. 61 for PV Plant, 23 March 2012 (**C-76**); Ministry of Regional Development and Public Works, National Construction Supervision Directorate, Use Permit No. 62 for Substation (Karadhalovo), 23 March 2012 (**C-77**); Ministry of Regional Development and Public Works, National Construction Supervision Directorate, Use Permit No. 63 for Substation (Borisovgrad), 23 March 2012 (**C-78**); Ministry of Regional

1219. The Karad Plant is constructed with a higher capacity of solar modules (60.4 MW of peak capacity) than the capacity of the inverters of the plant (at 50 MW nominal capacity).[1855] The Tribunal understands that, as a result, the Karad Plant can produce and feed electricity into the grid at the inverters' maximum capacity of 50 MW for a longer period of each day, because with a larger number of PV panels less intensity from the sun is required for the same amount of energy to reach the inverter. This type of construction also allows the Karad Plant to make up, to a certain extent, for normal losses of energy that are suffered in the process of producing energy at a PV plant.[1856] The Tribunal understands that at no time can the Karad Plant feed more energy into the electricity grid than the capacity of its inverters, *i.e.* 50 MW, would allow.

1220. On 22 March 2012, the Karad Plant received the "Statement of Findings to determine the fitness for acceptance of the construction site" called "Act 16".[1857]

1221. On 26 April 2012, the EWRC issued a license for electricity production for the Karad Plant to ACWA Bulgaria, at the time ZBE Partners. The License appears to consist of two elements: (i) a License Decision and (ii) a License (as stated above, when the Tribunal refers to the License it will usually refer to both documents together, unless otherwise specified). On the face of it, the License Decision seems to be the act of government that can be appealed and that details the steps the government took to reach its decision, whereas the License is a document handed out by the License Decision.[1858]

1222. On 11 June 2012, the EWCR issued the Permit, *i.e.* a license to perform the License largely based on the materials underlying the License or only slightly amended versions thereof.[1859]

1223. On 13 June 2012, ACWA Bulgaria and NEK entered into the Karad PPA.[1860]

---

Development and Public Works, National Construction Supervision Directorate, Use Permit No. 64 for Cable Line, 23 March 2012 (**C-79**) Long-Term Business Plan of Photovoltaic Park 50 MW Karadzhalovo 2013-2032 of ZBE Partners EAD (**C-171**), p. 12.

[1855]   CMOM, paras. 159, 225; CROMCMOJ, para. 16; COS, p. 35; HT, D1, 7 June 2021, pp. 51-53.

[1856]   CMOM; paras. 159, 225; CROMCMOJ, para. 215; COS p. 35; HT, D1, 7 June 2021, pp. 51-53.

[1857]   Act No. 16 (**R-201**); CMOM, pp. 75-76.

[1858]   License Decision (**C-103**); License (**C-158**).

[1859]   Permit (**C-105**).

[1860]   Karad PPA (**C-106**).

### 3.     The Respondent

1224.   The Respondent is the Republic of Bulgaria.

1225.   Bulgaria acceded to the VCLT on 21 April 1987.[1861] The ECT applies to Bulgaria since 16 April 1998.[1862] The ICSID Convention applies to Bulgaria since 13 May 2001.[1863] Bulgaria acceded to the EU on 1 January 2007.[1864]

### 4.     The seat of the Claimant: Malta

1226.   Malta is the Contracting Party in accordance with the laws of which the Claimant is organised.

1227.   The ECT applies to Malta since 28 August 2001.[1865] The ICSID Convention applies to Malta since 3 December 2003.[1866] Malta acceded to the EU on 1 May 2004.[1867] Malta acceded to the VCLT on 26 September 2012.[1868]

### 5.     Other relevant Bulgarian entities

1228.   MEET is the Bulgarian Ministry of Economy, Energy and Tourism, "the ministry with the primary responsibility for the regulation of energy matters."[1869]

1229.   EWRC is the Bulgarian regulator for energy and water. It issues licenses for production, it sets annual FiTs and FiPs, and it adopts the electricity trading rules, including the 2013 ETR, and other secondary legislation.[1870]

---

[1861]   United Nations Treaty Collection, Status of Treaties: VCLT, undated (**RL-45**).

[1862]   ECT: Members and Observers – Bulgaria, https://www.energycharter.org/who-we-are/members-observers/countries/bulgaria/, 12 December 2017 (**C-4**).

[1863]   ICSID: List of Contracting States and Other Signatories of the Convention, as of 11 January 2018 (**C-6**).

[1864]   EUROPEAN   UNION:   Bulgaria,   https://europa.eu/european-union/abouteu/countries/member-countries/bulgaria_en, 12 November 2018 (**RL-41**).

[1865]   ECT: Members and Observers – Bulgaria, https://www.energycharter.org/who-we-are/members-observers/countries/malta/, 12 December 2017 (**C-7**).

[1866]   ICSID: List of Contracting States and Other Signatories of the Convention, as of 11 January 2018 (**C-6**).

[1867]   EUROPEAN   UNION:   Malta,   https://europa.eu/european-union/abouteu/countries/member-countries/malta_en, 12 November 2018 (**RL-42**).

[1868]   United Nations Treaty Collection, Status of Treaties: VCLT, undated (**RL-45**).

[1869]   CMOM, para. 64.

[1870]   CMOM, para. 66; RCMOMOJ, para. 47.

1230.   BEH is the 100% State-owned holding company through which MEET holds the Respondent's main electricity-generation and related facilities, such as coal and nuclear energy plants, the gas and electricity network, NEK (as the public provider), and the companies that manage the grid. BEH brands itself as a "strategically important state company".[1871]

1231.   NEK, a subsidiary of BEH, 100% owned and controlled by BEH, provides and sells electricity to end consumers and owns Bulgaria's hydro energy plants. In respect of renewable energy production and the ERSA and the Energy Act, NEK is, by law, designated and referred to as the "public provider". As public provider it is entrusted with certain functions in that regard, such as purchasing the energy produced from RES at the applicable FiT, entering into the PPAs (before the Transition from FiT to FiP took place), and coordinating balancing groups and offering electricity to balance out the market.[1872]

1232.   ESO, another subsidiary of BEH, 100% owned and controlled by BEH, is Bulgaria's independent transmission grid operator.[1873]

1233.   For the purposes of this case, NEK and ESO fulfil public tasks prescribed to them by law.

### B.    The ERSA Regime, legitimate expectations, and the knowledge of the Respondent and the Claimant

1234.   Below the Tribunal will present the facts and the evidence that inform its understanding of the ERSA Regime, of what could legitimately be expected of the ERSA Regime, and of what the Respondent and the Claimant knew about the ERSA Regime, of each other, and the development of the PV sector.

1235.   This will be done largely by presenting quotes and excerpts from relevant Exhibits, followed, at times, by short observations and conclusions of the Tribunal, and ultimately followed by a summary of the factual findings at the end of the sub-chapter.

---

[1871]    Webpage BEH, last access unknown (**C-124**); CMOM, para. 67; RCMOMOJ, para. 177.

[1872]    Webpage NEK, 2020 (**C-125**); CMOM, para. 67; RCMOMOJ, para. 41, fn 35.

[1873]    Webpage ESO, 2017 (**C-126**); CMOM, para. 67; RCMOMOJ, paras. 177-178, fn 398.

1. **Primary and secondary laws, Directive 2009/28/EC, and the Karad PPA**

   a. *2007 Renewable and Alternative Energy Sources and Biofuels Act ("RAESBA")*

1236. Article 9 No 3. RAESBA states

   Article 9.

   Generation of energy from renewable energy sources and alternative energy sources shall be promoted while:

   …

   3. providing to electricity producers at least an equivalent effect of preferential treatment in terms of their revenue per unit of electricity generated in the cases of alteration of the mechanisms for promoting generation of electricity from renewable and alternative energy sources;[1874]

1237. The Parties agree that no similar clause was included in ERSA. The Parties disagree as to the significance thereof.

   b. *DIRECTIVE 2009/28/EC*

1238. Directive 2009/28/EC of the European Parliament and of the EU Council of 23 April 2009 on the promotion of the use of energy from RES and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC ("**Directive 2009/28/EC**"), reads in relevant part:

   Article 3

   Mandatory national overall targets and measures for the use of energy from renewable sources

   1. Each Member State shall ensure that the share of energy from renewable sources, calculated in accordance with Articles 5 to 11, in gross final consumption of energy in 2020 is at least its national overall target for the share of energy from renewable sources in that year, as set out in the third column of the table in part A of Annex I. Such mandatory national overall targets are consistent with a target of at least a 20 % share of energy from renewable sources in the Community's gross final consumption of energy in 2020. In order to achieve the targets laid down in this Article more easily, each Member State shall promote and encourage energy efficiency and energy saving.

---

[1874]    RAESBA (**R-006**), pp. 7-8, Article 9, No. 3.

2. Member States shall introduce measures effectively designed to ensure that the share of energy from renewable sources equals or exceeds that shown in the indicative trajectory set out in part B of Annex I.3.

In order to reach the targets set in paragraphs 1 and 2 of this Article Member States may, inter alia, apply the following measures:

(a) support schemes;[1875]

…

| | Share of energy from renewable sources in gross final consumption of energy, 2005 ($S_{2005}$) | Target for share of energy from renewable sources in gross final consumption of energy, 2020 ($S_{2020}$) |
|---|---|---|
| Bulgaria | 9,4% | 16% |

…

(1) In order to be able to achieve the national objectives set out in this Annex, it is underlined that the State aid guidelines for environmental protection recognise the continued need for national mechanisms of support for the promotion of energy from renewable sources.

…

Indicative trajectory

The indicative trajectory referred to in Article 3(2) shall consist of the following shares of energy from renewable sources:

$S_{2005}$+ 0,20 ($S_{2020}$− $S_{2005}$), as an average for the two-year period 2011 to 2012;

$S_{2005}$+ 0,30 ($S_{2020}$− $S_{2005}$), as an average for the two-year period 2013 to 2014;

$S_{2005}$+ 0,45 ($S_{2020}$− $S_{2005}$), as an average for the two-year period 2015 to 2016; and

$S_{2005}$+ 0,65 ($S_{2020}$− $S_{2005}$), as an average for the two-year period 2017 to 2018,

where

$S_{2005}$= the share for that Member State in 2005 as indicated in the table in part A,

and

$S_{2020}$= the share for that Member State in 2020 as indicated in the table in part A.[1876]

     *c.    The ERSA White Paper*

1239. The undated "White Paper" on the draft ERSA (the "**ERSA White Paper**"), reads in relevant part:

II. Reasons for the need for a new Law for the energy from RES

The current Law on the renewable and alternative energy sources and the biofuels [RAESBA] does not correspond to the necessary level to the

---

[1875]    Directive 2009/28/EC of the European Parliament and of the Council on the promotion of the use of energy from renewable sources, 23 April 2009 (**FR-35**), p. 13

[1876]    *Ibid.*, pp. 31-32, Annex I.

development of the social relationships and to the obligations undertaken by the Republic of Bulgaria for securing 16 % share of the energy from RES until 2020. The need of a new Law is also following the obligations of the Republic of Bulgaria to implement into its legislation the provisions of Directive 2009/28/EC dated 23 April 2009.[1877]

The draft Law **keeps** the principle for **obligatory offtake of the electricity produced by RES** on the basis of long term power purchase agreements (PPA) and preferential Feed-In Tariff (FIT). **The FIT is fixed for the entire term of the PPA** and shall be determined by the State Energy and Water Regulatory Commission (SEWRC) in accordance with the Ordinance for the determination of the electricity prices under the Energy Law.[1878]

1240. The ERSA White Paper demonstrates, to the Tribunal, that

a. Offtake, FiT, and term are the pillars of the ERSA Regime and both under RAESBA and ERSA the understanding was that if electricity was produced from RES, it falls under the "obligatory offtake" and the producer thereof had a right to sell it under its PPA at the applicable FiT.

b. The ERSA was thoroughly prepared and in that process the Respondent would have looked at other EU Member States practices and issues.

d. *The ERSA*

1241. The ERSA is the core piece of legislation of the ERSA Regime. It was first introduced and effective on 3 May 2011, as it appears from Claimant Exhibit C-41.

1242. It appears from the Respondent's second-round written submission (RROMROJ) that before the commissioning of the Karad Plant, the execution of the Karad PPA in June 2012, and the date of the Investment, the ERSA was amended once already, by means of the April 2012 Amendment, effective 10 April 2012.[1879]

1243. The Tribunal understands that the April 2012 Amendment introduced only relatively minor changes to the ERSA. It further understands that the practical relevance of the April 2012 Amendment to the Karad Plant was limited because (i) the main thrust of the April 2012 Amendment appears to have been the change of the relevant time for the determination of the applicable FiT for plants that had not yet received Act 16 and (ii)

---

[1877] ERSA White Paper (**C-40**), p. 1.

[1878] *Ibid.*, p. 2.

[1879] RROMROJ, para. 88; April 2012 ERSA (**R-294**); NA 25 January Transcript (**FR-104**).

the Karad Plant had already received Act 16 by the time the April 2012 Amendment came into effect.

1244. Nevertheless, the changes introduced by the April 2012 Amendment do affect the text of the Articles most relevant for the present dispute, including Article 31 ERSA and the ERSA as amended by the April 2012 Amendment (the "**April 2012 ERSA**") indeed appears to be the applicable version of the law at the time of the commissioning of the Karad Plant, the execution of the Karad PPA, and the Investment. It is therefore not understandable to this Tribunal, and it was not explained to it, (i) why the May 2011 version of the ERSA is relied on and constantly quoted, when, for all the Tribunal can see, it was not the applicable law at the date of commissioning, and (ii) why the April 2012 ERSA is only referenced to in one single footnote.[1880]

1245. In setting out the most relevant Articles of the ERSA below, the Tribunal will therefore set out the Articles from the April 2012 ERSA.

1246. That being said, the ERSA reads in relevant part:[1881]

Promulgated, State Gazette No. 35/3.05.2011, effective 3.05.2011, amended and supplemented, SG No. 29/10.04.2012, effective 10.04.2012

…

Article 1 (2)

The Energy Act shall apply to any issues not provided for in this Act.

Article 2. (1) The primary objectives of this Act are as follows:

1. promotion of production and consumption of energy produced from renewable sources;

 …

5. **providing information regarding the support schemes**, the benefits and practical specifics of the development and use of energy from renewable sources of all stakeholders involved in the process of production and consumption of electricity, heating and cooling from renewable sources, of production and

---

[1880]    RROMROJ, para. 88, fn 160. Similarly regarding the Energy Act: the Claimant did not exhibit the Energy Act at all whereas in the submissions of the Respondent reference is regularly made to Exhibit (**R-028**), the Energy Act as effective 3 May 2011 and Exhibit (**R-042**), the Energy Act as amended 18 May 2012 and effective 1 July 2012, and both Exhibits are, interchangeably, referred to as the May 2012 Energy Act. The Respondent only seldomly refers to the Energy Act (**R-247**), i.e. the version of the Energy Act apparently applicable at the time of the investment.

[1881]    April 2012 ERSA (**R-294**).

consumption of gas from renewable sources, as well as the production and consumption of biofuels and energy from renewable sources in transport;

(2) The objectives referred to in Article 2 shall be achieved by:

…

7. establishment of a National Information System for the potential, production and consumption of energy from renewable sources in the Republic of Bulgaria, hereinafter referred to as "National Information System";

…

Article 6. The State Commission of Energy and Water Regulation (SCEWR):

1. shall set preferential prices for purchasing electricity from renewable sources;

2. shall develop a methodology for fair distribution of the balance between the market price and the preferential prices of electricity produced from renewable sources among all consumers, including traders in electricity for the quantities for export;

3. shall approve and publish on its website the envisaged electric capacities, which may be allocated for connection to the transmission and distribution electricity grids to projects for production of electricity from renewable sources;

4. shall exercise control on conducting procedures for connection of energy projects for electricity production to the transmission and distribution electricity grids;

5. shall exercise control over the performance by transmission and distribution electricity grid operators of their obligations to report cases of significant decrease of quantities transferred and/or distributed electricity from renewable energy sources and on the corrective measures pursued;

6. shall exercise control over the performance by the transmission and distribution grid operators of their obligations to spend the funds under Article 29, Paragraph 1, only to cover the expenses under Article 29, Paragraph 4;

…

Article 12. (1) In order to achieve the mandatory national target of the Republic of Bulgaria for 16 percent total share of energy from renewable sources in the gross ultimate energy consumption, including 10 percent mandatory share of the energy from renewable sources in transport, the Minister of Economy, Energy, and Tourism shall develop NREAP

…

(4) Average values for two-year periods of the share of energy from renewable sources in the gross ultimate energy consumption according to the indicative trajectory are, as follows:

**1. from 2011 to 2012, inclusive - 10,72 percent;**

2. from 2013 to 2014, inclusive - 11,38 percent;

3. from 2015 to 2016, inclusive - 12,37 percent;

4. from 2017 to 2018, inclusive - 13,69 percent.

…

343

Article 13. (1) The Minister of Economy, Energy, and Tourism shall prepare and submit to the European Commission a report on the performance of NREAP each two years until 31 December 2021.

…

Chapter Four

PRODUCTION OF ENERGY FROM RENEWABLE SOURCES

Section I

General Provisions

…

Article 18.

(1) Production of electricity from renewable resources, including of electricity from cogeneration of heating and/or cooling and electricity from renewable sources, shall be encouraged by:

1. providing **guaranteed access** of electricity produced from renewable sources to the transmission and distribution electricity grids while remaining compliant with the security criteria set forth in the rules under Article 83, Paragraph 1, items 4 and 5 of the Energy Act;

 2. **guaranteeing the transmission and distribution** of electricity produced from renewable sources, while remaining compliant with the security criteria set forth in item 1;

3. **ensuring the construction of the necessary infrastructure and electricity capacities** for the purposes of regulation of the electricity system;

4. setting as a priority the dispatching of electricity produced from renewable sources, while remaining compliant with the security criteria set forth in item 1;

5. **purchasing of electricity produced from renewable sources for a period of time as set forth in this Act**;

6. **setting of a preferential price for purchasing of electricity produced from renewable sources**, including electricity produced from biomass by direct combustion technologies, with the exception of energy produced by means of hydroelectric stations with overall installed capacity over 10 MW;

…

(2) The incentives under paragraph 1 items 5, 6, 7 and the procedure for connection to the grid under Section II and Articles 31 and 32 shall not apply to energy facilities for production of electricity from renewable sources, **the connection of which is applied for after the date of the report of the Minister of Economy, Energy and Tourism under Article 13, Paragraph 1, in which it is reported that the overall national target under Article 12, Paragraph 1, is achieved**.

…

Section II

Connection of energy production projects for production of electricity from renewable sources

344

Article 22. (1) (Effective from 1.01.2012 - SG. 35/2011) Operators of electricity distribution grids shall submit annually, by 28 February of each year, to the respective electricity transmission grid operator the planned one-year ahead electricity production capacities that can be provided for connection to the distribution networks to projects for electricity production from renewable sources by region of connection and by voltage level.

(2) (Effective from 1.01.2012 - SG. 35/2011) Each electricity transmission grid operator shall submit annually, by 30 April of each year, to SCEWR and the Minister of Economy, Energy and Tourism, based on the 10-year plan for development of the electricity transmission grid and the proposals under Paragraph 1, estimates of electricity production capacities for a one-year period that can be provided for connection to the electricity transmission and distribution grids to projects for production of electricity from renewable sources by region of connection and by voltage level.

(3) (Effective from 1.01.2012 - SG. 35/2011) **The estimates** under Articles 1 and 2 **shall be developed on the basis of** the targets under the National Renewable Energy Action Plan and data on:

**1. the concluded preliminary contracts**;

2. the accounted for and projected electricity consumption;

3. the transmission capacity of the grids;

4. the possibilities for balancing the power in the electricity system.

(4) (Effective from 1.01.2012 - SG. 35/2011) Within one month of receipt of the proposals under Paragraph 2, the Minister of Economy, Energy and Tourism shall send to SCEWR a statement of opinion on the conformity of the proposals with the NREAP.

(5) (Effective from 1.01.2012 - SG. 35/2011) The State Commission of Energy and Water Regulation shall approve on annual basis by 30 of June of each year, and shall publish on its website the estimated electricity capacities for one-year period, considered from July 1, that can be connected to the electricity transmission and distribution grid to projects for production of electricity from renewable sources by region of connection and by voltage level.

(6) The conditions of and procedure for making the estimates under Paragraphs 1 and 2 shall be governed by the Ordinance under Article 60 of the Energy Act.

Article 23. (1) (**Effective from 1.07.2012** - SG. 35/2011) Persons who wish to build an energy facility for production of electricity from renewable sources or to expand an existing power plant or to increase the installed capacity of a power plant for production of electricity from renewable sources, shall submit to the operator of the respective grid an application for connection in regions indicated by them, approved under Article 22, Paragraph 5.

(2) (Effective from 1.07.2012 - SG. 35/2011) Applications under Article 1 shall be submitted after approval of the electricity capacities that may be available for connection, within the one-year period under Article 22, Paragraph 5.

(3) (Effective from 1.07.2012 - SG. 35/2011) The respective electricity grid operator shall consider the applications in the order of their receipt, and with a

reasoned statement of opinion shall come up with a decision as to the acceptability of each application within 14 days of its receipt.

(4) (Effective from 1.07.2012 - SG. 35/2011) The respective electricity grid operator shall send to the applicant its statement of opinion under Paragraph 3 and shall publish it on its website.

(5) (Effective from 1.07.2012 - SG. 35/2011) If the application was declared acceptable in the statement of opinion under Paragraph 3, the operator of the respective electricity grid shall conduct a survey and shall issue a statement of opinion on the conditions and manner of connection.

(6) (Effective from 1.07.2012 - SG. 35/2011) After all approved electricity capacities for the respective region have been allocated the electricity grid operator shall return the applications filed and not considered, which shall be deemed a reasoned refusal for connection under Article 117, Paragraph 4 of the Energy Act.

…

(13) The conditions of and provisions for conducting the procedures under Paragraph 1 - 12, including the criteria for admissibility and for exercising control by SCEWR shall be provided for in the Ordinance under Article 116, Paragraph 7 of the Energy Act

…

Article 25. (1) The provision of Article 23 shall not apply to energy projects for production of electricity from renewable sources where, at the time of filing of an application for connection, the producer of electricity from renewable sources declares he will not avail of the preferences under Articles 31 and 32.

(2) The capacities for connection under Paragraph 1 shall not be included in the envisaged electricity capacities which may be allocated for connection under Article 22, Paragraphs 1 and 2.

…

Article 27. (1) The costs for construction of facilities for the connection of an energy project of a producer to the respective grid up to the ownership boundary of the electrical facilities shall be at the producer's expense.

(2) **The costs** for construction of facilities for the connection of an energy project of a producer to the respective grid from the ownership boundary of the electrical facilities to the point of connection, as well as those **for development, including for reconstruction and modernization of electricity grids in relation to the connection shall be at the expense of the owner of the respective grid**.

(3) The ownership boundary of the electrical facilities shall be determined in accordance with the Ordinance under Article 116 Paragraph 7 of the Energy Act. When the point of connection does not coincide with the ownership boundary of the electric facilities, the provision of Article 116 Paragraph 5 of the Energy Act shall apply

…

Article 28. (1) In relation to the implementation of the targets and measures under the National Renewable Energy Action Plan, **operators of the transmission and distribution electricity grids shall include in the annual**

**investment and maintenance programmes funds for development of the grids in relation to connection, transmission and distribution of electricity produced from renewable sources.**

(2) Operators of the transmission and distribution electricity grids shall report on annual basis, by 31 of March of each year, to SCEWR on the performance of the activities budgeted in the investment and maintenance programmes for development of the grids under Paragraph 1 in the preceding calendar year for the purposes of connection of energy projects for production of electricity from renewable sources, and in case of failure to perform - on the measure pursued.

(3) The reports under Paragraph 2 shall include information on the sums collected under Article 29, Paragraph 1, and on their spending, as well as information under Article 30, Paragraph 7.

…

Article 29. (1) At the time of conclusion of a preliminary grid connection agreement the producer of electricity from renewable sources shall owe to the transmission or to the respective distribution company, which connects it, an advance payment in the amount of:

1. BGN 50,000 for each megawatt (MW) installed capacity of the future energy project, where the installed capacity is higher than 5 MW;

2. BGN 25,000 for each megawatt (MW) installed capacity of the future energy project, where the installed capacity is up to 5 MW, inclusive.

…

(4) **The funds** under Paragraphs 1 and 3 **shall be spent** for covering the costs of the construction of the connection facilities and **for the planned development, including the reconstruction, modernization and management of the electricity grids, in relation to the connection of the specific energy project for production of electricity from renewable energy sources**.

…

Section III

Purchase, transmission and distribution of electricity from renewable sources

Article 30.

(1) Producers of electricity from renewable energy sources, whose energy projects are with total installed capacity over 30 kW, shall conclude an agreement for access with an operator of the transmission or the distribution electricity grid under general terms and conditions approved by SCEWR and announced on the website of the operator of the respective distribution grid prior to concluding a contract for purchase of the electricity. …

…

(4) The producer of electricity from renewable sources with installed capacity over 30 kW shall ensure the real time data transmission to an operator of the transmission or of the distribution electricity grid about the electricity delivered to the point of connection.

(5) The operator of the transmission or of the distribution electricity grid may limit the remote transmission of energy to the electricity grid by way of

347

exception where the transmission capacities of the grid to which the producer is connected are exceeded.

…

Article 31.

(1) (Amended, SG No. 29/2012, effective 10.04.2012) **Electricity from renewable energy sources shall be purchased by the public provider**, from the end suppliers respectively, **at the preferential price set by SCEWR**, effective as of the date of commissioning into operation within the meaning of the Territorial Planning Act of the energy project for production of electricity, …

(2) **Electricity from renewable energy sources** under Paragraph 1 **shall be purchased based on long-term purchase contracts** signed **for a term of**:

1. **twenty years** - for electricity produced from geothermal and solar energy, as well as for electricity, produced from biomass;

…

(3) (Amended, SG No. 29/2012, effective 10.04.2012) The terms under Paragraph 2 shall start from the date of commissioning into operation of the energy project, respectively from the date of commissioning of the first stage of phased commissioning into operation, … For energy projects commissioned into operation, and installations mounted after 31 December 2015, the terms of purchasing shall be reduced by the period from that date to the date of the commissioning into operation, respectively mounting.

(4) **The price of electricity from renewable sources shall not be changed for the term of the purchase contract under Paragraphs 2**, except in the cases under Article 32, Paragraph 4 [*only concerns biomass*], and after the expiry of this term no price preferences shall be granted.

(5) (Amended, SG No. 29/2012, effective 10.04.2012) **The public provider**, the end suppliers respectively**, shall purchase the whole amount of electricity from renewable sources**, with the exception of amounts which the producer shall:

1. use for own needs;

2. at its own discretion use for its own consumption and for power supply of its branches and projects;

3. sell at freely agreed prices according to the procedure under Chapter Nine, Section VII of the Energy Act and/or at the balancing market.

…


Article 32. (1) The State Commission of Energy and Water Regulation shall set on annual basis, by 30 June of each year, preferential prices for purchase of electricity produced from renewable energy sources, with the exception of electricity produced by hydroelectric power plants with installed capacity over 10 MW.

(2) The preferential prices under Paragraph 1 shall be set according to the procedure under the respective Ordinance under Article 36, Paragraph 3 of the

Energy Act, taking into consideration the type of renewable source, the types of technologies, the installed capacity of the project, the place and manner of mounting of the facilities, as well as:

1. the investment costs;

2. **the rate of return**;

3. the capital and investment structure;

4. the productivity of the installation according to the type of technology and resources used;

5. expenses in relation with a higher degree of environmental protection;

6. costs of raw materials for electricity production;

7. expenses for fuels for transportation;

8. labour and salary costs;

9. other operational costs.

(3) The preferential price of electricity from renewable energy sources shall be determined for the whole term of the purchase contract under Article 31, Paragraph 2, and after the expiry of this term no price preference shall be granted.

…

(7) The percentage of change of the expenses for fuels for transportation shall be determined based on the average market price of the respective pricing element in the preceding reporting year.

…

Article 52.

(1) With a view to ensuring accessibility and availability of the information collected under the conditions and according to the procedure of this Act, a National Information System shall be established, maintained and updated in ASED of the potential, production and consumption of energy from renewable sources in the Republic of Bulgaria.

(2) To ensure the accessibility via the system under Paragraph 1, the following shall be provided:

1. information on the national targets of production and consumption of energy from renewable sources in general and by sector;

2. reports on the implementation of the NREAP;

…

6. information about the incentives for production and consumption of electricity, heating and cooling from renewable sources and gas from renewable sources;

…

1247. The Tribunal understands the ERSA and in particular its Articles 31 and 18 as follows.

a. The ERSA Regime works by mandating that electricity produced from RES is purchased at a FiT for the period of a PPA, which is 20 years in case of electricity from PV plants.

b. The obligations of the Respondent under the ERSA are further given a specified form in a long-term PPA.

c. If electricity is produced from RES, then there is an obligation to purchase it at the FiT. That is clarified in Article 31(5) ERSA, but also is the necessary and obvious logic underlying the rest of the ERSA, including its Articles 18(5) and 31(1) and (2). It is not contemplated in the ERSA that electricity produced from RES would not be bought at a FiT unless that electricity were used for the production of the electricity sold itself or, only at the producer's wish, sold on the free market.

d. The ERSA guarantees access of electricity produced from RES to the transmission and distribution electricity grids and the transmission and distribution of RES electricity though those grids (Article 18(1) ERSA Nos. 1 and 2).

e. The ERSA shows an awareness that an increase in renewable energy production will put a strain on the electricity network and will require investments into the necessary infrastructure and capacities. Ensuring that these investments are made and these structures are provided and updated is part of the government's encouragement of more investment in renewable energy capacities, and it is thus understood to be a task of the government, the costs of which are either costs of the government, or placed on the owners of the grid (Articles 18(1) No. 3, 27(2), 28(1) ERSA).

f. Providing information regarding the support schemes for renewable energy is officially one of the "primary objectives" of the ERSA (Article 2(1) No. 5 ERSA).

g. Monitoring capabilities and staying informed is an important theme in the ERSA.

h.  Concluded preliminary contracts are the documents through which the ERSA believes that the amount of upcoming connections can be anticipated.

i.  It is likely that at the time the April 2012 Amendment was debated and adopted, Bulgaria was aware of the number and envisaged capacity of preliminary connection agreements, including the one of the Karad Plant over 50 MW. This information would have indicated to Bulgaria that in all likelihood its expectations for 2012 would be exceeded.[1882] It also appears (see below) that at that time, the Respondent was aware of how much the ERSA had decreased the pipeline of renewable energy projects that had arisen under the RAESBA Regime. Nevertheless, the Respondent did not use the April 2012 Amendment to amend the indications in the law itself as to when the 16% Target would be reached, nor did the Respondent decide to introduce a cap in that law or allow the option of a moratorium of Article 22 ERSA to start earlier. The Respondent also refrained from making the Article 13(1) ERSA declaration that might have been able to close the ERSA Regime for new entrants under Article 18(2) ERSA.

e.  *The Energy Act*

1248.  The Energy Act in the form applicable at the time of the Investment reads in relevant part:[1883]

Article 4 (2) (Amended, SG No. 74/2006) The Minister of Economy, Energy and Tourism shall perform the following functions:

…

5. (supplemented, SG No. 35/2011, effective 3.05.2011) approve an inventory of the required new electricity generating capacities solely in cases where the security of electricity supply cannot be guaranteed through the effective licensing system under this Act or for the purpose of achieving the required share of energy from renewable sources in the gross ultimate consumption of energy, and promulgate the said inventory in the State Gazette;

…

Article 10. (1) (Amended, SG No. 18/2005) The State Energy and Water Regulatory Commission, hereinafter referred to as the "Commission", shall regulate energy-sector and water-supply and sewerage activities.

---

[1882]  NA 25 January Transcript (**FR-104**), pp. 7, 10.

[1883]  Energy Act (**R-247**).

(2) The Commission shall be an independent specialized state body, a legal person with a head office in Sofia.

…

Article 21. (1) (Previous Article 21, SG No. 18/2005) For regulation of the activities comprehended in electricity generation, transmission and distribution, natural gas transmission and distribution, trade in electricity and natural gas, heat generation and transmission, the Commission shall exercise the following powers:

1. issue, modify, supplement, suspend, terminate and withdraw licences in the cases provided for in this Act;

…

3. draft the statutory instruments of secondary legislation provided for in this Act;

4. approve the general conditions of the contracts provided for in this Act;

5. exercise control in the cases provided for in this Act;

6. perform price regulation in the cases provided for in this Act;

7. (amended, SG No. 74/2006) adopt the rules for trade in electricity and natural gas (Market Rules) and the technical rules for the networks (Grid Code), proposed by energy companies, and control compliance with the said rules;

…

8. adopt and control the implementation of a methodology for setting of prices for balancing electricity as part of the rules for trade in electricity under Item 7;

9. set the rules for access to the electricity and natural gas transmission networks, respectively to the electricity and natural gas distribution networks (Rules on Network Access);

…

19a. (new, SG No. 74/2006, effective as of the date of entry into force of the Treaty concerning the Accession of the Republic of Bulgaria to the European Union) provide the competent authorities of the European Communities all information under the law of the European Communities;

19b. (new, SG No. 74/2006, effective as of the date of entry into force of the Treaty concerning the Accession of the Republic of Bulgaria to the European Union) according to its authority, send requests and notices to the competent authorities of the European communities for granting temporary relief from the application of provisions in the law of the European communities and transitional periods in the field of energy in all cases under the law of the European communities;

Article 23. (1) In exercising the regulatory powers thereof, the Commission shall be guided by the following general principles:

1. prevention and preclusion of limitation or distortion of competition on the energy market;

2. **balancing the interests of energy companies and consumers**;

3. ensuring non-discrimination between the various categories of energy companies and between groups of consumers;

4. providing incentives for efficient operation of regulated energy companies;

5. providing incentives for development of a competitive market for energy sector activities, where conditions so permit.

…

Article 24. (1) (Amended, SG No. 74/2006) Implementing the power thereof referred to in Paragraph 1, Item 7a, 17a of Article 21 (1) and § 135 herein, the Commission shall adhere to the following principles:

1. (amended and supplemented, SG No. 74/2006) fair allocation of the economic consequences of market liberalisation between all parties to transactions in electricity and natural gas;

2. (supplemented, SG No. 74/2006) ensuring equal terms for conclusion of transactions at freely negotiated prices, compared to the transactions concluded with the public provider or the public suppliers of electricity and natural gas;

3. (supplemented, SG No. 74/2006) ensuring a balanced adjustment of end-user prices, taking into account the public service obligations, public obligations, and non-recoverable costs of the public provider or the public suppliers.

4. (new, SG No. 74/2006) ensuring all measures required to supply consumers with electricity and natural gas of certain quality at fully comparable, transparent, and objectively set prices, applied on equal-treatment conditions.

…

Article 30. (1) The following prices shall be subject to regulation by the Commission:

1. at which producers sell electricity to the public provider and/or to public suppliers;

…

4. (amended, SG No. 74/2006) at which the public provider sells electricity to public suppliers, to consumers connected to the transmission network, and to the distribution company, in order to cover the technological costs of transmission;

…

6. at which public providers sell electricity and natural gas to consumers connected to the respective distribution networks or to public suppliers;

7. (amended, SG No. 103/2009) for transmission of electricity and natural gas to consumers through the respective transmission and/or distribution networks;

8. for connection to the networks;

…

(2) The prices of electricity referred to in Items 1, 4 and 6 of Paragraph (1) shall be subject to regulation until all consumers acquire the status of eligible consumers.

…

353

Article 31. (Supplemented, SG No. 74/2006) In exercising its price regulation powers, in addition to the principles under Articles 23 and 24 herein, the Commission shall be guided by the following principles as well:

1. prices shall be non-discriminatory, based on objective criteria and determined in a transparent manner;

2. prices of energy companies shall cover the **economically justified operating costs**, including the costs of:

(a) management, operation and maintenance of energy works;

(b) maintenance of stand-by and regulating capacities required for reliable supply to consumers;

(c) delivery and maintenance of the stocks of fuels;

(d) repairs;

(e) depreciation;

…

3. apart from the costs covered under Item 2, prices shall include non-recoverable costs related to the transition to a competitive energy market, as well as costs resulting from fulfilment of public obligations related to security of supply;

4. prices must ensure an **economically justified rate of capital return**;

5. prices for the individual groups of consumers shall conform to the costs of delivery of energy and natural gas to the said consumers;

…

7. (new, SG No. 74/2006, amended, SG No. 35/2011, effective 3.05.2011) **fair passing of any costs attributable to the preferential pricing of energy from renewable sources and combined electricity and heat generation to electricity end consumers;**

8. (new, SG No. 74/2006) **fair passing of any system service, incl. ancillary services, cold reserve, and technology, costs to transmission network, respectively distribution network, users.**


Article 36

…

(3) The methods of price regulation, the rules for price formation or setting and modification, the procedure for provision of information, for submission of proposals on prices and for endorsement of prices shall be established by ordinances on electricity, heat and natural gas adopted by the Council of Ministers on a motion by the Commission.

…

Article 51. (1) A licence may be modified and/or supplemented by a decision of the Commission:

1. at the request of the licensee;

2. on the Commission's own initiative.

(2) The Commission shall have the right to initiate a modification and/or supplementation of a licence as issued in the following cases:

1. in order to ensure reliability or uninterrupted and high quality supply of electricity, heat and natural gas to consumers;

2. upon change in the relevant legislation;

3. to safeguard national security and public order in coordination with the relevant competent state bodies;

4. in case of risk to the life and health of citizens, of damage to the environment or to the property of third parties, when this does not necessitate withdrawal of the licence, and/or on a motion by specialized state bodies in pursuance of the powers vested therein;

5. should corporate transformation of a licensee or a capital improvement transaction is authorized, where this does not lead to termination of the licence.

(3) The Commission shall inform the licensee in writing of the initiation of a proceeding for modification and/or supplementation of the licence under Paragraph (2). Within fourteen days, the licensee may submit a written opinion regarding the grounds for the modification and/or supplementation of the licence.

….

Article 93a. (New, SG No. 74/2006, effective 1.07.2007) (1) (Amended, SG No. 35/2011, effective 3.05.2011) **The public provider shall purchase** electricity from producers, connected to the transmission network, on long-term availability and electricity purchase agreements, as well as **electricity produced from renewable sources**, from high-efficiency combined electricity and heat generation, and the quantity of electricity, defined under Article 4, Paragraph 2, Item 8.

Supplementary Provisions

Article 1

24. (Supplemented, SG No. 74/2006, SG No. 41/2009) "Energy company" shall be a legal entity which performs one or more of the activities related to the generation, conversion transmission, storage, distribution, delivery, and supply of electricity, heat or natural gas, and the electric power grid management on the grounds of a licence issued under this Act, or a person/entity extracting energy resources on the grounds of an extraction concession, or a person, which performs an activity related to the generation of electricity and/or heat without being obligated to obtain a licence for the activity performed thereby under this Act, or a person/entity performing oil and oil product transmission activity through pipelines.

1249. The Tribunal has taken note of the above provisions of the Energy Act and in particular the Respondent's reliance thereon.

1250. In the view of the Tribunal, however, the ERSA is *lex specialis* and, in relevant part, *lex posterior* to the Energy Act. This appears to be the case, not least, in light of Article 1(2) ERSA. The Tribunal also notes that electricity from renewable energy is a special type of electricity and that "producer of electricity from renewable sources" is a special type of producer of electricity or energy company. It is further evident that the Bulgarian legislator deemed it necessary to adopt the ERSA even though an Energy Act existed.

1251. In addition, the general principles of fairness, the balancing of costs, cost-efficiency, and economically justified costs and return referred to in the Energy Act, if applicable at all to the ERSA Regime, do not appear to contradict or limit the ERSA Regime nor would they appear to do so to a reasonable investor. To the contrary, in the view of the Tribunal, the ERSA (see above), and the FiT Decisions (see below) as acts of the Respondent give the impression that they would, *qua definitione*, be in alignment with the Energy Act, as would be a PV plant that fulfils the conditions for receiving the FiT set in such instruments.

1252. The Tribunal further notes that the Energy Act makes it clear that NEK was obliged by law to purchase electricity from RES.

       *f.*     *The 2010 Electricity Trading Rules*

1253. On 17 August 2010,[1884] the 2010 ETR were promulgated in the State Gazette. The 2010 ETR read in relevant part:[1885]

Chapter Five
Balancing Responsibility
Section I
Balance responsible parties
Art. 56.
…
(2) The balancing groups shall be: standard balancing groups, special balancing groups and special balancing group of producers from renewable energy resources (RES).

Chapter Eleven

---

[1884]    According to CMOM, para. 143, fn 154. Exhibit (**C-49**) is undated.

[1885]    2010 ETR (**C-49**), pp. 45ff.

Trading with electricity energy from Renewable Energy Sources

General provisions

…

Art. 197. (1) The transmission and the distribution companies shall provide to the Electricity System Operator till 15 December each year, information on the installed capacities of producers of electricity from RES, depending on the network to which they are connected, according the concluded contracts for access and transmission to the relevant network.

(2) The information under art. 1 shall contain at least:

1. name of owner.

2. number, type and technical characteristics of the generating sources.

3. connection point to the electricity transmission or electricity distribution network.

4. technical tools for capacity control.

5. the commercial electricity metering devices.

(3) **The Electricity System Operator shall maintain up-to-date register of all producers of electricity from RES.**

(4) **The Electricity System Operator shall be informed on a monthly basis at change in the information under paragraph 1, not later then the 5th (fifth) day before the end of the current month.**

(5) SEWRC shall inform the Electricity System Operator/the electricity distribution companies, the Public supplier/Public providers for termination of a license of a producer from RES, within three days as of the issuance of the administrative act.

…

Art. 202. (1) The special balancing group of producers from RES under art.198 shall be a separate balancing group, formed only for the generation installations of these producers and shall be balanced according the general conditions in these trading rules.

(2) **The producers from RES shall compensate the costs of balance responsible party of special balancing group** according art. 198, **in accordance with the provisions of art.203**.

(3) The costs for balancing of balance responsible party of the special balancing group of producers from RES, which are not compensated by the members of the group, for the allowed deviations under art. 203, paragraph 2 and paragraph 3, shall be accounted by the balance responsible party of the special balancing group and shall be covered by the premium.

Art. 203. (1) The individual imbalances of the producers from RES shall be determined by the balance responsible party of the special balancing group under art.198, on the basis of the hourly generation forecast schedule under art. 200, paragraph 1 and the readings of the electricity metering devices.

(2) At **deviations up to 20%** from the hourly generation forecast schedule under art.200, paragraph 1, **the relevant producer from RES shall not be**

**responsible** for the incurred imbalance of the group and does not owe payments to the balance responsible party of the special balancing group

(3) At **deviation with more than 20%** from the hourly generation forecast schedule, under art. 200, paragraph 1, in direction incurred **energy surplus**, the relevant producer from RES shall pay to the balance responsible party of the special balancing group of producers from RES, the determined for the given settlement period energy surplus, according paragraph 1, at **price equal to 50% of the price** for energy surplus, **only in case the total net imbalance for the relevant group is positive for this period of settlement**.

(4) At deviation with more than 20% from the hourly generation forecast schedule, under art. 200, paragraph 1, in direction incurred **energy deficit**, the relevant producer from RES shall pay to the balance responsible party of the special balancing group of producers from RES, the determined for the given settlement period energy deficit, according paragraph 1, at price equal to 50% of the price for energy deficit, only in case the total net imbalance for the relevant group is negative for this period of settlement.

(5) **In case of deviations from the hourly generation forecast schedule under paragraph 1, in direction different from the total net imbalance of the balancing group, payments to the balance responsible party are not owed**.

…

§ 6. Till 01.04. 2011 **the provisions of chapters V - XI shall apply experimentally after the integration of the software products for settlement of the transactions on the balancing energy market and after the end of the period for registration of the balance responsible party under art. 59, art. 60 and art. 61 of the rules**.

§ 7. Till 01.05. 2011 the Electricity System Operator shall reflect and summarise the results from the experimental period under the previous paragraph and shall propose for discussion amendments and additions of the rules.

§ 8. (1) **The imbalances under art. 202, paragraph 2, shall apply for 1 (one) year after the entry into force of the rules**.

1254. It is unclear to the Tribunal whether the 2010 ETR were ever fully in force and enforced. The Respondent submits that the 2010 ETR were never used to set balancing costs in any case since the balancing market of Bulgaria was not implemented until after the introduction of the 2013 ETR.[1886]

1255. In any case, the 2010 ETR's balancing regime for producers of renewable energy under its Article 203 does appear to be very favourable to producers of renewable energy, given that only deviations higher than 20% had to be paid for, only at half the regular price, and only if the whole special balancing group of producers of renewable energy

---

[1886]    RCMOMOJ, paras. 54, 191-192, 195.

was in imbalance in the same direction as the individual producer of renewable energy, *i.e.* surplus or deficit.

1256. The 2010 ETR also, once more, show the many possibilities which the Respondent had to be informed in real time about the capacity of the current and upcoming electricity producers in its territory.[1887]

g.    *The Karad PPA*

1257. On 13 June 2012, ACWA Bulgaria (then ZBE Partners) and NEK entered into the Karad PPA, which reads in relevant part:

Art. 1 (1) The PRODUCER shall sell and **the PUBLIC PROVIDER shall buy the active electricity energy produced by the Plant**, transmitted to the place of delivery after the first date of delivery, within the whole validity period of this agreement, for which there is an issued guarantee of origin with the exception of the energy, for which the PRODUCER has concluded sale agreements on the liberalized market, sale agreements on the liberalized market with issued guarantee of origin, or with which he participates on the balancing energy market, as well as the electricity produced for own needs and electricity supply of own facilities.

…

Art. 2 (1) The obligation for power purchasing by the PUBLIC PROVIDER at the applicable preferential price shall enter into force on the date of the event which occurs at the latest, namely:

-receipt of the Use Permit for the Plant and the connection facilities, according to the SDA;

-obtaining of a permit from the SEWRC for commencing of the licensed activity.

…

Art. 3 The term of this Agreement shall be 20 years.

…

Art. 4 (1) The Producer shall deliver the produced energy to the Public Provider at the point of delivery, specified in Annex 4, being an inseparable part of this agreement.

(2) The estimated quantities of active electricity energy, which the PRODUCER shall produce and the PUBLIC PROVIDER shall purchase during each following calendar year, are described on a monthly basis in Annex No 1, inseparable part of this Agreement. These quantities shall serve only for preliminary planning and shall be submitted to the PUBLIC PROVIDER by the end of November of the current year.

---

[1887]    *Cf.* the quoted Article 197 2010 ETR, but also Articles 206, 220 2010 ETR, not quoted.

Art. 5 (1) The PRODUCER shall be obliged to submit to the PUBLIC PROVIDER a guarantee of origin for the electricity energy, produced from renewable energy sources ("RES") pursuant to the Regulation under art. 35 from RESA within 10 days after its issuing, but not later than 12 (twelve) months from the expiration of the period for which the guarantee has been issued.

…

Art. 10 In compliance with Ordinance No. РД-16-1117/14.10.2011 the electricity, subject to purchase under a preferential price, as determined by the SEWRC, shall be considered only the electricity with issued guarantee of origin.

Art. 11(1) **The electricity, produced Plant pursuant to art. 1 (1) shall be purchased by the PUBLIC PROVIDER at the preferential price**, determined by SEWRC, pursuant to the provisions of Art. 31 RESA, § 7, par. 2 of TFP of RESA and art.9, para.2 of Ordinance No.РД-16-1117/14.10.2011.

(2) **The preferential price, at which the PRODUCER shall sell to the PUBLIC PROVIDER the electricity pursuant to art. I (1) of this Agreement**, has been determined by Decision No Ц-018/20.06.2011 of the SEWRC and is **485.60 BGN/MWh** (four hundred eighty six point sixty per Megawatt-hour), VAT exclusive – in compliance with Annex 7 – Use Permit No.ДК-07-ЮР-61/23.03.2012, Annex 8, Decision No. Ц-018/20.06.2011 of SEWRC and Annex 9 "Act establishing the suitability to accept the construction project" as of 27.02.2012, which represent an inseparable part of this Agreement.

…

Art. 18(1) The electricity quantities, for which the PUBLIC PROVIDER shall owe payment under this agreement, shall be determined by the readings of the electricity metering devices (elements of the commercial measurement systems), property of NEK EAD, in its capacity of transmission company (the "TRANSMISSION COMPANY"), installed in the areas of commercial measurement (pursuant to Annex No 4) and shall be included in monthly protocols, signed between the parties.

Art. 42 The Agreement may be terminated before the expiration of its validity only:

(1) upon mutual agreement between the Parties;

(2) Irresistible force event, which shall prevent (terminate) the production by the Plant for more than three years – with a 90-day notification from the Party, which lacks any interest in the further implementation, pursuant to art. 306, par. 5 of the Commercial Code (Promulgated SG, No 48 of 18.06.1991 with all subsequent changes);

(3) Default (in this case only the performing Party may terminate this Agreement) – with a 90-day advance notice under the terms of the Obligations and Agreements Act (Promulgated SG, No 275 of 22.11.1950 with all subsequent changes);

Art. 43 The PRODUCER shall be deemed to be in default if:

360

(a) The license of the PRODUCER has been revoked, or

(b) The PRODUCER allows a significant default of its obligations under this Agreement and such a default has not been corrected within 60 (sixty) days following the notification for correction of the default on behalf of the PUBLIC PROVIDER.

Art. 44 The PUBLIC PROVIDER shall be deemed to be in default, if:

(a) The PUBLIC PROVIDER shall allow for essential default of any of its obligations under this Agreement, including the obligation for electricity purchasing, which has not been corrected within 60 (sixty) days following the notification on behalf of the PRODUCER for correction of this violation, or

(b) The PUBLIC PROVIDER undertakes actions for unilateral termination of this Agreement beyond the cases stipulated in art. 42.

Art. 48 This agreement shall be regulated and interpreted in compliance with the laws of the Republic of Bulgaria.

Art. 49(1) Any dispute, deriving from or in relation with this Agreement or with its violation, termination or invalidity shall be resolved via negotiations between the Parties. The Parties may use the support of the State Energy and Water Regulatory Commission for voluntary resolution of their disputes.

(2) All disputes, deriving from this Agreement or in relation with it, including the disputes, caused or related to its interpretation, invalidity, implementation or termination, as well as disputes and issues not explicitly stipulated in the Agreement, or the adjustment of the Agreement to newly occurred circumstances, which the Parties cannot resolve through negotiations, shall be referred to and finally resolved by the competent Bulgarian court.

Art. 51(1) Changes in this Agreement shall be made in writing through Additional Agreement, signed by the duly authorized representative of each of the Parties.

(2) Par.1 shall not be implemented in the event that by virtue of normative or administrative act of a competent body the conditions under which this agreement has been concluded have changed, and that the new conditions are mandatory for the Parties.

(3) The PRODUCER shall not be entitled to be substituted in this Agreement or in any other way to assign a part or all of its rights and/or obligations under it or in any other way to release itself from the performance of its obligation without the prior written consent on behalf of the PUBLIC PROVIDER, which can not be unreasonably refused.

(4) In case the PRODUCER assigns the rights under this Agreement to a third party, after the receipt of the consent under para. (3) the PRODUCER shall be obliged to notify in writing the PUBLIC PROVIDER, who, after ascertaining of the succession, shall conclude an Annex to the present Agreement with the successor.

(5) Regardless of any arrangements made under this Agreement, the PRODUCER may freely pledge its receivables under this Agreement to its lenders or other entities appointed by them.[1888]

1258. Annex 1 to the Karad PPA, title "Production program" foresees a production of 49,137 MWh for June to December 2012 and **81,955 MWh for 2013**, with the June to December values of the 2013 forecast being exactly the same as in the 2012 forecast.[1889]

1259. Annex 3 to the Karad PPA, titled "Plant Description", lists the **"total power of installed modules" as 60,445 KWp**.[1890]

1260. The Karad PPA, although dated after the April 2012 Amendment, still appears to use the wording of Article 30(5) ERSA from before the April 2012 Amendment, *i.e.* wording that requires a guarantee of origin.

1261. To the Tribunal, the Karad PPA:

    a. codifies the obligations of the ERSA, making them obligations of NEK in its role as public provider;

    b. confirms the Tribunal's reading of the ERSA, in particular the commitment of full offtake and that it was not contemplated that, outside the known exceptions at the time, electricity from a renewable energy plant would not be purchased at the FiT; and

    c. confirms that Bulgaria and NEK were aware of the 60.4/50 Ratio and the amounts of energy that the Karad Plant would produce and sell at the FiT *ab initio*.

1262. Finally, it appears difficult to interpret the text of the Karad PPA in harmony with the Annual Production Cap.

---

[1888] Karad PPA (**C-106**).

[1889] *Ibid.*

[1890] *Ibid.*

2.    **The FiT Decision, the License, Act 16, and the process leading to those decisions**

a.    *Minutes of Meeting EWRC ACWA Bulgaria 17 April 2012*

1263.   On 17 April 2012 the EWRC held a meeting with representatives of ACWA Bulgaria to discuss a report on the project, the status of the Karad Project (building completed), the License, and the possibility of a permit for commercial operation pending the issuing of a license. The minutes of that meeting read in relevant part:[1891]

> Today, 17 April 2012 at 10:00 a.m., open meeting of State Energy and Water Regulatory Commission (SEWRC) was held. The meeting was chaired by the **President, Mr. Angel Semerdzhiev**.
>
> The meeting was attended by the Commission members Anzhela Toneva, Andon Rokov, Evgeniya Haritonova, Kostadin Balachev, Milena Milanova, Tsvetanka Andreeva and the Secretary General Emilia Saveva.
>
> The meeting was attended by the following persons: V. Lozanov - director of Regulation and Control - Electrical and Heat Energy Directorate, E. Istatkova - director of Economic Analyses and Regulatory Audits Directorate and experts of SEWRC.
>
> The meeting was covered by representatives of the media.
>
> …
>
> The following persons appeared at the meeting [*on behalf of ACWA Bulgaria*]:
>
> •Mr. Alessandro Cheschiat - Executive Director
>
> •Mr. Luis Sabate - Board of Directors member
>
> •Mr. Radoslav Mikov - authorised person
>
> ….
>
> R. Mikov [ACWA Bulgaria]:
>
> The report only mentions that the plant has installed capacities of 60.44 MW peaks due to the very nature of the technology used. **If it is possible, please be kind to mention in the technical part of the licence that the technical capacity of the panels is 60.44 MW peaks, since the power output supplied to the network of NEK EAD will be 50 MW**. This technological specificity is due to the technology used. This results from the two current transformations - first direct current is produced and then in the inverters it is transformed into alternating current, with its voltage being changed from medium to high voltage. There are losses after the transformation and at end the power output amounts to 50 MW.
>
> A. Semerdzhiev [President EWRC]: **We are aware of this fact.**

---

[1891]   EWRC, Minutes No. 55, 17 April 2012 (**R-204**).

A. Semerdzhiev: I have reviewed the dates and your application for issuance of a licence has not been delayed. You can also apply for issuance of permit for commercial operation at this time, avoiding the waiting for the final decision - thus, you will be able to start the planned production.

R. Mikov: We are ready to do this.

A. Semerdzhiev: Do it even before the issuance of this decision. It is expected to be taken on 25 April 2012. If there are no problems, you will be issued permit for commercial operation.

…

A. Semerdzhiev: **I suppose that the banks are satisfied, since you will have pretty good project profitability**.

A. Cheschiat [ACWA Bulgaria]:This was their expectation; the model is expressed as numbers.

A. Semerdzhiev: Is this the largest photovoltaic park that is to be commissioned? In some countries, the construction of such parks is prohibited because of the large amount of land that they cover.

A. Cheschiat [ACWA Bulgaria]:We have encountered these land problems in other countries. In Rovigo, Italy, 70W photovoltaic panels were installed. The land there is also industrial one.

1264. To the Tribunal this protocol is one of the central pieces of evidence. It shows that:

    a. Bulgaria was aware of the 60.4/50 Ratio and what it meant.

    b. Nothing indicates that Bulgaria "declined to approve" the 60.4/50 Ratio as the Respondent put it repeatedly.[1892]

    c. Bulgaria was aware of, and indeed treated with some levity, the Karad Project's "high" profitability.[1893]

    d. Bulgaria encouraged the Karad Plant to start producing and become operational as quickly as possible.

1265. The Tribunal further notes that the content of this meeting was conveyed to, among others, Messrs Blum, Roberts, Malik, and Yayikoglu, by their counsel by e-mail of the

---

[1892]    RROMROJ, paras. 122, 126; HT, D1, 7 June 2021, p. 223; RPHB, para. 85.

[1893]    As noted elsewhere, it is not entirely clear to the Tribunal how "high" that profitability would have actually been on the project level. The highest figure ever alluded to by the Respondent appears to be 11.4%, being, according to the Respondent, the project IRR if the Claimant were to be awarded its full claim. RCMOMOJ, paras. 271, 498.

same day. There is thus proof on the record that the Shareholders were made aware of the Respondent's positive attitudes expressed in this meeting.[1894]

### b.   The FiT Decision

1266.  On 20 June 2011, the EWRC set the FiT for July 2011 to June 2012 in the FiT Decision. The Decision reads in relevant part:

> The mandatory national target of Bulgaria for share of energy from renewable sources in the gross end-consumption of energy by 2020 (according to attachment I, part A of the Directive 2009/28/EO) is 16%. The National target should be achieved through increasing the production of electricity from renewable sources, the end-consumption of energy from renewable sources for heating and cooling and the consumption of energy from renewable sources in transport.[1895]
>
> …
>
> The SEWRC has issued on the grounds of Art. 39, para 1, item 1, in conjunction with Art. 39, para 3 of the Energy Act **licenses with condition for construction of energy sites** with the following capacity by type of technology:
>
> Wind Power Plants – 2017 MW;
>
> **Photovoltaic Power Plants- 230,1 MW**;
>
> Biomass Power Plants – 15 MW;
>
> **Total – 2262,1 MW**.[1896]
>
> …
>
> Regarding the average annual duration of operation of plants, the following objections have been made:
>
> 1. „**Bulgarian Photovoltaic Association**", requesting the **adjustment of the working hours of photovoltaic plants from 1 250 to 1 100**;
>
> 2. "Bulgarian Solar Association" requesting that the working hours of photovoltaic plants be individually set for each separate plant;
>
> After carried out additional analysis and research of the factors that impact the level of FiT for sale of electricity from renewable sources, in conjunction with the objections made during the public discussion and the ones submitted in written form, the Commission made the following inferences with respect to the method of calculating the FiT and with respect to the objections, related to the abovementioned specific pricing elements.
>
> I. General Principles for Setting the Preferential Prices

---

[1894]   Kostadin Sirleshtov (CMS) to Adi Blum, Richard Roberts, Abid Malik, Aygen Yayikoğlu, *et al.*, Kharadzhalovo - Licensing - result from the open hearing at SEWRC, 17 April 2012 (**C-203**).

[1895]   FiT Decision (**C-48**), p. 1.

[1896]   *Ibid.*, p. 2.

The main factors, used for setting the level of the electricity prices, produced from RES, are the amount of investment costs, including the costs for connection to the supply and transmission grids, the level of operational costs, capital costs, including depreciation costs, as set based on an average effective technical and economic life of the assets, and the return, calculated on the basis of the set target rate of return and the average investment costs, necessary for the production of electricity and the average annual productivity of the plants. The FiT reflects the type of the renewables, type of technology, installed capacity of the site, place and method of installation of the facilities.

Upon setting the prices of electricity from renewable sources, the SEWRC used data from the Report on the financing of renewable energy sources on the European energy market, published on the webpage of the European Commission, as well as other sources of information mentioned herein.

The FiT for production of electricity from RES do not take into consideration specific values of an individual investment project, but average values on the basis of official sources, international experience, adjusted with the specific Bulgarian circumstances. The prices are set by calculating the current value of the financial flows, deriving from the set by the Commission average necessary revenues of the above described pricing elements. **The FiT is paid annually for the period of mandatory purchase of electricity** and the set by the Commission rate of return before taxation is used upon calculating the current value of a discount factor.[1897]

…

The Commission believes that it is economically substantiated upon setting the FiT for RES to determine equal target value of the rate of return on capital when the own and borrowed capital have the same target capital structure. The use of this regulatory approach is related to the application of the principles, applicable upon the performance of the regulatory powers of the SEWRC, provided in Art. 23, para 1 of the Energy Act. **Upon the actual application of the FiT set by the Commission each investor has the opportunity to achieve different profitability, depending on the individual management of the investment project.**

The Commission sets a **target rate of return before the taxation of 9%** after the valuation of the investment risk related to the production of electricity from renewable sources, subject to mandatory purchase from the Public Provider or End Suppliers by applying the Capital asset pricing model (CAPM) and considering the following factors:[1898]

---

[1897] *Ibid.*, pp. 6-7.

[1898] *Ibid.*, p. 7; compare this part also to the translation of the Decision provided by the Respondent as Exhibit (**R-365**):

The Commission considers it economically justified to set **a uniform target value for the rate of return on capital**, at same target capital structure of own and borrowed capital, in setting the preferential prices for compulsory purchase of electricity from renewable energy sources. The use of this regulatory approach is related to the application of the principles applicable to the implementation of the regulatory powers by SEWRC in art. 23, paragraph 1 of the Energy Act. When the preferential prices set by the Commission are actually applied, each investor has the

366

…

Rate of return and capital structure

Upon setting the prices, we used target rate of return on capital of 9% with target **capital structure** 30% own capital and **70% borrowed capital**.[1899]

1. Investment costs per kW are in the amount of:

…

- For PPP with installed power over 200 kWp – 4 890 000 BGN/year.

…

3. Effective life of assets - 20 years;

4. Inflation of operating costs - 2%;

5. The **average annual duration of operation** of the plant is **1 250 hours** or annual commitment – 17.12%;

6. **Average rate** of return **9.00%**;

influencing the price level, the FiT for sale of electricity from PPP are as follows:[1900]

…

| Photovoltaic Power Plant over 200 kWp | | |
|---|---|---|
| Price, including | 485.60 | 100.00% |
| For operating costs | 30.73 | 6.33% |
| For depreciation costs | 216.34 | 44.55% |
| For return | 238.53 | 49.12% |

…

On the grounds of the abovementioned and on the grounds of § 8, para. 1 of the Transitional and Closing Provisions of the Renewable Energy Sources Act (State Gazette issue 35 dated 3 May 2011) with reference to art. 32 of the Renewable Energy Sources Act,

THE STATE ENERGY AND REGULATORY COMMISSION RESOLVED:

As of 1 July 2011, the preferential price for sale of electricity from renewable energy and water energy plants with capacity of more than 10 MV, without VAT, shall be as follows:

---

opportunity to achieve a different profitability depending on the individual management of the investment project.

The Commission sets a target rate of return before tax in the amount of 9 % following an assessment of the investment risk at production of electricity from renewable sources subject to compulsory purchase by the Public provider or the end suppliers by applying the Capital Asset Pricing Model (CAPM) and taking into account the following factors:

[1899]    FiT Decision (**C-48**), p. 14

[1900]    *Ibid.*, pp. 14-15.

...

15. For PPP with installed power over 200 kWp – 485.60 BGN per MV/h.[1901]

1267. The Tribunal deduces the following from the FiT Decision:

    a. The Respondent had knowledge of the number and scope of the licenses it granted. This provided the Respondent with another means of knowing how much renewable energy capacity was in the pipeline. The FiT Decision shows that the Respondent made active use of this knowledge.

    b. In June 2011, the Respondent had already licensed more PV capacity than it expected to be installed by 2015.[1902] The Respondent must have understood that this number was only going to increase. It must have understood so at that time, *i.e.* June 2011, as well as at later times, including when it debated and adopted the April 2012 Amendment.

    c. The rate of return of 9% was a target rate.

    d. The Respondent expected that individual plants would achieve individual levels of profitability.

    e. The Respondent assumed that investments would be financed by borrowed capital and assumed a rate of borrowed capital of 70% in order to calculate, on that basis, the price that was estimated to lead to the target rate of return.

    f. The fact that the Bulgarian Photovoltaic Association requested an adjustment of the working hours of PV plants to 1,100h is a further indication (i) that, as confirmed by the Respondent's expert, when it comes to setting a FiT, the average annual duration of operation is a variable that, if lower, leads to a higher FiT, and (ii) that the setting thereof represents a political choice.

    *c.*     *The Application for the License*

1268. On 12 January 2011, ACWA Bulgaria (then ZBE Partners) filed its application for the License. The application reads in relevant part:

---

[1901]   *Ibid.*, p. 16.

[1902]   *Cf. e.g.* the NREAP (**C-29**), pp. 210, 212.

1. I kindly ask you, by virtue of art. 39, para. 1, item 1 for the issuance of a license, pursuant to the provisions of the Energy Act (EA) for the: Production of electricity

2. The licensed activity shall be carried out at the following site(s ): Photovoltaic Power Plant (PVPP) "Karadzhalovo", the construction of which is pending, with a capacity of **electricity, transmitted to the electricity transmission grid**, after deducting the relevant losses, amounting to **50 MW** (and **maximum capacity of the installed PV modules - 60 435 kWp**). In order to connect the power plant, a 20/110 kV substation shall be constructed within the PVPP "Karadzhalovo" and underground cable, connecting the "Karadzhalovo" sub-station to the existing "Borisovgrad" sub-station.[1903]

1269. This is a further indicator to the Tribunal that the Respondent was aware of the 60.4/50 Ratio.

       *d.      Statement of Findings of the State Acceptance Commission (Act 16)*

1270. On 22 March 2012, the "State Acceptance Commission", decided to "accept the construction site" following a reading of the Statement of Findings "to determine the fitness for acceptance of the construction site" of the Karad Plant. The Statement includes an overview of the achieved power of the plant per inverter and remarks, in bold, that "[t]he total installed capacity of the park is 60450840 W".[1904]

1271. This is a further indicator to the Tribunal that the Respondent was aware of the 60.4/50 Ratio, did not object to it, did not seek to prevent it, and did not decline to license it.

       *e.      The License Decision*

1272. The License Decision of 26 April 2014 of the EWRC reads in relevant part:[1905]

ZBE Partners EAD has submitted an investment proposal for construction of a power plant for the production of electricity from a photovoltaic power plant Karadzhalovo with a total installed capacity of 50 MW which will be located in the territory of the village of Karadzhalovo, Parvomay Municipality, Plovdiv Region. It is envisaged that the construction and putting into operation of the energy site will be in May 2012.[1906]

…

---

[1903]    License Application (**C-166**), pp. 1-2.

[1904]    Act No. 16 (**R-201**), pp. 1, 5, 56; COS, p. 45.

[1905]    The excerpt is based on License Decision (**C-103**). No comparison to the Respondent's translation of the document submitted as Exhibit (**R-205**) was made.

[1906]    License Decision (**C-103**), p. 3.

Production characteristics and calculated yearly production based on solar radiation falling on an optimally sloping surface (25° to the horizon), reduced by the efficiency of photovoltaic modules and system losses are as follows:

- solar radiation for optimal slope surface

- 4,57 kWh/m2/d;

- effective module surface – 421 441 m2;

- **total installed capacity of the modules - 60 434,64 kWp**;

- specific annual electricity generation of **1 kWp – 1 312 kWh**;[1907]

- **connected power to the grid – 50 MW**;

The estimated average annual quantity of produced electricity energy for 2013 is in amount of **78 632 MWh** with decrease over years of the reviewed period 2013-2031 with an average of 0.8% and reaching 68 047 MWh annually in 2031.[1908]

…

ZBE Partners EAD has submitted agreement No ЕП-88/13.04.2011 for connection of photovoltaic power plant to the transmission electricity grid of NEC EAD. The subject of the agreement determines the necessary conditions and the specific technical requirements for the connection of the energy site – photovoltaic power plant with installed capacity of 50 MW, situated in the land belonging to the village of Karadzhalovo, Parvomay Municipality, Plovdiv Region. The set technical parameters are, as follows:

- **total nominal power – 50 MW**;

- voltage level – 110 kV;

- number of power lines – one;

- number of phases – three.[1909]

…

It is evident of the presented business plan for 2012-2031 that the total amount of investments for the construction of the energy site photovoltaic power plant Karadzhalovo with installed capacity of 50 MW is BGN 290 758 thousand (EUR 148 662 thousand) with sources of financing 100% borrowed capital.[1910]

…

There are presented business plan, investment analysis and financial model for the period 2012-2031, where the financial model is developed under the following parameters:

- Sale price of the electricity energy BGN 485.60 per MWh pursuant to decision No Ц- 018 dated 20.06.2011, where this price remains unchanged for the period.

---

[1907] This, to the understanding of the Tribunal, would equal 1,312 operating hours.

[1908] License Decision (**C-103**), pp. 3-4.

[1909] *Ibid.*, pp. 4-5.

[1910] *Ibid.*, p. 7.

370

- Estimated average annual quantity of generated energy for 2013 is in amount of **78 632** MWh with decrease over the years of the reviewed period with average of 0.8%.

- Operational costs that include: servicing costs, maintenance, insurances, administration expenses and others with average annual inflation for the period of 2%.

- Depreciations calculated by applying of a linear method and useful life 20 years or depreciation norm 5 %.

- **Average amount of the loan interest – 6.38%.**

| No | Type | Value |
|----|------|-------|
| 1 | Installed Capacity MW | 50 |
| 2 | Value of the investment in BGN thousand | 290 758 |
| 3 | Value of the investment per 1 kW installed capacity in BGN | 5 815 |

The Company is estimating to generate positive net cash flows from 2014 which determines its capacity to generate cash flow for servicing of the loans, as well as to be able to make other payments related to the performance of the activity.

The presented financial model is calculated on the basis of the investment costs and the stated exit parameters and with **discount factor r=7.00%** in result of which the values of the parameters for assessment of the project are:

- Net present value (NPV) – BGN 46 029 thousand;

- **Internal Return Rate (IRR) – 9.10%**

**-** Buy-Back Term – on the 10th year after putting the site into operation.

The said values of the parameters define the project as effective since the calculated net present value (NPV) is a positive number and the internal return rate (IRR) is higher that the discount factor (r=7%).[1911]

…

Given the above and on the grounds of Article 21, paragraph 1, item , Article 39, paragraph 1, item 1 and paragraph 3 of the Energy Act and Article20 of the Ordinance for licensing of the activities in energy,

THE STATE ENERGY AND WATER REGULATORY COMMISSION

HAS DECIDED:

1. To issue to ZBE Partners EAD, UIC: 201940814, having its seat and management address at: Republic of Bulgaria, Sofia Region, Stolichna Municipality, Sofia 1000, Sredets area, No 2a Saborna Street, floor 4

A License No Л-383-01/26.04.2012 for the performance of the activity "generation of electricity" for term of 25 (twenty five) years considered from the date of the decision of SEWRC for permission of the commencement performance of the license activity where it determines the conditions for construction of the energy site – photovoltaic power plant Karadzhalovo with

---

[1911]    *Ibid.*, p. 8.

**total installed capacity of 50 MW**, situated in the land belonging to the village of Karadzhalovo, Parvomay Municipality, Plovdiv Region, term for construction of the energy site and term for commencement of the license activity, as stated in the License – enclosure to this decision.

2.On the grounds of Article 14, paragraph 4 of the Ordinance for licensing of the activities in energy **to approve for ZBE Partners EAD business plan for the period 2012-2031**, enclosure to this decision and enclosure to the License under item 1.

The decision is subject to appeal in 14 (fourteen) days term before the Supreme Administrative Court.

Chairman

Angel Semerdzhiev[1912]

1273.  The License Decision indicates to the Tribunal that:

    a.  The Respondent knew about the 60.4/50 Ratio, the difference between nominal capacity and capacity of the solar modules installed, and what it would mean for the output of the Karad Plant.

    b.  The Respondent knew so directly, by knowing that the 60.4/50 Ratio was installed, and indirectly, by knowing the estimated output which would not have been achievable without the 60.4/50 Ratio.

    c.  Nothing indicates that Bulgaria "declined to approve" the 60.4/50 Ratio as the Respondent put it repeatedly.[1913] The License Decision would logically have been the document where the EWRC would have had to discuss, reason, and open up to appeal that it "declined" any part of ACWA Bulgaria's application.

    d.  The Respondent knew from the start that the Karad Plant's operating hours would exceed 1,250h. Accordingly, the Respondent cannot have been surprised by that.

    e.  The application documents of ACWA Bulgaria were carefully studied by the EWRC and became an integral part of the License Decision. The business plan of ACWA Bulgaria was even formally approved.

---

[1912]    *Ibid.*, p. 9.

[1913]    RROMROJ, paras. 122, 126; HT, D1, 7 June 2021, p. 223; RPHB, para. 85.

f.   The expected IRR at the time of licensing was 9.1%.

f.     *The License*

1274.  On 26 April 2012, the EWRC issued the License as an attachment to the License Decision.

1275.  It reads in relevant part:[1914]

1.2. The enclosures pointed in item 5.15, as well as their periodical update, represent an integral part of the conditions of this licence and they are enclosed on hard copy.

…

2.1. By this licence, the State Energy and Water Regulatory Commission, further referred to as "the commission", permits the licensee to perform the activity: production of electric energy ("the licence activity") through a new energy site – photovoltaic power plant with total installed capacity of 50 MW ("the plant") after its construction, under the conditions stated in this licence and after permission for commencement of performance of the licence activity by the commission.

…

2.3. The licensee **is obligated to construct the plant under the conditions and within the terms stated in the Conceptual design and in the Construction schedule** – enclosure No 1 to this licence.

2.4. The licensee performs the licence activity **only through the plant having the technical and the operational characteristics of the main facilities as stated in enclosure No 2 – Description of the site** with its technical and technological characteristics, which shall be prepared after the completion of the site.

…

5.2.2. After permitting the commencement of the performance of the licence activity by the commission, the licensee shall perform the activity: production of electric energy trough the energy site having the technical and technological characteristics of the facilities as described in enclosure No 2.

…

5.5.1. **The licensee shall construct the energy site and shall perform the license activity in accordance with the business plan for the period 2012-2031 – Enclosure No 4**, presented together with the application for issuance of a license, together with all amendments thereafter where it is taken into account that the assumptions regarding the operational expenses, the producing and the supplying of electric energy used therein are based on forecasts of the licensee

---

[1914]     License (**C-158**).

and they may be changed depending on the actual conditions, whereas such changes shall not be deemed for amendment of the business plan.

…

5.6.1. The measuring of the electric energy shall be performed in compliance with the legislation in force and with the Rules for measurement. The places of connection of the plant to the electricity transmission and/or the electricity distribution grid, the technical characteristics of the measurement systems, as well as the full single linear scheme of the plant are stated in enclosure No 3.

…

5.8.2. The licensee shall sell the electric energy to the public provider and/or the end supplier at prices determined by the commission with decisions – enclosure No 6 of the license.

…

15.5.1. The following enclosures represent an **integral part of this license**:

1.Enclosure No 1 – **Conceptual design and Construction schedule**;

2.Enclosure No 2 – **Description of the site with its technical and technological characteristics**;

3.Enclosure No 3 – Places for connection of the plant to the electricity transmission and/or electricity distribution grid, technical characteristics of the measurement systems, as well as the full single linear scheme of the plant;

4.Enclosure No 4 **– Business plan**;

5.Enclosure No 5 – Decisions for determination of the obligatory amounts of the insurances coverage;

6.Enclosure No 6 – **Decisions for determination of prices for sale of electric energy from photovoltaic power plants**.

1276.   The findings of the Tribunal regarding the License Decision and the 60.4/50 Ratio above equally apply to the License. The Tribunal notes that it is particularly evident from the License that site design, site descriptions, and the business plan that was handed in with the applications are integral parts of the License and even have to be adhered to by the Karad Plant. Therefore, rather than "declining to approve" the 60.4/50 Ratio, as of the date of the License the Respondent made it mandatory to use the 60.4/50 Ratio and to produce at the levels predicted by the business plan and only possible to achieve by employing the 60.4/50 Ratio.

    g.    *The Permit*

1277.   On 11 June 2012, the EWRC, granted the Permit to commence electricity generation as licensed under the License.

1278.   It reads in relevant part:

374

The estimated average annual quantity produced electricity for 2013 is estimated at **78 632 MWh**, with decrease over years of the reviewed period 2013-2031 with an average of 0.8% to 0,6% and reaching 68 047 MWh annually in 2031[1915]

…

Estimated average annual quantity of produced electricity for 2013 is **78 632 MWh**, and reduction of the quantity during the years of the reviewed period by an average of 0.8%.[1916]

The prepared analysis shows that the parameters embedded in the business plan, approved by Decision of SEWRC No. Л-383 of 26.04.2012, granting the licence to the company, are also kept in the provided business plan. In light of this, the Commission believes that the business plan should not be approved in the present administrative proceedings, insofar as the information has not been updated.

In view of the foregoing, and on the grounds of Art. 22, para 2, item 1 of the Ordinance on Licensing the Activities in the Energy Sector in conjunction with Art 40, para 1, item 1-3 of the Energy Act and Art 13, para 2 of the EA

STATE ENERGY AND WATER REGULATORY COMMISSION

DECIDED:

1. Grants to ZBE Partners EAD, UIC 201940814, with its seat and registered address in Bulgaria, Sofia District, Sofia, Sredets Region, 2a Saborna Str., fl. 4 permit to commence the performance of licensing activity under the issued licence No. Л-383-01/26.04.2012 for "electricity generation" by the constructed energy site Photovoltaic Power Plant "Karadzhalovo" with total installed capacity of 50 MW, located in the land of the village of Karadzhalovo, Parvomay Municipality, Plovdiv District.[1917]

1279. The Permit once more indicates to the Tribunal the knowledge of the 60.4/50 Ratio of the Respondent and the knowledge of, and important role of the business plan in the application documents for the License and the Permit.

### 3. Policy documents

#### a. The NREAP

1280. In April 2011, MEET presented the "National Renewable Energy Action Plan" (the "**NREAP**"), "drawn up in accordance with the template for national renewable energy action plans as set out in Directive 2009/28/EC".[1918]

---

[1915] Permit (**C-105**), p. 2.

[1916] *Ibid.*, p. 3.

[1917] *Ibid.*, p. 4.

[1918] NREAP (**C-29**).

1281. The NREAP states that it is "the main instrument developed to ensure the achievement of the national renewable energy targets".[1919]

1282. The NREAP states in relevant part:

> The widespread use of renewable sources ('RS') and the implementation of energy efficiency measures are among the priorities of the national energy policy and are in conformity with the objectives of the new energy policy for Europe.
>
> …
>
> The main tools laid down in the NREAP — regulatory, economic, financial and soft measures — take into consideration the specific features of the Bulgarian economy, the social conditions, the available resources and technologies and the opportunities for cooperation with the countries from the region and the other EU Member States.[1920]
>
> …
>
> The Act [*at that time the draft ERSA*] has introduced incentives and obligations for participants in the renewable energy market, namely:
>
> - …
> - **obligatory purchase of the electricity produced from renewable sources**, except for hydropower plants (HPPs) of over 10 MW installed capacity;
> - preferential purchase prices for the electricity produced, except for electricity produced by HPPs of over 10 MW installed capacity;
> - …;
> - **the owners of the transmission and distribution networks are required to allocate funds in their investment programmes for network development in relation to the promotion of electricity produced from renewable sources**.[1921]
>
> …
>
> The [RAESBA] introduced a number of incentives for the production of electricity from renewable energy sources in terms of prices, obligatory purchase of the electricity produced and long-term agreements. These incentive mechanisms are a key factor in attracting investors and whetting investor appetite as well as creating a favourable business environment which is to stimulate the construction of plants producing electricity from renewable energy sources. This has led to increased investor appetite for the production of renewable energy in recent years but has also created a few problems that constitute barriers to the development of the sector, the major of which are as follows:

---

[1919] *Ibid.*, p. 9.

[1920] *Ibid.*

[1921] *Ibid.*, p. 13.

- too many investors have expressed intentions to construct wind and solar farms which go beyond the capacity of the energy system;

- renewable energy projects have been implemented in sensitive areas with environmental restrictions in breach of environmental assessment procedures;

- requests have been submitted for the conversion of agricultural land to non-agricultural purposes in connection with the implementation of projects for the construction of wind and photovoltaic plants by investors that have not secured the necessary financial resources for these projects, which results in the alteration of the status and designation of fertile land and precludes its further use for agricultural purposes;

- a large number of the potential investors who submit feasibility study applications do not have serious investment intentions or do not have the financial capacity and technical expertise to implement these projects;

- only 10-15 % of the projects notified are operational and work is actually being carried out with regard to their implementation.

Based on the lessons learned and the experience already gained in the implementation of the existing legislation, **the National Renewable Energy Action Plan and the new Renewable Energy Act [ERSA] include new and additional measures and incentives for the development of renewable energy, avoiding the weaknesses and deficiencies detected so far**.[1922]

…

The assessment of the existing technical potential for renewable energy that can be exploited in Bulgaria in the period up to 2020 was made on the basis of …. the following key assumptions:

- …

- **increased investor appetite** for renewable energy in the **period 2012-2015** due to the obligatory purchase of the electricity produced from renewable sources at preferential prices;

- **weak investor interest** in renewable energy **after 31 December 2015** due to the expiry of the period of obligatory purchase of the electricity produced from renewable sources at preferential prices;[1923]

Electricity generation from wind and photovoltaic power plants is rapidly developing, as well as the use of solar energy for hot water purposes in the residential and services sector.[1924]

….

The purchase prices of electricity are regularly updated and revised in accordance with the efficiency of renewable energy technologies, investor appetite, prices of generating facilities, etc. **The flexibility of the price-setting**

---

[1922] *Ibid.*, p. 18.

[1923] *Ibid.*, p. 25.

[1924] *Ibid.*, p. 26.

**mechanism allows for an adequate response to developments in the renewable energy sector**.[1925]

…

### 23. **List containing detailed and up-to-date information on investor appetite and the state of administrative and authorisation procedures**

…

A list of the authorisations granted and the connection agreements concluded in respect of renewable energy installations will be established, broken down by regions and types of networks. The list will provide information on the time limits of decision-making procedures, the concluded preliminary and final agreements for connection to the network, the reasons for refused connections, the support schemes used, the calls for tender issued for the connection work, etc. In this way, civilian control over the public administration will be strengthened and investors will receive comprehensive information on the investor interest expressed.

The list will be drawn up and kept by the State Energy and Water Regulatory Commission, which, pursuant to its powers, is entitled to request commercial companies to make available information.

Stakeholders will be able to adequately assess market developments, the adequacy of administrative acts adopted, the duration of procedures, etc. This will also improve administrative services and **investors will have sufficient information in order to avoid making wrong investment decisions**.[1926]

…

As yet, there has been no need nor any cases of curtailment of the production capacity of producers of electricity from renewable energy sources by reason of the secure electricity system management. There have been isolated cases of curtailment of electricity from renewable sources in the north-east of Bulgaria due to capacity limitations and overload of the grid in the region. With the entry of more producers of electricity from renewable sources, however, and due to existing capacity limitations, such problems are likely to occur more frequently. In order to avoid the curtailment of the production from renewable sources, the network operators take the following measures:

- obligatory inclusion of the nominated production capacity of the producer of electricity from renewable sources in the dispatching schedule for production;

- …

- **annual allocation of funds in the investment programme of the network operator for development and reinforcement of the network in areas with high renewable energy potential.**

The introduction of the day-a head market or even the intra-day hour-ahead market approach, active demand-side participation, increased system storage capacities and development of smart grids are being considered. All these

---

[1925]    *Ibid.*, p. 56; There is some unclarity whether this refers to RAESBA, ERSA, or both.

[1926]    *Ibid.*, p. 70.

measures will minimise the curtailment of electricity from renewable energy sources due to technical reasons.[1927]

(f) What are the rules for charging transmission and distribution tariffs to generators of electricity from renewable energy sources?

**Generators of electricity from renewable energy sources that have opted for the feed-in tariff system are exempted from fees for access, transmission and distribution**. If they become players on the open market, they are placed on an equal footing with other participants in the market.[1928]

…

Taking into account the stagnation in infrastructure construction (power lines, substations, accumulating facilities, back-up facilities, management systems, etc.), the forecast for 2020 is the construction of 1200-1300 MW wind turbines and 300-320 MW solar systems.

In order to assess the costs of promoting renewable energy (through feed-in tariffs), the following boundary conditions are assumed:

- …

- The feed-in tariffs for electricity from hydropower stations and biomass will remain constant throughout the period.

- The feed-in tariffs for energy from wind turbines will fall to 90 % of the 2011 tariffs

- The feed-in tariffs for electricity from photovoltaic systems will fall by up to 65 % of the 2011 tariffs

- $CO_2$ emissions for the generating system will fall from 0.55 t/MWh to 0.46 t/MWh[1929]

…

It is envisaged that [under the ERSA] feed-in tariffs for electricity produced from renewable sources will not change for the period of validity of purchase agreements. Each year, the State Energy and Water Regulatory Commission sets preferential prices for the purchase of electricity, heating and cooling produced from renewable energy sources, except for energy produced by hydropower plants of over 10 MW installed capacity.[1930]

…

(p) What is granted by the scheme? (subsidies, capital grants, low interest loans, tax exemption or reduction, tax refunds)

Feed-in tariffs can be considered as a kind of subsidy, which in practice is paid for by the end user.

…

---

[1927]   *Ibid.*, pp. 146-147.

[1928]   *Ibid.*, p. 148.

[1929]   *Ibid.*, p. 159.

[1930]   *Ibid.*, p. 160.

(r) Are applications continuously received and granted or are there periodical calls? If periodical, could you please describe the frequency and conditions?

The feed-in tariff is valid for the whole duration of the agreement and new calls or applications are not required.[1931]

…

Specific questions for feed-in fixed tariffs:

(a) What are the conditions to get the fixed tariff?

All installations complying with the technical criteria, which are connected to the grid, may choose whether to apply the fixed tariff or to participate in trading on the free market.

(b) Is there a **cap on the total volume of electricity produced per year or of installed capacity that is entitled to the tariff**?

**There is no cap on the total volume of electricity produced**.

The cap of installed capacity is 10 MW for hydropower plants and 5 MW for biomass-fired power plants. In addition, tariff levels differ according to the capacity of the installation. **There is no cap on the electricity produced from wind, solar or geothermal sources**.[1932]

(c) Is it a technology specific scheme? What are the tariff levels for each?

The price depends on the type of renewable source and the size of the system. Each year, the SEWRC sets the feed-in tariffs for energy from renewable sources. **As of 31 March 2011**, the prices were as follows:

PVPPs of over 5 kWp installed capacity [BGN] **699.11**[1933]

5.1. Total contribution expected of each renewable energy technology to meet the binding 2020 targets and the indicative interim trajectory for the shares of energy from renewable resources in electricity, heating and cooling and transport

…

Electricity production by solar photovoltaic installations is developing more rapidly over the past few years. Investor appetite is expected to increase over the period 2010-2015, leading to an increase of about 95 %, on average, in installed capacity or 251 MW of installed capacity in 2015. For the period from 2016 to 2020, the construction of such capacities will increase by approx. 4 % per annum. **The planned average annual output varies from 1 250 kWh to 1 550 kWh per installed kWp.** Electricity production from this type of source is expected to reach 435 GWh [303 MW installed capacity] (a 6 % share of electricity from renewable sources).[1934]

---

[1931]     *Ibid.*, p. 162.

[1932]     *Ibid.*, pp. 169-170.

[1933]     *Ibid.*, p. 170.

[1934]     *Ibid.*, pp. 207-208, 210, 212.

1283. The NREAP calculated with an installed PV capacity of 75MW in 2012, 251 MW in 2015, and 303 MW in 2020.[1935]

1284. The Tribunal notes the following regarding the NREAP:

   a. The NREAP stems from only a month before the adoption of the ERSA and describes either what the ERSA will do, or aspects of the RAESBA Regime that the ERSA would not change. It is proper evidence of the Respondent's contemporaneous thinking and knowledge.

   b. All electricity from RES was to be purchased under the ERSA Regime.

   c. It was known by the Respondent that additional renewable electricity would be a strain on the electricity network and the network operator was to use more funds to strengthen the capacity of the network.

   d. Producers of renewable energy were, and were to be, exempted from any fees for access, transmission, or distribution.

   e. The ERSA was intended and understood fully to address all known weaknesses of the RAESBA, including investment beyond the capacity of the energy system.

   f. The flexibility of the pricing system was deemed sufficient.

   g. It was anticipated that the main investor interest would take place from 2012 to 2015, *i.e.* "frontloading" was expected and in accordance with the plan.

   h. FiTs were considered a subsidy paid for by the end user.

   i. The FiT applicable before the 2011-2012 FiT was BGN 699.11 and the 2011-2012 FiT was thus considerably lower.

   j. The Respondent expected an installed capacity of PV plants in 2012 of 75MW, of 251 MW in 2015, and of 303 MW in 2020. The actual result in June 2012 was 935 MW (see below).

---

[1935]  *Ibid.*, pp. 210, 212.

k.  There were no caps on the amount of electricity a single plant was allowed to produce.

l.  The Respondent expected an output from 1,250 kWh to 1,550 kWh per installed kWp of a PV plant. This is higher than the assumption for the relevant reference plant in the FiT Decision and higher than what the APC allowed. It also casts into doubt the Respondent's submission that it was surprised that PV plants turned out to have a 14.2% higher output than expected in the FiT Decision.[1936]

1285.  The Tribunal in that regard takes account of Mr Kristensen's statement that

the point here is that if they had used 1550 as opposed to 1250, according to the formula that I was presenting earlier, which was the levelized cost of electricity, that would have increased the denominator which would have meant that the feed-in tariff would have been lower. So by using 1250 hours as opposed to 1550 hours, actually what Bulgaria ended up doing was being quite generous in its allowance for hours.[1937]

1286.  This indicates to the Tribunal that the Respondent's expert believes that the operating hours of the reference plant were not set in error, underestimating what productivity levels would be reached, but in order to make the FiT more attractive. The Tribunal is not convinced by the Respondent's statement that the part of the NREAP discussed here only refers to PV plants constructed between 2016 and 2022.[1938]

b.  *The 2011 Energy Strategy*

1287.  In June 2011, the Respondent issued the 2011 Energy Strategy.[1939] The 2011 Energy Strategy "is a fundamental document of the national energy policy that is approved by the Council of Ministers and passed by the National Assembly of the Republic of Bulgaria."[1940]

1288.  Since the 2011 Energy Strategy post-dates the ERSA, logically, it confirms that views expressed in the NREAP and repeated in the 2011 Energy Strategy apply also after the

---

[1936]  RROMROJ, para. 16; ROP II, p. 72; HT, D1, 7 June 2021, p. 227.

[1937]  HT, D4, 10 June 2021, pp. 815-816.

[1938]  HT, D5, 11 June 2021, pp. 977, 983-987.

[1939]  2011 Energy Strategy (**C-28**).

[1940]  *Ibid.*, p. 4.

introduction of the ERSA. This increases the evidentiary value of the NREAP inasmuch as statements therein are confirmed by the 2011 Energy Strategy.

1289.  That being said, the 2011 Energy Strategy paints a very similar picture to that of the NREAP, showing (i) Bulgaria's desire to meet and even exceed the 16% Target (even speaking of a 20% target and selling a surplus),[1941] (ii) the desire to promote, and the knowledge of the necessity to promote investment in renewable energy capacity,[1942] (iii) Bulgaria's knowledge of rapidly increasing PV electricity production capacities,[1943] (iv) but underestimation of achieving the targets and when,[1944] and (v) Bulgaria's understanding that grid owners and operators, not renewable energy plants, would have to be incentivised to invest in the required technical infrastructure and management so that the network could shoulder the upcoming increase.[1945]

1290.  The 2011 Energy Strategy underlines that the achievement of the targets was supposed to take place "at the least cost to users" possible,[1946] and that it was a policy of Bulgaria "[to] use of the EU's best practices" and "[to] maintain[ ] a relatively uniform profit ratio for all RES electricity producers" based on clear rules and achieved "through current updating of the preferential purchase prices for electric power from renewable sources on the basis of changes in the investment costs and efficiency of technologies".[1947]

1291.  Most central to the present case is the following passage of the 2011 Energy Strategy:

Bulgaria conducts purposeful policy towards creation of a national scheme of mechanisms that would assist the development of RES. The greatest support is rendered to producers of electricity from RES, for whom the following is provided:

- Priority connection to the grid;

- **Guaranteed purchase of the generated electric power;**

---

[1941]    *Ibid.*, pp. 4, 5, 19-20.

[1942]    *Ibid.*, pp. 19, 33.

[1943]    *Ibid.*, p. 17.

[1944]    *Ibid.*, pp. 34, 38.

[1945]    *Ibid.*, pp. 21-22.

[1946]    *Ibid.*, pp. 33.

[1947]    *Ibid.*, pp. 21-22.

- **Guaranteed payoff through feed-in tariffs of the generated electric power;**
- Credit incentives;
- Relieved administrative procedures.

…

During the next decade … the need of support for RES is not expected to disappear.[1948]

1292. In the Tribunal's view, this passage shows that the Respondent's contemporaneous understanding was that the ERSA Regime paired a "guaranteed" FiT with a "guarantee" to purchase all electricity produced and that both a guaranteed offtake and a guaranteed price were important incentives in the ERSA Regime.

> c.    *Second National Report on Bulgaria's Progress in the Promotion and Use of Energy from Renewable Sources of December 2013*

1293. In the Second National Report on Bulgaria's Progress in the Promotion and Use of Energy from Renewable Sources of December 2013 prepared by MEET, the Respondent observed that "[i]n 2012, both production and consumption of energy from renewable sources (RS) in Bulgaria rose substantially, and, as a result, the country achieved its binding national target of 16% RES share in gross final energy consumption." According to the report, the overall share of energy from RES had already risen to 16.4% in 2012. The installed capacity of PV plants in Bulgaria rose from 25 MW in 2010, to 154 MW in 2011, to 1,013 MW in 2012.[1949]

### 4.    Comments by officials / public statements

1294. In the following, the Tribunal discusses its factual findings regarding comments of officials made in the Bulgarian Parliament, and in interviews with newspapers.

> a.    *Evidential value of statements in parliament*

1295. As an initial point, the Tribunal disagrees with the Respondent's submissions that descriptions of a law that is about to pass parliament made by ministers or members of

---

[1948]    *Ibid.*, p. 19, CMOM, para. 86.

[1949]    Second National Report on Bulgaria's Progress in the Promotion and Use of Energy from Renewable Sources, MEET, December 2013 (**R-059**), pp. 5-7.

parliament are commonplace and cannot form evidence of guarantees or commitments to investors.[1950]

1296. In the Tribunal's view, such descriptions, much like *travaux préparatoires*, can be helpful in the analysis of the content of law where it is (allegedly) unclear. They can, however, also show a contemporaneous understanding of what a regime entails and would offer to investors. They are thus an indicator of how an investor plausibly might have understood a regime, independently of the question whether an investor can show to have relied specifically on one or more such statements at the time.

### b.    16 February 2011 session of the Committee on Economic Policy, Energy, and Tourism of the Bulgarian Parliament

1297. On 16 February 2011 a session of the Committee on Economic Policy, Energy, and Tourism of the Bulgarian Parliament ("**CEET**") was held to discuss the then draft ERSA. The Minister of MEET, Mr Traykov, presented the draft ERSA. Also in attendance were a deputy minister, officials from government agencies and NEK, and representatives of power companies and other stakeholders, such as, for example, chambers of commerce and the Bulgarian Photovoltaic Association.[1951]

1298. According to the report of the session, the Minister of Energy stated that

> The draft act preserves **the principle of obligatory purchasing of the produced electric power** under long-term agreements and at preferential prices. The preferential prices are fixed for the entire term of the agreement and are determined by the SEWRC under the Ordinance for regulation of the prices of the electric power under the Energy Act.[1952]

1299. The Tribunal finds that this statement leaves no doubt that the minister understood the ERSA (and RAESBA) Regime to mean that "the produced electric power", *i.e.* all electric power produced by a renewable energy plant, would be purchased at a fixed FiT over a fixed term.

---

[1950]    RCMOMOJ, para. 76; RROMROJ, para. 57.

[1951]    Report from CEET on Draft ERSA, 16 February 2011 (**C-43**), p. 2.

[1952]    *Ibid.*, p. 4; CMOM, para. 132; see National Assembly, Committee on Regional Policy and Local Government, Minutes, Meeting of 17 February 2011 (**C-176**), p. 2; National Assembly, Committee on European Affairs and Oversight of the European Funds, Minutes, Meeting of 23 February 2011 (**C-177**), p. 2.

      *c.*     *17 February 2011 session of the Commission on Environment and Water of the Bulgarian Parliament*

1300.  On 17 February 2011, a session of the Commission on Environment and Water of the Bulgarian Parliament was held. The Vice Minister of MEET presented the draft ERSA.

1301.  According to the report of the session, he stated in relevant part:

> The [RAESBA] does not sufficiently correspond to the development of the present public relations and the commitments of the Republic of Bulgaria to provide a 16% share of the energy from renewable sources by 2020. The adoption of such new legislation is dictated by the obligation for transpose the provisions of Directive 2009/28/EC of the European Parliament and of the Council on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC, as well as by the necessity to implement clearly defined rules for granting preferences in the renewable energy sector.[1953]
>
> …
>
> The proposed legislation retains the existing principle of **compulsory purchase of electricity, produced in accordance with long-term contracts and for preferential prices, fixed for the entire duration of the respective contract** and determined by SEWRC as per the Regulation on Electricity Pricing under the Energy Act.[1954]
>
> …
>
> The proposed legislation will not cause direct and/or indirect effect on the state budget.[1955]
>
> …
>
> The included measures correspond with the development of the sector during the previous years, as well as with the new guidelines for reaching the overall targets in the energy policy of the European Union. The law will contribute to the increased transparency and efficiency of the administrative procedures, the improvement of the business climate, the achieving of economic growth, the increase the economy's competitiveness and the quality of life of the Bulgarian citizens. The reporting person stressed that the proposed legislation has been

---

[1953]  National Assembly, Commission on the Environment and Waters, Meeting of 17 February 2011 (**C-175**), p. 2.

[1954]  *Ibid.*, p. 3 (differently quoted at CMOM, para. 132); *cf.* also National Assembly, Committee on Regional Policy and Local Government, Minutes, Meeting of 17 February 2011 (**C-176**), p. 2 (differently quoted at CMOM, para. 149).

[1955]  National Assembly, Commission on the Environment and Waters, Meeting of 17 February 2011 (**C-175**), p. 5.

subject to extensive public debate and consultations with the concerned institutions.[1956]

1302. In the Tribunal's view, the statements of the Vice Minister confirm the Respondent's contemporaneous understanding that its ERSA Regime fixed price, term, and duration.

1303. The statements also indicate that, contrary to what the Respondent now submits, the ERSA was introduced not to curtail investment in renewable energy but to support it even more than under the RAESBA Regime.

1304. Bulgaria furthermore appears to have assumed that the ERSA Regime would be budget-neutral.

> ### d.     23 February 2011 session of the Committee on European Affairs and Oversight of European Funds of the Bulgarian Parliament

1305. On 23 February 2011, a session of the Committee on European Affairs and Oversight of European Funds of the Bulgarian Parliament was held.

1306. According to the minutes of the session, Mr Dimcho Mihalevski, then Member of the Bulgarian Parliament, expressed concern that "more renewable energy sources projects are being prepared than the number intended to be admitted at all" which "means probably loss of preliminary investments".[1957] Against that background he asked a question to Mr Nikolay Nalbantov, Director of the Energy Efficiency and Environmental Protection Directorate at MEET. The question and the answer were as follows:

> Dimcho Mihalevski:
>
> …
>
> You said: at the moment of entry into of the contract. I ask you in particular the following. If, e.g., there is a preconstruction permit. Does it mean that at the moment of the issued construction permit for the specific project, which – I will not go into further details – completed the respective technological procedure, that at this moment they can rely on this price and respectively make their business plans, respectively secure the ultimate financing, etc.? Or any other moment? This is my first question.

---

[1956]  *Ibid.*

[1957]  National Assembly, Committee on European Affairs and Oversight of the European Funds, Minutes, Meeting of 23 February 2011 (**C-177**), p. 5.

…

NIKOLAY NALBANTOV: As regards the first question, the law introduces a mechanism **for complete purchase for future projects**, but the Act also provides for, in the Transitional and Final Provisions, a regime for projects that are already at a certain stage of development. In particular, as regards the projects that have already obtained a construction permit the provisions envisage that the preferential price, which will be fixed for these projects, will be at the moment of issue of the construction permit. Provided that they have a construction permit upon the entry into force of the Act, the preferential price at this moment will be applicable to them.[1958]

1307. In the Tribunal's view, this statement indicates that the Respondent's contemporaneous understanding was that even though too many projects were in the pipeline, once certain conditions were fulfilled an investor could rely on the parameters of the ERSA Regime: price, term, and quantity.

> e. *3 May 2011 interview with the Vice Chair of the CEET*

1308. In an interview with a Bulgarian newspaper, which appeared on 3 May 2011, the then Vice Chair of CEET stated:[1959]

[ERSA] will definitely be able to distinguish the investors with serious intentions from those who have seen the opportunity to prepare documentation and look for buyers for a future project, thus only reserving capacity. The Act will make it easier for serious investors who are yet to make investments by showing them the free connection capacities and network development plans.

…

Fixing the price at the stage of Instrument 15 [Act 15] is in favor of the investors as the completion of this stage depends only on them.

While Instrument 16 [Act 16] depends also on the affiliation company, which, for objective or purely subjective reasons, may delay the investor. Fixing the price as of the stage of Instrument 15 was supported by the Ministry of Economy and the Ministry of Finance and was adopted by our parliamentary group.

The fear of the business is that no bank will finance anything without knowing what tariff will be applicable at the completion of the construction.

According to the Act, SEWRC sets one price on June 30 and it is applicable for one year. The investment in photovoltaics is such that it can be made until the stage of Instrument 15 without connection facilities for one year. The price is fixed and it does not change for this one year, which means that it is known 1

---

[1958] *Ibid.*

[1959] Dnevnik, Interview with Delyan Dobrev (GERB), Vice President of CEET, The Price of The Green Power Was Artificially Held High So Far, 3 May 2011 (**R-197**), pp. 1-3 (*cf.* also the Claimant's translation of the interview at (**C-133**)).

year in advance. **There is no unpredictability in the cases where the construction can be completed within this time frame**.

Here, it is very important to bear in mind that if the value of the technology and investment does not change, then this means that the price will not change either. But if it happens that the investment becomes more expensive, the price might be increased. So the risk is mostly related to the development of the technology, on which price formation depends.

…

According to SEWRC calculations, the rate of return on photovoltaic systems is now significantly higher than **10%, which is the regulator's goal in setting the preferential prices**. The reason is the discrepancy between the preferential price and the investment costs.

In some cases, at present, the return is above 20%, which is detrimental both to consumers and to the rest of the economy. These distortions are due to the inherent defect in the old Act which I already mentioned. If we imagine that this investor has a 3-year time frame for the completion of the project and purchases the most expensive part of the investments in the last 6 months, this means that it retains a price that is not up to date even today when compared to the investment value.

Investors claim that they have no interest in delaying because some of them pay licensing fees. This is a frivolous assertion, as the highest licensing fee is merely 0.5% of the investment costs. For an intentional delay of 3 years, the additional cost will be 1.5%. **For the past 3 years, the investment value of photovoltaics has fallen by more than 25%.** Everyone would prefer to pay 1.5% more fees to save 25% of their investment costs.

Due to the mismatch, by the end of March, we have 1,738 megawatts of photovoltaic projects that are in phase of preliminary or final contracts, or have already been commissioned. According to the National Action Plan for Renewable Energy Sources, our commitment as of 2020 is 303 megawatts of photovoltaics. By the end of 2011, our indicative target is 16 megawatts, and we already have an installed capacity of 28 megawatts.

The European objective is to provide 16% of green energy in final energy consumption rather than installed power.

**Our commitment with regard to the quantity of generated electricity is 21% of the final consumption**. This percentage means installed capacity of 303 megawatts from solar, and 1,256 megawatts from wind. At the moment we have a surplus of installed capacities under the 2011 plan and concluded preliminary and final solar energy contracts more than 6 times greater than our 2020 target. The situation is similar for wind – there is a total of 554 megawatts of wind farms in operation, given that the target for the end of this year is 370 megawatts. The total from preliminary and final contracts and capacities in operation is 3,634 megawatts, versus a target, 1256 by 2020. **Here the preliminary and final contracts and capacities in operation are 3 times greater than the 2020 target**. It is necessary also to keep in mind that the transmission and distribution networks have a certain capacity. According to NEK information, it is about 2,200–2,400 MW.

…

Under the new Act, the price is fixed for the entire period of preferential offtake. This is more proof that the investment environment is improving, rather than deteriorating.

…

The price is determined by SEWRC; it is not for the members of parliament to comment on it. We will know what it will be within one month after the Act becomes effective. Because the price will ensure both normal return on investment and consumer protection.

1309. In the Tribunal's view, this interview indicates that:

a. ERSA was seen as repairing and addressing the flaws of the RAESBA Regime.

b. ERSA was introduced to attract investment and to be investor-friendly.

c. A goal of ERSA was to remove unpredictability and to make financing of investments easier.

d. The April 2012 Amendment appears to have reinstated Act 16 as the decisive act for obtaining the FiT after only 11 months.

e. The interviewee understood 10% to be the target return rate of the EWRC and the ERSA.

f. The interviewee highlights that the target consumption rate for the share of electricity from RES of 21% was higher than the overall 16% Target for consumption of energy from RES.

g. Return rates above 20% under RAESBA were seen as detrimental to the system, but were not addressed under the ERSA, and it does not appear that the Bulgarian Parliament at the time understood the Energy Act to mean that it would have to address such high profits.

h. It was already known at the time that ERSA was adopted that existing capacity, and the capacity of final and preliminary connection agreements together far exceeded the expectations as to the development of renewable energy capacity in Bulgaria.

i. It was already known at the time that the ERSA was adopted that prices of PV panels were dropping rapidly.

390

j.  It was understood that the ERSA Regime would be capable of handling falling investment costs.

> f.    *25 January 2012 debate on the April 2012 Amendment*

1310.  On 25 January 2012, the April 2012 Amendment, introduced on 7 December 2011, was debated and put to a first vote in the Bulgarian Parliament.

1311.  During that session, a report of CEET of its meeting of 11 January 2012 was read into the protocol which stated in relevant part:

> Deputy Minister Delyan Dobrev explained that of the current projects with a capacity of 4,700 megawatts, about 1,000 megawatts have formal connection agreements, about 3,000 megawatts have preliminary connection agreements and about 700 megawatts are in operation. It was emphasized that solving the problems in the sector is in the interest of both the state and the producers. Otherwise, serious problems with the capacity of the network would arise in the future and the uncontrolled connection of new energy sites would lead to the imposition of restrictions on the purchase of electricity produced by them.[1960]

1312.  The Respondent relies on this quote as an indicator that investors were on notice that if the April 2012 Amendment would not curtail the problem, a cap might be introduced.

1313.  In the Tribunal's view, however, the quote and the whole debate on the April 2012 Amendment in the following pages of Exhibit FR-104 shows that the Respondent's reading is incorrect. The debate shows an understanding of the Bulgarian Parliament that developing network capacity was a task of the State that unfortunately, due to political faults, had been neglected and must be caught up on with priority. The debate shows undertones of worries about Bulgaria continuing to be perceived as a stable destination for investors and about reaching the overall 16% Target.[1961] The statement and the reference to restrictions on the purchase must therefore be understood, and would have been understood, as a reference to disconnections of plants for those moments when the network could not cope with connections anymore.

1314.  In any case, the statement shows, once more, that the Respondent in December 2011 and January 2012 was fully aware that it would exceed its official expectations as to the

---

[1960]    NA 25 January Transcript (**FR-104**), p. 7.

[1961]    *Ibid.*, pp. 7-14.

amount of renewable energy capacity to be connected in 2012 and yet chose to adopt the April 2012 Amendment exactly as it did.

g.    *19 April 2012 interview with the Chair of the EWRC*

1315.    In an interview with a Bulgarian newspaper, which appeared on 19 April 2012, the then Chair of the EWRC, Mr Semerdzhiev, was pressed on the increasing energy prices and an alleged NEK deficit.

1316.    Regarding the main factors for the increase in the energy price he stated

> First of all, it is the growth of the electricity production from RES as a result of the connection of new capacities to the system. According to the Energy Act, the obligation of the public supplier and the end suppliers is to purchase the **entire electricity as produced by RES producers** under preferential prices. On second place is the influence of the changes in the prices for the natural gas over the preferential price for power produced by cogeneration. Third, as of the beginning of 2013, the thermal condensation plants shall be obliged to purchase quotas for emission of greenhouse gas, which shall be a substantial expense for these plants and shall directly influence the change in the prices in the energy sector. Fourth, the inclusion of the full capacity of TPP AES Galabovo in the energy system, which production shall be purchased under a price as determined under long-term contract with NEK.[1962]

1317.    Regarding the alleged deficit of NEK, Mr Semerdzhiev stressed that if NEK takes losses within one period, it would be compensated for them in the next period.[1963] He underlined that NEK had "over income" over the previous period, and that "the total liquidity of the company [NEK] has improved since 2010". He recalled that the EWRC "guarantees" that the regulated part of NEK's activities is loss-free and that "[o]ne of the main reasons for the low liquidity number is that NEK uses its money for corporate purposes for the financing of hydro power plant Tsankov kamak".[1964]

1318.    The Chair further announced that "from 1st of July we will continue with the decrease of the prices in respect of purchase form RES, especially for photovoltaic."[1965]

1319.    In the Tribunal's view, the interview shows that:

---

[1962]    168 Hours Interview Angel Smerdzhiev (**C-181**), p. 1.

[1963]    *Ibid.*

[1964]    *Ibid.*, pp. 1-2.

[1965]    *Ibid.*, pp. 2-3.

a. The Respondent, and in particular the Chair of the organ of the Respondent that sets the FiT, contemporaneously understood the ERSA to mean that "the entire electricity" produced by producers of renewable energy had to be purchased at the FiT, and the Respondent communicated that understanding to the public.

b. Several factors led to the increase of energy prices in Bulgaria.[1966]

c. NEK was not in financial trouble.

### h.    28 June 2012 interview with the Chair of the EWRC

1320.  In an interview with a Bulgarian newspaper, which appeared on 28 June 2012, the then Chair of the EWRC stated the following.

> For all RES we reduced the rate of return from 9% to 7%. We believe that for this sector where prices are preferential and **the purchase of the entire production is guaranteed**, **there are no risks** concerning the plants operation from a legal point of view, therefore it is possible to work with lower rate of return. This will only affect the periods for return on investments, which, nevertheless, are shorter than the 15 years of FiT. **For some of the sites that were built with better equipment and which are efficient enough, the return period will drop below 5 years.**[1967]

1321.  In the Tribunal's view, the interview demonstrates that the Respondent, and in particular the Chair of the organ of the Respondent that sets the FiT, contemporaneously understood, and communicated to the general public, that the ERSA Regime "guaranteed" that "the entire production" of producers of renewable energy is purchased, and that an investment in renewable energy plants is risk-free from a legal point of view. The interview also shows that the Respondent knew about the high profitability of efficient plants "built with better equipment".

### i.    26 September 2013 Letter from BEH to MEET

1322.  In a letter from BEH to the Bulgarian Parliament and the Minister of MEET, dated 26 September 2013, the Holding stated:

---

[1966]    As also confirmed by AtomInfo.bg, Minister Dobrev –for the prices in the energy sector, 25 June 2012 (**C-182**), pp. 1-2.

[1967]    Capital, Interview with Angel Semerdzhiev, 23 June 2012 (**C-45**); CMOM, para. 132; CROMCMOJ, para. 158.

The material growth of newly connected power plants in 2012, which generate electric power from renewable energy sources, caused significant and sudden changes to the RES production – consumption balance, as in view of securing it there had to be a repeated limiting, inclusion and exclusion of base capacities, which on its side, had an impact on the efficiency of the respective power plants and on worsening the technical parameters of main facilities. To that relation, it is necessary to perform a revaluation of the existing mechanisms for encouragement (incentives and preferences) of the production of electric power from renewable energy sources (RES) in view of securing a balance in the mix of the available production capacity in the country and optimization of the costs for maintaining the RES security.[1968]

…

According to art. 31 of the RESA the electric power from renewable sources is purchased by the public provider, respectively the end suppliers, who purchase **the whole amount of electric power from renewable sources at the set by the SEWRC feed-in-tariff**, in effect as of the date of commissioning, pursuant to concluded long-term purchase agreements[1969]

…

The feed-in-tariffs for production of electric power from renewable sources **do not take into account particular values of an individual investment design, but averaged such on the base of official sources and the international experience, adjusted with the specific for Bulgaria circumstances**.

It should be noted that both in the country and in the other EU member – states is established a significant increase of the energy capacities from RES. In Bulgaria, the capacities from solar and wind energy hold the largest share. This leads to the occurrence of certain difficulties at the connection of new capacities to the transmission and distribution grids due to limited capacity. Moreover, this type of producers cause large and sudden changes in the balance production – consumption of the electricity system and need of balancing at additionally occurring expenses.

**Of utmost importance is to pay attention to the fact that the obligation for purchase of electric power from RES, as well as the compensation of the expenses of the public provider, lead to the utilization and commitment of a significant financial resource and they have a direct impact both on the public provider's financial condition, as well as on the state budget.**

**A number of countries undertook actions for limiting the measures for aid and support of the renewable energy sources, including retrospectively.** Here it should be noted that the European Commission is about to publish guidelines to the member-states for the methods for supporting the green energy. The document will outline how exactly the regulations should be elaborated in order to report any and all costs and expenses (incl. the additional load of the transmission grids) and not to bring to unexpected results, as the goal is to report

---

[1968]    Letter from BEH to Chair National Assembly, Chair CEET, Minister MEET, 26 September 2013 (**C-46**), p. 1 [Exhibit (**C-46**) appears to be identical to Exhibit (**C-151**)].

[1969]    *Ibid.*, p. 3.

the actual costs, and to avoid excessive profits on behalf of the producers of electric power from renewable energy sources.[1970]

1323.    The Letter goes on to report that Belgium, the Czech Republic, Greece, and France adopted, or were in the process of adopting, high fees and taxes on receivers of preferential prices. The letter then proposes concrete wording for amendments to provisions of the ERSA and the Energy Act and amendments to existing provisions deleting or weakening the obligation to purchase renewable energy and introducing (i) a 30% tax on revenues from solar energy, and (ii) annual caps on a maximum share of energy from RES after the reaching of which the Public Provider would be entitled to disconnect such plants and not to purchase their production any more. The proposed wording for the 30% tax is similar to the wording finally chosen for the introduction of the 20% Levy (see below).

1324.    In the Tribunal's view, this letter once more indicates the understanding of key entities on the side of the Respondent at the time of the Investment and even thereafter that (i) the obligation set out in the ERSA Regime was to purchase all electricity produced by a renewable energy plant, and (ii) different plants could achieve different profitability.

1325.    The letter also indicates growing discontent by those key entities about the costs of the ERSA Regime.

> *j.    28 April 2015 letter from EWRC to BEH and NEK*

1326.    In a letter by the Chair of the EWRC to the BEH and the NEK, dated 28 April 2015, the head of the EWRC wrote:

> The amendment to the provisions of Article 31, para. 5, item 1 of RESA, promulgated in SG No 109 of 2013, effective as of 01.01.2014, obliges the public supplier, end providers respectively, to purchase the electricity generated from renewable sources at feed-in-tariffs for the amount of electricity up to the amount of the determined average annual duration of work pursuant to a decision of SEWRC for determining a price for a particular producer. **Before the above amendment to RESA became effective, the public supplier, end providers respectively, had the obligation to purchase the entire amount of electricity generated from renewable sources**, except for the following amounts: those that the producers use for their own needs; those they choose to use for their own consumption and supply to their branches, enterprises or sites; those they sell at freely negotiated prices and/or at the balancing market. The legislator has not introduced a legal definition of the term "average annual duration of work".

---

[1970]    *Ibid.*, p. 4.

Within the meaning of Article 51 of the Statutory Instruments Act, only the Bulgarian National Assembly has the power to give a binding interpretation of the provisions of Article 31, para. 5 of RESA in its capacity of authority issuing the legal act. EWRC is not authorized to give a binding interpretation or supplement the law.[1971]

1327. The letter indicates to the Tribunal that in 2015, after the Seven Measures were introduced, the Respondent still believed that the Claimant had invested at a time when full offtake was part of the ERSA Regime.[1972]

### 5. Further background information

### a. *FT 5 October 2010 "Renewable energy: Cloudy forecast for solar power"*

1328. On 5 October 2010, the FT reported on the situation in Spain as follows:

Investment in the segment has dropped sharply in the past two years, as falling demand and lower wholesale power prices have combined with scarce financing and regulatory uncertainty, forcing companies to rethink their plans. Solar energy using photovoltaic (PV) cells has been the hardest hit, caught between tight credit conditions, government austerity and an official crackdown on market abuses and overinvestment. From 44MW of installed capacity at the end of 2005, Spain today has about 3,500MW of PV capacity, according to the European Commission. However, most of that was installed before October 2008, when feed-in tariffs for new plants were slashed. These cuts, plus the financing crisis, capacity quotas and uncertainty about pricing regimes have put the brakes on fresh investment in the sector.[1973]

1329. The newspaper article exemplarily demonstrates to the Tribunal that an EU government that was contemplating a new incentive regime for renewable energy and an investor that diligently prepared an investment in renewable energy in the EU that was to rely on an incentive regime in 2011 and 2012 would have known about the boom and the counter-measures in Spain. They would not have known, however, as the Respondent correctly submits, of the investor-State arbitrations arising from such measures, which came later.

---

[1971]    Letter from EWRC to BEH and NEK, 28 April 2015 (**C-165**).

[1972]    The letter also undermines the Respondent's description of how the APC was introduced, see above.

[1973]    Financial Times, Renewable energy: Cloudy forecast for solar power, 5 October 2010 (**R-020**).

        *b.*     *4 August 2015 Letter from Bulgaria to the European Commission*

1330. On 4 August 2015, the Respondent's Minister of MEET wrote a letter to the European Commission, DG Competition, replying to certain additional questions raised by the European Commission.

> 3.Rate of return of capital and capital structure
>
> The National Regulatory Authority has considered it economically justified in determining the preferential prices for mandatory purchase of electricity from renewable energy sources to set the same target value of the rate of return of capital, with the same target capital structure of equity and borrowed capital, as the corresponding rate of return is determined for the respective price period according to the state of the regulated supply of electricity, taking into account the type of technology and the associated risks in the production of electricity from renewable sources. The use of this regulatory approach is related to the application of the principles applicable in the implementation of the regulatory powers of the EWRC under Art. 23, para. 1 of the Energy Act. **In the actual application of the determined preferential prices each investor has the opportunity to achieve a different return depending on the individual management of the investment project.** The rate of return of capital remains unchanged for the entire period during which the mandatory power purchase agreement is valid.[1974]

1331. The letter to the Tribunal shows that the rate of return was an *ex ante* target rate, not a rate to be enforced, and that even in 2015, after the introduction of the Seven Measures, the Respondent still understood that in a fixed price model individual rates of return may vary and exceed the targeted rate.

        *c.*     *EC Decision on State Aid*

1332. The European Commission Decision on State Aid SA.44840 (2016/NN) of 4 August 2016 (the EC Decision on State Aid) reads in relevant part:[1975]

> 2.5. Budget and duration
>
> …
>
> (9) The notified measure came into effect on 3 May 2011 and will expire on 31 December 2021.
>
> …
>
> 6.3. Compatibility of the aid measure

---

[1974]    Letter from Bulgaria, Minister of MEET, to European Commission, re 'SA.39126 (2014/CP), RES supporting scheme in Bulgaria / Renewable Energy Sources Act (RESA)', 4 August 2015 (**C-240**), p. 4.

[1975]    EC Decision on State Aid (**FR-78**), paras. 59, 89.

…

(59) In line with point 248 of the EEAG, unlawful environmental aid or energy aid will be assessed in accordance with the rules in force on the date on which the aid was granted. Therefore, **the Commission has assessed the compatibility of the aid granted until 1 July 2014 based on the provisions of the 2008 Community Guidelines on State Aid for Environmental Protection (EAG),** and the compatibility of the aid granted after 1 July 2014 based on the provisions of the EEAG.

…

6.3.3. Conclusion on compatibility

(89) In view of the considerations set out above, the Commission finds that the **notified aid scheme** to support renewable electricity **is in line with the requirements of** respectively **the 2008 EAG** and the 2014 EEAG and, hence, is compatible with the internal market pursuant to Article 107(3)(c) TFEU. [footnotes omitted]

1333.  The EC Decision on State Aid thus states that the ERSA Regime was compatible with EU State aid rules at all times, *i.e.* before and after the introduction of the Seven Measures.

### 6.     Direct evidence of the Claimant's expectations: the Shareholders' and the Lender's due diligence and other documents

#### a.     *ACWA Power Board Investment Committee Presentation*

1334.  An ACWA Power Board Investment Committee Presentation of 26 February 2012 states in relevant part:

Key Risks & Mitigants

Retroactive revision of feed in tariffs

The regulatory framework in Bulgaria has clearly established a cost recovery mechanism whereby the additional cost of electricity is recovered by the utility from the end users. Thus, this regulation will not create a strain on the government budget. Further to that, Bulgaria has established a cap by region on the total installed capacity in renewables which is keeping the number of renewable MWs sustainable.[1976]

The EUR IRR agreed with seller in the LOI is 14.15% post Bulgarian taxes.

…

ACWA Power's EUR IRR becomes 12.7%.[1977]

---

[1976]    ACWA Power, Board Investment Committee Presentation, 26 February 2012 (**C-66**), p. 11.

[1977]    *Ibid.*, p. 32.

1335. The presentation includes a sensitivity calculation for a 10% and 20% retroactive reduction in FiT which would lead, according to the document, to a "Downside IRR" of 8.16% or 6.65% respectively.[1978]

### b.    *Karadzhalovo Solar Power Plant Market Study*

1336. The Karadzhalovo Solar Power Plant Market Study of March 2012, provided by Economic Consulting Associates (UK) and Infraproject Consult (Bulgaria) to the Lenders, reads in relevant part:

Assessment of NEK's creditworthiness and its future role

NEK's profit in 2010 before taxation amounted to BGN110 million (€56.4 million), 3.5% of revenue, while the company's turnover of BGN3,131 million implied a 10.5% increase compared to 2009.

**The additional cost incurred by NEK because of RE producers is covered by charging consumers a green tax**. The risk of NEK not recovering theses taxes are very small.[1979]

…

The solar PV FiT levels are determined in a very well defined methodology. The general principles in determining preferential prices of the electrical energy produced from ground-mounted PV systems are the assets useful lifespan, depreciation costs, rate of return and structure of the capital.[1980]

The useful lifespan of the assets is determined to be 20 years and the depreciations costs are calculated applying the linear method: for ground-mounted PV systems with installed capacity of over 200 kWp the depreciation costs are €124,670 per year. **When determining the prices a rate of return on capital of 9.00% is used** and a debt-equity ratio of 70:30. Other factors that are used in the calculation include:

Investments per MW for ground-mounted PV systems with installed capacity of over 200 kW: €2,500,000;

Operational costs (including environment protection expenses, remunerations and salaries, inventory, etc, expenses related to production process) amounting to €cents 1.3/kW;

Operational cost inflation: 2%;

The average annual working hours of the PV system are determined to be 1,250 or 14.27% of the maximum annual capacity;

---

[1978]    *Ibid.*, p. 37.

[1979]    ECA Report (**C-100**), p. 4.

[1980]    *Ibid.*, pp. 12, 75.

The preferential price of the electricity produced from RES does not change during the lifespan of the purchasing contract. Indexation of the price is made annually for the newly constructed systems.[1981]

…

These tariffs compare reasonably well with solar PV tariffs in other European countries. … There are always difficulties making cross-border comparisons with feed-in tariffs because, although calculation principles are usually very similar in different countries, differences in key parameters such as WACC and duration of payment can affect the final tariff. Other variables include the assessment of physical variables such as amount of usable solar radiation. However, due to the rapid changes in costs of solar PV per kW of electrical power, a key variable currently used is the date when the solar PV FiT was last updated in the different European countries.[1982]

…

**NEK has the obligation to buy the electricity from** RES for the period of 12 years (wind and hydro) and **20 years** (all other RES plants) **at the FiT**. The FiT is determined by SEWRC every year for new projects on the basis of a pre-defined methodology. The FiT is determined by the cost of the equipment (which is expected rapidly to decrease in the solar panel market). **FiT's for existing projects do not change over the lifetime of these projects.**[1983]

…

The participation in the FiT scheme exempts RE generators from trading on the deregulated market and from payment of charges for grid access (see section 2.4.3). **Generators are also not responsible for balancing when participating in the FiT scheme**.[1984]

…

**NEK** or other suppliers (if the generator is not connected to transmission system) are **obliged to purchase RES-E, except those quantities for which the producer has contracts on the deregulated electricity market or that have been sold in the balancing market**. Even though **participation** in the FiT scheme is **optional**, **all RES producers choose to participate as the FiT level is set higher than market prices**. Also, the volatility of solar and especially wind production make it difficult for RES generators to forecast their production levels and balancing costs could therefore be substantial.[1985]

…

A new system of market rules is expected to be formed (Austria model), which will deal with imbalances from RES-E. This **new balancing market for RES is expected to become operational in 2012**. In the new market mechanism there are several possibilities for RES producers regarding balancing arrangements:

---

[1981]    *Ibid.*, p. 75.

[1982]    *Ibid.*, pp. 75-76.

[1983]    *Ibid.*, p. 20.

[1984]    *Ibid.*

[1985]    *Ibid.*, pp. 20-21. Footnote omitted.

o A special balancing group is to be formed, with one Balance Responsible Party (BRP), which will forecast all renewable production and will distribute expenses. **The expected expenses will be around 3 to 5% difference in the forecast.**

o RES-E generators can be included in the special balancing groups of NEK or DISCOs. This scenario may have the lowest balancing costs for RES-E producers, as the groups would be large.

o RES-E generators can enter any other standard group or be responsible for its balances independently.[1986]

…

4.2.3 Ability to absorb RE and associated costs

The installed capacity of Karadzhalovo Solar Power Plant is 60 MW. This is a comparably high capacity facility and so the anticipated connection to the transmission grid through a high voltage 110 kV line is appropriate. Currently the Bulgarian power system absorbs 1,800 MW hydro power plants and 900 MW pumped-storage plants. **This provides enough flexibility to ensure system stability and the successful integration of the Karadzhalovo Solar Power Plant into the Bulgarian system**. There is a well developed 110 kV network in the region of the planned plant and our opinion is that its connection to the grid will be available without any problems. **So far the transmission grid has faced no problems with integrating RES facilities**. The only administrative issue (often faced by RES operators) would have been delays in the signing of the preliminary contracts with NEK or DISCO (these delays can be up to 6 months). After the signing of the contracts, delays in connection are minor but can occur due to do building delays or obtaining the necessary documentation of the building authorities. Surplus generation that cannot be offtaken by the TSO is very rare and presently this only occurs in the Dobrudja region (north-east), on days with string wind and low demand. In the region around Karadzhalovo this will not be a problem.[1987]

1337. The Tribunal is aware that this report was not made for the Claimant or its Shareholders. It finds it useful, however, as an indicator of how a reasonable entity with an interest in being critical would view the situation in Bulgaria in 2012.

1338. The report shows that consultants of the Lenders had the same expectations as the Shareholders regarding the Regime and that, contemporaneously and as experts, they read the ERSA in the same way as the Tribunal does now regarding price, term, and offtake obligation.[1988] The consultants did not anticipate connection problems or an unmanageable boom. They also did not anticipate any financial troubles for NEK. They

---

[1986] *Ibid.*, pp. 29-30.

[1987] *Ibid.*, pp. 64-65.

[1988] Or as the European Commission did view the ERSA Regime at that time, inasmuch as the report works with EU materials rather than with original Bulgarian materials.

did, however, anticipate balancing costs of up to 5% "difference in the forecast" for 2012 already.

c.      The Common Terms Agreement

1339.   In the Common Terms Agreement between ACWA Bulgaria and the Senior Lenders (as defined therein), dated 9 March 2012, the Parties agreed that a "Tariff Event" would occur if:

> at any time after the Tariff Qualification Date, any new Applicable Law enters into force or any existing Applicable Law is modified or repealed or a binding determination is made by the Regulator pursuant to which the Solar Plant (or solar plants in Bulgaria generally including the Solar Plant) will receive an amount (excluding VAT) less than the Expected Tariff Price for each MWh injected into the grid (including as a result of any Applicable Law which imposes any Taxes on any Feed-in-Tariff payable to the Borrower or to renewable energy projects generally, but excluding any imposition of new Taxes or increases of existing Taxes such as corporate income Taxes which apply to companies generally in Bulgaria)[1989]

1340.   According to Section 2.18 of the Common Terms Agreement, a Tariff Event after the Tariff Qualification Date, which appears to be the date of the Permit, may lead to an obligation (partially) to prepay the Senior Loans (as defined in the Common Terms Agreement), depending on how the financial model looks after the Tariff Event.

1341.   This shows to the Tribunal that the Lenders felt it was necessary to include a covenant in the Common Terms Agreement to clarify their rights in case Bulgaria were directly to tax the FiT.

d.      ACWA Bulgaria's "Long-term Business Plan" "2013-2032"

1342.   On 23 March 2012, ACWA Bulgaria (then ZBE Partners) produced a revised business plan titled "Long-term Business Plan of Photovoltaic Park 50 MW Karadzhalovo 2013-2032". The plan reads in relevant part:

> Expected annual electricity generation: **79 266 MWh/annually**.[1990]
>
> …

---

[1989]   Common Terms Agreement (**C-84**), p. 43, Article I, Section 1.01.

[1990]   Long-Term Business Plan of Photovoltaic Park 50 MW Karadzhalovo 2013-2032 of ZBE Partners EAD (**C-171**), p. 5. At (**C-171**), p. 12, it is stated that this is "conservatively accounting for the uncertainty of electricity production".

Return rate (**IRR**) of the project as a whole: **9.10 %**;[1991]

…

At the time of drafting of this revised business plan (20.03.2012), there have been successful carried out 72-hour tests for the plant and the connection facilities and state acceptance committees for the project and the connection facilities have been appointed to **start work on 22 March 2012**…[1992]

…

**The purchase price will be the same for the entire term of the validity of the purchase agreement.**

…

The electricity from renewable sources shall be purchased by the public supplier at the preferential price determined by the SEWRC in force at the date of drawing up of an act of finding for the completion of the construction of the energy site pursuant to Article 176, paragraph 1 of the Spatial Development Act. Electricity shall be purchased on the basis of a long-term purchase agreement for a period of twenty years. **The public supplier purchases all electricity from renewable sources for which a guarantee of origin has been issued**.[1993]

…

The preferential prices for electricity production from RES do not take into account specific values of an individual investment project but the averaged such on the basis of official sources, the international experience corrected with the circumstances specific to Bulgaria. Prices are determined by calculating the present value of the financial flows received through the average of the necessary revenue determined by the Commission for the pricing elements described. **Prices are an annuity for the mandatory electricity purchase period**, and in calculating the present value for a discount factor the Commission's return rate of the capital before taxation.[1994]

1343. It is unclear to the Tribunal whether this business plan, or an earlier version thereof, is the business plan that was relevant for, and became an integral part of, the License Decision, the License, and the Permit (see above). There are some indications that it is not, given that those documents speak of a business plan 2012-2031 rather than 2013-2032 and refer to a lower estimated annual production (78,632 MWh). Nevertheless, most other data appear to be similar or identical, including the IRR, and there is no reason to assume that the business plan pertaining to the License, the License Decision, and the Permit would have painted a very different picture.

---

[1991]    *Ibid.*, p. 11.

[1992]    *Ibid.*, p. 12.

[1993]    *Ibid.*, p. 19.

[1994]    *Ibid.*, p. 21.

1344.   The business plan does, in any case, indicate to the Tribunal:

    a.   The Karad Plant was fully ready on 22 March 2012.

    b.   ACWA Bulgaria's understanding of the ERSA Regime and its expectations regarding the ERSA Regime, and in particular regarding price, term, and offtake, were those that the Claimant now claims them to be, including for itself.

    c.   The expected IRR on the Karad Plant level (the relevant level according to the Respondent, see below), was 9.10% and thus within the target rate range of 9-10%.

    *e.    The due diligence report for the Shareholders*

1345.   The "Legal Due Diligence Report" of CMS Cameron McKenna LLP for the Shareholders, dated 18 April 2012, reads in relevant part:

> The Final Connection Agreement specifies that the **total nominal capacity of the Project is 50 MW**.
>
> …
>
> **Have your technical advisors confirm that the 50 MW capacity will not be exceeded, despite the maximum peak capacity of 60.4 MW of the solar modules specified by the Seller**.[1995]
>
> …
>
> The PPA may be amended only by an additional written agreement signed by both parties, except when the terms and conditions under which the PPA are amended by virtue of law or by an administrative deed issued by a competent body and the new terms and conditions are mandatory for the parties.[1996]
>
> …
>
> Current status and future trends of the PV sector in Bulgaria
>
> 3.1 Overall status of the grid capacity
>
> According to the Plan for Development of the Transmission Network (the "Plan") of Bulgaria by 2020, the overall installed capacity of the PV power plants shall not exceed 300MW by year 2020. Please note that the plan is not binding.
>
> The Annual report of the Transmission System Operator outlines that there are only 25MW of installed capacity of PV power plants for 2010 with a total amount of 14 320 MWh electricity produced.

---

[1995]   CMS Due Diligence Report (**C-75**), p. 18.

[1996]   *Ibid.*, p. 57.

**As of 16 January 2012 the amount of projects already connected to the grid totalled to 821.5 MW**. According to Natsionalna Elektricheska Kompania EAD ("NEK"), there are currently 2 083.5 MW of **projects with preliminary grid connection agreements** – 1 584 MW for wind farms, **481 MW for PV power plants** and 18.5 MW for biomass. **Projects with final grid connection agreements** amount to 767 MW of power capacity, out of which 460 MW for wind farms and **307 MW for PV plants**. The estimate is that Bulgaria must have around 2 300MW of RES powers by 2020 in order to meet the target of 16 % share in the energy sector.[1997]

…

3.3 Future trends

The current trends in the development of the PV sector are aimed towards the development of the rooftop solar projects, as well as the improvement of the connection regime of such projects. The FIT for such projects is much higher than the FIT of big PV projects.

The overall expectations are the price of the FIT for big PV projects to be reduced again by the SEWRC for the period 2012-2013. This is the unofficial government policy and prediction, expressed by the Minister of Economy, Energy and Tourism, as well as other government officials. However, if there will be such a decrease shall be known as soon as the SEWRC announces its annual decision on the amounts of the FIT (see section 8.3.2 below).[1998]

1346. This document shows to the Tribunal that internally the Shareholders understood the 60.4/50 Ratio exactly as the Claimant's witnesses presented it to the Tribunal.

1347. It also indicates that at the time the April 2012 Amendment was debated and adopted, the Respondent knew or should have known already that its expectations for the amount of renewable energy capacity to be installed in 2012, as for example expressed in the NREAP, would be exceeded by a lot and that indeed more capacity for PV plants had already final grid connection agreements than the Respondent officially expected to achieve by 2020 (307 MW actual v. 303 MW expected for 2020). Another 481 MW PV capacity already had obtained preliminary grid connection agreements. This is very relevant evidence in relation to the Respondent's "boom" argument (see below).[1999]

---

[1997]  *Ibid.*, p. 73; CMS, Regulatory Report (**C-80**), p. 4.

[1998]  CMS Due Diligence Report (**C-75**), p. 74; CMS Regulatory Report (**C-80**).

[1999]  In the Tribunal's view, given the asymmetry of knowledge, if the Claimant's shareholders knew, then the Respondent must have known, too.

405

*f.     E-Mail CMS to Shareholders*

1348.   On 20 April 2012, 9:42 AM, Mr Kostadin Shirleshtov of CMS wrote to ACWA Power, Crescent, and First Reserve in connection with the April 2012 Amendment. The subject of the e-mail is "Kharadzhalovo - changes in the legislation". It reads in relevant part:[2000]

> Based on the above, I would suggest that we address with the seller the following matters:
>
> - predictability of the local tax and waste treatment fee;
>
> - O&M restrictions - the legislation develops towards use of local workers and additional cost of having highly qualified manager(s);
>
> - balancing costs - we need to at least consider the cost for the coordinator of the balancing group or the cost for maintaining own balancing group in the future;
>
> - if the plant provides for own (independent) supply of electriicty (these are normally diesel generators), please note that they will be subject to future regulation and potential additional cost;
>
> If we try to think what could be the potential next steps on behalf of the Government in order to limit the profitability of renewable energy producers, I can think of several measures that the Government may consider:
>
> - increase of the fees for issuance of the guarantees of origin, issued by the Agency for sustainable development of the power sector;
>
>  - creation of national fund for decommissioning of renewable energy plants;
>
> - additional regulation related to the predictability of the output of the plants.

1349.   This e-mail is another indicator to the Tribunal that the Shareholders were aware that something would change with regard to balancing costs.

1350.   The counsel for the Shareholders also appears to have believed that the government might want to curtail the profitability of renewable energy producers.

*g.     Crescent Capital Final Investment Memorandum*

1351.   On 7 June 2012, Crescent Capital's Final Investment Memorandum was issued. It reads in relevant part:[2001]

> The final price for the purchase of the company was determined by an agreed upon financial model which demonstrates a post-tax IRR to the investors of

---

[2000]   E-mail from Kostadin Sirleshtov (CMS) to Adi Blum, Richard Roberts, Abid Malik, Aygen Yayikoğlu, *et al*., 20 April 2012 (**R-305**).

[2001]   Crescent Investment Memorandum (**C-62**).

15.40% from dividends over the 20-year life of the project. This IRR does not take into account some costs incurred above the project company, so the final return to CETF will may be slightly lower. Taking into account an exit from the company to a buyer which would accept a low-teen long-term return, CETF should realize a return above 20%.[2002]

…

5. Key Sensitivities

Tariff – While the FIT is set by the government and is fixed for 20 years, there remains a risk of the government changing the law and retroactively revising the solar tariff.[2003]

…

Regulatory Risk

Too many PV projects connecting to grid could cause a spike in electricity prices causing the government to take away promised benefits.

The Situation is different than in Czech Republic or Spain, as the Bulgarian Government has limited the final grid connection agreements that have been in issued, with a goal not to exceed 600 MW in the medium term and not to create an uncontrolled rush to solar tariffs.[2004]

1352. The document shows the Tribunal that when brainstorming possible bad outcomes, Crescent considered a retroactive claw-back of the fixed FiT, including in case too many connected renewable energy plants would cause a spike in electricity prices.

1353. Crescent believed the situation in Bulgaria to be different from that in Czech Republic or Spain in light of its belief that it was a goal of Bulgaria to cap the final grid connections at 600 MW "in the medium term". In doing so, however, Crescent appears to overlook that the 600 MW cap had not made it into the ERSA in the end, and that it had been informed by its own counsel that in April 2012 that goal had already been exceeded.

   h.    *The April meeting(s)*

1354. It has been a widely discussed subject in the present proceedings whether the Shareholders participated in meetings with government officials, when these meetings took place, who participated, and what was said there.

---

[2002]    *Ibid.*, p. 6.

[2003]    *Ibid.*, p. 22.

[2004]    *Ibid.*, p. 25.

1355.  The Tribunal in that regard cannot help but notice that the Claimant's and its witnesses' statements on the matter were in part contradictory and, surprisingly, were only really developed later during the proceedings, at the Hearing, and only then reached a level of detail the Tribunal would have expected from the start.

1356.  On the other hand, the Tribunal also notes that in respect of the alleged meeting(s) it is particularly difficult to overlook that the Respondent has not presented any fact witnesses to contradict the Claimant's statements about such meeting(s). It did not do so even though presenting such witnesses should have been a simple matter for the Respondent, would have greatly helped the Tribunal, and would have had the potential greatly to damage the Claimant's case.

1357.  That being said, the Tribunal has taken note of the e-mail from Miguel Munoz of Sun Edison SLU to Adi Blum, Aygen Yayikoglu, Richard Roberts, and others of 28 March 2012 7.18 pm, exhibited as Exhibit C-211, in which Mr Munoz informs Mr Blum and the others of the current agenda for their stay in Bulgaria from 10 to 12 April 2012:

- Tuesday10th
  - o  Morning: meet amongst ourselves and negotiate contracts (we will be getting there late Monday night)
  - o  Afternoon 4PM meet with Minister and if there's time left before dinner continue our meetings·
- Wednesday11th
  - o  Site visit–will likely take most of the day as the plant is 2.5h away from Sofia
- Thursday12th
  - o  Morning: NEK meeting
  - o  Late morning/early afternoon: continue our discussions[2005]

1358.  The Tribunal has also taken note of the content of the 18 September 2012 Letter as discussed below.

1359.  The Tribunal has also taken note of the witness statements that the Claimant has introduced as evidence.

---

[2005]  E-mail from Miguel Muñoz to Adi Blum and Reda Chaar, 28 March 2012 (**C-211**).

1360.   Against that background, the Tribunal finds the following facts established in respect of the alleged meeting(s):

    a.   One or two meetings took place between 10 April and 12 April 2012 between the Shareholders and government officials of the Respondent and officials from NEK, including one meeting with Deputy Minister Valentin Nikolov.

    b.   It is unclear what exactly was said and assured during the meetings and in what legal form, but it is certain that (i) in view of the following course of events, *i.e.* the Investment going forward, and the 18 September 2012 Letter, the meetings must have been reassuring, not discouraging, and (ii) as a consequence of the meeting(s), the Respondent was aware of the Karad Project and the Karad Plant and its ownership structure.

      *i.*    *The SPA*

1361.   The SPA of 28 June 2012 reads in relevant part:[2006]

1. Definitions and Schedules

1.1 Definitions

…

"Balancing Costs Law" means any Law which may enter into force in Bulgaria providing for or having the effect of:

(a) requiring the Company to notify any Competent Authority of the expected production of the PV Plant or expected injection into the Grid of any electricity produced by the PV Plant; and

(b) requiring the Project Company to pay any amounts for failure to comply with such forecasts,

or any Law having a similar effect;

…

"Law" means all applicable laws (statutory, judicial or otherwise), rules, regulations, ordinances, judgments, decrees, orders, injunctions and writs of any governmental authority, court, agency, department, commission, board, bureau or instrumentality thereof, including any directly applicable EU legislation

…

4.4 Price Adjustment Mechanism

…

---

[2006]    SPA (**C-107**).

(c) Balancing Costs Adjustment

The following shall apply in case on or before the Second Anniversary a Balancing Costs Law has entered into force or has been adopted by the Bulgarian Parliament or by any other Competent Authority (regardless of whether such Balancing Costs Law is applicable to the Company on or before the Second Anniversary or only thereafter):

(i) The Purchaser shall cause the Company to use its commercially reasonable efforts to retain a Balancing Agent that would cover all amounts the Company has to pay under the Balancing Costs Law at the best conditions reasonably available to the Company.

(ii) Within 60 (sixty) calendar days after the Second Anniversary (the "Relevant Deadline"), the Purchaser shall provide to the Seller its calculation for an adjustment of the Purchase Price to reflect the expected costs of retaining such Balancing Agent from the entry into force of the Balancing Costs Law until the twentieth anniversary of the Closing Date (the "Expected Balancing Agent Costs").

(iii) The Expected Balancing Agent Costs (in Euro / Wp per annum) shall be calculated based on actual costs incurred and/or reasonably expected to be incurred by the Company based on offers from Balancing Agents available to the Company as of the Relevant Deadline.

(iv) If at the Relevant Deadline no Balancing Agent is available at terms and conditions reasonably satisfactory to the Purchaser, or such Balancing Agent does not cover all amounts the Company is reasonably expected to pay under the Balancing Costs Law, the Purchaser shall provide to the Seller within the Relevant Deadline its calculation for an adjustment of the Purchase Price to reflect the reasonably expected additional or other costs of complying with the Balancing Costs Law from the entry into force of the Balancing Costs Law until the twentieth anniversary of the Closing Date (the "Expected Other Balancing Costs" and, together with the Expected Balancing Agent Costs, the "Expected Balancing Costs").

…

(viii) Thereafter, an adjusted purchase price shall be calculated so that under the modified cost assumptions and adjusted output assumptions (if any) yields the same IRR as the Financial Model at the Signing Date (the "Balancing Costs Law Adjusted Purchase Price").

(ix) The adjustment to the Purchase Price shall be calculated by deducting the Balancing Costs Law Adjusted Purchase Price from the Purchase Price, provided that **in no event shall such adjustment exceed an amount of Euro 750,000**.

(x) For the avoidance of doubt, if the Balancing Costs Law Adjusted Purchase Price is higher than the Purchase Price, no adjustment shall be made to the Purchase Price

…

1362. The SPA is another indicator that the Claimant expected that balancing costs would be imposed.

1363. In any case, it appears to the Tribunal that in light of the 2010 ETR the conditions for the Balancing Cost Adjustment (as defined in the SPA) had already been met, at least in theory, at the point of entering into the SPA.

<p style="text-align:center;"><em>j.     The 18 September 2012 Letter</em></p>

1364. On 18 September 2012,[2007] the Shareholders wrote to the Minister of MEET, copying, among others, the Respondent's Prime Minister, NEK, EWRC, the European Commission, and representatives of the United States and the World Bank. The Letter reads in relevant part:[2008]

> As you may be aware, ACWA Power International, First Reserve Corporation and Crescent Capital (together, Investors) have recently completed their acquisition of the 60.4MW Karadrzhalovo photovoltaic plant (Project) from the plant developer and operator, SunEdison. The total Project cost amounted to EUR 142 million. Each Investor is a new entrant in the Bulgarian power market. The support for the Project from your Ministry and the assurances received by the Investors from different bodies within the Bulgarian Government have all been instrumental in the Investors' decision to proceed with this acquisition. During the due diligence undertaken prior the making of the Project investment decision, we received numerous assurances that the long-term Feed-in-Tariff (FIT), as reflected in the executed off-take arrangement between the project company, ZBE Partners (Project Company), and NEK, will continue to apply throughout the life of the offtake agreement. We were also assured that no discriminatory taxes or other similar measures would be levied on solar projects. based on these assurances. Investors completed their acquisition of the Project Company at the end of June 2012.
>
> …
>
> During the preparation of this investment, Investors relied substantially on the assurances received from the Government, including regarding the Government's intention to uphold the FIT for the existing PV plants and not to levy discriminatory taxes or other similar measures such as the [Temporary Grid Access Fee], as well as the protections available to Investors under·the relevant bilateral investment treaties and the **Energy Charter Treaty** to which Bulgaria is a Party.[2009]

---

[2007]    According to the Claimant on 18 September 2012, according to the text of the letter some time between 14 and 27 September 2012; CROMCMOJ, para. 35; 18 September 2012 Letter (**C-110**).

[2008]    18 September 2012 Letter (**C-110**).

[2009]    *Ibid.*

1365.  The 18 September 2012 Letter further announces that unless the government were to take prompt action, the Shareholders would proceed with a "vigorous defence of their rights – under applicable law and international treaties".[2010]

1366.  From the record it appears that Bulgaria did not respond to the 18 September 2012 at the time.

1367.  The Tribunal deduces the following from the 18 September 2012 Letter:

    a.  The Letter, while not perfect evidence due to its character as a letter used in a dispute, nevertheless is a near-contemporaneous statement of key actors that makes plausible the Claimant's allegations regarding (i) direct assurances from the Respondent to its Shareholders, (ii) the taking place of in-person meetings with the government of the Respondent, (iii) the government's knowledge of the Karad Project, and (iv) the Shareholders reliance on its expectations in view thereof.

    b.  The evidentiary weight of the Letter is increased by the fact that Bulgaria did not respond to this letter contradicting any of the factual assertions made therein.

    c.  In terms of the timing of the Letter, the Tribunal further notes that it reached the Respondent seven years after the *Plama* decision on jurisdiction and roughly six years before the Respondent invoked Article 17(1) ECT against the Claimant.

    d.  The Tribunal further notes that the Letter refers to the Energy Charter Treaty and alludes to filing investment treaty claims against Bulgaria.

    *k.    Summary on due diligence*

1368.  In the Tribunal's view, the evidence regarding the Claimant's due diligence establishes that:

    a.  The Claimant and its Shareholders largely did expect what they now claim to have expected, *i.e.* that the price, term, and quantity parameters of the ERSA

---

[2010]    *Ibid.*

Regime were fixed and that the Respondent was prepared to handle any potential boom in energy from RES without changes to existing plants.

b. It was known to the market and the Shareholders that the balancing cost regime would change in the near future.

## C.    The Seven Measures

1369. Below the Tribunal sets forth the relevant facts regarding the Seven Measures and presents its observations in regard to them.

### a.    Temporary Grid Access Fee

1370. Articles 21, 30 and 32 of the Energy Act as amended as of 17 July 2012 read in relevant part:

Article 21. (Amended and supplemented, SG No. 74/2006, effective 1.07.2007, amended, SG No. 35/2011, effective 3.05.2011, SG No. 54/2012, effective 17.07.2012) (1) The State Energy and Water Regulatory Commission shall:

…

8. implement regulation of prices in the cases provided for in this Act, as well as determine on annual basis marginal price for concluding transactions in the balancing energy market.

…

Article 30. (Amended and supplemented, SG No. 74/2006, effective 1.07.2007, amended, SG No. 103/2009, supplemented, SG No. 47/2011, effective 22.09.2011, amended, SG No. 54/2012, effective 17.07.2012) (1) The following prices shall be subject to regulation by the Commission:

…

10. for transmission of electricity through transmission and/or distribution networks;

…

13. for access to the electricity transmission and electricity distribution networks.

Article 32. …

(4) (New, SG No. 54/2012, effective 17.07.2012) The Commission may determine temporary prices under Article 30, paragraph 1, items 10, 12, 13, 14 and 15 in case of delay of the operators of transmission or distribution networks in determining prices for access, transmission and distribution and may make

decisions on suitable compensatory measures in case the final prices for access, transmission and distribution deviate from temporary prices.[2011]

1371.  EWRC Decision C-33/14.09.2012 of 14 September 2012 which set the Temporary Grid Access Fee as of 18 September 2012 (the "**Temporary Grid Access Fee Decision**") reads in relevant part:

The price for access to the transmission network and distribution grid reflects the cost that are incurred with regard to the network management and are related to the activity of the overall management and administration of the electricity system, including costs associated with dispatching stations, commercial metering, reporting, as well as all other administrative costs and general purpose costs for the respective network.

…

Provisional prices for access to the transmission networks and distribution grids are calculated **as a relative share of the preferential prices for production of electricity from renewable sources** determined by the commission, with consideration of the amount and structure of the preferential price and the change in investment costs.[2012]

1372.  The Temporary Grid Access Fee Decision then sets the Temporary Grid Access Fee per category of reference plant and per applicable annual FiT decision, and for plants commissioned under the FiT Decision of 20 June 2011 it then further distinguishes per date of commissioning. It determines a fee almost twice as high for plants commissioned between 1 January 2012 and 30 June 2012 as for plants commissioned 1 July 2011 to 31 December 2011:

I. For photovoltaic power plants whose preferential prices are determined with Decision No Ц-018/ 31.03.2010 incl:

…

2. PP with photovoltaic modules over 5 kWp –145,66 BGN/MWh.


II. For photovoltaic power plants whose preferential prices are determined with Decision No Ц-010/ 30.03.2011 incl:

…

2. PP with photovoltaic modules over 5 kWp –139,82 BGN/MWh.

---

[2011]  Energy Act amended and supplemented, SG No. 54/17.07.2012, effective 17.07.2012, amended, SG No. 82/26.10.2012, effective 26.11.2012, SG No. 15/15.02.2013, effective 1.01.2014, supplemented, SG No. 20/28.02.2013, effective 28.02.2013 (**R-51**). The version of the Energy Act effective 17 July 2012 was not submitted but is represented in the later version of the Act exhibited as Exhibit (**R-051**).

[2012]  EWRC Decision No. C-33, 14 September 2012 (**R-212**) (**C-109**), pp. 1, 3; see also Letter from BEH to Chair National Assembly, Chair CEET, Minister MEET, 26 September 2013 (**C-46**), p. 5.

III. For photovoltaic power plants whose preferential prices are determined with **Decision No Ц-18/ 20.06.2011** incl.:

…

11. For PVPP with installed capacity over 200 kWp commissioned in the period 01.07.2011 - 31.12.2011 - 97,12 BGN/MWh.

12. For PVPP with installed capacity over 200 kWp commissioned in the period 01.01.2012-30.06.2012 - **189,38 BGN/MWh**

IV. For photovoltaic power plants whose preferential prices are determined with Decision No Ц-018/ 28.06.2012 incl.:

…

7. For PVPP with installed capacity over 10 000 kWp - 11,81 BGN/MWh.[2013]

1373.    The Temporary Grid Access Fee is payable to ESO.

1374.    On 25 March 2013 the Supreme Administrative Court of Bulgaria, fourth division, revoked Section III, Item 12 of the Temporary Grid Access Fee Decision, which is the section and the item that set the Temporary Grid Access Fee for the Karad Plant (see above).[2014]

1375.    On 21 December 2015 ACWA Bulgaria and ESO entered into the Access Fee Settlement Agreement which reads in relevant part (emphasis removed):

WHEREAS:

2. In performance of Decision No C-33/ l 4.09.2012 ELECTRICITY SYSTEM OPERATOR EAD has invoiced to ACWA PARK CF KARAD PV PARK EAD temporary grid access price for the period from September 2012-June 2013 in amount of BGN 11 847 477.73, with VAT of which ACWA PARK CF KARAD PV PARK EAD has paid BGN 10 708 443.60 with VAT and BGN 1 139 034.13 with VAT has not been paid.

…

6. Pursuant to the imperative provisions of the Energy Act (arg. of Article 84, paragraph 2 and Article 104 of the EA and § 1, item 15 of the Additional Provisions of the EA), the provision of access to the electricity transmission grid is a service against payment.

…

THE PARTIES AGREE FOR THE FOLLOWING:

---

[2013]    EWRC Decision No. C-33, 14 September 2012 (**R-212**) (**C-109**), pp. 3-4.

[2014]    Supreme Administrative Court of Bulgaria, Decision No. 8937 on Administrative Case 6082/2013, 19 June 2013 (**C-116**), p. 1.

1. In term of one (1) working days after the signing of this Agreement, ESO EAD shall issue credit notes to the issued invoices, as stated in Enclosure NQ 1 to the present Agreement, where at the same **time ESO EAD shall issue an invoice for the total sum of BGN 315 253,80**, with VAT included (Enclosure NQ 2) for the entire quantity of produced energy for the period from 18.09.2012 until 12.03.2014 **at price in amount of 2.45 BGN/MWh as identical to the one determined by Decision No C- 6/13.03.2014 of EWRC as permanent grid access price**. …

2. ESO EAD undertakes, in term of the previous point, to reimburse to ACWA PARK CF KARAD PV PARK EAD the sum of BGN 10 393 189,80 with VAT, representing the difference between the sum paid under Decision No C-33/14.09.2012 of EWRC and the sum agreed between the Parties under item 1 of the present Agreement for the provided service through bank transfer to the following bank account …

3. **The present Agreement settles in final the relations between the Parties, arising from or related to the repeal of Decision No C-33/14.09.2012 of EWRC and arising from or related to the due price for the provided service for access for the period from 18.09.2012 until 30.06.2013 and the period from 01.07.2013 until 12.03.2014 and neither Party shall have the right to claim further against the other Party.**

…

All disputes, related to the application of this settlement Agreement are of the exclusive competence of the state courts in the Republic of Bulgaria, Sofia.[2015]

1376. The Access Fee Settlement Agreement is signed by Messrs Abid Malik, Richard Roberts, and Adi Blum as "Executive Directors" of ACWA Bulgaria.[2016]

1377. The Tribunal notes that under the Temporary Grid Access Fee, plants commissioned in different years pay highly different amounts for the same access to the transmission network and distribution grid. The Temporary Grid Access Fee appears specifically to target plants commissioned in the first half year of 2012 that qualified for the FiT Decision.

1378. However, the Tribunal also notes that ACWA Bulgaria, *i.e.* the Investment, voluntarily accepted not to be reimbursed BGN 315,253.80 and accepted the Access Fee Settlement Agreement as the final settlement of all claims regarding the Temporary Grid Access Fee.

---

[2015]    Access Fee Settlement Agreement (**C-147**).

[2016]    *Ibid.*, p. 5.

b.     *Permanent Grid Access Fee*

1379.  Articles 21 (8) i.c.w. Article 30 (1) 10/13 of a 16 July 2012 amendment of the Energy Act (as set out above with regard to the Temporary Grid Access Fee) appear to have been the basis for EWRC Decision C-6/13/03/2014 of 13 March 2014, which set the Permanent Grid Access Fee (the "**Permanent Grid Access Fee Decision**").[2017]

1380.  The Permanent Grid Access Fee Decision reads in relevant part:

> According to article 21, paragraph 1, item 8 in relation to article 30, paragraph 1, item 10 and item 13 under the Energy Act (EA) at regulation by the State Energy and Water Regulatory Commission is liable the price for access to the electricity transmission and electricity distribution networks. As it can be seen by the provision of §1, item 15 by the Transitional and Final Regulations of EA, "access" is the right to use the transmission and/or distribution networks for electricity transmission against payment of price, as according to item 41a, user of these networks is a physical or a legal entity that supplies electricity in the network or is supplied by it. **Hence, users of the network are both consumers and producers of electricity, and being such they owe price for access to it**.[2018]
>
> …
>
> The appointed by Orders No. 3-E-14/10.01.2014 and No. 3-E-13/ 10.01.2014 working groups have made an analysis of the presented by the energy companies data of the costs that are caused by the producers of electricity form RS for the corresponding network, this including costs related to dispatching, substations, amounts for trade measurement, costs for their reporting, as well as administrative expenses and the data, consisted in the submitted by "EVN Bulgaria Elektrorazpredelenie" AD application with incoming No. E-13-48-135/02.12.2013 for approval of access prices to the electricity distribution network by producers of electricity.[2019]
>
> **[T]he prices subject of the present decision will be applied forward**…[2020]
>
> Considering the above stated, the Commission accepts the price for access to the electricity transmission network of "ESO" EAD, which to be due by producers of electric power from Photovoltaic Power Plants and Wind Power Plants, connected to the electricity transmission and distribution networks, to be determined in the amount of BGN 2.45 per MWh,[2021]

---

[2017]   Permanent Grid Access Fee Decision (**FR-84b**).

[2018]   *Ibid.*, p. 1.

[2019]   *Ibid.*, p. 4.

[2020]   *Ibid.*, p. 8.

[2021]   *Ibid.*, p. 12.

The access price will be due by all producers of electric power from sun and/or wind to "ESO" EAD and shall be paid by the operators of the electricity distribution networks to "ESO" EAD.[2022]

Pursuant to article 21, paragraph 1, item 8, article 30, paragraph 1, item 10 and item 13 of the Energy Act

THE STATE ENERGY AND WATER REGULATORY COMMISSION RULED:

It approves, as of 13.03.2014:

I. To "Electricity System Operator" EAD price for access to the electricity transmission network subject of the following pricing elements:

…

1. For producers of electric power produced by **solar or wind energy**, which is **purchased at preferential prices** – BGN 2.45 per MWh, VAT excluded.

2. For producers of electric power produced from renewable energy sources other than sun and wind, which is purchased at preferential prices – BGN 0.00 per MWh.

1381. The Tribunal notes that it has been presented with little information and argument to determine the relevant facts regarding the Permanent Grid Access Fee.

1382. Based on its analysis of the Permanent Grid Access Fee Decision and its annual successors, and further taking the Claimant's assertions regarding the Permanent Grid Access Fee at face value, the Tribunal proceeds on the basis that:

    a. The Permanent Grid Access fee was introduced on 13 March 2014.

    b. It was payable to ESO.

    c. For 2014-2015, the Permanent Grid Access Fee was set in the amount of BGN 2.45/MWh, for 2015-2016 in the amount of BGN 7.14/MWh, for 2016-2017 BGN 7.02/MWh, for 2017-2018 BGN 6.68/MWh, for 2018-2019 BGN 3.02/MWh, and for 2019-2020, 5.14/MWh.[2023]

1383. In the Tribunal's view, the statement in the Permanent Grid Access Fee Decision that the fee therein was only to be applied "forward" undermines the Respondent's position

---

[2022]   *Ibid.*, p. 13.

[2023]   CMOM, paras. 207, 209; CPHB, para. 40; Permanent Grid Access Fee Decision (**FR-84b**); EWRC Decision No. C-27/2015, 31 July 2015 (**C-117**); EWRC Decision No. C-19/2016, 30 June 2016 (**C-118**); EWRC Decision No. C-19/2017, 1 July 2017 (**C-119**); EWRC Decision No. C-11/2018, 1 July 2018 (**C120**); EWRC Decision No. C-19/2019, 1 July 2019 (**C-121**).

that the first Permanent Grid Access Fee also was to apply for the period during which the Temporary Grid Access fee was levied after that latter fee was revoked. Indeed, from the second, third, and fourth permanent grid access fee decisions, exhibited as Exhibits C-117-C-119, it appears that additional costs that arose to ESO as a consequence of the revocation of the Temporary Grid Access Fee were compensated by an increase to the 2015 Permanent Grid Access Fee and the two following Permanent Grid Access Fees.[2024] On the face of it, it thus appears that ACWA Bulgaria, at least to some degree, paid twice for that access, once in the Access Fee Settlement, and once through higher Permanent Grid Access Fees between 2015 and 2018.

1384. It also appears to the Tribunal that the Permanent Grid Access Fee would not have applied to producers of PV and wind energy that did not receive a FiT for their electricity.

<p style="text-align:center"><em>c.    Annual Production Cap</em></p>

1385. At the time of the commissioning of the Karad Plant, Article 31(5) ERSA read:[2025]

> (5) (Amended, SG No. 29/2012, effective 10.04.2012) **The public provider**, the end suppliers respectively, **shall purchase the whole amount of electricity from renewable sources**, with the exception of amounts which the producer shall:
>
> 1. use for own needs;
>
> 2. at its own discretion use for its own consumption and for power supply of its branches and projects;
>
> 3. sell at freely agreed prices according to the procedure under Chapter Nine, Section VII of the Energy Act and/or at the balancing market.

1386. Effective 1 January 2014 it read[2026]

> (5) (Amended, SG No. 29/2012, effective 10.04.2012, SG No. 109/2013, effective 1.01.2014) The public provider, the end suppliers respectively, shall purchase the electricity from renewable sources under the following conditions:
>
> 1. **at a preferential price** - for the quantities of electricity up to the amount of the **average annual running time** according to the SEWRC decision setting the price of the corresponding producer;

---

[2024]    EWRC Decision No. C-27/2015, 31 July 2015 (**C-117**), pp. 1-4; EWRC Decision No. C-19/2016, 30 June 2016 (**C-118**), p. 6; EWRC Decision No. C-19/2017, 1 July 2017 (**C-119**), pp. 3-4.

[2025]    April 2012 ERSA (**R-294**).

[2026]    2014 ERSA (**C-152**).

2. at the price approved by the SEWRC, at which the public provider sells electricity to end suppliers and electricity distribution companies - for the quantities exceeding the production under item 1;

3. the quantities under paragraphs 1 and 2 shall be decreased with the quantities used by producers for their own needs, to supply their branches, enterprises and sites, and the quantities they sell at freely agreed prices according to the procedure under Chapter Nine, Section VII of the Energy Act and/or at the balancing market.

1387.   As can be seen from the 24 July 2015 version of the Article, set out below, the Article was subsequently amended and supplemented effective 6 March 2015, but the ERSA in that version appears not to have been submitted to the record.

1388.   Effective 24 July 2015 Article 31(5) ERSA then read:[2027]

(5) (Amended, SG No. 29/2012, effective 10.04.2012, SG No. 109/2013, effective 1.01.2014, amended and supplemented, SG No. 17/2015, effective 6.03.2015, amended, SG No. 56/2015, effective 24.07.2015) The public provider or the end suppliers, as the case may be, shall purchase the electric power from renewable sources subject to the following conditions:

1. **at a preferential price** for the quantities of electric power up to the amount of the **net specific electric power generation** based whereon preferential prices have been fixed based on decisions by the EWRC; the net specific electricity generation determined shall not apply to the projects referred to in Item 3 of Article 24;

2. at a price applicable to the excess on the balancing market for the quantities in excess of the generation under Item 1

1389.   Furthermore, also effective 24 July 2015, paragraphs (12) and (13) were added to Article 31 ERSA, which read:

(12) (New, SG No. 56/2015, effective 24.07.2015) Producers may use the quantities of electric power in excess of those referred to in Item 1 of Paragraph (5) to supply their branches, enterprises and projects or sell them at freely agreed prices according to the procedure provided for in Chapter Nine, Section VII of the Energy Act and/or at the balancing market.

(13) (New, SG No. 56/2015, effective 24.07.2015) In respect of the quantities of electric power referred to in Paragraph (5), the trading (TPS) schedules of balancing groups involving members which are producers of electricity from renewable sources may only be modified in accordance with the procedure provided for by Article 73 of the Energy Act.

---

[2027]    2015 ERSA (**C-163**).

1390. In addition, an item 29 was added to Article 1 of the "Additional Provisions" to the ERSA which reads:

Additional Provisions

§1. Within the meaning of this Act:

…

29. (New, SG No. 56/2015, effective 24.07.2015) "Net specific electric power generation" shall mean the average annual electric power generation by 1 kW of installed capacity in accordance with the EWRC decision fixing preferential prices after deduction of the producer's own needs.

1391. The July 2015 amendment to the ERSA also added further transitional and concluding provisions, one of which is relevant here:

TRANSITIONAL AND CONCLUDING PROVISIONS

to the Act to Amend and Supplement the Energy Act

(SG No. 56/2015, effective 24.07.2015)

§ 17. By 31 July 2015, in accordance with the Energy from Renewable Sources Act, the Energy and Water Regulatory Commission shall adopt a decision determining the net specific electric power generation based whereon the preferential prices have been fixed in the relevant decisions by the Commission adopted until this Act's entry into force. In this case, Article 14 [*concerning statistical transfers*] shall not apply.

1392. Pursuant to that provision, on 31 July 2015, the EWRC adopted Decision SP-1 retroactively determining the net specific electric power generation for the previous FiT setting decisions including the FiT Decision. Decision SP-1 reads in relevant part:[2028]

With view of the above, until the said amendments to the RESA and with view of the fact that **the obligation for purchasing electricity from renewable sources was not placed in dependence from the net specific production of electricity**, the amount of such **net production has not been expressly specified by the EWRC** in the dispositions of the respective decisions for establishing feed-in tariffs of electricity, produced from renewable sources. Therefore, § 17 of the Transitive and Conclusive Provisions of the Law for the Amendment and Supplementing the Energy Act (Transitive and Conclusive Provisions of the Law for the Amendment and Supplementing of the EA, promulgated in State Gazette, issued No. 56 of 2015) stipulated that by 31.07.2015 in accordance with the RESA, the Regulator should issue a decision, establishing the net specific production of electricity, used as basis for determining the feed-in tariffs in the respective decisions of the EWRC, made before the effective date of that act - 24.07.2015. In this respect, the facts and circumstances, related to the decisions, issued by the EWRC until the said date,

---

[2028]    Decision SP-1 (**FR-81b (corrected)**).

according to the RESA and Renewable and Alternative Energy Sources and Biofuels Act (RAESBA, repealed) have been analysed, as well as their respective pricing elements, and the analysis resulted in the following conclusions:

…

With view of the above and after reviewing the pricing elements, based on which the feed-in tariffs have been determined, the EWRC established the following:

…

2. The net specific production of electricity, based on which the feed-in tariffs in EWRC's Decision No. Ц-18 of 20.06.2011 have been determined, is as follows:

…

2.15. 1 188 kWh, at the specified price - 485.60 BGN/MWh, excluding VAT, for power plants with photovoltaic modules over 200 kW;

1393. The 2014 ERSA thus limited the amount of electricity eligible for the preferential price to the "amount of the average annual running time" per 1 January 2014 and then later to the "net specific electric power generation" in accordance with the EWRC decision setting the FiT for the corresponding producer.

1394. Contrary to the Respondent's submission, the FiT Decision itself does not include a reference to net specific electric power generation, or 1,188 hours, or 5%. Without obtaining further explanations and introduction, the Tribunal was also not able to identify any such reference in Exhibit R-025 (the model allegedly underlying the FiT Decision) or to tie the Exhibit to the FiT Decision. The references of the Respondent and its expert to that Exhibit are furthermore imprecise and would appear, without further explanation, to be contradicted by the text of the ERSA and Decision SP-1 itself, which states that net production has not been expressly specified by the EWRC before Decision SP-1 of July 2015.[2029] The FiT Decision does, however, include references to "average annual duration of operation".

1395. Contrary to what the Claimant submits, it does seem that the ERSA Amendment was debated and that the Bulgarian Parliament and the public were sufficiently informed.[2030] The debate appears to have been heated and insinuations of corruption were made as to why the 20% Levy would only affect wind and solar producers. From the debate it

---

[2029] RCOMOJ, para. 126, fn 275; Oxera I, paras. 4.22, 7.12.

[2030] National Assembly, Transcript of the plenary meeting of 4 December 2013 (**C-50**), pp. 1-10; *Constitutional Court Decision No. 13* (**C-155**), pp. 3-4.

appears that the intent behind the ERSA Amendment that introduced the APC and the 20% Levy was to reduce the profits which were granted earlier under the ERSA Regime and specifically the ones due to the FiT Decision.[2031]

1396. It is unclear to the Tribunal how, from its mere wording, the APC could be applied to existing plants and PPAs such as the Karad PPA, but the Tribunal notes that the Parties agree that it did and so the Tribunal will accept the Claimant's explanation during the Hearing that NEK simply performed the Karad PPA as if the APC applied.[2032]

1397. In the Tribunal's view, contrary to the Respondent's submission, the change from average annual running time to net specific electric power generation is not a mere clarification of what was already the underlying idea of the ERSA Amendment, but a further reduction of the output eligible for purchase at the FiT.

1398. This is also logically true because, in the Tribunal's understanding, the share of the produced electricity which a plant consumed itself was not eligible for the FiT even before the introduction of the APC. Therefore, moving from annual operating hours to net specific power generation can only be explained as a deliberate additional reduction. After all, even after the first introduction of the APC, a PV plant with 1,250 actual operating hours and 5% actual own consumption would only have sold 1,188 hours to NEK at the FiT already. Had the actual annual operating hours of that plant, however, been higher than 1,250 hours it could have sold up to 62 more hours at the FiT.

1399. That the second step in the APC was a reduction is, however, also formally true, because, contrary to the Respondent's submissions, the ERSA and Decision SP-1 make it clear that in July 2015 the EWRC still had to determine the net specific electric power generation based on which the preferential prices were supposed to have been fixed before that time.

1400. The Tribunal observes in that regard that the July 2015 amendment to the ERSA also changed the price at which the surplus production could be sold, which also speaks against that amendment being a mere clarification.

---

[2031]  National Assembly, Transcript of the plenary meeting of 4 December 2013 (**C-50**), pp. 3-10; *Constitutional Court Decision No. 13* (**C-155**), pp. 3-4.

[2032]  HT, D1, 7 June 2021, pp. 75-76, 104.

1401.  On another issue, the Tribunal observes that the exception for output sold at freely agreed prices according to the procedure provided for in Chapter Nine, Section VII of the Energy Act was kept throughout all amendments of the ERSA relevant for the APC. This fact, the Tribunal notes, undermines the Respondent's argument that that exception in the original ERSA is relevant and would have indicated to the Claimant that Article 31(5) ERSA might be changed and that the offtake mechanism under the ERSA Regime, *i.e.* the principle of full offtake, through NEK, also might change.[2033]

1402.  The Tribunal finally observes that it was not informed on what grounds the Karad Plant appealed Decision SP-1 and on what grounds it decided not to continue that appeal.

d.      *20% Levy*

1403.  The ERSA Amendment added Articles 35a to c to the ERSA, which read:

Section V

(New, SG No. 109/2013, **effective 1.01.2014**)

**Fee** for Production of Electricity from Wind and Solar Energy

Article 35a. (New, SG No. 109/2013, effective 1.01.2014) (1) A fee shall be collected for the production of electricity from wind and solar energy.

(2) The size of the **fee** referred to in paragraph 1 shall be determined using the following formula:

FPE = **PP x QEP x 20 %,**

where:

FPE is the **fee** for production of electricity;

PP is the preferential price referred to in Article 31, paragraph 1 excluding the value added tax;

QEP is the quantity of the electricity purchased by the public provider and the end suppliers under Article 31, paragraph 5.

(3) Producers of electricity from wind and solar energy shall be liable for the **fee** referred to in paragraph 1.

Article 35b. (New, SG No. 109/2013, effective 1.01.2014) (1) The fee referred to in Article 35a shall be **deducted and paid in by the public provider, respectively by the end supplier**.

(2) Persons required to deduct and pay the fee under this section shall submit a quarterly statement in a standard form approved by the SEWRC with regard to the fee payable for the corresponding period.

---

[2033]      RROMROJ, paras. 47, 205-206; RPHB, para. 38; *cf.* Chapter Nine, Section VII, Energy Act (**R-247**).

(3) The information referred to in paragraph 2 shall be submitted by the 15th day of the month, following the respective quarter.

(4) The fee due shall be paid **into the executive budget** within the deadline for the submission of the statement referred to in paragraph 3.

Article 35c. (New, SG No. 109/2013, effective 1.01.2014) (1) For fees under Article 35a, not paid in within the deadline, an interest shall be due at the rate of the statutory interest under Interest on Taxes, Fees and Other State Receivables Act.

(2) The fee under Article 35a shall not be refundable.

(3) **Outstanding fees under Article 35a shall be subject to enforcement by a public collectors in accordance with the procedure of the Tax and Social Insurance Procedure Code**. The instrument establishing the account receivable shall be issued by the Chairperson of the SEWRC.[2034]

1404.  During the debate on the ERSA Amendment then Member of the National Assembly, Diana Yordanova, stated:

> … it is extremely urgent to explain what in fact underlies the direction of this proposal – what is the difference between a "fee" and "tax". I dared take out texts, definitions of both terms.
>
> Fees, dear colleagues, are a kind of a public state receivable. A peculiarity in the legal framework of the state fee is that the legislator requires that the ground for the collection of a fee is set out in a law.
>
> What is the legal regime of fees? They are a state receivable having a tax origin. They are not taxes but are completely subordinated to the regime of taxes. They are state financial receivables that form revenues to the budget. The legal basis for collecting fees is the provision – note this – of a service by a state authority or the possibility to receive a service.
>
> What are the similarities between "tax" and "fee"? It is about financial payments and the method of legal regulation is authoritative. This is clear.
>
> However, what is the main difference? Fee is paid as a counter consideration – it is received and is paid against the receipt of a service. A fee comes as a result from the provision of such a service. You first pay the fee and then receive the service. In practice, fees are paid voluntarily because the person themselves asks for the service.
>
> The law mandatorily requires payment on the part of legal entities and natural persons to the state and public entities by virtue of the public authority vested in them, as taxes are respectively "direct" and "indirect". But I will not discuss it any longer.
>
> I repeat it again; a fee is in its essence the price for the service determined by a legal instrument, which is received as revenue in the budget of the company or an entity – public – I highlight it – that has the right to provide it. I have three

---

[2034]    2014 ERSA (**C-152**).

questions here: is the State Energy and Water Regulatory Commission a regulatory authority or an authority that provides a service?

On the basis of everything that I have stated, I ask several justified questions. First, what are you afraid of to say that this is a new type of tax? Because, in its essence, it is a tax. What, dear colleagues, are you afraid of?

Or this is the easy way to present the proposal of your colleagues from Ataka and to thus give a ground to interested parties to dispute this decision of ours? Think about it![2035]

1405. On 31 July 2014, the Constitutional Court of the Respondent declared the 20% Levy unconstitutional and in relevant part, stated as follows:

State fees are financially mandatory payment, imposed unilaterally by the State. They are a type of public receivables that form the budget revenues. The legislature requires justification for the levy and the amount to be specified by law. This is done with the State Budget Act-2014 whereby by § 6 item 2 of the Final Provisions a new Article 35a, Para 1 and Para 3 of RESA are created, under which the production of energy from wind and solar energy shall be charge with a fee, which obliges producers of electricity from wind and solar energy.

The matter of fees is governed by two major pieces of legislation - State Fees Act (SFA, State Gazette104/1951, last amended State Gazette 68/2013) and Local Taxes and Fees Act (LTFA, State Gazette 117/1997, last amended and supplemented, State Gazette 101/2013). In Article 3, Para 1 SFA states that "the state fee shall be paid upon submission of a request to perform an action and / or issuance of the document to which it pays a fee as specified in the tariff."

The fee is payment to the state budget from a physical or legal person for having caused the action of a public authority in its own interest or has been granted the requested service. It is financially payment established by the state and collected by the authorities in connection with their business or service. Given the connection between the fee and the relevant consideration payment of the fee can be seen as a condition for receiving this benefit. Consequently fee is required to pay anyone for whom the legislature has defined financial responsibility for public expenditure made in his favor.

Fees are to some extent of gratuitous and voluntary nature. The liability is reflected in the service received or induced activity. Obligation to pay tax arises at the will of the citizen or legal person who wishes to benefit from a service (Decision No 10/2003 on case No 12/2003). Fees are paid voluntarily, because the payer's seeking a service or causing action of a public authority in its own interest. When a natural or legal person does not request services or causing the operation of a public authority, fee will not be due.

The grounds for payment of fee is using service or causing the operation of a public authority. It is a financial payment commissioned for collection to public authorities in relation to the services or activities for the benefit of the payer. **As rightly stated in the opinion of the Non-profit Association Bulgarian**

---

[2035]    National Assembly, Transcript of the plenary meeting of 4 December 2013 (**C-50**), p. 7; *cf.* also RCMOMOJ, para, 318, fn 710.

**Photovoltaic Association, with fees established under Article 35a, Para 1 of RESA, the legislator introduces an obligation for producers of electricity from wind and solar power (Article 35a, Para 3 of RESA) to grant payment without receiving of any service.**

Pursuant to Article 60, Para 1 of the Constitution taxes, as well as fees paid by individuals and legal entities shall be established by law according to their income and assets, as it was done in this case. The legal framework that governs the introduction of taxes depends on the will of the legislature. This requires precise determination of tax / service rendered or activities for the benefit of the payer. The need for a fee must be reasonable, objective and transparent. Setting the fees required transparency of the procedure, because the uncertainty of the introduction of additional, unsubstantiated increases in additional costs and harm financial burden on businesses in regulated sectors of the national economy, and this is to the detriment of the public. "Formal compliance with constitutional requirements is insufficient when a law introducing additional financial obligations for individuals is in breach of the nature of these obligations." (Ruling No 4/2013 on case No 11/2013). The Constitutional Court finds no reason to alter its previous practice, to depart from this understanding, because the requirements for legal order and stability require the Court to comply with its earlier rulings.[2036]

1406. The Bulgarian VAT Act reads in relevant part:

26(1) "Taxable amount," within the meaning given by this Act, shall be the value whereon the tax is charged or not charged depending on whether the supply is taxable or exempt.

(2) The taxable amount shall be determined on the basis of everything which constitutes the consideration which has been obtained by or is due to the supplier from the recipient or another person in connection with the supply, expressed in leva and stotinki exclusive of the tax under this Act. Any payment of damages and interest of a compensatory nature shall not be considered a consideration for a supply.[2037]

1407. ACWA Bulgaria's financial statements over 2014 indicate that, in 2014, it paid BGN 4.87 million under the 20% Levy[2038]

1408. Finally, while the Claimant claims that, after the 20% Levy was declared unconstitutional, it sought reimbursement of the amounts it had paid under the 20% Levy up to that point, from the Exhibits it relies on to prove that claim, it appears that ACWA Bulgaria only claimed reimbursement of the fees paid over April, May, and

---

[2036] *Constitutional Court Decision No. 13* (**C-155**), p. 4.

[2037] Bulgarian VAT Act, version of 26 February 2021 (**C-260**).

[2038] ACWA Bulgaria, Annual Management Report and Financial Statements, 31 December 2014 (**RE-3**), p. 20; FTI I, para. 3.30.

June 2014 from MEET and NEK,[2039] and over 1 July to 10 August 2014 from the Ministry of Finance of the Respondent.[2040]

1409. ACWA Bulgaria's claim also appears to have been more intricate than the Claimant represents it now. It does not appear to have been a claim for reimbursement, but a claim that NEK refrain from withholding the 20% Levy from amounts due to ACWA Bulgaria from before the date the decision of the Respondent's Constitutional Court went into effect, but still open after that date.[2041]

1410. This appears to have been based on the legal understanding of ACWA Bulgaria and the Respondent that the decision of the Constitutional Court only had *ex nunc* and not *ex tunc* effect, wherefore amounts already paid could not be claimed back. That claim letters were sent at all appears to be based on the disagreement between ACWA Bulgaria and the Respondent as to whether NEK after the decision of the Constitutional Court had obtained legal effect, was still under an obligation to withhold the 20% Levy on amounts it owed to ACWA Bulgaria from before the date of effect of the decision, but which it had not yet paid out.

1411. All claims were rejected by NEK or respectively the Respondent with reference to the *ex nunc* principle.[2042]

1412.  Based on the above, the Tribunal observes the following:

    a.  The 20% Levy was introduced as a fee, as evident from its text, its parliamentary history, and as held by the Bulgarian Constitutional Court.

    b.  The Bulgarian Constitutional Court found the 20% Levy unconstitutional because, materially, it did not comply with the Bulgarian constitutional requirements for the introduction of a fee.

---

[2039]    Letter from ACWA Bulgaria to MEET, ESO and NEK, 19 August 2014 (**C-187**).

[2040]    Letter from ACWA Bulgaria to Minister of Finance, 10 August 2016 (**C-156**).

[2041]    Letter from ACWA Bulgaria to MEET, ESO and NEK, 19 August 2014 (**C-187**); Letter from ACWA Bulgaria to Minister of Finance, 10 August 2016 (**C-156**).

[2042]    Letter from Minister of Finance to ACWA Bulgaria, 30 September 2016 (**C-157**), p. 2; Letter from NEK to ACWA Bulgaria, 29 August 2014 (**C-188**), p. 2.

c. The Bulgarian Constitutional Court does not hold that the 20% Levy would be a tax.

d. Payers of the 20% Levy do not receive anything in return for the payment, as also observed in the parliamentary debate regarding the 20% Levy and by the Bulgarian Constitutional Court.

e. The payment of the 20% Levy is made into the "executive budget".

f. Outstanding fees are enforced by "public collectors in accordance with the procedure of the Tax and Social Insurance Procedure Code".

g. The 20% Levy was introduced by an act of the Bulgarian Parliament, more specifically the ERSA Amendment. It applies to a group of entities.

h. Article 26 of the VAT Act appears to qualify any taxable amount as "consideration" in exchange for a supply.

i. It is unclear whether VAT was paid on the 20% Levy. The Claimant has alleged that VAT was paid without providing evidence thereof. The Respondent has not disputed that allegation.

j. The formula for the 20% Levy, *i.e.* FiT times quantity times 0.2, and the fact that the 20% Levy only applies to wind and PV plants that sell at the FiT make the 20% Levy a direct reduction of the FiT.

k. The Respondent and the Investment agree that the decision of the Constitutional Court only had *ex nunc* and not *ex tunc* effect, wherefore amounts already paid could not be claimed back under national law.

   a.   *Balancing Cost Exposure*

1413. The 2013 ETR, as amended and supplemented on 9 May 2014, read in relevant part:[2043]

Art 57. (amended – SG 39/2014)

…

(2) The end consumers who buy electricity at regulated prices and the producers of electricity from renewable sources and form co-generation shall be obliged to

---

[2043]    2013 ETR (**C-159**).

transfer the balancing responsibility to a coordinator through a contract under art. 11, p. 9 of these rules [*contract for participation in balancing group*].

Art. 70.

…

(4) (Previous para 3, amended - SG 39/2014) The producers of electricity from renewable sources and co-generation who sale the generated electricity energy at preferential prices and according the readings from the metering devices, shall not be entitled to participate in standard balancing

Art 155.

…

(9) (New- SG 39/2014) The calculation and the allocation of the costs from the realized imbalances shall be implemented according the principles for their allocation, written in the general terms and conditions of the balance responsible party, and the producers of electricity, including the producers from renewable sources and co-generation, shall pay costs for coverage of imbalances in the relevant balancing group in which they are members, only in case of a difference in the submitted by them schedules and the real production. Where the producer doesn't submit a generation schedules, the coordinator of the relevant balancing group shall prepare it on his behalf.

1414.   As stated above, it is unclear to the Tribunal whether the 2010 ETR were ever fully in force and enforced. The Respondent submits that the 2010 ETR were never used to set balancing costs in any case, as the balancing market of Bulgaria was not implemented until after the introduction of the 2013 ETR.[2044] The Parties agree that the 2013 ETR were introduced in June 2014.[2045]

1415.   ACWA Bulgaria's financial statements for 2014 indicate that it paid balancing costs for the first time in June 2014 and that in 2014 it paid BGN 1.113 million under the Balancing Cost Exposure.[2046]

1416.   The Tribunal has difficulties understanding the 2013 ETR: it is a complex piece of internal Bulgarian law, introduced into this arbitration without much explanation or a proper demonstration of what changes the EWRC made, when, and with what intention or background, and with what consequences.

---

[2044]   RCMOMOJ, paras. 54, 191-, 192, 195.

[2045]   RCMOMOJ, paras. 54, 191, 195; CMOM, para. 242.

[2046]   ACWA Bulgaria, Annual Management Report and Financial Statements, 31 December 2014 (**RE-3**), section iii, p. 20; FTI I, para. 3.30.

1417. That being said, the Tribunal understands the changes between the 2010 ETR and the 2013 ETR, as amended by SG 39/2014, to be the following:

    a.   In contrast with the 2010 ETR, it is certain that the 2013 ETR were applied and that balancing costs had to be paid under it.

    b.   Producers of renewable energy that sell at preferential prices were removed from one and the same single and special balancing group to be members of different "special balancing groups" to be coordinated by the Public Provider (*i.e.* NEK) (Article 56 2013 ETR).

    c.   Under the 2013 ETR, each individual producer appears to have to pay for individual deviations from its forecast, not deviations of the group.

    d.   All other "discounts" for renewable energy producers of Article 203 of the 2010 ETR appear to have been abolished, *e.g.* that the obligation to pay only arises in cases of deviations of more than 20%, that renewable energy producers pay half the costs only, and that only deviations in the same direction as the group deviation (surplus or deficit) have to be paid for.

      *b.    5% ESSF Contribution*

1418. The 2015 Energy Act reads in relevant part:[2047]

> Article 36b. (New - SG No. 56/24.07.2015, in force as of 24.07.2015) (1) A Fund "Electricity System Security Fund" hereinafter referred to as the "fund" is established for the purpose of management of the funds **for covering the expenses made by the public provider arising from its obligations under art. 93a, specified with a decision of the Commission**, including with reference to past regulatory periods.
>
> (2) The payment to the public provider for the purpose of covering the expenses with resources of the "Fund" is made monthly.
>
> (3) The "Fund" is a legal entity with headquarters in Sofia.
>
> …
>
> Article 36e. (New - SG No. 56/24.07.2015, in force as of 24.07.2015) (1) The resources of the Fund are raised by:
>
> 1. the contributions under art. 36f;

---

[2047]    2015 Energy Act (**R-082**).

2. the revenues, received after the allowances sale tenders under art. 57, para. 1 of the Climate Change Act, which are used for the development of renewable energy sources;

3. the revenues from interests, including late payments of the contributions under pt. 1;

4. donations;

5. the revenues from statistical transfers of energy from renewable sources which are used for development of renewable energy sources.

(2) The resources under para. 1 are spent on maintenance related to the Fund's activities and payments made for covering the expenses made by the public provider arising from its obligations under art. 93a, specified with a decision of the Commission, including with reference to past regulatory periods.

Article 36f. (New - SG No. 56/24.07.2015, in force as of 24.07.2015) (1) Monthly **contributions** amounting to 5 per cent are made by:

1.the producers of electricity- from their sold electricity [revenue][2048] without VAT;

2.the traders who import electricity- from the imported and sold electricity in the country profit without VAT;

(2) Not later than the fifth day of the current month, the producers of electricity and the traders who import electricity for the market in the country are obligated to submit in the Fund information related to the profit under para. 1 with reference to the previous month.

(3) The contributions in the Fund are paid in before the 15th day of the month, following the month for which they are due, and **are considered current operating expenditures for the tax purposes**.

(4) For the **purposes of the price regulation, expenses related to contributions under para. 1 are not included in the expenses recognized by the Commission**.

(5) The contributions under para.1 **are public state receivables**, and the contributions which have not been paid in within the fixed time limit are ascertained and collected under the procedure of the **Tax Insurance Procedure Code by the National Revenue Agency bodies**.

(6) The resources and the operations of the Fund are included in the consolidated fiscal program as resources and operations of other economically separated persons under art.13, para. 4 of the Public Finance Act, and are **not part of the State Budget**.

---

[2048] While the translation provided at Exhibit (**R-082**) speaks of "profit" here, the Parties agree that revenue/income is meant and later translations of amended articles also indicate that "revenue" rather than profit is meant here. Exhibit (**C-164**), for example, contains a later version of the Energy Act, *i.e.* the 2018 Energy Act. In that translation, Article 36f has already been amended. It can thus not be compared. However, in the translation at Exhibit (**C-164**) the term "revenue" is used also in other parts of the article, which were not amended, and where the translation at Exhibit (**R-082**) uses "profit". RROMROJ, paras. 258-259, fn 602; 2018 Energy Act (**C-164**); Energy Act, amended and supplemented, SG No. 17/26.02.2019, SG No. 41/21.05.2019, effective 21.05.2019 (**R-256**).

(7) The Fund resources granted for payment of the expenses made by the public provider are not subject to offset payment and are inaccessible.

…

Article 93a.(Last Amendment - SG No. 56/24.07.2015, in force as of 24.07.2015) (1) (Last Amendment - SG No. 54/2012, in force as of 17.07.2012) The public provider purchases electricity from producers [] connected to the electricity transmission network [][2049] on long-term availability and electricity purchase agreements, as well as electricity produced from renewable sources, from high-efficiency combined electricity and heat generation, and the quantity of electricity, defined under Article 4 (2), pt. 8.

1419. The official motives for the law that introduced the 5% ESSF Contribution, as submitted by the Respondent, read in relevant part:[2050]

> New provisions are introduced under Chapter Three, Section IV 'Price Regulation' of the law, which envisage the creation of 'Security of Electric Energy System' Fund. The creation of 'Security of Electric Energy System' Fund is a measure that is aimed at financial stabilization of the sector by means of reducing of the current deficit in Natsionalna Elektricheska Kompania. The achievement of this purpose will create conditions for liberalization of the Bulgarian electric energy market. The introduction of the mechanisms of the Fund will balance and stabilize the electric energy system, which is significantly affected by intercompany indebtedness due to accumulated financial deficit of the public provider. The creation of the Fund and its mechanisms for compensation of the public provider is aimed at filling of the vacuum created during the past years due to accumulated uncompensated receivables for public service obligations. **Natsionalna Elektricheska Kompania**, which is **obliged by virtue of the law to purchase at preferential price the electricity from renewable sources**, from highly efficient co-generation of heating and electric energy and a defined quota of energy from producers that use local primary energy sources of fuel, respectively **shall be adequately and completely compensated for the costs incurred under non-market conditions, defined by virtue of the Energy Act as "public service obligations"**.

1420. Articles 36b to 36f of the 2015 Energy Act, which are the basis for 5% ESSF Contribution, are again provisions of national law which are difficult to understand and were not adequately introduced or explained by the Parties.

---

[2049] While the translation provided at Exhibit (**R-082**) includes a comma here, from the original Article, and from later amendments of this Article (Exhibits **C-164**, **R-256**) it appears to the Tribunal that leaving out the comma would make more sense, *i.e.* by clearly separating the purchase obligations into purchases from (i) the great (nuclear) power plants that produce under long-term availability and electricity purchase agreements (ii) RES, and (iii) high-efficiency combined electricity on the one hand and the purchase of the quantity of electricity defined under Article 4(2), pt 8 Energy Act (local energy sources) on the other.

[2050] National Assembly, Motives to the 2015 Amendment of the Energy Act, 30 June 2015 (**R-081**), p. 1.

1421.   To begin with, it did not go unnoticed by the Tribunal that, throughout the whole CMOM, the Claimant referred to the wrong law as the basis for the 5% ESSF Contribution (the 2014 ERSA) and did not even submit the correct law as an exhibit. Nor did the Claimant later acknowledge its mistake, and even during the Hearing it still referred to the ERSA instead of the Energy Act.[2051]

1422.   Nevertheless, based on the Tribunal's study of the Parties' submissions, and in this case mostly the Respondent's explanation, and based on its study of the Energy Act itself as it evolved over time,[2052] the above set-out official "motives" for the introduction of the law,[2053] and several decisions of the Bulgarian Council of Ministers and the EWRC that refer to the ESSF and Article 36e of the 2015 Energy Act,[2054] the Tribunal considers itself able to understand the 5% ESSF Contribution, inasmuch as relevant for these proceedings, as follows:

   a.   The 5% ESSF Contribution is a contribution of all electricity producers and certain other actors in the energy market with the sole purposes of "covering the expenses of the public provider", *i.e.* NEK including namely expenses that result from obligations that are imposed on NEK by law and that consist of an obligation to pay a price different from the market price.

   b.   Indirectly, this contribution "helps" the consumers because otherwise their contributions into the system would have to be increased further, given that NEK's budget always needs to be balanced out through the setting of prices and surcharges to consumers over the following period.

   c.   The 2015 Energy Act refers to the 5% ESSF Contribution as a "contribution" or, according to the Respondent an "instalment",[2055] but not as a tax.

---

[2051]   COS, pp. 123-124, referring to 2015 ERSA (**C-163**).

[2052]   2015 Energy Act (**R-082**); 2018 Energy Act (**C-164**); Energy Act, amended and supplemented, SG No. 17/26.02.2019, SG No. 41/21.05.2019, effective 21.05.2019 (**R-256**).

[2053]   National Assembly, Motives to the 2015 Amendment of the Energy Act, 30 June 2015 (**R-081**).

[2054]   Decision No. 632 of the Council of Ministers on Approval of Report on the Activity of ESSF for 2017, 5 September 2018 (**R-234**); EWRC Decision No. C-19/2016, 30 June 2016 (**FR-86a**); EWRC Decision No. C-19/2017, 1 July 2017 (**FR-87a**).

[2055]   RROMROJ, para. 340.

d. The 5% ESSF contribution is designed as a 5% levy on the revenue, not profit, over all electricity sold by a producer of electricity.

e. For Bulgarian tax purposes, the 5% ESSF Contribution is considered a current operating expenditure.

f. The 5% ESSF Contribution is not considered when setting an annual FiT.

g. Electricity producers have to pay the 5% ESSF Contribution on a monthly basis directly into the ESSF Fund.

h. The law defines the 5% ESSF Contribution as public receivables, which, if not paid on time, are collected under the procedure of the Tax Insurance Procedure Code by the National Revenue Agency bodies.

i. It is unclear whether VAT was paid on the 5% ESSF Contribution payments. The Claimant alleges that it was but has not provided evidence thereof. The Respondent submits that Articles 36(f)(1) and (3) of the 2015 Energy Act would provide that no tax is due on the 5% ESSF Contribution, which explanation, absent any further elaboration, appears to be an incorrect reading of those two provisions.[2056]

j. Under Bulgarian law, the ESSF is not part of the Bulgarian state budget.

k. Payers of the 5% ESSF Contribution do not receive anything in return for it. If those payers sell their electricity to NEK and NEK is obliged to buy it by law, then, in part, they pay themselves.

l. EWRC decides how much NEK receives out of the ESSF.

1423. The Tribunal further observes that, as acknowledged by the Respondent's expert,[2057] when a 5% contribution is deducted from the whole revenue from sold electricity of a producer, and if that producer sells all its electricity at the FiT, the 5% levy for that producer is not different from a direct 5% reduction of the FiT. The fact that the 5%

---

[2056]    ROP III, p. 23; RPHB, para. 33.

[2057]    CPHB, para. 48; HT, D5, 11 June 2021, p. 956.

ESSF Contribution is explicitly not to be considered in setting a FiT, also means that new recipients of a FiT are not shielded from the effect of the 5% ESSF Contribution.

1424. The Tribunal further acknowledges as factually correct the Claimant's argument that due to the FiT being significantly higher than the regular electricity price, which is a result of (i) the higher costs of PV plants as opposed to those of regular electricity producers and (ii) the perceived necessity to attract investment into such plants, the revenue of a PV plant per MW is inflated by those factors compared to the revenue per MW of a regular energy producer. This means that a 5% levy on revenue in absolute terms "costs" a PV plant much more per MW than it does a regular energy producer.

c.    *Transition from FiT to FiP and the termination of the Karad PPA*

1425. The Energy Act as amended and supplemented by SG No. 38/8.05.2018, effective 8 May 2018 (the "**2018 Energy Act**"), reads in relevant part:[2058]

Article 21. … (1)

The Energy and Water Regulatory Commission shall:

…

8b. (new, SG No. 38/2018, effective 8.05.2018) determine, each year by the 30th of June, **premiums for electricity from renewable source** and from high-efficiency combined generation of electricity and heat generated by power plants with a installed electric capacity of 4 MW and more

…

Article 36i. (New, SG No. 38/2018, effective 1.07.2018) **The Fund shall conclude** with a producer under Article 162a and with a producer whose generating works have a **total installed capacity of 4 MW or more** under the Energy from Renewable Sources Act **a contract for compensation by means of premiums**.

(2) The premium shall not be paid, when the producer under Paragraph 1 has liabilities to the Fund, where the Fund shall not owe any interest for delay in this case.

(3) The Fund shall not owe a premium for the electricity amounts for which the producer under Paragraph 1:

1. has not concluded a transaction under the procedure of Article 100, Paragraphs 3 and/or 5 or a transaction on a balancing market;

2. has no transferred monthly certificates of origin or guarantees of origin under Article 34 of the Energy from Renewable Sources Act.

---

[2058]    2018 Energy Act (**C-164**).

(4) The Fund shall pay the premium by the end of the month, as of the 20th of which an expense accounting documents has been submitted and the monthly certificates of origin or a guarantee of origin have been transferred to Fund under Article 34 of the Energy from Renewable Sources Act.

1426. The Transitional and Concluding Provisions to the Act on the Amendments and Supplements to the Energy Act (SG No. 38/2018, effective 8.05.2018) read in relevant part:[2059]

§ 68. (1) By 31 October 2018 **producers of electricity from renewable sources** with total installed capacity of 4 MW and more of energy projects **shall conclude with the Electricity System Security Fund a contract for compensation with a premium for the quantities of electricity generated thereby up to the amount of their allocated net specific generation of electricity**, on the basis of which their preferential price was determined. The contracts for compensation with a premium shall enter into force not later than 1 January 2019.

(2) The premium shall be determined on an annual basis, by 30 June, by the Energy and Water Regulatory Commission as the **difference between the preferential price determined prior to the entry of this Act** into force or the updated preferential price for the project, as the case may be, **and the forecast market price of electricity generated from renewable sources determined for this period** depending on the primary energy source.

(3) The Electricity System Security Fund shall notify in a timely manner the public provider of the date from which the contract for compensation with a premium concluded with the relevant producer enters into force.

(4) The **premium shall be granted until the expiration of the term under the relevant long-term purchase contract** or contract under § 7 of the Transitional and Final Provisions of the Energy from Renewable Sources Act concluded before the entry of this Act into force

…

(8) **From the date of entry into force of the contract** referred to in Paragraph 1, **the purchase contract of the relevant producer** referred to in Paragraph 1 and concluded before the entry of this Act into force **shall be deemed terminated**, **and the public provider** or the end suppliers, as the case may be, **shall not purchase at a preferential price the electricity** generated by such producer.[2060]

---

[2059]    *Ibid.*, p. 159.

[2060]    *Ibid.*; the publicly available translation appears better to capture the apparent intent of this paragraph:

(8) From the date of entry into force of the contract under Para. 1, the buy out agreement of the respective producer under Para. 1, concluded before the entry into force of this act, shall be considered terminated and the public provider, respectively, the end suppliers, shall not buy out at a preferential price the electricity produced by this producer.

https://www.me.government.bg/en/files/download?hash=75c204b53f734ec7bb86aec1a6fb0788a2c8a4f c last access 18 February 2022.

1427. The CfP between ACWA Bulgaria and the ESSF of 31 October 2018 reads in relevant part:

> The Producer has entered into a contract with National Electricity Company EAD under No 121E3327013 by 13.06.2012, constituting Annex No.3 to this Agreement, which shall be terminated automatically with regard to the Energy Facility/Facilities described in letter A when this feed-in premium agreement shall become effective, on the grounds of §68 paragraph 8 of the Law Amending and Supplementing the Energy Act;[2061]
>
> …
>
> LASEA means the Law Amending and Supplementing the Energy Act, promulgated in State Gazette issue 38 of 8 May 2018.[2062]
>
> …
>
> 1. The subject of this Agreement is the compensation of the Producer from ESSF by paying a Premium for the amount of electricity produced by the Energy Facility and registered with a monthly Guarantee of Origin, for which the Producer has concluded transactions under Article 100, paragraph 4 and/or paragraph 6 of EA or on a Balancing Market.
>
> 2. ESSF shall compensate the Producer with a Premium up to the amount of the Premium due for the Specific Net Electricity Production, to the extent that such has been set for the Energy Facility.
>
> AMOUNT OF THE PREMIUM
>
> 3. The amount of a premium per MWh of electricity shall be set by the EWRC in accordance with § 68, paragraph 2 LASEA annually by 30 June as the difference between the preferential price set prior to the entry into force of the LASEA, respectively the updated preferential price of the facility, and the estimated market price set for that period for electricity produced from renewable sources depending on the primary energy source.
>
> 4. If necessary, the EWRC shall amend the set premium per MWh of electricity not more often than once every 6 months under the conditions of Article 31a, paragraph 2 EA.
>
> 5. ESSF shall determine and pay to the Producer the Premium for the amount of electricity produced by the Energy Facility, by applying the amount of the premium per MWh set or respectively amended for the respective regulatory period by the decision of the EWRC under Article 21, paragraph 1, p. 8b EA or respectively under Article 31a, paragraph 2 EA.[2063]
>
> …

---

[2061]   CfP between ACWA Bulgaria and the ESSF, 31 October 2018 (**R-236**), p. 1.

[2062]   *Ibid.*, 4.

[2063]   *Ibid.*, pp. 6-7.

ESSF shall be required to pay the Premium in due time, subject to the terms agreed upon, if the conditions under point 6 have been met.[2064]

…

34. This Agreement shall terminate automatically:

a) if the legal grounds for the payment of a Premium by ESSF In favour of the Producer are no longer valid as a result of changes in legislation;[2065]

…

37. If, as a result of changes to the laws, the grounds and/or the mechanism of payment of the Premium and/or an act by a Competent Body, which has entered into force and is subject to preliminary enforcement, shall be amended, or new requirements, restrictions or prohibitions with regard to the payment of the Premium shall be introduced, the Parties shall fulfil their obligations under this Agreement, insofar as this is not in contradiction with the law or the act by the Competent Body.[2066]

1428.  The verbatim transcript of the meeting of the Legal Affairs Committee of the Bulgarian Parliament of 28 March 2018, discussing the amendments to the Energy Act that introduce the Transition from FiT to FiP, reads in relevant part:

Valentin Nikolov: …

These agreements must be reorganized from long-term agreements to agreements for premium-based compensation. In other words, these will not be orthodox agreements as the rumors have it.

This agreement can in fact be transformed from one type to the other because there is a clause according to which when the legislation changes, conditions can be renegotiated based on the legislative changes. In other words, if the law changes, the new provisions will be applicable to all such agreements.[2067]

MARIANA METEVA: If I may, Mr Chairman, dear ladies and gentlemen of the Bulgarian Parliament, I would like to turn your attention to some concerns the National Electric Company has in its capacity as public supplier with regard to the proposed amendments to the Renewable Energy Act and in particular the absence of an express provision for termination as of July 1, 2018 of already effective long-term agreements concluded in accordance with the effective provisions of the Energy Act. Here is what we mean.

According to Article 38 of the Bill, as of July 1 the public supplier and the end distributors will not purchase electricity at preferential prices from producers with production capacity of 4 megawatts and over 4 megawatts under already effective long-term agreements. This means that, with this text, it can be deemed

---

[2064]    *Ibid.*, p. 12.

[2065]    *Ibid.*, p. 15.

[2066]    *Ibid.*, pp. 16-17.

[2067]    National Assembly, Legal Affairs Committee, Minutes, 28 March 2018 (**R-231**), p. 2.

that the legal obligation for the public supplier and the end distributors no longer exists. However, we are a party to many long-term agreements whose duration is provided for in the Act. The prices applicable for the entire duration of these agreements is also provided for in the provisions of the currently applicable Act. These are not terminated under the proposed legislation, they are to be restructured.

We will face a hypothesis where certain producers will be able to choose between concluding an agreement for premium payments from the Fund or to continue to demand from us, as a party to a long-term energy purchase agreement, to perform our contractual obligations. This is our main concern.

I would also like to point out that under two of our existing agreements, we would have to pay a considerable penalty, without citing concrete figures, even if the agreements are terminated pursuant to the provisions of the law. In light of that, I would like to ask you to take this into account when you move to approve the texts.[2068]

1429. The transcript of the plenary sitting of the Bulgarian Parliament of 4 April 2018, at which the amendments to the Energy Act that introduce the Transition from FiT to FiP were discussed for the first time, reads in relevant part:[2069]

In response to the comments made by Mr. Ermenkov, the MP Delyan Dobrev clarified the following: After calculations made, the **market risk** related to the difference between the estimated market price, which will be calculated by the Energy and Water Regulatory Commission and the actual price is **between 1 and 3%**, depending on the different energy sources. Regarding the proposal to secure the funds in the "Energy System Security" Fund, from the moment of its establishment until now there has been no case of lack of funds.[2070]

…

TASKO ERMENKOV (BSP for Bulgaria) [*opposition party*]:

…

We also run the **risk of affecting investors' rights guaranteed by the Energy Charter Treaty** and multiplication – I will express myself in a slightly more allegorical way – of the international legal actions against Bulgaria after the adoption of the Bill. **There is a danger that not all interests will be fully satisfied, the interests of investors in Bulgaria, as has happened many times since 2012, because we know that we have problems.** Towards the end, I will focus also on some of the suggestions we will make.

You know that in **Spain and the Czech Republic** there are already condemnatory judgments related to the retroactive reform that have been implemented by this country, and let's try to learn from the mistakes of others

---

[2068] *Ibid.*, p. 5.

[2069] NA 4 April Transcript (**R-232**).

[2070] *Ibid.*, p. 3.

not to repeat them, because we have a bitter experience and it is not good to multiply it.[2071]

Delyan Dobrev (GERB): …

Mr. Ermenkov, there is one thing with which I strongly disagree and I want to emphasize it here, from this rostrum. You talk about that there is a risk of affecting investors' rights, and you almost give examples of Spain and the Czech Republic, where investors are suing and there are condemnatory judgments. **What we are doing as a reform has nothing to do with what has been done in Spain and the Czech Republic, because in these countries the state has actually changed the environment by trying to reduce the income of these producers and violate their rates of return, which probably happened and therefore, there are convictions.**

**This is not the goal here. Here the goal is for the end result to be the same again. If the preferential price of a photovoltaic is BGN 485, with the changes it will take these BGN 485, but of two components – one is the market price of electricity, the other – the premium. The purpose of the Bill – I want to emphasize clearly, is not to endanger the rights of investors**.[2072]

…

TASKO ERMENKOV (BSP for Bulgaria): The rejoinder will be short.

First, with regard to the interests of **investors** – they probably **would not be threatened and would receive the same amount if** there was no calculated estimated price plus a supplement, but, but, but this could be achieved – I say it as another philosophy that could – to do this, **the sales on the market and then the contracts for difference to be certified by the EWRC as a difference, which must be paid in addition in order to receive those money 100% they had before**. This is the subject of another conversation.[2073]

…

Delyan Dobrev

What I want to emphasize once again is that the difference between the classic contract for difference, which covers the whole difference from the preferential to the market price, whatever it is, and the premium contract, which gives a fixed premium according to the type of producer, and so on for produced megawatts of electricity is essential. It is that when you guarantee the whole difference, you stimulate the participants in this market to behave in a non-market way, that is, you stimulate them to sell at any price, simply because they will receive their premium. And this was the preferred option even by those producers with preferential conditions – in one of the models, yes, there is a very little risk, which goes in both directions. This risk is for the investors and for the state, because it may turn out to have actually paid a little more than it should, but in this case there is zero risk in the "Energy System Security" Fund, i.e. there the

---

[2071] *Ibid.*, p. 14.

[2072] *Ibid.*, p. 15.

[2073] *Ibid.*

revenues are known exactly how much they should be, the regulator calculates them, predicts and these funds are there. There is 100% certainty for this component for the premium. While in the model that covers a contract for difference, that is, the entire amount, no matter what it is, deficits will be reached very quickly in the "Energy System Security" Fund, if that was the model, of course, and it is not, that will lead again to delayed payments, higher costs in energy sector and so on. Thank you.[2074]

…

MINISTER TEMENUZHKA PETKOVA: …

The World Bank has prepared a model for liberalization of the electricity market. This model, of course, has its question marks that remain. One of these question marks is precisely **the recommendation of the World Bank** regarding renewable energy sources **to introduce the model of a contract for difference** – something that later became clear to everyone that **there is no way to realize it**. With the assistance and participation of all of you, in fact, this principled **decision was made to introduce the model of a premium-contract**, as provided for also the State Aid Guidelines.[2075]

…

The second topic, which I think is very important in this bill, is related to the public provider – "Natsionalna Elektricheska Kompania". "Natsionalna Elektricheska Kompania" has expressed its opinion in regard to this bill. There, what concerns NEK is related to the renegotiation of contracts with producers of electricity from renewable energy sources at preferential prices. The text that has been recorded at present says that from July 1 NEK will stop buying this electricity at preferential prices, but here there is a nuance that I want to share with you and which will be clearly presented to your attention.

"Natsionalna Elektricheska Kompania" has contracts in which it is very clearly stated in which cases **NEK is in default**. One of these cases is **if he stops buying this electricity at preferential prices**. I am afraid that if the text in the Bill is not more definite, i.e. it becomes clear that from a certain date these contracts are terminated in connection with the liberalization, **it would create preconditions for NEK to be subject to relevant arbitration and court cases** – something which I don't think any of us want to happen. So, I think we can also think in that direction here. **I am glad that there will be a working group between first and second reading**. The Ministry will, of course, take an active part in this working group so that we can refine the texts and move forward. Thank you for your attention.[2076]

---

[2074] *Ibid.*, p. 17.

[2075] *Ibid.*, pp. 17-18.

[2076] *Ibid.*, pp. 18-19.

1430. The World Bank "Summary Report" "Bulgaria Power Sector: Making the Transition to Financial Recovery and Market Liberalization" of November 2016 (the "**World Bank Report**") reads in relevant part:[2077]

> Measure 2: Integrate IPPs [Independent Power Producers] with long-term power purchase agreements and producers benefiting from feed-in tariffs into the competitive wholesale market. Integration holds the promise of benefiting consumers through increased competition, liquidity and efficiency in the power markets while protecting the IPPs and RE revenue stability during the transition. One approach that has been used in other EU countries and is deemed adequate in the Bulgarian context is to convert the power purchase agreement, or offtake obligation, into a financial mechanism known as a **contract for difference** (CfD). It is also important to take into consideration some phasing in of CfDs into the marketplace. It is recommended that contract volumes for IPPs with long-term PPAs be introduced first, followed by that of the large RE producers and, finally, medium and smaller-scale RE producers and perhaps cogenerators. CfDs could also be used a transition mechanism support market liberalization for the regulated sector. In this case, supply companies could benefit from a CfD to procure the power required to cover "regulated volumes'. This would progressively expose consumers to market prices (see Focus area 3 for more details).
>
> …
>
> Table 1. CfDs - key design parameters

| The strike price | To be based on the original terms set out in the contract/regulation |
|---|---|
| The counterparty | Security of the Electricity System Fund (see discussion below) |
| Reference price | The **day-ahead market price** from IBEX should be used as the reference price for the settlement[2078] |

> …
>
> As mentioned earlier, some form of indirect government support, through state guarantees, would be necessary to improve the terms of the debt repayment and enhance the creditworthiness of the SESF as a CfD counterparty.[2079]

1431. Having studied the above documents and excerpts, and the submissions of the Parties, the Tribunal observes the following regarding the Transition from FiT to FiP:

---

[2077] World Bank Report (**R-96**), p. 9.

[2078] *Ibid.*

[2079] *Ibid.*, p. 14.

a. The 2018 Energy Act ended the obligation of the Public Provider, *i.e.* NEK and certain end suppliers, to purchase renewable energy and moved that obligation to the ESSF, to which those producers contribute 5% of their revenue from electricity sold (as outlined above).

b. The 2018 Energy Act obligated energy producers that sold under PPAs to enter into CfPs with the ESSF by 31 October, and considered the existing PPAs of any such producer to be terminated at the moment the respective CfP was entered into.

c. Under the CfP, the difference between the previous FiT and a forecast market price over one year is paid out by the ESSF until the date on which the original PPA would have expired.

d. At the time the 2018 Energy Act was adopted, the Respondent stated that it was not its intention to reduce the income of producers of renewable energy. The Respondent, however, was aware at that time that it would expose producers to a market risk.

e. At the time of the introduction of the 2018 Energy Act, there were concerns in the Bulgarian Government and Parliament (i) that the bill would not effectively terminate the outstanding PPAs, such as the Karad PPA, (ii) that the transition might be too sudden for investors and (iii) that the combination of these elements would open NEK and Bulgaria up to liability, in the latter case also under the Energy Charter Treaty.

f. It is unclear whether these concerns, expressed in regard to an earlier draft not on record, were (considered to be) addressed in the final version of the 2018 Energy Act.

g. It is also unclear whether, under Bulgarian law, Article 68(8) i.c.w. Article 68(1) of the Transitional and Concluding Provisions to the Act on the Amendments and Supplements to the Energy Act could and did terminate, or obligate ACWA Bulgaria to terminate, the Karad PPA and how these Articles interact with, *e.g.* Articles 42 and 52 of the Karad PPA. This is a question of Bulgarian law on which the Tribunal was not briefed.

h.  There is no dispute between the Parties, however, that the Karad PPA was effectively terminated by the Transition from FiT to FiT and ACWA Bulgaria.

i.  While the Respondent submits that it implemented World Bank policy recommendations when instituting the Transition from FiT to FiP,[2080] its implementation intentionally and knowingly deviates from the recommendations of the World Bank: the World Bank, for example, (i) recommended a contract for difference model, in which the difference between the market price and the original is paid out and the producer is left with no price risk, and (ii) envisioned that the price would be adjusted daily, not yearly, again limiting the price risk. The World Bank furthermore was of the view that the ESSF would expose producers of electricity sold at a FiT to a higher counterparty risk than before.

j.  The Tribunal understands that guaranteed reimbursement of the difference between a FiT and the actual market price obtained may distort the electricity market as no incentive exists in such a scenario for producers to maximise the price they can obtain on the market.

## D.    Facts relating to the Article 17(1) Objection

1432.  Below the Tribunal sets out the facts it deems relevant in respect of the Article 17(1) Objection.

1433.  In terms of the timeline leading to the Respondent's reliance on Article 17(1) ECT, the Tribunal observes that:

a.  On 8 February 2005 the decision on jurisdiction in *Plama* was issued.

b.  Following the decision on jurisdiction in *Plama* in February 2005, the Respondent, to the Tribunal's knowledge, did not make any general declaration in its official gazette regarding Article 17(1) ECT. Neither did it include a statutory provision, *e.g.* in the ERSA or any other investment or other laws of which the Tribunal is aware, that outlines its stance on Article 17(1) ECT, if

---

[2080]    RCMOMOJ, paras. 243-245, 250-256; RROMROJ, paras. 198, 261, 265, 267, 479-481; ROP II, pp. 88-90; HT, D1, 7 June 2021, p. 242; RPHB, para. 102; European Commission Guidance (**FR-41**); World Bank Report (**R-096**); NA 4 April Transcript (**R-232**).

there was a general stance on that Article. The Respondent, to the Tribunal's knowledge, also did not exchange letters with particular investors or classes of investors.[2081]

c.  On or around 18 September 2012 the Respondent received the 18 September 2012 Letter (as outlined and discussed above).[2082]

d.  By letter of 30 August 2017 (as referred to above), the Claimant notified the Respondent of its view that the Seven Measures violate the Respondent's obligations under the ECT and that if no amicable solution were reached within three months from the letter, the Claimant would proceed to international arbitration against the Respondent under Article 26 ECT.[2083]

e.  That letter received no reply. The Respondent in particular did not invoke Article 17(1) ECT in reaction to that letter or make any other reference to Article 17(1) ECT, nor, to the Tribunal's knowledge, did the Respondent ask the Claimant questions as to its ownership structure or business activities in Malta.

f.  On 6 August 2018, following negotiations of the draft for PO1 and in particular the timetable of the proceedings, the Respondent requested that the Tribunal order bifurcation of the proceedings and informed the Tribunal that it had advised the Claimant that it would object to the Tribunal's jurisdiction and the admissibility of the Claimant's claims because the advantages of Part III of the ECT are denied to Claimant pursuant to Article 17(1) ECT.[2084]

1434.  In terms of the Respondent's knowledge, the Tribunal observes that:

a.  The Respondent is assumed to know the content of the Treaties it has entered into, including Article 17(1) ECT.

---

[2081]  *Cf. Plama* (**CL-024**), para. 157. In this summary of facts the Tribunal takes no view on the correctness or incorrectness of the *Plama* decision, but simply observes what was not done following that decision.

[2082]  18 September 2012 Letter (**C-110**).

[2083]  Notice of Legal Dispute Arising Under the Energy Charter Treaty and Offer of Amicable Settlement to Bulgaria, from ACF to the Respondent, 30 August 2017 (**C-8**).

[2084]  Letter from the Respondent to the Tribunal of 6 August 2018.

b. The Respondent in the present proceedings is represented by the same internal and external counsel and the same two law firms as it was in *Plama*.[2085]

c. As already found above, the Respondent was informed of ACWA Bulgaria's business model and ownership structure during the meeting(s) in April 2012.

d. The Respondent also knew or could have known the business model and ownership structure of ACWA Bulgaria and the Claimant as from the date of the Investment in June 2012.

e. The Respondent also knew or could have known the business model and ownership structure of ACWA Bulgaria and the Claimant from the time it received the 18 September 2012 Letter. In light of the assertions of rights under the ECT with a view to the Temporary Grid Access Fee contained therein, the Letter would have, and/or should have moved the Respondent to make inquiries about the ownership structure of ACWA Bulgaria and the Claimant and the Claimant's business activities in Malta. The Letter also would have or should have instigated a process within the Respondent tending towards making up or beginning to make up its mind on invoking Article 17(1) ECT and when to do so.

1435. In light of its decision below, the Tribunal finds it unnecessary to set out the facts regarding the ownership of the Claimant and the degree of business activities of the Claimant in Malta.

1436. The Tribunal only notes that the Parties agree that citizens or nationals of a third State not being a Contracting Party own or control the Claimant in the sense of Article 17(1) ECT.

1437. The Parties further agree the Claimant is a holding company operating from Malta but without any holdings or employees in Malta. The Parties disagree on whether the Claimant's business activities in Malta are substantial in the sense of Article 17(1) ECT.

---

[2085] *Cf. Plama Consortium Ltd. v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008 **(CL-113)**; *Plama* **(CL-24)**.

### E.    Summary of Facts

1438.  Based on the analysis of the evidence provided, as set out in its most relevant parts above, and based on the submissions of the Parties, the Tribunal finds that the following are the established facts on which it must base its decision.

1439.  For the facts regarding aspects of the cases not dealt with in the summary below, the Tribunal refers to the preceding more detailed discussions of the facts and the references to those facts in the Tribunal's Analysis below.

1440.  The facts relating to the Article 17(1) Objection set out above are not set out again or further summarised below.

### a.    The ERSA Regime

1441.  The key established facts regarding the ERSA Regime are the following:

a.  To obtain investment in renewable energies at the level that the Respondent desired, required the granting of subsidies and the attracting of investors, and hence any Bulgarian regime would have been understood to seek to induce investment.

b.  Wind and PV energy production require large initial investments while having low annual operational costs. Annual operational costs are low because, for example, the creation of such energy does not require any fuel or input energy. This makes uncertainty of recovering the large initial investment, *i.e.* the costs that are "sunk" immediately after the investment is made, the main concern of an investor in wind or PV energy production.

c.  An *ex ante* regime is a scheme in which the key parameters of a regime are fixed *ex ante* and are then not to be changed for the promised duration, *i.e.* leaving those parameters untouched for existing plants "*ex post*".

d.  In doing so, an *ex ante* regime addresses or makes calculable and "bankable" the main concern of an investor in the wind and PV energy.

e.  At the time of the Investment, an *ex ante* regime was considered to be a very suitable, state-of-the-art, regime for subsidising and attracting investment in renewable energy from intermittent RES.

f.  The ERSA Regime at the time of the Investment in June 2012 was an *ex ante* regime with three key pillars: a fixed price, a fixed term, and full offtake.

g.  The fixed price for PV plants over 200 kWp was BGN 485.60. The term was 20 years.

h.  The aim of the ERSA Regime was to attract investment in energy from RES in Bulgaria. That is why an *ex ante* regime was chosen, as it was deemed to be the best system to attract that type of energy production.

i.  The ERSA Regime was supposed to be predictable and low-risk for projects that reached the required stage and fulfilled the mandatory conditions.

j.  The ERSA Regime was understood by the Respondent that way at the time of the Investment and even later internally, as could be seen from publicly accessible sources.

k.  The ERSA Regime was also advertised that way to the greater public.

l.  Any investor in Bulgaria between May 2011 and June 2012 would have understood the ERSA Regime that way, and so did the Shareholders, and the Claimant when it came into being.

m.  The Claimant was further reassured in this understanding by its due diligence and by a meeting with Deputy Minister of MEET, Mr Valentin Nikolov and other government officials and representatives of NEK on or around 10 April 2012.

n.  The Claimant and its Shareholders based their calculations regarding the Investment on that understanding and obtained financing on the basis of that understanding from Lenders which also reasonably shared that understanding.

   *b.    The target IRR of 9-10%*

1442.   Regarding the target IRR the Tribunal finds the following facts important:

a.  Until June 2012, the ERSA Regime was based on an *ex ante* target IRR of 9-10% before tax.

b.  The Respondent understood that target return to be an *ex ante* target only and understood that different returns for individual plants were possible. It communicated that understanding publicly and the understanding is also included in, and underlying the FiT Decision.

c.  The Respondent was under no internal or EU law obligation to amend a fixed *ex ante* regime *ex post* to adjust, upwards or downwards, the IRR of existing PV plants to the target return. If it was, then that putative obligation was not communicated openly nor was it made plausible, let alone proven to the Tribunal.

d.  The target applied at the level of the plant itself.

e.  After the introduction of the Seven Measures, the Karad Plant, even on the Respondent's own most positive calculations, did not achieve an IRR of 9-10%.

f.  It is unclear whether the Karad Plant would have exceeded an IRR of 9-10% absent the Seven Measures.

  *c.*  *EU State aid law*

1443.  Regarding whether the ERSA Regime constituted EU State aid and was in violation of EU State aid law, the Tribunal finds:

a.  The ERSA Regime constituted EU State aid but at no time was it in violation of EU State aid law.

  *d.*  *The alleged boom*

1444.  Regarding the alleged "boom" the Tribunal finds the following facts important:

a. Bulgaria officially expected 303MW installed PV capacity for 2020 and, in actual numbers, it achieved 935MW installed PV capacity in June 2012.[2086]

b. In early 2013 Bulgaria declared to have reached the share of renewable energy it had to reach by 2020 and the ERSA Regime was closed to new entrants.

c. It was the expectation of the Respondent that 5/6th of the added PV capacity would be added in the first half of the 2010-2020 decade.

d. At the time that the ERSA was introduced, in May 2011, and when the April 2012 Amendment was debated and introduced, December 2011 to April 2012, the Respondent was aware that prices for PV panels were falling.

e. At the time that the ERSA was introduced, the Respondent might have, and could have known, and, at the latest, at the time the April 2012 Amendment was debated and introduced the Respondent knew, that the project pipeline with preliminary and final connection agreements for all renewable energy plants in general, and for PV plants in particular, would exceed its official expectations regarding the capacity that would be installed over 2011, 2012, and 2013, and for PV capacity even up until 2020. The Respondent knew that the project pipeline might exceed the capacity of the electricity network.[2087]

f. Knowing full well about the size of the pipeline of projects and of already installed capacities, over the course of 2011 till mid-2012, the Respondent still believed it needed to attract further investment and continued to do so.

g. At the time of the Investment, and before, the Respondent had a much clearer and more fully informed view on the amount of investment and the increase of renewable energy capacity in Bulgaria than the Claimant could have had.

---

[2086] Evolution of installed PV capacity in the period 2009 to 2015 based on data from Bulgaria's Sustainable Energy Development Agency SEDA (**R-244**), tab "installed PV capacity," line 43. This data set actually shows yet another source of Bulgaria's real-time knowledge of the installed capacity, at least up until the April 2012 Amendment, namely the then mandatory "guarantees of origin" for the produced electricity to be given out by Bulgaria's Sustainable Development Agency, SEDA. According to the Respondent, such guarantees specify "inter alia the plant where the energy was produced, the type of produced energy, the date(s) that the energy was produced, the support scheme used (e.g., the FiT scheme), and a unique identification number." RROMROJ, para. 138, fn 291.

[2087] *Ibid.; cf.* also, *e.g.*, RCMOMOJ, para. 58; NA 25 January Transcript (**FR-104**), pp. 7, 10.

h.  Even before the introduction of the ERSA, the Respondent already had a view on, and knowledge of, recently installed and upcoming capacity through its view on, and access to, preliminary and final connection agreements, through its control over the licensing process, and through the knowledge of BEH, NEK, and ESO.

i.  The ERSA Regime was introduced to address and repair perceived and unsustainable elements of the RAESBA.

j.  The ERSA Regime was introduced after, and in full knowledge of, so called "booms" in Spain and Italy.

k.  The ERSA Regime was discussed by the Respondent, and understood by the Claimant and its Shareholders, as being aware of, and being prepared for reacting to, any such "booms".

*e.    The 60.4/50 Ratio*

1445.  Regarding the factual circumstances surrounding the 60.4/50 Ratio, the Tribunal finds the following established:

a.  The Respondent knew about the 60.4/50 Ratio directly, and indirectly by knowing how much electricity the Karad Plant was going to produce.

b.  The Karad Plant's 60.4/50 Ratio neither violated the License, nor did the Respondent "decline to approve" the 60.4/50 Ratio. To the contrary, because the License required that the Karad Plant be run according to its technical specifications, it required the Karad Plant to make use of the 60.4/50 Ratio.

c.  The Respondent was fully aware of, and expressed itself positively about, the added profitability the Karad Plant would achieve due to the 60.4/50 Ratio.

*f.    Network costs*

1446.  Regarding the factual circumstances surrounding the imposition of network costs/grid access fees, the Tribunal finds the following established:

a.  The Respondent was aware that its electricity grid would be challenged by the influx of producers of renewable energy and would need investment.

b. At the time of the Investment, the Respondent understood the improvement and the preparing of the network to be a task of the State and a cost not to be imposed on producers of renewable energy.

(1) Temporary Grid Access Fee

c. The Temporary Grid Access Fee charged different amounts for the same access to the transmission network and distribution grid depending on the date of commissioning of a plant, and it appears to have specifically targeted plants commissioned in the first half of 2012.

d. ACWA Bulgaria, *i.e.* the Investment, voluntarily accepted not to be reimbursed BGN 315,253.80 and accepted the Access Fee Settlement Agreement as the final settlement of all claims regarding the Temporary Grid Access Fee.

(2) Permanent Grid Access Fee

e. The Permanent Grid Access Fee appears to have been *de facto* applied retroactively from the date of the introduction of the Temporary Grid Access Fee onwards.

f. It appears that for the period from the introduction of the Temporary Grid Access Fee up to the date of the introduction of the Permanent Grid Access Fee, ACWA Bulgaria, at least to some degree, paid the Fee twice.

g. The Permanent Grid Access Fee appears not to have addressed and thus charged producers of wind and PV energy that did not receive a FiT, though, *de facto*, no such producers appear to have existed at the time of its introduction.

g. *The 20% Levy*

1447. Regarding the 20% Levy, the Tribunal finds the following established:

a. The 20% Levy was introduced as a fee and deliberately named and treated as such nationally.

b. The formula for the 20% Levy as set out in Article 35a (2) 2014 ERSA make the 20% Levy a direct reduction of the FiT.

  c. ACWA Bulgaria and the Respondent agree that even after the 20% Levy was declared unconstitutional, under Bulgarian law, ACWA Bulgaria could not claim back monies charged under the 20% Levy.

  *h. Balancing Cost Exposure*

1448. Regarding the factual circumstances surrounding the Balancing Cost Exposure, the Tribunal finds the following established:

  a. The Tribunal understands that, because of the way PV plants generate power, it is difficult for those plants to make accurate short-term/daily predictions as to how much electricity they will produce.

  b. The Tribunal understands that there are nevertheless good reasons for imposing balancing costs on producers of such energy, such as the full liberalisation of one's energy market, and incentivising more accurate predictions than a producer fully shielded from balancing costs might be inclined to offer.

  c. The Tribunal, however, also understands that there are good reasons for shielding producers of renewable energy from balancing costs, fully or in part, if a system purports to seek to attract that kind of energy generation with its elements of uncertainty.

  d. In any case, the Claimant and its Shareholders expected that balancing costs would be imposed on the Karad Plant and would form an additional cost to the Karad Plant in the near future.

  e. In 2012 and 2013, ACWA Bulgaria did not pay any imbalance costs.

  *i. The 5% ESSF Contribution*

1449. Regarding the factual circumstances surrounding the 5% ESSF Contribution, the Tribunal finds the following established:

  a. The 5% ESSF Contribution is introduced by law as a monthly contribution into a separate State fund.

  b. It is levied on the income from sales of energy producers and other entities.

    c.  It is classified as public state receivable and contributions which have not been paid within the fixed time limit are ascertained and collected under the procedure of the Tax Insurance Procedure Code by the National Revenue Agency bodies.

    d.  The 5% ESSF Contribution was introduced for the purpose of covering expenses of the Public Provider, including payments to producers of renewable energy.

    e.  The 5% ESSF Contribution is a *de facto* reduction of the FiT.

    f.  It disproportionately affects and disproportionately relies on funding from renewable energy producers that receive a FiT.

    *j.*    *Transition from FiT to FiP*

1450.  Regarding the factual circumstances surrounding the Transition from FiT to FiP, the Tribunal finds the following established:

    a.  The Transition from FiT to FiP as executed deliberately does not mirror what the World Bank had recommended.

    b.  The Transition from FiT to FiP does not guarantee the FiT.

    c.  The Transition from FiT to FiP exposes PV plants to added counterparty, market, and price risks, and burdens them with the need to sell their product.

    d.  The Transition from FiT to FiP terminated the Karad PPA.

## V.    ANALYSIS

1451.  In this chapter, the Tribunal will set out its analysis of (i) its jurisdiction, including the objections thereto, (ii) the merits of the case, and (iii) the Claimant's quantum claim. It will begin with recalling and expounding on its analysis of the applicable law.

### A.    Applicable Law

1452.  The Tribunal recalls that in the *Achmea* Decision it has already set out how it interprets Article 26(6) ECT, *i.e.* the provision of the ECT determining the applicable law between the Parties. The Tribunal has thus already determined what "decid[ing] the issues in dispute in accordance with this Treaty and applicable rules and principles of international law" means. The Tribunal has observed in that regard that "[a]s a matter

of course, in an intra-EU case such applicable rules and principles may include EU law, given that EU law is applicable international law between the Member States of the EU and thus contains rules and principles of international law applicable between them."[2088]

1453. In the *Achmea* Decision, the Tribunal has further set out how it will treat, and how it sees value in, arguments based on articles of the VCLT even though the VCLT is not directly applicable between Malta and the Respondent.[2089]

1454. The Tribunal finally recalls that in the *Achmea* Decision it found that, in practice, it was not necessary to apply EU law for the resolution of the dispute at that time.[2090] The Tribunal observes that that conclusion is still valid at the date of this Award. The only time when the Tribunal's analysis has come into contact with EU law was when the Tribunal took note of the EC Decision on State Aid as a fact (see above). In light of the contents of that Decision, the Tribunal had and has no need to engage further with any questions of EU State aid law or the question whether, and how, it could and should do so.

### B.    Jurisdiction

1455. The Tribunal will now (i) recall its findings on whether the conditions for its jurisdiction set out in Articles 26 ECT and 25 ICSID Convention are met, and deal with (ii) the Article 17(1) Objection, (iii) the Article 21 Objection, and (iv) the *Komstroy* Objection.

#### 1.    Requirements under ECT and ICSID

1456. The Tribunal recalls that it has already determined in the *Achmea* Decision that the conditions for its jurisdiction, as set out in Article 26 ECT and Article 25 ICSID Convention, are met in this case, subject to the resolution of the outstanding objections to jurisdiction. The Tribunal notes in that regard that the objection based on Article 21 ECT was made, unopposed, after the date of the *Achmea* Decision. For that reason, it was not anticipated in the *Achmea* Decision but it is addressed, for the first time, below.[2091]

---

[2088]    *Achmea* Decision, paras. 182-191.

[2089]    *Achmea* Decision, paras. 55-56.

[2090]    *Achmea* Decision, para. 191.

[2091]    *Achmea* Decision, paras. 152-157.

### 2.    Article 17 (1) Objection

1457.   Article 17 ECT reads in relevant part:

Non-Application of Part III in Certain Circumstances

Each Contracting Party reserves the right to deny the advantages of this Part to:

(1) a legal entity if citizens or nationals of a third state own or control such entity and if that entity has no substantial business activities in the Area of the Contracting Party in which it is organised;

(2) an Investment, if the denying Contracting Party establishes that such Investment is an Investment of an Investor of a third state with or as to which the denying Contracting Party:

(a) does not maintain a diplomatic relationship; or

(b) adopts or maintains measures that:

(i) prohibit transactions with Investors of that state; or

(ii) would be violated or circumvented if the benefits of this Part were accorded to Investors of that state or to their Investments.

1458.   Article 17 ECT is situated in Part III of the ECT which is titled "Investment Promotion and Protection". Part III includes Article 10 ECT, *i.e.* the Article of the ECT which the Claimant claims was breached.

1459.   Article 26 ECT reads in relevant part (emphasis added):

Article 26: Settlement of Disputes between an Investor and a Contracting Party

(1) **Disputes** between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, **which concern an alleged breach** of an obligation of the former **under Part III** shall, if possible, be settled amicably.

(2) If **such disputes** cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

(a) to the courts or administrative tribunals of the Contracting Party party to the dispute;

(b) in accordance with any applicable, previously agreed dispute settlement procedure; or

(c) in accordance with the following paragraphs of this Article.

…

#### a.    The Article 17(1) Objection

1460.   The Tribunal can deal relatively succinctly with the Article 17(1) Objection.

1461.  The text of Articles 17(1) and 26 ECT is clear: if the advantages of Part III, including, as relevant here, the advantages of Article 10 ECT, were validly denied to the Claimant, then as of the time that the denial took effect, the Respondent was no longer bound *vis-à-vis* the Claimant by any obligation under Part III of the ECT, including under Article 10 ECT, and, therefore, the Respondent cannot have breached any such provision *vis-à-vis* the Claimant as from that time.

1462.  That impossibility is important because Article 26 ECT only gives the Tribunal jurisdiction over disputes concerning an alleged breach of an obligation under Part III of the ECT. As a breach of any such obligation is impossible as of the time of a successful denial of the benefits of Part III of the ECT, no dispute in the sense of Article 26 ECT could arise as of that time. Consequently, the Tribunal would not have jurisdiction following a successful denial of the advantages of Part III of the ECT.

1463.  The Article 17(1) Objection would thus be dispositive of the Claimant's claims (i) if the Respondent's invocation of its right under Article 17(1) ECT met the conditions of that Article and (ii) if the invocation, in terms of its timing and effect, covered the breaches of Article 10(1) ECT that the Claimant alleges to have occurred.

1464.  The questions before the Tribunal are thus, first, as a general matter, whether the Respondent did invoke its right under Article 17(1) ECT, and, secondly, as a specific matter, whether such invocation, if made, did cover the breaches of Article 10(1) ECT alleged in this dispute.

1465.  The Tribunal will only deal with the second of these questions since, as will be seen below, the answer to this question will be dispositive of the Article 17(1) Objection.

1466.  The Tribunal notes in that regard that, in all cases, a reserved right to deny something requires an invocation or exercise of the right in some form – an act of denial – in order to be relied upon (this also appears to be the understanding of the Respondent based on its actions). It is furthermore for the Party seeking to rely on any such denial to prove that the denial took place, in accordance with the applicable conditions, and when.

1467.  The Tribunal also notes, in that regard, that Article 17(1) ECT does not dictate when or until when, at the latest, the right reserved under Article 17(1) ECT can be exercised. Accordingly, on the basis of the text of Article 17(1) ECT, an exercise of the right reserved under that Article is, in principle, always possible.

1468. What is doubtful, however, is whether, in case of a relatively late invocation of the right under Article 17(1) ECT, any such invocation could (still) have an effect on the alleged breaches, or the ongoing dispute in which the right was invoked, and under what conditions. In other words, it is doubtful whether a relatively late exercise of the right under Article 17(1) ECT could still be of relevance to an already ongoing dispute.

1469. In principle, though not always in detail, ECT-based case law on Article 17(1) is relatively clear and virtually unanimous in its answer to that last question: there is broad agreement that in any case after the commencement of an arbitration, an invocation of the right under Article 17(1) ECT cannot have an impact on the dispute raised in that arbitration. This is especially so, if in such a dispute one of the respondent's first reactions to an assertion of the rights under the ECT, or the request for arbitration, does not include a reference to Article 17(1) ECT and/or an inquiry about whether the conditions of that Article might be met.[2092]

1470. The Tribunal has no difficulty following that case law and its underlying logic in this case. Indeed, it is not evident from the text of Article 17(1) ECT that, as the Respondent argues, after a Contracting Party accorded the advantages of Part III to an investment and thus took upon itself the obligations of Part III of the ECT in relation to that investment, and after it then breached said obligations *vis-à-vis* that investment, the reserved right under the Article could be invoked retroactively to avoid liability for such a breach. Rather the opposite appears to be logically implied in the text of the Article, namely that, in order to free a Contracting Party from the obligations of Part III of the ECT *vis-à-vis* a certain investor, the right to deny of Article 17(1) ECT must have been invoked before any such obligation was breached. This is the case even if one were to believe that it might be possible to invoke the right under Article 17(1) ECT without any form of notification of the invocation. Without further argument and evidence to the contrary, a breach in and of itself cannot count as an invocation or exercise of the right to deny the advantage of the breached obligation.

---

[2092] See the above presentations of that case law by the Parties. The Tribunal does not wish to engage in an in-depth interpretation of the award of another tribunal, namely that in *Littop*. However, it is the Tribunal's impression that even the *Littop* tribunal would be able to agree with this paragraph.

1471. The Tribunal notes in that regard that, in any case, the facts of the present case (as presented above) form a particularly weak basis for deviating from the common denominator of ECT case law on the subject, because:

   a. the Respondent was familiar with the structure of the Claimant from the beginning of the Investment onwards and had a particularly good knowledge of the Karad Plant, which, according to the Respondent, was the largest PV plant in Bulgaria at the time,

   b. the rights of the Claimant under the ECT were first asserted in September 2012 (albeit only with a view to the Temporary Grid Access Fee, the only measure introduced at the time), and

   c. the same legal team that had represented Bulgaria in the *Plama* case and hence would have and should have been particularly alert to the possibilities and pitfalls of Article 17(1) ECT, nevertheless took almost a year after the notification of the present dispute to invoke Article 17(1) ECT.

1472. Against that background, it suffices to note that the invocation of the right under Article 17(1) ECT in the present case came too late to cover the breaches of the ECT alleged by the Claimant. Therefore, the invocation cannot have an effect on the Tribunal's jurisdiction over the present dispute.

1473. The Article 17(1) Objection as an objection to the Tribunal's jurisdiction is denied.

   b.    *The effect of the invocation of Article 17(1) ECT after 6 August 2018*

1474. What remains then is the subsidiary aspect of the Article 17(1) Objection, *i.e.* the Respondent's claim that, (i) in any case, any alleged breach of Article 10 ECT, being an obligation under Part III of the ECT, would automatically have come to an end on 6 August 2018, the date on which the Respondent notified the Tribunal that it had invoked the right under Article 17(1) ECT against the Claimant, and (ii) that, consequently, no damages could have been incurred after that date.

1475. While this element of the Article 17(1) Objection is arguably not a (pure) objection to jurisdiction, the Tribunal nevertheless finds that it is most conveniently addressed in the present part of the Award since the arguments on the subject build on each other.

1476. That being said, the Tribunal notes that whether the invocation of the right under Article 17(1) ECT in July/August 2018 affects the breaches in dispute in the present case, and the reparation for those breaches, need not be analysed as a case of a continuing breach versus continuing effects of a one-time breach. In that respect, the Tribunal merely observes that "the maintenance in effect of legislative provisions incompatible with treaty obligations of the enacting State", while in terms of conduct not completely analogous to the situation at hand, is a prime example of a continuing breach as opposed to a one-time breach with continuing effects, such as a direct expropriation.[2093]

1477. Rather, the dispositive issue here is again the timing of the invocation. In that regard, the Tribunal recalls its finding above that an invocation of the right under Article 17(1) ECT can be too late for it to affect the merits of an ongoing dispute. The Tribunal further recalls and agrees with the Respondent's statement that "[d]epending upon the circumstances prevailing, the contracting Party either is or is not obligated to accord the advantages of Part III".[2094]

1478. Therefore, when a Contracting Party was obligated to accord the advantages of Part III of the ECT with a view to certain measures in dispute, that obligation does not cease to exist as a consequence of a later invocation of the right under Article 17(1) ECT. Once it is determined that a Contracting Party is too late in denying the advantages of Part III with a view to the measures in dispute, that lateness aspect must also comprise the merits and quantum phases of that dispute in full. Liability and full reparation for a breach at a time at which advantages of Part III of the ECT were accorded cannot be evaded by a later invocation of the right under Article 17(1) ECT.[2095]

1479. The claim that no liability or damages arose after 6 August 2018 is thus equally dismissed.

---

[2093] International Law Commission Report on the work of its fifty-third session (23 April-1 June and 2 July-10 August 2001) edited by *International Law Commission [ILC]* [UN Doc A/56/10, [2001] II(2) UNYBILC 1, GAOR 56th Session Supp 10, 60, Commentary 3 to Article 14, available at https://legal.un.org/ilc/publications/yearbooks/english/ilc_2001_v2_p2.pdf, last accessed 19 May 2023.

[2094] ROP I, p. 12.

[2095] As outlined above: a breach after a successful invocation of Article 17(1) ECT is an impossibility.

c.     *Further aspects of the Article 17(1) Objection*

1480. The question of whether a valuation date later than 6 August 2018 is appropriate, a further subsidiary aspect of the Article 17(1) Objection, does not arise in light of the above findings and consequently requires no decision. On its face, the Tribunal notes that, in any case, the question would be one of valuation, not of liability.

1481. Finally, in light of the above decisions dismissing the Article 17(1) Objection in all its aspects, the Tribunal does not need to analyse whether the other two conditions of Article 17(1) ECT concerning the ownership and the existence of substantial business activities of the Claimant have been met.

### 3.     Article 21 Objection

1482. Article 21 ECT reads in relevant part:

ARTICLE 21

TAXATION

(1) Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.

…

(7) For the purposes of this Article:

(a) The term "Taxation Measure" includes:

(i) any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and

(ii) any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.

(b) There shall be regarded as taxes on income or on capital all taxes imposed on total income, on total capital or on elements of income or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, or substantially similar taxes, taxes on the total amounts of wages or salaries paid by enterprises, as well as taxes on capital appreciation.

(c) A "Competent Tax Authority" means the competent authority pursuant to a double taxation agreement in force between the Contracting Parties or, when no such agreement is in force, the minister or ministry responsible for taxes or their authorized representatives.

(d) For the avoidance of doubt, the terms "tax provisions" and "taxes" do not include customs duties.

1483. Article 21(1) ECT thus makes clear that where a disputed measure is a Taxation Measure within the meaning of the ECT, then in respect of that measure, an Investor has no rights under the ECT *vis-à-vis* the Contracting Party in whose territory it has invested, and the Contracting Party has no obligations towards the Investor.

1484. An investor that has no right with respect to a measure has no right to claim. A Contracting Party that has no obligations with respect to a measure cannot breach an obligation with respect to that measure.

1485. In such a scenario, no dispute in the sense of Article 26(1) and (2) ECT can arise and therefore no jurisdiction of an ECT tribunal can exist with respect to such measures.

1486. Consequently, if any one of the Seven Measures is a Taxation Measure within the meaning of the ECT, and if ACF's claim in respect of that measure concerns the imposition of the measure (the latter condition being relevant for the 20% Levy, see below), then this Tribunal does not have jurisdiction over that measure.

1487. The Respondent claims that the 20% Levy and the 5% ESSF Contribution are Taxation Measures and that, accordingly, the Tribunal does not have jurisdiction over the claims relating to them.

### a.    What constitutes a Taxation Measure under the ECT

1488. The initial question, then, is what constitutes a Taxation Measure under the ECT.

1489. Article 21 ECT, by which this Tribunal is bound when seeking a definition of "Taxation Measure", does not exhaustively define the term. It only provides examples of what is, in any case, included in the class of Taxation Measures, namely:

    a.    any provision relating to taxes of the domestic law of a Contracting Party;

    b.    any provision relating to taxes as defined in international agreements by which the Contracting Party is bound; and

    c.    taxes on income or on capital, consisting of all taxes imposed on total income, on total capital or on elements of income or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, or

substantially similar taxes, taxes on the total amounts of wages or salaries paid by enterprises, as well as taxes on capital appreciation.

1490. Article 21 ECT thus states, in short, that a Taxation Measure is any national or international provision relating to a tax by which the relevant Contracting Party is bound, including, in any case, taxes on income or on capital. Article 21 ECT is silent on what a tax consists of, *i.e.* what formal or substantive criteria would make a tax a tax or a Taxation Measure a Taxation Measure and as such it is circular in its explanation of a Taxation Measure. Neither does Article 21 ECT express a preference as to whether form or substance makes a measure a Taxation Measure or whether what is nationally called a tax might not be one under the ECT and vice-versa. On the basis of the text of Article 21 ECT the term or name "tax" appears, however, to be a key element of what a Taxation Measure consists of.

1491. Into that vacuum, case law and scholarship have injected many definitions and rules which have as their common denominator, largely agreed by the Parties, that a Taxation Measure within the meaning of the ECT under national and international law is a (i) levy of money by a State, which is (ii) imposed on a group of people, (iii) on the basis of a law (iv) to serve a public purpose and (v) for the payment of which no specific service or good is received in return.

1492. As this definition still leaves many measures on the fence, many attempts have been made to objectify or formalise the qualification as a Taxation Measure, and many more, more or less relevant, characteristics have been cited in different cases as indications of a measure being a tax, *e.g.* for example the name of a measure, who charges the levy in question, which account or budget it is paid into, how its payment is enforced, whether the charge is subject to VAT, etc.

1493. It has further been argued, convincingly in the view of the Tribunal's majority, that an international tribunal should defer as much as possible to the qualification of a measure by the national authorities in question.[2096]

---

[2096] Arbitrator Garibaldi does not agree with the breadth of the statement in this paragraph (1493). In his view, Article 21 ECT presents two main issues relevant to the present discussion. The first issue is whether the measure in question is "related to taxes" of the domestic law of the Contracting Party, in this case Bulgaria. This amounts to a reference by the ECT to the domestic law of Bulgaria, a reference which requires the Tribunal to interpret and apply the relevant provisions of that law, based on all competent

1494.  In this respect, there appears to be a consensus, with which the Tribunal agrees, that a national tax that is designed (i) to punish a single person or a limited number of persons or (ii) deliberately to violate the obligations of Part III of the ECT or (iii) to circumvent the obligations of that Part by relying on the Article 21 ECT exception, is a targeted *mala fide* measure that should not enjoy the privilege of Article 21 ECT. This view finds a basis, for example, in the accepted principle of international law that treaties must be interpreted and performed in good faith.[2097] Moreover, as bad faith is not to be presumed, and in light of the considerable measure of deference States are entitled to in the international legal evaluation of their national taxation measures (as referred to above), the assumption under Article 21 ECT is that a tax is a *bona fide* tax and tribunals agree that a finding that taxes have been imposed in bad faith can only be arrived at in in exceptional circumstances.[2098]

1495.  All the above factors and considerations indicate to the Tribunal that the answer to the question of whether a given measure is a Taxation Measure under the ECT comes down to a further case of "know-it-when-you-see-it", to be approached based on all circumstances of the case, to be held up, compared, and tested, as much as that is practically possible, against the above-mentioned criteria developed in the case law.

      *b.*    *The 20% Levy*

1496.  This exercise is easily done for the 20% Levy.

---

evidence made available to it. To this end, whether the written law of Bulgaria and/or the Bulgarian domestic authorities characterise the measure in question as a "tax" are certainly relevant considerations, but neither the ECT nor any rule of treaty interpretation requires the Tribunal to "defer as much as possible" to the judgment of those authorities. In this as in other matters, the Tribunal is bound to apply its own judgment. The second issue is whether the characterisation of the measure under domestic law, determined by the Tribunal as aforesaid, is the end of the matter. As the text (paragraph 1494) correctly points out, it is not. The Tribunal is bound to apply the rules of international law governing treaties, including those that require that treaties be interpreted and performed in good faith. It follows from those rules that the domestic characterisation of a measure as a domestic tax may be disregarded in certain circumstances indicative of bad faith on the part of the Contracting Party. These observations apply only to the statement of principle concerning deference to domestic authorities; Arbitrator Garibaldi fully concurs in the remainder of the Tribunal's analysis concerning the Article 21 Objection and all other aspects of this Award.

[2097]  *Cf.* VCLT, Articles. 26 and 31.

[2098]  *Antin* (**CL-40**), paras. 314-315, 317; *Isolux* (**RL-229**), para. 734; *Novenergia* (**CL-23**), para. 521; *RREEF* (**CL-59**), para. 186; *Watkins Holding S.À.R.L. et al. v. The Kingdom of Spain*, ICSID Case No. ARB/15/44, Award, 21 January 2020 (**RL-259**), para. 270. For the reasons stated in footnote 2096, Arbitrator Garibaldi does not agree with the statement that States are entitled to a "considerable measure of deference" in the international legal evaluation of their national taxation measures.

1497.   The text of the ERSA Amendment which introduced the 20% Levy, its description and treatment by the Respondent's Constitutional Court, and comments made in the Respondent's Parliament when the ERSA Amendment was debated, are a sufficient indication to the Tribunal that the 20% Levy was purposefully introduced not to be a tax, *i.e.* that Bulgaria deliberately avoided introducing the 20% Levy as a tax.[2099] In such a situation, the Tribunal sees no reason why it would go any further than what is in the name of a measure itself, *i.e.* why it would or could superimpose any interpretation in Respondent's favour, on what the Respondent deliberately did not want to be a tax.[2100]

1498.   In addition, even if the 20% Levy were a tax, the Tribunal could not overlook that ACF's claim regarding the 20% Levy has two elements, one of which does not concern the 20% Levy itself but rather the Respondent's alleged refusal to pay back monies it had levied under a measure that its own Constitutional Court had found unconstitutional. To the extent that ACF's claim is that keeping monies with which a host State has unjustifiably enriched itself would constitute a breach of Article 10(1) ECT, any qualification of the 20% Levy as Taxation Measure would leave the claim unaffected.

1499.   Therefore, the 20% Levy is not a Taxation Measure within the meaning of Article 21 ECT and the Article 21 Objection must fail with regard to it.

c.    *The 5% ESSF Contribution*

1500.   The determination exercise is more difficult for the 5% ESSF Contribution.

1501.   The 5% ESSF Contribution was introduced by law as a monthly contribution into a separate State fund. It was and is levied on the income from sales by energy producers and other entities. It is classified as a public state receivable and contributions which have not been paid within the fixed time limit are ascertained and collected under the procedure of the Tax Insurance Procedure Code by the National Revenue Agency bodies. The 5% ESSF Contribution was introduced with the purpose of covering expenses of the Public Provider including payments to producers of renewable energy, *i.e.* covering a public purpose.

---

[2099]   See above para. 1429.

[2100]   See also *Voltaic Network* (**RL-248**), para. 249.

1502. In a way, much like a tax, the 5% ESSF Contribution is a deduction of a certain percentage from a payment that is owed to one. In this particular case, the payment affected by the 5% deduction is also the only payment and only source of income of some of the payers of the Contribution, *i.e.* the renewable energy producers. That again is not necessarily very different from how many taxes function.

1503. In principle, then, the way the 5% ESSF Contribution functions forms a sufficient basis to call the 5% ESSF Contribution a tax.

1504. This conclusion is not necessarily undermined by the fact that the 5% ESSF Contribution is not paid into the state budget. In the Tribunal's view, it does not stand in the way of the qualification of a measure as a tax that it is collected into a separate budget or for a specific public purpose such as, for example, a war-effort levy or the "solidarity surcharge" introduced after the German reunification.

1505. The conclusion is also not necessarily undermined by the name given to the measure. "Contribution" or "instalment", while not as clear a name as "tax", are not names that, in the view of the Tribunal, would, by definition, exclude any such contribution or instalment from being a tax.

1506. On the other hand, the Tribunal has noted that the 5% ESSF Contribution, to a large extent, is designed to require that the renewable energy producers, which are the main recipients of money from the Public Provider (later the ESSF), contribute to fund payments to themselves. As far as the renewable energy producers are concerned, the benefit they receive in return for the Contribution, if anything, is payment of monies that were already owed to them before the introduction of the Contribution. To that extent, the 5% ESSF Contribution is a reduction of payments which were promised earlier. It is an indirect subsidy cut resulting from making all the receivers of a subsidy and a few other entities pay into a fund for those very subsidies.

1507. In addition, the Tribunal understands that of those entities charged with paying into the fund for the subsidies, the recipients of FiTs are disproportionately affected. As the Claimant rightly points out, the 5% ESSF Contribution reduces the revenue per kWh the most for recipients of high FiTs per kWh, *i.e.* for those producers in relation to which it was once decided that they would require the highest FiTs in order to attract their investment. Furthermore, while considered current operating expenditures, the 5%

ESSF Contribution nevertheless is explicitly not considered in setting a FiT. This underlines its character as a reduction of the FiT.

1508. In the Tribunal's view, these latter two aspects add an element of bad faith to the 5% ESSF Contribution – a *de facto* tariff cut.

1509. On balance, however, that element is not prominent and central enough to the measure, and the measure is not egregious enough in its impact, to justify a finding of bad faith that overcomes the presumption of good faith attendant to measures otherwise satisfying the ECT definition of a Taxation Measure.

1510. In that regard, the Tribunal notes that (i) the 5% ESSF Contribution was not imposed solely on producers of renewable energy, (ii) funding the Public Provider or the entity that pays for renewable energies is a public purpose and a perfectly normal purpose for taxation, (iii) the design of the measure does not appear to be aimed at circumventing the obligations imposed by the ECT or even to have had Article 21 and Part III of the ECT in mind, (iv) a tax does not necessarily cease to be a tax just because it has a disparate impact on (some of) those subject to it, and (v) the level of bad faith and the impact of the measure are in no way comparable to the extreme circumstances present, for example, in the *Yukos* case.

1511. The Tribunal concludes that the 5% ESSF Contribution is, in principle, a tax, and that the Claimant has not demonstrated that the 5% ESSF Contribution is a *mala fide* tax to the relevant degree. Consequently, the Tribunal finds that the 5% ESSF Contribution is a Taxation Measure within the meaning of the ECT. This Tribunal therefore has no jurisdiction to entertain claims related thereto.

### 4. The *Komstroy* Objection

1512. The Tribunal can deal very succinctly with the *Komstroy* Objection, which is, *de facto*, a renewed *Achmea* Objection.

1513. The Claimant is correct in its submission that the Tribunal's analysis in the *Achmea* Decision explicitly anticipated and proceeded on the assumption that the CJEU intended the *Achmea* Judgment to mean what the *Komstroy* Judgment later clarified it to mean. The Claimant is also correct in observing that the Tribunal nevertheless came to the

conclusion that the *Achmea* Objection did not stand in the way of its jurisdiction, for the reasons given in the *Achmea* Decision.[2101]

1514. The *Komstroy* Judgment is therefore neither a new development *vis-à-vis* the present dispute, nor does it raise new arguments that had not already been anticipated and dealt with in the *Achmea* Decision, nor do any other of the arguments in the *Komstroy* Objection reach that threshold.

1515. Hence, the *Komstroy* Objection cannot succeed. It is dismissed.

### C.    Merits

1516. In this subchapter, the Tribunal will present its analysis of the merits of the Claimant's claim.

1517. The Tribunal notes in that regard that the Claimant's merits claim is threefold and sevenfold: according to the Claimant, three Articles of the ECT have been breached by the Seven Measures individually and taken together.

1518. More in particular, the Claimant submits that the Seven Measures individually and as a whole violate:

   a.  Article 10(1) sentence two ECT (in connection with sentence one), *i.e.* the FET Obligation, in three variations by:

      i.  violating the Claimant's legitimate expectations,

      ii.  fundamentally altering the investment framework, and

      iii.  treating the investor and its investment inconsistently and non-transparently;

   b.  Article 10(1) sentence three ECT, *i.e.* the Impairment Clause; and

   c.  Article 10(1) final sentence ECT, *i.e.* the Umbrella Clause.

1519. The Tribunal will begin its analysis with the FET Obligation, and more in particular the alleged violation of the Claimant's legitimate expectations. It will then work its way

---

[2101]    *Cf. Achmea* Decision, paras. 166-170.

down the list set out above, reaching the next alleged breach on the list only if its previous results so command.

1520.   The Tribunal does not agree that splitting up a claim of a violation of the FET Obligation into three sub-claims is the most logical way, or the correct way, to present a claim in light of the content and the comprehensiveness of that Obligation. Nevertheless, for legibility and expository purposes and because, to a certain degree, the Claimant has the right to structure a proceeding, the Tribunal will largely follow that approach as has the Respondent – at times under protest. The Tribunal will, however, treat the aspects of the FET Obligation not relating to the legitimate-expectations claim jointly.

1521.   That being said, where the Tribunal finds a breach under one aspect of the FET Obligation, it finds a breach of the whole FET Obligation. That means that the Tribunal will use its analysis of that aspect of the FET Obligation as an opportunity to analyse whether, taking into account all the remaining circumstances of the case and the specific claim, a breach under the aspect pleaded by the Claimant equals a violation of the FET Obligation as a whole.

1522.   The Tribunal will deal with the FET analysis of the Permanent Grid Access Fee separately, as the claim regarding that Fee does not readily lend itself to an analysis under any of three separate headers presented by the Claimant.

1523.   The Tribunal will conduct its below analysis by setting out its understanding of the applicable rule and consequently by subsuming the above-established facts under the applicable rule – in general for the whole ERSA Regime and in particular for each of the Seven Measures as applicable. Summaries of facts presented above will not normally be repeated below, even if relevant or decisive for the analysis. General and specific counter-arguments will be dealt with at the appropriate place as early as possible.

1524.   In its analysis the Tribunal will seek to answer the obvious direct question before it, that is whether any of the Seven Measures violate Article 10(1) ECT. It will be further guided by the underlying questions before it, *i.e.* (i) who in the legal relationship between the Claimant and the Respondent had to bear the risk that a scheme to subsidize renewable energy production was, or would later turn out to be, or be perceived to be, needlessly generous; (ii) whether a State bound by Article 10(1) ECT and in particular

the FET Obligation, can lawfully correct, or "claw back", a perceived mistake *vis-à-vis* existing recipients of a scheme that is, or is perceived to be, needlessly generous; and (iii) whether the Seven Measures would actually fall under any such leeway to correct or "claw back", if existing.

1525.   In light of its finding on jurisdiction above, the Tribunal will not deal with the merits of the Claimant's claim regarding the 5% ESSF Contribution.

### 1.    FET

1526.   Article 10(1) ECT reads in relevant part:

> Article 10
>
> Promotion, Protection and Treatment of Investments
>
> (1) Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. [footnotes omitted]

1527.   Article 31 ERSA, as applicable at the time of the Investment, reads in relevant part (emphasis added):

> Article 31.
>
> (1) (Amended, SG No. 29/2012, effective 10.04.2012) **Electricity from renewable energy sources shall be purchased by the public provider**, from the end suppliers respectively, **at the preferential price set by SCEWR**, effective as of the date of commissioning into operation within the meaning of the Territorial Planning Act of the energy project for production of electricity, …
>
> (2) Electricity from renewable energy sources under Paragraph 1 shall be purchased based on long-term purchase contracts signed for a term of:
>
> 1. **twenty years** - for electricity produced from geothermal and solar energy, as well as for electricity, produced from biomass;
>
> …
>
> (3) (Amended, SG No. 29/2012, effective 10.04.2012) The terms under Paragraph 2 shall start from the date of commissioning into operation of the energy project, respectively from the date of commissioning of the first stage of phased commissioning into operation, … For energy projects commissioned into operation, and installations mounted after 31 December 2015, the terms of purchasing shall be reduced by the period from that date to the date of the commissioning into operation, respectively mounting.

(4) **The price of electricity from renewable sources shall not be changed for the term of the purchase contract under Paragraphs 2**, except in the cases under Article 32, Paragraph 4 [only concerns biomass], and after the expiry of this term no price preferences shall be granted.

(5) (Amended, SG No. 29/2012, effective 10.04.2012) **The public provider**, the end suppliers respectively, **shall purchase the whole amount of electricity from renewable sources**, with the exception of amounts which the producer shall:

1. use for own needs;

2. at its own discretion use for its own consumption and for power supply of its branches and projects;

3. sell at freely agreed prices according to the procedure under Chapter Nine, Section VII of the Energy Act and/or at the balancing market.

…

> a. *Legitimate expectations*

> (1)    The Tribunal's analysis

1528. The Tribunal must begin its legitimate expectations analysis with a disclaimer. The Tribunal uses the term "legitimate expectation" in this Award not because in its view the term would best describe which expectations are protected under Article 10(1) sentence two ECT (in connection with sentence 1) but because it is the established term in investor-State arbitration. The Tribunal does, however, only do so with the following qualification in mind: an expectation is legitimate only if, based on all circumstances of a case, (i) it is an expectation that was actually held by the specific investor in question and (ii) it would have been objectively reasonable for an objectified "normal" investor to hold that expectation under the given circumstances. An expectation is a protected expectation or a protected legitimate expectation if the violation thereof would constitute a breach of Article 10(1) sentence 2 ECT (in connection with sentence 1).

1529. That being said, it is agreed between the Parties, and repeated in multiple variations in case law, that violating legitimate expectations of an investor is a breach of the obligation to accord FET, and that for a legitimate expectations case to succeed, a Tribunal needs to be convinced that the asserted expectations (i) were created by the host State, (ii) were actually held and (iii) could objectively and legitimately be held by

the Investor (iv) at the time of the Investment, and that said expectations (v) were consequently breached by the host State.[2102]

1530.  The Tribunal sees no reason to apply any other tests as the one set out above. In light of the questions that the test raises, the Tribunal notes that the analysis of a legitimate-expectations claim is a fact-heavy exercise the outcome of which depends on all the relevant circumstances of the case.

1531.  In that regard, the Tribunal recalls that it has already established above that Bulgaria's ERSA Regime at the time of the Investment was an incentive regime known for, and advertised with, three main parameters: (i) a fixed price, (ii) full offtake, and (iii) a fixed period (20 years for the category of the Karad Plant). The purpose of the ERSA Regime was to attract, *i.e.* to induce, investment. The method and logic of the ERSA Regime was "*ex ante*", meaning that the key parameters of the Regime were set beforehand and then to be applied – under promise of no later adjustment – to all renewable energy plants that met the qualifying criteria by a set cut-off date.[2103]

1532.  The ERSA Regime was understood that way internally by the Respondent and represented as such externally. Those three pillars of the ERSA Regime and their underlying "*ex ante*" logic were set out in the ERSA and the Energy Act, they were propagated in debates of the Respondent's Parliament, and propagated in background and policy papers to the European Union, to professional audiences, and the general public. They were talked about in the press, expressed and relied upon in the FiT Decision, codified in the Karad PPA, and subject of a meeting between the Respondent and the Claimant.

1533.  In addition, the ERSA Regime was understood that way, and logically would have been so understood, by the "market" or professional investors in renewable energy at the time, given that the ERSA Regime replicated the key parameters and the key logic of an *ex ante* regime.

---

[2102]  See discussion of the case law by the Parties above.

[2103]  See above, para. 1458.

1534. Against that background, the Tribunal finds that objectively any reasonable investor would have understood the ERSA Regime as set out by the Tribunal above, and it further finds that, subjectively and legitimately, so did the Claimant.

1535. The Claimant thus had the protected legitimate expectation that once its Investment had met the conditions of the ERSA Regime and once its Investment had entered into the Karad PPA, the price, the offtake, and the period over which it would receive the set price for its offtake were fixed. The Claimant had the protected legitimate expectation that changes to the FiT, the offtake quantity, and the length of the offtake thereafter would only apply to plants that had not yet qualified for the ERSA Regime. The Claimant had the protected legitimate expectation that for existing plants, Bulgaria would not change the *ex ante* logic of its Regime to an *ex post* logic or a mixed logic. The Claimant did not have to expect that the key parameters agreed upon in the Karad PPA over the term of the Karad PPA would be deviated from, or that the Karad PPA would be terminated.

1536. Any of the above expectations, in the view of the Tribunal, would have included the expectation that what was not to be changed or reduced directly could not be deliberately reduced indirectly. An investor that is entitled to expect that a term, or price, or quantity commitment will not be amended directly by a host State obliged not to violate that investor's legitimate expectations, is also entitled to expect that the host State does not deliberately do so indirectly, trying to circumvent its obligation.

1537. That does not mean, however, that the Claimant's expectations did or could include an objective expectation that the ERSA Regime and the conditions for, and costs of, operating a PV plant in Bulgaria would remain completely unchanged over a period of twenty years, and that no new taxes, fees, or legislation would ever be introduced that would affect the Karad Plant and its revenues negatively.

1538. Laws are subject to constant change and amending its laws is a sovereign right of each State. Indeed, the ERSA itself was a follow-up to RAESBA and already amended for the first time in April 2012. As such, the ERSA was a sign of a changing regulatory landscape in a dynamic market.

1539. Furthermore, several aspects of the Respondent's energy market and the integration of renewable energy producers therein were still in flux at the time of the Investment: the

liberalisation of the energy market was a work in progress, the rules on how to balance the input into the electricity grid were still in an experimental phase, and the Bulgarian electricity system had difficulties learning how to cope with the influx of intermittent energy sources. The external conditions of investing in renewable energy and the worldwide economic conditions and availabilities were also subject to constant change.

1540.   Nevertheless, it is contrary to the logic and the promises inherent in an *ex ante* incentive regime in the form present here, and thus it does not need to be expected objectively, that any adjustments would undermine directly, or deliberately seek to undermine indirectly, the key tenets of the regime: price, term, and quantity.

### (a)   Risks and expectations inherent to an ex ante *incentive regime*

1541.   That is the case because an *ex ante* regime carries with it certain allocations of risk that by their mere logic create certain expectations and have an influence on what constitute legitimate expectations of investors *vis-à-vis* the operator of such a regime.

### (i)   Price risk, market risk, risk of offtake

1542.   First, in an *ex ante* regime, the operator of the regime relieves the investor in the scheme from the risk of change with regard to the parameters which are set *ex ante*. In the form chosen in Bulgaria, the incentive regime, for example, takes away the price risk and the risk of full offtake for a certain length of time, which means that for that time, an investor does not have to worry about what price it will achieve or whether it will be able to sell all the energy produced.

### (ii)   Risk of setting parameters

1543.   Secondly, at the internal level, an *ex ante* regime carries the risk of success or failure for its operator: if parameters of an *ex ante* regime are set too generously, a regime will pay more than the minimum necessary and/or longer than necessary for obtaining its goal. Profits earned by investors, while of no importance to the policy goal of the host State, might then be perceived as "too" high politically. If parameters are set too low, on the other hand, or conditions are too strict or not sufficiently stable, a regime might not attract an amount of investment deemed as sufficient.

1544. That risk of not being able perfectly to fine tune the parameters of an *ex ante* regime, in the view of the Tribunal, is a political risk to be addressed by inherently political choices and thus by definition to be borne by the party setting the parameters.

1545. What is more, in an *ex ante* regime that offers certain parameters in return for investment, it is not the role or obligation of an investor graciously to decline compensation that exceeds what it would require in terms of profitability. Indeed, an investor's very chance to obtain "overcompensation" is its incentive to produce better, or more of the desired product, and in doing so, further to develop the sector and bring the operator of the scheme closer to its goals.

1546. Furthermore, the fact that setting parameters perfectly would appear to be a near impossible feat also indicates that setting parameters is an approximation exercise, *i.e.* an exercise that will always end up either "over-" or "undercompensating" by a margin. This risk of "overcompensation" and "undercompensation", and this "gamble" to set the perfect parameters upfront knowing that they cannot be changed afterwards is what makes an *ex ante* scheme an *ex ante* scheme rather than an *ex post* scheme or a scheme that allows for fine-tuning during the lifetime of an investment.[2104]

1547. This aspect of an *ex ante* scheme is not, however, something to be regarded as inherently negative by the host State. "Setting and forgetting" relieves the host State running such a scheme from certain risks and concerns, *e.g.*: (i) the State does not have to obtain financing, invest, manage, or design itself, (ii) the State (ideally) attracts the investment sought after, (iii) the State, much like the investor, obtains administrative and financial visibility over the agreed term and has the advantage of being able to "forget", *i.e.* does not need to worry about further adjusting the programme and monitoring and setting prices for existing plants and (iv) if things go as planned, the State can close the programme for new entrants once its goal has been reached.

*(iii)    Risk of adopting the wrong incentive scheme*

1548. An *ex ante* regime thus has advantages and disadvantages for its operator, which conclusion leads, thirdly and finally, to the third level of allocation of risk inherent to

---

[2104]    Tellingly, the Respondent appears to accept that the ERSA Regime was "at risk" of undercompensating or compensating less than the target rate, a result that according to the Respondent did not require any action by it and did not trigger any obligations of it. That is an argument which undermines the Respondent's arguments regarding overcompensation and a reasonable return. *See* RROMROJ, para. 228.

an *ex ante* regime, namely the risk of choosing an *ex ante* regime over other available incentive regime structures and their advantages and disadvantages. The choice of an *ex ante* scheme is also a sovereign choice in favour of a scheme and against another scheme.

1549. The ERSA Regime, independently of its virtues, or the lack thereof, which are of no relevance to the Tribunal, above all is the regime that was freely chosen by the Respondent at the time of the Investment. The Respondent chose the ERSA Regime out of a range of options. It could have chosen to install a different incentive regime and could have decided to provide investors with lesser certainty (which likely would have resulted in less investment). As a sovereign State, however, the Respondent believed to be in need of the ERSA Regime, believed it to be advantageous for it, and freely and voluntarily decided to introduce the ERSA Regime, and to maintain it throughout the first half of 2012, in full knowledge of the pipeline of renewable energy projects (see below).

1550. That choice, again, is a risk of a host State inherent to its sovereign right and freedom to choose its laws as it sees fit. The sovereign right and freedom to choose one's laws includes the right and risk to choose wrongly and to try and fail in the design of one's laws and policies. It includes the risk that, later in time, the State will change its views on the necessity, desirability, costliness, and efficiency of a measure and the correctness of a choice.

1551. Of course, a sovereign State has the sovereign right to change course in such a situation and to amend its laws. However, in an *ex ante* regime, the risk of a change of the regime has been explicitly taken away from investors and taken up by the host State. That is especially so in case the alleged need for a change is based on an internal reason, such as a change of mind or policy, a miscalculation, or budgetary concerns, rather than on external factors, not present *in casu*, such as force majeure circumstances, catastrophes, wars, or other unexpected and unexpectable developments not priced into the original bargain.[2105]

---

[2105]    Due to the absence of such external factors in this case, the Tribunal does not need finally to consider the merit or demerit of any arguments in relation to the effect of any such external factor on the lawfulness of an action.

1552.   In that regard the Tribunal finds the asymmetry of knowledge between the Claimant and the Respondent to be of relevance. The Respondent chooses its incentive regime and the parameters thereof based on virtually full knowledge and access to all internal knowledge of all its agencies concerning the pipeline of projects, preliminary and final connection agreements, its budget, its policy goals, its electricity network, its internal politics. An investor, such as the Claimant, even by means of scrupulous due diligence can only obtain a very partial view on these factors based on publicly available sources and assurances made to the public and to itself. Comparatively, an investor "flies blind" to a great degree, which indeed is one of the concerns, and risks, an *ex ante* regime tries to take away.

1553.   Further in that regard, the Tribunal finds it of particular importance that the ERSA Regime set a term. Setting a term for certain conditions such as the price and the offtake quantity, in this case a term of 20 years, as expressed in the ERSA and the Karad PPA, and assumed in the FiT Decision, would not make sense if the key parameters set over that term were then subject to one-sided amendment mid-term, without that possibility having been announced or being obviously implicit *ex ante*. To the Tribunal, much like in a contract under most contract laws, a fixed term indicates that both the term and the other parameters of the bargain remain the same for the period of the fixed term unless otherwise agreed before the beginning of the term. Part of the promise of an *ex ante* regime that sets a term must thus be that the set parameters will not change during the term – a stabilisation so to speak.

*(iv)      Conclusion on risk allocation and legitimate expectations*

1554.   In light of the above, the Tribunal is of the view that an investor that invests in an *ex ante* incentive regime like the ERSA Regime does so in expectation of, and reliance on, the above set-out allocation of risks. It invests expecting, legitimately, that, unless otherwise announced *ex ante* or obviously implicit in the regime, or arguably in situations of *force majeure* or unforeseen circumstances, the State operating the incentive scheme for the term set in the regime, (i) takes upon itself the risk regarding the parameters that it sets *ex ante*, including the risk of negative change, and (ii) carries the risk of setting parameters wrongly, and (iii) also carries the risk of later believing to have chosen the wrong incentive regime.

478

1555.  To the level of abstraction of the present discussion, an *ex ante* regime, by its mere logic, will thus create legitimate expectations as to the allocation of risk that are protected against violation by Article 10(1) ECT.

(b)  *Allegedly limited scope of the stabilisation clause*

1556.  In light of the above-described stabilisation inherent to an *ex ante* regime such as the ERSA Regime, the Tribunal is less concerned by the alleged absence of a stabilisation clause that would cover all three key parameters and not just the FiT.

1557.  That is because, first, for the creation of the legitimate expectations in the present case, the Tribunal finds the *ex ante* logic of the ERSA Regime, as it was designed and advertised and tied to a specific term, and the allocation of risk in that regime, to be of much more relevance than the specific wording of any stabilisation clause. Laws can change and so can in theory stabilisation clauses, but not the logic of the system with which an investor was attracted to make its investment and sink its costs. Stabilising certain parameters, as outlined above, is the core idea and expectations-creating logic inherent to an *ex ante* regime as the ERSA Regime. No lack of stabilisation clause could take that away and few stabilisation clauses in a general law could increase that expectation of stability much further.

1558.  Secondly, in the Tribunal's reading, the stabilising language regarding the price in Article 31(4) ERSA, of which the Respondent admits that it is stabilising a part of its ERSA Regime, and which guarantees no direct changes to the FiT, is of the same or only a little more stabilising character than the explicit commitment to buy "the whole electricity" in Articles 31(1) and 31(5) ERSA as repeated in Articles 1(1) and 11 of the Karad PPA.

1559.  This impression is further reinforced by the fact that, at the time the ERSA was introduced and the Investment was made, when the goal was to achieve higher electricity production from RES, the Respondent did not even contemplate at all that it could limit the amount of renewable electricity it would purchase from one single plant, or that it might not want to buy all the renewable electricity of which it could get hold at the set price. Any such limitation would also not have made any sense under the goals of the ERSA Regime at the time.

1560. In addition, the Tribunal understands that under the RAESBA Regime prices could be amended for existing plants. Against that background, the legislator would have had a natural desire to underline that that aspect changed under ERSA. This provides a natural explanation of why it was specifically highlighted in Article 31(4) ERSA that that aspect had changed.

1561. In the Tribunal's view, the difference in wording between Article 31(4) ERSA and Article 31(1) and (5) ERSA is thus explained by the contemporaneous understanding of the offtake obligation which, in contrast with the price obligation as contained in Article 31(4) ERSA, did not require any signalling to the market or the public that the offtake obligation would not change over its term. The Tribunal therefore cannot accept arguments of the Respondent that read significance into these differences.

1562. Thirdly, the Tribunal also agrees with the Claimant's more general argument that price and quantity go hand in hand and that it would be peculiar, and thus unexpected, and requiring further explanation and warning, if, as the Respondent argues, only a price obligation, but not the quantity obligation was stabilised.

1563. Based on the above, the Tribunal concludes that there is no need (i) to identify a particular stabilisation clause in this case or (ii) to attach any significance to the existence or absence of a specific clause or its specific wording, and that (iii), in any case, Article 31(1), (4), and (5) ERSA include wording of a stabilising nature.

1564. The Tribunal in that regard agrees with the Claimant's observation that the admission of the Respondent that at least the price itself, *i.e.* the FiT itself, was stabilised, appears to differentiate the current case from virtually all case law submitted to the Tribunal in respect of incentive schemes for the production of energy from RES in other Contracting Parties.

(c) *Expectation of lawful behaviour is protected despite fears of worst-case scenarios or expectations of possibly unlawful behaviour*

1565. The Tribunal further finds that a legitimate expectation can and may include expectations that one holds while entertaining some fears that a host State will not do what based on its behaviour one may legitimately expect from it; or while making some worst-case calculations or sensitivity analyses based on worst-case assumptions; or

while accepting the imposition of certain "Tariff Events" (as discussed above) in documents negotiated with one's lenders.

1566. An investor can thus have a legitimate expectation protected under the FET Obligation even if it, or its lenders, fear, or even should fear, that a worst-case scenario could happen. Thinking in worst-case scenarios, expecting that a course of events can take a negative turn, and calculating sensitivities is a normal activity of a prudent investor or lender and does not undermine that such an investor or lender has a middle ground scenario in mind on the basis of which it invests or lends and forms its legitimate expectations as protected by Article 10(1) ECT.

1567. This is even more so if such fears concern scenarios in which bad faith is involved. The object and purpose of the ECT would be undermined if an investor's subjective concern or apprehension, or even expectation that a host State might violate the ECT could legally undermine its protected objective expectation that the host State will not do so. An investor must always be able to expect that the host State will adhere to the ECT. Where adherence to the law is concerned, legitimate expectations must always be deemed to be based on a situation that is lawful and stays lawful, even if that situation is fictional.

1568. In the present case, the legitimate expectations of the Claimant regard the key parameters of the ERSA Regime (price, volume, term) and that the Respondent would honour its commitments and keep price and volume stable over the term. Any expectation of the Claimant that the Respondent might unlawfully try to claw back granted advantages in violation of the ECT, as had happened in other Contracting Parties and was later, after the Investment, found unlawful by other ECT Tribunals in cases against those other Contracting Parties, cannot and does not undermine the Claimant's protected expectations that the Respondent would obey its commitments regarding the key parameters of the ERSA Regime nor does it undermine the Claimant's right to expect as much.

1569. Here again, the Tribunal finds that the above-described asymmetry of knowledge and visibility is of importance. The Tribunal cannot assume that the Claimant had the same breadth of information to which the Respondent had access. In the Tribunal's view, it would then not be fair and equitable, if the "blinder" side in an investment relationship could not rely on the promises and guarantees of stability of the more knowledgeable

side or the side with a better view on the factors and figures that determine the political fate of an incentive regime, just because some concerns or fears would have been in order, or worst-case scenarios were contemplated, the necessity of which of course became much more evident in hindsight.

1570. Furthermore, even though the regulatory landscape in Bulgaria appears to have been in relatively constant flux before (and after) the introduction of the ERSA, in the ERSA Regime, at the time of the Investment, a promise of price and quantity over time was given, a promise to relieve investors of certain risks, *i.e.* the risk of "error" in a government's trial and error approach, and a regime was introduced that works on the basis of such promises. Such a promise must then mean something to those who enter into the scheme at the time, even if the host State has changed its laws before and is likely to do so again, and even if a regulatory landscape is in flux.

(d)    *Sources of the legitimate expectations of stability*

1571. In the Tribunal's view, in the present case it does not need to analyse the question whether a general law can be the source of an expectation of stability. This is because, while the ERSA is clearly the centrepiece the ERSA Regime at the time of the Investment, the ERSA Regime consists of more than just the ERSA. As outlined above, the key obligations of the ERSA are repeated in the Karad PPA and also form the basis for the FiT Decision. The targets and the understanding and functioning of the ERSA Regime were discussed, explained, and advertised in a wide array of documents and fora. This multitude of primary and secondary documents and direct and indirect communications is what has created the legitimate expectations in the present case.

1572. Hence, whether the ERSA and in particular its Article 31 would have sufficed to do so by itself is not something this Tribunal needs to analyse. In any case, however, the Tribunal notes that Article 2(1) No 5 ERSA makes it one of the "primary objectives" of the ERSA to "provid[e] information regarding the [ERSA Regime]" and "the benefits and practical specifics of the development and use of energy from renewable sources of all stakeholders involved in the process of production and consumption of electricity".

(2)    General counterarguments of the Respondent

1573. The Respondent has four principal arguments against the Claimant's legitimate-expectations claim which the Tribunal will address here. The Tribunal's conclusions on

these counterarguments are applicable to all claims of the Claimant, not just the one based on its legitimate expectations.

(a)   *Relationship between Shareholder expectations and expectations of the Claimant and between public statements and expectations*

1574.   The Respondent argues that the Claimant, which was only incorporated in June 2012, failed to establish any legitimate expectations of its own and rather relies on alleged expectations of its Shareholders and their Lenders to establish its expectations. Furthermore, the Respondent argues that the Claimant failed to establish that it knew of and/or was moved, and could have been moved, to invest by any of the contemporaneous statements of Bulgarian officials, including at the April 2012 meeting(s) on which it now relies.

1575.   This line of argument, while theoretically interesting, must fail. While the Claimant and its Shareholders, let alone the Lenders, are of course separate legal entities, the Tribunal and no reasonable trier of fact can overlook that in this particular case the Claimant's shareholders' expectations are the very *raison d'être* of the Claimant – the SPV in the acquisition of the Investment – and are thus inherent to its existence.

1576.   The Claimant itself, in other words, is evidence that the Shareholders had the expectations they submit to have had and is thus an incorporation of those expectations. The Claimant would not have existed had it not been for these expectations, and the Claimant would not have immediately set out to do what it did, had the Shareholders' expectations not been held and had those expectations not been the Claimant's own expectations. The Claimant was only incorporated to profit from the advertised conditions of the ERSA Regime and hence necessarily expected from day one of its existence to be granted those conditions as expected.

1577.   Therefore, the Tribunal has no problem in reading the expectations that led to the creation of the Claimant as the Claimant's expectations. This means that the Shareholders' due diligence is indicative of the Claimant's expectations and knowledge, that the April 2012 meetings are relevant for the Claimant, and that the Shareholders' intelligence gathering, which so obviously took place before the Investment, would have led to the creation of knowledge of the Claimant.

1578. There is thus sufficient evidence that the Claimant had the legitimate and objective expectation that the ERSA Regime was as described above and, consequently, the second part of the Respondent's counterargument becomes moot.

1579. What is more, though, and what further contributes to the "objective" element of the expectations is that, as stated above, "due diligence" and intelligence gathering before July 2012 would have resulted easily and without much effort, and did result in the above-described understanding of the ERSA Regime.

1580. That is because (i) the ERSA, the FiT Decision, and a signed PPA, here the Karad PPA, alone would already have given any reasonable investor the above-described objective expectations, (ii) any reasonable investor in the ERSA Regime that put the necessary work into the Investment would necessarily have gained the above impression of the ERSA Regime, and (iii) the Tribunal is convinced by the evidence that the Claimant and its Shareholders are reasonable investors that did put the necessary work into their Investment. In addition, there are no indications whatsoever on the record that the Claimant would have interpreted the ERSA Regime differently or would have had any reason to do so at the time of the Investment.

1581. For the present case, therefore, the Tribunal finds it established that the Claimant expected that the ERSA Regime would be as it is described above, without a clear causal, almost physical link being, and having to be, established between any one specific statement and the asserted legitimate expectation.

1582. The second part of the Respondent's counterargument thus also fails on its merits.

1583. Finally, as to the Lenders, the Tribunal is aware that their expectations are of course not expectations of the Claimant. In the Tribunal's view, however, the expectations of the Lenders are, as stated above, expectations that show what a sophisticated third party with an interest not to have its loan go into default expected the ERSA Regime to be. The Lenders' due diligence thus also helps in the identification of what objective expectations would have arisen contemporaneously.

(b)     9% target rate

1584. The Respondent argues (i) that the ERSA Regime only ever set out, and advertised, to provide a reasonable return, being an IRR of 9%, and (ii) that returns above that level

had to be clawed back on the basis of Bulgarian and EU law, as was known to any reasonable investor and evident from the relevant primary and secondary laws. Therefore, if the Claimant ever had any legitimate expectations regarding the ERSA Regime, such expectations objectively could never have been to earn more than a reasonable return, being a 9% IRR. (The Respondent's case regarding the target rate has become, however, less clear over time given that, in light of the calculations of its own expert, its focus shifted to a degree from the target of 9% to the target of a "reasonable return".)

1585.  The argument, in all of its shapes, nevertheless fails on all factual and legal levels.

> (i)  *The ERSA Regime cannot have limited any legitimate expectation to one of only receiving a 9% IRR or a "reasonable return"*

1586.  As established above, the ERSA Regime did not work with offering an IRR, but it worked with offering a price, an offtake quantity, and a term on the basis of which potential investors could calculate and seek to maximise the best possible IRR for their individual circumstances.[2106]

1587.  The ERSA Regime was understood to have an *ex ante* target IRR of 9-10%, meaning that the Respondent sought to set and fix the parameters of its ERSA Regime *ex ante* so that an investor in the Regime would earn an IRR of approximately, or on "average", to use a word from the FiT Decision, 9-10%. It was always understood that, as described above, there was a risk of setting the parameters wrong and missing that target on the side of the Respondent, and that, on an investor's side, individual plants could earn less or more than that, as was clearly envisaged by contemporaneous documents and statements and as is also acknowledged by the Respondent and its expert.[2107]

1588.  The Respondent also failed to establish that under EU or Bulgarian law it was under an obligation to reduce the IRR of plants in its incentive scheme if that IRR exceeded 9%, especially for existing plants that had already sunk their costs. Neither did the Respondent establish any threshold IRR as of which any such alleged obligation would

---

[2106]  See above, para. 1458.

[2107]  *E.g.* RROMROJ, para. 228; HT, D1, 7 June 2021, pp. 197-198; ROP II, p. 13; ROP IV, p. 9; RPHB, para. 74.

have been triggered nor did it establish where that alleged obligation and threshold might have been set out in law.

1589. In addition, while the ERSA was the Respondent's effort to fix any perceived flaws of the RAESBA, the ERSA does appear to have left untouched profits gained by existing plants that were commissioned under RAESBA. The ERSA therefore cannot be deemed an expression, or evidence, of any obligation of the Respondent to claw-back profits exceeding a target IRR. As will be discussed below, the Respondent also failed to demonstrate that it introduced any of the Seven Measures to bring IRRs in line with an alleged IRR maximum, rather than to reduce the costs of the ERSA Regime (for its citizens).

1590. The Respondent has also not demonstrated with what kind of monitoring mechanism it would have supervised individual IRRs of individual plants and how it would have known about their economic conditions other than, for example, from their business plans and production forecasts to be handed in with their license application and attached to their PPAs.

1591. At least in the case of the Karad Plant, those documents, *i.e.* the License and the Karad PPA, and their attachments, demonstrate that at the time of approving the License and having NEK enter into the Karad PPA, the Respondent and NEK already knew the FiT, the term, and the expected output and costs of the Karad Plant, *i.e.* its IRR. Nevertheless, the Respondent approved of it anyway (the head of the EWRC even made a positive comment about the high profitability of the Plant (see above)).[2108]

1592. Furthermore, the aspect of "monitoring" and enforcing a reasonable return would become particularly muddy if one were to follow the Respondent's argument of a

---

[2108] This means that the Respondent either accepted the Karad Plant exceeding the target rate in violation of its alleged obligation not to do so, or that, in its view, it did not (sufficiently) exceed the target rate. In that regard, it is not known whether, absent the Seven Measures, the Karad Plant's IRR would indeed have exceeded an IRR of 9-10% by that much. The IRR appearing in the materials submitted with the License Application and in ZBE's financial model at the time, *i.e.* the projections contemporaneous to the date of the Investment, was calculated to be "only" 9.1% (License Decision (**C-103**), p. 8; Financial Model and Investment Analysis Karad Project, 26 April 2012 (**R-040**), Tab 3, Cell D26). According to the Respondent's expert, the IRR of the Karad Plant would have reached 11%. He reverse-engineers that figure on the basis of the Claimant's expert's counterfactual cash flow assumptions (*e.g.* Oxera I, fn 44; Oxera, IRR Analysis, 23 October 2020 (**R-143**)). The Claimant has submitted little on the topic but has stated that "the actual production of the plant has only slightly exceeded the projections in the [License Application] (by around 6%)" CPHB, para. 27, fn 52. The difference between the values referred to there, however, appears to be closer to 3.5% rather than 6%.

"reasonable return" to be based on an individual plant's WACC, *i.e.* resulting in a different definition of what number constitutes a reasonable return per plant (see below).

1593.  In light of the above, the ERSA Regime cannot have limited any legitimate expectation to one of only receiving a 9% IRR or a "reasonable return". A system that works with an offering of conditions, *i.e.* price, term, and quantity, cannot create any expectations against the offeror regarding the return that that system offers. It can only create expectations regarding the fulfilment of those conditions.

*(ii)    The facts of the case and the Respondent's quantum case undermine its argument on the matter*

1594.  The Respondent's argument is further heavily undermined by its own quantum case because, even on the Respondent's best quantum case, which is subject to a lot of justified criticism (see below), the Claimant would not have reached an IRR of 9% after the Seven Measures were introduced.

1595.  Nevertheless, the Respondent apparently did not appear to see a need further to amend the ERSA Regime and/or the Seven Measures to reinstate higher profits to the Karad Plant, nor was the Karad Plant otherwise compensated to make up the part of the 9% IRR that it could not realise, as might be expected if an IRR of 9% is what an investor could have legitimately expected.

1596.  The reasonable-return line of argument of the Respondent, if it had been accepted by the Tribunal, would therefore have been a self-defeating argument, or at least a daring defence accepting high losses to prevent even higher losses, given that the Respondent even on its best case would have been immediately in breach of the one legitimate expectation that it acknowledged that the Claimant could have held.

1597.  In that regard, the Tribunal also finds it difficult for the Respondent to argue that an investor would have had to expect not to earn more than a 9% IRR and that its profit would be cut if it did, but should have expected that it was possible to earn less than 9%. Equally problematic appears the Respondent's admission that the ERSA Regime is an "at risk" model with no guaranteed returns, coupled with the argument, however, that

"at risk" means that there is a risk of earning less than the target IRR, but no chance of earning more than that.[2109]

1598.  It finally appears incorrect to argue that the ERSA Regime works with reference plants, but that the "reasonable return" that an investor could expect at a maximum would not be that of the reference plant, but would have to be calculated on the basis of each plant individually. As stated above, this is also implausible in light of the Respondent's "monitoring" capabilities, given that the Respondent would not normally have known live economic data of individual plants, but rather only the data submitted with the initial application and the quantity of electricity produced.

*(iii)    Conclusion on the 9% target rate argument*

1599.  Therefore, the ERSA Regime did not introduce or seek to maintain a maximum IRR of any kind and the Claimant's legitimate expectations were not limited to expecting only a reasonable return, or an IRR of 9%.

*(c)    The alleged boom*

1600.  The Respondent argues that, after the FiT Decision of June 2011 but before a new FiT could legally apply, *i.e.* before July 2012, the prices of PV panels, suddenly and unexpectedly, fell at an extraordinary speed. Consequently, the FiT offered very large profitability to plants that bought their panels at lower than expected costs, leading to a successful rush to commission plants before July 2012 in order to obtain the FiT. That in turn led to the Respondent obtaining, already in 2012, more installed PV capacity than it had intended to introduce into its system over the coming ten years, which required the Respondent to react as it did by means of the Seven Measures.

1601.  According to the Respondent, it could not have expected this development, but a reasonable investor could have and should have expected it. Such an investor therefore cannot claim that the measures so expected violate the ECT.

1602.  The Respondent's argument, in short, is thus that unexpected and unexpectable external circumstances required the Respondent to act in the form of introducing the Seven Measures and that, therefore, the Respondent's actions either were not in violation of

---

[2109]    RROMROJ, para. 228.

the ECT in the first place, or that any such violation was excused by the necessity that arose from the unexpected and unexpectable circumstances.

1603. Nevertheless, even to reach the stage of entertaining the legal part of the idea that, *in casu*, unforeseen circumstances could remove the potential unlawfulness of measures of the Respondent, the Tribunal would have to be convinced that the Respondent established all elements of its exculpatory argument, *i.e.* that the events took place that it alleges to have taken place, that they came unexpected and were unexpectable, and that they required the Respondent to act. The Respondent's argument must also not suffer any other fatal deficiencies.

1604. The Tribunal is, however, not convinced of the existence of those elements *in casu* because the Respondent failed to establish them and also otherwise severely undermined its own argument. Consequently, the Tribunal need not, and does not reach the legal question whether unforeseen external circumstances could excuse the unlawfulness of the measures at issue.

    *(i)*    *Factual basis of the boom argument*

1605. To start with, the Respondent's argument employs assumptions of fact that do not hold:

<u>The alleged drop in prices and costs</u>

1606. The Respondent did not establish that after the ERSA and the FiT Decision were adopted, prices for PV panels and the LCOE for PV production dropped in a shocking manner, deviating in a completely unexpected and unexpectable way from the long-term trend.

1607. Indeed, when the Respondent's expert describes the trend for the falling of the prices of PV panels and installation costs, he speaks of "the global average total installed cost of PV falling by 84% from 2007 to 2019" and notes that "the prices of crystalline silicon (c-Si) modules, such as the ones used in the Karad Plant, fell by 87–92% during the period 2009–19". Mr Kristensen thus speaks of a trend that started before the ERSA and

the FiT Decision were adopted and that was thus known at the time.[2110] The figures that Mr Kristensen then presents following that description tell the same story.[2111]

1608. The price trend graph that the Respondent presented to the European Commission in June 2014 also shows a steady decline of prices at a high but even pace from week 42 of 2010, *i.e.* from long before the FiT Decision, until mid-2012.[2112]

1609. An interview with the Vice Chair of CEET contemporaneous to the introduction of the ERSA in May 2011, submitted by the Respondent, paints a similar picture when the Vice Chair announces that "[f]or the past 3 years, the investment value of photovoltaics has fallen by more than 25%."[2113]

1610. Only Mr Kristensen's own raw data, not further referred to in any figure, indicate that in the second half of 2012 the general downwards trend for prices for PV panels in the countries that he uses as examples was in a faster trajectory than before and after.[2114] Nevertheless, his data, and his and the Respondent's figures on the overall costs, the LCOE, for utility-scale PV plants, *i.e.* the more important data for setting a FiT, show that the decline in LCOE between 2010 and 2011, 2011 and 2012, and 2012 and 2013 hovers steadily around -20%, *i.e.* did not significantly change between the time before the FiT Decision and thereafter.[2115]

---

[2110]    Oxera I, para. 3.19, fn 65.

[2111]    Oxera I, para. 3.19, Figure 3.1; Oxera II, para. 3.25, Figure 3.1.

[2112]    Complaint No. E-04-11-9 from EWRC to European Commission in Respect of Infringement of European Union Law, 20 June 2014 (**R-067**), p. 4; *cf.* also CMOM, para. 78.

[2113]    Dnevnik, Interview with Delyan Dobrev (GERB), Vice President of CEET, The Price of The Green Power Was Artificially Held High So Far, 3 May 2011 (**R-197**), p. 2 (*cf.* also the Claimant's translation of the interview at (**C-133**)).

[2114]    Oxera, Cost and Capacity Trends of Intermittent RES, 23 October 2020 (**R-140**).

[2115]    RROMROJ, para. 39, Figure II.1; Oxera, FiT and LCOE Analysis, 14 May 2021 (**R-422**); Incidentally, this data set also shows that the 2012-2013 FiT was considerably lower than the LCOE at that time. For plants that bought their panels early in the July 2011 to June 2011 season, the "rush" to complete projects before the new FiT of July 2012 applied, might therefore actually have been a financial necessity to maintain the financial viability of their project, rather than a drive to lock in "excessive profits" (independently even of the fact that the latter intention behind the "rush" would not make the attempt to obtain the higher FiT more or less reprehensible, contrary to what the Respondent appears to suggest); *cf.* also CMOM, para. 78.



**Figure II.1     FiT applicable to large solar PV plants in Bulgaria, and the LCOE of solar PV RES-E, 2007–14**

Note:     LCOEs are for utility-scale solar PV. Quarterly LCOE data is linearly interpolated from annual data. The global LCOE estimate may diverge from the LCOE of solar PV plants in Bulgaria based on several factors, including the methodology for calculating the LCOE, the cost of capital, price levels, plant size, and capacity factors.

Source: Exhibit R-422, tab 'FiT and LCOE analysis', 'FiT and LCOE Analysis'.

1611.   Therefore, no significant deviation from any prior trend for the period of July 2011 to June 2012 took place after the adoption of the ERSA and the FiT Decision, and hence there is no factual basis for characterising what happened as an unexpected event.

1612.   What is more, all of the above data points and trends, with the potential exception of the interview with the Vice Chair of CEET, do not stem from, or represent, the Bulgarian market and Bulgarian data, but rather international averages.

1613.   The Tribunal is not aware that any actual prices and costs for the Bulgarian market for the relevant period were presented to it. Rather, the Tribunal was presented with some samples and averages from other countries or whole regions, or global averages. All cost and price data before the Tribunal therefore has to be taken with an additional grain of salt and cannot be regarded as a strong basis to establish a sudden and unexpected drop in costs in Bulgaria itself.

1614.   Indeed, the only actual price from Bulgaria of which the Tribunal is aware is that which was paid for the panels of the Karad Plant (according to the Expert of the Respondent the price for the panels of the Karad Plant was EUR 1.076 per "MW").[2116] Nevertheless,

---

[2116]     While Mr Kristensen uses "MW" here, it would appear from the source material that he means "Wp"), *cf.* Oxera I, para. 8.11; Complaint No. E-04-11-9 from EWRC to European Commission in Respect of Infringement of European Union Law, 20 June 2014 (**R-067**), p. 4.

rather than taking that price as evidence of the then paid market price of a rational actor in Bulgaria, the Respondent's expert submits, only relying on the above-mentioned 2014 graph of PV panel prices at a European port, that the price paid by the developer of the Karad Plant was 36-63% above market price in Bulgaria at the time.[2117] These contradictions do not help the Respondent's efforts to substantiate its boom argument.

<u>Knowledge of the capacity in the process of being installed</u>

1615.  The Respondent also did not establish that the amount of new PV capacity installed in the first half of 2012 in Bulgaria was not, could not, and should not have been known or foreseen by it.

1616.  As discussed above when dealing with the asymmetry of knowledge between the Claimant and the Respondent: the Respondent had access to all necessary knowledge regarding the pipeline of PV projects in Bulgaria virtually in real-time.

1617.  In contrast with a private investor, the Respondent had real-time access to the preliminary and final connection agreements and to the distribution agreements of new PV plants and knew what capacity was installed (as of 16 January 2012, PV plants with a capacity of 481 MW had preliminary connection agreements and PV plants with a capacity of 307 MW, *i.e.* more than the goal Bulgaria had proclaimed to have for 2020, had final grid connection agreements).[2118] Bulgaria was aware of the capacity for which it issued licenses. It had access to the PPAs. It was aware of the pipeline under RAESBA and what it had become, or rather what it still included, after the introduction of the ERSA (a decrease from ca 15,000 MW to 4,000 MW in July 2011, *i.e.* when the FiT started applying).

1618.  Bulgaria thus knew that even with the ERSA introduced, projects with more capacity than it sought to achieve in total until 2020 were in an advanced stage. Bulgaria discussed these numbers in its Parliament in January 2012 when debating the April 2012

---

[2117]  Oxera I, para. 8.11.

[2118]  CMS Due Diligence Report (**C-75**), p. 73; *CMS Regulatory Report* (**C-80**), p. 4. In the Tribunal's view, as discussed above, given the asymmetry of knowledge, if the Claimant's shareholders knew, then the Respondent must have known, too.

Amendment and still did not see a need to change course or to do more than what it did in the April 2012 Amendment.[2119]

<p style="text-align:center">The alleged unexpected increase in output of PV plants</p>

1619.    The Respondent also did not establish that the output of all PV plants was higher than expected, let alone that that increase came as a shock to it.

1620.    As established above when discussing the NREAP of April 2011, which, by the way, also indicates that at that time the Respondent was aware of the rapid developments in PV production, the Respondent expected an output from 1,250 kWh to 1,550 kWh per installed kWp of a PV plant.[2120]

1621.    Therefore, the Respondent cannot have been shocked by outputs of more than 1,250 kWh per kWp and especially not of outputs of "14.2%" more than that (*i.e.* 1,427.5 kWh per kWp), especially when, as established above, as brought up by the Respondent's expert, there are indicators that the Respondent only chose the lower end of that spectrum to make the FiT more attractive for investors.[2121]

1622.    What is more, for the larger PV plants, such as the Karad Plant, the Respondent would also have known the exact output forecasts through the licensing process and as a result of the attachment of those forecasts to the PPAs.[2122] Those forecasts would equally have taken away any surprise.

1623.    In that regard, it is a matter of course, but no valid counterargument, that, *de facto*, not every government agency will always have active knowledge of all that another government agency knows. Nevertheless, from the perspective of international law, the Respondent is one person with one knowledge. In addition, it may fairly be assumed that at least those organs and agencies involved in setting the FiT and in developing the incentive regime would and should have been aware of such data.

---

[2119]    *E.g.* NA 25 January Transcript (**FR-104**), p. 7.

[2120]    See above, para. 1301.

[2121]    See above, para. 1302.

[2122]    See *e.g.* the Bulgarian original of the Karad PPA (**C-106_BG**), p. 12 for the Karad Plant, a forecast of 81,995 MWh for 2013 which turned out to be very accurate in retrospect in relation to the average production of the Karad Plant.

<p style="text-align:center">493</p>

<u>Whether PV plants profited from allegedly rapidly declining costs</u>

1624.    The Respondent furthermore did not establish that plants profited from allegedly rapidly falling costs and prices.

1625.    The Tribunal finds the Claimant's argument convincing that a PV Plant, as the Karad Plant, which was ready to produce electricity some time in February 2012, at the latest early March 2012, would have purchased the PV panels much earlier than that. Accordingly, such a plant would have profited, if at all, only from the beginning of the decline in prices between July 2011-June 2012, *i.e.* not the June 2012 prices. As the prices for the panels only comprise of ca 50% of the costs of a plant,[2123] a plant would have also faced many other costs before that time.

1626.    In addition, the development, construction, and registration of a PV plant cannot take place within a few months and, therefore, will necessarily involve costs spread out over time. The extent to which any plant that managed to be commissioned on time to receive the 2011-2012 FiT rather than the following lower FiT, and in particular the Karad Plant, will have profited from the decrease in costs over the period of July 2011 to June 2012 is thus necessarily limited. The extent to which any such plant could have profited from such a decrease in a way that could not have been anticipated and built into the FiT Decision would be even more limited. For the Karad Plant, in any case, the Tribunal did notice the Respondent's simultaneous, somewhat confusing, submissions that while the Karad Plant had profited from a drop in prices, it had, however, overpaid for its panels.

<u>The alleged necessity to act in reaction to the boom</u>

1627.    Finally, the Respondent did not establish that it had to act in response to the alleged boom, be it on the basis of its electricity network capacity, or the budget of its citizens, or on the basis of any law.

1628.    As established above, in January 2012, for example, in full knowledge of the pipeline of renewable energy projects in Bulgaria and in full knowledge that it was larger than what the Respondent had officially anticipated to obtain by 2020, in full knowledge of

---

[2123]    *E.g.* Oxera I, para. 8.11; Complaint No. E-04-11-9 from EWRC to European Commission in Respect of Infringement of European Union Law, 20 June 2014 (**R-067**), p. 4.

the price that Bulgaria was offering for such electricity at the time, and while the prices for PV panels had further fallen, the Respondent debated the April 2012 Amendment in its Parliament and decided not to go further than that Amendment.[2124]

1629. Indeed, rather than contemplating to bring the whole ERSA Regime to its end in light of the soon-to-be reached 2020 target, the target and worry of the Respondent at that time still appears to have been to remain attractive for further investment in renewable energy production.

1630. In the Tribunal's view, that does not indicate that there would have been a (perceived) necessity, let alone an internal obligation for Bulgaria to act at the time. The Respondent, in any case, did not manage to substantiate any submission to the contrary.

*(ii)    The boom argument is contradictory*

1631. The Respondent's boom argument is also contradictory in itself and contradicted by other parts of its submissions and argument.

1632. The Respondent cannot claim to have been surprised by an alleged boom which, in its view, reasonable investors should have seen coming. If the Respondent was shocked by the boom that occurred in its own electricity system, then it cannot argue that an individual investor should have expected it to occur.

1633. Indeed, in a way, the Respondent's boom argument boils down to an argument that the Claimant had to be more aware of the developments in the Respondent's regulated renewable energy market than the Respondent itself and that the Claimant had no right legitimately to expect that the host State knew what it was doing and would do what it was saying. That is an unbearably high standard for the formation of legitimate expectations, as also discussed above with regards to the asymmetry of knowledge and the right to rely on a host State's representations.

1634. But the boom argument is also contradicted by other parts of the Respondent's submissions.

1635. Elsewhere in its submissions, the Respondent avers that, far from having been a sudden and unforeseeable event taking place in early 2012, the "surge" or "boom" in capacity

---

[2124]    See above, para. 1331.

and the drop in prices was a development starting, and noticed internally by its officials, even before the introduction of the ERSA. For example, the Respondent submits that "[b]eginning in early 2010, Bulgarian officials warned that the projected new RES capacity in Bulgaria far exceeded the available network capacity", and that "[o]fficials cautioned that Bulgarian consumers, who have the lowest wages in the EU and bear the entire cost of expensive electricity from RES, could not afford the costs associated with a rapid onset of new RES capacity to the system."[2125]

1636. The Respondent furthermore asserts that, contrary to the Claimant's submission, the ERSA was adopted to reduce incentives, "to remedy this overcapacity problem", and to "curtail the surge of RES development spurred by the [RAESBA] and to ensure cost-reflective FiTs in accordance with applicable law."[2126] The Respondent consequently admits that the ERSA was a failed attempt to address such a surge or boom.[2127]

1637. In pursuing that line of argument, the Respondent (inadvertently) paints a picture of having failed properly to address a known problem rather than having been surprised by a sort of external shock regarding the PV panel prices and the increase of capacity.

1638. In the Tribunal's view, the existence of two such contradictory lines of argument advanced simultaneously does undermine both positions.

1639. Nevertheless, the Tribunal also cannot help but notice that the latter line of argument, arguing that the ERSA was done in the knowledge of a potential, or even likely, rapid onset of renewable energy capacity, appears to be closer to the facts of the case.

1640. As established above, the Tribunal is convinced that the ERSA Regime was even advertised as fixing the problems of RAESBA including its overblown pipeline and as readying Bulgaria for any boom.[2128] Logically, the Respondent cannot have been surprised by a problem that it believed it was in the process of fixing. That is a fatal contradiction to the Respondent's boom argument.

---

[2125]  RCMOMOJ, para. 22.

[2126]  RCMOMOJ, paras. 56-57, 65, 387; RROMROJ, paras. 30, 62, 64, 98; HT, D1, 7 June 2021, p. 207.

[2127]  *E.g.* RROMROJ, paras. 64, 87, 506; HT, D1, 7 June 2021, p. 215.

[2128]  See above, para. 1461.

*(iii)    Whether a boom is a risk of an investor or of the host State*

1641.  Both lines of argument, that of a failed attempt to manage the boom and that of a totally unexpected boom, also bring back to mind the above-made considerations regarding the allocation of risk to be expected in an *ex ante* scheme such as the ERSA Regime.

1642.  As established above, the consequences of choosing the "wrong" law to address a problem but having advertised that law as sufficiently addressing the problem and as being able to weather the problem, is a sovereign risk of a State that adopts such a law.[2129]

1643.  But even a shockingly unexpected boom would not deliver a winning argument to the Respondent. This is because the risks which the Respondent claims unexpectedly manifested themselves, *i.e.* the risk of (i) over-estimating the costs of an investor, (ii) underestimating how much interest a scheme would generate on the part of investors, and (iii) miscalculating how much capacity one's own system and consumers could handle and pay for, are risks which fall in the sphere of risk of the offeror in an *ex ante* regime such as the ERSA Regime.

1644.  Furthermore, as discussed above, the Respondent has failed to demonstrate that the events after the adoption of the ERSA and the taking of the FiT Decision were of such an unpredictable nature that they far exceeded the normal level of unpredictability and dynamic inherent in the PV market, as acknowledged by the Respondent at the time.

1645.  The unpreparedness of ERSA and the alleged boom, even in its most unexpected and most intensive version, are thus risks of the Respondent, which the Claimant was entitled to expect that the Respondent would bear.

1646.  In that regard, the Tribunal notes that a drop in the costs of an investor is particularly irrelevant to an incentive regime that sets a price in full knowledge of the quantity of production it has to expect.

1647.  That is because the price of PV panels, *i.e.* the costs of an investor, while of course having the potential to leave a bitter political aftertaste, are irrelevant to an offeror of incentives that sets a price while knowing full well the quantity of electricity it is about

---

[2129]    See above, V.C.1.a(1)(a)(iii), paras. 1565-1570.

to, or risks to, receive. It is irrelevant to an offeror that, by definition, must have been willing to (have its citizens) pay that price for roughly the quantity in the pipeline at the time.

1648.  That is also because, on a more abstract level and in its purest form, an offeror of incentives for investments in PV plants is interested in the quantity it receives for the price it pays, not in the internal costs of the investor it attracts.

> *(iv)    The role of earlier booms and reactions thereto in other Contracting Parties*

1649.  The Respondent's boom argument is not helped, but rather further undermined, by references to renewable energy booms in other Contracting Parties, such as Spain and Italy, and to the Claimant's alleged awareness thereof.

1650.  The Respondent argues that it is relevant that the Shareholders will have known about what had happened in Spain and Italy. Nevertheless, even assuming that the reactions to alleged booms in such other States were all perfectly in line with the provisions of the ECT, or that, contrary to the Tribunal's holding above, an investor's expectations may be undermined in their objective legitimacy by an expectation of unlawful behaviour by a host State, the developments in other Contracting Parties do speak against the Respondent's "boom argument".

1651.  Indeed, the Tribunal notes that the "boom" and "bust" in Spain had happened in the late years of the first decennium of this century, around 2008,[2130] and a convincing argument can then be made that the Respondent (i) knew about these developments in one of its EU partners equally trying to achieve EU targets and (ii) nevertheless adopted both the ERSA Regime and the FiT.

1652.  In full knowledge of the developments in other EU Member States, the Respondent must have thought, then, that either the ERSA Regime would have mechanisms in place to manage a boom, or that a similar boom or surge would not happen in Bulgaria, even though it had happened elsewhere under allegedly similar circumstances.

---

[2130]    *Cf.* Financial Times, Renewable energy: Cloudy forecast for solar power, 5 October 2010 (**R-020**).

498

1653.  Both possibilities would represent mistakes of the Respondent that cannot undermine an investor's legitimate expectation that the Respondent would implement laws with the necessary care, which in this case would involve studying what other EU Member States facing the same renewable energy targets had done and were doing to meet those targets.

1654.  After all, if anything, Bulgaria would appear to be less entitled to an argument of surprise than first movers of incentive regimes that later did not work out as planned.

*(v)    Conclusion on the boom argument*

1655.  The boom argument of the Respondent thus fails on its factual premises. In light thereof, the Tribunal does not need to consider its legal merits.

*(d)    EU State aid*

1656.  The Respondent has argued (i) that EU State aid law requires that an investor would have to expect changes to an unnotified incentive scheme until it is approved by the European Commission, (ii) that without the Seven Measures the ERSA Regime would have been in violation of EU State aid law, and (iii) that EU State aid law required the Respondent not to grant investors more than a reasonable rate of return and to amend the returns of investors if they exceeded reasonable returns, and more specifically, (iv) that, in that spirit, EU State aid law required the Respondent to introduce the Seven Measures.

1657.  While these arguments have been rather central to the Respondent's case, the Tribunal can dismiss them quite succinctly.

1658.  As established above, the European Commission has held that the ERSA Regime in its form both before and after the introduction of the Seven Measures did not constitute unlawful EU State aid.[2131] In light thereof, all four arguments of the Respondent must fail on the basis of that fact alone. There is no need to entertain the arguments' further factual and legal merits. After all, logically, an investor cannot have to expect that a lawful State aid scheme requires changes, or that profits from a lawful State aid scheme are unlawful EU State aid.

---

[2131]    See above, paras. 1349-1350.

1659. That being said, the Tribunal notes that *prima facie* it appears doubtful that EU case law on intra-EU investor's expectations regarding EU State aid schemes would have been relevant to the Tribunal's determinations on whether expectations were legitimately held within the meaning of the FET Obligation of the ECT.

### (3)   Conclusion on legitimate expectations

1660. In light of the above, the Tribunal concludes that the Respondent induced investments into PV production in Bulgaria by means of an *ex ante* scheme that on the basis of an *ex ante* logic and allocation of risk, which Bulgaria had selected for good reasons, advertised three parameters (i) a fixed price over (ii) a fixed time (iii) for all energy produced. The ERSA Regime was internally and externally understood and communicated that way and the Claimant had a legitimate expectation that if it met the conditions of the ERSA Regime, which it did, it would, in return, benefit from those parameters over the term of the incentive scheme, 20 years, without direct or deliberate indirect interferences or reductions by the Respondent.

1661. The ERSA Regime did not bind the Respondent's sovereign hand forever not to introduce any measures it might deem necessary, based on new facts or changes in government, and depending on all circumstances of a situation. The ERSA Regime, and the legitimate expectations it created, however, did and do create the assumption that measures that undermine the core pillars of the ERSA Regime are unfair to an investor that had invested in reliance on them, even more so when such measures were introduced to undermine those core pillars.

1662. Having so concluded, in order to reach a more specific finding of liability or lack thereof, the Tribunal will now turn to the specific application of the above-developed standard and the above-established set of facts per each of the Seven Measures and consequently to the determination of whether any of the Seven Measures violated the established legitimate expectations of the Claimant.[2132]

---

[2132]   With the exception of the Permanent Grid Access Fee, which will be dealt with later below, and the 5% ESSF Contribution in relation to which jurisdiction was declined above.

1663. In doing so, the Tribunal is mindful that all of the above-mentioned general counter arguments failed, and consequently the Tribunal will not further engage with them below.

(4)    Application to Seven Measures

*(a)    Temporary Grid Access Fee*

1664. The Claimant is of the opinion (i) that it is a violation of its legitimate expectations and thus a breach of the ECT by the Respondent that its Investment, ACWA Bulgaria, did not receive back in full all the monies it had paid as Temporary Grid Access Fee until that Fee was declared invalid by the courts of the Respondent and (ii) that it would be entitled to receive compensation for the loss in value of its Investment caused by its Investment not having received back the amount in question, BGN 315,253.80.

1665. The Claimant's legitimate-expectations claim regarding the Temporary Grid Access Fee must, however, fail.

1666. As established above, ACWA Bulgaria, *i.e.* the Investment, voluntarily accepted not to be reimbursed an amount of BGN 315,253.80, and accepted the Access Fee Settlement Agreement as the final settlement of all claims regarding the Temporary Grid Access Fee.[2133]

1667. An investor cannot successfully claim to have had a legitimate expectation towards a host State regarding a claim to money that its investment, the owner of the claim, voluntarily relinquished. An investor cannot claim from anyone but the investment (or its representatives, depending on the applicable law) the losses in the value of the investment that the investor might suffer as a consequence of the investment's act of relinquishing the claim voluntarily.

1668. The Claimant does not present any fact or argument that would indicate otherwise.

1669. The Claimant's initial argument that the Respondent "refused" to pay back the amount is furthermore incorrect in light of the existence of the Access Fee Settlement Agreement. The Claimant's later clarification that the Respondent failed to make ESO

---

[2133] See above, paras.1392-1395.

pay back the amount can equally not stand without further evidence and argument, which were not provided.

1670. Equally unsupported is the Claimant's claim that the Access Fee Settlement Agreement was just a mitigation effort irrelevant, rather than crucial, to the Claimant's claim.

1671. There are also no indications that ACWA Bulgaria did not voluntarily enter into the Access Fee Settlement Agreement or that ACWA's (mis-)handling of the situation, and the resulting Claimant's loss, was caused to a legally relevant degree by the Respondent.

1672. The Claimant's legitimate-expectations claim regarding the Temporary Grid Access Fee is thus dismissed.

1673. The claim having been resolved on the basis of this preliminary point, there is no need for the Tribunal to analyse whether, absent the Access Fee Settlement Agreement, the Temporary Grid Access Fee could have violated the Claimant's legitimate expectations as established above under (1) - (3).

### (b)    APC

1674. Measured against the framework set out above, the APC constitutes the clearest breach of Article 10(1) ECT sentence 2 (in connection with sentence 1) by the Respondent.[2134]

### (i)    Application of the Tribunal's findings to the APC

1675. The APC directly undermines one of the three pillars of the *ex ante* model of the ERSA Regime, *i.e.* full offtake. The APC furthermore violates the logic of the ERSA Regime and its promise of "you build it and we buy what you produce". It constitutes a fundamental alteration of the ERSA Regime in violation of the Claimant's legitimate expectation of full offtake.

1676. It is, for example, completely contradictory to the original design, logic, and purpose of the ERSA Regime to cap the amount of electricity one could sell per plant and, in doing so, to tell investors not to aim higher than a certain amount, capping, or in fact appropriating, the upward potential of PV plants needlessly. If anything, the opposite of the APC would have fit into the logic of the ERSA Regime: to require a minimum

---

[2134]    The facts regarding the APC are discussed above at paras. 1402-1419.

productivity per square meter in order to make sure that only plants with high enough output per use of land be subsidised.

1677. Full offtake is also the only offtake parameter that makes sense under the logic of the ERSA Regime, *i.e.* a regime that seeks to increase renewable energy production. More output, in the normativity of the ERSA Regime, was deemed to be better than less output.

1678. More output by a single plant also has no negative consequences to the Respondent, rather the opposite: an additional kWh from the Karad Plant, or any plant for that matter, does not cost the Respondent, or rather its citizens, anything less or more than a kWh from another plant of the same category. At the same time, Bulgaria would have to register, administer, supervise, and connect to the grid and manage or have managed for balancing purposes additional plants in order to obtain the same kWh which Bulgaria obtains from the Karad Plant's higher capacity at no added administrative costs or effort. The Respondent thus obtains efficiency gains from bigger, more efficiently producing PV plants.

1679. Therefore, the original ERSA Regime must at least have been agnostic as to the origin of a kWh that the Public Provider would have to purchase at the set price for that category of plants. If anything, the Regime would logically favour bigger, more efficiently producing plants. (The Tribunal notes that the desire to push for smaller plants in private settings appears to have arisen later and/or to have been a parallel movement.)

1680. Therefore, the only logical purpose of the APC, albeit one that would reflect bad faith, can thus have been to reduce costs, in full knowledge that already existing plants could not reduce their capacity and withdraw, and that many plants produced more than the average assumption in the FiT Decision. The Respondent admits as much when it submits that with the APC it sought to reduce the returns of existing PV plants and the costs of the Public Provider.[2135]

1681. This makes the APC a unilateral, after-the-fact, change of the bargain after the Respondent had obtained the capacity goals to be achieved by the ERSA Regime. It

---

[2135] *E.g.* RCOMOJ, para. 128; National Assembly, Motives to the 2015 Amendment of the Energy Act, 30 June 2015 (**R-081**), p. 2.

makes the APC an abuse of the vulnerable situation of the producers of the desired good which had already sunk their costs (and obtained the necessary financing) in reliance on the promise, and the logic, of full offtake of their production. That is of course unfair within the meaning of Article 10(1) ECT, and a breach thereof.

### (ii)    Analysis of APC specific counter-arguments

1682.    In conjunction with the general counter-arguments dealt with above, the Respondent presents some specific counter arguments in defence of the APC, some of which, however, sail very close to the wind as concerns adherence to the facts of the case.

#### Knowledge and legality of the 60.4/50 Ratio

1683.    As outlined above, the Tribunal understands that, because of the 60.4/50 Ratio, the Karad Plant reaches higher annual production hours than the reference plant of the FiT Decision.[2136]

1684.    With a view to that fact, the Respondent argues that it was unaware of the existence of the 60.4/50 Ratio, that the 60.4/50 Ratio was obtained unlawfully, and that the EWRC had deliberately "declined" to license the Karad Plant with the 60.4/50 Ratio, and instead only licensed 50 MW of PV panels to a 50 MW inverter, *i.e.* a 1:1 ratio. Against that background, the Respondent differentiates between a licensed capacity, which it defines as the capacity the Karad Plant would have had without the 60.4/50 Ratio, and an unlicensed capacity, defined as the capacity that the Karad Plant actually has and which exceeds the licensed capacity. In the licensed capacity scenario, the APC only slightly reduces the output of the Karad Plant, namely by the 5% placeholder for alleged own consumption. The unlicensed capacity, on the other hand, is fully affected by the APC but, in the view of the Respondent, should be disregarded due to its unlawfulness.

1685.    That line of argumentation has no basis in fact whatsoever. As discussed above, there is no evidence that the 60.4/50 Ratio was unlawfully installed or fast-tracked or that the EWRC "declined" any part of the License or Permit as applied for by ACWA Bulgaria. There is ample evidence that the EWRC, and Bulgaria, intimately knew the Karad Plant, its business plan, and its projected output, and were aware of, fully understood, and even

---

[2136]    See above, para. 1236.

welcomed the 60.4/50 Ratio and what it would mean for the Karad Plant's profitability. Bulgaria even encouraged the Karad Plant to start producing.[2137]

1686.   The Respondent's position also does not rhyme with its submission that the EWRC could not deny licenses to plants that met the license requirements of the Energy Act and the Licensing Ordinance.[2138] After all, if ACWA Bulgaria really had tried to fast-track any administrative steps for the Karad Plant in an unlawful manner and if the 60.4/50 Ratio really constituted a design the licensing of which could have been denied, then ACWA Bulgaria would surely not have met the license requirements of the Energy Act and the Licensing Ordinance. The Respondent could then have declined to grant the License, to commission the Karad Plant, or to take any other act that would have qualified the Karad Plant for the FiT. In doing so, the Respondent could have refused, or at least delayed into the lower 2012-2013 FiT, grid access of the Karad Plant, which according to the Respondent was the largest PV plant in Bulgaria at the time, contributing a full 50 MW of capacity. This is a telling sign that the 60.4/50 Ratio was lawful and evidently not "declined" by the EWRC or other Bulgarian authorities (and if it had been unlawful, it would be a telling sign that the Respondent by choice did not do everything to prevent "overcapacity" from entering into its grid at the FiT).

1687.   Here it is important to remember that the existence of the 60.4/50 Ratio was obvious from all application documents, was acknowledged in discussions with the EWRC, the protocol of at least one of which is in the record, and could not have been overlooked during site visits and capacity tests of the Karad Plant. Bulgaria cannot in all seriousness plead that the EWRC was unaware of it at the time it granted the License.

1688.   In that regard, the Tribunal cannot help but notice that the question of the lawfulness and knowledge of the 60.4/50 MW Ratio constitutes a subject that would have been excellently suited for witness testimony by the Respondent. The Respondent could have easily brought forward internal voices from the EWRC or any of the other approving authorities regarding the alleged illegality and the absence of knowledge of the 60.4/50 Ratio. That it did not do so, on a point to be proven by the Respondent, together with

---

[2137]   *E.g.* RROMROJ, paras. 122, 126; HT, D1, 7 June 2021, p. 223.

[2138]   RPHB, paras. 65-66.

the ample evidence discussed above, is fatal to the Respondent's submission and calls into question the sincerity of the argument made.

1689. At the end of the day, the Tribunal agrees with the testimony of Mr Malik that the Bulgarian position is implying "that the Government of Bulgaria decided to authorise the License of a plant like Karad without understanding what are the restrictions of the grid in that region and whether that transmission system in that grid can evacuate or not …", and his further testimony that, as a government, regulator, or grid operator, "[y]ou do not connect anything to the grid unless you are sure that this plant is not going to add any disturbance in the grid and whether the grid can evacuate all the power this power plant can generate".[2139] This again undermines the Respondent's argument regarding its knowledge of the 60.4/50 Ratio and the output to be expected from the Karad Plant, but also more generally, it is another reminder of the Respondent's real-time knowledge of the allegedly unexpected boom in PV capacity discussed above. Indeed, even if Bulgaria, at its own risk, (deliberately) miscalculated the annual operating hours of its reference plants or set them at an erroneously low level, Bulgaria knew in any case how much the Karad Plant was expected to produce and, for that matter, what other plants were going to produce when it accepted them into the grid and later when it devised the APC (as discussed above).

1690. In addition, independently of the specific argument regarding the legality under Bulgarian law of the 60.4/50 Ratio and the Respondent's knowledge thereof, the Tribunal also cannot agree with the Respondent's broader insinuations that in the normativity of renewable energy incentive schemes in general, and the ERSA Regime in particular, it would be regarded negatively to build a more efficient plant or to produce more renewable energy at the same plant, or that doing so would have been discouraged by the ERSA Regime. The Tribunal can also not agree that the 60.4/50 Ratio would constitute a sinister trick to obtain additional money (again at no different costs per kWh to the NEK as the electricity from other plants of the same category), rather than a desired innovation helping in fulfilling the purpose of the ERSA Regime by making a plant more efficient and helping it to obtain more solar energy over longer periods of the day. Here again, the Tribunal recalls that obtaining electricity from RES was the purpose of the ERSA Regime and that it is inherent to working with an *ex ante*

---

[2139]    HT, D2, 8 June 2021, p. 462.

regime, and within the *ex ante* regime inherent to working with reference plants, that, as acknowledged by the Respondent at the time, individual entrants to the regime will achieve different profitability and will design their plants in the best way they see fit in light of the fixed parameters of the *ex ante* regime. At no time was the idea behind a reference plant model that every plant would be an exact replica of the reference plant, which, as the Tribunal has learned, is also an impossible feat to achieve due to regional differences even within one and the same country.

<div align="center">Article 31(5) ERSA</div>

1691.  As outlined above, Article 31(5) ERSA states that the Public Provider "shall purchase the whole amount of electricity from renewable sources" and Article 31(2) states that "[e]lectricity from renewable energy sources … shall be purchased based on long-term purchase contracts …".

1692.  The Respondent argues that even if one interpreted Article 31(5) ERSA (also read together with Article 31(2) ERSA) as containing a promise to purchase all electricity from a given PV plant, one could in any case not interpret the Article(s) as including a promise to do so at the FiT.[2140]

1693.  This argument equally fails.

1694.  The argument represents a highly artificial reading of those paragraphs, not only in light of the regulation in Article 31(1) ERSA that electricity from renewable energy is to be bought "at the preferential price set by SCEWR", *i.e.* at the applicable FiT, but also in light of the logic of the ERSA Regime in which, as discussed above, price and quantity go hand in hand.

1695.  Furthermore, the Respondent's argument, even if successful, would likely still lead to a finding of liability: the Tribunal is convinced that if the Respondent's reading had been the actually intended meaning of the ERSA Regime, the Regime would have been non-transparent to a degree that violates Articles 10(1) sentences 1 and 2 ECT.

1696.  Finally, the exceptions to the principle of full offtake set out in Article 31(5) ERSA, that is, (i) use for own needs and supply and (ii) electricity which a producer freely decides

---

[2140]  *E.g.* RCMOMOJ, paras. 130, 367- 368; RROMROJ, paras. 202, 204-205; ROP II, p. 69.

to sell at the open market, are self-evident and logical. They were obviously not intended to indicate that the promise of full offtake would not be fixed over the whole term of a PPA. Therefore, contrary to the submission of the Respondent, the list of exceptions in Article 31(5) ERSA has no impact on the Respondent's obligation of full offtake, at the FiT, over the whole term of a PPA.

*(iii)    Conclusion on APC*

1697.  In light of the above, the APC constitutes a breach of the Claimant's legitimate expectations and, in light of all circumstances of the case, a breach of Article 10(1) ECT sentence 2 (in connection with sentence 1). Consequently, the Claimant's claim in regard of the APC must be granted in regard thereof.

*(c)    20% Levy*

1698.  Measured against the framework set out above, the 20% Levy constitutes a breach of the legitimate expectations of the Claimant.

1699.  As established above, the formula for the 20% Levy, *i.e.* FiT times quantity times 0.2, and the fact that the 20% Levy only applies to wind and PV plants that sell at the FiT, together make the 20% Levy a direct reduction of the FiT by 20%.[2141]

1700.  In addition, amounting to 20%, the Levy also constitutes a very sizeable reduction, capable of more than taking away any usual profit margin, let alone the target IRR of 9%.

1701.  The 20% Levy thus constitutes a sizeable, direct reduction of one of the key pillars of the ERSA Regime and as such it violates the Claimant's legitimate expectation that these parameters would be fixed over the promised term of 20 years.

1702.  In that regard, the Tribunal notes that, even though the 20% Levy was also declared unconstitutional under Bulgarian law, ACWA Bulgaria and the Respondent appear to agree that under Bulgarian national law that decision only has an *ex nunc* effect and excludes any claim for reimbursement for fees already paid before the date that the decision of the Constitutional Court obtained legal effect. (ACWA Bulgaria and the Respondent appear to have disagreed over whether, after the decision obtained legal

---

[2141]    See above, para. 1429.

effect, NEK was still under an obligation to withhold the 20% Levy on amounts due to ACWA Bulgaria from before the decision obtained legal effect which had, however, not been paid out yet).[2142]

1703.  Accordingly, it was not possible for the Claimant to obtain full reparation under national law for the damage caused by the 20% Levy, even though the measure was unlawful under both the ECT and national law. This made ECT arbitration necessary.

1704.  In that regard, the Tribunal further notes that it found the Respondent's counterarguments specific to the 20% Levy unconvincing.

1705.  The argument of a *de minimis* impact of the 20% Levy is misleading because, as the Claimant rightly points out, the 20% Levy's small share in the damages claim of the Claimant is owed to the measure having stopped so quickly rather than to the measure having a *de minimis* nature. As established above, a 20% cut of the FiT can hardly be called *de minimis*.

1706.  The argument regarding the inclusion of a Tariff Event in the Common Terms Agreement (as discussed above) was already dealt with in general above. The Tribunal notes, however, that the Claimant is right to point out that if the Respondent's submission is that the 20% Levy constitutes a Tariff Event, then that submission constitutes an admission that the effect of the 20% Levy was a FiT reduction, a point relevant to the business case of the Claimant and its Lenders.

1707.  In light of the above, the 20% Levy constitutes a breach of the Claimant's legitimate expectations and, in light of all circumstances of the case, a breach of Article 10(1) ECT sentence 2 (in connection with sentence 1). The Claimant's claim concerning the 20% Levy is granted in full.

(d)    *Balancing Cost Exposure*

1708.  The Tribunal can be succinct on the Claimant's claim regarding the Balancing Cost Exposure.

---

[2142]    Letter from ACWA Bulgaria to Minister of Finance, 10 August 2016 (**C-156**); Letter from Minister of Finance to ACWA Bulgaria, 30 September 2016 (**C-157**); Letter from ACWA Bulgaria to MEET, ESO and NEK, 19 August 2014 (**C-187**); Letter from NEK to ACWA Bulgaria, 29 August 2014 (**C-188**).

1709. The Claimant has acknowledged that it expected the Karad Plant to be subject to some form of balancing costs and this is also represented in the SPA.

1710. It was also clear that the balancing market, and the question how to handle balancing costs and the balancing market in Bulgaria, was still in flux at the time of the Investment.

1711. The Claimant has also not made plausible that the maximum amount of the Balancing Costs Adjustment (as defined in the SPA) of EUR 750,000, as agreed in the SPA, constituted the maximum that it would have expected to be charged for balancing costs. More likely, the Balancing Cost Adjustment was just a placeholder to the maximum extent that was achievable in negotiations at the time of the SPA and in light of a lack of knowledge on all sides as to how a balancing regime would eventually look like. Indeed, the Claimant has not made a plausible case that it had any expectation regarding balancing costs other than that they would likely be imposed at some later time.

1712. The Claimant has also not argued successfully that, if it expected that the impact of the imposition of balancing costs would not have exceeded EUR 750,000 in damages, the expectation of such a precise maximum was a legitimate expectation induced by the Respondent and hence protected under the ECT. On the contrary, the Claimant has argued that the situation in Italy, and not any act of the Respondent, informed its expectations in that regard.

1713. Against that background, the Tribunal does not even reach a point where it would need to analyse whether the Balancing Cost Exposure indirectly affected one of the three pillars of the ERSA Regime, and namely the FiT, in a deliberate way.

1714. Incidentally, on the basis of a *prima facie* impression of the arguments and facts regarding the Balancing Cost Exposure, the Tribunal does not believe that the Balancing Cost Exposure had any such indirect, deliberate effect. The Tribunal has noticed, however, that the *de facto* effect of any additional fee is, of course, a reduction of the revenues of the Karad Plant and, what is more, that the 2010 ETR, *i.e.* the template under which the Claimant invested, were much more protective of renewable energy producers and much more understanding of their technology-inherent struggles to make accurate short-term output predictions.

1715. All things considered, the introduction of the Balancing Cost Exposure, however, did not, and does not, violate any protected legitimate expectations of the Claimant.

1716.   The Balancing Cost Exposure claim under this header is dismissed.

(e)    *Transition from FiT to FiP*

1717.   In the Tribunal's view, the Transition from FiP to FiT, while having a relatively minor impact on the Investment (resulting, in part, however, from its late introduction) and not necessarily introduced with an intention to reduce the FiT, nevertheless constitutes such a fundamental change to the core pillars of the ERSA Regime and its underlying logic, as set out above, that, in the way it was executed, it must be considered a violation of the FET Obligation and the Claimant's legitimate expectations.

1718.   The Transition from FiT to FiP undermines the promise of full and risk-free offtake. After the Transition, producers of PV energy beyond a certain size had to worry about how and where to sell their product and whether they would get paid. This is very different in administration and risk from a model with one known counterparty that offtakes all of one's production. In addition, a FiP from a CfP, *i.e.* a price to be received from at least two sources, is also different from a FiT, even though the revenues produced by both types of remuneration may end up being relatively similar.

1719.   Bulgaria, contrary to the recommendations of the World Bank, on which it seeks to rely to plead the reasonableness of its measure, deliberately did not introduce a contract for difference, which would have guaranteed producers to receive the exact same amount as the FiT they had received before, but chose a CfP and chose to set the premium only once a year. The Respondent indeed acknowledges the risk of not achieving the previous FiT in full, which, in its view, is a feature of the FiP scheme that incentivises its participants to achieve the best price possible.

1720.   The Transition from FiT to FiP thus openly and directly undermines the promise of the ERSA Regime regarding the fixing of a price over a term of 20 years.

1721.   Finally, the Transition from FiT to FiP also unilaterally terminated all PPAs including the Karad PPA. While this is a question of Bulgarian law, the Tribunal nevertheless notes that a termination of a contract in that way does not appear to be one of the options provided for in the plain text of either Article 42 or Article 51(2) i.c.w. 51(1) of the Karad PPA. The Transition from FiT to FiP is also not a minor amendment to the Karad PPA but signifies its relatively sudden termination – a quite fundamental move in only

the sixth year of a promised term of 20 years. Independently of the terms of the Karad PPA, such an abrupt change undermines the promised term of the ERSA Regime.

1722.   Therefore, the Transition from FiT to FiP, while not in its impact, in its nature is of such a magnitude that it violates the legitimate expectations of the Claimant and, absent any circumstances that could lead to a different conclusion, violates the FET Obligation.

1723.   The Claimant's claim in regard thereof is accordingly granted.

> b.    *Fundamentally altering the investment framework, non-transparent and inconsistent treatment*
>
> (1)    The Tribunal's analysis

1724.   The Tribunal now turns to the remaining aspects of the Claimant's claim on the basis of the FET Obligation.

1725.   The Tribunal observes that nuanced thoughts can be had about what FET must entail in addition to not violating legitimate expectations and to what extent Article 10(1), sentence one, ECT informs, determines, or provides context to, the notion of what FET entails, or even what can be expected by an Investor.

1726.   Nevertheless, there seems to be a core agreement between the Parties to this case, and also among most interpreters of the ECT, that FET is not accorded when after an investment is executed and costs are sunk, conditions that formed the basis for an investment are not kept stable to a certain degree, or when an investment is not treated in a stable and consistent manner to a sufficient degree, or when it turns out that a host State was insufficiently transparent about the true conditions for an investment.[2143]

1727.   The Tribunal notes in that regard that many adjectives such as "arbitrary", "radical", "reasonable", and "proportionate" have been used to describe what degree is a "certain" or "sufficient" degree that qualifies an act as a violation of the FET Obligation, although none of those adjectives appears in the text of Article 10(1) ECT sentences one and two.[2144] Therefore, none of the adjectives deemed important in case law and argument,

---

[2143]   Or, of course, when an investment or investor is discriminated against, an allegation that in this case was presented and will be dealt with in the context of the Impairment Clause.

[2144]   See the discussion of the case law by the Parties as set out above.

or the tests developed in case law, will relieve a tribunal from its duty to determine on the basis of all circumstances of a case whether FET, that is "fair" and "equitable" treatment, was accorded or not.

1728. Here there is necessarily a great overlap between behaviour that would violate a legitimate expectation of an investor, as already dealt with above, and behaviour that would violate the other aspects of the FET Obligation. This is not least the case because an investor can of course legitimately expect that these latter aspects of the FET Obligation also be fulfilled.

1729. Nevertheless, the aspects of the FET Obligation not related to expectations of a claimant are independent to the degree that even if no expectations were formed in relation to a certain behaviour, or even if contrary expectations had developed, the aspects of the FET Obligation not related to expectations must still not be violated. Examples of behaviour that would only violate one aspect of the FET Obligation but not the others, are, however, difficult to imagine, not least due to the comprehensive nature of the one FET Obligation, but also, more in detail, because even unfair, *e.g.* non-transparent, bad faith behaviour that only comes to light after the investment is executed would likely violate the legitimate expectation that no such behaviour be engaged in and that conditions before the investment had been transparent. Equally, a fundamental change to the stability of a framework after-the-fact would likely violate the legitimate expectation that no such change will occur.[2145]

1730. Having so analysed the scope of the obligation to accord FET of Article 10(1) sentence two (and one) ECT, with a view to the concrete claims and facts before it, the Tribunal notes as follows.

1731. First, the importance of this part of the Tribunal's analysis, following the above consideration of the legitimate-expectations claim, is limited, especially because the most fundamental changes to the ERSA Regime, the APC and the Transition from FiP to FiT, have already been conclusively dealt with above. This part of the Tribunal's analysis will be applied only to the Claimant's claims regarding the Temporary Grid Access Fee and the Balancing Cost Exposure.

---

[2145]     All of these theoretical considerations show that there is a limit to how much can be gained analytically, if anything at all, by splitting up a FET related claim into three different alleged breaches.

1732. Secondly, the Tribunal is aware that it is not the first tribunal to be faced with a claim regarding an incentive scheme for renewable electricity production and assertions of fundamental changes and inconsistent treatment. In light of the specific circumstances of the present case, when it comes to an *ex ante* regime as introduced *in casu* in the form of the ERSA Regime, the Tribunal can, for example, agree with the holding of the tribunal in *Eiser* that

> [t]aking account of the context and of the ECT's object and purpose, the Tribunal concludes that Article 10(1)'s obligation to accord fair and equitable treatment necessarily embraces an obligation to provide fundamental stability in the essential characteristics of the legal regime relied upon by investors in making long-term investments[2146][,]

or the tribunal in *Antin* that

> [i]n sum, considering the context, object and purpose of the ECT, the Tribunal concludes that the obligation under Article 10(1) of the ECT to provide FET to protected investments comprises an obligation to afford fundamental stability in the essential characteristics of the legal regime relied upon by the investors in making long-term investments. This does not mean that the legal framework cannot evolve or that a State Party to the ECT is precluded from exercising its regulatory powers to adapt the regime to the changing circumstances in the public interest. It rather means that a regulatory regime specifically created to induce investments in the energy sector cannot be radically altered —i.e., stripped of its key features— as applied to existing investments in ways that affect investors who invested in reliance on those regimes.[2147] [footnotes omitted]

1733. Thirdly, the Tribunal has already held above (i) that the key tenets of the ERSA Regime were full offtake, over 20 years, at full price and (ii) that the ERSA Regime was defined by its *ex ante* logic. These "essential characteristics" would thus also be the characteristics protected by the part of the FET Obligation not covered already by the obligation not to violate legitimate expectations falling under that standard.[2148]

1734. Fourthly, the Tribunal notes that it is particularly important that an *ex ante* regime that sets and allegedly fixes essential characteristics or parameters beforehand – *i.e. ex ante* – and propagates a certain logic, be transparent about what the operator of the scheme

---

[2146]   *Eiser* (**CL-21**), para. 382.

[2147]   *Antin* (**CL-40**), para. 532.

[2148]   Analytically in this case the question of a violation of the Claimant's legitimate expectations is inextricably linked with the question of whether the (expected) investment framework has been fundamentally altered.

can still do *ex post* and under what conditions. The ERSA Regime, for example, took certain possibilities off the table. Re-introducing those possibilities *ex post* will thus likely imply a lack of sufficient transparency *ex ante*. Burying charges and fees that had been officially abandoned in the details of administrative decisions and trying to impose cuts indirectly as a course of action will also often have to be deemed non-transparent.

1735. As outlined above, however, any finding of non-transparency will need to exceed a certain threshold to be relevant for the finding of a breach of Article 10(1) ECT. Absent more guidance in the ECT itself, the threshold must be based and identified on a case-by-case analysis considering all circumstances of a case. Whether that threshold is the one described in the *Stadtwerke* case, or rather whether the threshold described in *Stadtwerke* is the one applicable in the circumstances of the present case, the Tribunal has its doubts.[2149] Nevertheless, the Tribunal does not need further to engage in identifying the exact threshold given that the possible non-transparency aspect of the remaining claims does not, in any case, surpass even much lower thresholds.

1736. The Tribunal will now move to test those among the Seven Measures in relation to which it has not yet found a breach, or declined jurisdiction, above against the above set out standards.[2150]

1737. In doing so, the Tribunal will neither repeat its dismissal of the general counterarguments of the Respondent already dealt with above, nor again deal with the measure-specific, but not legal-principle-specific, counterarguments also already dealt with above.

(2)    Application to Seven Measures

(a)    *Temporary Grid Access Fee*

1738. The Claimant's Temporary Grid Access Fee claim under this header is dismissed for the same reasons as outlined above under a(4)(a). What the Investment voluntarily did to itself cannot be a breach by the Respondent. No causation to a legally relevant degree

---

[2149]    *Stadtwerke* (**RL-256**), para. 311.

[2150]    For the above set out reasons, the Permanent Grid Access Fee's alleged violation of the FET Obligation will be discussed under a separate header "V.C.1.c" below.

between the Respondent's actions and the action of ACWA Bulgaria that caused the loss of the Claimant was sufficiently argued for, let alone established.

1739.  The Temporary Grid Access Fee claim under this header is thus dismissed.

### (b)    Balancing Cost Exposure

1740.  Regarding the Balancing Cost Exposure, the Tribunal can also be relatively brief.

1741.  The way the Balancing Cost Exposure appears to have been designed and introduced *in casu* by the Respondent shows a shift in attitude towards the need for protection of producers of electricity from renewable energy and a shift in the degree of understanding for the technology-specific problems of PV and wind energy producers to produce accurate output forecasts built into the respective balancing rules. The Balancing Cost Exposure thus necessarily makes the ERSA Regime less attractive than it was at the time of the Investment. This change, however, does not reach a threshold beyond which the Tribunal would believe that the Exposure would constitute a fundamental change of the ERSA Regime or would make it unstable, inconsistent, or unfair and unequitable as compared to the situation at the time of the Investment.

1742.  That is even more so because, as established above, the Balancing Cost Exposure was an expected development in the evolution of the Bulgarian energy market. The necessity of balancing rules was a known quantity and only the specific design of such rules was an unknown quantity, not fully informed or yet given form by the experimental 2010 ETR.[2151] It is however difficult, in the Tribunal's view, to deem a specific design choice within the logic of an existing system to constitute a fundamental change of such a system.

1743.  Furthermore, the introduction of the Balancing Cost Exposure can also not be regarded to have taken place in a non-transparent way.

1744.  The Balancing Cost Exposure claim under this header is thus dismissed.

---

[2151]    See *e.g.* above, para. 1465.

### c.    Permanent Grid Access Fee

1745. That leaves the Tribunal to engage in the FET analysis of the claim regarding the Permanent Grid Access Fee, which, as announced above, does not readily lend itself to an analysis under the framework as submitted by the Claimant and thus has a particular place in the Tribunal's analysis of alleged breaches of the FET Obligation.

1746. The difficulty to place the analysis of the claim regarding the Permanent Grid Access Fee stems from the fact that the Permanent Grid Access Fee is not of a nature that it would directly affect any of the three core pillars of the ERSA Regime and, in particular, the FiT, nor has it sufficiently been established that it would do so indirectly in a deliberate way. Neither is the impact of the Permanent Grid Access Fee of such a nature or size that, in itself, it would have come as a shock to the Claimant which legitimately it did not have to expect.

1747. The Claimant has furthermore not established that it would be "necessarily implicit" in Article 31(4) ERSA that grid access costs would never be levied or only would be levied to a lesser degree.

1748. In addition, while the Permanent Grid Access Fee is non-transparent in part, its non-transparency alone does not reach a threshold as of which the Tribunal would be ready to conclude that the FET Obligation was breached.

1749. Nevertheless, a comprehensive analysis of all circumstances of the case as they pertain to the claim regarding the Permanent Grid Access Fee, which is the proper analysis of an alleged breach of the FET Obligation, leads the Tribunal to the conclusion that *in casu* the imposition of the Permanent Grid Access Fee constituted a breach of the FET Obligation. This conclusion is based in particular on the following reasons.

1750. First, the Permanent Grid Access Fee does constitute a significant change from the Respondent's approach to grid-access costs at the time of the Investment.

1751. As established above, the three pillars of the ERSA Regime (price, quantity, and time) were explicitly set in a framework of guaranteed access by RES producers to the transmission and distribution electricity grids.[2152] Indeed, up until the Temporary Grid

---

[2152]    See, for example, above, paras. 1264, 1463.

Access Fee was introduced, the thinking in Bulgaria was that the government had to provide for and facilitate, at its cost, the necessary conditions for an increase in the investment into renewable energy production in Bulgaria, including the provision of an electricity grid that could handle such an increase. But for an advance payment to be made by the producer at connection, the legal framework of the Respondent even appears to have mandated the Respondent and its network operators to shoulder these costs.[2153] Nevertheless, the Respondent's thinking switched later to the idea that providing the electricity grid needed by producers of renewable energy is a service for which such producers ought to pay. That new thinking was reflected in the Temporary and the Permanent Grid Access Fee.

1752. Secondly, it is evident that the ERSA Regime with the Permanent Gird Access Fee in place is a less attractive regime than the one in place at the time at which the Claimant invested and that any fee to be paid per MWh is *de facto* a reduction of a price to be received per MWh, such as the FiT.

1753. Thirdly, the Permanent Grid Access Fee also appears to have applied only to renewable energy producers that sell their production at a FiT and not to renewable energy producers that sell on the free market. While this distinction in practice might not have been of much relevance, because not many producers of renewable energy would have sold on the open market, if any at all, it shows that the logic of the Permanent Grid Access Fee was more related to a renewable energy producer receiving a FiT rather than to a renewable energy producer accessing the electricity grid.

1754. Fourthly, the application of the Permanent Grid Access Fee also appears to have known an element of unfairness (and non-transparency). While the Permanent Grid Access Fee Decision determines that the Fee is only to "apply forward",[2154] the Permanent Grid Access Fee, as the Tribunal understands, was deliberately set at higher values in 2015, 2016, and 2017 in order to recoup, at least in part, what the ESO had lost by the invalidation of the Temporary Grid Access Fee. That is a *de facto* retroactive application of the Permanent Grid Access Fee in contradiction of the announcement that such application would be prospective.

---

[2153]    See, for example, Articles 18(3), 27(2), and 28(1) ERSA.

[2154]    Permanent Grid Access Fee Decision (**FR-84b**), p. 8.

1755.  Fifthly, and finally, the unfairness of the Permanent Grid Access Fee is enhanced by what appears to be a double recovery in the case of the Claimant and its Investment because, if the Tribunal's understanding is correct, the Karad Plant paid twice for the retroactive application of the Permanent Grid Access Fee: once by means of the Remainder which was held back under the Access Fee Settlement Agreement and calculated to equal the amount of the Permanent Grid Access Fee that would have been levied had the Fee been applicable at the time, and a second time by paying a higher Permanent Grid Access Fee over the 2015, 2016, and 2017 season.

1756.  All of these factors together lead the Tribunal to conclude that the Permanent Grid Access Fee as imposed on ACWA Bulgaria constitutes a violation of the FET Obligation.

1757.  Therefore, the Claimant's claim regarding the Permanent Grid Access Fee is granted.

## 2.    Unreasonable Impairment

1758.  Article 10(1) ECT reads in relevant part:

> Article 10
>
> Promotion, Protection and Treatment of Investments
>
> (1) Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. …. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. [footnotes omitted]

### a.    The Tribunal's analysis

1759.  The Impairment Clause, in the view of the Tribunal, sets out a stand-alone obligation and a standard independent of the FET Obligation.

1760.  According to the Impairment Clause, it is the obligation of every Contracting Party not to use "unreasonable" or "discriminatory" measures to "impair" "in any way", the management, maintenance, use, enjoyment, or disposal of an Investment in its Area. The term "impair" in that regard cannot be seen as standing alone or directly referring to the "Investment" but can only be assessed together with the relevant object of the

verb, *i.e.* "to impair the management of an investment", "to impair the maintenance of an investment", the "use", the "enjoyment", or the "disposal" thereof.

1761. Accordingly, by its mere text, and particularly the use of the verb "to impair", the Impairment Clause thus sets out a prohibition to put obstacles in the way of certain aspects of an investment, *i.e.* a prohibition to make enjoying, running, or exiting the investment more difficult without good reason or out of bad faith. This does not, on its face, appear to have, at least directly, a relation with the value of an investment or to concern measures with merely a financial impact. The prohibition rather appears to concern administrative hurdles and access to (the value of) an investment.

1762. To "impair" and not to accord FET overlap to some extent. It is, for example, difficult to imagine that a Contracting Party that adopts discriminatory measures impairing the enjoyment of an investment could still be deemed to accord FET to that investment or its owner. Textually, however, "impair", on its face, appears to describe a more active and directed/targeted and possibly a smaller-scale act than the act of not according FET.

1763. In analysing the Impairment Clause, what first comes to the Tribunal's mind are measures directly attacking an investment in a relatively concrete way: measures such as repeated unnecessary health inspections, road blocks, searches of the premises without probable cause, export controls, ownership requirements, controls on the transfer of money, foreign currency restrictions, denial of visas, closing of ports, swamping an investment in unnecessary and endless acts of bureaucracy, or requiring additional bureaucratic steps from foreign investors without a reasonable basis.

1764. Fees which may be characterised as unfair by reason of undermining the more global investment framework or promises made in relation thereto, *i.e.* the kinds of fees already determined not to be in breach of the FET Obligation above, but still in need of being analysed under this header, are not the first kind of measure of which the Tribunal would think under this standard.

1765. Nevertheless, the phrase "in any way" contained in the Impairment Clause broadens the scope of the Impairment Clause beyond such a narrower view by indicating that all possible kinds of creative acts of impairment are covered by it, as long as they are "unreasonable" or "discriminatory", *i.e.* irrational, without good reason, or targeted out of bad faith.

1766. The phrase "in any way" therefore has two effects. First, it increases the overlap between the Impairment Clause and the FET Obligation since probably every violation of the latter would constitute an impairment "in any way". After all, an unreasonably imposed reduction of an investment's revenues in violation of the FET Obligation must be considered an impairment of the enjoyment of an investment in some way. This is at least how tribunals thus far, and both Parties, appear to interpret the Impairment Clause.

1767. Secondly, the phrase "in any way" makes the Impairment Clause cover acts that impair, but might not reach a magnitude or applicable threshold, or that are not of a nature that would constitute a violation of the FET Obligation. In addition, the reference to "in any way" indicates to the Tribunal that a measure does not have to have a sizeable impact in order for it to be an impairment in violation of the Impairment Clause.

1768. The limiting factor to the phrase "in any way", and most likely also the decisive factor for determining a breach of the Impairment Clause, then necessarily is whether a measure qualifies as "unreasonable" or "discriminatory". The ECT, however, neither specifies to what degree a measure must be unreasonable, nor does it set a threshold of unreasonableness to be overcome for a measure to be deemed "unreasonable" within the meaning of the Impairment Clause.

1769. Nevertheless, in the Tribunal's view, the qualification of an act as reasonable or unreasonable is never a black and white exercise. It is always a qualification to a degree.

1770. Hence, any qualification as unreasonable within the meaning of the Impairment Clause implies a qualification as unreasonable to a certain degree – to be determined by the Tribunal on the basis of the text of the Treaty, international law, and all circumstances of a case, informed, of course, by the learned choices and sound reasoning of other tribunals.

1771. The Tribunal agrees in that regard with those tribunals, and with those parts of the Claimant's argument, that conclude that in order to be triggered the Impairment Clause does not require shockingly and egregiously unreasonable treatment.

1772. The Tribunal however also agrees with the Respondent that not all degrees of unreasonableness can be, and can have been meant and understood to be, covered by the Impairment Clause. And here, of course, the impact of a measure can constitute one of the determining factors of the degree of reasonableness.

1773. The Tribunal further agrees with the Respondent that there are hardly any situations imaginable, in which it would be appropriate for a tribunal, as part of a test of the reasonableness of a measure, within the framework of an unreasonable impairment analysis, to engage in an analysis whether better, more reasonable options would have been available and should have been enacted.

1774. Finally, to the extent that measures such as the Seven Measures are concerned (*i.e.* measures of a broader scope and sweep than *e.g.* a health inspection or a road block, more classic obstacles to, or deteriorations of, the possibility to manage, maintain, use, enjoy, or dispose of an asset, that is to say measures that arguably can fall under the Impairment Clause only because of the breadth of the phrase "in any way"), the Tribunal agrees with many other tribunals that the standard of "reasonableness" in the Impairment Clause is not different from that to be applied when considering, inasmuch as necessary, the reasonableness or unreasonableness of a measure under the umbrella of a FET analysis.[2155] Accordingly, such a measure, if it was tested for its reasonableness under a FET analysis and found not to violate the FET Obligation, will not normally violate the Impairment Clause (see below).

1775. That leaves the Tribunal to investigate the other potentially determinative factor for the finding of a breach of the Impairment Clause, *i.e.* whether a measure qualifies as "discriminatory". The Tribunal, however, does not need to analyse the scope of that factor in depth, because (aside from the potential, but irrelevant, exception of the Temporary Grid Access Fee) the most that any of the Seven Measures has ever targeted any group has been the targeting of all nationally and internationally owned producers of PV and wind energy that receive a FiT. It appears obvious to the Tribunal that a measure having such a broad target cannot, without further aggravating circumstances, fall under whatever scope "discriminatory" may plausibly be understood to have under the Impairment Clause. Therefore, any claims of having been impaired by the allegedly discriminatory aspect of one of the Seven Measures still to be analysed by the Tribunal must fail.

1776. Having so concluded, the Tribunal will now apply the above framework to those measures among the Seven Measures that it has not yet found in breach of the ECT

---

[2155]     *E.g.*, albeit broader *Saluka,* (**CL-81**), para. 460 [introduced into ECT by *SunReserve* (**RL-262**), para. 947].

under previous parts of its analysis and in relation to which it has not declined jurisdiction.

      *b.*    *Application to the Seven Measures*

      (1)    Temporary Grid Access Fee

1777. The Claimant's Temporary Grid Access Fee claim under this header is dismissed for the same reasons as outlined above under 1.a(4)(a). It cannot be a breach by the Respondent what the Investment voluntarily did to itself. No causation to a legally relevant degree between the Respondent's actions and the action of ACWA Bulgaria that caused the loss of the Claimant was sufficiently argued for, let alone established.

1778. Accordingly, the Temporary Grid Access Fee claim under this header is dismissed.

      (2)    Balancing Cost Exposure

1779. The Tribunal finds that, for the same reasons as those outlined above under 1.b(2)(a) , the Balancing Cost Exposure cannot be deemed to be a measure that unreasonably impairs the management, maintenance, use, enjoyment or disposal of the Investment.

1780. There are also no traces of the Balancing Cost Exposure having been discriminatory against the Claimant.

1781. Accordingly, the Balancing Cost Exposure claim under this header is dismissed.

### 3.    Umbrella Clause

1782. The Umbrella Clause reads:

Article 10

Promotion, Protection and Treatment of Investments

(1) … Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party. [footnotes omitted]

1783. In view of the measures that still remain to be analysed by the Tribunal under this header, namely the Temporary Grid Access Fee and the Balancing Cost Exposure, the Tribunal observes that it does not need to engage in a detailed analysis of the scope of

the Umbrella Clause and does not need to take a position in the debate on the possible sources for obligations protected under the Umbrella Clause.

1784. With regard to the Temporary Grid Access Fee, no such analysis is needed because the Temporary Grid Access Claim has been dismissed earlier by reason of ACWA Bulgaria's voluntary self-infliction of the damage and lack of causation to a legally relevant degree between the Respondent's actions and the action of ACWA Bulgaria. That reason for dismissal is independent of the basis on which the Claimant claims a breach of the ECT and hence would not be affected by whatever interpretation of the Umbrella Clause the Tribunal might adopt.

1785. With regard to the Balancing Cost Exposure, no such analysis is needed because the Tribunal finds it evident that (i) the Respondent did not enter into any specific obligation with the Claimant or its Investment that would have prohibited, regulated, or included any other agreements on the introduction of those two measures and (ii) as established above under 1.b(2)(a), the Balancing Cost Exposure does not affect directly, or deliberately indirectly, any of the core pillars of the ERSA Regime. Since the Tribunal has already determined above that binding promises were only made in relation to those core pillars, then absent a specific agreement with a broader scope, even a broad interpretation of the potential sources of obligations of the Respondent within the meaning of the Umbrella Clause could have led only to a finding that obligations were entered into in relation to those core pillars.

1786. Therefore, the Balancing Cost Exposure, which the Tribunal has established not to affect the core pillars of the ERSA Regime, cannot have been covered by any obligation in relation to those pillars which the Respondent might or might not have entered into with the Investor or the Investment, no matter how broad or narrow the Tribunal would have been willing to interpret the Umbrella Clause.

1787. In that regard, it is further relevant that the Claimant made it exceedingly clear that it would not claim a breach of the Karad PPA, presumably the core document to any Umbrella Clause claim and argument.

1788. Therefore, the claims regarding the Temporary Grid Access Fee and the Balancing Cost Exposure are also dismissed inasmuch as they rely on the Umbrella Clause.

### 4. Alleged breach of the ECT by the Seven Measures taken as a whole

1789. As outlined above, the Tribunal has found that, taken individually, some of the Seven Measures did breach the ECT. Consequently, the Tribunal sees no need to analyse the Claimant's argument that the Seven Measures taken together as a whole have violated the ECT.

1790. In addition, on the basis of the arguments and the facts before it, the Tribunal does not consider it possible to find that the measures not found to be in breach of the ECT individually, could nevertheless be found to be in breach thereof when regarded as part of a coordinated effort in the form of all Seven Measures taken together or as part of the sum of all Seven Measures.

1791. To start with, there are no indications on the record that the Seven Measures would have constituted such a coordinated effort to circumvent protections. The Tribunal notes in that regard that some of the Seven Measures were follow-ups to each other, *e.g.* the Permanent Grid Access Fee to the Temporary Grid Access Fee, and on that basis alone could not be regarded as one measure.

1792. There is also no other reason to regard the Seven Measures as one being the sum of all Seven Measures.

1793. The part of the Claimant's claim asking the Tribunal to find that the Seven Measures together constituted a breach of Article 10(1) ECT will thus not be analysed further and, inasmuch as necessary, is dismissed.

### D. Quantum

#### 1. The Tribunal's analysis regarding quantum

##### a. *The standard of compensation, the method of calculating quantum, and the Claimant's quantum case*

1794. The Tribunal agrees with both Parties that the full compensation standard expressed in the *Chorzów Factory Case* applies and that "reparation must, as far as possible, wipe

out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed."[2156]

1795.  The Tribunal recalls that the Claimant sold the Investment to a third party disinterested in this dispute. The Tribunal agrees with the Claimant that, in light of the Investment having been sold, the correct method to establish the lawfully owed reparation is to compare the value of the Investment at the time it was sold, on 31 December 2019 (the "**Valuation Date**"), with the hypothetical value of the Investment on that Date, had the measures now found to be in violation of the ECT never been introduced. The Tribunal disagrees in that regard with the Respondent's claim already dismissed above, that its Article 17 Objection must influence the valuation date used by the Claimant and now accepted by the Tribunal.

1796.  The Tribunal agrees with the Claimant that a way to establish the difference between the factual and counterfactual scenario is to add the missed cash flows to the value of the Investment in the factual scenario and to deduct from those cash flows expenses that would not have been made, had the measures now found to be unlawful not been introduced.

1797.  The Tribunal observes that the Claimant did not make a case (in relation to the quantum aspect of the present case) that it would not have sold the Investment had it not been for the Seven Measures.

1798.  The Tribunal agrees with the Claimant that a causal and sufficiently proximate link between the Seven Measures and the losses claimed by the Claimant is established.

1799.  The Tribunal finds it sufficiently likely that 75% of the damages now being claimed under the header "legal fees and debt restructuring costs" are caused by those of the Seven Measures that were found to be unlawful.

### b.  The Respondent's alternative quantum case

1800.  The Tribunal further disagrees with the quantum aspect of the Respondent's "reasonable return" argument, the merits aspect of which was already dismissed above.

---

[2156]  *Case Concerning Factory at Chorzów (Germany v. Poland)*, Judgment 13, PCIJ, 13 September 1928 (**CL-123**), p. 47.

1801. Achieving a reasonable return, whatever that figure might be, was not the legitimate expectation of the Claimant, as established above.[2157] Being able to sell the promised quantity, at the promised price, over the promised term was. Therefore, the but-for scenario to the breach of not allowing the Investment to benefit from any of those promised parameters is not a scenario in which "a reasonable return" is achieved. The but-for scenario is benefiting from, or gaining the enjoyment of, those parameters. The moment an investor had a protected expectation that its investment would receive a certain price or would sell a certain quantity, wiping out the consequences of a violation of that expectation means receiving the full price or selling the full quantity, even independently of whether there also was an expectation that, overall, the investment would only earn about 9% IRR (which there was not).

1802. Within the full-reparation standard, which as discussed above mandates that a tribunal must seek to wipe out as far as possible all consequences of an unlawful act, no rule exists that full compensation would be due only if the consequences of the unlawful act, or the consequences of a mix of lawful and unlawful acts, would exceed a certain threshold or would have a combined equivalent effect of a certain reduction. Capping compensation indeed appears to be the antithesis of "full" compensation.

1803. In that regard, the Tribunal also cannot help but note that even on the Respondent's best quantum case, and assuming that the Claimant's protected expectations were somehow capped at an overall return of 9% IRR independently of concrete breaches by concrete measures, the Karad Plant's IRR would be 8.6%,[2158] *i.e.* below 9%, *i.e.* below the "rate of return that is initially set by the Bulgarian authorities" and that the European Commission found to be reasonable as corresponding to the level of the estimated WACC.[2159] The Claimant's claim would thus have to succeed even on the Respondent's best case and damages would have to be awarded.

1804. Further, the Tribunal cannot help but note that in order to reach that best possible figure and to make the case that such a figure (despite being lower than 9%) would have been a reasonable return anyway, the Respondent is forced to make the following assumptions and adjustments: (i) treat NOMAC and ACWA Bulgaria as one economic

---

[2157] See above, para. 1616.

[2158] RROMROJ, para. 25; ROP II, p. 72; ROP IV, p. 7.

[2159] RPO III, pp. 8, 13; EC Decision on State Aid (**FR-78**), paras. 19, 63.

entity, (ii) stretch the horizon for calculating the IRR from the 20 year term of the ERSA Regime to a 30 year term, (iii) pretend that the 60.4/50 Ratio was installed unlawfully, and (iv) compare the resulting IRR figure with an individualised WACC of ACWA Bulgaria, rather than with the WACC used in the FiT Decision. On the latter point, the Respondent disregards the WACC used in the FiT Decision, even though, in 2016, the European Commission found that it was a reasonable choice. It also disregards that that WACC, having been used in the FiT Decision, evidently is the relevant WACC for establishing what the Respondent would have deemed to be a reasonable return, had a reasonable return and the reference plant played the role that the Respondent now argues it to have played.[2160]

1805. The Tribunal cannot accept any of these assumptions and rather finds the Respondent's IRR calculations, which reach values below 7%, more convincing. If the Respondent's proposed standard were the applicable one, the damages due to the Claimant would therefore be even higher than the difference between an IRR of 8.6% and one of 9%. The Claimant has furthermore made a plausible case that even under the legal standard put forth by the Respondent, damages of at least around EUR 40 million, if not above EUR 50 million, would be owed.[2161]

### c.    Equivalent FiT reduction

1806. In that regard, the Tribunal also notes that for its calculations of the equivalent effect, the Respondent has treated the Karad Plant as if the 60.4/50 Ratio had been installed unlawfully, which it evidently was not, and that the Respondent assumes the legality of the APC. These assumptions severely distort the Respondent's equivalent-effect calculations and makes them wholly unusable for any comparison of effects, even if such comparison had any legal value.[2162]

---

[2160]    RPO III, pp. 8, 13; EC Decision on State Aid (**FR-78**), paras. 19, 21, 63.

[2161]    CROMCMOJ, paras. 21, 316, 443, 502, 552, 569, 570; COS, pp. 5, 142; HT, D1, 7 June 2021, p. 146; FTI II; paras. 3.38-3.42.

[2162]    After the Hearing the Respondent's expert also adjusted his equivalent effect calculation to then reach 9.8% (from 7.4% before) and thus even on the Respondent's case, *i.e.* excluding the APC and disregarding the 60.4/50 Ratio, the equivalent effect surpasses the allegedly relevant value referenced in *SilverRidge*; Oxera IV, para. 1.11.

d.    *The Claimant's quantum case stands unopposed*

1807.  Finally, the Tribunal observes that the Respondent has opposed the Claimant's quantum calculations only on the basis of principle and legal standard, not on the basis of alleged incorrectness of the calculation itself. Therefore, the calculations presented by the Claimant stand unopposed.

1808.  Having so concluded, the Tribunal now turns to determine the quantum of compensation owed.

## 2.    Quantum of compensation owed

1809.  Based on the above, the Tribunal determines that the following amounts are to be awarded per each measure.

| Regulatory Change | EUR m |
|---|---|
| Permanent Grid Access Fee | 3.44 |
| 20% Levy | 2.2 |
| Annual Production Cap | 53.4 |
| Transition from FiT to FiP | 1.7 |
| 75% of legal fees and debt restructuring costs claimed | 0.3 |
| **Total** | 61.04 |

1810.  The Tribunal deviates from the Claimant's quantum claim and table only as follows:[2163]

a.    As a matter of course, damages are only awarded in relation to measures which have been found to be in breach of Article 10(1) ECT.

b.    The Tribunal applies the above-discussed reduction to the claim for legal fees and debt restructuring costs.

---

[2163]    *Cf.* CMOM, para. 384; FTI II, para. 2.11, Table 2-5; FTI I, para. 7.7, Table 7-2.

c. Since the Claimant's quantum claim regarding the Permanent Grid Access Fee relies on a fictional start date of the measure, 18 September 2012, in connection with the alleged illegality of the Temporary Grid Access Fee and the holding back of the Remainder, as described above, the claim has to be adjusted to represent only damages caused by the Permanent Grid Access Fee, *i.e.* damages suffered as of the actual start date of the Permanent Grid Access Fee, 13 March 2014.[2164] The Tribunal has determined this adjustment to be EUR 160,000, the rough Euro equivalent of the Remainder of BGN 315,253.80 (as defined above). The Tribunal is aware that this is an approximation rather than an exact calculation within the DCF framework of Mr Edwards' analysis. The Tribunal is, however, convinced that in light of (i) the relatively low amounts involved in the adjustment, (ii) the potentially high costs of any further written round to this arbitration, in which the Tribunal would ask for updated "perfect" calculations (and comments thereon), and (iii) tribunals' considerable discretion in determining the amount of damages to be awarded, the adjustment is sufficiently adequate and tailored. This EUR 160,000 adjustment therefore has to be deducted from the Claimant's original claim regarding the Permanent Grid Access Fee which amounts to EUR 3.6 million. This leads to an amount to be awarded under this claim of EUR 3.44 million.

### 3. Pre- and post-Award Interest

1811. Awarding pre-award and post-award interest, to be compounded over time, in a case as the present case, is a necessary part of the attempt to wipe out all consequences of an unlawful act. In addition, while the Tribunal agrees with the Respondent that the Claimant's interest claim is of underwhelming clarity and precision, it is evident that the Claimant has requested full reparation for the damage caused by the unlawful measures of the Respondent and has requested an award of pre-award and post-award interest.

1812. Therefore, the Tribunal must award pre-award and post-award interest and in order to do so it must determine the appropriate level thereof. In that regard the Tribunal finds that the most fitting interest rate for both pre- and post-award interest is the rate applied

---

[2164]    *E.g.*, Edwards I, paras. 3.20-3.21, 7.8.

by the Claimant's expert, being 12m EURIBOR plus 2%.[2165] The Tribunal notes that this rate is significantly lower than the interest rate that ACWA Bulgaria paid over the variable part of its loans, being 3m EURIBOR / LIBOR plus 4%.[2166]

1813.   The rate so determined is to apply as pre-award interest from the Valuation Date until the date this Award is issued based on the 12m EURIBOR level at the Valuation Date, and as post-award interest from the date this Award is issued until the amount awarded is repaid in full based on the 12m EURIBOR level at the date of the Award.

1814.   Interest is to be compounded annually.

## VI.   COSTS

### A.   The Claimant

#### 1.   The Claimant's costs

1815.   The Claimant submits that it incurred USD 7,312,331.31 and EUR 331,042.37 in costs, fees, and expenses in connection with the present arbitration. The Claimant summarises its costs as follows[2167]

| Legal Fees | |
|---|---|
| • King & Spalding | USD 5,565,494.00 |
| • CMS | EUR 296,687.00 |
| Counsel's Costs & Expenses | USD 32,076.47 |
| | EUR 34,355.37 |
| FTI Consulting & Compass Lexecon Fees & Expenses | USD 889,760.84 |

---

[2165]   FTI II, paras. 2.19-2.20.

[2166]   FTI, I, paras. A5.46ff; Finance Agreement between Overseas Private Investment Corporation and ZBE Partners, 9 March 2012 (**C-89**); Loan Agreement between ZBE Partners and International Finance Corporation, 9 March 2012 (**C-90**).

[2167]   CCS, para. 9.

| ICSID Payments | USD 799,980.00 |
| ICSID Lodging Fee | USD 25,000.00 |

### 2.    The Claimant's position on costs

1816.  The Claimant requests that the Tribunal order the Respondent to pay the full expenses incurred by the Claimant in connection with the present arbitration in accordance with Article 61(2) ICSID Convention.[2168]

1817.  Pursuant to that Article, and Article 28(1) of the ICSID Rules, ICSID tribunals enjoy wide discretion as to how they allocate costs between the parties to a dispute. However, ICSID tribunals typically allocate costs based on a number of factors, including, but not limited to, the extent to which a party succeeds on its various claims and arguments, the circumstances of a case, and the conduct of the parties.[2169]

1818.  The Respondent's violation of the ECT necessitated that the Claimant incur the costs of this arbitration in order to obtain just compensation. In addition, the Respondent's conduct increased the complexity and expense of the case, most notably through its Request for Bifurcation regarding the unsuccessful *Achmea* Objection.[2170]

1819.  The Claimant acknowledges that its counsel King & Spalding has been engaged by the Claimant on a success fee basis but submits that it would only seek recovery of King & Spalding's total time investment on the case at normal hourly rates, as would be reflected in the figures provided in the CCS.[2171]

1820.  In the view of the Claimant, the height of its cost submission is reasonable in light of the complexity and duration of the case, the amount in dispute, and the manner in which the Respondent litigated the case.[2172]

---

[2168]    CROMCMOJ, para. 576; CMOM, para. 394; CCS, paras. 4, 6.

[2169]    CCS, para. 3; *Antin* (**CL-40**), para. 744.

[2170]    CROMCMOJ, para. 577; CCS, paras. 6-7.

[2171]    *Ibid.*, para. 9, fn 10.

[2172]    CCS, para. 10.

## B.    The Respondent

### 1.    The Respondent's costs

1821.  The Respondent submits that it incurred a total of EUR 20,199,830 and USD 800,000 in fees and costs. More specifically, the Respondent submits that it incurred the following costs:[2173]

| Legal Fees | |
|---|---:|
| • White & Case | EUR 15,709,552.00 |
| • Tomov & Tomov | EUR 772,799.00 |
| Administrative Costs | EUR 232,134.00 |
| Oxera Consulting LLP | EUR 3,485, 345.00 |
| ICSID Payments | USD 800,000.00 |

### 2.    The Respondent's position on costs

1822.  The Respondent requests that the Claimant be ordered to bear all of its, the Tribunal's, and ICSID's legal fees and expenses in relation to this proceeding in accordance with Article 61(2) ICSID Convention and Article 28(1) of the ICSID Rules.[2174]

1823.  Those Articles, as recognised by "numerous" ICSID tribunals, grant the Tribunal discretion to allocate the costs of the arbitration.[2175] The ECT does not contain any provisions on the allocation of costs.[2176]

1824.  Many investment treaty tribunals have applied the principle that "costs follow the event", *i.e.* that a losing claimant should bear the costs of the proceedings, and that, as

---

[2173]    *Ibid.*, para. 8.

[2174]    RCMOMOJ, para. 504; RROMROJ, paras. 569-570; RSC, para. 2.

[2175]    RSC, paras. 2-5.

[2176]    *Ibid.*, para. 5.

a general principle, the successful party should pay the reasonable legal costs of the unsuccessful party.[2177]

1825. In light thereof, and in a situation, where a tribunal lacks jurisdiction and a claimant's claims are without merit, an award that the Claimant must bear all costs of the defence is fully justified.[2178] In any case, the costs follow the event principle would even support an award of costs in the Respondent's favour if none of the Respondent's objections to jurisdiction, but only its case on the merits were to prevail.[2179]

1826. In the view of the Respondent, the height of its cost submission is reasonable taking into account the length and complexity of the proceedings, involving nine written submissions by the Respondent and four technical reports from the Respondent's expert, the nature of the issues in dispute, and the amount in dispute.[2180]

1827. The present arbitration involved many technically complex factual and legal issues and required analysis of Bulgarian, EU, and international law and of factual issues such as the Claimant's business activities or the development of the ERSA Regime.[2181] The Claimant furthermore (i) left out a lot of context to its claims which then had to be provided by the Respondent, (ii) filed unwarranted and overly broad document production requests of which all the requests that were eventually submitted to the Tribunal were denied, and (iii) amended the reasoning for its claim regarding the Karad PPA during the proceeding.[2182] The Claimant also refrained from referencing and exhibiting documents discussed in its witness statements leaving it to the Respondent to investigate them. In addition, the Claimant introduced complex new expert evidence without prior leave, leading to a supplemental expert briefing after the Hearing.[2183] Finally, the Respondent complains that due to schedule changes its legal team had to complete its Rejoinder during a time that was overlapping with a major hearing in

---

[2177] RCMOMOJ, para. 505; RSC, para. 5.

[2178] RCMOMOJ, para. 506; RSC, paras. 2, 6.

[2179] RSC, paras. 7, 18.

[2180] *Ibid.*, paras. 2, 10, 16.

[2181] *Ibid.*, para. 11

[2182] *Ibid.*, paras. 11, 12.

[2183] *Ibid.*, para. 13.

another case, and as a result it had to expand its legal team and incur associated increased costs.[2184]

1828.  The Respondent further submits that it is not unusual for there to be differences between the costs incurred by parties to a dispute as those parties may face significantly different issues.[2185]

1829.  The Respondent further submits that the Claimant's application for costs should be denied.[2186] Contrary to the Claimant's submission, a request for bifurcation for a jurisdictional objection is not a reason to award costs, especially because the Tribunal's decision to grant the bifurcation request demonstrates that it was warranted.[2187]

1830.  Similarly, additional costs in connection with the submissions on the *Komstroy* Judgment do not automatically fall to the Respondent, even if the renewed *Achmea* Objection were not to succeed, because the Tribunal decided that the objection warranted due consideration in the form of written submissions.[2188]

1831.  Finally, as stated above, much like a full reimbursement of costs were in order if the Respondent prevailed on the merits even if it did not prevail on any of its jurisdictional objections, vice versa the fact that the *Achmea* Objection failed cannot be a reason to award costs to the Claimant.[2189] The Respondent submits that "in a number of other cases where the respondent prevailed on the merits but not on a jurisdictional objection, tribunals nevertheless have ordered the claimant to pay the respondent's costs with only a modest deduction to take into account the outcome on jurisdiction."[2190]

---

[2184]   *Ibid.*, para. 14.

[2185]   *Ibid.*, para. 9.

[2186]   *Ibid.*, para. 2.

[2187]   *Ibid.*, para. 17

[2188]   *Ibid.*, para. 19.

[2189]   *Ibid.*, paras. 7, 18.

[2190]   *Ibid.*, para. 18.

C.    **The Tribunal**

1.    **The Tribunal's and ICSID's costs**

1832.  ICSID reports the following costs for this procedure:

| Arbitrators' fees and expenses (in USD and aggregate) | USD 1,064,722.68 |
|---|---|
| Mr. Jan Ortgies' fees and expenses | USD 179,773.96 |
| ICSID's administrative fees | USD 252,000.00 |
| Direct expenses | USD 106,058.31 |
| **Total** | **USD 1,602,554.95** |

2.    **The Tribunal's decision on costs**

1833.  The ECT does not include any agreement as to how to award costs in an arbitration under Article 26 ECT.

1834.  Article 61(2) ICSID Convention reads

Article 61

…

(2) In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.

1835.  Rule 28 ICSID Arbitration Rules reads

Rule 28

Cost of Proceeding

(1) Without prejudice to the final decision on the payment of the cost of the proceeding, the Tribunal may, unless otherwise agreed by the parties, decide:

(a) at any stage of the proceeding, the portion which each party shall pay, pursuant to Administrative and Financial Regulation 14, of the fees and

536

> expenses of the Tribunal and the charges for the use of the facilities of the Centre;
>
> (b) with respect to any part of the proceeding, that the related costs (as determined by the Secretary-General) shall be borne entirely or in a particular share by one of the parties.

(2) Promptly after the closure of the proceeding, each party shall submit to the Tribunal a statement of costs reasonably incurred or borne by it in the proceeding and the Secretary-General shall submit to the Tribunal an account of all amounts paid by each party to the Centre and of all costs incurred by the Centre for the proceeding. The Tribunal may, before the award has been rendered, request the parties and the Secretary-General to provide additional information concerning the cost of the proceeding.

1836. The Tribunal notes that both Parties agree that the Tribunal has discretion as to how to allocate the costs of the present proceedings.

1837. The Tribunal considers it a well-established principle of international arbitration, and indeed part of the attempt to wipe out all consequences of an unlawful act, that the loser pay the costs of the arbitration unless particular circumstances of the case warrant a different allocation of the costs. After all, had the "loser" immediately paid up, it would have saved the claimant the costs of the arbitration in the first place.

1838. The Tribunal is of the opinion that its decision on cost should be guided by that principle and, accordingly, that the Respondent, in principle, should bear the costs of the claims in which the Claimant prevailed which, in terms of the value of the claim, represent roughly 80% of the original amount claimed.

1839. Nevertheless, the Tribunal also observed some particular circumstances in the way the Claimant and the Respondent made their cases that, if not weighed up by similar shortcomings of the other side, could warrant an adjustment to an allocation on the basis of the principle that the loser pay: on the side of the Respondent, for example, the *Komstroy* Objection was evidently without any chance of succeeding in light of the text of the *Achmea* Decision, and the Respondent's arguments on the 60.4/50 Ratio were time-consuming but had no basis in fact whatsoever. On the side of the Claimant, however, important details presented in relation to the Seven Measures, their introduction, and their functioning, and in relation to actions of its local counsel, were incorrect or left out and the Tribunal agrees with the Respondent that this will have cost the Respondent additional time to react to as it did the Tribunal to understand it.

1840.  Considering the above, the Tribunal therefore finds the following allocation of costs appropriate.

1841.  The Respondent shall bear its own costs (*i.e.* EUR 20,199,830.00), 80% of the costs of the Claimant (*i.e.* EUR 264,833.90 and USD 5,209,865.05),[2191] and 80% of the costs of ICSID and the Tribunal (*i.e.* USD 1,282,043.96).

1842.  As a result, the Respondent shall pay to the Claimants EUR 264,833.90 and USD 5,209,865.05 with respect to the costs of the Claimant, and USD 480,766.49 with respect to the costs of ICSID and the Tribunal, under this header.

## VII.  AWARD

1843.  For the reasons set forth above, the Tribunal, deciding in accordance with the applicable rules of law, grants the following relief by which it:

    a.  REJECTS the Respondent's jurisdictional objections with the exception of the Article 21 Objection regarding the 5% ESSF Contribution;

    b.  FINDS to have jurisdiction over the matter before it with the exception of the claim regarding the 5% ESSF Contribution;

    c.  FINDS that the Respondent has breached the ECT;

    d.  ORDERS the Respondent to pay the Claimant the amount of EUR 61.04 million;

    e.  ORDERS the Respondent to pay the Claimant pre-award interest over that amount running from 31 December 2019 until the date of the Award at the rate of 12m EURIBOR plus 2% as valid on 31 December 2019, to be compounded annually;

    f.  ORDERS the Respondent to pay the Claimant post-Award interest over the awarded amount plus pre-award interest due running from the date of the Award

---

[2191]  These amounts represent 80% of the Claimants' costs summarized at paragraph 1815 of this Award, including the lodging fee (USD 25,000.00) paid by the Claimants to commence the proceeding, but excluding the advances paid to ICSID (USD 799,980.00). The advances paid by the Parties are represented in the costs of ICSID and the Tribunal.

at the rate of 12m EURIBOR plus 2% as valid on the date of the Award, to be compounded annually;

g.   ORDERS the Respondent to bear its own legal costs and expenses;

h.   ORDERS the Respondent to pay to the Claimant the Claimant's legal costs and expenses in the amount of EUR 264,833.90 and USD 5,209,865.05;

i.   ORDERS the Respondent to pay to the Claimant the Claimant's share of the Tribunal's and the Secretariat's fees and expenses in the amount of USD 480,766.49;

j.   DENIES all other claims and prayers of relief sought by the Parties.

Mr. Oscar Garibaldi
Arbitrator

01/02/2024

Professor Pierre Mayer
Arbitrator

01/02/2024

Judge Bruno Simma
President of the Tribunal

01/02/2024