# Exhibit 13

**ICSID**

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

### MATHIAS KRUCK AND OTHERS

### V.

### KINGDOM OF SPAIN

### (ICSID CASE NO. ARB/15/23)

I hereby certify that the attached document is a true copy of the Tribunal's Award dated 6 October 2023.

Martina Polasek
Acting Secretary-General

Washington, D.C., 6 October 2023

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**MATHIAS KRUCK AND OTHERS**

Claimants

and

**KINGDOM OF SPAIN**

Respondent

**ICSID Case No. ARB/15/23**

---

# AWARD

---

***Members of the Tribunal***
Prof. Vaughan Lowe, KC, President
Dr. Michael Pryles AO, PBM, Arbitrator
Prof. Zachary Douglas, KC, Arbitrator

***Secretary of the Tribunal***
Mr. Paul-Jean Le Cannu

*Date of dispatch to the Parties:* 6 October 2023

## REPRESENTATION OF THE PARTIES

*Representing Mathias Kruck and Others*:

Mr. Kenneth R. Fleuriet
Ms. Amy Roebuck Frey
Ms. Héloïse Hervé
King & Spalding
48 bis, rue de Monceau
75008 Paris
France
  and
Mr. Jan K. Schaefer
King & Spalding
TaunusTurm
Taunustor 1
Frankfurt am Main 60310
Germany
  and
Mr. Reginald R. Smith
Mr. Kevin D. Mohr
King & Spalding
1100 Louisiana, Suite 4100
Houston, Texas 77002
U.S.A.
  and
Mr. Christopher S. Smith
King & Spalding
1180 Peachtree St., Suite 1600
Atlanta, Georgia 30309
U.S.A.
  and
Ms. Verónica Romaní Sancho
Ms. Inés Vázquez García
Ms. Inés Puig-Samper
Ms. Cristina Matia Garay
Gómez Acebo & Pombo Abogados
Castellana, 216
28046 Madrid
Spain

*Representing the Kingdom of Spain*:

Ms. María del Socorro Garrido Moreno
Ms. Gabriela Cerdeiras Megias
Mr. Pablo Elena Abad
Ms. María Andres Moreno.
Mr. Javier Castro López
Ms. Lorena Fatás Pérez
Mr. Antolín Fernández Antuña
Mr. Roberto Fernández Castilla
Mr. José Luis Gómara Hernández
Mr. José Manuel Gutiérrez Delgado
Ms. Inés Guzmán Gutiérrez
Ms. Lourdes Martínez de Victoria Gómez
Ms. Mónica Moraleda Saceda
Ms. Amparo Monterrey Sánchez
Ms. Elena Oñoro Sainz
Ms. Almudena Pérez-Zurita Gutiérrez
Ms. Patricia Froehlingsdorf Nicolás
Ms. María José Ruiz Sánchez
Mr. Diego Santacruz Descartin
Mr. Alberto Torró Molés
Mr. Luis Vacas Chalfoun
Abogacía General del Estado
Departamento de Arbitrajes Internacionales
c/ Marqués de la Ensenada, 14-16, 2ª planta
28004 Madrid
Spain

# TABLE OF CONTENTS

I.    BACKGROUND TO THIS AWARD AND PROCEDURAL HISTORY .................1

II.   THE REMIT FROM THE DECISION ON LIABILITY ............................................5

III.  THE PARTIES' SUBMISSIONS AND THE TRIBUNAL'S DECISIONS ...............8

    A.    The Calculation of the Compensation Due ...........................................................9

    B.    Compensation Awarded ....................................................................................15

    C.    Interest Awarded ...............................................................................................18

IV.   COSTS ......................................................................................................................19

    A.    The Claimants' Position ....................................................................................19

        (1)   The Claimants are entitled to an award of costs including all of the costs, fees and expenses incurred in this arbitration .......................................................19

        (2)   The Claimants' costs, fees, and expenses are reasonable ...........................20

    B.    Spain's Position ................................................................................................22

        (1)   Spain is seeking an award of costs, including its legal costs and the costs of the arbitration .........................................................................................22

        (2)   The costs incurred by Spain are reasonable .................................................23

    C.    The Tribunal's Decision On Costs ....................................................................24

V.    DECISION ...............................................................................................................27

**TABLE OF SELECTED ABBREVIATIONS/DEFINED TERMS**

| | |
|---|---|
| AMG III or Third AMG Quantum Report | Supplementary Report in light of the Tribunal's Decision on Jurisdiction, Liability and Quantum Principles dated 14 Sept 2022 by Capgemini engineering and MaC Group, dated 10 February 2023 |
| AMG Response dated 22 March 2023 | MaC Group-Capgemini's Responses to Brattle's Criticisms dated 22 March 2023 |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| Brattle III or Third Brattle Quantum Report | Brattle Memorandum dated 10 February 2023 |
| C-[#] | Claimants' Exhibit |
| Cl. Costs Submission | Claimants' Costs Submission dated 3 May 2023 |
| Cl. Mem. | Claimants' Memorial on the Merits dated 28 July 2016 |
| Cl. Reply | Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction dated 26 April 2017 |
| CL-[#] | Claimants' Legal Authority |
| CPI | Consumer Price Index |
| Decision on Jurisdiction and Admissibility | The Tribunal's Decision on Jurisdiction and Admissibility dated 19 April 2021 (Appendix 1) |
| Decision on Liability | The Tribunal's Decision on Jurisdiction, Liability and Principles of Quantum dated 14 September 2022, together with a Partial Dissenting Opinion by Professor Douglas KC (Appendix 4) |
| DSG Claimants | The first 73 Claimants listed at paragraph 5 of the Decision on Liability, *i.e.* the Tribunal's Decision on Jurisdiction, Liability and Principles of Quantum dated 14 September 2022 (Appendix 4), and paragraph 2 of Decision on Jurisdiction, *i.e.* the Tribunal's Decision on Jurisdiction and Admissibility dated 19 April 2021 (Appendix 1) |
| DSG claims | The claims of the DSG Claimants |
| ECT | Energy Charter Treaty, 17 December 1994 |

| EU | European Union |
|---|---|
| First Brattle Quantum Report | Financial Damages to Investors, prepared by Carlos Lapuerta and Richard Caldwell of the Brattle Group, dated 27 July 2016 |
| First Reconsideration Decision | The Tribunal's 6 December 2021 Decision on the Respondent's Request for Reconsideration of the Tribunal's Decision dated 19 April 2021 (Appendix 2) |
| FIT | Feed-In Tariff |
| Hearing | Hearing on jurisdiction and merits held on 3-7 June 2019 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| New Regulatory Regime | New Regulatory Regime, which was established by a series of measures including RDL 9/2013 (12 July 2013); Law 24/2013 (26 December 2013); RD 413/2014 (6 June 2014), and Ministerial Order IET/1045/2014 (16 June 2014) |
| O&M | Operation and Maintenance |
| OPEX | Operating Expenses |
| PV | Photovoltaic energy |
| R-[#] | Respondent's Exhibit |
| Resp. Costs Submission | Respondent's Costs Submission dated 3 May 2023 |
| RD | Royal Decree |
| RDL | Royal Decree-Law |
| Second AMG Quantum Report | Rebuttal Expert Report, prepared by Grant Greatrex, David Pérez López, Jesús Fernández Salguero, Carlos Montojo González of Altran MaC Group, dated 27 June 2017 |
| Second Brattle Quantum Report | Rebuttal Report: Financial Damages to |

| | Investors, prepared by Carlos Lapuerta and Richard Caldwell of the Brattle Group, dated 26 April 2017 |
|---|---|
| Second Reconsideration Decision | The Tribunal's 25 July 2022 Decision on the Respondent's Request for Reconsideration of the Tribunal's Decision dated 19 April 2021 and the Tribunal's Decision dated 6 December 2021 (Appendix 3) |
| SPV | Special Purpose Vehicle |
| Third Reconsideration Decision | The Tribunal's 22 February 2023 Decision on the Respondent's Request for Reconsideration of the Tribunal Decision dated 14 September 2022 (Appendix 5) |
| Tribunal | Arbitral tribunal constituted on 19 January 2016 |
| TS Claimants | The last 43 Claimants listed at paragraph 2 of the Decision on Jurisdiction and Admissibility, *i.e.* the Tribunal's Decision on Jurisdiction and Admissibility dated 19 April 2021 (Appendix 1) |
| TS claims | The claims of the TS Claimants |
| TVPEE | Tax on the Production Value of Electric Power (created by Law 15/2012 of 27 December 2012, on fiscal measures for energy sustainability) |

## I.    BACKGROUND TO THIS AWARD AND PROCEDURAL HISTORY[1]

1.    This Award is the final stage in the proceedings concerning the DSG Claimants in the case of *Mathias Kruck and Others v. Kingdom of Spain*. It follows on from the Decision on Jurisdiction and Admissibility and from the Decision on Jurisdiction, Liability and Principles of Quantum, and now sets out in the form of an award those earlier Decisions, and the Tribunal's decisions relating to remedies and costs. Those earlier Decisions upheld, in part, the Tribunal's jurisdiction over the claims filed, and the admissibility of those claims. They also found that the Respondent had committed itself to pay the Claimants certain revenues at a rate set out in Spanish law and that the Respondent later amended that rate downwards in breach of that commitment, thus breaching the Claimants' rights under the Energy Charter Treaty ("**ECT**") and entailing an obligation to compensate the Claimants. This Award also sets out the Tribunal's decisions relating to remedies and costs.

2.    In its Decision on Jurisdiction and Admissibility dated 19 April 2021 ("**Decision on Jurisdiction and Admissibility**"), the Tribunal set out its decisions on jurisdiction and admissibility, together with its reasoning and with summaries of the procedural history and the factual background to that case as they stood at the time. The Decision on Jurisdiction and Admissibility is incorporated in this Award by reference. It is attached to this Award as **Appendix 1**.

3.    Paragraph 326 of the Decision on Jurisdiction and Admissibility reads (with some internal cross-references omitted and replaced by brackets '[]',) as follows:

> *VII. DECISION*
>
> *326. For the reasons set forth above, the Tribunal decides as follows:*
>
> *(1)  The jurisdictional objection based upon the relationship between the ECT and EU law is rejected; []*

---

[1] Summaries of the procedural history up to 14 September 2022, the date when the Tribunal's Decision on Jurisdiction, Liability and Principles of Quantum was issued, can be found in paragraphs 7 to 23 of the Decision on Jurisdiction, Liability and Principles of Quantum and paragraphs 16 to 116 of the Decision on Jurisdiction and Admissibility.

> *(2)  The jurisdictional objection based upon the tax carve-out in ECT Article 21 is upheld, and claims brought under ECT Article 10 based on the effect of the TVPEE are outside the jurisdiction of the Tribunal; []*
>
> *(3)  The objection referred to as the multi-party objection is upheld in part, and the Tribunal decides that it will not proceed to determine the merits of the claims of the TS Claimants because they are not part of 'the dispute' that the Respondent agreed to arbitrate; []*
>
> *(4)  The Tribunal will proceed to determine the merits of the claims of the DSG Claimants; []*
>
> *(5)  A written submission may be made by (i) the group of DSG Claimants and (ii) the Respondent, in accordance with paragraphs 242-243 above, each explaining the position specifically in relation to the claims of DSG Claimants; []*
>
> *(6)  The Tribunal will take the necessary steps to proceed with the determination of the remaining questions, including questions bearing upon jurisdiction, relating to the DSG claims; [] and*
>
> *(7)  The question of costs is reserved for decision in the context of its Award. [] .*

4.   Paragraphs 252-253 of the Decision on Jurisdiction and Admissibility identified the remaining questions bearing upon jurisdiction. They read as follows:

> *252. The fact of these investments was not challenged by the Respondent, although their characterization as "Investments" and the possibility of them serving as the basis of a claim in this case was disputed. Those matters are most easily considered along with other substantive questions, and will therefore be addressed later, along with questions of merits and quantum.*
>
> *253. The Tribunal determines, with the reservation in the preceding paragraph concerning the status of their "Investments", that it has jurisdiction* ratione personae *over the DSG Claimants, and can proceed to consider the merits of their claims, subject to the remaining objections to jurisdiction ...*

5.   On 4 June 2021 and 16 July 2021 respectively, the Claimants and the Respondent filed Supplemental Post-Hearing Briefs in order to refocus their submissions upon the framework set out in the Decision on Jurisdiction and Admissibility before the Tribunal proceeded to decide on the merits of the case, as envisaged in that Decision.

6.  On 30 September 2021, the Respondent filed its first Request for Reconsideration of the Tribunal's Decision of 19 April 2021 (the "**First Request for Reconsideration**"). The Claimants filed observations on the Request on 29 October 2021. On 6 December 2021, the Tribunal issued its Decision on the Respondent's Request for Reconsideration ("**First Reconsideration Decision**"), declining to reconsider the Decision on Jurisdiction and Admissibility. The First Reconsideration Decision is incorporated in this Award by reference. It is attached to this Award as **Appendix 2**.

7.  Paragraph 48 of the First Reconsideration Decision reads as follows:

    *For the reasons given above, the Tribunal DECIDES:*

    *(i) That the Judgment of the CJEU in the Komstroy case does not warrant the reopening of the questions addressed and decided in the Tribunal's Decision dated 19 April 2021; and*

    *(ii) That it will not alter its Decision dated 19 April 2021.*

8.  On 21 February 2022, the Respondent filed a Request to admit a recent arbitral decision as new evidence. The Tribunal decided on the Request on 1 March 2021, admitting the decision.[2]

9.  On 24 June 2022, the Respondent filed its second Request for Reconsideration of the Tribunal's Decision dated 19 April 2021 and the Tribunal's Decision dated 6 December 2021 (the "**Second Request for Reconsideration**"). The Claimants filed observations on that Request on 11 July 2022. On 25 July 2022, the Tribunal rejected the Second Request for Reconsideration ("**Second Reconsideration Decision**"). This Second Reconsideration Decision is incorporated in this Award by reference. It is attached to this Award as **Appendix 3.**

10. On 14 September 2022, the Tribunal issued its Decision on Jurisdiction, Liability and Principles of Quantum ("**Decision on Liability**"), together with a Partial Dissenting Opinion by Professor Douglas KC. The Decision on Liability and Partial Dissenting Opinion are incorporated in this Award by reference. They are attached to this Award as **Appendix 4**.

---

[2] *See* Decision on Jurisdiction, Liability and Principles of Quantum, ¶ 18.

11.    The Decision on Liability summarized the Tribunal's decision on liability, which found a breach of the Claimants' rights under the Energy Charter Treaty constituted by the repudiation of the commitment by Spain to maintain the stability of features of the regulatory regime established by RD 661/2007, under which the Claimants' PV facilities were registered. The Decision also set out, in its paragraphs 355 to 365, the principles according to which the amount of compensation due in respect of the breach was to be calculated and invited further submissions from the Parties concerning the calculation of the quantum of damages. The relevant paragraphs are reproduced below for ease of reference.[3]

12.    Before the Parties had made their further submissions the Respondent filed, on 27 December 2022, a Request for Reconsideration of the Tribunal's Decision dated 14 September 2022 (the "**Third Request for Reconsideration**"). After receiving the Claimants' comments on the Third Request for Reconsideration on 31 January 2023, the Tribunal decided to reject it in its **Third Reconsideration Decision**, dated 22 February 2023. This Decision is incorporated in this Award by reference. It is attached to this Award as **Appendix 5**.

13.    The Parties duly made their respective submissions on quantum in the form of expert reports. The Claimants' experts, Brattle, submitted a Memorandum dated 10 February 2023 ("**Brattle III**" or "**Third Brattle Quantum Report**"). The Respondent's experts, MaC Group and Capgemini engineering (formerly known as Altran), submitted their Supplementary Report on the same date ("**AMG III**" or "**Third AMG Quantum Report**") – for consistency with the terminology adopted in earlier Decisions, the Respondent's experts are referred to in this Award as "**AMG**" (Altran MaC Group).

14.    The submissions of 10 February 2023 by the Parties' respective experts each contained criticisms of the approach adopted by the opposing party to the determination of quantum. On 10 March 2023, the Tribunal invited very brief responses to those criticisms. AMG submitted to ICSID a Response dated 22 March 2023 and Brattle submitted a Memorandum dated 29 March 2023. The submissions were exchanged and copied to the Tribunal simultaneously on 29 March 2023.

---

[3] *See* ¶ 19, below.

15.    On 3 May 2023, the Parties submitted their submissions on costs.

16.    On 19 May 2023, having reviewed the Parties' most recent submissions on quantum and noted that they did not break down the damages into amounts payable to each of the DSG Claimants, the Tribunal invited the Claimants to provide by 2 June 2023 a breakdown of the damages claimed for each DSG Claimant, copying the Respondent, which could, if it so wished, comment on the breakdown by 9 June 2023.

17.    On 2 June 2023, the Claimants submitted an updated version of the Brattle damages model, which included a breakdown of the damages claimed for each DSG Claimant. On 9 June 2023, the Respondent submitted some comments from its experts, MaC Group and Capgemini engineering, along with an updated version of the Brattle damages model as modified by them.

18.    On 20 June 2023, the Parties each provided an updated list of their representatives in this proceeding and confirmed that they had not incurred any additional costs since 3 May 2023. On 11 September 2023, the Tribunal declared the proceeding closed.

## II.    THE REMIT FROM THE DECISION ON LIABILITY

19.    Paragraphs 355 to 366 of the Decision on Liability set the background for this final stage in these proceedings, and it will be helpful to set them out in full. They read, with footnotes omitted and internal cross-references marked as '[]', as follows:

> *355. In the present case the breach has been found to be constituted by the repudiation of the commitment by Spain to maintain the stability of features of the regulatory regime established by RD 661/2007, under which the Claimants' PV facilities were registered. Those features were the Feed-In Tariffs for PV plants, fixed and index-linked. Those tariffs were initially applicable for 25 years, with 80% of the tariff payable thereafter for the remainder of the operational life of the facility. That scheme was modified in 2010 by ending the right to 80% of the tariff after 25 years and extending the period for which 100% of the fixed tariff was payable to 28 years and later to 30 years, also capping the number of hours each year for which the tariff was payable.*
>
> *356. It is the repudiation of that pre-determined payment system by the introduction of the New Regulatory Regime in 2014 that constitutes the breach of the DSG Claimants' rights in this case. The Tribunal has decided that 21 June 2014, the date of the completion of the New Regulatory Regime identified by the Claimants, is to be taken as the date*

5

*of that breach. The Tribunal has found no other compensable breach of the DSG Claimant's rights under the ECT.*

*357. It follows that the measure of compensation is in principle the difference between the amount actually paid or payable to the Claimants for their electricity and the amount that would have been paid to the Claimants if key commitments in the regulatory regime under RD 661/2007, on the basis of which they made their investments, had been maintained as represented by the Respondent.*

*358. The investments at the heart of the present case are remarkably homogenous and made in a short period of time. They were made in three PV projects over a matter of months in 2008, and all were registered under the regime established by RD 661/2007. The PV plants still have some years of working life. In these circumstances, the Tribunal sees no reason why the compensation should not be set as an amount corresponding to the difference between the 'actual' tariffs and the RD 661/2007 'But-for' tariffs, calculated as its value on 21 June 2014.*

*359. If the tariffs due under RD 661/2007 had been paid (and continued to be paid) for the requisite period, the Claimants would have had no claim to any further compensation from the Respondent. Any additional effects upon contractual arrangements among the Claimants themselves would have been the result not of commitments made by the Respondent but of commitments made by the Claimants. Accordingly, the Tribunal declines to award any additional compensation in respect of the 'contractual' claims:* i.e., *the claims made in respect of bonus payments that would have been due under management and land rental contracts and the put and call options possessed by the real estate lessors. The approach to compensation adopted here also obviates the need to consider the impact of other factors addressed in the expert reports, including the (non-justiciable) 7% tax, adjustments to OPEX costs, the operational lifetime of plants, and cash collection problems. Similarly, there will be no gross-up for taxes.*

*360. The Tribunal has found that the 2010 modifications did not breach the ECT. It is accordingly the RD 661/2007 regime as modified by the 2010 reforms that is to be applied in calculating the damages due:* i.e., *with the fixed tariff payable for a total period of 30 years, and no fixed tariff payable thereafter, and the total number of hours each year for which the fixed tariff is payable capped in accordance with RDL 14/2010 but with no overall limitation on the rate of return achieved by each PV plant.*

*361. Interest from the date of the breach, 21 June 2014, up to the date of this Decision is payable. The Tribunal considers that as the Claimants incur no element of risk in relation to this payment it is appropriate to use Spain's borrowing rate, and to award compound interest in*

*accordance with what is now the established practice in investment tribunals. It accepts the argument of Claimant's experts that the rate should be 1.16%, based on the average yield on Spanish Government 10-year bonds at June 2016, and compounded on a monthly basis. 'Post-Award interest' is payable on the amount awarded at the same rate, and will be payable from the date of this Decision.*

*362. The Tribunal has studied the expert reports that have been submitted both by the Claimants and by the Respondent in this case, in an attempt to identify the basis for calculating the compensation due. It has not found that figure in those reports; nor has it found data from which that figure can confidently be calculated or approximated. Accordingly, the Tribunal remits this calculation to the Parties and their respective experts, to be made on the basis of the principles set in paragraphs 356-361 above, which the Tribunal has decided will afford appropriate compensation to the DSG Claimants. The Tribunal has decided that the calculation is to be based upon the data that formed the basis of the First Brattle Quantum Report, including the data on MWhs of electricity production, discount rates, and inflation. That data reflects the DSG Claimants' expectations on matters such as electricity production, and has proved to be a reasonable estimate.*

*363. The Parties are requested to consult and to report to the Tribunal within 60 days of the date of this Decision on an agreed sum of compensation payable to each of the 73 DSG Claimants in accordance with the principles set out above, including the interest payable up to the date of this Decision. In the event that the Parties are unable to agree upon such sums, each Party shall within the same 60 days of the date of this Decision submit its own estimate together with a very brief summary of the reasons for its inability to agree with the other Party upon the quantum of compensation due. The Tribunal will determine the amount of compensation payable.*

*364. The Tribunal will then proceed to issue an Award incorporating this Decision and setting out the amount of compensation payable.*

*365. The Parties are requested to submit their respective detailed claims for costs along with the responses pursuant to paragraph 363 above on quantum, within the same 60-day period. They are invited to make brief written submissions on costs, addressing in particular the significance of the dismissal of the TS Claimants claims following the 'multi-party' objection. The Tribunal's decision on costs also will be set out in the Award.*

*IX. DECISION*

*366. For the reasons set forth above, the Tribunal decides as follows:*

> *(1) The Tribunal's earlier decisions on jurisdiction, set out in paragraph 326 (1) to (3) of the Decision on Jurisdiction and Admissibility, are affirmed;*

> *(2) The Tribunal has jurisdiction under the ECT and the ICSID Convention over all of the claims made by the DSG Claimants [];*

> *(3) The issues in dispute are to be decided in accordance with the ECT and applicable rules and principles of international law [];*

> *(4) The Parties are invited to make their final submissions on costs, and the Tribunal will make its decision on costs in the Award, in accordance with paragraph 365 above.*

*The Tribunal decides by a majority as follows:*

> *(5) The Respondent has violated Part III of the ECT with respect to the Claimants' investments, and specifically the Respondent violated the rights of the DSG Claimants under Article 10 of the ECT to fair and equitable treatment by establishing the New Regulatory Regime [];*

> *(6) The Respondent is obliged to make reparation to the DSG Claimants in accordance with the principles stipulated in paragraphs 356-363 of this Decision;*

> *(7) The amount due to the DSG Claimants by way of reparation will be decided by the Tribunal and set out in an Award, in accordance with paragraphs 363 and 364 above.*

20.  This is the Award to which paragraph 366(4) and (7) of the Decision on Liability refers.

## III.  THE PARTIES' SUBMISSIONS AND THE TRIBUNAL'S DECISIONS

21.  We turn to the questions that remain outstanding for decision by the Tribunal, addressing first the question of compensation.

A.    THE CALCULATION OF THE COMPENSATION DUE

22.    While it is unfortunate that the Parties' experts did not succeed in establishing a more fruitful framework for the discussion of the matters on which they disagreed, the Tribunal is grateful for the clarity and concision with which their positions are presented and the points of disagreement between them are identified and explained in their respective reports filed on 10 February 2023. The Tribunal is also grateful to the experts for the provision of Excel models for the calculation of damages by means of toggle switches which allow calculations to be based on a wide range of variants of the initial scenario.

23.    Though both sets of experts provide estimates of the same losses, they have adopted approaches that differ in material details. The main differences are described by the experts in their respective third reports. They include the estimates of the impact of RDL 14/2010 and the cap on hours of operation for which the fixed tariff was payable,[4] and the application of the Consumer Price Index ("**CPI**"),[5] which together account for more than one half of the Claimants' damages claim. Other differences between the experts are explained in their respective reports and in the final submissions exchanged on 29 March 2023.

24.    There are also broader differences in approach, notably the Respondent's focus on isolating the individual impacts of each of the disputed measures and the deduction from the Claimants' damages claim of amounts attributed to measures in respect of which the Tribunal has found no liability.[6] These differences are reflected in the presentation and functionality of the experts' respective models, but once the models have been calibrated so as to apply the same assumptions to each of them there is no significant difference in mathematical models or the results that they produce.[7] The Claimants' model is more readily adaptable to reflect clearly the determinations on liability and the Tribunal has used the Claimants' Excel matrix, and in particular the Brattle DCF Adjust Model in Table S1, for the calculations, changing the toggle switches in the light of its decisions on the submissions of the Respondent and the Claimants. The Tribunal notes that this model, with its toggles adjusted to reflect

---

[4] Brattle III, ¶¶ 44–52; AMG III, ¶¶ 78–81.
[5] Brattle III, ¶¶ 66–73; AMG III, ¶¶ 72–74.
[6] AMG III, ¶¶ 52–54.
[7] AMG III, ¶¶ 53–54.

AMG's position, generates results that are almost identical to AMG's estimate of the compensation due to the Claimants.[8]

25.    In approximate terms, in their February 2023 report the Claimants' experts calculated the amount of compensation due, including pre-award interest, as a minimum of € 17.3m and a maximum of € 21.5m,[9] whereas the Respondent's experts calculated that amount as either € 2.6m[10] or, if certain assumptions made in the Brattle reports were removed, virtually zero.[11] Several of the most significant differences between the experts arise from their different interpretations of the Tribunal's directions in its Decision on Liability.

26.    The calculation of damages in circumstances where actual situations are compared with counter-factual scenarios can never be a precise science: it is always an approximation, based on an informed guess as to what the situation might have been but for the breach that is being compensated. It is nonetheless an exercise quite distinct from the determination of a case *ex aequo et bono*. Determinations *ex aequo et bono* may take into account many more factors than are relevant to a strictly legal determination and give those factors different roles and weights in the calculation of damages. In a strictly legal determination, the range of considerations to be taken into account is circumscribed by law and may exclude factors that could have a significant impact as extenuating circumstances in a particular case. The amount that a tribunal decides upon in an award of damages must be a reflection of the losses that can properly be said to have been caused by the legally relevant factors.

27.    The Parties' respective experts have, as directed, proceeded on the basis that:

    a.    the valuation date and date of breach is 21 June 2014;[12]

    b.    the calculation should be calculated on the basis of the 'Revenue Approach', *i.e.*, the difference between the revenues that the Claimants would have received from the Respondent but for the breach of the ECT and the revenues that have

---

[8] *See* Brattle's Memorandum dated 29 March 2023, fn. 7.
[9] Brattle III, Table 3.
[10] AMG III, Table 1 and ¶ 10.
[11] AMG III, Table 1 and ¶¶ 11, 106–109.
[12] Brattle III, ¶¶ 8, 20; AMG III, ¶ 27.

actually been received and are under the New Regime due to be received by the Claimants;[13]

    c.    no compensation is due for the 'contractual claims', *i.e.*, the claims relating to bonus payments under land rental contracts, and the put and call options;[14]

    d.    the assumed lifetime of the solar plants is thirty years;[15] and

    e.    there is no tax gross-up.[16]

28.    Paragraph 362 of the Decision on Liability stated that "[t]he Tribunal has decided that the calculation is to be based upon the data that formed the basis of the First Brattle Quantum Report."

29.    That Report, dated 27 July 2016, included what is accepted to be a mistaken assumption concerning the rate at which corporate income tax would be applied to the Spanish SPVs. The mistake was corrected in the Second Brattle Quantum Report, dated 26 April 2017.[17] It is accepted by AMG to be the only material difference between the two Brattle Quantum Reports.[18] The Tribunal has proceeded on the basis that this correction, which is not controversial, is made to the First Brattle Quantum Report.

30.    The First Brattle Quantum Report also provided for a longer regulatory lifetime than the thirty years that the Tribunal directed, and the model needs to be adjusted to take that into account.[19]

31.    The Tribunal confirms that along with this adjustment it is necessary to implement the provision in RDL 14/2010 for the elimination of the 20% 'step down' in the FIT rate applicable during years 25 to 30 of the operation of a facility.[20]

32.    Similarly, the handling of compensation for contractual claims needs to be adjusted to reflect its exclusion by the Tribunal (although, as the experts note, the effect is to

---

[13] Brattle III, ¶¶ 24–33; AMG III, ¶ 29. The term 'But For' scenario has a corresponding meaning.
[14] Brattle III, ¶¶ 34–36; AMG III, ¶¶ 65–68. As both Parties note, the effect is to reallocate some of the damages among the DSG Claimants, leaving the overall amount unchanged.
[15] Brattle III, ¶¶ 37–38; AMG III, ¶¶ 69–71.
[16] Brattle III, ¶ 39; AMG III, ¶ 32.
[17] Second Brattle Quantum Report, ¶ 6.
[18] Brattle III, ¶¶ 76–78; AMG III, ¶¶ 61–63. A second correction concerned only the TS Claimants and is not relevant here: *see* Second Brattle Quantum Report, ¶ 6.
[19] Brattle III, ¶¶ 40–41; AMG III, ¶¶ 69–70.
[20] Brattle III, ¶ 42; AMG Response dated 22 March 2023, pp. 2-3.

reallocate some of the damages among the various DSG Claimants, leaving the overall amount unchanged).[21]

33.    The treatment of the cap on the number of hours for which the FIT could be received was a matter on which the experts had different views.[22] The premise upon which the principles of compensation set out by the Tribunal in paragraph 360 of its Decision on Liability were based is that in the 'But For' position RDL 14/2010 had been implemented, but that the New Regulatory Regime had not. Accordingly, both the 'transitional'[23] and 'permanent'[24] caps on hours prescribed by RDL 14/2010 are to be applied in the 'But For' scenario:[25] the transitional cap is to be applied from 1 January 2011 to its planned expiry on 31 December 2013 and the permanent cap is applied thereafter until the end of the 30-year lifetime of the plants.[26]

34.    The Claimants' experts discuss the treatment of the 7% TVPEE tax or 'Generation Levy', which they say was implicitly compensated by a component of the regulated remuneration paid to electricity producers.[27] The Tribunal has already determined that it has no jurisdiction in respect of the tax measures. That follows from ECT Article 21(1), which stipulates that "[e]xcept as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties."[28] The Claimants' experts refer to "Spain's policy choice to neutralise the impact of the 7% Generation Levy on renewable installations" by providing implicitly for compensation,[29] and offer in their Excel model the option of applying this 'Neutralisation Approach' in the 'But For' scenarios. The Tribunal considers, however, that the application of the 'Neutralisation Approach' in the 'But For' scenario would be tantamount to treating it as a right to implicit compensation for the 7% tax, and that Article 21(1) precludes the creation of any such right on the basis of ECT Article 21(1). Accordingly, while the 7% levy was imposed and must therefore

---

[21] AMG III, ¶¶ 65-68.
[22] Brattle III, ¶¶ 44–53; AMG III, ¶¶ 79–81.
[23] RDL 14/2010, Second Transitional Provision (R-073).
[24] RDL 14/2010, First Additional Provision (R-073).
[25] This is the approach described in Brattle III, ¶ 49.
[26] This is described as the 'Brattle' approach: Brattle III, ¶¶ 48–51.
[27] Brattle III, ¶¶ 54–65.
[28] *See* Decision on Jurisdiction, ¶¶ 296–324.
[29] Brattle III, ¶ 64.

appear in the 'actual' scenario, and should be presumed to continue in the 'But For' scenario, no element of 'neutralization' should be built in.

35.     The Tribunal is aware that the result may appear paradoxical. It implies that there are circumstances where, under the ECT, a State is obliged not to reduce payments made to an investor but may achieve much the same effect by imposing taxes in a similar amount. That is, indeed, the implication of this approach; but it is the plain and unavoidable result of the explicit provisions of ECT Article 21, which limit the protections afforded to investors by ECT Articles 10 and 13 against the impact of taxation measures.

36.     The Parties' experts disagree on the manner in which the change in the inflation index effected by RDL 2/2013,[30] from the general CPI to the '**Adjusted CPI**' which excludes energy products, foodstuffs and the effects of tax changes, should be taken into account.[31] The main differences relate to the rates of inflation to be assumed in the 'But For' model, and the expected relationship between the CPI and the Adjusted CPI. The significance of this disagreement is substantial. It leads to a difference between the two sets of experts of over €5 million in their respective assessments of damages.[32]

37.     The Respondent's experts point out that the assumed inflation rates used by the Claimants were not in fact borne out by the actual historical record.[33] Paragraph 358 of the Decision on Liability indicated that the damages payable in this case should be "an amount corresponding to the difference between the 'actual' tariffs and the RD 661/2007 'But-for' tariffs, calculated as its value on 21 June 2014." The calculation does not focus upon actual developments after the valuation date but rather upon a valuation, as at the date of the breach, of the damages due. The Tribunal declines to accept the correction based upon the actual historical data concerning the CPI as proposed by the Respondent.[34]

38.     As far as the relationship between the CPI and the Adjusted CPI is concerned the Tribunal recalls that in paragraph 220 of the Decision on Liability it determined that

---

[30] Royal Decree-Law 2/2013, dated February 1, on urgent measures in the electrical system and the financial sector (C-83).
[31] Brattle III, ¶¶ 66–74; AMG III, ¶¶ 72–74, 86–89. Cf., Second AMG Quantum Report, ¶¶ 200–203.
[32] Brattle III, ¶ 73, and the experts' respective Excel models.
[33] AMG III, ¶¶ 41–42.
[34] AMG III, ¶ 41.

the change in the index was a technical adjustment and not a fundamental change in the compensation framework or a break with the promised regime. It further considers that the record in this case does not establish that the two indices will diverge as the Respondent's experts suggest.

39. For these reasons the Tribunal has decided to follow the analysis proposed by the Claimants' experts in relation to the treatment of the CPI in the assessment of damages.[35]

40. There are two other components of the damages claim to consider: the operations and maintenance ("**O&M**") contract adjustment, and the 'cash collection delay'.

41. The Claimants explain that they were able to negotiate a reduction in the O&M contracts after the introduction of the New Regulatory Regime but assume that they would not have been able to negotiate that reduction had the New Regulatory Regime not been established. The result would have been that 'but for' the New Regulatory Regime, operating costs would have been higher than the actual operating costs. Put another way, it is arguable that in this instance the New Regulatory Regime caused a 'negative loss' – a benefit – to the PV operators, in the form of the reduced operating costs that they were able to negotiate.

42. The Tribunal considered, in paragraph 359 of its Decision on Liability, that the 'lost revenue' approach to damages would obviate the need to consider, *inter alia*, adjustments to OPEX costs, the (actual) operational lifetime of plants, and cash collection problems. That is to say, in broad terms the question could be approached by asking, if the Respondent had paid what it promised to pay, how much more would the Claimants have received than they did receive, all other things being equal? In other words, the focus is on the shortfall in what the Respondent promised, rather than on making good all losses that were arguably consequential upon the Respondent's breach of its obligations under the ECT.

43. The sums received by the Claimants from the Respondent would not have been affected in the 'But For' scenario by variations in their O&M costs. Similarly, the amounts that the Claimants actually spent on O&M costs in the actual scenario have no bearing on

---

[35] Brattle III, ¶¶ 66–72.

how much the Respondent ought to have paid them. For that reason, the O&M contract adjustment is not to be taken into account.

44.    The 'cash collection delay' (or 'end of year distribution') point arises from the Claimants' allegation that the New Regulatory Regime deliberately delayed the payment of the remuneration that PV plants would normally expect to receive each month, with the result that companies needed to retain a higher level of working capital and to delay the ultimate repayment of working capital until the end of the project's life.[36]

45.    The Decision on Liability explained, in paragraphs 355 and 356, that the feature of the New Regulatory Regime that constituted a breach of the Claimants' rights under the ECT was the repudiation of the fixed and index-linked Feed-In tariffs for PV plants. The Tribunal has not decided that the cash collection delays were a part of the breach and it does not regard them as such. No compensation is due for them. It follows that they, too, are not to be taken into account. Put another way, they are to be treated as a constant in both the 'But For' and the actual scenarios.

46.    The Tribunal has considered the submissions of the Parties' experts on other matters, such as the application of the 'haircut' in the earlier Brattle Reports,[37] and estimates of the rate of product and module degradation,[38] and has decided that they are adequately reflected in the Tribunal's other determinations on quantum and do not require any further adjustment to the model for the calculation of damages.

### B.    COMPENSATION AWARDED

47.    The result of these determinations is that the damages payable to the group of DSG Claimants amount to €15,000,000, calculated to one significant place, composed as follows:

---

[36] Brattle III, ¶¶ 31–33.
[37] First Brattle Quantum Report, ¶¶ 109–112; Third AMG Quantum Report, ¶¶ 48–49; AMG Response dated 22 March 2023, p. 2.
[38] AMG III, ¶¶ 38–39.

## Table S2: Damage Summary Jun-2014

| | Past Damage € mln [A] | June 2014 Fair Value of DSG Interest | | Future Damages € mln [D] [C]-[B] | Total Damages € mln [E] [A]+[D] |
| --- | --- | --- | --- | --- | --- |
| | | But For € mln [B] | Actual € mln [C] | | |
| **DSG Damage** | | | | | |
| Total Ownership | -1.3 | 19.7 | 6.0 | -13.8 | -15.0 |
| Total Contractual Interests | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total DSG | -1.3 | 19.7 | 6.0 | -13.8 | -15.0 |

48.     The Tribunal derived this figure from the Brattle DCF Adjust Model, Table S1 in the Third Brattle Quantum Report. The toggles were set as follows:

## Table S1: Scenario Selection

| | |
| --- | --- |
| Lifetime | Tribunal Instruction |
| Remove reduction in remuneration after 25 years | YES |
| Cap on hours in But For | YES |
| Approach | Brattle |
| RDL 14/2010 cap on hours superseded | YES |
| 7% Levy included in Actual | YES |
| 7% Levy included in But For | YES |
| 7% neutralised in But For | NO |
| Adjusted CPI in But For | YES |
| Approach | Brattle |
| O&M contract adjustment | NO |
| Cash collection delay in But For | YES |
| Approach | Brattle |
| Corporate tax rate | Second Brattle Report |
| Include Contractual Arrangements | NO |

16

| Bonus payments | NO |
| Call option | NO |

49.    The Tribunal is satisfied that this sum fairly represents the damages that are due to the Claimants as a result of its previous determinations on merits and liability.

50.    The Third Brattle Quantum Report did not break down the damages into amounts claimed by each of the DSG Claimants.[39] On 19 May 2023 the Tribunal accordingly wrote to counsel for the Claimants, copying counsel for the Respondent, inviting the Claimants to provide such a breakdown by 2 June 2023, or to designate a person or account to receive the total amount of any compensation awarded to the DSG Claimants. The Respondent was invited to comment on the breakdown by 9 June 2023.

51.    The Claimants submitted a breakdown on 2 June 2023, in the form of an additional column (labelled Table S9) in the Brattle DCF Adjust Model in the Third Brattle Quantum Report which could be toggled to calculate the sums due to each individual Claimant. The Respondent submitted its comments, together with an updated version of the Brattle damages model as modified by the Respondent, on 9 June 2023. This updated model reflected the Respondent's approach to the calculation of damages, and the differences between the views of the Parties' respective experts have already been addressed by the Tribunal's decisions set out above and the toggling of the switches in Table S1 in the Third Brattle Quantum Report. The Respondent's comments did not otherwise cast doubt on the proportions in which damages calculated by the Tribunal should be distributed among the various DSG Claimants. Having considered the Respondent's comments the Tribunal decided that it is not necessary to make any adjustment to the proportions of the distribution set out in the Claimants' submission.

52.    Using the toggle settings on Table S1 (Scenario Selection) described above, the breakdown in Table S9 of compensation due as at 21 June 2014 is as follows:

| DSG Claimants 1-20 | Limited Partner Solar Andaluz 1-20 GmbH & Co. KG | 188,834 | each |
| DSG Claimants 21-35 | Limited Partner Solarpark Calasparra 251-265 GmbH & Co. KG | 241,952 | each |

---

[39] The Tribunal had requested, in paragraph 363 of the Decision on Liability, that the Parties "consult and […] report to the Tribunal within 60 days of the date of this Decision on an agreed sum of compensation payable to each of the 73 DSG Claimants …". A breakdown had been included as Table 16 on p. 84 of the Second Brattle Quantum Report, dated 26 April 2017.

17

| DSG Claimants 36-65 | Limited Partner Solarpark Tordesillas 401-430 GmbH & Co. KG | 253,786 | each |
|---|---|---|---|
| Total DSG Claimants damage | | 15,019,540 | |

53.     Other claims were either not entitled to any compensation or were claims made through one or more of DSG Claimants 1-65 and compensated by the compensation awarded to those Claimants. The position is presented in Table S9,[40] which reads in full as follows:

**Table S9: Damages to Particular Claimants**

| Claimant Number | Claimant Name | Ownership or Contractual Interest | Ownership | Harm, without PAI 1000s | Harm, with PAI at Historical Yield 1000s | Harm, with PAI at Fixed 1.16% 1000s |
|---|---|---|---|---|---|---|
| **DSG Claimants** | | | | | | |
| 1-20 | Limited Partner Solar Andaluz 1-20 GmbH & Co. KG | Alcolea | | 188.834 each | 208.106 each | 207.684 each |
| 21-35 | Limited Partner Solarparr Calasparra 251-265 GmbH & Co. KG | Calasparra | | 241.952 each | 266.645 each | 266.104 each |
| 36-65 | Limited Partner Solarparr Tordesillas 401-430 GmbH & Co. KG | Tordesillas | | 253.786 each | 273.687 each | 273.120 each |
| 66 | DSG Deutsche Solargesellschaft mbH | DSG GmbH | | 0 | 0 | 0 |
| 67 | DSG Spanien Verwaltungs GmbH | DSG Spain | | 0 | 0 | 0 |
| 68 | Mathias Kruck | Calasparra | | Claim through LP | Claim through LP | Claim through LP |
| | | DSG Spain | | 0 | 0 | 0 |
| 69 | Joachim Kruck | Alcolea | | Claim through LP | Claim through LP | Claim through LP |
| | | Tordesillas | | Claim through LP | Claim through LP | Claim through LP |
| | | Calasparra | | Claim through LP | Claim through LP | Claim through LP |
| | | Tordesillas | | Claim through LP | Claim through LP | Claim through LP |
| | | DSG GmbH | | Claim through DSG GmbH | Claim through DSG GmbH | Claim through DSG GmbH |
| | | DSG Spain | | 0 | 0 | 0 |
| | | Solar Andaluz Grundstücks S.L. | 25.0% | 0 | 0 | 0 |
| | | Deutsche Solar Iberica Real Estate S.L. | 33.3% | 0 | 0 | 0 |
| 70 | Peter Flachsmann | Alcolea | | Claim through LP | Claim through LP | Claim through LP |
| | | Tordesillas | | Claim through LP | Claim through LP | Claim through LP |
| | | DSG GmbH | | Claim through DSG GmbH | Claim through DSG GmbH | Claim through DSG GmbH |
| | | Solar Andaluz Grundstücks S.L. | 25.0% | 0 | 0 | 0 |
| | | Deutsche Solar Iberica Real Estate S.L. | 33.3% | 0 | 0 | 0 |
| 71 | Ralf Hofmann | Alcolea | | Claim through LP | Claim through LP | Claim through LP |
| | | Calasparra | | Claim through LP | Claim through LP | Claim through LP |
| | | Tordesillas | | Claim through LP | Claim through LP | Claim through LP |
| | | Tordesillas | | Claim through LP | Claim through LP | Claim through LP |
| | | Solar Andaluz Grundstücks S.L. | 25.0% | 0 | 0 | 0 |
| | | Deutsche Solar Iberica Real Estate S.L. | 33.3% | 0 | 0 | 0 |
| 72 | Rolf Schumm | Solar Andaluz Grundstücks S.L. | 12.5% | 0 | 0 | 0 |
| 73 | Frank Schumm | Alcolea | | Claim through LP | Claim through LP | Claim through LP |
| | | Solar Andaluz Grundstücks S.L. | 12.5% | 0 | 0 | 0 |
| | **Total DSG Claimants' Damage** | | | **15,020** | **16,552** | **16,519** |

### C.     INTEREST AWARDED

54.     The question of interest payable was decided in paragraph 361 of the Decision on Liability. There it was said that:

> Interest from the date of the breach, 21 June 2014, up to the date of this Decision is payable. The Tribunal considers that as the Claimants incur no element of risk in relation to this payment it is appropriate to use Spain's borrowing rate, and to award compound interest in accordance with what is now the established practice in investment tribunals. It accepts the argument of Claimant's experts that the rate should be 1.16%, based on the average yield on Spanish Government 10-year bonds at June 2016, and compounded on a monthly basis. 'Post-Award

---

[40] Brattle's updated model of 2 June 2023, Table S9, with the Scenario Selection indicated at paragraph 48 above.

*interest' is payable on the amount awarded at the same rate, and will be payable from the date of this Decision. [footnotes omitted]*

55.    The Tribunal has considered the Parties' submissions on the question of the amount of interest payable, and confirms that it considers the rate of 1.16%, calculated originally by the Claimants' experts on the basis of the yields on Spanish Government bonds, to be a fair and appropriate rate which is to be applied uniformly as a fixed rate to calculate pre- and post-award interest. That calculation is left to be made by the Parties as and when the sums due are paid.

## IV.    COSTS

### A.    THE CLAIMANTS' POSITION

56.    The Claimants seek an award of costs in the amount of € 4,808,928.08 and US$ 625,000, which the Claimants submit include all of the costs, fees, and expenses incurred by the Claimants in this arbitration.[41] They also argue that their costs, fees, and expenses are reasonable.[42]

### (1)    The Claimants are entitled to an award of costs including all of the costs, fees and expenses incurred in this arbitration

57.    The Claimants argue that they are entitled to a full costs award. They contend that the Tribunal enjoys wide discretion to allocate costs between the Parties pursuant to Article 61(2) of the ICSID Convention and ICSID Arbitration Rule 28(1). In exercising their discretion, ICSID tribunals may take into account a variety of factors, including "the extent to which a party has succeeded on its various claims and arguments, as well as the parties' conduct during the proceeding."[43]

58.    The Claimants emphasize that the DSG Claimants have prevailed on both jurisdiction and liability in this arbitration while Spain's primary objection on jurisdiction – the intra-EU objection – has been rejected four times by the Tribunal.[44]

---

[41] Claimants' Costs Submission dated 3 May 2023 ("Cl. Costs Submission"), ¶¶ 2, 12. The Claimants recall that they have consistently requested an award of costs in their submissions. *See* Cl. Costs Submission, fn. 1.
[42] Cl. Costs Submission, ¶ 13.
[43] Cl. Costs Submission, ¶ 3.
[44] Cl. Costs Submission, ¶ 4.

59.    The argument that Spain ought to be awarded costs as a result of its successful "multi-party" objection is without merit. In the Claimants' view, Spain benefitted financially from having to defend itself in one, rather than two, arbitrations.[45] In addition, the Claimants were the ones who suffered from the other side's "gamesmanship."[46] They point to Spain's baseless disqualification proposals against Mr. Born and Prof. Lowe, both of which they argue were designed to postpone the Hearing and generated additional costs.[47]

60.    The Claimants further contend that the cost to Spain of making the "multi-party" objection was necessarily limited: the argument was simple and took up a very small portion of Spain's pleadings.[48] Further, any procedural complications arising out of this objection were "the result of Spain's own efforts",[49] including what the Claimants see as the intentional mischaracterization of the Claimants' identity.[50]

61.    Finally, while Spain is free to argue, as it did, that that two separate arbitrations were preferable to one consolidated proceeding, the Claimants should not be penalized for pursuing a more cost-effective strategy.[51] In fact, the Claimants cannot but wonder whether Spain's objective behind the "multi-party" objection was to increase the Claimants' costs; the uneconomical nature of the second arbitration was precisely what led the TS Claimants to seek its discontinuance.[52]

(2)    **The Claimants' costs, fees, and expenses are reasonable**

62.    The Claimants argue that tribunals take a number of factors to determine the reasonableness of costs, including "the length of the proceeding, the complexity of the case, the amount in dispute, and the efficiency with which a party presents its case."[53] They further argue that the costs, fees, and expenses summarized in the table below "are reasonable in light of the complexity of this case, its duration, and the amount of

---

[45] Cl. Costs Submission, ¶ 5.
[46] Cl. Costs Submission, ¶ 6.
[47] Cl. Costs Submission, ¶ 6.
[48] Cl. Costs Submission, ¶ 7.
[49] Cl. Costs Submission, ¶ 8.
[50] Cl. Costs Submission, ¶ 8.
[51] Cl. Costs Submission, ¶ 9.
[52] Cl. Costs Submission, ¶ 10.
[53] Cl. Costs Submission, ¶ 11.

harm that Spain's violations of the Energy Charter Treaty caused to Claimants' investments."[54]

63.   As noted above, the Claimants request that "the Tribunal order Spain to pay the entirety of costs, fees, and expenses incurred by Claimants in this arbitration, in the amounts of € 4,808,928.08 and US$ 625,000",[55] as detailed in the following table:[56]

| CATEGORY | AMOUNT |
|---|---|
| **Legal Fees** | |
| ▪  King & Spalding | € 1,919,391.00 |
| ▪  Gómez-Acebo & Pombo | € 1,386,853.63 |
| **Expert Fees & Expenses** | |
| ▪  Brattle | € 857,305.36 |
| ▪  Mr. Jaume Margarit | € 40,892.86 |
| ▪  Prof. Dr. Manuel Aragón Reyes | € 66,333.33 |
| **Claimants' Costs & Expenses** | |
| ▪  Law Firms | € 171,174.30 |
| ▪  DSG Claimants | € 366,977.60 |
| ▪  TS Claimants | € 270,827.00 |
| **ICSID Payments**[57] | US$ 625,000.00 |

---

[54] Cl. Costs Submission, ¶ 13.
[55] Cl. Costs Submission, ¶ 14. The Claimants provide further details of their costs, fees, and expenses in Annex A to their submission.
[56] Cl. Costs Submission, ¶ 12.
[57] The figure provided by the Claimants is understood to include the advances on costs made by the Claimants and the fee for lodging the Claimants' Request for Arbitration.

| CATEGORY | AMOUNT |
|---|---|
| **TOTAL AMOUNT** | **€ 4,808,928.08**<br>**plus US$ 625,000.00** |

64. The Claimants also request that Spain be ordered to pay post-award interest on the total amounts provided at paragraph 63, "at a compound rate of interest to be determined by the Tribunal, until the date of Spain's full satisfaction of the award."[58]

### B.  SPAIN'S POSITION

65. Spain is requesting "an award pursuant to Article 61(2) of the ICSID Convention ordering that the Claimants bear the costs of this arbitration, as well as the Respondent's costs for legal representation, in the amount of € 3,140,653.46."[59] Spain argues that these costs are reasonable.[60]

### (1)  Spain is seeking an award of costs, including its legal costs and the costs of the arbitration

66. Like the Claimants, Spain argues that "ICSID tribunals enjoy wide discretion to allocate costs between the parties as they see fit pursuant to Articles 61(2) of the ICSID Convention and 28(1) of the ICSID Arbitration Rules."[61] According to Spain, one of the factors that tribunals take into account when allocating costs is the extent to which a party has succeeded on its claims and arguments.[62] In Spain's view, it has proved in these proceedings that it has fully complied with, and not breached any of, its obligations towards the Claimants and their investments.[63] As a result, Spain should not bear the costs of its defense in this arbitration.[64] Rather, the Tribunal should order the Claimants to pay the Respondent its full legal and arbitration costs, that is

---

[58] Cl. Costs Submission, ¶ 15.
[59] Respondent's Submission on Costs dated 3 May 2023 ("Resp. Costs Submission"), ¶ 1.
[60] Resp. Costs Submission, ¶ 8.
[61] Resp. Costs Submission, ¶ 2.
[62] Resp. Costs Submission, ¶ 4.
[63] Resp. Costs Submission, ¶ 4.
[64] Resp. Costs Submission, ¶ 5.

€ 3,140,653.46,[65] "plus a reasonable rate of interest from the date on which these costs are incurred until the date of their actual payment."[66]

67.  As an alternative argument, Spain submits that it should not be ordered to pay the Claimants' legal costs, even if the Claimants' claims are upheld, on the ground that "the case involved a number of challenging procedural and legal issues, which the Respondent addressed with professional and effective advocacy."[67]

68.  In the event that the Tribunal were to award the Claimants their legal costs, these should be limited to "costs that are i) reasonable and ii) incurred in connection with this arbitration."[68] Spain reserves its right to seek leave to file a submission on the Claimants' statement of costs, in particular "on the justification, reasonability and connection with the arbitration of such costs",[69] and to claim costs arising out of its additional submission, if any.[70]

### (2)  The costs incurred by Spain are reasonable

69.  Spain argues that the costs it is claiming are "reasonable in light of the complexity of this case, its duration, and the amount of time and efforts that the Kingdom of Spain has devoted to a dispute it should have never faced."[71] These costs are summarized in the table below.[72]

---

[65] Resp. Costs Submission, ¶¶ 5, 17.
[66] Resp. Costs Submission, ¶ 5.
[67] Resp. Costs Submission, ¶ 6.
[68] Resp. Costs Submission, ¶ 7.
[69] Resp. Costs Submission, ¶ 7.
[70] Resp. Costs Submission, ¶ 19.
[71] Resp. Costs Submission, ¶ 8.
[72] These amounts are listed in paragraphs 9-16 of the Respondent's Costs Submission.

| CATEGORY | AMOUNT |
|---|---|
| Advances on costs paid to ICSID[73] | € 545,472.53 |
| Expert Reports | € 634,040.00 |
| Translations | € 31,053.54 |
| Courier | € 3,352.14 |
| Editing Services | € 30,750.98 |
| Travelling Expenses | € 34,484.27 |
| Legal Fees | € 1,861,500.00 |
| **TOTAL AMOUNT** | **€ 3,140,653.46** |

70.    As noted above, Spain further requests that the Claimants pay "a reasonable rate of interest from the date on which these costs are incurred until the date of their actual payment."[74]

### C.    THE TRIBUNAL'S DECISION ON COSTS

71.    The costs of the arbitration, including the fees and expenses of the Tribunal, ICSID's administrative fees and direct expenses, amount (in US$) to:

| | |
|---|---|
| Arbitrators' fees and expenses | US$ 520,890.97 |
| ▪ Professor Vaughan Lowe KC | US$ 219,733.24 |
| ▪ Dr. Michael Pryles AO, PBM | US$ 117,912.56 |
| ▪ Professor Zachary Douglas KC | US$ 165,170.17 |
| ▪ Mr. Gary Born | US$ 18,075.00 |

---

[73] Spain states that it "has made the Advance on Costs to the SCC following the requests made by ICSID since the commencement of this arbitration. This advance amounts to EUR 545.472,53."  (Resp. Costs Submission, ¶ 9.) As noted below in footnote 76, ICSID's records indicate that the total amount in US dollars of the advances received from Spain is US$ 599,748.00.

[74] Resp. Costs Submission, ¶ 5.

| | |
|---|---|
| ICSID's administrative fees | US$ 316,000.00 |
| Direct expenses | US$ 246,948.13 |
| **Total**[75] | **US$ 1,083,839.10** |

72.   The above costs have been paid out of the advances made by the Parties in equal shares.[76] In addition, the Tribunal notes that the Claimants paid the US$ 25,000 fee for lodging the Request for Arbitration.[77]

73.   Article 61(2) of the ICSID Convention provides:

> *In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*

74.   The Parties are agreed that the Tribunal has a broad discretion with respect to the allocation of costs. They also agree that one relevant factor is the extent to which a party has succeeded on its claims and arguments.

75.   In the present case, the Tribunal does not doubt that the claims of the DSG and the TS Claimants were brought in good faith, and equally that the Respondent defended a position that it sincerely believed to be compatible with its obligations under the ECT.

76.   In relation to the dismissal of the TS claims, the Tribunal notes that the procedural issues were not previously so widely understood that the initiation of the case combining the TS claims and the DSG claims should be regarded as abusive. It also accepts that while the result of the dismissal of the TS claims was that both the Claimants (*i.e.*, the TS and the DSG claimants together) and the Respondent almost

---

[75] The ICSID Secretariat will separately provide the Parties with a detailed financial statement of the case trust fund.
[76] The advance paid by the Claimants amounts to US$ 599,960.00 and that paid by the Respondent amounts to US$ 599,748.00. The outstanding balance will be reimbursed to the Parties in proportion to the advance payments that they have made to ICSID.
[77] See footnote 57 above.

certainly had to bear some costs that would have been unnecessary had the DSG claims alone been pursued, it may well also be the case that the cost of the combined TS and DSG claims would have been less than that of two separate actions, one in respect of the TS claims and the other in respect of the DSG claims.

77.    The repeated attempts made by the Respondent to raise the intra-EU (*Achmea*) objection are viewed by the Tribunal against the background of developments in EU law that triggered them. The Tribunal also acknowledges the right of parties to challenge arbitrators and arbitral procedure and considers that only the clearest evidence can support a view that any such challenge is an improper procedural move.

78.    Considering the conduct of the proceedings in the present case in the light of these principles, the Tribunal considers that both the Claimants and the Respondent have pursued their cases reasonably.

79.    The Tribunal wishes to make a general observation. In this case, as in most others, the expert reports on quantum were filed on the basis of suppositions concerning liability that reflected the Claimants' case but were not entirely sustained by the Tribunal. The almost inevitable result was that the quantum reports were of limited utility to the Tribunal in approaching the determination of the exact amount due by way of damages. The Tribunal strongly commends the practice of preparing initial submissions on quantum on the basis of very approximate estimates of the losses sustained, such as might be necessary for meaningful attempts to resolve the dispute by negotiation, and only to proceed to detailed forensic presentations on precise amounts claimed once the basis and limits of liability have been established. Such a bifurcation of the merits and of the detailed consideration of quantum is generally in the interests of parties and tribunals alike.

80.    In its Decision on Jurisdiction and Admissibility, the Tribunal decided that it would not proceed to determine the merits of the claims filed on behalf of the TS Claimants because they were not part of 'the dispute' that the Respondent agreed to arbitrate. The DSG Claimants have succeeded in respect of approximately three fifths of the amount of their initial claim.[78] Their unsuccessful claims were denied on several different

---

[78] *See* Cl. Mem., ¶ 512; First Brattle Quantum Report, Table 23. Cf., Cl. Reply, ¶ 612; Second Brattle Quantum Report, ¶ 34; Third Brattle Quantum Report, ¶ 86.

grounds, including jurisdictional grounds (in respect of the 7% tax claims), merits grounds (allegations that pre-2013 measures violated their rights under the ECT), and some consequential grounds concerning the precise calculation of the damages due.

81.     The Tribunal has accordingly decided that the Respondent should pay its own costs and its share of the costs of the Tribunal, and should pay to the Claimants three-fifths of the Claimants' costs (including the Claimants' contribution to the costs of the Tribunal), *i.e.*, € 2,885,356.85 [79] plus US$ 340,151.73. [80] The Tribunal is satisfied that these amounts fairly take into account both the decision to decline jurisdiction in respect of the TS Claimants' claims and the partial success of the DSG Claimants. Interest on those sums is payable at a rate of 1.16% as from the date of this Award.

## V.    DECISION

82.     For these reasons, the Tribunal hereby decides:

(i)      To reaffirm its Decision on Jurisdiction and Admissibility dated 19 April 2021 and its Decision on Jurisdiction, Liability and Principles of Quantum dated 14 September 2022, together with the three Decisions on the Requests for Reconsideration, respectively dated 6 December 2021, 25 July 2022 and 22 February 2023,[81] and to incorporate all of those Decisions in this Award;

(ii)     by a majority,[82] that the Respondent has violated Part III of the ECT with respect to the Claimants' investments, and specifically the Respondent violated

---

[79] 4,808,928.08 x 3/5.

[80] (541,919.55 [expended portion of the Claimants' share of the advance on costs] + 25,000.00 [lodging fee]) x 3/5.

[81] *See* ¶¶ 2, 6, 9, 10 and 12, above.

[82] Arbitrator Douglas has previously filed a dissenting opinion on liability and the principles of quantum. In summary: he considers that the fair and equitable treatment standard in general, and the concept of legitimate expectations in particular, is a fault-based standard of liability. For liability to be established for a breach of legitimate expectations that means that, in addition to a breach of an objectively ascertained legitimate expectation, there must be a failure to give appropriate weight to the competing public and private interests at stake (through the analytical lens of proportionality), as would be the approach in comparative public law and in European law. This approach is mandated because the source of the expectations in this case is a general public regulation and not a private law contract and each legal institution engenders different expectations. If liability were to be found on this approach, then damages would be quantified on the basis of the difference between a proportionate modification to the subsidy regime in light of the relevant public interest factors and the actual modification held to be disproportionate. The question of whether the Claimants continued to earn a reasonable rate of return would, on this approach, be relevant to an assessment of both the proportionality of the modification (liability) and any compensation that might flow from a breach. Arbitrator Douglas thus dissents from the majority's strict-liability

the rights of the DSG Claimants under Article 10 of the ECT to fair and equitable treatment by establishing the New Regulatory Regime;

(iii)    That amount due to the group of DSG Claimants by way of reparation is € 15,019,540, and that interest on that sum is payable as from 21 June 2014 at a rate of 1.16%, in accordance with paragraphs 54 and 55 above; and

(iv)    That the Respondent should pay its own costs and contribution to the costs of the Tribunal, and should pay to the Claimants three-fifths of the Claimants' costs (including the Claimants' contribution to the costs of the Tribunal), *i.e.*, € 2,885,356.85 plus US$ 340,151.73, with interest on those sums payable at a rate of 1.16% as from the date of this Award.

---

approach to a breach of legitimate expectations and the contractual model for damages applied to it (*i.e.* by putting the Claimants in the position as if the public regulation had been fully "performed" without any modification). He nevertheless joins the majority in respect of the specific calculations made in this Award on the premise that the majority's findings of liability and the principles of quantum are correct.

28

_____          _____

Dr. Michael Pryles AO, PBM                    Prof. Zachary Douglas, KC
Arbitrator                                              Arbitrator

Date: 14 September 2023                    Date:

_____

Prof. Vaughan Lowe, KC
President of the Tribunal

Date:

_____          _____
    Dr. Michael Pryles AO, PBM                  Prof. Zachary Douglas, KC
            Arbitrator                                          Arbitrator

Date:                                              Date:




_____
    Prof. Vaughan Lowe, KC
    President of the Tribunal

Date:  15ᵗ September 2023

_____
Dr. Michael Pryles AO, PBM
Arbitrator

Date:

_____
Prof. Zachary Douglas, KC
Arbitrator

Date:    18.9.2023

_____
Prof. Vaughan Lowe, KC
President of the Tribunal

Date:

29