# Exhibit 16

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

ICSID Case No. ARB/17/14

**ROCKHOPPER EXPLORATION PLC, ROCKHOPPER ITALIA S.P.A. AND ROCKHOPPER MEDITERRANEAN LTD V. ITALIAN REPUBLIC**

---

**FINAL AWARD**

---

23 August 2022

Tribunal:
Pierre-Marie Dupuy (Appointed by the State)
Charles H. Poncet (Appointed by the investor)
Klaus Reichert (President)

View the document on jusmundi.com

Table of Contents

Final Award .................................................................................................................................... 0

TABLE OF SELECTED ABBREVIATIONS/DEFINED TERMS ................................................. 1

I. INTRODUCTION AND PARTIES .......................................................................................... 3

II. PROCEDURAL HISTORY ..................................................................................................... 5

III. THE PARTIES' REQUESTS FOR RELIEF ........................................................................ 15

A. Claimants' Request for Relief .......................................................................................... 15

B. Respondent's Request for Relief ...................................................................................... 16

IV. FACTUAL BACKGROUND ............................................................................................... 17

A. Introduction ...................................................................................................................... 17

B. The rejection in January 2016 by the Respondent of the Claimants' application for a production permit for the Ombrina Mare area .................................................................................................................. 19

C. The content of the relevant Italian law which was in force at the time of the rejection by the Respondent of the Claimants' application ........................................................................................................ 21

D. The rationale for the change in law in late 2015 ............................................................. 27

E. The third Claimant's purchase in 2014 of the other Claimants .................................... 32

F. The events which occurred in relation to the Claimants' application between the time of the investment and the final rejection in January 2016 ........................................................................................... 34

G. Overall conclusions & summary ..................................................................................... 52

V. JURISDICTION ..................................................................................................................... 52

A. The Fork-in-the-Road Principle Should Apply Under ECT Article 26(3)(b)(i) ............ 53

(a) The Parties' Positions .................................................................................................. 53

1. Respondent's Position ................................................................................................ 53

2. Claimants' Position .................................................................................................... 55

(b) The Tribunal's Analysis .............................................................................................. 56

VI. LIABILITY ........................................................................................................................... 56

A. Breach of ECT Article 13 Through Unlawful Expropriation .......................................... 56

(a) The Parties' Positions .................................................................................................. 57

1. Claimants' Position .................................................................................................... 57

2. Respondent's Position ................................................................................................ 58

(b) The Tribunal's Analysis .............................................................................................. 59

VII. QUANTUM .......................................................................................................................... 62

A. Standard of Compensation .............................................................................................. 62

B. Causation and Burden ...................................................................................................... 63

C. VAluation Date ................................................................................................................. 63

D. Valuations of Ombrina Mare .......................................................................................... 64

(a) The DCF Method .......................................................................................................... 64

1. Claimants' position .................................................................................................... 65

2. Respondent's position ................................................................................................ 67

(b) Market-Based Approach .............................................................................................. 69

1. Respondent's Position ................................................................................................ 69

2. Claimants' Position .................................................................................................... 70

(c) Other Valuations .......................................................................................................... 72

1. Sunk Costs .................................................................................................................. 72

Table of Contents

   2. Prior Valuations.................................................................................................................73

E. Taxation.................................................................................................................................74

F. The Tribunal's Analysis.........................................................................................................75

G. Other Costs...........................................................................................................................77

 (a) Additional Historical Pre-Development Costs...................................................................77

 (b) Decommissioning Costs.....................................................................................................77

H. Interest..................................................................................................................................78

 (a) Pre- and Post-Award Interest............................................................................................78

 (b) Simple or Compound Interest...........................................................................................79

 (c) Rate of Interest..................................................................................................................80

 (d) Past Practice in Rate of Interest........................................................................................81

 (e) The Tribunal's Determination on Rate of Interest............................................................81

I. Conclusion on Quantum.........................................................................................................83

VIII. COSTS...............................................................................................................................83

A. Claimants' Cost Submissions...............................................................................................83

B. Respondent's Cost Submissions............................................................................................84

C. The Tribunal's Decision on Costs.........................................................................................84

IX. AWARD................................................................................................................................86

Final Award

## Table of Selected Abbreviations/Defined Terms

| | |
|---|---|
| AIA | Integrated Environmental Authorisation (*Autorizazzione Integrata Ambientale*) |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| ECT | Energy Charter Treaty |
| C-[#] | Claimants' Exhibit |
| CJEU | Court of Justice of the European Union |
| Cl. Memorial on Jurisdiction, Liability, and Quantum or Memorial | Claimants' Memorial on Jurisdiction, Liability, and Quantum dated 22 December 2017 |
| Cl. Observations on *Vattenfall* | Claimants' Observations on the *Vattenfall* Tribunal Decision on the *Achmea* Issue dated 4 October 2018 |
| Cl. PHB on the Declaration | Claimants' Post Hearing Brief dated 4 March 2019 |
| Cl. PHB | Claimants' Post-Hearing Brief dated 11 October 2019 |
| Cl. Rejoinder on the Intra-EU Jurisdictional Objection | Claimants' Rejoinder on Respondent's Objections to Jurisdiction under Article 41(1) of the Arbitration Rules dated 1 June 2018 |
| Cl. Reply Memorial | Claimants' Reply Memorial on Jurisdiction, Liability, and Quantum dated 24 October 2018 |
| Cl. Response on the Intra-EU Jurisdictional Objection | Claimants' Response on Respondent's Objections to Jurisdiction under Article 41(1) of the Arbitration Rules dated 4 May 2018 |
| CL-[#] | Claimants' Legal Authority |
| Declaration | Declaration of the Representatives of the Governments of the Member States, of 15 January 2019 on the Legal Consequences of the Court of Justice |

|  | in *Achmea* and on Investment Protection in the European Union |
|---|---|
| EIA | Environmental Impact Assessment |
| Hearing | Hearing on Jurisdiction and Merits held from 4 to 8 February 2019 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, which entered into force on 14 October 1966 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| Medoilgas Italia | Medoilgas Italia S.p.A. (formerly, Intergas Più S.r.L.), MOG's wholly owned subsidiary |
| MOG | Mediterranean Oil and Gas Plc |
| October Hearing | Hearing on Post-Hearing Briefs held in Paris on 30 October 2019 |
| R-[#] | Respondent's Exhibit |
| Request for Arbitration | Request for Arbitration dated 14 April 2017 |
| Resp. Counter-Memorial | Respondent's Counter-Memorial dated 15 May 2018 |
| Resp. Intra-EU Jurisdictional Objection | Respondent's Objection to Jurisdiction under Article 41(1) of the Arbitration Rules dated 28 March 2018 |
| Resp. Observations on *Vattenfall* | Respondent's Observations on the *Vattenfall* Tribunal Decision on the *Achmea* Issue dated 4 October 2018 |
| Resp. Observations on *Masdar* | Respondent's Brief Commentary over *Masdar* and the Relevance of *Achmea* Decision over the current proceedings dated 11 June 2018 |
| Resp. PHB on the Declaration | Respondent's Post Hearing Brief dated 28 February 2019 |
| Resp. PHB | Respondent's Post-Hearing Brief dated 11 October 2019 |
| Resp. Rejoinder | Respondent's Rejoinder dated 9 January 2019 |
| Resp. Reply on the Intra-EU Jurisdictional Objection | Respondent's Reply on Objections to Jurisdiction under Article 41(1) of the Arbitration Rules dated 25 May 2018 |
| Request for Termination | Respondent's Request for Termination of the Proceedings dated 29 January 2019 |

| RL-[#] | Respondent's Legal Authority |
| Tr. Day [#], [page:line] | Transcript of the Hearing |
| Tribunal | Arbitral Tribunal constituted on 26 September 2017 |
| VCLT | Vienna Convention on the Law of Treaties |

# I. INTRODUCTION AND PARTIES

1.  This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("ICSID" or the "Centre") on the basis of the Energy Charter Treaty, which entered into force on 16 April 1998 (the "ECT") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "ICSID Convention").

2.  The Claimants are Rockhopper Italia S.p.A., a company incorporated under the laws of the Italian Republic, Rockhopper Mediterranean Ltd, a company incorporated under the laws of the United Kingdom, and Rockhopper Exploration Plc, a company incorporated under the laws of the United Kingdom (together, "Rockhopper" or the "Claimants"). There is a more detailed discussion later on in this Award concerning the Claimants and their respective roles in relation to the investment at the heart of this dispute. [1]

3.  The Respondent is the Italian Republic ("Italy" or the "Respondent").

4.  The Claimants and the Respondent are collectively referred to as the "Parties." The Parties' representatives and their addresses are listed above on page (i).

5.  This arbitration concerns the Claimants' claims for compensation arising from, they say, Italy's alleged violations of the ECT in respect of their investments in the putative *Ombrina Mare* oil and gas field located off the Italian coast in the Adriatic Sea. The Tribunal wishes to record, at the outset, that this arbitration is not, nor has it been concerned with whether or not the *Ombrina Mare* oil and gas field should have actually proceeded to a production stage from the completed exploration stage. Put another way, the Tribunal has not been asked to direct that such production should go ahead (and it will return briefly to that point just below). The sole and key matter for the Tribunal to decide is whether or not the Claimants are entitled to compensation pursuant to international law (as a matter of the ECT) for certain actions of Italy. Further, the Tribunal is also at pains to say that any such compensation could only arise, under international law, if the sovereign promises and actions of Italy triggered such rights on the part of the Claimants.

6.  The *Ombrina Mare* oil and gas field did not proceed to production, and as is clear from the record of this case and the discussion later on in this Award, this came about because Italy decided to pass a law in late 2015 which banned offshore production within a certain distance of Italian shores.

---

[1] *See* ¶ 94 below.

That was a sovereign decision made by Italy and the Tribunal indicates at the very outset that it should not be taken in any way to either criticize or deprecate that decision from either a political or environmental standpoint. Italy's sovereign choice to proscribe such offshore production, based on its own inherent authority and dignity, was its to make. However, that sovereign choice or act or decision (the label is not important) of Italy may carry with it a concomitant consequence to pay certain compensation pursuant to internationally-binding promises it made to foreign investors arising from its being a party to the ECT at the material time.

7. The Claimants have never sought, through this arbitration, to overturn that ban and force Italy to permit oil production in *Ombrina Mare.* The Tribunal makes no comment, nor should any be inferred, that such a remedy would be available to an ECT claimant; rather, their prayers for relief or claims are solely directed towards the securing of internationally-mandated compensation. In essence, the gravamen of the Claimants' case is that Italy's decision to impose the ban it did in late 2015 on offshore production came with a monetary price as a matter of the ECT. That monetary price, according to the Claimants, arises from Italy's own sovereign choices, first, in its choice to sign and ratify the ECT, and, secondly, in its choice to deprive the investors of their investment without an offer of compensation.

8. As already noted, offshore production in *Ombrina Mare* will not take place, but the choice of Italy to bring about that circumstance is something which, the Claimants say, engages international responsibility in damages. This, they argue, is <u>not</u> because Italy was somehow wrong, or not entitled (in a general sense), to regulate its territorial waters; rather because the extent of the prior interaction between Italy and the Claimants gave rise to internationally-protected rights of a specific nature, and the negation of these in late 2015 <u>without</u> (and this is critical) subsequent prompt payment of compensation, triggers claims under the ECT. The Claimants seek nothing above and beyond that which they say was promised to them as foreign investors, namely, a certain level of international protection and treatment under the ECT (an international treaty entered into by Italy).

9. As is set out below, Italy denies the Claimants' case in full.

10. The Tribunal appreciates and is acutely sensitive to the fact that there are strongly-held environmental, civic and political views about offshore production in *Ombrina Mare*. However, the outcome of this case passes no judgment whatsoever on the legitimacy or validity of those views. In particular, the Tribunal is at pains to point out that this award is not a "victory" for one side or the other in that environmental debate, which is of a civic or political character, but rather addresses the legal issue at hand, namely, whether compensation is due to a foreign investor in respect of its investment, based on specific international criteria as contained in a treaty to which Italy was, at the material time, a contracting party. As is discussed and analysed later in this Award, the material factual circumstances which have led to the final result of this arbitration are both specific and discrete from the environmental considerations which have been argued before the Tribunal.

11. By way of further introductory comment, the Tribunal is very careful in observing its mandate to fairly adjudicate upon the international rights (and only those rights) conferred by treaty upon foreign investors in Italy. Those substantive rights are the basis for the outcome of this case. More particularly, those substantive rights do not arise solely because this dispute has been adjudicated upon by an international tribunal rather than a domestic court. The Tribunal has not evolved or

pronounced upon anything other than the substantive rights promised to foreign investors by Italy in the ECT. The fact that the ECT gives foreign investors the option of ICSID arbitration for the purposes of seeking to vindicate their substantive rights (insofar as they might be found to have any) does not add or subtract from the content of such rights in any way. The Tribunal has sought to assiduously refrain from any form of "legislating" by its reasoning and final decision, and trusts that the Award will be read in that spirit.

12.    This Award is arranged as follows: Procedural History (Section II) ; The Parties' requests for relief (Section III); Factual Background (Section IV); Jurisdiction (Section V); Liability (Section VI); Quantum (Section VII); Costs (Section VIII); and Award (Section IX).

# II. PROCEDURAL HISTORY

13.    On 14 April 2017, ICSID received a request for arbitration from the Claimants against Italy (the "**Request for Arbitration**") together with Exhibits C-0001 to C-0011 and Legal Authorities CL-0001 to CL-0008, filed under the ECT and the ICSID Convention. On 5 May 2017, the Centre sent a communication to the Claimants with some questions regarding the Request for Arbitration. On 12 May 2017, the Claimants responded to the Centre's questions together with Exhibits C-0012 to C-0021.

14.    On 19 May 2017, the Secretary-General of ICSID registered the Request for Arbitration in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

15.    The Parties agreed to constitute the Tribunal in accordance with Article 37(2)(a) of the ICSID Convention as follows: the Tribunal would consist of three arbitrators, one to be appointed by each Party, and the third and presiding arbitrator to be appointed by agreement of the two co-arbitrators.

16.    On 26 September 2016, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. The Tribunal is composed of Mr. Klaus Reichert SC, a national of Germany and Ireland, President, appointed by his co-arbitrators in consultation with the Parties; Dr. Charles Poncet, a national of Switzerland, appointed by the Claimants; and Prof. Pierre-Marie Dupuy, a national of France, appointed by the Respondent. Ms. Marisa Planells-Valero, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

17.    In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 22 November 2017 by teleconference.

18.    Following the first session, on 8 December 2017, the Tribunal issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters. Procedural Order No. 1 provides,

*inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural language would be English, and set out, in Annex A, a schedule for the written and oral phase of the proceedings, with the Hearing on Jurisdiction, Merits and Quantum (the "**Hearing**") scheduled to take place from 4 to 8 February 2019, in Paris (France).

19. On 22 December 2017, pursuant to the procedural calendar in Annex A to Procedural Order No. 1, the Claimants submitted their Memorial on Jurisdiction, Liability and Quantum ("**Cl. Memorial on Jurisdiction, Liability and Quantum**"), together with Exhibits C-0022 to C-0145; Legal Authorities CL-0009 to CL-0119; witness statements from Ms. Fiona MacAulay, Mr. Roberto Leccese, Mr. Samuel Moody, and Mr. Stewart MacDonald; and expert reports from Richard Boulton and Mr. Peter Velez.

20. On 28 March 2018, the Respondent submitted an Objection to Jurisdiction under Article 41(1) of the Arbitration Rules and a Request for Bifurcation of the proceedings together with Legal Authorities RL-001 to RL-011 (the "**Resp. Intra-EU Jurisdictional Objection**" and "**Request for Bifurcation**"). The Respondent's objection was that the ECT and the ICSID Convention could not provide jurisdiction between nationals of one European Union ("**EU**") Member State and another EU Member State. By separate communication of that same date, the Respondent also requested a 3-month extension for the filing of its Counter-Memorial, originally due on 13 April 2018 (the "**Request for Extension**").

21. On 3 April 2018, the Claimants submitted observations to the Respondent's Request for Bifurcation ("**Cl. Resp. to Request for Bifurcation**") together with Exhibits C-146 to C-152 and Legal Authority CL-120, and on the Respondent's Request for Extension. On 9 April 2018, the Respondent submitted comments on the Claimants' observations of 3 April 2018 together with Legal Authorities RL-011 to RL-017.

22. On 10 April 2018, the Tribunal granted a 30-day extension of the deadline for the Respondent's Counter-Memorial and invited the Parties to collaborate on a revised timetable and revert to the Tribunal with an agreed schedule.

23. On 19 April 2018, the Centre received a communication from the Respondent dated 12 April 2018, which the Centre transmitted to the Tribunal on that same date. By this communication, the Respondent requested that the Tribunal reconsider its decision to grant a 30-day extension for the submission of its Counter-Memorial. The Respondent also informed the Tribunal that it had received notice on 10 April 2018 that the European Commission (the "**EC**") would be applying to intervene in this proceeding and file observations on the Judgment of the Court of Justice of the EU (the "**CJEU**") in *Slovak Republic v. Achmea B.V.* (Case C-284/16) [2] (the "***Achmea* Judgment**"). According to the Respondent, this new development supported the need for a bifurcation of the proceeding and for the scheduling of a procedural calendar on the Intra-EU Jurisdictional Objection only.

24. On 19 April 2018, the Tribunal informed the Parties that, after considering their arguments on the Request for Bifurcation, it had decided not to suspend the proceedings, but to prioritize for resolution of the following set of specific questions related to the Respondent's Intra-EU Jurisdictional Objection:
*Whether or not on the date of the Request for Arbitration was there a valid offer on the part of the Respondent to arbitrate, and if the answer to that question is yes, with the consequence that an*

---

[2] Judgment of the CJEU, *Slovak Republic v. Achmea B.V.*, Case C-284/16, 6 March 2018 (RL–011).

*arbitration agreement came into existence as between the parties, was that arbitration agreement vitiated at a later point in time? If so, when, and how.*

25.    By this same communication, the Tribunal invited the Parties to confer as to a briefing schedule on these specific questions within the context of the existing timetable and Hearing dates. On 23 April 2018, the Tribunal reiterated its invitation to the Parties.

26.    On 25 April 2018, the Claimants submitted to the Tribunal's consideration the Parties' jointly proposed modification of the procedural calendar, including the Parties' submissions regarding the Respondent's Intra-EU Jurisdictional Objection.

27.    On 1 May 2018, the Tribunal confirmed its decision (a) to grant the Respondent a 30-day extension for the submission of its Counter-Memorial, (b) not to suspend the proceedings but to prioritize the resolution of the specific set of questions in its communication of 19 April 2018 and, taking into consideration the Parties' joint proposal of 25 April 2018, issued an amended procedural calendar (the "**Amended Procedural Calendar**").

28.    On 4 May 2018, pursuant to the Amended Procedural Calendar, the Claimants submitted a Response to Italy's Objections to Jurisdiction under [Article 41(1) of the Arbitration Rules](#) ("**Cl. Response on the Intra-EU Jurisdictional Objection**") together with Exhibits C-153 and C-154.

29.    On 14 May 2018, the Claimants transmitted to the Tribunal the Parties' communications regarding the Respondent's request for access to a data room regarding the reserves in the *Ombrina Mare* oil and gas field.

30.    On 15 May 2018, the Respondent submitted its Counter-Memorial on Jurisdiction, Liability and Quantum ("**Resp. Counter-Memorial**"), together with Exhibits R-0001 to R-0012; Legal Authorities RL-0018 to RL-0025; witness statements of Mr. Franco Terlizzese, Mr. Gilberto Dialuce, Mr. Mariano Grillo, Ms. Rosanna De Nictolis, and Mr. Dante Brandi; and expert reports from Prof. Ezio Mesini, Prof. Eugenio Picozza, Prof. Angelo Di Gregorio, and Dr. Tiago Duarte-Silva.

31.    On 25 May 2018, the Respondent's submitted its Reply to the Claimants' Response on Jurisdictional Objections of 4 May 2018 ("**Resp. Reply on the Intra-EU Jurisdictional Objection**") together with Legal Authorities RL-025 to RL-031.

32.    On that same date, the Claimants informed the Parties of their agreement to extend the deadline for document requests. On 31 May 2018, the Tribunal issued an Amended Annex A to Procedural Order No. 1 reflecting the agreed changes.

33.    On 1 June 2018, the Claimants submitted their Rejoinder to the Respondent's Reply on the Intra-EU Jurisdictional Objection ("**Cl. Rejoinder on the Intra-EU Jurisdictional Objection**") including comments on the award rendered in *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain* (ICSID Case No. ARB/14/1) [3] (the "**Masdar Award**").

34.    On 11 June 2018, pursuant to the Tribunal's instructions, the Respondent submitted observations on

---

[3]   *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain,* ICSID Case No. ARB/14/1, Award, 16 May 2018 (CL-155).

the Claimants' submission regarding the Masdar Award and the relevance of the *Achmea* Judgment ("**Resp. Observations on Masdar**").

35.   On 14 June 2018, the Claimants informed the Tribunal (i) of the Parties' agreement to subject the Respondent's access to a data room relating to the *Ombrina Mare* field reserves to confidentiality and (ii) of the Parties' joint proposal to adopt a confidentiality order.

36.   On 2 July 2018, the Tribunal issued Procedural Order No. 2 on confidentiality.

37.   On 6 August 2018, the Tribunal issued Procedural Order No. 3 on the Parties' document production requests.

38.   On 15, 22, and 29 August 2018, the Parties submitted communications regarding the Respondent's alleged difficulties to access to the Claimants' data room. On 31 August 2018 the Tribunal invited the Respondent to submit its report on the *Ombrina Mare* reserves by 21 December 2018, and the Claimants to serve an expert report in response, together with any updates required to the report of its quantum expert, by 18 January 2019.

39.   On 21 September 2018, the Tribunal invited the Parties to submit their respective observations on the Decision on the *Achmea* Issue in *Vattenfall AB and others v. Federal Republic of Germany* (ICSID Case No. ARB/12/12) [4] (the "**Vattenfall Decision**") by 4 October 2018.

40.   On 1 October 2018, the EC submitted an Application for Leave to Intervene as a Non-Disputing Party (the "**EC Application**"). The Tribunal invited the Parties to submit observations on the EC Application by 9 October 2018.

41.   On 4 October 2018, the Parties submitted their observations on the Vattenfall Decision (the "**Observations on Vattenfall**"). In its submission, the Respondent renewed its Request for Bifurcation (the "**Renewed Request for Bifurcation**") and incorporated Legal Authorities RL-032 to RL-036 into the record. On 8 October 2018, the Claimants requested an opportunity to respond to the Respondent's argument introduced in its Observations on Vattenfall that the Tribunal should declare the claim inadmissible under the doctrine of *forum non conveniens*. On 10 October 2018, the Tribunal invited the Claimants to submit comments on the Respondent's *forum non conveniens* argument by 30 October 2018.

42.   On 11 October 2018, the Parties submitted their observations on the EC Application. The Claimants' observations were submitted together with Exhibits C-155 to C-156 and Legal Authorities CL-150 to CL-157. On that same date, the Tribunal invited the Parties to submit a response to the other Party's observations on the EC Application by 30 October 2018.

43.   On 24 October 2018, the Claimants submitted their Reply Memorial on Jurisdiction, Liability and Quantum ("**Cl. Reply Memorial**") together with Exhibits C-0157 to C-0169; Legal Authorities CL-0158 to CL-0180; second witness statements of Mr. Stewart MacDonald, Ms. Fiona MacAulay, and Mr. Roberto Leccese; expert report of Mr. Tim Chapman and second expert report of Mr. Richard Boulton. On 1 November 2018, the Claimants submitted an Addendum to their Reply, with minor clarifications in respect of certain paragraphs.

---

[4]   *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018 (CL-156).

44.     On 30 October 2018, the Respondent submitted comments on the Claimants' response to the EC Application, and the Claimants submitted comments on (i) the Respondent's response to the EC Application; and (ii) the Respondent's Observations on Vattenfall ("**Cl. Additional Comments on the EC Application and on Respondent's Observations on Vattenfall**").

45.     On 7 December 2018, the Tribunal issued Procedural Order No. 4 granting the EC's Application to intervene as it considered that the requirements of ICSID Arbitration Rule 37(2)(a) were satisfied. The Tribunal concluded that the EC should be allowed to intervene only in writing, without access to the record of the case nor to the oral hearing and confined to the EC answering the set of questions that the Tribunal submitted to the Parties on 19 April 2018. Furthermore, the EC's intervention was subject to the provision of a written undertaking by 14 December 2018 that it would comply with any decision on costs ordered by the Tribunal. In view of the EC's possible intervention and in the interest of procedural efficiency, the Tribunal further decided that the Parties' specific briefings on the 19 April 2018 questions, which were filed in parallel to the other briefings in the case, were now to be considered, along with all other matters, at the Hearing. As a result, the Renewed Request for Bifurcation was rejected.

46.     On 12 December 2018, the Tribunal invited the Parties to confer and submit to the Tribunal's consideration by 7 January 2019 a joint statement advising of the agreements regarding the hearing logistics, or of their respective positions in case of disagreement.

47.     On 14 December 2018, the EC submitted a request to reconsider and alter Procedural Order No. 4.

48.     On 15 December 2018, the Respondent submitted a request for an extension of the deadline for the submission of its Rejoinder on Jurisdiction, Liability and Quantum, originally due on 21 December 2018, to 11 January 2019. On 17 December 2018, the Claimants submitted a response to the Respondent's request for an extension of the deadline for the submission of the Rejoinder. On 18 December 2018, the Respondent submitted a reply to the Claimants' response.

49.     On 18 December 2018, the Tribunal issued Procedural Order No. 5 rejecting the EC's request to reconsider and alter Procedural Order No. 4.

50.     On 19 December 2018, the Tribunal granted an extension to the Respondent for the submission of its Rejoinder on Jurisdiction, Liability and Quantum by 9 January 2019. By this same communication, the Tribunal invited the Claimants' expert to submit a rebuttal report in response to Italy's report on the *Ombrina Mare* reserves, together with any necessary update to its quantum Report, originally due on 18 January 2019, by 31 January 2019.

51.     On 9 January 2019, the Respondent submitted its Rejoinder on Jurisdiction, Liability and Quantum ("**Resp. Rejoinder**"), together with Exhibits R-0013 and R-0014; Legal Authorities RL-0032 to RL-0065; second witness statements of Mr. Gilberto Dialuce and Franco Terlizzese; expert reports of Prof. Ezio Mesini, Prof. Eugenio Picozza, Prof. Angelo Di Gregorio, and Dr. Tiago Duarte-Silva.

52.     On 14 January 2019, the Claimants informed the Tribunal of the Parties' joint agreement regarding certain aspects of the Hearing organization, together with a tentative schedule.

53.     On 21 January 2019, the Tribunal issued a decision concerning certain organizational matters on

which the Parties had not reached agreement.

54. On 29 January 2019, the Respondent submitted a Request for Termination of the Proceedings (the "**Request for Termination**") together with the Declaration of the Representatives of the Governments of the Member States, of 15 January 2019 on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (the "**Declaration**"). By this communication, the Respondent requested the Tribunal to issue an award recognizing its lack of competence and terminating the proceedings. Alternatively, the Respondent requested a hearing on jurisdictional issues.

55. On 30 January 2019, the President of the Tribunal and the Parties held a conference call regarding certain pending matters related to the organization of the Hearing.

56. On 31 January 2019, the Tribunal, *inter alia*, rejected the Respondent's Request for Termination and the Respondent's alternative request for a hearing on jurisdictional issues only. In doing so, the Tribunal confirmed the dates for the Hearing and invited the Parties to address the contents of the Declaration in their oral statement at the Hearing. On that same date, the Claimants submitted Mr. David Wilson's Rebuttal Expert Report to the Respondent's report on the *Ombrina Mare* reserves together with supporting documents.

57. The Hearing was held at the World Bank offices in Paris from 4 to 8 February 2019. The following persons were present throughout the Hearing:
*Tribunal*:

Mr. Klaus Reichert SC President
Dr. Charles Poncet Arbitrator
Prof. Pierre-Marie Dupuy Arbitrator

*ICSID Secretariat*:

Ms. Marisa Planells-Valero Secretary of the Tribunal

*For the Claimants*:

Mr. Thomas Sprange QC King & Spalding
Mr. Viren Mascarenhas King & Spalding
Mr. Benjamin Williams King & Spalding
Ms. Flora Jones King & Spalding
Ms. Kateryna Frolova King & Spalding
Ms Pui Yee (Lisa) Wong King & Spalding

*Parties*:

Mr. Samuel Moody Rockhopper
Mr. Stewart MacDonald Rockhopper
Ms. Lucinda (Lucy) Williams Rockhopper
Mr. Michael (Paul) Culpin Rockhopper
Mr. Alun Griffiths Rockhopper

Mr. Mark King Harbour Litigation Funding
Mr. Dominic Afzali Harbour Litigation Funding
Mr. Joseph (Joe) Skilton Berkeley Research Group
Mr. Don Munn ERCE
Ms. Giorgia Diotallevi Ughi e Nunziante – Studio Legale

*Witnesses*:

Mr. Samuel Moody Rockhopper
Mr. Stewart MacDonald Rockhopper
Ms. Fiona MacAulay(Barkham) Echo Energy (formerly Rockhopper)
Mr. Roberto Leccese Ughi e Nanziante – Studio Legale

*Experts*:

Mr. Peter Velez Peter Velez Engineer L.L.C.
Mr. Richard Boulton One Essex Court
Mr. Tim Chapman Geopoint Advisory Limited
Mr. David Wilson ERCE

*For the Respondent*:

Mr. Giacomo Aiello Avvocatura dello Stato
Mr. Pietro Garofoli Avvocatura dello Stato
Mr. Andrea Giordano Avvocatura dello Stato
Ms. Laura Delbono Avvocatura dello Stato
Ms. Maria Chiara Malaguti Ministero degli Affari Esteri e della Cooperazione Internazionale - consultant
Ms. Giuditta Marra Avvocatura dello Stato – trainee
Ms Annalisa Signorelli Avvocatura dello Stato – trainee

*Parties*:

Gilberto Dialuce Ministero dello Sviluppo Economico

*Witnesses*:

Mr. Gilberto Dialuce Ministero dello Sviluppo Economico
Mr. Franco Terlizzese Ministero dello Sviluppo Economico
Mr. Mariano Grillo Ministero dell'Ambiente e della Tutela del Territorio e del Mare

*Experts*:

Mr. Eugenio Picozza Università Roma Tor Vergata – Emerito
Mr. Enzo Mesini Università di Bologna
Mr. Angelo Di Gregorio Università Milano Bicocca
Mr. Tiago Duarte-Silva CRA
Ms. Sharon McCollough Axis

*Court Reporters*:

Ms. Anne Marie Stallard Trevor McGowan
Mr. Trevor McGowan Trevor McGowan

*Interpreters*:

Ms. Monica Robiglio English-Italian interpreter
Ms. Daniela Ascoli English-Italian interpreter
Ms. Francesca Geddes English-Italian interpreter

58.    At the beginning of the Hearing on 4 February 2019, the Tribunal suggested, in the interest of procedural efficiency, to issue a ruling on the Intra-EU Jurisdictional Objection prior to any other ruling.[5] The Parties agreed with the Tribunal's suggested way of proceeding.[6]

59.    Before the conclusion of the Hearing on 8 February 2019, the Tribunal instructed the Parties to submit Post-Hearing Briefs exclusively on the issue of whether the Declaration changed the answer to the Tribunal's questions of 19 April 2018 and invited the Parties to confer and reach agreement as to the date for this submission.

60.    On 13 February 2019, the Parties informed the Tribunal that they had agreed to submit Post-Hearing Briefs on the Declaration by Thursday, 28 February 2019.

61.    On 28 February 2019, the Respondent submitted its Post-Hearing Brief on the Declaration (the "**Resp. PHB on the Declaration**") together with Legal Authorities RL-066 to RL-068. On that same date, the Claimants requested an extension until 4 March 2019 to file their Post-Hearing Brief on the Declaration and gave an undertaking not to open and read the Respondent's PHB on the Declaration and accompanying documents until after their submission of their own PHB on the Declaration. On that same date, the Tribunal granted the Claimants' request for an extension. On 4 March 2019, the Claimants submitted their Post-Hearing Brief on the Declaration (the "**Cl. PHB on the Declaration**") together with Legal Authorities CL-204 to CL-214.

62.    The Parties filed submissions on costs on 26 March 2019.

63.    On 23 April 2019, the Tribunal and the Parties were advised that Ms. Anna Toubiana, ICSID Legal Counsel, would be replacing Ms. Marisa Planells-Valero as Secretary of the Tribunal.

64.    On 18 June 2019, the Respondent submitted a Request for Suspension of the proceedings (the "**Request for Suspension**"). On the same date, the Tribunal invited the Claimants to submit any comments they may have on the Respondent's Request for Suspension by 24 June 2019. On 24 June 2019, the Claimants submitted their Response to the Request for Suspension.

65.    On 26 June 2019, the Tribunal issued its Decision on the Intra-EU Jurisdictional Objections denying the Respondent's objections and Request for Suspension.

66.    On 27 June 2019, the Tribunal invited the Parties to confer and revert to the Tribunal on the next

---

[5]  Tr. Day 1, 9:11-10:10.
[6]  Tr. Day 1, 13:7-11 (Claimants); 15:9-18 (Respondent).

steps of the proceeding. On 10 July 2019, the Claimants sent a communication to the Tribunal regarding the next steps in the proceeding. On 15 July 2019, the Centre invited the Respondent to submit observations on the Claimants' communication. On the same date, the Respondent confirmed its agreement with the Claimants' communication. On 16 July 2019, the Tribunal confirmed the Parties' agreement to file Post-Hearing Briefs on 11 October 2019, and informed the Parties that 30 October 2019 would be held open for oral closings at the offices of the World Bank in Paris.

67.  On 11 October 2019, the Parties submitted their respective Post-Hearing Briefs ("**PHB**"). On 14 October 2019, the Tribunal confirmed the one-day oral closing Hearing in Paris to be held on 30 October 2019.

68.  The Hearing on Post-Hearing Briefs ("**October Hearing**") was held in Paris on 30 October 2019. The following persons were present throughout the October Hearing:

*Tribunal*:

Mr. Klaus Reichert SC President
Dr. Charles Poncet Arbitrator
Prof. Pierre-Marie Dupuy Arbitrator

*ICSID Secretariat*:

Ms. Anna Toubiana Secretary of the Tribunal

*For the Claimants*:

Mr. Thomas Sprange QC King & Spalding
Mr. Viren Mascarenhas King & Spalding
Mr. Benjamin Williams King & Spalding
Ms. Flora Jones King & Spalding
Ms. Kateryna Frolova King & Spalding
Ms Pui Yee (Lisa) Wong King & Spalding
Mr. Kwasi Mills-Bampoe King & Spalding
Mr. Roberto Leccese Ughi e Nunziante – Studio Legale

*Parties*:

Mr. Samuel Moody Rockhopper
Mr. Stewart MacDonald Rockhopper

*For the Respondent*:

Mr. Giacomo Aiello Avvocatura dello Stato
Mr. Andrea Giordano Avvocatura dello Stato

*Court Reporters*:

Ms. Claire Hill Claire Hill Realtime Ltd

69.    On 4 November 2019, the Claimants submitted a request to the Tribunal for leave to respond to new quantum arguments raised by the Respondent during the October Hearing that were not raised in the Respondent's Post-Hearing Brief. On the same date, the Tribunal invited the Respondent to make observations on the Claimants' request by 7 November 2019.

70.    On 5 November 2019, the Respondent submitted observations to the Claimants' 4 November 2019 letter. In the same letter, the Respondent also objected to the submission of two additional documents by the Claimants at the end of the October Hearing. On 6 November 2019, the Claimants submitted observations on the Respondent's 5 November 2019 letter.

71.    On 6 November 2019, the Tribunal sent a letter to the Parties addressing their communications of 4, 5, and 6 November 2019. The Tribunal informed the Parties that (i) the documents submitted by the Claimants at the end of the October Hearing were not received by the Tribunal; (ii) the Tribunal granted the Claimants leave to submit narrow issues concerning quantum by 13 November 2019; and (iii) the Respondent had permission to reply by 29 November 2019. The Tribunal also asked the Parties to liaise further to reach a list of key anterior facts as undisputed by 6 December 2019.

72.    On 13 November 2019, the Claimants submitted a Response to Italy's New Quantum Arguments. On 29 November 2019, the Respondent submitted a Reply to the Claimants' Response to Italy's New Quantum Arguments ("**Resp. Reply to Claimants' Document on Quantum of 13 November 2019**"). On 4 December 2019, the Claimants submitted comments to the Respondent's 29 November 2019 submission. On 6 December 2019, the Respondent replied to the Claimants' 4 December 2019 comments.

73.    On 6 December 2019, the Claimants submitted the Parties' List of Facts Not in Dispute and the Respondent's confirmed their agreement to the List on 8 December 2019.

74.    On 17 March 2020, Dr. Poncet invited the Parties to confirm whether they would consent to Ms. Luisa Mockler, Of Counsel at Poncet SARL, assisting Dr. Poncet in the proceeding. On 18 and 26 March 2020, the Respondent and the Claimants informed the Tribunal that they had no objections, respectively. On 30 March 2020, the Parties were provided with a confidentiality undertaking signed by Ms. Mockler dated 28 March 2020.

75.    On 8 June 2020, the Claimants submitted an inquiry to the Tribunal regarding the timeframe within which the Tribunal anticipated issuing its final Award.

76.    On the same date, the Tribunal communicated to the Parties that it was too soon to forecast when the Award would be finalized, given the difficult circumstances presented by the worldwide COVID-19 pandemic.

77.    On 19 October 2020, the Tribunal informed the Parties that deliberations were advancing steadily, and the Tribunal hoped to be in a position to indicate soon whether the proceedings were to be closed. The Tribunal provided further updates on 30 March, 13 May, and 1 July 2021.

78.    On 13 September 2021, the Respondent sought the Tribunal's leave under paragraph 16.3 of Procedural Order No. 1 to file the judgment issued on 2 September 2021 by the Grand Chamber of the Court of Justice of the European Union ("**CJEU**") in Case C-741/19, *Republic of Moldova v.*

*Komstroy LLC* ("*Komstroy*").

79. On 20 September 2021, further to the Tribunal's invitation, the Claimants submitted a response opposing the Respondent's request. The Claimants' response was accompanied by legal authorities CL-0236 through CL-0246.

80. On 23 September 2021, the Tribunal through its Secretary conveyed the following message to the Parties:
    *The Tribunal refers to the Respondent's application to add the CJEU judgment (and Opinion of the Advocate General) in C-741/19 to the file of this case, as well as to the Claimants' comments on the application. The Tribunal has decided to admit these materials, and invites the Parties to comment on them by filing consecutive submissions limited to five pages per Party. The Respondent's submission shall be received by Wednesday, September 29, 2021. The Claimants' submission shall be received by Wednesday, October 6, 2021.*

81. On 29 September 2021, the Respondent submitted its Considerations on *Republic of Moldova v. Komstroy* (C-741/19) and AG Szpunar's Opinion.

82. On 6 October 2021, the Claimants submitted their Response to Respondent's Considerations on *Republic of Moldova v. Komstroy* (C-714/19) and AG Szpunar's Opinion, together with legal authorities CL-0247 to CL-0250.

83. On 20 December 2021, the Tribunal issued its Decision on the Italian Republic's Request for Reconsideration of 29 September 2021. The Tribunal dismissed Italy's request that the Tribunal reconsider its decision on jurisdiction in light of *Komstroy*.

84. On 10 January 2022, the Parties submitted their updated statements of costs.

85. The proceeding was closed on 25 April 2022.

86. On 19 August 2022, the Tribunal and the Parties were advised that Mr. Paul Jean Le Cannu, ICSID Team Leader and Legal Counsel, would be replacing Ms. Anna Toubiana as Secretary of the Tribunal. On 19 and 21 August 2022, further to the Secretariat's request, the Parties each confirmed their list of representatives in this proceeding.

# III. THE PARTIES' REQUESTS FOR RELIEF

## A. Claimants' Request for Relief

87. The Claimants' request for relief appears in its Post-Hearing Brief as follows: [7]

*164. For the reasons outlined above and in prior submissions, the Claimants seek an award granting the following relief:*

*164.1 a declaration that the Tribunal has jurisdiction to decide this dispute under the ECT and the ICSID Convention and dismissing Italy's preliminary objections to the Tribunal's jurisdiction to decide Rockhopper's claims;*

*164.2 a declaration that Italy has violated Part III of the ECT, including but not limited to Article 10 and Article 13, as well as international law, with respect to the Claimants' investments. Specifically, the obligations that Italy breached are:*

*164.2.1 the FET Standard as set out in* Article 10(1) of the ECT*;*

*164.2.2 its obligation to prevent impairment of Rockhopper's investment by unreasonable or discriminatory measures as set out in* Article 10(1) of the ECT*;*

*164.2.3 its obligation not to unlawfully expropriate Rockhopper's investment as set out in* Article 13 of the ECT*.*

*164.3 compensation to the Claimants of €281,675,391 million, comprising €275 million for lost profits and €6,675,391 for decommissioning costs;*

*164.4 pre- and post-award interest at 9% per annum compounded annually from 29 January 2016 until the date of Italy's final satisfaction of the award, which from 29 January 2016 to 4 February 2019 amounts to €83,792,062;*

*164.5 an order for Italy to reimburse all of the Claimants' costs incurred in connection with this arbitration, including fees and expenses of the arbitrators, legal counsel, witnesses, experts and consultants; and*

*164.6 such other relief as the arbitral tribunal deems just and proper.*

## B. Respondent's Request for Relief

88.   The Respondent's request for relief appears in its Counter-Memorial as follows: [8]

*In light of the above, the Respondent requests the Tribunal to:*

*a) Declare its lack of competence over the matter because*

Article 26 of the ECT

*i. does not apply to intra-EU disputes, and*

---

[7]  Cl. PHB, ¶ 164.

[8]  Resp. Counter-Memorial, p. 86 (emphasis in original).

*ii. prohibits the Claimants to request relief for the second time for the same dispute in front of this Tribunal for a matter already decided by domestic courts.*

*Should the Tribunal uphold its own jurisdiction on the claim and consider it admissible, the Respondent requests the Tribunal to:*

*b) <u>Declare</u>, on the merits, that all the claims of the Claimants under Article 10(1) and article 13 of the ECT are unfounded, and that the Respondent's conduct does not constitute a violation of such rules.*

*c) In the unfortunate event that the Tribunal were to uphold one of the claims of the Claimants and award some form of compensation, <u>declare</u> the requests for damages not supported by sufficient evidence of injury.*

*d) Ordering the Claimant to pay the expenses incurred by the Italian Republic in connection with these proceedings, including professional fees and disbursements, and to pay the fees and expenses of the Members of the Tribunal and the charges for the use of the facilities of the Centre, in accordance with Article 61(2) of the ICSID Convention.*

# IV. FACTUAL BACKGROUND

## A. Introduction

89.  The factual background to this arbitration is, essentially, relatively clear and in many key respects, not the subject of dispute or controversy between the Parties. This observation emerges most particularly from the document which the Parties collaboratively prepared, namely, "Facts Not In Dispute". [9] The discussion and analysis which follows concerning the factual background has been greatly assisted by the Parties' co-operation in this arbitration, stemming both from the preparation of the aforementioned document and also by their general approach to pleading in their submissions. This approach has aided the Tribunal's task in deciding the dispute allowing it to focus on what actually divides the Parties (namely, the legal consequences arising from the facts) rather than having to resolve what happened as regards every predicate event. It is underlined by the Tribunal at the outset of this section of the Final Award that its discussion and analysis which follows is not directed towards the resolution of the legal consequences of the factual background (which the Parties hotly contest), but rather to thoroughly set out what transpired over the material time.

90.  The Claimants' ultimate intention was to drill for, and then extract liquid and gas hydrocarbons from a shallow water area off the Italian coast called *Ombrina Mare*. As with any such type of extractive process, considerable engagement with the governmental authorities was necessary in order to complete the journey from the initial formulation of an investor's intention to the actual flowing of oil and/or gas. As is described in Section III.A of the Claimants' Memorial on Jurisdiction,

---

[9]  *See* ¶ 73 above.

Liability and Quantum, there is broadly a two-stage regulatory process in Italy for such projects, namely, first, one seeks an exploration permit[10], and then, subject to the fruits[11], if any, of such exploration[12], one seeks[13] a production permit. The details and content of such applications are, of course, considerably detailed but for the present there is no need to delve into such matters save to note the contours of the overall process.

91.    This section of the Award is arranged as follows: (B) the rejection in January 2016 by the Respondent of the Claimants' application for a production permit for the *Ombrina Mare* area; (C) the content of the relevant Italian law which was in force at the time of the rejection by the Respondent of the Claimants' application; (D) the rationale for the change in late 2015 of that relevant law; (E) an examination of the third Claimant's purchase in 2014 of the other Claimants, which is, for the purpose of this arbitration, the relevant investment; (F) the events which occurred in relation to the Claimants' application between the time of the investment and the final rejection in January 2016; and (G) the wider factual consequences of Law No. 208 of 2015.

92.    The Tribunal has arranged the factual background as described in the foregoing paragraph for the following reason. There is no dispute as to the fact that in January 2016 that the Respondent rejected the Claimants' application for a production permit. Having carefully considered the Parties' submissions the Tribunal believes that setting out that key event first will permit the reader to more fully understand and appreciate the factual nuances of the matters which led up to it. Put another way, the rejection by the Respondent in January 2016 of the Claimants' production permit application is the key moment through which to see the overall and relevant factual background to this arbitration. Once one sets out what finally happened, the task then is to analyse the "how" (and to a certain extent, the "why" though that is more by way of ensuring the full facts are duly taken into account) it happened.

93.    Two further introductory matters are now addressed: (a) concerning the nomenclature of the Claimants for the purpose of clarity; and (b) the timing of the investment.

94.    Footnote 1 to the Memorial on Jurisdiction, Liability and Quantum states, in part, as follows: "In August 2014, Rockhopper Exploration [the third Claimant] acquired Mediterranean Oil and Gas Plc ("MOG") and its wholly owned subsidiary Medoilgas Italia S.p.A. ("Medoilgas Italia") (formerly, Intergas Più S.r.L.), changing their names to Rockhopper Mediterranean [the second Claimant, which was the owner from May 2005 of 100% of the shares in the first Claimant] and Rockhopper Italia [the first Claimant, which was the named applicant for the offshore production concession], respectively."

95.    As regards the timing of the investment, which, for the purposes of this arbitration is the third Claimant's purchase in August 2014 of the second Claimant (which has some years before acquired the third Claimant), the Respondent's position is aligned with that of the Claimants. In particular,

---

[10]  Fact No. 8: "The MED granted Rockhopper Italia an Exploration Permit to explore the Ombrina Mare Field for the duration of six years", 5 May 2005.

[11]  Fact No. 10: "A flow test on the OM2Dir well confirmed the presence of oil, similar to that confirmed by OBM-1. The OM2 well also confirmed the presence of methane gas on the overlying Pliocenic levels", 2008.

[12]  Fact No. 9: "Rockhopper Italia conducted exploration activity pursuant to the Exploration Permit, including acquiring 2D and 3D seismic data from Edison, obtaining an EIA for the "Ombrina Mare 2" exploratory well, and drilling the Ombrina Mare 2 and Ombrina Mare 2 Dir wells. Rockhopper Italia spent approximately €18 million on conducting these exploration activities", 2005-2008.

[13]  Fact No. 11: "Rockhopper Italia submitted/the MED received Production Concession Application", 16/17 December 2008.

and for example, para. 6(b) of the Counter-Memorial specifically points to August 2014 as the relevant date for the purposes of legitimate expectation arguments (which the Respondent says have no basis in substance). The Tribunal draws the factual conclusion that the relevant date of the investment for the purposes of the arbitration is August 2014 as this appears to be common to both sides. This also is confirmed by Fact No. 37. Further, as confirmed by Fact No. 36, the third Claimants announced in May 2014 a recommended share and cash offer to acquire MOG and subsequently paid approximately EUR 36,000,000.00.

## B. The rejection in January 2016 by the Respondent of the Claimants' application for a production permit for the *Ombrina Mare* area

96.  The Claimants discuss the twists and turns over some years of their (and their predecessor's) application in Section III.B-N of the Memorial on Jurisdiction, Liability and Quantum, and leaving aside their characterisation of many of these events, the Tribunal considers that the appropriate starting point for its factual analysis is one key letter from the Respondent's Ministry for Economic Development (C-134) dated 29 January 2016. While chronologically at the end, essentially, of the factual matters pertinent to this arbitration, its importance and contents encapsulate and summarise succinctly the key considerations for this case. The translation of that letter is now recorded in full:

*TO*

*Rockhopper Italia S.p.A.*
*Via Cornelia 498*
*00166 Rome*

*... ...*

*Subject Application for the offshore exploitation concession of liquid and gas hydrocarbon called "d30 B.C-MD". Notice of termination of procedure with subsequent rejection.*

_____

*We would like to refer to the application for the offshore production concession of liquid and gas hydrocarbons called "d 30 B.C.-MD.", submitted by the company Rockhopper Italia S.p.A. on 18 December 2008, published in BUIG LIII-7, in order to notify the following: Law No. 208 of 28 December 2015 (2016 Law on Stability), published in the Official Gazette of the Italian Republic No. 302 of 30 December 2015, amended Article 6, paragraph 17 of Italian Legislative Decree No. 152 of 3 April 2006, laying down that: "for environmental and ecosystem purposes, (...) the research, prospection and exploitation of offshore liquid and gas hydrocarbons under Articles 4, 6 and 9 of Italian Law No. 9 of 9 January 1991 shall be forbidden within the boundaries of sea and coastal areas protected on any grounds for environmental protection purposes. Such prohibition shall also apply to sea areas up to twelve miles from the coastline around the entire Italian Peninsula and from the external perimeter of the aforementioned protected sea and coastal areas.*

*The relevant in-depth technical and cartographic studies carried out by the Directorate- General for the safety – including environmental safety - of mining and energy activities (UNMIG) of this Ministry have ascertained that the area subject to the application for the offshore exploitation concession of liquid and gas hydrocarbons called "d 30 B.C.-MD.", identified by the geographical coordinates included in the aforementioned application, interferes in full with the areas subject to the above-mentioned prohibition under environmental laws.*

*At the time these prohibitions became effective, this Administration was examining the supplementary documentation supporting the technical and economic capabilities requested by Italian Ministerial Decree of 25 March 2015 and by Directorate Decree of 15 July 2015 (Update of Standard Regulation) finally submitted by the Company on 16 December to complete the procedure downstream of the Decree on Environmental Compatibility issued on 17 August 2015 by the Minister of Environment and Protection of Land and Sea and of the Conference concluded on 9 November 2015.*

*In view of the above, pursuant to Article 2, paragraph 1 of Italian Law No. 241/1991, we hereby notify you of the completion of the proceeding and the rejection of the application for the offshore production concession of liquid and gas hydrocarbons called "d 30 B.C.-MD".*

*The abstract of this notice shall be published in the Official Hydrocarbons and Geo Resources Bulletin.*

*DIRECTOR-GENERAL*

97.    The core points which emerge from a reasonable reading of this letter, placed in the overall background of this case, are:

(1) The Claimants had a pending application (C-70) for an offshore production concession, since 2008, and this presupposes that the exploration permit stage had itself been addressed at an earlier time. Also, while the Claimants describe the period from 2008 onwards as being a "roller coaster ride" as regards how that application was dealt with by the Respondent (para. 5 of the Memorial on Jurisdiction, Liability and Quantum), factually speaking as of late 2015 they were still "in the game" as regards their intended offshore production concession. That application had not been rejected outright throughout the "roller coaster ride" years, but the aforementioned letter of 29 January 2016 unequivocally does so. It is a matter of ready logical inference than until such time as an application is rejected expressly, or by some rule which deems a certain amount of time passing to be a rejection (which does seem to apply in this matter), it is live and pending.

(2) A law[14] was published in the Respondent's Official Gazette on 30 December 2015 which prohibited research, prospection and exploitation in waters within a 12-mile limit of the Italian Peninsula. That was a new legal position as had such a law been in place before that time no-

---

[14]  Fact No. 46: "The Budget Law came into force (through Law 208 of 2015) and repealed the exemption for exploration permit holders with pending production concession applications provided for in Decree 83/2012", 1 January 2016. Fact No. 47: "Changes in legislation directed by the Renzi government (including the repeal of Decree 83/2012 in the Budget Law) obviated the relevance of five of the Referendum questions (including the question relating to Decree 83/2012", January 2016. As to the "Referendum questions", Fact No. 41: "Ten Regional Councils of Italy proposed a referendum by submitting six "referendum questions" relating to the oil and gas industry, including a question as to whether or not the amendment to Article 6 paragraph 17 of the Environmental Code introduced by Decree 83/2012 to exempt ongoing production concession applications from the Prohibition should be repealed. Three of the six questions asked whether sections of the Unlock Italy Decree should be repealed", 30 September 2015.

one, including the Claimants, would go to the trouble of spending any time, effort and money on exploring hydrocarbon production in waters within such a limit.

(3) The Claimants' pending application was rejected as a result of the new law as the proposed production wells would be within the new geographical limit. The Respondent's letter does not go beyond that reason as a stated basis for rejection of the Claimants' pending application. The letter notes, in addition, that at the time the new law came into force, the Respondent was examining the supplementary documentation supporting the technical and economic capabilities submitted by the Claimants on 16 December 2015 "to complete the procedure downstream of the Decree on Environmental Compatibility." The detail of what the Respondent was examining at that time is discussed in more detail below.

(4) The Tribunal also notes that the letter indicates that the pending application was "in play" for quite a few years having been filed in 2008. The Parties have also stipulated a number of pertinent facts in that regard as to the overall duration of the process (using that term in its widest and generic sense) in relation to the putative production in *Ombrina Mare* and the background going back over many years:

*The MED granted a production concession to Elf on the basis of production data submitted by Elf.* [Fact No. 5, 1992]

*Edison acquired the Ombrina Mare production concession from Elf.* [Fact No. 6, 1998]

*Edison relinquished the production concession.* [Fact No. 7, 2000]

*The MED granted Rockhopper Italia an Exploration Permit to explore the Ombrina Mare Field for the duration of six years.* [Fact No. 8, 5 May 2005]

*Rockhopper Italia conducted exploration activity pursuant to the Exploration Permit, including acquiring 2D and 3D seismic data from Edison, obtaining an EIA for the "Ombrina Mare 2" exploratory well, and drilling the Ombrina Mare 2 and Ombrina Mare 2 Dir wells. Rockhopper Italia spent approximately €18 million on conducting these exploration activities.* [Fact No. 9, 2005-2008]

*A flow test on the OM2Dir well confirmed the presence of oil, similar to that confirmed by OBM-1. The OM2 well also confirmed the presence of methane gas on the overlying Pliocenic levels.* [Fact No. 10, 2008]

*Rockhopper Italia submitted/the MED received Production Concession Application.* [Fact No. 11, 16/17 December 2008]

*The MED wrote to Rockhopper to confirm: "having heard the opinion of the Commission for Hydrocarbons and Mining Resources (CIRM) during the session held on the 23 June 2009, has come to the decision to begin the procedure to grant the concession".* [Fact No. 12, 23 June 2009]

*Rockhopper Italia submitted its EIA application to MEPLS and MCHA.* [Fact No. 13, 3 December 2009]

*The MCHA approved the EIA.* [Fact No. 14, 30 June 2010]

## C. The content of the relevant Italian law which was in force at the time of the rejection by the Respondent of the Claimants' application

98.  As part of the initial discussion of the factual context, the Tribunal considers it appropriate to set out in some detail the content of Law No. 208 of 2015 and the rationale behind it (insofar as is possible to do so) based on the objective content of the legislative record and processes. This Law is of particular importance as it is, as already discussed just above, the stated reason for the denial of the Claimants' application for an offshore production concession. While that conclusion can readily be stated, it is appropriate that a fuller understanding and description of the content of that Law is set out.

99.  The particular provision of Law No. 208 of 2015 which brought about the geographical limitation discussed just above, is as follows (CLA-7):
*Law 28 December 2015, No. 208*

*Art. 1, para 239*

*Article 6, para. 17, of legislative decree 3 April 2006, no. 152, second and third sentences are hereby replaced with the following: "The prohibition also applies to the marine areas located within twelve miles of the coastlines alongside the whole national coast perimeter and of the external perimeter of such protected marine and coastal areas. Enabling titles that have already been issued remain valid for the entire lifecycle of the oilfield, in compliance with safety and environmental protection standards. Maintenance activities aimed at implementing the technological upgrades necessary for the safety of the plants and the protection of the environment, as well as final environmental restoration activities must always be ensured".*

The Italian original thereof is:

*LEGGE 28 dicembre 2015, n. 208.*

*Disposizioni per la formazione del bilancio annual e pluriennale dello Stato (legge di stabilità 2016).*

*239. All'articolo 6, comma 17, del decreto legislativo 3 aprile 2006, n. 152, il secondo e il terzo periodo sono sostituiti dai seguenti: «Il divieto è altresì stabilito nelle zone di mare poste entro dodici miglia dale linee di costa lungo l'intero perimetro costiero nazionale e dal perimetro esterno delle suddette aree marine e costiere protette. I titoli abilitativi già rilasciati sono fatti salvi per la durata di vita utile del giacimento, nel rispetto degli standard di sicurezza e di salvaguardia ambientale. Sono sempre assicurate le attività di manutenzione finalizzate all'adeguamento tecnologico necessario alla sicurezza degli impianti e alla tutela dell'ambiente, nonché le operazioni finali di ripristino ambientale».*

100. The Tribunal also records now the law which was in force immediately preceding the passing of the foregoing provision. One gains a fuller understanding of the context of a statutory provision if one also examines that which it replaces or changes. The preceding regime was found in Law No. 83 of

2012 (CLA-6) (emphasis added by the Tribunal to the second and third sentences which were those changed in late 2015):

*Law decree 22 June 2012, No. 83 as amended by Law 134 of 7 August 2012*

*Art. 35, para. 1*

*Article 6, para. 17 of legislative decree 3 April 2006, no. 152, is hereby replaced with the following:*

*17. For the purposes of protecting the environment and the ecosystem, within the perimeter of marine and coastal areas which are for any reason protected for environmental protection purposes, pursuant to national or regional laws or in implementation of EU or international deeds or conventions, the exploration, prospecting or exploitation of liquid or gaseous hydrocarbons in the sea, as envisaged by articles 4, 6 and 9 of Law no. 9 of 9 January 1991, are prohibited. The prohibition also applies to the marine areas located within twelve miles of the coastlines alongside the whole national coast perimeter and of the external perimeter of such protected marine and coastal areas, except to the concession procedures under articles 4, 6 and 9 of Law no. 9 of 1991, ongoing as at the date of entry into force of legislative decree 29 June 2010 no. 128 and subsequent or connected authorization and concession procedures, as well as the validity of authorizations issued within that same date, also for the purposes of performing exploration, prospecting or exploitation activities yet to be authorized within the framework of the authorizations themselves, of any relevant extensions and of subsequent and connected authorization and concession procedures. The authorization of the above activities is subject to the prior completion of the environmental impact procedure under article 21 et seq. of this decree, and after hearing the opinion of the local authorities located within twelve miles from the marine and coastal areas affected by the activities under the first sentence, without prejudice to the activities under article 1, paragraph 82-sexies, of Law 23 August 2004, no. 239, authorized by the territorial supervisory offices of the national mining office for hydrocarbons and geo-resources, in compliance with the environmental restrictions imposed by the same, which shall send a copy of the relevant authorizations to the Ministry of economic development and the Ministry of the environment and the protection of land and sea. Upon the entry into force of the provisions under this paragraph, paragraph 81 of article 1 of Law 23 August 2004, no. 239 shall be repealed. As of the entry into force of this provision, the owners of offshore production concessions are required to pay on an annual basis the production rate under article 19, para. 1 of Legislative Decree 25 November 1996, no. 625 is hereby increased from 7% to 10% for gas and from 4% to 7% for oil. The sole owner or co-owner of each concession is required to pay the sums corresponding to the increase of the percentage to a specific income component of the State budget, all of which shall be reallocated, in equal parts, to specific income components of the budget of the Ministry of the environment and the protection of land and sea and of the Ministry of economic development, so as to ensure the full performance, respectively, of activities aimed at monitoring and countering marine pollution and activities for the supervision and control of the safety, also environmental, of offshore exploration and production plants.*

The Italian original is as follows:

*1. L'articolo 6, comma 17, del decreto legislativo 3 aprile 2006, n. 152, e' sostituito dal seguente: «17. Ai fini di tutela dell'ambiente e dell'ecosistema, all'interno del perimetro delle aree marine e costiere a qualsiasi titolo protette per scopi di tutela ambientale, in virtu' di leggi nazionali, regionali o in attuazione di atti e convenzioni internazionali sono vietate le attivita' di ricerca, di prospezione nonche' di coltivazione di idrocarburi liquidi e gassosi in mare, di cui agli articoli 4, 6 e 9 della legge 9 gennaio 1991, n. 9. Il divieto e' altresi' stabilito nelle zone di mare poste*

*entro dodici miglia dalle linee di costa lungo l'intero perimetro costiero nazionale e dal perimetro esterno delle suddette aree marine e costiere protette, fatti salvi i procedimenti concessori di cui agli articoli 4, 6 e 9 della legge n. 9 del 1991 in corso alla data di entrata in vigore del decreto legislativo 29 giugno 2010 n. 128 ed I procedimenti autorizzatori e concessori conseguenti e connessi, nonche' l'efficacia dei titoli abilitativi gia' rilasciati alla medesima data, anche ai fini della esecuzione delle attivita' di ricerca, sviluppo e coltivazione da autorizzare nell'ambito dei titoli stessi, delle eventuali relative proroghe e dei procedimenti autorizzatori e concessori conseguenti e connessi. Le predette attivita' sono autorizzate previa sottoposizione alla procedura di valutazione di impatto ambientale di cui agli articoli 21 e seguenti del presente decreto, sentito il parere degli enti locali posti in un raggio di dodici miglia dalle aree marine e costiere interessate dalle attivita' di cui al primo periodo. Dall'entrata in vigore delle disposizioni di cui al presente comma e' abrogato il comma 81 dell'articolo 1 della legge 23 agosto 2004, n. 239. A decorrere dalla data di entrata in vigore della presente disposizione, i titolari delle concessioni di coltivazione in mare sono tenuti a corrispondere annualmente l'aliquota di prodotto di cui all'articolo 19, comma 1 del decreto legislativo 25 novembre 1996, n. 625, elevata dal 7% al 10% per il gas e dal 4% al 7% per l'olio. Il titolare unico o contitolare di ciascuna concessione e' tenuto a versare le somme corrispondenti al valore dell'incremento dell'aliquota ad apposite capitolo dell'entrata del bilancio dello Stato, per essere interamente riassegnate, in parti uguali, ad appositi capitoli istituiti nello stato di previsione del Ministero dell'ambiente e della tutela del territorio e del mare e del Ministero dello sviluppo economico, per assicurare il pieno svolgimento rispettivamente delle azioni di monitoraggio e contrasto dell'inquinamento marino e delle attivita' di vigilanza e controllo della sicurezza anche ambientale degli impianti di ricerca e coltivazione in mare».*

101. The Parties have stipulated the following matters of fact as regards Law No. 83 of 2012:
    *The new government, led by Mario Monti, enacted Decree 83/2012 which further amended Article 6 of the Environmental Code to confirm that the Prohibition did not apply to applications for production concessions that were under review at the time Decree 128/2010 came into force.* [Fact No. 21, 26 June 2012]

    *Decree 83/2012 did not withdraw the 12-mile ban, it excluded from its scope those who already had started a production concession application at the time of Decree 128/2010.* [Fact No. 22, 26 June 2012] [15]

    *One of the stated purposes of Decree 83/2012, which was set out in the accompanying Government report, was to avoid contingent litigation that would follow from permit holders such as Rockhopper Italia who would understandably seek compensation for the denial of their legal rights.* [Fact No. 23, 26 June 2012] [16]

---

[15] Para. 83 of the Counter-Memorial further comments as to its "clear exceptional nature" as it was only directed towards those procedures which were open at the time of entry into force of Law No. 128 of 2010. Thus, any procedure which might have been initiated *post* the entry into force of Law No. 128 of 2010 would not have had the benefit of coming within this exception.

[16] In this respect the Tribunal records the relevant part of C-89 which is Document 5312 of the Camera dei Deputati: *Article 35 Paragraph 1 establishes a single, for oil and gas, and more rigid restricted area, up to 12 miles off the coastlines and the outer perimeter of protected marine and coastal areas, for any new prospection, exploration and production activity. The new limit, though more restrictive, makes the regulatory framework clearer while still allowing the conduction* [in the Italian original the word "svolgimento" is used] *of business activities that are important for the search of energy sources and for the economic and development of employment in the Country. It provides for the salvage* [in the Italian original the phrase "la salvezza" is used] *of the ongoing authorisation procedures at the date of entry into force of Legislative Decree no. 128 of 2010 as well as the related and ancillary procedures. The law provision therefore allows for the completion*

102. The Tribunal can reasonably draw the following conclusions from the foregoing matters concerning Law No. 83 of 2012.

*First*, it must have been a deliberate choice on the part of the Respondent to create a specific, and limited exception to the Law No. 128 of 2010. The exception was only made for those applications which had been pending prior to that law, and not any others which might have come along in the interim (if any).

*Secondly,* this exceptional step was therefore confined to a limited range of persons or entities, and not *erga omnes*. The fact that the Respondent must have had such a limited range of persons or entities in mind is confirmed by the following. The Respondent specifically took this step to avoid litigation and claims for damages from such companies. The Tribunal infers that it would have been reasonable for the Respondent to have had a clear sense of the number of companies in mind when considering the avoidance of the risk of litigation. It would have reasonably known from the records held by the relevant instrumentalities where the risks would lie and who the effected parties would be. By taking this step the Respondent must have considered it a risk worth abating.

*Thirdly*, this was not a "one-way-street" in favour of the companies, but came with a price. The royalty rates were increased, significantly (40%, as noted on p. 36 of the Italian original [17] of C-89), from 7% to 10% for gas and from 4% to 7% for oil. Nor indeed were these increases a blunt instrument resulting in simply more money in due course for the Respondent, but rather had within them a specific (and sophisticated) component directly related to the environment. The amount of the increased royalty would be reallocated, in equal parts, to specific income components of the budgets of two Ministries. This was specifically stated to be for "the full performance, respectively, of activities aimed at monitoring and countering marine pollution and activities for the supervision and control of the safety, also environmental, of offshore exploration and production plants."

103. For completeness, the Tribunal also recalls the relevant portion of Law No. 128 of 2010 (CLA-5), which was in place prior to Law No. 83 of 2012:

*Legislative decree 29 June, No. 128*

*Art. 2, para. 3, lett. h)*

*[The following paragraphs are added to article 6 of legislative decree 3 April 2006, No. 152 (...)]: (...) 17. For the purposes of protecting the environment and the ecosystem, within the perimeter of marine and coastal areas which are for any reason protected for environmental protection purposes, pursuant to national or regional laws or in implementation of international deeds or conventions, the exploration, prospecting or exploitation of liquid or gaseous hydrocarbons in the sea, as envisaged by articles 4, 6 and 9 of Law no. 9 of 9 January 1991, are prohibited. The prohibition also applies to the marine areas located within twelve nautical miles of the external perimeter of such protected marine and coastal areas, as well as – exclusively with regard to liquid hydrocarbons – in the area enclosed within five miles from the baseline of territorial waters along the entire*

---

[in the Italian original the word "completare" is used] *of certain already-discovered field development projects on which investments have already been made, and the development of projects resulting from new findings on areas already requested, thus avoiding burdens on public finances resulting from damage claims by companies to the Italian State for failure to meet expectations to ongoing investments and while ensuring additional tax revenues.*

[17] "*Attraverso l'aumento per una percentuale superiore al 40 per cento delle royalty in mare (dal 7 al 10 per cento per gas e dal 4 al 7 per cento per olio) si finanziano le attività di salvaguardia del mare e di sicurezza delle operazioni* offshore *da parte dei Ministeri dell'ambiente e della tutela del territorio e del mare e dello sviluppo economico.*"

*national coastal perimeter. Outside such areas, the authorization of the above activities is subject to the prior completion of the environmental impact procedure under article 21 et seq. of this decree, and after hearing the opinion of the local authorities located within twelve miles from the marine and coastal areas affected by the activities under the first sentence. The provisions under this paragraph apply to authorization procedures ongoing at the date of the entry into force of this paragraph. Enabling titles that have already been issued at the same date remain valid. Upon the entry into force of the provisions under this paragraph, paragraph 81 of article 1 of Law no. 239 dated 23 August 2004 shall be repealed.*

The relevant Italian original is as follows:

*17. Ai fi ni di tutela dell'ambiente edell'ecosistema, all'interno del perimetro delle aree marine e costiere a qualsiasi titolo protette per scopi di tutela ambientale, in virtù di leggi nazionali, regionali o in attuazione di atti e convenzioni internazionali sono vietate le attività di ricerca, di prospezione nonché di coltivazione di idrocarburi liquidi e gassosi in mare, di cui agli articoli 4, 6 e 9 della legge 9 gennaio 1991, n. 9. Il divieto è altresì stabilito nelle zone di mare poste entro dodici miglia marine dal perimetro esterno delle suddette aree marine e costiere protette, oltre che per i soli idrocarburi liquidi nella fascia marina compresa entro cinque miglia dalle linee di base delle acque territoriali lungo l'intero perimetro costiero nazionale. Al di fuori delle medesime aree, le predette attività sono autorizzate previa sottoposizione alla procedura di valutazione di impatto ambientale di cui agli articoli 21 e seguenti del presente decreto, sentito il parere degli enti locali posti in un raggio di dodici miglia dalle aree marine e costiere interessate dalle attività di cui al primo periodo. Le disposizioni di cui al presente comma si applicano ai procedimenti autorizzatori in corso alla data di entrata in vigore del presente comma. Dall'entrata in vigore delle disposizioni di cui al presente comma è abrogato il comma 81 dell'articolo 1 della legge 23 agosto 2004, n. 239.*

104.  The Parties have stipulated the following matters of fact as regards Law No. 128 of 2010:
      *The Government enacted Decree 128/2010 (amending Article 6 of the Environmental Code and imposing the Prohibition) pursuant to Delegation Law 69 of 18 June 2009 which introduced a prohibition on oil-and-gas exploration and production activities in proximity to certain protected marine and coastal areas, as well as in marine areas located within five miles of the national coastline.* [Fact No. 15, 26 August 2010]

      *Uncertainty existed as to the interpretation of Decree 128/2010. The MEPLS sought clarification from the Council of State on how to interpret and apply Decree 128/2010, in particular whether operators who had exploration permits and had already applied for production concessions would fall within the scope of the Prohibition contained in Decree 128/2010.* [Fact No. 17, 12 January 2011]

      *The Council of State requested the opinion of the MED, as well as the Ministry for European Policies and the Ministry for Regional Affairs, on the questions raised by the MEPLS.* [Fact No. 18, 16 March 2011]

      *The MED confirmed that, in its opinion, an exploration permit holder that has made a discovery has a legitimate expectation to obtain a production concession and should be allowed to file a production concession application for fields located in the marine and coastal areas affected by the Prohibition.* [Fact No. 19, 14 June 2011]

*The Council of State confirmed that an operator holding an exploration permit had no right to obtain a production concession.* [Fact No. 20, 20 October 2011]

105.    A succinct summary of the Tribunal's appreciation of the evolution of the relevant laws in the time <u>after</u> the filing of the Claimants' application for an offshore production concession is as follows:

(1) in 2010 the Respondent seems to have banned all new offshore (within 12 miles) drilling projects though it is not absolutely clear that this was precisely the case from the text of the law.[18] This lack of clarity prompted the clarification exercise leading ultimately to the Council of State's confirmation on 20 October 2011;

(2) in 2012 the Respondent made an exception to its 2010 position insofar applications for new offshore (within 12 miles) drilling projects were pending prior to the entry into force of Law No. 128 of 2010. It is also a matter of fact that when the Claimants' investment was made in August 2014 (as noted above in paragraph 94), this was the state of the law at that time; and

(3) in late 2015 the exception for pending applications, which had been made in 2012 (*i.e.* as noted in the immediately preceding sub-paragraph of this Award), was removed. It was the late 2015 "removal" of the exception for pending applications which, as discussed above, led to the Respondent rejecting the Claimants' application recorded in the letter of 29 January 2016.

## D. The rationale for the change in law in late 2015

106.    The Tribunal now turns to its examination of the rationale for the change in the law in late 2015. It is noted that the Claimants comment extensively on the political tussles which they say were the predicate for the change in the law which had as their background apparent tensions as between regional and central government (for example, Section III.O of the Memorial on Jurisdiction, Liability and Quantum). For the moment, however, the Tribunal has as its principal focus the objective background to the legislative activity concerned.

107.    The Tribunal's attention is drawn by the Claimants (para. 49 of their Post-Hearing Brief) to Request 5 of their Request for Documents. The Request states the following:
*Documents prepared or commissioned by the Respondent between 30 September 2015 and 1 January 2016 proposing Article 1, paragraph 239 of the Budget Law [CLA-7] (namely, the reinstatement of Decree 128/2010) including:*

*(i) initiative, proposal, and consultation documents;*

*(ii) memoranda containing an analysis of Article 1, paragraph 239 of the Budget Law;*

*(iii) transcripts of floor debates concerning the enactment of Article 1, paragraph 239 of the Budget Law;*

---

[18]  The Tribunal notes that on 27 April 2012 (*i.e.* before Law No. 83 of 2012 came into force creating the exception for pending applications) the Respondent extended the Claimants' Exploration Permit in relation to *Ombrina Mare* (C-88).

*(iv) minutes of Ministers' and/or Ministers' Council and/or Ministers' Presidency Council meetings in which the enactment of Article 1, paragraph 239 of the Budget Law was discussed; and*

*(v) memoranda prepared by the Italian Parliament regarding the impact of the enactment of Article 1, paragraph 239 of the Budget Law on the questions that had been certified by the Regional Councils for Referendum.*

108.   In response, the Respondent stated the following:

*All the documents are public and available at the following link of the Italian Parliament: Parlamento Italiano - Disegno di legge S. 2111 - 17ª ... www.senato.it/leg/17/BGT/Schede/Ddliter/ 46119.htm*

109.   The Claimants produced a translation of part of the documents embedded in the aforementioned internet address (C-0168) and the Tribunal now records an extract thereof (with emphasis added):

*3. On 22 December 2015 the Senate definitively approved the Budget Law:*

*A. During a meeting of the Advisory Committee, and in particular during meeting no. 190 of 21 December 2015 of the 13th Permanent Committee (Territory, environment, environmental assets) the ban introduced by paragraph 239 and the life cycle of oilfields were discussed (...).*

*B. Lastly, the list of amendments inserted at this stage shows the following:*

*- "G/2111B/16/5 DE PETRIS, URAS - UPHELD AS RECOMMENDATION*

*The Senate, whereas:*

*• Paragraphs 129-ter et seq. of article 1, of the 2016 Budget Law, in the version approved by the Chamber of Deputies, contain amendments to current legislation on the granting of authorization titles for hydrocarbon exploration and extraction.*

*• Over the past months, such issues have been dealt with in multiple popular protest and participation initiatives which have led, among other things, to the formalization of six referendum proposals, pursuant to art. 75 of the Constitution, subject to the prior issue of a resolution on part of ten regional Councils;*

*• On 27 November last, the Court of Cassation expressed, for its part, its favourable opinion on the formal correctness of the six fundamental referendum demands and on 13 January next, the Constitutional Court is expected to issue its ruling;*

*• The changes in legislation introduced on the matters at hand by the Chamber of deputies respond only in part to the issues raised by the Regions with the referendum requests, and in particular, the issues raised in referendum demands no. 2, no. 3 and no. 6 concerning the local entities' approval, the duration of enabling titles for exploration and extraction and the actual prohibition to grant permits within twelve nautical miles were eluded;*

*• The legal framework which would originate as a result of the provisions introduced by the*

*Chamber of deputies gives rise to several issues open to ambiguous interpretation, with particular reference to ongoing authorization procedures, and it does not appear to be in line with the intention clearly expressed by the regional Councils, which points to the envisaged referendum.*

*Orders the Government to:*

*• Interrupt the ongoing authorization procedures for the exploration and extraction of hydrocarbons within twelve nautical miles from the coastline, along the entire national coastal perimeter and from the external perimeter of protected marine areas, for the purpose of preventing the circumvention of the ban under article 6, paragraph 17 of Legislative Decree dated 3 April 2016, no. 152;*

*• Ensure the approval on part of the Regions and the local authorities represented in the Single Committee (Conferenza unificata) in relation to the planning of the hydrocarbon exploration and extraction activities;*

*• Define a limited and indisputable duration both of enabling titles concerning the exploration and of enabling titles concerning the extraction of hydrocarbons;*

*• Adequately assess the positioning expressed by the ten regional councils on the envisaged referendum on hydrocarbon exploration and extraction, also taking into account the need to revisit national energy policies in light of the agreement recently reached in Paris during the Conference of the Parties to the UN Framework Convention on Climate Change (COP21).* [Emphasis added.]

The Italian original thereof is as follows:

*3. Il 22 dicembre 2015 il Senato ha approvato definitivamente la Legge di Stabilità:*

*A. In una seduta della Commissione Consultiva, in particolare nella seduta n. 190 del 21 dicembre 2015 della 13ª Commissione permanente (Territorio, ambiente, beni ambientali) si parla del divieto introdotto dal comma 239 e della vita utile dei giacimenti (v. qui).*

*B. Infine, nell'elenco degli emendamenti inseriti in questa fase risulta quanto segue:*

*- "G/2111B/16/5 DE PETRIS, URAS - ACCOLTO COME RACCOMANDAZIONE*

*Il Senato, premesso che:*

*• i commi 129-ter e seguenti, dell'articolo 1, della Legge di Stabilità per il 2016, nel testo approvato dalla Camera dei deputati, contengono modifiche della vigente disciplina in materia di rilascio dei titoli autorizzativi concernenti la ricerca e l'estrazione di idrocarburi;*

*• tale materia è stata oggetto, nei mesi scorsi, di molteplici iniziative di protesta e di partecipazione popolare che hanno condotto, fra l'altro, alla formalizzazione di sei proposte di referendum abrogativo, ai sensi dell'art. 75 della Costituzione, previa deliberazione di dieci Consigli regionali;*

*• il 27 novembre scorso la Corte di Cassazione, ha espresso, per quanto di propria competenza, parere favorevole sulla correttezza formale dei sei quesiti referendari, e il 13 gennaio prossimo è previsto il pronunciamento della Corte Costituzionale;*

*• le modifiche legislative introdotte in materia dalla Camera dei deputati rispondono solo*

*parzialmente alle questioni poste dalle Regioni con le richieste di referendum, risultando in particolare eluse le questioni poste dai quesiti referendari n. 2, n. 3 e n. 6, concernenti l'intesa con gli Enti territoriali, la durata dei permessi dei titoli abilitativi per la ricerca e l'estrazione e il divieto effettivo di rilascio di permessi entro le dodici miglia marine;*

*• il quadro legislativo che si verrebbe a determinare con le disposizioni introdotte dalla Camera dei deputati presenta diverse problematiche di dubbia interpretazione, con particolare riferimento ai procedimenti autorizzativi in corso, e non appare rispondente alla volontà chiaramente espressa dai Consigli regionali, nella direzione della prevista consultazione popolare referendaria,*

*impegna il Governo:*

*• a interrompere l'iter dei procedimenti autorizzativi in corso concernenti ricerca ed estrazione di idrocarburi entro le dodici miglia marine dalle linee di costa, lungo l'intero perimetro costiero nazionale, e dal perimetro esterno delle aree marine protette, al fine di assicurare che non sia eluso il divieto di cui all'articolo 6, comma 17, del decreto legislativo 3 aprile 2006, n. 152;*

*• ad assicurare l'intesa con le Regioni e con gli enti locali rappresentati nella Conferenza unificata in ordine alla pianificazione delle attività di ricerca ed estrazione di idrocarburi;*

*• a definire una durata temporalmente limitata e certa sia per i titoli abilitativi concernenti la ricerca che per i titoli abilitativi concernenti l'estrazione di idrocarburi;*

*• a valutare adeguatamente l'orientamento espresso dai dieci consigli regionali in ordine all'effettuazione della prevista consultazione popolare referendaria in materia di ricerca ed estrazione di idrocarburi anche in considerazione della necessità di rivedere le politiche energetiche nazionali alla luce dell'accordo recentemente raggiunto a Parigi in occasione della Conferenza delle parti sulla Convenzione Quadro delle Nazioni Unite sui Cambiamenti Climatici (COP21).*

110. While the Claimants seek to rely upon statements made by individual parliamentarians (paras. 122-123 of the Reply Memorial on Jurisdiction, Liability and Quantum)(the record of those statements reflected in C-0168 does show views expressed which were unfavourable to the Claimants), ultimately the synthesis of final parliamentary views leading to the implementation of Law No. 208 of 2015 is that as set out just above in emphasised text. The Tribunal comes to this factual conclusion in light of the fact that the Respondent's response to the Claimants' Request No. 5 for the production of documents was specifically directed to the Parliamentary record (via the weblink indicated). Secondly, on reviewing the contents of C-0168 the Tribunal has considered that the extract recorded just above is the material reasoning at a parliamentary level. While there were indeed exchanges of differing viewpoints expressed by different parliamentarians, those are the types of evolving political discussions which are the product of such debates. Attributing to such diverse and competing political views, expressed in the cut and thrust of parliamentary discourse, the content of the rationale for final governmental decisions would likely take such debates out of their proper context.

111. However, the parliamentary record is not the complete picture. During the course of the oral hearing the Tribunal was assisted by the testimony of Dante Brandi who at the time of testimony

was the Consul General of the Respondent in Viet Nam, but had previously served in the Italian Embassy in London when there had been meetings with the Claimants' representatives. At para. 2 of his witness statement the following is stated:

*In particular, I refer to the meeting mentioned by Mr. Moody [of the Claimants] (paragraphs 56 to 58) with the then Ambassador of Italy to the United Kingdom, Pasquale Q. Terracciano. The meeting took place on April 2016 at the Embassy of Italy in London and, as correctly reported by Mr. Moody, I was present in my capacity of First Counsellor for Economic Affairs at the Embassy.*

112. During the course of the cross-examination of Dante Brandi, the following questions and answers were placed onto the record of this arbitration:

[Transcript, day 3, p. 5]

*Q. Prior to the meeting on 16th April, what was your knowledge of the Ombrina Mare project?*

*A. I was -- I was pretty well aware of the Ombrina Mare project because we had regular meetings with the Mediterranean Oil & Gas management first, and Rockhopper eventually, on a pretty regular basis.*

*Q. When you say "we", do you mean you and the ambassador or you individually?*

*A. Well, mainly myself, because of my competence at the time.*

[Transcript, day 3, p. 11]

*Q. So, Mr Brandi, my first question is this: do you accept that during 2015, and particularly the latter half of 2015, there was a battle going on between the federal government and the regions as to power? Do you accept that as a fact?*

*A. Yes.*

*Q. Do you also accept as a fact, Mr Brandi, that one of the results of that power struggle was that the ban was reintroduced in January 2016?*

*A. Yes.*

*Q. Do you also accept that as a result of that, Rockhopper did not receive the production concession?*

*A. No, I cannot say that.*

*...*

*MR SPRANGE: So, Mr Brandi, do you agree that as a matter of fact the ban reintroduced in 2016 had a negative impact upon Rockhopper's production concession application?*

*A. Well, what I recognise is that there was a struggle and some dialogue between local and central authorities in Italy upon developing investments in oil and gas sector, not only in Abruzzo, which is the region, but also in other Italian regions. This is what I acknowledge.*

*Q. Yes. And that led to a referendum; and then to avoid the referendum, the central government*

*reintroduced the ban. I think you've agreed with me so far on that; correct?*

*A. These are facts. I mean, this is just history.*

113. Taking this testimony together with the parliamentary record discussed above gives the Tribunal a reasonable overall picture of the factual background to Law No. 280 of 2015. Some of the principal points which reasonably emerge from the record are summarized in the following paragraph.

114. There were indeed political tensions in the background, and objectively speaking, such tensions as between central and regional authorities were undoubtedly present. There was an intention to hold a referendum (as noted in Fact No. 41), but the political grounds for this were resolved through parliamentary action at a central level (as noted in Fact No. 47). It can reasonably be seen that this parliamentary action headed off the likely referendum issues (again also noted in Fact No. 47). These are all the various manifestations of political discourse. They are, in and of themselves, part and parcel of the normal political functioning of a country. It is a different matter as to whether or not sovereign measures taken as a result of such political processes engage international responsibility pursuant to specific promises embodied in applicable treaties.

## E. The third Claimant's purchase in 2014 of the other Claimants

115. Having analysed the factual context of the legal position which applied in late 2015 (which was the apparent and stated basis of the Respondent to reject the Claimants' application for a production concession), the Tribunal now moves on to analyse that which was purchased by the third Claimant in August 2014. As already noted above, August 2014 is stipulated by the Parties to be the relevant date for the investment at hand in this arbitration for the purposes of the ECT.

116. As was already noted, the application for the production concession was pending since 2008, but the relevant (for present purposes) investment was made in August 2014. Thus, the investment can be encapsulated in its essential nature as the purchase by the third Claimant of an entity which had the benefit of a pending application for a production concession. The Tribunal also notes, in passing, that that pending application was the only one which was ever "in play" with the Respondent, and it was ultimately the application which was rejected by the letter dated 29 January 2016.

117. Within the record of the arbitration are a number of due diligence documents associated with the third Claimant's purchase of the other Claimants in 2014. In particular, there is a legal due diligence document (C-40) dated 21 May 2014 which contains the following discussion of the *Ombrina Mare* situation:

*(l) Ombrina Mare*

*(i) Ombrina Mare Exploration Permit*

*• MOG Italia has a 100 per cent participating interest in the Ombrina Mare Exploration Permit.*

• *The term of the Ombrina Mare Exploration Permit was extended in 2012 until 5 May 2015 by MED decree. We understand that the Ombrina Mare Exploration Permit was suspended for one year from 5 May 2011 until 5 May 2012.*

• *We understand from the Target that the Ombrina Mare 2d well has been completed but is shut-in pending field development.*

*(ii) Ombrina Mare Production Concession Application (d30BC MD)*

• *We understand that an application has been filed with the MED to obtain an exploitation production concession in relation to the well called "Ombrina Mare". However, such request has not yet been granted due to the pending arbitration proceedings. Please refer to section 7.1 for further details.*

*... ... ... ... ... ...*

*7. LITIGATION*

*7.1 Ombrina Mare (administrative litigation)*

*(a) We understand that MOG Italia has challenged (before the Lazio Regional Administrative Court (the "Court")) a decision of the Italian Ministry of the Environment and Protection of Land and Sea (the "MEPLS") which found that an Integrated Environmental Authorisation ("AIA") must be obtained before the MEPLS would provide sign off on the Environmental Impact Assessment ("EIA") already initiated by MOG Italia.*

*(b) An Environmental Impact Assessment is a statutory review of the potential environmental, social and economic effects that a proposed hydrocarbon development project may have and aims to identify, predict, evaluate and mitigate those effects.*

*(c) The claim submitted by MOG Italia sought to:*

*(i) obtain a declaration from the Court confirming that an AIA is not a precondition to the MEPLS signing off on the EIA; and*

*(ii) require the MEPLS to commence its sign off of the EIA on the Ombrina Mare well.*

*(d) On 17 April 2014, the Court rejected the claim filed by MOG Italia. As a result, MOG Italia has been required to apply for an AIA. We understand that MOG Italia has already prepared the necessary documentation in anticipation of this result and is ready to initiate the AIA procedure as soon as possible. However, we do not have visibility on how long it may take to obtain the AIA, as timings can vary widely from project to project.*

*(e) The Court has instructed MOG Italia to pay its own court costs while MOG Italia has reserved its right of appeal against the Court's ruling.*

118. Separately, in its review of the legal due diligence document the Tribunal finds no reference to Law No. 83 of 2012 save in connection with a different project (Guendalina) as regards an increase in royalty payments.

119.  In addition, within the record of the arbitration is a contemporaneous document entitled *Recommended Cash, Share and Contingent Consideration Offer* dated 23 May 2014 (C-41). The purpose of that document was to record the following:

> *The boards of Rockhopper Exploration plc ("Rockhopper") and of Mediterranean Oil & Gas plc ("MOG") are pleased to announce that they have reached agreement on the terms of a recommended acquisition under which Rockhopper will acquire the entire issued and to be issued ordinary share capital of MOG (the "Acquisition"). The Acquisition is to be effected by means of a Court sanctioned scheme of arrangement under Part 26 of the Companies Act 2006.*

120.  Further in the same document is the following statement concerning *Ombrina Mare*:

> *5.5 Rockhopper sees significant potential in the 100 per cent owned and operated Ombrina Mare project, which already has 2C Contingent Resources of 26.5 mmboe with the ability for this to be increased materially depending on the results of the next planned appraisal well. Rockhopper has spent time understanding the Ombrina Mare discovery and Rockhopper believes that with additional technical and engineering work, combined with some patience and funds available to support an appraisal of the discovery, its value can be significantly increased over time.*

121.  The Tribunal notes that in the witness statements of both Samuel Moody and Stewart MacDonald (presented on behalf of the Claimants) there is discussion of the acquisition and the processes which led to the consummation of that transaction. However, the contemporaneous and specific documentation, namely the legal due diligence and *Recommended Cash, Share and Contingent Consideration Offer*, in the Tribunal's assessment give the necessary full picture of the intended investment.

122.  As a matter of fact, therefore, <u>at the time the investment was made in August 2014</u>, there was:

(1) a pending application for a production concession;

(2) the relevant law in force prohibited exploration within 12 miles of the Italian coastline <u>but</u> provided for an exception for pending applications (*i.e.* there was a carve-out saver for applications such as that of the Claimants pending since 2008);

(3) the outcome of administrative litigation concerning a requirement to file an *Integrated Environmental Authorisation* as a prerequisite to the relevant Ministry signing off on the *Environmental Impact Assessment* had recently emerged. That litigation outcome was to the effect that the Claimants were going to have to file such an *Integrated Environmental Authorisation* or an "AIA" (which in fact was submitted on 13 May 2014 (C-113)); and

(4) the Claimants understood that "additional technical and engineering work, combined with some patience and funds available to support an appraisal of the discovery, its value can be significantly increased over time."

# F.  The events which occurred in relation to the Claimants'

# application between the time of the investment and the final rejection in January 2016

123. Having discussed and reviewed the various statutory and regulatory provisions which were in place at the material times, it is now appropriate to examine the specific important events surrounding how the Claimants' application for a production concession moved on from the time of the making of the investment in 2014.

124. On 6 March 2015, the Respondent's Ministry of the Environment and the Protection of Land and Sea issued a detailed and lengthy document (C-114) approving "Rockhopper's EIA application (including the AIA)" (Fact No. 39). This was titled "Opinion no. 1727 of 6 March 2015" in connection with *VIP 326 Joint VIA-AIA Investigation, pursuant to Art. 10 of Leg. Decree 152/2006 as amended - Cultivation project of the Ombrina Mare hydrocarbon reservoir in the scope of the d30 B.C-MD concession.* At p. 26 thereof, the following is stated (which is predicated on a plethora of recitals and considerations [19]):

*WITH REGARD TO, HAVING CONSIDERED AND ASSESSED the above, the Environmental Impact Assessment Technical Commission - VIA and VAS*

*EXPRESSES*

*its positive opinion on the environmental compatibility assessment regarding the implementation of the "Cultivation project of Ombrina Mare hydrocarbons in the scope of the d30 B.C-MD concession", provided that all of the proposed mitigation measures by the Applicant are taken and, as it is a VIA-AIA opinion, that it complies with the following prescriptive framework, which completely replaces the prescriptive frameworks of the VIA VAS Commission Opinions no. 541 of 7/10/2010, no. 1154 of 25/1/2013 and no. 1192 of 3/4/2013 and the requirements for the PMC (Monitoring and Control Plan) prepared by the IPPC Commission, Relevant Risk Division-AIA, included in this opinion*

The Italian original is as follows:

*Tutto ciò VISTO, CONSIDERATO E VALUTATO la Commissione Tecnica per la Verifica dell'Impatto Ambientale - VIA e VAS,*

*ESPRIME*

*giudizio positive di compatibilità ambientale concernente la realizzazione del "Progetto di coltivazione del giacimento di idrocarburi "Ombrina Mare nell'ambito della concessione di coltivazione d30 B.CMD" a condizione che vengano adottate tutte le misure di mitigazione proposte dal Proponente e, trattandosi di un parere VIA-AIA, che si ottemperi al seguente quadro prescrittivo,*

---

[19] Amongst the many different recitals and considerations the following is included (pp.3-4) (emphasis added): *HAVING CONSIDERED that the project area which, according to previous legislation (Legislative Decree no. 128/2010) was among the prohibited areas for research, development and cultivation, as the nearest project area is approximately 6.5 km from the coast, and according to the current legislation, Art. 35, paragraph 1, of Decree-Law no. 83/2012 (converted into Law no. 134/2012), which entered into force on 26 June 2012, is excluded from the prohibition since the transitional regime for the prohibition of hydrocarbon research and cultivation at sea established by Art. 2, par. 3, letter H of Leg. Decree 125/2010, does not apply to the concession proceedings referred to in Art. 9 of Law no. 9/1991 which, as the one in question, were in effect at the date of entry into force of Legislative Decree no. 128/2010 (26/8/2010).* In addition, the fact is recited of notes received from regions, provinces and cities, amongst others (p. 5).

*che sostituisce integralmente i quadri prescrittivi dei pareri della Commissione VIA VAS, n. 541 del 7/10/2010, n.1154 del 25/1/2013 e n. 1192 del 3/4/2013, e alle prescrizioni relative al PMC (Piano di Monitoraggio e Controllo) redatto dalla Commissione IPPC, Divisione Rischio Rilevante-AIA, incluso nel presente parere:*

125.   Following this statement of a positive opinion, the document sets out a long list of matters which must be undertaken. By way of representative example, the first such matter is now recorded:
*the Applicant must present the detailed design of the pipelines, the means and methods of laying or placing pipelines, and the technical choices that motivate such methods by including the following: 1) design of pipes (thickness, curvature, elasticity, mechanical and cathodic protections, thickeners, etc., 2) execution of reliefs along the pipeline corridors with detailed bathymetry, obstacle relief, geo-referencing of outlines, 3) seabed sediment characteristics, granulometry and lithology, 5) seabed currents for predicting interactions between pipelines and solid-state transport on the seabed, 6) safety sheets of the materials used for the protection of the new marine pipelines and cables for the hydraulic conductivity testing, 7) methods and point of withdrawal and disposal of water used for pressurisation and cleaning of the pipeline during the final testing phase*[...]

The Italian original is:

*il Proponente, prima dell'inizio dei lavori, dovrà presentare il progetto di dettaglio dei tracciati delle condotte, dei mezzi e delle modalita' di posa o di interramento delle condotte e le scelte tecniche che motivano tali modalità comprensivo dei seguenti elaborati: 1) progettazione delle condotte (spessori, curvature, elasticità, protezioni meccaniche e catodiche, appesantimenti, ecc), 2) esecuzione di rilievi lungo i corridoi dei tracciati delle condotte con batimetrie di dettaglio e georeferenziazione dei tracciati e degli ostacoli, 3) caratteristiche dei sedimenti di fondo con campionature di granulometria e litologia, 5)rappresentazione delle correnti di fondo per la previsione delle interazioni tra le condotte e il trasporto solido su fondale, 6) schede di sicurezza dei materiali utilizzati per la protezione delle nuova condotte marina e dei cavi per il collaudo idraulico della condotta, 7) modalità ed il punto di prelievo e smaltimento dell'acqua utilizzata per la pressurizzazione e pulizia della condotta nella fase di collaudo*[...]

126.   On 7 August 2015, the Respondent's Ministry of the Environment and the Protection of Land and Sea issued "MINISTERIAL DECREE – REGISTRATION 0000172 OF 07/08/2015" (Fact No. 40)(C-115). This was a similarly lengthy and detailed document akin to C-114 discussed just above. Following many recitals, the key part of the document states (p. 9):
*HAVING HELD that, on the basis of the foregoing, all the conditions have been met providing for the issuance of the decree herein below pursuant to Articles 10 and 26 of Legislative Decree no. 152 of 3 April 2006 and its subsequent amendments and additions;*

*DECREES*

*the environmental compatibility of the execution of the project "Development of the Ombrina Mare deposit in the context of the application for the awarding of the Production Concession conventionally known as d 30 B.C-MD", located in the Adriatic Sea adjacent the Abruzzo coast and the AIA for the operation of the Ombrina Mare platform submitted by the Company Medoilgas Italia*

*S.p.A, now "Rockhopper Italia S.p.A", with its registered office in Via Cornelia 498, 00166 Rome Italy on the condition that the prescriptive and administrative requirements indicated in the following Annexes, which are an integral part of this decree, are fulfilled:*

*- Annex 1: EIA Prescriptive Framework*

*- Annex 2: AIA Prescriptive Framework*

*- Annex 3: Administrative Prescriptions for the AIA*

*- Annex 4: Monitoring and Audit Plan for the AIA*

The Italian original is as follows:

*RITENUTO che, sulla base di quanto premesso, sussistono tutte le condizioni per dovere provvedere ai sensi degli articoli 10 e 26 del D.lgs 3 aprile 2006, n. 152 e ss.mm.ii. all'emanazione del presente provvedimento;*

*DECRETA*

*la compatibilità ambientale concernente la realizzazione del progetto di "Sviluppo del giacimento Ombrina Mare nell'ambito dell'istanza di conferimento della Concessione di Coltivazione convenzionalmente denominate d 30 B.C-MD'~ ubicata nel Mare Adriatico adiacente alla costa Abruzzese e la Autorizzazione Integrata Ambientale per l'esercizio delle piattaforma "Ombrina Mare" presentato dalla Società Medoilgas Italia S.p.a., ora "Rockhooper Italia S.p.A." con sede in Via Cornelia, 498 - 00166 Roma, a condizione che vengano ottemperate le prescrizioni e gli adempimenti amministrativi indicati net seguenti allegati che costituiscono parte integrante del presente decreto:*

*- Allegato 1: Quadro prescrittivo relativo alla VIA;*

*- Allegato 2: Quadro prescrittivo relativo all' AIA;*

*- Allegato 3: Adempimenti amministrativi relativi all' AIA;*

*- Allegato 4: Piano di monitoraggio e controllo relativo all'AIA.*

127. The Respondent's Counter-Memorial (para. 128-129) describes the aftermath of the publication in the Official Gazette by the Claimants of the aforementioned approvals:
*128. These environmental approvals (EIA) were published by Rockhopper in the Official Gazette number 93 - Part Two of Thursday 13 August 2015. As testified by Mr. Terlizzese, by then MISE had a firm belief that the current conditions rendered the project unviable.*

*129. Further, at that same time, the favorable EIA news provoked an enormous reaction against the project by Abruzzo Region and by the local communities and administrations, culminating in a climate of strong media pressure. Despite the high probability of a precautionary suspension of the environmental compatibility measure by the Regional Administrative Court, following the announced appeals by public bodies and / or environmental associations, the MED nonetheless continued the process, calling for a Conference of Services on 14 October 2015. The Conference of*

*Services was called for in order to acquire the missing opinions of the Ministry of Infrastructure and Transport, the Ministry of Defense and the Ministry of Agriculture and Forestry, as well as to "feel" the local administrations within 12 nautical miles from the places concerned from activities (as envisaged by the then current formulation of Article 6 paragraph 17 of Legislative Decree 152/2006).*

128.　On 14 August 2015, the Claimants formally wrote (C-116) to the Respondent's Ministry for Economic Development, recording the fact that they had caused to be published in the Official Gazette on 13 August 2015 the aforementioned approval, and then sought:
*In view of the above, the company Rockhopper Italia S.p.A.*

*lodges this application*

*for the start of the procedure for granting the production concession conventionally called 'd30B.C-MD'.*

129.　The Claimants refer to a particular provision of Italian law (CLA-3)("Decree 484") which they say was engaged at this moment:
*Decree of the President of the Republic 18 April 1994, No. 484*

*Art. 16, para. 3*

*The Ministry [translator's note: Ministry of economic development], within fifteen days from the receipt of the environmental compatibility decree by the Ministry of the environment, issues the decree for the award of the production concession.*

The Italian original is:

*3. Il Ministero, entro quindici giorni dalla notifica da parte del Ministero dell'ambiente della pronuncia di compatibilità ambientale, emana il decreto di conferimento di concessione di coltivazione.*

130.　At para. 166 of the Memorial on Jurisdiction, Liability and Quantum, the Claimants posit the case that, at the latest, by operation of this law, the grant of the production concession was legally due on 29 August 2015. In the Claimants' view of Italian law, this appears to be the moment the Parties' relationship changed, and moved from that which obtained heretofore (namely, an applicant hoping for a successful outcome to that of an applicant with a vested right to the subsequent grant of a production concession). If the Claimants are correct in their view of Italian law, then the Rubicon was crossed insofar as the right to the subsequent grant of the production concession was concerned.

131.　There is a profoundly important distinction, and the Tribunal has taken the greatest care to thoroughly appreciate its significance, namely, that as of that moment on 29 August 2015 the Claimants' position is that they had a right to be granted the production concession, <u>but</u> that is not the same thing as saying that they actually <u>had</u> such a production concession.

132. Expressed differently, the Claimants' argument is that they moved, at that moment on 29 August 2015, <u>from</u> the <u>hope</u> that their application for a production concession would be successful <u>to</u> a position where they definitively knew that their application was going to be successful and granted within a statutory time period. There was then, as a matter of Italian law, no going back and the outcome (*i.e.* the subsequent formal process of the grant of the production concession) was legally inevitable.

133. In that regard the Claimants refer the Tribunal to para. 97 of the First Witness Statement of Roberto Leccese, a partner at Ughi & Nunziante in Rome, which sets out his contemporaneous understanding of the legal position at that time (as advisor to the Claimants):
*We expected that the decision on the Production Concession would come within 15 days, <u>as required by law</u>.* [Emphasis added.]

134. The Respondent disputes the applicability of this provision and argues (paras. 63-73 of the Counter-Memorial) that it was repealed. In particular, the Respondent says that it was repealed as of 13 February 2008 by Article 36, para. 3(a) of the Environmental Code. Further, the Respondent refers the Tribunal to Article 15 on "Repeal of laws" of the "Provisions on the law in general" of the Italian Civil Code which provides that laws are repealed only by express declaration of the lawmaker in later laws or for incompatibility between the new and the preceding provisions or because the new law governs the entire matter already governed by the prior law. In the latter regard, it says that the Environmental Code governs the entirety of environmental matters. These submissions are confirmed by the Expert Report of Prof. Eugenio Picozza (section 5).

135. The Claimants counter, in the Reply, as follows:
*The amendments to the Environmental Code that allegedly impacted Articles 16 and 17 of Decree no. 484/1994 did not regulate the specific issues contained in those provisions. As Mr. Leccese explains, Decree no. 484/1994 and the Environmental Code regulate different matters: the former regulates applications for hydrocarbons permits before the MED, while the latter governs environmental matters, such as EIA applications pending before the MEPLS.*

136. These submissions are confirmed by Mr Leccese's Second Witness Statement, para. 21:
*The 15-day term pursuant to Decree no. 484/1994 (art. 16, paragraph 3) for the issue of the concession following the EIA was neither expressly nor tacitly repealed by the Environment Code, since (a) as stated above, the latter does not regulate the Production Concession Application process nor the MED's powers on the granting of a production concession; and, in any case, (b) the 15-day deadline set forth by Decree no. 484/1994 has nothing to do with the EIA process in that in that [sic] it applies after completion of the same.*

137. The final say in the exchange of written submissions before the Hearing, came from the Respondent in the Second Expert Report of Prof. Picozza, p. 25:
*I also supported the argument of the implicit repeal of the art. 16 of Presidential Decree 484/1994, which, moreover, expressly referred to both art. 2 paragraph 3 of the law 9.1.1991 (article completely repealed by the aforementioned article 36, paragraph 3, letter h) of the Environmental Code and of the art. 6 paragraph 4 of the law 8th July 1986, n. 349 (in turn repealed by Article 36*

*paragraph 3 letter a) of the Environmental Code).*

138.  At the Hearing (Tr. Day 3, pp. 53-54), Mr. Terlizzese (Director General of the Directorate-General for Safety of Mineral and Energy Activities, National Office for Hydrocarbons and Gee-resources (DGS-UNMIG), within the Ministry of Economic Development (MISE) was cross-examined as follows (in relevant extract). While the quotation is extensive, the Tribunal considers it to be of importance in order to fully and fairly reflect his testimony:

*Q. How engaged were you, on a day-to-day basis, on Rockhopper's production concession application between August 2015 and December 2015?*

*A. A fair amount. I would say that a significant part of my time that is not simply dedicated to this side of oil production was dedicated to this file, because it was very important, it was urgent, and it was important from many points of view. So I did give a lot of my time. I took part in meetings and I was also briefed regularly by the manager in charge.*

*Q. When you say it was very urgent, is that because the law requires a production concession to be granted within 15 days of the environmental decree being granted?*

*A. No, this is not so. The concession needs to formally be given within 150 days from the application. So my aim was to finish this work, having received the file around 15th August 2015, by the end of 2018 (sic).*

*Q. Are you sure it's not the fact that the concession has to be provided within 150 days of it being filed, and that it's 15 days after the EIA has been granted? I can show you the provisions of the law if you're unsure.*

*A. Yes, but I could also show you a list of the concessions that were granted in the whole history, and none of them were granted within 15 days of the EIA. And this is impossible because the operator is not in a position to give all the material, the documents that are necessary, within 15 days of the decree.*

*Q. Is it your evidence that you couldn't do it in 15 days because Rockhopper didn't give you some documents?*

*A. Even if Rockhopper had provided the documents, technically it would have been impossible for our offices to contact all the local administrations and follow this process that goes back to 2008/2009. So something that had happened at a very different time, with a different price scenario, but also from a technical, economic, structural and development the situation was completely different, so it had to completely be reviewed, and I think here there was nothing said by the company. The company wanted to obtain quickly the concession, like all other companies do. So we try, because the law asks us, to keep to the timing of the applications. So this is what we were doing. So we were committed, I was personally committed, and it was urgent, and the law states that. So we were completely compliant.*

139.  Following the conclusion of the cross-examination of Mr. Terlizzese he was re-examined by the Respondent and, again in the interests of thorough and complete fairness, the Tribunal records this further testimony in full (pp. 77-79):

*Re-direct examination by MR GAROFOLI*

Q. (Interpreted) Mr Terlizzese, we mentioned the files that exist at the ministry on this procedure, the production concession application by Rockhopper, and we also talked about some draft documents that, as a result of meetings and exchanges, were included in these files. Do these files contain also the assessments on the technical and financial producibility of this oilfield that were discussed with Mr Morandi?

A. Yes, there were a number of discussions, especially on the development project. We acknowledged that it would have been impossible to have more information on the amount available in this oilfield on the basis of a single well. The Rockhopper assessment is based particularly on how complex the treatment and recovery would be.

Q. So Rockhopper knew that the ministry had some doubts on the producibility from a technical and financial point of view of this oilfield? And here I refer to a question asked at 10.46 --

MR SPRANGE: I can be a patient man, but when a supposedly non-leading question starts with, "So Rockhopper knew the ministry had some doubts", even I lose my patience.

THE PRESIDENT: Could I say that, particularly in re-direct --

MR GAROFOLI: (In English) Okay, I'll go on.

THE PRESIDENT: -- it's probably best not to suggest the answer, because the answer that would come perhaps may not necessarily have the same weight with the Tribunal.

MR GAROFOLI: (Interpreted) Do you know whether Mr Morandi had been informed about these critical points and this doubt?

A. Yes.

Q. Did you discuss with Mr Morandi only the technical aspects or also the economic and financial aspects linked to this oilfield and the project in general?

A. We discussed the technical and economic capability of Rockhopper Italia and we discussed the economic viability of the project.

Q. Okay. Let's go to slide 49 of the Claimants' presentation. Maybe you were taken a bit by surprise when you replied, when you answered, because the way we interpret this slide, these are the studies made over time relating to the Ombrina Mare oilfield, and which were prepared and presented over time. Did you take into account all the technical studies prepared and presented by the applicants in the various phases of the project?

A. Yes. Even though they didn't have this form, we examined and compared the different scenarios, starting from when Elf submitted the first project. At that time the amount of data available were far more limited than what we later had. We could follow the evolution of the value of the figures, and obviously we focused on the recoverable oil, which is what was of interest to us. We also especially focused on the recovery rate, because this is a very controversial criterion. But if we look at the literature, we can see that the value[s] given by Elf in 2010 are very optimistic values.

MR GAROFOLI: (In English) Thank you, Mr President. This is enough for us.

140. At the Hearing (Tr. Day 5, pp. 191-195), Prof. Picozza was cross-examined on this subject, and the following exchange took place (while the quotation is extensive, the Tribunal considers it to be of importance in order to fully and fairly reflect his testimony):

*Q... Do you agree that there is a timeline in the law for the Ministry of Economic Development to decide an applicant's request for a production concession?*

*A. Yes. But I would like to point out the fact that the minister does not have a contractual obligation, but it also has administrative powers. This is quite different. So we cannot reason in terms of obligations. Otherwise the law would have not made a distinction between a damage caused by a delay and a damage caused by a tort. You may like it or not, but that's the truth.*

*Q. I like your answer very much because it's the truth, but also the answer to my question was: yes, there is a timeline. So now I want to ask you the next question. What is that timeline for the ministry to decide the application?*

*A. We are talking about the Ministry of Economic Development, aren't we? We are talking about the Ministry of Economic Development, aren't we? Because we have already exhausted the example with the Ministry of Environment.*

*Q. We are.*

*A. According to Decree 484, there were 15 days. But in my opinion, this rule is not applicable because it was based on the assumption that the ministry could decide independently from the EIA, regardless of the EIA. This is no longer true. But if we want to talk of who is at fault, I don't think it was the government, but the Parliament and the council of European ministers, because they said that the EIA was mandatory for these type of activities. And they also said that if a country did not comply, if a Member State did not comply with this, it could be subject to proceedings for breach of the regulations. This affected also the United Kingdom; obviously before Brexit, if it will take place.*

*Q. So I want to go to the first part of your answer. You say that there were 15 days for the Ministry of Economic Development to decide the production concession application after the Ministry of the Environment has issued the environmental permit, but you suggest that this should not be the case. What I want to know then is: affirmatively, what do you put forward as any indication of the timeline that the Ministry of Economic Development must act within after the Ministry of Environment has awarded the environmental permit?*

*A. It's important to say, first of all, that here we are talking about non-peremptory terms, if we talk about compensation. This has to be clear. Normally the same Law 241, which, as you know, is the main law of reference for administrative procedures, the law states 30 days. But this can be -- you can also have a challenge in a --*

*Q. Professor, if I may interrupt you. I don't want to talk about whether something is peremptory or non-peremptory, or the consequences that may follow if a timeline is not respected. I just want to know that if you are in Rockhopper's position, the Ministry of Environment has issued its environmental application permit on 7th August, and Rockhopper came to you and said, "Professor, what is the timeline now that the Ministry of Economic Development is supposed to act within on my production concession application?", what would you say in terms of the timeline under law?*

*A. I would tell them to be as patient -- to have biblical patience, patience in a biblical sense, because*

*the ministry does what they can. But you can also use an injunction, which is an instrument which is used quite often, and which is very important also according to the Italian Civil Code, an injunction that we notify by means of court officer. It has to be official; obviously an email or a letter sent by registered post is not enough. And this is very important to establish alleged fault. It's very important. Today this system is used also for public tenders, public procurement. If a company wants to appeal, they first have to send an injunction to the public body involved, and the public body has the opportunity to withdraw its measures if they are considered unlawful.*

*Q. So if Rockhopper came to you in August 2015, I understand your answer to be that you would tell them to be patient, that you would not be able to provide any timeline. So if they said, "Is it 15 days, 30 days, a year, two years?", you could not answer that, but you would say, "Perhaps you can seek an injunction at some point". Is that a fair summary of what you just said?*

*A. This is a statement that I don't entirely agree with. I would have indicated a timeframe, 30 days, because that's what the law says. I would have said, "Wait for 30 days. Maybe first send them a very polite letter. If they don't answer within 30 days, then issue an injunction, get an injunction issued". If I may add something, after 30 days, after another 30 days, you can start proceedings in front of the administrative tribunal, the power to demand the granting of the permit. This is how the Italian system works. In my presentation I forgot to say that I was a member of the committee that prepared the Administrative Procedure Code, so I know it inside out.*

141.  Following the conclusion of the cross-examination of Prof. Picozza he was re-examined by the Respondent and, again in the interests of thorough and complete fairness, the Tribunal records this further testimony in full (pp. 203-204):
*Re-direct examination by MR GAROFOLI*

*Q. (Interpreted) Only one question and then we are done. Can you remember the judgment of the Council of State 943/2016 that involved Rockhopper Italia SpA?*

*A. (Interpreted) Yes, of course.*

*Q. For the record, it is L-0137.*

*MR MASCARENAS: I did not discuss any Council of State judgments.*

*THE PRESIDENT: Although you did not in fact discuss it, it may still touch upon the cross-examination.*

*MR MASCARENAS: Fair enough.*

*MR GAROFOLI: As a result of this judgment, in terms of delay of the public administration or what could be considered lawful by the judges, was there a margin to request compensation in Italy by Rockhopper?*

*A. I can only express my opinion obviously; it is not necessarily the truth. Rockhopper also had another possibility: they could challenge the final rejection of the concession. I think it was dated 17th January 2017. And they could have also raised a constitutionality issue of the Budget Law, and*

*they could have reported Italy to the European Commission. And they could have requested the annulment and compensation or even just compensation. I would like to add that in the case law of the Court of Justice, although the assessment of responsibility does not necessarily go hand in hand with compensation, we have to decide, it has to be decided whether a breach has been committed or not. This is my opinion.*

*Q. So because they didn't do this, could they apply for compensation?*

*A. They didn't do this, and then they kind of lost the right to do it, because our code has two provisions: Article 29, that provides for annulment that must happen between 60 days; and then within 120 days from when the fact was assessed or the judgment became final, then they can apply for compensation.*

*MR GAROFOLI: Thank you very much, Professor.*

*THE PRESIDENT: Sir, thank you for your testimony. It's now concluded. Thank you. There are no questions from the Tribunal.*

142. The Tribunal now reflects on the Parties' positions on the specific testimony elicited from Mr. Terlizzese and Prof. Picozza and moves to their respective PHBs.

143. At para. 14.4 of the Cl. PHB, the Claimants expressly submit that Prof. Picozza conceded during the Hearing that Decree 484/1994 provides a timeline for the MED to act, failing which an applicant may pursue legal action against the Italian authorities, and that nothing in Decree 484/1994 modified Law 9/1991. In that same paragraph of the Cl. PHB the Claimants make a similar point as regards the testimony elicited from Mr. Terlizzese.

144. The Tribunal's review of the Resp. PHB does not ascertain similar, albeit contrary arguments as regards the consequence of the testimony at the hearing of Mr. Terlizzese and Prof. Picozza.

145. During the October Hearing the Claimants presented arguments encapsulated in a PowerPoint presentation and one page thereof is replicated now in full.

Italy knew that the 15 day deadline was law and carried consequences

• Italy failed to issue the Production Concession by 22 August 2015

• MED under obligation, pursuant to Article 16 paragraph 3 of Decree 484/1994 [L-**3**], to issue the production concession within 15 days from the EIA Decree

• Italy was aware of the deadlines:

• "Q. *Do you agree that there is a timeline in the law of the Ministry of Economic Development to decide an applicant's request for a production? A. Yes."* - Professor Picozza, **[Day 5/191:4-7]**

• *"So we try, because the law asks us, to keep to the timing of the applications* [...] So *we were committed, and it was urgent, and the law states that."* - Mr Terlizzese, **[Day 3/54:19-23]**

• Non-compliance with peremptory deadlines carries <u>legal</u> consequences:

"[...] *if the measure is not adopted, there are legal consequences, such as, for example, the possibility to resort to the Council of Ministers, to the president of the Council of Ministers, for substitution powers [...] the terms are peremptory because if the measure is not adopted within those terms, measures are adopted; there are possible consequences.*

- Mr Leccese, [Day 2/119:5-13]

146. During the October Hearing, the Claimants' oral submission on this Slide (p. 43 of the transcript) was as follows:

*I just refer you to slide 36, I would like you to start with the fact that Italy was very aware of the deadlines, and both Professor Picozza and Mr Terlizzese, who was considering the production concession, were aware of that, and Mr Leccese's evidence regarding the legal consequences of non-compliance is, as far as we see, unchallenged.*

147.  The Tribunal does not ascertain, from the October Hearing transcript, that the Respondent presented similar, albeit contrary arguments on this issue. However, that absence is not, in and of itself, determinative, and the issue must be decided taking all matters and evidence into due account.

148.  Having considered all of the Parties' positions and the detailed evidence which was placed before the Tribunal, both by way of written materials and, critically, oral testimony (in particular those summarized and recorded in the preceding paragraphs), it is duly established, as a matter of fact, that Decree 484 was in force at the relevant time, and not repealed.

149.  The Tribunal has taken the greatest care possible to ensure that a full, thorough and fair consideration has been given to the competing viewpoints, both in its extensive deliberations on the issue, and also reflected in the fullest opportunity afforded to both sides to cross and re-examine both witnesses. Ultimately, as with any contested matter of material and predicate importance, the Tribunal must decide by reference to that which has been persuasive. In this case, as discussed and analysed above, the Tribunal is persuaded that Decree 484 was in force at the relevant time.

150.  This finding has the factual consequence, in the Tribunal's view, that the (temporal) Rubicon was indeed crossed once the Respondent issued its Decree on 7 August 2015 <u>and</u> the Claimants lodged their application on 14 August 2015. At that latter moment, as a matter of the Tribunal's appreciation and factual findings of Italian law, the Claimants held a <u>right</u> to be granted the production concession. This was no mere hope or aspiration; the legal right to be granted such a concession was then irrevocably in train as a matter of Italian law as it then stood.

151.  The Tribunal will, however, now carefully review what the Claimants did vis-à-vis the Respondent thereafter lest there be any divergence between what is asserted in the arbitration (*i.e.* that the right to be granted the production concession has crystallised) and the relevant contemporaneous conduct (*e.g.* if the Claimants had conducted themselves thereafter in a manner suggestive of someone still acting in hope of a favourable outcome).

152.  Quite apart from the engagement of the time limit found in Decree 484, the Tribunal also reads the Decree of 7 August 2015 as unambiguously confirming that the Claimants <u>had</u> passed all the necessary tests to get the production concessions, <u>save</u> that a number of additional items of information (as contained in the four Annexes) needed to be submitted. There is no invocation of the precautionary principle, whether by express language or by inference, and the Tribunal considers the Decree of 7 August 2015 to be an unambiguous demonstration of the Respondent's unequivocal intention to move ahead to a grant of a production concession for the *Ombrina Mare* field, with the Claimants having duly satisfied the requirements for "environmental compatibility."

153.  As regards the precautionary principle, the Tribunal understands this rule to have acceptance and application within the EU. However, given the specific facts of this case, it does not have a

determinative role. The Tribunal understands why the Respondent's various organs would have applied the precautionary principle to the project for several years, but it must have, of course, a consistent basis throughout the time during which it is said to apply. Thus, a government or municipal authority, when invoking the precautionary principle must have a particular concern in mind. However, if that particular concern is then investigated and the government or authority decides that it is not as worrying as originally feared, then the action or plan stayed by the precautionary principle can go ahead. Such a government cannot, having satisfactorily investigated the matter, then decide to continue the operation of the precautionary principle on a new ground. This would, colloquially speaking, move the goalposts.

154. Thus, in the present case the Respondent's prior environmental concerns (which the Tribunal can entirely and readily understand would implicate the operation of the precautionary principle) must have logically come to a conclusion when it decided to issue the Decree on 7 August 2015. It emerges from that Decree, and the process which led up to it, that the Respondents carefully examined the environmental issues and then, for its own reasons, gave the environmental *imprimatur* to the Claimants on 7 August 2015. It was, therefore, not open to the Respondent to continue the operation of the precautionary principle on environmental grounds after that moment.

155. As regards events following 14 August 2015, but prior to the denial of the Claimants' application, the Parties have stipulated to a number of matters:
*The MED sent Rockhopper a letter, stating: "For the purpose of completing the procedure concerning the application in the subject [...] this Company is required to transmit an update to the documentation regarding its technical-economic capability in the light of the recent Management Decree of 15 July 2015 [...]"* [Fact No. 43, 11 December 2015]

*Rockhopper responded to the 11 December 2015 letter from the MED providing documentation supporting its financial capability. The letter concluded, "Therefore, we herewith declare that, according to the annexed documentation, the Company meets all the technical and economic requirements established by Directorial Decree of 15 July 2015." [Fact No. 44, 14 December 2015]*

156. In addition, there were meetings of a Steering Committee in October and November 2015 (involving the Respondent and regional provinces and municipalities)(*e.g.* discussed at paras. 168-169 of the Memorial on Jurisdiction, Liability and Quantum), and a letter from the Claimants on 27 November 2015 which demanded action in light of the passage of time (C-122). That letter of 27 November 2015 has significance in that it sets out the Claimants' contemporaneous views of their position as of that time (along with a long recitation of the history of the matter). Its purpose was to seek to suspend the elapsing of the "allotted term of the exploration permit" which would have occurred on 31 December 2015. The final part of the letter is as follows (emphasis added):

*Considering that to date all the time limits for the conclusion of the procedure have long since expired, invites this Ministry to conclude, without any further delay and by means of an express measure, the procedure to issue the production concession.*

*Should it fail to do so, expressly reserving the right to implement every available remedy against its non-compliance with the <u>obligation to conclude the main procedure</u>, it requests that this Ministry promptly suspend the elapsing of the allotted term of Permit B.R269.GC:*

• at least until the definitive conclusion of the procedure underway to award the production concession for offshore hydrocarbons indicated in application "d 30 B.C.-MD", through the issuance of the Decree to award the production concession by this Ministry;

• and also to enable the company Rockhopper to see to the maintenance and safety of the Ombrina Mare 2 dir well constructed for oil production and the existing temporary platform installed to support the wellhead.

157.  The aforementioned letter of 11 December 2015 from the Respondent to the Claimants (C-123) stated as follows:
      For the purpose of completing the procedure concerning the application in the subject and following the outcome of the Service Conference held on 14 October and 9 November 2015 and after the subsequent technical meeting of 27 November 2015, this Company is required to transmit an update to the documentation regarding its technical-economic capability in the light of the recent Management Decree of 15 July 2015 – Implementing Operational Procedures of Ministerial Decree dated 25 March 2015 and Performance Procedures for the Prospection, Research and Exploitation of Liquid and Gas Hydrocarbons Activities and related Checks published in the Official Journal of 3 September 2015, General Series, No. 204.

      In particular, it is hereby requested that the corporate and technical data pursuant to the provision of Article 6 thereof, "Evidence of the applicant's technical and economic capabilities" be added:

      - paragraph 3, also with regard to the "parent company" in the event details of the financial statements of this Company are not available yet;

      - paragraphs 13, 14, 15 and 16.

158.  The Tribunal considers this document to be of particular importance as it sets out the then precise requirements of the Respondent for the completion of the procedure for the Claimants' application. It must logically follow that nothing else, over and above these specific items were needed by the Respondent. The Tribunal can infer, therefore, that the four Annexes mentioned in the Respondent's Decree of 7 August 2015 were either fulfilled by this time, or were subject only to fulfilment by the addition of information requested on 11 December 2015. In either case, the factual position as of 11 December 2015 emerges clearly, namely, the very last items of required information were unambiguously articulated. Nothing else, over and above these, was apparently needed by the Respondent.

159.  The Claimants' response to the foregoing came on 14 December 2015 (C-124):
      We would like to refer to the letter dated 11 December 2015 (Prot. No. 0033009) from this Ministry related to the procedure in the subject, through which the company, Rockhopper Italia S.p.A., formerly named Medoilgas Italia S.p.A. (hereinafter, "**Rockhopper**" or the **"Company"**) was required to forward the updated documentation on its technical capabilities, pursuant to the recent Directorial Decree of 15 July 2015 – Implementing Operational Procedures of Ministerial Decree dated 25 March 2015 and Performance Procedures for the Prospection, Research and Exploitation of Liquid and Gas Hydrocarbons Activities and related Controls (hereinafter, the "**Decree**") and, in

*particular, to supplement corporate data pursuant to Article 6, paragraph 3 and paragraphs 13, 14, 15 and 16.*

*Without prejudice to the information provided in Rockhopper's letter dated 27 November 2015 and Ughi e Nunziante – Law Firm's letter on behalf of the Company, forwarded on the same day, in the spirit of the upmost co-operation that our Company has always shown in its relationship with the institutions, we would like to reply to the Ministry's requests as detailed below.*

*With regard to the financial capability requirements under Article 6, paragraph 3 of Directorial Decree, we hereby submit:*

*(i) a copy of the Rockhopper's approved Financial Statements for the last three financial years (2012, 2013, 2014) together with the reports of the administrative body and the Board of Independent and Statutory Auditors on the management of the Company (**Annexes 1, 2 and 3);***

*(ii) a copy of the latest Consolidated Financial Statements (**Annex 4);***

*(iii) a copy of the latest published Financial Statements of the parent company (such Financial Statements are enclosed with the Consolidated Financial Statements, see Annex 4 from page 74through page 79);*

*(iv) declaration in lieu of notary deed signed by Mr Morandi, in his capacity as legal representative pursuant to Articles 38, 47 and 76 of Decree of the President of the Italian Republic No. 445 of 28 December 2000 (**Annex 5)** concerning, in relation to the last three financial years, the following:*

*a. Rockhopper's turnover (business volume) - both global and specific;*

*b. Rockhopper's shareholders' equity*

*c. the ratio between the circulating assets and current liabilities;*

*d. the ratio between the net debt and the net equity;*

*(v) the Company's bankruptcy certificate and the anti-Mafia self-certifications of the managers, auditors and the legal representative of the sole shareholder (**Annex 6);***

*(vi) the certified copy of the Articles of Association or the Memorandum of Association (**Annex 7);***

*(vii) the report on Health, Safety, Environment and Waste Management (**Annex 8);***

*(viii) data on the parent company, Rockhopper Exploration Plc:*

*Rockhopper Exploration Plc, with registered office in the United Kingdom, Hilltop Park Devizes Road – Salisbury SP3 4UF, is a company operating in the research and exploitation of liquid and gas hydrocarbons fields listed in the AIM segment of the London Stock Exchange until August 2005. It was founded in 2004 and holds investments in the Falklands Islands as well as in the Mediterranean basin. Rockhopper Exploration Plc holds 40% of the share in the PL032 and PL033 exploitation concessions and is in the process of completing a "farm-in" announced in October 2013 to purchase 24% of the share in the PL004a, PL004b and PL004c blocks. The aforesaid blocks are located offshore the Falkland Islands and are managed by the operator Premier Oil. Likewise, offshore the Falkland Islands, the Company holds a 3% share in the PL003 block, managed by the company Falkland Oil*

*and Gas.*

*Further information is available at the website: http://rockhopperexploration.co.uk/rockhopper.html;*

*(ix) With regard to the financial capability requirements under Article 6, paragraphs 13, 14, 15 and 16 of Directorial Decree, we hereby provide the Technical Capability Specifications (**Annex 9 and related annexes**), whose information, data and documentation were prepared in strict compliance with factual, legal and technical elements listed under paragraphs 13, 14, 15 and 16 of the aforementioned Article.*

*Therefore, we herewith declare that, according to the annexed documentation, the Company meets all the technical and economic requirements established by Directorial Decree of 15 July 2015.*

160. According to the Tribunal's review of the record of this case, this is the last communication from the Claimants to the Respondent with information or materials in support of the application for the production concession. Also, the Tribunal does not see that there were any further requests from the Respondent to the Claimants for additional information. However, for completeness the Tribunal also now records two further matters, one occurring on 22 December 2015, and the second occurring on 30 December 2015.

161. The first of these two further matters is that the Claimants received the decision on their application of 27 November 2015 for the extension of the exploration permit. This is set out in a letter (dated 22 December 2015) from the Ministry of Economic Development (C-125) and the relevant operative text is as follows:
*1. The suspension of the time limit of the "B.R269.GC" research permit, which is held by the company ROCKHOPPER ITALIA S.p.A. (tax code no. 08344911006), with registered office in Rome, via Cornelia, 498 (post code 00166) shall be extended from 1 January 2016 and up to the date of the granting of the hydrocarbon cultivation concession at sea as provided for in the "d 30 BC-MD" application, and not later than 31 December 2016.*

162. The second matter is that on 30 December 2015, the first Claimant, Rockhopper Italia, commenced legal proceedings before the Lazio Administrative Court seeking an order that the Ministry of Economic Development grant the production concession and, in the absence of such a grant, to appoint an external commissioner to take the decision in lieu of that Ministry.[20] Those proceedings ultimately went nowhere due to the denial of application for the production concession the following month. Insofar as the Tribunal's review of the facts is concerned, these proceedings seem to be the final factual act prior to the denial.

163. As has already been discussed above in detail, the law changed on 28 December 2015 which brought in a ban on offshore drilling within a certain distance of the Italian shoreline. The Claimants' application was denied on 29 January 2016 (again as set out in detail above). The question, therefore, now arises for the Tribunal to determine is whether that change in the law was the sole cause of the denial of the Claimants' application (which is the Claimants' position), or was there

---

[20] Memorial on Jurisdiction, Liability and Quantum, ¶ 176; First Witness Statement of Roberto Leccese, ¶ 109.

anything else "in play" on the part of the Respondent at that time (the Respondent's position), particularly economical aspects.

164.   The Respondent's Counter-Memorial (para. 140) sets out its argument and, in essence, say that the in late December it was considering whether the proposed project could go ahead from an economic standpoint:

*At the end of 2015, the cost-effectiveness of the Ombrina Mare project - a legal requirement for the awarding of the concession – was not demonstrated yet, taking into consideration the sharply reduced market prices of crude oil. In particular, when Law 208/2015 came into force, the preliminary investigation was still ongoing and the last documents presented on 16 December 2015 by the Company were still under examination.*

165.   The Claimants counter in the Reply Memorial as follows:

*160. The fact of the matter is that the MED did not do any material analysis of the economics of Rockhopper Italia's proposal in November and December 2015. Rockhopper requested documents prepared or commissioned by the Respondent following the Conference of Services that took place on 27 November 2015 and 29 January 2016, when the MED rejected Rockhopper Italia's pending application, regarding the economic viability of the Ombrina Mare project. Italy produced only one document— PowerPoint slides prepared by DSG-UNMIG on 18 November 2015 comparing certain macroeconomic data relating to the Ombrina Mare Field in 2009 and 2015. Italy did not produce any other documents, which must be taken to mean that the MED did not generate any documents assessing the economic viability of the Ombrina Mare project between the period of 27 November 2015 to 29 January 2016.*

*161. Rockhopper also requested that Italy produce documents prepared or commissioned by the MED between 1 December 2015 and 29 January 2016 setting forth the bases for denying the Production Concession Application. Italy produced two documents. The first document was a Memorandum prepared for the Minister of the MED after the Conference of Services took place on 9 November 2015. The Memorandum does not contain any information about why the MED denied the Production Concession Application. ...*

*162. The second document is also not helpful to Italy: Italy produced an e-mail from a Rockhopper Italia employee to Mr. Terlizzese of the MED dated 17 November 2015 attaching documents regarding Rockhopper's financial assessment of the Ombrina Mare project, and other documents. All that this e-mail shows is that Rockhopper was keen to help the MED with the review process, and promptly submitted any documentation requested by the MED.*

*163. In sum, Italy did not produce any documents created or commissioned by the MED between 1 December 2015 and 29 January 2016 setting forth the bases for rejecting Rockhopper Italia's Production Concession Application.*

*...*

*166. The inference that should be drawn from the lack of contemporaneous documentation demonstrating real-time analysis of the project's economic viability is that this simply was not the focus of whether or not the MED should grant the Production Concession Application. Rather, the MED was waiting to see whether the Budget Law would be enacted, which would reintroduce the*

*Prohibition, and serve as the actual basis for the MED's rejection of the Production Concession Application.*

166. The Tribunal has carefully reviewed the relevant Redfern Schedule and has come to the inferential conclusion invited by the Claimants, namely, that the lack of contemporaneous documentation shows that economic viability was not "in play" in late 2015. The Respondent did not produce any contemporaneous documents to show that it was indeed examining the project in late 2015 from an economic point of view. The Di Gregorio report which the Respondent relies upon is *ex post facto*.

## G. Overall conclusions & summary

167. Drawing all the factual strands together, the Tribunal has been persuaded of the conclusion that the Claimants were, by August 2015, indeed possessed of the right to be granted the production concession. Decree 484 was engaged in their favour and the legal clock started ticking as of 14 August 2015. Further, throughout the subsequent months the Claimants complied with every demand made of them by the Respondent, and, as already inferentially established, economic analysis was not "in play" in December 2015 or January 2016.

168. The Claimants' conduct from August 2015 right up to 30 December 2015, which is set out above, demonstrates that they were a party clearly understanding themselves to be possessed of such a right, and none of the correspondence or actions taken by them throughout that time are irreconcilable with that viewpoint. In particular, the Claimants' engagement with the Respondent insofar as matters such as complying with requests for information, demanding an extension of the exploration permit lest its validity expired before the grant of the production concession, and (perhaps this is quite illuminating) ultimately bringing proceedings seeking an order compelling such a grant, are individually and collectively indicative of a party conducting itself in a consistent manner; that manner is consistent with a party believing itself to have a right to be granted a production concession. As a passing comment on the legal proceedings commenced on 30 December 2015, one notes that their purpose was not to force a decision on the application for a production concession, but rather to force the actual grant itself. This is consistent with the oral testimony of Mr. Terlizzese and Prof. Picozza as already recorded above.

169. The factual consequence of all of the foregoing is that before the formal denial by the Respondent of the production concession application, the Claimants had an undoubted right to be granted such a concession in respect of the *Ombrina Mare* field. The denial of the application wiped out for all purposes and in all respects, that right.

## V. JURISDICTION

170. The conclusions reached by the Tribunal in its [26 June 2019 Decision on the Intra-EU Jurisdictional Objections](#) read as follows:

*211. For the reasons set forth above, the Tribunal decides as follows:*

*(1) The Respondent's Intra-EU Jurisdictional Objection is hereby denied;*

*(2) The Tribunal will address separately in its Award the remaining jurisdictional and/or merits issues in this case;*

*(3) The Respondent's Request for Suspension is hereby denied; and*

*(4) Decisions regarding costs are deferred until a later time in these proceedings.*

171. This 2019 Decision on the Intra-EU Jurisdictional Objections is hereby incorporated by reference into the Award.

172. The conclusions reached by the Tribunal in its [20 December 2021 Decision on the Italian Republic's Request for Reconsideration of 29 September 2021](#) read as follows:

*52. For these reasons, the Tribunal DECIDES and ORDERS that:*

*a) The Respondent's Request for Reconsideration is denied.*

173. This 2021 Decision is hereby incorporated by reference into the Award.

174. In addition to the Intra-EU Jurisdictional Objections raised by the Respondent, which were decided in the above-cited Decision, the Respondent raised another objection, which the Tribunal addresses in the section below.

# A. The Fork-in-the-Road Principle Should Apply Under ECT Article 26(3)(b)(i)

## (a) The Parties' Positions

## *1. Respondent's Position*

175. The Respondent argues that the Claimants have requested satisfaction on the same grounds before the domestic courts, and, therefore, the following provision of the ECT applies [(Art. 26(2) and (3)](#)):

*(2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the*

*Investor party to the dispute may choose to submit it for resolution:*

*(a) to the courts or administrative tribunals of the Contracting Party party to the dispute;*

*(b) in accordance with any applicable, previously agreed dispute settlement procedure; or*

*(c) in accordance with the following paragraphs of this Article.*

*(3) (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.*

*(b) (i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).*

[The Respondent is included in Annex ID]

176.  The Respondent's arguments are contained in paras. 169-176 of the Counter-Memorial, paras. 27-79 of the Rejoinder, its Opening Presentation (slides 31-36) on 4 February 2019, and the oral submissions made on its behalf (Tr. Day 1, pp. 126-128).

177.  The Respondent's Counter-Memorial, paras. 163-164, set out the factual predicate for this argument: *163. In 2013, MOG introduced an appeal before TAR Lazio against the note of the Ministry for the Environment to the MATTM services of 8 July 2013 requesting a supplement of investigation, including as for the granting of the AIA, and the subsequent communication of the MATTM to MOG/ Rockhopper of 9 July 2013 with the request to submit all relevant information and documentation to obtain the AIA.*

 *164. MOG claimed inter alia that the defendant would have violated general principles of good administration and relevant procedures for having requested a certification that was not deemed to be due, as well as its legitimate expectations to receive the due authorization. The Tribunal rejected all claims.*

178.  In oral opening the Respondent's case on the issue was as follows (Tr. Day 1, pp. 126-128): *PROFESSOR MALAGUTI: Then I will continue briefly on the fork in the road, so we can finally get into the merits of the case. (Slide 32) On the fork in the road, I mean, I carefully heard what was said this morning, and I would say that basically we do not disagree on the principles of Article 26. I think the real disagreement is on whether the requirements are met in this particular case. The counsel for Claimants was already very kind in summarising the cases, so I don't think I need to get into details on what happened at the domestic level. Just a few clarifications. (Slide 35) First of all, in this specific case you do have one of the Claimants sitting here being the one who introduced the procedure at Italian level. I must say that of course -- we write it in our submissions -- if we keep using the triple identity test extremely formalistically, you never use the fork in the road, because it is always the case that a claimant uses its Italian domestic vehicle for its claims in the Member State territory; and then, even if it doesn't work, they can go with a company of the group and use an*

---

*arbitration for getting exactly to the same point. So if you had this interpretation, there is no history, there is nothing to discuss. There is simply no effet utile of the fork in the road. In this specific case I think it's quite clear that the Italy company who is sitting here was the one starting the procedure in Italy, and also there was a clear challenge of exactly the same facts and circumstances that are challenged here, in terms of procedure and legitimacy of asking an AIA. Also it is tricky the way the Claimants present the fact of not having asked for compensation. They lost the case, so they could not get compensation. But it was exactly the reason why they were asking for that procedure to obtain compensation. I would simply say that we repeat what we said in our Memorial, and that we should apply what Professor Jan Paulsson stated in the Pantechniki case (CL-69). The real question to ask would be: "... whether or not 'fundamental basis of a claim' sought to be brought before the international forum is autonomous of claims to be heard elsewhere." We state that it is exactly the same issue, and compensation was asked under legitimate expectations also on that case.*

## 2. Claimants' Position

179.    The Claimants oppose the objection (paras. 20-44 of the Cl. Reply Memorial, Opening Presentation of 4 February (slides 61-64), opening oral submissions (Tr. Day 1, pp. 75-84), and Post-Hearing Brief (paras. 8-10)).

180.    The Claimants' arguments, in oral opening, were as follows:
          [Tr. Day 1, pp. 80-81]

*In 2013 a new minister of the Ministry of the Environment changed that position and required a further environmental permission process, the AIA, to be submitted. Now, clearly that was contrary to prior representation and decision of the relevant ministry, so the Claimants -- in this case the Claimant entity, the Italian subsidiary -- filed an action in the local courts in Italy seeking to annul that decision, essentially to annul the requirement to provide the further environmental permit. That application was made immediately after the decision to require them to do so was issued in 2013 and it took its time to proceed through the Italian court system. A judgment at first instance was handed down in April 2014, which decided that the ministry's additional requirement, as a matter of Italian administrative and environmental law, was lawful. Rockhopper's response to that was twofold: in the first instance, they sought to appeal that decision at first instance; but without prejudice to that, they submitted the AIA application, and both those processes proceeded in tandem. And what in fact happened, as was alluded to in the wider chronology that Mr Sprange presented, was that the AIA, including the EIA, was formally granted in August 2015. What that left was the appeal hanging, and the question of: well, what purpose does this appeal have, in circumstances where the AIA has now been granted and so annulling it is a moot point? And the position that was taken in those proceedings by Rockhopper was that they did have a purpose, in the sense that it was still worthwhile, potentially, to have a ruling on whether the additional environmental requirement had been lawful or not, because that may well be of relevance to any subsequent and separate -- and that's the important point -- separate legal proceeding in unspecified fora regarding any damages that might arise from those decisions of the ministry that had been challenged. The chronology proceeds that the Budget Law obviously occurred in around the end of 2015 and the production concession application was rejected in January 2016, and subsequent to*

*that, that's when the Appeal Court in Italy upholds the first-instance judgment that determined that it was lawful to require the AIA, and that's where the proceedings in Italy ended.*

*…*

[p. 85]

*It's very much not the position where the Claimants in this case have, post-2016, said, "Well, the production concession has been rejected and now we're going to go to the Italian courts to challenge and seek an annulment of that production concession rejection, and also we want damages for that decision if we can't get specific performance to reverse that rejection". If that was the factual position, there would be more strength in Italy's argument. But the Claimants have taken an active position, after that production concession has been rejected, not to go to the local courts to challenge it or seek damages in relation to it. That highlights the fact that there's no causative link between the action in Italy and the action in this arbitration, because the causation in this case this week is not to do with delays and changes of position in terms of environmental permitting.*

## (b) The Tribunal's Analysis

181. The Tribunal considers that the Respondent's argument and objection is not persuasive. As is clear from the quotations from the Parties' oral opening submissions above, there is little factual or legal debate between them, and the issue revolves around the nature of the litigation commenced in Italy in 2013.

182. That litigation was an attack on the requirement for the project to obtain an AIA. The facts overtook, entirely, the disputed issue in that litigation as an AIA was sought by the Claimants, and then granted by the Respondent. It is a bridge too far to consider that a dispute about such (effectively a legally moot) matter engages the fork in the road provision of the ECT. The Claimants' oral summary of their position as regards their approach to adversarial proceedings following the denial by the Respondent of the application for a production concession is, in the Tribunal's view, persuasive. The objection is, therefore, denied.

## VI. LIABILITY

183. The Claimants advance their case on liability on three separate strands, namely, impairment, fair & equitable treatment, and unlawful expropriation. The Tribunal, within its own discretion and authority to arrange its reasoning, has decided to first examine the claim for breach of Article 13 of the ECT, namely, unlawful expropriation.

## A. Breach of ECT Article 13 Through Unlawful Expropriation

# (a) The Parties' Positions

## 1. Claimants' Position

184. The Claimants' starting point (para. 278 of the Memorial on Jurisdiction, Liability, and Quantum) is Article 13 of the ECT:

*(1)*

*Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalised, expropriated or subjected to a measure or measures having effect equivalent to nationalisation or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:*

*(a) for a purpose which is in the public interest;*

*(b) not discriminatory;*

*(c) carried out under due process of law; and*

*(d) accompanied by the payment of prompt, adequate and effective compensation.*

*Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the "Valuation Date").*

*Such fair market value shall at the request of the Investor be expressed in a Freely Convertible Currency on the basis of the market rate of exchange existing for that currency on the Valuation Date. Compensation shall also include interest at a commercial rate established on a market basis from the date of Expropriation until the date of payment.*

*(2) The Investor affected shall have a right to prompt review, under the law of the Contracting Party making the Expropriation, by a judicial or other competent and independent authority of that Contracting Party, of its case, of the valuation of its Investment, and of the payment of compensation, in accordance with the principles set out in paragraph (1).*

*(3) For the avoidance of doubt, Expropriation shall include situations where a Contracting Party expropriates the assets of a company or enterprise in its Area in which an Investor of any other Contracting Party has an Investment, including through the ownership of shares.*

185. The Claimants say (para. 283 of the Memorial) that
*The MED's decision to deny Rockhopper Italia's Production Concession Application amounts to an expropriatory measure. With this decision, Rockhopper Italia no longer enjoyed the right—nor even the legitimate expectation—that it would be awarded the Production Concession to exploit the*

*Ombrina Mare Field.*

186. The Claimants also say (para. 279 of the Memorial) that their investment in Italy enjoyed the protection of the ECT as it came within that Treaty's definition of "investments" namely, "tangible and intangible property," "any property rights," "forms of equity participation in a company or business enterprise," "claims to money," and "any right conferred by law or...permits" (via Article 1.1 of the ECT).

187. Finally, the Claimants say (para. 294 of the Memorial):
*Italy's actions constitute an unlawful expropriation. Article 13 of the ECT provides that investments shall not be subject to Expropriation except where such Expropriation is (a) for a purpose which is in the public interest; (b) not discriminatory; (c) carried out under due process of law; and (d) accompanied by the payment of prompt, adequate and effective compensation. Where a treaty requires several conditions for a lawful expropriation "arbitral tribunals seem uniformly to hold that failure of any one of those conditions entails a breach of the expropriation provision". In Crystallex v Venezuela, the tribunal concluded that Venezuela was in breach of the applicable treaty because no prompt, adequate and effective compensation was either offered or provided to Crystallex. The tribunal therefore concluded that Venezuela had expropriated Crystallex's assets, even though the tribunal accepted Venezuela's public interest goal in expropriating the investment, did not find Venezuela in breach of the due process standard, and was not satisfied that there were conclusive elements to support that the expropriation was discriminatory. Thus, any expropriation that does not satisfy all of these elements is unlawful, and violates Article 13.*

188. In this regard the Claimants submit (paras. 294-296 of the Memorial) that the "expropriation" was unlawful on three independent bases: (a) not undertaken for a public purpose; (b) discriminatory; and (c) without payment of prompt compensation.

## *2. Respondent's Position*

189. The Counter-Memorial (paras. 267 – 278) succinctly set out the Respondent's position which has been consistent throughout this arbitration:
*ITALY HAS NOT EXPROPRIATED CLAIMANTS' INVESTMENT*

*267. Claimants assert that MED's refusal to deny their concession application was expropriatory and amounted to a breach of Article 13 of the ECT.*

*268. Two reasons, which are autonomous from each other, are sufficient to dismiss this claim.*

*269. First, the extractive business of the Claimants never started and had never been authorised. Thus, it could not be expropriated to begin with.*

*270. Second, reasonable regulatory measures that a State passes to pursue societal policies without discriminating among its addresses constitute the legitimate exercise of police powers and,*

*therefore, any economic impact that they might cause on investors is not compensable.*

*271. On the other side, the facts of the case are completely different from Metalclad. In that case the project had been already approved and endorsed by the central government, and the denial of the right to operate a landfill jeopardized a project otherwise fully authorised. In this case it is the very "approval and endorsement" of the central government that is missing.*

*272. The awards in the cases cited by the Claimants do not assist their case. In Occidental, Abengoa and Tecmed, the State measured discontinued or rescinded an existing legal relationship that underpinned the investment. In the present case, instead, the State measure did not interfere with an existing title, but simply acknowledged the impossibility to confer a new one to the Claimants.*

*273. Certainly, Italian law prevents the Claimants from starting extraction and, as far as Claimants has made preparatory expenditures with that purpose, these will be lost. However, it cannot be said that Italy deprived Claimants of their extractive business, because they had never been in the position to commence it.*

*274. More importantly, Italy owes no compensation for the incidental inconvenience caused by its regulatory measures of general application. Claimants conceded as much, when it tried to deny that Italy's measures had any public purpose.*

*275. Of course, the Prohibitions served instead the goal of adopting a cautionary approach to the protection of the environment, prohibiting new extractions in the sensitive areas close to the coasts and the protected zones. Italy therefore can indeed "justify its expropriation on the basis that it was acting in the public interest," thus averting Claimants' view that its acts constituted unlawful expropriation.*

*276. Claimants contended that the grandfathering of previously authorised extraction activities is discriminatory.*

*277. As noted above, the distinction, far from being unreasonable or arbitrary, is possibly even necessary to safeguard actual vested rights and avoid retroactive prohibitions.*

*278. Claimants' suggestion that the regime allows permit-holders to amend their work is irrelevant, because amendments are allowed only within the authorised terms, and the clarification made above should suffice to rebut the suggestion that any subject could carry out new extractions circumventing the 2016 Prohibition.*

## (b) The Tribunal's Analysis

190.  By way of general introduction, and for clarity and ease of understanding as to how analysis of claims actually works, the Tribunal will divide its process of reasoning into three stages:
(1) The Tribunal must ascertain <u>the facts</u>. This process includes the making of findings on any facts which are in dispute. However, it must be remembered that not every fact put before the Tribunal, nor indeed every matter of factual dispute is relevant to the task at hand. The Tribunal has already

ascertained the facts of the case as set out earlier in this Award.

(2) The Tribunal ascertains the law. In a case such as this one, bound by an international treaty such as the ECT, the primary focus is on such principles as may have been chosen by the sovereigns (and any other type of signatory) to form part of the appropriately interpreted text. Article 13 of the ECT is the applicable law and is recorded above.

(3) In the light of the facts and the law so ascertained, the Tribunal reaches its decision. In some cases, this third stage may be quite straightforward. Once the law is correctly ascertained, the decision follows inevitably from the application of it to the facts found. In other instances, however, the third stage involves an element of judgment on the part of an arbitrator or tribunal. There is no uniquely 'right' answer to be derived from marrying the facts and the law, merely a choice of answers, none of which can be described as 'wrong'. The Tribunal will now move to this third stage in light of the facts and the law.

191.  The Tribunal has found, as a matter of fact, that the Claimants had a right to be granted a production concession which was engaged as of 14 August 2015. The factual analysis does not need to be repeated at this time and is sufficiently set out above. However, the Tribunal repeats, at this time, the critical distinction between the right which the Claimants actually had (namely, the right to be granted the production concession) and an actual or expressly stated production concession.

192.  It is also common ground that the Claimants made an investment for the purposes of the ECT. That is not the subject of a dispute between the Parties as is discussed extensively above in the factual analysis part of this Award. The Respondent's position in respect of the Claimants' expropriation claim encapsulates this common ground in that the relevant heading of the Counter-Memorial (quoted above) says "Italy has not expropriated Claimants' investment."

193.  Next, as a matter of fact (again based on the Tribunal's earlier analysis) that the Claimants' right to be granted the production concession came to an end due to two specific matters, namely, the Respondent passing the law published on 30 December 2015 and then sending the letter dated 29 January 2016 (based on that law) denying the actual grant of the production concession.

194.  As of that moment, 29 January 2016, the Claimants' right to be granted a production concession was taken away from it. Thereafter the Claimants had neither the right to be granted the production concession, much less the production concession itself. The Claimants went, in one fell swoop, from a position where they had rights to a valuable production concession which would actually lead, under Italian law, to such production concession, to essentially nothing at all. No lengthy elaboration is required to arrive at this conclusion. There was, factually speaking, an immediate and complete deprivation of the Claimants' investment. There were no indirect actions, whether described as creeping or otherwise, cumulatively leading to such deprivation, but rather a specific act on the part of the Respondent which brought about this circumstance on 29 January 2016.

195.  Put against this is the Respondent's key arguments against expropriation at paragraphs 269-270 of its Counter-Memorial:
*First, the extractive business of the Claimants never started and had never been authorised. Thus, it could not be expropriated to begin with.*

*Second, reasonable regulatory measures that a State passes to pursue societal policies without discriminating among its addresses constitute the legitimate exercise of police powers and, therefore, any economic impact that they might cause on investors is not compensable.*

196.  The Tribunal is not persuaded by the first of the Respondent's points, namely that the extractive business never started and had never been authorized. This position does not address the specific set of circumstances to which the facts of this case have given rise. The Claimants have not argued that they had an actual extractive business, but rather a much more nuanced point, namely, that the "decision to deny Rockhopper Italia's Production Concession Application amounts to an expropriatory measure." As a result of that decision Rockhopper Italia no longer enjoyed the right that it would be awarded the production concession to exploit the field in *Ombrina Mare*. Further, the argument that the extractive business had never been authorized misses that key point, as the Claimants were already possessed (as of 14 August 2015) of a specific right as analysed earlier in this Final Award.

197.  The Tribunal is equally not persuaded by the Respondent's invocation of police powers to justify that which it did in respect of the Claimants' investment. For the reasons set out above, the Tribunal considers the acts of the Respondent, being the combination of the law published on 30 December 2015 and the letter dated 29 January 2016 sent to the Claimants denying the production concession to constitute a direct expropriation for which no prompt compensation was offered, much less paid. The Claimants' right to protection from expropriation of their investment as a matter of the ECT was, of course, not absolute. Art. 13 of the ECT says as much. However, in order for a sovereign to avoid the consequence of unlawful expropriation it must cumulatively satisfy all of the requirements, (a)-(d) inclusive, of Art. 13(1) of the ECT.

198.  As already discussed above, the Tribunal has found that the environmental concerns most likely engaged the precautionary principle <u>before</u> the Decree of 7 August 2015; <u>but</u> once that Decree emanated from the Respondent the wish to engage the same principle again, on the same basis, is irreconcilable with a "positive opinion on the environmental compatibility assessment regarding the implementation of the 'Cultivation project of Ombrina Mare hydrocarbons in the scope of the d30 B.C-MD concession'" (the express language of that Decree). The more likely reason for the position taken by the Respondent culminating in the letter of 29 January 2016 is the political and civic engagements as discussed earlier in this Award.

199.  In summary, and having taken all of the Parties' positions into the most careful account, the Tribunal finds that the Respondent unlawfully expropriated the Claimants' investment when it denied, by letter dated 29 January 2016, the application for a production concession. This reflects the following of the Claimants' prayers for relief:
      *164.2 a declaration that Italy has violated Part III of the ECT, including but not limited to Article 10 and Article 13, as well as international law, with respect to the Claimants' investments. Specifically, the obligations that Italy breached are: ... its obligation not to unlawfully expropriate Rockhopper's investment as set out in* Article 13 of the ECT*.*

200.  In light of the foregoing, and considering that the Tribunal need only address those issues or questions which must be addressed to resolve the matter in issue in this arbitration, which is,

critically, a claim for compensation on the part of the Claimants based on one or other of three distinct alleged ECT breaches, the other two matters (FET and impairment), do not fall to be determined as a question to be dealt with in this Award.

201. With a finding of a direct and unlawful expropriation, the predicate facts for which occupied the closest scrutiny of the Parties, particularly when it came to the consequences of the events of 7 and 14 August 2015, that establishes liability on the part of the Respondent as a matter of the ECT.

202. Discussion and analysis of either the Claimants' FET (which essentially was a legitimate expectation claim) or impairment (which, on the Tribunal's appreciation appears to coincide mostly with the factual predicates for the expropriation claim) arguments would not add or subtract from the finding of unlawful expropriation insofar as the consequence of ECT liability is concerned. In essence, the question put to the Tribunal is succinctly encapsulated by the Claimants in their Post-Hearing Brief, para. 7:
   *In this arbitration, Rockhopper seeks and is entitled to full reparations for Italy's breaches of its obligations under the ECT and international law....*

203. The resolution of that question necessarily reposes on the Claimants having established one or other of their three liability allegations, expropriation, FET, or impairment. Once one (expropriation) was established, the relevance of the others for the outcome of the case diminished.

# VII. QUANTUM

## A. Standard of Compensation

204. The ECT provides, at Article 13(1), a standard of compensation for *lawful* expropriations. However, that standard is not taken to apply, as in this case, to instances of *unlawful* expropriation.

205. The Claimants [21] and Respondent [22] broadly agree that the applicable standard of compensation is to be drawn from customary international law.

206. The principle derived from customary international law is one of full compensation. It was first outlined in an interstate case, the *Factory at Chorzów* case, where the Permanent Court of Justice wrote that:

   *... reparation must, as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed.* [23]

---

[21] Cl. Memorial on Jurisdiction, Liability, and Quantum, ¶¶ 299, 306.

[22] Resp. Rejoinder, ¶ 253.

[23] *Case* Concerning Factory at Chorzów (Germany v. Poland), Judgment 13, PCIJ, Sept. 13, 1928 (1928 PCIJ, Series A. No. 17) ("Factory at Chorzów") p. 47, ¶ 125.

207. By analogy with interstate international law, the same standard has been transposed in international investments law between a foreign private investor and a sovereign State in a significant number of subsequent investment arbitrations [24] and, under the condition of not forgetting that the customary character of this rule only remains attached to its application among States, a rule later codified at Article 31 of the ILC Articles on the Responsibility of States, one may accept as the enunciation of a general principle of law the assertion of the *Vivendi* tribunal [25], referring to the statement above from *Factory at Chorzów*:

> *… it is generally accepted today that, regardless of the type of investment, and regardless of the nature of the illegitimate measure, the level of damages awarded in international investment arbitration is supposed to be sufficient to compensate the affected party fully and to eliminate the consequences of the state's action.* [26]

208. The Tribunal has determined, therefore, that the appropriate standard of compensation in this case is full compensation. This is consistent with the aforementioned long-standing principles.

209. In *Factory at Chorzów*, the tribunal referred to the fact that full compensation may necessarily be more than merely "the value of the undertaking at the moment of dispossession, plus interest to the day of payment" in order to provide full compensation. In this case, the Claimants seek the "fair market value" of their investment. [27] The Respondent, while continuing to deny liability, also performed its own quantum calculations based on 'the fair market value' of *Ombrina Mare*. [28]

210. In the present case, the standard of full compensation shall be taken to mean the fair market value of the investment at the time of the expropriation; namely, the value of the *Ombrina Mare* field on the Valuation Date.

# B. Causation and Burden

211. As explained by the Tribunal in its determination on expropriation [29], the Claimants have met their burden and the Tribunal is satisfied that an unlawful expropriation has occurred.

# C. VAluation Date

---

[24] *See*, for example, *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004 ("*MTD v. Chile*"), ¶ 238 (CL-50); *ADC Affiliate Ltd. and ADC & ADMC Management Ltd. v. Republic of Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006, ¶ 484 (CL-11); *Biwater Gauff Ltd., v. Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008, ¶¶ 775-776 (CL-19); *Mr. Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013 ("*Arif v Moldova*"), ¶ 559 (CL-35).

[25] *Compañía De Aguas Del Aconquija S.A. and Vivendi Universal S.A. v. Argentina*, Case No. ARB/97/3, Award, 20 August 2007 ("*Vivendi*"), ¶ 8.2.5 (CL-115).

[26] *Vivendi*, ¶ 8.2.7 (CL-115).

[27] Cl. Memorial on Jurisdiction, Liability, and Quantum, ¶ 308.

[28] Resp. Rejoinder, ¶ 302.

[29] *See* Section VI.A above.

212. It is a fact not in dispute between the Parties that the letter of 29 January 2016 formally rejected the Claimants' application to be granted a production concession.

213. The Claimants refer to this as the day the "MED decided the fate of the Production Concession Application"[30] and that this decision to deny Rockhopper Italia's Production Concession Application "amounts to an expropriatory measure" as in issuing this decision, "Rockhopper Italia no longer enjoyed the right—nor even the legitimate expectation—that it would be awarded the Production Concession to exploit the Ombrina Mare Field."[31] The Claimants write that the date of assessment of quantum is a legal matter, and that

*...[i]n this case, 29 January 2016 is an appropriate Date of Assessment because that is the effective date of the final and most significant measure that Claimants' challenge, namely, the denial of Claimants' Production Concession Application to develop and exploit the Ombrina Mare Field.*[32]

214. While the Respondent disputes that it expropriated anything – and certainly disputes that it had expropriated anything of value – it does agree that the letter was sent that day. Further, the Respondent and its expert Dr. Duarte-Silva use the valuation date of 29 January 2016 and it has not proposed an alternative valuation date.

215. The Tribunal will consequently assess the quantum of damage in this case using 29 January 2016 as the Valuation Date.

## D. Valuations of *Ombrina Mare*

216. The Claimants review three potential valuation systems, (a) Discounted Cash Flow (DCF), (b) Market Transactions[33], and (c) a sunk-costs approach. The Claimants' expert, Mr Boulton, favours the DCF model[34] for the purposes of compensation in this arbitration.

217. The Respondent does not believe the DCF model is appropriate to value *Ombrina Mare* and instead favours a Market Transaction based approach.[35]

## (a) The DCF Method

218. The DCF method values an investment based on the stream of future cash flows that the investment is expected to generate, "discounted" to a present value to account for the time value of money and the riskiness of the forecast cash flows.[36] It is the Claimants' preferred approach.

---

[30] Cl. Memorial on Jurisdiction, Liability, and Quantum, ¶ 198.

[31] Cl. Memorial on Jurisdiction, Liability, and Quantum, ¶¶ 283, 292.

[32] Cl. Memorial on Jurisdiction, Liability, and Quantum, ¶ 311.

[33] *E.g.* Cl. Memorial on Jurisdiction, Liability, and Quantum, ¶ 318.

[34] *E.g.* Cl. Memorial on Jurisdiction, Liability, and Quantum, ¶ 313.

[35] *See* Second Expert Report of Dr. Duarte-Silva, ¶ 36.

[36] Cl. Memorial on Jurisdiction, Liability, and Quantum, ¶ 313.

# 1. Claimants' position

219. The Claimants primarily advance a claim of EUR 275 million as the value of the loss of their investment, with at least EUR 6,675,391 in decommissioning costs, and interest on both figures at 9%, compounded annually. The interest – calculated to 4 February 2019 – would add another approx. EUR 83.8 million, bringing the total relief requested to approximately EUR 365.4 million. [37]

220. In order to reach this figure, the Claimants have relied upon a Discounted Cash Flow model with some further adjustments by their expert, Mr. Boulton. The Claimants specifically advocate for the use of the DCF model devised by Wood McKenzie and modified by Mr. Boulton.

221. The Claimants assert that the DCF method is the "dominant methodology" of valuation in the oil and gas sector *and* the primary method used to calculate fair market value of natural resource projects in investment arbitration. [38] They go on to note that DCF is a standard valuation method that is widely used by investment professionals, lenders, and corporations in many industries, including the hydrocarbons sector. [39]

222. The Claimants also cite to previous arbitrations that made use of a DCF model under similar circumstances. In *Gold Reserve v. Venezuela*, the tribunal applied a DCF model to award damages for two mining concessions that had not entered production. [40] In *Crystallex v. Venezuela*, the tribunal awarded damages for a mining property that had not yet entered production. [41]

223. The tribunal in *Al-Bahloul v. Tajikistan* outlined a four-point test for whether the utilisation of a DCF model is appropriate. [42] *First*, would the exploration have found any oil and gas reserves? *Second*, could the claimant have financed the exploration needed to find said reserves? *Third*, could the claimant finance and implement the exploitation of any found hydrocarbon reserves? *Finally*, would it have been possible to sell any hydrocarbons produced? The Claimants submit that "the present case renders unanimously positive answers to these questions." [43]

224. First, *Ombrina Mare* had been verified and appraised even before the Claimants took possession of it; [44] secondly, the Claimants had USD 250 million cash on its balance sheet and "ready recourse to financing" and thus "would certainly have been able to develop and put the field into production"; [45] thirdly, the Claimants point to their successful track records in "more remote and inhospitable environments;" [46] and finally, the Claimants write that "reports at the time confirmed that there was

---

[37] Cl. PHB, ¶ 163.

[38] Cl. Reply Memorial, ¶¶ 198-209.

[39] Cl. Memorial on Jurisdiction, Liability, and Quantum, ¶ 313; *see also* First Expert Report of Mr. Boulton, Section 3.

[40] Cl. Reply Memorial, ¶ 199, citing *Gold Reserve Inc. v. Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, 22 September 2014, ¶ 830 (CL-39).

[41] Cl. Reply Memorial, ¶ 200, citing to *Crystallex International Corporation v. Venezuela*, ICSID Case No. ARB(AF)/11/2, Award, 4 April 2016, ¶ 877 (CL-117).

[42] *Mohammad Ammar Al-Bahloul v. The Republic of Tajikistan*, SCC Case No. V054/2008, Final Award, 8 June 2010 "*Al Bahloul v. Tajikistan*"), ¶¶ 74-75 (CL-164).

[43] Cl. Reply Memorial, ¶¶ 202-203.

[44] Cl. Reply Memorial, ¶ 203.1.

[45] Cl. Reply Memorial, ¶ 203.2.

[46] Cl. Reply Memorial, ¶ 203.3.

a market for the hydrocarbons extracted."[47]

225.  In respect of its utility in this case, the Claimants argue that the DCF method is particularly "appropriate and reliable method," because of the generalized approach taken in the DCF assessment conducted, with no assumptions having been made in respect of a specific party as buyer or seller or operator, relying largely on industry standards, and not adjusting for favourable scenarios for a potential buyer *or* seller.[48]

226.  The Claimants also notes that Respondent itself used a DCF calculation when assessing the value of *Ombrina Mare*.[49] At the Hearing, both Professor DiGregorio and Mr. Terlizzese spoke of using DCF models in their analysis of oil and gas projects, with Mr. Terlizzese stating that "it is a model which is applied by default quite often."[50] When asked "why, of the several tools available, do you use the DCF?" Mr. Terlizzese answered that

*…it is a simple tool, so it is manageable for the administration; and it is an objective tool, because there are no factors such as the cost of money and other factors, but it carries out a net analysis of the economic result, on which several speculations can be made subsequently. So it is a basic platform that can be used with operators who also use different systems to assess investments when they make their submissions.*[51]

227.  Mr. Boulton's primary DCF analysis – which yields the EUR 275 million above – is based in factors such as a 2P reserves totalling 25.1 mmbbls,[52] a long-term oil price forecast of approx. USD 80/bbl,[53] expected costs adjusted to the valuation date, using Wood Mackenzie's benchmarking database,[54] and a discount rate of approximately 10% per annum.[55] (Mr. Boulton then includes interest; the Tribunal will discuss interest in the subsequent section.)

228.  The Claimants also present a "pre-tax high case" valuation of *Ombrina Mare*, which factors in 3C resources, an oil price of USD 100/bbl, and his lowest discounting rate, 8%, and that produces a valuation of no less than **EUR 1.5 billion**.

229.  On the lower end, the Claimants present a valuation using the "least beneficial" factors – 2C resources, USD 60/bbl, and a high discount rate of 15%. This calculation results in a value closer to just **EUR 68 million.**[56]

230.  While the Claimants advocate for the use of a DCF model, they also attack the Respondent's expert's calculations, based upon a version of the Wood Mackenzie DCF model with inputs he selected. The

---

[47]  Cl. Reply Memorial, ¶ 203.4

[48]  Cl. Memorial on Jurisdiction, Liability, and Quantum, ¶ 314.

[49]  Cl. PHB, ¶ 144, quoting Terlizzese, "*Discounted cash flow method is usually used to evaluate economically the project and its feasibility*" Terlizzese, ¶ 19 (C-9). *See also* Tr. Day 3, 32:21-43:9.

[50]  Tr. Day 3, 43:1-9.

[51]  Tr. Day 3, 42:10-17.

[52]  First Expert Report of Mr. Boulton, ¶¶ 2.3, 3.10-3.23, 4.7-4.14; *see also* Cl. Reply Memorial, ¶ 211.

[53]  *Ibid.*, ¶¶ 2.4, 4.15-4.37

[54]  *Ibid.*, ¶¶ 2.3, 4.41-4.46

[55]  First Expert Report of Mr. Boulton, ¶¶ 3.24-3.33, 4.47-4.57. The precise figure is 10.13%. Exhibit P-5, slide 23.

[56]  Cl. Reply Memorial, ¶ 213; Wood Mackenzie Valuation of Ombrina Mare, Report of 21 December 2017, ¶ 5.1, Exhibit RB-1.

Claimants argue that Dr. Duarte-Silva "deliberately skewed every metric in his comparative DCF analysis" in order to drastically undervalue *Ombrina Mare*. [57]

231. For example, regarding resources, the Claimants used the estimates from the ERCE CPR, which assumed resources of 25.1 MMstb (2C), while Dr. Duarte-Silva applied an estimate from Axis of just 4.04 MMstb (2C). Along with other factors he used, this input pushes his valuation to *negative* EUR 123 million; applying the ERCE estimate of the reserve (and leaving Dr. Duarte-Silva's other inputs), the valuation changes to a *positive* outcome of EUR 31 million. [58]

232. Dr. Duarte-Silva elected to use an oil price of USD 65/bbl. The Claimants note that Mr. Boulton used a long-term oil price between USD 70 and 80/bbl – a price that was still more conservative than oil giant BP, which was using a long-term oil price of USD 90/bbl at that time. The Claimants argue that Dr. Duarte-Silva's chosen price has "no reasonable basis" and is "an outlier." [59] The Claimants explain that the figure comes from Brent futures and argue that those markets are relevant in short-term projections but are largely irrelevant for making long-term (multi-decade) investment decisions. [60]

233. In respect of the discount rate, Dr. Duarte-Silva applies a 12.5% to 15% discount rate; while Mr. Boulton's DCF analysis used a rate closer 10%. The Claimants criticise the Respondent's use of the increased discount rate and note that Italy itself uses a 10% discount rate to value oil and gas projects at the relevant time. [61] By applying "an excessively conservative discount rate" in a model that already contains conservative inputs, Dr. Duarte-Silva "produces an excessively negative valuation... an unreasonably negative "double whammy" effect." [62]

## 2. Respondent's position

234. The Respondent does not propose using a DCF model. This is because Respondent does not believe that a DCF model is applicable as "Rockhopper" was not a "going concern" and had never been a going concern at the Valuation Date. [63] Instead, the Respondent prefers a market-based method.

235. The Respondent primarily objects to the DCF model being used because *Ombrina Mare* was an "appraisal-stage" project; that being the case, it argues that the *Ombrina Mare* field cannot be valued with a DCF approach, as production had not commenced and therefore no profits – or cash flow – had been generated. [64] The use of a DCF model, it writes, "implies the existence of a real or imminent stream of verifiable profits" which would be inappropriate as it "implicates the absolute certainty that, but for the assumed illegality, these expected gains would certainly have occurred." [65] The Respondent submits that

---

[57] Cl. PHB, ¶ 151.

[58] Cl. PHB, ¶ 152.

[59] Tr. Day 5, 11:13-15; *see* also Cl. PHB, ¶ 155.

[60] Cl. PHB, ¶ 155.

[61] Cl. PHB, ¶ 157.

[62] Cl. PHB, ¶ 158.

[63] *See* Respondent's Counter Memorial, ¶¶ 282-303.

[64] Resp. Counter-Memorial, ¶¶ 285-286.

[65] Resp. Counter-Memorial, ¶ 284.

*it is undisputed that Claimants have never started extraction, nor did they ever receive the authorisation to commence operation. Moreover, and obviously, Claimants' investments, which were essentially limited to the exploratory stage, never yielded any profit.* [66]

236. The Respondent also cites to several earlier arbitrations where a DCF method was considered inappropriate due to a lack of any revenue generation. In *Arif v. Moldova*, the tribunal wrote that "the DCF methodology is not appropriate for a business that never operated and where a satisfactory basis for its projected revenues has not been demonstrated. Use of a DCF methodology in these circumstances gives an excessively speculative outcome." [67] In *Caratube v. Kazakhstan*, the tribunal found that use of a DCF was not indicated unless it was "a going concern with a proven record of profitability." [68] It also rebuts the Claimants' assertions on the 'four-questions test' set by the tribunal in *Al-Bahloul v. Tajikistan*, writing that *Al-Bahloul*, "as generous as it may seem in the abstract," is, in fact "easily distinguishable" from the present case. The Respondent writes that *Ombrina Mare* "fails at the first step: the investor could not prove convincingly that the reserves identified could grant a profitable discovery and that they could secure third-party finance, owing to the dubious prospect of success." [69] The Respondent also notes that in *Al-Bahloul* the investor was "promised a license, which is not true in this case." [70]

237. The Respondent also pushes back against what it sees as the "inherently speculative" nature of the specific DCF valuation given by Mr. Boulton, illustrated by the "dramatic spread between the high and low outputs... [a spread] so extreme (more than 2200%) it only reinforced how speculative Rockhopper's damages claim is." [71] It also argues that even the lowest estimate is over-inflated, as it accounted for "the existence of an unviable gas discovery" and uses "inflated oil reserve estimates" [72] and is an "exercise in rampant speculation." [73]

238. The Respondent also writes that in the model, the Claimants "take an inexplicably optimist projection of oil prices" that then continue to rise, overly favourable inflation rates, and ignore the bearing of profitability ('economic justification') on the likelihood of the concession being granted. [74]

239. The Respondent concludes that "as is apparent from all of the factual data, there was in no way an initiated going concern" [75] in this case and that "in reality, even after the concession is obtained, it is not uncommon for projects to be abandoned altogether." [76]

240. Nonetheless, Dr. Duarte-Silva did conduct some DCF-based calculations of his own, using the Wood

---

[66] Resp. Counter-Memorial, ¶ 293.
[67] *Arif v. Moldova* (fn 24 above), ¶ 576 (CL-35).
[68] *Caratube International Oil Company LLP and Devincci Salah Hourani v. Republic of Kazakhstan,* ICSID Case No. ARB/13/13, Award, 27 September 2017 ("*Caratube v. Kazakhstan*"), ¶¶ 1094-1095 (RL-23).
[69] Resp. Rejoinder, ¶ 276.
[70] Resp. PHB, ¶ 153.
[71] Resp. PHB, ¶ 154.
[72] *Id.*
[73] *Ibid.,* ¶ 157.
[74] Resp. Rejoinder, ¶ 292; *see* also ¶¶ 293-295 on oil prices.
[75] Resp. Counter-Memorial, ¶ 289.
[76] Resp. Counter-Memorial, ¶ 302.

Mackenzie DCF model but altering the inputs. When he used a long-term Brent oil price of USD 65/bbl, a price discount of 13.4%, a discount rate of 12.5%, and a cost-overrun of 20%, Dr. Duarte-Silva arrived at a valuation of EUR 31 million. [77] He also noted that if the project was delayed by two years, it would reduce this valuation to just EUR 25 million. The Respondent submits that "as is glaringly clear, this value is many orders of magnitude lower than "*at least €275 million*," and is arrived at simply by using moderately more reasonable inputs to the same model that Mr. Boulton and Wood Mackenzie used." [78]

241.  Dr. Duarte-Silva also modified the DCF model using the Axis Well Technology data set. These valuations resulted in largely *negative* values for *Ombrina Mare*. [79] In fact, implementing the projected production profile from Axis, with a 10% discount rate, and all of the other inputs remaining the same as the baseline Wood Mackenzie model, resulted in a *negative* EUR 112 million valuation. [80] Essentially, according to his calculations, a discount rate of 8-15% yields negative valuations between negative EUR 123 million and negative EUR 94 million.

242.  Finally, the Respondent also objects to the use of Mr. Boulton's DCF-based valuation because Mr. Boulton hired Wood Mackenzie to prepare a DCF model for him, as it is not his area of expertise. The Respondent submits:

      *...[h]ow Claimants can validly argue that Mr. Boulton's opinions about a model outside of his expertise and built by someone else could somehow be helpful to the Tribunal is beyond comprehension of the Respondent.* [81]

243.  The Respondent concludes that calculating damages using the DCF method in this case, "is inherently unreliable, prone to abuse and not appropriate." [82] The Claimants' request to use the DCF method should be rejected in its view.

## (b) Market-Based Approach

244.  A market-based or comparable transactions approach attempts to find a fair market value of the asset by applying an index value from comparable transactions involving comparable companies between the expropriation and the valuation date. A "market-based" model is preferred by the Respondent.

## 1. Respondent's Position

245.  Using a market-based approach, Respondent's expert Dr. Duarte-Silva calculated a "fair market

---

[77]  Second Report of Dr. Duarte-Silva, ¶ 132.

[78]  Resp. PHB, ¶ 173.

[79]  Second Report of Dr. Duarte-Silva, ¶ 15; *see also* Exhibit TDS-46.

[80]  Second Report of Dr. Duarte-Silva, ¶ 33.

[81]  Resp. Reply to Claimants' Document on Quantum of 13 November 2019, 29 November 2019, ¶ 57.

[82]  Resp. Rejoinder, ¶ 289.

value" of *Ombrina Mare* as at the Valuation Date, based on the price that Rockhopper paid to acquire MOG in 2014. He did so by adjusting the acquisition value of MOG (EUR 36 million, in 2014) for changes in the oil markets between the acquisition date and the valuation date, using an index of over a hundred oil and gas companies. [83]

246.  Dr. Duarte-Silva noted that the indices that track mainly junior oil companies and exploration-focused firms declined in value similarly to the FTSE AIM Oil & Gas Index [84] – indeed, 87% of the index components lost value over this period. [85] As Dr. Duarte-Silva wrote,

> [t]his makes intuitive sense: in a declining oil market, it takes unusual circumstances for a company to gain value (e.g., new discoveries). I do not see any such circumstances occurring with Ombrina Mare between 2014 and the Valuation Date... More generally, I find that the very few component companies which showed unusually large stock price increases experienced exceptional events which increased their value against the industry average. [86]

247.  Using this methodology, Dr. Duarte-Silva valued *Ombrina Mare* at just EUR 13 million on the Valuation Date. [87]

248.  The Respondent argues that this method of valuation is supported by the VALMIN code, and also "makes the most intuitive sense." [88] Dr. Duarte-Silva argues that the correctness of his valuation is reinforced by the fact that

> ...when Rockhopper acquired MOG, it paid €36 million for both oil assets and approximately €12 million in cash that was held by MOG. So, net of the cash that was already in MOG, Rockhopper acquired MOG's oil assets for considerably less than €36 million. I have conservatively ignored this fact, which would result in a valuation of less than €9 million for Ombrina Mare as of the Valuation Date. [89]

249.  Dr. Duarte-Silva also dismisses counter-arguments by the Claimants regarding the use of the MOG acquisition, arguing that "an underperforming asset is not *per se* undervalued", that cash-flow constraints are not a reason for undervaluation, and that the Claimants did not substantiate their claim that there were no other serious bids for MOG. [90] The Respondent and Dr. Duarte-Silva note that one of the owners of MOG was Och-Ziff, one of the largest hedge-funds in the world. [91]

## 2. Claimants' Position

---

[83]  *See* Second Expert Report of Dr. Duarte-Silva, Section B. Adjustments to 2014 Acquisition Value.
[84]  Second Expert Report of Dr. Duarte-Silva, ¶ 56.
[85]  Second Expert Report of Dr. Duarte-Silva, ¶ 57.
[86]  Second Expert Report of Dr. Duarte-Silva, ¶ 57.
[87]  Second Expert Report of Dr. Duarte-Silva, ¶ 47. *See also* Resp. Rejoinder, ¶¶ 302-307.
[88]  Resp. PHB, ¶ 175.
[89]  Second Expert Report of Dr. Duarte-Silva, ¶ 48.
[90]  Second Expert Report of Dr. Duarte-Silva, ¶ 52.
[91]  Second Expert Report of Dr. Duarte-Silva, ¶ 53; *see also* Resp. PHB, ¶ 179.

250. The Claimants do not believe that a market-based or comparable transaction approach is appropriate to value *Ombrina Mare*.

251. The Claimants argue that Dr Duarte-Silva's "insistence" that only the market-based approach should be used to value *Ombrina Mare* is "fundamentally misguided,"[92] is "methodologically unsound" and that he "crudely makes a 63% reduction" based on an average decrease in the value of other companies.[93] The Claimants assert that truly comparable transactions are "few and far between" given the uniqueness of oil and gas assets[94] and argue along with their expert, Mr. Chapman – that a market approach can be useful but only when used as a "corroborative" analysis for a DCF modeled-figure.[95]

252. The Claimants put forward one comparable transaction – Mitsui and Co's March 2013 acquisition of *Tempa Rossa*, an onshore oil and gas field in Southern Italy. Using benchmarks from that acquisition, the Claimants arrive at a post-tax valuation for *Ombrina Mare* of EUR 173 million, and a pre-tax valuation of EUR 288 million.[96]

253. The Claimants also argue that in using a market-based approach, Dr. Duarte-Silva has mischaracterized the acquisition of MOG as an asset acquisition instead of a corporate acquisition.[97] The Claimants submit that

*The majority of companies on this index did decrease in value over this period. However, the changes in share price ranges between an increase of 585% and a decrease of 99.98%. This range highlights the effect that specific risks have on oil and gas companies, and the inappropriateness of the comparable company approach for oil and gas concessions.*[98]

254. The Claimants also argue that Dr. Duarte-Silva's 63% discount to the acquisition price to end up at the €13 million valuation is "unsound" as it assumes the value of the *Ombrina Mare* field moved in line with the average valuation of the companies making up the index he relies upon; it ignores large fluctuations in share prices between May 2014 and January 2016, "where one company's share price increased 585% and another's decreased 99.98%, demonstrating the uniqueness of oil and gas companies and assets."[99]

255. The 2014 MOG acquisition is also not considered an appropriate valuation benchmark by the Claimants for the *Ombrina Mare* field, as MOG's value was artificially depressed due to litigation, the underperformance of the Guendalina field, cash flow constraints, and a strong desire by MOG to contract with Rockhopper.[100]

256. Indeed, in this regard, the Claimants highlight statements to this effect from both Rockhopper and

---

[92] Cl. PHB, ¶ 147.

[93] Cl. PHB, ¶ 149.

[94] Cl. Reply Memorial, ¶ 217.

[95] Cl. PHB, ¶ 147, First Report of Mr. Chapman, ¶ 4.5. *See also* Cl. Reply Memorial, ¶ 227.

[96] Cl. Reply Memorial, ¶ 217.

[97] Cl. PHB, ¶ 147.

[98] Second Expert Report of Mr. Boulton, ¶ 4.30.

[99] Cl. Reply Memorial, ¶ 227.

[100] Second Expert Report of Mr. Boulton, ¶ 4.3

MOG, with the CFO of Rockhopper stating that

*... [Ombrina Mare] in MOG's hands was near worthless, because MOG did not have the means to actually develop the field. In contrast, the value of the asset in Rockhopper's hands better reflected its inherent fair market value (i.e. the DCF), because Rockhopper had the capital, expertise and commitment to commence production.* [101]

257.    This assessment was confirmed by MOG's own Chairman, who noted that the company was "sadly" struggling in its attempts to recover from a "series of setbacks at Guendalina," its principal producing asset, and regulatory issues with *Ombrina Mare*. He acknowledged that at the time, the MOG board believed that the necessary expansion into the Mediterranean region could only "be achieved by a significantly more capitalized company." [102]

258.    This was reinforced by the Claimants' expert Mr. Chapman, who wrote in his first report that he was unsurprised that the *Ombrina Mare* valuations were considerably larger than what Rockhopper ultimately paid for MOG. He explained that it is normal in M&A transactions for a buyer to believe it may be able to add value "after purchase through delivery of attributes such as capital, technical expertise and fresh strategy. The purchaser, Rockhopper in this case, pays away as little of this value as it can negotiate in the purchase price." [103]

259.    Mr. Boulton also touched on the difficulties of using a market-based approach in the oil and gas sector at the Hearing, noting that it is "close to impossible" to apply because each company has "unique characteristics" and it is very hard to find "something that you would say has the same structure, the same issues, the same permeability, the same development costs, the same size..." [104] In light of such difficulties, a different approach is more appropriate in this case.

## (c) Other Valuations

## *1. Sunk Costs*

260.    The Respondent argues that in fact, the only "potentially provable costs" are the sunk costs Rockhopper incurred after it acquired MOG. It further argues that the MOG acquisition was done with "eyes wide open" and that the risks relating to the production concession application were in MOG's books. [105] The Respondent argues that the Claimants cannot deny the risks now.

261.    The Respondent argues that such an approach would maximally lead to an award of damages of approximately EUR 2 million, the sum of sunk costs from 2014 (EUR 880,000) and 2015 (EUR 1,074,000). [106]

---

[101]  Second Witness Statement of Stewart MacDonald, ¶ 6.
[102]  Recommended Cash, Share and Contingent Consideration Offer by Rockhopper Exploration PLC for MOG, 23 May 2014, Exhibit TDS-43.
[103]  First Expert Report of Mr. Chapman, ¶ 2.3.
[104]  Tr. Day 5, 6:14-21.

[105]  Resp. Rejoinder, ¶ 308.

262.   In support of a sunk-cost damages award, the Respondent cites to several past arbitrations,[107] but particularly those in *Bear Creek v. Peru* and *Caratube v. Kazakhstan*, two natural resources cases in which those tribunals awarded sunk costs and no more. In *Bear Creek*, the tribunal found that a projection of profits is "too speculative when it is premised on the assumed acquisition of a permit or license that was not there to begin with."[108] The Respondent concedes that *Caratube* is "not perfectly analogous" but also asserts that the tribunal in that case confirmed that "without an ongoing concern, lost profits could only be recovered when they are proved to a high level of certainty."[109]

263.   The Claimants disagree with a sunk cost model, and point out in their Post-Hearing Brief that the Respondent appears to have abandoned sunk costs as a quantification of Rockhopper's damages (which tend to only be awarded in arbitrations in certain "industry sectors" such as hospitality).[110] Mr Boulton also touched on this briefly at the Hearing, asking

       *...should we value an asset by refer to what's been spent on it? [...] almost always that's irrelevant because the fact that you've spent money on something doesn't mean it's worth what you spent. You may have spent money foolishly and be left with an asset that's not worth what you've spent, or you may have spent money on an asset that now has a very significant future value.*[111]

264.   The Claimants also seek to distinguish the present case from the Respondent's cited support such as *Caratube v. Kazakhstan* and *Bear Creek v. Peru*. The Claimants point out that in *Caratube*, the tribunal held that the DCF method was not appropriate and instead opted for the sunk cost method for the assessment of damages as the claimant had, indeed, not established that its investment would have become a going concern, but it had also not made a commercial discovery, and had not presented required environmental (seismic) studies to justify the reserves.[112] In *Bear Creek*, the tribunal found that a hypothetical buyer would not have been able to proceed because it was unlikely to receive the required permit from the local community.[113]

265.   The Claimants also go on to rebut the significance of several other arbitrations raised by the Respondent, such as *Arif v. Moldova* and *Wena Hotels*,[114] by raising the same three distinguishing features of the present arbitration, namely, that the *Ombrina Mare* exploration work had already been completed, including the drilling of a second well with commercial discoveries as a result; the fact that Rockhopper had a large cash reserve on its balance sheet; and that all the necessary permits had been issued, "save for the granting of the concession itself."[115]

---

[106]   Resp. Rejoinder, ¶ 309.

[107]   *See* Resp. Counter-Memorial, ¶¶ 290-293.

[108]   Resp. Rejoinder, ¶ 280, citing *Bear Creek Mining Corporation v. Republic of Peru,* ICSID Case No. ARB/14/2, Award, 30 November 2017 (CL-165).

[109]   Resp. Rejoinder, ¶ 281, citing *Caratube v. Kazakhstan* (fn 68 above) (RL-23).

[110]   Cl. PHB, ¶ 150.

[111]   Tr. Day 5, 6:23-7:5.

[112]   Cl. Reply Memorial, ¶ 204.

[113]   Cl. Reply Memorial, ¶ 205.

[114]   Cl. Reply Memorial, ¶¶ 206.1-206.7.

[115]   Cl. Reply Memorial, ¶ 207.3.

## 2. *Prior Valuations*

266. The Claimants' Mr. Chapman was not particularly enthusiastic about using prior valuations, noting that they can be premised on out-of-date information. [116]

267. In preparing for its potential acquisition, MOG conducted a DCF analysis to determine the value of the *Ombrina Mare* field. It valued the field at approximately EUR 319 million. [117]

268. While investigating whether the acquisition was beneficial to the company, the Claimants also conducted their own valuation of *Ombrina Mare*. It was also a DCF analysis and determined the value of the field to be approximately EUR 184 million. [118] Mr. Boulton, discussing these valuations at the Hearing, noted that they put Rockhopper "in a strong negotiating position and led to MOG changing hands at less than its NAV." [119] This valuation was originally made on a post-tax basis and was GBP 93 million, or EUR 111 million. As the other valuations in this arbitration have been on a pre-tax basis, Mr. Boulton adjusted this valuation removing the applicable taxes, arriving at approximately EUR 184 million. [120]

## E. Taxation

269. Claimants request an award on a pre-tax basis, and make their claim for compensation on pre-tax, fair market value for *Ombrina Mare*. The Claimants write that "taxation on profits in Italy and taxation on any award in Italy are broadly commensurate" [121] and Mr. Boulton writes that "Rockhopper would be able to deduct or offset certain amounts from its tax liabilities, which further renders appropriate a damages calculation on a pre-, rather than post-, tax basis." [122]

270. The Claimants cite to the award in *CSOB v. Slovak Republic* [123] and to Robert Dunn, noting that "a plaintiff seeking to recover lost profits is not required to deduct the taxes it would have had to pay on the profits (had the profits been earned at the time) to arrive at net profits." [124]

271. The Respondent largely does not address the issue of taxation but did call a pre-tax valuation a "frivolous attempt to receive a higher award due to taxes" in its Response of 29 November 2019. [125] In the same document, Respondent also wrote that "to take account of taxes, [the Tribunal] can simply award a post-tax value and request that this value not be taxed."

---

[116] Expert Report of Mr. Chapman, ¶ 2.4.

[117] Ombrina Mare DCF Analysis, Exhibit L-82. This is a pre-tax figure.

[118] Rockhopper Exploration: Project Ferrari, Board Update of 9 April 2014, p. 11, Exhibit L-0095; Opening Presentation of Mr. Boulton, Slide 17, Exhibit P-0005.

[119] Opening Presentation of Mr. Boulton, Slide 17 (P-0005).

[120] *Ibid.*

[121] Cl. Memorial on Jurisdiction, Liability, and Quantum, ¶ 321.

[122] *Ibid.*

[123] *Československá Obchodní Banka A.S. v. Slovak Republic*, ICSID Case No. ARB/97/4, Award, 29 December 2004 (CL-112).

[124] Robert Dunn, Recovery of Damages For Lost Profits, 6th ed., at Section 6.11 (CL-0114).

[125] Resp. Reply to Claimants' Document on Quantum of 13 November 2019, 29 November 2019, ¶ 9.

## F. The Tribunal's Analysis

272. In light of the Tribunal's decision against the Respondent regarding the expropriation of the *Ombrina Mare* field,[126] it is appropriate that the Claimants receive compensation for that expropriation and that their decommissioning costs be paid. That is an uncontroversial conclusion to be drawn from the establishment of liability. Not only was the Claimants' investment directly expropriated, it was put to the cost of decommissioning.

273. The Tribunal has considered the parties' positions regarding quantum. In particular, the Tribunal notes the significant disparities both between the Parties' estimates of damage and also within their own analyses.

274. The Tribunal also notes the disagreement on approaches to the valuation of the *Ombrina Mare* field. As the Respondent repeatedly argues, it was not, technically, a going concern at the time of the expropriation, which does make the use of a DCF model more complicated. The Claimants, instead, argue that a DCF model is the oil industry standard.

275. Both parties have discussed the four-point test for the application of a DCF model in the *Al-Bahloul* case. The Tribunal takes particular note of that tribunal's statement that:

*...the application [of a DCF model] might be justified, inter alia, where the exploration of hydrocarbons is at issue. The determination of the future cash flow from the exploitation of hydrocarbon reserves need not depend on a past record of profitability. There are numerous hydrocarbon reserves around the world and sufficient data allowing for future cash flow projections should be available to allow a DCF calculation.*[127]

276. In the *Al-Balhoul* case, the tribunal in fact decided not to apply a DCF model (or, in fact, any model) as no evidence was presented to show that there had been any hydrocarbons found in the four areas at issue.[128]

277. Here, while the Claimant and Respondent dispute the precise size and value of the reserve, there remains no doubt that the reserve exists and could have been exploited. This is readily inferred from the fact that not only had there been a long-standing exploration process, but the Respondent was also sufficiently comforted as to the prospects of *Ombrina Mare* that it went ahead with the Decree of 7 August 2015. Of course, questions likely remain on both sides about the exact profitability of the reserve, but the Tribunal is at least one step further ahead than the claimants in *Al-Bahloul.*

278. The Claimants primarily advance a claim for EUR 275 million, based on the Wood Mackenzie DCF model and Mr. Boulton's modifications thereto. As noted above, analyses from that DCF model can in fact vary widely both above *and* below that figure. Indeed, the Wood Mackenzie DCF valuations of *Ombrina Mare* at the Valuation Date range from just EUR 68.3 million to EUR 1.59 *billion.* That is

---

[126] *See* Section VI.A above.
[127] *Al-Bahloul v. Tadjikistan* (fn 42 above), ¶ 75 (CL-164).
[128] *Ibid.,* ¶ 76.

a variation in valuations of *more than 1.5 billion euros* – or, as noted by the Respondent, a spread of over 2200%. In fairness, Mr. Boulton uses these high and low cases to present the reasonableness of his EUR 275 million estimate of damage, but it also serves to show the degree of variability even within the Claimants' own DCF model.

279. That being said, the Tribunal also does not find the Market Transactions approach compelling. The Tribunal is not persuaded by Dr. Duarte Silva's assessment that the sale price for MOG should necessarily be used as the basis upon which to value an asset that was then owned by it. Adopting this approach would be to overlook a critical change in that which the third Claimant bought in 2014. At the time of the investment there was no guarantee of what the future might hold for an entity which had been in "exploratory" mode for several years. In particular, the Decree of 7 August 2015 was, in reality, a very long and speculative way off. Once the Claimants' right to the grant of the production concession was triggered (as discussed earlier in this Award), the situation changed dramatically which would be obvious to any investor. An investor looking at the Claimants at the moment prior to expropriation, assuming the acts of the Respondent of 30 December 2015 and 29 January 2016 were not "in the air" or had not occurred, would see a completely different opportunity to that presented by MOG in 2014.

280. Similarly, the Tribunal does not find the arguments for a "sunk-cost model" persuasive in this case. In the Tribunal's estimation, *Ombrina Mare* was at a more advanced stage than where the application of a sunk-cost model would be appropriate.

281. It remains somewhat troubling to note Mr. Boulton's musing in the Hearing that "Ombrina Mare was probably worth more to Rockhopper than to many other market participants"[129] as that would appear to make an accurate valuation of the field all the more difficult. This is only reinforced by the Claimants advancing just one comparable transaction, that of the acquisition of the *Tempa Rossa*.

282. The Tribunal's misgivings about both of the dominant models proposed in the arbitration (the DCF and market-based analyses) are not reason to leave the Claimants without the remedy to which they are, as a matter of the ECT and international law, entitled.

283. Essentially, the Respondent argues that as *Ombrina Mare* was not a going concern, the DCF model cannot not apply. The Tribunal does not concur with this. The Claimants argue that a DCF model is standard in valuing hydrocarbon projects and demonstrated how such a model is even used by the Respondent in governmental valuations. However, the Tribunal does acknowledge the limitations of a DCF model and the somewhat more speculative nature of its use when applied in a situation such as in this case, where the expropriated asset has never had any cash flows of its own from which to extrapolate a more "bespoke" model. As noted in *Al-Bahloul*, the possibility exists, especially in the oil and gas sectors, to create a useful valuation from a DCF model for an investment that is not a going concern; but in this case, the most accurate valuation may, indeed, not be either Mr. Boulton's nor Mr. Duarte Silva's valuations from the Wood Mackenzie DCF model.

284. Instead, a more reliable and persuasive valuation may in fact arise from an earlier DCF model – namely, the valuation of *Ombrina Mare* from the DCF modelling used by Rockhopper in its decision

---

[129]  Tr. Day 5, 5:1-3. Mr. Boulton went on to note and that "*the reason for that is that Rockhopper had the capital that was necessary to develop the field, and Ombrina Mare is smaller than prospects that would be of interest to the majors. So, in some ways it falls in the middle between the majors, who would regard it as too small, and the exploration play companies, who don't have the capital to develop something like this. And for Rockhopper, it appears to me, it was in a sweet spot.*"

to acquire MOG (and, by extension, the *Ombrina Mare* field).

285. In 2014, prior to its acquisition of MOG, Rockhopper itself valued the *Ombrina Mare* field, pre-tax, at EUR 184 million.[130] (At the same time, MOG, the "seller", valued *Ombrina Mare* at EUR 319 million.)[131] The Tribunal finds the Claimants' arguments on the reasons for the depressed value of MOG persuasive, particularly the element of cashflow constraints leaving the company without the capital on hand necessary to exploit the field. Rockhopper's 2014 valuation was itself predicated on prior work prepared by Rothschild (C-34) and Canaccord (C-38).

286. The Tribunal has elected to use <u>this</u> valuation as its assessment of the fair market value of the *Ombrina Mare* field as of the Valuation Date. The Tribunal is confident in its judgment that EUR 184 million is the appropriate figure reflecting compensation under the ECT and international law in this case.

287. The Tribunal prefers this valuation as the competing interests surrounding its creation serve as a balance that the rival valuations in this arbitration largely lack. It was, indeed, created in part to convince shareholders that the MOG acquisition was a wise move for Rockhopper. However, simultaneously, it was also likely somewhat conservative, both out of fiscal responsibility to its shareholders and lest such a valuation inflate the asking price for the company that owned it.

288. In so doing, the Tribunal is not trying to "split the difference" between the Respondent and the Claimants' valuations. Rather, it has strived to find the truest valuation of *Ombrina Mare* on the Valuation Date. This figure of EUR 184 million, pre-tax, as of the Valuation Date is rooted directly in the evidence before the Tribunal and, while considerably less than that sought by the Claimants, or indeed considerably more that than argued for by the Respondent, it does suitably reflect a valuation which is informed by thorough (noting both Rothschild and Canaccord in the background) consideration.

## G. Other Costs

## (a) Additional Historical Pre-Development Costs

289. In his second report, Mr. Boulton described some historical exploration and appraisal costs incurred from 2005-2015.[132]

290. The Tribunal does not believe these costs are warranted as additional to the damages award. These are, in the Tribunal's view, swept up by the damages award as of the Valuation Date.

---

[130] As the other valuations in the arbitration have been pre-tax, the Tribunal has elected to use the pre-tax valuation provided by Mr. Boulton. The post-tax valuation was GBP 93m, or EUR 111m (with the appropriate exchange rate on the day). *See* Presentation of Mr. Boulton, Slide 11 (P-0005), which used "NPV10%" with "First oil 2018"; *see also* Cl. PHB, ¶ 138; Cl. Memorial on Jurisdiction, Liability, and Quantum, ¶ 321.

[131] Cl. PHB, ¶ 136, *see also* Exhibit L-0095.

[132] Second Expert Report of Mr. Boulton, ¶¶ 2.19-2.20.

## (b) Decommissioning Costs

291.　The Claimants have requested decommissioning costs for the *Ombrina Mare* field in the amount of EUR 6,675,391 as calculated by Mr. Boulton (slide 19 of his presentation). These costs were caused and engaged in the period after 29 January 2016 and the denial of the production concession. The Claimants were, as a matter of logic, put to this expense by the action of the Respondent.

292.　The Tribunal awards the Claimants their decommissioning costs of EUR 6,675,391.[133] These are duly established.

# H. Interest

293.　Article 13(1), final paragraph of the ECT, reads, in part, that compensation for a legal expropriation "shall also include interest at a commercial rate established on a market basis from the date of Exprorpiation until the date of payment."[134] Tribunals in unlawful expropriation cases have also historically applied interest to damages awards.

294.　The Tribunal has a wide discretion to determine the margin of interest applicable. This discretion extends to whether the interest is simple or compounded and, if compounded, the compounding intervals.

295.　As discussed above, the *Chorzów Factory* case set the standard for reparations as sufficient to "wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed."[135] Interest has become a recognised part of this standard. As the tribunal in *Yukos v. Russia* wrote,

> In the view of the Tribunal, there can be no doubt that, a fortiori, in the case of an unlawful expropriation, as in the present case, Claimants are entitled to interest from Respondent in order to ensure full reparation for the injury they suffered as a result of those of Respondent's measures that the Tribunal has found to be internationally wrongful.[136]

296.　The Tribunal will, in line with the entirely uncontroversial principles of interest rooted in the ECT and international law, award this remedy.

## (a) Pre- and Post-Award Interest

297.　The Claimants request both pre- and post-award interest. The Claimants rely on *AAPL v. Sri Lanka*,

---

[133]　Second Expert Report of Mr. Boulton, ¶¶ 2.19-2.20, 6.1-6.20.

[134]　Energy Charter Treaty, Article 13(1).

[135]　*Chorzów Factory*, op. cit., p. 47.

[136]　*Yukos Universal Ltd. v. The Russian Federation*, PCA Case No. 227, Award, 18 July 2014, ¶ 1677 (CL-75).

where the tribunal stated that "interest becomes an integral part of the compensation itself, and should run consequently from the date when the State's international responsibility became engaged." [137]

298. The Claimants also argue that the "majority" of arbitral tribunals do not distinguish between pre- and post-award interest. [138]

299. The Tribunal finds, consistent with *AAPL v. Sri Lanka*, that it is appropriate that pre- and post-award interest be applied. This takes account of the fact that over six years have now passed since the Valuation Date. Pre-award interest will be calculated from the Valuation Date, to the date of the Award. Post-award interest will run from the date of the Award.

## (b) Simple or Compound Interest

300. The Claimants have requested compound interest and provided several interest calculations performed by its expert, Mr. Boulton, applying compound interest semi-annually and annually. The Respondent has largely confined its submissions regarding interest to requesting a risk-free interest rate.

301. The Claimants argue that simple interest is insufficient to compensate for the delay between the harm and the award of damages. [139] The Claimants elaborate that "awarding simple interest fails to fully compensate claimants... all awards of pre-judgement interest should therefore be computed using compound interest." [140] The Claimants also argue that in the absence of compound interest a respondent "has an incentive to delay the arbitral proceedings (and/or payment of the award) because it is able to profit from the use of the Claimant's money during the pendency of the arbitration." [141]

302. Generally speaking, the application of annually compounding interest has become standard in investment arbitration. This largely began with the award in *Compañía del Desarrollo de Santa Elena v. Costa Rica*. In that dispute, the tribunal noted that while simple interest may be sufficient to compensate for damages such as breach of contract or injury, "the same considerations do not apply to cases relating to the valuation of property rights." [142] It went on to award compound interest in that case, noting that compound interest ensures that the injured party receives "the full present value of the compensation it should have received at the time of the taking" and ensuring that "the taking state is not entitled unjustly to enrich itself by reason of the fact that the payment of compensation has been long delayed." [143]

---

[137] Cl. Memorial on Jurisdiction, Liability, and Quantum, ¶ 326, quoting to *AAPL v. Sri Lanka*, ICSID Case No. ARB/87/3, Award, June 27, 1990, ¶ 114 (CL-0009).

[138] Cl. PHB, ¶ 162, citing Ripinsky and Williams, Damages in International Investment Law (2008), p. 387 (CL-0234).

[139] Cl. Memorial on Jurisdiction, Liability, and Quantum, ¶ 333.

[140] *Ibid.*, quoting to Jeffrey Colón & Michael Knoll, *Prejudgment Interest in International Arbitration*, Vol. 4, Issue 6, Transnational Dispute Management 10 (Nov. 2007), 10.

[141] Cl. Memorial on Jurisdiction, Liability, and Quantum, ¶ 332; *see also id.*, fn. 461.

[142] *Compañía del Desarrollo de Santa Elena v. Republic of Costa Rica*, Case No. ARB/96/1, Award of February 17, 2000, Exhibit CL-0024, ¶ 97 (CL-24).

[143] *Ibid.*, ¶ 101.

303. Later significant investment awards and academic writing have since relied upon the reasoning first outlined in *Santa Elena*, such as *Yukos* case quoted above, and cases such as *Azurix v. Argentina*, *Metalclad v. Mexico*, *MTD v. Chile*, *Tecmed v. Mexico*, *Siemens v. Argentina*, and *PSEG v. Turkey*.[144] The Claimants offered at least 20 investment arbitration awards wherein compound interest was granted.[145]

304. The Tribunal deems it appropriate to award interest in this matter, compounded annually, not semi-annually. In this regard the Tribunal has carefully considered each of the awards relied upon by the Claimants in support of its claim for compound interest, as noted just above, and while there is a diversity of approach ranging between monthly, quarterly, semi-annually, and annually, the preponderant view is for annual compounding.

## (c) Rate of Interest

305. [The Energy Charter Treaty at Article 13(1)](#) makes explicit reference to "interest at a commercial rate established on a market basis from the date of a legal expropriation until the date of payment" as the standard in a *legal* expropriation. Arguably, that standard would be the base point from which this Tribunal would assess an appropriate interest rate.

306. The Claimants' expert, Mr. Boulton, provided several "potentially relevant" interest rates for the Tribunal's consideration, based on the cost of borrowing in Italy. These include:
(1) Italian 5-year Government Bond yields (approximately 0.55%);

(2) A 12-month EURIBOR rate with a fixed uplift (EURIBOR +4%);

(3) Corporate loan rates (1.60%);

(4) An amalgam rate of the cost of borrowing of Rockhopper's peers (approximately 9%); or

(5) Interest rate on Rockhopper's standby loan facility (15% p/a).[146]

307. In contrast, the Respondent restricts the majority of its arguments on interest rate to its request for a "risked-free" interest rate. In its Counter-Memorial, it stated that "it is well established that the appropriate rate of interest is the risk-free rate" as a rate higher than that "compensates the Claimant for risks that it has not borne."[147] In its Post-Hearing Brief, the Respondent writes in a footnote that "sovereign debt bears more default risk than ICSID awards, and Dr. Duarte-Silva thus concludes that that [*sic*] the appropriate rate under this hypothetical would be at most the rate on the sovereign debt of the Italian Republic."[148]

---

[144] *Azurix Corp. v. The Argentine Republic,* ICSID Case No. ARB/01/12, Award, 14 July 2006 (CL-15); *Metalclad Corporation v. The United Mexican States,* ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000 (CL-47); *MTD v. Chile* (fn 24 above) (CL-50); *Tecmed, S.A. v. The United Mexican States,* ICSID Case No. ARB (AF)/00/2, Award, 29 May 2003 (CL-67); *Siemens A.G. v. The Argentine Republic,* ICSID Case No. ARB/02/8, Award, 6 February 2017 (CL-65); *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Sirketi v. Republic of Turkey,* ICSID Case No. ARB/02/5, Award, 19 January 2007 ("*PSEG Global v. Turkey*") (CL-60).

[145] Cl. Memorial on Jurisdiction, Liability, and Quantum, fn. 452.

[146] First Expert Report of Mr. Boulton, ¶¶ 5.9-5.25; Table 5-2.

[147] Resp. Counter Memorial, ¶ 312.

308. In his expert report, the Respondent's expert Dr. Duarte-Silva suggests applying the rate of 0.417% - which is, indeed, the rate at which Italy issues its sovereign debt.[149] He argued that as the Tribunal's award will be in "an amount that is not arbitrary and that equates to the fair market value of the allegedly expropriated asset," the amount awarded is "already de-risked and therefore *equivalent to a cash amount on the Valuation Date*. The appropriate rate to apply to this cash amount is a rate commensurate with the risk associated with cash: a risk-free rate."[150]

309. However, as the Claimants' expert Mr. Boulton points out, it is not particularly clear whether Mr. Duarte-Silva is referring to pre- or post-award interest.[151] Mr. Duarte-Silva's comment seems to most naturally apply to post-award interest; while enforcement of an award is never completely certain, it is reasonably so; as mentioned above, Dr. Duarte-Silva believes that sovereign debt carries more default risk than an ICSID award.

## (d) Past Practice in Rate of Interest

310. In *Tidewater v. Venezuela*, the arbitration was under a BIT, which referred to interest at "normal commercial rates." The Tribunal read this as representing "the rate at which the Claimants could themselves have borrowed the same sum."[152] It found that "the appropriate reference point is the cost of borrowing available to Claimants, not the amount that Respondent would have had to pay."[153]

311. Investment tribunals have frequently made use of interbank rates such as LIBOR, but with fixed uplifts.[154] The reasoning behind adding the fixed uplift is that it reflects the fact that the interbank rates such as LIBOR or EURIBOR are the rate at which banks led to each other. As the Tribunal in *Lemaire v. Ukraine* wrote,

*Loans to customers invariably include a surcharge [above the interbank rate], and this surcharge must be inserted in the calculation of interest to reflect the financial loss caused to Claimant by the temporary withholding of money. A claimant to whom money is awarded would not be fully compensated, if the interest rate applied did not include an appropriate margin.*[155]

## (e) The Tribunal's Determination on Rate of Interest

---

[148] Resp. PHB, fn. 216.

[149] Second Expert Report of Dr. Duarte-Silva, ¶ 143.

[150] Second Expert Report of Dr. Duarte-Silva, ¶ 144. (Emphasis original.)

[151] Second Expert Report of Mr. Boulton, ¶ 5.10.

[152] *Tidewater Investment SRL & Tidewater Caribe C.A. v. Venezuela,* ICSID Case No. ARB/10/5, Award, 13 March 2015, ¶ 209 (CL-118).

[153] *Ibid.,* ¶ 205.

[154] *See,* for example, the awards in *PSEG Global v. Turkey* (fn 144 above), ¶ 348 (CL-0060); *Enron Corporation and Ponderosa Assets, L.P. v. Argentine Republic,* ICSID Case No. ARB/01/3, Award, 22 May 2007, ¶ 452 (CL-0034); *Ioannis Kardassopoulos and Ron Fuchs v. The Republic of Georgia,* ICSID Case Nos. ARB/05/18 and ARB/07/15, Award, 3 March 2010 (CL-0119); *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan,* ICSID Case No. ARB/05/16, Award, 29 July 2008 (CL-0061).

[155] *Joseph Charles Lemire v. Ukraine,* ICSID Case No. ARB/06/18, Award, 28 March 2011, ¶ 355 (CL-0092).

312.   The Tribunal concurs with the Respondent that uncertainty of enforcement is not a reason to increase the interest rate on an award of damages. [156] That would be inappropriately punitive.

313.   In the Tribunal's view, it is commercially improbable that the Claimants would have elected to put the value of their investment into something with such low yields as a 5-year government bond – or even lower, such as Italian sovereign debt. It is also unlikely that the Claimants would be able to borrow at such rates.

314.   Mr. Boulton calculated an average rate of 1.60% [157] from the Bank of Italy's monthly rates for "loans other than bank overdrafts to non-financial institutions – new business." Mr. Boulton noted, however, that these rates are exclusively for new businesses and he did not investigate "whether these rates are kept low to encourage the creation of new companies (as a matter of policy)." [158] Given that caveat, the Tribunal is not convinced of the relevance of this particular rate.

315.   Conversely, while a rate of 15% may well be the interest rate on the Claimants' unsecured credit line, even Mr. Boulton concedes that "unsecured credit facilities often attract a higher interest rate than secured, or even unsecured, long term debt. Therefore, it seems that Rockhopper's true cost of borrowing would be somewhat lower than 15% per annum." [159]

316.   Instead, Mr. Boulton proposes – and the Claimants favour – a rate of 9%, averaged from the cost of debt of several of Rockhopper's contemporaries. The particular debt instruments vary somewhat, from secured loans, to unsecured notes, to convertible, or unsecured, or secured bonds. Perhaps unsurprisingly, the average reported rates also vary fairly widely, from 6.25% on the low end to 10% on the high end. Despite Mr. Boulton asserting that these companies are part of Rockhopper's "peer group", the companies themselves appear to have fairly diverse debt profiles and financial health. Not to mention that there is unknown variability in the details of the instruments – details such as the date of issuance of bonds, or whether they are refinanced bonds, or their durations – that can also have significant effects on the applicable interest rate, even with all other factors being equal.

317.   The Tribunal does not doubt that the rates used in the calculation of the 9% rate are real. It does, however, doubt the relevance of the rates used. Given the mix of instruments and duration of said instruments, and Mr. Boulton's own statement above regarding disparities between secured and unsecured debt instruments, and the diversity of the circumstances in which various companies secured financing, the Tribunal does not find this interest rate useful in this case.

318.   Instead, the Tribunal has determined that the most appropriate rate for interest is Mr. Boulton's proposed second option, EURIBOR with a fixed uplift of 4%. The fixed uplift takes account of the fact that the parties involved are not themselves banks, which would make an exclusively interbank rate inappropriate for the assessment of a "commercial rate" between the parties in the present case. Using an interbank rate with a fixed uplift is also a common practice within investment arbitration; Mr. Boulton also testified to that during the Hearing. [160] It is the most reasonable rate

---

[156] Resp. PHB, ¶ 188.

[157] Second Expert Report of Mr. Boulton, ¶ 5.21. In his first expert report, Mr. Boulton's average over the date range came to 1.66%. He updated his calculations in light of the extended date range (29 January 2016 to 31 July 2018, instead of 30 September 2017, from his first report).

[158] First Expert Report of Mr. Boulton, ¶¶ 5.15-5.17.

[159] First Expert Report of Mr. Boulton, ¶ 5.8.

[160] Tr. Day 5, 19:3-4: an interbank rate plus a margin "is commonly awarded by tribunals in my experience."

and in the Tribunal's opinion, it comes the closest to a commercial interest rate as contemplated by the ECT.

## I. Conclusion on Quantum

319.   The quantum of damage suffered by the Claimants due to the breach of the ECT by the Respondent and the expropriation of the Claimants' investment, based on the valuation date of 29 January 2016, is the pre-tax sum of EUR 184,000,000. The Tribunal also finds that it is appropriate that the Claimants receive EUR 6,675,391 in decommissioning costs. Interest is payable on both of these sums, set at EURIBOR +4% from the Valuation Date to the date of the Award (23 August 2022).

320.   The Tribunal has decided to allow a grace period of 4 months from the date of this Final Award during which interest will not be applied, in order to incentivise the swift payment. Should the Final Award remain unpaid as of 23 December 2022 (i.e., four months from the date of the Award), interest shall accrue at EURIBOR +4% on such part of the aforementioned amounts as may remain unpaid from time to time.

## VIII. COSTS

## A. Claimants' Cost Submissions

321.   On 10 January 2022 the Claimants filed their final costs submission which set out their claims as follows:
(a) Fees & Disbursements Billed & Paid up to 13 August 2020

King & Spalding – GBP 2,786,449.50

Disbursements – GBP 115,782.65

Ughi e Nunziante – GBP 744,961.53 plus EUR 39,001.36

Witness/Experts

ERCE – GBP 156,289.86

Richard Boulton – GBP 317,277.75

Geopoint Advisory – GBP 20,270.00

Peter Velez Engineering – GBP 73,730.65

Fiona MacAulay – GBP 42,284.72

Out of pocket costs and expenses – GBP 31,028.21

ICSID Payments – USD 475,019.39

(b) Fees incurred but not yet billed (from 14 August 2020)

King & Spalding – GBP 51,253.50

322. The Claimants also indicated that GBP 284,943 (billed and paid) and GBP 49,521 (incurred but not yet billed) were the costs involved in addressing the Respondent's intra-EU jurisdictional objections, and that these figures were encompassed by the figures set out above.

323. The Claimants' total for legal fees and expenses (leaving to one side claims for sums paid to ICSID) is, therefore, GBP 4,339,328.37 and EUR 39,001.36.

## B. Respondent's Cost Submissions

324. The Respondent's corresponding claims for costs, in EUR, were set out on 10 January 2022 as follows:
- Attendances - EUR 500,000.00

- Legal Fees - EUR 700,000.00

- Costs (translation, expertise, other expenses) - EUR 504,000.00

- Attendance at hearing (travel, accommodation, meals, etc) - EUR 129,000.00

- *Mutatis mutandis* for each of the foregoing headings the Respondent incurred a total of EUR 610,000.00 in respect of its intra-EU jurisdiction argument.

325. The Respondent's total claim for legal fees and expenses is, therefore, EUR 2,443,000.00.

## C. The Tribunal's Decision on Costs

326. Article 61(2) of the ICSID Convention provides:

*In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*

327. This provision gives the Tribunal discretion to allocate all costs of the arbitration, including attorney's fees and other costs, between the Parties as it deems appropriate.

328. First, as regards quantum, the Tribunal has no doubt but that the figures claimed by both sides are duly proven. The Tribunal is entitled to consider the submission of these figures by each side's legal representatives, who demonstrated the highest civility, professionalism and integrity throughout this arbitration, as authentic and correct.

329. Secondly, as regards the disposition of the claims for costs, it is the case that the Claimants have prevailed to the greater extent. The Claimants also prevailed entirely on the intra-EU jurisdiction issue which necessitated two Decisions prior to this Final Award. In principle, therefore, the Claimants should be awarded their costs and expenses as against the Respondent.

330. While there is a disparity, roughly in the order of twice what the Respondent has claimed, in the overall figures, this is not, in and of itself, a reason to award the Claimants considerably less than the amounts claimed. However, the Tribunal does note that the Claimants sought a much higher award of damages than that which is set out herein. Put against that is the factor that the Respondent fought, as was its entitlement in the defence of the public purse, every aspect of the Claimants' case.

331. Ultimately, the Tribunal must make its best estimate at what award reflects an appropriate contribution by the Respondent to the Claimant's legal fees and expenses and GBP 3,500,000.00 is such a figure.

332. The costs of the arbitration, including the fees and expenses of the Tribunal, ICSID's administrative fees and direct expenses, amount to (in USD):
Arbitrators' fees and expenses

| | |
|---|---|
| Mr. Klaus Reichert SC | 122,303.27 |
| Dr. Charles Poncet | 106,871.94 |
| Prof. Pierre-Marie Dupuy | 116,541.50 |
| ICSID's administrative fees | 242,000.00 |
| Direct expenses | 91,729.14 |
| Total | 679,445.85 |

333. The above costs have been paid out of the advances made by the Parties. ICSID received the following advances on costs from the Parties: USD 449,982.00 from the Claimants and USD 296,795.61 from the Respondent. [161]

---

[161] The remaining balance will be reimbursed to the parties in proportion to the payments that they advanced to ICSID. The final financial statement for this case will be sent to the Parties separately.

334.  Accordingly, and broadly consistent with the Tribunal's disposition of the claims for legal fees and expenses, orders the Respondent to pay the Claimant 80% of the expended portion of the Claimants' advances to ICSID, i.e. USD 301,284.18. [162]

# IX. AWARD

335.  For the reasons set forth above, the Tribunal decides as follows:

(1) Declares that the Tribunal has jurisdiction to decide this dispute under the ECT and the ICSID Convention and denies the Respondent's preliminary objections to the Tribunal's jurisdiction to decide the Claimants' claims;

(2) Declares that the Respondent has violated its obligation under

Article 13 of the ECT (the obligation not to unlawfully expropriate the Claimants' investment).

(3)

Orders the Respondent to pay compensation to the Claimants in the amount of EUR 184,000,000.00 (pre-tax) and EUR 6,675,391 for decommissioning costs.

(4) Awards pre- and post-award interest at EURIBOR +4% compounded annually from 29 January 2016 (on any outstanding balance as may be the case from time to time) until payment in full save for the four months from the date of this Award during which period no interest shall accrue, as contemplated in paragraphs 319 and 320 above;

(5) Orders the Respondent to pay the Claimants GBP 3,500,000.00 by way of costs incurred in connection with this arbitration, including fees and expenses of the legal counsel, witnesses, experts and consultants;

(6) Orders the Respondent to pay the Claimant 80% of the expended portion of the Claimants' advances to ICSID, i.e. USD 301,284.18; and

(7) All other prayers for relief are hereby denied.

336.  The individual opinion of Professor Pierre-Marie Dupuy is attached to this Award in accordance with ICSID Arbitration Rule 47(3).

Date: August 22, 2022

---

[162]  (339,722.93 + 36,882.30) x 0.8 = USD 301,284.18.