# Exhibit 17

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**MOL HUNGARIAN OIL AND GAS COMPANY PLC**

Claimant

and

**REPUBLIC OF CROATIA**

Respondent

**ICSID Case No. ARB/13/32**

---

# AWARD

---

*Members of the Tribunal*
Sir Franklin Berman QC, President
Professor William W. Park, Arbitrator
Professor Brigitte Stern, Arbitrator

*Secretary of the Tribunal*
Ms Aurélia Antonietti

*Assistant of the Tribunal*
Dr Peter Webster

*Date of dispatch to the Parties:* 5 July 2022

# REPRESENTATION OF THE PARTIES

*Representing MOL Hungarian Oil and Gas Company Plc:*

Dr Pál Kara
Mr Sándor Rézman
Október huszonharmadika u.18
Budapest, 1117
Hungary

and

Mr Arif Hyder Ali
Mr Alexandre de Gramont
Dr David Attanasio
Mr Michael Losco
Ms Rosey Wong
Dechert LLP
1900 K Street NW
Washington, D.C., 20006
United States of America

and

Mr Dániel Dózsa
Queritius
Petőfi Sándor u. 10
1052 Budapest
Hungary

*Representing Republic of Croatia*:

Mr Stephen Anway
Mr Luka Mišetić
Mr David Alexander
Mr Mark Stadnyk
Squire Patton Boggs (US) LLP
1211 Avenue of the Americas
New York, NY 10036
United States of America

and

Mr Rostislav Pekař
Ms Eva Cibulkova
Mr Matej Pustaj
Squire Patton Boggs
Václavské náměstí 813/57
110 00 Prague 1
Czech Republic

# TABLE OF CONTENTS

I.  INTRODUCTION AND PARTIES ...................................................................................... 1

II.  PROCEDURAL HISTORY ............................................................................................... 2

III.  FACTUAL BACKGROUND ........................................................................................... 50

IV.  JURISDICTION AND ADMISSIBILITY ..................................................................... 73

    A.  Annex IA to the ECT .................................................................................................. 75

    B.  The ECT and EU Member States .............................................................................. 83

        (1)  The GMA & FAGMA and EU law ...................................................................... 86

        (2)  Investor-State arbitration within the EU ............................................................ 86

V.  THE MERITS ................................................................................................................... 97

    A.  Introductory Remarks ................................................................................................ 97

        (1)  Introduction .......................................................................................................... 97

        (2)  Basic distinctions .................................................................................................. 99

    B.  The corruption allegation ........................................................................................ 100

        (1)  The corruption allegation in the pleadings of both Parties ............................... 101

            a.  For the Respondent .................................................................................... 102

            b.  For the Claimant ......................................................................................... 102

        (2)  The burden of proof ............................................................................................ 102

            a.  For the Respondent .................................................................................... 103

            b.  For the Claimant ......................................................................................... 104

        (3)  The standard of proof ......................................................................................... 104

        (4)  The evidence ........................................................................................................ 106

        (5)  The 'Austrian Files' ............................................................................................ 111

        (6)  The Respondent's case: The corruption allegation ........................................... 112

            a.  The UNCITRAL award ............................................................................ 115

            b.  Was there a bribe? ..................................................................................... 118

            c.  The Tribunal's decision ............................................................................ 129

            d.  Other issues ................................................................................................ 130

        (7)  The Claimant's Case: The Criminal Investigation and Prosecution ................. 137

    C.  The Claimant's claims under the ECT ................................................................... 141

        (1)  The Equity Claim ............................................................................................... 144

            a.  Attribution to Croatia ................................................................................ 151

| | | | |
|---|---|---|---|
| | b. | The Pension Funds | 152 |
| | c. | HANFA | 154 |
| | d. | Croatia | 161 |
| (2) | | The remaining claims | 168 |
| | a. | The Gas Market Claim | 170 |
| | b. | The Hydrocarbon Licence Claim | 191 |
| | c. | The Criminal Prosecution Claim | 201 |
| | d. | Date of Breach and Interest | 207 |
| (3) | | Other Relief | 210 |
| VI. | | COSTS | 211 |
| VII. | | DECISION | 214 |

## Table of Abbreviations/Defined Terms

| | |
|---|---|
| *Achmea* judgment | Decision of CJEU in Case C-284/16, *Slovak Republic v. Achmea B.V.* (Exhibit RA-343) |
| Amended Request | Claimant's Amended Request for Arbitration filed on 20 May 2014 |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| Austrian Files | Austrian Investigative Files (Exhibit R-154) |
| Bridger Note | Confidential note prepared by Mr Martin Bridger of Mr Robert Quick's 2013 interview with Mr Imre Fazakas (Exhibit C-706) |
| C-[#] | Claimant's Exhibit |
| CJEU / ECJ | Court of Justice of the European Union |
| CJEU Hernádi Judgment | Judgment of the CJEU in Case C-268/17 (Exhibit R-373) |
| CA-[#] | Claimant's Legal Authority |
| Claimant | MOL Hungarian Oil and Gas Company Plc (also known as "MOL") |
| Cl. Brief on UNCITRAL award | Claimant's Submission on the Preclusive Effect of the UNCITRAL award dated 5 May 2017 |
| Cl. Costs | Claimant's Submission on Costs dated 26 October 2018 |
| Cl. Memorial | Claimant's Memorial on the Merits dated 14 August 2015 |
| Cl. PHB | Claimant's Post-Hearing Brief dated 3 June 2018 |
| Cl. Rejoinder | Claimant's Rejoinder on Jurisdiction dated 23 June 2017 |

| | |
|---|---|
| Cl. Reply | Claimant's Reply on Jurisdiction and the Merits dated 14 October 2016 and revised on 11 November 2016 |
| Cl. Reply on Costs | Claimant's Reply Submission on Costs dated 7 December 2018 |
| Cl. Reply on Preliminary Objections | Claimant's reply submission on the Respondent's Preliminary Objections dated 14 July 2014 |
| Cl. Reply on Supplemental Costs | Claimant's Reply Submission on Supplemental Costs dated 7 April 2021 |
| Cl. Skeleton Brief | Claimant's Skeleton Arguments on the Preclusive Effect of the UNCITRAL Award dated 17 January 2017 |
| Cl. Supplement Costs | Claimant's Supplement Submission on Costs dated 24 March 2021 |
| Croatia | Republic of Croatia (also known as "the Respondent") |
| DORH | Croatian State Attorney's Office |
| EC | European Commission |
| ECT | Energy Charter Treaty, signed on 17 December 1994, and entered into force on 16 April 1998 |
| FAGMA | First Amendment to the Gas Master Agreement (Exhibit C-015) |
| FASHA | First Amendment to the Shareholders' Agreement (Exhibit C-011) |
| Ff | Following |
| GMA | Gas Master Agreement (Exhibit C-010) |
| HANFA | Croatian Financial Services Supervisory Agency |
| Hearings:<br>  i. Preliminary Objections Hearing<br>  ii. February 2017 Hearing | Hearings: |

| | |
|---|---|
| iii. July 2017 Hearing<br>iv. March 2018 Hearing<br>v. July 2018 Hearing<br>vi. November 2020 Hearing<br>vii. January 2021 Hearing | i. Hearing on Preliminary Objections held in Washington, D.C., on 11 September 2014<br>ii. Hearing on Jurisdiction and the Merits held in Washington, D.C., from 21 February 2017 to 3 March 2017<br>iii. Hearing on Jurisdiction and the Merits held in London from 24 July 2017 to 28 July 2017<br>iv. Hearing on Jurisdiction and the Merits held in Washington, D.C., from 7 March 2018 to 16 March 2018<br>v. Hearing on Jurisdiction and the Merits held in Paris from 4 July to 6 July 2018 (closing arguments)<br>vi. Hearing on the Claimant's Application on Criminal Proceedings held *via* Zoom on 24 November 2020<br>vii. Continuation Hearing held *via* Zoom on 27 January and 28 January 2021 |
| HEP | Hrvatska Elektropriveda d.d. |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| ILC | International Law Commission |
| INA | Industrija Nafte dd |
| MOL | MOL Hungarian Oil and Gas Company Plc (also known as "the Claimant") |
| Parties | MOL Hungarian Oil and Gas Company Plc and the Republic of Croatia |
| PO1 | Procedural Order No. 1 dated 9 June 2014 |
| PO3 | Procedural Order No. 3 dated 19 September 2016 regarding the Claimant's request for production of documents |

| PO6 | Procedural Order No. 6 dated 18 December 2018 detailing the circumstances under and the process by which new evidence would be admitted into the record |
| --- | --- |
| PO7 | Procedural Order No. 7 dated 15 May 2020 regarding evidence available in the Croatian Criminal Proceedings |
| PP | Prirodni Plin |
| PSO | Public Service Obligation |
| R-[#] | Respondent's Exhibit |
| Request | Claimant's Request for Arbitration dated 26 November 2013 |
| Resp. Brief on UNCITRAL award | Respondent's Brief on the UNCITRAL award dated 23 June 2017 |
| Resp. Costs | Respondent's Submission on Costs dated 26 October 2018 |
| Resp. Counter-Memorial | Respondent's Counter-Memorial on Jurisdiction and the Merits dated 13 June 2016 |
| Resp. PHB | Respondent's Post-Hearing Brief dated 1 June 2018 |
| Resp. Preliminary Objections | Respondent's Preliminary Objections dated 12 May 2014 |
| Resp. Rejoinder | Respondent's Rejoinder on Jurisdiction and the Merits dated 30 January 2017 |
| Resp. Reply on Costs | Respondent's Reply Submission on Costs dated 7 December 2018 |
| Resp. Reply on Supplemental Costs | Respondent's Reply Submission on Supplemental Costs dated 7 April 2021 |
| Resp. Skeleton Brief | Respondent's Skeleton Arguments on the Preclusive Effect of the UNCITRAL award, dated 18 February 2017 |
| Resp. Supplemental Costs | Respondent's Supplement Submission on Costs dated 24 March 2021 |

| Respondent | Republic of Croatia (also known as "Croatia") |
|---|---|
| RA-[#] | Respondent's Legal Authority |
| SBU | Standard Bundled Unit of gas storage capacity at Gas Storage Bergermeer |
| SHA | Shareholders' Agreement (Exhibit C-006) |
| Third Sava Revocation | Third Decision Revoking Sava License dated 7 September 2018 (Exhibit C-747) |
| Transcript, Day | Transcript of the Hearing |
| Tribunal | Arbitral Tribunal constituted on 14 April 2014 |
| VCLT | Vienna Convention on the Law of Treaties |
| UNCITRAL award | Final Award issued by the UNCITRAL tribunal on 23 December 2016 in The Republic of Croatia v. MOL Hungarian Oil and Gas Plc, PCA Case No. 2014-15 (Exhibit C-648) |
| UNCITRAL tribunal | Tribunal constituted in The Republic of Croatia v. MOL Hungarian Oil and Gas Plc, PCA Case No. 2014-15. Its Members were: Neil Kaplan (President), Jakša Barbić and Jan Paulsson. |

## I.   INTRODUCTION AND PARTIES

1.   This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("ICSID" or the "Centre") on the basis of the Energy Charter Treaty which entered into force on 16 April 1998 (the "ECT") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "ICSID Convention").

2.   The Claimant is MOL Hungarian Oil and Gas Company Plc ("MOL" or the "Claimant"), a corporation incorporated under the laws of Hungary on 1 October 1991, with its principal place of business in Budapest.

3.   The Respondent is The Republic of Croatia ("Croatia" or the "Respondent").

4.   The Claimant and the Respondent are collectively referred to as the "Parties." The Parties' representatives and their addresses are listed above on page (i).

5.   This dispute relates to the privatisation of Croatia's largest energy company, Industrija Nafte dd ("INA"). The Claimant, MOL, has been, since the privatisation process began in 2002-2003, the major private investor in INA, while the Croatian State continues to hold a substantial residual shareholding. Between them, these two major shareholders own close to the totality of INA shares. Initially, cooperation proceeded harmoniously under agreements between them. Since 2009, however, the two have been locked in increasingly acrimonious disagreement over INA's ownership, management, and operation in the wake of reports alleging that Croatia's former Prime Minister had been bribed to secure future advantages for MOL's benefit; these reports were, in turn, vehemently contested by MOL as trumped-up pretexts for Croatia to renege on its undertakings, thereby damaging both MOL's ownership rights and the profitable operation of INA and its subsidiaries. The ensuing differences between the two sides form the basis for a series of linked claims by MOL for breach of obligations arising out of the ECT, as will be more fully described below.

## II.   PROCEDURAL HISTORY

6.   On 26 November 2013, ICSID received a request for arbitration of the same date from MOL against Croatia (the "Request").

7.   On 5 December 2013, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

8.   On 20 December 2013, the Respondent accepted the Claimant's proposal contained in the Request for the method of constitution of the Tribunal. Consequently, the Tribunal was to be composed of three arbitrators appointed as follows:

   a)   Within 30 days of the registration of the Request, the Claimant would appoint its arbitrator;

   b)   Within 30 days of the appointment of Claimant's arbitrator, the Respondent would appoint its arbitrator;

   c)   The two arbitrators so appointed would, in consultation with the Parties, jointly select a third arbitrator to serve as President of the Arbitral Tribunal, within 30 days of the appointment of the Respondent's arbitrator; and

   d)   In the event that a Party failed to appoint its arbitrator, or the two Party-appointed arbitrators were unable to reach agreement on the identity of the President of the Arbitral Tribunal within the time limits specified above, the Chairman of the ICSID Administrative Council would appoint the arbitrator or arbitrators not yet appointed and would designate the President of the Arbitral Tribunal.

9.   Following appointment by the Claimant, Professor William W. Park (U.S., Swiss) accepted his appointment as arbitrator on 27 January 2014. On 5 February 2014, following appointment by the Respondent, Professor Brigitte Stern (French) accepted her appointment as arbitrator.

2

10. On 1 April 2014, the Parties informed the Centre that they had agreed to appoint Sir Franklin Berman (British) as the presiding arbitrator in this case. On 14 April 2014, Sir Franklin Berman accepted his appointment as presiding arbitrator.

11. On 14 April 2014, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "Arbitration Rules"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Mr James Claxton, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal. He was later replaced by Ms Aurélia Antonietti, ICSID Senior Legal Advisor, as of 30 April 2015.

12. On 12 May 2014, the Respondent filed Preliminary Objections ("Resp. Prelim Objections") pursuant to ICSID Arbitration Rule 41(5) and an alternative request to stay the proceeding as a provisional measure.

13. On 13 May 2014, Dr Peter Webster was appointed as Assistant to the Tribunal with the agreement of the Parties.

14. On 20 May 2014, the Claimant filed an amended version of the Request for Arbitration (the "Amended Request"), and within the days that followed, each Party made proposals for the scheduling of further filings by the Parties on the Respondent's Rule 41(5) Application, including a request on the part of the Claimant for an oral hearing.

15. On 28 May 2014, in accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties by teleconference.

16. On 9 June 2014, following the first session, the Tribunal issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters and the decision of the Tribunal on disputed issues. Procedural Order No. 1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural language would be English, and that the place of proceeding would be Washington, D.C. Procedural Order No. 1 also set out a timetable for submissions on Respondent's Preliminary Objections.

17. On 16 June 2014, the Respondent supplemented its Preliminary Objections pursuant to ICSID Arbitration Rule 41(5).

3

18. On 14 July 2014, the Claimant filed Observations on the Respondent's Preliminary Objections pursuant to ICSID Arbitration Rule 41(5) and requested a stay of the proceeding as a provisional measure.

19. On 6 August 2014, the Respondent filed a Reply on Preliminary Objections and on 29 August 2014, the Claimant filed a Rejoinder on the Respondent's Preliminary Objections and requested to stay the proceedings.

20. On 11 September 2014, a hearing on the Respondent's Preliminary Objections pursuant to ICSID Arbitration Rule 41(5) was held in Washington, D.C. (the "Preliminary Objections Hearing"). The following persons were present at the Preliminary Objections Hearing:

*Tribunal*:
Sir Franklin Berman                   President
Professor William Park               Arbitrator
Professor Brigitte Stern             Arbitrator

*ICSID Secretariat*:
Mr James Claxton                      Secretary of the Tribunal

*Assistant to the Tribunal:*
Dr Peter Webster

*For the Claimant*:
Mr Arif Hyder Ali                     Weil, Gotshal & Manges LLP
Mr Alexandre de Gramont              Weil, Gotshal & Manges LLP
Mr Theodore R. Posner                Weil, Gotshal & Manges LLP
Ms Samaa Haridi                       Weil, Gotshal & Manges LLP
Ms Marguerite C. Walter              Weil, Gotshal & Manges LLP
Mr Daniel Dózsa                       Weil, Gotshal & Manges LLP
Mr Nathaniel Morales                 Weil, Gotshal & Manges LLP
Mr Ricardo Ampudia                   Weil, Gotshal & Manges LLP
Dr Pál Kara                           General Counsel, MOL Hungarian
                                      Oil and Gas Co. Plc

*For the Respondent*:
Mr Read K. McCaffrey                 Squire Patton Boggs LLP
Mr Stephen P. Anway                  Squire Patton Boggs LLP
Mr Rostislav Pekař                    Squire Patton Boggs LLP
Ms Kristen M. Jarvis Johnson         Squire Patton Boggs LLP
Mr Craig D. Gaver                     Squire Patton Boggs LLP
Mr Luka S. Mišetić                    Law Offices of Luka S. Mišetić

4

| Ms Sabina Škrtić | Assistant Minister of the Economy |
| Mr Predrag Bogičević | Cabinet Secretary at the Ministry of Economy |

21.   On 11 September 2014, Professor Stern provided a further disclosure statement to the Parties concerning her independence and impartiality, providing the names of four additional cases in which members of the Claimant's legal team were currently pleading in front of her.

22.   On 18 September 2014, following the Preliminary Objections Hearing, each Party filed answers to questions posed by the Tribunal during the Hearing.

23.   On 1 October 2014, the Respondent supplemented its answers to the questions posed by the Tribunal in the Preliminary Objections Hearing.

24.   On 2 December 2014, the Tribunal issued a Decision on the Respondent's Preliminary Objections pursuant to ICSID Arbitration Rule 41(5). A copy of the Tribunal's Decision on Respondent's Application under ICSID Arbitration Rule 41(5) is attached hereto as Annex A.

25.   On 23 December 2014, the Respondent filed an application with the Tribunal for a confidentiality order.

26.   On 9 January 2015, the Claimant consented to the Respondent's application for a confidentiality order. Consequently, on 23 January 2015, the Tribunal issued Procedural Order No. 2 providing, *inter alia*, that:

> "The Parties undertake to maintain confidentiality as to all aspects of this arbitration proceeding, including all submissions, rulings, correspondence and evidence relating to the proceeding, except as may be necessary to comply with any ruling by the Tribunal, or in connection with revision or annulment proceedings relating to a final award or its enforcement, or unless otherwise required by law. This confidentiality undertaking shall survive the termination of the arbitral proceedings.
>
> In the case of conflict with any prior order of the Tribunal, this provision shall prevail. It shall not however be understood as standing in the way of the publication by ICSID on its website, in accordance with normal practice, of the bare procedural details of the progress of the arbitration.

> …
>
> Paragraph 24.1 of Procedural Order No. 1 does not apply to any ruling issued on or after the date of this Order. The award and any other rulings by the Tribunal shall only be made public if the Parties so agree."

27. On 13 May 2015, following the agreement of the Parties, the Tribunal issued a timetable for the continuation of the proceedings, which was later modified by agreement of the Parties.

28. Following exchanges between the Parties, it was agreed that a hearing on jurisdiction and the merits was to be held from 21 February 2017 to 3 March 2017 in Washington, D.C. (the "February 2017 Hearing").

29. On 14 August 2015, the Claimant filed its Memorial on Jurisdiction and the Merits ("Cl. Memorial").

30. On 21 March 2016, the Tribunal advised the Parties that Dr Webster had informed the Tribunal that he has been instructed by Squire Patton Boggs (UK) LLP in a commercial arbitration unconnected to this dispute.

31. On 11 April 2016, in response to the Claimant's request of 10 April 2016 for additional information with regards to Dr Webster's disclosure of 21 March 2016, the Respondent provided clarifications.

32. On 13 June 2016, the Respondent filed its Counter-Memorial on Jurisdiction and the Merits ("Resp. Counter-Memorial").

33. On 29 July 2016, the Claimant filed a request for the Tribunal to decide on production of documents.

34. On 10 August 2016, the Respondent filed observations on the Claimant's request for the Tribunal to decide on production of documents.

35. On 17 August 2016, the Claimant filed a response to the Respondent's observations of 10 August 2016.

36. On 19 September 2016, following exchanges between the Parties, the Tribunal issued Procedural Order No. 3 ("PO3") concerning MOL's request for production of documents.

*Inter alia*, the Decision granted in part the Claimant's Request No. 1, relating to a Session of the Croatian Government of 15 December 2009, subject to certain specific conditions; and granted Request No. 12, relating to criminal investigations in 2010-2011 regarding the conduct of Mr Ježić, subject to the Respondent's right to claim privilege.

37. On 30 September 2016, the Claimant filed an application to the Tribunal for an order of disclosure of the recording and transcript of the Government Session of 15 December 2009 and further documents in relation to Request No. 12 mentioned above.

38. On 14 October 2016, the Claimant filed its Counter-Memorial on the Respondent's Jurisdictional and Admissibility Objections, a Reply on the Merits and a Reply on Damages ("Cl. Reply").

39. On 25 October 2016, the Tribunal issued Procedural Order No. 4 on the Claimant's application of 30 September 2016, which was denied.

40. On 1 November 2016, the Claimant requested additional information concerning Dr Webster's co-counselling with Squire Patton Boggs.

41. On 11 November 2016, the Claimant filed a revised Reply.

42. On 22 November 2016, the Respondent filed a request for the Tribunal to decide on production of documents.

43. On 6 December 2016, the Tribunal issued Procedural Order No. 5 concerning the Respondent's request for the production of documents of 22 November 2016.

44. On 7 December 2016, the Tribunal confirmed that Dr Webster remained instructed as a junior barrister on the same matter as previously indicated. The Tribunal reiterated that to the best of Dr Webster's knowledge, the matter did not implicate any of the factual or legal issues in dispute before this Tribunal. Dr Webster was not instructed by Squire Patton Boggs in respect of any other matter. Moreover, the Tribunal had considered Dr Webster's further disclosure and saw no objection to his continuing to exercise his functions in respect of the Arbitration.

45. On 7 December 2016, the Claimant filed a request to determine the admissibility of evidence tendered by the parties. It asked the Tribunal to ask Croatia to provide evidence that: (a) the Respondent had requested permission from Austria to use the Austrian

Investigative Files ("Austrian Files") in this Arbitration (Exhibit R-154) (*i.e.*, documents that Croatia received from Austrian authorities pertaining to criminal proceedings unrelated to this arbitration), (b) Austria would consent to the use of the Austrian Files outside of the context of the criminal proceedings for which they were provided, and (c) if such consent would be provided, Austria had specifically consented that the Respondent could use the Austrian Files in this proceeding.

46. On 9 December 2016, the Respondent filed observations on the Claimant's request of 7 December 2016.

47. On 11 December 2016, the Claimant reiterated its arguments of 7 December 2016 and added that the UNCITRAL tribunal had ruled the Austrian Files inadmissible.

48. On 12 December 2016, the Tribunal decided that, having recently delivered its rulings on the applications for document production from either side, it saw no good reason to interpose at this stage any further decision on the admissibility of evidence, without prejudice to the right of any party to make submissions on the admissibility of evidence at the forthcoming hearing.

49. On 21 December 2016, the Parties provided their notices of witnesses that they intended to cross-examine at the forthcoming hearing. In addition, as the Respondent's Rejoinder had not yet been filed, the Claimant requested leave to amend its list after receiving the Respondent's submission.

50. On 27 December 2016, the Claimant provided the Tribunal with a copy of the UNCITRAL award dated 23 December 2016.

51. On 28 December 2016, the President informed the Parties that he would be available for a discussion as to the status of the UNCITRAL award and apprised the Parties that no cognizance would be taken of the UNCITRAL award until its status had been established.

52. On 1 January 2017, the Respondent filed observations on the status of the UNCITRAL award. The Respondent indicated, *inter alia*, that it would challenge the UNCITRAL award before the Swiss Federal Supreme Court, and that, in its opinion, it was not binding on this investment treaty Tribunal.

53. On 2 January 2017, the Claimant filed a request to suspend the merits of the case pending the Tribunal's decision on the significance and the admissibility of the UNCITRAL award. The Parties had an exchange on this issue on 3 January 2017.

54. On 6 January 2017, the President of the Tribunal held a telephone conference with the Parties and requested the Parties to submit their respective proposals, in writing, concerning the continuation of these proceedings in light of the UNCITRAL award. It was further established that a telephone conference with the entire Tribunal would be held on 16 January 2017.

55. On 13 January 2017, the Claimant submitted its proposal, which stated, *inter alia*, the following:

> "[The Claimant] requests the Tribunal to (i) suspend the proceedings on the merits; (ii) decide what effect the UNCITRAL Award has for the issues in dispute in this arbitration, particularly for Croatia's bribery-related jurisdictional objection; (iii) decide Croatia's non-bribery-related jurisdictional objections; and (iv) set forth its decision with respect to items (ii) and (iii) in a Decision on Jurisdiction and Claimant's Application on Res Judicata."

56. On the same date, Croatia submitted its proposal that consisted in going ahead as planned with its Rejoinder and the February Hearing, with post-hearing submissions to follow to address the UNCITRAL award, and a further hearing to continue cross-examination from the February Hearing and on the impact of the UNCITRAL award.

57. On 16 January 2017, the Tribunal held a Hearing on the status of the case by telephone conference.

58. On 17 January 2017, the Parties exchanged letters as to the admission of the UNCITRAL award in this proceeding and when this Tribunal should read it.

59. On 19 January 2017, the Tribunal issued a decision on procedural matters. It was decided that:

   (i)   The hearing scheduled to begin on 21 February 2017 would go ahead as planned.

   (ii)   With regard to the effect of the UNCITRAL award, the Tribunal decided that the Parties would file skeleton arguments on the UNCITRAL award and that

both Parties would be afforded an opportunity after the hearing to make full written submissions on the subject of the UNCITRAL award in the form of post-hearing briefs.

(iii) The Tribunal further decided on other procedural issues relating to the hearing such as time allocation and the examination of witnesses.

60. On 24 January 2017, the Claimant filed a request for reconsideration of the Tribunal's decision of 19 January 2017 and requested further directions as to the evidentiary record should the Tribunal revise its decision. It also formally introduced the UNCITRAL award into the record as Exhibit C-648.

61. On 25 January 2017, the Respondent filed an interim reply to the Claimant's application for reconsideration.

62. On 27 January 2017, the Claimant filed its Skeleton Arguments on the Preclusive Effect of the UNCITRAL award ("Cl. Skeleton Brief").

63. On 30 January 2017, the Tribunal issued a decision on procedural matters deciding, *inter alia*, not to change the established arrangements for the forthcoming February Hearing and emphasizing that it had neither the wish nor the intention to limit in any way the ability of either Party to put forward in full its argument on the estoppel or *res judicata* effect of the UNCITRAL Award. It added:

> "The Tribunal notes further that, in arbitral procedure as before national courts, it has long been understood that a tribunal may have to hear evidence *de bene esse*, that is to say, without prejudice to whether the evidence itself, or the matters to which the evidence is directed, turn out in the event to be relevant to issues which the tribunal is called upon to decide in its award – although it is possible that costs consequences may follow which the Tribunal would later have to address.'

64. On 30 January 2017, the Respondent filed a Rejoinder on Jurisdiction and the Merits ("Resp. Rejoinder").

65. On 31 January 2017, the Respondent filed an application for the Tribunal's assistance on securing the attendance and testimony of Messrs Imre Fazakas and József Tóth at the

February 2017, two witnesses not put forward by MOL but who had testified at the UNCITRAL hearing, and allegedly within MOL's control or sphere of influence.

66. On 5 February 2017, the Claimant filed an application to supplement and to confirm the record, and requested leave to file supplemental exhibits.

67. On 6 February 2017, the Tribunal held a pre-hearing conference by telephone.

68. On 6 February 2017, following the telephone conference, the Claimant filed a request for disclosure in relation to Exhibit R-210 (an addendum to a commission agreement between Hangarn and Torafin), which according to MOL formed part of the Hungarian Investigative Files that the Respondent failed to disclose in response to the Claimant's disclosure request No. 29 of 30 September 2016. Accordingly, the Claimant requested that the Tribunal order Croatia to immediately disclose further documents.

69. On 8 February 2017, the Respondent answered the Claimant's request of 6 February 2017, arguing, *inter alia*, that it had no disclosure obligations with respect to Exhibit R-210 or the Hungarian Investigative Files since this Tribunal had never ordered its production and that this file had been in the Claimant's possession since 2012.

70. On 8 February 2017, the Claimant requested the Tribunal to reject the Respondent's application that MOL be required to procure the appearance of Messrs Fazakas and Tóth, as it had no control or leverage over their decision to testify in the Arbitration. Nevertheless, the Claimant agreed to making a joint request to Messrs Fazakas and Tóth to appear. The Claimant also consented to this approach to secure the testimony of Prime Minister Sanader and Mr Petrović.

71. On 8 February 2017, the Claimant filed a skeleton argument on its application to declare the Austrian Files inadmissible.

72. On 9 February 2017, the Respondent answered the Claimant's request to supplement and confirm the record of 5 February 2017 and on the Austrian Files.

73. On 10 February 2017, the Claimant filed further observations on its application of 5 February 2017 and filed a response to the Respondent's observations of 9 February 2017. The Respondent also filed observations on the Claimant's observations of 8 February 2017 regarding the appearances of Messrs Fazakas and Tóth.

74. On 11 February 2017, the Tribunal issued a decision on pending procedural matters and decided as follows:

> (i)   In relation to Exhibit R-210, the Tribunal recalled the procedure for document production as laid down in Procedural Order No. 1 and saw no grounds to make any further order on document production on the eve of the oral hearing.
>
> (ii)   As regards to the question of the admissibility of the Austrian Files, the Tribunal noted the Parties' positions and stated that it was not in a position to rule on the matter without hearing the Parties. If, having heard the Parties, the Tribunal decided that it was not able to rule on the question on the spot, it would at that point give whatever directions were necessary for the witness examination which was to follow.
>
> (iii)   Finally, as regards the Respondent's application of 31 January 2017 in respect of Messrs Fazakas and Tóth, the Tribunal, given the schedule of the Hearing, indicated that it would, if possible, rule on this application, together with any other outstanding application for the calling of additional witnesses, at the close of the February Hearing or shortly thereafter.

75. On 14 February 2017, the Claimant requested leave to submit into the record two additional exhibits.

76. On 14 February 2017, Croatia indicated that MOL's counsel has decided not to cross-examine Mr Dinko Novoselec at the forthcoming hearing but that the witness had indicated that he may not be available to attend another hearing in the future and had requested the opportunity to be heard at the forthcoming hearing. Croatia requested the Tribunal's confirmation that it will hear Mr Novoselec's testimony at the forthcoming hearing. The Tribunal answered the same day that this made good sense and requested the Claimant's position. The Claimant replied the same day that, given the Tribunal's inclination, MOL withdrew its objection to Croatia's request.

77. On 15 February 2017, the Respondent objected to the filing of new exhibits by the Claimant.

78. On 15 February 2017, the Parties filed a joint stipulation concerning the testimony of Messrs Branko Radošević and Vedran Duvnjak. The Parties agreed that the UNCITRAL arbitration transcripts of the testimony of the two witnesses would stand in lieu of further examination of those witnesses in this Arbitration.

79. On 15 February 2017, the Claimant filed an application to declare Addendum No. 1.2. to the Commission Agreement between Hangarn and Torafin (Exhibit R-210) inadmissible.

80. On 17 February 2017, the Tribunal issued a decision on procedural matters and decided as follows:

> (i)    With regard to the Claimant's applications to supplement the record of 5 and 14 February 2017, the Tribunal noted the Respondent's consent to the admission of some exhibits addressed in the Claimant's 5 February application, and on that basis, directed that those exhibits be admitted to the record.

> (ii)   As to the remainder of the exhibits, the Tribunal decided that it would deal with the question of their admission at the February 2017 Hearing. To facilitate the process, the Parties were asked to list the exhibits concerned in the form of a schedule similar to a Redfern Schedule.

> (iii)  With regard to the Claimant's application to declare Exhibit R-210 inadmissible, the Tribunal decided that it would hear arguments on this question at the February 2017 Hearing in conjunction with argument on the admissibility of the Austrian Files.

> (iv)   With regard to the testimony of Mr Novoselec, the matter was left to be decided at the Hearing.

81. On 18 February 2017, the Respondent filed its Skeleton Brief on the UNCITRAL award ("Resp. Skeleton Brief").

82. On 20 February 2017, the Parties filed a joint stipulation concerning the testimony of Ms Katalin Tamás. The Parties agreed that the UNCITRAL arbitration transcripts of the testimony of Ms Tamás would stand in lieu of further examination in this Arbitration.

83. On 21 February 2017, the Claimant entered the following exhibits into the record: C-576, C-577, C-578, C-593, C-603, C-607, C-616, C-636, C-656, C-657, C-658, C-659, C-660,

C-661, C-662, C-663, C-664, C-665, C-666, C-667, and C-668. The Claimant also filed the Redfern schedule as ordered by the Tribunal in its decision of 17 February 2017 in relation its applications of 5 and 14 February 2017.

84. From 21 February 2017 to 3 March 2017, the Tribunal held a Hearing on jurisdiction and the merits in Washington, D.C. (the "February 2017 Hearing"). The following persons were present:

*Tribunal*:
| | |
|---|---|
| Sir Franklin Berman | President |
| Professor William Park | Arbitrator |
| Professor Brigitte Stern | Arbitrator |

*ICSID Secretariat*:
| | |
|---|---|
| Ms Aurélia Antonietti | Secretary of the Tribunal |

*Assistant to the Tribunal:*
Dr Peter Webster

*For the Claimant*:
| | |
|---|---|
| Mr Arif Hyder Ali | Dechert LLP |
| Mr Alexandre de Gramont | Dechert LLP |
| Mr Theodore R. Posner | Weil, Gotshal & Manges LLP |
| Mr Peter Fitgerald | Peters & Peters Solicitors LLP |
| Mr Michael O'Kane | Peters & Peters Solicitors LLP |
| Mr William Boyce | QEB Hollis Whiteman |
| Ms Maya Lester | Brick Court Chambers |
| Mr David Heaton | Brick Court Chambers |
| Mr Dalibor Valinčić | Wolf Theiss |
| Ms Ana Grubešić | Wolf Theiss |
| Ms Erica Franzetti | Dechert LLP |
| Mr Dániel Dózsa | Dechert LLP |
| Ms Erin Yates | Dechert LLP |
| Mr Rajat Rana | Dechert LLP |
| Mr Jeronimo Carcelen | Dechert LLP |
| Dr David Attanasio | Dechert LLP |
| Mr Michael Losco | Dechert LLP |
| Ms Tatiana Sainati | Dechert LLP |
| Mr Harsh Sancheti | Dechert LLP |
| Ms Jenn Cilingin | Dechert LLP |
| Ms Rosey Wong | Dechert LLP |
| Mr Nathaniel Morales | Dechert LLP |
| Ms Emmy Ehrenberg-Shannon | Peters & Peters Solicitors LLP |
| Ms Franziska Christen | Peters & Peters Solicitors LLP |
| Ms Madeline Tutman | Dechert LLP |

| | |
|---|---|
| Ms Whitley Tiller | RLM TrialGraphix Vendor |
| Ms Annett Schulze | RLM TrialGraphix Vendor |
| Mr Jacob Horseman | RLM TrialGraphix Vendor |
| Dr Pál Kara | MOL Group |
| Mr Sándor Rézman | MOL Group |

*For the Respondent*:

| | |
|---|---|
| Mr Stephen P. Anway | Squire Patton Boggs |
| Mr Luka S. Mišetić | Squire Patton Boggs |
| Mr Rostislav Pekař | Squire Patton Boggs |
| Mr David Alexander | Squire Patton Boggs |
| Mr Alain Farhad | Squire Patton Boggs |
| Mr Stephan Adell | Squire Patton Boggs |
| Ms Lenka Abelovská | Squire Patton Boggs |
| Mr Craig Gaver | Squire Patton Boggs |
| Mr Eva Cibulková | Squire Patton Boggs |
| Mr Matej Pustay | Squire Patton Boggs |
| Ms Neva Cirkveni | Squire Patton Boggs |
| Ms Vesna Vasiljević | Law Office of Vesna Vasiljević |
| Ms Ante Čikotić | Assistant Minister, Ministry of Environment and Energy |
| Ms Ivica Crnčec | Assistant Minister, Ministry of Justice |
| Ms Ana Matić Puljar | Advisor to the Ministry of Environment and Energy |

85.  The following witnesses were examined:

| | |
|---|---|
| Mr Zsolt Hernádi | MOL Group |
| Ms Ilona Fodor | MOL Group |
| Mr Ferenc Horváth | MOL Group |
| Mr Robert Ježić | |
| Mr Leo Dolezil | |
| Ms Vidonija Miletić-Plukavec | |

86.  The following experts testified:

| | |
|---|---|
| Mr David Dearman | Mazars LLP |
| Ms Laura Hardin | Alvarez & Marsal |
| Mr Robert Quick | BGS |
| Mr David Calvert-Smith | QEB Hollis Whiteman |
| Judge Louis Freeh | Chairman of Freeh Group International Solutions, LLC |
| Mr Michael Hershman | President and CEO of the Fairfax Group |
| Mr Anthony Way | Director of TWCOG LLP |

15

| Mr Zlata Durdevic | Full Professor of Criminal Procedural Law, Human Rights Law and European Criminal Law, School of Law, University of Zagreb |
|---|---|

87. At the February 2017 Hearing, the Tribunal asked for and received the Claimant's assurance that it would produce a confidential note prepared by Mr Martin Bridger of Mr Robert Quick's interview with Mr Imre Fazakas in 2013 in connection with Croatia's criminal allegations against MOL and Mr Hernadi's criminal proceedings (the "Bridger Note" and subsequently produced as Exhibit C-706).

88. At the end of the February Hearing, it was decided to hold a continuation hearing, which was later determined would take place in July 2017 (the "July 2017 Hearing").

89. The possibility for interim post-hearing briefs between the two hearings was discussed at the close of the February 2017 Hearing.

90. On 26 February 2017, at MOL's request and with Croatia consenting, the Tribunal admitted two new documents into the record, namely Professor Barbić's Disclosure dated 24 January 2017 (Exhibit C-704) and a letter from the Permanent Court of Arbitration ("PCA") to the Swiss Federal Tribunal dated 20 February 2017 (Exhibit C-705).

91. On 2 March 2017, the Claimant filed observations on the Respondent's request of 31 January 2017 about securing Messrs Fazakas and Tóth.

92. On 9 March 2017, the Respondent answered the Claimant's observations of 2 March 2017.

93. On 9 March 2017, the Respondent replied to MOL's letter of 2 March 2017 concerning the appearance of Messrs Fazakas and Tóth and commented on other proposed witnesses.

94. On 11 March 2017, the Claimant produced the Bridger Note to the Tribunal as Exhibit C-706, and asked the Tribunal to decide on its admissibility, as it argued that the Bridger Note was subject to attorney-client privilege.

95. On 16 March 2017, the Claimant answered the Respondent's observations of 9 March 2017, to which the Respondent answered on 17 March 2017.

96. On 27 March 2017, the Respondent filed observations on the Claimant's request of 15 February 2017 regarding Exhibit R-210 as well as a request to exclude that exhibit from the record as it formed part of the Hungarian Files.

97. On 28 March 2017, the Claimant filed a request for the Tribunal to compel the Respondent to produce the Hungarian Files to the Claimant.

98. On 30 March 2017, the Respondent filed observations on the Claimant's request of 11 March 2017 regarding the production of the Bridger Note, denying that the Bridger Note was covered by legal privilege or arguing in the alternative that the Claimant had waived any claim to legal privilege when it submitted Mr Quick's assessment of Mr Fazakas' credibility during that interview.

99. On 30 March 2017, the Respondent filed its observations on the Claimant's request for production of the Hungarian Files.

100. On 2 April 2017, the Claimant wrote to the Tribunal regarding various procedural matters in advance of the July 2017 Hearing.

101. On 5 April 2017, the Respondent replied to the Claimant's letter of 2 April 2017, to which the Claimant responded on 7 April 2017 and the Respondent answered on 8 April 2017.

102. On 22 April 2017, the Tribunal issued a decision on procedural matters. The Tribunal decided that both Parties were to submit written briefs on the question of estoppel or *res judicata* of the UNCITRAL award by 5 May 2017 and 23 June 2017 respectively. In addition, the Claimant was granted permission to submit a rejoinder on jurisdiction and admissibility as raised by the Respondent in its preliminary objections by 23 June 2017. Finally, the Tribunal decided that the proposal for interim post-hearing briefs was rejected.

103. On 1 May 2017, the Parties provided the Tribunal with the corrected versions of the February 2017 Hearing transcripts.

104. On 5 May 2017, the Tribunal issued a decision on outstanding procedural matters, in which it:

    (i)    decided to request the attendance of the following additional witnesses: Messrs Fazakas, Hürlimann, Petrović, Sanader, and Tóth, identified the procedure to be followed for each witness, and asked the Parties to agree on the subjects or areas on which the witnesses would be questioned;

    (ii)    recalled, regarding the Hungarian Files, that an implicit understanding had emerged during the course of the February 2017 Hearing that these files should

be disclosed, but reserved for later decision the question of the extent to which the contents of the Files could be used;

(iii)   ordered the Claimant to produce Mr Bridger's Note, and to enter it into the record as a Claimant document; and

(iv)   with regard to Claimant's applications to supplement the record, ruled the following exhibits admissible: C-579, C-581, C-582, C-583, C-584, C-587, C- 608, C-612, C-615, C-619, C-620, C-623, C-624, C-625, C-626, C-626, C- 627, C-628, C-629, C-631, C-632, C-633, C-634, C-635, C-637, C-638, C-640, C-41, C-684, C-685, C-687, C-688, C-689, C-690, C-691, C-693, C-694, C-695, C-696, C-697, C-698, C-699, and C-702; and the following exhibits inadmissible: C-680, C-686, C-692, C-700, C-701, and C-703.

105. On 5 May 2017, the Claimant filed its Submission on the Preclusive Effect of the UNCITRAL award ("Cl. Brief on UNCITRAL award").

106. On 25 May 2017, the Claimant filed a request for the Tribunal to decide on production of documents. The Claimant sought the disclosure of a letter from Mr Misetić to Minister Vrdoljak referred to by Judge Matija, a Constitutional Court judge, in a letter to his fellow judges while the Court was deliberating over Mr Sanader's challenge to the constitutionality of his conviction.

107. On 1 June 2017, the Respondent responded to the Claimant's request for the disclosure of 25 May 2017, arguing, *inter alia*, that the communication was protected by attorney-client privilege.

108. On 1 June 2017, the Tribunal issued a decision concerning the organization of the July 2017 Hearing and stated that it was now able to prepare the letters to Messrs Fazakas and Tóth based on the indications of the areas of potential testimony provided by the Parties. The Tribunal also requested that the Parties provide the Tribunal with a similar indication of the areas on which Messrs Petrović, Sanader and Hürlimann were to be questioned.

109. On 6 June 2017, the Claimant filed a response to the Respondent's observations of 1 June 2017, to which the Respondent replied on the same day.

110. On 14 June 2017, the Parties transmitted to the Tribunal a list of agreed topics for Messrs Sanader and Hürlimann. The Parties had only partially agreed on a list of topics for Mr Petrović.

111. On 16 June 2017, the Claimant filed an application to supplement the record, seeking to introduce 12 documents emanating from the Hungarian Files that were disclosed to the Claimant following the Tribunal's order of 5 May 2017.

112. On 17 June 2017, the Respondent provided additional explanations concerning the Misetić-Vrdoljak communication, to which the Claimant answered on the same day.

113. On 22 June 2017, the Respondent filed an application to the Tribunal to compel additional disclosures from Messrs Bridger and Fitzgerald.

114. On 23 June 2017, the Respondent filed its Brief on the UNCITRAL award ("Resp. Brief on UNCITRAL award")

115. On 23 June 2017, the Claimant filed a Rejoinder on Jurisdiction ("Cl. Rejoinder").

116. On 26 June 2017, the Respondent filed observations on the Claimant's request of 16 June 2017 and sought leave to introduce into the record documents from the Hungarian Files.

117. On 29 June 2017, the Claimant filed observations on the Respondent's request of 22 June 2017.

118. On 30 June 2017, the Claimant filed a reply to the Respondent's observations of 26 June 2017 regarding documents from the Hungarian Files.

119. On 30 June 2017, the Respondent filed a reply to the Claimant's observations of 29 June 2017.

120. On 5 July 2017, the Tribunal decided on production of documents:

(i)     denying MOL's request of 25 May 2017 regarding the Misetić-Vrdoljak communication, but asking Croatia to disclose any document showing whether the note was passed to the Constitutional Court;

(ii)    denying Croatia's request of 1 June 2017; and

(iii)     granting both Parties' applications to introduce documents from the Hungarian Files.

121. On 6 July 2017, Croatia introduced into the record new Exhibits R-362 to R-364.

122. On 7 July 2017, the President held a pre-hearing organizational meeting with the Parties by telephone conference.

123. On 12 July 2017, the Respondent filed observations on the Tribunal's decision of 5 July 2017, indicating that it found no evidence that the Misetić-Vrdoljak communication had been submitted to the Constitutional Court.

124. On 13 July 2017, the Claimant filed a response to the Respondent's observations of 12 July 2017.

125. On 14 July 2017, the Respondent filed a reply to the Claimant's response of 13 July 2017.

126. On 22 July 2017, the Respondent requested to add to the record a certified translation of the INA Privatisation Act.

127. From 24 July 2017 to 28 July 2017, the Tribunal held a Hearing in London. Present at the July 2017 Hearing were the following:

*Tribunal*:
Sir Franklin Berman                      President
Professor William Park                   Arbitrator
Professor Brigitte Stern                 Arbitrator

*ICSID Secretariat*:
Ms Aurélia Antonietti                    Secretary of the Tribunal

*Assistant to the Tribunal:*
Dr Peter Webster

*For the Claimant*:
Mr Arif Hyder Ali                        Dechert LLP
Mr Alexandre de Gramont                  Dechert LLP
Mr Theodore Posner                       Weil, Gotshal, & Manges LLP
Mr Dalibor Valinčić                      Wolf Theiss
Ms Ana Grubešić                          Wolf Theiss
Ms Erica Franzetti                       Dechert LLP
Mr Dániel Dózsa                          Dechert LLP
Mr Rajat Rana                            Dechert LLP

| | |
|---|---|
| Dr David Attanasio | Dechert LLP |
| Ms Tatiana Sainati | Dechert LLP |
| Mr Harsh Sancheti | Dechert LLP |
| Mr Nathaniel Morales | Dechert LLP |
| Ms Madeline Tutman | Dechert LLP |
| Mr Miguel Nakhle | Compass Lexecon |
| Dr Pál Kara | MOL Group |
| Mr Sándor Rézman | MOL Group |
| Mr Attila Megyimóri | MOL Group |
| Mr Jacob Horseman | RLM TrialGraphix |

| | |
|---|---|
| *For the Respondent*: | |
| Mr Stephen P. Anway | Squire Patton Boggs |
| Mr Luka S. Mišetić | Squire Patton Boggs |
| Mr Rostislav Pekař | Squire Patton Boggs |
| Mr David Alexander | Squire Patton Boggs |
| Mr Alain Farhad | Squire Patton Boggs |
| Mr Stephan Adell | Squire Patton Boggs |
| Mr Craig Gaver | Squire Patton Boggs |
| Mr Mark Stadnyk | Squire Patton Boggs |
| Ms Eva Cibulková | Squire Patton Boggs |
| Mr Matej Pustay | Squire Patton Boggs |
| Ms Vesna Vasiljević | Law Office of Vesna Vasiljević |
| Ms Ana Matić Puljar | Advisor to the Ministry of Environment and Energy |
| Mr Goran Jutriša | Senior Advisor, Office of the Prime Minister |

128. The following witnesses were examined:

| | |
|---|---|
| Mr Zoltán Áldott | MOL Group |
| Ms Agnes Bencsik | MOL Group |
| Ms Davorka Tancer | MOL Group |
| Mr Slavko Linić | |
| Mr Dubravko Štimac | |
| Mr Ivan Vrdoljak | |
| Mr Davor Mayer | |
| Ms Ružica Fijačko | |
| Mr Damir Vandelić (by videoconference) | |

129. The following experts testified:

| | |
|---|---|
| Mr Ivan Koprić | Full Professor and Head of the Chair of Administrative Science at the Faculty of Law of the University of Zagreb |

| Mr Petar Miladin | Full professor at the Faculty of Law of the University of Zagreb |
| Mr Ante Gašparović | County Court in Zagreb, Certified Securities Expert |
| Mr Marko Šikić | University of Zagreb |

130. At the end of the July 2017 Hearing, it was decided that a continuation hearing would take place (later confirmed for March 2018, "the March 2018 Hearing").

131. On 1 August 2017, the Secretary of the Tribunal wrote to Messrs Fazakas, Hürlimann, Petrović, Sanader, and Tóth to invite them to give evidence at the March 2018 Hearing. Mr Hürlimann declined the invitation on 22 August 2017, Mr Petrović on 20 October 2017, Mr Tóth on 27 December 2017, and Mr Fazakas on 5 January 2018. Dr Sanader indicated that he was willing to appear before the Tribunal.

132. On 3 August 2017, the Respondent filed further observations pursuant to the Tribunal's decision of 5 July 2017.

133. On 6 August 2017, the Claimant filed a request for reconsideration of PO 3 so as to allow one of the Claimant's requests for production of documents regarding HANFA submitted on 29 July 2016 that had been denied.

134. On 15 August 2017, the Claimant filed a response to the Respondent's observations of 12 July 2017 and 3 August 2017.

135. On 18 August 2017, the Respondent filed observations objecting to the Claimant's request of 6 August 2017.

136. On 24 August 2017, the Respondent filed a reply to the Claimant's response of 15 August 2017.

137. On 25 August 2017, the Claimant filed a reply to the Respondent's observations of 18 August 2017.

138. On 30 August 2017, the Respondent filed a rejoinder on the Claimant's request of 6 August 2017.

139. On 19 September 2017, the Tribunal rejected the Claimant's requests of 6 August 2017 and 15 August 2017.

140. On 6 October 2017, the Respondent filed a request to introduce four documents into the record, namely Exhibits R-365 to R-368, and submitted the decision of the High Administrative Court of the Republic of Croatia dated 24 May 2017 (Exhibit R-369) as agreed by the Parties.

141. On 9 October 2017, the Tribunal granted the Respondent's request of 6 October 2017 as the Claimant had no objections.

142. On 1 November 2017, the Claimant filed a rejoinder on the Respondent's request of 22 June 2017 regarding additional disclosures from Messrs Bridger and Fitzgerald.

143. On 6 November 2017, the Claimant added to the record as Exhibits C-744 a decision from the Swiss Federal Court of 17 October 2017 rejecting Croatia's application to set aside the UNCITRAL award.

144. On 20 November 2017, the Parties submitted a document setting forth the Parties' respective positions on the translation of the INA Privatisation Act.

145. On 5 January 2018, the Parties exchanged lists of witnesses to be examined at the March 2018 Hearing.

146. On 8 January 2018, the Tribunal wrote to the Parties regarding the March 2018 Hearing and indicated that it would be available for an additional hearing to hear closing statements after the post-hearing briefs in July 2018.

147. On 25 January 2018, the Tribunal informed the Parties that, in light of the refusal of Messrs Fazakas and Tóth to give evidence at the March 2018 Hearing, it would take no further steps to secure the attendance of these witnesses.

148. On 26 January 2018, the Parties provided a joint submission and a joint translation of the INA Privatisation Act.

149. On 9 February 2018, the Respondent filed a request to admit into the record new documents to be used in the cross-examination of Mr Dearman.

150. On 13 February 2018, the President held a pre-hearing organizational meeting with the Parties by telephone conference.

151. On 16 February 2018, the Claimant filed observations objecting to the Respondent's request of 9 February 2018.

152. On 18 February 2018, the Secretary of the Tribunal wrote to Dr Sanader's counsel to inquire about his availability to appear *via* video conference and communicating the arrangements to be made.

153. On 22 February 2018, the Tribunal rejected the Respondent's request of 9 February 2018 and ordered the Claimant to produce Mr Fitzgerald's note requested by the Respondent on 22 June 2017.

154. On 26 February 2018, the Claimant introduced into the record the Fitzgerald Note as Exhibit C-745. The Claimant also requested the production of the audio and transcript of a 2009 session of the Croatian government approving the FAGMA.

155. On 28 February 2018, the Respondent objected to the Claimant's request of 26 February 2018. On the same date, the Claimant filed its reply on the Respondent's observations and the Respondent filed a further response.

156. On 1 March 2018, the Tribunal rejected MOL's application of 26 February 2018.

157. On 2 March 2018, the Parties submitted the joint expert report, prepared at the Tribunal's request, by Mr Aron (for the Claimant) and Mr Way (for the Respondent).

158. On 3 March 2018, the Secretary of the Tribunal informed the Parties that Dr Sanader was not available to testify on the proposed dates.

159. On 6 March 2018, the Claimant submitted an Addendum to the First (2015) and Second (2016) Expert Reports of Messrs Spiller and Nahkle of Compass Lexecon.

160. On 6 March 2018, the Parties submitted the joint expert report, prepared at the Tribunal's request, by Professor Spiller and Mr Nakhle (for the Claimant), and Mr Qureshi (for the Respondent).

161. On 6 March 2018, the Respondent requested leave to introduce into the record the decision rendered by the Court of Justice of the European Union ("CJEU") in the Case C-284/16, Slovak Republic v. Achmea B.V. as Exhibit RA-343 (the "*Achmea* judgment"). The request was granted by the Tribunal on the same day.

24

162. From 7 March 2018 to 16 March 2018, the Tribunal held the continuation of the Hearing on jurisdiction and the merits in Washington, D.C. The following persons were present:

*Tribunal*:
| | |
|---|---|
| Sir Franklin Berman | President |
| Professor William Park | Arbitrator |
| Professor Brigitte Stern | Arbitrator |

*ICSID Secretariat*:
| | |
|---|---|
| Ms Aurélia Antonietti | Secretary of the Tribunal |

*Assistant to the Tribunal:*
Dr Peter Webster

*For the Claimant*:
| | |
|---|---|
| Mr Arif Hyder Ali | Dechert LLP |
| Mr Alexandre de Gramont | Dechert LLP |
| Ms Érica Franzetti | Dechert LLP |
| Mr Theodore Posner | Weil, Gotshal & Manges LLP |
| Mr Peter FitzGerald | Peters & Peters Solicitors LLP |
| Mr Michael O'Kane | Peters & Peters Solicitors LLP |
| Mr William Boyce | QEB Hollis Whiteman |
| Mr Dániel Dózsa | Dechert LLP |
| Mr Rajat Rana | Dechert LLP |
| Mr Dalibor Valinčić | Dechert LLP |
| Dr David Attanasio | Dechert LLP |
| Ms Sofia Mendoza | Dechert LLP |
| Mr Michael Losco | Dechert LLP |
| Ms Tatiana Sainati | Dechert LLP |
| Mr Harsh Sancheti | Dechert LLP |
| Ms Hayoung Park | Dechert LLP |
| Ms Anna Avilés-Alfaro | Dechert LLP |
| Ms Charlotte Boylan | Dechert LLP |
| Ms Emmy Ehrenberg-Shannon | Peters & Peters Solicitors LLP |
| Ms Lucia Mocibob | Wolf Theiss |
| Mr Siniša Jovicic | Wolf Theiss |
| Mr Jacob Horseman | RLM TrialGraphix |
| Parties: | |
| Dr Pál Kara | MOL Group |
| Mr Sándor Rézman | MOL Group |

*For the Respondent*:
| | |
|---|---|
| Mr Luka S. Misetic | Squire Patton Boggs |
| Mr Stephen P. Anway | Squire Patton Boggs |
| Mr David W. Alexander | Squire Patton Boggs |
| Mr Rostislav Pekar | Squire Patton Boggs |

| | |
|---|---|
| Mr Stephan Adell | Squire Patton Boggs |
| Mr Mark Stadnyk | Squire Patton Boggs |
| Mr Craig Gaver | Squire Patton Boggs |
| Ms Eva Cibulkova | Squire Patton Boggs |
| Mr Matej Pustay | Squire Patton Boggs |
| Mr Patrick B. Fenior | Squire Patton Boggs |
| Ms Vesna Vasiljević | Law Office of Vesna Vasiljević |
| Mr Goran Jutriša | Advisor in the Office of the President of the Government of Croatia |
| Ms Anja Bagarić | Chief Advisor to the Minister of Environmental Protection and Energy |

163. The following experts provided testimony:

| | |
|---|---|
| Mr David Dearman | Mazars LLP |
| Mr Arend Vast | Retired Judge |
| Mr Robert Quick | BGS |
| Mr David Aron | PDC |
| Sir Alan Dashwood | Henderson Chambers |
| Mr Pablo Spiller | Compass Lexecon |
| Mr Miguel Nakhle | Compass Lexecon |
| Mr Sirshar Qureshi | PWC |
| Mr Anthony Way | TWCOG LLP. |
| Professor Paul Craig | Professor at Oxford University |

164. On 8 March 2028, the Parties submitted a Joint Report, prepared at the Tribunal's request, by Sir Alan Dashwood and Prof. Paul Craig on areas of agreement and disagreement in their respective Expert Opinions.

165. On 11 March 2018, the Claimant sought leave to introduce into the record the 1997 decision of the European Communities (98/181/EC), approving the EC's entry into the Energy Charter Treaty, to which the Respondent objected.

166. At the March 2018 Hearing, it was decided that a continuation hearing would take place on 5-6 July 2018 (the "July 2018 Hearing").

167. At the March 2018 Hearing, the Tribunal raised the possibility of an early determination of the 'EU issue.' The Respondent provided its position on 19 March 2018 objecting to this possibility and the Claimant its position on 21 March 2019 indicating that it had no objections.

168. On 4 April 2018, the Tribunal informed the Parties that it would not pursue the possibility of hearing Dr Sanader and noted that Dr Sanader's evidence to the UNCITRAL Tribunal had been placed on the record. Regarding the procedure for handling Croatia's EU Law jurisdictional objections, the Tribunal indicated that the arrangements in operation would continue in effect and that each Party would have the opportunity to submit a written brief on the closing argument by 1 June 2018.

169. On 24 April 2018, Prof. Stern disclosed a further new appointment in another ICSID case.

170. On 15 May 2018, the Parties submitted French and German versions of the *Achmea* judgment, together with the EU Commission's submission in those proceedings (Exhibits RA-344 to RA-347).

171. On 29 May 2018, the Respondent introduced into the record with the Claimant's consent Exhibit R-372, a decision of the Administrative Court of Zagreb on the revocation of INA's license for the Northwest Croatia area.

172. On 31 May 2018, the Claimant informed the Tribunal of the passing of Mr György Mosonyi, one of its witnesses.

173. On 1 June 2018, the Respondent filed its Post-Hearing Brief ("Resp. PHB").

174. On 3 June 2018, the Claimant filed its Post-Hearing Brief ("Cl. PHB").

175. On 7 June 2018, the President held a pre-hearing organizational meeting with the Parties by telephone conference.

176. On 6 June 2018, the Claimant filed a request to exclude three factual exhibits and a legal authority the Respondent had introduced with its Post-Hearing Brief (Exhibit R-370, 371 and SQ-011).

177. On 13 June 2018, the Respondent objected to the Claimant's request.

178. On 14 June 2018, the Claimant filed its response to the Respondent's observations of 13 June 2018.

179. On 15 June 2018, the Respondent filed further observations on the Claimant's request to submit new evidence.

180. On 27 June 2018, the Respondent introduced into the record as agreed by the Parties Exhibits RA-377 to RA-379.

181. On 27 June 2018, the Tribunal issued its decision, admitting the new evidence introduced by the Respondent with its Post-Hearing Brief into the record.

182. From 4 July 2018 to 6 July 2018, the Tribunal held the continuation of the Hearing on jurisdiction and the merits in Paris. The following persons were present:

*Tribunal*
| | |
|---|---|
| Sir Franklin Berman | President |
| Professor William Park | Arbitrator |
| Professor Brigitte Stern | Arbitrator |

*ICSID Secretariat*:
| | |
|---|---|
| Ms Aurélia Antonietti | Secretary of the Tribunal |

*Assistant to the Tribunal:*
Dr Peter Webster

*Claimant:*
| | |
|---|---|
| Mr Arif Hyder Ali | Dechert LLP |
| Mr Alexandre de Gramont | Dechert LLP |
| Ms Érica Franzetti | Dechert LLP |
| Mr Dalibor Valinčić | Dechert LLP |
| Mr Theodore Posner | Weil, Gotshal & Manges LLP |
| Mr Peter FitzGerald | Peters & Peters Solicitors LLP |
| Mr Michael O'Kane | Peters & Peters Solicitors LLP |
| Mr William Boyce | QEB Hollis Whiteman |
| Mr Dániel Dózsa | Dechert LLP |
| Dr David Attanasio | Dechert LLP |
| Mr Michael Losco | Dechert LLP |
| Mr Harsh Sancheti | Dechert LLP |
| Ms Jennifer Cilingin | Dechert LLP |
| Ms Anna Avilés-Alfaro | Dechert LLP |
| Ms Emmy Ehrenberg-Shannon | Peters & Peters Solicitors LLP |
| Ms Franziska Christen | Peters & Peters Solicitors LLP |
| Dr Pál Kara | MOL Group |
| Mr Sándor Rézman | MOL Group |

*Respondent:*
| | |
|---|---|
| Mr Luka S. Misetic | Squire Patton Boggs |
| Mr Stephen P. Anway | Squire Patton Boggs |

28

| Mr David W. Alexander | Squire Patton Boggs |
| Mr Rostislav Pekar | Squire Patton Boggs |
| Mr Stephan Adell | Squire Patton Boggs |
| Mr Mark Stadnyk | Squire Patton Boggs |
| Mr Craig Gaver | Squire Patton Boggs |
| Ms Eva Cibulkova | Squire Patton Boggs |
| Mr Matej Pustay | Squire Patton Boggs |
| Ms Vesna Vasiljević | Law Office of Vesna Vasiljević |
| Dr Tomislav Ćorić | Minister of Environment and Energy |
| Mr Goran Jutriša | Senior Advisor at the Office of the Prime Minister |
| Ms Anja Bagarić | Chief Advisor to the Minister of Environment and Energy |

183. On 19 July 2018, the Claimant filed a request to respond to "Croatia's closing argument regarding MOL's License Revocation Claim centred on an application made during the Hearing that the claim be declared inadmissible."

184. On 20 July 2018, the Respondent asked the Tribunal if it were amenable to add into the record a position paper issued by the European Commission on 19 July 2018.

185. On 20 July 2018, the Respondent filed observations opposing the Claimant's request of 19 July 2018.

186. On 23 July 2018, the Claimant objected to the introduction of the European Commission's position paper of 19 July 2018.

187. On 24 July 2018, the Claimant filed a response to the Respondent's observations of 23 July 2018.

188. On 1 August 2018, the Claimant asked for guidance as to the Parties' costs submissions.

189. On 3 August 2018, the Respondent submitted its position on the Parties' costs submissions.

190. On 13 August 2018, the Parties informed the Tribunal that they had agreed to add the Croatian High Administrative Court's judgment on the Sava License revocation to the record as Exhibit C-746.

191. On 14 August 2018, the Tribunal denied the Parties' recent requests regarding the introduction of new documents into the record, with the sole exception of that relating to

the text of the new Judgment of the High Administrative Court bearing on the Sava licence revocation (filed as Exhibit C-746). The Tribunal gave the Parties guidance as to which issues it would have to decide on in its Award, and as to costs submissions.

192. On 22 August 2018, the European Commission filed an application for leave to intervene as a non-disputing party.

193. On 23 August 2018, the Respondent filed an application to submit the Judgment of the Court of Justice of the European Union dated 25 July 2018 in Case C-268/17 (the "CJEU Hernádi Judgment") to the record.

194. On 30 August 2018, the Tribunal informed the Parties that it was minded to reject the European Commission's application of 22 August 2018 at this late stage in the proceedings, and invited the Parties to provide any comments by 10 September 2018.

195. On 10 September 2018, the Claimant agreed with the Tribunal's decision to refuse the Commission's application and suggested adding to the record the award in *Vattenfall v. Germany* of 31 August 2018, which had declined to follow the *Achmea* judgment. The Respondent maintained its view that the EU Commission's 22 August 2018 application to intervene should be granted.

196. On 10 September 2018, the Claimant objected to the Respondent's request of 23 August 2018 to submit the CJEU Hernádi Judgment into the record. By the same letter, the Claimant sought permission to introduce six new documents into the record.

197. On 11 September 2018, the Respondent objected to the contents of the Claimant's 10 September letter.

198. On 20 September 2018, the Tribunal denied the European Commission's application to intervene as a non-disputing party given the advanced state of the proceeding. For similar reasons, the Tribunal declined also to admit to the record the Award of the tribunal in the *Vattenfall* arbitration.

199. On 23 October 2018, the Claimant informed the Tribunal that Croatia had issued an administrative decision revoking INA's Sava Exploration License and that the Parties had jointly agreed that this decision should be admitted into the record.

200. On 24 October 2018, the Claimant submitted the Third Decision Revoking Sava License ("Third Sava Revocation") of 7 September 2018 as Exhibit C-747.

201. On 26 October 2018, the Parties filed their Submissions on Costs ("Cl. Costs" and "Resp. Costs").

202. On 28 October 2018, the Respondent submitted that the Claimant's submission of costs was in violation of the Tribunal's instructions and asked that the document be stricken from the record.

203. On 28 October 2018, the Claimant answered that its submission was in line with the Tribunal's instructions, and requested that the Tribunal order the Respondent to provide the methodology for its costs calculations.

204. On 29 October 2018, the Claimant submitted a revised version of its Submission on Costs correcting arithmetical errors.

205. On 30 October 2018, the Tribunal decided to admit the CJEU Hernádi Judgment on a provisional basis and admitted the Third Sava Revocation, while reminding the Parties that the decision to admit documents into the record remained with the Tribunal itself.

206. On 31 October 2018, the Respondent submitted the CJEU Hernádi Judgment as Exhibit R-373* (provisional).

207. On 9 November 2018, the Respondent informed the Tribunal that on 8 November 2018, the German Supreme Court had set aside the arbitral award of 7 December 2012 in *Achmea B.V. v. Slovak Republic*.

208. On 26 November 2018, the Respondent informed the Tribunal that it continued to object to the contents of the Claimant's 26 October 2018 Submission on Costs and asked the Tribunal if it anticipated a ruling on the issue to be forthcoming, or if the Parties should request an extension to file their second round of cost submissions.

209. On 26 November 2018, the Claimant reiterated its 28 October 2018 request that the Tribunal order the Respondent to provide the methodology for its costs' calculations.

210. On 27 November 2018, the Respondent informed the Tribunal that on 17 November 2018, INTERPOL had renewed its arrest warrant against MOL's Chief Executive Officer, Mr Zsolt Hernádi.

211. On 28 November 2018, the Tribunal invited the Respondent to respond to the Claimant's Submission on Costs *de bene esse* so as to put the Tribunal is a position to consult the views of both Parties in its eventual decision on costs, if at that time it felt it necessary to do so.

212. On 29 November 2018, the Respondent informed the Tribunal that it had prepared a translation of the German Supreme Court's ruling on the *Achmea* case and that the Claimant had informed the Respondent that while it did not join the Respondent in its request to admit the document into the record, it also did not oppose it. The Respondent sought the Tribunal's permission to admit the translation into the record.

213. On 3 December 2018, the Tribunal agreed that the German Supreme Court's judgement on *Achmea* should be entered into the record and provided the Parties with procedural instructions to allow the Claimant to approve or make suggestions to the Respondent's English translation.

214. On 4 December 2018, the Claimant filed observations on the criminal proceedings referenced by the Respondent on 27 November 2018 concerning INTERPOL's reactivation of a Red Notice against Mr Hernádi and provided an update on the criminal proceedings against Messrs Hernádi and Sanader in the Zagreb County Court.

215. On 7 December 2018, the Respondent objected to the contents of the Claimant's letter of 4 December 2018.

216. On 7 December 2018, both Parties filed their observations on each other's Submissions on Costs ("Cl. Reply on Costs" and "Resp. Reply on Costs").

217. On 11 December 2018, the Claimant confirmed that it had no issues with the Respondent's English translation of the German Supreme Court's judgement on *Achmea*.

218. On 12 December 2018, the Tribunal invited the Respondent to submit the German Supreme Court Decision and its English translation, which it did on 12 December 2018, as Exhibit R-374.

219. On 18 December 2018, the Tribunal issued Procedural Order No. 6 ("PO6") detailing the circumstances under and the process by which new evidence would be admitted into the record, and further decided as follows:

> "The Tribunal invites the Parties to keep it informed of proceedings in the courts which appear to be relevant to the issues which the Tribunal will have to decide when delivering its Final Award. This request should be taken to apply to –
>
> a. the continuation or completion of the various proceedings in the Courts of Croatia that have been identified in the Parties' submissions in the Arbitration and (should that be the case) any new proceedings in the Courts of Croatia with a similar direct bearing on the issues mentioned above;
>
> b. any further judicial decisions of the Courts of Germany in consequence of the Judgment of the CJEU in the Achmea case, so far as such decisions come to the notice of either Party;
>
> c. any decision by the EU Council of Ministers as to action that should be taken by EU Member States in the light of the Achmea judgment; and
>
> d. any further judicial decisions of the CJEU having a direct bearing on the application or otherwise of the Achmea judgment to the Energy Charter Treaty.
>
> 3. Documents falling within any of the above categories are to be submitted to the Tribunal by the Parties jointly, accompanied if necessary by an agreed translation into English.
>
> 4. In case of doubt, the Parties are to apply to the Tribunal for specific guidance.
>
> 5. Documents submitted otherwise than in accordance with the above procedure will be disregarded.
>
> 6. Documentary exhibits submitted pursuant to paragraphs 2 and 3 above may be accompanied by only such factual explanation as is necessary to enable the Tribunal to understand the relevance of the document or documents concerned. As per paragraph 3 above, the factual explanation is to be agreed between the Parties and submitted jointly.
>
> 7. If the Tribunal is of the view at any time that further explanation or argument is required, including for the purpose of enabling it to assess the relevance and weight of any documentary exhibit or exhibits already admitted pursuant to paragraphs 2 and 3 above, it will open the opportunity for the Parties to provide it with such further explanation or argument.

8. Other than under paragraphs 6 and 7 above, no further factual or legal submission on the merits of the case may be made by either Party without the prior leave of the Tribunal.

9. An application for leave under paragraph 8 above must be accompanied by sufficient justification to enable the Tribunal to decide the application on its merits, but may not include material of a kind to prejudge the application.

10. Procedures will be determined by the Tribunal case by case for the application of paragraphs 7 and 9 above, and will be such as to guarantee the equality between the Parties."

220. On 4 January 2019, the Respondent submitted its *de bene esse* response to the Claimant's 26 October 2018 Submission on Costs.

221. On 17 January 2019, the Claimant stated that the Respondent's *de bene esse* submission was not in line with the Tribunal's guidelines and requested that it be stricken from the record.

222. On 18 January 2019, the Respondent asked that the Tribunal reject the Claimant's request of 17 January 2019.

223. On 20 January 2019, the Respondent brought to the Tribunal's attention three declarations on the *Achmea* judgment made by (i) 22 EU Member States; (ii) five EU Member States; and (iii) Hungary.

224. On 21 January 2019, the Tribunal informed the Parties that it would reserve its decision on the Claimant's 17 January 2019 request.

225. On 31 January 2019, the Tribunal invited the Parties to consider whether the three declarations referenced by the Respondent on 20 January 2019 should be regarded as covered by the terms of PO6.

226. On 1 February 2019, the Respondent submitted a *de bene esse* response to the Claimant's 4 December 2018 submission on the Croatian criminal proceedings and the INTERPOL Red Notice.

227. On 11 February 2019, the Respondent sought the Tribunal's permission to admit the three declarations detailed on 20 January 2019 into the record, noting that while the Claimant did not formally join in their application, it also did not object to it.

228. On 19 February 2019, the Tribunal gave the Claimant a further opportunity to join the Respondent in seeking permission to enter the three declarations into the record. Failing a response from the Claimant, the Respondent was to be granted the right to enter the declarations.

229. On 20 February 2019, the Claimant stated that it joined the Respondent in seeking the submission of the declarations.

230. On 5 March 2019, the Claimant sought leave to introduce the 2019 amendments to the INA Privatisation Act into the record. On the same date, the Tribunal invited the Respondent to provide its comments on the Claimant's request by 11 March 2019.

231. On 11 March 2019, the Respondent requested that, should the Tribunal grant the Claimant leave to submit the amendments proposed on 5 March 2019, it required the Claimant to provide written reasoning for the submission in accordance with Paragraph 17.3 of PO1.

232. On 11 March 2019, the Parties jointly asked the Tribunal to confirm that the EU Member declarations detailed in the Respondent's 20 January 2019 request could be submitted into the record. On the same date, the Tribunal confirmed the documents could be submitted.

233. On 12 March 2019, the Respondent submitted the EU Member declarations as Exhibits R-375 through R-377.

234. On 22 March 2019, the Claimant asked whether the 2019 amendments to the INA Privatisation Act could be admitted to the record and submissions allowed regarding its implications.

235. On 5 April 2019, the Tribunal decided on a calendar for submissions on the amendments to the INA Privatisation Act.

236. On 18 April 2019, the Claimant applied for an extension of time to file its submission concerning the amendments to the INA Privatisation Act and leave to add to the record transcripts of the debate held in the Croatian Parliament regarding these amendments.

237. On 18 April 2019, the Respondent objected to the Claimant's application.

238. On 18 April 2019, the Claimant commented on the Respondent's objection, to which the Respondent answered, and to which the Claimant replied later that day.

239. On 19 April 2019, the Tribunal decided to postpone the Parties' submissions so that it could rule on the Claimant's application.

240. On 1 May 2019, the Claimant reiterated its request for leave to submit the transcripts of the Croatian parliamentary debates regarding the 2019 Amendments to the INA Privatisation Act along with translated portions of the Transcripts to the record.

241. On 2 May 2019, the Tribunal invited the Parties to provide an agreed translation of the official document from the Government of Croatia accompanying the amendments to the INA Privatisation Act and extended the deadline for the Parties' submissions on the matter.

242. On 10 May 2019, the Respondent filed the agreed translation of the official document from the Government of Croatia accompanying the amendments to the INA Privatisation Act as provisional Exhibit R-378*.

243. On 17 May 2019, the Parties filed their submissions on the amended INA Privatisation Act.

244. On 22 May 2019, the Claimant renewed its request to submit portions of the transcripts of the debates held in the Croatian Parliament regarding the 2019 Amendments to the INA Privatisation Act into the record.

245. On 26 May 2019, the Respondent maintained its objections to the Claimant's request to submit the transcripts from the Croatian Parliament into the record.

246. On 27 May 2019, the Claimant sought permission to respond to the Respondent's 26 May 2019 submission.

247. On 29 May 2019, the Respondent asked the Tribunal to clarify if the Parties' reply submissions on the INA Privatisation Act were postponed until after the Tribunal's decision on the Claimant's 22 May 2019 request. On the same date, the Tribunal informed the Parties of its intention to rule on the matter shortly, but stated that it would not object to a one-week postponement at the request of the Parties.

248. On 29 May 2019, the Claimant reiterated its request of 27 May 2019.

249. On 29 May 2019, the Respondent requested a one-week extension for the filing of the reply submissions on the INA Privatisation Act.

250. On 30 May 2019, the Tribunal informed the Parties that it was postponing its decision on the Claimant's 22 May 2019 application.

251. On 30 May 2019, the Respondent reiterated its request that the reply submissions on the INA Privatisation Act be delayed until 7 June 2019. On the same date, the Claimant objected to the Respondent's extension request. The Tribunal subsequently extended the deadline for both Parties to 3 June 2019.

252. On 3 June 2019, the Parties submitted their reply submissions on the INA Privatisation Act.

253. On 24 June 2019, the Respondent filed a request for the Tribunal to decide on the admissibility of the EC's *amicus curiae* briefs in the District Court of the District of Columbia into the record.

254. On 27 June 2019, the Claimant provided its comments on the Respondent's 24 June 2019 request.

255. On 15 July 2019, the Tribunal rejected the Respondent's 24 June 2019 request to admit new evidence.

256. On 22 July 2019, the Respondent submitted a corrected translation of Exhibit C-018.

257. On 27 August 2019, the Claimant asked the Tribunal whether the 2019 Amendments to the INA Privatisation Act and the related submissions would be admitted definitively to the record and whether the Tribunal had before it all evidence needed to make that decision.

258. On 29 August 2019, the Tribunal informed the Parties that it was pursuing its deliberations on the Award and would "inform the Parties at the appropriate moment whether or not further evidence or submissions are required in relation to the 2019 amendments to the INA Privatisation Act."

259. On 30 December 2019, the Claimant filed a Request for Provisional Measures seeking *inter alia* an order instructing the Respondent to refrain from taking any actions on the

basis of "the illegitimate 'guilty' verdict rendered earlier today by the Zagreb County Court" against Mr Zsolt Hernádi that could adversely affect MOL's rights as an investor in Croatia, together with Exhibits CPM C-1 to CPM C-31 and CPM CA-1 to CA-17.

260. On 1 January 2020, the President of the Tribunal invited the Parties to participate in a conference call with him regarding the Claimant's 30 December 2019 request. On 2 January 2020, the Parties confirmed their availabilities for the call.

261. On 6 January 2020, the President of the Tribunal held a conference call with the Parties on the Claimant's Request for Provisional Measures.

262. On 6 January 2020, the Tribunal, *inter alia*, invited the Respondent to respond to the Claimant's Request for Provisional Measures by 13 January 2020.

263. On 8 January 2020, the Respondent requested leave to submit a new document with its forthcoming submission. On the same date, the Tribunal invited the Claimant's comments on the request. By email of the same date, the Claimant confirmed it had no objection to the Respondent's request. By letter of the same date, the Tribunal granted the Respondent's request.

264. On 13 January 2020, the Respondent submitted its Response to the Claimant's Request for Provisional Measures, together with Exhibits R-379 and RA-380.

265. On 14 January 2020, the Claimant sought leave to respond to the Respondent's Response to the Claimant's Request for Provisional Measures by 17 January 2020. By email of the same date, the Tribunal granted the Claimant's request, with the Respondent given until 22 January 2020 to file its reply, if any.

266. On 17 January 2020, the Claimant submitted its Reply in Support of its Request for Provisional Measures with accompanying documentation.

267. On 22 January 2020, the Respondent submitted its Rejoinder on the Claimant's Request for Provisional Measures.

268. On 29 January 2020, the Respondent updated the Tribunal on court proceedings in Croatia and sought guidance on submitting related documents.

269. On 1 February 2020, the Tribunal decided *inter alia* as follows:

(i)   It rejected the Claimant's Request for Provisional Measures because it had

> "come to the conclusion that the verdict of the Zagreb
> County Court in the criminal proceedings against
> Mr Hernádi and Mr Sanader has not been shown to give rise
> to an urgent new threat to the Claimant's interests sufficient
> to justify the award of the provisional measures sought by
> the Claimant. Nevertheless, in exercise of its general powers
> under ICSID Arbitration Rule 39(3), the Tribunal calls upon
> both Parties to refrain, pending the delivery of the Tribunal's
> Award, from taking any steps that might aggravate the
> dispute which is the subject of the Arbitration."

(ii)  It admitted *inter alia* into the record the verdict of the Zagreb County Court in the criminal proceedings against Messrs Hernádi and Sanader.

(iii)  It invited the Parties to confer, and to report back jointly, as to the potential relevance of further evidence, including oral evidence given during the proceedings in the Zagreb County Court (notably in relation to certain witnesses whom the Tribunal had itself attempted to call for the purposes of the Arbitration but who did not appear) and the most convenient method by which relevant evidence of that kind could be introduced into the record.

270. On 15 February 2020, the Claimant filed a submission and a proposed method for introduction of the evidence into the record in response to the Tribunal's Order of 1 February 2020.

271. On 17 February 2020, the Respondent filed a request to submit "a certain recent appellate decision of the High Administrative Court of the Republic of Croatia." By email of the same date, the Claimant confirmed it had no objections to the Respondent's request.

272. On 23 February 2020, the Respondent informed the Tribunal of differences between the Parties over the implementation of the Tribunal's 1 February 2020 ruling.

273. On 24 February 2020, the Claimant sought permission to respond to the Respondent's 23 February 2020 letter.

274. On 24 February 2020, the Tribunal granted the Respondent leave to submit the document described in its 17 February 2020 request, which it did on the same date as Exhibit R-380.

275. On 28 February 2020, the Tribunal invited the Claimant to submit a short response to the Respondent's 23 February 2020 letter.

276. On 2 March 2020, the Claimant submitted its comments on the Respondent's 23 February 2020 letter.

277. On 21 March 2020, the Respondent filed a request to submit "a certain recent appellate decision of the Supreme Court of the Republic of Croatia" into the record.

278. On 23 March 2020, the Tribunal granted the Respondent's 21 March 2020 request. The Respondent filed the same day the appellate decision of the Supreme Court of the Republic of Croatia (in English and Croatian) dated 6 March 2020 as Exhibit R-381.

279. By separate communication of 23 March 2020, the Tribunal rendered its decision on the Claimant's application of 15 February 2020. It reminded the Parties that their recent submissions had not been filed in accordance with the procedures detailed in PO6 and invited them to confer and report jointly on the relevance to the arbitration of the evidence given before the Zagreb County Court by particular witnesses who had either given evidence before the Tribunal in the Arbitration or had been invited by the Tribunal to appear as witnesses before it but had not agreed to do so. The Tribunal recalled for the record that all additional documents tendered in support of the recent correspondence, other than those that have been expressly admitted by the Tribunal, were to remain subject to paragraph 5 of PO6, without prejudice to the right of the Tribunal to call at any time for further evidence or argument, if it deemed it necessary to do so; attention was drawn in this connection to paragraph 7 of PO6.

280. On 16 April 2020, the Parties submitted a Joint Report on Evidence Arising from Croatian Criminal Proceedings in accordance with the Tribunal's 23 March 2020 Order, which also contained their respective positions as to which documents should be admitted into the record.

281. On 12 May 2020, the Claimant inquired into the status of the Tribunal's ruling on the joint report. By email of the same date, the Tribunal confirmed it would issue its ruling shortly.

282. On 15 May 2020, the Tribunal issued Procedural Order No. 7 ("PO7") whereby:

(i)    Mr Imre Fazakas; Mr Stephan Hürlimann; Mr Robert Ježić; and Mr Josip Petrović were identified as the persons whose testimony was given on oath before the Zagreb County Court and who had either given evidence before the Tribunal in the Arbitration or had been invited by the Tribunal to appear as witnesses before it but had not agreed to do so, and upon whom agreement has been reached between the Parties.

(ii)    The Tribunal accepted the offer by the Parties to produce an agreed version (in translation) of those parts of the minutes or transcripts of the hearings before the Zagreb County Court containing the testimony given by those persons, and gave leave for such documents to be entered on the record by whatever means the Parties agreed was most convenient. The Tribunal recalled that the witness testimony recorded in any such document would not become direct evidence in its own right in the Arbitration, as it was not evidence given before the Tribunal itself under the provisions of paragraphs 18 & 19 of PO1, but was admitted solely to test the evidence already on record against relevant material that had become available in the course of the Continued Croatian Criminal Proceedings.

(iii)    The Tribunal ruled on the Claimant's other Requests to admit other testimonies in the form of a Redfern Schedule.

(iv)    The Tribunal further invited the Claimant to file an Additional Memorial by 29 June 2020 and the Respondent to file an Additional Reply by 13 August 2020.

283.    On 19 June 2020, the Claimant asked that the deadline for its Additional Memorial to be extended until 7 July 2020, with the Respondent's Additional Reply then due on 21 August 2020, so that it could incorporate a recent ruling from the Croatian courts. By separate email of the same date, the Respondent confirmed its agreement with the request. The Tribunal granted the request by email of the same date.

284.    On 6 July 2020, the Claimant, with the Respondent's agreement, requested an extension until 9 July 2020 to file its Additional Memorial. On 7 July 2020, the Tribunal granted the request.

285. On 9 July 2020, the Claimant filed its Additional Memorial along with accompanying documentation (Exhibits C-749 to C-769).

286. On 9 July 2020, the Claimant also filed an application regarding the continued Croatian criminal proceedings (the "Application on Criminal Proceedings") whereby it sought leave "to extend its principal claims in the arbitration to cover the Continued Croatian Criminal Proceedings and the verdict of the Zagreb County Court."

287. On 24 August 2020, the Respondent filed (i) its Additional Reply to MOL's Additional Memorial of 9 July 2020 with accompanying documentation, and (ii) its Response to MOL's Application on Criminal Proceedings (the "Response on Criminal Proceedings"), objecting to the Application.

288. On 25 August 2020, the Tribunal asked the Parties to confirm their availabilities for an oral hearing in the week of 14 September.

289. On 31 August 2020, the Respondent notified its availability for a conference call with the President and an oral hearing.

290. On 8 September 2020, the Claimant confirmed its availability for a call with the President in September 2020, but stated it was not available for a hearing on the proposed dates in November and suggested December dates instead.

291. On 9 September 2020, the Tribunal invited the Respondent to provide its comments, if any, on the Claimant's 8 September 2020 letter.

292. On 14 September 2020, the Respondent provided its comments on the Claimant's 8 September 2020 letter.

293. On 16 September 2020, the Parties jointly proposed dates for a further hearing.

294. On 17 September 2020, the President of the Tribunal held a conference call with the Parties to discuss the next steps in the proceeding.

295. On 18 September 2020, the Tribunal asked the Parties to confirm their availabilities for two sets of hearing dates, one in November 2020 and one in January 2021. On 24 September 2020, the Parties jointly confirmed their availabilities for 24 November 2020 (the "November 2020 Hearing") and the week of 25 January 2021 (the "January

2021 Hearing"). On 28 September 2020, the Tribunal confirmed the November Hearing and asked the Parties how many days they thought would be necessary for the January 2021 Hearing. On 19 October 2020, the Parties estimated they would need three days in January.

296. On 20 October 2020, Mr Theodore Posner informed the Tribunal of his withdrawal as counsel to the Claimant due to his retirement.

297. On 26 October 2020, the Tribunal proposed holding the January Hearing on 27-29 January 2021. On 27 October 2020, the Claimant confirmed in agreement. On 28 October 2020, the Respondent confirmed its agreement.

298. On 17 November 2020, the President of the Tribunal held a pre-hearing conference call with the Parties.

299. On 17 November 2020, the Claimant filed an application to introduce into the record a 2020 decision of the Croatian State Attorney's Office ("DORH") (the "DORH Decision") by which allegedly DORH dismissed the criminal charges filed in 2011 by the Croatian Financial Services Supervisory Authority ("HANFA") against MOL and INA executives, including Mr Hernádi, in relation to MOL's 2010 private bid for INA's majority equity stake.

300. On 18 November 2020, the Tribunal issued Procedural Order No. 8 concerning the organization of the November 2020 Hearing.

301. On 19 November 2020, the Claimant informed the Tribunal that Mr Daniel Dozsa would be leaving Dechert effective 24 November 2020 but would continue on the Claimant's team. Mr Dozsa separately provided an updated power of attorney to that effect.

302. On 24 November 2020, the Tribunal held a hearing on the Application on Criminal Proceedings by video conference. Audio and video recordings were provided to the Parties afterwards (the "November 2020 Hearing"). The following persons participated in the Hearing:

*Tribunal*:
Sir Franklin Berman                 President
Professor William Park              Arbitrator
Professor Brigitte Stern            Arbitrator

43

*ICSID Secretariat*:
  Aurélia Antonietti                              Secretary of the Tribunal

*Assistant to the Tribunal:*
  Dr Peter Webster

*For the Claimant*:

| | |
|---|---|
| Mr Arif Hyder Ali | Dechert LLP |
| Mr Alexandre de Gramont | Dechert LLP |
| Mr Michael Losco | Dechert LLP |
| Ms Tamar Sarjveladze | Dechert LLP |
| Ms Anna Avilés-Alfaro | Dechert LLP |
| Mr Dániel Dózsa | Dózsa Law Office |
| Mr Dalibor Valincic | Wolf Theiss Rechtsanwälte GmbH & Co KG |
| Mr Peter FitzGerald | Peters & Peters Solicitors LLP |
| Ms Franziska Christen | Peters & Peters Solicitors LLP |
| Mr William Boyce | QEB Hollis Whiteman |
| Dr Pál Kara | Party Representative |
| Mr Sándor Rézman | Party Representative |

*For the Respondent*:

| | |
|---|---|
| Mr Luka S. Misetic | Squire Patton Boggs |
| Mr Stephen P. Anway | Squire Patton Boggs |
| Mr David W. Alexander | Squire Patton Boggs |
| Mr Rostislav Pekar | Squire Patton Boggs |
| Mr Stephan Adell | Squire Patton Boggs |
| Mr Mark D. Stadnyk | Squire Patton Boggs |
| Ms Eva Cibulkova | Squire Patton Boggs |
| Mr Matej Pustay | Squire Patton Boggs |
| Mr Goran Jutriša | Deputy Secretary General, Government of the Republic of Croatia |

303. On 4 December 2020, the Respondent filed its response to the Claimant's 17 November 2020 application to submit as additional evidence the DORH Decision.

304. On 4 December 2020, both Parties submitted their written responses to the questions posed by the Tribunal during the November 2020 Hearing.

305. On 6 December 2020, the Claimant provided comments on the Respondent's response to its 17 November 2020 application.

306. On 7 December 2020, the Tribunal invited the Claimant to provide a reply of no more than three pages to the Respondent's letter of 4 December 2020 by 10 December 2020, with the Respondent's reply, if any, due on 14 December 2020.

307. On 9 December 2020, the Respondent provided its objections to the Claimants recent communications and asked for permission to file a short submission by 14 December 2020.

308. On 10 December 2020, the Claimant submitted its reply to the Respondent's 4 December 2020 letter.

309. On 13 December 2020, the Tribunal provided its views on the recent submissions of the Parties, decided that the responses to its questions were closed but agreed that each side could file one further brief of no more than two pages.

310. On 14 December 2020, the Respondent submitted its reply to the Claimant's 10 December 2020 letter.

311. On 14 December 2020, the Claimant informed the Tribunal that the Parties had conferred and agreed that no further briefings on the Tribunal's questions would be required.

312. On 18 December 2020, the Respondent, on behalf of the Parties, asked the Tribunal for an extension until 23 December 2020 for the Parties to submit their corrections to the hearing transcripts. The Parties submitted their corrections accordingly.

313. On 5 January 2021, the Tribunal issued Procedural Order No. 9 concerning the Claimant's 9 July 2020 Application on Criminal Proceedings.

314. The Tribunal decided that, "[i]n the light of the Claimant's indication that the evidence given at the Second Trial, and the conduct and outcome of that Trial, were not strictly necessary in order to establish its claim (although it urges strongly that it would be prudent for the Tribunal to consider them); and in the light of the Respondent's indication (which the Tribunal understands to be uncontested) that the Second Trial verdict is not as yet executory, and is moreover under appeal,"

    (i)    It reaffirmed the terms of Procedural Orders Nos. 6 and 7.

(ii)    It confirmed that the terms of §2 a. of Procedural Order No. 6 apply to the Second Trial and its verdict, and to any subsequent proceedings in the Courts of Croatia following on from them, and requested the continued assistance of the Parties in that regard under §§2, 3, and 6 of Procedural Order No. 6.

315. On 6 January 2021, the Tribunal invited the Parties to provide an agenda for the January 2021 Hearing to be held from 27-29 January 2021.

316. On 8 January 2021, the Tribunal decided on the DORH Decision and issues. It reiterated that the terms of PO6 on the submission of documents needed to be complied with and admitted into the record the DORH Decision.

317. On 14 January 2021, the Parties provided their joint agenda for the upcoming hearing.

318. On 15 January 2021, the Claimant, in response to the Tribunal's 8 January 2021 letter, submitted the 5 February 2020 Decision by the Croatian State Attorney's Office as Exhibit C-770, and a factual description agreed by the Parties. On 16 January 2021, the Respondent confirmed its agreement with the contents of the Claimant's 15 January 2021 email.

319. On 21 January 2021, the President of the Tribunal held a pre-hearing meeting with the Parties by video conference.

320. On 25 January 2021, the Tribunal issued Procedural Order No. 10 regarding the organization of the January 2021 Hearing.

321. On 27 and 28 January 2021, the Tribunal held a hearing by video conference. Audio and video recordings were provided to the Parties afterwards. The following persons participated in the January 2021 Hearing:

*Tribunal*:
Sir Franklin Berman                      President
Professor William Park                   Arbitrator
Professor Brigitte Stern                 Arbitrator

*ICSID Secretariat*:
Aurélia Antonietti                       Secretary of the Tribunal

*Observer:*
Ms Shannon Hale                          Fox Scholar (with the Parties' agreement)

*For the Claimant*:

| | |
|---|---|
| Mr Arif Hyder Ali | Dechert LLP |
| Mr Alexandre de Gramont | Dechert LLP |
| Mr Michael Losco | Dechert LLP |
| Ms Tamar Sarjveladze | Dechert LLP |
| Ms Anna Avilés-Alfaro | Dechert LLP |
| Mr Dániel Dózsa | Dózsa Law Office |
| Mr Dalibor Valincic | Wolf Theiss Rechtsanwälte GmbH & Co KG |
| Mr Michael O'Kane | Peters & Peters Solicitors LLP |
| Mr Peter FitzGerald | Peters & Peters Solicitors LLP |
| Ms Franziska Christen | Peters & Peters Solicitors LLP |
| Mr William Boyce | QEB Hollis Whiteman |
| Dr Pál Kara | Party Representative |
| Mr Sándor Rézman | Party Representative |

*For the Respondent*:

| | |
|---|---|
| Mr Luka S. Misetic | Squire Patton Boggs |
| Mr Stephen P. Anway | Squire Patton Boggs |
| Mr David W. Alexander | Squire Patton Boggs |
| Mr Rostislav Pekar | Squire Patton Boggs |
| Mr Stephan Adell | Squire Patton Boggs |
| Mr Mark D. Stadnyk | Squire Patton Boggs |
| Ms Eva Cibulkova | Squire Patton Boggs |
| Mr Matej Pustay | Squire Patton Boggs |
| Mr Goran Jutriša | Deputy Secretary General, Government of the Republic of Croatia |
| Ms Dubravka Vlašić Pleše | Advisor to the Prime Minister, Office of the Prime Minister of the Republic of Croatia |

322. Following a medical emergency of a member of the Respondent's counsel team, the final day of the January 2021 Hearing was postponed.

323. On 1 February 2021, the Tribunal invited the Parties' views on how and if to proceed with rescheduling the final day of the Hearing.

324. On 7 February 2021, the Claimant, on behalf of the Parties, submitted a proposed schedule for written rebuttals and cost submissions and asked that the Tribunal hold a final video conference with the Parties to wrap up the proceedings.

325. On 8 February 2021, the Tribunal confirmed its agreement to the Parties' proposals of 7 February 2021 and asked the Parties to provide possible dates for a final concluding session.

326. On 15 February 2021, the Claimant filed its Written Rebuttal to Croatia's 28 January 2021 Presentation.

327. On 17 February 2021, the Respondent filed its Written Rejoinder to MOL's Written Rebuttal.

328. On 27 February 2021, the Parties submitted their joint corrections to the transcripts from the January 2021 Hearing.

329. On 4 March 2021, the Parties provided their availabilities for a final concluding session.

330. On 8 March 2021, the Tribunal confirmed that the final concluding session would be held on 14 April 2021.

331. On 17 March 2021, the Respondent filed an application to admit "the formal conclusions dated 3 March 2021 of CJEU Advocate General Szpunar in Case C-741/19, *Republic of Moldova v. Komstroy (formerly Energoalians)*" into the record. On the same date, the Tribunal invited the Claimant's comments on the application by 24 March 2021.

332. On 22 March 2021, the Claimant objected to the Respondent's 17 March 2021 application.

333. On 24 March 2021, the Parties submitted their supplemental submissions on costs.

334. On 30 March 2021, the Tribunal rejected the Respondent's 17 March 2021 application and noted "that, in accordance with uncontested evidence given before it in earlier stages of the proceedings, an Advocate General's Opinion is not a judicial decision, but rather a recommendation to the CJEU as to how a case before it should be decided, and is moreover not always followed by the CJEU."

335. On 7 April 2021, the Parties submitted their reply cost submissions.

336. On 14 April 2021, the Tribunal held the final concluding session by video conference.

337. On 30 April 2021, the Parties jointly provided the Tribunal with an update on the status of the Croatian criminal proceedings.

338. On 13 September 2021, the Respondent filed an application to introduce into the record the decision of the CJEU's Grand Chamber dated 2 September 2021 in Case C 741/19, *Republic of Moldova v. Komstroy LLC.*

339. On 14 September 2021, the Claimant confirmed that it did not object to such admission into the record. On the same say, the Respondent filed the decision as Exhibit R-382.

340. On 1 November 2021, the Parties provided the Tribunal with an update on the status of the Croatian criminal proceedings noting that "in a very recent judgment, the Croatian Supreme Court dismissed appeals against the convictions of Messrs Hernádi and Sanader, and affirmed the verdicts against both."

341. On 2 November 2021, the Claimant wrote to the Tribunal to ask for an update of the status of the Award.

342. On 8 November 2021, the Tribunal wrote to the Parties inviting them, pursuant to Arbitration Rule 39(4), to present observations regarding a possible recommendation to the Parties from the Tribunal, under Arbitration Rule 39(3), to exercise restraint and avoid any measures tending to exacerbate the dispute, pending the delivery of the Tribunal's Award.

343. On 12 November 2021, the Parties filed their observations.

344. On 15 November 2021, the Tribunal wrote to the Parties indicating *inter alia* that it was taking "the opportunity, in exercise of its powers under ICSID Arbitration Rule 39(3), to reaffirm its call upon both Parties to exercise restraint and to refrain, pending the delivery of the Tribunal's Award, from taking any steps that might aggravate the dispute which is the subject of the Arbitration."

345. On 15 December 2021, the Respondent filed the Croatian Supreme Court Judgment of 7 July 2021, together with the Parties' agreed English translation as Respondent's Exhibit R-383.

346. On 15 December 2021, the Claimant wrote to the Tribunal urging "the Tribunal to issue its Final Award by the end of the year or to provide a concrete indication as to when the Award will be issued."

347. On 3 January 2022, the Tribunal pronounced the proceeding closed under Arbitration Rule 38(1), but without prejudice to Rule 38(2) read in conjunction with Rule 34, and indicated that the terms of PO6 no longer had effect. It undertook to alert the Parties in good time once there was reasonable certainty over when the Award was likely to be ready for issue.

348. On 10 February 2022, the Respondent drew the Tribunal's attention to the decision of the CJEU in *Commission v European Food SA and others* (Case C-638/19) and Croatia's application for revision the UNCITRAL award and invited the Tribunal to "admit one or both of these independent developments into the ICSID arbitral record" under Arbitration Rule 38(2).

349. On 11 February 2022, the Tribunal wrote to the Parties recalling "that the proceeding has been closed in accordance with Arbitration Rule 38 on the terms indicated in the Tribunal's message of 3 January 2022."

350. On 15 April 2022, the Tribunal informed the Parties that it had extended the period to draw up and sign the award by 60 days under Arbitration Rule 46.

## III.   FACTUAL BACKGROUND

351. The Tribunal sets out in this section of the Award what it regards as the most salient facts. For the most part, these are uncontested. The purpose is to offer an overview of the dispute and what underlies it, so as to enable the reader more easily to navigate later parts of the Award in which the Claimant's claims and the Respondent's defences against them are dealt with in detail. This section does not, therefore, seek to be comprehensive even in respect of factual matters that are not in dispute. Particular findings of fact will be made, as necessary, at the appropriate point. The paragraphs that follow are, for the most part, set out in chronological order, not thematically, so as to permit a better picture to be gained of the way in which the relations between the Parties developed over the period in issue in the Arbitration.

352. In 2003, the Claimant, MOL, a significant energy company in Hungary, acquired from the Croatian State a 25% plus one shareholding in the Croatian corporation, INA, for a purchase price of USD 505 million. INA was at the time (and still is) Croatia's most

significant enterprise in the field of energy and had previously been wholly State owned.[1] The Claimant's investment represented the initial stage in the process of its privatisation set in train by an Act of the Croatian Parliament of March 2002 (the "INA Privatisation Act").[2] The privatisation represented in turn an element in Croatia's move towards membership in the European Union ("EU").

353. The terms of the INA Privatisation Act are the subject of closer analysis later in this Award.[3] Four of its main points are:

a) The privatisation procedure in Article 4 foresaw: (i) the transfer without charge of 7% of INA's shares to Croatian War Veterans and members of their families, (ii) the sale of up to a further 7% to INA's employees, (iii) the sale of up to 25% plus one share to a 'strategic investor,' (iv) a sale of at least 15% of INA's shares by way of public offering. It foresaw finally (v) a sale or swap of the remaining shares in accordance with market conditions, either to the strategic investor or on the capital market; this would be on the basis of a decision of the Croatian Government and subject to the prior consent of the Croatian Parliament.

b) The same Article provided that the Republic of Croatia "shall retain the ownership over 25% plus one share of INA d.d., which shall be privatised on the basis of a separate law upon the admission of the Republic of Croatia to the European Union."

c) Article 6 makes detailed provision for the selection of the strategic investor *via* open public tender, and for the Government of Croatia to determine the precise number of shares to be sold to the strategic investor.

d) Article 10 ("Protection of interests and safety of the Republic of Croatia") deals with the sale of further shares while the Croatian State remains a substantial shareholder. Its terms (in English) and their meaning are in dispute between the Parties, and will be considered below.

---

[1] Decision on Croatia's Rule 41(5) Application, para. 14.

[2] C-005.

[3] In response to the Tribunal's request, the Parties reported themselves unable to reach full agreement on an English translation; the points in dispute will be noted as appropriate later on.

354. The Claimant took part in the public tender process and was invited, alongside OMV Group of Austria and Rosneft Oil Company of Russia, to submit a formal offer. The other short-listed candidates did likewise, and a process of individual negotiation ensued, leading to final and definitive bids from each.[4]

355. The Claimant was declared the winner in July 2003, and duly acquired 25% plus one share.[5]

356. The Claimant and the Croatian Government thus became the two major shareholders in INA, and concluded on 17 July 2003, the same day as the Claimant acquired its shareholding, a Shareholders' Agreement (the "SHA") to regulate the relations between them.[6] The Tribunal highlights the following terms of the SHA:

   a) Clause 7 made provision in respect of corporate governance and specifically regarding the composition of the Supervisory Board and Management Board; a shareholder with a shareholding of between 25% and 50% had the right to appoint two members (out of seven) to the Management Board and two members (also out of seven) to the Supervisory Board. A shareholder which owned more than 50% of the shares had the right to nominate four members of each Board. Any remaining seats were to be filled in accordance with the Articles of Association and Croatian law.

   b) Clause 7 also gave the Claimant co-decision rights regarding certain reserved matters.

   c) Clause 6.1 set out the nature of INA's business, and Clause 6.2 provided that "[t]he parties shall co-operate in good faith and use their best efforts to ensure that INA is able to carry on the Business after Completion in the manner contemplated by Clause 6.1."

   d) By Clause 9.1.1, the Croatian Government undertook that if it "grants, at any time, its approval to any investor, other than the Strategic Investor, to acquire more than

---

[4] Resp. Counter-Memorial, para. 363.
[5] Resp. Counter-Memorial, para. 373.
[6] R-018.

ten percent (10%) of the issued share capital of INA, pursuant to Article 10, Paragraph 4 of the Privatisation Law, such approval will be given to the Strategic Investor subject to the same conditions".

e)   Clause 9.1.3 provided that Croatia "will use its reasonable efforts, subject to Croatian law, to assist INA to obtain all licences that it needs …".

357.  Between 2005 and 2007, Croatia continued implementing the privatisation process as required by the INA Privatisation Act. In 2005, Croatia transferred 7% of INA's shares to the Croatian War Veterans' Fund; in 2006, the Government listed INA's shares on the Zagreb Stock Exchange Market and sold 16% of them through public offering and in 2007, Croatia sold 7% of INA's shares to INA's employees.[7]

358.  Croatia passed the Gas Market Act on 30 March 2007,[8] containing various provisions on which the Claimant relies, as is addressed in more detail below. In particular, the Claimant complains about later contraventions of various provisions of the Gas Market Act by measures introduced in 2014 (the "Gas Market Measures").[9]

359.  By April 2007, discussions in a shareholders meeting between representatives of the Claimant (including Mr Hernádi) and the Respondent (Minister of Economy Polančec and Minister of Finance Šuker) had touched *inter alia* on the determination of future gas prices and on a possible renegotiation of the SHA.[10]

360.  By the beginning of 2008, the Croatian Government had privatised more than 50% of INA's shares by divesting itself of further shares (*e.g.* to the Veterans' Fund). However, the Government retained an approximately 44.85% shareholding.[11] The Respondent's contention is that at that stage it continued to have overall control over INA because the 7% of shares held by the Veterans' Fund were under Government influence and therefore amounted to an effective majority together with the Government's shareholding.[12]

---

[7] CLEX-014.

[8] C-063.

[9] See para. 414 below.

[10] C-068, paras. 7 & 9.

[11] Resp. Counter-Memorial, para. 45.

[12] Resp. Counter-Memorial, para. 46; see also para. 592(4) below.

361. In 2008, the Claimant made a further acquisition of INA shares.[13] The course of events is the subject of disagreement between the Parties and is considered in more detail below. It had initially been envisaged that there would be a share swap, by which the Government would have acquired shares in MOL in exchange for shares in INA.[14] In addition, the Claimant would make a public offer for further INA shares.[15] There was also discussion in this context of amending the SHA.[16]

362. In the event, the Claimant's public offer for INA shares was made before the share swap had been finalized; moreover, shortly after the public offer opened, the financial crash of 2008 happened. The offer was thus locked open at a price that looked very favourable, given the effect of the crash on stock market prices, and this led to the Claimant acquiring a considerable volume of shares, including the 7% from the Veterans' Fund, thus becoming INA's largest shareholder without need of the envisaged share swap. The Claimant thus held approximately 47.16% of INA's shares,[17] while Croatia's holding remained at approximately 44.85%.

363. Despite not proceeding with the share swap, the Claimant and Croatia did proceed with amending the SHA on 30 January 2009, by the First Amendment to the Shareholders' Agreement ("FASHA"). On the same date, they also concluded the Gas Master Agreement ("GMA").[18]

364. The reasons behind the GMA and FASHA, and the process by which the Croatian Government agreed to them, are vigorously disputed between the Parties (and now form part of the Respondent's corruption allegation; see further below). In summary, the Respondent says that an impasse had been reached in the Claimant's efforts to take control over INA, which it took the alleged bribe to unlock and, moreover, that the corporate governance structure imposed by the FASHA violated Croatian companies law, whereas the Claimant contends that the agreements were broadly considered and approved on the

---

[13] Cl. PHB Vol. II, para. 86; Resp. Counter-Memorial, para. 54.

[14] Cl. Memorial, paras. 59-60; Resp. Counter-Memorial, paras. 49-51.

[15] Resp. Counter-Memorial, para. 49.

[16] Cl. PHB Vol. II, Section 4.3.2.

[17] Cl. PHB Vol. II, paras. 83-86; Resp. Counter-Memorial, para. 54.

[18] C-011 and C-010 respectively.

Croatian side, and that there were legitimate reasons for entering into them both. The key features of the FASHA and GMA are as follows.

FASHA

a) The FASHA[19] amended the provisions in the SHA regarding INA's corporate governance; the Supervisory Board would now have nine members, of whom the Government would have the right to nominate three and the Strategic Investor the right to nominate five (Clause 7.1).

b) The Management Board was to comprise six members, with the Government and the Strategic Investor having the right to appoint three members each, but MOL having the right to nominate the President who would have the casting vote in the event that votes were tied (Clause 7.2).

c) There was, as before, a list of reserved matters; any resolution before the Supervisory Board relating to a reserved matter would require the affirmative vote of seven out of nine members (Clause 7.3).

d) Clause 7.6 recorded agreement that the corporate governance structure would be reviewed and re-considered on or prior to the second anniversary of the FASHA's effective date, though not so as to affect the established nomination rights.

e) The FASHA also introduced (i) a five year "lock-up" period, during which the Claimant could not, without the Croatian Government's consent, transfer any shares it held in INA (Clause 11); (ii) a right of first refusal in favour of the Government in the event that the Claimant sought to sell its stake (Clause 11.7); and (iii) a right to repurchase shares held by the Claimant in the event of certain changes of corporate control over MOL (Clause 11.6).

GMA

a) The GMA[20] provided for INA's gas storage activity and its gas trading activity to be unbundled from INA and the resulting Gas Storage Company and Gas Trading

---

[19] C-011.
[20] C-010.

Company, Prirodni Plin ("PP"), to be transferred as soon as reasonably possible to the Government (or a designated entity) at fair business value (recital B).

b) Croatia was to acquire the gas storage business by 31 January 2009 (Clause 3.1.1), and the – loss-making – gas trading business, by no later than 1 July 2009 (Clause 3.2.1). On 30 January 2009, INA spun off its gas storage business and Croatia acquired this business. However, Croatia did not comply with the obligation in the GMA to acquire the gas trading business (PP) by 1 July 2009. As is set out below, this date was later postponed to 1 December 2010 by Clause 2.2. of the First Amendment to the Gas Master Agreement ("FAGMA"), concluded on 16 December 2009,[21] but Croatia did not comply with that obligation either and, so far as the Tribunal is aware, still has not acquired PP.

365. The Respondent contends, as indicated above, that before the GMA and FASHA were concluded in January 2009, the Claimant had arranged to bribe the Prime Minister of Croatia, Dr Ivo Sanader, through a Mr Robert Ježić as intermediary. This corruption allegation lies at the heart of the dispute before the Tribunal, and forms the subject of Section V.B below. For the moment, the Tribunal notes certain facts which are not in essence disputed and which form key elements in the allegation.

366. On 26 May 2009, Dr Sanader met with Mr Hernádi and Mr Petrović (then a member of INA's Management Board) in Dr Sanader's office in the Croatian Government buildings in Zagreb. Mr Ježić also had a meeting with Dr Sanader that day. Both visits are recorded in the official visitors log.[22] The details of what was discussed at these meetings are vigorously disputed between the Parties; the Respondent adopts Mr Ježić's account that he used the occasion to tell Dr Sanader that the money had not yet arrived, whereupon Dr Sanader called Messrs Hernádi and Petrović back, after which he told Mr Ježić how the money was to be paid;[23] whereas the Claimant, relying in particular on Mr Hernádi's evidence, contends that the purpose of calling Mr Hernádi back was to discuss an issue of ethane supply from INA which Mr Ježić had raised in respect of his company, Dioki d.d.

---

[21] C-015.
[22] C-165; C-166; R-033.
[23] Resp. PHB Vol. III, paras. 293-298.

The Claimant contends further that the subject of Mr Hernádi's discussion with Dr Sanader was the importance of getting speedy approval of the FASHA by the Croatian Competition Authority.[24] The significance of the June date was that, if not met, it would have delayed MOL's ability to take over management control potentially by several months, which would in turn have been a critical issue for MOL, affecting its ability to consolidate INA into its accounts, against the background of its reporting obligations to its banks on 30 June.[25]

367. Reverting to the largely undisputed facts, in 2009 (the timing is disputed), Mr Stephan Hürlimann, Mr Ježić's long term tax advisor, met in Switzerland with a Mr Imre Fazakas.[26] Mr Hürlimann was a director of Xenoplast & Shipping AG ("Xenoplast"), a Swiss company in which Mr Ježić was closely involved, though there is much disagreement about the ownership of Xenoplast either then or since. Mr Fazakas is a Hungarian businessman. It is not disputed that he had acted at the time (and may still act) as a consultant for MOL, but he also had other business interests and did not act exclusively for MOL, and it is in dispute whether he was acting on MOL's behalf on the occasion in question.

368. There is much dispute about virtually every aspect of the meeting between Mr Hürlimann and Mr Fazakas: who approached whom to set it up, what was discussed, and on what basis. However, two contracts were subsequently concluded between Xenoplast (on the one hand) and two Cypriot companies on the other, Hangarn Oil Products Trading Ltd ("Hangarn"), a company with which MOL had a substantial long term oil supply contract, and Ceroma Holdings Limited ("Ceroma"):

    a) A "Consultancy Agreement"[27] with Ceroma dated 3 June 2009 which recited the principal's "interest … in obtaining financing for delivery of substantial quantity of raw materials and related products" to be marketed within the EU, but the "Project" was not further defined. Xenoplast was to provide "full consulting

---

[24] Cl. Reply Vol. II, paras. 120-146.
[25] Transcript, 24 February 2017, pp. 1018-1019.
[26] C-162.
[27] R-008.

services" including identification and selection of sources of finance and various legal and organizational services, in return for a flat fee of Euro 4.8 million payable in two equal instalments, one upon signature of the agreement and the second on 31 December 2009 "[i]n the event that the Project is successfully settled". The Agreement was to expire if the Project had not been finalized on or before 31 December 2009, unless extended by mutual agreement.

b) A "Consultancy and Service Agreement"[28] dated 4 June 2009 with Hangarn, which was stated to be "acting on behalf of a large Russian company." The Agreement required Xenoplast "to support [the Russian company] in connection with its business activities in Croatia and other countries of the former Yugoslavia", in the shape of lobbying, development of contacts, media relations, marketing, and general public relations, in return for which a flat fee of Euro 5.2 million was to be payable in two instalments, the first upon signature and the second on 31 December 2009. The contract was effective retroactively from 1 January 2008 and ran for one year, automatically renewable for one further year unless notice was given one month before the due expiry date.

369. Under these contracts, therefore, Euro 5 million was due to be paid to Xenoplast in June 2009 (by a combination of payments from Ceroma and Hangarn) and Euro 5 million in December 2009 (again by a combination of payments). Xenoplast received the first Euro 5 million on 17 and 18 June 2009 (as set out in paragraph 371 below). The second instalment was never paid.

370. A matter of days after the conclusion of these two contracts, the Competition Authority approved the FASHA[29] and the General Assembly of INA voted on the appointment of new Supervisory Board members, thereby implementing the FASHA within INA,[30] thus vouchsafing the Claimant management control over INA.

---

[28] R-009.
[29] Resp. Counter-Memorial, para. 103.
[30] R-047.

371. The two initial payments under the contracts with Hangarn and Ceroma were received into Xenoplast's account with Credit Suisse shortly afterwards, on 17 and 18 June 2009: Euro 2.6 million from Hangarn and Euro 2.4 million from Ceroma.[31]

372. On 1 July 2009, Dr Sanader resigned as Prime Minister and was in due course succeeded by his former Deputy, Ms Jadranka Kosor.[32]

373. On 3 July 2009, MOL sent a notice of breach of the GMA to the Government.[33]

374. On 31 July 2009, INA and PP concluded a Long-Term Gas Supply Agreement.[34]

375. On 19 October 2009, Messrs Sanader, Ježić and Hernádi met at the Marcellino restaurant, a popular location in governing circles in Zagreb.[35] Virtually all details are however contested: who met whom in what order and at what time, for what purpose, and what was discussed.

376. The following day, Dr Sanader and Mr Ježić flew together to Milan to a football match, in a private plane chartered by Mr Ježić's company, and went on the following day to Zurich, where they met Dr Sanader's brother, Flavio;[36] the details of what transpired on the way to Milan are however contested, as is the purpose and result of the side journey to Zurich.

377. On 8 December 2009, it was reported in the Croatian press that the Croatian State Attorney's Office ("DORH") had stated on its website that it had been asked to review the contract which gave MOL control of INA, and the related GMA, to determine whether they were detrimental to Croatia.[37] There were further reports that the President of Croatia had said that prosecutors should review the contracts to see why MOL had been granted full management rights.

---

[31] R-010 and R-011 respectively.
[32] R-052.
[33] C-090.
[34] C-430.
[35] C-168.
[36] C-160.
[37] C-102.

378. By letters dated 14 December 2009, Ceroma and Hangarn terminated the agreements with Xenoplast.[38] The Hangarn letter recited serious dissatisfaction with Xenoplast's "activity in connection with [the agreement]", and the Ceroma letter that the contract was "partly fulfilled, but after the partial payment … your activity was stopped for a not understandable reason". In each case, however, there was no request for reimbursement of the Euro 5 million already paid, and the terms of the termination expressly allowed Xenoplast to retain it.

379. Following the Respondent's alleged breaches of the GMA, negotiations took place between the Claimant and the Respondent, and culminated in the FAGMA.[39] Material provisions of the FAGMA are as follows:

    a) The Government's purchase of MOL's 100% share in PP would be postponed until 1 December 2010 (Clause 2.2).

    b) Provision was made for determination of the natural gas price to tariff and privileged customers.

        (i)    Clauses 4.1.1 and 4.1.2 laid down that INA "shall be enabled to perform" certain specified increases in the gas price to tariff customers and privileged customers effective from 1 January 2010.

        (ii)    Clauses 4.2 to 4.5 contained provisions regarding further gas price increases.

    c) Clause 6 included provisions regarding the mining fee (*i.e.,* royalty) for the exploitation of hydrocarbons.

380. Subject to the Respondent's contentions that these agreements are null and void (see below) or otherwise not binding on it, it is not in dispute that the Respondent refused to comply with various of its undertakings under the GMA and FAGMA.[40] The breaches of the FAGMA alleged by the Claimant include:[41]

---

[38] R-012.

[39] C-015.

[40] Resp. Counter-Memorial, para. 881.

[41] Cl. PHB Vol. VII, paras. 42-47.

a) Croatia did not acquire PP by 1 December 2010 (or at all), in breach of Clause 3.2.

b) Croatia raised hydrocarbon royalty rates beyond the agreed limits, in breach of Clause 6.

c) Croatia did not secure price increases from Hrvatska Elektropriveda d.d. ("HEP") and Petrokemija.

d) Croatia did not secure price increases for sales to households (*i.e.,* tariff customers), which PP had requested in April and July 2010.

381. On 24 September 2010, the Croatian State Attorney issued a public statement to the effect that the management rights acquired by the Claimant were disproportionately high in relation to its ownership stake in INA, and that in consequence his Office was "convinced" that there had been an overstepping of authority in the negotiations with Mr Polančec (the responsible Government Minister).[42]

382. Towards the end of 2010, the Claimant sought to acquire further shares in INA; a minute for the Board described the rationale for reaching majority shareholding as being to abolish the dependence of MOL's sole control on the Shareholders' Agreement's enforceability and thus eliminate its "exposure to the Government's compliance with private contracts."[43] It was proposed to acquire up to the total of the free floating shares (around 8%) *via* a private offer process, and on 2 December 2010, MOL publicly announced its intention to acquire up to 800,910 shares at a premium of 60% over market price.[44]

383. On the following day, the Croatian Financial Services Supervisory Authority ("HANFA") ordered the suspension of trading in INA's shares on the Zagreb Stock Exchange "until the public has been correctly and properly notified of the circumstances regarding the offer of [MOL], which will be determined by [HANFA] …".[45] The suspension remained in effect for 11 days, until 14 December 2010.[46]

---

[42] C-106.

[43] C-114.

[44] C-115; Cl. Memorial, para. 146.

[45] C-117.

[46] C-123.

384. On 6 December 2010, HANFA issued a public notice stating that, although MOL and the Croatian Central Depository and Clearing Company ("CDCC") had announced they would be requesting its opinion about certain aspects of the share offer, no such written request had yet been received. It added that, in view of "the media speculations about the potential actions of the parties concerned" which had neither been confirmed nor denied by them, the suspension of trading would remain in force.[47]

385. The Claimant denies that any such announcement had been made by it or CDCC. On the following day, however, MOL did apply to HANFA for an opinion confirming the view that, acting in concert, it and Croatia between them exceeded the threshold of 75% of the voting rights in INA and therefore that MOL, if acquiring further INA's shares, would not be obliged under the relevant legislation to launch a takeover bid.[48]

386. On 10 December 2010, the Croatian Government issued a press release,[49] quoting Prime Minister Kosor as saying that the Government was "on the point of finding a solution [sc. concerning MOL's bid] and we believe it will be achieved in accordance with Croatia's strategic and national interests".[50] It referred to a separate announcement from the Ministry of Economy that the Croatian Government "shall also accept informal agreements with all investors, whose goals and intentions correspond to the goals of the Government regarding the protection of ownership, investments and management in the energy sector."[51]

387. On 13 December 2010, HANFA issued and published the opinion that had been requested of it (the "HANFA Opinion") confirming that the Claimant might proceed without making a takeover bid.[52] The HANFA Opinion added, in its final paragraph:

> "Finally, the Agency believes[53] that MOL should refrain from the purchase or sale of the shares of INA on the regulated market of the

---

[47] C-533.

[48] R-322.

[49] See also a separate statement at C-557.

[50] C-473.

[51] Ibid.

[52] C-123.

[53] In answer to questions from the Tribunal, Ms Fijačko clarified when giving evidence that "holds" would be a better translation. See Transcript, 27 July 2017, p. 19.

Zagreb exchange during the validity of the respective share purchase bid, in order to avoid a possible suspicion of market manipulation or misuse of privileged information."

In an accompanying public statement, HANFA issued the warning that:

"4. By accepting this offer, investors undertake to transfer shares of INA d.d. to MOL, and acceptance of the offer cannot subsequently be withdrawn. Given the unpredictability of the movements of the price of shares of INA d.d. on the regulated market of the Zagreb Stock Exchange, it is possible that the market price will deviate from the price stated in MOL's offer, whether it be lower or higher than the one stated in MOL's offer. In the event that the market price is higher than the price in MOL's offer, the entire risk of the difference in the price shall be borne by the investor himself, particularly having in mind the inability of subsequent withdrawal of acceptance of the offer."[54]

388. The Parties are in dispute about the effect of the HANFA Opinion, and in particular whether the final paragraph (which was apparently not in the draft prepared by the responsible Department)[55] constituted a prohibition on MOL purchasing INA's shares during the period of its offer.[56]

389. When trading of INA shares resumed on 14 December 2010, the four Croatian mandatory Pension Funds had in place an offer price slightly higher than the Claimant's bid, and as a result, acquired substantial volumes of INA shares, which as at the date of closing submissions in this case they retained.[57]

390. On 15 December 2010, the Claimant's private offer was issued through the CDCC.[58] The documentation was sent to the CDCC at 3.09 pm on 14 December 2010, *i.e.,* after trading had already resumed on the stock exchange.[59] It is common ground that the Claimant was not permitted to increase the price while the offer remained open.

---

[54] PM-033.

[55] Transcript, 27 July 2017, p. 40.

[56] In an e-mail of 13 December 2010, MOL's external counsel reported that "the Chairman of HANFA has just called me and repeated their opinion/order not to purchase shares on the market, not even tomorrow" (C-532).

[57] Cl. Memorial, para. 171.

[58] Gašparović-041.

[59] PM-036.

391. On 15 December 2010, the Claimant lodged a complaint with HANFA alleging market manipulation by the Pension Funds, and/or use of privileged information.[60] HANFA dismissed these complaints on 17 December 2010,[61] and rejected later requests for reconsideration of that decision[62] and for the initiation of "direct supervision" over the Pension Funds' transactions related to INA's shares.

392. On 16 December 2010, HANFA, referring to comments made on behalf of the Claimant at a press conference complaining about "non-transparent, unfair, unclear and unfriendly" actions in the market, issued an order to the Claimant to stop coming forward in public with unverified information in relation to the trading in INA shares.[63]

393. On 28 March 2011, HANFA issued a decision that a temporary stop on trading of INA shares was necessary because of purchases by foreign investors.[64] The stop was to last until the end of 1 April 2011, though the Claimant contends that trade was suspended for almost the entirety of 2011.[65]

394. On 29 March 2011, Prime Minister Kosor was reported as stating that the Government would not allow there to be majority ownership of INA, and that a formal decision to that effect would be put to the Cabinet at its forthcoming session.[66]

395. On 18 May 2011, HANFA issued a reasoned decision declaring that MOL had engaged in market manipulation in its General Offer for purchase of INA shares of 15 December 2010 through its dissemination of false and misleading information by disguising the true purpose of its Offer.[67]

396. On 25 May 2011, Mr Ježić and Mr Hürlimann attended the State Attorney's Office for the Suppression of Corruption and Organised Crime ("USKOK") in Zagreb, were questioned,

---

[60] Gašparović-047.
[61] C-131.
[62] C-132.
[63] C-130.
[64] Gašparović-050.
[65] Cl. PHB Vol. VI, para. 53.
[66] C-126.
[67] C-133.

and made statements.[68] Prior to making his statement, Mr Ježić had already been in prison, having been arrested in relation to different allegations of corruption, but had been released on 21 April 2011.[69] The circumstances in which these interviews took place are in dispute (in particular, what had gone on beforehand), as is the accuracy of USKOK's record of the statements themselves:

    a)  Mr Hürlimann's statement covered the contracts concluded with Xenoplast and his dealings with Mr Fazakas in Switzerland.[70]

    b)  Mr Ježić's statement concerned what he described as a request by Dr Sanader to arrange receipt of money on Dr Sanader's behalf that was going to be paid by MOL, and in particular an encounter with Mr Hernádi and Mr Petrović sometime at the end of May 2009, as Messrs Hernádi and Petrović were leaving the Government building in Zagreb.[71]

397.  On 8 September 2011, Mr Ježić made a second statement to USKOK, in which he provided more details of what he said had happened to the money and about his encounter with Mr Hernádi and Mr Petrović, which was now recorded as having taken place in a room outside Dr Sanader's office.[72]

398.  On 2 June 2011, Prime Minister Kosor issued a Croatian Government decision to approve entering into negotiations with MOL for the amendment of the SHA and the FASHA;[73] the decision nominated a three-person negotiating commission comprising the Ministers of Economy and Finance and the President of the INA Supervisory Board, Davor Stern.

399.  On 4 June 2011, Mr Stern sent to colleagues, including the State Secretary at the Ministry of Economy, an email about the basis for negotiations, in which he stated "[t]his shall be a long and difficult battle but we can't underestimate the opponent nor think about anything else but victory. The support in public in politics shall be very important."[74] On

---

[68] C-162 & C-163.
[69] C-504.
[70] C-162.
[71] C-163.
[72] C-159.
[73] C-155.
[74] C-156.

15 June 2011, Mr Stern sent a further email stating, among other things, that "the Act about 49% needs to be proposed again, so that we won't wake up into 50% ownership by MOL when the trade begins."[75]

400. On 20 June 2011, Croatian media reported the leaked news of Mr Ježić's allegation of bribery and a "secret investigation" by USKOK.[76]

401. On 22 July 2011, Mr Popijač, the Minister of Economy, wrote to the Claimant and proposed that "until the settlement of all the objective circumstances, as strategic partners and greatest shareholders to restrain ourselves from further acquisition of [INA] shares and to maintain the present shares of the shareholders structure of [INA]".[77]

402. On 29 July 2011, the Ministry of Economy revoked the hydrocarbon exploration licences held by INA over three areas: Sava, Drava and Northwest Croatia,[78] on the stated ground that INA had failed to comply with the obligation to commence exploration works in the relevant licence areas by 31 March 2011 at the latest. The revocations were challenged before the Croatian courts, but the challenges were not decided for some time.

403. Article 72 of the Croatian Gas Market Act had provided that the Croatian Government could, from the date of entry into force of the Act until 1 August 2011, determine for a specified time the highest level of certain specified gas prices.[79] This was amended in August 2011 by a decree which varied Article 72 of the Act so as to make the power permanent, and exercisable by reference to "protecting the economic interest of the Republic of Croatia and ensuring international competitiveness taking into account the prices of gas on the international market for the same or similar categories of eligible customers."[80]

---

[75] C-290.
[76] C-731.
[77] C-125.
[78] C-184; C-185; C-186.
[79] C-063.
[80] CLEX-060.

66

404. In August 2011, Dr Sanader was questioned by USKOK regarding the FASHA and GMA, and on 23 September 2011, he was indicted on the criminal charges of abuse of office and accepting a bribe.[81]

405. In September 2011, Mr Popijač's Ministry produced a draft Bill to amend the INA Privatisation Act. The draft included reference to the importance of combating corruption, and included proposals to prohibit anyone other than Croatia from acquiring more than 49% of shares in INA, while requiring any shareholder who had previously acquired more than 49% of regular shares in INA to relinquish the excess.[82] On 24 September 2011, Ms Kosor was reported as saying that the reason behind the amendment was "reasonable doubt that someone had received a bribe in the privatisation process."[83] The amendment was not, however, passed by the Croatian Parliament.[84]

406. On 27 October 2011, the Croatian Government adopted and published in the Official Gazette the following decision:[85]

> "The State's Attorney Office of the Republic of Croatia is called to, in accordance with the constitutional and statutory powers, take all necessary measures by instituting legal proceedings and obtaining provisional measures in order to protect the ownership and management rights of the Republic of Croatia in INA d.d., Zagreb, and given the fact that certain criminal proceedings were launched related to the acquisition of ownership and management rights in INA d.d., Zagreb, by MOL - Hungarian oil and Gas Plc."

407. Dr Sanader's trial began in November 2011 in the Zagreb County Court.[86]

408. In the same month, the Respondent wrote to the Claimant raising various concerns about INA's operation and management, and placing on notice that, given "the charges [that] had been raised for corruption associated with INA d.d.", it would only negotiate on the

---

[81] Calvert-Smith-025.
[82] C-200.
[83] CLEX-094.
[84] The Act was, however, amended in 2019.
[85] C-018.
[86] Calvert-Smith-004.

basis of documents that were in force before the signing of the SHA, GMA, and FAGMA.[87]

409. On 30 January 2012, the Hungarian authorities, who had earlier rejected a mutual legal assistance request from Croatia for the interrogation of Mr Hernádi, issued a press *communiqué* stating that, following their own wide-ranging investigation and consideration of a large volume of evidence, they had come to the conclusion that no criminal act had been committed by MOL's managers in MOL's interest, and the investigation had therefore been closed.[88]

410. Dr Sanader was convicted on both charges in November 2012;[89] the written judgment was handed down on 1 July 2013.[90] The grounds for conviction included that "at the beginning of 2008," Dr Sanader had arranged with Mr Hernádi that, for the payment of Euro 10 million, he would do everything in his power to conclude the changes and amendments to the SHA, leading to the result that, without any basis, Croatia would grant MOL a prevailing influence over INA and would agree to detach the loss-making gas business from INA to be taken over by Croatia.

411. Following the conviction of Dr Sanader, Croatia submitted in September 2013 a renewed request to Hungary for mutual legal assistance and USKOK applied to the Croatian courts for and was granted an order for the pre-trial detention of Mr Hernádi,[91] on the strength of which it issued a European Arrest Warrant against Mr Hernádi on 1 October 2013.[92]

412. On 26 November 2013, the Claimant lodged its Request for Arbitration, and in an amended form on 20 May 2014.

413. On 17 January 2014, Croatia submitted a request of its own for a separate arbitration under the UNCITRAL Rules.[93]

---

[87] C-113.
[88] C-017.
[89] C-171 & C-321.
[90] C-170.
[91] C-173 & C-174.
[92] C-175.
[93] C-177.

414. On 27 February 2014, the Croatian Government adopted the Gas Market Measures which took effect on 1 April 2014:

a) Decision 2014-489 nominated Hrvatska elektroprivreda d.d. ("HEP"), a state-owned power company, to assume until 31 March 2017 the role that had previously been held by INA's subsidiary, PP, as the entity which was to sell gas to public service suppliers for use by households.[94]

b) Decision 2014-487 specified the price at which INA was obliged to sell gas to HEP.[95]

c) Decision 2014-488 specified the price at which HEP could sell to suppliers of household consumers.[96]

d) Decision 2014-490 specified the quantities of gas that INA had to sell to HEP.[97]

e) Decision 2014-491 obliged the gas storage facility operator Podzemmo skladištĕ plina d.o.o. ("PSP") to allocate 70% of the storage space in the gas storage system in the Okoli facility to the designated supplier on the gas wholesale market *i.e.,* HEP.[98]

415. PP's existing contract for storage of gas in the Okoli facility was due to end on 31 March 2014.[99] Consequent on the Gas Market Measures, a bidding procedure was instituted by the Croatian authorities for future storage rights at the Okoli facility.[100] The deadline for submitting bids, 1 March, came shortly after the publication online of the Gas Market Measures. PP participated, but failed to secure the quantity of storage that it sought, the four Standard Bundled Units ("SBU") allocated to it being insufficient for the gas it had in storage. An application by PP for permission to export gas in storage was left unanswered, leading to PP selling significant volumes of gas at a loss.[101] The reasons for

---

[94] C-030.
[95] C-031.
[96] C-033.
[97] C-032.
[98] C-034.
[99] Cl. PHB Vol. VII, para. 15.
[100] R-335.
[101] Cl. PHB Vol. VIII, paras. 179-180.

PP not being able to obtain the storage it sought, and whether PP acted reasonably when this situation emerged, are disputed.

416. On 31 March 2014, Mr Hernádi was indicted by the Croatian authorities on a charge of bribery, with a motion that he be tried *in absentia*.[102]

417. Dr Sanader's conviction for bribery and abuse of office was confirmed by the Croatian Supreme Court in April 2014.[103] Dr Sanader lodged an appeal with the Constitutional Court on constitutional grounds.

418. On 12 May 2014, the Respondent submitted its Application for summary dismissal of the proceedings under Arbitration Rule 41(5).

419. On 20 May 2014, the Claimant submitted its Request for Arbitration in an amended form, and on 16 June the Respondent submitted its 41(5) Rule Application in supplemented form.

420. Before a decision had been rendered on the court challenges (paragraph 402 above), Minister Vrdoljak (who had by then replaced Minister Popijač in the Ministry of Economy) announced on 17 July 2014 a new onshore tender round which covered certain of the areas included in the licences that INA had held before their revocation.[104]

421. In late 2014 the Croatian High Administrative Court upheld INA's challenges to the revocation of the Sava, Drava and Northwest Croatia licences.[105]

422. The licences were then revoked once more, the Sava and Northwest Croatia licences on 10 November 2014 and the Drava licence on 20 February 2015.[106] These further revocations were also challenged by INA before the Croatian courts.[107]

423. On 2 December 2014, the Tribunal issued its Decision rejecting the Respondent's Rule 41(5) Application and declining to stay the proceedings until the Croatian criminal

---

[102] C-176.

[103] C-172.

[104] C-193.

[105] Cl. PHB Vol. II, para. 315; C-187; C-188; C-189.

[106] Cl. PHB Vol. II, para. 316; C-190; C-191; C-192.

[107] DA-12; DA-14; DA-16.

proceedings had been fully resolved and the UNCITRAL arbitration had been fully adjudicated.

424. On 24 July 2015, Dr Sanader's appeal was upheld by the Constitutional Court, which quashed his convictions and ordered a retrial.[108] The principal ground was the following:

> "Introduction of additional elements into the proceedings, in particular the one regarding the court's presentation of evidence that the agreements executed between MOL and the Government were contrary to the interests of the Republic of Croatia, eventually clouded the distinction between the individual criminal responsibility of the prime minister for accepting a bribe and political responsibility of the Government for the executed agreements. It also created an external impression that the applicant, as prime minister, was tried not only for the criminal offence of accepting a bribe that he had been charged with, which is contrary to the guarantees of a fair trial in a democratic society based on the rule of law."

425. When the fresh proceedings so ordered were commenced, they were in fact a new trial of Dr Sanader as First Defendant but now alongside Mr Hernádi as Second Defendant *in absentia*.[109] This time there was only one single charge of bribery against both. The trial proceedings lasted for some considerable time.

426. On 23 December 2016, the UNCITRAL tribunal issued its final award.[110]

427. On 22 November 2016, the Administrative Court in Zagreb rejected INA's challenge against the second Drava revocation.[111] On 17 March 2017, it did so regarding the Sava revocation[112] and on 29 January 2018 regarding the Northwest Croatia revocation.[113] By decision dated 24 May 2017, the High Administrative Court rejected INA's appeal against the decision regarding Drava.[114]

---

[108] C-178.

[109] It seems as if Dr Sanader was also absent from the retrial on the ground of his state of health.

[110] C-648.

[111] Koprić-004.

[112] R-367.

[113] R-372.

[114] R-369.

428. On 14 June 2018, the Croatian High Administrative Court upheld an appeal by INA against the Administrative Court of Zagreb's Sava decision of 17 March 2017, reversed the decision of the Ministry of Economy of 10 November 2014 and sent the case back for reconsideration.[115] On 7 September 2018, the Ministry of Environmental Protection and Energy once more revoked INA's Sava licence.[116]

429. By decision dated 27 September 2019,[117] the High Administrative Court of Croatia rejected INA's appeal against the Administrative Court's decision upholding the Ministry of Economy's cancellation of INA's Northwest Croatia exploration licence.[118]

430. By written judgment dated 15 June 2020, the Zagreb County Court convicted both Defendants on the charge of bribery, and sentenced Dr Sanader to six years in prison and Mr Hernádi to two.[119] The convictions were based on a finding that the two Defendants had agreed, in return for Euro 10 million, to ensure the conclusion of an amendment to the SHA which would give MOL a predominant influence over INA even though there was no basis for it in MOL's shareholding, and had agreed (in the GMA) to separate INA's loss-making gas operations and transfer them to the Croatian State. The Euro 5 million that had been paid to Xenoplast was declared confiscated to Croatia, and Dioki Holding (the Swiss corporation) was ordered to surrender it within 15 days on pain of enforcement.

431. Both Defendants lodged appeals with the Croatian Supreme Court, which were rejected and the convictions upheld on 7 July 2021.[120]

---

[115] C-746.

[116] C-747.

[117] R-380.

[118] Parties' agreed summary of the judgment, sent by email dated 17 February 2020.

[119] C-751.

[120] R-383.

## IV.   JURISDICTION AND ADMISSIBILITY

432. The Respondent's preliminary objections first saw the light of day in the form of the grounds it put forward in its Application under Arbitration Rule 41(5) for summary dismissal of the arbitration proceedings initiated by the Claimant. This Application was rejected by the Tribunal on 2 December 2014 (see paragraphs 362-374 above and Annex A). In paragraph 52 of its Decision, the Tribunal took note of the fact that the rejection of the Respondent's preliminary objections under Rule 41(5) was without prejudice of any kind, as the Rule itself declares, to the Respondent's right to raise any of them in subsequent stages of the Arbitration pursuant to Rule 41(1).

433. In arriving at its Decision on the Respondent's Rule 41(5) Application, the Tribunal explained that the issue before it was whether the matters raised by the Respondent were sufficiently 'clear and certain' to enable them to be determined in summary proceedings, or whether they should be stood over to be determined in the normal way in a jurisdictional phase or on the merits. As, however, it had reached the conclusion that none of them could be properly decided without full opportunity to assess, amongst other things, the treaty, contractual and other legal arguments or to establish all the facts relevant to a proper understanding of the acquisition and operation of the Claimant's investments in Croatia, they could not, therefore, be determined within the framework of Rule 41(5). The Tribunal then went on, in paragraphs 48-50 of its Decision to give illustrative examples of why it felt compelled to that conclusion. In particular: as regards the objection relating to Annex IA to the ECT, the Tribunal was of the view that, other things apart, the issue, if seriously pursued, would require a detailed examination, against the limited amount of documentation publicly available, of the history and negotiation of the ECT; and, as regards the objection relating to the forum selection clauses in the SHA, the FASHA, and the GMA, the objection raised serious, and not straightforward, issues as to the relationship between treaty claims and contract claims.

434. From that point onwards, the preliminary objections did not take what might be called the 'exclusive' route of a separate preliminary objection under Arbitration Rule 41(1). Once it appeared that the Respondent did indeed wish to advance objections to the Tribunal's jurisdiction to hear the Claimant's claims or to the admissibility of those claims, a

procedural agreement was in due course reached between the Parties and the Tribunal entailing that all claims from either side would be argued and ultimately heard together in a single hearing (though, as matters turned out it was a series of hearings) on both jurisdiction and merits. Thus, the Respondent's preliminary objections were formally advanced in the form of chapters in its Counter-Memorial, and answered in the same way as part of the Claimant's Reply; and the exchange of written submissions culminated in a Rejoinder by the Claimant confined to jurisdiction and admissibility alone, in response to the Respondent's Rejoinder.

435. As they appeared, then, from the Counter-Memorial onwards, the Respondent's objections can be summarized by the Tribunal as follows –

   a) The bribery (as alleged by the Respondent) has the effect of depriving the Tribunal of jurisdiction or alternatively rendering the Claimant's claims inadmissible on various grounds, either in itself or in view of its effect on the legal status of the contractual arrangements that lie at their heart.

   b) The dispute settlement regime of the ECT is in any case inoperative in respect of disputes between claimants and respondents within the European Union ("EU").

   c) MOL is in any event barred from bringing claims under the 'umbrella clause' in Article 10(1) of the ECT in consequence of Hungary's inclusion in Annex IA to the ECT.[121]

436. The bribery allegations have come to take centre stage throughout these lengthy arbitral proceedings. They are also complex, and they relate in different ways both to issues of jurisdiction and admissibility and in addition to issues more closely associated with the merits of the Claimant's claims. They will therefore be dealt with separately, and as a single whole, in a later section of this Award. For the moment, and in the specific context of jurisdiction, the Tribunal will address the two objections listed as b) and c) above, but in the reverse order.

---

[121] Annex IA of the ECT is headed "List of Contracting Parties Not Allowing an Investor or Contracting Party to Submit a Dispute Concerning the Last Sentence of Article 10(1) to International Arbitration (in accordance with Articles 26(3)(C) And 27(2)". The Contracting Parties listed are Australia, Canada, Hungary and Norway.

A.   ANNEX IA TO THE ECT

437.   The essence of the Respondent's submission is that the listing of Hungary in Annex IA should be treated as a reservation to the ECT by Hungary, or as having equivalent effect to a reservation, and should therefore be interpreted as precluding a Hungarian corporation from advancing claims against Croatia under the last sentence of Article 10(1) ECT, in the same way as it undoubtedly does preclude a Croatian corporation from advancing claims of that kind against Hungary.[122] The governing legal text to be applied, either directly or by analogy, would be Article 21(1) of the Vienna Convention on the Law of Treaties, according to which a reservation duly established with regard to another party both modifies for the reserving State in its relations with that other party the provisions of the treaty to which the reservation relates to the extent of the reservation; and "modifies those provisions to the same extent for that other party in its relations with the reserving State."

438.   The first question to be determined by the Tribunal is thus whether the listing of Hungary in Annex IA is indeed to be regarded as a reservation by Hungary duly established with regard to Croatia.

439.   There are many reasons that would make it difficult to hold that the listing of four States in Annex IA constitutes, in law, reservations to the ECT by the States in question.

440.   The most obvious, and at first blush apparently decisive, objection is the prohibition of reservations to be found elsewhere in the ECT, in its Article 46. This is in outright and all-embracing terms: "[n]o reservations may be made to this treaty." The Tribunal is not aware of any case in which an international tribunal has found in favour of the existence of a purported reservation in the face of an internal prohibition of that kind, nor has any such precedent been put forward by the Respondent in argument. The Respondent relies on an extract culled from the International Law Commission's Guide to Practice on Reservations to Treaties of 2011, to the effect that '[w]hen a treaty prohibits reservations to all or certain of its provisions, a unilateral statement formulated in respect of those provisions … constitutes a reservation if it purports to exclude or modify the legal effect of certain provisions of the treaty … in their application to its author.'[123] However, this argument by

---

[122] Resp. Counter-Memorial, paras. 324-332.
[123] Resp. Counter-Memorial, para. 328; RA-149.

the Respondent inadmissibly conflates two basic ideas: the making of a reservation (referred to in the Vienna Convention on the Law of Treaties as its "formulation") and on the other hand its legal effect. In so doing, the Respondent's argument distorts the International Law Commission's evident intention, which appears with crystal clarity in what the Commission itself says, as cited in full by the Respondent. In its opening sentence, the Commission's Guideline 1.3.3 puts forward the common-sense proposition that, if a treaty contains a prohibition on reservations, then a unilateral statement by a contracting State "shall be presumed not to constitute a reservation."[124] It further lays down that if, by contrast, a different intention in fact appears from the text, then the statement must be classed as a purported reservation. But no more than that. The Guideline itself says nothing about the <u>status or effect</u> of this purported reservation – though the Commission, in its Commentary, does indeed go on to say quite plainly in paragraph (3) that "if the statement actually purports to exclude or modify the legal effect of the provisions of the treaty and not simply to interpret them, then it must be considered to be a reservation <u>and the consequence of article 19, subparagraphs (a) and (b) of the … Vienna Conventions is that such a reservation is impermissible and must be treated as such</u>".[125] This is of a piece with the Commission's comment later on, in the rubric to Chapter 3 of the Guidelines, that it has retained the concept of permissibility to indicate the process of determining whether a unilateral statement was <u>capable of producing the effects attached in principle to the formulation of a reservation</u>. That fits together, too, with the Commission's even more emphatic statement, in Guideline 4.5.1, that "[a] reservation that does not meet the conditions of formal validity and permissibility … <u>is null and void, and therefore devoid of any legal effect</u>"[126]. It follows that, far from lending any support to the Respondent's contentions as regards Annex IA, the International Law Commission's Guidelines are flatly to the contrary.

441. It might indeed be inferred from the preceding paragraph that the fact that Annex IA appears as part of a treaty complex that includes Article 46 serves as powerful confirmation that it cannot have been intended by the Parties to the ECT as constituting a

---

[124] RA-149.

[125] Ibid (emphasis added).

[126] Ibid (emphasis added).

set of 'reservations' in the usual sense which that term bears in the law of treaties. There are, however, numerous other reasons why the Tribunal is driven to the same conclusion.

442. In pride of place among them is that Annex IA does not meet the well-established definition of a treaty reservation laid down in Article 2(1)(d) of the Vienna Convention. As cited by the Respondent itself, this reads: "a unilateral statement, however phrased or named, made by a State, when signing, ratifying, accepting, approving or acceding to a treaty, whereby it purports to exclude or to modify the legal effect of certain provisions of the treaty in their application to that State." There is however no evidence before the Tribunal either (a) that Annex IA ever came into being as a unilateral statement, singly or jointly, by Hungary and the other three States listed; or (b) that anything resembling a unilateral statement ("formulated in writing and communicated to the contracting States and other States entitled to become parties to the treaty" as required by Article 23 of the Vienna Convention) took place when Australia, Hungary or Norway signed the ECT; or (c) that Hungary, at the time it became party to the ECT on ratification,[127] was doing other than simply giving its formal consent to be bound on the terms that had been settled in advance by the Contracting States collectively in their negotiation of the ECT. As to (a) in particular, the responses from the Parties to a question posed by the Tribunal during the Rule 41(5) phase of the proceedings confirm that the four countries listed in Annex IA were already so specified in the Treaty text as it was opened for signature on 17 December 1994, which excludes therefore the notion of something more being done unilaterally at the time of signature and ratification. As to (b) and (c) there is, from the point of view of form, nothing of any kind within the terms of the ECT that would allow for the procedures expressly laid down in the Vienna Convention as requirements for the making and communication of reservations or responses to them. The point is made not for abstract formalistic reasons, but because of the clear signal it offers that what the sophisticated negotiators had in mind was not a reservation.

443. Nor is there any equivalent signal in that direction in the terms in which the negotiators chose for Articles 26 & 27 of the ECT themselves. Article 26(3) contains three sub-

---

[127] In April 1988 for Hungary; of the other three States listed, Canada has not signed the ECT, Australia and Norway have signed but not ratified.

paragraphs, all of equal status. Sub-paragraph (a) lays down in straightforward terms the formal expression of consent ("unconditional consent") by each Contracting Party to the submission of disputes between Contracting Parties and Investors to international arbitration or conciliation. Sub-paragraphs (b) and (c) then put this together in equal and parallel terms with the two sets of circumstances in which that consent is <u>not</u> given, which it does by reference to Annexes ID and IA and the States listed in each. Something broadly similar is done in Article 27(2) in respect of inter-State disputes between Contracting Parties, except that here the main proposition and the limitations to it are wrapped up together in one sentence in one single paragraph. That can only be taken, in the view of the Tribunal, as showing that the relevant consents to arbitration were never given in the first place by the States listed in those two Annexes. The Tribunal observes that in any event Article 26(3)(a) itself specifies that the general consent it embodies is given "in accordance with the provisions of this Article." The inclusion of this phrase has, to the eyes of the Tribunal, an effect identical to that of Article 27, that is to say that the general consent given in sub-paragraph (a) cannot properly be interpreted as covering at all, even in principle, the limitations then dealt with in sub-paragraphs (b) and (c). The conclusion must therefore be that, far from being a process by which any individual Contracting State unilaterally 'purports to exclude or to modify the legal effect of certain provisions of the treaty in their application to that State,' Annex IA is in effect little more than additional detail. It is there to serve the purpose of making complete the operation of Articles 26 & 27 by specifying the four States who give the more limited consent, but without entailing the reciprocity linked with a reservation.

444. The Claimant makes a further point arising out of the language texts of paragraph (3)(a) of Article 26. It draws attention to the fact that, whereas the English text refers in a neutral fashion to the consent by "each Contracting Party" to the submission of "a dispute" to arbitration, the Spanish text refers more directly to such consent by "the Contracting Parties" in respect of "<u>their</u> disputes" (sus controversias) [emphasis added].[128] In so doing, says the Claimant, the Spanish text makes plain that each Party is directing its consent simply towards those disputes to which it itself is a party, without reference to the situation

---

[128] Cl. PHB Vol. IV, para. 13.

of its own investors vis-à-vis other States.[129] The Tribunal is not inclined to make much of this slight linguistic variation, but notes it as yet one further small indication pointing in the same direction as the conclusion it had itself arrived at.

445. The Tribunal is therefore unable to find any indication of an intention on the part of those negotiating the ECT to set up in Articles 26 and 27 and Annex IA a special and limited regime of reservations that would carry with it the inherent rule of reciprocity under the general law of treaties (Article 21 of the Vienna Convention). Any such rule of reciprocity would have to be grounded on some other legal foundation.

446. The Respondent's submission is, however, that a reciprocity rule should in fact be read into Annex IA and the associated substantive provisions of the ECT. The Tribunal approaches this submission with caution. As indicated above, no precedent has been cited to it of an international tribunal interpreting a treaty so as to circumvent an explicit prohibition on reservations contained within it. To do so would break new ground, with obvious implications for the stability of treaty relations, and could only be contemplated in compelling circumstances.

447. The Respondent invokes a general principle of reciprocity, which it contends is a fundamental tenet of public international law. Notwithstanding this ostensibly 'fundamental' character, the Respondent cites as its only supporting authority a sentence in the Introduction to Judge Simma's Hague Lectures of 1994 and his short article on *Reciprocity* in the Max Planck Encyclopaedia of International Law, and the general reference to "complementarities and mutual benefits" amongst the purposes of the ECT set out in Article 2.[130]

448. To take the last of these first, the Tribunal cannot regard this brief and non-specific phrase in the ECT's preamble as adequate authority for the far-reaching consequences which the

---

[129] Cl. PHB Vol. IV, para. 14.

[130] Resp. Counter-Memorial, paras. 344-345. The Respondent cites also, in a slightly different context, the arbitral awards in *AES Summit Generation Limited and AES-Tisza Eromu Erömü Kft v. The Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010 (RA-028) ("*AES v. Hungary*") and *Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 (RA-029), but as these were both cases of investors seeking to invoke the excluded part of Article 10(1) against Hungary, the question of reciprocity did not arise (Resp. Counter-Memorial, paras. 337-338).

Respondent seeks to derive from it.[131] Much the same goes for the more directly relevant reference to the Max Planck Encyclopedia. The Tribunal takes it as self-evident that the broad notion of mutuality which underlies international treaties as contractual instruments does not in any way restrict the sovereign prerogative of negotiating States to decide for themselves in the individual case what balance of rights and obligations represents, for them, an acceptable mutual bargain. Judge Simma's article in the Max Planck Encyclopedia is, understandably, in broad terms, and its three paragraphs on treaties contain no support for the idea that the general principle he is discussing can operate so as to override or modify the actual agreed terms of the treaty itself; he seems in fact, to the eyes of the Tribunal, to be saying exactly the contrary.[132] It is by no means unknown in international practice for States consciously and expressly to decide that the burden of right and obligation will fall differently on different treaty parties, or groups of treaty parties, striking contemporary examples being the Treaty on the Non-Proliferation of Nuclear Weapons and the UN Framework Convention on Climate Change. Similarly, where treaty parties wish differential treatment in the form of an opt-out to have reciprocal effect, the means lie easily in their hands so to provide, as was in fact done in the ECT itself in Article 45(2) in respect of provisional application. Moreover, the evidence from the ECT's negotiating record helpfully unearthed by the Parties' researches, shows that it had in fact been considered whether to handle the matter by way of reservations, but that this had been expressly rejected in favour of the scheme we now see in the text.[133] Putting all this together, the Tribunal is compelled to the conclusion that a reciprocity of effect cannot properly be read by implication into Annex IA and the associated provisions of the ECT.

---

[131] Likewise for Judge Simma's glancing reference in his Hague Lectures to "a reciprocity-based framework for diplomatic and consular relations, for legal transactions in the form of treaties, and for the protection of Foreigners" (RA-153).

[132] "… the realization of such reciprocity or mutuality of advantages in the terms of a treaty, while postulated on the political level as a principle of negotiation, is not required under general international law. Thus, the validity of a treaty devoid of substantive reciprocity … cannot be challenged because of this deficiency itself but only if the lack of reciprocity has been brought about by illegal means, eg through a threat or use of force contrary to the United Nations Charter …" (CA-035).

[133] Cl. Reply Vol. II, para. 668.

449. That is not, however, in the Tribunal's view, the end of the matter. Its task remains to give effect to Articles 10(1) and 26, and Annex IA, in their proper interpretation. The guideline for doing so must, as is commonly accepted, be that laid down in Article 31(1) of the Vienna Convention, namely, to determine in good faith the ordinary meaning to be given to those provisions in their context and in the light of the object and purpose of the ECT.

450. As indicated above, Articles 26 & 27, as completed by the listings in Annexes IA & ID, set out the consents to arbitration given by the Contracting Parties on ratification of the ECT. In their application to Croatia, these provisions entail the right of an investor from another ECT Party to invoke arbitration for resolution of an investment dispute, including (under Article 10(1)) a dispute over Croatia's 'observance of any obligation it has entered into with the investor or its investment.' The scope and coverage of that phrase is not however, in the view of the Tribunal, self-explanatory. The Claimant submits that it extends so far as to confer on the present Tribunal jurisdiction over alleged breaches of various contractual arrangements entered into in respect of the management of MOL's investment in INA, notably the FASHA, the GMA and the FAGMA.[134] The Respondent disputes this, not merely on the more fundamental grounds discussed above, but also because it alleges that those agreements are invalid in law (the law of Croatia).[135]

451. The Tribunal cannot accept the Claimant's proposition. There is no need for it to decide how far Article 10(1) does constitute a means for the enforcement of contractual obligations, but to the extent that it does, those obligations run in both directions. In this regard, the Tribunal is of the view that a principle, if not of reciprocity, then at least of mutuality, does apply; Article 10(1) cannot attach to the obligations solely of one side to agreed contractual arrangements, but must have in view the totality of the mutual obligations falling on both sides. Any given contractual promise cannot be taken on its own, divorced from the rest, but must be looked at in the context of the contract as a whole, in all its terms. To do otherwise would amount to rewriting a contract for the benefit of one of the parties to it, and for that there is no warrant at all in Article 10(1). That being so, the Tribunal regards it as of crucial importance that the contracts principally in question

---

[134] Cl. Memorial, Section IX.A.
[135] Resp. Rejoinder Vol. II, para. 443.

(see above) contain their own dispute settlement provisions, freely agreed between the parties to them, and that these provisions state themselves to be all-embracing, final, and exclusive. All are in substantially identical terms: "[t]he dispute resolution procedures set forth in this Clause … shall, as between the parties, be the binding and exclusive means to resolve all disputes. … All disputes which may arise between the Parties out of or in relation to or in connection with this Agreement which are not settled as provided in … shall be finally settled by arbitration in accordance with UNCITRAL. … Awards rendered in any arbitration hereunder shall be final and conclusive … There shall be no appeal to any court …".[136]

452. These provisions are clear and unambiguous. It is on record that they have in fact been resorted to, in parallel with the present Arbitration, in relation to the self-same contractual agreements. It is likewise on record that this has resulted in an arbitral award, which has in turn been cited to the present Tribunal in the particular context of the bribery allegations which will be dealt with below.

453. The Tribunal draws the following conclusions from the above –

   a) The Tribunal has not been accorded jurisdiction under the ECT to sit in judgment over the essential validity of the SHA, FASHA, GMA or FAGMA, or over alleged breaches of them, in place of the dispute settlement provisions laid down in those agreements themselves.[137]

   b) The Tribunal has no power to review or to revise decisions that may have been handed down by an UNCITRAL tribunal under those provisions.

   c) Conversely, the Tribunal retains jurisdiction to hear disputes between the Parties to the present proceedings over whether the performance of those agreements by the Respondent does or does not conform to Croatia's substantive obligations arising out of the first four sentences of Article 10(1) of the ECT. As the tribunal put the matter in *AES v. Hungary*, "the Tribunal considers that it has the right and

---

[136] R-018, Art. 15.1 & 15.2 (SHA); C-010, Art. 4.8.2.1 & 4.8.2.2 (GMA); preserved in operation by C-010, Art. 1.1 (FASHA); C-015, Art. 1.1 (FAGMA).

[137] The Respondent argued in the Rule 41(5) proceedings that the submission of contract disputes to UNCITRAL arbitration, far from being antithetical to the ECT, is precisely in line with the alternatives opened in Article 26 (Resp. Reply on Preliminary Objections, paras. 72-74).

duty to determine whether … conduct – which includes acts that could have breached contractual obligations – violated a specific Treaty obligation. In making this assessment, the Tribunal should not be considered to be analyzing the performance of contractual obligations as such."[138] The present Tribunal respectfully agrees. It is merely a reflection of the well-established distinction between treaty claims and contract claims.

d) In making that determination, the Tribunal will, pursuant to Article 26(6), decide the issues in dispute before it in accordance with the ECT and applicable rules and principles of international law, not, that is, by applying whatever may be the proper law of the contracts themselves.

## B.   THE ECT AND EU MEMBER STATES

454.  The Tribunal can therefore turn to the second of the Respondent's jurisdictional objections ((b) above), namely that arbitration under ECT Article 26 is not available to an investor of one EU Member State in an investment dispute with the Government of another EU Member State (the "EU objection").

455.  In its original version as set out in the Respondent's Counter-Memorial, the EU objection was both absolute and outright: the ECT as a whole was radically incompatible with the EU legal order; it could not have been intended to apply as between EU Member States; on Croatia's accession to the EU, incompatible rights and obligations previously contracted by it under treaty were automatically superseded as a matter both of EU law and international law; this resulted both from the substantive overlap between the material content of the ECT and the EU's internal legal and regulatory regime, and from the clash between arbitration under the ECT and the exclusive primacy of the EU's judicial system.[139]

456.  By the time of the Respondent's Rejoinder, the EU objection had quietly moderated itself into something more limited and specific, supported by the expert report of an eminent authority in EU law. It now based itself on an asserted conflict between Article 26 of the

---

[138] *AES v. Hungary* (RA-028), para. 9.3.5.
[139] Resp. Counter-Memorial, Section VII.

ECT and mandatory provisions of EU law on the settlement of disputes relating to EU law, namely, Articles 267 and 344 of the Treaty on the Functioning of the EU ("TFEU"). The specific ground of conflict was said to be that the contours of the present dispute would require the Tribunal to interpret and apply provisions of EU law, whereas Article 344 TFEU prohibits the submission of any dispute concerning the interpretation or the application of the EU Treaties to any method of settlement "other than those provided for therein," and Article 267 provides for a reinforcing mechanism in that regard (a request for preliminary rulings from the Court of Justice of the European Union ("CJEU") which was not however open to an arbitral tribunal, as it did not qualify as a court or tribunal of an EU Member State for the purposes of that Article. ECT Article 26 therefore became inapplicable upon the accession of Croatia to the EU on 1 July 2013, and there was accordingly no valid offer to arbitrate which MOL could accept when initiating the present Arbitration.[140] But the Respondent maintained its alternative submissions: that the obligations of EU Member States *inter se* constituted 'international law' which was thus to be applied by the Tribunal pursuant to Article 26(6) of the ECT; or that those obligations represented at least, and specifically as between Croatia and Hungary, "relevant rules of international law applicable in the relations between [them]" and were therefore to be taken into account in the interpretation of the ECT under Article 31(3)(c) of the Vienna Convention.[141] The Tribunal proceeds on the basis that the above represents the objection before it, on which it must now pronounce.

457. The preceding paragraph reflects the state of affairs at the time of the Hearings on jurisdiction and merits in 2017. By the time of the further Hearings on jurisdiction and merits in March 2018, the CJEU had handed down a judgment on an Article 267 request for a preliminary ruling from the courts of the Federal Republic of Germany, in which it held (citing also the principle of sincere cooperation under Article 4(3) of the Treaty on European Union) that the above provisions of the TFEU "precluded" investor-State arbitration clauses like that in the Germany-Czechoslovakia BIT. This judgment (the "*Achmea* judgment")[142] was entered onto the record and was the subject of extended

---

[140] Resp. Rejoinder Vol. II, paras. 502-520.
[141] Resp. Rejoinder Vol. II, paras. 508-509.
[142] *Slovak Republic v. Achmea BV*, CJEU, Case C-284/16, 6 March 2016 ("*Achmea* judgment") (RA-343).

debate between the Parties at the 2018 Hearings and since, on the basis of detailed written as well as oral evidence from the eminent legal experts on both sides.

458. The Tribunal invited the Parties in PO6 to keep it informed, *inter alia*, of decisions by the EU Council of Ministers as to action that should be taken by EU Member States in the light of the *Achmea* judgment, and of any further judicial decisions of the CJEU having a direct bearing on the application or otherwise of that judgment to the ECT.

459. Thereafter, after the conclusion of the final closing submissions and the further Hearings described in paragraphs 313-336 above, the Parties jointly entered onto the record under PO6 a further judgment of the CJEU (the "*Komstroy* judgment"),[143] again on an Article 267 request for a preliminary ruling (this time from the French courts), on a specific point of law which is not relevant to the circumstances of the present dispute. In giving judgment, however, the CJEU added certain observations, though they appear at first sight to be *obiter*, about the ECT, to the effect that ECT Article 26(2)(c) "must be interpreted as not being applicable to" disputes between an EU Member State and an investor of another Member State.

460. The Tribunal does not believe that either the *Achmea* or the *Komstroy* judgments in and of themselves have an effect on the decision that lies before it. It recognizes however that the judgments define authoritatively the obligations under EU law of one EU Member State towards another, and will take that into account, so far as may be relevant, in what follows.

461. Before proceeding to its decision on the EU objection, the Tribunal would like to express its sincere appreciation to the two expert witnesses, Professor Sir Alan Dashwood QC and Professor Paul Craig QC, for the very high quality of their expert evidence, which has been delivered in an exemplary manner and has been of inestimable help to the Tribunal in disentangling and then getting to grips with the issues of EU law involved, which are far from straightforward.

462. The Tribunal will approach the substance of the EU objection under three heads:

---

[143] *Republic of Moldova v. Komstroy LLC*, CJEU, Case C-741/19, 2 September 2021 ("*Komstroy* judgment") (R-382).

a) Does the dispute before it require the Tribunal to decide issues of EU law?

b) If so, would that have the effect of depriving the Tribunal of its jurisdiction to decide the dispute either in part or as a whole?

c) Without prejudice to the questions above, is there some more radical legal obstacle, deriving from the obligations of Member States under the EU constitutional treaties, that prevents the Tribunal from exercising whatever jurisdiction it would otherwise have under the ECT?

**(1)     The GMA & FAGMA and EU law**

463. Question a) can be disposed of summarily. The Tribunal is fully aware of the fact that the Parties are in sharp dispute as to whether the GMA and the FAGMA infringe binding provisions of EU law, and consequently as to the legal validity of those instruments under the law of Croatia. In the light of paragraph 453 above, however, it is clear that it does not fall within the competence of the Tribunal to pronounce either upon the validity of those agreements or on their breach. In respect of those agreements, the answer to question a) is therefore No, from which it follows that question b) falls away. This conclusion does not however in itself entail that those agreements and their performance lose all relevance for the issues which arise for decision in the Arbitration. As set out in paragraph 453, the Tribunal's competence remains intact over whether the performance of those agreements by the Respondent conforms to its substantive obligations under Article 10(1) of the ECT. The Tribunal will in this context consider whether undertakings freely given by Croatia or on its behalf in concluding those agreements did or did not amount to 'obligations' of the kind foreseen in the last sentence of Article 10(1), irrespective of whether such 'obligations' were contractually enforceable or had been given in other, non-contractual, forms.

**(2)     Investor-State arbitration within the EU**

464. It results from the above that the main and most substantial issue arising out of the EU objection is the one summarized in question c) above, namely, whether investor-State arbitration under the ECT is fundamentally excluded within the EU. That this has emerged

as the central issue is as the Tribunal believes it should be, given the weight and depth of the argument presented to it and the importance of the underlying issues.

465. It should be noted that, as mentioned above, the actual scope of the Respondent's objection modified itself in the course of the written proceedings. It should also be noted that the pending question then changed contours again by virtue of the fact that the *Achmea* proceedings before the CJEU, which had been mentioned in the Parties' written submissions, came to judgment very shortly before the oral Hearings on jurisdiction and merits held in March 2018, and could thus be taken into account by the two eminent expert witnesses and in their cross-examination, as well as in questioning by the Tribunal. It should finally also be recalled that (see above) the *Komstroy* proceedings before the same court have recently resulted in a further judgment, which is now on the record in these proceedings but, given its timing, could not by definition have been taken into account by the experts in their evidence, although it transpires that they had, in fact, been able to foresee some of the issues that might arise in it.

466. The erudite exposition by the expert witnesses of the relevant precepts of EU law relating to external (*i.e.,* non-EU) courts and tribunals, and in particular how these precepts have been developed judicially by the CJEU and its predecessor, has been of great benefit to the Tribunal in its attempts to grapple with doctrines that can occasion difficulty and even some surprise among lawyers accustomed to operating within the field of international law. This evidence having been heard, the main impression it left behind in the minds of the Tribunal was a basic doubt as to whether, in the event, it should be regarded as relevant to the question for decision by the Tribunal at all. That is because, as a member of the Tribunal pointed out during the witness examination, the expert evidence situated itself entirely within the EU legal order, whereas both experts (quite understandably) declined to profess any expertise in regard to the international legal order, that being the legal order within which this Tribunal has its origin and which provides the legal framework for its powers and functions.[144] In other words, the expertise on EU law, informative as it is, becomes largely irrelevant for the ascertainment of the Tribunal's jurisdiction.

---

[144] Transcript, 13 March 2018, pp. 976-978.

467. In a sense this conclusion is reassuring. That is because the essential plank in the Respondent's EU objection, from its original form onwards, has been that to decide the dispute the Tribunal would have to pronounce with binding effect on questions of EU law, which would be impermissible in the light of Croatia's obligations under the EU treaties. This was later reinforced by the Respondent's reliance on the *Achmea* judgment, with the further twist that the same conclusion would follow if a tribunal <u>might possibly</u> have to decide questions of EU law. These propositions give rise to the following intellectual puzzle: if the Tribunal were to follow the Respondent's submission by declining jurisdiction, it would on the face of it have to do so by reaching delicate conclusions about EU law; but even if it were on that basis to arrive at the 'right' decision, it would have got there precisely by the path it was not authorized to take. That would seem to lead to the result that its decision would be, from the viewpoint of EU law, at the same time both correct and legally invalid. The Tribunal put this conundrum to the expert witnesses, and neither had a satisfactory answer to it. So absurd a conclusion suggests strongly, however, that the legal theory behind it is questionable.

468. That said, the Tribunal's discussion with the two experts in a joint session did lead to a number of agreed conclusions which are of some significance, on any account, for the correct analysis of the questions which the Tribunal must answer on the way to determining its jurisdiction. Principal among them are the following –

> (i)     The extent of the Tribunal's jurisdiction is a question of international law, and does not fall for determination under the law of the EU.

> (ii)     The judgments of the CJEU are not binding on the Tribunal.

> (iii)     The EU and its Member States signed and ratified the ECT pursuant to a collective decision that they would each do so.

> (iv)     The policy behind that decision was at no time, either then or since, referred to the CJEU for a formal Opinion as to its compatibility with the EU treaties.

> (v)     The accession to the ECT by the EU, re-emphasized quite explicitly by its formal declaration as to the division of competences in respect of dispute

settlement with investors, pledged the EU's full faith to all of its terms, including Articles 26 & 27 with their references to international arbitration.

(vi) No competent expert, asked at the time, or subsequently when Croatia acceded to the EU, would have raised any doubt as to the competence of the EU to enter into those obligations, or as to their lawfulness.

469. Against that background, the Tribunal proceeds to its decision on the Respondent's EU objection. As already indicated, the question is to be decided by the application of international law, and more specifically the law of treaties. No other conclusion is permitted by the terms of Article 26(6) of the ECT, with their exclusive reference to "in accordance with this treaty and applicable rules and principles of international law." The Tribunal has no authority under the ECT to apply EU law as such. The Respondent maintains, however, that, inasmuch as the provisions of EU law on which it relies to support its objection are contained in or arise out of the basic EU treaties, they fall within that description of 'applicable rules and principles of international law.' In the alternative, it maintains that those provisions equally fall within the category of "any relevant rules of international law applicable in the relations between the parties," which the Tribunal should take into account "together with the context" under Article 31(3)(c) of the Vienna Convention when it comes to interpreting the ECT.[145] The Tribunal does not however believe that either of those propositions adds anything, in the present context, to the operation of the basic rules of treaty law laid down in the Vienna Convention, as will be demonstrated.

470. The Tribunal starts from the viewpoint that, stated quite simply, the essential question it has to answer is whether Croatia did or did not give a standing and unconditional consent to arbitration which MOL could in turn accept. For the reasons already given above, the Tribunal holds that consent of that kind was given by and became binding on Croatia at the time of its ratification of the ECT. The only basis on which that position could have changed, so long as the ECT remains in effect and in force between Croatia and Hungary (the parent State of MOL), would therefore be some further, supervening treaty relationship entered into at some later date which had the effect, in law, of overriding or

---

[145] Resp. Rejoinder Vol. II, paras. 508-509.

varying, as between those two States, the consent Croatia had given. The question therefore becomes a straightforward one of the application of successive treaties relating to the same subject matter, for which the Vienna Convention lays down a specific regime in its Article 30,[146] although the <u>application</u> of this regime in particular cases can be less than straightforward. The provisions of Article 30 must, of course, be read and applied in the context of and in combination with the remaining provisions of the Convention.

471. The terms of Article 30 directly relevant to the present case read as follows:

> "1. … the rights and obligations of States Parties to successive treaties relating to the same subject matter shall be determined in accordance with the following paragraphs.
>
> 2. When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.
>
> 3. When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.
>
> 4. When the parties to the later treaty do not include all the parties to the earlier one … (a) as between States Parties to both treaties the same rule applies as in paragraph 3 ….
>
> 5. Paragraph 4 is without prejudice … to any question of responsibility which may arise for a State from the conclusion or application of a treaty the provisions of which are incompatible with its obligations towards another State under another treaty."

472. Other potentially relevant provisions of the Vienna Convention can be found in Articles 27, 28, 41, 46, and 58.

473. The way in which Article 30 applies to the present case would therefore be conditioned by whether or not the ECT and the EU treaties do 'relate to the same subject matter' and to what extent they should be regarded as mutually incompatible. Of equal importance, though, is to determine which constitutes the earlier treaty and which the later treaty. In the present case, that last question raises unusual issues.

---

[146] VCLT Art. 30 (Application of successive treaties relating to the same subject matter).

474. Concerned as those judgments are only with the position within the four walls of the EU legal order, this question is not touched upon in either of the two CJEU judgments mentioned above. The Respondent concedes that Croatia, when a non-Member State, gave the unconditional consent to arbitration laid down in Articles 26 and 27 of the ECT. Its submission is, however, that Croatia's subsequent attainment of EU membership through the Treaty of Accession constituted a later treaty, and the effect of that later treaty was to supersede that consent by the internal arrangements within the EU for deciding legal disputes relating to investments by persons or enterprises of one Member State in the territory of another.[147]

475. That proposition is, however, questionable. The chronology appears to the Tribunal to be as follows:

- 1956-1993 – EU basic treaties culminating in the TEU (Maastricht Treaty) and the TFEU;

- 1994 – ECT concluded in on a coordinated basis by the EU and its Member States, ratified in 1997, and came into force in 1998 – conclusion of ECT by Croatia on the same dates;[148]

- 2001 – Treaty of Nice concluded to facilitate accession of new Member States, came into force 2003;

- 2011 – Croatian Treaty of Accession to the EU concluded, entered into force 2013.

476. It seems to the Tribunal axiomatic that when Croatia (and the other new Member States) acceded to EU membership, their relationship to the ECT can only have become identical to that of the earlier Member States. It is unthinkable that the new Member States can have acquired, on accession, a different set of rights and obligations towards their fellow Members under Articles 26 and 27 from that which had obtained at that moment under the ECT as between the earlier Member States. But for the earlier Member States the EU constitutional treaties cannot possibly be regarded as later treaties for the purposes of Article 30 of the Vienna Convention; it is the ECT which is plainly the later treaty. It must

---

[147] Resp. PHB Vol. II, paras. 122-123.
[148] Signature December 1994, ratification December 1997.

follow that it is only in the event that something in the post-accession EU treaties – specifically the Treaty of Nice (2003) or the Treaty of Lisbon (2009) – can plausibly be asserted to be incompatible with Articles 26 & 27 ECT that the 'successive treaty' argument might be capable of producing the effect which the Respondent wishes. But no such argument has been put to the Tribunal, neither in the Respondent's written and oral pleadings nor in the evidence of the expert witnesses. The argument advanced has centred on Articles 4(3), 267 and 344 whose origin lies far further back in the early history of the EU, and the Tribunal's understanding of the Treaties of Nice and Lisbon is that, apart from provisions on the broader policy objectives of the EU, they are concerned with revising the EU's internal governance but have no effect on the substance of the Articles just mentioned.

477. The two judgments of the CJEU in *Achmea* and *Komstroy* are, needless to say, not treaties, and so do not themselves fall within the scheme of Article 30 of the Vienna Convention. Their logic does, all the same, reinforce the conclusion above, inasmuch as judgments of this kind, as explained to the Tribunal by the expert witnesses, purport to state the law as it always has been in consequence of the founding treaties. It follows that – as a matter of EU legal theory – they neither bring about nor refer to any change in the basic EU legal principles which underly them.

478. If that is so, then the whole argument from the effect of successive treaties in international law falls to the ground. The ECT, in fact, emerges as the later treaty (to which all EU Member States and the EU itself are Parties), with the result that, should there indeed be any incompatibility, it would be the provisions of the EU treaties that must, under international law, yield to those of the ECT, not the other way round.

479. For these reasons, it would make no difference (see paragraph 473 above) whether the ECT and the EU treaties did or did not in fact 'relate to the same subject matter' within the meaning of Article 30 of the Vienna Convention, or, in that case, whether there was any incompatibility between them. If there is no incompatibility, then both treaties apply in full to both sets of parties, including ECT Article 26; if there should be some incompatibility, then the ECT takes precedence, including Article 26. For the purposes of the present Arbitration, the result is the same.

480. Notwithstanding paragraph 477 above, a question remains as to whether the CJEU judgments are to be understood as producing practical consequences *ex nunc* or *ex tunc*. The question is prompted by the imprecision in the operative clause of the *Achmea* judgment. The judgment states, in its English language version as cited to the Tribunal, that Articles 267 and 344 TFEU must be interpreted as 'precluding' arbitration clauses in inter-EU BITs, even though the authentic version in French and the version in German employ phrases (*s'opposer à*, and *entgegenstehen*) which are better translated into English in terms of opposition or incompatibility rather than 'preclusion.' At all events, it appears that, on the reference back to them, the German courts simply interpreted the Delphic phrase as requiring that the arbitration clause be declared null and void, and did so, surprisingly, without specific consideration of this central point.

481. Translated back into the categories of international law, this outcome would entail reading into the situation the proposition that provisions of EU law which had automatic effect as part of their internal law deprived EU Member States of the competence to agree to or implement an arbitration clause in an otherwise unexceptionable investment treaty. In short, that there was a defect, one arising out of its internal law, in the Member State's original consent to be bound by an investment treaty.

482. The rules governing that situation are to be found in Articles 27 and 46 of the Vienna Convention. Article 27 lays down the basic principle that a party may not invoke the provisions of its internal law as justification for its failure to perform a treaty, but without prejudice to Article 46, which sets out with greater precision that

> "1. A State may not invoke the fact that its consent to be bound by a treaty has been expressed in violation of a provision of its internal law regarding competence to conclude treaties as invalidating its consent unless that violation was manifest and concerned a rule of its internal law of fundamental importance.
>
> 2. A violation is manifest if it would be objectively evident to any State conducting itself in the matter in accordance with normal practice and in good faith."

483. It requires no further demonstration that these provisions roundly deny an EU Member State any right under international law to make such an argument in relation to the ECT.

Articles 27 and 46(1) are cast in negative terms which can only be displaced in the case of a "manifest" violation of internal law, and then that the violation had to concern a rule "of fundamental importance." Whatever argument may be made as to the second of these two criteria, the criterion that the violation must be manifest is in the circumstance plainly not fulfilled; far from the alleged violation being objectively evident, it would not have been evident at all even to the EU Member State itself or its fellow Members in the EU Council. Had the other contracting State or States raised the issue in the course of negotiation, they would have been firmly assured that all was in order, and in the ECT context, would no doubt have been specifically directed to the formal Decision of the EU Council and Commission, after consultation with the European Parliament, authorising the conclusion of the ECT by the EU itself in company with its Member States.[149] The matter is, as it were, open and shut.[150] So much so that it would be a matter of some surprise if the EU, as an institution firmly grounded on the rule of law, did seek in its international dealings to rest on an argument that was so clearly unsound in international law, and, worse still, might raise issues of good faith.

484. The expert advice received by the Tribunal from Prof. Craig explained the reasons why, within the scheme of the EU's legal order, an Opinion from the CJEU on a question of interpretation of the basic EU Treaties had to be assumed to state the legal position as of when the treaty in question first came into existence. Sir Alan Dashwood amplified this by drawing attention to the CJEU's particular power to specify that the operative effect of a given judgment should be prospective only, and he indicated from inside experience that the usual response to the ascertainment by the CJEU of a conflict of this kind was that the EU, or as the case may be the individual Member State, would fall under an obligation to take whatever steps would be necessary to eliminate the conflict for the future. Sir Alan's expectation was that, in the event that any such conflict was found to exist in the case of the ECT, the EU and its Member States would have to propose an appropriate amendment of the ECT to its non-EU Contracting Parties. While the Tribunal understands the point behind Prof. Craig's advice, it would regard the supplementary advice of Sir Alan (from

---

[149] CA-283.

[150] Clear confirmation can be found, so the Tribunal was told by the expert witnesses, in the Advocate-General's Opinion in the *Achmea* case itself.

which Prof. Craig did not dissent) as fitting in more naturally with normal international practice, and as running moreover in harmony with the general approach under the law of treaties reflected in Article 65 of the Vienna Convention. Presumably much the same line of thought lies behind the three declarations by EU Member States dated 16 January 2019 about their future course of action, so far as there is common ground between them relating to the ECT.[151]

485. The Tribunal is therefore of the view that, even if the Respondent's submission were correct that the specific obligations of EU Member States constituted 'international law' which was thus to be applied by the Tribunal pursuant to Article 26(6) of the ECT, it would make no difference to the analysis.

486. For the same reasons, the Respondent's alternative submission that the above obligations represented at least, and specifically as between Croatia and Hungary, "relevant rules of international law applicable in the relations between [them]" and were therefore to be taken into account in the interpretation of the ECT under Article 31(3)(c) of the Vienna Convention, adds nothing and can be set aside.

487. The last arrow in the Respondent's quiver is the submission that the ECT should in any case be read as subject to an 'implicit disconnection clause' in respect of its application within the EU area.[152] This submission is wholly without merit. There is nothing in either the Dashwood or the Craig expert report to lend any support to the idea that the Tribunal ought now to read a clause of that kind into the ECT. It flies in the face of the formal EU Decision on accession to the ECT referred to above, to which the text of the ECT was annexed in full without any hint of reservation or exception. It would also be flatly contradictory to the declaration on competence in respect of dispute settlement procedures made on behalf of the EU at the time of accession, which expressly contemplates (again without a hint of reservation or exception) that the EU or its Member States might become involved as parties to arbitration under Article 26. More generally, the range of situations in which an international tribunal might be justified in contemplating implying into a concluded treaty a provision of some considerable substantive effect that could readily

---

[151] R-375; R-376; R-377.
[152] Resp. Rejoinder Vol. II, paras. 446-453.

have been made an explicit part of the treaty but wasn't, must be vanishingly small. Any argument for doing so *ex post facto* in respect of a treaty project very largely promoted by the EU itself would smack of bad faith, directly contrary to the fundamental rule in the Vienna Convention, under the title *Pacta sunt servanda*: "[e]very treaty in force is binding upon the parties to it and must be performed by them in good faith."[153]

488. The Respondent's EU objection must therefore be rejected, and the Tribunal decides accordingly that it has jurisdiction to entertain the Claimant's claims in this Arbitration on the basis described above.

489. Having made that determination, the Tribunal will permit itself one further observation. As indicated above, the Respondent's submission in this Arbitration has been that Croatia's EU obligations constituted international law which the Tribunal ought either to apply directly or at least take into account in interpreting the ECT. But the *Komstroy* judgment, taken at face value, turns this proposition on its head. The CJEU holds that the conclusion of a treaty by the Council on behalf of the EU constitutes an act of one of its institutions, which is unexceptionable. But it goes on to deduce that the <u>provisions of the treaty</u> then "form an integral part of the legal order of the European Union from the time it enters into force."[154] From that and from the "autonomy of EU law with respect both to the law of the Member States <u>and to international law</u>", the further conclusion is drawn – and apparently without limitation – that "an arbitral tribunal such as that referred to in Article 26(6) ECT is required to interpret, and even apply, EU law." From which it is one step further to declare that the exercise of the EU's competence in international matters "cannot extend to <u>permitting, in an international agreement,</u> a provision according to which a dispute between an investor of one Member State and another Member State concerning EU law may be <u>removed from</u> the judicial system of the European Union."[155] And from there to the conclusion that Article 26 of the ECT "must be <u>interpreted</u> as not being <u>applicable</u> (all emphase supplied) to disputes between a Member State and an investor of another Member State …".[156] In other words, it is no longer EU law that

---

[153] See also the further reference to good faith in the interpretation of treaties in Article 31(1) of the Vienna Convention.

[154] *Komstroy* judgment, para. 23.

[155] Ibid., para. 62.

[156] Ibid., para. 66.

becomes part of international law, it is now international law that has become an integral part of EU law with all the consequences that follow. The Tribunal notes, with all fraternal respect, that, taken to its logical extreme, this proposition is self-defeating. One of its consequences would presumably be that an international court or tribunal, seized with a dispute, need go no further than to verify whether questions of EU law might arise – or perhaps even simply whether the EU itself is a party to the underlying treaty – from which point all that would be left for it to do is to pack up its tents and depart. But that is a proposition that no international court or tribunal could possibly accept. Once duly called into being under the relevant treaty instrument, an international court or tribunal is vested with two primary duties: to determine whether it has jurisdiction, and if so to exercise it. These are obligations, which the members of the court or tribunal are duty bound to fulfil; they cannot simply be abandoned, or ceded to some other instance as yet unknown or undetermined.

## V.   THE MERITS

490. Having thus established its jurisdiction, the Tribunal can proceed to its decision on the merits of the Claimant's claims, and the Respondent's defences to them. Before doing so, the Tribunal feels the need to emphasize certain aspects of the proceedings in this case and the factual circumstances that underly it.

### A.   INTRODUCTORY REMARKS

#### (1)   Introduction

491. The first is how long these proceedings have lasted and their complexity. They were launched by the Claimant's Request for Arbitration which (in its original version) carries the date of 26 November 2013. The Tribunal's final Award on the merits follows over eight years later. The sheer length the proceedings have taken to completion is not a circumstance that causes the Tribunal any satisfaction. It is partly – and to a not inconsiderable extent – to be laid at the door of the Covid pandemic with the manifold complications which it has brought in its train. But, even without Covid, the case has dragged itself on for far longer than would, or should, normally be the case for ICSID proceedings, and that is something for which the Tribunal disclaims any primary

responsibility. It is reflected in the sheer size of the record, a matter to which both sides to the dispute have on occasion themselves referred, in a tone of some apparent embarrassment. The last but one substantive document in the record, received in May 2021, represented a final consolidated index of the pleadings and other documents in the case, and stretched to just over 200 pages, a telling statistic which in itself attests with some graphic force to the length of time it must have taken for such a mass of material to accrete, and at the same time to the problems it gave rise to for the Tribunal in fulfilling its duty to manage and control the process, and then finally to come to its decision. It leads, apart from anything else, to the purely pragmatic observation on the part of the Tribunal that any attempt to deal in detail in this Award with all of that mass of material, and with every line of assertion and argument from the Parties that it gave rise to, would have been a self-defeating task, leading to yet further substantial delay, and without benefit to any of those involved. The Tribunal can only, therefore, give its blanket assurance to the Parties that each one of their claims and submissions has indeed been noted and taken into consideration, even if the terms of this Award itself address directly and substantively only those parts which the Tribunal, after extensive deliberation, has found material to the decisions embodied in it.

492. A second factor is the way in which these proceedings have found themselves intertwined with proceedings elsewhere. Here the Tribunal has specifically in mind the parallel UNCITRAL arbitration already referred to above brought by Croatia under the terms of certain agreements with MOL, which ran from early 2014 to the end of 2016 and entailed issues common to, or even identical with, those central to the present Arbitration, and which resulted in an award which will be further considered below. It equally has in mind the very lengthy criminal proceedings brought, in one form or another, in the Croatian courts against Dr Sanader and Mr Hernádi, which were already in train when the present arbitral proceedings were commenced in 2013 and continued to run in the background throughout the currency of the entire written and oral proceedings in the Arbitration, and were heard, as the Tribunal was informed, first in the Zagreb County Court, from there to the Supreme Court, from there to the Constitutional Court, from there back to the County

Court, and from there once again to the Supreme Court.[157] This moving backdrop has created additional complexities which will be mentioned later in the Award.

### (2)    Basic distinctions

493. The Tribunal also considers it useful to highlight at this introductory stage a number of distinctions which underlie the treatment that follows and should be borne in mind throughout.

494. The first is the important distinction between the contractual rights MOL says it possesses under various arrangements arrived at with Croatian governmental authorities in the course of establishing and managing its investment in INA, and, on the other hand, the rights derived from treaty (the ECT) which MOL claims against Croatia in this Arbitration (on which, see also paragraphs 450-453 above).

495. Another is the distinction between MOL and INA: MOL, as the Hungarian investor, the Claimant in this case, and INA, the Croatian corporation, with MOL's shareholding in INA representing the Claimant's investment in Croatia.

496. Yet another, and equally important distinction, is that between Mr Hernádi and MOL, or (to put the matter more generically) between the personal interests of the individual and the protected interests of the company of which the individual is a senior officer.

497. A further distinction is the one the Respondent seeks to draw between the Government of Croatia in its capacity as one of the shareholders in INA, and the conduct of the Government in its sovereign capacity, a subject on which the Tribunal will have something to say later in this Award.

498. And finally, in the specific context of the corruption allegations which have come to take centre stage in the dispute, there is the distinction between cases where an investment is alleged to be tainted by corruption from the outset, and, by contrast, an investment accepted to be *bona fide* when made but where corruption is said to have entered in later on, during the course of its management and operation.

---

[157] The judgment is now on the record as document R-383, lodged on 15 December 2021.

## B.    THE CORRUPTION ALLEGATION

499. As already indicated, the allegation of corruption came to form the central core of the argument before the Tribunal over the extended period of time described above. As the Respondent puts the argument in its Post-Hearing Brief, this is the 'one question the Tribunal must answer to determine the outcome of the dispute.'[158] It should also be remarked that the allegation was, at the same time, one of the main issues submitted to the UNCITRAL tribunal in the parallel arbitration, and it constituted, it goes without saying, the whole *raison d'être* of the Croatian criminal proceedings mentioned above. Each of these three courts or tribunals has been presented with extensive witness evidence on this central element in the case before it. However, the cast of witnesses appearing before the three fora, while overlapping in certain respects, has been far from identical. That has in turn given rise in the present proceedings to awkward problems of evidence and proof, with which the Parties have struggled but which they have not entirely overcome, leaving in their wake troubling issues for the Tribunal to resolve in arriving at this Award.

500. The Tribunal wishes to make it clear right at the outset that it is fully aware of the pernicious threat posed by the scourge of corruption, and its severely damaging effect on social and economic welfare, and on maintaining the flow of beneficial international investment. But the Tribunal is equally aware of its duty, in exercising its adjudicatory function, to treat the Parties before it objectively and on a footing of strict equality, from which it follows that it cannot confuse the notions of accusation and of proof. While practices of corruption have the dire effects referred to above, so also do accusations of corruption have potentially dire effects not merely on foreign investors and their interests, but also on the freedom and livelihoods of individuals who are involved. From this, there results the need for any investment tribunal to be alert and rigorous in its response to allegations of corrupt practice in the particular case, but at the same time to insist that any conclusions it draws must follow only on the basis of adequate proof.

---

[158] Resp. PHB Vol. I, para. 24.

### (1)    The corruption allegation in the pleadings of both Parties

501. Against that background, the Tribunal thinks it necessary first to lay out the various parts the corruption allegation has been called on to play in the present Arbitration, in regard both to jurisdiction and admissibility and to the substantive merits of the dispute between the Parties. It will then discuss the consequences the allegations of corruption have for these proceedings, and in particular for the all-important question of proof.

502. The Tribunal recalls that the Claimant in its Request for Arbitration and Memorial, alongside its main request for declaratory relief and monetary compensation for alleged breaches of Article 10(1) of the ECT, sought an order that the Republic of Croatia should "cease all harassment of MOL and INA and their respective officials, including … pursuing legal proceedings based on false evidence …".[159] This was followed from the Respondent's side by its Rule 41(5) Application which asked that the Tribunal, if it declined to order summary dismissal, should at a minimum stay the proceedings until the final resolution of the criminal proceedings against Dr Sanader and Mr Hernádi and a final adjudication of the UNCITRAL arbitration proceedings. The Respondent's Counter-Memorial (following the dismissal of the Rule 41(5) Application) contended that the Claimant's filing of the present Arbitration was nothing more than a defensive measure to shield it from the consequences of the corruption which had subsequently emerged and to claim for breaches of agreements that were, in consequence of that corruption, legally invalid;[160] it contended further that "[t]he evidence of the bribe in the UNCITRAL arbitration was overwhelming."[161] And, in its Rejoinder and Post-Hearing Submission, the Respondent held to the position, both that the Claimant's claims were to be rejected *in limine* on account of bribery, either on jurisdictional grounds or for inadmissibility, and that the FASHA, and GMA (and thus, by definition the FAGMA as well) were in any case null and void *ab initio* for the same reason.[162] The Claimant, for its part, as the proceedings wore on, developed its submissions into what is referred to as its '*Rompetrol* claim' as the

---

[159] Cl. Memorial, para. 473.
[160] Resp. Counter-Memorial, para. 1.
[161] Resp. Counter-Memorial, para. 6.
[162] Resp. Rejoinder Vol. II, paras. 400 & 586; Resp. PHB Vol. III, para. 442.

basis not merely for the relief described above but, in addition, for a claim to substantial monetary compensation for moral damage both to MOL and to Mr Hernádi.[163]

503. From the above, the Tribunal draws the conclusion that, in summary, the corruption allegation plays the following part in the case of each Party, negatively in the case of the Respondent, and positively in the case of the Claimant:

**a. For the Respondent**

(i)   as a ground for the Tribunal to decline jurisdiction, alternatively to hold the Claimant's claims to be inadmissible; and

(ii)   as leading to the result that the Claimant's claims, deriving as they do principally from transactions that were legally void *ab initio*, cannot in any case give rise to breaches of the treatment required by Article 10(1) of the ECT.

**b. For the Claimant**

(iii)   as the ground justifying incidental relief in the form of an order for non-harassment; and

(iv)   as the basis for an additional head of relief for non-pecuniary moral damage.

**(2)   The burden of proof**

504. As to the burden of proof, the Tribunal intends to apply the well-known and widely applied principle that 'he who asserts must prove'[164] in other words that each Party assumes the burden of establishing, to the appropriate degree of certainty, the propositions it relies on to establish the case which it advances before the Tribunal. When this principle is applied to the table above, it leads, so the Tribunal holds, to the following result –

---

[163] *I.e.,* compensation for "Croatia's disruption to MOL's management of its investment in INA, the resulting uncertainties in its decision-making and planning, the harm to MOL's global and local reputation, and the restriction to the liberty of MOL's CEO, Zsolt Hernádi." (Cl. PHB Vol. V, para. 264).

[164] *Onus probandi incumbit actori.*

### a. *For the Respondent*

a) So far as the requirement of proof is concerned, grounds (i) and (ii) above are indistinguishable.

b) What the Respondent must therefore prove, to the appropriate degree of certainty, is that a bribe was (i) offered to Dr Sanader, (ii) by MOL or knowingly on its behalf, and (iii) was accepted by Dr Sanader, (iv) for the purpose of influencing, (v) and did so influence, the conclusion and implementation by the Government of Croatia of the FASHA and the GMA. The Tribunal is of course aware that the Respondent has sought, in reliance on the two international anti-corruption Conventions and its own internal law, to argue that the mere offer (or solicitation) of a bribe is sufficient to establish the commission of the criminal offence, irrespective of whether the offer or request was in fact accepted or whether anything followed in its train. That may indeed be the intention behind the penal provisions in question, with their objective of stamping out the noxious and insidious practices they have in view, and this the Tribunal can well understand. It does not, however, mean that the identical approach can or should be adopted in the field of investment arbitration to that which is appropriate for the penal responsibilities of individuals. The consequences attaching to a finding of corruption by a tribunal are severe, as the Respondent's requests for relief show, and perhaps even more so in the case of an investment that had been duly made and is already in full operation. Take the hypothetical example of a bribe being solicited by a corrupt local official in order to grease the passage of a foreign investment proposal towards acceptance, or the converse example of the bribe being offered to the same end by a dishonest middleman said to be acting on the foreign investor's behalf. If in the first case, the request, or, in the second case, the offer were to be rejected with outrage by the recipient, and the project went ahead favourably all the same purely on its own honest merit, there might certainly be good reason for proceeding under the criminal law against the corrupt individual, but no case at all for causing the investment itself to fail with the wider loss and damage that would entail. And particularly in the present case, where the validity and good

103

faith of the original investment has not been called into question, and the investment was in full operation, both offer and acceptance of the corrupt payment would have to be established, and in addition its actual influence on the course of events, in order to justify an investment tribunal in interposing a major obstacle in the investment's continuing path.

**b. *For the Claimant***

c) So far as the requirement of proof is concerned, grounds (iii) and (iv) above are likewise indistinguishable.

d) What the Claimant must therefore prove, to the appropriate degree of certainty, is either that the competent authorities of the Respondent had no justifiable grounds for pursuing the criminal prosecution of the individuals in question, or else that the investigation and prosecution of those individuals was pursued in a manner that failed to pay adequate regard to the protections to which the Claimant, MOL, as a protected foreign investor, was entitled under the ECT.

505. It will be evident that (d) above is not the reverse of (b). While it may be necessary for the Claimant, in its defence, to challenge elements in the Respondent's case (in the terms set out above), the Claimant is under no requirement to <u>disprove</u> corruption; that would amount to an overturning of the basic rule about burden of proof for which the Tribunal can see no warrant, even in the case of corruption. As already indicated, accusation cannot stand in the place of proof, nor can it be taken by an investment tribunal as amounting to presumptive proof. This is an entirely separate question from whether, as the Respondent has invited it to do, the Tribunal ought to resort liberally to inferences in order to fill evidential gaps once a reasonable suspicion has been raised that corruption might be in play.

**(3)    The standard of proof**

506. The Tribunal turns now to what should be regarded as the appropriate standard of proof in respect of the claims of either Party.

507. The Claimant asserts that both the nature of the Respondent's allegations and their link to actual criminal proceedings require the Respondent to meet a markedly higher standard of

104

proof, closer to that of 'beyond reasonable doubt.'[165] The Respondent retorts that the issue before the Tribunal is analogous to a civil, not a criminal matter, and therefore that the applicable standard, as for all other issues in the Arbitration, should be the normal one of a balance of probabilities on the basis of the totality of the evidence.[166]

508.  The Tribunal, for its part, sees no need to enter into a theoretical discussion about applicable standards of proof. It has firm ground from which to proceed, in the shape of Rule 34(1) of the Arbitration Rules: "[t]he Tribunal shall be the judge of the admissibility of any evidence adduced and of its probative value."[167] That is the only specific provision on the subject contained in the ICSID Convention and the Arbitration Rules, nor is there anything on the subject in the ECT itself.[168] And that would not suggest any intention by the Contracting Parties to either instrument to tie a tribunal to any abstract notion as to standard of proof; it is left to each particular tribunal to reach its own conclusion as to what proof should be considered to be necessary in the circumstances of the dispute before it. In the circumstances of the present dispute, the Tribunal is in no doubt that the Respondent's corruption allegation requires to be established to an appreciably higher standard than a mere balance of probabilities. Other tribunals have adopted a similar approach in comparable circumstances.[169] What the Tribunal finds to be as striking as the wide-ranging unanimity of approach is the fact that in none of these cases, although bribery was alleged, was bribery found to have been proved to the requisite standard. In the present case, the Tribunal's conclusion as to the standard of proof is the product of the linked factors of the serious nature of the allegation itself, and the serious consequences which are sought to be drawn from it if the allegation is established. It is not, in the eyes

---

[165] Cl. PHB Vol. IV, para. 94.

[166] Resp. PHB Vol. III, para. 13.

[167] A substantially identical approach is to be found in Article 9(1) of the IBA Rules, by which the Tribunal is to be guided, in accordance with para. 15.1 of PO1.

[168] Article 26(6) of the ECT, on the applicable law, goes to substance, not procedure.

[169] *Vladislav Kim, et al. v. Republic of Uzbekistan*, ICSID Case No. ARB/13/6, Decision on Jurisdiction, 8 March 2017, para. 589 (CA-255); *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, Award, 10 December 2014, para. 479 (CA-146); *Liman Caspian Oil BV and NCL Dutch Investment BV v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Award, 22 June 2010, para. 422 (CA-017); *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009, paras. 221 & 232 (RA-167); ICC Case No. 14878, Final Award, 2008, para. 5 (CA-228); *Oostergetel v. Slovak Republic*, UNCITRAL, Final Award, 23 April 2012, para. 303 (CA-147).

of the Tribunal, a matter of deciding that an act of bribery was likely, or even very likely, to have taken place. It is a matter of being able to arrive at a conclusion that the alleged act of bribery <u>did</u> take place, that it <u>did</u> involve those accused of it, and that it <u>did</u> lead to the consequences alleged to have followed from it. In deciding whether those conclusions should or should not be drawn, the Tribunal will rely primarily on provable facts, but will be open to resorting to inferences to fill evidential gaps, though only if the gap was unavoidable and the inference itself a compelling one from the surrounding circumstances.[170] The Tribunal believes this approach to be substantially the same as that adopted by the UNCITRAL tribunal in respect of the same allegations.[171]

509. The Tribunal will then adopt much the same approach when addressing itself to the Claimant's converse assertion, namely that the corruption allegation was an unjustified pretext for oppressive treatment meted out to the Claimant and its investment. That is to say, the Tribunal will look primarily to provable facts, will be open, where necessary, to resorting to inferences to fill evidential gaps but only if the gap was unavoidable and the inference compelling;[172] and will expect proof to an appreciably higher standard than a mere balance of probabilities.

### (4)  The evidence

510. The Tribunal has been faced with particular difficulties in assessing the evidence offered to it. To a certain extent, these difficulties derive from the common problems associated

---

[170] The Tribunal notes, in addition, the specific references in the IBA Rules (Art. 9.6 & 9.7) to the availability of adverse inferences in specified circumstances, *i.e.,* where a party has failed without satisfactory explanation to produce a document or to make available any evidence, including testimony.

[171] UNCITRAL award, C-648, paras. 95 & 125: "Issues of corruption sometimes arise in international arbitration and arbitrators must be on their guard to ensure that they are not used as a mean of disguising this evil. But where in a case such as this the issue is raised fairly and squarely before the Tribunal it must not shirk its responsibilities. If this Tribunal finds corruption proved as alleged it will not hesitate to say so and subject MOL to all the consequences flowing therefrom. But, on the other hand, corruption has to be proved by evidence that convinces the Tribunal that the allegation has been made out. The Tribunal readily appreciates the enormous consequences that MOL and its officers will suffer if the allegation is established. It will not shrink from dismissing the allegation if it is not convinced by the evidence presented to it. … It clearly focuses on something between the balance of probabilities and absolute certainty whilst at the same time recognizing that the latter is unobtainable. Of course one must be conscious of semantics when dealing with this important issue but another way of looking at the matter is for the Tribunal to ask itself whether on the evidence it has heard, read, and seen it is convinced that the bribe took place as alleged by Croatia … This is a matter of persuasion, and it may well be that for most minds becoming persuaded of something requires more than accepting that it is more likely than not. … This is the approach this Tribunal will take: are the allegations of corruption supported by evidence that produce reasonable certainty?"

[172] See fn. 170.

with accusations of corruption and the inevitable obstacles they pose for the finder of fact. But to a considerable extent, too, they arise out of the exaggeration, repetitiveness and overreach in the arguments put to it by the Parties on the state of the evidence. This has extended even to mutual accusations of bad faith, or of attempts knowingly to mislead. These have been put to the Tribunal from either side through the mouths of law practices of high standing and repute, but have been of no assistance to the Tribunal at all in carrying out its task. The Tribunal has exerted itself throughout, during the lengthy course of the proceedings, to use its authority to maintain a rational and professional atmosphere suited to the occasion, and will reach its conclusions on the questions for decision on the basis of a calm and objective assessment of the evidence and argument, not swayed by more emotive allegations put forward in the heat of the moment.

511. Further difficulties of a very particular character face the Tribunal consequent on the large number of witnesses of fact, compounded by the circumstance that various amongst them have also appeared as witnesses either before the UNCITRAL tribunal or in the first or in the second set of Croatian criminal proceedings, or in more than one of these. Whereas other witnesses again (who may indeed have been closely associated with the key issues in dispute) appeared in one or both of these sets of proceedings, but were not called as witnesses in these proceedings. Additional complications then resulted from the fact that evidence given by witnesses in the UNCITRAL proceedings (both those who appeared in these proceedings and those who did not), as well as the record of their cross-examination, was tendered as evidence in these proceedings. Still further complications arose later on from the fact that some at least of the potentially significant witnesses not appearing in these proceedings did eventually give evidence before the Croatian criminal courts; here the Tribunal particularly has in mind Mr Fazakas and Mr Hürlimann. Nor has the Tribunal been helped by the fact that both Parties have, in their closing arguments and final submissions, tended to lump all of this material indiscriminately together without attempting any systematic distinction between what could properly be regarded as 'evidence' in the Arbitration and what might be admissible as extraneous testimony which, whatever weight the Tribunal might ultimately decide to give to it, was plainly in a different category.

512. The Tribunal, for its part, has done what it could to place itself in a position to exercise its duties and functions under Arbitration Rule 34(1) in a proper and objective manner. Thus it admitted the records of the UNCITRAL arbitration *de bene esse* pending whatever eventual decision might be necessary on their admissibility;[173] and it attempted, pursuant to Rule 34(2) and following consultation with the Parties, to secure the attendance of five witnesses whom it could see as central to the allegations made, but who had not been produced by either of the two Parties themselves. Invitations were thus sent in the Tribunal's name through agreed channels to Messrs Sanader, Petrović, Fazakas, Hürlimann, and Tóth, and followed up later at Tribunal request. Ultimately, though, the Tribunal decided not to pursue the question of Dr Sanader, given that the transcript of his evidence and cross-examination was available (on the terms described above), and none of the four remaining persons on the list agreed to appear. At a later stage, having been informed that three of these four, as well as Mr Ježić, had subsequently testified in the second criminal trial in the Zagreb County Court,[174] the Tribunal, following written and oral submissions by the Parties, decided in PO7, notwithstanding the very late stage the proceedings had already reached, to open a further limited phase of argument. Its purpose was specified to be "not to re-open the taking of evidence in the arbitration, but rather to allow the Parties and the Tribunal to test the evidence already on record against relevant material that has now become available in the course of the continued Croatian criminal proceedings, in the form of testimony given on oath before the Zagreb County Court by certain persons who had either given evidence before the Tribunal in the arbitration or had been invited by the Tribunal to appear as witnesses before it but had not agreed to do so."[175] The further phase took the form of additional written memorials from both sides, written responses to questions that had been posed by the Tribunal, and a two-day online Hearing.

---

[173] See the Tribunal's letter of 30 January 2017: "The Tribunal notes further that, in arbitral procedure as before national courts, it has long been understood that a tribunal may have to hear evidence *de bene esse*, that is to say, without prejudice to whether the evidence itself, or the matters to which the evidence is directed, turn out in the event to be relevant to issues which the tribunal is called upon to decide in its award – although it is possible that costs consequences may follow which the Tribunal would later have to address."

[174] C-749 – C-757; C-759; C-761 – C-768.

[175] PO7, para. 5.

513. The Tribunal is clear in its mind, at the end of this deluge of contradictory evidence, that it is in no position to determine with certainty exactly what did happen in the convoluted chain of events it has been asked to consider. It is equally clear to it, however, that its task is not to discover the literal and perfect truth. Its task is rather, as has already been made clear, to determine whether each Party has succeeded in making out the case it puts forward, with the facts that are required to support that case.

514. Against this background, it is as well to set out the general approach the Tribunal has taken to the witness evidence. It is clear that only those persons whose statements were tendered by one or the other Party and were thus open to cross-examination can be regarded as witnesses in the present proceedings, and only their statements and answers therefore can rank as evidence in the formal sense. No other conclusion is permitted by paragraphs 18 & 19 of PO1, and the reasons behind it need no further explanation. Testimony given before other bodies cannot have the same status, even if it may, if duly admitted, form part of the overall written material at the disposal of the Tribunal, and it will then be for the Tribunal freely to assess its relevance and probative weight under Arbitration Rule 34. In making this assessment, and in particular in assessing the question of credibility, the Tribunal will lend greater weight to evidence given to the UNCITRAL tribunal by persons who subsequently appeared as witnesses in the present proceedings. This is on the basis (a) that the present Tribunal will have been able to observe the witness's demeanour for itself, (b) that counsel will have been able to take the earlier testimony into account in their cross-examination or re-examination before this Tribunal, and – importantly – (c) that this Tribunal will have been in a position to put its own questions to the witness. None of this applies to statements made before other bodies, though the Tribunal may, as occasion demands and as foreshadowed in PO7, take into account whether such a statement was or was not given on oath.

515. Finally, the Tribunal turns to the matter of non-appearing witnesses. The Respondent asserts that there is a number of named witnesses whom the Claimant ought to have called in relation to the corruption allegation, but failed to.[176] The Claimant asserts that there are various witnesses (also named) whom the Respondent could easily have called to sustain

---

[176] Resp. PHB Vol. III, paras. 36-52 (Messrs Fazakas and Tóth); Resp. PHB Vol. III, paras. 145-147 (Mr Bacs).

its argument over the Croatian Government's approval of the FASHA and GMA, but chose not to.[177] The Respondent's argument is intended as the basis for claiming, from the Claimant's failure to call these witnesses, that certain inferences should be drawn as to the existence of corruption and MOL's complicity in it. The Claimant's argument is that its opponent is not entitled to make assertions as to the balance of advantage under the FASHA and GMA and the circumstances of their acceptance by Croatia when it could readily have backed those assertions through witnesses, so that its failure to do so must undermine the assertions themselves.

516. In either case, the Party concerned seeks, in other words, to persuade the Tribunal to draw adverse inferences from its opponent's failure, which in each case is said to have been deliberate. The Tribunal is disinclined to accept the Parties' invitations. Leaving aside the separate issue that it is in dispute whether Messrs Fazakas and Tóth really are under the Claimant's control, the Tribunal finds it hard to see that one side is more at fault than its opponent in this context. Be that as it may, the Tribunal is unconvinced that it would be right to draw overdramatic conclusions from the absence of particular witness evidence (the content of which, by definition, is still unknown). It would be one thing, in appropriate circumstances, to draw inferences from established facts, where the factual chain remains incomplete (under the conditions laid out in paragraphs 508-509 above). But that is not at all the same as inferring, from the mere fact that it was not introduced, what the content and effect of evidence would have been, if it had been introduced. The Tribunal is clear in its own mind that the valid approach remains that of the burden of proof, as determined in paragraphs 504-505 above, namely that it is up to each Party to produce sufficient evidence to make out its claims in the Arbitration. If a witness of potential interest has not been tendered, the consequential gap in the evidentiary picture will be taken into account as part of the Tribunal's assessment of whether the relevant Party has met the burden of proof lying on it.

---

[177] Cl. PHB Vol. VI, paras. 8 & 16 (Mrs Kosor, Mr Šuker, Mr Popijač and Mr Ante Samodol (the former Head of HANFA)).

### (5)  The 'Austrian Files'

517.  The Respondent has offered in evidence a further bundle of documents which the Parties have referred to, for convenience, as 'the Austrian Files.'[178] As the Tribunal was informed, these are documents forwarded by a regional office of the Austrian State Prosecutor in response to a formal request for mutual legal assistance put by Croatia to Austria.[179] The request was for the purposes of an entirely separate corruption investigation in Croatia which has no connection with the present matter, and the *dossier* returned was similarly from yet another corruption investigation in Austria which has no connection either with that or with the present matter.[180] The *dossier* was also placed before the UNCITRAL tribunal, which ruled it inadmissible.[181]

518.  An application for this Tribunal to do likewise was heard as part of the Hearing in February 2017, preceded by written submissions. After hearing the Parties, the Tribunal indicated at the time that it was not inclined to rule these documents inadmissible.[182] This was partly on the basis that the Tribunal could not regard itself as bound by a procedural decision in other proceedings, and partly out of the need to allow each Party full freedom to develop its case, though subject always to the Tribunal's inherent power to determine the materiality of any evidence submitted, and to decide what weight (if any) to give to it.

519.  Being now in a position to assess the question in the round, the Tribunal concludes that the Austrian Files are of no assistance to it over the points at issue in the present proceedings, and that no probative weight can be given to them in that context.

520.  There are two principal reasons for that conclusion. The first is the incomplete and disjointed nature of the documents in the *dossier*, together with the absence of a full picture of the provenance and status of many of them. The second is, however, the more substantive ground that, even if they were to be accepted as having probative value, the

---

[178] Resp. Counter-Memorial, para. 9; R-154.

[179] C-648, para. 151.

[180] C-648, para. 152.

[181] C-648, para. 198.

[182] Transcript, 23 February 2017, p. 720.

documents in the Austrian Files have nothing useful to say about the matters for decision in this Arbitration; see paragraph 553 below.

**(6)      The Respondent's case: The corruption allegation**

521.   The constituent parts of the corruption allegation have been set out at length in the award of the UNCITRAL tribunal, in the judgments of the Croatian courts, and in the Parties' pleadings in these proceedings. The Tribunal sees no need to rehearse them once more in all their detail. Reduced to their bare essentials, they are as follows; the Tribunal emphasizes that these items are listed as assertions or contentions (emanating from one side or from the other), not as established facts –

- At some point in late 2008, Dr Sanader, then Croatia's Prime Minister, asked Mr Robert Ježić, out of the blue and without further detail, whether it would be possible to arrange receipt of moneys from abroad.[183] Mr Ježić, for reasons not fully explained, deemed it better to forget about the request.

- Some while later, Dr Sanader reverted to the request. This time Mr Ježić, for reasons once again not fully explained, decided that, given Dr Sanader's position, the request could not be ignored. Therefore, sometime after that, he duly passed on to Dr Sanader the names of Xenoplast, a Swiss company, and of Mr Hürlimann in Zurich as the responsible person.[184]

- Sometime after that, Mr Hürlimann was contacted by, and then met in Zurich with, Mr Imre Fazakas, who intimated the wish to set up an arrangement with Xenoplast for the provision of consultancy services, of a not clearly specified nature. Mr Hürlimann had either been told or formed the impression – or perhaps was later told – that Mr Fazakas was acting in this matter for MOL.[185]

---

[183] Resp. Counter-Memorial, para. 7.
[184] Resp. Counter-Memorial, paras. 71-72.
[185] Resp. Counter-Memorial, para. 82.

- Sometime later, and as an aside in the margin of other business between them, Dr Sanader pressed Mr Ježić, perhaps once, perhaps more than once, over whether the money had arrived; and it emerged at some point that it would arrive in two tranches.[186]

- On a subsequent occasion in May 2009, when calling on Dr Sanader to lobby him for assistance over problems besetting Mr Ježić's Croatian company, Dioki d.d., Mr Ježić happened by chance to spot Mr Hernádi, accompanied by Mr Petrović, coming away from the Government building, and this prompted him to tell Dr Sanader that nothing had happened, whereupon the latter summoned Messrs Hernádi and Petrović back by telephone for a further short discussion from which he (Ježić) was excluded. When Mr Ježić was called back in after Hernádi and Petrović had left, Dr Sanader told him that Mr Hernádi had confirmed that the first half of the money would arrive soon and the rest by the end of the year.[187]

- A few days after these meetings, two consultancy contracts were drawn up between Messrs Fazakas and Hürlimann. The contracts were between Xenoplast and two Cypriot companies, Hangarn and Ceroma, and each provided for a fee to Xenoplast of Euro 5 million. Both contained a rather general description of the services to be provided. Both contracts were signed on the same day. Mr Hürlimann signed for Xenoplast and different signatories for the two Cypriot counterparties.[188]

- Some two weeks later on, a sum totalling Euro 5 million duly arrived in Xenoplast's account, comprised of roughly equal payments from Ceroma and from Hangarn.[189] All of this took place some months after the conclusion of the FASHA and the GMA. None of the money was actually conveyed to Dr Sanader or held directly on his account, Mr Ježić explaining to Dr Sanader (it remains unclear when this was for the first time) that the money should stay in Xenoplast's account for some time so as to avoid awkward questions being asked, and also that appreciable sums would have to be deducted for processing and other fees before arriving at the net amount.[190] In fact,

---

[186] Resp. PHB Vol. III, paras. 293-294.
[187] Resp. PHB Vol. III, paras. 293-298.
[188] See para. 367 above.
[189] See paras. 369 & 371 above.
[190] Cl. Rejoinder, para. 89.

though, the money did not remain with Xenoplast, but was loaned to another of Mr Ježić's companies, Dioki Holding, a Swiss corporation, and has since been placed beyond reach *via* a retroactive merger and loan subordination between these two Swiss companies.[191] Mr Ježić has over time given successive undertakings in the context of the criminal prosecutions to surrender the money to the Croatian authorities, but this has not yet taken place.[192]

- Some months later, Mr Ježić had a further change of heart (said to be in consequence of articles that had begun to appear in the Croatian media) and decided that he could no longer be part of the above arrangements, a decision which he imparted to Dr Sanader as they were flying to Milan for a football match in a private aircraft chartered by Mr Ježić. All of this Dr Sanader took in good part and led to the two of them flying straight on to Zurich afterwards to meet Dr Sanader's brother, Flavio, in order for Dr Sanader to arrange for Flavio to take over Mr Ježić's role in the above transactions.[193]

- There is no further information as to whether Mr Flavio Sanader in fact played any role; the two consultancy contracts were cancelled some months later, at the instance of Hangarn and Ceroma, citing unsatisfactory activity or partial non-performance by Xenoplast, and termination was accepted for Xenoplast some six months after that; each notice of termination was in terms indicating that no reimbursement was demanded or expected.[194]

- Some eighteen months after that, and nearly two years after Dr Sanader had resigned as Prime Minister, Mr Ježić (who had recently been released without charge from a spell in prison under investigation for another corruption matter) had a complete change of heart and volunteered himself to the Croatian prosecution authorities to confess to the above.[195] Mr Hürlimann appeared for interview on the same day.[196] These two

---

[191] C-291; C-495.
[192] Cl. PHB Vol. II, para. 259.
[193] Resp. PHB Vol. III, paras. 347-353.
[194] R-012; see para. 378 above.
[195] C-162.
[196] C-163.

statements became the centrepiece of the ensuing investigation, and in due course of the criminal proceedings against Dr Sanader and Mr Hernádi.

522. It will immediately be apparent that the above account is incomplete; it is marred in various places, if not by holes, then at least by threadbare patches that need to be filled if the Respondent is to make out its case (see paragraph 504b) above). Rather than go through the story in its every detail, the Tribunal will concentrate on the following:

1) Was there a bribe?

2) Did the bribe emanate from MOL (or knowingly on its behalf)?

3) Who was bribed and for what purpose?

4) Did the bribe achieve its purpose?

### a. The UNCITRAL award

523. Before undertaking that analysis, the Tribunal must deal with the Claimant's submission that the matter has been conclusively determined by the UNCITRAL tribunal in its award, which should be treated as definitive by the present Tribunal. In other words, that the matter is *res judicata* and it is neither necessary nor would it be proper for the present Tribunal to determine the matter for itself.

524. As already indicated,[197] the Parties were initially invited to submit written skeleton arguments on the question, with a further opportunity to make oral submissions at a future hearing, following which more extensive written briefs were filed on both sides. In its brief, the Claimant relies on the Respondent's complete reversal of position on the question since its request in its Rule 41(5) Application that the Tribunal stay the present Arbitration until the UNCITRAL proceedings (which it had initiated) had come to a conclusion.[198] The Claimant's argument in favour of lending the UNCITRAL award *res judicata* effect, supported by an expert opinion from Judge Schwebel, is essentially that an issue decided with binding force by one tribunal should not be open to re-litigation at the instance of the losing party before another tribunal, and this for broad reasons of the

---

[197] Paras. 400-413 & 431 above.
[198] Cl. Brief on UNCITRAL award, Annex A.

integrity of the arbitral process and the avoidance of unnecessary expense, as well as to avoid forum shopping and to deter the adoption of oppressive litigation tactics.[199] The Respondent answers, with an expert opinion by Prof. Bermann for support, that there is no general principle of collateral estoppel in international law, that these proceedings and the UNCITRAL proceedings were and are situated in different legal orders, and that in any event collateral estoppel can only attach to issues that were an essential part of the earlier judgment or award, but no wider than that.[200] The Tribunal, for its part, sees some validity in the Respondent's contention that an ICSID tribunal is under a duty to reach its own opinion on issues that are significant for its Award, but at the same time is disinclined to accept that the Respondent may choose to blow hot when sending an issue down the UNCITRAL route and asking this Tribunal to defer, and then blow cold when the chosen route decides the issue against it. It notes also the substantial disagreement between the Parties as to whether any genuinely new evidence has emerged since the UNCITRAL proceedings were concluded and, if so, was it significant and was it likely to have affected the UNCITRAL tribunal's decision.

525. The Tribunal is grateful for the opinions of the two learned experts. It is in little doubt that there does exist a general principle of law, of such a kind as to be available as a source of international law under Article 38(1)(c) of the Statute of the International Court of Justice, to the effect that a party to a dispute should not be permitted to seek to re-litigate before a different judicial instance an issue that has already been decided with binding effect by an earlier judicial instance endowed with competence over the matter. But the Tribunal sees no need to take sides between the rather expansive view as to that principle's reach put forward by one expert and the very restrictive approach of the other. The key to the question now before it seems to the Tribunal rather to be something else: quite simply, what did the UNCITRAL tribunal decide?

526. The issue put to the UNCITRAL tribunal by the Respondent was whether certain agreements between MOL and Croatia were rendered null and void on various grounds,

---

[199] Cl. Brief on UNCITRAL award, para. 13.
[200] Resp. Brief on UNCITRAL award, paras. 9, 35 & 41.

including the alleged corruption.[201] As to that, the tribunal's decision was in the negative; the dispositive paragraph says that "Croatia's claims … are all dismissed."[202] On its way to that conclusion, the tribunal held that "Croatia has failed to establish that MOL did in fact bribe Dr Sanader,"[203] but the tribunal makes no positive (or negative) finding of its own.[204] That being so, even if it were to be accepted that the UNCITRAL tribunal's conclusions on the bribery question did in some respect 'bind' the present Tribunal, there is nothing by which the Tribunal could be bound. The UNCITRAL tribunal held that Croatia had in those proceedings failed to meet its burden of proof, but nothing beyond that; it refrained from any finding that the alleged bribery had or had not occurred. By contrast, however, on the broader question of the validity or voidness of the MOL/Croatia agreements, the UNCITRAL tribunal did reach a clear decision, and one with operative effect, namely that Croatia's claim that these agreements were invalid was dismissed. That decision (as the Tribunal has already held) fell within the exclusive jurisdiction of the UNCITRAL tribunal and outside its own. It is a decision that will therefore not be revisited by the present Tribunal. The present Tribunal's review will be limited as set out in paragraph 453 above, in keeping with the basic distinction between contract claims and treaty claims.

527. The Tribunal therefore holds that, in respect of the corruption allegation, it cannot accept the Claimant's submission as to the *res judicata* effect of the UNCITRAL tribunal's findings. That said, the relevant findings of the UNCITRAL tribunal on this question are clearly worthy of respect, and this Tribunal will pay regard to them accordingly, bearing in mind in this context in particular (a) that the UNCITRAL tribunal expressed its conclusion as a "confident" one,[205] and (b) that in reaching that "confident conclusion" the UNCITRAL tribunal had had the benefit of hearing certain closely concerned

---

[201] Although the tribunal casts doubt on whether the other grounds were "more than makeweight claims instituted on the back of the bribery allegation" (C-648, para. 467).

[202] C-648, para. 490.

[203] Ibid., para. 333.

[204] See also ibid., para. 327: "A party making an allegation has the onus of establishing the allegation. It may fail to establish the events in question because the evidence does not tip the scales in favour of proof. Such a finding does not necessarily mean that the event in question did not occur – only that in applying the applicable rules the evidence did not satisfy the Tribunal that it could confidently conclude that the event did in fact occur."

[205] Ibid., para. 333.

witnesses (specifically Dr Sanader and Mr Petrović, as well as Mr Hürlimann) whom the Tribunal would itself wished to have had examined but who declined to appear in the present proceedings.

### b.   Was there a bribe?

528.   Reverting then to the four key questions set out in paragraph 522 above, the Tribunal is struck by the fact that for only one of them (Was there a bribe?) has concrete evidence been put forward in support, in this case in the form of the contracts between Hangarn and Ceroma, on the one part, and Xenoplast, on the other, and the manner and circumstances of their abrogation; together with such concrete evidence as is available about past patterns of payments to and by Hangarn and about payments into and out of the accounts of Xenoplast. The entirety of the other three questions (see further below) hangs on witness evidence, the greater part of which is challenged through the evidence of other witnesses.

529.   The Respondent's argument is that the Hangarn/Ceroma/Xenoplast contracts are fictitious constructs designed to provide cover for suspect dealings; insofar as they purport to be for 'consultancy' services, their nature is almost completely at large, and very little is specified about the nature or kind of actions to be undertaken, despite the very large fee (2 x Euro 5 million); the services were not ones falling naturally within Xenoplast's field of operation, nor is there any documentary evidence of what 'services', if any, within that broad envelope had in fact been provided for the benefit of the payer before the contracts were cancelled, all for reasons that remain opaque.[206] The Respondent says that this chain of events raises a series of red flags, inasmuch as it, and more, is indicative, so experience has shown, of a classic pattern for the concealment of bribery.[207] The Tribunal considers that there is much in this argument. The question is, how far does it take you? The Tribunal is prepared to assume that these events raise a strong suspicion that those involved in them were up to no good. But, in and of itself, that is all it shows. To make out its case, the Respondent has to show far more than that. It must above all establish the essential chain linking the Claimant at one end, to Dr Sanader at the other end. It must then establish that the objective was corruptly to influence the coming into operation of the FASHA and

---

[206] Resp. Counter-Memorial, paras. 172-175.
[207] Resp. PHB Vol. III, para. 71.

GMA, and finally that that corrupt objective was carried out. Without those further showings, all that those events, suspicious as they are, would demonstrate is that corrupt payments were made or promised to Mr Ježić, or to a company owned or controlled by Mr Ježić. They are, in other words, equally compatible with a hypothesis, which might be called the natural hypothesis, that the intended recipient was the actual recipient, *i.e.,* Mr Ježić. That is particularly so when, on the uncontested evidence, the money paid never got beyond Mr Ježić (or his companies), who then took steps to put it beyond the reach of any outside party. At that point, there is a diametric divergence between the Parties: the Respondent says that it is for the Claimant to show in effect that the payment was <u>not</u> intended for Dr Sanader by establishing what other purpose it had in the hands of Mr Ježić;[208] the Claimant retorts that it is for the Respondent to meet its burden of proof, and that it (the Claimant) never rested its argument on any specific alternative scenario (such as the Družba-Adria project),[209] so that it cannot be held to bear the burden of positively proving such a scenario in order to succeed in its defence.[210]

530. On this purely forensic issue, right lies on the Claimant's side. As the Tribunal has already held, the onus lies on the Respondent to prove its corruption allegation, which means to prove all of the elements which that allegation entails. It cannot be the case that the likelihood – or even a strong probability – in favour of a central element of one party's case creates a presumption that the rest of that party's case is valid, and that the other party must then rebut that presumption, or else it loses. As the essence of the Respondent's corruption allegation is bribery <u>of</u> Dr Sanader <u>by</u> MOL, to achieve <u>the FASHA and GMA</u>, that is what the Respondent must prove.

531. The Tribunal therefore turns its attention to the remaining three of the four essential questions set out in paragraph 522 above, starting with the first: did the bribe emanate from MOL (or knowingly on its behalf)? Here once again, when all the elements of proof are put together, the Tribunal is confronted by a striking fact: on whom does the

---

[208] Transcript, 22 February 2017, pp. 443-444.

[209] A project to transport Russian oil by pipelines through Hungary and Croatia to the port town of Omišalj. (See also Resp. Counter-Memorial, paras. 268-269).

[210] Cl. PHB Vol. IV, para. 83.

Respondent rely to make the link to Dr Sanader? Mr Ježić; on whom does the Respondent rely to make the link to MOL? Mr Ježić. It is Mr Ježić who:

- says that he was originally sounded out by Dr Sanader, in a private conversation no-one else can vouch for;

- says that, following up on a repeated request from Dr Sanader, he passed him the details of Xenoplast and Mr Hürlimann;

- says that he gave Mr Hürlimann to understand that it was MOL for whom Xenoplast was to perform the 'services';

- says that he was pressed (privately) by Dr Sanader over the non-arrival of the money, and that he alerted Dr Sanader (in another private conversation) that it had still not arrived;

- says that it was Dr Sanader who told him that the money would come in two tranches, and when;

- says further that he disclosed to Dr Sanader (possibly only after the event?) that the money would have to stay in Xenoplast's accounts for some time, and be subject to substantial handling fees;

- says that, after a change of heart, he broke the news to Dr Sanader (in yet another private conversation no-one else can vouch for) that he was withdrawing from the deal, and that Dr Sanader was apparently unperturbed by this, and took him along on a side excursion to arrange with his (Dr Sanader's) brother to take over Mr Ježić's role; and

- says that, after a later attack of conscience, he decided he must make a clean breast of it, and volunteered of his own free will to USKOK the testimony which led, ultimately, to the prosecution of Dr Sanader and also Mr Hernádi.[211]

Apart from the one item relating to Mr Hürlimann and the testimony to USKOK, all of the above was in private and uncorroborated (and, as the Tribunal was informed, has been

---

[211] C-163.

contested outright in the evidence to the UNCITRAL tribunal of Dr Sanader, and *pro tanto* that of Mr Petrović).

532. It is thus plain that the corruption allegation stands or falls by Mr Ježić. Without him, the Respondent has no case. His reliability as a witness must therefore be examined in detail.

533. It seems to the Tribunal patently obvious that the evidence of Mr Ježić needs to be approached with particular care, and this for a number of reasons. Central among them is the fact that, on any account – including his own – Mr Ježić himself was a central participant in the serious criminal conduct he alleges took place. Why therefore did he come forward with what is in effect a confession? under what circumstances did he do so? what did he stand to gain from doing so? why has he been subject to no form of prosecution, even threat of prosecution? why has he been allowed to hold on to the very substantial sum of money involved – even despite repeated undertakings to disgorge it?

534. These questions are obvious; they suggest themselves. And they lead automatically to the supposition that the motive behind Mr Ježić's actions may well have been, and in all probability was, to construct for himself a scenario of at least partial exculpation: yes, he was the knowing recipient of a large corrupt payment, but it was in reality intended to be passed on to someone else, and, once he had come to think better of the whole rotten arrangement, he had taken steps to make a clean breast of it, so that the real villain lay elsewhere, and by comparison his own culpability was only minor.

535. In the particular circumstances, this supposition is reinforced as a working hypothesis by the inescapable facts (a) that Mr Ježić has avoided all prosecution by the Croatian authorities (including, so it would seem, for other corruption offences for which he had been under investigation), and (b) that he has been allowed (so far at least) to keep the money.[212] The Respondent seeks to justify Mr Ježić being let off the hook on the basis that, had he been formally charged, Mr Ježić would have been able to avail himself of his constitutional privilege against self-incrimination, and would therefore not have been available as a witness (the key witness, the Tribunal interpolates) against Dr Sanader and Mr Hernádi.[213] This is an argument the Tribunal finds wholly unpersuasive. It is also

---

[212] Resp. PHB Vol. III, para. 71.
[213] Resp. PHB Vol. VI, para. 41.

disingenuous: if the authorities know for sure that Mr Ježić would decline to testify on the above grounds, then the reason not to prosecute him is that, although guilty, he will still agree to give evidence. But how could that situation have been arrived at in the mind of the prosecuting authorities without some discussion and agreement with Mr Ježić? These dealings the Respondent has however steadfastly declined to disclose. Yet, without such disclosure, the Tribunal has simply not been placed in a position to make a complete assessment of Mr Ježić's motives, his self-interest, and therefore his truthfulness as a witness, including specifically his evidence before the Tribunal itself.

536. Put together with the strange, and as yet unexplained, story of the conditions under which Mr Ježić – and Mr Hürlimann – first appeared to make their statements to USKOK (discussed further below), that gives rise to a state of affairs which obliges the Tribunal to approach Mr Ježić's evidence with great circumspection.

537. Besides being the essential pillar of the Respondent's case over the corruption allegation, Mr Ježić is also the only one of the central cast of characters apart from Mr Hernádi whom the Tribunal saw in front of it. He made two witness statements, and appeared in the witness box for a total of 10 ½ hours, so that the Tribunal had full opportunity to form a view of its own as to his truthfulness and reliability. He did not come out of the experience particularly well. Under questioning, the Tribunal found him evasive, and formed the impression of a witness who, when confronted with a difficulty, would pluck an explanation out of the air and then flounder when it came to pursuing the answer he had given or trying to reconcile it with his own earlier statements or those of others. The Tribunal notes that the UNCITRAL tribunal formed much the same impression. The Respondent makes great play of the fact that Mr Ježić's account remained consistent in its essential features over a long period of time and under sequential questioning in different forums. The Tribunal finds this argument, once again, to be unconvincing and indeed circular. Of course Mr Ježić stuck throughout to the main lines of his story; that is, after all, what constitutes his escape card. Consistency is in any case not in itself a validating factor, merely the absence of an invalidating one. More significant in the eyes of the Tribunal than consistency in the main points in Mr Ježić's story would be whether there are inconsistencies in the surrounding details which lend the main story their support – a matter that goes partly towards honesty and truthfulness in itself and partly towards the

reliability of the witness's memory. Conversely, the argument between the Parties over the supposition *falsus in uno falsus in omnibus*[214] is something the Tribunal regards as wholly beside the point. Whatever application that maxim may have in a criminal trial where a witness is shown to have been consciously untruthful in one part of his evidence, it has no useful application to the present situation where (the Tribunal repeats once again) the issue is simply whether a Party has or has not produced sufficient proof to meet the onus on it to establishing its case. The Tribunal takes it for granted, on a hypothetical level, that elements in the evidence of a dishonest witness may nevertheless be true, just as elements in the evidence of a basically honest witness may be incorrect or mistaken.

538. The Tribunal notes that in its award the UNCITRAL tribunal sets out an extended schedule of some of the most important items on which Mr Ježić's various accounts were thought to be inconsistent.[215] No useful purpose would be served by going through them once again one by one. Suffice it to say that the Tribunal had itself noted the self-same difficulties, and has not found them to have been dispelled by the materials later put before it by the Parties in the present proceedings, notably in the additional process specially laid on to permit it to consider the potential effect of the testimony in the criminal re-trial by the four named witnesses (see paragraph 512 above and paragraphs 541-542 below). It would be more relevant, in the Tribunal's view, to focus instead on the series of improbabilities which thread their way through the story as told by Mr Ježić:

1) <u>Why should Mr Ježić have been chosen to serve as the intermediary in an underhand deal?</u> Notwithstanding his connections in Croatian circles, it could hardly have been on the basis that Mr Ježić had a reputation for unblemished probity. It must rather have been that he was known to have offshore business operations which it was thought he was likely to be willing to use for nefarious purposes, and that must in turn be on the assumption that there would be something in it for him. Mr Ježić's role, whatever it was, must therefore be inherently suspect, – a suspicion enhanced by the fact of his having been put under investigation for another corruption offence.

---

[214] Resp. PHB Vol. III, para. 230.
[215] C-648, para. 305.

2) <u>Why should Dr Sanader choose to put, not only his whole political career, but even his personal welfare, hostage in the hands of someone with whom he had dealings, but who was by common agreement neither a confidant nor a close personal friend</u>? Mr Ježić was at the lowest a partly still unknown quantity, at the highest a highly dangerous one if anything went wrong. Would Dr Sanader in any event really have contemplated entering into so risky a corrupt dealing without insisting on some clear and foolproof arrangement by which he could be sure in advance that he would get his money, when he would get his money, and how much he would get? And can it be supposed that Mr Ježić would really have consented to become the exposed front-man without clear agreement in advance on what, in fact, was in it for him?

3) <u>Why would Dr Sanader hold key conversations with Mr Ježić in his ministerial office, and in particular the showdown with Mr Hernádi over non-payment not only in his office but also in the presence of a third party</u>? It would obviously have been in the interest of all concerned to avoid discussion of the deal either at a place where visitors would be logged in and out, or somewhere like the Marcellino restaurant which is widely frequented by public figures. Why not use whatever was the discreet location at which the alleged plot was initially hatched between Mr Hernádi and Dr Sanader? And would either Mr Hernádi or Dr Sanader have wanted to take the extra risk of letting Mr Petrović into the secret? Or is Mr Petrović supposed already to have known about it, in which case who else knew?

4) <u>Can it really be supposed that Dr Sanader simply shrugged his shoulders when Mr Ježić suddenly and without warning announced that he was withdrawing</u>? This is, after all, the same Dr Sanader who, by the Respondent's account, was so domineering a personality that he could force through his governmental colleagues key policy and economic decisions, like the terms of the FASHA and GMA, simply by letting his view be known. Note, too, that Mr Ježić himself carefully chose a discreet location which could not be overheard as the place to tell Dr Sanader he was going to leave him in the lurch. Is it credible that there was no come-back from Dr Sanader demanding at the very least to know what was going to happen to the money already paid?

5) <u>How can one explain the side-excursion to Zürich to line up Flavio Sanader to take Mr Ježić's place?</u> If his own brother was available to step into the breach at the drop of a hat, without forewarning, and also from a base in Switzerland, does it make any sense for Dr Sanader to have chosen Mr Ježić as the middleman in the first place? And, even then, what would have been the point of inviting Mr Ježić to tag along to a private family discussion? A discussion which, moreover, apparently involved no discussion at all of the future mechanics or of how Flavio would gain access to the moneys that were now assets on the books of Xenoplast.

6) <u>From the MOL angle, and given how much was at stake (whether things went well or whether they went wrong), is it plausible that Mr Hernádi for his part would simply have accepted as the key middlemen two people and a corporate entity completely unknown to him without both careful enquiry and some guarantee that the money would reliably find its way to its intended goal?</u> If there had been a bribe offered by or on behalf of MOL, then, even before it was paid, MOL would have wanted to know for sure that it would reach its target and have its intended effect. And MOL would have taken great pains to prevent the facts leaking out. If so, why choose as the intermediary on its side somebody (Mr Fazakas) with easily traceable links to MOL, and why would the intermediary have introduced himself to Mr Hürlimann in a way that pointed directly at MOL? The message could simply have been passed back down the chain to Mr Ježić and from him to Mr Hürlimann that the anticipated approach would come from a named individual, and that he (Hürlimann) was authorized to deal with that individual. And would Mr Hernádi, any more than Dr Sanader (see 3 above), have been willing subsequently to discuss details of the payment of the bribe in the presence of a third party?

7) <u>Finally, why reveal at all not just to Mr Hürlimann – but to Mr Ježić himself – that the ultimate source of the money was MOL?</u> For Mr Ježić to play the part envisaged, he had no need to know more than the identities of the actual payer or payers. And there was nothing to be gained by taking on the extra risk of telling him any more than that.

539. It can readily be seen from this recital that Mr Ježić's story is threaded through with a series of implausibilities that are not capable of being cured on the simple basis that he

continues to stick to it. It therefore became of interest to the Tribunal, having already formed an unfavourable view of Mr Ježić as a witness, to see what further colour his testimony in the continued Croatian criminal proceedings (the "Zagreb testimony") might give to his evidence in these proceedings. Similarly, whether the Zagreb testimony of the three key witnesses who had not appeared in these proceedings, might serve as corroboration of Mr Ježić's story.

540. Having heard the analysis of Mr Ježić's own Zagreb testimony[216] by counsel for both Parties, the Tribunal found itself no further forward. What Mr Ježić said to the Zagreb County Court on oath seemed to the Tribunal to exhibit the same qualities as had given rise to the Tribunal's earlier doubts about his reliability as a witness in these proceedings: prevarication, inconsistency in the details, and the propensity to grab at any explanation when this inconsistency was challenged. Marked, too, was the readiness to pass the buck to Mr Hürlimann whenever an awkwardness arose. The Tribunal's doubts as to Mr Ježić's veracity were thus left intact, as were his evident self-interest and its likely effect on the objectivity of his account.

541. When it comes to the three non-appearing witnesses, the testimony of Mr Fazakas touches only the evidence of Mr Ježić, but not that of Mr Hernádi or any of the other Claimant witnesses, and then no more than marginally.[217] It seems that Mr Fazakas never met Mr Ježić, nor had any direct dealings with him, his only dealings being with, or through, Mr Hürlimann; and, by definition, Mr Fazakas had no part in the key events said to have happened in Croatia. Thus Mr Fazakas's only significance for the Respondent's case lies in the payment of the money to Xenoplast, and in the link his involvement is said of itself to establish to the Claimant, MOL. As to the payments representing the alleged bribe, the Zagreb testimony failed to dispel the uncertainty over just what was the ownership or control over Hangarn or Ceroma at the relevant time, or what conclusions that might suggest as to whose money in reality it was that was paid to Xenoplast. And, as to his links, Mr Fazakas seems to have denied that, in introducing himself to Mr Hürlimann, he ever mentioned more than that he had connections with MOL, and it is only Mr Ježić or

---

[216] C-749; C-750; C-752; C-753; C-754; C-755; C-756; C-757; C-761.
[217] C-765; C-766; C-767.

Mr Hürlimann who claim, though each in their different ways, that they understood Mr Fazakas to be acting <u>for</u> MOL in the transaction. But it remains unclear whether either of them formed that impression from what the other had said to him, or from what they assert Mr Fazakas himself had said (which, in Mr Ježić's case, must have been as hearsay *via* Mr Hürlimann). The Tribunal takes it as read that a middleman in Mr Fazakas's area of activity is likely to have had a variety of roles, agencies, consultancies or connections, and may indeed also have acted on his own account as well, but the Tribunal has been shown nothing to suggest either that Mr Fazakas acted <u>only</u> on behalf of MOL, nor (other than the evidence and testimony of Messrs Ježić and Hürlimann) anything to show that he was specifically representing MOL on this occasion. The Respondent does nothing to assist its case through its insistent repetition in its written and oral submissions of references to the person concerned as 'MOL's paid consultant, Imre Fazakas'[218] which simply begs the question. The cardinal question is not whether Mr Fazakas acted as a consultant for MOL or had been paid by MOL (for which evidence was produced), but whether he was in fact representing MOL here and on this occasion, and that is a matter of proof not bald assertion. Apart from the evidence of Mr Ježić and the Zagreb testimony by him and Mr Hürlimann, all that seems to have been offered in this regard is Mr Fazakas's business card;[219] neither Mr Ježić nor Mr Hürlimann seemed able to produce other documentation of the kind that would normally be expected. Behind the business card, however, lies an enigma. It was not produced by either Mr Ježić or Mr Hürlimann to back their original statements to USKOK. Rather, so the Tribunal was given to understand, it arrived in USKOK's hands out of the blue much later on, under cover of an anonymous and unsigned letter which claimed to have been triggered by local press reports and wished USKOK great success in its work. The reference in it to local press reports, as well as the fact that the covering letter was written in Croatian, rule out any possibility that the business card's origin might have been Mr Hürlimann, but otherwise leaves its true provenance shrouded in mystery. Under these circumstances, and

---

[218] Resp. Counter-Memorial, para. 167; Resp. Rejoinder Vol. II, paras. 56, 67 & 135; Resp. PHB Vol. VI, para. 2. Other variants also being used on occasion, like 'agent' or 'associate.' Mr Hernádi's evidence to the Tribunal as to the relationship with Mr Fazakas was wholly at odds with any notion that Mr Fazakas had some sort of roving commission to act on behalf of MOL (Transcript, 23 February 2017, p. 940) and the Respondent has not offered anything to refute it.

[219] C-417.

without further evidence that this was in fact an item handed over by Mr Fazakas when he came to see Mr Hürlimann, then, despite the Respondent's repeated reliance on it, the business card is of no probative value. Or, to put it another way, the card 'proves' nothing more than what has seemingly never been denied, namely that Mr Fazakas has and uses a visiting card in those terms. Moreover, and with all due respect to the Respondent's attempt to portray it as a 'MOL business card,'[220] the Tribunal regards it as plain on its face that the card is nothing of the kind. It is the card of the Chairman of a Hungarian limited liability company ZMB (Zapadno-Malobalykskoye) which (on the evidence) was jointly owned by RussNeft[221] (in succession to Yukos) and MOL, both of whose logos appear in the upper corners, neither taking pride of place over the other.[222] Once again, therefore, the need remains for proof of something said by Mr Fazakas to show that he was acting for MOL, and the business card by itself is of no intrinsic evidentiary value.

542. What remains therefore is whether the Zagreb testimonies of Mr Ježić and Mr Hürlimann offered mutual reinforcement to one another in such a way as to overcome the insufficiencies in Mr Ježić's evidence noted above. To that question, the Tribunal can only give a resounding no. After hearing analysis of this testimony by counsel on both sides, the Tribunal was still left with the firm impression of Mr Ježić as a witness who will grasp at any explanation when in difficulty and try to talk himself out of the resulting contradictions afterwards; and of Mr Hürlimann as someone primarily intent on shuffling out of accepting any independent responsibility of his own. Although the two testimonies overlapped in the middle as they had to, beyond this central core they were shot through with inconsistencies – or indeed downright direct contradiction. The Tribunal detected also a feedback loop effect, in which one witness was unwilling to be sure whether he had heard something himself or had been told it by the other, whereas the latter, when pressed, cited as his source the former; and neither witness showed much reluctance to take refuge behind lapse of memory, general or particular. Moreover, just as with Mr Fazakas, Mr Hürlimann cannot by definition serve as a witness in respect of the key events in the

---

[220] Resp. PHB Vol. VI, para. 2.

[221] Russneft bought Yukos's original half-share in ZMB around 2005, at the same time as it acquired Hangarn from Yukos: WS Horváth, para. 16.

[222] ZMB is not, it seems, the same as the consulting company through which, the Respondent maintains, Mr Fazakas was paid consultancy fees by MOL.

story that took place in Croatia. Moreover, in evaluating the weight to be placed on Mr Hürlimann's testimony, the Tribunal is bound also to take into account, firstly, his refusal to accept the Tribunal's invitation to appear as a witness (as he had earlier refused that of the UNCITRAL tribunal), and, secondly, when eventually giving evidence to the UNCITRAL tribunal under judicial compulsion, his refusal to answer even the most mundane factual questions under the claim of privilege against self-incrimination. The consequence was that the only proceedings in which Mr Hürlimann agreed to give evidence were the criminal proceedings in Croatia, which is in itself a telling factor, and one which gives added urgency, in the Tribunal's considered opinion, to the still unexplained circumstances of Mr Hürlimann's initial arrival at USKOK's door in 2011, and the startling inconsistencies in the accounts of that day's events given by him and by Mr Ježić. The Tribunal can only say that, given the reliance the Respondent seeks to have the Tribunal place on the story offered to its authorities on that occasion and since developed, it stands as a blemish on the Respondent's case in this Arbitration that, throughout the over eight-year period since the proceedings commenced, it has never found the means to give the Tribunal any proper account of the events of that day and what must necessarily have preceded them.

### c. The Tribunal's decision

543. The Tribunal is thus forced to the conclusion that Mr Ježić's story cannot be relied upon, and, with that, it holds that the Respondent has fallen well short of fulfilling the burden on it to prove, to the necessary standard, the factual basis for its request that the Tribunal should disclaim jurisdiction over the Claimant's claims or declare them inadmissible, and the request is therefore rejected. In making this finding, the Tribunal associates itself with the view expressed by the UNCITRAL tribunal in its award, that this is not equivalent to a definitive finding on the part of the Tribunal that the alleged bribery did not occur, merely that the Respondent has not succeeded in proving, to the standard required, that it did occur (see also paragraphs 558-559 below).

544. The matter could be left there; but, given the importance of the issue, and in deference to the vigour and complexities of the arguments advanced, the Tribunal thinks it appropriate

to add its views and comments on certain other lines of evidence or proof that have been advanced on the Respondent's behalf during the course of the proceedings.

### d. Other issues

#### (i) Red flags

545. The Respondent has laid stress on the concept of the widely recognized, if unofficial, indicators of corruption conveniently tagged as 'red flags,' several of which can incontestably be noticed in the circumstances of the present case.[223] The Tribunal has no difficulty in accepting that they are a warning signal that corrupt activity may have been at play. 'Red flags' are, however, just that: a sign of danger ahead. They were conceived in the corruption context as a warning to decision-makers (who may include judges and arbitrators) to be alert to the threat, and, when it is apparent, to approach the evidence with the proper degree of alertness and caution. That is what the Tribunal has done. The point is, though, that 'red flags' are indicators, not proof of whatever it is that requires to be proved in the case in hand. In the present case, they carry a clear implication that there may be something suspect in the chain from the payer to the payee, namely from Mr Fazakas (via Hangarn/Ceroma and Xenoplast) to Mr Ježić. But that is as far as the 'red flags' by themselves can take you, and it is a far cry from what the Respondent needs to prove to make out its case, namely a bribe by the <u>Claimant</u>, of <u>Dr Sanader</u>, to secure the <u>implementation of the FASHA and GMA</u>.

#### (ii) Družba-Adria

546. The Respondent has made it a main plank in its argument that, unless its opponent can prove the hypothesis that the Družba-Adria or some other project was the intended object of the payments to Xenoplast, the conclusion must follow that they were intended for the FASHA and GMA, as the Respondent alleges.[224] The Tribunal refers to its earlier holding that, in accordance with general principle, it is for each Party to prove a case it wishes the Tribunal to uphold. The Respondent's proposition cannot therefore be accepted. The

---

[223] Resp. Counter-Memorial, para. 163, citing *Metal-Tech. v. Uzbekistan*, ICSID Case No. ARB/10/3, Award, 4 October 2013, para. 293 (RA-094).
[224] Transcript, 22 February 2017, pp. 443-444.

Tribunal has no need to accept as true Mr Fazakas's explanations to Mr Quick or in his Zagreb testimony in order to note that, in the absence of direct evidence to establish the purpose for which the money was paid, neither the Družba-Adria scenario nor, for that matter, the FASHA/GMA scenario amounts to more than one amongst alternative explanations.

(iii)  The Hangarn 'slush fund'

547. The Respondent has focussed attention on certain unusual aspects of the pattern of payments from MOL to Hangarn in order to submit that their true objective was to create in the hands of Hangarn a 'slush fund' that was then available for disguised use at the instance of MOL for corrupt purposes. It has attempted also to correlate certain of these payments in their size and their timing to the Hangarn/Ceroma payments to Xenoplast.[225]

548. On the narrower question, whether the money trail recorded in MOL's accounts demonstrates that the payment to Xenoplast was financed by moneys Hangarn had received from MOL, the Tribunal's answer must be that what has been shown establishes no more than that is one possibility. The Claimant has offered detailed expert forensic accounting evidence to say no, which the Respondent contests with expert evidence of its own. Given the very extensive volume of regular purchase and supply in the course of normal business between MOL and Hangarn, and the associated flow of substantial payments, the Tribunal regards the inference as nowhere near compelling enough to meet the test in paragraphs 508-509 above. If the payment, at least in the case of Hangarn, could have originated from MOL, there is next to no actual evidence that it did so originate.

549. On the broader question, whether the substantial and continuing relationship between MOL and Hangarn concealed within itself the creation of a convenient 'slush fund' for corrupt purposes, the Tribunal regards the evidence offered for so serious an allegation as wholly insufficient. The Tribunal heard at length from MOL's Executive Vice President of Downstream, Mr Horváth, who devised in 2008 the pricing scheme currently in use for purchase and supply by MOL from Hangarn. It thought Mr Horváth a serious and knowledgeable witness and found his explanation for the unorthodox elements in the

---

[225] Resp. Counter-Memorial, para. 91.

pricing scheme to be entirely plausible. It accepts Mr Horváth's explanation of the unorthodox and at times volatile elements in arrangements for trade in Russian oil and gas in the aftermath of the break-up of the Soviet Union, and the subsequent demise of Yukos. At most, the Respondent's evidence suggests that it might have been possible for the premium payments under the MOL/Hangarn long-term supply contract to be misused for nefarious purposes. That would no doubt be possible for other pricing schemes as well, but it falls far short of demonstrating that it was in fact what had happened, and it self-evidently fails to address at all whether and how moneys in the hands of Hangarn could then be deployed at MOL's direction.

550. Moreover, as to Ceroma, the Respondent has offered no evidence of any business or commercial relationship between Ceroma and MOL, and Mr Horváth's detailed briefing for the Board of MOL dated 7 July 2011, in the aftermath of the corruption allegation having emerged, sets out at length and in detail the origin and development of the 10-year relationship with Hangarn, as the trading company nominated by Yukos, but flatly denies any business relationship with Ceroma.[226] The Respondent's argument would seem to hinge in its entirety on what it submits ought to be read into the activities of Mr József Tóth.[227]

(iv)  Mr Tóth and Torafin

551. This might therefore be the appropriate place for a further comment by the Tribunal on the argument the Respondent has put to it about the connections between Mr József Tóth and the company Torafin.

552. As with Mr Fazakas, the Respondent has deliberately adopted a style of reference to Mr Tóth, seemingly at every opportunity, as 'the chief advisor to MOL's CEO.'[228] Mr Hernádi's evidence is however notably different, *i.e.,* that when he became CEO, he removed Mr Tóth from his executive positions into an unpaid role connected with his

---

[226] Horváth-008. The briefing uses the name "Cerena Holding," but the assumption must be that 'Ceroma' was what was meant.

[227] Hershman ER, Section E.

[228] *E.g.,* in written submissions (Resp. Counter-Memorial, para. 167; Resp. Rejoinder Vol. II, paras. 11, 57 & 84; Resp. PHB Vol. III, paras. 110 & 217) and also in oral argument.

extensive international and domestic contacts in the petroleum industry.[229] Apart from that, all that the Tribunal knows about Mr Tóth comes from Mr Horváth's evidence that Mr Tóth was in 2011 'Head of Crude Oil and Raw Material Supply,'[230] and from Mr Hernádi's evidence that all relationships with him were severed in the wake of the UNCITRAL arbitration.[231]

553. Against this background, the references to 'chief advisor' smack of a tactic to sow prejudice, since the Respondent has at no point offered the Tribunal any precise contention as to the particular role and function Mr Tóth is claimed to have performed within MOL at any given time that might be of relevance to the corruption allegation. Nor indeed has the Respondent made any submission to the Tribunal as to what part it considers Mr Tóth to have played in the events at issue in this Arbitration, or offered evidence to back that up. It has instead homed in on indications gleaned from extraneous documents (see the section on the Austrian files at paragraphs 517-520) that Mr Tóth, even while within MOL's employ, had received 'commissions' on supplies purchased by MOL from Hangarn. The Respondent describes these as 'illegal kickbacks' which amounted altogether to a very substantial sum of money.[232] The vehicle for doing so was a British Virgin Islands corporation, Torafin, which was part-owned by Hangarn,[233] and over which Mr Tóth was alleged to exercise 'significant control.'[234] The actual conduct imputed to Mr Tóth by the Respondent, if proved, would go no further than to show that there was malpractice in certain areas of Hangarn's business, and that the legitimate interests of MOL in some cases fell victim to it. They prove nothing at all, though, about whether the payments to Xenoplast from Hangarn or Ceroma originated from MOL or whether they were linked to the FASHA and GMA. From an evidentiary point of view, therefore, they are of little use.

---

[229] First WS Hernádi, para. 85.

[230] WS Horváth, para. 45.

[231] Second WS Hernádi, para. 29.

[232] Procedural Order No. 5, Resp. Redfern Schedule.

[233] Though, confusingly, the documents on which the Respondent sought to rely also place the relationship the other way round, so that it is Hangarn which is part-owned by Torafin.

[234] Resp. PHB Vol. III, para. 184.

(v)  MOL's internal investigations

554.  This may be a convenient place for the Tribunal to add a comment on the question whether the Claimant has been at fault in not conducting a proper internal investigation into the corruption allegation and disclosing its outcome in these proceedings. This is another contention on which the Respondent had laid repeated stress, in reliance on the expert report of Judge Freeh, whose opinion was that MOL would have been expected to initiate a credible, independent (that is to say, external) and comprehensive investigation into misconduct of the kind that has been alleged.[235]

555.  The Tribunal understands the logic behind this contention, but remains unsure what weight it is expected to place on it in the present context. If the Respondent should be understood as asserting that the Claimant was under a duty of self-exculpation, so that its failure constituted a form of confession, then the Tribunal regards this as no more than a variant of the invalid argument as to a reversal of the burden of proof, which the Tribunal has dealt with and rejected above. The Tribunal is, in any event, not convinced that it is true that there has been no proper investigation of the corruption allegation. Reference has already been made above to the detailed report submitted to the MOL Board in July 2011 on the relationship with Hangarn;[236] likewise to the fact that the report in question explicitly declared that MOL had no relationship of any kind with Ceroma. As to the question of independent external investigation, the Claimant has drawn attention to the stated conclusions of the Hungarian prosecution authorities that no evidence had been found of criminal conduct.[237] The Respondent has sought to disparage this statement as dishonest and unreliable. The Tribunal cannot, however, be asked to pick and choose as to the degree of faith and credit it will give to the prosecution authorities of one neighbouring State or another, but must take their statements on their face as the conclusions which those authorities have arrived at within their respective fields of competence. That said, the matter may however be in the last analysis of little practical

---

[235] Freeh ER, paras. 43-44.

[236] Horváth-008.

[237] Both this (C-723) and the internal report (Horváth-008) are on record in the Arbitration. In addition, Mr Hernádi gave it in evidence that MOL was at no stage approached by the Austrian authorities (Transcript, 23 February 2017, p. 935) and the Respondent has not asserted anything to the contrary.

relevance, given that the focus of Judge Freeh's opinion turns out in fact to be on the activities of Mr Tóth, the relevance of which the Tribunal has dealt with in paragraphs 551-553 above.

(vi)   The substance of the FASHA and GMA

556. The Tribunal pauses finally on one aspect of the case which has caused it great difficulty. It would summarize this as the argument that the unfavourable nature of the bargain embodied in the FASHA and/or the GMA serves as proof – or additional proof – that these agreements must have been procured by bribery. This was essentially the ground on which the Constitutional Court overturned the initial conviction of Dr Sanader, namely that the criminal courts had been wrong to take into account as an element of the alleged crime their own assessment (or, as the Claimant submitted, their prior assumption) that the agreements were against the interests of Croatia.[238] The Respondent's expert witness, Prof. Đurđević, sought in her evidence to make a distinction between the use of a public interest assessment in support of the bribery charge, which she agreed was inadmissible, and its use as part of the parallel charge for the separate criminal offence of misuse of office. In the latter context, it was acceptable, she suggested, on the basis that it was an abuse of office to act contrary to the interests of the State.[239] The Tribunal understands the point Prof. Đurđević seeks to make, and, while it can see the logic behind it, must observe that, in operation, such a doctrine could prove draconian and oppressive. As the Constitutional Court tartly observed, it blurs the essential difference between the criminal responsibility of an individual for his own conduct and the political responsibility of the Government for agreements it concluded. The second criminal trial, this time of Mr Hernádi together with Dr Sanader, was on a bribery charge alone. Yet, so far as the Tribunal can discern, it seems that some element of the same flawed reasoning did nevertheless come into play again, and more to the point, it appears to have crept in various forms into the Respondent's arguments and submissions in this Arbitration.[240]

---

[238] C-178.
[239] First Đurđević ER, paras. 68-72.
[240] See, *e.g.*, Resp. PHB Vol. VI, para. 18.

557. The proposition is, however, a self-fulfilling one, and cannot be accepted. It may perhaps be that in an extreme case a governmental decision is so entirely unreasonable that the only explanation for it has to be that it was procured by bribery or some other underhand means; but the chances of that happening in a democratic society must be vanishingly small. It is, however, common knowledge that in any society difficult policy decisions, or ones with serious economic consequences, are very likely to be the subject of divided opinion, and perhaps even sharply conflicting views; but they are decisions which elected Governments are there to take. It is equally common knowledge that, on a change of the political climate, or a change of government, past decisions are often drawn back into public debate, and can become politically very controversial after the event. Like the commercial judgements made by private companies which are later found not to have worked out well, the past decisions of prior Governments can be disavowed by their elected successors. But it is not for an international tribunal to sit in retrospective judgment on an elected Government's views as to what had or had not been in the public interest at the time. Far less still would it be tolerable to expect an international tribunal to be asked to accept a subsequent change in a State's assessment of what lay in its public interest as material support for an *ex post facto* allegation of corruption.

558. In the present case, the Tribunal has been shown ample evidence of the circumstances that led the parties to negotiate the FASHA and GMA, of the debates and reasoning that lay behind the eventual terms of these agreements, of the manner of their negotiation between the parties, and of the elaborate arrangements for their discussion and eventual approval by the Government of Croatia. Whatever the arguments might now be over who had the most powerful voice in those negotiations and discussions, or over whether the terms agreed now look good or bad for one side or for the other, the Tribunal can see nothing in the picture presented to it that would provide a basis of any kind for drawing adverse inferences. It is unable therefore to countenance any suggestion that the balance of burden and benefit laid down in the FASHA and GMA constitutes indirect evidence of their having been procured by corrupt means.

559. In the light of the above findings, namely that bribery has not been proved to the requisite standard, there is no need for the Tribunal to consider items c) and d) in paragraph 522 above, namely, who was bribed and for what purpose? did the bribe achieve its purpose?

### (7) The Claimant's Case: The Criminal Investigation and Prosecution

560. The Claimant argues, primarily, that the entire investigation into the corruption allegation and the prosecution that followed, leading several years later to the conviction of Dr Sanader and Mr Hernádi, was a deliberate and *mala fide* act designed to harm it in its position as major investor in INA.[241] Its secondary argument is that, to the extent that there may have been some justification for initiating the investigation, it and the ensuing prosecution were in any case carried on in a way that failed to respect the protections to which MOL, as a foreign investor, was entitled under the ECT.

*The bribery investigation*

561. The Tribunal will deal here with the primary argument only; the secondary argument will be dealt with below, together with the Claimant's other claims for breach of the ECT.

562. The issue can be disposed of more briefly than the Respondent's corruption allegation above.

563. The Claimant founds its claim on the award of the tribunal in the case of *The Rompetrol Group N.V. v. Romania*.[242] The *Rompetrol* award is of course not binding on the present Tribunal, but the Tribunal can nevertheless adopt the approach taken in that award, which can be summarized as follows:

- The claimant, Rompetrol, had complained about the instigation by the Romanian anti-corruption authorities of 'extraordinary and unreasonable' investigations of the claimant and its management in connection with the acquisition of a controlling shareholding in a former State corporation.[243]

- The investigations, which had not at the time led to any criminal prosecution, were taking place in the context of Romania's application for membership of the EU.[244]

- "The special character of the case is, in essence, that the Claimant's claims originate in and focus on measures taken by authorities of the Respondent State in the area of

---

[241] Cl. Reply Vol. III, Section 2.3.1.

[242] *The Rompetrol Group N.V. v. Romania*, ICSID Case No. ARB/06/3, Award, 6 May 2013 ("*Rompetrol v. Romania*") (CA-016).

[243] *Rompetrol v. Romania*, para. 46.

[244] Ibid., para. 152.

investigation and possible prosecution of criminal offences. These measures, moreover, are or have been directed not against the investor itself, a Dutch company, nor even for the most part against its investments in the host State, but rather against individuals …, the link between the two being the directing role that was played at the time by Messrs. … in the affairs of Rompetrol Rafinare S.A. ("RRC"), the principal Romanian subsidiary of the Claimant investor, as well as in the management and control of the Dutch holding company itself. There are, to be sure, certain other complaints …, but the Claimant's case stands or falls by whether it is able to make out its claim that the criminal investigations have breached the rights of the Claimant itself."[245]

- "The Tribunal wishes to make it plain from the outset that it would be acutely sensitive to any well-founded allegation that the investment arbitration process before it was intended to (or was in fact operating in such a way as to) block or inhibit the legitimate operation of the State's inherent function in the investigation, repression and punishment of crime, including economic crime and corruption. At the same time the Tribunal acknowledges the validity of the Claimant's argument that the pursuit of crime – or even its mere invocation – cannot serve on its own as a justification for conduct that breaches the rights of foreign investors under applicable treaties. To all of which the Tribunal adds a rider of its own, namely that association with the management of a foreign investor or a foreign investment cannot serve to immunize individuals from the normal operation of the criminal law, irrespective of whether the individual is a local national … or a foreign national …."[246]

- "The claims for decision in the arbitration are those of TRG, in respect of RRC, TRG's investment in Romania, which are qualitatively different in kind from whatever complaints there might be by individuals as to the violation of their individual rights by Romanian state authorities."[247]

- "… the cardinal feature of this case, namely how these provisions are to be applied in circumstances in which the Claimant is the Dutch investor, TRG, and the investment is TRG's holdings in its subsidiary, RRC. Mr. … is not the actual or entitled claimant, nor are his (former) interests through TRG in TRG's Romanian subsidiaries protected interests under the BIT. This distinction is fundamental to the case. … The focus of the Tribunal's attention will therefore be on actions taken by Romania against TRG itself or against TRG's Romanian investments, or (as the case may be) actions that affect TRG's management, operation and enjoyment of its Romanian investments. Such actions will be viewed against the background of TRG's legitimate expectations in respect of those investments …. An important element, in the particular context of unreasonableness or discrimination, will be to keep in mind the qualitative distinction between the proposition that an investigation by the State into potential wrongdoing was illegitimate in itself, and the proposition at a different level that things done in the

---

[245] Ibid., para. 151.
[246] Ibid., para. 152.
[247] Ibid., para. 172 iv.

course of a legitimate investigation were wrongful, unreasonable, or discriminatory."[248]

- "… there can be no dispute that actions directed against TRG or its investments in Romania fall within the zone of protection accorded by Article 3(1) of the BIT. Conversely, discrete actions or even a campaign of actions directed against Mr. … or others associated with him in their personal capacities would not in and of themselves be capable of amounting to a breach of TRG's treaty rights merely because of the association of those individuals with TRG or its investments. To come within the zone of protection, something more would be required. The Tribunal considers that the necessary link might take one of two forms. Either the conduct complained about could have been directed against the individuals for actions taken on behalf of and in the interest of the investor or its investment …. Or the conduct complained about could have been directed against individuals (even in their personal capacity) for the purpose of harming the investor or its investment through the medium of injury to the individuals."[249]

- "In so finding, the Tribunal wishes to make it plain that it would not regard any breach, or indeed any series of breaches, of procedural safeguards provided by national or international law in the context of a criminal investigation or prosecution as giving rise to the breach of an obligation of fair and equitable treatment. All will depend on the nature and strength of the evidence in the particular case, on the impact of the events complained about on the protected investor or investment, and on the severity and persistence of any breaches that can be duly proved, as well as on whatever justification the respondent State may offer for the course of events."[250]

564. The Claimant wishes the Tribunal to hold that the very initiation of the USKOK investigation into the corruption allegation (and then its pursuit through to criminal prosecution and trial) constituted a breach of its rights as a foreign investor under the ECT. It follows without further demonstration from the above sketch of the *Rompetrol* award that the Claimant has a steep hill to climb to establish any such claim. The Tribunal is of one mind with the *Rompetrol* tribunal that an investment tribunal would be very loth indeed to stand in the way of the exercise by a sovereign State of its prerogatives in the pursuit and punishment of serious crime, and all the more so when the criminality in question is one of recognized international concern. The Claimant maintains that the entire criminal investigation was initiated and pursued without there being what is conveniently referred to as 'probable cause,' *i.e.,* a sufficiently well-founded suspicion backed by

---

[248] Ibid., para. 198.
[249] Ibid., para. 200.
[250] Ibid., para. 279.

evidence.[251] It alleges, to reduce it to its barest essentials, that the whole corruption allegation was simply trumped up in bad faith, as a stick with which to beat a foreign investor which had fallen into disfavour after a change in the political mood in Croatia.

565. The Tribunal is not able to entertain this claim. To do so would go, to all appearances, far beyond anything the *Rompetrol* tribunal was willing to contemplate. It is self-evident that, once an allegation has been put before the competent authorities of a State that there had been a serious case of bribery affecting a major national company whose business is to provide an essential service both to domestic customers and to industry, those authorities are duty bound to investigate the allegation. The proposition is not dependent on the particular circumstance that Croatia was at the time a candidate State for EU membership, and in that context had given specific assurances to crack down on corruption. It would apply in any circumstances, even without Croatia's public commitment in the EU context to give it added emphasis. The Respondent might indeed be within its rights to say that its ratification, together with that of Hungary (and also Switzerland), of the United Nations Convention against Corruption[252] and the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions[253] carried with it an expectation (if not a formal obligation) on States Parties to follow up on suspicions raised of the commission of offences over which those Conventions required them to establish jurisdiction. The Claimant would have it that the story brought to USKOK by Mr Ježić should have been set aside right away and not pursued. But how could USKOK have been in a position to decide whether the story was either true, or else false or fraudulent, without investigating it? The only alternative would be that USKOK knew from the outset that the accusation was untrue, because it had itself conspired to concoct it.[254] But that would be a very serious accusation. Like the corruption allegation itself, it could not be countenanced except on the basis of substantial evidence, meeting a high standard of proof (see paragraph 509 above). It would in effect mean the Claimant taking upon itself the burden

---

[251] Cl. PHB Vol. V, para. 78.

[252] RA-050.

[253] RA-052.

[254] Cl. Memorial, paras. 183 & 187; Cl. PHB Vol. II, para. 221; Cl. PHB Vol. V, para. 99.

of <u>dis</u>-proving bribery, that is to say, of demonstrating positively, to the same high standard as the Tribunal has expected of the Respondent, that no bribery had taken place.

566. To what extent is the analysis different if the question at issue is, not the initiation of an investigation, but putting its outcome to the competent court in the form of a criminal prosecution? The answer, in the eyes of the Tribunal, is very little. The independence of the prosecutorial function, just like the independence of the judicial function, is an important international value, and a central component in the rule of law. If the conclusions reached by the prosecutorial arm are not well-founded, the place for that to be set right is in court, together with appropriate remedies for wrongful prosecution. None of those are processes for oversight by an investment tribunal, which has not had conferred on it either the competence or the means to carry it out.

567. Further discussion of the Claimant's various complaints against the conduct of the criminal process or its outcome is therefore postponed until later in this Award, to be measured against the specific protections guaranteed to foreign investors under the ECT.

## C.   THE CLAIMANT'S CLAIMS UNDER THE ECT

568. To recapitulate:

- All of the Claimant's claims under the ECT are within the jurisdiction of the Tribunal and are admissible; the same goes for the Respondent's defences to those claims; but in both cases subject to the following:

- The Tribunal will not re-open the award of the UNCITRAL tribunal as to the status of the FASHA and the GMA;

- No jurisdiction has been conferred on the Tribunal to supplant the exclusive dispute settlement clauses in the FASHA and the GMA;

- The Tribunal retains jurisdiction to hear disputes over whether the performance of those agreements by the Respondent conforms to its substantive obligations arising out of the first four sentences of Article 10(1) of the ECT; and

- The Claimant's claims against the institution of criminal investigations and the Respondent's defences based on the corruption allegation are rejected.

569. With that as background, the Tribunal will summarize the Claimant's claims before dealing with them one by one.

570. The Claimant founds its claims on Article 10(1) of the ECT, which reads as follows:

> "Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party."[255]

The Claimant invokes (a) the guarantee of fair and equitable treatment; (b) the non-impairment guarantee; and (c) the promise to observe obligations entered into with an investor or investment of another Contracting Party.

571. On the strength of the above, the Claimant seeks a variety of heads of relief, which can be summarized as follows –

    1)  a declaration of breach of the ECT;

    2)  monetary compensation for the pecuniary injury suffered from the Respondent's breach;

    3)  further monetary compensation for the Claimant's non-pecuniary injury (moral damage);

    4)  an order that the Respondent cease all harassment of the Claimant, INA, and their respective officials;[256]

---

[255] CA-034. The Claimant's PHB refers also to ECT Article 13 (Expropriation), but the Tribunal has been unable to find any specific claim of expropriation in the Claimant's submissions.

[256] "including but not limited to further revoking INA's licenses, pursuing legal proceedings based on false evidence, and making false or misleading statements to the media" (Cl. PHB Vol. I, para. 12 d).

5) an order that the Respondent provide the Claimant with guarantees of non-repetition;[257] and

6) an order that the Respondent provide the Claimant with measures of satisfaction in the form of an official recognition of responsibility and apology.[258]

572. It will immediately be evident that these requests for relief are very far-reaching, indeed some of them possibly unprecedented. Rather than considering at this stage in the abstract whether these remedies fall within the Tribunal's powers to award, it will be more convenient first to deal with the claims themselves on their merits before considering what remedy would be appropriate for those of them that are upheld.

573. The particular courses of conduct by or on behalf of the Respondent which form the factual basis for the Claimant's claims can in turn be summarized as follows[259] –

1) various measures which had the intention or effect of preventing the Claimant acquiring a controlling equity stake in INA (the "Equity Claim");

2) various measures to do with the liberalization of the Croatian gas market, including the unbundling of INA's gas trading business, the reorganizing of gas storage, and the management of gas market prices and royalty rates (the "Gas Market Claim");

3) various measures to do with the revocation or renewal of INA's hydrocarbon licences, and related permitting and property issues (the "Hydrocarbon Licence Claim"); and

4) the conduct of the criminal investigation and resulting prosecution of Mr Hernádi (and Dr Sanader) (the "Criminal Prosecution Claim").

---

[257] "in the form of conducting investigations and imposing appropriate disciplinary, administrative, or criminal sanctions against all those persons responsible for or participating in the campaign of harassment against MOL" (Cl. PHB Vol. I, para. 12 e).

[258] "to be made by the current Minister of Economy in a public press conference open to the media and through a public written statement from the Minister issued in Hungarian, English, and Croatian" (Cl. PHB Vol. I, para. 12 f).

[259] A further claim to do with INA's project to convert the Sisak refinery was withdrawn in the Claimant's PHB, without prejudice but, in view of the fact that it was not subsequently revived, is not included in the listing below.

### (1) The Equity Claim

574. The Claimant complains against the measures taken by the Respondent from late 2010, both on its own account through various organs of State, and in undisclosed collusion with others (specifically HANFA and the statutory Pension Funds), to put into effect its determination to ensure that MOL did not acquire a majority shareholding in INA. This, says the Claimant, had the effect of damaging the financial value of its shareholding, which in turn represents the central core of its investment in Croatia, protected under the ECT.[260]

575. The Respondent's opposition since that period to a MOL majority stake in INA is undeniable and is not contested. The Claimant's claim depends entirely on whether that went beyond a mere policy preference on the Respondent's part, so as to infringe a guarantee owed to the Claimant, or, failing that, at least a legitimate expectation acquired by the Claimant in the course of making its investment and administering it.

576. The Claimant's case is that it had always had the intention to expand its equity investment in INA, as the privatisation process developed, with the aim of achieving overall control. It contends that this must have been known to the Respondent and within its contemplation, and was in any event implicit in the concept of a 'strategic investor' as laid down in the INA Privatisation Act.[261] It had accordingly, over the years, proceeded openly to extend its shareholding beyond the 25% plus one share originally provided for.[262] By 2010, its holding amounted to some 47.15%, against the Respondent's own 44.85%.[263] All this was well known to the Respondent, and had never previously met with opposition on the Respondent's part. Quite to the contrary, it was the expansion of the Claimant's shareholding which led to the two sides negotiating the FASHA which, whatever its specific provisions, had as its whole *raison d'être* the need to rebalance shareholder rights in consequence of the changing pattern of shareholdings.[264]

---

[260] Cl. PHB Vol. VI, paras. 2-3.
[261] Cl. Memorial, para. 359.
[262] Cl. PHB Vol. II, paras. 77-87.
[263] Cl. Memorial, para. 53 & fn. 58.
[264] Cl. Memorial, paras. 115-121.

577. In the initial stages of the Arbitration, the Claimant had asserted that its initial investment in INA carried with it a guaranteed pathway towards acquiring a majority shareholding in due course. That particular claim was not, however, pursued as the proceedings moved on. Under cross-examination, Mr Hernádi agreed that the Claimant had been given no guarantee to that effect.[265] Mr Áldott, the Chairman of the INA Management Board, said the same.[266] The Tribunal considers this to have been a sensible concession, since the argument was plainly not sustainable in the light of the fact that one of the other chosen contenders for selection as strategic investor (Rosneft) had overtly withdrawn its bid on the explicit basis that no such guarantee was on offer.[267] That does not, needless to say, exclude the possibility that the Claimant might, in the course of its dealings with the Respondent's representatives, have acquired, if not a guarantee, then a legitimate expectation of some other kind which ought to be taken into account in assessing the merits of the Claimant's claim. It is that possibility which the Tribunal will now proceed to examine.

578. The obvious starting point is the terms of the INA Privatisation Act of 2002, which laid down the legal framework for the process through which the Claimant first acquired its investment in INA, after being selected as the 'strategic investor' pursuant to Article 6 of the Act. The Act's contents are sketched out in paragraph 353 above. The Tribunal extracts the following salient points –

   1) The privatisation of INA is placed unequivocally in the context of Croatia's move towards EU membership; Article 4(2) expressly foresees the final disposal of the Croatian State's retained share at that point, on the basis of a further Law.

   2) Once the initial distribution of shares to socially favoured beneficiaries has been achieved, the Act creates no obstacle to onward sale or purchase of shares in INA (subject only to the Croatian State's retained share and the possible need to acquire Croatia's consent).

---

[265] Transcript, 24 February 2017, pp. 1161, 1186 & 1199.

[266] Transcript, 24 July 2017, pp. 90-93.

[267] Linić-008: "Rosneft considers that a strategic investor in INA … should have the certainty, or at least be provided with strong comfort, that it will obtain management and ownership control over the medium term should it wish to do so; but we understand that the Government of Croatia is not currently in a position to offer this."

3) A conscious choice was made on the Respondent's side to get the privatisation process under way by selling to the strategic investor (MOL) the maximum quantity of shares permitted by law; the Government of Croatia would have been fully within its powers under the Act to opt for a lower number.

579. These points are not open to argument. They constitute a statutory mandate, and the Tribunal would not therefore expect them to have been changed or overlaid by anything that passed between the Croatian authorities and the contenders for strategic investor, nor has anything of that kind been argued by either Party in these proceedings. Where the Parties are at odds, however, is over Article 10(4), the section of the Act designed to deal with the 'protection of the interests and safety of the Republic of Croatia.' There are numerous variant translations of Article 10(4) on record in the Arbitration, all emanating in one way or another from Croatian official sources; the Tribunal has chosen, for convenience, to reproduce (but see below) the version that the advisors acting on behalf of Croatia issued to potential investors in 2002 as part of the invitation to tender:

> "As long as the Republic of Croatia is the owner of 10% of INA d.d. shares and more, none of the other shareholders or his related parties, except [in the case of sale referred to in Article 6 hereof][268], can, without a prior special consent of the Government of the Republic of Croatia, acquire gradually or at one time, INA d.d. shares whose aggregate nominal value exceeds 10% of the share capital or the shares of any other entity on the basis of a prior consent of the approved percentage of shares by the Government of the Republic of Croatia, which have voting rights at the general assembly of INA d.d.".[269]

580. With these differences in view, the Tribunal asked the Parties during the course of the proceedings to come up with an agreed translation of the INA Privatisation Act. This they proved unable to do, Article 10(4) proving the stumbling block. The differences between them were, however, small, the most critical being the phrase which the Tribunal has placed in parentheses in the text above.[270] In essence, the Respondent wishes to insert the definite article 'the' before 'sale,' so as to signal that the exception in Article 10(4)

---

[268] Parentheses added by the Tribunal.

[269] C-048.

[270] Joint Submission from MOL and Croatia on the INA Privatisation Act dated 30 January 2018.

attaches itself only to the initial sale to the strategic investor, but not beyond that.[271] The Claimant retorts that the definite article 'the' is not in the original, and would be out of place since the reference is to sales to the strategic investor in general, so that the exception would therefore cover both the initial sale to the strategic investor and all future ones to the same purchaser.[272]

581. The Tribunal is clear in its mind that the source of the difficulty is the different grammatical structure of the Slavonic languages by comparison with English; Slavonic languages will often omit an article altogether, whether definite or indefinite, when English insists on one.[273] The present seems to be just one of those cases where there is simply the absence of an article in the Croatian text, the sole authentic version of the Act, and no obvious indication whether what needs to be supplied to make clear sense in an English version is "a" or "the." To resolve the remaining ambiguity is a question of Croatian law. That being so (and without the benefit of any expert legal argument on the point from either side), the Tribunal simply does not feel capable of offering an opinion of its own on a legal issue which, ultimately, could only be decided by the Croatian courts.[274] The Tribunal can go no further than to say that the overall logic of the Act could be argued either way. Having said that, the Tribunal also doubts whether the point is as significant as has been suggested in argument. Even if the Article 10(4) exception should be taken as applying only to the initial sale of shares to MOL, so that, as a matter of Croatian law, specific consent was required for future purchases above the threshold, this leaves untouched the key question under the ECT, namely whether and under what circumstances that consent could legitimately be withheld.

582. Reverting then for a moment to the accumulation of the Claimant's shareholding after the initial purchase in 2003 and their subsequent listing on the Zagreb Stock Exchange in 2006, the next key events took place in 2008. There were meetings between Mr Hernádi for the Claimant and the Minister of the Economy (then Mr Polančec) for the Respondent

---

[271] Resp. PHB Vol. IV, para. 25.

[272] Cl. PHB Vol. VI, para. 188.

[273] Apparently, the same mismatch can also happen in reverse.

[274] As the proposed amendment to Article 10 brought forward by a Member of Parliament simultaneously with MOL's private share offer (C-434) was not proceeded with, no conclusion can be drawn from it as to the proper interpretation of Article 10 as it stands. Similarly for the Government's own proposed amendment of a year later (C-200).

which centred around the Claimant's expressed wish to increase its ownership stake in INA and the added control that would come with it.[275] The means proposed for MOL to acquire further shares, so far as the Croatian Government shareholding was concerned, was to carry out a share swap, under which Croatia would transfer INA shares to MOL in exchange for shares in MOL.[276] This was something specifically envisaged in the INA Privatisation Act.[277] It was recognized between the Parties that the process of share-swapping might in addition entail the obligation under Croatian law for MOL also to make a public offer to existing INA private shareholders, and that the outcome of the two together was likely to mean MOL gaining a majority shareholding in INA.[278] The hard facts of economic and financial life that brought an end to the share swap proposal are documented in the written pleadings of both Parties;[279] for present purposes, however, the key fact is that the Respondent was wholly behind the idea of the Claimant acquiring further INA shares in this way, and doing so out of the Respondent's own shareholding. Likewise, it is clear that the Respondent, which was fully aware of MOL's intention to launch a public offer to acquire the free float of INA shares, had raised no opposition to it. Quite the contrary, it could reasonably be said that, by offering advice on the most appropriate price to offer, the Respondent had not only smiled upon but positively facilitated the Claimant's plans.[280] The reasons why, against the economic crisis that erupted in 2008, MOL's timing of its public offer to shareholders turned out to be unfortunate will be dealt with, as necessary, below, but they are not germane to the Tribunal's assessment of the Respondent's overall attitude towards the acquisition of further INA shares by MOL. Following the public offer, the Claimant's shareholding rose to just over 47%.[281]

583. In the light of the above, the Tribunal has little difficulty in holding that the background against which the Claimant was openly induced to make its initial investment in INA was

---

[275] Cl. PHB Vol. II, para. 71.

[276] Cl. PHB Vol. II, paras. 71-78.

[277] C-005, Article 4.

[278] Cl. PHB Vol. II, para. 71.

[279] Cl. PHB Vol. II, paras. 83-84; Resp. Rejoinder Vol. II, para. 355.

[280] First WS Hernádi, para. 31.

[281] See generally paragraphs 361-363 above.

a formal privatisation process, laid down by parliamentary legislation, designed *inter alia* to enable Croatia to meet the requirements for accession to membership of the EU. The process was an open one, and was destined to be completed on EU accession. Particularly telling in that context is the crystal-clear statement in MOL's original formal expression of interest from June 2002[282] that, while being content with a minority shareholding at the initial stage of privatisation, its aim was further to increase its participation as partnership developed.[283] Against that background, any strategic investor would have been entitled to assume that, once the initial investment was duly made and it became actively engaged as strategic investor in the modernization and management of INA, Croatia would interpose no bar against it increasing the equity stake of its investment, or acquiring a majority stake, provided it set about doing so by lawful means. That assumption is one of a fundamental nature, linked with the original reasons for entering into the investment as 'strategic investor,' and therefore is an expectation the Tribunal must take into account in the assessment of whether the strategic investor's investment had received the fair and equitable treatment Article 10(1) of the ECT requires. The Tribunal is of the view that the fact that a further legislative decision or specific consent might have been required along the road in order to complete the privatisation of INA is immaterial to the expectations created at the time of the admission of the strategic investor and the course of conduct that followed.[284]

584. The Respondent resists the Equity Claim at all levels. Leaving to one side for the moment that it does not accept either that the Claimant has suffered the damage it claims, or the validity of the method adduced to measure it, the Respondent denies (a) that the Claimant

---

[282] C-049.

[283] "*Path to increase in participation*: MOL is prepared to be an active participant in a dialogue with the Croatian government regarding the optimal way in which to develop the future shareholding structure of INA. While MOL is prepared to acquire a minority stake in INA at this stage of privatisation, it would seek a path to further increase its participation in INA which could lead to a stronger partnership link, further promoting synergies and the competitive position of the Company in the longer term and ultimately creating significant value. We firmly believe that such clearly defined management responsibilities and a clear shareholding structure will ultimately serve the interests of all parties. MOL is prepared to discuss ways to achieve such objectives in further detail at a later stage of the process." (Ibid., p. 16).

[284] See Croatia's position paper of 15 May 2003 which refers to all of Croatia's residual shareholding over and above its own 25% plus 1 share being subject to a right of first refusal for the benefit of the strategic investor. (C-440, para. 1).

was prevented from acquiring a majority stake at all, and denies further (b) that there was anything reprehensible about its own actions in respect of the 2010 private share offer.

585. On the second of these arguments, the position is reasonably clear-cut. It is true, so it would seem, that it was the Claimant which took the conscious decision not to pursue the share swap that had been under discussion between the Parties.[285] The Tribunal was however given, in the evidence of Mr Hernádi and Mr Áldott, the reasons which led to this decision, deriving very largely but not exclusively from the changes in relative share values on the market.[286] The Tribunal regards these reasons as entirely plausible. Whether the decision itself was an economically good or bad one is a separate question, and one which is not for the Tribunal to judge. Conversely, the implication behind the Respondent's argument[287] that the Claimant could, in the years that followed, simply have pursued the share swap is, in the Tribunal's view, more than a little disingenuous, given the numerous indications which are on the record of the Croatian Government's strong public opposition by then to MOL's acquisition of a majority shareholding.[288] In those circumstances, it is hardly credible that the same Government would have acted as the agent to bring about what it vociferously opposed, by agreeing to transferring enough INA shares to help MOL across the line. And, by the same token, the Tribunal must regard it as highly unlikely, once outright hostility had set in between the two partners, that MOL would have wanted to welcome the arrival of Croatia as one of its own substantial shareholders.[289] The Claimant points out that the public announcement that the chief Croatian Prosecutor was convinced that positions had been abused in the MOL/Croatia negotiations came some two months before, and that, by early 2011, Mr Hernádi had already been questioned three times on the basis of mutual legal assistance requests from Croatia.[290]

---

[285] First WS Hernádi, para. 35.

[286] First WS Hernádi, para. 35; Second WS Áldott, para. 13.

[287] Resp. PHB Vol. IV, paras. 122-127.

[288] See, *e.g.*, the two public statements cited to this effect by the Respondent's witness, Mr Štimac (Štimac-003 & -004). See also the press reports in documents C-120, C-122 & C-124.

[289] Ms Bencsik's evidence was that the initial calculation within MOL was that an exchange of between 4 and 9% of MOL's shares would have been required (WS Bencsik, para. 10).

[290] Cl. Memorial, paras. 155-156.

586. The final argument, *i.e.,* that it was MOL's own ineptitude to blame for the failure of its private offer, is more conveniently discussed in connection with the allegations the Claimant has made about collusion between the Government and, on the one hand, the mandatory Pension Funds and, on the other, the Financial Services Supervisory Authority HANFA.

### a.  Attribution to Croatia

587. Before proceeding to consider the Parties' allegations in detail, the Tribunal notes that there is no agreement over whether either the mandatory Pension Funds or HANFA constitute entities whose actions engage the international responsibility of Croatia under international law. In respect of the Pension Funds, the Claimant rests its argument on the fact that, although they are private sector bodies owned and controlled by leading financial institutions, they are nevertheless closely linked to the Croatian Government through the important public function they perform under statute and through their investment portfolios, and should therefore be assumed to be open to Government influence.[291] The Claimant has not, however, sought to situate the Pension Funds within the accepted framework of attribution of conduct to the State under international law. The Tribunal doubts whether that is of any importance in context – both because it has found there to be (see below) ample direct evidence to justify the conclusion that the Pension Funds were in fact subjected to Government pressure; but equally because the target of the Claimant's complaint is not the Funds buying INA's shares and holding on to them, but rather the conduct of the Croatian Government in seeking to coerce them into doing so.[292]

588. In respect of HANFA, the Claimant's position is somewhat different. Here it does directly submit that HANFA's acts and omissions should be attributable to the Respondent, either on the basis that HANFA is an organ of the Croatian State for the purposes of Article 4 of the International Law Commission's Articles on State Responsibility or on the basis that HANFA is empowered by law to exercise elements of the governmental authority for the purposes of Article 5.[293] The basis for this submission is the law by which HANFA was

---

[291] Cl. PHB Vol. VI, paras. 69-75.

[292] Cl. PHB Vol. VI, para. 64: "It is Croatia's '*reaction and response*,' and its subsequent actions to regain control over INA as a whole that MOL challenges as contrary to Croatia's ECT obligations …".

[293] Cl. PHB Vol. VI, para. 97.

established, and the regulatory powers it confers on HANFA, together with the fact that all of the members of both its Management Board and its Supervisory Board are appointed by the Croatian Government with the approval of Parliament.[294] The Respondent's answer is simply that HANFA is independent of the Government in its operation.[295] The Tribunal is not convinced that the regulatory functions conferred on HANFA by Article 15 of the Act on the Croatian Financial Services Supervisory Agency dated 26 January 2012[296] constitute it a State organ or as 'empowered by … law … to exercise elements of the governmental authority'[297] under the principles of State responsibility. But neither does it regard the Respondent's response as a sufficient answer to allegations that in fact, in the particular case, HANFA allowed itself to be pressurized by the Government, or at least acted in collusion with it. That said, and similarly to the case of the Pension Funds (see above), the Tribunal doubts whether the question is of that great importance. As in the Pension Fund context, the real issue, to the mind of the Tribunal, is not whether the actions of HANFA in themselves constituted breaches of the ECT causing damage to the Claimant's protected interests, but rather the allegations by the Claimant in respect of the conduct of the Croatian Government in influencing the actions of HANFA.

### b.  The Pension Funds

589. Moving now to the facts, the Tribunal will begin with the case of the Pension Funds.

590. It is undisputed that the Pension Funds concerted between themselves a coordinated plan to take advantage of MOL's announced intention to make its private offer; that they exerted themselves, by placing pre-opening bids on the Zagreb Stock Exchange, to set and maintain the public market price slightly higher than MOL's publicly announced offer price; and that through doing so they succeeded in acquiring a substantial quantity (4.2 %) of INA shares at their own chosen price,[298] so effectively frustrating the success of MOL's private offer which netted only 0.1%.[299]

---

[294] Cl. PHB Vol. VI, para. 96.
[295] Resp. PHB Vol. IV, para. 37.
[296] PM-001.
[297] CA-195, Art. 5.
[298] Transcript, 27 July 2017, p. 97.
[299] Cl. PHB Vol. VI, para. 88; Resp. PHB Vol. IV, para. 137.

591. The direct evidence available to the Tribunal as to the Pension Funds' strategy and motives is limited. After the Respondent's last-minute withdrawal of the evidence of Mr Novoselec, the Tribunal was given nothing to go on other than the brief written evidence and subsequent cross-examination of Mr Štimac, the Chairman of PBZ, one of the four Pension Funds. The evidence offered by the Claimant was, of necessity, indirect. Ms Bencsik, giving evidence for the Claimant, says that it never made good sense for the Pension Funds to outbid MOL's offer price, since that price, which was at a substantial premium to the market price, was based on MOL's very specific individual wish to enhance the value of its existing investment.[300] Mr Štimac's answer to this was that it was precisely that which the Funds were aiming to cash in on, through the even higher premium they would be able to wring out of MOL when it sought to buy on from them the shares it had been thwarted from acquiring through its general offer. He concedes that, in the light of trading circumstances on the Zagreb Stock Exchange, his Fund (and presumably the other Funds too) would only be able to dispose of their holdings *en bloc*.[301] To the mind of the Tribunal, this counter-argument encounters the major flaw that the sizeable block of INA shares in question remains in the hands of each of the four Pension Funds today, over ten years later. Mr Štimac's explanation was that the Funds were still waiting for MOL to approach them – to which he added under questioning that they had no thought themselves of approaching MOL, the only credible buyer, since that would weaken their bargaining position as sellers.[302] Mr Hernádi maintained the contrary under cross-examination, namely that MOL <u>had</u> approached the Funds, and other intermediaries had done the same offering a greatly enhanced price, but to no avail.[303] There is a direct conflict of evidence here which the Tribunal is unable to resolve. However, the bare fact that each one of the Pension Funds is still holding on to these shares more than a decade after they were purchased undermines the credibility of Mr Štimac's account.[304] And

---

[300] WS Bencsik, para. 28.

[301] WS Štimac, para. 12.

[302] Transcript, 27 July 2017, pp. 106-107 & 110-111.

[303] Transcript, 24 February 2017, pp. 1224ff.

[304] Ms Bencsik points out as well that the Pension Funds have not exploited their position to involve themselves in INA's corporate governance as active investors, but nor has INA paid regular dividends of a kind that would be of interest to a passive investor (WS Bencsik, para. 28). Mr Štimac also failed notably, under cross-examination, to

Mr Štimac belies his own account by describing how his Fund had earlier capitalized on INA as a good investment opportunity by getting in a 1% shareholding in the 2006 Initial Public Offering and then selling it on to MOL at a profit during MOL's public offer two years later.[305] The Tribunal is forced to conclude that the observable factual state of affairs gives rise to a strong probability that the Pension Funds set about cornering the INA's shares at the Croatian Government's instigation or encouragement; and, having done so, rather than then realizing them at a profit, have held on to these illiquid investments ever since at the Government's encouragement.

### c.   HANFA

592.   In the case of HANFA, the picture is more complicated. It is not denied on either side that HANFA had important responsibilities towards the market that were clearly engaged by a major offering for the shares of INA, one of the few blue-chip stocks on the Croatian market. The question is how those responsibilities were carried out in the event, and on this the Parties are in sharp disagreement. The main steps are well known,[306] and can be summarized for convenience as follows. There is no, or only marginal, disagreement between the Parties over the facts themselves, but disagreement as to their meaning and significance.

1)   On 2 December 2010, MOL announced publicly that it proposed to acquire up to 800,910 shares in INA by way of private offer, at a premium of 60% above the market price.[307]

2)   The following day, HANFA ordered trading in INA shares on the Zagreb Stock Exchange to be suspended until the public had been "correctly and properly

---

substantiate the claim in his Witness Statement that the Pension Funds' purchase calculations had been influenced by news of promising INA prospects in Syria (Transcript, 27 July 2017, pp. 273-277).

[305] WS Štimac, paras. 9-10.

[306] Fuller details are at paragraphs 382-394 above.

[307] C-115.

notified of the circumstances regarding the offer";[308] the suspension remained in effect for 11 days.[309]

3) Four days later, MOL asked HANFA to confirm its understanding that it would not be obliged by law to make a takeover bid, given that MOL and Croatia held, between them, more than the threshold of 75% of the voting rights in INA.[310]

4) Six days later, and three days after the issue of a Croatian Government press release making it plain that the Government was not sympathetic to MOL's plans, HANFA issued, and made public in a Notification to Investors, its Opinion, in which it confirmed MOL's understanding, on the basis that, so long as the SHA was in effect, MOL and Croatia were regarded as acting in concert; it did however add to its Opinion a final paragraph indicating that it 'believed'[311] that MOL should refrain from purchase or sale of INA shares on the stock market during the currency of its bid, "in order to avoid a possible suspicion of market manipulation or misuse of privileged information," and the Head of HANFA personally telephoned MOL's legal counsel to reinforce the message; in addition, HANFA's public announcement warned private shareholders of the risk they bore if the market price of the shares turned out to be higher than MOL's offer price.[312]

5) By the time trading in INA shares resumed on the following day, the Pension Funds had succeeded, through the issue of pre-trading bids, in setting an opening price on the Zagreb stock market marginally above MOL's announced private offer price.[313]

6) MOL's private offer went out the day after that through the CDCC, the papers having been sent to CDCC in mid-afternoon the day before;[314] under the HANFA Opinion, MOL was disabled from competing with the Pension Funds on the stock

---

[308] C-117.

[309] The announcement also indicated (without any factual basis, according to the Claimant) that MOL and CDCC had "announced" their intention to seek HANFA's opinion on certain aspects of the offer, but had not yet done so.

[310] R-322.

[311] See Transcript, 27 July 2017, pp. 18-19, as to whether the more appropriate translation would be 'held.'

[312] C-123.

[313] Cl. Memorial, para. 172.

[314] PM-036.

market in parallel with its private offer, and under CDCC rules, it was locked into its nominated price for the private offer.

7) Later the same day, MOL complained to HANFA alleging market manipulation by the Pension Funds, a complaint which HANFA rejected two days later, after having reprimanded MOL for its public comments about actions in the market.[315]

8) The following March, HANFA imposed a one-month temporary stop on trading in INA shares,[316] giving as its reason the circumstances surrounding "significant trade by foreign investors;"[317] and the following day it was reported that the Croatian Government was against permitting majority ownership of INA and intended to adopt a decision to that effect.[318]

9) In May of the same year, HANFA issued a decision finding MOL to have engaged in market manipulation in its private offer, citing the knowing dissemination of false and misleading information by concealing that the real purpose behind its private offer was to gain majority control;[319] one week later, Messrs Ježić and Hürlimann volunteered their statements to USKOK which led ultimately to the bribery charges against Dr Sanader and Mr Hernádi.[320]

593. This is a tangled course of events, which requires interpretation.

594. The Tribunal begins with the observation that the Claimant must, in its opinion, be regarded as bearing its share of responsibility for how the situation developed. There is some dispute over how far Croatia, the other major shareholder in INA, had been informed of MOL's offer in advance of its being made public. At its most favourable, the notice would appear to have been given orally in a meeting the day beforehand with Mr Šuker (the Minister of Finance who also functioned as President of INA's Supervisory Board).[321]

---

[315] C-131.

[316] Though the Claimant maintains that the suspension remained in effect for almost the whole of that year (Cl. PHB Vol. VI, para. 53).

[317] Gašparović-050.

[318] C-126.

[319] C-133.

[320] C-162 & C-163.

[321] It is Mr Áldott who testifies to the meeting, but he does so only in the most general terms (Second WS Áldott, para. 17) mentioning only the presence of his colleague Mr Galacz, who has not been offered as a witness.

The Claimant dresses up Mr Šuker's responses during that meeting as a signal that the Government of Croatia had no objection to MOL's plans.[322] Even without any evidence to the contrary from the Croatian participants,[323] the Tribunal is reluctant to share that assessment, given that whatever communication was made took place at virtually the last minute and was neither formal nor in writing. All the more so as Mr Hernádi volunteered in his evidence that Mr Polančec had by then emerged as the leading, perhaps the sole, negotiator for Croatia, with Mr Šuker playing no active part,[324] and Mr Polančec had been MOL's chosen interlocutor for consultation on MOL's earlier public offer in 2008.[325] This chosen approach appears to the Tribunal all the more surprising given that MOL, linked as it was to Croatia *via* the SHA, was intending to rely, for the purposes of the applicable takeover legislation, on the legal construct that these two main shareholders were 'acting in concert.' It seems to the Tribunal not at all unreasonable that the first official and public reaction from the Government appeared a mere two days later, and that it was in the terms that MOL had every legal right to make its offer, but that the Government took exception to not having been properly notified in advance and would state its formal position in the days to come.[326] The Tribunal has been offered no direct explanation for why the Claimant chose to handle matters this way. The Claimant's conduct does, however, strongly suggest to the Tribunal that, for whatever reason, a souring of relations had already set in between the Parties by that time.[327] It is against that background that the Tribunal will examine what subsequently occurred in the conduct of HANFA, primarily, but also (see below) that of the Government.

595. The first question the Tribunal must pose itself is whether there is anything inherently suspect in HANFA intervening on 3 December 2010, in the wake of MOL having

---

[322] Cl. PHB Vol. II, para. 191.

[323] Mr Šuker was not offered as a witness by the Respondent.

[324] First WS Hernádi, paras. 23 ff.

[325] Ibid. para. 31; Second WS Hernádi para. 9.

[326] R-325 (Mr Popijač) and R-326 (Ms Kosor, who had apparently just returned from an official trip abroad).

[327] Mr Áldott describes this as 'coordinated actions to obstruct INA's management,' but once again does so only in general and largely unspecific terms (First WS Áldott, para. 24); and, when he does particularize, apart from a remark by the Croatian President in a radio interview, what he cites turn out on closer examination to have taken place later on, after the share offer was finished and done with. Mr Hernádi testifies in similarly sweeping terms, without particulars, but with implicit reference to events that did not occur until later (First WS Hernádi, para. 104).

announced the day before the intention to make its private offer. The Tribunal cannot accept any such suggestion. Whether the particular form the intervention took was well-judged or not is a matter for financial experts, but not one for the Tribunal to assess. There is no room for doubt that a general offer for INA shares by a major investor, which would by its nature have as its address a widely diversified group of domestic shareholders, represented a significant event on the Croatian scene. Nor is it unreasonable to imagine that this might in turn necessitate measures to ensure that small investors were protected, and that the relevant background facts were in the open.[328] In the Tribunal's view, this would have been the case irrespective of whether the offer to purchase came from a foreign investor or a domestic investor. The Tribunal regards it as highly likely that HANFA would have got wind by normal and legitimate means (as Mr Štimac says the Pension Funds had done) of the possibility that there were tensions at the governing level within INA, and specifically that the two major shareholders, who between them completely controlled INA's management, might be at odds with one another over the proposed share offer – as indeed became publicly evident a very short while afterwards. And it must also have been within the contemplation of any competent financial market authority that an issue might arise as to the operation of the takeover legislation, in which the authority itself could have a role to play – as indeed also proved to be the case.

596. That said, and given in particular the central role that HANFA's actions came to play in the arguments of the Parties, the Tribunal must nonetheless express its serious disappointment that no senior and ranking HANFA representative was made available as a witness to explain and answer questions (including from the Tribunal itself) as to what HANFA thought and did, especially at the policy level. The Tribunal means no disrespect to Ms Fijačko in saying so. It found her to be an honest and responsible witness; but the fact remains, and emerged clearly in her cross-examination, that she occupies (as she did at the time) a middle-level staff position at the Agency, and had no knowledge of what happens (or happened then) at the senior policy levels above her. Under those circumstances, while the Tribunal cannot find fault with the fact of HANFA's intervention

---

[328] According to MOL's internal documents, institutional investors held only one fifth of the free float in INA shares, and the remaining four fifths was fragmented between nearly 30,000 private individuals, most of them owning fewer than 50 shares (C-114).

on 3 December 2010, the Tribunal will have to examine with particular care the nature of that intervention and the events that followed in its train, and draw its own conclusions, as it considers appropriate, as to their significance.

597. Amongst the Claimant's complaints against the initial HANFA intervention is that the suspension of trading purported to base itself on the need for further information, whereas – in the Claimant's view – the information it had declared in public was both accurate and complete; but in any case, says the Claimant, nothing was done by HANFA during the suspension by way of seeking to acquire further information.[329] The Tribunal finds this argument overstated. The internal policy paper submitted to MOL's Board reveals that the preferred proposal was chosen from amongst a range of viable alternatives specifically on the basis that this option was assessed not to need HANFA approval or active governmental support. It reveals also that the main motive (and this is entirely consistent with the way the Claimant's case has been pleaded in this Arbitration) was to gain or consolidate MOL's operational control over INA, so that the exit opportunity for small shareholders who had failed to take advantage of the 2008 offer was no more than an additional make-weight.[330] The combination of these factors suggests to the Tribunal that there are likely to have been perfectly good reasons why HANFA, as the market regulator, might have been in need of time to make its own assessment of the situation.

598. That being so, the real questions, to the mind of the Tribunal, relate not to the trading suspension as such, but rather to its length and to the actions that followed in its train. Both of these elements give the Tribunal pause, for the reasons that follow.

599. The suspension ultimately lasted eleven days. That seems to the Tribunal surprisingly long to achieve what the Tribunal assumes above might have been its purpose. Moreover, no explanation has been offered for this length, nor (as indicated) was the Tribunal offered any witness evidence to justify it. Mr Gašparović, the Claimant's expert, told the Tribunal, on the basis of his extensive inside experience within HANFA, that the length was without precedent since the inception of the Zagreb Stock Exchange.[331] The Tribunal has also

---

[329] Cl. PHB Vol. VI, para. 26.

[330] C-114.

[331] Transcript, 28 July 2017, p. 60.

noted in this connection the Claimant's denial that the HANFA notice of 6 December 2010 (paragraph 592 above) had any basis for saying that MOL had announced an intention to seek a HANFA opinion, or any justification therefore to use this to bolster the grounds for its holding action.

600. As to the HANFA Opinion itself, when it eventually issued a further nine days later, the critical element in the present context is not the view taken by HANFA as to the operation of the takeover legislation (which is not contested), but the additional, final paragraph (quoted at paragraph 592 above) to the effect that MOL should refrain from stock market activity in parallel with the currency of its private share purchase offer. The Tribunal has taken note of the equivocal verb used ('believes' or alternatively 'holds'), and the vigorous debate between the Parties as to whether HANFA's indication in this paragraph did or did not constitute a binding restriction on MOL as the addressee. Whatever the answer to that question may be, the Tribunal regards it as wholly unrealistic to suppose that MOL could safely have ignored this expression of view on the part of HANFA, with its veiled threat of later proceedings against MOL for market manipulation etc., and least of all in the heated public atmosphere that had by then built up (see below). Any doubt that may remain on that score is put firmly to rest by the other unexplained event: the seemingly unprecedented telephone call in person from the Head of HANFA to the lawyer representing MOL designed to make sure that the warning was well understood.[332] In respect of all these happenings, the Tribunal was particularly struck by the answers given by Ms Fijačko, the only witness from inside HANFA and herself responsible for preparing the draft of the Opinion, (a) that the warning paragraph had not been in her draft, so must have been added in at the higher policy level, and (b) that she and her department had neither been informed nor consulted about the paragraph before the Opinion issued.[333] The Tribunal noted finally that Ms Fijačko indicated, in answer to the Tribunal's questions, that HANFA opinions were addressed to the requesting party and were not public documents, so that it was anomalous and without precedent for HANFA to choose to make

---

[332] Cl. PHB Vol. VI, para. 36.
[333] Transcript, 27 July 2017, pp. 40-41.

160

a public announcement out of this one, and to add the additional final paragraph along with it.[334]

601. The Tribunal is in no doubt that when the above factors are put together, they form parts of a highly unusual and surprising picture. Taking into account in addition the regrettable fact that no witness of fact has been put forward by the Respondent who might have been in a position to explain or justify them to the Tribunal's satisfaction, the Tribunal must conclude that these factors are suggestive of a high probability that their purpose was to make possible concertation of some kind between HANFA at a high-level and the Government which eventuated in an anomalous exercise of HANFA's supposedly independent powers in a way that was influenced by the policy objectives of the Croatian Government.

602. The Tribunal goes no further than that. As already indicated in paragraph 588 above, the Tribunal is not inclined to consider the actions of HANFA as in themselves capable of constituting breaches of the ECT, their significance being rather what they say about the conduct of the Croatian Government itself. That is the question to which the Tribunal will now turn.

### d. Croatia

603. The Tribunal refers to its findings in paragraphs 590 & 601 above about the evidence of external influence over what would otherwise have been the normal operation of the Pension Funds and of HANFA. The source of that influence must be assumed to have been the Croatian Government; it could not have come from anywhere else. That supposition of influence behind the scenes is corroborated by what the Government was itself saying and doing in public at the time. Starting with the holding statements by Prime Minister Kosor and Minister Popijač on 3 December 2010 (paragraph 594 above), the Government's hostility to MOL's planned private offer became steadily clearer; it was hinted at obliquely in the HANFA public notice of 6 December 2010, and by 10 December 2010, when the HANFA suspension was still in effect, it had emerged more plainly – if still indirectly – in a Government press release and a separate statement issued by the

---

[334] Transcript, 27 July 2017, p. 24.

Ministry of Economy. The press release quotes Ms Kosor as referring to a 'solution' to the situation resulting from MOL's bid which the Government was on the point of finding, while the Ministry's statement talks in terms of the Government 'accepting informal agreements' with all investors whose goals corresponded with its own, with the unmistakable implication that MOL's goals did not (paragraph 386 above).

604. The Tribunal therefore regards it as highly probable that, during that critical period of just over one week, the Respondent was moving in parallel, *i.e.,* both publicly and behind the scenes, to devise a scheme, under cover of the HANFA moratorium on share dealings, to frustrate any possibility that MOL's offer might result in it acquiring a majority stake in INA. It is also likely, in the Tribunal's opinion, that something essentially similar happened again some three months later, when HANFA's later decision imposing a temporary stop on trading in INA shares because of "significant trade by foreign investors" coincided almost exactly with Ms Kosor's outright statement the following day that majority ownership of INA would not be permitted (paragraphs 393-394 above).[335]

605. As already indicated, the Respondent says that it had every right, like any other minority shareholder, to oppose a takeover attempt by another shareholder. The Tribunal agrees that there is some validity in this argument, but only up to a point. Leaving aside the implication that the Claimant's offer was a 'hostile' one, the contention is based on the premise that Croatia was, in this context, simply 'any other commercial actor.'[336] This is, however, questionable. It elides the fact that Croatia, far from being a co-investor in the open market, was in truth the residual State shareholder in a continuing and as yet uncompleted privatisation process under Statute. The expectations engendered in the mind of potential strategic investors by the circumstances of INA's privatisation have been dealt with in paragraph 583 above. The Respondent here implicitly invokes the line of arbitral authority according to which the actions of a public agency do not engage the

---

[335] There is no evidence that a formal decision to that effect, as foreshadowed by Ms Kosor, was ever adopted. A subsequent press report of September 2011 gave notice that the INA Privatisation Act would be amended for the purpose, but that has not occurred either (First Compass Lexecon ER, para. 62 and fn.). The Tribunal is aware, from information supplied by the Parties, that the Privatisation Act was not amended until 2019, and that the amendment took the form of adding to Article 10 a new requirement for Government consent to a shareholding of over 50% but not prohibiting it (see para. 581 above)

[336] Resp. PHB Vol. IV, paras. 69 ff.

responsibility of the State under an investment treaty if the agency was merely exercising commercial rights, not sovereign or regulatory powers.[337] This argument may well be valid for the case of a public works contract, such as highway construction,[338] where there is a direct contractual relationship between the State agency and the investor for the execution of the work. But that is clearly not the situation here. To the extent that a contractual nexus exists, arising out of the SHA or FASHA, it was to settle the exercise of shareholder rights after the investment had been entered into, but it was not a contract for the execution of the investment itself. The Respondent cannot, through asserting what it claims are shareholder rights immunize itself from its international responsibilities, in this case those that stem from the ECT. As the Tribunal held in paragraphs 453 & 568 above, while it has no jurisdiction of its own over the FASHA and other agreements, the jurisdiction it retains is to hear disputes over whether how the Respondent seeks to exercise its rights (however they arise) does or does not conform to its substantive obligations arising out of the first four sentences of Article 10(1) of the ECT.

606. A more potent objection is the Respondent's second line of defence, namely that the Claimant has not, in actual fact, been prevented from extending its shareholding in INA into a majority stake. The Respondent says, firstly, that it was the Claimant's own misjudgements that led to the failure of its purchase offer in 2010, and, secondly, that nothing stood in the way of it continuing thereafter (as indeed it did in the first half of 2011) to buy INA shares until its objective had been achieved.[339]

607. The first of these contentions is derived from the uncontested fact that the MOL Board had weighed up various alternative routes towards gaining majority control and had consciously opted for a private share offer although its advisers had warned that it was less likely to succeed than a public offer on the stock exchange; and that the chronology showed that there was sufficient opportunity before the announced launch date, which

---

[337] The doctrine is analogous to the one applying under the law of State immunity for the purpose of distinguishing sovereign actions from those falling within the commercial conduct exception.

[338] *Salini Construttori S.P.A. and Italstrade S.P.A. v. Kingdom of Morocco*, ICSID Case ARB/00/4, Decision on Jurisdiction, 23 July 2001; Consortium *RFCC v. Kingdom of Morocco*, ICSID Case ARB/00/6, Decision on Jurisdiction, 16 July 2001; *Bayindir Insaat Turizm Ticaret Ve Sanayi A.S. v. Islamic Republic of Pakistan*, ICSID Case ARB/03/29, Decision on Jurisdiction, 14 November 2005.

[339] Resp. PHB Vol. IV, Section III.2.

MOL could and should have used to track the price level at which trading began on the market once the suspension was lifted, and abandon its private offer to avoid being outbid. As the Respondent puts it in its Post-Hearing Brief, "MOL knew that its offer was *already* outbid when it locked itself in to the lower price for 30 days – and it proceeded anyway."[340] This is an argument that carries considerable weight, to the mind of the Tribunal. Mr Áldott conceded under cross-examination that there was time, before committing itself to its contracted arrangement with CDCC, in which MOL could have decided to go for open competition on the stock market instead.[341] The Claimant was under a need to offer the Tribunal some explanation why it did not avail itself of this opportunity, but has failed to do so. Without an adequate explanation to that effect, it is not possible to conclude that the Claimant was 'prevented' by external forces from gaining its desired majority stake.

608.  Moving to the longer term, *i.e.,* the second of the Respondent's contentions, the Tribunal notes that the factual position is somewhat more complicated, and also more obscure. The Respondent has marshalled an array of evidence to show that, in the wake of the failure of its private offer, the Claimant did continue to buy INA shares on the open market, and that, by dint of raising its offer price, it was successful in acquiring a very much larger quantity of shares to take its total holding to 49.08% by May 2011.[342] The Respondent points out that MOL had authority from its Board to continue purchasing, that it also had ample funds at its disposal within the financial envelope approved by the Board,[343] and calculates that sufficient shares remained available within the free float to enable MOL to get across the 50% threshold (even if the Pension Fund holdings were left out of account).[344]

609.  On this crucial issue, the Parties are far apart. Mr Áldott's written evidence that the Pension Funds' holdings constituted in themselves a blocking share turned out to be inaccurate. The true position appears to be that, following the private offer, the free float of INA shares was somewhat in excess of the Pension Fund combined holding (*circa* 4%

---

[340] Resp. PHB Vol. IV, para. 108.
[341] Transcript, 24 July 2015, p. 185.
[342] Resp. PHB Vol. IV, para. 165.
[343] PM-011
[344] Resp. PHB Vol. IV, para. 137.

against 4.2%) and enough in itself to make up the MOL shortfall towards a majority shareholding (2.75%).[345] Following the substantial further purchases by MOL in 2011 described in the previous paragraph, the gap was very much closer still. The Respondent says that, after the close of the Hearings on the merits, the free float remained at 1.77% (Pension Funds again excluded).[346] To this key point, the Claimant offers no direct answer. It asserts in its Post-Hearing Brief that, by the termination of the second HANFA trading suspension in 2011, "the mandatory pension funds had acquired enough shares to make it impossible for MOL to acquire a majority stake in INA."[347] Its more detailed response has to be inferred from its contention that, even if MOL "had managed to acquire all of [the available] shares, this would still have been insufficient for MOL to acquire a majority equity stake in INA."[348]

610. The Tribunal begins its analysis with the observation that the Equity Claim depends entirely on the allegation that the Claimant has been prevented (sc. by the Respondent) from acquiring a majority shareholding in INA. Without this, there is no claim. In the Claimant's own words, its complaint is against "measures by Croatia designed to prevent MOL from acquiring a majority stake in INA, and to put Croatia in a position whereby it could take back control over INA."[349] Subsequent submissions have aimed in different ways at the means said to have been used, or at failures in transparency, but the central allegation remains the same, and it is an allegation of fact. It follows on basic principles that the Claimant bears the burden of establishing this central pillar of its case. The Tribunal is not convinced that this burden has been met. To do so would require it to be made out, to the necessary level of certainty, not just that something untoward happened in 2010/2011 in respect of MOL's share offer and its aftermath, but that it gave rise to a continuing block on the Claimant getting over the 50% threshold. Without that, there would be no substance to the claim that the Claimant has been 'prevent[ed] … from

---

[345] Transcript, 24 July 2017, 202-203.

[346] Resp. PHB Vol. IV, at para. 139.

[347] Cl. PHB Vol. VI, para. 101. See also ibid., para. 148: "When HANFA finally ended the suspension at the end of 2011, there was no liquidity remaining on the market …" (emphasis supplied).

[348] Ibid., para. 213.

[349] Cl. Memorial, para. 180.

acquiring a majority stake in INA.'[350] It is, of course, possible at the hypothetical level that what happened in 2010/2011 might have been inconsistent with the guarantees which the Claimant was entitled to under the ECT. But that is not the same as establishing that, as of the time when the Arbitration was launched in 2013/2014, the Claimant was then being 'prevented from acquiring that stake.'[351] The Claimant's basis for so alleging (see paragraph 609 above) is that – the Pension Funds aside – some shares in the free float were being traded on the market whereas others were not, and it was entitled to discount the latter in its calculations. Therefore, the Claimant adds, it hardly made any sense for it to make another public offer, especially in view of the hostility which was by then being shown by the Croatian Government.[352] This is not, however, enough. It amounts to the Claimant deeming itself to have been prevented from acquiring the shares it sought. Moreover, the negative responses which the Claimant presupposes a new offer would receive would be those of individual citizen shareholders, and the influence the Croatian Government might have sought to exert over these shareholders remains entirely speculative, as does the question whether such influence would or would not have prevailed if the situation had actually arisen. The Tribunal is in no doubt that that cannot be a sufficient basis for a compensation claim in the millions of US dollars.

611. Much the same can be said, in the Tribunal's view, about the question of purchasing shares from one or more of the Pension Funds. The Tribunal has concluded above (see paragraph 591) that it is not in a position to resolve the conflict of oral evidence as to whether the Claimant did or did not approach the Funds after the failure of its 2010 offer. It shares the Respondent's sense of surprise that nothing more in the way of documentary evidence was available to back up Mr Hernádi's assertion that one or more approaches were indeed made. However that may be, the Claimant cannot by any reasonable standard be heard to allege that it was <u>prevented</u> from acquiring the small quantity of extra shares it required without meeting the onus on it to prove that the necessary attempt had in fact been made, and had not succeeded, not to mention making a showing why, in the specific

---

[350] Ibid.

[351] Or, if it was being alleged that a prior breach had occurred which caused the Claimant continuing damage, it would be necessary to establish either that the breach still continued when the claim was brought, or at the very least that no means had been available to the Claimant to mitigate its damage.

[352] Cl. PHB Vol. VI, para. 218.

circumstances, the failure was to be laid at the door of the Respondent. Once again, notwithstanding the Tribunal's finding in paragraph 591 above that it was probable the Pension Funds had been holding on to their shares with Government encouragement, the Claimant cannot simply ask the Tribunal to accept that such a situation can be deemed to exist for all time without offering some concrete demonstration to that effect.

612. In face of the fact that share purchasing by the Claimant did, unequivocally, resume in the first part of 2011, and led to the Claimant acquiring a large number of additional shares, taking it up to the edge of the majority threshold, and in face of the fact that no obstacle is alleged to have been placed in the way of those additional purchases, it seems to the Tribunal virtually impossible for the Claimant to meet what is required to establish its claim. The Respondent asserts that the share purchasing then stopped,[353] which is seemingly not denied. More significant, to the mind of the Tribunal, is the fact that no explanation was offered by the Claimant, during the entire course of these very lengthy proceedings, for why it did stop buying INA shares in 2011. The closest approach to one is the passage cited in paragraph 610 above. But on its face that is an *ex parte* assertion that could just as well be applied to the early part of 2011 (when the Claimant was buying INA shares) as to the period thereafter (when it was not). The Claimant refers to the various hostile public statements made by Croatian official representatives in 2012/2013,[354] but on closer examination these turn out either to relate to inter-shareholder relations in the management of INA (Mr Linić) or to pre-negotiation posturing (Mr Cacić); it is not possible to dress them up as if they constituted a formal bar to further share purchases. Those statements which did foreshadow the introduction of a formal bar on majority ownership of INA remained at the level of threats, but were never, so it seems, carried into law.[355] The Tribunal acknowledges that there is some issue as to the imposition of the further HANFA suspension of trading in March 2011.[356] It is nevertheless the case that, even if that suspension dragged on beyond its formal closing date and occupied the whole of the rest of the year 2011, that was still a good two years

---

[353] Resp. PHB Vol. IV, para. 145.
[354] Cl. PHB Vol. VI, para. 217.
[355] See note 335 above.
[356] See para. 393 above.

short of the commencement of this Arbitration.[357] Without having been shown some valid reason why the share purchase programme was prevented from continuing during that time and achieving its desired result, the Tribunal cannot accept that the Equity Claim has been established. The Equity Claim is therefore dismissed.

613.   In the light of the above finding, it is not necessary for the Tribunal to go into the question, heavily disputed between the Parties, as to whether, assuming there had been a breach of the Respondent's obligation under the ECT to accord fair and equitable treatment to the Claimant's investment, the breach was one that resulted in measurable and compensable damage.[358] Nor, similarly, does the Tribunal see a need to comment specifically on the Respondent's assertion that the <u>type</u> of reparation sought by the Claimant would inevitably entail some form of double counting, since it would leave intact in the Claimant's hands the asset in respect of which the claim is asserted, while seeking to compensate a loss of added value to that same asset based upon a notional marketplace valuation, without there being any stated intention of taking the asset to market.

### (2)   The remaining claims

614.   As the Tribunal moves on to consider the remainder of the Claimant's claims (paragraph 573 above), there is a qualitative change. Whereas the claims already dealt with arose out of actions alleged to have been directed against the Claimant (MOL) itself, those to which the Tribunal will now come were actions or omissions directed at, and affecting, INA. This raises the question, who has the *jus standi* to claim compensation for them? According to basic international law doctrine, following the 1970 judgment of the International Court of Justice in the *Barcelona Traction* case, the right to claim, for injury to a corporate entity, vests in the entity itself, not in its shareholders. This is on the basis that international law does not have an institution of its own for the creation of corporate legal personality, but takes notice of, and gives effect to, the corporate legal personality created under the relevant national law.[359] The Court's specific conclusions were that,

---

[357] The Claimant in fact calls for its Equity loss to be assessed as of some years later still (30 September 2016) and then updated to the date of this Award (Cl. PHB Vol. VI, para. 362).

[358] First and Second Compass Lexecon ER; First and Second Qureshi ER.

[359] *Barcelona Traction, Light and Power Company, Limited (Belgium v. Spain)*, I.C.J. Reports 1970, p. 3, Question of admissibility-Capacity of Applicant Government to act, 5 February 1970, paras. 38-45.

although a wrong done to a company frequently causes prejudice to its shareholders, the mere fact that damage is sustained by both company and shareholder does not imply that both are entitled to claim compensation, unless "the act complained of is aimed at the direct rights of the shareholder as such."[360]

615. The case before this Tribunal exhibits the particular feature that Claimant and Respondent are themselves the two main shareholders in the company. The company is an entity created under the law of Croatia, and pre-existed MOL's investment. What MOL complains about is the conduct of its co-shareholder, Croatia, in that entity.

616. The Tribunal acknowledges the fact that several investment tribunals have accepted claims lodged by investors as shareholders in a company in which they had invested. This was either on the strength of specific provision in an investment treaty allowing claims of that kind, or through reading that possibility by implication into the terms of the governing treaty. In the case of the ECT, there is no specific provision to that effect. Nevertheless, Article 1 of the ECT does clearly include shareholdings within its definition of "Investment," and the dispute settlement provisions of Article 26 encompass in general terms "Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former" – so long as the dispute concerns the alleged breach of the Contracting Party's obligations under Part III of the ECT – and there is no doubt that the Claimant is, for ECT purposes, an 'Investor' through its shareholder interest in INA. The Tribunal is therefore content to assume, without specific argument from either Party on the point, that the Claimant does indeed have *ius standi* to sue in respect of injury to INA, so long as it can show that the injury arises out of breach of an obligation owed to it as an investor under Article 10(1) of the ECT. But it goes without saying that the Claimant would only be entitled to advance a claim for reparation in respect of injury occasioned to itself in consequence of the injury to INA, not for the injury to INA as such.

617. That said, it remains the case that INA is not an example of a company which owed its whole existence to being created as the vehicle through which a foreign investor would carry out its investment. INA already existed and actively functioned as an important part

---

[360] Ibid, para. 47.

of the Croatian economy. The Claimant bought in to a share in a going concern, alongside the Respondent as the other major stakeholder. In the Tribunal's view, this situation is not without its consequences. One consequence is that it is not lightly to be assumed that the Respondent would wish to cause injury to an entity of national importance in which it itself held a major interest. Any such intention would require proof. The Tribunal will keep both elements in mind in its examination of the Claimant's remaining claims.

### a. The Gas Market Claim

618. Much of the section which follows is closely interwoven with specific provisions of the GMA or FAGMA and the submissions of the Claimant based upon them. The factual basis for the Claimant's claims of breach of these agreements is, to all intents and purposes, not contested by the Respondent, which has offered no fact witnesses of its own. Nor indeed, the Tribunal notes, has the Respondent produced fact witnesses as to the purposes behind the GMA (and FAGMA) or the circumstances of their negotiation. The Respondent has not offered any adequate explanation for this failure, but that does not constitute in itself a sufficient reason for the Tribunal to draw adverse inferences. Conversely, the only evidence on record relevant to the present set of issues is that of Mr Hernádi, Ms Fodor, and Ms Tamás for the Claimant, a good part of which is not seriously challenged. The Tribunal regards it as sufficient to note, on the strength of that evidence, that it sustains the argument tying the conclusion of the FASHA and the GMA together, in the sense that MOL declined to enter into the latter without the former; in other words, that the GMA was regarded on both sides as essential to rescue INA from severe financial distress, but that MOL demanded, in return for its additional commitment under the GMA, the extra operational control over INA that the FASHA would grant. The FAGMA, in turn, was in essence the platform under which MOL would agree to the extension of time limits for Croatia to carry out certain of its obligations under the GMA.

619. The Respondent has chosen – the corruption issue aside – to rely solely on its submissions of law that the GMA and FAGMA (and associated agreements) are invalid for conflict with EU or domestic law on competition.[361] The Tribunal therefore thinks it appropriate

---

[361] Resp. PHB Vol. V, Section I.B.

to recall its finding in paragraphs 453 & 568 above that it does not have jurisdiction under the ECT to supplant the dispute settlement provisions contained in the GMA (or the FASHA), with the same conclusion following automatically so far as the FAGMA is concerned. That being so, the Tribunal has no basis for going further into the Respondent's legal submissions or into the clash of views between the legal experts on each side as to the applicable EU law and its effect on the issues in this Arbitration. The Tribunal starts instead from the proposition – which it regards as incontestable – that a written agreement can serve perfectly well as proof of understandings and commitments freely adopted between the parties to it, irrespective of whether they are legally enforceable as such. And, as the Tribunal observed in paragraph 453c), it retains the right to determine whether conduct violated a specific treaty obligation, including conduct that might, within a different legal framework, have been asserted as a breach of contractual obligation. That constitutes the background against which the Tribunal will evaluate the conduct of the Parties, for the purpose of applying the guarantees laid down in Article 10(1) of the ECT.

620. The Claimant complains against what it sees as sins of omission as well as sins of commission. The sins of omission consist, it says, in the Respondent's failure to liberalise sufficiently the Croatian gas market and, in that connection, its related failure to follow through with an agreed plan for relieving INA of its loss-making gas supply business while protecting its own social objectives.[362] The sins of commission consist, it says further, in the new Gas Market Measures which the Respondent brought into operation in early 2014, and which discriminated unfairly against INA and its subsidiaries.[363] Both of these, the Claimant contends, inflicted serious financial loss on INA, as they were bound to do, for which the Claimant is entitled to seek pro rata compensation.

621. The importance of INA in the social and economic structure of Croatia can be measured, not just by the fact that it is one of the very few blue-chip shares on the Zagreb stock market, but even more so by the fact that, at the time of Claimant's initial investment, INA was the official monopoly supplier of energy in the form of gas to Croatian households as

---

[362] Cl. PHB Vol. VIII, Section 4.1.1.
[363] Cl. PHB Vol. VIII, Sections 4.1.2 & 4.1.3.

well as to Croatian industry and commerce.[364] The source of that supply was a combination of domestic production (mainly by INA itself in its upstream activity) and imported gas. The particular significance of that in the present context is that the gas market in Croatia at the time of MOL's entry was tightly regulated by the State. INA was under the requirement to sell its gas to designated distributors who then sold it on to domestic and industrial consumers, all at set tariffs determined by the Government, with the exception of very large industrial consumers who negotiated individual supply contracts.[365] Consumer tariffs were set at artificially low levels, in consequence of which the prices set for INA's sales to the distributors were also artificially low. The inevitable consequence of this was that, at the time when INA's privatisation was set in train, its gas business was a substantial loss-maker, potentially exacerbated by the fact that INA was directly exposed to the risk of price fluctuation on the international gas market. The evidence before the Tribunal shows that the share of – considerably more expensive – imported gas in the supply for domestic consumption was at the level of 40%.[366]

622. The Claimant says that, given those circumstances, it was clearly understood that, in parallel with INA's progressive privatisation, there would also have to be a liberalisation of the Croatian gas market, and that this understanding was the basis on which it agreed to invest in INA.[367] There is documentary evidence to support this, in the shape of Croatia's commitments towards the EU,[368] undertaken as part of its approach towards EU membership, the formal application for which was submitted at much the same time as the Claimant's admission as INA's strategic investor. While taking issue with the significance to be attached to the EU-related actions both in substance and in their timing, the Respondent does not demur at the underlying factual assertions themselves.[369] More significantly still, Deputy Prime Minister Polančec, in his briefing to the Government

---

[364] C-061, p. 12.

[365] First Compass Lexecon ER, paras. 30-31.

[366] First Qureshi ER, para. 40 & C-065, p. 3; the Claimant's Experts put the figure for the later period 2010-2013 at 35% (First Compass Lexecon ER, para. 31).

[367] Cl. Memorial, paras. 70-73.

[368] C-043.

[369] Cf., for example, C-065.

some five years later, is categorical in his understanding that EU accession would entail real market prices for the sale of gas and that it had been so agreed with MOL.[370]

623. Further documentary evidence is provided by the terms of the Claimant's formal written offer in the strategic investor bidding process, which stated in express terms: "In particular, MOL would like to highlight the following assumptions that are considered to be important for its investment: … no material adverse change in the key fiscal and price regulatory environment applicable to INA's business and operations (including … the envisaged liberalisation of the natural gas distribution and supply market in Croatia, and the price regulation of natural gas and oil derivatives)."[371] The reference to 'envisaged liberalisation' demonstrates that the issues referred to were not mere unilateral conditions propounded by MOL, but represented matters of public record or that had been covered in the discussions between Croatia and the potential strategic investors. The Tribunal (by majority) therefore regards it as established that market liberalisation plus price reform was an overt premise on which the Claimant's proposed investment was predicated, and that this was known to, and must have been understood by, the Respondent when admitting the investment. All the more so in the light of the subsequent conduct of the Respondent: firstly, in legislating in 2007 the foundation for market liberalisation by providing both for the abolition of INA's supply monopoly the following year and for a fixed date three years later by which tariff regulation on domestic gas would have been lifted, as well as for the unbundling of INA's gas storage activity;[372] and secondly, by high-level discussion and agreement with the Claimant and INA as to how this was to be achieved over the transitional period.[373] It was inevitable that deregulation of the gas market and transition to open-market pricing would be sensitive and politically controversial, but that is not to be laid at the Claimant's door. The agreed solution, under which Croatia would take over INA's gas trading, import, and storage businesses after they had been unbundled, emanated largely from proposals put forward by the Respondent.[374] These mutually

---

[370] C-065, p. 4.

[371] C-050, p. 5 (emphasis supplied).

[372] C-063. Two years previously, Croatia had acceded to the Energy Community Treaty (First Compass Lexecon ER, para. 33 & fn. 37).

[373] C-068.

[374] Cl. Memorial, paras. 82-95.

agreed elements were in due course given binding legal shape in the terms of the GMA and associated agreements, and coincided in time approximately with the Claimant's public bid in 2008 for the acquisition of further INA shares. They coincided therefore also with the negotiation and conclusion of the FASHA, this time at the initiative of the Claimant, to give MOL operational control over INA. On the evidence before it, the Tribunal is bound to see the whole as constituting a package deal, and one which was, moreover, also designed as the platform for the very substantial injection by MOL of further capital into INA – of the order of USD 500 million – at the end of 2008 in order to rescue INA from its parlous financial situation largely attributable to its loss-making gas supply business, with the real risk that it posed of an INA bankruptcy.[375]

624. The Respondent does not seriously challenge the factual account set out above. Aside from quibbles over how far and at what point in time the EU liberalisation requirements emerged as fixed and binding, its rejection of the Claimant's assertions as to gas market liberalisation is based on a throwaway remark by Mr Linić (in the context of majority shareholdings) that he has no recollection or record of the market liberalisation issue being raised by the Claimant in the bidding process for strategic investor status.[376] The Tribunal regards this as disingenuous, given the undeniable fact of the loss-making nature of INA's gas market operations, and the significant effect this had on INA's financial health overall. The very fact that the readjustment of the gas market was a regular subject of discussion with the Government in the wake of MOL's entry as strategic investor – leading in due course to the negotiation and conclusion of the GMA and then the FAGMA – shows that the topic was a recognized part of the developing relationship between them and reflected in consequence in their contractual agreements.

625. In the light of the preceding paragraphs, the Tribunal regards as irrelevant to the issues before it the Respondent's contentions (accurate though they may be) that the EU has never demanded of its Member States a completely unregulated energy market, and that

---

[375] WS Mosonyi, paras. 15-23; Polančec presentation to Croatian Government (C-065, pp. 1-13). Croatia's delay in meeting the agreed deadline for conclusion of the package deal, and its threatened financial consequences, are documented in Cl. Mem, paras. 123-126.

[376] Resp. Counter-Memorial, para. 588; First WS Linić, paras. 26-29. See also Transcript, 26 July 2017, pp. 39-40.

EU Regulations for the gas market expressly permit the maintenance by Member States of a public service obligation ("PSO").

626. The Respondent invokes the awards in *Blusun v. Italy* and *Charanne v. Spain*,[377] in support of the proposition that an express undertaking towards the investor is required in order to furnish the basis for a fair and equitable treatment claim under the ECT.[378]A majority of the Tribunal is unpersuaded by this argument, for two reasons. The first is that the Respondent cites *dicta* from these decisions in the abstract, without context or analysis of the factual matrix or its relevance to the circumstances of this case.[379] In truth, what the *Electrabel* tribunal, cited by the *Blusun* tribunal, placed in the balance alongside protection for the investor against unfair changes was far more nuanced, namely "a reasonable degree of regulatory flexibility to respond to changing circumstances in the public interest … subsequent changes should be made fairly, consistently and predictably, taking into account the circumstances of the investment."[380] In *Blusun* itself, the proposition was a different one, whether (as the tribunal put it) tribunals should "sanctify laws as promises,"[381] citing in particular the distinction drawn by the *Philip Morris v. Uruguay* tribunal between "[p]rovisions of *general* legislation applicable to a plurality of persons or of categories of persons" by contrast with undertakings made by the host State to induce investors to make an investment.[382] Moreover, the Respondent's argument elides the central fact that in all of these cases the investor was asserting a duty on the part of the host State to <u>maintain</u> a regulatory or legislative framework in the form it had taken at the time at which the investment was made. Whereas here the Claimant investor's assertion is the contrary, *i.e.,* that what was relied on is precisely that the regulatory framework was expected to <u>change</u>, the understanding – indeed (says the Claimant) the agreed

---

[377] *Blusun S.A. et al. v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016 ("*Blusun v. Italy*") (CA-257) and *Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain*, SCC Arbitration No. 062/2012, Final Award, 21 January 2016 (RA-168). And might have referenced as well as the Decision in *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ICSID ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 ("*Electrabel v. Hungary*") (CA-042).

[378] Resp. PHB Vol. VII, para. 2.

[379] Resp. PHB Vol. VII, para. 2.

[380] *Electrabel v. Hungary*, para. 7.77.

[381] *Blusun v. Italy*, para. 367.

[382] *Philip Morris Brand Sàrl (Switzerland), Philip Morris Products S.A. (Switzerland) and Abal Hermanos S.A. (Uruguay) v. Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Award, 8 July 2016, para. 426 (CA-131).

understanding reflected in their contractual relations – being that it would change, and change in a certain direction.

627. The second reason is that the Respondent's line of argument assumes an equivalence between cases in which the purpose of the investment was to enter a foreign market under the terms of a regulatory regime, and cases where (as here) the foreign investor was being invited to take a share in a fully functioning domestic activity, but as a key part of a process of bringing about change in the way that activity would function, under the impetus provided by the entry of foreign capital and knowhow. MOL was, so to speak, not to be 'an investor' but the 'strategic' investor. A question remains whether these two situations call for the same analysis under all circumstances. It is not without significance that the Claimant's investment was regarded from the outset – by both sides – not as one-off but as dynamic, and that it was to operate in a form of double harness with the host Government itself, as demonstrated in practical terms by the fact that MOL's arrival on the scene as 'strategic investor' led naturally and necessarily to the conclusion of an SHA (then FASHA) and then to a GMA (then FAGMA). In particular, the state of the internal gas market in Croatia, notably the pricing regime and its effect on the financial health of INA, were live and active subjects of discussion with MOL, in Croatia's dual capacity, both as residual State shareholder in INA and as the State regulator for the gas market.

628. The Tribunal has already held (paragraphs 453 & 568 above) that it does not have jurisdiction under the ECT to supplant the dispute settlement provisions contained in the GMA or the FASHA themselves. To the extent, therefore, that the Claimant's claims in this Arbitration are claims for the breach of those agreements as such, they will not be further considered. The critically important element, however, in the narrative set out in the preceding paragraphs is that those agreements, so far as they relate to the gas market, are not the source of the understandings and commitments which underpinned the Claimant's initial investment in INA and the relationship between it and the Respondent in developing that investment to full effect, but rather the concretisation of understandings and commitments that had already come into existence. Nothing, therefore, stands in the way of the Tribunal examining the Respondent's overall conduct in respect of the gas market to ascertain whether it conforms to the guarantee of fair and equitable treatment and other protections under the ECT which the Claimant invokes.

176

629. For this purpose, the Tribunal will consider the following: gas pricing and supply up until 2013; gas pricing and supply from 2014 on; the associated rearrangement of gas storage in 2014; and, royalties.

(i) Gas pricing and supply up until 2013

630. This covers the period during which, after the Claimant's entry as strategic investor, INA continued to carry, through Prirodni Plin ("PP"), the PSO to supply Croatian consumers at regulated tariffs. The question need not be dealt with at length. It has already been shown that the Respondent failed to fulfil the understandings and commitments between itself and the Claimant with regard to liberalisation of the Croatian gas market and in particular the movement of regulated consumer gas tariffs towards market prices, and did so consciously and deliberately. The evidence has also shown that INA's gas supply business was inherently loss-making, as a direct result of the Respondent's PSO plus tariff regime, and that this represented a chronic drag on INA's financial health, which the Parties by common accord had recognized needed to be dealt with. It is also not disputed that the Respondent failed by deliberate choice to fulfil its side of the agreed solution that had emerged, even while the Claimant kept to its own side, including a substantial further injection of funds to rescue INA from potential collapse. While the Respondent's policy imperatives and social objectives are not a matter for judgement by the Tribunal, the Tribunal notes that little justification been offered to for these policy choices during the course of these arbitral proceedings other than the general hostility and ill will that had come to characterize the relations between the Parties, partly, though not exclusively, bound up with the corruption allegation which the Tribunal has disposed of above. The Tribunal (by majority) therefore finds that these deliberate failures on the Respondent's part constitute a breach of the guarantee of fair and equitable treatment of protected investments laid down in Article 10(1) of the ECT.

631. Arbitrator Stern sees things differently. According to the majority, there are two violations: one relating to the fact that the liberalisation of the gas market was not as MOL expected it to be; another relating to the non-fulfilment of the commitment by Croatia to buy both the Gas supply company and the Gas storage company. As concerns the first alleged violation, when an investor speaks about "its assumptions about an envisaged

liberalization", Arbitrator Stern cannot follow the majority in understanding that this corresponds to a special commitment of the Croatian Government, necessary for the existence of legitimate expectations. Although the majority does not use the term legitimate expectations, in her view, this concept is what is referred to when the majority mentions "an overt premise on which the Claimant's proposed investment was predicated", in paragraph 623 of the Award. In fact, the expectations of MOL were quite different, as explained in Claimant's Memorial, paragraph 85: "Notwithstanding Croatia's commitment to gas market liberalization, MOL considered that INA's gas business bore high regulatory risk, because the gas price increase that liberalization would entail was expected to be 'politically sensitive'." As concerns the second alleged violation, the majority based its conclusion on the fact that the commitment of the sale existed before and independently of the GMA and the FAGMA. Arbitrator Stern considers that the envisaged sale was exclusively rooted in the contracts and that they could never have been enforced in the absence of the contracts. The summary of the dispute, as mentioned in paragraph 5 of the Award, clearly shows that most of the claims are between MOL and the Government as a shareholder. When the majority states that the Respondent had "high-level discussion and agreement with Claimant and INA, referring to Exhibit C-68, there is no mention that this document was the "CONCLUSIONS FROM THE MEETING between representatives of the Government of the Republic of Croatia and MOL as shareholders in INA." In other words, this alleged violation is a violation of the contracts and consequently an alleged violation of Croatia as a shareholder, a conclusion which is confirmed by Article 4. 10 of the GMA entitled "Waiver of sovereign immunity": "Each of the Parties represents and warrants that this agreement and the actions and transactions contemplated thereunder are commercial rather the public or governmental acts …." As a result, Arbitrator Stern considers that the majority based its conclusion on a contradiction with the Tribunal's statement, with which she agrees, that the Tribunal has no jurisdiction over the contracts. In conclusion, Arbitrator Stern does not consider that the gas pricing and supply up until 2013 can be considered in violation of the ECT.

(ii)    Gas pricing and supply from 2014 on

632.    The issue here is not (as the Respondent has suggested) the replacement of INA/PP as the holder of the PSO, or whether the Respondent had valid reasons for choosing HEP in PP's place. The issue is whether the revised tariff arrangements, compared with those that had operated up to that date, constituted unjustifiable discrimination against the Claimant's investment and for the benefit of an entity owned by the Respondent; thus whether these tariff arrangements, too, in combination with the supply obligations laid upon INA through PP, were compatible with the duty to accord fair and equitable treatment, or, alternatively, whether they were compatible with the obligation to refrain from "[impairing in any way] by unreasonable or discriminatory measures" the "management, maintenance, use, [or] enjoyment" of the Claimant's investment.

633.    Put simply, the Claimant says that, virtually all legitimate requests for increases in gas tariff pricing having been turned down previously[383] while INA (through PP) bore the PSO, it was only at the moment when the PSO was transferred to a Croatian State-owned enterprise (HEP) that a price increase was announced. Even then, says the Claimant, the associated requirement imposed on INA compulsorily to supply to HEP the gas needed in specified volumes, put together with the mandatory price at which INA was forced to sell to HEP, were the knowing cause of INA being forced to continue with a loss-making activity.[384]

634.    The Respondent's justification for this state of affairs can be found in the evidence of Mr Vrdoljak, who was at the relevant time the Minister of Economy, and who testified that he bore direct responsibility for the 2014 Gas Market Measures. A great part of what Mr Vrdoljak said in evidence was directed towards defending the substitution of HEP for PP in the gas supply chain, and why PP's financial situation posed a risk to the security of the supply chain;[385] these are not, however, as indicated in paragraph 632 above, the questions which fall to the Tribunal to consider in the present context. That aside, whatever value Mr Vrdoljak's evidence might have as a substantive defence was undermined, in the

---

[383] See First Compass Lexecon ER, paras. 41-46 for the limited price increases that did take place in 2010-2014.
[384] Cl. PHB Vol. II, paras. 295-297.
[385] WS Vrdoljak, paras. 8-15.

179

eyes of the Tribunal by the following: his failure to recognize that the first and only change to the pricing regime occurred at the moment when it would benefit HEP not PP; his evasion of the incontrovertible fact that the essential question was not whether the customer price increase was in itself large or small, but the <u>combined</u> effect of the increased sale price by HEP and the decreased sale price to HEP; and most of all by his refusal to acknowledge that PP had knowingly been set up in the first place (by agreement) precisely to become the hived-off home of INA's loss-making activity so that it could then be taken over by the Respondent Government for the preservation of its political and social priorities. What did, conversely, emerge clearly into the light of day out of Mr Vrdoljak's cross-examination was his hostility towards MOL and INA/PP – specifically, in part, because of the former being a foreign investor – even to the extent of deliberately leaving significant letters unanswered because he was angry with them (see also paragraph 637 below).[386]

635. In the opinion of the Tribunal, the facts speak for themselves. It is self-evident that the 2014 gas pricing and supply measures were directed at INA/PP. The justifications offered by Mr Vrdoljak turn out to be of little value either over the element of discrimination in the treatment of HEP and INA, or over the continuing imposition on INA/PP by law over a period of some years of the requirement to operate at a loss. The Tribunal therefore holds that the 2014 gas pricing and supply measures constitute in themselves a breach both of the guarantee of fair and equitable treatment of protected investments, and of the guarantee against impairment of their management, use, or enjoyment by unreasonable or discriminatory measures, as laid down in Article 10(1) of the ECT.

(iii)  The 2014 gas storage regime

636. The new gas market arrangements described above necessitated a rearrangement of the regime that had been in place for the storage of gas at Okoli, the only gas storage facility in Croatia, and thus critical for the supply of gas to tariff customers, domestic or small industrial, since their consumption profile varied over the seasons of the year. In particular, gas reserves had to be built up over the summer months to guarantee supply during the

---

[386] Transcript, 26 July 2017, pp. 207-209.

high consumption winter months. It was also necessary to keep a permanent level of 'cushion gas' in the reservoir so as to maintain the required gas pressure in the network.[387] The gas storage business, as a monopoly, was lucrative and profitable.[388] The Okoli facility had originally been owned and operated by INA, but was hived off into a separate subsidiary, PSP, as part of the agreed arrangements under the GMA for the Government to take over INA's downstream business operations within Croatia.[389] Inevitably, these arrangements at Okoli called for substantial revision if INA was to lose its position as bearer of the supply arrangements under the PSO.

637. The new arrangements introduced as part of the Gas Market Measures of 2014 were superimposed on the regular bidding process operated by PSP for the allocation of space in the Okoli facility, which was already in its very final stages. The bidding round was to cover the coming three years. PP, which previously had access to the entire storage capacity at Okoli, had submitted its bid in the normal way, as had its competitors. The 2014 Measures, however, included the further new requirement on PSP to allocate 70% of its storage capacity to HEP, thus creating radically altered circumstances for those businesses competing for the 30% that remained available.[390] What ensued is a complicated story, which the Tribunal need not go into in detail. Its upshot was, however, that PP was allocated only 10% of what it had bid for (4 SBU).[391] There was some initial confusion in the argument of the Parties as to whether PP had any sufficient notice of the new regime so as to allow it to revise its initial bid, if it chose, but the Claimant conceded during the course of the proceedings that there would, in theory, have been time to do so, though there had been no advance warning and time was very short indeed, perhaps no more than one day.[392] There was also much dispute as the argument progressed over whether PP's tactics in the bidding process had been commercially obtuse, so that the adverse result could be laid, at least to some extent, at its own door. This is one further

---

[387] First WS Tamás, para. 31.

[388] Ibid., para. 26.

[389] Which in the end were never completely fulfilled; Croatia acquired the (profitable) storage business (PSP), but failed to acquire the (loss-making) supply business (PP).

[390] C-034.

[391] Cl. PHB Vol. VIII, para. 105.

[392] Ibid.

argument by the Respondent which the Tribunal regards as disingenuous, inasmuch as it disregards the obvious fact that a bidding round covering only the residual 30% of storage capacity is radically different from one covering the entire capacity.[393] Even had PP taken a leaf out of its competitors' book and bid for the full 100%, the outcome shows that it would have been awarded no more than 10.3 SBU,[394] which falls far short of what would have been needed to house the excess volume of gas it had in store (42 SBU).[395] That said, the Tribunal will take into account, when it comes to an assessment of damage, whether there were opportunities PP could have been expected to take to mitigate its loss. The brute fact remains, however, that PP was left with quantities of its own gas in store at Okoli which exceeded by a very substantial margin the storage it had been allocated, against a deadline of somewhat under one month when its storage entitlement would lapse.[396] Ms Tamás testified that it was not practically possible for so large a volume of gas to be withdrawn in the time available, not least in view of the fact that withdrawal necessarily reduces the pressure of gas in storage, thus progressively diminishing the effective withdrawal rate. It would have taken over four months, she says, to withdraw the excess, which could only therefore have been done, in theory, had PP begun its drawdown before the previous winter set in, so jeopardizing security of supply to domestic customers during the most critical season of the year.[397] Mr Vrdoljak, under cross-examination, berated PP for having so large a quantity of gas in store as the winter season came to an end, and told the Tribunal that a commercially astute PP would have begun a draw-down months before in anticipation of the possibility which eventually came to pass. This smacks to the Tribunal, however, more of *ex post facto* rationalization than commercial realism, and stands in direct contradiction to Mr Vrdoljak's earlier stigmatization of PP as a threat to Croatia's security of domestic supply.[398]

---

[393] The Tribunal is wholly unable to understand Mr Vrdoljak's assertion (Transcript, 26 July 2017, pp. 192-194) that it amounted in fact not to a reduction but to an increase of 30% because previously there was no trading of storage capacity.

[394] A figure arrived at by adding together the 13.45 awarded each to MET and PPD and the 4 awarded to PP, and dividing by three.

[395] Second Aron ER, para. 168.

[396] Cl. PHB Vol. VIII, para. 105.

[397] First WS Tancer, paras. 32-39.

[398] Transcript, 26 July 2017, pp. 198-201.

638. According to the Claimant, when faced with this harsh state of affairs, PP sold what it could on the market. It sought to sublet storage space from HEP, but was refused.[399] There was no practical means of exporting the excess for storage outside Croatia. It sought an extension of time from the Government, but was refused. Ultimately, therefore, PP was faced with a forced auction sale conducted by PSP over four days in April 2014, under terms which had PSP determine the opening minimum bid price, which would then decrease by a further 25% on each successive day for which the auction continued. HEP withheld its bid until the fourth day, and was thus able to buy a very substantial volume of gas at well below market prices. This was followed by another auction in May under similar rules but even lower prices, at which a smaller, though still substantial, volume was bought by one of PP's competitors.[400]

639. The Tribunal has no doubt that this set of facts, taken in the round, constitutes a breach of the twin guarantees of fair and equitable treatment, and non-impairment of management, use, or enjoyment laid down in Article 10(1) of the ECT. It is not within the Tribunal's remit to consider the policy reasons behind Croatia's decision itself to diverge from the agreed solution that it would acquire PP. But, from the moment that the different policy was implemented to transfer the PSO to HEP, radically restructure the storage regime at Okoli, and impose on INA, through PP, a fresh supply obligation to HEP at regulated prices, it became incumbent on the Respondent and its agencies to devise an arrangement by which PP could, on fair and equitable terms, dispose within a reasonable time of the gas it held in storage. It requires no further demonstration that the actual course of events, as described above, fell far short of what was required, and could readily have been foreseen as leading to losses which PP was in practice unable to avoid. That these measures and their probable effect were specifically intended to harm INA is also, in the opinion of the Tribunal, beyond reasonable doubt. It refers to its guideline (paragraph 617 above) that it is not lightly to be assumed that the Respondent would wish to cause injury to an entity in which it itself held a major interest. The Respondent asserts (though in a

---

[399] The Tribunal pays less regard to the further claim that PP's competitors quoted extortionate rates to sublet their capacity, as one of these competitors (MET) was also itself a subsidiary 40% owned by MOL (First Aron ER, para. 91; Second Way ER, para. 130).

[400] First WS Tamás, paras. 37-38.

different context) that the Claimant "does not explain why, in its fanciful theory, Croatia would seek to arbitrarily harm a company which, as the Claimant describes, is the '*jewel*' of the Croatian economy."[401] In the present context, there is no need to seek such an explanation in the face of the outright public declaration by the responsible Minister at the time that the unfavourable outcome of the storage tender process was not the result of the Government's regulatory decisions but rather of 'irresponsible and flippant behaviour by MOL's management and the responsible persons in INA.'[402] Moreover, in a zero-sum game, what harmed INA benefited HEP, which was not partly but wholly Government owned. All this serves, in the Tribunal's view, as a clear-cut demonstration in itself that no regard was paid to the consideration that was due to the Claimant as a protected investor under the ECT.

(iv)   Royalties

640. The Claimant complains about two unjustified increases of the royalty rates applicable to INA's domestic crude oil and natural gas production, once in April 2011, and again in March 2014. The applicable rates are, however, laid down in the GMA, as later amended by the FAGMA, and the Claimant's claim is one for breach of those Agreements.[403] It does not, therefore, fall within the Tribunal's jurisdiction under the ECT (paragraphs 453 & 568 above).

(v)   Damage and remedies

641. It follows that (with the exception of paragraph 640) above the Tribunal (by majority) finds that the Claimant has made out its claim that, viewed overall, the conduct of the Respondent up until the Gas Market Measures taken by it in 2014 and their implementation, constitute a substantive breach of its obligations under Article 10(1) of the ECT to accord to the Claimant's investment fair and equitable treatment at all times and/or to avoid impairing by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal.

---

[401] Resp. Counter-Memorial, para. 615.
[402] Way-012.
[403] Cl. PHB Vol. VIII, para. 48.

642. Over and above this declaration of breach, the Claimant is only entitled to a monetary remedy to the extent that it can show that the breach caused it loss or damage, and then how that damage is properly to be evaluated.[404] The Tribunal will first consider the question of causation, and then proceed to the issue of evaluation.

643. The Tribunal has the benefit of extensive expert evidence on these matters from Mr Aron and Compass Lexecon for the Claimant, and Mr Way and Price-Waterhouse Coopers (PWC) for the Respondent, all of whom had previously given expert evidence to the UNCITRAL tribunal as well, and were extensively cross-examined in the present proceedings. It is especially grateful for the Joint Compass Lexecon/PWC Report, produced at the Tribunal's request, setting out the areas of agreement and disagreement between them.[405] The Joint Report reveals a very substantial degree of common ground, and signposts clearly the reasons behind the identified differences, which are limited in number.[406]

(vi)   Causation

644. The Tribunal is confronted at this point with a problem that has exercised other tribunals faced with breaches of the fair and equitable treatment guarantee falling short of *de facto* expropriation, namely, how to identify the damage to a claimant or its investment that was in fact 'caused by' the respondent's breach. In many cases, including the present one, the classic notion of *restitutio in integrum* or its equivalent in monetary terms enunciated by the Permanent Court of International Justice in the *Chorzów Factory* case is of little help. So, too, for the principles of 'reparation' and 'injury' which lie at the core of the International Law Commission's Articles on State Responsibility, since both of them, in turn, also depend on the underlying notion of causation. Similar difficulties reside in the 'but for' analysis commonly employed in arbitral awards, since it can only work if it is possible, in the particular circumstances of the individual case, to determine with some objective precision where the investor or its investment would have stood if the host State

---

[404] *Victor Pey Casado and President Allende Foundation v. Republic of Chile*, ICSID Case No. ARB/98/2, Award, 13  September 2016, ("*Pey Casado v. Chile*"), paras. 205-206.

[405] And for the comparable Joint Statement from Mr Aron and Mr Way.

[406] The Joint Statement of Mr Aron and Mr Way (also produced at the Tribunal's request), revealed a far greater area of disagreement between them, and will be dealt with below.

had still exercised the rights or powers it lays claim to, but had done so 'fairly and equitably.' That can be particularly problematical where, as here, the findings of breach are for the most part in respect of what the Respondent has failed to do rather than what it has in fact done, *i.e.,* omissions rather than actions.

645. Both of the two sets of Compass Lexecon/PWC Reports proceed from the hypothesis that loss and damage to INA should be computed on the basis of the Respondent having been found to have failed to fulfil precise and specific positive obligations towards INA or MOL. They are also very largely in agreement over the methodology to be applied, if not the particular inputs that should be used for its application. That said, the obligations they assess for the purpose are those laid down in the GMA or FAGMA or associated agreements. In other words, the calculations are the same as if the claim upheld had been a straightforward one for breach of these agreements. The Tribunal cannot, however, proceed on that basis, given its finding that it has no jurisdiction of its own over breaches of those agreements, but only over whether the overall conduct of the Respondent (including in respect of the activities governed by those agreements) was or was not in accordance with the more general guarantees under Article 10(1) of the ECT.

646. That being so, and given that it would not have been justifiable in so long drawn-out an Arbitration to open a new limited phase of argument on damages to follow the findings of breach, the Tribunal intends to proceed as follows –

   1) There is no dispute between the Parties as to the fact that INA suffered loss or damage from the events the Claimant invokes, assuming them to be found to represent a breach of the ECT.

   2) No issue therefore arises as to causation as such.

   3) The Claimant's claim for relief in respect of the Gas Market Claim sounds entirely in monetary damages.

   4) The ECT contains no provisions of its own as to compensation or reparation for a finding of breach in respect of either 'fair and equitable treatment' or 'non-impairment' under Article 10(1).

5) Such findings of breach entail an exercise of judgement by a tribunal as to what was 'fair' or 'unfair', or 'reasonable' or 'unreasonable', which necessarily and inevitably requires a degree of discretionary assessment as well, in order to link compensable loss or damage to the nature of the breach as found.

6) The Tribunal will therefore use as the basis for its assessment the common ground between the Expert Reports, but make its own adjustments to the experts' calculations in order to arrive at a set of figures which fairly reflect its findings on breach as set out in paragraphs 630, 635 & 639 above.

647. For the above purposes, the gas pricing and supply measures (paragraphs 630 & 635), will be treated as one composite whole, as repeated and continuing failure by the Respondent, contrary to the reasonable expectations of the Claimant, to relieve INA of its loss-making gas supply business while absorbing INA's profitable gas storage business. The gas storage element of the 2014 Measures (paragraph 639) will be treated separately, inasmuch as it constituted a discrete set of events of short duration, and approximated most closely to a deprivation of property.

(vii)  The gas pricing and supply measures

648. Abstracting the figure for royalty increase (paragraph 640above) from the summary table on page 4 of the Joint Compass Lexecon/PwC Report, the calculation by the Claimant's experts comes to just short of USD 175 million, that by the Respondent's expert to just short of USD 157 million. Virtually the entirety of the discrepancy between them is attributable to a basic difference of approach towards what should be regarded as the applicable market price for gas, so as to calculate the monetary effect of INA/PP being placed under the requirement to sell gas to HEP at a Government-specified price from 2014 onward. The Compass Lexecon calculation (for the Claimant) proceeds from the starting point that the quantities INA/PP was obliged to sell to HEP substantially exceeded INA's domestic production, to arrive at the conclusion that the relevant determinant of the wholesale market price is the marginal cost of imported gas. This is on the basis that prices of domestically produced natural gas in Croatia cannot remain below the border price plus

cost of entering the domestic transportation system, otherwise it would lead to scarcity.[407] The argument, in simple lay terms, is that lower domestic price levels would remove from a supplier any incentive to import. The PWC calculation (for the Respondent) is derived, following the brief given to it, from the different analysis by the Respondent's gas market expert, Mr Way; Mr Way takes the view that, as domestically produced gas cannot be exported, it is not in competition with imported gas. In the result, he submits, there is a split market regime in Croatia for produced and imported gas, each of which has its own price.[408] Given this as the axiom to work from, the PWC Report concludes that, as the regulated selling price to HEP was higher than the domestic gas price (by a significant margin), there was no loss to INA/PP at all.[409]

649.   The Tribunal has some difficulty with the notion of a domestic 'market price' where, by definition, there is "not yet a freely-traded, open market" at all.[410] What Mr Way puts forward is in fact a 'cost-plus' price, which is a perfectly valid concept in appropriate circumstances, but is not the same as a 'market price.'[411] Nor can the Tribunal readily grasp the soundness of this approach when applied to circumstances in which there was, throughout the period under consideration, a very substantial reliance on imported gas to meet demand, to a level of some 40%.[412] Mr Way would bridge this gap in the argument with the assertion that INA/PP would have had the possibility of covering domestic demand entirely from indigenous sources had it invested more and operated more effectively.[413] The data underlying these assertions (which appear to cover oil and gas together) are contested,[414] and seem to the Tribunal in any case to stray beyond professional expertise into argumentation on the merits of the case.

650.   Having taken all these elements into consideration, the Tribunal is of the view that the fair way to deal with the question would be to blend the application of a cost-plus approach to

---

[407] First Compass Lexecon ER, paras. 47-48; Joint Report, p.10; Second Compass Lexecon ER, paras. 77-79.
[408] Second Way ER, para. 161.
[409] Second PWC ER, paras. 33-36.
[410] First Way ER, para. 100.
[411] Mr Way seems to have reached much the same conclusion, at para. 161 of his Second Report.
[412] Para. 621 above.
[413] First Way ER, paras. 48 ff.
[414] Second Aron ER, paras. 172-174.

that proportion of the gas supply to HEP as was in fact covered by domestic production (taken as 60%) with an import-price approach to that proportion of supply as was in fact met by imports (taken as 40%). As the relation between production and related costs plus a reasonable profit margin is conceded to be met by the Government-designated prices for sale to HEP, the calculation of notional loss can be found at a mid-point between the two expert valuations, namely 40% of USD 17.9 million, or USD 7.16 million. Deducting that amount from the base figure of USD 175 million gives a final figure of USD 167.84 million.

651. The question remains to be settled: can the Tribunal take a figure computed on the basis of contractual breach as appropriate for a breach of a more general kind of the guarantees of fair and equitable treatment and non-impairment as laid down above?

652. Reverting to paragraph 647 above, the Tribunal does not consider it appropriate to disaggregate the compensation for a global breach of the kind described into a series of precise components. It has therefore (by majority) chosen, in the absence of clear guidance either under the ECT or general international law, to accept the computation in paragraph 650 above at a figure of USD 167.84 million which, in its view, represents the proper approach towards compensation for the breach in question.

(viii) Gas Storage Measures

653. Coming now to the gas storage measures, the Tribunal is comfortable, having regard to the nature of the breach (paragraph 639 above), with the application of a 'but for' analysis, on the basis that the tangible outcome of the measures was that a volume of PP's gas in storage was forcibly sold at auction at artificial prices not computed on the basis of fair market values. Taking into account the two auction sales, in April and May 2014, Mr Aron, after various adjustments including on account of some of Mr Way's criticisms of his methodology, finally assesses the loss to MOL at USD 18.2 million.[415] This is computed on the basis of a current market price determined by the purchase cost of

---

[415] Presentation in evidence; Transcript, 13 March 2018, p.1030.

imported gas plus its transportation to the Croatian border.[416] Mr Way, as indicated, disputes that there was any loss at all, on the same basis as is discussed in paragraphs 648-649 above.[417]

654. The Tribunal is clear in its own mind that Mr Aron's analysis is the better one. Mr Way's approach is very largely dependent on his having concluded that PP brought the harm on itself by carrying too large a stockpile and by its inept bidding tactics in the competition for storage space – in other words, very much the same criticisms as the Tribunal heard from Minister Vrdoljak (see paragraph 637 above) – which goes, however, beyond Mr Way's area of expertise, and enters into the substantive merits of the dispute. In any event, Mr Way mistakes the real point at issue, which is not whether PP could have ended up with less gas in storage, but that a substantial volume of gas, incontestably owned by PP, was compulsorily sold over the owner's head by the Respondent's agent. This is a form of dispossession for which the only proper remedy is the shortfall between the value of the property dispossessed and the price paid over to its owner. And 'value' in that context must mean fair market value, in its normal definition of what would have been agreed between a willing buyer and a willing seller operating freely at arm's length. If, as Mr Way suggests, there would have been no domestic taker for that volume of gas, then the notional 'but-for' counter-factual would have been export (or re-export) out of Croatia and sale at international market prices. As for the cost of transportation, a convincing argument can be made either that that would be a seller's cost to be deducted from the final figure for the loss, or with equal logic that it was an extra cost imposed on INA/PP by the Respondent's actions and therefore ought to be reckoned as forming part of the loss caused. The Tribunal accordingly makes no adjustment on this account.

655. The Tribunal therefore accepts Mr Aron's figure of USD 18.2 million. It notes that this is a figure that has been updated to September 2016 through the addition of interest. The corresponding base figure as of the time of breach is, however, given in the Claimant's

---

[416] See para. 656 below for the computation of MOL's share of the loss. Mr Arons's figure takes into account as well the mitigation of loss through the sale of part of the gas to MET, stated to be owned as to 40% by MOL (First Aron ER, paras. 91-92.
[417] First Way ER, para. 5.2.

final Post-Hearing submissions as USD 16.1 million,[418] and that is the figure which the Tribunal will use. The Tribunal has considered whether that figure should be abated (see paragraph 650 above) by reference to the imputed mix between imported and domestic product contained in the quantity of gas sold at auction, but has decided that this would not be appropriate, not merely because the actual mixture is entirely notional rather than calculable, but chiefly because it is hard to envisage the varying origins of gas in a mix becoming a determining factor in a hypothetical 'but-for' sale on the international market.

656. The Tribunal notes (see paragraph 495 above) that in their respective reports both sets of damages experts have proceeded on the basis that, where the party suffering compensable loss or damage has been INA, the Claimant is entitled to claim in these proceedings for a *pro rata* share of the compensation calculated on the basis of MOL's percentage shareholding, taken as 49.08%. As this represents a common understanding between all of the experts, and is not contested in the submissions of either Party, the Tribunal does not see the need to go further into the matter.

### b. The Hydrocarbon Licence Claim

657. The Hydrocarbon Licence Claim comprises a variety of acts and omissions on the part of the Croatian authorities which the Tribunal has found it convenient to group together for the purposes of decision. The conduct in question revolves on the one hand around the revocation of certain of INA's onshore exploration licences for hydrocarbons and on the other around delays and hindrances in the granting of necessary permits which the Claimant says has adversely affected INA's operations under subsisting licences. It entails, as well as actions (licence revocation), also failures to act (permitting delays and hindrances). But it marks also a transition in the Claimant's claims in this Arbitration. This is not merely because it relates to INA's upstream activity in hydrocarbon extraction rather than to INA's governance or to the circumstances or expectations surrounding MOL's investment in INA. Whereas the conduct of the Respondent dealt with thus far in the Award can be said to have been targeted at MOL, the conduct presently at issue is plainly addressed at INA, and specifically at INA's normal core operations within Croatia. These

---

[418] Cl. PHB Vol. I, para. 11 and fn 3.

are, moreover, operations of long standing, going back to before the advent of the Claimant's investment, at a time when INA was still under total ownership by the State. It follows that the matters covered by this claim bring directly into play the points made in paragraph 617 above, which the Tribunal will therefore keep closely in mind.

658. The licence revocations relate to three onshore hydrocarbon exploration licences held by INA in what has been referred to as the 'Pannonian Basin'. As is commonly the case, the grant of an exploration licence carries with it obligations as to exploration activities that must be undertaken, no doubt to prevent a licensee 'sitting on' its rights to the exclusion of others. Under the governing legislation in Croatia, all mineral resources are owned by the State, and their exploitation is under the special protection of the State.[419] For these purposes, 'exploration' means physical activities going beyond mere mapping and prospecting.[420] Licences are granted following public tender, for specific plots of land identified by cadastral and land registry numbers.[421] The mandatory exploration activities and their timing is either specified in the Ministry's terms of tender or by the licence applicant in its bid, and then laid down definitively in the terms of the licence granted.[422]

659. The three licences in question, referred to as Sava, Drava and Northwest Croatia, had originally been granted to INA (under the legislation then in force) in 1997, and extended in 2000 and thereafter for further periods in 2005 and again in 2010. Once hydrocarbon deposits had been discovered through drilling, the part of the licence covering the area in question could then be converted into a production licence; on the evidence production licences had been granted in this way over acreage within all three licence areas, notably so in the case of Drava.[423] By the time of the 2010 extension, however, new and extensively revised legislation had come into force in Croatia (the Mining Act 2009), so that the 2010 licences included much more by way of detail as to the obligatory exploration programmes and the associated reporting obligations.[424] Under the 2009 Act, the normal

---

[419] Mining Act 2009, Art. 3 (DA-001).

[420] Ibid, Art. 9.

[421] Ibid, Art.19 & 22.

[422] Ibid, Art. 24.

[423] First Aron ER, paras. 15-16.

[424] Ibid, para. 17.

length of an exploration licence was reduced to three years, although there is provision for this to be extended to five years,[425] and the Tribunal understands it to be the case (though this is not material) that the 2010 licences were in fact for five years.

660. The Tribunal has not been told that anything under these licences proceeded other than normally throughout the earlier period. The present dispute arises out of the new licences under the 2009 Act having been revoked by the Minister, in the exercise of his express powers under Article 35(1)1 of the Act, for failure by INA to fulfil its reporting obligations and to commence exploration activities. The Claimant lays stress on the fact that this revocation happened – and happened, so it says, in peremptory fashion – only six or seven months after the grant of the new licences had been approved.[426] As indicated in the factual section of this Award (see paragraph 421 above) , the revocations were then challenged in the Administrative Courts, although (for reasons unexplained) not determined until September-December 2014, when all three challenges were upheld by the Court, which quashed the revocations and remitted them to the Minister for a fresh decision.[427] The fresh decisions by the Minister followed in each case some two months later, and took the form in each case of a second revocation, on much the same grounds as before, but more extensively reasoned.[428] The Minister had in the meanwhile already opened some months earlier a new tender round which covered parts of each of the three INA licence areas, and, following the second revocations, the licensing round went ahead. INA, which had bid in this round for the newly defined Drava sector, was awarded a new exploration licence in June 2016.[429] In parallel, INA had challenged the second revocations in the Administrative Courts, and again no decisions were forthcoming for some time; on this occasion, however, all three revocations were upheld by the Court in 2017-2018, and confirmed on appeal the following year (see paragraphs 427-429 above)

661. Viewed against this bare background, it is not difficult to see the attraction of an argument that INA had been the victim of unfair and inequitable treatment. It is not, however, until

---

[425] DA-001, Art. 25.
[426] Cl. PHB Vol. IX, para. 7.
[427] C-187; C-188; C-189.
[428] C-190; C-191; C-192.
[429] DA-032.

the detail is looked into more closely beneath its surface appearance that the full complexities of the situation are revealed.

662. To begin with, the Parties expended a great deal of energy in the earlier stages of the Arbitration over the interpretation of the applicable Croatian law, specifically the Mining Act and the legislation governing administrative actions and administrative proceedings. The question was whether the licence revocations, first and/or second, were lawful under the law of Croatia. Expert opinions were submitted from Mr Šikić (for the Claimant) and Mr Koprić (for the Respondent), who were both cross-examined, principally on administrative law and its relation to the Mining Act, although both disclaimed special expertise in the field of mining law. The Parties disagreed, on the basis of this expert advice, over whether the Minister was or was not under an obligation to revoke an exploration licence if the licensee failed to meet its undertakings in good time. They disagreed also over whether alternative measures were open in place of outright revocation, and over what procedures the Minister ought to follow before deciding either upon outright revocation or on some alternative route. Nor were they in agreement as to whether the Minister's powers under the Mining Act stood as they were written, or whether they should be regarded as *pro tanto* modified by Croatian administrative law.[430] As between the two experts, the Tribunal preferred the more practically realistic advice of Mr Koprić over that of Mr Šikić, which seemed to it more doctrinaire. The Tribunal noted, for example, that, even after the Croatian courts had definitively pronounced, Mr Šikić stuck to his opinion that some of their decisions had been wrong in law. It remains, however, the case that it is both unrealistic and unnecessary for the Tribunal to express any view of its own as to the application of the governing Croatian legislation in circumstances in which INA had the ready opportunity at its disposal, which it made use of, to challenge both sets of revocation decisions in court. The Tribunal notes, in addition, the availability to INA of a right of appeal, and that in their final decisions the competent courts delivered full and adequate reasoned judgments both on the operation of the Mining Act and on the general requirements of Croatian administrative law.

---

[430] Cl. PHB Vol. IX, Section 6.3; Resp. PHB Vol. VII, paras. 57-64.

663. The Tribunal was, however, grateful to Mr Koprić for bringing out (which was not clear before) that the new Croatian legislation on administrative procedure (the "GAPA" of 2009) enacted at much the same time as the new mining legislation, was also part of a concerted and carefully planned move towards harmonizing Croatian legal standards with those of free market economies, in preparation for Croatia's accession to the EU and its ratification of the European Convention on Human Rights. As Mr Koprić put it, administrative procedure "needed to be simplified and modernized in order to meet changed expectations," a reform which was then continued into the judicial structure with a further law in 2012 on Administrative Disputes (the "ADA").[431] The key point of substance is, however, as Mr Koprić again brings out, that under the old procedural law (which governed the challenges to the first revocation decisions) the court was limited to a review of formal legality; it was only under the new law (which governed the second revocation decisions) that the court became empowered to pronounce on the factual as well as the substantive correctness of administrative decisions.[432] Moreover, it became possible for the first time for the Administrative Courts to hold contested *inter partes* hearings ('contradictory hearings') on questions of fact, and a hearing of that kind was indeed a necessary requirement before an administrative court could make binding determinations on matters of fact.[433]

664. That aside, and valuable as it is as general background, the Tribunal is in any case not convinced that these questions of Croatian law are directly material to its decisions in the Arbitration. It might perhaps had been different had the courts ruled in INA's favour, yet the Minister declined to give effect to their ruling; but that is not the situation here. It was sensible on the part of the Claimant to adjust its stance in the final Post-Hearing pleadings to the position that "MOL does not allege that those court decisions were a breach of the ECT; its claim is limited to the actions of the Ministry of Economy";[434] and that, on grounds of basic principle, the Respondent is not entitled to plead its domestic legal

---

[431] First Koprić ER, paras. 3-8.
[432] Ibid, paras. 30-31.
[433] Ibid. para. 58.
[434] Cl. PHB Vol. IX, para. 129.

situation as a defence against its international obligations.[435] The Tribunal equally regards that principle as incontestable, subject to the proviso that the principle has to be understood in context – the proper context for present purposes being that an entity which applies for the grant of a right created by domestic law, must be understood as taking that right subject to whatever limits and conditions are laid down in that law.

665. The two key determinants, to the mind of the Tribunal, are therefore: (a) that the position under Croatian law as to the Minister's powers under the Mining Act 2009 and the circumstances for their exercise is finally and conclusively determined in the judgments delivered in 2017-2019 by the Croatian Administrative Courts; (b) that an exploration licence issued under the Mining Act is not an absolute item of property but a limited grant, the limits of which are set by the Act. Once those two propositions are established, it becomes clear that the Claimant's claim in this Arbitration is entirely dependent on its assertion that the Minister's revocation decisions (whether lawful or not), were actuated by an improper motive, in such a way as to implicate the guarantee of fair and equitable treatment under the ECT. To be sure, the Claimant does in addition submit that the Minister's decisions were in any case vitiated, for ECT purposes, by a failure of due process in the way they were taken, and by a lack of proportionality between the licence breaches and the sanction that followed.[436] As to the question of due process, the complaint is in essence that the affected party (INA) was denied any opportunity to make representations to the Minister before he took his decisions.[437] Whatever the abstract merits of this complaint, once it is accepted that INA had full and adequate opportunity, like any other licensee, to challenge the Minister's decisions in court, and that the challenge entailed findings of fact as well as law, the argument loses all its substance. If the Minister was obliged by law to proceed to revocation, it would have made no material difference to allow the licensee the opportunity to put it to him that he should not do so, least of all if his decision was ultimately challengeable in court. Likewise, if INA's position before the Court was that it had, in its contacts with the Ministry, provided all the necessary information, how could it have made a material difference to have been allowed

---

[435] Ibid, Section 6.1.
[436] Cl. PHB Vol. IX, paras. 103-109.
[437] Cl. PHB Vol. IX, para. 104.

a further opportunity to do so, given that it would be able, to challenge the outcome in court if it felt that the facts had not been properly assessed? And, as to the question of proportionality, that is plainly a criterion that can only arise in respect of the exercise of a discretionary power – a point made expressly by the *Occidental v. Ecuador* tribunal.[438] But it is in any event now established that the High Administrative Court did, in fact, take the principle of proportionality into consideration in reaching its 2017 decisions on the second Sava and Drava licence revocations.[439]

666. The central question for consideration is therefore the allegation that the revocation decisions were born out of hostility towards the Claimant and the wish to cause it harm. Concentrating its attention, therefore, on this, the Tribunal must draw attention once more to the fact that MOL and INA are not one and the same. INA is a domestic Croatian corporation, long pre-existing the arrival of foreign investment. Its activities have thus always been regulated by the law of the State of its creation, including notably its operations in the field of hydrocarbon exploration and exploitation. This was therefore the legal regime which regulated INA's ongoing activity in this field at the moment at which MOL acquired its interest as strategic investor, and remained the case after INA gained a foreign shareholder. It was, quite literally, <u>in</u> INA that the Claimant invested. And it bears recalling, too, as the Tribunal has frequently mentioned above, that the other major shareholder in INA was, and still remains, the Government of Croatia.

667. For all of the reasons just stated, the Tribunal cannot accept any automatic equivalence between measures directed at INA, and their effect on INA, and measures directed at the Claimant, and their effect on the Claimant. The Claimant has regularly tended, in the presentation of its written and oral argument, to elide the distinction between the two; but, in the view of the Tribunal, that does not offer a satisfactory framework for legal analysis. To put the matter more rigorously, in relation specifically to the terms of the ECT, the 'Investment of an Investor of another Contracting Party' to which Article 10(1) guarantees 'fair and equitable treatment' is not INA, but MOL's shareholding in INA. It is that which represents the 'asset owned' by the 'Investor' (MOL), in the form of 'shares, stock, or

---

[438] *Occidental Petroleum Corporation and Production Company v. The Republic of Ecuador*, ICSID Case No. ARB/06/11, Award, 5 October 2012 (CA-045), paras. 424-425.
[439] R-367, p. 19; R-369, p. 11.

other forms of equity participation in a company or business enterprise'.[440] The Tribunal has heard no argument on the point from either side, but it cannot interpret the mention in Article 1(6) of assets 'owned or controlled directly or indirectly by an Investor' as entailing that, when MOL subsequently gained management control over INA under the FASHA, that had the effect of transmuting INA itself into the Claimant's 'Investment' under the ECT.

668. The Tribunal cannot thus regard the revocation decisions as being, in themselves, 'treatment of' the Claimant's 'Investment' without further clear evidence that the decisions were in reality directed, so to speak <u>through</u> INA, at MOL's interest in INA. However, all that the Claimant has offered in this regard has been little more than coincidences in time between the revocation decisions and other events in the worsening inter-shareholder and governmental relations between Croatia and MOL, together with associated public statements by Croatian spokesmen.[441] The Tribunal must regard that as too slender a basis for the adverse inferences which the Claimant wishes it to draw, so as then to serve as the foundation for a multi-million-dollar claim.

669. The conclusion in the previous paragraph is put into especially sharp relief in the face of two countervailing factors. First, after the revocation of its three onshore exploration licences, INA was in fact granted a new licence in the normal way in the fresh licensing round over the one area it did apply for. Second, no evidence was put forward to suggest that anything stood in the way of INA deciding to re-bid for all three licence areas, which could doubtless have been done with a reservation of rights while the ultimate fate of the first revocation was still pending before the courts. Had the real purpose of the revocations been to injure MOL through INA, then INA would have been frozen out, in one way or another, from the entire re-licensing process.

670. But the Claimant's case is undermined by further weaknesses as well. INA was (is), as pointed out by both the Parties and the Expert Witnesses, a seasoned and sophisticated operator. It knew the local scene intimately, and from the inside. It cannot have been in any way ignorant, or uninformed, about the new legal regime and licensing framework

---

[440] ECT, Art. 1(6).
[441] See, *e.g.*, Cl. PHB Vol. IX, paras. 31-32.

introduced under the 2009 Mining Act. There can be no doubt that, when the rules changed, it was up to INA to undertake adequate study and take careful advice to make sure it understood the changes and their implications. If, instead, INA continued to trade on old assumptions, for example about the scope and timing of its reports to the Ministry, then it had no-one but itself to blame.[442] Finally, while the Claimant complains that no responsible witness was put up by its opponents to 'explain' the reasons for the licence revocations, it is equally true that the Claimant itself put up no witness of its own with direct experience of how the licensing scheme and its requirements worked in practice, either before the 2009 Mining Act or afterwards. The Tribunal was, indeed, more than a little surprised, given how much was resting on it, to be shown nothing at all, for example, about what the experience of other licence holders had been; surely something along those lines would have been essential to sustain an argument that INA had been deliberately singled out for harsh treatment.

671. The revocation element of the Hydrocarbon Licence Claim is therefore rejected.

672. Much the same fate awaits the other element of the Claim, which centres on hindrances in the granting of permits.

673. The Tribunal has no need to recite the content of the claim in painstaking detail. Its essence is that the execution of physical works in licensed areas, indeed the very permission from the Ministry that was required in many cases before work could begin, was subject to endless bureaucratic delays at the hands of the Ministry or the State Property Agency ("DUUDI", later a Ministry for State Property in its own right), and that this was once more the deliberate expression of a pervasive hostility against MOL within the Croatian Government machinery.[443]

674. The Tribunal needs no persuading that the bureaucratic processes which are under attack here could prove achingly slow. It accepts the evidence to that effect tendered by Mr Aron (for the Claimant) and not contested by Mr Way (for the Respondent). Ms Tancer refers in her evidence to egregious cases in which it took three years to gain construction and use permits so as to bring established discoveries into production, a process that Mr Aron

---

[442] See R-131, R-132 & C-190, cited in Resp. PHB Vol. VII, para. 45.
[443] Cl. PHB Vol. X.

thinks would normally be expected to take about six months. But the Tribunal accepts also the evidence of Mr Koprić and others, which is conceded by the Claimant, that the origin of the new and demanding procedures was the 2009 Mining Act.[444] In other words, the changes in question would have been general ones, applying to all licensees, and enacted for general public purposes. According to Mr Áldott, the logjam became even worse following the passage of a further Mining and Hydrocarbon Exploration and Exploitation Act in 2013.[445] Once again, therefore, this is general legislation applying across the board.

675. Nor does the Tribunal experience any difficulty in accepting that delays cost money, which, again, Mr Way does not contest, although he differs sharply from Mr Aron over how to assess and evaluate the loss. That is not, however, the primary issue, since the assessment of loss, and compensation for it, follows only from the establishment that there had been a breach, *i.e.,* of an obligation owed by the Respondent to the Claimant. And on that – which is the primary issue – this aspect of the Claimant's claim suffers from the self-same analytical defects as the revocation aspect (see above). This applies notably to the relation between INA, the party at the receiving end of the delays and other omissions, and what should be understood to constitute the Claimant's protected investment under the ECT; on that important question, paragraphs 666-668 above apply in full. But, even more so, the Tribunal misses yet again (see the last sentence of paragraph 669) an attempt of any kind on the Claimant's part to compare and contrast INA's experience with that of other licensees. The circumstance under consideration is, after all, not an exceptional one (as in the case of licence revocation) but must be the routine month-by-month experience of all holders of licences over onshore concessions. Without appropriate factual comparative evidence, it becomes impossible for the Tribunal to hold that even INA, let alone MOL through INA, had been singled out for especially hard and unfavourable treatment, still less so that this must have been the product of entrenched hostility on the part of various branches of the Croatian Government machinery. Bureaucratic heavy-handedness, galling though it may be, does not in and of itself reach the threshold for a

---

[444] First WS Tancer, paras. 44-45. Mr Koprić also makes the important point that in the earlier period, before the introduction of land ownership under free market conditions, the need to resolve property relations had often simply been ignored (First Koprić ER, paras. 18-19).

[445] Second WS Áldott, paras. 48-49.

claim under the ECT, unless it is shown to have been infected with some other adverse element of sufficient seriousness as to transform a mundane situation into a specific breach of the guarantee of fair and equitable treatment. And the burden of so showing rests unambiguously on the party advancing the claim of breach.

676. The Hydrocarbon Licence Claim is therefore rejected in its entirety.

### c. The Criminal Prosecution Claim

677. As indicated in paragraph 561above, the Tribunal decided to postpone until this stage in its Award detailed treatment of the Claimant's various complaints against the conduct of the investigation and prosecution of Dr Sanader and Mr Hernádi, and their outcome. The intention was, as there stated, to allow these complaints to be measured, outside the framework of the corruption allegation as such, against the specific protections guaranteed to foreign investors under the ECT.

678. The Claimant's complaints against the conduct of the Croatian prosecution agencies (DORH and USKOK) and criminal courts under this heading are legion. They can be summarized for present purposes as including (amongst other matters) inadequacies in the collection of evidence by the prosecutorate, or even the fabrication of evidence; failure to pursue necessary lines of enquiry; credulity on the part of the courts towards suspect evidence; animus towards the defence and favour to the prosecution in the handling of trials and the admission of evidence; curbs on defence rights in the course of trial proceedings.[446]

679. The Claimant's claim mounted on the basis of those complaints came to be referred to in the Arbitration proceedings as its 'Rompetrol claim' inasmuch as it was based on the authority of the award in the case of *The Rompetrol Group N.V. v. Romania*.[447] The relevant citations from that award are set out in full in paragraph 563 above.

680. There were times at which the Tribunal felt that it was being addressed as if it was a higher court of criminal appeal, rather than an international tribunal of limited jurisdiction under an investment treaty. The Tribunal must therefore begin by stating emphatically that it is

[446] Cl. PHB Vol. V.
[447] CA-016.

201

not equipped to serve as an instance of appeal against any part of the criminal proceedings that have taken place before the authorities, judicial or other, in Croatia. But, more important still, nor is it authorized to do so. The *Rompetrol* tribunal put the matter as follows –

> "The Tribunal wishes to make it plain from the outset that it would be acutely sensitive to any well-founded allegation that the investment arbitration process before it was intended to (or was in fact operating in such a way as to) block or inhibit the legitimate operation of the State's inherent function in the investigation, repression and punishment of crime, including economic crime and corruption."[448]

681. The present Tribunal endorses that approach. It follows that, to the extent that the Claimant's case and the remedies sought seek to have it intervene in, or sit in higher judgment on, the operation of the Croatian legal system or the verdicts of its highest courts, the Tribunal must decline. The Tribunal's task is confined to adjudicating on the existence or otherwise of breaches of the duties owed to investors of another State Party to the ECT and their investments, and to determining the appropriate remedies if breaches of that kind are found, what the *Rompetrol* tribunal refers to as "conduct that breaches the rights of foreign investors under applicable treaties."[449]

682. With that as the starting point, it can be seen that the Criminal Prosecution Claim faces two major difficulties.

683. The first is a question of timing, and is thus linked as much to admissibility as to substance. The claim in itself has an inevitable resemblance to a classic international law claim of denial of justice (*déni de justice*), to the effect that the institutions of a State have failed to accord to an alien the minimum standard of treatment which international law requires. Insofar as the two do share similar characteristics, it raises a question as to when the claim can properly be brought; or, to put it another way, a question as to the applicability of the

---

[448] Ibid, para. 152; see also the authorities cited by the Respondent, *Caratube International Oil Company LLP and Devincci Salah Hourani v. Republic of Kazakhstan*, ICSID Case No. ARB/13/13, Decision on the Claimants' Request for Provisional Measures, 4 December 2014 (RA-214); *EuroGas Inc. and Belmont Resources Inc. v. Slovak Republic*, ICSID Case No. ARB/14/14, Procedural Order No. 3 Decision on the Parties' Request for Provisional Measures, 23 June 2015 (R- 215), and *Hydro S.r.l. and others v Republic of Albania*, ICSID Case No. ARB/15/28, Order on Provisional Measures, 3 March 2016 (RA-216), all of which, moreover, had under consideration merely provisional measures, not substantive relief.

[449] *Rompetrol v. Romania*, para. 152.

'local remedies rule'. In the present case, at the time when the Claimant's claim was originally put forward, the prosecutors' investigations against Dr Sanader and Mr Hernádi had been completed and had led to Dr Sanader's first trial and conviction, followed by the indictment of Mr Hernádi. Questions were also active as to whether arrest warrants and associated Interpol red notices might be executed against Mr Hernádi outside the territory of Croatia. The indictment of Mr Hernádi was issued in March 2014, Dr Sanader's first conviction was confirmed by the Supreme Court the following month, and the Claimant's amended Request for Arbitration was filed the month after that. The corruption allegation was, therefore, already before the Croatian courts. Indeed, the Constitutional Court quashed Dr Sanader's conviction a year later and ordered a retrial, which led in turn to a second trial; the trial was this time against both Dr Sanader and Mr Hernádi, and ran until June 2020, followed by appellate proceedings that eventually concluded in July 2021. As this bare chronology discloses, criminal proceedings before the Croatian courts were, to all intents and purposes, under way throughout all the substantive stages of the present arbitral proceedings. The factual situation was thus sharply different from the one in the *Rompetrol* case, where no criminal charges had been brought, and the claim was in respect of injury or damage said to have been caused by particular incidents in a criminal investigation that had not yet concluded. The *Rompetrol* tribunal, even while it gave specific attention to the local remedies rule and its relationship to investment arbitration, was not therefore required to consider its application to a situation in which a criminal trial was actually in train. To the mind of the present Tribunal, it does mark a material difference if the intervention of an international tribunal is sought while the courts of the host State are in fact seized with a criminal proceeding – for the reasons stated in paragraph 680 above. There is thus a much stronger argument in these circumstances that a fair and equitable treatment or non-impairment claim based directly on the operation of the host State's criminal justice system ought not to be receivable while any reasonable avenue remains to correct the injustice suffered at the domestic level.[450]

684. Two conclusions can be drawn from the above: *one*, that (subject to a small qualification that will be dealt with below) by the time these arbitration proceedings were launched in

---

[450] See Art. 14 & 15 of the International Law Commission's Draft articles on Diplomatic Protection 2006, UN document A/61/10.

2014, whatever complaints might have arisen out of the criminal investigation (as in *Rompetrol*) had already been subsumed into the criminal trial process which provided the most natural and direct avenue for their correction; two, that it remains uncertain whether this Tribunal could properly have been asked to intervene into the criminal justice process while it was still in train and before it had come to its definitive conclusion.

685. The second major difficulty confronting the Criminal Prosecution Claim is both more serious and more substantive. It should be recalled at the outset that, so far as the Tribunal has been informed, no criminal proceedings have at any stage been brought in Croatia against the Claimant (MOL) or against INA, the locus of the Claimant's investment in Croatia. The criminal proceedings lying at the heart of the Claimant's claim were brought solely against (in the first instance) Dr Sanader, and then in their later iteration against Dr Sanader and Mr Hernádi as first and second defendants. Nor has it been alleged that any form of constraint had been exerted against MOL or INA in aid of the criminal proceedings, or any form of penalty levied against either of these as part of the outcome of the criminal proceedings. There has been no allegation, for example, that premises or records of MOL or INA had been searched, or that their documents or property had been frozen or seized as evidence. The closest approach is the bald assertion in the Claimant's Reply that "MOL has suffered extensive injury at Croatia's hands that is not pecuniary but nevertheless is very real, including harm to reputation, interference with its planning and decision-making, and the impairment of its operations caused by the reputation attacks on its CEO and chairman Zsolt Hernádi."[451] This assertion is not only bald and unspecific, it is also unsupported by reference to evidence of any kind. As the *Rompetrol* tribunal observed (see paragraph 563 above): "The claims for decision in the arbitration are those of TRG, in respect of RRC, TRG's investment in Romania, which are qualitatively different in kind from whatever complaints there might be by individuals as to the violation of their individual rights by Romanian state authorities" and later "the Claimant's case stands or falls by whether it is able to make out its claim that the criminal investigations have breached the rights of the Claimant itself."

---

[451] Cl. Reply, para. 92.

686. This brings the Tribunal to the question of injury or damage. The *Rompetrol* tribunal had clearly been troubled by the question whether the nature of the claim was such that it required a showing of injury or damage as an integral part of establishing the breach itself.[452] Its conclusion was that, while the relevant Articles of the investment Treaty guaranteeing fair and equitable treatment, non-impairment, and physical protection and security had principally in mind breaches which occasion actual, and therefore assessable, loss or damage to the investor, it remained the case that, as a matter of law, breaches of those obligations under an investment treaty may give rise to relief of different kinds. It went on to add:

> "To the extent, however, that a claimant chooses to put its claim (as in the present Arbitration) in terms of monetary damages, then it must, as a matter of basic principle, be for the claimant to prove, <u>in addition to the fact of its loss or damage</u>, its quantification in monetary terms and <u>the necessary causal link</u> between the loss or damage and the treaty breach."[453] (emphasis added).

The present Tribunal has found that discussion to be helpful and instructive. Its view is that the question whether proof of damage is integral to the breach can be argued both ways, but it shares the view of the *Rompetrol* tribunal that the matter is of little practical significance, if any at all, in situations where the claim asserted by the claimant is one for monetary compensation.

687. In the present Arbitration, in clear contrast to the *Rompetrol* arbitration, the Claimant has not given any precision to the relief it seeks specifically in respect of the Criminal Prosecution Claim. In *Rompetrol*, the claimant investor had set up an elaborate theory of damage and its evaluation, based on detailed expert advice, which sought to link, item by item, both the existence of damage and its quantification to incidents and events in the criminal investigation. This seems to have led to extensive debate between the tribunal and the parties and their respective experts, which is then dealt with at length in the tribunal's award.[454] In the present case, of the six heads of substantive relief set out at paragraph 12 in the Claimant's Post-Hearing Brief, only two are cast in monetary terms,

---

[452] *Rompetrol v. Romania*, paras. 187-190.
[453] Ibid, para. 190.
[454] Ibid, paras. 281-293.

head b) in respect of pecuniary injury, and head c) in respect of what is termed 'non-pecuniary injury' but without specific linkage to particular conduct or grounds of claim. The Tribunal understands that the monetary amount set down under head b) (USD 964.4 million as of 30 September 2016) is the arithmetical sum of the individual heads of damage claimed in respect of the other courses of Croatian conduct that have been dealt with in previous sections of this Award.[455] Apart, therefore from the four general remedies under heads a), d), e) and f), the only remaining claim to monetary damages which may be intended, so the Tribunal conjectures, to be linked to the Criminal Prosecution Claim is the claim under head c) to "moral compensation for MOL's non-pecuniary injury."[456]

688. It is, however, plain to the Tribunal that, irrespective of whether the claim is framed as pecuniary compensation or moral compensation, the Claimant's argument founders because it leaps in one bound from an allegation of breach to a claim for monetary relief while missing out completely the essential stage in between the two, namely the proof of damage having been suffered and that it resulted from the alleged breach (causation).[457] Without the slightest doubt, moreover, those two elements form a necessary part of any claimant's case, with the result that it is unambiguously on the claimant that the burden falls of establishing them. It is in this respect that the Claimant's argument in this case is wholly deficient. Unlike the painstaking (even if ultimately unsuccessful) efforts by the claimant in *Rompetrol* to itemize elements of damage and tie them to impugned events, the Tribunal has not been able, with the best will in the world, to discover anything similar in these proceedings. The closest approach is the inclusion in the Claimant's schedule of monetary damages of the cost of defending the criminal proceedings.[458] But, as indicated above, the defendant in the criminal proceedings was Mr Hernádi, not MOL, and the Tribunal misses a demonstration of any kind how and in what specific respect those proceedings were the cause of compensable damage to MOL, the Claimant investor. It seems as if the expectation is that damage can simply be assumed, as in the bland remark in the introduction to the Claimant's Post-Hearing Brief that the investigation, prosecution

---

[455] But including, it seems, the cost of defending the criminal proceedings; see para. 688 below.

[456] Quantified at USD 31 million.

[457] See, *e.g., Pey Casado v. Chile*, paras. 217-218.

[458] Quantified in nominal terms at USD 31 million.

and trial were wrongful "thereby harming MOL's investment in INA",[459] with nothing further by way of detail to back that up through evidence or even bare argument (see also paragraph 685 above). The Tribunal can well imagine the possibility that MOL's affairs could have suffered, if (for example) Mr Hernádi had been prevented from undertaking essential travel. But the existence of harm, its contours and cause, and in particular its extent, cannot be matters of supposition or imagination; they must be averred, described, and supported by proper evidence. This manifest deficiency in the Claimant's case becomes all the more glaring when it is noted, in addition, that the harm is asserted, in equal and undifferentiated terms, to flow from the pursuit not merely of Mr Hernádi, but equally of Dr Sanader, a Croatian citizen who played no role of any kind in the management or operation of INA, still less of MOL. And this despite the clear statement in the *Rompetrol* award (the basis for the Claimant's claim) that "'denial of justice' … is a legal institution which has as its very essence the relationship between a State and aliens within its territory (or under its jurisdiction). It is not a barrier interposed between a State and its own citizens …".[460]

689. The Criminal Prosecution Claim lacks therefore the factual underpinning necessary to enable it to be sustained, and must be set aside. That being so, the Tribunal does not consider it necessary to examine further the arguments raised by the Respondent challenging the rationale for the relief claimed and its justification.

#### d.  *Date of Breach and Interest*

690. As to the date of breach, given the findings in paragraphs 641 & 647 above, the Tribunal considers that the only fair and reasonable date to choose is the date of the Gas Market Measures of 2014, that is to say 1 April 2014.[461] It is, of course, aware that the breach in question is, to a large extent, one that would be classified under the ILC Articles as a "breach consisting of a composite act", and that in such a case the breach "occurs when the action or omission occurs which, taken with the other actions or omissions, is sufficient to constitute the wrongful act", but "extends over the entire period starting with the first

---

[459] Cl. PHB Vol. I, para. 10.
[460] *Rompetrol v. Romania*, para. 165.
[461] See para. 414 above.

of the actions or omissions of the series and lasts for as long as these actions or omissions are repeated and remain not in conformity with the international obligation."[462] It is difficult, however, to apply those criteria in any rigid way to breaches that arise out of failures to act rather than specific positive actions. The Tribunal will therefore retain one single date, as above, as the effective date of breach when the elements that constitute the Gas Market Claim can be taken to have crystallized. If pre-Award interest is to be awarded, it will thus run from that date.

691. On the question of interest, in its requests for relief the Claimant seeks pre-Award interest and sets the rate at LIBOR + 4%, compounded annually. The origin of this rate was not immediately clear at the outset. It is stated, in the Claimant's written submissions, to be 'a commercial rate',[463] and is the rate on the basis of which the calculations are performed in the Reports by the Claimant's experts, Compass Lexecon and Mr Aron. It was confirmed, however, in the course of later exchanges, and in particular the expert witness cross-examination, that the rate had not been adopted by the experts in the exercise of their own independent judgement, but that it had been included in their instructions from Claimant's counsel.[464]

692. Much of the ensuing discussion then revolved around the LIBOR + 4% rate. The Respondent's expert, PWC, regarded that rate as an inflated one, and in later exchanges Mr Qureshi expressed a clear preference for an alternative approach, resting on a 'Croatian deposit rate', which he felt to be more appropriate in the aftermath of the 2008 world financial crisis.[465]

693. The course of the argument between the Parties over the correct approach to the award of interest is made more difficult to follow by the fact that it is spread, in the written submissions, between the treatment of loss-of-profit claims (which the Tribunal has not upheld) and claims for financial loss, a limited number of which the Tribunal has accepted. So far as the Claimant has offered a basis to justify the instruction given to its experts, it

---

[462] Art. 15, paras. 1 & 2.
[463] Cl. Reply Vol. IV, para. 114; Cl. PHB Vol. I, para. 12.
[464] First Compass Lexecon ER, para. 6.
[465] First PWC ER, paras. 68-70.

rests, in broad and general terms, on the 'full reparation' standard enunciated in the ILC draft Articles.[466] The Respondent counters by invoking the analysis by the *Yukos* tribunal of four different approaches to interest rates,[467] of which only two seem to the Tribunal to be potentially applicable to the present case, namely the 'investment alternatives' approach and the 'borrowing rate' approach. The difference between the two is essentially that between what it would have cost the investor to raise the missing funds by bank lending in its own country (the 'borrowing rate' approach) or in the host State of the investment (the 'investment alternatives' approach), the Claimant preferring the first of these and the Respondent the second. The Tribunal does not find there to be a decisive argument favouring the adoption of one or the other, and recalls in this context the wide discretion recognized to lie in the hands of a tribunal over the award of interest.[468] Given, however, the common acceptance between the Parties that a loss to INA translates directly into a proportionate loss to MOL, the Tribunal finds the regularly applied 'borrowing rate' approach based on an adjusted LIBOR to be, on balance, more appropriate to the circumstances of the present case.

694. The Tribunal therefore decides as follows:

1) It is standard practice for pre-Award interest to be granted for breaches of investment guarantees that cause actual and measurable financial harm. The awards of damages to the Claimant specified in paragraphs 652 & 655 above will therefore carry interest, which will run from 1 April 2014 until the date of this Award.

2) There is no settled international rule as to whether interest of that kind should be simple or compound. While there has been a noticeable tendency towards the award of compound interest in recent years, the practice of investment tribunals remains divided. The International Law Commission, for its part, put forward merely the general rule of 'full reparation' cited above, leaving the interest question open. It is, however, clear that the award of compound interest requires

---

[466] Cl. Memorial, paras. 435-436.

[467] *Yukos Universal Limited (Isle of Man) v. Russian Federation,* PCA Case No. AA 227, Final Award, 18 July 2014, paras. 1659-1668 (RA-1113).

[468] Ibid, para. 1658.

to be justified as necessary to meet that result, and that the burden of doing so lies on the party claiming compound interest. In the absence, therefore, of any decisive argument by the Claimant, or any demonstration of what difference would result in the specific circumstances of the case between compound and simple interest, the Tribunal does not see itself justified in awarding compound interest for a discrete and limited financial loss.

695. The Tribunal is persuaded by the Respondent's expert evidence, which is supported also by the *Yukos* award, that the most commonly applied interest rate in ICSID arbitrations has been LIBOR + 2%.[469] That is accordingly the rate it will use for the pre-Award interest.

### (3)    Other Relief

696. The Claimant, in its written submissions, seeks, in addition to a finding of breach and an order for monetary compensation, an extensive array of further relief. This includes: a non-harassment order against Croatia in favour of MOL, INA, and their officials; guarantees of non-repetition; and measures of satisfaction – the content of which is spelled out in some detail.[470] These additional measures are very wide-ranging indeed.[471] To a considerable extent, moreover, these additional measures are, on their face, directed at aspects of the dispute between the Parties that either represent concluded past episodes (such as the Gas Market Measures of 2014 or the licence revocations) or are inextricably connected with issues on which neither side has proved its case to the Tribunal's satisfaction (the Claimant's complaints against the criminal investigation and prosecution, and the Respondent's response). Given, therefore, the limited nature and scope of the breaches upheld in the previous sections of this Award, the Tribunal is of the view that no further and wider remedies in their regard are justifiable, over and above those granted in paragraphs 652, 655 & 695 above.

---

[469] Second PWC ER, para. 65; see also the 2008 Study by the British Institute of International and Comparative Law cited by the *Yukos* tribunal.

[470] Cl. PHB Vol. I, para. 12.

[471] They include, to give one example, 'satisfaction in the form of an official recognition of responsibility and apology to be made by the current Minister of Economy in a public press conference open to the media and through a public written statement from the Minister issued in Hungarian, English, and Croatian.'

## VI.    COSTS

697. Both Parties seek an award of costs.[472] Their claims were quantified, pursuant to the Tribunal's orders and directions, in a two-stage exchange of costs submissions, later supplemented by a further submission from each side.

698. The total sum claimed by the Claimant amounts to USD 32,141,160.73 + GBP 3,087,970.01 + EUR 6,330,226.73 + HUF 12,589,259 + HRK 4,605,[473] and by the Respondent to USD 18,603,356.51.[474] As requested by the Tribunal, each Party accounted separately for the costs incurred in respect of: the Respondent's Rule 41(5) Application, the Respondent's jurisdictional objections, and the merits. The amounts concerned were justified to different levels of detail from one side to the other, but each side was allowed the opportunity to comment on the costs claims of the other. The Claimant complains, with some justice, that the Respondent's initial costs submissions failed to reflect in full what the Tribunal had requested, and submits that this had the effect of screening its own claims from the same scrutiny as it sought to bring to bear on those of the Claimant. But the Tribunal is satisfied that it is in possession of adequate material to form the basis for the decisions that follow.

699. It is uncontroversial that a tribunal operating under ICSID Rules has the most ample discretion over the award of costs. All that Arbitration Rule 47 lays down is that there must be included in the Award "any decision of the Tribunal" regarding the cost of the proceedings. The Tribunal is at the same time aware of the increasing tendency on the part of tribunals, both within the ICSID system and outside, to apply a 'costs follow the event' principle, under which the losing party is ordered to pay all or part of the costs of the arbitration and those of the winning party.

700. The fundamental difficulty in applying that principle to the present case is that its starting point is the identification of 'winning' and 'losing' party. To do so here is, however, by no means clear or simple. The Respondent launched an Rule 41(5) application to have the Arbitration dismissed *in limine*, which the Tribunal found to be unsustainable at that

---

[472] Cl. PHB Vol. I, para. 12; Resp. Rejoinder Vol. IV, para. 151.
[473] Cl. Supplement Costs, Annex A.
[474] Resp. Supplement Costs, p. 7.

preliminary stage. The Respondent then put forward an array of preliminary objections on jurisdictional and admissibility grounds, none of which has been upheld by the Tribunal. Likewise for the Respondent's application to have the proceedings divided into separate phases for jurisdiction/admissibility and merits – which would, in the event, have saved neither costs nor time. For its part, the Claimant failed in its two requests to the Tribunal to grant provisional measures under Arbitration Rule 39, and in other interlocutory applications such as its request that the Tribunal should determine the effect of the UNCITRAL award as a preliminary matter. As regards the merits, the Claimant succeeded with a limited number of its claims, losing however on its most substantial claims and the wide-ranging relief requested. Conversely, the Respondent failed notably to sustain its major line of defence, the corruption allegation, which overlapped with its jurisdictional/admissibility objections and took up, on a rough and ready computation, over half of the total time of the oral hearings in their successive phases. But then, nor did the Claimant succeed with its reverse claim on the same ground.

701. An overall assessment might thus rank the Claimant the successful party, but only by the narrowest of margins.

702. Further difficulties confront the Tribunal when it moves on to consider the Parties' countervailing claims to be awarded their own party costs against their opponent. The application of a crude win/lose test would, for the reasons set out above, not by any normal standard justify such an award to either side. Each Party urges on the Tribunal, however, arguments couched in the strongest terms as to why the conduct of the other Party in the course of the proceedings should lead the Tribunal to decide otherwise, or, more bluntly, to impose costs as a sanction for its opponent's misconduct. These arguments amount to mutual allegations by each Party against the other of bad faith and dishonest litigation tactics. They are cast (on both sides) in a form that also impugns the professional integrity of opposing counsel; they may not have been so intended, but that is the way they read. The Tribunal cannot set itself up to be the arbiter of good or bad litigation practice. Where issues have arisen in the course of these very lengthy proceedings that, in its view, raised questions of procedural fairness or equality of arms, it has expressed itself plainly and expected the Parties to comply. Where issues have arisen as to the honesty and reliability of witness (or other) evidence, the Tribunal, as it was duty bound to do, has formed its

212

own objective view on the materials presented to it, without the need to speculate as to Party motivation. Likewise for submissions of law put forward by one Party or the other, each one of which, if found to be relevant, has been considered and determined simply on its own intrinsic merits. And lastly, as regards the mutual recriminations that either one Party or its opponent has wrongly sought to litigate, or re-litigate, the corruption allegation in an inapposite forum, these allegations are regarded by the Tribunal as cancelling one another out. The Tribunal therefore sees no adequate ground for making a Party costs order on the strength of improper conduct.

703. There remains, finally, the question of the allocation of the costs of the Respondent's Rule 41(5) application. As the Tribunal had indicated in its Decision of 2 December 2014:

> "The Tribunal concludes this section of its decision with a brief word on costs. The costs of this phase of the proceedings, consisting as it did of more than one round of written argument, an oral hearing in Washington DC, and deliberations by the Tribunal, cannot be assumed to be negligible. Given that one of the main reasons behind the introduction of Rule 41(5) was to spare respondent States the wasted trouble and expense of having to defend wholly unmeritorious claims, it must follow per contra that a Respondent invoking the procedure under the Rule takes on itself the risk of adverse cost consequences should its application fail. The Tribunal sees no need to make a costs order now, but will take the matter into account when considering the question of costs at the end of the arbitral proceedings."[475]

The Respondent's Application having been decisively rejected for the reasons set out in the above Decision, the Tribunal can see no good ground for not following through, in this limited respect, by making the costs follow the event. The Claimant has assessed its corresponding costs at a total of EUR 856,308.69, and explained the basis for this calculation in its covering submission.[476] There is no reason not to accept this calculation.

704. Further difficulty for the Tribunal, in applying any blanket principle for cost allocation, resides in the sheer length and complexity of the proceedings, which the Tribunal has had occasion to note in paragraphs 491-492 above. Reviewing the proceedings as a whole as they come to their end, the Tribunal cannot avoid an overriding impression of multiplicity

---

[475] Decision of 2 December 2014, para. 54 (Annex A to this Award).
[476] Letter to the Tribunal of 29 October 2018, at para. 2.1, and Annex B.

of effort and on occasion sheer repetitiveness, what might colloquially be called 'overkill'. Nor can the Tribunal in all honesty pretend that the wasted effort so entailed was of assistance to it – or indeed to the Parties themselves – in focussing attention on what turned out to be the real issues at stake in the Arbitration, although predictably and inevitably it did bring in its train an increase in the costs of the Arbitration.[477]

705. Taking all the above into consideration, the Tribunal decides that the costs of the Arbitration shall be borne as to 60% by the Respondent and as to 40% by the Claimant.

706. The costs of the Arbitration, including the fees and expenses of the Tribunal and the Tribunal's Assistant, ICSID's administrative fees and direct expenses, amount to (in USD):

|  |  |
| --- | --- |
| Arbitrators' fees and expenses | |
| Sir Franklin Berman QC | USD 684,721.66 |
| Prof. William W. Park | USD 483,294.44 |
| Prof. Brigitte Stern | USD 475,794.39 |
| Dr Peter Webster | USD 237,724.35 |
| ICSID's administrative fees | USD 338,000 |
| Direct expenses (estimated) | USD 507,706.56 |
| **Total** | **USD 2,727,241.40** |

707. Other than as in paragraphs 706, 705 & 703 above, all costs submissions are rejected.

## VII.   DECISION

708. On the basis of the reasoning set out above, the Tribunal decides as follows:

1) The Respondent's objections to jurisdiction and admissibility are rejected.

2) The Tribunal has jurisdiction over the Claimant's claims, except to the extent set out in paragraph 453 above.

---

[477] As can be seen from para. 692 above, the total Party costs claimed in the Arbitration amount to approximately USD 55 million – to which of course must be added the costs of the Arbitration itself.

214

3) The Claimant's claims for breach of the Energy Charter Treaty arising out of the Gas Market Measures 2014 are accepted as set out in paragraphs 652 above.

4) The Claimant's further claims for breach of the Energy Charter Treaty arising out of the Gas Market Measures 2014 are accepted as set out in paragraph 655 above.

5) All other claims by the Claimant are rejected.

6) The Respondent shall pay to the Claimant the sum of USD 167.84 million as compensation for the breach referred to in sub-paragraph 3) above.

7) The Respondent shall pay to the Claimant the sum of USD 16.1 million as compensation for the breach referred to in sub-paragraph 4) above.

8) The sums referred to in sub-paragraphs 6) and 7) shall carry simple interest at a rate of LIBOR + 2% from 1 April 2014 until the date of issue of this Award.

9) The costs of the Arbitration shall be borne as to 60% by the Respondent, and as to 40% by the Claimant.

10) The Claimant's costs in respect of the Respondent's Rule 41(5) Application shall be reimbursed by the Respondent, in the amount of EUR 856,308.69.

11) As from the date of issue of this Award until the date of payment, the amounts referred to in paragraphs 6), 7), 9) and 10) above shall carry simple interest at the same rate as is specified in paragraph 8) above. For any period of time after LIBOR ceases to be operative, the rate to be applied in its place will be whatever rate is generally considered equivalent to LIBOR in respect of sums due in US dollars.

Sub-paragraphs 1), 2), 4), 5), 7), 9) and 10) above are decided unanimously; sub-paragraphs 3), and 6) by majority.

_Welli W. Park_

Prof. William W. Park
Arbitrator

Date:   3 July 2022

_Bull Stern_

Prof. Brigitte Stern
Arbitrator

Date:   3 July 2022

Sir Franklin Berman QC
President of the Tribunal

Date: 3 July 2022